**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et at.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

---

## NOTICE OF ERRATA

On Friday, June 7, 2019, Federal Defendants filed its response to Defendant-Intervenors'

motion to compel. *See* ECF No. 392. Federal Defendants' filing omitted the appendix of

declarations and unpublished authorities required by Rule 7 of Judge Hanen's Civil Procedures.

That appendix is now filed as an attachment to this notice.

//

//

//

Dated: June 10, 2019

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section

Attorneys for Federal Defendants

Respectfully submitted,

*/s/ Jeffrey S. Robins*
JEFFREY S. ROBINS
Attorney-in-Charge
Deputy Director
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Washington, DC 20044
Telephone: (202) 616-1246
Facsimile: (202) 305-7000
jeffrey.robins@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on June 10, 2019, this document was electronically filed with the Clerk of the Court using CM/ECF system, which will send notifications of such filings to all counsel of record.

*/s/ Jeffrey S. Robins*
JEFFREY S. ROBINS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et at.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

---

**APPENDIX OF DECLARATIONS AND UNPUBLISHED AUTHORITIES**

Pursuant to this Court's Civil Procedure, Rule 7, Federal Defendants hereby provide the

Court with the following appendix of declarations and unpublished authorities cited in its

response to Defendant-Intervenors' motion to compel:

| TAB | DECLARATIONS | PAGE # |
|---|---|---|
| A | Declaration of Tracy L. Renaud, Acting Deputy Director of USCIS | Fed. Defs. 001 |
| B | Donald J. Monica, Adjudications Branch Division Chief for the Service Center Operations Directorate within USCIS | Fed. Defs. 014 |
| C | Michael Hoefer, Chief of Office of Performance and Quality within USCIS | Fed. Defs. 030 |
| D | Tracy A. Bellisime, Associate Center Director for the Records Management Operations Branch, National Records Center for USCIS | Fed. Defs. 036 |

| TAB | UNPUBLISHED AUTHORITIES | PAGE # |
|:---:|---|---|
| 1. | *Kilmon v. Saulsbury Indus., Inc.,* No. MO:17-CV-99, 2018 WL 5800757 (W.D. Tex. Feb. 28, 2018) | Fed. Defs. 042 |
| 2. | *Montoya v. State Farm Lloyds*, No. 7:14-CV-182, 2015 WL 12940020 (S.D. Tex. Jan. 27, 2015) | Fed. Defs. 050 |
| 3. | *Small v. Amgen, Inc.*, No. 212CV476FTM29MRM, 2016 WL 7228863 (M.D. Fla. Sept. 28, 2016) | Fed. Defs. 058 |
| 4. | *Baker v. Holder,* No. 06-CV-91-HRW, 2010 WL 1334924 (E.D. Ky. Mar. 30, 2010) | Fed. Defs. 082 |
| 5. | *Guajardo v. Martinez*, No. 2:14-CV-450, 2015 WL 12831683 (S.D. Tex. Dec. 22, 2015) | Fed. Defs. 090 |
| 6. | *Adame v. Refugio County,* No. 2:16-CV-139, 2018 WL 1918656 (S.D. Tex. Apr. 24, 2018) | Fed. Defs. 093 |

# Tab A

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>              Plaintiffs,<br><br>       v.<br><br>KIRSTJEN M. NIELSEN, *et al.*,<br><br>              Defendants,<br><br>*and*<br><br>KARLA PEREZ, *et al.*,<br><br>              Defendant-Intervenors. | Case No. 18-cv-00068 |

## DECLARATION OF TRACY L. RENAUD

I, Tracy L. Renaud, hereby make the following declaration with respect to the above captioned matter.

1. I am the Acting Deputy Director of U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security. I began serving as the Acting Deputy Director on March 5, 2018. I also formerly served as the Acting Deputy Director of USCIS between January and October 2017.

2. As the Acting Deputy Director of USCIS, I am responsible, along with the Director, for overseeing approximately 19,000 federal employees and contractors, handling approximately 26,000 immigration benefit applications, petitions, and other requests on an average day.

1

3. Prior to March 2018, I served as the Associate Director of the Management Directorate within USCIS.

4. I make this declaration on the basis of my personal knowledge and information made available to me at this time during the course of my official duties.

**Limitations on Information Captured in USCIS Databases**

5. USCIS began accepting initial DACA requests on August 15, 2012, and began accepting DACA renewal requests on June 4, 2014.

6. The Computer Linked Application Information Management System (CLAIMS 3) and the Electronic Immigration System (ELIS) are electronic case management systems that USCIS uses to process certain immigration requests. From the inception of the DACA policy in 2012 until November 2015, all DACA requests were manually data entered into and processed in CLAIMS 3. See the publicly available Privacy Impact Assessment for CLAIMS 3 (DHS/USCIS/PIS-06(a)), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-claims3appendixupdate-may2018.pdf.  On November 1, 2015, USCIS began ingesting some DACA requests in ELIS.  In February 2016, USCIS transitioned to ELIS for the ingesting and processing of all newly filed DACA requests.  *See* the publicly available Privacy Impact Assessment for ELIS (DHS/USCIS/PIA-056 ELIS), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-elisappendixupdate-may2018.pdf.

7. Based on its ordinary business practices, USCIS maintains electronic and/or paper copies of its initial and renewal DACA decisions and its Requests for Evidence (RFEs) in DACA cases.  However, USCIS' case management systems do not electronically capture the underlying basis (bases) for denial of an initial or renewal DACA request or the basis (bases)

2

Fed. Defs. 003

on which a Request for Evidence (RFE) was sent, in a manner that can be systematically and reliably obtained.

8.  Individual case-by-case review of the electronic and/or paper files for over approximately 19,000 DACA requests (approximately 17,000 denied initial requests and approximately 2,000 denied renewal requests from Plaintiff States) to determine the underlying basis (bases) for the denials would be a highly burdensome undertaking.  Case-by-case review may also require further consultation with the adjudicator who rendered the decision. For each case requiring paper A-file review, many variables would impact the time it would take for the A-file to be transferred to an officer for review, including the current location of the A-file and whether it is in use by another DHS component or another USCIS office. Assuming most paper A-files that would be needed for this review are located at USCIS' National Records Center (NRC) and not otherwise currently needed by another DHS component or USCIS office, USCIS estimates that it would take approximately 15 business days from the date the A-file is requested, to the date it is received by an officer for review. USCIS further estimates that manual review of a paper A-file or electronic record to determine the underlying basis for denial, including an assessment of the evidence upon which the officer made the denial determination, would take approximately 20 minutes per case.   Therefore, USCIS estimates that individual case-by-case review of the electronic and/or paper files for over approximately 19,000 DACA requests would take more than approximately 6,300 hours to complete.

9.  Individual case-by-case review of the electronic and/or paper copies of the Requests for Evidence (RFEs) sent for over approximately 60,100 initial and renewal DACA requests (approximately 50,600 initial requests received RFEs and approximately 9,500 renewal

Fed. Defs. 004

requests received RFEs) to determine the basis (bases) for sending the RFE would also be an unduly burdensome undertaking.  USCIS estimates that it would take approximately five minutes per case to retrieve and review an electronic copy of the RFE, in order to determine the basis (bases) on which the RFE was sent.  To conduct this case-by-case electronic review for approximately 60,100 requests would take more than approximately 5,008 hours to complete.  Not all RFEs are available for review electronically, therefore the time required to complete this task would increase significantly depending on the number of physical A-files that would need to be retrieved and reviewed.

10. A response to Part 3, Question 4 on the Form I-821D is not required in order for USCIS to accept and process the Form I-821D.  USCIS officers review the evidence submitted with the request to determine the requestor's status on June 15, 2012.  A DACA requestor may have left the response to Part 3, Question 4 blank, handwritten a response to the question, or selected one of three standard responses available in a dropdown box that is available when completing the electronic PDF version of the Form I-821D.  The three standard responses that a DACA requestor may select in the dropdown box for Part 3, Question 4 are: "Status Expired," "Parole Expired," or "No Lawful Status".  Therefore, an electronic Form I-821D record in either CLAIMS 3 or ELIS may have a blank response for this question, or the response entered by the requestor on the Form I-821D may not have been in a format that was recordable electronically given USCIS electronic formatting limitations.  Additionally, CLAIMS 3 does not electronically capture the standard, dropdown, responses to Part 3, Question 4, on the Form I-821D, and ELIS does not capture this information in a complete manner.  Accordingly, individual, case-by-case review would be necessary to obtain this information.

4

11. Individual case-by-case review of ELIS records, an electronic copy of the Form I-821D, or the original paper version of the Form I-821D if an electronic copy is not available, for over approximately 156,000 requests to determine which of the three standard dropdown responses to Part 3, Question 4 is applicable to the requestor for ELIS and CLAIMS 3 cases, and the response to Part 3, Question 5a for CLAIMS 3 cases, would take approximately 10 minutes per case, for a total of approximately 26,000 hours.  For any cases that require paper review of the original Form I-821D, USCIS estimates that it would take approximately 15 days for an officer to receive the A-file for review after it is requested, assuming the A-file is located at the NRC and not otherwise currently needed by another DHS component or USCIS office.

12. USCIS databases do not electronically capture the underlying statutory basis for which an individual is eligible for adjustment of status to lawful permanent residence in a manner that can be systematically obtained.

13. USCIS estimates that individual case-by-case review of the electronic and/or paper records of more than approximately 7,000 individuals to determine the underlying statutory eligibility basis for adjustment of status to lawful permanent residence would take approximately five minutes per case, for a total of approximately 583 hours to complete.  While it is possible some of the records for these cases have been digitized and therefore the records could be requested and obtained electronically for review quickly, additional time would be required to obtain the paper A-file for cases that have not been digitized. For paper A-files that need to be transferred to an officer for review, USCIS estimates that it would take approximately 15 days for an officer to receive the A-file after it is requested, assuming the A-file is located at the NRC and not otherwise currently needed by another DHS component or USCIS office.

Fed. Defs. 006

14. Individual case-by-case review of electronic or paper records would require the diversion of officers and employees from other mission critical work. To the extent officers would need to review certain paper records, the files would need to be located and transferred, if even possible in every case, to the officer, which may take considerable time as such files are frequently in use by other DHS officers, such as U.S. Immigration and Customs Enforcement (ICE) trial attorneys in removal proceedings.

15. Many of the officers who would have to manually review the electronic and paper records on each case to determine the reasons for denial, RFE, or the responses selected on the Form I-821D to Part 3, Question 4 and 5a, would likely need to be diverted from reviewing, processing, and adjudicating DACA requests or immigration benefit requests, including potentially the review and resolution of background check hits and/or other security vetting procedures. Those ongoing operations would be significantly and detrimentally affected if adjudicators were diverted to work on this burdensome discovery.

**Burden of Document Collection**

16. USCIS has identified more than approximately 65 potential non-attorney custodians throughout the agency in numerous components and directorates, including Service Center Operations (SCOPS), the Office of Intake and Document Production (OIDP), the Fraud Detection and National Security Directorate (FDNS), the Field Office Directorate (FOD), the Office of Policy & Strategy (OP&S), the Office of Public Affairs (OPA), the Office of Management Executive Secretariat (Exec Sec), the External Affairs Directorate (EXA), and the Office of Legislative and Intergovernmental Affairs (OLIA). USCIS has identified an additional approximately 59 potential custodians who are current agency counsel in the USCIS Office of the Chief Counsel. USCIS has also identified at least 12 potential

6

custodians who are no longer employees of USCIS, approximately 8 of whom were former agency counsel.

17. Due to multiple unknown variables involved, the USCIS Office of Information Technology (OIT) is unable to provide a reliable estimate of the number of hours it would take to conduct a comprehensive search and collection of potentially responsive email records of current and former USCIS employees. This type of comprehensive collection requires, at a minimum, the following steps:

> Step 1: Searching of user archives using search terms and six-year data range. In order to search from 2012 to 2018 requires OIT to query every user archive for base searches to ensure the most complete results;

> Step 2: Accepting the results;

> Step 3: Deduplication and exporting the results to a server;

> Step 4: Transferring the files from the initial server to a forensic server;

> Step 5: Replicating the files to a second forensic server;

> Step 6: Replicating the files onto an encrypted DOJ hard drive.

18. OIT estimates that Step 1 could take approximately 6 to 8 hours per custodian to complete, due to the number of archives that would need to be searched to cover the six year time frame. In order not to inadvertently exclude potentially responsive documents, the keywords selected for searching emails would be so broad, *e.g.,* "DACA" or "deferred action," that they would likely result in an enormous volume in the hundreds of thousands of documents. Due to server limitations, OIT can run no more than 4 custodian searches simultaneously. Accordingly, OIT estimates that it would take approximately 204 to 272 hours to complete Step 1 for 136 custodians.

Fed. Defs. 008

19. The time estimate for completing Step 2 is impossible to reliably determine due to the unknown volume of results. At a minimum, OIT estimates that accepting the results could take approximately an hour per search, or approximately 136 hours for 136 custodians.

20. Likewise, the time estimate for completing Step 3 is impossible to reliably determine. Due to software limitations, OIT can export no more than four sets of files at a time across the entire application. Files are queued for export on a first in, first out basis, so if exports are already being run for other cases, the files for this case would be placed at the end of the queue, and therefore the exporting process for this case would be slowed significantly depending on the volume of files queued for export in other cases. A high volume of exports for this case would likewise significantly negatively impact OIT's ability to effectively comply with discovery requests in other USCIS litigation. Due to the large potential archive list, broad date range, and possible number of duplicates, OIT estimates that Step 3 would take approximately 1.5 hours per custodian to complete, or approximately 204 hours for 136 custodians.

21. It is also impossible to reliably estimate the time burden for completing Steps 4 through 6 as the burden entirely depends on the number of file results that remain after deduplication. Each transfer and replication step takes approximately 15 minutes per 1.5 GB to complete. If only 1.5 GB of email data per custodian remained after deduplication, it would take approximately 45 minutes per custodian to complete Steps 4 through 6, or approximately 102 hours for 136 custodians. However, in light of the six year date range of the discovery requests and the broad search terms that would need to be used to conduct the search, 1.5GB is a very low benchmark for this calculation. It is likely that many custodians would have three to four times as much data to be transferred.

Fed. Defs. 009

22. This overall estimate of approximately 493 to 561 hours to complete email searches and data transfers for 136 custodians is an exceedingly low estimate that assumes near perfect technological processing at every step.  Due to the high likelihood that custodians would have significantly more data to be transferred than the 1.5GB benchmark used above, as well as the high likelihood that data transfer speed would not be perfect, it is likely that the total time required to complete a search, collection, and transfer of this magnitude and complexity would be at least three to four times the number of hours indicated above.

23. Additionally, USCIS is not able to recover with 100% accuracy all emails that were sent or received prior to August 16, 2014.  Prior to this date, emails were maintained in individual user records, rather than through journaling on a server.  Therefore, emails sent or received prior to August 16, 2014, which were deleted by an individual user, may be unrecoverable. In limited circumstances, deleted emails sent or received prior to August 16, 2016, may be recoverable if captured in the individual's archive or in another user's archive, but it can be very burdensome and time consuming to retrieve emails from individual user archives depending on where the archives are located. Deleted emails sent or received prior to August 16, 2016, may also be recoverable if captured on USCIS email backup tapes before the email was deleted, however the process to restore back-up tapes is unduly burdensome, expensive, and would take information technology staff resources away from their core mission. Accessing these emails would require approximately 250 to 575 hours of active work per email account, plus additional time in transit from the storage site to the work site.

24. Documents only maintained locally on a former employee's hard drive cannot be recovered if the computer has been reimaged and reissued to another user.  Documents maintained on a former employee's share drive may be recovered if the share drive data was maintained on

9

the local office's server.  The burden of retrieving data from both current and former

employees' personal share drive and/or local drive, and transferring this data to the

Department of Justice (DOJ), and the burden of reviewing these records for responsiveness

and privileges, depends entirely on the amount of data obtained.  Due to limitations in OIT's

ability to search within all types of data files for keywords, entire contents of folders

containing any files with relevant keywords would generally need to be extracted.  This

method typically results in significantly large amounts of data to be obtained, transferred to

DOJ, and reviewed for responsiveness and privileges.  OIT estimates that it would take a

minimum of 2 hours to complete each data transfer per custodian to USCIS' forensic server,

another 2 hours per custodian to transfer the data to the second forensic server, and an

additional 2 hours per custodian to transfer the data to an encrypted DOJ hard drive.  Four

searches and collections of this non-email data can be run simultaneously, therefore, OIT

estimates that it would take a minimum of approximately 204 hours to complete this

collection and transfer for 136 custodians.  This estimate would increase if custodians stored

potentially responsive records in multiple locations, such that OIT would need to extract

folders from both a personal share drive and a local drive.

25. If each of the approximately 65 non-agency counsel custodians were to individually attempt

to conduct comprehensive searches of his or her own emails and non-email records to locate

all responsive records, USCIS estimates that it would take more than approximately 6,000

hours combined just to locate and segregate the responsive records, not including the time for

transferring large amounts of data to the Department of Justice (DOJ), and the time for

review of the documents for responsiveness and privileges by agency counsel.  This time

burden would increase significantly if an additional approximately 59 agency counsel

Fed. Defs. 011

custodians were to individually attempt to conduct comprehensive email searches of his or her own emails and non-email records to locate all responsive records.  Individual searches by each custodian would require the diversion of officers and employees from other mission critical work.

26. All the time burden estimates regarding email and non-email record collection would increase if additional custodians are identified.

Fed. Defs. 012

I certify, to the best of my knowledge and belief that content in this declaration is true and correct.

Executed this 6th day of July of 2018.

Tracy L. Renaud

# Tab B

# Exhibit B

Fed. Defs. 014

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>               Plaintiffs,<br><br>       v.<br><br>KIRSTJEN M. NIELSEN, *et al.*,<br><br>               Defendants,<br><br>*and*<br><br>KARLA PEREZ, *et al.*,<br><br>               Defendant-Intervenors. | Case No. 18-cv-00068 |

## DECLARATION OF DONALD J. MONICA

I, Donald J. Monica, hereby make the following declaration with respect to the above captioned matter.

1. I am employed by the Department of Homeland Security ("DHS") as the Adjudications Branch Division Chief for the Service Center Operations Directorate (SCOPS) within U.S. Citizenship and Immigration Services (USCIS). I have been in the Division Chief position since March 31, 2019. I have been employed by USCIS and its predecessor agency, the Immigration and Naturalization Service, since May 1980. As the Adjudications Branch Division Chief, I oversee all planning, management, and operational functions of the Division, including providing guidance for the review and decision making process for Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

1

2.  I make this declaration on the basis of my personal knowledge and information made available to me at this time during the course of my official duties.

3.  I understand that on June 13, 2018, Defendant-Intervenors propounded their Third set of Discovery Requests for Defendants. Defendant-Intervenors' Third Set of Disc. Req. to Def., Dkt. 80-3.

4.  I understand that on July 7, 2018 Defendants served a response on Defendant-Intervenors, which responded in part to Interrogatories Nos. 9-12 and objected to responding to the subparts of those interrogatories, as well as part of Interrogatory No. 13, as burdensome, among other objections. I further understand that Defendants' discovery response objected to Request for Production No. 7 as overbroad and burdensome, among other objections.

5.  I understand that on February 20, 2019, Defendants served a supplemental response on Defendant-Intervenors providing data in response to Interrogatories Nos. 3, 4, and 9 – 14 with respect to Plaintiff-State Mississippi.

6.  I also understand that on May 17, 2019, Defendant-Intervenors filed a Motion to Compel Defendants to respond to Interrogatories Nos. 9 -13 and produce documents responsive to Request for Production No. 7(3).

7.  All estimates provided below are based on best-case scenarios, assuming no unusual situations or circumstances arise.

**Burdens of Collecting and Manually Reviewing Records to Obtain Data Sought in Interrogatories Nos. 9-13 and Documents Sought in Request for Production 7(3)**

8.  Paragraphs 5-7 of the Declaration of Tracy Renaud, dated July 6, 2018, ("Renaud Decl.") explain the manual file review that would be required for USCIS to respond to the subparts of Interrogatories Nos. 9-12 and to Interrogatory No. 13 (except for responses to Part 3, Question 5a for cases processed in the USCIS Electronic Immigration System (ELIS)),

2

because USCIS' case management systems do not electronically capture the data Defendant-Intervenors seek in the normal course of business in a manner that can be reliably provided. Paragraphs 8-11 of the Renaud Decl. further detail the extraordinary time burden that would be necessary to conduct a manual file review of hundreds of thousands of records, and Paragraphs 16-26 detail the significant burden involved to conduct a comprehensive search for documents responsive to Request for Production No. 7(3), as the request is not conducive to a narrowly tailored keyword search. The approximate total number of requests to be reviewed and total estimated time burdens have been updated below to include the addition of Plaintiff State Mississippi.

9. For purposes of determining the basis (bases) for initial or renewal DACA denial (Interrogatories Nos. 9-10) from each Plaintiff State between June 2012 and June 2018, USCIS would need to gather records from the Alien File (A-file), the ELIS database, and/or any relevant systems information, including but not limited to emails on adjudicative guidance in Outlook, notices and correspondence in the Enterprise Correspondence Handling Online (ECHO) system, and records from TECS, EARM, and/or EAGLE. USCIS would then need to identify whether any of the A-files for the selected individuals are in electronic format and accessible in agency systems, such as the Enterprise Document Management System A-file repository (EDMS), and determine the location of the paper A-file for all others, because they will reside at different locations throughout the country. Not all A-files will be immediately available to USCIS for purposes of this review as they may be in use by other DHS components or other USCIS offices. Individual, manual case-by-case review of the electronic and/or paper records for approximately 19,730 denied DACA requests (approximately 17,582 denied initial requests and approximately 2,148 denied renewal

Fed. Defs. 017

requests for Plaintiff States from June 2012 to June 2018) to determine the underlying basis

(bases) for the denials and whether the request was denied "at least in part because the

applicant was a suspected gang member[,] . . . posed a threat to national security or public

safety[,]" or was denied "after the adjudicator determined the applicant met the five criteria

outlined in the 2012 DACA memorandum[,]" would be a highly burdensome undertaking.

10. Furthermore, the bases for denial identified in Interrogatories Nos. 9-10 are not necessarily

mutually exclusive and/or conducive to clear categorization.  For example, generally an

individual who is a suspected gang member may also be considered to pose a threat to public

safety.  Additionally, a suspected gang member with disqualifying convictions may have

been issued a denial notice referencing the disqualifying convictions. Accordingly, it will

likely be difficult to reconstruct and consistently determine all the applicable reasons an

officer denied a request a year or more after the adjudication. Case-by-case review to answer

these questions may also require further consultation with the adjudicator who rendered the

decision, who may not be available for consultation and/or may not recall the specific

adjudication.

11. For each case requiring paper A-file review, USCIS would need to first determine the

location of the paper A-file, because A-files will reside at different locations throughout the

country and each A-file would need to be manually requested for transfer. Many variables

would impact the time it would take for the A-file to be transferred to an officer for review,

including the current location of the A-file and whether it is in use by another DHS

component or another USCIS office. If the A-file is in use by another USCIS or DHS office

and cannot be released immediately, USCIS would need to wait for the physical A-file to be

released to an officer/employee for purposes of this review, which could be months.

4

Assuming most paper A-files that would be needed for this review are located at USCIS'
National Records Center (NRC) and not otherwise currently needed by another DHS
component or USCIS office, USCIS estimates that it would take approximately 15 business
days from the date the A-file is requested, to the date it is received by a USCIS officer for
review.

12. USCIS further estimates that once all relevant information is gathered, electronically and/or
physically, including from relevant systems, and the record is before the officer conducting
the review, manual review of the paper A-file and/or electronic record to determine the
underlying basis (bases) for denial, including an assessment of the evidence upon which the
officer made the denial determination, would take anywhere from approximately 20 to 90
minutes per case, depending on the complexity of the case and the volume of the record.
Therefore, USCIS estimates that individual case-by-case review of the electronic and/or
paper files for over approximately 19,730 DACA requests could take anywhere between
approximately 6,577 hours and 9,866 hours to complete.

13. For purposes of determining the basis (bases) for an initial or renewal Request for Evidence
(RFE) (Interrogatories Nos. 11-12), USCIS would need to access a copy of the RFE. If the
RFE was created in ECHO, an officer would access an electronic copy and confirm in ELIS
or CLAIMS 3 that the notice was issued and mailed. Individual case-by-case review of the
electronic and/or paper copies of the RFEs sent for approximately 60,853 initial and renewal
DACA requests (approximately 51,283 initial requests received RFEs and approximately
9,570 renewal requests received RFEs for Plaintiff States from June 2012 to June 2018) to
determine the basis (bases) for sending the RFE would also be an unduly burdensome
undertaking. USCIS estimates that it would take approximately five minutes per case to

5

retrieve and review an electronic copy of the RFE, in order to determine the basis (bases) on which the RFE was sent.  To conduct this case-by-case electronic review for approximately 60,853 requests would take more than approximately 5,071 hours to complete.  However, not all RFEs are available for review electronically, therefore the time required to complete this task would increase significantly depending on the number of physical A-files that would need to be retrieved and reviewed.  USCIS is not able to estimate the number of RFEs that are not electronically available and therefore is not able to estimate the number of physical A-files that would need to be retrieved and reviewed, however the steps and time burden described in Paragraph 11 above regarding locating and requesting individual A-files for transfer to an officer for review would still apply.

14. As explained in Paragraph 10 of the Renaud Decl., a response to Part 3, Question 4 on the Form I-821D (Interrogatory 13) is not required in order for USCIS to accept and process the Form I-821D.  USCIS officers review the evidence submitted with the request to determine the requestor's status on June 15, 2012.  A DACA requestor may have left the response to Part 3, Question 4 blank, handwritten a response to the question, or selected one of three standard responses available in a dropdown box that is available when completing the electronic PDF version of the Form I-821D.  The three standard responses that a DACA requestor may select in the dropdown box for Part 3, Question 4 are: "Status Expired," "Parole Expired," or "No Lawful Status".  Therefore, an electronic Form I-821D record in either CLAIMS 3 or ELIS may have a blank response for this question, or the response entered by the requestor on the Form I-821D may not have been in a format that was recordable electronically given USCIS electronic formatting limitations.  CLAIMS 3 does not electronically capture the standard, dropdown responses to Part 3, Question 4, on the

Fed. Defs. 020

Form I-821D, and ELIS does not systematically capture this data in a manner that can be reliably provided. Additionally, as explained in Note 2 of the Chart previously provided in response to Interrogatory No. 13, CLAIMS 3 does not electronically record the response to Part 3, Question 5a; only cases processed in ELIS contain this information electronically. Accordingly, manual, individual, case-by-case review would be necessary to obtain this information.

15. For purposes of determining the response provided on approved initial DACA requests to Part 3, Question 4 for approvals processed in ELIS and CLAIMS 3, and Part 3, Question 5a for approvals processed in CLAIMS 3, USCIS would need to review the individual case in ELIS, access a copy of the Form I-821D retained in the EDMS database, or locate and review the paper Form I-821D in the A-file if not available elsewhere. Individual case-by-case review of ELIS records, a digitized version of the Form I-821D, or the original paper version of the Form I-821D, for approximately 157,763 approved requests to determine which of the three standard dropdown responses to Part 3, Question 4 is applicable to the requestor for ELIS and CLAIMS 3 cases, and the response to Part 3, Question 5a for CLAIMS 3 cases, would take approximately 10 minutes per case, for a total of approximately 26,294 hours. For any cases that require paper review of the original Form I-821D, USCIS would need to first determine the location of the paper A-file, because A-files will reside at different locations throughout the country and each A-file would need to be manually requested for transfer. USCIS estimates that it would take approximately 15 days for an officer to receive the A-file for review after it is requested, assuming the A-file is located at the NRC and not otherwise currently needed by another DHS component or USCIS office. USCIS is not able

Fed. Defs. 021

to estimate the number of cases for which an electronic copy of the Form I-821D would not be available.

16. Individual case-by-case review of electronic and/or paper records to extract the data sought in Interrogatories Nos. 9-13 would require the diversion of officers and employees from other mission critical work. To the extent officers/employees would need to review certain paper records, the files would need to be located and transferred, if even possible in every case, to the officer/employee, which may take considerable time as such files are frequently in use by other DHS offices, such as U.S. Immigration and Customs Enforcement (ICE) trial attorneys in removal proceedings.  USCIS may not be able to obtain certain A-files if they are actively in use by another office, which may make the review necessary to determine the basis (bases) for denial or RFE nearly impossible.

17. Many of the officers/employees who would have to manually review the electronic and/or paper records on each case to determine the reasons for denial, RFE, or the responses selected on the Form I-821D to Part 3, Questions 4 and 5a, would likely need to be diverted from reviewing, processing, and adjudicating DACA requests or immigration benefit requests, including potentially the review and resolution of background check hits and/or other security vetting procedures, as these individuals are most familiar with the Form I-821D and the DACA adjudications process. Those ongoing operations would be significantly and detrimentally affected if adjudicators were diverted to work on this burdensome discovery, with the potential to significantly negatively impact and delay the adjudication of DACA requests, which could lead to other burdensome litigation against USCIS.

8

Fed. Defs. 022

**Burdens of Identifying, Collecting, Converting, Reviewing, and Redacting a Sample of
Denials, RFEs, and Approvals for Production to Defendant-Intervenors**

18. As explained in the Declaration of Michael Hoefer (Hoefer Decl.), dated June 7, 2019, in

order to obtain a sample of DACA denials, RFEs, and approvals for purposes of responding

to Interrogatories Nos. 9-13, USCIS' Office of Performance and Quality ("OPQ") would first

identify a sample of 1,960 receipt numbers across the five Interrogatory categories.

19. As explained in Paragraphs 9-12 above, for purposes of determining the basis (bases) for

denial of a sampling of initial and renewal DACA denials and whether the request was

denied "at least in part because the applicant was a suspected gang member[,] . . . posed a

threat to national security or public safety[,]" or was denied "after the adjudicator determined

the applicant met the five criteria outlined in the 2012 DACA memorandum[,]"

(Interrogatories Nos. 9-10), USCIS would need to gather records from the A-file, the ELIS

database, and/or any relevant systems information, including but not limited to emails on

adjudicative guidance in Outlook, notices and correspondence in ECHO, and records from

TECS, EARM, and/or EAGLE.  USCIS would then need to identify whether any of the A-

files for the selected individuals are in electronic format and accessible in agency systems,

such as the EDMS A-file repository, and determine the location of the paper A-file for all

others, because they will reside at different locations throughout the country. Not all A-files

will be immediately available to USCIS for purposes of this review as they may be in use by

other DHS components or other USCIS offices. USCIS would either need to wait for the

physical A-file to be released to an officer/employee for purposes of this review, which could

be months, or would need to replace the receipt number in the sample with a new randomly

selected receipt number.  As explained in the Hoefer Decl., replacing the receipt number has

the potential to impact the overall randomness of the sample. As explained in the Declaration

of Tracy A. Bellisime (Bellisime Decl.), dated June 7, 2019, available physical A-Files and Temporary A-Files (T-files) that are not digitized will need to be shipped to a central location where they can be scanned and saved electronically. ELIS records and relevant systems information would also need to be accessed, exported, and saved electronically.

20. As explained in Paragraph 13 above, for purposes of determining the basis (bases) for an initial or renewal RFE (Interrogatories Nos. 11-12), for each receipt number selected for the sampling, USCIS would need to access a copy of the RFE.  If the RFE was created in ECHO, an officer would need to access an electronic copy and confirm in ELIS or CLAIMS 3 that the notice was issued and mailed. If USCIS systems confirm the notice was mailed, USCIS would need to save an electronic copy of the RFE from ECHO into a central location. However, not all RFEs are available for review electronically, therefore the time required to complete this task would increase significantly depending on the number of physical A-files that would need to be retrieved and reviewed.  As explained in the Bellisime Decl., available physical A-Files and Temporary A-Files (T-Files) that are not digitized will need to be shipped to a central location where they can be scanned and saved electronically.

21. As explained in Paragraph 14 above, for purposes of determining the response provided on approved initial DACA requests to Part 3, Question 4 for cases processed in ELIS and CLAIMS 3, and Part 3, Question 5a for cases processed in CLAIMS 3, for each receipt number selected for the sampling (Interrogatory 13), USCIS would need to export information on the individual case from ELIS or access a copy of the Form I-821D in EDMS and save an electronic copy of the records into a central location, or locate the A-file and transfer the A-file to the NRC to scan the paper copy of the Form I-821D (if available).

Fed. Defs. 024

22. As explained in the Bellisime Decl., the scanned version of the A-files and/or Form I-821D, will need to be electronically saved to a central location in order to be transferred to the Department of Justice (DOJ) on an encrypted drive for loading into DOJ's document review platform. Additionally, a copy of all other relevant electronic records from ELIS, EDMS, ECHO, TECS, EARM, EAGLE and/or other relevant systems will need to be electronically saved to a central location and transferred to DOJ.

23. Because USCIS will need to redact law enforcement sensitive, law enforcement privileged, and other privileged or protected information before providing any records to Defendant-Intervenors, *see* Bellisime Decl., in many cases Defendant-Intervenors will likely be unable to determine whether an initial or renewal DACA request was denied at least in part because the requestor was a suspected gang member or at least in part because the requestor posed a threat to national security or public safety. The denial notice generally will not explicitly state that the individual is a suspected gang member or poses a threat to national security or public safety due to the relevant information being law enforcement sensitive and/or law enforcement privileged. Accordingly, providing a sampling of cases to Defendant-Intervenors to review would not necessarily enable them to extract the information they seek regarding denials.

**Burdens of Identifying and Reviewing a Sample of Denials, RFEs, and Approvals for USCIS to Obtain Data Sought in Interrogatories Nos. 9-13**

24. The burden and process for identifying the sample would be the same as described in the Hoefer Decl., without the added step of replacing any cases covered by 8 U.S.C. 1367.

25. The process and per case time burden for collection and review of the relevant A-files and other records for the sample would be the same as described in Paragraphs 9-16 above for

Fed. Defs. 025

purposes of identifying and reviewing a sample of cases to obtain the data sought in Interrogatories Nos. 9-13.

26. For purposes of determining the basis (bases) for denial for a sampling of initial and renewal DACA denials (Interrogatories Nos. 9-10), USCIS estimates that once all relevant information is gathered, electronically and/or physically, including from relevant systems, and the record is before the officer conducting the review, manual review of the paper A-file or electronic record to determine the underlying basis (bases) for denial, including an assessment of the evidence upon which the officer made the denial determination, would take anywhere from approximately 20 to 90 minutes per case, depending on the complexity of the case and the volume of the record. Therefore, USCIS estimates that individual case-by-case review of the electronic and/or paper files for a sample size of 750 cases (400 initial denials (2.3%) and 350 renewal denials (16.3%)), *see* Hoefer Decl., could take anywhere between approximately 250 hours and 1,125 hours to complete. These approximately 250 to 1,125 hours would be in addition to the estimated approximately 15 business days it would take from the date an A-file is requested to the date it is received by an officer for review, assuming the file is located at the NRC and not in use by another DHS component or USCIS office. If the A-file is in use by another USCIS or DHS office and cannot be released immediately, USCIS would need to wait for the physical A-file to be released to an officer/employee for purposes of this review, which could be months, or would need to replace the receipt number in the sample with a new randomly selected receipt number. As explained in the Hoefer Decl., replacing the receipt number has the potential to impact the overall randomness of the sample.

Fed. Defs. 026

27. For purposes of determining the basis (bases) on which the RFE was sent for a sampling of initial and renewal RFEs (Interrogatories Nos. 11-12), USCIS estimates that it would take approximately five minutes per case to retrieve and review an electronic copy of the RFE. To conduct this case-by-case electronic review for a sample size of 800 cases (410 initial RFEs (0.8%) and 390 renewal RFEs (4.1%), *see* Hoefer Decl., would take more than approximately 66 hours to complete. As noted in Paragraph 13 above, however, not all RFEs are available for review electronically, therefore the time required to complete this task would increase significantly depending on the number of physical A-files that would need to be retrieved and reviewed. USCIS is not able to estimate the number of RFEs that are not electronically available and therefore is not able to estimate the number of physical A-files that would need to be retrieved and reviewed, however the steps and time burden described in Paragraph 11 above regarding locating and requesting individual A-files for transfer to an officer for review would still apply.

28. For purposes of determining the response provided on approved initial DACA requests to Part 3, Question 4 for approvals processed in ELIS and CLAIMS 3, and Part 3, Question 5a for approvals processed in CLAIMS 3 for a sampling of approvals (Interrogatory 13), USCIS estimates that individual case-by-case review of ELIS records, an electronic copy of the Form I-821D, or the original paper version of the Form I-821D would take approximately 10 minutes per case. To conduct this case-by-case electronic review for a sample size of 410 cases (0.03%), *see* Hoefer Decl., would take more than approximately 68 hours to complete. As described in Paragraph 15 above, for any cases that require paper review of the original Form I-821D, USCIS estimates that it would take approximately 15 days for an officer to receive the A-file for review after it is requested, assuming the A-file is located at the NRC

Fed. Defs. 027

and not otherwise currently needed by another DHS component or USCIS office. If the A-file is in use by another USCIS or DHS office and cannot be released immediately, USCIS would need to wait for the physical A-file to be released to an officer/employee for purposes of this review, which could be months, or would need to replace the receipt number in the sample with a new randomly selected receipt number.  As explained in the Hoefer Decl., replacing the receipt number has the potential to impact the overall randomness of the sample. USCIS is not able to estimate the number of cases for which an electronic copy of the Form I-821D would not be available.

29. As described in Paragraphs 11-12 above, this type of manual file review, even for a sample of cases, would likely require the diversion of significant resources from other mission critical work, with the potential to significantly negatively impact and delay the adjudication of DACA requests, which could lead to other burdensome litigation against USCIS.

14

I certify, to the best of my knowledge and belief that content in this declaration is true and correct.

Executed this 7th day of JUNE of 2019.

Donald J. Monica

# Tab C

# Exhibit C

Fed. Defs. 030

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-00068 |
| KIRSTJEN M. NIELSEN, *et al.*, | |
| Defendants, | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| Defendant-Intervenors. | |

## DECLARATION OF MICHAEL HOEFER

I, Michael Hoefer, hereby make the following declaration with respect to the above captioned matter.

1. I am employed by U.S. Citizenship and Immigration Services ("USCIS") as Chief of the Office of Performance and Quality ("OPQ"). As Chief of OPQ, I am responsible for oversight and management in producing data and operational analyses to senior USCIS decision-makers in order to promote effective and efficient decision-making, and in responding to immigration data requests from key stakeholders including Congress, DHS, other government agencies, researchers, and the general public. I have held this position since September 2015.

1

Fed. Defs. 031

2.  I make this declaration on the basis of my personal knowledge and information made available to me at this time during the course of my official duties.

3.  I understand that on June 13, 2018, Defendant-Intervenors propounded their Third set of Discovery Requests for Defendants. Defendant-Intervenors' Third Set of Disc. Req. to Def., Dkt. 80-3.

4.  I understand that on July 7, 2018 Defendants served a response on Defendant-Intervenors, which responded in part to Interrogatories Nos. 9-12 and objected to responding to the subparts of those interrogatories, as well as part of Interrogatory No. 13, as burdensome, among other objections. I further understand that Defendants' discovery response objected to Request for Production No. 7 as overbroad and burdensome, among other objections.

5.  I understand that on February 20, 2019, Defendants served a supplemental response on Defendant-Intervenors providing data in response to Interrogatories Nos. 3, 4, and 9 – 14 with respect to Plaintiff-State Mississippi.

6.  I also understand that on May 17, 2019, Defendant-Intervenors filed a Motion to Compel Defendants to respond to Interrogatories Nos. 9 -13 and produce documents responsive to Request for Production No. 7(3).

**Identifying a Sample of DACA Denials, Requests for Evidence, and Approvals to Respond to Interrogatories Nos. 9-13**

7.  In order to obtain a sample of DACA denials, Requests for Evidence (RFEs), and approvals for purposes of responding to Interrogatories Nos. 9-13, OPQ would first have to identify a sample of receipt numbers, using a statistically sound methodology designed to randomly select receipt numbers, for each of the following categories of cases for the period of June 2012 to June 2018 for Plaintiff States: initial DACA denials (Interrogatory 9), DACA renewal denials (Interrogatory 10), initial DACA RFEs (Interrogatory 11), DACA renewal

2

RFEs (Interrogatory 12), and initial DACA approvals (Interrogatory 13). The preliminary estimates of the five sample sizes for each Interrogatory are: initial DACA denials (Interrogatory 9) 400 or 2.3% of the total initial denials during the specified period for Plaintiff States; DACA renewal denials (Interrogatory 10) 350 or 16.3%; initial DACA RFEs (Interrogatory 11) 410 or 0.8%; DACA renewal RFEs (Interrogatory 12) 390 or 4.1%; and initial DACA approvals (Interrogatory 13) 410 or 0.3%. The total number of sample records for the five populations is estimated to be 1,960.

8. The sample size estimates were calculated for proportions assuming the 95% confidence level and a precision of +/- 5% using the normal approximation and finite population correction factors. However, some of the characteristics of the DACA population that Defendant-Intervenors are attempting to measure could be rare (less than 30 receipts for any measured characteristic) and would not follow the normal approximation for variance estimation. As a result, the value of any conclusions about the broader population derived from a review of these samples may be limited due to the imprecision of the estimate.

9. Once the initial sample of randomly selected receipt numbers are identified, USCIS would need to identify whether any of the individuals selected are covered by 8 U.S.C. 1367. If any randomly selected individuals are covered by this confidentiality provision, USCIS would not be able to provide the A-file or any other information about those individuals to Defendant-Intervenors, and would instead replace the receipt number in the sample with another randomly selected receipt number. Replacing the receipt number in the sample because the individual is covered by 8 U.S.C. 1367 or because the A-file selected for the sample cannot be immediately released for review has the potential to impact the overall randomness of the sample.

Fed. Defs. 033

10. Based on past experience, USCIS estimates that it would take approximately 16 hours to identify the sample of cases for each category, identify whether any of the individuals are covered by 8 U.S.C. 1367, and replace the receipt numbers for affected individuals with another randomly selected receipt number. This estimate is based on a best-case scenario, assuming no unusual situations or circumstances arise.

11. It would not be possible to reduce the number of individual records to be reviewed by selecting a sample that would allow a single file to be reviewed for multiple interrogatories, as this type of selection would violate the random selection process and all the estimates would be invalid.

4

I certify, to the best of my knowledge and belief that content in this declaration is true and correct.

Executed this $\underline{7}$ th day of $\underline{June}$ of 2019.


_____
Michael Hoefer

5

Fed. Defs. 035

# Tab D

# Exhibit D

Fed. Defs. 036

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,

              Plaintiffs,

      v.

KIRSTJEN M. NIELSEN, *et al.*,

              Defendants,

*and*

KARLA PEREZ, *et al.*,

              Defendant-Intervenors.

Case No. 18-cv-00068

## DECLARATION OF TRACY A. BELLISIME

      I, Tracy A. Bellisime, hereby make the following declaration with respect to the above captioned matter.

1. I am the Associate Center Director for the Records Management Operations Branch (RMOB), National Records Center (NRC) for U.S. Citizenship and Immigrations Services (USCIS).  I have held this position since November of 2017.  In this position, I oversee the contract performance for the records contract for the NRC.   This includes file movement, maintenance and scanning.

2. I make this declaration on the basis of my personal knowledge and information made available to me at this time during the course of my official duties.

1

3. I understand that on June 13, 2018, Defendant-Intervenors propounded their Third set of Discovery Requests for Defendants. Defendant-Intervenors' Third Set of Disc. Req. to Def., Dkt. 80-3.

4. I understand that on July 7, 2018 Defendants served a response on Defendant-Intervenors, which responded in part to Interrogatories Nos. 9-12 and objected to responding to the subparts of those interrogatories, as well as part of Interrogatory No. 13, as burdensome, among other objections. I further understand that Defendants' discovery response objected to Request for Production No. 7 as overbroad and burdensome, among other objections.

5. I understand that on February 20, 2019, Defendants served a supplemental response on Defendant-Intervenors providing data in response to Interrogatories Nos. 3, 4, and 9 – 14 with respect to Plaintiff-State Mississippi.

6. I also understand that on May 17, 2019, Defendant-Intervenors filed a Motion to Compel Defendants to respond to Interrogatories Nos. 9 -13 and produce documents responsive to Request for Production No. 7(3).

**Burdens of Collecting, Consolidating, and Scanning Alien Files**

7. In order to produce copies of Alien Files (A-files) and paper Form I-821Ds to Defendant-Intervenors, available physical A-files and Temporary A-files (T-files) that have not been digitized will need to be shipped to a central location where they can be consolidated, scanned, and saved electronically.

8. The most efficient process for collecting, consolidating, and scanning physical A-files, T-files, and paper Form I-821Ds would be to utilize the facilities, equipment, and personnel available at the NRC in Lee's Summit, MO. Among other duties, the NRC stores over 16 million inactive A-files, and processes and responds to Freedom of Information Act requests.

Fed. Defs. 038

Because of its record-keeping function, the NRC is best positioned to collect, consolidate, and scan a sampling of records.  Based on experience, USCIS estimates that it takes approximately sixty minutes to pull, consolidate, prep, scan, and re-shelve an average-sized A-file.  If the file is located at the NRC, the cost to do so would be approximately $42.41 per file. For files that are not located at the NRC, the cost increases by an additional $25.00 to cover shipping costs. These estimates are based on a best-case scenario, assuming no unusual situations or circumstances arise. Additional resources may be needed or diverted from existing priorities in order to accomplish this scanning effort, depending on the file request volume.

9. An A-file serves as the official record of an individual's immigration history. *See also* DHS/USCIS-ICE-CBP-001 Alien File, Index, and National File Tracking System of Records, 82 Fed. Reg. 43556, 43557 (Sept. 18, 2017) (A-Files contain documents derived from the three immigration components of DHS: USCIS, U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP")). *Id.* A-files also contain information that originates elsewhere within DHS and outside of DHS.

10. A-Files generally contain information that is subject to law enforcement and other privileges. For instance, the results of background checks contained in the A-file are often law enforcement privileged. Required security checks that may be reflected in the A-file include checks of information originating with, or databases operated by the Federal Bureau of Investigation (FBI fingerprint check) and CBP (TECS). Information contained within CBP's TECS database may contain derogatory information that originates with yet other agencies, such as, but not limited to, ICE, the Transportation Security Administration, FBI, or the Department of State. Pages from additional databases, such as the Consolidated Consular

Fed. Defs. 039

Database (operated by the Department of State), or Student and Exchange Visitor Information System (operated by ICE) are often contained in A-Files. A-Files may also contain pages that originate with other agencies depending on how that individual entered the United States. A-Files may also include discussions, communications, and deliberations that are privileged, including those with agency counsel.

11. Once the consolidated A-files and/or paper Form I-821Ds are consolidated and scanned at the NRC, the scanned versions will need to be electronically saved to a central location in order to be transferred to the Department of Justice (DOJ) on an encrypted drive for loading into DOJ's document review platform.

12. Before production to Defendant-Intervenors, the sampling of A-files and other records would need to be reviewed by government counsel in DOJ's document review platform and redacted for privileges, personally identifiable information (PII), and other protected information, including information affecting equities and privileges of other agencies as well as information protected by various confidentiality statutes and regulations. Such privilege review will be a resource-intensive and time-consuming process for USCIS and other agencies whose documents and information may be included in the A-file and therefore would require review by counsel for other agencies.

Fed. Defs. 040

I certify, to the best of my knowledge and belief that content in this declaration is true and correct.

Executed this 7th day of June of 2019.

_Tracy A. Bellisime_
Tracy A. Bellisime

Fed. Defs. 041

# Tab 1

Case 1:18-cv-00068 Document 394-1 Filed on 06/10/19 in TXSD Page 45 of 99

2018 WL 5800757
Only the Westlaw citation is currently available.
United States District Court, W.D.
Texas, Midland-Odessa Division.

Michael KILMON, Individually and on
Behalf of Others Similarly Situated, Plaintiff,
v.
SAULSBURY INDUSTRIES, INC., Defendant.

No. MO:17-CV-99
|
Signed 02/28/2018

**Attorneys and Law Firms**

Matthew Scott Parmet, Parmet PC, Richard J. Burch, Bruckner Burch PLLC, Richard M. Schreiber, Andrew W. Dunlap, Jessica Marie Bresler, Lindsay R. Itkin, Michael A. Josephson, Josephson Dunlap Law Firm, Houston, TX, for Plaintiff.

Angella Hebert Myers, Cynthia K. Rigney, Janice S. Parker, The Myers Law Group, LLP, Dallas, TX, Mary Wahne Baker, Randall L. Rouse, Lynch, Chappell & Alsup, Midland, TX, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO COMPEL

DAVID COUNTS, UNITED STATES DISTRICT JUDGE

**\*1** BEFORE THE COURT is Michael Kilmon, individually and on behalf of others similarly situated's ("Plaintiff") Motion to Compel Further Responses to His First Set of Interrogatories and Requests for Production to Saulsbury Industries ("Motion to Compel Defendant"). (Doc. 33). After due consideration of the relevant pleadings, the Court finds Plaintiff's Motion to Compel Defendant shall be **GRANTED IN PART** and **DENIED IN PART**. (Doc. 33).

## I. BACKGROUND

This case arises from Plaintiff's employment with Saulsbury Industries, Inc. ("Defendant")—a leading engineering, construction, and fabrication company to heavy industrial clients across the United States. (Doc. 1 at 2). Plaintiff brings this action against Defendants individually and on behalf of other workers like him pursuant to 29 U.S.C. § 216(b). *Id.* at 1. Plaintiff alleges Defendants paid him the same hourly rate for all hours worked, including those in excess of forty in a workweek, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq. Id.* at 3.

Plaintiff filed his Collective Action Complaint on May 18, 2017. (Doc. 1). On September 13, 2017, Plaintiff filed his Opposed Motion for Conditional Certification and Notice to Putative Class Members. (Doc. 18). Plaintiff's Motion for Conditional Certification was ultimately granted by the Court on December 13, 2017. (Doc. 45). In the meantime, several discovery-related disputes arose.

Relevant to this Order, on July 24, 2017, Plaintiff propounded his First Set of Discovery on Defendant. (Doc. 33 at 1). Defendant's Objections and Responses to Plaintiff's First Set of Discovery ("Original Response") were served on September 7, 2017. (Doc. 33-1). Dissatisfied with Defendant's responses, Plaintiff prepared a deficiency letter to Defendant and the Parties conducted a telephonic conference on October 5, 2017. *Id.* Following the conference, Defendant served its First Supplemental Objections and Responses to Plaintiff's First Set of Discovery ("Supplemental Response") on October 10, 2017. (Doc. 33-4).

On October 31, 2017, Plaintiff filed the Motion to Compel at issue asserting Defendant has not supplemented its responses in good faith and such responses fail to comply with the Federal Rules of Civil Procedure. (Doc. 33). Defendant filed its Response on November 7, 2017, alleging Plaintiff failed to confer in good faith prior to filing his Motion to Compel and Defendant's responses and objections are proper. (Doc. 34). On November 14, 2017, Plaintiff filed his Reply. (Doc. 37). This matter is now ready for disposition.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 26(b) governs the scope of discovery. The rule provides that "parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional

to the needs of the case." Fed. R. Civ. P. 26(b)(1). Rule 26(b), although broad, may not be used "as a license to engage in an unwieldy, burdensome, and speculative fishing expedition." *Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1163 (5th Cir. 2010). The Court must limit discovery, if it determines, on motion or on its own, that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" or "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). In assessing the relevancy and proportionality of requested discovery, the Court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

**\*2** Federal Rule of Civil Procedure 37 controls motions to compel discovery or disclosure. Fed. R. Civ. P. 37 ("A party seeking discovery may move for an order compelling an answer, designation, production, or inspection."). Rule 37 allows such a motion when a party fails to answer an interrogatory under Federal Rule of Civil Procedure 33 or respond to a request for production under Federal Rule of Civil Procedure 34, provided such discovery requests are within the scope of Rule 26(b). *See* Fed. R. Civ. P. 37(a)(3). "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond" under Rule 37. Fed. R. Civ. P. 37(a)(4).

The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990). In response to an interrogatory under Rule 33, "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath"; "[t]he grounds for objecting to an interrogatory must be stated with specificity"; and "[a]ny ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure." Fed. R. Civ. P. 33(b)(3)–(4). In response to a Rule 34 request, "[f]or each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B).

## III. DISCUSSION

With respect to Plaintiff's First Set of Discovery, the Parties dispute: (1) whether or not Plaintiff conferred with Defendant in good faith prior to filing this Motion to Compel; (2) the propriety and application of Defendant's "general objections;" (3) the timeliness of objections raised in Defendant's Supplemental Response and whether such "specific objections" are merely boilerplate; (4) if Defendant has improperly withheld documents; and (5) the sufficiency of Defendant's responses.

### A. Confer in Good Faith

District courts typically do not appreciate having to referee discovery disputes among counsel and therefore require parties to expend efforts to resolve such disputes among themselves prior to seeking the court's involvement. Heidi K. Brown, *Fundamentals of Federal Litigation* § 16:1 (2009). Specifically, "a motion to compel must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1); Local Rule CV-7(i).

In his Motion to Compel, Plaintiff's Certificate of Conference states: "Prior to the filing of this Motion, Plaintiff's Counsel conferred with Defendant's Counsel to resolve the discovery dispute, but these attempts were unsuccessful." (Doc. 33 at 15.) The Parties agree that they met and conferred following Defendant serving its Original Response, but prior to Defendant's Supplemental Response. (Doc. 37 at 3). Plaintiff does not assert he attempted to confer with Defendant regarding the Supplemental Response, only that the "new/improper objections and the same deficient responses" prompted the filing of his Motion to Compel. *Id.*

The court may deny a motion if the movant fails to advise the court within the body of the motion that counsel for the parties have first conferred in a good-faith attempt to resolve the matter by agreement and, further, certifies the specific reason that no agreement could be made. Local Rule CV-7(i). The Plaintiff does not provide the requisite specific reason that no agreement could be reached and the Court is not convinced that the conferment requirement

has been satisfied. However, judging by the numerous discovery-related issues—both resolved and pending in this matter—it is unlikely the parties will be able to settle this dispute on their own. Therefore, the Court will rule on Plaintiff's Motion to Compel in the interest of judicial efficiency.

### B. General Objections

**\*3** In its Original Response, Defendant asserts five "General Objections" applicable to "each and every Interrogatory" in Plaintiff's First Set of Discovery. (Doc. 33-1). In its Supplemental Response, Defendant replaced this section with a "Statement Regarding Objections" in which Defendant removes the first four general objections and reasserts only the fifth objection to Plaintiff's definitions. (Doc. 33-4). The objection features eight subparts which each raise an objection to a different definition and provide some explanation, but do not point to any specific discovery request. *Id.*

The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *See McLeod,* 894 F.2d at 1485. Objections to discovery must be made with specificity, and the responding party has the obligation to explain and support its objections. *Heller v. City of Dall.,* 303 F.R.D. 466, 483 (N.D. Tex. 2014). Amended Federal Rule of Civil Procedure 34(b)(2) effectively codifies this requirement, at least in part:

> An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest.

Fed. R. Civ. P. 34(b)(2)(C). The Court finds Defendant failed to adequately support what remains a general objection to Plaintiff's definitions under a "Statement Regarding Objections" heading. Therefore, Defendant's objection is invalid for lack of specificity and a failure to support the objection.

### C. Specific Objections

#### 1. Timeliness

First, Plaintiff challenges a significant portion of Defendant's Supplemental Response as untimely. [1] (Doc. 33 at 3). Plaintiff requests the Court strike these allegedly new objections, answers, and responses because Defendant disclosed them after September 7, 2017—more than 30 days after Plaintiff served Defendant with the interrogatories and requests for production. *Id.* Defendant responds that it served the supplemental responses within the Parties' agreed upon time frame. (Doc. 34 at 6).

The responding party must serve its answers and any objections to interrogatories and requests for production within 30 days after being served with the requested discovery unless a shorter or longer time is stipulated under Federal Rule of Civil Procedure 29. Fed. R. Civ. P. 33, 34. Rule 29 enables parties to modify the procedures governing or limiting discovery without the Court's approval. *See* Fed. R. Civ. P. 29. Further, a party who responded to an interrogatory or request for production must supplement or correct its response in a timely manner if the party learns that in some material respect the response is incomplete or incorrect. Fed. R. Civ. P. 26.

In a letter dated September 19, 2017, Plaintiff informed Defendant of alleged deficiencies in Defendant's timely-served Original Response. (Doc. 33-2). Thereby, Defendant learned its Original Response was incomplete or incorrect and, after a couple conversations regarding the discovery, assured Plaintiff it would "remedy all issues." (Doc. 37 at 3). Defendant propounded its Supplemental Response on October 10, 2017, less than 30 days after Defendant learned of the alleged deficiencies of its Original Response. (Doc. 34 at 7). Further, the majority of the supplemental responses are merely request-specific assertions of Defendant's previously-raised "General Objections." Whether or not Defendant remedied all issues remains to be seen, but the Court finds the Parties agreed to the supplementation of Defendant's Original Response and Defendant did so in a timely manner. Therefore, Defendant's specific objections are not waived.

#### 2. Boilerplate Objections

**\*4** Plaintiff next asserts "nearly every single one" of Defendant's objections to certain interrogatories and requests for production begin with improper "boilerplate"

objections. [2] (Doc. 33 at 7). Specifically, Plaintiff criticizes Defendant's objections to breadth, burden, and Plaintiff's defined terms as inadequate, improper, and ineffective objections. *Id.* Defendant argues it provided specific reasoning as to why each request was overly broad and appropriately asserted its objections to Plaintiff's definitions each time an objectionable term was used.

### a. "Overly Broad" Objections

Although many of Defendant's objections use similar language, it does not necessarily follow that such objections are "boilerplate." That being said, Defendant's objections to Interrogatories 8 and 13 assert the requests are "overly broad and disproportional" and "vague and ambiguous," respectively, without further explanation. (Doc. 33-4 at 8, 13).

Similarly, many of Defendant's responses to Plaintiff's Requests for Production feature some variation of the language found in Defendant's response to Request for Production 3: "As written, the request is vague and ambiguous. The request is also disproportional to the needs of the case." (Doc. 33-4 at 16). In fact Defendant's objections to Requests for Production 4 and 8 use the same language, while objections to Requests for Production 2, 12, 15, 24, 25, 29, 30, 44, and 45 alter the formulaic response by pointing to the language of the requests it deems to be vague and ambiguous. (Doc. 33-4). Defendant's objection to Request for Production 1 argues "[s]uch a request is overly broad and likely to yield information that is not relevant to Plaintiff's claims, and as such, is disproportional to the needs of the case, considering the importance of this request." *Id.* at 15. Defendant objects to Requests for Production 11, 12, 29-33, and 55 due to Plaintiff's failure to limit the temporal scope which Defendant argues makes the requests overly broad and disproportional to the needs of the case. *Id.* Finally, Defendant responds with numerous reasons why Plaintiff's Request for Production 20 is overly broad. *Id.* at 23.

All these objections suffer from the same inadequacy: Defendant provides a "why" but fails to show "how" the requests are overly broad or disproportional. A party resisting discovery must show how the requested discovery was overly broad, burdensome, or oppressive by submitting affidavits or offering evidence revealing

the nature of the burden. *See Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005). Accordingly, Defendant has failed to support, and therefore waived, its objections.

Further, Defendant objects to several discovery requests as premature due to the pending certification of the proposed class. (Doc. 33-4). The Court has since certified the class and thus Defendant's objections of prematurity are waived as moot.

### b. Objections to Definitions

Many of Defendant's assertions of broadness and disproportionality are based on Defendant's objections to Plaintiff's defined terms used in the requests. The Court finds these objections are not "boilerplate," as Defendant raises the corresponding objection only when an allegedly objectionable term has been used. Thus, the Court analyzes Defendant's objections to determine if Plaintiff's requested discovery goes beyond the scope of Federal Rule of Civil Procedure 26.

**\*5** Defendant objects to Interrogatories 3, 7, 10, 12, and 13 for Plaintiff's use of "identify" in the discovery requests. (Doc. 33-4). Defendant asserts that Plaintiff's definition of the term goes beyond the scope allowed by Local Rule CV-26(b)(3) & (4). [3] *Id.* To the extent Plaintiff's definition of "identify" goes beyond the scope of Local Rule CV-26(b)(3) & (4), Defendant's objection is **SUSTAINED IN PART**.

Defendant objects to Interrogatories 4, 5, 7, and 11-13 and Requests for Production 19, 21-24, 30-32, 49-56, and 59 for the use of the words "you" and/or "your" as defined by Plaintiff to include Defendant, Defendant's agents, employees, insurance companies, attorneys, accountants, investigators, and anyone acting on Defendant's behalf. (Doc. 34-1). Defendant objects to Interrogatories 12 and 13 and Requests for Production 21 and 59 on the basis of attorney-client and work product privilege, arguing the requests' use of the word "you," which by definition includes Defendant's attorneys, asks for privileged material. (Doc. 33-4). The propriety of this assertion of privilege and the requisite privilege log are discussed below. As to Interrogatories 4, 5, 7, and 11 and Requests for Production 19, 22-24, 30-32, and 49-56 Defendant's argument is that the use of the word "you"

and/or "your" renders the requests overly broad and disproportional to the needs of the case as no claims regarding pay by insurance companies, accountants, etc., have been raised against Defendant. *Id.* The Court finds these objections are merely evasive, do not provide the requisite support, and are **OVERRULED.**

Defendant objects to Interrogatories 5, 7, 8, and 10 and Requests for Production 10, 26, 27, 36-39, and 52-54 for the use of the term "limitations period" arguing the defined period beginning May 18, 2014, and continuing through the present is overly broad. *Id.* In the case of a willful violation of the FLSA, as alleged in the instant case, the statute of limitations extends to three years. *See Ramos v. Al-Bataineh, 599 F. App'x 548, 551 (5th Cir. 2015).* Since the case was filed on May 18, 2017, the "limitations period" is not overly broad and Defendant's objections are **OVERRULED**.

### 3. Withheld Documents

Plaintiff next argues Defendant has produced no privilege log for documents withheld under any claim of privilege nor do its responses to requests for non-privileged documents indicate whether any materials are being withheld. (Doc. 33 at 8).

Defendant contends that it "made no assertion that it was withholding any responsive materials, save its response to Request for Production 16" for which a privilege log was produced. (Doc. 34 at 10). In order to support withholding any responsive documents or electronically stored information on the basis of privilege or work-product protection, Defendant must describe the withheld documents or electronically stored information in a privilege log submitted to Plaintiff's counsel in compliance with Federal Rule of Civil Procedure 26(b)(5)(A), which requires that:

> **\*6** When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or

disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Currently, Defendant's Privilege Log contains one entry and describes the single document withheld as "communications between counsel for Defendant and Defendant's representatives pertaining to Plaintiff's pay." (Doc. 37-1). However, Defendant has also lodged objections to Plaintiff's Interrogatories 12 and 13 and Requests for Production 21 and 59 because "the request would necessarily include within its purview information or documents protected by attorney-client or the work product privilege." (Doc. 33-4). Accordingly, Defendant is **ORDERED** to submit an updated privilege log to Plaintiff's counsel for any documents or information withheld based on privilege and work-product protection.

Similarly, Rule 34 provides that an objection to a request for production must state whether any responsive materials are being withheld on the basis of that objection. Fed. R. Civ. P. 34(b)(2)(C). Throughout the responses to Plaintiff's Requests for Production, Defendant states which documents have been produced subject to its objections, but fails to provide whether it has withheld additional responsive materials. (Doc. 33-4). Therefore, Defendant is **ORDERED** to amend its responses to clarify whether it is withholding additional responsive materials on the basis of its objections.

### 4. Withheld Identities & Information

Plaintiff next challenges Defendant's withholding of identities and information. (Doc. 33). Although Defendant does not respond to Plaintiff's argument, the Supplemental Response cites the pending certification of the class as justification for its limited—or lack of —response to the various requests. (Doc. 33-4). As previously stated, conditional class certification has been granted in the case. (Doc. 45) (Certifying the class as "[a]ll current and former hourly employees of Saulsbury Industries, Inc. who were, at any point in the past three years, paid straight time for overtime"). Defendant has already expressed its willingness to supplement and amend its discovery responses upon the conditional certification of a class. (Doc. 34 at 10). More importantly, Defendant

Fed. Defs. 047

has a duty to supplement any disclosures under Rule 26(a) as well as its responses to interrogatories or requests for production in a timely manner upon learning that such disclosures or responses are incomplete or incorrect. Fed. R. Civ. P. 26(e).

The Court's rulings on Defendant's objections, particularly in regard to Plaintiff's defined terms, provide further clarity regarding the scope of discovery in this case. Defendant is "expected to disclose the identity of those persons who may be used by them as witnesses or who, if their potential testimony were known, might reasonably be expected to be deposed or called as a witness by any of the other parties." Fed. R. Civ. P. 26 advisory committee's note (1993 amend.). Accordingly, Defendant is **ORDERED** to supplement its disclosures and responses in order to provide the identities and information requested within the scope of discovery. [4]

**\*7** Additionally, Plaintiff states Defendant has withheld information and materials relating to other wage-and-hour violations and lawsuits. (Doc. 33 at 12). Courts find willful violations of the FLSA where the evidence shows: "(1) admissions that an employer knew its method of payment violated the FLSA prior to the accrual of the action; (2) continuation of a pay practice without further investigation after being put on notice that the practice violated the FLSA; (3) earlier violations of the FLSA that would put the employer on actual notice of the Requirements of the FLSA; (4) failure to keep accurate or complete records of employment; and (5) prior internal investigations which revealed similar violations." *Bingham v. Jefferson Cty., Tex.*, No. 1:11–CV–48, 2013 WL 1312563, at \*14 (E.D. Tex. Mar. 1, 2013). The Court finds there is a nexus between the information requested and Plaintiff's overtime compensation claims in this lawsuit. Therefore, this information is relevant.

However, the Court recognizes the overbreadth of Interrogatory 11 and Requests for Production 28, 29, 31, and 32 in that they fail to limit the information sought to claims brought by, or investigations relating to, similarly-situated employees. Because the Court determines that discovery concerning dissimilar employees is not proportional to the needs of the case, the proposed discovery requests shall be limited to claims or investigations relating to Defendant's overtime pay practices for employees similarly situated to Plaintiff. As such, Defendant's objections to Interrogatory 11

and Requests for Production 28, 29, 31, and 32 are **SUSTAINED IN PART.**

### 5. Routine FLSA Discovery

Finally, Plaintiff asserts that Defendant has refused production of information and materials that are routine elements of FLSA discovery including: job postings, record retention policies, communication regarding pay practice, documents regarding job titles Defendant paid straight time for overtime, contracts or agreements between Defendant and each third party for whom Plaintiff worked, and invoices from a third party for services performed by Plaintiff. (Doc. 33 at 13). Defendant admits Request for Production 35, regarding job postings, and Interrogatory 8, regarding job titles paid straight overtime, should be supplemented following the conditional certification of the class. (Doc. 34).

Requests for Production 52-54 request information regarding non-party clients of Defendant, but are limited to those non-party clients that Plaintiff worked for during his employment. (Doc. 33-4). The Court finds these requests are relevant and sufficiently limited to the needs of the case. Fed. R. Civ. P. 26(b).

Requests for Production 9, 26, and 33 inquire as to Defendant's policies concerning record retention. (Doc. 33-4). Request for Production 9 limits the documents requested to those kept pursuant to FLSA obligations and pertaining to Plaintiff. *Id.* at 18. Similarly, Request for Production 26 seeks only the retention policy used by Defendant during the "limitations period." *Id.* at 26. The Court finds these requests are relevant and proportional to the needs of the case and notes Defendant has produced documents in response to these requests already. *Id.* However, Defendant must supplement such requests, if necessary, following the Court's entry of the present order.

Request for Production 33, on the other hand, asks for documents retained by Defendant "in order to meet any record-keeping requirement of the FLSA." *Id.* at 29. This request is overbroad and irrelevant. Therefore, Defendant's objection to Request for Production 33 is **SUSTAINED.**

The last two Requests for Production pertain to Defendant's pay practice, or the "subject matter of this litigation." *Id.* at 20, 24. Request for Production 16 specifically "requests emails describing Plaintiff's pay."

*Id.* at 20. The Court finds this request relevant and proportional to the case, and therefore Defendant must produce any responsive documents not protected by a privilege properly asserted in a privilege log. Fed. R. Civ. P. 26.

**\*8** The Court does recognize the overbreadth of Request for Production 25 which seeks "Documents containing written or oral communications to any person that are related to the subject matter of this litigation." (Doc. 33-4 at 24). Accordingly, Plaintiff's Request shall be limited to documents containing written or oral communications concerning Defendant's failure to pay overtime to similarly situated employees as Plaintiff within the limitations period defined by Plaintiff. As such, Defendant's objection to Plaintiff's Request for Production 25 is **SUSTAINED IN PART**.

### IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Plaintiff's Motion to Compel is **DENIED** as to Request for Production 33. (Doc. 33).

It is further **ORDERED** that Plaintiff's Motion to Compel is **GRANTED IN PART** as to Interrogatories 3, 7, 10-13 and Requests for Production 25, 28, 29, 31 and 32. *Id.*

It is further **ORDERED** that Plaintiff's Motion to Compel is **GRANTED** as to Interrogatories 4, 5, and 8 and Requests for Production 1-5, 8-12, 15, 16, 19-24, 26, 27, 30, 35-39, 44, 45, 49-56, 58-61, and 66-75. *Id.*

It is further **ORDERED** that Defendant supplement its written discovery responses within **30 DAYS** of this order. As part of supplementation, Defendant is **ORDERED** to amend its responses to clarify whether it is withholding additional responsive materials on the basis of its objections.

It is further **ORDERED** that Defendant submit a privilege log to Plaintiff's counsel for any documents or information withheld based on privilege and work-product protection within **30 DAYS** of this order.

Finally, given the circumstances surrounding the discovery at issue, the Court finds an award of expenses under Federal Rule of Civil Procedure 37(c)(5)(B) would be unjust.

It is so **ORDERED**.

### All Citations

Slip Copy, 2018 WL 5800757

### Footnotes

1   Specifically, Plaintiff challenges Defendant's supplemental responses to Interrogatories 1-13 and Requests for Production 1-5, 8-12, 15, 17, 19-27, 29-33, 36-39, 43-56, 58-64, and 66-73. (Doc. 33 at 3).

2   Plaintiff's Reply specifies Defendant's objections to Interrogatories 3-5, 7-8, and 10-12 and Requests for Production 1-4, 8, 10-12, 15, 19-27, 29-33, 36-39, 44-45, 49-56, and 59 contain the allegedly boilerplate objections. (Doc. 37 at n.4).

3   "Identify (With Respect to Persons). When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, e-mail address, and telephone number, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person." Local Rule CV-26(b)(3). "Identify (With Respect to Documents). When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s)." Local Rule CV-26(b)(4).

4   Specifically, Defendant must supplement Interrogatories 7, 8, 10, 12, and 13 and Requests for Production 1, 5, 8, 12, 58-61, 66-75.

**WESTLAW**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 2

Fed. Defs. 050

Montoya v. State Farm Lloyds, Not Reported in Fed. Supp. (2015)

Case 1:18-cv-00068  Document 394-1  Filed on 06/10/19 in TXSD  Page 53 of 99

2015 WL 12940020

2015 WL 12940020
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, McAllen Division.

Ricardo MONTOYA, Plaintiff,

v.

STATE FARM LLOYDS, et al, Defendants.

CIVIL ACTION NO. 7:14−CV−182
|
Signed 01/27/2015

**Attorneys and Law Firms**

D. Clinton Brasher, Joseph Azor Muckleroy, Brasher
Law Firm, Danny Ray Scott, Jr., Attorney at Law,
Sean M. Patterson, Scott Law Office, Beaumont, TX,
Orlando R. Lopez, Attorney at Law, San Antonio, TX,
for Plaintiff.

Brian Michael Chandler, Ramey Chandler et al, Houston,
TX, for Defendants.

### ORDER

Micaela Alvarez UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court are the "Motion for
Protective Order Regarding Plaintiff's Requests for
Admissions"[1] and "Motion for Protective Order to
Quash or to Limit Plaintiff's Rule 30(b)(6) Deposition
Notice,"[2] filed by State Farm Lloyds. Plaintiff has
responded to both the motion regarding requests
for admissions[3] and the motion regarding deposition
notice.[4] Similarly, State Farm has replied to both
motions.[5] State Farm has properly included a
certification in both motions noting it has conferred with
Plaintiff and counsel cannot agree about the disposition
of the motions.[6] Plaintiff has also filed a self-styled
"Motion to Compel Discovery, Overrule Objections, and
Compliance with Rule 26."[7]

After considering the motions, responsive filings, record,
and relevant authorities, the Court **GRANTS** State
Farm's motions, **STRIKES** Plaintiff's requests for
admissions, **QUASHES** Plaintiff's deposition notice and

subpoena duces tecum, **DENIES** Plaintiff's motion, and
upon proper submission, will order Plaintiff to pay State
Farm reasonable expenses.

### I. Background

On February 20, 2014, Plaintiff filed suit in state court
against State Farm and Richard Wallis (collectively,
"Defendants") asserting various insurance-related causes
of action for damages resulting from a wind or hail
storm.[8] Defendants subsequently removed the case to this
Court on April 10, 2014 based on diversity jurisdiction.[9]
On September 16, 2014, the parties appeared before the
Court for a status conference, whereby they informed
the Court there were no special discovery or scheduling
issues other than those noted in the Joint Discovery/Case
Management Plan.[10] Thus, the Court issued a scheduling
order consistent with the Rule 26 guidelines, setting a
discovery deadline of February 13, 2015.[11] From October
20, 2014 to January 14, 2015, the parties filed the instant
flurry of discovery-related motions and responsive filings.

### II. Protective Orders and Scope of Discovery

Federal Rule of Civil Procedure 26(b) governs the
permissible scope of discovery. The Rule's phrasing is
deliberately broad,[12] providing that "[p]arties may obtain
discovery regarding any nonprivileged matter that is
relevant to any party's claim or defense ... Relevant
information need not be admissible at the trial if the
discovery appears reasonably calculated to lead to the
discovery of admissible evidence."[13] Discovery rules "are
to be accorded a broad and liberal treatment to effect
their purpose of adequately informing the litigants in civil
trials."[14]

**\*2** However, district courts are tasked with guarding
against abusive discovery, including "an unwieldy,
burdensome, and speculative fishing expedition."[15] Rule
26(b)(2)(C) provides that the Court must limit the extent
of discovery if the discovery sought is unreasonably
cumulative or duplicative or can be obtained from a
more convenient or less burdensome source; if the party
seeking discovery has had ample opportunity to obtain the
information by discovery in the action; or if the burden
or expense of the proposed discovery outweighs its likely
benefit "considering the needs of the case, the amount in
controversy, the parties' resources, the importance of the

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 54 of 99
Montoya v. State Farm Lloyds, Not Reported in Fed. Supp. (2015)
2015 WL 12940020

issues at stake in the action, and the importance of the discovery in resolving the issues." [16]

Upon a motion by "a party or any person from whom discovery is sought," Federal Rule of Civil Procedure 26(c) permits a court, "for good cause, [to] issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ..." [17] On a showing of good cause, the district court is allowed to use its discretion to restrict what can be obtained through discovery, how it can be obtained, and how parties can use the materials once they are obtained. [18] Though there is no clear standard for what constitutes "good cause," the "burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." [19]

## III. Motion for Protective Order Regarding Plaintiff's Requests for Admissions

### A. Applicable Law

Federal Rule of Civil Procedure 36(a)(1) provides that a party may request that any other party admit the truth of any matters within the permissible scope of discovery relating to "facts, the application of law to fact, or opinions about either" and "the genuineness of any described documents." The purpose of the rule is to expedite the proceedings and to relieve the parties of the cost of proving undisputed and peripheral facts during trial. [20] "Rule 36(b) simultaneously emphasizes the importance of resolving an action on the merits while at the same time upholding a party's justified reliance on an admission in preparation for trial." [21] As the Fifth Circuit has noted, "Rule 36 is not a discovery device, and its proper use is as a means of avoiding the necessity of proving issues which the requesting party will doubtless be able to prove." [22] Therefore, "requests for admissions as to central facts in dispute are beyond the proper scope of the rule [and] have consistently been held improper." [23]

### B. Parties' Positions

In its motion, State Farm informs the Court that Plaintiff served **188** Requests for Admission to State Farm within the two-week period following the parties' initial pretrial conference and the Court's scheduling order in September 2014. [24] State Farm requests that the Court grant a protective order providing that State Farm will not be required to serve responses to any of these requests on several grounds.

First, State Farm claims these requests are manifestly unfair and a violation of Rule 26(f), as Plaintiff's counsel failed to disclose his intent to serve close to 200 Requests for Admissions prior to the filing of the Joint Discovery/Case Management Plan in preparation for the initial pretrial conference. [25] Second, it claims these requests are unduly burdensome and harassing, as evidenced by the sheer number of requests propounded. [26] Additionally, State Farm alleges many requests are improper because they are vague and require clarification. [27] Lastly, State Farm argues the requests are overly broad, irrelevant to the subject matter of this litigation, and fall outside the permissible scope of discovery since they "seek to have State Farm ratify what are, in essence, the legal conclusions Plaintiff has attached to the operative facts of the case." [28]

**\*3** In his three-page response, Plaintiff merely explains:

> Each request is tailored to this suit ... The requests ... are narrowly tailored to address Plaintiff's allegation in this litigation are [sic] within the scope of discovery as allowed by Rule 26(b)(1). The purpose of the admissions ... is an attempt to narrow the issues to avoid the time and cost associated with a deposition of State Farm's corporate representative. [29]

Not only does Plaintiff fail to establish the requests are within the scope of Rules 26(b) and 36(a)(1) in his conclusory response, but he also fails to address State Farm's arguments that these requests are burdensome and harassing. Plaintiff also does not inform the Court

why he failed to confer with Defendants regarding these extensive requests in preparation for the initial pretrial hearing. Additionally, Plaintiff's reasoning regarding the purpose of these admissions is clearly undermined by his deposition notice pursuant to Rule 30(b)(6), the subject of State Farm's second motion for protective order, discussed *infra*.

## IV. Motion for Protective Order to Quash or to Limit Plaintiff's Rule 30(b)(6) Deposition Notice

### A. Applicable Law

Federal Rule of Civil Procedure 30(b) provides that a party must give reasonable written notice of its request to depose "a public or private corporation, a partnership, an association, a governmental agency, or other entity." [30] The notice "must describe with reasonable particularity the matters for examination," and "[t]he named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf ..." [31] If the party wishes to serve a subpoena duces tecum in conjunction with the deposition notice, "the materials designated for production, as set out in the subpoena, must be listed in the notice or in an attachment." [32]

### B. Parties' Positions

On October 30, 2014, Plaintiff sent a Rule 30(b)(6) deposition notice with a subpoena duces tecum to State Farm. [33] The notice requests a corporate deposition on eleven categories of testimony and demands production of twenty-three categories of documents. [34] It also scheduled the deposition for December 17, 2014, forty-eight days after Plaintiff sent the notice to State Farm. [35] In its motion, State Farm objects to all deposition categories on various grounds and requests that the Court "enter a protective order quashing or limiting the corporate deposition topics proposed by Plaintiff, sustain State Farm's objections to the subpoena duces tecum, [and] enter State Farm's proposed protective order governing production of confidential and proprietary, or trade secret materials ..." [36] Plaintiff generally alleges the deposition categories are well within the proper scope of discovery. [37]

### V. Discussion

### A. Plaintiff's Petition

**\*4** In order to properly evaluate the significance of Plaintiff's requested information, the Court must consider the causes of action alleged in the state court petition. The bulk of Plaintiff's petition focuses on the undervaluing of the loss and State Farm's failure to pay an appropriate amount based on Plaintiffs' claim. The causes of action against State Farm include: breach of contract, violations of the Deceptive Trade Practices Act ("DTPA"), unfair settlement practices and noncompliance with the Texas Insurance Code for prompt payment of claims, breach of the duty of good faith and fair dealing, and common law fraud. [38] As to Defendant Richard Wallis, Plaintiff contends Wallis misrepresented the severity of the damages, was improperly trained and supervised by State Farm, and conducted a poor and unreasonable investigation of the claim, which led to an improper undervaluing of the loss. [39] Accordingly, the scope of discovery is limited to information relevant to these claims or reasonably calculated to lead to admissible evidence regarding these claims. Requests for information not sufficiently related to these causes of action are considered outside the scope of discovery.

### B. Analysis

Upon reviewing the motions and record, the Court is convinced that Plaintiff is engaging in an overly burdensome fishing expedition not aligned with the letter and spirit of the discovery rules and outside the proper scope of discovery in this case. Accordingly, <u>the Court finds good cause to GRANT State Farm's motions protecting against production of confidential, proprietary, or trade secret information and LIMIT the scope of discovery to the breach of contract claim at this stage in the proceedings.</u> As previously noted, the Court has the power to exercise broad discretion in limiting the scope and effect of discovery. [40] Indeed, this power includes the ability to set the timing and sequence of discovery and tailoring the discovery process to focus narrowly on one issue before expanding the scope of discovery. [41] Thus, while Plaintiff's extra-contractual claims stem from the breach of contract claim and discovery is generally permitted as to all of the claims simultaneously, the Court will sequence the parties' discovery efforts to focus on the breach of

contract issue first and then the extra-contractual claims subsequently if the breach of contract can be established.

*Requests for Admission*
As to the requests for admission specifically, the Court finds good cause to **STRIKE** Plaintiff's 188 requests in their entirety, as these voluminous requests are clearly excessive, harassing, and unduly burdensome. Additionally, although Defendants do not explain why each individual request is overly broad or unrelated to the subject matter of this litigation, an independent review of the record suggests that the requests are either outside the proper scope of Rule 26(b) or Rule 36(a)(1), or both. To name a few, Plaintiff requests that State Farm admit or deny whether it "publishes a company newsletter" and "documents personnel information regarding salary, bonuses and commissions." Plaintiff's requests also seek that State Farm admit or deny, for example, whether it "must objectively investigate a claim" or "may ignore evidence that supports coverage." In effect, Plaintiff's requests either seek admission of legal conclusions or central facts in dispute, rather than undisputed issues of fact or peripheral matters in an effort to expedite proceedings, or seek to obtain institutional information from State Farm that is wholly irrelevant to the policy and claims in the instant case. Plaintiff is attempting to use these requests as a discovery device, a tactic clearly prohibited by the Federal Rules and admonished in this circuit.

*Deposition Notice and Subpoena Duces Tecum*
Similarly, the Court finds good cause to **QUASH** the deposition notice with subpoena duces tecum. In light of their voluminous nature, the Court is not inclined to address every testimony and document category in Plaintiff's deposition notice and subpoena duces tecum individually. However, the Court will note that Plaintiff's categories of testimony and requested documentation are generally either outside the scope of the claims involved in this case, fishing for privileged or trade secret materials, cumulative, unrelated to the elements of any of the causes of action at issue, not stated with reasonable peculiarity, or not appropriately limited in time or subject matter.

**\*5** As State Farm correctly alleges, Plaintiff appears to be "seeking information in order to find a way to attack State Farm from an institutional standpoint, but this is not a class action regarding State Farm's

general claim handling program," nor do Plaintiff's causes of action require a showing of an element of "pattern or practice." [42] Because of the impermissible and burdensome scope of these requests, the Court reiterates its finding that limiting discovery to the breach of contract claim is warranted. The Court is further convinced that sequencing discovery and protecting State Farm against production of confidential information is appropriate since the parties have already exchanged expert reports pursuant to the Court's scheduling order, and State Farm has already produced numerous materials in response to Plaintiff's discovery demands. [43]

## VI. Plaintiff's Motion to Compel
In his motion to compel, Plaintiff prays that the Court compel State Farm to remove objections and respond to several requests for production, all focusing on discovery related to Plaintiff's extra-contractual claims. [44] Plaintiff also briefly alleges that State Farm only named independent adjuster Richard Wallis in its initial disclosures. In one short paragraph, Plaintiff claims this amounts to a violation of Rule 26 because "[n]o other witness for State Farm is listed" and "[t]his is important because there are several State Farm representatives identified in the claim file in their performance of some task." [45] Indeed, Rule 26 requires that the parties disclose name and, if known, contact information of individuals "likely to have discoverable information ..." [46] However, in light of the Court's holding as to State Farm's motions and limited discovery, Plaintiff's motion does not have any further relevance. Thus, Plaintiff's motion is hereby **DENIED.**

## VII. Sanctions
Having granted two protective orders in favor of State Farm, the Court finds Plaintiff's bad faith discovery tactics and misrepresentations to the Court warrant that counsel be sanctioned. As previously noted, these efforts are clearly burdensome, overly broad, excessive, and harassing. Additionally, Plaintiff's submission of numerous requests for admissions, deposition notice, and subpoena duces tecum a few weeks after the initial pretrial conference amount to a violation of the good faith requirement under Rule 26(f). While the Court is cognizant of the fact that discovery issues may at times develop after the Rule 26(f) conference and initial pretrial conference, the timing and current format of

these requests inform the Court that Plaintiff's counsel was well aware of the intention to serve these requests on State Farm, yet counsel did not inform Defendants that there were extended discovery issues for the Court's consideration during the Rule 26(f) conference or the parties' appearance before the Court. [47]

Even more concerning, Plaintiff's counsel blatantly mischaracterized to the Court the parties' communications about the deposition notice in an effort to have the Court dismiss State Farm's motion for protective order on procedural grounds. Specifically, Plaintiff contends the Court should dismiss the motion regarding deposition notice and subpoena duces tecum in its entirety because State Farm failed to confer in good faith with Plaintiff in violation of Federal Rule of Civil Procedure 26(c)(1) and Rule 7.1(D) of the Local Rules of the United States District Court for the Southern District of Texas. Plaintiff expressly notes:

> At no time before [State Farm] filed its motion did it attempt to confer with Plaintiff's counsel to resolve any disputes. [State Farm] did not make any effort to discuss any objections to Plaintiff's deposition notice. There was no good faith effort to reach some kind of compromise on the dispute and avoid wasting the Court's time and counsel's time in responding to such a motion. As such, [State Farm] has failed to satisfy Rule 26(c)(1) and this provides an independent ground to dismiss [State Farm]'s motion. [48]

*6 On the other hand, State Farm informs the Court that Plaintiff's averment is a misrepresentation of the exchanges between the parties before the filing of the instant motions, attaching as supporting evidence relevant correspondence. [49] Indeed, State Farm included a Certificate of Conference in its motion, representing to the Court that it conferred in good faith with Plaintiff but was unable to reach an agreement. [50]

After reviewing the record, the Court is extremely troubled by the harassing discovery tactics and misrepresentations by Plaintiff's counsel. Thus, despite Plaintiff's protestations that State Farm's alleged non-compliance with the rules amount to a waste of the Court's time, the Court finds Plaintiff's disingenuous and frivolous arguments are wholly contrary to the spirit of the rules and an obstruction to the efficient operation of justice. For the foregoing reasons, the Court hereby notifies Plaintiff's counsel that upon proper submission by Defendants' counsel of their reasonable expenses incurred in making these motions, the Court will award such expenses.

## VIII. Holding

Plaintiff's counsel in this case have wasted an unnecessary amount of time and expense in this futile and bad-faith discovery battle. Such resources would have been more appropriately spent reaching resolution outside the Court on this matter for the benefit of their client. These discovery tactics represent not merely a fishing expedition but "an effort to dredge the lake in hopes of finding a fish." [51] Therefore, for the reasons stated above, the Court finds good cause to **GRANT** State Farm's motions protecting against production of confidential, proprietary, or trade secret information. In turn, the Court **STRIKES** Plaintiff's requests for admissions and **QUASHES** Plaintiff's deposition notice and subpoena duces tecum. At this time, the Court permits discovery on the breach of contract claim only. In that regard, Plaintiff may depose a State Farm corporate representative to testify regarding the handling of Plaintiff's claim, the policies and procedures applicable to that claim, and policy coverage applicable to that claim. Plaintiff may also depose the adjuster(s) directly involved in the handling of Plaintiff's claim in these same areas. Further, the Court **DENIES** Plaintiff's motion to compel and upon proper submission, will order Plaintiff's counsel to pay reasonable expenses to State Farm.

IT IS SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2015 WL 12940020

Case 1:18-cv-00068 Document 394-1 Filed on 06/10/19 in TXSD Page 58 of 99
Montoya v. State Farm Lloyds, Not Reported in Fed. Supp. (2015)
2015 WL 12940020

## Footnotes

1   Dkt. No. 18 ("MPO Requests for Admissions").

2   Dkt. No. 20 ("MPO Deposition Notice").

3   Dkt. No. 19 ("Response Requests for Admissions").

4   Dkt. No. 24 ("Response Deposition Notice").

5   Dkt. No. 21 ("Reply Requests for Admissions") & 28 ("Reply Deposition Notice").

6   *See* FED. R. CIV. P. 26(c); *Local Rules of the United States District Court for the Southern District of Texas* 7.1(D).

7   Dkt. No. 30 ("Motion to Compel").

8   *See* Dkt. No. 1, Exh. 2 ("Petition").

9   Dkt. No. 1.

10  Minute Entry for Status Conference & Show Cause Hearing on September 9, 2014.

11  Dkt. No. 16.

12  *Crosby v. Louisiana Health Serv. & Indem. Co.*, 647 F.3d 258, 262 (5th Cir. 2011) ("Generally, the scope of discovery is broad ...").

13  FED. R. CIV. P. 26(b)(1).

14  *Herbert v. Lando*, 441 U.S. 153, 177 (1979).

15  *Crosby*, 647 F.3d at 264.

16  FED. R. CIV. P. 26(b)(2)(C).

17  FED. R. CIV. P. 26(c).

18  *Harris v. Amoco Prod. Co.*, 768 F. 2d 669, 684 (5th Cir. 1985).

19  *In re: Terra International, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (citing *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)).

20  *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, No. CIV.A. H–07–2426, 2008 WL 2036816, at *2 (S.D. Tex. May 9, 2008) (internal quotation marks and citations omitted).

21  *Id.*

22  *Pickens v. Equitable Life Assur. Soc. of U. S.*, 413 F.2d 1390, 1393 (5th Cir. 1969).

23  *Id.*

24  *See* MPO Requests for Admission, Exhs. A–B.

25  MPO Requests for Admission at ¶ 9–11.

26  *Id.* at ¶ 7, 12, 23–25.

27  Id. at ¶ 22.

28  *Id.* at ¶ 21.

29  Response Requests for Admission at p. 3.

30  FED. R. CIV. P. 30(b)(1), (6).

31  FED. R. CIV. P. 30(b)(6).

32  FED. R. CIV. P. 30(b)(2).

33  MPO Deposition Notice, Exh. A.

34  *Id.*

35  *Id. See also* MPO Deposition Notice at ¶ 6 (alleging "Plaintiff unilaterally selected the date of the deposition.").

36  MPO Deposition Notice at p. 24.

37  Response Deposition Notice at pp. 3–7.

38  Petition at ¶¶ 8.01–13.04.

39  Id. at ¶¶ 7.08–7.17

40  *Bradley*, 240 F.3d at 1073.

41  *See Crawford–El v. Britton*, 523 U.S. 574 (1998); *Fed. R. Civ. P.* 26(d).

42  MPO Deposition Notice at ¶¶ 44, 47.

43  *See* Dkt. No. 16; MPO Deposition Notice at ¶ 2.

44  Motion to Compel at pp. 2–4.

45  *Id.* at p. 2.

Montoya v. State Farm Lloyds, Not Reported in Fed. Supp. (2015)
Case 1:18-cv-00068 Document 394-1 Filed on 06/10/19 in TXSD Page 59 of 99

2015 WL 12940020

46    FED. R. CIV. P. 26(a)(1)(A)(i).

47    *See* MPO Requests for Admissions at ¶¶ 9–11.

48    Response Deposition Notice at pp. 2–3.

49    *See* Reply at ¶¶ 1–4 & Exhs. A–B.

50    MPO Deposition Notice at p. 25.

51    *Texaco, Inc. v. Sanderson,* 898 S.W2d 813, 815 (Tex. 1995).

---

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 3

Fed. Defs. 058

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)

Case 1:18-cv-00068    Document 394-1    Filed on 06/10/19 in TXSD    Page 61 of 99

2016 WL 7228863

2016 WL 7228863
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Fort Myers Division.

Rebecca A. SMALL and
Lawrence W. Small, Plaintiffs,
v.
AMGEN, INC., Pfizer, Inc.
and Wyeth, Inc., Defendants.

Case No: 2:12–cv–476–FtM–29MRM
|
Signed 09/28/2016

**Attorneys and Law Firms**

Jay P. Dinan, Parker Waichman, LLP, Bonita Springs, FL, Jordan L. Chaikin, Chaikin Law Firm PLLC, Fort Myers, FL, Keith Altman, Law Office of Keith Altman, Temecula, CA, Solomon Radner, Southfield, MI, Peter Cambs, Goede, Adamczyk & DeBoest, PLLC, Naples, FL, for Plaintiffs.

Alvin F. Lindsay, Hogan Lovells U.S. LLP, Miami, FL, David S. Johnson, Shook, Hardy & Bacon, LLP, Tampa, FL, Lauren S. Colton, Pro Hac Vice, Scott R. Haiber, Hogan Lovells U.S. LLP, Baltimore, MD, William P. Geraghty, Shook, Hardy & Bacon, LLP, Miami, FL, for Defendants.

**OMNIBUS DISCOVERY ORDER**

MAC R. MCCOY, UNITED STATES MAGISTRATE JUDGE

**\*1** This cause comes before the Court regarding Defendants' Motion to Compel (Doc. 126), Defendant Amgen Inc.'s Motion for Protective Order (Doc 127), Plaintiffs' Motion to Compel (Doc. 129) ("the Motions"), and related filings. The Court held a hearing on these Motions on December 30, 2015, after which the Court entered an Order (Doc. 147) holding in abeyance its decisions on the Motions pending resolution of Defendants' Motion for Judgment on the Pleadings (Doc. 107). After the Honorable Paul A. Magnuson entered an Order (Doc. 150) denying Defendants' Motion for Judgment on the Pleadings (Doc. 107), the Court set

a continued motion hearing on the Motions *sub judice* (Docs. 126, 127, and 129). The continued motion hearing was held on February 11, 2016, after the parties submitted supplemental materials (Docs. 164, 165) for the Court's consideration.

At the February 11 continued motion hearing, the Court heard oral argument on outstanding issues, including the status of the claims remaining in this action, the status of the parties' continued good-faith conferences on the outstanding discovery disputes, and the specific categories of discovery the parties still seek to obtain by way of their pending Motions.

**I. Applicable Legal Standards**

Fed. R. Civ. P. 26(b)(1), as amended effective December 1, 2015, governs the scope of discovery in civil cases. The rule states that generally:

> Parties may obtain discovery regarding any nonprivileged matter that is *relevant to any party's claim or defense and proportional to the needs of the case*, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1) (emphasis added). A party may file a motion to compel discovery pursuant to Fed. R. Civ. P. 37(a). Rulings on motions to compel discovery under Rule 37(a) are committed to the sound discretion of the trial court. *See NetJets Aviation, Inc. v. Peter Sleiman Dev. Grp., LLC*, No. 3:10–cv–483–J–32MCR, 2011 WL 6780879, at \*2 (M.D. Fla. Dec. 27, 2011) (citing *Commercial Union Ins. Co. v. Westrope*, 730 F.2d 729, 731 (11th Cir. 1984)).

Small v. Sanger, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 7228863

Case 1:18-cv-00068 Document 394-1 Filed on 06/10/19 in TXSD Page 62 of 99

Notably, "[t]he recent changes to the Federal Rules of Civil Procedure (in particular, Rule 26), although substantive and substantial, do not change the definition of relevance." *Steel Erectors, Inc. v. AIM Steel Int'l, Inc.*, 312 F.R.D. 673, 676 n.4 (S.D. Ga. 2016). The scope of permissible, relevant discovery is determined by the parties' claims and defenses. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 n.37 (11th Cir. 1997). The proponent of a motion to compel discovery bears the initial burden of proving that the information sought is relevant. *Bright v. Frix*, No. 8:12–cv–1163–T–35MAP, 2016 WL 1011441, at *1 (M.D. Fla. Jan. 22, 2016). "Evidence is relevant if it has any tendency to make the existence of any fact or consequence more or less probable than it would be without the evidence." *Gonzalez v. ETourandTravel, Inc.*, No. 6:13–cv–827–Orl–36TBS, 2014 WL 1250034, at *2 (M.D. Fla. Mar. 26, 2014) (citing *United States v. Capers*, 708 F.3d 1286, 1308 (11th Cir. 2013)).

**\*2** With regard to the proportionality requirement of amended Fed. R. Civ. P. 26(b)(1), the advisory committee notes explain:

> The present amendment restores the proportionality factors to their original place in defining the scope of discovery. This change reinforces the Rule 26(g) obligation of the parties to consider these factors in making discovery requests, responses, or objections. Restoring the proportionality calculation to Rule 26(b)(1) does not change the existing responsibilities of the court and the parties to consider proportionality, and *the change does not place on the party seeking discovery the burden of addressing all proportionality considerations. Nor is the change intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional.* The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes.

> ... A party claiming undue burden or expense ordinarily has far better information—perhaps the only information—with respect to that part of the determination. A party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as that party understands them. The court's responsibility, *using all the information provided by the parties*, is to consider these and all the other factors in reaching *a case-specific determination of the appropriate scope of discovery*.

Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment (emphasis added); *see also Sibley v. Choice Hotels Int'l*, No. CV 14–634 (JS)(AYS), 2015 WL 9413101, at *2 (E.D.N.Y. Dec. 22, 2015) (discussing the 2015 amendments); *Carr v. State Farm Mut. Auto. Ins., Co.*, 312 F.R.D. 459, 463–469 (N.D. Tex. 2015) (same); *Herrera–Velazquez v. Plantation Sweets, Inc.*, No. CV614–127, 2016 WL 183058, at *4 n.6 (S.D. Ga. Jan. 14, 2016) (same); *Vaigasi v. Solow Mgmt. Corp.*, No. 11CIV5088RMBHBP, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016) (same).

With regard to depositions of corporate representatives, Fed. R. Civ. P. 30(b)(6) states "[i]n its notice ..., a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must *describe with reasonable particularity* the matters for examination." (Emphasis added). Moreover, Fed. R. Civ. P. 30(d)(3)(B) allows for depositions to be limited under Fed. R. Civ. P. 26(c). Pursuant to Fed. R. Civ. P. 26(c)(1), "[a] party or any person from whom discovery is sought may move for a protective order." For good cause, the court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). The party seeking a protective order "carries the burden of showing good cause and/or the right to be protected." *See Schneider v. Hertz Corp.*, No. 3:05–cv–1298–J–MCR, 2007 WL 1231834, at *2 (M.D. Fla. Apr. 26, 2007) (citing *U.S. v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)). This Court has held that the burden "contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *Id.* (citing *Garrett*, 571 F.2d at 1326 n.3).

**\*3** Applying these standards and principles, the Court addresses the merits of the parties' outstanding discovery disputes below.

## II. Plaintiffs' Surviving Claims and Defendants' Defenses

As a threshold matter, the parties appear to have materially different views of the scope of the surviving claims and defenses asserted in this case and, relatedly, the scope of relevant discovery. (*Compare* Doc. 129 at

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 7228863

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 63 of 99

3 *with* Doc. 142 at 1–4; *and* Doc. 164 *with* Doc. 165). Because the scope of permissible discovery is necessarily informed by the operative claims and defenses, *see* Fed. R. Civ. P. 26(b)(1), the Court finds it instructive to examine the then-presiding District Judges' prior rulings on early dispositive-motion practice and their specific comments concerning discovery relating to certain surviving claims and defenses.

Plaintiffs Rebecca and Lawrence Small brought this action against Defendants Amgen, Inc. ("Amgen"), Wyeth, Inc. ("Wyeth"), Pfizer, Inc. ("Pfizer"), and Does 1–20 to recover damages for the injuries Ms. Small allegedly sustained as a result of her use of the prescription drug Enbrel. (*See* Doc. 97 at 1). Plaintiffs' Fourth Amended Complaint asserted claims for: strict liability based on a design defect (Count I); strict liability based on a failure to warn (Count II); breach of express warranty (Count III); negligence (Count IV); and loss of consortium (Count V). (Doc. 54).

On March 6, 2014, the Honorable John E. Steele entered an Opinion and Order dismissing the negligence claim (Count IV), but only to the extent Plaintiffs asserted a claim for the negligent failure to test or inspect, and to the extent Plaintiffs asserted a claim of negligence per se. (Doc. 66 at 15; *see also* Doc. 97 at 2).

On September 25, 2015, Judge Steele entered an Opinion and Order granting summary judgment in Defendants' favor as to the strict liability claim (Count II) in its entirety and the negligence claim (Count IV) to the extent that it includes a claim for the negligent failure to warn. (Doc. 97 at 28). Judge Steele denied summary judgment as to any other claim. (*See id.*). In denying summary judgment as to the design and manufacturing defect claims, Judge Steele reasoned:

> Plaintiffs allege that "Enbrel® contained an unreasonably dangerous defect in design or formulation in that, when it left the hands of the Defendants, an average consumer could not reasonably anticipate the dangerous nature of Enbrel® nor fully appreciate the attendant risk of injury associated with Enbrel®." (Doc. #54, ¶¶ 46, 74.) Plaintiffs also allege that Enbrel was negligently manufactured. (Id.) Defendants assert that plaintiffs' design and manufacturing defect claims are barred by the learned intermediary doctrine because unavoidably unsafe products are exempt from design defect liability if the

benefits of the product outweigh the risks and the product is accompanied by an adequate warning.

Defendants are essentially seeking the protection of comment k in § 402A of the Restatement (Second) of Torts. Comment k addresses "[u]navoidably unsafe products, described "as products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs." Restatement (Second) of Torts § 402A, cmt. k. "Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous." Id. (emphasis in original). Accordingly, the seller of an unavoidably unsafe product that was properly prepared and accompanied by proper directions and warnings will not be strictly liable "for unfortunate consequences attending its use merely because he or she has undertaken to supply the public with an apparently useful and desirable product." Id. **In order to be protected under comment k, "a defendant must show that the product is as safe as current testing and research permit, and that the product's benefits outweigh the known risks as of the date the product is distributed."** Tillman, 2015 WL 1456657, at *26 (citing Adams v. G.D. Searle & Co., Inc., 576 So. 2d 728, 732–733 (Fla. 2d DCA 1991)).

**\*4** Here, defendants assert that Dr. Kowal's testimony clearly shows that the benefits of Enbrel outweigh its risk. **Defendants have not, however, proffered any evidence showing that Enbrel was as safe as it could be at the time of Ms. Small's injuries. Furthermore, defendants' arguments are premature as the discovery period has yet to close.** Accordingly, defendants' motion for summary judgment is denied as to plaintiffs' design and manufacturing defect claims.

(Doc. 97 at 26–27) (emphasis added in bold typeface).

On January 25, 2016, the Honorable Paul A. Magnuson denied Defendants' motion for judgment on the pleadings as to Plaintiffs' claim for strict liability based on design defect (Count I) and the claim for negligent manufacture and design (Count IV). (Doc. 150 at 5). In his Order, Judge Magnuson characterized Defendants' argument concerning the design defect claim and ruled on that claim as follows:

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 7228863

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 64 of 99

Defendants contend that Plaintiffs' design-defect claim is preempted by the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ... Defendants' preemption argument rests on a case that was decided only days before the completion of briefing on the [prior] motion to dismiss. Mutual Pharm. Co. v. Bartlett, 133 S. Ct. 2466 (2013)....

The application of Bartlett's holding to this case **will require discovery into Enbrel's chemical formulation and whether that formulation is capable of redesign.** Bartlett found that when a drug is "chemically incapable" of being redesigned, it is impossible for a drug manufacturer to make the drug safer and thus state-law design-defect claims are preempted. Bartlett, 133 S. Ct. at 2475. **Defendants argue that Enbrel is a biologic and incapable of reformulation, but Plaintiffs dispute this contention and must be allowed to take discovery on the issue.** Because in this case the preemption question is not one that is purely legal, judgment on the pleadings on the basis of preemption is not appropriate.

If, however, Defendants are correct that Enbrel is incapable of redesign, Bartlett would bar any design-defect claim based on an alleged failure to redesign Enbrel. Moreover, it is likely, even if Enbrel is capable of redesign, that any claim that Defendants should have changed Enbrel's design before seeking FDA approval would likewise be preempted. See Yates v. Ortho–McNeil–Janssen Pharm., Inc., 808 F.3d 281, 299–300 (6th Cir. 2015) (holding that a claim for breach of a pre-approval design duty was speculative and was preempted). **These issues ... are matters for post-discovery dispositive-motion practice** ....

(Doc. 150 at 3–4) (emphasis added in bold typeface). Judge Magnuson also specifically construed Count I of the Fourth Amended Complaint to raise a manufacturing defect claim based on Judge Steele's treatment of that same claim in the prior Order on summary judgment. (Doc. 150 at 5 (citing Doc. 97 at 27)).

As a result of the dispositive motion practice described *supra*, Plaintiffs' remaining claims are: design and manufacturing defect (Count I); breach of express warranty (Count III); negligent manufacture and design (Count IV); and loss of consortium (Count V). These surviving claims, the defenses raised in opposition thereto, and consideration of the proportionality factors collectively inform the scope of permissible discovery and, thus, the outcome of the parties' pending discovery disputes. See Fed. R. Civ. P. 26(b)(1).

**\*5** As noted above, Judge Steele has already ruled that Defendants' asserted defense to the design and manufacturing defect claims based on comment k in § 402A of the Restatement (Second) of Torts requires Defendant to proffer evidence "showing that Enbrel was as safe as it could be at the time of Ms. Small's injuries." (Doc. 97 at 26–27). Moreover, Judge Magnuson has already ruled that Defendants' preemption defense concerning the surviving design defect claim entitles Plaintiffs to take discovery on the issue of whether Enbrel is a biologic incapable of reformulation. (Doc. 150 at 3–4).

### III. Plaintiffs' Motion to Compel (Doc. 129)

Plaintiffs' Motion to Compel asks the Court to overrule three (3) of Defendants' general or pervasive discovery objections, including objections to producing: (1) discovery relating to "indications" [1] other than Plaintiff Rebecca Small's alleged "indication;" (2) discovery relating to drugs in the same "class" as Enbrel (*i.e.*, "TNF inhibitors" [2] ); and (3) discovery relating to "adverse events" [3] other than Plaintiff Rebecca Small's alleged "adverse event." (Doc. 129 at 9–11).

Plaintiffs also raise issues [4] with respect to the following nine (9) identified categories of discovery [5] that appear to remain at least partially in dispute and, therefore, require Court resolution: (1) "listings of individuals with knowledge about the safety of Enbrel with respect to infections;" (2) "Company internal documents concerning the safety of Enbrel with respect to infections, particularly the risks of asymptomatic infections and the risks of restarting Enbrel after a life[-]threatening infection while taking Enbrel;" (3) "Adverse Event Reports;" (4) "Request for information on Canadian Dear Healthcare Professional Letter"; (5) "Requests for Admissions on Defendants [sic] conversations with Plaintiffs [sic] prescribing physician as well as production requests on communications;" (6) "Studies;" (7) production of certain additional portions of the 1998 Biologic License Application for Enbrel; (8) "Information Post 1998"; and (9) discovery concerning Defendants' recordkeeping as to certain documents. (Doc. 129 at 7–8 and 11–20; Doc. 168 at 49:16–64:20).

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 7228863

Case 1:18-cv-00068  Document 394-1  Filed on 06/10/19 in TXSD  Page 65 of 99

**\*6** The Court addresses each of the disputed objections and categories of discovery in turn below to the extent practicable given the extensive overlap between certain issues. [6]

### A. Defendants' General or Pervasive Objections

#### 1. Indications other than Ms. Small's alleged indication

Plaintiffs ask the Court to overrule Defendants' objections to producing discovery concerning indications other than the specific indication for which Ms. Small allegedly took Enbrel—*i.e.*, rheumatoid arthritis. (Doc. 129 at 9; *see also* Doc. 158 at 44:14). On this issue, Plaintiffs suggest that "[t]he Court look no further that [sic] Enbrel's package insert." (Doc. 129 at 9; *see also* Doc. 129–9). Plaintiffs argue that "[t]he warnings and precautions [in the insert] are not specific to indications" and "[i]f Defendant has responsive information on the safety of Enbrel, there is no basis to believe that [sic] would be relevant to one particular indication for Enbrel and not others." (Doc. 129 at 9).

In their written opposition, Defendants do not specifically respond to Plaintiffs' challenge on this point. Defendants assert, however, that Enbrel "has been evaluated in nearly 200 different clinical studies for over 20 years, in which over 25,000 global study patients have been observed for more than 34,000 patient-years of therapy *across all indications*." (Doc. 142 at 17 (footnotes omitted; emphasis added); *see also* Doc. 158 at 87:15–17). The obvious implication of these representations—made pursuant to Fed. R. Civ. P. 11—is that producing responsive documents relating to indications other than Ms. Small's specific alleged indication of rheumatoid arthritis would be unduly burdensome.

**\*7** The Court finds that Plaintiffs have failed to meet their burden to show why documents and information concerning indications other than rheumatoid arthritis are relevant to any surviving claim or defense asserted in this case. Discovery concerning indications other than Ms. Small's alleged indication appears to the Court to have no relationship to, bearing on, or significance to the surviving claims or defenses asserted in this case by Ms. Small or her husband. The Court is not persuaded that documents relating to, for example,

Enbrel as prescribed for indications of plaque psoriasis or ankylosing spondylitis—both of which are listed in the package insert filed by Plaintiffs (Doc. 129–9)—are relevant to the claim in this case that Enbrel allegedly caused Plaintiff Rebecca Small injury when she was prescribed and took Enbrel for rheumatoid arthritis.

Furthermore, based on the representations by Defendants' counsel (Doc. 142 at 17; *see also* Doc. 158 at 87:15–17), [7] the Court finds that the proposed discovery is not proportional to the needs of this case. *See* Fed. R. Civ. P. 26(b)(1). Specifically, the Court finds that requiring Defendants to produce all discovery sought irrespective of the underlying indication would potentially impose an undue and unacceptable burden on the Defendants. Moreover, the Court finds that the nature of the potential burden outweighs and eclipses the other proportionality factors.

Therefore, the Court sustains Defendants' objections and will limit the scope of discovery in this case to documents and information concerning the specific indication (*i.e.*, rheumatoid arthritis) for which Ms. Small allegedly was prescribed and took Enbrel. Insofar as Defendants may have previously offered to produce any categories of documents relating to other indications in their good-faith effort to resolve the pending discovery disputes in this case (*see, e.g.*, Doc. 158 at 39:3–7, 42:19–43:3; Doc. 168 at 40:15–41:6, 63:20–21), Defendants shall, if not already done, complete any such offered production within thirty (30) days from the date of this Order so that Plaintiffs may have the benefit of those documents going forward in this litigation. However, the Court will not require any additional or expanded discovery relating to other indications for the reasons set forth *supra*.

#### 2. Drugs in the same class as Enbrel (*i.e.*, TNF inhibitors)

Plaintiffs ask the Court to overrule Defendants' objections to producing discovery relating to drugs other than Enbrel that are in the same class as Enbrel—*i.e.*, TNF inhibitors. (Doc. 129 at 9; *see also* Doc. 168 at 62–63). According to Plaintiffs, "[t]he other primary members of the class are Humira and Remicade." (Doc. 129 at 9–10). Plaintiffs argue that "[i]n the routine course of business, manufacturers such as Defendants look to information from within the same class of drugs." (*Id.* at 10). Plaintiffs then leap to the conclusion that "from a common[-]sense

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 66 of 99

2016 WL 7228863

perspective, if there is responsive information concerning other TNF drugs in Defendants [sic] possession, the information is obviously relevant to Enbrel. If not why would Defendants maintain this information?" (*Id.* at 10). Plaintiffs also argue that "the FDA and the medical community look to the TNF drugs as a class" and, therefore, information relating to TNF inhibitors other than Enbrel should be produced by Defendants if it is responsive to one of the Plaintiffs' discovery requests. (*Id.*).

In response, Defendants argue that "[i]n essence, Plaintiffs have requested every document relating to every Enbrel® study ever contemplated or conducted by Defendants, and *every document relating to TNF inhibitors* and 'infections,' without any further specificity or explanation as to how such documents are relevant to their claims, let alone how such a broad request could possibly meet the requisite proportionality standards that govern discovery under the Federal Rules." (Doc. 142 at 2 (emphasis added); *see also id.* at 5 (summarizing select document requests pertaining to other TNF inhibitors)). Defendants add, "[i]n other words, Plaintiffs have essentially requested every document in existence relating to any Enbrel® study ever performed or contemplated and every document in existence relating to Enbrel® *or other TNF inhibitors* and 'infection.' " (Doc. 142 at 5 (emphasis added)).

**\*8** The Court finds that Plaintiffs have failed to satisfy their burden to show why documents and information relating to TNF inhibitors other than Enbrel are relevant to the specific claims and defenses asserted in this case. Plaintiffs' reasoning that such discovery is relevant because Defendants have it and that Defendants have it because it is relevant is circular and speculative. Plaintiffs do not allege in the operative Complaint (Doc. 54) that Rebecca Small was prescribed, purchased, or used any TNF inhibitor other than Enbrel. (*See id.* at ¶¶ 2, 13, 22). Moreover, Defendants are not alleged to have designed, manufactured, sold, or marketed the other TNF inhibitors in question. (*See* Doc. 54; *see also* Doc. 158 at 65–66). There is also no allegation in this case that the other TNF inhibitors in question are designed, manufactured, or formulated the same way as Enbrel. (*See* Doc. 54). Plaintiffs' arguments concerning the potential relevance of this discovery appear to be purely speculative and tantamount to a fishing expedition that risks imposing substantial, undue burdens on the Defendants that outweigh the potential probative value of such evidence.[8]

Therefore, the Court sustains Defendants' objections and will deny Plaintiffs' Motion to Compel to the extent it seeks discovery relating to TNF inhibitors other than Enbrel.

### 3. Adverse events other than Ms. Small's alleged adverse event

Plaintiffs ask the Court to overrule Defendants' objections to producing documents and information relating to adverse events other than the specific adverse event Ms. Small alleges she suffered—*i.e.*, an asymptomatic diverticulitis infection. (Doc. 129 at 11; *see also* Doc. 54 at ¶ 26).[9] In this regard, Plaintiffs argue "[o]ne of the central questions of this case is whether Enbrel is safe to restart in individuals who have suffered a serious infection while taking Enbrel. This issue is clearly not limited to what the original underlying infection was." (Doc. 129 at 11). Plaintiffs also contend that "questions are also raised on Enbrel causing asymptomatic infections." (*Id.*). In practical effect, Plaintiffs seek discovery concerning (1) adverse events involving *any* infection, including *but without limitation to*, diverticulitis infection and asymptomatic infection, and (2) restarting or resuming[10] Enbrel after suffering an infection while taking Enbrel. (*See id.*).

In response, Defendants appear to argue that discovery concerning adverse events should be limited to diverticulitis as "the only infection Plaintiffs have specifically identified to date that they contend Ms. Small suffered as a result of her use of Enbrel®." (Doc. 142 at 7; *see also id.* at 11). Consistent with their position, Defendants have produced "line listings"[11] for all adverse event reports of diverticulitis. (*Id.* at 11). Defendants argue that "[a]t the least, these documents should have allowed Plaintiffs to determine with specificity what more, if anything, they need," but Plaintiffs have not done so to date. (*Id.*). Additionally, Defendants complain that Plaintiffs' so-called "contraindication theory"—*i.e.*, the theory that it was not safe for Ms. Small to restart Enbrel after developing an infection while taking Enbrel— has never been pled, is a blatant attempt to revive the previously dismissed failure-to-warn claim, is addressed in Enbrel's package insert, and cannot now be shoehorned into Plaintiffs' surviving express warranty claim. (Doc.

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 7228863

142 at 11–12 and n.21–22 (citing Doc. 129 at 4–5); *see also id.* at 13, 21). [12]

**\*9** After a careful review of the parties' pleadings and submissions, the Court finds that documents and information relating to adverse events other than the specific adverse event alleged by Plaintiff Rebecca Small are not relevant to the claims or defenses in this case. Plaintiffs have failed to satisfy their burden to show how such discovery is relevant to Plaintiffs' specific claim that *Ms. Small* suffered a very particular type of adverse event—*i.e.*, a diverticulitis infection (Doc. 54 at ¶¶ 26–29)—allegedly caused by Enbrel. Although the Fourth Amended Complaint indisputably contains generalized allegations of the risk of "infection," "asymptomatic infections," "serious and significant infection," "severe and significant infections," "asymptomatic serious infections," and "serious, life-threatening side effects" when taking Enbrel (Doc. 54 at ¶¶ 20–21, 23, 29, 33, 36–37, 42, 68, 71, 93(a), 93(e)–(f), 93(h)), Plaintiffs allege that *Ms. Small* suffered only "a perforated bowel from a *diverticulitis infection*" that "caused an abscess to form surrounding the left uterer" and that "[u]ntil just a few days before her hospitalization, [she] was asymptomatic," (*id.* at ¶ 26 (emphasis added)). Thus, the Court will limit the scope of discovery in this case to diverticular infections, as that is the precise injury Ms. Small alleges Enbrel caused in her case. [13]

Additionally, the Court also finds that requiring Defendants to respond to expansive discovery pertaining to adverse events other than Ms. Small's particular adverse event is not proportional to the needs of this case based on the burdensomeness of the requests, especially given the indisputable fact that the potential occurrence of infection is an acknowledged (and disclosed) side effect of Enbrel. As such, it is logical to assume that Defendants would have voluminous documents relating to the general subject of infection(s). In fact, Plaintiffs appear to concede as much. (*See* Doc. 129 at 13).

In this regard, the Court is again sufficiently persuaded by the following representations of Defendants' counsel —made subject to Fed. R. Civ. P. 11—concerning the burden involved with this discovery:

> Although Defendants have not calculated a comprehensive and exact estimate—doing so would itself impose a substantial burden given the current scope of Plaintiffs' requests—the cost of identifying, retrieving, reviewing, and redacting the information requested would likely total in in [sic] excess of a million dollars. Enbrel® has been on the market since 1998, and has been prescribed to over 900,000 patients in the United States alone. It has been evaluated in nearly 200 different clinical studies for over 20 years, in which over 25,000 global study patients have been observed for more than 34,000 patient-years of therapy across all indications. Over 600,000 clinical and post-marketing adverse events have been reported for Enbrel®, including over 122,718 categorized as "infections." The source documents associated with these infection-related adverse events total in the millions of pages. It would take a significant amount of time, resources and expense to collect and produce source files relating to each 'infection' [sic] adverse event.

> In addition, the documents relating to these studies and adverse event reports are replete with confidential patient health information relating to study participants and other patients that would need to be redacted one page at a time. Requesting Amgen to conduct a comprehensive review of over 20 years' worth of documents to produce, for example, "[e]very DOCUMENT that addresses the significance of any ... study in relation to whether ENBREL CAUSES and/or is capable of CAUSING INFECTION" simply is not feasible.

**\*10** (Doc. 142 at 17 (footnotes omitted); *see also* Doc. 158 at 40:7–41:3, 42:9–43:17).

The Court specifically credits Defendants' representation —again, made pursuant to Fed. R. Civ. P. 11—that preparing a comprehensive and exact cost and time estimate to further substantiate Defendants' assertion of burden would itself be burdensome given the broad scope of Plaintiffs' discovery requests. As noted above, in determining whether or not discovery is "proportional to the needs of the case," the Court considers: (1) the importance of the issues at stake in the action, (2) the amount in controversy, (3) the parties' relative access to relevant information, (4) the parties' resources, (5) the importance of the discovery in resolving the issues, and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(1). In this instance, the Court finds that the burden associated with Plaintiffs' patently overbroad discovery requests

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 68 of 99

2016 WL 7228863

overwhelms and eclipses the other proportionality factors. Moreover, as explained by the advisory committee, to the extent possible, Plaintiffs are in the best position to explain the importance of the requested discovery in resolving the issues. *See* Fed. R. Civ. P. advisory committee's notes to 2015 amendment. Nevertheless, Plaintiffs have not done so persuasively.

To be clear, the Court will not limit discovery of adverse events to *asymptomatic* diverticular infections. Defendants initially explained that their records concerning adverse events are not categorized in such a way that Defendants can reliably distinguish or isolate those records relating to asymptomatic diverticulitis infections. The proffered reason for this was that an adverse event logically "wouldn't be reported unless there were signs and symptoms of something that warranted a report to the company." (Doc. 158 at 39:14–16; *see also id.* at 43:4–8). Moreover, Defendants' counsel explained that "an asymptomatic infection is not a term that the company would be familiar with and is not a term that is in ... their [sic] global safety database, for infection." (*Id.* at 39:21–23). Defendants' counsel indicated that the only exception might be if the term "asymptomatic" was somehow incorporated into a narrative portion of the adverse event report that is susceptible to text-based term searching. (*See* Doc. 158 at 40:7–13; Doc. 168 at 40:19–21). Because Defendants' records relating to adverse event reports are categorized and maintained in the manner they are, the Court will permit Plaintiffs to pursue relevant, proportional discovery relating to diverticular infections, whether or not the infection was asymptomatic.[14]

**\*11** Importantly, however, the Court agrees with Defendants that Plaintiffs have failed to show that discovery concerning Plaintiffs' so-called "contraindication theory" is relevant to any surviving claim in this litigation. To be sure, the operative Complaint contains a general factual allegation that Ms. Small resumed taking Enbrel three (3) months after her diverticulitis infection and subsequently developed "another round of serious complications associated with the use of Enbrel." (Doc. 54 at ¶¶ 27–28). In terms of the substantive counts asserted, however, that allegation resurfaces again only in the Negligence count (Count IV), where it is plainly cast as part of the negligent failure-to-warn claim that was previously disposed of on summary judgment:

> Defendants' representative advised Plaintiff Rebecca Small's doctor, Dr. Catherine Kowal, that it was appropriate for Ms. Small to resume taking Enbrel® subsequent to her first round of infections. Defendant had the duty to provide prescribing physicians with accurate, relevant information concerning the risks and benefits of using Enbrel®. Defendant breached this duty when it informed Dr. Kowal that it was appropriate to resume Ms. Small's prescription for Enbrel®. Dr. Kowal, in reasonable reliance of Defendants' sales representative, resumed Ms. Small's prescription for Enbrel®. Subsequently, Ms. Small suffered significant additional injuries associated with the use of Enbrel®. As a direct and proximate cause of Defendants' breach, Ms. Small suffered additional significant injuries associated with the use of Enbrel®.

(*Id.* at ¶ 92).

This conclusion is bolstered by the fact that Judge Steele previously characterized the same allegation as informing Plaintiffs' negligent failure-to-warn claim in his September 25, 2015 Opinion and Order granting summary judgment against Plaintiffs as to that claim based on the Learned Intermediary Doctrine:

> Plaintiffs attempt to avoid the impact of the learned intermediary doctrine by arguing that Dr. Kowal cannot be treated as a learned intermediary because defendants' pharmaceutical sales representative advised Dr. Kowal that it was safe to resume Ms. Small's treatment with Enbrel. As previously stated, the failure of the manufacturer to provide the physician with an adequate warning is not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that an adequate warning should have communicated....

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)

Case 1:18-cv-00068 Document 394-1 Filed on 06/10/19 in TXSD Page 69 of 99

2016 WL 7228863

* * *

Plaintiffs' failure to warn claim is also premised on the theory that defendants failed to provide guidance on resuming treatment with Enbrel after an infection. The problem with this theory is that manufacturers are only required to warn the prescribing physician of the possibility that the drug may cause the injury alleged by the plaintiff. There is no duty to provide guidance under Florida law. Furthermore, Dr. Kowal testified that requested guidance would not have changed her decision to resume Ms. Small's treatment with Enbrel. Accordingly, plaintiffs cannot show that defendants' purported failure to provide guidance as to when it was appropriate to resume treatment with Enbrel was the proximate cause of her injuries.

(Doc. 97 at 23–25 (quotation, citations, and footnote omitted)).

Plaintiffs have not adequately shown how the so-called "contraindication theory" concerning Ms. Small's restarting of Enbrel after her diverticulitis infection is part of and relevant to any of the *surviving* claims in this case based upon the allegations in the operative Complaint such that the Court should order expansive discovery on that point. During the February 11, 2016 continued motion hearing, Plaintiffs' counsel attempted to argue that "contraindication" is implicated by the surviving design defect and breach of express warranty claims. (Doc. 168 33:4–39:11). Upon a review of the operative Complaint, however, the Court finds no obvious inclusion of the "contraindication theory" in the design defect or express warranty claims, as those claims are currently pled. (*See* Doc. 54 at ¶¶ 45–51, 66–72). This conclusion is further bolstered in part by Judge Steele's March 6, 2014 Opinion and Order specifically rejecting Plaintiffs' attempts to "include the promises made by defendants' sales representative in their breach of express warranty claim" because Plaintiffs "failed to include any allegations regarding the representatives' promises in Count III." (Doc. 66 at 12 n.3). Without more, the Court is not persuaded that Plaintiffs are entitled on the basis of the "contraindication theory" to discovery of adverse event reports concerning patients who resumed taking Enbrel after experiencing an infection while taking Enbrel.

**\*12** Accordingly, the Court will not order any additional discovery concerning this subject beyond what

Defendants have offered to produce (*see* Doc. 165 at 4) as part of their good-faith efforts to resolve their discovery disputes with Plaintiffs. Specifically, as the Court understands it, Defendants ultimately "were able to determine from the global safety database, the adverse events that are classified as positive rechallenge for infection." (Doc. 168 at 40:23–25). [15] Defendants' counsel has represented that there were approximately 129 such reports, totaling approximately 1,600 pages of documents requiring heavy redactions because they contain patient information. (Doc. 168 at 40:25–41:6). Additionally, Defendants agreed to produce any adverse event reports classified within their database as "dechallenge," as opposed to "rechallenge," for infection. (Doc. 168 at 46:13–47:14; *see also* Doc. 165 at 4). The Court will require Defendants to complete this document production within thirty (30) days from the date of this Order, as offered, but the Court will not permit Plaintiffs to seek any expanded discovery as to these subjects for the reasons set forth *supra*.

**B. Disputed Categories of Discovery**

**1. "Listings of individuals with knowledge about the safety of Enbrel with respect to infections" (Doc. 129 at 7)**

Plaintiffs request that Defendants identify persons with supervisory responsibility over scientific research into the safety of Enbrel. (Doc. 129 at 7; Doc. 168 at 49). Plaintiffs' Request for Production No. 4 and Interrogatory No. 1 implicate this discovery. (Doc. 129 at 11–12). Request for Production No. 4 seeks:

> **REQUEST NO. 4:** Corporate organization charts that identify the persons with supervisory responsibility over scientific research into the safety of ENBREL and those working at their direction; the persons responsible for determining whether ENBREL CAUSES and/or is capable of CAUSING INFECTION and those working at their direction; the persons in charge of compiling and reporting INFECTION ADVERSE EVENTS for ENBREL and

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 7228863

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 70 of 99

those working at their direction; and the persons in charge of maintaining the source DOCUMENTS for INFECTION ADVERSE EVENTS for ENBREL and those working at their direction.

(Doc. 129 at 11). Additionally, Interrogatory No. 1 asks:

> **INTERROGATORY NO. 1:** Identify YOUR Chief Medical Officer; the persons with supervisory responsibility over scientific research into the safety of ENBREL; the persons responsible for determining whether ENBREL CAUSES and/or is capable of CAUSING INFECTION; the persons in charge of compiling and reporting INFECTION ADVERSE EVENTS for ENBREL; and the persons in charge of maintaining the source DOCUMENTS for INFECTION ADVERSE EVENTS for ENBREL.

(*Id.* at 11–12).

Defendants object to the document request and to the interrogatory as overbroad because they seek "information about a potentially large number of individuals." (*Id.*). Notwithstanding that objection, however, Defendants responded that "Dr. Janet Iles is the Global Safety Medical Director for Defendant Amgen and is knowledgeable about the adverse event collection and reporting system." (*Id.*). In their opposition brief, Defendants also argue that the document request and interrogatory are not limited by time or scope and, as such, "[t]he identification of all individuals 'involved in the safety of Enbrel' at four different companies over the 23–year history of the product, if it is even possible, would result in a list of hundreds of employees." (Doc. 142 at 18).

Here, the Court agrees with Defendants that the discovery requests in question, as presently framed, are facially overbroad and potentially unduly burdensome, especially given the number of corporate entities involved, the timeframe encompassed by the discovery requests, and the lack of reasonable particularity in Plaintiffs' formulation of the discovery requests. Defendants have, as a starting compromise, provided the name of the Global Safety Medical Director for Defendant Amgen, Inc. The Court finds this to be an appropriate course of action. Accordingly, Plaintiffs may start by deposing Dr. Iles and ask her—under oath—who else may be knowledgeable concerning the topics identified in the document request and the interrogatory. This deposition shall occur within forty-five (45) days from the date of this Order, if it has not already occurred. Plaintiffs may then seek to depose, as necessary and appropriate within the bounds of relevance and proportionality, other individuals whom Dr. Isles identifies for additional information.[16]

**\*13** To be clear, the Court fully expects Defendants to be in a position to offer the names of additional current and former employees who are reasonably likely to possess relevant information. The Court will require Plaintiffs to pursue that information beginning initially with the deposition of Dr. Isles and following up, as necessary and appropriate, with additional depositions and more particularized written discovery requests consistent with this Order. However, the Court expressly admonishes Defendants against unreasonably withholding information concerning other current or former employees who are reasonably likely to possess relevant information concerning the surviving claims and defenses asserted in this case. If Plaintiffs are dissatisfied with Defendants' cooperation with further discovery concerning the identification of witnesses reasonably likely to possess relevant information, then Plaintiffs may file an appropriate motion seeking relief from the Court, but only after first completing Dr. Isles' deposition in this case.

Of note, the Court specifically rejects Plaintiffs' suggestion that "Defendants likely could have sent a broadcast email to all employees asking whether the employee had [sic] responsive information on the topics of this case and if so, to contact counsel. This would have required minimal effort." (Doc. 129 at 12). Given the number of corporate entities involved, the time period encompassed by Plaintiffs' discovery requests, and the facially broad nature of the discovery requests, the Court finds that polling Defendants' employees by email and effectively tracking, managing, and reporting the results of that

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 7228863
Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 71 of 99

process would itself impose undue burden and expense on the Defendants.

### 2. "Company internal documents concerning the safety of Enbrel with respect to infections, particularly the risks of asymptomatic infections and the risks of restarting Enbrel after a life[-]threatening infection while taking Enbrel" (Doc. 129 at 7)

Plaintiffs ask the Court to require Defendants to produce documents (including internal correspondence or custodial files) from any additional witnesses within the Defendants who have relevant knowledge. (Doc. 129 at 7). Plaintiffs complain that "Defendants have asserted throughout their objections that all of the material that Plaintiffs seek is contained within the BLA [17] for Enbrel." (*Id.*). Plaintiffs further argue that "[t]he BLA represents information submitted to the FDA. It does not contain internal documents between employees of the Defendants. For example, internal reviews of the safety of Enbrel with respect to infections are not sent to the FDA, and are thus not part of the BLA." (*Id.*). Plaintiffs contend that "[i]t tests all bounds of credibility that there are no internal documents within the company that is [sic] relevant to Plaintiffs' remaining claims." (*Id.*).

Consistent with the Court's ruling above concerning the identification of potential witnesses, (*see* Part III.B.1. *supra*), the Court finds that Plaintiffs should first start by deposing Dr. Isles (or an appropriate Fed. R. Civ. P. 30(b)(6) witness designated by Defendants) and inquiring as to: (1) the categories of documents, if any, Defendants have in their possession, custody, or control that are relevant to the surviving claims and defenses in this case; (2) the identities of the custodian(s), if any, of any such categories of documents; and (3) the location(s) of any such categories of documents. Plaintiffs may then use this information and/or information obtained in subsequent depositions of other identified custodians to pursue more reasonably particularized, relevant, and proportional discovery requests.

### 3. "Adverse Event Reports" (Doc. 129 at 8)

Plaintiffs ask the Court to order Defendants to produce adverse event reports relating to "adverse events associated with restarting Enbrel after suffering a

life[-]threatening infection while take [sic] Enbrel." (Doc. 129 at 8). Plaintiffs also ask the Court to order Defendants to produce "the complete files for adverse events they concede are relevant to the case." (*Id.*). In this regard, Plaintiffs argue that "[a]s part of their production, Defendants provided a listing of some of the data about each case. Notably absent was narrative information that is maintained by Defendants. Defendants have no justification for failing to provide the narratives." (*Id.* at 13).

**\*14** Plaintiffs appear to include within this category of discovery certain alleged "standard operating procedures and/or policy and procedures manuals for handling of INFECTION ADVERSE EVENTS and REPORTABLE EVENTS pertaining to ENBREL." (*Id.* at 13 (quoting Plaintiffs' Document Request No. 38)). Plaintiffs also appear to include within the requests "complete copies of all databases used to track, trend, or record information regarding INFECTION ADVERSE EVENTS that YOU received among patients using ENBREL" or any equivalent information by reference to the business records in which Defendants store it. (*Id.* at 14–15 (quoting Plaintiffs' Document Request No. 39)).

Defendants contend in response that they have produced "line item listings for all reported adverse events relating to diverticulitis" and that "[t]he only issue arguably even in dispute is whether some defect in Enbrel® caused *Ms. Small's* infection (whatever that may be)." (Doc. 142 at 20). Defendants also reiterate their position that the burden of complying with Plaintiffs' discovery would be substantial, averring:

> [T]here are over 120,000 adverse events relating to infection. An exact determination of the volume of source documents associated with these 120,000 events would require a manual collection and review of hundreds of thousands of documents, but it is certain that they comprise millions of pages of medical records replete with confidential health information that would need to be redacted for each page.

(Doc. 142 at 21 (footnote omitted)).

At the February 11, 2016 continued motion hearing, Plaintiffs indicated that Defendants have agreed to produce responsive "MedWatch forms." (Doc. 168 at 58; Doc. 165 at 4). [18] However, Plaintiffs affirmed that they are also requesting other backup files relating to the responsive MedWatch forms that Defendants have agreed to produce. (Doc. 168 at 58). [19] Defendants do not agree to the produce the backup files. (*Id.*).

The parties' specific arguments concerning adverse event reports and other documents and information related thereto are governed by the Court's ruling set forth *supra* that the scope of discovery in this case must be limited by Ms. Small's particular indication —*i.e.*, rheumatoid arthritis—and her particular adverse event—*i.e.*, diverticular infection—except to the extent Defendants have already agreed as part of their good-faith efforts to resolve the parties' discovery disputes to produce any documents outside of these limitations. (*See* Parts III.A.1., III.A.3. *supra*). Thus, Plaintiffs' Motion (Doc. 129) is due to be denied to the extent it seeks any broader discovery relating to adverse event reports and related documents beyond what the Court has permitted herein or what Defendants have otherwise agreed to produce.

The Court will, however, require Defendants to produce to Plaintiffs within thirty (30) days from the date of this Order (if they have not already done so), documents sufficient to identify the Defendants' standard operating procedures, policies, and/or procedures relating to the handling of infection adverse events concerning Enbrel that (1) were in effect or used by the Defendants at the time Ms. Small's adverse event was reported or (2) that were otherwise applied by Defendants or applicable to Ms. Small's adverse event report at the time it was made. Insofar as these documents would have governed or would have applied to the reporting and Defendants' handling of Ms. Smalls' adverse event, the Court finds that they are clearly relevant to the claims asserted by Ms. Small in this litigation. Moreover, Defendants have offered no reason as to why this narrower subset of documents would be burdensome to identify and to produce.

**\*15** The Court rejects, however, Plaintiffs' argument that Defendants must be required to produce other "narrative information," source documents, databases, database-

related information, or equivalent information relating to the adverse event reports Defendants have consented to produce. This expanded universe of documents and information is not obviously relevant to the claims or defenses in this litigation or proportional to the needs of the case. In this regard, the Court accepts Defendants' counsel's representations—made subject to Fed. R. Civ. P. 11—that the requested production would entail hundreds of thousands of documents that include millions of pages of medical records potentially containing confidential health information requiring redaction. (Doc. 142 at 21). Moreover, it is not even clear to the Court at this time whether Plaintiffs have actually endeavored to review all of the documents and information Defendants have agreed to produce to date or, if so, why Plaintiffs contend that the previously produced documents are inadequate such that Plaintiffs should be entitled to more detailed information. Plaintiffs may review the documents that Defendants have agreed to produce and then pursue relevant and proportional discovery in a more deliberate and targeted fashion through reasonably particularized discovery requests.

### 4. "Request for information on Canadian Dear Healthcare Professional Letter" (Doc. 129 at 16)

Plaintiffs ask the Court to order Defendants to respond to a request for admission and to produce documents relating to a communication Defendants allegedly issued in Canada, which Plaintiffs describe as a "Dear Healthcare Professional Letter" to Canadian doctors concerning Enbrel. (Doc. 129 at 16–18). Plaintiffs argue that the communication, dated on or about April 21, 2009, included the following language concerning the safety of Enbrel:

> A TNF blocker may be restarted after recovery from the infection. The decision to restart a TNF blocker should include a re-evaluation of the benefits and risks of the TNF blocker. Both the decision to restart TNF blocker therapy and the duration of antifungal therapy should be made

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 7228863

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 73 of 99

in consultation with an infectious disease specialist, when feasible.

(*Id.*). Plaintiffs' Request for Admission No. 1 asks Defendants to admit that the letter was sent containing this language, and Plaintiffs' Requests for Production Nos. 64–65 ask for other documents relating to the letter and/or the statements made therein. (*Id.* at 16–17). Plaintiffs contend that "[b]y stating that Enbrel can be restarted, this implies that Defendants have actually evaluated the safety of restarting Enbrel. Any such evaluations, or lack thereof, are of central importance in this case." (*Id.* at 18; *see also* Doc. 158 at 69:22–70:24).

Defendants take the position that this discovery has no relevance to the case "beyond Plaintiffs' defunct failure-to-warn claim" and reiterate their arguments concerning the so-called "contraindication theory." (Doc. 142 at 21).

Consistent with the Court's ruling on the "contraindication theory" discovery above, (*see* Part III.A.3. *supra*), the Court denies Plaintiffs' Motion to the extent it seeks to compel any discovery relating to the Canadian "Dear Healthcare Professional Letter" described by the Plaintiffs. For the same reasons explained above, the Court finds that such discovery is not relevant to any of the surviving claims in this litigation. (*See id.*). The Court's conclusion in this regard is reinforced, at least in part, by the additional facts that: (1) these particular communications were allegedly disseminated to doctors *in a foreign country*; and (2) Plaintiffs have not alleged as part of any of the surviving claims in this case that Ms. Small or her prescribing or treating physicians ever received, read, or relied upon the communications in question.

### 5. "Requests for Admissions on Defendants [sic] conversations with Plaintiffs [sic] prescribing physician as well as production requests on communications" (Doc. 129 at 18)

Plaintiffs ask the Court to order Defendants to respond to a request for admission and to produce documents relating to communications between Defendants and Plaintiffs' prescribing physician, Dr. Kowal. (Doc. 129 at 18–19). Plaintiffs contend that "[o]ne of the key aspects of this case is a conversation that allegedly took place between Defendants and Ms. Small's prescribing

physician while Ms. Small was in the physician's office. The nature of the conversation was whether it was safe for Ms. Small to restart Enbrel after her first round of infections." (*Id.* at 18). Plaintiffs also complain that Defendants have denied that the conversation took place, but Defendants have failed to list any individuals or documents to support that denial. (*Id.*). On that basis, Plaintiffs charge that Defendants' responses and objections to Request for Admission No. 3 and Requests for Production Nos. 67–70 have no merit and are asserted in bad faith. (*Id.* at 18–19).

**\*16** Defendants argue that these communications are not relevant to Plaintiffs' claims based on two prior rulings by Judge Steele in this case. First, Defendants argue that Judge Steele's September 25, 2015 Opinion and Order (Doc. 97) granting summary judgment against Plaintiffs as to the failure-to-warn claims expressly deemed the communications to be irrelevant. (Doc. 142 at 22–23). Defendants rely upon the following excerpt from that summary judgment Order:

> [A]ny representations made by defendants' sales representative are irrelevant if Dr. Kowal had independent knowledge of the possibility that Enbrel could cause the injuries sustained by Ms. Small. Dr. Kowal's testimony clearly shows that she knew of the risks associated with the resumption of Enbrel before she spoke to the sales representative. (Doc. #82–1, pp. 33–34, 75; Doc. #82–3, pp. 17, 20; Doc. #82–5, p. 5.) Accordingly, the Court finds that the representations allegedly made by defendants' sales representative are irrelevant.

(*Id.* (quoting Doc. 97 at 24)).

Second, Defendants argue that Judge Steele also held in his March 6, 2014 Opinion and Order (Doc. 66) on the motion to dismiss the Fourth Amended Complaint that "the alleged statements from the sales representative cannot form the basis of Plaintiffs' express warranty

claim." (Doc. 142 at 23). Defendants rely upon the following excerpt from a footnote in that Order:

> In response to defendants' motion to dismiss, plaintiffs attempt to include the promises made by defendants' sales representative in their breach of express warranty claim. Plaintiffs, however, have failed to include any allegations regarding the representative's promises in Count III. Accordingly, the Court declines to include them among the alleged warranties.

(*Id.* (citing Doc. 66 at 12 n.3)).

Defendants also assert that (1) they have produced call notes with Dr. Kowal, which do not reflect a sales representative visit on the date in question; (2) Dr. Kowal testified "that she could not recall the alleged conversation or any visit from an Amgen sales representative on that date, nor do her notes or Ms. Small's medical records reflect any such visit;" and (3) "[t]here is nothing more for Defendants to provide about a conversation that appears to have never taken place and that the Court has twice ruled irrelevant to this case." (Doc. 142 at 23–24; *see also* Doc. 158 at 79:3–6, 86:4–6; Doc. 168 at 76:16–78:5).

At the February 11, 2016 continued motion hearing, Defendants offered to produce, in addition to the call notes:

> any other written communications in official locations within the company. So for example, if she called into the company to ask a question, a medical question, that would go to a department and become part of the company file. And we'll agree to produce those types of communications with Dr. Kowal to the extent there are any.

(Doc. 168 at 76:18–24).

The Court agrees with Defendants that Plaintiffs' Motion should be denied as to this issue based on the manner in which Plaintiffs' discovery requests are written. All of Request for Admission No. 3 and, arguably, parts of Requests for Production Nos. 67–70 are encompassed by Plaintiffs' so-called "contraindication theory." Consistent with the Court's ruling above on the "contraindication theory," the Court finds that Plaintiffs have not met their burden to show that the requested discovery concerning communications between Defendants and Plaintiffs' prescribing and treating physician are relevant to the surviving claims in this case. (*See* Part III.A.3. *supra*).

**\*17** As to those portions of Requests for Production Nos. 67–70 that may not be encompassed by the "contraindication theory," the Court finds that the requests, as presently framed, are facially overbroad. For example, Request No. 67 broadly demands the production of "any document that was provided to Plaintiffs' prescribing physician Dr. Kowal," irrespective of the subject matter to which the document relates or Defendants' reason for providing the document to Dr. Kowal. (Doc. 129 at 19–20). Requests Nos. 68 and 70 [20] go even further afield by demanding the production of "all emails, letters, reports, memoranda and other written or electronic communications discussing or referring to Plaintiffs' prescribing physician Dr. Kowal," irrespective of the parties to the communication, the subject matter of the communication, or the context in which Dr. Kowal is discussed or mentioned. (*Id.* at 20). Moreover, Request No. 69 broadly demands the production of "all documents concerning training of any of YOUR employees who had any direct contact with Dr. Kowal," irrespective of either the nature of the purported training or the nature of the contact between the employee and Dr. Kowal. (*Id.*).

To be clear, however, the Court disagrees with Defendants' characterization of Judge Steele's September 25, 2015 summary judgment Order. (*See* Doc. 142 at 22–23 (citing Doc. 97 at 13, 24)). Thus, no part of the Court's ruling as to the discovery issues *sub judice* is based on Defendants' characterization of the summary judgment Order. Judge Steele's conclusion concerning the "irrelevant" nature of the sales representative's alleged representations appears to be limited to the analysis of Plaintiffs' failure-to-warn claim under the Learned Intermediary Doctrine. (*See* Doc. 97 at 13, 24). The Court

does not construe Judge Steele's summary judgment Order as finding that the sales representative's alleged statements were necessarily irrelevant for *all* purposes in the case. (*See id.*). Although the Court now reaches that conclusion in light of the surviving claims in this case and the manner in which the Fourth Amended Complaint is framed, Judge Steele's summary judgment Order does not appear to have reached the broader question of whether the sales representative's alleged statements are relevant to any of the other asserted claims or defenses that have survived.

Accordingly, the Court will require Defendants to produce within thirty (30) days from the date of this Order (with new, formal Bates numbers, if not already done) copies of the call logs or call notes Defendants previously offered to produce (*see* Doc. 158 at 79:4–6) to confirm that no sales representative was present at Dr. Kowal's office on the date Plaintiffs allege the statements at issue were made. The Court will also require Defendants to produce within thirty (30) days from the date of this Order "any other written communications in official locations within the company" as described and as offered by Defendants' counsel at the February 11, 2016 hearing. (*See* Doc. 168 at 76:18–24). The Court will not, however, require Defendants to respond to any additional discovery on this point at this time based on the Plaintiffs' existing discovery requests.

### 6. "Studies" (Doc. 129 at 8)

Plaintiffs ask the Court to compel Defendants to produce unspecified "studies." (Doc. 129 at 8). Plaintiffs argue "[t]o the extent that studies contain information on the risk of infections associated with the use of Enbrel, particularly restarting Enbrel and asymptomatic infections, these studies should be produced. Defendants are willing to provide study information through 1998, but as discussed below, nothing after 1998." (*Id.*). At the February 11, 2016 continued motion hearing, Plaintiffs added that they are requesting information regarding studies conducted by Defendants of adverse event reports. (Doc. 168 at 60–61). These include what Plaintiffs describe as "Pharmacovigilance" or "internal Pharmacovigilance reviews." (*Id.*).

Plaintiffs do not connect the relief requested in their Motion concerning studies to any specific discovery request(s). In their response, however, Defendants

attempt to connect Plaintiffs' demand for studies concerning Enbrel to Requests for Production Nos. 6 and 11 (*see* Doc. 142 at 5 and n.3) and for studies concerning other TNF inhibitors to Requests Nos. 17, 22–23, 29–30 (*id.*). The Court notes, however, that various types of "studies" and a broad assortment of documents relating to such "studies" appear to be the subject of Plaintiffs' Requests for Production Nos. 5–34, 52, and 71. (*See* Doc. 129–1).

**\*18** Here, the Court finds that Plaintiffs' demand for the production of "studies" is due to be denied to the extent it is addressed by the Court's rulings *supra* concerning (1) limiting discovery to Ms. Small's specific indication of rheumatoid arthritis; (2) precluding discovery related to TNF inhibitors other than Enbrel; (3) limiting discovery to Ms. Small's specific adverse event of diverticular infection; and (4) precluding discovery related to Plaintiffs' so-called "contraindication theory." To the extent Defendants previously agreed as part of their good-faith efforts to resolve their discovery disputes with Plaintiffs to produce any studies or any documents relating to studies beyond the limitations imposed herein, the Court will require Defendants to produce what they previously offered to produce within thirty (30) days from the date of this Order. (*See* Doc. 158 at 84:2, 87:4–12; Doc. 165 at 4). To the extent Plaintiffs' Motion seeks to compel the production of studies or documents relating to studies above and beyond what Defendants have offered to produce, the Court denies the Motion at this time and will require Plaintiffs reformulate and re-serve their discovery requests, taking into account the discovery limitations the Court has imposed herein.

### 7. Production of certain additional portions of the 1998 Biologic License Application for Enbrel (Doc. 168 at 51)

Plaintiffs ask the Court to order Defendants to produce certain withheld portions of the BLA that were submitted to the United States Food and Drug Administration ("FDA") for approval of Enbrel. (Doc. 168 at 51). According to Plaintiffs, Defendants have produced approximately 75,000 pages of information from the BLA. (Doc. 158 at 59:20–23). Plaintiffs represented to the Court that the BLA is "a very specifically structured, regimented document" and it is "not uncommon" for the document to be 250,000 pages in length and some of the sections thereof could be 50,000 pages. (*Id.* at 60:2–9; Doc. 168

at 51:18–54:16). The original BLA seeking approval for Enbrel dates back to 1998. (Doc. 158 at 60:10–11).

Although Plaintiffs' Motion does not complain about the completeness of Defendants' production of the 1998 BLA for Enbrel, Plaintiffs asserted at the February 11, 2016 continued motion hearing that Defendants have failed to produce all relevant portions of the BLA, including "the manufacturing specifications for Enbrel" contained in the "Chemistry, Manufacturing and Control" ("CMC") section of the BLA. (Doc. 168 at 31:13–33:1, 51:18–54:16). Plaintiffs argue that discovery of the CMC is relevant to and necessary for Plaintiffs' design and manufacturing claims. (*See id.*). Plaintiffs appear to argue that even though Defendants have produced an index for the contents of the BLA, that index does not provide enough information for Plaintiffs to accurately focus their demand for production of other relevant portions of the BLA. (*See id.* at 53:15–54:9). Moreover, Plaintiffs argue that because Defendants likely maintain the BLA in electronic form and the document is not likely to contain privileged information, it would not be burdensome for Defendants to produce the remaining portions of the BLA electronically. (*Id.*).

In response, Defendants argue that they produced the BLA, an index to the BLA, and a "map" showing Plaintiffs' counsel what sections of the BLA were produced. (Doc. 168 at 72:1–3). Defendants also assert that they produced all of the sections of the BLA except for the CMC. (*Id.* at 72:3–5; 75:20–23). As for the CMC specifically, Defendants state "the chemistry, manufacturing and composition section ... is so highly confidential, if that's something we're ordered to produce ... we reserve the right to seek the necessary relief because that is the secret sauce ...." (*Id.* at 72:3–10). [21] Defendants' counsel elaborated as follows:

> I will tell you that is the equivalent of every detail for how Enbrel is made. There's an amino acid sequence which is publicly available. That's the composition, but how this molecule is engineered, the technique, what is used to actually get this TNF inhibitor into the

molecular shape that it is, is highly trade secret ....

(Doc. 168 at 92:4–9; *see also id.* at 93:10–12, 94:1–2). Thus, Defendants vehemently object to producing the CMC on confidentiality and trade-secret grounds. (*Id.* at 75:21–24). Because Plaintiffs raised an issue concerning production of the CMC for the first time at the February 11 hearing, Defendants offered to submit additional briefing and evidentiary support on that issue separately. (*Id.* at 75:24–76:1; 91:24–92:14; 97:8–10).

**\*19** Here, Plaintiffs failed to address adequately this specific issue in their Motion and the oral arguments proffered by the parties' counsel during the February 11 hearing were fragmented, incomplete, and unhelpful. As a result, the Court finds that it does not have sufficient information at this time to decide whether to order the production of any withheld portions of the BLA, including but not limited to the highly sensitive and confidential CMC. The Court, therefore, denies Plaintiffs' Motion without prejudice to the extent it seeks to compel the production of any additional portions of the 1998 BLA that Defendants may have withheld from production.

On this point, Plaintiffs may file a new, separate motion to compel that specifically addresses all issues Plaintiffs wish to raise concerning production of the remaining portions of the 1998 BLA, including but not limited to the CMC. Any such motion (and incorporated memorandum of law) shall be filed within fourteen (14) days of the date of this Order. The motion (and incorporated memorandum of law) shall not exceed thirty (30) pages. Moreover, Plaintiffs' new motion (1) must strictly comply with this Court's Local Rules and (2) may not include arguments or seek relief concerning any other discovery disputes between the parties. Given the parties' demonstrated propensity for conflating issues, the Court will constrain Plaintiffs and Defendants to addressing their continuing dispute concerning the 1998 BLA in a more targeted fashion. Defendants shall file their opposition brief within fourteen (14) days after the filing date of Plaintiffs' new motion. Defendants' opposition brief shall not exceed thirty (30) pages. No additional briefing (*e.g.*, reply or sur-reply) will be permitted on this issue unless subsequently ordered by the Court.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 77 of 99

**8. "Information Post 1998" (Doc. 129 at 8)**

Plaintiffs ask the Court to compel Defendants to produce otherwise responsive documents post-dating the time of the original approval of Enbrel by the FDA in 1998. (Doc. 129 at 8). Plaintiffs contend that Defendants have "arbitrarily limited its [sic] production to the time of the original approval in 1998." (*Id.*). Plaintiffs' complaint in this regard appears to include "any of the numerous filings to [sic] the BLA after 1998" relating to safety submitted to regulatory authorities in the United States and Europe (*id.* at 6; Doc. 168 at 51, 54:10–55:25), and "study information" after 1998 (Doc. 129 at 8).

At the December 30, 2015 motion hearing, Defendants' counsel explained that the 1998 BLA Defendants produced "contains all of the clinical studies, preclinical studies, that were conducted before the company went to the FDA to determine if Enbrel is safe and effective as a treatment for rheumatoid arthritis." (Doc. 158 at 84:1–5). Based on that, Defendants argue that post-1998 documents and information are not relevant to a design or formulation defect claim because Enbrel's design and formulation was approved in 1998. (*See id.* at 84:5–7). Notwithstanding their objection to producing post-1998 documents and information, Defendants offered as part of their good-faith effort to compromise this dispute to produce "labeling related supplemental biologic license applications if it related to a change for infection." (Doc. 168 72:19–73:8; 76:4–9).

The Court is not persuaded by Defendants' arguments as to the proposed temporal limitation. Merely because Enbrel was designed and received FDA approval in or before 1998 does not preclude the possibility that documents and information generated after 1998 might also be (1) relevant to the Plaintiffs' surviving design defect, manufacturing defect, and express warranty claims, and (2) proportional to the needs of the case. Therefore, the Court overrules Defendants' objection to producing discovery that post-dates the 1998 approval of Enbrel by the FDA based on the temporal limitation alone. Subject to any of the limitations set forth in this Order, Defendants must produce any post-1998 documents and information that are otherwise relevant, proportional to the needs of the case, and responsive to Plaintiffs' discovery requests. This includes, but is not limited to, otherwise relevant, proportional, and

responsive documents (subject to any of the limitations in this Order) that were submitted to European regulatory authorities after 1998. (*See* Doc. 168 at 54–55). Such production shall occur within thirty (30) days from the date of this Order. Based on the information before the Court at this time, the Court cannot conclude that such documents are irrelevant to the surviving claims and defenses in this case or disproportional to the needs of the case.

**9. Discovery concerning Defendants' recordkeeping as to certain documents (Doc. 168 at 52)**

**\*20** At the February 11, 2016 continued motion hearing, Plaintiffs requested a Fed. R. Civ. P. 30(b)(6) deposition to "understand how the company maintains the BLAs and the regulatory information that's in play here and ... how they maintain this information and give us a way to get much more focused on exactly which pieces are most responsive and relevant." (Doc. 168 at 52:9–15). This issue was not raised or briefed in Plaintiffs' Motion. (*See* Doc. 129). Moreover, the Court does not have the benefit of a response from Defendants on this narrow issue. Therefore, at this time, the Court will deny without prejudice what the Court construes as Plaintiffs' *ore tenus* motion to compel a corporate representative deposition on this topic.

**IV. Defendants' Motion to Compel (Doc. 126)**

For their part, Defendants move the Court for an order compelling Plaintiffs to respond to certain interrogatories and requests for production of documents. (Doc. 126 at 1). Specifically, Defendants' Motion seeks to compel: (1) responses to Interrogatories Nos. 2, 5, 7, 8, and 9; (2) Requests for Production No. 1 to the extent documents are referenced in Plaintiffs' interrogatory answers; and (3) certain documents and an external hard drive referenced during Ms. Small's deposition. (Doc. 126 at 7–8, 10).

Plaintiffs initially opposed all of the relief requested by Defendants. (*See* Doc. 139).

**A. Interrogatories Nos. 2 and 5, and Request for Production No. 1**

At the February 11, 2016 continued motion hearing, Defendants' counsel represented to the Court that the only interrogatories for which Defendants still seek relief

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 7228863

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 78 of 99

following Judge Magnuson's January 25, 2016 Order denying judgment on the pleadings are the interrogatories relating to damages—*i.e.*, Interrogatories Nos. 7, 8, and 9. (*See* Doc. 168 at 100:6–19). Therefore, the Court will deny Defendants' Motion without prejudice as moot to the extent it relates to Interrogatories Nos. 2 and 5, and Defendants' corresponding request for related documents in Request for Production No. 1.

### B. Interrogatories Nos. 7, 8, and 9, and Request for Production No. 1

At the December 30, 2015 initial motion hearing, Plaintiffs' co-counsel agreed to respond to the interrogatories and to produce documents relating to Plaintiffs' damages. (*See* Doc. 158 at 12:8–13, 92:1–94:20). Based upon Plaintiffs' willingness to do so, the Court ordered Plaintiffs to provide the damages information and documents they agreed to provide. (*See* Doc. 158 at 97:8–16). At the February 11 continued motion hearing, Plaintiffs' co-counsel advised the Court that Plaintiffs' responses and document production were forthcoming. (*See* Doc. 168 at 101:1–103:2). Based on the Court's understanding that Plaintiffs have agreed to supply the requested damages information and documents, the Court will deny Defendants' Motion without prejudice as moot insofar as it relates to Interrogatories Nos. 7, 8, and 9, and Defendants' corresponding request for related documents in Request for Production No. 1.

### C. Documents and External Hard Drive Referenced at Deposition

Defendants contend that Ms. Small referenced certain documents during her deposition that Plaintiffs failed to produce in response to written discovery. (*See* Doc. 126 at 9–10). These include: (1) Honeywell insurance documents; (2) prescription receipts; (3) bills for medical services; (4) evidence of payments for Enbrel; (5) the contents of a potentially damaged hard drive where Ms. Small keeps electronic files that includes damages-related documents and information; (6) consent documents from the Enbrel study in which Ms. Small was enrolled; and (7) publications from the Arthritis Foundation. (*See id.*).

Insofar as the documents Ms. Small referenced in her deposition relate to Plaintiffs' damages, they are encompassed by the parties' agreement on the record that Plaintiffs would produce such documents and information. (*See* Doc. 158 at 12:8–13, 92:1–94:20).

Accordingly, the Court will deny Defendants' Motion without prejudice as moot to the extent it seeks relief concerning such documents.

**\*21** With specific regard to the external hard drive described in Defendants' Motion (Doc. 126 at 9), Plaintiffs' counsel advised the Court during the December 30 hearing that Plaintiffs would produce all electronic files on the hard drive that are accessible, relevant, and responsive to Defendants' discovery requests. (*See* Doc. 158 at 95:10–96:17). As a result, Defendants' counsel suggested that the issues raised in Defendants' Motion concerning the hard drive were premature until Defendants had an opportunity to review the documents Plaintiffs promised to produce. (*See id.* at 96:18–97:4). Accordingly, the Court will deny Defendants' Motion without prejudice as premature to the extent the Motion requests any relief regarding the contents of the external hard drive or the sufficiency of Plaintiffs' document production from the contents of the external hard drive.

All that remains of Defendants' Motion, therefore, is Defendants' request for relief concerning the consent documents from the Enbrel study in which Ms. Small was enrolled and publications from the Arthritis Foundation referenced during Ms. Small's deposition. (*See* Doc. 126 at 10). The consent documents from the Enbrel study in which Ms. Small was enrolled are patently relevant to the claims and defenses in this litigation. Plaintiffs do not assert any legitimate basis for resisting production of such documents. Thus, the Court orders Plaintiffs to produce the consent documents from the Enbrel study within thirty (30) days from the date of this Order, if Plaintiffs have not already done so.

The publications from the Arthritis Foundation are, however, a different matter. Defendants make no attempt whatsoever in their Motion to argue the relevance of such documents. (*See* Doc. 126 at 10). Thus, the Court finds that Defendants have failed to satisfy their burden to demonstrate the relevance of the Arthritis Foundation publications. Accordingly, Defendants' Motion is due to be denied as to those discrete documents.

### V. Defendant Amgen Inc.'s Motion for Protective Order (Doc. 127)

Defendant Amgen, Inc. ("Amgen") requests that the Court issue a protective order regarding the deposition of the Rule 30(b)(6) corporate representative (Doc. 127 at

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 7228863

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 79 of 99

1). Specifically, Amgen argues that the deposition should not take place because Plaintiffs' deposition notice was untimely. (*Id.* at 4–5). Additionally, Amgen contends that the topics identified for the deposition are overly broad in light of Judge Steele's prior summary judgment Order (Doc. 97) as to Counts II (Strict Liability—Failure to Warn) and IV (Negligence). (Doc. 127 at 5).

Plaintiffs disagree with each of Amgen's contentions, but Plaintiffs advised the Court of their willingness to limit the scope of at least one of the deposition topics. (Doc. 138 at 9 (stating that "Plaintiffs are willing to limit [Topic 8] to Enbrel reports of asymptomatic infections, diverticulitis infections, and where the patient restarted the drug")).

Given the current status of this case, the Court finds that Amgen has suffered no prejudice as a result of the alleged untimeliness of the deposition notice. Thus, the Court will not preclude the requested corporate representative deposition on the basis of Defendants' timeliness objection. The Court will, however, deny the requested protective order as to Topic 2 and grant the requested protective order as to Topics 1 and 3–12 for the reasons set forth below. (*See* Doc. 127–1 at 7–8).

Topic 1 seeks "Testimony as to Amgen's record retention policies." (Doc. 127–1 at 7). The Court finds that this topic, as written, is overly broad on its face. Rule 30(b)(6), Fed. R. Civ. P., requires that a deposition notice served to a private corporation "must describe with reasonable particularity the matters on which examination is requested." Moreover, the Handbook on Civil Discovery for the Middle District of Florida states that "a notice ... to an entity, association, or other organization should accurately and concisely identify the designated area(s) of requested testimony, *giving due regard to the nature, business, size, and complexity of the entity being asked to testify*." Middle District Discovery (2015) at 7 § II(A)(4)(a) (emphasis added). Plaintiffs' Topic 1, as written, is not reasonably particularized, nor does it concisely identify the testimony Plaintiffs seek given the nature, business, size, and complexity of Amgen. Not every record maintained by Amgen—a large, complex organization that indisputably maintains a wide variety of records relating to its business—is relevant to the claims and defenses in this litigation. Therefore, not every record retention policy Amgen may (or may not) maintain is relevant to the claims and defenses in this litigation. The Court will not require Amgen to designate a corporate

representative to testify on Topic 1 as it is currently formulated.

**\*22** Topic 2 seeks "Testimony on how regulatory information concerning Enbrel is maintained by Amgen including, but not limited to, the BLA, regulatory correspondence, and regulatory communications." (Doc. 127–1 at 7). The Court finds that Topic 2 is reasonably particularized and that the topic concisely identifies the testimony Plaintiffs seek given the nature, business, size, and complexity of Amgen. The Topic is limited to the product at issue—*i.e.*, Enbrel—and is limited to regulatory information, correspondence, and communications. Importantly, this topic merely seeks to identify through deposition testimony how Amgen presently maintains the referenced categories of documents and information. Plaintiffs do not purport to seek disclosure of the contents of any such documents. Thus, Amgen's objection that "[t]his topic seeks information that is protected by the attorney-work product doctrine" appears to be without merit. Amgen fails to explain how the requested information constitutes protected attorney work product or to cite to any legal authority supporting Amgen's position in that regard. In particular, the Court finds that testimony concerning how Amgen maintains the BLA is highly relevant given the parties' continuing dispute regarding its complete production. Thus, the Court will require Amgen to designate and tender an appropriate corporate representative to testify in response to Topic 2.

Topic 3 seeks "Testimony as to Amgen [sic] Pharmacovigilance regarding Enbrel, to wit: the systematic detection, assessment, understanding, interpretation and prevention of adverse drug reactions." (Doc. 127–1 at 7). The Court finds that this topic, as written, is overly broad and subject to the Court's rulings *supra* concerning the relevance of pharmacovigilance, studies, and adverse events other than diverticular infection. (*See* Parts III.A.3., III.B.6. *supra*). Thus, the Court will grant Amgen's request for a protective order as to Topic 3 for the same reasons the Court has denied Plaintiffs' document discovery on those same issues.

Topic 4 seeks "Testimony as to Amgen['s] review of medical literature regarding adverse events reported with the use of Enbrel and Amgen [sic] assessment, interpretation and responsive action, if any." (Doc. 127–1

Small v... Amgen, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 7228863
Case 1:18-cv-00068    Document 394-1    Filed on 06/10/19 in TXSD    Page 80 of 99

at 7). The Court finds that this topic, as written, is overly broad and subject to the Court's ruling *supra* concerning the relevance of adverse events other than diverticular infection. (*See* Part III.A.3. *supra*). Thus, the Court will grant Amgen's request for a protective order as to Topic 4 for the same reasons the Court has denied Plaintiffs' document discovery on this issue.

Topic 5 seeks "Testimony as to Amgen's review, response, evaluation and action, if any, pertaining to correspondence from regulatory authorities." (Doc. 127–1 at 7). The Court finds that this topic, as written, is overly broad on its face and irrelevant because it is not limited to Enbrel. Even if the topic were limited to Enbrel, it is not subject to a reasonable or relevant temporal limitation such that Amgen can reasonably be expected to designate a corporate representative to provide responsive testimony. Moreover, this topic is subject to all of the limitations on the scope of discovery that the Court has ordered *infra*. Thus, the Court grants Amgen's request for a protective order as to Topic 5.

Topic 6 seeks testimony concerning "The design, goals, purpose, protocols and methodologies pertaining to the formation of Amgen Safety Updates, Integrated Summaries of Safety, Annual Reports, Periodic Safety Update Reports (PSURs), Investigator Brochures, Standard Response Documents (including date from Merlin/Phoenix databases), and Adverse Event Databases." (Doc. 127–1 at 7–8). This topic, as written, is deficient for the same reasons as Topic 5. Accordingly, the Court grants Amgen's request for a protective order as to Topic 6.

Topic 7 seeks testimony concerning "Individual adverse event or adverse drug experience cases received from worldwide sources referenced in Amgen Safety Updates, Annual Reports, Investigator Brochures, Periodic Safety Update Reports, and Standard Response Documents, including individual case histories and overviews." (Doc. 127–1 at 8). This topic, as written, is also deficient for the same reasons as Topic 5. Therefore, the Court grants Amgen's request for a protective order as to Topic 7.

Topic 8 seeks testimony concerning "Follow-up investigation or further testing done on any individual for whom an adverse event was reported, excluding adverse events from clinical trials." (Doc. 127–1 at 8). This topic, as written, is also deficient for the same reasons as Topic 5.

For those reasons, the Court grants Amgen's request for a protective order as to Topic 8.

**\*23** Topic 9 seeks testimony concerning "Compliance with 21 C.F.R. § 314.80(b), including the existence and development of written procedures for the surveillance, receipt, evaluation, and reporting of postmarketing adverse drug experiences to the FDA." (Doc. 127–1 at 8). This topic, as written, also suffers from the same defects as Topic 5. Therefore, the Court also grants Amgen's request for a protective order as to Topic 9.

Topic 10 seeks "Testimony as to the basis for the following statement being included in a Canadian Dear Health Care Professional Letter dated April 21, 2009:

> A TNF blocker may be restarted after recovery from the infection. The decision to restart a TNF blocker should include a re-evaluation of the benefits and risks of the TNF blocker. Both the decision to restart TNF blocker therapy and the duration of antifungal therapy should be made in consultation with an infectious disease specialist, when feasible."

(Doc. 127–1 at 8). This topic is subject to the Court's ruling *supra* concerning the discoverability of information relating to the so-called Dear Healthcare Professional Letter. (*See* Part III.B.4. *supra*). Accordingly, the Court grants Amgen's request for a protective order as to Topic 10 for the same reasons the Court denied Plaintiffs' motion to compel document discovery on the same issue.

Topic 11 seeks "[t]estimony as to what the company did to evaluate whether, and under what conditions it was safe to restart Enbrel after recovery from an infection." (Doc. 127–1 at 8). Relatedly, Topic 12 seeks "[t]estimony as to adverse events where an individual suffered complications after restarting Enbrel where the individual had suspended Enbrel due to infection." (*Id.*). The Court's ruling concerning the irrelevance of Plaintiffs' so-called "contraindication theory" is also fatal to these proposed deposition topics. (*See* Part III.A.3. *supra*). Thus, the Court grants Amgen's request for a protective order concerning Topics 11–12.

## VI. Adjusted Case Management Deadlines
Based upon the foregoing considerations, the Court will reset the remaining case management deadlines previously held in abeyance (*see* Doc. 147 at 1 ¶ 2) by separate order.

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)
Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 81 of 99
2016 WL 7228863

Accordingly, for the reasons set forth above, **IT IS HEREBY ORDERED:**

1) Defendants' Motion to Compel (Doc. 126) is **GRANTED IN PART** and **DENIED IN PART**, as set forth above.

2) Defendant Amgen Inc.'s Motion for Protective Order (Doc 127) is **GRANTED IN PART** and **DENIED IN PART**, as set forth above.

3) Plaintiffs' Motion to Compel (Doc. 129) is **GRANTED IN PART** and **DENIED IN PART**, as set forth above.

4) All other relief not expressly granted herein is **DENIED**.

5) The parties shall comply with the time periods set forth above for any action that the Court has ordered.

**DONE AND ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7228863

Footnotes

1   An "indication" appears to be defined by Plaintiffs as an authorized use of a drug to treat a medical condition. (*See* Doc. 54 at ¶ 19).

2   The acronym "TNF" stands for "tumor necrosis factor." (Doc. 54 at ¶ 14).

3   Plaintiffs' counsel defined an "adverse event" as "a coincidental circumstance where someone took the drug and they got sick. In and of itself [sic] does not mean the drug caused them to get sick; there's not necessarily a relationship." (Doc. 158 at 35:21–25).

4   Many of the issues enumerated *supra* were raised in Plaintiffs' Motion (Doc. 129) but some were articulated for the first time during Plaintiffs' counsel's oral argument during the December 30, 2015 and February 11, 2016 motion hearings (*see* Doc. 158; Doc. 168 at 49:16–64:20).

5   Plaintiffs' Motion fails to comply with the requirements of Local Rule 3.04(a), M.D. Fla. Plaintiffs explain that this failure is intentional because "[t]here is such a disconnect between Plaintiffs' requests and Defendants' responses, that the conventional request-by-request review will simply not work." (Doc. 129 at 2). The Court is willing to indulge Plaintiffs' approach as it relates to Defendants' general objections asserted in response to all of Plaintiffs' discovery requests. However, the Court strongly disapproves of Plaintiffs' disregard for Local Rule 3.04(a) insofar as Plaintiffs' Motion clearly encompasses *specific* discovery requests tied to *discrete* categories of documents or information that Defendants have refused to produce based on Defendants' stated objections. Plaintiffs' blatant disregard for Local Rule 3.04(a) may have spared Plaintiffs' counsel time and effort in preparing their Motion, but it has created substantial inefficiency and delay for the Court in digesting and resolving the issues presented by the Motion. Accordingly, the Court hereby expressly admonishes Plaintiffs and their counsel to comply with Local Rule 3.04 going forward in this case. Any failure to do so may result in the summary denial of the offending filing(s).

6   The Court notes that the parties have done an exceptionally poor job of presenting issues for the Court's consideration both in the parties' written submissions and in their oral arguments to the Court during two lengthy discovery hearings. The Court is left with the distinct impression that the parties' discovery disputes and their arguments relating to those disputes are unfocused, conflated, and ever-shifting targets. This appears to be due in large part to the parties' fundamentally divergent views of the surviving claims and defenses at play in this litigation. (*Compare* Doc. 129 at 3 *with* Doc. 142 at 1–4; *and* Doc. 164 *with* Doc. 165). The Court finds this divergence atypical and surprising, especially after the extensive dispositive-motion practice that has occurred in this case. The situation is further complicated by the parties' apparent inability or unwillingness to engage in a *meaningful* and *adequate* good-faith conference as required by Local Rule 3.01(g), M.D. Fla., and Fed. R. Civ. P. 37(a)(1) *before* seeking Court intervention. Moreover, as reflected in the Court's analysis of the discovery issues *infra*, Plaintiffs' discovery demands suffer markedly from pervasive overbreadth and lack of reasonable particularity while Defendants' arguments suffer from a pervasive lack of meaningful effort to plainly articulate or to substantiate Defendants' discovery objections. The net effect of these approaches has cast a pall of confusion over discovery in this case and has imposed an *extraordinary* burden upon the Court to attempt to navigate the dense thicket of fragmented and conflicting rhetoric that the parties have crafted to support their respective positions. As a consequence, the Court will enforce *strict* adherence to the Court's Local Rules going forward in this case, including

Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 82 of 99

2016 WL 7228863

but not limited to Local Rules 3.01(a), (d), and (g), 3.03, and 3.04. Any failure to comply with the Local Rules may result in a summary denial or striking of any offending filing(s).

7   The Court accepts these representations by Defendants' counsel, subject to counsel's obligations under Fed. R. Civ. P. 11.

8   Although Plaintiffs' Fourth Amended Complaint alleges in the Negligence count (Count IV) that "[d]espite the availability of *publicly available* adverse event information from the FDA, Defendants failed to make adequate use of this information including information on the relationship between *other TNF inhibitors and infections*," (Doc. 54 at ¶ 90 (emphasis added)), the Court finds that this general allegation does not render Plaintiffs' requests for discovery concerning other TNF inhibitors relevant or proportional to the needs of this litigation for all of the reasons set forth *supra*. Moreover, to the extent any such information concerning other TNF inhibitors is, as Plaintiffs allege, publicly available, then Plaintiffs have access to it without requiring Defendants to incur the effort and expense to produce it.

9   As explained by Plaintiffs' counsel, an asymptomatic infection describes a scenario where "the person had an infection, didn't know they had an infection until they were basically in a life-threatening circumstance." (Doc. 158 at 33:7–10).

10  According to Plaintiffs' counsel, a "dechallenge" is when a person gets "an infection from the drug. They stop taking the drug. The infection goes away." (Doc. 168 at 42:22–24). Conversely, a "rechallenge" is when a person restarts taking the drug and "the infection comes back." (*Id.* at 42:24–25).

11  According to Plaintiffs' counsel, a "line listing" is similar to a spreadsheet and contains relevant information from multiple adverse event reports, including the person's name, "the date, the age, what drugs the person was taking, the adverse event terms they got, et cetera." (Doc. 158 at 35–36).

12  As the Court presently understands Plaintiffs' so-called "contraindication theory," the theory appears to have two parts. The first part of the theory posits that it was not safe for Ms. Small to take Enbrel for her specific indication because the risks outweighed the benefits. (*See* Doc. 158 at 24:12–25:4; *see also* Doc. 168 at 16:24–17:17). The second part of the theory posits that it was not safe for Ms. Small to restart Enbrel after developing the diverticulitis infection while taking Enbrel because the risks outweighed the benefits. (*See* Doc. 129 at 4; *see also* Doc. 168 at 17:18–18:5). The Court's reference to the "contraindication theory" herein, however, is limited to the second part of the theory because that is what Plaintiffs appear to focus on for purposes of the pending discovery disputes between the parties.

13  For the sake of clarity, the Court considers the term "diverticular infection" to be interchangeable with the terms "diverticulitis," "diverticulitis infection," or "diverticular perforation" for purposes defining the scope of discovery. Although these terms may have more precise and distinguishable medical definitions, the Court uses them interchangeably here because the parties appear to use them interchangeably. The Court's focus here is on the nature and type of the subject *infection* that Plaintiffs allege Ms. Small suffered as a result of taking Enbrel. As such, the Court does not interpret or intend that the term "diverticular perforation," for example, as creating or implying any greater limitation on the scope of discovery than the terms "diverticular infection" or "diverticulitis."

14  The Court notes that at the February 11, 2016 continued motion hearing, Defendants' counsel represented to the Court that Defendants were ultimately able to search within their database for adverse event reports that contain references to asymptomatic infection in the narrative portions of the reports. (Doc. 168 at 40:19–21). That search yielded four (4) such reports that were to be produced to Plaintiffs. (*Id.* at 40:21–22). To the extent Defendants were able to identify those four (4) adverse event reports and have offered to produce them to Plaintiffs as part of the parties' good-faith effort to resolve their differences (*see* Doc. 165 at 4), the Court will require Defendants to produce the reports notwithstanding the other discovery limitations imposed in this Order.

15  Defendants offered to produce these documents after initially representing to the Court on the record that "to identify every case where a patient had an infection, went off Enbrel, went back on Enbrel and had another infection, [Defendants] would have to manually go through the 123,000 infection reports to determine whether or not there was a rechallenge." (Doc. 158 at 43:13–17). That initial representation appears to have been inaccurate based upon Defendants' subsequent investigation. (Doc. 168 at 40:23–41:6).

16  For the sake of absolute clarity, this Order should not be construed as imposing any limitation on the number of depositions Plaintiffs may pursue in this litigation consistent with Fed. R. Civ. P. 30(a)(2)(A)(i). Moreover, this Order should not be construed as pre-authorizing Plaintiffs to take more depositions in this litigation than the aforementioned Rule would otherwise permit. If Plaintiffs intend to conduct more than ten depositions and if Defendants will not stipulate to permit Plaintiffs to exceed the ten-deposition limit, Plaintiffs may file an appropriate motion seeking leave of Court to conduct additional depositions.

17  The acronym "BLA" stands for Biologic License Application. (Doc. 142 at 6; *see also* Doc. 129 at 6).

**Small v. Amgen, Inc., Not Reported in Fed. Supp. (2016)**
Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 83 of 99
2016 WL 7228863

18   According to Plaintiffs' counsel, a MedWatch form is, "a very specific report designed by the FDA," which all manufacturers are required to use and contains information from line listings in addition to other relevant information in narrative form. (Doc. 158 at 36:7–11). The Court gleans from counsel's explanation that a MedWatch form may be synonymous with an "adverse event report," but the relationship between these terms and concepts is not at all clear.

19   The Court notes that this request appears to be encompassed by Request for Production No. 40. (Doc. 129–4 at 52).

20   Requests for Production Nos. 68 and 70 appear to the Court to be identical and, therefore, impermissibly duplicative. (*See* Doc. 129 at 19–20; Doc. 129–1 at 22).

21   Defendants' counsel apprised the Court during the February 11, 2016 hearing:

   I raised the sensitivity of the CMC issue because we believe ... you shouldn't have to get into the hypersensitive CMC information. And the burden imposed by that in terms of patent litigation, in terms of whole a marketplace for what is called biosimilars, which are basically generic drugs for biologics and are now starting to be approved by the [FDA], if that's something that this Court orders, our client will have no choice but to take an appeal because it is that sensitive. (Doc. 168 at 87:15–25).

---

**End of Document**                                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   Fed. Defs. 081   23

# Tab 4

Fed. Defs. 082

2010 WL 1334924
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky,
Northern Division, at Ashland.

David Wayne BAKER, Plaintiff,
v.
Attorney General Eric H.
HOLDER., Jr., et al., Defendants.

Civil Action No. 06–CV–91–HRW.
|
March 30, 2010.

**Attorneys and Law Firms**

David Wayne Baker, Ashland, KY, pro se.

Anna R. Gwinn, U.S. Attorney's Office, Lexington, KY,
for Defendants.

**MEMORANDUM OPINION AND ORDER**

HENRY R. WILHOIT, JR., District Judge.

 **\*1** Defendants United States of America, the Bureau
of Prisons ("BOP"), Warden E.K. Cauley, and Inmate
Systems Manager Cathy Wyatt have filed a Motion to
Dismiss, or in the Alternative, Motion for Summary
Judgment. [R. 51] Plaintiff David Wayne Baker has filed
his response in opposition to the motion. [R. 55] The
motion is therefore ripe for decision.

**I. Background**

Baker is an inmate confined at the Federal Correctional
Institution in Ashland, Kentucky. On June 6, 2006,
Baker filed his Complaint in this action pursuant to the
doctrine announced in *Bivens v. Six Unknown Federal
Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d
619 (1971). [R. 1] In his Complaint, Baker challenged
(1) the BOP's imposition of a co-payment for health
care services; (2) its regulation preventing inmates from
possessing a copy of their presentence report ("PSR");
(3) its regulations permitting mail received from courts
which lack the required labeling to be opened outside the
presence of the inmate; and (4) its regulation preventing
inmates from receiving sexually-explicit materials.

On January 17, 2007, the Court entered a Memorandum
Opinion and Order rejecting each of Baker's claims
upon initial screening and dismissing the Complaint with
prejudice. [R. 22, 23] The Court rejected each claim
as lacking in legal merit, as barred by the statute of
limitations, for failure to exhaust administrative remedies,
or for several of these reasons. Baker timely appealed that
decision to the Court of Appeals for the Sixth Circuit. [R.
25]

On July 3, 2008, the Sixth Circuit entered its opinion
on appeal. [R. 36] The opinion does not address Baker's
claims regarding health care co-payments or possession
of his PSR, claims that Baker apparently abandoned on
appeal. With respect to the prison's policy of opening
mail received from courts outside of his presence, the
Sixth Circuit affirmed the dismissal of claims accruing on
or before November 29, 2004, as barred by the statute
of limitations. The Sixth Circuit reversed this Court's
dismissal of claims accruing after that date for failure
to demonstrate exhaustion of administrative remedies
as contrary to the Supreme Court's intervening decision
in *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 166
L.Ed.2d 798 (2007). Similarly, the Sixth Circuit affirmed
this Court's dismissal of Baker's March 15, 2004, claim
regarding receipt of sexually-explicit magazines as time-
barred, but reversed dismissal of his March 14, 2006,
claim for failure to demonstrate exhaustion as contrary
to *Jones.* Finally, the Sixth Circuit concluded that
Baker's allegations regarding these two types of claims
were sufficiently well pled to satisfy the particularity
requirements of Federal Rule of Civil Procedure 8. The
Sixth Circuit entered its mandate on September 11, 2008.
[R. 37]

Following remand, on June 16, 2009, the Court ordered
service of process upon defendants on the surviving
claims. [R. 41] In response, the Defendants filed their
motion to dismiss or for summary judgment on August
11, 2009. [R. 51] As grounds for their motion, Defendants
indicate that Baker did not file any inmate grievances
with respect to his legal mail claims on or after June
6, 2005, the one-year anniversary date before the filing
of this Complaint, and that he did not file any inmate
grievances with respect to his sexually-explicit magazine
claim on or after March 15, 2006, the date on which he
informally requested staff permit him to order and receive
such materials. Defendants therefore argue Baker has not
administratively exhausted these claims. Defendants also

generically contend that the BOP's regulations regarding the handling of mail from courts and sexually-explicit materials are constitutionally sound.

**\*2**  In his response [R. 55], Baker implicitly acknowledges that he did not file inmate grievance forms with respect to his surviving claims, but contends (1) the Defendants may not raise exhaustion in a motion to dismiss under Rule 12; (2) his exhaustion of claims which are barred by the statute of limitations nonetheless gave "fair notice" to the Defendants of those claims which are not, and the latter should therefore be deemed exhausted; and (3) he was not required to file a grievance with respect to each act taken pursuant to an established policy which he is challenging. With respect to the merits of his claims, Baker asserts that he has stated viable claims and that genuine issues of material fact preclude the entry of summary judgment. Finally, Baker contends that he is entitled to discovery prior to determination of Defendants' motion under Federal Rule of Civil Procedure 56(f). Baker has also filed separate motions to file an amended complaint and to compel discovery. [R. 56, 57] The Court will discuss each of these matters below.

## II. Discussion

A. *Defendants' Motion for Summary Judgment.*
Defendants have moved to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment pursuant to Rule 56. [R. 51] Baker opposes the Defendants' motion under Rule 12 because, he asserts, the affirmative defense of failure to exhaust administrative remedies is not one of the enumerated defenses expressly identified in Rule 12(b). [R. 55 at pg. 10–13] Rule 12(b) requires that every defense to a claim be asserted in a responsive pleading such as an answer, but also permits a party to assert certain defenses, such as improper venue or lack of personal jurisdiction, by motion. Through its use of the term "may," Rule 12(b) permits, but does not require, the identified bases for dismissal to be asserted by motion. Nothing in the terms of the rule precludes the assertion of other substantive bases for dismissal by motion. Indeed, other unenumerated grounds for dismissal—such as failure to exhaust administrative remedies and the statute of limitations—are commonly decided on motions to dismiss, a practice approved by the Sixth Circuit and the Supreme Court. *Scott v. Ambani,* 577 F.3d 642, 647 (6th Cir.2009); *Jones v. Bock,* 549 U.S.

199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) ("If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim.")

Even if this were not so, the defenses raised by the Defendant are properly before the Court. Because the Defendants have included additional material in support of their motion and rely upon materials extrinsic to the Complaint, the Court must treat their motion as one for summary judgment under Rule 56. Fed.R.Civ.P. 12(d); *Mays v. Buckeye Rural Elec. Co-op., Inc.,* 277 F.3d 873, 877 (6th Cir.2002) (district court may properly consider motion to dismiss as one for summary judgment when invited to consider matters outside the pleadings); *Ball v. Union Carbide Corp.,* 385 F.3d 713, 719 (6th Cir.2004) (where defendant moves both to dismiss and for summary judgment, plaintiff is on notice that summary judgment is being requested). The question of exhaustion and the viability of Baker's claims are therefore properly before the Court on Defendants' motion for summary judgment.

**\*3**  Rule 56 requires the entry of summary judgment for the moving party if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Kand Medical, Inc. v. Freund Medical Products, Inc.,* 963 F.2d 125, 127 (6th Cir.1992). The rule permits a defendant to challenge the viability of the plaintiff's claim by asserting that at least one essential element of plaintiff's claim is not supported by legally-sufficient evidence. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The defendant does not need his own evidence to support this assertion, but need only point to the absence of evidence favoring the plaintiff. *Turner v. City of Taylor,* 412 F.3d 629, 638 (6th Cir.2005). In response, the plaintiff cannot rely upon allegations in the pleadings, but must point to evidence of record in affidavits, depositions, and written discovery which demonstrate that factual questions remain for trial. *Hunley v. DuPont Auto,* 341 F.3d 491, 496 (6th Cir.2003). If the totality of the evidence submitted—viewed in a light most favorable to the plaintiff with the benefit of any reasonable factual inferences which can be drawn in his favor, *Harbin–Bey v. Rutter,* 420 F.3d 571, 575 (6th Cir.2005)—"would require a directed verdict for the moving party," summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the applicable substantive law requires the

nonmovant to meet a higher burden of proof, his evidence must be sufficient to sustain a jury's verdict in his favor in light of that heightened burden of proof at trial. *Harvey v. Hollenback,* 113 F.3d 639, 642 (6th Cir.1997); *Moore, Owen, Thomas & Co. v. Coffey,* 992 F.2d 1439, 1444 (6th Cir.1993).

Baker asserts that the motion for summary judgment is premature because he has not yet been afforded the opportunity to conduct discovery. While Baker invokes Rule 56(f), his affidavit does not establish that he "cannot present facts essential to justify its opposition" to the motion. Baker asserts that he seeks (1) the identity of the "Unknown John Does" named as Defendants in his Complaint; (2) information regarding Defendant Wyatt's authorization of or participation in opening his incoming legal mail; and (3) a listing of all incoming legal mail that was opened. But Baker offers no explanation how this information would assist him in resisting Defendants' motion for summary judgment, which is based upon exhaustion of administrative remedies and the pure questions of law regarding the constitutionality of the BOP's regulations regarding incoming legal mail and sexually-explicit materials. Because the information Baker seeks is not relevant to these questions, a request for time to conduct discovery is not a basis to delay consideration of Defendants' summary judgment motion. *Stewart v. Evans,* 351 F.3d 1239, 1244 (D.C.Cir.2003) (in *Bivens* suit under Fourth Amendment, Rule 56(f) request for discovery was properly denied where no amount of discovery could have altered undisputed facts); *Building and Const. Dept. v. Rockwell Intern. Corp.,* 7 F.3d 1487 (10th Cir.1993) (where requesting parties failed to show that discovery would produce any evidence relevant to motion, Rule 56(f) motion is properly denied).

### B. *Exhaustion of Administrative Remedies.*

**\*4** Federal law requires a prisoner to exhaust all administrative remedies available through the prison's inmate grievance system prior to filing suit. 28 U.S.C. § 1997e(a). In the Court's January 17, 2007, Memorandum Opinion and Order, the Court noted that Baker had administratively exhausted his claims regarding opening of his "legal mail" on April 29, 2004, and his claims regarding receipt of sexually-explicit materials on July 20, 2004. Because he waited until June 6, 2006, to file suit, however, the Court found that his claims were barred by the statute of limitations, [R. 22] a conclusion affirmed by the Sixth Circuit on appeal. [R. 36]

In his Complaint, however, Baker also complained of the same conduct occurring long after he had completed the grievance process. While certain of this conduct appeared to fall within the statute of limitations period, and hence would not be time barred, notably absent from the extensive documentation provided by Baker regarding his efforts at exhaustion was any indication that he had exhausted his administrative remedies regarding this later conduct. On this ground, the Court found that Baker had not exhausted his administrative remedies, a determination reversed by the Sixth Circuit in light of the Supreme Court's subsequent decision in *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). [R. 36]

The question to be determined on remand is therefore whether Baker did, in fact, administratively exhaust these claims. The Defendants state unequivocally that he did not:

> An examination of Plaintiff's official administrative remedy history shows on or after the relevant dates ... Plaintiff did not file any administrative remedies at any level regarding the opening of his legal mail or the sexually-explicit publication ban.

Declaration of Joseph Tang at ¶ 6. [R. 51–2] In his response, Baker does not contradict this critical assertion. At several places in his response, Baker asserts that there is a factual dispute about whether he exhausted his administrative remedies, but there is none. What Baker does contend is that although he did not exhaust his administrative remedies with respect to his surviving claims by invoking and completing the BOP's inmate grievance process, he nonetheless was either not required to do so or should be deemed to have done so as a matter of law. The Court will discuss his arguments in turn.

First, Baker argues that through his prior invocation of the grievance process in 2004, the BOP was put on "fair notice" of his claims, and therefore he was not required to exhaust his claims again for conduct occurring thereafter. Baker cites *Burton v. Jones,* 321 F.3d 569, 575 (6th Cir.2003) for this proposition, which set forth the Sixth

Circuit's rule that a grievance must give "prison officials fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made." Contrary to Baker's suggestion, *Burton's* holding relates to the sufficiency of the allegations made in a particular prison grievance to put prison officials on notice of the nature of prisoner's claim—it does not remotely support the notion that once prison officials are aware of that claim, the prisoner is thereafter excused from fully and properly exhausting a claim arising out of similar but distinct conduct as required by 42 U.S.C. § 1997e and *Woodford v. Ngo,* 548 U.S. 81, 86, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

**\*5** Second, Baker argues that because the conduct about which he complained was the same in each instance and taken pursuant to an established BOP regulation, he was not required to initiate a separate grievance for each occurrence. There is authority which holds that where the issue complained of is not an isolated or particular instance of conduct, but a policy or repeated pattern of conduct, the inmate must exhaust administrative remedies by filing a single grievance, and is not required to separately grieve each event. *Howard v. Waide,* 534 F.3d 1227, 1244 (10th Cir.2008) (*citing Johnson v. Johnson,* 385 F.3d 503, 521 (5th Cir.2004)); *Aiello v. Litscher,* 104 F.Supp.2d 1068, 1074 (W.D.Wis.2000). The Sixth Circuit has not addressed the issue.

However, the Court need not determine whether a prisoner's challenge to a pattern of conduct taken pursuant to a policy may be administratively exhausted by filing a single grievance, because such a determination would not assist Baker even if decided in his favor. Entirely apart from the merits of his underlying claims, Baker must have satisfied two procedural requirements for each claim: he must have timely and properly exhausted his administrative remedies, and then filed suit within the statute of limitations. Baker has not satisfied both of these procedural requirements with respect to any claim. As previously noted, while Baker did administratively exhaust both of his surviving claims in 2004, his failure to file suit until 2006 resulted in those claims being time-barred. And while his Complaint filed in 2006 may complain of conduct occurring within the one year immediately preceding its filing, the record establishes that he did not exhaust his administrative remedies with respect to that conduct which transpired within the limitations period. The record

therefore establishes that Baker has not exhausted his administrative remedies with respect to any timely-filed surviving claim, and those claims must therefore be dismissed with prejudice. *Woodford v. Ngo,* 548 U.S. 81, 86, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

C. *Merits of the Underlying Claims.*
Even if Baker had timely and properly exhausted his administrative remedies, both of his surviving claims would fail on the merits.

Baker's first claim is that the BOP is violating his constitutional rights by opening mail, outside of his presence, which is sent to him by a state or federal court but which lacks the "Special Mail—Open only in the presence of the inmate" label required by BOP regulations for "Special Mail" treatment. 28 C.F.R. § 540.2(c). As support for his argument, Baker relies on the Sixth Circuit's statement in *Sallier v. Brooks,* 343 F.3d 868, 877 (6th Cir.2003) that "mail from a court constitutes 'legal mail' and cannot be opened outside the presence of [the inmate]."

This Court has previously noted, however, that this isolated sentence indicates only the recognition of the basic right of prisoner's to receive mail. Both the Supreme Court and the Sixth Circuit have long recognized that this right is subject to reasonable regulation to meet a prison's security needs. *Wolff v. McDonnell,* 418 U.S. 539, 576–77, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (inmates' right to have legal mail opened only in their presence is subject to reasonable prison regulations); *Knop v. Johnson,* 977 F.2d 996, 1012 (6th Cir.1992) (prison officials may impose restrictions that are reasonably related to security or other legitimate penological objectives); *Lavado v. Keohane,* 992 F.2d 601, 607 (6th Cir.1993) ("prison officials may open prisoners' incoming mail pursuant to a uniform and evenly applied policy with an eye to maintaining prison security.")

**\*6** In a decision issued after *Sallier* was handed down, at least one district court found no constitutional violation where the BOP adhered to the same mail regulations at issue in this case. *Merriweather v. Zamora,* 2006 WL 2711809, at \*4 (E.D.Mich.2006) ("BOP P.S. 5265.11 is a reasonable regulation within the meaning of *Wolff.* The envelopes [which] did not indicate "legal mail," "open only in presence of inmate," or substantially similar language and were therefore not accorded

constitutionally protected status."). The Court cited the *Merriweather* opinion in its original Memorandum Opinion and Order dismissing the case. During the pendency of Baker's appeal and subsequent proceedings, the *Merriweather* decision has been affirmed in pertinent part. In *Merriweather v. Zamora,* 569 F.3d 307 (6th Cir.2009), the Sixth Circuit affirmed the dismissal on qualified immunity grounds of claims against mailroom employees in a federal prison to the extent those individuals acted consistently with the same BOP policy at issue here. *Id.* at 312 ("Before turning to the qualified immunity analysis, we must first consider whether any of the contested pieces of mail qualify as properly labeled legal mail.") Noting that the Supreme Court upheld the validity of prison mailroom regulations similar to those here over thirty years ago, *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Sixth Circuit held that in the aftermath of *Sallier* it is the " 'blatant disregard' for mail handling regulations concerning legal mail [that] violates constitutional protections." *Merriweather,* 569 F.3d at 317. Here, Baker does not contend that BOP employees disregarded the applicable mail regulations; rather, he asserts that they are liable for adhering to a policy which is itself unconstitutional. In light of the Sixth Circuit's affirmance in *Merriweather,* this claim unquestionably fails as a matter of law.

Baker's second claim is that the BOP regulations which prohibit federal prisoners from purchasing or obtaining sexually-explicit materials violates his constitutional rights. Program Statement 5266.10 ¶ 7 implements 28 C.F.R. § 540.72 and 28 U.S.C. § 530C(b)(6) (the "Ensign Amendment"). As the Court noted in its original opinion, numerous court have upheld the BOP's regulations in general and the Ensign Amendment in particular against constitutional challenges by prisoners. *Thompson v. Patterson,* 985 F.2d 202, 207 (5th Cir.1993) (prison officials may restrict access to sexually explicit materials consistent with the First Amendment); *Amatel v. Reno,* 156 F.3d 192, 196–202 (D.C.Cir.1998) (restrictions imposed by Ensign Amendment on prisoner's First Amendment rights satisfy *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) standards); *see also Boyd v. Stalder,* 2006 WL 3813711, at *4–5 (W.D.La. December 27, 2006) (upholding state prison rule prohibiting receipt of sexually-explicit materials).

Numerous courts have been faced with challenges to prison policies that are functionally identical to the one

at issue here, and have correctly found that a prison's need to maintain institutional security and to deter aggressive or violent behavior amply justifies the limited restriction imposed. *See Robertson v. South Carolina Dep't of Corrections,* 2010 WL 679070, at *9 (D.S.C. February 24, 2010) ("the SCDC policy is an incentive to promote good behavior and a desire to avoid placement in the ASU. Furthermore, restricting prisoner access to pornography is rational because the restriction reduces the risk that inmates will engage in disruptive sexual acts and/or sexual violence, thereby promoting institutional security."); *Baasi v. Fabian,* 2010 WL 924384, at * 12 (D.Minn. March 11, 2010) ("restricting a prisoner's access to sexually explicit materials is reasonably related to the legitimate penological interests of safety, of preventing sexual harassment, and of rehabilitating sex offenders.") (finding other *Turner* factors satisfied where prison officials had no other viable means to protect prison safety from disruptive effects of pornographic material and inmate retained alternative means of exercising First Amendment rights); *Beard v. Banks,* 548 U.S. 521, 532–33, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006) (upholding policy prohibiting inmates from accessing newspapers, magazines, and photographs against First Amendment challenge under *Turner* standard). The Court therefore reiterates its agreement with the District of Columbia Court of Appeals that the Ensign Amendment's prohibition against a prisoner receiving sexually explicit materials satisfies *Safley's* requirement that the regulation be "reasonably related to legitimate penological interests." *Safley,* 482 U.S. at 89; *Amatel,* 156 F.3d at 196–202. Baker's constitutional challenge to the BOP's regulations regarding sexually-explicit materials therefore fails as a matter of law.

### D. *Baker's Motion to Compel Discovery and to Amend Complaint.*

**\*7** Approximately one month after Baker filed his response to the Defendants' motion for summary judgment, on November 19, 2009, Baker filed a motion to compel the Defendants to respond to interrogatories he propounded upon them shortly after they filed their motion. [R. 57] In his motion, Baker indicates that on August 20, 2009, he sent interrogatories to the Defendants seeking information on how incoming mail addressed to prisoners is handled by mailroom staff, as well as the identities of mailroom staff who handled that mail. Baker asserts that when he had not received a response to his discovery requests, on October 1, 2009, he sent a

letter to Defendants' counsel inquiring as to the status of a response. Defendants' counsel apparently failed to respond to Baker's second letter on October 21, 2009. Defendants also did not file any response to Baker's motion to compel.

As a threshold matter, one cannot condone the Defendants' failure to respond to Baker's discovery requests, to his correspondence regarding those discovery requests, or to his motion to compel. While Baker delayed in making any discovery requests until a motion for summary judgment had been filed, the appropriate step for a party wishing to avoid discovery pending the outcome of a dispositive motion is to request a stay of discovery or seek a protective order, it is not to simply ignore the request. *See Apotex Corp. v. Merck & Co., Inc.,* 229 F.R.D. 142, 145 (N.D.Ill.2005) (contention that patentee would ultimately lose case was not a proper basis to refuse to respond to its discovery requests, where defendant had answered complaint, rather than moving to dismiss or seeking summary judgment, and had not sought a stay of discovery or a protective order barring or limiting discovery).

Nonetheless, the Court will deny the motion to compel in light of its disposition of Baker's claims. The information sought by Baker in his interrogatories is similar in kind to that which he identified in his Rule 56(f) request to delay consideration of the Defendants' motion for summary judgment. While it may be generally relevant to his claims, it has no bearing upon the dispositive questions raised by the Defendants with respect to his exhaustion of administrative remedies or the constitutionality of the BOP regulations. A court should deny a motion to compel where the information sought will not undermine a summary judgment granted on other grounds. *Cf. Brown v. Inter Ocean Ins. Co.,* 438 F.Supp. 951, 955 (N.D.Ga.1977) (where insurer was entitled to summary judgment in diversity breach of contract action brought by widow of life insurance applicant, any further inquiry into insurer's normal practices or procedures for processing insurance applications and issuing policies was unwarranted and, therefore, the widow's motion to compel the insurer to answer certain questions propounded to its employee regarding other pending lawsuits was denied).

Baker has also filed a motion to file an amended complaint to add further allegations regarding the handling of mail

received from courts after his complaint was filed in this action. While leave to file an amended complaint may be freely granted under Federal Rule of Civil Procedure 15, the Court will deny leave to amend the Complaint at this late stage in the proceedings. This case was filed nearly four years ago, and has already been appealed the Sixth Circuit and remanded for further proceedings. First, the sheer passage of time is sufficient ground to deny amendment in light of the evident prejudice to the Defendants. *Duncan v. Manager, Dept. of Safety, City and County of Denver,* 397 F.3d 1300, 1315 (10th Cir.2005) (untimeliness alone is an adequate reason to refuse leave to amend a complaint); *Conner v. Illinois Dept. of Natural Resources,* 413 F.3d 675, 679 (7th Cir.2005) (affirming denial of motion to amend complaint when filed late in litigation and in response to motion for summary judgment). Further, the amended complaint seeks to add merely new instances of BOP mailroom staff opening letters received from courts, and absent from Baker's new allegations is any suggestion that he exhausted his administrative remedies with respect to this conduct. While Baker was not required to make such an allegation under *Jones,* given the prominence of exhaustion as an issue in this litigation, Baker's silence on this point is notable. In light of the Court's determination that the BOP's mail policies are constitutional, adding allegations of new instances of adherence to that policy creates no new viable claims, and amendment may be denied as futile. *See Martinez v. Junta de Planificacion de Puerto Rico,* 736 F.Supp. 413, 422 (D.Puerto Rico 1990) (motion to amend complaint filed after defendant has moved for summary judgment will not be granted unless plaintiff can show substantial merit of proposed amendment and comes forward with substantial and convincing evidence for newly asserted claim).

### III. Conclusion

**\*8** Accordingly, **IT IS ORDERED** that:

1. Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [R. 51] is **GRANTED.**

2. Plaintiff's Complaint is **DISMISSED WITH PREJUDICE.**

3. Plaintiff's Motion for Leave to File and Serve Supplemental Complaint [R. 56] and Motion to Compel Answers to Interrogatories [R. 57] are **DENIED.**

Baker v. Cinder, Not Reported in F.Supp.2d (2010)
Case 1:18-cv-00068  Document 394-1   Filed on 06/10/19 in TXSD   Page 91 of 99
2010 WL 1334924

4. The Court will enter an appropriate Judgment.

5. This matter is **CLOSED** and shall be stricken from the active docket.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1334924

---

   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

**WESTLAW**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   Fed. Defs. 089   7

# Tab 5

Fed. Defs. 090

2015 WL 12831683
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Corpus Christi Division.

Gary GUAJARDO, et al, Plaintiffs,

v.

Alfredo Ricardo MARTINEZ; aka
Freddie Martinez, Jr., et al, Defendants.

CIVIL NO. 2:14–CV–450
|
Signed 12/22/2015

**Attorneys and Law Firms**

David Wesley Showalter, Heather Scilley von Sternberg,
Showalter Law Firm, Richmond, TX, for Plaintiffs.

J A Tony Canales, Canales Simonson PC, Paul G.
Kratzig, Paul G. Kratzig Assoc, Corpus Christi, TX, Lynn
Hamilton Butler, Husch Blackwell LLP, April E. Lucas,
Douglas D. Dodds, McGinnis Lochridge et al, Austin,
TX, for Defendants.

**ORDER**

Hilda Tagle, Senior United States District Judge

**\*1** BE IT REMEMBERED that on December 22, 2015
the Court **GRANTED** Martinez Defendants' Motion to
Stay Discovery Pending the Disposition of Defendants'
Motion to Dismiss, Dkt. No. 55, and Defendants Husch
Blackwell LLP's and Lynn Hamilton Butler's Joinder
to Motion to Stay Discovery Pending Disposition of
Defendants' Motion to Dismiss, Dkt. No. 57.

On November 12, 2014, Plaintiffs filed the instant
suit alleged violations of the Racketeer Influenced and
Corrupt Organizations ("RICO") Act against Defendants
Alfredo Ricardo Martinez, Jr. a.k.a. Freddie Martinez,
Jr., JoAnn Hobbs, John Martinez, Marc Martinez,
Eloy Leija, Marfre, LLC, Martzcom Music, LLC,
SCMP, LLC, A.R. Martinez Family Limited Partnership,
Martinez Land and Buffalo Company, LLC, ELM
Land and Buffalo Company, LLC, and Brothers Trei,
Ltd. (collectively "Martinez Defendants"), as well as
against Lynn Hamilton Butler and Husch Blackwell

LLP (collectively "Attorney Defendants"). Dkt. No.
1. Plaintiffs filed their First Amended Complaint on
February 26, 2015. Dkt. No. 4. On April 13, 2015,
Martinez Defendants, along with all other defendants,
jointly filed a motion to dismiss all of Plaintiffs' claims.
Dkt. No. 30. Plaintiffs responded on June 4, 2015. Dkt.
No. 40, and Defendants filed their reply, Dkt. No. 45.
Attorney Defendants filed a separate brief, and the Court
permitted Plaintiffs to file a sur-reply. Dkt. No. 51. The
motion to dismiss remains pending before this Court.

According to the instant motion, Plaintiff Gary Guajardo
("Guajardo") served his First Request for Production to
Martinez Defendants on October 30, 2015. Dkt. No. 55, ¶
5. Defendants request that the Court stay discovery until
the Court has ruled on Defendants' pending motion to
dismiss. Dkt. No. 55, ¶ 6. Defendants argue that the court
has broad discretion over discovery matters, and a stay is
warranted here because discovery would be costly given
the voluminous requests. Dkt. No. 55, ¶ 9. Defendants
state that the stay will preclude "enormously expensive
and unnecessary discovery, including the responses and
production of ten sets of discovery propounded upon
Martinez Defendants, and other litigation expenses until
preliminary questions ... are determined." Dkt. No. 55,
¶ 2. Defendants request that discovery be stayed until
the Court has determined which causes of action, if
any, will move forward. Dkt. No. 55, ¶ 9. Defendants
argue that Plaintiffs will not suffer prejudice as a result
of the stay. Dkt. No. 55, ¶ 9. In their motion joining
Martinez Defendants' motion to stay discovery, Attorney
Defendants argue that the case should be stayed pending
the Court's ruling on the motion to dismiss pursuant to
the mandate of the Texas Anti–SLAPP statute. Dkt. No.
57, ¶ 1. Attorney Defendants state that Plaintiff Guajardo
served his First Request for Production on October 21,
2015 and included twenty-four requests for production.
Dkt. No. 57, ¶ 4. Attorney Defendants state that they
seek dismissal of Plaintiffs claims under the Texas Anti–
SLAPP statute, and that the statute stays all discovery
pending the Court's ruling on the motion to dismiss. Dkt.
No. 57, ¶ 7.

**\*2** In response, Plaintiffs argue that Defendants fail to
allege that they will suffer prejudice or undue burden if
discovery proceeds. Dkt. No. 58, ¶ 10. Plaintiffs argue
that the Martinez Defendants' motion to stay discovery
rests on the assumption that the Court will grant their
motion to dismiss or at least dismiss some claims. Dkt.

No. 58, ¶ 12. Plaintiffs contest that, even if some claims are dismissed, the causes of action are so intertwined that the discovery requests propounded would still be necessary. Dkt. No. 58, ¶ 14. Plaintiffs also note that the parties have already undertaken significant investigation of the facts in the case, but Plaintiffs' RICO claims require further discovery, and Plaintiffs allege hiding and concealing property and information as part of the basis of Defendants' alleged racketeering activities. Dkt. No. 58, ¶ 16. Plaintiffs argue that a stay would disproportionately impact and harm them. Dkt. No. 58, ¶ 16. Plaintiffs further argue that Attorney Defendants failed to follow necessary procedure under the Texas Anti–SLAPP statute to warrant an automatic stay of discovery pending a motion to dismiss under that statute. Dkt. No. 58, ¶¶ 17–19.

"District courts have broad discretion in all discovery matters." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006). However, the "the issuance of a stay is by no means automatic." *United States ex rel. Gonzalez v. Fresenius Med. Care North America*, 571 F. Supp. 2d 766, 768 (W.D. Tex. 2008) (citation omitted). A district court has discretion to stay discovery "for good cause shown." Fed. R. Civ. P. 26(c). Good cause may exist if the party seeking the stay demonstrates that "annoyance, embarrassment, oppression, or undue burden or expense" would result absent the stay. Fed. R. Civ. P. 26(c). It also "may be appropriate where the disposition of a motion to dismiss might preclude the need for discovery altogether thus saving time and expense." *United States ex rel. Gonzalez*, 571 F. Supp. 2d at 768 (internal quotation marks omitted); *see also Landry v. Air Line Pilots Ass'n Int'l AFL–CIO*, 901 F.2d 404, 435–36 (5th Cir. 1990) (upholding the district court's grant of a stay pending the court's ruling on a motion for summary judgment because movants met their burden of showing why the discovery sought would be unduly expensive and burdensome).

Here, Defendants have met their burden to show that discovery would be expensive and burdensome if Defendants must conduct discovery prior to the Court's ruling on the motion to dismiss. Because Plaintiffs allege complex claims under civil RICO, Defendants' concerns about the cost and inconvenience of discovery are reasonable. Additionally, Plaintiffs represent that they have begun an investigation into the facts of the case that formed the basis of their pleadings. The Court infers that Plaintiffs' allegations that form the basis of their RICO claims developed from discovery in a related case in the Houston Division, which involved the same parties as the instant case. *See Guajardo v. Freddie Records, Inc.*, Case No. 4:10–cv–2024. With Defendants' motion to dismiss pending, Defendants have shown good cause for staying discovery.

The Court therefore finds there is good cause for staying discovery until it rules on the motion to dismiss. The Court **GRANTS** Martinez Defendants' motion to stay discovery and Attorney Defendants' motion to join Martinez Defendants' motion to stay discovery. The Court **STAYS** all discovery deadlines pending its ruling on the motion to dismiss.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 12831683

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# **Tab 6**

Fed. Defs. 093

Case 1:18-cv-00068   Document 394-1   Filed on 06/10/19 in TXSD   Page 96 of 99
Adame v. Refugio County, Not Reported in Fed. Supp. (2018)
2018 WL 1918656, 2018 Fair Empl.Prac.Cas. (BNA) 144,262

2018 WL 1918656
United States District Court, S.D.
Texas, Corpus Christi Division.

Ricardo ADAME, Plaintiff,
v.
REFUGIO COUNTY, Defendant.

CIVIL ACTION NO. 2:16-CV-139
|
Signed 04/24/2018

**Attorneys and Law Firms**

David Eric Wood, Attorney at Law, McAllen, TX, for Plaintiff.

Casey Terrence Cullen, Cullen Carsner Seerden and Cullen LLP, Victoria, TX, for Defendant.

## ORDER ADOPTING MEMORANDUM AND RECOMMENDATION

NELVA GONZALES RAMOS, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is Plaintiff Ricardo Adame's Motion for Relief from Final Judgment and Order (D.E. 49), seeking relief under Fed. R. Civ. P. 60(b). Plaintiff claims that his former supervisor, Refugio County Sheriff Robert Bolcik, made a statement to a former co-worker, Timothy Lee Dickey, which substantiates his racial discrimination claim.[1] Plaintiff did not discover this statement, which was allegedly made prior to his filing this action, until after this Court issued judgment in this case. On December 11, 2017, United States Magistrate Judge Jason B. Libby issued a Memorandum and Recommendation (M&R) recommending that the Court deny Plaintiff's motion. D.E. 51. Plaintiff timely objected. D.E. 52.

Plaintiff was informed in a Notice to Parties following the substance of the M&R that it was subject to adoption by this Court absent objections to the recommendations. D.E. 51, p. 11. Rule 72(b) requires that objections be specific. See SciCo Tec GmbH v. Boston Scientific Corp., 599 F. Supp. 2d 741, 743 (E.D. Tex. 2009) (nonspecific, conclusory objections "are no better than a complete failure to object"). It would defeat the judicial efficiency

purposes of Magistrate Judge review to require a de novo reconsideration of the entirety of an M&R without specific complaints.

Plaintiff's objections largely take the form of general discussions of the law (regarding the standards of review both on summary judgment and under Rule 60) and the facts (regarding both the merits and the discovery of the statement made to Dickey). He further requests to incorporate by reference material set out in prior filings. However, such briefing does not advise the Court of any particular error in the Magistrate Judge's analysis.

Plaintiff's general briefing fails to satisfy the specific-objection requirement of Rule 72(b). Even though the briefing may contain hints of objections, it is not for the Court to sift through and formulate those objections for Plaintiff. Malacara v. Garber, 353 F.3d 393, 405 (5th Cir. 2003). Except as addressed below, the Court will therefore disregard any briefing not directed to a specific objection.

The Court's review of Plaintiff's filing reveals only two explicitly stated objections:

1. General Objection: The M&R's "Factual and Procedural Background" describes the case under the wrong standard, failing to draw inferences in favor of Plaintiff and giving insufficient weight to evidence of pretext; and

2. Rule 60(c) Objection: The M&R errs in treating August 18, 2017, as the date on which Plaintiff's counsel became aware of the newly discovered evidence because counsel could not act on the evidence until Dickey agreed to sign his affidavit making the matter admissible.

Plaintiff's intent to lodge a third objection clearly emerges from his filing, so the Court will also review the M&R's recommendation to deny relief on the grounds that Plaintiff did not meet the diligence requirement from Rule 60(b)(2). The Court deems waived any objections to the M&R's recommendation to deny relief under the remaining subsections of Rule 60(b).

### A. Objection to Factual and Procedural Background
**\*2** Plaintiff objects to the M&R's "Factual and Procedural Background" discussion "because it fails to properly consider plaintiff's evidence" and "fails to draw

Adame v. 2898 Bairgild County, Not Reported in Fed. Supp. (2019)

Case 1:18-cv-00068 Document 394-1 Filed on 06/10/19 in TXSD Page 97 of 99

2018 WL 1918656, 2018 Fair Empl.Prac.Cas. (BNA) 144,262

the inferences from the evidence in his favor." *See* D.E. 52, p. 1. He also devotes much of his filing to recounting facts that were already in the record. *Id.* at 1–2, 7–8. Plaintiff's objection is misplaced, as he is not entitled to inferences in his favor under Rule 60(b), the authority under which he now must proceed.

The burden of proof to satisfy the requirements of Rule 60(b) lies on Plaintiff as movant, and the matter is entrusted to the Court's discretion. *United States v. Harrison Cty., Miss.*, 463 F.2d 1328, 1330 (5th Cir. 1972) (burden of proof on Rule 60(b) movant); *Delgado v. Shell Oil Co.*, 231 F.3d 165, 182 (5th Cir. 2000) (Rule 60(b) standard of review is abuse of discretion). Nothing in the standard of review suggests that, on a Rule 60 motion, Plaintiff is entitled to any inferences in his favor. [2]

Additionally, the factual recitation to which Plaintiff objects merely summarizes the procedural posture of the litigation and the Court's prior holdings. It does not relate to his claim of newly discovered evidence or the issue of due diligence and timeliness in having failed to discover the evidence and present his motion sooner. The Court finds no error with the M&R's discussion of the facts, nor is a Rule 60(b) motion "the proper vehicle for rehashing old arguments." *Frazier v. Map Oil Tools, Inc.*, 725 F. Supp. 2d 597, 609 (S.D. Tex. 2010) (quoting *Resolution Trust Corp. v. Holmes*, 846 F. Supp. 1310, 1316 (S.D. Tex. 1994) ) (internal quotation marks omitted). This objection is **OVERRULED**.

### B. Objection Under Rule 60(c)(1)

The second of Plaintiff's explicit objections relates to the M&R's recommendation to deny his motion because it was not brought within a reasonable time. *See* D.E. 51, p. 6. Setting aside, for now, whether Plaintiff exercised sufficient diligence to learn of the evidence upon which he now relies, the question is whether his motion was filed within a reasonable time of his actually discovering the evidence. *See* Fed. R. Civ. P. 60(c)(1) (motions under Rules 60(b)(1), (2), and (3) "must be made within a reasonable time," not to exceed one year after the judgment or order the motion seeks to vacate).

Specifically, Plaintiff "objects to the memorandum's notation about Plaintiff's counsel becoming aware of the conversation between Dickey and Bolcik on August 18, 2017." D.E. 52, p. 9. He does not claim this

is inaccurate, or that the Magistrate Judge erred in concluding that nearly four months elapsed from when Plaintiff discovered the new evidence to when he filed his motion. Instead, he contends that Dickey did not agree to sign his affidavit until October 1 and thus Plaintiff's motion, filed the next day, was made within a reasonable time. *Id.* The Court finds no error with the M&R's finding that Plaintiff's counsel learned of the evidence on August 18, 2017.

Plaintiff makes an additional argument regarding timeliness. Citing Rule 60(b)(1), which allows the Court to vacate a judgment or order based on "mistake, inadvertence, surprise, or excusable neglect," Plaintiff asks the Court to excuse the two-month period during which Plaintiff knew of Dickey's evidence, but his counsel was not yet aware of it. D.E. 52, p. 6. Plaintiff contends that his error in not promptly informing his attorney of the new evidence is excusable because Plaintiff, as a non-lawyer, mistakenly thought it was too late to submit any new evidence. *Id.* at 8–9. The Court therefore construes Plaintiff's reference to Rule 60(b)(1) as an argument that the Court should find that his motion was made within a reasonable time.

**\*3** Even if the date Plaintiff learned of the evidence is disregarded, the M&R appropriately observed that the evidence was available and could have been discovered years earlier through due diligence. The Court further agrees with the M&R that Plaintiff has failed to show the required "good reason for the failure to take appropriate action sooner." 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. § 2866 (3d ed.). Plaintiff has not explained what measures, if any, were taken to try to secure the testimony sooner, whether the testimony could have been compelled, or whether counsel could have filed the motion and sought additional time or the Court's assistance in securing the necessary evidence. His objections under Rule 60(c)(1) are **OVERRULED**.

### C. Objection Under Rule 60(b)(2)

Finally, Plaintiff's filing invokes Rule 60(b)(2), which relates to "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Plaintiff also addresses some of the requirements for relief under that Rule. The Court will therefore review the M&R's recommendation to deny relief under this provision.

Adame v. Refugio County, Not Reported in Fed. Supp. (2018)

Case 1:18-cv-00068 Document 394-1 Filed on 06/10/19 in TXSD Page 98 of 99

2018 WL 1918656, 2018 Fair Empl.Prac.Cas. (BNA) 144,262

To succeed under Rule 60(b)(2), Plaintiff must show "(1) that [he] exercised due diligence in obtaining the information; and (2) that the evidence is material and controlling and clearly would have produced a different result if present before the original judgment." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 257 (5th Cir. 2003).

**Due Diligence.** Plaintiff claims that he "had no way to obtain Mr. Dickey's information before he volunteered it." D.E. 52, p. 6. This assertion assumes that Plaintiff had no obligation to investigate his case by such measures as asking co-workers if they had any information relevant to his employment discrimination claim. *See generally* Fed. R. Civ. P. 11(b). Plaintiff has failed to meet his burden of proof to show that, despite the exercise of reasonable diligence, he would not have discovered Dickey's evidence in time to include it in a response to the summary judgment motion or to move for a new trial under Rule 59(b). Plaintiff thus fails to meet the diligence test. [3]

**Defendant's Silence.** Plaintiff claims that Defendant Refugio County (the County) is responsible for his tardiness in discovering Dickey's evidence, as it should have named Dickey either (1) when answering the complaint's allegation that Sheriff Bolcik is prejudiced against Hispanics; or (2) as a possible witness with

discoverable information. *See* D.E. 52, pp. 6–7. This argument also fails.

Even if the Court assumes that Sheriff Bolcik made the alleged comment and that the County knew about it, [4] Plaintiff's complaint never mentioned Dickey or referenced the comment, so there was no pertinent allegation for the County to admit or deny. Nor would Rule 26(a)(1) have required the County to disclose Dickey, unless the County expected to use him to support its case. *See* Fed. R. Civ. P. 26(a)(1) (party required to provide names of individuals having discoverable information that supports the party's claims or defenses); *see also* 8A WRIGHT & MILLER, § 2053 (Under Rule 26(a)(1), "a party is not required to disclose material that will solely aid its opponent...."). [5] This objection is **OVERRULED**.

**\*4** For the foregoing reasons, the Court **OVERRULES** Plaintiff's objections, **ADOPTS** as its own the findings of fact and conclusions of law from the M&R, and **DENIES** Plaintiff's motion.

ORDERED this 24th day of April, 2018.

### All Citations

Not Reported in Fed. Supp., 2018 WL 1918656, 2018 Fair Empl.Prac.Cas. (BNA) 144,262

Footnotes

1    Specifically, Dickey avers that Sheriff Bolcik told him that Plaintiff "was a 'worthless fuckin Mexican' and he had fired him." D.E. 49-1, p. 1. Defendant denies that Sheriff Bolcik made the statement. D.E. 53, p. 2.

2    Plaintiff complains that the Magistrate Judge improperly credited the County's denial of Dickey's allegation, instead of recognizing the disputed truth of the affidavit as a fact issue precluding summary judgment. *See* D.E. 52, pp. 9–10. Because this motion is under Rule 60, not Rule 56, this argument fails. The Court need not, and does not, reach any conclusion regarding the veracity of the statement or whether it is appropriately disputed.

3    Because Plaintiff cannot clear the diligence threshold, the Court need not consider whether Dickey's affidavit constitutes direct evidence of discrimination or whether the Court would have ruled differently on summary judgment had Dickey's affidavit then been part of the record. *See* D.E. 52, p. 6.

4    Plaintiff complains that the M&R assumes, in Defendant's favor, that Sheriff Bolcik did not, in fact, make the statement. No such assumption was made. The M&R merely observed that there are a number of reasons that the statement might not have been disclosed. It is Plaintiff's burden to show any wrongdoing on Defendant's part and he has failed to submit evidence in satisfaction of that burden.

5    Although initial disclosures are not to be filed with the Court under Rule 5(d), the County filed such disclosures. (D.E. 23). The Court notes that the County's disclosures appear to rely on an outdated version of Rule 26(a)(1). Specifically, the County's filing refers to "disputed facts alleged with particularity," a phrase that has not appeared in Rule 26(a)(1) since the 2000 amendments to the Federal Rules of Civil Procedure. *See* 8A WRIGHT & MILLER, § 2053. The Court will not consider the adequacy of the County's disclosures under any standard but the controlling one.

**Adame v. Refugio County, Not Reported in Fed. Supp. (2018)**
2018 WL 1918656, 2018 Fair Empl.Prac.Cas. (BNA) 144,262

---

**End of Document**
© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.