**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## APPENDIX

Pursuant to this Court's Civil Procedures, Rule 7, Defendant-Intervenor, State of New Jersey, hereby provides the Court with the following table of contents and copies of the documents and authorities cited in its Response to Plaintiff States' Motion for Summary Judgment:

| Ex. | Description | Page |
|---|---|---|
| 1. | Dec. 24, 2014 Memorandum Of Points And Authorities In Opposition To Plaintiffs' Motion for Preliminary Injunction filed by Defendants in *Texas v. United States*, Case No. 1:14-cv-254 (S.D. Tex.) (Dkt. 38) | NJ001 |
| 2. | *Choice Hotels Int'l, Inc. v. Goldmark Hosp., LLC*, No. 3:12-CV-0548-D, 2014 WL 642731 (N.D. Tex. Feb. 19, 2014) | NJ076 |
| 3. | *Shields v. Gawk Inc.*, No. 18-00150, 2019 WL 1787781 (S.D. Tex. Apr. 24, 2019) | NJ092 |
| 4. | *Third Pentacle, LLC v. Interactive Life Forms, LLC*, No. 3:10cv00238, 2012 WL 27473 (S.D. Ohio Jan. 5, 2012) | NJ098 |

| Ex. | Description | Page |
|:---:|:---|:---|
| 5. | *Webb v. Bunch*, No. 93-5258, 1994 WL 36854 (6th Cir. Feb. 8, 1994) | NJ101 |

Dated: June 14, 2019

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By:    */s/Glenn Moramarco*
Assistant Attorney General
(admitted pro hac vice)
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor
Trenton, New Jersey 08625-0116
Phone: (609) 376-3235
Fax: (609) 777-4015
Glenn.Moramarco@law.njoag.gov

Jeremy Hollander, Assistant Attorney General
(admitted pro hac vice)
Katherine A. Gregory, Deputy Attorney General
(admitted pro hac vice)
Kenneth S. Levine, Deputy Attorney General
(admitted pro hac vice)

*Attorneys for Defendant-Intervenor State of New Jersey*

# **<u>Exhibit 1</u>**

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

_____

| | |
|---|---|
| STATE OF TEXAS, *et al.* ) | |
| ) | |
| Plaintiffs, ) | No. 1:14-CV-254 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, *et al.* ) | |
| ) | |
| Defendants. ) | |

_____

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION AND SUMMARY OF THE ARGUMENTS .................................................. 1

NATURE AND STAGE OF THE PROCEEDING ........................................................................ 4

I.     STATUTORY AND REGULATORY BACKGROUND ................................................. 4

     A.    The Executive Branch's Discretion in Immigration Enforcement ........................ 4

     B.    The Executive Branch's Longstanding Exercise of Its Immigration Enforcement Discretion Through "Deferred Action" ............................................. 7

II.    PROCEDURAL BACKGROUND ................................................................................. 11

     A.    DHS's 2014 Guidance Challenged by Plaintiffs ............................................. 11

     B.    Plaintiffs' Claims ................................................................................................ 12

STATEMENT OF THE ISSUES TO BE RULED ON BY THE COURT ................................. 12

ARGUMENT ................................................................................................................................. 13

I.     THE COURT SHOULD DENY PLAINTIFFS' MOTION AND DISMISS THIS ACTION FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE PLAINTIFFS LACK STANDING ................................................................................. 13

     A.    Plaintiffs Have Failed to Demonstrate That They Will Suffer a Cognizable Injury Traceable to the Deferred Action Guidance ............................................ 15

          i.    Plaintiffs' Conjecture about Costs Associated with the Presence of Undocumented Aliens Is Not Cognizable .................................................. 16

          ii.   Plaintiffs Cannot Base Standing on Costs Triggered by State Law .......... 21

          iii.  Even Accepting Their Claims of Harm, Plaintiffs Have Not Demonstrated an Injury to Their Own Interests, as Opposed to the Interests Shared by All Taxpayers ............................................................ 23

     B.    Plaintiffs Cannot Pursue This Litigation on Behalf of the Purported Interests of their Citizens ................................................................................... 24

     C.    Prudential Considerations Further Compel Dismissal of Plaintiffs' Generalized Policy Grievance in this Area of Unique Federal Control .............. 27

II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS ....................................................... 30

     A.    Plaintiffs Cannot Bring an Independent Claim under the Take Care Clause .................................................................................................................. 30

i

NJ002

B. Deferred Action Is an Unreviewable Exercise of Enforcement Discretion .......... 31

    i. Congress Has Not Limited DHS's Longstanding Discretion to Grant Deferred Action ....................................................................................... 33

    ii. DHS's Tailored Guidance Faithfully Executes the Immigration Laws and Does Not "Abdicate" its "Statutory Responsibilities" ............. 37

C. Plaintiffs' APA Claims Lack Merit ...................................................... 44

    i. The Deferred Action Guidance Is Exempt From the Notice-And-Comment Requirement of the APA…………........................................ 44

    ii. The Guidance Is Consistent with Congress's Intent in Enacting the INA and Delegating to the Secretary Discretion in Enforcing Its Provisions .................................................................................. 47

III. PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ...................................................... 49

IV. GRANTING A PRELIMINARY INJUNCTION WOULD HARM DEFENDANTS AND THE PUBLIC INTEREST ........................................... 50

A. The Challenged Deferred Action Guidance Promotes Congressionally-Mandated Public Safety and National Security Objectives .................................. 51

B. The Challenged Deferred Action Guidance Furthers Humanitarian and Other Interests. ...................................................................... 53

C. Enjoining the Challenged Deferred Action Guidance Would Significantly Undermine the Public Interest ............................................................. 54

D. The Challenged Deferred Action Guidance and Exercises of Discretion Can Be Modified at Any Time ................................................................... 55

CONCLUSION ............................................................................ 55

NJ003

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967)......................................................................... 28

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3rd Cir. 2000) .......................................................... 50

*Adams v. Richardson*,
    480 F.2d 1159 (D.C. Cir. 1973) ........................................... 37, 38, 39

*Al- Aulaqi v. Obama*,
    727 F.Supp.2d 1 (D.D.C. 2010) ...................................................... 48

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982)................................................................... 23, 24

*Allen v. Wright*,
    468 U.S. 737 (1984)........................................................... 15, 18, 50

*Angelus Milling Co. v. Comm'r of Internal Revenue*,
    325 U.S. 293 (1945)......................................................................... 30

*Apache Bend Apartments, LTD. v. United States*,
    987 F.2d 1174 (5th Cir. 1993) ................................................... 28, 29

*Aquifer Guardians v. Fed. Highway Admin.*,
    779 F. Supp. 2d 542 (W.D. Tex. 2011)........................................... 49

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    131 S. Ct. 1436 (2011).................................................................... 24

*Arizona v. United States*,
    104 F.3d 1095 (9th Cir. 1997) ........................................................ 33

*Arizona v. United States*,
    132 S. Ct. 2492 (2012)............................................................ passim

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................... 17

*Ass'n of Civilian Technicians, Inc. v. FLRA*,
    283 F.3d 339 (D.C. Cir. 2002) ....................................................... 39

NJ004

*Ass'n of Irritated Residents v. E.P.A.*,
    494 F.3d 1027 (D.C. Cir. 2007) ............................................ 40

*Bartholomew v. United States*,
    740 F.2d 526 (7th Cir. 1984) ............................................ 36

*Bennett v. Spear*,
    520 U.S. 154 (1997)............................................ 27, 28

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)............................................ 50

*California v. United States*,
    104 F.3d 1086 (9th Cir. 1987) ............................................ 33

*Catano v. Local Bd. No. 94 Selective Serv. Sys.*,
    298 F. Supp. 1183 (E.D. Pa. 1969) ............................................ 31

*Chiles v. United States*,
    874 F. Supp. 1334 (S.D. Fla. 1994) ............................................ 34

*Chiles v. United States*,
    69 F.3d 1094 (11th Cir. 1995) ............................................ 33, 34

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013)............................................ passim

*Claybrook v. Slater*,
    111 F.3d 904 (D.C. Cir. 1997) ............................................ 34

*Conoco, Inc. v. Skinner*,
    970 F.2d 1206 (3d Cir. 1992)............................................ 36

*Crane v. Napolitano*,
    2013 WL 1744422 (N.D. Tex. April 23, 2013) ............................................ 36

*Crane v. Napolitano*,
    920 F. Supp. 2d 724 (N.D. Tex. 2013) ............................................ 14, 16, 18

*Crowley Caribbean Transp. Inc., v. Pena*,
    37 F.3d 671 (D.C. Cir. 1994)............................................ 41

*Cutler v. Hayes*,
    818 F.2d 879 (D.C. Cir. 1987) ............................................ 38, 39

NJ005

*DaCosta v. Nixon*,
55 F.R.D. 145 (E.D.N.Y. 1972) ....................................................................... 30, 31

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ................................................................................................ 14

*Del. Dep't of Natural Res. & Envtl. Control v. FERC*,
558 F.3d 575 (D.C. Cir. 2009) ............................................................................... 26

*Delta Found., Inc. v. United States*,
303 F.3d 551 (5th Cir. 2002) ............................................................................ 47, 48

*Demore v. Kim*,
538 U.S. 510 (2003) .................................................................................................. 5

*Enter. Int'l v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir. 1985) .................................................................................. 13

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
93 F.3d 897 (D.C. Cir. 1996) .................................................................................. 27

*Florida v. Mellon*,
273 U.S. 12 (1927) .............................................................................................. 18, 23

*Garcia v. San Antonio Metro. Transit Auth.*,
469 U.S. 528 (1985) ................................................................................................. 30

*Gulf Oil Corp. v. FEA*,
391 F. Supp. 856 (W.D. Pa. 1975) .......................................................................... 55

*Haitian Refugee Ctr. v. Gracey*,
809 F.2d 794 (D.C. Cir. 1987) ................................................................................ 15

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......................................................................................... passim

*Henderson v. Stalder*,
287 F.3d 374 (5th Cir. 2002) .................................................................................. 16

*Hodges v. Abraham*,
253 F. Supp. 2d 846 (D.S.C. 2002) ........................................................................ 54

*Hotel & Rest. Employees Union, Local 25 v. Smith*,
594 F. Supp. 502 (D.D.C. 1984) ............................................................................ 41

NJ006

*Hotel & Rest. Employees Union, Local 25 v. Smith*,
    846 F.2d 1499 (D.C. Cir. 1988) ............................................................. 41

*Illinois v. City of Chicago*,
    137 F.3d 474 (7th Cir.1998) ................................................................. 22

*INS v. Errico*,
    385 U.S. 214 (1966).............................................................................. 43

*Interstate Natural Gas Ass'n of Am. v. FERC*,
    285 F.3d 18 (D.C. Cir. 2002) ............................................................... 45

*Kalka v. Hawk*,
    215 F.3d 90 (D.C. Cir. 2000) ............................................................... 31

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    335 F.3d 357 (5th Cir. 2003) ........................................................... 3, 13

*Kendall v. U.S. ex rel. Stokes*,
    37 U.S. 524 (1838).............................................................................. 30

*Kenney v. Glickman*,
    96 F.3d 1118 (8th Cir. 1996) ............................................................... 41

*Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*,
    426 U.S. 394 (1976)............................................................................. 31

*Lewis v. Casey*,
    518 U.S. 343 (1996)............................................................................. 50

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014).................................................................... 27, 28

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)............................................................................. 45

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973)............................................................................. 15

*Lion Health Servs., Inc. v. Sebelius*,
    635 F.3d 693 (5th Cir. 2011) ............................................................... 50

*Little v. KPMG LLP*,
    575 F. 3d 533 (5th Cir. 2009) .............................................................. 50

NJ007

*Louisiana v. Verity,*
    853 F.2d 322 (5th Cir. 1988) ........................................................................ 47

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................... 2, 14, 15, 17

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
    485 U.S. 439 (1988) ................................................................................... 31

*Mada-Luna v. Fitzpatrick,*
    813 F.2d 1006 (9th Cir. 1987) .................................................................... 46

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .............................................................................. 25, 26

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) .............................................................................. 24, 25

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ................................................................................ 22, 29

*Medellin v. Texas,*
    552 U.S. 491 (2008) ................................................................................... 30

*Missouri v. Illinois,*
    180 U.S. 208 (1901) ................................................................................... 24

*Morton v. Ruiz,*
    415 U.S. 199 (1974) ................................................................................... 46

*Munaf v. Geren,*
    553 U.S. 674 (2008) ..................................................................................... 2

*Nat'l Res. Def. Council, Inc. v. Pena,*
    972 F. Supp. 9 (D.D.C. 1997) .................................................................... 54

*NB ex rel. Peacock v. Dist. of Columbia,*
    682 F.3d 77 (D.C. Cir. 2012) ..................................................................... 31

*New Jersey v. Sargent,*
    269 U.S. 328 (1926) ................................................................................... 25

*New Jersey v. United States,*
    91 F.3d 463 (3d Cir. 1996) ......................................................................... 33

NJ008

*New York v. United States*,
    505 U.S. 144 (1992) ............................................................................................. 15

*Nicholas v. INS*,
    590 F.2d 802 (9th Cir. 1979) ............................................................................ 46

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ............................................................................................. 49

*Oregon v. Mitchell*,
    400 U.S. 112 (1970) ........................................................................................... 15

*Padavan v. United States*,
    82 F.3d 23 (2d Cir. 1996) .................................................................................. 33

*Pennsylvania ex rel. Shapp v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976) ............................................................ 17, 23, 29

*People ex rel. Hartigan v. Cheney*,
    726 F. Supp. 219 (C.D. Ill. 1989) ........................................... 23, 24, 29, 30

*People of Colorado ex rel. Suthers v. Gonzales*,
    558 F. Supp. 2d 1158 (D. Colo. 2007) ............................................. 27, 33

*Perales v. Casillas*,
    903 F.2d 1043 (5th Cir. 1990) ........................................................................ 33

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................................................... 22, 29

*Prestage Farms, Inc. v. Bd. of Supervisors*,
    205 F.3d 265 (5th Cir. 2000) .......................................................................... 14

*Prof'ls & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) ..................................................................... 45, 46

*Public Citizen, Inc. v. EPA*,
    343 F.3d 449 (5th Cir. 2003) .......................................................................... 33

*Raines v. Byrd*,
    521 U.S. 811 (1997) ................................................................................... 14, 15

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    ("AAADC"), 525 U.S. 471 (1999) ......................................................... passim

*Riverkeeper, Inc. v. Collins*,
    359 F.3d 156 (2d Cir. 2004) ............................................................... 38

*Romeiro de Silva v. Smith*,
    773 F.2d 1021 (9th Cir. 1985) ..................................................... 46, 47

*Sanchez-Espinoza v. Reagan*,
    770 F.2d 202 (D.C. Cir. 1985) ............................................................ 48

*Sec'y of Labor v. Twentymile Coal Co.*,
    456 F.3d 151 (D.C. Cir. 2006) ............................................................ 32

*Sierra Club v. Jackson*,
    648 F.3d 848 (D.C. Cir. 2011) ............................................................ 43

*Sigmon v. Sw. Airlines Co.*,
    110 F.3d 1200 (5th Cir. 1997) ............................................................ 36

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ............................................................................... 18

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
    549 U.S. 422 (2007) ............................................................................. 19

*Soon Bok Yoon v. INS*,
    538 F.2d 1211 (5th Cir. 1976) ............................................................ 47

*Southdown, Inc. v. Moore McCormack Res., Inc.*,
    686 F. Supp. 595 (S.D. Tex. 1988) ..................................................... 51

*Star Satellite, Inc. v. City of Biloxi*,
    779 F.2d 1074 (5th Cir. 1986) ............................................................ 51

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................... 13

*Sturgeon v. Masica*,
    768 F.3d 1066 (9th Cir. 2014) ............................................................ 26

*Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*,
    201 F.3d 551 (5th Cir. 2000) .............................................................. 45

*Texas v. ICC*,
    258 U.S. 158 (1922) ............................................................................. 25

NJ010

*Texas v. United States,*
 106 F.3d 661 (5th Cir. 1997) ............................................................................ passim

*Texas v. United States,*
 497 F.3d 491 (5th Cir. 2007) ................................................................................ 15

*Town of Castle Rock v. Gonzales,*
 545 U.S. 748 (2005).............................................................................................. 35

*U.S. ex rel. Knauff v. Shaughnessy,*
 338 U.S. 537 (1950)............................................................................................ 4, 5

*United States ex. rel. Parco v. Morris,*
 426 F. Supp. 976 (E.D. Pa. 1977) .......................................................................... 8

*United States v. 9/1 Kg. Containers,*
 854 F.2d 173 (7th Cir. 1988) ................................................................................ 40

*United States v. Cox,*
 342 F.2d 167 (5th Cir. 1965) ................................................................................ 32

*United States v. Escobar,*
 No. 2:14-cr-00180-AJS (W.D. Pa. Dec. 16, 2014) ................................................ 31

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
 454 U.S. 464 (1982).............................................................................................. 28

*Virginia ex rel. Cuccinelli v. Sebelius,*
 656 F.3d 253 (4th Cir. 2011) ................................................................................ 25

*Warth v. Seldin,*
 422 U.S. 490 (1975).............................................................................................. 28

*Wayte v. U.S.,*
 470 U.S. 598 (1985).............................................................................................. 40

*Webster v. Doe,*
 486 U.S. 592 (1988).............................................................................................. 34

*Weinberger v. Romero-Barcelo,*
 456 U.S. 305 (1982).............................................................................................. 51

*Wilderness Soc'y v. Norton,*
 434 F.3d 584 (D.C. Cir. 2006) .............................................................................. 45

NJ011

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................ 13, 49

*Wyoming ex rel. Sullivan v. Lujan*,
  969 F.2d 877 (10th Cir. 1992) ................................................................. 28

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) ................................................................................ 24

*Wyoming v. U.S. Dep't of the Interior*,
  674 F.3d 1220 (10th Cir. 2012) ................................................... 17, 24, 26

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................................ 30

## STATUTES

5 U.S.C. § 553 ................................................................................... 13, 45
5 U.S.C. § 553(b)(3)(A) ............................................................................ 45
5 U.S.C. § 702 ............................................................................................ 48
5 U.S.C. § 706 ............................................................................................ 13
6 U.S.C. § 202(5) ................................................................................... 5, 48
6 U.S.C. § 2205 .......................................................................................... 34
8 U.S.C. § 1103 .......................................................................................... 48
8 U.S.C. § 1103(a) ..................................................................................... 34
8 U.S.C. § 1103(a)(1) .................................................................................. 4
8 U.S.C. § 1103(a)(3) ............................................................................. 4, 34
8 U.S.C. § 1151(b)(2)(A)(i) .................................................................. 37, 43
8 U.S.C. § 1154(a)(1)(D)(i)(II) .................................................................. 10
8 U.S.C. § 1154(a)(1)(D)(i)(IV) ................................................................. 10
8 U.S.C. § 1158(b)(1)(A) ............................................................................ 5
8 U.S.C. § 1182(a)(9)(B)(i)(II) ................................................................... 37
8 U.S.C. § 1182(d)(3) ................................................................................ 37
8 U.S.C. § 1182(d)(5)(A) ............................................................................ 5
8 U.S.C. § 1201(a) ..................................................................................... 37
8 U.S.C. § 1225 ................................................................................ 6, 37, 43
8 U.S.C. § 1225(b)(2) ................................................................................ 36

xi

8 U.S.C. § 1225(b)(2)(A) ................................................................................... 35

8 U.S.C. § 1226a ........................................................................................... 6, 43

8 U.S.C. § 1226(c) ..................................................................................... 5, 6, 43

8 U.S.C. § 1227(d)(1) ...................................................................................... 11

8 U.S.C. § 1227(d)(2) ...................................................................................... 11

8 U.S.C. § 1229b ................................................................................................. 5

8 U.S.C. § 1229b(b)(1) ..................................................................................... 43

8 U.S.C. § 1252(g) ..................................................................................... 10, 34

8 U.S.C. § 1255 ................................................................................................. 37

8 U.S.C. § 1324a(h)(3) ........................................................................... 8, 11, 48

8 U.S.C. § 1621 ................................................................................................. 22

49 U.S.C. § 30301 ....................................................................................... 11, 22

## CONSTITUTION

U.S. Const. art. II, § 3 ................................................................................. 13, 32

## REGULATIONS

8 C.F.R. § 2.1 ................................................................................................... 34

8 C.F.R. § 274a.12 ........................................................................................... 48

8 C.F.R. § 274a.12(c)(14) .......................................................................... passim

## OTHER AUTHORITIES

*Consolidated Appropriations Act, 2014*,
    Pub. L. No. 113-76, 128 Stat. 5, (2014) ................................................... 43

*DHS Appropriations Act 2010*,
    Pub. L. No. 111-83, 123 Stat. 2142 (2009) ................................................ 6

*Employment Authorization to Aliens in the United Sates*,
    46 Fed. Reg. 25079 (May 5, 1981) ..................................................... 43, 46

*National Defense Authorization Act for Fiscal Year 2004*,
    Pub. L. No. 108-36, 117 Stat. 1392 (2004) .............................................. 11

NJ013

*REAL ID ACT of 2005*,
    Pub. L. No. 109-13, 119 Stat. 231 (2005).......................................................................... 11, 22

*USA Patriot Act of 2001*,
    Pub. L. No. 107-56, 115 Stat. 272 (2001).............................................................................. 11

*Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*,
    43 Fed. Reg. 2776 (Jan. 19, 1978) ......................................................................................... 8

Kristi Lundstrom, *The Unintended Effects of the Three- and Ten-Year Unlawful Presence Bars*,
    76 Law & Contemp. Probs., 389 (2013) ................................................................................ 44

H.R. Rep. No. 111-157 (2009)........................................................................................... 7, 40

H.R. Rep. No. 85-1199 (1957)............................................................................................... 43

NJ014

**INDEX OF EXHIBITS**

| EXHIBIT NO. | DOCUMENT NAME | PAGE NO. |
|---|---|---|
| 1 | *Arpaio v. Obama*, No. 14-cv-1966 (D.D.C. Dec. 23, 2014) | 1 - 33 |
| 2 | Karl Thompson, Memorandum Opinion for the Sec'y of Homeland Security and the Counsel to the President: *DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014) | 34 - 66 |
| 3 | U.S. Department of Homeland Security, *Immigration Enforcement Actions: 2013, Annual Report* (Sept. 2014) | 67 – 74 |
| 4 | Immigration and Customs Enforcement (ICE), *ICE Enforcement and Removal Operations Report* (Dec. 19, 2014) | 75 - 95 |
| 5 | Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, to Thomas S. Winkowski, Acting Director, ICE, *et. al.*, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* (Nov. 20, 2014) | 96 - 101 |
| 6 | U.S. Citizenship and Immigration Services (USCIS), *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* (2014) | 102 - 135 |
| 7 | Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, to León Rodriguez, Director, USCIS, *et al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* (Nov. 20, 2014) | 136 - 140 |
| 8 | Andorra Bruno *et al.*, Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (July 13, 2012) | 141 - 163 |

NJ015

| EXHIBIT NO. | DOCUMENT NAME | PAGE NO. |
|---|---|---|
| 9 | Moore, Charlotte J., Cong. Research Serv., *Review of U.S. Refugee Resettlement Programs and Policies* (1980) (Excerpt) | 164 - 189 |
| 10 | Memorandum from Gene McNary, Commissioner, INS, to Regional Commissioners, INS, *Family Fairness: Guidelines for Voluntary Departure under 8 C.F.R. 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) | 190 - 191 |
| 11 | Memorandum from Paul W. Virtue, Acting Executive Associate Commissioner, INS, to Regional Directors *et al.*, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* (May 6, 1997) | 192 - 198 |
| 12 | Memorandum from Michael D. Cronin, Acting Executive Associate Commissioner, INS, to Michael A. Pearson, Executive Associate Commissioner, INS, *Victims of Trafficking and Violence Protection Act of 2000 Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas* (Aug. 30, 2001) | 199 - 204 |
| 13 | USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* (Nov. 25, 2005) | 205 - 213 |
| 14 | Memorandum from Donald Neufeld, Acting Associate Director, USCIS, to Field Leadership, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* (Sept. 4, 2009) | 214 - 221 |
| 15 | Sam Bernsen, Immigration and Naturalization Serv. (INS) General Counsel, *Legal Op. Regarding Service Exercise of Prosecutorial Discretion* (July 15, 1976) | 222 - 229 |
| 16 | Memorandum from Doris Meissner, INS Comm'r, to Regional Directors, *Exercising Prosecutorial Discretion* (Nov. 17, 2000) | 230 - 242 |

NJ016

| EXHIBIT NO. | DOCUMENT NAME | PAGE NO. |
|---|---|---|
| 17 | Memorandum from William J. Howard, Principal Legal Advisor, ICE, to OPLA Chief Council, ICE, *Prosecutorial Discretion* (Oct. 24, 2005) | 243 - 251 |
| 18 | Memorandum from Julie L. Myers, Assistant Sec'y, ICE, to Field Office Directors, ICE, *Prosecutorial and Custody Discretion* (Nov. 7, 2007) | 252 |
| 19 | Memorandum from Janet Napolitano, Secretary, DHS, to David V. Aguilar, Acting Commissioner, CPB, *et al*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) | 253 - 255 |
| 20 | President's Council of Economic Advisors, *The Economic Effects of Administrative Action on Immigration* (Nov. 2014) | 256 - 280 |
| 21 | Raul Hinojosa-Ojeda and Maksim Wynn, *From the Shadows to the Mainstream: Estimating the Economic Impact of Presidential Administrative Action and Comprehensive Immigration Reform* (Nov. 2014) | 281 - 311 |
| 22 | *Texas v. United States*, No. B-94-228 (S.D. Tex. Aug. 7, 1995) | 312 - 326 |
| 23 | *Challenges at the Border: Examining the Causes, Consequences, and Responses to the Rise in Apprehensions at the Southern Border: Hearing Before the S. Comm. on Homeland Security and Governmental Affairs* (July 9, 2014) (statement of Craig Fugate, Administrator, Federal Emergency Management Agency, *et al.*) | 327 - 332 |
| 24 | Congressional Research Service, *Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration* (July 3, 2014) | 333 - 357 |
| 25 | U.S. Department of State, Country Reports on Human Rights Practices for 2013 (excerpts from Guatemala, Honduras, and El Salvador reports) | 358 - 387 |

NJ017

| EXHIBIT NO. | DOCUMENT NAME | PAGE NO. |
|---|---|---|
| 26 | United Nations High Commissioner for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* (July 9, 2014) | 388 - 403 |
| 27 | Elizabeth Kennedy, *No Childhood Here: Why Central American Children Are Fleeing Their Homes* (2014) | 404 - 415 |
| 28 | USCIS, Current Statistics: Deferred Action for Childhood Arrivals: Countries of Birth (Dec. 19, 2014) | 416 - 421 |
| 29 | U.S. Customs and Border Protection (CBP), USBP Nationwide Apprehensions by Requested Citizenship FY 2010 – FY 2014 | 422 |
| 30 | NBC News, Meet the Press Transcript: Interview of Greg Abbott (Dec. 7, 2014) (excerpt) | 423 - 428 |
| 31 | USCIS, Current Statistics: Deferred Action for Childhood Arrivals: Pending, Receipts, Rejected, Approvals, Denials (Dec. 19, 2014) | 429 |
| 32 | *Review of the President's Emergency Supplemental Request: Hearing Before Sen. Comm. on Appropriations*, 113th Cong. 2 (Jul. 10, 2014) (stmt. of Jeh C. Johnson) | 430 - 435 |
| 33 | *Open Borders: The Impact of Presidential Amnesty on Border Security: Hearing Before the H. Comm. on Homeland Security*, 113th Cong. 3-4 (Dec. 2, 2014) (stmt. of Jeh C. Johnson) | 436 - 441 |

NJ018

## INTRODUCTION AND SUMMARY OF THE ARGUMENTS

The Constitution and Congress have vested the Executive Branch, and the Secretary of Homeland Security in particular, with broad discretion over the enforcement of federal immigration law—including determining whether and when to remove (or not remove) particular aliens. *See Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). On November 20, 2014, the Secretary issued a series of integrated directives pursuant to his authority under the Immigration and Nationality Act ("INA") and the Homeland Security Act of 2002 to establish Department of Homeland Security ("DHS" or "Department") wide enforcement priorities that emphasize national security, border security, and public safety. These priorities reflect DHS's need to adopt coordinated measures to further its enforcement efforts in light of limited resources. They are based on statutory obligations and congressional priorities, as well as humanitarian factors embodied in our immigration laws. Integral to these initiatives is a DHS guidance memorandum calling for the case-by-case exercise of deferred action—a long-established form of prosecutorial discretion—for certain low-priority aliens: those present in the United States since before 2010 and who either entered as children or are the parents of U.S. citizens or Lawful Permanent Residents ("LPRs"). Designation of these two categories of aliens as potentially eligible for deferred action serves two related purposes: (1) enhancing DHS's capacity to focus its limited resources on threats to national security, border security, and public safety, and (2) reducing the humanitarian cost of enforcement efforts when doing so is consistent with these priorities.

Through the present lawsuit, twenty States, four governors, and the Attorney General of Michigan seek to overturn and effectively commandeer federal enforcement prerogatives, including through the injunction of the deferred action policies announced on November 20. This effort cannot be reconciled with the Executive's well-recognized discretionary authority under the immigration laws to prioritize enforcement resources, including through grants of

NJ019

deferred action, or with the practical impossibility and humanitarian cost of removing every such alien regardless of consequence.  In any event, Plaintiffs' case fails at the threshold, because Plaintiffs lack standing.  Thus, as another federal district court ruled just yesterday in a similar challenge, this Court should dismiss this action for lack of jurisdiction and deny the motion for a preliminary injunction.  *See Arpaio v. Obama*, No. 14-cv-1966 (D.D.C. Dec. 23, 2014) (Ex. 1).

  **1.**  As an initial matter, this Court should deny the motion and dismiss this action for lack of subject matter jurisdiction because Plaintiffs lack Article III standing.  *See Munaf v. Geren*, 553 U.S. 674, 692 (2008) (finding it appropriate to "terminate the litigation" at the preliminary injunction stage if the "Government is entitled to judgment as a matter of law").  Plaintiffs themselves are not subject to the DHS deferred action guidance, and their claim that they nevertheless will be harmed by the guidance rests on multiple layers of speculation about the effect of the guidance on third parties not before the Court.  These allegations cannot support jurisdiction.  Nothing about Plaintiffs' status as States (or state executive officials) lessens the showing required to establish an Article III injury-in-fact here.  At its core, Plaintiffs' suit is a generalized disagreement about the scope of the prosecutorial discretion of the Executive Branch of the Federal Government, in the exercise of exclusive federal authority over immigration.  "[A]n injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575 (1992).

  **2.**  Even if this Court had jurisdiction, it should deny Plaintiffs' motion for the extraordinary relief of a preliminary injunction.  Plaintiffs must "'clearly carr[y] the burden of persuasion'" for each element of a preliminary injunction.  *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).  Plaintiffs fail

NJ020

to meet each element: they cannot show irreparable harm, nor a likelihood of success on the merits, nor that the balancing of the equities and the public interest favor issuance of an injunction.

     **a.**     For the same reasons that Plaintiffs lack any injury-in-fact sufficient to confer Article III standing, they cannot meet the heightened standard of irreparable harm required to obtain a preliminary injunction. Their generalized complaints of harm are speculative, conclusory, and therefore inadequate.

     **b.**     Plaintiffs also cannot demonstrate the requisite likelihood of success on the merits. At the outset, their lack of Article III standing is fatal to their likelihood of success. Beyond that, Plaintiffs' claims fail on the merits. First, contrary to Plaintiffs' claim, there is no independent cause of action under the Take Care Clause. Second, Plaintiffs' Administrative Procedure Act ("APA") challenge to the DHS guidance conflicts with the Executive's longstanding and well-recognized authority to exercise prosecutorial discretion in the immigration context. Indeed, the Supreme Court has made clear that the Federal Government's broad discretion in immigration enforcement includes the authority to "decide whether it makes sense to pursue removal at all," including because of "immediate human concerns." *See Arizona*, 132 S. Ct. at 2499. The Supreme Court has also recognized the government's "regular practice" of granting "deferred action" as an exercise of administrative discretion on the basis of "humanitarian reasons or simply for [the administration's] own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 483-84 (1999). The DHS guidance at issue here, which involves its prioritization of immigration enforcement efforts and the consideration of humanitarian factors, is thus committed to agency discretion by law and not subject to judicial review. *See Heckler v. Chaney*, 470 U.S. 821 (1985). Third, even if the Court

NJ021

could consider the merits of Plaintiffs' procedural and substantive challenges under the APA, they would fare no better. The DHS guidance concerning deferred action is a general statement of policy statutorily exempt from the APA's notice-and-comment requirement and was issued under the Secretary's authority to administer and enforce the Nation's immigration laws.

**c.** Finally, the balance of equities and the public interest weigh heavily against granting a preliminary injunction. An injunction would subvert the Executive's judgment about how best to protect border security, national security, and public safety, including its ordering of priorities to focus on the removal of aliens affecting those concerns. An injunction would also impose significant humanitarian costs and interfere with the Secretary's established authority to take into account humanitarian consequences in exercising his power to consider deferred action. *See Arizona*, 132 S. Ct. at 2499; *AAADC*, 525 U.S. at 483-84.

## NATURE AND STAGE OF THE PROCEEDING

### I. Statutory and Regulatory Background

#### A. The Executive Branch's Discretion in Immigration Enforcement

In the INA, Congress has charged the Secretary of Homeland Security with the administration and enforcement of the immigration laws. 8 U.S.C. § 1103(a)(1). In doing so, it has vested the Secretary with discretion over immigration matters, authorizing him to "establish such regulations; . . . issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the statute. *Id.* § 1103(a)(3) (emphasis added). That broad vesting of discretionary authority reflects the longstanding recognition that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).

The Secretary's discretion is at its apex when the removal of aliens is at issue. The INA

-4-

expressly authorizes immigration officials to grant aliens certain forms of discretionary relief

from removal, including parole, 8 U.S.C. § 1182(d)(5)(A); asylum, *id.* § 1158(b)(1)(A); and

cancellation of removal, *id.* § 1229b. Indeed, "[t]he broad discretion exercised by immigration

officials" is a "principal feature of the removal system." *Arizona*, 132 S. Ct. at 2499; *see also*

*AAADC*, 525 U.S. 471, 483-84. At each stage of the removal process—"commenc[ing]

proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—"the Executive has

discretion to abandon the endeavor." *AAADC*, 525 U.S. at 483-84.[1] Such broad authority and

discretion over immigration matters is further supported by the Executive Branch's inherent

power over the admissibility and exclusion of aliens. *See Knauff*, 338 U.S. at 542-43.

Recognizing that the immigration statutes it enacted vest the Executive Branch with

broad enforcement discretion, and recognizing the Executive Branch's inherent power and need

for flexibility in light of limited resources for immigration enforcement, Congress has directed

the Secretary to establish "national immigration enforcement policies and priorities." Homeland

Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C.

§ 202(5)). These priorities are essential: Congress has appropriated sufficient resources for

DHS to pursue only a small fraction of the violations it confronts. In particular, recent funding

provided to DHS's U.S. Immigration and Customs Enforcement ("ICE"), the component of DHS

charged with enforcing the interior, has allowed the agency to annually remove only a small

proportion of the estimated 11.3 million undocumented aliens living in the United States. *See*

Mem. Op. from Karl Thompson, Principal Dep'y Ass't Attorney General, Office of Legal

Counsel, for the Sec'y of Homeland Security and the Counsel to the President: *DHS's Authority*

---

[1] In rare circumstances, Congress has decided to limit the Executive's discretion. In those circumstances, in contrast to the present case, Congress has done so expressly. *See* 8 U.S.C. 1226(c); *Demore v. Kim*, 538 U.S. 510 (2003).

NJ023

*to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* at 9 (Nov. 19, 2014) ("OLC Op.") (Ex. 2).[2]  Such significant constraints require DHS to "ensure that [] its limited resources [are] devoted to the pursuit of" its highest priorities: "national security, border security, and public safety."  Mem. from Jeh Charles Johnson, Sec'y of Homeland Security, to Thomas S. Winkowski, Acting Director, ICE, *et al.*, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* at 2 (Nov. 20, 2014) ("Prioritization Guidance") (Ex. 5).

DHS's prioritization, as reflected in the guidance challenged in this case, is consistent with and reflected in the INA itself, which emphasizes the detention and removal of recent border crossers, criminal aliens, and threats to national security.  *See, e.g.*, 8 U.S.C. § 1225 (establishing a special "expedited removal" process for aliens apprehended at the border); *id.* § 1226(c) (providing mandatory detention for aliens convicted of certain crimes); *id.* § 1226a (providing mandatory detention of suspected terrorists).  Congress has explicitly directed DHS to prioritize "the identification and removal of aliens convicted of a crime by the severity of the crime," DHS Appropriations Act 2010, Pub. L. No. 111-83, 123 Stat. 2142, 2149 (2009) (enacted as amended), and to ensure "that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer," H.R. Rep. No. 111-157, at 8 (2009).  At the same time, it is well-settled that it is appropriate for the

---

[2] In light of the amount of annual appropriations and the removal priorities dictated by Congress, ICE has removed and returned between approximately 300,000 and 400,000 aliens a year.  *See* DHS Immigration Enforcement Actions: 2013 Annual Report, at 5 (Table 6; total removed),  7 (Table 10; total returned) (Ex. 3).  Many of these individuals, however, were apprehended attempting to unlawfully enter the United States rather than in the interior.  *See* ERO Report, 2014, at 7 (noting that more than two-thirds of those ICE removed were apprehended at the border) (Ex. 4).  These numbers do not include those removals and returns conducted by U.S. Customs and Border Protection ("CBP"), whose responsibilities relate solely to the border.  *See* DHS Immigration Enforcement Actions: 2013 at 8; *see also id.* at 5 (Table 6), p. 7 (Table 10).  Unlike CBP, ICE's responsibilities include removals from the interior *and* removals at the border, particularly of nationals of countries not contiguous to the United States.

NJ024

Executive Branch to consider, when exercising its discretion consistent with these priorities, the humanitarian and societal impacts of removal.  "Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime."  *Arizona*, 132 S. Ct. at 2499.

## B. The Executive Branch's Longstanding Exercise of Its Immigration Enforcement Discretion Through "Deferred Action"

In order to focus limited resources on higher priority aliens, the Executive Branch has long exercised prosecutorial discretion in the immigration context, including through "deferred action" with respect to certain classes of aliens.  *See AAADC*, 525 U.S. at 483-84 (describing "deferred action" as a "regular practice . . . of exercising . . . discretion").  Deferred action may also further other public interests beyond preserving resources and offering humanitarian relief, such as advancing foreign policy objectives, fostering economic development, and promoting administrative efficiency.  *Cf. Arizona*, 132 S. Ct. at 2499.  It does so by allowing DHS to defer, for a limited period of time subject to renewal, the removal of aliens who are low priorities for removal.  *See* U.S. Citizenship and Immigration Services ("USCIS"), *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* at 16 (2014) ("DACA Toolkit") (Ex. 6).  Deferred action does not confer legal immigration status or foreclose an alien's removal, as it is both time-limited and revocable at any time.  *See id.*  Nor does it provide an independent path to LPR status or U.S. citizenship.  *See, e.g.,* Mem. from Jeh Charles Johnson, Sec'y of Homeland Security, to León Rodriguez, Director, USCIS, *et al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* at 2 (Nov. 20, 2014) ("2014 Deferred Action Guidance") (Ex. 7) ("Deferred action does not confer any form of legal status in this country, much less citizenship.").  Longstanding

NJ025

regulations, based on authority granted to the Secretary and previously to the Attorney General, 8

U.S.C. § 1324a(h)(3), provide that an alien subject to deferred action may be eligible for

employment authorization.  8 C.F.R. § 274a.12(c)(14).  This ensures that when the DHS decides

not to remove an alien for a period of time, the alien is not left during that time to a choice

between seeking public support or working illegally.

For decades, the Executive Branch has implemented deferred action and other forms of

prosecutorial discretion both for individual aliens and for various classes of aliens.  For example,

during varying periods from 1956 to 1990, discretionary mechanisms similar to deferred action

were used to defer enforcement against aliens who were beneficiaries of certain approved visa

petitions,[3] nurses who were eligible for H-1 visas,[4] nationals of designated foreign states,[5] and

ineligible spouses and children of aliens who had been granted legal status under the

Immigration Reform and Control Act of 1986.[6]  *See* OLC Op. at 14.  Since the 1990s, deferred

action has been applied to additional classes of aliens, such as battered aliens who appear to

qualify for relief under the Violence Against Women Act of 1994 ("VAWA"),[7] T and U visa

applicants,[8] foreign students affected by Hurricane Katrina,[9] and widows and widowers of U.S.

---

[3] *See United States ex. rel. Parco v. Morris*, 426 F. Supp. 976, 979-80 (E.D. Pa. 1977).

[4] *See* Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses, 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978).

[5] *See* Andorra Bruno *et al.*, Cong. Research Serv., Analysis of June 15, 2012 DHS Mem., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 20-23 (July 13, 2012) (Ex. 8); Moore, Charlotte J., Cong. Research Serv., *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12-14 (1980) (excerpt as Ex. 9).

[6] Mem. from Gene McNary, Commissioner, INS, to Regional Commissioners, INS, *Family Fairness: Guidelines for Voluntary Departure under 8 C.F.R. 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) (Ex. 10).

[7] Mem. from Paul W. Virtue, Acting Executive Associate Commissioner, INS, to Regional Directors *et al.*, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997) (Ex. 11).

[8] Mem. from Michael D. Cronin, Acting Executive Associate Commissioner, INS, to Michael A. Pearson, Executive Associate Commissioner, INS, *Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001) (Ex. 12).

NJ026

citizens.[10]  *See id*. at 15-17.[11]  And beginning in 2012, deferred action has been available to aliens brought to the United States as children who meet certain guidelines, including having continuously resided in the United States since June 15, 2007, under what has been referred to as Deferred Action for Childhood Arrivals ("DACA").  *See* Mem. from Janet Napolitano, Sec'y of Homeland Security, to David V. Aguilar, Acting Commissioner, CBP, *et al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("2012 DACA Memo") (Ex. 19).

The Supreme Court has specifically acknowledged the Executive's prosecutorial discretion in immigration, including through deferred action.  *See AAADC*, 525 U.S. at 483-84 ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted [in 1996] the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience.").  Moreover, the Court held in *AAADC* that 8 U.S.C. § 1252(g) renders unreviewable the Executive's decision not to exercise discretion in favor of granting deferred action to an alien.  *Id.* at 483-84, 486-87.  The Supreme Court recently

---

[9] USCIS, Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ) at 1 (Nov. 25, 2005) (Ex. 13).

[10] Mem. from Donald Neufeld, Acting Associate Director, USCIS, to Field Leadership, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009) (Ex. 14).

[11] *See also* Sam Bernsen, INS General Counsel, *Legal Op. Regarding Service Exercise of Prosecutorial Discretion* at 2 (July 15, 1976) (Ex. 15) (noting the Executive's "inherent authority" to exercise prosecutorial discretion); Mem. from Doris Meissner, INS Comm'r, to INS Regional Directors, *Exercising Prosecutorial Discretion* at 2 (Nov. 17, 2000) (Ex. 16) (directing, following the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), that prosecutorial discretion "applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions," such as "granting deferred action or staying a final order"); Mem. from William J. Howard, Principal Legal Advisor, ICE, to Office of the Principal Legal Advisor (OPLA) Chief Counsel, ICE, *Prosecutorial Discretion* at 2 (Oct. 24, 2005) (Ex. 17) (recognizing that the "universe of opportunities to exercise prosecutorial discretion is large," including "in the pre-filing stage"); Mem. from Julie L. Myers, Ass't Sec'y, ICE, to Field Office Directors, ICE, *Prosecutorial and Custody Discretion* (Nov. 7, 2007) (Ex. 18) (recommending exercise of prosecutorial discretion for nursing mothers).

NJ027

reaffirmed the Executive Branch's broad authority over whether to initiate or defer removal

proceedings. *See Arizona*, 132 S. Ct. at 2499.

Congress also has approved the practice of deferred action. As noted, Congress enacted 8

U.S.C. § 1252(g) against the backdrop of the Executive's longstanding exercise of deferred

action and to protect that exercise of discretion from challenge by particular aliens denied that

relief. That action by Congress reflects a general ratification of the practice of deferred action as

a means of exercising enforcement discretion. In addition, Congress expanded the Executive's

VAWA deferred action program in 2000 by making eligible for "deferred action and work

authorization" children who could no longer self-petition under VAWA because they were over

the age of 21. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-

386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)).

Similarly, in 2008, as part of legislation authorizing DHS to grant "an administrative stay of a

final order of removal" to any individual who could make a *prima facie* showing of eligibility for

a T or U visa, Congress stated that "[t]he denial of a request for an administrative stay of

removal . . . shall not preclude the alien from applying for . . . deferred action." William

Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457,

§ 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1), (d)(2)).[12] Congress also has

specified classes of aliens who should be made eligible for deferred action, such as certain family

members of LPRs who were killed on September 11, 2001, *see* USA PATRIOT Act of 2001,

Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain family members of certain U.S.

citizens killed in combat, *see* Nat'l Defense Authorization Act for Fiscal Year 2004, Pub. L. No.

---

[12] In the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, § 202(c)(2)(B)(viii),119 Stat. 231, 302 (49 U.S.C. § 30301 note), Congress specified that proof of "approved deferred action status" constituted evidence of lawful status for the sole purpose of authorizing (but not requiring) states to issue driver's licenses to individual recipients.

NJ028

108-136, § 1703(c)-(d), 117 Stat. 1392, 1694.

## II.     Procedural Background

### A.  DHS's 2014 Guidance Challenged by Plaintiffs

On November 20, 2014, the Secretary issued a series of memoranda as part of a comprehensive initiative to establish Department-wide enforcement priorities that further focus DHS resources on national security, border security, and public safety.  One of those memoranda revised three aspects of DACA and provided deferred action guidelines for certain other aliens who are a low priority for removal.  *See* 2014 Deferred Action Guidance.  First, with regard to DACA, the memorandum removed the existing age cap of 31 so that individuals could request deferred action under DACA without regard to their current age, as long as they entered the United States before the age of 16.  *Id*. at 3.  Second, it extended the period of DACA from two to three years.  *Id*.  Third, it adjusted the relevant date by which an individual must have been in the United States from June 15, 2007 to January 1, 2010.  *Id*. at 4.  USCIS was instructed to begin accepting requests under the revised DACA guidelines no later than 90 days after the date the guidance was issued, *id.*, which is February 18, 2015.

The November 2014 Deferred Action Guidance also established separate guidelines under which certain parents of U.S. citizens or LPRs will be able to request deferred action ("DAPA").  To be considered for deferred action under DAPA, an individual must:  (1) have, on November 20, 2014, a son or daughter who is a U.S. citizen or LPR; (2) have continuously resided in the United States since before January 1, 2010; (3) have been physically present in the United States on November 20, 2014, and at the time of making a request for deferred action with USCIS; (4) have had no lawful status on November 20, 2014; (5) not fall within one of the categories of enforcement priorities set forth in another memorandum issued that same day; and

-11-

(6) present no other factors that, in the exercise of discretion, make the grant of deferred action inappropriate. *Id*. at 4. In addition, applicants are required to submit fingerprints and personal identifying information to USCIS for a background check. *Id*. USCIS was instructed to begin accepting requests from individuals under the DAPA guidelines no later than 180 days after the date of the policy's announcement, *id*. at 5, which is May 19, 2015.

As with DACA, DAPA requests will be assessed individually by immigration officers, who will determine whether to exercise discretion "on a case-by-case basis" considering all relevant factors. *Id*. at 4. Also, as with DACA, deferred action under DAPA does not confer any "substantive right, immigration status or pathway to citizenship," *id*. at 5, and it may be revoked at any time in the agency's discretion, *id*. at 2. Individuals who request deferred action under DAPA may also be eligible for work authorization for the deferred action period of 3 years, pursuant to longstanding regulations and statutory authority. *Id*. at 4-5; *see* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14).

### B. Plaintiffs' Claims

On December 3, 2014, Plaintiffs filed this suit, challenging DHS's authority to issue the November 20, 2014 Deferred Action Guidance and seeking declaratory and injunctive relief. (ECF No. 1, 14). Plaintiffs' Complaint includes three causes of action: that the guidance (1) violates the Take Care Clause of the Constitution, art. II, § 3, Cl. 5; (2) fails to comply with the APA's notice-and-comment requirement, *see* 5 U.S.C. § 553; and (3) violates the APA's substantive requirements, *see* 5 U.S.C. § 706. Plaintiffs moved for a preliminary injunction on all counts on December 4, 2014. *See* Pls.' Mot. for Prelim. Inj. ("Pls.' Mot.") (ECF No. 5).

### STATEMENT OF THE ISSUES TO BE RULED ON BY THE COURT

Plaintiffs seek to preliminarily enjoin the 2014 Deferred Action Guidance issued by the Secretary of Homeland Security concerning the exercise of prosecutorial discretion in the form

NJ030

of deferred action.  To obtain preliminary injunctive relief, the moving party must show: (1) a

likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of

preliminary relief; (3) that a balance of equities tips in its favor; and (4) that an injunction is in

the public interest.  *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008).  "[A]

preliminary injunction is 'an extraordinary remedy' which should only be granted if the party

seeking the injunction has 'clearly carried the burden of persuasion' on all four requirements."

*Karaha Bodas Co.*, 335 F.3d at 363.  "[I]f the movant does not succeed in carrying its burden on

any one of the four prerequisites, a preliminary injunction may not issue."  *Enter. Int'l v.*

*Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

## ARGUMENT

### I.  THE COURT SHOULD DENY PLAINTIFFS' MOTION AND DISMISS THIS ACTION FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE PLAINTIFFS LACK STANDING

The Court should deny Plaintiffs' motion for preliminary injunction without reaching the

merits because Plaintiffs lack Article III standing.  *Steel Co. v. Citizens for a Better Env't*, 523

U.S. 83, 94-95 (1998).  The Court should further dismiss Plaintiffs' claims for lack of subject

matter jurisdiction, consistent with the decision by a federal district court yesterday in a local

official's challenge to the 2014 Deferred Action Guidance, *see Arpaio*, Slip Op. at 3, and with

the decision of the only other court to have addressed a state's standing to challenge Defendants'

deferred action policies.  *See Crane v. Napolitano*, 920 F. Supp. 2d 724, 745-46 (N.D. Tex.

2013) (concluding that Mississippi lacked standing to challenge the 2012 DACA Memo), *appeal*

*pending*, No. 14-10049 (5th Cir.) (oral argument to be heard Feb. 3, 2015); *cf. Prestage Farms,*

*Inc. v. Bd. of Supervisors of Noxubee Cnty.*, 205 F.3d 265, 267 (5th Cir. 2000) (vacating

preliminary injunction and dismissing case for lack of standing).

Federal courts sit to decide cases and controversies, not to resolve disagreements about

NJ031

policy or politics. Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation and internal quotation omitted). Article III standing "is an essential and unchanging part of the case-or-controversy requirement." *Lujan*, 504 U.S. at 560. To establish standing, a plaintiff bears the burden of demonstrating, by competent proof, that it suffers an injury that is (1) "concrete, particularized, and actual or imminent"; (2) "fairly traceable to the challenged action"; and (3) "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks and citation omitted). Where standing is premised on a projected future injury, Article III demands not merely a possibility of injury, but a showing that the threatened future injury is "*certainly* impending." *Id.* at 1147.

The standing inquiry is "especially rigorous" where, as here, a plaintiff asks a federal court "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). Because standing requirements serve an "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere," courts must take care to "put aside the natural urge to proceed directly to the merits of [an] important dispute and to 'settle' it for the sake of convenience and efficiency." *Id.* at 820.

Plaintiffs have failed to demonstrate that any state, let alone every state joined in this action, has standing to seek to enjoin the 2014 Deferred Action Guidance. *Cf. Allen v. Wright*, 468 U.S. 737, 752 (1984) (standing limitations are designed "to ascertain whether the *particular*

-14-

*plaintiff* is entitled to an adjudication of the *particular claims* asserted") (emphasis added).[13]

### A. Plaintiffs Have Failed to Demonstrate That They Will Suffer a Cognizable Injury Traceable to the Deferred Action Guidance

The challenged guidance does not itself command the States to take, or refrain from taking, any action. Accordingly, this case is unlike the most common situation in which states have been found to have standing to challenge federal law. *See, e.g.*, *New York v. United States*, 505 U.S. 144 (1992); *Oregon v. Mitchell*, 400 U.S. 112 (1970); *Texas v. United States*, 497 F.3d 491, 496-97 (5th Cir. 2007) (Texas "suffered the injury of being compelled to participate in an invalid administrative process"). Instead, Plaintiffs complain of injury "from the government's allegedly unlawful regulation (or lack of regulation) of someone else," making standing "substantially more difficult to establish." *See Lujan*, 504 U.S. at 562. Furthermore, allowing Plaintiffs to challenge the DHS prosecutorial discretion guidance to which they are not themselves subject would conflict with the fundamental principle that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 804-807 (D.C. Cir. 1987) (applying principle to immigration context); *cf. Henderson v. Stalder*, 287 F.3d 374, 384 (5th Cir. 2002) (Jones, J., concurring) ("As a general proposition, a plaintiff who complains merely that a benefit has been unconstitutionally granted to others is asserting only a 'generalized grievance' that does not allow the plaintiff standing"). States have no more of a cognizable interest in the Federal Government's exercise of prosecutorial discretion under the INA than do their citizens.

Plaintiffs nonetheless seek to challenge the Secretary's exercise of discretion based on

---

[13] For all but two states – Texas and Wisconsin – Plaintiffs make no specific attempt to demonstrate any injury. Although no Plaintiff here has standing for the reasons discussed herein, nearly all Plaintiffs should be summarily dismissed for not even attempting to establish their standing.

-15-

conjecture about the indirect or incidental consequences that allegedly will flow from the 2014

Deferred Action Guidance.  Even assuming that a citizen or state could overcome the constraint

on standing articulated in *Linda R.S.*, Plaintiffs' allegations fail to demonstrate that the

challenged policy—which will allow DHS to increase its focus on border security and on

criminal and dangerous aliens—will result in an injury for any of the States, much less that an

injury is "*certainly* impending."  *Clapper*, 133 S. Ct. at 1147; *see also Arpaio*, Slip Op. at 20

(rejecting "such a broad interpretation of the injury requirement" that "would permit nearly all

state officials to challenge a host of Federal laws simply because they disagree with how many—

or how few—Federal resources are brought to bear on local interests").

### i. Plaintiffs' Conjecture about Costs Associated with the Presence of Undocumented Aliens Is Not Cognizable

Plaintiffs' first theory of harm is that the 2014 Deferred Action Guidance will increase

the presence of undocumented aliens in the Plaintiff States, forcing them to spend "substantial

resources" on law enforcement, emergency healthcare, and other public welfare services that are

available under state or federal law to indigent individuals (including any undocumented aliens

present within a state).  Am. Compl. ¶¶ 61-65 (ECF No. 14).  The district court in *Crane*

correctly rejected, as conjectural, a similar theory of harm offered by the State of Mississippi (a

plaintiff in this case) in its challenge to the 2012 DACA Memo.  *Crane*, 920 F. Supp. 2d at 745

("[T]he Court finds that Mississippi's asserted fiscal injury is purely speculative because there is

no concrete evidence that the costs associated with the presence of illegal aliens in the state of

Mississippi have increased or will increase as a result of the [DACA] Directive.").  Conclusory

allegations that a state's budget or tax revenues will be harmed in some general way by a federal

NJ034

policy are not sufficient to support standing.[14]  *See, e.g.*, *Pennsylvania ex rel. Shapp v. Kleppe*,

533 F.2d 668, 672-73 (D.C. Cir. 1976); *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220,

1234 (10th Cir. 2012); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (courts need not

accept "naked assertion[s] devoid of further factual enhancement"); *Lujan*, 504 U.S. at 562

(noting heightened burden to adduce facts where harm is tied to third-party actions).

   Plaintiffs' conjecture about increased spending on public welfare and emergency services

also runs counter to the terms of the DACA and DAPA initiatives.  To receive DACA or DAPA

under the 2014 Deferred Action Guidance, individuals must already have been present in the

country for at least five years.  Accordingly, any temporary deferral of deportation under the

guidance would not be expected to *increase* demand for services provided to undocumented

aliens, because the affected individuals are already present.  *See Wyoming*, 674 F.3d at 1234

(rejecting standing where state would incur cost regardless of federal policy).  Indeed, DACA

and DAPA may logically be expected to *decrease* covered aliens' need to rely on state social

welfare programs,[15] by facilitating recipients' ability (pursuant to existing regulations) to work

lawfully during the period of deferred action.  If anything, deferred action will have a positive

---

[14] Although Plaintiffs have failed to demonstrate a concrete injury as a result of *any* action by Defendants, the present inquiry before the Court is not whether an alleged harm is fairly traceable to the conduct of Defendants as a general matter, but rather whether it is "fairly traceable to *the challenged action*," *i.e.*, the 2014 Deferred Action Guidance. *See Clapper*, 133 S. Ct. at 1147 (emphasis added).  Accordingly, Plaintiffs' general allegations of harm from what they contend is Defendants' "lax attitude toward the immigration laws," Am. Compl. ¶ 62, or from the "immigration policies of the federal government" in general, *id.* ¶ 37, are wholly irrelevant here.

[15] Plaintiffs have separately failed to demonstrate redressability – another essential element of Article III standing – because enjoining the 2014 Deferred Action Guidance would not redress any alleged harms caused by the presence of eligible individuals, in light of existing limitations on DHS's removal resources and the fact an injunction would not compel the removal of any individual.  *See Crane*, 920 F. Supp. 2d at 745 ("Even if it is true that many illegal immigrants are permitted to remain in the state of Mississippi pursuant to the Directive and the Morton Memorandum, Plaintiffs have offered only conclusory allegations that those illegal aliens who are permitted to remain would otherwise have been removed.").  An injunction would prevent any such aliens from working legally, effectively forcing them instead to work illegally or seek public support.

-17-

economic effect,[16] but, in any event, Plaintiffs have wholly failed to support their contention that the 2014 Deferred Action Guidance will be a net drain on state resources.

Plaintiffs also speculate that the challenged policy will encourage a "new wave" of undocumented aliens to cross the border illegally—even though all aliens who arrive in the future are categorically foreclosed from receiving deferred action under DACA or DAPA. Am. Compl. ¶¶ 61-65. The Supreme Court has repeatedly rejected similar attempts to base standing on a theory that a federal policy somehow "encourages" complained-of third-party conduct. *See, e.g.*, *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (rejecting as "remote and indirect" Florida's theory that challenged law would induce citizens to remove property from the State and thereby diminish its revenues); *Allen*, 468 U.S. at 758-59; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). Another court in this District likewise concluded that alleged costs associated with the presence of undocumented aliens in the state did not give Texas standing to challenge federal immigration enforcement. *See Texas v. United States*, No. B-94-228, at *7 (S.D. Tex. Aug. 7, 1995) (Ex. 22) (agreeing with federal defendants that the decision to cross the border illegally results from the "conscious actions of aliens" rather than the actions or inactions of the U.S. Government), *aff'd on other grounds*, 106 F.3d 661 (5th Cir. 1997).[17]

Plaintiffs' speculation that the 2014 Deferred Action Guidance will increase illegal

---

[16] *See* President's Council of Economic Advisors, *The Economic Effects of Administrative Action on Immigration* (Nov. 2014) (Ex. 20) (estimating that the 2014 Deferred Action Guidance may, among other things, result in significant growth for economic measures); Raul Hinojosa-Ojeda and Maksim Wynn, *From the Shadows to the Mainstream: Estimating the Economic Impact of Presidential Administrative Action and Comprehensive Immigration Reform* (Nov. 2014) (Ex. 21) (concluding that DACA "has had and will continue to have a positive economic impact on its recipients as well as the economy as a whole").

[17] On appeal, the Fifth Circuit "assum[ed], without deciding," that Texas had standing and proceeded to reject its claim on other non-justiciability grounds, including that an "agency's decision not to take enforcement actions is unreviewable under the Administrative Procedure Act." 106 F.3d at 664 n.2, 667; *cf. Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (reiterating principle that courts generally may not reach merits of dispute before determining existence of jurisdiction but have discretion in the sequencing of threshold non-merits issues).

-18-

immigration is also belied by the terms of the guidance itself, which specifically excludes recent or future arrivals from consideration. *See Arpaio*, Slip Op. at 21-22 (determining that it "is speculative that a program, which does not apply to future immigrants, will nonetheless result in immigrants crossing the border illegally into . . . borders of this country"). Aliens cannot be considered for DACA or DAPA unless they have "continuously resided in the United States since before January 1, 2010." *See* 2014 Deferred Action Guidance at 4. In contrast, those apprehended at the border are among DHS's highest enforcement priorities. *See* Prioritization Guidance at 4. Any potential misconceptions that undocumented aliens may have about the scope of DACA and DAPA, *see* Am. Compl. ¶ 41, also cannot support standing, which requires a showing "that the defendant's *actual* action has caused" the alleged harm. *See Clapper*, 133 S. Ct. at 1150 n.5 (emphasis added). The challenged policy is expressly designed to deter—not encourage—future illegal border crossings. Moreover, the Government has undertaken substantial efforts to dispel potential misconceptions about immigration benefits in the United States. *See, e.g.*, *Challenges at the Border: Examining the Causes, Consequences, and Responses to the Rise in Apprehensions at the Southern Border: Hr'g Before the S. Comm. on Homeland Security and Governmental Affairs* at 4-5 (Jul. 9, 2014) (stmt. of Craig Fugate, Administrator, Federal Emergency Management Agency, *et al.*) ("Fugate statement") (Ex. 23).

Plaintiffs' assertion that the 2012 DACA Memo "led directly to a flood of immigration across the Texas-Mexican border," Am. Compl. ¶ 62, is similarly conclusory and insufficient to establish standing. Aliens who crossed the border, including during a recent surge of immigration in the summer of 2014, were not eligible for deferred action under the 2012 DACA Memo issued two years earlier, and any misconception they might have had to the contrary is not fairly traceable to that guidance. Plaintiffs' conclusory claim of causation further ignores the

NJ037

varied and complex factors that influence immigration, including many that are wholly outside

the United States' control. *See, e.g.*, *Arpaio*, Slip Op. at 21 ("[T]he decision for any individual to

migrate is a complex decision with multiple factors, including factors entirely outside the United

States' control, such as social, economic and political strife in a foreign country"); Cong.

Research Serv. Report, *Unaccompanied Alien Children: Potential Factors Contributing to*

*Recent Immigration*, Summary (July 3, 2014) (observing that "[u]naccompanied child migrants'

motives for migrating to the United States are often multifaceted," including a desire to escape

poverty and violence and concluding that "it remains unclear if, and how, specific immigration

policies have motivated children to migrate to the United States") (Ex. 24).[18]  Notably, DHS data

show that Mexican nationals constitute the vast majority of DACA beneficiaries, but since the

2012 DACA Memo was issued, the number of Mexican nationals apprehended by Border Patrol

at or near the border has decreased, not increased.  *Compare* USCIS, Current Statistics: Deferred

Action for Childhood Arrivals: Countries of Birth (Dec. 19, 2014) (Ex. 28) (showing that

Mexican nationals make up 78% of DACA grants) *with* CBP, USBP Nationwide Apprehensions

by Requested Citizenship FY 2010 – FY 2014 (Ex. 29) (demonstrating that illegal migration by

Mexican nationals has decreased since 2012).  This further reveals the attenuated and speculative

nature of the claim of causation on which Plaintiffs rely.

Finally, and perhaps most fundamentally, Plaintiffs' attempt to link the 2014 Deferred

Action Guidance to a predicted future increase in immigration ignores the reality that the

---

[18] State Department country reports confirm the existence of significant unrest and difficult living conditions in the countries from which many recent immigrants have come.  *See* State Dep't Country Report, Guatemala; State Dep't Country Report, Honduras; State Dep't Country Report, El Salvador (excerpts at Ex. 25).  *Accord* United Nations High Commissioner for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* (July 9, 2014) (excerpt at Ex. 26); Elizabeth Kennedy, *No Childhood Here: Why Central American Children Are Fleeing Their Homes* (Am. Immigration Council, 2014) (Ex. 27).

NJ038

challenged guidance *promotes* border security and a reduction of new illegal entrants. Congress has not provided DHS with resources to remove all undocumented aliens present in the United States; DHS thus must make choices about how to allocate its limited enforcement resources. By deferring the removal of individuals with significant community ties and no significant criminal records, DACA and DAPA free up limited resources so that federal authorities can more singularly focus on border security and recent illegal border-crossers, among other things. *See* Prioritization Guidance at 3. Accordingly, enjoining the 2014 Deferred Action Guidance would likely *exacerbate*, not redress, any alleged harm the Plaintiffs claim they will suffer as a result of illegal border crossings.

### ii. Plaintiffs Cannot Base Standing on Costs Triggered by State Law

Plaintiffs have identified only one alleged harm that they contend will "follow specifically from the extension of deferred action": costs associated with the grant of professional licenses and other state benefits that are triggered under state law by an individual's receipt of deferred action and/or work authorization. Am. Compl. ¶ 66 (citing Texas law); Pls' Mot. at 27 (citing Texas and Wisconsin law). These hypothetical future costs are not traceable to the 2014 Deferred Action Guidance, which does not require States to provide any state benefits to deferred action recipients; whether to provide such benefits is a decision made by the States. In fact, federal law establishes a presumption that certain categories of aliens, including the recipients of deferred action, are "not eligible for any State or local public benefits," including professional and commercial licenses, public housing, and unemployment benefits, *unless* a state affirmatively elects to provide those benefits. 8 U.S.C. § 1621. Federal law also contemplates that States may take federal alien classifications into account in administering their driver's licensing schemes. *See* REAL ID Act of 2005, Pub. L. No. 109-13, Div. B., § 202, 119 Stat.

NJ039

231, 312 (49 U.S.C. § 30301 note). The States thus have leeway in administering these schemes as long as they do not intrude on the federal power to classify on the basis of alien status.[19] Accordingly, costs associated with processing and providing state licenses or other state benefits to deferred action recipients are "self-inflicted injuries" that are not cognizable under Article III. *See Clapper*, 133 S. Ct. at 1152; *see also Illinois* 137 F.3d at 476 (holding that Illinois could not base standing on harms caused by state statute, *even if* "the balance of political power in Illinois may render [amendment of the statute] impossible at the moment"); *cf. Texas*, 106 F.3d at 666 (rejecting argument that Federal Government commandeered Texas's financial resources by causing them to expend funds incarcerating undocumented aliens, because the "State's correctional expenses stem from its enforcement of its own penal laws, not federal laws").[20]

---

[19] As we have elsewhere explained, a State may not selectively deny driver's licenses to some recipients of deferred action based on the State's own classification of aliens. *See* Amicus Br. of United States in Opp'n to Reh'g En Banc, *Ariz. Dream Act Coalition v. Brewer*, No. 13-16248 (9th Cir.) (filed Sept. 30, 2014); *see Plyler v. Doe*, 457 U.S. 202,225 (1982); *Mathews v. Diaz*, 426 U.S. 67, 80, 85 (1976). But it does not follow that States must provide driver's licenses to deferred action recipients as Wisconsin has done. Thus, to the extent that Wisconsin's claimed injury is an economic one flowing from the costs of providing driver's licenses, the injury is of Wisconsin's own making through the way it has structured its driver's licensure scheme. And to the extent Wisconsin's alleged injury is based instead on its policy opposition to providing driver's licenses to DACA or DAPA recipients, Wisconsin has no legally cognizable interest in a dispute about immigration policy. *See* Part I.C, *supra*; *see also Illinois v. City of Chicago*, 137 F.3d 474, 478 (7th Cir. 1998) ("A role as lawmaker does not confer a role as litigant in federal court.")

[20] In addition to this fundamental defect, Plaintiffs have also failed to establish that "the cost of processing and issuing additional licenses and [state] benefits" to DACA and DAPA recipients, Am. Compl. ¶ 68, would result in a net loss of revenue to the Plaintiff States. The costs of processing additional licenses could (and may already) be recouped through fees levied on the individual recipients. And any other hypothetical costs may be offset by an increase in income or sales tax revenues resulting from the legal employment of DACA and DAPA recipients who already reside in the Plaintiff States and who, without employment authorization, could only work illegally. *Cf. supra*, pp. 17-18 & n. 16. In analogous circumstances, the Supreme Court has declined to engage in the conjecture that would be required to conclude that a federal policy that does not operate against a state will nevertheless result in harm to the state's public fisc. *See Florida*, 273 U.S. at 18 (rejecting Florida's claim that federal policy would lead to diminution of tax revenues, because, *inter alia*, it was possible that the deficiency could "readily be made up by an increased rate of taxation").

NJ040

### iii. Even Accepting Their Claims of Harm, Plaintiffs Have Not Demonstrated an Injury to Their Own Interests, as Opposed to the Interests Shared by All Taxpayers

In addition to the foregoing defects, Plaintiffs fail to demonstrate an injury sufficient to confer standing because their generalized allegations of harm to the state fisc and general welfare are not injuries to Plaintiffs themselves, but to the taxpayers. *See People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 225 (C.D. Ill. 1989) (concluding that alleged decrease in state revenue and increase in social spending did not confer standing on Illinois because they "fall on the taxpayers and citizens of Illinois and not on the state *qua* state"). And as explained further in Part I.B below, Plaintiffs cannot pursue litigation against the Federal Government on the basis of injuries to their citizens.

To be sure, a direct and genuine injury to a State's own proprietary interests may give rise to standing. *See Alfred L. Snapp & Son*, *Inc. v. Puerto Rico*, 458 U.S. 592, 602 (1982). But "neither the impairment of the state's ability to look after its citizens nor the diminution of its tax revenues" as an indirect result of actions by the Federal Government constitutes a legally cognizable "injury to state proprietary interests." *Kleppe*, 533 F.2d at 672-73. For this reason, and in light of the "unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers," general diminutions of state revenue or increases in expenditures incidental to some federal policy are routinely found insufficient to establish state standing.[21] *See, e.g.*, *id.*; *Hartigan*, 726 F. Supp. at

---

[21] Indeed, if the Court were to deem Plaintiffs' generalized allegations of the harm sufficient for injunctive relief, it is difficult to see how such logic could be cabined. There are countless ways in which any given federal action may have some incidental intersection with state law. If Plaintiffs' theory of injury were accepted, states would have standing to challenge any decision to grant citizenship, lawful immigration status, asylum, or virtually any form of humanitarian relief, simply because such individuals could be eligible for benefits under state law. *See Arpaio*, Slip Op. at 20 (rejecting a "broad

-23-

NJ041

221-22. *Compare Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (finding cognizable injury where the effect of challenged state statute on specific tax revenues was direct and undisputed). In short, even if Plaintiffs had stated a fiscal injury traceable to the 2014 Deferred Action Guidance—which they have not—that injury would not fall on the States themselves and therefore cannot establish standing for the Plaintiffs as states. *See Hartigan*, 726 F. Supp. at 221-22; *cf. Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436 (2011) (discussing presumption that taxpayers do not have standing to challenge government expenditures).

### B. Plaintiffs Cannot Pursue This Litigation on Behalf of the Purported Interests of their Citizens

Plaintiffs cannot overcome their failure to demonstrate that they have standing in their own right by framing their claimed standing based on a *parens patriae* theory of representing the asserted rights of their citizens. *See* Am. Compl. ¶ 69 (asserting that Plaintiffs seek "to vindicate [the] interests . . . of their citizens"). "A State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son,* 458 U.S. at 610 n.16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)). As the Court explained in *Mellon*, "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." 262 U.S. at 485-86. In this regard, the Court emphasized, "it is the United States, and not the state, which represents [its citizens] as *parens patriae*." *Id.* Thus, while states may institute proceedings against private entities on behalf of their citizens, they may not sue "to protect citizens of the United States from the operation" of federal law. *Id.* This limitation is rooted in the proper allocation of authority between the state and federal governments: "[w]hen a state brings a suit

---

interpretation of the injury requirement [that] would permit nearly all state officials to challenge a host of Federal laws"; "Fortunately, the standing doctrine is not so limp.").

NJ042

seeking to protect individuals from [federal law], it usurps [the] sovereign prerogative of the federal government and threatens the general supremacy of federal law." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) (quotation marks and citation omitted).

This well-settled principle controls here. As in *Mellon*, Plaintiffs call upon this Court " to adjudicate, not rights of person or property, not rights of dominion over physical domain, not quasi sovereign rights actually invaded or threatened, but abstract questions of political power, of sovereignty, of government." 262 U.S. at 484-85. Such claims do not present a justiciable issue. *Id.*; *see also New Jersey v. Sargent*, 269 U.S. 328, 337 (1926) (allegations that provisions of federal law "go beyond the power of Congress and impinge on that of the state . . . do not suffice as a basis for invoking an exercise of judicial power"); *Texas v. ICC*, 258 U.S. 158, 162-63 (1922) (state's claim of infringement upon state sovereignty was merely "an abstract question of legislative power," not a justiciable case or controversy).

In their Complaint, Plaintiffs appear to suggest that *Massachusetts v. EPA* ("*Massachusetts*"), 549 U.S. 497 (2007), supports their effort to litigate on behalf of the interests of their citizens. *See* Am. Compl. ¶ 69. That case does not support standing here. In *Massachusetts*, the Supreme Court held that Massachusetts could challenge EPA's rejection of a petition for rulemaking to regulate greenhouse gases emitted by new motor vehicles. In doing so, the Court first assured itself that Massachusetts had demonstrated a cognizable injury-in-fact to its own proprietary or quasi-sovereign interests: *viz.*, a particularized injury "in its capacity as a landowner" of a "substantial portion of the state's coastal property," which was already being eroded by the "rising seas." 549 U.S. at 522 (citation omitted). The Court further deemed Congress's authorization in the Clean Air Act of the exact type of challenge brought by Massachusetts "of critical importance to the standing inquiry." *Id.* at 516. Although the Court

-25-

indicated that it was according Massachusetts "special solicitude in [the] standing analysis," it did so not only on account of the plaintiff's status as a "sovereign State," but also because Massachusetts was suing under a federal statute that secured it both a procedural right and a cause of action. *Id.* at 519-20. In determining that Massachusetts had standing in light of these specific circumstances, the Supreme Court also reaffirmed that its decision in *Mellon* "prohibits" a state from suing federal defendants "to protect her citizens from the operation of federal statutes." *Id.* at 520 n.17.

Because Plaintiffs have failed to satisfy the predicate requirement of an injury-in-fact to their own interests, and because there is no federal statute providing Plaintiffs a right and cause of action, *Massachusetts* does not apply here. In recognizing Massachusetts' ability to sue under the unique facts of that case, the Court did not "eliminate [a] state [plaintiff's] obligation to establish a concrete injury." *Del. Dep't of Natural Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009); *see also Sturgeon v. Masica*, 768 F.3d 1066, 1074 (9th Cir. 2014) (holding that "evidence of actual injury is still required"); *Wyoming*, 674 F.3d at 1238. To the contrary, Massachusetts had demonstrated such an injury in its capacity as landowner. 549 U.S. at 522. Accordingly, whatever effect the "special solicitude" employed in *Massachusetts* may have on the final standing analysis—an issue that is subject to considerable uncertainty in the lower courts—it cannot excuse Plaintiffs' failure here to allege a cognizable injury to their own interests. *See Wyoming*, 674 F.3d at 1238 ("Because [Wyoming has] failed to establish a concrete injury, we need not determine the parameters of 'special solicitude' in this case.").

Moreover, because Congress has not authorized the type of challenge brought by Plaintiffs—as it had for the Clean Air Act claim at issue in *Massachusetts*—Plaintiffs cannot take advantage of that "special solicitude" in any event. *See People of Colorado ex rel. Suthers v.*

NJ044

*Gonzales*, 558 F. Supp. 2d 1158, 1165 (D. Colo. 2007) (rejecting state's standing to challenge

alleged deficiencies in federal enforcement of immigration laws, because it "failed to identify

any recognition, by Congress or otherwise, of its right to challenge the actions that the

Government has taken").  In enacting the INA—and in particular, the provisions of the INA

addressing removal authority—Congress did not intend to permit states to police the Federal

Government's enforcement efforts.[22]  *See, e.g.*, *Arizona*, 132 S. Ct. at 2505-07 (holding that

Congress did not intend to allow states to countermand decisions by federal officials about

whether to prosecute immigration violations); *cf. Fed'n for Am. Immigration Reform, Inc. v.

Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996) ("The immigration context suggests the comparative

improbability of any congressional intent to embrace as suitable challengers in court all who

successfully identify themselves as likely to suffer from the generic negative features of

immigration.").  Thus, unlike Massachusetts, which undisputedly had a sovereign interest in its

shoreline, the Plaintiff States maintain no sovereign interest in directing immigration policy,

which is uniquely and exclusively entrusted to the federal government.  To the extent there are

sovereign interests implicated by this case, they are the sovereign interests of the United States,

which are not subject to policing by the States.  *See Arizona*, 132 S. Ct. at 2506.

### C. Prudential Considerations Further Compel Dismissal of Plaintiffs' Generalized Policy Grievance in this Area of Unique Federal Control

Prudential considerations about the "the proper—and properly limited—role of the courts

in a democratic society" further demonstrate that this Court may not review Plaintiffs' challenge

---

[22] For this reason, Plaintiffs' claims under the INA are also separately subject to dismissal because Plaintiffs do not fall with the INA's "zone-of-interests."  *See Bennett v. Spear*, 520 U.S. 154, 161-62 (1997); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388-89 & n.5 (2014) (holding that the "zone of interests" test, while non-jurisdictional in at least some circumstances, remains focused on whether the statute is intended to protect the class of persons encompassing the plaintiff from the harm that has occurred as a result of the alleged statutory violation).

NJ045

to the Secretary's administration and enforcement of the immigration laws. *Bennett*, 520 U.S. at 162 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Among other things, such considerations restrain courts from "adjudicating abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (internal quotations omitted). The Supreme Court has recently suggested that this limitation, although commonly couched as a question of "prudential standing," is an essential constraint on Article III jurisdiction. *See Lexmark Int'l*, 134 S. Ct. at 1387 n.3. It rests on the proposition that the "political branches of government are generally better suited to resolving disputes involving matters of broad public significance." *Apache Bend Apartments, Ltd. v. United States*, 987 F.2d 1174, 1176 (5th Cir. 1993) (en banc).[23]

These constraints bar Plaintiffs' policy-driven suit, which Plaintiffs themselves characterize as ultimately "not about immigration," but "about the rule of law, presidential power, and the structural limits of the U.S. Constitution," Am. Compl. ¶ 2.[24] *See Apache Bend*, 987 F.2d at 1179 (rejecting on prudential standing grounds a constitutional challenge by taxpayers to a congressional act that provided favored tax exemptions to a small number of individuals). Like the constitutional challenge to the tax code that the *en banc* Fifth Circuit declined to entertain in *Apache Bend*, Plaintiffs' claim would inject this Court into abstract issues

---

[23] Prudential concerns also appropriately bear on a district court's exercise of its traditional discretion to entertain an equitable action and to grant (or deny) injunctive and declaratory relief. *See*, *e.g.*, *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 148 (1967); 5 U.S.C. § 702.

[24] The Texas Attorney General confirmed this view in a recent television appearance, responding to a question about the nature of the harms for which the State had filed the instant lawsuit: "Sure. Because we're not suing for that economic harm. It's the way that Texas has been impacted that gives us standing. What we're suing for is actually the greater harm, and that is harm to the constitution by empowering the president of the United States to enact legislation on his own without going through Congress." *See* Meet the Press Transcript – Dec. 7, 2014 (excerpt at Ex. 30).

NJ046

of "wide public significance" appropriately left to the political branches. *See id.* States "may not convert the federal courts into publicly funded forums for the ventilation of public grievances." *Wyoming v. Lujan*, 969 F.2d 877, 881 (10th Cir. 1992) (internal quotation marks omitted).

The fact that the Plaintiff States seek judicial intervention that would reshape immigration policy—a uniquely federal prerogative—warrants strict adherence to this limitation. *See Arpaio*, Slip Op. at 2 ("Concerns over the judicial role are heightened when the issue before the court involves, as here, enforcement of the immigration laws."). Where a state's suit threatens "state interference with the exercise of federal powers," it presents "an important argument against standing" not present in private litigation. *Kleppe*, 533 F.2d at 678. This concern is particularly acute in the context of immigration, which is committed to the plenary authority of the federal government. *See Arizona*, 132 S. Ct. at 2499; *see also Mathews*, 426 U.S. at 81-82 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government"); *Plyler*, 457 U.S. at 225 (1982) (states "enjoy no power with respect to the classification of aliens").

These considerations make clear that states may not invoke the jurisdiction of the federal courts to advance their preferences regarding how the federal government should execute federal immigration laws and set enforcement policy, particularly based on the alleged indirect consequences from the federal government's application of the immigration statutes to third parties. Plaintiffs' redress concerning their policy disagreement with the Deferred Action Guidance, or with federal immigration policy more generally, is through the political process, not the courts. *Cf. Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 552 (1985) ("State sovereign interests . . . are more properly protected by procedural safeguards inherent in the

NJ047

structure of the federal system than by judicially created limitations on federal power.").

## II. PLAINTIFFS' CLAIMS FAIL ON THE MERITS

Regardless of how Plaintiffs' claim on the merits is framed, the result is the same: a challenge to the Executive's exercise of discretion in enforcing the Nation's immigration laws is not subject to judicial review. In any event, as explained below, even if the 2014 Deferred Action Guidance were subject to judicial review, Defendants have acted within and consistent with the APA and the broad authority provided by the INA.

### A. Plaintiffs Cannot Bring an Independent Claim under the Take Care Clause

Plaintiffs seek to state a separate cause of action under the Take Care Clause, but they cannot do so. None of the cases cited by Plaintiffs suggests there is judicially cognizable basis to challenge executive action under the Take Care Clause, separate and apart from an APA or statutory claim that the Executive acted outside of statutory authority.[25]  Moreover, any claim that the President has failed to "take Care that the Laws be faithfully executed" requires at least a

---

[25] None of the cases cited by Plaintiffs supports the proposition that their Take Care Clause claim is judicially cognizable as an independent basis for a challenge to whether the Executive acted within statutory authority; to the extent the Take Care Clause arose in those cases, it was in the context of an affirmative defense. *See* Pls.' Mot at 8-9. In *Kendall v. United States*, the Supreme Court addressed the effect of a statute establishing a "precise, definite act, purely ministerial; and about which the postmaster general had no discretion whatever." 37 U.S. (12 Pet.) 524, 613 (1838). In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the President conceded that he was acting outside of authority provided to him by statute. In *Medellin v. Texas*, 552 U.S. 491 (2008), the Supreme Court addressed, in the context of a non-self-executing treaty, whether a Presidential memorandum preempted state law in the absence of Congressional ratification. *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293, 296 (1945), recites the truism that the Executive must follow the law, notwithstanding that the Court held in that case that the IRS could lawfully exercise its discretion in refusing to waive the formal requirements of the authorized Treasury regulations. *Id.* at 295, 299. Likewise, in *DaCosta v. Nixon*, 55 F.R.D. 145 (E.D.N.Y. 1972), the court concluded that the ordering of plaintiff to return to his active service in Vietnam did not violate the Military Procurement Authorization Act of 1971 because "[t]he legislation . . . gave a very wide discretion to the President." *Id.* at 146. Finally, *Catano v. Local Bd. No. 94 Selective Serv. Sys.*, 298 F. Supp. 1183, 1184-86 (E.D. Pa. 1969)—a mandamus case in which the court ordered a draft board to grant a deferment under a statutory provision—is not applicable here; Plaintiffs have not made any argument (nor could they) that they would be entitled to the "drastic" relief of mandamus, which is "to be invoked only [for] extraordinary situations." *Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*, 426 U.S. 394, 402 (1976).

NJ048

showing that the Executive has acted inconsistently with the statutes Congress has enacted, and thus cannot be divorced from a statutory claim.

Plaintiffs' attempt to bring an independent cause of action under the Take Care Clause is also belied by the fact that they rely on *Heckler v. Chaney* for that cause of action. *See* Pls.' Mot. at 9. In *Chaney*, the Supreme Court addressed under the APA whether the FDA acted consistent with its statutory authority in exercising prosecutorial discretion. 470 U.S. at 821. The Court held that an agency's decision not to exercise its enforcement authority, or to exercise it in a particular way, is "presumed" to be "immune from judicial review under § 701(a)(2)" of the APA. *Id.* at 832. Although the Supreme Court referred to the Take Care Clause in its analysis, *id.* at 832, it ultimately confined its analysis to the justiciability of a challenge to the exercise of discretion in the enforcement of a statutory scheme.

Plaintiffs thus cannot bring an independent cause of action under the Take Care Clause; the APA provides the proper framework for this Court's analysis.[26] *Cf. Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46 (1998) (courts should avoid addressing unnecessary constitutional issues).

### B. Deferred Action Is an Unreviewable Exercise of Enforcement Discretion

The Secretary of Homeland Security's exercise of enforcement discretion through the

---

[26]   Plaintiffs' citation to the recent decision in *United States v. Escobar*, No. 2:14-cr-00180-AJS (W.D. Pa. Dec. 16, 2014), offers no additional support for their claims. *See Arpaio*, Slip Op. at 30 n.13. First, despite the fact that (1) both parties informed the *Escobar* Court that the November 20, 2014 immigration-related enforcement guidance memoranda were not at issue, and (2) the constitutionality of these policies was not addressed in either side's briefs, the *Escobar* Court reached the issue. *See Escobar*, ECF Nos. 30, 31, 32. This overreach by the *Escobar* Court was inappropriate and incorrect. Indeed, in issuing its decision, the *Escobar* Court flouted two vitally important principles of federal jurisdiction: first, the obligation of federal courts "not [to] decide constitutional questions unless it is necessary to do so," *Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000), and second, the rule that federal court "jurisdiction is limited to actual cases or controversies between proper litigants." *NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77 (D.C. Cir. 2012) (internal citations omitted).

NJ049

deferred action guidance at issue here is not subject to judicial review. The decision to prosecute—or not to prosecute—is an exercise of Executive power, and it follows, consistent with the constitutional separation of powers, that courts should not interfere with such discretionary decisions. *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) (en banc); *cf. Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 157 (D.C. Cir. 2006) (noting that "the traditional nonreviewability" of prosecutorial discretion applies to administrative enforcement).

The *Chaney* Court noted at least three reasons why agency enforcement decisions generally are not reviewable. First, an agency's enforcement strategy "often involves a complicated balancing of a number of factors which are peculiarly within its expertise," and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." 470 U.S. at 831-32. Second, an agency's decision not to exercise its enforcement authority "generally does not [involve the] exercise [of] *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. Third, an agency's exercise of enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" *Id.* (quoting U.S. Const. art. II, § 3).

The Court of Appeals for this Circuit has held that "[r]eview of agency nonenforcement decisions is permissible *only* where statutory language sets constraints on the agency's discretion." *Perales v. Casillas*, 903 F.2d 1043, 1048 (5th Cir. 1990) (emphasis added); *see also Public Citizen, Inc. v. EPA*, 343 F.3d 449, 464 (5th Cir. 2003) (finding non-justiciable challenge to EPA's decision whether to issue a notice of deficiency for air pollution because Clean Air Act

NJ050

did not "provide[] meaningful standards for defining the limits of that discretion"). "Such

standards are not present" here. *See id*. To the contrary, the Federal Government's immigration

enforcement efforts are not subject to judicial review. *See Texas*, 106 F.3d at 667 (holding that

"[r]eal or perceived inadequate enforcement of immigration laws does not constitute a

reviewable abdication of duty").[27]

### i. Congress Has Not Limited DHS's Longstanding Discretion to Grant Deferred Action

The Supreme Court has repeatedly and explicitly recognized that the INA grants broad

discretion to the Executive Branch, including the decision whether to initiate removal

proceedings or grant deferred action: "A principal feature of the removal system is the broad

discretion exercised by immigration officials. Federal officials, as an initial matter, must decide

whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499 (internal citation

omitted); *see also AAADC*, 525 U.S. at 483-84 ("At each stage" of the removal process, "the

Executive has discretion to abandon the endeavor"). The Supreme Court has also recognized

"deferred action" as such an exercise of administrative discretion. In *AAADC*, it explained that,

as of 1996, "the INS had been engaging in a regular practice (which had come to be known as

'deferred action') of exercising that discretion for humanitarian reasons or simply for its own

convenience." *Id*. The Supreme Court recounted the roots of this "commendable" practice: "To

ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate

proceedings, or decline to execute a final order of deportation." *Id*. at 484. And the Supreme

---

[27] Courts have consistently rejected similar challenges brought by states challenging the Federal Government's enforcement of immigration laws. *See Arizona v. United States*, 104 F.3d 1095, 1096 (9th Cir. 1997); *California v. United States*, 104 F.3d 1086, 1090-95 (9th Cir. 1987); *New Jersey v. United States*, 91 F.3d 463, 466-71 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 26-30 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1095-97 (11th Cir. 1995); *People of Colo. ex rel. Suthers*, 558 F. Supp. 2d at 1162.

NJ051

Court found that Congress enacted 8 U.S.C. § 1252(g) "to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations." *Id.* at 485.

The Secretary's discretion to grant deferred action draws upon the Secretary's broader discretion in enforcing the Nation's immigration laws. Through the INA, Congress has authorized the Secretary to "establish such regulations; . . . issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the statute. 8 U.S.C. § 1103(a)(3) (emphasis added); *see also* 6 U.S.C. § 2205 (directing the Secretary to establish "national immigration enforcement policies and priorities"); *Chiles v. United States*, 874 F. Supp. 1334, 1340-41 (S.D. Fla. 1994) (emphasizing that 8 U.S.C. § 1103(a) indicates that the "decision not to undertake enforcement action in certain situations is . . . committed to agency discretion" and hence unreviewable under the APA), *aff'd*, 69 F.3d 1094, 1096 n.5 (11th Cir. 1995) (stating that § 1103(a) "would not justify even an allegation of complete abdication of statutory duties to go to trial"); 8 C.F.R. § 2.1.[28] The Supreme Court has found that similar language commits action to agency discretion by law. *See Webster v. Doe*, 486 U.S. 592, 600 (1988); *see also Claybrook v. Slater*, 111 F.3d 904, 909 (D.C. Cir. 1997).

Deferred action is one longstanding means by which federal immigration authorities exercise such discretion. *See, e.g.*, *AAADC*, 525 U.S. at 483-84. Individuals who receive deferred action are not granted any legal immigration status. *See* 2014 Deferred Action Guidance at 2. Deferred action does not provide citizenship, or even an independent path to citizenship. *Id.* Rather, deferred action is a temporary deferral of an alien's removal, which can

---

[28] 8 C.F.R. § 2.1, the regulation implementing 8 U.S.C. § 1103, states that "[a]ll authorities and functions of the Department of Homeland Security to administer and enforce the immigration laws are vested in the Secretary of Homeland Security," and the Secretary may "in his discretion" delegate his authority and may, through "regulation, directive, memorandum or other means deemed as appropriate," announce principles "in the exercise of the Secretary's discretion."

NJ052

be revoked at any time in the agency's discretion. *See id*. Moreover, the 2014 Deferred Action Guidance challenged by Plaintiffs does not itself grant deferred action to anyone, but rather provides a framework for individualized determinations of whether certain persons should receive deferred action, after a case-by-case assessment. *Id*.

Rather than citing any statutory provision that conflicts with the 2014 Deferred Action Guidance (because there is none), Plaintiffs erroneously claim that two separate provisions of the INA provide limits on deferred action. *See* Pls.' Mot. at 23-24. First, Plaintiffs argue that the Secretary can *never* exercise prosecutorial discretion concerning removal. They assert that 8 U.S.C. § 1225(b)(2)(A) creates a "mandatory duty" to remove "any undocumented immigrant present in violation of federal law, unless Congress provides a specific exception." *See* Pls.' Mot. at 3-4, 23. But this provision relates to detention and removal procedures for those "seeking admission"—rather than to aliens who, like aliens eligible for DACA or DAPA, have maintained a long term physical presence in the United States—and certainly does not mandate removal. Plaintiffs also undermine their argument by acknowledging that the Secretary has discretion as to whether to pursue removal in individual cases. *See* Pls.' Mot. at 10.

Plaintiffs' radical position that all undocumented aliens must be removed is foreclosed by more than half a century of prosecutorial discretion and controlling precedent; it also would yield absurd results. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (recognizing "[t]he deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands"). The Supreme Court has recognized that "a principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S. Ct. at 2499 ("Federal [immigration] officials, as an initial matter, must decide whether it makes sense to pursue removal at all."). This discretion is critical to the effective operation of

-35-

the immigration system. "Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime." *Id*. at 2499. And, removing an alien to a home country that is "mired in civil war" could "create a real risk that the alien or his family will be harmed upon return." *Id*. "The dynamic nature of relations with other countries [also] requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities." *Id*. This Court should reject Plaintiffs' invitation, through their Section 1225 argument, to upset a central aspect of the immigration laws and to force the Executive, automatically and regardless of consequence, to remove any alien it encounters who is here illegally unless an express exemption applies.[29] *See Bartholomew* v. *United States*, 740 F.2d 526, 531 (7th Cir. 1984) (suggesting that a court should consider whether "a mandatory construction would yield harsh or absurd results"); *accord Sigmon* v. *Sw. Airlines Co*., 110 F.3d 1200, 1206 (5th Cir. 1997); *Conoco, Inc*. v. *Skinner*, 970 F.2d 1206, 1225 (3d Cir. 1992).

Second, Plaintiffs incorrectly claim that the statutory provisions that set forth requirements for parents of U.S. citizens to become LPRs somehow control the Secretary's exercise of enforcement discretion regarding the deferral of removal proceedings for a limited period of time, as in DACA and DAPA. *See* Pls.' Mot. at 14 (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255). As described above, individuals receiving deferred action do *not* obtain the LPR status that an adult U.S. citizen child may seek

---

[29] Plaintiffs rely on *Crane v. Napolitano*, No. 3:12-cv-03247, 2013 WL 1744422 (N.D. Tex. Apr. 23, 2013), for the proposition that 8 U.S.C. § 1225(b)(2) creates a mandatory duty for DHS to commence removal proceedings. *See* Pls.' Mot. at 3-4. That interpretation of the statute cannot be reconciled with controlling law for the reasons discussed above. And even the *Crane* Court, which ultimately dismissed the case for lack of jurisdiction, acknowledged that the Executive has discretion at each subsequent stage of the removal process, including the ability to dismiss removal proceedings after they are initiated. *Crane*, 2013 WL 1744422, at *13.

-36-

for his or her parent or any other enduring legal immigration status.[30]  *See* 2014 Deferred Action

Guidance at 2.  Moreover, any consequence that follows from receiving deferred action flows

from pre-existing legal authority.  *See, e.g.*, 8 C.F.R. § 274a.12(c)(14).

### ii. DHS's Tailored Guidance Faithfully Executes the Immigration Laws and Does Not "Abdicate" its "Statutory Responsibilities"

Plaintiffs' suggestion that the Secretary's exercise of prosecutorial discretion is a total

abdication, and thus not subject to the presumption of non-reviewability under *Chaney*, is based

on a misunderstanding of the INA and the challenged Deferred Action Guidance.  Plaintiffs take

language out of context from *Chaney* to suggest that the standard for review is whether the

Executive has "'consciously[,] and expressly [adopted] a general policy' of non-enforcement."

*See* Pls.' Mot. at 9 (citing *Chaney*, 470 U.S at, 833 n.4).  But the situation referred to in *Chaney*,

based on the D.C. Circuit's decision in *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir.

1973) (en banc), is when "the agency has 'consciously and expressly adopted a general policy'

that is so extreme *as to amount to an abdication of its statutory responsibilities*."[31]  *Chaney*, 470

U.S at, 833 n.4 (emphasis added).

---

[30] Further, Congress has recognized—not limited—the Executive's use of deferred action as a tool to temporarily prevent the removal of individuals who ultimately may later be entitled to lawful status.  *See supra*, pp. 10-11 (identifying instances where Congress has codified the use of deferred action for individuals who had a prospective, but not then-existing, entitlement to T or U visas, or to self-petitioner status under VAWA).  Hence, the fact that the INA gives the parents of U.S. citizens a potential prospective entitlement to lawful status makes the grant of deferred action to such individuals accord more, not less, with Congress's understanding of the permissible use of such discretion.  Plaintiffs' claims to the contrary based on inapposite portions of the INA should be rejected, and the presumption against judicial reviewability of the Executive's enforcement discretion stands.  *See Texas*, 106 F.3d at 667 (finding that a "court has no workable standard against which to judge the agency's exercise of discretion" in immigration enforcement).  Further, even the statutory provisions Plaintiffs cite recognize discretion in the immigration context.  *See, e.g.*, 8 U.S.C. § 1182(d)(3) (providing discretion to grant waivers of inadmissibility to certain aliens applying for nonimmigrant visas).

[31] Recognizing the high bar this sets, the Second Circuit noted in 2004 that "[n]o party has directed us to, nor can we locate, a decision by a court of appeals that has found, in performing the *Chaney* analysis, a federal agency to have abdicated its statutory duties."  *Riverkeeper, Inc. v. Collins*, 359 F.3d 156, 170-71 n.17 (2d Cir. 2004).

-37-

The Fifth Circuit has rejected a previous attempt by Texas to equate a perceived inadequacy in federal immigration enforcement with a statutory abdication. *See Texas*, 106 F.3d at 667 ("We reject out-of-hand the State's contention that the federal defendants' alleged systemic failure to control immigration is so extreme as to constitute a reviewable abdication of duty."). "Congress has not given [DHS] an inflexible mandate to bring enforcement actions against all violators of the [immigration laws]." *Cutler v. Hayes*, 818 F.2d 879, 893 (D.C. Cir. 1987) (distinguishing *Adams*, 480 F.2d at 1161); *see also Texas*, 106 F.3d at 667 (finding that a "court has no workable standard against which to judge the agency's exercise of discretion" in immigration enforcement).

DHS's effort to prioritize the removal of persons who present a risk to public safety, national security, and border security over those who present no such risk and have long ties to this country is fully consistent with congressional priorities. Concurrent with the Secretary's determination to further dedicate CBP's and ICE's limited enforcement resources to high-priority targets, *see* Prioritization Guidance at 1, the 2014 Deferred Action Guidance helps prevent the unwise and inefficient expenditure of removal resources on the lowest priority aliens by having a different agency—USCIS—implement DACA and DAPA through fees paid by the deferred action requestors. Indeed, DHS's allocation of enforcement priorities stands in stark contrast to the statutory abdication that the D.C. Circuit found in *Adams*, which predated *Chaney*. *See, e.g.*, *Ass'n of Civilian Technicians, Inc. v. FLRA*, 283 F.3d 339, 344 (D.C. Cir. 2002) (describing *Adams* as a case in which "the Secretary of Health, Education, and Welfare declined to enforce an entire statutory scheme, Title VI of the Civil Rights Act of 1964"); *see also Adams*, 480 F.2d at 1162 (concluding that agency was not exercising bona fide prosecutorial discretion because it was "actively supplying" racially segregated institutions "with federal funds, contrary

to the expressed purposes of Congress").

Congress has expressly recognized that DHS must set priorities to do its work effectively and consistent with the public interest, and both Congress and the Supreme Court have recognized deferred action as one such mechanism for exercising prosecutorial discretion. *See supra*, pp. 8-9. DACA and DAPA allow for deferral of the removal of certain low-priority aliens, including so that removal resources can be directed at higher priority aliens. Because no alien is automatically entitled to deferred action under DACA and DAPA—and because those who receive deferred action may have it revoked at any time—these policies do not negate any past violations of immigration laws Congress enacted. Such administrative postponement or deferment of enforcement is not a basis for judicial intervention. *Cutler*, 818 F.2d at 894.

Congress's funding choices further reinforce the point. DHS's limited resources will always constrain how many aliens can be removed. DHS has the appropriated resources to remove only a small proportion of illegal aliens present in the country. *See* OLC Op. at 9; *see also supra*, pp. 5-6 n.2. Given this reality, DHS must determine how best to utilize its limited resources for high-priority targets. *See* Prioritization Guidance at 1.

Thus, any suggestion by Plaintiffs that a statutory abdication can be found based solely on the number of those eligible for deferred action, *see* Pls.' Mot. at 15-17, ignores the constraints on the resources Congress has provided, which set the parameters against which DHS must make enforcement decisions. Based largely on these resource constraints, Congress has instructed DHS to not "simply round[] up as many illegal immigrants as possible, which is sometimes achieved by targeting the easiest and least threatening among the undocumented population," but to ensure "that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer." H.R. Rep. No. 111-

NJ057

157, at 8.  That is precisely the object of DACA and DAPA.

Further, to ensure that grants of deferred action are consistent with the agency's enforcement priorities, the Secretary reaffirmed that the revised DACA and DAPA policies would continue the case-by-case, individualized consideration that has characterized DACA since its inception in 2012, to ensure that each requestor is not an enforcement priority and does not possess a characteristic that would make deferred action inappropriate.  *See* 2014 Deferred Action Guidance at 2, 4-5; *see also* 2012 DACA Memo at 2.

There is also no merit to Plaintiffs' suggestion that DACA and DAPA are inappropriate because they are directed at groups meeting certain criteria, as agencies may establish frameworks for the exercise of discretion to reduce the risk that such discretion is exercised arbitrarily.  *See Arpaio*, Slip Op. at 32 (guidance "helps to ensure that the exercise of deferred action is *not* arbitrary and capricious"); *see, e.g.*, *Chaney*, 470 U.S. at 824 (challenge to a general enforcement policy regarding the use of drugs in executions); *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027 (D.C. Cir. 2007) (holding non-reviewable a broad agreement between the agency and an entire industry, which deferred agency enforcement for several years); *United States v. 9/1 Kg. Containers*, 854 F.2d 173, 178 (7th Cir. 1988) (endorsing FDA "non-enforcement policy"); *cf. Wayte v. United States*, 470 U.S. 598, 604, 609-10 (1985) (upholding categorical selective service non-enforcement policy applicable to 99.96% of violators—only 274 out of an estimated 674,000 violators were eligible for possible prosecution—against challenge of selective prosecution).[32]

---

[32] *See also Hotel & Rest. Employees Union, Local 25 v. Smith*, 594 F. Supp. 502, 505 (D.D.C. 1984) (holding that Attorney General's discretionary determination to grant "extended voluntary departure" to certain classes of aliens was valid exercise of prosecutorial discretion), *aff'd per curiam by an equally divided court*, 846 F.2d 1499 (D.C. Cir. 1988) (en banc); *Hotel & Rest. Employees Union*, 846 F.2d at 1510 (separate opinion of Mikva, J.) ("We agree . . . that where, as here, Congress has not seen fit to limit

-40-

The 2014 Deferred Action Guidance appropriately provides a framework for the exercise of prosecutorial discretion with respect to two groups, while specifying that each request for deferred action must be assessed on a discretionary, case-by-case basis.[33]  *See Arpaio*, Slip Op. at 32.  Without providing any source for their statistics, Plaintiffs assert that 99.5-99.8% of DACA requests have been granted.  Pls.' Mot. at 11; Am. Compl. ¶ 25.  Based on these unsupported assertions, they incorrectly claim that the program is "rubber-stamping" applicants.  *See* Pls.' Mot. at 10-12.  But, in reality, approximately six percent of adjudicated DACA requests have been denied, not counting the six percent of filed requests that were initially rejected when filed.  Specifically, as of December 19, 2014, of the 723,358 individuals who made initial requests for deferred action under DACA, 42,919 requests were rejected for not meeting an administrative requirement of the application.  *See* USCIS, Current Statistics: Deferred Action for Childhood Arrivals: Pending, Receipts, Rejected, Approvals, and Denials (2014) (Ex. 31).  Of the 674,404 requests that have been adjudicated, 38,080 (5.6%) were denied for failure to meet eligibility criteria or for other discretionary reasons and 636,324 (94.4%) were granted.  *Id.*  And these non-approval numbers do not even factor in the commonsense logic that an individual who may not merit deferred action, *e.g.*, one who has repeated arrests—is unlikely to apply in the

---

the agency's discretion to suspend enforcement of a statute as to particular groups of aliens, we cannot review facially legitimate exercises of that discretion."); *id.* at 1519-20 (separate opinion of Silberman, J.) (decisions to "suspend enforcement over a broad category of cases" are the kind "of policy choices and allocations left to the Executive Branch").

[33] Plaintiffs cite *Crowley Caribbean Transp. Inc., v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994), for the proposition that prosecutorial discretion usually arises in the context of a "*single-shot* non-enforcement decision." *See* Pls.' Mot. at 10.  But the D.C. Circuit used that language to distinguish prosecutorial discretion from a situation where an enforcement policy is based on a "direct interpretation[] of the commands of the substantive statute." *Crowley*, 37 F.3d at 677; *cf. Kenney v. Glickman*, 96 F.3d 1118, 1124 (8th Cir. 1996) (finding underlying statute established standards to assess an agency's compliance scheme for poultry processing).  There is no contention in this case that the Secretary is attempting to interpret a particular statutory provision of the INA as establishing deferred action.  Nor does the INA establish a meaningful standard to review the Secretary's exercise of prosecutorial discretion through deferred action.  In any event, each decision on whether to grant deferred action to a DACA or DAPA requestor is "single shot," as the determination is made on a case-by-case basis.

-41-

first place.

Plaintiffs' effort to portray the 2014 Deferred Action Guidance as a statutory abdication also ignores the Executive's long history of exercising prosecutorial discretion through the identification of certain discrete groups of aliens who may be eligible for an exercise of discretion. *See Arpaio*, Slip Op. at 31 (explaining that "the challenged deferred action programs continue a longstanding practice of enforcement discretion regarding the Nation's immigration laws," including through "a large class-based program"); OLC Op. at 14-18 (providing examples). This approach dates back to the 1950s. *See id.* at 14. More recently, under the "Family Fairness" program in 1990, the Executive granted "extended voluntary departure" and provided work authorization for certain aliens who were ineligible for legal status under the Immigration Reform and Control Act of 1986 but who were the spouses and children of aliens who qualified for legal status under the Act. *See id.* at 14-15. Since the 1990s, the Executive has also used deferred action for battered aliens who were waiting for visas to become available under VAWA, applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000, foreign students affected by Hurricane Katrina, and widows and widowers of U.S. citizens. *See id.* at 14-18. Further, longstanding regulations allow for deferred action recipients to be eligible for employment authorization. 8 C.F.R. § 274a.12(c)(14).[34]

Not only has Congress not limited the Executive's use of deferred action, but DACA and

---

[34] Plaintiffs claim that deferred action creates benefits, including work authorization. *See* Pls.' Mot. at 12-14. But there is nothing in the 2014 Deferred Action Guidance that provides any benefit beyond what is already provided for by statute or regulation. For example, regulations promulgated in 1981 codified existing procedures for granting employment authorization, including to deferred action recipients. *See Employment Authorization to Aliens in the United Sates*, 46 Fed. Reg. 25079, 25080-81 (May 5, 1981). In 1986, Congress enacted 8 U.S.C. § 1324a(h)(3), which confirmed the Attorney General's authority to grant work authorization. *See* OLC Op. at 21 n.11 ("This statutory provision has long been understood to recognize the authority of the Secretary to grant work authorization to particular classes of aliens.").

NJ060

DAPA mirror the particular priorities Congress has established. *Cf. Sierra Club v. Jackson*, 648

F.3d 848, 856 (D.C. Cir. 2011). The INA clearly prioritizes the detention and removal of threats

to border security, national security, and public safety. *See, e.g.*, 8 U.S.C. § 1225 (establishing

"expedited removal" for aliens apprehended at the border); *id.* § 1226(c) (providing mandatory

detention for certain criminal aliens); *id.* § 1226a (providing mandatory detention of suspected

terrorists); *see also* Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, Div. F., Tit. II,

128 Stat. 5, 251 (2014) (requiring DHS to "prioritize the identification and removal of aliens

convicted of a crime by the severity of that crime").

At the same time, numerous provisions of the INA reflect a concern for promoting family

unity among U.S. citizens and their undocumented families. *See INS v. Errico*, 385 U.S. 214,

220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates

that the Congress . . . was concerned with the problem of keeping families of United States

citizens and immigrants united.'") (quoting H.R. Rep. No. 85-1199, at 7 (1957)). Plaintiffs

suggest that recent changes in the INA deter family reunification, Pls.' Mot. at 14, but neglect to

acknowledge that the INA is replete with examples to the contrary. *See, e.g.*, 8 U.S.C.

§ 1151(b)(2)(A)(i) (placing no limits on number of immigrant visas available for parents of U.S.

citizens older than 21); § 1229b(b)(1) (giving discretion to Attorney General to cancel removal

for certain nonpermanent resident aliens who, *inter alia*, show that their removal would pose

significant difficulty to certain immediate family members who are U.S. citizens or LPRs).[35]

The Supreme Court has explicitly recognized that the Executive's enforcement of

immigration laws can and should take into account humanitarian and other interests:

---

[35] Even the article that Plaintiffs rely upon to argue that limitations have been placed on family reunifications acknowledges that "Congress continues to demonstrate its support of family unification in immigration legislation." *See* Kristi Lundstom, *The Unintended Effects of the Three- and Ten-Year Unlawful Presence Bars*, 76 Law & Contemp. Probs. 389, 394 (2013).

-43-

> Discretion in the enforcement of immigration law embraces immediate human
> concerns. Unauthorized workers trying to support their families, for example,
> likely pose less danger than alien smugglers or aliens who commit a serious
> crime. The equities of an individual case may turn on many factors, including
> whether the alien has children born in the United States, long ties to the
> community, or a record of distinguished military service. Some discretionary
> decisions involve policy choices that bear on this Nation's international relations.

*Arizona*, 132 S. Ct. at 2499; *see also AAADC*, 525 U.S. at 483-84 (describing long-recognized

humanitarian rationale as well as administrative convenience for deferred action). Both DACA

and DAPA appropriately reflect these concerns. *See, e.g.*, 2014 Deferred Action Guidance at 3

(recognizing that most individuals considered for DACA and DAPA "are hard-working people

who have become integrated members of American society").

In short, both DACA and DAPA are part of a long tradition of enforcement prioritization

and discretion by the Executive, grounded in its statutory and constitutional authority to

determine how best to use the limited resources available to enforce the Nation's immigration

laws. *See Arizona*, 132 S. Ct. at 2499. Plaintiffs' claim that the Secretary's 2014 Deferred

Action Guidance constitutes an abdication of a statutory duty must be rejected.

### C. Plaintiffs' APA Claims Lack Merit

Even if Plaintiffs' challenges to the 2014 Deferred Action Guidance were subject to

judicial review—which they are not—Plaintiffs' claims of procedural and substantive APA

violations lack merit.

#### i. The Deferred Action Guidance Is Exempt From the Notice-And-Comment Requirement of the APA

Plaintiffs claim that, in issuing the challenged guidance, DHS failed to comply with the

APA's notice-and-comment requirement, 5 U.S.C. § 553. This claim fails as a matter of law,

because the 2014 Deferred Action Guidance is statutorily "exempt from notice-and-comment

requirements" as a general statement of policy.  *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993);

*Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*, 201 F.3d 551, 556 (5th Cir. 2000)

(explaining that a challenged policy was "a list of investment guidelines; it therefore required no

notice and comment").  Congress has explicitly exempted from the notice-and-comment

requirement any "general statements of policy," 5 U.S.C. § 553(b)(3)(A).  The Supreme Court in

turn has defined such statements of policy as "statements issued by an agency to advise the

public prospectively of the manner in which the agency proposes to exercise a discretionary

power."  *Vigil*, 508 U.S. at 197 (citation omitted).

The 2014 Deferred Action Guidance fits squarely within this definition and is therefore

exempt from notice-and-comment requirements.  The Fifth Circuit has held that, in determining

whether an agency pronouncement is a statement of policy, "the starting point is 'the agency's

characterization of the rule.'"  *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592,

596 (5th Cir. 1995).[36]  Defendants have consistently maintained that the Deferred Action

Guidance is not a rule, but a policy that "supplements and amends . . . guidance" for the use of

deferred action.  *See* 2014 Deferred Action Guidance at 1, 2.  Further, unlike substantive rules, a

general statement of policy is one "that does not impose any rights and obligations" and that

"genuinely leaves the agency and its decisionmakers free to exercise discretion."  *Prof'ls &*

*Patients for Customized Care*, 56 F.3d at 595.  Here, the deferred action guidance "confers no

---

[36] Plaintiffs argue that it is "meaningless" that the 2014 Deferred Action Guidance makes clear that it is
not intended to confer any substantive right, immigration status, or pathway to citizenship.  But in the
Fifth Circuit, courts may consider the agency's characterization as evidence of the nature of the
pronouncement.  *See id.*; *see also, e.g.*, *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006).
The agency's characterization may, in some circumstances, even be a "key factor[]."  *See Interstate
Natural Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 59 (D.C. Cir. 2002).

-45-

substantive right,[37] immigration status or pathway to citizenship." 2014 Deferred Action

Guidance at 2. Further, as demonstrated above, *see supra*, pp. 40-41, the deferred action

guidance provides for an individualized decision concerning the exercise of prosecutorial

discretion. *See* 2014 Deferred Action Guidance at 4.

The Ninth Circuit found that legacy INS operating instructions from 1987 and 1981

providing guidance on deferred action were "general policy statements" that were exempt from

notice-and-comment. *See Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013, 1017 (9th Cir. 1987)

(noting that general policy statements "inform[] the public concerning the agency's future . . .

priorities for exercising its discretionary power" and "provide direction to the agency's personnel

in the field, who are required to implement its policies and exercise its discretionary power in

specific cases"); *see also Romeiro de Silva v. Smith*, 773 F.2d 1021, 1024-25 (9th Cir. 1985).

Ignoring *Mada-Luna*, Plaintiffs incorrectly rely on an earlier Ninth Circuit case, *Nicholas v. INS*,

590 F.2d 802, 807-08 (9th Cir. 1979), *see* Pls.' Mot. at 19, which did not involve a notice-and-

comment challenge and which predated both *Chaney* and *Vigil*.[38] In any event, "[m]ost other

courts that . . . considered this issue . . . concluded that the 1978 Operations Instruction [was] an

intra-agency guideline which confer[red] no substantive benefit on aliens seeking inclusion in the

deferred action category." *Romeiro de Silva*, 773 F.2d at 1023. Notably, in considering whether

an alien had a substantive right to request deferral of removal, the Fifth Circuit found that the

---

[37] Plaintiffs' claim that the 2014 Deferred Action Guidance "[c]ategorically authorize[es] work for millions of otherwise-unauthorized individuals," Pls.' Mot. at 23-24, is based on a false premise; there is nothing in the 2014 Deferred Action Guidance that provides any benefit beyond what is already provided for by statute or regulation. As discussed above, *see supra*, p. 42 n. 34, regulations promulgated in 1981 codified existing procedures for granting employment authorization, including to deferred action recipients. *See* 46 Fed. Reg. at 25080-81. Plaintiffs do not challenge this regulation, but in any event, it was adopted after notice-and-comment rulemaking and is fully compliant with the APA.

[38] Plaintiffs also rely on *Morton v. Ruiz*, 415 U.S. 199, 232 (1974), but *Morton* did not consider whether the "general statement of policy" exemption applied.

INS's procedures for granting deferred action did not create a right of application, let alone a right to receive the benefit. The court held that "[t]he decision to grant or withhold nonpriority status . . . lies within the particular discretion of the INS, and we decline to hold that the agency has no power to create and employ such a category for its own administrative convenience without standardizing the category and allowing applications for inclusion in it." *Soon Bok Yoon v. INS*, 538 F.2d 1211, 1213 (5th Cir. 1976).

Because the 2014 Deferred Action Guidance is a "general statement of policy," it is exempt from the APA's notice-and-comment requirements.

### ii. The Guidance Is Consistent with Congress's Intent in Enacting the INA and Delegating to the Secretary Discretion in Enforcing Its Provisions

Plaintiffs fail to raise any cognizable basis on which this Court could invalidate the 2014 Deferred Action Guidance under the APA. Plaintiffs assert, without discussion of case law, that the challenged guidance is "arbitrary and capricious," but this unsubstantiated argument is based solely on inaccurate characterizations of several provisions of the INA. These easily refuted suggestions do not meet the high bar for relief. When determining whether agency action is arbitrary, capricious or not in accordance with law, the Court's "scope of review . . . is very narrow." *Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988). The Court must "determine whether the agency decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Delta Found., Inc. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002) (quotation omitted). This standard of review is highly deferential. The "agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Id*.

As an initial matter, even if Plaintiffs' claim was justiciable, this Court should still

NJ065

decline to review such a claim under the APA because the enforcement of immigration law is a core executive power. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (finding that under the APA, 5 U.S.C. § 702, courts should decline to review matters on equitable grounds that intrude into core executive powers); *see also Al- Aulaqi v. Obama*, 727 F. Supp. 2d 1, 42 (D.D.C. 2010) (rejecting interjection into "sensitive" foreign affairs matters).

Regardless, the 2014 Deferred Action Guidance was issued in accordance with Congress's broad and explicit vesting of authority in the Secretary, charging him with "the administration and enforcement of [the INA and all other laws] relating to the immigration and naturalization of aliens," *see* 8 U.S.C. § 1103, and the obligation to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA. *Arizona*, 132 S. Ct. at 2499. Further, as explained above, no section of the INA conflicts with the Secretary's Deferred Action Guidance. *See supra*, pp. 35-37. And, Plaintiffs' challenge to the provision of employment authorization under independent operation of law and regulation, *see* 8 U.S.C. § 1324a(h)(3) and 8 C.F.R. § 274a.12, is misplaced, because aliens who are granted deferred action have long been eligible for work authorization based on independent provisions of law. *See* 8 C.F.R. § 274a.12(c)(14). Plaintiffs do not challenge the legality of these provisions.

The APA does not contemplate "pervasive oversight by federal courts over the manner and pace of agency compliance with [broad] congressional directives[.]" *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004). Here, Plaintiffs seek exactly the kind of judicial entanglement in discretionary policy decisions that the APA precludes. This claim, and

-48-

Plaintiffs' derivative claim under the Take Care Clause, must therefore be rejected.

### III. PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Because Plaintiffs have failed to establish that they will suffer any cognizable injury at all, they have necessarily failed to show that they will suffer an irreparable injury absent the injunction. The Supreme Court has made clear that a preliminary injunction cannot be entered only on a "possibility" of irreparable harm; "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (citations omitted). "The *Winter* standard requires [Plaintiffs] to demonstrate that irreparable harm is real, imminent, and significant—not merely speculative or potential—with admissible evidence." *Aquifer Guardians v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011).

Here, for the same reasons Plaintiffs lack an injury-in-fact, and even more so in light of the heightened standard for irreparable harm, Plaintiffs fall well short of demonstrating the harm required for preliminary injunctive relief. Their claim of irreparable harm rests on their speculation that the 2014 Deferred Action Guidance will cause a "humanitarian crisis along Texas's southern border and elsewhere" and "will be virtually irreversible" if DHS is allowed to implement it. Pls.' Mot. at 25. Nothing but speculation suggests that the guidance will cause these alleged injuries. As discussed above, these claimed future injuries are entirely contingent on the action of third parties not before the Court—individuals outside the country—and thus are purely speculative. *See, e.g.*, *Allen*, 468 U.S. at 758-59; *Little v. KPMG, LLP*, 575 F. 3d 533, 541 (5th Cir. 2009) ("[C]laim of injury depends on several layers of decisions by third parties . . . and is too speculative[.]").

Plaintiffs also speculate that the 2014 Deferred Action Guidance will lead "4 million

-49-

individuals [to] take advantage of" state benefits. Pls.' Mot. at 27. Not so. The 2014 Deferred

Action Guidance does not itself require the States to provide any state benefits to deferred action

recipients; that is a decision of the States. Although Plaintiffs identify some state benefits

contingent on proof of work authorization, *see* Pls.' Mot. at 27, the 2014 Deferred Action

Guidance itself does not itself confer any substantive right or immigration status to those whose

requests are approved; recipients are simply not deported for a limited amount of time at the

Secretary's discretion. In any event, it is entirely speculative that recipients of deferred action

will apply for, and will be granted, any state benefits. And even assuming that some will be

granted benefits, Plaintiffs have not shown that a preliminary injunction is necessary to prevent

such alleged harm;[39] states have power over their own laws and action taken pursuant to them.[40]

## IV.    GRANTING A PRELIMINARY INJUNCTION WOULD HARM DEFENDANTS AND THE PUBLIC INTEREST

Finally, Plaintiffs have failed to demonstrate—as they must—that the threatened

irreparable injury outweighs the threatened harm that the injunction would cause Defendants and

unrepresented third parties, and that granting the injunction would not "be adverse to public

interest." *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986); *Southdown,*

*Inc. v. Moore McCormack Res., Inc.*, 686 F. Supp. 595, 596 (S.D. Tex. 1988) (petitioner has

---

[39] *See supra*, pp. 17-18 & n. 16 (discussing economic benefits of DACA).

[40] Plaintiffs' requested injunction is also entirely disproportionate to their alleged irreparable harm. While Plaintiffs seek a *nationwide* injunction, only Texas and Wisconsin have attempted to show irreparable harm by identifying state laws allegedly providing benefits to future recipients of deferred action under DAPA and DACA, and only Texas claims specific costs allegedly caused by illegal immigration. Pls.' Mot. at 26-27. As a "general principle 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Even setting aside all other defects with their Motion, Plaintiffs have entirely failed to show entitlement to the nationwide injunction they seek. *See, e.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3rd Cir. 2000); *Lewis v. Casey*, 518 U.S. 343, 357 (1996). At the same time, the Constitution's vesting of immigration power exclusively in the Federal Government, and the constitutionally grounded interest in national uniformity in administration of the immigration laws, weigh heavily against an injunction regarding enforcement of federal immigration laws in one state. *Arizona*, 132 S. Ct. at 2498-99.

-50-

burden to show injunction will cause "no disservice to unrepresented third parties"). Courts

should "pay particular regard for the public consequences in employing the extraordinary remedy

of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) (citation omitted).

"[E]ven though irreparable injury may otherwise result to plaintiff," courts may postpone issuing

an injunction "until a final determination of the rights of the parties" if the injunction would

"adversely affect a public interest[.]" *Id.*   Here, the balance of equities and the public interest

weigh heavily against Plaintiffs' requested preliminary injunction.  As established above,

Plaintiffs' alleged harms are entirely speculative and disconnected from the guidance they seek

to enjoin.  In contrast, preventing DHS from implementing the 2014 Deferred Action Guidance

would cause serious harm and disruption.  It would undermine DHS's comprehensive efforts to

focus on its top enforcement priorities: national security, border security, and public safety, while

simultaneously resulting in undue and needless humanitarian harm.

### A.  The Challenged Deferred Action Guidance Promotes Congressionally-Mandated Public Safety and National Security Objectives

Congress has directed DHS, an agency with limited resources, to prioritize the removal of

aliens who pose a threat to national security, border security, and public safety.  *See supra*, pp. 6-

7, 42-43.  As explained above, that is precisely what the 2014 Deferred Action Guidance helps

DHS accomplish.  Individuals who may participate include high school graduates and parents of

U.S. citizens or LPRs, all of whom have lived in the United States for at least five years and are

determined on a case-by-case basis not to pose a threat to national security or public safety, or

otherwise to present a factor that makes deferred action inappropriate.  2014 Deferred Action

Guidance at 3-4.  By creating a mechanism to efficiently identify these aliens who are a low

priority for removal, these guidelines help the government to focus its removal efforts on

criminals, threats to national security, and more recent border crossers, while recognizing

NJ069

important humanitarian considerations. Documents provided through deferred action, for instance, allow immigration officials conducting enforcement actions to quickly distinguish recent border crossers and other enforcement priorities—who may be removed more quickly under existing statutory authority—from lower-priority aliens whose cases may impose additional burdens on already backlogged immigration courts.

The need for these guidelines is especially acute given recent developments affecting the removal of persons from the United States. At the border, for example, recent and sizable demographic shifts necessitate a significant realignment in the Department's approach to border enforcement. For example, the U.S. Border Patrol is apprehending an increasing number of nationals from Central American countries at the border (paired with a decrease in the apprehension of Mexican nationals). *See* U.S. Customs and Border Protection, *USBP Nationwide Apprehensions by Requested Citizenship FY 2010 – FY 2014* (Ex. 27). This shift requires both: (1) a significant transfer of ICE resources to assist with the removal of aliens apprehended by the Border Patrol who are not immediately removable to a contiguous country, and (2) the expenditure of increased overall resources, as the removal of persons to non-contiguous countries is far more resource-intensive. *See* ICE, ERO Annual Report: FY 2014 at 4, 9 (Ex. 4). In addition, restrictions on ICE's use of detainers with state and local law enforcement agencies, and the backlog in the immigration courts, have made the removal of aliens, including criminal aliens, from the interior of the country more difficult and resource-intensive. *Id.* at 4-5; *Review of the President's Emergency Supplemental Request: H'ng Before Sen. Comm. on Appropriations*, 113th Cong. 2 (Jul. 10, 2014) (stmt. of Jeh Johnson) (Ex. 32).

The Government continues to undertake substantial and successful efforts to stem illegal immigration across the Mexican border. This summer, for example, DHS shifted significant

NJ070

resources from across the Department to the border.  *See, e.g.*, *Open Borders: The Impact of Presidential Amnesty on Border Securit*y: *Hearing Before the H. Comm. on Homeland Security*, 113th Cong. 3-4 (Dec. 2, 2014) (stmt. of Jeh C. Johnson) (Ex. 33).  And in recent months the U.S. Government has held high-level discussions with Mexico and Central American countries, provided millions of dollars in aid to those countries, and initiated a large-scale public affairs campaign to explain to people in these countries the dangers of making the long journey to the United States, attempt to dissuade them from making the journey, and inform them that individuals, regardless of age, apprehended crossing the U.S. border will be priorities for deportation.  *See, e.g.*, Fugate statement at 4-6 (Ex. 23).

Due to these and other challenges in removing high-priority aliens, consistent with congressional mandates, DHS has had to further realign its resources away from non-priority aliens where possible.  The 2014 Deferred Action Guidance provides crucial support for this effort.  By actively inducing individuals who are not removal priorities to come forward, submit to background checks, and pay fees that fund the cost of investigating and processing their requests for deferred action from USCIS, DHS is better able to identify priority aliens and concentrate CBP's and ICE's enforcement resources on such aliens.

### B.  The Challenged Deferred Action Guidance Furthers Humanitarian and Other Interests

The public interest is also advanced by other equities from the discretion entailed in the 2014 Deferred Action Guidance.  As the Court in *Arizona* acknowledged, "[d]iscretion in the enforcement of immigration law embraces immediate human concerns."  132 S. Ct. at 2499.  Such discretion may properly recognize the difference between "[u]nauthorized workers trying to support their families" and "alien smugglers" or those "who commit a serious crime."  *Id.*  The Court also specifically suggested that family unity is an appropriate factor for DHS to consider in

-53-

exercising its enforcement discretion. *See id.* at 2499 ("The equities of an individual case may turn on many factors, including whether the alien has children born in the United States[.]"). The 2014 Deferred Action Guidance furthers these important goals. The injunction Plaintiffs seek would harm the public by halting policies that not only promote public safety and national security, but also humanitarian concerns and family unification. Deferred action impacts the lives of many people. For example, as of December 19, 2014, approximately 636,324 individuals have been granted deferred action under DACA. DHS, Current Statistics: Deferred Action for Childhood Arrivals: Pending, Receipts, Rejected, Approvals, and Denials (2014) (Ex. 31). Moreover, Plaintiffs' requested injunction would disrupt the effective enforcement of the laws, interfere with the orderly implementation of the mechanisms for considering some non-priority cases for deferred action under the 2014 Deferred Action Guidance, and impede the harmonization of enforcement priorities among DHS's component immigration agencies.

### C. Enjoining the Challenged Deferred Action Guidance Would Significantly Undermine the Public Interest

DHS officials have been instructed to implement the DACA modifications within 90 days and DAPA within 180 days. 2014 Deferred Action Guidance at 4-5. A preliminary injunction would prevent DHS from the timely implementation of this guidance. It is not in the public interest to delay a policy that promotes public safety, national security, administrative efficiency, and humanitarian concerns. *See, e.g., Nat'l Res. Def. Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997); *Hodges v. Abraham*, 253 F. Supp. 2d 846, 873 (D.S.C. 2002); *Gulf Oil Corp. v. FEA*, 391 F. Supp. 856, 864 (W.D. Pa. 1975). As explained further above, the 2014 Deferred Action Guidance is part of DHS's broader efforts to more effectively administer and enforce our Nation's immigration laws, including by allowing enforcement resources to be focused on high-priority aliens, thereby promoting national security and public safety, while at the same time

-54-

addressing the human concerns properly the subject of immigration enforcement efforts.

Moreover, because DACA and DAPA are fully funded through the fees paid by requestors, these

goals are being accomplished effectively and without cost to DHS. These initiatives also

advance the public interest by allowing individuals already been present in the country for many

years to work legally and thereby pay taxes like everybody else.

### D. The Challenged Deferred Action Guidance and Exercises of Discretion Can Be Modified at Any Time

Plaintiffs contend that a preliminary injunction is justified because "it [would] be difficult

or impossible to reverse Defendants' Actions[.]" Pls.' Mot. at 26. Plaintiffs are wrong.

Deferred action confers "no substantive right, immigration status or pathway to citizenship."

2014 Deferred Action Guidance at 5. And deferred action can be revoked at any time in the

agency's discretion. *Id.* at 2.

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should deny Plaintiffs' motion for preliminary

injunction and dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction.

Dated: December 24, 2014               Respectfully submitted,

KENNETH MAGIDSON               JOYCE R. BRANDA
United States Attorney               Acting Assistant Attorney General

DANIEL DAVID HU               KATHLEEN R. HARTNETT
Assistant United States Attorney       Deputy Assistant Attorney General
Deputy Chief, Civil Division

                         DIANE KELLEHER
                         Assistant Branch Director

                       */s/ Kyle R. Freeny*
                       KYLE R. FREENY (Cal. Bar No. 247857)
                        Attorney-in-Charge
                       HECTOR G. BLADUELL
                       BRADLEY H. COHEN
                       ADAM D. KIRSCHNER

NJ073

JULIE S. SALTMAN
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C.  20044
Tel.: (202) 514-5108
Fax: (202) 616-8470
Kyle.Freeny@usdoj.gov
*Counsel for Defendants*

NJ074

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction has been delivered electronically on December 24, 2014, to counsel for Plaintiffs via the District's ECF system.


*/s/ Kyle R. Freeny*
Counsel for Defendants

# **<u>Exhibit 2</u>**

2014 WL 642731
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

CHOICE HOTELS
INTERNATIONAL, INC., Plaintiff,
v.
GOLDMARK HOSPITALITY,
LLC, et al., Defendants.

Civil Action No. 3:12–CV–0548–D.
|
Feb. 19, 2014.

**Attorneys and Law Firms**

Robert A. Bragalone, Bradley Ryan Fellman, Gordon & Rees LLP, Dallas, TX, for Plaintiff.

Jules P. Slim, Law Office of Jules P. Slim, Irving, TX, for Defendants.

*MEMORANDUM OPINION AND ORDER*

SIDNEY A. FITZWATER, Chief Judge.

**\*1** In this action by plaintiff Choice Hotels International, Inc. ("Choice Hotels") against defendant Goldmark Hospitality, LLC ("Goldmark") for trademark infringement and false designation of origin under the Lanham Act, 15 U.S.C. § 1051 *et seq.,* common law trademark infringement under Texas law, and common law unfair competition under Texas law, Choice Hotels moves for summary judgment, or, alternatively, for partial summary judgment against Goldmark. For the reasons that follow, the court grants summary judgment as to liability on all claims but denies summary judgment as to remedies.

I

Choice Hotels franchises hotels.[1] It offers hotel and motel services under brand names such as Quality, Quality Inn, Quality Suites, and Quality Inn & Suites. It also owns several registered trademarks, including U.S.

Registration No. 3,053,888 (the "#888 Registration") and No. 2,732,875 (the "#875 Registration") (collectively, the "Quality Marks"). The Quality Marks are registered for use in the hotel and motel services industry.

In 2007 Choice Hotels entered into a franchise agreement ("Franchise Agreement") with Kroopa Investment, LLC ("Kroopa"), under which Kroopa operated a Quality Suites brand hotel at 13636 Goldmark Drive in Dallas (the "Goldmark Hotel Property"). In early 2010 Kroopa filed for bankruptcy but continued to operate the hotel as a debtor-in-possession. Later that year, Choice Hotels notified Kroopa that it had defaulted under the Franchise Agreement and that, if the default remained uncured, it would terminate the Franchise Agreement. Kroopa's reorganization plan was confirmed in 2011, but Kroopa fell into default again shortly thereafter. When after several more months Kroopa failed to cure the default, Choice Hotels terminated the Franchise Agreement, extinguishing Kroopa's right to use the Quality Marks.

Around the same time, defendant Goldmark, as the beneficiary of a deed of trust on the Goldmark Hotel Property, commenced foreclosure proceedings. Goldmark secured ownership of the Goldmark Hotel Property by foreclosure deed dated July 5, 2011. Choice Hotels notified Kroopa by a September 27, 2011 letter that it had learned that the Goldmark Hotel Property was continuing to display several Quality Suites marks after the termination of the Franchise Agreement. Choice Hotels requested that Kroopa respond no later than October 11, 2011 by providing written and photographic evidence that the marks had been removed. On October 11, 2011 Goldmark's counsel responded to Choice Hotels:

> The owners of the hotel are no longer operating as a Quality Suites. They are no[w] operating as an independent hotel called the Amerigold Suites focusing on extended stay guests. They have changed their online presence to Amerigold Suites and have covered the signage with temporary signs and are currently waiting for permanent sign permits to be approved. Unfortunately, I do not have pictures at this time to forward

you, but have requested them and will forward them to you upon receipt. Furthermore, they are no longer using any supplies or other items with the Quality Suites logo.

**\*2**  D.App. 12 (alterations added).

After Goldmark's counsel sent this letter to Choice Hotels, two signs bearing Quality Suites marks remained on the Goldmark Hotel Property. The first was a large overhead sign on the top of a tall tower that was visible to traffic from the main roadway (the "Tower Sign"); the second was a much smaller sign affixed to a short pole that was visible to traffic pulling up to and through the hotel's driveway (the "Driveway Sign"). One side of the Driveway Sign—the side facing traffic on Goldmark Drive—was at one point covered with a temporary banner bearing the name Amerigold Suites. The other side of the Driveway Sign, bearing the Quality Suites mark, remained uncovered for some time, but was eventually painted over. The Tower Sign was not covered or painted over at any point before this lawsuit was filed. [2]

Sometime during the months following Choice Hotels' receipt of the October 11, 2011 letter, Choice Hotels learned that the signage was still not covered, prompting Choice Hotels to contact Goldmark's counsel. In a letter dated February 2, 2012, Goldmark's counsel acknowledged that the Tower Sign remained uncovered but asserted that removing or covering it was cost-prohibitive:

> As stated, my client is happy to provide access to the property to allow Choice [Hotels] to remove the signs ("Quality Suites") from the property. The property was acquired by the current owner out of foreclosure and they have not operated it as Quality Suites nor have they advertised as such.... To arrange to have a crane and sign company remove the sign on the short notice you allowed, is cost prohibitive at this stage. Although the current owner would like to

have the signs removed, they do not have the necessary funds to do so at this time which is why they have covered the front signs with their own temporary signs. Please let me know the decisions of your client.

P.App. 199 (alteration added). [3]  On February 22, 2012 Choice Hotels filed this lawsuit, alleging claims for trademark infringement under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), common law trademark infringement under Texas law, and common law unfair competition under Texas law. It moves for summary judgment, or, in the alternative, for partial summary judgment on its claims against Goldmark. Goldmark opposes the motion.

## II

Because Choice Hotels will have the burden of proof at trial on its claims, to obtain summary judgment it "must establish 'beyond peradventure all of the essential elements of the claim[s.]" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.,* 878 F.Supp. 943, 962 (N.D.Tex.1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986)). This means that Choice Hotels must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law. *See, e.g., Martin v. Alamo Cmty. Coll. Dist.,* 353 F.3d 409, 412 (5th Cir.2003). "The court has noted that the 'beyond peradventure' standard is 'heavy." *Carolina Cas. Ins. Co. v. Sowell,* 603 F.Supp.2d 914, 923–24 (N.D.Tex.2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.,* 2007 WL 2403656, at \*10 (N.D.Tex. Aug.23, 2007) (Fitzwater, J.)). "An issue of fact is genuine if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inference in that party's favor that the evidence allows, would be sufficient to support a verdict in the party's favor." *Bank One,* 878 F.Supp. at 962 (citing *Hilton v. Sw. Bell Tel. Co.,* 936 F.2d 823, 827 (5th Cir.1991) (per curiam), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992)). "An issue of fact is not genuine

if no reasonable trier of fact could find in favor of the nonmovant." *Id.* (citing 🚩 *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990), *abrogated by* 🏳️ *Little v. Liquid Air. Corp.,* 37 F.3d 1069, 1075 n. 14 (5th Cir.1994)).

III

**\*3** Choice Hotels moves for summary judgment on its claim for trademark infringement under 🏳️ 15 U.S.C. § 1114, contending that it has established each essential element of the claim. Goldmark responds that there are genuine issues of material fact regarding whether Goldmark used Choice Hotels' marks in commerce and whether there is a likelihood of confusion surrounding the marks in question.

A

To succeed on its trademark infringement claim, Choice Hotels must first show ownership of a legally protectable mark, and it must then establish infringement of the mark. *TGI Friday's, Inc. v. Great Nw. Rests., Inc.,* 652 F.Supp.2d 763, 767 (N.D.Tex.2009) (Fitzwater, C.J.) (citing 🏳️ *Am. Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d 321, 329 (5th Cir.2008)). Under the Lanham Act, infringement exists if a person

> uses (1) any reproduction, counterfeit, copy, or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution, or advertising of any goods; (5) where such use is likely to cause confusion, or to cause mistake or to deceive.

*Id.* (quoting 🏳️ *Bos. Prof'l Hockey Ass'n v. Dall. Cap & Emblem Mfg.,* 510 F.2d 1004, 1009–10 (5th Cir.1975)) (citing 🏳️ 15 U.S.C. § 1114) (brackets omitted).

"The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade[.]" 15 U.S.C. § 1127. A mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." *Id.; see also* *Choice Hotels Int'l, Inc. v. Patel,* 940 F.Supp.2d 532, 539 (S.D.Tex.2013). "A finding of 'likelihood of confusion' requires 'a probability of confusion' rather than a mere possibility ." *John Crane Prod. Solutions, Inc. v. R2R & D, LLC,* 2012 WL 1571080, at \*2 (N.D.Tex. May 4, 2012) (Fitzwater,C.J.) (citing 🏳️ *Xtreme Lashes, LLC v. Xtended Beauty, Inc.,* 576 F.3d 221, 226 (5th Cir.2009)). "The following factors are used to determine the likelihood of confusion: (1) the strength of the plaintiff's trademark, (2) mark similarity, (3) product [or service] similarity, (4) outlet and purchaser identity, (5) advertising media similarity, (6) defendant's intent, (7) actual confusion, and (8) care exercised by potential purchasers." *Id.* (citing 🏳️ *Am. Rice,* 518 F.3d at 329). "The digits are a flexible and nonexhaustive list. They do not apply mechanically to every case and can serve only as guides, not as an exact calculus." 🏳️ *Paulsson Geophysical Servs., Inc. v. Sigmar,* 529 F.3d 303, 311 (5th Cir.2008) (quoting 🏳️ *Scott Fetzer Co. v. House of Vacuums Inc.,* 381 F.3d 477, 485 (5th Cir.2004)).

B

1

It is undisputed that Choice Hotels owns a legally protectable family of marks, including the #888 Registration and the #875 Registration. The registration of a trademark with the U.S. Patent and Trademark Office constitutes prima facie evidence of the validity of the mark and the registrant's exclusive right to use the mark for the services specified in the registration. *See* 🏳️ *Elvis Presley Enters., Inc. v. Capece,* 141 F.3d 188, 194 (5th Cir.1998); 15 U.S.C. § 1115(a). Choice Hotels has produced evidence of its registrations for each of its Quality Marks. [4] *See* P.App. 2–4, 18–48. And Goldmark concedes that Choice Hotels owns the Quality Marks. *See* Answer ¶¶ 54, 66.

2

**\*4** The court next considers whether Choice Hotels has established beyond peradventure that Goldmark "used" Choice Hotels' marks in commerce. Goldmark argues that Choice Hotels has not presented any evidence that Goldmark actually used the marks because the evidence Choice Hotels has adduced merely shows that Goldmark failed to take down signage while it repurposed the Goldmark Hotel Property, which it posits is of itself insufficient to prove that Goldmark used the mark. [5] Goldmark also argues that it did not use the marks because it "actively tried to disassociate itself" from Choice Hotels by re-branding the hotel as an Amerigod Suites and positioning itself as a "higher-quality, extended-stay residence location as opposed to the one-night 'cheapy'-style hotel" operated by Kroopa, Choice Hotels' former franchisee. D. Br. 12. Choice Hotels responds that Goldmark's argument is flawed in two respects: it is flawed factually because Goldmark's own evidence and admissions reflect that Goldmark was operating a hotel business during the relevant period, and it is flawed legally because, even if there was some period of time between Goldmark's foreclosure on the Goldmark Hotel Property and Goldmark's commencement of the operation of the hotel, Goldmark's continued display of the Quality Marks constituted use under the Lanham Act.

The court holds that Choice Hotels has established beyond peradventure that Goldmark used Choice Hotels' marks in commerce. Goldmark's assertion that Choice Hotels has not presented any evidence that Goldmark used the marks in commerce is not supported by the record. For example, Choice Hotels has introduced the October 11, 2011 letter from Goldmark's counsel stating that "[the owners of the Goldmark Hotel Property are now] operating as an independent hotel called the Amerigold Suites." P.App. 189. This evidence establishes that, even during the period when the hotel was being repurposed, Goldmark was operating the Goldmark Hotel Property as a hotel. The summary judgment record also includes photographs of the signs that bear the Quality Marks, and Goldmark concedes that these signs are located on the Goldmark Hotel Property and are Choice Hotels' *exact* marks. *See, e.g.,* D.App. 47. Even if there was some period of time between the foreclosure and Goldmark's commencement of the operation of the Amerigold Suites, it is clear from the summary judgment

record that the marks remained either partially or completely uncovered and visible to the public during that time. Contrary to Goldmark's unsubstantiated assertion, this evidence is sufficient to establish use under the Lanham Act. *See* 15 U.S.C. § 1127 ("[A] mark shall be deemed to be in use in commerce ... when it is used or displayed in the sale or advertising of services and the services are rendered in commerce[.]"); *Best W. Int'l v. Prime Tech Dev., L.L.C.,* 2007 U .S. Dist. LEXIS 29285, at \*24 (C.D.Ill. Apr. 20, 2007) ("Here, [defendant's] display of [plaintiff's] signs, even before the hotel was open for business, could be fairly construed as advertising."); *see also* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 25:26 (4th ed. 2013) ("[M]erely advertising an infringing mark itself is an act of infringement, apart from any manufacturing or sale."). Whether Goldmark intended to "dissociate itself" from Choice Hotels and the prior franchisee during the period is irrelevant for purposes of determining whether the marks were used. *See Choice Hotels,* 940 F.Supp.2d at 539 ("Defendants argue that [they] did not wish or intend to use the marks, but the use element does not depend on intent."). And even if Goldmark's intent were relevant to this element, Goldmark does not offer any specific citations to the record to support its factual assertions regarding the steps it allegedly took to dissociate itself from the Quality Marks. Goldmark has therefore failed to defeat Choice Hotels' showing that it is entitled to summary judgment on this element. *See* Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]").

C

**\*5** The court now turns to whether Choice Hotels has established a likelihood of confusion.

1

Goldmark contends that there is a genuine issue of material fact as to this element because several digits of confusion weigh against a finding of likelihood of confusion. Choice Hotels replies that, because it is

undisputed that Goldmark used Choice Hotels' exact marks, not merely similar marks, the court should not analyze the digits of confusion. It argues in the alternative that, if the court conducts a digits-of-confusion analysis, the undisputed facts weigh in Choice Hotels' favor such that a reasonable trier of fact would have to find a likelihood of confusion.


2

Assuming *arguendo* that a digits-of-confusion analysis is necessary when the marks are identical, [6] the court holds that Choice Hotels has established beyond peradventure that there is a likelihood of confusion. Goldmark neither disputes the strength of Choice Hotels' marks nor the fact that they have been registered. [7] Nor does Goldmark dispute that the marks at issue are identical to Choice Hotels' marks, conceding that the marks are Choice Hotels' exact marks. [8] Thus the first two digits of confusion weigh strongly in favor of a likelihood of confusion.


3

The next factor is the similarity of products or services provided by Goldmark and Choice Hotels. Without specific citations to the record, Goldmark asserts that "the evidence put forth by Defendant establishes that Defendant has put in significant effort to distinguish its services from those of Plaintiff and to establish itself as a higher-quality extended-stay residence location as opposed to the one-night 'cheapy'-style hotel operated under Plaintiff's flag." D. Resp. 14. Even assuming *arguendo* that Goldmark positioned itself as a higher-quality, extended-stay residence compared to the hotel operated by Kroopa under the Franchise Agreement, [9] it is undisputed that it still held itself out as a hotel. *See, e.g.,* D.App. 12 ("[The current owners of the Goldmark Hotel Property are now] operating as an independent hotel called the Amerigold Suites focusing on extended stay guests."); P.App. 213, 218. And although there is evidence to support Goldmark's assertion that it attempted to attract customers who would stay for longer periods of time than the typical one- or two-night guest at a hotel, it is also undisputed that Goldmark advertised itself to short-term guests as well. *See, e.g.,* D.App. 33 (advertisement

stating that "[t]his is a perfect place for people looking for a short or long-term stay for one great monthly price."). As for Goldmark's characterization of Choice Hotels, it offers no evidence about the quality of Choice Hotels' services to support its claim that the services provided by Goldmark are dissimilar to those provided by Choice Hotels. Thus the court concludes that, despite some differences in the services provided by Goldmark and those provided by Kroopa under the Franchise Agreement, there is still a significant degree of similarity between the services provided by Goldmark and Choice Hotels, because the undisputed evidence establishes that both entities are in the business of hotel operations. Thus the third digit of confusion weighs in favor of a likelihood of confusion. [10]


4

**\*6** The fourth factor is outlet and purchaser identity. Again without offering specific citations to the record, Goldmark contends that it services a different market from Choice Hotels because it focuses on an "upper-scale extended-stay market" while Choice Hotels services a "quick-stay market," and because it uses a different online reservation system from Choice Hotels' online reservation system. D. Resp. 14–15. Choice Hotels replies that Goldmark has failed to offer competent summary judgment evidence to support these assertions.

Although this factor is analytically distinct from the third factor discussed above, the arguments and evidence presented by the parties overlap with those presented regarding product or service similarity. Again assuming *arguendo* that Goldmark's clientele is somewhat different from Choice Hotels' clientele and that Goldmark uses a different online reservation system, it is undisputed that both entities operate hotels. Furthermore, Goldmark does not offer any evidence about how many of its customers used its online reservation system.

Goldmark also relies on Barton's affidavit, in which he avers:

> The towering sign was itself not visible to drive-up traffic [from the highway].... As for the smaller adjacent streets, because the sign is

so high, it is almost impossible to see from the streets below[.] ... Again, to the extent that it is visible, it is quickly concealed by trees to moving traffic.

Barton Aff. 5 (alterations added). [11] This statement does not create a genuine issue of material fact as to whether the signs were visible, because it does not deny the fact that the Tower Sign *is* visible to the public; it merely states that it is visible only for a short time. Choice Hotels disputes this statement in Barton's affidavit, contending that the sign is not concealed by trees and that it is easily visible from the surrounding roadways. It points to photographs of the sign in which the trees do not obstruct the sign from view. *See, e.g.,* P.App. 196. Viewing the evidence, however, in the light most favorable to Goldmark as the nonmovant and drawing all reasonable inferences in its favor, the court assumes that the Tower Sign "was only briefly visible from the street before it is concealed by trees." Barton Aff. 4.

Because it is undisputed that the Tower Sign and the Driveway Sign remained visible to traffic on public roadways, the fact that some of Goldmark's customers may have used its online reservation system before observing the signs does not create a genuine issue of material fact concerning the likelihood of confusion.

5

The fifth factor is the similarity of advertising media used. Goldmark maintains that this factor militates against a finding of likelihood of confusion because Goldmark never advertised itself as associated with Choice Hotels; Goldmark and Choice Hotels have different websites, online reservation systems, and different Internet domain names; and Goldmark removed some of the signage bearing the Quality Marks after foreclosing on the Goldmark Hotel Property. Choice Hotels replies that it is undisputed that the Tower Sign and the Driveway Sign on the Goldmark Hotel Property remained exposed to the public for months after the foreclosure and that such signage is clearly a form of advertising.

**\*7** Neither party has presented evidence sufficient to compare the parties' overall advertising approaches, but

it is undisputed that both the Tower Sign and Driveway Sign remained visible to the public for months following the foreclosure. Goldmark has adduced evidence that one side of the Driveway Sign was covered with a temporary banner bearing the Amerigold Suites name and logo and then eventually painted over, but it concedes that the other side of the sign—which was exposed to customers who drove through the Goldmark Hotel Property's driveway—remained uncovered. He also concedes that the Tower Sign was not covered or painted over at any point before Choice Hotels filed this lawsuit. The court concludes that the fifth factor weighs in favor of a finding of likelihood of confusion.

6

The sixth factor is Goldmark's intent. Goldmark argues that it was always its intent to distance itself from the Quality Marks and the reputation of the Goldmark Hotel Property that was developed under Kroopa's ownership. It asserts that evidence of its intent "is indicated by its removal or concealment of each and every feasible indicator of the Choice marks." D. Resp. 15. But the undisputed summary judgment evidence shows that both the Driveway Sign and Tower Sign remained completely uncovered until after Goldmark sent its September 27, 2011 cease-and-desist letter to the General Manager of the Goldmark Hotel Property, despite the fact that Goldmark acquired ownership of the Goldmark Hotel Property by foreclosure deed dated July 5, 2011; that Goldmark's counsel misrepresented to Choice Hotels in the October 11, 2011 letter that both signs were covered by temporary banners when in fact at least the Tower Sign remained uncovered; that although one side of the Driveway Sign was covered by a temporary banner, the other side remained uncovered until it was eventually painted over; and that the Tower Sign remained completely uncovered and was not painted over at any time before the filing of this lawsuit in February 2012. The fact that covering or removing the signs would be costly tends to support Goldmark's theory that it retained the signs merely because they would be expensive to remove rather than because it intended to derive a benefit from the reputation of Choice Hotels. But the fact that removing the signs would be costly does not excuse trademark infringement, and the undisputed evidence establishes that signs bearing Choice Hotels' exact marks remained on the Goldmark Hotel Property for months following foreclosure, and

after Choice Hotels repeatedly informed Goldmark of its trademark claim. The court concludes that the sixth factor does not favor either party.

7

The seventh factor is actual confusion. Goldmark maintains that Choice Hotels has not adduced any evidence of actual confusion. Choice Hotels does not present evidence of its own regarding this factor, but it contends that evidence produced by Goldmark supports an inference of actual confusion. Goldmark has introduced evidence that there are many reported instances of criminal conduct occurring on the Goldmark Hotel Property while Kroopa operated the property. *See, e.g.,* D.App. 154. It presents this evidence, in part, to show that Goldmark had a vested interest in distancing itself from Choice Hotels' family of marks. Citing Barton's affidavit, Goldmark states in its summary judgment response that, "[o]nce Goldmark took over the property in July of 2011 it was the increasingly rare prostitute or drug dealer that formerly frequented the Quality Suites that returned to the Amerigold Suites facility to continue their illegal business practices." D. Resp. 7. [12] Choice Hotels argues that this is an admission by Goldmark that certain customers—an alleged group of prostitutes and drug dealers—were actually confused, because they returned thinking that the Goldmark Hotel Property was still a Quality Suites hotel.

**\*8** The court concludes that this factor does not weigh strongly in favor of either party. Although Choice Hotels' interpretation of Goldmark's argument is plausible, it does not establish that the customers returned *because* they believed the Goldmark Hotel Property was a Quality Suites; they may have returned simply because they were familiar with the location. [13] Neither party has offered evidence about the number of customers who purchased lodging at the Goldmark Hotel Property before and after the foreclosure, or evidence about the reasons the customers chose to stay there. Accordingly, this factor does not figure prominently in its digits-of-confusion analysis. *Cf. Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.,* 628 F.2d 500, 506 (5th Cir.1980) (evidence of actual confusion is unnecessary for finding of likelihood of confusion).

8

The eighth factor is the degree of care exercised by potential purchasers. Neither party offers competent summary judgment evidence regarding this factor. Goldmark suggests that its customers were willing to pay a higher price for a higher-quality, extended-stay residence, but it does not offer proof about the prices it charged its customers or the prices charged by Choice Hotels. [14] The court concludes that this factor is inapplicable to the present facts. *See Choice Hotels,* 940 F.Supp.2d at 541 (factor inapplicable to facts where neither party provided evidence regarding factor).

9

In addition to analyzing the digits of confusion, Goldmark urges the court to consider the overall context in assessing the likelihood of confusion. The digits of confusion discussed above are non-exhaustive, "[n]o digit is dispositive, and the digits may weigh differently from case to case, 'depending on the particular facts and circumstances involved.' " *Xtreme Lashes,* 576 F.3d at 227 (quoting *Marathon Mfg. Co. v. Enerlite Prods. Corp.,* 767 F.2d 214, 218 (5th Cir.1985)). The court agrees with Goldmark that a consideration of the context is appropriate. *See, e.g., Scott Fetzer,* 381 F.3d at 485–86 ("Therefore, in addition to the digits of confusion, the particular context in which the mark appears must receive special emphasis."). But contrary to Goldmark's position, the context supports the conclusion beyond peradventure that there is a likelihood of confusion.

Goldmark contends that the typical consumer exercising ordinary caution would not have been confused by the continued display of Choice Hotels' marks on the Goldmark Hotel Property because other signage, including business cards at the front desk, bore the name and logo of Amerigold Suites, and as soon as a potential consumer walked inside the hotel, he would have realized the difference. In support of its argument, Goldmark relies on *National Business Forms & Printing, Inc. v. Ford Motor Co.,* 671 F.3d 526 (5th Cir.2012). That reliance is misplaced. In *National Business* a commercial printer supplied several used-car dealers that had no

affiliation with Ford Motor Co. ("Ford") promotional materials bearing Ford's logos in combination with the logos of other car brands. *Id.* at 530–31. The district court entered judgment for Ford, finding the printer liable for trademark infringement on the theory that the promotional materials used Ford's marks in a manner likely to confuse consumers as to whether Ford endorsed or approved of the dealerships' sales of Ford vehicles. *Id.* at 533–34. The Fifth Circuit reversed, holding that the district court clearly erred in finding that the promotional materials were likely to cause confusion. *Id.* at 534. It reasoned that because each piece of promotional material presented Ford's marks along with several other automakers' logos, "[t]he grouping of several competitors extinguishes any possible confusion, particularly where nothing in the district court's findings or in the record suggests that these used car dealers displayed the Ford marks elsewhere on their lots or showroom floors." *Id.* The Fifth Circuit also concluded that the typical consumer was not likely to "perceive that Ford endorsed or approved this diverse array of corporate logos, particularly at dealerships operating under the names 'Greenspoint Dodge Used Car Sales' and 'Tomball Dodge.' " *Id.*

**\*9** *National Business* is clearly distinguishable for several reasons, but most fundamentally because it is a case where the plaintiff, who was *not* a competitor to the defendant as to this category of products,[15] alleged that the defendant reproduced trademarks and applied them to promotional materials intended to be used in commerce by third-party retailers (i.e., the independent dealerships). In other words, the plaintiff was attempting to hold the defendant liable on a theory that *the third-party retailers*' use of the promotional materials was likely to cause confusion among the retailers' customers. But because each piece of promotional material that was sold to the retailers contained the corporate logos of at least three other automakers (competitors to Ford), there was no basis to find that a typical consumer would perceive that Ford intended to sponsor the promotional materials. Here, by contrast, Choice Hotels' theory does not rely on the sale of goods or services by a third-party retailer. Rather, Goldmark's Amerigold Suites was a direct competitor to Choice Hotels in the hotel services industry, and each of the signs at issue bore only the marks of Choice Hotels, not of others. Thus the salient features of the commercial relationship in *National Business* do not exist here.

Contrary to Goldmark's contention, the overall context supports the conclusion that Choice Hotels has demonstrated beyond peradventure that there is a likelihood of confusion. Before the termination of the Franchise Agreement between Choice Hotels and Kroopa, the Goldmark Hotel Property was operated as a licensed Quality Suites. After the Franchise Agreement was terminated and Goldmark took over operations, the continued display of the Quality Marks would likely cause confusion among consumers—especially among those consumers who were under the mistaken impression that the Goldmark Hotel Property was still a licensed Quality Suites. Although Goldmark was not the former franchisee, the likelihood-of-confusion logic that courts observe in failed franchisee cases nevertheless applies to this situation because an ordinary consumer would not have been able to perceive a difference between Kroopa (the former franchisee) and Goldmark (the entity that foreclosed on the Goldmark Hotel Property). *Cf. TGI Friday's Inc.,* 652 F.Supp.2d at 767 ("Therefore, if [former franchisees] are using the marks without [the franchisor's] consent, it is evident that there is a likelihood of consumer confusion between licensed ... restaurants and defendants' restaurants."); *Burger King Corp. v. Mason,* 710 F.2d 1480, 1492 (11th Cir.1983) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks."). The typical consumer exercising ordinary caution would have observed the continued display of Choice Hotels' exact marks on the Goldmark Hotel Property and would not have known that the hotel was no longer a licensed Quality Suites or that the hotel was under different ownership.

**\*10** The fact that Goldmark changed other signage on the Goldmark Hotel Property and had materials inside the hotel that bore the Amerigold Suites name and logo does not change this result. As the Eighth Circuit observed in *Downtowner/Passport International Hotel Corp. v. Norlew, Inc.,* 841 F.2d 214 (8th Cir.1988):

> any dissipation of confusion due to the existence of ... items [with other names or logos] does not cure the likelihood of confusion that initially existed upon entering the hotel.... [W]e find that a travel weary hotel patron might not notice

the inconsistent trademarks. He or she would, thus, still assume that the hotel was [one of plaintiff's hotels]. Bad experiences may deter the traveler from staying at [another one of plaintiff's hotels] at his or her next destination. And, if a traveler did conclude that the hotel was not [one of plaintiff's hotels] it is uncertain whether a traveler would gather up his or her luggage and begin a search for another hotel.

*Id.* at 219–20 (citations omitted). Similarly, in this case, potential customers looking for a hotel would have observed from the road two signs bearing Choice Hotels' exact marks. There is a substantial likelihood that a typical consumer traveling on the road would have seen these signs and mistakenly believed that the Goldmark Hotel Property was a licensed Quality Suites. Even if signage and other items inside the hotel indicated that the hotel was actually an Amerigold Suites, any dissipation of confusion would not have cured the likelihood of confusion that initially existed upon seeing the signs and entering the Goldmark Hotel Property.

"While likelihood of confusion is typically a question of fact, summary judgment is proper if the 'record compels the conclusion that the movant is entitled to judgment as a matter of law.' " *Xtreme Lashes,* 576 F.3d at 227 (quoting *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.,* 550 F.3d 465, 474 (5th Cir.2008)). The record does not contain any evidence that creates a genuine issue of material fact regarding the likelihood of confusion. Both the digits of confusion—especially the first two factors—and the overall context support a finding that Goldmark's continued use of the Quality Marks created a likelihood of confusion. None of the digits of confusion clearly favors the opposite conclusion. Choice Hotels has therefore established a likelihood of confusion beyond peradventure.

### D

Because Choice Hotels has established beyond peradventure the ownership of a legally protectable mark

and infringement of that mark, it is entitled to summary judgment as to liability on its claim for trademark infringement under 15 U.S.C. § 1114.

### IV

Choice Hotels also moves for summary judgment on its claims for false designation of origin under 15 U.S.C. § 1125(a), common law trademark infringement under Texas law, and common law unfair competition under Texas law, contending that facts establishing liability for these claims are identical to those establishing liability for trademark infringement under 15 U.S.C. § 1114. Goldmark concedes that liability for trademark infringement under § 1114 establishes liability for Choice Hotels' other claims.

**\*11** The court holds that Choice Hotels is entitled to summary judgment on its claim for false designation of origin under § 1125(a), common law trademark infringement under Texas law, and common law unfair competition under Texas law. *See Choice Hotels,* 940 F.Supp.2d at 538 ("Nevertheless, the Court must only conduct one inquiry to determine the [defendants'] liability because ... the facts that support an action for trademark infringement under the Lanham Act also support the other three actions); *see also Philip Morris USA Inc. v. Lee,* 547 F.Supp.2d 667, 674 (W.D.Tex.2008) ("The elements of trademark infringement and false designation of origin are identical, and the same evidence will establish both claims." (citations omitted)); *Dall. Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.,* 616 F.Supp.2d 622, 637 (N.D.Tex.2009) (Kinkeade, J.) ("A determination of a likelihood of confusion under federal law is sufficient to prove trademark infringement under Texas law." (citing *Elvis Presley,* 141 F.3d at 193)); *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.,* 53 S.W.3d 799, 806 n. 3 (Tex.App.2001, pet.denied) ("A trademark infringement and unfair competition action under Texas common law presents essentially 'no difference in issues than those under federal trademark infringement actions.' " (quoting *Zapata Corp. v. Zapata Trading Int'l, Inc.,* 841 S.W.2d 45, 47 (Tex.App.1992, no writ))).

V

Choice Hotels requests that the court grant a permanent injunction enjoining Goldmark from using any of the Quality Marks. Goldmark opposes Choice Hotels' request for injunctive relief, reiterating many of the same arguments it made on the merits. The only argument not previously addressed *supra* in § III is Goldmark's contention that Choice Hotels is not entitled to a permanent injunction because both signs have been removed from the Goldmark Hotel Property as of the date Choice Hotels filed its motion for summary judgment and there is no evidence that there is a threat of future injury to Choice Hotels.

The Lanham Act vests district courts with the jurisdiction to grant an injunction "according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). Were Choice Hotels seeking a preliminary injunction, it would be required to establish each of the following: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to Choice Hotels outweighs the threatened harm the injunction may do to Goldmark; and (4) that granting the preliminary injunction will not disserve the public interest. *See, e.g.,* Jones v. Bush, 122 F.Supp.2d 713, 718 (N.D.Tex.2000) (Fitzwater, J.), *aff'd,* 244 F.3d 134 (5th Cir.2000) (per curiam) (unpublished table decision). "Where a plaintiff seeks permanent injunctive relief, the test is the same, except that 'the movant must show actual success on the merits of the claim, rather than a mere likelihood of such success.' " Caroline T. v. Hudson Sch. Dist., 915 F.2d 752, 755 (1st Cir.1990) (quoting K–Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir.1989)). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and ... such discretion must be exercised consistent with traditional principles of equity." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

**\*12** The court holds that Choice Hotels has not established beyond peradventure that it is entitled to a permanent injunction. The first factor (actual success

on the merits) is satisfied, but there are disputed issues of material fact that preclude summary judgment as to the remaining factors. Although there is evidence in the record suggesting that Choice Hotels ultimately may be entitled to a permanent injunction, the beyond peradventure burden is heavy, and Choice Hotels has not met this burden as to its request for such an extraordinary remedy. *See, e.g.,* DSC Commc'ns Corp. v. Next Level Commc'ns, 107 F.3d 322, 328 (5th Cir.1997) (noting that "it is clear injunctions are an extraordinary remedy, to be granted only when a party is threatened with injury for which he cannot obtain a sufficient legal remedy"). Moreover, Goldmark has adduced evidence that would permit a reasonable trier of fact to find that Goldmark was slow to remove the signs in question only because it considered the cost of doing so to be prohibitive, not because it intended to trade on Choice Hotels' trademarks. Goldmark was not the former franchisee; it was a beneficiary of a deed of trust under which the Goldmark Hotel Property was foreclosed on. So this is not, for example, a case in which a former franchisee intentionally traded on the franchisor's trademarks after their franchise agreement was terminated. *See, e.g.,* TGI Friday's Inc., 652 F.Supp.2d at 766–67 ("Defendants concede that they did not cease using [plaintiff's] marks on receipt of the termination letters, and that they continue to use the marks and hold their restaurants out as [licensed locations of the plaintiff]."). There is also evidence that, by the time Choice Hotels filed this summary judgment motion, Goldmark had painted over, covered up, or otherwise removed the signs in question and that no signs bearing Quality Marks are currently visible on the Goldmark Hotel Property. And there is evidence that Goldmark removed other signage and paraphernalia with Choice Hotels' marks before Choice Hotels filed this lawsuit; that Goldmark uses its own online reservation system; and that Goldmark holds itself out to potential customers as an Amerigold Suites, not a Quality Suites. Choice Hotels has therefore failed to establish under the heavy beyond peradventure that it is threatened with irreparable injury. Accordingly, Choice Hotels' motion for summary judgment is denied to the extent it seeks a permanent injunction. [16]

VI

In addition to its request for injunctive relief, Choice Hotels moves for summary judgment on monetary damages. Choice Hotels requests damages in the form of (1) Goldmark's profits during the period of infringement, (2) actual damages as measured by a reasonable royalty, and (3) a trebling of damages.

A

The Lanham Act provides, in pertinent part, that subject to the principles of equity, a plaintiff shall be entitled

> to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

**\*13** 15 U.S.C. § 1117(a). "Though the district court has discretion in determining an equitable damages award, genuine disputes concerning material facts, such as the actual amount of damages or the willfulness of infringement, may still preclude a summary judgment award of damages." *Choice Hotels,* 940 F.Supp.2d at 543–44.

B

The first form of monetary damages Choice Hotels seeks is Goldmark's profits during the period of infringement. "An award of the defendant's profits is not automatic."

*Seatrax, Inc. v. Sonbeck Int'l, Inc.,* 200 F.3d 358, 369 (5th Cir.2000). The Fifth Circuit has "identified a non-exhaustive list of factors to determine when a plaintiff is entitled to an accounting of the defendant's profits under § 1117(a): (1) whether the defendant intended to confuse or deceive; (2) whether sales have been diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting [its] rights; (5) the public interest in making the conduct unprofitable; and (6) whether it is a case of palming off." *Id.* (paragraph breaks omitted). "If the court determines that an accounting of profits is appropriate, the plaintiff is entitled to only those profits attributable to the unlawful use of its trademark." *Id.*

The court holds that Choice Hotels has failed to establish beyond peradventure that it is entitled to Goldmark's profits. [17] Choice Hotels presents a profit and loss accounting statement from Goldmark as a basis for determining Goldmark's profits during the relevant period. [18] *See* P. Br. 19–20; P.App. 220–221. But it subsequently attacks the accuracy of the statement with other evidence, contending that other documents show that Goldmark reported higher net profits during the same period. *See* P. Br. 20; P.App. 223–27. Choice Hotels disputes some of the deductions listed on the profit and loss statement—disputes that raise genuine issues of material fact as to the amount of Goldmark's profits during the relevant period. Moreover, Choice Hotels does not address until its reply brief the six factors for determining whether a plaintiff is entitled to an accounting of defendant's profits. Genuine issues of material fact as to some of these factors remain to be tried. *See Choice Hotels,* 940 F.Supp.2d at 546 (denying summary judgment as to profits). Summary judgment is therefore inappropriate as to Choice Hotels' request for Goldmark's profits.

C

The second form of monetary damages Choice Hotels requests is actual damages as measured by a reasonable royalty. Relying on *Boston Professional Hockey Ass'n,*

597 F.2d 71, and related cases, Choice Hotels argues that it is entitled to royalties based on the royalty formula that was in effect under the Franchise Agreement between Choice Hotels and Kroopa. Under this formula, Choice Hotels was to receive 8.5% of Kroopa's gross room revenue. Goldmark responds that Choice Hotels' damages theory is not legally viable because there was never any prior licensing relationship between it and Choice Hotels, so the reasonable royalties method of calculating actual damages is inapposite. It does not respond to Choice Hotels' damages estimate as a factual matter.

**\*14** The court holds that Choice Hotels' damages theory is legally viable but that Choice Hotels has not established beyond peradventure the amount of actual damages. Goldmark has not cited any authority holding that a prior licensing agreement between the parties is a prerequisite to using a reasonable royalty to measure damages for trademark infringement. In fact, in *Boston Professional Hockey Ass'n* there was never any licensing arrangement between the parties because the defendant's attempts to secure a licensing agreement had failed. *See* 🚩 *Bos. Prof'l Hockey Ass'n,* 597 F.2d at 74. The Fifth Circuit nevertheless held that the plaintiff's damages should have been determined by the royalty formula that had been offered during the licensing negotiations. 🚩 *Id.* at 76 ("Based upon a $15,000 offer for a three-year contract, [the defendant's] four-year infringement of the right to manufacture and sell three-inch emblems damaged plaintiffs in the amount of $20,000."). Accordingly, *Boston Professional Hockey Ass'n* suggests that a prior licensing arrangement is not a prerequisite to using a reasonable royalty method to calculate damages. And in other cases, the Fifth Circuit has approved of using this method. *See* 🚩 *Brennan's Inc. v. Dickie Brennan & Co.,* 376 F.3d 356, 371 (5th Cir.2004) ("The amount that a party hypothetically would have agreed to pay as a reasonable royalty for use of the mark is sometimes used as a measure of damages in trademark actions, especially those involving licensing relationships."); *see also* 🚩 *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1126 (5th Cir.1991) (affirming damages award based on initial franchise fee of $10,000 per store and continuing royalty of 1% in trade dress infringement case under Lanham Act). This method can make economic sense, assuming the royalty formula bears a rational relationship to the rights appropriated by the infringer,[19] because an

estimated royalty can serve as a proxy for the value that Choice Hotels would have received had Goldmark been licensed to use its marks. *See* Restatement (Third) of the Law of Unfair Competition § 36, cmt. d (1995) ("The former royalty rate may then be one of several reasonable measures of the plaintiff's loss.").

Although its damages theory is legally viable, Choice Hotels has not established beyond peradventure the amount of its actual damages. It cites the Franchise Agreement between it and Kroopa and argues that a royalty rate of 8.5% of Goldmark's gross room revenue is an appropriate damages estimate. Goldmark does not dispute this damages estimate as a factual matter, but its failure to respond does not permit the court to enter a "default" summary judgment on this issue. Even though the evidence is undisputed, Choice Hotels has not established beyond peradventure that the royalty formula is appropriate as applied to these facts. The Franchise Agreement includes a "royalty fee" of 4.65% of the hotel's gross room revenue and a "system fee" of 3.85% of the hotel's gross room revenue "for the ongoing development, maintenance and upgrading of the Property Management System and Reservation System, and for advertising, publicity, public relations, marketing, reservations and other similar services that [Choice Hotels] will provide [the licensee]." P.App. 52. It is not clear on the basis of the summary judgment briefing and record whether the "system fee" should be included as part of the royalty rate because it is undisputed that Goldmark did not use Choice Hotels' online reservation system for the Goldmark Hotel Property. It is also unclear whether Goldmark availed itself of the other benefits mentioned in the monthly fees clause, suggesting that the formula may provide a windfall to Choice Hotels. Accordingly, Choice Hotels has not established beyond peradventure that applying the full 8.5% royalty rate bears a rational relationship to the rights appropriated by Goldmark.[20] Summary judgment is therefore unwarranted as to Choice Hotels' request for actual damages.

### D

**\*15** Choice Hotels also requests treble damages. Goldmark responds that trebling of damages is not appropriate under the facts and circumstances of this case. Because the court has concluded that Choice Hotels is not entitled to summary judgment as to damages, there

is no predicate for Choice Hotels' request for trebling. Accordingly, the court denies this request as premature.

## VII

Finally, Choice Hotels requests leave to provide supplemental documentation regarding its costs and to move for attorney's fees. The Lanham Act provides that, subject to principles of equity, the plaintiff shall be entitled to recover "the costs of the action," and, "in exceptional cases," the court may award "reasonable attorney fees." 15 U.S.C. § 1117(a)(3). Because Choice Hotels is not entitled to summary judgment as to remedies, its remedies claims remain for trial. Choice Hotels will have the opportunity—for example, in the context of an attorney's fees application filed under Rule 54(d)(2)—to apply for attorney's fees and nontaxable costs. The court therefore denies Choice Hotels' request for leave as premature.

The court expresses no view about whether this case is "exceptional" within the meaning of § 1117(a)(3).

\* \* \*

For the reasons explained, the court grants Choice Hotels' motion for summary judgment as to liability on its claims for trademark infringement under 🏳 15 U.S.C. § 1114, false designation of origin under 🚩 15 U.S.C. § 1125(a), common law trademark infringement under Texas law, and common law unfair competition under Texas law, but denies the motion as to remedies.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 642731

## Footnotes

1    In deciding this motion, the court views the evidence in the light most favorable to Goldmark as the summary judgment nonmovant and draws all reasonable inferences in its favor. *See, e.g., Owens v. Mercedes–Benz USA, LLC,* 541 F.Supp.2d 869, 870 n. 1 (N.D.Tex.2008) (Fitzwater, C.J.) (citing 🏳 *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.,* 422 F.Supp.2d 698, 701 n. 2 (N.D.Tex.2006) (Fitzwater, J.)).

2    Although these signs remained on the Goldmark Hotel Property, Goldmark appears to have undertaken some effort to re-brand the hotel as an Amerigold Suites. The signage at the front desk of the hotel was changed to remove any Quality Suites marks; business cards at the front desk were replaced with cards bearing the Amerigold Suites name and logo; Goldmark advertised the property in a local apartment guide as an Amerigold Suites; the breakfast service, which had been a Quality Suites service, was terminated; the telephone at the hotel was answered by staff describing the hotel as an Amerigold Suites; and Goldmark ceased using the Quality Suites online reservation system.

3    This letter is attached as part of Choice Hotels' amended appendix filed in support of its motion for summary judgment. Choice Hotels' original appendix was filed concurrently with its motion on September 13, 2013. On January 29, 2014 Choice Hotels filed a notice of *errata* regarding the original appendix. In its notice, Choice Hotels explained that several of the pages in the original appendix were mistakenly left blank and that it had only recently noticed the error. It attached an amended appendix with corrected pages. On February 5, 2014 Goldmark filed an objection to the filing of the amended appendix, arguing that the filing was untimely and should be stricken on the ground that Choice Hotels had not first obtained leave to file the document.

Assuming *arguendo* that leave of court was necessary, the court treats Choice Hotels' notice of *errata* as a motion for leave to file an amended appendix and grants the motion. It also overrules Goldmark's February 5, 2014 objection. Although in other circumstances the court would permit Goldmark as the nonmovant to file supplemental briefing to address the amended appendix, the court does not do so here because Goldmark filed its response to the motion for summary judgment before Choice Hotels filed its notice of *errata,* and in doing so Goldmark did not raise any challenge to Choice Hotels' original appendix. The court therefore finds no basis in the record to conclude that the inclusion of blank pages in Choice Hotels' original appendix interfered in any way with Goldmark's ability to respond to the summary judgment motion. In fact, one of the exhibits included in Choice Hotels' amended appendix—which was blank in its original appendix—was included by Goldmark in *its* appendix, which was filed in conjunction with its summary judgment response brief. *Compare* D.App. 48–50, *with* P.App. 219–21. Accordingly, all of the court's citations to "P.App.' in this memorandum opinion and order refer to Choice Hotels' January 29, 2014 amended appendix.

4    The court grants Choice Hotels' request to take judicial notice of the registrations under Fed.R.Evid. 201. *See, e.g.,*

Super–Krete Int'l, Inc. v. Sadleir, 712 F.Supp.2d 1023, 1029 n. 1 (C.D.Cal.2010) (taking judicial notice of trademark registrations).

5    The court understands Goldmark's argument to be about the application of the word "use" in 15 U.S.C. § 1114, not the phrase "in commerce."

6    Although there is considerable support for the view that a digits-of-confusion analysis is unnecessary when the defendant is using the plaintiff's exact marks, the Fifth Circuit has not explicitly recognized this rule. In Rolex Watch USA, Inc. v. Meece, 158 F.3d 816 (5th Cir.1998), the Fifth Circuit held that "[t]he district court erred by failing to consider and weigh all of the digits of confusion." Id. at 831. In *Paulsson* the defendant seized on this language, arguing that the district court erred by not analyzing each of the eight digits. Paulsson, 529 F.3d at 310. The Fifth Circuit rejected this argument, noting that the *Rolex Watch* holding does not apply to cases where the defendant uses the exact mark. Id. at 310–11. Although Choice Hotels' position is consistent with *Paulsson,* that decision does not establish that a digits-of-confusion analysis is unnecessary when the marks are identical. Rather, *Paulsson* holds that a district court does not err when it fails to consider each and every digit of confusion when the marks are identical. It does not establish the rule that, when the marks are identical, a district court can find that there is a likelihood of confusion without considering any of the digits. Some courts have suggested that *Paulsson* should be read more broadly in cases where the marks are identical. *See, e.g.,* Choice Hotels Int'l, Inc. v. Bhakta, 2013 WL 1403526, at *3 (S.D.Tex. Apr.5, 2013) ("The likelihood-of-confusion test is met as a matter of law when the defendants are using a plaintiff's exact marks as opposed to merely similar marks.") (citing *Paulsson* ); Coach Inc. v. Sassy Couture, 2012 WL 162366, at *5 (W.D.Tex. Jan.19, 2012) (citing *Paulsson* and noting that "analysis of the digits of confusion is 'inapplicable to the facts of [a] case where the [Defendant] used the exact same mark' "); *cf.* Microsoft Corp. v. Software Wholesale Club, Inc., 129 F.Supp.2d 995, 1007 n. 11 (S.D.Tex.2000) ("Generally, a likelihood of confusion analysis involves a factual inquiry into several different factors. However, in the case of a counterfeit mark, likelihood of confusion is clear.") (citation omitted). But in the present case, because even under a digits-of-confusion analysis there is no genuine issue of material fact as to likelihood of confusion, the court need not decide whether this analysis is necessary where the marks are identical. *See, e.g.,* Microsoft Corp. v. Grey Computer, 910 F.Supp. 1077, 1088 (D.Md.1995) ("Where, as here, the goods distributed by Defendants are intentional copies and virtually identical to the trademark owner's goods, likelihood of confusion may be established at the summary judgment stage.").

7    The #875 Registration and the #888 Registration, as well as other registrations in the Quality Marks, have become incontestable under 15 U.S.C. § 1065.

8    Goldmark asserts that Choice Hotels "caused" the marks to be placed on the Goldmark Hotel Property in the first place, apparently suggesting that Goldmark is not liable for trademark infringement because Choice Hotels entered into a franchise agreement with Kroopa and Goldmark never agreed to such an arrangement. *See* D. Resp. 14. This argument lacks force. Goldmark instituted foreclosure proceedings on the Goldmark Hotel Property and failed to remove or cover the marks in question for months after assuming ownership of the Goldmark Hotel Property. Although Goldmark was not a party to the Franchise Agreement, Goldmark assumed responsibility for complying with applicable trademark laws when it foreclosed on the Goldmark Hotel Property. That in doing so Goldmark would be required to pay for the removal of the marks is simply a cost of doing business after foreclosing on the Goldmark Hotel Property and choosing to operate it as a hotel.

9    The only record citations found anywhere in Goldmark's response brief on these factors are located in the section entitled, "Factual Background." Most of these citations are to statements in the affidavit of Timothy Barton ("Barton"), Goldmark's managing member and records custodian.

By separate motion, Choice Hotels moves on various grounds to strike certain statements made in Barton's affidavit. Goldmark has not responded to the motion to strike. The court grants the motion in part and denies it in part as moot. The court grants the motion as to Barton's statements that the Quality Marks "carried very little value" and that "there existed no likelihood of brand confusion" because these statements are improper legal conclusions under Fed.R.Evid. 702. *See, e.g.,* C.P. Interests, Inc. v. Ca. Pools, Inc., 238 F.3d 690, 697 (5th Cir.2001) (citing Owen v. Kerr McGee Corp., 698 F.2d 236, 240 (5th Cir.1983)). Choice Hotels' remaining objections are overruled as moot because,

even if the court considers the statements or photographs to which Choice Hotels objects, they do not create a genuine issue of material fact that precludes granting of summary judgment as to liability.

10   This factor is to be considered on a spectrum, because "[t]he greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.,* 628 F.2d 500, 505 (5th Cir.1980). The services rendered by Choice Hotels and Goldmark need not be identical in order to be deemed similar for purposes of applying the digits-of-confusion analysis. *See* 📙 *Beef/Eater Rests., Inc. v. James Burrough Ltd.,* 398 F.2d 637, 639 (5th Cir.1968) (noting that "parties need not be in competition and that the goods or services need not be identical" to support finding of likelihood of confusion).

11   The court is citing the Barton affidavit in this manner because Goldmark attached the affidavit to its response brief rather than include it in its appendix. Although doing so was procedurally improper, the court will consider the affidavit because doing so has not interfered with the decisional process of the court.

12   In support of its response, Goldmark offers hundreds of pages of police reports regarding alleged instances of criminal activity that occurred on the Goldmark Hotel Property during Kroopa's ownership. *See* D.App. 67–420. Goldmark requests that the court take judicial notice of these reports under Fed.R.Evid. 201. It argues that judicial notice is appropriate because the authenticity of the reports can be openly, clearly, and easily ascertained. The court declines to take judicial notice of these documents.

Goldmark downloaded the records from a website, which includes the following disclaimer, which is prominently displayed on the first page:

This information reflects crimes as reported to the Dallas Police Department as of the current date. Crime classifications are based upon preliminary information supplied to the Dallas Police Department by the reporting parties and the preliminary classifications may be changed at a later date based upon additional investigation. Therefore, the Dallas Police Department does not guarantee (either expressed or implied) the accuracy, completeness, timeliness, or correct sequencing of the information contained herein and the information should not be used for comparison purposes over time.

Dallas Police Department, *Disclaimer and Restriction on Use,* http:// policereports.dallaspolice.net (last visited Feb. 19, 2014). In light of this explicit disclaimer of the accuracy or completeness of the police reports downloaded from the website, the court denies Goldmark's request to take judicial notice.

13   From a public relations standpoint, Choice Hotels might prefer this explanation over the conclusion that Quality Suites hotels are a preferred choice of prostitutes and drug dealers.

14   There are several photographs in the summary judgment record indicating a price for a month-long stay at the Amerigold Suites. *See, e.g.,* D.App. 37. But Goldmark neither points to this evidence as a basis for measuring the degree of care exercised by potential purchasers, nor does it provide any evidence of the prices charged by Choice Hotels.

15   In a portion of *National Business* that Goldmark does not cite, the Fifth Circuit affirmed the district court's grant of summary judgment to Ford on a different class of products: decals and stickers that contained *only* Ford's marks and *were* offered for direct sale on its website. *See* 📙 *National Business,* 671 F.3d at 533, 538; *see also* 🚩 *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.,* 2009 WL 3570387, at *3 (S.D.Tex. Oct.30, 2009) (district court opinion describing category of products). For this class of products, the commercial printer and Ford were direct competitors, which supported the district court's finding of a likelihood of confusion. *See* 📙 *National Business,* 671 F.3d at 533 ("[The printer's] products directly compete with products sold by Ford and their licensed marketers, and competition occurs in a relatively small market of buyers[.]").

16   Choice Hotels also requests injunctive relief in the form of (1) an order requiring Goldmark to deliver to Choice Hotels any item in its possession, custody, or control bearing any of the Quality Marks, and (2) an order requiring Goldmark to file a sworn statement of compliance. These requests are also denied at the summary judgment stage.

17   In its reply, Choice Hotels requests leave to supplement this motion with additional evidence regarding Goldmark's profits. Because Choice Hotels will have the opportunity to provide additional evidence at trial, the court denies this request.

18   The precise end date for the relevant period is not clear from the summary judgment briefing and record. For example, Choice Hotels states in its reply that Goldmark "left the 'towering sign' with the Quality Suites® name uncovered and displayed in front of its hotel through *at least* April 2012." P. Reply 6 (emphasis added). The precise termination date of the relevant period is potentially relevant to the amount of damages owed by Goldmark.

19   The court expresses no view as to whether the royalty formula proposed by Choice Hotels bears a rational relationship to the rights appropriated by Goldmark. Some courts have noted that the use of a royalty formula derived from a prior licensing arrangement provides a windfall to the plaintiff where the defendant did not receive all of the benefits

associated with the licensing arrangement. *See, e.g.,*  *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 920 (Fed.Cir.1984); *see also* Restatement (Third) of the Law of Unfair Competition § 36, cmt. d (1995) (noting that "in some cases the royalty measure may also fail to account for the absence of other benefits and burdens present in an actual licensing relationship").

20   The full 8.5% royalty rate may in fact bear a rational relationship to the rights appropriated by Goldmark. The court expresses no view on the ultimate merits of this particular damages estimate other than to say that the summary judgment briefing and record do not establish beyond peradventure that Choice Hotels is entitled to the damages award that it proposes.

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   NJ091  16

# **Exhibit 3**

2019 WL 1787781
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Galveston Division.

Joe SHIELDS Plaintiff,

v.

GAWK INC.; Scott Kettle;
Kennedy Weaver Defendants.

Civil Action No. 3:18-CV-00150
|
Signed 04/24/2019

**Attorneys and Law Firms**

Joe Shields, Friendswood, TX, pro se.

Kennedy Weaver, Missouri City, TX, pro se.

## MEMORANDUM AND RECOMMENDATION

ANDREW M. EDISON, UNITED STATES
MAGISTRATE JUDGE

**\*1** Pending before the Court is Plaintiff's 1st Amended
Motion for Summary Judgment as to Defendant Kennedy
Weaver ("Motion for Summary Judgment"). Dkt. 24. All
dispositive motions have been referred to the undersigned
by United States District Court Judge George C. Hanks,
Jr. for report and recommendation. Dkt. 21. After careful
consideration of the pleadings and the applicable law, the
Court RECOMMENDS that the Motion for Summary
Judgment be GRANTED IN PART and DENIED IN
PART.

## FACTUAL BACKGROUND

Plaintiff Joe Shields ("Shields") claims that Defendant
Kennedy Weaver ("Weaver") violated the Telephone
Consumer Protection Act ("TCPA"), 47 U.S.C. § 227
*et seq.*, and Section 305.053 of the Texas Business and
Commerce Code when Weaver sent a non-emergency,
automated call to Shields's cell phone without his consent.

Shields contends that he was assigned a cellular telephone
number by his cellular service provider on July 16, 2014,
and submitted this number to the National Do-Not-Call
list within 24 hours. Shields says that this phone number
was never submitted on any website and only his family
and friends were provided with the phone number.

On February 13, 2018, at 7:31 p.m., Shields's cell phone
rang twice, but he apparently did not pick up in time.
The cell phone indicated that he had missed a call
and had a new voicemail message waiting. Shields then
accessed the voicemail. It was a pre-recorded message
from Weaver offering cash for houses in the Houston area.
The voicemail instructed "interested parties to call the
telephone number 281-236-9343, which is the telephone
number that was assigned to the Defendant Weaver at the
time the robocall was made." Dkt. 24 at 3. Shields called
this number and spoke to Weaver who confirmed that "it
was a recorded message from me yes" and that "it is the
way we do marketing for our business." *Id.*

Shields alleges that this recorded message made to his
cellular telephone number violates Section 227(b) of the
TCPA because it is the use of an artificial or prerecorded
voice to deliver a message without his prior express
consent. *See* 47 U.S.C. § 227(b)(1)(B). Shields also
contends that the call violates Section 227(c) of the TCPA
because it is unlawful to make telephonic solicitations to
a telephone number listed on the Do-Not-Call registry.
*See* *id.* at § 227(c)(5); 47 C.F.R. § 64.1200(c).
Shields further claims that Weaver has violated Section
305.053 of the Texas Business and Commerce Code for
the same reasons Section 227(b) and 227(c) have
been violated—by the making an artificial or prerecorded
call to his cellular phone number, and by initiating a
telemarketing call to his cellular phone number when it
was on the National Do-Not-Call list. As a result of this
single February 13, 2018 phone call, Shields "requests
that the Court find that the Defendant Weaver is liable to
[Shields] in the statutory sum of $2,000.00 ... [f]urther,
due to Defendant Weaver's willful and knowing behavior,
[Shields] requests that the Court treble the statutory
amount to $6,000.00." Dkt. 24 at 3–4. Shields further
requests the court grant an injunction against Weaver
prohibiting him from engaging in similar behavior in the
future.

## SUMMARY JUDGMENT STANDARD

**\*2**  Under Federal Rule of Civil Procedure 56, a court must grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of fact is not "material" unless its resolution would affect the outcome of the case. See Hamilton v. Segue Software Inc., 232 F.3d 473, 477 (5th Cir. 2000).

The moving party bears the burden of informing the court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such absence. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, all evidence and reasonable inferences made must be viewed in the light most favorable to the party opposing the motion. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. See FED. R. CIV. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 (1986). The party defending against the motion for summary judgment cannot defeat the motion unless he provides specific facts that demonstrate a genuine issue of material fact such that a reasonable jury might return a verdict in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. See id. at 249–50. In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. See Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996).

### PRO SE LITIGANTS

Shields and Weaver are both proceeding pro se in this case. "Despite our general willingness to construe pro se filings liberally, we still require pro se parties to fundamentally abide by the rules that govern the federal courts." EEOC v. Simbaki, Ltd., 767 F.3d 475, 484 (5th Cir. 2014) (internal quotation marks and citation omitted). When

it comes to summary judgment proceedings, this means that a pro se party moving for summary judgment is required to properly present summary judgment evidence and specifically refer to this evidence in order to place it before the court. See id. ("Pro se litigants must properly ... present summary judgment evidence") (internal citations omitted). Likewise, "the notice afforded by the Rules of Civil Procedure and the local rules is considered sufficient to advise a pro se party of his burden in opposing a summary judgment motion." Howe v. Adams, No. 3:14-CV-349, 2018 WL 1427175, at \*3 (S.D. Tex. Mar. 22, 2018) (internal quotation marks and citation omitted).

In this case, the Court has bent over backwards to accommodate the pro se litigants. The Court has explained to the parties on several occasions that they need to abide by the Federal Rules of Civil Procedure—even if they are not represented by counsel. The Court even held a telephonic hearing last month at which it gave Weaver extra time to respond to the Motion for Summary Judgment. Despite the Court's guidance, Weaver failed to file a response to the Motion for Summary Judgment.

**\*3**  Notwithstanding Weaver's failure to respond to the Motion for Summary Judgment, summary judgment may not be awarded by default "simply because there is no opposition, even if the failure to oppose violated a local rule." Hibernia Nat'l Bank v. Admin. Cent. Sociedad Anonima, 776 F.2d 1277, 1279 (5th Cir. 1985). "However, a court may grant an unopposed summary judgment motion if the undisputed facts show that the movant is entitled to judgment as a matter of law." Day v. Wells Fargo Bank Nat'l Ass'n, 768 F.3d 435, 435 (5th Cir. 2014) (citation omitted).

### ANALYSIS

### A. TCPA

To protect individual consumers from receiving intrusive and unwanted commercial telemarketing calls, Congress passed the TCPA in 1991. See Minis v. Arrow Fin. Servs., LLC, 565 U.S. 368, 372 (2012). In findings supporting the legislation, Congress stated that unrestricted telemarketing can be an intrusive invasion of privacy, and that telephone subscribers consider automated or prerecorded calls (regardless of the content)

to be a nuisance. *See id.* The TCPA is codified in Section 227, Title 47, of the United States Code.

Shields asserts two distinct types of TCPA claims against Weaver: (1) use of an artificial or prerecorded voice ( Section 227(b) ); and (2) making a telephone call to a number on the National Do-Not-Call registry ( Section 227(c) ). The Court will discuss each claim separately.

### 1. Section 227(b)

Section 227(b) makes it unlawful to:

> make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

47 U.S.C. § 227(b)(1)(A)(iii). The TCPA creates a private right of action in which a person may bring an action for a violation of Section 227(b) and the regulations prescribed under that subsection "to enjoin such violation [and/or] ... to receive $500 in damages for each such violation." *Id.* at § 227(b)(2)(G)(3)(B). Moreover, "[i]f the court finds that the defendant willfully or knowingly violated this subsection ... the court may ... increase the amount of the award to an amount equal to not more than 3 times" the $500. *Id.* at § 227(b)(2)(G) (3)(C).

"The three elements of a TCPA claim [under Section 227(b) ] are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system [or an artificial or prerecorded voice]; (3) without the

recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) (citing 47 U.S.C. § 227(b)(1) ). In this case, Shields has presented summary judgment evidence establishing all three elements of a Section 227(b) TCPA claim.

The uncontroverted summary judgment evidence establishes that on February 13, 2018, Weaver called Shields's cellular telephone number without his permission and left a prerecorded message. This is a clear violation of the TCPA. Shields is, therefore, entitled to summary judgment on the Section 227(b) claim. *See Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1038 (D. Minn. 2010) ("Because there is no dispute that [defendant] placed an automated call to [the plaintiff's] cellular phone on December 30, 2008 for non-emergency purposes, [Magistrate] Judge Noel found that [the plaintiff] was entitled to summary judgment on his TCPA claim.").

**\*4** The Court must now address the amount of damages to award Shields for Weaver's violation of Section 227(b). Because there are no actual monetary losses incurred by Shields, the TCPA fixes his damages at $500 for each violation. *See* 47 U.S.C. § 227(b)(3)(B).

"Under the TCPA, a court may in its discretion award double or even treble damages for any 'willful or knowing' violations of § 227(b)." *Cunningham v. Greenstar Capital Sols., LLC*, No. 4:18-CV-000161-ALM-CAN, 2018 WL 4572711, at \*7 (E.D. Tex. Aug. 1, 2018) (citing 47 U.S.C. § 227(b)(3) ). A willful or knowing violation does "not requir[e] bad faith, but only that the person have reason to know, or should have known, that his conduct would violate the statute." *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 899 (W.D. Tex. 2001) (citation omitted). Applying that standard here, the Court is unable to conclude that Weaver willfully or knowingly violated Section 227(b). Although Shields alleges Weaver's actions were willful and knowing, "[n]o [summary judgment] evidence was presented which would support a finding that [Weaver] was more than negligent in its TCPA violation—specifically, there was no evidence [Weaver] knowingly disregarded [Shields's] revocation of consent, nor was there any evidence [Weaver] knew

or should have known [he] was violating the TCPA." *Adamcik v. Credit Control Servs., Inc.*, 832 F. Supp. 2d 744, 755 (W.D. Tex. 2011). As such, the Court finds that Shields is not entitled to treble damages for his Section 227(b) claim. He is limited to $500 for the statutory violation.

### 2. Section 227(c)

Section 227(c) directed the Federal Communications Commission ("FCC") to promulgate regulations aimed at the establishment and operation of a national database of telephone numbers of subscribers who object to receiving telephone solicitations and, further, permitted the FCC to prohibit telephone solicitations to any number in the database. *See* 47 U.S.C. § 227(c). Addressing the specific concerns expressed in Section 227(c), the FCC implemented regulations codified at 47 C.F.R. § 64.1200(c), making it unlawful for a caller to make telephonic solicitations to a telephone number listed on the National Do-Not-Call list.

Section 227(c) grants a right of private action to "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). This language is critical, as it does not permit the recovery of damages in a private right of action for Section 227(c) violations arising out of the first call to a person within any 12-month period. "No private right of action accrues and a telemarketer is not in violation of [ Section 227(c) ] unless and until it telephones a party more than once in any twelve-month period after the person has informed the telemarketer that he or she does not want to be called." *Charvat v. ATW, Inc.*, 712 N.E.2d 805, 807 (Ohio App. 1998). In the instant case, Shields readily acknowledges that he is only challenging a single phone call made by Weaver. Pursuant to the clear language of Section 227(c)(5), Shields is not entitled to compensation for the first telemarketing call made to him in violation of regulations promulgated under Section 227(c). [1] He would be permitted to recover for violations of Section 227(c) only if he received subsequent phone calls, but there

are no such calls at issue in this case. As a result, Shields cannot prevail on his Section 227(c) claim.

### B. Section 305.053 of the Texas Business and Commerce Code

**\*5** Section 305.053 of the Texas Business and Commerce Code is coextensive with the TCPA. It provides a cause of action for violations of the TCPA, permitting a person who receives a communication that violates the TCPA to bring a claim under Texas law against the person who originated the communication. The Texas statute provides that:

(a) A person who receives a communication that violates 47 U.S.C. Section 227 ... may bring an action in this state against the person who originates the communication for:

(1) an injunction;

(2) damages in the amount provided by this section; or

(3) both an injunction and damages.

TEX. BUS. & COM. CODE § 305.053(a).

The Court has already found that Weaver violated Section 227(b) of the TCPA. As such, the Court finds that Shields is also entitled to summary judgment on his Section 305.053 claim based on the violation of Section 227(b). *See Morris v. Hornet Corp.*, No. 4:17-CV-00350, 2018 WL 4781273, at *9 (E.D. Tex., Sept. 14, 2018) ("Because the Court has concluded that Plaintiff is entitled to summary judgment on his TCPA claim, Plaintiff is also entitled to summary judgment on" his Section 305.053 claim.). Because, as discussed above, Shields cannot establish an actionable claim under Section 227(c), he is not entitled to prevail on his Section 305.053 claim based on the alleged Section 227(c) violation.

As far as damages are concerned, Section 305.053 provides that "[a] plaintiff who prevails in an action for damages under this section is entitled to the greater of: (1) $500 for each violation; or (2) the plaintiff's actual damages." TEX. BUS. & COM. CODE § 305.053(b). Because Shields has already been awarded $500 for Weaver's violation

of Section 227(b), he is not entitled to any additional monetary damages for the corresponding violation of Section 305.053. *See Masters v. Wells Fargo Bank S. Cent., N.A.*, No. A-12-CA-376-SS, 2013 WL 3713492, at *3 (W.D. Tex. July 11, 2013) ("There is no indication in either the TCPA or in Texas's analogue that either legislative body intended to allow double recovery under both state and federal law for the same TCPA violations."); *David L. Smith & Assocs., LLP v. Stealth Detection, Inc.*, 327 S.W.3d 873, 878 (Tex. App.—Dallas 2010, no pet.) (permitting plaintiff to recover $500 per call for violations of both the TCPA and Section 305.053, awarding a total of $16,500 for 33 calls).

**C. INJUNCTIVE RELIEF**
Both the TCPA and Section 305.053 expressly permit a private plaintiff to seek an injunction to prevent illegal telemarketing calls from continuing. *See* 47 U.S.C. § 227(b)(3); TEX. BUS. & COM. CODE § 305.053(a). To that end, Shields seeks an injunction in this case to prohibit Weaver from engaging in similar type of conduct in the future.

The legal standard for issuing a permanent injunction is "essentially the same" as for a preliminary injunction. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). To prevail on a permanent injunction, the movant must show: (1) actual success on the merits of its claims; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest. *See Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 312 (5th Cir. 1999).

*6 When a statute authorizes injunctive relief, the presumption is that the legislative branch still intended the courts to exercise their traditional equitable discretion in deciding whether to grant an injunction. *See United States v. Marine Shale Processors*, 81 F.3d 1329, 1360 (5th Cir. 1996) ("a court of equity must exercise its discretion with an eye to the congressional policy as expressed in the relevant statute"); *Town of Huntington v. Marsh*, 859 F.2d 1134, 1143 (2d. Cir.

1988) ("injunctive relief does not follow automatically upon a finding of statutory violations" but depends on "traditional equitable principles"). Federal judges are "not mechanically obligated to grant an injunction for every violation of law," *Weinberger v Romero-Barcelo*, 456 U.S. 305, 313 (1982) (citation omitted), but rather must assess whether the relief requested comports with "what is necessary, what is fair, and what is workable," *North Carolina v. Covington*, 137 S.Ct. 1624, 1625 (2017) (citation omitted).

Weighing the equities in this case, the Court does not believe an injunction is necessary. This is because there is no evidence whatsoever that Weaver has directed—or even attempted to direct—a single robocall to Shields (or anyone else) since the February 2018 pre-recorded call complained about in this lawsuit. There is no suggestion that additional robocalls from Weaver are expected to flood the phone lines in the near future. With no imminent threat of repeated violations of the TCPA and/or Section 305.053, the Court sees little reason to invoke its equitable powers and impose permanent injunctive relief.

*See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006) (holding that traditional principles of equity do not contemplate the "categorical grant of [equitable] relief" upon a finding of liability).

**CONCLUSION AND RECOMMENDATION**

For the reasons stated above, the Court RECOMMENDS that the Motion for Summary Judgment (Dkt. 24) be GRANTED IN PART and DENIED IN PART, and Shields be awarded $500 in damages.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

**All Citations**

Slip Copy, 2019 WL 1787781

**Shields v. Gawk Inc., Slip Copy (2019)**

2019 WL 1787781

Footnotes

1    This "more than one telephone call within any 12-month period" restriction is not found in ⬜ Section 227(b). ⬜ Section
     227(b) allows a consumer to recover damages for the first prerecorded voice message telemarketing call.

---

**End of Document**                                                         © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# **Exhibit 4**

2012 WL 27473
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio, Western Division.

THIRD PENTACLE, LLC, c/
o Thomas Leach, Manager, Plaintiff,
v.
INTERACTIVE LIFE FORMS, LLC, c/
o Steve A. Shubin Sr., et al., Defendants.

No. 3:10cv00238.
|
Jan. 5, 2012.

**Attorneys and Law Firms**

David D. Brannon, Dwight Dean Brannon, Brannon &
Associates, Dayton, OH, for Plaintiff.

Stephen D. Behnke, Behnke, Martin & Schulte, LLC,
Dayton, OH, for Defendants.

**DECISION AND ENTRY**

SHARON L. OVINGTON, United States Magistrate
Judge.

**I.**

**\*1** Plaintiff Third Pentacle, LLC initially brought
this case against Defendants Sarah Pate, Steve Shubin
(individually), and Interactive Life Forms, LLC.
Third Pentacle's claims included, in part, trademark
infringement, breach of contract, and unjust enrichment.

Within ten days of the date Third Pentacle filed its
Complaint, nearly all parties—Third Pentacle, Interactive
Life Forms, and Shubin (but not Pate)—reached a
settlement agreement (the Settlement Agreement). Third
Pentacle and Pate are the only remaining parties.

Pate's responses to Third Pentacle's Complaint raise
several (amended) counterclaims against Third Pentacle,
including (in part) trademark infringement, breach of
contract, and unjust enrichment. In their respective
pleadings, Third Pentacle and Pate seek declaratory

judgment establishing who owns Third Pentacle and who
owns the trademark "Raven Riley."

The case is before the Court upon Pate's Motion to
Compel Discovery Concerning Settlement Agreement
Between Plaintiff, Interactive Life Forms, LLC,
and Steven Shubin (Doc. # 50), Third Pentacle's
Memorandum Contra (Doc. # 53), Pate's Reply (Doc. #
55), and the record as a whole.

**II.**

Beginning in 2005, Pate and Thomas Leach (and others)
each held an ownership interest in Third Pentacle.
Although the business was financially successful, Pate
and Leach encountered problems that led her to file a
lawsuit in state court against Leach and others. By April
2009, Pate and Leach had resolved their differences, and
they ended the state lawsuit with a settlement agreement
and by adopting an amended operating agreement related
to Third Pentacle. Under their state-court settlement
agreement, Pate and Leach would each receive $10,000
from Third Pentacle in the future. They further agreed that
those payments would occur when Third Pentacle received
past-due royalties, at least $20,000, that Interactive Life
Forms owed Third Pentacle.[1]

As the ensuing months ticked by Third Pentacle allegedly
did not receive royalty payments from Interactive Life
Forms. Coincidentally—or not—Shubin provided Pate
with money upon occasion; the amounts varied and added
up to approximately $10,000. Pate maintains that the
money was a gift. Leach grew suspicious when he learned
about Pate's receipt and retention of $10,000 directly from
Shubin. This, and other events, led Leach to conclude, in
part, that Pate had nefariously retained royalty payments
that Interactive Life Forms owed Third Pentacle under a
contract titled "Fleshlight Girls Contract."

**III.**

Pate acknowledges in the present case that she received a
total of approximately $10,000 from Shubin. See Doc. #
55 at Page ID# 981. In response to Third Pentacle's claims,
she counters that the money was a gift, not royalties
owed to Third Pentacle. She further asserts that Third
Pentacle received a substantially larger amount from

Shubin or Interactive Life Forms as part of the Settlement Agreement they reached in the instant case. If so, she reasons, Third Pentacle suffered no monetary harm by her retention of Shubin's gift.

**\*2** Through her Motion to Compel, Defendant Pate seeks to learn more about matters related to the Settlement Agreement, particularly the "amount of money Third Pentacle claimed it was owed, the amount of money it actually received, and the reasons the parties may have agreed to some amount less than the total amount due...." (Doc. # 50 at PageID # 923). Pate contends that the information she seeks "goes to numerous issues pending in this case including but not limited to the following: (1) that portion of the Settlement Agreement concerning the division of $20,000 worth of money due from ILF [Interactive Life Forms]; and (2) Plaintiff's claim for breach of fiduciary duty; and (3) Sarah Pate's claim for monetary damages." *Id.* at Page ID# 922.

Third Pentacle argues that Pate is not entitled to information about the Settlement Agreement due to its confidentiality provision.

## IV.

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party .... For good cause, the court may order discovery of any matter relevant to the subject matters involved in the action. Relevant information need not be admissible at the trial if the discovery appears to be reasonably calculated to lead to the discovery of admissible evidence...." Fed.R.Civ.P. 26(b)(1). Courts must limit discovery when it is unreasonably cumulative or duplicative, when the party has already had a sufficient opportunity to obtain the sought-after information, or when the burden or expense of providing the sought-after information outweighs its likely benefits. Fed.R.Civ.P. 26(b)(2)(C)(i)-(iii); *see Ewert v. Holzer Clinic, Inc.,* 2009 WL 4547567 at \*2 (S.D.Ohio 2009) (King, M.J.).

In the present case, the information Pate seeks to discover includes the amount Third Pentacle actually received from Interactive Life Forms and Shubin under the Settlement Agreement. This information is relevant under Rule 26(b)(1) and Pate's request for it is reasonably calculated to lead to the discovery of admissible evidence. If Third

Pentacle received a substantial settlement amount—over $20,000 (as much as $100,000 to $200,000, as Pate "has reason to believe" (Doc. # 50 at PageID # 923))—then Pate may be able to show that Third Pentacle suffered no financial harm due to her acceptance and retention of approximately $10,000 directly from Shubin. Without financial harm caused by Pate, Third Pentacle's breach of contract claim would fail for lack of an essential element. Moreover, if Third Pentacle received more than $20,000 in past-due royalties from Interactive Life Forms and if the money Pate received directly from Shubin was an actual gift, as Pate asserts, then Third Pentacle might still owe Pate $10,000 under the terms of the Pate/Leach state-court settlement agreement.

Additionally, Pate's discovery request for the amount Third Pentacle received under the Settlement Agreement seeks information that is relevant, under Rule 26(b)(1), to her claim that Third Pentacle has breached the terms of its Amended Operating Agreement. She asserts that Third Pentacle owes her money under the Amended Operating Agreement in light of past-due royalties (i.e., those owed by Interactive Life Forms) that were earned when she was still a part owner of Third Pentacle. Pate reasons that those earnings were past due until Third Pentacle received payment from Interactive Life Forms under the terms of the Settlement Agreement. This is a reasonable assertion given that the Settlement Agreement led to the dismissal of Third Pentacle's claims against Interactive Life Forms. Third Pentacle claimed, for example, that Interactive Life Forms breached the Fleshlight Girls Contract by not paying royalties it owed Third Pentacle. The upshot is that if Third Pentacle has received royalties that it earned during the time when Pate was a co-owner, she would have a factual basis for asserting that Third Pentacle still owes her money under the Amended Operating Agreement.

**\*3** Third Pentacle contends that a confidentiality provision in the Settlement Agreement bars it from disclosing, and Pate from discovering, the information she seeks. A confidentiality privilege generally applies to the substance of communications made during negotiations that result in a confidential settlement agreement. *See* 🔖 *Goodyear Tire & Rubber Company v. Chiles Power Supply, Inc.,* 332 F.3d 976, 980–81 (6th Cir.2003). But, the privilege does not apply here as to the amount Third Pentacle received under the Settlement Agreement. The amount discloses nothing specific about what was said during the settlement negotiations between Third Pentacle

2012 WL 27473

(essentially, Leach), Interactive Life Forms, or Shubin. *See* 🔖 *id.* at 981 ("Thus, as with other privileges, the relationship itself is not privileged, but only the underlying communications."). Yet the confidentiality privilege does apply to Pate's requests for substantive information, such as the amount Third Pentacle claimed it was owed during settlement negotiations and the reasons the parties agreed to some amount less than the total amount due.

Third Pentacle further argues that Pate's claim for damages is unrelated to any royalty payments or to the amount Third Pentacle received in the Settlement Agreement. This contention lacks merit. For the reasons discussed previously, the total amount of the Settlement Agreement is related—indeed, relevant under Rule 26(b)(1)—to Pate's claims (breach of contract and unjust enrichment).

Third Pentacle also maintains that Pate's discovery requests fail because she breached the Pate/Leach state-court settlement agreement, because she holds no ownership interest in Third Pentacle, and because she breached her of fiduciary duties to Third Pentacle. These arguments encompass much that remains at issue in the case. For example, Pate claims that Third Pentacle owes her money from royalties it earned when she was a co-owner; Third Pentacle disagrees. Third Pentacle claims that Leach is the sole owner of Third Pentacle; Pate disagrees. The parties' disagreements on these and other issues are presently under review in connection with the pending motions for summary judgment. Although Third Pentacle presently holds a strong belief in the merits of its litigation positions, its strong belief—whether ultimately justified or not—provides no basis for avoiding its discovery obligations created by the Federal Rules of Civil Procedure.

Accordingly, Pate's Motion to Compel is well taken, in part, as to her request for Third Pentacle to disclose the actual amount it received under the terms of the Settlement Agreement. Pate's Motion to Compel otherwise seeks information shielded by the confidentiality privilege.

### IT IS THEREFORE ORDERED THAT:

1. Defendant Pate's Motion to Compel (Doc. # 50) is GRANTED, in part. ***On or before January 12, 2012,*** Third Pentacle shall disclose the amount of money it received under the terms of the Settlement Agreement reached by Third Pentacle, Interactive Life Forms, and Shubin. Third Pentacle shall disclose the required information to Pate's counsel of record in writing, verified by sworn statement, and for counsel's eyes only. The settlement amount shall otherwise remain confidential, absent further Order of the Court; and

**\*4** 2. Defendant Pate's Motion to Compel (Doc. # 50) is DENIED in remaining part.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 27473

Footnotes

1   On this point, the state settlement agreement provides:
    13) ... once the Company receives all money past due from [Interactive Life Forms] (ILF), that such monies shall be placed in the (Third Pentacle) bank account and (Sarah Pate) and (Thomas Leach) shall thereafter receive a distribution of Ten Thousand and 00/100 Dollars ($10,000.00) each within three business days, on the condition that at least Twenty Thousand and 00/100 Dollars ($20,000.00) is received from (ILF).
    *See* Doc. # 50 at 922.

# **Exhibit 5**

KeyCite Yellow Flag - Negative Treatment
Distinguished by Sandoval v. Romero, D.N.M., March 3, 2011

16 F.3d 1223
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table
of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI
CTA6 Rule 28 and FI CTA6 IOP 206 for rules
regarding the citation of unpublished opinions.)
United States Court of Appeals, Sixth Circuit.

Anthony S. WEBB, Plaintiff–Appellant,
v.
Bobby BUNCH, Warren County Jailer; Mayor,
City of Bowling Green, Ky.; Warren County
Fiscal Court; Betty Bunch; Jessie Miller;
Peanut Gaines; Sgt. Alexander Maxwell; Terrill
Talley; Daniel Alexander; Rick Givens; Larry
Nunn and Joe Leonard, Defendant–Appellees.

No. 93–5258.
|
Feb. 8, 1994.

On Appeal from the United States District Court for the
Western District of Kentucky, No. 92–00120; Heyburn, J.

**Synopsis**
W.D.Ky.

REVERSED AND REMANDED.

**Procedural Posture(s):** On Appeal.

Before: MILBURN and BATCHELDER, Circuit Judges;
and COHN, District Judge. [*]

COHN, District Judge.

## I. Introduction

 **\*1** This is a 42 U.S.C. § 1983 case. Plaintiff-appellant
Anthony Webb (Webb) appeals the decision of the United
States District Court for the Western District of Kentucky
at Bowling Green in favor of defendant-appellees. Webb,
proceeding pro se, contends that defendant-appellees,

in their individual and official capacity, violated his
constitutional rights while he was incarcerated at the
Warren County Jail. The district court granted defendant-
appellees motion to dismiss the Mayor of Bowling
Green; the Warren County Fiscal Court; the City of
Bowling Green, and the County of Warren. The official
capacity claims were also dismissed. Summary judgment
was granted in favor of defendants-appellees on Webb's
claims of conspiracy, excessive force, denial of appropriate
medical care, revocation of mail and visitor privileges,
removal of property, and confinement in a solitary cell
with no water.

On appeal, Webb argues that the district court erred:
(1) by refusing to rule on his discovery request, and (2)
by finding that defendant-appellees did not use excessive
force in dealing with Webb. For the reasons which follow,
we REVERSE AND REMAND.

## II. Discovery

### A.

WEBB SAYS THAT THE DISTRICT COURT
ABUSED ITS DISCRETION BY FAILING
TO PERMIT HIM TO OBTAIN DISCOVERY
THEREBY IMPEDING HIS ABILITY TO
PREPARE A MOTION FOR SUMMARY
JUDGMENT AND FORCING HIM TO FILE A
MOTION IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT. [2]

The record reflects that Webb sent defendant-appellees a
request for production of documents on September 21,
1992. Webb then filed a motion styled "Motion to Hold
In Abeyance To Complete Discovery" asking the district
court to hold the action in abeyance until discovery was
completed. Webb told the court he would file a response
when he completed his discovery. On October 30, 1992,
defendant-appellees filed a motion to dismiss and for
summary judgment.

Webb responded with a motion to compel discovery and
a motion in opposition to defendant-appellees motion
for summary judgment. The motion to compel asked the
court to order the defendants to produce the documents
requested in Webb's earlier request and the motion also

constituted Webb's response to the motion for summary judgment since he denied the truth of the assertions in defendants' motion. He again indicated the defendants failure to produce documents thus preventing him from providing a full defense. Defendant-appellees filed a response to Webb's request for production of documents and objections to the request. Defendants stated that they would make the documents related to the operation of the Warren County Regional Jail available to Webb or his agent at their attorney's office. [3] Defendants objected to the remaining requests and refused to provide the requested information. On January 28, 1993 the district court granted defendant-appellees' motion to dismiss and for summary judgment. In addition, the district court denied Webb's motion to compel discovery as moot.

B.

**\*2**  Webb's ground for appeal should be considered an objection to the district court's entry of judgment for the defendant-appellees prior to the completion of discovery. An appellate court reviews a district court's ruling on a discovery matters using an abuse of discretion standard. *Theunissen v. Matthews,* 935 F.2d 1454 (6th Cir.1991). Abuse of discretion is defined as a firm and definite conviction that the trial court committed a clear error of judgment. *Logan v. Dayton Hudson Corp.,* 865 F.2d 789, 790 (6th Cir.1989).

The record does not contain a copy of the district court's scheduling order. Therefore, the Court does not know if discovery was formally closed. Based upon the record, it is clear that defendants engaged in discovery, taking numerous depositions at which plaintiff was not present. Webb's attempts at discovery were met with objections from the defendants and no ruling from the district court. Webb, in his response to the defendants' motion for summary judgment argued that he needed the documents to be able to show the Court the involvement of each individual. Yet, the district court found that Webb would be unable to refute the evidence presented by defendants and would be unable to produce sufficient information to withstand a motion for directed verdict.

Technically, Webb was required to file an affidavit requesting the district court stay consideration of the motion for summary judgment pursuant to Fed.R.Civ.P. 56(f). [4] *Shavrnoch v. Clark Oil and Refining Corp.,* 726 F.2d 291, 294 (6th Cir.1984). Webb's initial "Motion To Hold In Abeyance Until Discovery is Complete", was filed nearly one month prior to the defendant-appellees' motion for summary judgment. There was nothing for the district court to hold in abeyance at that time. The motion for summary judgment was filed October 30, 1992. However, Webb's response to the motion included a motion to compel. The inclusion of the motion to compel should have alerted the district judge that discovery was incomplete and that consideration of the summary judgment motion should have been delayed until the completion of discovery.

We find that the district court abused its discretion in granting defendant-appellees' motion for summary judgment and finding Webb's discovery motion moot particularly since no mention was made of it in the Court's memorandum.

III. Excessive Force

Webb next appeals the district court's finding that the defendant-appellees did not use excessive force against him on two separate occasions in October 1991.

A.

The explanation which follows comes from the briefs and the district court's memorandum and opinion.

1.

On October 1, 1991 Webb says that the water in his sink would not shut off and he summoned the jail guards for help by beating on the cell door. When the guards arrived, Webb says that one of the guards stated that he was going to handcuff Webb to the metal bench on the floor. Webb told the guards he was not going to be handcuffed to the floor and says that the guards entered the cell, grabbed him, kicked his feet out from under him and jumped on him. He says that the handcuffs were placed on his wrists so tight they made his wrists bleed. As a result of defendant-appellees' actions, Webb says he suffered a back injury.

**\*3** Defendant-appellees submitted depositions and affidavits (not part of the appendix) stating that Webb had plugged up his toilet with an article of clothing and continued to flush it until his jail cell flooded. When the jail guards came to his cell to mop up the water, Webb threatened to kill anyone who came in the cell. Defendant-appellees say that Webb had to be subdued and was restrained for a short period of time so that his cell could be cleaned.

On October 21, 1991 Webb stated that he was severely injured by the jail guards. The guards came to his cell to take him to court and Webb says that he refused to go to court because his shoes had been taken from him. He says the guards wrestled him to the floor, one guard rammed his knee into his shoulder and, as a result, he suffered severe injury.

Defendant-appellees admit that they wrestled Webb to the floor with a knee to the shoulder but that such force was necessary to subdue him in order to transport him to his court appearance. [5] Defendant-appellees presented deposition testimony (again not part of the appendix) that Webb resisted the guards and had to be physically carried into the courtroom.

### 2.

The district court held that Webb failed to produce any evidence to refute defendant-appellees' evidence that the force used was not excessive and that Webb would be unable to produce sufficient evidence at trial to withstand a motion for a directed verdict. The district court also stated that the amount of force used during both instances was insufficient to constitute a violation of Webb's Eighth Amendment right to be free of cruel and unusual punishment as there was nothing in the record that indicated that the force was applied maliciously or for the purpose of causing harm.

### B.

On appeal, Webb says that defendant-appellees admit they used force to subdue him and that use of force caused him serious physical injury in the nature of shoulder and back problems and scarring of his wrists. Whether the force used was excessive, Webb argues, is a question for a jury.

Defendant-appellees respond that Webb failed to provide any evidence that the force used by the jail officials was excessive and that the evidence they submitted shows that the use of force was not excessive. Defendant-appellees contend that Webb fictionalized the events for the purpose of harassing the appellees.

### C.

An appellate court reviews a grant of summary judgment de novo. *EEOC v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990). The party seeking summary judgment bears the initial burden of showing an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The nonmoving party must present "specific facts showing there is a genuine issue for trial." *Celotex,* 477 U.S. at 324. Something more than an allegation that a factual dispute exists must be presented to defeat a motion for summary judgment. *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir.1993). The pleadings of a pro se litigant are held to a less stringent standard than a formal pleading drafted by a lawyer. *Haines v. Kerner,* 404 U.S. 519 (1972). "The drafting of a formal pleading presupposes some degree of legal training or, at least, familiarity with applicable legal principles, and pro se litigants should not be precluded from resorting to the courts merely for want of sophistication." *Jourdan v. Jabe,* 951 F.2d 108, 110 (6th Cir.1991).

### 1.

**\*4** Pretrial detainees retain at least the same constitutional rights as enjoyed by convicted prisoners. *Bell v. Wolfish,* 441 U.S. 520, 545 (1979). Although the Eighth Amendment does not protect a pretrial detainee, "the Eighth Amendment rights of prisoners are analogized to those of detainees under the Fourteenth Amendment to avoid the anomaly of extending greater constitutional protection to a [person convicted of a crime] than to one awaiting trial." *Roberts v. City of Troy,* 773 F.2d 720, 723 (6th Cir.1985).

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. *Whitley v. Albers,* 475 U.S. 312, 319 (1986). When a prison official is accused of using excessive force in violation of the Eighth Amendment whether to dispel a riot or to maintain or restore discipline, the court must decide "whether the force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically to cause harm." *Hudson v. McMillan,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156, 166 (1992). Relevant to that determination is the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of the injury inflicted. [6] *Whitley,* 475 U.S. at 321. From these factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.*

2.

The district court found that the amount of force used by defendant-appellees to subdue Webb in order to clean his cell and in order to take him for a court appearance was permissible and did not constitute a violation of the Eighth Amendment. The district court also found that the force was not applied maliciously or for the purpose of causing harm, was not excessive; and as a matter of law found that Webb would be unable to produce sufficient evidence to refute the evidence presented by defendant-appellees.

Based upon the record before it, the Court has no way of knowing who is right. It is clear that Webb, on October 1, 1991, in some manner interfered with defendant-appellees attempt to clean his cell and that on October 21, 1991 Webb resisted defendant-appellees attempt to escort him to his court appearance. Defendant-appellees may have been required to use force in order to subdue him and to maintain order and discipline. While Webb has not come forward with any evidence other than his own assertions showing that the force used was malicious or was applied for the purpose of causing harm, or was excessive there is no way of knowing on the record before us what likely occurred. [7] Under the *Whitley* and *Hudson* doctrines, Webb's claims would appear to show that defendants

acted in bad faith. In contrast, defendants claim that Webb was injured as a result of his resistance to their reasonable attempts to subdue him. If defendant's version is true, Webb was not subjected to malicious or sadistic behavior. "The cause of [Webb's] injury impacts his Eighth Amendment claim, thereby preventing the issuance of summary judgment ..." *Moore,* 2 F.3d at 700. [8]

IV. Conclusion

**\*5**  This is a case where the appointment of counsel is necessary for a meaningful appellate review particularly given the course defendants followed and the district court and their highly argumentative approach to defending the district court's decision.

REVERSED AND REMANDED.

BATCHELDER, Circuit Judge, dissenting.
**\*5**  I see this case in a very different light, and I dissent from the majority's holding in this case because I believe the district court properly granted summary judgment for the defendants.

*A. Abuse of Discretion in Granting Summary Judgment While Discovery Motion Still Pending*

Without ever identifying what particular evidence Webb had the right to obtain through discovery, the majority holds that the district court erred in failing to rule on Webb's motion to compel discovery. In determining whether the district court abused its discretion in this case, it seems to me to be important to consider what remaining evidence there was to be discovered; if the evidence that the plaintiff was unable to discover, because of the district court's hasty grant of summary judgment, was irrelevant, how can it be an abuse of discretion to not rule on the motion to compel (irrelevant) discovery? The majority refers to this undiscovered evidence as simply the "documents requested in Webb's earlier request," and those documents consisted of the following (taken verbatim from Webb's request):

1. Name, address, phone number, of each and every defendant named in this action.

2. Copy of any/all documents, directives, regulations, rules, policy/procedure governing the orderly operation of the Warren Regional Jail.

3. Date and time of the adoption of any such documentation as mentioned in the above request.

4. Name, address, phone number of person having any such authority as to document/impelment these rules, directives, policy/procedures into the Warren Regional Jail.

5. Any document to which mentions Anthony S. Webb by name, that pertains to any rule infractions, force reports, or any document mentioning any mis-conduct by the plaintiff while incarcerated in the Warren Regional Jail.

6. Dates, time, name, address, phone number of any personal making any such above reports.

7. Name, address, phone number of all medical personal employed at the Warren Regional Jail.

8. Copy of any document which mentions Anthony S. Webb, by name that reflects any medical request, treatment while confined in the Warren Regional Jail.

9. Copy of any document which mentions Anthony S. Webb, by name, that reflects the date, time, and personal property of the plaintiff upon admittance/ entrance to the Warren Regional Jail.

10. Name, address, phone number of personal making any such documentation as mentioned in the above.

11. Copy of any document reflecting the name, address, of any person making visitation to the Warren Regional Jail for the purpose of visitting the plaintiff.

12. Copy of any document reflecting/mentioning Anthony S. Webb, by name, concerning any and all money mailed to/left on visits, and personal account.

**\*6** 13. Copy of any document which mentions any confiscation of money/property from Anthony S. Webb.

14. Copy of video tape of final sentence and judgment in Case No. 91–CR–0034 rended on October 21, 1991 in the Warren Circuit Court, by Judge Lewis.

Webb's Request for Production of Documents. As is clear from Webb's request, very little of what Webb wanted was relevant to the issue in the case, *i.e.,* whether excessive force was used to subdue Webb when he refused to comply with the jailers' requests, and the defendant's response to Webb's motion revealed this. Nevertheless, the defendants agreed to make available to Webb or his agent most of the documents requested. This was not an unreasonable approach to take in discovery, and the district court quite properly could have taken Webb's failure to arrange to get the documents he requested as an indicator that he no longer needed or wanted the documents. Furthermore, Webb concedes in his brief that he basically had all the evidence he wanted. *See* Webb's Brief at 4 ("The appellant decided that since he had most of the medical records in his file, that he would purse [sic] a civil action against the persons that were responsible for his injuries...."). And yet, the majority finds *reversible* error in the district court's failure to hold off on granting summary judgment until Webb got more evidence through discovery.

The majority does not contend that it is necessarily improper for a district court to rule on a motion for summary judgment before discovery is completed, and it is not. If the nonmoving party has been afforded sufficient time to develop facts essential to justify his opposition to the motion and a reasonable opportunity to respond to all issues to be considered by the court, the district court in its discretion may grant the motion notwithstanding the existence of discovery motions that have not been ruled upon. *See* 🚩 *Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir.1989);* 🚩 *American Nurses' Ass'n v. Illinois, 783 F.2d 716, 729 (7th Cir.1986).* Here, Webb was able to present fully his version of the facts (after all, he was an eyewitness to the events), and he has presented nothing that would indicate that there exists somewhere additional evidence that will come to light to help his case. In this circumstance, I do not believe that the district court abused its discretion in ruling on the defendants' motion for summary judgment before Webb had exhausted all potential discovery routes.

*B. Grant of Summary Judgment*

The majority next holds that summary judgment was inappropriate because "[b]ased on the record before it, [this] Court has no way of knowing who is right." The

majority admits that "Webb has not come forward with any evidence other than his own assertions showing that the force used was malicious or was applied for the purpose of causing harm or was excessive," but again says that "there is no way of knowing on the record before us what likely occurred."

**\*7** Metaphysically speaking, the majority is correct in saying that we have no way of knowing what really happened; we have a case of directly contradictory assertions and we cannot say with certainty that the defendants did not use excessive force. Summary judgment is not about certainty, however. The inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). Under the *Anderson* standard, the district court did not err in granting summary judgment. The evidence that contradicted Webb's characterization of the events was overwhelming: he admits that he flatly refused to comply with the orders given to him by those in authority over him, the deputies all testified that he physically and strenuously resisted their attempts to subdue him (and that this was

his regular practice), the deputies uniformly testified that the force used was only that reasonably necessary to get Webb under control, and another inmate supported the defendants' view saying that the officers "never once hit Mr. Webb or did they use excessive force." In these circumstances, the defendants' factual allegations were supported by documentation appropriate under Federal Rule of Civil Procedure 56, and the evidence was "so one-sided that [the defendants] must prevail as a matter of law." *Anderson,* 477 U.S. at 252. If the majority's view were law, any time there were contradictory factual assertions on material issues that case would have to go to trial. Fortunately, this is not the rule, for it would be a terrible waste of judicial resources to guarantee every prisoner a full trial on his bald assertions of mistreatment at the hands of the prison authorities. [1]

For the foregoing reasons, I would affirm the judgment of the district court.

**All Citations**

16 F.3d 1223 (Table), 1994 WL 36854

**Footnotes**

\*    Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

2    Defendant-appellees failed to respond to this ground of appeal and instead provided the Court with an unnecessary and irrelevant discussion regarding Webb's character and criminal history.

3    There is no explanation of how Webb could examine the documents in an attorney's office since he was in jail at the time.

4    Rule 56(f) provides:

    Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

5    The judge before whom Webb was to appear ordered him brought to the courtroom whether or not he wanted to come.

6    Serious injury need not be shown to establish an Eighth Amendment violation. *Hudson, supra.*

7    The dissent contends that Webb was able to fully present his version of the facts to the district court. However the district court's failure to deal with Webb's discovery motion effectively prevented Webb from fully developing and presenting the facts to the district court. Further, the dissent seems to believe that the majority is unwilling to consider the defendants' depositions because Webb was not present during the proceedings. To the contrary, the majority has considered the depositions as well as the affidavits offered by defendants and it finds that they conflict with Webb's version of the facts and his affidavits and that Webb was not given sufficient opportunity to support his positions.

8    In *Moore,* plaintiff provided only his own sworn affidavit contradicting defendants version of the facts.

1    I also do not understand why counsel should be appointed for Webb for any reason, much less the reasons given. It does not follow from the defendants' "highly argumentative approach" that Webb is entitled to counsel for this meritless section 1983 action. If the defendants can be accused of being "highly argumentative" and "provid[ing] the Court with

an unnecessary and irrelevant discussion regarding Webb's character and criminal history," it is simply because they are tired of wasting state funds on this meritless case.

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.