**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

**DEFENDANT-INTERVENORS' BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

I.      STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT .................. 1

II.     INTRODUCTION ......................................................................................... 1

III.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS................ 4

        A.      History of Deferred Action in the Immigration Context ........................ 4

        B.      Deferred Action for Childhood Arrivals ("DACA") ............................ 5

        C.      Developments Since the DACA Memorandum....................................... 7

IV.     SUMMARY OF THE ARGUMENT ............................................................... 11

V.      ARGUMENT ............................................................................................ 12

        A.      Plaintiffs' Motion For Summary Judgment Is Premature..................... 12

        B.      Disputed Questions Prevent a Finding that Plaintiffs Have Standing to Sue ....... 14

                1.      *This Record Does Not Support Summary Judgment That DACA Caused an Injury-In-Fact Sufficient to Confer Article III Standing on Plaintiffs* ...... 14

                2.      *Plaintiffs Are Not Entitled to Summary Judgment on the Question Whether Their Injuries Are Redressable, as Required for Article III Standing* ...... 19

                3.      *Plaintiffs Cannot Assert* Parens Patriae *Standing Against the United States, and Even if They Could, They Offer No Evidence that DACA Has Harmed a Substantial Portion of Texans* .............................................................. 21

                4.      *Plaintiffs Are Not Owed "Special Solicitude" and Their Novel Theory of "Abdication Standing" Should Not Be Endorsed* ..................................... 28

        C.      This Action Does Not Present a Case or Controversy .......................... 30

        D.      DACA Is An Exercise of Enforcement Discretion that Is Unreviewable Under the APA............................................................................................... 32

        E.      Plaintiffs' Substantive APA Claims Are Without Merit........................ 38

        F.      A Ruling on Plaintiffs' Take Care Clause Claims Should Be Deferred Until After A Merits Hearing ........................................................................... 39

        G.      Principles of Equity Require that the Court Abstain from Injunctive Relief........ 40

                1.      *Nationwide Injunctions Should Be Disfavored Generally, and in this Case in Particular* .......................................................................... 40

                2.      *The Balance of the Equities Tips Strongly Away from Plaintiffs* .............. 41

VI.     CONCLUSION ........................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Telecom, Inc. v. MCI Telcomm. Corp.*,
 197 F.3d 694 (5th Cir. 1999) ............................................................2, 12

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
 458 U.S. 592 (1982)..................................................................................21, 23

*All Access Today, L.P. v. Aderra Inc.*,
 No. A-08-CA-498 LY, 2009 WL 10669445 (W.D. Tex. July 7, 2009) ..................................42

*Arizona v. United States*,
 567 U.S. 387 (2012)..................................................................................4, 22, 32

*Ass'n of Flight Attendants-CWA v. Huerta*,
 785 F.3d 710 (D.C. Cir. 2015) ............................................................36

*Baker v. Carr*,
 369 U.S. 186 (1962)..................................................................................32

*Batalla Vidal v. Nielsen*,
 279 F. Supp. 3d 401 (E.D.N.Y. 2018) ................................................8

*Bennett v. Spear*,
 520 U.S. 154 (1997)..................................................................................31

*Boudreaux v. Swift Transp. Co.*,
 402 F.3d 536 (5th Cir. 2005) ............................................................36

*Casa de Maryland v. U.S. Dep't of Homeland Sec.*,
 No. 18-1521, 2019 WL 2147204 (4th Cir. May 17, 2019)...........................9, 20, 37

*Chrysler Corp. v. Brown*,
 441 U.S. 281 (1979)..................................................................................34

*CQ, Inc. v. TXU Mining Co., L.P.*,
 565 F.3d 268 (5th Cir. 2009) ............................................................25

*Del. Dep't of Nat'l Res. & Envt'l Control v. FERC*,
 558 F.3d 575 (D.C. Cir. 2009)............................................................29

*Dine Citizens Against Ruining Our Environment v. Bernhardt*,
 923 F.3d 831 (10th Cir. 2019) ............................................................40

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ............................................................................................41

*Feller v. Brock*,
    802 F.2d 722 (4th Cir. 1986) ............................................................................20

*Georgia v. Pennsylvania R. Co.*,
    324 U.S. 439 (1945) ..........................................................................................23

*Georgia v. Tennessee Copper Co.*,
    206 U.S. 230 (1907) ..........................................................................................23

*Gov't of Manitoba v. Bernhardt*,
    923 F.3d 173 (D.C. Cir. 2019) ....................................................................21, 22

*Hardware Mut. Cas. Co. v. Schantz*,
    178 F.2d 779 (5th Cir. 1949) ............................................................................20

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ..........................................................................................32

*I.N.S. v. Chadha*,
    462 U.S. 919 (1983) ..........................................................................................31

*K.P. v. LeBlanc*,
    627 F.3d 115 (5th Cir. 2010) ............................................................................19

*Kennedy v. Silas Mason Co.*,
    334 U.S. 249 (1948) .......................................................................................2, 13

*Kirkland v. N.Y. State Dep't of Corr. Servs.*,
    No. 82 CIV. 0295, 1988 WL 108485 (S.D.N.Y. Oct. 12, 1988) ......................31

*Lawson v. Callahan*,
    111 F.3d 403 (5th Cir. 1997) ............................................................................20

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................19, 21

*Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*,
    140 F.3d 622 (5th Cir. 1998) ..............................................................................4

*Maryland People's Counsel v. F.E.R.C.*,
    760 F.2d 318 (D.C. Cir. 1985) ........................................................................21

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ..............................................................................21, 22, 28

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923)..................................................................................21, 22

*Michigan v. E.P.A.*,
  581 F.3d 524 (7th Cir. 2009) ................................................................................21

*Missouri v. Illinois*,
  180 U.S. 208 (1901)................................................................................................22

*Moore v. Charlotte-Mecklenburg Bd. of Ed.*,
  402 U.S. 47 (1971)..................................................................................................30

*Murphy v. NCAA*,
  138 S. Ct. 1461 (2018)............................................................................................29

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C. 2018) ..............................................8, 20, 37, 38

*NAACP v. Trump*,
  315 F. Supp. 3d 457 (D.D.C. 2018) ...........................................................8, 20

*Okpalobi v. Foster*,
  244 F.3d 405 (5th Cir. 2001) ...........................................................................20

*Parm v. Shumate*,
  Civil Action No. 3-01-2624, 2006 WL 1228846 (W.D. La. May 1, 2006) ...........................26

*Pennsylvania v. West Virginia*,
  262 U.S. 553 (1923)...............................................................................................23

*Prof'ls & Patients for Customized Care v. Shalala*,
  56 F.3d 592 (5th Cir. 1995) ................................................................................36

*Ranger Ins. Co. v. Culberson*,
  454 F.2d 857 (5th Cir. 1971) ..............................................................................27

*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*,
  279 F. Supp. 3d 1011 (N.D. Cal. 2018) ..................................................4, 8, 28

*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*,
  908 F.3d 476 (9th Cir. 2018) ...................................................................... *passim*

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999)..........................................................................................4, 38

*Smith v. Palafox*,
  728 F. App'x 270 (5th Cir. 2018) .....................................................................26

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ..................................................................................14, 15

*Symetra Life Ins. Co. v. Rapid Settlements Ltd.*,
    612 F. Supp. 2d 759 (S.D. Tex. 2007) ...............................................................42

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ........................................................7, 16, 36

*Texas v. United States*,
    328 F. Supp. 3d. 662 (S.D. Tex. 2018) ...........................................................2, 11

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ................................................................. *passim*

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ................................................................22, 32, 34

*United Pub. Workers of Am. (C.I.O.) v. Mitchell*,
    330 U.S. 75 (1947) ...................................................................................30

*United States v. Texas*,
    136 S. Ct. 2271 (2016) .............................................................................7

*United States v. Windsor*,
    570 U.S. 744 (2013) .........................................................................31, 32

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*,
    751 F.2d 721 (5th Cir. 1985) ....................................................................20

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...............................................................................31

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 ............................................................................................41

*Wells v. SmithKline Beecham Corp.*,
    601 F.3d 375 (5th Cir. 2010) ....................................................................25

**Statutes**

5 U.S.C. § 701(a)(2) ............................................................................................32

6 U.S.C. § 202(5) ..................................................................................................4

8 U.S.C. § 1103(a)(1) ...........................................................................................4

8 U.S.C. § 1154(a)(1)(K) .......................................................................................5

8 U.S.C. § 1227(d)(2) ............................................................................................4

8 U.S.C. § 1324a(a)(1) .........................................................................................16

8 U.S.C. § 1324a(h)(3) .........................................................................................38

8 U.S.C. § 1611(b)(2)-(3) .....................................................................................38

28 U.S.C. § 1292(a)(1) .........................................................................................10

28 U.S.C. § 1292(b) .............................................................................................10

**Rules**

Fed. R. Civ. P. 56(a) ..............................................................................................3

Fed. R. Civ. P. 56(c) .............................................................................................25

Fed. R. Civ. P. 56(d) ..................................................................................1, 10, 12

Fed. R. Civ. P. 602 ...............................................................................................26

Fed. R. Evid. 602 .................................................................................................25

**Other Authorities**

8 C.F.R. § 274a.1(f), (h), (j) .................................................................................16

8 C.F.R. § 274a.12(c) ...........................................................................................38

8 C.F.R. § 274a.12(c)(14) ...............................................................................5, 39

46 Fed. Reg. 25,080 (May 5, 1981) ...............................................................6, 33

52 Fed. Reg. 16,228 (May 1, 1987) ...............................................................6, 33

61 Fed. Reg. 47,039 (Sept. 6, 1996) ..............................................................6, 33

76 Fed. Reg. 53,764 (Aug. 29, 2011).............................................................6, 33

80 Fed. Reg. 7912 (Feb. 12, 2015) ...........................................................6, 7, 33

Appellants' Opening Brief at 49-56, *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (No. 18-15068, Dkt. 31), 2018 WL 1020397.................................................................................14, 15, 18, 19

Application for a Stay at 24-25, *Trump v. Stockman*, No. 18-678 ...............................................................................................................40

*Dep't of Homeland Sec. v. Casa de Maryland*
(May 24, 2019), *mot. to expedite consideration of cert. pet. denied*, No. 18-
1469, 2019 U.S. LEXIS 3892 (U.S. June 3, 2019) ..................................................3

10B Fed. Prac. & Proc. Civ. § 2732 (4th ed., Wright & Miller et al., eds., 2019) .......................13

10B Fed. Prac. & Proc. Civ. § 2751 (4th ed., Wright & Miller et al., eds., 2019) .......................21

H.R. 6, 116th Cong. (2019) ...........................................................................................6

Petition for Writ of Certiorari, *Nielsen v. Batalla Vidal* (Nov. 5, 2018)
(Nov. 5, 2018) ............................................................................................ *passim*

Petition for Writ of Certiorari, *Trump v. NAACP*
(Nov. 5, 2018) ......................................................................................3, 13, 34

U.S. Dep't of Justice, Litigation Guidelines for Cases Presenting the Possibility of
Nationwide Injunctions (September 23, 2018) ...........................................40

Petition for Writ of Certiorari, *U.S. Dep't of Homeland Sec. v. Regents of the
Univ. of California*
(Nov. 5, 2018) ......................................................................................3, 13, 28

## I.      STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Defendant-Intervenors Karla Perez, *et al.*, ("Defendant-Intervenors") respectfully request that the Court either deny outright Plaintiffs' Motion for Summary Judgment ("MSJ"), Dkt. 356, or delay ruling on the motion until Defendant-Intervenors have had an opportunity to file a supplemental brief in response twenty-one days after the close of discovery, as established in the Court's Scheduling Order, *see* Dkt. 337 (Nov. 14, 2018 minute entry); Dkt. 367; *see also* Fed. R. Civ. P. 56(d).

## II.     INTRODUCTION

Plaintiffs' motion for summary judgment should be denied, because it is in substance nothing more than a request for reconsideration, on the same record, of the Court's previous denial of summary judgment at the time of preliminary injunction briefing.  Plaintiffs' motion merely recycles the same arguments from Plaintiffs' earlier briefing, without presenting or attaching *any* new evidence.

Defendant-Intervenors cannot provide a full response to Plaintiffs' motion at this time because Plaintiffs and Federal Defendants have repeatedly frustrated Defendant-Intervenors' vigorous efforts to pursue discovery as contemplated by the Court's Scheduling Order.  *See, e.g.*, Dkts. 383 & 386.  As a consequence, evidence related to the key factual questions in dispute at the preliminary injunction stage is still being developed through discovery.   In addition, Defendant-Intervenors' expert reports and disclosures are not due for another month, until July 19, pursuant to the Court's Scheduling Order.  *See* 11-14-18 Minute Entry; Dkt. 367.  Full development of expert testimony is critical in this case, in particular because Plaintiffs, unable to prove through their own witnesses that they suffer any injuries as a result of DACA, mischaracterize testimony from Defendant-Intervenors' experts in their premature motion for summary judgment.  *See, e.g.*, Dkt. 357 at 35-38.

Plaintiffs' premature MSJ, based *entirely* on the truncated preliminary injunction record, runs counter to this Court's determination that final resolution of the merits and assessment of any appropriate relief should await a fully developed record.  As the Court recognized in declining to grant a preliminary injunction, resolving these issues "with only a preliminary injunction record, and perhaps at great risk to many, does not make sense or serve the best interests of this country."  *Texas v. U.S.*, 328 F. Supp. 3d. 662, 742 (S.D. Tex. 2018).  Had Plaintiffs wished to challenge that determination, and seek review on the basis of the preliminary injunction record alone, the Court gave them every opportunity to do so, including by certifying the case for interlocutory appeal, *see* Dkt. 320, but Plaintiffs declined that offer.  This Court then established a process by which the parties could build a full record to assist this Court and any reviewing courts in considering all arguments, *see* Dkt. 337 (Nov. 14, 2018 minute entry allowing Defendant-Intervenors to seek discovery until August 21, 2019).  Plaintiffs' motion for summary judgment asks the Court to grant precisely the kind of premature ruling against which the Court cautioned, because today's record is the same as the preliminary injunction record.  As of mid-June 2019, Defendant-Intervenors have only just begun to receive partial responses to their *initial* discovery requests, and Plaintiffs' and Federal Defendants' lack of cooperation has caused delays that will now almost certainly require court intervention.  *See* Dkts. 383 & 386.  In addition, Defendant-Intervenors are still preparing their own expert analyses, which are not required until mid-July.

Motions for summary judgment are disfavored where material discovery is ongoing.  *See, e.g.*, *Access Telecom, Inc. v. MCI Telcomm. Corp.*, 197 F.3d 694, 720 (5th Cir. 1999).  Furthermore, the Supreme Court has long recognized that cases of great public importance in particular should not be decided on anything less than a complete record.  *See, e.g.*, *Kennedy v.*

*Silas Mason Co.*, 334 U.S. 249, 256-57 (1948).  Notably, the Supreme Court has not accepted any of the federal governments' petitions for writs of certiorari seeking that Court's resolution of questions concerning DACA's legality on incomplete records.  *See* Ex. 47, Petition for Writ of Certiorari, *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of California* (Nov. 5, 2018); Ex. 46, Petition for Writ of Certiorari*, Nielsen v. Batalla Vidal* (Nov. 5, 2018); Ex. 48, Petition for Writ of Certiorari*, Trump v. NAACP* (Nov. 5, 2018); Ex. 54, Petition for Writ of Certiorari, *Dep't of Homeland Sec. v. Casa de Maryland* (May 24, 2019), *mot. to expedite consideration*, No. 18-1469, 2019 U.S. LEXIS 3892 (U.S. June 3, 2019).  The instant case stands out from these other cases, because it presents the most advanced opportunity to develop a full record regarding the question of DACA's legality and what, if any, interest Plaintiffs have in contesting that enforcement policy.  This Court should not truncate the discovery process and should not grant summary judgment now.

If the Court were inclined to resolve Plaintiffs' motion at this time, that motion would have to be denied due to the many factual disputes that require resolution by a factfinder.  For example, the question whether DACA has caused Plaintiffs any direct injuries sufficient to establish standing remains hotly contested, and is the subject of ongoing discovery.  Plaintiffs have offered *no* evidence during discovery connecting Texas expenditures to any DACA recipients, nor have Plaintiffs offered any evidence to support their theory that DACA recipients would "self-deport" if DACA were to end, as Plaintiffs must show in order to establish that the Court can grant relief that addresses their purported injury.  Dkt. 357 at 27-28.  Similarly, there are disputes throughout the record, including competing expert testimony, regarding Plaintiffs' legally flawed and factually unsupported theory of harm based on "labor market distortions."  Dkt. 357 at 32.  Material questions of fact relevant to the merits of Plaintiffs' claims under the

Administrative Procedure Act ("APA") are similarly the subject of ongoing discovery disputes. *See* Dkt. 386.  These "genuine dispute[s] as to [] material fact[s]" preclude a grant of summary judgment.  Fed. R. Civ. P. 56(a); *see also Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998).

## III.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

### A.   History of Deferred Action in the Immigration Context

Congress has charged the Secretary of Homeland Security with the administration and enforcement of immigration laws.  8 U.S.C. § 1103(a)(1).  Recognizing that these laws vest the Executive Branch with broad enforcement discretion, Congress has also directed the Secretary to establish "national immigration enforcement policies and priorities."  6 U.S.C. § 202(5). Congress appropriates only enough funds to remove or return approximately 450,000 immigrants each year, even though approximately 12 million immigrants are potentially subject to removal. *Cf.* Ex. 62A.  As a result, the Executive must necessarily exercise prosecutorial discretion in the immigration context, including through "deferred action" with respect to removal of certain non-U.S. citizens.

The Supreme Court has recognized that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. U.S.,* 567 U.S. 387, 396 (2012). More specifically, "deferred action," the Court has noted, is a "regular practice . . . of exercising that discretion."  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999). Congress has even codified the existence of deferred action.  *See* 8 U.S.C. § 1227(d)(2) (distinguishing "deferred action" from an "administrative stay of removal").  For decades, the Executive Branch has implemented deferred action and other forms of prosecutorial discretion both for individual non-U.S. citizens and for various classes of non-U.S. citizens. *See Regents of*

*the Univ. of California v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1019-22 (N.D. Cal. 2018) (describing programs since 1975).

To advance its enforcement priorities, the Department of Homeland Security ("DHS") has frequently granted discretionary relief from removal to undocumented immigrants through deferred action, "an act of administrative convenience to the government which gives some cases lower priority."  *See* 8 C.F.R. § 274a.12(c)(14); *see generally* Dkt. 224 at 13-14; 8 U.S.C. § 1154(a)(1)(K); *id.* § 1184(p)(6); *id.* § 1255(a)).

### B.    Deferred Action for Childhood Arrivals ("DACA")

In 2012, the Secretary of Homeland Security issued a memorandum providing guidelines for the exercise of discretion to grant deferred action to non-U.S. citizens brought to the United States as children who meet certain criteria, including having continuously resided in the United States since June 15, 2007 (the "DACA Memorandum").   Dkt. 6 at 3-5.  The DACA Memorandum provided guidance to all three branches of DHS—Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and United States Citizenship and Immigration Services ("USCIS")—in exercising their enforcement discretion.   Because DACA only applies to immigrants who arrived as children before mid-2007, the number of individuals who may be affected is fixed (and diminishing).  Currently, there are 669,080 DACA recipients.  *See* Ex. 62H.

As with the many forms of discretionary relief that preceded it, deferred action under DACA is an exercise in prosecutorial discretion, granted in an individualized, temporary, and contingent manner.  *See* Ex. 62I at 8, 18; Ex. 62J;  Ex. 62C.  DACA is "not a benefit and does not confer any status," nor does it "lead to any status;" it "simply means that action to remove someone is deferred until a certain date and that the decision to pursue removal may be revisited at some point in the future."  Dkt. 226-2 at 12.  By its own terms, the DACA Memorandum does

not "confer[] . . . [a] pathway to citizenship." Ex. 36.  Like other recipients of deferred action such as individuals under orders of supervision or witnesses in criminal investigations, some DACA recipients may never be able to legalize their status.  As such, DACA differs fundamentally from the proposed Development, Relief, and Education for Alien Minors Act, which would provide a *permanent* path to *legal citizenship* for recipients.  *See, e.g.*, Ex.43.

Though DACA recipients may be eligible for work authorization or other benefits, that is a consequence not of the DACA Memorandum itself, but of independent rules promulgated through formal rulemaking procedures long before the DACA Memorandum.  *See* Exs. 49-53.  Plaintiffs do not challenge any of those substantive regulations as being beyond DHS's authority or having been adopted without appropriate procedures.

Although Plaintiffs cite "advance parole" as evidence that DACA was beyond DHS's authority, *see* Dkt. 357 at 21-22, advance parole does not provide immigration status to DACA recipients.  Advance parole is a document issued by USCIS "for urgent humanitarian reasons or significant public benefit to a foreign national inside the United States who is preparing to travel abroad and is planning to return."  Exs. 2, 18, 19, 62I.  The advance parole document is not "a grant of parole," and CBP officers make "a separate discretionary decision regarding the parole request upon the foreign national's arrival at the point of entry."  Ex. 2, 19, 62K.  Thus, DACA grantees who have received an advance parole document do not receive additional immigration status and may still be denied entry at the border.[1]

---

[1] Advance parole is a regular component of immigration enforcement and has not been purposefully created or amended to open a path to immigration status for DACA recipients. Between 2013 and 2015, USCIS issued advance parole documents to 2.85% of all DACA recipients, and only 0.69% of all DACA grantees applied to adjust their status after receiving advance parole. Ex. 19 at 6-8.  The number of DACA recipients who became eligible to adjust their status after (and because) they received advance parole under DACA is a factual dispute that requires further development through the regular discovery process.  *See* Dkt. 386 at 14-15.

### C.    Developments Since the DACA Memorandum

In 2014, over two years after announcing DACA, DHS announced a distinct policy regarding DHS's exercise of enforcement discretion, referred to as Deferred Action for Parents of Americans ("DAPA").  *See generally* Ex. 18.  DAPA guided the exercise of discretion, specifically grants of deferred action, with respect to a potential group of up to 4 million parents of U.S. citizens and lawful residents.  *See id.*  Starting on December 3, 2014, a number of states—including certain Plaintiffs in the instant action—brought suit to challenge the legality of DAPA.  The Court of Appeals for the Fifth Circuit ultimately affirmed a ruling by this Court that the Secretary of Homeland Security's adoption of DAPA exceeded her authority.  *Texas v. U.S.*, 809 F.3d 134 (5th Cir. 2015) ("Texas DAPA").  The Supreme Court granted review, but an evenly divided Court was unable to rule on the merits of the government's appeal.  *U.S. v. Texas*, 136 S. Ct. 2271 (2016).

Significantly, in the DAPA litigation, Plaintiffs and the other states *did not* contest the legality of DACA.  *See Texas v. U.S.*, 86 F. Supp. 3d 591, 606 (S.D. Tex. 2015) (noting that the DACA Memorandum is "not before the Court and will not be addressed by this opinion.").  Indeed, in ruling against DAPA, the Fifth Circuit was careful to note that "DACA and DAPA are not identical," in part because the population covered by DACA is far smaller and less likely to have backgrounds that might warrant discretionary denial of deferred action.  *Texas DAPA*, 809 F.3d at 174.

On September 4, 2017, Attorney General Jeff Sessions sent a letter to the Secretary of DHS summarizing his view that DACA was unlawful, Dkt. 52-2, and the next day the DHS Secretary ordered the wind down of DACA, Dkt. 52-3.  Shortly after DHS announced its intention to wind-down DACA, numerous plaintiffs, including individuals whose removal

proceedings had been deferred pursuant to DACA, challenged the determinations of the Attorney General and DHS Secretary in several courts around the country.

On January 9, 2018, the U.S. District Court for the Northern District of California issued a preliminary injunction against DHS and its Secretary, ordering them to "maintain DACA on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments," subject to certain exceptions. *Regents*, 279 F. Supp. 3d at 1048, *aff'd*, 908 F.3d 476 (9th Cir. 2018); *see also Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018) (similar injunction on Feb. 13, 2018).  On April 24, 2018, the U.S. District Court for the District of Columbia issued a preliminary injunction that vacated DHS's September 5 memorandum rescinding DACA, which then required the Department to accept new applications for deferred action under DACA. *See NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018).  On June 22, 2018, in response to the District of Columbia order, DHS issued a memorandum purporting to clarify its decision to wind down DACA, and reiterating that the rescission was not done as a matter of policy choice, but based on the premise that the "the DACA policy was contrary to law."  Ex. 23 at 2.  The district court then reaffirmed its order, rejecting as "inadequate" Federal Defendants' arguments for DACA's unlawfulness. *NAACP v. Trump*, 315 F. Supp. 3d 457, 471-72 (D.D.C. 2018), *order partially stayed pending appeal*, *NAACP v. Trump*, 321 F. Supp. 3d 143 (D.D.C. 2018) (staying previous order as to new DACA applicants and advance parole, but not DACA renewals).  Although one district court initially found DHS's rescission lawful, that decision has since been overruled by the Court of Appeals for the Fourth Circuit.  *See Casa de Maryland v. U.S. Dep't of Homeland Sec.*, No. 18-1521, 2019 WL 2147204, at *15 (4th Cir. May 17, 2019).  The federal

- 8 -

courts in which the issue has been presented now uniformly hold that DHS's rescission of DACA was unlawful.

On May 1, 2018—nearly six years after the DACA Memorandum was originally issued, almost eight months after DHS's memorandum directing the wind-down of DACA, and only after numerous judicial orders compelled DHS to maintain DACA in place—Plaintiffs filed the instant action, challenging for the first time the lawfulness of the 2012 DACA Memorandum. On May 2, 2018, Plaintiffs filed a motion for a preliminary injunction ("PI").  *See* Dkt. 5. This Court then ordered the parties to conduct limited expedited discovery related to the Plaintiffs' motion. *See* Dkt. 53.

The Court ultimately denied Plaintiffs' motion for a preliminary injunction, *see* Dkt. 319 at 117, in part because Plaintiffs could not prove "the legal element" of irreparable harm due to their nearly-six-year delay in challenging DACA, Dkt. 319 at 111-12.  The Court reasoned that a "delay in seeking an injunction has been viewed as a concession or an indication that the alleged harm does not rise to a level that merits an injunction." Dkt. 319 at 109.  The Court noted that to halt DACA on the current record "does not make sense nor serve the best interests of this country."   Dkt. 319 at 115.   Additionally, although Plaintiffs argued in their preliminary injunction briefing that summary judgment was appropriate, *see* Dkt. 218 at 55-56, the Court rejected that contention,  *see* Dkt. 302 at 6 ("I know there is a pleading by the states that said, why don't you just go ahead and grant a summary judgment?  I am not doing that.").

Plaintiffs had, but passed up, an opportunity to seek immediate appeal.  *See* 28 U.S.C. § 1292(a)(1).  In addition, the Court certified its order pursuant to 28 U.S.C. § 1292(b), so as to permit Plaintiffs the option to seek immediate appellate review of the legal questions presented. Plaintiffs chose not to appeal notwithstanding the Court's invitation.   Therefore, this Court

ordered a full case management and discovery schedule through August of 2019. *See* Dkt. 337 (Nov. 14, 2018 minute entry).[2]

Despite the Court's entry of a scheduling order, Plaintiffs have provided no interrogatory responses or documents to Defendant-Intervenors since June 29, 2018, well before this Court's denial of Plaintiffs' motion for a preliminary injunction and adoption of a traditional case management schedule.   *See* Dkt. 383 at 6 (citing Dkt. 383-19 at 4).   Notwithstanding the Defendant-Intervenors' pending discovery requests, on February 4, 2019, Plaintiffs filed a motion for summary judgment.  *See* Dkt. 356.  Shortly thereafter, Defendant-Intervenors filed a 56(d) motion to defer or deny summary judgment on the ground that the full discovery period ordered by this Court is necessary to illuminate genuine questions of material fact, *see* Dkt. 374 at 2-3, as well as motions to compel discovery, *see* Dkt. 383; Dkt. 386.  Defendant-Intervenors have *still* not received new discovery from Plaintiffs since filing the Rule 56(d) motion.

Pursuant to this Court's Scheduling Order, Defendant-Intervenors' expert reports are not due for another month, on July 19, 2019.   *See* 11-14-18 Minute Entry (setting 6/30/19 as Defendant-Intervenors' expert report deadline); Dkt. 367 (postponing all deadlines by a period of 19 days).   Defendant-Intervenors intend to submit a number of supplemental expert reports, including from experts on which Plaintiffs rely in their motion for summary judgment.  *See, e.g.*, Dkt. 357 at 35-38.   Defendant-Intervenors also intend to designate new experts on matters relevant to standing and the merits of Plaintiffs' claims, including but not limited to whether any of Plaintiffs' claimed costs are offset by revenue generated by DACA recipients. *See Texas*, 328 F. Supp. 3d at 736–37 (finding that whether "costs are more than offset by the economic

---

[2] The Court subsequently extended the discovery deadline to September 9, 2019, after Federal Defendants further delayed discovery because of the lapse in congressional appropriations.  *See* Dkt. 367.

- 10 -

advantages that Texas derives from the DACA recipients[ is] a position on which [Defendant-Intervenors] may ultimately be proven correct when this case is tried on the merits").

IV.   **SUMMARY OF THE ARGUMENT**

Defendant-Intervenors respectfully request that the Court deny Plaintiffs' premature motion for summary judgment.  This Court set a schedule allowing Defendant-Intervenors to conduct discovery until September 19, 2019, and, in light of the fact that Plaintiffs have provided no discovery for close to a year, the Court should require Plaintiffs to participate in discovery pursuant to the governing schedule.  Plaintiffs' premature motion for summary judgment represents an effort by Plaintiffs to subvert the discovery process and rush the Court into entering final judgment, which Plaintiffs already unsuccessfully sought, on the nearly identical factual record as currently exists.

Summary judgment is also inappropriate at this time because genuine disputes of material fact remain.  There are genuine disputes of material fact going to Plaintiffs' standing to bring this action, including whether they have suffered any concrete injury, and whether the remedy Plaintiffs seek would redress any such alleged injury.  Even if Plaintiffs have standing, critical factual disputes remain regarding whether DACA is a substantive rule or merely an unreviewable policy guidance concerning the exercise of enforcement discretion.  And even if DACA were reviewable, there are numerous disputed facts related to whether DACA is consistent with the Immigration and Nationality Act ("INA") and unambiguously expressed intent of Congress to provide the Executive with broad latitude in the immigration context.

On each of these issues—standing, reviewability, and procedural and substantive lawfulness—open questions remain, and further discovery would better inform the Court's eventual merits ruling and any subsequent review of that ruling.  Defendant-Intervenors respectfully request that this Court deny Plaintiffs' premature motion for summary judgment or

delay ruling until after the close of discovery and supplemental briefing according to the existing scheduling order.

## V.     ARGUMENT

### A.     Plaintiffs' Motion For Summary Judgment Is Premature

Since the Court entered its Scheduling Order, Defendant-Intervenors have been vigorously pursuing responses to their discovery requests.  *See, e.g.*, Dkt. 383 (Mot. to Compel Disc. from Tex.); Dkt. 386 (Mot. to Compel Disc. from Fed. Defs.).  Federal Defendants' and Plaintiff States' lack of cooperation has significantly delayed Defendant-Intervenors' efforts. *See id.*  Indeed, Defendant-Intervenors have not received a single document or answer from Plaintiffs since June 2018, and just recently received (less than two months ago) incomplete supplemental responses to their initial discovery requests from Federal Defendants.  Since filing their premature MSJ, Plaintiffs have unilaterally and improperly halted the discovery process. *See* Dkt. 383-10 at 2 ("The parties can discuss whether supplementing discovery responses is needed should the Court rule that additional discovery is required on Plaintiff States' standing."). As such, the discovery process is only in its infancy, and many discovery requests remain outstanding.  This Court should not, as noted in Defendant-Intervenors' Rule 56(d) motion, allow Plaintiffs to deny Defendant-Intervenors a "full and fair opportunity to discover information essential to [their] opposition to summary judgment," Dkt. 363 at 3 (quoting *Access Telecom, Inc. v. MCI Telcomm. Corp.*, 197 F.3d 694, 720 (5th Cir. 1999)), or award Plaintiffs final judgment on a record that the Court itself characterized as preliminary and presenting open questions.  *See id.* at 4.

That is particularly so given the national importance of this matter.  The Supreme Court has recognized that cases of great public importance, particularly those involving constitutional issues, should not be decided on anything less than a complete record.  "While [the Court] might

be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide." *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256-57 (1948); Ex. 24, 10B Fed. Prac. & Proc. Civ. § 2732 (4th ed., Wright & Miller et al., eds., 2019) (cases of public importance need a fully-developed record).

As this Court has observed, "there are four decisions concerning the DACA phase out," and each "worked with records different from . . . the record now before this Court." Dkt. 319 at 17-18 (Ct.'s PI Opinion).  However, no DACA case has a fully developed record, including this one.  *See, e.g.*, *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 493 (9th Cir. 2018) ("[T]he administrative record in this case still consists of a scant 256 publicly available pages, roughly three-quarters of which are taken up by the three published judicial opinions from the *Texas* litigation.").  Notably, the Supreme Court did not accept any of the federal government's petitions for writs of certiorari seeking resolution regarding DACA's legality in those actions where the record was incomplete.  *See* Exs. 46-48, 54.

This history suggests that the Supreme Court is awaiting a case that presents a more fully developed record, which would allow the Court to finally resolve the many aspects of the case. The United States, for example, has sought in the DACA rescission cases to litigate the question of the propriety of nationwide injunctions.  *See*, *e.g.*, Ex. 42, Appellants' Opening Brief at 49-56, *Regents*, 908 F.3d 476 (No. 18-15068, Dkt. 31), 2018 WL 1020397.  Yet Plaintiffs' refusal to provide discovery for any Plaintiff other than Texas, *see* Dkt. 383 at 15 (Mot. to Compel Disc. from Tex.), and refusal to provide complete discovery responses even for Texas, *see id.* at 5-6, would frustrate the Supreme Court's ability to address that issue, should this case ever go before that Court.  The same is true of the merits issues that divide the parties.  While Plaintiffs

maintain that the extent of case-specific discretion exercised by individual DACA adjudicators is irrelevant, Defendant-Intervenors maintain that DACA adjudicators exercise considerable individualized discretion, and that this fact is central to DACA's legality.  Even if the Court were to side with Plaintiffs eventually on this legal dispute, full development of the factual record and resolution of the parties' factual disputes would assist a reviewing court and avoid the possible need for a remand.  This Court should not truncate the discovery process by entertaining Plaintiffs' summary judgment motion now, depriving the parties—and reviewing courts—of the benefit of a fully developed record.

### B.    Disputed Questions Prevent a Finding that Plaintiffs Have Standing to Sue

#### 1.    *This Record Does Not Support Summary Judgment That DACA Caused an Injury-In-Fact Sufficient to Confer Article III Standing on Plaintiffs*

Plaintiff States have not carried their burden to establish that, as a matter of law, DACA *caused* any of their alleged harms; without making that showing, Plaintiff States have no injury-in-fact standing.  *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547-48 (2016) (noting plaintiffs must suffer an injury-in-fact that is fairly traceable to the challenged conduct of the defendant). Injuries that are "hypothetical" or "conjectural," such as those asserted by Plaintiffs, cannot establish Article III standing.  *Id.*  To the extent the Court is inclined to accept Plaintiffs' legal theories concerning standing, it should nevertheless deny summary judgment since there are still genuine disputes as to whether DACA caused any of Plaintiffs' alleged direct injuries, which Plaintiffs must show in order to establish standing.

First, none of Texas's alleged harms are directly caused by DACA, and Plaintiffs offer *zero* evidence connecting Texas expenditures to DACA recipients.  *See* Dkt. 288 at 5-8 (Def.-Ints.' Post-Disc. PI Resp.).[3]  Recognizing it is unable to prove its standing through its own

---

[3] Defendant-Intervenors incorporate by reference their preliminary injunction briefing and evidence to this response.

evidence, Texas relies on the expert testimony of Dr. Perryman to argue that DACA recipients cost the state millions of dollars in the form of expenditures in social services.  *See* Dkt. 357 at 37.  However, as Dr. Perryman explains in his supplemental expert report, Texas' reliance on Dr. Perryman's analysis is misplaced because he is not aware of any costs to the State of Texas as a result of DACA and he provides no evidence of such costs in his report or analysis.  *See* Ex. 7 ¶ 6; *see also id.* ¶¶ 7-14.  Dr. Perryman merely assumed that DACA recipients impose costs on the State for purposes of his cost-benefit analysis, and he neither conducted a study of whether DACA recipients impose costs on the state nor is aware of any studies or research that identifies any cost to Texas of DACA recipients. *See id*. ¶ 8.  Furthermore, even if Texas were able to identify a DACA recipient that creates costs for Texas (and Texas cannot), the State would incur such costs whether or not the individual was a DACA recipient.  Ex. 7 ¶ 14 (testifying that DACA does not cause any assumed costs; "it's not because they are in DACA, it's because they are here.").

Seemingly recognizing this fundamental flaw, Plaintiffs attempt to claim that DACA resulted in some unspecified, conjectural level of increases to pre-existing education, healthcare, and law enforcement costs because DACA "incentiviz[es] unlawfully present aliens to remain in the country."  Dkt. 357 at 37.  Plaintiffs offer no empirical evidence of this "incentive" in operation, however, Dkt. 357 at 37-38, and the record contains ample evidence to the contrary, *cf. Texas*, 86 F. Supp. 3d at 635 (concluding that some of plaintiff states' alleged injuries, similar to those now asserted by Texas, were *indirect* and *speculative* and *without* apparent redressability) (emphasis added).

Plaintiffs also assert that DACA recipients would "self-deport" if DACA were to end, alleviating Plaintiffs' purported harm, but there is at the very least a genuine dispute of fact

- 15 -

regarding this unproven theory.  Dkt. 357 at 38.  Texas relies on testimony by their expert, Dr. Lloyd Potter, and a question in a survey by New Jersey's expert, Dr. Tom Wong, to establish an injury-in-fact based on this "self-deportation" theory; however, there are serious problems with the reliance Plaintiffs place on that testimony. In any event, the record contains ample contrary evidence that a factfinder could credit, which precludes summary judgment.

First, Dr. Potter's opinions regarding the effect of DACA rescission on DACA recipients' ability to work are based on wholly unsupported assumptions not grounded in any research.  *See* Dkt. 390 at 17-18 (Mot. to Strike Pls.' Experts).  Dr. Potter assumes (incorrectly) that DACA recipients could not work, and therefore would leave the United States, if DACA were rescinded. *See* Dkt. 390 at 17.  This assumption is wrong.  DACA recipients would be able to work irrespective of DACA.  *See, e.g.*, 8 U.S.C. § 1324a(a)(1); 8 C.F.R. § 274a.1(f), (h), (j); *see also* Dkt. 390 at 18.  This fact is something Dr. Potter himself later conceded.  *See* Dkt. 390 at 17-19 (adding, "Well, I hadn't really kind of thought that whole thing through").

Tellingly, Dr. Potter could not provide *any* estimate of how many DACA recipients were likely to leave Texas under his "self-deportation" theory.  Dkt. 390 at 20 (Mot. to Strike Pls.' Experts).  Moreover, Dr. Potter was also unable to identify any research on the possibility that DACA recipients would return to their country of origin.  *See* Dkt. 390 at 19 ("[T]he causes of return migration are difficult to address because there is limited research and understanding of return migration.").  Indeed, Dr. Potter's own statements reveal that DACA recipients, as a group, are among the least likely noncitizens to leave the United States.  *See* Dkt. 288 at 14 (DACA recipients are "children who were brought into the United States at young ages, who grew up speaking fluent English, attending U.S. schools, and consuming American culture" and are thus "unrepresentative of subjects included in prior studies of return migration").  As such,

Dr. Potter's testimony cannot even imply, let alone establish as a matter of law, that Plaintiffs incur costs they would not incur in the absence of DACA. As Defendant-Intervenors have already noted, Dr. Potter's testimony is so speculative and unreliable that it should not be considered at all. *See* Dkt. 390 at 18-20. Even if this Court does not strike his testimony, its speculative and contested nature is far from sufficient to permit entry of summary judgment.

Second, in his supplemental declaration, Dr. Perryman explains that Dr. Wong's survey question cannot establish Plaintiffs' "self-deportation" theory either. This survey question by New Jersey's expert on which Plaintiffs' rely—"How likely are you to leave the country if DACA ends?"—should not be considered for purposes of summary judgment because it both presents a hypothetical that requires respondents to speculate about uncertain, future plans and suffers from survey bias, as it was framed by other questions evoking perceived Government antagonism against DACA recipients. *See* Dkt. 288 at 16 (Def.-Ints.' Post-Disc. PI Resp.); *see also* Ex. 7 at ¶ 15 (opining that question suffers from survey bias because the series of questions immediately preceding "emphasize uncertainties related to the future of DACA, therefore likely affecting the respondents' mindset and potentially increasing the number of respondents who indicate they would leave the country if DACA ends."). Finally, the way the question is framed does not necessarily suggest survey respondents admitted they would *voluntarily* or *permanently* return to their country of origin if DACA were to end; the question may be interpreted as inquiring whether respondents thought they would face deportation if DACA ended, particularly in light of where the question was placed in the survey. *See id*. ¶ 16. However, there is no evidence in the record that shows Federal Defendants would, in fact, deport DACA recipients if DACA ended. The question can also be interpreted as asking whether respondents would leave the United States to visit family or other type of visit. Thus, there are

strong reasons to doubt that survey takers' answers to Dr. Wong's hypothetical questions are predictive of actual behavior. *See* Dkt. 288 at 11 (Def.-Ints.' Post-Disc. PI Resp.) (highlighting established research on survey design showing that question order can inaccurately bias survey-takers).

Third, there is ample evidence in the record—more than sufficient to demonstrate a genuine dispute of material fact—showing that if DACA were rescinded, DACA recipients would remain where they are as undocumented immigrants instead of leaving the country. *See* Dkt. 288 at 11 (Def.-Ints.' Post-Disc. PI Resp.) (noting Defendant-Intervenors' testimony about their desire to remain in the United States even if DACA ended); Ex 2 ¶¶ 43-44 (expert testifying DACA rescission would not cause recipients to leave the U.S.); Ex. 9 ¶ 36 (expert testifying that if DACA ends, DACA recipients are likely to simply return to the shadows). As Dr. Robert Smith explains in his declaration, current studies show that DACA recipients do not return to their country of origin. *See* Ex. 8 at ¶ 35. Dr. Smith testified that none of the DACA recipients in his study have left the U.S. to return to live in their country of origin. *Id*. These data points— which focus on actual behavior as a measure of future behavior, as opposed to hypothetical speculation—are "a better basis to analyze the likelihood that DACA recipients will return to their countries of birth than the single datum in the Wong survey." *Id*. Among other things, Dr. Smith also testified that his study shows DACA recipients are "embedded within their families in the United States" and are unlikely to return to their country of origin if DACA ended. *Id*. In sum, summary judgment is inappropriate, because, at the very least, the ample evidence refuting Dr. Potter and Dr. Wong's testimony establishes a genuine dispute of material fact about whether DACA recipients would leave the U.S. following DACA's rescission.

Moreover, Plaintiffs offer no demographic evidence that DACA causes an overall decrease in emigration relative to *normally occurring* emigration rates within the DACA-eligible population. Plaintiffs cannot show that DACA has impelled a *greater* number of individuals to remain in the United States than would have in DACA's absence—which is what Plaintiffs must show to tie their alleged injuries to DACA.[4] Without some baseline emigration rate as a comparison, Plaintiffs' inferences about DACA's effect on emigration patterns are wholly speculative. In fact, contrary to Plaintiffs' view, multiple experts have demonstrated that recent migration patterns have nothing to do with DACA at all. *See* Dkt. 288 at 18 (Def.-Ints.' Post-Disc. PI Resp.) (testimony by Barbara Hines and Dr. Douglas Massey indicating that the recent migration of unaccompanied children across the southern border has no relationship to DACA); *id*. at 19 (former ICE Director Sarah Saldaña stating that DACA is not a pull factor for immigration into the United States); *see also* Exs. 2, 12, 15.

2.    *Plaintiffs Are Not Entitled to Summary Judgment on the Question Whether Their Injuries Are Redressable, as Required for Article III Standing*

Even if Plaintiffs could establish that DACA caused an injury-in-fact (and they cannot), Plaintiffs' cannot show that they are entitled to summary judgment on the question whether their injuries are redressable, as is required to establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992); *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (Plaintiffs must show a "favorable decision will relieve a discrete injury") (internal citations omitted).

Texas has not established that it is beyond dispute that its injuries would be redressable if DACA were rescinded. Plaintiffs have failed to establish that DACA recipients would leave

---

[4] Plaintiffs' failure to demonstrate causation is even more apparent when considering their use of Dr. Wong's survey evidence. *See* Dkt. 357 at 38. Whatever value Dr. Wong's survey has to show whether any DACA recipients would leave the United States upon DACA's rescission, that is not the relevant question regarding injury-in-fact. Plaintiffs must show those same recipients only stayed in the United States to begin with because of DACA, which Dr. Wong's survey does not even purport to address. Given DACA recipients' characteristics, as outlined by Dr. Potter, it is not clear how much, if at all work authorization impacted DACA-eligible immigrants' decision to remain in the United States. *See generally* Dkt. 390 at 17-18 (Mot. to Strike Pls.'s Experts).

- 19 -

their states, that social costs would decrease, or that U.S. citizens in the Plaintiff States would encounter increased job opportunities in the absence of DACA.  *See* Part B.I.1, *supra*; Part B.I.3, *infra*; *see also* Dkt. 288 at 11-17, 19-21 (Def.-Ints.' Post-Disc. PI Resp.).

Moreover, Federal Defendants have stated that the injunctive relief requested by Plaintiffs would be "impossible" to comply with, given that other courts (having found that DACA is lawful) issued injunctions preserving DACA and against its rescission.  Dkt. 366 at 20-21; *see, e.g.*, *Regents*, 908 F.3d at 520; *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C.), *adhered to on denial of reconsideration*, 315 F. Supp. 3d 457 (D.D.C. 2018); *Casa de Maryland*, 2019 WL 2147204, at *15.  Thus, injunctive relief from this Court could not redress Plaintiffs' alleged harm.  *See* Dkt. 366 at 21 (Fed. Defs.' Resp. to MSJ).  Given that it would directly conflict with current injunctions by multiple other sister courts, an injunction of DACA would thus not be an appropriate remedy.  *Feller v. Brock*, 802 F.2d 722, 727–28 (4th Cir. 1986) (vacating a preliminary injunction that directly conflicted with another court's injunction because, among other things, it failed to preserve the status quo).[5]

Likewise, Plaintiffs lack standing to pursue a declaratory judgment.  *See Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997) (finding that a plaintiff did not have standing to sue for declaratory relief under the Civil Justice Reform Act or the Declaratory Judgment Act because she could not show injury, causation, and *redressability*); *Okpalobi v. Foster*, 244 F.3d 405, 431 (5th Cir. 2001) (en banc) (Higginbotham, J., concurring) ("[T]he Declaratory Judgment

---

[5] Principles of comity likewise weigh against further hearing Plaintiffs' claims at all, since other federal courts are actively considering the same "core issue" of DACA's legality in a case filed before the present action (a core issue, to note, that was not the subject of the previous DAPA litigation).  *See* Dkt. 52 at 18; *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-30 (5th Cir. 1985) (first-to-file rule is a discretionary doctrine resting on principles of comity and sound judicial administration, under which a court should dismiss or stay an action substantially overlapping and covering the same "core issue" as another previously filed action).

Act . . . does not jettison traditional standing requirements.").   Declaratory judgment would no more redress Plaintiffs' alleged injuries than an injunction would.[6]

Finally, Plaintiffs Alabama, Arkansas, Louisiana, Nebraska, South Carolina, West Virginia, Kansas, and Mississippi have not offered *any* evidence of harm, and therefore have not demonstrated that they are entitled to summary judgment on that issue.   *See* Dkt. 383 at 21-22 (Mot. to Compel Disc. from Tex.).   Because these states have not alleged any specific harms, they cannot establish redressability as required under *Lujan*.   504 U.S. at 562.

      3.     *Plaintiffs Cannot Assert* Parens Patriae *Standing Against the United States, and Even if They Could, They Offer No Evidence that DACA Has Harmed a Substantial Portion of Texans*

*Parens patriae* standing is not available to states in suits against the federal government. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 180-81 (D.C. Cir. 2019); *Michigan v. E.P.A.*, 581 F.3d 524, 529 (7th Cir. 2009); *Maryland People's Counsel v. F.E.R.C.*, 760 F.2d 318, 320 (D.C. Cir. 1985).   Although some statutes provide limited exceptions to this general rule, the APA is not one of them.   *Compare Maryland People's*, 760 F.2d at 320 (holding that the Natural Gas Act provides an exception to the *Mellon* rule because it expressly notes that an "agency of the State" may bring suit), *with Gov't of Manitoba*, 923 F.3d at 180-81 (holding that, unlike the Natural Gas Act, the APA provides no exception to the "*Mellon* bar").

Likewise, the Supreme Court did not create an exception to the *Mellon* bar in *Massachusetts v. E.P.A.*   *See Gov't of Manitoba*, 923 F.3d at 181-83.   Indeed, the D.C. Circuit

---

[6] Indeed, declaratory relief was designed to avoid *impending* injuries by prospectively adjudicating the parties' liability; it was not intended as a "declaration" of legal rights and wrongs regarding alleged injuries that have already been incurred and that the Court cannot otherwise redress.   *See, e.g., Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949) ("The purpose of the Declaratory Judgment Act is to settle 'actual controversies' before they ripen into violations of law . . . ."); *see also* Ex. 25, "Purpose of Declaratory Judgments," 10B Fed. Prac. & Proc. Civ. § 2751 (4th ed., Wright & Miller et al., eds., 2019).

has recently clarified that *Massachusetts* was not a *parens patriae* standing case at all—and the analysis of quasi-sovereign interests therein related only to the Court's discussion of special solicitude.  *See id.* at 182 (quoting *Massachusetts*, 549 U.S. at 522).  Rather, *Massachusetts* simply reiterates the Court's express, eighty-year stance on the issue: *Mellon* prohibits a state from acting as *parens patriae* to "protect her citizens from the operation of federal statutes" (including the APA), but the state may sue the United States to "assert ***its*** rights under federal law," as when Massachusetts alleged that the EPA caused direct injury to ***its own*** territory.  *See Gov't of Manitoba*, 923 F.3d at 182-83 (quoting *Massachusetts*, 549 U.S. at 520 n.17) (emphasis added).  Here, the Plaintiff States do not seek to assert their own rights under federal law, but rather seek to challenge the operation of federal immigration priorities on the basis of purported injury to a subpopulation of state residents by the federal government.  As *Gov't of Manitoba* confirms, this they may not do.  That limit on state power to challenge the federal government under a theory of *parens patriae* is especially appropriate in the field of immigration—which is under the *exclusive control* of the federal government.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2402 (2018); *Arizona*, 567 U.S. at 395 ("The federal power to determine immigration policy is well settled," and immigration policy must be determined by "one national sovereign, not the 50 separate States.").

Even if *parens patriae* standing were available to Plaintiffs, Plaintiffs' theory of harm to Texas residents from "labor market distortions" is legally flawed and factually unsupported.  At the very least, this alleged harm is intensely disputed throughout the record, and is not ripe for resolution on summary judgment.

Separate from the limits discussed above, a state cannot claim *parens patriae* standing to defend the economic well-being of a subpopulation of its residents, *see* Dkt. 357 at 34 (Pls.' MSJ

Br.), where, as here, the government action it challenges does not harm or may even benefit the overall state population. The Supreme Court has long recognized that a state may have *parens patriae* standing to redress widespread, concrete harm to the material well-being of its residents caused by external forces and out-of-state private actors. *See, e.g.*, *Missouri v. Illinois*, 180 U.S. 208 (1901) (sewage from Illinois dumped into Missouri waterways); *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907) (noxious gases discharged from a neighboring Tennessee plant); *Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923) (West Virginia restricting Pennsylvania residents' access to natural gas, "a matter of grave public concern" affecting a "substantial portion of the State's population"); *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 450 (1945) (burdensome price-fixing by out-of-state corporate defendants, a "blight" causing Georgia's economy and her residents' welfare to "seriously suffer[]"); *Alfred L. Snapp & Son*, 458 U.S. at 609-10 (recognizing *parens patriae* standing where state sought to defend residents against employment discrimination by out-of-state private actor). In no case, however, has the Court countenanced a state's assertion of *parens patriae* standing on behalf of a subgroup of its residents the state politically favors, when the challenged action materially *benefits* as many (if not more) other state residents. More specifically, as relevant here, a state cannot assert *parens patriae* standing to challenge federal policy or legislation in order to vindicate the interests of *some* unknown subset of state residents the state deems worthy of protecting and who purportedly face harm in the form of increased marketplace "competition" as a result of the presence of *other* state residents the state does not wish to protect. *Parens patriae* is simply not a procedural mechanism by which a state can select winners and losers among its residents.

Here, the parties seriously dispute the extent to which DACA harms Plaintiffs economically, and facts on this issue are clearly material to Plaintiffs' purported *parens patriae*

standing.  The record is replete with evidence that the economic *benefits* created and experienced by DACA recipients substantially outweigh any purported harm to any other state residents. Defendant-Intervenors have, moreover, diligently sought more evidence on these issues. Already in the record, for instance, Dr. Perryman (an expert on labor markets who has performed extensive research on econometrics in Texas), concludes that, for Texas,

> [T]he direct gains in business activity associated with DACA recipients include an estimated $11.5 billion in output (gross product) and $7.2 billion in income each year in addition to more than 108,100 jobs. When multiplier effects are included, the total rises to $25.8 billion in annual output, $16.0 billion in income per year, and 324,000 jobs.

Ex. 6 at 15.  Dr. Perryman further explains that, rather than displacing other workers, DACA recipients and other immigrants make important contributions to the U.S. economy by filling jobs left unfilled in the United States because of an ongoing and growing labor shortage. *Id.* at 10-14.  Further discovery is likely to disprove Plaintiffs' claim that DACA displaces U.S. citizen workers, *see* Dkt. 383 at 9, and likely to reveal more evidence demonstrating that, quite the opposite, DACA recipients strengthen the U.S. economy and society by running businesses that could employ U.S. citizens and lawful workers, or by filling important jobs such as EMTs, teachers, and medical doctors.

Plaintiffs, by contrast, fail to offer *any* reliable evidence supporting their allegations of job loss or depressed wages (which again, even if true, would not be grounds for *parens patriae* standing given the more-than-commensurate benefits provided by DACA recipients).  At the summary judgment stage, Plaintiffs' conjectures of "potential[]" harm, *see* Dkt. 357 at 36 (Pls.' MSJ Br.), are simply inadequate.

Plaintiffs offer one expert—Dr. Donald Deere—in support of their *parens patriae* argument.  Although Dr. Deere broadly claims that "immigration reduces the wages of native

workers with the same skills," Dkt. 358-21 at 8, he admits that he has not specifically studied immigration's effect on wages or the economy, Dkt. 390 at 16 (Mot. to Strike Pls.' Experts); Ex. 8 at 4, 27 (Deere Depo.), nor has he conducted any analysis focused on the DACA population specifically.  As such, he is not qualified to offer an expert opinion on Plaintiffs' labor distortion claims, and his statements are not reliable, relevant, or admissible to support Plaintiffs' allegations.  *See Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380 (5th Cir. 2010) (affirming district court's decision to exclude experts, in part, because they failed to bridge the analytical gap between the generalized nature of a class-wide study and the specific characteristics of the product at issue).

Similarly, Plaintiffs rely on Dr. Deere to establish the allegedly harmful interplay between DACA and the Affordable Care Act ("ACA").  Plaintiffs likewise rely on similar conjecture, unsupported by any empirical evidence.  *See* Dkt. 357 at 25 (Pls.' MSJ Br.) (citing Dkt. 358-21 at 8).  However, as argued more fully in Defendant-Intervenors' Motion to Strike, Dr. Deere offers a *hypothetical thought experiment* of how the ACA *might* impact some employers' decision-making, taking as true core assumptions for which he does not offer *any* evidence.  *See id.* at 4-8; *see also* Dkt. 390 at 6-10 (Mot. to Strike Pls.' Experts).  Dr. Deere's theories, which are inherently conjectural, do not come close to meeting federal standards for admissible evidence.  *See, e.g.*, *CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 278–79 (5th Cir. 2009) (finding expert's proffered evidence not reliable where it is "based on speculation and conjecture" and "requires numerous speculative leaps" to support the relevant allegations).  Dr. Deere is similarly unqualified to offer an expert opinion on this topic.  *See* Dkt. 390.

Devoid of any additional support for their labor market distortion claim, Plaintiffs also cite to unsupported conjecture about DACA's effect on jobs by then-Attorney General

Sessions—who has neither personal nor expert knowledge of the matter at issue, and who is not a disclosed witness in this case. *See* Dkt. 357 at 23. This "evidence" cannot be presented in a form that would be admissible at trial, *see* Fed. R. Evid. 602, and as such, cannot support a motion for summary judgment, *see* Fed. R. Civ. P. 56(c). Similarly, Plaintiffs rely on purported concessions from business amici in this case that DACA displaces U.S. citizen workers. Dkt. 357 at 23. However, that is not what those amici said, and in any event, amicus briefs are not competent summary judgment evidence. *See, e.g.*, *Parm v. Shumate*, Civil Action No. 3-01-2624, 2006 WL 1228846, at *1 n.3 (W.D. La. May 1, 2006) ("Summary judgment evidence may not be submitted by a non-party") (Ex. 30).[7]

Finally, Plaintiffs rely on various statements from Defendant-Intervenors' experts to attempt to demonstrate that DACA recipients, who are already-present immigrants, have adversely affected labor competition. *See* Dkt. 357 at 34-35. However, Defendant-Intervenors' experts do not prove Texas' case. Dr. Perryman, for example, expressly states that he does not "know one way or the other" whether "an employer has hired a DACA recipient for a job that a U.S. citizen also applied for." Dkt. 358-24 at 9. Likewise, Dr. Brannon's referenced statements regard only "general economic principle[s]," rather than any specific empirical evidence about DACA's effects on wages. *See* Dkt. 289-3 at 140-41, Tr. 93:20-94:1.[8] These statements do not establish that there is no dispute of material fact that Plaintiffs' theories regarding labor

---

[7] Moreover, it is not clear whether the content of the legal briefs of these *amici* is supported by either the personal knowledge or expert opinion of the briefs' authors, and whether Plaintiffs plan to call those authors to testify on their behalf at trial. *Cf.* Fed. R. Civ. P. 602; 56(c). As such, they cannot be relied on to support summary judgment until Plaintiffs "explain how the [documents] could be reduced to admissible evidence at trial." *See Smith v. Palafox*, 728 F. App'x 270, 276 (5th Cir. 2018).

[8] To the extent Dr. Brannon's testimony can be characterized as evidence that "unskilled" DACA recipients displace and depress the wages of "unskilled" U.S. citizens, Dr. Perryman's expert testimony directly contradicts this evidence. Ex. 7 ¶¶ 18-26 (testifying he has no information that there are DACA recipients who compete for low-skilled jobs with non-DACA workers, and even if there were DACA recipients competing for such jobs, he has no evidence that there are measurable negative effect on wages, particularly in light of the fact that employers are increasing wages for unskilled workers due to labor shortages). Therefore, summary judgment is inappropriate.

competition are correct. In the same vein, evidence that some DACA Intervenors have found productive employment in the United States, Dkt. 357 at 23, 25 (Pls.' MSJ Br.), could only, even in theory, support a finding of harm to Plaintiffs through a purely speculative chain of inferences: that (i) citizens of Plaintiff States (ii) with adequate qualifications (iii) were not successful in securing those same jobs because of DACA, and then (iv) did not find reasonably equivalent employment before their economic wellbeing was injured.  There is no such evidence in the record.  *See* Dkt. 319 at 39 n.44 (Ct.'s PI Opinion) (noting "the record does not indicate why these candidates were chosen."); *Ranger Ins. Co. v. Culberson*, 454 F.2d 857, 862 n.1 (5th Cir. 1971) (noting that "facts," not "hypotheses," are required for summary judgment).

Finally, even if the Court determined that some of this testimony might be admissible and plausibly supported Plaintiffs' allegations of harm, the record also contains empirically founded evidence directly and materially disputing Plaintiffs' factual allegations.  For example, Defendant-Intervenors' expert Dr. Ku submits that there "has not been any overall decline in employment for U.S. born workers following the implementation of DACA or the ACA."  Dkt. 225-3 at 113-14.  And, notwithstanding his sweeping claims about immigration reducing native worker wages, even Dr. Deere admits that "there is no consensus in the economic literature on the magnitude of this effect," and the scholarly research he relies on concludes that this effect, of undocumented workers in the labor market, "seems to cluster *around zero*."  *See* Dkt. 225-6 at 28; Dkt. 225-5 at 57 (emphasis added) (Borjas Working Paper).[9]  Indeed, in its opinion denying Plaintiffs' motion for preliminary injunction, this Court recognized that Defendant-Intervenors might ultimately be proven right on their argument that Plaintiffs have not suffered any overall injury traceable to DACA, and that further factual development—in which Plaintiffs have

---

[9] Defendant-Intervenors have been vigorously seeking further discovery from Plaintiffs' offered experts about alleged depressed wages and supposed substantial economic harm to the States' citizens, which Plaintiffs have refused to provide.

steadfastly refused to participate—is necessary to resolve this central question of fact.  *See* Dkt. 319 at 106 (Ct.'s PI Opinion).

At the very least, DACA's effect on employment and wages of U.S. citizens in Texas is vigorously disputed, and, most likely, its innocuous effect would be even clearer upon further discovery.  Further, even if Texas could show that DACA increased economic competition for a subset of Texans, its overarching benefits to the Texas economy would preclude Texas from asserting standing *parens patriae* to challenge DACA.[10]

4.      *Plaintiffs Are Not Owed "Special Solicitude" and Their Novel Theory of "Abdication Standing" Should Not Be Endorsed*

To make up for their lack of evidentiary support for injury, Plaintiffs claim that they are owed "special solicitude" under *Massachusetts v. EPA*, 549 U.S. 497 (2007).   However, Plaintiffs offer no evidence that DACA has harmed their "quasi-sovereign interests," as required by *Massachusetts*.  *See id.* at 518-20; Dkt. 357 at 21-24 (Pls.' MSJ Br.).  Moreover, a generic cause of action under the APA does not give Plaintiffs any specific "procedural right" to challenge DACA.  *Cf. Massachusetts*, 549 U.S. at 516, 518 (attaching "critical importance" to the "procedural right" afforded by the Clean Air Act to challenge the EPA's denial of a petition for rulemaking on emissions standards).

Additionally, although the Fifth Circuit previously believed that states had "special solicitude" to defend against DAPA's "institutional injury to their lawmaking authority," *Texas DAPA*, 809 F.3d at 154, the Supreme Court has since clarified the relationship between the

---

[10] The rescission cases do not help Plaintiffs' assertion of *parens patriae* standing here.  *Contra* Dkt. 357 at 26 (Pls.' MSJ Br.).  First, the court in *Regents* expressly noted that it found standing based on direct injury-in-fact, rather than *parens patriae* standing, *see Regents*, 279 F. Supp. 3d at 1035, *aff'd*, 908 F.3d 476 (9th Cir. 2018), and the *Batalla* opinion did not discuss *parens patriae* standing at all, *see generally Batalla*, 291 F. Supp. 3d at 268.  Second, because DACA has actually benefitted U.S. citizens' economic well-being, it would make sense for the rescission-case plaintiffs to receive *parens patriae* standing for what would thus be a "serious" injury to a "substantial" portion of their population.  Precisely the opposite conclusion applies to Plaintiffs here.  At the very least, it would require factual findings resolving the disputed evidence before the Court could determine that Texas has *parens patraie* standing based on precisely the opposite factual premise that was the basis of standing in the rescission cases.

federal government and the states in connection with federal legislation in a manner that undermines the Fifth Circuit's analysis.  In *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), the Supreme Court considered the difference between federal legislation that operates as a "direct command to the States" in a manner that implicates their sovereign interests, and federal governmental action that only directly regulates private individuals.  *Id.* at 1479-81 (citation omitted).  Here, DACA is the latter, a mere exercise of federal enforcement discretion that directly affects only private parties (*i.e.*, DACA recipients).  DACA does not operate on the states themselves, and neither "nullifies" nor "strips" any state powers.  *Contra* Dkt. 5 at 26-27 (Pls.' PI Mot.).  Accordingly, there is no intrusion on the Plaintiffs' sovereignty, and Plaintiffs are owed no "special solicitude" to object to the incidental effects of federal policy.

Moreover, even if Plaintiffs *were* owed "special solicitude," that would not "eliminate the State petitioner's obligation to establish a concrete injury."  *Del. Dep't of Nat'l Res. & Envt'l Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009).  Here, as stated above, DACA has caused no such injury, either directly to Texas or to a substantial portion of its citizens' economic well-being.

Finally, to the extent that Plaintiffs claim a *separate* cause of action due to their alleged "institutional injury" being coupled with the federal government's "abdication" of responsibility under federal statutes, *see* Dkt. 357 at 29 (Pls.' MSJ Br.), this novel theory is not backed by *any* controlling precedent, and is wholly implausible.  In *Massachusetts*, "abdication" was simply part of the Court's standard injury-in-fact analysis, and provided no independent basis for standing.  Conferring independent "abdication standing" on Plaintiffs would invite them to complain to a federal court virtually every time they had a policy disagreement with the federal government over how to allocate limited resources, which would foreseeably occur with great

frequency.  *See United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 90-91 (1947) (courts should not become "the organ of political theories" or opine on "ill defined controversies").  No such basis for standing exists, and this Court should not find one here.

For these reasons, Plaintiffs lack standing to bring this action.  At the very least, however, it is plain that disputes of material fact remain as to the factual bases undergirding Plaintiffs' claims to standing, and further factual development through the discovery process that this Court ordered but in which Plaintiffs have refused to participate is necessary before the Court may rule on this issue.

### C.    This Action Does Not Present a Case or Controversy

There is no actual case or controversy within the meaning of Article III of the Constitution here because Plaintiffs and the Federal Defendants are, in fact, aligned.  Plaintiffs and the Federal Defendants "desire precisely the same result," and "[t]here is, therefore, no case or controversy within the meaning of Art. III of the Constitution." *Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 47-48 (1971) (per curiam) (citation omitted).   After Plaintiffs filed the instant case seeking a declaration that DACA is unlawful, Federal Defendants expressly and unequivocally reaffirmed that "Plaintiffs and Federal Defendants agree—DACA is unlawful." Dkt. 71 at 13 (Fed. Defs.' Resp. to PI Mot.).  Plaintiffs have received support from the supposedly adverse Federal Defendants at every stage in this matter, *see generally* Dkt. 118 (Def.-Ints.' Mot. to Dismiss), and indeed, Federal Defendants urge the Court to *grant* Plaintiffs' motion for summary judgment, *see* Dkt. 366 at 7-10 (Fed. Defs.' Resp. to MSJ).   Federal Defendants have propounded no discovery on Plaintiffs, and both Plaintiffs and Federal Defendants have been intransigent in cooperating with Defendant-Intervenors during the discovery phase, requiring Defendant-Intervenors to seek the assistance of the Court in requiring

the supposedly adverse parties to participate in the court-ordered discovery process.  Dkt. 383
(Mot. to Compel Disc. from Tex.); Dkt. 386 (Mot. to Compel Disc. from Fed. Defs.).

The fact that Defendant-Intervenors are participating in the litigation "does not create
sufficient adversity to provide jurisdiction. [Instead, t]hey have properly called the court's
attention to the lack of subject matter jurisdiction." *Kirkland v. N.Y. State Dep't of Corr. Servs.*,
No. 82 CIV. 0295, 1988 WL 108485, at *3 (S.D.N.Y. Oct. 12, 1988) (Ex. 41).   While the
Supreme Court has previously recognized Congressional litigants' "proper" role in defending
federal legislation, *I.N.S. v. Chadha*, 462 U.S. 919, 940 (1983), Defendant-Intervenors share no
comparable nexus to the federal actions challenged here, *cf. United States v. Windsor*, 570 U.S.
744, 807 (2013) (Alito, J., dissenting) (representing *Windsor* to apply only "in the narrow
category of cases in which a court strikes down an Act of Congress, and the Executive declines
to defend the Act, [whereupon] Congress both has standing to defend the undefended statute and
is a proper party to do so").   Moreover, Defendant-Intervenors are at a serious disadvantage
compared to "proper" defendants, because Federal Defendants here are simultaneously forcing
Defendant-Intervenors to defend the case alone *and* denying requested and essential discovery
that only they are in a position to provide.   *See* Dkt. 386 (Mot. to Compel Disc. from Fed.
Defs.).[11]

Furthermore, prudential considerations regarding the "proper—and properly limited—
role of the courts in a democratic society" favor dismissal of this challenge to the federal
government's administration of immigration laws.  *Bennett v. Spear*, 520 U.S. 154, 162 (1997)
(quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).   "Even when Article III permits the
exercise of federal jurisdiction, prudential considerations demand that the Court insist upon 'that

---

[11] While Defendant-Intervenors believe the lack of adversity is a sufficient reason to dismiss this action as a legal
matter, the refusal of both parties to participate fully in the discovery process also outlines why, at this stage, a grant
of summary judgment is unwarranted.

concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'"   *Windsor*, 570 U.S. at 760 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

### D.      DACA Is An Exercise of Enforcement Discretion that Is Unreviewable Under the APA[12]

The APA precludes judicial review of decisions that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and "an agency's decision not to take enforcement action" is precisely among those agency actions that "should be presumed immune from judicial review under § 701(a)(2)."   *Heckler v. Chaney*, 470 U.S. 821, 832 (1985).   Immigration is an area in which the Executive enjoys particularly broad discretion, and consequently these principles of judicial deference apply here with specific force.   *See Trump*, 138 S. Ct. at 2408.   Indeed, the "principal feature of the removal system is the broad discretion exercised by immigration officials," including the discretion not to pursue removal at all.   *Arizona*, 567 U.S. at 396. DACA is one such exercise of the Secretary's broad enforcement discretion with respect to questions of removal.   *Cf. id.*   The DACA Memorandum simply sets forth *discretionary criteria* for which immigrants subject to removal can be considered for a favorable exercise of discretion—a prioritization that Congress has effectively *required* by appropriating only enough funds to remove approximately 450,000 non-U.S. citizens a year (or approximately 3.75% of the total relevant population).   *See* Dkt. 224 at 1-3 (Def.-Ints.' Post-Disc. PI Br.).   Because the INA does not "set constraints" on this discretion, such exercise of discretion is unreviewable under the APA.

The Fifth Circuit's ruling regarding reviewability of DAPA is inapposite.   DACA is not DAPA, and "any extrapolation from DACA [to DAPA] must be done carefully."   *See Texas*

---

[12] For further and more detailed discussion, *see* Dkt. 224 at 41-47 (Def.-Ints.' Post-Disc. PI Br.).

*DAPA*, 809 F.3d at 173.  First, while the DAPA-eligible population was approximately 4.3 million, the DACA-eligible population is much smaller.  *Id*. at 147-48.  Thus, the Fifth Circuit's reasoning that Congress was unlikely to delegate discretion over the removal of the substantial portion of the total noncitizen population eligible for DAPA, *see id.* at 181, does not apply here.  Second, granting deferred action (and, to be clear, nothing more[13]) to DACA recipients did not create the same change of "economic and political magnitude" that the Fifth Circuit identified with regard to DAPA.  *See Texas DAPA*, 809 F.3d at 181.  Here, rather, the Secretary was constrained by congressional appropriations to choose *some* discretionary criteria for non-U.S. citizen removals, and reasonably determined that individuals committed to long-term, law-abiding, and productive life in America are not enforcement priorities and may merit consideration for deferred action.  *See* Ex. 62C; *see also Texas DAPA*, 809 F.3d at 174.  The DACA population, as the Fifth Circuit recognized, is "*less* likely to have backgrounds that would warrant a discretionary denial" than the DAPA population.  *Texas DAPA*, 809 F.3d at 174 (emphasis added).

Finally, since the Fifth Circuit's DAPA opinion, the Supreme Court has clarified the law in a way that undermines the Fifth Circuit's earlier reasoning that categorical executive action could not be discretionary.   In *Texas*, the Fifth Circuit attached legal significance to the fact that DAPA affected "the immigration classification of *millions of* [undocumented immigrants] *on a class-wide basis*."  *Texas DAPA*, 809 F.3d at 170 (emphasis added).  In *Trump*, the Supreme

---

[13] Non-U.S. citizens granted deferred action pursuant to DACA may be eligible for work authorization or benefits by virtue of *independent rules promulgated prior to the existence of the DACA Memorandum*. *See* 46 Fed. Reg. 25,080 (May 5, 1981); 52 Fed. Reg. 16,228 (May 1, 1987) (authorizing individuals with deferred action to request work authorization based on economic need); 76 Fed. Reg. 53,764 (Aug. 29, 2011); 61 Fed. Reg. 47,039 (Sept. 6, 1996); 80 Fed. Reg. 7912 (Feb. 12, 2015) (lifting barriers for certain noncitizens to participate in Social Security retirement and disability and Medicare benefits).  Each of these regulations was formally adopted years ago, and Plaintiffs raise no challenge to those regulations, either as a matter of substance or procedure.  The *only* thing accomplished by DACA is it provides guidance in the exercise of discretion that may, if exercised favorably, permit additional individuals to benefit under these independent rules and regulations.  DACA does not itself confer any benefits.

Court rejected that legal analysis. The majority rejected the position, espoused by the dissent in that case, that an "executive order affecting millions of individuals on a categorical basis" could not be an "exercise[e] of discretionary authority." *Trump*, 138 S. Ct. at 2440 n5 (Sotomayor, J., dissenting). Instead, the Court applied a deferential standard appropriate to the Executive's discretion in the immigration context. *Id*. at 2419 (majority opinion). The implication is clear. When, as with DACA, the Executive exercises even class-wide enforcement discretion in the immigration context, those Executive decisions are unreviewable under the APA.[14]

Furthermore, DACA is a policy statement advising the public "of the manner in which the agency proposes to exercise [its] discretionary power" in prioritizing certain non-U.S. citizens for removal, and was therefore exempt from the procedural requirements of notice-and-comment rulemaking. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979); *see generally* Dkt. 308 at 2-5 (Def.-Ints.' Supp. PI Br.); Dkt. 224 at 47-56 (Def.-Ints.' Post-Disc. PI Br.). At the very least, there exist material factual disputes as to whether DACA conferred non-discretionary, substantive rights, making this question demonstrably unfit for resolution as a matter of law.

The record indicates that DACA does not constrain agency adjudicators from exercising discretion, but instead guides their exercise of discretion in evaluating deferred action. Agency officials have provided statements refuting any notion that they "rubber-stamp[]" DACA applications, and explaining how they evaluate them on a case-by-case basis. *See, e.g.*, Ex. 27 at 24-26, 62T, 11 at 548. Indeed, they may deny applications that meet DACA criteria. Ex. 40 at 548. This is doubtless why numerous courts have found that agency officials may exercise discretion and that they have in fact done so. *See, e.g.*, *Batalla*, 291 F. Supp. 3d at 273 (finding

---

[14] DACA, which merely permits a class of non-U.S. citizens to make individualized requests for discretionary relief, is less broad than the class-based entry restrictions upheld in *Trump*.

discretion); *Regents*, 908 F.3d at 507, 510 (finding discretion).   Federal Defendants likewise recognize that DACA did not require notice-and-comment rulemaking.   *See* Dkt. 366 at 15-17 (Fed. Defs.' Resp. to MSJ).

At the preliminary injunction stage, the Court deemed this factual record insufficient to conclusively determine whether agency officials exercise discretion in granting DACA requests. *See* Dkt. 319 at 102 (Ct.'s PI Opinion).   It credited evidence submitted by Plaintiffs as creating genuine issues of material fact on this point that would need further development prior to final judgment.   Dkt. 319 at 100-102.   Discussing the issue of discretion, the Court noted that the evidence presented by Plaintiffs "is not convincing, either in its quantity or quality, and there is at least some evidence presented by the Defendant-Intervenors to the contrary."   *Id.*   Nothing has changed concerning the record related to agency discretion since that ruling by the Court because Federal Defendants object to producing this discovery to Defendant-Intervenors, and it is accordingly unclear (among other things) how DACA is currently being adjudicated.   Dkt. 386 at 7, 13-14 (Mot. to Compel Disc. from Fed. Defs.).   Plaintiffs rely on the same limited, and dated, evidence as they did previously at the preliminary injunction stage to allege a lack of discretion—none of which speaks to the discretion DHS applications processors exercise today. *See* Dkt. 319 at 98-99 (Ct.'s PI Opinion); Dkt. 357 at 33 (Pls.' MSJ Br.) (both noting the DACA Memorandum's initial wording, DHS Secretary Duke's comments during the DAPA litigation, and one former USCIS center's representations, about discretionary denials).   The Court correctly found that Plaintiffs could not meet their burden based on this limited evidence at the preliminary injunction phase, specifically recognizing that DHS may have changed its practices since the *Texas DAPA* litigation to allow its officers greater discretion.   Dkt. 319 at 100-02. Now, at this premature summary judgment phase, offering no updated evidence about DHS's

current practices,[15] Plaintiffs likewise cannot meet their burden on the basis of that *same* inadequate record. *See, e.g.*, *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (noting that the movant has the burden of proof for establishing that there are no issues of material fact).

The question whether agency officials exercise discretion is critical, as it bears on whether or not DACA confers "rights and obligations" on recipients. *See Texas DAPA*, 809 F.3d at 171. DACA adjudicators' use of discretion is inextricably linked to the question of whether the agency statement (DACA here) practically "*constrain[s] their discretion* enough to create a binding norm," subject to formal rulemaking. *See Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 718 (D.C. Cir. 2015) (emphasis added); *see also Texas*, 86 F. Supp. 3d at 668-69 ("As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm." (quoting *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596-97 (5th Cir. 1995))). With this key factual determination still in dispute, this Court should not grant the Plaintiffs' Motion for Summary Judgment.

Furthermore, even if demonstrating that DACA confers "rights and obligations" were sufficient, by its own terms the DACA Memorandum "confers no substantive right, immigration status or pathway to citizenship." Dkt. 6 at 143. Indeed, non-U.S. citizens granted deferred action pursuant to DACA are only eligible for work authorization or benefits solely on the basis of other, independent, and prior agency rules.

Even if DACA could be construed to itself confer "rights and obligations," important disputes of material fact on that point remain unanswered. Defendant-Intervenors have not

---

[15] Of course, this is precisely the evidence that Defendant-Intervenors have been seeking, to no avail, from Federal Defendants. *See* Dkt. 386 (Mot. to Compel Disc. from Fed. Defs.).

received requested discovery from Plaintiff States *or* Federal Defendants, *see, e.g.*, Dkt. 383 (Mot. to Compel Disc. from Tex.), that is necessary to resolve whether DACA confers "rights and obligations."  *See* Dkt. 363 at 5.  For example, at the preliminary injunction stage, Plaintiff States and this Court relied upon advance parole and social services spending as a *likely* "right and obligation" conferred by DACA.  *See* Dkt. 319 at 96-97.  However, Plaintiffs have yet to provide any evidence that any DACA recipient in fact used advance parole as a basis to adjust immigration status, and Federal Defendants have refused to produce discovery in response to Defendant-Intervenors' requests for advance parole information.

Likewise, the purported social services costs that Plaintiff States claim to have incurred are also in dispute, *see* Part IV.B.1, *supra*, and are also the subject of outstanding discovery requests.  In short, as of now, Plaintiffs have failed to identify any DACA recipients who used state-funded social services and failed to connect the receipt of DACA to eligibility for state social services.  Plaintiffs have not met their burden of proof regarding the "rights and obligations" allegedly conferred by DACA (even if this Court in the abstract believes such a burden *could* be met), and as such, this Court should allow further discovery that would better elucidate these material facts.

Multiple other courts have determined that DACA is not a substantive rule.[16]  This Court has determined that a factual record is crucial to assessing each sides' assertions regarding notice-and-comment rulemaking.  *See* Dkt. 319 at 103 & n.108.  That process should not be truncated artificially by granting summary judgment when discovery is only partially complete

---

[16] *See, e.g.*, *Regents*, 908 F.3d at 512-14 (noting that DACA did not require notice-and-comment because it "explicitly contemplated case-by-case discretion"); *Batalla*, 291 F. Supp. 3d at 272-73 (finding "the DACA Rescission Memo to be a general statement of policy, not a legislative rule"); *Casa de Maryland*, 2019 WL 2147204, at *15 (holding that DACA's rescission does not require notice-and-comment); *NAACP*, 298 F. Supp. 3d at 236-37 (observing that "[f]or the same reasons that the promulgation of DACA needed no notice and comment, its rescission needed no notice and comment") (internal citations omitted).

and many discovery requests remain outstanding.  *See* Dkt. 386 at 18 (noting the multiple discovery documents that the Plaintiff States have failed to produce).  Given the factual issues that remain in dispute, further discovery is required before the trier of fact can adequately evaluate these questions.[17]

### E.    Plaintiffs' Substantive APA Claims Are Without Merit

Plaintiffs' substantive APA arguments mischaracterize federal immigration law and misstate facts.  Deferred action does not confer immigration status.  *See Texas DAPA*, 809 F.3d at 168 (recognizing that deferred action under DAPA was "a change in designation," not immigration status).  Deferred action is an established practice of DHS, recognized by Congress, and supported by historical precedent.  *Reno*, 525 U.S. at 484-85 (praising deferred action as a "commendable exercise in administrative discretion, developed without express statutory authorization").

The discretionary grant of work authorization is a separate issue from deferred action and has no bearing on the legality of deferred action or DACA.  Far from restricting work authorization, Congress has empowered the Secretary of DHS to grant work authorization to non-U.S. citizens who lack immigration status.  *See* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c).  It is through work authorization, rather than deferred action, that non-U.S. citizens become eligible for social welfare benefits.  *See* 8 U.S.C. § 1611(b)(2)-(3); *Texas DAPA*, 809 F.3d at 148 (observing that the INA specifically provides that work authorized individuals may receive social security retirement benefits, social security disability benefits, or health insurance

---

[17] As another example, the Federal Defendants also deny the Plaintiff States' allegations regarding notice-and-comment, which indicates that they possess evidence requiring them to take positions similar to Defendant-Intervenors.  Dkt. 374 at 8.  Nonetheless, the Federal Defendants have not provided this evidence to Defendant-Intervenors.  *Id.*

under Medicare Part A).  As such, when Plaintiffs claim that "DACA creates eligibility for a host of benefits," Plaintiffs are simply wrong.  *Contra* Dkt. 357 at 10 (Pls.' MSJ Br.).

Parole—such as advance or humanitarian parole—does not confer immigration status either.  The INA grants discretion to DHS to parole immigrants into the United States, and that action by DHS has never been understood to contradict the statutory scheme for immigration.  8 C.F.R.  § 274a.12(c)(14).  Plaintiffs have asserted that DACA is unlawful because it allows recipients access to "advance parole, which clears a path to legal status," Dkt. 357 at 39-44 (Pls.' MSJ Br.), but there is *no* evidence that a single DACA recipient in fact adjusted status or naturalized after securing a needed lawful entry through advance parole.  Defendant-Intervenors' Interrogatory 13 to Federal Defendants requests information regarding the intersection, if any, of DACA and advance parole.  Federal Defendants have as yet refused to respond to that discovery request, Dkt. 386 (Mot. to Compel Disc. from Fed. Defs.), and Defendant-Intervenors are preparing new discovery requests on advance parole.  This Court should not grant summary judgment on Plaintiffs' substantive APA claims without allowing Defendant-Intervenors the opportunity to obtain discovery to determine whether the purported harms that Plaintiffs allege do, in fact, occur.

### F.   A Ruling on Plaintiffs' Take Care Clause Claims Should Be Deferred Until After A Merits Hearing

The Executive had the authority to enact DACA, and DACA does not violate the Take Care Clause.  At the preliminary injunction stage, the Court acknowledged, "[T]he Take Care Clause could actually be the basis for arguing that DACA is both constitutionally permissible and constitutionally impermissible . . . . The instant case pits the concept of faithfully enforcing the law against the concept of prosecutorial discretion."  Dkt. 319 at 64-65.

The Court "deferr[ed] judgment on the Take Care Clause until a full hearing on the merits or until the appropriate court on appeal instructs it to decide the issue."  Dkt. 319 at 67. Given that the Plaintiff States have refused to participate in the discovery process, provide the relevant evidence necessary, or to take an appeal to the Fifth Circuit, Defendant-Intervenors' respectfully request the Court defer judgment on the Take Care Clause.  *See* Dkt. 319 at 67.

### G.    Principles of Equity Require that the Court Abstain from Injunctive Relief

As discussed above, *see* Part IV.B.2, *supra*, Federal Defendants should not be placed in the vise of competing injunctions issued by sister federal district courts.[18]  Furthermore, even without these pre-existing (and uniform) injunctions from the rescission cases, a nationwide injunction would not be a proper remedy, particularly when only *one* of the Plaintiff States has adduced *any* evidence of purported injury.  Moreover, the balance of equities and public interest in this case weigh strongly against providing Plaintiffs with injunctive relief, particularly on the basis of what is essentially the same record that this Court had before it at the preliminary injunction phase, when it expressly declined to grant summary judgment.

### 1.    Nationwide Injunctions Should Be Disfavored Generally, and in this Case in Particular

This Court has recognized that nationwide injunctions against the Federal Government are ill-advised.  *See* Dkt. 319 at 14-15 (compiling commentary on nationwide injunctions and

---

[18] Plaintiffs' recent attempt to recast their requested remedy as non-injunctive is incorrect, unavailing, and inconsistent with their own previous filings.  *See* Dkt. 387 at 8-10 (Pls.'s Opp. to Mot. to Compel Disc.) (arguing that "[p]ermanent injunctive relief is not necessary" and reasoning that a "vacatur" of DACA is the "appropriate remedy" in this case).  To be clear, Plaintiffs seek injunctive relief in their Complaint, Dkt. 1 at 4, which they have not since amended.  Additionally, Plaintiffs' recent summary judgment brief again requests that the Court "prevent Federal Defendants from issuing any new DACA permits or renewing any existing DACA permits."  Dkt. 357 at 46. Moreover, a "[v]acatur of agency action is a . . . **form of injunctive relief**" that restores the status quo. *See Dine Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019) (cited in Dkt. 387 at 14 (Pls.'s Opp. to Mot. to Compel Disc.)) (emphasis added).  This injunction to "set aside" DACA would specifically conflict with the current rescission case injunctions ordering these same federal agencies to maintain DACA in place.  Finally, to the extent Plaintiffs (incorrectly) argue that a vacatur order would not require Federal Defendants to actually *do* anything, it would consequently do nothing to remedy their alleged injuries, in which case Plaintiffs should be denied standing for lack of redressability.

their disadvantages). Federal Defendants have long agreed. *See* Ex. 44 at 24 (noting that "[n]ationwide injunctions . . . transgress both Article III and longstanding equitable principles by affording relief that it is not necessary to redress any cognizable, irreparable injury to the parties in the case"); *see also* Ex. 45.

Here, a nationwide injunction is particularly inappropriate, because only one Plaintiff, Texas, has even attempted to demonstrate injury from DACA. *See generally* Dkt. 383 (Mot. to Compel Disc.); *see also* Dkt. 357 at 37 (Pls.' MSJ Br.) (arguing that the "evidence introduced" shows that "Texas" has borne costs associated with DACA, and naming no other Plaintiff States). Granting a nationwide injunction based on the injuries suffered by one state would be ill-advised, but doing so where even those injuries are speculative, disputed, and the subject of pending discovery would be even more inappropriate.

### 2. *The Balance of the Equities Tips Strongly Away from Plaintiffs*

According to well-established principles of equity, Plaintiffs are not entitled to the injunctive relief they seek: Plaintiffs' delay in filing this action demonstrates their lack of irreparable harm; other remedies are available to redress Texas' alleged harm; DACA recipients face far greater hardship from losing DACA than Texas faces from DACA remaining in place; ending DACA would considerably harm the public interest, both nationwide and in Texas. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (for permanent injunctive relief, plaintiffs must show: (1) irreparable harm; (2) lack of adequate alternative remedies; (3) a balance of hardships weighing in their favor; and (4) no disservice to the public interest); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (recognizing that even upon victory on the merits, requested injunctive relief must not be awarded as a matter of course when the balance of the equities weighs against it).

Indeed, this Court has already recognized that—based on a substantially similar record—the balance of the equities weighs against granting preliminary relief to Plaintiffs. *See* Dkt. 319 at 115. Plaintiffs' six-year delay in challenging DACA and decision not to appeal this Court's preliminary injunction ruling only confirms what is already clear from analyzing Texas' purported injuries: any alleged harm DACA caused Texas has certainly not been "irreparable." *See Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, 612 F. Supp. 2d 759, 774 (S.D. Tex. 2007) (finding that delay of over one year was evidence plaintiffs would not suffer irreparable harm); Ex. 47 at 4, *All Access Today, L.P. v. Aderra Inc.*, No. A-08-CA-498 LY, 2009 WL 10669445, at *4 (W.D. Tex. July 7, 2009) (holding that it is well-settled that a "significant delay, on its own, provides an independent reason for finding there is no irreparable injury") (Ex. 37). Indeed, this Court noted Plaintiffs' delay when denying them a preliminary injunction, based on a record substantially unchanged to this day. *See* Dkt. 319 at 111.

Additionally, DACA provides considerable economic and societal benefits, both in Texas and nationwide, and DACA's termination would run contrary to the public interest. DACA recipients are integrated members of society. DACA recipients pay taxes, own businesses, work in a variety of industries, volunteer in their communities, and often advocate for other vulnerable populations. *See*, *e.g.*, Dkt. 224 at 53-54 & n.28 (Def.-Ints.' Post-Disc. PI Br.); *see also* Part IV.B.3, *supra* (outlining overall economic benefits of DACA to Texas). Halting DACA would negatively affect public safety and the wellbeing of Plaintiffs' residents, both immigrant and non-immigrant. Terminating DACA would discourage immigrants' willingness to assist law enforcement with criminal investigations, *see* Dkt. 224 at 15, Ex. 3, and by "compound[ing] the harmful effects of employment and economic loss . . . could result in additional demands placed on our mental health and social welfare system[s]." Dkt. 224 at 65, Ex. 4 at 18.

As this Court has recognized, the DACA "egg" "has been scrambled," and "many DACA recipients and others nationwide have relied upon it for the last six years." Dkt. 319 at 115 (Ct.'s PI Opinion); *see also id.* (concluding, on substantially the same record, that Defendant-Intervenors and the public's interest "outweigh those of the Plaintiff States").

The Court should not grant Plaintiffs' request for the nationwide injunction of DACA on the basis of an incomplete record. Instead, the Court should deny Plaintiffs' motion for summary judgment.

## VI.    CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court deny Plaintiffs' motion for summary judgment, or in the alternative defer adjudication of Plaintiffs' request until after Defendant-Intervenors have had an opportunity to respond to Plaintiffs' motion, twenty-one days after the close of discovery as ordered by this Court (or as modified by any subsequent order).[19]

Dated: June 14, 2019                    Respectfully Submitted,

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**
By: */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)

---

[19] The genuine disputes of material fact that preclude a response to a summary judgment motion at this stage in the litigation, as set forth herein and in Defendant-Intervenors' motion to deny or defer summary judgment, Dkt. 363, constitute a showing of good cause for the alternative request for an extension of time to respond to Plaintiffs' motion for summary judgment pursuant to Fed. R. Civ. P. 6(b)(1)(A). *Contra* Dkt. 373 at 8-9; *see Arreola v. Zapata Cty., Tex.*, No. 5:16-CV-00285, 2017 WL 4174932, at *1 (S.D. Tex. Sept. 12, 2017) ("This Court enjoys 'broad discretion to grant or deny a[n] extension'" based on equitable factors such as the possibility of prejudice, the reason for the delay, and whether the movant has acted in good faith (quoting *Salts v. Epps*, 676 F.3d 468, 474 (5th Cir. 2012)) (Ex. 38).

Ernest I. Herrera (Tex. Bar No. 24094718);
(SD of Tex. Bar No. 2462211)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org

Denise Hulett
Mexican American Legal Defense and
Educational Fund
1512 14th Street
Sacramento, CA 95814
Phone: (916) 444-3031
Email: dhulett@maldef.org
(Admitted pro hac vice)

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC 20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-
Driemeier@ropesgray.com
(Admitted pro hac vice)

**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

## <u>CERTIFICATE OF SERVICE</u>

      I, the undersigned, hereby certify that, on the 14th day of June, 2019, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*

Nina Perales
