**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**EXHIBITS IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# Volume 1

# Exhibits 1 - 6

# DEF-INTERV.
# EX. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF AMANDA BROWNSON

My name is Amanda Brownson. I am over the age of 18 and fully competent to make this declaration.

1. I am currently the Associate Executive Director of Governmental Relations for the Texas
   Association of School Business Officials.  I previously worked as Director of Research

and Policy at Raise Your Hand Texas, a non-profit organization whose mission is to advance research-drive innovation in education policy and practice at the campus, district, and state levels.

2. From 2013 to 2016, I served as Director of State Funding at the Texas Education Agency ("TEA").  During my time at TEA, I directed the Division of State Funding, which was responsible for calculating and distributing state aid payments under the Foundation School Program (FSP) and collecting recapture payments under Chapter 41 of the Texas Education Code.

3. Prior to my time at TEA, I served as a consultant at Moak, Casey & Associates, where a significant portion of my time was spent assisting school districts with the state aid calculations under the Foundation School Program.

4. I have a doctorate in Education Policy and Planning from the University of Texas at Austin.  My CV is attached as Exhibit 1.

5. The opinions I provide in this declaration are based on my extensive training and experience in the field of Texas school finance.   I am being compensated for my time in preparing this report at the rate of $150 per hour.  There are no cases in the past four years in which I have testified as an expert in trial or by deposition.

6. As TEA's Director of State Funding, I became familiar with the types of data that TEA collected.  From my experience, TEA does not track the number of Texas public school students who are: undocumented; DACA recipients; or unaccompanied children (UAC).

7. Per the request of counsel for Defendant-Intervenors, I reviewed the declaration of Leo Lopez that the Plaintiffs submitted in this case, and I attended Mr. Lopez's deposition on June 14, 2018, in Austin, Texas.  I offer the following opinions:

2

8. Mr. Lopez, in paragraph 3 of his declaration, estimates that the average funding entitlement for fiscal year 2019 will be $9,826 per unaccompanied child in attendance for an entire school year, assuming that the student qualifies for bilingual education and compensatory education weighted funding. To arrive at that figure, Mr. Lopez appears to have made several assumptions. He presumes that a student is enrolled for the entire school year, attends school every day (*i.e.*, 100 percent average daily attendance), and is eligible for both a bilingual education and a compensatory education weight. Those assumptions are inappropriate for a number of reasons.

9. First, the average child does not attend school every single day. Based on my comparison of average daily attendance (ADA) to enrollment over the previous two school years (2015-2016 and 2016-2017), ADA is likely about 93 percent of enrollment, not 100 percent. By overestimating ADA, Mr. Lopez also overstates the average funding entitlement per student.

10. Because TEA does not track UAC, it is unclear what percentage of those students would be eligible for compensatory education weighted funding, that is, which students in the prior school year participated in the federal free and reduced-priced lunch program. Mr. Lopez provides no basis in his declaration for assuming that 100 percent of UACs fall into the "compensatory education" category. In addition, because TEA does not track DACA recipients, it is unclear what percentage of those students would be eligible for a compensatory education weight.

11. At his deposition, Mr. Lopez stated that he believed UACs are a reasonable proxy for DACA. UACs do not seem to have a connection to DACA and it is inappropriate to use the cost of educating UACs as a proxy for the cost of educating DACA recipients. After

3

reviewing the United States Citizenship and Immigration Services guidelines for DACA, it is my understanding that a child has to have resided continuously in the United States since June 15, 2007 in order to qualify for DACA. However, Mr. Lopez testified in his deposition that the population of UACs he used to calculate the average funding entitlement per student were released to sponsors in October 2014 or later. Thus, it seems as though there is little to no overlap between UACs and DACA recipients.

12. Furthermore, bilingual education funding seems to have little to no connection to DACA recipients. Students are not likely to receive bilingual education weighted funding as DACA recipients. After reviewing the United States Citizenship and Immigration Services guidelines for DACA, I understand that a child would have to be at least 15 years old to request DACA. From my experience at TEA, I understand that students can qualify for the bilingual weight if they are identified as limited English proficient and are participating in a bilingual education, English as a Second Language (ESL), or other special language program. Based on my experience, students drawing the bilingual education weight are more likely to be in elementary or middle school. I know of no elementary school student who is 15 years old or older, and the majority of middle school students are under age 15. While Texas high schools may offer language programs that would generate funding under the bilingual/ESL weight, those programs are generally for recent immigrant students who would have arrived after the June 15, 2007 date for DACA eligibility. Therefore, it is very unlikely that current DACA recipients receive additional funding under the bilingual education weight.

13. For those reasons, Mr. Lopez's $9,826 estimate is an inflated estimate of the average funding entitlement for fiscal year 2019 for UACs and for DACA recipients. Further,

4

Mr. Lopez makes the abovementioned assumptions for fiscal years 2016, 2017 and 2018 and, therefore, the cost estimates of $9,573, $9,639 and $9,841 discussed in his paragraph 4 are also inflated.

14. In paragraph 5 of his declaration, Mr. Lopez says the entire cost of educating unaccompanied minors is borne by the State. That conclusion understates the role that local property taxes play in providing for the cost of education in Texas. Under the Foundation School Program, a total entitlement is calculated based on the number of students who attend school, the funding weights those students draw down, and the characteristics of the school district that may impact cost (*e.g.*, the district's cost-of-education index and school size). Once that total entitlement is calculated, a local share is subtracted based on the application of a tax rate to the prior-year property value of the school district in which the student attends school. Over time, as the economy and population changes, property values tend to increase. According to the TEA website, the State of Texas's share of education spending for public schools has dropped from 49 percent in 2008 to 40 percent in 2018.

15. Over the past three school years, it appears that local property values in Texas have, in fact, increased or are projected to increase at a rate fast enough to offset student enrollment increases such that the overall state aid has not increased as student enrollment increased, This demonstrates that in recent years increased local property taxes, rather than increased state aid, have paid for student enrollment growth in Texas public schools. *See Table 1.*

16. Table 1 likely over-estimates the true statewide cost of the Foundation School Program in fiscal years 2018 and 2019, as average daily attendance appears likely to decline once

final data reflecting actual attendance are incorporated into the state aid calculations. According to the 2017-2018 TEA Statewide Summary of Finance, payments were made this year based on estimated average daily attendance of 5,060,903 students. However, the TEA district planning estimate (DPE) currently reflects projected ADA of only 5,008,020 (a drop of more than 52,000 students). One consequence of that anticipated drop is that the TEA district planning estimate reflects an anticipated "settle-up" in the state's favor of almost $340 million for the 2017-2018 school year, which the state will recuperate by reducing payments to certain districts in the 2018-2019 school year. TEA has been making payments to school districts based on the legislative payment estimate (LPE) data reflecting higher student counts. Each September, TEA "settles up" with school districts by making payments to any districts who were under-paid during the prior year and recuperating any over-payments that were made during the prior year by reducing payments in the current year.

17. In paragraph 6 of his declaration, Mr. Lopez says the State plans for an increase of approximately 70,000 students in enrollment growth across Texas each year. That increase is likely not due to DACA, as DACA eligibility to my understanding requires a person to have lived in the United States since 2007. Additionally, the figure of 70,000 appears to overstate the actual enrollment growth experienced by the public education system in recent years. *See Table 2.*

18. The estimate of the deficit ($143.4 million) in the Foundation School Program in paragraph 7 does not appear to take into account the anticipated "settle-up" process. If TEA's estimate of settle-up is accurate, it should be sufficient to more than compensate for the roughly $143.4 million deficit projected in February 2018. Additionally, since

TEA's average daily attendance estimated for 2018 appears to have been high – and the 2019 count was estimated based on an increase from 2018 – it is likely that TEA also overestimated the count of ADA in 2019.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 15th day of June, 2018 in    Travis County                         .

_____
AMANDA BROWNSON

**Table 1.**  State Aid and Local Revenue under the Foundation School Program, 2015-2016 through 2018-2019

|  | 2015-2016 (final) | 2016-2017 (final) | 2017-2018 (LPE) | 2018-2019 (LPE) |
|---|---|---|---|---|
| **ADA** | 4,924,906.14 | 4,971,924.26 | 5,060,903.35 | 5,168,918.312 |
| **Local Property Taxes** | $27,755,285,353 | $29,371,727,289 | $31,402,528,887 | $33,697,402,941 |
| **Total FSP / Available School Fund State Aid** | $21,526,864,980 | $20,996,934,591 | $21,014,663,863 | $20,828,813,651 |
| **Estimated Recapture** | ($1,579,109,696) | ($1,721,320,031) | ($2,081,434,387) | ($2,690,714,377) |
| **State Aid Net of Recapture** | $19,947,755,284 | $19,275,614,560 | $18,933,229,476 | $18,138,099,274 |

*Source: TEA Statewide Summary of Finance Reports.  Recapture figures in Table 1 were taken from the TEA website for the corresponding "run id."*

**Table 2.  Annual Texas Public School Enrollment Growth**



*Source: TEA PEIMS Standard Reports available online:*
https://tea.texas.gov/Reports_and_Data/Student_Data/Standard_Reports/PEIMS_Standard_Reports_Overview/

# DEF-INTERV.
# EX. 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

## DECLARATION OF BARBARA HINES

I, Barbara Hines, hereby declare:

1.  I am over the age of 18 and make this declaration based on my own personal knowledge. If called to testify, I could and would do so competently as follows:

**Background and Experience**

2.  I have been a licensed attorney in Texas since 1975. I have practiced in the field of immigration law since that time. From 1982 until January, 1999, I handled all type of immigration cases, including visa applications, naturalizations, adjustment of status, requests for deferred action and other immigration benefits, as well as removal defense, in private practice. From October 1991 until June 1994, I also served as the Co-Director of the Lawyers Committee for Civil Rights of Texas, Immigrant and Refugee Rights Program. As Co-Director of the Texas Lawyers Committee, I litigated immigration

cases in Texas, wrote amicus briefs, provided back up technical support for immigration non-profits in the state, and participated in state-wide coalitions. From January, 1999 until December 2014, I founded and directed the immigration clinic at the University of Texas School of Law.  As a faculty member in the immigration clinic, I taught substantive immigration law and lawyering skills as well as supervised students in their casework.   The cases handled by the immigration clinic included removal defense, adjustment of status, applications under the Violence Against Women's Act, U visas, citizenship, DACA, deferred action, and asylum,  As an additional teaching activity, I taught a seminar at the University of Texas School of Law on the immigration consequences of crimes (for two semesters).

3.   From June 2015 to May 2017, I served in part time capacity as a Senior Fellow at the Emerson Collective, a non-profit organization based in Palo Alto, California, founded by Laurene Powell Jobs.  At the Emerson Collective, I was funded to conduct immigration advocacy and legal work in Texas and nationally, particularly relating to detention of families seeking asylum.

4.   Since retiring from my position at the immigration clinic, I have taught as an Adjunct Professor at the University of Texas School of Law.  In the fall of 2016, I taught a seminar entitled Immigration Law and Policy which included readings and a discussion of the DACA program.  In the spring of 2018, I taught a course entitled Advanced Topics in Immigration Law and Policy, where again DACA was included as a class topic.  For several years, I served as an update resource for Kurzban's Immigration Law Sourcebook, the leading immigration treatise.

2

5. From 1981 until 2016, I was Board Certified in Immigration and Nationality Law by the State Bar of Texas. I did not renew my Board Certified because I am no longer working full time.

6. I was a Fulbright scholar in Argentina in 1996 and 2004 where I researched Argentine immigration law and a taught a course on U.S. immigration law at the University of Palermo in Buenos Aires, Argentina.

7. I have won numerous awards for my work in the field of immigration law. Later this month, June 2018, I will be awarded the Ohtli Award by the Mexican Government for service to Mexicans and Mexican Americans. My other awards include: the 2014 University of Texas School of Law Massey Award for Teaching; the 2010 National Lawyers Guild Carol King Award; the 2007 AILA Elmer Fried Excellence in Teaching Award; the 2002 Texas Law Fellowships Excellence in Public Interest Award; the 1993 AILA Texas Chapter Litigation Award; and the 1992 American Immigration Lawyers Association (AILA) Jack Wasserman Award for Excellence in Litigation.

8. Attached to this declaration is my resume showing publications in the past 10 years. Within the past four years, I only testified by deposition or at trial in one case: *Grassroots Leadership, Inc. et al. v. Texas Department of Public Safety, et al.*, No. D-1-GN-15-004336 in Travis County District Court. I am being compensated $250/hr. plus expenses for my work in this case.

9. The opinions I express in this declaration are based on my training, decades of experience practicing and teaching immigration law, and direct contact with undocumented youth and other attorneys who represent undocumented youth.

10. I have worked with undocumented youth, including the DACA population, for many years.  Before the passage of DACA, I represented young undocumented individuals in my private practice and law clinic, and I assisted in finding legal representation across the country for students facing removal proceedings.  In addition, during my tenure at the University of Texas Immigration Clinic, I advised college students about their immigration status and subsequently their eligibility for DACA.

11. When DACA became available, in collaboration with other organizations and volunteer lawyers, the University of Texas immigration clinic and the William Wayne Justice Center for Public Interest designed a system of free legal clinics to assist DACA-eligible individuals to file their applications.  Over the course of two years, we held thirteen pro bono clinics in Austin staffed by students and volunteers and assisted between 50-100 individuals at each clinic to file for deferred action under DACA. Our clinic model was replicated across the state and the country.   The immigration clinic also filed DACA applications for applicants who were already clients of the clinic.  I also spoke at schools and community organizations regarding DACA eligibility.

12. Through my experience working with the DACA population, I have become familiar with and have worked closely with many individuals who have received DACA, including law students whom I have taught.

## DACA ADJUDICATIONS

13. The United States Citizenship and Immigration Services is the immigration benefits division of the Department of Homeland Security.  After September 11, 2001 (9/11), the U.S. Immigration and Nationality Service split into three agencies under the newly formed Department of Homeland Security:  Citizenship and Immigration Services

(USCIS), Immigration and Customs Enforcement (ICE) and Customs and Border Enforcement (CBP).[1]  USCIS is not the law enforcement arm of DHS and in fact, the separation of enforcement and immigration benefits was specifically contemplated when DHS was created. "The Services function –also called adjudications or benefits-involves the approval or denial of applications filed by would be migrants…".[2] The term "immigration benefits" means "any application or petition to confer, certify, change, adjust, or extend any status granted under the Immigration and Nationality Act." 8 U.S.C.A. § 1572.  In addition to the statutory definition, the term also refers to others actions of USCIS decisions, for example: naturalization, employment authorization, deferred action, renewal and replacement of lost documents.

14. The majority of applications for immigration benefits are adjudicated at a remote USCIS Service Center without an in-person interview.  Instead they are decided based on the information contained in the application, supporting documents, and a biometrics background check.  In fact, 44 different immigration benefits are adjudicated in this manner.[3] These immigration benefits range from non-immigrant visa petitions to applications for lawful permanent residence status.

15. Over the course of my career, the former INS and now USCIS has shifted most of its adjudication functions to the remote Service Centers.  The adjudication of DACA applications thus follows normal USCIS procedures for most immigration benefits.

16. Like other applicants, DACA applicants are required to submit documentation establishing their eligibility and respond to any requests for additional evidence.  For

---

[1] See Homeland Security Act of 2002, available at https://www.dhs.gov/homeland-security-act-2002.
[2] Aleinikoff, Thomas Alexander. Immigration and Citizenship: Process and Policy. 7th ed., West, 2012. p. 240
[3] "Service Center Forms Processing." United States Citizenship and Immigration Services, United States Department of Homeland Security, <www.uscis.gov/forms/service-center-forms-processing>

DACA that is proof of age, length of residency in the U.S, school records, relevant criminal records, and a biometrics background check of law enforcement and national security databases.  Furthermore, like many other applications adjudicated without an interview, if the USCIS officer has questions about the application, the agency will issue a Request for Further Evidence or require an in-person interview of a DACA applicant.[4]

17. From my experience supervising numerous DACA clinics, and from my work on the individual cases at the immigration clinic, I learned that applicants who would not qualify for DACA do not apply, either because they could not meet the DACA requirements (including age, education or length of presence in the U.S.), or because they had a disqualifying personal history. As an attorney, when I learned that a potential applicant would not meet the eligibility criteria for DACA, I counselled that individual not to apply.  I also saw some individuals who were not sure that they met the high bar of the DACA criteria decline to file an application out of fear that they would be placed in removal, or out of fear that they would spend $465.00, a sizable sum of money for the undocumented population we served, only to face likely rejection.

18. When DACA was announced, non-profit organizations, immigration clinics, immigrant advocacy organizations and private attorneys mobilized to provide free or low cost legal advice to DACA eligible individuals, using workshop and clinic models.  Others, such as United We Dream, developed an on-line screening tool.  These efforts screened out individuals whose applications were likely to be denied by USCIS if they had applied.

---

[4] "Frequently Asked Questions." United States Citizenship and Immigration Services, United States Department of Homeland Security, <www.uscis.gov/archive/frequently-asked-questions>

19. DHS statistics show that from January 2017 to the present, the rate of DACA initial application denials is 19.81%.[5]

20. Based on my experience as an immigration lawyer, and what I know from conversations with other immigration lawyers, the DACA denial rate is consistent with other discretionary applications such as adjustment of status. It is my opinion that the approval rate of DACA applications is not due to "rubber stamping" but due to the high caliber of the DACA applications submitted to USCIS.

## ADVANCED PAROLE AND ADJUSTMENT OF STATUS TO LAWFUL PERMANENT RESIDENCE

21. Parole authority, including advanced parole, is provided for under INA §212(d)(5) and implementing regulations. Parole may be granted, for humanitarian reasons or in the public interest, to allow a person to enter the U.S or to be released from detention. 8 CFR §212.5. Cubans may be granted parole in place, making them eligible for the Cuban Adjustment Act, even if they entered without inspection.[6]

22. Advance parole allows a person who is present in the U.S. to travel abroad and upon return to the U.S. to present a parole document for re-entry. 8 C.F.R. § 212.5(f). Advance parole is available to a wide range of persons, other than DACA holders,

---

[5] "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (September 30) " United States Citizenship and Immigration Services, United States Department of Homeland Security, September 30, 2017, available at https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20 Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr4.pdf and "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status Fiscal Year 2012-2018." United States Citizenship and Immigration Services, United States Department of Homeland Security, 31 Mar. 2018, available at www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms% 20Data/All%20Form%20Types/DACA/DACA_Quarterly_Report_4.2.18.pdf
[6] Kurzban, Ira J. Kurzban's Immigration Law Sourcebook: A Comprehensive Outline and Reference Tool. 15th ed., American Immigration Lawyers Association, 2016. p. 888-890

including those with a pending application for adjustment of status, Temporary Protected Status, T and U non-immigrant visas, IMMACT 90 and LIFE Act Family Unity beneficiaries, and Temporary Resident Applicants under INA §245A.[7]

23. The presentation of an advance parole document upon arrival back into the U.S. does not guarantee readmission. The inspecting officer at a port of entry may still deny entry based on inadmissibility grounds.[8] An individual's re-entry into the U.S. with advance parole is a lawful entry under immigration law. For example, a person with Temporary Protected Status (TPS) can apply for advance parole to visit a sick relative in her home country. If the TPS-holder is permitted to re-enter the U.S., she had made a lawful entry. There are approximately 437,000 TPS holders in the United States.[9]

24. Advance parole has been recognized as an accepted practice by the Board of Immigration Appeals.[10] The decision to grant advance parole is made on a case by case basis.[11]

25. Contrary to the claims in the Palinkas affidavit, DHS reports that in 2015 it granted a total of 300,803 advance parole applications; 12,847 of those advance parole grants went to DACA recipients (4.27%). In 2014, DHS granted advance parole to 5,687 DACA recipients, while granting a total of 253,119 advance parole applications (2.25%). In

---

[7] "Instructions for Application for Travel Document." United States Citizenship and Immigration Services, United States Department of Homeland Security, 23 Dec. 2016, <www.uscis.gov/sites/default/files/files/form/i-131instr.pdf>
[8] Id.
[9] Redacted, Name. "Temporary Protected Status: Overview and Current Issues." Congressional Research Service, Congressional Research Service, 15 May 2018, <www.everycrsreport.com/files/20180515_RS20844_182e73595c174cfea704cbb57ad5e17f22abed40.pdf>
[10] *Matter of G-A-C-*, 22 I&N Dec. 83 (BIA 1998.); Matter of Arrabally and Yarabelly 25 I&N Dec.771 (BIA 2012).
[11] "USCIS Advance Parole Documents ." United States Citizenship and Immigration Services, United States Department of Homeland Security, 6 Jan. 2017, <www.dhs.gov/sites/default/files/publications/USCIS%20-%20USCIS%20Advance%20Parole%20Documents.pdf>

2013, DHS granted advance parole to 1,409 DACA recipients, while granting a total of 263,420 advance parole applications (.53%).[12]

26. The total number of DACA advance parole documents issued from 2012 to 2015, 19,943, represents only 2.9% of the 698,758 individuals granted DACA from 2012 to 2015. In addition, this number is, in all likelihood actually lower because a single DACA recipient could have been granted advance parole more than one time. DHS data aggregates the number of advance parole documents issued, not the number of individuals granted advanced parole.

**Adjustment of Status**

27. Adjustment of status to lawful permanent residence is provided for under INA §245. Lawful permanent residence is not citizenship. Instead, a lawful permanent resident is eligible to apply for naturalization five years after obtaining status or after three years, if married to a U.S. citizen.

28. The requirements for adjustment of status, among others, include lawful admission or parole, maintenance of lawful status, an approved visa petition under the family or employment based categories and a current visa number.[13] INA § 245. Adjustment of status for immediate relatives, (spouse of a citizen, child under age 21 of a citizen parent, parent of a citizen child over the age of 21) while requiring lawful admission or parole, does not require the maintenance of lawful status. In addition, there is no limitation on the number of immediate relatives who may obtain status each year, and thus, a visa

---

[12] *Id.* p. 6
[13] The visa quota system limits the number of immigrant visas (other than immediate relatives) issued each year world-wide in each category as well as per-country limitations. INA §§201-203.

number is always currently available.  Immediate relatives represent the largest number of immigrants, almost one-half, admitted as lawful permanent residents each year.[14]

29.  In addition to adjustment of status under INA §245, INA §245(i) provides for adjustment of status without lawful admission or parole and without maintenance of lawful status. This section of the immigration laws requires that a visa petition or labor certification application[15] was filed before April 30, 2001 and that upon adjustment of status, the applicant pay an additional $1000 penalty as part of the filing fee.

30.  Although §245(i) has been repealed, the statute provides a "grandfathering" mechanism. The principal beneficiary of the visa petition or labor certification application, his or her spouse, and children (who were under the age of 21 at the time of the filing of the petition or application) are "grandfathered." 8 CFR §245.10(a) (1)(i). They are able to adjust their status based on the original visa petition or labor certification application or any other future approved petition.

31.  "Grandfathering" is person-specific, rather than petition-specific. This means that an applicant may use a different petition and different visa category than the one filed before April 30, 2001 to adjust status.  8 CFR §245.10.  Thus, some DACA holders are "grandfathered" under INA §245(i) and may use this mechanism to adjust status without advance parole or lawful admission.[16]

32.  Furthermore, the number of DACA recipients who adjusted status after obtaining advance parole is very small.  According to DHS statistics, between 2013 and 2015,

---

[14] "Table 6. Persons Obtaining Lawful Permanent Resident Status By Type And Major Class Of Admission: Fiscal Years 2014 To 2016." *United States Department of Homeland Security*, United States Department of Homeland Security, 18 Dec. 2017, <www.dhs.gov/immigration-statistics/yearbook/2016/table6>
[15] The labor certification application filed with the Department of Labor is the first step for certain employment based categories.  20 CFR § 656 *et. seq.*
[16] Matter of Ilic, 25 I&N Dec. 717, 719 (BIA 2012) citing Memo, Yates, Assoc. Dir. Operations, USCIS, HQOPRD, 70/23.1 (March 2005).

4,833 DACA recipients adjusted their status to lawful permanent residence after obtaining advance parole.[17] A much larger group of non-DACA recipients, 11,999 individuals, adjusted status after receiving advance parole during the same periods of time.[18]

33. The overwhelming majority of DACA recipients who adjusted their status to lawful permanent residence did so without advance parole. This becomes evident by comparing the 4,833 DACA recipients who adjusted their status to lawful permanent residence after obtaining advance parole to the 34,681 DACA recipients who adjusted their status without advance parole.[19] This much larger group of DACA recipients were *already* eligible to adjust because they entered with a non-immigrant visa. because they were "grandfathered" or because they qualified under another law that does not require a lawful admission.[20] Thus, for them, DACA served as a temporary bridge as they transitioned from undocumented to an immigration status.

34. Although Mexicans make up the largest percentage of DACA recipients, those from countries other than Mexico and Central America generally arrived in the U.S. with non-immigrant visas and under the visa-waiver program. Thus, this DACA population would be eligible for adjustment of status, notwithstanding advance parole.

35. DACA recipients' independent eligibility for adjustment of status, without the need for advance parole, is consistent with data regarding visa overstays. Mexican citizens

---

[17] "USCIS Advance Parole Documents ." United States Citizenship and Immigration Services, United States Department of Homeland Security, 6 Jan. 2017, p. 8 <www.dhs.gov/sites/default/files/publications/USCIS%20-%20USCIS%20Advance%20Parole%20Documents.pdf>
[18] *Id.* See also https://www.washingtonpost.com/news/fact-checker/wp/2017/09/07/did-obama-allow-a-backdoor-to-citizenship-through-daca/?utm_term=.db47214653fb
[19] Plaintiffs assert that 39,514 DACA recipients have been approved for lawful permanent resident status. See Dkt. 5 at 3 and Dkt. 6 at App. 12.
[20] *Id.* p. 5

comprise the largest number of DACA holders.   Of the approximately 800,000

individuals who have had or currently have DACA, 548,000 come from Mexico.[21]

36. At the same time, after Canadians, Mexicans constitute the largest number of visa

overstays in the country.[22]

37. In addition to adjustment of status under INA 245 and 245(i), DACA recipients have

other means of adjustment of status that do not require legal admission or parole.

Applicants under the Violence Against Women Act may adjust status, regardless of their

means of entry into the country. INA §§ 204(a)(1)(A)(iii)-(vii) and (B)(ii)-(iii); 8 CFR

§204.2(c)(4).   Likewise, victims of crime or trafficking may apply for U and T visas

(*see* INA §§101(a)15 (U) and (T)) and subsequently adjust their status to lawful

permanent residence, regardless of their manner of entry. INA §§245(l) and (m).   Others

may qualify for Special Juvenile Immigrant Status because of abuse or abandonment by a

parent, leading to lawful permanent residence without having to prove a lawful entry or

parole. INA §101(a)(27)(j). Central Americans may qualify Special Rule Cancellation

under the Nicaraguan and Cuban Adjustment Act. 8 CFR §1240.61(a)(4). A person

granted asylum or whose parent was granted asylum is eligible to adjust status to lawful

permanent residence after one year in asylee status.  Asylee adjustment does not require a

lawful admission.  INA §209.

38. For example, a person could receive DACA, subsequently be granted asylum and adjust

status one year later. I counselled a person who received DACA and did exactly this.

---

[21] López, Gustavo, and Jens Manuel Krogstad. "Key Facts about Unauthorized Immigrants Enrolled in DACA." Pew Research Center, Pew Research Center, 25 Sept. 2017, <www.pewresearch.org/fact-tank/2017/09/25/key-facts-about-unauthorized-immigrants-enrolled-in-daca/>
[22] "Entry/Exit Overstay Report Fiscal Year 2015." United States Department of Homeland Security, United States Department of Homeland Security, 19 Jan. 2016, p. 22 <www.dhs.gov/sites/default/files/publications/FY%2015%20DHS%20Entry%20and%20Exit%20Overstay %20Report.pdf>

When her parents received asylum, she adjusted her status as a derivative of their asylum grant.

39. During the DACA clinics held by the University of Texas Law School, we regularly screened for and counselled DACA applicants who qualified for other means of adjustment of status or permanent residence and referred them to non-profit agencies and private lawyers to pursue these avenue, in addition to pursuing DACA. We took several cases from the DACA clinics for full representation at the immigration clinic because they were eligible for other forms of status under the immigration laws.

40. For many of the DACA youth who attended workshops across the country, it was the first time they had spoken to any attorney and many were unaware of other legal options available to them.

41. None of these avenues of obtaining lawful permanent residence status under the Immigration and Nationality Act involve "jumping ahead of any line" as erroneously asserted by Mr. Palinkas. Instead they represent lawful, historical and well-established means of obtaining permanent residence in the U.S. that are available to all non-citizens, including DACA recipients.

**UNLAWFUL PRESENCE AND DACA**

42. Unlawful presence has been defined by both statute and policy memos. Periods of time in deferred action (and not any time before or after such periods) have never been considered unlawful presence for purposes of INA §212(a)(9). The tolling of unlawful presence is not unique to DACA holders who receive deferred action. On the contrary, since the passage of the 1996 immigration law creating the concept of unlawful presence,

13

the period of time in deferred action has never been counted for the accrual unlawful presence.[23]

## LEAVING THE U.S. IF DACA IS CANCELLED

43. Based on my experience working with the DACA population, I do not believe that the rescission of the DACA initiative will cause recipients to leave the United States. I worked with this population for many years before the DACA program. Almost none of them considered or made the decision to leave the United States. Instead, they advocated or hoped for federal legislation that would provide them with permanent status in the United States. I have only worked with one DACA eligible student who left the U.S. with his parents before the DACA program; this was because his family was granted residency in Canada.

44. Many DACA recipients come from mixed status families whom they would not abandon by leaving the US. Other DACA recipients have other means of legalizing their status through other immigration provisions of the law, as previously explained herein. Some are currently on the waiting lists for immigrant visas under the world-wide quota system. Others plan to marry. These applicants would not leave the U.S. either. It is my opinion that without DACA, they will remain in the U.S. and be forced back into the uncertainty of unauthorized status.

---

[23] See, Adjudicator's Field Manual, (AFM) Chapter 40. 9(b)(3)(J),
https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-17138/0-0-0-18383.html#0-0-0-617;
Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act, Revision to and Re-designation of Adjudicator's Field Manual (AFM) Chapter 30.l(d) as Chapter 40.9 (AFM Update AD 08-03), May 6, 2009, http://www.aila.org/infonet/uscis-consolidation-guidance-unlawful-presence; Additional Guidance for Implementing Sections 212(a)(6) and 212(a)(9) of the Immigration and Nationality Act (Act). June 17, 1997, http://www.aila.org/infonet/ins-grounds-inadmissibility-unlawful-presence and 40.9 Section 212(a)(9) of the Act - Aliens Unlawfully Present after Previous Immigration Violations." United States Citizenship and Immigration Services, United States Department of Homeland Security, www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-17138/0-0-0-18383.html

## UNACCOMPANIED MINORS AND DACA

45. An "unaccompanied child" (UAC) is a unique identifier under immigration law and has nothing to do with DACA. A UAC is a child who "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g) (2012).

46. Some UACs are further protected under the William Wilberforce Trafficking Victims Protection Act of 2005 and the Reauthorization Act of 2008 (TVPRA). Under the TVPRA, "special immigrant juvenile status" is available to a child who has been declared dependent by a juvenile court in the U.S. or who has been placed by such court in custody of a state agency or other individual or agency; whose reunification with one or both of his or her parents is not viable due to abuse, neglect, abandonment or a similar basis under state law and for whom it has been determined that it would not be in his or her best interest to return to his or her country of nationality or country of last residence or that of his or her parents. INA §§101(a)(27)(J)(i) and (ii).

47. UACs are typically identified shortly after crossing the border into the United States. UACs arriving during what has been described as a "surge" from Central America in 2012 and the years thereafter cannot qualify for DACA because they did not arrive in the U.S. before June 15, 2007 and remained in the U.S. since 2007. Thus, it is my opinion that the number of UACs in Texas is unrelated to the number of DACA recipients in Texas. Furthermore, the number of UACs in Texas has no relationship to the costs, benefits, or impact of the DACA program on Texas.

15

48. Scholarly research demonstrates that the announcement of the DACA program did not lead to an increase in the number of UACs arriving at the southern border. First, the numbers of UACs from Central America had been steadily rising well before DACA began.[24]

49. David Bier, a fellow at the CATO Institute, concluded that "the overwhelming weight of evidence reveals that DACA was not a factor in the recent influx of children."[25] Data shows that "the massive increase in unaccompanied alien children (UACs) began before DACA was even announced in June 2012. Without knowledge of the program, the children who came to the border in early 2012 could not have been motivated by DACA…. Fewer UACs entered illegally in the 3 months after DACA than the 3 months before it."[26] "In fact, fewer children entered the United States illegally in 2014 than in 2004, indicating that illegal child migration is not a recent phenomenon.[27]

50. Instead, the violent conditions in Central American, from where the majority of UACs come, represent the primary reason for the larger numbers, and secondarily the provisions of the TVPRA.[28] "Research based on qualitative survey evidence has generally concluded that violence is a leading cause of recent increases in emigration from the Northern Triangle, including unaccompanied child migration."[29]

---

[24] Bier, David. "*Examining* the UAC-DACA Link." Niskanen Center, Niskanen Center, 9 Feb. 2015, <niskanencenter.org/wp-content/uploads/2015/02/Examining-the-UAC-DACA-Link2.pdf>
[25] *Id.* p. 9
[26] *Id.* p. 1
[27] *Id.*
[28] Clemens, Michael A. "Violence, Development and Migration: Evidence from Central American Child Migrant Apprehensions." IZA Institute of Labor Economics, Deutsche Post Foundation, July 2017,< ftp.iza.org/dp10928.pdf>
[29] Clemens, Michael A. "Violence, Development and Migration: Evidence from Central American Child Migrant Apprehensions." IZA Institute of Labor Economics, Deutsche Post Foundation, July 2017, p. 5 < ftp.iza.org/dp10928.pdf>

51. "Violence is among of the main drivers causing the increase. Whereas Central American countries that are experiencing high levels of violence have seen thousands of children flee, others with lower levels of violence are not facing the same outflow."[30] "The TVPRA, along with the violence in the originating countries and economic conditions emerge as the some of the key determinants. The claim that DACA is responsible for the increase in the flow of unaccompanied alien children is not supported by the data".[31]

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 15th day of June, 2018 in Austin, TX

Barbara Hines

---

[30] Wong, Tom K. "Statistical Analysis Shows That Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border." Center for American Progress, Center for American Progress, 18 Nov. 2015, <www.americanprogress.org/issues/immigration/news/2014/07/08/93370/statistical-analysis-shows-that-violence-not-deferred-action-is-behind-the-surge-of-unaccompanied-children-crossing-the-border/ >

[31] Amuedo-Dorantes, Catalina, and Thitima Puttitanun. DACA and the Surge in Unaccompanied Alien Children. Princeton University, <paa2015.princeton.edu/papers/151149.>; Puttitanun, Thitima. "DACA and the Surge in Unaccompanied Minors at the US-Mexico Border." Freshwater Biology, Wiley/Blackwell (10.1111), 6 Apr. 2016, p. 19 <onlinelibrary.wiley.com/doi/pdf/10.1111/imig.12250.>

17

# DEF-INTERV.
# EX. 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF ART ACEVEDO

My name is Art Acevedo.  I am over the age of 18 and fully competent to make this declaration.

1. I am currently the Chief of Police for the City of Houston, Texas. I was sworn in as Chief
   of Police for the City of Houston on November 30, 2016.

2. I have 32 years of law enforcement experience. Prior to my appointment as Houston's
   Chief of Police, I served as the Chief of Police for the City of Austin from July 2007 until

1

I joined the Houston Police Department ("HPD"). I began my law enforcement career in 1986 as a field patrol officer in East Los Angeles with the California Highway Patrol, a densely populated community and comprised of many immigrants, primarily of Hispanic/Latino origin. I rose through those ranks and was promoted to Chief, California Highway Patrol in 2005.

3. I have held various leadership positions in and am currently a member of the Major Cities Chiefs Association (MCCA) and the International Association of Chiefs of Police (IACP). I am currently the First Vice President and Chair of the Homeland Security Committee of the MCCA and represent the organization on the Criminal Intelligence Coordinating Council. I am also a member of the IACP Research Advisory Committee and a member for United States Department of Homeland Security Secretary Advisory Council.

4. I have a Bachelor of Science Degree in Public Administration from the University of La Verne in California.

5. The views expressed in this declaration are based on my law enforcement training, decades of experience, and direct contact with undocumented residents in Houston, Austin, and in California.

6. The City of Houston is the fourth most populous city in the nation with a population of about 2.3 million residents. Its population is comprised of citizens, non-citizens, legal residents, visitors and undocumented immigrants.

7. As Chief of Police, I lead a department of 5,200 sworn law enforcement officers and 1,200 civil support personnel.[1] On average, HPD annually responds to roughly 1.2 million calls for service, makes 400,000 traffic stops and actively investigates 150,000

---

[1] *See* http://www.houstontx.gov/police/chief.

reported crimes.  I am proud of the hard work that HPD does to keep the City of Houston safe.  HPD officers work tirelessly to investigate crimes, arrest those responsible, and protect all Houstonians, regardless of their immigration status. Moreover, HPD recognizes the greatest force multiplier that enables us to keep everyone within our jurisdiction safe, is the public.

8. HPD works cooperatively with our partners at the Texas Department of Public Safety and federal law enforcement agencies, including Immigration and Customs Enforcement. For example, we collaborate to arrest perpetrators of human trafficking and to disrupt violent street gangs that threaten our communities.

9. To solve crimes, HPD works extremely hard to build and maintain trust, communication, and strong relationships with the communities it is sworn to serve and protect.  The City of Houston is safer when everyone, regardless of immigration status, feels comfortable interacting with law enforcement.  For that reason, I am a big proponent of "community policing" and "relational policing."  I view every interaction with a resident as an opportunity to create a positive relationship between the police officer and the individual community member.

10. HPD officers rely on the information and community connections we have to solve crimes. Our jobs are made much more difficult if we do not have the trust of the community.  For example, in circumstances in which only one person witnessed a crime and that person is unwilling to report what happened because of fear of deportation, I have to direct more resources toward solving that crime than would otherwise be necessary.  Those are resources that could otherwise be spent investigating other crimes. Most troubling, are crimes that remain unsolved due to the loss of trust and cooperation

from victims and/witnesses in the immigrant communities, which results in the further victimization of the public at large. Thus, community trust is essential to our ability to do our jobs effectively to protect the Houston community.

11. Undocumented immigrants are among the most vulnerable members of the Houston community and are often afraid of reporting crime and providing needed assistance and cooperation. Many undocumented immigrants fear that interaction with law enforcement could lead to an investigation into their immigration status, deportation and separation from their family members, many whom are in this country legally.

12. In my experience, an all-too-familiar scenario that I encounter is one of an abuser threatening his undocumented partner that she will be deported if she reports his abuse to police. Many times, the abused partner believes these threats and does not report the crime to our Department or otherwise seek assistance for fear of deportation and separation from her children.

13. In April 2017, I announced that HPD found that, against the backdrop of increased fears of deportation among immigrants, the number of Latinos reporting violent crimes to HPD fell 13 percent and the number of Latinos reporting rape had fallen 42.8 percent from the previous year. That data was alarming. A person who rapes, robs or violently attacks an undocumented immigrant would likely do the same to a citizen or legal permanent resident.

14. Last year, Houston saw a decrease in domestic violence reports from the Latino community, while at the same time the City saw an increase in non-Hispanic victims reporting rape and an increase in non-Hispanics reporting other violent crimes.[2]

---

[2] *See* "HPD chief announces decrease in Hispanics reporting rape and violent crimes compared to last year", at https://www.chron.com/news/houston-texas/houston/article/HPD-chief-announces-decrease-in-Hispanics-

15. The problem of undocumented immigrants underreporting crime is not unique to Houston. A 2013 survey of the Counties of Harris, Cook, Los Angeles and Maricopa seeking to assess the impact of police involvement in immigration enforcement among Latinos found that 70 percent of undocumented individuals and 44 percent of all Latinos said that they would "be less likely to contact law enforcement authorities if they were victims of a crime for fear that police would ask them or people they know about immigration status."[3]  In that same study, over two thirds of undocumented immigrants and nearly half of all Latinos said that they "would be less likely to voluntarily offer information about, or report, crimes" because of a similar fear.

16. Houston's immigrant population is one of the fastest-growing in the United States and the City's Latino population constitutes approximately 44 percent of the population, so the problem of underreporting crime has serious consequences for the public safety of all Houstonians.

17. Aside from underreporting crime, Houston families that include at least some immigrant family members sought help after Hurricane Harvey at much lower rates than their U.S.-born counterparts.   Mayor Sylvester Turner and I publicly urged all Houstonians, regardless of immigration status, to seek the help they needed after Hurricane Harvey. Nonetheless, according to a recent survey, "half of immigrants whose homes were damaged (46 percent) said they were worried that if they tried to get help in recovering from Hurricane Harvey, they would draw attention to their or a family member's immigration status."[4]

---

11053829.php
[3] *See* Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement," at www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF.
[4] *See* "Hurricane Harvey: The Experiences of Immigrants Living in the Texas Gulf Coast," at

18. An injunction of the DACA program would further exacerbate the abovementioned public safety concerns.   In my experience, young people who felt protected from deportation came out of the shadows and were more likely to cooperate with law enforcement. I have personal experience with young DACA program recipients and knowledge of the fear the current uncertainty is creating.

19. However, DACA recipients who once again face the prospect of becoming undocumented (should the rescission of DACA stand) fear negative immigration consequences if they come forward to report crime.   One 2013 nationwide survey of 2,700 DACA-eligible young adults found that "fifty-nine percent of our respondents say they would report a crime now in a situation when they wouldn't before [DACA]."[5] These findings are consistent with my views of the Houston undocumented population based on my experience as Chief of Police.  The effect of DACA on public safety cannot be overstated.   DACA makes our communities safer for all people.

20. Enjoining DACA would harm community policing efforts throughout our Nation and, therefore, public safety; it would significantly impair the progress that the law enforcement community has made over the last several decades.

21. Despite our greatest efforts to build bridges of trust to enhance our crime fighting and public safety mission, rescinding DACA will lead to less cooperation from members of the community, force HPD to spend more resources investigating crime, and lead to a degradation of our ability to fight and solve crime, making all communities less safe.

---

http://files.kff.org/attachment/Report-Hurricane-Harvey-The-Experiences-of-Immigrants-Living-in-the-Texas-Gulf-Coast.
[5] *See* "Here's how DACA changed the lives of young immigrants, according to research," at
https://www.vox.com/2017/9/2/16244380/daca-benefits-trump-undocumented-immigrants-jobs.

Any measure that harms trust between law enforcement and immigrant groups perpetuates a class of silent victims and witnesses.

22. If DACA recipients in Houston lose their deferred action, they will be less likely to report crime and as witnesses, will be less likely to stand up for ALL victims of crime.  The loss of their trust and cooperation will have a negative effect on HPD's ability to fulfill its mission.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this ___15TH___ day of June, 2018 in Houston, Harris County, Texas.

ART ACEVEDO

# DEF-INTERV.
# EX. 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF LEIGHTON KU, PhD, MPH</u>

I, Leighton Ku, declare as follows:

1. My name is Leighton Ku and I am over eighteen years of age.  I have personal knowledge of and could testify in Court concerning the following statements of fact.

2. I am a Professor of Health Policy and Management and Director of the Center for Health Policy Research at the Milken Institute School of Public Health, George Washington University in Washington, DC.  I have attached my Curriculum Vitae as Exhibit A to this declaration.

3. I am a nationally-known health policy researcher with over 25 years of experience.  I have conducted substantial research about immigrant health, health care, and costs.  I have authored or co-authored more than a dozen articles and reports about immigrant health issues, including articles in peer-reviewed journals such as <u>Health Affairs</u> and

1

<u>American Journal of Public Health</u>, as well as scholarly reports published by diverse non-profit organizations including the Migration Policy Institute, the Cato Institute and the Commonwealth Fund, as well as many more articles and reports on other subjects.  I have testified before the U.S. Senate Finance Committee about immigrant health issues and provided analyses and advice to state governments and non-governmental organizations in many states about immigrant health.

4. In November 2017, I provided an expert declaration about the effects of terminating DACA on health insurance coverage and states (*State of New York, et al. v Trump, et al.*).[1]  I have not provided testimony in any other court cases in the past four years.

5. In addition, I have conducted substantial research about health policy and employment. For example, in 2017, I authored studies about how repealing the Affordable Care Act (ACA) would affect employment levels and state economies, including "Repealing Federal Health Reform: The Economic and Employment Consequences for States" (2017).  This research is attached as Exhibit B.

6. I also have knowledge of health insurance and employment through my role as a voluntary (unpaid, appointed) Executive Board member for the District of Columbia's Health Benefits Exchange Authority, which governs the District's health insurance marketplace, formed under the federal ACA.  This includes oversight of health insurance for small businesses as well as individual health insurance in the District of Columbia.

7. I have a PhD in Health Policy from Boston University (1990) and Master of Public Health and Master of Science degrees from the University of California at Berkeley

---

[1] Declaration of Leighton Ku in *State of New York, et al. v Donald Trump, et al.* in U.S. District Court for the Eastern District of New York. Nov. 22, 2017.

2

(1979).  Prior to becoming a faculty member at George Washington University, I was on

the staff of the Urban Institute and the Center on Budget and Policy Priorities.

8.  I have been engaged by the Mexican American Legal Defense and Educational Fund and

the Office of the Attorney General of the State of New Jersey for this case. I am being

paid at a rate of $187.50 per hour.

### Overview

9.  This declaration discusses five topics: (1) a response to the declaration of Dr. Donald

Deere on joint effects of Deferred Action for Childhood Arrivals (DACA) and the ACA

on employment,[2] (2) the effects of terminating DACA on employment in the health sector

and on patient care, (3) a brief description of DACA recipients' eligibility for insurance

coverage under the ACA, (4) a review of the effects of DACA on mental health, and (5)

the effects of terminating DACA on health expenditures by states.  In that final section, I

also briefly discuss the declaration of Ms. Monica Smoot about medical expenditures in

Texas for undocumented immigrants.

### DACA and the ACA Do Not Create Incentives to Hire DACA Recipients Instead of U.S.-Born Citizens

10.  Dr. Donald Deere, a consultant paid by the Office of the Attorney General of Texas,

alleges that the combined effect of the ACA and DACA reduces the employment of

citizens in favor of DACA recipients (or as he calls them, "undocumented immigrants

who are authorized to work").

11.  Dr. Deere's hypothesis that the ACA creates an incentive to hire DACA recipients

instead of citizens is misplaced.  I am not aware of any empirical evidence about the

---

[2] Declaration of Donald Deere, PhD, in *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  April 27, 2018.

3

number of citizens who are unemployed because of such a possibility or aware of any empirical evidence that employers are hiring DACA recipients in lieu of citizens because of potential differences in ACA-related penalties. Nor does Dr. Deere show any such actual evidence. His hypothesis is built on a series of unsupported assumptions. His argument contradicts logic and well-established research.

12. To understand his claim, a brief review of applicable provisions of the ACA is necessary. Under §1513 of the ACA, a large employer with 50 or more full-time employees may be assessed federal tax penalties if it fails to offer affordable employer-based insurance and one or more of its employees instead obtains coverage in a health insurance exchange and receives federal premium tax credits. Specifically, large employers who do not offer any health insurance coverage may be penalized $2,320 per full-time employee (minus first 30) if at least one full-time employee receives a federal premium subsidy for marketplace coverage. Moreover, if the employer offers health insurance but does not cover at least 60% of total allowed costs or the insurance is not affordable because the employee's share of an individual premium (not the premium for the full family) exceeds 9.56% of income (in 2018), then the employer may be assessed fines of the lesser of $3,480 per full-time employee receiving a premium tax credit or $2,320 per full-time employee, minus the first 30 employees.[3] This provision is also known as the "employer shared responsibility" requirement or "employer mandate."

---

[3] Cigna. Employer Mandate Fact Sheet. 2018. https://www.cigna.com/assets/docs/about-cigna/informed-on-reform/employer-mandate-fact-sheet.pdf

4

13. The employer shared responsibility does not apply to smaller firms with fewer than 50 employees.[4]

14. The employer shared responsibility was designed to ensure that large employers did not stop offering health insurance to their workers when the exchanges became available.

15. Large firms (50 or more workers) employ about three-quarters of all American workers,[5] and virtually all (97%) of businesses with 50 or more employees offer health insurance coverage to their employees and did so even before the ACA (for example, 96% in 2010). More specifically, in Texas, 97% of firms with 50 or more workers offered health insurance in 2016 and 95% did so in 2010.[6] Thus, the employer penalties are virtually irrelevant to employers with more than 50 workers and should not affect their hiring or wage decisions. The lack of employer-sponsored health insurance coverage is primarily a problem of smaller businesses, but the ACA penalty does not apply to them, so it ought not affect their hiring decisions either.

16. DACA recipients are not eligible for premium tax credits or for the health insurance exchanges (like other undocumented immigrants), in contrast to U.S. citizens or other immigrants like those who are lawful permanent residents.[7]

---

[4] Kaiser Family Foundation. Employer Responsibility Under the Affordable Care Act. Mar. 5, 2018. https://www.kff.org/infographic/employer-responsibility-under-the-affordable-care-act/.

[5] Bureau of Labor Statistics. Distribution of private sector employment by firm size class. ttps://www.bls.gov/web/cewbd/table_f.txt

[6] Agency for Healthcare Research and Quality. Table II.A.2 Percent of private-sector establishments that offer health insurance by firm size and State: United States, 2016. https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2016/tiia2.pdf; see also https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2010/tiia2.htm

[7] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health Policy Issue Brief, Dec. 13, 2013. http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.

17. Dr. Deere makes it seem like large numbers of citizen workers could get premium tax credits and therefore could trigger penalties for their employers. This is misleading. In order to be eligible for the health insurance exchanges and premium tax credits, a person cannot be eligible for other insurance coverage, such as employer-sponsored coverage, Medicaid or Medicare. (In unusual cases where the employer coverage is too low, as described above, a person may be eligible for exchange coverage). That is, whether or not an employee takes insurance from his or her employer is irrelevant. The key issue is whether the employer offers insurance to full-time employees. In addition, to get the premium tax credits, people must generally have incomes between 100 and 400 percent of the poverty line. According to Census data for 2017, about 49% percent of adults 18 to 35 (roughly the DACA age range) have incomes in this range, and the other half would not be eligible for tax credits.[8] Therefore, only a small share of citizen workers could get the premium tax credits that might trigger federal tax penalties. The overwhelming majority of citizen workers in large businesses are not eligible for premium tax credits and their employment poses no risk to their employers.

18. Dr. Deere hypothesizes that ACA and DACA policies combined create an incentive for employers to hire DACA recipients instead of citizens, since employers are potentially subject to tax penalties under the employer shared responsibility provisions when they hire citizens but not when they hire DACA recipients, and since citizens are eligible for premium tax credits, but not DACA recipients. He suggests that these policies make it harder for U.S. citizens to find work and depresses their wages. Although he does not indicate how many citizens may be affected, he suggests the number is large by

---

[8] Based on analyses of the Census Bureau's Annual Social and Economic Survey, March 2018, as tabulated by https://www.census.gov/cps/data/cpstablecreator.html

mentioning that there are about 683,000 DACA recipients, of which 112,000 are in Texas. This is a huge exaggeration of the potential scope. Dr. Deere also exaggerates the number of people receiving premium tax credits by citing an outdated statistic that 64 million people are eligible for premium tax credits. The actual number receiving them was 8.7 million in 2017.[9]

19. Moreover, the extent to which an employer would hire a DACA recipient in lieu of a citizen worker because the DACA recipient is not eligible for premium tax credits relies on the dubious assumption that many employers are aware of this obscure nuance of health law. To the extent that this minor incentive exists, it may be counteracted by other employment compliance barriers that firms may face in hiring DACA recipients.[10] There are small conflicting conceptual incentives which may favor or disfavor hiring citizens vs. DACA recipients. It is plausible that they balance out and are, in reality, immaterial.

20. At the current time, unemployment rates are at record lows and many businesses have serious problems finding enough qualified workers.[11] In fact, the cancellation of DACA and the resulting loss of work authorization for hundreds of thousands of workers who have DACA will compound this shortage of qualified workers and create a severe hardship for many businesses and their customers. Hundreds of business leaders have

---

[9] Kaiser Family Foundation. Estimated Total Premium Tax Credits Received by Marketplace Enrollees. https://www.kff.org/health-reform/state-indicator/average-monthly-advance-premium-tax-credit-aptc/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[10] Jones D, Ombok O. DACA and the Challenges Faced by Employers in Workplace Compliance. Association of Corporate Counsel. May 20, 2015. http://www.acc.com/legalresources/quickcounsel/employers-in-workplace-compliance.cfm

[11] Lynch D. 'This is super tight': Companies struggle to find, retain workers in a hot economy." Washington Post. Jan. 12, 2018. https://www.washingtonpost.com/business/economy/this-is-super-tight-companies-struggle-to-find-retain-workers-in-a-hot-economy/2018/01/12/0c1ce97e-f7cf-11e7-b34a-b85626af34ef_story.html?noredirect=on&utm_term=.94ad14c9418e

noted that DACA recipients are vital to their firms and to the economy and have opposed its termination.[12]

21. More fundamentally, Dr. Deere's hypothesis about DACA recipients displacing citizen workers is based on a belief that there is a fixed number of jobs available for which citizens and non-citizen immigrants compete and, if one gains, then the other must inherently lose. If we believe that line of reasoning, then it also follows that hiring women inevitably harms men's employment, hiring African Americans inevitably harms white Americans, etc. There is not a "fixed number" of jobs in the U.S. economy; the economy is dynamic and having more qualified workers, as well as more entrepreneurs, whether immigrants, women or African Americans, can contribute to economic growth, creating more employment opportunities for both citizens and immigrants alike. It is certainly plausible that, in specific cases, a qualified DACA immigrant may be hired for a job over a similarly qualified citizen worker, or vice versa, but economic growth leads to better employment for both qualified citizens and qualified immigrants.

22. Dr. Deere's belief that DACA and the ACA harm employment is not supported by rigorous research.

23. Evidence suggests that the overall effect of DACA and related policies is to stimulate the economy and thereby to increase employment of both citizens and non-citizens. Analyses conducted in 2014 by the White House Council of Economic Advisers examined the effect of administrative actions on immigration taken by President Obama,

---

[12] America's Voice. Hundreds of Business Leaders Write Letter in Support of DACA, Dreamers. Sept. 1, 2017. https://americasvoice.org/blog/business-leaders-support-daca/

particularly DACA, on employment and the economy.[13]  Its analyses indicated that these

immigration policies lead to increased growth in the U.S. economy and more jobs and

create no harm to employment or wages of U.S.-born workers.  (It is noteworthy that this

analysis was conducted after the ACA was enacted and includes effects of the Act.)

24. More recently, analyses by the Cato Institute indicated that terminating DACA could

reduce economic growth in the U.S. by $280 billion over the next decade.[14] These

reductions in economic growth ultimately cause a loss of jobs.

25. In a parallel study that I conducted last year, we found that repealing key elements of the

ACA (specifically the Medicaid expansion, health insurance exchanges (or marketplaces)

and premium tax credits) would have caused 3 million jobs to be lost by 2021, almost a

third of which would have been in the health care sector, and would have lowered states'

economies by $1.5 trillion over five years.[15]

26. A recent review of several economic studies, conducted since the ACA was adopted,

found that the Act did not reduce employment or lower wages.[16]

27. More broadly speaking, there is a strong scientific consensus that immigration benefits

the U.S. economy.  A distinguished panel of researchers was convened by the National

---

[13] White House Council of Economic Advisers. *The Economic Effect of Administrative Action on Immigration*. Nov. 2014.
https://obamawhitehouse.archives.gov/sites/default/files/docs/cea_2014_economic_effects_of_immigration_executive_action.pdf
[14] Brannon I, Albright L. *The Economic and Fiscal Impact of Repealing DACA*.  The Cato Institute.  Jan. 18,2017.
[15] Ku L Steinmetz E, Brantley E, Bruen B. *Repealing Federal Health Reform: The Economic and Employment Consequences for States*.  Brief, Commonwealth Fund, Jan. 6, 2017.
http://www.commonwealthfund.org/Publications/Issue-Briefs/2017/Jan/Repealing-Federal-Health-Reform
[16] Abraham J, Royalty A. *How Has the Affordable Care Act Affected Work and Wages? Evidence Shows the Law Has Had Little Effect*.  Leonard Davis Institute of Health Economics, University of Pennsylvania.  Jan. 2017.  https://ldi.upenn.edu/brief/how-has-affordable-care-act-affected-work-and-wages

Academy of Sciences in 2016 to consider the economic and fiscal impact of immigration in the U.S.[17] It concluded that, based on many years of rigorous research, that there is little evidence that immigration significantly reduces employment or wages of native-born workers in the U.S. Even more recently, a letter signed by 1,470 economists, including Nobel Prize winners and former directors of the Office of Management and Budget, the Council of Economic Advisers and Congressional Budget Office from both parties, agreed that immigration strengthens the economy and policies that threaten immigrants would harm the economy.[18]

28. The skills of immigrant workers typically complement those of the U.S.-born workforce, enabling both to be more productive. For example, the contributions of immigrant construction workers help build homes, office buildings, factories and roads that enable citizens to be employed in other sectors of the economy. In addition, immigrant entrepreneurs have been important contributors to innovation and economic growth in the United States.[19] Immigration helps lead to further economic growth and cancelling DACA would set back employment and the economy.

29. A simple and direct way to illustrate the flaw with Dr. Deere's arguments is to present Census data about changes over several years in unemployment levels, comparing U.S.-born citizens and non-citizens who are 18 to 30-year-old adults, the approximate age

---

[17] Blau F, Mackie , eds. *The Economic and Fiscal Consequences of Immigration.* National Academy of Sciences. Washington DC: National Academy Press. 2016.

[18] *An Open Letter from 1,470 Economists on Immigration* (written to President Trump and leaders of both houses of Congress). April 12, 2017. https://www.newamericaneconomy.org/feature/an-open-letter-from-1470-economists-on-immigration/

[19] Akcigit U, Grigsby J, Nicholas T. *Research: Immigrants Played an Outsize Role in America's Age of Innovation. Harvard Business Review.* April 21, 2017. https://hbr.org/2017/04/research-immigrants-played-an-outsize-role-in-americas-age-of-innovation?referral=03759&cm_vc=rr_item_page.bottom.

range for working DACA recipients. The Census data do not provide the detailed

immigration status that would enable us to separate DACA recipients from other non-

citizen immigrants, including those who are lawful permanent residents, temporary legal

immigrants (e.g., those with work or student visas) and the undocumented. For the sake

of simplicity, I exclude data about naturalized citizens, who tend to have high

employment levels. The chart below illustrates trends from 2011 to 2016 for Texas and

the overall United States.[20]



30. Under Dr. Deere's hypothesis that DACA and the ACA increase unemployment by

citizens, we would expect rising unemployment by U.S.-born citizens, while non-citizen

unemployment falls. In fact, the data reveal that both citizens and non-citizens have had

falling unemployment rates in recent years. In Texas, a high immigrant state,

unemployment levels fell faster for U.S. born citizens than for non-citizens. There has

---

[20] These data are tabulated from a web-based application of the U.S. Census Bureau, located at
https://www.census.gov/cps/data/cpstablecreator.html

not been any overall decline in employment for U.S. born workers, following the implementation of DACA or the ACA.  DACA, the ACA and the strong economy have combined to fuel employment for citizens and non-citizens alike.

**Effects of the Loss of DACA for Health Care Providers**

31. Termination of DACA will create very specific and substantial harm for those who have DACA and for the employers and customers of the DACA recipients.  One area that exemplifies the harm that will occur is the health care sector.  Many DACA recipients are health care professionals and support staff, such as physicians, nurses, medical aides, etc., who care for patients, including U.S. born citizens and others.  A large share of the nation's health workforce is immigrant.  Immigrant health care professionals not only provide additional manpower, but they also provide diversity, language skills and cultural understanding that help meet the health needs of diverse American patients.  The loss of DACA would cause them to lose work authorization, which would create hardships both for their employers as well as for their potential patients.  DACA termination could also cause students to lose eligibility for educational opportunities or scholarships, which may keep them from becoming health professionals.  States have an inherent interest in maintaining the supply and quality of medical care for their residents, and this jeopardizes that interest.

32. The Migration Policy Institute analyzed data from the Census Bureau's American Community Surveys and estimated that 5,300 current DACA recipients are health care professionals (e.g., doctors, nurses, technicians) and another 8,600 are health care support

staff (e.g., medical aides, home health staff, etc.).[21]  More are engaged in other positions in health care organizations, such as administration, computer services, food service, etc. It estimated that 40,700 DACA recipients work in education, health care or social services organizations.  In addition, a large number of DACA recipients are receiving training to be health care professionals in the future, including doctors, nurses, etc. and the loss of status would short-circuit their ability to provide those services in the future.

33. Health care executives representing a number of Catholic hospitals have written to President Trump, explaining the importance of DACA recipients as valued members of their health care workforce and how their employment is vital to their patients.[22]  The American Association of Medical Colleges has noted that a substantial number of DACA recipients have applied for or are enrolled in medical colleges and cancellation of DACA would imperil their education and their ability to serve patients in the future.[23]  Similar problems are likely to occur for those in training for nursing and other health professions.

34. The loss of immigrant health workers would have adverse effects on the long-term care of frail elderly and disabled individuals: large numbers of DACA recipients work as home health workers, providing nursing home and community-based care to senior citizens and those with disabilities.[24]  It is particularly worth noting that the Medicaid

---

[21] Zong J, Soto A, Batalova J, Gelatt J, Capps R.  A *Profile of Current DACA Recipients by Education, Industry and Occupation.*  Washington, DC: Migration Policy Institute.  Nov. 2017. www.migrationpolicy.org.

[22] Hochman R, et al.  Letter to President Trump regarding DACA. Sept. 2, 2017. https://www.chausa.org/docs/default-source/media-resources/catholic-health-care-system-ceos-ltr-to-president-trump-re-daca-9-2-2017.pdf

[23] Cited by Japsen B.  How Trump's Move to End DACA May Worsen the Doctor Shortage. *Forbes.*  Sept. 5, 2017.  https://www.forbes.com/sites/brucejapsen/2017/09/05/how-trumps-move-to-end-daca-worsens-the-doctor-shortage/#6a7f47b65b06

[24] Scheiber N, Abrams R.  What Older Americans Stand to Lose If Dreamers are Deported. *New York Times.*  Sept. 7, 2017.

program is the leading payer for long-term care services in the U.S. The lack of suitably trained long-term care staff will adversely affect state Medicaid programs and limit the ability of these state programs to provide the care that they are obligated to offer to Medicaid recipients.

**How DACA Affects Heath Insurance Coverage and Access to Health Care**

35. Under DACA, recipients have a temporary deferral of removal proceedings, can receive authorization to work legally and can engage in other activities of civil society such as continue their education, obtain drivers' licenses, etc. The survey and analysis conducted by Professor Tom Wong of the University of California at San Diego found that most DACA recipients are employed and most have private health insurance coverage.[25]

36. Federal law does not accord DACA recipients eligibility for federal health insurance benefits, including Medicaid, the health insurance program for low-income populations, nor are they permitted to enroll in the health insurance exchanges (marketplaces) formed under the ACA or to receive federal health insurance premium tax credits that are designed to make this insurance more affordable. DACA recipients are barred from federal health insurance assistance, like other undocumented immigrants. State or local governments may opt to offer public insurance coverage for certain undocumented immigrants, including DACA recipients, using state or local funds without federal funding support.[26] For example, the District of Columbia supports a state-funded Health

---

[25] Declaration of Prof. Tom Wong, *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division. May 16, 2018.

[26] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health

14

Care Alliance, which provides medical assistance to low-income adults not eligible for Medicaid including undocumented immigrants and DACA recipients; no federal funding is used.[27] New York State provides Medicaid coverage to DACA recipients, but not other undocumented immigrants, without federal funding support.[28]

37. The only federal health insurance benefit available to low-income undocumented immigrants is very limited emergency Medicaid coverage (42 U.S.C. § 1396b(v)).[29] The costs of their emergency care (e.g., emergency room care, ambulance, etc.) can be covered under Medicaid. However, this limited benefit does not provide broader coverage for other ambulatory or inpatient hospital services, prescription drugs, etc. It provides reimbursement to emergency providers for care rendered to low-income undocumented immigrants, including labor and delivery costs for children born to undocumented immigrant mothers. Hospitals are separately required to provide emergency care, to at least screen and stabilize their emergency medical conditions, to all potential patients regardless of insurance coverage or citizenship status, under the Emergency Medical Treatment and Active Labor Act (EMTALA, 42 U.S.C. § 1395dd). The Medicaid emergency care benefit essentially provides a mechanism to reimburse providers for the emergency care they are otherwise required to offer to low-income undocumented immigrants.

---

Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.
[27] District of Columbia Department of Health Care Finance.  Health Care Alliance.
https://dhcf.dc.gov/service/health-care-alliance
[28] New York State Department of Health.  GIS 13 MA/011: Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens.
https://www.health.ny.gov/health_care/medicaid/publications/gis/13ma011.htm.
[29] A previous limited federal grant program, called "Section 1011," provided federal funding for emergency care for undocumented immigrants separate from Medicaid, but that program has now expired.  https://www.cms.gov/Regulations-and-Guidance/Legislation/UndocAliens/.

38. In addition, many community-based health care providers provide free- or subsidized ambulatory health care services to needy or uninsured patients, including undocumented immigrants. Perhaps most important, community health centers that receive federal grants under Section 330 of the Public Health Service Act, sometimes also called Federally Qualified Health Centers (FQHCs), including the subset of Migrant Health Centers that focus on care for migrant workers, are required to provide primary health care to all patients regardless of insurance or immigration status. Many other "safety net providers – including non-profit, charitable and state or local public clinics – often provide free or subsidized care to uninsured persons, including undocumented immigrants, although the basis for that care varies. In some cases, state or local laws or regulations require such service, in other cases it is a matter of clinical practice and a belief in charitable mission.

39. Because of the barriers they face in securing health insurance coverage, non-citizen immigrants, which include DACA recipients, undocumented immigrants and other immigrants who have been legally admitted but are not citizens, are much more likely to be uninsured than U.S.-born or naturalized citizens and to have less private insurance and less Medicaid coverage, even when one compares low-income (below 200% of the poverty line) non-citizen immigrants and citizen adults. The lack of insurance creates financial barriers and as a result non-citizens have substantially less access to and use of medical services, including primary health care services, emergency medical care, hospital care and most other forms of health care, than citizens.[30]

---

[30] Ku L, Jewers M.  Health Care for Immigrants: Policies and Current Issues.  Migration Policy Institute, June 2013.  www.migrationpolicy.org

16

40. DACA enables recipients to work and many are thereby able to obtain employment-based private health insurance, which is the dominant form of insurance in the United States. If DACA is lost, the former DACA recipients would lose their work authorization and, as a result, lose their jobs and their employer-based health insurance. If they are not working they have few other options to obtain health insurance, other than emergency Medicaid. Moreover, if the breadwinner in a family loses his or her job and private health insurance, his or her dependents may also lose their insurance coverage, even if they are U.S. born citizens. In principle, a person without employer-based health insurance, Medicaid, or other publicly subsidized coverage, could purchase individual (non-group) health insurance on the private market. The sad reality, however, is that individual health insurance is expensive and a person who is no longer employed or who has low income generally cannot afford individual health insurance premiums. Thus, the health insurance prospects for undocumented immigrants without DACA and unemployed are bleak.

**Mental Health Consequences of the Loss of DACA**

41. Even though DACA does not generally provide health insurance coverage benefits, research indicates that DACA improves the mental health of recipients and their families by reducing stress related to their undocumented status and the fear of adverse actions, such as deportation, loss of work, loss of educational opportunities, separation from their families, etc. Research, including studies published in peer-review journals by investigators at Harvard Medical School,[31] the University of California at Davis,[32] and

---

[31] Venkataramani AS, Shah SJ, O'Brien R, Kawachi I, Tsai AC. Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasiexperimental study. *Lancet Public Health.* 2017; 2(4): e175-e181; Venkataramani AS, Tsai AC. Dreams Deferred: The Public Health Consequences of Rescinding DACA. *New England J Medicine.* 2017; 377(18):1707-9.

the Universities of California at Berkeley and at San Francisco,[33] show that the receipt of

DACA has significantly reduced psychological stress and improves mental health status.

The researchers warn that the loss of DACA will lead to higher stress and additional

mental health problems for hundreds of thousands of people. Recent research by my

colleagues at George Washington University also indicates that recent threats to legal

immigration status have created major psychological stress on immigrant parents, who

are worried about their own status as well as the future well-being of their children.[34]  In

addition, a study by Stanford University researchers found that the DACA that protected

mothers also led to better mental health status for their U.S.-born citizen children;

children feel more secure when their parents do not fear deportation and can safely work.

This shows the broader repercussions of changes in DACA policy which can even affect

citizen children.[35]

42. The stress caused by loss of DACA could compound the harmful effects of employment

and economic loss and could result in additional demands placed on our mental health

and social welfare systems system and, in some cases, may lead to increased risk of

disruptive behavior that could pose broader risks and further tax our social, educational

---

[32] Patler C, Laster Pirtle W. From undocumented to lawfully present: do changes to legal status impact psychological wellbeing among Latino immigrant young adults? *Social Science and Medicine.* 2017 March 9 (Epub ahead of print).

33 Siemons R, Raymond-Flesh M, Auerswald CL, Brindis CD.  Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA). *J Immigr Minor Health.* 2017 Jun;19(3):543-551. doi: 10.1007/s10903-016-0354-x.

[34] Roche K, Vaquera E, White R, Rivera MI.  Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents. *J Adolescent Health.*  2018 Mar; 62(5): 525–531.

35 Hainmueller J, Lawrence D, Martén L, et al. Protecting unauthorized immigrant mothers improves their children's mental health. *Science* 2017 August 31 (Epub ahead of print).

and criminal justice systems. DACA has helped many youth and young adults "come out of the shadows." Loss of DACA will push them back into the shadows and jeopardize the mental health of DACA recipients and their families, with broader societal effects within states. States have an inherent interest in the well-being, public health and safety of their residents. Terminating DACA undermines the interests of states.

### Estimates of Potential Health Costs at State Levels Due to the Loss of DACA

43. The loss of DACA would harm states because the loss of private health insurance coverage will increase public expenditures for emergency Medicaid and other uncompensated care for those who become uninsured, creating additional financial burdens on the states. States would have to bear higher expenditures for medical care that would be rendered to former DACA recipients who become uninsured. Without private health insurance, DACA recipients would become more reliant on emergency Medicaid and community-based uncompensated care. In the analysis below, I describe paths by which undocumented immigrants can get emergency medical care reimbursed by Medicaid and some forms of community-based uncompensated care. Nonetheless, these are not optimal forms of health care and would still leave many former DACA recipients with reduced access to medical care, which could endanger their health.

44. In this section, I estimate potential financial costs for states if DACA is lost. DACA provides work authorization to young adults who would otherwise be without immigration status and thereby enables them to work legally. A majority of working DACA recipients get private health insurance through their jobs. Loss of work authorization would cause them to lose their jobs. The loss of employment would also trigger the loss of employment benefits, like health insurance coverage for them and their

dependents.  In principle, some of those losing employment-based insurance might be able to purchase individual (non-group) health insurance on the private market, but without the income of a job, the cost of individual health insurance would be essentially unaffordable.  Undocumented immigrants, including DACA recipients, are ineligible for Medicaid or health insurance marketplaces (exchanges) and premium tax credits.  As a result, former DACA recipients must instead rely on emergency Medicaid coverage and/or community-based care for those without insurance, such as that provided by community health centers or state or local public health clinics.  I use recent national survey data to estimate the costs of emergency Medicaid and community-based care for individual states, as well as for the nation, if DACA recipients lose their status and, as a result, lose employment and private health insurance coverage.

45. I describe the basis and sources of data for my estimates below.  I note that these are estimates and that differences in methods or data sources could change the results somewhat, but the general magnitude and direction of results ought to be robust and valid.

46. For estimates of the number of people affected, I draw on data from the U.S. Citizenship and Immigration Services (USCIS) agency about persons approved for DACA as of June 30, 2017.[36]  I apply these data about the number of DACA recipients to Prof. Tom Wong's estimate that 91.4% of DACA recipients are employed and 57% have employer-based private insurance,[37] based on his survey of DACA recipients, to estimate the effects

---

[36] U.S. Citizenship and Immigration Services.  DACA Performance Data, 3rd Quarter, Fiscal Year 2017.
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf
[37] Declaration of Prof. Tom Wong, *op cit.*

20

of potential loss of employment and private insurance coverage. (A Migration Policy Institute report[38] estimates somewhat lower employment levels, but their data are for DACA-eligible youth, not actual DACA recipients. For example, they report that 83% of DACA-eligible men 16-32 not in secondary school were employed vs. 79% of average U.S. men that age. It seems likely that actual DACA recipients work more than those who are DACA-eligible, since they must apply for DACA and receive it in order to get work authorization).

47. I conducted my own analyses of the 2016 National Health Interview Survey, conducted by the Centers for Disease Control and Prevention, and found that 55% of working DACA-eligible immigrants have private insurance (based on the criteria of being non-citizen immigrants between the ages of 18 and 36 residing in the U.S for more than 5 years, excluding Medicaid recipients since DACA recipients are not eligible for Medicaid, except emergency Medicaid coverage). This level is essentially the same as Prof. Wong's estimate and corroborates it.

48. For estimates of the implications and costs of alternative sources of medical care that former DACA recipients are likely to use I draw on my own analyses of the Center for Disease Control and Prevention's 2016 National Health Interview Survey (NHIS) and the Agency for Healthcare Research and Quality's 2015 Medical Expenditure Panel Survey (MEPS). I am an experienced analyst of these data and have published numerous studies using these nationally representative survey data.

49. The NHIS and MEPS data do not directly indicate who receives DACA, but permit an estimate of DACA eligibility. I use Prof. Wong's estimate that 57% of employed DACA

---

[38] Capps R, Fix M, Zong J. The Education and Work Profiles of the DACA Population. August 2017.

recipients get insurance through work.  (My analysis of NHIS data show that 55% of the DACA-eligible immigrants, as described above, who are working have private insurance, about the same as Prof. Wong's estimate of employer-based insurance coverage among DACA recipients.  Two separate data sources yield almost the same estimate, corroborating each other). The loss of DACA and work authorization would trigger the loss of their jobs and therefore their private health insurance.

50. The 2016 NHIS data indicates that DACA-type adults who are not working have a 19 percent probability of using emergency room care in the last 12 months.  Since the loss of DACA would result in the loss of work authorization, legal work and employment-based insurance, it is reasonable to assume that about 19% of former DACA recipients would need to rely on emergency Medicaid to pay their emergency medical bills.  Although they may have had incomes above Medicaid eligibility limits when they were employed, the loss of DACA and work authorization will cause them to lose income and often become impoverished, so more will fall within Medicaid income criteria.  To estimate the costs of emergency medical care, I relied on my analyses of MEPS data and estimated that the average annual cost of emergency room care received by an 18-36 year old immigrant who had been in the US for more than five years was $1,275 in 2015.  I used estimates of national health expenditure price increases per capita from 2015 to 2018, conducted by the federal Centers for Medicare and Medicaid Services,[39] to estimate that the annual cost would rise by 13.7% to $1,450 each for the 19% of adults who had previously been

---

[39] Centers for Medicare and Medicaid Services.  National Health Expenditures. https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/index.html

privately-insured working DACA recipients in each state, but who would now be uninsured.

51. I estimated the costs of community-based uncompensated care that would be received by the newly uninsured immigrant adults, due to the loss of DACA. For this, I drew on estimates by Teresa Coughlin and her colleagues at the Urban Institute.[40] That study estimated that in 2013, the average uninsured person received uncompensated medical care costing $1,702 per person, of which 26% was provided as uncompensated care at publicly-supported state or local community-based ambulatory sites, such as community health centers or state or local clinics. This is equal to $449 in community-based ambulatory care per uninsured in 2013. This amount was inflated by 24.6% to account for health care cost inflation between 2013 and 2018 to $559 per uninsured person. I multiplied this amount by the number of former DACA recipients who would lose their jobs and private health insurance in each state.

52. Based on the methods and sources, described above, the additional public costs that would be borne at state levels in 2018 are shown in Table 1 below. These are annual costs in 2018; the cumulative costs over several years would be substantially higher. These estimates are conservative, since they do not include the additional costs that might be borne by states if dependents of DACA recipients – their spouses or children – lose private health insurance if the DACA recipient loses his or her job.

53. Table 1 presents estimates for the United States (excluding the territories, such as Puerto Rico and the Virgin Islands), for the seven plaintiff states in this case (Texas, Alabama,

---

[40] Coughlin T, Holahan J, Caswell K, McGrath M. *Uncompensated Care for the Uninsured, 2013: A Detailed Examination.* Kaiser Commission on Medicaid and the Uninsured. May 2014. https://kaiserfamilyfoundation.files.wordpress.com/2014/05/8596-uncompensated-care-for-the-uninsured-in-2013.pdf

Arkansas, Louisiana, Nebraska, South Carolina and West Virginia) and for all other states and the District of Columbia. These estimates are based on the loss of employment-based health insurance coverage and the need to rely on public sources of care, such as emergency Medicaid and community-based safety net services.

Table 1. Estimates of Additional Public Costs Due to the Loss of DACA Status

| State | Number Currently Employed (1) | Number Who Could Lose Private Insurance If They Lose Their Jobs (2) | Number Who Might Require Emergency Room Use If Uninsured (3) | 2018 Costs of Emergency Room Care (4) | 2018 Cost of Community-Based Uncompensated Care (5) | Total Estimated 2018 Public Costs Due to Loss of DACA (6) |
|---|---|---|---|---|---|---|
| Total, U.S. | 716,618 | 408,472 | 77,610 | $112,508,841 | $228,521,352 | $341,030,194 |
| **Plaintiff States** | | | | | | |
| Alabama | 3,918 | 2,233 | 424 | $615,125 | $1,249,406 | $1,864,531 |
| Arkansas | 4,663 | 2,658 | 505 | $732,126 | $1,487,051 | $2,219,177 |
| Louisiana | 1,892 | 1,078 | 205 | $297,040 | $603,331 | $900,372 |
| Nebraska | 3,093 | 1,763 | 335 | $485,597 | $986,315 | $1,471,912 |
| South Carolina | 5,879 | 3,351 | 637 | $922,978 | $1,874,699 | $2,797,677 |
| Texas | 114,043 | 65,005 | 12,351 | $17,904,797 | $36,367,172 | $54,271,969 |
| West Virginia | 108 | 61 | 12 | $16,933 | $34,393 | $51,326 |
| **Other States** | | | | | | |
| Alaska | 133 | 76 | 14 | $20,951 | $42,554 | $63,504 |
| Arizona | 25,530 | 14,552 | 2,765 | $4,008,181 | $8,141,182 | $12,149,363 |
| California | 204,507 | 116,569 | 22,148 | $32,107,494 | $65,214,856 | $97,322,349 |
| Colorado | 15,821 | 9,018 | 1,713 | $2,483,947 | $5,045,248 | $7,529,195 |
| Connecticut | 4,560 | 2,599 | 494 | $715,911 | $1,454,116 | $2,170,026 |
| Delaware | 1,326 | 756 | 144 | $208,215 | $422,915 | $631,130 |
| Dist Columbia | 707 | 403 | 77 | $110,924 | $225,302 | $336,226 |
| Florida | 30,351 | 17,300 | 3,287 | $4,765,132 | $9,678,657 | $14,443,789 |
| Georgia | 22,150 | 12,625 | 2,399 | $3,477,526 | $7,063,347 | $10,540,873 |
| Hawaii | 532 | 303 | 58 | $83,516 | $169,632 | $253,148 |
| Idaho | 2,873 | 1,637 | 311 | $451,014 | $916,072 | $1,367,086 |
| Illinois | 38,879 | 22,161 | 4,211 | $6,103,967 | $12,398,019 | $18,501,986 |
| Indiana | 9,020 | 5,142 | 977 | $1,416,180 | $2,876,462 | $4,292,642 |
| Iowa | 2,570 | 1,465 | 278 | $403,516 | $819,598 | $1,223,114 |
| Kansas | 6,234 | 3,554 | 675 | $978,799 | $1,988,078 | $2,966,877 |
| Kentucky | 2,814 | 1,604 | 305 | $441,830 | $897,419 | $1,339,249 |
| Maine | 90 | 51 | 10 | $14,063 | $28,564 | $42,626 |
| Maryland | 9,023 | 5,143 | 977 | $1,416,610 | $2,877,336 | $4,293,946 |
| Massachusetts | 7,360 | 4,195 | 797 | $1,155,588 | $2,347,162 | $3,502,750 |
| Michigan | 5,946 | 3,389 | 644 | $933,597 | $1,896,267 | $2,829,864 |
| Minnesota | 5,743 | 3,273 | 622 | $901,597 | $1,831,270 | $2,732,867 |
| Mississippi | 1,344 | 766 | 146 | $211,085 | $428,744 | $639,829 |
| Missouri | 3,244 | 1,849 | 351 | $509,274 | $1,034,407 | $1,543,681 |
| Montana | 69 | 40 | 8 | $10,906 | $22,151 | $33,057 |
| Nevada | 11,988 | 6,833 | 1,298 | $1,882,117 | $3,822,846 | $5,704,964 |
| New Hampshire | 342 | 195 | 37 | $53,668 | $109,008 | $162,676 |
| New Jersey | 20,315 | 11,580 | 2,200 | $3,189,526 | $6,478,378 | $9,667,904 |
| New Mexico | 6,250 | 3,562 | 677 | $981,238 | $1,993,033 | $2,974,271 |
| New York | 38,848 | 22,143 | 4,207 | $6,099,088 | $12,388,109 | $18,487,197 |
| North Carolina | 25,094 | 14,304 | 2,718 | $3,939,733 | $8,002,154 | $11,941,886 |
| North Dakota | 94 | 54 | 10 | $14,780 | $30,021 | $44,801 |
| Ohio | 4,101 | 2,338 | 444 | $643,875 | $1,307,801 | $1,951,675 |
| Oklahoma | 6,296 | 3,589 | 682 | $988,413 | $2,007,606 | $2,996,019 |
| Oregon | 10,347 | 5,898 | 1,121 | $1,624,539 | $3,299,668 | $4,924,207 |
| Pennsylvania | 5,468 | 3,117 | 592 | $858,404 | $1,743,540 | $2,601,944 |
| Rhode Island | 1,141 | 650 | 124 | $179,085 | $363,748 | $542,833 |
| South Dakota | 233 | 133 | 25 | $36,592 | $74,323 | $110,915 |
| Tennessee | 7,653 | 4,362 | 829 | $1,201,507 | $2,440,431 | $3,641,938 |
| Utah | 8,895 | 5,070 | 963 | $1,396,521 | $2,836,531 | $4,233,052 |
| Vermont | 40 | 23 | 4 | $6,314 | $12,824 | $19,138 |
| Virginia | 11,195 | 6,381 | 1,212 | $1,757,561 | $3,569,855 | $5,327,417 |
| Washington | 16,394 | 9,345 | 1,776 | $2,573,920 | $5,227,996 | $7,801,916 |
| Wisconsin | 6,931 | 3,951 | 751 | $1,088,144 | $2,210,174 | $3,298,318 |
| Wyoming | 569 | 325 | 62 | $89,399 | $181,582 | $270,981 |

Notes: See text for explanation of the source of estimates.
Analyses by Leighton Ku, June 11, 2018

54. For the overall United States (not including the territories), about 408,000 DACA recipients would lose their private health insurance and become uninsured if DACA is terminated. Of them, about 78,000 would require emergency care in 2018, which would lead to about $113 million in additional Medicaid emergency care expenditures. The 408,000 newly uninsured individuals would incur about $229 million in community-based uncompensated care at community health centers, public clinics and other safety net sites. In total, the public costs of increased public health care would rise by about $341 million in 2018 due to the loss of DACA. It is worth noting that, despite the emergency or charity care provided, DACA recipients would still have substantial unmet medical needs because they would lack insurance coverage for other medical costs, such as specialty ambulatory care, medications and inpatient hospital care.

55. I also illustrate the effects for two states: Texas, the largest of the plaintiff states, and for New Jersey.

56. In Texas, the loss of DACA could lead about 65,000 more people to become uninsured. Of them, more than 12,000 would require emergency medical care in 2018, costing about $18 million. And the 65,000 uninsured people would require about $36 million in additional community-based uncompensated care. The total increase in one year in additional public medical expenditures in Texas would equal about $55 million in 2018 as a result of the termination of DACA.

57. For New Jersey, the loss of DACA could cause the number of uninsured people to rise by about 11,500. This would increase public medical care costs by $7.6 million, including $2.5 million in emergency Medicaid costs and $5.1 million in community-based uncompensated care costs. New Jersey also has an innovative Charity Care – Hospital

26

Care Payment Assistance Program that helps subsidize uncompensated care costs due to inpatient and outpatient hospital care for uninsured patients.[41] Increasing the number of uninsured patients, due to loss of DACA, would create additional financial burdens for this program and create hardships for hospitals across the state.

58. In her declaration, Ms. Monica Smoot of the Texas Health and Human Services Commission[42] notes that her agency incurs costs to provide emergency Medicaid services, family violence services and CHIP perinatal coverage for undocumented immigrants, as well as additional uncompensated medical care provided by state public hospitals. She does not provide estimates of the costs of these services for DACA recipients. While I cannot comment on the accuracy of her estimates, I note, as described above, that if DACA is lost, then a substantial number of those who currently have employer-sponsored health insurance will lose their work authorization and thereby lose their jobs and private health insurance and will become uninsured (and often become impoverished). They will still have medical needs, however, and many will have to receive services such as emergency Medicaid or other charity care type facilities (including uncompensated care at state hospitals) that previously could have been financed by their private health insurance. The loss of DACA will cause public expenditures for emergency Medicaid services and related services for uninsured people to rise even higher, creating additional costs for the state of Texas.

---

[41] New Jersey Department of Health.  Charity Care – New Jersey Hospital Care Payment Assistance Program.  http://www.nj.gov/health/charitycare/
[42] Declaration of Monica Smoot in *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  April 9, 2018.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the forgoing is true and correct.

Respectfully submitted,

_____

Leighton Ku, PhD, MPH

June 15, 2018

28

# DEF-INTERV.
# EX. 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 1:18-CV-68 |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| Defendants, | ) |
| KARLA PEREZ, *et al.*, | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| STATE OF NEW JERSEY, | ) |
| Proposed Defendant-Intervenor. | ) |

## DECLARATION OF MEG WIEHE AND MISHA HILL

We, Meg Wiehe, and Misha Hill declare as follows:

1. We are tax policy experts working for the Institute on Taxation and Economic Policy (ITEP). ITEP is a non-profit, nonpartisan research organization that provides in-depth analyses on the effects of federal, state, and local tax policies. ITEP's mission is to ensure the nation has a fair and sustainable tax system that raises enough revenue to fund our common priorities, including education, health care, infrastructure and public safety. ITEP researchers use a tax incidence model to produce distributional and revenue analyses of current tax systems and proposed changes at the federal, state, and local level.

   a. Meg Wiehe is the Deputy Director of ITEP. She has worked with ITEP since 2010. Meg is nationally recognized expert on state and local taxation. She studies, writes and provides commentary and insight to a wide range of audiences on historical and current trends in state tax and budget policy. In particular, her analyses focus both on how tax and budget policies affect low- and moderate-income families as well as the intersection of fiscal policies and state and local

governments' ability to fund basic public priorities, including education,
infrastructure and health care. Meg has conducted hundreds of revenue and
distributional analyses of proposed tax changes in more than 40 states using
ITEP's microsimulation tax model. She also is a lead author of ITEP's flagship
report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States*.
Meg holds a Master of Public Administration from the Maxwell School at
Syracuse University and a Bachelor of Arts in Anthropology from the University
of Virginia.

b. Misha Hill has been a State Policy Fellow at ITEP since 2016. Misha's work with
ITEP has focused, in part, on supporting research and analysis of taxes paid by
undocumented immigrants. She is a co-author of ITEP's first report examining the
tax contributions of young undocumented immigrants and helped develop the
methodology. She has updated analyses and reports on taxes paid by all
undocumented immigrants. She has authored half a dozen blog posts related to
taxes paid by undocumented immigrants and given Spanish-language press
interviews presenting the findings. She holds a Master of Public Policy from The
George Washington University and Bachelor of Arts in Hispanic Studies from the
University of Pennsylvania.

2. According to U.S. Citizenship and Immigration Services (USCIS), the agency that
administers Deferred Action for Childhood Arrivals (DACA), as of January 31, 2018
over 680,000 young people who were brought to the United States as children without
documentation are currently enrolled in DACA.[1] The Migration Policy Institute, a non-
profit, non-partisan think tank that analyzes the movement of people worldwide,

---

[1] U.S. Citizenship and Immigration Services, "Deferred Action for Childhood Arrivals (DACA)
as of Jan. 31, 2018." Available at:
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigrat
ion%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Jan_31_2018.
pdf

estimates an additional 643,000 individuals are eligible for DACA but not currently enrolled.[2]

3. We used the above estimates of the current population receiving and eligible for but not receiving Deferred Action for Childhood Arrivals (DACA) in each state to estimate the annual aggregate state and local tax contributions of the DACA-eligible population.

4. Young undocumented immigrants eligible for or enrolled in DACA, like all people living and working in the U.S., pay state and local income, property, sales, and excise taxes. We estimate that the total DACA-eligible population contributes more than $1.7 billion annually in state and local taxes. $1.2 billion of that is from the population currently enrolled in DACA. The following assumptions were made to calculate the sales and excise, income, and property taxes of the DACA-eligible population:

   a. Taxpaying units and employment status:

      i. ITEP's analysis treats each DACA-eligible immigrant who is working as a single taxpaying unit.

      ii. The employment rate of immigrants depends on legal status

      iii. 2017 national survey of 3,063 DACA recipients found that 91 percent of respondents were employed.[3] DACA enrollees pay the same income taxes (in states with income taxes) as other lawfully present individuals. DACA enrollees receive a temporary social security number which allows them to file federal and state income taxes and, additionally payroll taxes are deducted from their paychecks. This declaration assume 100 percent compliance with tax laws by DACA enrollees.

      iv. The previously mentioned national survey also found that prior to obtaining DACA only 44 percent of survey respondents were employed.

---

[2] Migration Policy Institute, "Estimates of DACA-Eligible Population at U.S., State, & County Levels." Available at: http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles#overlay-context=events

[3] "Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey." Center for American Progress, https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf

Our analysis assumes that 44 percent of the population that is eligible for DACA but not currently enrolled are employed.

b.   Income of DACA-eligible population

    i.   Immigrant wages change depending on legal status. Undocumented workers earn $22,029 a year on average and granting DACA status increases wages by 8.5 percent, according to a 2014 report by the Center for American Progress.[4] The average wages applied to the estimated DACA working population in ITEP's analysis are:

- $23,901 for the DACA-eligible population working and enrolled in the program.
- $22,029 for the DACA-eligible population working, but not enrolled in the program.

c.   Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by DACA-eligible population in each state.

    i.   ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law in place as of December 31, 2014. In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of the state and local tax laws as of January 2015 on taxpayers at 2012 income levels.[5] To estimate effective tax rates for the DACA-eligible population we applied effective tax rates calculated in the 2015 *Who Pays?* report to the DACA-eligible population.

d.   We estimate that the DACA-eligible population contributes $287 million in state and local income taxes annually.

---

[4] Oakford, Patrick. "Administrative Action on Immigration Reform." Center for American Program, September 2014. https://www.americanprogress.org/issues/immigration/reports/2014/09/04/96177/administrative-action-on-immigration-reform/

[5] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

    i. Eligible immigrants enrolled in DACA are required to pay personal income taxes using a temporary social security number. Thus, this study assumes the 682,00 DACA-enrolled workers are fully complying with state personal income taxes. Personal income tax effective rates in each state were applied accordingly. Various studies have estimated between 50 and 75 percent of undocumented immigrants currently pay personal income taxes predominantly using Individual Tax Identification (ITIN) numbers or with false social security numbers.[6] This analysis assumes a 50 percent compliance rate for DACA-eligible immigrants who are not enrolled and applies 50 percent compliance if DACA protections are lost. Personal income tax effective rates in each state were applied to 50 percent of the estimated income.

    ii. Enrolled DACA recipients are eligible to receive the federal Earned Income Tax Credit (EITC) and the state versions of the credit as well, however state EITC benefits were not included in this study for two reasons: 1) all DACA-eligible workers are treated as single taxpaying units and 2) the average income of the enrolled DACA population is above the EITC income eligibility amounts for single workers. The impact of state EITCs was also left out of the other policy options given that DACA-eligible immigrants not enrolled in the program are ineligible for the credit.

e. We estimate the DACA-eligible population contributes $416 million annually in state and local property taxes. The DACA-eligible population pays property taxes either directly as homeowners, or indirectly through higher rents as tenants.

---

[6] See among others: Feinleib, Joel, and David Warner. "Issue Brief #1: The Impact of Immigration on Social Security and the National Economy." Social Security Advisory Board, Social Security Advisory Board, Dec. 2005, www.ssab.gov/Portals/0/OUR_WORK/REPORTS/Impact%20of%20Immigration%20on%20Social%20Security%20Brief_2005.pdf; Singer, Paula, and Linda Dodd-Major. "Identification Numbers and U.S. Government Compliance Initiatives." Tax Analysts, 20 Sept, 2004; and Cornelius, Wayne, and Jessica Lewis. Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities, La Jolla, Calif.: University of California at San Diego, Center for Comparative Immigration Studies, 2007.

      i.   The first step in calculating property taxes was to identify the share of DACA-eligible immigrants who are homeowners or renters in each state. This analysis used state-by-state data from the Migration Policy Institute to estimate homeownership rates for undocumented immigrants in each state.[7] The ITEP model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

    f.   We estimate the DACA-eligible population contributes $1 billion annually in state and local sales and excise taxes. The DACA-eligible population, like anyone purchasing goods or services, pays consumption taxes directly at the point of sale on taxable items.

      i.   Sales and excise taxes are collected by retailers every time a purchase is made on a taxable good or service. It is reasonable to assume that DACA eligible immigrants pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes thus the estimated rates in ITEP's *Who Pays?* for each state were applied to the various estimated DACA-eligible population incomes.

5.   A useful way to compare taxes paid across income levels is the effective tax rate. This is the total of all taxes paid - income, property, and sales and excise - as a share of income. The DACA-eligible population pays an average effective tax rate of 8.3 percent.[8] ITEP's 2015 report, *Who Pays: A Distributional Analysis of the Tax Systems in All Fifty States* found that the middle 20% of taxpayers pays on average an effective tax rate of 9.7 percent, and the top 1 percent of taxpayers pays just 7 percent of their income in taxes.[9]

---

[7] Christensen Gee, et al. "Undocumented Immigrants' State and Local Tax Contributions." Institute on Taxation and Economic Policy, Mar. 2017, http://www.itep.org/pdf/immigration2017.pdf. See Appendix 2

[8] Hill, Misha E. and Meg Wiehe. "State and Local Tax Contributions of Young Undocumented Immigrants", Institute on Taxation and Economic Policy, Apr. 2018, https://itep.org/state-local-tax-contributions-of-young-undocumented-immigrants-2/

[9] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

This means the DACA-eligible population pays state and local taxes at a similar rate to middle income taxpayers across the country.

6. We also estimate that if DACA protections were lost the population would continue to contribute to state and local revenues, but at much lower levels. We estimate a total loss of $693 million in state and local tax revenues.

    a. DACA protections increase state and local tax contributions because they increase employment rates,[10] increase average salaries,[11] and increase the share paying state personal income taxes from 50 to 100 percent.[12] Surveys of DACA recipients found that after receiving DACA protections respondents were employed at higher rates and earned higher wages. This is likely because the work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers, pursue advanced degrees, and protects them from wage theft by unscrupulous employers. Thus, a loss of DACA protections would eliminate the revenue gained from the increased salaries DACA affords.

7. Every state revenue stream could be harmed by the loss of DACA protections. In New Jersey, 53,000 residents are eligible for or receiving DACA, given the previously stated assumptions, this represents a contribution $57.2 million in state and local taxes which represents an average effective tax rate 7.9 percent. This includes $7.7 million in state and local income tax, $22.7 million in property tax, and $26.6 million in sales and excise taxes. If DACA protections were lost their contributions would decrease by $18.7 million to $38.4 million.

8. For all the foregoing reasons, in our professional opinions rescinding DACA would reduce the state and local tax contributions of the population eligible for DACA by nearly half in New Jersey and nearly $700 million nationally. This would hamper state and local revenues and hurt their economies.

_____

[10] See footnote 3

[11] See footnote 3

[12] See 4.a.3

9. Attached as **Exhibit A** hereto is a list of publications each of us has authored over the past 10 years and our CVs.

10. Neither of us has testified as an expert at trial or by deposition over the past 4 years.

11. We are each being paid $187.50/hour for our services in connection with this litigation.


   We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of our knowledge.

Respectfully submitted,

_MEwiehe_
Meg Wiehe

6/15/18
Date


_MEHill_
Misha Hill

6/15/18
Date

# EXHIBIT A

# MEG WIEHE

924 Green Street, Durham, NC 27701
(617) 230-3624 • megwiehe@gmail.com

## EDUCATION

**Maxwell School of Syracuse University,** *Masters of Public Administration, June 2006*

**University of Virginia,** *Bachelor of Arts, Anthropology, May 1998. Graduated with High Distinction*

## WORK EXPERIENCE

**Institute on Taxation and Economic Policy (ITEP)**                              **Durham, NC/Washington, DC**
*Deputy Director (2016-present); State Tax Policy Director (2010-2016)*

- Responsible for planning, managing, and implementing ITEP's state and federal tax policy programmatic work. This includes setting organizational goals and priorities, tracking policy developments in all 50 states and the federal level, ensuring ITEP is informing and influencing key tax debates, and building and maintaining key partnerships.
- Serve as a spokesperson for ITEP through media interviews, presentations, and meetings with policymakers and funders.
- Along with Executive Director, oversee ITEP's fundraising program including grant proposal and report writing, maintaining relationships with funders, and cultivating new donors.
- Directly manage and support six staff members.
- Authored numerous ITEP reports on topics including tax credits for workers and families, documenting the taxes paid by undocumented immigrants, closing tax loopholes, promoting progressive revenue raising options, and comprehensive state and local tax reform. Co-author on ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.*

**North Carolina Justice Center**                                              **Raleigh, NC**
*Senior Policy Analyst/Outreach Director; NC Budget and Tax Center (2006-2010)*
- Promoted progressive fiscal policy through coalition building, media outreach, lobbying, and public presentations
- Conducted research and wrote publications on state and local fiscal and economic policy
- Co-coordinator of statewide revenue coalition, Together NC, and led successful campaign to enact a state Earned Income Tax Credit in 2007

**Boston Museum Project**                                                    **Boston, MA**
*Special Projects Coordinator/Project Coordinator (2002-2005)*
- Coordinated development operation laying ground work for $180 million capital campaign through prospect research, donor cultivation, and special events
- Led political and communications strategy including securing a site for project, producing newsletter, managing website content, and regular correspondence with project constituents
- Supervised two staff, conducted weekly staff meetings, and managed high-level Board of Directors

**MASSPIRG**                                                      **Amherst and Boston, MA**
*Massachusetts Community Water Watch AmeriCorps Program Director (2000-2002)*
- Recruited, trained, and supervised 13 full-time AmeriCorps members
- Built collaborative relationships with non-profits and state and local government leaders
- Revised program mission, developed five year strategic plan, and established performance objectives
*Mass Student PIRG Campus Organizer (1998-2000)*
- Recruited, trained, and supervised college students and community volunteers to lead national, state, and local social change campaigns

# Misha E. Hill

(C) 609.234.5931          804 Green St., Apt D-2, Durham, NC 27701          hill.misha@gmail.com

## EDUCATION

**Master of Public Policy,** concentration in Health Policy                                   May 2016
*The George Washington University* | Washington, DC
**B.A. Hispanic Studies,** concentrations in Modern Middle East Studies and Theatre Arts          May 2010
*University of Pennsylvania* | Philadelphia, PA

## POLICY RESEARCH EXPERIENCE

**State Policy Fellow** | *Institute on Taxation and Economic Policy* | Durham, NC          Sept 2016—Present
  ❖ Participated in quantitative and qualitative analyses of the varying impact of fiscal policy by income and
    citizenship status for the purpose of continuing dialogue within the organization, establishing and developing
    external written, and responding to technical assistance requests from key stake holders such as the California
    Attorney General
  ❖ Advocated within the organization for the inclusion of a race equity lens and drafted an internal document to
    support this advocacy
  ❖ Created written products in collaboration with senior staff and independently on various state tax policy topics,
    including taxes paid by undocumented immigrants and adding a gendered lens to tax and budget policy
  ❖ Responded to Spanish language media inquiries related to published reports
  ❖ Presented at a national conference on current and upcoming research and analytical capabilities of the
    organization
  ❖ Tracked state legislative action related to tax policies and identified trends in consumption tax policy

**Income Support Research Assistant** | *Center on Budget and Policy Priorities* | Washington, DC   Nov 2015—Sept 2016
  ❖ Compiled a weekly email for distribution to state and national advocates on the latest news and research related
    to TANF policies
  ❖ Collected national and state level TANF statistics, including annual spending, caseloads, and applications, from
    HHS and state agencies to inform internal analyses and future work
  ❖ Tracked state and federal legislative action related to income support programs

**Women's Health Policy Intern** | *The Henry J. Kaiser Family Foundation* | Washington, DC          Jun 2015—Aug 2015
  ❖ Compiled comprehensive database of Medicaid family planning expansion programs to inform future research
  ❖ Performed qualitative research for a fact sheet on financing of maternity care in the US
  ❖ Presented a summary of work to about 20 participants that articulated why Medicaid family planning expansion
    programs were an important topic for federal fiscal policy

**Income Support Intern** | *Center on Budget and Policy Priorities* | Washington, DC          Sep 2014—May 2015
  ❖ Co-authored a report on state General Assistance programs
  ❖ Drafted briefs for an advocacy tool kit at a national conference on expanding TANF work programs
  ❖ Modeled alternatives of changes to TANF policies displaying the effects on families' incomes
  ❖ Performed literature reviews of prior research related to various income support programs
  ❖ Monitored and summarized media on state and federal legislative and policy changes to income support
    programs
  ❖ Compiled data on TANF policies into summaries, fact sheets, graphs, and graphics for organization website

## DIRECT SERVICE EXPERIENCE

**WorkFirst NJ Administrator** | *HomeFront, Inc.* | Lawrence, NJ          Jun 2010—Oct 2012
  ❖ Supported TANF participants in goal setting, GED preparation, and finding employment

## COMMUNITY SERVICE

**Harm Free Zone Participant** | *SpiritHouse* | Durham, NC          Jun 2017—Present
  ❖ SpiritHouse uses art, culture, and media to support the empowerment of communities impacted by racism,
    criminalization, and incarceration. Harm Free Zone is a project that works to build communities that do not rely on
    law enforcement. Participated in performances, transformative justice, trainings, campaigns and book studies.

**End Shackling Campaign Participant** | *SisterSong, Inc.* | Durham, NC          March 2018—Present
  ❖ Provided fiscal policy insight for campaign to end the shackling of pregnant persons in North Carolina prisons
    and jails

**Certified Application Counselor** | *Northern Virginia Family Services* | Falls Church, VA          Dec 2014—Mar 2015
  ❖ Assisted primarily Spanish-speaking consumers in applying for health insurance through the ACA Marketplace

## LANGUAGES AND TECHNOLOGY SKILLS

**Language:** Spanish, Fluent in written and oral
**Technology:** STATA and SPSS (academic training), Adobe Illustrator, Microsoft Excel, WordPress, MailChimp, and The
Raiser's Edge

Meg Wiehe's Publication

| Organization | Title | Date |
|---|---|---|
| Institute on Taxation and Economic Policy | Lottery, Casino and other Gambling Revenue: A Fiscal Game of Chance | 6/12/2018 |
| Institute on Taxation and Economic Policy | SALT/Charitable Workaround Credits Require a Broad Fix, Not a Narrow One | 5/23/2018 |
| Institute on Taxation and Economic Policy | How Long Has It Been Since Your State Raised Its Gas Tax? | 5/22/2018 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants | 4/30/2018 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants | 4/30/2018 |
| Institute on Taxation and Economic Policy | 10 Things You Should Know about the Nation's Tax System | 4/13/2018 |
| Institute on Taxation and Economic Policy | Many Large Corporations Reporting Tax Cut-Inspired Employee Bonuses Were Paying Low T | 4/12/2018 |
| Institute on Taxation and Economic Policy | Fifteen (of Many) Reasons We Need Real Corporate Tax Reform | 4/11/2018 |
| Institute on Taxation and Economic Policy | Who Pays Taxes in America in 2018? | 4/11/2018 |
| Institute on Taxation and Economic Policy | Extensions of the New Tax Law's Temporary Provisions Would Mainly Benefit the Wealthy | 4/10/2018 |
| Institute on Taxation and Economic Policy | Many Localities Are Unprepared to Collect Taxes on Online Purchases; Amazon.com and oth | 3/26/2018 |
| Institute on Taxation and Economic Policy | ITEP Testimony on "Post Tax Reform Evaluation of Recently Expired Tax Provisions" | 3/14/2018 |
| Institute on Taxation and Economic Policy | Preventing State Tax Subsidies for Private K-12 Education in the Wake of the New Federal 5 | 2/23/2018 |
| Institute on Taxation and Economic Policy | What the Tax Cuts and Jobs Act Means for States – A Guide to Impacts and Options | 1/26/2018 |
| Institute on Taxation and Economic Policy | Key Lessons for States as They Determine Responses to the Federal Tax Bill | 1/26/2018 |
| Institute on Taxation and Economic Policy | National and 50-State Impacts of House and Senate Tax Bills in 2019 and 2027 | 12/6/2017 |
| Institute on Taxation and Economic Policy | How True Tax Reform Would Eliminate Breaks for Real Estate Investors Like Donald Trump | 12/1/2017 |
| Institute on Taxation and Economic Policy | Six More Things to Know About the Senate Tax Plan | 11/29/2017 |
| Institute on Taxation and Economic Policy | Revised Senate Plan Would Raise Taxes on at Least 29% of Americans and Cause 19 States t | 11/18/2017 |
| Institute on Taxation and Economic Policy | Analysis of the House Tax Cuts and Jobs Act | 11/6/2017 |
| Institute on Taxation and Economic Policy | 9 Things You Should Know About the Tax Debate | 11/3/2017 |
| Institute on Taxation and Economic Policy | The Domestic Production Activities Deduction: Costly, Complex and Ineffective | 10/26/2017 |
| Institute on Taxation and Economic Policy | Benefits of GOP-Trump Framework Tilted Toward the Richest Taxpayers in Each State | 10/26/2017 |
| Institute on Taxation and Economic Policy | Trickle-Down Dries Up | 10/26/2017 |
| Institute on Taxation and Economic Policy | State Tax Codes as Poverty Fighting Tools | 10/4/2017 |
| Institute on Taxation and Economic Policy | State Tax Codes as Poverty Fighting Tools | 9/14/2017 |
| Institute on Taxation and Economic Policy | Trump Proposals Would Reduce the Share of Taxes Paid by the Richest 1%, Raise It for Ever | 9/14/2017 |
| Institute on Taxation and Economic Policy | Reducing the Cost of Child Care Through State Tax Codes in 2017 | 9/13/2017 |
| Institute on Taxation and Economic Policy | Property Tax Circuit Breakers in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Options for a Less Regressive Sales Tax in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Nearly Half of Trump's Proposed Tax Cuts Go to People Making More than $1 Million Annu | 8/17/2017 |

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | Comment Letter to Treasury on Earnings Stripping Regulations | 8/4/2017 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 7/21/2017 |
| Institute on Taxation and Economic Policy | Trump's $4.8 Trillion Tax Proposals Would Not Benefit All States or Taxpayers Equally | 7/20/2017 |
| Institute on Taxation and Economic Policy | Comment Letter on Tax Reform to Senate Finance Chairman | 7/17/2017 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/12/2017 |
| Institute on Taxation and Economic Policy | Trump Budget Uses Unrealistic Economic Forecast to Tee Up Tax Cuts | 6/29/2017 |
| Institute on Taxation and Economic Policy | Public Loss Private Gain: How School Voucher Tax Shelters Undermine Public Education | 5/17/2017 |
| Institute on Taxation and Economic Policy | Why States That Offer the Deduction for Federal Income Taxes Paid Get It Wrong | 5/1/2017 |
| Institute on Taxation and Economic Policy | What Real Tax Reform Should Look Like | 4/27/2017 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants (2017) | 4/25/2017 |
| Institute on Taxation and Economic Policy | Comparing the Distributional Impact of Revenue Options in Alaska | 4/24/2017 |
| Institute on Taxation and Economic Policy | State and Local Tax Contributions of Undocumented Californians: County-by-County Data | 4/24/2017 |
| Institute on Taxation and Economic Policy | 10 Things You Should Know on Tax Day | 4/13/2017 |
| Institute on Taxation and Economic Policy | Who Pays Taxes in America in 2017? | 4/13/2017 |
| Institute on Taxation and Economic Policy | The U.S. Is One of the Least Taxed Developed Countries | 4/10/2017 |
| Institute on Taxation and Economic Policy | Testimony before the Alaska House Labor & Commerce Committee On House Bill 36 | 4/4/2017 |
| Institute on Taxation and Economic Policy | Assessing the Distributional Consequences of Alaska's House Bill 115 (Version L) | 3/28/2017 |
| Institute on Taxation and Economic Policy | Affordable Care Act Repeal Includes a $31 Billion Tax Cut for a Handful of the Wealthiest Ta | 3/17/2017 |
| Institute on Taxation and Economic Policy | Taxes and the On-Demand Economy | 3/15/2017 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions | 3/1/2017 |
| Institute on Taxation and Economic Policy | Combined Reporting of State Corporate Income Taxes: A Primer | 2/24/2017 |
| Institute on Taxation and Economic Policy | State Tax & Revenue Information | 1/31/2017 |
| Institute on Taxation and Economic Policy | State-by-State Tax Expenditure Reports | 1/31/2017 |
| Institute on Taxation and Economic Policy | Fairness Matters: A Chart Book on Who Pays State and Local Taxes | 1/26/2017 |
| Institute on Taxation and Economic Policy | State Estate and Inheritance Taxes | 12/21/2016 |
| Institute on Taxation and Economic Policy | The Federal Estate Tax: A Critical and Highly Progressive Revenue Source | 12/7/2016 |
| Institute on Taxation and Economic Policy | Fact Sheet: Preserving the Estate Tax | 12/7/2016 |
| Institute on Taxation and Economic Policy | Privatization, Waste, and Unfunded Projects: The Problems with Trump's Infrastructure Pro | 11/30/2016 |
| Institute on Taxation and Economic Policy | State Tax Preferences for Elderly Taxpayers | 11/28/2016 |
| Institute on Taxation and Economic Policy | Collecting Sales Taxes Owed on Internet Purchases | 11/18/2016 |
| Institute on Taxation and Economic Policy | Fact Sheet: Comparison of House GOP Tax Plan, Trump's Initial Tax Proposal and Trump's R | 11/15/2016 |
| Institute on Taxation and Economic Policy | The Short and Sweet on Taxing Soda | 10/28/2016 |
| Institute on Taxation and Economic Policy | Cigarette Taxes: Issues and Options | 10/18/2016 |
| Institute on Taxation and Economic Policy | State Tax Subsidies for Private K-12 Education | 10/12/2016 |

| Institute on Taxation and Economic Policy | Comment Letter to FASB on Income Tax Disclosure | 9/30/2016 |
| Institute on Taxation and Economic Policy | State Tax Codes as Poverty-Fighting Tools | 9/15/2016 |
| Institute on Taxation and Economic Policy | Property Tax Circuit Breakers | 9/14/2016 |
| Institute on Taxation and Economic Policy | Reducing the Cost of Child Care Through State Tax Codes | 9/14/2016 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 9/14/2016 |
| Institute on Taxation and Economic Policy | Options for a Less Regressive Sales Tax | 8/22/2016 |
| Institute on Taxation and Economic Policy | How State Tax Changes Affect Your Federal Taxes: A Primer on the "Federal Offset" | 8/22/2016 |
| Institute on Taxation and Economic Policy | Indexing Income Taxes for Inflation: Why It Matters | 8/22/2016 |
| Institute on Taxation and Economic Policy | The Folly of State Capital Gains Tax Cuts | 8/17/2016 |
| Institute on Taxation and Economic Policy | Why Sales Taxes Should Apply to Services | 7/27/2016 |
| Institute on Taxation and Economic Policy | Income Tax Offers Alaska a Brighter Fiscal Future | 7/12/2016 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/11/2016 |
| Institute on Taxation and Economic Policy | Ryan Tax Plan Reserves Most Tax Cuts for Top 1 percent, Costs $4 Trillion Over 10 Years | 6/29/2016 |
| Institute on Taxation and Economic Policy | Distributional Analyses of Revenue Options for Alaska | 4/13/2016 |
| Institute on Taxation and Economic Policy | Higher Education Income Tax Deductions and Credits in the States | 3/22/2016 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions (2016) | 2/24/2016 |
| Institute on Taxation and Economic Policy | Tennessee Hall Tax Repeal Would Overwhelmingly Benefit the Wealthy, Raise Tennesseans | 2/23/2016 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 2/11/2016 |
| Institute on Taxation and Economic Policy | Tax Foundation Model Seeks to Revive Economic Voodoo | 2/11/2016 |
| Institute on Taxation and Economic Policy | Testimony before the Vermont Senate Committee on Finance: Tax Policy Issues with Legali: | 1/19/2016 |
| Institute on Taxation and Economic Policy | ITEP Comments to the Vermont Senate Committee on Finance: Tax Expenditure Evaluation | 1/13/2016 |
| Institute on Taxation and Economic Policy | A Primer on State Rainy Day Funds | 10/20/2015 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/17/2015 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Tennessee Is a "Low Tax State" Overall, But Not for Families Living in F | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: South Dakota Is a "Low Tax State" Overall, But Not for Families Living | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Washington Is a "Low Tax State" Overall, But Not for Families Living in | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Florida is a "Low Tax State" Overall, But Not for Families Living in Pove | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Texas is a "Low Tax State" Overall, But Not for Families Living in Pover | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Arizona is a "Low Tax State" Overall, But Not for Families Living in Pov | 9/17/2015 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/22/2015 |
| Institute on Taxation and Economic Policy | Pay-Per-Mile Tax is Only a Partial Fix | 6/24/2015 |
| Institute on Taxation and Economic Policy | Testimony: Adding Sustainability to the Highway Trust Fund | 6/17/2015 |
| Institute on Taxation and Economic Policy | Issues with Taxing Marijuana at the State Level | 5/6/2015 |

| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions (2015) | 4/15/2015 |
| Institute on Taxation and Economic Policy | State Tax Preferences for Elderly Taxpayers | 3/23/2015 |
| Institute on Taxation and Economic Policy | Grocery Tax Exemption Is No Improvement for Idaho | 2/5/2015 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/18/2014 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 8/5/2014 |
| Institute on Taxation and Economic Policy | Options for Progressive Sales Tax Relief | 7/30/2014 |
| Institute on Taxation and Economic Policy | State Estate and Inheritance Taxes | 7/21/2014 |
| Institute on Taxation and Economic Policy | Pay-Per-Mile Tax is Only a Partial Fix | 5/28/2014 |
| Institute on Taxation and Economic Policy | STAMP is an Unsound Tool for Gauging the Economic Impact of Taxes | 5/21/2014 |
| Institute on Taxation and Economic Policy | Improving Tax Fairness with a State Earned Income Tax Credit | 5/15/2014 |
| Institute on Taxation and Economic Policy | Tennessee Hall Tax Repeal Would Overwhelmingly Benefit the Wealthy, Raise Tennesseans | 3/24/2014 |
| Institute on Taxation and Economic Policy | Personal Income Tax Reform: Improving the Fairness of Taxes in the District of Columbia | 11/12/2013 |
| Institute on Taxation and Economic Policy | Paying for Education Finance Reform in Colorado | 10/10/2013 |
| Institute on Taxation and Economic Policy | Low Tax for Who? | 9/19/2013 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/19/2013 |
| Institute on Taxation and Economic Policy | Washington is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Texas is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Tennessee is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | South Dakota is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Florida is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Arizona is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | A Closer Look at TABOR (Taxpayer Bill of Rights) | 8/19/2013 |
| Institute on Taxation and Economic Policy | Tax Expenditure Reports: A Vital Tool with Room for Improvement | 8/14/2013 |
| Institute on Taxation and Economic Policy | Tax Incentives: Costly for States, Drag on the Nation | 8/14/2013 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/24/2013 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State and Local Tax Contributions (2013) | 7/10/2013 |
| Institute on Taxation and Economic Policy | 5% Cut in Indiana's Income Tax is Stacked in Favor of the Wealthy | 4/26/2013 |
| Institute on Taxation and Economic Policy | Indiana Senate's Income Tax Cut: Just as Lopsided as the Governor's | 4/8/2013 |
| Institute on Taxation and Economic Policy | Kansas House and Senate Proposals Set the Stage for Tax Hikes on Poor and Middle-Income | 4/2/2013 |
| Institute on Taxation and Economic Policy | Governor Jindal's Tax Plan Would Increase Taxes on Poorest 60 Percent of Louisianans | 4/1/2013 |
| Institute on Taxation and Economic Policy | States with "High Rate" Income Taxes are Still Outperforming No-Tax States | 2/28/2013 |
| Institute on Taxation and Economic Policy | Laffer's New Job Growth Factoid is All Rhetoric and No Substance | 2/27/2013 |
| Institute on Taxation and Economic Policy | IDACorp— Biggest Winner Under Property Tax Plan— Pays Nothing in State Income Taxes | 2/13/2013 |
| Institute on Taxation and Economic Policy | Kansas Governor's New Plan Increases Taxes on Poor Yet Slashes Revenue by $340 Million | 2/1/2013 |

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | Who Pays? (Fourth Edition) | 1/30/2013 |
| Institute on Taxation and Economic Policy | More Inaccuracies, Bigger Omissions: Arthur Laffer's Newest Study of Income Tax Repeal Fa | 1/23/2013 |
| Institute on Taxation and Economic Policy | Proposal to Eliminate Income Taxes Amounts to a Tax Increase on Bottom 80 Percent of Lo | 1/11/2013 |
| Institute on Taxation and Economic Policy | Previewing Tax Reform in the States: National Trends and State-specific Prospects for 2013 | 12/13/2012 |
| Institute on Taxation and Economic Policy | Tax Principles: Building Blocks of A Sound Tax System | 12/1/2012 |
| Institute on Taxation and Economic Policy | Five Steps Toward a Better Tax Expenditure Debate | 10/1/2012 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/13/2012 |
| Institute on Taxation and Economic Policy | Most of Indiana Tax Rate Cut Would Flow to Upper-Income Taxpayers | 8/27/2012 |
| Institute on Taxation and Economic Policy | Corporate Income Tax Apportionment and the "Single Sales Factor" | 8/1/2012 |
| Institute on Taxation and Economic Policy | State Estate and Inheritance Taxes | 8/1/2012 |
| Institute on Taxation and Economic Policy | Four Tax Ideas for Jobs-Focused Governors | 7/15/2012 |
| Institute on Taxation and Economic Policy | The Progressive Income Tax: An Essential Element of Fair and Sustainable State Tax System: | 7/15/2012 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: A Boondoggle | 7/1/2012 |
| Institute on Taxation and Economic Policy | Tax Bill Signed by Governor Brownback Makes Kansas an Outlier | 5/24/2012 |
| Institute on Taxation and Economic Policy | Latest Kansas Tax Bill Carries $680 Million Price Tag and Raises Taxes on Those Least Able to | 5/17/2012 |
| Institute on Taxation and Economic Policy | Three Strategies for Making Enacted Kansas Tax Plan Less Unfair and Less Costly | 5/10/2012 |
| Institute on Taxation and Economic Policy | Kansas Tax Bill Would Cost $600 Million a Year While Hiking Taxes on Low-Income Families | 5/8/2012 |
| Institute on Taxation and Economic Policy | How Federal Tax Reform Can Help or Hurt State and Local Governments | 4/25/2012 |
| Institute on Taxation and Economic Policy | Regarding Proposals to Increase Taxes on Upper-Income Rhode Islanders | 4/24/2012 |
| Institute on Taxation and Economic Policy | Repealing Estate Tax Will Not Create An Economic Boom | 4/1/2012 |
| Institute on Taxation and Economic Policy | Idaho House Tax Plan Stacked In Favor of the Wealthy | 3/24/2012 |
| Institute on Taxation and Economic Policy | Alaska Senate State Affairs Committee Regarding SB 29, The Alaska Tax Break Transparency, | 3/6/2012 |
| Institute on Taxation and Economic Policy | Tax Plans Put Kansas on Road Away from Fair & Adequate Tax Reform | 3/3/2012 |
| Institute on Taxation and Economic Policy | Testimony on Reinstating Maryland's "Millionaires' Tax" | 2/29/2012 |
| Institute on Taxation and Economic Policy | Arthur Laffer Regression Analysis is Fundamentally Flawed, Offers No Support for Economic | 2/15/2012 |
| Institute on Taxation and Economic Policy | "High Rate" Income Tax States Are Outperforming No-Tax States | 2/8/2012 |
| Institute on Taxation and Economic Policy | Kansas Governor Tax Proposal: Wealthy Kansans Pay Less, Poor and Middle-Income Kansan | 1/11/2012 |
| Institute on Taxation and Economic Policy | Costs of Personal Income Tax Repeal in Kansas | 10/4/2011 |
| Institute on Taxation and Economic Policy | Tax Expenditures: Spending By Another Name | 10/1/2011 |
| Institute on Taxation and Economic Policy | Cigarette Taxes: Issues and Options | 10/1/2011 |
| Institute on Taxation and Economic Policy | Uncertain Benefits, Hidden Costs: The Perils of State-Sponsored Gambling | 10/1/2011 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools (2011) | 9/22/2011 |
| Institute on Taxation and Economic Policy | Rewarding Work Through Earned Income Tax Credits | 9/1/2011 |
| Institute on Taxation and Economic Policy | State Income Taxes and Older Adults | 9/1/2011 |

| Institute on Taxation and Economic Policy | State Treatment of Itemized Deductions | 9/1/2011 |
| Institute on Taxation and Economic Policy | Property Tax Circuit Breakers | 9/1/2011 |
| Institute on Taxation and Economic Policy | The Folly of State Capital Gains Tax Cuts | 9/1/2011 |
| Institute on Taxation and Economic Policy | Split Roll Property Taxes | 9/1/2011 |
| Institute on Taxation and Economic Policy | Reducing the Cost of Child Care Through Income Tax Credits | 9/1/2011 |
| Institute on Taxation and Economic Policy | Property Tax Homestead Exemptions | 9/1/2011 |
| Institute on Taxation and Economic Policy | Capping Property Taxes: A Primer | 9/1/2011 |
| Institute on Taxation and Economic Policy | Taxes and Economic Development 101 | 9/1/2011 |
| Institute on Taxation and Economic Policy | Fighting Back: Accountable Economic Development Strategies | 9/1/2011 |
| Institute on Taxation and Economic Policy | Examining Economic Development Research | 9/1/2011 |
| Institute on Taxation and Economic Policy | Texas is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Washington is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Tennessee is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Florida is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Arizona is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Why States That Offer the Deduction for Federal Income Taxes Paid Get it Wrong | 8/14/2011 |
| Institute on Taxation and Economic Policy | How State Personal Income Taxes Work | 8/1/2011 |
| Institute on Taxation and Economic Policy | Indexing Income Taxes for Inflation: Why it Matters | 8/1/2011 |
| Institute on Taxation and Economic Policy | How State Tax Changes Affect Your Federal Taxes: A Primer on the "Federal Offset" | 8/1/2011 |
| Institute on Taxation and Economic Policy | How Property Taxes Work | 8/1/2011 |
| Institute on Taxation and Economic Policy | Income Tax Simplification: How to Achieve It | 8/1/2011 |
| Institute on Taxation and Economic Policy | Tax Policy Nuts and Bolts: Understanding the Tax Base and Tax Rate | 8/1/2011 |
| Institute on Taxation and Economic Policy | Introduction to ITEP's Tax Incidence Analysis | 8/1/2011 |
| Institute on Taxation and Economic Policy | "Nowhere Income" and the Throwback Rule | 8/1/2011 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: A Boondoggle | 7/14/2011 |
| Institute on Taxation and Economic Policy | How Can States Collect Taxes Owed on Internet Sales? | 7/1/2011 |
| Institute on Taxation and Economic Policy | Options for Progressive Sales Tax Relief | 7/1/2011 |
| Institute on Taxation and Economic Policy | Should Sales Taxes Apply to Services? | 7/1/2011 |
| Institute on Taxation and Economic Policy | How Sales and Excise Taxes Work | 7/1/2011 |
| Institute on Taxation and Economic Policy | Illinois Must Ignore CME's Tax Tantrum | 6/11/2011 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on Combined Reporting Legislation | 5/19/2011 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on Tax Expenditure Procedural Reform | 5/19/2011 |
| Institute on Taxation and Economic Policy | Connecticut Takes a Stand for Progressive Tax Policy and a Balanced Budget Approach | 5/14/2011 |
| Institute on Taxation and Economic Policy | States Should Not Allow Amazon.com to Bully Them into Forgoing Sales Tax Reform | 4/14/2011 |

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | ITEP's Testimony on Sales Tax Modernization Proposal | 4/13/2011 |
| Institute on Taxation and Economic Policy | Don't Give Up on Pease: States Can Decouple from Recent Federal Tax Cuts for Wealthy te | 4/10/2011 |
| Institute on Taxation and Economic Policy | In It for the Long Haul: Why Concerns over Personal Income Tax "Volatility" Are Overblown | 3/31/2011 |
| Institute on Taxation and Economic Policy | Should Illinois Tax Retirement Income? | 3/24/2011 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on EITC Legislation | 3/16/2011 |
| Institute on Taxation and Economic Policy | Topsy-Turvy: State Income Tax Deductions for Federal Income Taxes Turn Tax Fairness on it | 3/10/2011 |
| Institute on Taxation and Economic Policy | Five Reasons to Reinstate Maryland's "Millionaires' Tax" | 3/9/2011 |
| Institute on Taxation and Economic Policy | The ITEP Guide to Fair State and Local Taxes | 3/3/2011 |
| Institute on Taxation and Economic Policy | Dear Wall Street Journal: No Need to File a Missing Persons Report, Oregon's High-income | 12/22/2010 |
| Institute on Taxation and Economic Policy | How the Bush Tax Cuts Affect State Revenues | 12/15/2010 |
| Institute on Taxation and Economic Policy | The Good, the Bad and the Ugly: 2010 State Tax Policy Changes | 12/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Washington's Fundamental Tax Mismatch: Washington is a Low Tax Sta | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Texas' Fundamental Tax Mismatch: Texas is a Low Tax State, But Not fo | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Tennessee's Fundamental Tax Mismatch: Tennessee is a Low Tax State, | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Florida's Fundamental Tax Mismatch: Florida is a Low Tax State, But No | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Arkansas Fundamental Tax Mismatch: Arkansas is a Low Tax State, But | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Arizona's Fundamental Tax Mismatch: Arizona is a Low Tax State, But N | 9/15/2010 |
| Institute on Taxation and Economic Policy | Credit Where Credit is (Over) Due: Four State Tax Policies Could Lessen the Effect that State | 9/15/2010 |
| Institute on Taxation and Economic Policy | "Writing Off" Tax Giveaways: How States Can Help Balance Their Budgets by Reforming or F | 8/24/2010 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on TRAC Sales and Use Tax Proposal | 8/13/2010 |
| North Carolina Budget and Tax Center | BTC Report: The Governor's 2010-11 Budget: A reasonable, though painful, approach to the | 5/25/2010 |
| North Carolina Budget and Tax Center | BTC REPORTS: All Hands on Deck: Predictions for the FY 2010-11 and FY 2011-12 budget shi | 4/8/2010 |
| Institute on Taxation and Economic Policy | A Capital Idea | 1/15/2010 |
| North Carolina Budget and Tax Center | BTC REPORTS: The 2009-2011 State Budget: Trifecta of spending cuts, tax increases and fed | 9/1/2009 |
| North Carolina Budget and Tax Center | BTC REPORTS: The House budget: deteriorating revenue picture forces tough decisions | 6/1/2009 |
| North Carolina Budget and Tax Center | BTC REPORTS: The Senate's Proposed Budget: Overall Spending Target Mirrors Governor's I | 4/1/2009 |
| North Carolina Budget and Tax Center | BTC BRIEF: Beyond the Crystal Ball: Projecting the 2009-10 General Fund Budget Shortfall | 2/1/2009 |

Misha Hill's Publications

| Organization | Title | Date |
|---|---|---|
| Institute on Taxation and Economic Policy | All Bets are Off: State-Sponsored Sports Betting Isn't Worth the Risk | 6/13/2018 |
| Institute on Taxation and Economic Policy | In the Face of the Trump Administration's Anti-Immigrant Agenda, We Must Rely on Evid | 5/4/2018 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants | 4/30/2018 |
| Institute on Taxation and Economic Policy | Trends We're Watching in 2018, Part 5: 21st Century Consumption Taxes | 4/20/2018 |
| Institute on Taxation and Economic Policy | We Must Protect Dreamers | 1/16/2018 |
| Institute on Taxation and Economic Policy | All I Want for Christmas is a Clean DREAM Act | 12/13/2017 |
| Institute on Taxation and Economic Policy | Poverty is Down, But State Tax Codes Could Bring it Even Lower | 9/15/2017 |
| Institute on Taxation and Economic Policy | Besides Eviscerating the Safety Net, Trump Budget Would Put States in a Fiscal Bind | 5/26/2017 |
| Institute on Taxation and Economic Policy | Trump Budget Plan Would Eliminate Child Tax Credits for Working Families Due to Paren | 5/23/2017 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants (2017) | 4/25/2017 |
| Institute on Taxation and Economic Policy | Young Undocumented Immigrants Pay Taxes Too | 4/25/2017 |
| Institute on Taxation and Economic Policy | What to Watch in the States: State Earned Income Tax Credits (EITC) on the Move | 3/24/2017 |
| Institute on Taxation and Economic Policy | A Tax Perspective on International Women's Day | 3/8/2017 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants Pay Taxes | 3/2/2017 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions | 3/1/2017 |
| Institute on Taxation and Economic Policy | What to Watch in the States: Modernizing Sales Taxes for a 21st Century Economy | 2/15/2017 |
| Institute on Taxation and Economic Policy | Lawmakers Should Not Use Disproven Trickle-Down Myth to Ramrod Tax Cuts for the Rid | 2/8/2017 |
| Institute on Taxation and Economic Policy | The Short and Sweet on Taxing Soda | 10/28/2016 |
| Center on Budget and Policy Priorities | State General Assistance Programs Are Weakening Despite Increased Need | 7/9/2015 |

# DEF-INTERV.
# EX. 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 1:18-cv-00068** |
| **UNITES STATES OF AMERICA, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

**Declaration of M. Ray Perryman, Ph D**

1.   My name is M. Ray Perryman. I am over the age of 18 years and am fully competent to make this affidavit. The statements contained herein are true and correct based upon the personal knowledge and information I have gained throughout my professional career as well as specific research related to this engagement.

2.   I have been retained by Mexican American Legal Defense and Education Fund (MALDEF) to review the declarations of Monica Smoot, Donald Deere, Lloyd Potter, and Leonard Lopez and offer relevant responses. My primary focus will be the declarations of Dr. Deere and Ms. Smoot. As background to my responses, I will also offer a perspective on economic issues related to this matter and Deferred Action for Childhood Arrivals (DACA).

3.   The Perryman Group is being compensated for work on this assignment based on billable hours plus expenses. My personal rate is $800 per hour. Other personnel have billing rates in the $250 to $450 per hour range. The level of compensation is not dependent in any way on the opinions I express in, or the outcome

1

of, this matter. Much of the work on this project has been performed by individuals working under my supervision at The Perryman Group.

4.    My complete Curriculum Vitae (CV) has been attached, which includes a list of all publications that I have authored and my professional qualifications. I am also attaching a list of my testimony over the past five years in litigation matters.

## I.    **Qualifications**

5.    I am President and Chief Executive Officer of The Perryman Group (TPG), an economic and financial analysis firm with its principal place of business in Waco, Texas. The Perryman Group has about 20 employees and maintains access to a large network of professionals in the United States and abroad.

6.    I have more than 40 years of academic and professional experience in economics and finance since completing my graduate education. My educational background includes a Bachelor of Science degree in Mathematics from Baylor University and a Ph.D. in Economics from Rice University. My academic career includes 17 years as a member of the faculty of Baylor University and five years as Business Economist-in-Residence at Southern Methodist University. During my tenure at Baylor, I served 10 years in an endowed research chair as the Herman Brown Professor of Economics and five years as University Professor and Economist-in-Residence. I have published five books and published or presented more than 400 academic papers on a wide range of topics. I have also served as an officer in several academic societies and as the editor of academic journals and monograph series. I have won numerous awards for my research endeavors.

7.    In the professional arena, I have authored more than 2,500 trade and professional articles. I also publish a monthly newsletter and a weekly syndicated column. My subscription forecasting services have provided data and projections regarding the economies of the US, Texas, regions and metropolitan areas in Texas, and Texas counties for more than three decades. I provide a daily syndicated radio program and deliver dozens of speeches each year on economic matters. I have also

served on numerous governmental task forces and am actively involved in the public policy process. I am frequently invited to provide testimony to legislative and regulatory bodies on various economic issues. I have received numerous awards for my work in these areas, including recent designations as the 2012 Texan of the Year by the Texas Legislative Conference, the 2012-13 Baylor University Meritorious Service Award, and the 2016 Cesar E. Chavez Legacy Award. I have more than 40 years of consulting experience, and my firm has served the needs of over 2,500 clients.

8.    I have decades of experience in assessing the alleged harms of various actions and policies. I have evaluated damages arising in litigation matters in hundreds of engagements. I have also assessed alleged harms in numerous regulatory proceedings and reports (including many involving a balancing of interests) on a wide variety of issues and have performed hundreds of policy studies dealing with similar issues. I have frequently testified on such issues before Congress and various legislative bodies. Topics have included, among others, energy policy, financial regulation, utility regulation, environmental issues, transportation, insurance, energy, water resources, and telecommunications.

9.    I am a Texas resident, my firm is based in Texas, and I have extensive experience in analyzing the economies of all areas of Texas. I developed the Texas Econometric Model beginning more than 40 years ago and have consistently maintained and updated it since that time. I have been providing forecasts of the state economy as well as its regions and metropolitan areas on a regular basis for more than 35 years. I am also the author of "Texas, Our Texas," the comprehensive plan that led to most of the major economic development incentive programs in the state. Many of our analyses have been specific to Texas; at least 500 studies or other reports have included measurement of economic and fiscal effects of economic patterns or changes on the state in addition to thousands of articles, columns, newsletters, interviews, and speeches.

10.   I also have extensive experience in the analysis of labor markets. Comprehensive workforce assessments have been conducted both from the perspective of communities and of potential locating firms. I have performed projects of

3

this nature for the US Department of Commerce, the US Department of Labor, the Texas Workforce Commission, the Texas Workforce Investment Council, the Bill and Melinda Gates Foundation, the Texas Higher Education Coordinating Board, and scores of councils of government, economic development organizations, local governments, educational institutions, trade associations, and chambers of commerce. I also developed and maintain a comprehensive occupational model which has been used in hundreds of studies of workforce issues. I have taught courses in labor economics at the undergraduate and graduate levels.

11. I have performed numerous studies related to the effects of immigration on the economy and the cost and benefits of immigrants as well as undocumented workers in the United States and Texas. These studies have included assessments of the effects of such workers in each of the 50 US states. My work in this area has been supported by, among others, Americans for Immigration Reform, the Partnership for a New American Economy, and the Ford Foundation. I have also testified before the Texas House of Representatives and other governmental entities regarding the benefits of foreign workers on several occasions.

12. In the area of health care, I have studied numerous aspects of health and wellness including economic analysis of issues (among others) related to obesity, diabetes, cancer, as well as public policy studies related to numerous health issues (including indigent health care, Medicaid and Children's Health Insurance Program (CHIP) funding, benefits of health insurance coverage for State employees, and scope of practice). I have also performed assessments for medical schools, hospital systems, and health-oriented research facilities. I have studied the economic and fiscal effects of education facilities as well as major hospital systems such as Parkland Memorial Hospital, University Health System, Texas Medical Center, Menninger Clinic, Baylor Scott & White, and Methodist Hospital. Assessments have also been performed for medical schools including UT Southwestern, The University of Texas Medical Branch, M.D. Anderson, the University of Kansas Medical School, The University of Texas Health Science Center at San Antonio, Baylor College of Medicine, Texas Tech University Health Sciences Center, The University of Texas Dell Medical School, the Temple Medical and Educational District, and multiple institutions and initiatives within

4

Texas A&M University's Research Valley Biocorridor. I have also analyzed numerous emerging technologies in the health care arena, including wound care treatment advances, genomic medicine, nanomedicine, and vaccine incubation. I have also examined the economic and effects of cancer, diabetes, mental health conditions obesity, and wellness. In addition, I serve on the board of directors of a large health insurance company with approximately $70 billion in annual revenue and 20,000+ employees (served as Chair of Finance, Governance, and Compensation Committees); am a Leadership Fellow of the National Association of Corporate Directors; serve as chair of a state advisory board for a large health-related group; and have served as chair and member of numerous trade association and related boards. A major study I performed using models I developed was recently published in *The Journal of Medical Economics*.

13. My experience also includes other topic areas important to this matter. I have studied education and school finance on a number of occasions and am very familiar with the issues. I have assisted both the Texas House and Senate in analyzing various funding alternatives. In addition, my regular forecast series includes population projections and I have studied the various issues related to demographics including, among others, the effects of the aging of the population, domestic and international migration patterns, and workforce changes.

14. I frequently prepare public policy studies and have been involved in shaping legislation. Representative topics include energy deregulation, communications (telephone, Internet, and cable), judicial reforms, insurance, transportation (water, air, rail, trucking, and highway funding), financial services, health care, economic development, education funding and policy, taxation, social services, oil and gas development, pipelines, mergers and acquisitions, competition, real estate, franchising, legal aid, and international trade). Analysis by my firm often plays a key role in policy formulation and implementation. I have served as advisor and/or consultant to several Presidents; numerous House and Senate Committees; the US Departments of State, Defense, Commerce, Labor, the Interior, Housing and Urban Development, Agriculture, Energy, Treasury, and Transportation; the Federal Reserve Board; The Federal Home Loan Bank Board; The Federal Energy Regulatory Commission; the International Trade

Commission; and more than 50 other state and federal agencies. I have provided testimony to Congress on numerous occasions and testified before various federal and state legislative committees and regulatory bodies on approximately 200 occasions; I have also provided testimony in several other countries. I have served on numerous federal and state task forces on economic issues and have received numerous awards for public policy work, including Congressional and legislative citations.

15. My complete resume is attached to this declaration along with a list of my litigation testimony over the past several years. I will begin this discussion with some relevant background information and then comment on the declarations noted above within his framework.

## II.   Overview of DACA

16. Implemented in August 2012, DACA allows individuals who entered the United States as children to remain here for school or work. Specifically, young undocumented immigrants can apply for a two-year reprieve from deportation that also grants the ability to work in the United States. As of March 31, 2018, there were 693,850 persons across the country enrolled in DACA, and approximately 113,960 of these individuals lived in Texas.[1] However, an estimated total of 1.3 million people nationwide are eligible to apply for DACA, including over 226,000 in Texas.[2]

17. To be eligible for DACA, a non-citizen must be under the age of 31 as of June 15, 2012; have entered the US while under the age of 16; have resided in the US continuously since June 15, 2007; and have entered the US without inspection or have been lacking lawful visa status before June 15, 2012. Furthermore, applicants must currently be in school, have graduated from high school, have obtained a GED, or have been honorably discharged from the armed forces or Coast Guard. Additionally, an

---

[1] Approximate Active DACA Recipients: State or Territory of Residence As of March 31, 2018, USCIS, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Mar_31_2018.pdf.
[2] Examining the Contributions of the DACA-Eligible Population in Key States, New American Economy, November 6, 2017, https://research.newamericaneconomy.org/report/examining-the-contributions-of-the-daca-eligible-population-in-key-states/.

applicant must not have been convicted of a felony, a significant misdemeanor, or have more than three misdemeanors of any kind.[3]

18.  A 2017 national survey of DACA recipients found that approximately 91% of DACA recipients are currently employed.[4] About 69% of respondents indicated that they were able to get a job with better pay after receiving DACA.[5] Similarly, 54% indicated they moved to a job that better fit their career goals, and 56% moved to a job with better working conditions.[6] On average, wages increased by 69% after receiving DACA, rising from $10.29 per hour to $17.46 per hour.[7] The increased earnings helped 69% of respondents "become financially independent" and 71% to better aid their family financially.[8]

19.  The survey also found that 45% of DACA recipients are currently in school.[9] Among that population, 72% are pursuing a bachelor's degree or higher.[10] Overall, 36%

---

[3] DACA (Deferred Action for Childhood Arrivals), Immigration Equality, (n.d.),
https://www.immigrationequality.org/get-legal-help/our-legal-resources/path-to-status-in-the-u-s/daca-deferred-action-for-childhood-arrivals/#.WyAAFN%E2%80%A6.
[4] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[5] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[6] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[7] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[8] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[9] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[10] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

of respondents 25 years or older have at least a bachelor's degree and 94% of those currently in school indicated that DACA allowed them to pursue educational opportunities that would not have been available without the program.[11]

III.   **Current Labor Situation in the United States**

    **A. Unemployment and Job Openings**

    20. Any analysis of the effects of immigration on the economy must include an analysis of the domestic labor market. Essentially, the labor market refers to the availability of labor (workers) and employment (jobs).

    21. According to the US Bureau of Labor Statistics (BLS), the US seasonally adjusted unemployment rate in May 2018 was 3.8%, meaning the 3.8% of the labor force (which includes those employed and those available for work and seeking employment) is currently without a job.[12] The number of unemployed persons fell to 6.1 million in May of 2018.[13] It should also be noted that initial claims for unemployment are also at or near historically low levels.[14]Unemployment as traditionally measured counts only people who are actively looking for work, and changes in the rate are largely driven by cyclical factors such as the health of the economy and whether businesses are hiring, as well as longer-term demographic trends. It is assumed that a well-functioning economy will always have some natural unemployment. In fact, most economists consider an unemployment rate of 4.5-5% to signify that the economy is at or near full employment.

---

[11] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[12] The Employment Situation -- May 2018, US Bureau of Labor Statistics, June 1, 2018, https://www.bls.gov/news.release/pdf/empsit.pdf.
[13] The Employment Situation – May 2018, US Bureau of Labor Statistics, June 1, 2018, https://www.bls.gov/news.release/pdf/empsit.pdf.
[14] Unemployment Insurance Weekly Claims, US Department of Labor, June 14, 2018, https://www.dol.gov/sites/dolgov/files/OPA/newsreleases/ui-claims/20181010.pdf.

22. The US is actually experiencing a labor shortage in many industries and in different parts of the country. With the economy at or near full employment, it is becoming increasingly difficult for employers to fill open positions. According to the most recent data, over half of the Metropolitan Statistical Areas (MSA) in the US had an unemployment rate below the national rate of 3.7% in April and 88 MSAs had an unemployment rate below 3%.[15] Some areas of the country are even experiencing unemployment levels as low as 2%, particularly in Hawaii, Iowa, South Dakota, Vermont, Virginia, and Wisconsin. The lowest unemployment rate is the 1.5% found in Ames, Iowa. While low unemployment levels seem like a good thing, insufficient numbers of workers available to fill new positions can actually slow overall economic growth as companies have difficulties expanding to meet demand.

23. In April 2018, there were 6.7 million job openings, representing a job opening rate of 4.3% (percentage of job openings to the sum of the number of people in the labor force and the number of job openings). This number represents the highest level of job openings and the highest rate of job openings since the series began in December 2000, and likely the highest in US history. There is now less than one unemployed person per job opening, compared to over six in 2009. Close to 36% of firms report having a position that is unfilled as of February.[16]

24. Within certain industries, the disparity between job openings and potential workers is even more marked. For example, according to New American Economy, online job listings in science, technology, engineering and math (STEM) fields outnumbered unemployed STEM workers 13 to 1 in 2016.[17] In addition, in 2014 there were 5.6 healthcare online job listings for every unemployed healthcare worker in Texas.[18] Overall, there are at least 15 occupations in the US health sector in which unfilled job listings outnumbered unemployed workers by more than 10 to 1.[19] Labor

---

[15] Unemployment at the MSA level is only calculated on a seasonally unedjusted basis, so those rates are compared here, see Metropolitan Area Employment and Unemployment – April 2018, Bureau of Labor Statistics, May 30, 2018, https://www.bls.gov/news.release/pdf/metro.pdf.
[16] The Labour Market is Hot... Too Hot: Deutsche Bank, ValueWalk, February 8, 2018, https://www.valuewalk.com/2018/02/us-labour-market-tightening/.
[17] Innovation & STEM Fields, New American Economy, (n.d.), https://www.newamericaneconomy.org/issues/innovation-stem-fields/.
[18] The Contributions of New Americans in Texas, New American Economy, August 2016, p. 15.
[19] Healthcare, New American Economy, (n.d.), https://www.newamericaneconomy.org/issues/healthcare/.

shortages in healthcare fields are even more alarming because the demand for those positions are expected to increase dramatically as more and more Baby Boomers age and require additional care.

### B. Labor Force Participation

25. One of the reasons for the current labor shortage is that the labor force participation rate has been declining in the past years. The labor force participation rate measures the number of people age 16 or older who are either working or have looked for work in the past year as a proportion of the total population age 16 or older. Labor force participation, in contrast to the unemployment rate, deals more with underlying patterns such as demographics and social norms and choices. Although the health of the job market affects labor force participation (people drop out during downturns and re-enter during recoveries), it is only one factor among many and is experiencing a notable downward trend.

26. The Bureau of Labor Statistics tracks the labor force participation rate, which measures people who are either working or have looked for work in the past year. After increasing for more than 60 years, the participation rate peaked in the late 1990s at just over 67%. At the beginning of the Great Recession in 2007, it stood at 66%, and fell slightly by 2009 during the worst of the downturn in the business cycle. Even with job market improvement since the end of the recession, the labor force participation rate has continued to fall. The labor force participation rate in May 2018 was 62.7%.[20] The decline is projected to continue, and by the late 2020s, BLS predicts that only about 60% of Americans 16 and older will be part of the labor force, with the proportion dropping to only 57% by 2060.[21] While on the surface that percentage decline does not seem overly large, a one percentage point drop equates to around 2.6 million laborers leaving the workforce.

---

[20] The Employment Situation -- May 2018, Bureau of Labor Statistics, June 1, 2018, https://www.bls.gov/news.release/pdf/empsit.pdf.
[21] Toossi, Mitra, A Look At The Future Of The U.S. Labor Force To 2060, Bureau of Labor Statistics, September 2016, https://www.bls.gov/spotlight/2016/a-look-at-the-future-of-the-us-labor-force-to-2060/home.htm.

27. There are multiple reasons for this decline. For one, the main source of the growth that has occurred since the 1950s was due to women entering the work force. The labor force participation rate of men peaked at the end of the 1940s and has long been declining, but the overall proportion of people working continued to rise as women joined the labor force in large numbers. In 1950, more than 86% of the US male population age 16 and over was part of the labor force, but the proportion has fallen steadily since that time to about 68% now. In 1950, less than 34% of women 16 or older were participating, but the proportion of women in the workforce grew rapidly in the following decades and peaked at roughly 60% in the late 1990s and early 2000s. However, the labor force participation rate of women peaked in 1999 at 60% and has now also begun to fall.[22]

28. Another major reason for the decline in labor force participation is the aging of the large generation of people born between 1946 and 1964 during the post-war "baby boom." The baby boomer generation has been a large share of the labor force but is now aging beyond prime working years (defined by BLS as ages 25 to 54). In fact, the oldest boomers began to reach retirement age several years ago. Participation rates among people aged 55 and older are much lower than in the prime working age ranges, and as more of the baby boomers retire there will be additional downward pressure on overall participation rates.[23]

29. The working patterns and choices of young people is also affecting the overall participation rate. BLS data indicate that the labor force participation rate of youths (ages 16 to 24) has fallen over the past several decades, especially since 2000. School is the most commonly cited reason among those choosing not to work.[24]

---

[22] *For larger discussion, see* Toossi, Mitra, A Look At The Future Of The U.S. Labor Force To 2060, Bureau of Labor Statistics, September 2016, https://www.bls.gov/spotlight/2016/a-look-at-the-future-of-the-us-labor-force-to-2060/home.htm.

[23] *For larger discussion, see* Toossi, Mitra, A Look At The Future Of The U.S. Labor Force To 2060, Bureau of Labor Statistics, September 2016, https://www.bls.gov/spotlight/2016/a-look-at-the-future-of-the-us-labor-force-to-2060/home.htm.

[24] Toossi, Mitra, Labor Force projections to 2024: the labor force is growing, but slowly, Bureau of Labor Statistics, December 2015, https://www.bls.gov/opub/mlr/2015/article/labor-force-projections-to-2024.htm#_edn1.

## C.  Market Responses to Smaller Workforce

30.  Most of these patterns have either been expected for many years (aging of the baby boomers), the result of the end of a major social transition (women entering the workforce in large numbers), or partly a desirable shift (young people choosing to further their education). The decline in the labor force participation rate will lead to a slower expansion in the workforce down the road. The civilian noninstitutional population was projected (by BLS) to grow from 251 million in 2015 to 326 million in 2060 (an increase of 75 million); however, the labor force is projected to increase from 157 million in 2015 to 186 million in 2060, an increase of only 29 million.[25]

31.  The labor shortage will become an increasing problem as the labor force participation rate continues to decline. Markets have responded to this phenomenon in multiple ways. Some companies have increased wages to attract more qualified applicants. In addition, there have been massive investments in technology that substitutes capital for labor or makes existing labor more productive. Accommodations to keep people in the workforce have also been developed. Options such as flex time, job sharing, and working at home are now more common, and many workplaces offer day care and even parent care on site. Retirees have also been rehired on a part-time or consulting basis. Immigration, both documented and undocumented, has also been a part of the solution.

## D.  Need for Immigrants

32.  These various market solutions have had some effect to date but will likely fall short in the future. Given that the United States is currently at full employment with record job openings and low levels of initial claims, it would clearly be difficult to maintain current growth patterns without immigrants. In the future, immigrants and their children are likely to be an increasingly crucial aspect of the workforce as the US population ages and baby boomers continue to retire. In fact, the share of immigration in

---

[25] Toossi, Mitra, A Look At The Future Of The U.S. Labor Force To 2060, Bureau of Labor Statistics, September 2016, https://www.bls.gov/spotlight/2016/a-look-at-the-future-of-the-us-labor-force-to-2060/home.htm.

population growth is projected to be larger than the share of growth from natural increase (the number of births and deaths in the native population) beginning in 2024 and is expected to account for around 80% of growth by the 2040s.[26]

33. Immigrants are already a vital part of the US economy. The foreign-born population reached 43.7 million in 2016 and accounted for 13.5% of the US population.[27] That level is almost triple the share in 1970 and is only slightly below the all-time-high level of 14.8% immigrant which occurred back in 1890.[28] An estimated 11 million of these immigrants are unauthorized.[29]

34. In 2016, about 26 million immigrants were working in the United States, which is about 16% of the total workforce.[30] Most of them are working legally, but about 8 million were undocumented.[31] Lawful immigrants are most likely to be employed in professional, management, business, or service jobs.[32] Undocumented workers are most likely to be working in service or construction jobs.[33]

35. Immigration fluctuates with the economy, particularly within the undocumented segment. During the 1990s and early 2000s when the US economy was expanding, the unauthorized immigrant population was also rising. However, during the Great Recession, more people were leaving than entering, and the undocumented population decreased. Since that time, it has remained relatively stable. The number of

---

[26] Toossi, Mitra, A Look At The Future Of The U.S. Labor Force To 2060, Bureau of Labor Statistics, September 2016, https://www.bls.gov/spotlight/2016/a-look-at-the-future-of-the-us-labor-force-to-2060/home.htm.

[27] Selected Characteristics of the Native and Foreign-Born Populations, 2016 American Community Survey 1-Year Estimates, US Census Bureau.

[28] Lopez, Gustavo and Kristen Bialik, Key Findings About U.S. Immigrants, Pew Research Center, May 3, 2017, http://www.pewresearch.org/fact-tank/2017/05/03/key-findings-about-u-s-immigrants/.

[29] Lopez, Gustavo and Kristen Bialik, Key Findings About U.S. Immigrants, Pew Research Center, May 3, 2017, http://www.pewresearch.org/fact-tank/2017/05/03/key-findings-about-u-s-immigrants/; Zong, Jie, Jeanne Batalova, and Jeffrey Hallock, Frequently Requested Statistics on Immigrants and Immigration in the United States, February 8, 2018, https://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states#Unauthorized.

[30] Selected Characteristics of the Native and Foreign-Born Populations, 2016 American Community Survey 1-Year Estimates, US Census Bureau; The Employment Situation – May 2018, Bureau of Labor Statistics, June 1, 2018, https://www.bls.gov/news.release/pdf/empsit.pdf.

[31] Lopez, Gustavo and Kristen Bialik, Key Findings About U.S. Immigrants, Pew Research Center, May 3, 2017, http://www.pewresearch.org/fact-tank/2017/05/03/key-findings-about-u-s-immigrants/.

[32] Lopez, Gustavo and Kristen Bialik, Key Findings About U.S. Immigrants, Pew Research Center, May 3, 2017, http://www.pewresearch.org/fact-tank/2017/05/03/key-findings-about-u-s-immigrants/.

[33] Lopez, Gustavo and Kristen Bialik, Key Findings About U.S. Immigrants, Pew Research Center, May 3, 2017, http://www.pewresearch.org/fact-tank/2017/05/03/key-findings-about-u-s-immigrants/.

unauthorized immigrants in the US labor force has been in the range of eight million or so for several years, which is about 5% of the total workforce (they comprise about 8.5% of the Texas workforce).[34]

36. These observations clearly reveal that immigration should be viewed in a broader social and economic context as one of several market responses to ongoing demographic trends and business conditions. It is not an isolated issue, but rather one that functions within the framework of the complex interactions of myriad factors that drive the modern economy. The United States and Texas in particular need additional workers to meet ongoing labor shortages. DACA recipients, who have lived in the United States since childhood and have often completed higher levels of education and have support networks in place, are well equipped to efficiently meet a portion of this need.

## IV.    Benefits of DACA to the US Economy

37. Many studies, including my own, have shown that undocumented immigrants actually have a net positive effect on the Texas economy and state and local governments, despite the costs they might present.[35] With the legal protection and incentives for further education offered by DACA, recipients are likely to be particularly important to the US economy, especially in light of labor shortages that must, to a significant degree, be filled by immigrants.

38. A non-partisan policy study has estimated that 1.3 million young undocumented immigrants that are eligible for DACA are the source of $2 billion in direct state and local tax revenues.[36] In Texas, DACA recipients currently are estimated

---

[34] Passel, Jeffrey S. and D'Vera Cohn, Size of U.S. Unauthorized Immigrant Workforce Stable After the Great Recession, Pew Research Center, November 3, 2016, p. 4-5.

[35] Texas Needs the Workers!!: An Analysis of the Economic and Fiscal Impact of Undocumented Workers, The Perryman Group, February 2016; Anderson, Will, Undocumented immigrants provide Texas with net benefit of more than $700 million annually, report says, Austin Business Journal, November 6,, 2017, https://www.bizjournals.com/austin/news/2017/11/06/undocumented-immigrants-provide-texas-with-net.html.

[36] Hill, Misha E. and Meg Wiehe, State & Local Tax Contributions of Young Undocumented Immigrants, Institute on Taxation & Economic Policy, April 2017, http://itep.org/wp-content/uploads/2017DACA.pdf.

to contribute between $259 and $313 million in direct state and local taxes annually.[37] One study found that DACA recipients will contribute $460.3 billion to the US gross domestic product over the next decade.[38] According to New American Economy, the DACA-eligible population in Texas has close to $2.6 billion in purchasing power.[39]

39. In an analysis of DACA recipients performed by my firm, The Perryman Group, I estimated that, for the United States, direct benefits of DACA recipients include an estimated $84.3 billion in annual output (gross product), $52.8 billion in annual personal income, and almost 685,200 jobs. When multiplier effects are considered, the total benefits rise to $188.6 billion in annual output and $117.3 billion in income per year, as well as nearly 2.1 million jobs. For Texas, the direct gains in business activity associated with DACA recipients include an estimated $11.5 billion in output (gross product) and $7.2 billion in income each year in addition to more than 108,100 jobs. When multiplier effects are included, the total rises to $25.8 billion in annual output, $16.0 billion in income per year, and 324,000 jobs.

40. With the analysis provided above as a backdrop, I will now examine the declarations that I have been asked to review in this matter.

## V.    Response to the Declaration of Monica Smoot

41. In her declaration, Monica Smoot, the Chief Data and Analytics Officer at the Texas Health and Human Services Commission (HHSC), provided estimates of the cost of providing services and benefits to undocumented immigrants.[40] Specifically, for fiscal

---

[37] Examining the Contributions of the DACA-Eligible Population in Key States, New American Economy, November 6, 2017, https://research.newamericaneconomy.org/report/examining-the-contributions-of-the-daca-eligible-population-in-key-states/; Hill, Misha E. and Meg Wiehe, State & Local Tax Contributions of Young Undocumented Immigrants, Institute on Taxation & Economic Policy, April 2017, http://itep.org/wp-content/uploads/2017DACA.pdf.
[38] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[39] Examining the Contributions of the DACA-Eligible Population in Key States, New American Economy, November 6, 2017, https://research.newamericaneconomy.org/report/examining-the-contributions-of-the-daca-eligible-population-in-key-states/.
[40] Declaration of Monica Smoot, May 2, 2018, Par. 7-10.

15

year 2015, the estimated costs were $73 million for the Texas Emergency Medicaid, $1.0 million for the Texas Family Violence Program (FVP), and $30 million for the Texas Children's Health Insurance Program (CHIP) Prenatal Coverage, totaling $104 million.[41] She also provides an estimate of the amount of uncompensated medical care from public hospitals from undocumented immigrants, which totaled $716.8 million in fiscal year 2008, the latest estimate.[42]

42. It is important to note that none of these programs ask about or record residency or citizenship status and that these numbers are at best only estimates of the cost to the State of Texas. For the costs from HHSC services, aside from Texas Emergency Medicaid, the services described in the Rider 59 report (including uncompensated care) are available to citizens and non-citizens. However, HHSC assumed, without further analysis, that citizens and non-citizens receive these services at rates equal to their proportion of the population.

43. Social science research suggests that undocumented immigrants are less likely to avail themselves of hospitals and other health care services available to them when compared to the rest of the population.[43]

44. The HHSC report further assumed that in 2015 no less than 50% of non-citizens in Texas are undocumented immigrants (1.48 million).[44] However that assumption is also not methodologically sound because it takes an estimate of the undocumented population in Texas by the US Department of Homeland Security and divides that number into the estimate of non-citizens in Texas provided by the US

---

[41] For a summary of costs in fiscal years 2007, 2009, 2011, 2013, and 2015, see Declaration of Monica Smoot, May 2, 2018, Exhibit 5 (Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Update to the Report Required by Rider 59, H. B. 1, 80th Legislature, Regular Session, 2007, March 2017, p. 4).

[42] Declaration of Monica Smoot, May 2, 2018, Par. 11.

[43] Much of this literature is summarized in Hacker, Karen et al. "Barriers to Health Care for Undocumented Immigrants: A Literature Review." *Risk Management and Healthcare Policy* 8 (2015): 175–183. *PMC*. Web. 16 June 2018.

[44] This estimate was a conservative assumption based on the most recent estimate of undocumented immigrants from the Department of Homeland Security (2012) and the estimate of non-citizens from the 2015 American Community Survey; see Declaration of Monica Smoot, May 2, 2018, Exhibit 5 (Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Update to the Report Required by Rider 59, H. B. 1, 80th Legislature, Regular Session, 2007, March 2017, p. 5-6).

Census American Community Survey to generate a proportion/percent of undocumented Texans.

45. The HHSC then applied its 50% undocumented rate to the Texas costs for Emergency Medicaid and the Texas Family Violence Programs.

46. More problematic is the HHSC estimate with respect to the CHIP Prenatal Coverage. Although HHSC admitted that recipients of CHIP Prenatal Coverage can be US citizens, documented non-citizens, or undocumented non-citizens, HHSC applied the 50% multiplier to its entire cost for CHIP Prenatal Coverage.

47. Therefore, the report estimated that about half of the costs for the Emergency Medicaid and CHIP prenatal coverage programs were due to undocumented immigrants, though it is unknown whether undocumented immigrants truly comprised half of the patients using Emergency Medicaid or CHIP prenatal coverage (or half of the expenses caused by these services).[45]

48. The estimate for FVP for fiscal year 2015 further used the organization's entire budget for funding 71 non-profit family violence shelters and 10 non-residential centers in addition to projects to provide services to victims of family violence, scaled down by the proportion of the estimated number of undocumented immigrants to the entire Texas population.[46] However, many of these costs are fixed for the fiscal year, and would not vary as the number of potential undocumented immigrants fluctuated, especially since this analysis assumes that only 5.4% of the potential recipients of these services would be undocumented immigrants.[47]

49. Even if they were not based on unreliable methodology, these estimates are actually quite low compared to what the state spends on health expenses each year. For perspective, the overall health care expenditures for Texas in fiscal year 2015

---

[45] Declaration of Monica Smoot, May 2, 2018, Exhibit 5 (Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Update to the Report Required by Rider 59, H. B. 1, 80th Legislature, Regular Session, 2007, March 2017, p. 7).
[46] Declaration of Monica Smoot, May 2, 2018, Exhibit 5 (Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Update to the Report Required by Rider 59, H. B. 1, 80th Legislature, Regular Session, 2007, March 2017, p. 8).
[47] Declaration of Monica Smoot, May 2, 2018, Exhibit 5 (Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Update to the Report Required by Rider 59, H. B. 1, 80th Legislature, Regular Session, 2007, March 2017, p. 8).

totaled nearly $43.0 billion, of which $18.0 billion was funded by Texas general revenue sources.[48] The HHSC by far had the largest share of those expenditures, with $25.4 billion total health care expenditures, $10.4 billion of which came from general revenue funding.[49] The HHSC administers the Medicaid and CHIP programs, along with others. The average Medicaid per-member monthly cost for acute and long-term care was $529, which would total $6,348 annually.[50] The amount estimated to have been spent on undocumented immigrants ($104 million in 2015) is actually quite small compared to the overall health care expenditures from HHSC health programs like Medicaid and CHIP across the state (less than 1%). Assuming 1.48 million undocumented immigrants as in the HHSC report, that would put the cost per-undocumented immigrant for the Emergency Medicaid and CHIP prenatal care at approximately $70 annually, while the FVP program would cost another $0.68 per undocumented immigrant.

50. Moreover, these estimates are for the entire undocumented population in Texas, rather than specifically related to DACA recipients. While there were approximately 1.65 million undocumented immigrants estimated to be in Texas as of 2014,[51] there have only been 112,336 approved DACA initial applications as of September 30, 2015.[52] The total number of DACA recipients in Texas was 111,670 as of January 2018, while there are an estimated 182,000 that are immediately eligible in the state as of 2017.[53] So at most, based on the latest estimates, 6.7% of the entire

---

[48] Texas Health Care Spending Report, Fiscal 2015, Texas Comptroller of Public Accounts, January 31, 2017, p. 2.
[49] Texas Health Care Spending Report, Fiscal 2015, Texas Comptroller of Public Accounts, January 31, 2017, p. 2.
[50] Texas Health Care Spending Report, Fiscal 2015, Texas Comptroller of Public Accounts, January 31, 2017, p. 8.
[51] Estimated unauthorized immigrant population, by state, 2014, Pew Research Center, November 3, 2016, http://www.pewhispanic.org/interactives/unauthorized-immigrants/
[52] National and State Estimates of the Unauthorized Immigrant Population, 2010-14, Migration Policy Institute, https://www.migrationpolicy.org/sites/default/files/datahub/State-County-Unauthorized-Estimates.xlsx; Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2015 (September 30), U.S. Citizenship and Immigration Services (USCIS).
[53] Approximate Active DACA Recipients as of January 31, 2018, U.S. Citizenship and Immigration Services (USCIS), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Jan_31_2018.pdf; National and State Estimates of the DACA-Eligible Population, 2017, Migration Policy Institute, https://www.migrationpolicy.org/sites/default/files/datahub/State%20and%20County%20Estimates%20of%20DACA-Eligible%20Population-2017-FINAL.xlsx.

undocumented persons in Texas are actually DACA recipients, and the share would only reach 11% if more of those eligible applied to the program. It is important to note that DACA recipients are not eligible for many normal Medicaid or CHIP programs beyond the ones listed in this report.[54] Moreover, the end of DACA would not necessarily affect the size of the undocumented population in Texas, as there will be an ongoing need for workers. Thus, the costs of these programs would not necessarily be reduced. In fact, to the extent that the replacement workers exhibited lower educational levels and less earning capacity, as would be expected, the demands on the social service system might be even greater (as discussed below).

51. DACA recipients are less likely to require these programs than other undocumented immigrants in that DACA recipients are more likely to get paid more and have better economic outcomes, so are ultimately less likely to need to rely on these services and benefits. As mentioned above, in a 2017 survey of DACA recipients, approximately 69% of respondents indicated that they were able to obtain a job with better pay after receiving DACA, 54% indicated they moved to a job that better fit their career goals, and 56% moved to a job with better working conditions.[55] On average, wages increased by 69% after DACA certification, rising from $10.29 per hour to $17.46 per hour.[56] The survey also indicated that the annual average salary for DACA recipients was $36,232 (median salary $32,000), while for those who were employed before receiving DACA benefits, the average annual salary was only $20,068.[57]

---

[54] North, Anna, DACA helped some immigrants finally get health care. Now they could lose it., Vox, September 28, 2017, https://www.vox.com/identities/2017/9/28/16351866/daca-health-care-reproductive-health-undocumented-immigrants.
[55] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[56] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.
[57] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/; Results from Tom K. Wong et al., 2017 National DACA Study, Updated October 7, 2017, https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf.

Respondents aged 25 and older reported an average annual salary of $41,621 (median salary $37,595).[58] The increased earnings helped 69% of respondents "become financially independent" and 71% to better aid their family financially.[59]

52. Many of these financial benefits are likely due to the legality of respondents' employment as they received DACA. The DACA-recipients' ability to live and work legally in the US would also potentially place them outside the income guidelines for HHSC programs as well as allow them to sign up for health insurance, although they are not eligible for coverage under the Affordable Care Act and would need to pay the full price for health insurance outside the marketplace if not offered by employers.[60] Rather than trying to end DACA, achieving comprehensive protection for DACA recipients through legislation would be a better outcome for this population, as that could increase access to health care. Again, the removal of DACA would not necessarily impact the size of the undocumented population in Texas and therefore would not lower the costs reported by Ms. Smoot. However, an increase in the availability of health care to the DACA eligible population could also decrease the costs from these programs as well as the amount of uncompensated medical care in the state.

53. Furthermore, this entire analysis of the costs of DACA recipients disregards the benefits they offer the economy. It has been estimated that DACA recipients in Texas currently contribute between $259 and $313 million in direct state and local taxes annually.[61] There are also the large contributions to the economy as a whole which also

---

[58] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[59] Wong, Tom K., et al., DACA Recipients' Economic and Educational Gains Continue to Grow, Center for American Progress, August 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[60] North, Anna, DACA helped some immigrants finally get health care. Now they could lose it., Vox, September 28, 2017, https://www.vox.com/identities/2017/9/28/16351866/daca-health-care-reproductive-health-undocumented-immigrants.

[61] Examining the Contributions of the DACA-Eligible Population in Key States, New American Economy, November 6, 2017, https://research.newamericaneconomy.org/report/examining-the-contributions-of-the-daca-eligible-population-in-key-states/; Hill, Misha E. and Meg Wiehe, State & Local Tax Contributions of Young Undocumented Immigrants, Institute on Taxation & Economic Policy, April 2017, http://itep.org/wp-content/uploads/2017DACA.pdf.

generate tax receipts. As noted, I estimate that the direct gains in business activity associated with DACA recipients in Texas include $11.5 billion in output (gross product) and $7.2 billion in income each year in addition to more than 108,100 jobs. The total rises to $25.8 billion in annual output, $16.0 billion in income per year, and 324,000 jobs with multiplier effects. This economic activity generates further tax receipts to the state and local governments. My analysis of the overall undocumented population for the Ford Foundation revealed that, on balance, the State government in Texas as well as local governments across the state receive a substantial net benefit even when accounting for all incremental costs of the undocumented population (health care, education, public safety, and other services).[62] The relative gains for DACA recipients are even more pronounced, as they have higher average compensation and lower needs for public services.

54. Stated more succinctly and putting aside the computational methodological issues noted above, Ms. Smoot provided a myopic static analysis of one cost factor without any consideration of the overall picture and without identifying the role of DACA in her identified costs. It is as if an automobile manufacturer determined that cars were not profitable to produce because it has to buy wiper blades. She failed to consider what was likely to happen if these individuals left the state, and she made no effort to incorporate the overall net effects of DACA on the state. A dynamic analysis of both the total costs and the benefits associated with DACA recipients clearly demonstrates that the benefits exceed the associated costs for governmental entities in Texas.

## VI.    Response to the Declaration of Donald Deere, PhD

55. Dr. Deere presents a simple hypothetical situation in which a potential employer is deciding between a US citizen and an undocumented immigrant with an Employment Authorization Document ("EAD"). Dr. Deere indicates that an employer would expect the US citizen to be more expensive to employ than a DACA recipient with an EAD because of the employer mandate penalties described in the Affordable Care

---

[62] Texas Needs the Workers!!: An Analysis of the Economic and Fiscal Impact of Undocumented Workers, The Perryman Group, February 2016.

21

Act (ACA).[63] Dr. Deere concludes that "mandate provisions of the ACA gives employers a financial incentive to hire an undocumented immigrant who is authorized to work instead of an identically skilled citizen in certain instances."[64] However, Dr. Deere's hypothetical is incomplete in that it ignores other decision criteria employers would use even when deciding between employees with similar skills. In particular, Dr. Deere's hypothetical ignores the potential for an employer to prefer to hire a citizen in light of current attitudes toward DACA and fears that the end of the program could lead to future deportation. As another example, investments in training for DACA recipients are riskier due to their uncertain future status. Employers consider a number of factors in any hiring decision, with the potential for ACA-related penalties only one criterion among many. Even in the stylized world of textbook hypotheticals, one would consider the total cost differential between two applicants in making a hiring decision.

56. Dr. Deere further asserts that "there will be relatively less hiring of U.S. citizens and relatively lower wages on average for those who are hired."[65] However, his hypothetical does not reflect the real world and the situations to which it relates is very limited at best and likely nonexistent.

57. To analyze Dr. Deere's claim that an increase in the number of undocumented immigrants in the US and Texas will "put downward pressure on wages and make it more difficult for some U.S. citizens to find employment,"[66] I analyzed the potential number of instances where the penalty associated with the Affordable Care Act (ACA) could be relevant. The process used in this analysis is first to look at the employment totals at US firms with 50-99 employees and 100 or more employees from the US Bureau of Labor Statistics (BLS). As of the first quarter of 2017, according to BLS, there were 137,000 firms with 50 to 99 employees and 128,000 firms with 100 or more employees.[67] To those numbers, I applied data from the Kaiser Family Foundation

---

[63] Declaration of Donald Deere, PhD, April 27, 2018, p. 5.
[64] Declaration of Donald Deere, PhD, April 27, 2018, p. 7.
[65] Declaration of Donald Deere, PhD, April 27, 2018, p. 7.
[66] Declaration of Donald Deere PhD., May 2, 2018, page 5.
[67] United States Department of Labor, Bureau of Labor Statistics, Business Employment Dynamics, *National Business Employment Dynamics Data by Firm Size Class, Table F. Distribution of private sector employment by firm size class, not seasonally adjusted* and *Table G, Distribution of private sector firms by size class, not seasonally adjusted,* https://www.bls.gov/bdm/bdmfirmsize.htm.

on the percentage of firms offering health benefits for firms with 50 to 99 employees and firms with 100 or more employees to determine the total number of employees who would not receive health benefits at firms in which the ACA penalty would be relevant (firms with 50 or more employees). The Kaiser data indicated 10 percent of firms with 50 to 99 employees (with a total of 9.4 million employees) and 4 percent of firms with 100 or more employees (with a total of 77.3 million employees) did not offer health benefits to at least some of their employees.[68] This calculation resulted in 941,300 employees in firms of 50 to 99 employees and 3,090,320 employees in firms with 100 or more employees for a total of 4,031,620 employees potentially not being offered health benefits. I next calculated the portion of employees not receiving health benefits at firms with 50 or more employees of total employment at firms of all sizes which was 3.36%.

58. The total number of Deferred Action for Childhood Arrivals (DACA) approved initial applications in Texas as of March 2017 was 124,300.[69] It is estimated that 91.4% of those DACA approved recipients were employed resulting in a likely maximum of 113,610 DACA approved recipients working in Texas.[70] Assuming a random distribution of DACA employees across firms of all sizes, it is reasonable to apply the same 3.36% ratio calculated above to the DACA approved recipients working in Texas to produce a number of DACA employees working in Texas at firms with 50 or more employees with no health benefits, or instances where the Deere hypothetical could come into play. That number is 3,813. Applying the maximum penalty per employee under the ACA of $3,480 to the 3,813 possible employees results in a total maximum penalty to Texas

---

[68] Employer Health Benefits 2017 Annual Survey, The Kaiser Family Foundation and Health Resources & Educational Trust, September 19, 2017, Section 2 Health Benefits Offer Rates, https://www.kff.org/report-section/ehbs-2017-section-2-health-benefits-offer-rates/.

[69] Actual DACA-approved population statistics are not available prior to as of September 4, 2017, so approved initial applications is used as a conservative approximation of actual DACA recipients in Texas as of first quarter 2017. See U.S. Citizenship and Immigration Services, Number of Form I-821D, Consideration of Deferred Action
for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017, March 31, 2017,
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr2.pdf.

[70] Wong, Tom K.,et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Center for American Progress, August 28, 2017,
https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

employers of $13,268,035. The affected employees, if any, would be distributed throughout the state.

59. The total maximum penalty amount of $13,268,035 is extremely small compared to total wages in Texas, representing only 0.00198% of total Texas wages.[71] The number of employees which could potentially be affected (3,813) represents only 0.032% of total employees in Texas.[72] The total maximum penalty amount is also miniscule (0.00072%) compared to Texas nominal gross product.[73] This amount is certainly not of sufficient magnitude to affect overall wage and employment levels of citizens in Texas.

60. Moreover, it is highly unlikely that this maximum level (or any level, for that matter) would ever be achieved. Dr. Deere's analysis assumes that there are not jobs available for both workers. As described previously, the US economy is characterized by full employment, record job openings, and record low unemployment. Moreover, demographic trends suggest that it is likely to remain so on average for decades to come. It is therefore unlikely that the citizen would be deprived of a job, have employment delayed, or wages depressed. In fact, his structure would require that a DACA individual and a citizen were applying for the same job with exactly the same qualifications, that there was only one job available, that the ACA provision is known and being enforced, and there were no other intervening factors such as the stigma or training risks that I outlined above. It is extremely unlikely that such a situation would ever occur, and certainly not with sufficient frequency to impact the labor market. It is far more likely that eliminating DACA would deprive Texas employers of needed workers and constrain the economy as described previously. There is no other obvious source of workers under current demographic conditions.

---

[71] The calculation is $13,268,035/$670,233,522,000. The total wage number is total wages for 2017 based on data from the US Bureau of Labor Statistics, Quarterly Census of Employment and Wages, available at https://www.bls.gov/data/.
[72] This calculation is 3,813/11,935,179 total employees in Texas as of March 2017 based on data from the US Bureau of Labor Statistics, Quarterly Census of Employment and Wages, available at https://www.bls.gov/data/.
[73] This calculation is $13,268,035/$1,838,115,540,000 Texas nominal gross product for 2017. My firm, The Perryman Group, is the source of the Texas nominal gross product number.

61. In summary, Dr. Deere's limited hypothetical analysis is incomplete even from a theoretical perspective and has no relevance in illustrating outcomes in a "real world" setting.

## VII.    Response to the Declarations of Leonardo Lopez and Lloyd Potter

62. It is my understanding that school finance and demographics experts will be responding to the declarations of Leonardo Lopez and Lloyd Potter. Thus, I will confine my comments to brief notes with regard to the economic aspects related to their declarations.

63. The declaration of Leonardo Lopez deals with the estimated cost to Texas of educating unaccompanied children in Texas public schools. Putting aside the fact that unaccompanied children and DACA recipients are not the same group of immigrants, a full examination of the issue must consider the benefits of having these children in the state as well as the costs. As noted, on balance, the benefits associated with immigrants, even undocumented immigrants, far outweigh the associated costs. Mr. Lopez's static analysis ignores important benefits associated with DACA recipients (previously described) and thus presents only a partial analysis of the implications for schools. The same issues that I addressed in my more detailed analysis of Ms. Smoot's declaration with regard to (1) making no effort to apportion his estimates to the DACA recipients, (2) not considering the likely market response to removing the DACA recipients, and (3) not accounting for the net benefits when all costs (including education) are considered in a dynamic context are equally relevant with respect to the isolated calculations of a single factor by Mr. Lopez.

64. The declaration of Lloyd Potter, PhD, the Texas State Demographer, discusses factors influencing migration and the likelihood that some DACA participants will return to their home country. While I agree with Dr. Potter that economic factors influence migration patterns, and that individual choices, situations, and preferences affect decisions to immigrate or emigrate, a comprehensive analysis would take into account the likely market response and the economic implications of any emigration. The assertion that some may leave, even if true, is not a positive development for

25

business activity or governmental resources. As described previously, the end result might well be that they were replaced by less qualified immigrants. Additionally, the presence of these immigrants is beneficial to the state economy even when associated all costs are considered in a dynamic manner. Therefore, if current DACA recipients leave the state, the implications for the state economy and employers would be negative, and net fiscal situation confronting the State and local governments would also likely be adversely affected.

## VIII.   Conclusion

65. Immigrant workers are important to the Texas economy and the fiscal wellbeing of governmental entities given current and likely future labor market conditions. In addition, the benefits of undocumented workers far outweigh costs.

66. Ms. Smoot presents a static snapshot of one element of current costs, but ignores the benefits associated with DACA recipients, the likely market response, and the dynamic picture when all costs and benefits are considered. Dr. Deere presents a limited and incomplete hypothetical which would not have any material effect on actual wages and employment (and likely no effect at all).

67. From an economic and fiscal perspective, the benefits of DACA far outweigh the costs, and a permanent solution should be found that allows the state to make effective use of this much needed resource.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of June, 2018.

_M. Ray Perryman_

M. Ray Perryman