**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**EXHIBITS IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# Volume 2

# Exhibits 7 - 12

# DEF-INTERV.
# EX. 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 1:18-cv-00068** |
| **UNITED STATES OF AMERICA, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| _____ | § | |

**Supplemental Declaration of M. Ray Perryman, Ph D**

1.    My name is M. Ray Perryman. I am over the age of 18 years and am fully competent to make this affidavit. The statements contained herein are true and correct based upon the personal knowledge and information I have gained throughout my professional career as well as specific research related to this engagement.

2.    I submit this Declaration in support of Defendant-Intervenors response to Plaintiffs' Motion for Summary Judgment. This Declaration is not my entire expert report or analysis in the case. In addition to my prior work in this matter, I intend to submit a report containing additional analysis on or before the expert discovery deadline on July 19, 2019.

3.    In my prior Declaration on June 15, 2018, I set forth my experience and qualifications in the areas of economic analysis, labor market analysis, immigration, health care, and public policy issues. Because I will also be commenting on survey methodology and workforce issues at this time, I will briefly describe my expertise in these arenas.

1

4.   In addition to extensive training in statistical methods including surveys, I have conducted hundreds of surveys for utilities, local governments, economic development organizations, and corporations. For a period of several years, my firm conducted ongoing consumer-related surveys on a quarterly basis. I have testified in litigation and regulatory matters on numerous occasions regarding survey research in matters related to antitrust, intellectual property, and other issues. I have also served as a consultant to the U.S. Department of Commerce, the U.S. Department of Labor and the Federal Reserve System on the major national surveys that they conduct on a regular basis.

5.   In the area of workforce studies, I have taught courses in labor markets at the graduate and undergraduate level, published numerous peer reviewed articles on labor market systems, and developed a large-scale econometric model of the U.S. which includes an extensive labor market component. I also created the U.S. Multi-Regional Industry-Occupation System, a large-scale model that has been used in hundreds of applications. I have conducted labor market assessments for numerous entities, including the U.S. Department of Commerce, the U.S. Department of Labor, the Texas Workforce Commission, the Texas Workforce Investment Council, the Texas State Technical College System, dozens of councils of governments (COGs), economic development organizations, local governments, educational institutions, trade associations, and chambers of commerce. These studies have focused on a variety of topics including, among others, workforce sufficiency, higher education needs, workforce comparisons, and wage rate patterns.

6.   I submit this Declaration in response to statements made by the Plaintiffs regarding my research and testimony related to my prior Declaration of June 15, 2018 where I opined that the economic benefits of DACA far outweigh any costs that these individuals "might present" to the State of Texas. Plaintiffs cite to my reports, prior declaration in this matter dated June 15, 2018, and deposition as evidence that the DACA recipients impose costs on the State of Texas. However, I am not aware of any costs to the State of Texas as a result of DACA and I provide no evidence of such costs in my report or analysis.

2

7.   My estimates were based on a larger study that I performed in 2016, entitled "Texas Needs the Workers!!: An Analysis of the Economic and Fiscal Impact of Undocumented Workers," related to the overall impacts of undocumented persons on the Texas economy.[1] My prior declaration in this matter was based on my earlier work, which found, among other things, that the undocumented population had a substantial positive effect on both the Texas economy and the State and local governments. In addition, I used this information to demonstrate that DACA recipients would also be reasonably expected to bring notable benefits to the state.

8.   To conduct my cost-benefit analysis, I assumed that DACA recipients imposed approximately $250 million in direct costs to the State of Texas. I did not conduct a study of whether DACA recipients imposed costs on the State of Texas, and I am aware of no studies or other research that identifies such costs.

9.   My cost estimates in "Texas Needs the Workers" were assumptions and not based on any research or information linking DACA recipients to costs to the State of Texas. The sources on which I relied to form my assumptions, including a general cost analysis by the Congressional Budget Office (CBO) and a study prepared by the Federation for American Immigration Reform (FAIR), estimate costs related to undocumented immigrants and their children and do not identify any costs attributable to DACA recipients.

10.  Similarly, the population estimates from the Migration Policy Institute (MPI), upon which I relied in my analysis, do not identify costs attributable to DACA recipients. My analysis based on these estimates implicitly assumes that the expenditures for education, health care, and other categories are approximately the same for documented and undocumented residents.

11.  In summary, none of my analysis regarding immigration or the DACA recipients has identified any cost to the State imposed by DACA recipients.

12.  It should be noted that (1) I did not use any utilization data or other information obtained from the State in determining these estimates and (2) the calculations did not in any way use information that would identify costs imposed by

---

[1] Texas Needs the Workers!!: An Analysis of the Economic and Fiscal Impact of Undocumented Workers, The Perryman Group, February 2016.

DACA recipients on Texas. In fact, I have been extensively utilizing virtually all State economic data for more than 40 years, and I am not aware that the State collects any such information.

13.  For the DACA estimates to which I refer in ¶ 39 of my original Declaration in this case, I used a study by the Center for American Progress to obtain an estimate of the number of DACA recipients**.**[2] As with my other sources, this study did not identify or analyze costs to Texas imposed by DACA recipients.

14.  In contrast to the impression created in the Plaintiffs' Brief, I explicitly rejected any causal relationship between DACA and any costs to the State or other governments. I noted in my deposition that DACA was not the cause of any alleged outlays, stating that "it's not because they have DACA, it's because they are here."[3]

15.  The survey of Dr. Tom Wong asks a question related to respondents' plans if DACA ends which indicates that a certain number of them (22.3%) answered that they are likely or very likely to leave the United States.[4] It is my understanding that Plaintiffs cite this response as evidence that DACA recipients would leave the country if DACA ended. However, relying on this particular question in Dr. Wong's survey as evidence of harm to the State is problematic due to problems such as survey bias given preceding questions, the speculative nature of the question and the involvement of complex plans, and other issues. Many of the questions in Dr. Wong's survey (including those I relied on in my testimony) are relatively simple, factual questions such as "Are you currently employed?"[5] or "Please indicate your average hourly wage OR annual salary."[6] By contrast, a question such as "How likely are you to leave the country if DACA ends?"[7] is beyond respondents' experience, requiring them to speculate on future plans that they might not have previously considered; it is also a complex, difficult, hypothetical

---

[2] Results from Tom K. Wong et al., 2017 National DACA Study, Updated 10/7 to include urban-rural cross-tabulations, 2017.

[3] Oral Deposition of Ray Perryman, State of Texas v. United States of America, case 1:18-cv-00068, June 27, 2018, p. 76.

[4] Supplemental Declaration of Tom K. Wong, State of Texas v. United States of America, case 1:18-cv-00068, June 14, 2018, p. 13.

[5] Supplemental Declaration of Tom K. Wong, State of Texas v. United States of America, case 1:18-cv-00068, June 14, 2018, p. 3.

[6] Supplemental Declaration of Tom K. Wong, State of Texas v. United States of America, case 1:18-cv-00068, June 14, 2018, p. 4.

[7] Supplemental Declaration of Tom K. Wong, State of Texas v. United States of America, case 1:18-cv-00068, June 14, 2018, p. 13.

question. Most have been in the United States for an extended period of time as evidenced by the fact that the median age at which respondents entered the United States is 6[8] and their average age at the time they took the survey is 25.[9] In addition, the question calls for speculation based on the facts that it is incomplete and that respondents do not have full information such as whether there would be a replacement for DACA or other changes affecting their potential immigration status.

16.  The question series immediately preceding the question regarding respondents' likelihood of leaving the country if DACA ends involved immigration enforcement under the Trump administration (including questions about concerns related to safety, finances, property, and the future) and a question related to the demand by state attorney generals that the Trump administration end DACA. These questions emphasize uncertainties related to the future of DACA, therefore likely affecting the respondents' mindset and potentially increasing the number of respondents who indicate they would leave the country if DACA ends. In fact, these questions could create the impression in some respondents that they could be deported immediately if DACA were terminated. It is well established that the order of survey questions and the nature of prior questions can affect responses in survey research. Given these factors, this question cannot be reasonably relied upon as evidence that DACA recipients would leave the U.S. if DACA were terminated.

17.  I discussed at length in my original Declaration that DACA results in a net benefit to the Plaintiff States. Every study related to immigration which I have conducted over the course of my professional career has clearly indicated that the immigrant population, including undocumented immigrants, generates clearly positive net economic benefits. In the current economic situation with historically low unemployment, the immigrant workforce is particularly crucial. If the elimination of DACA reduces available workers, it is harmful to the economy and in particular the companies where the DACA recipients are employed.

---

[8] Supplemental Declaration of Tom K. Wong, State of Texas v. United States of America, case 1:18-cv-00068, June 14, 2018, p. 20.
[9] Supplemental Declaration of Tom K. Wong, State of Texas v. United States of America, case 1:18-cv-00068, June 14, 2018, p. 19.

18.  According to the U.S. Bureau of Labor Statistics (BLS), the U.S. unemployment rate remained at 3.6 percent in May, the lowest rate since December 1969, and the total number of unemployed persons was 5.9 million.[10] This level is well below the widely accepted informal definition of "full employment" of 4%. Moreover, BLS estimates that as of the last day of March 2019, there were an estimated 7.5 million job openings in the United States.[11] Even if every unemployed person filled an available job (which is impossible for many reasons), there would still be a gap of some 1.6 million positions that were unfilled.

19.  The Texas unemployment rate in April was 3.7% according to the Bureau of Labor Statistics, with total estimated unemployment of 513,200.[12]

20.  In such a tight labor market, it becomes difficult for employers to fill open positions, and ending DACA could worsen the problem, causing harm to numerous firms across the nation. DACA recipients are typically either employed or enrolled in school, and Dr. Wong's survey indicates that well over 90% of respondents are employed.[13] Without DACA, the ability of these workers to continue in their jobs is uncertain and removing them from the labor force would be damaging to their employers in the Plaintiff States and elsewhere and the economy. The corresponding reductions in business activity would also result in reduced tax revenues to the Plaintiff States.

21.  The deposition of Dr. Ike Brannon in this matter discussed low-skilled non-DACA workers and the potential for negative wage impacts due to competition from DACA recipients.[14] Dr. Brannon estimates that one-third of DACA recipients have not been to college, which he implies equates to being low skill.[15] Dr. Brannon does not

---

[10] The Employment Situation -- May 2019, Bureau of Labor Statistics, US Department of Labor, June 2019.

[11] Job Openings and Labor Turnover – March 2019, Bureau of Labor Statistics, US Department of Labor, May 2019.

[12] Texas Economy at a Glance, Bureau of Labor Statistics, US Department of Labor, https://www.bls.gov/eag/eag.tx.htm, accessed June 4, 2019.

[13] Supplemental Declaration of Tom K. Wong, State of Texas v. United States of America, case 1:18-cv-00068, June 14, 2018, p. 3.

[14] Deposition of Ike Brannon, , State of Texas v. United States of America, case 1:18-cv-00068, June 26, 2018, p. 95-96.

[15] Supplemental Declaration of Tom K. Wong, State of Texas v. United States of America, case 1:18-cv-00068, June 14, 2018, p. 3; Wong, Tom K., et. al., DACA Recipients' Economic and Educational Gains

explain the basis for his estimate of the proportion of DACA recipients who have a college education, and Mr. Wong's survey results related to DACA recipients' education levels indicate that they may have higher education levels than Dr. Brannon assumes, with 27.4% having a high school diploma or GED and only 1.3% not responding to the question. In addition, 44.9% of respondents are still in school, with 71.5% of those pursuing bachelor's or higher degrees.[16]

22.   Even if the full one-third of DACA recipients do not have college degrees, it is unlikely that they would all be considered "unskilled" given the wide variety of non-college certificates and training that is available and the types of jobs often filled by high school graduates that are not regarded as "unskilled." If some DACA recipients are unskilled, they have exhibited a high propensity for education, and many would likely exhibit upward mobility to more skilled positions.

23.   Moreover, there is significant evidence of a shortage of workers in lower-skilled jobs. A study by The Conference Board indicates that "companies are now having a more difficult time finding blue-collar workers than white-collar workers" and that growing shortages can be in "sectors that include transportation, health care support, manufacturing, agriculture, mining, and construction." The study also found that, "in addition to increasing wages, companies may have to expand their pools of potential workers."[17] In some industries, such as agriculture, the labor shortage problem is particularly acute.[18]

24. The U.S. Bureau of Labor Statistics projects significant growth in occupations with no formal education credentials or which require only a high school education over

---

Continue to Grow, August 28, 2017, updated to include breakdowns of urban and rural DACA recipients, November 2, 2017.
[16] Supplemental Declaration of Tom K. Wong, State of Texas v. United States of America, case 1:18-cv-00068, June 14, 2018, p. 8, 13-14.
[17] New Trend: Blue-Collar Workers are Now Scarcer than White-Collar Workers, News Release, The Conference Board, December 13, 2018. Accessed June 5, 2019 at https://www.conference-board.org/pdf_free/press/6057%20-%20Blue-Collar%20Labor%20Shortages.pdf.
[18] See, for example, U.S. Farmers Encounter Ongoing Farm Labor Shortage, AgAmerica Lending, July 12, 2018, accessed June 5, 2019 at https://agamerica.com/farm-labor-shortage/ or "Survey: California farms face continuing employee shortages," California Farm Bureau Federation, News Release, April 30, 2019 accessed June 5, 2019 at https://www.cfbf.com/news-releases#survey-california-farms-face-continuing-employee-shortages-4-30-2019.

the 2016-2026 period.[19] In particular, of the 818 entries in the Occupational Outlook Handbook Occupation Finder, 104 have no formal education credentials and 340 require only a high school diploma or GED. About 145 of those 444 occupations are expected to add at least 5,000 jobs over the 10-year production period, with 33 expected to add at least 50,000 jobs over the 10-year period and 76 expected to add between 10,000 and 49,999.

25.  With shortages already emerging and notable growth in demand expected to continue, it is unlikely that competition from DACA recipients will result in falling wages. In fact, The Conference Board study indicates that, "in certain instances, companies looking to attract enough blue-collar workers will have to continue increasing wages and, as a result, possibly experience diminished profits." In addition, Gad Levanon, lead report author and Chief Economist of North America at The Conference Board noted that "the picture looks very different for the workers themselves. Compared to a few years ago, blue-collar workers are now much more likely to have a job they are satisfied with and experience rapid wage growth."[20]

26.  Given the number of DACA recipients, the number in school, the number with advanced degrees, and the number working in skilled positions, I have no information that there are DACA recipients competing for low-skilled jobs with non-DACA workers. Even if there were DACA recipients seeking low-skilled jobs similar to those filled by U.S. citizens or documented immigrants, under current market conditions, it is highly unlikely that there will be any measurable negative effect on wages, particularly in light of the fact that employers are now increasing wages for unskilled workers due to shortages.

---

[19] See, Torpey, Elka, Employment outlook for occupations that don't require a formal educational credential, Career Outlook, Bureau of Labor Statistics, November 2018. Occupational Outlook Handbook, Occupation Finder, US Department of Labor, Bureau of Labor Statistics accessed June 5, 2019 at https://www.bls.gov/ooh/occupation-finder.htm?pay=&education=No+formal+educational+credential&training=&newjobs=&growth=&submit=GO and https://www.bls.gov/ooh/occupation-finder.htm?pay=&education=High+school+diploma+or+equivalent&training=&newjobs=&growth=&submit=GO.

[20] New Trend: Blue-Collar Workers are Now Scarcer than White-Collar Workers, News Release, The Conference Board, December 13, 2018. Page 2. Accessed June 5, 2019 at https://www.conference-board.org/pdf_free/press/6057%20-%20Blue-Collar%20Labor%20Shortages.pdf.

27.  The State exists to serve its residents and it is apparent that ending DACA would be contrary to those interests in multiple contexts.

28.  Neither my testimony and analysis nor any other evidence that I have seen supports the Plaintiff States' contention that specific harm from the presence of DACA recipients has been established. Any representation of my work to the contrary is incorrect. In fact, all analysis I have conducted related to DACA and immigration indicates that DACA is beneficial to employers, governments, and the economy.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of June, 2019.

M. Ray Perryman

# DEF-INTERV.
# EX. 8

FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

## DECLARATION OF PROFESSOR ROBERT COURTNEY SMITH

I, Robert Courtney Smith, hereby declare I am over the age of 18 and make this declaration based on my personal knowledge. If called to testify, I would do so competently as follows:

**Summary of Professional Qualifications**

1. I am a Professor of Sociology, Immigration Studies and Public and International Affairs at the Marxe School of Public and International Affairs, Baruch College, and the Sociology Department, the Graduate Center, City University of New York. I received my doctorate in Political Science from Columbia University in 1995. My doctoral dissertation analyzed migration from Mexico to New York, and was nominated for the Bancroft Prize. In 2006, I published a book, *Mexican New York*, (University of California Press), which won the 2006 prize for the best book from the International Migration Section of the American Sociological Association (ASA), the 2007 Robert Park Prize for the best book in Urban and Community Sociology Section, also of the ASA, and the 2008 Distinguished Book Award from the ASA, the only prize for a book awarded by the ASA as a whole. During 2007-08, I was Visiting Scholar at the Russell Sage Foundation, during 2009-10 was a Guggenheim Fellow, and during 2016-17 was a Fellow at the Advanced Research Cooperative at the CUNY Graduate Center. All these fellowships were for researching immigration and related issues. I have done extensive research on Mexican migration to the US. Since 1988, I have made regular visits to Mexico, and have done extensive fieldwork repeatedly in Mexico. I have had research or postdoctoral grants, all rigorously peer-reviewed, from the Spencer Foundation-National Academy of Education, the

1

National Science Foundation, the Social Science Research Council, the Oral History Research Project at Columbia, the W.T. Grant Foundation, and others.

2.  My research has been published in the *American Sociological Review*, the flagship journal of the American Sociological Association.  I have served on a review panel for the National Science Foundation, and was a member on their Working Group to Enhance the Scientific Bases of Qualitative Research.  I have served as a consultant to the Census Bureau.  I have a coauthored a book on migrants' experience and knowledge of a Mexican healthcare program, forthcoming from Routledge.  I have two large, longitudinal projects on how having, lacking, gaining, or losing legal status affects mobility and life chances, including of those with DACA. The first book is drafted, and is under contract with the University of California Press. The second research project continues work from the DACA Access Project, for which I was the Lead, which screened over 1700 persons for DACA or other types of visas, and helped over 300 to apply for DACA, offering casework and legal services, and began following the lives of many of them. This research is funded by the Russell Sage Foundation, and continues through 2021 with funding from the W.T. Grant Foundation. My vita lists a fuller description of my research, awards and other intellectual work.  Over the course of my career, I have raised $2-3 million for my work.

3.  My time for this work is billed at a rate of $350.00 per hour.  Payment to me is not contingent on my opinions in or the outcome of this matter.

**Introduction.**

4.  This declaration focuses on the question of migration histories of DACA recipients, and the likelihood of return migration to their country of origin, were they to lose the work permits and other protections that DACA afforded them.  My overall belief is that DACA recipients, as a group, are unlikely to return to their home countries, and particularly not to Mexico or other top DACA recipient countries, for a variety of reasons adumbrated below.

5.  The first section offers an overview of the DACA program and population. The second section analyzes the likelihood DACA recipients would return in light of the history of increasingly permanent settlement among Mexican immigrants, and the theory of cumulative causation for migration.  I conclude that DACA recipients' degree of settlement, combined with the harsh realities they would likely face if they returned to their country of origin, would not create a cumulative causation feedback loop promoting more migration. It would, rather, inhibit it.  The third section analyzes data from the DACA Access Project, which I direct.  This section analyzes the migration histories of over 1700 DACA eligible persons we screened in our study, who are almost entirely Mexican.  The key finding is that very few people had returned to Mexico since June, 2007, and that, among DACA eligible persons, even fewer had returned since June, 2007. The final section briefly considers Dr. Lloyd Potter's declaration, and the premises of his conclusion.

**II: DACA PROGRAM AND POPULATION: A High Achieving and Settled Population.**

*DACA Program and Recipients -- Overview.*

6.  DACA was created by President Barack Obama in June 2012 to provide relief to youth who had been brought to the US or had come as children, and had either lost authorization to be present in the US, or had never been able to obtain it.  DACA does not confer immigration status, but is

2

rather a form of prosecutorial discretion by which the government grants temporary, renewable, work permits, and protection against deportation, for youth who meet certain eligibility requirements (Napolitano, 2012). These requirements included of successful applicants:

7. Had arrived in the US before age 16, and be in the US on June 15, 2012;

8. Been continuously in the US between June, 15, 2007 and June 15, 2012 (or until date of application after that date, save for short trips, e.g. to attend a parent's funeral);

9. Had finished high school, gotten a GED, or been enrolled in Adult Education, or had been serving or had served in the US military;

10. Not present a threat to the US (e.g. not have been convicted of a crime).

11. DACA recipients find themselves in a legal, institutional, limbo: They have grown up in America, see it as home, gone to American schools, and contributed to it by their taxes and their work, but have not been given permanent legal status. In the President's words, DACA was created to help the young people who "want to staff our labs, or start new businesses, or defend our country" (Obama, 2012).

12. DACA recipients, as a group, are high achievers, who are deeply settled in the US. The educational requirement meant that most DACA recipients had a high school diploma, a GED, or were pursuing Adult Education. DACA recipients are enrolled in college at nearly the same rate (18%) as all Americans (20% for the overall US population) (Zong et al., 2017:4), while another 15% had done some college and 4% had earned a Bachelor's Degree or higher – some 37% had done at least some college, while 44% had finished high school and stopped. A key reason so many undocumented children stayed in school is that American schools are more open to them than some other institutions. Under the 1982 *Plyler v. Doe* Supreme Court decision, undocumented students have a constitutional right to a free K-12 public school education. The Court's logic was that children should not be held responsible for their parents' decisions, that children are afforded special protection *as children* under American law, and that the government has an interested in not creating an "underclass" of uneducated persons in society. Moreover, many states have adopted policies supporting undocumented students, for example, making them eligible for in-state tuition at public universities if they reside in that state, or offering them state financial aid to attend college, on the same bases as other students (Gonzales, 2016; Dickson et al. 2017). Where many successful undocumented youth saw their futures blocked in the labor market, they saw universities as open to them, and went to college.

13. Second, getting DACA is expensive, time-consuming, and complicated, as I saw firsthand in leading the DACA Access Project. Indeed, many people eligible for DACA could not or did not apply. Initial estimates in 2012 were that there were some 2.1 million youth who could apply for DACA –1.2 million who immediately qualified for it, and another approximately 900,000 who would age into it at age 15 (about 473,000), if they stayed in school, or who could become DACA eligible by getting a GED or enrolling in adult education (about 426,000; Batlova et al., 2014; see also Hipsman, 2014, 2016). In 2014, Batalova et al. (2014) estimated that about 55% of immediately DACA-eligible persons had applied for it, white 45% had not. By 2016, 63% of immediately DACA-eligible persons had applied (which fell to 48% when considering those who could become DACA-eligible with more education; Hipsman, et al. 2016). Interestingly, the numbers of DACA applications fell over time, from a high of 228,582 in the last quarter of 2012, to 26,995 in the last quarter of 2014, and similar numbers through 2016 (Hipsman et al. 2016). Many reported that the $465 fee was a burden and impediment to applying.

3

14. Reports from nonprofits helping people apply for DACA reported that the initial 2012-13 surge in applications was driven largely by more successful students in high school or college, who could more easily meet DACA's requirements and navigate its demanding application process. This makes sense, because DACA required proof of continuous residence *for every six months* from June 2007 until the time of application -- 5 years if one applied in 2012, and 10 years if one applied in 2017. Moreover, the proof that was most valued by DHS was institutional documentation --- e.g. school records, medical records, or employment records. This was easiest to obtain if one was currently in school, or had stayed in school, and had lived in only one or a few places (Batalova, 2014; Zong et al. 2017). Moreover, those who got DACA could afford to pay the $465 application fee, and they or their families had kept school or medical or other records, or knew how to navigate American institutions to get them. That these youth knew how to navigate American institutions should not be surprising, because they have grown up in America, and attended American schools. Higher percentages of younger than older DACA-eligible persons actually applied for DACA (53% aged 15-19, 44% aged 20-24, 33% over age 25; Batalova, et al., 2014).[1] That the DACA approval rate was high – some 91% – and denials low – 9%[2] – suggests the applicants were well prepared. In my experience with the DACA Access Project, many DACA applicants sought help of some kind in preparing their applications. Gonzales et al. (2014: 1861) found that their subjects reported getting help from various organizations, including 28% who got help at legal clinics, 15% who got help from private lawyers, 22% from community organizations, and 7% at religious organizations

15. Applying for DACA required long history in the US, and good record keeping.

16. Overall, USCIS reports (on 2/28/19) it accepted 909,304 initial applications for DACA, and approved 824,947; it denied 81,221. The program is preponderantly used by Latino/a immigrants; for applicants born in Mexico, 707,589 of the initial applications accepted, and 649,288 of the applications approved, according to USCIS data. Moreover, El Salvador, Guatemala, and Honduras are the next three largest DACA contributors, with between 22,000 and 34,000 DACA applicants apiece. The number five spot was South Korea, with fewer than 10,000 applicants. There were about 690,000 DACA recipients in September 2017, when the current administration sought to end it; and 673,320 active and 38,710 pending renewals (totaling 712,050) in February 2019.

17. DACA recipients are young. Two-thirds were under age 25 in 2017, when the average age was 24; only 24% were ages 26-30, and only 11% were 31-36 in 2017. Some 83% of DACA recipients were unmarried when applying. (Lopez and Krogstad, 2017) (Gonzales et al. 2014 reported the average age of DACA recipients in their sample was 22.6 years in 2014). Wong's (2017) survey finds the median age of arrival in the US for DACA recipients was 6 years old. If the average age of DACA recipients in 2017 was 24, we can surmise that most DACA recipients have been in the country about 18 years, slightly longer than the just under 15 years that most undocumented persons had been in the country in 2018 (Passel and Cohn, 2018).

18. While I will discuss other characteristics of the DACA population later in the report, the central takeaway here is that DACA recipients are successful young people who came to the US as children and have lived most of their lives here.

---

[1] The number of DACA-eligible persons increased over the course of the program, because those under age 15 when it was announced became eligible when they turned 15, while those under age 30 when it was announced did not age out of eligibility.

[2] Author's calculations from latest USCIS data from 2/28/19, which showed 909,304 total initial applications, 824,947 approvals (90.7%) and 81,221 denials (8.9%).

4

## II: HISTORY OF MIGRATION AND MIGRATION THEORY PREDICT AGAINST LARGE POST DACA RETURNS

19. For DACA recipients from Mexico -- 79% of all DACA recipients -- the history of migration to the US from Mexico, and migration theory, can help us assess the likelihood that DACA recipients would return to Mexico were DACA to end, and they lost their employment authorization. The history of US immigration policies and migration over the last 30-40 years is one of decreasing circular migration to the US, and increasingly permanent settlement of all Mexican immigrants in the US, including those who lack legal status. Given this trend, it seems unlikely that many DACA recipients would return to their home countries.

20. Prior to the 1980s-1990s, there was a pattern of circular migration between Mexico and the US. In this pattern, Mexican migrants, in the majority, men, would work in the US and periodically return to Mexico to visit their families, who mostly stayed in Mexico. One study estimated that for every 100 new entrants from Mexico into the US, approximately 85 would return home in any given year. In one formulation, the site of production (work) for Mexicans was the US, while the site of reproduction (having a family) was Mexico -- they were separate sites. Several factors have combined to change this pattern towards increasingly permanent settlement, so that the likelihood one would take another trip, which had stood at .14 or .18 before 1986, fell by 2010 effectively to zero (Massey et al 2017; 2008).

21. Several factors promoted this change from circular to permanent settlement. A first and extremely decisive factor was a great increase in US border enforcement. Increased US border enforcement made it harder and more expensive to cross the border, increasing the use of smugglers (coyotes). Massey et al (2017) report that more expensive smugglers increased the chances one would get across. This increase in expense did not stop further attempts; though many were caught, most continued to attempt to cross until successful. In Massey et al's (2017) words: "The combination of increasingly costly and risky trips and the near certainty of getting into the United States created a decision-making context in which it still made economic sense to migrate but not to return home to face the high costs and risks of subsequent entry attempts." Second, US policy increased enforcement in formerly heavily used crossing areas (e.g. near San Diego), so that migrants increasingly sought to cross into the US in more remote areas, often deserts, where they are more vulnerable to natural risks, and to organized crime. The increased risk of getting caught, and the cost and danger of crossing, were other persuasive reasons to reduce the number of times one crossed the border.

22. A third factor promoting increasingly permanent settlement was the legalization program of the 1986 Immigration Reform and Control Act (IRCA). IRCA enabled those who got temporary and then permanent legal status to immigrate their families legally to the US. This made permanent settlement more likely. The increased legal penalties for migrants caught crossing the border more than once have further increased incentives for migrants to avoid crossing the border, making it less likely one will return to Mexico after having come to the US. Newly legalized immigrants were better able to relocate within the US, which prompted many to move to new areas of the US, offering new labor markets into which Mexican and other immigrants legalized by IRCA could integrate, and cheaper housing in areas where they felt their children could have better quality of life. These factors helped promote more Mexican migration to new destination areas, including the south, Midwest, and northeastern parts of the US (Zuniga and Hernandez Leon, 2005; Smith, 2006). Finally, the wage penalty paid by undocumented migrants after IRCA increased, meaning that they did not get earnings rewards for years working in the US the way

5

they had before IRCA. However, this lower reward to working in the US compared to before was still much greater than what they expected to earn in Mexico (Massey et al 2017). A final contextual factor is that the Mexican economy, while growing, has not been able to create enough good jobs for many new labor market entrants, wages are low, and levels of informal employment are high.

**Migration Theory and the Likelihood of DACAs Returning to Countries of Birth.**

23. We can get a deeper understanding of the likelihood of DACA recipients returning to Mexico or other countries of origin by using the theory of cumulative causation to consider both how extensively DACA recipients are settled in the US, and the harsh possibilities they would very likely face, were they to return to their countries of origin. This theory, developed by Massey and his colleagues (2017, 2008, 1986, 1987, 2002), argues that the costs of migration to each individual decrease as more people from one's village or town or neighborhood migrate. Moreover, the economy and society in the person's home town becomes oriented towards being a "migrant sending community," and the social and economic centers of power shift towards those in the US destination. This process is not unique to Mexican migrants, nor to the contemporary period.

24. Key mechanisms that make the theory of cumulative causation work are networks, and information flows. The costs imposed by migration decrease because migrants use their family and friendship networks at their destination to gain information, get jobs, and find a place to live. The information flowing through those networks promotes more migration, but more so if the information is positive and actionable. For example, information about a new place to live where there is cheap housing and jobs, and a reference to apply for such a job, is actionable and positive. Conversely, information that one is encountering troubles finding a job in the new destination would inhibit more migration.

25. A rough proxy for the posited DACA returnees exists in Mexico, in the form of over 400,000 *retornados* or *Otros Dreamers/* returnees or Other Dreamers, as they are referred to in Mexico (Garrido de la Calleja and Anderson, 2018; Jacobo-Suarez and Jensen, 2018). These are youth, mainly, who returned to Mexico with deported parents, or were deported themselves, especially during the Obama administration's peak deportation years, including the highest in 2012, of 407,821 (Syracuse University TRAC system, which reports USCIS data;https://trac.syr.edu/phptools/immigration/removehistory/). Some are US citizens, and others were born in Mexico, but grew up in the US, like DACA recipients.

26. Research in Mexico on the returnees paints a grim picture of the prospects that DACA recipients returning to Mexico would face. Current and past returnees to Mexico face a variety of problems that would complicate their ability to thrive in their work or educational lives. A primary example is how the Mexican educational system has not accommodated, or struggled to help, returnees who grew up in the US is the *Apostille,* or raised seal requirement for official documents (Garrido de la Calleja and Anderson, 2018; Jacobo-Suarez and Jensen, 2018; Jacobo-Suarez, 2017). While this system was created to ensure the authenticity of documents, it became a major struggle for returned students who had grown up in the US. Concretely, this meant that deported parents trying to enroll their children in Mexican schools experienced extensive delays, and too often students were denied admission because they did not have these raised seals on documents. This included not only birth certificates, but school records, which are often printed from school offices without a raised seal. Returnee students who tried to get their high school or college educations validated often had the same issues. If they did not have the raised seal

6

documents, they were unable to enroll school.

27. One case was Nancy Landa, whose repeated attempts to get her university studies in the US recognized in Mexico so that she could pursue a Master's Degree in Mexico led her to apply to a university in London to do her Master's (Weiss, 2017). She told me it was easier to go abroad to get her Master's, than to convince the Mexican bureaucracy to recognize her undergraduate degree. It is common that returnees have neither these raised seal documents, nor have the wherewithal to obtain them. They are often deported from the US (as Nancy Landa was, for being undocumented) on short notice, and lack the networks and funding to be able to get those documents. This led to the emergence of *apostillado* services that obtain these raised seal documents for those in Mexico who cannot get them for themselves (Jacobo-Suarez and Jensen, 2018). In cases I know of, they charge up to $1000 for such services.

28. The Mexican government has begun to address these issues to some degree. The requirement for K-12 public schools has been removed in the law, but in practice, many local school authorities still require it. For validation of college documents from the US, the prohibitions in Mexican law that required the raised seal have been removed. This change enables Mexican universities to accept US university documents such as transcripts. But there revalidation of degrees may be more complicated. Jacobo-Suarez and Jensen (2018:31 Jacobo-Suarez, 2017) report that "Degrees obtained in US universities can be revalidated in their entirety if they are within the list of 'highly prestigious' institutions compiled by the (Mexican) federal government." (parentheses added). The Mexican Secretary of Public Education (SEP) has not trained its staff in how to implement these changes, and researchers report that local officials still ask for raised seals on documents. How much these measures have been or will be implemented remains unknown. Similarly, programs to help returned migrants in the labor market have required migrants to have birth certificates and official identification credentials, which many do not have (Barrios de la O, 2017).

29. Returnee students face problems that DACA recipients would also likely face were they to return (Garrido de la Calleja and Anderson, 2018; Jacobo-Suarez and Jenson, 2018). Returnees feel out of place, struggle in Mexican schools, and report facing discrimination in the Mexican educational system and society. Sometimes, this is premised on the belief that if one was deported from the US, it was for doing something criminal. Moreover, Mexican educational institutions do not have Spanish as a Second Language Programs or other programs to help such returnees. Most DACA recipients came to the US as children, and have years of schooling in the US, and usually in English. DACA recipients who returned to Mexico would likely have similar experiences to returnees, many of whom have also been educated in American schools.

30. Many returnees have a hard time becoming economically stable (Cobo Quintero and Angel Cruz, 2012; Albo Martinez, et al, 2012). Despite often being fluent in both English and Spanish, returnees report their access to good housing, and good jobs with incomes sufficient to support themselves and their families, is limited. Albo Marquez et al (2012) report that 81% of returnees make 3x the minimum wage or less, which may not be enough to support the basic necessities (Valdes-Martinez et al 2018 worry may not be enough to support the basic necessities for life with dignity and without extreme want. (Differences between possible future DACA returnees and prior returnees or deportees could affect their earnings or other reintegration experience.)

31. Finally, the Mexican government has been very slow to respond to current returnees to Mexico. While they have taken some steps in removing the legal barriers, for example, of the Apostille or raised seal requirement, the Mexican government has not created programs with significant funding to promote better transition and integration of these youth into Mexican society. DACA

recipients returning home would likely not face better conditions.

32. If any DACA recipients were return to Mexico upon losing DACA, the conditions the first DACA returnees would face would be unlikely to foster more migration, and in fact, would inhibit it. The information that would come back would be negative – about problems encountered – and would not promote more migration. The causation could be cumulative, but would likely inhibit more return migration. I have focused on the Mexican case here, because Mexicans accounted for the large majority of DACA applications. But the next three countries with the highest number of DACA applicants are El Salvador, Guatemala, and Honduras, who would present possible DACA returnees with equally bad, or worse, conditions (Department of State, 2018 Country Reports on Human Rights Practices, March, 2019).

## DACA ELIGIBLE PERSONS TENDENCY TO RETURN TO MEXICO IN THE DACA ACCESS PROJECT

*DACA and the Migration Patterns of Return to Mexico.*

33. The question I have been asked to opine on regards how likely it would be for DACA recipients to return to Mexico if they were to lose DACA and their work permits, or be unable to get jobs in the US. We can assess the question of future likely return to Mexico by understanding patterns of prior return to Mexico from persons in the DACA Access Project.

34. Specifically, we can approach this question by analyzing data on migration histories of persons in the DACA Access Project. This study, funded by the Russell Sage Foundation and W.T. Grant Foundation, includes a large InTake database of 1707 persons who were screened for DACA or other visas across New York State. This project included 15 organizations across New York State, from Montauk to near Canada. Moreover, because it did the screenings through all types of organizations -- educational, religious, labor-oriented, service-providing – and in collaboration with the Mexican Consulate, it includes a wider, deeper, swath of the undocumented population than most other studies.

35. Most of the screened persons in our data do not return to Mexico, and when they do, it is for visit, not to live permanently. Of our 1707 cases, 155 had left the US to visit Mexico since June 15, 2007, while 1437 had not left; 115 cases did not report data. This yields a rate of 7.2 % of anyone in our database who had left the US since 2007 for any reason or any length of time (1437+155=1492; 155/1492=7.2%). However, this number goes down when we screen for three key DACA criteria of the date of arrival and age of arrival, and presence in the US on June 15, 2012. More specifically, when we filter the database by those who were in the US before June 15, 2007, those who were born after June 15, 1981, and those who were in the US on June 15, 2012, we get 58 of 876 who have left the US to visit Mexico, or 6.6%. When we filter for those three conditions, but also filter for those who had a high school diploma or a GED, or were enrolled in school or adult education -- making them immediately eligible for DACA, and thus more likely to actually apply and get it -- we get only 18 of 337 who had left the US to visit Mexico since June 15, 2007, or 5.3%. Of these 18, 8 did not specify how long they were gone. Of the remaining 10, we could determine how long they stayed for 5 of them -- 3 stayed for short stays (e.g. "15 days while Dad was sick"); 2 specified a period of less than a year[3]. These low rates of having left the US to visit Mexico, and the short, temporary, nature of the visits abroad,

---

[3] In addition, 3 others specified only the year, so it is unclear how long they were out of the US; one specified years that were not relevant to DACA eligibility (prior to 2007), and another was unclear.

suggest that DACA recipients overwhelmingly would not return home, were they to lose their work permits or other protections DACA affords them. None of the DACA recipients whose cases we are following in my study have left the US to return to live in Mexico. I believe that these data are a better basis to analyze the likelihood that DACA recipients will return or not return to their countries of birth than the single datum in the Wong survey.

36. Moreover, data from the DACA Access Project indicate that these DACA eligible youth were embedded within their families in the United States. Of the 876 persons who were in the US on June 15, 2007, and in the US on June 15, 2012, and were born after June 15, 1981, the large majority lived with their immediate families (625 of 876, or 71%), 150 (17%) lived with extended family (which includes both immediate and extended family), and 113 (13%) lived with roommates, relatives, or others (9 cases have missing values). The implication of this high percentage of DACA eligible persons living with their immediate or extended family is that their social networks and lives are in the US already. They would have less reason to return to Mexico, were they to lose DACA or their work permits. Rather, they would be more likely to remain in the US as long term undocumented youth who grew up in America.

## RESPONSE TO DR. LLOYD POTTER'S DECLARATION.

37. Dr. Potter's declaration argues that some DACA recipients would return to their country of origin if they lost their work authorization, or could not otherwise find work. I offer several responses to Dr. Potter's report. First, the premises of Dr. Potter's report merit discussion, because those premises are what he uses to infer that some DACA recipients would go back. Second, Dr. Potter does not consider findings in one of his cited articles that would point towards different conclusions for DACA recipients, that is, to suggest they might move less. And third, the studies themselves are drawn from samples that are not ideal for inferring about decisions DACA recipients might make.

38. First, Dr. Potter premises his argument on work by Ihrke (2014)[4], which analyzes Current Population Survey data on moves across county lines in 2012-2013, and Kennan and Walker (2011). Using research on movement across county lines in the US, where most of the movers have no legal status obstacles to movement, is not a strong basis to predict movement across national boundaries where legal status is key to making those decisions.

39. Second, there are other statistical relationships reported in that article which could also portend fewer moves by DACA recipients than Dr. Potters premise and statistics might suggest. For example, Ihrke (2014) reports that, for Latinos -- most DACA recipients are Latino -- only 17.6% of moves were job related, the lowest among all racial and ethnic groups reported, except African Americans (15.1%). Moreover, Ihrke (2014) reports that never married persons had lower rates of moving than married ones; Lopez and Krogstad (2017) report that 83% of DACA recipients were unmarried when applying. Ihrke (2014: 3, Table 1) does report that 43.3% of moves "from abroad" were job related, but that statistic is not broken down by any demographic categories, eg.

---

[4] Dr. Potter cites a statistic from Ihrke (2014) saying that 43% of moves across county lines were job related in that year, while 30% were family related (Potter, 2019: p 3). However, my review of the article shows that it reports 30% of moves were family related, but that *19.4%* were employment related (Ihrke, 2014: p1).

race, citizenship status, marital status, etc. We do not know, for example, how many of these moves were international migrants, or US citizens returning home. Moreover, the rate of moving for job related reasons was only 16.3% for those with only a high school education, and 17.2% for those with some college; these two groups account for a majority of DACA eligible persons (Zong et al 2017).

40. Finally, Kennan and Walker (2011) derive their model of geographic moves and income on a "relatively homogenous sample" (2011: 247) of "white males with a high school education" from the National Longitudinal Survey of Youth -- most decidedly not a large demographic among the DACA recipient population. Ihrke (2104) draws on the 2013 Annual Social and Economic Supplement (ASEC) of the Current Population Survey (CPS), which provide representative samples of the overall population. But the report analyzes movement mainly to-from counties within the United States. Generalizing from a model or statistical relationship based on movement from one county to another in the US to predict or surmise future movements of DACA recipients -- long established in the US -- back across the US-Mexico border, from which it would be difficult to return, is a fraught intellectual exercise. I am not convinced that the models Potter premises his conclusions on are good predictors of DACA recipients' behavior. These models do not consider, for example, DACA recipients family attachments. I plan to supplement this report prior to the July, 2019, deadline for expert reports.

**SIGNATURE.**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of June, 2019.

Robert Courtney Smith, Ph.D.

**REFERENCES.**

Albo Marquez, Adolfo and Juan Luis Ordaz Diaz and Juan Jose LI Ng. 2012.  Insercion laboral y caracteristicas de los migrantes mexicanos de retorno 2005-2011: Comparacion rural-urbano.  Pp237-268. In  Ramirez Garcia, Telesforo and Manuel Angel Castillo. 2012.  *El Estado de la Migracion: Mexico ante los recientes desafios de la migration internacional.*  Editors. National Population Council.  Mexico City.

Barrios de la O, Maria Inez. 2017. Desafios de intervención social para la inserción laboral de migrantes mexicanos deportados. El caso de Tijuana, Baja California In  *Miradas migratorias regionales en México.*

Batlova, Jeanne, Sarah Hooker, and Randy Capps with James Bachmeier. 2014. DACA at the Two-Year Mark; A National and State Profile of Youth Eligible and Applying for Deferred Action.  Washington DC: Migration Policy Institute.

----. 2013. Deferred Action for Childhood Arrivals at the One-Year Mark: A Profile of CurrentlyEligible Youth and Applicants.  Washington DC: Migration Policy Institute.

Basia, D.Ellis, Roberto G. Gonzales, and Sarah Rendon  Garcia. 2019.  The Power of Inclusion: Theorizing "Abjectivity" and Agency Under DACA.  *Cultural Studies * Cultural Methodologies.*  19 (3): 161-172

Capps, Randy, Michael Fix, and Jie Zong. 2016.  A Profile of U.S. Children with  Unauthorized Immigrant Parents. Migration Policy Institute. Washington D.C.

Capps, Randy, Michael Fix, and Jie Zong. 2017. The Education and Work Profiles of the DACA Population. Migration Policy Institute. Washington, D.C.

Cobo Quintero, Salvador and Jenny Angel Cruz. 2012. Poblacion nacida en el extranjero enMexico: inmigrantes y mexianos por  ascendencia. Pp 127-156 in Ramirez Garcia, Telesforo and Manuel Angel Castillo. 2012.  *El Estado de la Migracion: Mexico ante los recientes desafios de la migration internacional.*  Editors. National Population Council.  Mexico City.

Dickson,  Lisa, T.H. Gindling, and  James Kitchin. 2017.  The  Education and Employment  Effects of DACA, In-State  Tuition and Financial  Aid for Undocumented Immigrants. *Discussion  Paper No 11109.* IZA Institute for Labor Economics.  Bonn, Germany.

Escobar Latapi, Agustin. 2012. La politica Social Mexicana y los Migrantes de Retorno. Pp 126-153 In Jose Luis Calva (editor) *Empleo digno, distribucion del ingreso y bienestar.*  Vol 11. National Council of Universities.

Garrido  de la Calleja, Carlos and Jill Anderson. 2018.  Editors. *Sanctuarios Educativos en Mexico? Proyectos y propuestas ante la criminalizacion de joevenes dreamers retornados y deportados.* Universidad de Veracruz, Mexico.

Gelatt, Julia and Jie Zong. 2018. Settling In: A Profile of the Unauthorized Immigrant Population in the United States. Migration Policy Institute. Washington, D.C.
https://www.migrationpolicy.org/research/profile-unauthorized-immigrant-population-united-states

11

Gonzales, R. G. (2011). Learning to be illegal: Undocumented youth and shifting legal contexts in the transition to adulthood. *American Sociological Review.* 76: 602–619.

Gonzales, Roberto G. and Angie M. Bautista-Chavez. 2014. Two Years and Counting: Assessing the Growing Power of DACA. American Immigration Council.  Washington, D.C. June.

Gonzales, R. G., Terriquez, V., & Ruszczyk, S. P. (2014). Becoming DACAmented: Assessing the short-term benefits of Deferred Action for Childhood Arrivals (DACA). *American Behavioral Scientist.* 58: 1852-1872

Gonzales, Roberto G., Sarah A. Rendón-García & Kristina Brant. 2018. (Un)Authorized Transitions: Illegality,  DACA, and the Life  Course. *Research in Human Development.* DOI:10.1080/15427609.2018.1502543

Gonzales, Roberto G., Sarah A. Rendón-García .2016. Understanding the Deferred Action for Childhood Arrivals (DACA) impact on young adults' well-being. American Psychological Association. https://www.apa.org/pi/families/resources/newsletter/2016/11/deferred-action

Gonzales, Roberto G., and Edelina M Burciaga. 2018 Segmented pathways of illegality: Reconciling the coexistence of master and auxiliary statuses in the experiences of 1.5-generation Undocumented young adults. *Ethnicities.* 18(2): 178–191

Hipsman, F., Gomez-Aguinaga, B., & Capps, R. 2016. DACA at four: Participation in the deferred action program and impacts on recipients (MPI issue brief). Washington, DC: Migration Policy Institute.

Hipsman, Faye, Barbara Gomez-Aguinaga, Randy Capps. 2014. DACA at Two: Participation in the Deferred Action Program and Impacts on Recipients.  Policy Brief. Migration Policy Institute.

Ihrke, David. 2014.  Reason for Moving: 2012 to 2013: Population Characteristics.  U.S. Census Bureau. https://www.census.gov/prod/2014pubs/p20-574.pdf

Jacobo-Suarez, Monica and Bryant Jensen. 2018.  Schooling for US-Citizen Students in Mexico.  Paper presented at Conference on "The Impact of Immigration Enforcement Policies on Teaching and Learning in America's Public Schools." Washington DC. February 28.

Jacobo-Suarez, Monica. 2017. De Regreso a "Casa" y Sin Apostilla: Estudiantes MexicoAmericanos en Mexico.  *Sinetica: Revista Electronica de Educacion.* Universidad Jesuita de Guadalajara.

Kennan, John, and James Walker. 2011. The Effect of Expected Income on Individual Migration Decisions. *Econometrica.* 79 (1): 211-251.

Lopez, Gustavo and  Jens Manuela Krogstad.  2017 (September 25). Key facts about unauthorized immigrants enrolled in DACA. Pew Research Reports.  https://www.pewresearch.org/fact-tank/2017/09/25/key-facts-about-unauthorized-immigrants-enrolled-in-daca/

Martinez Diaz Covarrubias, Sandra and Agustin Escobar Latapi. 2018. Factores de integracion de los migrantes de retorno mexicanos. La influencia de los contextos de recepcion. *CONYUNTURA DEMOGRAFICA.* Number 13.

Massey Douglas S. 1986. The Settlement Process Among Mexican Migrants to the United States.

12

*American Sociological Review.*51:670–685.

Massey Douglas S, Alarcón Rafael, Durand Jorge, González Humberto. 1987. <u>Return to Aztlan: The Social Process of International Migration from Western Mexico</u>. Berkeley: University of California Press.

Massey Douglas S, Arango Joaquín, Hugo Graeme, Kouaouci Ali, Pellegrino Adela, Taylor J. Edward. 1998. *Worlds in Motion: International Migration at the End of the Millennium.* Oxford: Oxford University Press

Massey Douglas S, Capoferro Chiara. 2008. The Geographic Diversification of U.S. Immigration. In: Massey Douglas S., editor. *New Faces in New Places: The Changing Geography of American Immigration.* New York: Russell Sage. pp. 25–50.

Massey Douglas S, Durand Jorge, Malone Nolan J. 2002. *Beyond Smoke and Mirrors: Mexican Immigration in an Age of Economic Integration.* New York: Russell Sage Foundation.

Massey, Douglas, Jorge Durand, and Karen Pren.  2017.  Why Border Enforcement Backfired. *American Journal of Sociology.*  121(5): 1557-1600.

Napolitano, Janet. 2012. Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children. Memo. June 15, 2012. Department of Homeland Security.

Obama, Barack.  2012.  Remarks by the President on Immigration.June 15, 2012. https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration

Passel, Jeffrey S. and V. Cohn. 2018. U.S. Unauthorized Immigrant Total Dips to Lowest Level in a DecadeNumber from Mexicocontinuesto decline, while Central America is the only growing region. Pew Research Reports. **https://www.pewhispanic.org/wp-content/uploads/sites/5/2019/03/Pew-Research-Center_U-S-Unauthorized-Immigrants-Total-Dips_2018-11-27.pdf**

Patler, Caitlin, Jorge A. Cabrera, and Dream Team Los Angeles. 2015. From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program. Institute for Research on Labor and Economics Report. UCLA. https://escholarship.org/uc/item/3060d4z3

Patler, Caitlin, and Whitney Laster Pirtle. 2018. From undocumented to lawfully present: Do changes in legal status impact psychological wellbing among latino immigrant young adults? Social *Science and Medicine.* 199: 39-48.

Ramirez Garcia, Telesforo and Manuel Angel Castillo. 2012.  *El Estado de la Migracion: Mexico ante los recientes desafios de la migration internacional.* Editors. National Population Council.  Mexico City. Smith, Robert Courtney. 2006.  *Mexican New York: Transnational Worlds of New Immigrants.*  Berkeley: University of California Press.

Smith, Robert Courtney. 2006.  *Mexican New York: Transnational Worlds of New Immigrants.*  Berkeley: University of California Press.

Valadez-Martínez, Laura, Matt Padley, María Fernanda Torres Penagos. 2018. A Dignified Standard of Living in Mexico: Results of a Pilot Study of the Minimum Income Standard Approach. *Social Indicators Research.* 140(2): pp 695–714

13

Weiss, Laura. 2017. No One Talks about Life After Deportation; These Mexican Activists Are Changing That. *The Nation.* April 28.

Wong, Tom K. 2018.  In Their Own Words: A Nationwide Survey of Undocumented Millennials. UC San Diego Working Paper. October. https://escholarship.org/uc/item/1db6n1m2

Wong, Tom. K, Greisa Martinez Rosas, Adam Luna, Henry Manning, Adrian Reyna, Patrick O'Sheam Tin Jawetz, and Philip E. Wolgin. 2017 (August 28). DACA Recipients' Economic and Educational Gains Continue to Grow. Center for American Progress. Washington, D.C.

Wong, Tom K, Donald Kerwin, Jeanne M. Atkinson, Mary Meg McCarthy. 2014. Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey. *Journal of Migration and Security* 2(4): 287-304.

Wong, T. K., Richter, K. K., Rodriguez, I., &Wolgin, P. E. (2015). Results from a nationwide survey of DACA recipients illustrate the program's impact (Report). Washington, DC: Center for American Progress. Retrieved from https://www.americanprogress.org/issues/immigration/news/2015/07/09/117054/resultsfrom-a-nationwide-survey-of-daca-recipients-illustrate-the-programs-impact/

Zong, Jie. Ariel. G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, and  Randy Capps. 2017.  A Profile of Current DACA  Recipients by Education, Industry, and Occupation. *Fact Sheet.* November. Migration Policy Institute. Washington, D.C.

Zong, Jie, Jeanne Batalova, and Micayla Burrows. 2019 (March 14). Frequently Requested Statistics on Immigrants and Immigration in the United States. *Spotlight.* Migration Policy Institute. Washington, D.C.

Zuniga, Victor and Ruben Hernandez Leon. 2006.  *New Destinations: Mexican Immigration in the United States.* NY: Russell Sage Foundation.

**Department of State Documents.**

Department of State. 2018 2018 Country Reports on Human Rights Practices: Honduras. March 13, 2019. https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/honduras/

Department of State. 2018 2018 Country Reports on Human Rights Practices: Guatemala. March 13, 2019. https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/guatemala/

Department of State. 2018 2018 Country Reports on Human Rights Practices: El Salvador. March 13, 2019. https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/el-salvador/

June 2019

CURRICULUM VITAE
Robert Courtney  Smith
email: robert.smith@baruch.cuny.edu; robsmithcuny@gmail.com.

## EDUCATION
1995. Ph.D. Columbia University, Political Science Department.
1987. B.A. Univ of Delaware, Honors Degree, Econ/Political Science.Phi Beta Kappa, magna cum laude.

## ACADEMIC APPOINTMENTS
Professor of Sociology, Immigration Studies and Public Affairs, Marxe School of Public and International Affairs, Baruch College 2009-present
Sociology Department, the Graduate Center, CUNY. September, 2009-present
Ph.D. Program in Social Welfare, Graduate Center, CUNY. 2019-present.
Associate Professor, Baruch College, and Graduate Center, CUNY, September, 2004 to August, 2009.
Assistant Professor, Sociology Department, Barnard College.  July, 1995, to June 2005.

## Faculty Affiliate
CUNY Institute for Demographic Research (CIDR), Marxe School, Baruch College.
Center for Nonprofit Strategy and Management (CNSM). Baruch College, Marxe School.

## ACADEMIC HONORS, FELLOWSHIPS AND GRANTS.

| | |
|---|---|
| 2018-2021 | William T. Grant Foundation. *Effects of Legal Status Change (DACA) on Individuals, within Families, and Across Local Ecosystems. $599,000* |
| 2016-2018 | Russell Sage Foundation. *Long Term Effects of Legal Status and Deferred Action Across Legal Status Categories and Institutional Ecosystems.* $149,000 |
| 2015-2016 | *Mexican Initiative on Deferred Action MIDA.--* Principal Investigator, Lead and Coordinator. Service/research   will legalize 1000+ persons, and study service delivery and effects of legal status. US$1.25 million (Mexican Consulate, Institute for Mexicans Abroad; Juntos Podemos Foundation). |
| 2015 | Sociological Research Association (inducted) |
| 2015 | Universidad de Deusto, Bilbao, Spain. Erasmus Mundus Fellow, Program in International Migration and Social Cohesion.  May/June 2015. |
| 2013 | Max Planck Institute for the Study of Religion and Ethnicity,  Gottingen, Germany . Fellow, December. |
| 2011-2013 | CIDE (Centro de Investigacion y Docenia Economica), Mexico City.  "How to Talk to Mexican Migrants About Seguro Popular." $80,000. |
| 2011-2013 | CIDE, Mexico City.  "How Much Do Mexican Migrants in New York Know about Seguro Popular?"  $200,000. |
| 2011-2012 | CUNY Collaborative Incentive Research Grant, "Contested Immigrant Incorporation and American Institutions:  Race, ethnicity and immigration, and the violation and enforcement of Voting Rights."(with Andy Beveridge)" *$25,000.* |
| 2010-2012 | National Science Foundation, Sociology Program.  "Strengthening Qualitative Research: Assimilation and the Transition to Early Adulthood for Mexican Americans."  $93,000. |
| 2009-2010 | John Simon Guggenheim Foundation Fellow. |
| 2007-2008 | Russell Sage Foundation, Visiting Scholar.   "Early Adulthood and Assimilation of Children of Immigrants." |

June 2019

| | |
|---|---|
| 2005-2010 | William T. Grant Foundation. "Early Adulthood and Assimilation of Children of Immigrants." . Principal Investigator. supplement, 2008-2010. $225,000. |
| 2008-09 | PSC-CUNY. Research Grant. "Undocumented Students and Higher Education." Principal Investigator. $3500. |
| 2007—2008 | PSC-CUNY. Research Grant. "The Social Construction of Developmental Contexts" Principal Investigator. $3500. |
| 2005-06 | PSC-CUNY Research Grant. "Moral Narratives, Adolescence and Mobility in the second generation." Principal Investigator. $3500. |
| 2005-06 | Carnegie Foundation. "Transnational and Local Dimensions of Immigrant Political Mobilization: Mexican, Pakistani and Liberian Experiences in New York." Co-Principal Investigator (with John Mollenkopf, Marilyn Gittell, Thomas Weiss) $25,000. |
| 2006. | CUNY Diversity Grant. "Undocumented Immigrants and CUNY." Principal Investigator. $3000. |
| 1998-2000. | "Gender, race and ethnicity and social organization: determinants of second generation Mexican American educational and work mobility in New York City." National Science Foundation, Social, Behavioral and Economic Research Directorate. Principal Investigator. 2000-2002. Supplement. $133,000. |
| 1999-2000. | "Gendered ethnicity at three strategic sites: Explaining variation in second generation Mexican American men and women's work and school mobility." Social Science Research Council, Program in International Migration, Post-doctoral Fellowship. $20,000. |
| 1999-2000. | Writing Grant for, *Mexican New York: Transnational Worlds of New Immigrants,* from Oral History Research Program, Post-Doctoral Fellowship, Rockefeller Foundation. |
| 1999-2001. | "Gendered ethnicity at three strategic sites: Explaining variation in second generation Mexican American men and women's work and school mobility." National Academy of Education/Spencer Postdoctoral Fellowship. $45,000. |

## OTHER PROFESSIONAL OR CAREER AWARDS.
*Non-Academic/Community Awards.*
2008 Youth Advocate of the Year, Associacion Tepeyac. New York.
2014 Citation by New York City Public Advocate Leticia James for Masa, as Masa Board Chair, with Masa Executive Director Aracelis Lucero.
2019 Migrant and Seasonal Headstart, Spring.
2019 Baruch College Alumni Association Professor Service Award

## SCHOLARLY WORK UNDER CONTRACT, IN DEVELOPMENT OR UNDER REVIEW.
## Books.
*Horatio Alger Lives in Brooklyn, But Check His Papers: Mexican Americans Coming of Age in New York.* Drafted, under contract, University of California Press.

*This Is Still America! Immigration and Contested Immigrant Political Incorporation.* (research done)

*How Governments and Institutions Should Communicate with Immigrants: Lessons from Seguro Popular Healthcare Proeject.* by Robert Courtney Smith, Principal Investigator, Don Waisanen, Guillermo Yrizar Barbosa. (forthcoming, Routledge).

June 2019

## Articles.

2019    Hawthorne Effects in Ethnography: Epistemology, Ethics and Scientific Validity (drafted)

2018    Policy Cracks and Organizational Bridges in Promoting DACA: The Collaborative University-Immigrant Organization-Consular Approach in the Mexican Initiative on Deferred Action (MIDA) in New York State. (by R. Smith, G.Yrizar, and MIDA Team; (drafted).

2018    In the Emergency Room with Erving Goffman and Oliver Sacks: Analytic Autoethnography of Familial and Institutional Social Identity Construction of an Alzheimer's Patient (drafted).

## PUBLICATIONS AND PRIZES (previously published)

### Books

2006.  Smith, Robert Courtney.   *Mexican New York: Transnational Lives of New Immigrants.* University of California Press.
*WINNER of the 2006 W.I. Thomas and Florian Zaniecki Award of the International Migration Section of the American Sociological Association for best book on migration; 2007 Robert Park Award of the Community and Urban Sociology Section of the American Sociological Association for the best book on community and urban sociology; 2007 Baruch College Presidential Excellence Award for Distinguished Scholarship; Co-WINNER 2008 Best Book Award of the Latino/a Section of the American Sociological Association; 2008 Distinguished Book Award from the American Sociological Association.*

### Journal Articles

2017    "Don't Let the Illegals Vote! The Myths of Voter Fraud and Illegal Latino Voters. *Russell Sage Foundation Journal* Special Issue on *Undocumented Immigration.*

2016    What's A Life Worth? Ethnographic Counterfactual Analysis, Undocumented Status and Sociological Autopsy in a Wrongful Death Lawsuit. *Ethnography.*  Spring.

2014.  Black Mexicans, Conjunctural Ethnicity and Operating Identities: Long Term Ethnographic Analysis.  April. *American Sociological Review.*
*WINNER – 2015 Louis Wirth Best Article Award,* International Migration Section of the American Sociological Association; *Honorable Mention,* Latino/a Sociology Section, ASA.

2008.  Smith, Robert Courtney. Horatio Alger Lives in Brooklyn: Extra-family Support, Intra-Family Dynamics, and Socially Neutral Operating Identities in Exceptional Mobility Among Children of Mexican Immigrants. *Annals of the American Academy of Political and Social Science.*

2008.  Smith, Robert Courtney. Horatio Alger Lives in Brooklyn: Extra-family Support, Intra-Family Dynamics, and Socially Neutral Operating Identities in Exceptional Mobility Among Children of Mexican Immigrants. *Annals of the American Academy of Political and Social Science.* November.

2008.  Smith, Robert C. "Contradictions of Diasporic Institutionalization: The 2006 Mexican Migrant Vote and Other Forms of Inclusion and Control." May.  *Racial and Ethnic Studies.*
*Reprinted in:*  2009. Jean-Michel LeFleur, editors.  *The Transnational Political Participation of Immigrants: A Transatlantic Perspective.*  London: Routledge.

2003.  Smith, Robert C. "Migrant Membership as an Instituted Process: Migration, the State and the Extra-Territorial Conduct of Mexican Politics." *International Migration Review.*  Summer. 37 (2): 297-343.
*Reprinted in:*  2005. *International Migration and the Globalization of Domestic Politics*, edited by Reynold Koslowski.  New York and London: Routledge.

June 2019

2003.   Smith, Robert C. 2003. "Diasporic Memberships in Historical Perspective: Comparative Insights from the Mexican and Italian Cases". *International Migration Review*. Fall. 37 (3): 722-757.

2000.   Smith, Robert C. 2000. "How Durable and New is Transnational Life? Historical Retrieval through Local Comparison." *Diaspora*. 9 (2): 203 235.
*Reprinted, in shortened form*: 2001. "Local Level Transnational Life in Rattvik, Sweden and Ticuani, Mexico: An Essay in Historical Retrieval" in *New Transnational Social Spaces*, edited by L. Pries, 37-59. New York: Routledge.

1998.   Smith, Robert C. 1998.   "Transnational Localities: Technology, Community the Politics of Membership within the Context of Mexico-US Migration" *Journal of Urban and Comparative Research*. 6: 196-241. Edited by Michael Peter Smith and Luis Guarnizo. New Brunswick, NJ: Transaction Publishers.
*Translation and Reprint*: 2001. "Los Ausentes Siempre Presentes: Tecnologia, Comunidad, y la Politica de Miembresia en el contexto de la migracion Mexicana hacia Estados Unidos." In *Las Disputas por el Mexico Rural*, edited by Sergio Zendejas y Pieter Vandergeest, Zamora, Michoacan: El Colegio de Michoacan.
*Reprint*: 1998."Transnational Localities: Community, Technology and the Politics of Membership Within the Context of Mexico-U.S. Migration," in *Encuentros Antropológicos: Power, Identity and Mobility*,   edited by Valentina Napolitano and Xóchitl Leyva Solano. London: Institute of Latin American Studies.

## Book Chapters

2017   Cuatro reflexiones en las limitaciones diarias y las posibilidades reales y practicas de la vida transnacional y la globalizacion. (Four reflections on the daily limitations and real and practical possibilities of transnational life and globalization).   In *Intersecciones urbanas : Ciudad transnacional / Ciudad global*.   Federico Besserer, editor. México : Universidad Autónoma Metropolitana-Unidad Iztapalapa  y Juan Pablos.

2017   Smith, Robert Courtney. Mexicans in New York at a Crossroads in the Second Decade of the New Millenium. In *Latinos in New York: Communities in Transition* .Second Edition. edited by Angelo Falcon, Sherri Baver and Gabriel Haslip-Viera.

2013   Smith, Robert C. Mexicans: Civic Engagement, Education, and Progress Achieved and Inhibited. In Nancy Foner, Editor. *New Immigrants in New York*. Second Edition. New York: Columbia University Press.

2010.   Smith, Robert C. Increasing Concrete Knowledge and Community Capacity: How CUNY and other Institutions Can Help Reshape Mexican Educational Futures in New York. In *Helping Young Refugees and Immigrants Succeed*. Palgrave MacMillan.

2008.   Smith, Robert C.   "Latino Incorporation into the United States: Local and Transnational Perspectives." In Havidan Rodriguez, Rogelio Saenz and Cecilia Menjivar, editors, *Sourcebook on Latino/as in the U.S.* Springer.

2005.   Smith, Robert C. "Racialization and Mexicans in New York City." In *New Destinations for Mexican Migration,* edited by Ruben Hernandez Leon and Victor Zuniga. New York: Russell Sage Foundation.

## Proceedings, Government Reports, Commissioned Studies and Affidavits.

2016   Executive Summary and Overall First Report, Mexican Initiative on Deferred Action. Report to Instituto de Mexicanos en el Exterior (IME)

2012.   Smith, Robert C, Don Waisanen, Guillermo Yrizar, Aracelis Lucero, Manuel Castro. How to

June, 2019

Talk to Migrants About Seguro Popular. CIDE (Centro de Investigacion y Docenia Economica), Mexico City, Mexico.

2012 Smith, Robert C. and Seguro Popular Research Team. Estudio del Nivel de Informacion Sobre El Seguro Popular Con Que Cuenta La Poblacion Migrante Mexicana de la Ciudad de Nueva York, EE.UU. Contract report for CIDE (Centro de Investigacion y Docenia Economica), Mexico City

2012 Report on Long Term Prospects and Future Family Service Needs of Decedent X.

2011 Separate and Unequal: A History of Segregation and Discrimination on Long Island and in Nassau County, and African American and Latino "Communities of Interest". Affidavit for Boone v. Nassau County Legislature et al; Voting Rights Act lawsuit.

2007 US. v Village of Port Chester. Second Declaration of Robert Courtney. Smith. Affidavit . Analyzes racial dynamics in interaction in second town hearing on Voting Rights Act case.

2006. US v. Village of Port Chester. Declaration of Robert Courtney. Smith. Affidavit analyzing history of discrimination and racial and ethnic dynamics in voting and politics in Port Chester.

1996 Smith, Robert C. "Counting Migrant Farmworkers: Causes of the Undercount of Farmworkers in the Northeastern United States in the 1990 Census, and Strategies to Increase Coverage for Census 2000." *Final Report* to the Center for Survey Methods and Research, Statistical Research Division, Bureau of the Census, Washington DC.

### *Public Sociology Pieces*

2019 Want to Help Children? Let Undocumented Parents Drive. *New York Daily News*. 6-10-19.

2013 Smith, Robert Courtney. We Need to End Our Natural Experiment with Undocumented Children. Op-Ed *National Journal*. first posted 2-4-13.

2013 We Need to End Our Natural Experiment with Undocumented Children. Op-Ed *National Journal*. first posted 2-4-13. tp://www.nationaljournal.com/thenextamerica/immigration/opinion-we-need-to-end-our-natural-experiment-with-undocumented-children-20130204

2013. Impact of Immigration: 3 Points by Sociology Professor Robert C. Smith. National Journal. Feb 1 http://www.nationaljournal.com/thenextamerica/immigration/impact-of-immigration-3-_points-by-sociology-professor-robert-c-smith-20130201

2010. Smith, Robert Courtney. Jeffersonian Science, Public Sociology, and Academic Careers: Some Insights and Suggestions for Potential Future Social Scientists. In *Sociologists in Action*. edited by Kathleen Korgan, Jonathan White, Shelley White. Pine Forge Press.

2009 Urgente Legalizar Aquellos que vinieron siendo ninos: El Dream Act puede ser parte de la solucion. (It's Urgent to Legalize Migrants Who Came as Children: Dream Act Could Be Part of a Solution) Op-Ed in *La Voz de Mexico*, a Mexican newspaper in New York. 9-09.

2009. Smith, Robert C. "Mexicans in New York." Encyclopedia of New York. edited by Kenneth Jackson. New Haven: Yale University Press.

## UNIVERSITY, COLLEGE, AND DEPARTMENTAL AND SERVICE. (selected, recent)
*2004-2015 BARUCH COLLEGE, CUNY.*
### Committee Work and College/ University Service.
Board Member (elected, also listed under community service) CUNY Mexican Institute 2012-present.
Lang Selection Committee, 2017, 2019.
Search Committee, Western Hemisphere Chair, MSPIA, 2017.
Promotion and Budget Committee, School of Public Affairs. 2008-2012; 2014-present.
Diversity Committee, Baruch College, 2016-2019.
Executive Committee, Baruch College, 2016-present.

June, 2019

Admissions Committee, School of Public Affairs, 2009-2013.
Admissions Committee, Graduate Center, Sociology Department, 2009-2011; 2017-2018.
Search Committee, Communications 2009-2010.
CUNY Chancellors Commission on Mexicans and Mexican Americans and Higher Education. 2004-2012.

**Institutional Programs/Reports/Major Proposals (Selected).**
2007-present. *Lead Faculty, Mexican Consulate Leadership Program, School of Public Affairs.*

2006.   "CUNY, Mexican Immigrants and Legal Status" Report to the CUNY Diversity Projects
        Development Fund, University Affirmative Action Committee. August 24.

**Courses taught.**
Immigration and American Institutions;   The Peopling of New York (Honors Research Course);
Qualitative Studies of Community; Introduction to Public Administration; Capstone (thesis course);
Ethnography and Related Methods; Poverty and Public Policy; Research Methods; Sociology of
Immigration, Citizenship and Undocumented Status; The Second Generation.

*Doctoral Students (only CUNY reported).*
Principal Sponsor, CUNY.
Stephen Ruszczyk, CUNY Graduate Center, Sociology (defended, 2015)
Allison Goodman, CUNY Graduate Center, Sociology (defended, 2013).
Pamela Izvanariu, CUNY, Graduate Center, Sociology
Guillermo Yrizar, CUNY Graduate Center, Sociology.
Hiroyuki Shibata, CUNY Graduate Center, Sociology.
Isabel Gil E. CUNY Graduate Center, Sociology.

**COMMUNITY RELATED PROFESSIONAL SERVICE (selected)**
2012-present.   Board member (elected, advisory). CUNY Mexican Studies Institute.
2013     IME Becas Selection Committee, CUNY Mexican Studies Institute.
2013-2015 New York Immigration Coalition (NYIC) Working Group on Implementation of DACA
         (Deferred Action for Childhood Arrivals)
2012     Dream Fellowship, New York Immigration Coalition.  Selection Committee.
2000.    "Mexico's Relations with its diaspora in the United States: Past Errors, Future Potentials." Day
         long seminar in Mexico City with Transition Team of President-elect of Mexico, Vicente Fox.

**SERVICE TO THE PROFESSION (Sociology, selected)**
2016 Chair of Louis Wirth Award Committee, International Migration Section, ASA.
2011-2013 Member, Award for Public Understanding of Sociology. ASA.
2013 Chair, Public Sociology Award, International Migration Section, ASA.
2012-15 ADVANCE Mentor (Prof. Nadia Flores).
2011 Chair, Robert Park Book Award Committee, ASA.
2009     Chair, Latino/a Section Best Book Award Committee.
2008-2011 Member, International Migration Council, ASA; proposer of public sociology award.
2007     Chair, Thomas and Zaniecki Award Committee, International Migration Section, ASA.
2004.    Social Science Research Council.  Summer Institute on Migration.  Institute Faculty Member.

June, 2019

2003-2005. National Science Foundation. Panelist, Review Panel, Sociology, Grants to Improve Doctoral Dissertation Research.

2003.    "Workshop on Scientific Foundations of Qualitative Research" National Science Foundation. Conference to orient its initiative on qualitative research. July.

1998-present. Associate Editor. *Global Networks: A Journal of Transnational Research.*

## NONPROFIT WORK AND LEADERSHIP (Selected)

2012-present -- Board Chair, Masa -- Masa partners with Mexican and Latino children, youth, and families in the South Bronx to develop strong learners and leaders who fully participate in and contribute to the larger community. (*masany.org*)

1998-2012. Co-Founder and Board Member -- Mexican Educational Foundation, which merged with Masa in 2009 (officially Masa-MexEd, dba Masa). Programs for after school homework help; ESL for parents;  high school mentorship program; college readiness and application; others.

## EXPERT WITNESS Consulting (inclusive last five years, and selected cases from before)

2006-07 United States Department of Justice, Expert Witness and Consultant, U.S. v. Port Chester. testified in federal court in Voting Rights Act trial.

2011. Boone v. Nassau County Legislature et al;  2011.  Affadavit written, not deposed.

2014. Douglas Morales v Cliffside Park School District -- affidavit written; deposed.

2015-2019 (last 5 years) Deportation (Cancelation of Removal) Cases -- Pedro Salazar, Ciriano Garcia Mejia, Cristian Gutierrez, Alejandro Hidalgo Polo.

## RECENT CONFERENCE PRESENTATIONS (Selected).

2019    The Hawthorne Effect in Ethnography . August. American Sociological Association.

2018    Three Methods of Analysis in a Longitudinal Ethnographic Project.  University of Chicago, Population Research Center.

2017    American Sociological Association.  Invited Paper on Culture and Immigration. Conjunctural Ethnicity and Contexts Across the Life Course. Montreal. August.

2017    CUNY- El Colegio de Mexico Conference, "Una Introducion a la dinamica demografica y las politicas migratorias en America del Norte y el triangulo septentrional de Centroamerica: Recorrido academico y cultural." January.

2017    El Colegio de Mexico, Humbolt Chair Conference. "Workshop on longitudinal approaches in migration studies, focusing on regions of arrival". April. Plenary Session Anchor. Two Logics and Three Methods of Analysis in a Longitudinal Ethnographic Project.

2016    University of Puebla Benemerita, International Conference on InterCultural Education. Keynote Address on Migration, Integration and Legal Status in the US.  November.

2016.   ARC Fellow: "Don't Let the Illegals Vote!": Myths of Voter Fraud and Illegal Latino Voters. CUNY Grad Center.

2015    Keynote Address.  Conference on Migration, Development and Policy.  Universidad de Tlaxcala, Tlaxcala, Mexico.

2014.   Keynote Address.   Robert C. Smith International Conference on Migration. Benemerita Autonomous University of Puebla (BUAP). Puebla. MEXICO.
Invited Session: "Invisible Work and Undocumented Immigrants -- A Conversation with Roberto Gonzales and Robert Smith." Eastern Sociological Society Meetings. Baltimore.

2013    Fellow Presentation. "New Methods for Cased Data Based Analysis in Longitudinal Fieldwork on Children of Immigrants." Max Planck Institute, Center for Study of Religion and Ethnicity,

June, 2019

Gottingen, GERMANY. December 12, 2013.

2013   Plenary Session.   "Diaporic Bureaucracies and other Institutions of and Limitations on Transnational Life: Some Caveats for Theorizing".   presented at "Transnacionalidad y la Ciudad",   Conference celebrating the 20th Anniversary of   the Doctoral Program in Anthropology, Autonomous Metropolitan University, Iztapalapa, Mexico City, MEXICO. Nov 18-19.

# DEF-INTERV.
# EX. 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

## DECLARATION OF ROBERTO G. GONZALES, PH.D.

I, Roberto G. Gonzales, declare:

1.     I am a Professor of Education with tenure at Harvard University. I teach in the Harvard Graduate School of Education, which was ranked by the U.S. News & World Report as the number one school of education nationally. I write this declaration in support of Defendant Intervenors in Texas v. U.S., 1:18-CV-68 (SDTX), a challenge to the Deferred Action for Childhood Arrivals program, commonly known as DACA.

2.     This declaration is based on my knowledge, education, training and my extensive research on immigrant incorporation, as well as facts that I have personally observed or been made aware of. I have written two peer-reviewed books and have authored several peer-reviewed journal articles, book chapters, and reports on this subject. I have studied undocumented immigrant youth and young adults for more than fifteen years. In fact, my research, including a twelve-year longitudinal study in Los Angeles and a six-year national study on the effects of

DACA, includes the most comprehensive studies on this population.  I received a Ph.D. in sociology in 2008. I have held tenure track academic appointments at the University of Washington and the University of Chicago. I have attached a true and complete copy of my curriculum vitae to this Declaration.  The compensation I am paid for testimony in this case is $200 per hour.  In the past four years, I have not testified as an expert in trial or by deposition.

      3. When DACA was created in 2012, I launched a national research project to study the program's effects on its recipients.  In 2013, sixteen months after the program's implementation, my team at Harvard surveyed 2,684 DACA eligible young adults; of those, 2,381 had obtained DACA by the time of the survey. We recruited respondents through a range of local and national organizations, consular offices, college and university campuses, GED programs, and community-based organizations. Because we were interested in understanding how a range of the DACA-eligible population was accessing this new status, we purposely drew our sample so as to include roughly one-third respondents with a high school diploma or less, one-third with some college experience, and one-third with a college degree (Associate's degree or higher). It is difficult to obtain survey data from undocumented populations because they comprise a fairly small proportion of the U.S. population, and because of their legal vulnerability and their low-income background (Bloch, 2006). Surveying them through random dialing methods, respondent driven sampling, or other types of probability sampling can be quite costly, and sometimes cost-prohibitive, especially on a national scale. We therefore relied on a sample drawn through a web survey and a multistage recruitment process—including "gateway" organizations (immigrant service agencies, law offices, churches, schools, universities, and local and national undocumented young adult organizations), snowball sampling, and targeted efforts to find harder-to-reach individuals to learn about the short-term benefits of DACA on the lives of some

recipients.

Following up on our survey, in 2015 and 2016, we carried out face-to-face interviews with 481 DACA recipients in Arizona, California, Georgia, New York, Illinois, and South Carolina. All respondents arrived to the United States before the age of 15 and had at least one undocumented parent. Most arrived from Mexico (78%), whereas others arrived from countries in Central and South America, Asia, Africa, the Caribbean, and Europe, and nearly two-thirds are women. We drew our sample based on the following characteristics: 1) We selected only respondents who met the DACA eligibility criteria; and 2) We drew our sample to reflect a diverse cross-section of educational experiences.

Interviews with DACA beneficiaries covered a broad range of topics, including experiences growing up in the United States, K-12 education and beyond, work history, health and well-being, and the impact of DACA. In particular, DACA's impact on participants' lives constituted the major focus of our analyses. Interviews were coded by our research team at Harvard University. Through in-person meetings, the research assistants generated a code book reflecting the topics covered in the interviews, such as "applying to DACA" and "academic support." From this initial coding, we examined the data coded under "Effects of DACA" for all of the interviews. We then conducted thematic analyses, first to organize our data and then to identify general patterns in our participants' experiences with DACA. This generated a new list of "DACA effects." Taken together, our analyses helped us identify central themes in how DACA beneficiaries reflected on the impact of their new status on their lives.

## Life Before DACA

4.     My research into undocumented immigrants long predates DACA—extending back 15 years.  From 2002 to 2015, I followed 150 undocumented young adults in Los Angeles, examining the ways they responded to adolescent and adult transitions and an accompanying shrinking of rights.[1]  Comparing the experiences of a group of college-goers with a group of

---

[1] I highlight their stories in my book, Lives in Limbo: Undocumented and Coming of Age in America (2016). Lives

young people who discontinued their schooling at or before high school graduation, I found that over time even those who had attained advanced degrees shared similar work and life outcomes with their less-educated peers.  That is, once they finished their academic programs, their options for employment were similar to those of their  lesser achieving counterparts who had not finished high school—college graduates had little choice but  to enter into the informal, low-wage labor market.

5.      My research into the adolescent and adult transitions of undocumented immigrant young people shows how they undergo unique developmental trajectories during adolescence that compare negatively to their American born and citizen peers.[2]  I conceptualize this process as a *transition to illegality*.

6.      Undocumented young adults cannot legally work, vote, receive financial aid, or drive in most states, and deportation remains a constant threat.  Unauthorized residency status thus has little direct impact on most aspects of childhood but is a defining feature of late adolescence and adulthood.  As such, the life course trajectories of undocumented immigrant young people look markedly different than those of their American-born and citizen peers.

7.      Due to their constitutional access to K-12 education, undocumented children grow up to a large extent protected from the limits of their immigration status, as they attend public schools and develop their identities alongside U.S.-born and citizen peers.  Childhood thus constitutes a period of integration for undocumented children, as their school experiences allow

in Limbo has won six major awards, including the Society for the Study of Social Problems C. Wright Mills Award, the Law and Society Association Herbert Jacob Book Award, the American Education Research Association Outstanding Book Award, and the Society for Social Work and Research Book Award.

[2] Jeffrey Jensen Arnett, *Emerging Adulthood: A Theory of Development from the Late Teens through the Twenties*, 55 AMERICAN PSYCHOLOGIST 469 (2000).

them to develop feelings of belonging to the United States as well as expectations and life aspirations rooted in American culture.

8.      It is not until adolescence that undocumented youth begin to directly confront the social implications of their undocumented status, at which point they enter a critical developmental period of discovery.  Although some undocumented youth are cognizant of their immigration status before their teenage years, being undocumented only becomes salient when matched with experiences of exclusion.  At the time when they begin to require state identifications for driving, working, and travelling, undocumented youth come to realize how lacking legal status will thwart them from developing their desired adult lives.  Characterized by confusion, frustration, and vulnerability, this critical developmental period comprises a major "turning point" in the lives of undocumented youth, producing a jolting shift in their self-perceptions and pressing them to make their transitions into adulthood within same social confines as their undocumented parents.

9.      For many undocumented youth, knowledge about their immigration status depresses their motivations and renders pursuing educational trajectories both financially unrealistic and meaningless.[3]  Unable to access federal financial aid makes it impossible for most undocumented youth to finance their higher education.

10.     Further, just as they experience a shrinking of access, their familial and financial responsibilities increase, pressing them to find work in the underground economy and help

---

[3] Leisy J. Abrego, *Legitimacy, Social Identity, and the Mobilization of Law: The Effects of Assembly Bill 540 on Undocumented Students in California*, LAW & SOCIAL INQUIRY 33(3) (2009); Leisy J. Abrego, *I Can't Go to College Because I Don't Have Papers: Incorporation Patterns of Undocumented Latino Youth*, 4 LATINO STUDIES 212-231 (2006); Roberto G. Gonzales, *On the Wrong Side of the Tracks: The Consequences of School Stratification Systems for Unauthorized Mexican Students*, 85 PEABODY JOURNAL OF EDUCATION 469 (2010); Carola Suárez-Orozco, Marcelo M. Suárez-Orozco, and Irina Todarova, LEARNING IN A NEW LAND: IMMIGRANT STUDENTS IN AMERICAN SOCIETY (2008).

support their families.  A small minority of undocumented youth are able to enroll in

postsecondary institutions due in large part to other external factors such as consistent support

from educators, counselors, parents, and other mentors—all of whom contribute to instilling in

youth optimistic outlooks and work ethics to pursue their dreams.  This, however, is not the

norm.

11.     Ultimately, the transition to "illegality" for undocumented youth involves a

gradual, adaptive process that wears them down and leaves them precarious in uncertain legal

conditions.  Without work authorization or financial aid to pursue their educational goals,

undocumented youth are pressed to relinquish their aspirations to accept poorly paid and often

physically demanding work with other undocumented workers in the underground economy.

12.     Further, having to lead adult lives without work authorization or driver's licenses

not only increases their risk of police encounters and deportation, but undermines their moral

standing, diminishing their feelings of self-worth and belonging to mainstream society.[4]  In

response, undocumented youth learn to avoid immigration authorities, abide closely to traffic

laws, and constantly look over their shoulders for police.

13.     Further, they grow vigilant toward strangers, avoid potentially threatening

situations, and learn to conceal their immigration status to strangers, authorities, employers, and

even friends and romantic partners.  Over time these conditions take their toll on young

immigrants' minds and bodies, leaving them physically fatigued, emotionally drained, and

feeling increasingly hopeless about their future possibilities.  The young people I met described

---

[4] Hirokazu Yoshikawa, Carola Suárez-Orozco, and Roberto G. Gonzales, *Unauthorized status and youth development in the United States: Consensus statement of the society for research on adolescence*, 27 JOURNAL OF RESEARCH ON ADOLESCENCE 4-19 (2017); Carola Suárez-Orozco, Hirokazu Yoshikawa, Robert Teranishi, and Marcelo Suárez-Orozco, *Growing Up in the Shadows: The Developmental Implications of Unauthorized Status*, 81 HARVARD EDUC. REV. 438-473 (2011).

physical and emotional manifestations of stress: chronic headaches, toothaches, ulcers, difficulty sleeping problems, eating disorders, and thoughts of suicide.

14.     Further, as they associate themselves with other low-skilled and undocumented migrant laborers, they adopt similar lifestyles and perspectives, gradually assuming roles as undocumented immigrants who must live in fear, with minimal prospects, and limited rights.  By their late twenties, undocumented young people complete their transition to "illegality," finding themselves in stagnated and uncertain situations.  Accordingly, the transition to "illegality" involves a process that leaves them emotionally worn down and feeling hopeless about their futures.

15.     Those who make it to postsecondary education are able to minimize and delay some of these transformations by avoiding low-wage work and remaining in institutional contexts that tend to support their aspirations and educational progress.  However, college goers are not immune to immigration status-related threats, family responsibilities, financial concerns, and fears of deportation.  Accordingly, few are able to avoid low-wage informal work to finance their studies, and many leave school in order to save money for their education.

16.     Even college goers learn to accept that their immigration status—not their dreams—will shape most of their future plans.  Without access to work authorization at the end of their  studies, educated undocumented young persons face the same limited range of low-wage job opportunities  as other undocumented immigrants, arriving even less prepared and more vulnerable than their peers  who dropped out of school before them.

17.     Undocumented young people grow up in communities around the country and attend school alongside American-born and citizen peers.  But as friends are obtaining driver's licenses, taking after-school jobs, and thinking about college, their immigration status prohibits

7

them from accessing important rites of passage. For many, these barriers are debilitating. And, over the years, their levels of stress and anxiety grow. Excluded from financial aid for college and unable to secure the kinds of jobs their American born and citizen peers were taking, my respondents had no choice but to exist as second-class members of our society, living in fear in a shadow economy.

### The Benefits of DACA

18.     But things changed for many young people in 2012 when DACA was created. In five years, DACA has provided its recipients opportunities to access broader forms of adult life and to benefit from their investments in education. It has also allowed them important opportunities to contribute to their families, communities, and the United States economy. DACA recipients have made enormous gains. They have experienced social mobility. They have increased their educational attainment. They have experienced improved mental health. And they have a greater sense of belonging. None of these gains are trivial. DACA has provided its recipients access to the American Dream and new forms of social mobility. They now lead everyday lives with much more breathing room and without fear of deportation.

19.     My team at Harvard surveyed 2,684 DACA eligible young adults in 2013, sixteen months after DACA was created. Of those, 2,381 had obtained DACA by the time of the survey.

20.     Just sixteen months into the program, 59 percent of respondents had obtained a new job, and a significant portion (45 percent) had increased their job earnings. Just over one fifth of survey respondents had obtained a paid internship, which likely provided valuable career training not typically available in jobs for young adults with limited employment histories. In addition, DACA recipients began building credit.[5] Almost one-half of survey respondents opened up their

---

[5] Although undocumented immigrants are not necessarily prohibited from possessing a bank account, the receipt of a Social Security number through DACA allows young people to overcome bureaucratic hurdles and sometimes

first bank account after receiving DACA. And roughly one-third of our respondents had acquired their first credit card. Close to 60 percent of our respondents had obtained a driver's license. And, twenty-one percent of those we surveyed had acquired health care after receiving DACA, perhaps due to new education- or employment-based plans or to greater facility in providing documentation to clinics and hospitals.

21.    Particularly impressive, our survey pointed to DACA's strong impact on recipients finding new opportunities in education and employment. Though having DACA benefited all recipients, the effects were especially pronounced for DACA recipients attending higher education and those with higher education degrees, who have been able to match their educational attainment and degrees with high skilled jobs. Respondents who attended community and four-year colleges were more likely than their peers with no college experience to obtain a new job and increase their earnings.

22.    Aiding in their success, DACA college graduates had multiple mentors in high school, they were active in clubs and in leadership roles in school, they were involved in their communities, and they were connected to organizations. As a result, these young people likely possessed the social networks and information that allowed them to maximize DACA's benefits to access job-related opportunities.

23.    We found that the improved earnings of DACA recipients were helping them to access higher education.[6] While DACA does not remove restrictions from federal financial aid, DACA holders were better able to earn and save money for college tuition, related fees, and

---

awkward or uncomfortable situations when trying to open a bank account. Similar hindrances apply to obtaining a credit card.

[6] Roberto G. Gonzales, Benjamin Roth, Kristina Brant, Jaein Lee, and Carolina Valdivia, *DACA at Year Three: Challenges and Opportunities in Assessing Education and Employment, New Evidence from the UnDACAmented Research Project*, AMERICAN IMMIGRATION COUNCIL (Feb. 2016) http://immigrationpolicy.org/sites/default/files/docs/daca_at_year_three.pdf.

books.  What's more, while DACA recipients continued to provide financial support to their parents, their increased earnings through DACA allowed them greater flexibility to pay for college.  We also found that more modestly educated DACA recipients were successful in finding trade schools and occupational certificate programs.

24.     Following up on our survey, we were interested in how DACA recipients were experiencing their status.  So, in 2015 and 2016, we carried out face-to-face interviews with 481 DACA recipients in Arizona, California, Georgia, New York, Illinois, and South Carolina.  This carefully drawn sample provides a unique opportunity to understand how DACA is affecting the educational trajectories of a wide range of young adult immigrants.[7]  The evidence we gained from the survey provided a detailed picture of how DACA was working for a diverse cross-section of young people.

25.     Take Miguel[8], from El Monte, California.  Miguel graduated from his high school in 2011, and started taking classes at a local community college.  DACA was initiated during Miguel's first year of college, and provided him a significant financial boost that allowed him to persist in his schooling.  With a work permit, he started working at a print shop and was able to enroll as a full-time student.  Having a driver's license also made life much easier for Miguel.  In many parts of California, one could easily spend two or more hours a day on the bus.  After

---

[7]  We used purposive sampling methods to generate a sample of DACA recipients exhibiting a range of educational experiences. Based on the DACA requirements for eligibility, the participants screened by the authors were under the age of 31 as of June 15, 2012; had arrived in the United States before age 16; had accumulated at least five years of continuous residence in the United States; and had no felony convictions, significant misdemeanors, or more than two other misdemeanors.  Because we were interested in a range of experiences, our sample included those young people who had not yet graduated from or were enrolled in a U.S. high school or the equivalent.  While DACA eligibility is open to minors, this study focuses on young adult DACA recipients. We recruited respondents through national and local organizations and through referrals by those who had taken the survey.  The extensive interview covers several key areas: childhood and early years in the United States; migration history;  the impact of DACA; household and neighborhood characteristics; social networks; elementary and secondary education; post-secondary education; work history and finances; civic engagement;  health and emotional well-being; interactions with the justice system; and aspirations for the future.

[8]  To protect our research subjects' confidentiality and to avoid deductive disclosure, we use pseudonyms to conceal real names.  This practice is customary in qualitative research with sensitive populations.

working for a year and establishing credit, Miguel pooled his money together with his father and they opened up a cell phone store in nearby La Puente. Just last year, Miguel started a business as a web designer. He credits DACA for providing opportunities to build a career.

26.     DACA recipients not only have increased access to the very resources that are assisting them to make important educational transitions, they also have a renewed sense of purpose that fueled educational pursuits. Eighteen-year-old Carolina from Chicago told us, "My freshman and sophomore year, I did really bad [in school], mostly because I was just not motivated because all of this is going to be worthless in the end. But then when DACA came out, I started doing a lot better since I was like, 'OK, I actually have a chance.'"

27.     Max from New York put it this way, "I finally feel like I am a part of the U.S., like I'm no longer living in the shadows. I can now work legally. I can now be able to drive legally. When I go to the doctor's, the clinic, it is being paid for through health insurance that I'm eligible for."

28.     And Jenny from Phoenix told us, "I don't know where I would be right now, without DACA. I don't know if I would be going to school. In some ways, I feel like it saved my life."

29.     Perhaps the biggest success of DACA is its positive impact on young people with modest levels of education, those who may have left school at or before their high school graduation.[9] In terms of distance traveled, DACA's biggest success stories come from moderate achievers. Statistically, most undocumented immigrant youth end their schooling before

---

[9] Roberto G. Gonzales, Marco A. Murillo, Cristina Lacomba, Kristina Brant, Martha C. Franco, Jaein Lee, and Deepa S. Vasudevan, *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark*, CENTER FOR AMERICAN PROGRESS (2017), https://www.americanprogress.org/issues/immigration/reports/2017/06/22/434822/taking-giant-leaps-forward/.

entering college.[10] Due to a combination of scarce family resources, exclusion from financial aid at the state and federal levels, and depressed motivations stemming from legal limitations, accessing higher education is prohibitive for many undocumented young people.

30.     But, for the hundreds of thousands of DACA recipients without high school or college degrees, DACA has incentivized young people to return to GED or workforce development programs.  It has also provided important onramps to certificate programs in the trades and in health care.   These DACA recipients received training in industries such as medicine, dentistry, construction, cosmetology, teaching, law, nursing, and insurance.  As a result, DACA recipients have used these opportunities as stepping stones to build careers.

31.     Before DACA, choices were severely restricted to jobs in low-wage sectors. Despite length of time in the United States or level of education completed, they were limited to grueling jobs that did not offer opportunities for job security, safety, or benefits.  But through the work authorization provided by DACA, and the incentives to invest in education, DACA has enabled its recipients to obtain better employment.  In particular, DACA recipients who completed certificate or licensing programs experienced significant growth in salary.  For many (68 percent), hourly salaries increased from $5 to $8 to more than $14 an hour. Most (76 percent) at least doubled their previous salaries, earning between $25,000 and $30,000 per year.

32.     Equally impactful is DACA's positive role in improving the mental health of its recipients.  DACA has led to an overall decrease in stress.  More than two-thirds of recipients told us they were less afraid of law enforcement and of being deported.  Many report feeling less fear around government authorities, with new comfort to call on the police when in need.  In fact,

---

[10]  In fact, more than 40 percent of unauthorized adults ages 18 to 24 do not complete high school, and only 49 percent of unauthorized high school graduates go to college.  *See* Jeffrey Passel, D'Vera Cohn, *A Portrait of Unauthorized Migrants in the United States* (2009), http://www.pewhispanic.org/files/reports/107.pdf.

59 percent of our respondents say they would report a crime now, but would not before. With work authorization documents, DACA recipients are also able to apply for driver's licenses in any state. The ability travel freely and safely to school and work, without always looking over their shoulders, has decreased stressful situations.

### Ending DACA Would Have Disastrous Effects

33.     A repeal of DACA would have disastrous consequences for the young people who have enjoyed increased access over these last five years and who would experience a cruel transition back to a life of blocked access, daily struggles, and stigma.[11] Over the last five years, they have grown into their new status. Access to better employment and increased opportunities for education have allowed them to lead lives with more breathing room. They have purchased cars, moved into better living situations, and have provided better opportunities for their children. If DACA were to end, these benefits would be taken away, and their financial situation would decline significantly. They would be hard pressed to keep up with their car payments, they would likely lose their homes, and they would have to make hard decisions, including whether or not to pull their children from daycare they can no longer afford.

34.     DACA recipients would also return to lives of stigma, fear, and worry. Over time, these processes have grave consequences not only on individuals' mobility trajectories but also on their minds and bodies.[12] They would return to lives on the outside, a fate they would share with many of their parents. Their work options would be limited to unstable, dangerous jobs. They would carry out their day-to-day lives always looking over their shoulders in fear of being apprehended, detained, and deported. And they would likely experience health problems

---

[11] Roberto G. Gonzales, *Learning to be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood*, 76 AMERICAN SOCIOLOGICAL REV. 602-619 (2011).

[12] Roberto G. Gonzales, LIVES IN LIMBO: UNDOCUMENTED AND COMING OF AGE  IN AMERICA (2016).

as a result. Their everyday lives would be narrowly circumscribed by their undocumented status -- punctuated by anxiety, fear, limitation, and dreams not only deferred, but also snatched away from them.

35.     The loss of access to America's polity as well as to their feelings of belonging could have negative consequences on the health and well-being of these young people. This abrupt transition from a protected status with important forms of access to an unprotected reality marked by exclusions from the very mechanisms to ensure their social mobility and well-being is a cruel revocation of their futures and a very difficult pill to swallow.

36.     Without DACA, hundreds of thousands of young people who have been leading productive lives will likely return to the shadows—uninsured, underemployed, and carrying high levels of stress and anxiety. What's more, there is a good possibility that many of these young people will be compelled to leave school. Many will no longer be able to afford postsecondary tuition. And many more will no longer see incentives for investing in school with uncertain payoffs. These realities, marked by feelings of loss, are certain to sow uncertainty and disillusionment.

37.     In addition, a large segment of the DACA eligible population will lack the tools and experience to navigate clandestine lives. Because of its eligibility criteria, DACA has allowed tens of thousands of teenagers the opportunity to obtain DACA while in high school and, as a result, reduce the developmental barriers to adolescent and adult transitions, thus, at least partially, delaying the transition to illegality. If DACA were to end, these youngsters could be the most vulnerable. Because of their access to work authorization and driver's licenses, and reduced fears of deportation, these young people have experienced normal adolescent transitions. As such, DACA has positively shaped their sense of belonging and future outlooks. To have

everything ripped away from them will likely have dire consequences.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 15, 2018, at Cambridge, Massachusetts.

Roberto G. Gonzales, Ph.D.

# DEF-INTERV.
# EX. 10

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

               Plaintiffs,

       v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

               Defendants.

CIVIL ACTION NO. 17-cv-5228

**DECLARATION OF SHOBA
SIVAPRASAD WADHIA**

I, Shoba Sivaprasad Wadhia, declare as follows:

1.      I am presently the Samuel Weiss Faculty Scholar, Clinical Professor of Law and founding director of the Center for Immigrants' Rights Clinic at Penn State Law in University Park. I have been employed by the Pennsylvania State University ("University") since 2008. This declaration was prepared in my individual capacity and does not reflect the views of the University.

2.      In 1999, I received my Juris Doctorate degree from the Georgetown University Law Center. Since that time, I have worked in the immigration field for nearly 20 years in the following settings: private practice, non-profit organizations, and institutions of higher education.

3.      As a practitioner, I have practiced immigration law on behalf of individuals seeking a benefit before the immigration agency as well as those challenging removal or seeking relief from removal before an immigration judge or the appellate agency. In the non-profit sector, I have drafted, reviewed, and analyzed legislative proposals on immigration and convened or participated in meetings with government officials, organizational leaders, and the public on immigration topics.

4.      As an academic researcher, my work focuses on the role of prosecutorial discretion in immigration law and the intersections of race, national security and immigration. In the area of prosecutorial discretion in immigration law, my scholarship has served as a foundation for scholars, advocates, and government officials seeking to understand or design a strong prosecutorial discretion policy. My book, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases,* was published by New York University Press and is the first book on the topic.

5.      I have published more than 30 articles, book chapters, and essays on immigration law, including a number discussing the use of prosecutorial discretion in immigration cases. My work has been published in seventeen law journals, including but not limited to *Emory Law Journal*; *Texas Law Review*; *Columbia Journal of Race and Law*; *Notice & Comment, Yale Journal on Regulation*; *Harvard Latino Law Review*; *Connecticut Public Interest Law Journal*; *Georgetown Immigration Law Journal*; and *Howard Law Journal*. Some of my scholarly works have been cited by federal judges in their opinions and decisions.

6.      I have delivered several academic lectures and papers over the past 15 years on a variety of topics, including the history of prosecutorial discretion in immigration cases.

7.      As an educator, I teach law students in the doctrinal survey course in immigration law and a specialized course in asylum and refugee law. I also supervise students in an in-house law school clinic known as the Center for Immigrants' Rights, which I founded.

8.      Since the Fall 2008 semester, I have supervised more than 75 students on the following types of cases and projects: policy products on behalf of institutional clients, outreach and education with the community and local municipality, and legal support in individual cases.

9.      I currently sit on the Board of Trustees of the American Immigration Council and previously served as a Commissioner on the American Bar Association's Commission on Immigration.

10.     I have received multiple awards and honors, including: Pro Bono Attorney of the Year by the American-Arab Anti-Discrimination Committee in 2003, leadership awards by the Department of Homeland Security's Office of Civil Rights and Civil Liberties and Office of the Inspector General in 2008, recognition as the 2017 Honoree by the National Immigration Project

3

and the award for Excellence in Legal Advocacy by the American-Arab Anti-Discrimination Committee in 2017.

11.     I spent nearly a decade researching the history of prosecutorial discretion in immigration cases, especially its historical use, legal foundation, and litigation challenging the use of such authority, before and while writing my book. The opinions expressed in this declaration are based largely on the research for my book as well as related articles which have been published in law journals.

12.     More information about my experience and qualifications as an expert, a complete list of my publications, and other relevant information is contained in my *curriculum vitae*, which is attached as Exhibit A to this declaration.

### Summary of Expert Opinions

13.     I have been asked for my expert opinion concerning the history and use of prosecutorial discretion, including specifically deferred action, by federal immigration authorities in the United States. I have also been asked for my expert opinion as to how the formation and termination of the Deferred Action for Childhood Arrivals (DACA) compares to prior uses of deferred action. A summary of my conclusions are as follows:

- Prosecutorial discretion is a tool that has been part of the immigration system for as long as the system has operated.

- Deferred action is one form of prosecutorial discretion in immigration law and enjoys a long history.

- The Department of Homeland Security ("DHS") and its predecessor, Immigration and Naturalization Services ("INS"), have applied deferred action and other forms of prosecutorial discretion to groups (while still

4

requiring a case-by-case determination of each individual) based on

factors that are largely consistent with the eligibility criteria utilized for

DACA.

- The method by which DACA has been terminated is inconsistent with

  how deferred action has been used and applied historically.

### Prosecutorial Discretion in Immigration Law

14.     Prosecutorial discretion refers to the choice by the DHS and its predecessor

agencies, including INS, of whether and how to enforce the full scope of immigration law

against a person or group persons if at all.

15.     When an individual enters the country without inspection, overstays a visa, or

engages in conduct that makes her removable, she is subject to removal by DHS. This requires

enforcement action (*i.e.*, prosecution) by DHS to effectuate.

16.     To illustrate, when DHS chooses not to file legally valid immigration charges

against a person who is present in the United States without authorization discretion is being

exercised favorably. In other words, the question of whether to use discretion is raised only

where there is legally sufficient basis to bring immigration enforcement actions in the first place.

17.     There are more than one dozen forms of prosecutorial discretion in federal

immigration law. These forms have been outlined in several guidance documents issued by DHS

and INS, including a memorandum published in 1976 by then-INS General Counsel Sam

Bernsen (the "Bernsen Memo"),[1] a 2000 memorandum published by then-INS Commissioner

---

[1] Memorandum from Sam Bernsen, General Counsel, Immigration and Naturalization Service, Legal Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976), https://www.ice.gov/doclib/foia/prosecutorial-discretion/service-exercise-pd.pdf.

Doris Meissner (the "Meissner Memo"),[2] a 2011 memorandum by then-Immigrations and

Customs Enforcement ("ICE") Commissioner John Morton (the "Morton Memo"),[3] and more

recently by then-DHS Secretary Jeh Johnson (the "Johnson Memo").[4]

  18. The memoranda list at least 15 types of prosecutorial discretion. The most

commonly utilized forms are:

- Deciding whether to issue, serve, file, or cancel a Notice to Appear;

- Deciding whom to stop, question, and arrest;

- Deciding whom to detain or release;

- Deciding whether to settle, dismiss, appeal, or join in a motion on a case; and

- Deciding whether to grant deferred action, parole, or a stay of removal.

  19. Other forms of prosecutorial discretion include the use of "extended voluntary

departure"[5] and "deferred enforcement departure."[6] Formerly called extended voluntary

departure, deferred enforcement departure can be utilized by the President to temporarily

safeguard classes of individuals from removal.[7]

---

[2] Memorandum from Doris Meissner, Commissioner of Immigration and Naturalization Service, on Exercising Prosecutorial Discretion, (Nov. 17, 2000), http://library.niwap.org/wp-content/uploads/2015/IMM-Memo-ProsDiscretion.pdf.

[3] Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, on Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens, (June 17, 2011), http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf.

[4] Memorandum from Jeh Charles Johnson, Secretary of U.S. Department of Homeland Security, on Policies for the Apprehension, Detention and Removal of Undocumented Immigrants, (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

[5] Ira Kurzban, *Kurzban's Immigration Law Sourcebook* 493 (11th ed. 2009).

[6] Shoba S. Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 Connecticut Pub. Int. L. J. 243, n.124 (2009), citing U.S. Citizenship and Immigration Services, Affirmative Asylum Procedures Manual 57 (Nov. 2007).

[7] U.S. Citizenship and Immigration Services, Adjudicator's Field Manual 38.2(a) (2007),

20.     Prosecutorial discretion may be exercised at any stage of the immigration enforcement process including right before an arrest, prior to the filing of charges, and even after a removal order has been entered. As ICE's Principal Legal Advisor, William J. Howard, explained in a 2005 memo, there is a "universe of opportunities" to exercise prosecutorial discretion in federal immigration enforcement.[8]

21.     While there are multiple forms of prosecutorial discretion and stages at which it may be enforced, the outcome in any case is the same: a temporary reprieve from removal proceedings and/or deportation.

22.     The concept behind prosecutorial discretion is entrenched in the prioritization of limited government resources and compassion for individuals without a lawful immigration status who present strong qualities or equities in their cases. When DHS makes the choice to not take enforcement actions against a mother caring for an ill child, for a student affected by a natural disaster back home, or for a Dreamer working and/or finishing school, prosecutorial discretion is being exercised favorably with respect to that individual.

### Legal Basis for Use of Prosecutorial Discretion

23.     Prosecutorial discretion in immigration law has been recognized repeatedly by federal courts and former agency heads.[9] The basis for this discretion is inherent to agency enforcement action as well as statutory authority.

---

https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-16606/0-0-0-16764.html.

[8] Memorandum from William J. Howard, Principal Legal Advisor, U.S. Immigration and Customs Enforcement, on Prosecutorial Discretion (Oct. 24, 2005), http://www.asistahelp.org/documents/resources/DHS_NTA_discretion_7076BC4F57842.pdf; *see also* Shoba S. Wadhia, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases* 27 (2015).

[9] *See, e.g.*, Bernsen Memo, *supra* note 1, at 1-2.

7

24.     Discretion in agency action dates back to the New Deal, with the birth of the modern administrative state.

25.     The Bernsen Memo published in 1976 is one of the first legal opinions issued on the use of prosecutorial discretion in immigration. The Bernsen Memo traces prosecutorial discretion back to common law and cites to the 1868 Confiscation Cases to describe the general authority of the Executive Branch to terminate a case. This same memo cites to a 1934 memo by the Attorney General to highlight the various sources for prosecutorial discretion and its extension to both civil and criminal contexts.

26.     The Bernsen Memo also identifies the Take Care Clause, Article II, Section 3 to the U.S. Constitution, as a source of authority for prosecutorial discretion in immigration matters.

27.     The Meissner Memo builds upon the Bernsen Memo and provides a broad overview regarding the use of prosecutorial discretion, including connections to criminal law. Standards guiding prosecutorial discretion in the criminal context historically have informed the use of such discretion in immigration.

28.     A review of the immigration statute, the Immigration and Nationality Act, also makes clear that Congress authorizes DHS to utilize its discretion. Section 103 delegates the administration and enforcement of immigration law to DHS, 8 U.S.C. § 1103(a)(1), and section 242 prohibits judicial review of three specific acts of prosecutorial discretion (commencement of proceedings, adjudication of cases, and execution of removal orders), *id.* § 1252(g).

29.     The Homeland Security Act delegates the establishment of national immigration enforcement policies and priorities to the DHS Secretary. 6 U.S.C. § 202(5).

30.     The Supreme Court also explicitly recognized the use of discretion in immigration

law. In *Arizona v. United States* 567 U.S. 387 (2012), the Court concluded that several anti-

immigration provisions in an Arizona statute overreached into federal domain over immigration

matters and explained that "a principal feature of the removal system is the broad discretion

exercised by immigration officials" in relation to how "federal officials, as an initial matter, must

decide whether it makes sense to pursue removal at all." *Id.* at 396.

### History of Use of Prosecutorial Discretion

31.     Formal uses of prosecutorial discretion immigration law can be traced back to as

early as September 20, 1909. On that date, the Department of Justice issued a letter concerning

the initiation of proceedings to cancel naturalization.[10]

32.     In individual matters, prosecutorial discretion is exercised routinely, including

whether to arrest, interrogate, file charging documents, or appeal a case. It is exercised at every

stage, including after an order of removal has been obtained. Over time, INS and, then, DHS

have taken greater care to ensure more uniformity in how prosecutorial discretion is exercised.

33.     The Meissner Memo provides a broad overview regarding the use of prosecutorial

discretion, including a list of 13 factors to consider when evaluating the "totality of the

circumstances" of a particular case. These factors include, but are not limited to: (i) immigration

status; (ii) length of residence in the United States, (iii) criminal history, (iv) humanitarian

concerns, and (v) immigration history, (vi) likelihood of ultimately removing the alien, (vii)

likelihood of achieving enforcement goal by other means, (viii) whether the alien is eligible or is

---

[10] Bernsen Memo, *supra* note 1, at 4 (quoting Department of Justice Circular Letter Number 107 (Sep. 20, 1909). ("In the opinion of the department, as a general rule, good cause is not shown for the institution of proceedings to cancel certificates of naturalization alleged to have been fraudulently or illegally procured unless some substantial results are to be achieved thereby in the way of betterment of the citizenship of the country.").

likely to become eligible for other relief, (ix) effect of action on future admissibility, (x) current

or past cooperation with law enforcement authorities, (xi) honorable U.S. military service, (xii)

community attention, and (xiii) resources available to the INS.

34.     In addition to these factors for consideration, the Meissner Memo calls for even-

handed application of discretion: "Service officers are not only authorized by law but expected to

exercise discretion in a judicious manner at all stages of the enforcement process."

35.     The Meissner Memo has been repeatedly reaffirmed in subsequent years, through

both a 2003 memo from INS Associate Commissioner Johnny N. Williams,[11] shortly after DHS

was formed, a 2007 memo from ICE Assistant Secretary Julie Myers,[12] and the 2011 Morton

Memo, which details at least 16 factors for consideration and listing particular care for veterans,

minors, and elderly individuals, among others.[13]

36.     Beyond the application of prosecutorial discretion in individual cases, there are

many examples of the use of prosecutorial discretion on behalf of groups of people.

37.     **1956 (Eisenhower):** Thousands of Hungarian "Freedom Fighters" were permitted

to enter the United States by way of "parole." Faced with the inaction of Congress to solidify an

immigration statute for refugees, the administration moved to exercise prosecutorial discretion to

admit refugees from Hungary.[14]

---

[11] Memorandum from Johnny N. Williams, Executive Associate Commissioner of the Office of Field Operations, U.S. Immigration and Naturalization Service, on Family Unity Benefits and Unlawful Presence (Jan. 27, 2003).

[12] Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, on Prosecutorial and Custody Discretion (Nov. 7, 2007), https://www.ice.gov/doclib/foia/prosecutorial-discretion/custody-pd.pdf.

[13] Morton Memo at 5, *supra* note 3.

[14] Shoba S. Wadhia, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases* 29-30, (2015). ("Similar parole programs were applied in subsequent administrations to protect classes of individuals."). Kate M. Manuel & Michael J. Garcia, *Executive Discretion as to Immigration: Legal*

38.     **1956 (Eisenhower):** An extended voluntary departure program was implemented for certain beneficiaries of an approved third-preference petition for skilled or other workers.[15]

39.     **1981 (Reagan):** Extended voluntary departure was issued to thousands of Polish nationals as refugees residing in the United States when Poland declared martial law.[16]

40.     **1987 (Reagan):** After Congress passed the Immigration Reform and Control Act of 1986 (IRCA), the "Family Fairness" executive action was announced to defer deportations for children of a parent eligible for permanent residency.[17]

41.     **1990 (George H.W. Bush):** The "Family Fairness" policy was expanded to defer deportations to spouses and children of immigrants who qualified for permanent residency under IRCA.[18]

---

*Overview*, U.S. Congressional Research Service (Nov. 10, 2014), https://fas.org/sgp/crs/homesec/R43782.pdf.

[15] Immigration and Naturalization Service, Operations Instructions, O.I. § 242.10(a)(6)(i) (1956).

[16] Stephen H. Legomsky & Cristina M. Rodriguez, *Immigration and Refugee Law and Policy* 1115-17 (5th ed. 2009); David Reimers, *Still the Golden Door: The Third World Comes to America* 202 (1986).

[17] 64 Interpreter Releases 1191 (Oct. 26, 1987); *see also* American Immigration Council, *Reagan-Bush Family Fairness: A Chronological History* 1-2, (Dec. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/reagan_bush_family_fairness_final_0.pdf.

[18] Marvine Howe, *New Policy Aids Families of Aliens*, N.Y. Times (Mar. 5, 1990), http://www.nytimes.com/1990/03/05/nyregion/new-policy-aids-families-of-aliens.html; 67 Interpreter Releases 204 (Feb. 26, 1990); 67 Interpreter Releases 153 (Feb. 5, 1990). ("President Bush's policy followed a narrower 1987 executive order by President Reagan's immigration commissioner that applied only to children."). Immigration and Nationality Act of 1990, Pub. L. 101-649, Sec. 301, 104 Stat. 4978, http://www.justice.gov/eoir/IMMACT1990.pdf.

42.    **2007 (George W. Bush):** Deferred enforcement departure was announced for certain Liberians in light of armed conflict in in Liberia.[19] The policy has since been extended for 18 months at a time, most recently by President Obama in September 2016.[20]

43.    **2011 (Obama):** ICE Commissioner John Morton published several memoranda concerning prosecutorial discretion. One memo discussed the specific enforcement priorities of the federal government with regard to deportable immigrants with criminal records, noting that "particular care should be given when dealing with lawful permanent residents, juveniles, and the immediate family members of U.S. citizens."[21] Another guidance memorandum dealt with the use of prosecutorial discretion for plaintiffs, victims, and witnesses in order to "avoid deterring individuals from reporting crimes and from pursuing actions to protect their civil rights."[22]

44.    Several administrations have used prosecutorial discretion as an instrument for protecting victims of crime, domestic abuse, and sexual assault.

### Deferred Action

45.    Deferred action is one of the most common forms of prosecutorial discretion in immigration law and enjoys a long history. It is one of the few forms of prosecutorial discretion

---

[19] Deferred Enforcement Departure- Liberia, U.S. Citizenship and Immigration Services, http://www.uscis.gov/humanitarian/temporaryprotected-status-deferred-enforced-departure/ded-granted-country-liberia/ded-granted-country-liberia (last updated Sep. 28, 2016).

[20] Memorandum from Barack Obama, President of the United States of America, on Deferred Enforced Departure for Liberians (Sep. 28, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/09/28/presidential-memorandum-deferred-enforced-departure-liberians.

[21] Morton Memo, *supra* note 3, at 2.

[22] Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, on Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011), https://www.ice.gov/doclib/foia/prosecutorial-discretion/certain-victims-witnesses-plaintiffs.pdf.

to provide with it work authorization, the others being parole[23] and orders of supervision.[24] Historically, decisions to grant deferred action have also rested on identifiable humanitarian factors for consideration.

46.     For many years, deferred action was in operation through case-by-case determinations but not publicly understood. Previously described as "nonpriority," it operated essentially in secret for much of the 20th Century.

47.     In the early 1970s, as part of his effort to support his clients John Lennon and Yoko Ono, attorney Leon Wildes pursued Freedom of Information Act (FOIA) litigation to obtain deferred action records from INS.

48.     Through these records, Wildes conducted groundbreaking research and revealed multiple facets of deferred action. Among these revelations was the fact that deferred action cases labeled as "tender age" involved individuals who were teenagers or young adults when INS granted deferred action.[25]

49.     Following Wildes' litigation on behalf of Lennon and Ono, INS issued guidance on deferred action through "Operations Instructions." These instructions contained factors for INS agents and officers to determine whether a case should be referred for deferred action. They included: (i) young or old age; (ii) years present in the United States; (iii) health condition

---

[23] 8 U.S.C. § 1182(d)(5)(A) (2013) ("The Attorney General may…in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission.…").

[24] Shoba S. Wadhia, *Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases*, 6 Colum. J. of Race and L. 1, 7-8 (2016). ("Unlike deferred action, which can be granted or processed at any stage of immigration enforcement, an order of supervision may be processed after the government orders removal."); 8 U.S.C. § 1231(a)(3) (2006).

[25] Shoba S. Wadhia, *Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases* 64, (2015).

requiring care in the United States; (iv) impact of removal on family in United States; and (v) criminal or other problematic conduct.[26]

50.     The Operations Instructions required consideration for deferred action "[i]n every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors, he shall recommend consideration for deferred action category...."[27]

51.     Since that time, INS and DHS have repeatedly issued guidance over the course of several administrations on the use of deferred action for both individuals and groups. In the last 15 years, DHS has granted deferred action in thousands of cases for largely humanitarian reasons.

52.     Deferred action can have a significant impact on the individual and his or her family, as individuals granted deferred action are able to apply for employment authorization upon the showing of "economic necessity."[28]

53.     The United States Citizenship and Immigration Services ("USCIS") Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices details that a request for deferred action can be formally filed by the individual, a legal representative, or USCIS officers.[29] A request must have at least four components: an explanation supporting the

---

[26] *Id.* at 197, n.8(ii), citing (Legacy) Immigration and Naturalization Service, Operations Instructions, O.I. § 103.1(a)(1)(ii) (1975).

[27] *Id.*

[28] 8 C.F.R. § 274.12(c)(14) (2008); Shoba S. Wadhia, *The Aftermath of United States v. Texas: Rediscovering Deferred Action*, Notice & Comment: A Blog from the Yale Journal on Regulation and the ABA Section of Administrative Law & Regulatory Practice (Aug. 10, 2016), http://yalejreg.com/nc/the-aftermath-of-united-states-v-texas-rediscovering-deferred-action-by-shoba-sivaprasad-wadhia/.

[29] Shoba S. Wadhia, Standard Operating Procedure for Deferred Action (non-DACA), (Mar. 7, 2012), (Obtained under the Freedom of Information Act from U.S. Citizenship and Immigration Services; received Aug. 2015), http://works.bepress.com/shoba_wadhia/36/.

request with supplemental documentation, proof of identity and nationality, any documents utilized to enter the U.S., and biographical information. My understanding is that this policy still guides USCIS treatment of deferred action requests outside DACA. In addition, ICE has the authority to grant deferred action to individuals.

### Legal Basis for Deferred Action

54.     The legal foundation for the use of deferred action is clear from opinions of federal courts, federal statutes, regulations, and memoranda published by DHS and INS.

55.     Agency regulations that have been in place for nearly 30 years explicitly identify "deferred action" as one basis for the provision of work authorization. 8 C.F.R. § 274a.12(c)(14).

56.     Federal immigration law provides that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action[.]" 8 U.S.C. § 237(d)(2).

57.     Shortly after the Operations Instructions were published in 1975, several Courts of Appeals recognized the ability of INS to offer deferred action to individuals who were facing removal or who were removable.[30]

58.     The Supreme Court in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), specifically mentioned "deferred action" when analyzing 8 U.S.C. § 1252(g), which precludes judicial review over certain acts of prosecutorial discretion decisions.

---

[30] *Soon Bok Yoon v. INS*, 538 F.2d 1211, 1211 (5th Cir. 1976); *Vergel v. INS*, 536 F.2d 755, 755 (8th Cir. 1976); *David v. INS*, 548 F.2d 219, 223 (8th Cir. 1977).

15

59.     Memoranda published by DHS provide guidance on the use of prosecutorial discretion in immigration law and in doing so identify the grant of deferred action as one such use of discretion.[31]

### Historical Use of Deferred Action

60.     Long before DACA, thousands of individuals have been processed for and granted work authorization pursuant to deferred action.[32]

61.     Historically, many deferred action cases have been driven by factors that are relevant to the DACA population. Two factors in particular have long driven outcomes in deferred action cases: age and long term presence in the United States.

62.     DHS and its predecessor agencies have often set criteria, similar to those put forth in DACA, for how deferred action should be applied to particular groups, while still requiring a case-by-case determination for each individual.

63.     **2003 (George W. Bush):**  INS Associate Director of Operations Williams Yates published memoranda directing officers to use prosecutorial discretion forms like deferred action to protect victims who were eligible for eligible for certain statutory protections such as a U visa.[33]

---

[31] Letter from 130+ Law Professors (Sep. 3, 2014), https://pennstatelaw.psu.edu/_file/Law-Professor-Letter.pdf.

[32] Wadhia, *supra* note 25, at 2.

[33] Memorandum from William Yates, Associate Director of Operations, U.S. Citizenship and Immigration Services, on Centralization of Interim Relief for U Nonimmigrant Status Applicants (Oct. 8, 2003), http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%20 1998-2008/2003/ucntrl100803.pdf; Memorandum from William Yates, Associate Director of Operations, U.S. Citizenship and Immigration Services, on Assessment of Deferred Action Requests for Interim Relief from U Nonimmigrant Status Aliens in Removal Proceedings (May 6, 2004), http://www.uscis.gov/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2004/uprcd050604.pdf; *see also* Wadhia, *supra* note 25, at 61.

64.     **2005 (George W. Bush):** The President announced a "deferred action" program for foreign academic students affected by Hurricane Katrina.[34]

65.     **2009 (Obama):** USCIS announced deferred action for the widows of U.S. citizens. In announcing the decision, DHS Secretary Janet Napolitano said: "Granting deferred action to the widows and widowers of U.S. citizens who otherwise would have been denied the right to remain in the United States allows these individuals and their children an opportunity to stay in the country that has become their home while their legal status is resolved."[35]

66.     Deferred action has been used to protect individuals applying for relief under the Violence Against Women Act (VAWA). VAWA was enacted by Congress in 1994 and twice amended to include statutory remedies for abused spouses, parents, and children; victims of crimes and domestic abuse; and victims of human trafficking.

67.     One protection under VAWA allows abused spouses and children of U.S. citizens and green card holders (lawful permanent residents) or the abused parents of U.S. citizens to file petitions for themselves with USCIS.

68.     The self-petition process is critical to victims of domestic violence and abuse because it allows them to achieve a positive immigration status without having to rely on their abuser. If the self-petition is ultimately approved, the petitioner may receive deferred action.[36]

---

[34] Shoba S. Wadhia, *Response, In Defense of DACA, Deferred Action, and the DREAM Act*, 91 Tex. L. Rev. 59, n. 46 (2013), citing Press Release, U.S. Citizenship and Immigration Services, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina (Nov. 25, 2005), http://www.uscis.gov/files/pressrelese/F1Student_11_25_05_PR.pdf.

[35] DHS Establishes Interim Relief for Widows of U.S. Citizens, https://www.dhs.gov/news/2009/06/09/dhs-establishes-interim-relief-widows-us-citizens.

[36] William A. Kandel, *Immigration Provisions of the Violence Against Women Act (VAWA)*, U.S. Congressional Research Service (May 15, 2012), https://fas.org/sgp/crs/misc/R42477.pdf

69.     Deferred action also has been used as a mechanism to keep immigrants who are the spouses, parents, and children of military members together.

70.     The examples identified above are not exhaustive but demonstrate how DHS (and INS before it) has long used the instrument of deferred action and its authority under the INA to protect certain classes of people.[37]

## DACA

71.     DACA falls in line with the long history described above. By its terms, DACA requires the individual to document entry into the United States before the age of sixteen and presence in the United States since June 15, 2007.[38] Long-term residence and tender age are two central facets of deferred action.

72.     Beyond those characteristics, the totality of circumstances weighs in favor of DACA grantees receiving deferred action based on past guidance documents. Among other things, DACA grantees are either in school, have graduated from high school (or obtained an equivalent degree), or have served honorably in the military.

73.     The idea of protecting those who came to the United States at a young age, residing in the United States for a long period of time, and with other equities from removal through deferred action longstanding and in fact customary.

74.     The implementation of DACA, even on a wide scale, is entirely consistent with previous acts of prosecutorial discretion by Democratic and Republic administrations.

---

[37] Wadhia, *supra* note 25, at 68.

[38] Memorandum from Janet Napolitano, Secretary of Homeland Security, on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

75.     The decision to and method by which DACA has been terminated raises serious

legal questions and is wholly inconsistent with how deferred action has been used and applied

historically.

76.     Previous decisions to end deferred action programs or to change course on broad

exercises of prosecutorial discretion have been triggered by new statutory protections through an

Act of Congress that rendered the exercise of further prosecutorial discretion unnecessary,

changes in country conditions, or other significant changes in circumstances. DACA's

termination does not meet any of these criteria.

77.     Despite the great success of the DACA program and the contributions of its

grantees to our schools, businesses, communities, and economy, this Administration has turned

DACA grantees into among the most vulnerable immigrants. This switch from protecting those

with the most compelling cases for deferred action to the most vulnerable for such a large group

of immigrants is remarkable and also destabilizes the structure of prosecutorial discretion in the

immigration system.

### Conclusion

78.     Deferred action is a long-recognized form of prosecutorial discretion in

immigration law and with a strong legal foundation. The operation of DACA is a lawful exercise

of prosecutorial discretion. Categorically revoking deferred action from hundreds of thousands of

beneficiaries without reason is not only unprecedented but is in tension with the history of both

INS and DHS.

19

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

*Shoba Sivaprasad Wadhia*

SHOBA SIVAPRASAD WADHIA

Dated this 15th day of December 2017.

# EXHIBIT A

Wadhia Resume Page 1

# CURRICULUM VITAE
## Shoba Sivaprasad Wadhia
## Samuel Weiss Faculty Scholar
## Penn State Law-University Park
## Phone: 814-865-3823 | Email: ssw11@psu.edu

## EMPLOYMENT

**Pennsylvania State University School of Law, University Park, PA**
**Samuel Weiss Faculty Scholar, Clinical Professor of Law**
**Director/Founder, Center for Immigrants' Rights, June 2008-present**

Direct an immigration clinic whose mission is to advance immigrants' rights through legal excellence, advocacy, education, and collaboration with key stakeholders on immigration law and policy. Supervise law students representing clients on policy projects, community education and individual cases pertaining to U.S. immigration law and policy.

Publications by the Center

Press releases and stories about the Center's work

**Teaching at Penn State Law:**

Center for Immigrants' Rights Clinic (5 credits)

Advanced Immigration Clinic (2 credits)

Asylum and Refugee Law (3 credits)

Immigration Law (3 credits)

**Scholarship at Penn State Law (see publication list below)**

**Service at Penn State Law:**

**Post-Election:** Penn State Law's Center for Immigrants' Rights has been at the forefront of responding to immigration issues Post-Election at local and national levels. See: https://pennstatelaw.psu.edu/immigration-after-election for more details.

**Minority Mentor Program:** Helped to develop and institutionalize the law school's first minority mentor program, aimed at improving the climate of law school and academic performance. Received initial and renewal matching grant from Penn State's Equal Opportunity Commission.

**Interdisciplinary Roundtable on Immigration:** Co-founder/chair of Interdisciplinary Working Group on Immigration, whose objective is to build connections among research

Wadhia Resume Page 2

and service organizations who work with or conduct research about immigrants and immigration, and to raise awareness of resources available among the local community of scholars and service providers.

**Academic Symposia Featuring Nationally Renowned Scholars and Legal Experts:** Organized and moderated academic symposia annually from 2009-12 on national immigration topics, with featuring speakers from around the nation.

- Symposium: Immigration in a New Administration (2009)
- Symposium: Immigration Adjudications: Court Reform and Beyond (2010)
- Colloquium: 30th Anniversary of the Refugee Act (2010)
- Symposium: 10th Anniversary of 9/11 (2011)
- Symposium: Immigration Remedies for Victims of Domestic Abuse (2012)

**Faculty Committees:** Serve(d) on the following academic committees:

- Diversity Committee (Chair) (2013-present)
- Strategic Planning Committee (2013-14)
- Academic Rules Committee (2012-13)
- Curriculum Committee (2009-12)
- Clinics Committee (2008-9)

**National Immigration Forum, Washington DC**
**Deputy Director for Legal Affairs, January 2007- June 2008**
**Senior Policy Associate/Counsel, July 2002-December 31, 2006**

- Worked for national immigration advocacy organization on the multiple legislative efforts, including the creation of the Department of Homeland Security, comprehensive immigration reform, immigration enforcement, and post 9-11 proposals affecting immigrants
- Provided legal and policy expertise on immigration issues to government officials, interested advocates, and the public
- Played a leadership role in working groups engaged in strategy and policy development on immigration law and policy reform with government officials
- Analyzed, prepared and/or drafted legislative and regulatory proposals on immigration law and policy for government officials and interested advocates

**Maggio Kattar, P.C., Washington DC**
**Attorney, 2000-2002/Law Clerk, 1998-2000**

- Represented clients in deportation (removal) proceedings before the VA and MD immigration courts
- Represented clients before Immigration and Naturalization Service (now Department of Homeland Security) during interviews for immigration benefits
- Interviewed clients and witnesses; prepared affidavits, evidentiary materials and legal briefs; conducted related legal research

Wadhia Resume Page 3

## EDUCATION

**Georgetown University Law Center, Washington, DC, J.D., May 1999**

*Related Coursework/Activities*
Georgetown Immigration Law Journal- Senior Notes & Comments Editor
Immigration and Refugee Law
Advanced Seminar on Immigration Research

**Indiana University, A.B. with Honors, Political Science, May 1996**

## PUBLICATIONS

**Books**

Beyond Deportation: *The Role of Prosecutorial Discretion in Immigration Cases* (New York University Press 2015), new on paperback May 1, 2017
- Website: www.beyonddeportation.com
- Reviews published by NYU Press: https://nyupress.org/books/9781479870059/
- Review in Oxford University's Border Criminologies, April 22, 2016.
- Review in International Migration Review, Fall 2016.
- Featured in Guernica Magazine, July 1, 2016
- Review in Harvard Law Review, Recent Publications, June 2016
- Review in The Federal Lawyer, October/November 2016
- Review by Reader's Favorite, Book Review, August 2016
- Review by International Migration Review, Book Review, Fall 2016

**Law Journals**

Emory Law Journal, Is Immigration Law National Security Law? 66 Emory Law Journal 669 (2017).

"Beyond Deportation: Understanding Immigration Prosecutorial Discretion and U.S. v. Texas," 36 IMMGR. & NAT'LITY L. REV. 94 (2015).

"Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases" Colum. J. Race & L. 1 (2016).

"The Aftermath of United States v. Texas: Rediscovering Deferred Action," Notice and Comment, Yale Journal on Regulation (2016).

The President and Deportation: DACA, DAPA, and the Sources and Limits of Executive Authority - Response to Hiroshi Motomura Washburn Law Journal (2016).

"Executive Action and Immigration" Case W. Res. Journal of International Law 48 (2016).

Wadhia Resume Page 4

"The History of Prosecutorial Discretion in Immigration Law" American University Law Review Vol 64.5 (2015).

"The Rise of Speed Deportation and the Role of Discretion," Vol. 5 No. 1 Colum. J of Race & L. (2014).

"Immigration Remarks for the 10th Annual Wiley A. Branton Symposium," Vol. 57 No. 3 HOW. L.J. (2014).

"My Great FOIA Adventure and Discoveries of Deferred Action Cases at ICE," 27 Geo. Immig. L.J. (2013).

"In Defense of DACA, Deferred Action, and the DREAM Act," 91 Texas L. Rev. SEE ALSO 59 (2013).

"The Immigration Prosecutor and the Judge: Examining the Role of the Judiciary in Prosecutorial Discretion Decisions," 16 Harv. Latino L. Rev.  39 (2013).

"Sharing Secrets: Examining Deferred Action and Transparency in Immigration Law," 10 U. N. H. L. Rev. 1 (2012).

"Business As Usual: Immigration and the National Security Exception," 114 Penn State L. Rev. 1485 (2010).

"The Role of Prosecutorial Discretion in Immigration Law," 9 Connecticut Pub. Int. L. J. 243 (2010).

 "Under Arrest: Immigrants' Rights and the Rule of Law," 38 U. Memphis L. Rev. 853 (2008).

"The Policy and Politics of Immigrant Rights," 16 Temple Pol. & Civil Rts. L. Rev. 387 (2007).

"Immigration: Mind Over Matter," 5 U. Md. L. J. on Race, Religion, Gender & Class 201 (2006).

**Book Chapters and Essays**

American Immigration Lawyers Association, *Prosecutorial Discretion, Practice Advisory* (w. A. Gallagher and A. Nunez) (2017)

Carolina Academic Press, Book Chapter, Dreams Deferred: Deferred Action, Prosecutorial Discretion, and the Vexing Case(s) of DREAM Act Students in Law Professor and Accidental Historian (2017)

Wadhia Resume Page 5

American Immigration Lawyers Association, *The Long and Winding Road of Prosecutorial Discretion, Practice Advisory* (w. L. Wildes and P. Taurel) (2015)

Who are the Players in Immigration Law? in What Every Lawyer Should Know About Immigration Law (American Bar Association 2014)

Reflections on Prosecutorial Discretion One Year After the Morton Memo, in *Emerging Issues Analysis* (LexisNexis, June 2012)

Prosecutorial Discretion in Immigration Agencies: A Year in Review, in *Emerging Issues Analysis* (LexisNexis, January 2012)

The Term Illegal Alien, *in Debates on U.S. Immigration*, (Sage Publications, 2012)

The Morton Memo and Prosecutorial Discretion: An Overview, American Immigration Council (July 2011)

Reading the Morton Memo: Federal Priorities and Prosecutorial Discretion, American Immigration Council (December 2010)

"Letter to Lahore," The Subcontinental Vol. 1, Issue 3 (with Sin Yen Ling), (2004)

Obama-Biden Presidential Transition Team, Immigration Policy: Transition Blueprint for the Obama Administration, 2008 (contributor)

Immigration Law Weekly, *Concerns With The DOJ's Proposed Rule To Implement The St. Cyr. Ruling* (w. Rob Randhava and Nancy Morawetz), September 13, 2003

Florida Bar Association, *21st Annual Immigration Law Update, Extreme Hardship For Waivers of Inadmissibility*, (w. Michael Maggio), 2000

## APPOINTMENTS/HONORS

American-Arab Anti-Discrimination Committee, Excellence in Legal Advocacy Award, September 2017

National Immigration Project of the National Lawyers Guild, 2017 Honoree, June 2017

Penn State Law, Faculty Diversity Award, February 2017

Global Connections, Spirit of Internationalization Award, March 15, 2016

Named Samuel Weiss Faculty Scholar at Penn State Law, July 2013

Appointed to American Bar Association Commission on Immigration: 2010-2014

Wadhia Resume Page 6

Department of Homeland Security, Office of Inspector General, Leadership Plaque, June 2008

Department of Homeland Security, Office of Civil Rights and Civil Liberties, award for leadership as co-chair of NGO working group, June 2008

Department of Homeland Security, Office of Civil Rights and Civil Liberties, Leadership Plaque, April 2006

American-Arab Anti-Discrimination Committee, Pro Bono Attorney of the Year, June 2003

Indiana University, Political Science Department, William Jennings Bryan Prize, 1996

Indiana University, Honors Division: Summer Research Grant, 1996

American University, Washington Semester Program, Dean's Scholarship, 1994

Congressional Award: Silver, 1991; Bronze, 1989

State/National Forensics League: over 25 trophies in related competitions, 1990-1993

## BAR ADMISSIONS

State of Maryland

State of New Jersey

Court of Appeals for the Third Circuit

Supreme Court of the United States

## MEMBERSHIPS

American Bar Association (since 2008) (Commissioner, 2010-2014)

American Civil Liberties Union, Pennsylvania Chapter, Board Member (2010-2011)

American Constitution Society (since 2015)

American Immigration Council, Board of Trustees (since 2016)

American Immigration Lawyers Association (since 2001)

National Immigration Project, National Lawyers Guild (since 2000)

Pennsylvania Immigration Resource Center, Board Member (2008-2011)

**<u>PRESENTATIONS</u> (HIGHLIGHTS)**

**2017**

Lecturer (Invited), Arlin Adams Center for Law and Society at Susquehanna University, Immigration in a New Administration, Selinsgrove, Pennsylvania, October 10, 2017

2017-2018 Cannon Lecturer (Invited), Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases in the Wake of the Trump Administration, University of Toledo School of Law, Toledo, Ohio, September 11, 2017

Faculty Speaker, Student Orientation, Diversity and Inclusion in the Legal Profession, Penn State Law at University Park, August 15, 2017

Panelist, International Student Orientation, Understanding International Student Visas and the U.S. Travel Ban, Office of Global Programs, Pennsylvania State University, August 12, 2017

Panelist, National Council for State Legislatures (Invited), <u>National Summit</u>, Immigration in 2017, Boston, MA, August 6, 2017

Discussant, Southeastern Association of Law Schools (SEALS), Workshop on National Security, Discussion Group: Trump's Executive Actions on Immigration: Travel Ban, Extreme Vetting, Border Surveillance, and Mass Deportation, Boca Raton, FL, August 4, 2017

Moderator (Invited), Annual Conference, American Immigration Lawyers Association, Prosecutorial Discretion, New Orleans, LA, June 21, 2017

Guest Speaker (Invited), Interfaith Initiative Centre County, Immigration in a New Administration, June 11, 2017

Speaker (Invited), Annual Conference, <u>Community Diversity Group Conference</u>, Immigration, June 6, 2017

Panelist (Invited), Career Professionals Conference, Pennsylvania State University, Immigration in a New Administration, May 9, 2017

Keynote (Invited), Immigrant Justice Week Keynote Speaker, University of Wisconsin School of Law, Beyond Deportation: The Role of Prosecutorial Discretion in the Wake of Trump's Executive Orders, April 2017

Moderator, "<u>All In at Penn State Law: Addressing Diversity and Implicit Bias in the Legal Academy</u>, Penn State Law, March 16, 2017

Wadhia Resume Page 8

Keynote (Invited), Sprit of Internationalization Awards Ceremony, Hosted by Global Connections, March 16, 2017

Speaker (Invited), National Press Conference on Executive Order on Immigration, Hosted by Americas Voice, March 6, 2017

Speaker (Invited), National Community Call on Executive Order on Immigration (Muslim Ban 2.0), Hosted by Muslim Advocates, March 6, 2017

Organizer, Executive Orders on Immigration: Where Have We Been and What Lies Ahead? at Penn State Law, February 24, 2017

Guest Speaker on Immigration for International Ministries at Penn State University, February 24, 2017

Speaker (Invited), Post-Executive Order Briefing for Academics, American Immigration Council February 15, 2017

Speaker, Information Session on Executive Orders on Immigration for Postdoctoral students, staff and faculty at Penn State, February 10, 2017

Speaker, Information Session on Executive Orders on Immigration for Engineering faculty, staff and students at Penn State, February 7, 2017

Organizer, Information Session, President Trump's Executive Orders on Immigration, February 3, 2017

**2016**

Speaker (Invited), Post-Election Research Briefing for Academics, Muslim Registry, American Immigration Council, December 20, 2016

Facilitator, Community Dialogue on Diversity, Immigration and Race Post-Election, State College, PA, November 18, 2016

Panelist (Invited), Fall Conference, DC Chapter of the American Immigration Lawyers Association, Notices to Appear/Prosecutorial Discretion, November 16, 2016

Panelist (Invited), Equal Justice Leadership and Training Conference, United States v. Texas and Prosecutorial Discretion, Washington D.C., October 26, 2016

Keynote and Book Discussion (Invited), Spartan Scholars Awards Ceremony, Ocean Township High School, Ocean, NJ, October 24, 2016

Wadhia Resume Page 9

Lecture and Book Discussion (Invited), <u>Washington University School of Law</u>
(sponsored by the Immigration Law Society and American Constitution Society), St.
Louis, MO, October 14, 2016

Book Talk, University Women's Club (Invited), Book and Play Review Group, Schlow
Centre Regional Library, State College, PA, September 26, 2016

Immigration Issues after U.S. v. Texas, Center for Immigrants' Rights Clinic, September
1, 2016

Immigration Issues after U.S. v. Texas, State College Municipal Building, A Panel
Discussion, August 31, 2016

Book Talk and Discussion of DAPA/DACA Case at Supreme Court, State College
Sunrise Rotary, State College, PA, August 17, 2016

Book Talk and Discussion of DAPA/DACA Case at the Supreme Court and Beyond;
Brown University Bookstore, Providence, RI, August 4, 2016

Panelist (Invited), American Immigration Lawyers Association's Annual Conference,
Humanitarian Remedies in Immigration Law, June 2016

Guest Lecturer (Invited) United Nations Association of Centre County, May 2016

Cornell University School of Law, invited to present my research and FOIA strategies to
social scientists working on empirical research related to deferred action, April 2016

Cornell University School of Law, present remarks on Beyond Deportation at a school
sponsored public forum, April 2016

Pennsylvania Bar Association, Law Form on Mass Incarceration, Pittsburgh, PA
(representing Penn State Law), March 31, 2016

Emory University School of Law, Discussion of Beyond Deportation (w. C. Kuck,
sponsored by Immigration Law Society), February 2016

Emory University School of Law, annual Thrower Symposium on National Security,
Invited panelist on domestic terrorism, immigration and national security, February 2016
Washington College of Law at American University, spoke about Beyond Deportation
and Texas case (w. A. Frost, B. Johnson, P. Spiro) February 2016

New York School of Law/City Bar Association of New York City/NYU Press: panel on
Beyond Deportation and United States v. Texas (w. L. Benson, A. Kalhan, F. Anello),
January 2016

American Association for Law Schools, Annual Conference, (Invited) "Is Immigration
Law Administrative Law," January 2016

**2015**

University of Cincinnati School of Law, Invited Speaker from Immigration and
Nationality Law Review, Spoke about Beyond Deportation and United States v. Texas,
November 2015

Case Western Reserve University School of Law, annual symposium, Invited panelist on
executive action and immigration, October 2015

Chicago Bar Foundation/Mayor Brown/National Immigrant Justice Center: Panel
Discussion on Beyond Deportation and United States v. Texas (w. G. Hereen, T. Magner,
C. Valenzuela), October 2015

American Civil Liberties Union, Washington D.C., Book Talk on Beyond Deportation,
September 2015

Department of Justice Office of Immigration Litigation, Washington D.C., Invited talk on
Beyond Deportation to DOJ attorneys, September 2015

Temple University, Beasley School of Law, Philadelphia, PA, Panel Discussion on
Beyond Deportation (w. Jaya Ramji-Nogales, J. Family), September 2015

Drexel School of Law, Philadelphia, PA, Panel Discussion on Beyond Deportation (w. B.
Stock and A. Kalhan), September 2015

National Press Club, Book Launch of Beyond Deportation (with S. Legomsky, F. Sharry
and E. Quinn), June 2015

Panelist, American Constitution Society, Going it Alone? Presidential Power and the
DAPA Debate, June 2015

Moderator, American Immigration Lawyers Association's Annual Conference, The Long
and Winding Road of Prosecutorial Discretion, June 2015

Keynote Speaker, Pennsylvania Immigration Resource Center, Light of Liberty Awards,
March 2015

Keynote Speaker, Conference on Race, Class, Gender and Ethnicity: University of North
Carolina School of Law-Chapel Hill, February 2015

Presenter, CLE on Immigration and Executive Action, Centre County Bar Association,
February 2015

Opening Remarks and Panelist, American University Law Review, Symposium on
Prosecutorial Discretion, January 2015

Wadhia Resume Page 11

Panelist, American Association for Law School's Academic Symposium on
Congressional Dysfunction and Executive Lawmaking, January 2015

**2014**

Moderator, Penn State Law, Symposium "Shining the Light on Gender-Based Violence at
Home and Abroad", October 2014

Facilitator, National Immigration Project, Continuing Legal Education Program on
Challenges to Immigration Detention, September 2014

Panelist, American Bar Association, Homeland Security Institute August 2014

Presenter of and Commentator on Works-in-Progress, Immigration Law Professors
Workshop, University of California Irvine- School of Law May 2014

Presenter of and Commentator on Works-in-Progress, The Association of American Law
Schools Annual Conference on Clinical Legal Education, April 2014

**2013**

Panelist, Tenth Annual Wiley A. Branton / Howard Law Journal Symposium, Howard
University School of Law, October 2013

Workshop and Presenter, Clinical Law Review Writers' Workshop 2013, New York
University School of Law, September 2013

Panelist, National Immigration Project, CLE Program on "Developments in Immigration
Law & Removal Defense" (May 2013)

**2012**

Moderator, American Bar Association Section on Administrative Law and Regulatory
Practice, Fall Conference, Understanding Prosecutorial Discretion in Immigration Law,
(October 2012)

Luncheon Speaker, Pennsylvania State University, Migration Studies Project,
Immigration Law and the Administration's Deferred Action for Childhood Arrivals
Program, (September 2012)

Organizer and Moderator, Penn State Law's Symposium on Immigration Remedies for
Victims of Domestic Abuse, (September 2012) (w. Centre County Women Resource
Center's Civil Legal Representation Project)

Panelist, Immigration Law Teachers Workshop, Plenary on Prosecutorial Discretion

Wadhia Resume Page 12

(June 2, 2012)

Panelist, Press Conference, "The NSEERS Effect: A Decade of Racial Profiling, Fear, and Secrecy" (June 4, 2012)

Speaker, Press Conference: "Law Professors Alongside DREAMers Discuss Details of Memo Outlining President's Legal Authority to Grant Much Needed Relief for the Latino Community," (June 1, 2012), http://act.americasvoiceonline.org/page/-/americasvoice/audio/DREAM%20060112.mp3

Panelist, Foreign Policy Association, *Immigration Policy: What Is It and What Should It Be?* (May 24, 2012)

Panelist, American Immigration Lawyers Association, CLE Audio Seminar on Cancellation of Removal Relief (April 26, 2012)

**2011**

Panelist, American Immigration Lawyers Association, CLE Webinar on Deferred Action (October 25, 2011)

Penn State Law, Center for Immigrants' Rights, The 9/11 Effect and its Legacy on U.S. Immigration Laws, Organizer and Moderator (September 2011)

Panelist, 23nd Annual Minority Attorney Conference, Immigration Panel, Philadelphia, PA (March 17 & 18, 2011)

Panelist, Maggio + Kattar Community Forum on Prosecutorial Discretion and Private Bills, Washington D.C. (January 26, 2011)

**2010**

Penn State Law, Center for Immigrants' Rights, Fall Colloquium on the 30th Anniversary of the Refugee Act, Organizer and Moderator (November 2010)

Presenter, Penn State University, Research Unplugged, Presentation on "Immigration Rights and Wrongs" (October 2010)

Penn State Law, World on Trial, Jury Member and Foreperson (September 2010)

Robert C. Byrd Center for Legislative Studies, Tom E. Moses Memorial Lecture on the U.S. Constitution (September 2010)

Seton Hall Law School, National People of Color Legal Scholarship Conference, Moderator and Panelist (September 2010)

Wadhia Resume Page 13

Panelist, Penn State University Dickinson School of Law, <u>Symposium on Iqbal v. Ashcroft</u> (2010)

M.C. and Moderator, Penn State University Dickinson School of Law, <u>Symposium on Immigration Adjudications and Court Reform</u> (2010)

**2009**

Lecturer, Penn State University, Presidential Leadership Academy, Immigration (2009)

Lecturer, Penn State University, School for International Affairs, Asylum Law (2009)

University of Illinois School of Law, Big 10 Aspiring Scholars Conference, Abstract Presentation (2009)

M.C. and Moderator, Penn State Dickinson School of Law, Symposium on Immigration Reform (2009)

Panelist, Georgetown University Law Center, Panel on Counterterrorism and Immigration (2009)

**2008**

Panelist, University of Connecticut School of Law, Symposium on Immigration (2008)

Panelist, University of Memphis School of Law, Symposium on Immigration Issues (2008)

**Older**

New England People of Color Conference, Moving Forward or Moving Backward? Criminal Justice and Immigration in the 21st Century, Commentator (2007)

Panelist, Stanford Law School, Symposium on Immigration Reform and Policy (2007)

Panelist, Temple University School of Law, Symposium on Immigration Reform (2006)

Panelist, University of Texas School of Law, Symposium on Immigration and Civil Rights (2006)

Panelist, University of Maryland School of Law, Symposium on Immigration Reform (2004)

Instructor, District of Columbia Bar: Continuing Legal Education Series, Removal and Deportation (2002-03)

Wadhia Resume Page 14

Panelist, Columbia University Law School, Panel on Immigration Policy and Due Process (2005)

Panelist, Catholic University Law School, Panel on Immigration Policy and Due Process (2005)

Panelist, Georgetown University Law Center, Alumni Panel on Public Interest Law (2004)

Arab Community Center for Economic and Social Services, Panel on Immigration Policy (2004)

University of Michigan-Dearborn, Teach-In on Immigration Policy (2005)

Illinois Coalition for Immigrant and Refugee Rights, Policy Summit, Panel on Immigration Policy and Due Process (2004)

Speaker, New York University School of Law/Breakthrough: Forum on Immigration Policy (2004)

Panelist, Japanese American Citizens League/Office of Chinese Americans Annual Leadership Conference: Panel on Immigration Policy and Due Process (2003-2005)

National Lawyers Guild Annual Convention, Panels on Immigration Policy (2001-05)

Panelist, Ethiopian Community Development Council: Panel on Department of Homeland Security and its Impact on the Asylum and Refugee Community (2003)

**MEDIA**

MSNBC The Last Word with Lawrence O'Donnell, November 20, 2014.

USA Today, What's Next for Trump's travel ban? June, 2017

New York Times Magazine, Is It Possible to Resist Deportation in Trump's America? May 2017

Wisconsin Public Radio, Travel Ban Litigation, July 2017

WPSU, Travel Ban Blocked, But Its Aftermath Reverberates At Penn State, May 2017

The Hill, Immigrant detention centers marred by 'needless deaths' amid poor care – report, May 2017

Wadhia Resume Page 15

ABC23 News, <u>Immigration Concerns</u>, May 2017

WPSU, Featured Guest on Immigration Panel, <u>Conversations Live</u>, March 2017

WPSU, Featured Guest, <u>Digging Deeper on Immigration</u> (w. Pennsylvania State University President Eric Barron), March 2017 (aired April 2017)

Town & Gown, <u>Lunch with Mimi</u>, March 2017

ABC23 New, <u>Immigration Concerns</u>, March 2017

WJAC, <u>Trump's executive order could be stopped before going into effect</u>, March 2017

Bloomberg BNA, <u>Are Immigrants Protected Under Obama No Longer Safe?</u>, February 2017

Law360, <u>3 Key Takeaways From The 9th Circ.'s Travel Ban Ruling</u>, February 2017

The Washington Post, <u>Draft executive order would begin 'extreme vetting' of immigrants and visitors to the U.S.</u>, January 2017

The Atlantic, <u>Two Cases Could Limit or Enhance Trump's Ability to Engage in Mass Deportations</u>, January 2017

NBC News, <u>Obama Leaves Behind a Mixed Legacy on Immigration</u>, January 2017

Centre Daily Times (Front Page),  <u>Teach-In Offers Overview of Immigrants' Rights</u>, January 2017

WTAJ-TV, <u>Statewide 'teach-in' held on immigrants' rights</u>, January 2017

WJAC-TV, Penn State Law hosts 'Teach-In' on immigrants' rights, January 2017

Centre Daily Times (Front Page), <u>Borough Council Expresses Support for Immigrant Community</u>, January 2017

WTAJ-TV, <u>Resolution approved to help immigrants</u>, January 2017

Statecollege.com, <u>Borough Council Passes Immigration Enforcement Resolution</u>, January 2017

The Guardian, <u>Registry used to track Arabs and Muslims dismantled by Obama administration</u>, December 2016

Long Island Press, <u>Obama Administration Dismantles Framework of Muslim-Focused Registry</u>, December 2016

Wadhia Resume Page 16

Huffington Post, <u>Obama Administration Makes Last-Minute Bid To Stall Trump's Ability To Create Muslim Registry</u>, December 2016

The Atlantic, <u>America Already Had a Muslim Registry</u>, December 2016

The Guardian, <u>Muslims to march on White House in bid to dismantle discriminatory registry</u>, December 2016

PBS Newshour, <u>Could President Trump really create a tracking system for U.S. Muslims?</u> , December 2016

Politifact, <u>In context: "Dreamers" and background checks</u>, December 2016

VICE, <u>This Small Town Is Helping Undocumented Immigrants, but Don't Call It a 'Sanctuary City'</u>, December 2016

Centre Daily Times (<u>Front Page): Penn State supports DACA students, hopes to ease fears</u>, December 2016

Philadelphia Inquirer, <u>Ebola scare over, Liberian immigrants lose right to stay in U.S.</u>, November 2016

Long Island Press, <u>Trump Team Considering Resurrecting Ineffective & Discredited Bush-Era Muslim Registry</u>, November 2016

ATTN, <u>Why Muslim Registries Haven't Worked in America</u>, November 2016

Medium, <u>Musings on Dreamers, Mass Deportations and a "Muslim Registry"</u>  November 2016

New York Times, <u>Trump Camp's Talk of Registry and Japanese Internment Raises Muslims' Fears</u>, November 2016

Vox, <u>Donald Trump's proposed "Muslim registry," explained</u>, November 2016

The Christian Science Monitor, <u>Will Trump's plan to register Muslims make it to The White House?</u> , November 2016

Penn State Research Magazine <u>Profile on Clinic and Research</u>, Spring 2016

Penn State <u>Probing Questions Video Project</u>, February 2016

National Public Radio, <u>Take Note</u>: Unauthorized Immigrants and the Use of Prosecutorial Discretion, September 18, 2015 (full length book interview)

Minnesota Public Radio, <u>Untangling Obama's Immigration Policy</u>, March 2, 2016

San Francisco Chronicle, <u>Paris attacks stoke fears at home about Syrian refugees</u>, November 17, 2015

CNN National, <u>States cannot refuse refugees, but they can make it difficult</u>, November 16, 2015

Wall Street Journal <u>Appeals Court to Again Consider Obama Immigrant Deportation Policy</u> July 9, 2015

Buzzfeed <u>No Clear Indications About Ruling On Immigration Actions Case At Arguments</u>, April 17, 2015

Vox.com <u>The government can't enforce every law. Who gets to decide which ones it does?</u>, March 31, 2015

<u>C-SPAN coverage</u>, Association for American Law Schools, Academic Symposium on Executive Action, Jan. 5, 2015.

Rachel Maddow Blog <u>Judge takes aim at Obama's immigration policy</u>, Dec. 17, 2014.

MSNBC <u>Bush appointee rules Obama's immigration action unconstitutional</u>, Dec. 16, 2014.

Roll Call <u>Obama's Immigration Actions Test Presidential Power</u>, November 20, 2014.

The Roanoke Times <u>Goodlatte signs legal brief fighting Obama immigration action</u> Dec. 17, 2014.

<u>C-SPAN coverage</u>, American Bar Association, Homeland Security Institute, August 2014.

The Economist Blog <u>Mini-DREAM and the rule of law</u>, June 18, 2012.

Dallas Morning News <u>U.S. Immigration Enforcements 'Prosecutorial Discretion' History Dates to John Lennon</u>, October 6, 2013.

<u>The Epoch Times</u> Immigration's Legal Labyrinth: The Agony of Discretion, November 16, 2014.

United We Dream, Speaker, Press Conference <u>UWD & Legal Experts Define Success: Presidential Executive Action Must Be Broad, Bold and Inclusive</u>, Oct. 29, 2014.

National Immigration Law Center, Invited Speaker, Press Conference <u>Law and Precedent Allow Broad Presidential Action on Immigration</u>, August 14, 2014.

America's Voice, Invited Speaker, Press Conference: "<u>Law Professors Alongside</u>

Wadhia Resume Page 18

DREAMers Discuss Details of Memo Outlining President's Legal Authority to Grant Much Needed Relief for the Latino Community," June 1, 2012.

**Original Op-Eds/Opinion Pieces**

American Constitution Society, Muslim Ban Litigation: An Unfinished Symphony, July 20, 2017

American Constitution Society, Reflections on Bona Fide Relationships, July 14, 2017

American Immigration Council, ImmigrationImpact, Ending Deportation Priorities Breaks Away from Decades of History and Sound Policy, July 10, 2017.

SCOTUS Blog, Immigration symposium: Delays, detentions and due process – Why Jennings matters, June 27, 2017.

American Constitution Society, Musings on Today's Travel Ban Decision by the Supreme Court, June 26, 2017.

Medium, The Birth and Death of Deferred Action (and what the Future Holds), June 16, 2017.

American Immigration Council, ImmigrationImpact, The Dire State of Immigration Detention in Georgia, June 6, 2017.

Yale Law Journal on Regulation, Notice and Comment, Prosecutorial Discretion at ICE: My Latest FOIA Adventure, May 26, 2017.

Yale Law Journal on Regulation, Notice and Comment, Donald Trump's Enforcement Plan and the Future of Discretion, April 25, 2017.

Medium, Immigration Law and Policy After the Executive Orders: Five Key Points, March 25, 2017.

American Constitution Society, Musings on Muslim Ban 2.0, March 13, 2017.

The Conversation, Trump's immigration executive orders: The demise of due process and discretion, March 6, 2017. (reprinted in Associated Press, Newsweek, Salon, Houston Chronicle, and additional outlets)

Medium, Leaked DHS Memo Implementing the Executive Order on Border Enforcement, February 18, 2017.

Medium, Leaked DHS Memo Implementing the Executive Order on Interior Enforcement (or Is Prosecutorial Discretion Dead?), February 18, 2017.

Medium, On This Day: The End of NSEERS, December 2016.

Notice & Comment, Yale Journal on Regulation; Medium, Understanding the Final Rule Ending NSEERS, December 2016.

Medium, Shutting Down Special Registration, December 2016.

Medium, NSEERS or "Muslim" Registration Was a Failed Post 9–11 Program and Must Come to an End, November 2016.

American Constitution Society, Medium, Musings on Dreamers, Mass Deportations and a "Muslim Registry", November 2016.

Medium, Immigration Law and Policy After the Election: Six Key Points, November 2016

Supreme Court of the United States Blog (SCOTUS Blog), Symposium: A meditation on history, law and loss, June 23, 2016.

American Constitution Society. Beyond Deportation: Prosecutorial Discretion Requests After U.S. v. Texas, June 28, 2016.

American Constitution Society. Reflections on Judge Hanen's Reprimand. May 23, 2016.

American Immigration Council, ImmigrationImpact. Understanding Justice Kennedy's Upside Down Argument, April 20, 2016.

ImmigrationProf Blog. U.S. v. Texas – TRUE OR FALSE?, April 19, 2016.

American Constitution Society. Notice and Comment Rulemaking in U.S. v. Texas, April 15, 2016.

Yale Law Journal on Regulation, Notice and Comment, Employment Authorization and Prosecutorial Discretion: The Case for Immigration Unexceptionalism, February 10, 2016.

The Patriot-News, Trump's Muslim ban reeks of failed post-9/11 anti-Muslim policies, December 10, 2015.

The Hill, 9-11 Flashback and Future Immigration Policy, December 9, 2015.

The Hill, On the Anniversary of Obama's Immigration Announcement, November 21, 2015.

Centre Daily Times, Syrian Refugees and Moral Courage, November 21, 2015.

The Hill, Immigration Argument at the Fifth Circuit, July 14, 2015.

Centre Daily Times, State College Raid: Reflections One Year Later, June 9, 2015.

American Constitution Society. A President's Constitutional and Faithful Execution of Immigration Law, January 19, 2016.

American Constitution Society. Book Talk. Beyond Deportation: The Role of Prosecutorial Discretion in Immigration Cases, January 27, 2016.

From the Square. NYU Press Blog. The Refugee Dilemma and the Broader Immigration Debate, December 11, 2015.

American Constitution Society. Seeking to Understand the Fifth Circuit Ruling on Deferred Action, November 11, 2015.

Crimmigration. Beyond Deportation: The Relationship Between Immigration Prosecutorial Discretion and Criminal Activity, August 4, 2015.

From the Square. NYU Press Blog, Book Notes: Beyond Deportation, July 28, 2015.

ImmigrationProf Blog. Law Professor Blogs, Work authorization for dreamers, a week of wonders and woes, July 17, 2015.

ImmigrationProf Blog. Law Professor Blogs, Beyond Deportation, July 10, 2015.

Centre Daily Times Raids, rights and the rule of law, June 24, 2014.

The Hill Relics of 'deferred action', November 20, 2014.

The Hill- Op-Ed To file or not to file Vargas's Notice to Appear, July 17, 2014.

Centre Daily Times State College Raid: Reflections One Year Later, June 9, 2015.

ImmigrationProf Blog. Law Professor Blogs, *Immigration Prosecutorial Discretion and Deportation,* April 30, 2014.

AILA Slip Opinion Blog. American Immigration Lawyers Association, *Ninth Circuit Upholds the Rule of Law and Limits Chevron Deference for Children who "Age-Out" During the Green Card Process*, October 2012.

ImmigrationProf Blog. Law Professor Blogs, *Deferred Action in Immigration Law: The Next Generation,* June 28, 2012.

AILA Leadership Blog. American Immigration Lawyers Association, *DHS Releases Long-Awaited Memo on Controversial 9/11 Program* (w. Denyse Sabagh), May 2012.

Wadhia Resume Page 21

AILA Slip Opinion Blog. American Immigration Lawyers Association, *Musings on the Visa Waiver Program, No-Right Waivers and the Age of Youth*, March 2012.

AILA Slip Opinion Blog. American Immigration Lawyers Association, Board Offers New Standard for Administrative Closure, and Highlights the Importance of Decisional Independence, February 2012.

ImmigrationProf Blog. Law Professor Blogs, *Prosecutorial Discretion and Post 9-11*, December 2011.

AILA Slip Opinion Blog. American Immigration Lawyers Association, Third Circuit Reflects on Unlawful Presence, Chevron, and the Importance of Prosecutorial Discretion, September 2011.

ImmigrationProf Blog. Law Professor Blogs, *White House's Review of Removal Cases*, September 2011.

ImmigrationProf Blog. Law Professor Blogs, *9/11 Registration and the Morton Memo*, July 2011.

ImmigrationProf Blog. Law Professor Blogs, (w. Leon Wildes) *Prosecutorial Discretion and the Legacy of John Lennon,* July 2011.

Co-founder and contributor to "Race Matters" blog: http://endnseers.blogspot.com/

**Advocacy - Law Professor Letters**

Co-author of letter to the White House supporting the legal authority of executive action in immigration law, signed by 136 law professors and featured in national press, Sept. 3, 2014
- Washington Post Lawyer's agree:  Obama has broad authority to act on deportations, Sept. 3, 2014

Co-author of letter supporting President Obama's deferred action programs announced signed by 135 law professors and featured in national press and at congressional hearings, Nov. 25, 2014:
- Associated Press Bigstory Legal Scholars: Obama's immigration actions lawful, Nov. 25, 2014

Co-author of letter to the White House defending the legality of extending deferred action to the parents of DACA (Deferred action for Childhood Arrivals) recipients, Nov. 3, 2014
- NBC News Law Profs: Legal To Include More Immigrant Parents In Exec Action, Dec. 3, 2014

Co-author of law professor letter challenging *Texas v. U.S.* (March 2015), signed by 104 immigration law scholars and featured in national press

- NBC News Legal Experts: <u>Ruling Blocking Immigration Action 'Deeply Flawed'</u>, March 13, 2015
- Law 360: Law Profs. Call Executive Action Injunction 'Deeply Flawed', March 13, 2015

## OTHER EXPERIENCE

**Howard University School of Law, Washington DC**
*Adjunct Faculty, January 2008-May 2008*
Taught 3 unit course on immigration law and policy

**American University, Washington College of Law, Washington DC**
*Adjunct Faculty, Spring 2005-August 2008*
Taught 3 unit course on asylum and refugee law

**Indiana University, Bloomington, Indiana**
*Teaching Assistant, Fall 1995*
Taught undergraduate course on American Political Science

**Georgetown University Law Center, Washington DC**
*Research Assistant for T. Alexander Aleinikoff, 1997-1998*

**District of Columbia Superior Court, Washington DC**
*Legal Intern, Fall 1997*

**Advice Desk for Abused Women, Durban, South Africa**
*Legal Intern/Trainer, Summer 1997*
Monitored women's collectives in rural regions of Zululand; Lived in a shelter for and counseled abused women and children; Wrote legal analysis of the Advice Desk for Abused Women's activities

**Indian Social Institute, New Delhi, India**
*Legal Researcher, Summer 1996*
Published legal analysis of girl-child prostitution in India; Conducted field work in village and slum areas of Delhi; wrote white paper on human rights education methods for women

**Department of Justice, Civil Rights Division, Washington DC**
*Washington Semester Intern, Fall 1994*
Read and absorbed Title II of the American with Disabilities Act (ADA); Reviewed and assessed complaints falling under Title II of ADA

## VOLUNTEER WORK AND COMMUNITY SERVICE

Wadhia Resume Page 23

- Georgetown University Law Center Mentor, Public Interest Law Scholars Program, 2006-2009
- National Lawyers Guild, Washington DC Chapter, Immigration Comm. Chair, 2001-2004
- Florida Immigrant Advocacy Center, Legal Volunteer, Spring 1996 (one week intensive)
- Council for Community Accessibility, Bloomington, IN, Volunteer, 1995
- Monmouth Medical Center, Long Branch, NJ, Hospital Volunteer, 1988-1993- 500+ hours

# DEF-INTERV.
# EX. 11

535

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

———————

No. 1:14-cv-254

STATE OF TEXAS, ET AL., PLAINTIFFS

*v.*

UNITED STATES OF AMERICA, ET AL., DEFENDANTS

———————

**DECLARATION OF DONALD W. NEUFELD**

———————

I, Donald W. Neufeld, hereby make the following declaration with respect to the above captioned matter.

1.  I am the Associate Director for Service Center Operations (SCOPS) for U.S. Citizenship and Immigration Services (USCIS), a component within the U.S. Department of Homeland Security (DHS or Department).  I have held this position since January 2010.  In this position, I oversee all policy, planning, management and execution functions of SCOPS.  My current job duties include overseeing a workforce of more than 3,000 government employees and 1,500 contract employees at the four USCIS Service Centers located in California, Nebraska, Texas and Vermont. These four centers adjudicate about four million immigration-related applications and requests annually, including all requests for deferred action under the

536

Deferred Action for Childhood Arrivals (DACA) process.

2.   I was previously the Deputy/Acting Associate Director for USCIS Domestic Operations from June 2007 to January 2010 where I oversaw all immigration adjudication activities at USCIS's four Service Centers and 87 field offices throughout the United States, as well as 130 Application Support Centers, four Regional Offices, two Call Centers, the Card Production Facility and the National Benefits Center.   From January 2006 to June 2007, I was Chief of USCIS Field Operations managing and overseeing the 87 field offices delivering immigration benefit services directly to applicants and petitioners in communities across the United States and the National Benefits Center (NBC) which performs centralized front-end processing of certain applications and petitions.   My career with USCIS and the legacy Immigration and Naturalization Service spans more than 30 years, where I have held several leadership positions including Deputy Assistant District Director for the Los Angeles District, Assistant District Director and later District Director of the Miami District, and Service Center Director for the California and Nebraska Service Centers.   I began my career in 1983, initially hired as a clerk in the Los Angeles District, then serving as an Information Officer, then an Immigration Examiner, conducting interviews and adjudicating applications for immigration benefits.   I also performed inspections of arriving passengers at Los Angeles International Airport.

537

3. I make this declaration on the basis of my personal knowledge and information made available to me in the course of my official duties.

### USCIS's Role in Immigration Enforcement

4. DHS has three components with responsibilities over the enforcement of the nation's immigration laws: (1) Immigration and Customs Enforcement (ICE); (2) Customs and Border Protection (CBP); and (3) USCIS. USCIS is the DHS component that administers a variety of immigration-related programs. Currently, USCIS adjudicates approximately seven million applications, petitions and requests per year, including applications for naturalization by lawful permanent residents (LPRs), immigrant visa petitions (including employment-based visa petitions filed by U.S. employers and family-based visa petitions filed by U.S. citizens and LPRs), a variety of non-immigrant petitions (including temporary worker categories such as the H-1B), asylum and refugee status, other humanitarian protections under the Violence Against Women Act (VAWA) and for victims of trafficking and crimes, humanitarian parole, and deferred action, among others.

5. USCIS's current budget is approximately $3.2 billion. This budget is funded overwhelmingly by user fees paid by individuals who file applications. Only approximately 5% of our budget is from Congressionally-appropriated taxpayer funds, and those appropriations are specifically designated for

538

operation and maintenance of the employment verifi-
cation system, known as E-Verify, and for limited
citizenship-related services (none of which are related
to requests for deferred action).

6.    USCIS employs approximately 13,000 federal
employees and an additional 5,000 contract employees
housed in a range of facilities throughout the United
States and overseas.   USCIS maintains 87 Field Of-
fices under its Field Operations Directorate (FOD)
and four major Service Centers under SCOPS.
These Service Centers are located in Dallas, Texas;
Laguna Niguel, California; Lincoln, Nebraska; and St.
Albans, Vermont.   Altogether, the Service Centers
employ approximately 3,000 federal workers.   USCIS
also operates the NBC, which is similar in size to a
Service Center.   The NBC performs some limited
adjudications, although it was originally established to
prepare cases for adjudication in other offices by con-
ducting pre-interview case review.

7.    The Field Offices and Service Centers adjudi-
cate a wide range of immigration-related applications
and requests.   USCIS distributes the responsibility
for processing and adjudicating various categories of
applications and requests among the Field Offices and
Service Centers based on multiple considerations in
order to achieve maximum efficiency, reliability, con-
sistency, and accuracy.

8.    The Service Centers are designed to adjudi-
cate applications, petitions and requests of pro-

grams that have higher-volume caseloads, including non-immigrant visa petitions (such as H-1Bs), I-130 petitions establishing relationships between a U.S. citizen or LPR and a foreign national relative, employment-based applications for adjustment of status to lawful permanent residence, multiple forms of humanitarian protection (including temporary protected status, protection under the VAWA, non-immigrant status for victims of crimes and trafficking), and requests for deferred action under the DACA process.[1]

9. In addition to the Field Offices and Service Centers, USCIS also uses three centralized "lockboxes" for the initial receipt and processing of most applications, requests, and fee payments received by the

---

[1] DACA is not the only deferred action program handled by USCIS Service Centers. For example, the Vermont Service Center (VSC) currently administers two programs through which individuals may be placed in deferred action, one related to relief under VAWA and one related to U nonimmigrant status. VAWA allows certain spouses, children, and parents to self-petition for family-based immigration benefits if they have been battered or subjected to extreme cruelty by the U.S citizen or LPR spouse or parent, or U.S. citizen son or daughter. If the VAWA self-petition is approved by VSC, the self-petitioner can file an application for adjustment of status that is adjudicated by the appropriate field office. In addition, based on the approved self-petition, the self-petitioner is eligible for consideration for deferred action and for an employment authorization document. VSC adjudicates all VAWA self-petitions and also administers the deferred action and EAD component of the VAWA program.

540

agency each year. At the lockbox, every application
and request is opened, reviewed for basic filing re-
quirements, then fees are collected, and data is cap-
tured. In order to ensure reliability and proper pro-
cessing, each application and request must be logged
into one of the USCIS computer systems, the paper
applications and requests must be scanned, the pay-
ment must be processed, a receipt must be issued, and
the hardcopy applications and requests must be dis-
tributed to the appropriate Field Office, Service Cen-
ter, or the NBC for further processing.

### The DACA Process

10. In 2012, then-Secretary of Homeland Security
Napolitano "set[] forth how, in the exercise of our
prosecutorial discretion, the Department of Homeland
Security (DHS) should enforce the Nation's immigra-
tion laws." In doing so, USCIS was tasked with im-
plementing the DACA process and adjudicating these
requests for deferred action. As explained by then-
Secretary Napolitano, the DACA process supports
DHS-wide efforts to efficiently prioritize overall en-
forcement resources through the removal of criminals,
recent border crossers, and aliens who pose a threat to
national security and public safety, while recognizing
humanitarian principles embedded within our immi-
gration laws. The individuals who could be consid-
ered for DACA "lacked the intent to violate the law"
because they were "young people brought to this coun-
try as children[.]" She further explained such chil-

541

dren and young adults could be considered, on a case-by-case basis, for deferred action if they met the guidelines, passed a criminal background check, and lived in the U.S. continuously for five years. Secretary Napolitano explained that DACA was part of "additional measures to ensure that [DHS's] enforcement resources [were] not expended on these low priority cases but [were] instead appropriately focused on people who meet [DHS's] enforcement priorities." *See* Exhibit A (June 15, 2012 Memorandum, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," (hereinafter "the Napolitano Memo")).

11. Under DACA, aliens brought to the United States as children before the age of 16 and who are determined to meet other certain guidelines, including continuous residence in the United States since June 15, 2007, can be considered for deferred action on a case-by-case basis.[2]   Requestors who meet the guide-

---

[2] The guidelines for DACA under the Napolitano Memo include: 1) being under the age of 31 as of June 15, 2012; 2) entering the U.S. before reaching the age of 16; 3) continuously residing in the U.S. since June 15, 2007 to the present time; 4) being physically present in the U.S. on June 15, 2012 and at the time of making the request for consideration for DACA; 5) having no lawful status on June 15, 2012; 6) being currently in school, having graduated or obtained a certificate of completion from high school, having obtained a General Educational Development (GED) certificate, or being an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and, 7) having not been con-

lines are not automatically granted deferred action under DACA. Rather, each initial DACA request is individually considered, wherein an adjudicator must determine whether a requestor meets the guidelines and whether there are other factors that might adversely impact the favorable exercise of discretion.

12. In addition to satisfying the DACA guidelines, requestors must submit to, and pay for, a background check. Information discovered in the background check process is also considered in the overall discretionary analysis. If granted, the period of deferred action under the existing DACA program is— depending on the date of the grant—two or three years.[3] Requestors simultaneously apply for employment authorization, although the application for employment authorization is not adjudicated until a decision is made on the underlying DACA request.

13. Procedurally, the review and adjudication of an initial request for deferred action under DACA is a multi-step, case-specific process described in greater detail below. The process begins with the request be-

---

victed of a felony, a significant misdemeanor, three or more other misdemeanors, and not otherwise posing a threat to national security or public safety.

[3] The 2012 Napolitano Memo directed USCIS to issue two-year periods of deferred action under DACA. Pursuant to the November 20, 2014 memo issued by Secretary Johnson, as of November 24, 2014, all first-time DACA requests and requests for renewals now receive a three-year period of deferred action.

543

ing mailed to a USCIS lockbox, which then reviews requests for completeness. Following review at the lock-box stage, those requests that are not rejected (as briefly described below) are sent to one of the four USCIS Service Centers for further substantive processing. Once a case arrives at a Service Center, a specially trained USCIS adjudicator is assigned to determine whether the requestor satisfies the DACA guidelines and ultimately determine whether a request should be approved or denied.

14. Unlike a "denial," a DACA request is "rejected" when the lockbox determines upon intake that the request has a fatal flaw, such as failure to submit the required fee,[4] failure to sign the request, illegible or missing required fields on the form, or it is clear that the requestor does not satisfy the age guidelines.

15. A DACA request is "denied" when a USCIS adjudicator, on a case-by-case basis, determines that the requestor has not demonstrated that they satisfy the guidelines for DACA or when an adjudicator determines that deferred action should be denied even though the threshold guidelines are met. Both scenarios necessarily involve the consideration of and exercise of USCIS's discretion.

16. Adjudicators evaluate the evidence each requestor submits in conjunction with the relevant

---

[4] Very limited fee exemptions are considered. *See* Exhibit B (FAQ 8).

DACA guidelines, assess the appropriate weight to accord such evidence, and ultimately determine whether the evidence is sufficient to satisfy the guidelines. Adjudicators must utilize judgment in determining weight accorded to the submitted evidence.

17. Where a guideline is not prescriptive, USCIS must also exercise significant discretion in determining whether that guideline, and the requestor's case in relation to that guideline, counsels for or against a grant of deferred action. For example, one of the DACA guidelines is that the requestor "has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety." *See* Exhibit A, at 1. While determining whether a requestor has been convicted of a felony is straightforward, determining whether a requestor "poses a threat to national security or public safety" necessarily involves the exercise of the agency's discretion.

18. Even if it is determined that a requestor has satisfied the threshold DACA guidelines, USCIS may exercise discretion to deny a request where other factors make the grant of deferred action inappropriate. For example, if the DACA requestor is believed to have submitted false statements or attempted to commit fraud in a prior application or petition, USCIS has denied DACA even when all the DACA guidelines, including public safety considerations, have been met. As another example, when USCIS learned that a

545

DACA requestor falsely claimed to be a U.S. citizen and had prior removals, as an exercise of discretion, USCIS denied the request even though those issues are not specifically part of the DACA guidelines.

19.  Under current DACA procedures, denials issued solely on discretionary grounds, including for national security and public safety reasons, are generally required to undergo review by USCIS headquarters.  There is an exception to that requirement for cases involving gang affiliation—where such affiliation is confirmed by interview—and those cases may be denied without further guidance from USCIS headquarters.  After an adjudicator in a USCIS Service Center determines that, in his or her discretion, a request should be denied for purely discretionary reasons, the adjudicator may send to USCIS headquarters a "Request for Adjudicative Guidance," which summarizes the case, usually recommends a denial for discretionary reasons, and seeks concurrence or guidance before rendering a final decision.  This process has been established to allow USCIS to ensure consistency and avoid arbitrary decisions regarding discretionary denials.

20.  Adjudicators have the authority to verify documents, facts, and statements provided by the requestor by contacting educational institutions, other government agencies, employers, or other entities.  *See* Exhibit B (USCIS Frequently Asked Questions for DACA Requestors (hereinafter DACA FAQs)), FAQ

546

21.   In addition, adjudicators at the Service Centers may refer a case for interview at a Field Office.  *See* Exhibit C (redacted DACA interview notices).  Typically, an interview would be requested when the adjudicator determines, after careful review of the request and supporting documents, that a request is deniable, but potentially curable, with information that can best be received through an interview instead of requesting additional supporting documents.   For example, where an adjudicator suspected a requestor was associated with a gang, an interview was conducted to question the requestor regarding this association.

21.   An adjudicator may also issue a "Request for Evidence" (RFE) or a Notice of Intent to Deny (NOID) to require the requestor to submit additional evidence in support of the request for DACA.   An RFE is issued when not all of the required initial evidence has been submitted or the adjudicator determines that the totality of the evidence submitted does not meet the DACA guidelines or other discretionary factors.   A NOID is more appropriate than issuing an RFE when the officer intends to deny the request based on the evidence already submitted because the request does not appear to meet DACA guidelines or other discretionary factors, but the request is not necessarily incurable.   Since August 15, 2012 through December 31, 2014, 188,767 RFEs and 6,496 NOIDs have been issued in the process of adjudicating DACA requests.   Failure to respond may result in a denial. *See* Exhibit D (redacted DACA-related RFEs and

547

NOIDs); Exhibit E. In addition, all DACA requestors must submit to background checks, and requests are denied if these background checks show that deferred action would be inappropriate. Information discovered in this process may be provided to ICE, CBP, and other law enforcement authorities for further action if appropriate. *See* Exhibit B (DACA FAQs 19 and 20).

22. If USCIS denies a DACA request, USCIS applies its policy guidance governing the referral of cases to ICE. Normally, if the case does not involve a criminal offense, fraud, or a threat to national security or public safety, the case is not referred to ICE for purposes of removal proceedings. Many of the cases involving discretionary denials were referred to ICE due to public safety issues.

23. Since the inception of DACA through December 31, 2014, USCIS accepted as filed 727,164 initial requests for deferred action under DACA. An additional 43,174 requests were submitted to USCIS, but were rejected at the lockbox stage. Of the 727,164 initial requests that were accepted for filing, 638,897 were approved, 38,597 were ultimately denied, and the rest remain pending. All DACA requestors also submit applications for employment authorization. Of

548

the 970,735 employment authorization applications received, 825,640 were approved.[5]  *See* Exhibit E.

24. The reasons for these 38,597 denials vary. Most were based on a determination that the requestor failed to meet certain threshold criteria, such as continuous residence in the United States. Other denials involved cases in which the deciding official exercised further judgment and discretion in applying the criteria set forth in the policy, including where individuals were determined to pose a public safety risk based on the individual circumstances of the case. For example, DACA requests have been denied for discretionary public safety reasons because the requestor was suspected of gang membership or gang-related activity, had a series of arrests without convictions, arrests resulting in pre-trial diversionary programs, or ongoing criminal investigations. Requests have also been denied on the basis that deferred action was not appropriate for other reasons not expressly set forth in 2012 DACA Memorandum, such as evidence of immigration fraud.  See supra ¶ 18 (citing examples).  Until very recently, USCIS lacked any ability to automatically track and sort the reasons for

---

[5] The total number of employment authorization document application receipts is higher than the number of DACA requests because USCIS systems do not distinguish between employment authorization document applications made by initial requestors, renewal requestors, or those seeking to replace an employment authorization document.

549

DACA denials, and it still lacks the ability to do so for all DACA denials except for very recent ones.

25.  DACA is funded exclusively through the fees requestors submit with their DACA request.  No Congressional appropriations are used to administer DACA.

### 2014 DACA Modifications and <u>Deferred Action for Parents of U.S. Citizens and LPRs (DAPA)</u>

26.  On November 20, 2014, Secretary Johnson issued a memorandum directing DHS to implement certain modifications to DACA and to create a process for certain parents of U.S. Citizens and LPRs to apply for deferred action (DAPA).  The DACA modifications include:  (1) allowing individuals over 31 to request deferred action; (2) increasing the period of deferred action and work authorization from two to three years; and (3) adjusting the date regarding the beginning of the continuous residence period from June 15, 2007 to January 1, 2010.  These modifications will not change the case-by-case process for reviewing DACA requests described above.  USCIS is in the process of determining the procedures for reviewing requests under DAP A, and thus USCIS has not yet determined whether the process to adjudicate DAPA requests will be similar to the DACA process.  However, as with DACA, DAPA will be funded through fees submitted by requestors, and USCIS will not use Congressional appropriations to administer DAPA.

550

27.  The 2014 DACA modifications and DAPA do not restrict the longstanding authority of USCIS to grant deferred action in the exercise of its discretion. Accordingly, if a requestor is denied DACA or DAPA, USCIS may consider deferred action for the requestor if such action is considered appropriate in the agency's discretion.  *See* Exhibit B (DACA FAQ 71).

28.  USCIS has taken some steps to implement the expanded DACA and DAPA, such as securing adequate office space and beginning to develop a form, among others.  In taking these steps, USCIS has counted on receiving the fees that will be generated by requestors when submissions commence in February for DACA and May 2015 for DAPA.  USCIS has carefully calibrated expenses incurred in light of anticipated revenues to ensure the continuing fiscal integrity of our budget.  USCIS's budget contemplates that we will begin receiving fees from requestors soon to cover some of the expenses we have already incurred and fund the process as it continues to go forward.

29.  Based on our experience implementing DACA in 2012, we anticipate that fewer than the total number of estimated persons who might meet the guidelines for DAPA would submit requests.  The total estimated population for DACA was projected to be approximately 1.2 million individuals in 2012.  To date, approximately 720,000 initial DACA requests, or roughly 60% of the total estimated population, have been received by the agency.  The projected total population

for DAPA is estimated at approximately 3.85 million. USCIS currently anticipates approximately 50% of this population will submit requests in the 18-month period after USCIS begins accepting requests.

30. As the foregoing paragraphs explain, the DACA program requires case-by-case consideration of each request and provides for individualized adjudicatory judgment and discretion. Each case is first reviewed by lockbox contractors who reject requests that are incomplete. All non-rejected cases are then forwarded to a USCIS Service Center for a case-by-case review. Upon careful review of the case, adjudicators regularly issue RFEs and NOIDs for additional evidence, where after initially reviewing the request, adjudicators determine the request is deniable, but also curable with additional evidence. In making a decision on each case, adjudicators must carefully evaluate the weight of the submitted evidence to ensure compliance with the discretionary guidelines broadly outlined by the Secretary when establishing DACA. They must also make determinations on individual requests based on non-prescriptive guidelines such as "public safety" and "national security." Finally, in DACA, USCIS exercises its discretion by otherwise denying a request where other factors not included in the guidelines would make the grant of deferred action inappropriate.

552

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of Jan. of 2015.

/s/ <u>DONALD W. NEUFELD</u>
Donald W. Neufeld

# DEF-INTERV.
# EX. 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

## DECLARATION OF DOUGLAS S. MASSEY, PH.D

1.      My name is Douglas S. Massey and I am over the age of 18 and fully competent to make this declaration.

2.      I was asked by Defendant-Intervenor's counsel to serve as an expert witness in this case.  I am being compensated for my time in preparing this report at the rate of $250 per hour.

3.      A complete list of my qualifications, including a list of all publications authored in the previous 10 years, is included in my curriculum vitae, attached hereto as Exhibit A to this declaration.  I have not served as an expert witness in any litigation in the last 4 years.

4.      I have 38 years of experience on the faculties of the University of Pennsylvania, the University of Chicago, and Princeton University. In the course of my career, I have accumulated substantial expertise on documented and undocumented migration from Latin America to the United States, and on the status and behavior of Latin American migrants within

the United States.

5.      I am currently the Henry G. Bryant Professor of Sociology and Public Affairs at Princeton University where I direct the Office of Population Research, the nation's oldest Population Research Center. I also direct the New Immigrant Survey, the Latin American Migration Project, and the Mexican Migration Project, which together collect and disseminate data on documented and undocumented migration to data users throughout the world.  I have published more than 10 books and 100 refereed articles on the subject of international migration. I hold a 1978 Ph.D. from Princeton and am an elected member of the National Academy of Sciences, the American Academy of Arts and Sciences, and the American Philosophical Society. I am Past-President of the American Academy of Political and Social Science, the American Sociological Association, and the Population Association of America. In 2009 I won the Distinguished Career Award of the International Migration Section of the American Sociological Association, and the Mexican Migration Project has been recognized by a MERIT Award from the National Institutes of Health as well as the Malinowski Award from the Society for Applied Anthropology, bestowed to honor the project's "efforts to understand and serve the needs of the world through the use of social science."

6.      The Mexican Migration Project (MMP), which I have directed for 30 years, is the largest and most reliable source of data on documented and undocumented migration to the United States. Since 1987 it has annually collected detailed data on Mexico-U.S. migration through representative surveys of Mexican communities and targeted surveys of U.S. destination areas. The database currently includes surveys from 161 communities located throughout Mexico, which together contain data on 27,113 households and 169,945 individuals, 26,446 of whom reported U.S. migratory experience. All MMP data are publicly available from the project

website at http://mmp.opr.princeton.edu/, which currently has 4,757 registered data users worldwide.

7.      Since 1998 I have also directed the Latin American Migration Project (LAMP), which uses methods developed on the MMP to carry out surveys of migrant sending communities in other nations throughout Latin America, including Costa Rica, Colombia, the Dominican Republic, Ecuador, El Salvador, Guatemala, Haiti, Nicaragua, Peru, and Puerto Rico. The LAMP database currently includes 10,388 households and 57,433 persons, 5,520 with international migratory experience and has 1,882 registered users. The references authored or coauthored by me and cited in this declaration rely on the MMP database for findings reported on Mexico and the LAMP database for findings on Central America.

8.      Migration from Mexico to the United States began in the early 20th as a result of direct recruitment by private employers and expanded rapidly during the First World War with U.S. government recruitment and accelerated further during the 1920s in response high labor demand in the United States (Massey et al. 1987; Massey, Durand, and Malone 2002). After a hiatus during the Great Depression in the 1930s, Mexico-U.S. migration was revived in 1942 by the Bracero Program, a binational agreement negotiated by federal authorities with Mexico to allow the annual importation of Mexican laborers for short-term work on temporary visas. By the late 1950s, around 450,000 Bracero migrants were entering the United States each year, along with around 50,000 permanent residents (Massey and Pren 2012).

9.      The Bracero Program was terminated by Congress at the end of 1964, by which time some 4.6 million Mexican Braceros had entered and worked the United States. In 1965 Congress amended U.S. immigration law to enact the first-ever numerical restrictions on legal immigration from the Americas. These restrictions were tightened by additional legislation in

1976, which imposed an annual quota of 20,000 permanent resident visas on all nations in the Western Hemisphere (Massey, Durand, and Malone 2002). As opportunities for legal entry constricted, Mexicans increasingly entered without authorization in response to ongoing U.S. labor demand and higher wages north of the border (Massey, Durand, and Pren 2014).

10.     Unauthorized migration grew from 1965 to 1979, then stabilized and thereafter fluctuated in response to economic conditions in Mexico and the United States. Before 1986 unauthorized migration was heavily circular, with 85% of undocumented entries offset by departures, yielding a slowly growing unauthorized population (Massey and Singer 1995). In 1986 the United States began a sustained militarization of the Mexico-U.S. border. By 2010 the number of Border Patrol agents had multiplied 5.6 times and the agency's budget had increased nearly 24 times (Massey 2015, 2016). The intensification of border enforcement dramatically increased the financial costs and physical risks of unauthorized border crossing and in response migrants minimized crossing, not by remaining in Mexico but by staying longer in the United States, steadily lowering the rate of return migration back to Mexico (Massey, Durand, and Pren 2015).

11.     Since net migration equals in-migration minus out-migration, the ultimate effect of border militarization was to increase the net volume of unauthorized migration and accelerate growth in the undocumented population, which rose from 2 million in 1988 to 12 million in 2008. As male workers stayed longer in the United States, they increasingly arranged for the entry of their spouses and children (Massey, Durand, and Pren 2016). These children are today's Dreamers and DACA recipients. Once families were reunited north of the border, husbands and wives began having U.S.-born citizen children, as did single male migrants who over time formed romantic partnerships in the United States. As of 2016, some 5.1 million children were

estimated to reside in the U.S. with an undocumented parent, 79% of whom were U.S. citizens and 2% were legal permanent residents (Capps, Fix, and Zong 2016).

12.     Mexico's fertility rate began a precipitous decline during the 1970s and approached replacement levels after the year 2000, leading to the aging of Mexican society and a steady rise in Mexico's average age. Migration is strongly age-dependent, with rates rising from the late teens through the early 20s and then declining to low levels by age 30. Owing to the fertility decline, the average age in Mexico rose from around 17 years in the 1970s to 29 years today. As a result, unauthorized migration began to decline around 2000 and according to the best estimates (Passel and Cohn 2017) in 2008 the net inflow turned negative (with departures exceeding arrivals). At this point, undocumented Mexican migration has been negative for a decade, the size of the undocumented is falling, and number of Mexicans being apprehended at the border is at its lowest point since the 1940s. Owing to its demographic transition to low fertility, undocumented migration from Mexico is over, and despite persistent employment demand and higher wages in the United States, it is unlikely to revive (Massey, Durand and Pren 2016).

13.     Migration from Central America to the United States began in the 1980s as a direct result of the U.S. political and military intervention in the region, which covertly supported death squads in El Salvador and Guatemala while training and equipping an army of "Contras" based in Honduras in an effort to topple the leftist Sandinista regime in Nicaragua and thereby prevent the spread of communism in Latin America (Lundquist and Massey 2005). From 1980 to 1986, civil violence spread, deaths multiplied, and as a result of ongoing violence the region's economy constricted. In response, Central Americans fled northward and crossed the border without authorization. While Nicaraguan refugees were allowed to adjust status and

become legal permanent residents (since they were fleeing a nation with a leftist government opposed by the United States), refugees fleeing El Salvador, Honduras, and Guatemala (governed by right-wing regimes allied with the United States) were not recognized and remained undocumented (Massey, Durand, and Pren 2014). The Central American minors seeking asylum at the border today are a legacy of this outflow, seeking to escape horrendous conditions caused by the U.S. intervention by reuniting with family members in the United States who had fled the region during the 1980s and 1990s.

14.     Although research indicates that unauthorized Mexican migrants to the United States originally came and went in response to economic circumstances on both sides of the border (Massey 1987; Massey and Espinosa 1997), the connection between return migration and economic conditions in Mexico was broken by the militarization of the border after 1986, causing rates of return to drop precipitously toward levels near zero, where they remain today (Massey, Durand, and Pren 2015). Studies show that, controlling for economic conditions on both sides of the border, rates of return migration fall steadily as migrants spend more time in the United States (Massey 1986; Massey and Espinosa 1997).

15.     Even during the era of circular migration before 1986, once established in the United States as settlers, the likelihood of returning to Mexico after five years in the United States was close to zero (Massey 1987). Similar findings hold for migrants from Central America, who are even less likely to return because of endemic violence in their regions of origin. As with Mexican migrants, the likelihood of returning home also falls sharply for Central Americans with time spent in the United States (Massey and Riosmena 2010) and has steadily fallen over time for Central American migrants generally, with one study finding a zero likelihood of return migration to the region as of 2005 (Massey, Durand, and Pren 2014).

6

16.     According to the latest statistics from U.S. Citizen and Immigrant Services (2018), there are 814,000 young people registered for DACA. Of these, 79% are Mexicans, 9% are Central Americans, and 6% are from elsewhere in Latin America. This population is not representative of undocumented U.S. residents generally, only 50% of whom are Mexican with 16% coming from Central America (Passel and Cohn 2017). Two-thirds of DACA recipients are under age 25 (compared to just 23% of all undocumented migrants), 54% are female (with a figure of 46% for all undocumented migrants), and 83% are single (compared with 40% for undocumented migrants generally) according to data reported by Lopez and Krogstad (2017) and the Migration Policy Institute (2018).

17.     These differences are not surprising given the criteria required to qualify for DACA. All recipients must have entered the United States before their 16th birthday, have been under the age of 31 as of June 15, 2012, physically residing in the country on that date, and also present at the time of their application. Moreover, all were high school graduates, GED holders, or persons honorably discharged from the U.S. Armed Forces who had lived continuously in the United States since June 15, 2007. None has ever been convicted of a felony or even a significant misdemeanor and all have been judged to pose no threat to national security or public safety by the U.S. Department of Homeland Security, a level of vetting far stricter than experienced by new legal permanent residents.

18.     Based the foregoing profile and the findings summarized above, I conclude it is very unlikely that DACA recipients from Mexico and Central America will voluntarily return to their countries of origin if they lose the legal right to remain in the United States. All available data indicate a strong attachment to the United States, and their many years of U.S. experience from a young age render them unrepresentative of subjects included in prior studies of return

7

migration. Earlier studies overwhelmingly focused on persons who began migrating as adult labor migrants, not children who were brought into the United States at young ages, who grew up speaking fluent English, attending U.S. schools, and consuming American culture. In addition, DACA recipients are unprepared for life and labor in their countries of birth. Most speak elementary household Spanish, cannot read or write very well in that language, and are unfamiliar with the culture and customs of nations they left long ago.

19.     Ultimately, by virtue of applying for DACA the recipients have signaled their ardent wish to remain in the United States and identify as Americans, despite the risks of coming out of the shadows and registering their presence with federal authorities. They had no real say about their being brought to the United States as minors, but by registering with DACA they are exercising their will to have a say about where they spend the rest of their lives, expressing a clear intent to remain where they grew up and in the only country they really know, whatever the challenges they face in achieving that end.   I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 13th day of June, 2018 in Jamaica, Vermont.

_____
Douglas S. Massey, Ph.D
Henry G. Bryant Professor of Sociology and Public Affairs
Princeton University

# REFERENCES

Capps, Randy, Michael Fix, and Jie Zong. 2016. *A Profile of Children with Unauthorized Immigrant Parents*. Washington, DC:  Migration Policy Institute.

López, Gustavo, and Jens Manuel Krogstad. 2017. *Key Facts about Unauthorized Immigrants Enrolled in DACA. Washington, DC: Pew Research Center*. http://www.pewresearch.org/fact-tank/2017/09/25/key-facts-about-unauthorized-immigrants-enrolled-in-daca/

Lundquist, Jennifer H., and Douglas S. Massey. 2005. "Politics or Economics?  International Migration During the Nicaraguan Contra War." *Journal of Latin American Studies* 37:29-53.

Massey, Douglas S. 1986. "The Settlement Process Among Mexican Migrants to the United States." *American Sociological Review* 51:670-85.

Massey, Douglas S. 1987. "Understanding Mexican Migration to the United States." *American Journal of Sociology* 92:1372-1403.

Massey, Douglas S. 2015.  "Militarization of the Mexico-U.S. Border and its Effect on the Circularity of Migrants." Pp. 23-33  in Diego Acosta and Anja Wiesbrock, eds., *Global Migration: Old Assumptions and New Dynamics*, Volume 1.  New York: Praeger.

Massey, Douglas S. 2016. "The Mexico-U.S. Border in the American Imagination." *Proceedings of the American Philosophical Society* 160(2):160-177.

Massey, Douglas S., Rafael Alarcón, Jorge Durand, and Humberto González. 1987.  *Return to Aztlan:  The Social Process of International Migration from Western Mexico.*  Berkeley and Los Angeles:  University of California Press.

Massey, Douglas S. Jorge Durand, and Nolan Malone. 2002. *Beyond Smoke and Mirrors: Mexican Immigration in an Age of Economic Integration.*  New York:  Russell Sage Foundation.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2014. "Explaining Undocumented Migration." *International Migration Review* 48(4):1028-1061.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2015. "Border Enforcement and Return Migration by Documented and Undocumented Mexicans." *Journal of Ethnic and Migration Studies* 41(7): 1015-1040,

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2016. "Why Border Enforcement Backfired." *American Journal of Sociology* 121 (5): 1557– 1600.

Massey, Douglas S., and Kristen E. Espinosa. 1997. "What's Driving Mexico-U.S. Migration?  A Theoretical, Empirical and Policy Analysis." *American Journal of Sociology* 102:939-999.

Massey, Douglas S., and Karen A. Pren. 2012. "Unintended Consequences of US Immigration

Policy: Explaining the Post-1965 Surge from Latin America." *Population and Development Review* 38:1-29.

Massey, Douglas S., and Fernando Riosmena. 2010. "Undocumented Migration from Latin America in an Era of Rising U.S. Enforcement." *Annals of the American Academy of Political and Social Science* 630(1):137-161.

Massey, Douglas S., and Audrey Singer. 1995. "New Estimates of Undocumented Mexican Migration and the Probability of Apprehension." *Demography* 32:203-13.

Migration Policy Institute. 2018. *Profile of the Unauthorized Population: United States.* Washington, DC: Migration Policy Institute. https://www.migrationpolicy.org/data/ unauthorized-immigrant-population/state/US#

Passel, Jeffrey S., and D'Vera Cohn. 2017. *As Mexican Share Declined, U.S. Unauthorized Iimmigrant Population Ffell in 2015 Below Recession Level.* Washington, DC: Pew Research Center. http://www.pewresearch.org/fact-tank/2017/04/25/as-mexican-share-declined-u-s-unauthorized-immigrant-population-fell-in-2015-below-recession-level/

U.S. Citizenship and Immigration Services. 2018. "Data Set: Form I-821D Deferred Action for Childhood Arrivals." Washington, DC: U.S. Citizenship and Immigration Services. https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals