**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**EXHIBITS IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# Volume 3

# Exhibits 13 - 18

# DEF-INTERV.
# EX. 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | § Case No. 1:18-CV-68 |
| | § |
| UNITED STATES OF AMERICA, *et al.*, | § |
| | § |
| Defendants, | § |
| | § |
| and | § |
| | § |
| KARLA PEREZ, *et al.*, | § |
| | § |
| Defendant-Intervenors. | § |

**DECLARATION OF R. GIL KERLIKOWSKE**

I, R. Gil Kerlikowske, declare:

1.      I was the Commissioner of U.S. Customs and Border Protection (CBP) from 2014-2017. I am currently a Professor of Practice at Northeastern University in the School of Criminal Justice and Criminology.  I am also a Distinguished Senior Fellow at the Global Resilience Institute at Northeastern University and a non-resident Fellow at Rice University.  I hold a B.A. and an M.A. in Criminal Justice from the University of South Florida.  My address is 4286 Massachusetts Ave NW, Washington, D.C. 20016.

2.      Prior to my tenure at CBP, I had approximately four decades of experience with law enforcement and drug policy.    From 2009 to 2014, I served as the Director of the Office of National Drug Control Policy.  From 2000 to 2009, I served as the Chief of Police for Seattle, Washington.  From 1998 to 2000, I served as the Deputy Director for the U.S. Department of

1

Justice, Office of Community Oriented Policing Services.   In addition, I served as the Police

Commissioner for Buffalo, New York, from 1994 to 1998.  I began my law enforcement career

as a police officer in St. Petersburg, Florida in 1972.  I enlisted in the U.S. Army in 1970 and

served as a Military Police officer.

      3.     I have attached a true and complete copy of my curriculum vitae to this

Declaration which includes many of my publications over the past ten years.  The compensation

I am paid for testimony in this case is $250 per hour.  In the past four years, I have testified as an

expert in trial or by deposition in the *Texas v. United States* case.

      4.     During my tenure at CBP I oversaw approximately 60,000 employees.  CBP

officers protect our nation's borders and safeguard national security by keeping criminal

organizations, terrorists and their weapons out of the United States while facilitating lawful

international travel and trade.

      5.     This declaration addresses the relationship between DACA and CBP's

immigration enforcement mission.  I make this declaration on the basis of my personal

knowledge and knowledge gained during my tenure at CBP.

  **6.  Use of Prosecutorial Discretion by CBP Works in Tandem With DACA**

      7.     The Department of Homeland Security (DHS) had during my tenure, and to my

knowledge still has, three departments with responsibilities over the administration and

enforcement of the nation's immigration laws: CBP, U.S. Immigration and Customs

Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).  CBP secures the

borders at and between ports of entry, preventing the admission of inadmissible aliens and the

entry of illicit goods.  CBP works closely with ICE, which is responsible for identifying,

apprehending, detaining and removing inadmissible and deportable aliens from the United

2

States, including aliens apprehended by officers and agents of CBP. CBP also, to my knowledge, continues to work closely with USCIS, which among other duties, determines on a case-by-case basis whether deferred action for individual undocumented immigrants is appropriate under certain circumstances.

8.      CBP officers and agents regularly encounter individuals who lack lawful status to enter or remain in the United States. The number of apprehensions on the southern border regularly exceeds 400,000 individuals per year. Since 2009, there have been over 2.4 million apprehensions.[1] While the vast majority of these individuals are apprehended while attempting to illegally cross the border into the United States, CBP also encounters individuals who are unlawfully present in the country, often at internal checkpoints located at areas of strategic importance.

9.    CBP exercises discretion working closely with ICE, given finite resources that are under the control of ICE, when it decides to release someone on an order of supervision or release someone to NGO's. CBP officers and agents also regularly exercise discretion with respect to the individuals they encounter. This discretion takes the form of deciding whom to stop, question or arrest. In addition, federal regulations authorize CBP officers to issue a Notice to Appear (NTA) to initiate removal proceedings before an immigration judge. See 8 CFR § 239.1. For example, in 2016, the most recent year for which data is available, CBP, in communication and cooperation under the authority of ICE, issued

---

[1] Southwest Border Migration FY2018, U.S. CUSTOMS AND BORDER PROTECTION, https://www.cbp.gov/newsroom/stats/sw-border-migration#.

93,146 NTAs, about 45 percent more NTAs than in 2015.[2] However, CBP chose many times, as an act of discretion, to leave the decision of whether to issue an NTA to ICE.

10.     CPB issued guidance to its officers through roll call training during which it provided direction on the priorities for enforcement based upon the policy directive of Secretary Johnson. I had no direct involvement in the roll call training, but I do know that those meetings occurred.

**Benefits of Deferred Action for CBP Immigration Enforcement Efforts**

11.     In my experience, when a CBP agent at a checkpoint or other location encounters an individual whose immigration status is not apparent after initial questioning, that alien is taken to the nearest location where the agent can continue to question and process the alien. During processing, an alien's biographical information and biometrics (i.e., fingerprints) are collected. Record checks are run through CBP and other law enforcement systems. Agents review all of the pertinent facts and circumstances to determine whether or not the alien is a priority for removal.

12.     This process is detailed in DHS Secretary Johnson's November 20, 2014 memorandum, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants.*[3] This memorandum discusses prioritizing the removal of aliens who pose a threat to national security, border security or public safety.

13.     Processing aliens involves questioning the individual, collecting biographical and biometric information, and conducting background checks. This process takes a CBP agent time that could otherwise be spent at the checkpoint or on other enforcement duties.

---

[2] *See* U.S. Department of Homeland Security, "Immigration Enforcement Actions: 2016" (Dec. 2017), available at  https://www.dhs.gov/sites/default/files/publications/Enforcement_Actions_2016.pdf
[3] *See* Memorandum on Policies for the Apprehension, Detention and Removal of Undocumented Immigrants, DEP'T OF HOMELAND SEC. (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

4

14.     Individuals granted deferred action under the 2012 Deferred Action for Childhood Arrivals (DACA) guidelines are, at times, encountered by CBP agents at checkpoints or other locations.  When a DACA recipient is able to provide DACA documentation or a work authorization document, a CBP agent can more efficiently verify the identity of the individual, as well as the authenticity of the documentation provided.  Absent other factors and circumstances meriting further inquiry, and upon verifying the information provided, CBP agents normally take no further action with respect to that individual because that individual has already been registered, subjected to a background check and determined not to be an enforcement priority.

15.     The DACA initiative allows CBP to more efficiently identify individuals who are not a priority for removal and allows individual agents to better concentrate their limited enforcement efforts on those individuals who do pose a threat to national security, border security and public safety.  In this way, DACA improves the operations of CBP and of DHS by allowing the agencies to better carry out their law enforcement missions in the context of limited resources.

### Benefits of the DACA Initiative for Community Safety

16.     Based on my years of experience in law enforcement, I believe DACA substantially benefits the overall safety of our communities.

17.     It is my understanding that the DACA initiative allows USCIS to process deferred action applications for undocumented individuals who meet the stated requirements.  The more deferred action grants made, the more individual non-citizens CBP agents can easily identify as not being enforcement priorities. This allows CBP to expend its finite resources to combat threats to national security, border security and public safety.

5

18.     Providing front line law enforcement personnel with documentation from vetted individuals who do not pose a threat to public safety or border security allows them to return more quickly to duties that have a higher priority.

19.     As a former police chief and former Commissioner of CBP, one of the nation's largest law enforcement organizations, I understand the critical need to prioritize law enforcement resources.  If law enforcement organizations do not ensure that their limited resources are directed to their highest priorities, overall public safety is compromised.  Focusing limited immigration enforcement resources on aliens who are eligible for DACA diverts resources from addressing recent border crossers and real national security and public safety threats, such as those who may be terrorists, smugglers, drug traffickers, or engaged in transnational organized crime.

20.     Another law enforcement benefit of DACA is that,

6

temporarily eliminating the immediate fear of detention and deportation, recipients may be more inclined to cooperate with federal, state, and local law enforcement in reporting crimes or serving as witnesses in criminal cases.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on 23 June , 2018, at

R. Gil Kerlikowske

1

# DEF-INTERV.
# EX. 14

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

## DECLARATION OF STEPHEN H. LEGOMSKY

My name is Stephen H. Legomsky.  I am over the age of 18 and fully competent to make this declaration.  I have personal knowledge of, and could testify in court concerning, the following statements of fact:

1.     I am the John S. Lehmann University Professor Emeritus at the Washington University School of Law in Saint Louis, Missouri.  I have taught United States immigration law for more than 30 years and am the author (co-author starting with the fifth edition) of the law school coursebook "Immigration and Refugee Law and Policy," the seventh edition of which is now in process.  This book is published by Foundation Press.  I am also the author of "Immigration and the Judiciary – Law and Policy in Britain and America," published by the Oxford

1

University Press in 1987, as well as numerous articles on immigration law in scholarly journals.

2.   From October 2011 to October 2013, which includes the times when the program known as Deferred Action for Childhood Arrivals ("DACA") was announced and initiated, I served as the Chief Counsel of U.S. Citizenship and Immigration Services (USCIS), in the United States Department of Homeland Security (DHS). USCIS is the agency charged with implementing DACA.   From July 2015 to October 2015 I served as Senior Counselor to the Secretary of Homeland Security, also on immigration matters.   I have advised both Democratic and Republican Administrations on immigration policy. For example, I chaired the 5-member policy advisory group convened by Immigration and Naturalization Service Commissioner Gene McNary (during the administration of George H.W. Bush), which met with the Commissioner for a half-day every month.   I also advised the transition teams for President Clinton and President Obama.

3.   I have testified, as a private citizen, before both the U.S. House and U.S. Senate Judiciary Committees concerning the legality of large-scale deferred action programs.   My written statement submitted in conjunction with my House Judiciary Committee testimony of Feb. 25, 2015 (the latter of the two testimonies) analyzes   the   legal   issues   in   detail   and   can   be   found   at https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf.

4.   At present, I am an inactive member of the State Bar of California.

## I.    DACA and Prosecutorial Discretion

5.      DHS routinely establishes priorities guiding its exercise of prosecutorial discretion in the enforcement of the immigration laws. One of the instruments DHS uses for implementing enforcement priorities is deferred action. 8 CFR § 274a.12(c)(14) (deferred action "gives some cases lower priority"). DACA, in turn, is one particular deferred action initiative.

6.      DACA is a decision by the agency to defer action (immigration enforcement proceedings) against an individual. To quote the U.S. Supreme Court in *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), just as it true of other federal agencies, DHS's decision "not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. [DHS] must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing."

7.      When making a decision not to bring immigration enforcement proceedings against an individual, DHS must also balance factors specific to immigration -- national security, public safety, border security, degree of fault and compassionate circumstances, to name just a few.

8.     Reinforcing those considerations is the express mandate from Congress:   The
Secretary of Homeland Security is "responsible" for "establishing immigration
enforcement policies and priorities."  6 USC § 202(5).

9.     There are occasions on which DHS selects  deferred action as the preferred
vehicle for implementing its prosecutorial priorities.  Among the individuals who
are low enforcement priorities, DHS has to decide which, if any, should receive
deferred action.  To make that decision DHS has to balance not only the same
factors that affected its prosecutorial priorities generally, but several others as
well.

10.    On the one hand, DACA requestors are present in the U.S. in violation of the
immigration laws.  On the other hand there are countervailing equities and there
are benefits that DACA provides and that DHS has both the expertise and the
responsibility to evaluate.  These include the relative absence of moral culpability
evidenced by the violation (DACA eligibles violated the immigration laws but
were innocent children at the time, typically brought here by their parents).  In
addition, DACA eligibles had to have lived in the United States since 2007 and be
under the age of 31, so that many know only this country.

11.    DACA, unlike a negative decision simply to forgo or delay active prosecution and
release an individual, draws undocumented immigrants out of the shadows and
into the open, so that DHS can know their names, addresses, and histories; if a
DACA requestor or recipient has a criminal history or violates the law, DHS can
immediately place that individual into removal proceedings by issuing a Notice to
Appear.  At the same time, if DHS officers come across an individual who has

obtained a DACA grant, the officers can quickly determine from that individual's paperwork, without redundant and time-consuming investigation, that the DACA recipient has been vetted and already deemed low-priority.

12.    Benefits that accrue beyond DHS include the fact that communities are safer when crime victims and witnesses feel secure enough to report crimes to the police; DACA boosts the tax contributions of the recipients; and unscrupulous employers who currently know they can hire unauthorized workers at low wages will have less reason to hire DACA recipients over U.S. workers and will be less able to drive down overall market wages or working conditions in the process. As with other non-enforcement actions, the agency's expertise leaves it uniquely well-positioned to balance those policy factors.

13.    USCIS and its predecessor agency have utilized prosecutorial discretion, and deferred action in particular, for several decades.[1]

14.    During my time as Chief Counsel of USCIS I had ample occasion to study a range of issues related to deferred action generally and DACA in particular. I am not aware of any law, court decision, or other legal authority that forbids the use of deferred action, or limits its use to specific statutorily-enumerated contexts, or allows it when the number of affected individuals is small but not when that number is large.

15.    Indeed, either deferred action or its functional equivalent has been used by several Administrations, of both political parties, to grant temporary reprieves from

---

[1] The history is described in Office of Legal Counsel, U.S. Dept. of Justice, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014), at 13-20; and in Shoba Sivaprasad Wadhia, *Beyond Deportation – The Role of Prosecutorial Discretion* (2015), chap. 4.

removal, and in some cases temporary employment authorization, to large, specifically-defined subclasses of undocumented immigrants. A list of some 39 examples is provided by Amer. Immigration Council, Executive Grants of Temporary Immigration Relief, 1956-Present (Oct. 2014), https://www.americanimmigrationcouncil.org/sites/default/files/research/executiv e_grants_of_temporary_immigration_relief_1956-present_final_0.pdf.

16.     These past Administrations granted temporary reprieves from removal to large subclasses of undocumented immigrants for a variety of reasons.   In some instances the beneficiaries tended to be those with a bridge to some form of legal status.  DACA too serves as such a bridge because many current DACA recipients are eligible to adjust as they grow older and marry.  But a bridge to a formal legal status is merely one reason for creating such programs; many such programs were designed to serve other humanitarian purposes.  Here again, DACA is similar to those programs.  Examples of deferred action or similar programs for classes of individuals who otherwise lacked any bridge to legal immigration status include:

- President George H.W. Bush's 1989 parole of Soviet and Indochinese who had been denied refugee status;

- President George H.W. Bush's 1992 grant of "deferred enforced departure" to certain Salvadorans whose temporary protected status had expired;

- President Clinton's 1994 extension of that 1992 grant;

- President George W. Bush's 2005 grant of deferred action to foreign students who had been adversely affected by Hurricane Katrina;

- President George W. Bush's 2007 grant of deferred enforced departure to Liberians after their temporary protected status had expired;

- President Obama's 2009 and 2011 extensions of that 2007 grant; and

- President Obama's 2009 grant of deferred action to widows and widowers of U.S. citizens and their children under age 21.

*Id.* These illustrate the broad range of humanitarian, foreign policy, and other reasons for executive action that spare large numbers of aliens from removal and in many cases grant temporary permission to work.

17.     The number of individuals benefited by past deferred action or similar programs varies, but in some instances exceeds several hundred thousand. For example, the discretionary program for Cuban asylum seekers from 1959 to 1972 allowed over 600,000 individuals to be paroled into the U.S.; the discretionary program for people from Vietnam, Cambodia, and Laos from 1975-1979 allowed over 350,000 individuals to be paroled into the U.S.; President Reagan's 1987 program of deferred action for undocumented children of some noncitizens who applied to legalize after 1986 immigration reform involved more than 100,000 families; and, according to the congressional testimony of President Bush's Immigration and Naturalization Service Commissioner, the President's 1990 "family fairness" program was expected (at the time it was announced) to defer the deportation of, and authorize employment for, some 1.5 million undocumented spouses and children of the legalization beneficiaries under the 1986 Immigration Reform and Control Act (IRCA). For detailed support, *see* Stephen H. Legomsky, U.S. House Judiciary     Committee     testimony     of     February     25,     2015,

https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-

Testimony.pdf.

18.     Despite occasional imprecise language in various court filings, immigration law

recognizes a crucial difference between lawful "presence" and lawful "status."

USCIS has interpreted deferred action as giving rise to temporary lawful

"presence," but it cannot, and as the memo creating DACA explicitly provides,

does not, create any legal immigration "status." Because the individual continues

to lack lawful immigration *status*, DACA, like any other grant of deferred action,

may be revoked, and the individual placed in removal proceedings, at any time.

Once DACA is revoked, one who had entered without inspection will be

removable under 8 USC § 1182(a)(6)(A)(i) (present in the United States without

being admitted or paroled).  One who overstayed a nonimmigrant visa will be

removable under 8 USC § 1227(a)(1)(C)(i) (failed to maintain nonimmigrant

status or comply with the conditions of such status).  Consequently, DACA is

never a barrier to the government commencing removal proceedings when it

wishes to do so.  Moreover, since all DACA recipients had to have been already

previously unlawfully present for much longer than the one-year period that

triggers the ten-year inadmissibility bar (with some narrow exceptions, including

those who were not unlawfully present for a year or more after age 18), and since

DACA does not erase that previous period of unlawful presence, the person will

ordinarily be inadmissible for ten years upon departure from the United States.  8

USC §§ 1182(a)(9)(B)(i)(II), 1182(a)(9)(B)(iii).

19. Even if a court were to hold that the executive branch lacks the authority to deem deferred action recipients temporarily lawfully present, that conclusion would be at most a reason to invalidate the determination of lawful presence, not a reason to invalidate DACA itself. No law makes lawful presence a prerequisite for deferred action or for the grant of work authorization (the latter discussed separately in section II below).

20. A grant of DACA, like any other grant of deferred action, is simply a tentative, revocable signal to an alien that he or she is a low enforcement priority and that the government therefore does not intend to initiate removal proceedings for a specified period of time. As the regulations explain, deferred action is simply "an act of administrative convenience to the government which gives some cases lower priority." 8 CFR § 274a.12(c)(14).

21. In exchange, the DACA requestor must come forward, submit biographic and biometric data that will then be checked against various law enforcement and intelligence databases, provide his or her address, supply documentary proof of the DACA threshold criteria, and send payment of the processing fee ($465 at the inception of DACA).

22. Like any other workers with U.S. income, DACA recipients are required to pay federal and state income taxes, including Social Security and Medicare taxes. One who receives deferred action and work authorization does become eligible for various federal benefits that flow from existing law -- mainly various statutory provisions and in at least one instance a binding regulation. Examples include 8 CFR § 274a.12(c)(14) (allowing deferred action recipients to apply for temporary

9

work permits if they can demonstrate economic necessity); 8 USC §§ 1611(b)(2,3) (Social Security and certain Medicare benefits, although DACA recipients, having been under age 31 since 2012 at the earliest, will ordinarily be ineligible for both Social Security and Medicare for the next several decades); and 26 USC § 32 (earned income tax credit).

23. But the key point concerning these other benefits is that, in issuing DACA, the Obama Administration did not attempt to change any of the laws or policies that make deferred action recipients eligible for those benefits. Nor am I aware of any legal problems with the laws that provide those benefits to DACA and other deferred action recipients.

24. Because DACA requires continuous residence in the United States since June 15, 2007, it is not available to anyone who arrives today or in the future. Thus it creates no incentive for future illegal immigration.

25. DHS grants deferred action precisely when the INA does not provide a lawful immigration status to an individual but where there are equities that are felt to warrant deferred action. Through its application of prosecutorial discretion, DHS routinely grants deferred action to undocumented individuals. Examples include those who are seeking to adjust under the Violence Against Women Act (VAWA); who are applying for withholding of removal; who are applying for cancellation of removal; who are seeking to adjust status as beneficiaries of family preference petitions; who have applied for U-visas; or who have applied for T-visas.

## II.   Employment Authorization

26.   On the subject of the employment rights of aliens, perhaps the most important provision of the Immigration and Nationality Act (INA) is 8 USC § 1324a(h)(3). That is the definitional provision that lays out which aliens may work and which ones may not.  To be ineligible for employment authorization, the alien must *not* be "either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act *or by the [Secretary of Homeland Security]*"[2] [my emphasis].  *Id.*  The plain language of this provision makes clear that employment authorization is not limited to those aliens whom other provisions of the Immigration and Nationality Act (INA) already authorize to work; it extends also to those whom the Secretary of Homeland Security so authorizes.

27.   That plain language completes the statutory scheme in a way that comports with common sense and sound policy.  On the one hand, the INA identifies several specific categories of aliens who are eligible for employment authorization.  In addition to the LPRs explicitly mentioned in section 1324a(h)(3), a few examples are 8 USC §§ 1101(a)(15) (H,O, and P) (certain temporary workers), 1158(c)(1)(B) (asylees), and 1254a(a)(1)(B) (recipients of temporary protected status).  On the other hand, the INA also identifies several specific categories of aliens who are ineligible for employment authorization.  Examples include business visitors, 8 USC § 1101(a)(15)(B); visitors for pleasure, *id*; asylum applicants for the first 180 days after the filing of the application, 8 USC §

---

[2] The text refers to the Attorney General, but under the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002), § 1517, that term is now to be read as referring to the Secretary of Homeland Security, to whom the relevant authority has been reassigned.

1158(d)(2); individuals in removal proceedings (unless already authorized to work), 8 USC § 1226(a)(3); and (with exceptions) those who are awaiting execution of final removal orders, 8 USC § 1231(a)(7).  For all other aliens – i.e., those who (like the DACA recipients) typically do not fall within either of these two sets of provisions -- 8 USC § 1324a(h)(3) clarifies that the decision whether to authorize work is left to the Secretary of Homeland Security, who is the official to whom Congress has delegated principal responsibility for administering and enforcing the immigration laws, 8 USC § 1103(a); 6 USC § 202(5).

28.　　The formal regulations supplement this carefully-constructed statutory scheme. They list numerous categories of aliens who are eligible for employment authorization.  Many of the listed categories cover classes of aliens who are typically present in the United States unlawfully.  These include individuals with pending *applications* for cancellation of removal, registry, temporary protected status, and (under 1986 legislation) legalization.  See, respectively, 8 CFR §§ 274a.12(c) (10, 16, 19, and 22).  In a similar vein, section 274a.12(c)(14), first adopted in 1982 during the Reagan Administration and in frequent and continuous use ever since, expressly makes deferred action recipients eligible for employment authorization, provided they can show an "economic necessity" to work.

## III.　Advance Parole

29.　　8 USC § 1182(d)(5) gives the Secretary of Homeland Security the discretion to "parole" an alien into the United States, on a case by case basis, "for urgent humanitarian reasons or significant public benefit."  The term "advance parole"

refers to a decision by USCIS, upon request, to provide a reasonable assurance --
though not a guarantee -- that a person who is currently in the United States and
who wishes to leave temporarily will "likely" be paroled back into the country
upon his or her return. *Matter of Arrabally and Yerrabelly*, 25 I. & N. Dec. 771,
778 n.6 (BIA 2012).  This enables the person to leave the country temporarily
without undue fear of being unable to return.

30.    Parole can come into play in another context.  To be eligible for adjustment of
status to lawful permanent residence under 8 USC § 1255, one has to have been
"admitted or paroled" at one time.  Id. § 1255(a).  A person who was admitted on
a nonimmigrant visa will meet this requirement even if he or she has now
overstayed, but a person who entered without inspection (and has never been
admitted or paroled) will not.

31.    In general, adjustment of status under 8 USC § 1255 requires proof that the
person meets all the substantive requirements for LPR status plus additional
requirements for the adjustment of status procedure.  Although parole will satisfy
the "admitted or paroled" requirement, it will not result in adjustment of status
unless the applicant meets all those other requirements as well.  These include not
only fitting within one of the categories of lawful permanent resident
affirmatively authorized by Congress (for example family, employment skills,
etc.), but also not falling within any of the more than 20 pages of inadmissibility
grounds laid out in 8 USC § 1182(a) (subject to a few narrowly drawn statutory
discretionary waivers).  These alone are rigorous requirements.

32.  But there are others, one of which is of critical importance here.   Under 8 USC §
1255(c)(2), almost all adjustment of status applicants who are not immediate
relatives (a term defined narrowly in 8 USC § 1151(b)(2)(A)(i)  to encompass
only certain very close family members of US citizens) must prove they have
continuously maintained a lawful status in the U.S. since entry.  That requirement
alone disqualifies the overwhelming majority of DACA recipients, regardless of
advance parole.  The only numerically significant sub-group of DACA recipients
for whom advance parole would remove that one remaining obstacle to
adjustment of status consists of immediate relatives, and even then only if they
entered without inspection.

33.  Understanding the effects of advance parole on DACA recipients is crucial,
because some have relied on the possibility of advance parole to claim that
DACA effectively creates a path to LPR status and eventual U.S. citizenship.  For
two reasons, that characterization is faulty.   First, neither DACA nor advance
parole creates that path.   As explained above, the person still needs some
independent statutory route to LPR status; if such a route exists, and the person
otherwise meets all the prescribed requirements, then advance parole merely helps
to satisfy one of the many statutory requirements.  Second, as of December 31,
2015, fewer than 1% of all DACA recipients had received advance parole and
then received or even applied for adjustment of status.   Letter from Leon
Rodríguez, Director, USCIS, to Charles E. Grassley, Chairman, Committee on the
Judiciary, United States Senate (June 29, 2016).  The tiny percentage who do so
are applying for a benefit expressly conferred by the INA.

14

34. In his affidavit presented to this court, Mr. Palinkas states that DACA recipients who received advance parole and then applied for adjustment of status "jumped the line and were able to get permanent residence faster than the legal and eligible applicants who filed under current USCIS rules and regulations." That statement is incorrect. The small percentage of DACA recipients who receive advance parole and apply for adjustment of status are not permitted to "jump the line." As immediate relatives, they are statutorily exempt from numerical limitations and thus need only await administrative processing, just like all other immediate relatives seeking adjustment of status.

## IV.   The "Rubber-Stamping" Assertion

35. Mr. Palinkas's affidavit asserts that USCIS adjudicators are forced to "rubber-stamp" their approvals of DACA requests. His premises for this claim are that DACA adjudications normally do not require personal interviews and that the approval rates are in his view high.

36. As to the interview issue: the particular threshold criteria for DACA are ordinarily ascertainable from a combination of written documents and required background checks. For example, whether the requestor "has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on the date of this memorandum" can be ascertained through a combination of employment or school records, leases, or other documents. Once that timeline is established, the person's age at time of arrival, which must be under 16, can be determined from the birth certificate. The same is true of the requirement that the person not be above the age of 30 on the date of filing the

request. Whether the person "is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States" is established through the official school or Armed Services records. And the facts that relate to criminal history or threats to public safety or national security are gleaned from the required searches of the relevant law enforcement and intelligence databases. The National Standard Operating Procedures ("SOPs") for DACA adjudicators lay out in detail the wide range of documents that the adjudicators are expected to consult. See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 44-64. For these determinations, personal interviews are not necessary and would add little if any value.

37. To accept Mr. Palinkas's theory that the lack of a personal interview per se renders the results unreliable, one would have to condemn not only the DACA process, but the entire body of work performed by the USCIS Service Centers. They receive applications in the mail or online and decide the cases on the basis of the required documentation and the background checks. See U.S. Citizenship and Immigration Services, USCIS Service Centers, https://egov.uscis.gov/crisgwi/go?action=offices.type&OfficeLocator.office_type =SC. They handle more than 4 million cases per year. See U.S. Citizenship and Immigration Services, "USCIS Service Center Operations," Fiscal Year 2016 Report to Congress (Jan. 18, 2017),

https://www.dhs.gov/sites/default/files/publications/USCIS%20-
%20USCIS%20Service%20Center%20Operations.pdf, at 2.  See also U.S.
Citizenship and Immigration Services, Service Center Forms Processing (last
updated Apr. 16, 2018), https://www.uscis.gov/forms/service-center-forms-
processing, which lists all the different forms that the five Service Centers
adjudicate.  By my count there are 45 different benefit adjudications assigned to
the Service Centers.  They include a number of benefits that are either
prerequisites to, or applications for, formal legal status as immigrants or
nonimmigrants -- i.e., cases in which the long-term consequences are far greater
than for DACA requests.

38.   The DACA SOPs for the adjudicators include instructions to carefully examine all
cases for possible fraud, "based on the standard fraud protocols."  See USCIS
Service Center Directorate, National Standard Operating Procedures (SOP),
Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 7 and chap.
I.

39.   As to the approval/denial rates: the most recent available official compilation of
DACA approval and denial rates displays those data as of March 31, 2018.  See
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20St
udies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Q
uarterly_Report_4.2.18.pdf.  The cumulative denial rate for initial DACA requests
(i.e. as opposed to renewals), from the inception of the program through March
31, 2018, was approximately 8.5%.[3]

---

[3] Importantly, these are just the denials on the merits.  They are to be distinguished from, and do not include,
"rejections," which entail returning the DACA file to the requestor upon arrival at the lockbox, for technical reasons

40.     One would expect the denial rate to be lowest in the early years of the program and highest as time goes on, because the initial batch of requests would be likely to be the strongest; the more marginal requests might be expected to be filed later. In fact, that is precisely what has happened; the compilation above shows the denial rate steadily increasing with time, reaching above 20% for the first two quarters of fiscal year 2018. The annual denial rates for initial DACA requests for fiscal year 2013 through the first two quarters of 2018, calculated from the USCIS official report cited above (denials divided by the sum of approvals and denials), were as follows:

| Fiscal Year | Denial Rate |
| --- | --- |
| 2013 | 2.3% |
| 2014 | 13.4% |
| 2015 | 17.4% |
| 2016 | 17.7% |
| 2017 | 16.4% |
| 2018 | 20.1% |

41.     In all, some 75,510 DACA requests have been denied on the merits as of March 31, 2018. *Id.*

42.     The roughly 80% current approval rate is not surprising when one considers the applicant pool. A person who is undocumented, especially if there is some other negative information in his or her background, is highly unlikely to initiate contact with the immigration authorities, voluntarily reveal his or her name and address, confess to being undocumented, confess to any other negative history,

---

such as failure to sign the form, failure to enclose the required fee or the required documents, etc.

and send a check for $465 – all for a benefit that is most likely going to be denied. It is thus hardly surprising that the approval rate is as high as it is. Given the applicant pool, the approval rate does not support any inference of rubber-stamping.

43.     In any given case, an adjudicator who determines that he or she needs additional information in order to reach a decision may issue a "Request for Evidence" (an "RFE"). I do not have access to the precise number of DACA RFEs, but on information and belief my impression is that they have numbered in the thousands.

44.     In the end, despite his conclusory assertions that the DACA adjudication process is insufficiently rigorous, Mr. Palinkas never identifies a single concrete piece of information that he claims adjudicators are unable to obtain or consider. I am similarly unable to identify any such missing information.

## V.     Discretion

45.     Previously cited examples of deferred action or equivalent exercises aimed at large, specifically-defined classes of undocumented immigrants demonstrate that numerous Presidents have assumed they had the power to create such programs. While the fact that other Administrations have done something does not prove that it is legal to do so, it is instructive that Congress has long been fully aware of these actions and to date has never blocked the practice. There is no indication that Congress believed these past practices to be unlawful.

46.     Even assuming *arguendo* that all deferred action must be issued on an individual basis, DACA satisfies that requirement. The fact that the agency has announced

the general criteria that should guide the exercise of that discretion does not mean that there is no discretion to exercise. Agency guidance as to the exercise of discretion in individual cases is a common practice that serves several crucial purposes. Important general policy decisions like DACA should be made at the leadership level, because political accountability rests solely with leadership, not with the career employees whose job is to carry out the policies. Further, only the leadership can disseminate guidance throughout the agency so that the people on the ground know what they are supposed to do, so that important priorities will be transparent to the public, and so that there will be some reasonable degree of consistency. Consistency in turn is essential to equal treatment. To the extent avoidable, the decision whether to arrest, detain, prosecute, or grant or deny deferred action should not depend on which officer happens to encounter the person or which prosecutor's desk the person's file happens to land on. For all these reasons, the DACA process wisely entails adopting general threshold criteria at the front end while still requiring individualized, case-by-case discretion at the back end.

47. The National Standard Operating Procedures issued by agency and departmental leadership to the USCIS adjudicators repeatedly and explicitly admonish them to approach each case individually and to exercise discretion. See USCIS Service Center Directorate, National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA) (Sept. 13, 2012), at 17 ("individual *may* be favorably *considered* for DACA if" the threshold criteria are met) (my emphasis); 44 (substantially similar instruction); 74 ("decision whether to defer

20

action in a particular case is *individualized and discretionary*, taking into account the nature and severity of the underlying criminal, national security, or public safety concerns") (my emphasis); 75 ("criminal history ... is a factor to be considered in the unreviewable *exercise of discretion*") (my emphasis).

48.     There is no evidence to support any counter-instinctive assumption that the USCIS adjudicators who decide DACA requests are systematically disobeying the Secretary's multiple clear instructions to exercise discretion on a case-by-case basis. They are in fact exercising discretion at two different stages of the process:

49.     First, some of the threshold criteria themselves require fundamentally discretionary judgments. Whether someone endangers the public safety, for example, is more than simply a matter of finding facts. The adjudicator has to decide not only how probable and how severe a danger the particular individual poses, but also how probable and how severe it *has to be* before finding the person to be a threat to public safety. There is no scientific answer to that question; it is a matter of opinion, not fact. The same is true when the question is whether the person is a threat to national security. There are foundational facts to be ascertained, but once they are, the adjudicator must decide whether the threat is probable enough and severe enough to warrant denying DACA. This is the classic definition of a discretionary determination – one for which there is no uniquely correct answer. See, e.g., S.A. de Smith, "Constitutional and Administrative Law" (4th ed. 1981), at 278. The fact that the discretion is exercised in applying the threshold criteria rather than separately after the threshold criteria have been met does not make the determination any less

21

discretionary. The adjudicator is still choosing between two permissible courses of action. See, e.g., *Gonzalez-Oropeza v. U.S. Attorney General*, 321 F.3d 1331, 1332-33 (11th Cir. 2003) (determinations of "exceptional and extremely unusual hardship," which is a statutory prerequisite for cancellation of removal, are discretionary and therefore unreviewable); *Romero-Torrez v. Ashcroft*, 327 F.3d 887, 889-92 (9th Cir. 2003) (same). Nor is there any apparent legal or policy reason to value either exercise of discretion more than the other.

50.     Second, the Neufeld affidavit submitted in the DAPA litigation in fact gave specific examples of cases in which DACA was denied in the exercise of discretion even though the threshold criteria had been met. See *State of Texas v. United States*, Civ. No. B-14-254 (S.D. Tex. Feb. 16, 2015), Exh. 44, Declaration of [USCIS Associate Director for Service Operations] Donald W. Neufeld, at 510, para. 18. In his sworn declaration, Mr. Neufeld stated that "USCIS has denied DACA even when all the DACA guidelines, including public safety considerations, have been met." *Id.* He furnished specific examples. They included cases where a person had committed or had attempted to commit fraud in *prior* applications or petitions (not in connection with the DACA requests themselves), or where a person met all the threshold criteria but had previously made a false claim of U.S. citizenship and had had prior removals. *Id.*

51.     For all the foregoing reasons, and for additional reasons elaborated in my U.S. House Judiciary Committee testimony of February 25, 2015, https://judiciary.house.gov/wp-content/uploads/2016/02/Legomsky-Testimony.pdf, it is my firmly-held opinion that DACA is a case-by-case exercise

22

of prosecutorial discretion by which DHS fulfills the Congressional directive to set and carry out immigration enforcement priorities.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this   16th   day of July, 2018 in   St. Louis, Missouri.

Stephen H. Legomsky

23

# DEF-INTERV.
# EX. 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant- | § | |
| Intervenors | § | |

## DECLARATION OF SARAH R. SALDAÑA

My name is Sarah R. Saldaña. I am over the age of 18 and fully competent to make this declaration.

1. I am the former Director of U.S. Immigration and Customs Enforcement ("ICE"), a component of the Department of Homeland Security ("DHS" or "Department"). I held that position from December 23, 2014 to January 20, 2017.

1

2.  In my position as ICE Director, I led the largest investigative agency within DHS, overseeing nearly 20,000 employees in 400 offices across the country and 46 foreign countries.   I make this declaration on the basis of my personal knowledge and information made available to me in the course of my official duties.

3.  Before becoming ICE Director, I served as a United States Attorney for the Northern District of Texas for more than three years.   I was previously an Assistant United States Attorney in the same office and a partner in the trial department of a law firm in Dallas, Texas.

4.  I am a graduate of Texas A&I University, currently Texas A&M University, and hold a Bachelor of Science degree.   I also hold a Juris Doctorate from Southern Methodist University.

**DHS and ICE Mission of Immigration Enforcement**

5.  ICE is one of the three DHS components with responsibilities over the administration and enforcement of the nation's immigration laws.   The other two agencies are the U.S. Customs and Border Protection ("CBP") and U.S. Citizenship and Immigration Services ("USCIS").

6.  ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade and immigration.   In working to achieve its mission, ICE coordinates closely with CBP, which includes the Offices of Border Patrol, Field Operations, and Air and Marine Operations, and employs the uniformed corps of officers and agents charged with patrolling our nation's ports and borders.   ICE also partners with USCIS

immigration adjudicators who decide eligibility for immigration benefits and certain other forms of immigration relief.

7.  Within ICE, the Office of Enforcement and Removal Operations (ERO) is responsible for identifying, apprehending, detaining, and removing inadmissible or deportable aliens from the United States, as appropriate.  ERO also removes aliens transferred to ICE by CBP officers and agents, and aliens against whom removal proceedings are initiated by USCIS.

## Limited Resources of DHS and ICE

8.  During my tenure as ICE director, ERO consistently removed hundreds of thousands of aliens annually from the United States.  ICE records reflect that there were 226,119 individuals removed in FY 2017; while I was ICE Director, ICE removed 240,255 individuals in FY 2016 and 235,413 in FY 2015.[1]

9.  Based on limited resources, DHS does not have the capacity to investigate, detain, and remove all individuals who violate our immigration laws.  The most current estimate of the unauthorized immigration population residing in the United States is 12.1 million.[2]

10. Congress has chosen to provide limited funding for immigration enforcement, thus requiring DHS to make decisions about how it allocates its limited resources for the investigation, arrest and removal of undocumented immigrants. In light of DHS's limited resources and statutory mandates, ICE prioritized the apprehension and

---

[1] *See* US ICE, "Fiscal Year 2017 ICE Enforcement and Removal Operations Report," at 12, available at https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf
[2] This estimate was released in July 2017 and is current to January 2014. *See* DHS Office of Immigration Statistics, Office of Strategy, Policy & Plans, "Estimates of the Unauthorized Immigrant Population Residing in the United States:    January    2014,"    July    2017,    available    at https://www.dhs.gov/sites/default/files/publications/Unauthorized%20Immigrant%20Population%20Estimates%20i n%20the%20US%20January%202014_1.pdf.

removal of persons who pose a threat to national security, persons apprehended while attempting to cross the border illegally or who recently did so ("recent border crossers"), and persons convicted of serious crimes or who otherwise threaten public safety.   The vast majority of individuals removed by ICE fell into one of these categories.   For example, for FY 2015, ICE removed a total of 235,413 individuals.  Of those removals, 70% were in the border region, and 59% were of individuals with criminal convictions.  Only 2.5% (5,939) of removals were of noncriminals in the interior of the U.S.   For FY 2016, ICE removed a total of 240,255 individuals.  Of those removals, 73% were in the border region, and 58% were of individuals with criminal convictions.  Only 2.1% (5,014) of removals were of noncriminals in the interior of the U.S.  For FY 2017, ICE removed a total of 226,119 individuals.  Of those removals, 64% were in the border region, and 56% were of individuals with criminal convictions.  Only 6.1% (13,744) of removals were of noncriminals in the interior of the U.S.[3]

**ICE Enforcement Challenges**

11. Besides limited resources, ICE faces several challenges in accomplishing its enforcement mission.   One challenge requiring ICE to spend more resources conducting removals is the changing demographics of the immigrant population entering the country.   For example, from FY 2010 to FY 2014, the number of Mexican nationals apprehended by the Border Patrol fell by 43 percent, while the number of apprehensions of nationals from El Salvador, Guatemala, and Honduras increased by 423 percent in FY 2014.  In general, removing Central Americans is

---

[3] *See* US ICE, "Fiscal Year 2017 ICE Enforcement and Removal Operations Report," at 13, available at https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf

4

more resource-intensive than removing Mexican nationals. While a Mexican national apprehended by CBP may, in many cases, be removed in a matter of hours, often without entering ICE custody, a national of a non-contiguous country apprehended at the border must generally be transferred to ICE and may need to remain in ICE custody for weeks or months until travel documents can be obtained from that country and removal arrangements via aircraft can be arranged.[4]

12. Another important demographic change impacting Department operations was the unprecedented surge of children and families from El Salvador, Guatemala, and Honduras intercepted at the border during FY 2014. Such cases present unique challenges for ICE given the special care needed and the legal obligations imposed by applicable laws and court orders with regard to providing housing for alien children in immigration proceedings,[5] as well as the stringent standards applicable to ICE family residential centers.[6]

13. To respond to these developments, ICE significantly expanded its family-appropriate housing, which must be designed and operated in a manner appropriate for the unique needs of this population and compliant with applicable legal requirements and residential standards, which are far more expensive to satisfy than those applicable to adult detention facilities.[7]

---

[4]   Although inadmissible aliens apprehended at the border are often subject to the "expedited removal" process, those who demonstrate a "credible fear" of persecution or torture if returned to their countries are legally entitled to formal removal proceedings before an immigration judge, which can take many months, if not years, to complete. Because nationals of some Central American countries are more likely than Mexican nationals to claim a fear of return, the increased percentage of Central American apprehensions increases DHS's costs in managing and deterring border violations.

[5]   *See* William Wilberforce Trafficking Victim Protection Reauthorization Act of 2008, Pub. L. No. 110-457 (Dec. 23, 2008); *Flores* settlement agreement, *Flores v. Reno*, Case No. CV 85-4544 (C.D. Cal. Jan. 17, 1997).

[6]   *See* ICE Family Residential Standards, at http://www.ice.gov/detention-standards/family-residential.

[7] https://www.dhs.gov/sites/default/files/publications/CFO/17_0524_U.S._Immigration_and_Customs_Enforcement.pdf.

14. To address the demographic changes in illegal immigration (i.e., increases in Central American families requiring ICE involvement), and to do our part to ensure border integrity, ICE diverted resources from the interior of the country to the border. This, in turn, resulted in fewer resources available to identify, detain, and remove individuals in the interior of the country. For instance, over the course of FY 2014, ERO detailed over 800 of its officers and support personnel (over 10 percent of the ERO workforce) to support southwest border operations. ICE also reallocated increased detention capacity, transportation resources, and other assets to support those operations.

15. Although during the Trump Administration, ICE has increased its arrests of individuals in the interior, removals of individuals apprehended in the interior still constituted only 36% of all removals in FY 2017, thus demonstrating the continued focus on enforcement in the border region.[8]

16. Another factor significantly impacting the ability of ICE to remove individuals from the United States is the backlog of the nation's immigration courts, which are under the jurisdiction of the Department of Justice. There are currently 714,067 cases pending before the immigration courts, up from 629,051 in FY 2017.[9] In particular, cases on the non-detained immigration court dockets routinely take years or more to complete.

**Impact of DACA and a Potential Injunction Blocking DACA**

---

[8] *See* US ICE, "Fiscal Year 2017 ICE Enforcement and Removal Operations Report," at 13, available at https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf
[9] TRAC Immigration, "Immigration Court Backlog Tool," available at http://trac.syr.edu/phptools/immigration/court_backlog/

17. DACA represents an effort by DHS, among others, to better prioritize its limited resources toward removing individuals who pose threats to national security, public safety, or the integrity of the border, as was required by Congress when it directed DHS in its Appropriations Act to prioritize "identification and removal of [immigrants] . . . by the severity of the crime."[10]   Among other things, DACA is intended to: incentivize certain non-priority aliens to present themselves to DHS, submit biographic and biometric information, and undergo background checks; and provide temporary relief from removal, which is expected to assist state and local law enforcement agencies with community-policing efforts.   DACA also complements and supports DHS's priority-based use of its resources.

18. Enjoining DACA would prevent ICE from benefitting from the efficiencies that such policy was intended to create.   For instance, when state and local law enforcement agencies encounter an alien who has received deferred action under DACA, ICE personnel would be able to quickly confirm the alien's identity through a biometric match.   This is because USCIS collects fingerprints and conducts background checks for DACA requestors.   The availability of such information allows ICE to more efficiently work with our law enforcement partners to promote public safety.

19. Similarly, when ICE officers are engaged in at-large enforcement operations, such as to locate criminal and fugitive alien targets, they often encounter non-target aliens who may also be removable from the United States.   If such aliens have received deferred action under DACA and have documentary proof of this on their persons, ICE officers would be able to ascertain more quickly whether enforcement resources

---

[10] DHS Appropriations Act, Pub. L. No. 111-83, 123 Stat 214, 2149 (2009).

should be expended to detain and initiate removal proceedings against the individuals. This would also allow ICE to further focus its resources on priority aliens.

20. DACA also assists with the efficient processing of high-priority cases in the immigration courts. While ICE attorneys who represent DHS in removal proceedings before the immigration courts can and do exercise prosecutorial discretion to promote efficient handling of dockets by immigration judges, DACA assists ICE attorneys and immigration judges in identifying non-priority cases. And, when an alien in removal proceedings receives deferred action from DHS under DACA, the agency may choose to drop the case, thereby making additional docket time available for high-priority cases. Once the cases of aliens with deferred action under DACA are taken off the immigration dockets, immigration judges should be able to focus more time and effort on the adjudication of cases involving recent border entrants and national security and public safety threats.

21. Enjoining DACA is likely to limit, in certain circumstances, the ability of law enforcement officials to protect public safety. Cooperation between police and community members is a cornerstone of modern law enforcement. While ICE has long taken steps to ensure that prosecutorial discretion is appropriately used when the agency encounters individuals who are crime victims and witnesses,[11] DACA further enhances the willingness of undocumented crime victims and witnesses to come forward and cooperate with their local law enforcement agencies, thereby bolstering efforts by police to address crimes that affect our communities, including domestic violence, human trafficking, and gang activity.

---

[11] *See, e.g.,* ICE Policy No. 10076.1, Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011), available at http://www.ice.gov/doclib/secure-communities/pdf/domestic-violence.pdf.

22. In sum, enjoining DACA would jeopardize the efficiencies that such policy can provide to ICE, making it more difficult to efficiently and effectively carry out its mission. An injunction also undermines the effectiveness of community policing in various jurisdictions, impedes the identification of non-priority aliens, and leaves in place a barrier to more efficient proceedings to removal of threats from our country.

23. The DACA memo established guidelines for the exercise of prosecutorial discretion, specifically the grant of deferred action, with respect to individuals who were brought to the country before the age of 16. ("DACA" memo")[12] The DACA memo provided that DHS, through ICE personnel as well as that of USCIS, would exercise prosecutorial discretion through grants of deferred action. The DACA memo instructed USCIS to "establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the above criteria and are at least 15 years old, for a period of two years, subject to renewal[.]" DACA memo at 2-3.

24. By authorizing USCIS to establish a process for exercising prosecutorial discretion on a consistent and case by case basis, DHS conserves the resources of individual ICE officers and other ICE personnel who would not have to divert their time from investigating, apprehending and detaining priority individuals in order to verify documents, take biometrics and investigate the background of low-priority individuals. In this way, DHS was able to continue to exercise prosecutorial discretion and focus its resources on its law enforcement priorities.

---

[12] DHS, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," June 15, 2012, available at https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this *27th* day of June, 2018 in *Dallas, Dallas County, Texas*.

_____

SARAH R. SALDAÑA

10

# DEF-INTERV.
# EX. 16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF BRIAN MANLEY

My name is Brian Manley. I am over the age of 18 and fully competent to make this declaration.

1.  I am currently the Chief of Police for the City of Austin, Texas. I was sworn in as

    Chief of Police for the City of Austin in June 2018.

2.  Previously, I served as the City's Interim Chief of Police from December 2016 to

    June 2018.

1

3.  I have been a state-certified peace officer with the Austin Police Department ("APD" or "Department") and served in various capacities at APD for over 27 years. I joined APD in 1991 as a Patrol Officer and was later promoted to Detective, Sergeant, Lieutenant, and Commander. I have served in and led many APD units, including Patrol, Narcotics, Child Abuse, Homicide, Highway Enforcement, Internal Affairs, Special Operations & Homeland Security, and Recruiting and Training. From 2005 to 2012, I was a Commander overseeing multiple units including Internal Affairs, Special Operations, and Recruiting and Training. I then served as Assistant Chief and executive liaison to the Austin City Manager's office and Austin City Council from 2012 to 2015. I then served as Chief of Staff to the Chief of Police until I was appointed as the Interim Chief.

4.  I have also taught a course in criminal justice at St. Edward's University as an adjunct professor and served as an instructor at the APD Leadership Academy.

5.  I have a Bachelor's degree in Finance from the University of Texas at Austin and a Master of Science in Organizational Leadership and Ethics degree from St. Edward's University.

6.  The views expressed in this declaration are based on my police training, my 27 years at APD, and regular interaction with undocumented residents in Austin.

7.  The City of Austin is the eleventh largest city in the nation with a population of approximately 950,000 people.[1] Its' population is comprised of citizens, non-

---

[1] *See* https://www.census.gov/newsroom/press-releases/2018/estimates-cities.html; *see also* "Austin, Texas U.S. Census QuickFacts," at https://www.census.gov/quickfacts/fact/table/austincitytexas/LND110210.

citizens, legal residents, visitors and undocumented immigrants. The Austin area has a growing number of undocumented people.[2]

8. As Chief of Police, I manage APD's personnel, budget, and police operations. APD is one of the largest law enforcement agencies in Texas, with over 2,600 employees (including approximately 1,900 sworn law enforcement officers) and an annual budget of approximately $422 million.

9. I admire the dedication of APD officers to ensure Austin is safe and friendly for all. It is APD's mission to keep all Austin residents safe, whether they are citizens or not, documented or not.

10. APD works collaboratively with the Texas Department of Public Safety ("DPS") and several federal law enforcement agencies, including Immigration and Customs Enforcement ("ICE"). For example, DPS, ICE and APD team up as members of the Central Texas Human Trafficking Task Force to identify victims and prosecute violators of human trafficking laws.

11. For APD to fulfill its mission, it is imperative that everyone, regardless of immigration status, feels safe and comfortable interacting with and reporting crime to the police. I have heard from people at community forums that undocumented immigrants and their close family members are fearful that interacting with APD officers will result in deportation, either for themselves or a loved one. Based on conversations with my counterparts in other cities, I know that many law enforcement executives in Texas are concerned over the underreporting of crime.

---

[2] See "20 metro areas are home to six-in-ten unauthorized immigrants in the U.S." at, http://www.pewresearch.org/fact-tank/2017/02/09/us-metro-areas-unauthorized-immigrants/

We know from first-hand experience that the communities we serve are safer when undocumented immigrants and their families cooperate with the police.

12. As the Chief of Police, and in my previous roles at APD, I work hard to build trust between APD and the people of Austin. A cooperative police-community relationship is essential for solving crime and making people feel safe.

13. Consequently, I implement the "community policing" model of law enforcement in which APD officers strive to be more visible in the community and develop more meaningful relationships with the people we serve. APD devotes a significant amount of resources toward that end. For example, APD officers attend important community meetings and events. We have also expanded the number of patrol commanders to give them additional time to attend events and build stronger relationships with our community.

14. Implementation of our community policing philosophy has also led to changes in recruitment and hiring processes. For example, previously, our hiring videos emphasized action scenes of the APD Swat Team; now, we are intentional about including footage of our officers engaging with community members.

15. In July of 2016, the Matrix Consulting Group released their report on APD's current community policing practices and recommended improvements to strengthen our relationship with Austin's residents. We have already implemented a significant number of those recommendations.

16. I believe undocumented immigrants are at risk of being preyed upon by criminals who know that undocumented immigrants are among the least likely in our community to report crime. Undocumented residents are particularly hesitant to

4

report crime because they believe that doing so, or assisting with an investigation, could mean deportation and separation from their families and support networks. When crimes go unreported, all Austin residents are less safe.

17.    In the last several years, APD has devoted considerable time to ensure that Austin's undocumented immigrants feel safe. APD coordinates, participates in, and helps organize safety and outreach events in the Austin immigrant community.

18.    APD created a position for a "Refugee and Immigrant Outreach Liaison." That person partners with neighborhood schools, churches and other organizations to provide civic education to recent immigrants and encourage their participation in school and police-related activities. Special emphasis is placed on organizing events that take place in the apartment complexes where large numbers of refugees and immigrants live. By going to the places where families and individuals live, APD is able to introduce these individuals to police officers in a non-threatening environment.

19.    I do not profess to be an expert on the DACA program, or immigration law in general. Based on my experience and work with Austin's immigrant community, I believe that an end to the DACA program would make it less likely that DACA recipients would report crime and thus impair APD's ability to effectively investigate crimes in the Austin area. Moreover, if the DACA program ends, Austin could have a larger population of people who are at risk of being preyed on by criminals.

20.    DACA applicants come forward to be registered, photographed and fingerprinted and that aids the law enforcement activities of APD. If a DACA recipient is

arrested and fingerprints are taken and run through the DHS system, the federal government could quickly confirm the person's identity. The availability of that person's information in the system allows APD and DHS officials to work more effectively and cooperatively to promote public safety. If the DACA program ends, I am concerned that APD would lose that advantage.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __18__ day of June, 2018 in _Austin, Texas_ .

BRIAN MANLEY

PHILIP KEARNEY
NOTARY PUBLIC
ID# 13109650-7
State of Texas
Comm. Exp. 04-20-2021

Philip Kearney

6

# DEF-INTERV.
# EX. 17



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director (MS 2000)*
Washington, DC 20529-2000

**U.S. Citizenship and Immigration Services**

APR 1 7 2015

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate
Washington, DC 20510

Dear Chairman Grassley:

Thank you for your February 27 and March 20 letters.

From your February 27 letter, I understand that you are seeking information regarding a specific individual, including information regarding his involvement in Deferred Action for Childhood Arrivals (DACA). In addition, you are seeking the official policy and other information related to the adjudication of DACA requests from suspected or known gang members. This letter addresses your DACA-related questions regarding that individual and responds to your inquiries regarding DACA and gang membership. Per your request, U.S. Citizenship and Immigration Services (USCIS) is preparing the individual's A-file. Because the individual possesses a protected status unrelated to DACA, the Department is obligated to make certain redactions before transmitting the file to you.

Our review of the file indicates that on January 22, 2013, the individual requested deferred action pursuant to DACA. At the time of filing his request for deferred action, he was in removal proceedings as an alien present in the United States without being admitted or paroled. It appears he came to the attention of U.S. Immigration and Customs Enforcement (ICE) as a result of a 2012 arrest for possession of marijuana, for which charges were subsequently dismissed. Based on ICE records, there is no indication that ICE was aware at the time of the arrest that the individual was a gang member. His request for deferred action was approved on August 26, 2013, notwithstanding a TECS record indicating that he was a known gang member, and his application for employment authorization was approved. After the deferred action request was approved, immigration proceedings were administratively closed on December 18, 2013.

Based on standard procedures and protocols in place at the time, the DACA request and related employment authorization should not have been approved. On March 5, 2015, USCIS provided notice to the individual of the termination of his deferred action and employment authorization.

All DACA requests presenting information that the requestor is or may be a member of a criminal street gang are referred to the Background Check Unit (BCU) within the USCIS Service Center considering the request. The BCU is responsible for reviewing and resolving TECS hits and other criminal, national security, and public safety concerns in accordance with USCIS

The Honorable Charles E. Grassley
Page 2

policy. The applicable USCIS internal guidance, which was in place at the time this individual's
deferred action request was approved, states, "For a known street gang member, … the DACA
BCU Team should deny the I-821D [Consideration of Deferred Action for Childhood Arrivals]
as a matter of discretion." The guidance also provides that if an adjudicator has evaluated the
totality of the circumstances in such a case and believes the request should be approved as a
matter of discretion, the request may be granted only after USCIS Headquarters approval. I have
enclosed a copy of this internal guidance.

While records indicate that, pursuant to standard protocols as stated above, the case was
appropriately sent to the BCU based upon the derogatory information in the background check,
the outcome of the resolution process and final decision did not comply with USCIS policy.
Given the fact that the individual was identified as a known gang member, his request should
have been denied by the adjudicator. Even if the adjudicator believed there were mitigating facts
sufficient to justify a positive exercise of discretion despite the TECS record, the case should
have been elevated to USCIS Service Center Operations Headquarters (HQSCOPS) for review
prior to a final decision being made.

USCIS is taking the following proactive steps and measures to be sure other errors did not occur
and to prevent such an error from occurring in the future:

- USCIS has provided refresher training in the following areas:
  - All Immigration Service Officers who adjudicate DACA requests received
    refresher training in interpreting and applying TECS records.
  - Officers received DACA refresher training regarding disqualifying public safety
    and criminality concerns, including but not limited to gang membership,
    significant misdemeanors, and three or more misdemeanor criminal offenses.
  - Additional refresher training was given to all officers who handle DACA requests
    on proper protocol and elevation of cases requiring USCIS HQSCOPS' review
    and concurrence prior to a final decision.
  - BCU Officers received refresher training in reviewing, applying and resolving
    TECS hits. USCIS will ensure that the BCU Officer who processes the resolution
    memo of the TECS hit obtains concurrence from a subject matter expert or
    supervisor prior to adjudicating a DACA request involving specified public safety
    or criminality issues such as criminal history or gang membership.

- The refresher training was provided by USCIS Headquarters personnel who are subject
  matter experts in TECS and the DACA adjudication process. This training was
  mandatory for all ISOs who adjudicate DACA requests, all Immigration Service Officers
  who process resolutions related to TECS hits, and all supervisors and managers who
  oversee these processes. All listed training was provided between March 30 and April
  10, 2015.

Furthermore, USCIS is in the process of completing a review of prior DACA approvals to
determine if requests from known gang members were processed in a manner consistent with
standard protocol. USCIS has identified certain cases that merit further review and is therefore
undertaking a thorough review of each of these individual case files. We anticipate conclusion

The Honorable Charles E. Grassley
Page 3

of that individualized review in the coming weeks, and, following conclusion of such review, we would be happy to provide a briefing to you and your staff on our findings.  Preliminary information concerning this review is included in the enclosure.

Detailed responses to the questions in your March 20 letter regarding DACA approvals are enclosed, which Senator Tillis, who co-signed that letter, will receive under separate cover. Should you require any additional assistance, please have your staff contact the USCIS Office of Legislative Affairs at (202) 272-1940.

Respectfully,

León Rodríguez
Director

Enclosures:
1) Responses to Questions
2) USCIS Internal Guidance

U.S. Department of Homeland Security's Response to
Chairman Grassley and Senator Tillis's March 20, 2015 Letter

**1. Since DACA's creation, how many applications have been approved?  Please provide the answer by fiscal year.**

As of March 20, 2015, U.S. Citizenship and Immigration Services (USCIS) has approved 886,638 Deferred Action for Childhood Arrivals (DACA) requests, of which 223,826 were requests for renewal of DACA.  The number of DACA requests approved by fiscal year is as follows:

| | | |
|---|---|---|
| FY 2012 | 1,685 | |
| FY 2013 | 471,293 | |
| FY 2014 | 158,278 | (Initial – 135,797; Renewal – 22,481) |
| FY 2015 | 255,382 | (Initial – 54,037; Renewal – 201,345) |

**2. Of the DACA applications approved, please provide the number of applicants that:**

USCIS does not track this information electronically and is working toward developing a tracking system to capture this information in the future.  However, USCIS recently conducted a batch TECS query of all approved DACA cases in order to identify records that contained information indicating known or suspected gang association.  Based on the information obtained from the query, out of all 886,638 cases approved for initial DACA or renewal of DACA, we found TECs records pertaining to 49 DACA recipients.  Of these 49, 13 individuals had TECS records entered after DACA adjudication.  The 13 cases are being reviewed for possible termination.  Twenty had TECS records at the time of filing, and one had a TECS record placed during the adjudication process.  These cases are being reviewed. As noted below, any cases that were approved for known gang members were approved in error, as USCIS HQ has not cleared approval of any DACA requests by a known or suspected gang member.  Fifteen had TECS records that were vetted and were determined not to be gang members/gang affiliates.  These cases were adjudicated on their merits.

**a. Had known gang affiliation.**

In the analysis described above, we did not distinguish between known or suspected gang members.  Further manual review would be required to obtain this information.

**b. Suspected gang affiliation.**

In the analysis described above, we did not distinguish between known or suspected gang members.  Further manual review would be required to obtain this information.

    **c.  Had criminal affiliations.**

USCIS does not electronically track this information.  A manual review of files would be required to obtain this information.  Since not all crimes disqualify a requestor from being favorably considered for DACA, a requestor with one or two non-significant misdemeanors could have been approved.  USCIS is working toward developing a tracking system to capture this information in the future.

**3.  Please explain why USCIS approved DACA applications for known or suspected gang members and others with criminal affiliations.**

Cases that were approved for known gang members were approved in error, as USCIS HQ has not cleared approval of any DACA requests by a known or suspected gang member.  USCIS is not aware of any DACA grants where there was disqualifying criminal activity.  DACA Refresher Training has been provided to prevent errors in the future.

**4.  By fiscal year, how many DACA applications have been denied because of gang affiliation or other criminal affiliation?**

USCIS does not currently electronically track information regarding the basis for a denial of a DACA request.  A manual review of files would be required to obtain this information for each DACA denial.  USCIS is working toward developing a tracking system to capture this information in the future.

**5.  By fiscal year, please provide the number of DACA terminations as a result of gang affiliation or other criminal affiliation.**

USCIS does not electronically capture the reasons for termination of a DACA request.  Ad hoc manual reports from each service center indicate that as of March 20, 2015, USCIS has terminated DACA for 282 requestors for having gang affiliation and/or criminal issues.  Additionally, USCIS is in the process of manually reviewing another 13 DACA terminations to determine the reason for termination.

The following is a breakdown by fiscal year of the 282 DACA requests terminated due to criminal or gang issues:

|  |  |
|---|---|
| FY 2013 | 28 |
| FY 2014 | 131 |
| FY 2015 | 123 |

**6.   What steps is USCIS taking to ensure that known or suspected gang members or criminally affiliated applications are denied DACA or approved DACA is terminated once knowledge of gang affiliation or other criminal affiliation is known?**

When a suspicion of gang affiliation or other criminal affiliation comes to the attention of USCIS after the DACA request has been approved, the case is reviewed for possible termination.  This information is typically communicated by ICE as result of their engagement with local law enforcement or other encounters.

DACA refresher training was conducted by USCIS HQ subject matter experts who traveled to each of the Service Centers.  The training included interpreting and applying TECS records and a review of the disqualifying factors for DACA, including gang membership and significant misdemeanors.  Additional refresher training was given to all officers who handle DACA requests on proper protocol and elevation of cases requiring USCIS HQSCOPS' review and concurrence prior to a final decision.  The training was delivered to each ISO who adjudicates Form I-821D, *Consideration of Deferred Action for Childhood Arrivals*, the ISOs assigned to work DACA in the Background Check Unit, as well as management who oversees these ISOs.  This training was conducted between March 30, 2015 and April 10, 2015.

**U.S. Citizenship and Immigration Services**
**Internal DACA Adjudication Guidance**

| | |
|---|---|
| Title | Known or Suspected Gang Membership |
| Question | How should we handle DACA requests when there is a record that the requestor is a known or suspected criminal street gang member? |
| Answer | The BCU DACA Team should handle any DACA requests when the record indicates that the requestor was, is or may be a member of a criminal street gang.  Supervisors should only refer novel, complex, or sensitive cases to HQSCOPS, through the normal chain of command.  The Centers should not approve a DACA request filed by a known or suspected gang member without approval from HQSCOPS. |

USCIS's Notice to Appear (NTA) guidance includes "known or suspected street gang members" in its definition of an Egregious Public Safety (EPS) case.  Therefore, if there is reason to believe the DACA requestor is a known or suspected gang member because the record indicates that the DACA requestor is under investigation for, or has been arrested for (without disposition), or has been convicted of a crime involving gang activities (e.g., a TECS record indicating the alien is a gang member or a suspected gang member as shown in the <u>images A and B</u>), the DACA BCU Team should follow the handling procedures for EPS cases described in Chapter 8, Section G, of the DACA SOP.

<u>ICE Priority</u>

If, in response to the referral to ICE (RTI), ICE issues an NTA or otherwise indicates that the DACA requestor is an enforcement priority, the DACA BCU Team should deny the I-821D using call up DACA 511 - DISCRETIONARY from the Appendix F.

<u>Known Gang Member</u>

For a known street gang member, if an RTI is not required, as stated in the National Background Identity and Security Checks Operating Procedures (NaBISCOP), or if one is required and ICE does not issue an NTA or otherwise notify USCIS of any action that it has taken in the case within 60 days, the DACA BCU Team should deny the I-821D as a matter of discretion and notify ICE of the decision.

Suspected Gang Member

For a suspected street gang member, if an RTI is not required, as stated in the NaBISCOP, or if one is required and ICE does not issue an NTA or otherwise notify USCIS of any action that it has taken in the case within 60 days, the DACA BCU Team must refer the case for an interview to determine whether or not the requestor is, in fact, a gang member.  Please contact the appropriate Field Office POC through established channels to facilitate the interview process.  If, after the interview, it is inconclusive whether the requestor is a gang member (e.g., based on the preponderance of the evidence the person is a street gang member), the DACA BCU Team should deny the I-821D as a matter of discretion because the person has not met the burden of showing he or she is 'more likely than not' not a street gang member and therefore does not pose a threat to public safety. The DACA BCU team must notify ICE of the decision.

# DEF-INTERV.
# EX. 18

# The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others

The Department of Homeland Security's proposed policy to prioritize the removal of certain aliens unlawfully present in the United States would be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of U.S. citizens and legal permanent residents would also be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of recipients of deferred action under the Deferred Action for Childhood Arrivals program would not be a permissible exercise of DHS's enforcement discretion.

November 19, 2014

MEMORANDUM OPINION FOR THE SECRETARY OF HOMELAND SECURITY
AND THE COUNSEL TO THE PRESIDENT

You have asked two questions concerning the scope of the Department of Homeland Security's discretion to enforce the immigration laws. First, you have asked whether, in light of the limited resources available to the Department ("DHS") to remove aliens unlawfully present in the United States, it would be legally permissible for the Department to implement a policy prioritizing the removal of certain categories of aliens over others. DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year. DHS's proposed policy would prioritize the removal of aliens who present threats to national security, public safety, or border security. Under the proposed policy, DHS officials could remove an alien who did not fall into one of these categories provided that an Immigration and Customs Enforcement ("ICE") Field Office Director determined that "removing such an alien would serve an important federal interest." Draft Memorandum for Thomas S. Winkowski, Acting Director, ICE, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* at 5 (Nov. 17, 2014) ("Johnson Prioritization Memorandum").

Second, you have asked whether it would be permissible for DHS to extend deferred action, a form of temporary administrative relief from removal, to certain aliens who are the parents of children who are present in the United States. Specifically, DHS has proposed to implement a program under which an alien could apply for, and would be eligible to receive, deferred action if he or she is not a DHS removal priority under the policy described above; has continuously resided in the United States since before January 1, 2010; has a child who is either a U.S. citizen or a lawful permanent resident; is physically present in the United

1

*Opinions of the Office of Legal Counsel in Volume 38*

States both when DHS announces its program and at the time of application for deferred action; and presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Draft Memorandum for Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and Others* at 4 (Nov. 17, 2014) ("Johnson Deferred Action Memorandum"). You have also asked whether DHS could implement a similar program for parents of individuals who have received deferred action under the Deferred Action for Childhood Arrivals ("DACA") program.

As has historically been true of deferred action, these proposed deferred action programs would not "legalize" any aliens who are unlawfully present in the United States: Deferred action does not confer any lawful immigration status, nor does it provide a path to obtaining permanent residence or citizenship. Grants of deferred action under the proposed programs would, rather, represent DHS's decision not to seek an alien's removal for a prescribed period of time. *See generally Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483–84 (1999) (describing deferred action). Under decades-old regulations promulgated pursuant to authority delegated by Congress, *see* 8 U.S.C. §§ 1103(a)(3), 1324a(h)(3), aliens who are granted deferred action—like certain other categories of aliens who do not have lawful immigration status, such as asylum applicants—may apply for authorization to work in the United States in certain circumstances, 8 C.F.R. § 274a.12(c)(14) (providing that deferred action recipients may apply for work authorization if they can show an "economic necessity for employment"); *see also* 8 C.F.R. § 109.1(b)(7) (1982). Under DHS policy guidance, a grant of deferred action also suspends an alien's accrual of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I), provisions that restrict the admission of aliens who have departed the United States after having been unlawfully present for specified periods of time. A grant of deferred action under the proposed programs would remain in effect for three years, subject to renewal, and could be terminated at any time at DHS's discretion. *See* Johnson Deferred Action Memorandum at 2, 5.

For the reasons discussed below, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be permissible exercises of DHS's discretion to enforce the immigration laws. We further conclude that, as it has been described to us, the proposed deferred action program for parents of DACA recipients would not be a permissible exercise of enforcement discretion.

## I.

We first address DHS's authority to prioritize the removal of certain categories of aliens over others. We begin by discussing some of the sources and limits of

2

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

DHS's enforcement discretion under the immigration laws, and then analyze DHS's proposed prioritization policy in light of these considerations.

**A.**

DHS's authority to remove aliens from the United States rests on the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. §§ 1101 *et seq.* In the INA, Congress established a comprehensive scheme governing immigration and naturalization. The INA specifies certain categories of aliens who are inadmissible to the United States. *See* 8 U.S.C. § 1182. It also specifies "which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Id.* (citing 8 U.S.C. § 1227); *see* 8 U.S.C. § 1227(a) (providing that "[a]ny alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien" falls within one or more classes of deportable aliens); *see also* 8 U.S.C. § 1182(a) (listing classes of aliens ineligible to receive visas or be admitted to the United States). Removal proceedings ordinarily take place in federal immigration courts administered by the Executive Office for Immigration Review, a component of the Department of Justice. *See id.* § 1229a (governing removal proceedings); *see also id.* §§ 1225(b)(1)(A), 1228(b) (setting out expedited removal procedures for certain arriving aliens and certain aliens convicted of aggravated felonies).

Before 2003, the Department of Justice, through the Immigration and Naturalization Service ("INS"), was also responsible for providing immigration-related administrative services and generally enforcing the immigration laws. In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, Congress transferred most of these functions to DHS, giving it primary responsibility both for initiating removal proceedings and for carrying out final orders of removal. *See* 6 U.S.C. §§ 101 *et seq.*; *see also Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005) (noting that the immigration authorities previously exercised by the Attorney General and INS "now reside" in the Secretary of Homeland Security and DHS). The Act divided INS's functions among three different agencies within DHS: U.S. Citizenship and Immigration Services ("USCIS"), which oversees legal immigration into the United States and provides immigration and naturalization services to aliens; ICE, which enforces federal laws governing customs, trade, and immigration; and U.S. Customs and Border Protection ("CBP"), which monitors and secures the nation's borders and ports of entry. *See* Pub. L. No. 107-296, §§ 403, 442, 451, 471, 116 Stat. 2135, 2178, 2193, 2195, 2205; *see also Name Change From the Bureau of Citizenship and Immigration Services to U.S. Citizenship and Immigration Services*, 69 Fed. Reg. 60938, 60938 (Oct. 13, 2004); *Name Change of Two DHS Components*, 75 Fed. Reg. 12445, 12445 (Mar. 16, 2010). The Secretary of Homeland Security is thus now "charged with the administration and

3

enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).

As a general rule, when Congress vests enforcement authority in an executive agency, that agency has the discretion to decide whether a particular violation of the law warrants prosecution or other enforcement action. This discretion is rooted in the President's constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and it reflects a recognition that the "faithful[]" execution of the law does not necessarily entail "act[ing] against each technical violation of the statute" that an agency is charged with enforcing. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Rather, as the Supreme Court explained in *Chaney*, the decision whether to initiate enforcement proceedings is a complex judgment that calls on the agency to "balanc[e] . . . a number of factors which are peculiarly within its expertise." *Id.* These factors include "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." *Id.* at 831; *cf. United States v. Armstrong*, 517 U.S. 456, 465 (1996) (recognizing that exercises of prosecutorial discretion in criminal cases involve consideration of "'[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan'" (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985))). In *Chaney*, the Court considered and rejected a challenge to the Food and Drug Administration's refusal to initiate enforcement proceedings with respect to alleged violations of the Federal Food, Drug, and Cosmetic Act, concluding that an agency's decision not to initiate enforcement proceedings is presumptively immune from judicial review. *See* 470 U.S. at 832. The Court explained that, while Congress may "provide[] guidelines for the agency to follow in exercising its enforcement powers," in the absence of such "legislative direction," an agency's non-enforcement determination is, much like a prosecutor's decision not to indict, a "special province of the Executive." *Id.* at 832–33.

The principles of enforcement discretion discussed in *Chaney* apply with particular force in the context of immigration. Congress enacted the INA against a background understanding that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal quotation marks omitted). Consistent with this understanding, the INA vested the Attorney General (now the Secretary of Homeland Security) with broad authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the statute. 8 U.S.C. § 1103(a)(3). Years later, when Congress created the Department of Homeland Security, it expressly charged DHS with responsibility for "[e]stablishing national immigration enforcement policies and

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities." Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).

With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA. *Arizona*, 132 S. Ct. at 2499. The INA expressly authorizes immigration officials to grant certain forms of discretionary relief from removal for aliens, including parole, 8 U.S.C. § 1182(d)(5)(A); asylum, *id.* § 1158(b)(1)(A); and cancellation of removal, *id.* § 1229b. But in addition to administering these statutory forms of relief, "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499. And, as the Court has explained, "[a]t each stage" of the removal process—"commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—immigration officials have "discretion to abandon the endeavor." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483 (quoting 8 U.S.C. § 1252(g) (alterations in original)). Deciding whether to pursue removal at each of these stages implicates a wide range of considerations. As the Court observed in *Arizona*:

> Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. . . . The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

132 S. Ct. at 2499.

Immigration officials' discretion in enforcing the laws is not, however, unlimited. Limits on enforcement discretion are both implicit in, and fundamental to, the Constitution's allocation of governmental powers between the two political branches. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). These limits, however, are not clearly defined. The open-ended nature of the inquiry under the Take Care Clause—whether a particular exercise of discretion is "faithful[]" to the law enacted by Congress—does not lend itself easily to the application of set formulas or bright-line rules. And because the exercise of enforcement discretion generally is not subject to judicial review, *see*

5

*Chaney*, 470 U.S. at 831–33, neither the Supreme Court nor the lower federal courts have squarely addressed its constitutional bounds. Rather, the political branches have addressed the proper allocation of enforcement authority through the political process. As the Court noted in *Chaney*, Congress "may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833. The history of immigration policy illustrates this principle: Since the INA was enacted, the Executive Branch has on numerous occasions exercised discretion to extend various forms of immigration relief to categories of aliens for humanitarian, foreign policy, and other reasons. When Congress has been dissatisfied with Executive action, it has responded, as *Chaney* suggests, by enacting legislation to limit the Executive's discretion in enforcing the immigration laws.[1]

Nonetheless, the nature of the Take Care duty does point to at least four general (and closely related) principles governing the permissible scope of enforcement discretion that we believe are particularly relevant here. First, enforcement decisions should reflect "factors which are peculiarly within [the enforcing agency's] expertise." *Chaney*, 470 U.S. at 831. Those factors may include considerations related to agency resources, such as "whether the agency has enough resources to undertake the action," or "whether agency resources are best spent on this violation or another." *Id.* Other relevant considerations may include "the proper ordering of [the agency's] priorities," *id.* at 832, and the agency's assessment of "whether the particular enforcement action [at issue] best fits the agency's overall policies," *id.* at 831.

Second, the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences. *See id.* at 833 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers"). In other words, an agency's enforcement decisions should be consonant with, rather than contrary to, the congressional policy underlying the statutes the agency is charged with administering. *Cf. Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (explaining that where Congress has given an agency the power to administer a statutory scheme, a court will not vacate the agency's decision about the proper administration of the statute unless, among other things, the agency "'has relied on factors which Congress had not intended it to consider'" (quoting

---

[1] *See, e.g.*, Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 503–05 (2009) (describing Congress's response to its dissatisfaction with the Executive's use of parole power for refugee populations in the 1960s and 1970s); *see also, e.g., infra* note 5 (discussing legislative limitations on voluntary departure and extended voluntary departure).

6

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

Third, the Executive Branch ordinarily cannot, as the Court put it in *Chaney*, "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)); *see id.* (noting that in situations where an agency had adopted such an extreme policy, "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion'"). Abdication of the duties assigned to the agency by statute is ordinarily incompatible with the constitutional obligation to faithfully execute the laws. *But see, e.g.*, *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200 (1994) (noting that under the Take Care Clause, "the President is required to act in accordance with the laws—including the Constitution, which takes precedence over other forms of law").

Finally, lower courts, following *Chaney*, have indicated that non-enforcement decisions are most comfortably characterized as judicially unreviewable exercises of enforcement discretion when they are made on a case-by-case basis. *See, e.g.*, *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 676–77 (D.C. Cir. 1994). That reading of *Chaney* reflects a conclusion that case-by-case enforcement decisions generally avoid the concerns mentioned above. Courts have noted that "single-shot non-enforcement decisions" almost inevitably rest on "the sort of mingled assessments of fact, policy, and law . . . that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp.*, 37 F.3d at 676–77 (emphasis omitted). Individual enforcement decisions made on the basis of case-specific factors are also unlikely to constitute "general polic[ies] that [are] so extreme as to amount to an abdication of [the agency's] statutory responsibilities." *Id.* at 677 (quoting *Chaney*, 477 U.S. at 833 n.4). That does not mean that all "general policies" respecting non-enforcement are categorically forbidden: Some "general policies" may, for example, merely provide a framework for making individualized, discretionary assessments about whether to initiate enforcement actions in particular cases. *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (explaining that an agency's use of "reasonable presumptions and generic rules" is not incompatible with a requirement to make individualized determinations). But a general policy of non-enforcement that forecloses the exercise of case-by-case discretion poses "special risks" that the agency has exceeded the bounds of its enforcement discretion. *Crowley Caribbean Transp.*, 37 F.3d at 677.

**B.**

We now turn, against this backdrop, to DHS's proposed prioritization policy. In their exercise of enforcement discretion, DHS and its predecessor, INS, have long

7

employed guidance instructing immigration officers to prioritize the enforcement of the immigration laws against certain categories of aliens and to deprioritize their enforcement against others. *See, e.g.,* INS Operating Instructions § 103(a)(1)(i) (1962); Memorandum for All Field Office Directors, ICE, et al., from John Morton, Director, ICE, *Re: Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011); Memorandum for All ICE Employees, from John Morton, Director, ICE, *Re: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011); Memorandum for Regional Directors, INS, et al., from Doris Meissner, Commissioner, INS, *Re: Exercising Prosecutorial Discretion* (Nov. 17, 2000). The policy DHS proposes, which is similar to but would supersede earlier policy guidance, is designed to "provide clearer and more effective guidance in the pursuit" of DHS's enforcement priorities; namely, "threats to national security, public safety and border security." Johnson Prioritization Memorandum at 1.

Under the proposed policy, DHS would identify three categories of undocumented aliens who would be priorities for removal from the United States. *See generally id.* at 3–5. The highest priority category would include aliens who pose particularly serious threats to national security, border security, or public safety, including aliens engaged in or suspected of espionage or terrorism, aliens convicted of offenses related to participation in criminal street gangs, aliens convicted of certain felony offenses, and aliens apprehended at the border while attempting to enter the United States unlawfully. *See id.* at 3. The second-highest priority would include aliens convicted of multiple or significant misdemeanor offenses; aliens who are apprehended after unlawfully entering the United States who cannot establish that they have been continuously present in the United States since January 1, 2014; and aliens determined to have significantly abused the visa or visa waiver programs. *See id.* at 3–4. The third priority category would include other aliens who have been issued a final order of removal on or after January 1, 2014. *See id.* at 4. The policy would also provide that none of these aliens should be prioritized for removal if they "qualify for asylum or another form of relief under our laws." *Id.* at 3–5.

The policy would instruct that resources should be directed to these priority categories in a manner "commensurate with the level of prioritization identified." *Id.* at 5. It would, however, also leave significant room for immigration officials to evaluate the circumstances of individual cases. *See id.* (stating that the policy "requires DHS personnel to exercise discretion based on individual circumstances"). For example, the policy would permit an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations to deprioritize the removal of an alien falling in the highest priority category if, in her judgment, "there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority." *Id.* at 3. Similar discretionary provisions would apply to

8

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

aliens in the second and third priority categories.[2] The policy would also provide a non-exhaustive list of factors DHS personnel should consider in making such deprioritization judgments.[3] In addition, the policy would expressly state that its terms should not be construed "to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who were not identified as priorities," and would further provide that "[i]mmigration officers and attorneys may pursue removal of an alien not identified as a priority" if, "in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest." *Id.* at 5.

DHS has explained that the proposed policy is designed to respond to the practical reality that the number of aliens who are removable under the INA vastly exceeds the resources Congress has made available to DHS for processing and carrying out removals. The resource constraints are striking. As noted, DHS has informed us that there are approximately 11.3 million undocumented aliens in the country, but that Congress has appropriated sufficient resources for ICE to remove fewer than 400,000 aliens each year, a significant percentage of whom are typically encountered at or near the border rather than in the interior of the country. *See* E-mail for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from David Shahoulian, Deputy General Counsel, DHS, *Re: Immigration Opinion* (Nov. 19, 2014) ("Shahoulian E-mail"). The proposed policy explains that, because DHS "cannot respond to all immigration violations or remove all persons illegally in the United States," it seeks to "prioritize the use of enforcement personnel, detention space, and removal assets" to "ensure that use of its limited resources is devoted to the pursuit of" DHS's highest priorities. Johnson Prioritization Memorandum at 2.

In our view, DHS's proposed prioritization policy falls within the scope of its lawful discretion to enforce the immigration laws. To begin with, the policy is based on a factor clearly "within [DHS's] expertise." *Chaney*, 470 U.S. at 831. Faced with sharply limited resources, DHS necessarily must make choices about which removals to pursue and which removals to defer. DHS's organic statute itself recognizes this inevitable fact, instructing the Secretary to establish "national

---

[2] Under the proposed policy, aliens in the second tier could be deprioritized if, "in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority." Johnson Prioritization Memorandum at 4. Aliens in the third tier could be deprioritized if, "in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority." *Id.* at 5.

[3] These factors include "extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child or a seriously ill relative." Johnson Prioritization Memorandum at 6.

9

immigration enforcement policies and priorities." 6 U.S.C. § 202(5). And an agency's need to ensure that scarce enforcement resources are used in an effective manner is a quintessential basis for the use of prosecutorial discretion. *See Chaney*, 470 U.S. at 831 (among the factors "peculiarly within [an agency's] expertise" are "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all").

The policy DHS has proposed, moreover, is consistent with the removal priorities established by Congress. In appropriating funds for DHS's enforcement activities—which, as noted, are sufficient to permit the removal of only a fraction of the undocumented aliens currently in the country—Congress has directed DHS to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime." Department of Homeland Security Appropriations Act, 2014, Pub. L. No. 113-76, div. F, tit. II, 128 Stat. 5, 251 ("DHS Appropriations Act"). Consistent with this directive, the proposed policy prioritizes individuals convicted of criminal offenses involving active participation in a criminal street gang, most offenses classified as felonies in the convicting jurisdiction, offenses classified as "aggravated felonies" under the INA, and certain misdemeanor offenses. Johnson Prioritization Memorandum at 3–4. The policy ranks these priority categories according to the severity of the crime of conviction. The policy also prioritizes the removal of other categories of aliens who pose threats to national security or border security, matters about which Congress has demonstrated particular concern. *See, e.g.*, 8 U.S.C. § 1226(c)(1)(D) (providing for detention of aliens charged with removability on national security grounds); *id.* § 1225(b) & (c) (providing for an expedited removal process for certain aliens apprehended at the border). The policy thus raises no concern that DHS has relied "on factors which Congress had not intended it to consider." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658.

Further, although the proposed policy is not a "single-shot non-enforcement decision," neither does it amount to an abdication of DHS's statutory responsibilities, or constitute a legislative rule overriding the commands of the substantive statute. *Crowley Caribbean Transp.*, 37 F.3d at 676–77. The proposed policy provides a general framework for exercising enforcement discretion in individual cases, rather than establishing an absolute, inflexible policy of not enforcing the immigration laws in certain categories of cases. Given that the resources Congress has allocated to DHS are sufficient to remove only a small fraction of the total population of undocumented aliens in the United States, setting forth written guidance about how resources should presumptively be allocated in particular cases is a reasonable means of ensuring that DHS's severely limited resources are systematically directed to its highest priorities across a large and diverse agency, as well as ensuring consistency in the administration of the removal system. The proposed policy's identification of categories of aliens who constitute removal

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities is also consistent with the categorical nature of Congress's instruction to prioritize the removal of criminal aliens in the DHS Appropriations Act.

And, significantly, the proposed policy does not identify any category of removable aliens whose removal may not be pursued under any circumstances. Although the proposed policy limits the discretion of immigration officials to expend resources to remove non-priority aliens, it does not eliminate that discretion entirely. It directs immigration officials to use their resources to remove aliens in a manner "commensurate with the level of prioritization identified," but (as noted above) it does not "prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities." Johnson Prioritization Memorandum at 5. Instead, it authorizes the removal of even non-priority aliens if, in the judgment of an ICE Field Office Director, "removing such an alien would serve an important federal interest," a standard the policy leaves open-ended. *Id.* Accordingly, the policy provides for case-by-case determinations about whether an individual alien's circumstances warrant the expenditure of removal resources, employing a broad standard that leaves ample room for the exercise of individualized discretion by responsible officials. For these reasons, the proposed policy avoids the difficulties that might be raised by a more inflexible prioritization policy and dispels any concern that DHS has either undertaken to rewrite the immigration laws or abdicated its statutory responsibilities with respect to non-priority aliens.[4]

## II.

We turn next to the permissibility of DHS's proposed deferred action programs for certain aliens who are parents of U.S. citizens, lawful permanent residents ("LPRs"), or DACA recipients, and who are not removal priorities under the proposed policy discussed above. We begin by discussing the history and current practice of deferred action. We then discuss the legal authorities on which deferred

---

[4] In *Crane v. Napolitano*, a district court recently concluded in a non-precedential opinion that the INA "mandates the initiation of removal proceedings whenever an immigration officer encounters an illegal alien who is not 'clearly and beyond a doubt entitled to be admitted.'" Opinion and Order Respecting Pl. App. for Prelim. Inj. Relief, No. 3:12-cv-03247-O, 2013 WL 1744422, at *5 (N.D. Tex. Apr. 23) (quoting 8 U.S.C. § 1225(b)(2)(A)). The court later dismissed the case for lack of jurisdiction. *See Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 8211660, at *4 (N.D. Tex. July 31). Although the opinion lacks precedential value, we have nevertheless considered whether, as it suggests, the text of the INA categorically forecloses the exercise of enforcement discretion with respect to aliens who have not been formally admitted. The district court's conclusion is, in our view, inconsistent with the Supreme Court's reading of the INA as permitting immigration officials to exercise enforcement discretion at any stage of the removal process, including when deciding whether to initiate removal proceedings against a particular alien. *See Arizona*, 132 S. Ct. at 2499; *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483–84. It is also difficult to square with authority holding that the presence of mandatory language in a statute, standing alone, does not necessarily limit the Executive Branch's enforcement discretion, *see, e.g., Chaney*, 470 U.S. at 835; *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 381 (2d Cir. 1973).

11

action relies and identify legal principles against which the proposed use of deferred action can be evaluated. Finally, we turn to an analysis of the proposed deferred action programs themselves, beginning with the program for parents of U.S. citizens and LPRs, and concluding with the program for parents of DACA recipients.

**A.**

In immigration law, the term "deferred action" refers to an exercise of administrative discretion in which immigration officials temporarily defer the removal of an alien unlawfully present in the United States. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (citing 6 Charles Gordon et al., *Immigration Law and Procedure* § 72.03[2][h] (1998)); *see* USCIS, *Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* at 3 (2012) ("USCIS SOP"); INS Operating Instructions § 103.1(a)(1)(ii) (1977). It is one of a number of forms of discretionary relief—in addition to such statutory and non-statutory measures as parole, temporary protected status, deferred enforced departure, and extended voluntary departure—that immigration officials have used over the years to temporarily prevent the removal of undocumented aliens.[5]

---

[5] Parole is available to aliens by statute "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Among other things, parole gives aliens the ability to adjust their status without leaving the United States if they are otherwise eligible for adjustment of status, *see id.* § 1255(a), and may eventually qualify them for Federal means-tested benefits, *see id.* §§ 1613, 1641(b)(4). Temporary protected status is available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions. *Id.* § 1254a. Deferred enforced departure, which "has no statutory basis" but rather is an exercise of "the President's constitutional powers to conduct foreign relations," may be granted to nationals of appropriate foreign states. USCIS, Adjudicator's Field Manual § 38.2(a) (2014). Extended voluntary departure was a remedy derived from the voluntary departure statute, which, before its amendment in 1996, permitted the Attorney General to make a finding of removability if an alien agreed to voluntarily depart the United States, without imposing a time limit for the alien's departure. *See* 8 U.S.C. §§ 1252(b), 1254(e) (1988 & Supp. II 1990); *cf.* 8 U.S.C. § 1229c (current provision of the INA providing authority to grant voluntary departure, but limiting such grants to 120 days). Some commentators, however, suggested that extended voluntary departure was in fact a form of "discretionary relief formulated administratively under the Attorney General's general authority for enforcing immigration law." Sharon Stephan, Cong. Research Serv., 85-599 EPW, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation* at 1 (Feb. 23, 1985). It appears that extended voluntary departure is no longer used following enactment of the Immigration Act of 1990, which established the temporary protected status program. *See U.S. Citizenship and Immigration Services Fee Schedule*, 75 Fed. Reg. 33446, 33457 (June 11, 2010) (proposed rule) (noting that "since 1990 neither the Attorney General nor the Secretary have designated a class of aliens for nationality-based 'extended voluntary departure,' and there no longer are aliens in the United States benefiting from such a designation," but noting that deferred enforced departure is still used); H.R. Rep. No. 102-123, at 2 (1991) (indicating that in establishing temporary protected status, Congress was "codif[ying] and supersed[ing]" extended voluntary departure). *See generally* Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum,* Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children at 5–10 (July 13, 2012) ("CRS Immigration Report").

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

The practice of granting deferred action dates back several decades. For many years after the INA was enacted, INS exercised prosecutorial discretion to grant "non-priority" status to removable aliens who presented "appealing humanitarian factors." Letter for Leon Wildes, from E. A. Loughran, Associate Commissioner, INS at 2 (July 16, 1973) (defining a "non-priority case" as "one in which the Service in the exercise of discretion determines that adverse action would be unconscionable because of appealing humanitarian factors"); *see* INS Operating Instructions § 103.1(a)(1)(ii) (1962). This form of administrative discretion was later termed "deferred action." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484; *see* INS Operating Instructions § 103.1(a)(1)(ii) (1977) (instructing immigration officers to recommend deferred action whenever "adverse action would be unconscionable because of the existence of appealing humanitarian factors").

Although the practice of granting deferred action "developed without express statutory authorization," it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (internal quotation marks omitted); *see id.* at 485 (noting that a congressional enactment limiting judicial review of decisions "to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA]" in 8 U.S.C. § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations"); *see also, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"). Deferred action "does not confer any immigration status"—i.e., it does not establish any enforceable legal right to remain in the United States— and it may be revoked by immigration authorities at their discretion. USCIS SOP at 3, 7. Assuming it is not revoked, however, it represents DHS's decision not to seek the alien's removal for a specified period of time.

Under longstanding regulations and policy guidance promulgated pursuant to statutory authority in the INA, deferred action recipients may receive two additional benefits. First, relying on DHS's statutory authority to authorize certain aliens to work in the United States, DHS regulations permit recipients of deferred action to apply for work authorization if they can demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]"). Second, DHS has promulgated regulations and issued policy guidance providing that aliens who receive deferred action will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* at 42

13

(May 6, 2009) ("USCIS Consolidation of Guidance") (noting that "[a]ccrual of unlawful presence stops on the date an alien is granted deferred action"); *see* 8 U.S.C. § 1182(a)(9)(B)(ii) (providing that an alien is "unlawfully present" if, among other things, he "is present in the United States after the expiration of the period of stay authorized by the Attorney General").[6]

Immigration officials today continue to grant deferred action in individual cases for humanitarian and other purposes, a practice we will refer to as "ad hoc deferred action." Recent USCIS guidance provides that personnel may recommend ad hoc deferred action if they "encounter cases during [their] normal course of business that they feel warrant deferred action." USCIS SOP at 4. An alien may also apply for ad hoc deferred action by submitting a signed, written request to USCIS containing "[a]n explanation as to why he or she is seeking deferred action" along with supporting documentation, proof of identity, and other records. *Id.* at 3.

For decades, INS and later DHS have also implemented broader programs that make discretionary relief from removal available for particular classes of aliens. In many instances, these agencies have made such broad-based relief available through the use of parole, temporary protected status, deferred enforced departure, or extended voluntary departure. For example, from 1956 to 1972, INS implemented an extended voluntary departure program for physically present aliens who were beneficiaries of approved visa petitions—known as "Third Preference" visa petitions—relating to a specific class of visas for Eastern Hemisphere natives. *See United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 979–80 (E.D. Pa. 1977). Similarly, for several years beginning in 1978, INS granted extended voluntary departure to nurses who were eligible for H-1 visas. *Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*, 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978). In addition, in more than two dozen instances dating to 1956, INS and later DHS granted parole, temporary protected status, deferred enforced departure, or extended voluntary departure to large numbers of nationals of designated foreign states. *See, e.g.*, CRS Immigration Report at 20–23; Cong. Research Serv., ED206779, *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12–14 (1980). And in 1990, INS implemented a "Family Fairness" program that authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ("IRCA"). *See* Memorandum for Regional Commissioners,

---

[6] Section 1182(a)(9)(B)(i) imposes three- and ten-year bars on the admission of aliens (other than aliens admitted to permanent residence) who departed or were removed from the United States after periods of unlawful presence of between 180 days and one year, or one year or more. Section 1182(a)(9)(C)(i)(I) imposes an indefinite bar on the admission of any alien who, without being admitted, enters or attempts to reenter the United States after previously having been unlawfully present in the United States for an aggregate period of more than one year.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

INS, from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) ("Family Fairness Memorandum"); *see also* CRS Immigration Report at 10.

On at least five occasions since the late 1990s, INS and later DHS have also made discretionary relief available to certain classes of aliens through the use of deferred action:

*1. Deferred Action for Battered Aliens Under the Violence Against Women Act.* INS established a class-based deferred action program in 1997 for the benefit of self-petitioners under the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, tit. IV, 108 Stat. 1796, 1902. VAWA authorized certain aliens who have been abused by U.S. citizen or LPR spouses or parents to self-petition for lawful immigration status, without having to rely on their abusive family members to petition on their behalf. *Id.* § 40701(a) (codified as amended at 8 U.S.C. § 1154(a)(1)(A)(iii)–(iv), (vii)). The INS program required immigration officers who approved a VAWA self-petition to assess, "on a case-by-case basis, whether to place the alien in deferred action status" while the alien waited for a visa to become available. Memorandum for Regional Directors et al., INS, from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997). INS noted that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action." *Id.* But because "[i]n an unusual case, there may be factors present that would militate against deferred action," the agency instructed officers that requests for deferred action should still "receive individual scrutiny." *Id.* In 2000, INS reported to Congress that, because of this program, no approved VAWA self-petitioner had been removed from the country. *See Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary,* 106th Cong. at 43 (July 20, 2000) ("H.R. 3083 Hearings").

*2. Deferred Action for T and U Visa Applicants.* Several years later, INS instituted a similar deferred action program for applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. No. 106-386, 114 Stat. 1464. That Act created two new nonimmigrant classifications: a "T visa" available to victims of human trafficking and their family members, and a "U visa" for victims of certain other crimes and their family members. *Id.* §§ 107(e), 1513(b)(3) (codified at 8 U.S.C. § 1101(a)(15)(T)(i), (U)(i)). In 2001, INS issued a memorandum directing immigration officers to locate "possible victims in the above categories," and to use "[e]xisting authority and mechanisms such as parole, deferred action, and stays of removal" to prevent those victims' removal "until they have had the opportunity to avail themselves of the provisions of the VTVPA." Memorandum

15

for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001). In subsequent memoranda, INS instructed officers to make "deferred action assessment[s]" for "all [T visa] applicants whose applications have been determined to be bona fide," Memorandum for Johnny N. Williams, Executive Associate Commissioner, INS, from Stuart Anderson, Executive Associate Commissioner, INS, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* at 1 (May 8, 2002), as well as for all U visa applicants "determined to have submitted *prima facie* evidence of [their] eligibility," Memorandum for the Director, Vermont Service Center, INS, from William R. Yates, USCIS, *Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants* at 5 (Oct. 8, 2003). In 2002 and 2007, INS and DHS promulgated regulations embodying these policies. *See* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (promulgated by *New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status*, 67 Fed. Reg. 4784, 4800–01 (Jan. 31, 2002)) (providing that any T visa applicant who presents "*prima facie* evidence" of his eligibility should have his removal "automatically stay[ed]" and that applicants placed on a waiting list for visas "shall maintain [their] current means to prevent removal (deferred action, parole, or stay of removal)"); *id.* § 214.14(d)(2) (promulgated by *New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status*, 72 Fed. Reg. 53014, 53039 (Sept. 17, 2007)) ("USCIS will grant deferred action or parole to U-1 petitioners and qualifying family members while the U-1 petitioners are on the waiting list" for visas.).

   *3. Deferred Action for Foreign Students Affected by Hurricane Katrina.* As a consequence of the devastation caused by Hurricane Katrina in 2005, several thousand foreign students became temporarily unable to satisfy the requirements for maintaining their lawful status as F-1 nonimmigrant students, which include "pursuit of a 'full course of study.'" USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* at 1 (Nov. 25, 2005) (quoting 8 C.F.R. § 214.2(f)(6)), *available at* http//www.uscis.gov/sites/default/files/USCIS/Humanitarian/Special%20Situati ons/Previous%20Special%20Situations%20By%20Topic/faq-interim-student-relie f-hurricane-katrina.pdf (last visited Nov. 19, 2014). DHS announced that it would grant deferred action to these students "based on the fact that [their] failure to maintain status is directly due to Hurricane Katrina." *Id.* at 7. To apply for deferred action under this program, students were required to send a letter substantiating their need for deferred action, along with an application for work authorization. Press Release, USCIS, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* at 1–2 (Nov. 25, 2005), *available at* http://www.uscis.gov/sites/default/files/files/pressrelease/F1Student_ 11_25_05_PR.pdf (last visited Nov. 19, 2014). USCIS explained that such

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

requests for deferred action would be "decided on a case-by-case basis" and that it could not "provide any assurance that all such requests will be granted." *Id.* at 1.

*4. Deferred Action for Widows and Widowers of U.S. Citizens.* In 2009, DHS implemented a deferred action program for certain widows and widowers of U.S. citizens. USCIS explained that "no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death" and USCIS had not yet adjudicated a visa petition on the spouse's behalf. Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, *Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009). "In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens," USCIS issued guidance permitting covered surviving spouses and "their qualifying children who are residing in the United States" to apply for deferred action. *Id.* at 2, 6. USCIS clarified that such relief would not be automatic, but rather would be unavailable in the presence of, for example, "serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons." *Id.* at 6.[7]

*5. Deferred Action for Childhood Arrivals.* Announced by DHS in 2012, DACA makes deferred action available to "certain young people who were brought to this country as children" and therefore "[a]s a general matter . . . lacked the intent to violate the law." Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("Napolitano Memorandum"). An alien is eligible for DACA if she was under the age of 31 when the program began; arrived in the United States before the age of 16; continuously resided in the United States for at least 5 years immediately preceding June 15, 2012; was physically present on June 15, 2012; satisfies certain educational or military service requirements; and neither has a serious criminal history nor "poses a threat to national security or public safety." *See id.* DHS evaluates applicants' eligibility for DACA on a case-by-case basis. *See id.* at 2; USCIS, *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* at 11 ("DACA Toolkit"). Successful DACA applicants receive deferred action for a

---

[7] Several months after the deferred action program was announced, Congress eliminated the requirement that an alien be married to a U.S. citizen "for at least 2 years at the time of the citizen's death" to retain his or her eligibility for lawful immigration status. Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 568(c), 123 Stat. 2142, 2186 (2009). Concluding that this legislation rendered its surviving spouse guidance "obsolete," USCIS withdrew its earlier guidance and treated all pending applications for deferred action as visa petitions. *See* Memorandum for Executive Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, et al., *Re: Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (REVISED)* at 3, 10 (Dec. 2, 2009).

period of two years, subject to renewal. *See* DACA Toolkit at 11. DHS has stated that grants of deferred action under DACA may be terminated at any time, *id.* at 16, and "confer[] no substantive right, immigration status or pathway to citizenship," Napolitano Memorandum at 3.[8]

Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disapprove or limit the practice.[9] On the contrary, it has enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly directed that deferred action be extended to certain categories of aliens. For example, as Congress was considering VAWA reauthorization legislation in 2000, INS officials testified before Congress about their deferred action program for VAWA self-petitioners, explaining that "[a]pproved [VAWA] self-petitioners are placed in deferred action status," such that "[n]o battered alien who has filed a[n approved] self petition . . . has been deported." H.R. 3083 Hearings at 43. Congress responded by not only acknowledging but also expanding the deferred action program in the 2000 VAWA reauthorization legislation, providing that children who could no longer self-petition under VAWA because they were over the age of 21 would nonetheless be "eligible for deferred action and work authorization." Victims of Trafficking and

---

[8] Before DACA was announced, our Office was consulted about whether such a program would be legally permissible. As we orally advised, our preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis. We noted that immigration officials typically consider factors such as having been brought to the United States as a child in exercising their discretion to grant deferred action in individual cases. We explained, however, that extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action. We advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria. We also noted that, although the proposed program was predicated on humanitarian concerns that appeared less particularized and acute than those underlying certain prior class-wide deferred action programs, the concerns animating DACA were nonetheless consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.

[9] Congress has considered legislation that would limit the practice of granting deferred action, but it has never enacted such a measure. In 2011, a bill was introduced in both the House and the Senate that would have temporarily suspended DHS's authority to grant deferred action except in narrow circumstances. *See* H.R. 2497, 112th Cong. (2011); S. 1380, 112th Cong. (2011). Neither chamber, however, voted on the bill. This year, the House passed a bill that purported to bar any funding for DACA or other class-wide deferred action programs, H.R. 5272, 113th Cong. (2014), but the Senate has not considered the legislation. Because the Supreme Court has instructed that unenacted legislation is an unreliable indicator of legislative intent, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969), we do not draw any inference regarding congressional policy from these unenacted bills.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)).[10]

Congress demonstrated a similar awareness of INS's (and later DHS's) deferred action program for bona fide T and U visa applicants. As discussed above, that program made deferred action available to nearly all individuals who could make a prima facie showing of eligibility for a T or U visa. In 2008 legislation, Congress authorized DHS to "grant . . . an administrative stay of a final order of removal" to any such individual. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1)). Congress further clarified that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action." *Id.* It also directed DHS to compile a report detailing, among other things, how long DHS's "specially trained [VAWA] Unit at the [USCIS] Vermont Service Center" took to adjudicate victim-based immigration applications for "deferred action," along with "steps taken to improve in this area." *Id.* § 238. Representative Berman, the bill's sponsor, explained that the Vermont Service Center should "strive to issue work authorization and deferred action" to "[i]mmigrant victims of domestic violence, sexual assault and other violence crimes . . . in most instances within 60 days of filing." 154 Cong. Rec. 24603 (2008).

In addition, in other enactments, Congress has specified that certain classes of individuals should be made "eligible for deferred action." These classes include certain immediate family members of LPRs who were killed on September 11, 2001, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain immediate family members of certain U.S. citizens killed in combat, National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)–(d), 117 Stat. 1392, 1694. In the same legislation, Congress made these individuals eligible to obtain lawful status as "family-sponsored immigrant[s]" or "immediate relative[s]" of U.S. citizens. Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361; Pub. L. No. 108-136, § 1703(c)(1)(A), 117 Stat. 1392, 1694; *see generally Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2197 (2014) (plurality opinion) (explaining which aliens typically qualify as family-sponsored immigrants or immediate relatives).

Finally, Congress acknowledged the practice of granting deferred action in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (codified at

---

[10] Five years later, in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960, Congress specified that, "[u]pon the approval of a petition as a VAWA self-petitioner, the alien . . . is eligible for work authorization." *Id.* § 814(b) (codified at 8 U.S.C. § 1154(a)(1)(K)). One of the Act's sponsors explained that while this provision was intended to "give[] DHS statutory authority to grant work authorization . . . without having to rely upon deferred action . . . [t]he current practice of granting deferred action to approved VAWA self-petitioners should continue." 151 Cong. Rec. 29334 (2005) (statement of Rep. Conyers).

49 U.S.C. § 30301 note), which makes a state-issued driver's license or identification card acceptable for federal purposes only if the state verifies, among other things, that the card's recipient has "[e]vidence of [l]awful [s]tatus." Congress specified that, for this purpose, acceptable evidence of lawful status includes proof of, among other things, citizenship, lawful permanent or temporary residence, or "approved deferred action status." *Id.* § 202(c)(2)(B)(viii).

### B.

The practice of granting deferred action, like the practice of setting enforcement priorities, is an exercise of enforcement discretion rooted in DHS's authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed. It is one of several mechanisms by which immigration officials, against a backdrop of limited enforcement resources, exercise their "broad discretion" to administer the removal system—and, more specifically, their discretion to determine whether "it makes sense to pursue removal" in particular circumstances. *Arizona*, 132 S. Ct. at 2499.

Deferred action, however, differs in at least three respects from more familiar and widespread exercises of enforcement discretion. First, unlike (for example) the paradigmatic exercise of prosecutorial discretion in a criminal case, the conferral of deferred action does not represent a decision not to prosecute an individual for past unlawful conduct; it instead represents a decision to openly tolerate an undocumented alien's continued presence in the United States for a fixed period (subject to revocation at the agency's discretion). Second, unlike most exercises of enforcement discretion, deferred action carries with it benefits in addition to non-enforcement itself; specifically, the ability to seek employment authorization and suspension of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). Third, class-based deferred action programs, like those for VAWA recipients and victims of Hurricane Katrina, do not merely enable individual immigration officials to select deserving beneficiaries from among those aliens who have been identified or apprehended for possible removal—as is the case with ad hoc deferred action—but rather set forth certain threshold eligibility criteria and then invite individuals who satisfy these criteria to apply for deferred action status.

While these features of deferred action are somewhat unusual among exercises of enforcement discretion, the differences between deferred action and other exercises of enforcement discretion are less significant than they might initially appear. The first feature—the toleration of an alien's continued unlawful presence—is an inevitable element of almost any exercise of discretion in immigration enforcement. Any decision not to remove an unlawfully present alien—even through an exercise of routine enforcement discretion—necessarily carries with it a tacit acknowledgment that the alien will continue to be present in the United States without legal status. Deferred action arguably goes beyond such tacit acknowledgment by expressly communicating to the alien that his or her unlawful

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

presence will be tolerated for a prescribed period of time. This difference is not, in our view, insignificant. But neither does it fundamentally transform deferred action into something other than an exercise of enforcement discretion: As we have previously noted, deferred action confers no lawful immigration status, provides no path to lawful permanent residence or citizenship, and is revocable at any time in the agency's discretion.

With respect to the second feature, the additional benefits deferred action confers—the ability to apply for work authorization and the tolling of unlawful presence—do not depend on background principles of agency discretion under DHS's general immigration authorities or the Take Care Clause at all, but rather depend on independent and more specific statutory authority rooted in the text of the INA. The first of those authorities, DHS's power to prescribe which aliens are authorized to work in the United States, is grounded in 8 U.S.C. § 1324a(h)(3), which defines an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]." This statutory provision has long been understood to recognize the authority of the Secretary (and the Attorney General before him) to grant work authorization to particular classes of aliens. *See* 8 C.F.R. § 274a.12; *see also Perales v. Casillas*, 903 F.2d 1043, 1048–50 (5th Cir. 1990) (describing the authority recognized by section 1324a(h)(3) as "permissive" and largely "unfettered").[11] Although the INA

---

[11] Section 1324a(h)(3) was enacted in 1986 as part of IRCA. Before then, the INA contained no provisions comprehensively addressing the employment of aliens or expressly delegating the authority to regulate the employment of aliens to a responsible federal agency. INS assumed the authority to prescribe the classes of aliens authorized to work in the United States under its general responsibility to administer the immigration laws. In 1981, INS promulgated regulations codifying its existing procedures and criteria for granting employment authorization. *See Employment Authorization to Aliens in the United States*, 46 Fed. Reg. 25079, 25080–81 (May 5, 1981) (citing 8 U.S.C. § 1103(a)). Those regulations permitted certain categories of aliens who lacked lawful immigration status, including deferred action recipients, to apply for work authorization under certain circumstances. 8 C.F.R. § 109.1(b)(7) (1982). In IRCA, Congress introduced a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002), to be enforced primarily through criminal and civil penalties on employers who knowingly employ an "unauthorized alien." As relevant here, Congress defined an "unauthorized alien" barred from employment in the United States as an alien who "is not . . . either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added). Shortly after IRCA was enacted, INS denied a petition to rescind its employment authorization regulation, rejecting an argument that "the phrase 'authorized to be so employed by this Act or the Attorney General' does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act." *Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46092, 46093 (Dec. 4, 1987). Because the same statutory phrase refers both to aliens authorized to be employed by the INA and aliens authorized to be employed by the Attorney General, INS concluded that the only way to give effect to both references is to conclude "that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the

requires the Secretary to grant work authorization to particular classes of aliens, *see, e.g.*, 8 U.S.C. § 1158(c)(1)(B) (aliens granted asylum), it places few limitations on the Secretary's authority to grant work authorization to other classes of aliens. Further, and notably, additional provisions of the INA expressly contemplate that the Secretary may grant work authorization to aliens lacking lawful immigration status—even those who are in active removal proceedings or, in certain circumstances, those who have already received final orders of removal. *See id.* § 1226(a)(3) (permitting the Secretary to grant work authorization to an otherwise work-eligible alien who has been arrested and detained pending a decision whether to remove the alien from the United States); *id.* § 1231(a)(7) (permitting the Secretary under certain narrow circumstances to grant work authorization to aliens who have received final orders of removal). Consistent with these provisions, the Secretary has long permitted certain additional classes of aliens who lack lawful immigration status to apply for work authorization, including deferred action recipients who can demonstrate an economic necessity for employment. *See* 8 C.F.R. § 274a.12(c)(14); *see also id.* § 274a.12(c)(8) (applicants for asylum), (c)(10) (applicants for cancellation of removal); *supra* note 11 (discussing 1981 regulations).

The Secretary's authority to suspend the accrual of unlawful presence of deferred action recipients is similarly grounded in the INA. The relevant statutory provision treats an alien as "unlawfully present" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I) if he "is present in the United States after the expiration of the period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii). That language contemplates that the Attorney General (and now the Secretary) may authorize an alien to stay in the United States without accruing unlawful presence under section 1182(a)(9)(B)(i) or section 1182(a)(9)(C)(i). And DHS regulations and policy guidance interpret a "period of stay authorized by the Attorney General" to include periods during which an alien has been granted deferred action. *See* 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); USCIS Consolidation of Guidance at 42.

The final unusual feature of deferred action programs is particular to class-based programs. The breadth of such programs, in combination with the first two features of deferred action, may raise particular concerns about whether immigration officials have undertaken to substantively change the statutory removal system rather than simply adapting its application to individual circumstances. But the salient feature of class-based programs—the establishment of an affirmative application process with threshold eligibility criteria—does not in and of itself cross the line between executing the law and rewriting it. Although every class-wide deferred action program that has been implemented to date has established

---

regulatory process, in addition to those who are authorized employment by statute." *Id*; *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986) (stating that "considerable weight must be accorded" an agency's "contemporaneous interpretation of the statute it is entrusted to administer").

certain threshold eligibility criteria, each program has also left room for case-by-case determinations, giving immigration officials discretion to deny applications even if the applicant fulfills all of the program criteria. *See supra* pp. 15–18. Like the establishment of enforcement priorities discussed in Part I, the establishment of threshold eligibility criteria can serve to avoid arbitrary enforcement decisions by individual officers, thereby furthering the goal of ensuring consistency across a large agency. The guarantee of individualized, case-by-case review helps avoid potential concerns that, in establishing such eligibility criteria, the Executive is attempting to rewrite the law by defining new categories of aliens who are automatically entitled to particular immigration relief. *See Crowley Caribbean Transp.*, 37 F.3d at 676–77; *see also Chaney*, 470 U.S. at 833 n.4. Furthermore, while permitting potentially eligible individuals to apply for an exercise of enforcement discretion is not especially common, many law enforcement agencies have developed programs that invite violators of the law to identify themselves to the authorities in exchange for leniency.[12] Much as is the case with those programs, inviting eligible aliens to identify themselves through an application process may serve the agency's law enforcement interests by encouraging lower-priority individuals to identify themselves to the agency. In so doing, the process may enable the agency to better focus its scarce resources on higher enforcement priorities.

Apart from the considerations just discussed, perhaps the clearest indication that these features of deferred action programs are not per se impermissible is the fact that Congress, aware of these features, has repeatedly enacted legislation appearing to endorse such programs. As discussed above, Congress has not only directed that certain classes of aliens be made eligible for deferred action programs—and in at least one instance, in the case of VAWA beneficiaries, directed the expansion of an existing program—but also ranked evidence of approved deferred action status as evidence of "lawful status" for purposes of the REAL ID Act. These enactments strongly suggest that when DHS in the past has decided to grant deferred action to an individual or class of individuals, it has been acting in a manner consistent with congressional policy "'rather than embarking on a frolic of its own.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139

---

[12] For example, since 1978, the Department of Justice's Antitrust Division has implemented a "leniency program" under which a corporation that reveals an antitrust conspiracy in which it participated may receive a conditional promise that it will not be prosecuted. *See* Dep't of Justice, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (November 19, 2008)*, *available at* http://www.justice.gov/atr/public/criminal/239583.pdf (last visited Nov. 19, 2014); *see also* Internal Revenue Manual § 9.5.11.9(2) (Revised IRS Voluntary Disclosure Practice), *available at* http://www.irs.gov/uac/Revised-IRS-Voluntary-Disclosure-Practice (last visited Nov. 19, 2014) (explaining that a taxpayer's voluntary disclosure of misreported tax information "may result in prosecution not being recommended"); U.S. Marshals Service, *Fugitive Safe Surrender FAQs*, *available at* http://www.usmarshals.gov/safesurrender/faqs.html (last visited Nov. 19, 2014) (stating that fugitives who surrender at designated sites and times under the "Fugitive Safe Surrender" program are likely to receive "favorable consideration").

(1985) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 375 (1969)); *cf. id.* at 137–39 (concluding that Congress acquiesced in an agency's assertion of regulatory authority by "refus[ing] . . . to overrule" the agency's view after it was specifically "brought to Congress'[s] attention," and further finding implicit congressional approval in legislation that appeared to acknowledge the regulatory authority in question); *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981) (finding that Congress "implicitly approved the practice of claim settlement by executive agreement" by enacting the International Claims Settlement Act of 1949, which "create[d] a procedure to implement" those very agreements).

Congress's apparent endorsement of certain deferred action programs does not mean, of course, that a deferred action program can be lawfully extended to any group of aliens, no matter its characteristics or its scope, and no matter the circumstances in which the program is implemented. Because deferred action, like the prioritization policy discussed above, is an exercise of enforcement discretion rooted in the Secretary's broad authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed, it is subject to the same four general principles previously discussed. *See supra* pp. 6–7. Thus, any expansion of deferred action to new classes of aliens must be carefully scrutinized to ensure that it reflects considerations within the agency's expertise, and that it does not seek to effectively rewrite the laws to match the Executive's policy preferences, but rather operates in a manner consonant with congressional policy expressed in the statute. *See supra* pp. 6–7 (citing *Youngstown*, 343 U.S. at 637, and *Nat'l Ass'n of Home Builders*, 551 U.S. at 658). Immigration officials cannot abdicate their statutory responsibilities under the guise of exercising enforcement discretion. *See supra* p. 7 (citing *Chaney*, 470 U.S. at 833 n.4). And any new deferred action program should leave room for individualized evaluation of whether a particular case warrants the expenditure of resources for enforcement. *See supra* p. 7 (citing *Glickman*, 96 F.3d at 1123, and *Crowley Caribbean Transp.*, 37 F.3d at 676–77).

Furthermore, because deferred action programs depart in certain respects from more familiar and widespread exercises of enforcement discretion, particularly careful examination is needed to ensure that any proposed expansion of deferred action complies with these general principles, so that the proposed program does not, in effect, cross the line between executing the law and rewriting it. In analyzing whether the proposed programs cross this line, we will draw substantial guidance from Congress's history of legislation concerning deferred action. In the absence of express statutory guidance, the nature of deferred action programs Congress has implicitly approved by statute helps to shed light on Congress's own understandings about the permissible uses of deferred action. Those understandings, in turn, help to inform our consideration of whether the proposed deferred action programs are "faithful[]" to the statutory scheme Congress has enacted. U.S. Const. art. II, § 3.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

### C.

We now turn to the specifics of DHS's proposed deferred action programs. DHS has proposed implementing a policy under which an alien could apply for, and would be eligible to receive, deferred action if he or she: (1) is not an enforcement priority under DHS policy; (2) has continuously resided in the United States since before January 1, 2010; (3) is physically present in the United States both when DHS announces its program and at the time of application for deferred action; (4) has a child who is a U.S. citizen or LPR; and (5) presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. You have also asked about the permissibility of a similar program that would be open to parents of children who have received deferred action under the DACA program. We first address DHS's proposal to implement a deferred action program for the parents of U.S. citizens and LPRs, and then turn to the permissibility of the program for parents of DACA recipients in the next section.

### 1.

We begin by considering whether the proposed program for the parents of U.S. citizens and LPRs reflects considerations within the agency's expertise. DHS has offered two justifications for the proposed program for the parents of U.S. citizens and LPRs. First, as noted above, severe resource constraints make it inevitable that DHS will not remove the vast majority of aliens who are unlawfully present in the United States. Consistent with Congress's instruction, DHS prioritizes the removal of individuals who have significant criminal records, as well as others who present dangers to national security, public safety, or border security. *See supra* p. 10. Parents with longstanding ties to the country and who have no significant criminal records or other risk factors rank among the agency's lowest enforcement priorities; absent significant increases in funding, the likelihood that any individual in that category will be determined to warrant the expenditure of severely limited enforcement resources is very low. Second, DHS has explained that the program would serve an important humanitarian interest in keeping parents together with children who are lawfully present in the United States, in situations where such parents have demonstrated significant ties to community and family in this country. *See* Shahoulian E-mail.

With respect to DHS's first justification, the need to efficiently allocate scarce enforcement resources is a quintessential basis for an agency's exercise of enforcement discretion. *See Chaney*, 470 U.S. at 831. Because, as discussed earlier, Congress has appropriated only a small fraction of the funds needed for full enforcement, DHS can remove no more than a small fraction of the individuals who are removable under the immigration laws. *See supra* p. 9. The agency must therefore make choices about which violations of the immigration laws it

25

will prioritize and pursue. And as *Chaney* makes clear, such choices are entrusted largely to the Executive's discretion. 470 U.S. at 831.

The deferred action program DHS proposes would not, of course, be costless. Processing applications for deferred action and its renewal requires manpower and resources. *See Arizona*, 132 S. Ct. at 2521 (Scalia, J., concurring in part and dissenting in part). But DHS has informed us that the costs of administering the proposed program would be borne almost entirely by USCIS through the collection of application fees. *See* Shahoulian E-mail; *see also* 8 U.S.C. § 1356(m); 8 C.F.R. § 103.7(b)(1)(i)(C), (b)(1)(i)(HH). DHS has indicated that the costs of administering the deferred action program would therefore not detract in any significant way from the resources available to ICE and CBP—the enforcement arms of DHS—which rely on money appropriated by Congress to fund their operations. *See* Shahoulian E-mail. DHS has explained that, if anything, the proposed deferred action program might increase ICE's and CBP's efficiency by in effect using USCIS's fee-funded resources to enable those enforcement divisions to more easily identify non-priority aliens and focus their resources on pursuing aliens who are strong candidates for removal. *See id.* The proposed program, in short, might help DHS address its severe resource limitations, and at the very least likely would not exacerbate them. *See id.*

DHS does not, however, attempt to justify the proposed program solely as a cost-saving measure, or suggest that its lack of resources alone is sufficient to justify creating a deferred action program for the proposed class. Rather, as noted above, DHS has explained that the program would also serve a particularized humanitarian interest in promoting family unity by enabling those parents of U.S. citizens and LPRs who are not otherwise enforcement priorities and who have demonstrated community and family ties in the United States (as evidenced by the length of time they have remained in the country) to remain united with their children in the United States. Like determining how best to respond to resource constraints, determining how to address such "human concerns" in the immigration context is a consideration that is generally understood to fall within DHS's expertise. *Arizona*, 132 S. Ct. at 2499.

This second justification for the program also appears consonant with congressional policy embodied in the INA. Numerous provisions of the statute reflect a particular concern with uniting aliens with close relatives who have attained lawful immigration status in the United States. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977); *INS v. Errico*, 385 U.S. 214, 220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress . . . was concerned with the problem of keeping families of United States citizens and immigrants united.'" (quoting H.R. Rep. No. 85-1199, at 7 (1957)). The INA provides a path to lawful status for the parents, as well as other immediate relatives, of U.S. citizens: U.S. citizens aged twenty-one or over may petition for parents to obtain visas that would permit them to enter and permanently reside

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

in the United States, and there is no limit on the overall number of such petitions that may be granted. *See* 8 U.S.C. § 1151(b)(2)(A)(i); *see also Cuellar de Osorio*, 134 S. Ct. at 2197–99 (describing the process for obtaining a family-based immigrant visa). And although the INA contains no parallel provision permitting LPRs to petition on behalf of their parents, it does provide a path for LPRs to become citizens, at which point they too can petition to obtain visas for their parents. *See, e.g.*, 8 U.S.C. § 1427(a) (providing that aliens are generally eligible to become naturalized citizens after five years of lawful permanent residence); *id.* § 1430(a) (alien spouses of U.S. citizens become eligible after three years of lawful permanent residence); *Demore v. Kim*, 538 U.S. 510, 544 (2003).[13] Additionally, the INA empowers the Attorney General to cancel the removal of, and adjust to lawful permanent resident status, aliens who have been physically present in the United States for a continuous period of not less than ten years, exhibit good moral character, have not been convicted of specified offenses, and have immediate relatives who are U.S. citizens or LPRs and who would suffer exceptional hardship from the alien's removal. 8 U.S.C. § 1229b(b)(1). DHS's proposal to focus on the parents of U.S. citizens and LPRs thus tracks a congressional concern, expressed in the INA, with uniting the immediate families of individuals who have permanent legal ties to the United States.

At the same time, because the temporary relief DHS's proposed program would confer to such parents is sharply limited in comparison to the benefits Congress has made available through statute, DHS's proposed program would not operate to circumvent the limits Congress has placed on the availability of those benefits. The statutory provisions discussed above offer the parents of U.S. citizens and LPRs the prospect of permanent lawful status in the United States. The cancellation of removal provision, moreover, offers the prospect of receiving such status

---

[13] The INA does permit LPRs to petition on behalf of their spouses and children even before they have attained citizenship. *See* 8 U.S.C. § 1153(a)(2). However, the exclusion of LPRs' parents from this provision does not appear to reflect a congressional judgment that, until they attain citizenship, LPRs lack an interest in being united with their parents comparable to their interest in being united with their other immediate relatives. The distinction between parents and other relatives originated with a 1924 statute that exempted the wives and minor children of U.S. citizens from immigration quotas, gave "preference status"—eligibility for a specially designated pool of immigrant visas—to other relatives of U.S. citizens, and gave no favorable treatment to the relatives of LPRs. Immigration Act of 1924, Pub. L. No. 68-139, §§ 4(a), 6, 43 Stat. 153, 155–56. In 1928, Congress extended preference status to LPRs' wives and minor children, reasoning that because such relatives would be eligible for visas without regard to any quota when their LPR relatives became citizens, granting preference status to LPRs' wives and minor children would "hasten[]" the "family reunion." S. Rep. No. 70-245, at 2 (1928); *see* Act of May 29, 1928, ch. 914, 45 Stat. 1009, 1009–10. The special visa status for wives and children of LPRs thus mirrored, and was designed to complement, the special visa status given to wives and minor children of U.S. citizens. In 1965, Congress eliminated the basis on which the distinction had rested by exempting all "immediate relatives" of U.S. citizens, including parents, from numerical restrictions on immigration. Pub. L. No. 89-236, § 1, 79 Stat. 911, 911. But it did not amend eligibility for preference status for relatives of LPRs to reflect that change. We have not been able to discern any rationale for this omission in the legislative history or statutory text of the 1965 law.

immediately, without the delays generally associated with the family-based immigrant visa process. DHS's proposed program, in contrast, would not grant the parents of U.S. citizens and LPRs any lawful immigration status, provide a path to permanent residence or citizenship, or otherwise confer any legally enforceable entitlement to remain in the United States. *See* USCIS SOP at 3. It is true that, as we have discussed, a grant of deferred action would confer eligibility to apply for and obtain work authorization, pursuant to the Secretary's statutory authority to grant such authorization and the longstanding regulations promulgated thereunder. *See supra* pp. 13, 21–22. But unlike the automatic employment eligibility that accompanies LPR status, *see* 8 U.S.C. § 1324a(h)(3), this authorization could be granted only on a showing of economic necessity, and would last only for the limited duration of the deferred action grant, *see* 8 C.F.R. § 274a.12(c)(14).

The other salient features of the proposal are similarly consonant with congressional policy. The proposed program would focus on parents who are not enforcement priorities under the prioritization policy discussed above—a policy that, as explained earlier, comports with the removal priorities set by Congress. *See supra* p. 10. The continuous residence requirement is likewise consistent with legislative judgments that extended periods of continuous residence are indicative of strong family and community ties. *See* IRCA, Pub. L. No. 99-603, § 201(a), 100 Stat. 3359, 3394 (1986) (codified as amended at 8 U.S.C. § 1255a(a)(2)) (granting lawful status to certain aliens unlawfully present in the United States since January 1, 1982); *id.* § 302(a) (codified as amended at 8 U.S.C. § 1160) (granting similar relief to certain agricultural workers); H.R. Rep. No. 99-682, pt. 1, at 49 (1986) (stating that aliens present in the United States for five years "have become a part of their communities[,] . . . have strong family ties here which include U.S. citizens and lawful residents[,] . . . have built social networks in this country[, and] . . . have contributed to the United States in myriad ways"); S. Rep. No. 99-132, at 16 (1985) (deporting aliens who "have become well settled in this country" would be a "wasteful use of the Immigration and Naturalization Service's limited enforcement resources"); *see also Arizona*, 132 S. Ct. at 2499 (noting that "[t]he equities of an individual case" turn on factors "including whether the alien has . . . long ties to the community").

We also do not believe DHS's proposed program amounts to an abdication of its statutory responsibilities, or a legislative rule overriding the commands of the statute. As discussed earlier, DHS's severe resource constraints mean that, unless circumstances change, it could not as a practical matter remove the vast majority of removable aliens present in the United States. The fact that the proposed program would defer the removal of a subset of these removable aliens—a subset that ranks near the bottom of the list of the agency's removal priorities—thus does not, by itself, demonstrate that the program amounts to an abdication of DHS's responsibilities. And the case-by-case discretion given to immigration officials under DHS's proposed program alleviates potential concerns that DHS has

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

abdicated its statutory enforcement responsibilities with respect to, or created a categorical, rule-like entitlement to immigration relief for, the particular class of aliens eligible for the program. An alien who meets all the criteria for deferred action under the program would receive deferred action only if he or she "present[ed] no other factors that, in the exercise of discretion," would "make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. The proposed policy does not specify what would count as such a factor; it thus leaves the relevant USCIS official with substantial discretion to determine whether a grant of deferred action is warranted. In other words, even if an alien is not a removal priority under the proposed policy discussed in Part I, has continuously resided in the United States since before January 1, 2010, is physically present in the country, and is a parent of an LPR or a U.S. citizen, the USCIS official evaluating the alien's deferred action application must still make a judgment, in the exercise of her discretion, about whether that alien presents any other factor that would make a grant of deferred action inappropriate. This feature of the proposed program ensures that it does not create a categorical entitlement to deferred action that could raise concerns that DHS is either impermissibly attempting to rewrite or categorically declining to enforce the law with respect to a particular group of undocumented aliens.

Finally, the proposed deferred action program would resemble in material respects the kinds of deferred action programs Congress has implicitly approved in the past, which provides some indication that the proposal is consonant not only with interests reflected in immigration law as a general matter, but also with congressional understandings about the permissible uses of deferred action. As noted above, the program uses deferred action as an interim measure for a group of aliens to whom Congress has given a prospective entitlement to lawful immigration status. While Congress has provided a path to lawful status for the parents of U.S. citizens and LPRs, the process of obtaining that status "takes time." *Cuellar de Osorio*, 134 S. Ct. at 2199. The proposed program would provide a mechanism for families to remain together, depending on their circumstances, for some or all of the intervening period.[14] Immigration officials have on several

---

[14] DHS's proposed program would likely not permit all potentially eligible parents to remain together with their children for the entire duration of the time until a visa is awarded. In particular, undocumented parents of adult citizens who are physically present in the country would be ineligible to adjust their status without first leaving the country if they had never been "inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a) (permitting the Attorney General to adjust to permanent resident status certain aliens present in the United States if they become eligible for immigrant visas). They would thus need to leave the country to obtain a visa at a U.S. consulate abroad. *See id.* § 1201(a); *Cuellar de Osorio*, 134 S. Ct. at 2197–99. But once such parents left the country, they would in most instances become subject to the 3- or 10-year bar under 8 U.S.C. § 1182(a)(9)(B)(i) and therefore unable to obtain a visa unless they remained outside the country for the duration of the bar. DHS's proposed program would nevertheless enable other families to stay together without regard to the 3- or 10-year bar. And even as to those families with parents who would become subject to that bar, the proposed deferred action program would have the effect of reducing the

29

occasions deployed deferred action programs as interim measures for other classes of aliens with prospective entitlements to lawful immigration status, including VAWA self-petitioners, bona fide T and U visa applicants, certain immediate family members of certain U.S. citizens killed in combat, and certain immediate family members of aliens killed on September 11, 2001. As noted above, each of these programs has received Congress's implicit approval—and, indeed, in the case of VAWA self-petitioners, a direction to expand the program beyond its original bounds. *See supra* pp. 18–20.[15] In addition, much like these and other programs Congress has implicitly endorsed, the program serves substantial and particularized humanitarian interests. Removing the parents of U.S. citizens and LPRs—that is, of children who have established permanent legal ties to the United States—would separate them from their nuclear families, potentially for many years, until they were able to secure visas through the path Congress has provided. During that time, both the parents and their U.S. citizen or LPR children would be deprived of both the economic support and the intangible benefits that families provide.

We recognize that the proposed program would likely differ in size from these prior deferred action programs. Although DHS has indicated that there is no reliable way to know how many eligible aliens would actually apply for or would be likely to receive deferred action following individualized consideration under the proposed program, it has informed us that approximately 4 million individuals could be eligible to apply. *See* Shahoulian E-mail. We have thus considered whether the size of the program alone sets it at odds with congressional policy or the Executive's duties under the Take Care Clause. In the absence of express statutory guidance, it is difficult to say exactly how the program's potential size bears on its permissibility as an exercise of executive enforcement discretion. But because the size of DHS's proposed program corresponds to the size of a population to which Congress has granted a prospective entitlement to lawful status

---

amount of time the family had to spend apart, and could enable them to adjust the timing of their separation according to, for example, their children's needs for care and support.

[15] Several extended voluntary departure programs have been animated by a similar rationale, and the most prominent of these programs also received Congress's implicit approval. In particular, as noted above, the Family Fairness policy, implemented in 1990, authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens granted legal status under IRCA—aliens who would eventually "acquire lawful permanent resident status" and be able to petition on behalf of their family members. Family Fairness Memorandum at 1; *see supra* pp. 14–15. Later that year, Congress granted the beneficiaries of the Family Fairness program an indefinite stay of deportation. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5030. Although it did not make that grant of relief effective for nearly a year, Congress clarified that "the delay in effectiveness of this section shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." *Id.* § 301(g). INS's policies for qualifying Third Preference visa applicants and nurses eligible for H-1 nonimmigrant status likewise extended to aliens with prospective entitlements to lawful status. *See supra* p. 14.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

without numerical restriction, it seems to us difficult to sustain an argument, based on numbers alone, that DHS's proposal to grant a limited form of administrative relief as a temporary interim measure exceeds its enforcement discretion under the INA. Furthermore, while the potential size of the program is large, it is nevertheless only a fraction of the approximately 11 million undocumented aliens who remain in the United States each year because DHS lacks the resources to remove them; and, as we have indicated, the program is limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. There is thus little practical danger that the program, simply by virtue of its size, will impede removals that would otherwise occur in its absence. And although we are aware of no prior exercises of deferred action of the size contemplated here, INS's 1990 Family Fairness policy, which Congress later implicitly approved, made a comparable fraction of undocumented aliens—approximately four in ten—potentially eligible for discretionary extended voluntary departure relief. *Compare* CRS Immigration Report at 22 (estimating the Family Fairness policy extended to 1.5 million undocumented aliens), *with* Office of Policy and Planning, INS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000* at 10 (2003) (estimating an undocumented alien population of 3.5 million in 1990); *see supra* notes 5 & 15 (discussing extended voluntary departure and Congress's implicit approval of the Family Fairness policy). This suggests that DHS's proposed deferred action program is not, simply by virtue of its relative size, inconsistent with what Congress has previously considered a permissible exercise of enforcement discretion in the immigration context.

In light of these considerations, we believe the proposed expansion of deferred action to the parents of U.S. citizens and LPRs is lawful. It reflects considerations—responding to resource constraints and to particularized humanitarian concerns arising in the immigration context—that fall within DHS's expertise. It is consistent with congressional policy, since it focuses on a group—law-abiding parents of lawfully present children who have substantial ties to the community—that Congress itself has granted favorable treatment in the immigration process. The program provides for the exercise of case-by-case discretion, thereby avoiding creating a rule-like entitlement to immigration relief or abdicating DHS's enforcement responsibilities for a particular class of aliens. And, like several deferred action programs Congress has approved in the past, the proposed program provides interim relief that would prevent particularized harm that could otherwise befall both the beneficiaries of the program and their families. We accordingly conclude that the proposed program would constitute a permissible exercise of DHS's enforcement discretion under the INA.

### 2.

We now turn to the proposed deferred action program for the parents of DACA recipients. The relevant considerations are, to a certain extent, similar to those

31

discussed above: Like the program for the parents of U.S. citizens and LPRs, the proposed program for parents of DACA recipients would respond to severe resource constraints that dramatically limit DHS's ability to remove aliens who are unlawfully present, and would be limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. And like the proposed program for LPRs and U.S. citizens, the proposed program for DACA parents would preserve a significant measure of case-by-case discretion not to award deferred action even if the general eligibility criteria are satisfied.

But the proposed program for parents of DACA recipients is unlike the proposed program for parents of U.S. citizens and LPRs in two critical respects. First, although DHS justifies the proposed program in large part based on considerations of family unity, the parents of DACA recipients are differently situated from the parents of U.S. citizens and LPRs under the family-related provisions of the immigration law. Many provisions of the INA reflect Congress's general concern with not separating individuals who are legally entitled to live in the United States from their immediate family members. *See, e.g.*, 8 U.S.C. § 1151(b)(2)(A)(i) (permitting citizens to petition for parents, spouses and children); *id.* § 1229b(b)(1) (allowing cancellation of removal for relatives of citizens and LPRs). But the immigration laws do not express comparable concern for uniting persons who lack lawful status (or prospective lawful status) in the United States with their families. DACA recipients unquestionably lack lawful status in the United States. *See* DACA Toolkit at 8 ("Deferred action . . . does not provide you with a lawful status."). Although they may presumptively remain in the United States, at least for the duration of the grant of deferred action, that grant is both time-limited and contingent, revocable at any time in the agency's discretion. Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the immigration system Congress has enacted and the policies that system embodies.

Second, as it has been described to us, the proposed deferred action program for the parents of DACA recipients would represent a significant departure from deferred action programs that Congress has implicitly approved in the past. Granting deferred action to the parents of DACA recipients would not operate as an interim measure for individuals to whom Congress has given a prospective entitlement to lawful status. Such parents have no special prospect of obtaining visas, since Congress has not enabled them to self-petition—as it has for VAWA self-petitioners and individuals eligible for T or U visas—or enabled their undocumented children to petition for visas on their behalf. Nor would granting deferred action to parents of DACA recipients, at least in the absence of other factors, serve interests that are comparable to those that have prompted implementation of deferred action programs in the past. Family unity is, as we have discussed, a significant humanitarian concern that underlies many provisions of the INA. But a concern with furthering family unity alone would not justify the

32

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

proposed program, because in the absence of any family member with lawful status in the United States, it would not explain why that concern should be satisfied by permitting family members to remain in the United States. The decision to grant deferred action to DACA parents thus seems to depend critically on the earlier decision to make deferred action available to their children. But we are aware of no precedent for using deferred action in this way, to respond to humanitarian needs rooted in earlier exercises of deferred action. The logic underlying such an expansion does not have a clear stopping point: It would appear to argue in favor of extending relief not only to parents of DACA recipients, but also to the close relatives of any alien granted deferred action through DACA or any other program, those relatives' close relatives, and perhaps the relatives (and relatives' relatives) of any alien granted any form of discretionary relief from removal by the Executive.

For these reasons, the proposed deferred action program for the parents of DACA recipients is meaningfully different from the proposed program for the parents of U.S. citizens and LPRs. It does not sound in Congress's concern for maintaining the integrity of families of individuals legally entitled to live in the United States. And unlike prior deferred action programs in which Congress has acquiesced, it would treat the Executive's prior decision to extend deferred action to one population as justifying the extension of deferred action to additional populations. DHS, of course, remains free to consider whether to grant deferred action to individual parents of DACA recipients on an ad hoc basis. But in the absence of clearer indications that the proposed class-based deferred action program for DACA parents would be consistent with the congressional policies and priorities embodied in the immigration laws, we conclude that it would not be permissible.

### III.

In sum, for the reasons set forth above, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be legally permissible, but that the proposed deferred action program for parents of DACA recipients would not be permissible.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*