**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**EXHIBITS IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# Volume 4

# Exhibits 19 - 29

# DEF-INTERV.
# EX. 19



# USCIS Advance Parole Documents

**January 6, 2017**
**Fiscal Year 2016 Report to Congress**



## Homeland Security

*U.S. Citizenship and Immigration Services*

# Message from U.S. Citizenship and Immigration Services

January 6, 2017



I am pleased to submit the following report, "USCIS Advance Parole Documents," which has been prepared by U.S. Citizenship and Immigration Services (USCIS).

This report was compiled pursuant to language set forth in Senate Report 114-68 accompanying the Fiscal Year (FY) 2016 Department of Homeland Security Appropriations Act (P.L. 114-113).

Pursuant to congressional requirements, this report is being provided to the following Members of Congress:

The Honorable John R. Carter
Chairman, House Appropriations Subcommittee on Homeland Security

The Honorable Lucille Roybal-Allard
Ranking Member, House Appropriations Subcommittee on Homeland Security

The Honorable John Hoeven
Chairman, Senate Appropriations Subcommittee on Homeland Security

The Honorable Jeanne Shaheen
Ranking Member, Senate Appropriations Subcommittee on Homeland Security

I am pleased to respond to any questions you may have. Please do not hesitate to contact me at (202) 272-1000 or the Department's Deputy Under Secretary for Management and Chief Financial Officer, Chip Fulghum, at (202) 447-5751.

Sincerely,

León Rodríguez
Director
U.S. Citizenship and Immigration Services

i

DEFINT00773

# Executive Summary

This report responds to the Senate request to provide information on the use of advance parole documents.[1]

As requested, the report provides details on how many applications for advance parole documents were received by USCIS and, of those, how many applications were approved and denied. From FYs 2012–2015, USCIS received approximately 300,000 applications for advance parole documents each year. The majority of requests for advance parole documents comes from individuals seeking adjustment of status.

Without conducting a manual review of each case, USCIS is unable to provide data on all deferred action recipients who obtained advance parole documents, because USCIS does not track electronically advance parole applications from recipients of deferred action that is not associated with the Deferred Action for Childhood Arrivals (DACA) policy. However, this report does include the number of DACA recipients who obtained advance parole documents and the number of applicants for adjustment of status (seeking lawful permanent resident status, commonly known as applying for a "green card") who obtained advance parole documents.

The report also provides data on the number of applications for which the filing fee was waived because of an inability to pay. The majority of applicants for advance parole do not receive a waiver for the filing fee.

Without a manual review of each case, USCIS could not determine electronically which recipients actually traveled abroad, returned, were paroled into the United States upon return on the basis of an advance parole document, and applied for adjustment of status. When an individual applies for adjustment of status, USCIS verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and admitted or paroled into the United States on the basis of the evidence presented, such as a stamped advance parole document, and/or the review of the Department's records of that applicant. However, this report does provide information on the number of certain recipients, including DACA and non-DACA recipients, who obtained advance parole documents and subsequently filed adjustment of status applications.[2]

---

[1] With the exception of data on fee waiver requests for Form I-131, this report, based on USCIS's understanding of the legislative language, includes only information on requests for advance parole documents made for individuals currently in the United States.

[2] Some recipients of deferred action under DACA may be eligible to file for adjustment of status independent of a grant of advance parole and/or entry into the United States pursuant to a grant of advance parole. However, as with the request for statistical data in requests (3) and (5) in Senate Report 114-68, providing data on this population is

DEFINT00774

Without a manual review of each case, USCIS also could not determine the specific basis for approval of an advance parole document or the supporting documentation that was considered when making a determination on the application for an advance parole document, because USCIS does not track this information electronically.  However, this report does provide information on the types of supporting evidence accepted in support of applications for an advance parole document.

---

not possible without a manual review to construct each individual's immigration history using means such as the paper A-file and a full systems review.

DEFINT00775



# USCIS Advance Parole Document

# Table of Contents

I.    Legislative Language ............................................................................................. 1

II.   Background ............................................................................................................. 2

III.  Data Report ............................................................................................................ 5

IV.   Conclusion.............................................................................................................. 9

.

DEFINT00776

# I.   Legislative Language

This document has been compiled in response to language included in Senate Report 114-68, which accompanies the Fiscal Year (FY) 2016 Department of Homeland Security Appropriations Act (P.L. 114-113).

Senate Report 114-68 states as follows:

> The Committee seeks more detail on the use of advance parole and directs USCIS to report on how many advance parole documents are being approved for entry into the United States.  The report should, for the past 4 years, detail:
>
> (1) how many applications for advance parole were made, how many granted, and how many denied;
> (2) the number of advance parole documents granted to deferred action recipients and applicants for adjustment of status;
> (3) the specific basis for the grant of advance parole under USCIS' criteria set forth in the instructions to the Form I–131 (i.e., educational, employment, or humanitarian);
> (4) the number of applications in each year for which the filing fee was waived;
> (5) the supporting documentation, by type, that was used to make advance parole determinations; and
> (6) the number of aliens, broken down by deferred action recipients and non-deferred action recipients, granted advance parole who left the country, were paroled back into the country using the advance parole document, and have filed an application for adjustment of status to lawful permanent residence.

DEFINT00777

# II.  Background

USCIS may issue an advance parole document for urgent humanitarian reasons or significant public benefit to a foreign national[3] inside the United States who is preparing to travel abroad and is planning to return.[4]  USCIS issues advance parole documents pursuant to the general statutory parole authority under sections 103(a) and 212(d)(5) of the Immigration and Nationality Act (INA), section 402(4) of the Homeland Security Act (P.L. 107-296), and the implementing regulations, as well as pursuant to program-specific provisions, such as INA section 244(f)(3) and 8 CFR 244.15 regarding Temporary Protected Status.[5]  The use of advance parole documents also has been recognized by the Board of Immigration Appeals.[6]  The decision to grant an advance parole document, as with parole, is a matter of discretion and is decided case-by-case. USCIS weighs the circumstances of the specific request and any reasons in support of parole against any negative factors that may exist.

Issuance of an advance parole document is not, itself, a grant of parole, and receipt of an advance parole document does not guarantee the recipient's parole into the United States following travel abroad.[7]  A U.S. Customs and Border Protection officer makes a separate discretionary decision regarding the parole request itself upon the foreign national's arrival at the port of entry.

## Supporting Documentation

USCIS electronically does not track the supporting documentation that is considered when making a determination on the application for an advance parole document. However, to be considered for advance parole, all applicants must submit a Form I-131, *Application for Travel Document*, and the following required evidence:

---

[3] The term "foreign national" generally is used in lieu of the term "alien," which means a person who is not a citizen or national of the United States. Notwithstanding, when quoting the title, subtitle, or text of a statute or regulation that includes the term "alien," the term "alien" is used.
[4] USCIS issues single-use and multiple-use advance parole documents. USCIS also may issue a travel document that provides advance authorization for parole to a foreign national outside the United States with a need to visit the United States temporarily for urgent humanitarian reasons or significant public benefit. Information on these travel documents is not included in this report.
[5] Congress specifically has stated that a TPS beneficiary may travel abroad with the prior consent of the Secretary. INA § 244(f)(3).
[6] *Matter of G-A-C-*, 22 I&N Dec. 83 (BIA 1998); *Matter of Arrabally*, 25 I&N Dec. 771 (BIA 2012).
[7] *Matter of G-A-C-*, 22 I&N Dec. at 88 n.3; *Matter of Arrabally*, 25 I&N Dec. at 778 n.6.

DEFINT00778

- Proper fee in accordance with the form instructions[8] or a fee waiver request. Generally, USCIS may not waive fees for applications for an advance parole document for individuals within the United States;[9]
- Copy of any document issued by the Department showing the person's current immigration status in the United States, if any;
- Copy of receipt notice for a pending adjustment or other immigration benefit application, if applicable;
- Copy of the order, notice, or document that granted deferred action, if applicable;
- Copy of a government-issued photo identity document;
- Two photographs as described in the form instructions; and
- Evidence supporting the facts that are the reason for the advance parole document request.

Individuals who have received deferred action under the DACA policy and who request an advance parole document additionally must provide documentation that the travel will be in furtherance of humanitarian, employment, or educational purposes. Travel for vacation is not a valid basis for issuance of a DACA-related advance parole document. USCIS determines whether the foreign national's purpose for international travel is justifiable on the basis of the circumstances described in the request and the supporting documentation provided.

Supporting documentation to demonstrate humanitarian purposes includes, but is not limited to:

- A letter from the applicant's physician explaining the nature of his or her medical condition, the specific medical treatment to be sought outside of the United States, and a brief explanation why travel outside the United States is medically necessary; or
- Documentation of a family member's serious illness or death.

Supporting documentation to demonstrate educational purposes includes, but is not limited to:

- A letter from a school employee acting in an official capacity describing the purpose of the travel and explaining why travel is required or beneficial; or
- A document showing enrollment in an educational program requiring travel.

---

[8] 8 CFR 103.7.
[9] 8 CFR 103.7(c)(3) and (d).

3

Supporting documentation to demonstrate employment purposes includes, but is not limited to:

- A letter from the applicant's employer or conference host describing the need for travel; or
- A document showing a specific employment need, such as a conference program, that also shows the applicant's participation.

4

DEFINT00780

# III.  Data Report

Tables 1, 2A, 2B, and 3 provide the available requested USCIS data on advance parole documents for FYs 2012–2015, in response to requests (1), (2), and (4) in Senate Report 114-68, respectively.[10]  Without a manual review of each case, USCIS could not determine the specific basis for approval of an advance parole document or the supporting documentation that was considered when making a determination on the application for an advance parole document, because USCIS does not track this information electronically.  Accordingly, this report does not include statistical data in response to requests (3) and (5) in the Senate Report.

Regarding request (6) in Senate Report 114-68, without a manual review of each case, USCIS also could not determine electronically which deferred action recipients and nondeferred action recipients actually traveled abroad, returned, were paroled into the United States upon return on the basis of an advance parole document, and applied for adjustment of status.  Therefore, this report does not include full data in response to request (6) of the Senate Report.  When an individual applies for adjustment of status, however, USCIS verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and admitted or paroled into the United States on the basis of the evidence presented, such as a stamped parole document, and/or the review of the Department's records of that applicant.  Thus, in Tables 4A and 4B, USCIS has provided data regarding individuals with an approved advance parole request and a later approved application for adjustment of status, broken down by DACA recipients and non-DACA recipients.  Some recipients of deferred action under DACA may be independently eligible to file for adjustment of status independent of a grant of advance parole and/or entry into the United States pursuant to a grant of advance parole.  However, as with the request for statistical data in response to requests (3) and (5) of the Senate Report, providing data on this population is not possible without a manual review to construct each individual's immigration history using means such as the paper A-file and a full systems review.

---

[10] However, because USCIS is unable to provide data on non-DACA deferred action recipients who obtained advance parole documents without conducting a manual review of each such case, Table 2A provides only data on deferred action under DACA.

DEFINT00781

**Table 1:  Receipts, Approvals, and Denials for Form I-131, Application for Travel Document for Individuals within the United States**

| U.S. Citizenship & Immigration Services (USCIS) Form I-131 - Advance Parole Receipts, Approvals, and Denials Fiscal Years 2012 – 2015 | | | |
| --- | --- | --- | --- |
| Fiscal Year | Receipts* | Approvals | Denials |
| 2012 Total | 284,064 | 283,470 | 9,322 |
| 2013 Total | 291,336 | 263,420 | 7,581 |
| 2014 Total | 291,553 | 253,119 | 18,326 |
| 2015 Total | 334,301 | 300,803 | 18,553 |
| **Grand Total** | **1,201,254** | **1,100,812** | **53,782** |

*Not all applications are adjudicated in the same fiscal year as received.  Thus, numbers of approvals and denials always may not equal receipt numbers.

**Table 2A:  Deferred Action for Childhood Arrivals Recipients who Obtained Advance Parole Documents**

| U.S. Citizenship & Immigration Services Form I-131, Application for Travel Document Filed after Form I-821D Approval "Valid From" Date* Fiscal Years 2012 – 2015 | |
| --- | --- |
| Fiscal Year | I-131 Approvals |
| 2012 Total | - |
| 2013 Total | 1,409 |
| 2014 Total | 5,687 |
| 2015 Total | 12,847 |
| **Grand Total** | **19,943** |

Without conducting a manual review of each case, USCIS is unable to provide data on non-DACA deferred action recipients who obtained advance parole documents.

*Comparison used the earliest Form I-821D "valid from" date by A-Number.  The Form I-821D decision date was used where invalid data were returned for the Form I-821D "valid from" date.

DEFINT00782

**Table 2B:  Applicants Within the United States with a Pending Form I-485, Application to Register Permanent Residence or Adjust Status, who Obtained Advance Parole Documents**

| U.S. Citizenship & Immigration Services Form I-131, Application for Travel Document Advance Parole Approvals Filed in Connection with a Form I-485 Fiscal Years 2012 – 2015 | |
|---|---|
| **Fiscal Year** | **I-131 Approvals** |
| 2012 Total | 252,616 |
| 2013 Total | 229,210 |
| 2014 Total | 210,062 |
| 2015 Total | 253,671 |
| **Grand Total** | **945,559** |

**Table 3:  Approvals of Fee Waiver Requests for Form I-131 for Individuals in the United States and Abroad**

| U.S. Citizenship and Immigration Services Form I-131, Application for Travel Document Approved Fee Waivers Fiscal Years 2012 - 2015 | |
|---|---|
| **Fiscal Year** | **Approvals** |
| 2012 | 1,189 |
| 2013 | 1,518 |
| 2014 | 2,733 |
| 2015 | 4,737 |
| **Grand Total** | **10,177** |

Fee waiver data exclusively on requests for an advance parole document for individuals within the United States can only be determined through a manual file review.  Domestic cases generally are ineligible for a fee waiver, but waivers may be authorized at the discretion of USCIS.  Therefore, the vast majority of these fee waiver approvals are likely for requests for advance parole documents for individuals who are abroad.

DEFINT00783

**Table 4A:  Deferred Action for Childhood Arrivals Recipients who Obtained Advance Parole Documents and Later Filed an Adjustment of Status Application**

| U.S. Citizenship & Immigration Services I-131, Application for Travel Document Advance Parole Approvals with Receipt Date After I-821D Approval "Valid From" Date* and I-485 Receipts Filed after I-131 "Valid From" Date* Fiscal Years 2012 - 2015 | |
| --- | --- |
| **Fiscal Year** | **I-131 Recipients** |
| 2012 | - |
| 2013 | 370 |
| 2014 | 1,652 |
| 2015 | 2,811 |
| **Grand Total** | **4,833** |

*Comparison used the earliest Form I-821D or Form I-131 "valid from" date by A-Number.  Decision date was used where invalid data were returned for Form I-821D or Form I-131 "valid from" date.

**Table 4B:  Individuals who Obtained Advance Parole Documents (excluding Deferred Action for Childhood Arrivals recipients) and Later Filed an Adjustment of Status Application**

| United States Citizenship and Immigration Services I-131, Application for Travel Document Non-DACA Recipients of Advance Parole Documents with I-485 Filed on or after I-131 "Valid From" Date* Fiscal Years 2012 – 2015 | |
| --- | --- |
| **Fiscal Year** | **I-131 Recipients** |
| 2012 | 2,010 |
| 2013 | 2,517 |
| 2014 | 3,639 |
| 2015 | 3,833 |
| **Grand Total** | **11,999** |

*Comparison used the earliest Form I-131 "valid from" date by A-Number.  Status date was used where invalid data were returned for Form I-131 "valid from" date.

USCIS excluded individuals who had a pending adjustment of status application, or earlier filed an adjustment of status application at the time of the advance parole document request because USCIS understands the legislative language to request only those adjustment of status applications filed after an approved advance parole document request.

8

# IV. Conclusion

USCIS issues advance parole documents pursuant to the Secretary's authority under sections 103(a) and 212(d)(5) of the INA, section 402(4) of the Homeland Security Act (P.L. 107-296), and the implementing regulations, as well as pursuant to program-specific provisions, such as INA section 244(f)(3) and 8 CFR 244.15 regarding Temporary Protected Status. USCIS adjudicates applications for advance parole documents case-by-case, applying the criteria set forth in law. The number of receipts and approvals of requests for advance parole documents have been fairly consistent from FYs 2012–2015. FY 2014 and FY 2015 saw an increase in denials (noting not all approvals or denials occur in the same fiscal year in which an application was filed, as shown by the filing receipt).

Of the groups about which the legislative language inquires, the largest group of advance parole document recipients is individuals with pending applications to adjust status to lawful permanent residence. As noted in the report, although USCIS is unable to provide volume data on non-DACA deferred action recipients who obtained advance parole documents because USCIS systems currently do not track this information electronically, USCIS is able to identify that individuals who obtained advance parole documents because DACA recipients were a small portion of the total group. The number of DACA recipients who have applied for adjustment of status after receiving an advance parole document has been fairly consistent from FYs 2012–2015.

Finally, USCIS notes that the number of fee waiver requests granted for applications for an advance parole document has remained very small from FYs 2012–2015. The majority of individuals applying for advance parole documents pays a fee.

DEFINT00785

# DEF-INTERV.
# EX. 20



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director (MS 2000)*
Washington, DC 20529-2000

**U.S. Citizenship
and Immigration
Services**

JUN 29 2016

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate
Washington, DC 20510

Dear Chairman Grassley:

Thank you for your March 2, 2016 letter. Secretary Johnson asked that I respond on his behalf.

U.S. Citizenship and Immigration Services (USCIS) appreciates the opportunity to respond to your questions about immigration parole authority and advance parole as it may relate to individuals who have been granted Deferred Action for Childhood Arrivals (DACA).

As this Administration previously emphasized, neither deferred action nor advance parole creates "a path to citizenship." Only individuals who qualify to be classified as an immigrant under the Immigration and Nationality Act (INA) are eligible for lawful permanent residence. The most common basis for such an immigrant classification is a specified family relationship or employment qualification. Obtaining deferred action or advance parole does not alter the requirement that an alien must meet all existing requirements to be classifiable as an immigrant and all other requirements for admissibility.

In your letter, you requested information regarding the population of DACA recipients who have received advance parole. According to USCIS electronic records, of the 713,300 individuals granted DACA through December 31, 2015, a total of 22,340 were subsequently approved for advance parole based on their submission of a separate advance parole request. This calculation is based on our identification of a common A-number associated with both the DACA and advance parole records. From among the 713,300 individuals who have been granted DACA, USCIS electronic records indicate that fewer than one percent were subsequently granted advance parole and also applied for adjustment of status—a total of 5,068. As of December 31, 2015, of those 5,068, a total of 2,994 have been approved for adjustment of status. The 2,994 constitutes less than one-half of one percent of the 713,300 DACA recipients.

It is important to note that some among the group of 2,994 DACA recipients who were approved for advance parole and who were subsequently granted adjustment of status may have been otherwise eligible for adjustment of status regardless of the grant of advance parole. For example, if a DACA recipient had been previously admitted (or paroled) into the United States and subsequently fell out of status, he or she would already meet the inspection and admission

The Honorable Charles E. Grassley
Page 2

(or parole) requirements of INA § 245(a) for adjustment of status. A subsequent parole into the
United States would not affect that eligibility. It would be cost prohibitive and significantly
burdensome to conduct a manual analysis of each of these files to identify such cases.

Without a manual review of each case, USCIS could not electronically determine which
DACA recipients among the 2,994 who were approved for adjustment of status and who had
applied for and received advance parole, actually traveled abroad, returned, and were paroled
into the United States upon return. When an individual applies for adjustment of status, USCIS
verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and
admitted or paroled into the United States based on the evidence presented, such as a stamped
parole document, and/or the review of the Department's records of that applicant.

Thank you again for your letter and interest in this important issue. Senator Lee, who co-
signed your letter, will receive a separate, identical response. Should you wish to discuss this
matter further, please do not hesitate to contact me.

Respectfully,

León Rodríguez
Director

# DEF-INTERV.
# EX. 21



**Office of the Attorney General**
Washington, D. C. 20530

Dear Acting Secretary Duke,

I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

Jefferson B. Sessions III

# DEF-INTERV.
# EX. 22

 Official website of the Department of Homeland Security

 U.S. Department of
Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:** September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner
Citizenship and Immigration Services Ombudsman

**FROM:**

Elaine C. Duke
Acting Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

# Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] (# ftn1) Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] (# ftn2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] (# ftn3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] (# ftn4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] (# ftn5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum

establishing DACA,[6] (# ftn6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7] (# ftn7)

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents

that have been accepted by the Department as of the date of this memorandum.

- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.

- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.

- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.

- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course —retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.

- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.

- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

---

[1] (# ftnref1) Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as

outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] (# ftnref2) *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (# ftnref3) *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] (# ftnref4) *Id.*

[5] (# ftnref5) *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] (# ftnref6) Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] (# ftnref7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Topics:  Border Security (/topics/border-security)
Keywords:  DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

# DEF-INTERV. EX. 23

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland
# Security

June 22, 2018

<u>MEMORANDUM FROM SECRETARY KIRSTJEN M. NIELSEN</u>

On September 5, 2017, Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum (the "Duke memorandum") rescinding the enforcement policy known as Deferred Action for Childhood Arrivals (DACA). Acting Secretary Duke concluded that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation [over the enforcement policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA)], and the September 4, 2017 letter from the Attorney General [concerning DACA], it is clear that the June 15, 2012 DACA program should be terminated." Accordingly, "in the exercise of [her] authority in establishing national immigration policies and priorities," she "rescind[ed] the June 15, 2012 memorandum," subject to certain exceptions.

On April 24, 2018, the U.S. District Court for the District of Columbia held that the Duke memorandum was subject to judicial review under the Administrative Procedure Act and that it provided insufficient justification for rescinding the DACA policy. The court vacated the Duke memorandum and remanded to the Department of Homeland Security (DHS). The court issued a 90-day stay of vacatur, however, to afford DHS an opportunity to provide further explanation for rescinding the DACA policy.

Because the D.C. district court has requested further explanation, I am providing such explanation here. Having considered the Duke memorandum and Acting Secretary Duke's accompanying statement, the administrative record for the Duke memorandum that was produced in litigation, and the judicial opinions reviewing the Duke memorandum, I decline to disturb the Duke memorandum's rescission of the DACA policy, and it is my understanding that the Department of Justice will continue to seek appellate review of preliminary injunctions that restrict DHS from implementing the Duke memorandum and rescinding the DACA policy. This explanation reflects my understanding of the Duke memorandum and why the decision to rescind the DACA policy was, and remains, sound.

The Secretary of Homeland Security is vested with authority over "the administration and enforcement" of the immigration laws, 8 U.S.C. § 1103(a)(1), including the discretion to "[e]stablish[ ] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). The DACA policy of deferred action was cast as an exercise of enforcement discretion to forbear from removing a certain class of aliens who are subject to removal under law. DHS also had concluded that under pre-existing statutory and regulatory provisions a grant of deferred action would trigger certain collateral benefits for such aliens, such as eligibility for employment authorization. In considering how DHS's discretion to establish enforcement policies and priorities should be exercised, the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons.

First, as the Attorney General concluded, the DACA policy was contrary to law. The Fifth Circuit ruled that DAPA should be enjoined on a nationwide basis on the ground, among other things, that it likely was contrary to the statutory scheme of the Immigration and Nationality Act (INA). As the Fifth Circuit held, "the INA does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Texas v. United States*, 809 F.3d 134, 186 n.202 (5th Cir. 2015). An equally divided Supreme Court affirmed that decision. In light of those decisions and other factors, Secretary Kelly rescinded the DAPA policy in June 2017. Any arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful.

The memorandum announcing the DAPA policy both expanded the DACA policy by loosening the age and residency criteria and adopted a similar deferred action policy for parents of U.S. citizens and lawful permanent residents. The Fifth Circuit's rejection of DAPA and expanded DACA did not turn on whether the covered aliens had a pathway to lawful status (which not all of them had). Rather, it turned on the incompatibility of such a major non-enforcement policy with the INA's comprehensive scheme. The Attorney General concluded that the DACA policy has the same statutory defects that the Fifth Circuit identified with DAPA—a determination and ruling by the Attorney General that, in any event, I am bound by pursuant to 8 U.S.C. § 1103(a)(1).

Second, regardless of whether the DACA policy is ultimately illegal, it was appropriately rescinded by DHS because there are, at a minimum, serious doubts about its legality. A central aspect of the exercise of a discretionary enforcement policy is a judgment concerning whether DHS has sufficient confidence in the legality of such policy. Like Acting Secretary Duke, I lack sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not.

There are sound reasons for a law enforcement agency to avoid discretionary policies that are legally questionable. Those reasons include the risk that such policies may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work. The fact that some courts have recently held or suggested that the DACA policy is legal does not change my view that the DACA policy's legality is too questionable to warrant continuing the policy, especially in light of the Attorney General's contrary determination and ruling about the DACA policy and the contrary implication of the decisions of the Fifth Circuit Court of Appeals and the Supreme Court invalidating the DAPA policy.

Third, regardless of whether these concerns about the DACA policy render it illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy. To start, DHS should enforce the policies reflected in the laws adopted by Congress and should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens under the guise of prosecutorial discretion—particularly a class that Congress has repeatedly considered but declined to protect. Even if a policy such as DACA could be implemented lawfully through the exercise of prosecutorial discretion, it would necessarily lack the permanence and detail of statutory law. DACA recipients continue to be illegally present, unless and until Congress gives them permanent status.

Accordingly, I agree with Acting Secretary Duke and the Attorney General that if a policy concerning the ability of this class of aliens to remain in the United States is to be adopted, it should be enacted legislatively.

In addition, DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis. While the DACA policy on its face did allow for individual considerations, a categorical deferred-action policy, at the very least, tilts the scales significantly and has the practical effect of inhibiting assessments of whether deferred action is appropriate in a particular case. Without the DACA policy, DHS may consider deferred action on a case-by-case basis, consistent with the INA. Moreover, considering the fact that tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years and then have been released into the country owing to loopholes in our laws—and that pattern continues to occur at unacceptably high levels to the detriment of the immigration system—it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens. All of those considerations lead me to conclude that Acting Secretary Duke's decision to rescind the DACA policy was, and remains, sound as a matter of both legal judgment and enforcement policy discretion.

I do not come to these conclusions lightly. I am keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives. Nevertheless, in considering DHS enforcement policy, I do not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy and the other reasons for ending the policy discussed above. That is especially so because issues of reliance would best be considered by Congress, which can assess and weigh a range of options. In contrast, the DACA policy was announced as a temporary stopgap measure, not a permanent fix; it was expressly limited to two-year renewal periods, it expressly conferred no substantive rights, and it was revocable at any time. In my judgment, neither any individual's reliance on the expected continuation of the DACA policy nor the sympathetic circumstances of DACA recipients as a class overcomes the legal and institutional concerns with sanctioning the continued presence of hundreds of thousands of aliens who are illegally present in violation of the laws passed by Congress, a status that the DACA non-enforcement policy did not change. And in all events, the rescission of the DACA policy does not preclude the exercise of deferred action in individual cases if circumstances warrant.

For these reasons, in setting DHS enforcement policies and priorities, I concur with and decline to disturb Acting Secretary Duke's decision to rescind the DACA policy.

Kirstjen M. Nielsen
Secretary

3

# DEF-INTERV.
# EX. 24

**10B Fed. Prac. & Proc. Civ. § 2732 (4th ed.)**

Federal Practice & Procedure   |   April 2019 Update

**Federal Rules Of Civil Procedure**

The Late Charles Alan Wright [a156], Arthur R. Miller [a157], Mary Kay Kane [a158], Richard L. Marcus [a159], A. Benjamin Spencer [a160], Adam N. Steinman [a161]

**Federal Rules of Civil Procedure**

**Chapter 8. Judgment**

Mary Kay Kane [a545]

**Rule 56. Summary Judgment**

**D. Summary Judgment In Particular Actions And On Particular Issues**

§ 2732 Complicated Cases and Cases Involving Important Public Issues

---

**Primary Authority**

- Fed. R. Civ. P. 56

---

**Forms**

- 4 West's Federal Forms, District Courts—Civil §§ 4701 to 4778

---

The Advisory Committee Note that accompanied Rule 56 when the federal rules were promulgated in 1938 begins with the statement that "this rule is applicable to all actions." [1] Accordingly, there is no provision in Rule 56 itself or in the Advisory Committee Note for the special handling of a motion for summary judgment in complicated cases or suits that involve important public issues. Rather, all civil actions that come before the court on a Rule 56 motion—complex or simple, important or unimportant—are subject to the same standard; summary judgment will be granted when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." [2]

Despite this principle of uniform treatment, a review of summary-judgment decisions rendered in complex cases and cases involving important public issues suggests that Rule 56 motions may be much less successful in this form of litigation than in other, simpler matters. The notion that summary judgment may not be appropriate in complicated and important litigation seems to have its roots in a series of Supreme Court decisions in the 1940s, [3] culminating with the Court's opinion in Kennedy v. Silas Mason Company. [4] That case was an action by employees for overtime pay under the Fair Labor Standards Act. In his opinion for the Court, Justice Jackson recognized that the case posed

Case 1:18-cv-00068   Document 400-4   Filed on 06/15/19 in TXSD   Page 35 of 193

§ 2732 Complicated Cases and Cases Involving Important..., 10B Fed. Prac. &...

an "extremely important question, probably affecting all cost-plus-fixed-fee war contractors …." [5] As a result of the potential consequences of a decision on the overtime question, the Court reversed the district court's grant of a Rule 56 motion.

> We do not hold that in the form the controversy took in the District Court that tribunal lacked power or justification for applying the summary judgment procedure. But summary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of farflung import, on which this Court should draw inferences with caution from complicated courses of legislation, contracting and practice.

Justice Jackson went on to say:

> We consider it the part of good judicial administration to withhold decision of the ultimate questions involved in this case until this or another record shall present a more solid basis of findings based on litigation or on a comprehensive statement of agreed facts. While we might be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide. [6]

Similar concerns were expressed in a 1971 Supreme Court opinion in an equal-protection case, Askew v. Hargrave. [7] The Court in remanding the case commented on the fact that it had been decided in the court below on a summary-judgment motion. Reflecting on the propriety of that treatment, the Court commented, "[s]ince the manner in which the program operates may be critical in the decision of the equal protection claim, that claim should not be decided without fully developing the factual record at a hearing." [8]

Despite the fact that summary judgment may be inappropriate in many cases involving complex fact situations, [9] the lower courts have not, for the most part, embarked on a policy of automatically denying summary judgment because of the presence of an important public issue or a complicated dispute. On the contrary, most courts have recognized that a complex but undisputed fact situation should not necessarily bar summary judgment. [10] Similarly, if the decision rests upon an issue of law, the fact that it poses a difficult problem of interpretation or application should not prevent the grant of summary judgment if there is no triable issue of fact. [11]

The following three sections explore in detail the use of summary judgment in several areas in which courts have recognized that summary-judgment motions must be handled cautiously. These include: antitrust and patent litigation; [12] cases involving major constitutional or civil-rights acts questions; [13] and cases arising in the employment setting. [14] In addition to these areas, and for similar public policy and complexity reasons, summary judgment has been found unsuitable in copyright cases, [15] trademark actions, [16] shareholder derivative [17] and other securities acts cases. [18]

Despite the fact that some courts use language indicating that they are applying a "different" standard in deciding summary-judgment motions in "complicated" or "important" cases, closer inspection reveals that there is little variation from the considerations typically used under Rule 56. In unusual situations, a reviewing court will reverse the grant of a summary judgment and remand the case for trial for the specific purpose of developing the facts in order to clarify the application of new legal principles or complex issues of law. [19] In similar circumstances trial courts occasionally will

refuse summary judgment in order to develop a complete record for review and to bring disputed issues into sharper focus. [20] In general, however, the factor actually being explored in these cases is whether the record reveals the existence of any unresolved questions of motive, intent, credibility, demeanor, or other disputes of material facts that justify proceeding to trial.

a156          Charles Alan Wright Chair in Federal Courts, The University of Texas.

a157          University Professor, New York University. Formerly Bruce Bromley Professor of Law, Harvard University.

a158          John F. Digardi Distinguished Professor of Law, Chancellor and Dean Emeritus, University of California, Hastings College of the Law.

a159          Horace O. Coil ('57) Chair in Litigation, University of California, Hastings College of the Law.

a160          Justice Thurgood Marshall Distinguished Professor of Law, University of Virginia School of Law.

a161          University Research Professor of Law, University of Alabama.

a545          John F. Digardi Distinguished Professor of Law, Chancellor and Dean Emeritus, University of California, Hastings College of the Law.

Westlaw. © 2019 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1          **Committee Note**
           The Advisory Committee Note to Rule 56 is reprinted in vol. 12A, Appendix C of the Civil Unit.

2          **Standard**
           See §§ 2725 to 2728.

3          **Supreme Court cases**
           Eccles v. Peoples Bank of Lakewood Village, Cal., 333 U.S. 426, 68 S. Ct. 641, 92 L. Ed. 784 (1948). Although the district court granted the government's motion for summary judgment in a suit for a trust patent to certain Indian lands, the Supreme Court reversed stating that "the duty of the Court under the jurisdictional act can be discharged in a case of this complexity only by trial, findings and judgment in regular course." Arenas v. U.S., 322 U.S. 419, 434, 64 S. Ct. 1090, 1097, 88 L. Ed. 1363 (1944).

4          **Kennedy case**
           334 U.S. 249, 68 S. Ct. 1031, 92 L. Ed. 1347 (1948).

5          **Important question**
           334 U.S. at 256, 68 S. Ct. at 1034.

6          **Good judicial administration**
           334 U.S. at 256-257, 68 S. Ct. at 1034.

7          **Askew case**
           401 U.S. 476, 91 S. Ct. 856, 28 L. Ed. 2d 196 (1971).

8          **Factual record needed**
           401 U.S. at 479, 91 S. Ct. at 858.

9          **Summary judgment inappropriate**
           Genuine issues of material fact regarding whether a certain canal and a certain wetland area in the Florida Everglades were meaningfully distinct water bodies precluded summary judgment, on a claim under the Clean Water Act alleging that the water management district's activity of pumping polluted water from the canal into the wetland required a National Pollutant Discharge Elimination System permit. South Florida Water Management Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 124 S. Ct. 1537, 158 L. Ed. 2d 264 (2004).
           Securities and Exchange Commission v. Research Automation Corp., 585 F.2d 31 (2d Cir. 1978).

U.S. v. Lowell, 557 F.2d 70 (6th Cir. 1977).

Complicated issues of fact did not lend themselves to disposition by summary judgment so that a Rule 56 motion would be denied on claims that involved an intricate pattern of facts. U.S. for Use and Benefit of T/N Plumbing & Heating Co. v. Fryd Const. Corp., 423 F.2d 980 (5th Cir. 1970).

A material fact issue existed whether defendants' conduct made performance of plaintiff's contract with its distributors more burdensome or expensive so as to impose liability under the Michigan law of tortious interference with advantageous business relationships, notwithstanding no showing of breach or termination of such a relationship, precluding summary judgment. Stormor, a Div. of Fuqua Industries, Inc. v. Johnson, 587 F. Supp. 275 (W.D. Mich. 1984).

When the identity of the entity to whom defendant actually was selling its product was an issue in a fraudulent misrepresentation action, and when there were allegations that certain entities were an integrated operation all of which did business with the defendant, summary judgment was not appropriate on the fraudulent misrepresentation claim on the ground that defendant had not done business with the plaintiff. Raul Intern. Corp. v. Sealed Power Corp., 586 F. Supp. 349 (D.N.J. 1984). When a case is such that a full inquiry into the facts is advisable for the purpose of clarifying the application of the law, summary judgment is not appropriate. Hoover v. Holston Valley Community Hosp., 545 F. Supp. 8 (E.D. Tenn. 1981).

Professional Investors Life Ins. Co., Inc. v. Roussel, 528 F. Supp. 391 (D. Kan. 1981).

Cinocca v. Baxter Laboratories, Inc., 400 F. Supp. 527, 530 (E.D. Okla. 1975), **citing Wright & Miller**. The issue as to whether the method utilized by the Federal Energy Administration in determining the maximum lawful ceiling price for diesel fuel sold by plaintiff at retail to oil drilling rig customers was unjust for failure of the Administration to consider the fact that each delivery to a different well location would cause the bill price to be increased or decreased according to site accessibility could not be determined on the motion of plaintiff for summary judgment in the absence of evidence as to what portion of the charges in different sales could actually be considered transportation costs. Banks Enterprises, Inc. v. Federal Energy Administration, 69 F.R.D. 403 (D. Wyo. 1975).

Ohio Edison Co. v. City of Hubbard, 69 F.R.D. 58 (N.D. Ohio 1975).

In a consumer class action against several banks, a question of fact existed that precluded summary judgment for one of the defendant banks when plaintiff claimed that the defendant bank was understating the true annual interest rate on credit card accounts by disclosing an annual rate based upon a 360-day year, rather than a 365 day calendar year, and when, segregating the complex computations involved into their elements, one of the necessary elements of the equation was missing. Haas v. Pittsburgh Nat. Bank, 60 F.R.D. 604 (W.D. Pa. 1973).

"Complex cases where the questions are not, and often cannot be, conveniently isolated as pure questions of law are not appropriately disposed of by summary judgment." Elliott v. Elliott, 49 F.R.D. 283, 284 (S.D. N.Y. 1970).

10 **Complicated facts not bar**

"Where, as in this case, the decision of a question of law by the Court depends upon an inquiry into the surrounding facts and circumstances, the Court should refuse to grant a motion for a summary judgment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law. In the case at bar that had been done, and we have no doubt that the Court correctly determined that the contract was valid." Palmer v. Chamberlin, 191 F.2d 532, 540 (5th Cir. 1951).

"Conflict concerning the ultimate and decisive conclusion to be drawn from undisputed facts does not prevent rendition of a summary judgment, when that conclusion is one to be drawn by the court. The court had before it all the facts which formal trial would have produced. Going through the motions of trial would have been futile. Judgment therefore was given properly for the defendant." Fox v. Johnson & Wimsatt, 127 F.2d 729, 737 (App. D.C. 1942).

Fact that antitrust violations are commonly proved by circumstantial evidence did not preclude summary judgment in a complex antitrust case involving a claim of illegal tying. Camellia City Telecasters, Inc. v. Tribune Broadcasting Co., Inc., 762 F. Supp. 290 (D. Colo. 1991).

In a complex trademark infringement and unfair competition case, when it appears that the trial is not likely to develop additional evidence helpful to either side, summary judgment may well be the

§ 2732 Complicated Cases and Cases Involving Important..., 10B Fed. Prac. &...

Case 1:18-cv-00068   Document 400-4   Filed on 06/15/19 in TXSD   Page 38 of 193

appropriate method of disposing of the case, even as to the issues of distinctiveness and the likelihood of confusion. Pignons S. A. de Mecanique de Precision v. Polaroid Corp., 498 F. Supp. 805 (D. Mass. 1980), judgment aff'd, 657 F.2d 482 (1st Cir. 1981).

Summary judgment is properly granted, even in complex cases, when the facts established by the movants' evidence are opposed solely by the opponent's conclusory assertions or are clearly uncontroverted and the facts so established are not susceptible of the interpretation that the opponent sought to give them to create through inference a dispute of material fact. Carroll v. United Steelworkers of America, AFL-CIO-CLC, 498 F. Supp. 976 (D. Md. 1980), aff'd without opinion, 639 F.2d 778 (4th Cir. 1980).

McKeithen v. S. S. Frosta, 430 F. Supp. 899, 901 (E.D. La. 1977), **quoting Wright & Miller**.

U.S. v. St. Thomas Beach Resorts, Inc., 11 V.I. 79, 386 F. Supp. 769 (D.V.I. 1974), aff'd, 529 F.2d 513 (3d Cir. 1975).

Summary judgment was the proper and practical procedure for disposing of all issues pertaining to the invalidity and nonprotectability of the alleged service and trademarks "DROWNPROOF" and "DROWNPROOFING" as used in connection with water survival lessons. Hamm v. Knocke, 374 F. Supp. 1183 (E.D. Cal. 1973).

"Admittedly, summary judgment is to be employed sparingly, especially in anti-trust cases where there may be complex factual issues involved; but where, as here, the facts are clear, the rule should be enforced." Record Club of America, Inc. v. Columbia Broadcasting System, Inc., 310 F. Supp. 1241, 1245 (E.D. Pa. 1970).

**11**   **Complicated legal issues not bar**

Ammons v. Franklin Life Ins. Co., 348 F.2d 414, 417 (5th Cir. 1965).

Kentucky Rural Elec. Co-op. Corp. v. Moloney Elec. Co., 282 F.2d 481, 483–484 (6th Cir. 1960).

DuSesoi v. United Refining Co., 540 F. Supp. 1260 (W.D. Pa. 1982).

Schwartzreg v. Califano, 480 F. Supp. 569 (S.D. N.Y. 1979).

"[T]he fact that there exists an important, difficult or complicated question of law is not a bar to a summary judgment where it is clear there is no genuine issue of a material fact. Resolution of the legal issues will not be rendered easier by going through the trial when there is no issue of fact to be tried."

Lewis v. Coleman, 257 F. Supp. 38, 40 (S.D. W. Va. 1966).

Crowder v. U.S., 255 F. Supp. 873 (N.D. Cal. 1964), judgment aff'd per curiam, 362 F.2d 1011 (9th Cir. 1966).

See also the cases cited in § 2725 n. 9.

**Compare**

"Complex cases where the questions are not, and often cannot be, conveniently isolated as pure questions of law are not appropriately disposed of by summary judgment." Elliott v. Elliott, 49 F.R.D. 283, 284 (S.D. N.Y. 1970).

**12**   **Antitrust and patent**

See § 2732.1.

**13**   **Constitutional and civil rights**

See § 2732.2.

**14**   **Employment setting**

See § 2732.3.

**15**   **Copyrights**

Copyright-infringement plaintiff satisfied extrinsic test for ordinary works showing similarities between plaintiff's television script and defendant's television pilot script as to scene, plot, sequence of events, mood, setting, pace, characters and dialogue sufficient to raise a genuine issue of material fact regarding substantial similarity, precluding summary judgment for defendant in a copyright-infringement action. Shaw v. Lindheim, 919 F.2d 1353 (9th Cir. 1990).

Genuine issues of material fact existed as to whether only the idea of plaintiffs' motion picture or the expression of that idea was copied by defendants' motion picture, precluding summary judgment in a copyright action. Twentieth Century-Fox Film Corp. v. MCA, Inc., 715 F.2d 1327 (9th Cir. 1983).

A genuine issue of material fact as to whether a residential home marketing company had received and viewed catalogues containing home plans, allegedly sent to them by architectural design companies, and as to how similar the marketing company's architectural plans were to the architectural designs

therein precluded summary judgment on the issue of whether the marketing company had access to the architectural companies' works, for purposes of determining whether the marketing company infringed on the architectural design companies copyrights. Design Basics LLC v. J & V Roberts Investments, Inc., 130 F. Supp. 3d 1266 (E.D. Wis. 2015).

Genuine issues of material fact existed regarding whether the purpose and character of the jazz festival promoter's use of an artist's work weighed in favor of or against a fair-use finding, and whether the use affected the market for the artist's works, precluding summary judgment on the festival promoter's fair-use defense to copyright infringement. Rivera v. Mendez & Compania, 988 F. Supp. 2d 159 (D.P.R. 2013).

A genuine issue of material fact existed as to whether the adulterated software of the software developer and publisher was correctly sold at computer shows of the computer-fair proprietor, precluding partial summary judgment on the issue of direct infringement in the developer and publisher's action against the computer-fair proprietor for vicarious liability for copyright infringement. Adobe Systems Inc. v. Canus Productions, Inc., 173 F. Supp. 2d 1044 (C.D. Cal. 2001).

A genuine issue of material fact existed as to whether there was an absence of substantial similarity in the coordination and arrangement of the symbols between the design of children's clothing by the originator and allegedly infringing designer and the manufacturer, for the purpose of a copyright-infringement claim; the alleged infringers did not rebut the presumption of validity in the originator's copyright since the allegedly infringing clothing featured the same symbols and animals that the originator used, and the alleged infringers employed them in a similar manner as the originator, and on similar backgrounds. U-Neek, Inc. v. Wal-Mart Stores, Inc., 147 F. Supp. 2d 158 (S.D. N.Y. 2001).

The evidence raised a genuine issue of material fact as to whether the photograph of a man serving a woman breakfast in bed was substantially similar to the copyrighted photograph picture of the same scene, precluding summary judgment in a copyright-infringement case; although some similarities were inherent in the concept of breakfast being served in bed, the photographs both depicted the husband serving his wife coffee and a croissant accompanied by a red flower in a crystal bud vase on identical wooden trays, and the positioning and expressions of the couples were similar. Sharpshooters, Inc. v. Retirement Living Pub. Co., Inc., 932 F. Supp. 286 (S.D. Fla. 1996).

In an action challenging whether the trustee of the author's literary estate had copyrights in certain manuscripts sought to be published in another author's book, there were issues of fact as to whether the documents had fallen into the public domain because of their prior publication, with the approval of the trust, in the latter author's doctoral dissertation, given the lack of a record as to which of the documents now sought to be published were published in the dissertation. Kramer v. Newman, 749 F. Supp. 542 (S.D. N.Y. 1990).

In an action involving the validity of copyrights for a statistical software program and alleged infringement, a genuine issue of material fact existed regarding the alleged similarity of two software programs and whether all or at least some portions of one program could have been validly copyrightable, precluding summary judgment. S & H Computer Systems, Inc. v. SAS Institute, Inc., 568 F. Supp. 416 (M.D. Tenn. 1983).

In a copyright-infringement action involving the copyright status of dolls, material issues of fact existed as to the originality of plaintiff's dolls for which a derivative copyright had been obtained, and as to the infringement of the copyright by defendant's dolls, precluding summary judgment. Knickerbocker Toy Co., Inc. v. Winterbrook Corp., 554 F. Supp. 1309 (D.N.H. 1982).

A genuine issue of material fact existed as to whether the ordinary lay observer should detect such a substantial similarity between a copyrighted arcade video game and a hand-held video game that copying went so far as to constitute improper appropriation precluding summary judgment in a copyright-infringement action. Midway Mfg. Co. v. Bandai-America, Inc., 546 F. Supp. 125 (D.N.J. 1982).

A genuine issue of material fact existed as to the copyright registrability of eyeglass displays, precluding summary judgment in favor of the alleged infringer in a copyright-infringement action brought by the developer of the displays. Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 95 F.R.D. 95 (D. Del. 1982).

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-00068   Document 400-4   Filed on 06/15/19 in TXSD   Page 40 of 193

§ 2732 Complicated Cases and Cases Involving Important..., 10B Fed. Prac. &...

In a copyright-infringement action brought by the copyright owners and the licensor of the performing rights to copyrighted musical compositions, summary judgment in favor of plaintiffs on defendants' copyright misuse and antitrust claims was precluded by the existence of factual issues concerning whether, applying the rule of reason, the licensor's activities under the consent decree constituted an unreasonable restraint of trade and misuse of copyrights in the licensing arrangements sanctioned by the decree afforded no real alternative to a blanket license for defendants' restaurant-nightclub, even though the licensor offered a per piece license in accordance with its obligations under the consent decree. Broadcast Music, Inc. v. Moor-Law, Inc., 484 F. Supp. 357 (D. Del. 1980).

In an action for the infringement of two design copyrights used on wallpaper and fabric, a genuine issue of fact existed as to whether defendant actually did copy plaintiff's copyrighted designs, precluding the entry of summary judgment. Andre Matenciot, Inc. v. David & Dash, Inc., 422 F. Supp. 1199 (S.D. N.Y. 1976).

The issue whether defendants unlawfully copied plaintiffs' book by virtue of a television production and subsequent magazine publication of a substantially similar folk story was a question of fact precluding summary judgment in a copyright-infringement action. Reyher v. Children's Television Workshop, 377 F. Supp. 411 (S.D. N.Y. 1974).

In an action to recover for the infringement of copyrights on statues of children, issues of fact existed as to the invalidity under defendants' theory that plaintiff had no assignment of the copyrights in the statues at the time the statues bearing the notice that they were copyrighted by plaintiff were sold and as to infringement precluding summary judgment for defendants. Dave Grossman Designs, Inc. v. Bortin, 347 F. Supp. 1150 (N.D. Ill. 1972).

**But compare**

Summary judgment is appropriate in a copyright-infringement action when the substantial similarity determination involves an architectural work that is merely a compilation of common design ideas. Dream Custom Homes, Inc. v. Modern Day Const., Inc., 773 F. Supp. 2d 1288 (M.D. Fla. 2011), aff'd, 476 Fed. Appx. 190 (11th Cir. 2012).

Although summary judgment is not readily granted in cases of copyright infringement, it is appropriate if, considering the evidence and drawing all inferences from it in the light most favorable to the nonmoving party, no reasonable jury could find that the works are substantially similar in idea and expression. Thus, summary judgment was granted when the accused song "Independent Women" did not infringe the copyrighted lyrics for the song "Independent Lady;" the songs' lyrics were dissimilar in theme, subject matter, structure, characters, and arrangement. Toliver v. Sony Music Entertainment, Inc., 149 F. Supp. 2d 909 (D. Alaska 2001), aff'd, 47 Fed. Appx. 496 (9th Cir. 2002).

Although summary judgment is ordinarily disfavored in copyright infringement cases, when the evidence is so overwhelming that the court would be justified in ordering a directed verdict at trial, it is proper to grant summary judgment. Columbia Pictures Industries, Inc. v. Landa, 974 F. Supp. 1 (C.D. Ill. 1997).

Although the district court should be especially wary of granting summary judgment in cases alleging copyright infringement, a photograph showing the body of a pregnant woman and the face of a male actor, which advertised a forthcoming movie, was fair use of the copyrighted photograph of the pregnant actress and defendant's motion for summary judgment would be granted. Leibovitz v. Paramount Pictures Corp., 948 F. Supp. 1214 (S.D. N.Y. 1996), judgment aff'd on the merits, 137 F.3d 109 (2d Cir. 1998).

Motions for summary judgment in copyright-infringement and unfair-competition cases have been generally frowned upon; nevertheless, a Rule 56 motion may be granted for defendant in a copyright-infringement action if, after assuming copying, the court finds that any similarity between the work is insubstantial or that undisputed facts raise a complete defense as a matter of law. Data Cash Systems, Inc. v. JS&A Group, Inc., 480 F. Supp. 1063 (N.D. Ill. 1979), aff'd on the merits, 628 F.2d 1038 (7th Cir. 1980).

The evidence in a copyright-infringement action established as a matter of law that unauthorized performances of copyrighted musical compositions occurred in defendant's cocktail lounge and restaurant. KECA Music, Inc. v. Dingus McGee's Co., 432 F. Supp. 72 (W.D. Mo. 1977).

**Trademark actions**

16

Case 1:18-cv-00068   Document 400-4   Filed on 06/15/19 in TXSD   Page 41 of 193

§ 2732 Complicated Cases and Cases Involving Important..., 10B Fed. Prac. &...

In a suit brought by one perfumer against another, seeking a judgment declaring that plaintiff's "like perfumes," specifically its "Fragrance S", were not infringing on defendant's higher priced "SHALIMAR" colognes and perfumes, a genuine issue of material fact existed with respect to whether plaintiff falsely represented that Fragrance S was like or similar to SHALIMAR, precluding the entry of summary judgment. Saxony Products, Inc. v. Guerlain, Inc., 513 F.2d 716 (9th Cir. 1975).

A genuine issue of material fact existed as to whether the trademark licensee's marks for its luggage with ridges and grooves were famous, precluding summary judgment on the trademark dilution claim against the alleged infringer under the Lanham Act. Rimowa Distribution, Inc. v. Travelers Club Luggage, Inc., 217 F. Supp. 3d 400 (D. Mass. 2016).

Genuine issues of material fact, including whether others in the industry would generally need the term to adequately describe their product or service, precluded summary judgment in a trademark-infringement action as to the purported genericness of the "CAMOWRAPS" mark owned by the manufacturer of adhesive vinyl films and products that were sold in camouflage patterns and used on vehicles, hunting gear, and sports equipment. Camowraps, LLC v. Quantum Digital Ventures LLC, 74 F. Supp. 3d 730 (E.D. La. 2015).

A genuine issue of material fact existed as to whether the holder of registered trade-dress rights in plastic bag closures used the trade dress in a generic way, and thus whether the holder abandoned its rights, precluding summary judgment on the holder's trade-dress infringement claim against an alleged infringer, which made "Clipps G-Series" bag closures. Schutte Bagclosures Inc. v. Kwik Lok Corp., 48 F. Supp. 3d 675 (S.D. N.Y. 2014).

If a factual inference must be drawn, in a trademark-infringement claim, to arrive at a particular finding on one of the eight "likelihood of confusion" factors, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment; the bottom line on a motion for summary judgment is not how many factors favor each side but whether a reasonable trier of fact might differ as to the likelihood of confusion. U-Neek, Inc. v. Wal-Mart Stores, Inc., 147 F. Supp. 2d 158 (S.D. N.Y. 2001).

Whether restaurant owners' filing of a trademark application for the name "Mad Murphy" two days after learning that the competitors' "Mad Murphy's" cafe was reopening was in bad faith precluded summary judgment in a trademark-infringement case. McKay v. Mad Murphy's, Inc., 899 F. Supp. 872, 882 (D. Conn. 1995), citing Wright, Miller & Kane.

Genuine issues of material fact existed as to the infringement of the senior user's "Pac-Man" mark for an arcade video game by the junior users' "Packri Monster" mark for a hand held video game, precluding summary judgment on the trademark-infringement claim. Midway Mfg. Co. v. Bandai-America, Inc., 546 F. Supp. 125 (D.N.J. 1982).

In an action by a patent assignee and licensee alleging that defendants falsely represented the characteristics of their doctor blade device in violation of the Lanham Trademark Act, unresolved issues of fact concerning the durability of defendants' blades precluded summary judgment. Max Daetwyler Corp. v. Input Graphics, Inc., 545 F. Supp. 165 (E.D. Pa. 1982).

In an action by a telephone service company against a bank alleging trademark infringement and unfair competition, genuine issues of material fact existed as to whether the "Cityphone" trademark used by the telephone service corporation as a designation for an information service that may be called to inquire about various activities, services and shops located in the city was infringed upon by the "Citiphone" trademark used by the bank as a designation for an intrabank phone used solely in connection with the "Citicash" machine, thus precluding summary judgment in favor of the telephone service corporation. New York Yellow Pages, Inc. v. Citibank, N.A., 480 F. Supp. 77 (S.D. N.Y. 1979).

Unresolved factual issues precluded the entry of summary judgment on the question whether the word "light" was a common descriptive or generic word for beer, as to which the brewer had no exclusive rights, and whether the descriptive use of that word for beer could constitute trademark infringement or unfair competition. Jos. Schlitz Brewing Co. v. General Brewing Co., 430 F. Supp. 571 (E.D. Wis. 1977).

**17**

**Derivative actions**

"This court has indicated that summary judgment should rarely be granted against a plaintiff in a stockholder's derivative action especially when the plaintiff has not had an opportunity to resort

Case 1:18-cv-00068  Document 400-4  Filed on 06/15/19 in TXSD  Page 42 of 193

§ 2732 Complicated Cases and Cases Involving Important..., 10B Fed. Prac. &...

to discovery procedures. … Indeed, in many stockholder's derivative actions there will be issues as to the knowledge, intent and motive which will require a full trial with an opportunity to observe the demeanor of the witnesses, and to conduct cross-examination in open court." Schoenbaum v. Firstbrook, 405 F.2d 215, 218 (2d Cir. 1968).

"It seems clear, therefore, that it was improvident to cut through the tangled web of this complex litigation by deciding an isolated question on a summary judgment motion, thereby disposing of the entire case, when so much was riding on related issues." Miller v. General Outdoor Advertising Co., 337 F.2d 944, 948 (2d Cir. 1964).

A genuine issue of fact as to the materiality of alleged omissions and plaintiff's reliance thereon precluded summary judgment in an action brought under a section of the Securities Act establishing civil liabilities on account of a false registration statement. Collins v. Signetics Corp., 443 F. Supp. 552 (E.D. Pa. 1977).

Lewis v. Dansker, 68 F.R.D. 184 (S.D. N.Y. 1974) (issue over whether omission was material).

18

**Securities cases**

A genuine issue of material fact existed as to whether the auditor had acted with scienter in making alleged misrepresentations in its audit opinion letter and whether the shareholders had purchased the corporation's stock in actual reliance on the representations in the audit opinion letter, precluding summary judgment on the shareholders' claims against the auditor alleging fraud in violation of the federal securities law. Gould v. Winstar Communications, Inc., 692 F.3d 148 (2d Cir. 2012).

Material issue of fact as to whether written and oral representations about the right of debenture holders to tender their debentures to the corporation in case of certain triggering events were material and misleading to a reasonable investor precluded summary judgment on the debenture holders' claims under the Securities Exchange Act of 1934 and Securities Act of 1933; the central issue was not whether the particular statements, taken separately, were literally true, but whether the representations, taken together and in context, would have misled a reasonable investor. McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576 (2d Cir. 1990).

In an action by a corporation seeking to recover insider's short-swing profits a fact question existed as to whether the insider traded through nominees, precluding summary judgment. Kay v. Scientex Corp., 719 F.2d 1009 (9th Cir. 1983).

In an action alleging that the corporation's proxy solicitation violated the Securities Exchange Act, plaintiffs established a triable issue of material fact as to whether the amendment to the certificate of incorporation could be characterized as an antitakeover device in that it could discharge unrelated persons from making a tender offer for the corporation's share, precluding summary judgment. Texas Partners v. Conrock Co., 685 F.2d 1116 (9th Cir. 1982).

In a securities-fraud suit brought by a general partner of two limited partnerships, alleging that the company and accounting firm made false and misleading statements regarding the value of the company's stock which the plaintiffs' limited partners received in exchange for oil and gas leases, a genuine issue of material fact existed with respect to whether the accounting firm, knowing of the company's efforts to consummate the exchange transaction, acted recklessly in supplying the company with a 16-month financial statement, which was considerably more favorable than the 12-month report initially prepared, precluding entry of summary judgment for the accounting firm. Spectrum Financial Companies v. Marconsult, Inc., 608 F.2d 377 (9th Cir. 1979).

A question whether the president and chief executive officer of a corporation negotiated a merger agreement for both "favored" shareholders, who were to receive cash for their shares, and other shareholders, who were to receive shares, was a factual issue precluding summary judgment that there was a material omission from the proxy solicitation materials in that respect. Gould v. American-Hawaiian S. S. Co., 535 F.2d 761 (3d Cir. 1976).

In an action brought by a shareholder of an acquired business trust to rescind a merger on the basis of false statements contained in the proxy statement, issues of fact relating to the claim that defendants failed to disclose the true nature of the consulting agreement with the chairman of a committee specially appointed to assure that the merger would be fair to the public shareholders precluded summary judgment. Hahn v. Breed, 587 F. Supp. 1369 (S.D. N.Y. 1984).

Case 1:18-cv-00068   Document 400-4   Filed on 06/15/19 in TXSD   Page 43 of 193

§ 2732 Complicated Cases and Cases Involving Important..., 10B Fed. Prac. &...

In an action against a corporation and a trust company for "tipping" and utilization of various items of inside information relating to the corporation's financial and project projections and certain public policy matters, substantial fact issues existed as to whether the subject data was material and nonpublic, thus precluding summary judgment; furthermore, given the existence of those issues, the third relevant "tipping" issue of scienter would not be considered at the summary judgment stage. State Teachers Retirement Bd. v. Fluor Corp., 566 F. Supp. 945 (S.D. N.Y. 1983).

In an action alleging securities violations in connection with an English public limited company's "any or all" tender offer for the debentures of its wholly owned United States subsidiary, the issue of whether the earnings figures were calculable with substantial certainty during the pendency of the tender offer and whether the figures were material and should have been disclosed were substantial issues of material fact, precluding summary judgment. Fisher v. Plessey Co. Ltd., 559 F. Supp. 442 (S.D. N.Y. 1983).

On the minority shareholder's allegation of omission in the bank's proxy materials of information with respect to the reasons for changes in the bank's profit-sharing plans allegedly made for the benefit of controlling defendants, a genuine issue of material fact existed as to whether the withheld information was material, precluding summary judgment as to the violation of the antifraud provisions of the federal securities laws. Bank and Trust Co. of Old York Road v. Hankin, 552 F. Supp. 1330 (E.D. Pa. 1982).

An issue of fact existed as to whether the bank, the employer of an appraiser who allegedly inflated the values of property used to secure bonds, recklessly gave substantial assistance to violations of the federal securities laws by the brokerage firm and issuing corporation, precluding summary judgment in favor of the bank on the issue of aider and abettor liability under rule 10b-5. Frankel v. Wyllie & Thornhill, Inc., 537 F. Supp. 730 (W.D. Va. 1982).

In an action brought by a securities broker to recover an alleged deficiency following its liquidation of the customer's special cash and margin accounts, a genuine issue of material fact existed with respect to whether there was a violation of Regulation T, and whether the conduct of the parties was such as to enable the customer to seek rescission under the Securities Exchange Act, precluding summary judgment. Bache Halsey Stuart, Inc. v. Killop, 509 F. Supp. 256 (E.D. Mich. 1980).

The question whether negotiations between the corporation and the third party would have been viewed by a reasonable investor as significantly altering the total mix of information available, and thus whether it should have been disclosed to one seeking to require the corporation to redeem, was a question of fact not susceptible to resolution on a motion for summary judgment. Trecker v. Scag, 500 F. Supp. 752 (E.D. Wis. 1980).

In a securities-fraud class action brought by purchasers of bonds and notes, material issues of fact existed as to whether the bond indenture trustee became a participant in the allegedly fraudulent scheme or assisted in its completion with respect to the alleged illegality surrounding the bond/note transactions, precluding summary judgment. Nelson v. Quimby Island Reclamation Dist. Facilities Corp., 491 F. Supp. 1364 (N.D. Cal. 1980).

The entry of summary judgment was impossible when, in an action by the customer of a stockbrokerage firm against the firm which purchased its assets, on allegations that the Securities Exchange Act of 1934 was violated by the churning of plaintiff's account, unresolved material issues of fact remained on the issue whether a de facto merger between the two firms had occurred, thus permitting the firm which acquired the first firm's assets to incur liability to the first firm's customers. Goldstein v. Gardner, 444 F. Supp. 581 (N.D. Ill. 1978).

The extent of plaintiff's reliance on the expertise of defendants as her brokers and the extent of defendants' disclosures to plaintiff concerning the nature and effect of the trading being conducted in her account were questions of fact precluding summary judgment on the issue whether defendants owed plaintiff a duty that could be the basis of a Rule 10b-5 violation. McMillan v. E. F. Hutton & Co., Inc., 399 F. Supp. 1153 (N.D. Cal. 1975).

**Remand to develop facts**

Askew v. Hargrave, 401 U.S. 476, 91 S. Ct. 856, 28 L. Ed. 2d 196 (1971).

Fact issue, as to whether the Postal Service was justified in distinguishing between temporary resident aliens and permanent resident aliens in a postal regulation governing employment eligibility, precluded

summary judgment on the issue whether it had exceeded its authority in promulgating the regulation; the enabling act required the Postal Service to promulgate regulations which promoted efficiency. Tovar v. U.S. Postal Service, 3 F.3d 1271 (9th Cir. 1993).

Challenge by employee at hydroelectric dam operated by the Bureau of Reclamation to the alleged failure of federal officers and agencies to conduct a proper wage survey in conformity with the Prevailing Rate Employees Act had to be remanded for fuller development of the record before determinative issues could be resolved on appeal from a motion granting summary judgment against the employee. Anderson v. Hodel, 899 F.2d 766 (9th Cir. 1990).

S. J. Groves & Sons Co. v. Ohio Turnpike Commission, 315 F.2d 235, 238 (6th Cir. 1963).

**See also**

Bass v. Ambrosius, 185 Wis. 2d 879, 520 N.W.2d 625, 629-630 (Ct. App. 1994), **quoting Wright, Miller & Kane**.

**Refusal by trial court**

In an interpleader action brought by the employer of a former husband seeking relief from conflicting state-court orders growing out of a dispute between the former husband and former wife regarding support payments and arrearages, genuine issues of material fact existed with respect to whether the former husband was supporting a new family and what the permissible amount of garnishment was under federal law, precluding summary judgment. Champion Intern. Corp. v. Ayars, 587 F. Supp. 1274 (D. Conn. 1984).

In a prison inmate's action alleging that the prison officials violated his due-process rights by placing him in restricted housing for 12 days without a hearing, the evidence raised a substantial fact issue as to the inmate's right to a notice and a hearing which precluded summary judgment. Tunnell v. Office of Public Defender, 583 F. Supp. 762 (E.D. Pa. 1984).

Perma Research & Development Co. v. Singer Co., 308 F. Supp. 743 (S.D. N.Y. 1970).

"From all the background it seems reasonably clear that the case at bar is not only one of first impression but is also a test case and one of the battles in a war between the television broadcasting industry on the one hand and the CATV operators on the other. I do not believe that our Court of Appeals would approve an attempt to decide such a case by summary judgment." Columbia Broadcasting System, Inc. v. Teleprompter Corp., 251 F. Supp. 302, 305 (S.D. N.Y. 1965).

"The voluminous pleadings, affidavits, exhibits and memoranda; the extensive arguments of counsel; the technical nature of the subject matter; the importance of the issues to the railroad industry; the quantity of the factual material to be analyzed, and the many complex questions of law involved are impelling reasons for denying summary relief. The issues are now obscured by argumentative statements and counter-assertions and the conflicting inferences and conclusions which the parties contend are to be drawn from an incomplete record of the transactions and course of dealing involved. All of these matters pose complex questions of fact and law. Their cumulative weight is too heavy a burden for so frail a vehicle as a motion for summary judgment." Boston & M. R. R. v. Lehigh & N. E. R. Co., 188 F. Supp. 486, 490-491 (S.D. N.Y. 1960).

20

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.
# EX. 25

Case 1:18-cv-00068   Document 400-4   Filed on 06/15/19 in TXSD   Page 46 of 193

§ 2751 Purpose of Declaratory Judgments, 10B Fed. Prac. & Proc. Civ. § 2751 (4th ed.)

**10B Fed. Prac. & Proc. Civ. § 2751 (4th ed.)**

Federal Practice & Procedure  |  April 2019 Update

Federal Rules Of Civil Procedure

The Late Charles Alan Wright [a156], Arthur R. Miller [a157], Mary Kay Kane [a158], Richard L. Marcus [a159], A. Benjamin Spencer [a160], Adam N. Steinman [a161]

Federal Rules of Civil Procedure

Chapter 8. Judgment

Mary Kay Kane [a545]

Rule 57. Declaratory Judgment

A. In General

§ 2751 Purpose of Declaratory Judgments

---

**Primary Authority**

- Fed. R. Civ. P. 57

---

**Forms**

- 4 West's Federal Forms, District Courts—Civil §§ 4781 to 4799

---

Actions for declaratory judgments represent a comparatively recent development in American jurisprudence. [1] The traditional and conventional concept of the judicial process has been that the courts may act only when a complainant is entitled to a coercive remedy, such as a judgment for damages or an injunction. Until a controversy had matured to a point at which that relief was appropriate and the person entitled thereto sought to invoke it, the courts were powerless to act.

At times, however, this approach created an undue hardship. There may be an actual dispute about the rights and obligations of the parties, and yet the controversy may not have ripened to a point at which an affirmative remedy is needed. Conversely, this stage may have been reached, but the party entitled to seek the remedy may fail to take the necessary steps. For example, the maker of a promissory note may have stated to the payee that the instrument would not be honored at maturity because, perhaps, his signature is claimed to have been forged or procured by fraud or affixed without his authority. The payee had to wait until payment was due before appealing to the courts. It might well have been important for the payee to ascertain in advance whether the note was a binding obligation and whether he might rely on it and list it among his assets. Nevertheless, under the conventional approach, the payee could receive

Case 1:18-cv-00068   Document 400-4   Filed on 06/15/19 in TXSD   Page 47 of 193

§ 2751Purpose of Declaratory Judgments, 10B Fed. Prac. & Proc. Civ. § 2751 (4th ed.)

no judicial relief until the instrument became due and was dishonored. [2] In a similar vein, it might have been necessary for a person to determine whether some contractual provision was binding that the person deemed void. Under the traditional approach, a person who desired to contest the matter had to assume the risk and to hazard the consequences of committing a breach and then await a suit. [3] Or the owner of a patent might assert that a manufacturer was infringing the owner's monopoly, while the latter contended that its product was not an infringement or that the patent was invalid. The manufacturer was helpless, however, to secure an adjudication of the issue, but had to await suit for infringement, unless the manufacturer preferred to yield and discontinue the activity.

In all of these situations the declaratory-judgment remedy provides a useful solution. It gives a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so. [4] The declaratory-judgment remedy enlarges the judicial process and makes it more pliant and malleable by putting a new implement at the disposal of the courts. It always is discretionary with the courts whether to make use of this procedure. [5] The jurisdiction of the courts is not expanded and requests for declaratory judgments may be heard only in cases that otherwise are within their jurisdiction. [6] Nor may the court grant a declaratory judgment in the absence of an actual controversy between the parties. [7]

The remedy made available by the Declaratory Judgment Act [8] and Rule 57 is intended to minimize the danger of avoidable loss and the unnecessary accrual of damages and to afford one threatened with liability an early adjudication without waiting until an adversary should see fit to begin an action after the damage has accrued. [9] It relieves potential defendants "from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure—or never." [10] It permits actual controversies to be settled before they ripen into violations of law or a breach of contractual duty [11] and it helps avoid a multiplicity of actions by affording an adequate, expedient, and inexpensive means for declaring in one action the rights and obligations of litigants. [12]

| | |
|---|---|
| a156 | Charles Alan Wright Chair in Federal Courts, The University of Texas. |
| a157 | University Professor, New York University. Formerly Bruce Bromley Professor of Law, Harvard University. |
| a158 | John F. Digardi Distinguished Professor of Law, Chancellor and Dean Emeritus, University of California, Hastings College of the Law. |
| a159 | Horace O. Coil ('57) Chair in Litigation, University of California, Hastings College of the Law. |
| a160 | Justice Thurgood Marshall Distinguished Professor of Law, University of Virginia School of Law. |
| a161 | University Research Professor of Law, University of Alabama. |
| a545 | John F. Digardi Distinguished Professor of Law, Chancellor and Dean Emeritus, University of California, Hastings College of the Law. |

Westlaw. © 2019 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1    **Recent development**
     See § 2752.
     Stephenson v. Whittington, 6 Ark. App. 4, 636 S.W.2d 878, 879 (1982), **citing Wright & Miller**.

2    **Payee of note**

In this situation the maker of the note might have had a remedy in equity through a bill quia timet. Walsh, Equity, 1930, § 116. There was no similar equitable remedy for the payee.

3    **Hazard consequences of breach**

The most striking illustration of such a situation is presented by the facts of Willing v. Chicago Auditorium Ass'n, 277 U.S. 274, 48 S. Ct. 507, 72 L. Ed. 880 (1928), in which Justice Brandeis intimated that declaratory judgments would be unconstitutional. See § 2753. In that case the lessee under a long-term lease wished to tear down an unprofitable auditorium, and build a profitable office building, but the lessors were threatening to declare the lease at an end if the auditorium was razed. It was held that the lessee could not find out, in advance, whether the lessors' construction of the lease was sound.

4    **Useful solution**

Hyatt Intern. Corp. v. Coco, 302 F.3d 707, 711 (7th Cir. 2002), **citing Wright, Miller & Kane**.

B. Braun Medical, Inc. v. Abbott Laboratories, 124 F.3d 1419, 1428 (Fed. Cir. 1997), **citing Wright, Miller & Kane**.

Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1532 n.137 (D.C. Cir. 1984), **citing Wright & Miller**, vacated on other grounds, 471 U.S. 1113, 105 S. Ct. 2353, 86 L. Ed. 2d 255 (1985).

Museum of Modern Art v. Schoeps, 549 F. Supp. 2d 543, 547 (S.D. N.Y. 2008), **citing Wright, Miller & Kane**.

Richmond Steel, Inc. v. Legal and General Assur. Soc., Ltd., 799 F. Supp. 234, 237 (D.P.R. 1992), **citing Wright, Miller & Kane**.

Pratt v. Wilson, 770 F. Supp. 539, 545 (E.D. Cal. 1991), **citing Wright, Miller & Kane**.

State Farm Fire and Cas. Co. v. Taylor, 118 F.R.D. 426, 429 (M.D. N.C. 1988), **citing Wright, Miller & Kane**.

Government Emp. Ins. Co. v. LeBleu, 272 F. Supp. 421, 426 (E.D. La. 1967).

Zamir, The Declaratory Judgment Revisited, 30 Current Legal Problems 43 (1977).

**See also**

Chauvet v. City of Westwego, 599 So. 2d 294, 296 (La. 1992), **citing Wright, Miller & Kane**.

5    **Discretion of courts**

See § 2759.

6    **Jurisdiction not expanded**

See § 2766.

7    **Actual controversy**

See § 2757.

8    **Declaratory Judgment Act**

28 U.S.C.A. § 2201.

9    **Accrual of damages**

A proper purpose of the Declaratory Judgment Act is to allow potential defendants to resolve a dispute without waiting to be sued or until the statute of limitations expires, and the mere fact that a declaratory-judgment action is brought in anticipation of other suits does not require dismissal of the declaratory-judgment action by the federal court. Sherwin-Williams Co. v. Holmes County, 343 F.3d 383 (5th Cir. 2003).

ACandS, Inc. v. Aetna Cas. and Sur. Co., 666 F.2d 819 (3d Cir. 1981).

Cunningham Bros., Inc. v. Bail, 407 F.2d 1165, 1168 (7th Cir. 1969).

Luckenbach S. S. Co. v. U.S., 312 F.2d 545, 548 (2d Cir. 1963).

Aluminum-can manufacturer's potential litigation costs in possible actions brought against it or against the company which bought the cans from it for ultimate sale to consumers were not the type of "accruing damage" that Declaratory Judgment Act was intended to curtail; although the Act was meant to settle legal rights without awaiting violation of rights or the disturbance of relationships, it was not meant to prevent the cost of litigating when those violations or disturbances had already occurred. Crown Cork & Seal Co., Inc. v. Borden, Inc., 779 F. Supp. 33, 35 (E.D. Pa. 1991), **citing Wright, Miller & Kane**.

Declaratory Judgment Act was not a proper vehicle for the tow-truck operator to assert its claim against the city for deprivation of his constitutional rights in connection with the award of a towing contract to other providers; the Act was designed to prevent the accrual of avoidable damages, and

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-00068   Document 400-4   Filed on 06/15/19 in TXSD   Page 49 of 193

§ 2751Purpose of Declaratory Judgments, 10B Fed. Prac. & Proc. Civ. § 2751 (4th ed.)

these had already occurred. Hoagy Wrecker Service, Inc. v. City of Fort Wayne, 776 F. Supp. 1350 (N.D. Ind. 1991).

Reynolds v. Stahr, 758 F. Supp. 1276, 1281 (W.D. Wis. 1991), citing Wright, Miller & Kane.

Kelley v. Thomas Solvent Co., 790 F. Supp. 719, 723 (W.D. Mich. 1990), quoting Wright, Miller & Kane.

Koch Engineering Co., Inc. v. Monsanto Co., 621 F. Supp. 1204, 1206 (E.D. Mo. 1985), quoting Wright, Miller & Kane.

Government Emp. Ins. Co. v. LeBleu, 272 F. Supp. 421, 427 (E.D. La. 1967).

Channel Master Corp. v. JFD Electronics Corp., 263 F. Supp. 7, 8 (E.D. N.Y. 1967).

Japan Gas Lighter Ass'n v. Ronson Corp., 257 F. Supp. 219, 237 (D.N.J. 1966).

**See also**

City of Grand Forks v. Grand Forks Herald, Inc., 307 N.W.2d 572, 575 (N.D. 1981), citing Wright & Miller.

**Damoclean threat**

Japan Gas Lighter Ass'n v. Ronson Corp., 257 F. Supp. 219, 237 (D.N.J. 1966).

**See also**

Freeman v. Marine Midland Bank-New York, 419 F. Supp. 440 (E.D. N.Y. 1976).

Mine Safety Appliance Co. v. Energetics Science, Inc., 416 F. Supp. 530 (S.D. N.Y. 1976).

The granting of declaratory relief is proper when the judgment will serve a useful purpose in clarifying and settling the legal relations at issue, or when it will terminate and afford relief from uncertainty, insecurity, and the controversy giving rise to the proceedings. Ungar v. Dunkin' Donuts of America, Inc., 68 F.R.D. 65 (E.D. Pa. 1975), rev'd on other grounds, 531 F.2d 1211 (3d Cir. 1976).

**Before breach**

The essence of the declaratory remedy is affording a form of relief, on the basis of acts either complete or threatened, that will operate to adjust the rights of the parties in cases in which the award of a prospective coercive judgment would, for any number of reasons, be inappropriate. Halkin v. Helms, 690 F.2d 977, 1007 n.110 (D.C. Cir. 1982), citing Wright & Miller.

U.S. v. Fisher-Otis Co., Inc., 496 F.2d 1146 (10th Cir. 1974).

A declaration that the landowner breached its duty of confidentiality and its duty not to market its property, which were imposed by a letter of intent between the landowner and a potential purchaser, was not appropriate; the declaration would involve the adjudication of past conduct, and a declaration would serve no useful purpose, such as guiding the parties' future conduct. Beazer Homes Corp. v. VMIF/Anden Southbridge Venture, 235 F. Supp. 2d 485 (E.D. Va. 2002).

Government Emp. Ins. Co. v. LeBleu, 272 F. Supp. 421, 426 (E.D. La. 1967).

**See also**

Declaratory judgment is inappropriate solely to adjudicate past conduct. Gruntal & Co., Inc. v. Steinberg, 837 F. Supp. 85 (D.N.J. 1993).

Granting of declaratory relief is proper only when the judgment will serve a useful purpose in clarifying and settling the legal relations at issue, or when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings. Maryland Cas. Co. v. Rosen, 445 F.2d 1012 (2d Cir. 1971).

**Compare**

Leasehold owner was not entitled to a declaratory judgment that its termination of management agreements and the ejection of the property-management company from its properties was proper, when the owner already had terminated the agreements, the company had vacated the premises, the parties' potential damages resulting from any breach of those contracts was fixed, the parties' behavior with respect to their respective obligations would not be affected, and no accrual of avoidable damages would be avoided by the relief sought. Delaware State University Student Housing Foundation v. Ambling Management Co., 556 F. Supp. 2d 367 (D. Del. 2008).

**Avoid multiplicity**

United Food & Commercial Workers Local Union Nos. 137, 324, 770, 899, 905, 1167, 1222, 1428, and 1442 v. Food Employers Council, Inc., 827 F.2d 519, 524 (9th Cir. 1987), citing Wright, Miller & Kane.

Reynolds v. Stahr, 758 F. Supp. 1276, 1281 (W.D. Wis. 1991), citing Wright, Miller & Kane.

10

11

12

Case 1:18-cv-00068 Document 400-4 Filed on 06/15/19 in TXSD Page 50 of 193

§ 2751Purpose of Declaratory Judgments, 10B Fed. Prac. & Proc. Civ. § 2751 (4th ed.)

Ungar v. Dunkin' Donuts of America, Inc., 68 F.R.D. 65 (E.D. Pa. 1975), rev'd on other grounds, 531 F.2d 1211 (3d Cir. 1976).

Smith v. Transit Cas. Co., 281 F. Supp. 661, 670 (E.D. Tex. 1968), aff'd, 410 F.2d 210 (5th Cir. 1969).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.
# EX. 26

# INTENTIONALLY LEFT BLANK

# DEF-INTERV.
# EX. 27

```
1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
2                  BROWNSVILLE DIVISION

3                    + + + + +

4    _____
                                      :
5    IN THE MATTER OF:                :
                                      :
6    STATE OF TEXAS, ET AL.,          :
                                      :
7                   Plaintiff,        :
                                      :
8        v.                           :  Civil Action No.
                                      :  1:18-CV-00068
9    UNITED STATES OF AMERICA,        :
     ET AL.,                          :
10                  Defendants,       :
                                      :
11   and                              :
                                      :
12   KARLA PEREZ, et al.,             :
                                      :
13                  Defendant-        :
                    Intervenors,      :
14   and                              :
                                      :
15   STATE OF NEW JERSEY,             :
                                      :
16                  Defendant-        :
17                  Intervenor.       :
                                      :
18   _____:

19                  Thursday,
                    August 2, 2018
20
                    Washington, D.C.
21

22   DEPOSITION OF:

23                    MICHAEL KNOWLES

24

25
```

```
 1    Will you agree, though, that if there's a
 2    question out on the table that you will answer
 3    that question before taking the break?
 4         A    Yes.
 5         Q    Is there any reason you can't give
 6    full and truthful answers today such as taking a
 7    medication that makes you not able to answer
 8    questions or if you have some kind of illness
 9    today that's making it difficult for you to
10    answer questions, is there anything like that
11    today?
12         A    No.
13         Q    Thank you.
14              We have finished with the rules of the
15    road.
16         A    All right.
17         Q    I'm going to ask you some background
18    questions now about your job and what you do.
19    All right?
20              Tell me, what is your job?
21         A    Yes, I am an Asylum Officer with U.S.
22    Citizenship and Immigration Services in the
23    Arlington, Virginia office.
24         Q    And, when did you start working for
25    USCIS?
```

 1    National Union president went and basically met

 2    every employee in the building.

 3         Q    All right.  Now, are you familiar in

 4    a general sense with the types of applications

 5    that are adjudicated at Service Centers?

 6         A    I'm not familiar as a worker with

 7    those form types because my job is just

 8    adjudicating asylum claims.  But, I have general

 9    familiarity with the kinds of benefits that

10    various offices adjudicate.

11         Q    And, do you know where DACA requests

12    are adjudicated?

13         A    Generally, in Nebraska, the Nebraska

14    Service Center.  And, at some time, they have

15    been also done at the California Service Center.

16              But, if you're familiar with the

17    Service Center operations, they tend to shift

18    work around the country.  I think at one time

19    earlier in the Agency's evolution, they would,

20    you know, they had different portfolios assigned

21    to different Centers.

22              But, it's really a mobile work,

23    depending on volume, backlogs, staffing and so

24    on.

25         Q    Do adjudications at USCIS Service

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                              Page 22

1    Centers typically include an interview?

2         A    No, they do not.

3         Q    Are you aware of DACA --

4         A    In fact, I'm sorry, I'm not aware of

5    any interviews being conducted in Service

6    Centers.  They're really not set up, you know,

7    there's no interview offices, no -- there's no

8    what we call public interface between the Service

9    Centers and the public.

10             Although, sometimes, a Service Center

11   may send a case to a field office with a request

12   that the field officer interview the applicant to

13   obtain further information or evidence.

14        Q    Are you aware of any specific

15   instances where a DACA request was referred to a

16   field office for interview?

17        A    Yes, I'm aware of, you know,

18   anecdotally.  I don't -- because I don't do the

19   work.  But, I have spoken with several of my

20   colleagues in recent months about that question.

21             I've spoken specifically with our

22   union reps in the Washington, D.C. Field Office

23   and the Atlanta, Georgia Field Office.  And, they

24   told me about doing interviews on behalf of the

25   Service Center in several cases where the Service

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 23

1    Center needed more information.  They called in

2    the DACA applicant.

3              I think in these cases, they were

4    suspected of gang activity or gang association.

5    And so, they brought in the applicants and

6    pursued the lines of questioning requested by the

7    Service Center.  Sent the cases back to the

8    Service Center with the findings.

9         Q     Have you had an opportunity to speak

10   with members of the USCIS union about how they

11   adjudicate DACA applications?

12        A     Yes, I've spoken with the former

13   president of the Local that represents employees

14   at the California Service Center.  I say former

15   because they just had an election.  That

16   individual is now the vice president, same Local.

17             I've spoken with the president of the

18   Nebraska Service Center and the vice president of

19   the Nebraska Service Center.

20             I can't recall whether the California

21   president has personally adjudicated DACA cases.

22   I believe he may have.

23             But, the two individuals in Nebraska

24   both -- they are ISOs who had done DACA.

25        Q     And, you spoke to those two?

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 24

```
 1        A     Yes, yes.
 2        Q     Okay.  And, did you have occasion to
 3   speak with these union members who include DACA
 4   adjudications about whether they rubberstamp
 5   applications?
 6        A     Yes.
 7        Q     And, can you convey or share with us
 8   what you learned from those conversations?
 9        A     Well, I asked them, you know, what
10   would you say to the criticism that this
11   adjudication is a rubberstamp operation?
12             They said no, far from it.  We have
13   very specific training and guidance.  Every case
14   is treated on its own merits.  We do thorough
15   examination of the evidence.
16             We do the necessary background checks.
17   We flag any cases that are of concern or
18   supervisory review.
19             The individuals kind of bristled at
20   the thought that they would -- it would be said
21   that their colleagues rubber-stamped anything.
22        Q     Did you have occasion to talk with any
23   DACA adjudicator about how much consideration
24   they gave and how much discretion they exercised
25   with respect to DACA applications compared to
```

1    other applications that they may adjudicate?

2          A     Yes, I mean, I asked them, it's really

3    in the same conversation about so-called rubber-

4    stamping.  I said, it's been said by critics of

5    the program that you guys don't have any

6    discretion.

7                    And, they were quite surprised and

8    said, well, yes, we -- by definition, any

9    adjudication requires some discretion.  That's

10   why we have immigration officers who are trained

11   in immigration law to apply the law on a case by

12   case basis and use discretion in their decisions.

13                    They're not under orders to

14   automatically approve or deny a case.  They're

15   looking at case by case.

16                    Does the applicant -- I would say this

17   of any adjudication, does the applicant meet the

18   stated criteria or not?  And, even if they do

19   meet the stated criteria, are there any

20   discretionary reasons to deny them or any

21   mandatory reasons such as criminal record or

22   possible terrorist, national security threat, et

23   cetera, et cetera.

24                    So, they -- one individual said, of

25   all the form types that he had adjudicated at the

1    Nebraska Service Center, DACA, he felt, was the

2    most -- the one that required the most

3    discretion.

4              And, he said, particularly, because

5    the requirements were quite stringent to show the

6    physical presence, to show the continuous

7    physical presence and also to make sure that

8    there was no criminal record.

9              And, also, that there was no fraud

10   involved.

11        Q    Did you have occasion to speak with

12   DACA adjudicators or other union members about

13   the use of discretion and the criteria related to

14   education?  The DACA criteria that the individual

15   either be in school or have completed high

16   school?

17        A    I didn't ask specifically, you know,

18   do you discretion with that?  I asked just in

19   general, do you use discretion to making your

20   decision.

21              Now, they did, in the course of

22   describing their work, they were describing their

23   work because I asked them to describe their work,

24   because I don't know their work other than what I

25   read in the newspapers about the program.

```
 1                  So, what are you looking for in terms

 2      of qualification?  They're looking at, of course,

 3      continuous presence, time of entry, the age,

 4      education, military service and criminal records.

 5                  The only thing I remember them telling

 6      me about specifically about the education was

 7      that they were particularly attentive to looking

 8      at potential fraud.

 9                  And, they referred to with some pride

10      of ownership that their unit had successfully

11      worked with our fraud detection and national

12      security folks and ICE to uncover and pursue

13      prosecution because ICE pursued the prosecution

14      of so-called diploma mills.

15                  And so, they were particularly

16      vigilant about possible document fraud.

17          Q     And, in order for a DACA adjudicator

18      to figure out whether an applicant was presenting

19      information that might be related to a diploma

20      mill, did they describe that they were using

21      discretion in that consideration?

22          A     I didn't ask those kind of questions.

23      I don't have any personal knowledge of how they

24      pursued their adjudications.

25          Q     Okay.
```

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
Michael Knowles on 08/02/2018                              Page 28

```
 1        A      They just, you know, reiterated that

 2   they do it with due diligence and coordination,

 3   they don't do it in a vacuum.  They work, as I

 4   said, closely with the Fraud Detection and

 5   National Security folks.

 6              When there are indicators of problems,

 7   they're instructed to flag them, bring them to

 8   their supervisors and pursue whatever avenues are

 9   necessary.

10        Q      Is it fair to say that DACA requests

11   are adjudicated by Immigration Service Officers?

12        A      Yes.

13        Q      And, are you familiar with the

14   training generally that is offered Immigration

15   Services Officers?

16        A      Yes, well, there is the BASIC

17   Immigration Service Officer Training, also known

18   as BASIC, all caps.

19              It is a -- it was historically, I

20   think a four-week course.  It's now been extended

21   this year.  I can't recall to five or six weeks,

22   which every Immigration Services Officer must

23   take.  And, so a requirement of their employment,

24   must take it and pass.

25              And, that's conducted at our Service
```

```
 1    to assign the work, but make sure it's a

 2    reasonable caseload.  Make sure that you're on

 3    top of your staffing.  Make sure that people have

 4    the right training, the right equipment and that

 5    the supervision that they get should be of a

 6    coaching and a mentoring kind of leadership, not

 7    just counting widgets.

 8              So, it's an area of constant, well, I

 9    would say creative tension between quality and

10    quantity.

11              But, having said that, we are held to

12    very high quality standards.  And, my own office,

13    we have a 100 percent review, supervisory review.

14    If I don't get it right, they send the case back

15    and have me do it over again.

16         Q    Has any DACA adjudicator that you've

17    spoken to or any union member in a Service Center

18    told you that DACA applications are rubber-

19    stamped because of high workload?

20         A    Not specifically.  I mean, they did

21    not describe it to me as, hey, you know, DACA is

22    the worst of all as far as assembly line.

23              That the pressure to produce, I would

24    say, is equally felt among form types in Service

25    Centers, in Field Offices, in Asylum Offices.
```

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 33

1            We, you know, we're adjudicating

2     benefits that involve people on an industrial

3     scale.  And, there's always those that had a

4     tension.

5            So, I did, however, have our union

6     reps from Nebraska say that they were often told

7     to make sure that they got the decisions right

8     and that they should take the time that they

9     needed to do the case correctly.

10           That doesn't mean that the pressure's

11    off to produce, but they were specifically told

12    not to sacrifice quality in order to make their

13    production.

14       Q     And, were any -- did anybody

15    communicate to you that that was the case

16    specifically with DACA that they ought to take

17    the time --

18       A     Yes.

19       Q     -- to do it right?

20       A     Yes, yes.

21       Q     And, can you share that with us?

22       A     Well, I thought I just did, like the

23    individual said. I, you know, said are you

24    pressured to keep the line moving?  He said,

25    well, yes, we're always pressured to keep the

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                      **Page 39**

1    about such matters.

2             Q       Further down in the paragraph, there's

3    a sentence that begins with the word "and."  I'll

4    read that to you.

5                 Quote, and, USCIS management has

6    ensured that these applications are not properly

7    screened as has it over assigned the workload for

8    the completion of these applications to be

9    favorably rubber-stamped as long as they meet

10   minimal requirements, unquote.

11                 Did I read that correctly?

12           A       Mm-hmm.

13           Q       Based on your conversations with

14   members of the union and with DACA adjudicators

15   about their workload, do you agree with that

16   sentence?

17           A       I do not agree with that sentence.

18           Q       Okay.  The first sentence in the next

19   paragraph starting with the word "since."  I'll

20   read it to you and you let me know if that's what

21   it says.

22                 Quote, since June 2012, USCIS has

23   continually bypassed Congress and existing

24   immigration law as contained in the Immigration

25   and Nationality Act with the enactment of the

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 40

1    DACA program, unquote.

2              Did I read that correctly?

3         A    Yes.

4         Q    Do you agree with that statement?

5         A    I do not.

6         Q    Okay.  With respect to the final

7    sentence in the paragraph, quote, in the interim,

8    taking a backseat to this avalanche of benefits -

9    -

10        A    I'm sorry, I'm not sure where we are.

11        Q    We're still in the paragraph that

12   begins with the word "since."

13        A    Right.

14        Q    It's the very last sentence.

15        A    Uh-huh, oh, I see, in the interim,

16   okay.

17        Q    Yes, quote, in the interim, taking a

18   backseat to this avalanche of benefits bestowed

19   on illegal aliens are the jobs, wages, benefits

20   and security that rightfully belong to Americans

21   and their families as well as those individuals

22   who applied for immigration benefits in

23   accordance with existing law and procedure,

24   unquote.

25             Do you see that there?

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
Michael Knowles on 08/02/2018                                    **Page 44**

```
 1        A    Mm-hmm.

 2        Q    I'm going to read you that sentence.

 3   Quote, that is why a moratorium on the existing

 4   DACA program must be put into effect until a

 5   system is established that will ensure proper

 6   procedure and vetting for all.

 7             Next sentence, we should stop

 8   processing any and all pending DACA applications

 9   immediately, unquote.

10             Do you see that?

11        A    I do.

12        Q    Do you agree with that sentence?

13        A    I don't and I, if I may, I'd like to

14   explain why I don't agree with it.  It's because,

15   to the best of my knowledge, which is admittedly

16   not firsthand because I don't process DACA, but

17   from what I've read in public news sources, the

18   Agency's own websites and talking to my members

19   who do this work, I have no reason to doubt that

20   we have proper procedures and vetting for all.

21             I'm confident that like all other CIS

22   programs, we have proper procedures and vetting.

23             I'm also confident, based on my

24   experience, the USCIS, like other immigration

25   agencies, are constantly reviewing and correcting
```

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 45

1    course when necessary, revising, updating

2    technology when a threat is perceived, addressing

3    it properly when fraud is detected, taking

4    appropriate action.

5            When there are unscrupulous advocates,

6    there are various measures that are taken.

7            So, it's not that procedures are

8    static, they're always dynamic.  And, I think one

9    of the things that I know our workers are proud

10   of is that they participate, our workers, our

11   members, participate in constantly improving the

12   organization by bringing problems to the

13   attention of management.

14           And, we have a management that

15   actually seeks, you know, valid, current

16   information from the folks doing the work.

17           So, it's not that we're not in need of

18   improvement, we're always in need of improvement,

19   but to call for the shutting down of a program

20   for lack of proper procedure and vetting, I don't

21   believe that -- I'm not aware of any evidence

22   that we don't have proper procedure and vetting.

23           Whether one agrees with the program or

24   not as a policy is another matter.  And, I'm not

25   really a partisan on the public policy.  I'm

1   speaking to the work that I know my members do

2   and have told me they do.

3        Q    Do you think that adjudication like

4   DACA could be outsourced to individuals outside

5   the Agency?  What is your view of that?

6        A    I don't -- I'm not sure what you mean

7   by outsourced.

8        Q    Hire private contractors to simply

9   look at DACA applications?

10        A    Well, the union would vigorously

11   oppose, as it does almost all contracting out,

12   but certainly of what we call inherently

13   governmental functions.

14             I can give you a historic example.

15   Several years ago, the Agency, this was maybe

16   over ten years ago, the Agency attempted to do

17   what they call an A76 study of where contractors

18   were invited to compete for a contracting out of

19   what was then called Customer Contact

20   Representatives or the folks that work the front

21   window in a Field Office answering questions and

22   resolving cases.

23             And, the union successfully, with the

24   support of Congress, stopped and actually had

25   Congress defund that study because we argued

1   these are inherently governmental functions, even

2   the contact rep at the front window requires very

3   specialized training, high accountability and

4   they do, sometimes, some level of adjudications.

5              Those individuals have now been

6   retitled to be Immigration Services Officers

7   Level I.  Those folks exercise a high degree of,

8   you know, required proficiency and

9   accountability.

10             I would never support the contracting

11  out of adjudication of any benefit.  That's

12  definitely, you know, according to the

13  Immigration and Naturalization Nationality Act,

14  sorry, those functions are to be performed by

15  Immigration Officers.

16             MS. PERALES:  I'd like to take a short

17  break before passing the witness.  It's been

18  about an hour.  So, if we could go off the

19  record.

20             (Whereupon, the above-entitled matter

21  went off the record at 12:07 p.m. and resumed at

22  12:28 p.m.)

23             MS. PERALES:  Okay, we're back on the

24  record.

25             I pass the witness.  And, I think I'm

```
 1    sometime.

 2         A      Okay.

 3         Q      So, let's just try not to talk over

 4    each other and try give me verbal answers.

 5         A      All right.

 6         Q      So, after you received Mr. Palinkas's

 7    declaration, what did you do next?

 8         A      Well, I thought about it and I called

 9    folks that I knew.  For example, I called my

10    colleagues in the Washington District Office.

11                These are all the people that I spoke

12    to are union representatives.  And, my -- I don't

13    have the capacity to like send out a broadcast

14    message, a survey, you know, assemble all the

15    people that work there.

16                And, I would not normally do that

17    unless the employees were making it an issue they

18    wanted me to take on.

19                So, just to -- for me to assess and be

20    able to answer the question, what do you think

21    about this statement, I wanted to find out from

22    folks who have more familiarity with the subject

23    what they do.

24                So, I called my colleagues, as I said,

25    one in Washington District.  The individual is
```

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 57

1    one of my Local vice presidents and what we call

2    an ISO Level III.

3              So, their Senior Immigration Services

4    Officer said, hey, what do you think about this

5    statement?  And, do you, as an Immigration

6    Services Officer, in a Field Office, ever

7    interview DACA applicants?

8              Because, one of the statements that

9    Mr. Palinkas made was, no DACA applicant is every

10   interviewed.  I didn't know the answer to that so

11   I asked my colleague.

12             She says, well, not normally, but

13   sometimes we do.  And, I said like, for instance

14   what?  And, she said, well, I personally received

15   two different applications files from the Service

16   Center asking me to call in the individuals and

17   interview them about potential gang activity.

18             And, I said do you get involved in

19   adjudicating the case?  No, I was -- my mission

20   was to interview them about these things and send

21   my findings back to the Service Center.  I have

22   no idea, she said, what they did there.

23             Called my colleague in Atlanta --

24        Q    Stop really quick, let's -- before we

25   go to Atlanta, let's finish up, it's D.C.,

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**                                    Page 60

 1   her to uncover, you know, other data or whatever.

 2        Q     So, as you sit here today, you're

 3   aware of only two instances at the Washington

 4   District Office where DACA applicants were

 5   interviewed?

 6        A     Right.  Whether there were more, I

 7   have no idea.

 8        Q     Okay.

 9        A     Because I didn't go and like do a data

10   call or, you know, call the district director.  I

11   didn't really feel that was my role.  I really

12   was trying to assess from my members and my

13   fellow union representatives, what was their own

14   knowledge of the matter?

15        Q     Could you have done a data call?

16        A     I suppose I could have as a union rep.

17   But, my -- I'm not involved in the case.  I was

18   just called and asked from information and

19   comment.

20              If we were involved in any kind of a

21   case as a moving party or whatever, we might do a

22   data call.  And, in our parlance, it's called a

23   request for information.

24              But, normally, the union's request,

25   you know, our right to request and the Agency's

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    **Page 61**

 1    response of what responsibility to provide me

 2    with information would be usually with respect to

 3    a labor issue.

 4                 So, for example, if I was defending

 5    somebody in an adverse action, I might ask for

 6    data information pertaining to their personnel

 7    file.

 8                 Or, if it affected, say, the overtime

 9    practices of the Agency and we were litigating

10    over, you know, improper payment of overtime, I

11    might be asking for records pertaining to that.

12                 But, wouldn't really have a reason to

13    ask the Agency for like statistics about DACA.

14    Because, I'm not involved in the case.

15                 If my members, however, had brought to

16    me an issue about DACA that affected their

17    working conditions, for example, if they felt

18    like they were, you know, being overwhelmed with

19    the caseload or there was massive fraud or

20    rubber-stamping or whatever.

21                 And, I wanted to bring that issue

22    forward to the Agency, yes, I might be asking for

23    information.

24                 But, none of my members have ever

25    brought that to me as a concern.

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**                                    Page 63

```
 1   Local.

 2        Q     All right, so, we have that call you

 3   made.

 4              Then, let's talk about the next call

 5   you made.  Who'd you call?

 6        A     I called -- well, no, mind you, I

 7   don't know if sequentially, I don't have the

 8   dates and the sequence of who I called when.

 9        Q     All right, let's -- I won't hold you

10   to that --

11        A     But, I did call my colleague at the

12   Atlanta District --

13        Q     Mm-hmm.

14        A     -- who is the current Local president

15   of that Local union.

16        Q     Okay.

17        A     And, she is also an ISO Level III

18   Senior Adjudicator.

19        Q     And, what did you ask her?

20        A     Same thing.  Here's this statement,

21   what do you think?  Is it, you know, are you

22   aware of any occasions when DACA applicants are

23   every interviewed?

24              She goes, yes, I sometimes get cases.

25   I can't remember the specifics.  I think it might
```

1    have been similar kind of thing, possible gang

2    activity.

3              But, the reason that she got these

4    files was the Service Center needed, in order to

5    complete their adjudication, a face to face

6    interview to verify tests or look at documents.

7              I didn't ask extensively, you know,

8    who, what, where, how and when occurred during

9    the interview.

10             But, she said, it's -- both

11   individuals said, it's highly unusual for people

12   to be interviewed.  But, when necessary, they

13   are.

14        Q    Did she tell you how many interviews

15   she had personally done?

16        A    I believe she said two.

17        Q    Are you aware besides those two of a

18   single DACA applicant being interviewed at the

19   Atlanta Field Office?

20        A    I have no, I mean, again, my only

21   source of knowledge about it was these phone

22   calls.

23        Q    So, that's a no?

24        A    I have -- yes, no.

25        Q    Okay.  And, what other phone calls did

1    you make?

2         A     So, I called the former, I think I

3    stated this earlier on the record, former

4    president of the Local out in California that

5    represents California Service Center.

6              And, that individual is an ISO II.  I

7    believe had done some DACA, but I just, I frankly

8    cannot remember.  I did not take notes of these

9    phone calls.

10        Q     Okay.  So, you don't know if the

11   individual who's the former president of the

12   California Local had ever actually processed a

13   DACA application personally?

14        A     I cannot recall, but I asked him to

15   speak generally to the program.  And, he told me,

16   you know, the basic process and so on.

17              I do recall, however, the two

18   individuals that I spoke to in Nebraska, that the

19   current Local president and the vice president

20   both had been ISO in the DACA unit.

21        Q     So, let's go back to California real

22   quick before we get to Nebraska.

23        A     All right.

24        Q     Did the California former president

25   tell you that he had personally interviewed any

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 66

```
 1   DACA applicant?

 2        A    No, because they don't do interviews

 3   in Service Centers.

 4        Q    Hold on.  So, was he the individual

 5   who worked in the Service Center?

 6        A    Yes.

 7        Q    So, did he tell you that interviews

 8   had ever been done at the California Service

 9   Center.

10        A    No, and they would never have been

11   done because the Service Centers aren't set up

12   for interviews.  That's why my colleagues in the

13   Field Offices so that when an interview is

14   necessary, it's sent to a Field Office where the

15   Field Office, having jurisdiction over the

16   residence, the area residence of the applicant.

17        Q    Did the individual who's the former

18   president in California tell you that his Service

19   Center had ever sent a DACA applicant to be

20   interviewed by a Field Office?

21        A    I don't recall him saying that.  I'm

22   not sure I asked him that either.

23        Q    So, as you sit here today, you're

24   unaware of a single DACA applicant being

25   interviewed out of the California Service Center?
```

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**                    Page 67

1        A     I have no way to know that.

2        Q     Let's go to Nebraska now. What were

3    the job descriptions of the individuals in

4    Nebraska that you called?

5        A     They were both ISO IIs.

6        Q     What was their role with the union?

7        A     The one is the current president and

8    the other is the current vice president at the

9    Nebraska Service Center.

10        Q     What did you ask these individuals?

11        A     I sent them the statement.  I asked

12    did they have any comments about it?  They were

13    both somewhat surprised that most of it appeared

14    to be opinion rather than, you know, certainly

15    Mr. Palinkas, as an ISO II in a Field Office,

16    does not have personal knowledge of this.

17              They found a number of statements that

18    they thought were not factual.

19              And, I basically said, so, tell me

20    what you guys do.  How do you do it?  I asked

21    them about discretion.  I asked them about

22    rubber-stamping.

23              I think I -- I mean, I could repeat

24    myself --

25        Q     Okay.

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 68

```
 1          A       -- but, I said it earlier in the
 2    record.
 3          Q       Sure.
 4          A       But, they both said, no, we don't
 5    rubberstamp, we're extensively trained.  We are
 6    to flag any problems, either a hit from the
 7    database, criminal record, misdemeanor, whatever.
 8                  They both talked about the involvement
 9    of their unit in uncovering some so-called
10    diploma mills with collaboration of FDMS fraud
11    detection national security Unit of CIS and ICE,
12    that resulted in prosecutions.
13          Q       Sure.
14          A       They both bristled at the idea that
15    they rubber-stamped.  They both said that they
16    were held to very high quality standards.
17                  And, that, you know, that the question
18    of, you know, what does one need to do to be
19    approved?  Well, one needs to meet the criteria.
20    If they don't meet the criteria, they don't get
21    approved.
22                  If they meet the criteria, they might
23    get approved provided they don't have bars to
24    seeking the benefit like a criminal record.
25          Q       Did those individuals tell you they
```

```
 1    I think mandatory criteria for DACA.  Does that

 2    sound familiar?

 3         A    No, I mean, I'm not sure if I used

 4    that term or not.  But, I believe there are set

 5    criteria having to do with age, you know, date of

 6    entry, continuous presence, school records,

 7    military records, criminal records.

 8         Q    Would you agree with me that there are

 9    criteria that will disqualify?

10         A    Yes.

11         Q    Those criteria are what?

12         A    Well to the best of my knowledge from

13    what I have read publicly and what I discussed

14    with the employees it would be failure to meet

15    the criteria, like their age, their physical

16    presence, continuous physical presence or not,

17    and the occasions where my contacts told me that

18    they knew cases were definitely denied and that

19    they were vigilant in looking for would be, for

20    example, fraudulent documentation or evidence of

21    criminal activity or any other threats to

22    national security like gang associations or

23    whatnot.

24         Q    So is it your position and your

25    understanding that a gang affiliation being a
```

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**                                    Page 76

```
 1   national security threat potentially, or
 2   committing fraud in other immigration paperwork,
 3   would be criteria that would automatically
 4   disqualify someone from receiving a DACA?
 5        A     I wouldn't be able to speak to the
 6   specific criteria or how they adjudicate, but I
 7   would, you know, based on my own work with
 8   asylum, yes, I mean if somebody has a criminal
 9   record or, you know, is a national security
10   threat, those are all -- There is no automatic,
11   these are discretionary decisions, but those are
12   things that are clearly taken into consideration.
13        Q     As you sit her today --
14        A     Right.
15        Q     -- are you aware of a single DACA
16   application that was denied after the person met
17   the initial criteria --
18              (Simultaneous speaking)
19        A     I am not aware.  I wouldn't have any
20   reason to be aware of that because it's not my
21   area, but I mean I can say that in other areas of
22   the service, including my own, status or benefits
23   are revoked when evidence comes to our attention
24   that somebody committed fraud or there is
25   evidence of some other disqualifier.
```

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**                              Page 79

```
 1    and my colleagues told me about the kinds of
 2    cases that would be denied, but I didn't ask
 3    about specific cases.
 4         Q     Sure.  So you know that applications
 5    have been denied based on statistics that are
 6    posted on USCIS's website?
 7         A     Right.  And by the testimony of my
 8    colleagues that they have denied cases or
 9    colleagues have denied cases and for what reasons
10    they have denied cases.
11         Q     So your colleagues have told you they
12    denied cases?
13         A     Yes.
14         Q     Okay.  Did they tell you why they
15    denied those cases?
16         A     Yes, because they didn't meet the
17    criteria or because there was some, you know,
18    discretionary reason.
19         Q     What discretionary reason?
20         A     That maybe the evidence was in
21    question or there was fraud or if there was
22    evidence of criminal activity.
23         Q     Okay.  Besides the evidence being in
24    question, evidence of fraud or lack of, I think
25    you said a lack of --
```

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**                                    Page 80

```
 1          A       It didn't meet the criteria, right.

 2          Q       Are you aware of any discretionary

 3    denial of the DACA application?

 4          A       I wouldn't have that kind of knowledge

 5    not having worked there, but, you know, the use

 6    of the word "discretion" I think sometimes is

 7    misused.

 8                  So it implies -- Based in my line of

 9    business, which is highly discretionary, it's not

10    like a flip of a coin or I don't feel like it,

11    right, you know, it is my authority to make or

12    not make a decision but it has to be based on

13    evidence based on proper application of the law,

14    such as how I feel about it.

15                  Oh, yes, they meet the criteria but

16    I'm just not going to approve it.  That would be

17    an abuse of discretion.  So we often in my trade

18    as an asylum officer we are trained in the proper

19    use of discretion and in the, you know, the

20    favorable exercise of discretion when the

21    evidence merits that.

22          Q       Did you send Mr. Palinkas's

23    declaration to anyone else besides the

24    individuals you just named?

25          A       No.
```

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
**Michael Knowles on 08/02/2018**                                    Page 108

```
 1        A    It's, you know, it's very subjective,

 2   a credibility determination, you're balancing

 3   both physical evidence as well as subjective

 4   evidence.

 5             And, it might be their own testimony

 6   is sufficient.  It might be medical evidence.  It

 7   might be witness testimony.  It might be evidence

 8   from the file of a family member.

 9             So, you're really -- it's probably one

10   of the most nuanced intensive kind of

11   determinations that we have in USCIS.

12        Q    So, is it fair to say, you consider a

13   lot more than just paperwork?

14        A    Well, we have to.  Yes, and that's why

15   an interview is so critical because so much of it

16   is dependent on the personal story of the

17   applicant.

18        Q    Are you aware of any DACA recipient

19   that was -- received an interview to the depths

20   that you just described?

21        A    I don't believe that's normally part

22   from what I understand, part of their

23   determination.  Because, you're really only

24   looking at those limited criteria of, you know,

25   age, physical presence, school, military,
```

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 109

```
 1    criminal history, whatever.
 2              You're not -- we're looking at, you
 3    know, by nature, for looking at so much more.
 4              Moreover, it's important to understand
 5    and, I'm sure, I don't mean to school you because
 6    I'm sure you've become an expert on the DACA
 7    program, but it is not a benefit.
 8              They're not, you know, they can't
 9    adjust status from DACA.  It's not even a status,
10    it's a deferred action.
11              And, during the pendency of their
12    deferred action, they can have a work permit,
13    though it's a very limited benefit if it could
14    even be called a benefit.
15        Q    Let me stop you there and unpack that
16    a little bit.
17        A    But, by contrast, asylum, you're
18    looking at a permanent, relatively permanent
19    protected status from which one can within 18
20    months adjust and get a green card and then
21    within the requisite period, apply for
22    naturalization.
23              And so, the stakes are incredibly high
24    because you're looking at a path to citizenship.
25    But, the stakes are also high because, if you
```

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 110

```
 1   improperly deny asylum, you could be placing the

 2   United States in breach of international

 3   convention which prohibits us from sending

 4   refugees back to their death or their

 5   incarceration or their persecution.

 6        Q     So, is it your view that the fact that

 7   someone obtaining asylum status could have a

 8   pathway to citizenship justify the in depth

 9   review you do as an asylum officer?

10        A     Well, that plus the fact that so much

11   of it hinges on their testimony which you can

12   only determine in an interview.  We do not have

13   the paper adjudication of any asylum claim.

14             However, they do present an extensive,

15   in the application, for asylum.  It's many, many

16   pages.  And, they usually will be accompanied by

17   affidavits, witness evidence, doctors evaluations

18   of, you know, physical injuries in triplicate.

19             Sometimes, one asylum case could be,

20   you know, entire mail bin or two or three,

21   depending on the complexity of the case.

22             Now, they are among the most complex

23   of USCIS adjudications.  So, to compare them to

24   DACA is, I mean, it's really apples and oranges.

25        Q     Are you aware that someone who
```

**STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.**
Michael Knowles on 08/02/2018                                    Page 116

```
 1   States lawfully.
 2              MR. BIGGS:  If somebody -- to your
 3   under -- to the best of your knowledge, if
 4   someone who is without status in the United
 5   States were to leave the country, would they be
 6   lawfully let back in under advanced parole?
 7              MS. PERALES:  Objection, calls for a
 8   legal conclusion.
 9              MR. BIGGS:  Let me actually ask the
10   question again because it's probably not a fair
11   question.
12              Someone who doesn't have status at
13   all, can they apply for advanced parole as far as
14   you know?
15              MS. PERALES:  Objection, calls for a
16   legal conclusion.  You may answer.
17              MR. KNOWLES:  Yes, they could, but
18   they have to qualify for it.
19              MR. BIGGS:  Do you know if they would
20   qualify for it?
21              MR. KNOWLES:  It depends on what it is
22   that -- on what their circumstances are.  I mean,
23   it's --
24              BY MR. BIGGS:
25        Q    Sure.  Just --
```

```
 1    further benefits or something along those lines?

 2         A    Well, advanced parole is simply the

 3    ability to re-enter the United States in whatever

 4    status they were when they applied for it,

 5    correct.

 6              I mean, I don't have any personal

 7    knowledge of it.  I'm really giving you common

 8    sense answers based on general things I've read.

 9    But, I don't adjudicate advanced parole.

10              MR. BIGGS:  So you know if any DACA

11    recipients have used advanced parole to later

12    adjust their status?

13              MS. PERALES:  Objection, foundation.

14    You may answer.

15              MR. KNOWLES:  Yes, I do not adjudicate

16    DACA or advanced parole.  I have read in the

17    press that some DACA recipients who effect

18    illegal entry or re-entry through it because they

19    have advanced parole might, therefore, be able to

20    adjust status if they qualify for some status --

21    some other status.

22              I mean, you can't just adjust status

23    because you got advanced parole.  You have to be

24    qualified for that status to which you are

25    adjusting.
```

 1                     And, not appropriate to grant somebody

 2       who didn't.

 3                     Moreover, we have checks and balances

 4       in my program that mitigate against that because

 5       every case that I approve has to be reviewed by

 6       my supervisor.

 7                     MR. BIGGS:  Let me ask it a different

 8       way.

 9                     Would it be appropriate in your view

10       to approve everyone without a single interview?

11                     MR. PERALES:  Objection, objection,

12       vague.  You may answer.

13                     MR. BIGGS:  Go ahead.

14                     MR. KNOWLES:  In my program, we

15       interview everybody.

16                     BY MR. BIGGS:

17            Q     Sure.  So, it would be inappropriate

18       to just not interview people, right?

19            A     What's that?

20                     MS. PERALES:  Objection, vague.

21                     MR. BIGGS:  Would it be inappropriate

22       --

23                     MR. KNOWLES:  And, it would be illegal

24       for me to adjudicate an asylum case on paper.

25       It's not the procedure.  But, there are many,

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 131

1    many, many different form types throughout CIS

2    that are adjudicated on paper.

3              BY MR. BIGGS:

4         Q    Do you --

5         A    That's why we have Service Centers and

6    they are not adjudicated by interview because an

7    interview is not required for every kind of case.

8         Q    You said it would be illegal.  What

9    law would that be breaking?

10        A    Well, the INA specifies that, and I

11   can't quote you the clause, but an asylum

12   interview -- an asylum application has to, you

13   know, has to be interviewed.  That's just

14   standard.

15        Q    Would you agree with me that it's

16   important for USCIS to follow the INA?

17        A    It is.

18             MR. BIGGS:  Would you agree with me

19   that it's important for the USCIS to just follow

20   the law generally?

21             MS. PERALES:  Okay, go ahead and

22   answer.

23             MR. KNOWLES:  Well, I would like to

24   say I'm not speaking for CIS but as a union rep.

25   I think we all expect our agencies to follow the

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                               Page 144

```
 1    Walker's turn.
 2                 MR. WALKER:  I have no other
 3    questions.
 4                 MS. PERALES:  Oh, you pass?  It's my
 5    turn then.
 6                 MR. WALKER:  Yes.
 7                 MS. PERALES:  I only have one
 8    question.
 9          CROSS EXAMINATION
10                 BY MS. PERALES:
11          Q     Mr. Knowles, you spoke a few moments
12    ago with Mr. Biggs about approval rates.
13          A     Mm-hmm.
14          Q     And, my question is whether you would
15    expect different form applications to have the
16    same approval rate across the Agency?
17          A     No, I would not.
18          Q     Why not?
19          A     Well, I think I said earlier,
20    comparing  the asylum adjudication to DACA is
21    really apples and oranges, elephants and zebras,
22    whatever.
23                 My reference in my testimony to what
24    I do is really to talk about what I do.  That's
25    what I know and what I do is very specific to
```

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 145

```
 1    asylum.
 2                 But, there are some things that are
 3    consistent throughout the Agency like security
 4    checks and, you know, performance measures and
 5    accountability and all of those things.
 6                 But, I would expect different approval
 7    rates because, and I think I alluded to this in
 8    some of my earlier statements, each form type is
 9    very specific.  The scope of it is very
10    different.
11                 So, you know, when you're adjudicating
12    a work permit, it's a work permit whether you're
13    adjudicating an asylum application, it's that.
14    And there are -- the scope is very different.
15                 For some cases, it's very limited.
16    And the threshold of -- that one has to meet is
17    different.
18                 So, you know, in DACA, my limited
19    understanding is, you know, I'm sure there's all
20    kinds of subcategories, but it's, you know, age,
21    time of entry, continuous presence and school
22    records and military records, et cetera, and
23    criminal history.
24                 It's a very limited scope because the
25    program itself is very limited.  It's not even a
```

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                    Page 146

1    status, it's a deferred action.  Their status is

2    still they're unlawfully here.

3              Prosecutorial action is deferred, as

4    I understand it from the public information.  I'm

5    not trying to redefine what DACA is.

6              And, they get a work permit for

7    dependency of that status.  But, it's not even a

8    status as we commonly understand it.  They're

9    still in unlawful status.

10             So, many applicants that I interview

11   are not in status, right, when they come to me.

12   Some are in status.

13             If I deny an applicant asylum who is

14   not in status, they're actually referred to the

15   immigration court.

16             If they are in status, they're just

17   denied asylum and they retain the status that

18   they have for as long as that status is valid.

19             So, approval rates, I mean, it's the

20   approval rate should be reflective of, as I said

21   earlier, to Mr. Biggs, did they qualify or didn't

22   they?  Right?  And, if all the people qualify,

23   well, you would expect there to be a high

24   approval rate.

25             If they didn't qualify, you would

1   expect it to be reflective of the caseload.

2              MS. PERALES:  Thank you.

3              I pass the witness.

4              MR. BIGGS:  I think I have one more or

5   maybe two --

6              MR. KNOWLES:  Sure.

7              MR. BIGGS:  -- depends on how we talk

8   to each other.

9        CROSS EXAMINATION

10             MR. BIGGS:  Is it your understanding

11  that once someone's DACA application is approved

12  that they maintain an unlawful presence in the

13  United States?

14             MS. PERALES:  Objection,

15  mischaracterizes the testimony.  Objection, calls

16  for a legal conclusion.

17             MR. BIGGS:  You can answer.

18             MR. KNOWLES:  Yes, I don't have

19  personal knowledge of that.  I am -- I would

20  probably say I'm speculating, I'm guessing based

21  on my knowledge as an asylum officer, when I

22  interview somebody, I ascertain, what is their

23  immigration status?  Right?

24             So, they're either, you know, entry

25  without inspection.  They're either a current,

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Michael Knowles on 08/02/2018                                    Page 151

```
 1   C E R T I F I C A T E

 2   This is to certify that the foregoing transcript

 3   Deposition of: Michael Knowles

 4   In the matter of: State of Texas v USA

 5   Before: US District Court

 6   Date: 08-02-18

 7   Place: Washington, DC

 8   were duly recorded and accurately transcribed

 9   under my direction; further, that said transcript

10   is a true and accurate record of the proceedings;

11   and that I am neither counsel for, related to,

12   nor employed by any of the parties to this action

13   in which this deposition was taken; and further

14   that I am not a relative nor an employee of any

15   of the parties nor counsel employed by the

16   parties, and I am not financially or otherwise

17   interested in the outcome of the action.

18

19   -----------------------

20   Jennifer Bernardi

21   Court Reporter

22

23

24

25
```

# DEF-INTERV.
# EX. 28

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
STATE OF TEXAS, et al.,          )
        Plaintiffs,              )
                                 )
VS.                              )
                                 )
UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
        Defendants,              )
                                 )
and                              )
                                 )
KARLA PEREZ, et al.,             )
                                 )
        Defendant-Intervenors.   )
```

**********************************************

ORAL DEPOSITION OF

DONALD R. DEERE, Ph.D.

JUNE 28, 2018

**********************************************

     ORAL DEPOSITION OF DONALD R. DEERE, Ph.D., produced
as a witness at the instance of the
Defendant-Intervenors, and duly sworn, was taken in the
above-styled and numbered cause on the 28th of June,
2018, from 10:15 a.m. to 12:45 p.m., before Kathleen
Casey Collins, CSR, in and for the State of Texas,
reported by machine shorthand, at the Office of the
Attorney General, 301 West Fifteenth Street, Seventh
Floor, Austin, Travis County, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

1  economics in most of your classes?

2      A.   Analysis of the labor market.  So labor

3  supply, labor demand, and labor market equilibrium.  I'd

4  say that pretty much covers it.

5      Q.   Okay.  Currently, what are -- what is your

6  occupation or what are you doing now?

7      A.   Well, I'm still an economist.  I work for

8  Welch Consulting.  I started there, actually, as an

9  employee in 2005.  I had worked for Welch Consulting as

10  a consultant for some years prior to that, and I retired

11  from the university and moved to Welch Consulting full

12  time at that time.  And what we do is economic and

13  statistical work, primary litigation support most often

14  in the labor employment sphere.

15      Q.   When you say "litigation support," what is --

16  what does that involve for you?

17      A.   Well, it involves both testifying and

18  consulting expert engagements.  So a testifying expert

19  like this where, you know, we write a report or

20  declaration, sometimes be deposed, rarely testify in

21  court.

22          Consulting engagements are where we're

23  engaged by law firms and/or companies directly to

24  analyze various aspects of their employment data and

25  provide them the information that they would -- that the

1    lawyers would then use to provide legal advice to their

2    clients.

3        Q.   What -- what did your focus -- what did your

4    research focus on when you were at Texas A&M?

5        A.   Primary labor economics.  You can see the list

6    of publications on the -- on the vita that are pretty

7    much -- not all of them, but most of them have something

8    to the with aspects of -- of the labor market.

9        Q.   Have you ever conducted research regarding the

10   effects of immigration on the labor market?

11       A.   No, I have not done that.

12       Q.   Have you ever written any articles regarding

13   the effects of immigration on the labor market?

14       A.   No.

15       Q.   Have you ever conducted research regarding the

16   effects of immigration on wages?

17       A.   No.

18       Q.   Have you ever written any article, even if it

19   was an op-ed or anything like that, regarding the

20   effects of immigration on wages?

21       A.   I don't think so, no.

22       Q.   Have you ever conducted research regarding the

23   interaction between immigration and public benefits?

24       A.   Well, other than what I've done in my

25   declaration with regard to the ACA, I would say no.

1    Q.   Have ever -- have you ever written any

2  articles regarding the interaction between immigration

3  and public benefits, so as opposed to research?

4    A.   I'm sorry.  Would you --

5    Q.   Sure.

6    A.   -- repeat.

7    Q.   No problem.

8    A.   I'm trying to distinguish that question from

9  the prior question.

10    Q.   The prior question, unless I misspoke, it

11  was -- I was asking about research.

12            But have you ever written anything

13  published, even if it was in a newspaper or a magazine,

14  regarding the interaction between immigration and public

15  benefits?

16    A.   And I would say the only thing I've written

17  about that would be the declaration that brings us here

18  today.

19    Q.   Well, we have that out today as exhibit --

20  Exhibit 1; and if we can go to the first page of this

21  exhibit, it says here in the body of this text,

22  "Plaintiff States disclose the following experts in

23  accordance with the Court's scheduling order," and your

24  name is listed here.

25            Do you understand that the parties

```
 1   called -- going by the name Plaintiff States are calling
 2   you as an expert witness?
 3        A.   Yes.
 4        Q.   Let's go to Page 4, again, the beginning of
 5   your supplemental declaration.
 6                  A quick question about Welch Consulting
 7   itself more broadly.  Is that -- where is that based?
 8        A.   It's based in Bryan, Texas.
 9        Q.   So is that -- is that where you -- I imagine
10   you lived in the area already from working at A&M?
11        A.   I live in College Station, which is right next
12   to Bryan, yes.
13        Q.   Okay.  So you didn't have to go too far.
14                  Okay.  What kind of research has Welch
15   Consulting done around the issue of immigration?
16        A.   I don't know that it has.  I mean, you know,
17   again, Welch Consulting is a -- we're engaged by clients
18   in primarily litigation-support-type roles.  And so
19   maybe there's been something involving immigration that
20   someone in the firm -- because we have offices in
21   California, Los Angeles, and D.C. as well, that someone
22   else has worked on, but I can't immediately call that to
23   mind.
24        Q.   Are there any -- what are the major areas of
25   the Texas Welch Consulting in terms of their -- their
```

1   advice and research?

2        A.   It's -- it's typically labor employment.   I

3   mean, we really have two areas -- well, three areas

4   about which we are engaged most often.

5                One is wage and hour type of litigation.

6   So it's allegations about violations of the FLSA or

7   State wage and hour laws and the implications of that.

8   We typically analyze data to assist in those cases.

9                The second type of cases are

10  discrimination cases like Title VII and/or EEOC or LLFC

11  agency actions, or sometimes they're State actions as

12  well, that are involving claims of discrimination based

13  on protected characteristics in employment of either

14  pay, promotion, hiring, or termination.

15               And then a third area would be damages in

16  wrongful termination or personal injury cases where

17  we're making economic damage calculations, typically for

18  individuals who are claiming either they were hurt or

19  they were fired inappropriately.

20       Q.   Well, I don't believe I've brought it with me,

21  but I wanted to ask you about your recent testimony

22  history.   You said that -- that Welch does some

23  discrimination cases.

24               Let's go to the back -- the very last

25  page of Exhibit 1.  Do any of these cases deal with --

 1       A.   Yes.

 2       Q.   When did you prepare your first declaration?

 3       A.   Well, it -- I would say April 27th, 2018, and

 4  obviously some days before that.  I didn't write it all

 5  in one day.

 6       Q.   Sure.  When did you prepare your supplemental

 7  declaration?

 8       A.   June 14th, 2018, and some of the days leading

 9  up to that.

10       Q.   Why did you prepare your supplemental

11  declaration?

12            MR. DISHER:  And I'll just instruct the

13  witness you can answer to the extent you can without

14  disclosing conversations you may have had with counsel

15  for this case.  Go ahead and answer.

16       A.   Well, I -- I thought a little more about the

17  issue of immigration and its impact on the labor market

18  and DACA recipients specifically and impact on the

19  market, because the initial declaration was focused

20  primarily, if not solely, on the interaction of DACA and

21  the ACA; and really the -- there are broader aspects to

22  the implications for the labor market of the DACA

23  recipients and their labor supply or their work status,

24  and that -- so I wanted to expand the declaration and

25  cover what is really sort of the broader aspects of the

1    impact of that impact.

2         Q.    Did you do any additional quantitative

3    analysis or research --

4         A.    Yes.

5         Q.    -- for that question?

6         A.    Yes.

7         Q.    Okay.  And what -- what was that?

8         A.    Well, as I note in the -- my supplemental

9    declaration, there's a -- there's a -- there is a pretty

10   big literature in economics about the impacts of

11   immigration generally on the labor market; and I

12   reviewed certainly not all but some of that literature,

13   a couple of pieces of which I cited in my supplemental

14   declaration.

15        Q.    In the supplemental declaration, which is

16   Exhibit 1, could we go to Page 7, and if you look at

17   Paragraph 23, the sentence that starts with "Economic

18   theory implies," if you can review this paragraph, and

19   take your time answering and reviewing.

20              Is this the paragraph that you inserted

21   with regard to looking at the issue of immigration and

22   its effect on the labor market?

23        A.    Well, this is a paragraph that I inserted in

24   the supplemental declaration, and it does refer to the

25   issue of the impact of immigration on the labor market.

```
 1        Q.    Sure thing.

 2              Can we look at 221, which is in the

 3   middle of Page 8.  There's a paragraph there that starts

 4   with the word "thus" in the middle.  Do you see that?

 5        A.    Yes.

 6        Q.    And it says, "Thus, many small businesses are

 7   exempt from the employer penalty because they do not

 8   reach the minimum employee threshold."

 9              Do you agree with that?

10        A.    Yes.  The law is the law.

11        Q.    Okay.  Therefore, the scenario in your

12   declaration would not apply to small businesses with

13   fewer than 50 employees.  Right?

14        A.    That is correct.  I think -- I think

15   technically the 50 is sort of an average.  You know, if

16   you were 49 in months and 51 in other months, there's --

17   there are rules for how to decide.  But, yeah,

18   basically, small employers it wouldn't apply.

19        Q.    Okay.  So based on -- what you were talking

20   about is there could be instances where a company has

21   seasonal workers and regardless of the number of those

22   workers, if they don't meet a certain number of hours,

23   then they might not qualify for the -- for the mandate

24   either or the penalty?

25        A.    I don't know what the rules are in that case.
```

1   But, again, there are clearly smaller employers, however

2   defined, to which this does not apply.  I agree with

3   that.  To which the ACA penalty interaction part of my

4   declaration does not apply.

5       Q.   Okay.  Well, let's look back at your

6   declaration and look at -- so this is going back to

7   Exhibit 1, and look at Paragraph 7.  You say that

8   individuals with an EAD are not eligible for premium

9   subsidies.  Right?

10      A.   Yes.

11      Q.   Isn't it true that you assume that firms have

12  perfect knowledge or complete information regarding the

13  laws and regulations associated with the Affordable Care

14  Act penalty?

15                MR. DISHER:   Objection, vague.

16      A.   I wouldn't say complete and perfect

17  information, no.

18      Q.   Did you do any analysis of when businesses

19  have knowledge of how the employer mandate or employer

20  penalty will apply?

21      A.   No.

22      Q.   Did you consult any studies or surveys that

23  would discuss a firm's knowledge or possession of

24  information regarding the ACA employer penalty?

25      A.   No.

1      Q.   For your scenario in the declaration, you also

2  assume that employers are not considering other factors

3  such as training costs of U.S. citizen workers or other,

4  as you say, lawfully present workers versus DACA

5  recipients.  Right?

6               MR. DISHER:  I'm sorry.  Could you repeat

7  that question?

8               MR. HERRERA:  Sure.

9      Q.   For -- looking at the scenario you have in

10  your declaration, the -- of Worker A versus Worker B,

11  you assume that employers are not considering other

12  factors such as training costs of -- of lawfully present

13  workers versus DACA recipient workers.  Right?

14               MR. DISHER:  Objection, vague.

15  Objection --

16      A.   I wouldn't --

17               MR. DISHER:  -- mischaracterizes his

18  testimony.

19               Go ahead.

20      A.   I wouldn't agree with that.  I'm assuming that

21  the employer is viewing the two workers as close

22  substitutes, that they might both need training or they

23  would both need training.  I mean, they're --

24      Q.   Okay.  So if -- going back to the knowledge

25  question, if you did no analysis or examined no other

```
 1   research regarding a firm's knowledge of information
 2   regarding the employer penalty, then how do you know how
 3   that factor -- how that factors into your scenario?
 4               MR. DISHER:  Objection, mischaracterizes
 5   testimony.
 6        A.   Well, I mean, certainly employers are aware of
 7   the ACA.   You're talking about the largest employers
 8   here that are presumably the most sophisticated and have
 9   the most resources and have the most at stake if they
10   screw up with regard to employment law.   So there's an
11   incentive for employers to understand the law.
12               So I -- you know, I don't know that --
13   I'm certainly not assuming they have perfect knowledge.
14   I think it's sort of silly to assume they're completely
15   unaware of any aspects of the ACA whatsoever.   So maybe
16   it's somewhere in the middle.
17        Q.   Okay.   And when you say -- would it be fair to
18   say that you assumed for the purposes of your report
19   that employers are aware of the fact that employees with
20   EAD are not eligible for premium subsidies?
21               MR. DISHER:  Objection, vague.
22        A.   Well, they're at least differentially
23   eligible, less likely to get.   Yeah, that would be a --
24   a part of it.
25        Q.   Okay.  Would it be fair to say that you
```

```
 1   criteria, meaning that they're less likely to get the --
 2   the premium subsidy?
 3       A.   I don't know that it matters why they view
 4   them as -- as less expensive.  It matters that they view
 5   them as less expensive because of the ACA, whether it's
 6   they would get a -- they would be less likely to claim
 7   the credit or they would be less likely to be eligible
 8   for the credit or whatever.  It really doesn't matter.
 9   What matters is that the employer -- you've got two
10   choices, "A" and "B," and they're otherwise the same
11   except "A" costs more because of the ACA.  I'm going
12   to choose "B."  That's what is assumed in that
13   scenario.
14       Q.   Okay.  So you're saying that -- that they --
15   that otherwise they would be the same.  So you're
16   controlling in this scenario for other cost factors such
17   as training.  Right?
18                   MR. DISHER:  Objection, vague.
19       A.   Well, as I said, it's sort of all other things
20   equal is the -- is the theoretical point that the
21   example is talking about, yes.
22       Q.   Okay.  And all other things being equal would
23   include something like training costs?
24       A.   Yes.
25       Q.   Okay.  Would it be fair -- would it be correct
```

1   to say that you assume that employers are aware that a

2   job applicant has an EAD authorizing employment before

3   making the hiring decision?

4              MR. DISHER:  Objection, asked and

5   answered.  Objection, vague.

6        A.   Well, I don't know immigration employment law.

7   But I know that you've got to have I-9 information, and

8   I would think that the EAD would be shown at the I-9

9   stage.  Now, whether that's post offer or not, I'm not

10  completely sure.

11       Q.   Okay.

12       A.   But, again, the assumption here -- as I said,

13  the key assumption is that the employer views the DACA

14  recipient as cheaper, other things equal.  And if other

15  things aren't equal, maybe training is a little bit more

16  expensive for the DACA recipient, but maybe the subsidy

17  more than offsets that so...

18              But the discussion in the supplement --

19  supplemental declaration is other things equal, the

20  employer views the DACA recipient, who he knows the DACA

21  recipient is more expensive because of the ACA relative

22  to the lawfully present individual, who they apparently

23  know is lawfully present, and that's the comparison.

24       Q.   Sure.  And I get the -- I get the point of

25  the -- of the comparison and what -- what your analysis

1   has concluded.  But I'm just trying to get at what the

2   decision-making is here for an employer for -- so in

3   your example, the employer, when making the decision,

4   this is the -- you talked about immigration law and I-9.

5   You're assuming here that the employer already knows

6   that the applicant has an EAD?

7          A.   As I just said, the employer has two options.

8   One is a DACA recipient.  They know that.  One is

9   lawfully present.  They know that.  And they view the

10  DACA recipient as cheaper because of the ACA regulations

11  and law, period.  That's the -- the key assumption for

12  the hypothetical in the supplemental declaration.

13               MR. HERRERA:  Okay.  Objection,

14  nonresponsive.

15      Q.   So just -- just answering that specific

16  question, you're -- you're assuming that the employer

17  knows that that person has an EAD before making the

18  hiring decision?

19               MR. DISHER:  Objection, asked and

20  answered.

21      A.   I said they knew they were a DACA recipient

22  so -- and -- and have an EAD.

23      Q.   Okay.  What other assumptions did you make for

24  the purpose of this scenario?

25      A.   None.

1        Q.    Okay.   Let's look at Page 9 of Exhibit 4 --
2   or, rather, Exhibit 3, and so that's the Page 9 that's
3   at the top right.
4              In the first full paragraph there that
5   begins with "Employee demographics," there is a numbered
6   list before which the article says, "Certain kinds of
7   employees will not trigger the penalty, including," and
8   then so there's that list.
9              So "Certain kinds of employees will not
10  trigger the penalty, including, No. 1, highly
11  compensated employees (i.e., those earning at least
12  400 percent of the applicable federal poverty level),
13  who are not eligible for subsidies in any event."
14              Do you agree with that?
15              MR. DISHER:   Objection to the extent it
16  calls for a legal conclusion.
17       A.    I mean, my understanding is that individuals
18  between 104 percent -- 100 percent and 400 percent of
19  the poverty level are the ones that are eligible.   Below
20  100 I think would be No. 3, Medicaid.   And above 400
21  would be No. 1, highly compensated.   So that is my
22  understanding, yes.
23       Q.    Okay.   And do you agree that employees covered
24  by a policy owned by a parent or a spouse will not
25  trigger the penalty?

```
 1                    MR. DISHER:   Same objection.
 2       A.   If that's part of the law, I agree.
 3       Q.   And do you agree that employees eligible for
 4  Medicaid coverage, which are not eligible for the
 5  subsidized policies, would not trigger the penalty?
 6                    MR. DISHER:   Same objection.
 7       A.   Same answer.  I said that already.  Yes.
 8       Q.   And slightly -- slightly different.  Would you
 9  agree that employees eligible for Medicare coverage
10  would not trigger the penalty?
11                    MR. DISHER:   Objection, calls for a legal
12  conclusion.
13       A.   And my answer is if that's what the law says,
14  I'll agree.
15       Q.   And would you agree that those who choose to
16  be uninsured do not trigger the -- the penalty?
17                    MR. DISHER:   Same objection.
18       A.   I agree with whatever the law says.
19       Q.   Did you attempt to make any calculation of
20  U.S. citizens or other lawful residents in the
21  United States who currently match at least one of the
22  criteria that we just went over from Page 9 of
23  Exhibit 3?
24       A.   No.
25       Q.   Conversely, you don't know how many U.S.
```

1    citizens in the U.S. would meet none of the criteria in
2    that list on Page 9.   Right?
3         A.    No.
4         Q.    Therefore, isn't it true that you don't know
5    how many U.S. citizens in the U.S. there are who would
6    trigger the penalty?
7         A.    I'm not sure what "would trigger the penalty"
8    means.   But I do know that, you know, there's -- in the
9    reference somewhere, 8.7 million are the number who
10   actually receive premium tax credits.   So it's at least
11   that many.
12        Q.    Okay.   Well, let's -- before we go -- before
13   we look at that figure, you -- it's true that you don't
14   know how many U.S. citizens or other lawful residents in
15   the United States there are who would trigger -- trigger
16   the penalty based on this list of criteria on Page 9?
17              MR. DISHER:   Objection, vague.
18        A.    I do not.
19        Q.    Did you conduct any analysis of employer
20   awareness of eligibility of employees for premium
21   subsidies?
22        A.    No.
23        Q.    And based on your answer earlier about the
24   I-9, is it correct to say you did not research whether
25   an individual presents I-9 documentation before or after

1    hiring?

2            MR. DISHER:   Objection, vague.

3        A.    I -- I don't know how that works.   I'm not

4    sure what the law is there so...

5        Q.   Okay.   So you didn't --

6        A.   I didn't -- I'm sorry.   What was your --

7        Q.   Sure.

8        A.   I did not do any research to answer that

9    question either.

10       Q.   Okay.   Well, let's look at -- and you brought

11   up a figure a second ago.   Let's look back at your

12   declaration on Page 3.   So that's Exhibit 1, Page 3.

13            In the footnote of Page 3 of your

14   declaration, is that the 8.7 million number you were

15   referring to?

16       A.   In Footnote 4 on Page 3 of Exhibit 1, yes.

17       Q.   Okay.   And the footnote belongs to a

18   paragraph, Paragraph 8, which says that the resulting

19   estimates from a -- from the CBO study that you cite,

20   the resulting estimates are that 64,000,000 -- let's go

21   back and read the whole paragraph.

22            "The Congressional Budget Office and the

23   Joint Committee On Taxation in March 2012 estimated the

24   impact of the ACA on nonelderly workers and their

25   families who were projected to receive employment-based

1   getting a subsidy or if it's some subset of the

2   8.7 million.  But with that caveat, yes, 8.7 million is

3   the number who were getting a subsidy in February of

4   2017.

5                MR. DISHER:  Can we take a 10-minute

6   break?

7                MR. HERRERA:  Sure.

8                   (RECESS TAKEN)

9        Q.   (BY MR. HERRERA) All right.  Let's look at

10  your declaration again, and keep in mind the whole

11  declaration, and I'm really asking for your -- your

12  opinions in this case, but I want to give you a certain

13  place on Page 8 of your declaration just to -- to kind

14  of guide your thinking.  This is where your conclusions

15  are.  This is Exhibit 1, the page numbered eight.

16                And your conclusion in Paragraph 26 is

17  "This result will have adverse consequences for certain

18  U.S. citizens because some employers will find it

19  financially advantageous to hire an immigrant who is not

20  lawfully present and who is authorized to work in the

21  U.S. instead of an equally productive U.S. citizen."

22                Isn't it true that you do not give an

23  estimate of how many U.S. citizen workers would be

24  displaced by DACA workers in the situation that you

25  describe in your declaration?

1    A.    I do not give an estimate of the number.   That

2 is correct.

3    Q.    Okay.   It is true that you do not consider the

4 income levels of DACA recipients.   Correct?

5                MR. DISHER:   Objection, vague.

6    A.    I -- there's nothing in my declaration that

7 makes reference to the income levels of DACA recipients.

8 That's true.

9    Q.    Do you plan to -- well, we'll come back.

10                You don't know how many DACA recipients

11 have received bachelor degrees.   Right?

12    A.    I do not.

13    Q.    You don't know how many DACA recipients have

14 received doctorate-level degrees.   Right?

15    A.    I do not.

16    Q.    You don't know how many DACA recipients have

17 received law degrees.   Right?

18    A.    I do not.

19    Q.    And got forbid, we -- we don't need anymore

20 lawyers.

21                But did you examine any factors relating

22 to the earning potential of DACA recipients for your

23 analysis?

24                MR. DISHER:   Objection, vague.

25    A.    Other than the illustrative calculations about

1  what happens at various pay levels for the two examples

2  I illustrate.  Now, I make no reference to earnings

3  levels.

4       Q.  And that would be -- and, also, that would

5  include no analysis of what a DACA recipient who earns

6  an advanced degree might make in the future.  Correct?

7       A.  I did not look at that, no.

8       Q.  Okay.  Now, keeping in mind your scenario

9  again of Worker A versus Worker B or a U.S. citizen or

10  lawfully present worker versus a DACA recipient, as you

11  describe it, if a DACA recipient earns a certain income

12  level, then wouldn't the U.S. citizen counterpart

13  applicant in your scenario also be making that income

14  level?

15              MR. DISHER:  Objection, vague.

16       Q.  Or -- and I'll phrase it differently.

17              Going to your scenario again, if a DACA

18  recipient is being considered for earning a certain

19  income level in that -- in that job application, then

20  wouldn't the U.S. citizen counterpart job applicant in

21  your scenario also be offered that same income level?

22              MR. DISHER:  Same objection.

23       A.  Well, let me -- let me answer it this way:  I

24  think what you're saying if -- in my scenario here, I've

25  got a DACA recipient and a lawfully present individual

1   Those factors relevant to the position for which they've

2   applied, period.

3       Q.   Do employers always stick to factors which are

4   relevant to the job?

5               MR. DISHER:  Objection, calls for

6   speculation.  Objection, outside the scope of his

7   testimony.

8       A.   I don't know.

9       Q.   You did no analysis of how ethnic or racial

10  discrimination could factor into an employer's

11  decision-making when considering a U.S. citizen versus a

12  DACA recipient.  Right?

13              MR. DISHER:  Objection -- go ahead and

14  answer the question.

15              Objection, calls for an assumption.

16  There we go.  Thank you.  Go right ahead.

17      A.   I did not consider race, ethnicity, gender, or

18  any other characteristic irrelevant to the position for

19  which people have applied in this -- in my analysis.

20      Q.   Going back -- okay.  So a little -- a second

21  ago -- a few minutes ago, we got a little sidetracked.

22  We were talking about income or -- or possible earnings.

23              So if -- if a -- so going back to your

24  scenario again, if a DACA recipient is being considered

25  for a job that will make a certain level of income, then

```
 1    in your scenario the U.S. citizen counterpart is being

 2    considered for that same wage or income.  Right?

 3         A.   Yes.

 4         Q.   Okay.  And if the U.S. citizen applicant is

 5    being considered for an income level or a wage that

 6    makes that applicant ineligible for the subsidy, then

 7    the employer would not choose the DACA recipient

 8    applicant -- or, rather, then the employer would not

 9    choose the U.S. citizen applicant because of fear of

10    incurring the ACA penalty.  Right?

11                   MR. DISHER:  Objection, vague.

12         A.   I think you said that backwards.

13         Q.   Okay.  I think I did.

14         A.   So my answer is no, I disagree.

15         Q.   Okay.  Okay.  Fair enough.

16              Okay.  So if the U.S. citizen counterpart

17    applicant is being considered for a certain wage and

18    that makes that applicant ineligible for the subsidy,

19    then the employer would not choose the DACA recipient

20    applicant over the U.S. citizen applicant because of

21    fear of incurring the ACA penalty.  Right?

22         A.   That makes sense.  I mean, again, yeah.

23    Income over 400 -- so $150,000-a-year job, the ACA

24    penalty is not going to be a deciding factor.  I would

25    agree with that.
```

1     Q.   Okay.  And because you did not consider the

2   income levels or income earning potential of DACA

3   recipients, you have no way of knowing how many U.S.

4   citizen applicants in your scenario would lose out on

5   job opportunities to DACA recipient applicants, do you?

6              MR. DISHER:  Objection, vague.

7     A.   I don't know the number.  I was not asked to

8   provide the number.

9     Q.   All right.  Let's look at -- let's go back to

10  your declaration and look at the paragraph that we

11  were -- we looked at kind of earlier on today,

12  Paragraph 23, which is on Page 7 of your supplemental

13  declaration.  So you've already reviewed this and we

14  went over it a little bit, and so keep this in mind.

15  I'm going to show you something else.

16              (Exhibit No. 5 marked)

17     Q.   So I'm handing you what is marked as

18  Exhibit 5.  And when you're discussing the issue in your

19  declaration -- the issue of the interaction of the DHS

20  Memorandum and the ACA on the labor market, you cite at

21  some point to this article, right, that article that is

22  Exhibit 5?

23     A.   Well, not exactly.  This article appears to be

24  the working-paper version of what was eventually

25  published.  They were the same name.  But I suspect it's

```
 1   equal.  Other" -- "Although the theoretical implication
 2   that, other things being equal, immigration reduces the
 3   wages of native workers..."
 4             So did you do any analysis of whether
 5   that theoretical implication has any bearing on the
 6   current reality in the United States?
 7                  MR. DISHER:  Objection, vague.
 8      A.   To the extent that economic theory is useful
 9   in predicting what happens, it does have bearing on
10   what's happening.
11      Q.   Okay.  But for -- for this declaration, you
12   didn't do any calculations about the degree to which
13   wages would be reduced because of immigration?
14      A.   I did not make a calculation about the
15   magnitude, no.  I would -- that's why I cited the papers
16   by Borjas and Card because, you know, they talk about
17   theirs and many other studies that try to assess the
18   implications of immigration on native wages for -- to
19   get -- you know, to say -- to get an estimate of
20   magnitudes.
21      Q.   Okay.  And you say -- but Borjas says that the
22   impact of immigration on the wages of native workers
23   seems to cluster around zero.  Right?
24                  MR. DISHER:  Objection, misstates the
25   document.
```

1    been difficult to find very large effects on wages; and

2    that's, I believe, an accurate assessment of what the

3    literature says.

4                    MS. PERALES:  If I can take a second off

5    the record.

6                    MR. DISHER:  Yeah.

7                    (DISCUSSION OFF THE RECORD)

8                    MR. HERRERA:  Back on.  Bear with me for

9    one minute.

10      Q.    (BY MR. HERRERA) Would you -- you don't know

11   how many jobs will be denied to United States citizens

12   because of the scenario that you describe in your

13   declaration, do you?

14                    MR. DISHER:  Objection, vague.

15      A.    Well, it's not just "will be."  I suppose it's

16   "has been" -- "have been."  But I do not know the

17   number, no.

18      Q.    Okay.  Would it be correct to say that under

19   the compensation principle, Texas overall could be

20   better off as a result of the work authorization of DACA

21   recipients?

22                    MR. DISHER:  Objection, vague.

23   Objection, outside the scope of his testimony.

24      A.    Possible -- well, Texas overall, but I don't

25   understand what "Texas overall better off" means.  What

1 opportunities.  Right?

2     A.   Well, sure, they have other opportunities; but

3 it may -- in general, those opportunities are inferior

4 to the one that they lost out on by the fact that it

5 wasn't their first choice.

6     Q.   Let's go to Paragraph 25 of your declaration.

7 You say in the second sentence on that paragraph -- in

8 that paragraph, "The interplay between the DHS

9 Memorandum and the ACA makes some U.S. citizens more

10 expensive to hire than equally productive immigrants who

11 are not lawfully present."

12          You cannot say how many U.S. citizens are

13 more expensive to hire, can you?

14     A.   Well, I don't know that number.

15     Q.   Because you made a number of assumptions, the

16 ones we've already discussed, can you calculate the

17 actual cost of equally productive U.S. citizens and DACA

18 recipients in the situation you described?

19          MR. DISHER:  Objection, misstates the

20 testimony.  Objection, vague.

21     A.   I don't understand that question.

22     Q.   Okay.  So you -- you made a number of

23 assumptions including -- or you held a number of things

24 equal, right, in your scenario?

25     A.   Okay.

1      Q.    However, in many instances, job applicants are

2   not equal in that regard or in that many regards.

3   Right?

4              MR. DISHER:   Objection, vague.

5      A.    Not all job applicants are going to be

6   identical.  That's correct.

7      Q.    Okay.  So you don't always know the actual

8   cost difference between a U.S. citizen worker and a DACA

9   recipient applying for the same job.  Right?

10             MR. DISHER:   Objection, vague.

11     A.    Well, the 3400 -- whatever, $3400-plus

12  shared-responsibility payment, you know that.  So --

13     Q.    Right.

14     A.    -- I'm not sure what your question is.

15     Q.    You said that you examined the declarations of

16  other experts in this case.  Right?

17     A.    Yes.

18     Q.    Okay.  Which ones did you examine?

19     A.    Dr. Ray Perryman and doctor -- I think it's

20  Leighton Ku, K-u.

21             MR. HERRERA:   Can we take a break now?

22             MR. DISHER:   Sure.

23                 (RECESS TAKEN)

24             MR. HERRERA:   Okay.  Back on the record.

25     Q.    (BY MR. HERRERA) Dr. Deere, did you do any

 1  analysis of whether firms with 50 or more employees

 2  offer health insurance to all of their workers?

 3          MR. DISHER:  Objection, vague.

 4     A.   No, I did not.

 5          MR. HERRERA:  The intervenors pass the

 6  witness.

 7                    EXAMINATION

 8  BY MS. GREGORY:

 9     Q.   Good afternoon.  My name is Katherine Gregory.

10  I'm a Deputy Attorney General with the New Jersey Office

11  of Attorney General, and I'm representing the

12  defendant-intervenor the State of New Jersey in this

13  case.

14          I just have a few more questions for you.

15  I'll try to keep it brief; and I'm going to try not to

16  touch on any areas that we've already hit, but I can't

17  make any promises.

18          Just talking about your two declarations

19  generally, did you review any research or documentation

20  in addition to the specific citations in your

21  declaration?  So was there anything not cited that you

22  reviewed in preparing those declarations?

23     A.   There's some other papers that are probably

24  generally cited by either Borjas or Card that I did

25  cite, more of that -- more of that immigration

1        A.    I think I looked at the Long -- it's, you

2    know, a brief writeup of his that's cited by, I think,

3    Perryman and Ku.  They talk -- you know, that's where

4    the 91 percent employed number comes from.  You know,

5    it's got a little bit of info about who the DACA

6    recipients are.  I looked at that.

7        Q.    Did you perform any research in preparing

8    these declarations relating to Texas businesses?

9                    MR. DISHER:  Objection, vague.

10        A.    I looked at what the current labor force

11    numbers are for Texas, which would be generally employed

12    by Texas businesses; but otherwise, no.

13        Q.    Did you talk to any hiring managers or human

14    resource representatives in preparing these

15    declarations?

16        A.    No.

17        Q.    Do you know how many Texas employers have 50

18    or more full-time employees?

19        A.    No.

20        Q.    Do you know how many DACA recipients are

21    employed in companies with 50 or more full-time

22    employees?

23        A.    No.

24        Q.    Are all Texas residents, DACA recipients or

25    citizens required to purchase health insurance?

```
 1                    MR. DISHER:  Objection to the extent it

 2   calls for a legal conclusion.

 3        A.   Well, you know, I thought the answer to the

 4   question was sort of yes in light of the ACA, but then I

 5   think something recently was -- the individual mandate

 6   was rescinded.  I'm not -- I'm not sure I know how to

 7   answer that question.  I kind of would have said yes,

 8   but now I'm saying maybe it's no.

 9        Q.   That's fine.  Do you know how many Texas

10   residents are exempt from the coverage requirements of

11   the ACA?

12                    MR. DISHER:  Same objection.

13        A.   No.

14                    MS. GREGORY:  Do you have a copy of the

15   supplemental declaration I could look at?

16                    MS. PERALES:  Uh-huh.  Is that Deere 2 or

17   Deere 1?

18                    MR. DISHER:  Deere 1.

19                    MS. GREGORY:  It's right there.  I'm

20   sorry.

21                    MS. PERALES:  I'll give it to you.  I'll

22   give it to you.

23                    MS. GREGORY:  I promise I won't --

24                    MS. PERALES:  Don't worry.

25        Q.   (BY MS. GREGORY) Okay.  If you could pull out
```

1    Deere 1 and turn to Page 5.  Okay.  Paragraph 13.  We

2    talked a little bit about all other things equal, that

3    term you use in Paragraph 13, "other things equal."

4                   Can you describe some of the

5    characteristics or traits that would be included in

6    "other things equal"?  You mentioned relevant

7    characteristics to the job, but could you just describe

8    what some of those could entail?

9                   MR. DISHER:  Objection, asked and

10   answered.

11        A.   Well, the sentence here in which that resides

12   is "As a threshold matter, the addition of some 694,000

13   work-eligible individuals nationwide, with 114,000 of

14   these in Texas, will, other things equal, put downward

15   pressure on wages and make it more difficult for some

16   U.S. citizens to find employment."

17                   So there the "other things" is really

18   talking about overall market demand conditions.  In

19   other words, this factor alone, not changing anything

20   else about the economy, will have this kind of effect.

21   It will put downward pressure on wages and make it more

22   difficult.

23                   But does that mean if you go out and you

24   look over a period of time during which DACA recipients

25   expanded and lots of other things were going on, could

1   you look at, you know, January of one year and December

2   the next and subtract the employment difference and say,

3   ah, that's the effect of whatever happened in DACA that

4   year, no, you couldn't because there's other things

5   going on, changing.

6          And so that's -- that's really what --

7   it's holding other things that would affect wages and

8   employment in the U.S. and in Texas constant.

9       Q.   And what are -- can you give an example of

10   some of those other things?

11      A.   The general level of demand from, you know,

12   other countries for U.S. exports; the -- the general

13   level of consumer spending in the U.S.; the birth rate;

14   the other population sources in the U.S., the other

15   sources of immigration.  Holding all of that constant.

16      Q.   Okay.  And what do you mean when you say

17   "work-eligible" in this paragraph?

18      A.   Having -- in this particular, I mean holding

19   an EAD because I'm talking about the DACA recipients.

20      Q.   Okay.  Does "work-eligible" mean all of those

21   individuals are employed?

22      A.   No.

23      Q.   Does it mean that they're all seeking

24   employment?

25      A.   No.

1    Q.   So if -- so you can't say how many of those

2  are seeking employment or employed?

3    A.   Well, according to the Wong study about

4  91 percent employed.  You can take that unemployment

5  rate and then add that in.  So, you know, 90-plus

6  percent would be in the labor force if you take the Wong

7  study as a source.

8    Q.   Okay.  Did you take that as a source in

9  drafting this declaration?

10    A.   No.

11    Q.   In Paragraph 13, you also say it would make --

12  quote, make it more difficult for some U.S. citizens to

13  find employment, end quote.   How many is some?

14    A.   More than one -- more than zero.

15    Q.   Okay.  But you can't give a more exact number

16  than that?

17    A.   I've not been asked to calculate that number.

18    Q.   Okay.

19    A.   I mean, you could -- think of the following

20  mental experiment.  Suppose all 694,000 work-eligible

21  individuals disappeared, including the -- whatever

22  percentage of them were actually employed.  What would

23  then happen?  Would every single employer stay exactly

24  where they are, or would they hire some more people?

25  And if they hired some more people, well, that might

```
 1   best worker they can.  So I'm not sure how to answer

 2   that.

 3        Q.   Okay.  So would salary history be a relevant

 4   aspect to an employer?

 5        A.   The salary history of the two individuals who

 6   applied?

 7        Q.   Yes.

 8        A.   It might well be; but as you may know, in some

 9   jurisdictions it's illegal for the employers to ask

10   about that now.

11        Q.   Is it illegal in Texas?

12        A.   No.

13        Q.   What about salary requirements of the two

14   individuals?  Would that be a relevant aspect?

15        A.   It could be, and it is legal to ask about that

16   as far as I know.

17        Q.   Okay.  How many employers in Texas base hiring

18   decisions entirely on costs associated with the ACA?

19        A.   I don't know.

20        Q.   Are those careers for which it's difficult for

21   employers to find U.S. citizens willing to undertake

22   that labor?

23        A.   I don't know.

24        Q.   Are there costs associated with replacing

25   employees who leave a business?
```

1      Q.   If DACA is enjoined in July of 2018, how many
2  U.S. citizens will be hired by Texas businesses?
3      A.   Well, I don't know what "enjoined" would mean,
4  first of all.  Does that mean that those individuals
5  would no longer be able to work?  But let's assume the
6  answer is yes.  It's equivalent to what I said a minute
7  ago about if all 680,000 just disappeared.  I would
8  assume that there would be some hiring to replace them.
9  I do not know the number.  I have not been asked to
10 calculate that.
11     Q.   If DACA were enjoined in July of 2018 and
12 hundreds of thousands of DACA recipients suddenly lost
13 the ability to work, how would Texas businesses be
14 affected?
15               MR. DISHER:  Objection, vague.
16 Objection, outside the scope of his testimony.
17     A.   Some of them would have to -- would be without
18 some employees that they previously had and would have
19 to go from there, either hiring other employees or
20 making other adjustments.
21     Q.   What kinds of other adjustments?
22               MR. DISHER:  Same objection.
23     A.   Cutting back on the output they produce or the
24 level of service they provide.  It depends -- it depends
25 on what industry they're in.

```
 1                    BROWNSVILLE DIVISION
 2  STATE OF TEXAS, et al.,              )
            Plaintiffs,                  )
 3                                       )
    VS.                                  )
 4                                       )
    UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
 5          Defendants,                  )
                                         )
 6  and                                  )
                                         )
 7  KARLA PEREZ, et al.,                 )
                                         )
 8          Defendant-Intervenors.   )
 9
                   REPORTER'S CERTIFICATE
10          DEPOSITION OF DONALD R. DEERE, Ph.D.
                     JUNE 28, 2018
11
12       I, Kathleen Casey Collins, Certified Shorthand
13  Reporter in and for the State of Texas, hereby certify
14  to the following:
15       That the witness, DONALD R. DEERE, Ph.D., was duly
16  sworn by the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19       That the deposition transcript was submitted on
20  _____, ____, to the witness or to the attorney for
21  the witness for examination, signature and return to me
22  by _____, _____;
23       That pursuant to information given to the
24  deposition officer at the time said testimony was
25  taken, the following includes counsel for all parties
```

```
 1   of record:
 2       Mr. Todd L. Disher, Attorney for the Plaintiffs
         Mr. Ernest Herrera and Ms. Nina Perales, Attorneys
 3           for Defendant-Intervenors
         Mr. Daniel David Hu, Attorney for Defendants
 4       Ms. Katherine Gregory, Attorney for New Jersey
             Office of Attorney General
 5
 6       I further certify that I am neither counsel for,
 7   related to, nor employed by any of the parties or
 8   attorneys in the action in which this proceeding was
 9   taken, and further that I am not financially or
10   otherwise interested in the outcome of the acti
11       Certified to by me this _____ day of June
12   2018.
13                    _____
                      KATHLEEN CASEY COLLINS
14                    Texas CSR NO. 2018
                      Certificate Expires 12/31/18
15                    Ken Owen & Associates
                      Firm Certificate No. 115
16                    801 West Avenue
                      Austin, Texas  78701
17                    (512) 472-0880
18
19
20
21
22
23
24
25
```

# DEF-INTERV.
# EX. 29

                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
                          BROWNSVILLE DIVISION

STATE OF TEXAS, et al.,          )
        Plaintiffs,              )
                                 )
VS.                              )
                                 )
UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
        Defendants,              )
                                 )
and                              )
                                 )
KARLA PEREZ, et al.,             )
                                 )
        Defendant-Intervenors.   )
        *********************************************
                        ORAL DEPOSITION OF
                        LLOYD POTTER, Ph.D.
                          JUNE 27, 2018
        *********************************************

        ORAL DEPOSITION OF LLOYD POTTER, Ph.D., produced as
a witness at the instance of the Defendant-Intervenors,
and duly sworn, was taken in the above-styled and
numbered cause on the 27th of June, 2018, from 9:59 a.m.
to 1:46 p.m., before Kathleen Casey Collins, CSR, in and
for the State of Texas, reported by machine shorthand,
at the Offices of the Attorney General, 301 West
Fifteenth Street, Seventh Floor, Austin, Travis County,
Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

1        A.    Yes.

2        Q.    Would you say that you are an expert in youth

3    violence prevention?

4        A.    Yes.   I'm not as current on that in the last

5    nine years as I was previously, but yes.   I keep up with

6    it, but I don't -- I'm not active in youth violence

7    prevention research any longer.

8        Q.    And with respect to suicide prevention, would

9    you describe yourself as an expert?

10       A.    It's similar to the youth violence.   I keep up

11   with it.   I read articles and so on on it.   But I'm not

12   doing -- actively doing research in suicide prevention

13   for the last eight years or so.

14       Q.    Are you actively doing research right now on

15   any topic in demography?

16       A.    Yes.

17       Q.    What is that topic?

18       A.    Well, one, we produce the population estimates

19   and projections for the state.   So there is applied

20   research to be done in the production of those

21   population estimates and projections, which involve

22   doing research into fertility, mortality, and migration,

23   which are the components of population change; and

24   having an understanding of those components and how they

25   act and behave within the Texas population are key

1   elements to -- and having done research and

2   understanding what's happening with that are key

3   elements to us producing accurate population estimates

4   and projections.

5        Q.   Would you say that today you are an expert in

6   the subfield of demography that produces population

7   estimates?

8        A.   Yes.

9        Q.   Okay.  When I'm quiet, I'm crossing off

10  questions --

11       A.   Okay.

12       Q.   -- because we've covered a lot.

13            When you teach demographic methods, do

14  you teach the methods that are used at your center to

15  make population estimates?

16       A.   That's a component of the methods that we

17  teach, yes -- or that I teach.

18       Q.   When your center makes population estimates

19  for Texas, what are the databases that you typically

20  rely upon?

21       A.   For population estimates, there's quite a few.

22  So we receive vital statistics from the State department

23  of -- Department of State Health Services.  We conduct

24  surveys of a number of different entities.  So we survey

25  cities to get information on -- and counties on building

1    permits.  We have data from the Texas Education Agency

2    on school enrollment.

3              I'm trying to think what else.  Those are

4    probably some of the major sources of data that we use.

5        Q.    How about data from the U.S. census?

6        A.    For our estimates, the census is the base of

7    that, and so the decennial census is the foundation that

8    we build off of.

9              And then the Census Bureau also produces

10   population estimates, and we'll use those to examine our

11   estimates to see if they're in the ballpark; and if

12   they're not, then we do research to figure out if

13   they're wrong or if we're wrong and then to adjust them

14   if we are.

15       Q.    Is it correct to say that sometimes you look

16   at the U.S. Census American Community Survey data?

17       A.    Yes.  I frequently -- for -- for production --

18   not for actual production of the estimates; but we do

19   use the American Community Survey to identify certain

20   indicators that give us some sense of our level of

21   accuracy.

22       Q.    Does your center provide estimates of the

23   undocumented or unauthorized population in Texas?

24       A.    We do not currently do that.  We tend to rely

25   on the Pew Research Center estimates and then the

1   Department of Homeland Security estimates.   I mean,

2   those are the ones that we'll point to, and they tend to

3   be pretty close to each other.

4        Q.   What are some of the methodological challenges

5   associated with estimating the unauthorized population

6   in Texas?

7        A.   Well, one is you have to use an indirect

8   method because there's no source of directly asking --

9   identifying unauthorized immigrants and asking them

10  their status; and even if somebody did do that, I think

11  there would be some question as to the accuracy of the

12  reporting.  And so essentially the methodology relies on

13  indicators of things that would be associated with being

14  undocumented.

15       Q.   And so, for example, data regarding people who

16  are noncitizens is potentially associated with

17  undocumented.  Is that right?

18                 MR. DISHER:  Objection, vague.

19       A.   Yes.  The -- the methodology that is used by

20  the Pew Research Center identifies people who respond to

21  the American Community Survey as noncitizens and other

22  characteristics that they have in terms of assessing a

23  probability of them being undocumented immigrants.

24       Q.   Are you familiar with any of the disclaimers

25  that the Pew center provides with its estimates of

1  people respond to the American Community Survey asking

2  where they lived last year, if they lived in a foreign

3  country, that's the foundation of the shift that we've

4  seen in the number and percent from -- toward Asian

5  countries and away from Mexico and Central and South

6  American countries.

7      Q.    Has your center or have you done any research

8  specific to any decline in immigration from Mexico to

9  Texas?

10     A.    Could you say that one more time?

11     Q.    Has either you on your center done any

12 research specifically on the decline of migrants coming

13 from Mexico to Texas?

14     A.    I wouldn't say we've done research.   We've

15 done -- other than just tabulating and reporting.   If

16 you call that research then...but we've not, like,

17 looked to see, well, why is that happening and looking

18 at that.

19     Q.    And, similarly, with respect to return

20 migration, has your center tabulated and reported data

21 on return migration from Texas to other countries?

22     A.    We have, again, from -- let me take back the

23 "we have."

24             I think we've just reported from other

25 sources.   So we've not -- so, again, from, I think, a

1   number of researchers that have looked at return

2   migration.   So we have not because you -- with the

3   American Community Survey, you don't know who's

4   returned.

5       Q.   Okay.  So you have -- in your center, you have

6   reported data or reported analysis by others regarding

7   return migration from -- of people living in Texas?

8       A.   Yeah.  I'm not -- when you say "reporting," do

9   you mean --

10      Q.   Well, making public in any manner.

11      A.   Yes.  I mean, so from the report I was

12  mentioning earlier, the Pew research report that --

13  that -- research that has looked at return migration,

14  and I have presented that in presentations that I've

15  given.

16      Q.   Okay.  And the data that you're talking about

17  from the Pew Research Center, was that specific to

18  Texas?

19      A.   No.  It was for the U.S.

20      Q.   And would it be fair to say that when you've

21  reported the data for the U.S. about return migration,

22  you haven't provided any analysis of the reasons why

23  people are returning to their home countries?

24              MR. DISHER:  Objection, vague.

25      A.   I think in the context of that, there is

1   this -- I probably have articulated speculation that --

2   that it probably has to do with a lack of employment

3   opportunity within the United States, and so the

4   migrants are kind of not able to work here and so

5   they're returning home.

6       Q.   And when you talk about that lack of

7   employment opportunity, is that associated with the

8   economic decline after --

9       A.   Right.

10      Q.   -- 2008?

11      A.   So it would have been, yeah, post the

12  recession or kind of as the recession was really picking

13  up.

14              There were reports that immigrants, both

15  authorized and unauthorized, were returning to their

16  country of origin because they were losing -- again, the

17  reports were more speculative in terms of why they were

18  going.  I haven't seen anything that says we know that

19  this is the reason that they were leaving.

20      Q.   Okay.  You anticipated my next question, which

21  is is it correct to say that neither you nor your center

22  have done research on the reasons why individuals might

23  leave Texas and return to their home countries?

24              MR. DISHER:  Objection, vague.

25      A.   Yes, that's fair.

1     Q.    Okay.  Would you say that you have a research
2  specialization in immigrant populations?
3                    MR. DISHER:  Objection, vague.
4     A.    Yeah.  I don't know if I would say I have a
5  specialization.  I have pretty deep familiarity with it.
6  But I wouldn't say if -- if what's your -- if somebody
7  asks me what my area of research is, I wouldn't say I'm
8  an immigrant specialist.
9     Q.    Okay.  Do you have a research specialization
10 in the factors that lead to either legal or illegal
11 immigration to the United States?
12    A.    No.
13    Q.    Does your -- does your -- I'm sorry.  I want
14 to get the words right.
15                    Does your institute conduct research
16 specifically on unauthorized immigrants living in Texas?
17    A.    We have.
18    Q.    When was that?
19    A.    Probably about five or six years ago.
20    Q.    And what was that research?
21    A.    We had attempted to estimate the geographic
22 distribution of the unauthorized immigrant population in
23 the state.
24    Q.    Did you end up publishing those results?
25    A.    No.

```
 1       Q.   Was it because you weren't able to get sort of
 2  confidence results?
 3       A.   We attempted to publish them.  The methodology
 4  that we had employed was questioned by one of the
 5  reviewers, and the staff member that we had working on
 6  this left and we never followed through and addressed
 7  the -- it was doable, but we just didn't.  We weren't
 8  able to address it.
 9       Q.   Have either you or your institute ever
10  conducted research on the reasons that immigrants come
11  to or leave the United States, and specifically
12  undocumented immigrants?
13                 MR. DISHER:   Objection, vague.
14       A.   No.
15       Q.   Let's turn to your declaration, which is
16  Exhibit 3.
17       A.   Okay.
18       Q.   I think we can put your CV aside for the
19  moment; although, I could ask you questions about it all
20  day because I think it's absolutely fascinating.  I'm
21  mindful of Andrew's airplane flight, and so let's turn
22  to your declaration.
23                 Can you summarize for me the specific
24  opinions that you offer in your declaration?
25       A.   Let's see.  I think probably one is that
```

1   there's pretty strong evidence that the bulk of

2   migration behavior, especially distance migration

3   behavior, is economically and specifically work

4   associated.

5            And -- and then probably the other

6   summary point would be that if DACA participants were

7   unable to work, some number and/or percentage of them

8   would likely leave the United States and return to their

9   country of origin or another country where they may be

10  able to work.

11      Q.   Okay.  Do you offer any other opinions in the

12  report besides the two that you've given to me?

13      A.   Well, I think I do articulate some of the

14  characteristics that I think we could anticipate would

15  be associated with the propensity for an immigrant to

16  return to their country of origin.

17      Q.   Would it be fair to say that with your -- with

18  respect to your opinion about DACA participants

19  returning because of work-related reasons that that

20  opinion does not distinguish DACA recipients from other

21  unauthorized workers who might lose their employment?

22            MR. DISHER:  Objection, vague.

23  Objection, misstates the testimony.

24            Go ahead and answer.

25      A.   Yeah.  I think there probably is a distinction

1    between the two that could be made.

2         Q.   Okay.  And so specifically with respect to

3    return migration because of employment reasons, which is

4    what I understand your opinion about DACA recipients is,

5    tell me how your opinion would differentiate, if it

6    does, between a DACA recipient making the decision to

7    return and migrate versus a plain-old undocumented

8    person.

9                   MR. DISHER:  Objection, vague.

10        A.   I think a DACA participant has a -- currently

11   has a different status than an unauthorized immigrant;

12   and so a DACA participant probably has -- has other

13   motivations to potentially -- different -- different

14   sets of motivations than an unauthorized immigrant.

15        Q.   I understand.  And so specifically with

16   respect to work-related reasons -- because I know that

17   people's motivations can really vary quite a bit.  So

18   let me ask you whether your opinion regarding the

19   likelihood of an individual to leave Texas upon losing

20   DACA and work authorization is similar to the likelihood

21   of an unauthorized person who is not somebody who just

22   lost DACA?

23                   MR. DISHER:  Objection, vague.  Go ahead.

24        A.   So the -- I think you had, like, two -- two

25   things about DACA.  Was there something about losing --

```
 1        Q.    Okay.  I'll back up and break it down.

 2        A.    Okay.

 3        Q.    Your -- your report, and specifically

 4   Paragraph 11, talks about loss of permission to work in

 5   the United States.

 6              Do you see that in the very first words

 7   of your Paragraph 11?

 8        A.    Uh-huh.

 9        Q.    Okay.  So do you understand that when an

10   individual loses Deferred Action for Childhood Arrivals,

11   loses DACA, that that individual also loses permission

12   to work in the United States?

13        A.    I would assume those two that -- yes, that if

14   they lost DACA status, then they would also not be

15   eligible to work in the United States.

16        Q.    And is that what you're talking about in

17   Paragraph 11 when you say, "some DACA participants could

18   be expected to migrate out of the U.S. back to their

19   country of origin"?

20              MR. DISHER:  Objection.  It misstates his

21   testimony.

22              THE REPORTER:  Objection what?

23              MR. DISHER:  Misstates his testimony.  Go

24   ahead.

25        A.    Can you say that one more time?
```

1          Q.    Sure.   You -- you mentioned a moment ago that

2     you understand that if somebody loses DACA, that

3     individual loses work authorization.   Is that right?

4          A.    Yes.   But that's not what I'm saying here.

5          Q.    Okay.   Okay.   Help me understand what you're

6     saying in Paragraph 11 when you say "with loss of

7     permission to work in the U.S."

8          A.    So that would be if DACA participants, as part

9     of the DACA program, were not able to work in the

10    United States.   I was not making any statement about

11    loss of DACA status so that -- so that there the

12    concept, I think, would be that assuming that DACA

13    status was still present and they were unable to work,

14    lost permission to work.

15         Q.    Okay.   Do you have any understanding of the

16    legal relationship between Deferred Action for Childhood

17    Arrivals and federal work authorization?

18                MR. DISHER:   Object to the extent it

19    calls for a legal conclusion.

20                Go ahead and answer if you can.

21         A.    I don't.

22         Q.    Okay.   So I'm going to talk with you within

23    that frame that you were just discussing.   We will posit

24    a DACA recipient that has lost work authorization and

25    can no longer work -- be employed legally.

```
 1        A.    Uh-huh.

 2        Q.    Do you understand that the loss of permission

 3   to work would apply to working as an employee of a

 4   company?

 5              MR. DISHER:  Objection, vague.

 6        A.    Say that one more time.

 7        Q.    Do you understand that loss of permission to

 8   work in the U.S. would mean loss of permission to work

 9   as an employee for a company or a government?

10              MR. DISHER:  Same objection.

11        A.    In the United States?

12        Q.    Yes.

13        A.    Yes.  Okay.

14        Q.    Okay.  Do you understand whether loss of

15   permission to work in the U.S. would extend to working

16   as an independent consultant?

17              MR. DISHER:  Objection, vague and to the

18   extent it calls a legal conclusion.

19              Other than that, go ahead.

20        A.    I would assume that it would mean work any

21   kind of work.

22        Q.    And so it would also mean loss of permission

23   to work as an independent consultant.  Is that right?

24        A.    I --

25              MR. DISHER:  Same objections.
```

1          A.    I think I would assume that, yes.

2          Q.    Okay.   Would it also -- would loss of

3   permission to work in the U.S. in your mind also mean

4   loss of permission to mow lawns for money?

5                    MR. DISHER:   Objection, calls for

6   speculation.   Objection to the extent it calls for a

7   legal conclusion.

8                    Go ahead again.

9          A.    Yes.   I would think, yes, that basically

10   working and receiving compensation for work would be

11   part of losing permission to work.

12          Q.    Would your opinion regarding the likelihood of

13   return migration of DACA recipients change if the loss

14   of permission to work for them only extended to work as

15   employees and did not cover self-employed or independent

16   contractor work?

17                    MR. DISHER:   Objection, speculation.

18   Objection to the extent it calls for a legal conclusion.

19                    Other than that, go ahead and answer.

20          A.    I think if -- I think probably if DACA

21   participants were denied -- so they continue to have

22   legal status and they were denied permission to work but

23   that they could go out and mow lawns and bring in some

24   revenue, that probably would reduce the number of DACA

25   participants that might return to their country of

1  origin or another country.

2      Q.   Would it also be fair to say that the number

3  of DACA recipients likely to return to their home

4  country would be reduced if DACA recipients, in addition

5  to mowing lawns and making monies, could open their own

6  business and generate income either through being an

7  accountant or a restaurant owner?

8              MR. DISHER:  Same objections.

9      A.   Yes.

10     Q.   Okay.  I'm going to circle back around to my

11 original question, which I asked poorly because we

12 didn't have a common understanding of the loss of

13 permission to work.

14              So when we talk about DACA recipients

15 losing permission to work and their likelihood of

16 returning to their home country, in your opinion, does

17 the DACA recipient at that point stand in similar shoes

18 to an unauthorized immigrant who also does not have

19 permission to work, at least with respect to their

20 employment opportunities?

21              MR. DISHER:  Objection, speculation.

22 Objection, calls for a legal conclusion.

23              Go ahead and answer if you can.

24     A.   I'm not sure I followed you.

25     Q.   Okay.

```
 1        A.    Try one more time.

 2        Q.    Would you agree with me that an unauthorized

 3   immigrant who is not authorized to work has limited

 4   employment possibilities?

 5              MR. DISHER:  Same objections.

 6        A.    An authorized immigrant who does not have

 7   permission to work?

 8        Q.    Has limited employment opportunities.

 9        A.    Yes.

10        Q.    Okay.  And would you agree to me -- with me

11   that a DACA recipient who has lost permission to work

12   also has limited employment opportunities?

13        A.    Yes.

14              MR. DISHER:  Same objections.

15        Q.    So would you agree with me then that the DACA

16   recipient who has lost work authorization is, at least

17   with respect to employment opportunities, similarly

18   positioned to an unauthorized immigrant?

19              MR. DISHER:  Same objections.

20        A.    Yeah.  I don't -- don't know that, because I

21   know -- know relatively little about the details of the

22   DACA -- kind of what their status would be.

23                   So I would anticipate there would be a

24   difference between the two, because if one is here

25   legally, or meaning they have permission to live here
```

 1   and couldn't be deported, assuming they were compliant

 2   with the DACA requirements, and the person who was

 3   undocumented but not here legally and regardless of if

 4   they were identified that they could be deported, there

 5   would probably be some differential between the two.

 6        Q.   And would there be a differential with respect

 7   to employment opportunities?

 8              MR. DISHER:  Same objections.

 9        A.   I would expect so, yes.

10        Q.   What might those differentials with respect to

11   employment opportunities be?

12              MR. DISHER:  Same objections.

13        A.   I would think that an employer would be more

14   likely to employ somebody who was here legally as

15   opposed to somebody who wasn't.

16        Q.   Even if they were both not work authorized?

17              MR. DISHER:  Objection.  It calls for

18   speculation.

19        A.   Yeah.  Probably not.

20        Q.   So when you say "probably not" --

21        A.   Well, I hadn't really kind of thought that

22   whole thing through.

23        Q.   Okay.  So if an employer is hiring for an open

24   position and has an applicant who is undocumented and

25   thus lacks permission to work and somebody who received

1   DACA but is -- has lost permission to work, would those

2   two employment applicants be similarly situated?

3                  MR. DISHER:  Objection, calls for

4   speculation.  Objection to the extent it calls for a

5   legal conclusion.

6       A.   I would think so, yes.

7       Q.   So would it be fair to say then that -- that

8   your declaration does not posit that DACA recipients who

9   lose their permission to work are any more likely to

10  return to their home country than an unauthorized person

11  living in Texas?

12                 MR. DISHER:  Objection, vague.

13      A.   Yeah.  I don't -- I don't think I could state

14  that.  No, I don't think so.

15      Q.   When you say "I can't state that," do you mean

16  that your report does not take a position on that, or is

17  that I asked a question that was so confusing you

18  couldn't answer it?

19      A.   Probably a little bit of -- well, certainly

20  the latter.

21      Q.   Okay.  Okay.  There's a little bit of a double

22  negative there, unfortunately, because of the way I have

23  to ask the question; but let me ask it a little bit more

24  in the positive sense.

25                 Does your declaration opine that a DACA

1   recipient who loses permission to work is more likely to

2   return to their home country than an unauthorized

3   immigrant living in Texas who is similarly not --

4   doesn't have permission to work?

5       A.   The -- is this -- my testimony or -- what's

6   the thing called, the --

7       Q.   Your testimony.

8       A.   It does not address the issue of -- and so I'm

9   not making a comparison between the two.

10      Q.   All right.  So then is it fair to say that

11  your report or your declaration does not posit that DACA

12  recipients who lose permission to work are any more or

13  less likely to return to their home country than an

14  unauthorized person in Texas?

15      A.   It doesn't make a comparison between the two.

16              MR. DISHER:  Let's take a five-minute

17  break.

18              MS. PERALES:  Absolutely.  Absolutely.

19                  (RECESS TAKEN)

20      Q.   (BY MS. PERALES) Dr. Potter, we've taken a

21  short break and now we're back together again.  Over the

22  break, we've discussed a little bit about this case

23  among all of the lawyers, and you've been here for that.

24              So I'd like to start with a question of

25  whether you understand that the relief that Texas and

 1    the other plaintiff states are seeking in this case is

 2    an end to the DACA initiative?

 3         A.   I do understand that now.

 4         Q.   Okay.  And as you stated earlier, your

 5    understanding is that if an individual were to lose

 6    DACA, that individual would lose permission to work in

 7    the U.S.?

 8         A.   Yes.

 9         Q.   Okay.  And our understanding is now the same

10    on that.

11              Would it be correct to say that in your

12    report you do not offer the opinion that there will be a

13    positive effect on the size of the unauthorized

14    immigrant population in Texas because of DACA?

15              MR. DISHER:  Objection, vague.

16         A.   Could you state that one more time?

17         Q.   Yes.  Would it be correct to say that you do

18    not offer the opinion in your declaration that there is

19    a positive effect on the size of the unauthorized

20    immigrant population in Texas because of DACA?

21              MR. DISHER:  Same objection.

22         A.   Yeah.  I don't -- I don't address that in it.

23         Q.   Would it be correct to say that you do not

24    offer the opinion in your declaration that DACA creates

25    net negative effects on the Texas economy?

1    A.   I don't --

2              MR. DISHER:  Objection, vague.  Go ahead.

3    A.   I don't address that.

4    Q.   Would it be correct to say that you do not

5    offer the opinion in your declaration that DACA causes

6    specific expenditures by Texas State agencies that are

7    different from expenditures made on unauthorized

8    immigrants in Texas?

9              MR. DISHER:  Same objection.

10   A.   I don't address that.

11   Q.   Would it be correct to say that you do not

12   offer the opinion that DACA increases unauthorized

13   immigration to the United States?

14   A.   I don't address that.

15   Q.   Okay.  Now, in your declaration at the end are

16   a number of citations under the heading "References."

17   Do you see that?

18   A.   Yes.

19   Q.   Okay.  I count one, two, three, four, five,

20   six, seven, eight.  Is it correct to say there are eight

21   works cited in your report?

22   A.   Yes.

23   Q.   Okay.  Do these articles or published studies

24   form the entire basis of the opinions that you offer in

25   your declaration?

```
 1              MR. DISHER:  Objection, vague.
 2         A.   No.
 3         Q.   Okay.  In addition to the eight articles that
 4    are cited in your declaration, what else do you rely on
 5    to form your opinions?
 6         A.   My experience and knowledge of the field of
 7    demography and population issues.
 8         Q.   Okay.  Would it be accurate to say that your
 9    experience and knowledge in demography is not specific
10    as to the reasons why an immigrant would choose to
11    return or migrate to their home country?
12              MR. DISHER:  Objection, vague.
13         A.   Could you say it one more time?
14         Q.   Sure.  You've mentioned that your opinions are
15    based on your knowledge of demography and your past work
16    and experience.  Is that correct?
17         A.   Yes.
18         Q.   Is it correct to say that your knowledge of
19    demography and your past work and experience does not
20    include a specific study of the reasons why an
21    unauthorized immigrant might choose to return to their
22    home country?
23              MR. DISHER:  Objection, vague.  Go ahead.
24         A.   Yeah.  I think probably to get that specific
25    that would be true.
```

1        Q.    Okay.   Are there any other scholarly works or

2   studies other than the ones cited in your declaration

3   that support your opinion that losing permission to work

4   in the United States would cause some DACA recipients to

5   return to their home country?

6        A.    I believe there are other -- there is other

7   research that would support that.

8        Q.    Can you name any specifically today?

9        A.    No.

10        Q.    Okay.   Paragraph 4, if you would turn with me.

11   In Paragraph 4, I'm going to read you a sentence from

12   Paragraph 4 after the parenthetical to the Aguila

13   article.

14             Is it correct to say that there is a

15   sentence in Paragraph 4 that says, quote, Most

16   undocumented migrants coming to the U.S. are doing so to

17   work, unquote?  Am I right in reading that?

18        A.    Yes.

19        Q.    Okay.   Do you believe that statement to be

20   true for Texas as well?

21        A.    I believe that it's true.

22        Q.    Would it also be correct to say that work is

23   the reason many migrants come to Texas even when the

24   migrants lack work authorization?

25             MR. DISHER:  Objection, calls for

```
 1    speculation.

 2         A.    I think so.

 3         Q.    And, in fact, you cite Doug Massey's article

 4    and his finding that undocumented migration from Mexico

 5    appears to reflect U.S. labor demand and access to

 6    migrant networks.  Is that correct?

 7         A.    Yes.

 8         Q.    Let's take a look at your Paragraph 5.  You

 9    talk about inter-county migration within the

10    United States.  Is that correct?

11         A.    Yes.

12         Q.    And you are citing the Current Population

13    Survey and an article by Ihrke?

14         A.    Yes.

15         Q.    Would it be fair to say that the analysis that

16    you talk about in Paragraph 5 did not look specifically

17    at undocumented workers?

18         A.    It did not look at specifically undocumented

19    workers.

20         Q.    I have a similar question with respect to

21    Paragraph 6.  You talk about some work by Kennan and

22    Walker involving interstate migration decisions.  Is

23    that right?

24         A.    Yes.

25         Q.    Okay.  Would it be correct to say that the
```

1  study that you're discussing here by Kennan and Walker

2  did not look specifically at undocumented workers?

3      A.   That's correct.

4      Q.   Okay.  So would it then be fair to say, with

5  respect to Paragraph 5 and 6, that we don't know if

6  those findings hold true specifically for the

7  undocumented-worker population?

8              MR. DISHER:  Objection, vague.

9      A.   Yes, it's fair to say we don't know that.

10     Q.   Would you agree with me that the income

11 prospects for undocumented workers might be tempered by

12 factors that are unique to them like the presence of

13 migrant networks or the concern about drawing

14 immigration enforcement by moving to a place with a job

15 where the immigrant doesn't look like the people in

16 their community?

17             MR. DISHER:  Objection, calls for

18 speculation.

19     A.   I'm not sure I followed it.

20     Q.   All right.  I'll break it down for you.

21             In Paragraph 5 and 6 and 4, you talk

22 about factors that are associated with migrant flows,

23 and we get more specific in Paragraph 4 with respect to

24 undocumented workers and the reason why they move where

25 they move for jobs.  Is that right?

1      A.   Yeah.  I don't know.

2      Q.   Let's look at Paragraph 7.  In Paragraph 7

3 you discuss a study by Orrenius and Zavodny.  Is that

4 correct?

5      A.   Yes.

6      Q.   By the way, I think those are superhero names,

7 Orrenius and Zavodny.  I went and looked it up.  They're

8 both women, which makes it even better.

9            I'm going to take a moment and mark that

10 study.

11            (Exhibit No. 4 marked)

12      Q.   You now have what has been marked Deposition

13 Exhibit No. 4.  Do you recognize this as the study by

14 Orrenius and Zavodny that you cited in your declaration?

15      A.   Yes.

16      Q.   Okay.  Is it correct to say that the Orrenius

17 study that is Exhibit 4 did not look at Texas?

18      A.   I think Texas was part of it.  So it wasn't

19 Texas was excluded.  It was, I think, focusing on the

20 United States.

21      Q.   Turn with me to the Table 1, which I believe

22 is the third page.

23      A.   Oh, yes.  Sorry.

24      Q.   No.  It's my fault for not pointing you to the

25 specific information.

1              Can you tell me if Texas appears in

2  Table 1?

3       A.   It does not.

4       Q.   Do you understand the Orrenius study to be a

5  study of states with mandatory E-Verify laws?

6       A.   Yes.

7       Q.   Do you know whether Texas has a mandatory

8  E-Verify law?

9       A.   I don't know.

10      Q.   What is your understanding of mandatory

11  E-Verify?

12      A.   My understanding would be that when somebody

13  applies for a position, they need to provide proof of

14  authorization to work.

15      Q.   Do you understand the E-Verify system to be a

16  computer-based system to check work authorization?

17      A.   That's my understanding, yes.

18      Q.   And do you understand that in states that

19  have - let's see how they put it - laws mandating

20  universal use of E-Verify that employers are required to

21  screen job applicants in the E-Verify computer system?

22              MR. DISHER:  Objection to the extent it

23  calls for a legal conclusion.

24      A.   That's my understanding.

25      Q.   Okay.  And do you understand E-Verify to be a

1  system maintained by the federal government?

2      A.   I don't know.  I think it's -- for some

3  reason, I think it's variable from state to state.

4      Q.   Okay.  And it's possible there could be

5  variation from state to state on who is required to

6  screen their employees --

7      A.   Correct.

8      Q.   -- through E-Verify?

9           Would you agree with me that the

10 experience of an unauthorized immigrant in applying for

11 work in a universal E-Verify state is going to be

12 different from an unauthorized immigrant applying for

13 work in a state that doesn't require E-Verify like

14 Texas?

15           MR. DISHER:  Objection, calls for

16 speculation.

17     A.   I would think so.

18     Q.   In Paragraph 7, you identify some findings in

19 the Orrenius study.  Look at Paragraph 7 with me and

20 count, if you would, the lines, one, two, three, four,

21 five.  On the sixth line down, I'm going to read you the

22 sentence and you tell me if I read it correctly.

23           Quote, Orrenius and Zavodny found that

24 possible undocumented immigrants in states that had

25 implemented such efforts may have more difficulty

1   working and more difficulty changing jobs, unquote.

2             Is that correct?

3       A.   Yes.

4       Q.   Would it be fair to say that if Orrenius and

5   Zavodny were looking at states with mandatory E-Verify

6   that their findings would not be applicable to a state

7   like Texas that does not have mandatory E-Verify with

8   respect to difficulty working and difficulty changing

9   jobs?

10             MR. DISHER:   Objection, vague.

11  Objection, calls for speculation.

12      A.   Say it one more time.

13      Q.   Sure.   I'll rephrase it slightly because I

14  think I can do a better job.

15             Would it be correct to say that Orrenius

16  and Zavodny's findings that undocumented immigrants

17  would have more difficulty working and more difficulty

18  changing jobs in mandatory E-Verify states do not apply

19  to a state like Texas that does not have mandatory

20  E-Verify?

21             MR. DISHER:   Same objections.

22      A.   I would expect there to be a differential.

23      Q.   All right.   But can you explain to me if their

24  findings, which were specifically based on studying

25  mandatory E-Verify in those particular states, whether

1    those findings can apply at all to Texas since Texas
2    doesn't have mandatory E-Verify?
3                   MR. DISHER:  Objection, vague.
4         A.    I think it would probably apply to certain
5    types of jobs that do require some verification of work
6    status; but certainly there are, I think, a fair number
7    of jobs within Texas that don't require verification and
8    so it certainly wouldn't apply to those types of
9    positions.
10        Q.    And can you specifically identify any jobs in
11   Texas that are subject to E-Verify requirements?
12        A.    Well, I don't know specifically.  I do know
13   working for the State would be one.  So that would be
14   one.
15        Q.    Okay.  So can we agree then that with respect
16   to jobs in Texas that are not for the State of Texas, at
17   least, that the findings of Orrenius and Zavodny about
18   unauthorized immigrants having more difficulty working
19   and more difficulty changing jobs because of universal
20   E-Verify would not apply in Texas?
21                   MR. DISHER:  Objection, vague.
22   Objection, asked and answered.
23        A.    Yeah.  I don't think you could make a blanket
24   statement about that, but probably some -- some aspects
25   of it would apply and others wouldn't, again, because

1    there are jobs that do -- would require verification of
2    permission to work within Texas.
3        Q.    But you can't identify any other than working
4    for the State of Texas?
5        A.    I'm not that familiar with -- I'm not familiar
6    with the other types of jobs that might require that in
7    Texas.
8        Q.    Now, there's the -- I'd like to talk to you
9    about your last sentence in Paragraph 7 regarding the
10   findings of Orrenius and Zavodny suggesting that
11   unauthorized immigrants leave states that adopted
12   universal E-Verify laws.
13              Do you see that sentence there?
14       A.    Yes.
15       Q.    You say that Orrenius and Zavodny found some
16   evidence, and do you recall what that "some evidence"
17   was?
18       A.    I think, as I recall, they saw a decline in
19   estimates of the unauthorized immigrants in those
20   states, and they attributed -- and didn't -- did not
21   also see an increase in other states, and they
22   attributed that to the unauthorized immigrants moving
23   out of the United States.
24       Q.    And they attributed that to the states
25   adopting universal E-Verify laws.  Is that correct?

```
1         A.    That was -- that was the -- they implied that
2    that was a likely explanation for their findings.
3         Q.    Would it be fair to say that that finding is
4    not applicable to Texas because Texas does not have
5    universal E-Verify?
6         A.    I don't think that I could say that.
7         Q.    Okay.  Well, do you understand that Orrenius
8    and Zavodny looked at states that previously had
9    E-Verify, the voluntary program like Texas, and
10   subsequently adopted a universal E-Verify program?
11        A.    Yes.
12        Q.    Okay.  So the situation in those states before
13   the adoption of E-Verify we can agree would be similar
14   to the situation in Texas today, that it's a voluntary
15   program for employers?
16                  MR. DISHER:  Objection, vague.
17        A.    Yes, I think so.
18        Q.    Okay.  So when Orrenius and Zavodny suggest
19   that unauthorized immigrants leave states that adopt
20   universal E-Verify laws, that suggestion or that finding
21   would not be applicable to Texas because Texas has not
22   adopted a universal E-Verify law.  Correct?
23        A.    I'm not sure that I can say that.
24        Q.    And why is that?
25        A.    I just don't -- I don't have any evidence or
```

1  information about whether or not it would apply.

2      Q.    And when you say "it would apply," you mean

3  Orrenius and Zavodny's findings regarding unauthorized

4  immigrants who leave states with universal E-Verify

5  laws?

6              MR. DISHER:  Objection, vague.

7      A.    Yes.

8      Q.    Turn with me, if you would, to the Orrenius

9  article at Page 7.  I'd like you to look with me at the

10 "Results" section, which is preceded by a number five.

11 Do you see that around the middle of the page?

12     A.    Yes.

13     Q.    Okay.  Now, if you read down with me to the

14 second paragraph -- okay.  It's actually not the second

15 paragraph.  It's the first paragraph.

16             There is a sentence, and I'm going to

17 count the lines down in the top - one, two, three, four,

18 five, six.  Is it correct to say that Orrenius and

19 Zavodny found no statistically significant negative

20 effect of universal E-Verify laws on non-recent

21 immigrants?

22             MR. DISHER:  Objection, misstates the

23 document.

24     A.    Okay.  Could you state your question again?

25     Q.    Uh-huh.  I'll ask a new question.

```
 1              MS. PERALES:  If you want a running
 2   objection, Todd, you can have it.
 3        Q.    In Paragraph 1 of this "Results" section,
 4   after the sentence "Table 2 reports the results," is it
 5   correct to say that Orrenius and Zavodny found, quote,
 6   The presence of a universal E-Verify mandate last year
 7   has a significant negative effect on the number of
 8   likely unauthorized immigrants who arrived 1 to 5 years
 9   ago, unquote?  Did I read that correctly?
10        A.    Yes.
11        Q.    And then in the next sentence do I read
12   correctly when I read, quote, The estimated effects for
13   likely unauthorized immigrants as a whole, non-recent
14   immigrants, and new immigrants are also negative but not
15   statistically different from zero, unquote?  Is that
16   correct?
17        A.    Yes.
18        Q.    Okay.  Is it fair to say then that Orrenius
19   and Zavodny found that with respect to immigrants who
20   had -- unauthorized immigrants who have been present
21   more than five years that there was a statistically
22   significant negative effect of universal E-Verify laws?
23              MR. DISHER:  Objection.  The document
24   speaks for itself.
25        A.    That's my understanding of their conclusion.
```

1    Q.   Would you agree with me then that the Orrenius

2  study does not provide research support for the

3  contention that immigrant unauthorized workers in Texas

4  who have lived in the U.S. at least five years are

5  likely to leave the state?

6                 MR. DISHER:   Objection, vague.

7    A.   It does not specifically address Texas.

8    Q.   It also specifically found that with respect

9  to immigrants who had been present for more than five

10 years, there was no statistically significant negative

11 effect of universal E-Verify.   Correct?

12   A.   Correct.

13   Q.   Let's look at Paragraph 8.   In your second

14 sentence, tell me if I read this correctly:   Quote, The

15 causes of return migration are difficult to address

16 because there is limited research and understanding of

17 return migration, unquote.

18                 Did I read that correctly?

19   A.   Yes.

20   Q.   Can you explain that sentence a little bit

21 more or expand on it for me.

22   A.   There just isn't that much research looking at

23 migrants who have returned to their country of origin

24 and their reasons for why they returned.

25   Q.   Other than the articles that you cite in your

1   declaration, are you aware of any other research on the

2   topic of return migration?

3       A.   Not that I could cite today, but I believe

4   there are other articles and research out there that

5   have looked at that.

6       Q.   Okay.  Are you aware of any articles or

7   research that focused on return migration from Texas

8   specifically?

9       A.   I'm not familiar with them, but there may be

10  some that have.

11      Q.   Are you familiar with any research on the

12  possibility of return migration of people who receive

13  DACA?

14      A.   I'm not familiar with any research on that.

15      Q.   Are you aware of any research on return

16  migration that focuses on young adults brought to the

17  U.S. as children who have resided in the U.S. at least

18  10 years?

19      A.   So research on children who have come to the

20  United States as children?

21      Q.   And who have resided in the U.S. at least

22  10 years.

23      A.   Not specifically, but I believe there are some

24  studies that have looked at DACA recipients -- or DACA

25  participants.

```
 1   any -- any specific studies about return migration that
 2   you relied on for your declaration other than the ones
 3   that are cited in your declaration?
 4        A.   That I --
 5        Q.   Relied on while preparing your declaration
 6   that are not cited in your declaration.
 7        A.   Can I cite them today?
 8        Q.   Yes.
 9        A.   I don't think I can cite them today.
10        Q.   Okay.  Let's take a look at Paragraph 8.  You
11   say in your first sentence after the comma, and tell me
12   if I read this correctly, quote, It is reasonable to
13   conclude that some DACA participants would return to
14   their country of origin if they lose or are not given
15   permission to work in the U.S., unquote.
16             Did I read that correctly?
17        A.   Yes.
18        Q.   How many is "some"?
19        A.   More than one.
20        Q.   Can you help me find a top number for "some"?
21   Do you have --
22        A.   All of them.
23        Q.   Do you think it's reasonable to conclude that
24   all DACA participants would return to their country of
25   origin if they lost work authorization?
```

1      A.    From everything I've looked at and thought
2  about, I don't think I could actually put a number on
3  it.
4      Q.    So larger than one but less than all.  Is that
5  it?
6      A.    Yes.
7      Q.    Okay.  Do you have any other more specific
8  estimate of the number of DACA participants who would
9  return to their country of origin?
10     A.    I do not.
11     Q.    Did you perform any analysis yourself
12 personally that would shed light on the number of DACA
13 participants that you think would return to their
14 country of origin if they lost work authorization?
15             MR. DISHER:  Objection, vague.
16     A.    I did not.
17     Q.    Would you agree with me that it is reasonable
18 to conclude that a DACA participant might return to
19 their country of origin for reasons unrelated to
20 employment?
21             MR. DISHER:  Objection, calls for
22 speculation.
23     A.    I think that's reasonable that some DACA
24 participants do return to the their country of origin,
25 not necessarily for employment.

1      Q.    So, for example, it might be possible that a

2   DACA participant returns to their country of origin to

3   marry.  Correct?

4      A.    That's possible.

5      Q.    Or possible that the person returns to their

6   country of origin to care for an elderly parent.  Is

7   that correct?

8      A.    Yes.

9      Q.    Okay.  So given that there are various reasons

10  that DACA participants might return to their home

11  country, do you have any way of quantifying the number

12  of DACA recipients who might leave because of

13  employment-related reasons like losing work

14  authorization?

15     A.    I don't.  I think to do that you would have to

16  have some information about the number lost and look at

17  changes over time.  You'd have to look at it in terms of

18  what actually happens, which would be speculation at

19  this point.

20     Q.    Would you say that when you use the word

21  "some" when you say, some DACA participants would return

22  to their country of origin if they lose permission to

23  work in the U.S., that your use of the word "some" there

24  is hypothetical?

25                 MR. DISHER:  Objection, vague.

1      A.    When you say "hypothetical"?

2      Q.    Meaning that you consider it a theoretical

3  possibility but you don't have a number to assign to

4  that group of "some."

5                MR. DISHER:  Objection, vague.

6  Objection, compound.

7      A.    I don't have a number.

8            What was the first part of the question?

9      Q.    And, thus, the possibility is presented as one

10  that is theoretical but not quantified?

11                MR. DISHER:  Same objection.

12      A.    Yeah.  I mean, I think -- I think it's

13  unlikely that it's just theoretical.  I mean, I believe

14  that if DACA participants lost permission to work that

15  would be a motivating factor for some of them to return

16  to their country of origin.

17      Q.    But you're -- has any DACA participant told

18  you personally that they would return to their home

19  country if they lost work authorization?

20      A.    No.

21      Q.    In Paragraph 8, at the bottom of the page and

22  then flowing over to the top of the next page, you have

23  identified some characteristics that would make it more

24  or less likely for some DACA participants to emigrate if

25  they were denied permission to work in the U.S.  Is that

1   between regular undocumented immigrants and DACA

2   participants.

3       Q.   And would one of those distinctions be that

4   the DACA recipient may have been working with work

5   authorization for some period of time before losing it?

6       A.   Compared to undocumented immigrants, yes.

7       Q.   Okay.  In your last sentence you say, "The

8   variation in characteristics within the DACA applicant

9   population suggests that some do have characteristics

10  that have been associated with higher probability of

11  emigration from the U.S."

12             And is it fair to say that what you have

13  in the parentheses there are those characteristics that

14  you think some DACA recipients have that are associated

15  with a higher probability of return?

16             MR. DISHER:  Objection, misstates his

17  testimony.

18             Go ahead and answer.

19      A.   The -- so -- so these are some examples, not

20  necessarily an exhaustive list.  And, yes, that I think

21  there are some DACA participants that share similar

22  characteristics to unauthorized immigrants that are

23  associated with a probability of return migration.

24      Q.   Have you done any study of the characteristics

25  within the DACA population to assess how many have the

1    characteristics that you associate with a probability --

2    a higher probability --

3         A.    I have --

4         Q.    -- of return?

5         A.    I have not.

6         Q.    Okay.

7         A.    Sorry.  I didn't mean to --

8         Q.    Are you aware of any studies not done by you

9    that examine the characteristics within the DACA

10   population to see whether some have a higher probability

11   of return to their home country?

12        A.    Not specifically for probability of return

13   migration, but there are studies looking at the

14   characteristics of DACA participants.

15        Q.    Did you look at any of those studies to try to

16   get a handle on the number of DACA participants who

17   might have characteristics associated with a higher

18   probability of return to their home country?

19        A.    I did not.

20        Q.    Can you tell me what year a DACA recipient had

21   to have arrived in the United States by in order to get

22   DACA?

23        A.    I don't recall.

24        Q.    Can you tell me the age under which a DACA

25   recipient had to have arrived in the United States in

1    United States at least up until about 2008?

2         A.   Yes.   Until about 2008, there was a steady

3    increase in the unauthorized population in the

4    United States --

5         Q.   Okay.

6         A.   -- or we estimate that there has been.

7         Q.   And IRCA was enacted sometime before then.   Is

8    that right?

9         A.   Yes.   I think it was '84.

10        Q.   '86, perhaps?

11        A.   86, yeah.

12        Q.   Okay.   We're going to leave the Wishnie

13   article alone now.

14        A.   Okay.

15        Q.   I'm not going to ask you any more questions

16   about it.

17             Would it be correct to say that the

18   opinions in your report are not based on speaking with

19   any individual DACA recipients?

20        A.   Yes.

21        Q.   Would it be correct to say that the opinions

22   in your report are not based on any survey research of

23   DACA recipients?

24        A.   Probably not completely.

25        Q.   Are you aware of any of the --

```
 1        A.    I think the Current Population Survey probably

 2  surveyed some DACA participants.

 3        Q.    Good catch.   Yes.

 4              So other than the Current Population

 5  Survey or any other census survey that might have

 6  captured the responses of DACA recipients, would it be

 7  correct to say that the opinions in your report are not

 8  based on survey research of DACA recipients?

 9        A.    Yes.

10        Q.    Okay.   Are you aware of any organizations of

11  undocumented students at UTSA?

12        A.    Vaguely.

13        Q.    Have you ever sought to attend a meeting of

14  any undocumented students at UTSA?

15        A.    No.

16        Q.    You talked about some of the possibilities

17  with respect to DACA recipients leaving Texas after

18  losing work authorization, and you described that --

19  that it's greater than one but less than all, and I'd

20  like to return for a minute to that.

21              Is it more likely than not, in your

22  estimation, that the number of DACA recipients who would

23  return to their home country from Texas after losing

24  work authorization would be fairly small?

25              MR. DISHER:   Objection, vague.
```

1      A.    Yeah.   I don't -- I don't think I could say --

2    I don't believe that I can quantify a number other than

3    I think some would.

4      Q.    Okay.  So then is it within the realm of

5    possibility that the number could be fairly small?

6                 MR. DISHER:  Objection, vague.

7      A.    Yes, in the same turn as it could be that it

8    could be really large.

9      Q.    Do you consider it equally likely that the

10   number of DACA recipients who would return to their

11   country after losing work authorization is small or very

12   large?

13                 MR. DISHER:  Objection, vague.

14     A.    I don't think I could state that.

15     Q.    Okay.  So is it your position that you cannot

16   say that it is more likely that the number of DACA

17   recipients who would return is small versus very large?

18                 MR. DISHER:  Objection, vague.

19     A.    Can you -- can you define what "small" and

20   what "large" is?

21     Q.    Okay.  Well, is it -- okay.  Let's talk about

22   it in terms of percents because numbers could be

23   confusing.

24                 Do you consider it equally likely that

25   more than 50 percent or less than 50 percent of DACA

1   recipients would return to their home country after

2   losing work authorization?

3       A.   I really don't think I could put a percent on

4   it, but I do state that I think most DACA participants

5   would stay in the United States.

6       Q.   Would you agree with me that if DACA

7   recipients had to arrive in the United States before

8   they were 16 years old that that characteristic of

9   arriving in the United States before age 16 would tend

10  to increase the probability of them staying in the

11  United States if they lost work authorization?

12              MR. DISHER:  Objection, vague.

13  Objection, asked and answered.  Objection, incomplete

14  hypothetical.

15      A.   Compared to?

16      Q.   Those who arrived in the United States after

17  the age of 16.

18              MR. DISHER:  Same objections.

19      A.   But then they're not eligible for DACA or --

20      Q.   Right.  So the characteristic -- would you

21  agree with me that the characteristic of DACA recipients

22  of having arrived in the United States before the age of

23  16 makes them less likely to return when compared to the

24  general unauthorized immigrant population?

25              MR. DISHER:  Objection, vague.

1  representing a defendant-intervenor in this case.  I am

2  just going to touch on a few areas and try not to take

3  up too much more of your time.

4            The same rules apply that Ms. Perales

5  explained earlier.  If you don't understand my question,

6  please just let me know and I will try to rephrase it.

7  We'll try not to talk over each other, and hopefully we

8  can move this right along.

9       A.   Okay.

10      Q.   Okay.  I just want to ask a little bit about

11 the articles in your declaration.  Did you select the

12 articles that you cited in the declaration?

13      A.   Yes.

14      Q.   How did you select them?

15      A.   Reading that during -- well, during a search

16 through bibliographic software and identifying a lot of

17 articles and sorting through the ones that I thought

18 were relevant to what I was asked to testify about.

19      Q.   And why did you choose these particular

20 articles included in your declaration?

21      A.   They seemed most relevant to the points that I

22 was hoping to make and also concise.  So there's some

23 degree of parsimony was also a factor.

24      Q.   Did you select any research or articles

25 included in your declaration that directly address the

1    topics of DACA?

2                        MR. DISHER:   Objection, vague.

3          A.    No.

4          Q.    Why not?

5          A.    They weren't -- I didn't find any that

6    addressed the issue of probability of return migration

7    among DACA participants.

8          Q.    In considering which scholarly references to

9    include in your declaration, did you consider the

10   reliability of the authors as a subject matter?

11         A.    Yeah.   For those that I was familiar with,

12   yes, that was a factor.

13         Q.    Which ones are you unfamiliar with?

14         A.    I didn't -- I don't know Wishnie.   I shouldn't

15   say "know."   I've not read Wishnie -- Wishnie's work

16   before.   And then Kennan and Walker I wasn't familiar

17   with before.   The others I've had some familiarity with

18   before.

19         Q.    Okay.   So I'd like to go to Paragraph 4 of

20   your declaration, which I believe is Exhibit 3.   I

21   believe this is an Emma Aguila article for the research.

22                   Are you familiar with her work?

23         A.    I'm sorry.   I'm -- I'm -- can you point me to

24   where we are?

25         Q.    So Paragraph 4, about midway down, there's a

1    correct?

2        A.    Yes.

3        Q.    Okay.   Have there been any other studies that

4    address this issue in the last 17 years?

5                    MR. DISHER:   Objection, vague.

6        A.    If there are, there aren't many.

7        Q.    Okay.   You don't know for sure?

8        A.    I didn't -- I don't think I found any when I

9    looked that specifically address this.

10       Q.    And when we say "this," do we mean young

11   immigrants -- how would you characterize the -- the

12   Regan and Olsen research as you cited it here in this

13   paragraph?

14       A.    They were looking at return migration --

15       Q.    Okay.

16       A.    -- of immigrants.

17       Q.    Okay.

18                    MS. GREGORY:   I'd like to have this

19   marked, please.

20                    (Exhibit No. 7 marked)

21       Q.    Dr. Potter, do you recognize Exhibit 7, titled

22   "You Can Go Home Again: Evidence From Longitudinal

23   Data"?

24       A.    Yes.

25       Q.    And is this the article that you cited in

1    Paragraph 9 of your declaration?

2         A.    Yes.

3         Q.    Did this study address DACA recipients?

4         A.    No.

5         Q.    Did this study distinguish between documented

6    and undocumented immigrants?

7         A.    No.

8         Q.    On Page 339, the first page, looking at the

9    right-hand column, the second full paragraph, it begins

10   "in this paper."  Do you see where --

11        A.    Yes.

12        Q.    Okay.  So in this paragraph the author states

13   that they use longitudinal data from the 1979 youth

14   cohort of the National Longitudinal Surveys (NLSY79) to

15   study emigration, with an "E," in one cohort of

16   immigrants.

17              Did I read that correctly?

18        A.    Yes.

19        Q.    What is the National Longitudinal Surveys?

20        A.    It's a survey that follows people over time

21   and asks a range of questions about their

22   characteristics and socioeconomic characteristics.

23        Q.    So what would be the 1979 youth cohort of the

24   National Longitudinal Surveys?

25        A.    That would be the cohort that they started

1  following in 1979.

2       Q.   Do you know when -- or what age a cohort is

3  when they begin following them?

4       A.   I don't know.

5       Q.   Okay.  So the sentence immediately after that

6  I just read says that more than 750 NLSY79 respondents

7  were born abroad to foreign nationals.

8              Did I read that correctly?

9       A.   Yes.

10      Q.   So this particular cohort was born in or

11 before 1979.  Is that correct?

12      A.   Yes.

13      Q.   Let's look at Footnote 2, which is on the same

14 page.  The very last sentence says, quote, By 1996, only

15 71 foreign cases were eligible to be interviewed for

16 NLSY79, end quote.

17             Did I read that correctly?

18      A.   Yes.

19      Q.   So in your reading, does that mean that there

20 were only -- there was only complete data for

21 71 individuals?

22      A.   In the survey?

23      Q.   Yes.

24      A.   Not in the survey, but that they had

25 identified as, quote, unquote, foreign cases in the

```
 1   survey.

 2       Q.   So what does that mean, only 71 foreign cases

 3   were eligible to be interviewed?  What is your

 4   understanding of that?

 5       A.   So they were looking at people who started in

 6   the 1979 cohort and followed them over time; and by

 7   1996, they had identified 71 cases who had returned

 8   to -- I think to their country of origin or had left the

 9   United States.

10       Q.   Dr. Potter, are you familiar with the DACA

11   eligibility requirements?

12       A.   Vaguely.

13       Q.   Are you aware that DACA applicants had to be

14   under 31 years old by 2012 to be eligible for deferred

15   status and, therefore, wouldn't have been born yet in

16   1979?

17       A.   Yes.

18       Q.   You can set that to the side, Exhibit 7.

19                MS. GREGORY:  I'd like to have this

20   marked, please.

21                (Exhibit No. 8 marked)

22       Q.   Dr. Potter, you're looking at Exhibit 8.  Is

23   this the article that you cite in Paragraph 10 of your

24   declaration?

25       A.   Yes.
```

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION
 3  STATE OF TEXAS, et al.,            )
          Plaintiffs,                 )
 4                                     )
    VS.                                )
 5                                     )
    UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
 6        Defendants,                  )
                                       )
 7  and                                )
                                       )
 8  KARLA PEREZ, et al.,               )
                                       )
 9         Defendant-Intervenors.  )
10
                    REPORTER'S CERTIFICATE
11            DEPOSITION OF LLOYD POTTER, Ph.D.
                    JUNE 27, 2018
12
13       I, Kathleen Casey Collins, Certified Shorthand
14  Reporter in and for the State of Texas, hereby certify
15  to the following:
16       That the witness, LLOYD POTTER, Ph.D., was duly
17  sworn by the officer and that the transcript of the oral
18  deposition is a true record of the testimony given by
19  the witness;
20       That the deposition transcript was submitted on
21  _____, ____, to the witness or to the attorney for
22  the witness for examination, signature and return to me
23  by _____, _____;
24       That pursuant to information given to the
25  deposition officer at the time said testimony was
```

```
 1  taken, the following includes counsel for all parties
 2  of record:
 3        Mr. Todd L. Disher and Mr. Trent Peroyea
              Attorneys for the Plaintiffs
 4        Ms. Nina Perales, Attorney for
              Defendant-Intervenors
 5        Mr. Andrew Bobb, Attorney for Defendants
          Ms. Katherine Gregory, Attorney for New Jersey
 6            Office of Attorney General
 7        I further certify that I am neither counsel for,
 8  related to, nor employed by any of the parties or
 9  attorneys in the action in which this proceeding was
10  taken, and further that I am not financially or
11  otherwise interested in the outcome of the action.
12        Certified to by me this _____ day of June,
13  2018.
14                      _____
                        KATHLEEN CASEY COLLINS
15                      Texas CSR NO. 2018
                        Certificate Expires 12/31/18
16                      Ken Owen & Associates
                        Firm Certificate No. 115
17                      801 West Avenue
                        Austin, Texas  78701
18                      (512) 472-0880
19
20
21
22
23
24
25
```