**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**EXHIBITS IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# Volume 7

# Exhibits 36 - 48

# DEF-INTERV.
# EX. 36

Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland Security

June 15, 2012

MEMORANDUM FOR:    David V. Aguilar
                    Acting Commissioner, U.S. Customs and Border Protection

                    Alejandro Mayorkas
                    Director, U.S. Citizenship and Immigration Services

                    John Morton
                    Director, U.S. Immigration and Customs Enforcement

FROM:    Janet Napolitano
         Secretary of Homeland Security

SUBJECT:    Exercising Prosecutorial Discretion with Respect to Individuals
            Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the
Department of Homeland Security (DHS) should enforce the Nation's immigration laws against
certain young people who were brought to this country as children and know only this country as
home. As a general matter, these individuals lacked the intent to violate the law and our ongoing
review of pending removal cases is already offering administrative closure to many of them.
However, additional measures are necessary to ensure that our enforcement resources are not
expended on these low priority cases but are instead appropriately focused on people who meet
our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of
prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of
  this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education
  development certificate, or is an honorably discharged veteran of the Coast Guard or
  Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple
  misdemeanor offenses, or otherwise poses a threat to national security or public safety;
  and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

2

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

3

# DEF-INTERV.
# EX. 37

Case 1:18-cv-00068   Document 400-7   Filed on 06/15/19 in TXSD   Page 7 of 390

All Access Today, L.P. v. Aderra Incorporated, Not Reported in Fed. Supp. (2009)

2009 WL 10669445

2009 WL 10669445
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas, Austin Division.

ALL ACCESS TODAY, L.P., Plaintiff,
v.
ADERRA INCORPORATED, Defendant.

CAUSE NO. A-08-CA-498 LY
|
Signed 07/07/2009

**Attorneys and Law Firms**

Jeffery Robert Johnson, Reed & Scardino LLP, Lawrence
A. Waks, Jackson Walker, L.L.P., Austin, TX, for
Plaintiff.

John Karl Buche, Buche & Associates, PC, La Jolla, CA,
Randall S.D. Jacobs, Bienstock & Michael, P.C., New
York, NY, for Defendant.

**INTERIM REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

ROBERT PITMAN, UNITED STATES
MAGISTRATE JUDGE

**\*1 TO: THE HONORABLE LEE YEAKEL UNITED
STATES DISTRICT JUDGE**
Before the Court are Defendant's Motion & Application
for Preliminary Injunction and Request for Oral Hearing,
filed January 23, 2009 (Clerk's Dkt. #38); Plaintiff
All Access Today's Response to Aderra Incorporated's
Application for Preliminary Injunction, filed February
16, 2009 (Clerk's Dkt. #45); Plaintiff's Motion to
Strike the Declaration of Edward J. Donnelly in
Support of Aderra's Motion for a Preliminary Injunction,
filed March 4, 2009 (Clerk's Dkt. #58); Defendant's
Reply Declaration in Support of Preliminary Injunction
Against AAT, filed March 10, 2009 (Clerk's Dkt.
#63); Opposition of Defendant Aderra Incorporated to
Plaintiff's Motion to Strike the Declaration of Edward
J. Donnelly in Support of Aderra's Motion for a
Preliminary Injunction, filed March 11, 2009 (Clerk's
Dkt. #66); Plaintiff's Motion to Preserve Confidentiality
Designations, filed March 23, 2009 (Clerk's Dkt. #71);

Defendant's Opposition to Plaintiff's Motion to Preserve
"Attorneys' Eyes Only" Designations, filed March 30,
2009 (Clerk's Dkt. #75); and Plaintiff's Reply to
Defendant's Memorandum in Opposition to Motion to
Preserve Confidentiality Designations, filed April 13,
2009 (Clerk's Dkt. #76). The Magistrate Court submits
this Report and Recommendation to the United States
District Court pursuant to 28 U.S.C. § 636(b) and Rule
1(h) of Appendix C of the Local Court Rules of the United
States District Court for the Western District of Texas,
Local Rules for the Assignment of Duties to United States
Magistrate Judges.

**I. BACKGROUND**

Plaintiff All Access Today (Plaintiff) initiated this suit
on June 27, 2008 against Defendant Aderra Incorporated
(Defendant) and Aderra UK, LTD (Aderra UK). Plaintiff
is a limited partnership, established in 2004, that provides
services for musicians. [1] Defendant also provides services
to musicians and is a business that began in January of
2007 as a d/b/a of Motherboard, L.L.C. [2] and became
and independent corporation in April of 2007. [3] Plaintiff
raised several causes of action primarily arising out of the
alleged improper use of Plaintiff's trademark "Live in a
Flash" (the Mark).

[1]     (Declaration of Chris Guggenheim ¶ 3, Clerk's Dkt.
        #52 (Guggenheim Decl.))

[2]     (Declaration of Edward J. Donnelly in Support of
        Aderra's Motion for a Preliminary Injunction,
        Donnelly Declaration ¶ 15, Clerk's Dkt. #38
        (Donnelly Decl.))

[3]     (Id. ¶ 45.)

Defendant and Aderra UK moved to dismiss the action
for lack of personal jurisdiction. [4] Following a report
and recommendation from this Court, [5] Judge Yeakel
denied the motion in part and granted the motion in
part, removing Aderra UK from the litigation for lack of
personal jurisdiction on October 28, 2008. [6]

[4]     (Clerk's Dkt. #7.)

[5]     (Clerk's Dkt. #27.)

6

(Clerk's Dkt. #28.)

Defendant filed its answer and nineteen counterclaims on November 18, 2008. 7 The counterclaims are based, in part, on Defendant's assertion that it is the true owner of the Mark as well as several other phrases that share key words with the Mark. It appears that both Plaintiff and Defendant use the Mark and related phrases in association with recordings of events that are transferred to USB devices and sold immediately following the events. 8 For a time, Plaintiff and Defendant operated together under a joint venture agreement (JV Agreement). 9

7

(Clerk's Dkt. #30.)

8

(Donnelly Decl. ¶ 12; Guggenheim Decl. ¶ 10.)

9

(Donnelly Decl. ¶ 41; Guggenheim Decl. ¶ 25.)

## II. CURRENT MOTIONS

**\*2** Premised on its counterclaims, Defendant requests that the Court enter a preliminary injunction to prohibit Plaintiff from:

> unfairly competing with [Defendant], from selling, advertising or any other use of [Defendant's] Mark and name, selling or advertising Re-Recordable USB Media Services and Re-Recordable USB Media products using [Defendant's] Technology and Proprietary Information, from using any infringing trademarks on such products or in connection with such services, from any future use by [Plaintiff] of [Defendant's] trademarks and copyrighted materials on websites and on promotional literature and protect [Defendant's] 50% interest in the profits of the joint venture which have been concealed and converted by [Plaintiff]. 10

Defendant's motion for preliminary injunction is based, in large part, on the Declaration by Edward J. Donnelly (Donnelly). Donnelly is the founder, president and principal stockholder of the Defendant. 11

10

(Clerk's Dkt. # 38 at 38-39.)

11

(Donnelly Decl. ¶ 2.)

In addition to filing a response, Plaintiff also brings a motion to strike portions of Donnelly's declaration. As part of its response, Plaintiff submitted a declaration from Chris Guggenheim (Guggenheim) as well as numerous supporting documentation. Guggenheim is the chief executive officer of the Plaintiff. 12 The declaration was filed separately 13 and significant portions of it are sealed, marked confidential and/or marked attorneys' eyes only, as permitted by the protective order in place in this case. 14

12

(Guggenheim Decl. ¶ 2.)

13

(*See* attachments to Clerk's Dkt. #53.)

14

(Clerk's Dkt. #51.)

Defendant replied to Plaintiff's response to Defendant's motion for preliminary injunction by filing a declaration by Defendant's attorney. In it, Defendant's attorney objects to the confidentiality designations made by Plaintiff. 15 As a response to Defendant's objections, Plaintiff moves to preserve the confidentiality designations.

15

(Clerk's Dkt. #63.)

## III. ANALYSIS

A preliminary injunction is an extraordinary remedy that the Court may only impose where the party requesting the injunction demonstrates (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction would not disserve the public interest. *Winter v. NRDC, Inc.*, —— U.S. ——, 129 S. Ct. 365, 374 (2008); *Paulsson Geophysical Servs. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008). To be successful, the party requesting the injunction must clearly carry the burden of

Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 9 of 390
All Access Today, L.P. v. Aderra Incorporated, Not Reported in Fed. Supp. (2009)
2009 WL 10669445

persuasion on each of the four factors. *Southern Co. v. Dauben, Inc.*, No. 08-10248, 2009 U.S. App. LEXIS 7993 at *11 (5th Cir. April 15, 2009). If a party fails to carry its burden on one factor, then the injunction must be denied. *Id.* The party resisting an injunction may assert that a claim is defeated by an affirmative defense, in which case, the party asserting the defense has the burden of proving its success. *Conan Properties, Inc. v. Conans Pizza*, 752 F.2d 145, 152 (5th Cir. 1985).

**\*3** Defendant asserts that it is entitled to a preliminary injunction based on the following counterclaims: (1) unfair competition and false designations of origin in violation of 15 U.S.C. § 1125; (2) palming-off and misappropriation of confidential information; (3) false advertising in violation of 15 U.S.C. § 1125(a); (4) common law unjust enrichment; (5) breach of fiduciary relationship, breach of non-disclosure agreement, breach of "a relationship of trust & confidence," and civil conspiracy; (6) constructive trust; (7) dilution under Texas law; (8) tortious interference with existing business relations and prospective contracts; and (9) copyright infringement.

**A. Failure to Make Clear Showing of Irreparable Injury**
Defendant must show that there is a substantial threat of irreparable injury if the injunction is not issued. *Winter v. NRDC, Inc.*, 129 S. Ct. at 374-75; *Paulsson*, 529 F.3d at 309. The mere possibility of an irreparable injury is not sufficient. *Winter*, 129 S. Ct. at 375 (" 'possibility' standard is too lenient.") Instead, Defendant must prove that irreparable injury is *likely* in the absence of a preliminary injunction. *Id.* The focus is not on the magnitude of the harm, but on its irreparability. *Id.* The party seeking injunctive relief, faces a heavy burden of clearly establishing irreparable harm. *Id.*

**1. Lack of Presumption of Irreparable Harm**
Defendant asserts that it is entitled to a presumption of irreparable injury for its claim of trademark infringement because it has demonstrated that consumer confusion is likely. [16] However, the Fifth Circuit explicitly stated in *Paulsson* that it has refused to adopt this position. 529 F.3d at 312-13. In fact, the Fifth Circuit stated that, in light of the United States Supreme Court decision in *eBay v. MercExchange*, the presumption of irreparable injury in a trademark case is "a difficult question." *Id.* at 313 (citing

*eBay v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct. 1837 (2006)).

[16] (Clerk's Dkt. #38 at 21.)

Guided by the Fifth Circuit's decision in *Paulsson*, an independent inquiry of the four preliminary injunction factors must be done, even in trademark infringement suits, to determine whether there is irreparable injury.

Absent a presumption of harm, Defendant states that it will suffer irreparable harm through:

> (1) loss of market share; (2) because it is unclear whether [Plaintiff has] the financial wherewithal to pay monetary damages; (3) because monetary damages would require additional expense ... (4) that the goodwill of [Plaintiff's] duplicate trademark will dilute the value of [Defendant's] Mark; and (5) that the use of confusingly similar marks by [Plaintiff] will harm [Defendant's] reputation— which money may never correct. [17]

[17] (*Id.* at 22.)

After conducting an independent inquiry, the undersigned concludes that Defendant has failed to prove that it would suffer an irreparable injury if the injunction were not imposed.

**2. Delay in Requesting Injunction Disproves Irreparable Injury**
It is difficult to determine that an injury is irreparable if there is a significant delay between a party's request for a preliminary injunction and its discovery of the facts that form the basis for its request. *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975); *GoNannies, Inc. v. GoAuPair.com, Inc.*, 464 F. Supp. 2d 608, 609 (N.D. Tex. 2006) ("Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance

Case 1:18-cv-00068   Document 400-7   Filed on 06/15/19 in TXSD   Page 10 of 390

All Access Today, L.P. v. Aderra Incorporated, Not Reported in Fed. Supp. (2009)

2009 WL 10669445

of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.")

 **\*4**  Donnelly, the founder, president, principal stockholder and representative of the corporate Defendant requesting the injunction, states that he learned in June 2007 that Defendant's name had been removed from some of the technical systems used to create the USB drives. [18] Also in the summer of 2007, Guggenheim informed Donnelly that it planned to begin selling recordings on USB drives under the name "Live in a Flash." [19] Donnelly did not object. [20] Additionally, Donnelly states that in January 2008, Plaintiff created and used banners with the mark "Live in a Flash" on them. [21] Donnelly emphasis that Plaintiff took this action – "*without any authorization to use the Mark by [Defendant].*" [22] At this time, Donnelly states that Defendant's "intent to steal had become manifest." [23] At the end of January 2008, Donnelly claims he was "threatened" by an employee of Plaintiff who demanded software without Defendant's alleged Mark. [24] In February 2008, Donnelly noticed an article in Billboard Magazine where "*Guggenheim was quoted therein as saying that [Plaintiff] created the USB media for MB20 and Ringo Starr without any mention of [Defendant].*" [25]

[18]   (Donnelly Decl. ¶ 62.)

[19]   (Guggenheim Decl. ¶ 46.)

[20]   (*Id.*)

[21]   (Donnelly Decl. ¶ 108.)

[22]   (*Id.*, emphasis in original.)

[23]   (*Id.* ¶ 111.)

[24]   (*Id.* ¶ 114.)

[25]   (*Id.* ¶ 119, emphasis in original.)

Despite Defendant's repeated and continued concerns about the actions of Plaintiff, despite Defendant's allegations of months of threats, stolen technology, misidentification of product origin, and the "manifest" intent of Plaintiff to steal, Defendant took no legal action. Plaintiff, not Defendant, initiated this suit in June 2008. [26] Although Defendant requested injunctive relief in its counterclaims, filed in November 2008, [27]

Defendant did not file this motion for a preliminary injunction until January of 2009. Defendant's request for the extraordinary remedy of injunctive relief was filed some time between twelve and eighteen months after the allegedly improper actions were first identified. Defendant's inaction of a year or more, coupled with Defendant's decision to wait to request an injunction until after being sued by Plaintiff leads the undersigned to conclude that Defendant would not suffer an irreparable injury absent an injunction.

[26]   (Clerk's Dkt. #1.)

[27]   (Clerk's Dkt. #29, 30.)

Courts which have considered far shorter delays have concluded that the delay demonstrates a lack of irreparable injury. *See, e.g., Rimkus Consulting Group v. Cammarata*, 255 F.R.D. 417, 438 (S.D. Tex. 2008) (no irreparable injury due to delay of one year); *Symetra Life Ins. v. Rapid Settlements,* No. H-05-3167, 2007 U.S. Dist. LEXIS 52234 at \*39-40 (S.D. Tex. July 19, 2007) (thirteen month delay, no irreparable injury); *Wireless Agents, v. T-Mobile,* 82 U.S.P.Q.2D (BNA) 1779, No. 3:05-CV-0094-D. 2006 U.S. Dist. LEXIS 36590 \*13-15 (N.D. Tex. June 6, 2006) (one year delay, no irreparable injury); *P&G v. Ultreo, Inc.*, 574 F. Supp.2d 339, 354 (S.D. N.Y. 2008) (six month delay, no irreparable injury); *Gorman v. Coogan*, 273 F. Supp.2d 131, 134-35 (D. Me. 2003) (one year delay, no irreparable injury); *J&J Snack Foods v. Nestle USA*, 149 F. Supp.2d 136, 158 (D.N.J. 2001) (eight month delay, no irreparable injury); *Kusan v. Alpha Distribs.*, 693 F. Supp. 1372, 1375 (D. Conn. 1988) (seven month delay, no irreparable injury); *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985) (ten week delay, no irreparable injury). *See also, GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir. 1984) (commenting that delay in requesting injunctive relief demonstrates "no sense of urgency" by the moving party; *Sci. Weight Loss v. United States Med. Care*, No. CV 08-2852 PSG (FFMx), 2008 U.S. Dist. LEXIS 84454 at \*17 (C.D. Cal. Oct. 6, 2008) (motion to continue filed by moving party, no irreparable injury).

A significant delay, on its own, provides an independent reason for finding there is no irreparable injury. *See Tough Traveler v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("delay alone may justify a denial of a preliminary injunction"); *Adventure Plus Enters. v. Gold Suit, Inc.*, No. 3-06-CV-2032-BD, 2008 U.S. Dist. LEXIS 27220 at \*3 (N.D. Tex. Apr. 2, 2008) (eighteen month

2009 WL 10669445

delay, no irreparable injury, injunction denied solely for that reason); *Amicus Communications, L.P. v. Hewlett-Packard Co., Inc.*, No. SA-98-CA-1176-PMA, 1999 WL 495921 at *17-19 (W.D. Tex. June 11, 1999) (concluding no irreparable injury solely based on delay).

**\*5** The undersigned concludes that there is no irreparable injury due to the considerable amount of time that passed between Donnelly's discovery of the allegedly improper conduct and Defendant's application for a preliminary injunction. Given Defendant's inability to demonstrate irreparable harm, his application for a preliminary injunction should be denied.

## IV. ADDITIONAL PENDING MOTIONS

### A. Motion to Strike

Plaintiff seeks to strike portions of Donnelly's declaration that Plaintiff claims are not based on personal knowledge and are improper statements of opinion. [28] The undersigned did not rely on any of the challenged portions of Donnelly's declaration in reaching the recommendation above. Accordingly, Plaintiff's motion to strike portions of Donnelly's declaration is dismissed.

[28]     (Clerk's Dkt. #58)

### B. Motion to Preserve Confidentiality Designations

Several portions of Guggenheim's declaration and attached exhibits are sealed and/or designated as "attorneys' eyes only." Under the protective order in place in this suit, parties are permitted to designate information as "Confidential" or "For Counsel Only" or "Attorneys' Eyes Only." [29]

[29]     (Clerk's Dkt. #51.)

In lieu of a proper reply to its motion for preliminary injunction, Defendant's counsel filed a reply declaration. [30] He objected to the confidentiality designations of Guggenheim's declaration and attached exhibits. Under the protective order, if a party disagrees with the opposing party's confidentiality designation of a document, they must object in writing. [31] Within fourteen days of receiving an objection, the party that produced the confidential information must file a motion with the Court to preserve the confidentiality designations. [32]

[30]     (Clerk's Dkt. #63.)

[31]     (Clerk's Dkt. #51. at ¶ 9.)

[32]     (*Id.*)

As provided in the protective order, Plaintiff moved the Court to preserve its confidentiality designations. [33] Plaintiff insists that the information it sealed and marked "attorneys' eyes only" is sensitive and contains trade secrets, financial and customer information. Defendant's counsel insists that he must be permitted to show these confidential portions to Donnelly in order to properly reply to Guggenheim's factual assertions.

[33]     (Clerk's Dkt. #71.)

The undersigned did not rely on any of the confidential portions of Guggenheim's declaration in reaching the recommendation above. The undersigned concluded that the injunction should be denied due to Defendant's delay in seeking it. The facts in support of this conclusion are primarily drawn from Donnelly's declaration, not Guggenheim's, and there is no reason to show the confidential portions of the declaration to Donnelly. Therefore, Defendant has proffered no compelling reason to disturb the confidentiality designations adopted by Plaintiff at this time.

Accordingly, the undersigned overrules Defendant's objections to Plaintiff's confidentiality designations and grants Plaintiff's motion to preserve its confidentiality designations.

## V. RECOMMENDATION AND ORDERS

In accordance with the statements above, the undersigned **RECOMMENDS** that the District Court **DENY** Defendant's Motion & Application for Preliminary Injunction and Request for Oral Hearing, filed January 23, 2009 (Clerk's Dkt. #38).

**IT IS ORDERED** that Plaintiff's Motion to Strike the Declaration of Edward J. Donnelly in Support of Aderra's Motion for a Preliminary Injunction, filed March 4, 2009 (Clerk's Dkt. #58) is **DISMISSED**;

Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 12 of 390

All Access Today, L.P. v. Aderra Incorporated, Not Reported in Fed. Supp. (2009)

2009 WL 10669445

**\*6 IT IS FURTHER ORDERED** that the objections contained in Defendant's Reply Declaration in Support of Preliminary Injunction Against AAT, filed March 10, 2009 (Clerk's Dkt. #63) are **OVERRULED**;

**IT IS FINALLY ORDERED** that Plaintiff's Motion to Preserve Confidentiality Designations, filed March 23, 2009 (Clerk's Dkt. #71) is **GRANTED**.

### VI. OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

**All Citations**

Not Reported in Fed. Supp., 2009 WL 10669445

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.
# EX. 38

Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 14 of 390

Arreola v. Zapata County, Texas, Not Reported in Fed. Supp. (2017)

2017 WL 4174932

2017 WL 4174932
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Laredo Division.

Dalia ARREOLA, Plaintiff,

v.

ZAPATA COUNTY, TEXAS, et al., Defendants.

Civil action no. 5:16–CV–00285
|
Signed 09/12/2017

**Attorneys and Law Firms**

Adam Poncio, Alan Braun, Thomas Newton Cammack, III, Poncio Law Offices PC, Murray Edward Malakoff, San Antonio, TX, for Plaintiff.

Eileen M. Leeds, Guerra, Leeds, Sabo & Hernandez, PLLC, Brownsville, TX, for Defendants.

**SECOND AMENDED SCHEDULING ORDER**

J. SCOTT HACKER, United States Magistrate Judge

*1 Now pending before the Court is Defendants' belated "Agreed Motion for Extension of Deadlines" filed on September 11, 2017. (Dkt. No. 28). All parties seek, either explicitly or implicitly, an extension of the discovery deadline, the deadline to amend pleadings, and the deadline to file contested motions. (Id. at 1–2). The parties argue that, despite their due diligence, they have been unable to meet the Court's deadlines because of unforeseen circumstances, such as difficulty in finding a translator for a deposition, Hurricane Harvey, and preparations for a trial in state court. The Court thus examines whether the parties' motion may be granted on the bases of "excusable neglect" and "good cause." For the reasons that follow, the Court decides that query in the affirmative.

First, Defendants suggest that their failure to request a Second Amended Scheduling Order before the September 8, 2017 deadline is justified by excusable neglect. Under Federal Rule of Civil Procedure 6(b), when an act may or must be done within a specified time, the court may extend time on motion after time has expired if the party failed to

act because of "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). This Court enjoys "broad discretion to grant or deny a extension" and the "excusable neglect" standard is "quite elastic in its application." Salts v. Epps, 676 F.3d 468, 474 (5th Cir. 2012) (quoting Wright & Miller, Fed. Practice & Procedure § 1165) (internal quotations omitted). Factors relevant to the determination of excusable neglect include: (1) "the possibility of prejudice to opposing parties," (2) "the length of the [movant's] delay and its impact on the proceeding," (3) "the reason for the delay and whether it was within the control of the movant," and (4) "whether the movant has acted in good faith." Id.

Weighing these factors together, the Court finds that Defendants' neglect is excusable. First, there is little, if any, prejudice to Plaintiff because all parties agreed to the instant motion. Second, any delay by Defendants is negligible because no trial date has been set and extending the above deadlines will not cause undue delay to the ultimate resolution of this matter. But cf. Hoffman v. AmericaHomeKey, Inc., 23 F. Supp. 3d 734, 747 (N.D. Tex. 2014) ("Finally, this case is set for trial in a few short months [and] another extension of the remaining deadlines in this case [will] thus cause undue delay of the ultimate resolution of this matter."). Moreover, Defendants make clear that the "extension is not sought for delay [ ], but so that justice may be done." (Id. at 2). Third, there is good reason to believe that the delay was beyond Defendants' control. Lastly, the fourth and final relevant factor—the movant's good faith— weighs in favor of finding that Defendants' belatedness constitutes excusable neglect. For the foregoing reasons, the Court excuses Defendants' belated filing of their "Agreed Motion for Extension of Deadlines."

The Court next examines whether there is "good cause" to grant Defendants' "Agreed Motion for Extension of Deadlines." See, e.g., Graham v. HRchitect, Inc., No. 4:16–CV–743, 2017 WL 3216609, at *1 (E.D. Tex. July 28, 2017) ("A party seeking an after-the-fact extension [of a scheduling order] bears a heavier burden of demonstrating both 'good cause' and 'excusable neglect.' "); Richardson v. St. Phillips Coll., No. CIVASA08CV0054FBNN, 2008 WL 4724502, at *1 (W.D. Tex. Oct. 24, 2008) ("Failing to address [both] good cause and excusable neglect is reason to deny the motion [to amend the scheduling order]."). A scheduling order may only be modified for "good cause" and with the judge's consent. Fed. R. Civ. P 16(b)(4). The Fifth Circuit instructs lower courts to balance the

Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 15 of 390

Arreola v. Zapata County, Texas, Not Reported in Fed. Supp. (2017)

2017 WL 4174932

following four factors in deciding whether the good cause standard has been satisfied: "(1) the explanation for the failure [to adhere to the deadlines]; (2) the importance [of the proposed modification to the scheduling order]; (3) the potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA,* 315 F.3d 533, 535 (5th Cir. 2003) (quoting *Reliance Ins. Co. v. La. Land & Exploration Co.,* 110 F.3d 253, 257 (5th Cir. 1997) (internal quotations omitted).

 **\*2** The Court finds that the balance of factors weighs in favor of amending the amended scheduling order. First, each party requires adequate time to prepare its case. Second, the deposition of Plaintiff via a translator is important to case preparation and weighs in favor of a second amended scheduling order. Third, granting the motion gives rise to no prejudice because Plaintiff does not oppose the relief sought, thereby rending the fourth factor moot. For these reasons, the Court **GRANTS** Defendants' "Agreed Motion for Extension of Deadlines" (Dkt. No.

28) and **ISSUES** the below Second Amended Scheduling Order. Each of the following actions shall be completed by the dates indicated:

This Second Amended Scheduling Order shall not be modified, absent leave of Court and showing of good cause, and shall be binding on all parties. All other deadlines that are not specifically set out in this Second Amended Scheduling Order or a prior Scheduling Order will be governed by the Federal Rules of Civil Procedure and/or the Court's Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4174932

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.
# EX. 39

KeyCite Blue Flag – Appeal Notification
Petition for Certiorari Docketed by DEPARTMENT OF
HOMELAND SECURITY, ET AL. v. CASA DE MARYLAND, ET
AL., U.S., May 24, 2019

924 F.3d 684
United States Court of Appeals, Fourth Circuit.

CASA DE MARYLAND; Coalition for Humane
Immigrant Rights (CHIRLA); Fair Immigration
Movement (FIRM); One America; Promise Arizona;
Make the Road Pennsylvania; Michigan United;
Arkansas United Community Coalition; Junta for
Progressive Action, Inc.; Angel Aguiluz; Estefany
Rodriguez; Heymi Elvir Maldonado; Nathaly Uribe
Robledo; Eliseo Mages; Jesus Eusebio Perez;
Josue Aguiluz; Missael Garcia; Jose Aguiluz;
Maricruz Abarca; Annabelle Martines Herra; Maria
Joseline Cuellar Baldelomar; Brenda Moreno
Martinez; Luis Aguilar; J.M.O., a minor child;
Adriana Gonzales Magos, next of friend to J.M.O.;
A.M., a minor child; Isabel Cristina Aguilar Arce,
next of friend to A.M., Plaintiffs - Appellants,
v.
U.S. DEPARTMENT OF HOMELAND SECURITY;
U.S. Citizenship and Immigration Services;
U.S. Immigration and Customs Enforcement;
U.S. Customs and Border Protection; Donald
J. Trump, in his official capacity as President
of the United States; William P. Barr, in his
official capacity as Attorney General of the United
States; Elaine C. Duke, in her official capacity
as Acting Secretary of Homeland Security; L.
Francis Cissna, in his official capacity as Director
of U.S. Citizenship and Immigration Services;
Ronald D. Vitiello, in his official capacity as
Acting Director of U.S. Immigration and Customs
Enforcement; Kevin K. McAleenan, in his
official capacity in his official capacity as Acting
Commissioner of Custom and Border Protection;
United States of America, Defendants - Appellees.
Casa De Maryland; Coalition for Humane Immigrant
Rights (CHIRLA); Fair Immigration Movement
(FIRM); One America; Promise Arizona; Make
the Road Pennsylvania; Michigan United;
Arkansas United Community Coalition; Junta for
Progressive Action, Inc.; Angel Aguiluz; Estefany
Rodriguez; Heymi Elvir Maldonado; Nathaly Uribe
Robledo; Eliseo Mages; Jesus Eusebio Perez;
Josue Aguiluz; Missael Garcia; Jose Aguiluz;
Maricruz Abarca; Annabelle Martines Herra; Maria
Joseline Cuellar Baldelomar; Brenda Moreno
Martinez; Luis Aguilar; J.M.O., a minor child;
Adriana Gonzales Magos, next of friend to J.M.O.;
A.M., a minor child; Isabel Cristina Aguilar Arce,
next of friend to A.M., Plaintiffs - Appellees,
v.
U.S. Department of Homeland Security; U.S.
Citizenship and Immigration Services; U.S.
Immigration and Customs Enforcement; U.S.
Customs and Border Protection; Donald J. Trump,
in his official capacity as President of the United
States; William P. Barr, in his official capacity as
Attorney General of the United States; Elaine C.
Duke, in her official capacity as Acting Secretary
of Homeland Security; L. Francis Cissna, in his
official capacity as Director of U.S. Citizenship
and Immigration Services; Ronald D. Vitiello,
in his official capacity as Acting Director of
U.S. Immigration and Customs Enforcement;
Kevin K. McAleenan, in his official capacity in
his official capacity as Acting Commissioner
of Custom and Border Protection; United
States of America, Defendants - Appellants.

No. 18-1521, No. 18-1522
|
Argued: December 11, 2018
|
Decided: May 17, 2019

Synopsis
**Background:** Noncitizens who received forbearance of
their removal from the country under the Deferred
Action for Childhood Arrivals (DACA) policy brought
action against Department of Homeland Security (DHS),
challenging Acting Secretary of Homeland Security's
decision to rescind DACA as a violation of the Fifth
Amendment, the Administrative Procedure Act (APA),
and common law principles of estoppel. The United States
District Court for the District of Maryland, Roger W.
Titus, Senior District Judge, 284 F.Supp.3d 758, granted

in part and denied in part DHS's motion for summary judgment. DADA recipients appealed.

**Holdings:** The Court of Appeals, Diaz, Circuit Judge, held that:

[1] Immigration and Nationality Act's (INA) jurisdictional bar did not preclude judicial review of Acting Secretary's decision to rescind the DACA policy;

[2] Acting Secretary's decision to rescind DACA policy was not an unreviewable agency action that was committed to agency discretion by law;

[3] Acting Secretary's decision to rescind DACA policy was a general statement of policy that was not subject to notice and comment rulemaking;

[4] DHS failed to give a reasoned explanation for its change in policy when it rescinded DACA policy, and thus such decision was arbitrary and capricious; and

[5] government was not equitably estopped from sharing DACA applicant information.

Affirmed in part, reversed in part, vacated in part, dismissed in part, and remanded.

Richardson, Circuit Judge, wrote opinion concurring in part and dissenting in part.

West Headnotes (42)

[1]    **Aliens, Immigration, and Citizenship**
           👉 **Inadmissible at time of entry, reentry, or adjustment of status**
       **Aliens, Immigration, and Citizenship**
           👉 **Crime and Related Grounds**
       Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law.

       Cases that cite this headnote

[2]    **Aliens, Immigration, and Citizenship**
           👉 **Power to deny admission or remove in general**
       Because of the practical fact that the government can't possibly remove all removable aliens, the Secretary of Homeland Security has discretion to prioritize the removal of some and to deprioritize the removal of others.

       Cases that cite this headnote

[3]    **Courts**
           👉 **Previous Decisions as Controlling or as Precedents**
       Although not binding on courts, Department of Justice's Office of Legal Counsel's opinions reflect the legal position of the executive branch and are generally viewed as providing binding interpretive guidance for executive agencies.

       Cases that cite this headnote

[4]    **Federal Courts**
           👉 **Summary judgment**
       The Court of Appeals reviews a district court's grant of summary judgment de novo.

       Cases that cite this headnote

[5]    **Federal Courts**
           👉 **Summary judgment**
       The Court of Appeals can affirm a grant of summary judgment only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

       Cases that cite this headnote

[6]    **Federal Courts**
           👉 **Injunction**
       The Court of Appeals reviews a district court's grant of an injunction for abuse of discretion.

Cases that cite this headnote

**[7]    Federal Courts**
👉 Jurisdiction

The Court of Appeals considers the argument that claims are not justiciable de novo.

Cases that cite this headnote

**[8]    Aliens, Immigration, and Citizenship**
👉 Decisions reviewable

Immigration and Nationality Act (INA) provision limiting judicial review of actions of the Secretary of Homeland Security, which applied only to Secretary's decisions or actions to commence proceedings, adjudicate cases, or execute removal orders, did not preclude judicial review of Acting Secretary's decision to rescind the Deferred Action for Childhood Arrivals (DACA) policy, as the rescission was not a commencement of a proceeding, adjudication of a case, or execution of a removal order. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

Cases that cite this headnote

**[9]    Aliens, Immigration, and Citizenship**
👉 Decisions reviewable

Final order of removal of an alien was not required before judicial review of Acting Secretary of Homeland Security's decision to rescind Deferred Action for Childhood Arrivals (DACA) policy was permitted under INA's jurisdictional bar, which precluded judicial review of Secretary's decision or action to commence proceedings, adjudicate cases, or execute removal orders; rescission of DACA was not an initial action in the commencement of removal proceedings against any individual alien. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

Cases that cite this headnote

**[10]    Aliens, Immigration, and Citizenship**
👉 Jurisdiction and venue

Decisions to open an investigation or to surveil the suspected violator are not encompassed by Immigration and Nationality Act's jurisdictional bar, even though these decisions may be part of the deportation process. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

Cases that cite this headnote

**[11]    Federal Courts**
👉 Organization and jurisdiction of lower court; venue

A party may challenge subject matter jurisdiction for the first time on appeal.

Cases that cite this headnote

**[12]    Aliens, Immigration, and Citizenship**
👉 Decisions reviewable

Immigration and Nationality Act (INA) provision that limited judicial review to final orders of the Secretary of Homeland Security did not apply to action challenging Acting Secretary's decision to rescind Deferred Action for Childhood Arrivals (DACA) policy, as such provision only applied to review of an order of removal. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(b)(9).

Cases that cite this headnote

**[13]    Aliens, Immigration, and Citizenship**
👉 Proceedings for adoption and review

Acting Secretary of Homeland Security's decision to rescind Deferred Action for Childhood Arrival (DACA) policy was not an unreviewable agency action that was committed to agency discretion by law, where Acting Secretary was rescinding a general enforcement policy that had been in existence for over five years and affected hundreds of thousands of enrollees based on the view that the policy was unlawful. 5 U.S.C.A. § 701(a)(2).

Cases that cite this headnote

**[14]**   **Administrative Law and Procedure**
🔑 Actions Committed to Agency Discretion in General

Although there is a strong presumption in favor of judicial review of agency action, the Administrative Procedure Act bars judicial review of agency action committed to agency discretion by law. 5 U.S.C.A. § 701(a)(2).

Cases that cite this headnote

**[15]**   **Administrative Law and Procedure**
🔑 Presumptions as to Reviewability

Where an agency expresses a broad or general enforcement policy, different considerations than those driving the *Heckler v. Chaney*, 470 U.S. 821, presumption that agency enforcement decisions are unreviewable are at play; as general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion.

Cases that cite this headnote

**[16]**   **Administrative Law and Procedure**
🔑 Enforcement in general

An agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review.

Cases that cite this headnote

**[17]**   **Administrative Law and Procedure**
🔑 Trial or review de novo

The Court of Appeals reviews de novo a district court's determination that an agency decision was not subject to notice and comment rulemaking under the Administrative Procedure Act. 5 U.S.C.A. §§ 551(4)-(5), 553(a)-(c).

Cases that cite this headnote

**[18]**   **Administrative Law and Procedure**
🔑 Legislative rules; substantive rules

**Administrative Law and Procedure**
🔑 Legislative rules; substantive rules

Rules issued through the Administrative Procedure Act's notice-and-comment process are often referred to as legislative rules because they have the force and effect of law. 5 U.S.C.A. §§ 551(4)-(5), 553(a)-(c).

Cases that cite this headnote

**[19]**   **Aliens, Immigration, and Citizenship**
🔑 Proceedings for adoption and review

Acting Secretary of Homeland Security's decision to rescind Deferred Action for Childhood Arrival (DACA) policy was a general statement of policy that was not subject to notice and comment rulemaking under the Administrative Procedure Act (APA), where rescission memorandum removed a mechanism under which individuals could receive deferred action, but placed on limitations on other lawful enforcement prerogatives of the Department of Homeland Security (DHS), memorandum did not create rights or benefits enforceable by any party, and memorandum did not bind subsequent Secretaries. 5 U.S.C.A. § 553(a)-(c).

Cases that cite this headnote

**[20]**   **Administrative Law and Procedure**
🔑 Legislative rules; substantive rules

**Administrative Law and Procedure**
🔑 Policy statements; ad hoc rules

**Administrative Law and Procedure**
🔑 Notice and comment in general

The critical question in distinguishing between legislative rules and general statements of policy is whether the statement is of present binding effect; if it is, then the Administrative Procedure Act calls for notice and comment. 5 U.S.C.A. § 553(a)-(c).

Cases that cite this headnote

**[21]** **Administrative Law and Procedure**
👈 Legislative rules; substantive rules

Substantive or legislative rules, pursuant to
properly delegated authority, have the force of
law and create new law or impose new rights
or duties. 5 U.S.C.A. § 553(a)-(c).

Cases that cite this headnote

**[22]** **Administrative Law and Procedure**
👈 Legislative rules; substantive rules

**Administrative Law and Procedure**
👈 Notice and comment in general

A rule is "legislative," and thus subject
to notice and comment rulemaking
under Administrative Procedure Act, if it
supplements a statute, adopts a new position
inconsistent with existing regulations, or
otherwise effects a substantive change in
existing law or policy. 5 U.S.C.A. § 553(a)-(c).

Cases that cite this headnote

**[23]** **Administrative Law and Procedure**
👈 Policy statements; ad hoc rules

**Administrative Law and Procedure**
👈 Policy statements; other informal
pronouncements

General statements of policy, which are not
subject to notice and comment rulemaking
under Administrative Procedure Act, advise
the public prospectively of the manner in
which the agency proposes to exercise a
discretionary power. 5 U.S.C.A. § 553(b)(A).

Cases that cite this headnote

**[24]** **Administrative Law and Procedure**
👈 Policy statements; ad hoc rules

**Administrative Law and Procedure**
👈 Policy statements; other informal
pronouncements

A directive that does not establish a binding
norm and leaves agency officials free to

exercise their discretion qualifies as a general
statement of policy, which is not subject
to notice and comment rulemaking under
Administrative Procedure Act. 5 U.S.C.A. §
553(b)(A).

Cases that cite this headnote

**[25]** **Administrative Law and Procedure**
👈 Deference given to agency in general

**Administrative Law and Procedure**
👈 Presumptions and Burdens on Review

The Administrative Procedure Act's arbitrary
and capricious standard renders judicial
oversight highly deferential, with a
presumption in favor of finding the agency
action valid. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

**[26]** **Administrative Law and Procedure**
👈 Review for arbitrary, capricious,
unreasonable, or illegal actions in general

The arbitrary and capricious standard does
not reduce judicial review to a rubber stamp
of agency action; rather, courts must engage
in a searching and careful inquiry of the
administrative record, so that they may
consider whether the agency considered the
relevant factors and whether a clear error of
judgment was made. 5 U.S.C.A. § 706(2)(A).

1 Cases that cite this headnote

**[27]** **Administrative Law and Procedure**
👈 Review for arbitrary, capricious,
unreasonable, or illegal actions in general

Where agency action qualifies as
unreasonable as a matter of law, it is likely
to have been arbitrary and capricious. 5
U.S.C.A. § 706(2)(A).

Cases that cite this headnote

**[28]** **Administrative Law and Procedure**
👈 Trial or review de novo

The Court of Appeals evaluates the issue of whether agency action was arbitrary or capricious de novo, on appeal from a district court's review of the action. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[29] **Administrative Law and Procedure**
🔑 Report or opinion; reasons for decision

To comply with the Administrative Procedure Act's arbitrary and capricious standard, an agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[30] **Administrative Law and Procedure**
🔑 Findings; reason or explanation

The giving of adequate reasons for an agency's decision is one of the basic procedural requirements of administrative rulemaking.

Cases that cite this headnote

[31] **Administrative Law and Procedure**
🔑 Theory or grounds not provided or relied upon by agency

In a challenge under the Administrative Procedure Act's arbitrary and capricious standard, an agency's action must be upheld, if at all, on the basis articulated by the agency itself. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[32] **Administrative Law and Procedure**
🔑 Report or opinion; reasons for decision

An agency satisfactorily explains a decision when it provides enough clarity that its path may reasonably be discerned.

Cases that cite this headnote

[33] **Administrative Law and Procedure**
🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

If the agency provides a satisfactory explanation for a decision, the court will uphold its decision.

Cases that cite this headnote

[34] **Administrative Law and Procedure**
🔑 Findings; reason or explanation

**Administrative Law and Procedure**
🔑 Force of law in general

Where an agency has failed to provide even a minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[35] **Administrative Law and Procedure**
🔑 Change of policy; reason or explanation

In changing policies, agencies must provide a reasoned explanation for the change; at a minimum, an agency must display awareness that it is changing position and show that there are good reasons for the new policy.

Cases that cite this headnote

[36] **Administrative Law and Procedure**
🔑 Change of policy; reason or explanation

The agency's explanation for a change in policy must address the facts and circumstances that underlay or were engendered by the prior policy, including any serious reliance interests; an unexplained inconsistency in agency policy indicates that the agency's action is arbitrary and capricious and therefore unlawful. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[37] **Aliens, Immigration, and Citizenship**
🔑 Proceedings for adoption and review

Department of Homeland Security (DHS) failed to give a reasoned explanation for its change in policy when it rescinded the Deferred Action for Childhood Arrivals (DACA) policy, and thus such decision was arbitrary and capricious in violation of the Administrative Procedure Act, where DHS's rescission memorandum stated that the policy was rescinded because it was unlawful, but did not identify any statutory provision with which it conflicted, Office of Legal Counsel had provided DHS with a reasoned analysis supporting DACA's legality, DACA policy was not identical to Deferred Action for Parents of Americans (DAPA) policy that had been struck down in court and was cited by DHS as a reason for rescinding DACA, and DHS did not account for reliance interests that would have been affected by the rescission. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[38] **Estoppel**
  👉 Particular United States officers, agencies, or proceedings

Noncitizens who participated in Deferred Action for Childhood Arrivals (DACA) program could not have reasonably believed that the information they provided to government as part of their DACA applications would never be used for immigration enforcement purposes, and thus government was not equitably estopped from sharing DACA applicant information, where government had warned DACA applicants that information they provided could be used for immigration enforcement where criteria for commencement of removal proceedings or referral to law enforcement for a determination whether to commence such proceedings were met and warned that its policies governing the sharing of applicant information could be modified at any time.

Cases that cite this headnote

[39] **Estoppel**

[40] **Estoppel**
  👉 Basis of estoppel

Equitable estoppel is a well-established concept invoked by courts to aid a party who, in good faith, has relied, to his detriment, upon the representations of another.

Cases that cite this headnote

[40] **Estoppel**
  👉 Essential elements

To establish equitable estoppel, it is only necessary to show that the person sought to be estopped, by statements or conduct, misled another to his prejudice.

Cases that cite this headnote

[41] **Estoppel**
  👉 Estoppel Against Public, Government, or Public Officers

As against the government, estoppel may only be justified, if ever, in the presence of affirmative misconduct by government agents.

Cases that cite this headnote

[42] **Constitutional Law**
  👉 Resolution of non-constitutional questions before constitutional questions

It is well established that normally the court will not decide a constitutional question if there is some other ground upon which to dispose of the case.

Cases that cite this headnote

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge. (8:17-cv-02942-RWT)

**Attorneys and Law Firms**

ARGUED: John A. Freedman, Emily Newhouse Dillingham, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellants/Cross-

Appellees. Hashim M. Mooppan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees/Cross-Appellants. ON BRIEF: Elizabeth J. Bower, Kevin B. Clark, Priya R. Aiyar, WILLKIE FARR & GALLAGHER LLP, Washington, D.C.; Dennis A. Corkery, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, Washington, D.C.; Ajmel A. Quereshi, HOWARD UNIVERSITY SCHOOL OF LAW, Washington, D.C., for Appellants/Cross-Appellees. Chad A. Readler, Acting Assistant Attorney General, Mark B. Stern, Abby C. Wright, Thomas Pulham, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellees/Cross-Appellants.

Before KING, DIAZ, and RICHARDSON, Circuit Judges.

**Opinion**

Affirmed in part, reversed in part, vacated in part, dismissed in part, and remanded by published opinion. Judge Diaz wrote the majority opinion, in which Judge King joined. Judge Richardson wrote an opinion concurring in part and dissenting in part.

DIAZ, Circuit Judge:

**\*1** In 2012, the Secretary of Homeland Security established the Deferred Action for Childhood Arrivals ("DACA") policy. Under this policy, certain noncitizens who came to the United States as children could receive deferred action—a decision forbearing their removal from the country. Hundreds of thousands of individuals, including those who appear as Plaintiffs in these appeals, applied for and received grants of deferred action under DACA.

In 2017, the Acting Secretary of Homeland Security rescinded DACA, which prompted a flurry of lawsuits across the country challenging the action. Plaintiffs in these appeals (a group of individuals and organizations) allege that the government's decision to rescind DACA (and its changes to policies governing the use of information provided by DACA applicants) violates the Fifth Amendment to the U.S. Constitution, as well as the

Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq., and common law principles of estoppel.

On the government's motion for summary judgment, the district court determined that Plaintiffs' challenges were subject to judicial review, that the rescission of DACA and changes to the government's policies on use of DACA applicant information did not violate the APA, that the constitutional claims were without merit, and that DACA's rescission did not violate principles of estoppel. The court, however, ordered the government (on grounds of estoppel) to comply with the policies promulgated in 2012 on the use of information provided by DACA applicants and enjoined it from altering these policies.

As we explain, we agree with the district court that Plaintiffs' challenges are subject to judicial review. We also agree with the district court that the government's decision to rescind DACA did not require notice and comment under the APA. But the decision nonetheless violated the APA because—on the administrative record before us—it was not adequately explained and thus was arbitrary and capricious. We also conclude that the district court erred in ordering the government to comply with its policies promulgated in 2012 on the use of information provided by DACA applicants and enjoining it from altering those policies.

Given our resolution, we decline, under the doctrine of constitutional avoidance, to decide whether Plaintiffs' Fifth Amendment rights were violated. Nor do we address Plaintiffs' remaining arguments challenging the district court's grant of summary judgment.

I.

A.

**[1]** Before turning to the record material, some context is in order. The Secretary of Homeland Security is "charged with the administration and enforcement" of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1103(a)(1). One of the enforcement tools available under the INA is the removal of aliens from the United States. "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." Arizona v. United States, 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351

(2012); *see* 8 U.S.C. §§ 1182(a), 1227(a) (listing classes of deportable and inadmissible aliens).

**\*2** **[2]** Because of the "practical fact," however, that the government can't possibly remove all such aliens, the Secretary has discretion to prioritize the removal of some and to deprioritize the removal of others. *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015); *see* 6 U.S.C. § 202(5) (charging the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities"). One form of discretion the government exercises is deferred action, which "is a decision by Executive Branch officials not to pursue deportation proceedings against an individual or class of individuals otherwise eligible for removal from this country." *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 487 (9th Cir. 2018), *petition for cert. filed*, 87 U.S.L.W. 3201 (U.S. Nov. 5 & 19, 2018) (No. 18-587).

**[3]** Immigration authorities have granted deferred action and related forms of relief from deportation or removal since at least the early 1960s. *See id.* at 487-89; The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. ——, 2014 WL 10788677, at \*10-13 (Nov. 19, 2014) ("2014 OLC Opinion")[1] (addressing the Department's practices of granting deferred action ad hoc and through broad policies making relief from removal available to particular groups of aliens). The Supreme Court also has recognized deferred action by name, describing it as the executive branch's "regular practice ... of exercising ... discretion for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 484, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

[1] The Office of Legal Counsel, or OLC, is an office within the U.S. Department of Justice that drafts legal opinions of the Attorney General and provides its own written opinions and other advice in response to requests from various agencies within the executive branch. *See* 28 U.S.C. § 512 (providing that agency heads may seek legal advice from the Attorney General); 28 C.F.R. § 0.25 (delegating Attorney General's authority to render legal advice to OLC); "Office of Legal Counsel," The United States Department of Justice, https://www.justice.gov/olc (saved as ECF opinion attachment). Although not binding on courts, OLC opinions "reflect[ ] the legal

position of the executive branch" and "are generally viewed as providing binding interpretive guidance for executive agencies." *United States v. Arizona*, 641 F.3d 339, 385 n.16 (9th Cir. 2011) (internal quotation marks omitted) (Bea, J., concurring in part and dissenting in part), *aff'd in part, rev'd in part*, 567 U.S. 387, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012).

## B.

Turning now to the record material, the essential undisputed facts are as follows. To ensure government resources were not spent on the "low priority cases" of "certain young people who were brought to [the United States] as children and know only this country as home," J.A. 129, then Secretary of Homeland Security Janet Napolitano announced in a June 15, 2012, memorandum the policy that has become known as DACA. The DACA Memo made renewable two-year terms of deferred action from removal and authorization for employment available to individuals who came to the United States as children, satisfied certain other eligibility criteria,[2] and passed background checks.

[2] In its original form, deferred action was available to individuals who were under age 16 when they came to the United States, were not above age 30, had continuously (Continued) resided in the United States for at least five years preceding June 15, 2012, and were present in the country on June 15, 2012, and satisfied certain other requirements relative to public safety and education or military service.

**\*3** To be considered for deferred action under DACA, applicants had to submit to biometric screening and provide extensive personal information to the Department of Homeland Security. The Department informed applicants that the information provided was "protected from disclosure ... for the purpose of immigration enforcement proceedings" unless the requestor met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence removal proceedings.[3] J.A. 1004. The Department warned, however, that these policies could be "modified, superseded, or rescinded at any time without notice" and were "not intended to" and did not "create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.*

3      Separately, the Department noted that the information provided could be shared with national security and law enforcement agencies "for purposes other than removal." J.A. 1004.

The DACA Memo made clear that it "confer[red] no substantive right, immigration status[,] or pathway to citizenship." J.A. 131. DACA recipients, however, were eligible to receive a host of other benefits under preexisting statutes and regulations, including advance parole allowing reentry into the United States after travel abroad, social security benefits, and certain forms of public assistance. *See* 8 U.S.C. §§ 1182(d)(5)(A), 1611(b)(1), 1621(b)(1), (d); 8 C.F.R. §§ 1.3(a)(4)(vi), 212.5. DACA recipients also were eligible to receive employment authorization on a showing of economic necessity. *See* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14).

In November 2014, then Secretary of Homeland Security Jeh Johnson announced a separate deferred action policy for certain parents of United States citizens and lawful permanent residents that became known as Deferred Action for Parents of Americans ("DAPA"). [4] The DAPA memorandum also expanded DACA by (1) extending the deferred action and employment authorization terms from two to three years; (2) removing the "age cap" that previously excluded certain individuals from DACA eligibility; and (3) reducing the period of time that someone needed to be physically present in the United States to be eligible for DACA. *See* J.A. 167-68.

4      The 2014 OLC Opinion concluded that DAPA "would constitute a permissible exercise of [the Department of Homeland Security]'s enforcement discretion under the INA." J.A. 162; 2014 WL 10788677, at *23. While the opinion doesn't directly address the Department's authority to implement DACA, it does recount that, before DACA was announced, the OLC had "orally advised" the Department that the policy would be permissible "provided that immigration officials retained discretion to evaluate each application on an individualized basis." J.A. 149 n.8; 2014 WL 10788677, at *13 n.8.

A coalition of states led by Texas sued to block implementation of the DAPA policy (and its proposed expansions to DACA) on the grounds that it violated the APA and the Take Care Clause of the Constitution, U.S. Const. art. II, § 3 (the "*Texas* litigation"). *See Texas v. United States*, 86 F.Supp.3d 591, 604 & n.1, 607 (S.D. Tex.

2015). The district court in that case granted injunctive relief, *id.* at 671-72, 677-78 & n.111, and the Fifth Circuit affirmed, *Texas v. United States*, 809 F.3d 134, 178-79, 186, 188 (5th Cir. 2015). The Supreme Court affirmed the Fifth Circuit's judgment by an equally divided vote. *United States v. Texas*, ––– U.S. ––––, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016) (per curiam).

In June 2017 (approximately five months after the Trump administration took office), then Secretary of Homeland Security John Kelly rescinded DAPA but left in place DACA and the deferred action relief and employment authorizations granted between the issuance of the DAPA Memo and the district court's decision in the *Texas* litigation.

**\*4** On September 4, 2017, Attorney General Jefferson Sessions wrote to then Acting Secretary Elaine Duke, advising her to rescind DACA. According to the Attorney General:

> DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related ... DAPA ... policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. ... Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA. [ 5 ]

> In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

J.A. 379 (internal citations omitted).

5      Plaintiffs in the *Texas* litigation had written to General Sessions in June 2017, requesting that the Secretary of Homeland Security rescind DACA and prohibit new grants and renewals of deferred action. The letter warned that, if the Executive Branch failed

to so act, plaintiffs there would amend their complaint to challenge DACA.

The next day, Acting Secretary Duke rescinded DACA and instructed Department personnel to "wind-down" the policy. J.A. 380, 383. The Secretary's Rescission Memo recounts in a "Background" section the DACA and DAPA policies, the *Texas* litigation, Secretary Kelly's rescission of DAPA, the letter to Attorney General Sessions from the plaintiffs in the *Texas* litigation, and General Sessions's September 4 letter. The Rescission Memo then states:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017[,] letter from the Attorney General, it is clear that the June 15, 2012[,] DACA program should be terminated.

J.A. 383.

The Rescission Memo—which issued without notice or an opportunity for public comment—did not end DACA outright. Rather, it allowed for a case-by-case basis adjudication of initial applications for deferred action and employment authorization accepted by September 5, 2017, and renewal requests accepted by October 5, 2017, from current DACA beneficiaries whose benefits would expire between September 5, 2017, and March 5, 2018.

The Memo stated that the Department would not terminate existing grants of deferred action and employment authorization under DACA "solely based on the directives" in the Memo and would "generally honor" approved applications for advanced parole. *Id.* But it made clear that the Department would reject all other DACA applications, including initial applications filed after September 5, 2017, and all pending and future applications for advance parole under DACA. *Id.* The Memo, however, explicitly placed "no limitations" on the Department's "otherwise lawful enforcement ... prerogatives." J.A. 384.

**\*5** The Department also announced that once an individual's deferred action under DACA expired,

information provided by applicants would not be "proactively provided to [law enforcement agencies] for the purpose of immigration enforcement proceedings" unless the requestor met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence removal proceedings. J.A. 1142. For individuals whose pending DACA requests were denied, the announcement stated that "[g]enerally, information provided in DACA requests will not be proactively provided to other law enforcement entities ... for the purpose of immigration enforcement proceedings" unless the requestor posed "a risk to national security or public safety" or met criteria for commencement of removal proceedings or referral to U.S. Immigration and Customs Enforcement for a determination whether to commence removal proceedings. J.A. 1143.

Nearly 800,000 individuals have received deferred action under DACA since its inception.

C.

Plaintiffs' complaint raises a host of challenges to the government's decision to rescind DACA. First, the complaint alleges that the rescission is a substantive rule and thus requires notice-and-comment rulemaking under the APA. Next, it asserts that the government's decisions to rescind DACA and change the way the government proposed to share personal information collected from DACA applicants were arbitrary, capricious, and contrary to law, in violation of the APA, and violated the substantive and procedural due process protections of the Fifth Amendment. Plaintiffs also allege that the decision to rescind DACA violates the equal protection guarantee of the Fifth Amendment. Finally, Plaintiffs say that the government should be equitably estopped from rescinding DACA or using information provided by DACA applicants for immigration enforcement purposes beyond those first announced in 2012, when the government's information-sharing policies were first implemented.

The district court granted partial summary judgment to the government. The court found (contrary to the government's contention) that Plaintiffs' claims were justiciable. *Casa De Maryland v. DHS*, 284 F.Supp.3d 758, 768-71 (D. Md. 2018). But on the merits, the court

determined that DACA's rescission and the government's changes to its policies on information-sharing did not violate the APA and that Plaintiffs' constitutional claims lacked merit. *Id.* at 771-77. The court also determined that DACA's rescission did not violate the doctrine of estoppel. *Id.* at 777-78.

The court, however, granted summary judgment to Plaintiffs on the portion of their estoppel claim pertaining to the sharing of DACA applicant information. The court ordered the government to comply with the policies as originally announced in 2012 and enjoined it from altering these policies. *Id.* at 778-79; J.A. 1531-33.

 **[4]** **[5]** **[6]** These appeals followed. We review a district court's grant of summary judgment de novo. *Roland v. USCIS*, 850 F.3d 625, 628 (4th Cir. 2017). "We can affirm a grant of summary judgment only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Certain Underwriters at Lloyd's, London v. Cohen*, 785 F.3d 886, 889-90 (4th Cir. 2015) (internal quotation marks omitted). We review a district court's grant of an injunction for abuse of discretion. *South Carolina v. United States*, 907 F.3d 742, 753 (4th Cir. 2018).

## II.

 **[7]** We begin with the government's argument that Plaintiffs' claims are not justiciable, an issue we consider de novo. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014); *Angelex Ltd. v. United States*, 723 F.3d 500, 505 (4th Cir. 2013).

### A.

The government contends that Plaintiffs' claims are immune from judicial review under 8 U.S.C. § 1252(g), a provision of the INA stating, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

 ***6** **[8]** According to the government, § 1252(g) bars review here in two ways. First, noting that the Supreme

Court in *AAADC* observed that § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations," 525 U.S. at 485, 119 S.Ct. 936, [6] the government contends that this section bars review because DACA's rescission is a "no deferred action" decision. But this contention ignores both the plain language of § 1252(g) and the Supreme Court's determination in *AAADC* that this section "applies *only* to three discrete actions that the [Secretary of Homeland Security] may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.' " *Id.* at 482, 119 S.Ct. 936 (first emphasis added). In rescinding DACA, the Acting Secretary did none of these things.

[6]     The Supreme Court said as much after reviewing a treatise describing the practice of deferred action and litigation that would result when it was not granted. *AAADC*, 525 U.S. at 484-85, 119 S.Ct. 936. That treatise, however, referred explicitly to "[e]fforts to (Continued) challenge the refusal to exercise [deferred action] *on behalf of specific aliens.*" *Id.* at 485, 119 S.Ct. 936 (emphasis added). Plaintiffs don't challenge the refusal to grant deferred action to a particular individual.

 **[9]** **[10]** Second, the government says that § 1252(g) precludes review because DACA's rescission is an initial "action" in the commencement of removal proceedings. As the government would have it, review of its decision to rescind DACA must await a final order of removal. The Supreme Court in *AAADC* though "specifically rejected a broad reading of the three discrete actions listed in [§] 1252(g)." *Regents*, 908 F.3d at 504. Specifically, "decisions to open an investigation, [or] to surveil the suspected violator" are not encompassed by § 1252(g)'s jurisdictional bar, even though these decisions "may be part of the deportation process." *AAADC*, 525 U.S. at 482, 119 S.Ct. 936; *see Jennings v. Rodriguez*, —— U.S. ——, 138 S.Ct. 830, 841, 200 L.Ed.2d 122 (2018) (Alito, J., plurality) ("[In *AAADC*, w]e did not interpret [§ 1252(g)] to sweep in any claim that can technically be said to 'arise from' the three listed actions. ... Instead, we read the language to refer *to just those three specific actions themselves.*" (emphasis added)).

And while we accept that § 1252(g) "is specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings," *AAADC*, 525 U.S. at 487, 119 S.Ct. 936, the government hasn't

moved to remove any of the Plaintiffs. The two Circuit decisions on which the government relies to support the proposition that judicial review of DACA's rescission is available only through review of a final order of removal —*Vasquez v. Aviles*, 639 F. App'x 898 (3d Cir. 2016), and *Botezatu v. INS*, 195 F.3d 311 (7th Cir. 1999)—are inapposite. Those cases involved challenges to individual "no deferred action" decisions by aliens adjudicated removable. *Vasquez*, 639 F. App'x at 901; *Botezatu*, 195 F.3d at 314. The government's reliance on *AAADC* is therefore misplaced, and we reject its argument that § 1252(g) bars review of Plaintiffs' claims. [7]

[7]    *Accord Regents*, 908 F.3d at 504 (holding § 1252(g) doesn't deprive courts of jurisdiction to review DACA's rescission); *NAACP v. Trump*, 298 F.Supp.3d 209, 224 (D.D.C. 2018) (rejecting as "misplaced" government's reliance on *AAADC* and finding § 1252(g) didn't bar review of challenges to DACA's rescission), *appeals docketed*, Nos. 18-5243, 18-5245 (D.C. Cir. Aug. 10 & 13, 2018), *petition for cert. before judgment filed*, 87 U.S.L.W. 3204 (U.S. Nov. 5, 2018) (No. 18-588); *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 152-54 (E.D.N.Y. 2017) (rejecting government's § 1252(g) argument in challenge to DACA's rescission), *appeals docketed*, Nos. 18-1985, 18-1986 (2d Cir. July 5, 2018), *petition for cert. before judgment filed*, 87 U.S.L.W. 3201 (U.S. Nov. 5, 2018) (No. 18-589).

## B.

**\*7**  **[11]**  The government argues that another provision of the INA—8 U.S.C. § 1252(b)(9)—bars review of Plaintiffs' claims. The government did not press this argument in the district court. But because a party may challenge subject matter jurisdiction for the first time on appeal, *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003), we consider this issue.

**[12]**  Section 1252(b)(9) provides that "[j]udicial review of all questions of law and fact ... arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9). But that provision doesn't help the government here because it "applies *only* with respect to review of an *order of removal* under [8 U.S.C. § 1252(a) (1)]." *INS v. St. Cyr*, 533 U.S. 289, 313, 121 S.Ct. 2271, 150

L.Ed.2d 347 (2001) (emphases added; internal quotation marks and alteration omitted); *see Calcano-Martinez v. INS*, 232 F.3d 328, 340 (2d Cir. 2000) ("Congress enacted [§ 1252(b)(9)] for the important purpose of consolidating all claims that *may be brought in removal proceedings* into one final petition for review of a final order in the court of appeals." (emphasis added)), *aff'd*, 533 U.S. 348, 121 S.Ct. 2268, 150 L.Ed.2d 392 (2001).

The government's contention that § 1252(b)(9) bars review thus is without merit.

## C.

**[13]**  Next, the government contends that judicial review is foreclosed under the APA because the decision to rescind DACA is committed to agency discretion by law. We do not agree.

**[14]**  "Although there is a 'strong presumption' in favor of judicial review of agency action," *Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986)), the APA bars judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The government says that the Acting Secretary's decision to rescind DACA is a type of agency enforcement decision that is presumptively unreviewable under the Supreme Court's decision in *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). [8] Invoking the "broad discretion exercised by immigration officials" that is a "principal feature of the removal system," *Arizona*, 567 U.S. at 396, 132 S.Ct. 2492, the government urges that the concerns driving *Chaney*'s presumption of unreviewability apply with "particular force" in the removal context, a context in which allowing delay would result in ordering the government to allow a "continuing violation" of federal law, *AAADC*, 525 U.S. at 490, 119 S.Ct. 936.

[8]    The government doesn't appear to seriously contest that Plaintiffs' procedural APA claim challenging the decision to rescind DACA is subject to judicial review. *Accord Lincoln v. Vigil*, 508 U.S. 182, 195-98, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (process by which an agency makes a rule may be reviewed for compliance with applicable procedural requirements,

Casa De Maryland v. U.S. Department of Homeland Security, 924 F.3d 684 (2019)

2019 WL 2147204

regardless of reviewability of the substance of the rule).

And while conceding that an agency's expression of a legal interpretation announced in a broad or general enforcement policy may be reviewable, the government says that the decision to rescind DACA is distinguishable because it rested on discretionary enforcement concerns and expressed the Department of Homeland Security's view about the scope of its enforcement authority, not the substantive unlawfulness of the policy. Finally, relying on the Supreme Court's post-*Chaney* decision in *ICC v. Bhd. of Locomotive Eng'rs* ("*BLE*"), 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987), the government argues that, even if the sole rationale for the rescission decision was the view that DACA was unlawful, such rationale cannot provide a "hook" to support review of the decision.

**\*8** Because the government relies so heavily on *Chaney* for its argument, we turn to that decision. There, a group of death row inmates petitioned the Food and Drug Administration to prevent the use in lethal injections of certain drugs that the agency had not approved for that purpose. 470 U.S. at 823-24, 105 S.Ct. 1649. The agency refused to act, based on its view that its jurisdiction to act under the substantive law was unclear and, even if it had jurisdiction, it would decline to exercise that jurisdiction under its inherent discretion to do so. *Id.* at 824-25, 105 S.Ct. 1649. The petitioners filed suit, seeking an order directing the agency to act. *Id.* at 825, 105 S.Ct. 1649.

Without addressing the jurisdictional issue, the Court held that the agency's discretionary decision not to enforce the substantive law was unreviewable under the APA. *Id.* at 828, 837-38, 105 S.Ct. 1649. As the Court explained, such decisions "often involve[ ] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action ... best fits the agency's overall policies." *Id.* at 831, 105 S.Ct. 1649.

Nonenforcement decisions, the Court observed, generally do not involve the exercise of "*coercive* power over an individual's liberty or property rights," and, accordingly, do "not infringe upon areas that courts often are called upon to protect." *Id.* at 832, 105 S.Ct. 1649. Such decisions also "share[ ] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not

to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* For these reasons, the Court found, such decisions have "traditionally been committed to agency discretion," and Congress, in "enacting the APA[,] did not intend to alter that tradition." *Id.* (internal quotation marks omitted). Thus, the Court concluded, "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." *Id.*

Here, however, the Department of Homeland Security's decision to rescind DACA is not a "*Chaney*-type enforcement action[ ]." *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996). For starters, the Acting Secretary did not exercise his discretion in an individual case. [9] Nor did she identify a violation of the INA against which to act, determine whether government resources would be best spent enforcing one violation over another, or decide whether the Department would succeed if it pursued a particular violation. Rather, Acting Secretary Duke rescinded a general enforcement policy in existence for over five years and affecting hundreds of thousands of enrollees based on the view that the policy was unlawful.

9       The government correctly observes that an agency's discretionary decision to enforce the law may be unreviewable under § 701(a)(2). *See Speed Mining*, 528 F.3d at 311, 317-18 (holding agency's discretionary decision to enforce substantive law by issuing citations for safety violations was committed to agency discretion and therefore unreviewable). But *Speed Mining* is distinguishable because it involved a discretionary enforcement decision in an individual case.

**[15]** Major agency policy decisions are "quite different from day-to-day agency [ ]enforcement decisions." *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1988). Where an agency expresses a broad or general enforcement policy, different considerations than those driving *Chaney*'s presumption are at play. "As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994).

*9  **[16]**  Accordingly, as courts have recognized, an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review. *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 811-12 (D.C. Cir. 1998) (holding courts had jurisdiction under APA because challenged agency action was a general policy of refusing to enforce provision of substantive law and not a "single-shot non-enforcement decision" (citing *Crowley*, 37 F.3d at 674-76)); *see Kenney*, 96 F.3d at 1123-24 (concluding *Chaney* applies to "individual, case-by-case determinations of when to enforce existing [law] rather than permanent policies or standards" and did not encompass agency's adoption of general policies stating standards agency deemed acceptable to implement statutory goals); *Crowley*, 37 F.3d at 672-73, 675 (*Chaney*'s presumption applies if "agency bases its refusal to enforce in an individual case solely on a legal interpretation without explicitly relying on its enforcement discretion"); *see also Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (holding challenge to agency's interpretation of law and regulations advanced in enforcement policy statement was "not the type of discretionary judgment concerning the allocation of enforcement resources that [*Chaney*] shields from judicial review"); *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 767, 773 (D.C. Cir. 1992) (holding *Chaney*'s presumption "is inapplicable or at least inapposite [where plaintiff] raise[d] a facial challenge to the [agency's] statutory interpretation embodied in [a regulation] and d[id] not contest a particular enforcement decision" and citing authority in support). DACA's rescission fits well within this rubric. [10]

[10]  Our dissenting colleague contends that decisions from the D.C. Circuit supporting our view that DACA's rescission is reviewable don't explain how they can be reconciled with *Chaney*. Dis. op. at 712–14. We disagree. *See Crowley*, 37 F.3d at 675-77; *Nat'l Wildlife Fed'n*, 980 F.2d at 772-73.

The government attempts to distinguish this authority, but its efforts are unavailing. It claims DACA's rescission involved discretionary balancing because it was based on concerns about its legality and "litigation risk," a term that appears to refer to the likelihood the policy would have been invalidated had it been challenged in the *Texas* litigation. But the Rescission Memo doesn't identify the "risk" of litigation as a "consideration" on which the Acting Secretary relied in rescinding the policy. Rather, the Memo relies on the Attorney General's

conclusion that DACA needed to be rescinded because it was unlawful. [11]  True, the Attorney General's letter also proffers the conclusion that "potentially imminent litigation" would invalidate DACA, as was the case with DAPA in the *Texas* litigation. But we agree with the determination of our district court colleague Judge Bates in his opinion resolving challenges to DACA's rescission that this justification "was too closely bound up with [the Attorney General's] evaluation of DACA's legality," *NAACP*, 298 F.Supp.3d at 234, and thus cuts against *Chaney*'s presumption of unreviewability.

[11]  *See* 8 U.S.C. § 1103(a)(1) ("[D]etermination[s] and ruling[s] by the Attorney General with respect to all questions of law shall be controlling [on the Secretary of Homeland Security]."); *see Yanez-Marquez v. Lynch*, 789 F.3d 434, 450 n.6 (4th Cir. 2015) (finding Attorney General's position controlling where Department of Homeland Security and Attorney General had conflicting views about applicability of a legal doctrine).

Nor are we persuaded by the government's claim that DACA's rescission rested on the Department's view of the scope of its enforcement authority, not the substantive unlawfulness of the policy. As Judge Bates aptly noted when presented with the same argument, "this strikes the [c]ourt as a distinction without a difference. To say that a particular agency action is 'without statutory authority' is simply to say that no statutory provision authorizes that action; in a sense, therefore, it is a determination of the substantive content of each statutory provision that might plausibly apply." *Id.* at 232. We, like Judge Bates, "fail[ ] to perceive any meaningful difference between an agency's conclusion that it lacks statutory authority and its interpretation of a specific statutory provision." *Id.* [12]

[12]  Our dissenting colleague notes that Acting Secretary Duke didn't say in the Rescission Memo "that DACA *must* be terminated or that she lacked the legal authority to enforce DACA or a DACA-like program." Dis. op. at 712. It is true that Acting Secretary Duke wrote only that it was clear DACA "should" be terminated. J.A. 383. Standing alone, however, "should" can express the notion of requirement or obligation. *Should*, Webster's Third New International Dictionary Unabridged (2002) ("used ... to express duty, obligation, [or] necessity"). Given the Attorney General's evaluation of DACA's legality and the absence of any reference

to litigation risk in the Rescission Memo's list of considerations, this use of the word "should" supports our conclusion, *ante*, at 698–99, 699–700, that the Secretary rescinded DACA based on her view that the policy was unlawful. Contrary to our dissenting colleague's view, our decision today does not intrude on discretionary prerogatives of the Executive Branch (*see* Dis. op. at 713–14); rather, it "preserves the judiciary's role as the ultimate arbiter of statutory meaning while at the same time affording agencies breathing space to adopt enforcement policies for discretionary reasons," *NAACP*, 298 F.Supp.3d at 234.

**\*10** The government also relies on the Supreme Court's decision in *BLE* as further support for the view that Plaintiffs' claims are unreviewable. But there, the Supreme Court held only that "where a party petitions an agency for reconsideration on the ground of material error, *i.e.*, on the same record that was before the agency when it rendered its original decision, an order which merely denies rehearing of the prior order is not itself reviewable." 482 U.S. at 280, 107 S.Ct. 2360 (internal quotation marks, ellipsis, and alteration omitted). The government is correct that the Court also rejected the principle that, if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable," citing as an example a prosecutor's refusal to institute criminal proceedings based on the belief that the law will not sustain a conviction. *Id.* at 283, 107 S.Ct. 2360. But *BLE* still does not advance the government's argument.

For one thing, Plaintiffs here filed a timely challenge to the government's *original* decision to rescind DACA. *BLE* doesn't bar review of that type of challenge. Moreover, as the government itself concedes, Appellees' Opening & Response Br. at 19, *BLE* addressed the scope of judicial review in the context of agency non-enforcement action in an individual case. *See Crowley*, 37 F.3d at 675-77 (explaining the basis for distinguishing —for purposes of judicial review—between individual enforcement decisions and implementation of broad enforcement policies). DACA's rescission involves a broad enforcement policy, not an individual decision. [13]

[13] We accept that agency action doesn't become reviewable simply because "the agency gives a 'reviewable' reason for otherwise unreviewable action." *BLE*, 482 U.S. at 283, 107 S.Ct. 2360. But, as we've explained, DACA's rescission is not such an

unreviewable decision. *See NAACP*, 298 F.Supp.3d at 231 ("[A]n otherwise reviewable interpretation of a statute does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion.").

In sum, we hold that Plaintiffs' claims are reviewable. [14]

[14] The government has not cross-appealed from the district court's additional determination that all Plaintiffs had standing, *Casa*, 284 F.Supp.3d at 771, and the parties have not briefed this issue on appeal. Nonetheless, reviewing this issue de novo, *Bostic*, 760 F.3d at 370, we agree with the district court that the individual DACA recipient Plaintiffs have standing to sue. We consequently need not consider whether the other Plaintiffs have standing. *See id.* at 370-71.

### III.

### A.

**[17]** We turn now to the merits and consider first whether the district court erred in granting summary judgment to the government on Plaintiffs' procedural APA claim. The court determined that DACA's rescission was akin to a policy statement and thus was not subject to notice and comment under the APA. *Casa*, 284 F.Supp.3d at 772. We review this determination de novo. *Children's Hosp. of the King's Daughters, Inc. v. Azar* ("*CHKD*"), 896 F.3d 615, 619 (4th Cir. 2018).

**[18]** The APA generally requires that agencies provide notice of proposals to create, amend, or repeal a rule [15] and an opportunity for interested persons to comment on the proposal. *See* 5 U.S.C. §§ 551(4)-(5), 553(a)-(c). "Rules issued through the notice-and-comment process are often referred to as legislative rules because they have the force and effect of law." *Perez v. Mortg. Bankers Ass'n*, — U.S. ——, 135 S.Ct. 1199, 1203, 191 L.Ed.2d 186 (2015) (internal quotation marks omitted). "[T]he APA provides[, however,] that, unless another statute states otherwise, the notice-and-comment requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.' " *Id.* at 1203-04 (quoting 5 U.S.C. § 553(b)(A)).

[15]   The parties don't dispute that DACA's rescission qualifies as a "rule" for APA purposes. *See* 5 U.S.C. § 551(4).

**\*11**   [19] Plaintiffs argue that DACA's rescission required notice and comment under the APA because the Rescission Memo is a legislative rule that mandates how Department officials must act and substantively affects DACA recipients. The government rejects this premise, countering that the Memo is a general statement of policy. We agree with the government. [16]

[16]   *Accord Regents*, 908 F.3d at 512-14 (holding DACA's rescission is not a binding rule of substantive law); *NAACP*, 298 F.Supp.3d at 237 ("[T]he rescission of DACA was exempt from notice and comment as a general statement of agency policy."); *Batalla Vidal v. Nielsen*, 291 F.Supp.3d 260, 270-73 (E.D.N.Y. 2018) (dismissing notice-and-comment claims because Rescission Memo is not a legislative rule), *appeals docketed*, Nos. 18-1521, 18-1525, 18-1986 (2d Cir. May 21 & July 5, 2018).

[20]   [21]   [22] The critical question in distinguishing between legislative rules and general statements of policy is whether the statement "is of present binding effect; if it is, then the APA calls for notice and comment." *Elec. Privacy Info. Ctr. v. DHS* ("*EPIC*"), 653 F.3d 1, 7 (D.C. Cir. 2011) (internal quotation marks and ellipsis omitted). "[S]ubstantive or legislative rule[s], pursuant to properly delegated authority, ha[ve] the force of law, and create[ ] new law or impose[ ] new rights or duties." *CHKD*, 896 F.3d at 620 (internal quotation marks omitted); *see Nat'l Latino Media Coal. v. FCC*, 816 F.2d 785, 788 (D.C. Cir. 1987) ("A valid legislative rule is binding upon all persons, and on the courts, to the same extent as a congressional statute."). "To that end, a rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *CHKD*, 896 F.3d at 620 (internal quotation marks and alteration omitted).

[23]   [24] By contrast, general statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Vigil*, 508 U.S. at 197, 113 S.Ct. 2024 (internal quotation marks omitted). A directive that doesn't establish a "binding norm" and leaves agency officials free to exercise their discretion qualifies as a general statement of policy. *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir.

1995) (citing *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987), and *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1015 (9th Cir. 1987)).

The Rescission Memo removes a mechanism under which individuals could receive deferred action but places "no limitations" on other lawful enforcement prerogatives of the Department of Homeland Security. J.A. 384. As the district court observed, *Casa*, 284 F.Supp.3d at 772, the Memo doesn't curtail the Department's discretion to make deferred action available on a case-by-case or ad hoc basis. Nor does the Memo, by its terms, create "right[s] or benefit[s]" enforceable "by any party." J.A. 384.

Additionally, although DACA was rescinded based on the government's view that the policy was unlawful, the Rescission Memo doesn't bind subsequent Secretaries who might disagree with this reasoning or bar the Department from implementing other deferred action policies in the future. Contrary to Plaintiffs' arguments, the Memo doesn't "replace[ ] agency discretion with a new binding rule of substantive law," *Mada-Luna*, 813 F.2d at 1014 (internal quotation marks omitted), affecting the rights of people regulated by the Department, *see EPIC*, 653 F.3d at 7 (agency's statement "cast in mandatory language so the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences" qualifies as binding on those subject to it (internal quotation marks omitted)). It therefore falls on the policy "end of the spectrum," *CHKD*, 896 F.3d at 620-21 (internal quotation marks omitted), and thus was exempt from notice and comment under the APA.

B.

**\*12**   We consider next whether the district court erred in granting summary judgment to the government on Plaintiffs' claim that DACA's rescission is substantively invalid under the APA.

1.

[25]   [26]   [27]   [28] The APA requires a reviewing court to "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). These "criteria render our oversight highly

2019 WL 2147204

deferential, with a presumption in favor of finding the agency action valid." *Friends of Back Bay v. U.S. Army Corps of Eng'rs,* 681 F.3d 581, 587 (4th Cir. 2012) (internal quotation marks omitted). This standard, however, "does not reduce judicial review to a rubber stamp of agency action." *Id.* (internal quotation marks omitted). Rather, "we must engage in a searching and careful inquiry of the [administrative] record, so that we may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Id.* (internal quotation marks omitted). Where agency action qualifies as "unreasonable as a matter of law, it is likely to have been arbitrary and capricious." *Id.* (citing *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 377 n.23, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). "We evaluate [this issue] de novo[.]" *Id.*

**[29]** **[30]** **[31]** To comply with § 706(2)(A), an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The giving of "adequate reasons" for an agency's decision is "[o]ne of the basic procedural requirements of administrative rulemaking." *Encino Motorcars, LLC v. Navarro,* ––– U.S. ––––, 136 S.Ct. 2117, 2125, 195 L.Ed.2d 382 (2016). In a challenge under § 706(2)(A), "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm,* 463 U.S. at 50, 103 S.Ct. 2856; *see Jimenez–Cedillo v. Sessions,* 885 F.3d 292, 299 (4th Cir. 2018) ("[A] reviewing court may not speculate on reasons that might have supported a change in agency position [ ]or supply a reasoned basis for the agency's action that the agency itself has not given." (internal quotation marks and citation omitted)).

**[32]** **[33]** **[34]** An agency satisfactorily explains a decision when it provides "enough clarity that its 'path may reasonably be discerned.' " *Jimenez–Cedillo,* 885 F.3d at 297 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). If the agency provides such an explanation, "we will uphold its decision." *Id.* at 297-98, 95 S.Ct. 438. "But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars,* 136 S.Ct. at 2125.

**[35]** **[36]** These principles apply with equal force to a change in agency position. *Jimenez–Cedillo,* 885 F.3d at 298. Thus, in changing policies, agencies "must 'provide a reasoned explanation for the change.' " *Id.* (quoting *Encino Motorcars,* 136 S.Ct. at 2125). "At a minimum, an agency must 'display awareness that it is changing position and show that there are good reasons for the new policy.' " *Id.* (quoting *Encino Motorcars,* 136 S.Ct. at 2126). The agency's explanation must address the "facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests." *Encino Motorcars,* 136 S.Ct. at 2126 (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515-16, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009)). "An 'unexplained inconsistency' in agency policy indicates that the agency's action is arbitrary and capricious, and therefore unlawful." *Jimenez–Cedillo,* 885 F.3d at 298 (quoting *Encino Motorcars,* 136 S.Ct. at 2125).

2.

**\*13** **[37]** Plaintiffs argue that DACA's rescission was arbitrary and capricious because the Department of Homeland Security failed to give a reasoned explanation for the change in policy, particularly given the significant reliance interests involved. We agree. [17]

[17] Plaintiffs also assert that (1) the district court failed to consider evidence of "bad faith" and "animus" underlying the decision to rescind DACA presented in their complaint and (2) the Department's conclusions about DACA's legality are substantively incorrect. Given our disposition, we decline to address these arguments.

As we have explained, DACA was rescinded based on the Department's view that the policy was unlawful. But neither the Attorney General's September 4 letter nor the Department's Rescission Memo identify any statutory provision with which the DACA policy conflicts. *Cf. Encino Motorcars,* 136 S.Ct. at 2127 (rejecting as insufficient agency statement regarding statutory exemption proffered in support of policy change where agency did not "analyze or explain" why statute should be interpreted as agency suggested).

The Attorney General's letter does mention that the Fifth Circuit affirmed the injunction against the DAPA

policy on "multiple legal grounds" in the *Texas* litigation, J.A. 379, and the Rescission Memo cites to this ruling. The Fifth Circuit's ruling was based in part on its determination that the DAPA policy likely ran counter to the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." *Texas*, 809 F.3d at 179. There is no dispute here, however, that "DACA has no analogue in the INA." *NAACP*, 298 F.Supp.3d at 239 (internal quotation marks omitted). Further, as the Fifth Circuit explained in reaching its conclusion, "DACA and DAPA are not identical." *Texas*, 809 F.3d at 174.

The Attorney General's letter also asserts that DACA suffered from the same "constitutional defects that the courts recognized as to DAPA." J.A. 379. The courts in the *Texas* litigation, however, did not address constitutional claims. And while the Attorney General urged in his letter that his office had a duty to "defend the Constitution" and "faithfully execute the laws passed by Congress," J.A. 379, he does not explain how allowing the DACA policy to remain in effect would violate that duty.

The Attorney General's letter and the Rescission Memo also proffer the concern—based on the Attorney General's determination that the DAPA and DACA policies share the same legal defects—that "potentially imminent" litigation would result in a ruling in the *Texas* litigation enjoining DACA. Entirely absent, however, is an explanation why it was likely that the district court in the *Texas* litigation would have enjoined DACA.

Further, the 2014 OLC Opinion outlining the Department's authority to implement the DAPA policy identified "from the nature of the Take Care duty" at least "four general ... principles governing the permissible scope of enforcement discretion," J.A. 137-38; 2014 WL 10788677, at *5-6, and noted that concerns "animating DACA were ... consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion," J.A. 149 n.8; 2014 WL 10788677, at *13 n.8.

**\*14** The point is that the Department had before it at the time it rescinded DACA a reasoned analysis from the office tasked with providing legal advice to all executive branch agencies that supported the policy's legality. Yet the Department changed course without any explanation for why that analysis was faulty. *Cf. Fox*

*Television Stations*, 556 U.S. at 516, 129 S.Ct. 1800 ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay ... the prior policy.").

Nor did the Department adequately account for the reliance interests that would be affected by its decision. Hundreds of thousands of people had structured their lives on the availability of deferred action during the over five years between the implementation of DACA and the decision to rescind. Although the government insists that Acting Secretary Duke [18] considered these interests in connection with her decision to rescind DACA, her Memo makes no mention of them.

[18]    The government urges us to consider the June 2018 memorandum from former Secretary of Homeland Security Kirstjen Nielsen belatedly proffered by the government as a basis for upholding DACA's rescission. We decline to do so because the memorandum was not part of the administrative record in this appeal. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

Accordingly, we hold that the Department's decision to rescind DACA was arbitrary and capricious and must be set aside.

## IV.

**[38]** We turn next to the district court's rulings (1) granting summary judgment to Plaintiffs on the portion of their estoppel claim pertaining to sharing of DACA applicant information, and (2) ordering the government to comply with the information-sharing policies promulgated in 2012 and enjoining it from altering those policies.

**[39]  [40]  [41]** "Equitable estoppel is a well-established concept invoked by courts to aid a party who, in good faith, has relied, to his detriment, upon the representations of another." *United States ex rel. Humble Oil & Ref. Co. v. Fid. & Cas. Co. of N.Y.*, 402 F.2d 893, 897 (4th Cir. 1968) (internal footnote omitted). To establish equitable estoppel, "[i]t is only necessary to show that the person [sought to be] estopped, by ... statements or conduct, misled another to his prejudice." *Id.* at 898 (quoting *United States ex rel. Noland Co. v. Wood*, 99 F.2d 80, 82 (4th Cir. 1938)). As against the government, "estoppel may only be

justified, if ever, in the presence of affirmative misconduct by government agents." *Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003).

In enjoining the government, the district court determined that estoppel "potentially would apply to any use for immigration enforcement of the information collected ... during DACA registrations" because "the Government promised not to transfer or use the information gathered from [DACA applicants] for immigration enforcement." *Casa*, 284 F.Supp.3d at 778.

We disagree with the district court. The government did not make such a promise or suggest in any other way that its policies governing the sharing of information provided by DACA applicants would never change. Rather, the government warned DACA applicants that information they provided could be used for immigration enforcement where criteria for commencement of removal proceedings or referral to law enforcement for a determination whether to commence such proceedings were met. It also warned that its policies governing the sharing of applicant information could be "modified, superseded, or rescinded at any time without notice" and created no "right or benefit." J.A. 1004. In view of these clear and unequivocal warnings, Plaintiffs could not reasonably believe that the information they provided as part of their DACA application would never be used for immigration enforcement purposes. *Cf. Volvo Trucks of N. Am., Inc. v. United States*, 367 F.3d 204, 212 (4th Cir. 2004) ("Equitable estoppel requires reasonable reliance."). Plaintiffs' equitable estoppel claim thus necessarily fails.

## V.

***15** [42] We turn finally to Plaintiffs' constitutional claims, which were dismissed by the district court. We decline to decide whether DACA's rescission violates the Fifth Amendment's due process and equal protection guarantees under the "well established principle governing the prudent exercise of this [c]ourt's jurisdiction that normally the [c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia Cty. v. McMillan*, 466 U.S. 48, 51, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984) (per curiam). Because we have determined that DACA's rescission

violates the APA, we need go no further. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016).

We also decline to decide whether Plaintiffs' Fifth Amendment rights were violated by the policies announced on September 5, 2017, regarding the sharing of personal information from DACA applicants.[19] *McMillan*, 466 U.S. at 51, 104 S.Ct. 1577. Our decision today restores DACA to its pre-September 5, 2017, status, rendering a nullity the information-sharing policies announced on September 5. It therefore is unnecessary to address Plaintiffs' constitutional challenge to these policies. *See Veasey*, 830 F.3d at 265.[20]

[19]     Although the district court found Plaintiffs' due process claims lacked merit, its analysis addressed DACA's rescission, not information-sharing. *Casa*, 284 F.Supp.3d at 775-77.

[20]     Plaintiffs also contend that the district court misapplied Fed. R. Civ. P. 56 by failing to (1) afford them a reasonable opportunity for discovery on their claims, (2) consider or address their statement of material facts in dispute, and (3) view the facts in the light most favorable to them. They allege further that the district court misapplied the APA by granting summary judgment to the government without addressing their (Continued) contention that the administrative record was incomplete and by failing to consider evidence of "bad faith and improper behavior" by government officials. Given our disposition, we find it unnecessary to address these issues.

## VI.

To sum up: We affirm the district court's rulings that Plaintiffs' claims are justiciable and that DACA's rescission did not require notice and comment under the APA. We reverse the district court's ruling sustaining the rescission of the policy as valid under 5 U.S.C. § 706(2)(A). DACA's rescission is vacated as arbitrary and capricious, and the matter is remanded for further proceedings consistent with this opinion. We reverse the district court's ruling finding Plaintiffs entitled to injunctive relief on equitable estoppel grounds, reverse the grant of summary judgment in Plaintiffs' favor, and vacate the injunction. Because we find it unnecessary to decide Plaintiffs' constitutional challenges to DACA's rescission and the related changes to the Department's

policies governing use of information provided by DACA applicants, we vacate the district court's judgment on these issues and dismiss those claims.

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, DISMISSED IN PART, AND REMANDED*

RICHARDSON, Circuit Judge, concurring in part and dissenting in part:

The plaintiffs ask this Court to invalidate the rescission of DACA, a seven-year-old program explained at its inception as an act of prosecutorial discretion. The Majority's opinion grants this request, reasoning that the Department of Homeland Security behaved in an arbitrary and capricious manner by giving what my good colleagues decide are faulty legal reasons for rescinding the discretionary policy.

I disagree with the premise that the Administrative Procedure Act permits this review of the Executive Branch's rescission of DACA. Enforcement discretion lies at the heart of executive power. The Executive may decide to prosecute, or not prosecute, an individual or a group so long as the reasons for that decision are constitutionally sound and the decision does not violate or abdicate the Executive's statutory duties. Here, the Executive's proper exercise of that discretion to rescind DACA is judicially unreviewable under the Administrative Procedure Act, regardless of one's view of the policy questions underlying DACA. To hold otherwise permits the Judicial Branch to invade the province of the Executive and impair the carefully constructed separation of powers laid out in our Constitution.

### I. Background

**\*16** The Secretary of Homeland Security is charged by statute with enforcing the nation's immigration laws. *See* 8 U.S.C. § 1103(a); 6 U.S.C. § 202(5). Among those responsibilities is removing individuals subject to removal under federal law. *See Arizona v. United States*, 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.* At each stage of the process—from investigation to execution of a removal order—the Secretary has the discretion to pursue

removal or forbear doing so. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

The Secretary has used this discretion to prioritize the removal of certain categories of aliens and deprioritize others. *See, e.g.*, Memorandum from Doris Meissner, Commissioner, Dep't of Justice, Immigration & Naturalization Service, "Exercising Prosecutorial Discretion" 7–9 (Nov. 17, 2000) (deprioritizing the removal of aliens who, for instance, resided in the United States for a long time, had little to no criminal history, and had greater ties to the United States than another country); Memorandum from John Morton, Director, Dep't of Homeland Sec., Immigration & Customs Enforcement, "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" 2 (June 17, 2011) (deprioritizing the removal of veterans, minors, elderly individuals, pregnant women, and various other groups). On top of these general, department-wide enforcement policies, individual agents have been empowered to exercise enforcement discretion based on specific circumstances. *See, e.g.*, Meissner Memorandum at 1–2. Just as a highway patrolman has discretion whether to pull over a given driver (and even after pulling someone over, whether to give that person a ticket), immigration agents can weigh individual and country-specific humanitarian circumstances when deciding whether to exercise their prosecutorial discretion. *See* Morton Memorandum at 4.

Relying on this broad enforcement discretion to set enforcement priorities and to guide agents in rendering their individualized enforcement decisions, the Secretary of Homeland Security established the DACA program. Memorandum from Janet Napolitano, Secretary, Dep't of Homeland Sec., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012). DACA authorized agents to grant deferred action [1] to certain people brought illegally to the United States as children. Under DACA, aliens who applied and satisfied certain gateway criteria were "granted" or "denied" deferred action, ostensibly on an individualized, case-by-case basis. *Id.* Even when granted, deferred action could be revoked unilaterally by the Department. *See AAADC*, 525 U.S. at 484–85, 119 S.Ct. 936. The DACA memorandum stated expressly

that it conferred upon recipients of deferred action "no substantive right, immigration status or pathway to citizenship." Napolitano Memorandum at 3.

[1]     "Deferred action" means "an act of administrative convenience to the government which gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14).

Two years later, the Secretary expanded DACA by loosening some restrictions and extending the period of deferred action from two years to three. Memorandum from Jeh Johnson, Secretary, Dep't of Homeland Sec., "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants" (Nov. 20, 2014). In the same action, the Secretary also created a new enforcement policy, known as "DAPA," extending "deferred action, on a case-by-case basis," to parents of American citizens and lawful permanent residents. *Id.* at 4.

**\*17**  Led by Texas, a coalition of states challenged this new policy in federal court, arguing that DAPA (and the DACA expansion) violated the Administrative Procedure Act as well as the President's Article II duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. The district court preliminarily enjoined DAPA, holding that the Department had "legislated a substantive rule without complying with the procedural requirements under the" APA. *Texas v. United States,* 86 F.Supp.3d 591, 677 (S.D. Tex. 2015). The Fifth Circuit affirmed the district court, finding that the Department had promulgated DAPA in violation of the APA and that it was "manifestly contrary" to the Immigration and Nationality Act ("INA"). *Texas v. United States,* 809 F.3d 134, 182 (5th Cir. 2015).[2]

[2]     In finding DAPA subject to review under the APA, the Fifth Circuit held that deferred action "is much more than nonenforcement." *Texas,* 809 F.3d at 166. The court reasoned that since recipients are conferred "lawful presence" and may receive associated benefits such as driver's licenses and unemployment insurance, deferred action was not an exercise of enforcement discretion. *Id.* at 168, 168 n.108.

The Supreme Court granted certiorari and directed the parties to brief not only the issues decided by the Fifth Circuit, but also whether "the Guidance violates the Take Care Clause of the Constitution, Art. II, § 3." *United States v. Texas,* ― U.S. ――, 136 S.Ct. 906, 193 L.Ed.2d 788 (2016). But after oral argument, the Fifth Circuit

decision was summarily affirmed by an equally divided Court. *United States v. Texas,* ― U.S. ――, 136 S.Ct. 2271, 2272, 195 L.Ed.2d 638 (2016).

In response, the Secretary rescinded the enjoined DAPA program and DACA expansion. Memorandum from John Kelly, Secretary, Dep't of Homeland Sec., "Rescission of November 20, 2014 Memorandum" (June 15, 2017). And several months later, after Texas threatened to challenge the original DACA policy, the Acting Secretary similarly rescinded DACA. Memorandum from Elaine Duke, Acting Secretary, Dep't of Homeland Sec., "Rescission of the June 15, 2012 Memorandum" (Sept. 5, 2017).

In justifying her decision to rescind DACA, the Acting Secretary referred to the Supreme Court and Fifth Circuit decisions in the DAPA litigation. She also relied on a letter from the Attorney General that asserted that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." *Id.* at 3–4. The Acting Secretary nonetheless ordered that DACA be wound down in stages over a six-month period. *Id.*

## II. Administrative Procedure Act Review

The plaintiffs primarily contend that the rescission of DACA violates the APA. Because I find that immigration enforcement decisions are committed to the discretion of the Department, I part with my colleagues and conclude that the rescission of DACA is judicially unreviewable under the APA.[3]

[3]     The plaintiffs' constitutional claims are, of course, reviewable, and I address them separately below.

### A. Discretionary enforcement decisions are presumptively unreviewable.

The APA regulates the decisionmaking process of federal agencies. As such, the statute provides for the judicial review of a "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Even so, the statute does not permit review of agency action that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This provision applies to a variety of agency decisions

2019 WL 2147204

that are unsuitable for judicial review. *See Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). One essential category of decisions "generally committed to an agency's absolute discretion" consists of enforcement decisions, both in the civil and criminal arenas. *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

**\*18** Discretion in prosecutorial enforcement is deeply rooted in the Constitution's separation of powers. *See, e.g.*, *In re Aiken County*, 725 F.3d 255, 264 (D.C. Cir. 2013); Saikrishna Prakash, *The Chief Prosecutor*, 73 GEO. WASH. L. REV. 521, 537–63 (2005). Indeed, the division of labor with respect to enforcement is among the most critical protections the Constitution affords: The Executive Branch decides whether and when to bring enforcement actions while the Judicial Branch adjudicates the government's claims. This division reflects the Framers' recognition that, "in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986).

Encroachment by the judiciary into enforcement decisions upsets this constitutional balance. If judges could decide which cases to prosecute, that would combine the role of prosecutor and judge in one branch of government, seriously risking individual liberty. *See In re United States*, 345 F.3d 450, 454 (7th Cir. 2003); *see also* 1 BARON DE MONTESQUIEU, THE SPIRIT OF LAWS 154 (Thomas Nugent trans., 6th ed. 1792) ("[T]here is no liberty, if the judiciary power be not separated from the legislative and executive."). And if the judiciary could decide which meritorious cases *not* to prosecute, that would improperly divest the President, who unlike judges is elected by the people, of the executive authority that the Constitution affords to protect public safety and enhance public welfare. Thus, in "the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.' " *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)); *see also United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("[T]he Executive Branch has exclusive authority

and absolute discretion to decide whether to prosecute a case."). The judiciary's role is to protect individuals by properly adjudicating the charges against them—for example, by dismissing meritless enforcement actions after they are filed. It is normally neither appropriate nor necessary for judges to involve themselves in the decision to bring, or not to bring, enforcement actions.

Though perhaps more often discussed in the criminal context, this broad enforcement discretion also encompasses civil enforcement decisions. *See Speed Mining, Inc. v. Federal Mine Safety*, 528 F.3d 310, 317 (4th Cir. 2008); *see also Southern Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 448, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979). Indeed, the Supreme Court has recognized that the concerns that counsel against reviewing criminal enforcement decisions are even stronger in the context of immigration removal decisions. *AAADC*, 525 U.S. at 490, 119 S.Ct. 936 (noting that the "systemic costs" of judicial supervision of enforcement decisions are "greatly magnified in the deportation context"); *see also Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).

The nature of civil enforcement discretion led the Supreme Court in *Heckler v. Chaney* to hold that an agency's nonenforcement decision was presumptively unreviewable under the APA. In that case, the Food and Drug Administration refused to take civil enforcement action against a class of drug manufacturers and others who produced and distributed drugs used by states to perform executions. The FDA explained its decision not to institute any enforcement action as a product of concerns that it lacked jurisdiction to address the use of drugs in such a way. Yet even if it could, the FDA noted that it would decline to exercise jurisdiction over those manufacturers under its inherent enforcement discretion. The Court found the decision to be presumptively unreviewable under the APA because agency enforcement decisions "involve[ ] a complicated balancing of a number of factors," like allocating resources and prioritizing policies, that "are peculiarly within [the FDA's] expertise" and are thus generally unsuitable for judicial review. *Chaney*, 470 U.S. at 831, 105 S.Ct. 1649; *cf. Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (noting that the factors that underlie prosecution decisions are of the type that courts are not competent to evaluate).

**\*19**  While civil enforcement decisions are presumptively unreviewable, Congress can overcome that presumption by "circumscrib[ing] agency enforcement discretion" through a substantive statute. *Chaney*, 470 U.S. at 834, 105 S.Ct. 1649; *see also id.* at 830, 105 S.Ct. 1649 (noting that judicial review is unavailable under the APA if the statute provides "no judicially manageable standards ... for judging how and when an agency should exercise its discretion"). In this way, Congress retains the ability to restrict the Executive's enforcement discretion. In *Chaney*, to decide whether the FDA was so restricted, the Court examined the relevant statutory provisions and determined that the statutes provided no dictate about when enforcement discretion must be exercised. Since the FDA's enforcement discretion was both statutorily authorized and unconstrained, the Court held that the enforcement decision was not subject to APA review.

*Chaney* also noted, without deciding, two other possible bases for judicial review of civil nonenforcement decisions: if (1) the decision was based "solely on belief that [the agency] lacked jurisdiction"; or (2) an agency expressly adopted a "general policy that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4, 105 S.Ct. 1649. The Supreme Court later rejected the first possibility in *I.C.C. v. Brotherhood of Locomotive Engineers*, finding that an agency's reliance on a "reviewable reason" for an otherwise unreviewable discretionary decision did not transform the decision into one subject to APA review. 482 U.S. 270, 283, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987). The second, which might be thought related to the Take Care Clause, U.S. CONST. art II, § 3, remains a narrow exception theoretically permitting judicial review of agency enforcement decisions in some rare cases.

### B. The rescission of DACA is not reviewable.

The decision to rescind DACA is precisely the sort of enforcement decision that is "traditionally ... 'committed to agency discretion' " and not reviewable by the courts. *Chaney*, 470 U.S. at 832, 105 S.Ct. 1649. None of the recognized exceptions to that limitation apply, and so the rescission of DACA is not reviewable under the APA.

The Supreme Court has recognized that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). Indeed, executive decisions about immigration enforcement are even further beyond the capacity of judicial review than criminal enforcement decisions, which are otherwise thought to represent the peak of executive discretion. *AAADC*, 525 U.S. at 489–90, 119 S.Ct. 936.

As a result, with or without DACA, government agents have discretion to grant deferred action in individual cases. *Id.* at 483–84, 484 n.8, 119 S.Ct. 936. At least by its own terms, DACA did not eliminate the individualized discretion over enforcement decisions: it created procedural and substantive scaffolding to guide that discretion. *See* Napolitano Memorandum at 2. Rescinding DACA took away the scaffolding but left the underlying core—individualized discretion—untouched. Thus, insofar as DACA is merely a programmatic enforcement decision, so is its rescission, and both are unreviewable.

The best argument in favor of reviewability is that DACA itself was something other than an enforcement decision. Once granted, deferred action makes recipients eligible for benefits such as the ability to work legally in the country. These are subsidiary or collateral benefits that arise from other legal provisions not challenged here. *See* 8 U.S.C. § 1324a(h)(3) (" '[U]nauthorized alien' means ... that the alien is not at that time ... authorized to be so employed by this chapter or by the Attorney General."); *see also* 8 C.F.R. § 274a.12(c)(14). Yet the Fifth Circuit found DAPA reviewable because it "would affirmatively confer 'lawful presence' and associated benefits." *Texas*, 809 F.3d at 166. Moreover, some have argued that DACA only masquerades as a program involving individualized discretion and in fact amounts to an entitlement of benefits for the class of aliens who meet the program's threshold criteria. Again, the Fifth Circuit reached a similar conclusion about DAPA. *See id.* at 171–76.

**\*20**  But neither side presses such an argument in this case, and for good reason. The government does not because it claims DACA's rescission is unreviewable. Nor do the plaintiffs, because if they did, their case would be much harder on the merits. DACA relied on identified individualized enforcement as a necessary predicate for the program's existence. *See* The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others, 38 Op. O.L.C. ——, 2014 WL 10788677, at \*13 n.8 (Nov. 19, 2014). If

that predicate was false, then DACA was almost surely procedurally and substantively invalid. And that would mean one of the Department's proffered explanations for rescinding DACA—that it was likely unlawful—was valid. Unsurprisingly then, the plaintiffs do not rely on this point, giving us no occasion to consider whether DACA might be anything other than what it claimed to be: a program for a specific exercise of prosecutorial discretion.

No other exception makes the plaintiffs' APA claims reviewable. In particular, nothing in the INA overcomes *Chaney*'s presumption of unreviewability. That presumption "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Chaney*, 470 U.S. at 832–33, 105 S.Ct. 1649; *see also Webster v. Doe*, 486 U.S. 592, 600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) ("§ 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based[.]"). Nothing in the INA cabins the government's broad immigration enforcement discretion. To the contrary, the INA expansively vests the Secretary of Homeland Security with authority for "establishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5); *see also* 8 U.S.C. § 1103(a)(1). Our nation's immigration laws do not limit the Secretary's authority to enforce those laws by removing illegal aliens. As a result, the INA does not overcome the presumptive unreviewability of the DACA rescission.

## C. The generalized nature of DACA does not render its rescission reviewable.

The Majority adopts a new exception, contending that general enforcement policies, unlike individual enforcement decisions, are reviewable. While this exception has some support in out-of-circuit precedent, I would reject it.

This exception is grounded in dictum from *Chaney*, which left open the possibility of review when an agency adopts a "general policy *that is so extreme as to amount to an abdication of its statutory responsibilities*." *Chaney*, 470 U.S. at 833 n.4, 105 S.Ct. 1649 (emphasis added). That is, a general policy that licensed illegal conduct across the board or that categorically excluded a class of individuals from complying with the law might well be reviewable. But nobody here is arguing that the *rescission* of DACA should be so characterized. Nor could they. A return to

the pre-DACA regime would increase the Department's enforcement of the immigration laws, not abandon it.

A few cases from the D.C. Circuit seem to stretch *Chaney*'s dictum to encompass any "general enforcement policy," as opposed to a "single-shot nonenforcement decision." *E.g.*, *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994)). The facts of these cases suggest this principle may be narrower than it appears at first blush. For example, in some cases, the agency's policy was promulgated as a binding regulation after notice-and-comment rulemaking, which would of course be much more amenable to judicial review than a program like DACA, announced by an informal memorandum. *See National Wildlife Federation v. EPA*, 980 F.2d 765 (D.C. Cir. 1992). It also appears that these cases did not involve programs that, like DACA, were expressly predicated on the agency's exercise of individualized discretion.

**\*21** To the extent that the D.C. Circuit *has* embraced the broad principle that *any* "general enforcement policy" is judicially reviewable, that principle simply cannot be reconciled with *Chaney*. There, the Supreme Court held unreviewable the FDA's categorical decision not to take enforcement action against a *class of actors* (drug manufacturers, prison administrators, and others in the drug distribution chain). 470 U.S. at 824–25, 837–38, 105 S.Ct. 1649. The fact that the decision was made by the FDA Commissioner made no difference. *See id.* at 824, 105 S.Ct. 1649. The D.C. Circuit's decisions in this area do not even attempt to explain how this sweeping principle can be reconciled with the facts of *Chaney*. *See, e.g.*, *Crowley*, 37 F.3d at 675–77. Indeed, they often have no reasoning, simply reciting language (often dicta) from earlier circuit cases.

Such a broad exception for "generalized enforcement policies" would also unduly trammel the Executive Branch in carrying out its duties. The head of an agency has every right to exercise enforcement discretion. Standardizing (*i.e.*, generalizing) how agents use their prosecutorial discretion does not alter its character. Whether the Secretary exercises her discretion over an individual case or provides guidance for how discretion should be applied in a class of cases, the decision is unreviewable as one "committed to agency discretion by law." Under the plaintiffs' view, a line agent's decision not

to remove a cancer-stricken alien would be unreviewable, but a front-office policy directing line agents to consider whether an alien is terminally ill would be reviewable. That distinction is untenable. *See Perales v. Casillas*, 903 F.2d 1043, 1048 (5th Cir. 1990) (holding that § 701(a)(2) precluded review of a categorical refusal by a district office to grant work authorization and pre-hearing voluntary departure to a certain class of eligible aliens over a three-year period).

As anyone who has exercised enforcement discretion knows, supervisory control over that discretion is necessary to avoid arbitrariness and ensure consistency. Supervision through generalized guidance that directs the exercise of enforcement discretion cannot transform the enforcement directive into a reviewable action. To find that discretionary enforcement decisions are unreviewable only when inferior officers exercise single-shot enforcement decisions also brushes aside the separation of powers that the Constitution lays out. The President is empowered by Article II to "take Care that the Laws be faithfully executed," and thus may hire officers to assist in these duties. But the constitutional responsibility remains firmly at the President's feet, and therefore, the President remains responsible for his subordinates' exercise of executive power. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) ("The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them."). [4]

[4] The supervisory use of prosecutorial discretion is not a novel phenomenon. *See, e.g.*, *Treasury Department Circular to the Supervisors of the Revenue* (Sept. 30, 1791), in 9 PAPERS OF ALEXANDER HAMILTON 248–49 (Harold C. Syrett ed., 1965) (advising Treasury officials that "a great relaxation appears unavoidable" in enforcing provisions for seizing spirits without required certificates); Ruth Wedgwood, *The Revolutionary Martyrdom of Jonathan Robbins*, 100 YALE L.J. 229, 278, 339–53 (1990) (describing President Adams's decision to direct the federal prosecutor to enter a *nolle prosequi* for an allegedly mutinous sailor and describing then-Representative John Marshall's floor speech defending the Executive's prosecutorial discretion, *see* 10 ANNALS OF CONG., 6th Cong. 1st Sess. 614–17 (Mar. 7, 1800)); DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS,

THE JEFFERSONIANS: 1801–1829, at 5–6 (2001) (noting President Jefferson's "decision to pardon two individuals who had been convicted under the Sedition Act and to quash the pending prosecution of a third"); Letter from Thomas Jefferson to William Duane (May 23, 1801), in 8 THE WRITINGS OF THOMAS JEFFERSON 54, 55 (Paul Leicester Ford ed., 1897) (explaining that whenever President Jefferson should be met with a prosecution under the Sedition law he would treat it as a nullity and order a *nolle prosequi*).

**\*22** DACA—at least on its face—was just such an unreviewable exercise of supervisory enforcement discretion. It was issued by the Secretary and instructed her subordinates when and how to exercise their discretion, emphasizing that "requests for relief pursuant to this memorandum are to be decided on a case by case basis." Napolitano Memorandum at 2. Such general decisions on enforcement policy, no less than the individual decisions that flow from them, cannot be reviewed by the courts without intruding on the prerogatives of the Executive Branch. And that is necessarily true of DACA's rescission, which merely removed one avenue for exercising individualized discretion. As a result, the rescission is an even less viable candidate for judicial review than is the promulgation of DACA.

**D. The Acting Secretary's use of legal reasoning in rescinding DACA does not render her decision reviewable.**

The plaintiffs also argue that the Acting Secretary's use of legal reasoning in deciding to rescind DACA makes the decision subject to judicial review. In their view, courts can evaluate legal determinations.

This argument is foreclosed by Supreme Court precedent. The Supreme Court has matter-of-factly explained that there is no "principle that if the agency gives a reviewable reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283, 107 S.Ct. 2360 (internal quotation marks omitted). Enforcement decisions are often intertwined with legal reasoning, most obviously "the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction." *Id.* The Court found it "entirely clear" that this "reviewable" proposition cannot render the prosecutor's "refusal to prosecute" subject to judicial review. *Id.*

Efforts to distinguish *BLE* factually cannot avoid its holding. In *BLE*, an agency had refused to reconsider a prior decision on the ground of material error. The Court found that such denials of reconsideration have "traditionally been 'committed to agency discretion by law.' " *Id.* at 282, 107 S.Ct. 2360 (quoting *Chaney*, 470 U.S. at 832, 105 S.Ct. 1649). As here, the plaintiffs argued that the particular decision before the Court should be reviewable anyway, because the agency had based its refusal on a reviewable issue of law. The Court disagreed and held, as noted, that an unreviewable decision does not become reviewable by virtue of the reasons provided. *Id.* at 280–81, 107 S.Ct. 2360. That holding is plainly not limited to cases involving requests for reconsideration. After *BLE*, the scope of permissible judicial review must be determined by the type of agency action at issue and not the agency's reasons for acting.

Just as in *BLE*, there is a nonsensical implication in the plaintiffs' position: that the Executive's discretion is more constrained when it gives a "reviewable" reason for its actions than when it gives no reason at all. If the Acting Secretary was wrong about the likely illegality of DACA,[5] then this might mean that she had provided *no lawful reason* for the rescission. But in the context of the Executive's enforcement discretion, this is perfectly appropriate. The Executive need not explain why it makes particular enforcement and non-enforcement decisions. The Judicial Branch cannot bootstrap review of decisions committed to the discretion of the other branches simply because the reasons provided are of a type that judges consider themselves competent to evaluate.

[5]    Evaluating the actual legality of DACA requires considering whether and how a court may adjudicate an alleged violation of the Take Care Clause. *See Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613, 9 L.Ed. 1181 (1838). But it also requires addressing the distinct question of whether and how one presidential administration may determine that a previous administration's policy was inconsistent with the constitutional obligation to take care that the nation's immigration laws be faithfully executed. *Cf.* Letter from President George Washington to Sec'y Alexander Hamilton, U.S. Dep't of the Treasury (Sept. 7, 1792) in 32 WRITINGS OF GEORGE WASHINGTON 144 (John C. Fitzpatrick ed., 1939) (writing in 1792 about enforcing unpopular tax laws, President Washington explained that it was his "duty to see the Laws executed: to permit them to be

trampled upon with impunity would be repugnant to it").

**\*23**    In any event, the Acting Secretary's rescission memorandum was not a mere statement on the legality of DACA. Instead, the memorandum considered various court rulings as well as the Attorney General's letter before concluding that the "DACA program *should* be terminated." Duke Memorandum at 4 (emphasis added). She did not say that DACA *must* be terminated or that she lacked the legal authority to enforce DACA or a DACA-like program. And in declaring the rescission of DACA after a six-month wind-down period, the Acting Secretary invoked her statutory authority to "establish[ ] national immigration policies and priorities." *Id.* The Acting Secretary's legal analysis was only one aspect of her reasoning for rescinding DACA, and, of course, a prosecutor may consider beliefs about the law when setting enforcement policy, *see BLE*, 482 U.S. at 283, 107 S.Ct. 2360.

For these reasons, I conclude that the plaintiffs' APA claims are not reviewable and would dismiss them.

### III. Constitutional Claims

Because they rule for the plaintiffs under the APA, my colleagues in the Majority decline to address the plaintiffs' constitutional claims. But because I find the plaintiffs' APA claims to be unreviewable, I must briefly address their claims that the rescission of DACA also violates the Fifth Amendment's guarantees of Due Process and Equal Protection.[6] I have little trouble concluding that it did not.

[6]    Of course, courts may review the exercise of enforcement discretion for compliance with the Constitution. *See Armstrong*, 517 U.S. at 464, 116 S.Ct. 1480.

### A. Due Process

The plaintiffs' due process claim fails to articulate a constitutionally protected life, liberty, or property interest impacted by the rescission of DACA. And without a protected interest, there can be no unconstitutional deprivation.

2019 WL 2147204

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V, cl. 4. A plaintiff raising a due process claim must thus begin by identifying a relevant liberty or property interest. *Wooten v. Clifton Forge Sch. Bd.*, 655 F.2d 552, 554 (4th Cir. 1981). While a government benefit may create such an interest, "a person clearly must have more than an abstract need or desire for [the benefit] .... He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

While the plaintiffs argue that DACA created such a claim of entitlement, it did not. On its face, DACA explicitly conferred no protected property or liberty interest, making deferred action putatively available on a discretionary case-by-case basis for two-year periods that could be terminated at any time at the Secretary's discretion. *See* Napolitano Memorandum at 2–3; *AAADC*, 525 U.S. at 484–85, 119 S.Ct. 936. The memorandum itself acknowledged that such rights could be conferred only by "Congress, acting through its legislative authority." *Id.* at 3; *see also Smith v. Ashcroft*, 295 F.3d 425, 429 (4th Cir. 2002) (noting that for a statute to create a liberty or property interest, "it must confer more than a mere expectation (even one supported by consistent government practice) of a benefit"). Having failed to show a protected interest, the plaintiffs' due process claim fails.

The plaintiffs may have serious concerns about our nation's immigration laws and the Department's policy of enforcing those laws. But an understandable policy concern is not a legally cognizable right. The rescission of DACA simply does not generate a due process claim.

### B. Equal Protection

The plaintiffs also argue that the rescission of DACA violates the Fifth Amendment's guarantee of equal protection by targeting a class of aliens for removal based on their race and national origin. *See Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). They have failed to plausibly allege such a claim.

**\*24** As both parties acknowledge, DACA is an enforcement policy, and so the plaintiffs' challenge to its rescission is necessarily a selective-prosecution claim.[7]

In an ordinary selective-prosecution case, the plaintiffs would have to show that the government's conduct "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *see also Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480 (noting that "the decision whether to prosecute may not be *based on* 'an unjustifiable standard such as race, religion, or other arbitrary classification' ") (emphasis added) (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)). There is also a "presumption that a prosecutor has acted lawfully," which can be displaced only by "clear evidence." *AAADC*, 525 U.S. at 489, 119 S.Ct. 936. But the plaintiffs' burden is even higher in this case, because the rescission of DACA only applies to aliens who are in this country illegally. Such an alien "has no constitutional right to assert selective enforcement as a defense against his deportation," with a possible exception for "rare" cases of particularly "outrageous" discrimination. *Id.* at 488, 491, 119 S.Ct. 936.

> [7]  The plaintiffs assert that they are not claiming selective prosecution "but instead that the Government violated the Equal Protection Clause by rescinding the DACA program in order to target a class defined by race and national origin." Appellants' Response Brief at 30. This attempted rewording makes no difference. The rescission of DACA reset the agency's enforcement policies to no longer channel the exercise of enforcement discretion in a certain way. As the plaintiffs cannot dispute that the government has the statutory authority to enforce the immigration laws against them, any equal protection claim in this context must necessarily be a selective-prosecution claim.

Here, both DACA and its rescission are, on their face, neutral policies. Logically, the presumption of lawfulness that applies in individual selective-prosecution cases is at least as strong when applied to neutral policies promulgated by senior Executive Branch officials. And the plaintiffs must allege facts that, if true, plausibly suggest that this presumption can be overcome and replaced with an inference of outrageous discrimination.

The plaintiffs have alleged two sets of facts to support their claim of discrimination. First, they argue that since 93% of DACA recipients are Latino, the program's rescission had a disparate impact. A selective-prosecution claim normally requires differential treatment of "similarly situated individuals of a different race." *Armstrong*, 517

U.S. at 465, 116 S.Ct. 1480. Yet who is "similarly situated" to DACA recipients except other DACA recipients? Setting aside the closely related and now-rescinded DAPA program, DACA stands alone as a unique exercise of Executive authority. While there are other deferred action programs (many of which are statutory), none resembles DACA. And the Department rescinded DACA for all recipients, not just for those of a particular ethnicity or nationality.

Second, the plaintiffs rely on presidential campaign tweets, which they claim show invidious animus. But the plaintiffs must create a plausible inference that the same animus allegedly underlying these statements also motivated the Attorney General and the Acting Secretary to take the official government actions at issue. Their complaint simply lacks the connective tissue required to draw that inference. There is also an "obvious alternative explanation" for these officials' actions. *Ashcroft v. Iqbal*, 556 U.S. 662, 682, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). As the record shows, DACA has long been politically controversial. It "should come as no surprise," *id.*, that well-known policy differences would lead cabinet officials in a new administration to change a controversial government policy. *See* Memorandum from John Kelly, Secretary, Dep't of Homeland Sec., "Enforcement of the Immigration Laws to Serve the National Interest" 2 (Feb. 20, 2017) (setting out the Administration's new enforcement policies and stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement"). Changes in government policy are perfectly lawful, and for a selective-prosecution claim, we must presume that the Attorney General and the Acting Secretary were motivated by such a lawful purpose. *AAADC*, 525 U.S. at 489, 119 S.Ct. 936. The plaintiffs allege no facts plausibly displacing that presumption.

**\*25** In short, the plaintiffs have presented no evidence that racial motivations played any part in either the former Attorney General's advice or the former Acting Secretary's decision to rescind DACA. Therefore, I would dismiss the equal protection claim.

### IV. Information-Sharing Policy

The Majority is correct that the plaintiffs' estoppel claim against the Department is baseless. The availability of

equitable estoppel against the government is controversial under any circumstances. *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 419–21, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). The issue remains unresolved by the Supreme Court. *See id.* at 423, 110 S.Ct. 2465. And we have recognized that if such a doctrine is ever justified in this context, there must be "affirmative misconduct by government agents." *Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003) (citing *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973)).

In any case, the mere fact that the Department explicitly told applicants that its information-sharing policy "may be modified, superseded, or rescinded at any time" and that the policy "may not be relied upon to create any right or benefit," J.A. 1004, is enough to end our analysis. There was nothing for the plaintiffs to rely on for the proposition that their information was immune from disclosure.

Additionally, even if the doctrine of estoppel applied here, that would not justify the district court's nationwide injunction. *See Gill v. Whitford*, — U.S. —, 138 S.Ct. 1916, 1930–31, 1934, 201 L.Ed.2d 313 (2018); *Virginia Society for Human Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001) (abrogated on other grounds). This potent judicial tool was largely unheard-of until the mid-twentieth century. Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 428 (2017). These broad injunctions pose many drawbacks that can quickly outweigh their benefits, particularly when they are overused (and overused repeatedly). Among other things, such injunctions sharpen plaintiffs' incentives to forum-shop while inhibiting the proper ventilation of difficult legal issues by deterring other lower courts from grappling with them. *See id.* at 460–61. Under our decentralized and multifaceted judicial system, judges must scrutinize the scope of the injunctive remedies they fashion. Even assuming a nationwide injunction could be appropriate in some case, an injunction that is limited to the plaintiffs should generally suffice.

\* \* \*

We in the Judicial Branch have a narrowly circumscribed role. It is not our place to second-guess the wisdom of the discretionary decisions made by the other Branches. The rescission of DACA was a controversial and contentious

decision, but one that was committed to the Executive Branch. For this reason, I respectfully dissent.

**All Citations**

924 F.3d 684, 2019 WL 2147204

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.
# EX. 40

 Neutral

As of: June 12, 2019 2:19 PM Z

# *Dep't of Homeland Sec. v. Casa de Md.*

Supreme Court of the United States

June 3, 2019, Decided

No. 18-1469.

**Reporter**

2019 U.S. LEXIS 3892 *

Department of Homeland Security, et al., Petitioners v. Casa de Maryland, et al.

**Prior History:** *Casa De Md. v. United States Dep't of Homeland Sec., 2019 U.S. App. LEXIS 14600 (4th Cir. Md., May 17, 2019)*

**Judges:** **[*1]** Roberts, Thomas, Ginsburg, Breyer, Alito, Sotomayor, Kagan, Gorsuch, Kavanaugh.

## Opinion

The motion to expedite consideration of the petition for a writ of certiorari is denied.

---

**End of Document**

# DEF-INTERV.
# EX. 41

Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 50 of 390

Kirkland v. New York State Dept. of Correctional Services, Not Reported in F.Supp. (1988)

1988 WL 108485, 48 Empl. Prac. Dec. P 38,631

1988 WL 108485
United States District Court, S.D. New York.

Edward L. KIRKLAND, et al., Plaintiffs,

v.

The NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al., Defendants.

No. 82 CIV. 0295 (TPG).
|
Oct. 12, 1988.

*OPINION*

GRIESA, District Judge.

**\*1** Plaintiffs Edward Kirkland et. al., a class of
black corrections employees, originally brought this
action in 1982 against the New York State Civil
Service Commission and the Department of Correctional
Services. Plaintiffs claimed that the 1981 Correction
Lieutenant examination administered by Civil Service was
racially discriminatory. The parties reached a settlement
involving a consent decree, which was approved by this
court on November 9, 1982.

In January 1988 a joint motion was made by plaintiffs and
defendants for an order approving a particular method of
"zone" or "bandwidth" scoring. If approved, defendants
propose to apply zone scoring to the results of the 1987
Correction Lieutenant examination. Both plaintiffs and
defendants agree that zone scoring would be permissible
under the terms of the settlement and is the most desirable
method of scoring. However, a group of correction
employees who took the 1987 exam have intervened. They
move to dismiss the joint motion for lack of subject matter
jurisdiction on the ground that it presents no case or
controversy to this court. They propose to challenge
the scoring method under state law in a state court. However,
the interveners assert that, if the federal court exercises
jurisdiction over the joint motion, they wish to contest
approval of the scoring system on the merits.

The interveners' motion to dismiss the joint motion for
lack of subject matter jurisdiction is granted.

*Facts*

The 1982 settlement provided, among other things, for a
particular method of scoring for the *1981* examination.
The settlement did not specify a scoring method for future
examinations. Future selection procedures were simply to
avoid "adverse impact" on minority candidates.

The next Correction Lieutenant examination was held in
1987. After the examination was administered, the Civil
Service, in conjunction with plaintiffs' expert psychologist,
decided to use the zone method of scoring. Essentially,
this method considers all scores within a given range to be
equivalent, *e.g.,* if scores 90–100 are designated as the top
"band," a 99 and a 91 would be ranked equally.

In July 1987 the Appellate Division of the New York
Supreme Court decided an unrelated case dealing with
zone scoring. *McGowan v. Burstein,* 130 A.D.2d 123, 518
N.Y.S.2d 247 (3d Dept.1987). The court held that this
method *presumptively* violates New York's constitutional
requirement that promotional exams be based on merit
and fitness. The Appellate Division upheld an injunction
prohibiting the State from using zone scoring unless
authorized to do so by prior court order. This injunction
was so broad as to cover the proposed use of zone scoring
by the State in the present case.

On January 5, 1988, while review of the *McGowan* decision
was pending in the New York Court of Appeals, plaintiffs
and defendants in the present case filed the motion now
before this court, seeking an order approving application
of the zone scoring method to the 1987 Correction
Lieutenant examination. The parties claimed that such
a motion was appropriate because of the injunction in
*McGowan.*

**\*2** On February 22, 1988 a group of white employees
who took the 1987 Correction Lieutenant examination
filed a motion in the present case seeking to intervene as
of right for the purpose of moving to dismiss the joint
motion for lack of subject matter jurisdiction or, in the
alternative, contesting the approval of the scoring method
on the merits. All parties consented to the application to
intervene, which was subsequently granted on April 12,
1988.

In a decision filed June 2, 1988 the New York Court of Appeals reversed the Appellate Division in *McGowan* and held that zone scoring is not presumptively unconstitutional. The court ruled that the validity of the particular application of the zone method must be ruled upon where challenged, but that there is no presumption of invalidity. *McGowan v. Burstein,* 71 N.Y.2d 729, 530 N.Y.S.2d 64. The injunction entered below was vacated.

Despite the vacating of the injunction in *McGowan,* plaintiffs and defendants in the *Kirkland* case persist in their joint motion.

### The Present Motion

The interveners claim this court has no subject matter jurisdiction because the joint motion of plaintiffs and defendants presents no case or controversy. This claim is based on the fact that plaintiffs and defendants are in full agreement about the validity of their scoring method and are jointly seeking the *same ruling* from the court. Additionally they claim that plaintiffs have no standing and their claims are now moot since these plaintiffs have all been offered positions as Correction Lieutenants.

If the joint motion is dismissed for lack of jurisdiction, interveners state that they will challenge the zone scoring in a New York State court, under New York State constitutional law, in the event defendants actually apply the zone scoring method.

Plaintiffs and defendants claim that there is in fact a justiciable controversy. Plaintiffs argue that the court's jurisdiction over the original case covers the joint motion since they are seeking to enforce the prior consent decree. Moreover, plaintiffs claim to have standing to enforce provisions of the settlement which they bargained for and received.

Plaintiffs and defendants claim that a controversy arises from defendants' reluctance to proceed with zone scoring without court approval. Originally they claimed that the *McGowan* injunction forced defendants to take a position adverse to plaintiffs and to decline to apply zone scoring. Although the injunction has been vacated, defendants state that they are still reluctant to use zone scoring due to the uncertainty over New York law. Allegedly, a future action in State court might produce a ruling in

conflict with the 1982 settlement in this case. They further claim that the interveners' opposition creates a justiciable controversy if one did not otherwise exist.

### Discussion

The federal judicial power is limited to actual cases or controversies. U.S. Const. art III, § 2. This requires a conflict between at least two genuinely adverse parties.

**\*3** When both parties affirmatively desire the same result, no justiciable case is presented. *Moore v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 47 (1971); Wright, Miller & Cooper, 13 *Federal Practice and Procedure* § 3530 at 317 (1984). The court must dismiss a case where the cooperation of the plaintiff and the defendant might adversely affect the rights of outsiders if the question of law is decided in the manner that both of the parties desire. *Lord v. Veazie,* 49 U.S. 251 (1850).

Parties may be sufficiently adverse while taking the same position on the proper outcome, if they are legally required to adopt contrary positions absent a judicial determination. *INS v. Chadha,* 462 U.S. 919 (1983). In *Chadha,* the INS agreed with Chadha that it was unconstitutional for the House of Representatives to veto its suspension of his deportation. However, INS was "adverse" to Chadha because in the absence of a ruling by the Supreme Court, the INS would be forced to comply with the veto and deport him.

In the present case, plaintiffs and defendants desire precisely the same result: an order by this court approving the application of zone scoring to the 1987 Correction Lieutenant examination.

There is no external constraint here forcing the parties to adopt adverse positions, as there was in *Chadha.* Defendants' claim that the lower court injunction in *McGowan* required them to adopt a contrary position to plaintiffs is now moot, since that injunction has been vacated. While the validity of zone scoring may still be an open question, defendants are legally free to apply any scoring method which they believe complies both with New York law and with the consent decree in this case. If a lawsuit is brought to challenge the scoring method, then that would present a justiciable controversy. Indeed, interveners have indicated that they will bring

Kirkland v. New York State Dept. of Correctional Services, Not Reported in F.Supp. (1988)

1988 WL 108485, 48 Empl. Prac. Dec. P 38,631

such an action. However, since the issues to be raised are primarily, if not exclusively, under state law, interveners have quite properly indicated that they will sue in a state court.

There is no inherent necessity for this court to approve zone scoring as part of the administration or enforcement of the 1982 consent decree. That decree does not require the use of zone scoring. Any scoring method which avoids adverse racial impact complies with the decree.

The issue which provoked plaintiffs' and defendants' application to the court is whether or not zoning scoring comports with New York's constitutional requirement that examinations be based on merit and fitness. But plaintiffs and defendants are not adverse in any way on this issue. This issue will only be ripe for decision if and when zone scoring is actually instituted by the State and a genuinely adverse party with standing challenges it in an appropriate forum.

In sum, jurisdiction over the 1982 action does not provide jurisdiction over the present motion.

The presence of the *interveners* in this action does not create sufficient adversity to provide jurisdiction. They have properly called the court's attention to the lack of subject matter jurisdiction in respect to the motion as brought by plaintiffs and defendants. If defendants do in fact apply the zone scoring method, interveners properly propose to challenge the zone scoring in New York state court, if that method is in fact applied by defendants. Then

there will be questions arising under New York law that will be ripe for adjudication.

**\*4** Brief mention should be made of the interveners' claim that plaintiffs lack standing to raise any issue regarding application of zone scoring to the 1987 examination because plaintiffs and the members of plaintiff class have succeeded in achieving the purpose of their litigation—*i.e.,* obtaining offers of the position of Correction Lieutenant as a result of the 1981 examination. Plaintiffs respond that the consent decree which they obtained contained provisions not only about the procedures regarding the 1981 test but certain general provisions about future selection procedures, and plaintiffs have standing to raise questions about such procedures.

This standing issue, as the parties present it, has not been adequately briefed and the court does not decide it. There is no necessity to do so in view of the court's ruling on the lack of a justiciable controversy.

There is no case or controversy before the court. The motion of the interveners to dismiss the joint motion for lack of subject matter jurisdiction is granted.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1988 WL 108485, 48 Empl. Prac. Dec. P 38,631

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.
# EX. 42

Consolidated Case Nos. 18-15068, 18-15069, 18-15070,
18-15071, 18-15072, 18-15128, 18-15133, 18-15134

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

**REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,**

*Plaintiffs-Appellees,*

v.

**U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,**

*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the Northern District of California

————————————

### APPELLANTS' OPENING BRIEF

————————————

CHAD A. READLER
  *Acting Assistant Attorney General*

ALEX G. TSE
  *Acting United States Attorney*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2000*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION .......................................................................3

STATEMENT OF THE ISSUES.............................................................................4

PERTINENT STATUTES AND REGULATIONS ................................................5

STATEMENT OF THE CASE................................................................................5

    A.    Overview of "deferred action" and the Acting Secretary's decision
          to wind down the discretionary DACA non-enforcement policy..............5

    B.    Prior proceedings.........................................................................................8

SUMMARY OF ARGUMENT............................................................................. 12

STANDARD OF REVIEW .................................................................................. 15

ARGUMENT ........................................................................................................ 15

I.    Plaintiffs' Claims Are Non-Justiciable................................................................ 15

    A.    The Acting Secretary's decision is not subject to APA review
          because it is committed to agency discretion by law...............................15

    B.    8 U.S.C. § 1252 bars pre-enforcement review of plaintiffs'
          claims. .......................................................................................................25

II.    The Acting Secretary's Decision Was Lawful. ...................................................... 28

    A.    The DACA rescission was not arbitrary and capricious...........................28

    B.    The DACA rescission did not violate equal protection............................40

    C.    The implementation of the DACA rescission will not violate due
          process. ......................................................................................................45

III.   The District Court Erred In Granting A Nationwide Preliminary
       Injunction............................................................................................... 48

       A.    Injunctive relief must be limited to redressing plaintiffs'
             cognizable injuries..........................................................................49

       B.    The injunction goes well beyond redressing plaintiffs' cognizable
             injuries............................................................................................54

CONCLUSION .................................................................................................... 57

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                  **Page(s)**

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) ........................................................................................33

*Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle,*
829 F.2d 933 (9th Cir. 1987) ..................................................................... 20, 21

*Arizona v. United States,*
567 U.S. 387 (2012) ..............................................................................5, 13, 17

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................44

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
403 U.S. 388 (1971) ........................................................................................28

*Botezatu v. INS,*
195 F.3d 311 (7th Cir. 1999) ..........................................................................26

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
419 U.S. 281 (1974) ............................................................................28, 31, 36

*Bresgal v. Brock,*
843 F.2d 1163 (9th Cir. 1987) ................................................................... 51, 53

*Brittain v. Hansen,*
451 F.3d 982 (9th Cir. 2006) ..........................................................................47

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ................................................................................... 50, 51

*Clarke v. Securities Indus. Ass'n,*
479 U.S. 388 (1987) ........................................................................................55

*County of Sacramento v. Lewis,*
523 U.S. 833 (1998) ................................................................................... 47, 48

*Crowley Caribbean Transp., Inc. v. Pena,*
37 F.3d 671 (D.C. Cir. 1994) ..........................................................................20

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ................................................................48

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ............................................................35

*Federal Trade Comm'n v. Enforma Nat. Prods., Inc.,*
    362 F.3d 1204 (9th Cir. 2004) ...............................................15

*Federation for Am. Immigration Reform, Inc. v. Reno,*
    93 F.3d 897 (D.C. Cir. 1996) .................................................55

*Garcia v. McCarthy,*
    649 F. App'x 589 (9th Cir. 2016) ..........................................19

*Gerhart v. Lake Cty.,*
    637 F.3d 1013 (9th Cir. 2011) ...............................................47

*Greater Los Angeles Council on Deafness, Inc. v. Baldrige,*
    827 F.2d 1353 (9th Cir. 1987) ...............................................24

*Green v. Napolitano,*
    627 F.3d 1341 (10th Cir. 2010) .............................................27

*Hadayat v. Gonzalez,*
    458 F.3d 659 (7th Cir 2006) ..................................................43

*Hawaii v. Trump,*
    878 F.3d 662 (9th Cir. 2017) .................................................53

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ......................... 2, 6, 13, 16, 17, 19, 20
                             21, 22, 23, 24, 37, 38

*ICC v. Brotherhood of Locomotive Eng'rs,*
    482 U.S. 270 (1987) ................................... 13, 16, 21, 23

*Kandamar v. Gonzales,*
    464 F.3d 65 (1st Cir. 2006) ...................................................43

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ...............................................................56

*Kwai Fun Wong v. United States*,
    373 F.3d 952 (9th Cir. 2004) .........................................................................28

*Lewis v. Casey*,
    518 U.S. 343 (1996) ......................................................................................50

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ........................................................................16, 20, 22

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) .................................................................................54, 55

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
    638 F.3d 644 (9th Cir. 2011) ...................................................................50, 51

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ......................................................................................51

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ......................................................................................39

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ......................................................................................56

*McKenzie v. City of Chi.*,
    118 F.3d 552 ..................................................................................................50

*Meinhold v. U.S. Dep't of Def.*,
    34 F.3d 1469 (9th Cir. 1994) ........................................................................50

*Morales de Soto v. Lynch*,
    824 F.3d 822 (9th Cir. 2016) ...................................................................18, 19

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...............................................................28, 33, 34, 38

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008) .........................................................................44

*Reno v. American-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ..............................2, 5, 6, 10, 13, 14, 18, 25
                                        26, 27, 40, 41, 42, 43

*San Luis & Delta-Mendota Water Auth. v. Locke,*
   776 F.3d 971 (9th Cir. 2014) ..................................................................31

*Sierra Club v. Whitman,*
   268 F.3d 898 (9th Cir. 2001) ..................................................................20

*Steckman v. Hart Brewing Inc.,*
   143 F.3d 1293 (9th Cir. 1998) .......................................................... 15, 46

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ...............................................................................49

*Texas v. United States,*
   86 F. Supp. 3d 591 (S.D. Tex. 2015) .......................................................7
   809 F.3d 134 (5th Cir. 2015) ................................7, 24, 29, 30, 31, 32, 33, 39

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) ...............................................................................26

*Town of Chester v. Laroe Estates, Inc.,*
   137 S. Ct. 1645 (2017) ...........................................................................49

*United States v. Armstrong,*
   517 U.S. 456 (1996) ....................................................................16, 40, 43

*In re United States,*
   138 S. Ct. 443 (Dec. 20, 2017) ................................................................9

*United States v. Texas,*
   136 S. Ct. 2271 (2016) .............................................................................7

*Vasquez v. Aviles,*
   639 F. App'x 898 (3d Cir. 2016) ...........................................................26

*Washington v. Trump,*
   847 F.3d 1151 (9th Cir. 2017) ...............................................................53
   858 F.3d 1168 (9th Cir. 2017) ...............................................................44

*Wayte v. United States,*
   470 U.S. 598 (1985) ...............................................................................40

*Webster v. Doe*,
  486 U.S. 592 (1988) ..................................................................................................24

*Zepeda v. U.S. Immigration & Naturalization Serv.*,
  753 F.2d 719 (9th Cir. 1983) ...............................................................................49, 50

**Statutes:**

5 U.S.C. § 701(a)(2) ......................................................................2, 4, 12, 15, 18

5 U.S.C. § 702 ...........................................................................................................55

5 U.S.C. § 706(2)(A) ..............................................................................................28

6 U.S.C. § 202(5) ...........................................................................5, 17, 34, 35, 38

8 U.S.C. § 1103(a) ...................................................................................................43

8 U.S.C. § 1103(a)(1) ......................................................................................5, 37

8 U.S.C. § 1182(a) .....................................................................................................5

8 U.S.C. § 1182(h) ..................................................................................................27

8 U.S.C. § 1182(i) ....................................................................................................27

8 U.S.C. § 1227(a) .....................................................................................................5

8 U.S.C. § 1229b ......................................................................................................27

8 U.S.C. § 1229c ......................................................................................................27

8 U.S.C. § 1252(a)(1) ............................................................................................26

8 U.S.C. § 1252(a)(2)(B)(i) .................................................................................27

8 U.S.C. § 1252(a)(2)(D) ......................................................................................27

8 U.S.C. § 1252(b) ............................................................................................. 2, 4

8 U.S.C. § 1252(b)(9) ............................................................................................13

8 U.S.C. § 1252(g) ...........................................................................2, 4, 25, 26

8 U.S.C. § 1255 ........................................................................................ 27

28 U.S.C. § 1292(a)(1) ............................................................................... 3

28 U.S.C. § 1292(b) .................................................................................... 4

28 U.S.C. § 1331 ......................................................................................... 3

42 U.S.C. § 7521(a)(1) .............................................................................. 39

**Regulation:**

8 C.F.R. § 247a.12(c)(14) ...................................................................... 6, 55

**Other Authorities:**

*Remarks by the President on Immigration* (June 15, 2012),
    https://go.usa.gov/xnZFY ................................................................. 34

DHS, USCIS:

*Frequently Asked Questions: Rejected DACA Requests* Q5
    (Dec. 27, 2017), https://www.uscis.gov/daca2017/mail-faqs ............... 47

*Response to Preliminary Injunction* (Jan. 13, 2018),
    https://www.uscis.gov/humanitarian/deferred-action-childhood-
    arrivals-response-january-2018-preliminary-injunction ...................... 11

*Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs)*
    (Nov. 7, 2011), https://go.usa.gov/xncPK (last visited Feb 13, 2018) ......... 46

# INTRODUCTION

In 2012, the Secretary of Homeland Security set forth the enforcement policy commonly known as DACA (Deferred Action for Childhood Arrivals). Under that policy, individuals illegally in this country who met certain criteria were granted deferred action, which is a temporary forbearance from removal that may also entail certain collateral benefits. From its inception, the policy was a stop-gap measure in anticipation of potential legislative action, and the government made clear that the policy did not grant any substantive rights, lawful immigration status, or pathway to citizenship. The government later expanded the criteria for DACA and created a new policy known as DAPA (Deferred Action for Parents of Americans and Lawful Permanent Residents). Texas and twenty-five other states brought suit challenging the latter policies. The suit resulted in a nationwide injunction that was affirmed by the Fifth Circuit and by an equally divided Supreme Court. Texas then threatened to challenge the original DACA policy.

In September 2017, in light of the prior litigation and the Attorney General's legal analysis, the Acting Secretary of Homeland Security decided to rescind the DACA policy through an orderly wind-down. Plaintiffs in these and other suits challenged that enforcement decision on a variety of grounds under the Administrative Procedure Act (APA) and the Constitution. The district court denied in significant part the Government's motion to dismiss and granted a preliminary injunction. Those remarkable orders require the government to maintain a

discretionary non-enforcement policy that is materially indistinguishable from one previously found unlawful by the Fifth Circuit and four Justices of the Supreme Court, and to thereby affirmatively sanction an ongoing violation of federal law by nearly 700,000 aliens without lawful status. The orders (which have been certified for interlocutory appeal) should be reversed.

*First*, the Acting Secretary's decision is not subject to judicial review in this action. The decision to rescind DACA is an exercise of enforcement discretion that is traditionally committed to agency discretion under the APA. 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 830-32 (1985). And, even assuming that judicial review of this deferred-action rescission were available at all, it could take place only on review of a final removal decision. 8 U.S.C. § 1252(b), (g); *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 (1999) (*AADC*).

*Second*, in any event, the Acting Secretary's decision was not arbitrary and capricious under the APA. For this purely discretionary enforcement decision, the Immigration and Nationality Act (INA) prescribes no legal or factual determinations that must be made or even considered. There is thus no warrant for setting aside the Acting Secretary's entirely rational decision to discontinue the DACA policy in light of the prior nationwide injunction against policies closely related to DACA, as well as the Attorney General's opinion regarding the legal viability of DACA itself.

*Third*, the Acting Secretary's decision does not violate the Constitution's equal-protection guarantee. The rescission of DACA applies equally to all persons without

2

regard to their ethnicity. This immigration enforcement policy is not subject to challenge based on the common circumstance that it has a greater impact on members of certain ethnicities than others, especially given the lack of any evidence that the Acting Secretary would have retained DACA if the aliens lacking lawful status had been other than predominantly Latino, let alone in the face of questions about DACA's legality.

In sum, while there is significant room for disagreement over immigration enforcement in general and DACA in particular, such policy decisions belong in the hands of the political branches and should not be judicially second-guessed, at least absent a colorable constitutional claim. The district court's preliminary injunction should be vacated, and its order denying in part the government's motion to dismiss should be reversed.

## STATEMENT OF JURISDICTION

The plaintiffs in five related cases invoked the district court's jurisdiction under 28 U.S.C. § 1331. *See, e.g.*, Excerpts of Record (ER.) 76. On January 9, 2018, the district court granted plaintiffs' motion for a preliminary injunction, denied in part the government's motion to dismiss, and certified the issues decided therein for interlocutory appeal. ER.46-48. The defendants filed timely notices of appeal on January 16. *E.g.*, ER.64-68. This court has jurisdiction over the injunction appeals under 28 U.S.C. § 1292(a)(1).

On January 12, 2018, the district court denied in part and granted in part the government's motion to dismiss. ER.62-63. The district court also certified for interlocutory appeal the issues decided in that order, and both sides petitioned this Court to grant permission for interlocutory appeal. On January 25, this Court accepted the district court's orders for interlocutory review. This Court has jurisdiction over the motion-to-dismiss appeals under 28 U.S.C. § 1292(b).

## STATEMENT OF THE ISSUES

1. Whether plaintiffs' APA claims are not subject to review because the Acting Secretary's decision to wind down the DACA non-enforcement policy was "committed to agency discretion by law," 5 U.S.C. § 701(a)(2).

2. Whether the district court lacked jurisdiction to consider plaintiffs' claims in light of the jurisdiction-channeling provisions in 8 U.S.C. § 1252(b), (g).

3. Whether plaintiffs failed to state a claim that the Acting Secretary's decision was arbitrary and capricious;

4. Whether plaintiffs failed to state a claim that the Acting Secretary's decision violated equal protection;

5. Whether plaintiffs failed to state a claim that the implementation of the DACA rescission will violate due process; and

6. Whether the district court erred in granting a preliminary injunction requiring the government to maintain DACA on a nationwide basis.

4

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum.

## STATEMENT OF THE CASE

**A.    Overview of "deferred action" and the Acting Secretary's decision to wind down the discretionary DACA non-enforcement policy**

1. The INA charges the Secretary of Homeland Security "with the administration and enforcement" of the INA and "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Individuals are subject to removal if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012); *see* 8 U.S.C. §§ 1182(a), 1227(a).

As a practical matter, the federal government cannot remove every removable alien, and a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. The Secretary of Homeland Security is vested with authority to "[e]stablish[ ] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). In light of such policies and priorities, officials of the Department of Homeland Security (DHS) must first "decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. "At each stage" of the process, moreover, "the Executive has discretion to abandon the endeavor." *AADC*, 525 U.S. at 483. Like other exercises of enforcement discretion, this may

5

involve "a complicated balancing of a number of factors which are peculiarly within

[the agency's] expertise." *Chaney*, 470 U.S. at 831.

2. This case concerns an application of the practice of "deferred action" by

which the Secretary of Homeland Security may exercise discretion to forbear from

seeking the removal of an alien for a designated period. *See AADC*, 525 U.S. at 483-

84; 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative

convenience to the government which gives some cases lower priority"). In addition

to the temporary relief from removal directly flowing from a grant of deferred action,

certain collateral consequences may flow under pre-existing laws and regulations,

including the ability to apply for work authorization in certain circumstances. *See, e.g.*,

8 C.F.R. § 247a.12(c)(14). However, DHS retains the discretion to revoke deferred

action unilaterally, and an individual with deferred action remains removable at any

time. *See AADC*, 525 U.S. at 484-85.

On June 15, 2012, DHS announced the policy known as DACA, which makes

deferred action available to "certain young people who were brought to this country

as children." ER.140. Following successful completion of a background check and

review, an alien who met certain age, residence, and other guidelines could receive

deferred action for a period of two years, subject to renewal. ER.142-43. The DACA

Memo stated that it "confer[red] no substantive right, immigration status or pathway

to citizenship. Only the Congress, acting through its legislative authority, can confer

these rights." ER.143. DHS later expanded DACA by loosening certain guidelines and

6

extending the period of deferred action to three years, and it also created a new,

similar policy known as DAPA for parents of Americans and lawful permanent

residents. ER.269.

The District Court for the Southern District of Texas entered a nationwide

preliminary injunction against DAPA and the expansion of DACA. *Texas v. United

States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). The Fifth Circuit affirmed, concluding

that the policy violated both the INA and the APA's notice-and-comment

requirements. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). The Supreme Court

affirmed the injunction by an equally divided Court. *United States v. Texas,* 136 S. Ct.

2271 (2016) (per curiam). In response, then-Secretary John Kelly rescinded DAPA

and the DACA expansion in June 2017. ER.176. Shortly thereafter, Texas threatened

to challenge the original DACA policy. ER.274.

3. On September 5, 2017, DHS decided to wind down the remaining DACA

policy in an orderly fashion. ER.125. As Acting Secretary Elaine Duke explained in

the memorandum, "[t]aking into consideration the Supreme Court's and the Fifth

Circuit's rulings in the ongoing litigation, and [a] September 4, 2017 letter from the

Attorney General, it is clear that the June 15, 2012 DACA program should be

terminated." ER.130. Therefore, "[i]n the exercise of [her] authority in establishing

national immigration policies and priorities," the Acting Secretary determined to begin

an orderly wind-down of the policy. *Id.* The memorandum provides that DHS will

"adjudicate—on an individual, case by case basis—properly filed pending DACA

renewal requests . . . from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id.* The memorandum further provides that DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum" for the remaining periods of deferred action. *Id.*

## B.  Prior proceedings

1. Shortly after the Acting Secretary's decision, plaintiffs—consisting of individual DACA recipients, a union with DACA recipient members, the University of California and its president, and various States and localities—brought these five related suits in the Northern District of California challenging the rescission of DACA. *See* Case Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813 (N.D. Cal.). Similar challenges are pending in other district courts. Plaintiffs challenged the rescission on substantive and procedural grounds under the APA. Plaintiffs also alleged that the rescission violated equal protection and that its implementation violated due process.

Planning to move to dismiss on threshold grounds, the government asked the district court to permit it to brief dispositive issues in the case prior to any discovery or record proceedings. The district court rejected that request, and the government filed the administrative record. Dkt.No.64.

The district court then ordered the government to "complete" the administrative record with "all emails, letters, memoranda, notes, media items, opinions and other materials directly or indirectly considered in the final agency decision to rescind DACA," including "all DACA-related materials considered by persons (anywhere in the government)" who provided the Acting Secretary with written or verbal advice. Dkt.No.79, at 12-13. The district court further determined that, because the Acting Secretary's decision referred to concerns about DACA's legality, the government had categorically "waived attorney-client privilege over" certain materials. *Id.* at 10. And the court ruled—without briefing—that thirty-five documents identified on a court-ordered privilege log must be filed on the public docket. *Id.* at 13. In the meantime, plaintiffs served burdensome discovery requests upon the government and took numerous depositions from government personnel, including high-level officials and senior advisors.

2. In response to these extraordinary rulings, the government sought relief first from this Court and, after a divided panel of this Court denied mandamus, from the Supreme Court, which stayed the district court's orders and ultimately vacated this Court's decision. *In re United States*, 138 S. Ct. 443, 445 (Dec. 20, 2017) (per curiam). The Court made clear that the government's threshold defenses deserve close attention, noting that the district court should "consider certifying [its] ruling for interlocutory appeal under 28 U.S.C. § 1292(b)" and only consider whether an expanded record was necessary following resolution of threshold issues. *Id.* at 445.

9

3. While the mandamus proceedings were pending, the government filed a motion to dismiss, and plaintiffs filed a motion for a preliminary injunction.

On January 9, 2018, the district court denied in substantial part the government's justiciability arguments in its motion to dismiss and granted plaintiffs' preliminary injunction motion. ER.1. Although the court acknowledged that, under *Heckler v. Chaney*, "decisions not to prosecute or initiate enforcement actions are generally not reviewable," it declared that "[o]ur case is different from *Chaney*" on various grounds. ER.19-21. It further held that its jurisdiction was unaffected by 8 U.S.C. § 1252(g), ER.22-23, which channels claims against actions taken to remove an alien into the review of final removal orders, thus protecting "'no deferred action' decisions and similar discretionary determinations." *AADC*, 525 U.S. at 483, 485. The court concluded that this provision did not restrict its jurisdiction because plaintiffs challenged "the across-the-board cancellation of a nationwide program" rather than "already-commenced deportation or removal proceedings." ER.22. The court explained that its order rejecting the bulk of the government's threshold arguments met the criteria for interlocutory appeal under 28 U.S.C. § 1292(b) and certified that order accordingly. ER.48-49.[1]

---

[1] The district court accepted the government's threshold arguments only to the extent it held that plaintiffs Minnesota and Maine did not have statutory standing because the interests they asserted were only "marginally related" to the INA's purposes. ER.28.

10

In issuing a preliminary injunction, the court concluded that plaintiffs were likely to succeed on their claim that the DACA rescission was arbitrary and capricious. First, the court held that the rescission was "'not in accordance with law' because it was based on the flawed legal premise that the agency lacked authority to implement DACA." ER.29. Second, the district court held that the government's invocation of litigation risk was a "post-hoc rationalization" because the memorandum "can only be reasonably read as" relying on a claim of illegality, and that, in any event, the Acting Secretary failed to consider factors weighing against the rescission of DACA, including reliance interests of DACA recipients. ER.39-40.[2]

4. On January 12, the district court denied in part and granted in part the government's merits arguments in its motion to dismiss. ER.50. The court held that plaintiffs had stated a claim that the rescission of DACA was arbitrary and capricious for the reasons given in its prior opinion. ER.51. The court also held that plaintiffs had stated a claim that the DACA rescission denied them equal protection because "93 percent of DACA recipients" are "Latinos and Mexican nationals," and plaintiffs' allegations regarding "campaign rhetoric" raised "a plausible inference that racial animus towards Mexicans and Latinos was a motivating factor in the decision to end

---

[2] Although the government appeals the injunction, it has taken steps to comply in the interim. *See Response to Preliminary Injunction* (Jan. 13, 2018), https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction.

DACA." ER.59-61. The court additionally denied the motion to dismiss plaintiffs'
claim that the rescission's implementation violated substantive due process. ER.55-57.

The court dismissed plaintiffs' claim that the Acting Secretary was required to
use notice-and-comment rulemaking to rescind DACA. ER.51-53. The court also
rejected plaintiffs' claims that the DACA rescission violated an equal protection right
to pursue a livelihood, violated due process, and was equitably estopped. ER.53-
61.The court again certified its order for interlocutory review. ER.62-63.

5. On January 16, the government filed a notice of appeal from the district
court's order granting a preliminary injunction. ER.64-68. Both the government and
the plaintiffs also filed petitions under 28 U.S.C. § 1292(b) asking this Court to accept
the district court's certification of its orders for interlocutory appeal. This Court
granted those petitions on January 25, and, on January 26, this Court *sua sponte*
consolidated the various appeals and issued an omnibus briefing schedule.[3]

## SUMMARY OF ARGUMENT

1. In rescinding the previous non-enforcement policy embodied in DACA, the
Acting Secretary reset the agency's enforcement priorities. A determination of general
enforcement policy, like other enforcement decisions, is traditionally committed to
agency discretion by law and thus not subject to APA claims. *See* 5 U.S.C. § 701(a)(2);

---

[3] The government also filed a petition for writ of certiorari before judgment on
January 18, 2018. *See Department of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 17-
1003. That petition is currently scheduled for consideration at the Supreme Court's
February 16, 2018, conference.

*Heckler v. Chaney*, 470 U.S. 821, 831 (1985). That is particularly true in the immigration context, where the "broad discretion exercised by immigration officials" is a "principal feature of the removal system." *Arizona v. United States*, 567 U.S. 387, 396-97 (2012). That the Acting Secretary's discretionary enforcement decision was based on legal analysis is immaterial, because the fact that an "agency gives a 'reviewable' *reason* for otherwise unreviewable action" does not mean that "the *action* becomes reviewable." *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) (*BLE*) (emphases added).

Nothing in the INA cabins that discretion here. To the contrary, 8 U.S.C. § 1252(g) precludes jurisdiction over challenges to "'no deferred action' decisions and similar discretionary determinations . . . outside the streamlined process that Congress has designed" for litigating an alien's removal. *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 & n.9 (1999) (*AADC*); *see also* 8 U.S.C. § 1252(b)(9). Thus, even if the Acting Secretary's exercise of enforcement discretion were subject to review at all, that review could take place only in a petition from a final removal order.

2.  Assuming that the Acting Secretary's decision to wind down DACA were nevertheless subject to review here, the decision would plainly satisfy the APA's deferential standard. Regardless whether the original DACA policy was consistent with the INA, there is no claim that it was mandated by the statute or that rescinding it violated the statute. And the Acting Secretary's discretionary rescission of DACA based on her clearly expressed concern that it would be enmeshed in litigation and

likely enjoined nationwide was eminently reasonable, given the *Texas* litigation invalidating DAPA and expanded DACA, as well as the Attorney General's opinion that DACA would and should meet the same fate. Neither precedent nor the APA required the Secretary to spell out the subsidiary legal reasons why it is illusory to distinguish DACA from expanded DACA and DAPA, and there likewise is no basis for a court to set aside the Secretary's purely discretionary enforcement decision based on mere disagreement with her reasonable legal conclusion.

The Acting Secretary's decision in no way violates equal protection rights. The DACA rescission applies equally to persons of all ethnicities, although, like virtually all immigration policies, it has a disproportionate effect on certain ethnicities—here, Latinos from Central and South America. A challenge to such a facially-neutral immigration enforcement policy based on allegations of discriminatory motive is not permitted under *AADC*. 525 U.S. at 488-92. And, even assuming such a challenge could proceed at all under *AADC*, plaintiffs have come nowhere near alleging the clear evidence of outrageous government conduct necessary to make out a claim of discriminatory enforcement in the immigration context. *Id.*

Plaintiffs' due process challenge to the DACA rescission's implementation is similarly meritless. Plaintiffs do not and cannot offer any plausible factual basis for their conclusory (and incorrect) assertion that the government has changed its policy regarding whether information provided by DACA recipients to U.S. Citizenship and Immigration Services (USCIS) will be shared with other DHS components for

14

purposes of immigration enforcement proceedings. And plaintiffs in any event fail to

identify a deprivation of a protected interest that would be a conscience-shocking

violation of substantive due process rights.

3.  Finally, even if injunctive relief were appropriate, the nationwide injunction

entered would be patently overbroad. Bedrock principles of standing and equitable

discretion limit the scope of any injunction to plaintiffs in this case, and only those

plaintiffs with a cognizable injury—*i.e.*, the particular DACA recipients who are

named plaintiffs or validly represented by the union plaintiff.

## STANDARD OF REVIEW

"[T]he legal premises underlying a preliminary injunction" are reviewed de

novo. *Federal Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1211 (9th Cir.

2004). Otherwise, the district court's entry of the preliminary injunction is reviewed

for abuse of discretion. *Id.* The district court's decision on the motion to dismiss is

reviewed de novo. *Steckman v. Hart Brewing Inc.,* 143 F.3d 1293, 1295 (9th Cir. 1998).

## ARGUMENT

I.  **Plaintiffs' Claims Are Non-Justiciable.**

A.  **The Acting Secretary's decision is not subject to APA review because it is committed to agency discretion by law.**

1.  The APA precludes review of agency actions that are "committed to agency

discretion by law." 5 U.S.C. § 701(a)(2). This provision applies to various types of

agency decisions that "traditionally" have been regarded as unsuitable for judicial

review, *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993), including the decision whether or not to institute enforcement actions, *Chaney*, 470 U.S. at 831. Such exercises of discretion, the Supreme Court has explained, can involve "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* An agency may "not only assess whether a violation has occurred," but "whether agency resources are best spent on this violation or another"; whether enforcement in a particular scenario "best fits the agency's overall policies"; and whether the agency "has enough resources to undertake the action at all." *Id.* In addition, when an agency declines to enforce, it "generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. In this way and others, agency enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch [whether or] not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.*; *United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("[T]he decision *whether or not* to prosecute . . . generally rests entirely in [the prosecutor's] discretion." (emphasis added)). Such discretionary enforcement actions "cannot be the subject of judicial review" even when an agency (or a prosecutor) bases them on what would be "a 'reviewable' reason" in another context. *BLE*, 482 U.S. at 283.

The Acting Secretary's decision to discontinue a prior non-enforcement policy falls well within the types of enforcement decisions that traditionally have been

understood as "committed to agency discretion." Like the decision to adopt a policy of selective non-enforcement, the decision whether to retain such a policy can "involve[] a complicated balancing" of factors that are "peculiarly within [the] expertise" of the agency, including determining how the agency's resources are best spent and how the non-enforcement policy fits with the agency's overall policies. *Chaney*, 470 U.S. at 831. Likewise, a decision to abandon an existing non-enforcement policy will not, in itself, deprive any individual of liberty or property. Indeed, an agency's decision to reverse a prior policy of civil non-enforcement is akin to changes in policy as to criminal prosecutorial discretion, which regularly occur within the Department of Justice both during and across presidential administrations, and which, as noted, are generally not amenable to judicial review. Judicial review is available if a decision to enforce results in an adverse final determination that deprives an individual of liberty or property, but that review is limited to the substance of the final determination; an individual cannot escape his guilt of the criminal or civil offense by bringing an APA challenge to an agency's discretionary decision to enforce the law.

This presumption of nonreviewability applies with particular force in the context of immigration enforcement discretion. In general, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Arizona v. United States*, 567 U.S. 387, 396 (2012); *see also, e.g.*, 6 U.S.C. § 202(5) (vesting authority in the Secretary of Homeland Security to "[e]stablish[] national immigration enforcement policies and priorities"). And more specifically, a

17

suit challenging a discretionary decision to enforce the immigration laws would entail the extraordinary relief of ordering the government to allow a "continuing violation of United States law" to persist. *AADC*, 525 U.S. at 490. The revocation of a prior immigration non-enforcement policy is thus plainly a decision that is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and not subject to attack under the APA.

2.  The district court's reasons for rejecting that conclusion are all contrary to precedent and unpersuasive on their own terms.

*First*, the district court reasoned that the Acting Secretary's decision was reviewable because, rather than adopting a non-enforcement policy, it rescinded one. ER.21 ("An agency action to terminate [an existing non-enforcement policy] bears no resemblance to an agency decision not to regulate something never before regulated."). That distinction is irreconcilable with this Court's decision in *Morales de Soto v. Lynch*, 824 F.3d 822 (9th Cir. 2016), which expressly rejected the notion that *Chaney*'s rule would apply only to a "decision *not* to enforce agency regulations" and not "the contrary decision *to* enforce." *Id.* at 827 n.4. In that case, an alien had unlawfully reentered the country after being ordered removed, and Immigration and Customs Enforcement (ICE) had chosen to "reinstate the prior order of removal" (without a hearing), rather than exercise its "prosecutorial discretion to initiate a new removal proceeding before an immigration judge." *Id.* at 825. The Court held that, under *Chaney*, it had "no authority to review the merits of ICE's discretionary decision

18

to reinstate a prior removal order," even though the agency had exercised its

discretion "*to* enforce" that order rather than "*not* to enforce" it. *Id.* at 827 & n.4.

*Morales de Soto* and *Chaney* compel a similar conclusion here. As explained above, a

decision to enforce and a decision not to enforce are both traditionally committed to

agency discretion as they both implicate "the same need for 'a complicated balancing

of a number of factors . . . peculiarly within [the agency's] expertise.'" *Id.* (quoting

*Chaney*, 470 U.S. at 831).[4]

    *Second*, the district court reasoned that the rescission of DACA was reviewable

because it addressed "broad enforcement policies," instead of "an individual

enforcement decision." ER.20. As an initial matter, this distinction mischaracterizes

*Chaney*. The non-enforcement decision in *Chaney* was not an individualized decision by

the FDA to forgo enforcement of the Federal Food, Drug, and Cosmetic Act against

an alleged violator. Rather, the plaintiffs in *Chaney* requested the FDA to enforce the

statute's misbranding prohibition against the use of certain drugs for capital

punishment, by taking "various investigatory and enforcement actions" against "drug

manufacturers," "prison administrators," and "all [others] in the chain of

distribution"; the FDA, however, *categorically* concluded that its enforcement discretion

"should not be exercised to interfere with this particular aspect of state criminal

---

[4] For the same reason, an agency's decision whether, and on what terms, to
settle an enforcement action is likewise committed to its discretion by law. *See Garcia v.
McCarthy*, 649 F. App'x 589, 591 (9th Cir. 2016) (collecting cases).

justice systems." 470 U.S. at 824-25. Similarly, in *Lincoln*, the Indian Health Service's unreviewable decision reallocated funds from an entire regional treatment program in the Southwest to other nationwide Service programs, not from an individual's treatment plan. 508 U.S. at 184, 188. In short, the question under Section 701(a)(2) is whether the type of agency decision at issue is inherently discretionary in nature, not the number of people to whom it applies.[5]

Common sense would dictate this conclusion even if it were not already settled law. Agency decisions about how its "resources are best spent" or how certain enforcement activity "best fits the agency's overall policies," *Chaney*, 470 U.S. at 831, are at least as susceptible to implementation through broad guidance as through case-by-case enforcement decisions. *See Sierra Club v. Whitman*, 268 F.3d 898, 903 (9th Cir. 2001) (explaining that "[t]o leave enforcement decisions to the discretion of the [agency]" means that the agency must decide "the most effective way to accomplish the objectives of the [law] as a whole").

---

[5] *Crowley Caribbean Transport, Inc. v. Pena*, 37 F.3d 671 (D.C. Cir. 1994), does not, as the district court appeared to believe, establish a different rule. In that case, the D.C. Circuit distinguished between a "*single-shot* non-enforcement decision" and a "*general enforcement policy*," but did so on the ground that broad enforcement policies "are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision." *Id.* at 676-77. But this case involves no embedded interpretation of the INA's substantive commands. The Acting Secretary's decision to wind down the DACA non-enforcement policy did not directly interpret the INA's provisions governing the primary conduct of aliens and other parties, but rather addressed (at most) the INA's constraints on her enforcement discretion.

For example, in *Alaska Fish & Wildlife Federation & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933 (9th Cir. 1987), this Court explained that "[p]olitical and geographical considerations" led the agency "to conclude that traditional methods of enforcing game laws are not effective in the vast reaches of rural Alaska" and therefore to "adopt[] a written policy stating that subsistence hunting in Alaska during the closed season would not be punished." *Id.* at 935. The Court held that a statutory grant of enforcement discretion "precludes . . . review of the [agency]'s failure to enforce" the law, *id.* at 938, notwithstanding the fact that the agency had adopted a broad non-enforcement policy. Conversely, individual enforcement decisions are regularly informed by general interpretations of the agency's substantive statute to determine "whether a violation has occurred." *Chaney*, 470 U.S. at 831; *see BLE*, 482 U.S. at 283 ("[A] common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction.").

*Third*, the district court reasoned that review of the Acting Secretary's decision was appropriate because DACA recipients had relied on collateral benefits obtained as a result of their deferred action. ER.20. The court noted that "work authorizations, for example, allow recipients to join in the mainstream economy" and suggested that "[i]n contrast to nonenforcement decisions, rescissions of commitments . . . exert much more direct influence on the individuals . . . to whom the repudiated commitments were made." *Id.* (quotation marks omitted). At the outset, the premise

21

of the district court's reasoning—that DHS had made a commitment to certain persons unlawfully in the country—is simply incorrect. Indeed, DHS made explicit when it adopted the DACA non-enforcement policy that "[t]his memorandum confers no substantive right." ER.130. More fundamentally, any reliance interests would not legitimate judicial review of otherwise nonreviewable acts of discretion. In *Lincoln*, for example, the Indian Health Service had operated its regional program for seven years, providing important medical treatment to disabled children on which the recipients had undoubtedly come to rely. *See* 508 U.S. at 185-88. Notwithstanding that reliance, the Supreme Court held that the Service's discretionary decision to discontinue the program by reallocating a lump-sum appropriation was non-reviewable. *Id.* at 193-94.

Nor does the availability of review turn on the significance of a plaintiff's asserted interest in an agency's discretionary enforcement decision. The Supreme Court made this clear in *Chaney*, where plaintiffs offered "evidence that use of the drugs [that FDA declined to regulate] could lead to a cruel and protracted death." 470 U.S. at 827. Holding that it could not properly review the agency's decision, the Supreme Court emphasized that "[t]he fact that the drugs involved in this case are ultimately to be used in imposing the death penalty must not lead this Court or other courts to import profound differences of opinion over the meaning of the Eighth Amendment . . . into the domain of administrative law." *Id.* at 838.

*Fourth*, the district court reasoned that review was possible because "there *is* law to apply" in this case, given that "[t]he main, if not exclusive, rationale for ending DACA was its supposed illegality" and "determining illegality is a quintessential role of the courts." ER.21. But it is both well established and common sense that an agency's discretionary decision whether to enforce a law is not made reviewable because it is based on an understanding of governing law. As the Supreme Court held in *BLE*, that an "agency gives a 'reviewable' reason for otherwise unreviewable action" does not mean that "the action becomes reviewable." 482 U.S. at 283. The Court noted, by way of example, "that a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction"; although "[t]hat is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point . . . it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.* Thus, the fact that the Acting Secretary's exercise of enforcement discretion reasonably considered not only the litigation risk from a lawsuit by Texas but also the Attorney General's legal assessment of DACA does not meaningfully distinguish this case from countless instances where the enforcement decisions of prosecutors or agencies turn in part on legal analysis regarding the meaning of statutes, regulations, or the Constitution.

Rather, for an enforcement decision to be reviewable, the "law to apply" must depart from tradition by "circumscrib[ing] agency enforcement discretion" and

"provid[ing] meaningful standards for defining the limits of that discretion." *Chaney*, 470 U.S. at 834. Such limits might be found in the statute that provides the agency with enforcement discretion, if Congress has set "substantive priorities" or otherwise limited "an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833; *see also Texas v. United States*, 809 F.3d 134, 168 (5th Cir. 2015) (holding that court could review whether DAPA ran afoul of alleged INA constraints on enforcement discretion). Or they might be found in the agency's own regulations having a similarly restrictive effect. *See Greater Los Angeles Council on Deafness, Inc. v. Baldrige*, 827 F.2d 1353, 1361 (9th Cir. 1987). But neither plaintiffs nor the district court have identified anything in the INA or immigration regulations that limited DHS's discretion in rescinding DACA.[6]

In sum, none of the district court's reasons, individually or collectively, justify applying APA review to the Acting Secretary's discretionary decision to rescind the DACA non-enforcement policy. And it warrants emphasis that those reasons, if accepted by this Court, would lead to a radical and untenable intrusion on agencies' enforcement discretion. Consider the following example of a quintessential exercise of prosecutorial discretion: one chief prosecutor adopts a general policy of not enforcing

---

[6] Constitutional constraints on enforcement discretion also are traditionally reviewable and provide meaningful standards to apply. *See Webster v. Doe*, 486 U.S. 592, 603-04 (1988). Review of plaintiffs' constitutional claims is therefore not precluded by § 701(a)(2), although those claims are separately barred here by 8 U.S.C. § 1252(g) and are meritless in any event. *See infra* Parts I.B, II.B-C.

24

drug laws against low-level, non-violent offenders because she views them as victims of circumstance who should receive treatment and support; but her successor then rescinds that non-enforcement policy based on her legal concerns that the policy would violate her duty to faithfully execute the laws and provide equal treatment to defendants. The district court's analysis in this case would allow drug offenders in that circumstance, who are concededly guilty, to nevertheless seek judicial review of the legal reasoning underlying the second prosecutor's discretionary decision to enforce the drug laws in a different manner than her predecessor. That is not, and cannot possibly be, the law.

**B**.  **8 U.S.C. § 1252 bars pre-enforcement review of plaintiffs' claims.**

1. Under 8 U.S.C. § 1252, judicial review of DHS enforcement decisions is generally available, if at all, only through the procedures for reviewing removal orders set forth in that section. As particularly relevant here, section 1252(g) states that "[e]xcept as provided in this section . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this subchapter." As the Supreme Court explained in *AADC*, section 1252(g) is "designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of

judicial intervention outside the streamlined process that Congress has designed." *See* 525 U.S. at 485 & n.9.

The Acting Secretary's rescission of DACA is such a "'no deferred action' decision[]," *AADC*, 525 U.S. at 485, and is an initial "action" in the agency's "commence[ment] [of] proceedings" against aliens who are unlawfully in the country, 8 U.S.C. § 1252(g). Thus, even assuming that the DACA rescission were reviewable, it would be reviewable only as otherwise "provided in [Section 1252]," *id.*—that is, through "[j]udicial review of a final order of removal," *id.* § 1252(a)(1). *See, e.g., Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) (concluding that, under section 1252(g), "[t]he District Court therefore lacked jurisdiction to consider [plaintiff's] challenge to his denial of DACA relief"); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is . . . excluded from the jurisdiction of the district court."). That review of a final order of removal is the sole avenue for judicial review is underscored by 8 U.S.C. § 1252(b)(9), which channels into the review of final removal orders all questions of law or fact arising from any action taken to remove an alien. *See AADC*, 525 U.S. at 483 (characterizing section 1252(b)(9) as an "unmistakable 'zipper' clause"); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994).

The limitation on review here is consistent with the review procedures for other kinds of discretionary DHS actions. For example, under 8 U.S.C.

§ 1252(a)(2)(B), "no court shall have jurisdiction to review" judgments regarding the grant or denial of specified forms of discretionary relief—including cancellation of removal, voluntary departure, certain waivers of inadmissibility, and adjustment of status. *See* 8 U.S.C. § 1252(a)(2)(B)(i) (citing 8 U.S.C. §§ 1182(h), 1182(i), 1229b, 1229c, 1255). Congress provided a limited exception to that jurisdictional bar for "review of constitutional claims or questions of law," *id.* § 1252(a)(2)(D), but it mandated that any such review occur only "upon a petition for review [of a final order of removal] filed with an appropriate court of appeals in accordance with this section," *id.*; *see, e.g.*, *Green v. Napolitano*, 627 F.3d 1341, 1347 (10th Cir. 2010).

2. The district court nevertheless held that Section 1252(g) did not affect its jurisdiction because plaintiffs challenged "the across-the-board cancellation of a nationwide program" rather than "already-commenced deportation proceedings." ER.22 (emphasis omitted). But Section 1252 does not permit parties to evade its jurisdictional-channeling provisions merely by initiating pre-enforcement challenges. Section 1252(g) bars review of any "action" to "commence proceedings" in order to protect "'no deferred action' decisions and similar discretionary determinations," which includes preventing the decision to wind down the DACA policy from being challenged in "separate rounds of judicial intervention" outside the process designed by Congress. *AADC*, 525 U.S. at 485. Plaintiffs cannot frustrate the INA's reticulated review scheme by filing suit before the agency has officially initiated an enforcement proceeding.

27

This Court's decision in *Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004), cited by the district court, ER.22-23, is inapposite. That case involved a claim for damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), on the ground that certain actions taken by agency officials were unconstitutional. The plaintiff expressly disclaimed a challenge to her removal, *Kwai Fun Wong*, 373 F.3d at 964, and this Court relied upon the fact that the challenge did "not pose the threat of obstruction of the institution of removal proceedings or the execution of removal orders about which *AADC* was concerned," *id.* at 970. Plainly, the same cannot be said concerning plaintiffs' challenge to the rescission of the DACA non-enforcement policy.

## II. The Acting Secretary's Decision Was Lawful.

### A. The DACA rescission was not arbitrary and capricious.

1. Even if the Acting Secretary's decision were reviewable under the APA, it was plainly not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That standard of review is "narrow," *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983): "[A] court is not to substitute its judgment" for the agency's reasonable judgment, and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

28

It is uncontroverted that nothing in the INA requires any aspect of the DACA policy. The claim, instead, is that once an agency has adopted a purely discretionary non-enforcement policy, it must provide a robust explanation for a decision to pursue a different enforcement policy. Unsurprisingly, neither plaintiffs nor the district court have identified any authority for this proposition. Nor can they seriously dispute that it would have been reasonable for the Secretary to act based on the litigation risks presented by maintaining a policy (original DACA) that was materially indistinguishable to ones (expanded DACA and DAPA) that had been enjoined nationwide by the Fifth Circuit in a decision affirmed by an equally divided Supreme Court, especially in the face of a threat by Texas and other States to challenge DACA on the same grounds.

Yet that is precisely what the Secretary did, based on the evident risk that the existing DACA policy would at a minimum be the subject of protracted litigation, and very likely be enjoined nationwide. In *Texas v. United States*, the court concluded that DAPA and expanded DACA were unlawful on both procedural and substantive grounds. 809 F.3d at 178; *see id.* at 147 n.11 (including the "DACA expansions" within the opinion's references to "DAPA"). The entirety of the Fifth Circuit's reasoning applies equally to the original DACA policy.

With respect to procedure, the Fifth Circuit concluded that the memorandum expanding DACA and creating DAPA was not exempt from notice and comment as a statement of policy because of how the *original DACA policy* had been implemented.

*Texas*, 809 F.3d. at 171-78. The court found that, "[a]lthough the DAPA Memo facially purports to confer discretion," in fact it would operate as a binding statement of eligibility for deferred action because that is how the original DACA policy had been implemented. *Id*. at 171, 174 n.139.

With respect to substance, the Fifth Circuit held that DAPA and expanded DACA were contrary to the INA because (1) "[i]n specific and detailed provisions," the INA already "confers eligibility for 'discretionary relief,'" including "narrow classes of aliens eligible for deferred action," *Texas,* 809 F.3d at 179; (2) the INA's otherwise "broad grants of authority" could not reasonably be construed to assign to the Secretary the authority to create additional categories of aliens of "vast 'economic and political significance,'" *id*. at 182-83; (3) DAPA and expanded DACA were inconsistent with historical deferred-action policies because they neither were undertaken on a "country-specific basis . . . in response to war, civil unrest, or natural disasters," nor served as a "bridge[] from one legal status to another," *id*. at 184; and (4) "Congress ha[d] repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ('DREAM Act'), features of which closely resemble DACA and DAPA." *Id*. at 185 (footnote omitted). Every one of those factors likewise applies to the original DACA policy.

2.  In declining to uphold the Acting Secretary's plainly reasonable rationale, the district court subjected her enforcement decision to review that would have been inappropriate even for decisions less inherently discretionary. The court posited

30

reasons that might (in its view) distinguish DACA from DAPA and expanded DACA, and faulted the Acting Secretary for failing to expressly address them. ER.37. But the district court provided no authority (because none exists) for the proposition that the APA required the Acting Secretary to provide the equivalent of a bench memo setting out the subsidiary legal arguments to be made by each side in the course of protracted litigation, with an accompanying evaluation of the likelihood of success in various district courts, the courts of appeals, and the Supreme Court. *Cf. San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 999 (9th Cir. 2014) (even very brief explanation was adequate); *Bowman*, 419 U.S. at 286 (rationale need only be reasonably discernable). So long as the ultimate litigation judgment was reasonable, the Acting Secretary's decision was not arbitrary and capricious. And the judgment was eminently reasonable, because even assuming that some courts might deem certain distinctions material, the prospect of litigation and a nationwide injunction in the Fifth Circuit were at a minimum substantial. The district court did not conclude otherwise or provide any support for the proposition that the Acting Secretary was required to maintain DACA's discretionary non-enforcement policy in the face of such a significant risk based on the mere possibility of a different outcome.

Moreover, even on its own terms, the district court's litigation-risk analysis does not withstand scrutiny. The court emphasized the Fifth Circuit's observation that "any extrapolation from DACA [to DAPA] must be done carefully." *Texas*, 809 F.3d at 173. The Fifth Circuit's point, however, was that DAPA might be lawful even if

DACA were not, rather than the other way around. *See id.* at 174 (noting that the "DAPA Memo contain[ed] additional discretionary criteria"). And regardless, the Fifth Circuit went on to affirm, "under any standard of review," the comparison of the policies undertaken by the district court in that case. *Id.* at 174 n.139.

The district court here speculated, however, that DAPA might have been more vulnerable to challenge because "Congress had already established a pathway to lawful presence for alien parents of citizens," while "no such analogue" exists for DACA recipients. ER.37. That reasoning gets matters entirely backward. Insofar as the creation of pathways to lawful presence was relevant, the fact that Congress had legislated only for certain individuals similarly situated to DAPA beneficiaries—and not DACA recipients—would make DACA *more* inconsistent with the INA than DAPA. In any event, the basis of the Fifth Circuit's *Texas* decision was not the existence of a particular statutory pathway to lawful presence, but the "specific and intricate provisions" of the INA as a whole addressing discretionary relief. 809 F.3d at 186. Those provisions no more include DACA recipients than DAPA beneficiaries. Confirming the point, the Fifth Circuit also affirmed the injunction with respect to expanded DACA, which differed from the original DACA policy only in legally immaterial ways: the length of the deferred-action period, and the modified age and duration-of-residence guidelines.

The district court also reasoned that DACA might be distinguishable from DAPA because 689,800 aliens are recipients of DACA, whereas 4.3 million aliens

potentially qualified for DAPA. ER. 37. But whatever the ultimate number of individuals that might be affected, there can be no debate that DACA is, like DAPA and expanded DACA, a policy of "vast 'economic and political significance,'" to which the Fifth Circuit's reasoning would apply. *Texas*, 809 F.3d at 183. By contrast, the type of historical deferred-action practices that the Fifth Circuit suggested are permissible were much more "limited in time and extent, affecting only a few thousand aliens for months or, at most, a few years." *Id.* at 185 n.197. The Acting Secretary did not act arbitrarily in failing to credit a distinction between DACA and DAPA that the Fifth Circuit expressly rejected.

The district court further erred in suggesting that, whether or not the original DACA policy was unlawful as it had been implemented, it could have been fixed "by simply insisting on exercise of discretion" in individual cases. ER.37. The Fifth Circuit relied on the lack of individual discretion only for its conclusion that the DAPA Memorandum was procedurally unlawful, not substantively so. *Texas*, 809 F.3d at 171-78. Thus, even if the Acting Secretary could have altered the DACA policy sufficiently to overcome the procedural objection, it would not have affected the Fifth Circuit's substantive conclusion—at least unless the change were so drastic as to return to a

practice of "single, ad hoc grants of deferred action made on a genuinely case-by-case basis," *id.* at 186 n.202, which is precisely what the DACA rescission achieves.[7]

Lastly, the district court erroneously concluded that the litigation-risk rationale was arbitrary and capricious because the Acting Secretary "should have—but did not—weigh DACA's programmatic objectives as well as the reliance interests of DACA recipients." ER.40. In these circumstances, reliance interests are not "an important aspect" of the decision whether to retain DACA. *State Farm*, 463 U.S. at 43. On its face, DACA confers no legitimate reliance interests. DACA made deferred action available for only two-year periods, which could "be terminated at any time" at the agency's discretion. ER.151. When he announced DACA in 2012, President Obama explained that it was a "temporary stopgap measure," not a "permanent fix." *Remarks by the President on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY. And he urged Congress to act "because these kids deserve to plan their lives in more than two-year increments." *Id.* A purely discretionary policy that can be revoked at any time cannot create legally cognizable reliance interests—and certainly not beyond the stated duration (generally two years) of deferred-action grants. Nothing in the INA

---

[7] Nor did the Acting Secretary "fail[] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, by not discussing the possibility of defending DACA on the procedural ground of laches. ER.40. That doctrine may provide a defense where a plaintiff's unreasonable delay in bringing suit prejudiced the government. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967). The district court did not explain what prejudice the government might have established from Texas's failure to bring suit earlier.

prevents the Secretary of Homeland Security from changing her "national
immigration enforcement policies and priorities." 6 U.S.C. § 202(5). And any reliance
was even less justified, of course, to the extent that DACA was unlawful.

At a minimum, the asserted reliance interests were too insubstantial to
necessitate express consideration, because they plainly fail to overcome the substantial
change in circumstances that arose as a result of the Supreme Court's affirmance of
the Fifth Circuit's decision, which significantly increased the risk that DACA would
be enjoined nationwide and thus drastically reduced the degree to which DACA
recipients could rely on the continuation of what was already a purely discretionary
non-enforcement policy. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), on
which the district court relied, is entirely inapposite. That case involved the
Department of Labor's interpretation of whether automotive service advisors were
covered by a statutory exemption from the overtime provisions of the Fair Labor
Standards Act. Unlike the policy at issue here, the one in *Encino Motorcars* concerned
private parties' substantive statutory rights, had been in place for thirty-three years,
and was not subject to a significant risk of imminent judicial invalidation. *Id.* at 2126-
27. The relevant industry stakeholders had therefore developed a strong and justified
reliance interest that necessitated consideration under the APA.

In any event, the Acting Secretary's decision was suitably respectful of the
interests of existing DACA recipients. Based on her reasonable evaluation of the
litigation risk posed by the imminent lawsuit against the DACA policy, the choice she

35

faced was between a gradual, orderly, administrative wind-down of the policy, and the risk of an immediate, disruptive, court-imposed one. Her decision to phase out the policy over a two-and-a-half-year period—permitting a period of additional renewals and permitting renewed and existing grants of deferred action to expire by their terms—was, by far, the more humane choice.

3. The district court was on no firmer ground in rejecting the litigation-risk concern as a "post hoc rationalization" for the Acting Secretary's decision. ER.43. In the court's view, "[t]he Attorney General's letter and the Acting Secretary's memorandum can only be reasonably read as stating DACA was illegal and that, *given that DACA must, therefore, be ended,* the best course was 'an orderly and efficient wind-down process,' rather than a potentially harsh shutdown in the Fifth Circuit." ER.39.

But the court's narrow reading of the Acting Secretary's rationale is hardly the only one that "may reasonably be discerned" from the Acting Secretary's memorandum. *Bowman*, 419 U.S. at 286. Indeed, that memorandum focused from beginning to end principally on litigation concerns, not the legality of DACA *per se.* The memorandum recounted in significant detail the litigation surrounding the DAPA and expanded DACA policies. ER. 125. It noted that the agency's prior June 2017 decision to discontinue DAPA and expanded DACA was made after "considering the [government's] likelihood of success on the merits of th[at] ongoing litigation." ER.129. It described the subsequent letter from Texas and other States to the Attorney General notifying him of those States' intention to amend the existing

36

lawsuit to challenge the original DACA policy. *Id.* It quoted the Attorney General's qualified statement that "it is *likely* that potentially imminent litigation would yield similar results with respect to DACA." *Id.* (emphasis added). And it concluded that, in light of the foregoing, and "[i]n the exercise of [her] authority in establishing national immigration policies and priorities" under 6 U.S.C. § 202(5), the Acting Secretary had decided merely that the DACA policy "should" be terminated and wound down in "an efficient and orderly fashion," *not* that it "must" be, as the district court erroneously asserted. ER.129-30. Given all that, the district court indisputably erred in holding that the memorandum was not, at the very least, reasonably susceptible to the interpretation that the Acting Secretary's decision was based on the risk that the government was not likely to succeed on the merits of the "imminent litigation." ER.129.

The district court also posited that litigation risk could not have been a rationale for the Acting Secretary's decision because, "once the Attorney General had determined that DACA was illegal, the Acting Secretary had to accept his ruling as 'controlling.'" ER.39 (citing 8 U.S.C. § 1103(a)(1)). But even if the Acting Secretary were bound by the Attorney General's legal determination as to DACA's unlawfulness, she could and did conclude that an independent basis for winding down DACA is that the policy would be enmeshed in litigation and subject to a likely injunction even if courts ultimately rejected the Attorney General's view. Indeed, the

FDA's non-enforcement policy in *Chaney* similarly relied on both enforcement

discretion and a perceived lack of jurisdiction. 470 U.S. at 824.

4. In any event, the Acting Secretary's decision is independently supported by

her reasonable conclusion, informed by the Attorney General's advice, that

indefinitely continuing the DACA policy would itself have been unlawful. As detailed

above, the Fifth Circuit had already concluded that DAPA and expanded DACA were

procedurally and substantively invalid, in a decision that four Justices of the Supreme

Court voted to affirm. *See supra* pp. 29-30. The Attorney General expressed his

agreement with the conclusion reached by the Fifth Circuit in a decision that applies

equally to the original DACA policy. *See* ER.176 (concluding that the DACA policy

was "effectuated . . . without proper statutory authority and with no established end-

date, after Congress' repeated rejection of proposed legislation that would have

accomplished a similar result"). It cannot be that the Acting Secretary's decision to

rescind the purely discretionary DACA non-enforcement policy on the basis of the

Fifth Circuit's decision, the Supreme Court's equally divided affirmance, and the

Attorney General's opinion was the type of "clear error of judgment," *State Farm*, 463

U.S. at 43, that would make it arbitrary and capricious under the APA.

The district court concluded that the Acting Secretary could not rely on an

assessment of DACA's legality unless it was correct as a matter of law. *See* ER.29

("When agency action is based on a flawed legal premise, it may be set aside as

'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law.'") (citing *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007)). Citing the Secretary's broad discretion in "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and DHS's "long and recognized practice" of granting deferred action (along with work authorization and other benefits) on a programmatic basis, the court concluded that, in its view, DACA was lawful. ER.31. But the Fifth Circuit rejected those precise considerations when offered in support of DAPA and expanded DACA. *See Texas*, 809 F.3d at 183.

More fundamentally, the district court was wrong to conclude that the Acting Secretary's discretionary decision to end a particular enforcement policy of doubtful legality must automatically be set aside if a court subsequently decides that the policy was lawful. ER.37-38. The court relied on the Supreme Court's decision in *Massachusetts* v. *EPA*, *supra*, for that proposition. But in that case a provision of the Clean Air Act spoke directly to the agency decision at issue, and *required* EPA to regulate any air pollutant which the agency concluded endangered public health or welfare. *See* 42 U.S.C. § 7521(a)(1) (mandating that the EPA Administrator "shall" prescribe standards). The agency had "refused to comply with this clear statutory command" in part because it misunderstood its authority. 549 U.S. at 533. By contrast here, no one contends that the INA requires DHS to continue the DACA policy of deferred action. Rather, the DACA policy was created as a matter of DHS's broad discretion to set enforcement priorities. After careful review, the Acting Secretary determined to rescind that discretionary policy based on concerns about its legality,

39

and nothing in either the APA or INA authorizes setting aside her reasonable determination.

### B.    The DACA rescission did not violate equal protection.

Plaintiffs have failed to state a claim that the DACA rescission violated equal protection. Their claim that the Acting Secretary's enforcement decision was motivated by racial animus is foreclosed by the Supreme Court's decision in *AADC*.

1. In *AADC*, the Supreme Court rejected a group of aliens' attempt to defend against removal by asserting that the Government was discriminating against them based on their First Amendment activity. 525 U.S. at 488-92. Relying on its decisions in *Armstrong*, 517 U.S. at 463-65, and *Wayte v. United States,* 470 U.S. 598, 607-08 (1985), the Court began with the principle that "[e]ven in the criminal-law field, a selective prosecution claim is a *rara avis." AADC*, 525 U.S. at 489. As the Court reaffirmed, "[b]ecause such claims invade a special province of the Executive—its prosecutorial discretion—we have emphasized that the standard for proving them is particularly demanding, requiring a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully." *Id.*

The Supreme Court in *AADC* then held that an even more restrictive rule than *Armstrong*'s clear-evidence standard was required when the claim of selective enforcement arises in the immigration context, because the concerns raised by such claims are "greatly magnified." *AADC*, 525 U.S. at 489-90. The Court observed that the "delay" associated with challenges to immigration enforcement decisions is more

40

harmful because it "permit[s] and prolong[s] a continuing violation of United States

law," especially given that "[p]ostponing justifiable deportation (in the hope that the

alien's status will change . . . or simply with the object of extending the alien's

unlawful stay) is often the principal object of resistance to a deportation proceeding."

*Id.* at 490. The Court also recognized that heightened separation-of-powers concerns

arise in this context because inquiring into the motives behind immigration

enforcement entails "not merely the disclosure of normal domestic law enforcement

priorities and techniques," but also "the disclosure of foreign-policy objectives and [in

some cases, like *AADC* itself,] foreign-intelligence products and techniques." *Id.* at

490-91. Given all this, the Court dismissed "[t]he contention that a violation [of

federal law] must be allowed to continue because it has been improperly selected" as

"not powerfully appealing." *Id.* at 491.

Accordingly, the Court held that, "as a general matter," "an alien unlawfully in

this country has no constitutional right to assert selective enforcement as a defense

against his deportation." *AADC*, 525 U.S. at 488. Although the Court did "not rule

out the possibility of a rare case in which the alleged basis of discrimination is so

outrageous that the . . . considerations [against discriminatory-enforcement claims]

can be overcome," it also did not decide "[w]hether or not there be such exceptions."

*Id.* at 491.

2. A claim that a facially-neutral policy like the DACA rescission was

motivated by racial animus is insufficient to overcome *AADC*'s general bar on

discriminatory-motive challenges to immigration-enforcement decisions. *See* 525 U.S. at 491-92 (holding that even selectively targeting particular aliens on the basis of their First Amendment activity did not rise to the level of the possible exception for "outrageous" discrimination). Virtually any immigration policy is likely to have a disparate impact on aliens of some ethnicity, and thus would be vulnerable to a discriminatory-motive allegation from aliens merely seeking to continue their unlawful presence in this country. Even if all such claims were ultimately proven baseless, the very act of adjudicating them leads precisely to the delay and foreign policy concerns the Court described in *AADC*. *See id.* at 490.

Notably, neither plaintiffs nor the district court identified a single case holding that *AADC*'s possible exception for "outrageous" discrimination exists and was satisfied (and the government is not aware of such of a case). Instead, the district court, in a footnote, ignored *AADC* and distinguished *Armstrong* on the ground that "[p]laintiffs' claims cannot fairly be characterized as selective-prosecution claims" because they do not "implicate the [Acting Secretary's] prosecutorial discretion" to remove "one person rather than another," as they instead concern her "decision to end a nationwide deferred-action program [allegedly] motivated by racial animus." ER.59 n.3. That, however, is a distinction without a difference, because *AADC*'s rationale applies at least equally (if not more) to broad immigration enforcement policies as it does to individual enforcement decisions.

42

3. At a minimum, if racial discriminatory-motive claims are cognizable in the immigration-enforcement context at all under *AADC*, they must meet the "particularly demanding" standard applicable in the criminal-enforcement context: plaintiffs must plausibly allege the existence of "'clear evidence'" of "outrageous" discrimination, thus "displacing the presumption that a [federal enforcement official] has acted lawfully," before the claim may proceed past the pleadings. *AADC*, 525 U.S. at 489, 491 (citing *Armstrong*, 517 U.S. at 463-65). This standard is extremely demanding, and plaintiffs have identified no case where a court has held it to be satisfied. Indeed, several courts of appeals rejected equal-protection challenges to a registration requirement for male immigrants from certain (predominantly Muslim) countries—which led to removal for those without lawful status—on the ground that "outrageous" discrimination had not been sufficiently demonstrated. *See, e.g.*, *Kandamar v. Gonzales*, 464 F.3d 65, 73-74 (1st Cir. 2006); *Hadayat v. Gonzalez*, 458 F.3d 659, 664-65 (7th Cir 2006).

Rather than applying the *AADC* standard, the district court held that plaintiffs had stated a claim that the DACA rescission violated equal protection based on a much lesser showing. It concluded merely that their allegations regarding candidate Trump's "campaign rhetoric" raised a "plausible inference that racial animus towards Mexicans and Latinos," who "account for 93 percent of DACA recipients," "was a motivating factor in the decision to end DACA." ER.59, ER.61. The court believed

43

that a "fact-intensive inquiry [was] needed to determine whether defendants acted with discriminatory intent." *Id.* The court's holding is flawed in myriad respects.

In relying on "campaign rhetoric," the court disregarded the absence of *any* statement by the actual decisionmaker in this case—Acting Secretary Duke—that could give rise to any inference of animus. Acting Secretary Duke was the only government official with the legal authority to rescind a DHS policy that DHS had operated for the previous five years, 8 U.S.C. § 1103(a)—regardless of the (undisputed) involvement by the White House. For plaintiffs to succeed, it is the Acting Secretary's decision that must be infected by discriminatory animus. Yet plaintiffs' contention that the Acting Secretary's decision was tainted by the President's alleged bias does not even satisfy the ordinary pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009), much less the "clear evidence" standard of *AADC* and *Armstrong*. Contrary to the district court's understanding, there are no factual issues to resolve.

Moreover, even taking the President's statements on their own terms, such statements are insufficient. First, nationality, as opposed to ethnicity, is not an invidious classification for purposes of federal immigration law. *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008). And second, most of the statements did not refer to DACA, or indeed any official policy, since they occurred on the campaign trail and preceded the President's inauguration and oath of office. *See Washington v. Trump*, 858 F.3d 1168, 1173 & n.4 (9th Cir. 2017) (Kozinski, J., dissenting from denial of

44

rehearing en banc). Indeed, as the district court recognized, the few cited statements referring directly to DACA are, in fact, favorable to DACA recipients. ER.61.

Simply put, the statements relied on by the district court do not come close to plausibly alleging clear evidence of discriminatory motive. Indeed, it is utterly implausible that Acting Secretary Duke would have retained DACA if the nearly 700,000 aliens without lawful status were not predominantly Latino, especially given the questions about DACA's legality. The equal-protection claim should be dismissed.

## C. The implementation of the DACA rescission will not violate due process.

Plaintiffs failed to state a substantive due-process claim based on their assertion that the government has changed its policy regarding whether information provided by DACA recipients to USCIS will be shared with other DHS components for purposes of immigration enforcement proceedings. Plaintiffs did not allege any facts giving rise to a plausible inference that such a policy change has actually occurred—and DHS has made clear that its policy in fact has not changed. Nor have plaintiffs identified an improper deprivation of a protected interest, as required to state a substantive due-process claim.

1. The district court credited plaintiffs' assertions that DHS has changed its information policy. ER.56. But those conclusory assertions are unsupported—and in fact contradicted—by documents referenced by plaintiffs, as well as other publicly

available materials. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998).

When DACA was initially implemented, DHS published a "frequently asked questions" web page that included guidance covering DHS's policy regarding the sharing of information provided to USCIS by DACA requestors. *See* ER.145. The guidance stated that information would be "protected from disclosure to ICE and [Customs and Border Protection (CBP)] for the purpose of immigration enforcement proceedings," subject to exceptions where the criteria for issuance of a Notice to Appear are satisfied (for example, where national security, public safety, or significant criminal activity interests are implicated), and subject to the caveat that it "may be modified, superseded, or rescinded at any time." ER.149; *see also id.* (explaining that information may be used for certain purposes other than removal); USCIS, *Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs)* (Nov. 7, 2011), https://go.usa.gov/xncPK (last visited Feb 13, 2018).

Nothing in the Acting Secretary's Rescission Memorandum changes that approach—in fact, the memorandum makes no reference to information sharing at all. Plaintiffs point only to a questions-and-answers document issued with the memorandum, but that document simply confirms that DACA information "generally" "will not be proactively provided to ICE and CPB for the purpose of immigration enforcement proceedings." ER.136. Far from demonstrating a change in policy, this document is entirely consistent with DHS's existing information-sharing

46

policy—which DHS reiterated in guidance it issued thereafter. DHS, USCIS,

*Frequently Asked Questions: Rejected DACA Requests* Q5 (Dec. 27, 2017),

https://www.uscis.gov/daca2017/mail-faqs ("This information-sharing policy has not

changed in any way since it was first announced, including as a result of the Sept. 5,

2017 memo starting a wind-down of the DACA policy."). Plaintiffs' conclusory

assertion that the government has changed its information-sharing policy is therefore

unsupported—and in fact contradicted—by their factual allegations and publicly

available documents.

2. In any event, plaintiffs' allegations do not state a substantive due process

violation. When a plaintiff alleges a substantive due process violation based on

principles of "fundamental fairness," the alleged conduct must effect a "government

deprivation of life, liberty, or property," *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir.

2006) (quotation omitted), and must be "so egregious" and "outrageous" as to "shock

the contemporary conscience," *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850

(1998).

The district court held that the plaintiffs had alleged a "mutually explicit

understanding, giving rise to a protected interest in the confidentiality of DACA

recipients' personal information," ER.56, but the information-sharing policy does not

give rise to such an interest. The DACA guidance could not have been clearer that the

policy was entirely non-binding: it states that it does not confer any substantive

entitlement and could be altered or rescinded at any time. ER.149 (stating that

47

information-sharing policy may be "modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural"). In the face of this clear language, a subjective belief to the contrary cannot create a protected due process interest. "A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government." *Gerhart v. Lake County*, 637 F.3d 1013, 1020-21 (9th Cir. 2011).

Finally, even if a due process interest did exist, plaintiffs have failed to show that DHS's alleged change to its information-sharing policy shocks the conscience. *Lewis,* 523 U.S. at 847 n.8, 850. The information-sharing policy has always been subject to a number of exceptions providing for use in certain immigration-enforcement and non-removal contexts, and any hypothetical expansion of those uses would not be conscience-shocking, especially given that plaintiffs were given clear notice that the policy conferred no rights and could change. For this reason as well, plaintiffs fail to state a substantive due process claim with respect to DHS's information-sharing policy.

## III. The District Court's Nationwide Injunction Is Overbroad.

Even assuming the district court correctly concluded that plaintiffs' substantive APA claim is reviewable and that the DACA rescission was likely arbitrary and capricious, the court still erred in enjoining the rescission of DACA on a "nationwide basis." ER.46. The court's injunction contravenes bedrock principles of Article III

48

and equitable discretion by sweeping far more broadly than necessary to redress the
plaintiffs' cognizable injuries.

> **A.** **Injunctive relief must be limited to redressing plaintiffs'
> cognizable injuries.**

1. To establish Article III standing, a plaintiff "must allege personal injury fairly
traceable to the defendant's allegedly unlawful conduct and likely to be redressed by
the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).
"[S]tanding is not dispensed in gross," and the plaintiff must establish standing
"separately for each form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S.
Ct. 1645, 1650 (2017). As this Court has recognized, "our legal system does not
automatically grant individual plaintiffs standing to act on behalf of all citizens
similarly situated." *Zepeda v. U.S. Immigration & Naturalization Serv.*, 753 F.2d 719, 730
n.1 (9th Cir. 1983).

The same principles inform the Supreme Court's repeated admonition that the
standing requirements of Article III preclude a court from granting relief that is not
directed to remedying the injury asserted by the plaintiff. Thus, for example, in
*Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the Court held that the plaintiffs
lacked standing to challenge regulations after the parties had resolved the controversy
regarding the regulations' application to the project that had caused the plaintiffs'
injury. Noting that the plaintiffs' "injury in fact with regard to that project ha[d] been
remedied," the Court held that to allow the plaintiffs to challenge the regulations

"apart from any concrete application that threatens imminent harm to [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Id.* at 494; *see also Lewis v. Casey*, 518 U.S. 343, 357-59 (1996) (rejecting proposition that "once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court w[as] authorized to remedy *all* inadequacies in that administration," because "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established").

This Court likewise has recognized the "elementary principle" that, absent class certification, plaintiffs are "not entitled to relief for people whom they do not represent." *Zepeda*, 753 F.2d at 730 n.1. Were it otherwise, any individual plaintiff "could merely file an individual suit as a pseudo-private attorney general and enjoin the government in all cases." *Id.* The Seventh Circuit also has squarely held that a district court may not "grant relief to non-parties" where an injunction limited to the party would provide complete relief because a broader injunction "exceed[s] the district judge's powers under Article III of the Constitution." *McKenzie v. City of Chi.*, 118 F.3d 552, 555 & n.* (7th Cir. 1997).

2. Even apart from Article III's requirements, fundamental principles of equity support the same rule. The "Supreme Court has cautioned that 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs' before the court." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979));

*see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Thus, "[i]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification." *Haven Hospice*, 638 F.3d at 664; *see also Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 (9th Cir. 1994).

In *Los Angeles Haven Hospice*, this Court agreed with the district court that a regulation was facially invalid, but nonetheless vacated an injunction insofar as it barred the government from enforcing the regulation against entities other than the plaintiff. 638 F.3d at 665. The Court recognized that relief extending to parties not before the Court is authorized only "if such broad relief is necessary to give prevailing parties the relief to which they are entitled." *Id.* at 664 (citing *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987)).

As this Court has also recognized, "nationwide injunctions 'have a detrimental effect by foreclosing adjudication by a number of different courts and judges.'" *Los Angeles Haven Hospice*, 638 F.3d at 664 (quoting *Califano*, 442 U.S. at 702). Here, the same legal issues are currently pending in (among other cases) litigation that may soon be before the Second Circuit. *See Nielsen v. Vidal*, Order of Jan. 31, 2018, Case Nos. 18-122, 18-123 (holding petition for interlocutory appeal under 1292(b) in abeyance pending district court's resolution of pending preliminary injunction motion); *Vidal v. Nielsen*, Case Nos. 16-4756, 17-5228, Dkt.No.254 (Feb. 13, 2018) (granting preliminary injunction for essentially the same reasons as the district court in this case). If this Court were to leave the nationwide injunction in place, then the plaintiffs

51

in that case and all other DACA recipients within the Second Circuit would be covered by this injunction, even if that court were to hold that the DACA rescission is lawful.

Nationwide injunctions are further problematic for a related reason. They provide plaintiffs all the benefits of a class action without any of the burdens or obligations. Once a single plaintiff prevails, the district court issues the relief that might have been appropriate if it had certified a class of all affected parties. But insofar as the federal government prevails, it gains none of the benefits of prevailing in a class action and, in particular, cannot preclude other plaintiffs from filing suit to relitigate the same issues. Indeed, in this very case, the district court dismissed two State plaintiffs for lack of standing, ER.28, yet the resident DACA recipients those States sought to protect will still benefit from the injunction, essentially nullifying the court's own standing holding.

3. The district court grappled with none of these Article III or equitable issues. Rather than analyzing the scope of relief necessary to address the injury alleged by plaintiffs before it, the court summarily stated that "Plaintiffs have established injury that reaches beyond the geographical bounds of the Northern District of California" because "[t]he problem affects every state and territory of the United States." ER.47. But that rationale would hold true for any national policy subject to a facial challenge, leading to the improper and unfair results described above.

This Court's decision in *Hawaii v. Trump*, 878 F.3d 662 (9th Cir. 2017), is not to the contrary. There, recognizing that "[i]njunctive relief must be tailored to remedy the specific harms shown by the plaintiffs," this Court upheld a nationwide injunction only because it deemed that necessary to give plaintiffs full relief based on its view that "the immigration laws of the United States should be enforced vigorously and *uniformly*." *Id.* at 701. That rationale cuts the exact opposite way here. Deferred action is itself a departure from vigorous and uniform enforcement of the immigration laws. Accordingly, enjoining the rescission of DACA on a nationwide basis, rather than as limited to particular DACA recipients whose loss of DACA would cognizably injure plaintiffs, increases rather than lessens that departure.

Even more inapposite is *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam). There, this Court merely declined to stay a nationwide temporary restraining order, emphasizing both that it need not conclusively resolve the TRO's proper geographic scope and that "the Government has not proposed a workable alternative form of the TRO that . . . that would protect the proprietary interests of the [plaintiff] States at issue here while nevertheless applying only within the States' borders." *Id.* at 1166-67. That case thus represents, at most, a tentative application of the principle that injunctive relief extending to third parties can be awarded when such relief is necessary to provide complete relief to the plaintiffs. *See Bresgal*, 843 F.2d at 1170-71 ("[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a

53

class action—*if such breadth is necessary to give prevailing parties the relief to which they are
entitled.*").

**B.    The injunction goes well beyond redressing plaintiffs' cognizable injuries.**

1.  The district court's nationwide injunction violates the requirements of
Article III and equity. The injunction grants relief to thousands of DACA recipients
who are not parties before the court and who do not need to be covered to provide
plaintiffs here with complete relief. In particular, a proper injunction would be limited
to DACA recipients who are named plaintiffs or validly represented by the union
plaintiff, as well as any additional DACA recipients whose loss of DACA would
impose cognizable injuries on the various entity plaintiffs.

2. Properly limiting the injunction in this manner would be particularly
significant because the district court further erred in holding that the entity plaintiffs
will suffer a cognizable injury from the DACA rescission. In particular, the court held
that those plaintiffs will be injured in their capacities as employers of DACA
recipients. ER.23-24. But that is not a judicially cognizable interest for purposes of
challenging the DACA rescission.

To begin, the entity plaintiffs' interests as employers do not even satisfy Article
III. The decision to rescind the DACA policy does not directly regulate these parties
by requiring them to do (or refrain from doing) anything. Instead, these plaintiffs
complain of indirect injury flowing from the government's enforcement decision

concerning their employees. But it is settled law that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). The district court rejected the government's reliance on *Linda R.S.*, reasoning that the causal relationship between the non-prosecution decision and the asserted injury in *Linda R.S.* had been "speculative," whereas the alleged harm here to the entity plaintiffs' "proprietary interests" would be the "direct result" of the DACA rescission. ER.26. But in addition to the particular causation holding in *Linda R.S.*, the Supreme Court relied on the more general proposition that, "in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Id.* at 619. The entity plaintiffs thus simply do not have a judicially cognizable interest in the nonprosecution of their employees.

The entity plaintiffs' interests as employers also fall outside the INA's zone of interests. The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 395 (1987). Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke*, 479 U.S. at 396. Here, no provision of the INA even arguably protects the entity plaintiffs from bearing any incidental employment effects from their employees' loss of

deferred action. *Cf. Federation for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899

(D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens

into this country, where plaintiffs relied on incidental effects of that policy on

workers). To the contrary, DHS's discretionary decision to grant deferred-action

recipients the collateral benefit of employment authorization is a matter of regulatory

grace rather than statutory mandate, 8 C.F.R. § 274a.12(c)(14), which underscores that

employers lack a cognizable interest in challenging the INA's purely discretionary

decision whether to grant or rescind deferred action at all. By the district court's

contrary logic, every employer in the country would have standing to directly

challenge any removal proceeding against any one of its employees. Although the

zone-of-interests test may not "be especially demanding," *Match-E-Be-Nash-She-Wish

Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012), it cannot be stretched

beyond the bounds of reason.[8]

---

[8] Similarly, the entity plaintiffs lack third-party standing, as employers or
otherwise, to bring constitutional claims on behalf of DACA recipients. *See Kowalski v.
Tesmer*, 543 U.S. 125, 134 (2004).

56

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated and its order denying in part the government's motion to dismiss should be reversed.

Respectfully submitted,

CHAD A. READLER.
  *Acting Assistant Attorney General*

ALEX G. TSE
  *Acting United States Attorney*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK B. STER.N
ABBY C. WRIGHT
THOMAS PULHAM
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2000*

February 2018

## STATEMENT OF RELATED CASES

A petition for writ of certiorari before judgment is currently pending in the Supreme Court. *See Department of Homeland Security v. Regents of the University of California*, Case No. 17-1003.

Counsel for appellants are not aware of any related cases, not consolidated here, pending in this Court as defined in Ninth Circuit Rule 28-2.6.

# CER.TIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,975 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

_s/ Mark B. Stern_
MARK B. STERN

**CER.TIFICATE OF SER.VICE**

I hereby certify that on February 13, 2018, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the appellate CM/ECF system. Participants in the case are registered

CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


　　　　　　　　　　　　　*s/Mark B. Stern*
　　　　　　　　　　　　　MARK B. STERN

# ADDENDUM

Case 18-40068 Document: 00513048161 Date Filed: 08/09/19 Entry: 61 Page: 124 of 247

## TABLE OF CONTENTS

5 U.S.C. § 701 ...........................................................................................A1

6 U.S.C. § 202 ...........................................................................................A2

8 U.S.C. § 1252 .........................................................................................A3

8 C.F.R. § 274a.12(c) .............................................................................. A11

**5 U.S.C. § 701**

**(a)** This chapter applies, according to the provisions thereof, except to the extent that--

**(1)** statutes preclude judicial review; or

**(2)** agency action is committed to agency discretion by law.

**(b)** For the purpose of this chapter--

**(1)** "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--

**(A)** the Congress;

**(B)** the courts of the United States;

**(C)** the governments of the territories or possessions of the United States;

**(D)** the government of the District of Columbia;

**(E)** agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

**(F)** courts martial and military commissions;

**(G)** military authority exercised in the field in time of war or in occupied territory; or

**(H)** functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix;[1] and

**(2)** "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

A1

**6 U.S.C. § 202**

The Secretary shall be responsible for the following:

**(1)** Preventing the entry of terrorists and the instruments of terrorism into the United States.

**(2)** Securing the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department at ports of entry.

**(3)** Carrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service) immediately before the date on which the transfer of functions specified under section 251 of this title takes effect.

**(4)** Establishing and administering rules, in accordance with section 236 of this title, governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States.

**(5)** Establishing national immigration enforcement policies and priorities.

**(6)** Except as provided in part C of this subchapter, administering the customs laws of the United States.

**(7)** Conducting the inspection and related administrative functions of the Department of Agriculture transferred to the Secretary of Homeland Security under section 231 of this title.

**(8)** In carrying out the foregoing responsibilities, ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce.

**8 U.S.C. § 1252**

**(a) Applicable provisions**

**(1) General orders of removal**

Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to section 1225(b)(1) of this title) is governed only by chapter 158 of Title 28, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

**(2) Matters not subject to judicial review**

**(A) Review relating to section 1225(b)(1)**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review--

**(i)** except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,

**(ii)** except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

**(iii)** the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or

**(iv)** except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

**(B) Denials of discretionary relief**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review--

**(i)** any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or

**(ii)** any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

**(C) Orders against criminal aliens**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title.

**(D) Judicial review of certain legal claims**

Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

**(3) Treatment of certain decisions**

No alien shall have a right to appeal from a decision of an immigration judge which is based solely on a certification described in section 1229a(c)(1)(B) of this title.

**(4) Claims under the United Nations Convention**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

**(5) Exclusive means of review**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e). For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction to review" include habeas corpus review pursuant to section 2241 of Title 28, or any other habeas corpus provision, sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).

**(b) Requirements for review of orders of removal**

With respect to review of an order of removal under subsection (a)(1), the following requirements apply:

**(1) Deadline**

The petition for review must be filed not later than 30 days after the date of the final order of removal.

**(2) Venue and forms**

The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings. The record and briefs do not have to be printed. The court of appeals shall review the proceeding on a typewritten record and on typewritten briefs.

**(3) Service**

**(A) In general**

The respondent is the Attorney General. The petition shall be served on the Attorney General and on the officer or employee of the Service in charge of the Service district in which the final order of removal under section 1229a of this title was entered.

**(B) Stay of order**

Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise.

**(C) Alien's brief**

The alien shall serve and file a brief in connection with a petition for judicial review not later than 40 days after the date on which the administrative record is available, and may serve and file a reply brief not later than 14 days after service of the brief of the Attorney General, and the court may not extend these deadlines except upon motion for good cause shown. If an alien fails to file a brief within the time provided in this paragraph, the court shall dismiss the appeal unless a manifest injustice would result.

**(4) Scope and standard for review**

Except as provided in paragraph (5)(B)--

**(A)** the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

**(B)** the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary,

**(C)** a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law, and

**(D)** the Attorney General's discretionary judgment whether to grant relief under section 1158(a) of this title shall be conclusive unless manifestly contrary to the law and an abuse of discretion.

No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 1158(b)(1)(B), 1229a(c)(4)(B), or 1231(b)(3)(C) of this title, unless the court finds, pursuant to subsection (b)(4)(B), that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.

**(5) Treatment of nationality claims**

**(A) Court determination if no issue of fact**

If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

**(B) Transfer if issue of fact**

If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of Title 28.

**(C) Limitation on determination**

The petitioner may have such nationality claim decided only as provided in this paragraph.

**(6) Consolidation with review of motions to reopen or reconsider**

When a petitioner seeks review of an order under this section, any review sought of a motion to reopen or reconsider the order shall be consolidated with the review of the order.

**(7) Challenge to validity of orders in certain criminal proceedings**

**(A) In general**

If the validity of an order of removal has not been judicially decided, a defendant in a criminal proceeding charged with violating section 1253(a) of this title may challenge the validity of the order in the criminal proceeding only by filing a separate motion before trial. The district court, without a jury, shall decide the motion before trial.

**(B) Claims of United States nationality**

If the defendant claims in the motion to be a national of the United States and the district court finds that--

**(i)** no genuine issue of material fact about the defendant's nationality is presented, the court shall decide the motion only on the administrative record on which the removal order is based and the administrative findings of fact are conclusive if supported by reasonable, substantial, and probative evidence on the record considered as a whole; or

**(ii)** a genuine issue of material fact about the defendant's nationality is presented, the court shall hold a new hearing on the nationality claim and decide that claim as if an action had been brought under section 2201 of Title 28.

The defendant may have such nationality claim decided only as provided in this subparagraph.

**(C) Consequence of invalidation**

If the district court rules that the removal order is invalid, the court shall dismiss the indictment for violation of section 1253(a) of this title. The United States Government may appeal the dismissal to the court of appeals for the appropriate circuit within 30 days after the date of the dismissal.

**(D) Limitation on filing petitions for review**

The defendant in a criminal proceeding under section 1253(a) of this title may not file a petition for review under subsection (a) during the criminal proceeding.

**(8) Construction**

This subsection--

**(A)** does not prevent the Attorney General, after a final order of removal has been issued, from detaining the alien under section 1231(a) of this title;

**(B)** does not relieve the alien from complying with section 1231(a)(4) of this title and section 1253(g)[1] of this title; and

**(C)** does not require the Attorney General to defer removal of the alien.

**(9) Consolidation of questions for judicial review**

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361

or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

**(c) Requirements for petition**

A petition for review or for habeas corpus of an order of removal--

**(1)** shall attach a copy of such order, and

**(2)** shall state whether a court has upheld the validity of the order, and, if so, shall state the name of the court, the date of the court's ruling, and the kind of proceeding.

**(d) Review of final orders**

A court may review a final order of removal only if--

**(1)** the alien has exhausted all administrative remedies available to the alien as of right, and

**(2)** another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided by the prior proceeding was inadequate or ineffective to test the validity of the order.

**(e) Judicial review of orders under section 1225(b)(1)**

**(1) Limitations on relief**

Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may--

**(A)** enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection, or

**(B)** certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection.

**(2) Habeas corpus proceedings**

Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of--

**(A)** whether the petitioner is an alien,

**(B)** whether the petitioner was ordered removed under such section, and

**(C)** whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

A8

**(3) Challenges on validity of the system**

**(A) In general**

Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of--

**(i)** whether such section, or any regulation issued to implement such section, is constitutional; or

**(ii)** whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

**(B) Deadlines for bringing actions**

Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure described in clause (i) or (ii) of subparagraph (A) is first implemented.

**(C) Notice of appeal**

A notice of appeal of an order issued by the District Court under this paragraph may be filed not later than 30 days after the date of issuance of such order.

**(D) Expeditious consideration of cases**

It shall be the duty of the District Court, the Court of Appeals, and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph.

**(4) Decision**

In any case where the court determines that the petitioner--

**(A)** is an alien who was not ordered removed under section 1225(b)(1) of this title, or

**(B)** has demonstrated by a preponderance of the evidence that the alien is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, the court may order no remedy or relief other than to require that the petitioner be provided a hearing in accordance with section 1229a of this title. Any alien who is provided a hearing under section 1229a of this title pursuant to this paragraph may thereafter obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1).

**(5) Scope of inquiry**

In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was

A9

issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

**(f) Limit on injunctive relief**

**(1) In general**

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

**(2) Particular cases**

Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law.

**(g) Exclusive jurisdiction**

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

**8 C.F.R. § 274a.12**

(c) *Aliens who must apply for employment authorization.* An alien within a class of aliens described in this section must apply for work authorization. If authorized, such an alien may accept employment subject to any restrictions stated in the regulations or cited on the employment authorization document. USCIS, in its discretion, may establish a specific validity period for an employment authorization document, which may include any period when an administrative appeal or judicial review of an application or petition is pending.

(1) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (A–1 or A–2) pursuant to 8 CFR 214.2(a)(2) and who presents an endorsement from an authorized representative of the Department of State;

(2) An alien spouse or unmarried dependent son or daughter of an alien employee of the Coordination Council for North American Affairs (E–1) pursuant to § 214.2(e) of this chapter;

(3) A nonimmigrant (F–1) student who:

(i)(A) Is seeking pre-completion practical training pursuant to 8 CFR 214.2(f)(10)(ii)(A)(1) and (2);

(B) Is seeking authorization to engage in up to 12 months of post-completion Optional Practical Training (OPT) pursuant to 8 CFR 214.2(f)(10)(ii)(A)(3); or

(C) Is seeking a 24–month OPT extension pursuant to 8 CFR 214.2(f)(10)(ii)(C);

(ii) Has been offered employment under the sponsorship of an international organization within the meaning of the International Organization Immunities Act (59 Stat. 669) and who presents a written certification from the international organization that the proposed employment is within the scope of the organization's sponsorship. The F–1 student must also present a Form I–20 ID or SEVIS Form I–20 with employment page completed by DSO certifying eligibility for employment; or

(iii) Is seeking employment because of severe economic hardship pursuant to 8 CFR 214.2(f)(9)(ii)(C) and has filed the Form I–20 ID and Form I–538 (for non–SEVIS schools), or SEVIS Form I–20 with employment page completed by the DSO certifying eligibility, and any other supporting materials such as affidavits which further detail the unforeseen economic circumstances that require the student to seek employment authorization.

(4) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (G–1, G–3 or G–4) pursuant to 8 CFR 214.2(g) and who presents an endorsement from an authorized representative of the Department of State;

(5) An alien spouse or minor child of an exchange visitor (J–2) pursuant to § 214.2(j) of this chapter;

(6) A nonimmigrant (M–1) student seeking employment for practical training pursuant to 8 CFR 214.2(m) following completion of studies. The alien may be employed only in an occupation or vocation directly related to his or her course of study as recommended by the endorsement of the designated school official on the I–20 ID;

(7) A dependent of an alien classified as NATO–1 through NATO–7 pursuant to § 214.2(n) of this chapter;

(8) An alien who has filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR part 208, whose application:

(i) Has not been decided, and who is eligible to apply for employment authorization under § 208.7 of this chapter because the 150-day period set forth in that section has expired. Employment authorization may be granted according to the provisions of § 208.7 of this chapter in increments to be determined by the Commissioner and shall expire on a specified date; or

(ii) Has been recommended for approval, but who has not yet received a grant of asylum or withholding or deportation or removal;

(9) An alien who has filed an application for adjustment of status to lawful permanent resident pursuant to part 245 of this chapter. For purposes of section 245(c)(8) of the Act, an alien will not be deemed to be an "unauthorized alien" as defined in section 274A(h)(3) of the Act while his or her properly filed Form I–485 application is pending final adjudication, if the alien has otherwise obtained permission from the Service pursuant to 8 CFR 274a.12 to engage in employment, or if the alien had been granted employment authorization prior to the filing of the adjustment application and such authorization does not expire during the pendency of the adjustment application. Upon meeting these conditions, the adjustment applicant need not file an application for employment authorization to continue employment during the period described in the preceding sentence;

(10) An alien who has filed an application for suspension of deportation under section 244 of the Act (as it existed prior to April 1, 1997), cancellation of removal pursuant to section 240A of the Act, or special rule cancellation of removal under section 309(f)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Pub.L. 104–208 (110 Stat. 3009–625) (as amended by the Nicaraguan Adjustment and Central American Relief Act (NACARA)), title II of Pub.L. 105–100

(111 Stat. 2160, 2193) and whose properly filed application has been accepted by the Service or EOIR;

<Text of subsection (c)(11) effective until March 14, 2018.>

(11) An alien paroled into the United States temporarily for emergency reasons or reasons deemed strictly in the public interest pursuant to § 212.5 of this chapter;

<Text of subsection (c)(11) effective March 14, 2018.>

(11) Except as provided in paragraphs (b)(37) and (c)(34) of this section and § 212.19(h)(4) of this chapter, an alien paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit pursuant to section 212(d)(5) of the Act.

(12) An alien spouse of a long-term investor in the Commonwealth of the Northern Mariana Islands (E–2 CNMI Investor) other than an E–2 CNMI investor who obtained such status based upon a Foreign Retiree Investment Certificate, pursuant to 8 CFR 214.2(e)(23). An alien spouse of an E–2 CNMI Investor is eligible for employment in the CNMI only;

(13) [Reserved]

(14) An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment;

(15) [Reserved]

(16) Any alien who has filed an application for creation of record of lawful admission for permanent residence pursuant to part 249 of this chapter;

(17) A nonimmigrant visitor for business (B–1) who:

(i) Is a personal or domestic servant who is accompanying or following to join an employer who seeks admission into, or is already in, the United States as a nonimmigrant defined under sections 101(a)(15)(B), (E), (F), (H), (I), (J), (L) or section 214(e) of the Act. The personal or domestic servant shall have a residence abroad which he or she has no intention of abandoning and shall demonstrate at least one year's experience as a personal or domestic servant. The nonimmigrant's employer shall demonstrate that the employer/employee relationship has existed for at least one year prior to the employer's admission to the United States; or, if the employer/employee relationship existed for less than one year, that the employer has regularly employed (either year-round or seasonally) personal or domestic servants over a period of several years preceding the employer's admission to the United States;

A13

(ii) Is a domestic servant of a United States citizen accompanying or following to join his or her United States citizen employer who has a permanent home or is stationed in a foreign country, and who is visiting temporarily in the United States. The employer/employee relationship shall have existed prior to the commencement of the employer's visit to the United States; or

(iii) Is an employee of a foreign airline engaged in international transportation of passengers freight, whose position with the foreign airline would otherwise entitle the employee to classification under section 101(a)(15)(E)(i) of the Immigration and Nationality Act, and who is precluded from such classification solely because the employee is not a national of the country of the airline's nationality or because there is no treaty of commerce and navigation in effect between the United States and the country of the airline's nationality.

(18) An alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in section 241(a)(3) of the Act may be granted employment authorization in the discretion of the district director only if the alien cannot be removed due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or because the removal of the alien is otherwise impracticable or contrary to the public interest. Additional factors which may be considered by the district director in adjudicating the application for employment authorization include, but are not limited to, the following:

(i) The existence of economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support; and

(iii) The anticipated length of time before the alien can be removed from the United States.

(19) An alien applying for Temporary Protected Status pursuant to section 244 of the Act shall apply for employment authorization only in accordance with the procedures set forth in part 244 of this chapter.

(20) Any alien who has filed a completed legalization application pursuant to section 210 of the Act (and part 210 of this chapter).

(21) A principal nonimmigrant witness or informant in S classification, and qualified dependent family members.

(22) Any alien who has filed a completed legalization application pursuant to section 245A of the Act (and part 245a of this chapter). Employment authorization shall be granted in increments not exceeding 1 year during the period the application is

pending (including any period when an administrative appeal is pending) and shall expire on a specified date.

(23) [Reserved by 76 FR 53796]

(24) An alien who has filed an application for adjustment pursuant to section 1104 of the LIFE Act, Public Law 106–553, and the provisions of 8 CFR part 245a, Subpart B of this chapter.

(25) Any alien in T–2, T–3, T–4, T–5, or T–6 nonimmigrant status, pursuant to 8 CFR 214.11, for the period in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(26) An H–4 nonimmigrant spouse of an H–1B nonimmigrant described as eligible for employment authorization in 8 CFR 214.2(h)(9)(iv).

(27) to (33) [Reserved]

<Text of subsection (c)(34) added by 82 FR 5289, effective March 14, 2018, as amended by 82 FR 31887.>

(34) A spouse of an entrepreneur parolee described as eligible for employment authorization in § 212.19(h)(3) of this chapter.

(35) An alien who is the principal beneficiary of a valid immigrant petition under section 203(b)(1), 203(b)(2) or 203(b)(3) of the Act described as eligible for employment authorization in 8 CFR 204.5(p).

(36) A spouse or child of a principal beneficiary of a valid immigrant petition under section 203(b)(1), 203(b)(2) or 203(b)(3) of the Act described as eligible for employment authorization in 8 CFR 204.5(p).

A15

Case: 19-40068, 02/19/2019, ID: 10782809, DktEntry: 31, Page 30 of 40

# DEF-INTERV.
# EX. 43



II

Calendar No. 112

116TH CONGRESS
1ST SESSION

# H. R. 6

---

## IN THE SENATE OF THE UNITED STATES

JUNE 5, 2019

Received; read the first time

JUNE 10, 2019

Read the second time and placed on the calendar

---

# AN ACT

To authorize the cancellation of removal and adjustment
of status of certain aliens, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4    (a) SHORT TITLE.—This Act may be cited as the

5  "American Dream and Promise Act of 2019".

6    (b) TABLE OF CONTENTS.—The table of contents for

7  this Act is as follows:

Sec. 1. Short title; table of contents.

TITLE I—DREAM ACT

Sec. 101. Short title.

2

Subtitle A—Treatment of Certain Long-term Residents Who Entered the
United States as Children

Sec. 111. Permanent resident status on a conditional basis for certain long-
term residents who entered the United States as children.
Sec. 112. Terms of permanent resident status on a conditional basis.
Sec. 113. Removal of conditional basis of permanent resident status.

Subtitle B—General Provisions

Sec. 121. Definitions.
Sec. 122. Submission of biometric and biographic data; background checks.
Sec. 123. Limitation on removal; application and fee exemption; waiver of
grounds for inadmissibility and other conditions on eligible in-
dividuals.
Sec. 124. Determination of continuous presence and residence.
Sec. 125. Exemption from numerical limitations.
Sec. 126. Availability of administrative and judicial review.
Sec. 127. Documentation requirements.
Sec. 128. Rule making.
Sec. 129. Confidentiality of information.
Sec. 130. Grant program to assist eligible applicants.
Sec. 131. Provisions affecting eligibility for adjustment of status.
Sec. 132. Supplementary surcharge for appointed counsel.
Sec. 133. Annual report on provisional denial authority.

TITLE II—AMERICAN PROMISE ACT

Sec. 201. Short title.

Subtitle A—Treatment of Certain Nationals of Certain Countries Designated
for Temporary Protected Status or Deferred Enforced Departure

Sec. 211. Adjustment of status for certain nationals of certain countries des-
ignated for temporary protected status or deferred enforced de-
parture.

Subtitle B—General Provisions

Sec. 221. Definitions.
Sec. 222. Submission of biometric and biographic data; background checks.
Sec. 223. Limitation on removal; application and fee exemption; waiver of
grounds for inadmissibility and other conditions on eligible in-
dividuals.
Sec. 224. Determination of continuous presence.
Sec. 225. Exemption from numerical limitations.
Sec. 226. Availability of administrative and judicial review.
Sec. 227. Documentation requirements.
Sec. 228. Rule making.
Sec. 229. Confidentiality of information.
Sec. 230. Grant program to assist eligible applicants.
Sec. 231. Provisions affecting eligibility for adjustment of status.

3

# TITLE I—DREAM ACT

**SEC. 101. SHORT TITLE.**

This title may be cited as the "Dream Act of 2019".

# Subtitle A—Treatment of Certain Long-term Residents Who Entered the United States as Children

**SEC. 111. PERMANENT RESIDENT STATUS ON A CONDITIONAL BASIS FOR CERTAIN LONG-TERM RESIDENTS WHO ENTERED THE UNITED STATES AS CHILDREN.**

(a) CONDITIONAL BASIS FOR STATUS.—Notwithstanding any other provision of law, and except as provided in section 113(c)(2), an alien shall be considered, at the time of obtaining the status of an alien lawfully admitted for permanent residence under this section, to have obtained such status on a conditional basis subject to the provisions of this title.

(b) REQUIREMENTS.—

(1) IN GENERAL.—Notwithstanding any other provision of law, the Secretary or the Attorney General shall cancel the removal of, and adjust to the status of an alien lawfully admitted for permanent residence on a conditional basis, or without the conditional basis as provided in section 113(c)(2), an

4

1    alien who is inadmissible or deportable from the

2    United States (or is under a grant of Deferred En-

3    forced Departure or has temporary protected status

4    under section 244 of the Immigration and Nation-

5    ality Act (8 U.S.C. 1254a)) if—

6        (A) the alien has been continuously phys-

7        ically present in the United States since the

8        date that is 4 years before the date of the en-

9        actment of this Act;

10       (B) the alien was younger than 18 years of

11       age on the date on which the alien entered the

12       United States and has continuously resided in

13       the United States since such entry;

14       (C) the alien—

15           (i) subject to section 123(d), is not in-

16           admissible under paragraph (1), (6)(E),

17           (6)(G), (8), or (10) of section 212(a) of

18           the Immigration and Nationality Act (8

19           U.S.C. 1182(a));

20           (ii) has not ordered, incited, assisted,

21           or otherwise participated in the persecution

22           of any person on account of race, religion,

23           nationality, membership in a particular so-

24           cial group, or political opinion; and

5

1          (iii) is not barred from adjustment of
2     status under this title based on the crimi-
3     nal and national security grounds de-
4     scribed under subsection (c), subject to the
5     provisions of such subsection; and
6     (D) the alien—
7          (i) has been admitted to an institution
8     of higher education;
9          (ii) has been admitted to an area ca-
10    reer and technical education school at the
11    postsecondary level;
12         (iii) in the United States, has ob-
13    tained—
14              (I) a high school diploma or a
15         commensurate alternative award from
16         a public or private high school;
17              (II) a General Education Devel-
18         opment credential, a high school
19         equivalency diploma recognized under
20         State law, or another similar State-
21         authorized credential;
22              (III) a credential or certificate
23         from an area career and technical
24         education school at the secondary
25         level; or

6

1          (IV) a recognized postsecondary

2          credential; or

3              (iv) is enrolled in secondary school or

4          in an education program assisting students

5          in—

6              (I) obtaining a high school di-

7              ploma or its recognized equivalent

8              under State law;

9              (II) passing the General Edu-

10             cation Development test, a high school

11             equivalence diploma examination, or

12             other similar State-authorized exam;

13             (III) obtaining a certificate or

14             credential from an area career and

15             technical education school providing

16             education at the secondary level; or

17             (IV) obtaining a recognized post-

18             secondary credential.

19     (2) APPLICATION FEE.—

20         (A) IN GENERAL.—The Secretary may,

21     subject to an exemption under section 123(c),

22     require an alien applying under this section to

23     pay a reasonable fee that is commensurate with

24     the cost of processing the application but does

25     not exceed $495.00.

7

1         (B) SPECIAL PROCEDURE FOR APPLICANTS

2         WITH DACA.—The Secretary shall establish a

3         streamlined procedure for aliens who have been

4         granted DACA and who meet the requirements

5         for renewal (under the terms of the program in

6         effect on January 1, 2017) to apply for can-

7         cellation of removal and adjustment of status to

8         that of an alien lawfully admitted for perma-

9         nent residence on a conditional basis under this

10       section, or without the conditional basis as pro-

11       vided in section 113(c)(2). Such procedure shall

12       not include a requirement that the applicant

13       pay a fee, except that the Secretary may re-

14       quire an applicant who meets the requirements

15       for lawful permanent residence without the con-

16       ditional basis under section 113(c)(2) to pay a

17       fee that is commensurate with the cost of proc-

18       essing the application, subject to the exemption

19       under section 123(c).

20     (3) BACKGROUND CHECKS.—The Secretary

21   may not grant an alien permanent resident status on

22   a conditional basis under this section until the re-

23   quirements of section 122 are satisfied.

24     (4) MILITARY SELECTIVE SERVICE.—An alien

25   applying for permanent resident status on a condi-

8

1 tional basis under this section, or without the condi-
2 tional basis as provided in section 113(c)(2), shall
3 establish that the alien has registered under the
4 Military Selective Service Act (50 U.S.C. 3801 et
5 seq.), if the alien is subject to registration under
6 such Act.

7 (c) CRIMINAL AND NATIONAL SECURITY BARS.—

8 (1) GROUNDS OF INELIGIBILITY.—Except as
9 provided in paragraph (2), an alien is ineligible for
10 adjustment of status under this title (whether on a
11 conditional basis or without the conditional basis as
12 provided in section 113(c)(2)) if any of the following
13 apply:

14 (A) The alien is inadmissible under para-
15 graph (2) or (3) of section 212(a) of the Immi-
16 gration and Nationality Act (8 U.S.C. 1182(a)).

17 (B) Excluding any offense under State law
18 for which an essential element is the alien's im-
19 migration status, and any minor traffic offense,
20 the alien has been convicted of—

21 (i) any felony offense;

22 (ii) three or more misdemeanor of-
23 fenses (excluding simple possession of can-
24 nabis or cannabis-related paraphernalia,
25 any offense involving cannabis or cannabis-

9

1        related paraphernalia which is no longer

2        prosecutable in the State in which the con-

3        viction was entered, and any offense involv-

4        ing civil disobedience without violence) not

5        occurring on the same date, and not aris-

6        ing out of the same act, omission, or

7        scheme of misconduct; or

8            (iii) a misdemeanor offense of domes-

9        tic violence, unless the alien demonstrates

10       that such crime is related to the alien hav-

11       ing been—

12            (I) a victim of domestic violence,

13           sexual assault, stalking, child abuse or

14           neglect, abuse or neglect in later life,

15           or human trafficking;

16            (II) battered or subjected to ex-

17           treme cruelty; or

18            (III) a victim of criminal activity

19           described in section 101(a)(15)(U)(iii)

20           of the Immigration and Nationality

21           Act (8 U.S.C. 1101(a)(15)(U)(iii)).

22    (2) WAIVERS FOR CERTAIN MISDEMEANORS.—

23   For humanitarian purposes, family unity, or if oth-

24   erwise in the public interest, the Secretary may—

10

(A) waive the grounds of inadmissibility under subparagraphs (A), (C), and (D) of section 212(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(2)), unless the conviction forming the basis for inadmissibility would otherwise render the alien ineligible under paragraph (1)(B) (subject to subparagraph (B)); and

(B) for purposes of clauses (ii) and (iii) of paragraph (1)(B), waive consideration of—

(i) one misdemeanor offense if the alien has not been convicted of any offense in the 5-year period preceding the date on which the alien applies for adjustment of status under this title; or

(ii) up to two misdemeanor offenses if the alien has not been convicted of any offense in the 10-year period preceding the date on which the alien applies for adjustment of status under this title.

(3) AUTHORITY TO CONDUCT SECONDARY REVIEW.—

(A) IN GENERAL.—Notwithstanding an alien's eligibility for adjustment of status under this title, and subject to the procedures de-

11

1  scribed in this paragraph, the Secretary of
2  Homeland Security may, as a matter of non-
3  delegable discretion, provisionally deny an appli-
4  cation for adjustment of status (whether on a
5  conditional basis or without the conditional
6  basis as provided in section 113(c)(2)) if the
7  Secretary, based on clear and convincing evi-
8  dence, which shall include credible law enforce-
9  ment information, determines that the alien is
10  described in subparagraph (B) or (D).

11  (B) PUBLIC SAFETY.—An alien is de-
12  scribed in this subparagraph if—

13  (i) excluding simple possession of can-
14  nabis or cannabis-related paraphernalia,
15  any offense involving cannabis or cannabis-
16  related paraphernalia which is no longer
17  prosecutable in the State in which the con-
18  viction was entered, any offense under
19  State law for which an essential element is
20  the alien's immigration status, any offense
21  involving civil disobedience without vio-
22  lence, and any minor traffic offense, the
23  alien—

24  (I) has been convicted of a mis-
25  demeanor offense punishable by a

12

1       term of imprisonment of more than
2       30 days; or

3           (II) has been adjudicated delin-
4           quent in a State or local juvenile court
5           proceeding that resulted in a disposi-
6           tion ordering placement in a secure
7           facility; and

8           (ii) the alien poses a significant and
9           continuing threat to public safety related
10          to such conviction or adjudication.

11      (C) PUBLIC SAFETY DETERMINATION.—
12  For purposes of subparagraph (B)(ii), the Sec-
13  retary shall consider the recency of the convic-
14  tion or adjudication; the length of any imposed
15  sentence or placement; the nature and serious-
16  ness of the conviction or adjudication, including
17  whether the elements of the offense include the
18  unlawful possession or use of a deadly weapon
19  to commit an offense or other conduct intended
20  to cause serious bodily injury; and any miti-
21  gating factors pertaining to the alien's role in
22  the commission of the offense.

23      (D) GANG PARTICIPATION.—An alien is
24  described in this subparagraph if the alien has,
25  within the 5 years immediately preceding the

13

1      date of the application, knowingly, willfully, and

2      voluntarily participated in offenses committed

3      by a criminal street gang (as described in sub-

4      sections (a) and (c) of section 521 of title 18,

5      United States Code) with the intent to promote

6      or further the commission of such offenses.

7           (E) EVIDENTIARY LIMITATION.—For pur-

8      poses of subparagraph (D), allegations of gang

9      membership obtained from a State or Federal

10     in-house or local database, or a network of

11     databases used for the purpose of recording and

12     sharing activities of alleged gang members

13     across law enforcement agencies, shall not es-

14     tablish the participation described in such para-

15     graph.

16          (F) NOTICE.—

17           (i) IN GENERAL.—Prior to rendering

18          a discretionary decision under this para-

19          graph, the Secretary of Homeland Security

20          shall provide written notice of the intent to

21          provisionally deny the application to the

22          alien (or the alien's counsel of record, if

23          any) by certified mail and, if an electronic

24          mail address is provided, by electronic mail

14

1    (or other form of electronic communica-

2    tion). Such notice shall—

3            (I) articulate with specificity all

4            grounds for the preliminary deter-

5            mination, including the evidence relied

6            upon to support the determination;

7            and

8            (II) provide the alien with not

9            less than 90 days to respond.

10           (ii) SECOND NOTICE.—Not more than

11   30 days after the issuance of the notice

12   under clause (i), the Secretary of Home-

13   land Security shall provide a second writ-

14   ten notice that meets the requirements of

15   such clause.

16           (iii) NOTICE NOT RECEIVED.—Not-

17   withstanding any other provision of law, if

18   an applicant provides good cause for not

19   contesting a provisional denial under this

20   paragraph, including a failure to receive

21   notice as required under this subpara-

22   graph, the Secretary of Homeland Security

23   shall, upon a motion filed by the alien, re-

24   open an application for adjustment of sta-

25   tus under this title and allow the applicant

15

1        an opportunity to respond, consistent with

2        clause (i)(II).

3        (G) JUDICIAL REVIEW.—An alien is enti-

4        tled to judicial review of the Secretary's deci-

5        sion to provisionally deny an application under

6        this paragraph in accordance with the proce-

7        dures described in section 126(c).

8    (4) DEFINITIONS.—For purposes of this sub-

9  section—

10        (A) the term "felony offense" means an of-

11        fense under Federal or State law that is pun-

12        ishable by a maximum term of imprisonment of

13        more than 1 year;

14        (B) the term "misdemeanor offense"

15        means an offense under Federal or State law

16        that is punishable by a term of imprisonment of

17        more than 5 days but not more than 1 year;

18        (C) the term "crime of domestic violence"

19        means any offense that has as an element the

20        use, attempted use, or threatened use of phys-

21        ical force against a person committed by a cur-

22        rent or former spouse of the person, by an indi-

23        vidual with whom the person shares a child in

24        common, by an individual who is cohabiting

25        with or has cohabited with the person as a

16

1      spouse, by an individual similarly situated to a

2      spouse of the person under the domestic or

3      family violence laws of the jurisdiction where

4      the offense occurs, or by any other individual

5      against a person who is protected from that in-

6      dividual's acts under the domestic or family vio-

7      lence laws of the United States or any State,

8      Indian tribal government, or unit of local gov-

9      ernment; and

10         (D) the term "convicted", "conviction",

11      "adjudicated", or "adjudication" does not in-

12      clude a judgment that has been expunged or set

13      aside, that resulted in a rehabilitative disposi-

14      tion, or the equivalent.

15   (d) LIMITATION ON REMOVAL OF CERTAIN ALIEN

16 MINORS.—An alien who is under 18 years of age and

17 meets the requirements under subparagraphs (A), (B),

18 and (C) of subsection (b)(1) shall be provided a reasonable

19 opportunity to meet the educational requirements under

20 subparagraph (D) of such subsection. The Attorney Gen-

21 eral or the Secretary may not commence or continue with

22 removal proceedings against such an alien.

23   (e) WITHDRAWAL OF APPLICATION.—The Secretary

24 of Homeland Security shall, upon receipt of a request to

25 withdraw an application for adjustment of status under

17

1 this section, cease processing of the application, and close

2 the case. Withdrawal of the application under this sub-

3 section shall not prejudice any future application filed by

4 the applicant for any immigration benefit under this title

5 or under the Immigration and Nationality Act (8 U.S.C.

6 1101 et seq.).

7 **SEC. 112. TERMS OF PERMANENT RESIDENT STATUS ON A**

8 **CONDITIONAL BASIS.**

9     (a) PERIOD OF STATUS.—Permanent resident status

10 on a conditional basis is—

11         (1) valid for a period of 10 years, unless such

12     period is extended by the Secretary; and

13         (2) subject to revocation under subsection (c).

14     (b) NOTICE OF REQUIREMENTS.—At the time an

15 alien obtains permanent resident status on a conditional

16 basis, the Secretary shall provide notice to the alien re-

17 garding the provisions of this title and the requirements

18 to have the conditional basis of such status removed.

19     (c) REVOCATION OF STATUS.—The Secretary may

20 revoke the permanent resident status on a conditional

21 basis of an alien only if the Secretary—

22         (1) determines that the alien ceases to meet the

23     requirements under section 111(b)(1)(C); and

24         (2) prior to the revocation, provides the alien—

25             (A) notice of the proposed revocation; and

18

1          (B) the opportunity for a hearing to pro-
2      vide evidence that the alien meets such require-
3      ments or otherwise to contest the proposed rev-
4      ocation.

5    (d) RETURN TO PREVIOUS IMMIGRATION STATUS.—
6 An alien whose permanent resident status on a conditional
7 basis expires under subsection (a)(1) or is revoked under
8 subsection (c), shall return to the immigration status that
9 the alien had immediately before receiving permanent resi-
10 dent status on a conditional basis.

11 **SEC. 113. REMOVAL OF CONDITIONAL BASIS OF PERMA-**
12                    **NENT RESIDENT STATUS.**

13    (a) ELIGIBILITY FOR REMOVAL OF CONDITIONAL
14 BASIS.—

15          (1) IN GENERAL.—Subject to paragraph (2),
16      the Secretary shall remove the conditional basis of
17      an alien's permanent resident status granted under
18      this title and grant the alien status as an alien law-
19      fully admitted for permanent residence if the alien—

20              (A) is described in section 111(b)(1)(C);

21              (B) has not abandoned the alien's resi-
22          dence in the United States during the period in
23          which the alien has permanent resident status
24          on a conditional basis; and

1         (C)(i) has obtained a degree from an insti-

2     tution of higher education, or has completed at

3     least 2 years, in good standing, of a program in

4     the United States leading to a bachelor's degree

5     or higher degree or a recognized postsecondary

6     credential from an area career and technical

7     education school providing education at the

8     postsecondary level;

9         (ii) has served in the Uniformed Services

10     for at least 2 years and, if discharged, received

11     an honorable discharge; or

12         (iii) demonstrates earned income for peri-

13     ods totaling at least 3 years and at least 75

14     percent of the time that the alien has had a

15     valid employment authorization, except that, in

16     the case of an alien who was enrolled in an in-

17     stitution of higher education, an area career

18     and technical education school to obtain a rec-

19     ognized postsecondary credential, or an edu-

20     cation program described in section

21     111(b)(1)(D)(iii), the Secretary shall reduce

22     such total 3-year requirement by the total of

23     such periods of enrollment.

24     (2) HARDSHIP EXCEPTION.—The Secretary

25     shall remove the conditional basis of an alien's per-

20

1   manent resident status and grant the alien status as

2   an alien lawfully admitted for permanent residence

3   if the alien—

4        (A) satisfies the requirements under sub-

5   paragraphs (A) and (B) of paragraph (1);

6        (B) demonstrates compelling circumstances

7   for the inability to satisfy the requirements

8   under subparagraph (C) of such paragraph; and

9        (C) demonstrates that—

10            (i) the alien has a disability;

11            (ii) the alien is a full-time caregiver;

12   or

13            (iii) the removal of the alien from the

14       United States would result in hardship to

15       the alien or the alien's spouse, parent, or

16       child who is a national of the United

17       States or is lawfully admitted for perma-

18       nent residence.

19   (3) CITIZENSHIP REQUIREMENT.—

20        (A) IN GENERAL.—Except as provided in

21   subparagraph (B), the conditional basis of an

22   alien's permanent resident status granted under

23   this title may not be removed unless the alien

24   demonstrates that the alien satisfies the re-

21

1    quirements under section 312(a) of the Immi-
2    gration and Nationality Act (8 U.S.C. 1423(a)).
3         (B) EXCEPTION.—Subparagraph (A) shall
4    not apply to an alien who is unable to meet the
5    requirements under such section 312(a) due to
6    disability.
7         (4) APPLICATION FEE.—The Secretary may,
8    subject to an exemption under section 123(c), re-
9    quire aliens applying for removal of the conditional
10   basis of an alien's permanent resident status under
11   this section to pay a reasonable fee that is commen-
12   surate with the cost of processing the application.
13        (5) BACKGROUND CHECK.—The Secretary may
14   not remove the conditional basis of an alien's perma-
15   nent resident status until the requirements of sec-
16   tion 122 are satisfied.
17   (b) TREATMENT FOR PURPOSES OF NATURALIZA-
18   TION.—
19        (1) IN GENERAL.—For purposes of title III of
20   the Immigration and Nationality Act (8 U.S.C. 1401
21   et seq.), an alien granted permanent resident status
22   on a conditional basis shall be considered to have
23   been admitted to the United States, and be present
24   in the United States, as an alien lawfully admitted
25   for permanent residence.

22

1     (2) LIMITATION ON APPLICATION FOR NATU-

2 RALIZATION.—An alien may not apply for natu-

3 ralization while the alien is in permanent resident

4 status on a conditional basis.

5     (c) TIMING OF APPROVAL OF LAWFUL PERMANENT

6 RESIDENT STATUS.—

7     (1) IN GENERAL.—An alien granted permanent

8 resident status on a conditional basis under this title

9 may apply to have such conditional basis removed at

10 any time after such alien has met the eligibility re-

11 quirements set forth in subsection (a).

12     (2) APPROVAL WITH REGARD TO INITIAL APPLI-

13 CATIONS.—

14     (A) IN GENERAL.—Notwithstanding any

15 other provision of law, the Secretary or the At-

16 torney General shall cancel the removal of, and

17 adjust to the status of an alien lawfully admit-

18 ted for permanent resident status without con-

19 ditional basis, any alien who—

20     (i) demonstrates eligibility for lawful

21 permanent residence status on a condi-

22 tional basis under section 111(b); and

23     (ii) subject to the exceptions described

24 in subsections (a)(2) and (a)(3)(B) of this

25 section, already has fulfilled the require-

23

1   ments of paragraphs (1) and (3) of sub-

2   section (a) of this section at the time such

3   alien first submits an application for bene-

4   fits under this title.

5   (B) BACKGROUND CHECKS.—Subsection

6   (a)(5) shall apply to an alien seeking lawful

7   permanent resident status without conditional

8   basis in an initial application in the same man-

9   ner as it applies to an alien seeking removal of

10   the conditional basis of an alien's permanent

11   resident status. Section 111(b)(3) shall not be

12   construed to require the Secretary to conduct

13   more than one identical security or law enforce-

14   ment background check on such an alien.

15   (C) APPLICATION FEES.—In the case of an

16   alien seeking lawful permanent resident status

17   without conditional basis in an initial applica-

18   tion, the alien shall pay the fee required under

19   subsection (a)(4), subject to the exemption al-

20   lowed under section 123(c), but shall not be re-

21   quired to pay the application fee under section

22   111(b)(2).

## Subtitle B—General Provisions

23

24   **SEC. 121. DEFINITIONS.**

25   In this title:

24

1       (1) IN GENERAL.—Except as otherwise specifi-

2   cally provided, any term used in this title that is

3   used in the immigration laws shall have the meaning

4   given such term in the immigration laws.

5       (2) APPROPRIATE UNITED STATES DISTRICT

6   COURT.—The term "appropriate United States dis-

7   trict court" mean the United States District Court

8   for the District of Columbia or the United States

9   district court with jurisdiction over the alien's prin-

10   cipal place of residence.

11       (3) AREA CAREER AND TECHNICAL EDUCATION

12   SCHOOL.—The term "area career and technical edu-

13   cation school" has the meaning given such term in

14   section 3 of the Carl D. Perkins Career and Tech-

15   nical Education Act of 2006 (20 U.S.C. 2302).

16       (4) DACA.—The term "DACA" means de-

17   ferred action granted to an alien pursuant to the

18   Deferred Action for Childhood Arrivals policy an-

19   nounced by the Secretary of Homeland Security on

20   June 15, 2012.

21       (5) DISABILITY.—The term "disability" has the

22   meaning given such term in section 3(1) of the

23   Americans with Disabilities Act of 1990 (42 U.S.C.

24   12102(1)).

25

(6) FEDERAL POVERTY LINE.—The term "Federal poverty line" has the meaning given such term in section 213A(h) of the Immigration and Nationality Act (8 U.S.C. 1183a).

(7) HIGH SCHOOL; SECONDARY SCHOOL.—The terms "high school" and "secondary school" have the meanings given such terms in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801).

(8) IMMIGRATION LAWS.—The term "immigration laws" has the meaning given such term in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17)).

(9) INSTITUTION OF HIGHER EDUCATION.—The term "institution of higher education"—

(A) except as provided in subparagraph (B), has the meaning given such term in section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002); and

(B) does not include an institution of higher education outside of the United States.

(10) RECOGNIZED POSTSECONDARY CREDENTIAL.—The term "recognized postsecondary credential" has the meaning given such term in section 3

26

1 of the Workforce Innovation and Opportunity Act

2 (29 U.S.C. 3102).

3     (11) SECRETARY.—Except as otherwise specifi-

4 cally provided, the term "Secretary" means the Sec-

5 retary of Homeland Security.

6     (12) UNIFORMED SERVICES.—The term "Uni-

7 formed Services" has the meaning given the term

8 "uniformed services" in section 101(a) of title 10,

9 United States Code.

10 **SEC. 122. SUBMISSION OF BIOMETRIC AND BIOGRAPHIC**

11         **DATA; BACKGROUND CHECKS.**

12     (a) SUBMISSION OF BIOMETRIC AND BIOGRAPHIC

13 DATA.—The Secretary may not grant an alien adjustment

14 of status under this title, on either a conditional or perma-

15 nent basis, unless the alien submits biometric and bio-

16 graphic data, in accordance with procedures established

17 by the Secretary. The Secretary shall provide an alter-

18 native procedure for aliens who are unable to provide such

19 biometric or biographic data because of a physical impair-

20 ment.

21     (b) BACKGROUND CHECKS.—The Secretary shall use

22 biometric, biographic, and other data that the Secretary

23 determines appropriate to conduct security and law en-

24 forcement background checks and to determine whether

25 there is any criminal, national security, or other factor

27

1 that would render the alien ineligible for adjustment of
2 status under this title, on either a conditional or perma-
3 nent basis. The status of an alien may not be adjusted,
4 on either a conditional or permanent basis, unless security
5 and law enforcement background checks are completed to
6 the satisfaction of the Secretary.

**7 SEC. 123. LIMITATION ON REMOVAL; APPLICATION AND**
**8         FEE EXEMPTION; WAIVER OF GROUNDS FOR**
**9         INADMISSIBILITY AND OTHER CONDITIONS**
**10         ON ELIGIBLE INDIVIDUALS.**

11    (a) LIMITATION ON REMOVAL.—An alien who ap-
12 pears to be prima facie eligible for relief under this title
13 shall be given a reasonable opportunity to apply for such
14 relief and may not be removed until, subject to section
15 126(c), a final decision establishing ineligibility for relief
16 is rendered.

17    (b) APPLICATION.—An alien present in the United
18 States who has been ordered removed or has been per-
19 mitted to depart voluntarily from the United States may,
20 notwithstanding such order or permission to depart, apply
21 for adjustment of status under this title. Such alien shall
22 not be required to file a separate motion to reopen, recon-
23 sider, or vacate the order of removal. If the Secretary ap-
24 proves the application, the Secretary shall cancel the order
25 of removal. If the Secretary renders a final administrative

28

1 decision to deny the application, the order of removal or
2 permission to depart shall be effective and enforceable to
3 the same extent as if the application had not been made,
4 only after all available administrative and judicial rem-
5 edies have been exhausted.

6    (c) FEE EXEMPTION.—An applicant may be exempt-
7 ed from paying an application fee required under this title
8 if the applicant—

9        (1) is younger than 18 years of age;
10        (2) received total income, during the 12-month
11     period immediately preceding the date on which the
12     applicant files an application under this title, that is
13     less than 150 percent of the Federal poverty line;
14        (3) is in foster care or otherwise lacks any pa-
15     rental or other familial support; or
16        (4) cannot care for himself or herself because of
17     a serious, chronic disability.

18    (d) WAIVER OF GROUNDS OF INADMISSIBILITY.—
19 With respect to any benefit under this title, and in addi-
20 tion to the waivers under section 111(c)(2), the Secretary
21 may waive the grounds of inadmissibility under paragraph
22 (1), (6)(E), (6)(G), or (10)(D) of section 212(a) of the
23 Immigration and Nationality Act (8 U.S.C. 1182(a)) for
24 humanitarian purposes, for family unity, or because the
25 waiver is otherwise in the public interest.

29

1    (e) ADVANCE PAROLE.—During the period beginning
2  on the date on which an alien applies for adjustment of
3  status under this title and ending on the date on which
4  the Secretary makes a final decision regarding such appli-
5  cation, the alien shall be eligible to apply for advance pa-
6  role. Section 101(g) of the Immigration and Nationality
7  Act (8 U.S.C. 1101(g)) shall not apply to an alien granted
8  advance parole under this section.

9    (f) EMPLOYMENT.—An alien whose removal is stayed
10  pursuant to this title, who may not be placed in removal
11  proceedings pursuant to this title, or who has pending an
12  application under this title, shall, upon application to the
13  Secretary, be granted an employment authorization docu-
14  ment.

15  **SEC. 124. DETERMINATION OF CONTINUOUS PRESENCE**
16            **AND RESIDENCE.**

17    (a) EFFECT OF NOTICE TO APPEAR.—Any period of
18  continuous physical presence or continuous residence in
19  the United States of an alien who applies for permanent
20  resident status under this title (whether on a conditional
21  basis or without the conditional basis as provided in sec-
22  tion 113(c)(2)) shall not terminate when the alien is
23  served a notice to appear under section 239(a) of the Im-
24  migration and Nationality Act (8 U.S.C. 1229(a)).

30

1   (b) TREATMENT OF CERTAIN BREAKS IN PRESENCE
2   OR RESIDENCE.—

3        (1) IN GENERAL.—Except as provided in para-
4     graphs (2) and (3), an alien shall be considered to
5     have failed to maintain—

6             (A) continuous physical presence in the
7          United States under this title if the alien has
8          departed from the United States for any period
9          exceeding 90 days or for any periods, in the ag-
10         gregate, exceeding 180 days; and

11            (B) continuous residence in the United
12         States under this title if the alien has departed
13         from the United States for any period exceeding
14         180 days, unless the alien establishes to the
15         satisfaction of the Secretary of Homeland Secu-
16         rity that the alien did not in fact abandon resi-
17         dence in the United States during such period.

18        (2) EXTENSIONS FOR EXTENUATING CIR-
19     CUMSTANCES.—The Secretary may extend the time
20     periods described in paragraph (1) for an alien who
21     demonstrates that the failure to timely return to the
22     United States was due to extenuating circumstances
23     beyond the alien's control, including the serious ill-
24     ness of the alien, or death or serious illness of a par-
25     ent, grandparent, sibling, or child of the alien.

31

1    (3) TRAVEL AUTHORIZED BY THE SEC-

2  RETARY.—Any period of travel outside of the United

3  States by an alien that was authorized by the Sec-

4  retary may not be counted toward any period of de-

5  parture from the United States under paragraph

6  (1).

7   (c) WAIVER OF PHYSICAL PRESENCE.—With respect

8 to aliens who were removed or departed the United States

9 on or after January 20, 2017, and who were continuously

10 physically present in the United States for at least 4 years

11 prior to such removal or departure, the Secretary may,

12 as a matter of discretion, waive the physical presence re-

13 quirement under section 111(b)(1)(A) for humanitarian

14 purposes, for family unity, or because a waiver is other-

15 wise in the public interest. The Secretary, in consultation

16 with the Secretary of State, shall establish a procedure

17 for such aliens to apply for relief under section 111 from

18 outside the United States if they would have been eligible

19 for relief under such section, but for their removal or de-

20 parture.

21 **SEC. 125. EXEMPTION FROM NUMERICAL LIMITATIONS.**

22   Nothing in this title or in any other law may be con-

23 strued to apply a numerical limitation on the number of

24 aliens who may be granted permanent resident status

32

1  under this title (whether on a conditional basis, or without

2  the conditional basis as provided in section 113(c)(2)).

3  **SEC. 126. AVAILABILITY OF ADMINISTRATIVE AND JUDI-**

4  **CIAL REVIEW.**

5  (a) ADMINISTRATIVE REVIEW.—Not later than 30

6  days after the date of the enactment of this Act, the Sec-

7  retary shall provide to aliens who have applied for adjust-

8  ment of status under this title a process by which an appli-

9  cant may seek administrative appellate review of a denial

10  of an application for adjustment of status, or a revocation

11  of such status.

12  (b) JUDICIAL REVIEW.—Except as provided in sub-

13  section (c), and notwithstanding any other provision of

14  law, an alien may seek judicial review of a denial of an

15  application for adjustment of status, or a revocation of

16  such status, under this title in an appropriate United

17  States district court.

18  (c) JUDICIAL REVIEW OF A PROVISIONAL DENIAL.—

19  (1) IN GENERAL.—Notwithstanding any other

20  provision of law, if, after notice and the opportunity

21  to respond under section 111(c)(3)(E), the Secretary

22  provisionally denies an application for adjustment of

23  status under this title, the alien shall have 60 days

24  from the date of the Secretary's determination to

33

1   seek review of such determination in an appropriate

2   United States district court.

3   (2) SCOPE OF REVIEW AND DECISION.—Not-

4   withstanding any other provision of law, review

5   under paragraph (1) shall be de novo and based

6   solely on the administrative record, except that the

7   applicant shall be given the opportunity to supple-

8   ment the administrative record and the Secretary

9   shall be given the opportunity to rebut the evidence

10   and arguments raised in such submission. Upon

11   issuing its decision, the court shall remand the mat-

12   ter, with appropriate instructions, to the Depart-

13   ment of Homeland Security to render a final deci-

14   sion on the application.

15   (3) APPOINTED COUNSEL.—Notwithstanding

16   any other provision of law, an applicant seeking ju-

17   dicial review under paragraph (1) shall be rep-

18   resented by counsel. Upon the request of the appli-

19   cant, counsel shall be appointed for the applicant, in

20   accordance with procedures to be established by the

21   Attorney General within 90 days of the date of the

22   enactment of this Act, and shall be funded in ac-

23   cordance with fees collected and deposited in the Im-

24   migration Counsel Account under section 132.

25   (d) STAY OF REMOVAL.—

34

1       (1) IN GENERAL.—Except as provided in para-

2    graph (2), an alien seeking administrative or judicial

3    review under this title may not be removed from the

4    United States until a final decision is rendered es-

5    tablishing that the alien is ineligible for adjustment

6    of status under this title.

7       (2) EXCEPTION.—The Secretary may remove

8    an alien described in paragraph (1) pending judicial

9    review if such removal is based on criminal or na-

10    tional security grounds described in this title. Such

11    removal shall not affect the alien's right to judicial

12    review under this title. The Secretary shall promptly

13    return a removed alien if a decision to deny an ap-

14    plication for adjustment of status under this title, or

15    to revoke such status, is reversed.

16 **SEC. 127. DOCUMENTATION REQUIREMENTS.**

17    (a) DOCUMENTS ESTABLISHING IDENTITY.—An

18 alien's application for permanent resident status under

19 this title (whether on a conditional basis, or without the

20 conditional basis as provided in section 113(c)(2)) may in-

21 clude, as evidence of identity, the following:

22       (1) A passport or national identity document

23    from the alien's country of origin that includes the

24    alien's name and the alien's photograph or finger-

25    print.

35

1      (2) The alien's birth certificate and an identity
2   card that includes the alien's name and photograph.

3      (3) A school identification card that includes
4   the alien's name and photograph, and school records
5   showing the alien's name and that the alien is or
6   was enrolled at the school.

7      (4) A Uniformed Services identification card
8   issued by the Department of Defense.

9      (5) Any immigration or other document issued
10   by the United States Government bearing the alien's
11   name and photograph.

12      (6) A State-issued identification card bearing
13   the alien's name and photograph.

14      (7) Any other evidence determined to be cred-
15   ible by the Secretary.

16   (b) DOCUMENTS ESTABLISHING ENTRY, CONTIN-
17   UOUS PHYSICAL PRESENCE, LACK OF ABANDONMENT OF
18   RESIDENCE.—To establish that an alien was younger than
19   18 years of age on the date on which the alien entered
20   the United States, and has continuously resided in the
21   United States since such entry, as required under section
22   111(b)(1)(B), that an alien has been continuously phys-
23   ically present in the United States, as required under sec-
24   tion 111(b)(1)(A), or that an alien has not abandoned res-
25   idence in the United States, as required under section

36

1  113(a)(1)(B), the alien may submit the following forms

2  of evidence:

3         (1)   Passport   entries,   including   admission

4         stamps on the alien's passport.

5         (2) Any document from the Department of Jus-

6         tice or the Department of Homeland Security noting

7         the alien's date of entry into the United States.

8         (3)  Records from any educational institution

9         the alien has attended in the United States.

10        (4) Employment records of the alien that in-

11        clude the employer's name and contact information,

12        or other records demonstrating earned income.

13        (5)  Records of service from the Uniformed

14        Services.

15        (6) Official records from a religious entity con-

16        firming the alien's participation in a religious cere-

17        mony.

18        (7) A birth certificate for a child who was born

19        in the United States.

20        (8) Hospital or medical records showing med-

21        ical treatment or hospitalization, the name of the

22        medical facility or physician, and the date of the

23        treatment or hospitalization.

24        (9) Automobile license receipts or registration.

37

1      (10) Deeds, mortgages, or rental agreement

2  contracts.

3      (11) Rent receipts or utility bills bearing the

4  alien's name or the name of an immediate family

5  member of the alien, and the alien's address.

6      (12) Tax receipts.

7      (13) Insurance policies.

8      (14) Remittance records, including copies of

9  money order receipts sent in or out of the country.

10      (15) Travel records.

11      (16) Dated bank transactions.

12      (17) Two or more sworn affidavits from individ-

13  uals who are not related to the alien who have direct

14  knowledge of the alien's continuous physical pres-

15  ence in the United States, that contain—

16         (A) the name, address, and telephone num-

17      ber of the affiant; and

18         (B) the nature and duration of the rela-

19      tionship between the affiant and the alien.

20      (18) Any other evidence determined to be cred-

21  ible by the Secretary.

22  (c) DOCUMENTS ESTABLISHING ADMISSION TO AN

23  INSTITUTION OF HIGHER EDUCATION.—To establish that

24  an alien has been admitted to an institution of higher edu-

25  cation, the alien may submit to the Secretary a document

38

1 from the institution of higher education certifying that the

2 alien—

3     (1) has been admitted to the institution; or

4     (2) is currently enrolled in the institution as a

5     student.

6     (d) DOCUMENTS ESTABLISHING RECEIPT OF A DE-

7 GREE FROM AN INSTITUTION OF HIGHER EDUCATION.—

8 To establish that an alien has acquired a degree from an

9 institution of higher education in the United States, the

10 alien may submit to the Secretary a diploma or other doc-

11 ument from the institution stating that the alien has re-

12 ceived such a degree.

13     (e) DOCUMENTS ESTABLISHING RECEIPT OF A HIGH

14 SCHOOL DIPLOMA, GENERAL EDUCATIONAL DEVELOP-

15 MENT CREDENTIAL, OR A RECOGNIZED EQUIVALENT.—

16 To establish that in the United States an alien has earned

17 a high school diploma or a commensurate alternative

18 award from a public or private high school, has obtained

19 the General Education Development credential, or other-

20 wise has satisfied section 111(b)(1)(D)(iii), the alien may

21 submit to the Secretary the following:

22     (1) A high school diploma, certificate of comple-

23     tion, or other alternate award.

24     (2) A high school equivalency diploma or certifi-

25     cate recognized under State law.

39

1       (3) Evidence that the alien passed a State-au-
2    thorized exam, including the General Education De-
3    velopment test, in the United States.

4       (4) Evidence that the alien successfully com-
5    pleted an area career and technical education pro-
6    gram, such as a certification, certificate, or similar
7    alternate award.

8       (5) Evidence that the alien obtained a recog-
9    nized postsecondary credential.

10       (6) Any other evidence determined to be cred-
11    ible by the Secretary.

12   (f) DOCUMENTS ESTABLISHING ENROLLMENT IN AN
13 EDUCATIONAL PROGRAM.—To establish that an alien is
14 enrolled in any school or education program described in
15 section 111(b)(1)(D)(iv) or 113(a)(1)(C), the alien may
16 submit school records from the United States school that
17 the alien is currently attending that include—

18       (1) the name of the school; and

19       (2) the alien's name, periods of attendance, and
20    current grade or educational level.

21   (g) DOCUMENTS ESTABLISHING EXEMPTION FROM
22 APPLICATION FEES.—To establish that an alien is exempt
23 from an application fee under section 123(c), the alien
24 may submit to the Secretary the following relevant docu-
25 ments:

40

1    (1) DOCUMENTS TO ESTABLISH AGE.—To es-

2  tablish that an alien meets an age requirement, the

3  alien may provide proof of identity, as described in

4  subsection (a), that establishes that the alien is

5  younger than 18 years of age.

6    (2) DOCUMENTS TO ESTABLISH INCOME.—To

7  establish the alien's income, the alien may provide—

8         (A) employment records or other records of

9      earned income, including records that have been

10      maintained by the Social Security Administra-

11      tion, the Internal Revenue Service, or any other

12      Federal, State, or local government agency;

13         (B) bank records; or

14         (C) at least two sworn affidavits from indi-

15      viduals who are not related to the alien and

16      who have direct knowledge of the alien's work

17      and income that contain—

18            (i) the name, address, and telephone

19          number of the affiant; and

20            (ii) the nature and duration of the re-

21          lationship between the affiant and the

22          alien.

23    (3) DOCUMENTS TO ESTABLISH FOSTER CARE,

24  LACK OF FAMILIAL SUPPORT, OR SERIOUS, CHRONIC

25  DISABILITY.—To establish that the alien is in foster

41

1    care, lacks parental or familial support, or has a se-
2    rious, chronic disability, the alien may provide at
3    least two sworn affidavits from individuals who are
4    not related to the alien and who have direct knowl-
5    edge of the circumstances that contain—

6        (A) a statement that the alien is in foster
7        care, otherwise lacks any parental or other fa-
8        miliar support, or has a serious, chronic dis-
9        ability, as appropriate;

10        (B) the name, address, and telephone num-
11        ber of the affiant; and

12        (C) the nature and duration of the rela-
13        tionship between the affiant and the alien.

14    (h) DOCUMENTS ESTABLISHING QUALIFICATION FOR
15    HARDSHIP EXEMPTION.—To establish that an alien satis-
16    fies one of the criteria for the hardship exemption set forth
17    in section 113(a)(2)(C), the alien may submit to the Sec-
18    retary at least two sworn affidavits from individuals who
19    are not related to the alien and who have direct knowledge
20    of the circumstances that warrant the exemption, that
21    contain—

22        (1) the name, address, and telephone number of
23        the affiant; and

24        (2) the nature and duration of the relationship
25        between the affiant and the alien.

42

1      (i) DOCUMENTS ESTABLISHING SERVICE IN THE

2  UNIFORMED SERVICES.—To establish that an alien has

3  served in the Uniformed Services for at least 2 years and,

4  if discharged, received an honorable discharge, the alien

5  may submit to the Secretary—

6        (1) a Department of Defense form DD–214;

7        (2) a National Guard Report of Separation and

8    Record of Service form 22;

9        (3) personnel records for such service from the

10   appropriate Uniformed Service; or

11       (4) health records from the appropriate Uni-

12   formed Service.

13  (j) DOCUMENTS ESTABLISHING EARNED INCOME.—

14       (1) IN GENERAL.—An alien may satisfy the

15  earned    income    requirement    under    section

16  113(a)(1)(C)(iii) by submitting records that—

17          (A) establish compliance with such require-

18       ment; and

19          (B) have been maintained by the Social Se-

20       curity Administration, the Internal Revenue

21       Service, or any other Federal, State, or local

22       government agency.

23       (2) OTHER DOCUMENTS.—An alien who is un-

24  able to submit the records described in paragraph

25  (1) may satisfy the earned income requirement by

43

1    submitting at least two types of reliable documents

2    that provide evidence of employment or other forms

3    of earned income, including—

4          (A) bank records;

5          (B) business records;

6          (C) employer or contractor records;

7          (D) records of a labor union, day labor

8        center, or organization that assists workers in

9        employment;

10        (E) sworn affidavits from individuals who

11        are not related to the alien and who have direct

12        knowledge of the alien's work, that contain—

13            (i) the name, address, and telephone

14           number of the affiant; and

15            (ii) the nature and duration of the re-

16           lationship between the affiant and the

17           alien;

18        (F) remittance records; or

19        (G) any other evidence determined to be

20        credible by the Secretary.

21    (k) AUTHORITY TO PROHIBIT USE OF CERTAIN

22  DOCUMENTS.—If the Secretary determines, after publica-

23  tion in the Federal Register and an opportunity for public

24  comment, that any document or class of documents does

25  not reliably establish identity or that permanent resident

44

1   status under this title (whether on a conditional basis, or

2   without the conditional basis as provided in section

3   113(c)(2)) is being obtained fraudulently to an unaccept-

4   able degree, the Secretary may prohibit or restrict the use

5   of such document or class of documents.

6   **SEC. 128. RULE MAKING.**

7       (a) IN GENERAL.—Not later than 90 days after the

8   date of the enactment of this Act, the Secretary shall pub-

9   lish in the Federal Register interim final rules imple-

10   menting this title, which shall allow eligible individuals to

11   immediately apply for relief under section 111 or

12   113(c)(2). Notwithstanding section 553 of title 5, United

13   States Code, the regulation shall be effective, on an in-

14   terim basis, immediately upon publication, but may be

15   subject to change and revision after public notice and op-

16   portunity for a period of public comment. The Secretary

17   shall finalize such rules not later than 180 days after the

18   date of publication.

19       (b) PAPERWORK REDUCTION ACT.—The require-

20   ments under chapter 35 of title 44, United States Code,

21   (commonly known as the "Paperwork Reduction Act")

22   shall not apply to any action to implement this title.

23   **SEC. 129. CONFIDENTIALITY OF INFORMATION.**

24       (a) IN GENERAL.—The Secretary may not disclose

25   or use information (including information provided during

45

1 administrative or judicial review) provided in applications
2 filed under this title or in requests for DACA for the pur-
3 pose of immigration enforcement.

4    (b) REFERRALS PROHIBITED.—The Secretary, based
5 solely on information provided in an application for adjust-
6 ment of status under this title (including information pro-
7 vided during administrative or judicial review) or an appli-
8 cation for DACA, may not refer an applicant to U.S. Im-
9 migration and Customs Enforcement, U.S. Customs and
10 Border Protection, or any designee of either such entity.

11    (c) LIMITED EXCEPTION.—Notwithstanding sub-
12 sections (a) and (b), information provided in an applica-
13 tion for adjustment of status under this title may be
14 shared with Federal security and law enforcement agen-
15 cies—

16        (1) for assistance in the consideration of an ap-
17     plication for adjustment of status under this title;

18        (2) to identify or prevent fraudulent claims;

19        (3) for national security purposes; or

20        (4) for the investigation or prosecution of any
21     felony offense not related to immigration status.

22    (d) PENALTY.—Any person who knowingly uses, pub-
23 lishes, or permits information to be examined in violation
24 of this section shall be fined not more than $10,000.

**HR 6 PCS**

46

1 **SEC. 130. GRANT PROGRAM TO ASSIST ELIGIBLE APPLI-**
2 **CANTS.**

3     (a) ESTABLISHMENT.—The Secretary of Homeland
4 Security shall establish, within U.S. Citizenship and Immi-
5 gration Services, a program to award grants, on a com-
6 petitive basis, to eligible nonprofit organizations that will
7 use the funding to assist eligible applicants under this title
8 by providing them with the services described in sub-
9 section (b).

10     (b) USE OF FUNDS.—Grant funds awarded under
11 this section shall be used for the design and implementa-
12 tion of programs that provide—

13     (1) information to the public regarding the eli-
14 gibility and benefits of permanent resident status
15 under this title (whether on a conditional basis, or
16 without the conditional basis as provided in section
17 113(c)(2)), particularly to individuals potentially eli-
18 gible for such status;

19     (2) assistance, within the scope of authorized
20 practice of immigration law, to individuals submit-
21 ting applications for adjustment of status under this
22 title (whether on a conditional basis, or without the
23 conditional basis as provided in section 113(c)(2)),
24 including—

25     (A) screening prospective applicants to as-
26 sess their eligibility for such status;

47

1         (B) completing applications and petitions,

2         including providing assistance in obtaining the

3         requisite documents and supporting evidence;

4         and

5         (C) providing any other assistance that the

6         Secretary or grantee considers useful or nec-

7         essary to apply for adjustment of status under

8         this title (whether on a conditional basis, or

9         without the conditional basis as provided in sec-

10         tion 113(c)(2)); and

11     (3) assistance, within the scope of authorized

12 practice of immigration law, and instruction, to indi-

13 viduals—

14         (A) on the rights and responsibilities of

15         United States citizenship;

16         (B) in civics and English as a second lan-

17         guage;

18         (C) in preparation for the General Edu-

19         cation Development test; and

20         (D) in applying for adjustment of status

21         and United States citizenship.

22 (c) AUTHORIZATION OF APPROPRIATIONS.—

23     (1) AMOUNTS AUTHORIZED.—There are author-

24 ized to be appropriated such sums as may be nec-

48

1    essary for each of the fiscal years 2020 through

2    2030 to carry out this section.

3         (2) AVAILABILITY.—Any amounts appropriated

4    pursuant to paragraph (1) shall remain available

5    until expended.

6 **SEC. 131. PROVISIONS AFFECTING ELIGIBILITY FOR AD-**

7           **JUSTMENT OF STATUS.**

8         An alien's eligibility to be lawfully admitted for per-

9    manent residence under this title (whether on a condi-

10    tional basis, or without the conditional basis as provided

11    in section 113(c)(2)) shall not preclude the alien from

12    seeking any status under any other provision of law for

13    which the alien may otherwise be eligible.

14 **SEC. 132. SUPPLEMENTARY SURCHARGE FOR APPOINTED**

15           **COUNSEL.**

16         (a) IN GENERAL.—Except as provided in section 122

17    and in cases where the applicant is exempt from paying

18    a fee under section 123(c), in any case in which a fee is

19    charged pursuant to this title, an additional surcharge of

20    $25 shall be imposed and collected for the purpose of pro-

21    viding appointed counsel to applicants seeking judicial re-

22    view of the Secretary's decision to provisionally deny an

23    application under section 126(c)(3).

24         (b) IMMIGRATION COUNSEL ACCOUNT.—There is es-

25    tablished in the general fund of the Treasury a separate

49

1 account which shall be known as the "Immigration Coun-

2 sel Account". Fees collected under subsection (a) shall be

3 deposited into the Immigration Counsel Account and shall

4 to remain available until expended for purposes of pro-

5 viding appointed counsel as required under this title.

6     (c) REPORT.—At the end of each 2-year period, be-

7 ginning with the establishment of this account, the Sec-

8 retary of Homeland Security shall submit a report to the

9 Congress concerning the status of the account, including

10 any balances therein, and recommend any adjustment in

11 the prescribed fee that may be required to ensure that the

12 receipts collected from the fee charged for the succeeding

13 two years equal, as closely as possible, the cost of pro-

14 viding appointed counsel as required under this title.

15 **SEC. 133. ANNUAL REPORT ON PROVISIONAL DENIAL AU-**

16 **THORITY.**

17     Not later than 1 year after the date of the enactment

18 of this Act, and annually thereafter, the Secretary of

19 Homeland Security shall submit to the Congress a report

20 detailing the number of applicants that receive—

21         (1) a provisional denial under this title;

22         (2) a final denial under this title without seek-

23     ing judicial review;

24         (3) a final denial under this title after seeking

25     judicial review; and

50

1       (4) an approval under this title after seeking ju-

2  dicial review.

## TITLE II—AMERICAN PROMISE ACT

**SEC. 201. SHORT TITLE.**

6      This title may be cited as the "American Promise Act

7  of 2019".

## Subtitle A—Treatment of Certain Nationals of Certain Countries Designated for Temporary Protected Status or Deferred Enforced Departure

**SEC. 211. ADJUSTMENT OF STATUS FOR CERTAIN NATIONALS OF CERTAIN COUNTRIES DESIGNATED FOR TEMPORARY PROTECTED STATUS OR DEFERRED ENFORCED DEPARTURE.**

17    (a) IN GENERAL.—Notwithstanding any other provi-

18  sion of law, the Secretary or the Attorney General shall

19  cancel the removal of, and adjust to the status of an alien

20  lawfully admitted for permanent residence, an alien de-

21  scribed in subsection (b) if the alien—

22      (1) applies for such adjustment, including sub-

23      mitting any required documents under section 227,

24      not later than 3 years after the date of the enact-

25      ment of this Act;

51

1       (2) has been continuously physically present in

2    the United States for a period of not less than 3

3    years before the date of the enactment of this Act;

4    and

5       (3) is not inadmissible under paragraph (1),

6    (2), (3), (6)(D), (6)(E), (6)(F), (6)(G), (8), or (10)

7    of section 212(a) of the Immigration and Nationality

8    Act (8 U.S.C. 1182(a)).

9    (b) ALIENS ELIGIBLE FOR ADJUSTMENT OF STA-

10   TUS.—An alien shall be eligible for adjustment of status

11  under this section if the alien is an individual—

12      (1) who—

13         (A) is a national of a foreign state (or part

14        thereof) (or in the case of an alien having no

15        nationality, is a person who last habitually re-

16        sided in such state) with a designation under

17        subsection (b) of section 244 of the Immigra-

18        tion and Nationality Act (8 U.S.C. 1254a(b))

19        on January 1, 2017, who had or was otherwise

20        eligible for temporary protected status on such

21        date notwithstanding subsections (c)(1)(A)(iv)

22        and (c)(3)(C) of such section; and

23         (B) has not engaged in conduct since such

24        date that would render the alien ineligible for

25        temporary protected status under section

52

1    244(c)(2) of the Immigration and Nationality

2    Act (8 U.S.C. 1245a(c)(2)); or

3    (2) who was eligible for Deferred Enforced De-

4    parture as of January 1, 2017, and has not engaged

5    in conduct since that date that would render the

6    alien ineligible for Deferred Enforced Departure.

7    (c) APPLICATION.—

8    (1) FEE.—The Secretary shall, subject to an

9    exemption under section 223(c), require an alien ap-

10    plying for adjustment of status under this section to

11    pay a reasonable fee that is commensurate with the

12    cost of processing the application, but does not ex-

13    ceed $1,140.

14    (2) BACKGROUND   CHECKS.—The   Secretary

15    may not grant an alien permanent resident status on

16    a conditional basis under this section until the re-

17    quirements of section 222 are satisfied.

18    (3) WITHDRAWAL OF APPLICATION.—The Sec-

19    retary of Homeland Security shall, upon receipt of

20    a request to withdraw an application for adjustment

21    of status under this section, cease processing of the

22    application and close the case. Withdrawal of the ap-

23    plication under this subsection shall not prejudice

24    any future application filed by the applicant for any

25    immigration benefit under this title or under the Im-

53

1    migration and Nationality Act (8 U.S.C. 1101 et

2    seq.).

## Subtitle B—General Provisions

4    **SEC. 221. DEFINITIONS.**

5        (a) IN GENERAL.—In this title:

6            (1) IN GENERAL.—Except as otherwise specifi-

7        cally provided, any term used in this title that is

8        used in the immigration laws shall have the meaning

9        given such term in the immigration laws.

10           (2) DISABILITY.—The term "disability" has the

11       meaning given such term in section 3(1) of the

12       Americans with Disabilities Act of 1990 (42 U.S.C.

13       12102(1)).

14           (3) FEDERAL POVERTY LINE.—The term "Fed-

15       eral poverty line" has the meaning given such term

16       in section 213A(h) of the Immigration and Nation-

17       ality Act (8 U.S.C. 1183a).

18           (4) IMMIGRATION LAWS.—The term "immigra-

19       tion laws" has the meaning given such term in sec-

20       tion 101(a)(17) of the Immigration and Nationality

21       Act (8 U.S.C. 1101(a)(17)).

22           (5) SECRETARY.—Except as otherwise specifi-

23       cally provided, the term "Secretary" means the Sec-

24       retary of Homeland Security.

54

1        (6) UNIFORMED SERVICES.—The term "Uni-
2    formed Services" has the meaning given the term
3    "uniformed services" in section 101(a) of title 10,
4    United States Code.

5        (b) TREATMENT OF EXPUNGED CONVICTIONS.—For
6    purposes of adjustment of status under this title, the
7    terms "convicted" and "conviction", as used in sections
8    212 and 244 of the Immigration and Nationality Act (8
9    U.S.C. 1182, 1254a), do not include a judgment that has
10   been expunged or set aside, that resulted in a rehabilita-
11   tive disposition, or the equivalent.

12   **SEC. 222. SUBMISSION OF BIOMETRIC AND BIOGRAPHIC**
13   **DATA; BACKGROUND CHECKS.**

14       (a) SUBMISSION OF BIOMETRIC AND BIOGRAPHIC
15   DATA.—The Secretary may not grant an alien adjustment
16   of status under this title unless the alien submits biometric
17   and biographic data, in accordance with procedures estab-
18   lished by the Secretary. The Secretary shall provide an
19   alternative procedure for aliens who are unable to provide
20   such biometric or biographic data because of a physical
21   impairment.

22       (b) BACKGROUND CHECKS.—The Secretary shall use
23   biometric, biographic, and other data that the Secretary
24   determines appropriate to conduct security and law en-
25   forcement background checks and to determine whether

55

1 there is any criminal, national security, or other factor

2 that would render the alien ineligible for adjustment of

3 status under this title. The status of an alien may not

4 be adjusted unless security and law enforcement back-

5 ground checks are completed to the satisfaction of the Sec-

6 retary.

7 **SEC. 223. LIMITATION ON REMOVAL; APPLICATION AND**

8 **FEE EXEMPTION; WAIVER OF GROUNDS FOR**

9 **INADMISSIBILITY AND OTHER CONDITIONS**

10 **ON ELIGIBLE INDIVIDUALS.**

11     (a) LIMITATION ON REMOVAL.—An alien who ap-

12 pears to be prima facie eligible for relief under this title

13 shall be given a reasonable opportunity to apply for such

14 relief and may not be removed until, subject to section

15 226(c), a final decision establishing ineligibility for relief

16 is rendered.

17     (b) APPLICATION.—An alien present in the United

18 States who has been ordered removed or has been per-

19 mitted to depart voluntarily from the United States may,

20 notwithstanding such order or permission to depart, apply

21 for adjustment of status under this title. Such alien shall

22 not be required to file a separate motion to reopen, recon-

23 sider, or vacate the order of removal. If the Secretary ap-

24 proves the application, the Secretary shall cancel the order

25 of removal. If the Secretary renders a final administrative

56

1 decision to deny the application, the order of removal or

2 permission to depart shall be effective and enforceable to

3 the same extent as if the application had not been made,

4 only after all available administrative and judicial rem-

5 edies have been exhausted.

6    (c) FEE EXEMPTION.—An applicant may be exempt-

7 ed from paying an application fee required under this title

8 if the applicant—

9        (1) is younger than 18 years of age;

10       (2) received total income, during the 12-month

11    period immediately preceding the date on which the

12    applicant files an application under this title, that is

13    less than 150 percent of the Federal poverty line;

14       (3) is in foster care or otherwise lacks any pa-

15    rental or other familial support; or

16       (4) cannot care for himself or herself because of

17    a serious, chronic disability.

18  (d) WAIVER OF GROUNDS OF INADMISSIBILITY.—

19       (1) IN GENERAL.—Except as provided in para-

20    graph (2), with respect to any benefit under this

21    title, and in addition to any waivers that are other-

22    wise available, the Secretary may waive the grounds

23    of inadmissibility under paragraph (1), subpara-

24    graphs (A), (C), and (D) of paragraph (2), subpara-

25    graphs (D) through (G) of paragraph (6), or para-

57

1  graph (10)(D) of section 212(a) of the Immigration

2  and Nationality Act (8 U.S.C. 1182(a)) for humani-

3  tarian purposes, for family unity, or because the

4  waiver is otherwise in the public interest.

5  (2) EXCEPTION.—The Secretary may not waive

6  a ground described in paragraph (1) if such inad-

7  missibility is based on a conviction or convictions,

8  and such conviction or convictions would otherwise

9  render the alien ineligible under section

10  244(c)(2)(B) of the Immigration and Nationality

11  Act (8 U.S.C. 1254a(c)(2)(B)).

12  (e) ADVANCE PAROLE.—During the period beginning

13  on the date on which an alien applies for adjustment of

14  status under this title and ending on the date on which

15  the Secretary makes a final decision regarding such appli-

16  cation, the alien shall be eligible to apply for advance pa-

17  role. Section 101(g) of the Immigration and Nationality

18  Act (8 U.S.C. 1101(g)) shall not apply to an alien granted

19  advance parole under this section.

20  (f) EMPLOYMENT.—An alien whose removal is stayed

21  pursuant to this title, or who has pending an application

22  under this title, shall, upon application to the Secretary,

23  be granted an employment authorization document.

58

1    **SEC. 224. DETERMINATION OF CONTINUOUS PRESENCE.**

2    (a) EFFECT OF NOTICE TO APPEAR.—Any period of

3    continuous physical presence in the United States of an

4    alien who applies for adjustment of status under this title

5    shall not terminate when the alien is served a notice to

6    appear under section 239(a) of the Immigration and Na-

7    tionality Act (8 U.S.C. 1229(a)).

8    (b) TREATMENT OF CERTAIN BREAKS IN PRES-

9    ENCE.—

10       (1) IN GENERAL.—Except as provided in para-

11       graphs (2) and (3), an alien shall be considered to

12       have failed to maintain continuous physical presence

13       in the United States under this title if the alien has

14       departed from the United States for any period ex-

15       ceeding 90 days or for any periods, in the aggregate,

16       exceeding 180 days.

17       (2) EXTENSIONS FOR EXTENUATING CIR-

18       CUMSTANCES.—The Secretary may extend the time

19       periods described in paragraph (1) for an alien who

20       demonstrates that the failure to timely return to the

21       United States was due to extenuating circumstances

22       beyond the alien's control, including the serious ill-

23       ness of the alien, or death or serious illness of a par-

24       ent, grandparent, sibling, or child of the alien.

25       (3) TRAVEL AUTHORIZED BY THE SEC-

26       RETARY.—Any period of travel outside of the United

59

1    States by an alien that was authorized by the Sec-
2    retary may not be counted toward any period of de-
3    parture from the United States under paragraph
4    (1).

5    (c) WAIVER OF PHYSICAL PRESENCE.—With respect
6    to aliens who were removed or departed the United States
7    on or after January 20, 2017, and who were continuously
8    physically present in the United States for at least 3 years
9    prior to such removal or departure, the Secretary may,
10   as a matter of discretion, waive the physical presence re-
11   quirement under section 211(a)(2) for humanitarian pur-
12   poses, for family unity, or because a waiver is otherwise
13   in the public interest. The Secretary, in consultation with
14   the Secretary of State, shall establish a procedure for such
15   aliens to apply for relief under section 211 from outside
16   the United States if they would have been eligible for relief
17   under such section, but for their removal or departure.

18   **SEC. 225. EXEMPTION FROM NUMERICAL LIMITATIONS.**

19   Nothing in this title or in any other law may be con-
20   strued to apply a numerical limitation on the number of
21   aliens who may be granted permanent resident status
22   under this title.

60

1  SEC. 226. AVAILABILITY OF ADMINISTRATIVE AND JUDI-

2          CIAL REVIEW.

3      (a) ADMINISTRATIVE REVIEW.—Not later than 30

4  days after the date of the enactment of this Act, the Sec-

5  retary shall provide to aliens who have applied for adjust-

6  ment of status under this title a process by which an appli-

7  cant may seek administrative appellate review of a denial

8  of an application for adjustment of status, or a revocation

9  of such status.

10     (b) JUDICIAL REVIEW.—Notwithstanding any other

11  provision of law, an alien may seek judicial review of a

12  denial of an application for adjustment of status, or a rev-

13  ocation of such status, under this title in the United

14  States district court with jurisdiction over the alien's resi-

15  dence.

16     (c) STAY OF REMOVAL.—

17          (1) IN GENERAL.—Except as provided in para-

18       graph (2), an alien seeking administrative or judicial

19       review under this title may not be removed from the

20       United States until a final decision is rendered es-

21       tablishing that the alien is ineligible for adjustment

22       of status under this title.

23          (2) EXCEPTION.—The Secretary may remove

24       an alien described in paragraph (1) pending judicial

25       review if such removal is based on criminal or na-

26       tional security grounds. Such removal does not af-

61

1    fect the alien's right to judicial review under this

2    title. The Secretary shall promptly return a removed

3    alien if a decision to deny an application for adjust-

4    ment of status under this title, or to revoke such

5    status, is reversed.

6  **SEC. 227. DOCUMENTATION REQUIREMENTS.**

7        (a) DOCUMENTS ESTABLISHING IDENTITY.—An

8    alien's application for permanent resident status under

9    this title may include, as evidence of identity, the fol-

10   lowing:

11        (1) A passport or national identity document

12       from the alien's country of origin that includes the

13       alien's name and the alien's photograph or finger-

14       print.

15        (2) The alien's birth certificate and an identity

16       card that includes the alien's name and photograph.

17        (3) A school identification card that includes

18       the alien's name and photograph, and school records

19       showing the alien's name and that the alien is or

20       was enrolled at the school.

21        (4) A Uniformed Services identification card

22       issued by the Department of Defense.

23        (5) Any immigration or other document issued

24       by the United States Government bearing the alien's

25       name and photograph.

62

1    (6) A State-issued identification card bearing
2    the alien's name and photograph.

3    (7) Any other evidence determined to be cred-
4    ible by the Secretary.

5    (b) DOCUMENTS ESTABLISHING CONTINUOUS PHYS-
6    ICAL PRESENCE.—An alien's application for permanent
7    resident status under this title may include, as evidence
8    that the alien has been continuously physically present in
9    the United States, as required under section 211(a)(2),
10   the following:

11    (1) Passport entries, including admission
12    stamps on the alien's passport.

13    (2) Any document from the Department of Jus-
14    tice or the Department of Homeland Security noting
15    the alien's date of entry into the United States.

16    (3) Records from any educational institution
17    the alien has attended in the United States.

18    (4) Employment records of the alien that in-
19    clude the employer's name and contact information.

20    (5) Records of service from the Uniformed
21    Services.

22    (6) Official records from a religious entity con-
23    firming the alien's participation in a religious cere-
24    mony.

63

1      (7) A birth certificate for a child who was born

2    in the United States.

3      (8) Hospital or medical records showing med-

4    ical treatment or hospitalization, the name of the

5    medical facility or physician, and the date of the

6    treatment or hospitalization.

7      (9) Automobile license receipts or registration.

8      (10) Deeds, mortgages, or rental agreement

9    contracts.

10      (11) Rent receipts or utility bills bearing the

11    alien's name or the name of an immediate family

12    member of the alien, and the alien's address.

13      (12) Tax receipts.

14      (13) Insurance policies.

15      (14) Remittance records, including copies of

16    money order receipts sent in or out of the country.

17      (15) Travel records.

18      (16) Dated bank transactions.

19      (17) Two or more sworn affidavits from individ-

20    uals who are not related to the alien who have direct

21    knowledge of the alien's continuous physical pres-

22    ence in the United States, that contain—

23          (A) the name, address, and telephone num-

24        ber of the affiant; and

64

1         (B) the nature and duration of the rela-

2     tionship between the affiant and the alien.

3         (18) Any other evidence determined to be cred-

4     ible by the Secretary.

5     (c) DOCUMENTS ESTABLISHING EXEMPTION FROM

6 APPLICATION FEES.—An alien's application for perma-

7 nent resident status under this title may include, as evi-

8 dence that the alien is exempt from an application fee

9 under section 223(c), the following:

10         (1) DOCUMENTS TO ESTABLISH AGE.—To es-

11     tablish that an alien meets an age requirement, the

12     alien may provide proof of identity, as described in

13     subsection (a), that establishes that the alien is

14     younger than 18 years of age.

15         (2) DOCUMENTS TO ESTABLISH INCOME.—To

16     establish the alien's income, the alien may provide—

17         (A) employment records or other records of

18         earned income, including records that have been

19         maintained by the Social Security Administra-

20         tion, the Internal Revenue Service, or any other

21         Federal, State, or local government agency;

22         (B) bank records; or

23         (C) at least two sworn affidavits from indi-

24         viduals who are not related to the alien and

65

1       who have direct knowledge of the alien's work

2       and income that contain—

3               (i) the name, address, and telephone

4           number of the affiant; and

5               (ii) the nature and duration of the re-

6           lationship between the affiant and the

7           alien.

8       (3) DOCUMENTS TO ESTABLISH FOSTER CARE,

9   LACK OF FAMILIAL SUPPORT, OR SERIOUS, CHRONIC

10  DISABILITY.—To establish that the alien is in foster

11  care, lacks parental or familial support, or has a se-

12  rious, chronic disability, the alien may provide at

13  least two sworn affidavits from individuals who are

14  not related to the alien and who have direct knowl-

15  edge of the circumstances that contain—

16              (A) a statement that the alien is in foster

17          care, otherwise lacks any parental or other fa-

18          miliar support, or has a serious, chronic dis-

19          ability, as appropriate;

20              (B) the name, address, and telephone num-

21          ber of the affiant; and

22              (C) the nature and duration of the rela-

23          tionship between the affiant and the alien.

24      (d) AUTHORITY TO PROHIBIT USE OF CERTAIN DOC-

25  UMENTS.—If the Secretary determines, after publication

66

1   in the Federal Register and an opportunity for public com-

2   ment, that any document or class of documents does not

3   reliably establish identity or that permanent resident sta-

4   tus under this title is being obtained fraudulently to an

5   unacceptable degree, the Secretary may prohibit or re-

6   strict the use of such document or class of documents.

7   **SEC. 228. RULE MAKING.**

8       (a) IN GENERAL.—Not later than 90 days after the

9   date of the enactment of this Act, the Secretary shall pub-

10   lish in the Federal Register interim final rules imple-

11   menting this title, which shall allow eligible individuals to

12   immediately apply for relief under section 211. Notwith-

13   standing section 553 of title 5, United States Code, the

14   regulation shall be effective, on an interim basis, imme-

15   diately upon publication, but may be subject to change and

16   revision after public notice and opportunity for a period

17   of public comment. The Secretary shall finalize such rules

18   not later than 180 days after the date of publication.

19       (b) PAPERWORK REDUCTION ACT.—The require-

20   ments under chapter 35 of title 44, United States Code,

21   (commonly known as the "Paperwork Reduction Act")

22   shall not apply to any action to implement this title.

23   **SEC. 229. CONFIDENTIALITY OF INFORMATION.**

24       (a) IN GENERAL.—The Secretary may not disclose

25   or use information provided in applications filed under this

67

1 title (including information provided during administrative

2 or judicial review) for the purpose of immigration enforce-

3 ment.

4     (b) REFERRALS PROHIBITED.—The Secretary, based

5 solely on information provided in an application for adjust-

6 ment of status under this title (including information pro-

7 vided during administrative or judicial review), may not

8 refer an applicant to U.S. Immigration and Customs En-

9 forcement, U.S. Customs and Border Protection, or any

10 designee of either such entity.

11     (c) LIMITED EXCEPTION.—Notwithstanding sub-

12 sections (a) and (b), information provided in an applica-

13 tion for adjustment of status under this title may be

14 shared with Federal security and law enforcement agen-

15 cies—

16     (1) for assistance in the consideration of an ap-

17     plication for adjustment of status under this title;

18     (2) to identify or prevent fraudulent claims;

19     (3) for national security purposes; or

20     (4) for the investigation or prosecution of any

21     felony not related to immigration status.

22     (d) PENALTY.—Any person who knowingly uses, pub-

23 lishes, or permits information to be examined in violation

24 of this section shall be fined not more than $10,000.

68

1 SEC. 230. GRANT PROGRAM TO ASSIST ELIGIBLE APPLI-

2             CANTS.

3     (a) ESTABLISHMENT.—The Secretary of Homeland

4 Security shall establish, within U.S. Citizenship and Immi-

5 gration Services, a program to award grants, on a com-

6 petitive basis, to eligible nonprofit organizations that will

7 use the funding to assist eligible applicants under this title

8 by providing them with the services described in sub-

9 section (b).

10     (b) USE OF FUNDS.—Grant funds awarded under

11 this section shall be used for the design and implementa-

12 tion of programs that provide—

13         (1) information to the public regarding the eli-

14         gibility and benefits of permanent resident status

15         under this title, particularly to individuals poten-

16         tially eligible for such status;

17         (2) assistance, within the scope of authorized

18         practice of immigration law, to individuals submit-

19         ting applications for adjustment of status under this

20         title, including—

21             (A) screening prospective applicants to as-

22             sess their eligibility for such status;

23             (B) completing applications and petitions,

24             including providing assistance in obtaining the

25             requisite documents and supporting evidence;

26             and

HR 6 PCS

69

1    (C) providing any other assistance that the
2   Secretary or grantee considers useful or nec-
3   essary to apply for adjustment of status under
4   this title; and

5   (3) assistance, within the scope of authorized
6 practice of immigration law, and instruction, to indi-
7 viduals—

8    (A) on the rights and responsibilities of
9   United States citizenship;

10    (B) in civics and English as a second lan-
11   guage;

12    (C) in preparation for the General Edu-
13   cation Development test; and

14    (D) in applying for adjustment of status
15   and United States citizenship.

16 (c) AUTHORIZATION OF APPROPRIATIONS.—

17   (1) AMOUNTS AUTHORIZED.—There are author-
18 ized to be appropriated such sums as may be nec-
19 essary for each of the fiscal years 2020 through
20 2030 to carry out this section.

21   (2) AVAILABILITY.—Any amounts appropriated
22 pursuant to paragraph (1) shall remain available
23 until expended.

70

1 **SEC. 231. PROVISIONS AFFECTING ELIGIBILITY FOR AD-**

2 **JUSTMENT OF STATUS.**

3     An alien's eligibility to be lawfully admitted for per-

4 manent residence under this title shall not preclude the

5 alien from seeking any status under any other provision

6 of law for which the alien may otherwise be eligible.

Passed the House of Representatives June 4, 2019.

Attest:                    CHERYL L. JOHNSON,

*Clerk.*

Calendar No. 112

116TH CONGRESS
1ST SESSION

# H.R. 6

# AN ACT

To authorize the cancellation of removal and adjustment of status of certain aliens, and for other purposes.

JUNE 10, 2019

Read the second time and placed on the calendar

# DEF-INTERV. EX. 44

No. 18-678

_____

_____

IN THE SUPREME COURT OF THE UNITED STATES

_____

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,
APPLICANTS

v.

AIDEN STOCKMAN, ET AL.

_____

APPLICATION FOR A STAY IN THE ALTERNATIVE TO
A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

NOEL J. FRANCISCO
  Solicitor General
    Counsel of Record
Department of Justice
Washington, D.C. 20530-0001
SupremeCtBriefs@usdoj.gov
(202) 514-2217

PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are Donald J. Trump, in his official capacity as President of the United States; James N. Mattis, in his official capacity as Secretary of Defense; Joseph F. Dunford, Jr., in his official capacity as Chairman of the Joint Chiefs of Staff; Richard V. Spencer, in his official capacity as Secretary of the Navy; Mark T. Esper, in his official capacity as Secretary of the Army;* Heather A. Wilson, in her official capacity as Secretary of the Air Force; and Kirstjen Nielsen, in her official capacity as Secretary of Homeland Security.

Respondents (plaintiffs-appellees below) are Aiden Stockman, Nicolas Talbott, Tamasyn Reeves, Jaquice Tate, John Doe 1, John Doe 2, Jane Doe, and Equality California.  Respondents also include the State of California (intervenor-plaintiff-appellee below).

---

\*      Former Acting Secretary of the Army Ryan D. McCarthy was a defendant below in this case.  When Mark T. Esper became Secretary of the Army, Secretary Esper was automatically substituted.

IN THE SUPREME COURT OF THE UNITED STATES

_____

No. 18-678

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,
APPLICANTS

v.

AIDEN STOCKMAN, ET AL.

_____

APPLICATION FOR A STAY IN THE ALTERNATIVE TO
A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

Pursuant to this Court's Rule 23 and the All Writs Act, 28 U.S.C. 1651, the Solicitor General, on behalf of applicants Donald J. Trump, et al., respectfully seeks, as an alternative to certiorari before judgment, a stay of the nationwide preliminary injunction issued by the United States District Court for the Central District of California (App., _infra_, 1a-21a, 22a-35a), pending the consideration and disposition of the government's appeal from that injunction to the United States Court of Appeals for the Ninth Circuit and, if the court of appeals affirms the injunction, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court. Should the Court decline to grant certiorari before judgment or stay the injunction in its entirety, the government respectfully

2

requests that the Court stay the nationwide scope of the injunction pending the resolution of the government's appeal in the court of appeals and any further proceedings in this Court.

The district court in this case preliminarily enjoined the military from implementing a policy that Secretary of Defense James Mattis announced earlier this year after an extensive review of military service by transgender individuals.  In arriving at that new policy, Secretary Mattis and a panel of senior military leaders and other experts determined that the prior policy, adopted by Secretary Mattis's predecessor, posed too great a risk to military effectiveness and lethality.  As a result of the court's nationwide preliminary injunction, however, the military has been forced to maintain that prior policy for nearly a year.

The government has appealed that injunction and has filed a petition for a writ of certiorari before judgment to the court of appeals.[1]  The government now files this application for a stay of the injunction as an alternative to certiorari before judgment. The government seeks such a stay only if the Court denies certiorari before judgment.  If the Court grants certiorari before

---

[1]    The petition for a writ of certiorari before judgment in this case (No. 18-678) was filed on November 23, 2018, and docketed that same day.  As explained more fully in a letter filed in this Court with the certiorari petition, the government's filing of the petition on November 23 allows the petition to be distributed on December 26, 2018, for consideration at the Court's January 11, 2019 conference, without a motion for expedition.  The government respectfully requests that this stay application be considered simultaneously with the certiorari petition.

judgment, it would presumably render a decision in this case by the end of June 2019.  Because such a decision would potentially allow the military to begin implementing the Mattis policy in the reasonably near future, the government does not seek interim relief in the event the Court grants certiorari before judgment.

Should the Court deny certiorari before judgment, however, a decision by the Court this Term would no longer be possible.  Even if the government were immediately to seek certiorari from an adverse decision of the court of appeals, this Court would not be able to review that decision until next Term.  Absent a stay, the nationwide injunction would thus remain in place for at least another year and likely well into 2020 -- a period too long for the military to be forced to maintain a policy that it has determined, in its professional judgment, to be contrary to the Nation's interests.  The government therefore respectfully requests a stay of the injunction pending further proceedings in the court of appeals and this Court, in the event this Court denies certiorari before judgment.

At a minimum, the Court should stay the nationwide scope of the injunction, so that the injunction prohibits the implementation of the Mattis policy only as to the seven individual respondents who are currently serving in the military or seeking to join it -- namely, Stockman, Talbott, Reeves, Tate, John Doe 1, John Doe 2, and Jane Doe.  Such a narrower injunction -- which would limit the district court's preliminary remedy to the parties

4

in this case -- would allow the military to implement the Mattis policy in part while litigation proceeds through 2019 and into 2020.  This Court has previously stayed a nationwide injunction against a military policy to the extent it swept beyond the parties to the case, see United States Dep't of Def. v. Meinhold, 510 U.S. 939 (1993), and it should, at a minimum, grant such a partial stay here.[2]

\*     \*     \*     \*     \*

It is with great reluctance that we seek such emergency relief in this Court.  Unfortunately this case is part of a growing trend in which federal district courts, at the behest of particular plaintiffs, have issued nationwide injunctions, typically on a preliminary basis, against major policy initiatives.  Such injunctions previously were rare, but in recent years they have become routine.  In less than two years, federal courts have issued 25 of them, blocking a wide range of significant policies involving national security, national defense, immigration, and domestic issues.

In cases involving these extraordinary nationwide injunctions, moreover, several courts have issued equally

---

[2]     In accordance with this Court's Rule 23.3, the government also moved in the district court and the court of appeals for a stay of the injunction -- and, at a minimum, its nationwide scope -- pending appeal.  Neither court has ruled on the government's motion.  Should either court rule while this Court is considering this application, the government will promptly notify this Court.

5

extraordinary discovery orders, compelling massive and intrusive discovery into Executive-Branch decision-making, including blanket abrogations of the deliberative-process privilege. See, e.g., Karnoski Pet. 14 n.4.[3]  In the face of these actions, we have had little choice but to seek relief in the courts of appeals; and when that has proven unavailing, to do so in this Court.  Absent such relief, the Executive will continue to be denied the ability to implement significant policy measures, subject to appropriate checks by an independent Judiciary in resolving individual cases and controversies.

STATEMENT

A.   The Military's Policies

1.   To assemble a military of "qualified, effective, and able-bodied persons," 10 U.S.C. 505(a), the Department of Defense (Department) has traditionally set demanding standards for military service, Karnoski Pet. App. 116a.  "The vast majority of Americans from ages 17 to 24 -- that is, 71% -- are ineligible to join the military without a waiver for mental, medical, or behavioral reasons."  Id. at 125a.

Given the "unique mental and emotional stresses of military service," Karnoski Pet. App. 132a, a history of "[m]ost mental health conditions and disorders" is "automatically disqualifying,"

---

[3]      References to "Karnoski Pet." and "Karnoski Pet. App." are to the petition for a writ of certiorari before judgment and the appendix to that petition filed on November 23, 2018, in Trump v. Karnoski, No. 18-676.

6

id. at 151a.  In general, the military has aligned the disorders it has deemed disqualifying with those listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association (APA).  Id. at 132a-133a.  The 1980 edition of the DSM listed, among other disorders, "transsexualism."  Id. at 133a.  When the DSM was updated in 1994, "transsexualism" was subsumed within, and replaced by, the term "'gender identity disorder.'"  Ibid. (citation omitted); see C.A. E.R. 416.[4]

Consistent with the inclusion of "'transsexualism'" in the DSM, the military's accession standards -- the "standards that govern induction into the Armed Forces" -- had for decades disqualified individuals with a history of "'transsexualism'" from joining the military.  Karnoski Pet. App. 126a-127a; see id. at 133a; C.A. E.R. 482.  And although the military's retention standards -- the "standards that govern the retention and separation of persons already serving in the Armed Forces" -- did not "require" separating "'transsexual[]'" servicemembers from service, "'transsexualism'" was a "permissible basis" for doing so.  Karnoski Pet. App. 127a.

2.  In 2013, the APA published a new edition of the DSM, which replaced the term "gender identity disorder" with "gender dysphoria."  Karnoski Pet. App. 136a.  That change reflected the

_____

[4]      References to the "C.A. E.R." are to the excerpts of record filed in Karnoski v. Trump, No. 18-35347 (9th Cir. May 29, 2018).

APA's view that, when there are no "accompanying symptoms of distress, transgender individuals" -- individuals who identify with a gender different from their biological sex -- do not have "a diagnosable mental disorder." C.A. E.R. 416; see Karnoski Pet. App. 204a.

According to the APA, a diagnosis of gender dysphoria should be reserved for individuals who experience a "marked incongruence between [their] experienced/expressed gender and assigned gender, of at least 6 months' duration," associated with "clinically significant distress or impairment in social, occupational, or other important areas of functioning." C.A. E.R. 417; see Karnoski Pet. App. 136a-138a. Treatment for gender dysphoria often involves psychotherapy and, in some cases, may include gender transition through cross-sex hormone therapy, sex-reassignment surgery, or living and working in the preferred gender. Karnoski Pet. App. 155a-156a; C.A. E.R. 345-346. The APA emphasizes that "[n]ot all transgender people suffer from gender dysphoria." Karnoski Pet. App. 152a (citation omitted; brackets in original). "Conversely, not all persons with gender dysphoria are transgender." Id. at 152a n.57; see ibid. (giving the example of men who suffer genital wounds in combat and who "feel that they are no longer men because their bodies do not conform to their concept of manliness") (citation omitted).

3.   In June 2016, then-Secretary of Defense Ashton Carter ordered the armed forces to adopt a new policy on "Military Service of Transgender Service Members." Karnoski Pet. App. 87a. In a

8

shift from the military's longstanding policy, Secretary Carter
declared that "transgender individuals shall be allowed to serve
in the military." Id. at 88a. But Secretary Carter recognized
the need for "[m]edical standards" to "help to ensure that those
entering service are free of medical conditions or physical defects
that may require excessive time lost from duty." Id. at 91a.
Secretary Carter thus ordered the military to adopt, by July 1,
2017, new accession standards that would "disqualify[]" any
applicant with a history of gender dysphoria or a history of
medical treatment associated with gender transition (including a
history of sex reassignment or genital reconstruction surgery),
unless the applicant met certain medical criteria. Id. at 91a-
92a. An applicant with a history of medical treatment associated
with gender transition, for example, would be disqualified unless
the applicant provided certification from a licensed medical
provider that the applicant had completed all transition-related
medical treatment and had been stable in the preferred gender for
18 months. Id. at 92a. If the applicant provided the requisite
certification, the applicant would be permitted to enter the
military and serve in the preferred gender.

Secretary Carter also imposed new retention standards,
effective immediately, prohibiting the discharge of any
servicemember on the basis of gender identity. Karnoski Pet. App.
91a. Under the Carter policy, current servicemembers who received
a diagnosis of gender dysphoria from a military medical provider

9

would be permitted to undergo gender transition at government expense and serve in their preferred gender upon completing the transition.   C.A. E.R. 219-236; see Karnoski Pet. App. 93a. Transgender servicemembers without a diagnosis of gender dysphoria, by contrast, would be required to continue serving in their biological sex.  See Karnoski Pet. App. 128a; C.A. E.R. 221-222.

4.   On June 30, 2017 -- the day before the Carter accession standards were set to take effect -- Secretary of Defense James Mattis determined, "after consulting with the Service Chiefs and Secretaries," that it was "necessary to defer" those standards until January 1, 2018, so that the military could "evaluate more carefully" their potential effect "on readiness and lethality." Karnoski Pet. App. 96a.  Without "presuppos[ing] the outcome" of that study, Secretary Mattis explained that it was his intent to obtain "the views of the military leadership and of the senior civilian officials who are now arriving in the Department" and to "continue to treat all Service members with dignity and respect." Id. at 97a.

While that study was ongoing, the President stated on Twitter on July 26, 2017, that "the United States Government will not accept or allow" "Transgender individuals to serve in any capacity in the U.S. Military." Karnoski Pet. App. 98a.  The President issued a memorandum in August 2017 noting the ongoing study and directing the military to "return to the longstanding policy and practice on military service by transgender individuals that was in place prior to June 2016 until such time as a sufficient basis

10

exists upon which to conclude that terminating that policy and practice would not have * * * negative effects" on the military. Id. at 100a.  The President ordered Secretary Mattis to submit "a plan for implementing" a return to the longstanding pre-Carter policy by February 2018, while emphasizing that the Secretary could "advise [him] at any time, in writing, that a change to th[at] policy is warranted." Id. at 100a-101a.

5.   Secretary Mattis thereafter established a panel of experts to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members." Karnoski Pet. App. 106a.  The panel consisted of "senior uniformed and civilian Defense Department and U.S. Coast Guard leaders." Id. at 205a.  After "extensive review and deliberation," the panel "exercised its professional military judgment" and presented its independent recommendations to the Secretary.  Id. at 148a.

In February 2018, Secretary Mattis sent the President a memorandum proposing a new policy consistent with the panel's conclusions, along with a lengthy report explaining the policy. Karnoski Pet. App. 113a-209a.  Like the Carter policy, the Mattis policy holds that "transgender persons should not be disqualified from service solely on account of their transgender status." Id. at 149a.  And like the Carter policy, the Mattis policy draws distinctions on the basis of a medical condition (gender dysphoria) and related treatment (gender transition).  Id. at 207a-208a.

11

Under the Mattis policy -- as under the Carter policy -- transgender individuals without a history of gender dysphoria would be required to serve in their biological sex, whereas individuals with a history of gender dysphoria would be presumptively disqualified from service. Ibid. The two policies, however, differ in their exceptions to that disqualification.

Under the Mattis accession standards, individuals with a history of gender dysphoria would be permitted to join the military if they have not undergone gender transition, are willing and able to serve in their biological sex, and can show 36 months of stability (i.e., the absence of gender dysphoria) before joining. Karnoski Pet. App. 123a. Under the Mattis retention standards, servicemembers who are diagnosed with gender dysphoria after entering service would be permitted to continue serving if they do not seek to undergo gender transition, are willing and able to serve in their biological sex, and are able to meet applicable deployability requirements. Id. at 123a-124a.

Under both the accession and the retention standards of the Mattis policy, individuals with gender dysphoria who have undergone gender transition or seek to do so would be ineligible to serve, unless they obtain a waiver. Karnoski Pet. App. 123a. The Mattis policy, however, contains a categorical reliance exemption for "transgender Service members who were diagnosed with gender dysphoria and either entered or remained in service following the announcement of the Carter policy." Id. at 200a.

12

Under that exemption, those servicemembers "who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy, may continue to receive all medically necessary treatment   * * *   and to serve in their preferred gender, even after the new policy commences." Ibid.; see C.A. E.R. 489.

6.   In March 2018, the President issued a new memorandum "revok[ing]" his 2017 memorandum "and any other directive [he] may have made with respect to military service by transgender individuals." Karnoski Pet. App. 211a.   The 2018 memorandum recognized that the Mattis policy reflected "the exercise of [Secretary Mattis's] independent judgment," and it permitted the Secretaries of Defense and Homeland Security "to implement" that new policy. Id. at 210a-211a.

B.   Procedural History

1.   Shortly after the President issued his 2017 memorandum, respondents -- four current servicemembers, three individuals who seek to join the military, and an advocacy organization -- brought suit in the Central District of California, challenging as a violation of their equal-protection, due-process, privacy, and First Amendment rights what they described as "the ban" on military service by transgender individuals reflected in the President's 2017 tweets and memorandum.   D. Ct. Doc. 1, at 3 (Sept. 5, 2017); see id. at 15-19.   The State of California subsequently intervened in the suit as a plaintiff.   D. Ct. Doc. 66 (Nov. 16, 2017).

13

2.   In December 2017, the district court issued a nationwide preliminary injunction, requiring the military to maintain and implement the Carter policy.  See App., _infra_, 21a.  The court construed the President's 2017 tweets and memorandum as reflecting a "ban" on military service by "transgender people."  _Id._ at 18a. The court determined that such "discrimination on the basis of one's transgender status is subject to intermediate scrutiny." _Id._ at 19a.  And in the court's view, the government's justifications for the "ban[]" did not survive such scrutiny.  _Id._ at 19a.  The court therefore concluded that respondents were likely to succeed in their equal-protection challenge.  _Ibid._

3.   In March 2018, the government informed the district court that the President had issued the new memorandum, which revoked his 2017 memorandum (and any similar directive) and allowed the military to adopt Secretary Mattis's proposed policy.  D. Ct. Doc. 82, at 4 (Mar. 23, 2018); see D. Ct. Doc. 80 (Mar. 23, 2018). In light of that new policy, the government moved to dissolve the December 2017 injunction.  D. Ct. Doc. 82, at 1-28.

In September 2018, the district court denied the government's motion.  App., _infra_, 22a-35a.  The court found "the new policy" to be "essentially the same as the first policy," "continu[ing]" the "ban[]" on "transgender people" in the military that the President had supposedly "announced" in 2017.  _Id._ at 31a.  The court reiterated its determination that "intermediate scrutiny" applies to "transgender discrimination."  _Id._ at 32a.  And it

14

concluded that the military's justifications for "the transgender ban" were still not "persuasive" enough to survive such scrutiny. Id. at 34a.

4.  The government appealed, D. Ct. Doc. 125 (Nov. 16, 2018), and filed a motion asking the court of appeals to hold the briefing schedule in abeyance pending the appeal of the nationwide preliminary injunction in the related case of Karnoski v. Trump, No. 18-35347 (9th Cir. argued Oct. 10, 2018), petition for cert. before judgment pending, No. 18-676 (filed Nov. 23, 2018). 18-56539 C.A. Doc. 11, at 3-4 (Nov. 20, 2018). In that motion, the government also informed the court of appeals that, in order to afford this Court "the opportunity to consider all pending appeals of preliminary-injunction decisions enjoining the [Mattis] policy on a nationwide basis," the government intended to file petitions for writs of certiorari before judgment in both this case and Karnoski on November 23, 2018, if the court of appeals had not rendered decisions in the cases by then. Id. at 5. The court of appeals suspended the briefing schedule in this case pending further order of the court. 18-56539 C.A. Doc. 25 (Dec. 11, 2018).

The government also moved in the district court and the court of appeals for a stay of the preliminary injunction -- and, at a minimum, its nationwide scope -- pending appeal. D. Ct. Doc. 130 (Nov. 28, 2018); 18-56539 C.A. Doc. 23-1 (Dec. 3, 2018). Both stay motions remain pending. Should either court rule while this

15

Court is considering this application, the government will promptly notify this Court.

ARGUMENT

In a petition for a writ of certiorari before judgment filed in this Court on November 23, 2018, the government seeks review of the district court's nationwide preliminary injunction against the Mattis policy. For the reasons set forth in the petition, this Court should grant certiorari before judgment. If the Court declines to do so, however, the government respectfully requests, in the alternative, a stay of the injunction pending the resolution of the government's appeal in the court of appeals and any further proceedings in this Court. At a minimum, the Court should stay the nationwide scope of the injunction pending those proceedings.

Under this Court's Rule 23 and the All Writs Act, 28 U.S.C. 1651, a single Justice or the Court has authority to enter a stay pending proceedings in a court of appeals.[5] In considering an application for such a stay, the Court or Circuit Justice considers the likelihood of whether four Justices would vote to grant a writ of certiorari if the court of appeals ultimately rules against the applicant; whether five Justices would then conclude that the case was erroneously decided below; and whether, on balancing the equities, the injury asserted by the applicant outweighs the harm

---

[5] See, e.g., Trump v. International Refugee Assistance Project, 138 S. Ct. 542 (2017); West Virginia v. EPA, 136 S. Ct. 1000 (2016); Stephen M. Shapiro et al., Supreme Court Practice § 17.6, at 881-884 (10th ed. 2013).

16

to the other parties or the public.  See <u>San Diegans for the Mt.
Soledad Nat'l War Mem'l</u> v. <u>Paulson</u>, 548 U.S. 1301, 1302 (2006)
(Kennedy, J., in chambers); <u>Hilton</u> v. <u>Braunskill</u>, 481 U.S. 770,
776 (1987) (traditional stay factors).  All of those factors
support a stay of the injunction or, at a minimum, its nationwide
scope.

I.   THIS COURT IS LIKELY TO GRANT REVIEW IF THE COURT OF APPEALS
     AFFIRMS THE INJUNCTION AND ITS NATIONWIDE SCOPE

     If the court of appeals affirms the district court's
nationwide preliminary injunction against the Mattis policy, this
Court is likely to grant review.  Respondents challenge the
constitutionality of the Mattis policy.  That challenge concerns
a matter of imperative public importance:  the authority of the
U.S. military to determine who may serve in the Nation's armed
forces.  After an extensive process of consultation and review
involving senior military officials and other experts, the
Secretary of Defense determined that individuals with a history of
the medical condition gender dysphoria should be presumptively
disqualified from military service, particularly if they have
undergone the treatment of gender transition or seek to do so.
See pp. 10-12, <u>supra</u>.

     The district court in this case entered a nationwide
preliminary injunction nullifying that exercise of professional
military judgment and blocking the implementation of a policy that
the Secretary has deemed necessary to "place the Department of

17

Defense in the strongest position to protect the American people, to fight and win America's wars, and to ensure the survival and success of our Service members around the world." Karnoski Pet. App. 208a.  If the court of appeals were to affirm the injunction, a judicial intrusion of that significance into the operation of our Nation's armed forces would warrant this Court's review.  See Department of the Navy v. Egan, 484 U.S. 518, 520 (1988) (granting certiorari to address interference with Executive Branch determinations that are of "importance * * * to national security concerns"); see also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 12 (2008).

Leaving aside the merits of respondents' constitutional challenge, the issue of the appropriate remedy would itself present a question of exceptional importance warranting this Court's review.  The district court in this case enjoined the implementation of the Mattis policy on a nationwide basis.  The government has previously sought -- and this Court has previously granted -- review of whether a court of appeals erred in affirming the nationwide scope of an injunction entered by a district court. See Trump v. Hawaii, 138 S. Ct. 2392, 2423 (2018); Summers v. Earth Island Institute, 555 U.S. 488, 492 (2009).  If the court of appeals affirms the nationwide scope of the district court's injunction here, this Court's review would again be warranted.

That is particularly so because the nationwide relief ordered in this case extends a disturbing but accelerating trend among lower

18

courts of issuing categorical injunctions designed to benefit nonparties. Lower courts, including the Ninth Circuit, once recognized that injunctions should be limited to redressing irreparable harm to the plaintiffs. See Meinhold v. United States Dep't of Def., 34 F.3d 1469, 1480 (9th Cir. 1994) (vacating a "nation-wide injunction" against the Department's policy on military service by gays and lesbians except to the extent that the injunction granted relief to the particular plaintiff before the court); see also, e.g., McKenzie v. City of Chicago, 118 F.3d 552, 555 (7th Cir. 1997).

Those same courts and others, however, have since transformed a remedy that had been imposed in only a small number of cases into the norm. Thus, in a span of less than two years, district courts have issued 25 nationwide injunctions or temporary restraining orders against major policy decisions in areas including national defense, national security, immigration, and domestic policy. For example, district courts have issued nationwide injunctions against:

- the temporary suspension of entry into the United States of certain foreign nationals from select countries previously identified by prior Administrations or Congress as presenting a heightened risk of terrorism or other national-security concerns, in order to review screening and vetting procedures for foreign travelers;[6]

---

[6]   See Darweesh v. Trump, No. 17-cv-480, 2017 WL 388504 (E.D.N.Y. Jan. 28, 2017); Tootkaboni v. Trump, No. 17-cv-10154,

19

- entry restrictions on foreign nationals from select countries identified by a worldwide review as failing to provide information needed to adequately vet their nationals or otherwise presenting heightened national-security risks;[7]

- conditions on federal grants to local governments to ensure that the Nation's immigration laws are faithfully executed;[8]

- exemptions to protect the sincerely held religious beliefs or moral convictions of certain entities whose

_____

2017 WL 386550 (D. Mass. Jan. 29, 2017); Mohammed v. United States, No. 17-cv-786, 2017 WL 438750 (C.D. Cal. Jan. 31, 2017); Washington v. Trump, No. 17-cv-141, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017); Hawaii v. Trump, 241 F. Supp. 3d 1119 (D. Haw. 2017); International Refugee Assistance Project v. Trump, 241 F. Supp. 3d 539 (D. Md.), aff'd in part, vacated in part, 857 F. 3d 554 (4th Cir.), vacated, 138 S. Ct. 353 (2017); Hawaii v. Trump, 245 F. Supp. 3d 1227 (D. Haw.), aff'd in part, vacated in part, 859 F.3d 741 (9th Cir.), vacated, 138 S. Ct. 377 (2017).

[7]    See Hawaii v. Trump, 265 F. Supp. 3d 1140 (D. Haw.), aff'd in part, vacated in part, 878 F.3d 662 (9th Cir. 2017), rev'd, 138 S. Ct. 2392 (2018); International Refugee Assistance Project v. Trump, 265 F. Supp. 3d 570 (D. Md. 2017) (same), aff'd, 883 F.3d 233 (4th Cir.), vacated, 138 S. Ct. 2710 (2018).

[8]    See County of Santa Clara v. Trump, 250 F. Supp. 3d 497 (N.D. Cal. 2017); City of Chicago v. Sessions, 264 F. Supp. 3d 933 (N.D. Ill. 2017), aff'd, 888 F.3d 272 (7th Cir.), reh'g en banc granted, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4), vacated, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018) (en banc); County of Santa Clara v. Trump, 275 F. Supp. 3d 1196 (N.D. Cal. 2017), aff'd in part, vacated in part, 897 F.3d 1225 (9th Cir. 2018); City & Cnty. of San Francisco v. Sessions, No. 17-cv-4642, 2018 WL 4859528 (N.D. Cal. Oct. 5, 2018); City of Chicago v. Sessions, 321 F. Supp. 3d 855 (N.D. Ill. 2018).

20

health plans are subject to the mandate of contraceptive coverage under Affordable Care Act regulations;[9]

- the rescission of Deferred Action for Childhood Arrivals (DACA), a discretionary policy of immigration enforcement adopted in 2012 as a temporary stop-gap measure permitting some 700,000 aliens to remain in the United States unlawfully while Congress considered a more permanent solution;[10]

- Executive Orders promoting efficiency and accountability in the federal civil service;[11]

- the termination of discretionary temporary protected status designations for four countries based on the Secretary of Homeland Security's determination that the extraordinary conditions that gave rise to the years-old

_____

[9]    See California v. Health & Human Servs., 281 F. Supp. 3d 806 (N.D. Cal. 2017).

[10]    See Regents of the Univ. of Cal. v. Department of Homeland Sec., 279 F. Supp. 3d 1011 (N.D. Cal.), aff'd, 908 F.3d 476 (9th Cir. 2018), petition for cert. pending, No. 18-587 (filed Nov. 5, 2018); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401 (E.D.N.Y.), appeal docketed, No. 18-485 (2d Cir. Feb. 20, 2018), petition for cert. before judgment pending, No. 18-589 (filed Nov. 5, 2018); see also Casa de Maryland v. Department of Homeland Sec., 284 F. Supp. 3d 758 (D. Md. 2018) (enjoining any change in the use of information provided by DACA recipients to the Department of Homeland Security (DHS), despite DHS's public statements that no such change had been made).

[11]    See American Fed'n of Gov't Emps. v. Trump, 318 F. Supp. 3d 370 (D.D.C. 2018).

21

(sometimes decades-old) "temporary" designations no longer persisted;[12] and

- a rule addressing unlawful mass migration at the southern border and the massive recent increase in meritless asylum claims.[13]

Equally troubling, several courts issuing these nationwide preliminary injunctions have also ordered massive and intrusive discovery into Executive-Branch decision-making, including, in a number of instances, blanket abrogations of the deliberative-process privilege. In the related Karnoski case, for example, the district court ordered the President to compile a detailed privilege log of presidential communications and the Executive Branch to produce many thousands of documents withheld under the deliberative-process privilege. Karnoski Pet. 14 n.4. In other cases involving nationwide injunctions, the government has likewise been ordered to produce wide swaths of deliberative-process materials and, in one instance, "to include in the administrative record all * * * 'emails, letters, memoranda, notes, media items, opinions, and other materials'" considered by an acting Cabinet

---

[12]   See Ramos v. Nielsen, No. 18-cv-1554, 2018 WL 4778285 (N.D. Cal. Oct. 3, 2018).

[13]   See East Bay Sanctuary Covenant v. Trump, No. 18-cv-6810, 2018 WL 6053140 (N.D. Cal. Nov. 19, 2018). On December 11, 2018, the Solicitor General filed an application in this Court for a stay of the district court's nationwide injunction pending appeal to the Ninth Circuit. No. 18A615.

22

Secretary with respect to a particular policy.  In re United States, 875 F.3d 1200, 1212 (9th Cir.) (Watford, J., dissenting), vacated, 138 S. Ct. 443 (2017); see, e.g., Order at 1-2, Ramos v. Nielsen, No. 18-cv-1554 (N.D. Cal. Aug. 15, 2018); Mem. Op. at 13-17, Stone v. Trump, No. 17-2459 (D. Md. Nov. 30, 2018).[14]

There is an additional concern for the Judiciary as well as the Executive.  "Given the sweeping power of the individual judge to issue a national injunction, and the plaintiff's ability to select a forum," it raises the prospect that a plaintiff will engage in forum shopping, or that plaintiffs will file in multiple courts in the hope of obtaining a single favorable nationwide ruling. Samuel L. Bray, Multiple Chancellors:  Reforming the National Injunction, 131 Harv. L. Rev. 417, 460 (2017).  Even if other district courts disagree, see, e.g., Sarsour v. Trump, 245 F. Supp. 3d 719 (E.D. Va. 2017) (declining to preliminarily enjoin the temporary suspension of entry into the United States of certain foreign nationals), so long as any court of appeals lets stand a single nationwide injunction -- which they largely have, with limited exceptions -- it prevents the implementation of Executive-Branch policies nationwide or even globally.  See, e.g., Regents

---

[14]    In still other suits against the government, which do not involve nationwide injunctions, intrusive discovery into Executive-Branch decision-making has likewise been ordered or is likely to be sought.  See 7/3/18 Tr. at 82, New York v. United States Dep't of Commerce, No. 18-cv-2921 (S.D.N.Y.), mandamus denied, Nos. 18-2652, 18-2856 (2d Cir. 2018), cert. granted, No. 18-557 (Nov. 16, 2018); Statement Pursuant to F.R.C.P. 26(f) at 4, District of Columbia v. Trump, No. 17-cv-1596 (D. Md. Sept. 14, 2018).

of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 908 F.3d 476
(9th Cir. 2018), petition for cert. pending, No. 18-587 (filed Nov.
5, 2018); International Refugee Assistance Project v. Trump, 883
F.3d 233 (4th Cir. 2018), vacated, 138 S. Ct. 2710 (2018).  But see
City & Cnty. of San Francisco v. Trump, 897 F.3d 1225, 1244 (9th
Cir. 2018) (determining that the record was "not sufficient to
support a nationwide injunction"); Order, City of Chicago v.
Sessions, No. 17-2991 (7th Cir. June 26, 2018) (staying nationwide
scope of preliminary injunction).

Accordingly, if the court of appeals affirms the nationwide
scope of the injunction here -- continuing this troubling and
increasing trend in the lower courts -- that decision would warrant
this Court's review.  Hawaii, 138 S. Ct. at 2425 (Thomas, J.,
concurring); see id. at 2429 ("If federal courts continue to issue
[universal injunctions], this Court is duty-bound to adjudicate
their authority to do so.").  Indeed, it is only this Court that can
arrest this trend and address this rapidly expanding threat to the
respect that each coordinate Branch of our Nation's government owes
the others.

II.  THERE IS AT LEAST A FAIR PROSPECT THAT THIS COURT WILL REVERSE
     IF THE COURT OF APPEALS AFFIRMS THE INJUNCTION AND ITS
     NATIONWIDE SCOPE

There is also at least a "fair prospect," Maryland v. King,
567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), that if
the court of appeals affirms the preliminary injunction and its
nationwide scope, this Court will reverse.

24

A.   As explained in the government's certiorari petition in the related Karnoski case, respondents' equal-protection challenge to the Mattis policy lacks merit.  See Karnoski Pet. 19-25.  Under the Mattis policy, individuals may "not be disqualified from service solely on account of their transgender status."  Karnoski Pet. App. 149a.  Like the Carter policy before it, the Mattis policy turns on a medical condition (gender dysphoria) and related treatment (gender transition) -- not any suspect or quasi-suspect classification.  Id. at 92a, 121a-124a.  Rational-basis review therefore applies, particularly given the military context in which the policy arises.  And the Mattis policy satisfies that deferential review because it reflects, inter alia, the military's reasoned and considered judgment that "making accommodations for gender transition" would "not [be] conducive to, and would likely undermine, the inputs -- readiness, good order and discipline, sound leadership, and unit cohesion -- that are essential to military effectiveness and lethality."  Id. at 197a.

B.   Even if respondents could demonstrate a likelihood of success on their constitutional claim, there is a fair prospect that this Court would vacate the nationwide scope of the preliminary injunction.  Nationwide injunctions like the one here transgress both Article III and longstanding equitable principles by affording relief that is not necessary to redress any cognizable, irreparable injury to the parties in the case.  They also frustrate

the development of the law, while obviating the requirements for and protections of class-action litigation.

1.   a.   Respondents lack Article III standing to seek injunctive relief beyond what is needed to redress an actual or imminent injury-in-fact to respondents themselves.  "[S]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing * * *  for each form of relief that is sought."  <u>Town of Chester</u> v. <u>Laroe Estates, Inc.</u>, 137 S. Ct. 1645, 1650 (2017) (citations omitted); see <u>Gill</u> v. <u>Whitford</u>, 138 S. Ct. 1916, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").  The remedy sought thus "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." <u>Whitford</u>, 138 S. Ct. at 1931 (quoting <u>Lewis</u> v. <u>Casey</u>, 518 U.S. 343, 357 (1996)).  "The actual-injury requirement would hardly serve [its] purpose  . . .  of preventing courts from undertaking tasks assigned to the political branches, if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy <u>all</u> inadequacies in that administration."  <u>DaimlerChrysler Corp.</u> v. <u>Cuno</u>, 547 U.S. 332, 353 (2006) (brackets and citation omitted).

Applying that principle, this Court has invalidated injunctions that afforded relief that was not shown to be necessary to prevent cognizable injury to the plaintiff himself. For example, in <u>Lewis</u>, the Court held that an injunction directed

26

at certain prison practices was overbroad, in violation of Article III, because it enjoined practices that had not been shown to injure any plaintiff. 518 U.S. at 358. The injunction "mandated sweeping changes" in various aspects of prison administration designed to improve prisoners' access to legal services, including library hours, lockdown procedures, access to research facilities and training, and "'direct assistance'" from lawyers and legal support staff for "illiterate and non-English-speaking inmates." Id. at 347-348 (citation omitted).

This Court held that the plaintiffs lacked standing to seek, and the district court thus lacked authority to grant, such broad relief. Lewis, 518 U.S. at 358-360. The district court had "found actual injury on the part of only one named plaintiff," who claimed that a legal action he had filed was dismissed with prejudice as a result of his illiteracy and who sought assistance in filing legal claims. Id. at 358. "At the outset, therefore," this Court held that "[it] c[ould] eliminate from the proper scope of the injunction provisions directed at" the other claimed inadequacies that allegedly harmed "the inmate population at large." Ibid. "If inadequacies of th[at] character exist[ed]," the Court explained, "they ha[d] not been found to have harmed any plaintiff in this lawsuit, and hence were not the proper object of this District Court's remediation." Ibid.

Here, respondents likewise lack standing to seek an injunction that goes beyond redressing any harm to respondents themselves.

27

Even if the seven individual respondents who are currently serving in the military or seeking to join it -- namely, Stockman, Talbott, Reeves, Tate, John Doe 1, John Doe 2, and Jane Doe -- could show that they would suffer cognizable, irreparable injuries from the implementation of the Mattis policy, those injuries would be fully redressed by an injunction limited to them.    An injunction so limited would also fully redress any purported injuries to the other respondents in this case.    The advocacy organization -- Equality California -- has not identified any members beyond the individual respondents named above who would even arguably suffer an irreparable injury.    See D. Ct. Doc. 20, at 2 (Oct. 2, 2017) (identifying only Stockman, Talbott, and Tate as members).    And even assuming that the State of California has Article III standing at all, the district court did not identify any irreparable injury to the State in issuing the injunction or declining to dissolve it. See App., <u>infra</u>, 19a-20a, 22a-35a.    In any event, the State has not identified anyone beyond the individual respondents named above whose disqualification from military service would even arguably irreparably injure it.    See D. Ct. Doc. 1, at 4, 6-7 (complaint alleging that three individual respondents -- Stockman, Reeves, and John Doe 1 -- are residents of the State of California).

    b.    This Court also has recognized and applied the corollary principle that, where a plaintiff faces actual or imminent injury at the outset of a suit but that injury is subsequently redressed or otherwise becomes moot, the plaintiff no longer can seek

28

injunctive relief to redress alleged harms to anyone else.  For example, in Alvarez v. Smith, 558 U.S. 87 (2009), the Court held that the plaintiffs' challenge to a state-law procedure for disputing the seizure of vehicles or money had become moot because their "underlying property disputes" with the State "ha[d] all ended":  the cars that had been seized from the plaintiffs had been returned, and the plaintiffs had either forfeited the money seized or had "accepted as final the State's return of some of it."  Id. at 89; see id. at 92.  The Court accordingly held that the plaintiffs could no longer seek declaratory or injunctive relief against the State's policy.  Id. at 92.  Although the plaintiffs had "sought certification of a class," class certification had been denied, and that denial was not appealed.  Ibid.  "Hence the only disputes relevant" in this Court were "those between th[ose] six plaintiffs" and the State concerning specific seized property, "and those disputes [were] * * * over."  Id. at 93.  And although the plaintiffs "continue[d] to dispute the lawfulness of the State's hearing procedures," their "dispute [wa]s no longer embedded in any actual controversy about the plaintiffs' particular legal rights."  Ibid.

Similarly, in Earth Island, the Court held that a plaintiff lacked standing to seek to enjoin certain Forest Service regulations after the parties had resolved the controversy regarding the application of those regulations to the specific project that had caused that plaintiff's own claimed injury.  555 U.S. at 494-497.  The plaintiff's "injury in fact with regard to

29

that project," the Court held, "ha[d] been remedied," and so he lacked standing to maintain his challenge to the regulations. Id. at 494. The Court expressly rejected a contrary rule that, "when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action" -- in Earth Island, "the regulation in the abstract" -- "apart from any concrete application that threatens imminent harm to his interests." Ibid. Such a rule would "fly in the face of Article III's injury-in-fact requirement." Ibid.

The same conclusion logically follows where, as here, a plaintiff's only injury would be eliminated by an injunction barring application of the challenged policy to the plaintiff. If a plaintiff himself is no longer in any imminent danger of suffering injury from the policy -- whether because his injury has become moot, as in Alvarez and Earth Island, or because a plaintiff-specific injunction prevents any future injury to that plaintiff from the policy -- he lacks standing to press for additional injunctive relief. The fact that the challenged policy could still cause concrete injury to nonparties is irrelevant. As Alvarez and Earth Island both demonstrate, the plaintiff must show the relief he seeks is necessary to redress his own actual or imminent injury-in-fact; potential injuries to others do not entitle the plaintiff to seek relief on their behalf.

30

2.    Independent of Article III, the nationwide preliminary injunction here violates fundamental rules of equity by granting relief broader than necessary to prevent irreparable harm to respondents.    This Court has long recognized that injunctive relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 (1994) (citation omitted). Where no class has been certified, a plaintiff must show that the requested relief is necessary to redress the plaintiff's own irreparable harm; the plaintiff cannot seek injunctive relief in order to prevent harm to others.    See Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 163 (2010) (plaintiffs "d[id] not represent a class, so they could not seek to enjoin [an agency order] on the ground that it might cause harm to other parties"). Even where a class has been certified, relief is limited to what is necessary to redress irreparable injury to members of that class.    See Lewis, 518 U.S. at 359-360, 360 n.7.

History confirms that the injunction in this case violates "traditional principles of equity jurisdiction." Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 319 (1999) (citation omitted).    This Court "ha[s] long held that the jurisdiction" conferred by the Judiciary Act of 1789 "over 'all suits . . . in equity' * * * is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of

31

Chancery at the time of the separation of the two countries." Id.
at 318 (brackets, citation, and internal quotation marks omitted).
Absent a specific statutory provision providing otherwise, then,
"the equity jurisdiction of the federal courts is the jurisdiction
in equity exercised by the High Court of Chancery in England at the
time of the adoption of the Constitution and the enactment of the
original Judiciary Act, 1789." Ibid. (citation omitted).

    Absent-party injunctions were not "traditionally accorded by
courts of equity." Grupo Mexicano, 527 U.S. at 319. Indeed, they
did not exist at equity at all. See Bray 424-445 (detailing
historical practice). Thus, in the late 19th century, this Court
rejected injunctive relief that barred enforcement of a law to
nonparties. Bray 429 (discussing Scott v. Donald, 165 U.S. 58
(1897)). As a consequence, for example, in the 1930s courts issued
more than 1600 injunctions against enforcement of a single federal
statute. Bray 434. The nationwide injunction in this case is
thus inconsistent with "longstanding limits on equitable relief."
Hawaii, 138 S. Ct. at 2425 (Thomas, J., concurring).

    3.   Nationwide injunctions like the one here also disserve
this Court's interest in allowing an issue to percolate in the
lower courts. See United States v. Mendoza, 464 U.S. 154, 160
(1984). While other suits may proceed even after a nationwide
injunction is issued, the moment the first nationwide injunction
on a question is affirmed by a court of appeals, this Court is
forced to either grant review or risk losing the opportunity for

32

review altogether; there may be no second case if it denies review in the first, because other plaintiffs may simply drop their suits and rely on the first nationwide injunction.  Permitting such nationwide injunctions also undercuts the primary mechanism Congress has authorized to permit broader relief:  class actions. It enables all potential claimants to benefit from nationwide injunctive relief by prevailing in a single district court, without satisfying the prerequisites of Federal Rule of Civil Procedure 23, while denying the government the corresponding benefit of a definitive resolution as to all potential claimants if it prevails instead.  See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 176 (1974).  In other words, if plaintiffs file multiple suits against a government policy, they collectively need to win only a single suit for them all to prevail, while the government must run the table to enforce its policy.

4.  Finally, nationwide preliminary injunctions (and accompanying discovery orders, as in the related Karnoski case) deeply intrude into the separated powers upon which our national government is based.  Under those principles, the political Branches are charged with making national policies, including and especially with regard to the national defense.  The Judicial Branch, in contrast, is charged with resolving specific cases and controversies -- and in particular, redressing concrete injuries to specific parties when the policies adopted by the political Branches transgress legal limits.  See Marbury v. Madison, 5 U.S.

33

(1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion."). The types of unrestrained orders that have, in recent years, transformed from rare exceptions into routine interim remedies risk undermining, if not reversing, this fundamental constitutional order -- ultimately, to the long-term detriment of all Branches of our national government. This Court's intervention is therefore both necessary and appropriate.

III. THE BALANCE OF EQUITIES STRONGLY SUPPORTS A STAY OF THE INJUNCTION IN ITS ENTIRETY OR AT LEAST OF ITS NATIONWIDE SCOPE

The nationwide preliminary injunction in this case causes direct, irreparable injury to the interests of the government and the public, which merge here. See Nken v. Holder, 556 U.S. 418, 435 (2009). It does so by forcing the Department to maintain a policy that it has determined poses "substantial risks" and threatens to "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." Karnoski Pet. App. 206a; cf. King, 567 U.S. at 1303 (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (brackets in original) (quoting New Motor Vehicle Bd. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). Given this severe harm to the

34

federal government -- which far outweighs respondents' speculative claims of injury, see D. Ct. Doc. 36 at 17-19 (Oct. 23, 2017); D. Ct. Doc. 82, at 27-28 (Mar. 23, 2018); D. Ct. Doc. 105, at 14-15 (May 7, 2018) -- the Court should stay the injunction in its entirety.

At a minimum, the Court should stay the nationwide scope of the injunction, such that the injunction bars the implementation of the Mattis policy only as to Stockman, Talbott, Reeves, Tate, John Doe 1, John Doe 2, and Jane Doe. The Court granted just such a stay in Meinhold. In that case, a discharged Navy servicemember brought a facial constitutional challenge against the Department's "then-existing policy regarding homosexuals." Meinhold, 34 F.3d at 1473. After the district court enjoined the Department from "taking any actions against gay or lesbian servicemembers based on their sexual orientation" nationwide, this Court stayed that order "to the extent it conferred relief on persons other than Meinhold." Ibid.; see Meinhold, 510 U.S. at 939.

The Court should follow the same course here. Indeed, this case and others involving constitutional challenges to the Mattis policy illustrate the distinct harms to the government from nationwide injunctions. The government is currently subject to four different nationwide preliminary injunctions, each requiring the government to maintain the Carter accession and retention standards. Even if the government were to prevail in the Ninth Circuit -- which has before it two of these injunctions (in this

35

case and in <u>Karnoski</u> v. <u>Trump</u>, No. 18-35347) -- the government would still need to proceed with its appeal before the D.C. Circuit, see <u>Doe 2</u> v. <u>Trump</u>, No. 18-5257.  And even then, the government would still be subject to a fourth nationwide preliminary injunction, issued by the district court in Maryland.  See <u>Stone</u> v. <u>Trump</u>, 280 F. Supp. 3d 747 (D. Md. 2017).  Although the government moved nine months ago to dissolve that injunction in light of the new Mattis policy, see Gov't Mot. to Dissolve the Prelim. Inj., <u>Stone</u>, <u>supra</u> (No. 17-cv-2459) (Mar. 23, 2018), the district court in Maryland has not ruled on the government's pending motion.

Given the injunctions' nationwide scope, the government would have to succeed in vacating all four before it could begin implementing the Mattis policy.  So long as even a single injunction remains in place, the military will be forced to maintain nationwide a policy that it has concluded is contrary to "readiness, good order and discipline, sound leadership, and unit cohesion," which "are essential to military effectiveness and lethality."  <u>Karnoski</u> Pet. App. 197a; see <u>id.</u> at 202a (explaining that the "risks" associated with the Carter policy should not be incurred "given the Department's grave responsibility to fight and win the Nation's wars in a manner that maximizes the effectiveness, lethality, and survivability" of servicemembers).

By contrast, respondents will suffer no injury -- let alone irreparable injury -- if the nationwide scope of the injunction is stayed pending the resolution of the government's appeal and any

36

further proceedings in this Court.  That is because the injunction would still bar the implementation of the Mattis policy as to the seven individual respondents who are currently serving in the military or seeking to join it, redressing any purported harm to respondents themselves.  See pp. 26-27, <u>supra</u>.

The balance of equities therefore warrants, at a minimum, a stay of the nationwide scope of the injunction.  In the absence of certiorari before judgment, such a stay would at least allow the military to implement in part the Mattis policy -- a policy it has determined, after a thorough and independent review, to be in the Nation's best interests -- while litigation continues through 2019 and into 2020.[15]

---

[15]    In applications filed simultaneously with this one, the government also seeks, as an alternative to certiorari before judgment, stays of the preliminary injunctions (or, at a minimum, their nationwide scope) in <u>Karnoski</u> and <u>Doe</u>.  If this Court were to stay the injunctions in these cases in whole or in part, that decision would be binding precedent on the application of the stay factors to such an injunction and would therefore require the district court to similarly stay the injunction in <u>Stone</u>.

37

CONCLUSION

If the petition for a writ of certiorari before judgment is denied, the injunction should be stayed in its entirety pending the disposition of the appeal in the court of appeals and, if that court affirms the injunction, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court.  At a minimum, the Court should stay the nationwide scope of the injunction, such that the injunction bars the implementation of the Mattis policy only as to the seven individual respondents in this case who are currently serving in the military or seeking to join it.

Respectfully submitted.

NOEL J. FRANCISCO
<u>Solicitor General</u>

DECEMBER 2018

APPENDIX

District court order granting preliminary injunction
    (Dec. 22, 2017) ...........................................1a

District court order denying motion to dissolve preliminary
    injunction (Sept. 18, 2018) ...............................22a

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## CIVIL MINUTES—GENERAL

| Case No. | **EDCV 17-1799 JGB (KKx)** | Date | December 22, 2017 |
|---|---|---|---|
| Title | ***Aiden Stockman et al. v. Donald J. Trump et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) DENYING Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (Dkt. No. 36); and (2) GRANTING Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 15)**

Two motions are before the Court. First, Plaintiffs Aiden Stockman, Nicolas Talbott, Tamasyn Reeves, Jaquice Tate, John Doe 1, John Doe 2, Jane Doe, and Equality California (collectively, "Plaintiffs") have filed a Motion for Preliminary Injunction. ("MPI," Dkt. No. 15.) Second, Defendants Donald J. Trump ("President Trump"), in his official capacity as President of the United States; James N. Mattis, in his official capacity as Secretary of Defense; Joseph F. Dunford, Jr., in his official capacity as Chairman of the Joint Chiefs of Staff; Richard V. Spencer, in his official capacity as Secretary of the Navy; Ryan D. McCarthy, in his official capacity as Acting Secretary of the Army; Heather A. Wilson, in her official capacity as Secretary of the Air Force; and Elaine C. Duke, in her official capacity as Acting Secretary of Homeland Security (collectively, "Defendants,") have filed a Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. ("MTD," Dkt. No. 36.)

The Court held a hearing on these matters on December 11, 2017. After considering the issues raised in oral argument, the papers filed supporting and opposing these motions, and the amici briefs, the Court DENIES Defendants' Motion to Dismiss. Additionally, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction.

---

**CIVIL MINUTES—GENERAL**

Case 1:18-cv-00068 Document 400-79 Filed on 06/25/19 in TXSD Page 256 of 390
Case 2:17-cv-01799-JGB-KK Document 79 Filed 12/15/17 Page 2 of 21 Page ID #:2331

2a

# I.  BACKGROUND

## A.  Procedural History

On September 5, 2017, Plaintiffs filed a complaint against Defendants, asserting four causes of action: (1) Fifth Amendment equal protection; (2) Fifth Amendment due process; (3) Fifth Amendment right to privacy; and (4) First Amendment retaliation for free speech and expression.  ("Complaint," Dkt. No. 1 ¶¶ 49–77.)  Plaintiffs seek declaratory relief.

Plaintiffs filed their MPI on October 2, 2017.  (Dkt. No. 15.)  Defendants filed their MTD and Opposition to Plaintiffs' MPI on October 23, 2017.  (Dkt. No. 36.)  Plaintiffs filed a Reply for their Motion to Preliminary Injunction and an Opposition to Defendants' Motion to Dismiss on November 6, 2017.  ("MPI Reply," Dkt. No. 47.)  Defendants filed their MTD reply on November 13, 2017.  ("MTD Reply," Dkt. No. 61.)

## B.  Factual History

The parties do not dispute the basic facts in this case.  In June 2016, after multiple years of data review, the Department of Defense ("DOD") announced it would implement a new policy allowing transgender people to serve openly in the United States military ("June 2016 Policy").  (See generally Dkt. No. 28, Exh. C.)  In reliance on this policy change, many transgender individuals came out to their chain of command without incident.  On July 26, 2017, President Trump changed course, tweeting:

> After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military.  Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail.  Thank you.

("President Trump's Twitter Proclamation," Dkt. No. 28, Exh. F.)

On August 25, 2017, President Trump issued a memorandum ("Presidential Memorandum") formalizing the policy he announced via Twitter.  (Dkt. No. 28, Exh. G.)  The Presidential Memorandum contains several operative prongs: (1) it indefinitely extends the prohibition preventing transgender individuals from entering the military (the "Accession Directive"); (2) it requires the military to authorize the discharge of transgender service members (the "Retention Directive"); and (3) it largely halts the use of DOD or Department of Homeland Security ("DHS") resources to fund sex reassignment surgical procedures for current military members ("Sex Reassignment Surgery Directive") (collectively, "Directives").  (Id. at 47.)  The DOD must submit a plan implementing the Presidential Memorandum by February 2018.  (Id.)

Case 1:18-cv-00068 Document 400-79 Filed on 06/15/19 in TXSD Page 257 of 390
Case 8:17-cv-01799-JGB-KK Document 79 Filed 12/22/17 Page 3 of 21 Page ID #:2332

3a

On September 14, 2017, Defendant Secretary of Defense James Mattis ("Defendant Mattis") issued an "Interim Guidance"[1] which established the temporary DOD policy regarding transgender persons. (MTD at 7.) While the Interim Guidance is in effect, no current transgender service member will be discharged or denied reenlistment solely based on their transgender status. Id. Defendant Mattis must present a plan to implement the Presidential Memorandum to President Trump by February 21, 2018. (Id.)

### 1. Military Transgender Policy before July 2017

In August 2014, the DOD removed references to mandatory exclusion based on gender and identity disorders from its physical disability policy. ("Declaration of Eric K. Fanning," Dkt. No. 22 ¶¶ 12–13.) Additionally, the DOD directed each branch of the armed forces to assess whether there remained any justification to prohibit service by openly transgender individuals. (Id. at 13.)

In July 2015, then-Secretary of Defense Ashton B. Carter created a group to begin comprehensively analyzing whether any justification remained validating the ban on open service by transgender individuals. ("Declaration of Brad Carson," Dkt. No. 26 ¶¶ 8–9.) The working group created by Secretary Carter included the Armed Services, the Joint Chiefs of Staff, the service secretaries, and other specialists from throughout the DOD (the "Working Group"). (Id. ¶ 9.) The review process included analyzing evidence from a variety of sources, such as scholarly materials and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders of units with transgender service members. (Id. ¶ 10.)

Additionally, the Working Group commissioned the RAND Corporation, a nonprofit research institution that provides analysis to the military, to complete a comprehensive study on the impact of permitting transgender individuals to serve openly. (Id. ¶ 11.) The 113-page study, "Assessing the Implications of Allowing Transgender Personnel to Serve Openly" (the "RAND Report," Dkt. No. 26, Exh. B), examined factors such as the health care costs and readiness implications of allowing open service by transgender persons. The RAND Report also analyzed the other 18 foreign militaries which permit military service by transgender individuals, focusing on Australia, Canada, Israel, and the United Kingdom—the four countries "with the most well-developed and publicly available policies on transgender military personnel." (RAND Report at 23.) This comparative analysis found no evidence that allowing open service by transgender persons would negatively affect operational effectiveness, readiness, or unit cohesion. (Id. at 24.) Moreover, the RAND Report concluded healthcare costs for transgender service members would "have little impact on and represents an exceedingly small proportion of [the DOD's] overall health care expenditures." (Id. at 22–23.) Specifically, the RAND Report found health care costs would increase "by between $2.4 million and $8.4 million annually." (Id. at 22.) By

---

[1] Neither party has included a copy of the Interim Guidance as an exhibit, but a copy may be found at https://defense.gov/Portals/1/Documents/PDFs/Military-Service-By-Transgender-Individuals-Interim-Guidance.pdf (last visited December 8, 2017).

Case 1:18-cv-00068 Document 400-79 Filed on 06/25/19 in TXSD Page 258 of 390
Case 2:17-cv-01799-RJB Document 179 Filed 12/11/17 Page 4 of 21 Page ID #:2333

4a

contrast, the overall healthcare cost of those serving in the active component of the military is approximately $6 billion annually, while the overall healthcare cost for the DOD is $49.3 billion annually. (Id. at 22–23.) Furthermore, the RAND Report noted discharging transgender service members, "[a]s was the case in enforcing the policy on homosexual conduct, [] can involve costly administrative processes and result in the discharge of personnel with valuable skills who are otherwise qualified." (Id. at 77.) At the conclusion of its analysis, the Working Group "did not identify any basis for a blanket prohibition on open military service of transgender people. Likewise, no one suggested . . . that a bar on military service by transgender persons was necessary for any reason, including readiness or unit cohesion." (Declaration of Eric K. Fanning ¶ 27.)

Based on the results of this review process, on June 30, 2016, Secretary Carter issued a Directive-type Memorandum announcing transgender Americans may serve openly and without fear of being discharged based solely on that status. ("DTM 16-005," Dkt. No. 22, Exh. C.) Secretary Carter stated:

> These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability and retention, is consistent with military readiness and with strength through diversity.

(Id. at 135.)

This assessment was shared by some of the highest ranking military officials in the country. (See generally Declaration of Eric K. Fanning; "Declaration of Michael Mullen," Dkt. No. 21; "Declaration of Raymond E. Mabus," Dkt. No. 23; "Declaration of Deborah L. James," Dkt. No. 24.) According to the directive, transgender individuals would be permitted to enlist in the military and serve openly beginning on July 1, 2017. (DTM 16-005, at 137.) This date was later postponed until January 1, 2018. (See Dkt. No. 28, Exh. E.) The DOD also issued handbooks, regulations, and memorandums which provided instruction to military commanders in how to implement the new policies, set forth guidance related to medical treatment provisions, and expressly prohibited discrimination on the basis of gender identity. (See "Transgender Service in the U.S. Military," Dkt. No. 22, Exh. 6.)

The former military leaders among the Working Group, such as, former Secretary of the Army Eric K. Fanning, former Chairman of the Joint Chiefs of Staff Admiral Michael Mullen, former Secretary of the Navy Raymond E. Mabus, and former Secretary of the Air Force Deborah L. James, have all explicitly drawn parallels connecting the allowance of open service by transgender persons to the allowance of open service by gay and lesbian persons. (See Declaration of Eric K. Fanning ¶¶ 10–16; Declaration of Michael Mullen ¶¶ 9–15; Declaration of Raymond E. Mabus ¶¶ 19, 24; Declaration of Deborah L. James ¶ 44.) These leaders contend many of the same worries accompanying allowing open transgender service were vocalized, and eventually allayed, in the context of ending "Don't Ask Don't Tell." (See Declaration of Eric K.

Case 1:18-cv-00068 Document 400-79 Filed on 06/25/19 in TXSD Page 259 of 390
Case 2:17-cv-01799-KJM-KJN Document 79 Filed 12/27/17 Page 5 of 21 Page ID #:2334

5a

Fanning ¶¶ 10–16; Declaration of Admiral Michael Mullen ¶¶ 9–15; Declaration of Raymond E. Mabus ¶¶ 19, 24; Declaration of Deborah L. James ¶ 44.)

## 2. Military Transgender Policy after July 2017

On July 26, 2017, President Trump changed course, announcing via Twitter that transgender individuals would not be permitted to serve in the military. (President Trump's Twitter Proclamation.) One month later, his Presidential Memorandum promulgated the Accession Directive, Retention Directive, and Sex Reassignment Surgery Directive. (Presidential Memorandum.) President Trump stated the Obama Administration had "dismantled the [DOD and DHS's] established framework by permitting transgender individuals to serve openly in the military." (Id.) Additionally, he stated the Obama Administration failed to identify a sufficient basis to conclude ending the longstanding policy against open transgender service "would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." (Id.) The Accession Directive extends the policy prohibiting open accession into the military beyond January 1, 2018. The Retention and Sex Assignment Directives take effect on March 23, 2018. (Id.)

On September 14, 2017, Defendant Mattis issued the Interim Guidance, which stated the accession prohibition "remain[s] in effect because current or history of gender dysphoria or gender transition does not meet medical standards." (Interim Guidance.) The Interim Guidance notes this general prohibition is still "subject to the normal waiver process." (Id.) By February 21, 2018, Defendant Mattis must submit to President Trump "a plan to implement the policy and directives in the Presidential Memorandum." (Id.)

Regarding the Sex Assignment Directive, the Interim Guidance provides "[s]ervice members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition." (Id.) However, "no new sex reassignment surgical procedures for military personnel will be permitted after March 22, 2018, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex." (Id.) This language essentially mirrors that of the Presidential Memorandum. (Presidential Memorandum.)

The reception to President Trump's policy change by the military has been somewhat critical. Current Chairman of the Joint Chiefs of Staff Joseph Dunford disagrees with the decision to reinstate the transgender ban, stating he "believe[s] that any individual who meets the physical and mental standards . . . should be afforded the opportunity to continue to serve." (Dkt. No. 28, Exh. I.) He has also previously told lawmakers transgender troops have served the military honorably and he would continue to abide by this sentiment for as long as he holds his position. (Id.) Additionally, it is not clear the nation's top military leaders were consulted about this policy change prior to President Trump's Twitter Proclamation. (See Dkt. No. 28, Exh. M.) Moreover, after the promulgation of President Trump's tweets, 56 retired generals and admirals signed a declaration stating a ban on open service by transgender persons would degrade military readiness. (Dkt. No. 28, Exh. O.)

Case 1:18-cv-00068 Document 400-79 Filed on 06/25/19 in TXSD Page 260 of 390
Case 2:17-cv-01799-RSL Document 79 Filed 12/11/17 Page 6 of 21 Page ID #:2335

6a

## C.  The Plaintiffs

### 1.  Aiden Stockman

Plaintiff Aiden Stockman is a transgender man from California who intended to join the Air Force. ("Stockman Declaration," Dkt. No. 16 ¶ 1.)  Plaintiff Stockman has conducted online research to prepare for the enlistment process, including talking to friends and neighbors stationed at an Air Force base near his home. (Id. ¶ 9.)  He came out to his family as transgender during his sophomore year of high school. (Id. ¶ 4.)  During his junior year, he took the Armed Services Vocational Aptitude Battery ("ASVAB") test in hopes he could join the military upon graduation. (Id. ¶ 10.)  Plaintiff Stockman intends to undergo chest surgery, also called "top surgery" as soon as possible, likely in the spring of 2018. (Id. ¶ 11.)  He states that if the ban were lifted, he would go talk with a recruiter about enlisting as soon as his chest surgery is completed. (Id. ¶ 15.)

### 2.  Nicolas Talbott

Plaintiff Nicolas Talbott is a transgender man from Ohio who intended to join the Air Force National Guard. ("Talbott Declaration," Dkt. No. 17 ¶ 1.)  Plaintiff Talbott came out as transgender to his mother at the age of 16 and, in 2012, started taking hormones according to his transition plan. (Id. ¶¶ 5–6.)  He states he tried to enlist but the military recruiters would not allow him because of his transgender status. (Id. ¶ 7.)  After he learned the accession ban was lifted in June 2016, Plaintiff Talbott spoke with an Air Force National Guard recruiter who advised him to enlist. (Id. ¶ 11.)  Plaintiff Talbott was told to get letters certifying that being transgender had no adverse effects on his ability to serve and that older, unrelated injuries would also have no adverse effects. (Id.)  He then began studying for the ASVAB in anticipation of being allowed to join the military, but President Trump's Twitter Proclamation discouraged him. (Id. ¶ 14.)  Plaintiff Talbott maintains he would seek immediate enlistment were the ban lifted today. (Id. ¶ 16.)

### 3.  Tamasyn Reeves

Plaintiff Tamasyn Reeves is a transgender woman from California who wants to serve in the Navy. ("Reeves Declaration," Dkt. No. 18 ¶ 1.)  Plaintiff Reeves had tried to enlist in the military in 2010, but was rejected because she, at the time, identified as gay. (Id. ¶ 5.)  In 2011, she learned about what it means to be transgender and started coming out to her colleagues and friends. (Id. ¶ 6.)  A year later, she started taking hormones to begin her medical transition. (Id. ¶ 7.)  The policy change June 2016 excited Plaintiff Reeves, and she intended to enlist as soon as she finished her college degree. (Id. ¶ 9.)  The revived ban, however, sunk her hopes. (Id. ¶ 10.)  She states she would immediately talk to a recruiter about enlisting upon receiving her degree in the spring of 2018 if the ban was lifted. (Id. ¶ 12.)

---

**CIVIL MINUTES—GENERAL**     Initials of Deputy Clerk MG

Case 1:18-cv-00068 Document 400-79 Filed on 06/15/19 in TXSD Page 261 of 390
Case 2:17-cv-01799-RSB-RC Document 79 Filed 12/25/19 Page 7 of 21 Page ID #:2336

7a

### 4. Jaquice Tate

Plaintiff Jaquice Tate is a transgender man currently serving as a Sergeant in the Army. ("Tate Declaration," Dkt. No. 19 ¶ 1.) He enlisted in 2008 and has served domestically, in Germany, and on deployment in Iraq. (Id. ¶ 4.) For his service in Iraq, he was awarded an Army Commendation Medal. (Id. ¶ 6.) He has also received multiple Army Achievement Medals, Certificates of Appreciation, and two Colonel Coins of Excellence. (Id. ¶ 11.) Plaintiff Tate, in reliance on the June 2016 Policy, came out to his chain of command. (Id. ¶ 19.) In Fall of 2016, Plaintiff Tate, in conjunction with his chain of command and his doctor, created his medical transition plan. (Id. ¶ 21.) Consequently, he started taking hormones in February 2017 and received approval for chest surgery. (Id.) Plaintiff Tate expects to receive chest surgery in late 2017 or early 2018. (Id.) Plaintiff Tate feels as though the ban demeans his years of military service. (Id. ¶ 23.)

### 5. John Doe 1

Plaintiff John Doe 1 is a transgender man who currently serves as a Non-Commissioned Officer in the Air Force. ("John Doe 1 Declaration," Dkt. No. 29, Exh. 2.) Plaintiff John Doe 1 grew up in a military family and intends to make a career out of his military service. (Id. ¶¶ 2–3.) He has received numerous commendations and endorsements from his chain of command. (Id. ¶¶ 7–8.) In April 2017, in reliance on the June 2016 Policy, he came out to his chain of command and received a medical transition plan. (Id. ¶ 17.) Plaintiff John Doe 1 fears he will be discharged under the express terms of the ban. (Id. ¶ 19.) He understands the Sex Reassignment Surgery Directive denies him transition-related medical care. (Id. ¶ 21.) Consequently, he intends to pay out-of-pocket for chest surgery. (Id.) Plaintiff John Doe 1 is bewildered at how he went from first in his class at Airmen Leadership School to being deemed unfit to serve. (Id. ¶ 25.)

### 6. John Doe 2

Plaintiff John Doe 2 is a transgender man who currently serves in the Army. ("John Doe 2 Declaration," Dkt. No. 29, Exh. 3.) Plaintiff John Doe 2 enlisted in 2015 at the age of 17, and earned two Colonel Coins of Excellence by August 2017. (Id. ¶ 6.) He possess technical expertise pertaining to the operations, diagnostics, and maintenance of multichannel communications systems necessary for the Army to make real-time tactical decisions. (Id. ¶ 5.) His position requires Secret-level security clearance. (Id.) He expects to serve in the Army until he is eligible to receive retirement benefits. (Id. ¶ 11.) While Plaintiff John Doe 2 realized he was transgender in his junior year of high school, he did not come out to anyone until he joined the Army. (Id. ¶¶ 15, 18.) In reliance on the June 2016 policy change, he came out to his chain of command and began researching the new policies and guidance. (Id. ¶¶ 20–21.) He worked with an Army doctor to develop a medical transition plan and treatment. (Id. ¶ 21.) After meeting with his commander and doctors, Plaintiff John Doe 2 was approved for chest surgery, and expects to have it completed in March 2018. (Id. ¶ 22.) He anticipates completing his medical transition by 2020. (Id.) However, after the promulgation of the Presidential Memorandum, he fears being subject to an imminent involuntary discharge. (Id. ¶¶ 28–29.)

Case 2:18-cv-00068 Document 100-79 Filed on 06/25/19 in TXSD Page 262 of 390
Case 2:17-cv-01799-JGB-KK Document 79 Filed 12/15/17 Page 8 of 21 Page ID #:2337

8a

### 7. Jane Doe 2

Plaintiff Jane Doe is a transgender woman currently serving in the Air Force. ("Jane Doe Declaration," Dkt. No. 29, Exh. 4.) Plaintiff Jane Doe entered the military in 2010, having already completed her college degree. (Id. ¶¶ 2–3.) As a consequence, she entered the military as an Airman First Class. (Id. ¶ 3.) After basic training, she was stationed domestically then selected for deployment in the Middle East. (Id.) She has received an Air Force Commendation Medal for distinctly exemplary service. (Id. ¶ 5.) Plaintiff Jane Doe intends on serving in the military until she is eligible for a pension and retirement benefits. (Id. ¶ 9.) While she identified as transgender at age 14, she waited until college to come out to those closest to her. (Id. ¶ 11.) In reliance on the June 2016 policy change, she came out to the rest of her family and to the public, updating her social media to her correct gender. (Id. ¶ 13.) With her chain of command and doctor, she created a medical transition plan which had received all the necessary approvals. (Id. ¶ 14.) She fears the Presidential Memorandum will strip her of her career, salary, and housing. (Id. ¶¶ 15–18.)

### 8. Equality California

Plaintiff Equality California ("EQCA") is an organization dedicated to LGBTQ civil rights. ("Declaration of Rick Zbur," Dkt. No. 20 ¶ 2.) Its membership includes transgender individuals in active service, transgender military veterans, and transgender individuals who have intend to pursue long-term military careers. (Id. ¶ 4.)

## D. Pending Cases

On October 30, 2017, the Honorable Colleen Kollar-Kotelly of the D.C. District Court issued a nationwide injunction concerning the Accession and Retention Directives. See Doe 1 v. Trump, --- F. Supp. 3d ----, CV 17-01597 (CKK), 2017 WL 4873042, at *2 (D.D.C. Oct. 30, 2017). That court, however, dismissed the Sex Reassignment Surgery Directive claim, holding the plaintiffs lacked standing to challenge that directive. Id. at *23–24. The court noted one plaintiff, who had her transition-related procedure canceled by the Defense Health Agency, later received a waiver and is currently having her request processed. Id. at *24. A second plaintiff's prospective harm was deemed too speculative, as her transition treatment plan would not begin until after she returned from active duty in Iraq. Id. Finally, a third plaintiff is set to begin transition surgery before the ban would go into effect, also excluding him from harm. Id. The court concluded "no Plaintiffs have demonstrated that they are substantially likely to be impacted by the Sex Reassignment Surgery Directive, and none have standing to challenge that directive." Id.

The court in Doe 1 conducted a lengthy analysis regarding the import of the Presidential Memorandum. As here, Defendants in Doe 1 essentially argued "the Presidential Memorandum merely commissioned an additional policy review; that review is underway; nothing is set in stone, and what policy may come about is unknown; and regardless, Plaintiffs are protected by

Case 1:18-cv-00068 Document 400-79 Filed on 06/15/19 in TXSD Page 263 of 390
Case 2:17-cv-01799-JGB-KK Document 79 Filed 12/25/19 Page 9 of 21 Page ID #:2338

9a

the Interim Guidance." <u>Id.</u> at *17. Finding the defendants' arguments to be a "red herring," the court stated:

> The President controls the United States military. The directives of the Presidential Memorandum, to the extent they are definitive, are the operative policy toward military service by transgender service members. The Court must and shall assume that the directives of the Presidential Memorandum will be faithfully executed. <u>See</u> <u>Nat'l Mining Ass'n v. U.S. Army Corps of Engineers</u>, 145 F.3d 1399, 1408 (D.C. Cir. 1998) (assessing "faithful" application of agency rule). Consequently, the Interim Guidance must be read as implementing the directives of the Presidential Memorandum, and any protections afforded by the Interim Guidance are necessarily limited to the extent they conflict with the express directives of the memorandum.
>
> . . .
>
> Nothing in the August 2017 Statement by Secretary Mattis, or the Interim Guidance, can or does alter these realities. The Statement provides that Secretary Mattis will establish a panel of experts "to provide advice and recommendations on the implementation of the president's direction." After the "panel reports its recommendations and following ... consultation with the secretary of Homeland Security," Secretary Mattis will "provide [his] advice to the president concerning implementation of his policy direction." Put differently, the military is studying how to implement the directives of the Presidential Memorandum. Such a policy review and implementation plan are likely necessitated by the fact that—as borne out by the RAND Report and the declarations submitted by the Pseudonym Plaintiffs—transgender service members occupy a variety of crucial positions throughout the military, including active duty postings in war zones. Presumably, the removal and replacement of such individuals during a time of war cannot occur overnight. Accordingly, Defendants are correct that policy decisions are still being made. But the decisions that must be made are how to best implement a policy under which transgender accession is *prohibited*, and discharge of transgender service members is *authorized*. Unless the directives of the Presidential Memorandum are altered—and there is no evidence that they will be—military policy toward transgender individuals must fit within these confines.
>
> . . .
>
> Finally, although Defendants make much of the protections afforded by the Interim Guidance to transgender individuals, that protection is necessarily qualified by the Presidential Memorandum. The Interim Guidance provides that: "*As directed by the [Presidential] Memorandum*, no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status." (Emphasis added). The protections

afforded by the Presidential Memorandum lapse by February 21, 2018, and discharge must be authorized by March 23, 2018. The Interim Guidance can do nothing to obviate these facts. Nor is standing vitiated by the mere possibility that the President may alter the directives of the Presidential Memorandum. See Appalachian Power Co. v. EPA, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("[A]ll laws are subject to change. Even that most enduring of documents, the Constitution of the United States, may be amended from time to time. The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment."). Nor is there evidence that such a change may occur, given the President's unequivocal pronouncement that "the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military."

Id. at *17–18 (emphasis in original). The Court considers Doe to be persuasive authority, and finds its analysis sound and useful.

On November 21, 2017, the Honorable Marvin J. Garbis of the District of Maryland issued a nationwide injunction concerning the Accession Directive, the Retention Directive, and the Sex Reassignment Surgery Directive. Stone v. Trump, --- F. Supp. 3d ---- No. CV MJG-17-2459, 2017 WL 5589122, at *16 (D. Md. Nov. 21, 2017). Distinguishing the plaintiffs before it from the plaintiffs in Doe 1, the Stone court noted plaintiffs Stone and Cole were "highly unlikely to complete their medically-necessary surgeries before the effective date of the Directive." Id. at *13. Additionally, while the Doe 1 court found a disqualifying lack of certainty impeded the plaintiffs' standing, the Stone court stated there is "no lack of certainty regarding when transition treatment will begin for [plaintiffs] Stone and Cole since treatment has already begun, and [their] surgeries are endangered by the Directive's deadline." Id. That court approvingly cited the standing and constitutional analysis in Doe 1. Id. at *10, 15.

## II.  MOTION TO DISMISS

Defendants present a two-pronged challenged to Plaintiffs' Complaint. First, they assert Plaintiffs lack standing and do not face an imminent threat of future injury. Alternatively, they assert Plaintiffs' claims are unripe and not yet fit for judicial determination. (MTD at 11.)   For the reasons stated below, the Court concludes it has jurisdiction to determine the constitutionality of the Accession Directive, Retention Directive, and Sex Reassignment Surgery Directive.

### A.  Legal Standard

Under Rule 12(b)(1), a party may bring a motion to dismiss for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A challenge to the court's jurisdiction may be facial or factual. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000)). In a facial attack, the moving party asserts the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. Safe Air, 373

11a

F.3d at 1039.  By contrast, in a factual attack, the moving party disputes the truth of allegations that, by themselves, would otherwise invoke federal jurisdiction.  Id.

When considering a factual attack, a court applies a standard similar to that used in deciding summary judgment motions.  Evidence outside the pleadings may be considered, but all factual disputes must be resolved in favor of the nonmoving party.  See Dreier v. United States, 106 F.3d 844, 847 (9th Cir. 1996).  If the moving party presents admissible evidence in support of its motion, "the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."  Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

In a facial challenge, "a court examines the complaint as a whole to determine whether the plaintiff has alleged a proper basis of jurisdiction."  Watson v. Chessman, 362 F. Supp. 2d 1190, 1194 (S.D. Cal. 2005).  Again, a plaintiff's complaint is treated similarly to a summary judgment motion: the allegations are treated as true and all inferences are drawn in favor of the plaintiff.  Id.  "The court will not, however, infer allegations supporting federal jurisdiction; federal subject matter must always be affirmatively alleged."  Id. (quoting Century Sw. Cable Television, Inc. v. CIIF Assocs., 33 F.3d 1068 (9th Cir. 1994)).  When a plaintiff relies on the general federal question statute, 28 U.S.C. § 1331, "a claim not arising under the United States Constitution, or any federal statute . . . . will not generally survive a Rule 12(b)(1) facial attack."  Id. (internal citations and quotation marks omitted).

## B.  Standing

"Constitutional standing concerns whether the plaintiff's personal stake in the lawsuit is sufficient to make out a concrete 'case' or 'controversy' to which the federal judicial power may extend under Article III, § 2."  Pershing Park Villas Homeowners Ass'n v. United Pacific Ins. Co., 219 F.3d 895 (9th Cir. 2000).  "[T]he irreducible constitutional minimum of standing" is comprised of three elements: (1) an injury-in-fact; (2) a causal connection between the injury and challenged conduct such that the injury is "fairly traceable" to the challenged action; and (3) it must be "likely," not merely "speculative" that the injury can be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).  The injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  Id. at 560.  "The party invoking federal jurisdiction bears the burden of establishing these elements."  Id. at 561.

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).  Thus, the "standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of Government was unconstitutional."  Id. (quoting Raines v. Byrd, 521 U.S. 811, 819 (1997)).  Importantly, when there are multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."  Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650–51 (2017).

Case 8:17-cv-01799-JGB-KK Document 79 Filed 12/22/17 Page 12 of 21 Page ID #:341
Case 7:18-cv-00039-O Document 100-79 Filed on 06/25/19 in TXSD Page 266 of 390

12a

Defendants argue Plaintiffs have not demonstrated injury-in-fact. (MTD at 17.) For the foregoing reasons, the Court finds Plaintiffs met their burden and have standing to challenge the Accession, Retention, and Sex Reassignment Surgery Directives.

### 1. Accession Directive

The Accession Directive indefinitely extends the prohibition preventing transgender individuals from entering the military. The prohibition would have expired on December 31, 2017. Defendants argue no Plaintiff "has been denied accession into the military, which could be denied for numerous reasons wholly unrelated to an applicant's transgender status." (Id. at 18.) Additionally, "allegations of speculative future harms are insufficient to establish standing." (Id.) Defendants have made this argument twice before, to no avail. See Stone, 2017 WL 5589122, at *11; Doe 1, 2017 WL 4873042, at *20–22. Citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 205, (1995), Gratz v. Bollinger, 539 U.S. 244, 251 (2003), and Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 709–10 (2007), the Doe 1 court noted the appropriate inquiry is two-pronged: (1) whether the plaintiff is "very likely" to apply for accession "in the relatively near future"; and (2) whether the plaintiff is "substantially likely to hit a barrier when he applies for accession." Doe 1, 2017 WL 4873042, at *21. The court found it was likely one of the plaintiffs will graduate from the Naval Academy and attempt to accede, and "[a]nything else is the product of mere speculation." Id. Likewise, based on a plaintiff's declarations and testimony showing he had already met with a recruiting officer and had plans to accede which "are not speculative," the Stone court also found a plaintiff faced a "substantial risk" that his "attempt to accede . . . will be prohibited solely on the basis of his transgender status." Stone, 2017 WL 5589122, at *11. Defendants' argument leaves this Court similarly unpersuaded.

Here, Plaintiffs Stockman, Talbott, and Reeves have separately demonstrated an affirmative intent to join the military, going as far as to take the ASVAB, speaking with military recruiters, and attempting to join even before Secretary Carter promulgated DTM 16-005. (See Declaration of Aiden Stockman ¶¶ 9–11; Declaration of Nicolas Talbott ¶¶ 7–16; Declaration of Tamasyn Reeves ¶¶ 7–12.) These Plaintiffs all declare that, were the ban lifted today, they would seek enlistment. See Declaration of Aiden Stockman ¶ 15; Declaration of Nicolas Talbott ¶ 16; Declaration of Tamasyn Reeves ¶ 12.) While Defendants argue Plaintiffs may be eligible for individualized waivers (MTD at 18), Plaintiffs contend, and the Doe 1 court agreed, transgender people have never been eligible for medical waivers. See Doe 1, 2017 WL 4873042, at *21 (finding "no evidence that waivers are actually made available to transgender individuals, or that they will be"); Supplemental Declaration of Eric K. Fanning, Dkt. No. 47-1 ¶ 11; Supplemental Declaration of Raymond Edwin Maybus Jr., Dkt. No. 47-2 ¶ 10.) Additionally, even if Plaintiffs could successfully apply for a waiver, the need to apply for one when no other group must do so is likely also a violation of equal protection rights. See Hawaii v. Trump, 859 F.3d 741, 767–68 (9th Cir. 2017) (holding a plaintiff need not wait for a denial of discretionary waiver from the travel ban in order to challenge the ban), vacated as moot on other grounds, 2017 WL 4782860, at *1 (U.S. Oct. 24, 2017); Doe 1, 2017 WL 4873042, at *21 (stating "even if a bona fide waiver

Case 8:17-cv-01799-JGB-KK   Document 79   Filed 12/22/17   Page 13 of 21   Page ID #:2342
Case 7:18-cv-00068   Document 400-79   Filed on 02/15/19 in TXSD   Page 267 of 390

13a

process were made available . . . [this] would not vitiate the barrier that [the plaintiff] claims is violative of equal protection.")

Based on the submitted declarations, the Court is convinced Plaintiffs Stockman, Talbott, and Reeves are highly likely to apply for accession in the relatively near future and are substantially likely to hit a barrier upon that application. This injury is concrete, particularized, imminent, and not at all hypothetical. Consequently, Plaintiffs have standing to challenge the Accession Directive.

## 2. Retention Directive

Beginning on March 23, 2018, the Retention Directive authorizes the discharge of military members solely on the basis of their transgender status. (See Presidential Memorandum; President Trump's Twitter Proclamation.) Defendants argue Plaintiffs merely "*may* be discharged from the military in the future" and note, as of yet, no transgender service member has been discharged. (MTD at 17 (emphasis added).) Consequently, "Plaintiffs' speculation that they may be discharged in the future is insufficiently concrete and imminent to establish standing." Id. However, by characterizing Plaintiffs' fear as "speculation," Defendants ignore the surrounding political and legal realities. The Commander-in-Chief of the military, President Trump, announced:

> After consultation with my Generals and military experts, please be advised that the United States Government *will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military*. Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail. Thank you.

(President Trump's Twitter Proclamation, (emphasis added).)

This proclamation has been expanded into a full Presidential Memorandum, which proclaims the Retention Directive is set to begin on March 23, 2018. (Presidential Memorandum.) Nonetheless, Defendants untenably argue that Plaintiffs' fear of being discharged is speculative because no one has yet been discharged. (MTD at 17.) This logic falls apart under scrutiny, however, as the Presidential Memorandum does not even take effect until 2018. The Presidential Memorandum is clear in its intent, force, and impending effect.

Plaintiffs argue courts routinely decide questions of constitutionality before the promulgation of implementing regulations. (MPI Reply at 10, citing Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n, 346 F.3d 851, 872 n.22 (9th Cir. 2003) (holding statutory challenge justiciable despite absence of implementing regulations "because it is clear that any standard required" would violate the constitution although no standard had yet issued); Nance v. EPA, 645 F.2d 701, 713, 717 (9th Cir. 1981) (holding statutory challenge justiciable although the "EPA has not yet promulgated regulations under the amended act").) The Court agrees with Plaintiffs' position. Plaintiffs Tate, John Doe 1, and John Doe 2, all current military service members,

Case 8:17-cv-01799-JGB-KK   Document 79   Filed 12/25/17   Page 14 of 21   Page ID #:2343
Case 7:18-cv-00063   Document 100-79   Filed on 06/15/19 in TXSD   Page 268 of 390

14a

plausibly fear discharge once the Retention Directive becomes operative.  (See Tate Declaration ¶ 25; John Doe 1 Declaration ¶ 19; John Doe 2 Declaration ¶¶ 28–29.)  This fear is appropriately born out of President Defendant Trump's Twitter Proclamation, the Presidential Memorandum, and the Interim Guidance.  Consequently, the Court finds Plaintiffs Tate, John Doe 1, and John Doe 2 face concrete, particularized, and imminent injury.  Accordingly, they have standing to challenge the constitutionality of the Retention Directive.

### 3.  Sex Reassignment Surgery Directive

The Court believes it useful to juxtapose Plaintiffs against the plaintiffs in Doe 1.  The Doe 1 plaintiffs failed this first prong of the standing inquiry, as the court found "the risk of being impacted by the Sex Reassignment Surgery Directive is not sufficiently great to confer standing." 2017 WK 4873042 at * 23.  As previously discussed, that court noted Jane Doe 1's transition related procedure had been canceled, but defendants had submitted a declaration stating Jane Doe 1 had received a "health care waiver necessary to receive a transition-related surgery [and] is currently being processed."  Id. at 24.  This finding rendered Jane Doe 1 ineligible to challenge the Sex Reassignment Surgery Directive.  Additionally, Jane Doe 3 would not have begun her transition plan until after she returns from active deployment in Iraq.  Id.  The court found "[g]iven the possibility of discharge, the uncertainties attended by the fact that she has yet to begin any transition treatment, and the lack of certainty on when such treatment will begin, the prospective harm . . . is too speculative to constitute an injury in fact."  Id.  Finally, one of the named plaintiffs had stated that he would transition prior to applying for accession; therefore, he also failed to show injury-in-fact.  Id.

Here, Plaintiff John Doe 1 received a medical transition plan in April 2017.  (John Doe 1 Declaration ¶ 17.)  He has also received a diagnosis of gender dysphoria.  ("John Doe 1 Supplemental Declaration," Dkt. No. 47-6 ¶ 2.)  As a part of his plan, he is to begin taking Hormone Replacement Therapy ("HRT") "later this year," "once [he receives] final approvals from the Medical Multidisciplinary Team and [his] commander."  (Id. ¶ 3.)  He is scheduled to receive chest surgery in mid-2018 and sex organ surgery in 2020.  (Id. ¶¶ 4–5.)  Plaintiff John Doe 2 received a formal diagnosis of gender dysphoria in October 2016.  ("John Doe 2 Supplemental Declaration," Dkt. No. 47-7 ¶ 2.)  He began HRT in March 2017.  (Id. ¶ 3.)  His transition plan includes a projected chest surgery date in April 2018 and sex organ surgery by the end of 2021.  (Id. ¶¶ 4–5.)

According to the Presidential Memorandum, "no new sex reassignment surgical procedures for military personnel will be permitted after March 22, 2018, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex."  (Presidential Memorandum.)  In deciding whether Plaintiffs have standing to challenge the Sex Reassignment Surgery Directive, the Court ordered the parties to submit supplemental briefing discussing the definition of the terms "necessary to protect the health" and "begun a course of treatment to reassign his or her sex."  (Dkt. No. 66.)  Additionally, the Court asked the parties to discuss whether and how these terms apply to Plaintiffs John Doe 1 and John Doe 2.  (Id.)  In response to the Court's order, Defendants argue

Case 8:17-cv-01799-JGB-KK Document 79 Filed 12/22/17 Page 15 of 21 Page ID #:2344
Case 7:18-cv-00068 Document 400-79 Filed on 06/15/19 in TXSD Page 269 of 390

15a

the Sex Reassignment Surgery Directive is currently under review and the final definitions of these terms are not yet ascertainable. (Dkt. No. 70, at 3.) Thus, Defendants contend Plaintiffs have not demonstrated injury-in-fact because no one yet knows what the future policy will be. (Id.) Despite this hand waiving, Defendants suggest the definitionally hollow term "necessary to protect the health" may equate to the legally hefty term "medically necessary." (Id. at 5–6.) However:

> As of now, Defendants therefore cannot state what the full scope and impact of [the] future policy will be with respect to sex reassignment surgery until the pending review is completed, including whether or not [the] current understanding of the terms 'necessary to protect the health' or 'begun a course of treatment to reassign his or her sex' will be altered in the future.

(Id. at 6.)

By contrast, Plaintiffs contend reading the Sex Reassignment Surgery Directive in context of the overall directive shows that it is intended to deny coverage of the surgery except in cases where the surgery is "necessary to protect the health of a transgender service member *for a reason unrelated to gender transition.*" (Dkt. No. 72 (emphasis in original).) Plaintiffs note the Sex Reassignment Surgery Directive is not an isolated order but is part of a larger policy directive excluding transgender people from military service. (Id.) They argue the purpose of the Directive is to "hasten the departure of transgender individuals from the military, both by sending a clear message that they are unwelcome and by causing some current service members to leave military service because they cannot obtain needed medical care." (Id. at 4.) Moreover, Plaintiffs believe Defendants chose the ambiguous phrase "necessary to protect the health" as a way of intentionally avoiding the common legal term "medically necessary." (Id. at 5.) The interpretation must be different because then the surgeries would continue whenever they were proscribed as part of a gender transition plan, a reading which would "essentially nullify the Directive and contravene President Trump's premise about the cost of surgical care." Stone, 2017 WL 558122 at *13. Notably, Defendants made the same argument before the Stone court, which stated:

> [I]f the exception were to be interpreted under the broad terms proposed by Defendants, the 'exception' would essentially nullify the Directive and Contravene President Trump's premise about the cost of surgical care . . . Defendants may not evade judicial review by advancing (or, in this case, weakly suggesting) an interpretation of the challenged action that is both implausible and would fatally undercut the President's announced policy.

Id. at *13 (citation omitted).

This Court is equally unpersuaded by Defendants' construction of the Sex Reassignment Surgery exception. If the Sex Reassignment Surgery Directive means anything, it means a transgender service member cannot receive the surgery simply because it is "medically

necessary." President Trump stated the policy change is occurring because the military would be "burdened with the tremendous medical costs." (President Trump's Twitter Proclamation.) Allowing sex reassignment surgeries whenever they became medically necessary would result in the exception swallowing the rule and would do nothing to address President Trump's concerns. Perhaps anticipating this outcome, Defendants equivocate in their briefing, only suggesting that "necessary to protect the health" might equate to "medical necessity" instead of firmly proffering a definition. Defendants hesitated when deciding whether the exception applies to Plaintiffs (MTD Reply at 7, (stating that Plaintiffs "potentially fall within the exception to the funding directive")), and now attempt to forge that hesitation into an axe sharp enough to chop down Plaintiffs' standing argument. As Defendants are not able to outright state Plaintiffs fit into the exception and are entitled to the surgery, Plaintiffs' fears that the surgery will be denied are plausible given the plain words of President Trump. Consequently, Plaintiffs John Doe 1 and John Doe 2 have demonstrated injury-in-fact as it pertains to the Sex Reassignment Surgery Directive.

As an aside, despite the Court's order for supplemental briefing, neither party addressed the meaning of "begun a course of treatment to reassign his or her sex." This definition could be impactful as it is not at all clear Plaintiff John Doe 1 stands on the same jurisdictional footing as Plaintiff John Doe 2. Without supplemental briefing the Court cannot be certain, but it appears Plaintiff John Doe 1 may not have yet started HRT, while Plaintiff John Doe 2 began it earlier this spring. (Compare John Doe 1 Supplemental Declaration ¶ 3 with John Doe 2 Supplemental Declaration ¶ 3.) Consequently, Plaintiff John Doe 1 may not have sufficiently "begun a course of treatment to reassign his or her sex," and thus would be ineligible for the exception regardless if the surgery was "necessary to protect" his health.

## C. Ripeness

Alternatively, Defendants argue this case should be dismissed because it is not ripe to be adjudicated. A dispute is ripe when it presents concrete legal issues in actual cases. Colwell v. HHS, 558 F.3d 1112, 1123 (9th Cir. 2009). "Ripeness and standing are closely related because they originate from the same Article III limitation." Montana Envtl. Info. Ctr. v. Stone-Manning, 766 F.3d 1184, 1188 (9th Cir. 2014) (citing Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 n.5 (2014)). In fact, "in many cases, ripeness coincides squarely with standing's injury in fact prong." Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing. . . . Indeed, because the focus of our ripeness inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline.")

Plaintiffs have satisfied the injury-in-fact requirements and have standing to challenge the Accession, Retention, and Sex Reassignment Surgery Directives. Thus, Plaintiffs also have established constitutional ripeness. Bishop Paiute Tribe v. Inyo Cty., 863 F.3d 1144, 1153 (9th Cir. 2017). Defendants' ripeness argument is not based in constitutional ripeness, but prudential ripeness. Whether a dispute is ripe depends on "the fitness of the issues for judicial decision" and "the hardship to the parties" of withholding review. Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977).

Case 8:17-cv-00006-RK-KK Document 79 Filed 02/25/19 Page 17 of 21 Page ID #:346
Case 1:18-cv-00068 Document 400-79 Filed on 06/15/19 in TXSD Page 271 of 390

17a

This case is fit for judicial decision.  President Trump has unambiguously stated his policy intentions, then formalized those intentions into an operative Presidential Memorandum.  "The only uncertainties are how, not if, the policy will be implemented and whether, in some future context, the President might be persuaded to change his mind and terminate the policies he is now putting into effect."  Stone, 2017 WL 5589122, at *14.  The constitutionality of the Directives within the Presidential Memorandum are fit for constitutional review; indeed, the Accession Directive goes into effect within a few short weeks.  (Presidential Memorandum.)  The Court need not wait for the Presidential Memorandum to be fully implemented before determining its constitutionality.  Union Pac. R.R. Co., 346 F.3d at 872 n.22.  Additionally, Plaintiffs would bear the brunt of the harm were judicial review withheld.  Plaintiffs have demonstrated "they are already suffering harmful consequences such as the cancellation and postponements of surgeries, the stigma of being set apart as inherently unfit, facing the prospect of discharge, . . . the inability to move forward with long-term medical plans, and the threat to their prospects of obtaining long-term assignments.  Waiting until after the Directives have been implemented to challenge their alleged violation of constitutional rights only subjects them to substantial risk of even greater harms."  Stone, 2017 WL 5589122, at *14; Doe 1, 2017 WL 4873042, at *24–25 ("The directives are known, and so are the circumstances under which they were issued.  They cannot be more concrete, and future policy by the military—absent action from the president—cannot change what the directives require. . . . Furthermore, the nature of the equal protection analysis in this case, which asses the facial validity of the Presidential Memorandum, means that the Court would not benefit from delay—the salient facts regarding the issuance of the Presidential Memorandum are not subject to change.")

Accordingly, having found Plaintiffs have standing to challenge the Directives, and that this case is ripe for judicial adjudication, the Court DENIES Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

### III.  MOTION FOR PRELIMINARY INJUNCTION

#### A.  Legal Standard

A plaintiff seeking a preliminary injunction must establish that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  "A preliminary injunction is an extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (describing the "substantial proof" requirement to grant a preliminary injunction as much higher than the burden of proof for a summary judgment).

The Ninth Circuit has adopted a "sliding scale" test for preliminary injunctions.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.  Id.  For example, "serious questions" as to the

Case 8:17-cv-01799-JGB-KK Document 79 Filed 12/25/19 Page 39 of 42 Page ID #:2347
Case 7:18-cv-00008 Document 490-79 Filed on 06/15/19 in TXSD Page 272 of 390

18a

merits of a case, combined with a showing that the hardships tip sharply in the plaintiff's favor, can support the issuance of an injunction, assuming the other two elements of the <u>Winter</u> test are also met. <u>Winter</u>, 555 U.S. at 24 ("Courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, and should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") <u>Id.</u>

A preliminary injunction can take two forms: either a prohibitory injunction or a mandatory injunction. <u>Chalk v. U.S. Dist. Court Cent. Dist. of California</u>, 840 F.2d 701, 704 (9th Cir. 1988). A prohibitory injunction prevents a party from taking action pending a resolution on the merits, <u>Heckler v. Lopez</u>, 463 U.S. 1328, 1333 (1983) (stating that a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"), while a mandatory injunction "orders a responsible party to take action." <u>Meghrig v. KFC W., Inc.</u>, 516 U.S. 479, 484 (1996). Since the "basic function" of a preliminary injunction is to preserve the status quo pending resolution on the merits, mandatory injunctions are "particularly disfavored." <u>Id.</u> Indeed, mandatory injunctions will not be issued unless failure to do so will result in "extreme or very serious damage." <u>Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.</u>, 571 F.3d 873, 879 (9th Cir. 2009).

## B. Likelihood of Success on the Merits

Defendants argue "[t]he President and Secretary Mattis' decision that the complex issues presented by the policy on military service by transgender individuals warrant additional study before changes are made to longstanding policies passes muster under any standard." (MTD at 25.) However, this is not what happened in this case. In July of 2017, President Trump announced transgender people are barred from military service, and nothing in the Presidential Memorandum or Interim Guidance alters the fact that the decision has already been made. Defendants, in their briefing and at oral argument, attempt to focus on the constitutionality of the Interim Guidance and not the policy that takes place once it expires.[2] Even the title of the current operative policy, the "*Interim* Guidance," (emphasis added) attests to its temporary nature.

Defendants additionally contend military personnel decisions should be accorded a highly deferential level of review. However, this deferential review is most appropriate when the military acts with measure, and not "unthinkingly or reflexively." <u>Rostker v. Goldberg</u>, 453 U.S. 57, 72 (1981). Here, the only serious study and evaluation concerning the effect of transgender people in the armed forces led the military leaders to resoundingly conclude there was no justification for the ban. (<u>Supra</u>, "Military Transgender Policy Before July 2017," at 3–5.) The Court agrees with the <u>Doe 1</u> court, which noted "the record at this stage of the case shows that the reasons offered for categorically excluding transgender individuals were not supported and

---

[2] The <u>Doe 1</u> court's analysis of the interaction between the Presidential Memorandum and the Interim Guidance is sound and adopted by the Court. 2017 WL 4873042, at *17–18. Portions of that analysis have been reproduced in this Opinion. (<u>See</u> <u>supra</u> 9–10.)

were in fact contradicted by the only military judgment available at the time." 2017 WL 4873042, at *31. "[T]he Court's analysis in this Opinion has not been based on an independent evaluation of evidence or faulting the President for choosing between two alternatives based on competing evidence." Id.

The Ninth Circuit has strongly suggested that discrimination on the basis of one's transgender status is equivalent to sex-based discrimination. See Schwenk v. Hartford, 204 F.3d 1187, 1201–02 (9th Cir. 2000) ("both [the Gender Motivated Violence Act and Title VII] prohibit discrimination based on gender as well as sex. Indeed, for the purposes of these two acts, the terms 'sex' and 'gender' have become interchangeable." Additionally, sex-based discrimination can include discrimination based on someone failing "to conform to socially-constructed gender expectations.") Several district courts in this circuit have plainly held discrimination on the basis of one's transgender status is subject to intermediate scrutiny. See Norsworthy v. Beard, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); Olive v. Harrington, No. 115CV01276BAMPC, 2016 WL 4899177, at *5 (E.D. Cal. Sept. 14, 2016). Moreover, the courts which have examined the constitutionality of the transgender ban have also applied intermediate scrutiny. See Stone, 2017 WL 5589122, at *15; Doe 1, 2017 WL 4873042, at *27–29. The Court is persuaded by the analysis contained in these opinions.

Plaintiffs are "protected by the Fifth Amendment's Due Process Clause[, which] contains within it the prohibition against denying to any person the equal protection of the laws." U.S. v. Windsor, 133 S. Ct. 2675, 2695, 186 L. Ed. 2d 808 (2013). Consequently, the government must proffer a justification which is "exceedingly persuasive," "genuine," "not hypothesized," not "invented *post hoc* in response to litigation," and "must not rely on overbroad generalizations." United States v. Virginia, 518 U.S. 515, 531 (1996). Defendants' justifications do not pass muster. Their reliance on cost is unavailing, as precedent shows the ease of cost and administration not survive intermediate scrutiny even if it is significant. Frontiero v. Richardson, 411 U.S. 677, 688–91 (1973). Moreover, all the evidence in the record suggests the ban's cost savings to the government is miniscule. (RAND Report at 22–23.) Furthermore, Defendants' unsupported allegation that allowing transgender individuals to be in the military would adversely affect unit cohesion is similarly unsupported by the proffered evidence. (Compare MTD at 30–31 with RAND Report at 24.) These justifications fall far short of exceedingly persuasive. Accordingly, the Court finds Plaintiffs have demonstrated their Equal Protection claim will likely succeed on the merits and further analysis of their other claims is unnecessary at this stage of the proceedings.

## C. Irreparable Harm

Defendants first argue, "for much the same reasons they lack standing, Plaintiffs cannot show that they are likely to be injured if the Court does not enter an injunction." (MTD at 24.) Considering the Court has already found Plaintiffs have standing, this argument is easily dismissed. Second, Defendants contend Plaintiffs' injuries would not be beyond remediation. (Id.) For example, they argue separation from the military would not constitute irreparable harm

because it is within the Court's equitable powers to remedy the injury.  (Id.)  However, these arguments fail to address the negative stigma the ban forces upon Plaintiffs.

Plaintiffs allege, and the Court agrees, the ban sends a damaging public message that transgender people are not fit to serve in the military.  (MPI Reply at 19.)  There is nothing any court can do to remedy a government-sent message that some citizens are not worthy of the military uniform simply because of their gender.  A few strokes of the legal quill may easily alter the law, but the stigma of being seen as less-than is not so easily erased.  See Obergefell v. Hodges, 135 S. Ct. 2584, 2602 (2015) ("laws excluding same-sex couples from the marriage right impose stigma and injury of the kind prohibited by our basic charter"); Lawrence v. Texas, 539 U.S. 558, 573 (2003) ("If protected conduct is made criminal and the law which does so remains unexamined for its substantive validity, its stigma might remain even if it were not enforceable as drawn for equal protection reasons.")  Additionally, "the deprivation of constitutional rights unquestionably constitutes irreparable injury." Hernandez v. Sessions, 872 F.3d 976, 994 (9th Cir. 2017) (internal quotations omitted) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)).  This ban singles out transgender individuals for unequal treatment solely because of their transgender status.  Plaintiffs have appropriately demonstrated irreparable injury.  See Stone, 2017 WL 5589122, at *16; Doe 1, 2017 WL 4873042, at *32.

## D.  Balance of Equities and Public Interest

The Court finds Plaintiffs have shown the balance of equities and public interest weighs in favor of granting injunctive relief.  Plaintiffs already feel the stigma attached to the Directives.  (See Tate Declaration ¶ 23; John Doe 1 Declaration ¶¶ 23–25; John Doe 2 Declaration ¶¶ 30–33, 38–39.)  Defendants again attempt to make the preliminary injunction about the Interim Guidance and not the policies which will supersede the Interim Guidance.  (MTD at 40.)  As noted above, this argument is misplaced.  Additionally, as in Stone and Doe 1, Defendants make a perfunctory argument regarding the import of a strong national defense.  (MTD at 40.)  However:

> A bare invocation of "national defense" simply cannot defeat every motion for preliminary injunction that touches on the military. On the record before the Court, there is absolutely no support for the claim that the ongoing service of transgender people would have any negative effective on the military at all. In fact, there is considerable evidence that it is the discharge and banning of such individuals that would have such effects.... Moreover, the injunction that will be issued will in no way prevent the government from conducting studies or gathering advice or recommendations on transgender service.

Stone, 2017 WL 5589122, at *16 (quoting Doe 1, 2017 4873042, at *33.)  The record stands much the same here as it did in Stone and Doe 1, thus the Court has no reason to deviate from the above analysis.  In sum, considering all the Winter factors weigh in favor of granting a preliminary injunction, the Court preliminarily enjoins the Accession, Retention, and Sex Reassignment Surgery Directives pending the final resolution of this lawsuit.

Case 7:18-cv-00063 Document 100-79 Filed on 06/15/19 in TXSD Page 275 of 390
Case 5:17-cv-01799-JGB-KK Document 79 Filed 12/22/17 Page 21 of 21 Page ID #:2350

21a

## IV.  CONCLUSION

Finding the Plaintiffs have established injury-in-fact as it pertains to the Accession, Retention, and Sex Reassignment Surgery Directives, and finding this case ripe for adjudication, the Court DENIES Defendants' Motion to Dismiss.  Additionally, finding the <u>Winter</u> factors weigh in favor of granting a preliminary injunction, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction.  Therefore, until this litigation is resolved, the Court ORDERS:

1.  Defendants, and their agents, employees, assigns, and all those acting in concert with them are enjoined from categorically excluding individuals, including Plaintiffs Aiden Stockman, Nicolas Talbot, Tamasyn Reeves, from military service on the basis that they are transgender; and

2.  No current service member, including Plaintiffs Jaquice Tate, John Doe 1, John Doe 2, and Jane Doe, may be separated, denied reenlistment, demoted, denied promotion, denied medically necessary treatment on a timely basis, or otherwise subjected to adverse treatment or differential terms of service on the basis that they are transgender.

**IT IS SO ORDERED.**

Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 276 of 390
Case 5:17-cv-01799-JGB-KK Document 124 Filed 09/18/18 Page 1 of 14 Page ID #:6388

22a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 17-01799 JGB (KKx)** | Date | September18, 2018 |
|---|---|---|---|
| Title | ***Aiden Stockman, et al. v. Donald J. Trump, et al.*** | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   **Order DENYING Defendants' Motion to Dissolve the Preliminary Injunction (Dkt. No. 82) (IN CHAMBERS)**

On March 23, 2018, Defendants Donald J. Trump ("President Trump"), in his official capacity as President of the United States; James N. Mattis, in his official capacity as Secretary of Defense; Joseph F. Dunford, Jr., in his official capacity as Chairman of the Joint Chiefs of Staff; Richard V. Spencer, in his official capacity as Secretary of the Navy; Ryan D. McCarthy, in his official capacity as Acting Secretary of the Army; Heather A. Wilson, in her official capacity as Secretary of the Air Force; and Elaine C. Duke, in her official capacity as Acting Secretary of Homeland Security (collectively, "Defendants") filed a Motion to Dissolve the Preliminary Injunction. ("Motion," Dkt. No. 82.) Plaintiffs Aiden Stockman, Nicolas Talbott, Tamasyn Reeves, Jaquice Tate, John Doe 1, John Doe 2, Jane Doe, and Equality California (collectively, "Plaintiffs") filed an opposition on April 25, 2018. ("Opposition," Dkt. No. 98.) Defendants filed a reply on May 7, 2018. ("Reply," Dkt. No. 105.) The Court held a hearing on this matter on July 30, 2018. Upon consideration of the papers filed in support of and in opposition to this Motion, as well as the oral arguments presented by the parties, the Court DENIES Defendants' Motion.

## I.   BACKGROUND

### A. Procedural History

On September 5, 2017, Plaintiffs filed a complaint against Defendants, asserting four causes of action: (1) Fifth Amendment equal protection; (2) Fifth Amendment due process;

Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 277 of 390
Case 3:17-cv-01799-JGB-KK Document 124 Filed 09/18/18 Page 2 of 14 Page ID #:6389

23a

(3) Fifth Amendment right to privacy; and (4) First Amendment retaliation for free speech and expression. ("Complaint," Dkt. No. 1 ¶¶ 49–77.) Plaintiffs seek declaratory relief. (Id.) Plaintiffs filed a Motion for Preliminary Injunction on October 2, 2017. ("MPI," Dkt. No. 15.) The Court granted Plaintiffs' MPI on December 22, 2017. ("December Order," Dkt. No. 79.)

## B. Factual History

The parties do not dispute the basic facts in this case. In June 2016, after multiple years of data review, the Department of Defense ("DOD") announced it would implement a new policy which allowed transgender people to serve openly in the United States military ("June 2016 Policy"). (See generally Dkt. No. 28, Exh. C.) On July 26, 2017, President Trump changed course, and tweeted:

> After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail. Thank you.

("President Trump's Twitter Proclamation," Dkt. No. 28, Exh. F.)

On August 25, 2017, President Trump issued a memorandum ("2017 Presidential Memorandum") formalizing the policy he announced via Twitter. (Dkt. No. 28, Exh. G.) The 2017 Presidential Memorandum contained several operative prongs: (1) it indefinitely extended the prohibition preventing transgender individuals from entering the military (the "Accession Directive"); (2) it required the military to authorize the discharge of transgender service members (the "Retention Directive"); and (3) it largely halted the use of DOD or Department of Homeland Security ("DHS") resources to fund sex reassignment surgical procedures for current military members ("Sex Reassignment Surgery Directive") (collectively, "Directives"). (Id. at 47.) The DOD was to submit a plan implementing the 2017 Presidential Memorandum by February 2018. (Id.)

On September 14, 2017, Defendant Mattis, the current Secretary of Defense, issued an "Interim Guidance" which established the temporary DOD policy regarding transgender persons. DoD Interim Guidance on Military Service by Transgender Individuals (September 2017), available at https://defense.gov/Portals/1/Documents/PDFs/Military-Service-By-Transgender-Individuals-Interim-Guidance.pdf (last visited September 13, 2018). While the Interim Guidance was in effect, no current transgender service member could be discharged or denied reenlistment solely based on their transgender status. Id.

///
///
///

1. **Military Transgender Policy before July 2017**

    In August 2014, the DOD removed references to mandatory exclusion based on gender and identity disorders from its physical disability policy.  ("Declaration of Eric K. Fanning," Dkt. No. 22 ¶¶ 12–13.)  Additionally, the DOD directed each branch of the armed forces to assess whether there remained any justification to prohibit service by openly transgender individuals.  (Id. at 13.)

    In July 2015, then-Secretary of Defense Ashton B. Carter created a group to begin comprehensively analyzing whether any justification remained which validated the ban on open service by transgender individuals.  ("Declaration of Brad Carson," Dkt. No. 26 ¶¶ 8–9.)  The working group created by Secretary Carter included the Armed Services, the Joint Chiefs of Staff, the service secretaries, and other specialists from throughout the DOD (the "Working Group").  (Id. ¶ 9.)  As part of the review process, the Working Group analyzed evidence from a variety of sources, including scholarly materials and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders of units with transgender service members.  (Id. ¶ 10.)

    In addition, the Working Group commissioned the RAND Corporation, a nonprofit research institution that provides analysis to the military, to complete a comprehensive study on the impact of permitting transgender individuals to serve openly.  (Id. ¶ 11.)  The 113-page study, "Assessing the Implications of Allowing Transgender Personnel to Serve Openly" (the "RAND Report," Dkt. No. 26, Exh. B), examined factors such as the health care costs and readiness implications of allowing open service by transgender persons.  The RAND Report also analyzed the other 18 foreign militaries which permit military service by transgender individuals, focusing on Australia, Canada, Israel, and the United Kingdom—the four countries "with the most well-developed and publicly available policies on transgender military personnel."  (RAND Report at 23.)  This comparative analysis found no evidence that allowing open service by transgender persons would negatively affect operational effectiveness, readiness, or unit cohesion.  (Id. at 24.)  Moreover, the RAND Report concluded healthcare costs for transgender service members would "have little impact on and represents an exceedingly small proportion of [the DOD's] overall health care expenditures."  (Id. at 22–23.)  Specifically, the RAND Report found health care costs would increase "by between $2.4 million and $8.4 million annually."  (Id. at 22.)  By contrast, the overall healthcare cost of those serving in the active component of the military is approximately $6 billion annually, while the overall healthcare cost for the DOD is $49.3 billion annually.  (Id. at 22–23.)  Furthermore, the RAND Report noted discharging transgender service members, "[a]s was the case in enforcing the policy on homosexual conduct, [] can involve costly administrative processes and result in the discharge of personnel with valuable skills who are otherwise qualified."  (Id. at 77.)  At the conclusion of its analysis, the Working Group "did not identify any basis for a blanket prohibition on open military service of transgender people.  Likewise, no one suggested . . . that a bar on military service by transgender persons was necessary for any reason, including readiness or unit cohesion."  (Declaration of Eric K. Fanning ¶ 27.)

Case 8:17-cv-01799-JGB-KK Document 124 Filed 09/18/19 Page 4 of 14 Page ID #:6391
Case 1:18-cv-00069-RC Document 400-7 Filed 06/15/19 in TXSD Page 279 of 390

25a

Based on the results of this review process, on June 30, 2016, Secretary Carter issued a Directive-type Memorandum announcing transgender Americans may serve openly and without fear of being discharged based solely on that status. ("DTM 16-005," Dkt. No. 22, Exh. C.) Secretary Carter stated:

> These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability and retention, is consistent with military readiness and with strength through diversity.

(Id. at 135.)

Some of the highest ranking military officials in the country concurred with this assessment. (See generally Declaration of Eric K. Fanning; "Declaration of Michael Mullen," Dkt. No. 21; "Declaration of Raymond E. Mabus," Dkt. No. 23; "Declaration of Deborah L. James," Dkt. No. 24.) According to the directive, transgender individuals would be permitted to enlist in the military and serve openly beginning on July 1, 2017. (DTM 16-005, at 137.) This date was later postponed to January 1, 2018. (See Dkt. No. 28, Exh. E.) The DOD also issued handbooks, regulations, and memoranda which instructed military commanders how to implement the new policies, set forth guidance related to medical treatment provisions, and expressly prohibited discrimination on the basis of gender identity. (See "Transgender Service in the U.S. Military," Dkt. No. 22, Exh. 6.)

The former military leaders among the Working Group, such as former Secretary of the Army Eric K. Fanning, former Chairman of the Joint Chiefs of Staff Admiral Michael Mullen, former Secretary of the Navy Raymond E. Mabus, and former Secretary of the Air Force Deborah L. James, have all explicitly drawn parallels between allowing open service by transgender persons and permitting open service by gay and lesbian persons. (See Declaration of Eric K. Fanning ¶¶ 10–16; Declaration of Michael Mullen ¶¶ 9–15; Declaration of Raymond E. Mabus ¶¶ 19, 24; Declaration of Deborah L. James ¶ 44.) These leaders contend that many of the same concerns relating to open transgender service were vocalized, and eventually allayed, in the context of ending "Don't Ask Don't Tell." (See Declaration of Eric K. Fanning ¶¶ 10–16; Declaration of Admiral Michael Mullen ¶¶ 9–15; Declaration of Raymond E. Mabus ¶¶ 19, 24; Declaration of Deborah L. James ¶ 44.)

## 2. Military Transgender Policy after July 2017

On July 26, 2017, President Trump changed course, announcing via Twitter that transgender individuals would not be permitted to serve in the military. (President Trump's Twitter Proclamation.) One month later, his 2017 Presidential Memorandum promulgated the Accession Directive, Retention Directive, and Sex Reassignment Surgery Directive. (2017 Presidential Memorandum.) President Trump claimed the Obama Administration had "dismantled the [DOD and DHS's] established framework by permitting transgender individuals

Case 8:17-cv-01799-JGB-KK   Document 124   Filed 09/16/19   Page 5 of 14   Page ID #:6392
Case 7:18-cv-00068   Document 400-7   Filed on 06/15/19 in TXSD   Page 280 of 390

26a

to serve openly in the military." (Id.)  Additionally, he stated the Obama Administration failed to identify a sufficient basis to conclude ending the longstanding policy against open transgender service "would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." (Id.)

The military reception to President Trump's policy change was somewhat critical. Current Chairman of the Joint Chiefs of Staff Joseph Dunford disagreed with the decision to reinstate the transgender ban, stating he "believe[s] that any individual who meets the physical and mental standards . . . should be afforded the opportunity to continue to serve." (Dkt. No. 28, Exh. I.)  He also previously told lawmakers transgender troops have served the military honorably, and he would continue to abide by this sentiment for as long as he holds his position. (Id.)  Additionally, it is not clear whether the nation's top military leaders were consulted about this policy change prior to President Trump's Twitter Proclamation. (See Dkt. No. 28, Exh. M.) Moreover, after the promulgation of President Trump's tweets, 56 retired generals and admirals signed a declaration stating a ban on open service by transgender persons would degrade military readiness. (Dkt. No. 28, Exh. O.)

The Accession Directive would have extended the policy prohibiting open accession into the military beyond January 1, 2018.  The Retention and Sex Assignment Surgery Directives were to take effect on March 23, 2018. (Id.)  However, a series of judicial orders, including the Court's December Order, preliminarily enjoined the government from enacting these policies. See Doe 1 v. Trump, 275 F. Supp. 3d 167 (D.D.C. 2017); Stone v. Trump, 280 F. Supp. 3d 753 (D. Md. 2017); Karnoski v. Trump, No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017).  To date, these injunctions remain in place.

### 3.  The Mattis Memorandum

On February 22, 2018, Defendant Mattis promulgated a memorandum which recommended that President Trump revoke his prior 2017 Presidential Memorandum in order for the military to implement a new policy. ("Mattis Memorandum," Dkt. No. 83-1.)  Defendant Mattis states he "created a Panel of Experts [("the Panel")] comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders and directed them to consider [the issue of transgender military service] and develop policy proposals based on data, as well as their professional military judgment . . . ." (Id. at 1.)  The Panel "met with . . . transgender Service members" and "reviewed available information on gender dysphoria . . . and the effects of gender dysphoria on military effectiveness, unit cohesion, and resources." (Id. at 1–2.)  Based on the work of the Panel, the DOD concluded there are "substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria, and require, or have already undertaken, a course of treatment to change their gender." (Id. at 2.) Additionally, exempting those individuals could "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." (Id.)  The Mattis Memorandum also criticized the RAND Report, noting it "contained significant shortcomings," "referred to limited and heavily caveated data to support its conclusions, glossed over the impacts of healthcare costs, readiness, and unit cohesion, and

Case 8:17-cv-01799-JGB-KK Document 124 Filed 09/18/19 Page 6 of 14 Page ID #:6393
Case 7:18-cv-00058 Document 400-7 Filed on 06/15/19 in TXSD Page 281 of 390

27a

erroneously relied on the selective experiences of foreign militaries . . . ." (Id.) Defendant Mattis concluded the DOD should adopt the following policies:

> Transgender persons with a history or diagnosis of gender dysphoria are disqualified from military service, except under the following limited circumstances: (1) if they have been stable for 36 consecutive months in their biological sex prior to accession; (2) Service members diagnosed with gender dysphoria after entering into service may be retained if they do not require a change of gender and remain deployable within applicable retention standards; and (3) currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and received medically necessary treatment for gender dysphoria.

> Transgender persons who require or have undergone gender transition are disqualified from military service.

> Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex.

(Id. at 2–3.) Defendant Mattis also sent President Trump a report which detailed why, in the opinion of the DOD, this new policy would be necessary to further the interests of the military. ("DOD Report," Dkt. No. 83-2.) President Trump issued a new memorandum on March 23, 2018, which revoked the 2017 Presidential Memorandum and allowed the DOD to implement its preferred policy. ("2018 Presidential Memorandum," Dkt. No. 83-3.) Given these developments, Defendants ask the Court to dissolve the preliminary injunction issued in the Court's December Order. (Motion at 2.)

### 4. Karnoski v. Trump

On April 13, 2018, the Honorable Marsha J. Pechman issued an order which partially granted plaintiffs' motion for summary judgment in a similar case. Karnoski v. Trump, No. C17-1297-MJP, 2018 WL 1784464 (W.D. Wash. Apr. 13, 2018). In Karnoski, the defendants made several of the same arguments advanced here, such as mootness, standing, and level of deference to the DOD Report. Id. Judge Pechman held that discrimination against transgender persons should be subject to strict scrutiny. Id. at *10–11. However, the court declined to determine the level of deference due to the DOD Report. Id. at 11–13. Additionally, the court held that the preliminary injunction already issued should remain in effect, and struck the defendants' motion to dissolve the preliminary injunction. Id. at *14. The defendants appealed this decision, and that appeal is currently pending before the Ninth Circuit. The Ninth Circuit recently ruled that the preliminary injunction should remain in place during the pendency of the appeal in order to preserve the status quo. (Karnoski, et al. v. Trump, et al., No. 18-35347, Dkt. No. 90.) Thus, under the current legal landscape, the Ninth Circuit has begun the process of reviewing the Karnoski decision, including the order upholding the preliminary injunction and striking

Case 8:17-cv-01799-JGB-KK Document 124 Filed 05/15/19 Page 7 of 14 Page ID #:6394
Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 282 of 390

28a

defendants' motion to dissolve, and has maintained the preliminary injunction while <u>Karnoski</u> is under review.

## II. LEGAL STANDARD

The basic function of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits. <u>Univ. of Texas v. Camenisch</u>, 451 U.S. 390, 392 (1981). To obtain a preliminary injunction, a party must either show (1) a combination of probable success and the possibility of irreparable harm, or (2) the balance of hardship tips in its favor and the party has raised serious questions. <u>Arcamuzi v. Continental Air Lines, Inc.</u>, 819 F.2d 935, 937 (9th Cir. 1987); <u>see also</u> <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008) (holding that, to obtain a preliminary injunction, a movant must show: (1) likelihood of success on the merits; (2) irreparable harm; (3) balance of equities tips in his favor; and (4) an injunction is in the public interest). A district court has discretion to dissolve or to modify a preliminary injunction if factual or legal circumstances have changed since the issuance of the injunction. <u>See</u> <u>Mariscal-Sandoval v. Ashcroft</u>, 370 F.3d 851, 859 (9th Cir. 2004). "A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." <u>Sharp v. Weston</u>, 233 F.3d 1166, 1170 (9th Cir. 2000).

## III. DISCUSSION

### A. Mootness

Defendants contend Plaintiffs' challenge is now moot because any dispute over the new policy "presents a substantially different controversy" than Plaintiffs' challenge to the 2017 Presidential Memorandum. (Motion at 8.) Defendants state the appropriate question is whether the "challenged conduct continues" or whether the policy "has been sufficiently altered as to present a substantially different controversy from the one [previously] decided." (<u>Id.</u> (quoting <u>Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.</u>, 508 U.S. 656, 662 n.3 (1993)).) Defendants argue Plaintiffs' original challenge was premised on the assumption that President Trump had ordered a categorical ban excluding transgender individuals for reasons not supported by prevalent military judgment. (Motion at 8.) The new policy, Defendants argue, contains several exceptions which would allow "some" transgender individuals to serve and is the product of "independent military judgment following extensive study." (<u>Id.</u>) Defendants maintain this new policy turns "on the basis of a medical condition and its associated treatment," and does not implement the 2017 Presidential Memorandum. (Reply at 2.) These arguments fail.

The enactment of a new policy does not moot a challenge to a previous one where, as here, the new one differs little from the first. In <u>City of Jacksonville</u>, the city enacted an ordinance which required it to set aside a certain percentage of its money each year for "Minority Business Enterprises" ("MBE's"). 508 U.S. at 658. The plaintiff challenged this policy, and a district court entered a preliminary injunction against the city. <u>Id.</u> at 659. The city later repealed

Case 8:17-cv-01799-JGB-KK Document 124 Filed 09/18/19 Page 8 of 14 Page ID #:6395
Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 283 of 390

29a

its MBE ordinance and replaced it with a new ordinance which had three principal differences: (1) it now applied just to women and black people, not to women and other minority groups; (2) the percentage of money set aside for these businesses became a percentage range rather than a set percentage figure; and (3) there were now five alternative methods for achieving the city's participation goals. Id. at 661. In its discussion on mootness, the Supreme Court noted:

> There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so. *Nor does it matter that the new ordinance differs in certain respects from the old one.* City of Mesquite [,455 U.S. 283 (1982),] does not stand for the proposition that it is only the possibility that the selfsame statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect. The gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment to black- and female-owned contractors—and, in particular, insofar as its "Sheltered Market Plan" is a "set aside" by another name—*it disadvantages them in the same fundamental way.*

Id. at 669 (emphasis added). Here, President Trump stated the essence of the first policy in his Twitter proclamation: transgender people will no longer be able to serve in the U.S. military. (President Trump's Twitter Proclamation.) In keeping with that proclamation, the first policy banned the accession and retention of transgender individuals. (2017 Presidential Memorandum). The policies described in the 2017 Presidential Memorandum and the 2018 Presidential Memorandum are fundamentally the same. Indeed, President Trump specifically announced this review process along with the first policy. (2017 Presidential Memorandum). This new policy specifically bans transgender individuals from serving in the military in a manner consistent with their gender identity. (Mattis Memorandum.) It excludes anyone who requires or has undergone gender transition, and requires proof that a person has been stable in their birth sex for the last thirty-six months. (Id.) In sum, it disadvantages transgender service members "in the same fundamental way." City of Johnsonville, 508 U.S. at 669.

Defendants contend this policy has exceptions which will allow some transgender individuals to serve in the military (Motion at 5–6), yet these very exceptions expose the policy as being substantially the same as the first. To start, all transgender individuals "who require or have undergone gender transition are disqualified from military service." (Mattis Memorandum at 2–3.) Yet, transgender individuals "without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex." (Mattis Memorandum at 2–3.) Additionally, people *with* gender dysphoria who do not require or have not undergone gender transition are exempted from the policy as long as they are "willing and able to adhere to all standards associated with their biological sex." (Id.) Taken together, it is clear that a diagnosis of gender dysphoria is neither necessary nor sufficient to be excluded from the military under this new policy. What is both necessary and sufficient to be excluded, irrespective of a diagnosis of gender dysphoria, is a person serving consistent with their

Case 3:17-cv-01799-GB-KK Document 124 Filed 09/18/19 Page 5 of 14 Page ID #:396
Case 8:18-cv-00063-Document 400-7 Filed on 06/15/19 in TXSD Page 284 of 390

30a

transgender identity. In short, the policy aims to eliminate a person's *trans*ness, and nothing else. See Karnoski, 2018 WL 1784464, at *12 ("Requiring transgender people to serve in their biological sex does not constitute open service in any meaningful way, and cannot reasonably be considered an exception to the Ban. Rather, it would force transgender service members to suppress the very characteristics that defines them as transgender in the first place.") (internal quotation marks omitted); see also Christian Legal Soc'y v. Martinez, 561 U.S. 661, 689 (2010) (rejecting purported distinction between targeting same-sex intimate conduct and discriminating against gay people).

For the purpose of mootness, the controversy presented by the new policy is substantively the same as the controversy presented by the old policy. Transgender individuals will be disadvantaged "in the same fundamental way." City of Jacksonville, 508 U.S. at 669. Defendants have appropriately informed the Court that it must decide whether the challenged conduct continues. (Motion at 8.) It clearly does.

## B. Constitutional Review

### 1. Military Deference and Rational Basis Review

Defendants argue this new policy triggers rational basis review because it "draws lines on the basis of a medical condition (gender dysphoria) and an associated treatment (gender transition), not on transgender status." (Motion at 10.) This characterization, however, does not match reality. As noted above, a diagnosis of gender dysphoria is neither necessary nor sufficient for a person to be excluded from the military under this new policy. Yet the discussion does not end here, as Defendants also argue they are entitled to deference becasue the new policy is a military decision. (Id. (citing, e.g., Rostker v. Goldberg, 453 U.S. 57, 67 (1981) ("Congress is [not] free to disregard the Constitution when it acts in the area of military affairs . . . but the tests and limitations to be applied may differ because of the military context"); Goldman v. Weinberger, 475 U.S. 503, 507 (1986) ("Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society.")).) This deferential review is most appropriate when the military acts with measure, and not "unthinkingly or reflexively." Rostker, 453 U.S. at 72.

In the Court's December Order, it noted "the only serious study and evaluation concerning the effect of transgender people in the armed forces led the military leaders to resoundingly conclude there was no justification for the ban." (December Order at 18.) Following the promulgation of this Order, Defendants conducted their own study and have submitted their own report. (DOD Report; Mattis Memorandum.) The DOD has concluded that "accommodating gender transition would create unacceptable risks to military readiness; undermine good order, discipline, and unit cohesion; and create disproportionate costs." (Motion at 15 (citing Mattis Memorandum at 2).) However, there are several reasons why the DOD Report and the new policy are not entitled to military deference.

Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 285 of 390
Case 3:17-cv-01799-JOB-KRC Document 124 Filed 09/18/19 Page 10 of 14 Page ID #:6397

31a

First, the new policy and DOD Report represent after-the-fact justifications for the military ban on transgender service members. The relevant timeline is as follows: On July 26, 2017, President Trump announced that "*After consultation with my Generals and military experts*, please be advised that the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military." (President Trump's Twitter Proclamation (emphasis added).) With this statement, President Trump made two things clear: (1) he had already consulted the relevant military experts who presumably provided information on how to proceed; and (2) the decision had been made to ban transgender individuals from serving in the military. The Interim Guidance and 2017 Presidential Memorandum formalized the policy announced in the initial proclamation. Following a series of defeats in the courts, including specific rebukes for not having an adequate military record to justify the ban, the DOD now, in 2018, has conducted a study which attempts to rationalize a decision made on July 26, 2017—a decision which, purportedly, already followed such a consultation with military experts.

As noted above, the new policy is essentially the same as the first policy, which distinguishes this case from Trump v. Hawaii, 138 S. Ct. 2392 (June 26, 2018). There, the Supreme Court upheld President Trump's authority to restrict entry of nationals from seven countries "whose systems for managing and sharing information about their nationals the President deemed inadequate." Id. at 2404. The immigration policy at issue underwent two substantive revisions before being squarely presented to the Supreme Court. Id. at 2403–04. In that case, there were serious allegations of religious animus levied at President Trump due to pronouncements, on multiple occasions, that he sought to implement a "Muslim ban." Id. at 2435–38 (Sotomayor, J. dissenting) (noting that President Trump, as a candidate, was "calling for a total and complete shutdown of Muslims entering the United States," which progressed to a characterization of his policy as "a suspension of immigration from countries where there's a proven history of terrorism") (internal quotation marks omitted) . Notably, the final immigration policy before the Supreme Court did not concern a total Muslim ban as originally called for by then-Candidate Trump. Instead, the policy before the Supreme Court concerned seven specific countries, only five of which contained Muslim-majority populations. Id. at 2421. This, then, would cover only 8% of the world's Muslim population. Id. Additionally, three Muslim-majority countries were specifically removed from an earlier iteration of this immigration policy. Id. at 2422.

This case is distinguishable from Hawaii. Here, Trump specifically announced that he was banning transgender people from the military. This second iteration of the policy continues to do exactly that. The evolving limiting principles present in the Hawaii immigration policy revisions are absent here. Additionally, then-Candidate Trump specifically called for a Muslim ban at some point in the future. Here, President Trump announced the United States Government will not accept or allow transgender individuals, a decision which had followed military consultation. This language directly implies the necessary study has already concluded. For these reasons, Hawaii is inapposite to the present discussion.

Perhaps conceding the DOD Report represents an after-the-fact justification for the original transgender ban, Defendants argue Schlesinger v. Ballard, 419 U.S. 498 (1975), offers an

Case 3:17-cv-00066-KRC-RAC Document 124-7 Filed 06/15/19 in TXSD Page 286 of 390
Case 3:17-cv-00066-KRC Document 124 Filed 09/18/19 Page 12 of 14 Page ID #:6398

32a

example of when the Supreme Court accepted such a justification. (Motion at 11.) There, the Court upheld a statutory scheme under which male naval officers who failed to be promoted were subject to a shorter mandatory discharge schedule than female officers under the same circumstances. Schlesinger, 419 U.S. at 499–505. In discussing the rationale behind this difference in treatment, the Supreme Court noted that "Congress may thus quite rationally have believed that women line officers had less opportunity for promotion than did their male counterparts . . . ." Id. at 577. Defendants note that the dissent criticized the majority for "conjur[ing] up a legislative purpose." Id. at 500 (Brennan, J. dissenting). Plaintiffs contend the Supreme Court looked to whether a sufficient justification for the law existed at the time of its enactment. (Opposition at 12.) Upon review of this case, it is unclear whether the language Defendants quote represents an acceptance of an after-the-fact justification. However, language in other Supreme Court cases is not so ambiguous. See United States v. Virginia, 518 U.S. 515, 531 (1996) (noting that the government must proffer a justification which is "exceedingly persuasive," "genuine," "not hypothesized," not "invented *post hoc* in response to litigation," and "must not rely on overbroad generalizations"); Sessions v. Morales-Santana, 137 S. Ct. 1678, 1696 (2017) ("It will not do to hypothesize or invent governmental purposes for gender classifications *post hoc* in response to litigation.") (internal quotations omitted).

For these reasons, the Court finds Defendants are not entitled to rational-basis review pursuant to the doctrine of military deference. Although Karnoski explicitly found that transgender discrimination should be subject to strict scrutiny, this Court has already found that intermediate scrutiny is appropriate. (December Order at 19 (citing Schwenk v. Hartford, 204 F.3d 1187, 1201–02 (9th Cir. 2000) ("both [the Gender Motivated Violence Act and Title VII] prohibit discrimination based on gender as well as sex. Indeed, for the purposes of these two acts, the terms 'sex' and 'gender' have become interchangeable." Additionally, sex-based discrimination can include discrimination based on someone failing "to conform to socially-constructed gender expectations."); Norsworthy v. Beard, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); Olive v. Harrington, No. 115CV01276BAMPC, 2016 WL 4899177, at *5 (E.D. Cal. Sept. 14, 2016)).)

## 2. Intermediate Scrutiny

"A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." Sharp v. Weston, 233 F.3d 1166, 1170 (9th Cir. 2000). Under intermediate scrutiny, Defendants must proffer a justification for this new policy which is substantially related to an exceedingly persuasive justification. Virginia, 518 U.S. at 533. Defendants state the transgender ban advances three separate interests: (1) promoting military readiness based on deployability; (2) promoting unit cohesion based on concerns about maintaining sex-based standards; and (3) lowering costs. (Motion at 14–23.) The Court previously considered and rejected Defendants' third argument. (December Order at 19 ("[Defendants'] reliance on cost is unavailing, as precedent shows the ease of cost and administration cannot not survive intermediate scrutiny even if it is significant. Frontiero v. Richardson, 411 U.S. 677, 688–91 (1973)").) Accordingly, the Court will focus on Defendants' first two arguments.

Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 287 of 390
Case 8:17-cv-01799-JGB-KRC Document 124 Filed 09/18/18 Page 12 of 14 Page ID #:6399

33a

### i.  Military Readiness

Notably, Defendants continue to assert the operative question is whether a person suffers from gender dysphoria. (Motion at 15.)  However, as discussed above, this focus misses the mark, as a diagnosis of gender dysphoria is neither necessary nor sufficient to be excluded from the military under this policy.  Consequently, the Court is not persuaded by Defendants' fears of increased mental instability for those who suffer from gender dysphoria. (Id. at 14–16.)  People with gender dysphoria are explicitly exempted from this new policy as long as they do not present as transgender. (Mattis Memorandum at 2–3.)  Likewise, Defendants' concern that those who undergo gender transition surgery could negatively affect deployability is not substantially related to the actual effect of this policy.  Defendants state the majority of current transgender service member treatment plans include a request for gender transition surgery. (Motion at 22–23.)  However, the Mattis Memorandum bans all individuals who present as transgender from the military, not only those who have undergone gender transition surgery. (Mattis Memorandum at 2–3.)  The decision to ban the accession of people who have undergone gender transition surgery is thus one part of the whole policy, and the purported rationalization for this decision, though contested by Plaintiffs, cannot be used to justify the whole policy even if assumed to be valid.  In sum, the concerns voiced by Defendants are not substantially related to the effect of the policy, nor are these concerns exceedingly persuasive.

### ii.  Unit Cohesion

Defendants first argue that any transgender service member accommodation policy which "does not require full sex-reassignment surgery could 'erode reasonable expectations of privacy that are important in maintaining unit cohesion, as well as good order and discipline.'" (Motion at 18 (quoting DOD Report at 37).)  Defendants premise their argument by stating the only feasible way for transgender service members to serve in the military would involve requiring them to submit to sex reassignment surgery. (Id. at 18–19.)  Defendants then state that allowing service members "who have developed . . . the anatomy of their identified gender to use the facilities of either their identified gender or biological sex would invade the expectations of privacy of the non-transgender service members who share those quarters." (Id. at 19 (citing DOD Report at 37) (internal quotations omitted).)  Thus, Defendants argue the military faces two choices: create separate facilities for transgender service members, which is deemed "logistically impracticable," or be presented with "irreconcilable privacy demands." (Id. (citing DOD Report at 37).)  Additionally, Defendants cite to a specific instance where a commanding officer faced dueling equal opportunity complaints—one from a transgender woman with male sex organs who wanted to use the female shower facilities, and one from the other female service members in the unit. (Id.)

In response, Plaintiffs cite to a litany of non-binding cases to support their contention that Courts across the country have held that allowing transgender individuals to live in accord with their identity does not threaten the privacy or safety interests of others. (Opposition at 7 (citing, e.g., Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034,

34a

1046–47 (7th Cir. 2017); <u>M.A.B. v. Bd. of Educ. of Talbot Cty.</u>, 286 F. Supp. 3d 704, 724–26 (D. Md. 2018)).)  Defendants note that none of Plaintiffs' cited cases concern the military context. (Reply at 10.)

The military has often used concerns regarding unit cohesion to contest permitting open service by individuals in minority groups.  In <u>Log Cabin Republicans v. U.S.</u>, the court ruled that that the military's "don't ask, don't tell" policy ("DADT"), which banned open service by gay persons, violated the First Amendment of the Constitution.  716 F. Supp. 2d 884 (C.D. Cal. 2010).[1]  The court made this determination despite the government's argument that DADT "is necessary to protect unit cohesion and heterosexual service members' privacy."  <u>Id.</u> at 920.  In finding DADT "is not necessary to protect the privacy of service [] members," <u>id.</u> at 923, the court relied upon testimony given by various officers in the military who attested there was no nexus between DADT and a loss of unit cohesion.  <u>Id.</u> at 921–22; <u>see also</u> <u>Witt v. U.S. Dep't of Air Force</u>, 739 F. Supp. 2d 1308, 1315 (W.D. Wash. 2010) (finding that open gay service would not affect unit cohesion, and noting that the "men and women of the United States military have over the years demonstrated the ability to accept diverse peoples into their ranks and to treat them with the respect necessary to accomplish the mission, whatever that mission might be. That ability has persistently allowed the armed forces of the United States to be the most professional, dedicated and effective military in the world.").  Notably, these concerns were also present in "past efforts to stop the integration of blacks and women into the armed forces; efforts bolstered by arguments that history and common sense proved wrong."  <u>Witt v. U.S. Dep't of Air Force</u>, 444 F. Supp. 2d 1138, 1143 (W.D. Wash. 2006), <u>aff'd in part, rev'd in part sub nom.</u> <u>Witt v. Dep't of Air Force</u>, 527 F.3d 806 (9th Cir. 2008); <u>see also</u> <u>Dahl v. Sec'y U.S. Navy</u>, 830 F. Supp. 1319 (E.D. Cal. 1993) (citing a DOD report as stating "Most of the issues raised regarding the effect that admitting declared homosexuals would have on unit cohesion . . . are also reminiscent of the arguments advanced against the 1948 order to desegregate military establishments, and later the arguments that sought to minimize the role of women Armed Forces.  Those who resist changing the traditional policies support their position with statements of the negative effects on discipline, morale, and other abstract values of military life.").

In the history of military service in this country, "the loss of unit cohesion" has been consistently weaponized against open service by a new minority group.  Yet, at every turn, this assertion has been overcome by the military's steadfast ability to integrate these individuals into effective members of our armed forces.  As with blacks, women, and gays, so now with transgender persons.  The military has repeatedly proven its capacity to adapt and grow stronger specifically by the inclusion of these individuals.  Therefore, the government cannot use "the loss of unit cohesion" as an excuse to prevent an otherwise qualified class of discrete and insular minorities from joining the armed forces.  The Court finds this justification of the transgender ban is not exceedingly persuasive and cannot survive intermediate scrutiny.

---

[1] A subsequent opinion vacated this decision on the grounds that the original case had become moot due to Congress voluntarily enacting the Don't Ask, Don't Tell Repeal Act of 2010.  <u>Log Cabin Republicans v. U.S.</u>, 658 F.3d 1162 (9th Cir. 2011).

Case 1:18-cv-00068 Document 400-7 Filed on 06/15/19 in TXSD Page 289 of 390
Case 3:17-cv-01799-JGB-KK Document 124 Filed 09/18/18 Page 14 of 14 Page ID #:6401

35a

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motion to Dissolve the Preliminary Injunction.


**IT IS SO ORDERED.**

# DEF-INTERV.
# EX. 45



**Office of the Attorney General**
**Washington, D. C. 20530**

September 13, 2018

MEMORANDUM FOR:      HEADS OF CIVIL LITIGATING COMPONENTS
                               UNITED STATES ATTORNEYS

FROM:                     THE ATTORNEY GENERAL

SUBJECT:               Litigation Guidelines for Cases Presenting the Possibility of
                               Nationwide Injunctions

       This Memorandum provides general guidelines for Department of Justice attorneys involved in litigation challenging a federal government program, regulation, order, or law. Its purpose is to ensure that principled and consistent positions are advocated by the Department's litigators handling cases that present the possibility of overbroad injunctive relief, and that Department attorneys take opportunities as appropriate to reaffirm the constitutional and prudential limitations on the remedial authority available to judges.

       "Nationwide injunctions" purport to bar the federal government from enforcing a law or policy as to any person or organization, anywhere in the United States, regardless whether those persons or organizations are parties to the case, and regardless whether such broad injunctions are necessary to provide relief to the plaintiff in the case. A number of such injunctions in recent years have brought to the fore the problem of judges acting outside the bounds of their authority and granting relief that reaches far beyond the confines of the particular case or controversy before them. Consistent with the longstanding position of the Executive Branch under Administrations of both parties, the Department of Justice opposes the issuance of such nationwide injunctions.

       The Department consistently has argued against granting relief outside of the parties to a case. In briefs filed during the Administration of President George W. Bush, for example, the Department argued that "equitable relief must be tailored to the particular final agency action and parties before the court and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs'" Brief for Petitioners at 41, *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (No. 07-463) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The Department under the Administration of President Barack Obama repeated these arguments in briefs filed in *Los Angeles Haven Hospice, Inc. v. Sebelius*, No. 09-5631 (9th Cir. 2010), and *Sequoia Forestkeeper v. Tidwell*, No. 12-16206 (9th Cir. 2012), among others. And more recently, the Department has continued to challenge the entry of nationwide injunctions in a number of cases on constitutional and equitable grounds. *See, e.g.*, Petition for a Writ of Certiorari at 31–33, *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (No. 16-1436) (2017).

Department litigators defending against cases that carry the potential for issuance of a nationwide injunction should maintain the Department's considered and longstanding position. Specifically, litigators should, as appropriate, make arguments to convey that nationwide injunctions (1) exceed the constitutional limitations on judicial power; (2) deviate from longstanding historical exercise of equitable power; (3) impede reasoned discussion of legal issues among the lower courts; (4) undermine legal rules meant to ensure orderly resolution of disputed issues; (5) interfere with judgments proper to the other branches of government; and (6) undermine public confidence in the judiciary. In cases brought pursuant to the Administrative Procedure Act (APA) that present the possibility of a universal vacatur of a challenged rule, litigators should make similar arguments as appropriate, as well as note that nothing in the APA supersedes the traditional equitable limitation of relief to the parties before the court. Litigators should always be mindful of relevant local precedent, and to the extent that binding precedent forecloses any of the foregoing arguments in a particular jurisdiction, litigators should typically preserve those arguments for further appellate review. Under no circumstances should Department litigators make arguments inconsistent with these points, unless with the express authorization of the Deputy Attorney General or the Associate Attorney General, as appropriate.

The information contained in this Memorandum is offered for use by litigators preparing to present these arguments. It is not meant to be exhaustive, and litigators are encouraged to conduct further research when briefing each of these points, as needed.[1]

## I.      Nationwide Injunctions are Inconsistent with Constitutional Limitations on Judicial Power.

Department litigators should remind courts that the constitutional limitations on their authority do not permit them to issue injunctions that extend beyond the parties to the case before them if such action is unnecessary to provide relief to the parties to the case.

Injunctive relief that extends beyond the parties to a case cannot be squared with the Constitution's limitation of the "judicial Power" vested in Article III courts.[2] The Supreme Court, from early in its history, has interpreted the equitable power of Article III courts as the power "to render a judgment or decree upon the rights of the litigant parties" consistent with the exercise of such powers at common law or in English courts of equity. *See Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 718 (1838).

Modern standing doctrine, drawn from Article III's limitation on "the exercise of the judicial power to 'Cases' and 'Controversies,'" requires a plaintiff to "demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe*

---

[1] In order to see the arguments contained herein in the context of a specific case, litigators may wish to consult a brief filed by the Department of Justice that addresses the scope-of-remedy question. The Department's en banc brief in the Seventh Circuit case *City of Chicago v. Sessions*, No. 17-2991, is available for this purpose at https://www.justice.gov/file/1064606/download.

[2] Justice Thomas, concurring in *Trump v. Hawaii*, stated that "[e]ven if Congress someday enacted a statute that clearly and expressly authorized [nationwide] injunctions, courts would need to consider whether that statute complies with the limits that Article III places on the authority of federal courts." 584 U.S. __ (2018) (Thomas, J., concurring) (slip op. at 3 n.2).

2

*Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). But nationwide injunctions often afford relief not only to persons who are not parties to a case, but even to those who would have had no standing to seek an injunction in the first place—thereby affording relief far beyond "the inadequacy that produced the injury in fact that the plaintiff has established." *See Lewis v. Casey*, 518 U.S. 343, 357 (1996).

## II.    Nationwide Injunctions Have No Basis in Equitable Practice.

Department litigators should, as appropriate, emphasize that the recent rise in nationwide injunctions is an ahistorical anomaly inconsistent with centuries of judicial practice by courts sitting in equity. The Supreme Court has recognized the "[g]eneral rule"—rooted in traditional equitable principles—that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (internal quotations and citation omitted). And it has held, more specifically, that the Judiciary Act of 1789, which confers jurisdiction on the federal courts over suits at equity, confers only the authority that was historically available at the time of its enactment. *See Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (The Court "ha[s] long held that 'the jurisdiction'" conferred by the Judiciary Act of 1789, ch. 20, 1 Stat. 73, "over 'all suits . . . in equity' * * * 'is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries.'") (brackets and citations omitted); *see also Trump v. Hawaii*, 584 U.S. __ (2018) (Thomas, J., concurring) (slip op. at 5) (stating that "district courts' authority to provide equitable relief is meaningfully constrained. This authority must comply with longstanding principles of equity that predate this country's founding.").

Nationwide injunctions are a relatively recent phenomenon. They were unknown in the English courts of equity and so were not part of the jurisdictional grant made by the Judiciary Act. *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 425 (2017). Scholars have not identified any such injunctions issued in the U.S. prior to 1963. (The first nationwide injunction appears to have been issued by the D.C. Circuit in *Wirtz v. Baldor Electric Company*, 337 F.2d 518 (D.C. Cir. 1963)). Before that—for close to two hundred years of American judicial history—courts issuing injunctions consistently limited relief to the plaintiffs to a case. In fact, it appears that injunctions with nationwide scope simply were not contemplated; litigants did not request them, and courts did not issue them. *See Bray, supra*, at 438 n.121. Instead, when faced with the types of challenges to federal action that might result in a nationwide injunction today, courts carefully circumscribed their remedies to the parties and case or controversy at hand.[3] *Cf. Trump*, 584 U.S. __, __ (Thomas, J., concurring) (slip op. at 7, 10)

---

[3] New Deal legislation prompted a spate of injunctions, but not of the national sort with which the federal government recently has had to contend. For example, more than 1,600 injunctions issued against the enforcement of the Agricultural Adjustment Act's processing tax—but the government was still able to collect the tax from more than 71,000 taxpayers who had not challenged the tax in court. *See* Report of Attorney General Homer Cummings, *Injunctions in Cases Involving Acts of Congress*, Sen. Doc. No. 42, 75th Cong., 1st Sess., at 3 (Mar. 25, 1937). Similar patterns occurred pursuant to other laws as well.

(noting that "[f]or most of our history, courts understood judicial power as fundamentally the power to render judgments in individual cases," and concluding that nationwide injunctions "are legally and historically dubious.") (quotations and brackets omitted).

Scholars have not found a single example of any judge issuing this type of extreme remedy in the first 175 years of the Republic. It took more than 200 years for the first 22 nationwide injunctions to be issued; recently, courts issued 22 in just over one year.

## III.    Nationwide Injunctions Impede the Consideration of a Disputed Legal Issue By Different Courts.

Department litigators should remind courts of the utility of multiple lower court decisions on a contested legal issue. The issuance of nationwide injunctions seriously impedes decision-making in the federal courts by interfering with percolation of a contested legal issue. One of the primary benefits of our judicial system is the ongoing dialogue that develops over time among the lower courts, whose decisions ordinarily do not bind one another pending review by the Supreme Court. *See Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 488-89 (1900). This dialogue occasionally will lead circuit courts to resolve conflicts on their own; at a minimum, it provides useful information to the Supreme Court in the form of multiple reasoned lower court opinions and the consequences that have flowed from them. The Supreme Court has explicitly affirmed the importance of percolation in the lower courts—particularly when the government is involved—saying that "[g]overnment litigation frequently involves legal questions of substantial public importance," and a rule allowing one court to issue a definitive ruling against the government in such cases "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue. Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari." *See United States v. Mendoza*, 464 U.S. 154, 160 (1984); *see also Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting) ("We have in many instances recognized that when frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement by this Court."); *McCray v. New York*, 461 U.S. 961, 963 (1983) (Stevens, J., statement respecting the denial of certiorari) ("[F]urther consideration of the substantive and procedural ramifications of the problem by other courts will enable us to deal with the issue more wisely at a later date.").

Nationwide injunctions often cut off this organic development and discussion of the law. When a lower court enjoins a federal law, regulation, or policy on a nationwide basis, that decision typically forces the government to appeal and, if necessary, petition for a writ of certiorari—even if a different case might have more cleanly presented the issue, or even if review by another court might have provided helpful additional material for the Supreme Court's eventual consideration. The issuance of an injunction with nationwide scope may also discourage other litigants from challenging that law, rule, regulation, or policy, exacerbating the isolation of the first, purportedly definitive ruling.

4

IV.     **Nationwide Injunctions Undermine Legal Rules Intended to Ensure the Orderly Resolution of Disputed Legal Issues.**

Department litigators should remind courts that the practice of issuing nationwide injunctions improperly undermines well-established legal rules that reflect considered judgments about how to ensure the orderly resolution of disputed legal issues in specific circumstances. First, a court that issues a nationwide injunction flouts the specific mechanism that the law provides for large numbers of similarly situated persons to pursue relief efficiently: the class action system. *See McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) ("Because a class has not been certified, the only interests at stake are those of the named plaintiffs. . . . A wrong done to plaintiff in the past does not authorize prospective, class-wide relief unless a class has been certified. Why else bother with class actions?"); *Zepeda v. INS*, 753 F.2d 719, 727, 730 n.1 (9th Cir. 1983) (holding that "the injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs," because "[plaintiffs] are not entitled to relief for people whom they do not represent. If this elementary principle were not true, there would be no need for class actions."). Class action rules have safeguards in place that are faithful to the limits on judicial power established by the Constitution and that protect the interests of both parties. While class action requirements ensure that each side in a legal dispute is equally bound by the outcome, litigation culminating in a nationwide injunction is lopsided: a win for the plaintiff resulting in a nationwide injunction binds the government, but a win by the government allows additional plaintiffs to continue to challenge a law or policy until one of them succeeds. In other words, the government must litigate a number of suits all across the country and must win them all, while litigants challenging the law or policy need only win once.

Second, nationwide injunctions contravene the principle, recognized by the Supreme Court, that legal issues involving the federal government should be subject to relitigation in different circuits. A nationwide injunction is an attempt at preventing the government from having a second or subsequent opportunity to litigate an issue that it lost as to a single individual plaintiff. But in *Mendoza*, 464 U.S. at 162, which concerned the similar practice of nonmutual offensive collateral estoppel, the Court declared that the latter "does not apply against the [g]overnment in such a way as to preclude relitigation of issues." Instead, in recognition that "the [g]overnment is not in a position identical to that of a private litigant," *id.* at 159 (internal quotation marks and citation omitted), the government should be afforded the opportunity to press its case in different courts and against different plaintiffs.[4]

Third, in some circumstances, nationwide injunctions may result in conflicting obligations placed on the federal government, in which it is logically impossible for the government to comply with all court orders.[5] Such an outcome might leave the Supreme Court as the only court with the

---

[4] Relitigation in different circuits benefits not only the government but also the Supreme Court, as discussed *supra* in Section III.

[5] For example, the government may occasionally face a situation in which one lawsuit seeks to end a particular program or policy, and another simultaneous lawsuit seeks to preserve it. If nationwide injunctions issue in the plaintiffs' favor in both suits, the government will be required by law to take two directly opposing actions.

authority to resolve the conflict. Unless and until the Supreme Court settles the issue, conflicting injunctions may place government agencies and attorneys in the untenable position of choosing which court order to comply with and which to—unavoidably—contravene.

## V.   Nationwide Injunctions Interfere With Judgments that Properly Belong to the Other Branches of Government.

Department litigators should argue, when appropriate, that the issuance of a nationwide injunction interferes with judgments that properly belong to Congress and to the Executive Branch. First, it falls to Congress to establish by statute limited and specific contexts in which a single court has the authority to review agency actions with nationwide applicability. (The Clean Air Act, for example, explicitly assigns certain rule challenges to the D.C. Circuit where the rule is "nationally applicable." *See* 42 U.S.C. § 7607(b)(1).)   Nationwide injunctions may in some instances undermine Congress' authority to determine when definitive review by a single court is appropriate. Second, nationwide injunctions deprive the Executive Branch of the opportunity to determine whether or how to apply a particular ruling beyond the parties in the case. Traditionally, the Executive has had the discretion, taking into account the contours of an adverse lower court ruling, its own policy priorities, and other prudential factors, to decide whether to abide by an adverse ruling even outside of the geographical area in which the ruling is legally binding.[6] *Cf. Mendoza*, 464 U.S. at 161 (recognizing that the conduct of government litigation involves policy choices, including whether and when to appeal adverse rulings). A nationwide injunction takes away that discretion that belongs properly to the Executive Branch.

## VI.   The Availability of Nationwide Injunctions Undermines Public Confidence in the Judiciary.

Department litigators should highlight the institutional dangers to the judiciary raised by the issuance of nationwide injunctions. The availability of nationwide injunctions offers would-be plaintiffs a strong incentive to forum shop. Sophisticated litigants and interest groups carefully choose their federal district court, intra-district division, and corresponding circuit court, with an eye toward the courts most likely to be sympathetic to their claims. Such forum shopping in litigation of high-profile, politically-sensitive cases designed to achieve nationwide injunctions may do lasting harm to the public's confidence in the rule of law and the fairness and impartiality of the federal judiciary.

Nationwide injunctions may further undermine the public's confidence in the judiciary because they may be perceived as a sign of disrespect from one court to another. A lower court issuing a nationwide injunction effectively takes away from the other courts any opportunity they might have had to resolve similar issues pending or soon to come before them. Even worse, a nationwide injunction sometimes has the effect of granting relief to parties that raised the same issues before another court that declined to grant relief to those parties. A judge's refusal to respect

---

[6] When defending a regulation that was promulgated through notice and comment procedures required by the APA, Department attorneys advising their clients after an adverse ruling should note that an agency may not choose to give broader effect to a vacatur ruling that is limited in scope—that is, it may not itself effectively repeal the challenged rule—without again going through notice and comment.

the judgment of his or her colleagues sends a strong signal to the public that their own respect for judicial decision-making is misplaced.

## VII.   In APA Cases:  Universal Vacatur Is Not Contemplated by the APA.

In any case brought pursuant to the APA that presents the possibility of universal vacatur (*i.e.* the possibility that the court might vacate the rule with respect to all persons, even those who are not parties to the case), Department litigators should, as appropriate, and where not inconsistent with circuit precedent, additionally argue that the APA's text should not be read to displace the traditional equitable limitation of relief to the parties before the court.  Some courts have vacated regulations in their entirety, citing the text of the APA's judicial review provision, which instructs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be" arbitrary and capricious, contrary to constitutional rights, in excess of statutory jurisdiction, without observance of procedure, unsupported by substantial evidence, or unwarranted by the facts.  5 U.S.C. § 706; *see also Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409-10 (D.C. Cir. 1998).  But the APA's text does not permit, let alone require, such a broad remedy.  *Cf. Trump*, 584 U.S. ___ (Thomas, J., concurring) (slip op. at 3) ("No statute expressly grants district courts the power to issue universal injunctions.").

First, in some cases the relevant "agency action" that is subject to challenge by a plaintiff is the *application* of a regulation to the plaintiff—not the regulation itself.  The APA authorizes judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  When no special statutory provision "permit[s] broad regulations to serve as the 'agency action,' and thus to be the object of judicial review directly," the final agency action that is the proper object of judicial review must be "some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  If the court finds that a regulation on which the agency relied in taking the concrete action that is the proper subject of legal challenge is legally flawed, the appropriate relief is for the court to invalidate the *concrete action*—that is, to "hold unlawful" the reviewable "agency action," in the APA's terminology.  The court should not go beyond the boundaries of the case and invalidate the regulation itself, which was not properly before the court.  Section 706 cannot authorize "setting aside" an entire regulation under these circumstances.

Second, even where the rule itself is the subject of legal challenge, the text of section 706 does not specify whether the rule, if found invalid, should be set aside *on its face* or *as applied to the challenger*.  In the absence of a clear statement in the APA that it displaces traditional rules of equity, courts should adopt the latter reading of the "set aside" language.  The historical backdrop to the APA's enactment lends further support to this reading.  The absence of nationwide injunctions prior to Congress' enactment of the APA in 1946 (and for over fifteen years thereafter) suggests that the APA was not originally understood to authorize courts to issue such broad relief.

Finally, the APA provides that in the absence of a special statutory review provision, the proper "form of proceeding" under the APA is a traditional suit for declaratory or injunctive relief. *See* 5 U.S.C. 703.  Declaratory and injunctive remedies are equitable in nature and, as discussed

7

*supra*, equitable relief traditionally has been limited to determining the rights of the parties before the court. *See supra* at I-II.

\*          \*          \*

These guidelines are intended only for Department of Justice litigators and should not be relied upon by any party as a limitation on any Department attorney's authority to assert any argument in any particular case or as a standard against which the government's arguments in briefs are to be measured.

# DEF-INTERV. EX. 46

No.

# In the Supreme Court of the United States

---

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT*

---

**PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT**

---

NOEL J. FRANCISCO
*Solicitor General*
*Counsel of Record*
JOSEPH H. HUNT
*Assistant Attorney*
*General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney*
*General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor*
*General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA).  In 2016, this Court affirmed, by an equally divided Court, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined.  See *United States* v. *Texas*, 136 S. Ct. 2271 (per curiam).  In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies.  DHS thus instituted an orderly wind-down of the DACA policy.  The questions presented are as follows:

1.  Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2.  Whether DHS's decision to wind down the DACA policy is lawful.

(I)

## PARTIES TO THE PROCEEDING

Petitioners are Kirstjen M. Nielsen, Secretary of Homeland Security; the U.S. Department of Homeland Security; Jefferson B. Sessions III, Attorney General of the United States; Donald J. Trump, President of the United States; U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; and the United States.

Respondents are Martin Jonathan Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and Carolina Fung Feng, on behalf of themselves and all other similarly situated individuals; Make the Road New York, on behalf of itself, its members, its clients, and all similarly situated individuals; the State of New York; the State of Massachusetts; the State of Washington; the State of Connecticut; the State of Delaware; the District of Columbia; the State of Hawaii; the State of Illinois; the State of Iowa; the State of New Mexico; the State of North Carolina; the State of Oregon; the State of Pennsylvania; the State of Rhode Island;  the State of Vermont; the State of Virginia; and the State of Colorado.

(II)

## TABLE OF CONTENTS

Page

Opinions below ........................................................................ 1
Jurisdiction............................................................................ 2
Statutory provisions involved .................................................. 2
Statement ............................................................................. 3
Reasons for granting the petition ........................................... 13
    A.  The questions presented warrant the Court's
        immediate review ........................................... 14
    B.  These cases squarely present the reviewability and
        the lawfulness of DACA's rescission ............................ 15
    C.  The Court should grant each of the government's
        petitions and consolidate the cases for consideration
        this Term ........................................................ 16
Conclusion ........................................................................... 18
Appendix A — District court memorandum and order
              (Nov. 9, 2017) .............................................. 1a
Appendix B — Notice of appeal (Jan. 8, 2018) ................... 59a
Appendix C — District court amended memorandum &
              order & preliminary injunction
              (Feb. 13, 2018)............................................ 62a
Appendix D — Notice of appeal (Feb. 20, 2018)............... 130a
Appendix E — District court memorandum and order
              (Mar. 29, 2018).......................................... 133a
Appendix F — Notice of appeal (May 21, 2018) ............... 172a
Appendix G — Court of appeals order accepting
              interlocutory appeals (July 5, 2018)........ 175a

## TABLE OF AUTHORITIES

Cases:

    *Arizona* v. *United States*, 567 U.S. 387 (2012) ..................... 3
    *Casa de Maryland* v. *Department of Homeland Sec.*,
        284 F. Supp. 3d 758 (D. Md. 2018) ...................................... 9
    *Department of Homeland Sec.* v. *Regents of the*
        *Univ. of Cal.*, 138 S. Ct. 1182 (2018).................................. 15

(III)

IV

Cases—Continued:                                                    Page

*Heckler* v. *Chaney*, 470 U.S. 821 (1985)...........................3, 10
*Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ..............................3, 4
*Texas* v. *United States*:
    86 F. Supp. 3d 591 (S.D. Tex.), aff'd, 809 F.3d 134 (5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016)..............6
    809 F.3d 134 (5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016)........................................................................6
*United States* v. *Texas*, 136 S. Ct. 2271 (2016) ....................6
*United States, In re*, 138 S. Ct. 443 (2017)............................9

Statutes, regulation, and rules:

Administrative Procedure Act, 5 U.S.C. 551 *et seq.*..............5
    5 U.S.C. 701(a)(2)...........................................................10
Immigration and Nationality Act, 8 U.S.C. 1101 *et seq.*.................................................................................3
    8 U.S.C. 1103(a)(1)...........................................................3
    8 U.S.C. 1158(b)(1)(A).......................................................3
    8 U.S.C. 1182(a) (2012 & Supp. V 2017) .........................3
    8 U.S.C. 1227(a) (2012 & Supp. V 2017) .........................3
    8 U.S.C. 1229b.................................................................3
    8 U.S.C. 1252.................................................................10
Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* ..................8
6 U.S.C. 202(5) (2012 & Supp. V 2017) ...............................3
8 C.F.R. 274a.12(c)(14) .........................................................4
Fed. R. Civ. P.:
    Rule 12(b)(1) ..........................................................10, 16
    Rule 12(b)(6) ................................................10, 11, 12, 16
Miscellaneous:

S. 1291, 107th Cong., 1st Sess. (2001) ..................................4
S. 1545, 108th Cong., 1st Sess. (2003) ..................................4

V

Miscellaneous—Continued:                                    Page

S. 2075, 109th Cong., 1st Sess. (2005) .................................. 4

S. 2205, 110th Cong., 1st Sess. (2007) .................................. 4

S. 3827, 111th Cong., 2d Sess. (2010) .................................. 4

U.S. Citizenship & Immigration Servs.,
  U.S. Dep't of Homeland Sec.:

   *Deferred Action for Childhood Arrivals:*
     *Frequently Asked Questions* (Mar. 8, 2018),
     https://go.usa.gov/xngCd ............................................. 5

   *Frequently Asked Questions: Rescission of*
     *DACA* (Sept. 5, 2017), https://go.usa.gov/
     xPVmE ...................................................................... 8

   *Guidance on Rejected DACA Requests*
     (Feb. 14, 2018), https://go.usa.gov/xPVmG .............. 8

# In the Supreme Court of the United States

———————

No.

KIRSTJEN M. NIELSEN, SECRETARY OF HOMELAND
SECURITY, ET AL., PETITIONERS

*v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

———————

*ON PETITION FOR A WRIT OF CERTIORARI*
*BEFORE JUDGMENT TO THE UNITED STATES*
*COURT OF APPEALS FOR THE SECOND CIRCUIT*

———————

**PETITION FOR A WRIT OF CERTIORARI**
**BEFORE JUDGMENT**

———————

The Solicitor General, on behalf of the Secretary of Homeland Security and other federal parties, respectfully petitions for a writ of certiorari before judgment to the United States Court of Appeals for the Second Circuit.

## OPINIONS BELOW

The order of the district court granting in part and denying in part the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) (App. 1a-58a) is reported at 295 F. Supp. 3d 127.  The order of the district court granting respondents' motion for a preliminary injunction (App. 62a-129a) is reported at 279 F. Supp. 3d 401.  The order of the district court granting in part and denying in part the government's motion to dismiss under Rule 12(b)(6) (App. 133a-171a) is reported at 291 F. Supp. 3d 260.

(1)

2

## JURISDICTION

On November 9, 2017, the district court granted in part and denied in part the government's Rule 12(b)(1) motion (App. 1a-58a), and certified its decision for interlocutory appeal on January 8, 2018. The government filed a notice of appeal of that decision the same day (App. 59a-61a), and the court appeals granted permission to appeal that decision on July 5, 2018 (App. 175a-176a). The district court entered a preliminary injunction on February 13, 2018 (App. 62a-129a). The government filed a notice of appeal of the preliminary injunction on February 20, 2018 (App. 130a-132a). The district court granted in part and denied in part the government's Rule 12(b)(6) motion on March 29, 2018 (App. 133a-171a), and certified its decision for interlocutory appeal on April 30, 2018. The government filed a notice of appeal of that decision on May 21, 2018 (App. 172a-174a), and the court of appeals granted permission to appeal that decision on July 5, 2018 (App. 175a-176a). The court of appeals' jurisdiction over the appeal of the preliminary injunction rests on 28 U.S.C. 1292(a)(1). The court of appeals' jurisdiction over the appeals of the certified rulings rests on 28 U.S.C. 1292(b). The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1) and 28 U.S.C. 2101(e).

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are set forth in the appendix to the petition for a writ of certiorari before judgment in *United States Department of Homeland Security* v. *Regents of the University of California*, also filed today. *Regents* App. 127a-143a.

3

## STATEMENT

1. a. The Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, charges the Secretary of Homeland Security "with the administration and enforcement" of the immigration laws. 8 U.S.C. 1103(a)(1). Individual aliens are subject to removal if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see 8 U.S.C. 1182(a) (2012 & Supp. V 2017); see also 8 U.S.C. 1227(a) (2012 & Supp. V 2017). As a practical matter, however, the federal government cannot remove every removable alien, and a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

For any alien subject to removal, Department of Homeland Security (DHS) officials must first "decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. After removal proceedings begin, government officials may decide to grant discretionary relief, such as asylum or cancellation of removal. See 8 U.S.C. 1158(b)(1)(A), 1229b. And, "[a]t each stage" of the process, "the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*). In making these decisions, like other agencies exercising enforcement discretion, DHS must engage in "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). Recognizing the need for such balancing, Congress has provided that the "Secretary [of Homeland Security] shall be responsible for  *  *  * [e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. 202(5) (2012 & Supp. V 2017).

4

b. In 2012, DHS announced the policy known as Deferred Action for Childhood Arrivals (DACA). See *Regents* App. 97a-101a. Deferred action is a practice in which the Secretary exercises discretion to notify an alien of her decision to forbear from seeking his removal for a designated period. *AADC*, 525 U.S. at 484. Under DHS regulations, aliens granted deferred action may apply for and receive work authorization for the duration of the deferred-action grant if they establish economic necessity. 8 C.F.R. 274a.12(c)(14). A grant of deferred action does not confer lawful immigration status or provide any defense to removal. DHS retains discretion to revoke deferred action unilaterally, and the alien remains removable at any time.

DACA made deferred action available to "certain young people who were brought to this country as children." *Regents* App. 97a. The INA does not provide any exemptions or special relief from removal for such individuals. And, dating back to at least 2001, bipartisan efforts to provide such relief legislatively had failed.[1] Under the DACA policy, following successful completion of a background check and other review, an alien would receive deferred action for a period of two years, subject to renewal. *Id.* at 99a-100a. The policy made clear that it "confer[red] no substantive right, immigration status or pathway to citizenship," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." *Id.* at 101a.

---

[1] See, *e.g.*, S. 1291, 107th Cong., 1st Sess. (2001); S. 1545, 108th Cong., 1st Sess. (2003); S. 2075, 109th Cong., 1st Sess. (2005); S. 2205, 110th Cong., 1st Sess. (2007); S. 3827, 111th Cong., 2d Sess. (2010).

5

DHS explained that information provided in the DACA request process would be protected from disclosure for the purpose of immigration enforcement proceedings unless certain criteria related to national security or public safety were satisfied, or the individual met the requirements for a Notice to Appear. USCIS, DHS, *Deferred Action for Childhood Arrivals: Frequently Asked Questions* (Mar. 8, 2018), https://go.usa.gov/xngCd. DHS also stated, however, that this information-sharing policy "may be modified, superseded, or rescinded at any time without notice," and that it "may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 6.

Later, in 2014, DHS created a new policy of enforcement discretion referred to as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). See *Regents* App. 102a-110a. Through a process expressly designed to be "similar to DACA," DAPA made deferred action available for certain individuals who had a child who was a U.S. citizen or lawful permanent resident. *Id.* at 107a. At the same time, DHS also expanded DACA by extending the deferred-action period from two to three years and by loosening the age and residency criteria. *Id.* at 106a-107a.

c. Soon thereafter, Texas and 25 other States brought suit in the Southern District of Texas to enjoin DAPA and the expansion of DACA. The district court issued a nationwide preliminary injunction, finding a likelihood of success on the claim that the DAPA and expanded DACA memorandum was a "'substantive' rule that should have undergone the notice-and-comment rule making procedure" required by the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.*

6

*Texas* v. *United States*, 86 F. Supp. 3d 591, 671 (S.D. Tex. 2015); see *id.* at 607, 647, 664-678.

The Fifth Circuit affirmed the injunction, holding that the DAPA and expanded DACA policies likely violated both the APA and the INA. *Texas* v. *United States*, 809 F.3d 134, 146, 170-186 (2015). The court of appeals concluded that plaintiffs had "established a substantial likelihood of success on the merits of their procedural claim" that DAPA and expanded DACA were invalidly instituted without notice and comment. *Id.* at 178. The court also concluded, "as an alternate and additional ground," that the policies were substantively contrary to law. *Ibid.* The court observed that the INA contains an "intricate system of immigration classifications and employment eligibility," and "does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Id.* at 184, 186 n.202. It also noted that Congress had repeatedly declined to enact legislation "closely resembl[ing] DACA and DAPA." *Id.* at 185.

After briefing and argument, this Court affirmed the Fifth Circuit's judgment by an equally divided Court, *United States* v. *Texas*, 136 S. Ct. 2271, 2272 (2016) (per curiam), leaving the nationwide injunction in place.

d. In June 2017, Texas and other plaintiff States in the *Texas* case announced their intention to amend their complaint to challenge the original DACA policy. D. Ct. Doc. 77, at 238-240 (Oct. 6, 2017).[2] They asserted that "[f]or the[] same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was

___

[2] Citations to the district court docket are to *Batalla Vidal* v. *Nielsen*, No. 16-cv-4756.

7

unlawful, the original June 15, 2012 DACA memorandum is also unlawful." *Id.* at 239.

On September 5, 2017, rather than confront litigation challenging DACA on essentially the same grounds that had succeeded in *Texas* before the same court for the DAPA and expanded DACA policies, DHS decided to wind down DACA in an orderly fashion. *Regents* App. 111a-119a. In the rescission memorandum, then-Acting Secretary of Homeland Security Elaine Duke explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation," as well as the Attorney General's view that the DACA policy was unlawful and that the "potentially imminent" challenge to DACA would "likely * * * yield similar results" as the *Texas* litigation, "it is clear that the June 15, 2012 DACA program should be terminated." *Id.* at 116a-117a. The Acting Secretary accordingly announced that, "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the original DACA memorandum was "rescind[ed]." *Id.* at 117a.

The rescission memorandum stated, however, that the government "[w]ill not terminate the grants of previously issued deferred action * * * solely based on the directives in this memorandum" for the remaining two-year periods. *Regents* App. 118a. The memorandum also explained that DHS would "provide a limited window in which it w[ould] adjudicate certain requests for DACA." *Id.* at 117a. Specifically, DHS would "adjudicate —on an individual, case by case basis—properly filed pending DACA renewal requests * * * from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between

8

the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id.* at 117a-118a.

DHS has also made clear that the "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017" DACA rescission. USCIS, DHS, *Guidance on Rejected DACA Requests* (Feb. 14, 2018), https://go.usa.gov/xPVmG; see USCIS, DHS, *Frequently Asked Questions: Rescission of DACA* (Sept. 5, 2017), https://go.usa.gov/xPVmE.

e.   Respondents—including individual DACA recipients, 16 States, and the District of Columbia—brought these two related suits in the Eastern District of New York challenging the rescission of DACA. Collectively, they allege that the termination of DACA is unlawful because it is arbitrary and capricious under the APA; violates the APA's requirement for notice-and-comment rulemaking as well as the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*; denies respondents equal protection and due process; and permits the government to use information obtained through DACA in a manner inconsistent with principles of due process and equitable estoppel. See App. 12a-17a. Similar challenges were filed in the Northern District of California and in the District of Columbia. See, *e.g.*, *Regents of the Univ. of Cal.* v. *Department of Homeland Sec.*, No. 17-cv-5211 (N.D. Cal. filed Sept. 8, 2017); *NAACP* v. *Trump*, No. 17-cv-1907 (D.D.C. filed Sept. 18, 2017). A summary of the proceedings in the Eastern District of New York (*Batalla Vidal*) follows in this petition. A summary of the proceedings in the other district courts can be found in the

9

government's petitions in those cases, filed simultaneously with this one.[3]

2. In *Batalla Vidal*, the government filed the administrative record in October 2017, and the district court set December 15 as the deadline for the government's motion to dismiss. As in the parallel Northern District of California litigation, before the government filed its dispositive motion, the district court permitted respondents to engage in broad discovery and directed a vast expansion of the administrative record. D. Ct. Doc. 90, at 10-11 (Oct. 19, 2017). And, as in *Regents*, the government sought review of the district court's orders in a petition for a writ of mandamus in the court of appeals.

While the government's mandamus petition was pending before the Second Circuit, this Court ordered the district court in *Regents* to resolve the government's threshold arguments and to consider whether interlocutory appeal was appropriate, before considering whether any record expansion was necessary. See *In re United States*, 138 S. Ct. 443, 445 (2017) (per curiam). One week later, the Second Circuit denied the government's petition for writ of mandamus in these cases. 17-3345 C.A. Doc. 171 (Dec. 27, 2017). At the same time, however, the court of appeals recognized—as had this Court—that the burdensome obligations imposed by the district court's orders could be obviated if the district court were "to certify its ruling [on the government's threshold defenses] for interlocutory appeal," and noted that "it may be prudent for the District Court

---

[3]  The government largely prevailed in a similar challenge to the rescission filed in the District of Maryland. See *Casa de Maryland* v. *Department of Homeland Sec.*, 284 F. Supp. 3d 758 (2018). An appeal of that decision is pending before the Fourth Circuit.

10

to stay discovery pending the resolution of such proceedings." *Id.* at 4.  Following the court of appeals' decision, on December 30, 2017, the district court stayed its orders requiring expansion of the administrative record and authorizing discovery.  Those orders remain stayed.

3. While the litigation over the record proceeded, the government filed its motion to dismiss these suits under Federal Rule of Civil Procedure 12(b)(1) and (6). D. Ct. Doc. 95 (Oct. 27, 2017).  On November 9, the district court denied in part and granted in part the government's motion to dismiss under Rule 12(b)(1).  App. 1a-58a.

The district court first rejected the government's argument that the rescission of DACA was unreviewable under the APA because it was "committed to agency discretion by law," 5 U.S.C. 701(a)(2).  App. 24a-34a.  It distinguished *Chaney*, *supra*, on the grounds that (1) these cases concern the rescission of a policy of non-enforcement, rather than the refusal to take a specific enforcement action, and (2) in the court's view the rescission was not based on a "complicated balancing" of factors "within [the agency's] expertise," but on DHS's determination that the DACA policy was unlawful. App. 29a (quoting *Chaney*, 470 U.S. at 831) (brackets in original).  The court also held that the INA, 8 U.S.C. 1252, did not require respondents' claims to be channeled through that statute's review scheme because the rescission of DACA itself "did not trigger any specific enforcement proceedings."  App. 35a.

The district court dismissed on standing grounds the respondents' claim that DHS failed to provide sufficient notice of the rescission, as well as the States' claims based on DHS's alleged change in its information-sharing

11

policy.  App. 134a-171a.  But it found that respondents
adequately alleged standing to raise their remaining
claims (including the individual respondents' claims
based on DHS's alleged change in its information-sharing
policy).  App. 39a-56a.  And it deferred consideration of
the government's motion to dismiss under Rule 12(b)(6).
App. 57a-58a.

The district court subsequently granted the govern-
ment's request to certify the court's decision for inter-
locutory appeal.  The government filed a notice of ap-
peal of that decision, App. 59a-61a, and petitioned the
Second Circuit for permission to appeal.

4.  On February 13, 2018, the district court granted
respondents' motion for a preliminary injunction re-
quiring DHS to "maintain the DACA program on the
same terms and conditions that existed" before the re-
scission.  App. 126a; see App. 62a-129a.

The district court held that respondents were likely
to succeed on their claim that DHS's decision to rescind
DACA was arbitrary and capricious, concluding that
the decision rests on an "erroneous legal conclusion that
the DACA program is unlawful and unconstitutional,"
and on the "factually erroneous premise" that the
courts in the *Texas* litigation had recognized "'constitu-
tional defects . . . as to DAPA.'"  App. 91a, 105a (capi-
talization and citation omitted).  It also noted that the
decision "appears to be internally inconsistent" because
the Attorney General concluded that the policy was
unconstitutional, but DHS ordered a wind-down of the
policy rather than an immediate termination.  App. 107a.

The district court rejected the government's argu-
ment that the decision is based on the practical implica-
tions of retaining the policy, given its doubtful legality.

12

The court concluded that the Attorney General's statement that "it is likely that potentially imminent litigation" would lead the *Texas* court to hold DACA unlawful did not reflect "a reasoned assessment of 'litigation risk'" and that the record did not otherwise reflect such an assessment. App. 110a-111a. The court also reasoned that, even if the record did indicate that litigation risk had been taken into account, the rationale was not sufficiently explained, and failed to take "account of reliance interests [the DACA] program has engendered." App. 113a.

After concluding that the balance of harms tipped in respondents' favor, the district court issued a preliminary injunction requiring the government to maintain the DACA policy nationwide, subject to some limitations. App. 126a. Specifically, like the preliminary injunction issued in the *Regents* litigation, the court indicated that DHS was not required to consider new requests for DACA or requests for "advanced parole" from existing DACA recipients, and could adjudicate DACA renewal requests "on a case-by-case, individualized basis." *Ibid.* The government filed a notice of appeal from the district court's preliminary injunction order on February 20, 2018. App. 130a-132a.

5. On March 29, 2018, the district court issued an order granting in part and denying in part the rest of the government's motion to dismiss under Rule 12(b)(6). App. 133a-171a.

The district court denied the motion to dismiss with respect to respondents' claim that the rescission was arbitrary and capricious "[f]or the reasons stated in" its preliminary-injunction decision. App. 137a. It also declined to dismiss respondents' equal-protection claim, concluding that campaign statements by then-candidate

13

Trump "raise a plausible inference" that DHS's decision to rescind DACA was motived by discriminatory animus. App. 152a-153a. The court dismissed respondents' claims based on DHS's alleged change in its information-sharing policy because, in light of DHS's public announcements, respondents had not "plausibly alleged that DHS actually changed its information-sharing policy." App. 160a. And it dismissed respondents' remaining claims against the rescission of DACA, including with respect to notice-and-comment, the Regulatory Flexibility Act, and procedural due process. App. 146a, 170a.[4]

The district court again granted the government's motion to certify its decision for interlocutory appeal. The government filed a notice of appeal of that decision, App. 130a-132a, and again petitioned the Second Circuit for permission to appeal.

6. On July 5, 2018, the Second Circuit granted the government's petitions for interlocutory appeal of the district court's November 2017 and March 2018 orders, App. 175a-176a, and on July 25 the court of appeals consolidated the pending appeals. Oral argument is tentatively scheduled for January 2019.

**REASONS FOR GRANTING THE PETITION**

These cases concern the Executive Branch's authority to revoke a discretionary policy of non-enforcement that is sanctioning an ongoing violation of federal immigration law by nearly 700,000 aliens. The DACA policy is materially indistinguishable from the related policies

---

[4] The district court also declined to dismiss respondents' due-process claim based on DHS's alleged failure to process certain renewal requests that arrived late to DHS or contained clerical errors. App. 170a. The government does not challenge that ruling here.

14

that the Fifth Circuit held were contrary to federal immigration law in a decision that four Justices of this Court voted to affirm.  No one contends that the policy is required by federal law.  And, in fact, consistent with the view of the Department of Justice, DHS has decided that the policy is unlawful and should be adopted only by legislative action, not unilateral executive action. Yet as a result of nationwide preliminary injunctions issued by the District Courts in the Northern District of California and the Eastern District of New York, DHS has been required to keep the policy in place, now more than a year since the agency's decision.

The government today is filing petitions for writs of certiorari before judgment to the Second, Ninth, and D.C. Circuits, each of which has before it a decision concluding that the rescission of DACA either is or likely is unlawful.  As explained in the *Regents* petition, those decisions are wrong and they warrant this Court's immediate review.  The government presents each of these petitions to ensure that the Court has an adequate vehicle in which to resolve the questions presented in a timely and definitive manner.  The government respectfully submits that the Court should grant each petition for a writ of certiorari before judgment, consolidate these cases for decision, and consider this important dispute this Term.

### A.  The Questions Presented Warrant The Court's Immediate Review

The government's petition in *Regents* explains in detail why a grant of certiorari is necessary in order to obtain an appropriately prompt resolution of this important dispute.  *Regents* Pet. 15-17.  More than eight months ago, this Court recognized the need for an "ex-

15

peditious[]" resolution of this dispute in its order dismissing without prejudice the government's petition for a writ of certiorari before judgment in *Department of Homeland Security* v. *Regents of the University of California*, 138 S. Ct. 1182 (2018). Absent certiorari before judgment, even if a losing party were immediately to seek certiorari from a decision of one of the courts of appeals, this Court would not be able to review that decision in the ordinary course until next Term at the earliest. In the interim, the government would be required to retain a discretionary non-enforcement policy that DHS and the Attorney General have correctly concluded is unlawful and that sanctions the ongoing violation of federal law by more than half a million people. And the very existence of this litigation (and resulting uncertainty) would continue to impede efforts to enact legislation addressing the legitimate policy concerns underlying the DACA policy.

**B. These Cases Squarely Present The Reviewability And The Lawfulness Of DACA's Rescission**

The cases pending before the Second Circuit squarely present both of the questions presented. The respondents raise all of the principal challenges to the lawfulness of the rescission of DACA, including that it is arbitrary and capricious, that it should have gone through notice-and-comment rulemaking, and that it violates equal-protection and due-process principles. The government moved to dismiss all of respondents' claims on justiciability and merits grounds. And although the district court relied solely on respondents' arbitrary-and-capricious claim in entering a preliminary injunction, the court addressed the government's justiciability arguments in its November 9 order denying the govern-

16

ment's motion to dismiss under Rule 12(b)(1), and ad-
dressed all of the government's merits arguments in its
March 29 order denying the government's motion to
dismiss under Rule 12(b)(6).  The appeals of all three
orders, moreover, have been consolidated before the
Second Circuit.  A grant of certiorari before judgment
would therefore bring before this Court all of the rele-
vant questions.

### C.  The Court Should Grant Each Of The Government's Petitions And Consolidate The Cases For Consideration This Term

To ensure an adequate vehicle for the timely and de-
finitive resolution of this dispute, the Court should
grant the government's petition in this case, as well as
the petitions in *Regents* and *NAACP*, and consolidate
the cases for further review.

As noted in the *Regents* petition, the cases that are
the subject of this petition in many ways replicate the
cases in the parallel litigation that are the subject of
the *Regents* petition.  The respondents in each set of cases
present essentially the same challenges to the rescis-
sion of DACA.  The district courts entered identical na-
tionwide preliminary injunctions based exclusively on
respondents' arbitrary-and-capricious claims, but then
passed on the remaining claims in orders denying the
government's motions to dismiss all of respondents'
claims.  In both sets of cases, the relevant orders from
the district courts have all been certified and accepted
for interlocutory appeal and have been consolidated be-
fore the respective courts of appeals.

Because the *Regents* cases have already been before
the Court twice before and because, in light of this
Court's previous order, the Ninth Circuit is likely to is-

17

sue a decision before the Court even considers the government's certiorari petitions, the Court may prefer to grant certiorari in *Regents* over these cases.  The Court should, at a minimum, hold this petition pending resolution of the *Regents* petition and any further proceedings before this Court.  An order vacating the injunction issued in *Regents* would have no practical consequence unless the injunction in these cases was similarly vacated.

The government respectfully submits, however, that the Court should grant all three petitions and consolidate the cases for this Court's review.  In so doing, the Court would ensure that no intervening developments in the lower courts—for example, a reversal of the preliminary injunction by the Ninth Circuit—would impede or complicate the Court's ability to reach all of the claims against the rescission of DACA on which respondents have prevailed in the lower courts and thus provide a definitive resolution of this dispute this Term.

18

## CONCLUSION

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*
JOSEPH H. HUNT
*Assistant Attorney*
*General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney*
*General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor*
*General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

NOVEMBER 2018

# DEF-INTERV.
# EX. 47

No.

# In the Supreme Court of the United States

―――――

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

―――――

*ON PETITION FOR A WRIT OF CERTIORARI*
*BEFORE JUDGMENT TO THE UNITED STATES*
*COURT OF APPEALS FOR THE NINTH CIRCUIT*

―――――

**PETITION FOR A WRIT OF CERTIORARI**
**BEFORE JUDGMENT**

―――――

NOEL J. FRANCISCO
*Solicitor General*
*Counsel of Record*
JOSEPH H. HUNT
*Assistant Attorney*
*General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney*
*General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor*
*General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA).  In 2016, this Court affirmed, by an equally divided Court, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined.  See *United States* v. *Texas*, 136 S. Ct. 2271 (per curiam).  In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies.  DHS thus instituted an orderly wind-down of the DACA policy.  The questions presented are as follows:

1.  Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2.  Whether DHS's decision to wind down the DACA policy is lawful.

(I)

## PARTIES TO THE PROCEEDING

Petitioners are the Donald J. Trump, President of the United States; Jefferson B. Sessions III, Attorney General of the United States; Kirstjen M. Nielsen, Secretary of Homeland Security; U.S. Department of Homeland Security; and the United States.

Respondents are the Regents of the University of California; Janet Napolitano, President of the University of California; the State of California; the State of Maine; the State of Maryland; the State of Minnesota; the City of San Jose; Dulce Garcia; Miriam Gonzalez Avila; Saul Jimenez Suarez; Viridiana Chabolla Mendoza; Norma Ramirez; Jirayut Latthivongskorn; the County of Santa Clara; and Service Employees International Union Local 521.

(II)

**TABLE OF CONTENTS**

Page

Opinions below ........................................................................ 1
Jurisdiction ............................................................................. 2
Statutory provisions involved ................................................ 2
Statement ................................................................................ 2
Reasons for granting the petition ........................................ 14
    I.    The questions presented warrant this Court's
        immediate review ....................................................... 15
    II.   The decisions below are wrong .................................. 17
        A.  DACA's rescission is unreviewable under
            the APA ................................................................ 17
        B.  DACA's rescission is lawful ................................. 23
            1.  The rescission is reasonable in light of
                DHS's serious doubts about the legality of
                the DACA policy ........................................... 23
            2.  The rescission is reasonable in light of
                DHS's additional and independent policy
                concerns ...................................................... 27
            3.  The rescission is reasonable in light of
                DHS's correct determination that DACA
                is unlawful .................................................. 28
            4.  The rescission does not violate equal
                protection or due process ............................. 30
    III.  The Court should grant certiorari before
        judgment in all three cases ......................................... 32
Conclusion ............................................................................ 34
Appendix A — District court order denying FRCP
                        12(b)(1) dismissal and granting
                        provisional relief (Jan. 9, 2018) .................. 1a
Appendix B — District court order granting in part
                        defendants' motion to dismiss under
                        FRCP 12(b)(6) (Jan. 12, 2018) ................. 71a
Appendix C — Notice of appeal (Jan. 16, 2018) ................. 91a
Appendix D — Court of appeals order (Jan. 25, 2018) ....... 96a

(III)

IV

Table of Contents—Continued:                    Page

Appendix E  —  Memorandum on Exercising
                 Prosecutorial Discretion with Respect
                 to Individuals Who Came to the United
                 States as Children (June 15, 2012) .......... 97a
Appendix F  —  Memorandum on Exercising
                 Prosecutorial Discretion with Respect
                 to Individuals Who Came to the United
                 States as Children and with Respect to
                 Certain Individuals Who Are the
                 Parents of U.S. Citizens or Permanent
                 Residents (Nov. 20, 2014) ...................... 102a
Appendix G  —  Memorandum on Rescission of Deferred
                 Action for Childhood Arrivals
                 (Sept. 5, 2017) ........................................... 111a
Appendix H  —  Memorandum from Secretary Kirstjen
                 M. Nielsen (June 22, 2018) ..................... 120a
Appendix I  —  Statutory provisions .................................. 127a

## TABLE OF AUTHORITIES

Cases:

*Arizona* v. *United States*, 567 U.S. 387 (2012) ........... 2, 3, 19

*Bowman Transp., Inc.* v. *Arkansas-Best Freight*
   *Sys., Inc.*, 419 U.S. 281 (1974) ........................................... 24

*Casa de Maryland* v. *Department of Homeland Sec.*,
   284 F. Supp. 3d 758 (D. Md. 2018) ...................................... 8

*Dames & Moore* v. *Regan*, 453 U.S. 654 (1981)................. 17

*FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502
   (2009)................................................................................. 23

*Harlow* v. *Fitzgerald*, 457 U.S. 800 (1982) ........................ 28

*Heckler* v. *Chaney*, 470 U.S. 821 (1985)..................... *passim*

*I.C.C.* v. *Brotherhood of Locomotive Eng'rs*,
   482 U.S. 270 (1987)....................................................... 18, 21

*Jennings* v. *Rodriguez*, 138 S. Ct. 830 (2018) .................... 22

V

Cases—Continued:                                                    Page

*Lincoln* v. *Vigil*, 508 U.S. 182 (1993) .................................. 18

*Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto.
Ins. Co.*, 463 U.S. 29 (1983) ..................................... 23, 26, 29

*Reno* v. *American-Arab Anti-Discrimination
Comm.*, 525 U.S. 471 (1999) .........................3, 19, 22, 30, 31

*Texas* v. *United States*:

86 F. Supp. 3d 591 (S.D. Tex.), aff'd,
809 F.3d 134 (5th Cir. 2015), aff'd,
136 S. Ct. 2271 (2016) .................................... 5

809 F.3d 134 (5th Cir. 2015), aff'd,
136 S. Ct. 2271 (2016) ............................5, 6, 24, 25, 29

*Texas* v. *United States*, No. 18-cv-68,
2018 WL 4178970 (S.D. Tex. Aug. 31, 2018).............. 16, 25

*Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200
(1994)......................................................................... 22

*Trump* v. *Hawaii*, 138 S. Ct. 2392 (2018)........................... 31

*United States* v. *Armstrong*, 517 U.S. 456
(1996).................................................................. 19, 28, 30

*United States* v. *Nixon*, 418 U.S. 683 (1974)...................... 17

*United States* v. *Texas*, 136 S. Ct. 2271 (2016) .............. 6, 16

*Wayte* v. *United States*, 470 U.S. 598 (1985) ..................... 20

*Youngstown Sheet & Tube Co.* v. *Sawyer*,
343 U.S. 579 (1952).............................................. 17

Constitution, statutes, regulation, and rules:

U.S. Const.:
Art. III............................................................................ 31
Amend. V (Due Process Clause)................................... 30
Administrative Procedure Act,
5 U.S.C. 551 *et seq.*.............................................. 5
5 U.S.C. 701(a)(2)................................... 9, 17, 18, 19, 127a
5 U.S.C. 706(2)(A)................................................ 23, 128a

VI

Statutes, regulation, and rules—Continued:          Page

Federal Food, Drug, and Cosmetic Act,
   21 U.S.C. 301 *et seq.*.................................................... 20
Immigration and Nationality Act,
   8 U.S.C. 1101 *et seq.*.................................................... 2
      8 U.S.C. 1103(a)(1)................................................... 2
      8 U.S.C. 1158(b)(1)(A)............................................. 3
      8 U.S.C. 1182(a) (2012 & Supp. V 2017) ......................... 2
      8 U.S.C. 1227(a) (2012 & Supp. V 2017) ......................... 2
      8 U.S.C. 1229b......................................................... 3
      8 U.S.C. 1252...............................................9, 17, 21, 129a
      8 U.S.C. 1252(b)(9) ............................................. 22, 138a
      8 U.S.C. 1252(g)................................................. 21, 143a
Railway Labor Act, 45 U.S.C. 151 *et seq.* ........................... 21
Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* ............. 8, 12
6 U.S.C. 202(5) (2012 & Supp. V 2017) ............... 3, 19, 28, 29
28 U.S.C. 1254(1) ...................................................... 15
28 U.S.C. 1292(b) ................................................... 11, 12
28 U.S.C. 2101(e) ...................................................... 16
8 C.F.R. 274a.12(c)(14)............................................... 3
Fed. R. Civ. P.:
   Rule 12(b)(1) ................................................... 9, 10, 12
   Rule 12(b)(6) ...................................................... 9, 12
Sup. Ct. R. 11 ......................................................... 16

Miscellaneous:

S. 1291, 107th Cong., 1st Sess. (2001) ................................ 4
S. 1545, 108th Cong., 1st Sess. (2003) ................................ 4
S. 2075, 109th Cong., 1st Sess. (2005) ................................ 4
S. 2205, 110th Cong., 1st Sess. (2007) ................................ 4
S. 3827, 111th Cong., 2d Sess. (2010) ................................. 4

VII

Miscellaneous—Continued:                                    Page

Stephen M. Shapiro et al., *Supreme Court Practice*
   (10th ed. 2013) ................................................................... 17

The White House, *Remarks by the President on
   Immigration* (June 15, 2012), https://go.usa.gov/
   xnZFY .............................................................................. 26

U.S. Citizenship & Immigration Servs.,
   U.S. Dep't of Homeland Sec.:

   *Deferred Action for Childhood Arrivals:
      Frequently Asked Questions* (Mar. 8, 2018),
      https://go.usa.gov/xngCd ....................................... 4, 5

   *Frequently Asked Questions:  Recession of
      DACA* (Sept. 5, 2017), https://go.usa.gov/
      xPVmE .......................................................................... 7

   *Guidance on Rejected DACA Requests*
      (Feb. 14, 2018), https://go.usa.gov/xPVmG .......... 7, 31

# In the Supreme Court of the United States

──────────

No.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

──────────

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE NINTH CIRCUIT*

──────────

**PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT**

──────────

The Solicitor General, on behalf of the United States Department of Homeland Security and other federal parties, respectfully petitions for a writ of certiorari before judgment to the United States Court of Appeals for the Ninth Circuit.

### OPINIONS BELOW

The order of the district court granting respondents' motion for a preliminary injunction and denying the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) (App. 1a-70a) is reported at 279 F. Supp. 3d 1011.  The order of the district court granting in part and denying in part the government's motion to dismiss under Rule 12(b)(6) (App. 71a-90a) is reported at 298 F. Supp. 3d 1304.

(1)

2

## JURISDICTION

On January 9, 2018, the district court denied the government's Rule 12(b)(1) motion, entered a preliminary injunction, and certified its Rule 12(b)(1) decision for interlocutory appeal.  On January 12, 2018, the district court granted in part and denied in part the government's Rule 12(b)(6) motion and certified its decision for interlocutory appeal.  The government filed a notice of appeal of both the January 9 and January 12 orders on January 16, 2018 (App. 91a-95a).  The Ninth Circuit granted permission to appeal both the January 9 and January 12 orders on January 25, 2018.  App. 96a.  The court of appeals' jurisdiction over the appeal of the preliminary injunction rests on 28 U.S.C. 1292(a)(1).  The court of appeals' jurisdiction over the appeal of the certified rulings rests on 28 U.S.C. 1292(b).  The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1) and 28 U.S.C. 2101(e).

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are set forth in the appendix to this petition.  App. 127a-143a.

## STATEMENT

1. a. The Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, charges the Secretary of Homeland Security "with the administration and enforcement" of the immigration laws.  8 U.S.C. 1103(a)(1).  Individual aliens are subject to removal if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law."  *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see 8 U.S.C. 1182(a) (2012 & Supp. V 2017); see also 8 U.S.C. 1227(a) (2012 & Supp. V 2017).  As a

3

practical matter, however, the federal government cannot remove every removable alien, and a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

For any alien subject to removal, Department of Homeland Security (DHS) officials must first "decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. After removal proceedings begin, government officials may decide to grant discretionary relief, such as asylum or cancellation of removal. See 8 U.S.C. 1158(b)(1)(A), 1229b. And, "[a]t each stage" of the process, "the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*). In making these decisions, like other agencies exercising enforcement discretion, DHS must engage in "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). Recognizing the need for such balancing, Congress has provided that the "Secretary [of Homeland Security] shall be responsible for * * * [e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. 202(5) (2012 & Supp. V 2017).

b. In 2012, DHS announced the policy known as Deferred Action for Childhood Arrivals (DACA). See App. 97a-101a. Deferred action is a practice in which the Secretary exercises discretion to notify an alien of her decision to forbear from seeking his removal for a designated period. *AADC*, 525 U.S. at 484. Under DHS regulations, aliens granted deferred action may apply for and receive work authorization for the duration of the deferred-action grant if they establish economic necessity. 8 C.F.R. 274a.12(c)(14). A grant of deferred

4

action does not confer lawful immigration status or provide any defense to removal. DHS retains discretion to revoke deferred action unilaterally, and the alien remains removable at any time.

DACA made deferred action available to "certain young people who were brought to this country as children." App. 97a. The INA does not provide any exemptions or special relief from removal for such individuals. And, dating back to at least 2001, bipartisan efforts to provide such relief legislatively had failed.[1] Under the DACA policy, following successful completion of a background check and other review, an alien would receive deferred action for a period of two years, subject to renewal. App. 99a-100a. The policy made clear that it "confer[red] no substantive right, immigration status or pathway to citizenship," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." App. 101a.

DHS explained that information provided in the DACA request process would be protected from disclosure for the purpose of immigration enforcement proceedings unless certain criteria related to national security or public safety were satisfied, or the individual met the requirements for a Notice to Appear. USCIS, DHS, *Deferred Action for Childhood Arrivals: Frequently Asked Questions* (Mar. 8, 2018), https://go.usa.gov/xngCd. DHS also stated, however, that this information-sharing policy "may be modified, superseded, or rescinded at any time without notice," and that it "may not be relied

---

[1] See, *e.g.*, S. 1291, 107th Cong., 1st Sess. (2001); S. 1545, 108th Cong., 1st Sess. (2003); S. 2075, 109th Cong., 1st Sess. (2005); S. 2205, 110th Cong., 1st Sess. (2007); S. 3827, 111th Cong., 2d Sess. (2010).

5

upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 6.

Later, in 2014, DHS created a new policy of enforcement discretion referred to as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). App. 102a-110a. Through a process expressly designed to be "similar to DACA," DAPA made deferred action available for certain individuals who had a child who was a U.S. citizen or lawful permanent resident. App. 107a. At the same time, DHS also expanded DACA by extending the deferred-action period from two to three years and by loosening the age and residency criteria. App. 106a-107a.

c. Soon thereafter, Texas and 25 other States brought suit in the Southern District of Texas to enjoin DAPA and the expansion of DACA. The district court issued a nationwide preliminary injunction, finding a likelihood of success on the claim that the DAPA and expanded DACA memorandum was a "'substantive' rule that should have undergone the notice-and-comment rule making procedure" required by the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.* *Texas* v. *United States*, 86 F. Supp. 3d 591, 671 (S.D. Tex. 2015); see *id.* at 607, 647, 664-678.

The Fifth Circuit affirmed the injunction, holding that the DAPA and expanded DACA policies likely violated both the APA and the INA. *Texas* v. *United States*, 809 F.3d 134, 146, 170-186 (2015). The court of appeals concluded that plaintiffs had "established a substantial likelihood of success on the merits of their procedural claim" that DAPA and expanded DACA were invalidly instituted without notice and comment. *Id.* at

6

178. The court also concluded, "as an alternate and additional ground," that the policies were substantively contrary to law. *Ibid.* The court observed that the INA contains an "intricate system of immigration classifications and employment eligibility," and "does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Id.* at 184, 186 n.202. It also noted that Congress had repeatedly declined to enact legislation "closely resembl[ing] DACA and DAPA." *Id.* at 185.

After briefing and argument, this Court affirmed the Fifth Circuit's judgment by an equally divided Court, *United States* v. *Texas*, 136 S. Ct. 2271, 2272 (2016) (per curiam), leaving the nationwide injunction in place.

d. In June 2017, Texas and other plaintiff States in the *Texas* case announced their intention to amend their complaint to challenge the original DACA policy. D. Ct. Doc. 64-1, at 238-240 (Oct. 6, 2017).[2] They asserted that "[f]or the[] same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful." *Id.* at 239.

On September 5, 2017, rather than confront litigation challenging DACA on essentially the same grounds that had succeeded in *Texas* before the same court for the DAPA and expanded DACA policies, DHS decided to wind down DACA in an orderly fashion. App. 111a-119a. In the rescission memorandum, then-Acting Secretary of Homeland Security Elaine Duke explained that, "[t]aking into consideration the Supreme Court's

_____

[2] Citations to the district court docket are to *Regents of the University of California* v. *DHS*, No. 17-cv-5211.

7

and the Fifth Circuit's rulings in the ongoing litigation," as well as the Attorney General's view that the DACA policy was unlawful and that the "potentially imminent" challenge to DACA would "likely * * * yield similar results" as the *Texas* litigation, "it is clear that the June 15, 2012 DACA program should be terminated."  App. 116a-117a.  The Acting Secretary accordingly announced that, "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the original DACA memorandum was "rescind[ed]." App. 117a.

The rescission memorandum stated, however, that the government "[w]ill not terminate the grants of previously issued deferred action * * * solely based on the directives in this memorandum" for the remaining two-year periods.  App. 118a.  The memorandum also explained that DHS would "provide a limited window in which it w[ould] adjudicate certain requests for DACA." App. 117a. Specifically, DHS would "adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests * * * from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017."  App. 117a-118a.

DHS has also made clear that the "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017" DACA rescission.  USCIS, DHS, *Guidance on Rejected DACA Requests* (Feb. 14, 2018), https://go.usa.gov/ xPVmG (DHS Information-Sharing Guidance); see

8

USCIS, DHS, *Frequently Asked Questions: Rescission of DACA* (Sept. 5, 2017), https://go.usa.gov/xPVmE.

e. Shortly after DHS's decision to rescind DACA, respondents brought these five related suits in the Northern District of California challenging the rescission of DACA. Collectively, they allege that the termination of DACA is unlawful because it is arbitrary and capricious under the APA; violates the APA's requirement for notice-and-comment rulemaking as well as the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*; denies respondents equal protection and due process; and permits the government to use information obtained through DACA in a manner inconsistent with principles of due process and equitable estoppel. See App. 21a-22a. Similar challenges were filed in the Eastern District of New York and in the District of Columbia. See, *e.g.*, *Batalla Vidal* v. *Nielsen*, No. 16-cv-4756 (E.D.N.Y. filed Sept. 19, 2017); *NAACP* v. *Trump*, No. 17-cv-1907 (D.D.C. filed Sept. 18, 2017). A summary of the proceedings in the Northern District of California (*Regents*) follows in this petition. A summary of the proceedings in the other district courts can be found in the government's petitions in those cases, filed simultaneously with this one.[3]

2. In *Regents*, the government filed the administrative record in October 2017. Litigation ensued in which respondents obtained orders from the district court directing a vast expansion of the administrative record, in addition to immediate discovery. See, *e.g.*, D. Ct. Doc. 79 (Oct. 17, 2017). The government sought review of

_____

[3] The government largely prevailed in a similar challenge to the rescission filed in the District of Maryland. See *Casa de Maryland* v. *Department of Homeland Sec.*, 284 F. Supp. 3d 758 (2018). An appeal of that decision is pending before the Fourth Circuit.

9

those orders in a mandamus petition in the court of appeals, which a divided panel of the Ninth Circuit denied. 875 F.3d 1200 (2017).  After granting a stay of the district court's orders, 138 S. Ct. 371 (2017), this Court granted the government's petition for a writ of certiorari, vacated the Ninth Circuit's judgment, and remanded for further proceedings.  138 S. Ct. 443 (2017) (per curiam).  On remand, the district court stayed its orders requiring expansion of the administrative record and authorizing discovery "pending further order." D. Ct. Doc. 225, at 1 (Dec. 21, 2017).

While the litigation over the record proceeded, the government filed a motion to dismiss all five suits under Federal Rule of Civil Procedure 12(b)(1) and (6).  D. Ct. Doc. 114 (Nov. 1, 2017).  At the threshold, the government argued that respondents' claims are not reviewable because DHS's decision to rescind DACA is committed to agency discretion by law, see 5 U.S.C. 701(a)(2); and because judicial review of the denial of deferred action, if available at all, is barred under the INA prior to the issuance of a final removal order, see 8 U.S.C. 1252. The government also argued that respondents' arbitrary-and-capricious claims fail because DHS rationally explained the decision to wind down the discretionary DACA policy given the Acting Secretary's conclusion that the policy is unlawful and the imminent risk of its being invalidated in the *Texas* case.  Finally, the government argued that respondents' other claims are without merit because the rescission of DACA is exempt from notice-and-comment requirements; does not violate principles of equal protection or due process; and does not change or affect the policies governing the use of aliens' personal information.

10

Respondents opposed the government's motion to dismiss and filed a motion for a preliminary injunction, seeking to prevent the government from rescinding the DACA policy. D. Ct. Doc. 111 (Nov. 1, 2017); D. Ct. Doc. 205 (Nov. 22, 2017).

3. On January 9, 2018, the district court denied the motion to dismiss to the extent it was based on Rule 12(b)(1), and entered a preliminary injunction requiring the government to "maintain the DACA program on a nationwide basis." App. 66a; see App. 1a-70a.

The district court first ruled that the rescission of DACA was not committed to agency discretion by law. The court acknowledged that an agency's decisions "not to prosecute or initiate enforcement actions are generally not reviewable as they are 'committed to an agency's absolute discretion.'" App. 27a (quoting *Chaney*, 470 U.S. at 831). But it concluded that the rescission of DACA was different because it involved a "broad enforcement polic[y]," rather than an "'individual enforcement decision'"; it rescinded a policy of enforcement discretion, instead of announcing a new one; and the "main" rationale for rescinding the prior policy was its "supposed illegality," which the court concluded it was authorized to assess. App. 28a-30a (citation omitted). The court also concluded that the INA did not preclude review because "plaintiffs do not challenge any particular removal but, rather, challenge the abrupt end to a nationwide deferred-action and work-authorization program." App. 30a-31a.

The district court then ruled that respondents were entitled to a preliminary injunction, concluding that they had demonstrated a likelihood of success on their claims that the rescission of DACA was arbitrary and capricious. App. 41a-62a. The court acknowledged that

11

"a new administration is entitled to replace old policies with new policies so long as they comply with the law," App. 2a, and the court did not dispute that DACA was a discretionary non-enforcement policy that was neither mandated nor specifically authorized by statute. It nonetheless concluded that respondents were likely to succeed because "the agency's decision to rescind DACA was based on a flawed legal premise" and because the government's "supposed 'litigation risk' rationale" was an invalid "post hoc rationalization" and, "in any event, arbitrary and capricious." App. 42a.

Finding that respondents had satisfied the remaining equitable requirements for an injunction, App. 62a-66a, the district court ordered the government, "pending final judgment" or other order, "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017." App. 66a. The court specifically directed that the government must "allow[] DACA enrollees to renew their enrollments." *Ibid.*[4]

The district court *sua sponte* certified its order for interlocutory appeal under 28 U.S.C. 1292(b), to the ex-

---

[4] The district court identified certain "exceptions" to its injunction —namely, "(1) that new applications from applicants who have never before received deferred action need not be processed; (2) that the advance parole feature need not be continued for the time being for anyone; and (3) that defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." App. 66a-67a. The court also specified that "[n]othing in [its] order" would prohibit DHS from "remov[ing] any individual, including any DACA enrollee, who it determines poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed." App. 67a.

12

tent it denied the "questions interposed by the government in its motion to dismiss under [Rule] 12(b)(1)." App. 70a.

4.  On January 12, 2018, the district court issued a further order granting in part and denying in part the government's motion to dismiss to the extent it was based on Rule 12(b)(6).  App. 71a-90a.  The court declined to dismiss respondents' arbitrary-and-capricious claims "[f]or the same reasons" stated in its January 9 order.  App. 72a.  It declined to dismiss the equal-protection claim, concluding that respondents' allegations "raise a plausible inference that racial animus towards Mexicans and Latinos was a motivating factor in the decision to end DACA."  App. 87a; see App. 83a-87a. And it declined to dismiss the claim that DHS violated substantive due process by allegedly "chang[ing] its policy" on the use of personal information "provided by DACA recipients," reasoning that such a change would "'shock[] the conscience.'"  App. 79a-81a (citation omitted).   The court dismissed respondents' remaining claims, including with respect to notice-and-comment, the Regulatory Flexibility Act, procedural due process, equitable estoppel, and equal protection based on a fundamental right to a job.  App. 72a-79a, 81a-83a, 87a.  The court again *sua sponte* certified its order for interlocutory appeal pursuant to 28 U.S.C. 1292(b).  App. 89a.

5.  Days later, the government filed notices of appeal of the district court's orders, App. 91a-95a, petitioned the Ninth Circuit for interlocutory appeal of the district court's decisions resolving the government's motion to dismiss under Rule 12(b)(1) and (6), and filed a petition for a writ of certiorari before judgment in this Court.

13

The court of appeals granted the government's petition for interlocutory appeal and consolidated the appeals. App. 96a; see 18-15133 C.A. Doc. 3 (January 26, 2018). On February 26, 2018, this Court denied the government's certiorari petition "without prejudice," stating that it "assumed that the Court of Appeals will proceed expeditiously to decide this case." 138 S. Ct. 1182. But while briefing in the Ninth Circuit was completed on April 17 and oral argument was held on May 15, the court of appeals has not yet issued a decision as of the printing of this petition.[5]

6. In June 2018, current Secretary of Homeland Security Kirstjen Nielsen issued a memorandum in response to the district court in *NAACP* v. *Trump*, *supra*, providing further explanation of DHS's decision to rescind DACA. App. 120a-126a. Secretary Nielsen concluded that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons." App. 122a. First, the Secretary agreed that "the DACA policy was contrary to law" and explained that "[a]ny arguable distinctions between the DAPA and DACA policies" were not "sufficiently material" to convince her otherwise. *Ibid.*; see App. 122a-123a. Second, the Secretary reasoned that, in any event, "[l]ike Acting Secretary Duke, [she] lack[s] sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not." App. 123a.

---

[5] On October 17, 2018, the government informed the court of appeals that, "in order to ensure review by the Supreme Court during its current Term," it intended to file a petition for a writ of certiorari before judgment if the court of appeals did not issue its judgment by October 31. 18-15068 C.A. Doc. 198.

14

She noted that "[t]here are sound reasons for a law en-
forcement agency to avoid discretionary policies that
are legally questionable."  App. 122a-123a.  Third, the
Secretary offered several "reasons of enforcement pol-
icy to rescind the DACA policy," regardless of whether
the policy is "illegal or legally questionable."  App. 123a.
The Secretary also explained that, although she "do[es]
not come to these conclusions lightly," "neither any in-
dividual's reliance on the expected continuation of the
DACA policy nor the sympathetic circumstances of
DACA recipients as a class" outweigh the reasons to
end the policy.  App. 125a.  The government promptly
informed the court of appeals of Secretary Nielsen's
memorandum.  18-15068 C.A. Doc. 184 (June 22, 2018).

## REASONS FOR GRANTING THE PETITION

These cases concern the Executive Branch's author-
ity to revoke a discretionary policy of non-enforcement
that is sanctioning an ongoing violation of federal immi-
gration law by nearly 700,000 aliens.  The DACA policy
is materially indistinguishable from the related policies
that the Fifth Circuit held were contrary to federal im-
migration law in a decision that four Justices of this
Court voted to affirm.  No one contends that the policy
is required by federal law.  And, in fact, consistent with
the view of the Department of Justice, DHS has decided
that the policy is unlawful and should be adopted only
by legislative action, not unilateral executive action.
Yet as a result of nationwide preliminary injunctions is-
sued by the District Courts in the Northern District of
California and the Eastern District of New York, DHS
has been required to keep the policy in place, now more
than a year since the agency's decision.

In denying the government's previous petition for a
writ of certiorari before judgment "without prejudice,"

15

this Court "assumed that the Court of Appeals will proceed expeditiously to decide this case." 138 S. Ct. 1182 (2018). That has not happened. Although the court of appeals heard oral argument on May 15, 2018, it has yet to issue its decision. And while no one, respondents included, contends that the legality of DACA's rescission will be finally resolved without this Court's review, absent prompt intervention from this Court, there is little chance the Court would resolve this dispute for at least *another year*.

Accordingly, the government today is filing petitions for writs of certiorari before judgment to the Second, Ninth, and D.C. Circuits, each of which has before it a decision concluding that the rescission of DACA either is or likely is unlawful. As explained below, those decisions are wrong and they warrant this Court's immediate review. The government presents each of these petitions to ensure that the Court has an adequate vehicle in which to resolve the questions presented in a timely and definitive manner. The government respectfully submits that the Court should grant each petition for a writ of certiorari before judgment, consolidate these cases for decision, and consider this important dispute this Term.

## I. THE QUESTIONS PRESENTED WARRANT THIS COURT'S IMMEDIATE REVIEW

Congress has vested this Court with jurisdiction to review "[c]ases in the courts of appeals * * * [b]y writ of certiorari * * * *before or* after rendition of judgment or decree." 28 U.S.C. 1254(1) (emphasis added). "An application * * * for a writ of certiorari to review a case before judgment has been rendered in the court of appeals may be made at any time before judgment."

16

28 U.S.C. 2101(e). This Court will grant certiorari before judgment "only upon a showing that the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." Sup. Ct. R. 11. These cases satisfy that standard.

An immediate grant of certiorari is necessary to obtain an appropriately prompt resolution of this important dispute. Even if a losing party were immediately to seek certiorari from a decision of one of the courts of appeals, this Court would not be able to review that decision in the ordinary course until next Term at the earliest. In the interim, the government would be required to retain a discretionary non-enforcement policy that DHS and the Attorney General have correctly concluded is unlawful and that sanctions the ongoing violation of federal law by more than half a million people. And the very existence of this litigation (and resulting uncertainty) would continue to impede efforts to enact legislation addressing the legitimate policy concerns underlying the DACA policy.

Such a delay is untenable and unnecessary. This Court is already familiar with the relevant issues in light of its consideration on plenary review of *United States* v. *Texas*, 136 S. Ct. 2271 (2016) (per curiam). And as the same district court that heard the *Texas* case has recently held (and as explained below), the reasoning of the Fifth Circuit's decision in *Texas* holding DAPA and the DACA expansion unlawful equally applies to DACA itself. See *Texas* v. *United States*, No. 18-cv-68, 2018 WL 4178970, at *38 (S.D. Tex. Aug. 31, 2018). Only this Court can resolve the conflict in the lower courts and provide much-needed clarity to the government and DACA recipients alike.

17

More than eight months ago, this Court recognized the need for an "expeditious[]" resolution of this dispute in its order denying without prejudice the government's earlier petition. 138 S. Ct. 1182. The Court has granted certiorari before judgment to promptly resolve other important and time-sensitive disputes. See, *e.g.*, *Dames & Moore* v. *Regan*, 453 U.S. 654, 668 (1981); *United States* v. *Nixon*, 418 U.S. 683, 686-687 (1974); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 584 (1952); cf. Stephen M. Shapiro et al., *Supreme Court Practice* § 4.20, at 287-288 (10th ed. 2013) (collecting cases where "[t]he public interest in a speedy determination" warranted certiorari before judgment). It should follow the same course here.

## II. THE DECISIONS BELOW ARE WRONG

Review is also warranted because the decisions below are incorrect. DHS's decision to rescind DACA—a policy of enforcement discretion—is a classic determination that is "committed to agency discretion by law," 5 U.S.C. 701(a)(2), and therefore unreviewable under the APA. Even if DHS's prospective denial of deferred action were reviewable, that could only be at the behest of an individual alien after a final order of removal was entered against the alien. See 8 U.S.C. 1252. In any event, the decision to rescind the DACA policy is not arbitrary and capricious, does not violate equal-protection or due-process principles, and is not otherwise unlawful.

### A. DACA's Rescission Is Unreviewable Under The APA

1. a. The APA precludes review of agency actions that are "committed to agency discretion by law." 5 U.S.C. 701(a)(2). "Over the years," this Court has interpreted that provision to apply to various types of

18

agency decisions that "traditionally" have been regarded as unsuitable for judicial review. *Lincoln* v. *Vigil*, 508 U.S. 182, 191 (1993). Section 701(a)(2) precludes review of an agency's decision not to institute enforcement actions, *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985); an agency's refusal to reconsider a prior decision based on an alleged "material error," *I.C.C.* v. *Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) (*BLE*); and an agency's allocation of funds from a lump-sum appropriation, *Lincoln*, 508 U.S. at 192. Such exercises of discretion, the Court has explained, often require "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Chaney*, 470 U.S. at 831.

With respect to an agency's enforcement discretion in particular, an agency may "not only assess whether a violation has occurred," but "whether agency resources are best spent on this violation or another"; whether enforcement in a particular scenario "best fits the agency's overall policies"; and whether the agency "has enough resources to undertake the action at all." *Chaney*, 470 U.S. at 831. In addition, the Court has noted that when an agency declines to enforce, it "generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. In this way and others, agency enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Ibid.*

b. DHS's decision to discontinue the DACA policy falls comfortably within the types of agency decisions

19

that traditionally have been understood as "committed to agency discretion." 5 U.S.C. 701(a)(2). Like the decision to *adopt* a policy of selective non-enforcement, the decision whether to *retain* such a policy can "involve[] a complicated balancing" of factors that are "peculiarly within [the] expertise" of the agency, including determining how the agency's resources are best spent and how the policy fits with the agency's overall policies. *Chaney*, 470 U.S. at 831. Likewise, a decision to abandon an existing non-enforcement policy will not, in itself, bring to bear the agency's coercive power over any individual. Indeed, an agency's decision to reverse a prior policy of civil non-enforcement is akin to changes in policy as to criminal prosecutorial discretion, which regularly occur within the U.S. Department of Justice both within and between presidential administrations, and which have never been considered amenable to judicial review. See *United States* v. *Armstrong*, 517 U.S. 456, 464 (1996).

This presumption of nonreviewability applies with particular force when it comes to immigration. As this Court has recognized, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see 6 U.S.C. 202(5) (2012 & Supp. V 2017). And, unlike in the ordinary criminal context, a decision not to enforce tolerates not merely past misconduct but a "continuing violation of United States law." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999). Thus, in the absence of a statutory directive "otherwise circumscribing" the agency's discretion, *Chaney*, 470 U.S. at 833, the Secretary's decisions establishing DHS's enforcement priorities for the Nation's immigration laws are beyond a

20

court's authority to review. There is no such directive here.

c. The district courts' reasons for finding DHS's decision reviewable are unavailing.

First, it makes no difference that the rescission of the DACA policy addressed a "broad enforcement polic[y]," App. 28a, instead of an individual enforcement decision. See *Batalla Vidal* App. 29a-30a. Agency decisions about how its "resources are best spent" or how certain enforcement activity "best fits the agency's overall policies," *Chaney*, 470 U.S. at 831, are just as susceptible to implementation through broad guidance as through case-by-case enforcement decisions. See, *e.g.*, *Wayte* v. *United States*, 470 U.S. 598, 601-603 (1985). And *Chaney* itself concerned the programmatic determination whether to enforce the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 301 *et seq.*, with respect to drugs used to administer the death penalty. See 470 U.S. at 824-825.

Nor does it matter that DHS has *eliminated* a policy of non-enforcement, rather than *adopted* one. App. 29a-30a; *Batalla Vidal* App. 30a. A decision whether to retain a non-enforcement policy implicates all of the same considerations about agency priorities and resources that inform the decision to adopt such a policy in the first instance. And because the rescission does not, by itself, initiate removal proceedings, "like the FDA's non-enforcement decision in *Chaney*, there are no agency proceedings here to provide a 'focus for judicial review,' and DACA's rescission does not itself involve the exercise of coercive power over any person." *NAACP* App. 33a (citation omitted).

Finally, DHS's decision is not reviewable simply because it rests on the agency's view of the legality of the

21

DACA policy, among other independent reasons. App. 30a; *Batalla Vidal* App. 30a; *NAACP* App. 42a-43a. An otherwise unreviewable agency action does not "be-come[] reviewable" because "the agency gives a 'review-able' reason." *BLE*, 482 U.S. at 283. In *BLE*, the ICC's decision not to reconsider a prior decision was therefore unreviewable, even though the agency based that denial on an interpretation of its legal obligations under the Railway Labor Act, 45 U.S.C. 151 *et seq.* 482 U.S. at 276, 283. And in *Chaney*, the Food and Drug Admin-istration's decision not to enforce the misbranding pro-hibition did not become reviewable even though it was based, in part, on the agency's understanding of its au-thority to initiate such proceedings. 470 U.S. at 824. The same is true here.

2. At a minimum, Congress has foreclosed district courts from adjudicating collateral attacks on DHS's discretionary enforcement decisions and policies in the manner pursued by respondents.

Under 8 U.S.C. 1252, judicial review of DHS enforce-ment decisions is generally available, if at all, only through the review procedures of removal orders set forth in that section. In particular, Section 1252(g) states that "[e]xcept as provided in this section * * * no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to com-mence proceedings, adjudicate cases, or execute re-moval orders against any alien under this subchapter." Section 1252(g) is "designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the ba-ses for separate rounds of judicial intervention outside

22

the streamlined process that Congress has designed."
*AADC*, 525 U.S. at 485.  That design is also reflected in
8 U.S.C. 1252(b)(9), which channels into the review of
final removal orders "all questions of law and fact * * *
arising from any action taken * * * to remove an alien
from the United States."  See *AADC*, 525 U.S. at 483
(describing Section 1252(b)(9) is an "unmistakable 'zip-
per' clause"); see also *Jennings* v. *Rodriguez*, 138 S. Ct.
830, 839-841 (2018) (plurality opinion); *id.* at 853-857
(Thomas, J., concurring in part and concurring in the
judgment).

Even in instances where the statutory text less
clearly precludes review, this Court has held that, when
it is fairly discernible that Congress intends a particular
review scheme to be exclusive, a plaintiff is not permit-
ted to circumvent that exclusive scheme by filing a
preemptive district-court action, but must instead pre-
sent his or her claims or defenses in the manner and to
the extent permitted by that review scheme.  See *Thun-
der Basin Coal Co.* v. *Reich*, 510 U.S. 200, 207-209
(1994).  The rescission of the DACA policy is precisely
the sort of "'no deferred action' decision[]," *AADC*,
525 U.S. at 485, and "part of the process by which
[the alien's] removability will be determined," *Jen-
nings*, 138 S. Ct. at 841 (plurality opinion), that Con-
gress intended to channel through the INA's careful re-
view scheme.  Respondents cannot escape that scheme
simply by filing suit before the agency has initiated an
enforcement proceeding against the individual respond-
ents.  Respondents' claims, "if they are reviewable at
all," must be litigated in removal proceedings, not through
"separate rounds of judicial intervention" in federal dis-
trict court.  *AADC*, 525 U.S. at 485.

23

## B. DACA's Rescission Is Lawful

Even if DHS's decision to rescind DACA is reviewable under the APA, it is plainly valid. Under the APA, the decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). That standard of review requires only that the "agency 'examine the relevant data and articulate a satisfactory explanation for its action.'" *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted). "[A] court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). DHS's decision to begin an orderly wind-down of an indisputably discretionary policy of non-enforcement based on serious doubts about the legality of the policy, as well as the legal and practical implications of maintaining such a policy without statutory authority, easily passes that test. The district courts' contrary conclusions are unpersuasive.

### 1. The rescission is reasonable in light of DHS's serious doubts about the legality of the DACA policy

DHS reasonably rested its decision on the legal and practical implications of maintaining a policy of non-enforcement (original DACA) that is materially indistinguishable from policies (DAPA and expanded DACA) that were struck down by the Fifth Circuit in a decision affirmed by this Court. Particularly in the face of the threat by Texas and other States to challenge DACA, that rationale alone provides a permissible reason for initiating an orderly wind-down of the policy.

a. As an initial matter, the district courts in *Regents* and *Batalla Vidal* erred in concluding that "[t]he Attorney General's letter and the Acting Secretary's memorandum can only be reasonably read as stating DACA

24

was illegal and that, given that DACA must, therefore, be ended." App. 56a (emphasis omitted); see *Batalla Vidal* App. 110a. As the court in *NAACP* correctly recognized, DACA's rescission is based on concerns that go beyond the ultimate legality of DACA. Such concerns are evident from the original rescission memorandum. *NAACP* App. 56a; see *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (courts should uphold agency action based on any ground that "may reasonably be discerned" from the decision). And any doubt on that score is eliminated by Secretary Nielsen's subsequent statement that "regardless of whether the DACA policy is ultimately illegal, it was appropriately rescinded by DHS because there are, at a minimum, serious doubts about its legality." App. 123a.

b. That rationale is eminently reasonable. In *Texas* v. *United States*, the Fifth Circuit concluded that DAPA and expanded DACA were unlawful on both procedural and substantive grounds. 809 F.3d 134, 178 (2015), aff'd, 136 S. Ct. 2271 (2016); see *id.* at 147 n.11 (including the "DACA expansions" within the opinion's references to "DAPA"). The entirety of the Fifth Circuit's reasoning applies equally to the original DACA policy. With respect to procedure, the Fifth Circuit concluded that the memorandum creating DAPA and expanding DACA was not exempt from notice-and-comment as a statement of policy based entirely on how the *original DACA policy* had been implemented. See *id.* at 171-178.

As a matter of substance, the Fifth Circuit held that DAPA and expanded DACA were contrary to the INA because (1) "[i]n specific and detailed provisions," the INA already "confers eligibility for 'discretionary re-

25

lief,'" including "narrow classes of aliens eligible for deferred action," *Texas*, 809 F.3d at 179 (citation omitted); (2) the INA's otherwise "broad grants of authority" could not reasonably be construed to assign to the Secretary the authority to create additional categories of aliens of "vast 'economic and political significance,'" *id.* at 183 (citation omitted); (3) DAPA and expanded DACA were inconsistent with historical deferred-action policies because they were not undertaken on a "'country-specific basis * * * in response to war, civil unrest, or natural disasters,'" nor served as a "bridge[] from one legal status to another," *id.* at 184 (citation omitted); and (4) "Congress ha[d] repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ('DREAM Act'), features of which closely resemble DACA and DAPA." *Id.* at 185 (footnote omitted). Every one of those factors also applies to the original DACA policy. Indeed, the Southern District of Texas recently determined, "guided by [that] Fifth Circuit precedent," that the INA could not "'reasonably be construed'" to authorize the maintenance of that policy. *Texas*, 2018 WL 4178970, at *38 (citation omitted); see *id.* at *45-*47 (finding no material differences between DAPA and DACA).[6]

In light of these similarities, DHS could permissibly rescind the DACA policy based on the agency's doubts about the legality of the policy and its likely fate in the courts. As Secretary Nielsen explained, "[a] central aspect of the exercise of a discretionary enforcement pol-

---

  [6] The Southern District of Texas nevertheless declined to issue a preliminary injunction enjoining the DACA policy in light of, among other things, Texas's delay in seeking injunctive relief. See *Texas*, 2018 WL 4178970, at *57-*62.

26

icy is a judgment concerning whether DHS has sufficient confidence in the legality of such policy." App. 123a. The "sound reasons" to insist upon such confidence "include the risk that [legally questionable] policies may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work." *Ibid.* The arbitrary-and-capricious standard does not allow a court "to substitute its judgment" for such a "rational" explanation by a law-enforcement agency. *State Farm*, 463 U.S. at 42-43.

c. Contrary to the district courts' conclusions, DHS did not fail to sufficiently consider the reliance interests of DACA recipients. See App. 58a; *Batalla Vidal* App. 113a-114a; *NAACP* App. 106a-108a. When President Obama announced DACA in 2012, he explained that it was a "temporary stopgap measure," not a "permanent fix." The White House, *Remarks by the President on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY. And, by its own terms, DACA made deferred action available for only two-year periods, which could "be terminated at any time at the agency's discretion." App. 104a. By choosing a gradual and orderly administrative wind-down of the policy rather than risk an immediate disruptive court-imposed one, DHS ensured that existing DACA grants would be permitted to expire according to their stated two-year terms and even permitted a limited window for additional renewals. In any event, as Secretary Nielsen explained, although the agency was "keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives," it reasonably found that any asserted reliance interests did not "outweigh the questionable legality of the DACA policy" or

27

the other factors the agency considered.  App. 125a.  As she observed, "[t]hat is especially so because issues of reliance would best be considered by Congress, which can assess and weigh a range of options."  *Ibid*.  The APA provides no basis to second-guess that judgment.

### 2.  *The rescission is reasonable in light of DHS's additional and independent policy concerns*

DHS's decision to rescind DACA is independently supported by several additional enforcement-policy concerns.  Secretary Nielsen explained that "regardless of whether * * * the DACA policy [is] illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy."  App. 123a.  Those reasons include the agency's determination that (1) "DHS should enforce the policies reflected in the laws adopted by Congress and should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens under the guise of prosecutorial discretion"; (2) "DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis"; and (3) "it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens," especially given that "tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years."  App. 123a-124a.  Respondents may disagree with these assessments, but they cannot be dismissed as irrational.

The *NAACP* court criticized these reasons as nothing more than the Secretary's "attempt to disguise * * * objection[s] to DACA's legality as * * * policy justification[s] for its rescission," *NAACP* App. 100a, and too

28

"cursory" to serve as an independent basis for DHS's decision, *id.* at 102a-103a. That description, however, runs directly counter to the Secretary's explanation that her policy concerns provided a "separate and independently sufficient" reason for her conclusion that the DACA policy "properly was—and should be—rescinded." App. 122a. The presumption of regularity (and principles of inter-Branch comity) require courts to presume that executive officials—and certainly Cabinet officials—are acting in good faith "in the absence of clear evidence to the contrary." *Armstrong*, 517 U.S. at 464 (citation omitted); cf. *Harlow* v. *Fitzgerald*, 457 U.S. 800, 807 (1982). Neither the fact that the Secretary's policy concerns may also inform her view on DACA's legality, nor the succinctness of her explanation, provides remotely sufficient evidence to overcome that presumption.[7]

### 3. *The rescission is reasonable in light of DHS's correct determination that DACA is unlawful*

Finally, DHS's decision is also independently supported by its conclusion, informed by the Attorney General's advice, that indefinitely continuing the DACA policy would itself have been unlawful. As detailed above, the Fifth Circuit had already concluded that the DAPA and expanded DACA policies were invalid in a decision

---

[7] The *NAACP* court also reasoned that the Secretary's "messaging" rationale (the third enforcement-policy reason) was an impermissible "*post hoc* rationalization." See *NAACP* App. 94a-95a. But the court itself acknowledged that the purpose of that proposition of administrative law is "simply to prevent courts from considering 'rationales offered by anyone other than the proper decisionmakers.'" *Id.* at 92a (citation omitted). There is no dispute that Secretary Nielsen is a "proper decisionmaker[]" for matters of immigration enforcement policies and priorities. *Ibid.*; see 6 U.S.C. 202(5) (2012 & Supp. V 2017).

29

that four Justices of this Court voted to affirm. See pp. 24-25, *supra*. And the Attorney General expressed his agreement with the conclusion reached by the Fifth Circuit in a decision that applies equally to the original DACA policy. See App. 116a. DHS's conclusion is correct: DACA is unlawful. Regardless, it cannot be that DHS's decision to rescind DACA on the basis of the Fifth Circuit's decision, this Court's equally divided affirmance, and the Attorney General's opinion was the type of "clear error of judgment," *State Farm*, 463 U.S. at 43 (citation omitted), that would make it arbitrary and capricious under the APA.

In *Regents* and *Batalla Vidal*, the district courts concluded that DHS could not rely on an assessment of DACA's legality unless it is correct as a matter of law. See App. 42a; *Batalla Vidal* App. 91a-92a. Relying on the Secretary's broad discretion in "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. 202(5) (2012 & Supp. V 2017), and DHS's "long and recognized practice" of granting deferred action on a programmatic basis, those courts concluded that DACA is lawful. App. 45a; see App. 42a-48a; *Batalla Vidal* App. 102a-104a. But the Fifth Circuit rejected those precise considerations when offered in support of the DAPA and expanded DACA policies. See *Texas*, 809 F.3d at 183.

In *NAACP*, the district court declined to pass on the legality of DACA, but concluded that DHS did not adequately explain its own view. *NAACP* App. 49a-52a. But, as explained above, the Fifth Circuit's *Texas* decision provides a robust analysis of the legality of DAPA and expanded DACA in a manner that applies with full force to the original DACA policy. See pp. 24-25, *supra*. The Duke and Nielsen memoranda make clear that

30

DHS agrees with the Fifth Circuit's conclusion that the DAPA and expanded DACA policies were unlawful under the INA and sees no meaningful distinctions. See App. 122a ("Any arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful."); App. 117a. The law requires nothing more.

### 4. The rescission does not violate equal protection or due process

The district courts also erred in failing to dismiss respondents' claims that DHS's actions violate equal-protection or due-process principles.

a. In *Regents* and *Batalla Vidal*, the district courts declined to dismiss respondents' claim that the rescission violates equal-protection principles incorporated in the Due Process Clause of the Fifth Amendment. See App. 83a-87a; *Batalla Vidal* App. 147a-157a.[8] But that claim is foreclosed by this Court's decision in *AADC*, which imposed a general bar on discriminatory-motive claims in the immigration-enforcement context. Such claims, the Court explained, "invade a special province of the Executive—its prosecutorial discretion." 525 U.S. at 489; see *Armstrong*, 517 U.S. at 463-465. And in the immigration context, this concern is "greatly magnified" because such claims "permit and prolong a continuing violation of United States law," and also potentially implicate foreign-policy concerns. *AADC*, 525 U.S. at 490. Although the district courts relied heavily on then-candidate Trump's "campaign rhetoric" unconnected to DACA or DACA recipients, App. 85a; *Batalla Vidal*

---

[8] The *NAACP* court declined to reach the equal-protection challenge to the rescission in light of its statutory holding. See *NAACP* App. 67a.

31

App. 152a-153a, neither court suggested that such statements trigger *AADC*'s sole potential exception, reserved for "a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome." 525 U.S. at 491. Indeed, even apart from *AADC*, the President's statements are wholly insufficient to suggest that Secretaries Duke and Nielsen were motivated by racial animus in deciding to rescind a policy sanctioning the ongoing violation of federal immigration law by 700,000 aliens, especially given the serious questions about its legality.

b. The *Regents* court also found that the respondents adequately stated a claim under substantive due process based on DHS's alleged change in its information-sharing policy for personal information gathered from DACA requestors. App. 79a-81a. But there has been no such change and respondents have failed to plausibly allege otherwise. See DHS Information-Sharing Guidance; see also *Batalla Vidal* App. 159a-160a (dismissing a similar claim on that basis); *NAACP* App. 71a-72a (same). Nor would any change to the scope of exceptions to the information-sharing policy violate substantive due process, especially given DHS's express reservation of rights to do so. See pp. 4-5, s*upra*.[9]

---

[9] The district courts also erred in enjoining the rescission of DACA on a nationwide basis. For the reasons given by Justice Thomas in his concurrence in *Trump* v. *Hawaii*, 138 S. Ct. 2392, 2424-2429 (2018), such relief exceeded the Article III power of the court to remedy the concrete and particular injuries of the parties before it; is inconsistent with longstanding equitable principles; and undermines the sound administration of the federal court system.

32

### III. THE COURT SHOULD GRANT CERTIORARI BEFORE JUDGMENT IN ALL THREE CASES

To ensure an adequate vehicle for the timely and definitive resolution of this dispute, the Court should grant the government's petitions in *Regents*, *Batalla Vidal*, and *NAACP*, and consolidate the cases for further review.

A. This petition in *Regents* presents both of the questions presented and all of the relevant claims, including that the rescission of DACA is arbitrary and capricious; denies respondents equal protection and due process; and violates the APA's requirement for notice-and-comment rulemaking. Although the district court's preliminary injunction rests only on respondents' arbitrary-and-capricious claim, the district court addressed the remaining claims in its orders denying the government's motion to dismiss all of respondents' claims on reviewability and merits grounds. By virtue of the Ninth Circuit's acceptance of the interlocutory appeals of those orders and consolidation, a grant of certiorari before judgment would bring before the Court the entire case. Accordingly, this petition should be granted.

B. As fully explained in the *NAACP* petition, the related cases before the D.C. Circuit also raise both questions presented. Respondents in those cases likewise claim that the rescission is arbitrary and capricious; denies respondents equal protection and due process; and violates the APA's procedures concerning notice-and-comment rulemaking. In *NAACP*, however, respondents do not present some of the more tangential claims against the rescission, including, for example, that the rescission violates principles of equitable estoppel. The district court, moreover, did not pass on any constitutional

33

challenges to the rescission. Nevertheless, the Court should also grant certiorari in *NAACP* because that court invited Secretary Nielsen's supplemental memorandum, and it is the only district court to have passed on the effect of that memorandum on the questions presented.

C. Finally, as fully explained in the *Batalla Vidal* petition, the consolidated cases before the Second Circuit at issue in *Batalla Vidal* in many ways replicate the consolidated cases before the Ninth Circuit at issue here. The respondents in each set of cases present essentially the same challenges to the rescission of DACA, and the district courts entered identical nationwide preliminary injunctions based exclusively on respondents' arbitrary-and-capricious claims. Because an order vacating the injunction issued in *Regents* would have no practical consequence unless the injunction in *Batalla Vidal* was similarly vacated, the Court should at least hold the *Batalla Vidal* petition pending resolution of the other petitions. But to ensure that no developments in the lower courts between the filing of this petition and the Court's resolution of the case undermine the Court's ability to provide a definitive resolution of this overall dispute, the government respectfully submits that the Court should also issue a writ of certiorari to the Second Circuit.

\* \* \* \* \*

In 2012, DHS adopted a temporary, stop-gap policy of enforcement discretion, allowing some 700,000 aliens to remain in the United States even though existing laws provided them no ability to do so. After a change in administrations, DHS announced that it was ending that policy based on serious doubts about its legality and the practical implications of maintaining it. Secretary Nielsen has since made clear that DHS's decision also rests on policy considerations wholly apart from any legality concerns. It

34

is plainly within DHS's authority to set the Nation's immigration enforcement priorities and to end the discretionary DACA policy.  By order of two district courts, however, DHS has been required to maintain that policy on a nationwide basis for over a year, even while efforts by the President and others to provide a sound legal basis for the policy through the legislative process have failed. More than eight months ago, this Court recognized that this dispute called for an expeditious resolution.  That is even more evident today.  The Court should grant review in these cases and ensure that it can provide a timely and definitive resolution of the dispute this Term.

CONCLUSION

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

NOEL J. FRANCISCO
  *Solicitor General*
JOSEPH H. HUNT
  *Assistant Attorney
    General*
JEFFREY B. WALL
  *Deputy Solicitor General*
HASHIM M. MOOPPAN
  *Deputy Assistant Attorney
    General*
JONATHAN Y. ELLIS
  *Assistant to the Solicitor
    General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
  *Attorneys*

NOVEMBER 2018

# DEF-INTERV.
# EX. 48

**No.**

# In the Supreme Court of the United States

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE D.C. CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT**

NOEL J. FRANCISCO
*Solicitor General
Counsel of Record*
JOSEPH H. HUNT
*Assistant Attorney
General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney
General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor
General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

*Department of Justice
Washington, D.C. 20530-0001
SupremeCtBriefs@usdoj.gov
(202) 514-2217*

**QUESTIONS PRESENTED**

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA).  In 2016, this Court affirmed, by an equally divided Court, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) discretionary enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined.  See *United States* v. *Texas*, 136 S. Ct. 2271 (per curiam).  In September 2017, DHS determined that the original DACA policy was unlawful and would likely be struck down by the courts on the same grounds as the related policies.  DHS thus instituted an orderly wind-down of the DACA policy.  The questions presented are as follows:

1.  Whether DHS's decision to wind down the DACA policy is judicially reviewable.

2.  Whether DHS's decision to wind down the DACA policy is lawful.

(I)

### PARTIES TO THE PROCEEDING

Petitioners are Donald J. Trump, President of the United States; Jefferson B. Sessions III, Attorney General of the United States; Kirstjen M. Nielsen, Secretary of Homeland Security; U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; the U.S. Department of Homeland Security; and the United States.

Respondents are the Trustees of Princeton University; Microsoft Corporation; Maria De La Cruz Perales Sanchez; National Association for the Advancement of Colored People; American Federation of Teachers, AFL-CIO; and the United Food and Commercial Workers International Union, AFL-CIO, CLC.

(II)

# TABLE OF CONTENTS

Page

Opinions below .................................................................. 1
Jurisdiction ...................................................................... 1
Statutory provisions involved ........................................ 2
Statement ........................................................................ 2
Reasons for granting the petition ................................ 13
    A.  The questions presented warrant the Court's
        immediate review ............................................ 14
    B.  These cases squarely present the reviewability and
        the lawfulness of DACA's rescission ............................. 15
    C.  The Court should grant each of the government's
        petitions and consolidate the cases for consideration
        this Term ........................................................ 16
Conclusion ...................................................................... 17
Appendix A — District court memorandum opinion
               (Apr. 24, 2018) ........................................ 1a
Appendix B — District court order (Apr. 24, 2018) ............ 75a
Appendix C — District court order (Apr. 24, 2018) ............ 77a
Appendix D — District court memorandum opinion
               (Aug. 3, 2018) ........................................ 80a
Appendix E — District court order (Aug. 3, 2018) ........... 110a
Appendix F — Notice of appeal (Aug. 6, 2018) ................. 112a
Appendix G — Notice of appeal (Aug. 6, 2018) ................. 114a

# TABLE OF AUTHORITIES

Cases:

    *Arizona* v. *United States*, 567 U.S. 387 (2012) .................... 2
    *Casa de Maryland* v. *Department of Homeland Sec.*,
      284 F. Supp. 3d 758 (D. Md. 2018) ...................................... 8
    *Department of Homeland Sec.* v. *Regents of the*
      *Univ. of Cal.*, 138 S. Ct. 1182 (2018)................................. 14
    *Heckler* v. *Chaney*, 470 U.S. 821 (1985)................................ 3
    *Reno* v. *American-Arab Anti-Discrimination*
      *Comm.*, 525 U.S. 471 (1999) .................................................. 3

(III)

IV

Cases—Continued: Page

*Texas* v. *United States:*
    86 F. Supp. 3d 591 (S.D. Tex.), aff'd, 809 F.3d 134
        (5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016) ............5
    809 F.3d 134 (5th Cir. 2015), aff'd, 136 S. Ct. 2271
        (2016)................................................................................5
*United States* v. *Texas*, 136 S. Ct. 2271 (2016) ...................6

Statutes, regulation, and rules:

Administrative Procedure Act, 5 U.S.C. 551 *et seq.*.............5
    5 U.S.C. 701(a)(2)........................................................8, 9
Immigration and Nationality Act, 8 U.S.C. 1101
    *et seq.* ...........................................................................2
    8 U.S.C. 1103(a)(1)...........................................................2
    8 U.S.C. 1158(b)(1)(A) .....................................................2
    8 U.S.C. 1182(a) (2012 & Supp. V 2017) .........................2
    8 U.S.C. 1227(a) (2012 & Supp. V 2017) .........................2
    8 U.S.C. 1229b..................................................................2
    8 U.S.C. 1252...................................................................8
Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* ..................7
6 U.S.C. 202(5) (2012 & Supp. V 2017) .................................3
8 C.F.R. 274a.12(c)(14) ........................................................3
Fed. R. Civ. P.:
    Rule 12(b)(1) ...................................................................8
    Rule 12(b)(6) ...................................................................8

Miscellaneous:

S. 1291, 107th Cong., 1st Sess. (2001) ...............................4
S. 1545, 108th Cong., 1st Sess. (2003) ...............................4
S. 2075, 109th Cong., 1st Sess. (2005) ...............................4
S. 2205, 110th Cong., 1st Sess. (2007) ...............................4
S. 3827, 111th Cong., 2d Sess. (2010) .................................4

V

Miscellaneous—Continued:                              Page

U.S. Citizenship & Immigration Servs.,
    U.S. Dep't of Homeland Sec.:

   *Deferred Action for Childhood Arrivals:*
       *Frequently Asked Questions* (Mar. 8, 2018),
       https://go.usa.gov/xngCd ........................................... 4

   *Frequently Asked Questions:  Rescission of*
       *DACA* (Sept. 5, 2017), https://go.usa.gov/
       xPVmE ...................................................................... 7

   *Guidance on Rejected DACA Requests*
       (Feb. 14, 2018), https://go.usa.gov/xPVmG .............. 7

# In the Supreme Court of the United States

————

No.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., PETITIONERS

*v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL.

————

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE D.C. CIRCUIT*

————

**PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT**

————

The Solicitor General, on behalf of the President of the United States, Donald J. Trump, and other federal parties, respectfully petitions for a writ of certiorari before judgment to the United States Court of Appeals for the District of Columbia Circuit.

### OPINIONS BELOW

The order of the district court granting respondents summary judgment (App. 1a-74a) is reported at 298 F. Supp. 3d 209.  The order of the district court declining to reconsider its prior order (App. 80a-109a) is reported at 315 F. Supp. 3d 457.

### JURISDICTION

On April 24, 2018, the district court granted respondents summary judgment (App. 1a-74a).   The district court declined to reconsider its prior order and entered

(1)

final judgment on August 3, 2018 (App. 80a-109a).  The government filed its notice of appeal on August 6, 2018 (App. 112a-115a).  The court of appeals' jurisdiction over the appeal of the district court's final judgment rests on 28 U.S.C. 1291.  The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1) and 28 U.S.C. 2101(e).

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are set forth in the appendix to the petition for a writ of certiorari before judgment in *United States Department of Homeland Security* v. *Regents of the University of California*, also filed today.  *Regents* App. 127a-143a.

## STATEMENT

1. a. The Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, charges the Secretary of Homeland Security "with the administration and enforcement" of the immigration laws.  8 U.S.C. 1103(a)(1).  Individual aliens are subject to removal if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law."  *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see 8 U.S.C. 1182(a) (2012 & Supp. V 2017); see also 8 U.S.C. 1227(a) (2012 & Supp. V 2017).  As a practical matter, however, the federal government cannot remove every removable alien, and a "principal feature of the removal system is the broad discretion exercised by immigration officials."  *Arizona*, 567 U.S. at 396.

For any alien subject to removal, Department of Homeland Security (DHS) officials must first "decide whether it makes sense to pursue removal at all."  *Arizona*, 567 U.S. at 396.  After removal proceedings begin, government officials may decide to grant discretionary relief, such as asylum or cancellation of removal.  See 8 U.S.C. 1158(b)(1)(A), 1229b.  And, "[a]t each stage" of

3

the process, "the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*). In making these decisions, like other agencies exercising enforcement discretion, DHS must engage in "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). Recognizing the need for such balancing, Congress has provided that the "Secretary [of Homeland Security] shall be responsible for * * * [e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. 202(5) (2012 & Supp. V 2017).

b. In 2012, DHS announced the policy known as Deferred Action for Childhood Arrivals (DACA). See *Regents* App. 97a-101a. Deferred action is a practice in which the Secretary exercises discretion to notify an alien of her decision to forbear from seeking his removal for a designated period. *AADC*, 525 U.S. at 484. Under DHS regulations, aliens granted deferred action may apply for and receive work authorization for the duration of the deferred-action grant if they establish economic necessity. 8 C.F.R. 274a.12(c)(14). A grant of deferred action does not confer lawful immigration status or provide any defense to removal. DHS retains discretion to revoke deferred action unilaterally, and the alien remains removable at any time.

DACA made deferred action available to "certain young people who were brought to this country as children." *Regents* App. 97a. The INA does not provide any exemptions or special relief from removal for such individuals. And, dating back to at least 2001, bipartisan efforts to provide such relief legislatively had

4

failed.[1]  Under the DACA policy, following successful completion of a background check and other review, an alien would receive deferred action for a period of two years, subject to renewal.  *Id.* at 99a-100a.  The policy made clear that it "confer[red] no substantive right, immigration status or pathway to citizenship," because "[o]nly the Congress, acting through its legislative authority, can confer these rights."  *Id.* at 101a.

DHS explained that information provided in the DACA request process would be protected from disclosure for the purpose of immigration enforcement proceedings unless certain criteria related to national security or public safety were satisfied, or the individual met the requirements for a Notice to Appear.  USCIS, DHS, *Deferred Action for Childhood Arrivals: Frequently Asked Questions* (Mar. 8, 2018), https://go.usa.gov/xngCd.  DHS also stated, however, that this information-sharing policy "may be modified, superseded, or rescinded at any time without notice," and that it "may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter."  *Id.* at 6.

Later, in 2014, DHS created a new policy of enforcement discretion referred to as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  See *Regents* App. 102a-110a.  Through a process expressly designed to be "similar to DACA," DAPA made deferred action available for certain individuals who had a child who was a U.S. citizen or lawful permanent resident.  *Id.* at 107a.  At the same time,

---

[1] See, *e.g.*, S. 1291, 107th Cong., 1st Sess. (2001); S. 1545, 108th Cong., 1st Sess. (2003); S. 2075, 109th Cong., 1st Sess. (2005); S. 2205, 110th Cong., 1st Sess. (2007); S. 3827, 111th Cong., 2d Sess. (2010).

5

DHS also expanded DACA by extending the deferred-action period from two to three years and by loosening the age and residency criteria. *Id.* at 106a-107a.

c. Soon thereafter, Texas and 25 other States brought suit in the Southern District of Texas to enjoin DAPA and the expansion of DACA. The district court issued a nationwide preliminary injunction, finding a likelihood of success on the claim that the DAPA and expanded DACA memorandum was a "'substantive' rule that should have undergone the notice-and-comment rule making procedure" required by the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq. Texas* v. *United States*, 86 F. Supp. 3d 591, 671 (S.D. Tex. 2015); see *id.* at 607, 647, 664-678.

The Fifth Circuit affirmed the injunction, holding that the DAPA and expanded DACA policies likely violated both the APA and the INA. *Texas* v. *United States*, 809 F.3d 134, 146, 170-186 (2015). The court of appeals concluded that plaintiffs had "established a substantial likelihood of success on the merits of their procedural claim" that DAPA and expanded DACA were invalidly instituted without notice and comment. *Id.* at 178. The court also concluded, "as an alternate and additional ground," that the policies were substantively contrary to law. *Ibid.* The court observed that the INA contains an "intricate system of immigration classifications and employment eligibility," and "does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Id.* at 184, 186 n.202. It also noted that Congress had repeatedly declined to enact legislation "closely resembl[ing] DACA and DAPA." *Id.* at 185.

6

After briefing and argument, this Court affirmed the Fifth Circuit's judgment by an equally divided Court, *United States* v. *Texas*, 136 S. Ct. 2271, 2272 (2016) (per curiam), leaving the nationwide injunction in place.

d.  In June 2017, Texas and other plaintiff States in the *Texas* case announced their intention to amend their complaint to challenge the original DACA policy.  D. Ct. Doc. 60, at 238-240 (Feb. 16, 2018).[2]  They asserted that "[f]or the[] same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful." *Id.* at 239.

On September 5, 2017, rather than confront litigation challenging DACA on essentially the same grounds that had succeeded in *Texas* before the same court for the DAPA and expanded DACA policies, DHS decided to wind down DACA in an orderly fashion.  *Regents* App. 111a-119a.  In the rescission memorandum, then-Acting Secretary of Homeland Security Elaine Duke explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation," as well as the Attorney General's view that the DACA policy was unlawful and that the "potentially imminent" challenge to DACA would "likely * * * yield similar results" as the *Texas* litigation, "it is clear that the June 15, 2012 DACA program should be terminated." *Id.* at 116a-117a.  The Acting Secretary accordingly announced that, "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the original DACA memorandum was "rescind[ed]." *Id.* at 117a.

---

2  Citations to the district court docket are to *Trustees of Princeton University* v. *United States*, No. 17-cv-2325.

7

The rescission memorandum stated, however, that the government "[w]ill not terminate the grants of previously issued deferred action * * * solely based on the directives in this memorandum" for the remaining two-year periods. *Regents* App. 118a. The memorandum also explained that DHS would "provide a limited window in which it w[ould] adjudicate certain requests for DACA." *Id.* at 117a. Specifically, DHS would "adjudicate —on an individual, case by case basis—properly filed pending DACA renewal requests * * * from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id.* at 117a-118a.

DHS has also made clear that the "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017" DACA rescission. USCIS, DHS, *Guidance on Rejected DACA Requests* (Feb. 14, 2018), https://go.usa.gov/xPVmG; see USCIS, DHS, *Frequently Asked Questions: Rescission of DACA* (Sept. 5, 2017), https://go.usa.gov/xPVmE.

e. Shortly after DHS's decision to rescind DACA, respondents brought these two related suits in the District of Columbia challenging the rescission of DACA. Collectively, they allege that the termination of DACA is unlawful because it is arbitrary and capricious under the APA; violates the APA's requirement for notice-and-comment rulemaking as well as the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*; denies respondents equal protection and due process; and permits the government to use information obtained through DACA in

8

a manner that is inconsistent with due-process princi-
ples.  See App. 17a-18a.  Similar challenges were filed
in the Eastern District of New York and in the North-
ern District of California.  See *Batalla Vidal* v. *Nielsen*,
No. 16-cv-4756 (E.D.N.Y. filed Sept. 19, 2017); *Regents
of the Univ. of Cal.* v. *DHS*, No. 17-cv-5211 (N.D. Cal.
filed Sept. 8, 2017).  A summary of the proceedings in
the District of Columbia (*NAACP*) follows in this peti-
tion.  A summary of the proceedings in the other district
courts can be found in the government's petitions in
those cases, filed simultaneously with this one.[3]

   2.  In *NAACP*, the government filed motions to dis-
miss both suits under Federal Rule of Civil Procedure
12(b)(1) and (6).  D. Ct. Doc. 15 (Nov. 8, 2017).  At the
threshold, the government argued that respondents'
claims are not reviewable because DHS's decision to re-
scind DACA is committed to agency discretion by law,
see 5 U.S.C. 701(a)(2); and because judicial review of the
denial of deferred action, if available at all, is barred un-
der the INA prior to the issuance of a final removal or-
der, see 8 U.S.C. 1252.  The government also argued
that respondents' arbitrary-and-capricious claims fail
because DHS rationally explained the decision to wind
down the discretionary DACA policy given the Acting
Secretary's conclusion that the policy is unlawful and
the imminent risk of its being invalidated in the *Texas*
case.  Finally, the government argued that respondents'
other claims are without merit because the rescission of
DACA is exempt from notice-and-comment require-
ments; does not violate principles of equal protection or

---

   [3]  The government largely prevailed in a similar challenge to the
rescission filed in the District of Maryland.  See *Casa de Maryland*
v. *DHS*, 284 F. Supp. 3d 758 (2018).  An appeal of that decision is
pending before the Fourth Circuit.

9

due process; and does not change or affect the policies governing the use of aliens' personal information.

Respondents opposed the government's motions to dismiss and filed a motion for summary judgment or, in the alternative, a preliminary injunction preventing the government from rescinding the DACA policy and from modifying its information-sharing policy.  D. Ct. Docs. 23, 28 (Dec. 15, 2017).

3.  On April 24, 2018, the district court entered an order granting respondents summary judgment and vacating the agency's rescission of DACA.  App. 1a-74a.

The district court first rejected the government's justiciability arguments.  The court concluded that the INA did not preclude review of respondents' claims before a final order of removal on the ground that "there is no allegation here that removal proceedings have yet been initiated against any DACA beneficiary, so there are no pending removal proceedings with which [respondents'] challenge might interfere."  App. 21a.  And the court determined that the rescission of DACA was not "committed to agency discretion by law," 5 U.S.C 701(a)(2), on the ground that Section 701(a)(2) does not apply to an agency's rescission of "a general enforcement policy predicated on [a] legal determination that the program was invalid."  App. 43a.  The court also reasoned that litigation risk "is insufficiently independent from the agency's evaluation of DACA's legality to trigger *Chaney*'s presumption of unreviewability."  *Ibid.*

On the merits, the district court concluded that the rescission was arbitrary and capricious under the APA because the rescission memorandum's "legal reasoning was insufficient to satisfy the Department's obligation to explain its departure from its prior stated view that DACA was lawful."  App. 51a.  The court acknowledged

10

that the memorandum cited the Fifth Circuit's decision in *Texas*. *Ibid*. But the court interpreted that decision as holding only that "DAPA likely conflicted with the INA's 'intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status.'" *Ibid*. (citation omitted). The court reasoned that, "unlike DAPA, 'DACA has "no analogue in the INA,"'" and thus the Fifth Circuit's analysis was "inapposite." *Ibid*. (citations omitted). The court also concluded that DHS had failed to adequately consider reliance interests of DACA recipients who had structured their affairs "on the assumption that they would be able to renew their DACA benefits." App. 54a. Finally, the court determined that DHS's litigation-risk concern was arbitrary and capricious because, if a court were to find DACA unlawful under the *Texas* decision, it would have had "'broad discretion' to 'fashion[] equitable relief,'" such as allowing DHS an "opportunity to wind the program down." App. 58a (citation omitted; brackets in original).

The district court rejected respondents' claim that the rescission should have undergone notice-and-comment rulemaking, explaining that the rescission was "exempt from notice and comment as a general statement of agency policy." App. 48a. And the court dismissed the respondents' claim against DHS's alleged change in its information-sharing policy. App. 71a-72a. The court reasoned that, in light of DHS's recent public statements that the policy was unchanged, respondents had not "plausibly allege[d] that DACA beneficiaries' information has been or will be used inconsistently with DHS's stated information-sharing policy." App. 72a.

11

Finally, the court deferred ruling on respondents' equal-protection and due-process challenges to the rescission of DACA. App. 66a-67a. And the court stayed its order for 90 days to permit the Secretary of Homeland Security to "reissue a memorandum rescinding DACA, this time providing a fuller explanation." App. 66a.

4. On June 22, 2018, current Secretary of Homeland Security Kirstjen Nielsen issued a memorandum in response to the district court's invitation. *Regents* App. 120a-126a. In her memorandum, Secretary Nielsen concluded that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons." App. 122a. First, the Secretary agreed that "the DACA policy was contrary to law" and explained that "[a]ny arguable distinctions between the DAPA and DACA policies" were not "sufficiently material" to convince her otherwise. *Ibid.*; see App. 122a-123a. Second, the Secretary reasoned that, in any event, "[l]ike Acting Secretary Duke, [she] lack[s] sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not." App. 123a. She noted that "[t]here are sound reasons for a law enforcement agency to avoid discretionary policies that are legally questionable." App. 122a-123a. Third, the Secretary offered several "reasons of enforcement policy to rescind the DACA policy," regardless of whether the policy is "illegal or legally questionable." App. 123a. The Secretary also explained that, although she "do[es] not come to these conclusions lightly," "neither any individual's reliance on the expected continuation of the DACA policy nor the sympathetic circumstances of DACA recipients as a class" outweigh the reasons to end the policy. App. 125a.

12

5. On August 3, 2018, the district court denied the government's motion to reconsider its prior order in light of Secretary Nielsen's memorandum. App. 80a-109a. The court largely accepted that the Nielsen memorandum provided a relevant "'further explanation'" for DHS's decision, rather than (as respondents' urged) an impermissible "*post hoc* rationalization." App. 91a (citation omitted).[4] But it concluded that the memorandum did not provide a basis to revisit its reviewability or merits determinations. App. 95a-108a.

On reviewability, the district court observed that the Nielsen memorandum, like the rescission memorandum, was based in part on the view that "the DACA policy was contrary to law." App. 97a (citation omitted). And the court reasoned that "'an otherwise reviewable' legal interpretation 'does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion.'" App. 95a-96a (citation omitted). It rejected the independent non-legal policy reasons offered by Secretary Nielsen as simply an "attempt to disguise an objection to DACA's legality as a policy justification for its rescission." App. 100a.

On the merits, the district court reaffirmed its conclusion that the rescission of DACA is arbitrary and capricious because it did not find DHS's explanation to include a sufficient "legal assessment that th[e] [c]ourt

---

[4] The district court refused to consider one of the several enforcement-policy reasons offered by the Secretary on the ground that it was a *post hoc* rationalization—namely, the importance for DHS to "project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens," *Regents* App. 124a. See App. 94a.

13

could subject to judicial review." App. 105a. As for Secretary Nielsen's other rationales, the court expressed skepticism that the Secretary actually considered them to be "'independently sufficient'" given the court's conclusion that "three of those grounds—the substantial-doubts, legislative-inaction, and individualized-discretion rationales—simply recapitulate the Secretary's inadequately explained legal assessment." App. 106a (citation omitted). In any event, the court reasoned that the Secretary's memorandum "fails to engage meaningfully with the reliance interests and other countervailing factors that weigh against ending the program." *Ibid.* In the court's view, Secretary Nielsen "demonstrates no true cognizance of the serious reliance interests at issue here" and therefore the court refused to "accept as sufficient" her determination that "any reliance interests are outweighed" by the Secretary's other concerns about the DACA policy. App. 107a.

The government filed notices of appeal from the district court's final judgment on August 6, 2018. App. 112a-115a. On August 17, the district court stayed its order vacating the rescission of DACA insofar as the order granted relief beyond that already granted by the district courts in *Regents* and *Batalla Vidal*. D. Ct. Doc. 31.

## REASONS FOR GRANTING THE PETITION

These cases concern the Executive Branch's authority to revoke a discretionary policy of non-enforcement that is sanctioning an ongoing violation of federal immigration law by nearly 700,000 aliens. The DACA policy is materially indistinguishable from the related policies that the Fifth Circuit held were contrary to federal immigration law in a decision that four Justices of this Court voted to affirm. No one contends that the policy is required by federal law. And, in fact, consistent with

14

the view of the Department of Justice, DHS has decided that the policy is unlawful and should be adopted only by legislative action, not unilateral executive action. Yet as a result of nationwide preliminary injunctions issued by the District Courts in the Northern District of California and the Eastern District of New York, DHS has been required to keep the policy in place, now more than a year since the agency's decision.

The government today is filing petitions for writs of certiorari before judgment to the Second, Ninth, and D.C. Circuits, each of which has before it a decision concluding that the rescission of DACA either is or likely is unlawful. As explained in the *Regents* petition, those decisions are wrong and they warrant this Court's immediate review. The government presents each of these petitions to ensure that the Court has an adequate vehicle in which to resolve the questions presented in a timely and definitive manner. The government respectfully submits that the Court should grant each petition for a writ of certiorari before judgment, consolidate these cases for decision, and consider this important dispute this Term.

### A. The Questions Presented Warrant The Court's Immediate Review

The government's petition in *Regents* explains in detail why a grant of certiorari is necessary in order to obtain an appropriately prompt resolution of this important dispute. *Regents* Pet. 15-17. More than eight months ago, this Court recognized the need for an "expeditious[]" resolution of this dispute in its order dismissing without prejudice the government's petition for a writ of certiorari before judgment in *Department of Homeland Sec.* v. *Regents of the University of California*, 138 S. Ct. 1182 (2018). Absent certiorari before

15

judgment, even if a losing party were immediately to seek certiorari from a decision of one of the courts of appeals, this Court would not be able to review that decision in the ordinary course until next Term at the earliest. In the interim, the government would be required to retain a discretionary non-enforcement policy that DHS and the Attorney General have correctly concluded is unlawful and that sanctions the ongoing violation of federal law by more than half a million people. And the very existence of this litigation (and resulting uncertainty) would continue to impede efforts to enact legislation addressing the legitimate policy concerns underlying the DACA policy.

### B. These Cases Squarely Present The Reviewability And The Lawfulness Of DACA's Rescission

The cases pending before the D.C. Circuit squarely present both of the questions presented. The respondents raise all of the principal challenges to the lawfulness of the rescission of DACA, including that it is arbitrary and capricious, that it should have gone through notice-and-comment rulemaking, and that it violates equal-protection and due-process principles. The government moved to dismiss all of respondents' claims on justiciability and merits grounds. Respondents opposed dismissal for all of their claims and moved for summary judgment on the arbitrary-and-capricious and notice-and-comment claims. And the district court's final judgment rests on essentially the same arbitrary-and-capricious claim on which the district courts in *Regents* and *Batalla Vidal* rest their nationwide preliminary injunctions.

These cases, moreover, present at least one advantage over the cases at issue in *Regents* and *Batalla Vidal*. Secretary Nielsen issued her memorandum,

16

which provides further explanation for DHS's decision to rescind DACA, in response to an order from the district court in these cases. And she did so after the decisions in *Regents* and *Batalla Vidal* were on appeal. As a result, the district court here is the only court to have addressed the effect of that memorandum on the questions presented (including by considering and rejecting respondents' arguments that Secretary Nielsen's explanation should be disregarded in its entirety as *post hoc* rationalization).

A grant of certiorari before judgment to the D.C. Circuit would therefore ensure that the district court's analysis of Secretary Nielsen's memorandum is before this Court, and it would allow the Court to resolve, at a minimum, the government's justiciability arguments and the arbitrary-and-capricious claim after a final judgment.

### C. The Court Should Grant Each Of The Government's Petitions And Consolidate The Cases For Consideration This Term

To ensure an adequate vehicle for the timely and definitive resolution of this dispute, in addition to granting the government's petition in these cases, the Court should also grant the petitions for a writ of certiorari before judgment in *Regents* and *Batalla Vidal*, and consolidate the cases for further review. Although respondents here present the principal challenges against the rescission of DACA, they do not present some of the more tangential claims against the rescission, including, for example, that the rescission violates principles of equitable estoppel, and their equal-protection challenge is premised on DHS' alleged discrimination on the basis of DACA recipients' unlawful immigration status, not their race. The district court in these cases, moreover, did not pass on any constitutional challenges to the rescission.

17

The government thus respectfully submits that the Court should grant all three petitions and consolidate the cases for this Court's review. In so doing, the Court would ensure that no intervening developments in the lower courts—for example, a reversal by the Second or Ninth Circuits of one of the preliminary injunctions—would impede or complicate the Court's ability to reach all of the claims against the rescission of DACA on which respondents have prevailed in the lower courts and thus provide a definitive resolution of this dispute this Term.

## CONCLUSION

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

NOEL J. FRANCISCO
  *Solicitor General*
JOSEPH H. HUNT
  *Assistant Attorney*
  *General*
JEFFREY B. WALL
  *Deputy Solicitor General*
HASHIM M. MOOPPAN
  *Deputy Assistant Attorney*
  *General*
JONATHAN Y. ELLIS
  *Assistant to the Solicitor*
  *General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
  *Attorneys*

NOVEMBER 2018