**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**EXHIBITS IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# Volume 8

# Exhibits 49 - 61

# DEF-INTERV.
# EX. 49

46 FR 25079-03, 1981 WL 119909(F.R.)

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

Immigration and Naturalization Service

8 CFR Part 109

Employment Authorization to Aliens in the United States

Tuesday, May 5, 1981

**\*25079**  AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Final rule.

**\*25080**  SUMMARY: This final rule adds a new Part 109 to Chapter I of Title 8 of the Code of Federal Regulations to codify procedures and criteria for the grant of employment authorization to aliens in the United States. The new rules are necessary to codify the various Service Operations Instructions and policy statements in one place in the regulations so that the public may conveniently locate the rules on employment authorization for aliens and the standards which are applicable.

EFFECTIVE DATE: June 4, 1981.

FOR FURTHER INFORMATION CONTACT:

For General Information: Stanley J. Kieszkiel, Acting Instructions Officer, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536. Telephone: (202) 633-3048.

For Specific Information: Richard R. Spurlock, Immigration Examiner, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536. Telephone: (202) 633-2361.

SUPPLEMENTARY INFORMATION: On March 26, 1980, a proposed rule was published in the Federal Register (45 FR 19563) to add a new part 109 to Chapter I of existing regulations to codify procedures and criteria for the grant of employment authorization to aliens in the United States. Section 109.1(a) Classes of aliens eligible, identifies the classes of aliens who are authorized to be employed in the United States as a condition of their admission without specific authorization from the Service. "Employment authorization" in § 109.1(a) means that the aliens may engage in activities solely related to the status in which they were admitted. For example, an "A" diplomat may engage in activities related to his diplomatic functions; and an "L-1" intra-company transferee may engage in activities solely related to the purposes set forth in the visa petition. Paragraph (b) of § 109.1 describes the classes of aliens who may apply for discretionary work authorization based upon their financial need and that of their families. Section 109.2 sets forth the criteria under which a district director may revoke previously granted work authorization. It also sets forth notification requirements to the alien and allows submission of rebuttal evidence by the alien.

In response to the publication of the proposed rule in the Federal Register, approximately 30 responses were received from various commenters including immigration reform federations, attorneys, community service groups, and Service employees. All responses were given careful consideration. Most commenters fully supported the codification of criteria and procedures for work authorization of aliens in the United States. However, there was wide diversity of opinion as to whether the Service should be strict or permissive when granting work authorization.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Several commenters expressed concern that § 109.1(a) did not adequately cover all categories for nonimmigrants who are permitted to work while in the United States. Five additional classes of nonimmigrant aliens who are authorized to work in the United States have been added to this part.

In addition, the wording has been revised for certain categories to conform to the provisions of the Refugee Act of 1980.

There was opposition expressed by several commenters for the showing of economic need as a pre-requisite to work authorization; they contend that such a requirement will unduly burden the alien and Service. To alleviate this burden the regulation has been amended to provide for a simple statement to be submitted by the alien attesting to his/her assets, income and expenses to be used by the district director in granting work permission.

Title 45 Public Welfare, Part 1060, Attachment A, Community Services Administration (CSA) Income Poverty Guidelines, apply to all financially assisted grants under the Economic Opportunity Act. It is provided that agencies may use these guidelines for other administrative or statistical purposes as appropriate. The Service has incorporated the CSA poverty guidelines by reference in § 109.1(b) of the regulations. The acceptance of the alien's statement as to financial status and the use of the income poverty guidelines should overcome objections to the absence of articulated standards or guidelines.

A number of commenters labeled as unfair the requirement that the alien's application for asylum under section 208 of the Act be "prima facie approvable" before his/her employment would be authorized. The wording has been changed to read "non-frivolous application" so as to include any application for asylum where a substantive claim of persecution is made.

It was also suggested that the proposed rule be amended to include nunc-pro-tunc employment authorization for asylum applicants.

Section 209 of the I. & N. Act provides that an alien granted asylum pursuant to section 208 may be adjusted to the status of permanent resident alien notwithstanding the exclusionary provisions of section 245(c) of the Act. Therefore, the alien granted asylum is not prejudiced by the absence of a nunc-pro-tunc employment authorization provision in Part 109.

Several writers claimed that the principle of due process will be violated because the district director's authority to revoke employment authorization under § 109.2 is not reviewed by someone other than the person who made the initial decision. The Service's position is that the review by a district director is at an appropriate level of responsibility to insure due process.

Section 109.2 provides for the district director to notify the alien of his intent to revoke employment authorization when it appears that one or more of the conditions on which it was granted no longer exist. The alien is given an opportunity to present countervailing evidence within 15 days of the notice as to why his/her permission to work should not be revoked. Employment in the United States is not an inherent right of the aliens described in § 109.1(b). Their employment authorization is a matter of administrative discretion because humanitarian or economic needs warrant administrative action. The Service has authority to withdraw the work authorization when one or more of the factors for eligibility cease to exist, or for good cause shown.

After carefully evaluating the comments received as discussed above, Chapter I of Title 8 of the Code of Federal Regulations is amended by adding a new Part 109 to read as follows:

**PART 109—EMPLOYMENT AUTHORIZATION**
Sec.109.1 Classes of aliens eligible.109.2 Revocation of employment authorization.
Authority: Sec. 103, 245(c); (8 U.S.C. 1103, 1255(c))
 8 CFR § 109.1

## § 109.1 Classes of aliens eligible.

(a) Aliens authorized employment incident to status. The following classes of aliens are authorized to be employed in the United States as a condition of their admission or subsequent change to one of the indicated classes, and specific authorization need not be requested:

(a)(1) A lawful permanent resident alien.

(a)(2) An alien admitted to the United States as a refugee under section 207 of the Act.

(a)(3) An alien paroled into the United States as a refugee.

(a)(4) An alien granted asylum under section 208 of the Act.

 **\*25081**  (a)(5) An alien admitted to the United States as a nonimmigrant fiance or fiancee.

(a)(6) An alien admitted in one of the following classifications, or whose status has been changed to such classification under section 247, 248 of the Act:
(a)(6)(i) A foreign government official (A-1), or (A-2).

(a)(6)(ii) An employee of a foreign government official (A-3).

(a)(6)(iii) A nonimmigrant visitor for business (B-1).

(a)(6)(iv) A nonimmigrant crewman (D-1).
(a)(6)(v) A nonimmigrant treaty trader or investor (E-1), or (E-2).

(a)(6)(vi) A representative of an international organization (G-1), (G-2), (G-3), or (G-4).

(a)(6)(vii) A personal servant of an employee or representative of an international organization (G-5).

(a)(6)(viii) A temporary worker or trainee (H-1), or (H-2), or (H-3).

(a)(6)(ix) An information media representative (I).
(a)(6)(x) An exchange visitor (J-1).

(a)(6)(xi) An intra-company transferee (L-1).

The employment authorization is limited solely to the extent and conditions described for the corresponding classifications in section 101(a)(15) of the Act, 8 CFR Part 214, and 22 CFR 63.24.
(b) Aliens who must apply for work authorization. Any alien within a class of aliens described in this section may apply for work authorization to the district director in whose district the alien resides:

(b)(1) Any alien maintaining a lawful nonimmigrant status in one of the following classes may be granted permission to be employed:
(b)(1)(i) Alien spouse or unmarried dependent son or daughter of a foreign government official (A-1), or (A-2) as provided in § 214.2(a) of this chapter.

(b)(1)(ii) Alien nonimmigrant student (F-1) as provided in § 214.2(f) of this chapter.

(b)(1)(iii) Alien spouse or an unmarried dependent son or daughter of an officer or employee of an international organization (G-4) as provided in § 214.2(g) of this chapter.

(b)(1)(iv) Alien spouse of an exchange visitor (J-2) as provided in § 214.2(j) of this chapter.

(b)(2) Any Alien who has filed a non-frivolous application for asylum pursuant to Part 208 of this chapter may be granted permission to be employed for the period of time necessary to decide the case.

(b)(3) Any alien who has properly filed an application for adjustment of status pursuant to section 245 of the Act may be granted permission to be employed for the period of time necessary to decide the case.

(b)(4) Any alien who has applied to an immigration judge under § 242.17 of this chapter for suspension of deportation pursuant to section 244(a) of the Act may be granted permission to be employed for the period of time necessary to decide the case: Provided, The applicant can establish an economic need to work.

(b)(5) Any deportable alien granted voluntary departure prior to commencement of a hearing under § 242.5(a)(v), (vi), or (viii) of this chapter may be granted permission to be employed for the period of time prior to voluntary departure: Provided, The alien establishes to the satisfaction of the district director that he/she is financially unable to maintain himself/herself and family without employment. Factors which may be considered in granting employment authorization to an alien who has been granted voluntary departure:
(b)(5)(i) Length of voluntary departure granted;


(b)(5)(ii) Dependent spouse and/or children in the United States who rely on the alien for support;

(b)(5)(iii) Reasonable chance that legal status may ensue in the near future; and

(b)(5)(iv) Reasonable basis for consideration of discretionary relief.

(b)(6) Any alien in whose case the district director recommends consideration of deferred action, an act of administrative convenience to the government which gives some cases lower priority: Provided, The alien establishes to the satisfaction of the district director that he/she is financially unable to maintain himself/herself and family without employment.

The Community Service Administration Income Poverty Guidelines, Appendix 22 CFR 42.91(a)(iii) shall be used as the basic criteria to establish economic necessity for employment authorization requests where the alien's need to work is a factor. The applicant shall submit a signed statement listing his/her assets, income, and expenses as evidence of his/her economic need to work. Permission to work granted on the basis of the applicant's statement may be revoked under § 109.2 upon a showing that the information contained in the statement was not true and correct.
8 CFR § 109.2

### § 109.2 Revocation of employment authorization.
(a) Basis for revocation of employment authorization. Employment authorization granted under § 109.1(b) of this part may be revoked by the district director when it appears that one or more of the conditions upon which it was granted no longer exist, or for good cause shown.


(b) Notice of intent to revoke employment authorization. When a district director determines that employment authorization should be revoked, he/she shall serve notice of the reasons and the intention to revoke on the alien. The alien will be granted a period of fifteen days from the date of service of notice in which to submit evidence why the authorization should not be revoked. The decision by the district director shall be final and no appeal shall lie from the decision to revoke the authorization.

**Certification**

In accordance with 5 U.S.C. 605(b), this rule will not have a significant economic impact on a substantial number of small entities nor is it a major rule as defined in E.O. 12291. The rule codifies, under one part of the regulations, existing Service practice and procedures relating to employment authorization for aliens. This codification will enable the public to find all the rules on employment authorization in one convenient part.

Dated: April 20, 1981.

David Crosland,

Acting Commissioner of Immigration and Naturalization.

[FR Doc. 81-13460 Filed 5-4-81; 8:45 am]

BILLING CODE 4410-10-M

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.
# EX. 50

52 FR 16216-01, 1987 WL 142272(F.R.)
RULES and REGULATIONS
DEPARTMENT OF JUSTICE
8 CFR Parts 109 and 274a
[INS No. 1023-87]

Control of Employment of Aliens

Friday, May 1, 1987

**\*16216**  AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Final rule.

SUMMARY: This rule adds Part 274a and redesignates Part 109 with amendments as Part 274a, Subpart B, by: (1) Defining terms to clarify the regulations; (2) adding new sections to establish procedures for the verification of employment eligibility for workers in the United States; (3) delineating new sections to establish enforcement and process procedures for violations; (4) redesignating Part 109 (Employment Authorization) as Subpart B of Part 274a to consolidate into one part what would otherwise be dispersed regulations. The rule is necessitated by the Immigration Reform and Control Act of 1986, Pub. L. 99-603, which amended the Immigration and Nationality Act (Act) by adding provisions prohibiting the unlawful employment of aliens. These provisions make it unlawful to hire, recruit or refer for a fee for employment, unauthorized aliens in the United States. The rule provides for an employment eligibility verification system designed to prevent the employment of unauthorized aliens. The statute mandates the Attorney General to issue regulations implementing these provisions not later than June 1, 1987.
EFFECTIVE DATE: June 1, 1987.

FOR FURTHER INFORMATION CONTACT:Walter D. Cadman, Deputy Assistant Commissioner, Investigations Division, Immigration and Naturalization Service, 425 I Street, NW., Washington, DC 20536, Telephone: (202) 633-2997.

SUPPLEMENTARY INFORMATION: Since 1972 numerous attempts have been made by Congress and recent Administrations to pass immigration reform legislation. The imposition of sanctions on employers has been a central element of nearly all such attempts with the view that curbing illegal immigration would not be effective without such sanctions. The Select Commission on Immigration and Refugee Policy was established by Congress in October 1978. It was created to review immigration policy issues, assess the impact of legal and illegal immigrants on the nation, and recommend changes in policy and practice. The Commission made a series of over 70 recommendations concerning these issues in its final report in May 1981. Those recommendations included the imposition of employer sanctions to control illegal immigration. Thereafter a Cabinet level task force reviewed the Select Commission Report and other recommendations on immigration reform. In 1981 and 1982 alone some 28 hearings were conducted by House and **\*16217**  Senate immigration subcommittees on proposed immigration reform.
Since 1975 INS has vigorously worked in the spirit of cooperation with employers on an ad hoc basis to encourage a policy of employing only U.S. citizens and aliens lawfully authorized to work in the United States. The success of this effort, called Operation Cooperation, has been encouraging, but with the limits of INS resources and lack of statutory backing such programs have been of limited effectiveness. Mandatory compliance is the only effective mechanism that reduces "pull" factors that encourage rather than discourage illegal immigration.

On November 6, 1986, the President signed into law the Immigration Reform and Control Act of 1986, Pub. L. 99-603, (IRCA). This legislation is the most comprehensive reform of our immigration laws in 35 years. The employer sanctions

provisions of IRCA constitute one of three cornerstones on which immigration reform is based. The other two are increased enforcement measures and legalization.

Section 101 of IRCA is designed to control the unlawful employment of aliens in the United States by imposing civil and criminal penalties on those persons and entities that hire, or that recruit or refer for a fee unauthorized aliens. Section 101 of IRCA amends the Act by adding section 274A which closes a large gap in the enforcement of our immigration laws by: (1) Making it unlawful to hire, recruit or refer for a fee unauthorized aliens; (2) requiring those who hire, or who recruit or refer for a fee individuals for employment, to verify both the identity and employment eligibility of such individuals and (3) making it unlawful to continue to employ unauthorized aliens hired after November 6, 1986. While section 112 of IRCA amends section 274(a) of the Act (which sets forth criminal penalties for individuals who harbor illegal aliens), employment of illegal aliens in and of itself does not constitute harboring under section 274(a) of the Act as amended.

Since enactment of IRCA, INS has been working to develop these rules along with a balanced enforcement policy. On January 20, 1987, INS published a notice in the Federal Register to solicit comments from the public and other interested parties concerning draft rules implementing the employer provisions of IRCA. Interested parties were also provided with preliminary working drafts for review and comment. Numerous comments were received from a wide cross-section of society.

These comments were reviewed and evaluated in the development of a proposed rule, published in the Federal Register on March 19, 1987. The proposed rule invited comment on all issues, particularly those concerning: the nature of verification; the mandatory and universal aspect of the requirements for employers to complete and maintain the designated form; the range of documents which should be accepted under the regulation to establish identity; the guidelines relating to the role of state employment agencies in the issuance of verification certificates; the application of penalties to procedural as well as substantive violations of the Act; and the necessary changes to prior Part 109 of the regulations, redesignated as Subpart B of Part 274a in the proposed rule.

**Public Comments**

*General Information*

Approximately 4,000 comments were received from the public during the comment period. Additionally, hundreds of telephone calls were received. Commentors represented a very broad spectrum of American society and included private citizens; agricultural, business, industrial and labor organizations; Congressional sources and governmental entities at the federal, state, and local levels; educational institutions; voluntary agencies; interest groups and organizations; and law firms. Because many of these commentors provided their views on several different sections of the proposed rules within one response, the figures provided below are approximate as to the number of comments received in each area of concern. INS is appreciative of the number of responses and instructive comments, which clearly reflect the broad public interest in this statute.

The comments received in many instances enlightened Service officials concerning prevailing buisness and industry practices, and the problems which employers face in verification and the other responsibilities imposed by IRCA. As a result, there are some significant refinements in the rule, which INS believes are in the public interest and that represent a logical outgrowth of the comments. While the final rule may not satisfy the concerns of everyone who commented, INS believes that most issues have been addressed in the spirit of mutual dialogue. Every effort has been made to minimize the impact of our requirements on the affected parties, consistent with the statute; and to ensure continuity with other agencies' guidelines and definitions, to the extent possible. Furthermore, INS expects that these guidelines will prove sufficiently flexible so that employers and others required to comply with statutory and regulatory procedures will be able to do so in ways that suit current personnel hiring, recruiting and referring practices with minimal disruption.

INS will continue to encourage voluntary cooperation and compliance along with traditional enforcement in achieving the goal of this legislation. INS has established a new office for Employer and Labor Relations to administer a program of education and cooperation with employers and other affected entities. Many public appearances have been made by INS officials in the last few months to inform and solicit comments from interested parties. INS envisions a balanced approach between education and cooperation, and strict enforcement of penalties for egregious and persistent violators. INS will continue to develop agency guidelines and policies which further the goals of education, information, and employer awareness as effective methods of ensuring public support and voluntary compliance.

Consistent with this intent, INS wishes to remind the public that IRCA and Title VII of the Civil Rights Act prohibit discrimination in employment, or recruitment or referral for a fee for employment, on the basis of national origin. Additionally, IRCA generally prohibits discrimination on the basis of citizenship status in the case of a citizen or intending citizen. There are serious penalties which may be applied to those who violate the anti-discrimination laws of the United States. It is important to recognize that the purpose of the employer verification provisions of IRCA is not to discriminate against those with the right to work in the United States, regardless of their alienage or citizenship status. Rather, the purpose is to halt unlawful employment of those not entitled to work, and thus to have an ameliorative effect on illegal immigration to the United States. Application of the verification laws and voluntary compliance by employers will enhance job opportunities for lawfully authorized workers.

*Comments Received*

**1. Recruiters and Referrers**

By far the vast majority of comments (over 3,100), and the most contentious, related to the Service's proposed regulations in regard to recruiters and referrers. Many professionals in this industry were concerned that: (1) They would have to retroactively verify the **\*16218** status of individuals whom they had recruited or referred since enactment of IRCA; (2) they would be prospectively required to perform verifications on all individuals recruited or referred, despite the fact that many of these individuals would either express no interest in the recruitment, or would not be hired as the result of referral; and (3) they would have to perform face-to-face verifications, despite prevailing industry practices relating to telephonic recruitments over long distances where there is no opportunity for such verifications.

INS carefully scrutinized the public comments received relating to this issue and performed an analysis of the extent of regulatory flexibility which was permitted by statute. Although it was determined that an absolute waiver of requirements for recruiters and referrers was beyond the permissible statutory scope, the Service has significantly modified the terms under which such entities may comply. Under the final rule: (1) Recruiters and referrers will not be required to retroactively verify individuals recruited or referred during the period, given the impossibility of this task; (2) the regulations have been amended so that referrers and recruiters need to verify within three business days of hiring only those individuals actually hired as the result of the referral; and (3) the verification procedures for recruiters and referrers have been amended to permit completion of the process by those who act as agents in their interest. This includes, but is not limited to affiliates, notaries, attorneys, national organizations, and even employers who hire the referred individuals. In this way, verifications used not be performed in person by the recruiter or referrer. These modifications to the proposed rule will greatly alleviate the concerns expressed by recruiters and referrers over the verification process. By statute, however, liability still rests with the recruiter or referrer.

**2. Use of Agents**

A similar concern expressed in the comments received from some employers and others indicated misunderstanding regarding their ability to use commonly accepted legal principles to delegate verification responsibilities through contractual or business arrangements. Approximately 75 responses were received on this concern. The definition of the term "employer" found in 8 CFR 274a.1(g) and the verification procedures outlined for recruiters and referrers in 8 CFR 274a.2(b)(1)(iv) specifically permit these arrangements. These provisions of the regulations incorporate

the concepts found in the Fair Labor Standards Act. They provide great flexibility in the use of intermediaries for verification, because, rather than establish a restrictive definition of agent, they permit verification by anyone "acting in [the employer's recruiter's or referrer's] interest." Employers, recruiters, and referrers may use central clearing houses or similar organizations to satisfy the document verification requirements of the Act. However, liability remains with the employer, the recruiter, or the referrer for any failure of the third party to satisfy the requirements of law.

### 3. Retroactive Verification

Another similar concern was expressed by employers concerning their responsibility to retroactively verify employees who were hired subsequent to enactment but prior to June 1, 1987. Approximately 50 responses were received on this issue. Recognizing these concerns, INS has taken the following steps in the final rule: (1) Employees who were hired but quit or were terminated within this period need not be verified; (2) employees who were hired within this period and continue to be employed, must be verified on or before September 1, 1987; and (3) as stated above, recruiters and referrers need not verify individuals recruited or referred within the period. Many concerns were expressed to INS about the lack of availability of a final Form I-9 during the public education period prior to June 1. INS recognizes that some employers took the step, in good faith, of commencing retroactive verification of employees using the version of the form which was published for comment with the proposed rule on March 19, 1987. In such instances, INS will accept verifications which were performed using this form as satisfying the requirements of the law and regulations. However, only the finalized Form I-9 should be used for verifications performed on or after June 1.

### 4. Union Hiring Halls

Approximately 60 comments were received on the issue of whether union hiring halls constituted a form of recruitment or referral for a fee based upon union dues paid. Opinions were divided on this matter. The final rule excludes union hiring halls from such definition. INS does not believe inclusion of these entities was within Congressional intent. However, such arrangements may be included in contractual or collective bargaining agreements between unions and employers where they are in the interests of both parties.

### 5. Definition of Hire

The Service in its proposed rules defined "hire" as the "actual commencement of employment of an employee . . ." This aroused public concern as to the appropriate time for completion of the verification process. Approximately 20 comments were received in this regard. INS realizes that employers with decentralized operations may actually hire an individual well in advance of the time that the employee commences work. While the regulations state that the Service wishes to stress that verification may be completed either at the time of an individual's acceptance of an offer of employment or at the time employment actually commences.

### 6. State Employment Agency Verification

The rule provides for procedures relating to verification by a state employment agency. These procedures were developed on the basis of discussions with state employment agencies. INS also attended several open forums at which state employment agencies were well represented. INS anticipates that future modifications to this rule will be forthcoming in order to further develop standardized certification forms and procedures for all state agencies which choose to exercise the option to issue certifications which is granted them under the statute.

### 7. Pre-enactment ("Grandfather") Status

The proposed rule specified that a pre-enactment employment status is retained by an individual even though termporarily interrupted because of leave for study, illness, pregnancy, or transfer from one location to another with the same company. It provided that status would be lost by termination, exclusion, or deportation. Approximately 15 comments were received from the public, including labor law attorneys familiar with other agencies' definitions and

procedures. The commentors recommended that the rule address other temporary employment interruptions. INS has considered these suggestions, and adopted several of them, including: Strikes and layoffs where there is a reasonable basis for believing that the individual will be reemployed by the same employer; promotions or demotions within the same company and intracompany transfers; and other temporary leaves which have been **\*16219** approved by the employer. The public is directed to the regulations for other examples of interruptions which do not cause loss of the pre-enactment status of the individual.

The public should be aware that pre-enactment status pertains to the continued employment of individuals hired, recruited, or referred prior to November 7, 1986 only. It does not accord an illegal alien the right to remain in the United States.

### 8. Independent Contractor

Several business entities (approximately 25) provided their views on this aspect of the proposed regulations. They recommended that INS include the term "independent contractor" among the definitions in the regulations. The final rule specifies criteria and factors that are to be considered in determining whether a particular business arrangement constitutes an agreement with an independent contractor as opposed to an employee. The criteria and factors which have been enumerated are consistent with current Internal Revenue Service guidelines. Those who engage the labor services of an independent contractor are not responsible for verification of the employment eligibility of the employees of the independent contractor. However, contracts may not be used for the purposes of circumventing the employment eligibility verification requirements of employees.

### 9. Three-day Period for Completion of Verification

Approximately 30 comments were received on this proposed rule from various sources, including governmental employing entities. Commentors generally believed that the three-day period for completion of verification is sufficient. However, it was recommended that an exception be made for an individual who does not possess an acceptable document and needs to secure one for verification. It was noted that even large numbers of United States citizens are not in possession of certain documents and may need additional time to obtain them. Commentors were concerned that failure to provide an exception to the three-day requirement might result in unemployment of authorized workers who are awaiting replacement or initial issuance of documents.

The final rule allows an exception in cases where an individual has lost a document or has not yet obtained a document necessary for either identity or work authorization purposes. In such a case, the individual is required to present a receipt for the application of the document within three days, and present the required document itself within twenty-one days.

### 10. Identification Documents

The proposed rule required employees to present an employer with a document or documents that establish identity and employment eligibility. With regard to documents that establish identity alone, the proposed rule required presentation of a state-issued driver's license or state-issued identification card except where the individual is under sixteen years old or lives or works in one of the eight states that does not issue an identification card. The statute allows the Attorney General to designate alternative identity documents for individuals covered by the two exceptions.

Approximately 60 responses concerned this issue. Public comment was received from a variety of sources, including private individuals, several colleges, and some agricultural enterprises such as produce farmers. Many strongly opposed these restrictions on the use of alternative documents. Commentors noted that the requirement would be extremely confusing for employers and unnecessarily burdensome for individuals who do not have a driver's license or identification card, yet might have one of the designated alternative documents.

The final rule establishes an expanded list of identity documents and permits parents or guardians to sign the Form I-9 on behalf of minors under sixteen years of age. Documents from this expanded list can be used by anyone in any state for the purpose of establishing identity.

In terms of number and variety, the list contains a wide range of identity documents and is based upon recommendations received in response to the proposed rule. The list has been defined in consideration of the recency of the legislation and in recognition of the fact that a comprehensive but reasonable list is in the interest of the public at this time.

The statute mandates that any alternative identity document provide a "reliable means of identification." The Congress, both in the statute and in its legislative history, expressed a particular concern with fraud in the verification system. For these reasons, INS will closely monitor the reliability and integrity of the list of alternative identity documents. After a sufficient period of time has elapsed to enable the public to become accustomed to and familiar with the law, and based upon information acquired from system monitoring, INS may propose amendments to this list.

### 11. I-9 Retention

In response to public comment, the one-year period of validity of the I-9 for rehiring purposes has been expanded to three years in the final rule. This period coincides with the minimum retention period required for the Form I-9. Also, INS believes that this three year rehire provision adequately deals with the concerns of temporary help companies. Such temporary help companies can rehire the same individual without limit during a three year period (beginning on the date the Form I-9 was initially completed) as long as the individual remains authorized to work.

### 12. Authority to Inspect I-9

There were numerous public comments on the proposed rule regarding inspection of the Form I-9. The Service believes that the final rule requiring employers to produce the Form I-9 for inspection upon request of an INS officer after three days notice is well within our statutory authority. IRCA provides at section 274A(B)(3) that "the person or entity must retain the form (Form I-9) and make it available for inspection by officers of the Service or the Department of Labor beginning on the date . . ." The final regulations specify that INS will provide employers or others with three days advance notice of an inspectional visit, in order that they may comply with a request for production of the Form I-9. IRCA does not require Service officers to present a subpoena or warrant prior to a request to inspect. Furthermore, they will be permitted to produce the forms to the Service office which is located closest to the place where the forms have been retained, if different from where the demand was made. However, this does not preclude INS from obtaining warrants based on probable cause, for entry onto the premises of suspected violators without advance notice. The past experience of many agencies with similar responsibilities has proven the occasional necessity of such actions, where serious, repeated violators are concerned.

### 13. Good Faith Defense

An employer, recruiter, or referrer who establishes that he or she has acted in good faith to comply with the verification requirements of the regulations will have established an affirmative yet rebuttable defense that he or she has in fact complied with the law with respect to such hiring, recruiting, or referral. An employer,  **\*16220**  recruiter, or referrer must attest on Form I-9 that he or she has verified the employment eligibility and identity of an individual hired, recruited, or referred. This attestation may be made if the document or combination of documents examined in the verification process reasonably appears on its face to be genuine.

### 14. Organization of Subpart B: Employment Authorization

The rule redesignates Part 109, with amendments, as Part 274a, Subpart B, employment authorization. In response to public comments, § 274a.12, classes of aliens authorized to accept employment, has been expanded to identify aliens not

previously identified in Part 109, and has also been subdivided to clarify and articulate classes of aliens who are or may be authorized to accept employment in the United States. The section contains three paragraphs generally categorizing these classes, which include: (1) Aliens authorized employment incident to status, whose employment authorization is not restricted in terms of location or type of employment and who need not seek employment authorization from INS; (2) aliens authorized employment with a specific employer incident to status, whose employment is subject to the restrictions imposed upon the particular nonimmigrant classification; and (3) aliens who must apply to INS for employment authorization. Within these paragraphs, the rule contains a comprehensive listing of employment authorization classifications.

### 15. Nonimmigrant Student Employment Authorization

In response to the proposed rule, numerous institutions of higher learning urged INS to retain the procedure concerning on-campus employment for full-time students, and for students in a work-study program which is part of the regular curriculum available within the student's program of study. The final regulations incorporate these recommendations by classifying on-campus employment as employment which is incident to the student's status. Academic institutions will need to comply with the employment verification requirements of IRCA with respect to these nonimmigrant students.

### 16. Employment Authorization for Temporary Workers, Exchange Visitors, and Intra-company Transferrees

In response to public comments, the final rule provides for an automatic extension of employment authorization for a period of 120 days for H, J, and L nonimmigrants who have filed timely applications for extensions of stay. The automatic extension of employment authorization is valid only for an alien who continues employment with the same employer. In the event that INS is unable to adjudicate such an application for extension of status within the 120 day period, the alien may apply for employment authorization pursuant to the application procedure defined in the rule. Thus the regulations address continued employment authorization for employment-related classifications of nonimmigrant aliens during periods when extensions of stay are pending. They also recognize the possibility of delays in the processing of applications for extensions of stay, and provide an application procedure in the event of any unusual delay. These provisions were added in direct response to the recommendations of commentors.

### 17. Interim Employment Authorization

The final rule requires INS to adjudicate an application for employment authorization within sixty days from the date of the receipt by INS of the application or the date of the receipt of a returned application. Any application for employment authorization not adjudicated within sixty days will result in an automatic grant to the applicant of interim employment authorization for a period of up to 120 days. In promulgating this rule, INS recognizes the importance of expeditious processing of employment authorization applications. As in the case of the rule regarding employment authorizations for certain nonimmigrant extension applicants, this regulation was developed in response to public comment.

### 18. Automatic Termination of Temporary Employment Authorization

In the past, Service practice was not uniform in the grant of temporary work authorization to certain aliens such as nonimmigrants and parolees. These individuals were sometimes granted work authorization for indefinite periods of time despite its "temporary" nature, on Service Form I-94 or other documents. In order to reconcile this inconsistency with the terms of IRCA, INS has specified in the regulations that any temporary employment authorization granted prior to June 1, 1987, pursuant to 8 CFR 109.1(b) or its redesignation as § 274a.12(c), shall automatically terminate on the date specified by the Service on the document issued to the alien, or on June 1, 1988, whichever is earlier. Any document issued by the Service prior to June 1, 1987 that authorizes temporary employment for an indefinite period beyond June 1, 1988 will become null and void on June 1, 1988, and must be surrendered to the Service on the date of the document's expiration or on June 1, 1988, whichever is earlier. The public is advised that no notice of intent to revoke or other Service advisory is necessary under this rule.

Automatic termination of such employment authorization does not preclude a subsequent application for employment authorization. The rule requires the issuance of a new employment authorization provided that the alien remains eligible for employment in the United States. This regulation is not applicable to an alien whose employment authorization is inherent in his or her status, such as a lawful permanent resident.

This rule is promulgated for the sole purpose of enabling INS to replace the multiplicity of outstanding employment authorization documents with a standard, uniform document. INS is taking this step because it believes this transition to a new uniform document is in the interest of employers and those aliens authorized to work in the United States.

This rule is a major rule within the context of E.O. 12291 in terms of the effect it will have on the national economy. A Regulatory Impact Analysis in conjunction with a Regulatory Flexibility Analysis as required by 5 U.S.C. 603 and 604, is available for review by the public upon request.

The information collection requirements contained in this regulation have been submitted to and cleared by OMB under the Paperwork Reduction Act.

## List of Subjects

### 8 CFR Part 109

Aliens, Employment.

### 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment.

For the reasons set out in the preamble, INS amends Chapter I of Title 8 of the Code of Federal Regulations as follows:

## PART 109—EMPLOYMENT AUTHORIZATION

1. Part 109 is removed and reserved.

2. A new Part 274a is added to read as follows:

## *16221 PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

**Subpart A—Employer Requirements**

Secs.

274a.1 Definitions.

274a.2 Verification of employment eligibility.

274a.3 Continuing employment of unauthorized aliens.

274a.4 Good faith defense.

274a.5 Use of labor through contract.

274a.6 State employment agencies.

274a.7 Pre-enactment provisions for employees hired prior to November 7, 1986.

274a.8 Prohibition of indemnity bonds.

274a.9 Enforcement procedures.

274a.10 Penalties.

274a.11 Special rule for legalization, special agricultural worker and Cuban/Haitian entrant adjustment applicants.

**Subpart B—Employment Authorization**

274a.12 Classes of aliens authorized to accept employment.

274a.13 Application for employment authorization.

274a.14 Termination of employment authorization.
Authority: Secs. 101, 1103, 274A of the Immigration and Nationality Act, 8 U.S.C. 1101, 1103, 1324A.

**Subpart A—Employer Requirements**
8 CFR § 274a.1

**§ 274a.1 Definitions.**
For the purpose of this chapter—

(a) The term "unauthorized alien" means, with respect to employment of an alien at a particular time, that the alien is not at that time either: (1) Lawfully admitted for permanent residence, or (2) authorized to be so employed by this Act or by the Attorney General;

(b) The term "entity" means any legal entity, including but not limited to, a corporation, partnership, joint venture, governmental body, agency, proprietorship, or association;

(c) The term "hire" means the actual commencement of employment of an employee for wages or other remuneration;

(d) The term "refer for a fee" means the act of sending or directing a person or transmitting documentation or information to another, directly or indirectly, with the intent of obtaining employment in the United States for such person, for remuneration whether on a retainer or contingency basis; however, this term does not include union hiring halls that refer union members or non-union individuals who pay union membership dues;

(e) The term "recruit for a fee" means the act of soliciting a person, directly or indirectly, and referring that person to another with the intent of obtaining employment for that person, for remuneration whether on a retainer or contingency basis; however, this term does not include union hiring halls that refer union members or non-union individuals who pay union membership dues;

(f) The term "employee" means an individual who provides services or labor for an employer for wages or other remuneration but does not mean independent contractors as defined in paragraph (j) of this section or those engaged in casual domestic employment as stated in paragraph (h) of this section;

(g) The term "employer" means a person or entity, including an agent or anyone acting directly or indirectly in the interest thereof, who engages the services or labor of an employee to be performed in the United States for wages or

other remuneration. In the case of an independent contractor or contract labor or services, the term "employer" shall mean the independent contractor or contractor and not the person or entity using the contract labor;

(h) The term "employment" means any service or labor performed by an employee for an employer within the United States, including service or labor performed on a U.S. vessel or U.S. aircraft which touches at a port in the United States, but does not include casual employment by individuals who provide domestic service in a private home that is sporadic, irregular, or intermittent;

(i) The term "State employment agency" means any State government unit designated to cooperate with the United States Employment Service in the operation of the public employment service system;

(j) The term "independent contractor" includes individuals or entities who carry on independent business, contract to do a piece of work according to their own means and methods, and are subject to control only as to results. Whether an individual or entity is an independent contractor, regardless of what the individual or entity calls itself, will be determined on a case-by-case basis. Factors to be considered in that determination include, but are not limited to, whether the individual or entity: Supplies the tools or materials; makes services available to the general public; works for a number of clients at the same time; directs the order or sequence in which the work is to be done and determines the hours during which the work is to be done. The use of labor or services of an independent contractor are subject to the restrictions in section 274A(a)(4) of the Act and § 274a.5 of this part;

(k) The term "pattern or practice" means regular, repeated, and intentional activities, but does not include isolated, sporadic, or accidental acts.

 8 CFR § 274a.2

## § 274a.2 Verification of employment eligibility.

A. **General.** This section states the requirements and procedures persons or entities must comply with when hiring, or when recuiting or referring for a fee, individuals in the United States, or continuing to employ aliens knowing that the aliens are (or have become) unauthorized aliens. The Form I-9, Employment Eligibility Verification Form, has been designated by the Service as the form to be used in complying with the requirements of this section. The Form I-9 may be obtained in limited quantities at INS District Offices, or ordered from the Superintendent of Documents, Washington, DC 20402. The Form I-9 may be photocopied or printed without regard to the restrictions set forth in § 299.4 of this Chapter. Employers need only complete the Form I-9 for individuals who are hired after November 6, 1986 and continue to be employed after May 31, 1987. Employers shall have until September 1, 1987 to complete the Form I-9 for individuals hired from November 7, 1986 through May 31, 1987. Recruiters and referrers for a fee need complete the Form I-9 only for those individuals who are recruited or referred after May 31, 1987. In conjunction with completing the Form I-9, an employer or recruiter or referrer for a fee must examine documents that evidence the identity and employment eligibility of the individual. The employer or recruiter or referrer for a fee and the individual must each complete an attestation on the Form I-9 under penalty of perjury. However, if an individual attests to an employer or recruiter or referrer for a fee, that he or she is an alien who intends to apply or has applied for benefits under the provisions of section 245A or 210 of the Act or section 202 of the Immigration Reform and Control Act of 1986, then the individual is authorized to work in the United States until September 1, 1987 without providing the employer or the recruiter or referrer for a fee with documentary evidence of work authorization. In this case, the employer, or the recruiter or referrer for a fee, should follow the procedures set forth in § 274a.11 of this part. Employers and recruiters and referrers for a fee who fail to comply with the employment verification requirements set forth in paragraph (b) of this section shall be subject to penalties as stated in § 274a.10 of this part.

 **\*16222**  (b) Employment verification requirements—(1) Examination of documents and completion of Form I-9.

(i) An individual who is hired or is recruited or referred for a fee for employment must:

(A) Complete Section 1—"Employee Information and Verification" on the Form I-9 at the time of hiring; or if an individual is unable to complete the Form I-9 or needs it translated, someone may assist him or her. The preparer or translator must read the Form to the individual, assist him or her in completing Section 1—"Employee Information and Verification," and have the individual sign or mark the Form in the appropriate place. The preparer or translator should then complete the "Preparer/Translator Certification" portion of the Form I-9; and

(B) Present to the employer or the recruiter or referrer for a fee documentation as set forth in paragraph (b)(1)(v) of this section establishing his or her identity and employment eligibility within the time limits set forth in paragraphs (b)(1)(ii) through (v) of this section. However, pursuant to the "Special Rule" set forth in § 274a.11 of this part, legalization, special agricultural worker, and Cuban/Haitian entrant adjustment applicants are authorized to work without presenting documentation establishing work authorization until September 1, 1987.

(ii) except as provided in paragraph (b)(viii) of this section, an employer, his or her agent, or anyone acting directly or indirectly in the interest thereof, must within three business days of the hire:

(A) Physically examine the documentation presented by the individual establishing identity and employment eligibility as set forth in paragraph (b)(1)(v) of this section; and

(B) Complete Section 2—"Employer Review and Verification" on the Form I-9.

(iii) An employer, his or her agent, or anyone acting directly or indirectly in the interest thereof, who hires an individual for employment for a duration of less than three business days must comply with paragraphs (b)(1)(ii)(A)-(B) of this section before the end of the employee's first working day.

(iv) A recruiter or referrer for a fee for employment must comply with paragraphs (b)(1)(ii)(A)-(B) of this section within three business days of the date the referred individual was hired by the employer. Recruiters and referrers may designate agents to complete the employment verification procedures on their behalf including but not limited to notaries, national associations, or employers. If a recruiter or referrer designates an employer to complete the employment verification procedures, the employer need only provide the recruiter or referrer with a photocopy of the Form I-9.

(v) The individual may present either an original document that establishes both employment authorization and identity, or an original document that establishes employment authorization and a separate original document that establishes identity. The document identification number and expiration date (if any) should be noted in the appropriate space provided on the Form I-9. An employer or a recruiter or referrer for a fee may not specify which document or documents an individual is to present.

(A) The following documents are acceptable to evidence both identity and employment eligibility:

(1) United States passport;

(2) Certificate of United States Citizenship, INS Form N-560 or N-561;

(3) Certificate of Naturalization, INS Form N-550 or N-570;

(4) An unexpired foreign passport which:

(i) contains an unexpired stamp therein which reads, "Processed for I-551. Temporary Evidence of Lawful Admission for permanent residence. Valid until ———. Employment authorized." or

(ii) has attached thereto a Form I-94 bearing the same name as the passport and contains an employment authorization stamp, so long as the period of endorsement has not yet expired and the proposed employment is not in conflict with any restrictions or limitations identified on the Form I-94.

(5) Alien Registration Receipt Card, INS Form I-151 or Resident Alien INS Form I-551, provided that it contains a photograph of the bearer;

(6) Temporary Resident Card, INS Form I-688;

(7) Employment Authorization Card, INS Form I-688A.

(B) The following documents are acceptable to establish identity only:

(1) For individuals 16 years of age or older:

(i) a state-issued drivers's license or state-issued identification card containing a photograph. If the drivers's license or identification card does not contain a photograph, identifying information should be included such as: Name, date of birth, sex, height, color of eyes, and address;

(ii) School identification card with a photograph;

(iii) Voter's registration card;

(iv) U.S. military card or draft record;

(v) Identification card issued by federal, state, or local government agencies or entities;

(vi) Military dependent's identification card;

(vii) Native American tribal documents;

(viii) United States Coast Guard Merchant Mariner Card;

(ix) Driver's license issued by a Canadian government authority;

(2) For individuals under age 16 who are unable to produce a document listed in paragraph (b)(1)(v)(B)(1) of this section, the following documents are acceptable to establish identity only:

(i) School record or report card;

(ii) Clinic doctor or hospital record;

(iii) Daycare or nursery school record.

(3) Minors under the age of 16 who are unable to produce one of the identity documents listed in paragraph (b)(1)(v)(B)(1) or (2) of this section are exempt from producing one of the following procedures are followed:

(i) The minor's parent or legal guardian completes on the Form I-9 Section 1—"Employee Information and Verification" and in the space for the minor's signature, the parent or legal guardian writes the words, "minor under age 16."

(ii) The minor's parent or legal guardian completes on the Form I-9 the "Preparer/Translator certification."

(iii) The employer or the recruiter or referrer for a fee writes in Section 2—"Employer Review and Verification" under List B in the space after the words "Document Identification ›" the words, "minor under age 16."

(C) The following are acceptable documents to establish employment authorization only:

(1) A social security number card other than one which has printed on its face "not valid for employment purposes";

(2) An unexpired reentry permit, INS Form I-327;

(3) An unexpired Refugee Travel document, INS Form I-571;

(4) A Certification of Birth issued by the Department of State, Form FS-545;

(5) A Certification of Birth Abroad issued by the Department of State, Form DS-1350;

(6) An original or certified copy of a birth certificate issued by a State, county, or municipal authority bearing a seal;

(7) An employment authorization document issued by the Immigration and Naturalization Service;

(8) Native American tribal document;

(9) United States Citizen Identification Card, INS Form I-197;

(10) Identification card for use of resident citizen in the United States, INS Form I-179.

 **\*16223** (vi) If an individual is unable to provide the required document or documents within the time periods specified in paragraphs (b)(1)(ii) and (iv) of this section, the individual must present a receipt for the application of the document or documents within three days of the hire and present the required document or documents within 21 days of the hire.

(vii) If an individual's employment eligibility document expires, the employer or the recruiter or referrer for a fee must update the Form I-9 to reflect that the individual is still authorized to work in the United States; otherwise the individual may no longer be employed, recruited, or referred. In order to update the Form I-9, the employee or referred individual must present a document that either shows continuing employment eligibility or is a new grant of work authorization. The employer or the recruiter or referrer for a fee should review this document, and if it appears to be genuine and to relate to the individual, update the form by noting the document's identification number and expiration date of the Form I-9.

(viii) An employer is not required to reverify an employee's employment eligibility as set forth in paragraphs (b)(1)(i)—(v) of this section if the employee is continuing his or her employment and at all times has a reasonable expectation of employment. "Continuing employment" includes but is not limited to situations where:

(A) The employee takes approved paid or unpaid leave on account of study, illness or disability of a family member, illness or pregnancy, maternity or paternity leave, vacation, union business, or other temporary leave approved by the employer;

(B) The employee is promoted, demoted, or gets a pay raise;

(C) The employee is laid off for lack of work;

(D) The employee is on strike or in a labor dispute;

(E) The employee is reinstated after disciplinary suspension for wrongful termination, found unjustified by any court, arbitrator, or administrative body, or otherwise resolved through reinstatement or settlement;

(F) The employee transfers from one distinct unit of an employer to another distinct unit of the same employer; the employer may transfer the employee's Form I-9 to the receiving unit; or

(G) The employee continues his or her employment with a related, successor, or reorganized employer, provided that the employer obtains and maintains from the previous records and Forms I-9 where applicable. For this purpose, a related, successor, or reorganized employer includes:

(1) The same employer at another location;

(2) An employer who continues to employ some or all of a previous employer's workforce in cases involving a corporate reorganization, merger, or sale of stock or assets; or

(3) An employer who continues to employ some or all of another employer's workforce where both employers belong to the same multi-employer association and employees continue to work in the same bargaining unit under the same collective bargaining agreement.

(2) Retention and Inspection of Form I-9. (i) Form I-9 must be retained by an employer or a recruiter or referrer for a fee for the following time periods:

(A) In the case of an employer, three years after the date of the hire or one year after the date the individual's employment is terminated, whichever is later; or

(B) In the case of a recruiter or referrer for a fee, three years after the date of the referral.

(ii) Any person or entity required to retain Forms I-9 in accordance with this section shall be provided with at least three days notice prior to an inspection of the Forms by an authorized Service officer. At the time of inspection, the Forms I-9 must be made available at the location where the request for production was made, or if the Forms I-9 are kept at another location, at the nearest Service office to that location. No subpoena or warrant shall be required for such inspection. Any refusal or delay in presentation of the Forms I-9 for inspection is a violation of the retention requirements as set forth in section 274A(b)(3) of the Act. In addition, if the person or entity has not complied with a request to present the Forms I-9, any Service officer listed in section 242.1 of this chapter may compel production of the Forms I-9 by issuing a subpoena.

(3) Copying of documentation. An employer or a recruiter or referrer for a fee may, but is not required to, copy a document presented by an individual solely for the purpose of complying with the verification requirements of this section. If such copy is made, it must be retained with the Form I-9. The retention requirements in paragraph (b)(2) of this section do not apply to the photocopies.

(4) Limitation on use of Form I-9. Any information contained in or appended to the Form I-9, including copies of documents listed in paragraph (c) of this section used to verify an individual's identity or employment eligibility, may be used only for enforcement of the Act and Sections 1001, 1028, 1546, or 1621 of Title 18, United States Code.

(c) Employment verification requirements in the case of hiring an individual who was previously employed. (1) When an employer hires an individual whom he or she has previously employed, if the employer has previously completed the Form I-9 and complied with the verification requirements set forth in paragraph (b) of this section with regard to the individual, the employer may (in lieu of completing a new Form I-9) inspect the previously completed Form I-9 and:

(i) If upon inspection of the Form I-9 relating to the individual, the employer determines that the Form I-9 relates to the individual and that the individual is eligible to work, no additional verification or new Form I-9 need be completed if the individual is hired within three years of the initial execution of the Form I-9; or

(ii) If upon inspection of the Form I-9, the employer determines that the individual is no longer eligible to work in the United States, the employer shall not rehire the individual unless he or she follows the updating procedures in paragraph (b)(1)(vii) of this section.

(2) For purposes of retention of the Form I-9 by an employer for a previously employed individual hired pursuant to paragraph (c)(1) of this section, the employer shall retain the Form I-9 for a period of three years commencing from the date of the initial execution of the Form I-9 or one year after the individual's employment is terminated, whichever is later.

(d) Employment verification requirements in the case of recruiting or referring for a fee an individual who was previously recruited or referred. (1) When a recruiter or referrer for a fee refers an individual for whom he or she has previously completed a Form I-9, and the recruiter or referrer has completed the Form I-9 and complied with the verification requirements set forth in paragraph (b) of this section with regard to the individual, the recruiter or referrer may (in lieu of completing a new Form I-9) inspect the previously completed Form I-9 and:

(i) If upon inspection of the Form I-9 relating to the individual, the recruiter or referrer determines that the Form I-9 relates to the individual and that the individual is authorized to work, no additional verification or new Form I-9 need be completed if the individual is referred within three years of the initial execution of the Form I-9: or

(ii) If upon inspection of the Form I-9, the recruiter or referrer determines that **16224** the individual is no longer authorized to work in the United States, the recruiter or referrer shall not refer the individual for employment unless he or she follows the updating procedures in paragraph (b)(1)(vii) of this section.

(2) For purposes of retention of the Form I-9 by a recruiter or referrer for a previously referred individual pursuant to paragraph (d)(1) of this section, the recruiter or referrer shall retain the Form I-9 for a period of three years commencing from the date of the initial execution of the Form I-9.

 8 CFR § 274a.3

### § 274a.3 Continuing employment of unauthorized aliens.

An employer who continues the employment of an employee hired after November 6, 1986, knowing that the employee is or has become an unauthorized alien with respect to that employment, is in violation of section 274(a)(2) of the Act.

 8 CFR § 274a.4

### § 274a.4 Good faith defense.

An employer or a recruiter or referrer for a fee for employment who shows good faith compliance with the employment verification requirements of § 274a.2(b) of this part shall have established a rebuttable affirmative defense that the person or entity has not violated section 274A(a)(1)(A) of the Act with respect to such hiring, recruiting, or referral.

 8 CFR § 274a.5

### § 274a.5 Use of labor through contract.

Any person or entity who knowingly uses a contract, subcontract, or exchange entered into, renegotiated, or extended after the date of enactment, to obtain labor or services of an unauthorized alien shall be considered to have hired the alien for employment in the United States in violation of section 274A(a)(1)(A) of the Act.

8 CFR § 274a.6

### § 274a.6 State employment agencies.

(a) General. A state employment agency as defined in § 274a.1 of this part may, but is not required to, verify employment eligibility pursuant to section 274A(b) of the Act. However, should a state employment agency choose to do so, it must:

(1) Complete the verification process for all individuals referred;

(2) Complete the verification process in accordance with the requirements of § 274a.2(b) of this part;

(3) Issue to an individual it refers a certification as set forth in paragraph (c) of this section, in which case an employer who hires the individual shall be deemed to have complied with the verification requirements of § 274a.2(b)(1) of this part, provided that the certification is retained by the employer in the same manner prescribed for Form I-9 in § 274a.2(b)(2) of this part; and

(4) Require the surrender of the certification back to the agency by the individual referred, if he or she is not hired as a result of the referral.

(b) Compliance with the provisions of section 274A of the Act. State employment agencies which choose to verify employment eligibility of individuals pursuant to § 274a.2(b) of this part shall comply with all provisions of section 274A of the Act and the regulations issued thereunder, and are subject to the penalties provided in § 274a.10 of this part for failure to comply.

(c) Procedures for state employment agency certification. All certifications issued by a state employment agency pursuant to paragraph (a)(3) of this section shall conform to the following standards. They must:

(1) Be issued on official agency letterhead, signed by an appropriately designated official, and contain the embossed seal of the agency;

(2) Be addressed to the particular employing entity to which the individual is referred, and contain identifying data concerning the individual being referred;

(3) Certify that the state agency has complied with the requirements of section 274A(b) of the Act concerning verification of the identity and employment eligibility of the individual referred, and determined that the individual is authorized to work in the United States;

(4) Clearly stipulate any restrictions, conditions, or other limitations which relate to the individual's employment eligibility in the United States; and

(5) State that the employer is not required to reverify the individual's identity or employment eligibility, but must retain the certification letter in lieu of Form I-9.

(d) Procedures for individuals who are certified by state employment agencies. Any individual referred to a potential employer by a state employment agency pursuant to this section shall present the original certification to that employer. If the referred individual is hired, the certification shall be provided by the individual to the employer for retention. If the referred individual is not hired, the original cetification shall be surrendered by the individual to the state employment

agency which issued the certificate. No copies shall be made of this certification, except as provided in paragraph (e) of this section.

(e) Retention of state employment agency certifications. Certifications issued by state employment agencies pursuant to this section shall be retained in the same manner and for the same period as Form I-9:

(1) In original form by the state employment agency, upon surrender by the individual referred if he or she is not hired; or

(2) In duplicate form by the state employment agency if the individual referred is hired; and

(3) In original form by the employer if the individual referred is hired.

8 CFR § 274a.7

## § 274a.7 Pre-enactment provisions for employees hired prior to November 7, 1986.

(a) The penalties provisions as set forth in section 274A (e) and (f) of the Act for violations of section 274A (a)(2) and (b) of the Act shall not apply to the "continuing employment" of an employee who was hired prior to November 7, 1986. For purposes of this section, "continuing employment" is defined in § 274a.2(b)(vi) of this part.

(b) For purposes of this section, an employee who was hired prior to November 7, 1986 shall lose his or her pre-enactment status if the employee:

(1) Quits; or

(2) Is terminated by the employer; the term termination shall include, but is not limited to, situations in which an employee is subject to seasonal employment; or

(3) Is excluded or deported from the United States or departs the United States under an order of voluntary departure.

8 CFR § 274a.8

## § 274a.8 Prohibition of indemnity bonds.

(a) General. It is unlawful for a person or other entity, in hiring or recruiting or referring for a fee for employment of an individual, to require the individual to post a bond or security, to pay or agree to pay an amount, or otherwise to provide a financial guarantee or indemnity, against any potential liability arising under this part relating to such hiring, recruiting, or referring of the individual. However, this prohibition does not apply to performance clauses which are stipulated by agreement between contracting parties.

(b) Penalty. Any person or other entity who requires any individual to post a bond or security as stated in this section shall, after notice and opportunity for an administrative hearing in accordance with section 274A(e)(3)(B) of the Act, be subject to a civil fine of $1,000 for each violation and to an administrative order requiring the return to the individual of any amounts received in violation of this section or, if the individual cannot be located, to the general fund of the Treasury.

8 CFR § 274a.9

## *16225  § 274a.9 Enforcement procedures.

(a) Procedures for the filing of complaints. Any person or entity having knowledge of a violation or potential violation of section 274A of the Act may submit a signed, written complaint in person or by mail to the Service office having jurisdiction over the business or residence of the potential violator. The signed, written complaint must contain sufficient information to identify both the complainant and the potential violator, including their names and addresses. The complaint should also contain detailed factual allegations relating to the potential violation including the date, time and place that the alleged violation occurred and the specific act or conduct of the employer alleged to constitute a violation of

the Act. Written complaints may be delivered either by mail to the appropriate Service office or by personally appearing before any immigration officer at a Service office.

(b) Investigation. The Service may conduct investigations for violations on its own initiative and without having received a written complaint. When the Service receives a complaint from a third party, it shall investigate only those complaints which have a reasonable probability of validity. If it is determined after investigation that the person or entity has violated section 274A of the Act, the Service shall issue and serve upon the alleged violator a citation or a Notice of Intent to Fine. Service officers shall have reasonable access to examine any relevant evidence of any person or entity being investigated.

(c) Citation and notice of intent to fine. If after investigation the Service determines that a person or entity has violated section 274A of the Act for the first time during the citation period (June 1, 1987 through May 31, 1988) the Service shall issue a citation. If after investigation the Service determines that a person or entity has violated section 274A of the Act for the second time during the citation period or for the first time after May 31, 1988, the proceeding to assess administrative penalties under section 274A of the Act is commenced by the Service by issuing a Notice of Intent to Fine on Form I-762. Service of this Notice shall be accomplished pursuant to Part 103 of this chapter. The person or entity identified in the Notice of Intent to Fine shall be known as the respondent. The Notice of Intent to Fine may be issued by an officer defined in § 242.1 of this chapter with concurrence of the District Counsel or his or her designee.

(1) Contents of the notice of intent to fine. (i) The Notice of Intent to Fine will contain a concise statement of factual allegations informing the respondent of the act or conduct alleged to be in violation of law, a designation of the charge(s) against the respondent, the statutory provisions alleged to have been violated, and the penalty that will be imposed.

(ii) The Notice of Intent to Fine will provide the following advisals to the respondent:

(A) That the person or entity has the right to representation by counsel of his or her own choice at no expense to the government;

(B) That any statement given may be used against the person or entity;

(C) That the person or entity has the right to request a hearing before an Administrative Law Judge pursuant to 5 U.S.C. 554-557, and that such request must be made within 30 days from the service of the Notice of Intent to Fine ;

(D) That the Service will issue a final order in 45 days if a written request for a hearing is not timely received and that there will be no appeal of the final order.

(d) Answer to notice of intent to fine. (1) If a respondent contests the issuance of a Notice of Intent to Fine, he or she must, by mail, serve a written answer responding to each allegation listed in the Notice and request a hearing within thirty days from the issuance of the Notice.

(2) If the respondent does not file an answer within thirty days, the Service shall issue a final order to which there is no appeal.

 8 CFR § 274a.10

## §274a.10 Penalties.

(a) Criminal penalties. An employer or a recruiter or referrer for a fee who engages in a pattern and practice of violating section 274A(a)(1)(A) or (a)(2) of the Act, may be fined not more than $3,000 for each unauthorized alien, imprisoned for not more than six months for the entire pattern or practice, or both, notwithstanding the provisions of any other Federal law relating to fine levels.

(b) Civil penalties. An employer or a recruiter or referrer for a fee may face civil penalties for a violation of section 274A of the Act. Civil penalties may be imposed by the Service or an Administrative Law Judge for violations under section 274A of the Act. In determining the level of the penalties that will be imposed, a finding of more than one violation in the course of a single proceeding or determination will be counted as a single violation. However, a single violation will include penalties for each unauthorized alien who is determined to have been knowingly hired or recruited or referred for a fee.

(1) A respondent found by the Service (if the respondent fails to request a hearing) or an Administrative Law Judge (at a hearing) to have knowingly hired or to have knowingly recruited or referred for a fee unauthorized alien for employment in the United States or to have knowingly continued to employ an unauthorized alien, shall be subject to the following order:

(i) To cease and desist from such behavior;

(ii) To pay a civil fine according to the following schedule:

(A) First violation—not less than $250 and not more than $2,000 for each unauthorized alien; or

(B) Second violation—not less than $2,000 and not more than $5,000 for each unauthorized alien; or

(C) More than two violations—not less than $3,000 and not more than $10,000 for each unauthorized alien; and

(iii) To comply with the requirements of section 274a.2(b) of this part, and to take such other remedial action as is appropriate.

(2) A respondent determined by the Service (if a respondent fails to request a hearing) or by an Administrative Law Judge to have failed to comply with the employment verification requirements as set forth in § 274a.2(b) of this part, shall be subject to a civil penalty in an amount of not less than $100 and not more than $1,000 for each individual with respect to whom such violation occurred. In determining the amount of the penalty, consideration shall be given to:

(i) The size of the business of the employer being charged;

(ii) The good faith of the employer;

(iii) The seriousness of the violation;

(iv) Whether or not the individual was an unauthorized alien; and

(v) The history of previous violations of the employer.

(3) Where an order is issued with respect to a respondent composed of a distinct, physically separate subdivision which does its own hiring or its own recruiting or referring for a fee for employment (without reference to the practices of, or under the control of or common control with, another subdivision) the subdivision shall be considered a separate person or entity.

(c) Enjoining pattern or practice violations. If the Attorney General has reasonable cause to believe that a person or entity is engaged in a pattern or practice of employment, recruitment or referral in violation of section 274A(a)(1)(A) or (2) of the Act, the **\*16226** Attorney General may bring civil action in the appropriate United States District Court

requesting relief, including a permanent or temporary injunction, restraining order, or other order against the person or entity, as the Attorney General deems necessary.

8 CFR § 274a.11

**§274a.11** **Special rule for legalization, special agricultural worker, and Cuban/Haitian entrant adjustment applicants.**
An individual who claims to be eligible, and who intends to apply or has applied, for benefits pursuant to section 245A or 210 of the Act or section 202 of the Immigration and Reform and Control Act of 1986, is authorized to work without presenting an employer or a recruiter or referrer for a fee with documentary evidence of work authorization. When an individual indicates to an employer or a recruiter or referrer for a fee that he or she claims to qualify for such benefits and that he or she intends to apply or has applied for such benefits, he or she shall attest to that fact by checking on the Form I-9, the third box of Part 1 (Employee Information and Verification) and noting "Special Rule" in the space after "Alien Number A " and "September 1, 1987" in the space after "expiration of employment authorization." The individual must also provide a document listed in § 274a.2(b)(1)(v)(B) of this part that establishes identity. The employer shall follow all of the employment verification procedures set forth in § 274a.2(b) of this part except that the employer or the recruiter or referrer for a fee shall note on the Form I-9 that the individual has stated his or her intention to seek such benefits by writing on the Form I-9 in Section 2—"Employer Review and Verification" under List C ("Documents that Establish Employment Eligibility") in the space after "Document Identification" the words "Special Rule" and in the space after "Expiration Date," "September 1, 1987". After September 1, 1987, such individuals, employers and recruiters and referrers for a fee will be required to fully comply with all provisions of § 274a.2(b) of this part. Employers, recruiters, and referrers, however, may update the Form I-9 if they follow the procedures set forth in § 274a.2(b)(2) of this part.


**Subpart B—Employment Authorization**
8 CFR § 274a.12

**§ 274a.12** **Classes of aliens authorized to accept employment.**
(a) Aliens authorized employment incident to status. Pursuant to the statutory or regulatory reference cited, the following classes of aliens are authorized to be employed in the United States without restrictions as to location or type of employment as a condition of their admission or subsequent change to one of the indicated classes, and specific employment authorization need not be requested:

(1) An alien who is a lawful permanent resident (with or without conditions pursuant to section 216 of the Act), as evidenced by Form I-151 or Form I-551 issued by the Service;

(2) An alien admitted to the United States as a lawful temporary resident pursuant to section 245A or 210 of the Act, as evidenced by an employment authorization document issued by the Service;

(3) An alien admitted to the United States as a refugee pursuant to section 207 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(4) An alien paroled into the United States as a refugee for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(5) An alien granted asylum under section 208 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(6) An alien admitted to the United States as a nonimmigrant fiance or fiancee pursuant to section 101(a)(15)(K) of the Act, or an alien admitted as the child of such alien, for the period of admission of the United States, as evidenced by an employment authorization document issued by the Service;

(7) An alien admitted as a parent (N-8) or dependent child (N-9) of an alien granted permanent residence under section 101(a)(27)(I) of the Act, as evidenced by an employment authorization document issued by the Service;

(8) An alien admitted to the United States as a citizen of the Federated States of Micronesia (CFA/FSM) or of the Marshall Islands (CFA/MIS) pursuant to agreements between the United States and the former trust territories, as evidenced by an employment authorization document issued by the Service;

(9) An alien granted suspension of deportation under section 244(a) of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(10) An alien granted withholding of deportation under section 243(h) of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service; or

(11) An alien who has been granted extended voluntary departure by the Attorney General as a member of a nationality group pursuant to a request by the Secretary of State. Employment is authorized for the period of time in that status as evidenced by Form I- issued by the Service.

(b) Aliens authorized for employment with a specific employer incident to status. The following classes of nonimmigrant aliens are authorized to be employed in the United States by the specific employer and subject to the restrictions described in the section(s) of this chapter indicated as a condition of their admission in, or subsequent change to, such classification. An alien in one of these classes is not issued an employment authorization document by the Service:

(1) A foreign government official (A-1 or A-2), pursuant to § 214.2(a) of this chapter. An alien in this status may be employed only by the foreign government entity;

(2) An employee of a foreign government official (A-3), pursuant to § 214.2(a) of this chapter. An alien in this status may be employed only by the foreign government official;

(3) A foreign government official in transit (C-2 or C-3), pursuant to § 214.2(c) of this chapter. An alien in this status may be employed only by the foreign government entity;

(4) A nonimmigrant crewman (D-1 or D-2) pursuant to § 214.2(d), and Parts 252 and 253, of this chapter. An alien in this status may be employed only in a crewman capacity on the vessel or aircraft of arrival, or on a vessel or aircraft of the same transportation company, and may not be employed in connection with domestic flights or movements of a vessel or aircraft;

(5) A nonimmigrant treaty trader (E-1) or treaty investor (E-2), pursuant to § 214.2(e) of this chapter. An alien in this status may be employed only by the treaty-qualifying company through which the alien attained the status. Employment authorization does not extend to the dependents of the principal treaty trader or treaty investor (also designated "E'1" or "E-2"), other than those specified in paragraph (c)(2) of this section;

(6) A nonimmigrant student (F-1) pursuant to § 214.2(f)(9) of this chapter. An alien in this status may be employed only in accordance with the following conditions:

(i) On campus for not more than twenty hours a week while school is in session; or

 *16227   (ii) On campus full time when school is not in session if the student is eligible and intends to register for the next term or session. In addition, a nonimmigrant student (F-1) may engage in a work-study program as part of the regular

curriculum available within the student's program of study in accordance with the conditions specified in § 214.2(f)(10) of this chapter;

(7) A representative of an international organization (G-1, G-2, G-3, or G-4), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the foreign government entity or the international organization;

(8) A personal employee of an official or representative of an international organization (G-5), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the official or representative of the international organization;

(9) A temporary worker or trainee (H-1, H-2A, H-2B, or H-3), pursuant to § 214.2(h) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained;

(10) An information media representative (I), pursuant to § 214.2(i) of this chapter. An alien in this status may be employed only for the sponsoring foreign news agency or bureau. Employment authorization does not extent to the dependents of an information media representative (also designated "I");

(11) An exchange visitor (J-1), pursuant to § 214.2(j) of this chapter. An alien in this status may be employed only by the exchange visitor program sponsor or appropriate designee and within the guidelines of the program approved by the United States Information Agency;

(12) An intra-company transferee (L-1), pursuant to § 214.2(1) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained;

(13) Officers and personnel of the armed services of nations of the North Atlantic Treaty Organization, and representatives, officials, and staff employees of NATO (NATO-1, NATO-2, NATO-3, NATO-4, NATO-5 and NATO-6), pursuant to § 214.2(o) of this chapter. An alien in this status may be employed only by NATO;

(14) An attendant, servant or personal employee (NATO-7) of an alien admitted as a NATO-1, NATO-2, NATO-3, NATO-4, NATO-5, or NATO-6, pursuant to § 214.2(o) of this chapter. An alien admitted under this classification may be employed only by the NATO alien through whom the status was obtained; or

(15) A nonimmigrant alien within the class of aliens described in paragraphs (b)(9), (11), and (12) of this section whose status has expired but who has filed a timely application for an extension of such status pursuant to §214.2 of this chapter. These aliens are authorized to continue employment with the same employer for a period not to exceed 120 days beginning on the date of the expiration of the authorized period of stay. If the alien's application for extension of stay has not been adjudicated within this period, the alien may apply to the district director for employment authorization pursuant to paragraph (c)(15) of this section.

(c) Aliens who must apply for employment authorization. Any alien within a class of aliens described in this section must apply for work authorization. If authorized, such an alien may accept employment subject to any restrictions indicated in the regulations or cited on the employment authorization document:

(1) An alien spouse or unmarried dependent son or daughter of a foreign government official (A-1 or A-2) pursuant to § 214.2(a)(2) of this chapter, or the dependent of an employee of a foreign government official (A-3) pursuant to § 214.2(a)(3) of this chapter;

(2) An alien spouse or unmarried dependent son or daughter of an alien employee of the Coordination Council for North American Affairs (E-1) pursuant to § 214.2(e) of this chapter;

(3) A nonimmigrant (F-1) student who:

(i) Is seeking off-campus employment authorization due to economic necessity pursuant to § 214.2(f) of this Chapter;

(ii) Is seeking employment for purposes of practical training pursuant to § 214.2(f) of this chapter. The alien may be employed only in an occupation which is directly related to his or her course of studies; or

(iii) Has been offered employment under the sponsorship of an international organization within the meaning of the International Organization Immunities Act (59 Stat. 669), if such international organization provides written certification to the district director having jurisdiction over the intended place of employment that the proposed employment is within the scope of the organization's sponsorship;

(4) An alien spouse or unmarried dependent son or daughter of an officer or employee of an international organization (G-4) pursuant to § 214.2(g) of this chapter;

(5) An alien spouse or minor child of an exchange visitor (J-2) pursuant to § 214.2(j) of this chapter;

(6) A nonimmigrant (M-1) student seeking employment for practical training pursuant to § 214.2(m) of this chapter following completion of studies if such employment is directly related to the student's course of study;

(7) A dependent of an alien classified as NATO-1 through NATO-7 pursuant to § 214.2(n) of this chapter;

(8) Any alien who has filed a non-frivolous application for asylum pursuant to Part 208 of this chapter. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

(9) Any alien who has filed an application for adjustment of status to lawful permanent resident pursuant to Part 245 of this chapter. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

(10) Any alien who has filed an application for suspension of deportation pursuant to Part 244 of this chapter, if the alien establishes an economic need to work. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

(11) Any alien paroled into the United States temporarily for emergent reasons or reasons deemed strictly in the public interest pursuant to § 212.5 of this chapter;

(12) Any deportable alien granted voluntary departure, either prior to or after hearing, for reasons set forth in §242.5(a) (2) (v), (vi), or (viii) of this chapter may be granted permission to be employed for that period of time prior to the date set for voluntary departure including any extension granted beyond such date. Factors which may be considered in adjudicating the employment application of an alien who has been granted voluntary departure are the following:

(i) The length of voluntary departure granted;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support;

(iii) Whether there is a reasonable chance that legal status may ensue in the near future; and

 **\*16228**  (iv) Whether there is a reasonable basis for consideration of discretionary relief.

(13) Any alien against whom exclusion or deportation proceedings have been instituted, who does not have a final order of deportation or exclusion, and who is not detained may be granted temporary employment authorization if the district director determines that employment is appropriate. Factors which may be considered by the district director in adjudicating the employment application of such an alien are the following:

(i) The existence of the economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support;

(iii) Whether there is a reasonable chance that legal status may ensue in the near future; and

(iv) Whether there is a reasonable basis for consideration of discretionary relief;

(14) An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment;

(15) A nonimmigrant alien within the class of aliens described in paragraphs (b)(9), (11), and (12) of this section whose application for extension of stay has not been adjudicated within the 120-day period as set forth in paragraph (b)(15) of this section.

(d) Basic criteria to establish economic necessity. Title 45—Public Welfare, Poverty Guidelines, 45 CFR 1060.2 should be used as the basic criteria to establish eligibility for employment authorization when the alien's economic necessity is identified as a factor. The alien shall submit an application for employment authorization listing his or her assets, income, and expenses as evidence of his or her economic need to work. Permission to work granted on the basis of the alien's application for employment authorization may be revoked under §274a.14 of this chapter upon a showing that the information contained in the statement was not true and correct.General. An application (in the form of a written request) for employment authorization by an alien under § 274.12(c) of this chapter shall be filed with the district director having jurisdiction over the applicant's residence. Except for paragraph (c)(8) of this section, the approval of an application for employment authorization shall be within the discretion of the district director. Where economic necessity is identified as a factor, the alien must provide information regarding his or her assets, income, and expenses on the application for employment authorization.1I11(b) Approval of application. If the application is granted, the alien shall be notified of the decision and issued employment authorization for a specific period of time. Such authorization shall be subject to any conditions noted on the employment authorization document.1I11(c) Denial of application. If the application is denied, the applicant shall be notified in writing of the decision and the reasons for the denial. There shall be no appeal from the denial of the application.1I11(d) Interim employment authorization. The district director shall adjudicate the application for employment authorization within 60 days from the date of receipt of the application by the Service or the date of receipt of a returned application by the Service. Failure to complete the adjudication within 60 days will result in the grant of interim employment authorization for a period not to exceed 120 days. Such authorization shall be subject to any conditions noted on the employment authorization document. However, if the district director adjudicates the application prior to the expiration date of the interim employment authorization and denies the individual's employment authorization application, the employment authorization granted under this section shall automatically terminate.1I80§ 274a.141I89Termination of employment authorization.1I11(a) Automatic termination of employment authorization.1I11(1) Employment authorization granted under § 274a.12(c) of this chapter shall automatically terminate upon the occurrence of one of the following events:1I11(i) The expiration date specified by the Service on the employment authorization document is reached;1I11(ii) Exclusion or deportation proceedings are

instituted (however, this shall not preclude the authorization of employment pursuant to § 274a.12(c) of this part where appropriate); or1I11(iii) The alien is granted voluntary departure.1I11(2) Termination of employment authorization pursuant to this paragraph does not require the service of a notice of intent to revoke; employment authorization terminates upon the occurrence of any event enumerated in paragraph (a)(1) of this section.

However, automatic revocation under this section does not preclude reapplication for employment authorization under § 274.12(c) of this part.

(b) Revocation of employment authorization— (1) Basis for revocation of employment authorization. Employment authorization granted under § 274a.12(c) of this chapter may be revoked by the district director:

(i) Prior to the expiration date, when it appears that any condition upon which it was granted has not been met or no longer exists, or for good cause shown, or

(ii) Upon a showing that the information contained in the application is not true and correct.

(2) Notice of intent to revoke employment authorization. When a district director determines that employment authorization should be revoked prior to the expiration date specified by the Service, he or she shall serve written notice of intent to revoke the employment authorization. The notice will cite the reasons indicating that revocation is warranted. The alien will be granted a period of fifteen days from the date of service of the notice within which to submit countervailing evidence. The decision by the district director shall be final and no appeal shall lie from the decision to revoke the authorization.

(c) Automatic termination of temporary employment authorization granted prior to June 1, 1987. (1) Temporary employment authorization granted prior to June 1, 1987, pursuant to 8 CFR 109.1(b), or its redesignation as § 274a.12(c) of this part, shall automatically terminate on the date specified by the Service on the document issued to the alien, or on June 1, 1988, whichever is earlier. Automatic termination of temporary employment authorization does not preclude a subsequent application for temporary employment authorization.

(2) A document issued by the Service prior to June 1, 1987, that authorizes temporary employment authorization for any period beyond June 1, 1988, is null and void pursuant to paragraph (c)(1) of this section, and must be surrendered to the Service on the date that the temporary employment authorization terminates or on June 1, 1988, whichever is earlier. The alien shall be issued a new employment authorization document at the time the document is surrendered to the Service if the alien is eligible for temporary employment authorization pursuant to § 274a.12(c) of this chapter.

(3) No notice of intent to revoke is necessary for the automatic termination of temporary employment authorization pursuant to this part.

Dated: April 28, 1987.

Alan C. Nelson,

Commissioner, Immigration and Naturalization Service.


[FR Doc. 87-9896 Filed 4-30-87; 8:45 am]

BILLING CODE 4410-10-M

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.

# EX. 51

61 FR 47039-01, 1996 WL 500956(F.R.)

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

Immigration and Naturalization Service

8 CFR Part 103

[AG Order No. 2054-96; INS No. 1792-96]

RIN 1115-AE51

Definition of the Term Lawfully Present in the United States for Purposes of
Applying for Title II Benefits Under Section 401(b)(2) of Public Law 104-193

Friday, September 6, 1996

**\*47039** AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Interim rule with request for comments.

SUMMARY: This interim rule amends the Immigration and Naturalization Service (Service) regulations to define the term "an alien who is lawfully present in the United States" so that the Social Security Administration may determine which aliens in the United States are eligible for benefits under title II of the Social Security Act. Aliens who are considered "lawfully present in the United States," however, must otherwise satisfy the requirements for benefits under title II of the Social Security Act in order to receive social security benefits.

DATES: This rule is effective September 6, 1996. Written comments must be received on or before November 5, 1996.

ADDRESSES: Please submit written comments, in triplicate, to the Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW., Room 5307, Washington, DC 20536. To ensure proper handling, please reference INS number 1792-96 on your correspondence. Comments are available for public inspection at this location by calling (202) 514-3048 to arrange an appointment.

FOR FURTHER INFORMATION CONTACT:

Derek C. Smith, Assistant General Counsel, Office of the General Counsel; or Sophia Cox, Adjudications Officers, Adjudications Division; Immigration and Naturalization Service, 425 I Street, NW., Room 3214, Washington, DC 20536, telephone (202) 514-2895 or (202) 514-5014.

SUPPLEMENTARY INFORMATION: On August 22, 1996, the President signed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Personal Responsibility Act), Pub. L. 104-193. Section 401(a) of the Personal Responsibility Act provides that, subject to limited exceptions, only "qualified aliens," as defined under section 431, may receive Federal public benefits, **\*47040** including retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, and unemployment benefits, among others.

Section 431(b) of the Personal Responsibility Act defines the term "qualified alien" to mean the following six groups of aliens:

(1) Aliens who are lawfully admitted for permanent residence under the Immigration and Nationality Act (Act);

(2) Aliens who are granted asylum under section 208 of the Act;

(3) Refugees admitted into the United States under section 207 of the Act; or

(4) Aliens who are paroled into the United States under section 212(d)(5) of the Act for a period of at least 1 year;

(5) Aliens whose deportation is being withheld under section 243(h) of the Act; and

(6) Aliens who are granted conditional entry pursuant to section 203(a)(7) of the Act as in effect prior to April 1, 1980.

Section 401(b)(2) of the Personal Responsibility Act, however, provides an exception, which allows aliens who are "lawfully present in the United States," as determined by the Attorney General, to receive benefits under title II of the Social Security Act. (Title II benefits include, for example, retirement benefits.) The purpose of this regulation, therefore, is to define the term "an alien who is lawfully present in the United States," as required under section 401(b)(2) of the Personal Responsibility Act, thereby enabling the Social Security Administration to determine whether aliens who are not "qualified aliens" are eligible to receive title II benefits, if they are lawfully present in this country. This definition is made solely for the purpose of determining an alien's eligibility for payment of title II social security benefits, as required under section 401(b)(2) of the Personal Responsibility Act, and is not intended to confer any immigration status or benefit under the Immigration and Nationality Act.

In determining which aliens are lawfully present for the purposes of section 401(b)(2) of Public Law 104-193, the Service had to distinguish among many classes of aliens in the United States. The characteristic common to all the classes of aliens defined as "lawfully present in the United States" is that their presence in the United States has been sanctioned by a policy determination that a particular class of aliens should be allowed to remain in the United States, and that policy determination has almost always been implemented by an official act having the force of law. Each of the five categories defined as lawfully present fits within this rationale. First, the Service has concluded that Congress intended for qualified aliens, as defined in section 431(b) of the Personal Responsibility Act, to be included in the definition of lawfully present. Second, aliens who have been inspected and admitted to the United States and have not violated their status are lawfully present under the terms of the Immigration and Nationality Act. Third, an alien who has been paroled into the United States is lawfully present pursuant to section 212(d)(5) of the Act. However, persons who are paroled in order to determine whether or not they must be excluded under the Act are not lawfully present because no determination has been made as to the lawfulness of their presence, and they are allowed into the United States to avoid having to keep them in detention while they wait proceedings. Fourth, aliens who belong to one of the seven classes of aliens listed in section 103.12(a)(4) of this rule have been permitted to remain in the United States either by an act of Congress or through some other policy determination affecting that class of aliens. Aliens in temporary resident status pursuant to section 210 or 245A of the Act, aliens under Temporary Protected Status (TPS) pursuant to section 244A of the Act, and Family Unity beneficiaries pursuant to section 301 of Pub. L. 101-649 are all in lawful status under the Act. Cuban-Haitian entrants, aliens in deferred action status, aliens under Deferred Enforced Departure, and aliens who are the spouses and children of a United States citizen with an approved visa petition all remain in the United States under a Presidential or administrative policy that permits them to do so. Finally, applicants for asylum and withholding of deportation are permitted to remain in the United States because section 208(a) of the Act requires the Attorney General to create a procedure for adjudicating claims for asylum made by aliens physically present in the United States. Section 208(a) of the Act was passed to implement the obligations of the United States under the Convention Relating to the Status of Refugees, of July 28, 1951, as incorporated into the Protocol Relating to the Status of Refugees, of January 31, 1967.

**Good Cause Exception**

This interim rule is effective upon publication in the Federal Register although the Service invites post-promulgation comments and will address any such comments in a final rule. For the following reasons, the Service finds that good cause exists for adopting this rule without the prior notice and comment period ordinarily required by 5 U.S.C. 553(b). Section 401(b)(2) of Pub. L. 104-193 requires the Attorney General to define the term "an alien lawfully present in the United States" so that the Social Security Administration can determine which aliens are eligible for payment of title II

social security benefits under the terms of the Social Security Act. Absent a definition of "an alien lawfully present in the United States," section 401(a) of Pub. L. 104-193 requires the Social Security Administration to suspend payments under title II for aliens who are not "qualified aliens" (as defined under section 431(b)) and who file applications on or after September 1, 1996. It is therefore impracticable to adopt this rule with the prior notice and comment period normally required under 5 U.S.C. 553(b).

**Regulatory Flexibility Act**
The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant economic impact on a substantial number of small entities, because this regulation affects individuals, not small entities.

**Executive Order 12866**
This interim rule is considered by the Department of Justice, Immigration and Naturalization Service, to be a "significant regulatory action" under E.O. 12866, section 3(f), Regulatory Planning Review, and it has been submitted to the Office of Management and Budget for review under E.O. 12866.

**Executive Order 12988**
This interim rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of E.O. 12988.

**Executive Order 12612**
This regulation will not have a substantial direct effect on the States, on the relationships between the National government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with E.O. 12612, it is determined that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

**List of Subjects in 8 CFR Part 103**
Administrative practice and procedure, Authority delegations **\*47041** (Government agencies), Freedom of Information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

Accordingly, part 103 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

**PART 103—POWERS AND DUTIES OF SERVICE OFFICERS; AVAILABILITY OF SERVICE RECORDS**
1. The authority citation for part 103 continues to read as follows:

Authority: 5 U.S.C. 552, 552(a); 8 U.S.C. 1101, 1103, 1201, 1252 note, 1252b, 1304, 1356; 31 U.S.C. 9701; L E.O. 12356; 47 FR 14874, 15557; 3 CFR 1982 Comp., p. 166; 8 CFR part 2.
 8 CFR § 103.12
2. A new §103.12 is added to read as follows:
 8 CFR § 103.12

**§103.12** Definition of the term "lawfully present" aliens for purposes of applying for Title II social security benefits under Public Law 104-193.
(a) Definition of the term an "alien who is lawfully present in the United States." For the purposes of section 401(b)(2) of Pub. L. 104-193 only, an "alien who is lawfully present in the United States" means:

(1) A qualified alien as defined in section 431(b) of Pub. L. 104-193;

(2) An alien who has been inspected and admitted to the United States and who has not violated the terms of the status under which he or she was admitted or to which he or she has changed after admission;

(3) An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Act for less than 1 year, except:

(i) Aliens paroled for deferred inspection or pending exclusion proceedings under 236(a) of the Act; and

(ii) Aliens paroled into the United States for prosecution pursuant to 8 CFR 212.5(a)(3);

(4) An alien who belongs to one of the following classes of aliens permitted to remain in the United States because the Attorney General has decided for humanitarian or other public policy reasons not to initiate deportation or exclusion proceedings or enforce departure:

(i) Aliens currently in temporary resident status pursuant to section 210 or 245A of the Act;

(ii) Aliens currently under Temporary Protected Status (TPS) pursuant to section 244A of the Act;

(iii) Cuban-Haitian entrants, as defined in section 202(b) Pub. L. 99-603, as amended;

(iv) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101-649, as amended;

(v) Aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

(vi) Aliens currently in deferred action status pursuant to Service Operations Instructions at OI 242.1(a)(22);

(vii) Aliens who are the spouse or child of a United States citizen whose visa petition has been approved and who have a pending application for adjustment of status;

(5) Applicants for asylum under section 208(a) of the Act and applicants for withholding of deportation under section 243(h) of the Act who have been granted employment authorization, and such applicants under the age of 14 who have had an application pending for at least 180 days.

(b) Non-issuance of an Order to Show Cause and non-enforcement of deportation and exclusion orders. An alien may not be deemed to be lawfully present solely on the basis of the Service's decision not to, or failure to, issue an Order to Show Cause or solely on the basis of the Service's decision not to, or failure to, enforce an outstanding order of deportation or exclusion.

Dated: September 4, 1996.

Janet Reno,

Attorney General.

[FR Doc. 96-22963 Filed 9-4-96; 3:10 pm]

BILLING CODE 4410-10-M

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.

# EX. 52

76 FR 53764-01, 2011 WL 3793637(F.R.)
RULES and REGULATIONS
DEPARTMENT OF HOMELAND SECURITY
8 CFR Parts 1, 100, 103, 204, 207, 208, 209, 211, 212, 213a, 214, 223, 235, 236, 238, 240, 241, 244, 245, 245a, 248, 264, 265, 270, 274a, 287, 292, 299, 301, 310, 312, 316, 319, 320, 322, 324, 325, 328, 329, 330, 332, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 343a, 343b, 343c, 392, and 499
[CIS No. 2481-09; DHS Docket No. USCIS-2009-0022]
RIN 1615-AB83

Immigration Benefits Business Transformation, Increment I

Monday, August 29, 2011

AGENCY: U.S. Citizenship and Immigration Services, DHS.

**\*53764** ACTION: Final rule; request for comments.

SUMMARY: The Department of Homeland Security (DHS) is amending its regulations to enable U.S. Citizenship and Immigration Services (USCIS) to migrate from a paper file-based, non-integrated systems environment to an electronic customer-focused, centralized case management environment for benefit processing. This transformation process will allow USCIS to streamline benefit processing, eliminate the capture and processing of redundant data, and reduce the number of and automate its forms. This transformation process will be a phased multi-year initiative to restructure USCIS business processes and related information technology systems. DHS is removing references to form numbers, form titles, expired regulatory provisions, and descriptions of internal procedures, many of which will change during transformation. DHS is also finalizing interim rules that permitted submission of benefit requests with an electronic signature when such requests are submitted in an electronic format rather than on a paper form and that removed references to filing locations for immigration benefits. In addition, in this rule DHS is publishing the final rule for six other interim rules published during the past several years, most of which received no public comments.

DATES: Effective date: This rule is effective November 28, 2011.

Comment date: Written comments must be submitted on or before October 28, 2011.

ADDRESSES: You may submit comments, identified by DHS docket number USCIS-2009-0022 by one of the following methods:

• Federal eRulemaking Portal: http://www.regulations.gov. Follow the instructions for submitting comments.

• E-mail: You may submit comments directly to USCIS by e-mail at uscisfrcomment@dhs.gov. Include DHS docket number USCIS-2009-0022 in the subject line of the message.

• Mail: Sunday Aigbe, Chief, Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529-2020. To ensure proper handling, please reference DHS docket number USCIS-2009-0022 on your correspondence. This mailing address may be used for paper, disk, or CD-ROM submissions.

• Hand Delivery/Courier: Sunday Aigbe, Chief, Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529-2020. Contact Telephone Number is (202) 272-8377.

FOR FURTHER INFORMATION CONTACT: Dan Konnerth, Policy Chief, Office of Transformation Coordination, U.S. Citizenship and Immigration Services, Department of Homeland Security, 633 Third St., NW., Washington, DC 20529-2210. Contact Telephone Number is (202) 233-2381.

SUPPLEMENTARY INFORMATION:

**Table of Contents**

I. Public Participation

II. Background

A. Introduction

B. Authority

C. USCIS Transformation Initiative

D. How Transformation Will Work

E. Other Regulatory Changes Necessary for the Transformation Initiative

III. The Changes Made by This Rule

A. Removing References to Form Numbers and Form Titles

B. Removing References to Position Titles Within USCIS

C. Replacing "Service" With More Specific Component Names and Removing References to Particular USCIS Offices

D. Removing Information About Procedures for Filing and Internal Processing of Benefit Requests

E. Removing Obsolete and Expired Regulatory Provisions; Correcting and Updating Provisions Affected by Statutory Changes

F. Revising or Reorganizing Sections or Paragraphs for Clarity and Consistency and To Remove Duplicative Information

IV. Discussion of Comments Received in Response to the April 29, 2003, Interim Rule

V. Discussion of Other Interim Final Rules Being Finalized

A. Application for Refugee Status; Acceptable Sponsorship Agreement Guaranty of Transportation, RIN 1615-AA24

B. Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, RIN 1615-AA57

C. Eliminating the Numerical Cap on Mexican TN Nonimmigrants, RIN 1615-AA96

D. Allocation of Additional H-1B Visas Created by the H-1B Visa Reform Act of 2004, RIN 1615-AB32

E. Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and the Baltic States as Employment-Based Immigrants, RIN 1615-AB14

F. Revoking Grants of Naturalization, RIN 1615-AA30

VI. Discussion of Comments Received in Response to the June 5, 2009, Interim Rule

VII. Regulatory Requirements

A. Administrative Procedure Act

B. Unfunded Mandates Reform Act of 1995

C. Small Business Regulatory Enforcement Fairness Act of 1996

D. Executive Order 12866

E. Executive Order 13132

F. Executive Order 12988 Civil Justice Reform

G. Paperwork Reduction Act

H. Regulatory Flexibility Act

**I. Public Participation**

Interested persons are invited to submit written data, views, or arguments on all aspects of this rule. Comments that will provide the most assistance to USCIS in developing these procedures will reference a specific portion of this rule, explain the reason for any recommended change, and include data, information, or authority that support the recommended change.

Instructions: All submissions must include the component name and DHS docket number USCIS-2009-0022. All comments received will be posted without change to http://www.regulations.gov, including any personal information provided.

Docket: For access to the docket to read background documents or comments received go to http://www.regulations.gov. Submitted comments may also be inspected at the Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529-2020.

**II. Background**

*A. Introduction*

U.S. Citizenship and Immigration Services (USCIS) receives approximately six million immigration benefit requests each year, comprised of more than fifty types of applications and petitions. USCIS historically accepted paper applications and depended on paper files. These applications and **\*53765** paper files were the only means for USCIS to adjudicate applications and petitions and that paper-based process, by contemporary standards, was inefficient. Until recently, USCIS processed on paper all immigration benefits, verified the identity of applicants, and provided other government agencies with the information required to quickly identify criminals and possible terrorists.

USCIS is modernizing its processes and systems in light of the development of technology to accommodate and encourage greater use of electronic data submission, to include e-filing and electronic interaction. USCIS will not eliminate paper filing at this time but will convert the data from paper filing to an electronic medium when the completed form is received. USCIS will then operate in an electronic environment fostering greater operational efficiency, provide transparency, and improve access to information through online accounts for those who do business with USCIS.

The Department of Homeland Security (DHS) and USCIS began the transformation of USCIS operations by eliminating regulatory references to filing locations for immigration benefits, thereby permitting USCIS to more rapidly adjust filing locations to meet demand and operational needs and to provide that information on petition and application forms and through other means, such as on the USCIS Web site. See Removing References to Filing Locations and Obsolete References to Legacy Immigration and Naturalization Service; Adding a Provision to Facilitate the Expansion of the Use of Approved Electronic Equivalents of Paper Forms, 74 FR 26933 (June 5, 2009) ("Filing Location Rule").

DHS is expanding on the Filing Location Rule by affording additional flexibility for applicants and petitioners to file, and for USCIS to receive and process, benefit requests, biometrics, and supporting documentation in an electronic environment. For example, amendments in this rule to 8 CFR 103.2(a)(1) (relating to filing), 8 CFR 103.2(a)(7) (relating to receipt dates), and 8 CFR 103.8 (relating to delivery of notices) each replace language geared solely to paper files and benefit requests with language that is equally applicable in a paper or electronic environment.

## B. Authority

The Government Paperwork Elimination Act (GPEA), Public Law 105-277, tit. XVII, section 1703, 112 Stat. 2681, 2681-749 (Oct. 21, 1998), 44 U.S.C. 3504 note, provides that, when possible, Federal agencies use electronic forms, electronic filing, and electronic submissions to conduct agency business with the public. GPEA establishes the means for the use and acceptance of electronic signatures. This rule will significantly enhance the ability of USCIS to fully implement GPEA. The Homeland Security Act of 2002, Public Law 107-296, section 102, 116 Stat. 2135 (Nov. 25, 2002), 6 U.S.C. 112, and the Immigration and Nationality Act of 1952, as amended (INA or Act), section 103, 8 U.S.C. 1103, charge the Secretary of Homeland Security with administration and enforcement of the immigration and naturalization laws. DHS implemented an electronic signature provision for immigration benefit filings with USCIS in 2003. Electronic Signature on Applications for Immigration and Naturalization Benefits, 68 FR 23010 (April 29, 2003). The Secretary promulgates this final rule under the broad authority to administer the Department of Homeland Security, and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority.

DHS is also adding new fees to the USCIS fee regulations as required by recent legislation. Effective August 13, 2010, Public Law 111-230 imposes additional fees on certain H-1B and L-1 nonimmigrants. 124 Stat. 2485 (Aug. 13, 2010); New 8 CFR 103.7(b)(1)(v).

## C. USCIS Transformation Initiative

USCIS is engaged in an enterprise-wide transformation effort to implement new business processes and to improve service, operational efficiency, and national security. USCIS's new operational environment will employ online accounts, such as those used by many private sector organizations.

Applicants and petitioners will be able to access individualized accounts that will provide electronic access to information on how to apply for benefits, allow easier filing, and permit applicants and petitioners, and their representatives, to track the status of open applications and petitions. Applicants and petitioners will be able to use a secure USCIS Internet Web site to access accounts "on-demand" in an electronic service environment available at all times.

USCIS will develop new automated case management tools to access data electronically, prevent the loss of information, and provide adjudicators with a comprehensive view of an alien's immigration history. USCIS's electronic environment will facilitate and expedite information collection, reduce benefit fraud and result in more consistent and efficient decisions. USCIS is supplementing existing paper filing options by adding more user-friendly electronic filing options.

USCIS will improve many of its internal security, operational efficiency, and public service capabilities as transformation proceeds. USCIS will first allow the creation of accounts for various applicants, followed by enhanced e-filing and

case management capabilities, and then improve reporting and Freedom of Information Act (FOIA), 5 U.S.C. 552, tools. Once deployed, these tools will be applied and made available to the immigrant, humanitarian, and nonimmigrant applicant populations.

USCIS's transformation to an electronic environment is based on three objectives and long-term benefits: enhanced national security and integrity of filings, public service, and operational efficiency. USCIS's transformation will use modern electronic audit and investigative methods to improve national security and integrity by identifying potential fraud and other risks by effectively collecting, analyzing and sharing information used to verify an alien's or other individual's identity and eligibility for various immigration benefits. USCIS will use a more complete picture of an alien's immigration history by analyzing information across benefit applications, thus exposing those attempting to perpetrate fraud or who are otherwise ineligible for immigration benefits. For example, an applicant's or beneficiary's marital or employment history in an existing agency file or in another pending application may provide relevant information that differs from the information in the application or petition being adjudicated. A responsible and transparent approach toward the handling of such personal information protects the rights of individuals and organizations interacting with USCIS and thereby fosters their trust and cooperation. At the same time, this approach facilitates authorized sharing of information with partner components of DHS—such as U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE)—in a secure environment that better protects against unauthorized disclosures. This approach will facilitate authorized sharing of information with partner agencies—such as the Department of State (DOS) and the Department of Justice (DOJ). In addition, electronic transmission and storage of information is faster, less costly and more secure than the physical movement of paper files.

 **\*53766**  USCIS will improve public service by adjudicating requests for benefits more accurately and quickly, and by providing more timely and accurate information about immigration benefits and the status of benefit requests. Applicants, petitioners, and their representatives will have access to relevant forms, instructions, case status, and other actions and information through online accounts that organize information and transactions to meet their needs. DHS will continue to ensure the confidentiality of its immigration records in accordance with the requirements of the law, including the Privacy Act, 5 U.S.C. 552a,[FN1] and 8 CFR 208.6. USCIS's transformation to an electronic environment will enable it to become an innovative and agile organization that better understands its workload and best uses all available resources, investing in its people and infrastructure to ensure cost-effective and consistent results.

1       The Privacy Act grants United States citizens and lawful permanent residents the right to access and amend their records. DHS policy, as a matter of discretion, permits nonimmigrant aliens equivalent ability to access and correct records. Memorandum for Directorate and Component Leadership from Hugo Teufel III, Chief Privacy Officer, DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons, Memorandum 2007-1 (January 19, 2007), found at http://www.dhs.gov/xlibrary/assets/privacy/privacy—policyguide—2007-1.pdf.

### D. How Transformation Will Work

USCIS adopted a "person-centric" business approach to transformation based on establishing various types of individual and organizational accounts. The key to this approach is encouraging individual applicants, petitioners, beneficiaries, organizations, legal representatives, and others who interact with USCIS to access their own online accounts. Applicants, petitioners, and others will be able to electronically submit benefit requests with supporting documentation, access status information regarding pending benefit requests, change their addresses and contact information, obtain FOIA-related materials, and comply with some registration requirements of the Immigration and Nationality Act.

USCIS's transformation will create an end-to-end electronic adjudicative process encompassing an alien's entire immigration lifecycle, unlike the current process that uses multiple systems and focuses on each individual benefit request. Data initially provided by account holders will be reused, if appropriate, to reduce data entry required for subsequent benefit requests. Additional and revised data will be used to update and enhance account information. Account data submitted to support various immigration benefit transactions will be verified, where feasible and appropriate, through

links to other internal and external data systems, potentially reducing the need for applicants and petitioners to provide certain forms of supporting evidence and reducing potential requests for evidence from USCIS.

USCIS's transformation will eventually affect all aspects of USCIS benefit processing operations and technology. This operational concept is intended to standardize processes across USCIS operations relating to case intake, biometrics, background checks, adjudication, scheduling, and notifications. USCIS benefit adjudication operations will be changed incrementally from a paper- and hard copy file-based process to an electronic process, making it possible to process benefit requests more efficiently. With the implementation of these improvements, USCIS will enhance the overall process.

### E. Other Regulatory Changes Necessary for the Transformation Initiative

DHS anticipates that additional regulatory changes will be required over the next several years as the transformation of USCIS to an electronic environment progresses. DHS expects, for example, to revise regulations pertaining to filing and handling of immigrant benefit requests to lead to computer system enhancements applied to immigrant applications and benefits. DHS will not make transformation-related changes to 8 CFR part 214 at this time, but will publish a separate rulemaking to address business transformation as well as reorganizing and simplifying that part.

### III. The Changes Made by This Rule

DHS is amending those parts of chapter I of 8 CFR that regulate affidavits of support, citizenship and naturalization, employment authorization, nonimmigrant benefits (other than part 214) and related waivers, permanent resident documents, refugee and asylum processing, Temporary Protected Status, and travel documents. These amendments are best understood by the changes effected, rather than as individual amendments to the regulations.

### A. Removing Form Title and Number References, and Adding Filing Definitions

DHS is removing references to form numbers and form titles. At this time, USCIS will continue to accept paper submission of most applications, petitions, and benefit requests, although it will phase out references to mandatory use of specific forms for specific purposes in the regulations. Mandating in regulations specific form numbers reduces USCIS's ability to modify its business processes to reflect filing procedures in an electronic environment. Form names and numbers will continue to exist for reference purposes but will not be specifically referenced in the regulations. This rule is an early step in the transformation process and purposely does not remove all form references from all regulations affecting USCIS procedures at this time. Forms identified by number will continue to appear until other parts of DHS regulations are amended to address transformation requirements. The list of prescribed forms will be removed from 8 CFR parts 299 and 499, although USCIS will continue to refer to form numbers on its Internet Web site, at http://www.uscis.gov, and public information telephone scripts. DHS components ICE, and CBP will likewise continue to refer to form numbers on their Internet Web sites, http://www.ice.gov, and http://www.cbp.gov.

In most instances, DHS is removing form names and numbers by replacing the form reference with a generic statement, such as "the form designated by USCIS." Removal of these references from a paragraph or section in some instances, however, requires changes which cannot be achieved through replacement of a term or phrase. In those instances, the entire paragraph is revised.

DHS is removing references to the specific forms known by form numbers: AR-11, G-28, G-325, I-90, I-94, I-102, I-129, I-130, I-131, I-191, I-192, I-193, I-212, I-290B, I-407, I-512, I-539, I-551, I-566, I-589, I-590, I-601, I-602, I-607, I-644, I-688, I-730, I-765, I-797, I-797A, I-797B, I-821, I-854, I-864, I-864A, I-864P, I-865, I-907, I-914, I-917, I-918, N-300, N-400, N-426, N-565, N-600, and N-643. This list is not intended to be exhaustive, nor are all references to the listed forms removed by this final rule. Additional references to these and other USCIS forms will be phased out in subsequent rules. DHS is not removing references to forms that primarily affect the functions of DHS components other than USCIS.

Enumerating OMB control numbers for USCIS information collection requirements in regulations is no longer necessary and, therefore, 8 CFR 100.7 is being removed. OMB control numbers continue to be displayed on USCIS forms pursuant to the Paperwork **53767** Reduction Act, 44 U.S.C. 3512, and on the USCIS Internet Web site.

DHS is adding new definitions for "application," "petition," and "benefit request" to transition from "forms" to either paper or electronic instruments used to seek various immigration benefits. The terms "application" and "petition" are used together, separately, and interchangeably in many sections of chapter I of the 8 CFR and this rule does not affect every reference to those terms. The term "benefit request" is often used in the sections amended by this rule in place of application or petition in the interest of economy of words, to reduce the ambiguity and confusion resulting from the constant use of both terms, improve readability, and to add flexibility for describing what a particular capability may be called when it is converted to an electronic interaction. No substantive change results from defining these terms in this rule.

As the USCIS transformation initiative progresses, electronic versions of forms and digital images of supporting documents will largely replace paper forms and documents for adjudication and records retention purposes. USCIS will specify the process and standards for the transmission of electronic benefit requests and supporting documents on its Internet Web site, but it is intended that these standards will accommodate the technology in most home and public computers so as to be widely accessible.

DHS is adding a definition of "form instructions" to establish that the term refers to the most recent, approved version of such instructions available through the USCIS Internet Web site, regardless of the fact that other editions of these instructions may exist and be in circulation through other sources. Whether published in paper form or on the USCIS web site, all form and form instructions will continue to comply with Paperwork Reduction Act requirements, including public notice and comment periods. 44 U.S.C. 3507. In addition to traditional instructions appended to a USCIS form, the term as defined by this rule encompasses the process information (e.g., filing locations, instructions on the process for submission of supporting documents) that USCIS publishes on its Internet Web site in addition to those traditional instructions, and may also include non-form and non-substantive guidance such as appendices, exhibits, guidebooks, or manuals.

USCIS does not publish its Registration for Classification as Refugee, Form I-590, with instructions for the U.S. Refugee Admissions Program (USRAP), for general public use. Access to the USRAP is managed by DOS, and implemented by its overseas processing entities (OPEs). OPEs assist targeted populations of refugee applicants with preparation of the Registration for Classification as Refugee. As such, the term "form instructions" includes process information that USCIS publishes about the USRAP.

DHS is adding a definition for the terms "execute" or "executed" when referring to completion of an application or petition to request a benefit to ensure consistency across paper and electronic media.

### B. Removing References to Position Titles Within USCIS

Wherever possible, DHS is removing references to official position titles used within DHS or used in the past by the former Immigration and Naturalization Service (INS). These titles include director, district director, and commissioner as well as position descriptions such as examiner or adjudicator. Both position titles and delegated authority to perform specific duties assigned to USCIS employees are subject to change, potentially rendering regulatory references inaccurate or delaying implementation of planned operational changes. DHS is revising those titles and position descriptions with USCIS, DHS, or other component names, as appropriate and necessary to provide DHS with the operational flexibility required to facilitate adjudication in an electronic environment. DHS is also replacing obsolete references to the Attorney General, substituting the Secretary where appropriate.

DHS is, for example, amending 8 CFR 103.7(d) by removing the specific titles of USCIS employees who are designated to certify official immigration records. DHS and USCIS will delegate authority to appropriate officials who may be required to fulfill this responsibility.

### C. Replacing "Service" With More Specific Component Names and Removing References to Particular USCIS Offices

The definition of "Service" in newly designated 8 CFR 1.2 is amended to provide flexibility and promote the goals of transformation. The regulations in chapter I of the 8 CFR contain provisions that, to varying degrees, govern facets of all of the immigration components of DHS—CBP, ICE, and USCIS. Where DHS has determined that the section being amended by this rule applies only to USCIS, that defined acronym is inserted to replace the previously named office, position, title, or component. Where the section pertains to an action that may have been taken by INS, or a function that is the purview of or shared with another component, the term "the Service" is retained or inserted. Thus, "the Service" in 8 CFR may refer to any immigration-related component of DHS, including USCIS, ICE, or CBP. As DHS does not purport to revise every paragraph within 8 CFR, the absence of a change to an existing usage of "Service" in a particular context does not necessarily indicate a position with respect to component authority in that context. Similarly, remaining references to the former Immigration and Naturalization Service and the acronym INS are replaced by more accurate terms.

### D. Removing Information About Procedures for Filing and Internal Processing of Benefit Requests

Some parts of the regulations include details of the internal processing and handling of benefit requests or descriptions relating to submission of paper versions of benefit request forms. Administrative filing requirements, locations, and procedures will not be prescribed in regulations but will be outlined in more flexible methods of conveying instructions. This modification will not change eligibility criteria or evidentiary standards. See, e.g., 8 CFR 212.7(a)(3) ("* * * If the application is approved the director shall complete Form I-607 for inclusion in the alien's file."). See also 8 CFR 214.2(l)(5)(ii)(E), ("* * * The consular officer shall also endorse all copies of the alien's Form I-129S with the blanket L-1 visa classification and return the original and one copy to the alien. When the alien is inspected for entry into the United States, both copies of the Form I-129S shall be stamped to show a validity period not to exceed three years and the second copy collected and sent to the appropriate Regional Service Center for control purposes.") These details are not essential to the regulations, do not add substantive requirements or impose limitations, and unnecessarily burden the text of the regulations. To the extent that this information is required to be published, 5 U.S.C. 552(a)(1)(A), (B), DHS will publish an organization and functions rule in part 2 of 8 CFR. DHS is removing these types of provisions because they are subject to change during transformation and because such information is more appropriately included within field manuals and other instructional materials that USCIS can readily revise and describe in more detail.

 **\*53768**  Terms such as "in writing," "written decision," and "written notice" have not been removed because an electronic transmission constitutes a valid writing. GPEA provides: "Electronic records submitted or maintained in accordance with procedures developed under this title, or electronic signatures or other forms of electronic authentication used in accordance with such procedures, shall not be denied legal effect, validity, or enforceability because such records are in electronic form." Public Law 105-277, tit. XVII, section 1707, 112 Stat. at 2681-751 (Oct. 21, 1998) . GPEA defines electronic signature as "* * * a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message; and indicates such person's approval of the information contained in the electronic message." Id. Thus, as provided in GPEA, a notice on the status of a request for benefits, a request for additional evidence, and a notice of approval or denial of a request for benefits may be effected by electronic communication if that method is requested by the person who has requested the benefit, notwithstanding a regulatory provision that requires such notice to be "in writing." Nonetheless, for clarity's sake, 8 CFR 103.8 provides that electronic delivery of notices suffices in appropriate circumstances. See new 8 CFR 103.8.

*E. Removing Obsolete and Expired Regulatory Provisions; Correcting and Updating Provisions Affected by Statutory Changes*

DHS is also removing regulatory provisions that have expired because of statutory lapses or self-executing time limits, or that are obsolete, and to make non-discretionary corrections to provisions affected by statutory amendments or extensions of time. In addition, DHS revises obsolete statutory and regulatory citations.

DHS is adding three paragraphs to USCIS fee regulations to reflect statutory fees which are already collected but which were not previously included in regulations. See new 8 CFR 103.7(b)(1)(i)(CCC)-(EEE). The additions provide the $1500 or $750 fee for filing certain H-1B petitions required by the American Competitiveness and Workforce Improvement Act (ACWIA), the additional fee of $500 for filing certain H-1B and L petitions established by Section 426 of the Visa Reform Act of 2004, and the additional $150 fee for H-2B petitions required by the Real ID Act of 2005. See, respectively, INA section 214(c)(9)(B), 8 U.S.C. 1184(c)(9)(B); INA section 214(c)(12)(C), 8 U.S.C. 1184(c)(12)(C); INA section 214(c) (13)(C), 8 U.S.C. 1184(c)(13)(B). These fees are used, generally, for training, scholarships, and fraud detection and prevention. INA sections 286(s), (v), 8 U.S.C. 1356(s), (v). USCIS determines liability for both of these fees and calculates the amount due through a series of questions on the H and L petition form. The determination process is unchanged by this rulemaking. Provisions are also added to prescribe a fee of $2000 for certain H-1B nonimmigrants or $2250 for certain L-1 nonimmigrants as required by recent legislation. Public Law 111-230, section 402, 124 Stat. 2488 (Aug. 13, 2010). Fees collected pursuant to these sections are deposited in the General Fund of the Treasury. Id, at section 402(c). DHS is not required to publish these fees in the CFR since the statute is clear in requiring their collection and use. Nevertheless, most USCIS stakeholders know to refer to 8 CFR 103.7 for the proper USCIS fees, and DHS believes it is a better practice to make sure that these statutorily mandated fees are also clearly delineated along with the fees established administratively by DHS through rulemaking.

Section 209.1(f) is a companion provision to match the existing provision in 8 CFR 209.2(b), which sets out the process and standards for asylees seeking adjustment of status who require a waiver of inadmissibility. Since both refugees and asylees applying for adjustment of status are subject to identical standards for waivers of inadmissibility these standards are now reflected in this section addressing both types of applicants. INA section 209(c), 8 U.S.C. 1159(c).

Since the statutory cap on adjustment by asylees has been removed, the text referencing that cap—at 8 CFR 209.1(a) (1)(vi) and the sentence that follows—are removed. For the same reason, 8 CFR 209.2(a)(2) is revised by removing the last three sentences of the paragraph. See Public Law 109-13, tit. I, section 101(g), 119 Stat. 302 (May 11, 2005), 8 U.S.C. 1101 note.

DHS is revising 8 CFR 209.2(d) to clarify that a medical examination, including compliance with vaccination requirements, is required of asylees applying for adjustment of status. The vaccination supplement no longer exists as a stand-alone document but rather is incorporated into the medical examination. Form instructions provide detailed guidance regarding the medical examination requirement.

DHS is removing 8 CFR 212.8 and 212.9, relating to nonpreference investor visas and to former third and sixth preference employment-based visas, because the provisions are obsolete. The provisions of the Act that provided for these visas were repealed by section 111 of the Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 (Nov. 29, 1990).

DHS is removing 8 CFR 212.11, which regards the admissibility of an alien who has been convicted of a violation of a law relating to a controlled substance because it is redundant. This section provided that in determining the admissibility of an alien who has been convicted of a violation of any law relating to a controlled substance, the term controlled substance as used in section 212(a)(23) of the Act shall mean the same as that referenced in the Controlled Substances Act, 21 U.S.C. 801, et seq. Section 212(a)(2) of the Act governs inadmissibility for criminal acts and Section 212(a)(2)(A) (i)(I) specifically includes violations of the Controlled Substance Act. INA section 212(a)(2)(A)(i)(II), 8 U.S.C. 1182(a) (2)(A)(i)(II).

DHS revised Section 244.17 to reflect current policies and procedures for re-registration of TPS beneficiaries.

DHS is removing 8 CFR 245.1(e)(2) as obsolete. This section provided for the adjustment of status of certain nonimmigrant registered nurses in accordance with the Immigration Nursing Relief Act of 1989, Public Law 101-238, 103 Stat. 2099 (Dec. 18, 1989), 8 U.S.C. 1182 note. The application period for this provision ended on March 20, 1995, and USCIS no longer has pending applications related to this provision. This regulation also makes related conforming changes to 8 CFR 245.1(g)(1) and 245.2(a)(5)(ii).

Section 245.9 is removed. This section provided for adjustment of status for certain Chinese nationals pursuant to the Chinese Student Protection Act, Pub. L. 102-404, 106 Stat. 1969 (Oct. 9, 1992). The application period for this provision ended June 30, 1994, and USCIS no longer has pending applications related to this provision. Id.

Section 245.12 is removed. This section provided for adjustment of status for certain Polish and Hungarian parolees pursuant to section 646 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104-208, 110 Stat. 3009 (Sep. 30, 1996). Persons eligible for benefits under this provision must have been paroled into the U.S. prior to December 31, 1991. USCIS has not received applications pursuant to this section for several years and is unlikely to receive any in the future. Public Law 104-208, 110 Stat. 3009 (Sep. 30, 1996).

**\*53769**  Section 245.13 is removed. This section provided for adjustment of status for certain nationals of Nicaragua and Cuba pursuant to section 202 of the Nicaragua Adjustment and Central American Relief Act, Public Law 105-100, 111 Stat. 2160, 2193 (Nov. 19, 1997). The application period for benefits under this provision ended April 1, 2000. USCIS no longer has pending applications pursuant to this provision. Id.

Section 245.20 is removed . This section provided for adjustment of status of Syrians granted asylum under the Syrian Adjustment Act, Public Law 106-378, 114 Stat. 1442 (Oct. 27, 2000). Eligibility under this provision required entry prior to Dec. 31, 1991. USCIS no longer has pending applications pursuant to this provision and is unlikely to receive any in the future.

Section 245.21 is revised because the Consolidated Appropriations Act of 2005 amended the Indochinese Parolee Act to eliminate the 3-year filing window and 5,000 visa limit.

Parts 264 and 265 are revised to encompass management of fingerprinting, registration, and address reporting requirements in an electronic environment and to remove obsolete references.

This rule adds 8 CFR 316.6 and revises 8 CFR 316.5, 8 CFR 322.2, and 8 CFR 341.5 to conform to the amendments to the Act by the National Defense Authorization Act (NDAA 2008), Public Law 110-181, 122 Stat. 3 (Jan. 28, 2008). The NDAA 2008 provides certain immigration benefits for any qualifying spouse or child of a member of the Armed Forces. Specifically, the NDAA 2008 amended section 319(e) of the Act; 8 U.S.C. 1430(e), to allow certain spouses of members of the Armed Forces to count any qualifying time abroad as continuous residence and physical presence in the United States for purposes of naturalization and to permit such naturalization to occur outside the United States. INA section 319(e), 8 U.S.C. 1430(e); INA section 322(d), 8 U.S.C. 1433(d); 8 U.S.C. 1443a.

This rule revises 8 CFR 319.3 to conform to the amendments to the INA by the National Defense Authorization Act (NDAA 2004), Public Law 108-136, 117 Stat. 1565 (Nov. 24, 2003), which provides certain immigration benefits relating to the naturalization of any qualifying surviving child or parent of a member of the Armed Forces. Specifically, NDAA 2004 provides for the naturalization of any qualifying surviving child or parent of a member of the Armed Forces who dies during a period of honorable service, a benefit only previously afforded to surviving spouses. INA section 319(d), 8 U.S.C. 1430(d).

This rule revises 8 CFR 322.3 to conform to the various legislative amendments to the Act. Specifically, 8 CFR 322.3(a) was revised to conform to the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107-273, enacted on November 2, 2002, which amended section 322 of the Act to allow U.S. citizen grandparents and U.S. citizen legal guardians to apply for naturalization on behalf of a child born and residing outside of the United States. Public Law 107-273, 116 Stat. 1758 (Nov. 2, 2002); see INA section 322, 8 U.S.C. 1433(a). Such an application by the U.S. citizen grandparent or U.S. citizen legal guardian can be made within 5 years of the death of a U.S. citizen parent of a child who could otherwise have been the beneficiary of an application for naturalization under section 322 of the Act. See Id. This change will conform the regulations to legislation and current practice.

In addition, current 8 CFR 322.3(a) requires the citizen parent (or, as appropriate, grandparent or guardian) to include with the application a request concerning when the applicant would like to have the child's naturalization interview scheduled. The form instructions elicit the information needed to schedule the interview. Therefore, there is no need for a separate provision on this point in 8 CFR 322.3(a).

This rule revises 8 CFR 322.3(b) to conform to the amendments to the Act made by the Intercountry Adoption Act of 2000, Public Law 106-279, which added a definition of certain adoptees to section 101(b)(1)(G) of the Act on October 6, 2000. 114 Stat. 825 (Oct. 6, 2000). The new definition describes children adopted in a foreign state that is a party to the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption of May 22, 1993. INA section 101(b)(1)(G), 8 U.S.C. 1101(b)(1)(G). That definition under section 101(b)(1)(G) of the Act corresponds to the visa categories IH-3 and IH-4 and became effective when the Hague Adoption Convention entered into force in the United States on April 1, 2008. See id. USCIS implemented the Intercountry Adoption Act by publishing an interim rule, "Classification of Aliens as Children of United States Citizens Based on Intercountry Adoptions Under the Hague Convention," on October 4, 2007. See 72 FR 56831 (Oct. 4, 2007). The additional changes in this rule conform to the requirements codified on that date and which have been followed since April 1, 2008.

In addition, several expired and obsolete naturalization-related regulatory provisions have been removed, including 8 CFR: 312.3(a) (standardized citizenship testing), 329.5 (natives of the Philippines with active duty service during World War II), 332.2 (establishment of photographic studios), 334.16-334.18 (naturalization petitions), 335.11-335.13 (naturalization petitions), 338.11 and 338.12 (naturalization court processes), 339.2(c) (reports relating to petitions filed prior to October 1, 1991), and 340.1 (reopening of a naturalization application by a district director pursuant to section 340(h) of the Act).

In 8 CFR 312.3, paragraph (a) is removed because the "standardized citizenship testing" for applicants for naturalization ended on August 30, 1998. See 63 FR 25080 (May 6, 1998).

Section 329.5 is removed because the filing period for submitting an application for naturalization under section 405 of the Immigration Act of 1990, the corresponding statutory naturalization authority, expired on February 3, 1995. See 8 CFR 329.5(e).

Sections 334.16-334.18, 335.11-335.13, and 339.2(c) are removed because they relate to any "petition for naturalization" filed prior to October 1, 1991. Such petitions were under the jurisdiction of the naturalization court until that date. See 8 CFR 310.4; INA section 310, 8 U.S.C. 1421.

*F. Revising or Reorganizing Sections or Paragraphs for Clarity and Consistency, and To Remove Duplicative Information*
DHS is reorganizing 8 CFR part 1 (Definitions) and 8 CFR part 103 (Immigration Benefits, Biometric Requirements, Availability of Records), without substantive change. The reorganization of these sections does not introduce new obligations, requirements, or procedures. The reorganization is designed to simplify and rearrange existing regulatory requirements in a manner which is easier for the public to identify and understand. This rulemaking also removes

regulatory provisions which repeat statutory or other regulatory information or which restate filing information that USCIS routinely includes in its form instructions. None of the changes made effect a substantive change in the law. DHS is also reorganizing certain parts of 8 CFR without substantive change. DHS intends, in the recodification of these regulations, to conform to the understood policy, intent, and purpose of the original regulations, with such **\*53770** amendments and corrections as will remove ambiguities, contradictions, and other imperfections.

The regulations pertaining to filing and adjudication of immigration benefits are contained in 8 CFR 103.2. That section also incorporates the specific requirements contained in USCIS form instructions. See 8 CFR 103.2(a)(1). Repeating or paraphrasing parts of this information within other regulations that relate to specific benefits is unnecessary, possibly confusing, and may be inaccurate. Such repetition can lead the reader to conclude that a provision is somehow uniquely applicable to that particular benefit type. For example, "* * * The director shall consider all the evidence submitted and such other evidence as he or she may independently require to assist his or her adjudication" is repetitive information found within another regulation. See 8 CFR 214.2(h)(9)(i). Or, "* * * A copy of a document submitted in support of a visa petition filed pursuant to section 214(d) of the Act and this paragraph may be accepted, though unaccompanied by the original, if the copy bears a certification by an attorney, typed or rubber-stamped, in the language set forth in § 204.2(j) of this chapter. However, the original document shall be submitted if requested by the Service" is both repetitive and inaccurate because the referenced paragraph and procedure no longer exist. See also 8 CFR 214.2(k)(1).

This rule organizes 8 CFR part 103 into four subparts: subpart A—Applying for Benefits, Surety Bonds, Fees; subpart B—Biometric Requirements; subpart C—Reserved; and subpart D—Availability of Records.

Section 103.1 is removed. The delegation of authority, formerly found in 8 CFR 103.1(a), was redundant of authority specified in 8 CFR 2.1. Section 103.2(a) is revised, primarily to describe alternate procedures for electronic submission of benefit requests with digital images of supporting documentation. With the definition of "benefit request" added in 8 CFR part 1, the terms "application" and "petition" are being replaced by the term "benefit request" to reduce possible confusion regarding the use of specific paper versions of forms traditionally required to apply for benefits. As stated earlier, the terms "petition" and "application" are not being replaced throughout the rest of this chapter I and will be accorded the meaning now ascribed to them in 8 CFR part 1. Although this paragraph was recently revised, the additional changes made by this rule will clarify filing procedures for both the current environment and the electronic environment.

Section 103.2, paragraph (a)(7) is revised to describe establishment and recordation of filing dates for benefit requests in an electronic environment. That paragraph had previously described procedures that reflected regular mail, hand delivery, and internal actions of USCIS for physically handling paper, such as stamping files with dates by hand. Specific internal procedures for determining how receipt dates and times are to be associated with a particular benefit request for which date and time are appropriate, or even essential, will be established for requests that will be received electronically, in paper format, or both. USCIS realizes that the date of filing is very important when a benefit request has a deadline or a date-specific impact on eligibility. Such benefit requests are not affected by this rule because the date the benefit request is received by USCIS will still be recorded in the system. While the internal process for recording the date when a request is received or complete will not be promulgated, the ability of filers of a benefit request to obtain a definitive receipt date will not be affected by removing the requirement for USCIS to stamp receipt dates.

In addition, 8 CFR 103.2(a)(7) is revised to eliminate possible inconsistency with 8 CFR 103.2(a)(1), clarifying that USCIS may reject a benefit request if data have not been entered in required fields. Further, 8 CFR 103.2(a)(7)(iii) is added to codify the current policy that there is no appeal when a case is rejected in accordance with this section. In USCIS parlance, the term "rejected" means that the benefit request and fee payment are returned for failure to comply with all filing requirements without being fully considered, and can be re-filed when properly completed, while "denied" means that the request is fully adjudicated and considered, and the applicant is determined ineligible for the benefit sought. Appeals of rejections are generally returned without consideration. Therefore, this change is only clarifying and has no substantive effect.

Section 103.2(b)(1) is revised to update terminology and to clarify that every applicant or petitioner must remain eligible for the benefit request at the time of adjudication and that every benefit request must be submitted with all prescribed supporting documentation. USCIS longstanding policy and practice, as well as a basic tenet of administrative law, is that the decision in a particular case is based on the administrative record that exists at the time the decision is rendered. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1972). Thus, the granting of any benefit request by DHS is not based solely on what is provided at the time of the initial request and is contingent on the fact that circumstances will not change during the processing of a benefit request in such a way so as to render the applicant ineligible. This change will reduce any confusion that may exist for those who believe that eligibility is based solely on what is provided at the time of the initial request and instead will clarify that eligibility is subject to change if circumstances change while processing occurs. This clarification may be especially important in the transformed electronic environment. This revision is not a substantive change in eligibility criteria and is thus appropriate for this final rule.

Sections 103.2, paragraphs (b)(4) and (b)(5) are revised to refer applicants and petitioners to form instructions and other sources for information on the format in which supporting documentation must be submitted. It is generally unnecessary to specify the form that an evidentiary document must be in unless a higher degree of authenticity is required than a photocopy or reasonably legible facsimile. The form instructions for a benefit request will clearly spell out when a copy, original, certified, notarized, or other specific type of document is required to meet the applicable evidentiary standard. In its transformation initiative, DHS wants to accept and use scanned or electronic documents whenever possible and believes that this approach will also be the most convenient method for the public. As stated, regulatory provisions that reflect a paper application process impede that goal. Allowing a digital format instead of a copy would not affect a person's eligibility for a benefit. Thus, this change is made without prior public comment.

This rule also eliminates express reference to Form G-884, currently used to request the return of original documents, and advises the public to follow USCIS instructions for requesting such documents. Eliminating reference to a specific form promotes greater regulatory flexibility and better accommodates future processing efficiencies. USCIS anticipates using the current form for several years during the transformation process and will continue to provide instructions for requesting the return of paper documents retained in DHS files through its Internet Web site, the USCIS **53771** Customer Service Center, or other methods. See new 8 CFR 103.2(b)(4).

Section 103.3 is amended by revising the term "shall file" to read "must submit" and revising the phrase "with the office where the unfavorable decision was made" to read "as indicated in the applicable form instructions" in the last sentence in paragraph (a)(2)(i). This change will make this section more consistent with the changes made and terminology used in the Filing Location Rule. The word "shall" is less clear than "must" so substituting "must" clarifies the provision without changing the clear meaning. While the terms "file" and "filing" are not changed throughout 8 CFR by this rule, the amendment is apt in this instance for clarity because the term "file" seems to imply a paper environment, as opposed to "submit," which lends itself more clearly to both paper and electronic submissions. The provision requiring submission to a certain office location is removed in favor of form instructions which, as defined in this rule, will provide the flexibility to centralize or otherwise shift appeals based on future needs and developments. No substantive change is made to eligibility requirements.

As transformation progresses, USCIS develops system interfaces with other government information systems, reducing reliance on various forms of documentation currently supplied by benefit applicants. For example, proof of military service is more readily obtained by USCIS directly from the Department of Defense than from the applicant. Section 103.2, paragraph (b)(5) has been amended to clarify that USCIS may waive submission of documentation that it may obtain through direct interfaces.

Section 103.5a is redesignated as 103.8 and revised. This revision provides for electronic delivery of notices instead of paper notices in appropriate circumstances at the petitioner's or applicant's request. Absent such a request, a mailed

paper notice remains the default option at this time. Amendments to the descriptions of routine and personal service used for delivery of notices now include a specific provision for the use of electronic media for such purposes. For consistency of process, this rule amends other sections to remove specific requirements of notice and instead cross references the notice and service provisions in 8 CFR 103.8.

Section 103.5b is redesignated as 103.9 and revised. References to Form I-824, currently used to request further action on an approved benefit request, are removed. As transformation progresses, it is envisioned that the need for this form will diminish because account holders will request the services currently provided by the form by accessing their own accounts.

Section 103.7, paragraph (d) is amended to remove specific references to officials authorized to certify immigration records. This change will give USCIS flexibility to delegate authority for this activity to various officials as necessary for efficiency.

Section 103.2, paragraph (e), relating to fingerprint requirements, is revised and redesignated as sections 103.16 and 103.17. These sections have been reorganized and revised to reflect that most USCIS biometric collection is now accomplished digitally at USCIS offices. Paragraph (c) of 8 CFR 103.2, explaining the consequences of failure to provide biometric information, must be read in conjunction with 8 CFR 103.2(b)(13), which provides standard exceptions for such failure. This regulation removes references to specific offices where applicants must report for biometrics collection to allow USCIS greater flexibility for handling such matters. USCIS will continue to provide such information through other means.

Newly designated 8 CFR 103.17 describes biometric service fee collection requirements formerly described in 8 CFR 103.2(e). Revisions to this section more clearly reflect existing regulatory requirements regarding the authorized collection of biometrics.

Sections 103.8 through 103.11 and sections 103.21 through 103.36, which pertain to Freedom of Information and Privacy Act requests, are removed because they are outdated. Current DHS policies and procedures on these subjects are contained in 6 CFR part 5. New 8 CFR 103.42 has been added to direct readers to the DHS regulations.

Regulations relating to submission and consideration of benefit requests are located at 8 CFR 103.2(a)(1) (general filing instructions), 8 CFR 103.2(b)(1) (demonstrating eligibility for the benefit), 8 CFR 103.2(b)(16)(ii) (consideration of evidence in discretionary decisions), and in the form instructions such as for Form I-129 "* * * By signing this form you have stated, under penalty of perjury (28 U.S.C. 1746) that all information and documentation submitted with this form are true and correct. You have also authorized the release of any information from your records that USCIS may need to determine eligibility for the benefit you are seeking and consented to USCIS verification of such information." Accordingly, because processing and handling information which is broadly applicable to all USCIS benefit types is set forth in both 8 CFR 103.2 and in the instructions to various forms, USCIS is removing such information from regulations governing consideration of specific benefits.

Section 207.1(a) is revised to instruct prospective applicants to "submi[t] an application, including biometric information, in accordance with form instructions." The term "form instructions" is in turn defined in 8 CFR 1.2 as those prescribed by USCIS on its official Internet Web site currently, notwithstanding other versions in circulation, and may also include non-form guidance such as appendices, exhibits, guidebooks, or manuals. In the context of the U.S. Refugee Admissions Program (USRAP), USCIS does not publish its Form I-590, with instructions, for general public use. Instead, access to the USRAP is managed by the DOS, and implemented by its contracted overseas processing entities (OPEs). OPEs assist targeted populations of refugee applicants with preparation of the Form I-590. As such, the term "form instructions," as defined in 8 CFR 1.2 and used in 8 CFR 207.1(a), does not refer to traditional instructions appended to a USCIS form, but rather the process information that USCIS publishes about the USRAP.

Sections 207.1, paragraphs (b) and (c) are revised by consolidating the existing firm resettlement rule in paragraph (b) and removing paragraph (c). To emphasize the legal relevance of the firm resettlement analysis, this revision moves the third sentence of original paragraph (b) to the forefront. This consolidated provision more clearly articulates that the "considerations" enumerated in new paragraphs (b)(1) through (b)(3) apply to the firm resettlement analysis generally and not, as may be misconstrued from the existing, bifurcated structure, only to an analysis of whether an applicant is "not firmly resettled." No substantive changes are made by these structural modifications of the firm resettlement rule.

Re-numbered paragraph 207.2(a) has also been re-titled from "hearing" to "interview," to better reflect the nature of USCIS interaction with refugee applicants. No substantive change is intended.

Section 207.7(d) is amended by eliminating an outdated, transitional, alternative date (February 28, 2000) for measuring the 2-year deadline by which such petitions must be filed; there is no change to the discretionary extension for humanitarian reasons. Lastly, in anticipation of future processing efficiencies afforded by transformation, this rule eliminates an express **53772** requirement that "separate" petitions be filed for each qualifying family member, in favor of guidance that petitioners file "in accordance with the form instructions." USCIS contemplates retaining in the "form instructions" the requirement that "separate" petitions be filed for each qualifying family member, until such time that USCIS has in place transformed systems to promote additional processing efficiencies such as consolidating petitions for qualifying family members. This change will accommodate the adoption of such efficiencies without need for a future rulemaking.

Section 207.7(f)(3) is amended by adding an opening phrase to the last sentence, "[f]or a derivative inside or arriving in the United States." While this section, entitled "Benefits," applies to both paragraphs (f)(1) (derivative in the United States) and (f)(2) (derivative outside the United States), the last sentence was added to clarify that the benefit of employment authorization, incident to refugee status, becomes available to overseas beneficiaries, not upon approval of the family petition, but upon travel and their admission into the United States as refugees.

Section 208.1(b) is revised by replacing "The Director of International Affairs" with "The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO)" where it first appears and with "Associate Director of RAIO" in later references. Similarly, section 208.2(a) is revised by replacing "Office of International Affairs" in the title with "Refugee, Asylum, and International Operations (RAIO)," and by replacing "the Office of International Affairs" wherever it appears with "RAIO." As stated earlier this rule removes specific officers' titles, functions, and authorities where possible, and employee authorities are generally established pursuant to 8 CFR section 2.1. However, DHS has determined that the roles, functions, and authorities of asylum officers and who they report to are sufficiently distinct as provided in the INA so as to preclude substitution of USCIS for those titles where they appear in the Code of Federal Regulations. For example, INA section 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E), under the expedited removal statute, defines "asylum officer" as an "* * * immigration officer who (i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208, and (ii) is supervised by an officer who meets the conditions described in clause (i) and has had substantial experience adjudicating asylum applications." Retaining these titles is not expected to impair USRAP and RAIO from applying the principles of transformation to their operations in the future.

Section 208.5(b)(1)(ii) is revised to perfect an amendment made in the Filing Location Rule. In that rule, 8 CFR 208.4(b) was revised by referring applicants to the instructions on the Form I-589 for specific filing information and thereafter by eliminating specific instructions contained in former sections 208.4(b)(1)-(5). This rule implements a conforming amendment to that earlier revision by removing the phrase "pursuant to § 208.4(b)" in the last sentence of 8 CFR 208.5(b)(1)(ii).

Moreover, the Filing Location Rule replaced the term "district director" with "DHS office" in two locations. With the elimination of the reference to the "district director" in former 8 CFR 208.4(b)(5) (relating to asylum applications filed with the district director), the remaining reference to "the DHS office" in new 8 CFR 208.5(b)(1)(ii) lacks an anchor to an earlier reference. To avoid confusion as to whether a specific DHS office is empowered under this provision, 8 CFR 208.5(b)(1)(ii) is revised by replacing "the DHS office" with simply "DHS" wherever it appears.

Section 208.7(c) is amended by replacing a mandatory requirement (if applicable) to submit "proof that he or she has continued to pursue his or her asylum application before an immigration judge or sought administrative or judicial review." In anticipation of future system efficiencies afforded by transformation that may allow USCIS to gather the data directly from the Executive Office for Immigration Review (EOIR) within the Department of Justice and federal courts, USCIS is modifying this provision by replacing the mandatory production requirement with more flexible text: "* * * USCIS may require that an alien establish * * *". Until such time that system improvements are in place, USCIS will continue to require production of such evidence and will communicate such requirements through form instructions, as defined in 8 CFR 1.2.

Section 208.21(c) is amended by removing an outdated, transitional, alternative date (February 28, 2000) for measuring the 2-year deadline by which such petitions must be filed; there is no change to the discretionary extension for humanitarian reasons. Lastly, in anticipation of future processing efficiencies afforded by transformation, this rule eliminates an express requirement that "separate" petitions be filed for each qualifying family member, in favor of "in accordance with the form instructions." USCIS contemplates retaining in the "form instructions" the requirement that "separate" petitions be filed for each qualifying family member, until such time that USCIS has in place transformed systems to promote additional processing efficiencies such as consolidating petitions for qualifying family members.

Section 208.21(d) is revised similar to section 208.21(c) and for the same reasons.

Section 209.1(c) is amended by removing the last clause relating to a vaccination supplement completed by a designated civil surgeon. USCIS recently consolidated the separate vaccination supplement and record of the medical examination into one form, Report of Medical Examination and Vaccination Record. Thus the language referring to a separate supplement is outdated. Relevant guidance will continue to be available in form instructions. This language is also deleted in anticipation of future processing efficiencies wherein civil surgeons may have online accounts through which they may submit reports directly to USCIS instead of completing paper forms.

Section 209.2(e) is revised by removing the first two sentences of the original paragraph, retaining only the last sentence. In the original paragraph, there was an internal inconsistency between the first sentence (requiring interview of all applicants) and the third sentence (allowing USCIS to determine whether an interview was warranted). This revision retains only the sentence that allows USCIS to determine on a case-by-case basis whether an interview is warranted. This result is consistent with the companion paragraph at existing 8 CFR 209.1(d) (refugee adjustment interviews) and current USCIS practice.

Section 209.2(f) is revised for purposes of plain language. To align with the companion paragraph at 8 CFR 209.1(e), text was added stating that USCIS will notify a denied applicant of the right to renew an adjustment request in removal proceedings before EOIR. Otherwise, no substantive change is intended.

Section 223.2 is reorganized and revised for clarity in addition to removing references to forms. The revision also clarifies existing authority to accept and process requests for refugee travel documents overseas.

Several paragraphs within 8 CFR part 264 are revised and reorganized for **53773** clarity. Section 264.1 (registration and fingerprinting requirements) is revised and reorganized, removing obsolete instructions, general information duplicated in 8 CFR 103.2, and fingerprinting requirements now described in 8 CFR 103.16. Section 264.5, paragraph (d)

(replacement of permanent resident cards for conditional residents) is revised to remove information included on the form instructions for Form I-90. New 8 CFR 264.5(h) is added to replace information previously located in 8 CFR 264.1(h). Section 264.6 is revised to remove obsolete instructions and for clarity.

## IV. Discussion of Comments Received in Response to the April 29, 2003, Interim Rule

DHS published an interim rule with request for comments revising 8 CFR 103.2(a)(2) to permit submission of benefit requests with an electronic signature when such requests are submitted in an electronic format rather than on a paper form. Electronic Signature on Applications and Petitions for Immigration and Naturalization Benefits, 68 FR 23010 (April 29, 2003). That rule implemented the electronic filing and the acceptance of electronic signatures requirement of GPEA and meet the requirements of section 461 of the Homeland Security Act of 2002 for a study of the feasibility of online filing and to establish an electronic tracking system for applications in order to provide applicants with access to the status of their applications. Public Law 107-296 title IV, subtitle E, section 461, 118 Stat. 2202 (Nov. 22, 2002), 6 U.S.C. 278.

USCIS received 13 public comments relating to the interim rule. Virtually all commenters supported the use of electronic signatures and urged USCIS to do more to promote a more robust and user-friendly electronic filing environment. Several of the commenters made specific proposals recommending enhancements to the current limited electronic filing procedures available to applicants and petitioners. Various commenters suggested enhancements to the electronic filing process, such as acceptance of credit cards for electronic payment, re-use of data for subsequent transactions, interfaces and compatibility with commercial immigration software, standards for electronic submission of supporting documents, provisions for attorney-client electronic collaboration in the preparation of benefit requests, improvements to current biometric collection procedures, and protection of the privacy of data. DHS encourages these types of comments in response to this rulemaking. The comments will not be addressed here individually because they exceed the scope of the interim rule, which was limited to the electronic signature process. The broad subject of the comments, electronic filing of USCIS benefit requests, will be more fully addressed as the USCIS transformation progresses.

Several commenters raised concerns about the security of electronic signatures and described the pros and cons of various existing technologies. The interim rule did not specify the technology which will be employed by USCIS for the capture and verification of electronic signatures. As the transformation initiative is implemented, USCIS will explore alternatives and adopt an appropriate solution which is fully compliant with DHS security standards and ensures privacy. Therefore, no changes are made to the interim rule as a result of the comments received and the interim rule is adopted as final without change.

## V. Discussion of Other Interim Final Rules Being Finalized

USCIS conducted a review of current and past agency regulatory activities and identified six interim rules for which no public comments were received and which were never completed as final rulemakings. Because some of the provisions of these interim rules are now either expired or further modified by this rulemaking, DHS is adopting them as final and, where appropriate, removing or revising the regulatory language. The interim rules that are adopted as final include:

• Application for Refugee Status; Acceptable Sponsorship Agreement Guaranty of Transportation, 64 FR 27660 (May 21, 1999);

• Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, 66 FR 27445 (May 17, 2001);

• Eliminating the Numerical Cap on Mexican TN Nonimmigrants, 69 FR 11287 (March 10, 2004);

• Allocation of H-1B Visas Created by the H-1B Visa Reform Act of 2004, 70 FR 23775 (May 5, 2005);

• Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and Baltic States as Employment-Based Immigrants, 70 FR 21129 (April 25, 2005); and

• Revoking Grants of Naturalization, 65 FR 17127 (March 31, 2000).

A summary of, the legal authority for, the public comments received on, and the changes made to each of these interim rules is as follows:

### A. Application for Refugee Status; Acceptable Sponsorship Agreement Guaranty of Transportation, RIN 1615-AA24

This interim rule required that all sponsorship agreements be secured before an applicant is granted admission as a refugee at a U.S. port-of-entry (POE). This is a separate decision from whether or not such persons can be admitted to the U.S. in refugee status. This rule permits advantageous treatment for applicants for refugee status who have their eligibility interviews with a DHS officer scheduled before a sponsorship agreement has been secured.

This rule implemented section 702 of the Immigration Act of 1990 (IMMACT 90), Public Law 101-649, 104 Stat. 4978 (Nov. 29, 1990). It allowed a U.S. citizen, a lawful permanent resident petitioner, or an alien applicant for permanent resident status to seek an exemption from the general prohibition against approval of immigration benefits based upon a marriage entered into while the beneficiary or applicant was under deportation, exclusion or related judicial proceedings. The rule established procedures to allow persons with bona fide marriages to obtain immigration benefits without complying with the two year foreign residency requirements instituted by the Immigration Marriage Fraud Amendments of 1988 (IMFA). This rule amended 8 CFR 204.2 and 245.1. USCIS is not modifying these provisions in the current rule.

The Act authorized the Attorney General to admit refugees to the United States under certain conditions. INA section 207, 8 U.S.C. 1157. There is no requirement for an applicant to have secured sponsorship in advance of a determination that he or she meets the Act's definition of refugee. INA section 101(a)(42), 8 U.S.C. 1101(a)(42). This rule clarified that sponsorship is a requirement separate and apart from the determination that an applicant is classified as a refugee.

USCIS received no comments on this interim final rule.

The interim rule amended 8 CFR 207.2. That section is revised further by this rule to accommodate transformation by removing form numbers, job titles, extraneous provisions, and internal procedure. USCIS has not changed the substance of the provisions added by the interim rule.

### B. Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, RIN 1615-AA57

This rule provided adjustment of status to lawful permanent residents for **\*53774** certain nationals of Syria. The interim rule discusses the eligibility requirements and sets forth procedures for the application of persons wanting to adjust their status.

The Act provides that all aliens granted asylum are eligible to apply for adjustment of status 1 year after being granted asylum, subject to a maximum of 10,000 per year. INA section 209, 8 U.S.C. 1159. Pub. L. 106-378, 114 Stat. 825 (Oct. 27, 2000), waived the annual limit for a group of Jewish Syrian nationals who were allowed to depart Syria and enter the United States after December 31, 1991, and who were subsequently granted asylum in the United States.

No public comments were received.

This final rule removes 8 CFR 245.20 which was added by the interim rule. That provision is obsolete because no eligible applicants remain.

### C. Eliminating the Numerical Cap on Mexican TN Nonimmigrants, RIN 1615-AA96

This interim rule eliminated the annual numerical cap on Mexican Professionals under the North American Free Trade Agreement (NAFTA). It also eliminated the petition for a Mexican-based NAFTA professional and the corresponding labor condition application (LCA) requirement. Mexican citizens who come to the U.S. under a TN classification must apply directly to DOS for a visa. DOS will then adjudicate the alien's eligibility for TN classification. Upon approval and issuance of a visa, the alien may then apply for admission to the United States. These changes to the regulations are consistent with NAFTA's requirement that the annual numerical cap and petition provisions for Mexican professionals sunset by January 1, 2004.

On December 17, 1992, the United States, Canada and Mexico signed the North American Free Trade Agreement (NAFTA), which entered into force on January 1, 1994. Public Law 103-182, title I, section 101, 107 Stat. 2061 (1993), 19 U.S.C. 3311. NAFTA allows for the temporary entry of qualified businesspersons from each of the parties to the agreement. See Public Law 103-182, title III, section 341(a), 107 Stat. 2116 (1993), 19 U.S.C. 3401. Professionals under the NAFTA are admitted to the United States as Trade NAFTA (TN) nonimmigrant aliens. INA section 214(e), 8 U.S.C. 1184(e). In Appendix 1603.D.4 of NAFTA, NAFTA established an annual numerical ceiling of 5,500 on Mexican TN admissions for a period of 10 years. NAFTA Appendix 1603.D.4, INA section 214(e)(4), (5), 8 U.S.C. 1184(e)(4), (5). The interim rule eliminated the annual numerical cap for citizens of Mexico seeking a TN visa as required by expiration of the 10-year period. Id.

No public comments were received.

This rule finalizes the interim rule without change.

### D. Allocation of Additional H-1B Visas Created by the H-1B Visa Reform Act of 2004, RIN 1615-AB32

This interim rule implemented changes made by the Omnibus Appropriations Act for Fiscal Year 2005 to the numerical limits of H-1B nonimmigrant visa category and the fees for filing of H-1B petitions. It also: (1) Informed the public of procedures USCIS used to allocate in fiscal year 2005, as well as for the future fiscal years starting with fiscal year 2006; (2) amended and clarified the process that USCIS will use in the future in allocating all petitions subject to numerical limitations under the Act; and (3) alerted the public about additional fees that must accompany certain H-1B petitions.

An H-1B nonimmigrant is an alien employed in a specialty occupation or a fashion model of distinguished merit and ability. INA section 101(a)(15)(H), 8 U.S.C. 1101(a)(15)(H); 8 CFR 214.2(h)(4). A specialty occupation requires theoretical and practical application of a body of specialized knowledge and attainment of a bachelor's or higher degree in the specific specialty as a minimum qualification for entry into the United States. Id. The Act provides that the number of nonimmigrants who may be issued H-1B visas or granted H-1B status may not exceed 65,000 per fiscal year. INA section 214(g), 8 U.S.C. 1184(g). The 65,000 cap does not include H-1B employees of institutions of higher education, nonprofit research organizations, or governmental research organizations. The H-1B Visa Reform Act of 2004 added a third exception to the 65,000 limit, by providing that an additional 20,000 visas would be available for an alien who has earned a master's or higher degree from a United States institution of higher education. Omnibus Appropriations Act for Fiscal Year 2005, Public Law 108-447, div. J, title IV, 118 Stat. 2809 (Dec. 8, 2004); INA section 214(g)(5)(C), 8 U.S.C. 1184(g)(5)(C). This law also raised the American Competitiveness and Workforce Improvement Act of 1998 fee (ACWIA) to $1,500 or $750, depending on the size of the employer, and imposed a $500 fraud prevention and detection fee (fraud fee) on certain employers filing H-1B petitions. Id; INA section 214(c)(9), 8 U.S.C. 1184(c)(9). These fees are required in addition to the base USCIS filing fee.

No public comments were received.

This rule finalizes the interim rule without change.

*E. Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and the Baltic States as Employment-Based Immigrants, RIN 1615-AB14*

This interim rule codified the new sunset date of September 30, 2006, for the Soviet Scientists Immigration Act of 1992 (SSIA). The SSIA allowed USCIS to allot visas to eligible scientists or engineers of the independent states of the former Soviet Union and the Baltic states with expertise in nuclear, chemical, biological, or other high-technology field or defense projects. The rule also codified a new numerical limit of 950 visas (excluding spouses and children if accompanying or following to join).

The SSIA provided that up to 950 immigrant visas may be allotted to eligible scientists or engineers of the independent states of the former Soviet Union and the Baltic states if the scientists or engineers had expertise in nuclear, chemical, biological or other high technology fields or were working on such high technology defense projects, as defined by the Attorney General. Public Law 102-395, title VI, section 610, 106 Stat. 1874 (Oct. 6, 1992); INA section 203(b)(2)(A), 8 U.S.C. 1153(b)(2)(A). This program expired on October 24, 1996. The Foreign Relations Authorization Act, Fiscal Year 2003 reinstated the program and, among other changes not applicable to this interim rule, provided that it would expire 4 years from the date of enactment. Public Law 107-228, div. B, title XIII, section 1304(d), 116 Stat. 1437 (Sept. 30, 2002); INA section 203(b)(2)(A), 8 U.S.C. 1153(b)(2)(A).

No public comments were received.

This rule removes provisions pertaining to the SSIA because they have expired. 8 CFR 204.10.

*F. Revoking Grants of Naturalization, RIN 1615-AA30*

This rule amended the process by which the Service would administratively reopen and revoke a grant of naturalization. This interim rule changed the burden of proof that the Service would use in revocation proceedings and made other changes to the administrative process. 65 FR 17127 (March 31, 2000).

The Secretary has sole authority to grant a person naturalization as a United States citizen. INA section 310(a), 8 U.S.C. 1421(a). The Act also provides **\*53775** DHS with the authority "to correct, reopen, alter, modify, or vacate an order naturalizing [a] person" as a United States citizen. INA section 340(h), 8 U.S.C. 1451(h). The interim rule was promulgated under this authority.

No public comments were received.

This rule removes regulations that were invalidated on July 20, 2000, by the Ninth Circuit Court of Appeals in a nationwide class action lawsuit. Gorbach v. Reno, 219 F.3d 1087 (9th Cir. 2000) (en banc). That decision held that the Attorney General lacked the statutory authority to promulgate regulations permitting revocation of citizenship of a naturalized citizen through administrative proceedings. Id. See also INA sections 310(a), 340(a), (h), 8 U.S.C. 1421(a), 1451(a), (h). The government did not seek Supreme Court review of that decision, thus USCIS is precluded from using those regulations to revoke naturalization. This rule removes the applicable regulations from 8 CFR 340.10.

**VI. Discussion of Comments Received in Response to the June 5, 2009, Interim Rule**

On June 5, 2009, DHS published an interim rule in the Federal Register "Removing References to Filing Locations and Obsolete References to Legacy Immigration and Naturalization Service; Adding a Provision To Facilitate the Expansion of the Use of Approved Electronic Equivalents of Paper Forms." The rule revised many sections of the 8 CFR, many of which are further revised by this rulemaking.

USCIS received only three comments in response to this rulemaking: one from an immigration practitioner, one from an organization of immigration practitioners, and one from an organization representing businesses which frequently rely on international personnel. A discussion of those comments follows.

One commenter noted that the revision to 8 CFR 214.2(l)(2)(i) apparently unintentionally added to the petitioner's burden by requiring that "the petitioner shall advise * * * whether a previous petition has been filed for the same beneficiary * * *" whereas the original language stated "the petitioner shall advise * * * whether it has filed a petition for the same beneficiary." (Emphasis in original). Although this change was inadvertent and not intended to affect any right, the requirement as revised is entirely consistent with both the INA and the current form instructions. The Act limits the amount of time an alien can spend in the United States as an L-1 or H nonimmigrant (not just for a particular petitioner). See section 214(c)(2)((D) of the Act, 8 U.S.C. 1184.2(c)(2)(D). The current Form I-129, Supplement L, question 2 requires submission of copies of USCIS-issued documents relating to periods of H or L stay in the United States during the past seven years. It does not limit such submission to documents relating to the current petitioner. Accordingly, USCIS has not adopted the commenter's suggestion that we revert to the prior language.

The commenter made an additional comment regarding the omission of the word "of" from the first sentence in 8 CFR 214.2(l)(2)(ii). USCIS appreciates notification by the commenter of the typographical error which will be corrected in this rule. As previously discussed, 8 CFR part 214 will be reorganized in a future transformation-related rulemaking.

Another commenter suggests that USCIS avail itself of the opportunity to revise 8 CFR 212.7 to reflect the fact that K nonimmigrants may apply for a waiver only pursuant to section 212(d)(3) of the Act and that such persons may only apply for a waiver under section 212(h) or 212(i) of the Act at the time of application for adjustment of status. The commenter noted that both the regulation and form instruction for Form I-601, Application for Waiver of Ground of Inadmissibility, are incorrect. USCIS appreciates the comment and the commenter's suggestions may be addressed in a future rulemaking or with a form revision. However, the interim rule was limited to removing filing jurisdiction limitations from regulations. Thus the commenter's suggestion exceeds the scope of the changes made and will not be adopted in this rulemaking.

The final commenter addressed the removal of filing jurisdictions from regulations. The commenter expresses its concern that an accelerated process for changing filing locations could have an adverse impact on the public. The commenter was especially concerned about situations involving statutory or regulatory deadlines for filing where the public may have insufficient notice of the proposed change.

The same commenter, while supportive of USCIS' transformation efforts, offered several suggestions to minimize the potential adverse impacts of this rulemaking. The commenter recommended that, at each place the regulations are amended, to direct the public to "instructions on the form," and that USCIS add a phrase to explain that form instructions will be available on line, that any change to the filing instructions will be provided to the public by formal announcement no less than 30 days in advance of the change, and that when a filing jurisdiction changes, USCIS offices formerly designated to receive such filings continue to accept them for at least 180 days after the effective date of the change.

USCIS understands and appreciates the commenter's concerns. We realize that numerous changes in filing instructions and locations may be confusing. It is our intent to reduce filing locations and complexity, and change them less often, not more. In the case of time-sensitive benefit requests, USCIS will keep such factors in mind when making changes and make adjustments to the change schedule so as to not result in missing a deadline because of the filing location change.

The commenter suggested that the preamble language describing the USCIS National Customer Service Center (NCSC) as a source of information regarding filing locations be removed because its membership has not gotten consistently reliable information from this source. The commenter recommended that USCIS customer service representatives be

directed to consult the online form instructions before offering any advice to applicants regarding filing location. USCIS regrets any incorrect information that may be provided and always endeavors to provide the NCSC staff with information regarding filing requirements so questions may be answered. USCIS encourages the public to report possible erroneous or outdated messages so that they may be corrected. No change to the interim rule is made as a result of this comment.

The commenter also suggests that information about changes to form and filing instructions be posted in a consistent and prominent location on USCIS Web site along with a chronological list of all changes to form instructions, including filing location changes. As the interim rule stated, filing locations are provided on USCIS form instructions. The current official version of the form and instructions are the versions on the USCIS Internet Web site for forms, http://www.uscis.gov/forms. Also, the USCIS home page will alert the public and stakeholders of any recent or planned filing location changes. In addition, USCIS will continue to publicize filing location changes with press releases. Additional suggestions for improving the Web site and information sharing are welcome.

The commenter also suggested that regulations mandate a 180-day transition period for filing location changes, during which USCIS would **\*53776** accept such benefit requests at both the prior and new filing location. USCIS works to ensure that benefit requests are not rejected as a result of abrupt changes in filing location. USCIS announces filing changes well in advance and generally includes a transition period considering all factors and circumstances surrounding the change. However, forwarding mail from offices that formerly handled requests to the new office is very expensive and an inefficient use of USCIS fee revenue. USCIS will provide as much lead time as possible before making filing changes and will implement the changes in such a way so as to minimize the impacts of the change. However, a 180 day implementation period for each filing change is impracticable and will not be adopted.

The commenter also expressed a concern that USCIS intends to stop producing and distributing a paper version of its form instructions. As transformation continues, the filing of paper forms is expected to decrease substantially as USCIS expects electronic means to become the preferred filing method. As was the goal of GPEA and has been the experience of other Federal agencies that provide electronic filing options, in the future certain forms or requests may lend themselves to a totally electronic submission with no paper option. Nevertheless, at this time, as stated elsewhere in this preamble, USCIS will continue to provide paper versions of most forms and instructions as well as portable document format or other electronic versions through its Internet Web site. Further, the electronic versions of form instructions will parallel the written form instructions precisely, so the method chosen should cause no inconsistencies in benefit eligibility or adjudication.

The commenter also suggested that USCIS provide access to earlier versions of forms and instructions. Following a form's revisions, USCIS often provides that previous version of the form are acceptable until further notice or for a prescribed period. However, when changes are made to a form because eligibility criteria are changed by law or regulation, the previous version of a form may be outdated, incomplete, and unacceptable. Further, for ease of administration and consistency in adjudication, USCIS prefers to receive the most current version so the employee reviewing the form knows where to look for the required data elements. Thus USCIS sees little value in providing previous versions of forms as a general policy or requirement, and the commenter's suggestion has not been adopted.

The commenter also suggested that any elimination of geographically-based jurisdiction should be coupled with a new model for determining such jurisdiction. The interim rule gave USCIS greater flexibility to alter filing locations, but it does not change how internal responsibilities for adjudicating benefit requests are prescribed. For many benefit requests, notwithstanding their removal from the CFR, filing locations will seldom or not change. USCIS will continue to make changes in filing, appearance or jurisdictional requirements with the convenience of and service to applicants, petitioners, and beneficiaries as a primary concern. Thus, in response to this comment, methods of determining jurisdiction are not revised in this rule.

## VII. Regulatory Requirements

### A. Administrative Procedure Act

The Administrative Procedure Act (APA) requires DHS to provide public notice and seek public comment on substantive regulations. See 5 U.S.C. 553. The APA, however, excludes certain types of regulations and permits exceptions for other types of regulations from the public notice and comment requirement. DHS issues this rule without providing the opportunity for prior notice and comment for the reasons described below. DHS nevertheless invites comments on this rule and will consider all timely comments submitted during the public comment period as described in the "Public Participation" section.

Removal of form numbers and titles, position titles, and procedural guidance, and reorganization and clarification of 8 CFR. The Administrative Procedure Act (APA) excepts from the prior notice and opportunity for comment requirements "* * * rules of agency organization, procedure or practice." 5 U.S.C. 553(b)(A). This rule removes form numbers and titles, position titles, and procedural guidance, reorganizes and clarifies parts of 8 CFR, and makes changes such as removing Form I-129, district director, instructions for retaining copies of documents, and instructions for forwarding of files. Accordingly, to the extent that this rule adopts rules of agency organization, procedure or practice, those portions of the rule are excepted from the notice-and-comment requirements under 5 U.S.C. 553(b)(A).

Remove and update outdated provisions. This rule removes provisions of 8 CFR where statutory authorization has expired, corrects provisions required by statutory amendments or extensions, removes extraneous or outdated provisions, and corrects erroneous references. For example, this rule removes references to the Irish Peace Process Cultural and Training Program Act because that law was repealed in 2005 and removes nonpreference investor visas and third and sixth preference employment-based visas because authorization for these visas was repealed in 1990. This rule is a ministerial action necessary to conform regulations with law. Therefore, advance public notice and an opportunity for public comment is unnecessary and not in the public interest. See 5 U.S.C. 553(b)(3)(B).

### B. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### C. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

### D. Executive Orders 13563 and 12866

Executive Orders 13563 and 12866 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule is not a "significant regulatory action" under section 3(f) of Executive Order 12866, Regulatory Planning and Review, and does not require an assessment of potential costs and benefits under section 6(a)(3) of that Order. The Office **53777** of Management and Budget has not reviewed it under Executive Order 12866.

There will be no additional costs incurred by any individual or business as a result of the changes in this rule. The rule will clarify and revise existing regulations and does not alter the regulations in a significant manner. Once transformation is complete, USCIS applicants, petitioners, representatives, and others will realize a significant savings in time and effort when submitting immigration benefit requests, seeking case status information, and communicating with USCIS.

### E. *Executive Order 13132*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. *Executive Order 12988 Civil Justice Reform*

Section 3(c) of Executive Order 12988 requires Executive agencies to review regulations in light of applicable standards in section 3(a) and section 3(b) to determine whether they are met or it is unreasonable to meet one or more of them. DHS has completed the required review and determined that, to the extent permitted by law, this final rule meets the relevant standards of Executive Order 12988.

### G. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, Public Law 104-13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting and recordkeeping requirements inherent in a rule. Public Law 104-13, 109 Stat. 163 (May 22, 1995). This rule does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act.

### H. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601-612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104-121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. When an agency makes changes effective through a final rule for which notice and comment are not necessary, the RFA does not require an agency to prepare a regulatory flexibility analysis. Accordingly, USCIS has not prepared a regulatory flexibility analysis.

### List of Subjects

#### *8 CFR Part 1*

Administrative practice and procedure, Immigration.

#### *8 CFR Part 100*

Organization and functions (Government agencies).

#### *8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

#### *8 CFR Part 204*

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 207***

Immigration, Refugees, Reporting and recordkeeping requirements.

***8 CFR Part 208***

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 209***

Aliens, Immigration, Refugees.

***8 CFR Part 211***

Immigration, Passports and visas, Reporting and recordkeeping requirements.

***8 CFR Part 212***

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

***8 CFR Part 213a***

Administrative practice and procedure, Aliens, Immigrants.

***8 CFR Part 223***

Immigration, Refugees, Reporting and recordkeeping requirements.

***8 CFR Part 235***

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

***8 CFR Part 236***

Administrative practice and procedure, Aliens, Immigration.

***8 CFR Part 238***

Air Carriers, Aliens, Government contracts, Maritime carriers.

***8 CFR Part 240***

Administrative practice and procedure, Immigration.

***8 CFR Part 241***

Administrative practice and procedure, Aliens, Immigration.

***8 CFR Part 244***

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 245a*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 248*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 264*

Reporting and recordkeeping requirements.

*8 CFR Part 265*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 270*

Administrative practice and procedure, Aliens, Employment, Fraud; Penalties.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

*8 CFR Part 287*

Immigration, Law enforcement officers.

*8 CFR Part 292*

Administrative practice and procedure, Immigration, Lawyers, Reporting and recordkeeping requirements.

*8 CFR Part 299*

Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 301*

Citizenship and naturalization, Reporting and recordkeeping requirements.

**\*53778  *8 CFR Part 310***

Citizenship and naturalization, Courts.

*8 CFR Part 312*

Citizenship and naturalization, Education.

*8 CFR Part 316*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 319*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 320*

Citizenship and naturalization, Infants and children, Reporting and recordkeeping requirements.

*8 CFR Part 322*

Citizenship and naturalization, Infants and children, Reporting and recordkeeping requirements.

*8 CFR Part 324*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 325*

Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 328*

Citizenship and naturalization, Military personnel, Reporting and recordkeeping requirements.

*8 CFR Part 329*

Citizenship and naturalization, Military personnel, Veterans.

*8 CFR Part 330*

Reporting and recordkeeping requirements, Seamen.

*8 CFR Part 332*

Citizenship and naturalization, Education, Reporting and recordkeeping requirements.

*8 CFR Part 333*

Citizenship and naturalization.

*8 CFR Part 334*

Administrative practice and procedure, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

*8 CFR Part 335*

Administrative practice and procedures, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

***8 CFR Part 336***
Administrative practice and procedure, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

***8 CFR Part 337***
Citizenship and naturalization, Courts.

***8 CFR Part 338***
Citizenship and naturalization, Reporting and recordkeeping requirements.

***8 CFR Part 339***
Citizenship and naturalization, Courts.

***8 CFR Part 340***
Citizenship and naturalization, Law enforcement.

***8 CFR Part 341***
Citizenship and naturalization, Reporting and recordkeeping requirements.

***8 CFR Part 342***
Administrative practice and procedure, Citizenship and naturalization.

***8 CFR Part 343***
Citizenship and naturalization.

***8 CFR Part 343a***
Citizenship and naturalization, Reporting and recordkeeping requirements.

***8 CFR Part 343b***
Citizenship and naturalization, Reporting and recordkeeping requirements.

***8 CFR Part 343c***
Archives and records, Citizenship and naturalization, Courts.

***8 CFR Part 392***
Citizenship and naturalization, Reporting and recordkeeping requirements.

*8 CFR Part 499*

Citizenship and naturalization.

Accordingly, the interim rules published at 68 FR 23010, on April 29, 2003; 64 FR 27660 on May 21, 1999; 66 FR 27445 on May 17, 2001; 69 FR 11287 on March 10, 2004; 70 FR 23775 on May 5, 2005; 70 FR 21129 on April 25, 2005; and 65 FR 17127 on March 31, 2000 are adopted as final without change, and chapter I of title 8 of the Code of Federal Regulations is amended as follows:

1. Part 1 is revised to read as follows:

## PART 1—DEFINITIONS

Sec.

1.1 Applicability.

1.2 Definitions.

1.3 Lawfully present aliens for purposes of applying for Social Security benefits.
Authority: 8 U.S.C. 1101; 8 U.S.C. 1103; 5 U.S.C. 301; Pub. L. 107-296, 116 Stat. 2135; 6 U.S.C. 1 et seq.
 8 CFR § 1.1

### § 1.1 Applicability.

This part further defines some of the terms already described in section 101 and other sections of the Immigration and Nationality Act (66 Stat. 163), as amended, and such other enactments as pertain to immigration and nationality. These terms are used consistently by components within the Department of Homeland Security including U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services.
 8 CFR § 1.2

### § 1.2 Definitions.

As used in this chapter I, the term:

Act or INA means the Immigration and Nationality Act, as amended.

Aggravated felony means a crime (or a conspiracy or attempt to commit a crime) described in section 101(a)(43) of the Act. This definition applies to any proceeding, application, custody determination, or adjudication pending on or after September 30, 1996, but shall apply under section 276(b) of the Act only to violations of section 276(a) of the Act occurring on or after that date.

Application means benefit request.

Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked. However, an arriving alien who was paroled into the United States before April 1, 1997, or who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure

from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act.

Attorney means any person who is eligible to practice law in, and is a member in good standing of the bar of, **\*53779** the highest court of any State, possession, territory, or Commonwealth of the United States, or of the District of Columbia, and is not under any order suspending, enjoining, restraining, disbarring, or otherwise restricting him or her in the practice of law.

Benefit request means any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit, whether such request is filed on a paper form or submitted in an electronic format, provided such request is submitted in a manner prescribed by DHS for such purpose.

Board means the Board of Immigration Appeals within the Executive Office for Immigration Review, Department of Justice, as defined in 8 CFR 1001.1(e).

Case, unless the context otherwise requires, means any proceeding arising under any immigration or naturalization law, Executive Order, or Presidential proclamation, or preparation for or incident to such proceeding, including preliminary steps by any private person or corporation preliminary to the filing of the application or petition by which any proceeding under the jurisdiction of the Service or the Board is initiated.

CBP means U.S. Customs and Border Protection.

Commissioner means the Commissioner of the Immigration and Naturalization Service prior to March 1, 2003. Unless otherwise specified, references after that date mean the Director of U.S. Citizenship and Immigration Services, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears.

Day, when computing the period of time for taking any action provided in this chapter I including the taking of an appeal, shall include Saturdays, Sundays, and legal holidays, except that when the last day of the period computed falls on a Saturday, Sunday, or a legal holiday, the period shall run until the end of the next day which is not a Saturday, Sunday, or a legal holiday.

Department or DHS, unless otherwise noted, means the Department of Homeland Security.

Director or district director prior to March 1, 2003, means the district director or regional service center director, unless otherwise specified. On or after March 1, 2003, pursuant to delegation from the Secretary of Homeland Security or any successive re-delegation, the terms mean, to the extent that authority has been delegated to such official: asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge. The terms also mean such other official, including an official in an acting capacity, within U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, or other component of the Department of Homeland Security who is delegated the function or authority above for a particular geographic district, region, or area.

EOIR means the Executive Office for Immigration Review within the Department of Justice.

Executed or execute means fully completed.

Form when used in connection with a benefit or other request to be filed with DHS to request an immigration benefit, means a device for the collection of information in a standard format that may be submitted in paper format

or in an electronic format as prescribed by USCIS on its official Internet Web site. The term Form followed by an immigration form number includes an approved electronic equivalent of such form as may be prescribed by the appropriate component on its official Internet Web site.

Form instructions means instructions on how to complete and where to file a benefit request, supporting evidence or fees, or any other required or preferred document or instrument with a DHS immigration component. Form instructions prescribed by USCIS or other DHS immigration components on their official Internet Web sites will be considered the currently applicable version, notwithstanding paper or other versions that may be in circulation, and may be issued through non-form guidance such as appendices, exhibits, guidebooks, or manuals.

ICE means U.S. Immigration and Customs Enforcement.

Immigration judge means an immigration judge as defined in 8 CFR 1001.1(l).

Immigration officer means the following employees of the Department of Homeland Security, including senior or supervisory officers of such employees, designated as immigration officers authorized to exercise the powers and duties of such officer as specified by the Act and this chapter I: aircraft pilot, airplane pilot, asylum officer, refugee corps officer, Border Patrol agent, contact representative, deportation officer, detention enforcement officer, detention officer, fingerprint specialist, forensic document analyst, general attorney (except with respect to CBP, only to the extent that the attorney is performing any immigration function), helicopter pilot, immigration agent (investigations), immigration enforcement agent, immigration information officer, immigration inspector, immigration officer, immigration services officer, investigator, intelligence agent, intelligence officer, investigative assistant, special agent, other officer or employee of the Department of Homeland Security or of the United States as designated by the Secretary of Homeland Security as provided in 8 CFR 2.1.

Lawfully admitted for permanent residence means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed. Such status terminates upon entry of a final administrative order of exclusion, deportation, or removal.

Petition. See Benefit request.

Practice means the act or acts of any person appearing in any case, either in person or through the preparation or filing of any brief or other document, paper, application, or petition on behalf of another person or client before or with DHS.

Preparation, constituting practice, means the study of the facts of a case and the applicable laws, coupled with the giving of advice and auxiliary activities, including the incidental preparation of papers, but does not include the lawful functions of a notary public or service consisting solely of assistance in the completion of blank spaces on printed DHS forms, by one whose remuneration, if any, is nominal and who does not hold himself or herself out as qualified in legal matters or in immigration and naturalization procedure.

Representation before DHS includes practice and preparation as defined in this section.

Representative refers to a person who is entitled to represent others as provided in 8 CFR 292.1(a)(2) through (6) and 8 CFR 292.1(b).

Respondent means an alien named in a Notice to Appear issued in accordance with section 239(a) of the Act, or in an Order to Show Cause issued in accordance with 8 CFR 242.1 (1997) as it existed prior to April 1, 1997.

Secretary, unless otherwise noted, means the Secretary of Homeland Security.

**\*53780**  Service means U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and/or U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears.

Service counsel means any immigration officer assigned to represent the Service in any proceeding before an immigration judge or the Board of Immigration Appeals.

Transition program effective date as used with respect to extending the immigration laws to the Commonwealth of the Northern Mariana Islands means November 28, 2009.

USCIS means U.S. Citizenship and Immigration Services.
 8 CFR § 1.3

**§ 1.3 Lawfully present aliens for purposes of applying for Social Security benefits.**
(a) Definition of the term an "alien who is lawfully present in the United States." For the purposes of 8 U.S.C. 1611(b)(2) only, an "alien who is lawfully present in the United States" means:

(1) A qualified alien as defined in 8 U.S.C. 1641(b);

(2) An alien who has been inspected and admitted to the United States and who has not violated the terms of the status under which he or she was admitted or to which he or she has changed after admission;

(3) An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Act for less than 1 year, except:

(i) Aliens paroled for deferred inspection or pending removal proceedings under section 240 of the Act; and

(ii) Aliens paroled into the United States for prosecution pursuant to 8 CFR 212.5(b)(3);

(4) An alien who belongs to one of the following classes of aliens permitted to remain in the United States because DHS has decided for humanitarian or other public policy reasons not to initiate removal proceedings or enforce departure:

(i) Aliens currently in temporary resident status pursuant to section 210 or 245A of the Act;

(ii) Aliens currently under Temporary Protected Status (TPS) pursuant to section 244 of the Act;

(iii) Cuban-Haitian entrants, as defined in section 202(b) of Pub. L. 99-603, as amended;

(iv) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101-649, as amended;

(v) Aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

(vi) Aliens currently in deferred action status;

(vii) Aliens who are the spouse or child of a United States citizen whose visa petition has been approved and who have a pending application for adjustment of status;

(5) Applicants for asylum under section 208(a) of the Act and applicants for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture who have been granted employment authorization, and such applicants under the age of 14 who have had an application pending for at least 180 days.

(b) Non-issuance of a Notice to Appear and non-enforcement of deportation, exclusion, or removal orders. An alien may not be deemed to be lawfully present solely on the basis of DHS's decision not to, or failure to:

(1) Issue a Notice to Appear; or

(2) Enforce an outstanding order of deportation, exclusion or removal.

## PART 100—STATEMENT OF ORGANIZATION

2. The authority citation for part 100 continues to read as follows:

Authority: 8 U.S.C. 1103; 8 CFR part 2.

 8 CFR § 100.7

**§ 100.7 [Removed]**

8 CFR § 100.7

3. Section 100.7 is removed.

## PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS

4. The authority citation for part 103 continues to read as follows:

Authority: 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Pub. L. 107-296, 116 Stat. 2135; 6 U.S.C. 1 et seq.; E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

5. The heading for part 103 is revised as set forth above.

6. In part 103, §§ 103.1 through 103.10 are designated under the following subpart A heading:

**Subpart A—Applying for Benefits, Surety Bonds, Fees**

8 CFR § 103.1

**§ 103.1 [Removed and Reserved]**

8 CFR § 103.1

7. Section 103.1 is removed and reserved.

 8 CFR § 103.2

8. Section 103.2 is amended by:

a. Removing the phrases "petition or application" and "application or petition" and adding in its place the phrase "benefit request"; and by removing the phrase "petitions and applications" and adding in its place the phrase "benefit requests" whenever they appear in the following places:

i. Paragraph (a)(2);

ii. Paragraph (a)(3);

iii. Paragraph (a)(7)(ii);

iv. Paragraph (b)(6);

v. Paragraph (b)(7);

vi. Paragraph (b)(8)(i);

vii. Paragraph (b)(8)(ii);

viii. Paragraph (b)(8)(iii);

ix. Paragraph (b)(9) introductory text;

x. Paragraph (b)(9)(ii);

xi. Paragraph (b)(10)(i);

xii. Paragraph (b)(10)(ii);

xiii. Paragraph (b)(11);

xiv. Paragraph (b)(12);

xv. Paragraph (b)(13)(i);

xvi. Paragraph (b)(13)(ii);

xvii. Paragraph (b)(14);

xviii. Paragraph (b)(15); and

xix. Paragraph (b)(18); and

b. Revising the section heading;

c. Revising paragraph (a)(1);

d. Revising the term "BCIS" to read "USCIS" in paragraph (a)(2) last sentence;

e. Revising the term "§ 1.1(f)" to read "§ 1.2" in paragraph (a)(3) first sentence;

f. Revising paragraph (a)(6);

g. Revising paragraph (a)(7)(i) and adding paragraph (a)(7)(iii);

h. Revising paragraph (b)(1);

i. Revising paragraph (b)(4);

j. Revising the phrase "by submitting a properly completed and signed Form G-884 to the adjudicating USCIS office" to read "in accordance with instructions provided by USCIS" in paragraph (b)(5) last sentence;

k. Revising the term "application, petition" to read "benefit request" in paragraph (b)(7) last sentence;

l. Revising the term "in writing" to read "communicated by regular or electronic mail" in paragraph (b)(8)(iv) first sentence;

m. Revising the second sentence in paragraph (b)(17)(i);

n. Revising paragraph (b)(19); and

o. Removing paragraph (e).

The revisions and addition read as follows:
8 CFR § 103.2

**§ 103.2 Submission and adjudication of benefit requests.**
(a) Filing. (1) Preparation and submission. Every benefit request or other document submitted to DHS must be executed and filed in accordance with the form instructions, notwithstanding any provision of 8 CFR chapter 1 to the contrary, and such instructions are incorporated into the regulations requiring its submission. Each benefit request or other document must be filed with fee(s) as required by regulation. Benefit requests which require a person to submit biometric information must also be filed with the biometric service fee in 8 CFR 103.7(b)(1), for each individual who is required to provide biometrics. Filing fees and biometric service fees are non-refundable and, except as otherwise **\*53781** provided in this chapter I, must be paid when the benefit request is filed.
\* \* \* \* \*
(6) Where to file. All benefit requests must be filed in accordance with the form instructions.

(7) Receipt date. (i) Benefit requests submitted. A benefit request which is not signed and submitted with the correct fee(s) will be rejected. A benefit request that is not executed may be rejected. Except as provided in 8 CFR parts 204, 245, or 245a, a benefit request will be considered received by USCIS as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format. The receipt date shall be recorded upon receipt by USCIS.
\* \* \* \* \*
(iii) Rejected benefit requests. A benefit request which is rejected will not retain a filing date. There is no appeal from such rejection.

(b) Evidence and processing. (1) Demonstrating eligibility. An applicant or petitioner must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication. Each benefit request must be properly completed and filed with all initial evidence required by applicable regulations and other USCIS instructions. Any evidence submitted in connection with a benefit request is incorporated into and considered part of the request.
\* \* \* \* \*
(4) Supporting documents. Original or photocopied documents which are required to support any benefit request must be submitted in accordance with the form instructions.
\* \* \* \* \*
(17) \* \* \*

(i) \* \* \* These records include alien and other files, arrival manifests, arrival records, Department index cards, Immigrant Identification Cards, Certificates of Registry, Declarations of Intention issued after July 1, 1929, Permanent Resident Cards, or other registration receipt forms (provided that such forms were issued or endorsed to show admission for permanent residence), passports, and reentry permits. \* \* \*

* * * * *

(19) Notification of decision. The Service will notify applicants, petitioners, and their representatives as defined in 8 CFR part 1 in writing of a decision made on a benefit request. Documents issued based on the approval of a request for benefits will be sent to the applicant or beneficiary.

* * * * *8 CFR § 103.3

### § 103.3 [Amended]

8 CFR § 103.3

9. Section 103.3 is amended by:

a. Revising the term "shall file" to read "must submit" and revising the phrase "with the office where the unfavorable decision was made" to read "as indicated in the applicable form instructions" in the last sentence in paragraph (a)(2) (i); and

b. Revising the term "§ 103.9(a) of this part" to read "8 CFR 103.10(e)" in paragraph (c) last sentence.


### §§ 103.8 through 103.11 [Removed]

8 CFR § 103.8 8 CFR § 103.9 8 CFR § 103.10 8 CFR § 103.11

10. Sections 103.8 through 103.11 are removed.

8 CFR § 103.5a

### § 103.5a [Redesignated as § 103.8]

8 CFR § 103.5a 8 CFR § 103.8

11. Section 103.5a is redesignated as § 103.8.

8 CFR § 103.8

12. Newly redesignated § 103.8 is amended by:

a. Revising the section heading;

b. Revising the paragraph (a) heading;

c. Revising paragraphs (a)(1);

d. Removing the "." at the end of paragraph (a)(2)(iv), and adding a "; or" in its place; and by

e. Adding paragraph (a)(2)(v).

The revisions and addition read as follows:

8 CFR § 103.8

### § 103.8 Service of decisions and other notices.

* * * * *

(a) Types of service—(1) Routine service. (i) Routine service consists of mailing the notice by ordinary mail addressed to the affected party and his or her attorney or representative of record at his or her last known address, or

(ii) If so requested by a party, advising the party of such notice by electronic mail and posting the decision to the party's USCIS account.

(2) * * *

(v) If so requested by a party, advising the party by electronic mail and posting the decision to the party's USCIS account.
* * * * *8 CFR § 103.5b

**§ 103.5b [Redesignated as § 103.9]**
8 CFR § 103.5b  8 CFR § 103.9
13. Section 103.5b is redesignated as § 103.9.
 8 CFR § 103.7
14. Section 103.7 is amended by:

a. Revising the term "BCIS" to read "USCIS" wherever that term appears in paragraph (a)(1);

b. Adding new paragraphs (b)(1)(i)(CCC), (DDD), and (EEE).

The revisions and addition read as follows:
 8 CFR § 103.7

**§ 103.7 Fees.**
* * * * *
(b) * * *

(1) * * *

(i) * * *

(CCC) American Competitiveness and Workforce Improvement Act (ACWIA) fee. $1500 or $750 for filing certain H-1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions.

(DDD) Fraud detection and prevention fee. $500 for filing certain H-1B and L petitions, and $150 for H-2B petitions as described in 8 CFR 214.2(h)(19).

(EEE) Public Law 111-230 fee. Petitioners who are required to submit the Fraud Detection and Prevention Fee described in paragraph (b)(1)(i)(DDD) of this section are also required to submit an additional $2000 for an H-1B petition or an additional $2250 for an L-1 petition if:

(1) The petitioner employs 50 or more persons in the United States;

(2) More than 50 percent of those employees are in H-1B or L-1 status; and

(3) The petition is filed prior to the expiration of section 402 of Public Law 111-230.
* * * * *8 CFR § 103.9
15. Newly redesignated § 103.9 is revised to read as follows:
 8 CFR § 103.9

**§ 103.9 Request for further action on an approved benefit request.**
(a) Filing a request. A person may request further action on an approved benefit request as prescribed by the form instructions. Requests for further action may be submitted with the original benefit request or following the approval of such benefit.

(b) Processing. The request will be approved if the requester has demonstrated eligibility for the requested action. There is no appeal from the denial of such request.

8 CFR § 103.12

**§ 103.12 [Removed]**

8 CFR § 103.12

16. Section 103.12 is removed.

8 CFR § 103.37

**§ 103.37 [Redesignated as § 103.10]**

8 CFR § 103.37 8 CFR § 103.10

17. Section 103.37 is redesignated as § 103.10.

8 CFR § 103.10

18. Newly redesignated § 103.10 is amended by:

a. Redesignating paragraphs (g), (h), and (i) as paragraphs (b), (c), and (d) respectively;

b. Revising the term "paragraph (f) of this section" to read "paragraph (c) of this section or 8 CFR 1003.1(h)(2)" in newly redesignated paragraph (c)(2); and by

c. Adding paragraph (e).

The addition reads as follows:

8 CFR § 103.10

**§ 103.10 Precedent decisions.**

* * * * *

(e) Precedent decisions. Bound volumes of designated precedent **\*53782** decisions, entitled "Administrative Decisions under Immigration and Nationality Laws of the United States," may be purchased from the Superintendent of Documents, U.S. Government Printing Office. Prior to publication in volume form, current precedent decisions are available from the Department of Justice, Executive Office for Immigration Review's Virtual Law Library at: http://www.justice.gov/eoir/vll/libindex.html.

8 CFR § 103.16

19. Section 103.16 is added under an added subpart B heading to read as follows:

**Subpart B—Biometric Requirements**

8 CFR § 103.16

**§ 103.16 Collection, use and storage of biometric information.**

(a) Use of biometric information. Any individual may be required to submit biometric information if the regulations or form instructions require such information or if requested in accordance with 8 CFR 103.2(b)(9). DHS may collect and store for present or future use, by electronic or other means, the biometric information submitted by an individual. DHS may use this biometric information to conduct background and security checks, adjudicate immigration and naturalization benefits, and perform other functions related to administering and enforcing the immigration and naturalization laws.

(b) Individuals residing abroad. An individual who is required to provide biometric information and who is residing outside of the United States must report to a DHS-designated location to have his or her biometric information collected, whether by electronic or non-electronic means.

8 CFR § 103.17

20. Section 103.17 is added under subpart B to read as follows:

8 CFR § 103.17

**§ 103.17** Biometric service fee.

(a) Required fees. DHS will charge a fee, as prescribed in 8 CFR 103.7(b)(1), for collecting biometric information at a DHS office, other designated collection site overseas, or a registered State or local law enforcement agency designated by a cooperative agreement with DHS to provide biometric collection services, to conduct required law enforcement checks, and to maintain this biometric information for reuse to support other benefit requests. Requests for benefits must be submitted with the biometric service fee for all individuals who are required to submit biometric information and a biometric services fee and who reside in the United States at the time of filing for the benefit.

(b) Non-payment of biometric service fee. (1) If a benefit request is received by DHS without the correct biometric service fee, DHS will notify the applicant, petitioner, and, when appropriate, the applicant or petitioner's representative, of the deficiency, and no further action will be taken on the benefit request until payment is received. Failure to submit the correct biometric service fee in response to a notice of deficiency within the time allotted in the notice will result in denial of the benefit request. There is no appeal from the denial of a benefit request for failure to submit the correct biometric service fee. A motion to reopen a benefit request denied for failure to submit the correct biometric service fee will be granted only on proof that:

(i) The correct biometric service fee was submitted at the time of filing the benefit request;

(ii) The correct biometric service fee was submitted in response to the notice of deficiency within the time allotted in the notice; or

(iii) The notice of deficiency was sent to an address other than the address on the benefit request or the notice of representation, or the applicant or petitioner notified DHS, in writing, of a change of address or change of representation subsequent to filing and before the notice of deficiency was sent and the DHS notice of deficiency was not sent to the new address.

(2) If the reason for the deficiency in the biometric service fee is that a check or financial instrument used to pay the biometric service fee is returned as not payable, the remitter must be allowed 14 calendar days to pay the fee and any associated service charges. If the fee and charges are not paid within 14 calendar days, the benefit request will be denied.

**§§ 103.20-103.36 [Removed and Reserved]**

8 CFR § 103.20 8 CFR § 103.21 8 CFR § 103.22 8 CFR § 103.23 8 CFR § 103.24 8 CFR § 103.25 8 CFR § 103.26 8 CFR § 103.27 8 CFR § 103.28 8 CFR § 103.29 8 CFR § 103.30 8 CFR § 103.31 8 CFR § 103.32 8 CFR § 103.33 8 CFR § 103.34 8 CFR § 103.35 8 CFR § 103.36

21. Sections 103.20 through 103.36 are removed.

**Subpart C—[Reserved]**

22. Add reserved subpart C.

23. Sections 103.38 through 103.41 are designated under the following subpart D heading:

**Subpart D—Availability of Records**

* * * * *8 CFR § 103.41

24. In § 103.41, paragraph (c) is revised to read as follows:

8 CFR § 103.41

**§ 103.41 Genealogy request fees.**

\* \* \* \* \*

(c) Manner of submission. The application and fee must be submitted in accordance with form instructions.

8 CFR § 103.42

25. Section 103.42 is added under subpart D to read as follows:

8 CFR § 103.42

**§ 103.42 Rules relating to the Freedom of Information Act (FOIA) and the Privacy Act.**

Immigration-related regulations relating to FOIA and the Privacy Act are located in 6 CFR part 5.


**PART 204—IMMIGRANT PETITIONS**

26. The authority citation for part 204 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1186a, 1255, 1641; 8 CFR part 2.

8 CFR § 204.3

**§ 204.3 [Amended]**

8 CFR § 204.3

27. Section 204.3 is amended by:

a. Revising the term "§ 103.2(e) of this chapter" to read "8 CFR 103.16" and the terms "the Service" and "The Service" to read "USCIS" wherever the terms appear in paragraph (c)(3); and by

b. Revising the term "BCIS" to read "USCIS", the term "Form I-600" to read "petition", and the term "I-600A" to read "advance processing request" wherever the terms appear in paragraph (h)(3)(ii).

8 CFR § 204.4

**§ 204.4 [Amended]**

8 CFR § 204.4

28. Section 204.4 is amended by:

a. Revising the term "§ 103.2(e) of this chapter to read "8 CFR 103.16" in the second sentence in paragraph (d)(1); and by

b. Removing the phrase ", Form I-360," in the last sentence in paragraph (d)(1).

8 CFR § 204.6

**§ 204.6 [Amended]**

8 CFR § 204.6

29. In § 204.6, paragraph (l) is removed and reserved.

8 CFR § 204.10

**§ 204.10 [Removed and Reserved]**

8 CFR § 204.10

30. Section 204.10 is removed and reserved.

8 CFR § 204.302

**§ 204.302 [Amended]**

8 CFR § 204.302

31. In § 204.302, paragraph (b), first sentence, is amended by revising the term "8 CFR 1.1(i), (j) and (m)," to read "8 CFR 1.2".

 8 CFR § 204.310

§ 204.310 [Amended]
8 CFR § 204.310

32. In § 204.310, paragraph (b), first sentence, is amended by revising the term "8 CFR 103.2(e)" to read "8 CFR 103.16".

## PART 207—ADMISSION OF REFUGEES

33. The authority citation for part 207 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1151, 1157, 1159, 1182; 8 CFR part 2.

 8 CFR § 207.1

34. Section 207.1 is revised to read as follows:

 8 CFR § 207.1

### § 207.1 Eligibility.

 *53783 (a) Filing. Any alien who believes he or she is a refugee as defined in section 101(a)(42) of the Act, and is included in a refugee group identified in section 207(a) of the Act, may apply for admission to the United States by submitting an application, including biometric information, in accordance with the form instructions, as defined in 8 CFR 1.2.

(b) Firmly resettled. Any applicant (other than an applicant for derivative refugee status under 8 CFR 207.7) who has become firmly resettled in a foreign country is not eligible for refugee status under this chapter I. A refugee is considered to be "firmly resettled" if he or she has been offered resident status, citizenship, or some other type of permanent resettlement by a country other than the United States and has traveled to and entered that country as a consequence of his or her flight from persecution. Any applicant who claims not to be firmly resettled in a foreign country must establish that the conditions of his or her residence in that country are so restrictive as to deny resettlement. In determining whether or not an applicant is firmly resettled in a foreign country, the officer reviewing the matter shall consider the conditions under which other residents of the country live:

(1) Whether permanent or temporary housing is available to the refugee in the foreign country;

(2) Nature of employment available to the refugee in the foreign country; and

(3) Other benefits offered or denied to the refugee by the foreign country which are available to other residents, such as right to property ownership, travel documentation, education, public welfare, and citizenship.

(c) Immediate relatives and special immigrants. Any applicant for refugee status who qualifies as an immediate relative or as a special immigrant shall not be processed as a refugee unless it is in the public interest. The alien shall be advised to obtain an immediate relative or special immigrant visa and shall be provided with the proper petition forms to send to any prospective petitioners. An applicant who may be eligible for classification under sections 203(a) or 203(b) of the Act, and for whom a visa number is now available, shall be advised of such eligibility but is not required to apply.

 8 CFR § 207.2

35. Section 207.2 is revised to read as follows:

 8 CFR § 207.2

### § 207.2 Applicant processing.

(a) Interview. Each applicant 14 years old or older shall appear in person before an immigration officer for inquiry under oath to determine his or her eligibility for admission as a refugee.

(b) Medical examination. Each applicant shall submit to a medical examination as required by sections 221(d) and 232(b) of the Act.

(c) Sponsorship. Each applicant must be sponsored by a responsible person or organization. Transportation for the applicant from his or her present abode to the place of resettlement in the United States must be guaranteed by the sponsor.

8 CFR § 207.3

36. Section 207.3 is revised to read as follows:

8 CFR § 207.3

### § 207.3 Waivers of inadmissibility.

(a) Authority. Section 207(c)(3) of the Act sets forth grounds of inadmissibility under section 212(a) of the Act which are not applicable and those which may be waived in the case of an otherwise qualified refugee and the conditions under which such waivers may be approved.

(b) Filing requirements. An applicant may request a waiver by submitting an application for a waiver in accordance with the form instructions. The burden is on the applicant to show that the waiver should be granted based upon humanitarian grounds, family unity, or the public interest. The applicant shall be notified in writing of the decision, including the reasons for denial if the application is denied. There is no appeal from such decision.

8 CFR § 207.4

37. Section 207.4 is revised to read as follows:

8 CFR § 207.4

### § 207.4 Approved application.

Approval of a refugee application by USCIS outside the United States authorizes CBP to admit the applicant conditionally as a refugee upon arrival at the port within four months of the date the refugee application was approved. There is no appeal from a denial of refugee status under this chapter.

8 CFR § 207.5

38. Section 207.5 is revised to read as follows:

8 CFR § 207.5

### § 207.5 Waiting lists and priority handling.

Waiting lists are maintained for each designated refugee group of special humanitarian concern. Each applicant whose application is accepted for filing by USCIS shall be registered as of the date of filing. The date of filing is the priority date for purposes of case control. Refugees or groups of refugees may be selected from these lists in a manner that will best support the policies and interests of the United States. The Secretary may adopt appropriate criteria for selecting the refugees and assignment of processing priorities for each designated group based upon such considerations as reuniting families, close association with the United States, compelling humanitarian concerns, and public interest factors.

8 CFR § 207.7

39. Section 207.7 is amended by:

a. Revising the term "U.S. Attorney General" to read "Secretary" in paragraph (b)(5);

b. Revising paragraph (d);

c. Removing the last two sentences in paragraph (e); and

d. Revising paragraph (f).

The revisions read as follows:

 8 CFR § 207.7

**§ 207.7 Derivatives of refugees.**

\* \* \* \* \*

(d) Filing. A refugee may request accompanying or following-to-join benefits for his or her spouse and unmarried, minor child(ren) (whether the spouse and children are inside or outside the United States) by filing a petition in accordance with the form instructions. The petition may only be filed by the principal refugee. Family members who derived their refugee status are not eligible to request derivative benefits on behalf of their spouses and child(ren). A petition must be filed for each qualifying family member within 2 years of the refugee's admission to the United States, unless USCIS determines that the filing period should be extended for humanitarian reasons. There is no time limit imposed on a family member's travel to the United States once the petition has been approved, provided that the relationship of spouse or child continues to exist and approval of the petition has not been subsequently revoked. There is no fee for this petition.

\* \* \* \* \*

(f) Approvals. (1) Spouse or child in the United States. When a spouse or child of a refugee is in the United States and the petition is approved, USCIS will notify the refugee of such approval. Employment will be authorized incident to status.

(2) Spouse or child outside the United States. When a spouse or child of a refugee is outside the United States and the petition is approved, USCIS will notify the refugee of such approval. USCIS will send the approved petition to the Department of State for transmission to the U.S. Embassy or Consulate having jurisdiction over the area in which the refugee's spouse or child is located.

(3) Benefits. The approval of the petition shall remain valid for the duration of the relationship to the refugee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the  **\*53784**  principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of a refugee. For a derivative inside or arriving in the United States, USCIS will issue a document reflecting the derivative's current status as a refugee to demonstrate employment authorization, or the derivative may apply, under 8 CFR 274a.12(a), for evidence of employment authorization.

 \* \* \* \* \*8 CFR § 207.9

40. Section 207.9 is revised to read as follows:

 8 CFR § 207.9

**§ 207.9 Termination of refugee status.**

The refugee status of any alien (and of the spouse or child of the alien) admitted to the United States under section 207 of the Act will be terminated by USCIS if the alien was not a refugee within the meaning of section 101(a)(42) of the Act at the time of admission. USCIS will notify the alien in writing of its intent to terminate the alien's refugee status. The alien will have 30 days from the date notice is served upon him or her in accordance with 8 CFR 103.8, to present written or oral evidence to show why the alien's refugee status should not be terminated. There is no appeal under this chapter I from the termination of refugee status by USCIS. Upon termination of refugee status, USCIS will process the alien under sections 235, 240, and 241 of the Act.

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

41. The authority citation for part 208 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Pub. L. 110-229, tit. VII, 122 Stat. 754; 8 CFR part 2.

 8 CFR § 208.1

**§ 208.1 [Amended]**

8 CFR § 208.1

42. Section 208.1 is amended by:

a. Revising in the last sentence of paragraph (a)(1) the term "8 CFR parts 3 and 103, where applicable" to read "8 CFR parts 103 and 1003, as applicable"; and

b. Revising in paragraph (b) the term "The Director of International Affairs" to read "The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO)".

8 CFR § 208.2

**§ 208.2 [Amended]**
8 CFR § 208.2
43. Section 208.2 is amended in paragraph (a) by revising the paragraph heading to read: "Refugee, Asylum, and International Operations (RAIO)" and by revising the terms "the Office of International Affairs" and "The Office of International Affairs" to read: "RAIO" wherever they appear.

8 CFR § 208.5

**§ 208.5 [Amended]**
8 CFR § 208.5
44. Section 208.5 is amended by:

a. Removing the phrase ", pursuant to § 208.4(b)," in the last sentence of paragraph (b)(1)(ii)

b. Revising the phrase "The DHS office" to read "DHS" and by revising the phrase "the DHS office" to read "DHS" in paragraph (b)(1)(ii); and

c. Revising the term "Attorney General" to read "Secretary" in paragraph (b)(2).

8 CFR § 208.7
45. Section 208.7 is amended by:

a. Revising the phrase "submit a Form I-765, Application for Employment Authorization" to read "request employment authorization" in paragraph (a)(1), first sentence;

b. Revising the term "Form I-765" to read "employment authorization request" in paragraph (a)(1), last sentence;

c. Revising the phrase "the Service" to read "USCIS" in paragraph (a)(2), first sentence;

d. Revising the phrase "the Commissioner" to read "USCIS" in paragraph (b), introductory text; and

e. Revising paragraph (c), introductory text.

The revision reads as follows:

8 CFR § 208.7

**§ 208.7 Employment authorization.**
* * * * *

(c) Supporting evidence for renewal of employment authorization. In order for employment authorization to be renewed under this section, the alien must request employment authorization in accordance with the form instructions. USCIS may require that an alien establish that he or she has continued to pursue an asylum application before an immigration judge or sought administrative or judicial review. For purposes of employment authorization, pursuit of an

asylum application is established by presenting one of the following, depending on the stage of the alien's immigration proceedings:

* * * * *8 CFR § 208.9

### § 208.9 [Amended]

8 CFR § 208.9

46. In § 208.9, paragraph (b) is amended by removing the phrase "electronically or through any other means designated by the Attorney General".

8 CFR § 208.10

### § 208.10 [Amended]

8 CFR § 208.10

47. Section 208.10 is amended by revising the term "the Office of International Affairs" to read "USCIS" in the third sentence.

8 CFR § 208.12

### § 208.12 [Amended]

8 CFR § 208.12

48. In § 208.12, paragraph (a) is amended by revising the term "the Office of International Affairs, other Service offices," to read "other USCIS offices".

8 CFR § 208.14

### § 208.14 [Amended]

8 CFR § 208.14

49. In § 208.14, paragraph (b) is amended by revising the term "Office of International Affairs" to read "RAIO".

8 CFR § 208.21

50. Section 208.21 is amended by revising paragraphs (c) and (d) to read as follows:

8 CFR § 208.21

### § 208.21 Admission of the asylee's spouse and children.

(c) Spouse or child in the United States. When a spouse or child of an alien granted asylum is in the United States, but was not included in the asylee's application, the asylee may request accompanying or following-to-join benefits for his or her spouse or child, regardless of the status of that spouse or child in the United States, in accordance with the form instructions. The petition must be filed by the asylee for each qualifying family member within 2 years of the date in which he or she was granted asylum status, unless it is determined by USCIS that this period should be extended for humanitarian reasons. Upon approval of the petition, USCIS will notify the asylee of such approval. Employment will be authorized incident to status. To demonstrate employment authorization, USCIS will issue a document reflecting the derivative's current status as an asylee, or the derivative may apply, under 8 CFR 274a.12(a), for evidence of employment authorization. The approval of the derivative benefits petition shall remain valid for the duration of the relationship to the asylee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of an asylee.

(d) Spouse or child outside the United States. When a spouse or child of an alien granted asylum is outside the United States, the asylee may request accompanying or following-to-join benefits for his or her spouse or child(ren) by filing a separate petition for each qualifying family member in accordance with the form instructions. A petition for each qualifying family member must be filed within 2 years of the date in which the asylee was granted asylum, unless USCIS determines that the filing period should be extended for  *53785  humanitarian reasons. When a petition is approved, USCIS will notify the asylee of such approval. USCIS will also send the approved petition to the Department of State for transmission to the U.S. Embassy or Consulate having jurisdiction over the area in which the asylee's spouse or child is located. The approval of the petition shall remain valid for the duration of the relationship to the asylee and, in the

case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of an asylee.

* * * * *8 CFR § 208.24

51. Section 208.24 is amended by:

a. Revising paragraph (a) introductory text;

b. Revising paragraph (b) introductory text; and by

c. Revising the term "§ 3.2 or § 3.23 of this chapter" to read 8 CFR 1003.2 and 8 CFR 1003.23" and by revising the term "the Service" to read "USCIS", wherever the term appears in paragraph (f).

The revisions read as follows:

8 CFR § 208.24

**§ 208.24** **Termination of asylum or withholding of removal or deportation.**

(a) Termination of asylum by USCIS. Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of USCIS if, following an interview, the asylum officer determines that:

* * * * *

(b) Termination of withholding of deportation or removal by USCIS. Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of withholding of deportation or removal made under the jurisdiction of USCIS if the asylum officer determines, following an interview, that:

* * * * *8 CFR § 208.30

52. Section 208.30 is amended by revising paragraph (d)(3) to read as follows:

8 CFR § 208.30

**§ 208.30** **Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.**

* * * * *

(d) * * *

(3) The alien may be required to register his or her identity.

* * * * *8 CFR § 208.31

**§ 208.31** **[Amended]**

8 CFR § 208.31

53. In § 208.31, paragraph (a) is amended by revising the term "The Service" to read "USCIS" in the last sentence.


**PART 209—ADJUSTMENT OF STATUS OF REFUGEES AND ALIENS GRANTED ASYLUM**

54. The authority citation for part 209 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1157, 1158, 1159, 1228, 1252, 1282; Pub. L. 110-229, tit. VII, 122 Stat. 754; 8 CFR part 2.

8 CFR § 209.1

55. Section 209.1 is amended by:

a. Revising paragraph (a)(1);

b. Revising paragraph (b);

c. Removing from paragraph (c) last sentence the phrase ", by submitting with the adjustment of status application a vaccination supplement, completed by a designated civil surgeon in the United States";

d. Revising paragraphs (d) and (e); and

e. Adding paragraph (f).

The revisions read as follows:

 8 CFR § 209.1

**§ 209.1 Adjustment of status of refugees.**
* * * * *

(a) Eligibility. (1) Every alien in the United States who is classified as a refugee under 8 CFR part 207, whose status has not been terminated, is required to apply to USCIS one year after entry in order for USCIS to determine his or her admissibility under section 212 of the Act, without regard to paragraphs (4), (5), and (7)(A) of section 212(a) of the Act.
 * * * * *

(b) Application. Upon admission to the United States, every refugee entrant will be notified of the requirement to submit an application for permanent residence one year after entry. An application for the benefits of section 209(a) of the Act must be submitted along with the biometrics required by 8 CFR 103.16 and in accordance with the applicable form instructions.
 * * * * *

(d) Interview. USCIS will determine, on a case-by-case basis, whether an interview by an immigration officer is necessary to determine the applicant's admissibility for permanent resident status under this part.

(e) Decision. USCIS will notify the applicant in writing of the decision on his or her application. There is no appeal of a denial, but USCIS will notify an applicant of the right to renew the request for permanent residence in removal proceedings under section 240 of the Act. If the applicant is found to be admissible for permanent residence under section 209(a) of the Act, USCIS will approve the application, admit the applicant for lawful permanent residence as of the date of the alien's arrival in the United States, and issue proof of such status.

(f) Inadmissible Alien. An applicant who is inadmissible to the United States as described in 8 CFR 209.1(a)(1), may, under section 209(c) of the Act, have the grounds of inadmissibility waived by USCIS except for those grounds under sections 212(a)(2)(C) and 212(a)(3)(A), (B), (C), or (E) of the Act for humanitarian purposes, to ensure family unity, or when it is otherwise in the public interest. An application for the waiver may be requested with the application for adjustment, in accordance with the form instructions.
 8 CFR § 209.2

56. Section 209.2 is amended by:

a. Revising the term "the director" to read "USCIS" whenever that term appears in paragraph (a)(2);

b. Removing the undesignated paragraph at the end of paragraph (a)(1);

c. Removing the second, third, and last sentences in paragraph (a)(2); and

d. Revising paragraphs (b) through (f).

The revisions read as follows:

 8 CFR § 209.2

**§ 209.2 Adjustment of status of aliens granted asylum.**

* * * * *

(b) Inadmissible Alien. An applicant who is not admissible to the United States as described in 8 CFR 209.2(a)(1)(v), may, under section 209(c) of the Act, have the grounds of inadmissibility waived by USCIS except for those grounds under sections 212(a)(2)(C) and 212(a)(3)(A), (B), (C), or (E) of the Act for humanitarian purposes, to ensure family unity, or when it is otherwise in the public interest. An application for the waiver may be requested with the application for adjustment, in accordance with the form instructions. An applicant for adjustment under this part who has had the status of an exchange alien nonimmigrant under section 101(a)(15)(J) of the Act, and who is subject to the foreign resident requirement of section 212(e) of the Act, shall be eligible for adjustment without regard to the foreign residence requirement if otherwise eligible for adjustment.

(c) Application. An application for the benefits of section 209(b) of the Act may be filed in accordance with the form instructions. If an alien has been placed in removal, deportation, or exclusion proceedings, the application can be filed and considered only in proceedings under section 240 of the Act.

(d) Medical examination. For an alien seeking adjustment of status under section 209(b) of the Act, the alien shall **\*53786** submit a medical examination to determine whether any grounds of inadmissibility described under section 212(a)(1)(A) of the Act apply. The asylee is also required to establish compliance with the vaccination requirements described under section 212(a)(1)(A)(ii) of the Act.

(e) Interview. USCIS will determine, on a case-by-case basis, whether an interview by an immigration officer is necessary to determine the applicant's admissibility for permanent resident status under this part.

(f) Decision. USCIS will notify the applicant in writing of the decision on his or her application. There is no appeal of a denial, but USCIS will notify an applicant of the right to renew the request in removal proceedings under section 240 of the Act. If the application is approved, USCIS will record the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application, but not earlier than the date of the approval for asylum in the case of an applicant approved under paragraph (a)(2) of this section.

**PART 211—DOCUMENTARY REQUIREMENTS: IMMIGRANTS; WAIVERS**

57. The authority citation for part 211 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

8 CFR § 211.1

58. Section 211.1 is amended by:

a. Revising paragraph (b)(3); and

b. Removing paragraph (d).

The revision reads as follows:

8 CFR § 211.1

**§ 211.1 Visas.**

(b) * * *

(3) If an immigrant alien returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad believes that good cause exists for his or her failure to present an unexpired immigrant visa, permanent

resident card, or reentry permit, the alien may file an application for a waiver of this requirement with the DHS officer with jurisdiction over the port of entry where the alien arrives. To apply for this waiver, the alien must file the designated form with the fee prescribed in 8 CFR 103.7(b)(1). If the alien's permanent resident card was lost or stolen and the alien has been absent for less than one year, rather than the waiver application the alien must apply for a replacement card as described in 8 CFR 264.5. In the exercise of discretion, the DHS officer who has jurisdiction over the port of entry where the alien arrives may waive the alien's lack of an immigrant visa, permanent resident card, or reentry permit and admit the alien as a returning resident if DHS is satisfied that the alien has established good cause for the alien's failure to present an immigrant visa, permanent resident card, or reentry permit. Filing a request to replace a lost or stolen card will serve as both application for replacement and as application for waiver of passport and visa, without the obligation to file a separate waiver application.

* * * * *8 CFR § 211.2

## § 211.2 [Amended]

8 CFR § 211.2

59. In § 211.2, paragraph (b) is amended in the second sentence by revising the phrase "file Form I-193, Application for Waiver of Passport and/or Visa", to read "apply on the form specified by USCIS".

8 CFR § 211.3

60. Section 211.3 is amended by:

a. Revising the section heading; and

b. Revising the term "Form I-551" to read "a permanent resident card" whenever the term appears in the first sentence.

The revision reads as follows:

8 CFR § 211.3

## § 211.3 Expiration of immigrant visa or other travel document.

* * * * *8 CFR § 211.5

## § 211.5 [Amended]

8 CFR § 211.5

61. Section 211.5 is amended by:

a. Revising the phrase "Form I-551 or I-688 shall become" to read "the alien's permanent resident card becomes" in the last sentence in paragraph (b); and

b. Revising the term "on Form I-90" to read "in accordance with 8 CFR 264.5" in the last sentence of paragraph (c).


## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

62. The authority citation for part 212 continues to read as follows:

Authority: 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255; 8 U.S.C. 1185 note (Pub. L. 108-458, § 7209, 118 Stat. 3638; Public Law 110-229, tit. VII, 122 Stat. 754; 8 CFR part 2.

8 CFR § 212.1

## § 212.1 [Amended]

8 CFR § 212.1

63. In § 212.1, paragraph (n) is removed and reserved.

8 CFR § 212.2

**§ 212.2 [Amended]**

8 CFR § 212.2

64. Section 212.2 is amended by revising the term "the Form I-212" or "Form I-212" to read "the application" wherever it appears in the following places:

a. Paragraph (b)(1);

b. Paragraph (b)(2);

c. Paragraph (e), in the last sentence;

d. Paragraph (f);

e. Paragraph (i)(1) introductory text; and

f. Paragraph (i)(2).

8 CFR § 212.2

65. Section 212.2 is further amended by:

a. Revising the term "sections 212(a)(17) and 212(d)(3)(A) of the Act and § 212.4 of this part" to read "sections 212(a)(9)(A) and 212(d)(3)(A) of the Act and 8 CFR 212.4" in the second sentence of paragraph (b)(1);

b. Revising the phrase "Form I-212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal," to read "an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), in accordance with the form instructions," in the last sentence of paragraph (b)(1);

c. Revising the phrase "an application on Form I-212" to read "the application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), in accordance with the form instructions" in paragraph (c)(1)(ii);

d. Revising the phrase "the Form I-212 to the Service office with jurisdiction over the area within which the consular officer is located" to read "the application to the designated USCIS office" in paragraph (c)(2);

e. Revising the phrase "Form I-212" to read "the waiver request on the form designated by USCIS" in the first sentence in paragraph (d);

f. Revising the phrase "Form I-601, Application for Waiver of Grounds of Excludability, must be filed simultaneously with the Form I-212" to read "he or she must file both waiver requests simultaneously on the forms designated by USCIS with the fees prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the last sentence in paragraph (d).

g. Revising the phrase "Form I-212, Application for Permission to Reapply" to read "the application on the form designated by USCIS" in the second sentence in paragraph (e);

h. Revising the phrase "file Form I-212" to read "apply on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the first sentence in paragraph (g)(1) introductory text;

i. Removing the last sentence in paragraph (g)(1) introductory text;

j. Removing paragraphs (g)(1)(i) and (ii);

k. Revising the term "8 CFR 245.15(t)(2)" to read "8 CFR 245.15(t)(2) or 8 CFR 245.13(k)(2)" in the first sentence of paragraph (g)(2);

**\*53787** l. Revising the phrase "Form I-212 or Form I-601 concurrently with the Form I-131, Application for Travel Document" to read "waiver form concurrently with the parole request" in the first sentence in paragraph (g)(2);

m. Removing the last sentence in paragraph (g)(2); and by

n. Revising the phrase "section 212(a)(16) or (17) of the Act" to read "section 212(a)(9)(A) of the Act" in the second sentence of paragraph (j).

8 CFR § 212.3

### § 212.3 [Amended]
8 CFR § 212.3

66. In § 212.3, paragraph (a) is amended by revising the phrase "Form I-191, Application for Advance Permission to Return to Unrelinquished Domicile" to read "the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions".

8 CFR § 212.4

### § 212.4 [Amended]
8 CFR § 212.4

67. Section 212.4 is amended by:

a. Revising the term "Form I-192 to the district director in charge of the applicant's intended port of entry prior to the applicant's arrival in the United States", to read "the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), and in accordance with the form instructions" in the first sentence in paragraph (b);

b. Removing the term "of Form I-854, Inter-Agency Alien Witness and Informant Record," in the first sentence of paragraph (j)(1); and

c. Revising the phrase "the Commissioner shall" to read "USCIS will" in the first sentence in paragraph (j)(1);

d. Revising the phrase "The Commissioner" or "the Commissioner" to read "USCIS" wherever the term appears in the second and third sentences in paragraph (j)(1); and

e. Revising the phrase "the Commissioner" to read "USCIS" in the second sentence in paragraph (j)(2).

8 CFR § 212.5

### § 212.5 [Amended]
8 CFR § 212.5

68. In § 212.5, paragraph (f) is amended by revising the term "Form I-512" to read "an appropriate document authorizing travel".

8 CFR § 212.7

69. Section 212.7 is amended by:

a. Revising the section heading;

b. Revising the paragraph (a)(1);

c. Revising paragraph (a)(3);

d. Revising in paragraph (a)(4), fourth sentence, the phrase "deportable in a deportation proceeding" to read "deportable in deportation proceedings or removable in removal proceedings";

e. Revising the paragraph (b)(1);

f. Removing paragraph (b)(3);

g. Revising in the first sentence in paragraph (b)(4)(i) the phrase "section 212(a) (1) or (3) (because of mental retardation or because of a past history of mental illness)" to read "section 212(a)(1)(A)(iii) of the Act" and the phrase "an executed Form I-601 to the consular or Service office" to read "a waiver request";

h. Removing the last sentence in paragraph (b)(4)(i);

i. Redesignating paragraphs (b)(4) and (5) as paragraphs (b)(2) and (3), respectively;

j. Revising the term "Form I-612" to read "the form designated by USCIS" in paragraph (c)(5);

k. Revising the term "the Service" to read "USCIS" in the last sentence in paragraph (c)(9)(vi) introductory text;

l. Removing the phrase "with the Service" in the first sentence in paragraph (c)(9)(vi)(B); and

m. Revising the term "Form I-797 (and/or I-797A and I-797B)" to read "the USCIS approval notice" in paragraph (c)(9)(vi)(B)(1).

The revisions read as follows:
8 CFR § 212.7

## § 212.7 Waiver of certain grounds of inadmissibility.

(a) Filing and adjudication of waivers under sections 212(g), (h), or (i) of the Act. (1) Application procedures. Any alien who is inadmissible under sections 212(g), (h), or (i) of the Act who is eligible for a waiver of such inadmissibility may file on the form designated by USCIS, with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. When filed at the consular section of an embassy or consulate, the Department of State will forward the application to USCIS for a decision after the consular official concludes that the alien is otherwise admissible.
* * * * *

(3) Decision. USCIS will provide a written decision and, if denied, advise the applicant of appeal procedures in accordance with 8 CFR 103.3.
* * * * *

(b) Section 212(g) waivers for certain medical conditions. (1) Application. Any alien who is inadmissible under section 212(a)(1)(A)(i), (ii), or (iii) of the Act and who is eligible for a waiver under section 212(g) of the Act may file an application as described in paragraph (a)(1) of this section. The family member specified in section 212(g) of the Act may file the waiver application for the applicant if the applicant is incompetent to file the waiver personally.
* * * * *8 CFR § 212.8

## § 212.8 [Removed and Reserved]
8 CFR § 212.8
70. Section 212.8 is removed and reserved.
8 CFR § 212.9

**§ 212.9 [Removed and Reserved]**

8 CFR § 212.9

71. Section 212.9 is removed and reserved.

8 CFR § 212.10

72. Section 212.10 is revised to read as follows:

8 CFR § 212.10

**§ 212.10 Section 212(k) waiver.**

Any applicant for admission who is in possession of an immigrant visa, and who is inadmissible under section 212(a)(5)(A) or 212(a)(7)(A)(i) of the Act, may apply at the port of entry for a waiver under section 212(k) of the Act. If the application for waiver is denied, the application may be renewed in removal proceedings before an immigration judge as provided in 8 CFR part 1240.

8 CFR § 212.11

**§ 212.11 [Removed and Reserved]**

8 CFR § 212.11

73. Section 212.11 is removed and reserved.

8 CFR § 212.14

**§ 212.14 [Amended]**

8 CFR § 212.14

74. Section 212.14 is amended by:

a. Revising the phrase "a completed Form I-854, Inter-Agency Alien Witness and Informant Record," to read "an application for S nonimmigrant status on the form designated for such purposes" in paragraph (a)(1)(i);

b. Revising the phrase "a completed Form I-854" to read "the completed application" in the first sentence of paragraph (a)(2)(iii);

c. Revising the phrase "Form I-854 requesting" to read "completed application for" in the second sentence of paragraph (a)(2)(iii); and

d. Revising the phrase "a Form I-854" to read "the application" in paragraph (a)(2)(iii), last sentence.

8 CFR § 212.15

**§ 212.15 [Amended]**

8 CFR § 212.15

75. Section 212.15 is amended by:

a. Revising the phrase "shall submit Form I-905, Application for Authorization to Issue Certification for Health Care Workers" to read "must apply on the form designated by USCIS in accordance with the form instructions" in the first sentence of paragraph (j)(1) introductory text;

b. Revising the phrase "As required on Form I-905, the" to read "The" in the last sentence of paragraph (j)(1), introductory text;

c. Revising the term "shall submit Form I-905" to read "must apply" in the first sentence of paragraph (j)(2)(i);

d. Revising the phrase "shall submit Form I-905, Application for Authorization to Issue Certification for Health Care Workers with the appropriate fee contained in 8 CFR 103.7(b)(1)" to read "must apply on the form designated by USCIS

with the fee prescribed in 8 CFR 103.7(b)(1) and in **53788** accordance with the form instructions" in the first sentence in paragraph (j)(2)(ii).

e. Revising the phrase "After receipt of Form I-905, USCIS shall, in all cases," to read "USCIS will" in paragraph (j)(3)(i);

f. Removing the phrase "to the Associate Commissioner for Examinations" from paragraph (j)(3)(iii);

g. Revising the phrase "a Form I-905 requesting," to read "a request for" in the second sentence of paragraph (l); and

h. Revising the term "Form I-905" to read "the request" in the second sentence of paragraph (m)(2) introductory text.
8 CFR § 212.16

**§ 212.16 [Amended]**
8 CFR § 212.16
76. Section 212.16 is amended by

a. Revising the term "Form I-192" to read "the request on the form designated by USCIS", by revising the term "the Service" to read "USCIS", and by revising the phrase "completed Form I-914 application package" to read "application" in paragraph (a);

b. Revising the terms "the Commissioner", "The Service", and "the Service" to read "USCIS" wherever those terms appear in paragraph (b); and by

c. Revising the term "The Commissioner" to read "USCIS" in paragraph (d).
8 CFR § 212.17
77. Section 212.17 is amended by:

a. Revising paragraph (a); and

b. Revising the term "Form I-192" to read "the waiver" wherever the term appears in paragraph (b).

The revision reads as follows:
8 CFR § 212.17

**§ 212.17 Applications for the exercise of discretion relating to U nonimmigrant status.**
(a) Filing the waiver application. An alien applying for a waiver of inadmissibility under section 212(d)(3)(B) or (d)(14) of the Act (waivers of inadmissibility), 8 U.S.C. 1182(d)(3)(B) or (d)(14), in connection with a petition for U nonimmigrant status being filed pursuant to 8 CFR 214.14, must submit the waiver request and the petition for U nonimmigrant status on the forms designated by USCIS in accordance with the form instructions. An alien in U nonimmigrant status who is seeking a waiver of section 212(a)(9)(B) of the Act, 8 U.S.C. 1182(a)(9)(B) (unlawful presence ground of inadmissibility triggered by departure from the United States), must file the waiver request prior to his or her application for reentry to the United States in accordance with the form instructions.
* * * * *

**PART 213A—AFFIDAVITS OF SUPPORT ON BEHALF OF ALIENS**
78. The authority citation for part 213a continues to read as follows:

Authority: 8 U.S.C. 1183a; 8 CFR part 2.
8 CFR § 213a.1

**§ 213a.1 [Amended]**

8 CFR § 213a.1

79. Section 213a.1 is amended by:

a. Revising in the definition of household income the phrase "signed a U.S. Citizenship and Immigration Services (USCIS) Form I-864A, Affidavit of Support Contract Between Sponsor and Household Member" to read "signed the form designated by USCIS for this purpose";

b. Revising in the definition of household size, in the second sentence in paragraph (1), the term "Form I-864" to read "affidavit of support", wherever the term appears;

c. Revising in the definition of joint sponsor the term "a Form I-864" to read "an affidavit of support";

d. Revising in the definition of sponsor the term "a Form I-864" to read "an affidavit of support"; and

e. Revising in the definition of substitute sponsor the term "a Form I-864" to read "the affidavit of support" and the term "the Form I-130 or I-129F" to read "a relative or fiancé´E(e) petition".

8 CFR § 213a.2

80-82. Section 213a.2 is amended by:

a. Revising paragraphs (a)(1)(i) through (a)(1)(v)(A);

b. Revising the phrase "Form I-864 or Form I-864A" to read "affidavit of support or required affidavit of support attachment form" in the first sentence of paragraph (a)(1)(v)(B);

c. Revising the phrase "Form I-864 and any Form I-864A" to read "affidavit of support and any required affidavit of support attachment" in the last sentence of paragraph (a)(1)(v)(B);

d. Revising the phrase "the Form I-130 or Form I-600 immigrant visa petition (or the Form I-129F petition, for a K nonimmigrant seeking adjustment)" to read "relative, orphan or fiancé´E(e) petition" in the first sentence of paragraph (b)(1);

e. Revising the phrase "in Form I-864P Poverty Guidelines" to read "the Poverty Guidelines" in paragraph (c)(2)(i)(A);

f. Revising the term "Form I-864" to read "affidavit of support" in paragraph (c)(2)(iii)(A)(2);

g. Revising paragraph (c)(2)(iii)(C);

h. Revising the phrase "filed USCIS Form I-407, Abandonment of Lawful Permanent Resident Status" to read "abandoned permanent resident status, executing the form designated by USCIS for recording such action" in paragraph (e)(2)(i)(C);

i. Revising the phrase "Form I-864 or Form I-864A" to read " affidavit of support and any required attachments" wherever the term appears in paragraph (f);

j. Revising the phrase "the signed Form(s) I-864 (and any Form(s) I-864A)" to read "any relevant affidavit(s) and attachments" in paragraph (g)(1); and

k. Revising paragraphs (g)(2)(i) and (ii).

l. Section 213a.2 is further amended by revising the terms "Form I-864", "the Form I-864", and "a Form I-864" to read "an affidavit of support" wherever those terms or phrases appear in the following places:

i. Paragraph (b), introductory text;

ii. Paragraph (b)(1);

iii. Paragraph (b)(2);

iv. Paragraph (c)(1)(ii)(B);

v. Paragraph (c)(2)(i)(A);

vi. Paragraph (c)(2)(i)(B);

vii. Paragraph (c)(2)(i)(C)(2);

viii. Paragraph (c)(2)(i)(C)(4);

ix. Paragraph (c)(2)(i)(D);

x. Paragraph (c)(2)(ii)(C);

xi. Paragraph (c)(2)(iii)(D);

xii. Paragraph (c)(2)(v);

xiii. Paragraph (c)(2)(vi);

xiv. Paragraph (d);

xv. Paragraph (e)(1);

xvi. Paragraph (e)(2)(i) introductory text;

xvii. Paragraph (e)(2)(i)(D);

xviii. Paragraph (e)(2)(ii);

xix. Paragraph (e)(3); and

xx. Paragraph (f) heading.

m. Section 213a.2 is further amended by revising the terms "Form I-864A", "the Form I-864A", or "a Form I-864A" to read "an affidavit of support attachment" wherever those terms or phrases appear in the following places:

i. Paragraph (c)(2)(i)(C)(1);

Immigration Benefits Business Transformation, Increment I, 76 FR 53764-01

ii. Paragraph (c)(2)(i)(C)(2);

iii. Paragraph (c)(2)(i)(C)(3);

iv. Paragraph (c)(2)(i)(C)(4);

v. Paragraph (c)(2)(i)(C)(5);

vi. Paragraph (c)(2)(i)(D);

vii. Paragraph (c)(2)(iii)(B) introductory text;

viii. Paragraph (c)(2)(v);

ix. Paragraph (c)(2)(vi);

x. Paragraph (e)(1);

xi. Paragraph (e)(2)(i) introductory text;

xii. Paragraph (e)(2)(i)(D);

xiii. Paragraph (e)(2)(ii);

xiv. Paragraph (e)(3); and

xv. Paragraph (f) heading.

The revisions read as follows:
 8 CFR § 213a.2

### § 213a.2 Use of affidavit of support.

(a) Applicability of section 213a affidavit of support. (1)(i)(A) In any case specified in paragraph (a)(2) of this section, an intending immigrant is **\*53789** inadmissible as an alien likely to become a public charge, unless the qualified sponsor specified in paragraph (b) of this section or a substitute sponsor and, if necessary, a joint sponsor, has executed on behalf of the intending immigrant an affidavit of support on the applicable form designated by USCIS in accordance with the requirements of section 213A of the Act and the form instructions. Each reference in this section to the affidavit of support or the form is deemed to be a reference to all such forms designated by USCIS for use by a sponsor for compliance with section 213A of the Act.

(B) If the intending immigrant claims that, under paragraph (a)(2)(ii)(A), (C), or (E) of this section, the intending immigrant is exempt from the requirement to file an affidavit of support, the intending immigrant must include with his or her application for an immigrant visa or adjustment of status an exemption request on the form designated by USCIS for this purpose.

(ii) An affidavit of support is executed when a sponsor signs and submits the appropriate forms in accordance with the form instructions to USCIS or the Department of State, as appropriate.

(iii) A separate affidavit of support is required for each principal beneficiary.

(iv) Each immigrant who will accompany the principal intending immigrant must be included on the affidavit. See paragraph (f) of this section for further information concerning immigrants who intend to accompany or follow the principal intending immigrant to the United States.

(v)(A) Except as provided for under paragraph (a)(1)(v)(B) of this section, the Department of State consular officer, immigration officer, or immigration judge will determine the sufficiency of the affidavit of support based on the sponsor's, substitute sponsor's, or joint sponsor's reasonably expected household income in the year in which the intending immigrant filed the application for an immigrant visa or of adjustment of status, and based on the evidence submitted with the affidavit of support and the Poverty Guidelines in effect when the intending immigrant filed the application for an immigrant visa or adjustment of status.

 * * * * *

(c) * * *

(2) * * *

(iii) * * *

(C) Joint sponsor. A joint sponsor must execute a separate affidavit of support on behalf of the intending immigrant(s) and be willing to accept joint and several liabilities with the sponsor or substitute sponsor. A joint sponsor must meet all the eligibility requirements under paragraph (c)(1) of this section, except that the joint sponsor is not required to file a visa petition on behalf of the intending immigrant. The joint sponsor must demonstrate his or her ability to support the intending immigrant in the manner specified in paragraph (c)(2) of this section. A joint sponsor's household income must meet or exceed the income requirement in paragraph (c)(2)(iii) of this section unless the joint sponsor can demonstrate significant assets as provided in paragraph (c)(2)(iv)(A) of this section. The joint sponsor's household income must equal at least 125 percent of the Poverty Guidelines for the joint sponsor's household size, unless the joint sponsor is on active duty in the Armed Forces and the intending immigrant is the joint sponsor's spouse or child, in which case the joint sponsor's household income is sufficient if it equals at least 100 percent of the Poverty Guidelines for the joint sponsor's household size. An intending immigrant may not have more than one joint sponsor, but, if the joint sponsor's household income is not sufficient to meet the income requirement with respect to the principal intending immigrant, any spouse and all the children who, under section 203(d) of the Act, seek to accompany the principal intending immigrant, then the joint sponsor may specify on the affidavit that it is submitted only on behalf of the principal intending immigrant and those accompanying family members specifically listed on the affidavit. The remaining accompanying family members will then be inadmissible under section 212(a)(4) of the Act unless a second joint sponsor submits an affidavit(s) on behalf of all the remaining family members who seek to accompany the principal intending immigrant and who are not included in the first joint sponsor's affidavit. There may not be more than two joint sponsors for the family group consisting of the principal intending immigrant and the accompanying spouse and children.

 * * * * *

(g) * * *

(2)(i) To avoid inadmissibility under section 212(a)(4) of the Act, an alien who applies for an immigrant visa, admission, or adjustment of status as an alien who is following-to-join a principal intending immigrant must submit a new affidavit(s) of support, together with all documents or other evidence necessary to prove that the new affidavits comply with the requirements of section 213A of the Act and 8 CFR part 213a.

(ii) When paragraph (g)(2)(i) of this section requires the filing of a new affidavit for an alien who seeks to follow-to-join a principal sponsored immigrant, the same sponsor who filed the visa petition and affidavit of support for the principal sponsored immigrant must file the new affidavit on behalf of the alien seeking to follow-to-join. If that person has died, then the alien seeking to follow-to-join is inadmissible unless a substitute sponsor, as defined by 8 CFR 213a.1, signs a new affidavit that meets the requirements of this section. Persons other than the person or persons who signed the

original joint affidavits on behalf of the principal sponsored immigrant may sign a new joint affidavit on behalf of an alien who seeks to follow-to-join a principal sponsored immigrant.

* * * * *8 CFR § 213a.3

83. Section 213a.3 is revised to read as follows:

 8 CFR § 213a.3

§ 213a.3 **Change of address.**

(a) Submission of address change. (1) Filing requirements. If the address of a sponsor (including a substitute sponsor or joint sponsor) changes while the sponsor's support obligation is in effect, the sponsor shall file a change of address notice within 30 days, in a manner as prescribed by USCIS on its address change form instructions.

(2) Proof of mailing. USCIS will accept a photocopy of the change of address form together with proof of the form's delivery to USCIS as evidence that the sponsor has complied with this requirement.

(3) Electronic notices. USCIS will provide the sponsor with a receipt notice for an address change.

(4) Alien sponsors. If the sponsor is an alien, the sponsor must still comply with the requirements of 8 CFR 265.1 to notify USCIS of his or her change of address.

(b) Civil penalty. If the sponsor fails to give notice in accordance with paragraph (a) of this section, DHS may impose on the sponsor a civil penalty in an amount within the penalty range established in section 213A(d)(2)(A) of the Act. Except, if the sponsor, knowing that the sponsored immigrant has received any means-tested public benefit, fails to give notice in accordance with paragraph (a) of this section, DHS may impose on the sponsor a civil penalty in an amount within the penalty range established in section 213A(d)(2)(B) of the Act. The procedure for imposing a civil penalty is established at 8 CFR part 280.

 8 CFR § 213a.4

§ 213a.4 **[Amended]**
8 CFR § 213a.4
 **\*53790**  84. Section 213a.4 is amended by:

a. Revising the term "8 CFR 103.5a(a)(2)" to read "8 CFR 103.8(a)(2)" in paragraph (a)(1)(i); and

b. Revising the phrases "a Form I-864 or Form I-864A" and "the Form I-864 or Form I-864A" to read "an affidavit of support" in the first sentence in paragraph (a)(3).

 8 CFR § 213a.5

85. Section 213a.5 is revised to read as follows:

 8 CFR § 213a.5

§ 213a.5 **Relationship of this part to other affidavits of support.**

Nothing in this part precludes the continued use of other affidavits of support provided by USCIS in a case other than a case described in § 213a.2(a)(2). The obligations of section 213A of the Act do not bind a person who executes such other USCIS affidavits of support. Persons sponsoring an Amerasian alien described in section 204(f)(2) of the Act remain subject to the provisions of section 204(f)(4)(B) of the Act and 8 CFR 204.4(i), as appropriate.

**PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS**

86. The authority citation for part 223 continues to read as follows:

Authority: 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol Relating to the Status of Refugees, Nov. 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

 8 CFR § 223.2

87. Section 223.2 is revised to read as follows:

 8 CFR § 223.2

### § 223.2 Application and processing.

(a) Application. An applicant must submit an application for a reentry permit, refugee travel document, or advance parole on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(b) Filing eligibility. (1) Reentry permit. An applicant for a reentry permit must file such application while in the United States and in status as a lawful permanent resident or conditional permanent resident.

(2) Refugee travel document. (i) Except as provided in paragraph (b)(2)(ii) of this section, an applicant for a refugee travel document must submit the application while in the United States and in valid refugee status under section 207 of the Act, valid asylum status under section 208 of the Act or is a permanent resident who received such status as a direct result of his or her asylum or refugee status.

(ii) Discretionary authority to accept a refugee travel document application from an alien not within the United States. As a matter of discretion, the Service office with jurisdiction over a port-of-entry or pre-flight inspection location where the alien is seeking admission, or the overseas Service office where the alien is physically present, may accept and adjudicate an application for a refugee travel document from an alien who previously had been admitted to the United States as a refugee, or who previously had been granted asylum status in the United States, and who departed from the United States without having applied for such refugee travel document, provided the officer:

(A) Is satisfied that the alien did not intend to abandon his or her refugee or asylum status at the time of departure from the United States;

(B) The alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylum status; and

(C) The alien has been outside the United States for less than 1 year since his or her last departure.

(c) Ineligibility. (1) Prior document still valid. An application for a reentry permit or refugee travel document will be denied if the applicant was previously issued a reentry permit or refugee travel document which is still valid, unless it was returned to USCIS or it is demonstrated that it was lost.

(2) Extended absences. A reentry permit issued to a person who, since becoming a permanent resident or during the last five years, whichever is less, has been outside the United States for more than four years in the aggregate, shall be limited to a validity of one year, except that a permit with a validity of two years may be issued to:

(i) A permanent resident described in 8 CFR 211.1(a)(6) or (a)(7);

(ii) A permanent resident employed by a public international organization of which the United States is a member by treaty or statute, and his or her permanent resident spouse and children; or

(iii) A permanent resident who is a professional athlete who regularly competes in the United States and worldwide.

(3) Permanent resident entitled to nonimmigrant diplomatic or treaty status. A permanent resident entitled to nonimmigrant status under section 101(a)(15)(A), (E), or (G) of the Act because of occupational status may only be issued a reentry permit if the applicant executes and submits with the application, or has previously executed and submitted, a written waiver as required by 8 CFR part 247.

(d) Effect of travel before a decision is made. Departure from the United States before a decision is made on an application for a reentry permit or refugee travel document will not affect the application.

(e) Processing. USCIS may approve or deny a request for a reentry permit or refugee travel document as an exercise of discretion. If it approves the application, USCIS will issue an appropriate document.

(f) Effect on proceedings. Issuance of a reentry permit or refugee travel document to a person in exclusion, deportation, or removal proceedings shall not affect those proceedings.

(g) Appeal. Denial of an application for a reentry permit or refugee travel document may be appealed in accordance with 8 CFR 103.3.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION
88. The authority citation for part 235 is revised to read as follows:

Authority: 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, published January 2, 2004), 1201, 1224, 1225, 1226, 1228, 1365a note, 1379, 1731-32; Pub. L. 110-229, tit. VII, 122 Stat. 754; 8 U.S.C. 1185 note (Pub. L. 108-458, § 7209, 118 Stat. 3638).
 8 CFR § 235.3

### § 235.3 [Amended]
8 CFR § 235.3
89. In § 235.3, paragraph (b)(1)(i) is amended by revising the term "§ 1.1(q) of this chapter" to read "8 CFR 1.2".
 8 CFR § 235.8

### § 235.8 [Amended]
8 CFR § 235.8
90. In § 235.8, paragraph (e) is amended by revising the term "§ 1.1(q) of this chapter" to read "8 CFR 1.2".

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED
91. The authority citation for part 236 continues to read as follows:

Authority: 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1362; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.
 8 CFR § 236.2

### § 236.2 [Amended]
8 CFR § 236.2
92. In § 236.2, paragraph (a) is amended by revising the term "§ 103.5a(c) of this chapter" to read "8 CFR 103.8(c)".
 8 CFR § 236.16

### § 236.16 [Amended]
8 CFR § 236.16

93. Section 236.16 is amended by revising the phrase "using Form I-131, Application for Travel Document" to read "in accordance with 8 CFR **\*53791** 223.2(a)"in the first sentence and revising the phrase "the district director" to read "USCIS" in the second sentence.

8 CFR § 236.18

### § 236.18 [Amended]
8 CFR § 236.18

94. In § 236.18, paragraph (b) is amended by revising the term "§ 103.5a of this chapter" to read "8 CFR 103.8(a)(2)" wherever that term appears.

### PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS

95. The authority citation for part 238 continues to read as follows:

Authority: 8 U.S.C. 1228; 8 CFR part 2.

8 CFR § 238.1

96. In § 238.1, paragraph (b)(2)(i) is amended by revising the term "§§ 103.5a(a)(2) and 103.5a(c)(2) of this chapter" to read "8 CFR 103.8".

### PART 240—VOLUNTARY DEPARTURE, SUSPENSION OF DEPORTATION AND SPECIAL RULE CANCELLATION OF REMOVAL

97. The heading for part 240 is revised as set forth above.

98. The authority citation for part 240 continues to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; sections 202 and 203, Pub. L. 105-100, 111 Stat. 2160, 2193; section 902, Pub. L. 105-277, 112 Stat. 2681; 8 CFR part 2.

8 CFR § 240.67

99. Section 240.67 is amended by revising paragraph (a) introductory text to read as follows:

8 CFR § 240.67

### § 240.67 Procedure for interview before an asylum officer.

(a) Fingerprinting requirements. USCIS will notify each applicant 14 years of age or older to appear for an interview only after the applicant has complied with fingerprinting requirements pursuant to 8 CFR 103.16, and USCIS has received a definitive response from the FBI that a full criminal background check has been completed. A definitive response that a full criminal background check on an applicant has been completed includes:

\* \* \* \* \*

### PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED

100. The authority citation for part 241 continues to read as follows:

Authority: 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1223, 1224, 1225, 1226, 1227, 1228, 1231, 1251, 1253, 1255, 1330, 1362; 18 U.S.C. 4002, 4013(c)(4); Pub. L. 107-296, 116 Stat. 2135 (6 U.S.C. 101, et seq.); 8 CFR part 2.

8 CFR § 241.4

### § 241.4 [Amended]
8 CFR § 241.4

101. In § 241.4, paragraph (d)(2), first sentence is amended by revising the term "8 CFR 103.5a" to read "8 CFR 103.8".

8 CFR § 241.5

102. Section 241.5 is amended by revising paragraph (a)(5) to read as follows:

8 CFR § 241.5

**§ 241.5 Conditions of release after removal period.**

(a) * * *

(5) A requirement that the alien provide DHS with written notice of any change of address in the prescribed manner.

* * * * *

**PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES**

103. The authority citation for part 244 continues to read as follows:

Authority: 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

8 CFR § 244.3

**§ 244.3 [Amended]**

8 CFR § 244.3

104. Section 244.3 is amended by:

a. Revising the term "the Service" to read "USCIS" in the first sentence in paragraph (b);

b. Removing the phrase "of grounds of inadmissibility on Form I-601 (Application for waiver of grounds of excludability)" in the second sentence in paragraph (b);

c. Revising the term "The Service" to read "USCIS" in paragraph (c) introductory text.

8 CFR § 244.4

**§ 244.4 [Amended]**

8 CFR § 244.4

105. In § 244.4, paragraph (b) is amended by revising the term "section 243(h)(2) of the Act" to read "section 208(b)(2)(A) of the Act".

8 CFR § 244.5

**§ 244.5 [Amended]**

8 CFR § 244.5

106. In § 244.5, paragraph (a) is amended by revising the term "the Attorney General" to read "DHS" wherever the term appears.

8 CFR § 244.6

107. Section 244.6 is revised to read as follows:

8 CFR § 244.6

**§ 244.6 Application.**

(a) An application for Temporary Protected Status must be submitted in accordance with the form instructions, the applicable country-specific Federal Register notice that announces the procedures for TPS registration or re-registration, and 8 CFR 103.2, except as otherwise provided in this section, with the appropriate fees and biometric information as described in 8 CFR 103.7(b)(1), 103.16, and 103.17.

(b) An applicant for TPS may also request employment authorization pursuant to 8 CFR 274a. Those applicants between the ages of 14 and 65 who are not requesting authorization to work will not be charged a fee for an application for employment authorization.

8 CFR § 244.7

**§ 244.7 [Amended]**

8 CFR § 244.7

108. Section 244.7 is amended by:

a. Revising the phrase "Form I-821, Application for Temporary Protected Status" to read "the form designated by USCIS with any prescribed fees and in accordance with the form instructions" in paragraph (a); and

b. Revising the term "Attorney General" to read "DHS" in paragraph (b).

8 CFR § 244.9

**§ 244.9 [Amended]**

8 CFR § 244.9

109. In § 244.9, paragraph (a)(4) is amended by revising the phrase "Form I-551 or Form I-94" to read "evidence of admission for lawful permanent residence or nonimmigrant status".

8 CFR § 244.10

110. Section 244.10 is amended by:

a. Revising the section heading; and

b. Revising paragraphs (a), (b) (c) and (d).

The revisions read as follows:

8 CFR § 244.10

**§ 244.10 Decision and appeal.**

(a) Temporary treatment benefits. USCIS will grant temporary treatment benefits to the applicant if the applicant establishes prima facie eligibility for Temporary Protected Status in accordance with 8 CFR 244.5.

(b) Temporary Protected Status. Upon review of the evidence presented, USCIS may approve or deny the application for Temporary Protected Status in the exercise of discretion, consistent with the standards for eligibility in 8 CFR 244.2, 244.3, and 244.4.

(c) Denial. The initial decision to deny Temporary Protected Status, a waiver of inadmissibility, or temporary treatment benefits shall be in writing served in person or by mail to the alien's most recent address provided to the Service and shall state the reason(s) for the denial. Except as otherwise provided in this section, the alien will be given written notice of his or her right to appeal. If an appeal is filed, the administrative record shall be forwarded to the USCIS AAO for review and decision, except as otherwise provided in this section.

(1) If the basis for the denial of the Temporary Protected Status constitutes a ground for deportability or inadmissibility which renders the alien ineligible for Temporary Protected Status under § 244.4 or inadmissible under § 244.3(c), the decision shall **\*53792** include a charging document which sets forth such ground(s).

(2) If such a charging document is issued, the alien shall not have the right to appeal the USCIS decision denying Temporary Protected Status as provided in 8 CFR 103.3. However, the decision will also apprise the alien of his or her right to a de novo determination of his or her eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18.

(d) Administrative appeal. The appellate decision will be served in accordance with 8 CFR 103.8. If the appeal is dismissed, the decision must state the reasons for dismissal.

(1) If the appeal is dismissed on appeal under 8 CFR 244.18(b), the decision shall also apprise the alien of his or her right to a de novo determination of eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18.

(2) If the appeal is dismissed, USCIS may issue a charging document if no charging document is presently filed with the Immigration Court.

(3) If a charging document has previously been filed or is pending before the Immigration Court, either party may move to re-calendar the case after the administrative appeal is dismissed.
 * * * * * 8 CFR § 244.11

§ 244.11 [Amended]
8 CFR § 244.11
111. Section 244.11 is amended by revising the term "§ 3.3 of this chapter" to read "8 CFR 1003".
 8 CFR § 244.12

§ 244.12 [Amended]
8 CFR § 244.12
112. Section 244.12, is amended by:

a. Revising the term "the INS" to read "USCIS" in paragraphs (a) and (c); and

b. Revising the phrase "appealed to the Administrative Appeals Unit" to read "pending administrative appeal" in paragraph (d).
 8 CFR § 244.14

§ 244.14 [Amended]
8 CFR § 244.14
113. Section 244.14 is amended by:

a. Revising the term "director" to read "USCIS" in paragraph (a) heading;

b. Revising the term "The director" to read "USCIS" in paragraph (a) introductory text;

c. Revising the term "the district director" to read "USCIS" in paragraph (a)(2) last sentence;

d. Revising the term "Attorney General" to read "DHS" in paragraph (a)(3);

e. Revising the term "director" to read "USCIS" in paragraph (b) heading; and by

f. Revising the term "§ 240.14(a)(3)" to read "8 CFR 244.14(a)(3)" and the term "§ 103.5a of this chapter" to read "8 CFR 103.8(a)(2)" in paragraph (b)(1).
 8 CFR § 244.16

§ 244.16 [Amended]
8 CFR § 244.16
114. In § 244.16, the term "the Department of Justice" is revised to read "DHS".
 8 CFR § 244.17
115. Section 244.17 is revised to read as follows:

8 CFR § 244.17

**§ 244.17 Periodic registration.**

(a) Aliens granted Temporary Protected Status must re-register periodically in accordance with USCIS instructions. Such registration applies to nationals of those foreign states designated or redesignated for more than one year by DHS. Applicants for periodic re-registration must apply during the registration period provided by USCIS. Re-registering applicants will not need to re-pay the TPS application fee that was required for initial registration except that aliens requesting employment authorization must submit the application fee for employment authorization. The biometric service fee described in 103.7(b), or an approved fee waiver, will be required of applicants age 14 and over. By completing the application, applicants attest to their continuing eligibility. Such applicants do not need to submit additional supporting documents unless USCIS requests them to do so.

(b) If an alien fails to register without good cause, USCIS will withdraw Temporary Protected Status. USCIS may, for good cause, accept and approve an untimely registration request.

8 CFR § 244.18

116. Section 244.18 is amended by revising paragraphs (b) and (d) to read as follows:

8 CFR § 244.18

**§ 244.18 Issuance of charging documents; detention.**

* * * * *

(b) The filing of the charging document by DHS with the Immigration Court renders inapplicable any other administrative, adjudication or review of eligibility for Temporary Protected Status. The alien shall have the right to a de novo determination of his or her eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18. Review by the Board of Immigration Appeals shall be the exclusive administrative appellate review procedure. If an appeal is already pending before the Administrative Appeals Office (AAO), USCIS will notify the AAO of the filing of the charging document, in which case the pending appeal shall be dismissed and the record of proceeding returned to the jurisdiction where the charging document was filed.

* * * * *

(d) An alien who is determined by USCIS deportable or inadmissible upon grounds which would have rendered the alien ineligible for such status as provided in 8 CFR 244.3(c) and 8 CFR 244.4 may be detained under the provisions of this chapter pending removal proceedings. Such alien may be removed from the United States upon entry of a final order of removal.


**PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE**

117. The authority citation for part 245 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1182, 1255; Pub. L. 105-100, section 202, 111 Stat. 2160, 2193; Pub. L. 105-277, section 902, 112 Stat. 2681; Pub. L. 110-229, tit. VII, 122 Stat. 754; 8 CFR part 2.

8 CFR § 245.1

118. Section 245.1 is amended by:

a. Revising the term to "section 214(k)" to read: "section 214(l)" in the last sentence in paragraph (c)(2);

b. Removing and reserving paragraph (e)(2);

c. Revising the third sentence in paragraph (g)(1); and by

d. Removing the fourth sentence in paragraph (g)(1).

The revision reads as follows:

8 CFR § 245.1

**§ 245.1 Eligibility.**

* * * * *

(g) * * *

(1) * * * A preference immigrant visa is considered available for accepting and processing if the applicant has a priority date on the waiting list which is earlier than the date shown in the Bulletin (or the Bulletin shows that numbers for visa applicants in his or her category are current). * * *

* * * * *8 CFR § 245.2

**§ 245.2 [Amended]**

8 CFR § 245.2

119. Section 245.2 is amended by removing the phrase ", except when the applicant has established eligibility for the benefits of Public Law 101-238" in the second sentence in paragraph (a)(5)(ii).

8 CFR § 245.7

120. In § 245.7, paragraph (a) is revised to read as follows:

§ 245.7 Adjustment of status of certain Soviet and Indochinese parolees under the Foreign Operations Appropriations Act for Fiscal Year 1990 (Pub. L. 101-167). (a) Application. Each person applying for benefits under section 599E of Public Law 101-167, 103 Stat. 1195, 1263, must file an application on the form prescribed by **\*53793** USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

* * * * *8 CFR § 245.9

**§ 245.9 [Removed and Reserved]**

8 CFR § 245.9

121. Section 245.9 is removed and reserved.

8 CFR § 245.10

122. In § 245.10, paragraph (n)(2) is revised to read as follows:

8 CFR § 245.10

**§ 245.10 Adjustment of status upon payment of additional sum under Public Law 103-317.**

* * * * *

(n) * * *

(2) To demonstrate physical presence on December 21, 2000, the alien may submit copies of documents issued by the former INS or EOIR such as arrival-departure forms or notices to appear in immigration court.

* * * * *8 CFR § 245.11

123. In § 245.11, remove the last two sentences in paragraph (f) and add a new sentence to read as follows:

8 CFR § 245.11

**§ 245.11 Adjustment of aliens in S nonimmigrant classification.**

* * * * *

(f) * * * The applicant may request employment authorization or permission to travel outside the United States while the application is pending by filing an application pursuant to 8 CFR 274a.13 or 8 CFR 223.2.

* * * * *8 CFR § 245.12

**§ 245.12 [Removed and Reserved]**

8 CFR § 245.12

124. Section 245.12 is removed and reserved.

8 CFR § 245.13

**§ 245.13 [Removed and Reserved]**
8 CFR § 245.13
125. Section 245.13 is removed and reserved.
 8 CFR § 245.15
126. Section 245.15 is amended by:

a. Revising the phrase "Advance Authorization for Parole (Form I-512)" to read "advance parole authorization" and revising the phrase "Advance Authorization for Parole" to read "authorization" in paragraph (c)(4)(ii);

b. Revising paragraph (g)(1);

c. Revising paragraph (n)(1);

d. Revising the phrase "the Director of the Nebraska Service Center verifies that Service" to read "USCIS verifies that DHS" and by revising the term "the Director may approve" to read "USCIS may approve" in the first sentence in paragraph (n)(2);

e. Revising the term "the Service" to read "USCIS" in the second sentence in paragraph (n)(2);

f. Revising paragraph (s)(1);

g. Revising paragraph (t)(1);

h. Revising the phrase "an Application for Travel Document (Form I-131) with the Nebraska Service Center, at P.O. Box 87245, Lincoln, NE 68501-7245" to read "a request on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the first sentence of paragraph (t)(2)(i); and

i. Revising the term "Form I-485" to read "application for adjustment of status" in the second sentence in paragraph (t)(2)(i).

The revisions read as follows:
 8 CFR § 245.15

**§ 245.15** Adjustment of Status of Certain Haitian Nationals under the Haitian Refugee Immigrant Fairness Act of 1998 (HRIFA).
* * * * *
(g) * * *

(1) Filing of applications with USCIS. USCIS has jurisdiction over all applications for the benefits of section 902 of HRIFA as a principal applicant or as a dependent under this section, except for applications filed by aliens who are in pending immigration proceedings as provided in paragraph (g)(2) of this section. All applications filed with USCIS for the benefits of section 902 of HRIFA must be submitted on the form designated by USCIS with the fees prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. After proper filing of the application, USCIS will instruct the applicant to appear for biometrics collection as prescribed in 8 CFR 103.16.
 * * * * *
(n) * * *

(1) Application for employment authorization. An applicant for adjustment of status under section 902 of HRIFA who wishes to obtain initial or continued employment authorization during the pendency of the adjustment application must file an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. The applicant may submit the application either concurrently with or subsequent to the filing of the application for HRIFA benefits.

* * * * *

(s) Action of immigration judge upon referral of decision by a notice of certification. (1) General. Upon the referral by a notice of certification of a decision to deny the application, in accordance with paragraph (r)(3) of this section, the immigration judge will conduct a hearing to determine whether the alien is eligible for adjustment of status under section 902 of HRIFA in accordance with this paragraph (s)(1).

* * * * *

(t) * * *

(1) Travel from and return to the United States while the application for adjustment of status is pending. If an applicant for benefits under section 902 of HRIFA desires to travel outside, and return to, the United States while the application for adjustment of status is pending, he or she must file a request for advance parole authorization on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. Unless the applicant files an advance parole request prior to departing from the United States and USCIS approves such request, his or her application for adjustment of status under section 902 of HRIFA is deemed to be abandoned as of the moment of departure. Parole may only be authorized pursuant to the authority contained in, and the standards prescribed in, section 212(d)(5) of the Act.

* * * * *8 CFR § 245.18

127. Section 245.18 is amended by:

a. Revising the section heading;

b. Revising paragraph (d)(1);

c. Revising the term "the Service" to read "USCIS" in paragraph (d)(2); and

d. Revising the last sentence in paragraph (k).

The revisions read as follows:

8 CFR § 245.18

**§ 245.18 Physicians with approved employment-based petitions serving in a medically underserved area or a Veterans Affairs facility.**

* * * * *

(d) Employment authorization. (1) Once USCIS has approved a petition described in paragraph (a) of this section, the alien physician may apply for permanent residence and employment authorization on the forms designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

* * * * *

(k) * * * Such physicians may apply for advance parole on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

* * * * *8 CFR § 245.20

**§ 245.20 [Removed and Reserved]**

8 CFR § 245.20

128. Section 245.20 is removed and reserved.

8 CFR § 245.21

129-130. Section 245.21 is amended by:

a. Adding the word "and" at the end of paragraph (a)(3);

b. Removing paragraph (a)(4);

c. Redesignating paragraph (a)(5) as paragraph (a)(4);

d. Revising paragraph (b);

e. Revising the second sentence in paragraph (d)(1);

 **\*53794**  f. Revising paragraph (d)(2);

g. Revising the last sentence in paragraph (f);

h. Revising paragraph (h);

i. Revising paragraph (i);

j. Revising the terms, "Service" and "Service's" to read "USCIS'" in paragraph (j);

k. Removing paragraph (m); and

l. By revising the terms "The Service" and "the Service" to read "USCIS" wherever the terms appear in the following paragraphs:

i. Paragraph (a) introductory text;

ii. Paragraph (c);

iii. Paragraph (d) introductory text;

iv. Paragraph (d)(4);

v. Paragraph (g)(3);

vi. Paragraph (j);

vii. Paragraph (k); and

viii. Paragraph (l).

The revisions read as follows:
 8 CFR § 245.21

**§ 245.21** **Adjustment of status of certain nationals of Vietnam, Cambodia, and Laos.**
\* \* \* \* \*

(b) Application. An applicant must submit an application on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions. Applicants who are 14 through 79 years of age must also submit the biometrics service fee described in 8 CFR 103.17.

* * * * *

(d) * * *

(1) * * * An alien who is eligible for adjustment of status under section 586 of Public Law 106-429 may request a stay of removal during the pendency of the application. * * *

(2) DHS will exercise its discretion not to grant a stay of removal, deportation, or exclusion with respect to an alien who is inadmissible on any of the grounds specified in paragraph (m)(3) of this section, unless there is substantial reason to believe that USCIS will grant the necessary waivers of inadmissibility.

* * * * *

(f) * * * In order to obtain a waiver for any of these grounds, the applicant must submit an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

* * * * *

(h) Employment authorization. Applicants who want to obtain employment authorization based on a pending application for adjustment of status under this section may apply on the form specified by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(i) Travel while an application to adjust status is pending. An applicant who wishes to travel outside the United States while the application is pending must obtain advance permission by filing the application specified by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

* * * * * 8 CFR § 245.22

131. In § 245.22, paragraph (c) is revised to read as follows:

8 CFR § 245.22

**§ 245.22** **Evidence to demonstrate an alien's physical presence in the United States on a specific date.**

* * * * *

(c) DHS-issued documentation. An applicant for permanent residence may demonstrate physical presence by submitting DHS-issued (or predecessor agency-issued) documentation such as an arrival-departure form or notice to appear in immigration proceedings.

* * * * *

## PART 245a—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR TEMPORARY OR PERMANENT RESIDENT STATUS UNDER SECTION 245A OF THE IMMIGRATION AND NATIONALITY ACT

132. The authority citation for part 245a continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1255a, and 1255a note.

133. The heading for part 245a is revised as set forth above.

8 CFR § 245a.4

**§ 245a.4 [Amended]**

8 CFR § 245a.4

134. In § 245a.4, paragraph (b)(16), third sentence is amended by revising the term "§ 103.5a(b) of this Act" to read "8 CFR 103.8(b)".

8 CFR § 245a.12

**§ 245a.12 [Amended]**

8 CFR § 245a.12

135. In § 245a.12, paragraph (b) introductory text, third sentence is amended by revising the term "fingerprinting as prescribed in § 103.2(e) of this chapter" to read "fingerprinting as prescribed in 8 CFR 103.16".

8 CFR § 245a.37

**§ 245a.37 [Amended]**

8 CFR § 245a.37

136. In § 245a.37, paragraph (b) is amended by revising the term "§ 103.5a of this chapter" to read "8 CFR 103.8" wherever that term appears.


**PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION**

137. The authority citation for part 248 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1184, 1258; 8 CFR part 2.

8 CFR § 248.1

**§ 248.1 [Amended]**

8 CFR § 248.1

138. Section 248.1 is amended by:

a. Revising the term "the Service" to read "USCIS" in paragraph (b) introductory text;

b. Revising the term "the Service" to read "USCIS" in paragraph (b)(1);

c. Revising the phrase "The district director or service center director shall" to read "USCIS will" in the second sentence in paragraph (c)(1);

d. Revising the phrase "The district director or service center director" to read "USCIS" in the last sentence in paragraph (c)(3); and

e. Removing the phrase "before the Service" in the last sentence in paragraph (c)(3).

8 CFR § 248.3

139. Section 248.3 is amended by:

a. Adding introductory text;

b. Revising paragraph (a);

c. Revising paragraph (b);

d. Revising the phrase "Form I-539 and be accompanied by a Form I-566, completed and endorsed in accordance with the instructions on that form" to read "the prescribed application accompanied by the appropriate endorsement from the Department of State recommending the change of status" in the second sentence in paragraph (c);

e. Removing and reserving paragraph (d);

f. Revising the term "sections 101(a)(15)(E), (H), (I), (J), (L), or (Q)(ii) of the Act" to read "sections 101(a)(15)(E), (H), (I), (J), or (L) of the Act" in paragraph (e)(2);

g. Revising the term "the district director" to read "USCIS" in the last sentence in paragraph (f); and

h. Revising the phrase "Form I-539, Application to Extend/Change Nonimmigrant Status, with the appropriate fee, and Form I-854, Inter-Agency Alien Witness and Informant Record, with attachments" to read "the forms designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in paragraph (h) introductory text.

The revisions read as follows:
8 CFR § 248.3

### § 248.3 Petition and application.

Requests for a change of status must be filed on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b) and in accordance with the form instructions.

(a) Petition by employer. An employer must submit a petition for a change of status to E-1 treaty trader, E-2 treaty investor, H-1C, H-1B, H-2A, H-2B, H-3, L-1, O-1, O-2, P-1, P-2, P-3, Q-1, R-1, or TN nonimmigrant.

(b) Application by nonimmigrant. (1) Individual applicant. Any nonimmigrant who seeks to change status to:

(i) A dependent nonimmigrant classification as the spouse or child of **\*53795** a principal whose nonimmigrant classification is listed in paragraph (a) of this section, or

(ii) Any other nonimmigrant classification not listed in paragraph (a) of this section must apply for a change of status on his or her own behalf.

(2) Multiple applicants. More than one person may be included in an application where the co-applicants are all members of a single family group and either all hold the same nonimmigrant status or one holds a nonimmigrant status and the co-applicants are his or her spouse and/or children who hold derivative nonimmigrant status based on the principal's nonimmigrant status.

\* \* \* \* \*

### PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

140. The authority citation for part 264 continues to read as follows:

Authority: 8 U.S.C. 1103, 1201, 1201a, 1301-1305; 8 CFR part 2.
8 CFR § 264.1
141. Section 264.1 is amended by:

a. Removing the entry for Form "I-485A" from the table in paragraph (a);

b. Removing the entries for Forms "I-688", "I-688A" and "I-688B" from the table in paragraph (b);

c. Adding the entries for "Form I-862" and "Form I-863" in proper numerical sequence in the table in paragraph (b);

d. Revising paragraph (c);

e. Revising the term "Service" to read "USCIS" in paragraph (d);

f. Revising paragraph (g); and

g. Removing paragraphs (h) and (i).

The revisions read as follows:

8 CFR § 264.1

**§ 264.1 Registration and fingerprinting.**

* * * * *

(b) * * *


**Form No. and Class**

* * * * *

Form I-862, Notice to Appear—Aliens against whom removal proceedings are being instituted.

Form I-863, Notice of Referral to Immigration Judge—Aliens against whom removal proceedings are being instituted.

* * * * *

(c) Replacement of alien registration. Any alien whose registration document is not available for any reason must immediately apply for a replacement document in the manner prescribed by USCIS.

* * * * *

(g) Registration and fingerprinting of children who reach age 14. Within 30 days after reaching the age of 14, any alien in the United States not exempt from alien registration under the Act and this chapter must apply for registration and fingerprinting, unless fingerprinting is waived under paragraph (e) of this section, in accordance with applicable form instructions.

(1) Permanent residents. If such alien is a lawful permanent resident of the United States and is temporarily absent from the United States when he reaches the age of 14, he must apply for registration and provide a photograph within 30 days of his or her return to the United States in accordance with applicable form instructions. The alien, if a lawful permanent resident of the United States, must surrender any prior evidence of alien registration. USCIS will issue the alien new evidence of alien registration.

(2) Others. In the case of an alien who is not a lawful permanent resident, the alien's previously issued registration document will be noted to show that he or she has been registered and the date of registration.

8 CFR § 264.2

**§ 264.2 [Amended]**

8 CFR § 264.2

142. In § 264.2, paragraph (d) is amended by revising the term "be fingerprinted on Form FD-258, Applicant Card, as prescribed in § 103.2(e) of this chapter" to read "be fingerprinted as prescribed in 8 CFR 103.16."

8 CFR § 264.5

143. Section 264.5 is amended by:

a. Revising paragraph (a);

b. Revising the term "Form I-90" to read "the designated form" wherever the term appears in paragraphs (c)(1) and (2);

c. Revising paragraph (d) introductory text;

d. Revising paragraph (e);

e. Revising paragraph (g) and by

f. Adding paragraphs (h) and (i).

The revisions read as follows:

8 CFR § 264.5

### § 264.5 Application for replacement Permanent Resident Card.

(a) Filing instructions. A request to replace a Permanent Resident Card must be filed in accordance with the appropriate form instructions and with the fee specified in 8 CFR 103.7(b)(1); except that no fee is required for an application filed pursuant to paragraphs (b)(7) through (9) of this section, or paragraphs (d)(2) or (4) of this section.

* * * * *

(d) Conditional permanent residents required to file. A conditional permanent resident whose card is expiring may apply to have the conditions on residence removed in accordance with 8 CFR 216.4 or 8 CFR 216.6. A conditional resident who seeks to replace a permanent resident card that is not expiring within 90 days may apply for a replacement card on the form prescribed by USCIS:

* * * * *

(e) Supporting documentation. (1) The prior Permanent Resident Card must be surrendered to USCIS if a new card is being requested in accordance with paragraphs (b)(2) through (5) and (b)(8) and (9) of this section.

(2) A request to replace a Permanent Resident Card filed pursuant to paragraph (b)(4) of this section must include evidence of the name change such as a court order or marriage certificate.

(3) A request to replace a Permanent Resident Card in order to change any other biographic data on the card must include documentary evidence verifying the new data.

* * * * *

(g) Eligibility for evidence of permanent residence while in deportation, exclusion, or removal proceedings. A person in deportation, exclusion, or removal proceedings is entitled to evidence of permanent resident status until ordered excluded, deported, or removed. USCIS will issue such evidence in the form of a temporary permanent resident document that will remain valid until the proceedings are concluded. Issuance of evidence of permanent residence to an alien who had permanent resident status when the proceedings commenced shall not affect those proceedings.

(h) Temporary evidence of registration. USCIS may issue temporary evidence of registration and lawful permanent resident status to a lawful permanent resident alien who is departing temporarily from the United States and has applied for issuance of a replacement permanent resident card if USCIS is unable to issue and deliver such card prior to the alien's contemplated return to the United States. The alien must surrender such temporary evidence upon receipt of his or her permanent resident card.

(i) Waiver of requirements. USCIS may waive the photograph, in person filing, and fingerprinting requirements of this section in cases of confinement due to advanced age or physical infirmity.

8 CFR § 264.6

144. Section 264.6 is revised to read as follows:

8 CFR § 264.6

### § 264.6 Application for a nonimmigrant arrival-departure record.

(a) Eligibility. USCIS may issue a new or replacement arrival-departure record to a nonimmigrant who seeks:

**\*53796** (1) To replace a lost or stolen record;

(2) To replace a mutilated record; or

(3) Was not issued an arrival-departure record pursuant to 8 CFR 235.1(h)(1)(i), (iii), (iv), (v), or (vi) when last admitted as a nonimmigrant, and has not since been issued such record but now requires one.

(b) Application. A nonimmigrant may request issuance or replacement of a nonimmigrant arrival-departure record by applying on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(c) Processing. A pending application filed under paragraph (a) of this section is temporary evidence of registration. If the application is approved, USCIS will issue an arrival-departure document. There is no appeal from the denial of this application.


## PART 265—NOTICES OF ADDRESS

145. The authority citation for part 265 is revised to read as follows:

Authority: 8 U.S.C. 1103 and 1305.

8 CFR § 265.1

146. Section 265.1 is revised to read as follows:

8 CFR § 265.1

**§ 265.1 Reporting change of address.**

Except for those exempted by section 263(b) of the Act, all aliens in the United States required to register under section 262 of the Act must report each change of address and new address within 10 days of such change in accordance with instructions provided by USCIS.


## PART 270—PENALTIES FOR DOCUMENT FRAUD

147. The authority citation for part 270 continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, and 1324c; Pub. L. 101-410, 104 Stat. 890, as amended by Pub. L. 104-134, 110 Stat. 1321.

8 CFR § 270.2

**§ 270.2 [Amended]**

8 CFR § 270.2

148. Section 270.2 is amended by revising the term "§ 103.5a(a)(2) of this chapter" to read "8 CFR 103.8(a)(2)" wherever that term appears in the following places:

a. Paragraph (d) and

b. Paragraph (i).


## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

149. The authority citation for part 274a continues to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

8 CFR § 274a.12

150. Section 274a.12 is amended by:

a. Revising the term "BCIS" to read "USCIS" wherever that term appears in paragraph (a)(5);

b. Revising paragraph (b)(6)(iv);

c. Revising the term "BCIS" to read "USCIS" in paragraph (c) introductory text;

d. Revising paragraph (c)(1);

e. Revising paragraph (c)(4); and

f. Removing and reserving paragraph (c)(23).

The revisions read as follows:

8 CFR § 274a.12

**§ 274a.12 Classes of aliens authorized to accept employment.**
* * * * *
(b) * * *

(6) * * *

(iv) An employment authorization document under paragraph (c)(3)(i)(C) of this section based on a 17-month STEM Optional Practical Training extension, and whose timely filed employment authorization request is pending and employment authorization issued under paragraph (c)(3)(i)(B) of this section has expired. Employment is authorized beginning on the expiration date of the authorization issued under paragraph (c)(3)(i)(B) of this section and ending on the date of USCIS' written decision on the current employment authorization request, but not to exceed 180 days; or
* * * * *
(c) * * *

(1) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (A-1 or A-2) pursuant to 8 CFR 214.2(a)(2) and who presents an endorsement from an authorized representative of the Department of State;
* * * * *
(4) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (G-1, G-3 or G-4) pursuant to 8 CFR 214.2(g) and who presents an endorsement from an authorized representative of the Department of State;
* * * * * 8 CFR § 274a.13
151. Section 274a.13 is amended by:

a. Revising paragraph (a);

b. Removing the term "INS" in paragraph (b); and

c. Revising paragraph (d).

The revision reads as follows:

8 CFR § 274a.13

**§ 274a.13 Application for employment authorization.**

(a) Application. Aliens authorized to be employed under sections 274a.12(a)(3), (4), (6) through (8), (a)(10) through (15), and (a)(20) must file an application in order to obtain documentation evidencing this fact.

(1) Aliens who may apply for employment authorization under 8 CFR 274a.12(c), except for those who may apply under 8 CFR 274a.12(c)(8), must apply on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. The approval of applications filed under 8 CFR 274a.12(c), except for 8 CFR 274a.12(c)(8), are within the discretion of USCIS. Where economic necessity has been identified as a factor, the alien must provide information regarding his or her assets, income, and expenses.

(2) An initial employment authorization request for asylum applicants under 8 CFR 274a.12(c)(8) must be filed on the form designated by USCIS in accordance with the form instructions. The applicant also must submit a copy of the underlying application for asylum or withholding of deportation, together with evidence that the application has been filed in accordance with 8 CFR 208.3 and 208.4. An application for an initial employment authorization or for a renewal of employment authorization filed in relation to a pending claim for asylum shall be adjudicated in accordance with 8 CFR 208.7. An application for renewal or replacement of employment authorization submitted in relation to a pending claim for asylum, as provided in 8 CFR 208.7, must be filed, with fee or application for waiver of such fee.

* * * * *

(d) Interim employment authorization. USCIS will adjudicate the application within 90 days from the date of receipt of the application, except in the case of an initial application for employment authorization under 8 CFR 274a.12(c)(8), which is governed by paragraph (a)(2) of this section, and 8 CFR 274a.12(c)(9) in so far as it is governed by 8 CFR 245.13(j) and 245.15(n). Failure to complete the adjudication within 90 days will result in the grant of an employment authorization document for a period not to exceed 240 days. Such authorization will be subject to any conditions noted on the employment authorization document. However, if USCIS adjudicates the application prior to the expiration date of the interim employment authorization and denies the individual's employment authorization application, the interim employment authorization granted under this section will automatically terminate as of the date of the adjudication and denial.


## PART 287—FIELD OFFICERS; POWERS AND DUTIES

152. The authority citation for part 287 continues to read as follows:

Authority: 8 U.S.C. 1103, 1182, 1225, 1226, 1251, 1252, 1357; Homeland Security Act of **53797** 2002, Pub. L. 107-296 (6 U.S.C. 1, et seq.); 8 CFR part 2.

8 CFR § 287.5

### § 287.5 [Amended]

8 CFR § 287.5

153. Section 287.5 is amended by:

a. Removing the phrase "as defined in 8 CFR 103.1(b)" in paragraph (a) introductory text;

b. Revising the term "the BCIS" to read "USCIS" in paragraph (c)(1)(viii); and

c. Revising the term "the BCIS" to read "USCIS" in paragraph (c)(2)(viii).

8 CFR § 287.7

### § 287.7 [Amended]

8 CFR § 287.7

154. In § 287.7, paragraph (b)(8) is amended by revising the term "the BCIS" to read "USCIS".

## PART 292—REPRESENTATION AND APPEARANCES

155. The authority citation for part 292 continues to read as follows:

Authority: 8 U.S.C. 1103, 1252b, 1362.

8 CFR § 292.1

### § 292.1 [Amended]

8 CFR § 292.1

156. Section 292.1 is amended by revising the terms "§ 1.1(f) of this chapter" and "8 CFR 1.1(f)" to read "8 CFR 1.2" wherever the term appears in the following places:

a. Paragraph (a)(1); and

b. Paragraph (a)(6) first sentence.

8 CFR § 292.3

### § 292.3 [Amended]

8 CFR § 292.3

157. Section 292.3 is amended by revising the terms "8 CFR 1.1(f)" and "8 CFR 1.1(j)", to read "8 CFR 1.2" in paragraph (a)(2);

8 CFR § 292.4

158. Section 292.4 is amended by revising paragraph (b) to read as follows:

8 CFR § 292.4

### § 292.4 Appearances.

* * * * *

(b) A party to a proceeding and his or her attorney or representative will be permitted to examine the record of proceeding in accordance with 6 CFR part 5.

## PART 299—IMMIGRATION FORMS

159. The authority citation for part 299 continues to read as follows:

Authority: 8 U.S.C. 1101 and note, 1103; 8 CFR Part 2.

8 CFR § 299.1

160. Section 299.1 is revised to read as follows:

8 CFR § 299.1

### § 299.1 Prescribed forms.

A listing of USCIS, ICE, and CBP approved forms referenced in chapter I can be viewed on the Office of Management and Budget Web site at http://www.reginfo.gov. A listing of approved USCIS forms can also be viewed on its Internet Web site.

8 CFR § 299.3

### § 299.3 [Removed and Reserved]

8 CFR § 299.3

161. Section 299.3 is removed and reserved.

8 CFR § 299.5

### § 299.5 [Removed and Reserved]

8 CFR § 299.5

162. Section 299.5 is removed and reserved.


**PART 301—NATIONALS AND CITIZENS OF THE UNITED STATES AT BIRTH**

163. The authority citation for part 301 continues to read as follows:

Authority: 8 U.S.C. 1103, 1401; 8 CFR part 2.

8 CFR § 301.1

164. Section 301.1 is amended by revising paragraph (a)(1) to read as follows:

8 CFR § 301.1

**§ 301.1 Procedures.**

(a) * * *

(1) As provided in 8 CFR part 341, a person residing in the United States who desires to be documented as a United States citizen pursuant to section 301(h) of the Act may apply for a passport at a United States passport agency or may submit an application on the form specified by USCIS in accordance with the form instructions and with the fee prescribed by 8 CFR 103.7(b)(1). The applicant will be notified when and where to appear before a USCIS officer for examination on his or her application.

* * * * *

**PART 310—NATURALIZATION AUTHORITY**

165. The authority citation for part 310 continues to read as follows:

Authority: 8 U.S.C. 1103, 1421, 1443, 1447, 1448; 8 CFR 2.1.

8 CFR § 310.2

**§ 310.2 [Amended]**

8 CFR § 310.2

166. Section 310.2, first sentence, is amended by revising the term "The Service" to read "USCIS" and the term "Service district" to read "Service district, as defined in 8 CFR 316.1,"


**PART 312—EDUCATIONAL REQUIREMENTS FOR NATURALIZATION**

167. The authority citation for part 312 continues to read as follows:

Authority: 8 U.S.C. 1103, 1423, 1443, 1447, 1448.

8 CFR § 312.1

168. Section 312.1 is amended by revising paragraph (c) to read as follows:

8 CFR § 312.1

**§ 312.1 Literacy requirements.**

* * * * *

(c) Literacy examination. (1) Verbal skills. The ability of an applicant to speak English will be determined by a designated immigration officer from the applicant's answers to questions normally asked in the course of the examination.

(2) Reading and writing skills. Except as noted in 8 CFR 312.3, an applicant's ability to read and write English must be tested in a manner prescribed by USCIS. USCIS will provide a description of test study materials and testing procedures on the USCIS Internet Web site.

8 CFR § 312.2

Immigration Benefits Business Transformation, Increment I, 76 FR 53764-01

169. Section 312.2 is amended by revising paragraph (c) to read as follows:

 8 CFR § 312.2

**§ 312.2** **Knowledge of history and government of the United States.**

\* \* \* \* \*

(c) History and government examination. (1) Procedure. The examination of an applicant's knowledge of the history and form of government of the United States must be given orally in English by a designated immigration officer, except:

(i) If the applicant is exempt from the English literacy requirement under 8 CFR 312.1(b), the examination may be conducted in the applicant's native language with the assistance of an interpreter selected in accordance with 8 CFR 312.4 but only if the applicant's command of spoken English is insufficient to conduct a valid examination in English;

(ii) The examination may be conducted in the applicant's native language, with the assistance of an interpreter selected in accordance with 8 CFR 312.4, if the applicant is required to satisfy and has satisfied the English literacy requirement under 8 CFR 312.1(a), but the officer conducting the examination determines that an inaccurate or incomplete record of the examination would result if the examination on technical or complex issues were conducted in English, or

(iii) The applicant has met the requirements of 8 CFR 312.3.

(2) Scope and substance. The scope of the examination will be limited to subject matters prescribed by USCIS. In choosing the subject matters, in phrasing questions and in evaluating responses, due consideration must be given to the applicant's:

(i) Education,

(ii) Background,

(iii) Age,

(iv) Length of residence in the United States,

(v) Opportunities available and efforts made to acquire the requisite knowledge, and

(vi) Any other elements or factors relevant to an appraisal of the adequacy of the applicant's knowledge and understanding.

 8 CFR § 312.3

 **\*53798**  170. Section 312.3 is revised to read as follows:

 8 CFR § 312.3

**§ 312.3** **Testing of applicants who obtained permanent residence pursuant to section 245A of the Act.**

An applicant who has obtained lawful permanent resident alien status pursuant to section 245A of the Act, and who, at that time, demonstrated English language proficiency in reading and writing, and knowledge of the government and history of the United States through either an examination administered by USCIS or the INS or a standardized section 312 test authorized by the USCIS or the INS for use with Legalization applicants as provided in section 245A(b)(1)(D)(iii) of the Act, will not be reexamined on those skills at the time of the naturalization interview. However, such applicant, unless otherwise exempt, must still demonstrate his or her ability to speak and understand English in accordance with 8 CFR 312.1(c)(1) and establish eligibility for naturalization through testimony in the English language.

**PART 316—GENERAL REQUIREMENTS FOR NATURALIZATION**

171. The authority citation for part 316 continues to read as follows:

Authority: 8 U.S.C. 1103, 1181, 1182, 1427, 1443, 1447; 8 CFR part 2.

 8 CFR § 316.1

172. Section 316.1 is revised to read as follows:

 8 CFR § 316.1

## § 316.1 Definitions.

As used in this part, the term:

Application means any form, as defined in 8 CFR part 1, on which an applicant requests a benefit relating to naturalization.

Residence in the Service district where the application is filed means residence in the geographical area over which a particular local field office of USCIS ordinarily has jurisdiction for purposes of naturalization, regardless of where or how USCIS may require such benefit request to be submitted, or whether jurisdiction for the purpose of adjudication is relocated or internally reassigned to another USCIS office.

Service district means the geographical area over which a particular local field office of USCIS ordinarily has jurisdiction for purposes of naturalization.

 8 CFR § 316.2

## § 316.2 [Amended]

8 CFR § 316.2

173. In § 316.2, paragraph (a)(5) is amended by removing the end the phrase ", and in which the alien seeks to file the application".

 8 CFR § 316.4

174. Section 316.4 is amended by:

a. Revising paragraph (a);

b. Removing paragraph (b); and

c. Redesignating paragraph (c) as paragraph (b).

The revision reads as follows:

 8 CFR § 316.4

## § 316.4 Applications; documents.

(a) The applicant will apply for naturalization in accordance with instructions provided on the form prescribed by USCIS for that purpose.

 * * * * *8 CFR § 316.5

175. Section 316.5 is amended by adding paragraph (b)(6) to read as follows:

 8 CFR § 316.5

## § 316.5 Residence in the United States.

* * * * *

(b) * * *

(6) Spouse of military personnel. Pursuant to section 319(e) of the Act, any period of time the spouse of a United States citizen resides abroad will be treated as residence in any State or district of the United States for purposes of naturalization under section 316(a) or 319(a) of the Act if, during the period of time abroad, the applicant establishes that he or she was:

(i) The spouse of a member of the Armed Forces;

(ii) Authorized to accompany and reside abroad with that member of the Armed Forces pursuant to the member's official orders; and

(iii) Accompanying and residing abroad with that member of the Armed Forces in marital union in accordance with 8 CFR 319.1(b).

* * * * * 8 CFR § 316.6

176. Section 316.6 is added to read as follows:

8 CFR § 316.6

**§ 316.6 Physical presence for certain spouses of military personnel.**

Pursuant to section 319(e) of the Act, any period of time the spouse of a United States citizen resides abroad will be treated as physical presence in any State or district of the United States for purposes of naturalization under section 316(a) or 319(a) of the Act if, during the period of time abroad, the applicant establishes that he or she was:

(a) The spouse of a member of the Armed Forces;

(b) Authorized to accompany and reside abroad with that member of the Armed Forces pursuant to the member's official orders; and

(c) Accompanying and residing abroad with that member of the Armed Forces in marital union in accordance with 8 CFR 319.1(b).

**PART 319—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SPOUSES OF UNITED STATES CITIZENS**

177. The authority citation for part 319 continues to read as follows:

Authority: 8 U.S.C. 1103, 1430, 1443.

8 CFR § 319.1

**§ 319.1 [Amended]**

8 CFR § 319.1

178. In § 319.1, paragraph (a)(5) is amended by removing the phrase "and in which the alien has filed the application"

8 CFR § 319.3

179. Section 319.3 is amended by revising paragraph (a) to read as follows:

8 CFR § 319.3

**§ 319.3 Surviving spouse, child, or parent of a United States citizen who died during a period of honorable service in an active duty status in the Armed Forces of the United States.**

(a) Eligibility. To be eligible for naturalization under section 319(d) of the Act, the surviving spouse, child, or parent of a United States citizen must:

(1) Establish that his or her citizen spouse, child, or parent died during a period of honorable service in an active duty status in the Armed Forces of the United States and, in the case of a surviving spouse, establish that he or she was living in marital union with the citizen spouse, in accordance with 8 CFR 319.1(b), at the time of the citizen spouse's death;

(2) At the time of examination on the application for naturalization, reside in the United States pursuant to a lawful admission for permanent residence;

(3) Be a person of good moral character, attached to the principles of the Constitution of the United States, and favorably disposed toward the good order and happiness of the United States; and

(4) Comply with all other requirements for naturalization as provided in 8 CFR 316, except for those contained in 8 CFR 316.2(a)(3) through (6).
* * * * *8 CFR § 319.11
180. Section 319.11 is amended by revising paragraph (a) introductory text to read as follows:
 8 CFR § 319.11

**§ 319.11** Filing of application.
(a) General. An applicant under this part must submit an application for naturalization in accordance with the form instructions with the fee required by 8 CFR 103.7(b)(1). An alien spouse applying for naturalization under section 319(b) of the Act who is described in 8 CFR 319.2 must also submit a statement of intent containing the following information about the **\*53799** citizen spouse's employment and future intent:
* * * * *

**PART 320—CHILD BORN OUTSIDE THE UNITED STATES AND RESIDING PERMANENTLY IN THE UNITED STATES; REQUIREMENTS FOR AUTOMATIC ACQUISITION OF CITIZENSHIP**
181. The authority citation for part 320 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443; 8 CFR part 2.
 8 CFR § 320.3
182. Section 320.3 is amended by:

a. Revising paragraph (a); and

b. Revising paragraph (b)(1) introductory text.

The revisions read as follows:
 8 CFR § 320.3

**§ 320.3** How, where, and what forms and other documents should be filed?
(a) Application. Individuals who are applying for a certificate of citizenship on their own behalf should submit the request in accordance with the form instructions on the form prescribed by USCIS for that purpose. An application for a certificate of citizenship under this section on behalf of a child who has not reached the age of 18 years must be submitted by that child's U.S. citizen biological or adoptive parent(s), or legal guardian.

(b) Evidence. (1) An applicant under this section must establish eligibility as described in 8 CFR 320.2. An applicant must submit the following supporting evidence unless such evidence is already contained in USCIS administrative file(s):
* * * * *8 CFR § 320.5
183. Section 320.5 is revised to read as follows:
 8 CFR § 320.5

**§ 320.5 Decision.**

(a) Approval of application. If the application for the certificate of citizenship is approved, after the applicant takes the oath of allegiance prescribed in 8 CFR 337.1 (unless the oath is waived), USCIS will issue a certificate of citizenship.

(b) Denial of application. If the decision of USCIS is to deny the application for a certificate of citizenship under this section, the applicant will be advised in writing of the reasons for denial and of the right to appeal in accordance with 8 CFR 103.3(a). An applicant may file an appeal within 30 days of service of the decision in accordance with the instructions on the form prescribed by USCIS for that purpose, and with the fee required by 8 CFR 103.7(b)(1).

(c) Subsequent application. After an application for a certificate of citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion for reopening or reconsideration in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7(b)(1).

## PART 322—CHILD BORN OUTSIDE THE UNITED STATES; REQUIREMENTS FOR APPLICATION FOR CERTIFICATE OF CITIZENSHIP

184. The authority citation for part 322 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443; 8 CFR part 2.
 8 CFR § 322.1

**§ 322.1 [Amended]**
8 CFR § 322.1

185. Section 322.1 is amended, in the definition of "adopted child" by revising "section 101(b)(1)(E) or (F)" to read "section 101(b)(1)(E), (F) or (G)".
 8 CFR § 322.2

186. Section 322.2 is amended by:

a. Revising the section heading; and by

b. Adding paragraph (c) to read as follows:
 8 CFR § 322.2

**§ 322.2 Eligibility.**
* * * * *

(c) Exceptions for children of military personnel. Pursuant to section 322(d) of the Act, a child of a member of the Armed Forces of the United States residing abroad is exempt from the temporary physical presence, lawful admission, and maintenance of lawful status requirements under 8 CFR 322.2(a)(5), if the child:

(1) Is authorized to accompany and reside abroad with the member of the Armed Forces pursuant to the member's official orders; and

(2) Is accompanying and residing abroad with the member of the Armed Forces.
 8 CFR § 322.3

187. Section 322.3 is amended by:

a. Revising the section heading;

b. Revising paragraph (a);

c. Revising paragraph (b)(1)(viii);

d. Revising paragraph (b)(1)(xi);

e. Revising paragraph (b)(1)(xii);

f. Revising paragraph (b)(1)(xiii); and

g. Revising paragraph (b)(2), the first sentence.

The revisions read as follows:

8 CFR § 322.3

**§ 322.3** **Application and supporting documents.**

(a) Application. A U.S. citizen parent of an alien child (including an adopted child) may file an application for the child to become a citizen and obtain a certificate of citizenship under section 322 of the Act by submitting an application on the form prescribed by USCIS in accordance with the form instructions and with the fee prescribed by 8 CFR 103.7(b)(1). If the U.S. citizen parent has died, the child's U.S. citizen grandparent or U.S. citizen legal guardian may submit the application, provided the application is filed not more than 5 years after the death of the U.S. citizen parent.

(b) * * *

(1) * * *

(viii) Evidence that the child is present in the United States pursuant to a lawful admission and is maintaining such lawful status, or evidence establishing that the child qualifies for an exception to these requirements as provided in 8 CFR 322.2(c) pursuant to section 322(d) of the Act. Such evidence may be presented at the time of interview when appropriate; * * * * *

(xi) For adopted orphans applying under section 322 of the Act, a copy of notice of approval of the orphan petition and supporting documentation for such petition (except the home study) or evidence that the child has been admitted for lawful permanent residence in the United States with the immigrant classification of IR-3 (Orphan adopted abroad by a U.S. citizen) or IR-4 (Orphan to be adopted by a U.S. citizen);

(xii) For a Hague Convention adoptee applying under section 322 of the Act, a copy of the notice of approval of the Convention adoptee petition and its supporting documentation, or evidence that the child has been admitted for lawful permanent residence in the United States with the immigrant classification of IH-3 (Hague Convention Orphan adopted abroad by a U.S. citizen) or IH-4 (Hague Convention Orphan to be adopted by a U.S. citizen); and

(xiii) Evidence of all legal name changes, if applicable, for the child, U.S. citizen parent, U.S. citizen grandparent, or U.S. citizen legal guardian.

(2) If USCIS requires any additional documentation to make a decision on the application, the parents may be asked to provide that documentation under separate cover or at the time of interview. * * *

8 CFR § 322.4

188. Section 322.4 is revised to read as follows:

8 CFR § 322.4

**§ 322.4** **Interview.**

The U.S. citizen parent and the child must appear in person before a USCIS officer for examination on the application under this section. If the U.S. citizen parent is deceased, the **\*53800** child's U.S. citizen grandparent or U.S. citizen legal guardian who filed the application on the child's behalf must appear.

8 CFR § 322.5

189. Section 322.5 is revised to read as follows:

8 CFR § 322.5

### § 322.5 Decision.

(a) Approval of application. If the application for certificate of citizenship is approved, after the applicant takes the oath of allegiance prescribed in 8 CFR 337.1 (unless the oath is waived), USCIS will issue a certificate of citizenship. The child is a citizen as of the date of approval and administration of the oath of allegiance.

(b) Denial of application. If the USCIS decision is to deny the application for a certificate of citizenship under this section, the applicant will be furnished with the reasons for denial and advised of the right to appeal in accordance with the provisions of 8 CFR 103.3(a). An applicant may file an appeal within 30 days of service of the decision in accordance with the instructions on the form prescribed by USCIS for that purpose, and with the fee required by 8 CFR 103.7(b)(1).

(c) Subsequent application. After an application for a certificate of citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion for reopening or reconsideration in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7(b)(1).


### PART 324—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: WOMEN WHO HAVE LOST UNITED STATES CITIZENSHIP BY MARRIAGE AND FORMER CITIZENS WHOSE NATURALIZATION IS AUTHORIZED BY PRIVATE LAW

190. The authority citation for part 324 continues to read as follows:

Authority: 8 U.S.C. 1103, 1435, 1443, 1448, 1101 note.

8 CFR § 324.2

### § 324.2 [Amended]

8 CFR § 324.2

191. In § 324.2, paragraph (b) is amended by revising the term "N-400, as required by § 316.4 of this chapter" to read "the form designated by USCIS in accordance with the form instructions and with the fee prescribed in 8 CFR 103.7(b)(1) as required by 8 CFR 316.4".

8 CFR § 324.3

### § 324.3 [Amended]

8 CFR § 324.3

192. In § 324.3, paragraph (b)(1) is amended by revising the phrase "an Application for Naturalization, form N-400, to USCIS" to read "an application for naturalization on the form prescribed by USCIS".

8 CFR § 324.5

193. Section 324.5 is revised to read as follows:

8 CFR § 324.5

### § 324.5 Former citizen of the United States whose naturalization by taking the oath is authorized by a private law.

A former citizen of the United States whose naturalization by taking the oath before any naturalization court or office of USCIS within the United States is authorized by a private law must submit an application on the form specified by USCIS, without fee, in accordance with the form instructions.

**PART 325—NATIONALS BUT NOT CITIZENS OF THE UNITED STATES; RESIDENCE WITHIN OUTLYING POSSESSIONS**

194. The authority citation for part 325 continues to read as follows:

Authority: 8 U.S.C. 1103, 1436, 1443.

8 CFR § 325.4

**§ 325.4 [Amended]**

8 CFR § 325.4

195. In § 325.4, paragraph (b)(3) is amended by revising the term "Service district in the United States where the application is filed" to read "Service district, as defined in 8 CFR 316.1,".


**PART 328—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WITH 1 YEAR OF SERVICE IN THE UNITED STATES ARMED FORCES**

196. The authority citation for part 328 continues to read as follows:

Authority: 8 U.S.C. 1103, 1439, 1443.

8 CFR § 328.4

197. Section 328.4 is revised to read as follows:

8 CFR § 328.4

**§ 328.4 Application and evidence.**

(a) Application. An applicant for naturalization under section 328 of the Act must submit an application on the form prescribed by USCIS in accordance with the form instructions and as provided in 8 CFR 316.4.

(b) Evidence. The applicant's eligibility for naturalization under 8 CFR 328.2(a) or (b) will be established only by the certification of honorable service by the executive department under which the applicant served or is serving.


**PART 329—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WITH ACTIVE DUTY OR CERTAIN READY RESERVE SERVICE IN THE UNITED STATES ARMED FORCES DURING SPECIFIED PERIODS OF HOSTILITIES**

198. The authority citation for part 329 continues to read as follows:

Authority: 8 U.S.C. 1103, 1440, 1443; 8 CFR part 2.

8 CFR § 329.4

199. Revise § 329.4 to read as follows:

8 CFR § 329.4

**§ 329.4 Application and evidence.**

(a) Application. An applicant for naturalization under section 329 of the Act must submit an application on the form prescribed by USCIS in accordance with the form instructions and as provided in 8 CFR 316.4.

(b) Evidence. The applicant's eligibility for naturalization under 8 CFR 329.2(a), (b), or (c)(2) will be established only by a certification of honorable service by the executive department under which the applicant served or is serving.

8 CFR § 329.5

**§ 329.5 [Removed]**

8 CFR § 329.5

200. Section 329.5 is removed.


**PART 330—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SEAMEN**

201. The authority citation for part 330 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443.

 8 CFR § 330.2

**§ 330.2 [Amended]**

8 CFR § 330.2

202. In § 330.2, paragraph (a) is amended by revising the phrase "Application for Naturalization, Form N-400." to read "application on the form designated by USCIS.".


**PART 332—NATURALIZATION ADMINISTRATION**

203. The authority citation for part 332 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443, 1447.

 8 CFR § 332.1

204. Section 332.1 is revised to read as follows:

 8 CFR § 332.1

**§ 332.1 Designation of USCIS employees to administer oaths and conduct examinations and hearings.**

(a) Examinations. All USCIS officers are hereby designated to conduct the examination for naturalization required under section 335 of the Act, provided that each officer so designated has received appropriate training.

(b) Hearings. Section 336 of the Act authorizes USCIS officers who are designated under paragraph (a) of this  **\*53801** section to conduct hearings under that section.

(c) Depositions. All USCIS officers who are designated under paragraph (a) of this section are hereby designated to take depositions in matters relating to the administration of naturalization and citizenship laws.

(d) Oaths and affirmations. All USCIS officers who are designated under paragraph (a) of this section are hereby designated to administer oaths or affirmations except for the oath of allegiance as provided in 8 CFR 337.2.

 8 CFR § 332.2 8 CFR § 332.3 8 CFR § 332.4

§§ 332.2, 332.3, and 332.4 [Removed and Reserved]

 8 CFR § 332.2 8 CFR § 332.3 8 CFR § 332.4

205. Sections 332.2, 332.3, and 332.4 are removed and reserved.


**PART 333—PHOTOGRAPHS**

206. The authority citation for part 333 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443.

 8 CFR § 333.1

207. In § 333.1, paragraph (a) is revised to read as follows:

 8 CFR § 333.1

**§ 333.1 Description of required photographs.**

(a) Every applicant who is required to provide photographs under section 333 of the Act must do so as prescribed by USCIS in its form instructions.

* * * * *8 CFR § 333.2

208. Section 333.2 is revised to read as follows:

 8 CFR § 333.2

**§ 333.2 Attachment of photographs to documents.**

A photograph of the applicant must be securely and permanently attached to each certificate of naturalization or citizenship, or to any other document that requires a photograph, in a manner prescribed by USCIS.


**PART 334—APPLICATION FOR NATURALIZATION**

209. The authority citation for part 334 continues to read as follows:


Authority: 8 U.S.C. 1103, 1443.

 8 CFR § 334.2

210. In § 334.2, paragraph (a) is revised to read as follows:

 8 CFR § 334.2

**§ 334.2 Application for naturalization.**

(a) An applicant may file an application for naturalization with required initial evidence in accordance with the general form instructions for naturalization. The applicant must include the fee as required in 8 CFR 103.7(b)(1).

* * * * *8 CFR § 334.11

211. Section 334.11 is amended by:


a. Revising the term "Form N-300" to read "the form specified by USCIS, in accordance with the form instructions" in paragraph (a); and by


b. Revising paragraph (b).


The revision reads as follows:

 8 CFR § 334.11

**§ 334.11 Declaration of intention.**

* * * * *

(b) Approval. If approved, USCIS will retain the application in the file and advise the applicant of the action taken.

* * * * *

**§§ 334.16-334.18 [Removed]**

8 CFR § 334.16 8 CFR § 334.17 8 CFR § 334.18

212. Sections 334.16 through 334.18 are removed.


**PART 335—EXAMINATION ON APPLICATION FOR NATURALIZATION**

213. The authority citation for part 335 continues to read as follows:


Authority: 8 U.S.C. 1103, 1443, 1447.

 8 CFR § 335.2

214. Section 335.2 is amended by:

a. Revising the term "Service" to read "USCIS" and the term "§ 332.1 of this chapter" to read "8 CFR 332.1" in paragraph (a);

b. Revising the terms "The Service" and "Service" to read "USCIS" wherever that term appears in paragraph (b) introductory text;

c. Revising paragraph (b)(3);

d. Revising the terms "the Service officer", "The Service officer" and "the Service" to read "USCIS" wherever the terms appear in paragraph (c);

e. Revising paragraph (d)(2);

f. Revising the term "Service" to read "USCIS" wherever the term appears in paragraph (e); and

g. Revising the term "Service" to read "USCIS" and the term "§ 312.4 of this chapter" to read "8 CFR 312.4" wherever the terms appear in paragraph (f).

The revisions read as follows:
 8 CFR § 335.2

**§ 335.2 Examination of applicant.**
* * * * *
(b) * * *

(3) Confirmation from the Federal Bureau of Investigation that the fingerprint data submitted for the criminal background check has been rejected.
 * * * * *
(d) * * *

(2) Service of subpoenas. Subpoenas will be issued on the form designated by USCIS and a record will be made of service. The subpoena may be served by any person over 18 years of age, not a party to the case, designated to make such service by USCIS.
 * * * * *8 CFR § 335.3

**§ 335.3 [Amended]**
8 CFR § 335.3
215. Section 335.3 is amended by revising the terms "The Service officer" and "the Service officer" to read "USCIS" wherever the terms appear in the following places:

a. Paragraph (a); and

b. Paragraph (b).
 8 CFR § 335.4

**§ 335.4 [Amended]**
8 CFR § 335.4
216. Section 335.4 is amended by revising the phrase "the Service officer designated in § 332.1 of this chapter" to read "the USCIS officer described in 8 CFR 332.1".
 8 CFR § 335.5

**§ 335.5 [Amended]**

8 CFR § 335.5

217. Section 335.5 is amended by revising the terms "the Service" and "The Service" to read "USCIS" wherever the terms appear.

8 CFR § 335.6

218. Section 335.6 is amended by revising the term "the Service" to read "USCIS" wherever the term appears in the following places:

a. Paragraph (a);

b. Paragraph (b); and

c. Paragraph (c).

8 CFR § 335.7

219. Section 335.7 is revised to read as follows:

8 CFR § 335.7

**§ 335.7 Failure to prosecute application after initial examination.**

An applicant for naturalization who has appeared for the examination on his or her application as provided in 8 CFR 335.2 will be considered as failing to prosecute such application if he or she, without good cause being shown, either failed to excuse an absence from a subsequently required appearance, or fails to provide within a reasonable period of time such documents, information, or testimony deemed by USCIS to be necessary to establish his or her eligibility for naturalization. USCIS will deliver notice of requests for appearance or evidence as provided in 8 CFR 103.8. In the event that the applicant fails to respond within 30 days of the date of notification, USCIS will adjudicate the application on the merits pursuant to 8 CFR 336.1.

8 CFR § 335.9

**§ 335.9 [Amended]**

8 CFR § 335.9

220. Section 335.9 is amended by:

a. Revising the phrase "Service office to the Service office" to read "USCIS office to the USCIS office" in paragraph (a); and

b. Revising the term "district director" to read "USCIS" and the term 'the Service's' to read "USCIS'" in paragraph (b).

8 CFR § 335.10

**§ 335.10 [Amended]**

8 CFR § 335.10

221. Section 335.10 is amended by revising the terms "the Service" and "the district director" to read "USCIS" wherever the terms appear.

**§§ 335.11 through 335.13 [Removed]**

**\*53802** 222. Sections 335.11 through 335.13 are removed.

**PART 336—HEARINGS ON DENIALS OF APPLICATIONS FOR NATURALIZATION**

223. The authority citation for section 336 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443, 1447, 1448.

 8 CFR § 336.1

**§ 336.1 [Amended]**

8 CFR § 336.1

224. Section 336.1 is amended by:

a. Revising the phrase "the Service shall" to read "USCIS will" in the first sentence in paragraph (a); and

b. Revising the phrase "may be made in person or by certified mail to the applicant's last known address" to read "must be by personal service as described in 8 CFR 103.8" in paragraph (c).

 8 CFR § 336.2

225. Section 336.2 is revised to read as follows:

 8 CFR § 336.2

**§ 336.2 USCIS hearing.**

(a) The applicant, or his or her authorized representative, may request a hearing on the denial of the applicant's application for naturalization by filing a request with USCIS within thirty days after the applicant receives the notice of denial.

(b) Upon receipt of a timely request for a hearing, USCIS will schedule a review hearing, within a reasonable period of time not to exceed 180 days from the date upon which the appeal is filed. The review will be with an officer other than the officer who conducted the original examination or who rendered determination upon which the hearing is based, and who is classified at a grade level equal to or higher than the grade of the examining officer. The reviewing officer will have the authority and discretion to review the application for naturalization, to examine the applicant, and either to affirm the findings and determination of the original examining officer or to re-determine the original decision in whole or in part. The reviewing officer will also have the discretion to review any administrative record which was created as part of the examination procedures as well USCIS files and reports. He or she may receive new evidence or take such additional testimony as may be deemed relevant to the applicant's eligibility for naturalization or which the applicant seeks to provide. Based upon the complexity of the issues to be reviewed or determined, and upon the necessity of conducting further examinations with respect to essential naturalization requirements, such as literacy or civics knowledge, the reviewing immigration officer may, in his or her discretion, conduct a full de novo hearing or may utilize a less formal review procedure, as he or she deems reasonable and in the interest of justice.

(c) Improperly filed request for hearing. (1) Request for hearing filed by a person or entity not entitled to file. (i) Rejection without refund of filing fee. A request for hearing filed by a person or entity who is not entitled to file such a request must be rejected as improperly filed. In such a case, any filing fee will not be refunded.

(ii) Request for hearing by attorney or representative without proper Form G-28. If a request for hearing is filed by an attorney or representative who has not properly filed a notice of entry of appearance as attorney or representative entitling that person to file the request for hearing, the appeal will be considered as improperly filed. In such a case, any filing fee will not be refunded regardless of the action taken. The reviewing official will ask the attorney or representative to submit a proper notice of entry within 15 days of the request. If such notice is not submitted within the time allowed, the official may, on his or her own motion, under 8 CFR 103.5(a)(5)(i), make a new decision favorable to the affected party without notifying the attorney or representative. The request for hearing may be considered properly filed as of its original filing date if the attorney or representative submits a properly executed notice entitling that person to file the request for hearing.

(2) Untimely request for hearing. (i) Rejection without refund of filing fee. A request for hearing which is not filed within the time period allowed must be rejected as improperly filed. In such a case, any filing fee will not be refunded.

(ii) Untimely request for hearing treated as motion. If an untimely request for hearing meets the requirements of a motion to reopen as described in 8 CFR 103.5(a)(2) or a motion to reconsider as described in 8 CFR 103.5(a)(3), the request for hearing must be treated as a motion and a decision must be made on the merits of the case.

8 CFR § 336.9

226. Section 336.9 is amended by:

a. Revising the term "the Service" to read "USCIS" in paragraph (a);

b. Revising paragraph (b); and

c. Revising the term "Service" to read "USCIS" in paragraph (d).

The revision reads as follows:

* * * * *

(b) Filing a petition. Under these procedures, an applicant must file a petition for review in the United States District Court having jurisdiction over his or her place of residence, in accordance with Chapter 7 of Title 5, United States Code, within a period of not more than 120 days after the USCIS final determination. The petition for review must be brought against USCIS, and service of the petition for review must be made upon DHS and upon the USCIS office where the hearing was held pursuant to 8 CFR 336.2.

* * * * *

## PART 337—OATH OF ALLEGIANCE

227. The authority citation for part 337 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443, 1448; 8 CFR Part 2.

8 CFR § 337.2

228. Section 337.2 is revised to read as follows:

8 CFR § 337.2

### § 337.2 Oath administered by USCIS or EOIR.

(a) Public ceremony. An applicant for naturalization who has elected to have his or her oath of allegiance administered by USCIS or an immigration judge and is not subject to the exclusive oath administration authority of an eligible court pursuant to section 310(b) of the Act must appear in person in a public ceremony, unless such appearance is specifically excused under the terms and conditions set forth in this part. Such ceremony will be held at a time and place designated by USCIS or EOIR within the United States (or abroad as permitted for certain applicants in accordance with 8 U.S.C. 1443a) and within the jurisdiction where the application for naturalization was filed, or into which the application for naturalization was transferred pursuant to 8 CFR 335.9. Naturalization ceremonies will be conducted at regular intervals as frequently as necessary to ensure timely naturalization, but in all events at least once monthly where it is required to minimize unreasonable delays. Naturalization ceremonies will be presented in such a manner as to preserve the dignity and significance of the occasion.

(b) Authority to administer oath of allegiance. The Secretary may delegate authority to administer the oath of allegiance prescribed in section 337 of the Act to such officials of DHS and to immigration judges or officials designated by the Attorney General as may be necessary for the efficient administration of the naturalization program.

(c) Execution of questionnaire. Immediately prior to being administered the oath of allegiance, each applicant must complete the questionnaire on the  *53803  form designated by USCIS. USCIS will review each completed questionnaire and may further question the applicant regarding the responses provided. If derogatory information is revealed, USCIS

will remove the applicant's name from the list of eligible persons as provided in 8 CFR 335.5 and he or she will not be administered the oath.
 8 CFR § 337.3

**§ 337.3 [Amended]**
8 CFR § 337.3
229. Section 337.3 is amended by revising the terms "the Service" and "the district director" to read "USCIS" whenever the terms appear in the following places:

a. Paragraph (a) introductory text;

b. Paragraph (a)(4);

c. Paragraph (b); and

d. Paragraph (c).
 8 CFR § 337.7

**§ 337.7 [Amended]**
8 CFR § 337.7
230. Section 337.7 is amended by revising the terms "the Service" and "Service" to read "USCIS" whenever the terms appear in the following places:

a. Paragraph (a); and

b. Paragraph (b).
 8 CFR § 337.8
231. Section 337.8 is revised to read as follows:
 8 CFR § 337.8

**§ 337.8 Oath administered by the courts.**
(a) Notification of election. An applicant for naturalization not subject to the exclusive jurisdiction of 8 CFR 310.2(d) must notify USCIS at the time of the filing of, or no later than at the examination on, the application of his or her election to have the oath of allegiance administered in an appropriate court having jurisdiction over the applicant's place of residence.

(b) Certificate of eligibility. (1) Exclusive jurisdiction. In those instances falling within the exclusive jurisdiction provision of section 310(b)(1)(B) of the Act, USCIS will notify the court of the applicant's eligibility for admission to United States citizenship by notifying the clerk of the court within 10 days of the approval of the application.

(2) Non-exclusive jurisdiction. In those instances in which the applicant has elected to have the oath administered in a court ceremony, USCIS will notify the clerk of the court in writing that the applicant has been determined by the USCIS to be eligible for admission to United States citizenship upon taking the requisite oath of allegiance and renunciation in a public ceremony. If a scheduled hearing date is not available at the time of notification, USCIS will notify the applicant in writing that the applicant has been approved but no ceremony date is yet available.

(c) Preparation of lists. (1) At or prior to the oath administration ceremony, the representative attending the ceremony will submit to the court, in duplicate, lists of persons to be administered the oath of allegiance and renunciation. After the ceremony, and after any required amendments and notations have been made to the lists, the clerk of the court will sign the lists.

(2) The originals of all court lists specified in this section will be filed permanently in the court, and the duplicates returned by the clerk of the court to USCIS. The same disposition will be made of any list presented to, but not approved by, the court.

(d) Personal representation of the government at oath administration ceremonies. An oath administration ceremony must be attended by a representative of USCIS who will review each completed questionnaire and may further question the applicant regarding the responses provided. If derogatory information is revealed, the USCIS representative will remove the applicant's name from the list of eligible persons as provided in 8 CFR 335.5 and the court will not administer the oath to such applicant.

(e) Written report in lieu of personal representation. If it is impractical for a USCIS representative to be present at a judicial oath administration ceremony, written notice of that fact will be given by the USCIS to the court. The list of persons to be administered the oath of allegiance and renunciation, forms, memoranda, and certificates will be transmitted to the clerk of the court, who will submit the appropriate lists to the court.

(f) Withdrawal from court. An applicant for naturalization not subject to the exclusive jurisdiction of 8 CFR 310.3(d) who has elected to have the oath administered in a court oath ceremony may, for good cause shown, request that his or her name be removed from the list of persons eligible to be administered the oath at a court oath ceremony and request that the oath be administered by an immigration judge or USCIS. Such request must be in writing to the USCIS office which granted the application and must cite the reasons for the request. USCIS will consider the good cause shown and the best interests of the applicant in making a decision. If it is determined that the applicant will be permitted to withdraw his or her name from the court ceremony, USCIS will give written notice to the court of the applicant's withdrawal, and the applicant will be scheduled for the next available oath ceremony, conducted by an Immigration Judge or USCIS, as if he or she had never elected the court ceremony.

8 CFR § 337.9

**§ 337.9 [Amended]**
8 CFR § 337.9
232. In 8 CFR § 337.9, paragraph (a) is amended by removing the phrase ", administered either by the Service or an immigration judge".


**PART 338—CERTIFICATE OF NATURALIZATION**
233. The authority citation for part 338 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443; 8 CFR part 2.
8 CFR § 338.1
234. Section 338.1 is revised to read as follows:
8 CFR § 338.1

**§ 338.1 Execution and issuance of certificate.**
(a) Issuance. When an applicant for naturalization has taken and subscribed to the oath of allegiance in accordance with 8 CFR part 337, USCIS will issue a Certificate of Naturalization at the conclusion of the oath administration ceremony.

(b) Contents of certificate. The certificate must be issued to the applicant in accordance with section 338 of the Act in his or her true, full, and correct name as it exists at the time of the administration of the oath of allegiance. The certificate must show, under "country of former nationality," the name of the applicant's last country of citizenship, as shown in the application and USCIS records, even though the applicant may be stateless at the time of admission to citizenship.
8 CFR § 338.3

**§ 338.3 [Amended]**

8 CFR § 338.3

235. Section 338.3 is amended by revising the terms "the Service" and the term "the district director" to read "USCIS".

8 CFR § 338.5

236. Section 338.5 is revised to read as follows:

8 CFR § 338.5

**§ 338.5 Correction of certificates.**

(a) Application. Whenever a Certificate of Naturalization has been delivered which does not conform to the facts shown on the application for naturalization, or a clerical error was made in preparing the certificate, an application for issuance of a corrected certificate may be filed, without fee, in accordance with the form instructions.

(b) Court-issued certificates. If the certificate was originally issued by a clerk of court under a prior statute and USCIS finds that a correction is justified and can be made without mutilating the certificate, USCIS will authorize the issuing court to make the necessary correction and to place a dated endorsement of the court on the reverse **\*53804** of the certificate explaining the correction. The authorization will be filed with the naturalization record of the court, the corrected certificate will be returned to the naturalized person, and the duplicate will be endorsed to show the date and nature of the correction and endorsement made, and then returned to USCIS. No fee will be charged the naturalized person for the correction.

(c) USCIS-issued certificates. If the certificate was originally issued by USCIS (or its predecessor agency), and USCIS finds that a correction was justified, the correction shall be made to the certificate and a dated endorsement made on the reverse of the certificate.

(d) Administrative actions. When a correction made pursuant to paragraphs (b) or (c) of this section would or does result in mutilation of a certificate, USCIS will issue a replacement Certificate of Naturalization and destroy the surrendered certificate.

(e) Data change. The correction will not be deemed to be justified where the naturalized person later alleges that the name or date of birth which the applicant stated to be his or her correct name or date of birth at the time of naturalization was not in fact his or her name or date of birth at the time of the naturalization.

**§§ 338.11 through 338.13 [Removed and Reserved]**

8 CFR § 338.11 8 CFR § 338.12 8 CFR § 338.13

237. Sections 338.11 through 338.13 are removed and reserved.

**PART 339—FUNCTIONS AND DUTIES OF CLERKS OF COURT REGARDING NATURALIZATION PROCEEDINGS**

238. The authority citation for part 339 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443, 1448.

8 CFR § 339.1

**§ 339.1 [Amended]**

8 CFR § 339.1

239. Section 339.1 is amended by revising the phrase "the Service pursuant to § 338.1 of this chapter" to read "USCIS in accordance with 8 CFR 338.1".

8 CFR § 339.2

240. Section 339.2 is revised to read as follows:

8 CFR § 339.2

§ 339.2 **Monthly reports.**

(a) Oath administration ceremonies. Clerks of court will on the first day of each month or immediately following each oath ceremony submit to USCIS a report listing all oath administration ceremonies held and the total number of persons issued the oath at each ceremony, in accordance with USCIS instructions. The report will include a list of persons attending naturalization oath ceremonies during the month, and certified copies of any court orders granting changes of name.

(b) Petitions filed for de novo hearings. The clerk of court must submit to USCIS a monthly report of all persons who have filed de novo review petitions before the court. The report shall include each petitioner's name, alien registration number, date of filing of the petition for a de novo review, and, once an order has been entered, the disposition.

(c) Other proceedings and orders. The clerk of court must forward to USCIS copies of the records of such other proceedings and other orders instituted on or issued by the court affecting or relating to the naturalization of any person as may be required from time to time.

(d) Use of reports for accounting purposes. State and federal courts may use the reports as a monthly billing document, submitted to USCIS for reimbursement in accordance with section 344(f)(1) of the Act. USCIS will use the information submitted to calculate costs incurred by courts in performing their naturalization functions. State and federal courts will be reimbursed pursuant to terms set forth in annual agreements entered into between DHS and the Administrative Office of United States Courts.


**PART 340—REVOCATION OF NATURALIZATION**

241. The authority citation for part 340 continues to read as follows:

Authority: 8 U.S.C. 1103, 1443.

8 CFR § 340.1

§ 340.1 **[Removed and reserved]**

8 CFR § 340.1

242. Section 340.1 is removed and reserved.

8 CFR § 340.2

243. Section 340.2 is revised to read as follows:

8 CFR § 340.2

§ 340.2 **Revocation proceedings pursuant to section 340(a) of the Act.**

(a) Recommendations for institution of revocation proceedings. Whenever it appears that any grant of naturalization may have been illegally procured or procured by concealment of a material fact or by willful misrepresentation, and a prima facie case exists for revocation pursuant to section 340(a) of the Act, USCIS will make a recommendation regarding revocation.

(b) Recommendation for criminal prosecution. If it appears to USCIS that a case described in paragraph (a) of this section is amenable to criminal penalties under 18 U.S.C. 1425 for unlawful procurement of citizenship or naturalization, the facts will be reported to the appropriate United States Attorney for possible criminal prosecution.


**PART 341—CERTIFICATES OF CITIZENSHIP**

244. The authority citation for part 341 continues to read as follows:

Authority: Pub. L. 82-414, 66 Stat. 173, 238, 254, 264, as amended; 8 U.S.C. 1103, 1409(c), 1443, 1444, 1448, 1452, 1455; 8 CFR part 2.

8 CFR § 341.1

245. Section 341.1 is revised to read as follows:

8 CFR § 341.1

## § 341.1 Application.

An application for a certificate of citizenship by or in behalf of a person who claims to have acquired United States citizenship under section 309(c) of the Act or to have acquired or derived United States citizenship as specified in section 341 of the Act must be submitted on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the instructions on the form.

8 CFR § 341.2

246. Section 341.2 is amended by:

a. Revising paragraph (a)(1) introductory text;

b. Revising the phrase "at the district director's option" to read "at the discretion of USCIS" in paragraph (b)(1);

c. Revising the phrase "A district director shall assign an officer of the Service to" to read "USCIS will" in the first sentence in paragraph (d);

d. Removing the phrase "to the district director" in the last sentence in paragraph (d); and

e. Removing paragraph (g).

The revision reads as follows:

8 CFR § 341.2

## § 341.2 Examination upon application.

(a) * * *

(1) When testimony may be omitted. An application may be processed without interview if the USCIS officer adjudicating the case has in the administrative file(s) all the required documentation necessary to establish the applicant's eligibility for U.S. citizenship, or if the application is accompanied by one of the following:

* * * * *8 CFR § 341.3

## § 341.3 [Amended]

8 CFR § 341.3

247. Section 341.3 is amended by revising the phrase "an officer of the Service or a United States consular official" to read "a DHS or Department of State official".

8 CFR § 341.5

248. Section 341.5 is revised to read as follows:

8 CFR § 341.5

## § 341.5 Decision.

(a) Adjudication. USCIS may adjudicate the application only after the **\*53805** appropriate approving official has reviewed the report, findings, recommendation, and endorsement of the USCIS officer assigned to adjudicate the application.

(b) Approval. If the application is granted, USCIS will prepare a certificate of citizenship and, unless the claimant is unable by reason of mental incapacity or young age to understand the meaning of the oath, he or she must take and subscribe to the oath of renunciation and allegiance prescribed by 8 CFR 337 before USCIS within the United States. Except as provided in paragraph (c), delivery of the certificate in accordance with 8 CFR 103.2(b)(19) and 8 CFR 103.8 must be made in the United States to the claimant or the acting parent or guardian.

(c) Approval pursuant to section 322(d) of the Act. Persons eligible for naturalization pursuant to section 322(d) of the Act may subscribe to the oath of renunciation and allegiance and may be issued a certificate of citizenship outside of the United States, in accordance with 8 U.S.C. 1443a.

(d) Denial. If USCIS denies the application, the applicant will be furnished the reasons for denial and advised of the right to appeal in accordance with 8 CFR 103.3.

(e) Subsequent application. After an application for a certificate of citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion to reopen or reconsider in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7.

8 CFR § 341.6 8 CFR § 341.7

**§§ 341.6 and 341.7 [Removed]**

8 CFR § 341.6 8 CFR § 341.7

249. Sections 341.6 and 341.7 are removed.

**PART 342—ADMINISTRATIVE CANCELLATION OF CERTIFICATES, DOCUMENTS OR RECORDS**

250. The authority citation for part 342 is revised to read as follows:

Authority: 8 U.S.C. 1103, 1453.

8 CFR § 342.2

251. Section 342.2 is revised to read as follows:

8 CFR § 342.2

**§ 342.2 Service of notice.**

The notice required by 8 CFR 342.1 must be by personal service as described in 8 CFR 103.8(a)(2).

**PART 343—CERTIFICATE OF NATURALIZATION OR REPATRIATION; PERSONS WHO RESUMED CITIZENSHIP UNDER SECTION 323 OF THE NATIONALITY ACT OF 1940, AS AMENDED, OR SECTION 4 OF THE ACT OF JUNE 29, 1906**

252. The authority citation for part 343 is revised to read as follows:

Authority: 8 U.S.C. 1101, 1103, 1443, 1454, and 1455.

8 CFR § 343.1

**§ 343.1 [Amended]**

8 CFR § 343.1

253. Section 343.1 is amended in the first sentence by revising the term "therefor on Form N-580" to read: "in accordance with USCIS instructions".

**PART 343a—NATURALIZATION AND CITIZENSHIP PAPERS LOST, MUTILATED, OR DESTROYED; NEW CERTIFICATE IN CHANGED NAME; CERTIFIED COPY OF REPATRIATION PROCEEDINGS**

254. The authority citation for part 343a is revised to read as follows:

Authority: 8 U.S.C. 1101 note, 1103, 1435, 1443, 1454, and 1455.

 8 CFR § 343a.1

255. Section 343a.1 is amended by:

a. Revising the phrase "shall apply on Form N-565 for a new paper in lieu thereof" to read "must apply on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in paragraph (a);

b. Revising the phrase "shall apply on Form N-565" to read "must apply" in paragraph (b); and

c. Revising paragraph (c).

The revision reads as follows:

 8 CFR § 343a.1

**§ 343a.1 Application for replacement of or new papers relating to naturalization, citizenship, or repatriation.**

* * * * *

(c) Adjudication and disposition. (1) Interview. The applicant shall only be required to appear in person for interview under oath or affirmation in specific cases. Those cases which necessitate an interview enabling an officer to properly adjudicate the application at the office having jurisdiction will be determined by USCIS.

(2) Approval. If an application for a new certificate of naturalization, citizenship, or repatriation or a new declaration of intention is approved, the new certificate or declaration will be issued and delivered by personal service in accordance with 8 CFR 103.8(a)(2). If an application for a new certified copy of the proceedings under the Act of June 25, 1936, as amended, or under section 317(b) of the Nationality Act of 1940, or under section 324(c) of the Immigration and Nationality Act, or under the provisions of any private law is approved, a certified photocopy of the record of the proceedings will be issued. If, subsequent to naturalization or repatriation, the applicant's name was changed by marriage, the certification of the photocopy will show both the name in which the proceedings were conducted and the changed name. The new certified copy will be delivered to the applicant in accordance with 8 CFR 103.8(a)(2).

(3) Denial. If the application is denied, the applicant shall be notified of the reasons for the denial and of the right to appeal in accordance with 8 CFR 103.3.

 8 CFR § 343a.2

**§ 343a.2 [Amended]**

 8 CFR § 343a.2

256. Section 343a.2 is amended by revising the terms "Service" and "the Service" to read "USCIS" and the term "Form N-565" to read "an application" wherever those terms appear.

**PART 343b—SPECIAL CERTIFICATE OF NATURALIZATION FOR RECOGNITION BY A FOREIGN STATE**

257. The authority citation for part 343b continues to read as follows:

Authority: 8 U.S.C. 1103, 1443, 1454, 1455.

 8 CFR § 343b.1

### § 343b.1 [Amended]

8 CFR § 343b.1

258. Section 343b.1 is amended by revising the term "Form N-565" to read "the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions".

8 CFR § 343b.3

259. Section 343b.3 is revised to read as follows:

8 CFR § 343b.3

### § 343b.3 Interview.

When the application presents a prima facie case, USCIS may issue a certificate without first interviewing the applicant. In all other cases, the applicant must be interviewed. The interviewing officer must provide a complete written report of the interview before forwarding the application for issuance of the certificate.

8 CFR § 343b.4

260. Section 343b.4 is revised to read as follows:

8 CFR § 343b.4

### § 343b.4 Applicant outside of United States.

If the application is received by a DHS office outside the United States, an officer will, when practicable, interview the applicant before the application is forwarded to USCIS for issuance of the certificate. When an interview is not practicable, or is not conducted because the application is submitted directly to USCIS in the United States, the **\*53806** certificate may nevertheless be issued and the recommendation conditioned upon satisfactory interview by the Department of State. When forwarding the certificate in such a case, USCIS will inform the Secretary of State that the applicant has not been interviewed, and request to have the applicant interviewed regarding identity and possible expatriation. If identity is not established or if expatriation has occurred, the Department of State will return the certificate to USCIS for disposition.

8 CFR § 343b.11

261. Section 343b.11 is revised to read as follows:

8 CFR § 343b.11

### § 343b.11 Disposition of application.

(a) Approval. If the application is granted, USCIS will prepare a special certificate of naturalization and forward it to the Secretary of State for transmission to the proper authority of the foreign state in accordance with procedures agreed to between DHS and the Department of State, retain the application and a record of the disposition in the DHS file, and notify the applicant of the actions taken.

(b) Denial. If the application is denied, the applicant will be notified of the reasons for denial and of the right to appeal in accordance with 8 CFR 103.3.

### PART 343c—CERTIFICATIONS FROM RECORDS

262. The authority citation for part 343c is revised to read as follows:

Authority: 5 U.S.C. 552; 8 U.S.C. 1103.

8 CFR § 343c.1

### § 343c.1 [Amended]

8 CFR § 343c.1

263. Section 343c.1 is amended by revising the term "Form G-641" to read "the form designated by USCIS in accordance with the form instructions".

**PART 392—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WHO DIE WHILE SERVING ON ACTIVE DUTY WITH THE UNITED STATES ARMED FORCES DURING CERTAIN PERIODS OF HOSTILITIES**

264. The authority citation for part 392 continues to read as follows:

Authority: 8 U.S.C. 1103, 1440 and note, and 1440-1; 8 CFR part 2.
 8 CFR § 392.2

265. In § 392.2, paragraph (d)(2) is revised to read as follows:
 8 CFR § 392.2

**§ 392.2 Eligibility for posthumous citizenship.**

* * * * *

(d) * * *

(2) The certification required by section 329A(c)(2) of the Act to prove military service and service-connected death must be requested by the applicant on the form designated by USCIS in accordance with the form instructions. The form will also be used to verify the decedent's place of induction, enlistment, or reenlistment.
 8 CFR § 392.3

266. Section 392.3 is amended by:

a. Revising the term "the Service" to read "USCIS" in the last sentence in paragraph (a)(2);

b. Revising paragraph (b); and

c. Revising paragraph (c).

The revisions read as follows:
 8 CFR § 392.3

**§ 392.3 Application for posthumous citizenship.**

* * * * *

(b) Application. An application for posthumous citizenship must be submitted on the form designated by USCIS in accordance with the form instructions.

(c) Application period. An application for posthumous citizenship must be filed no later than two years after the date of the decedent's death.
 * * * * *8 CFR § 392.4

267. In § 392.4, paragraphs (a) and (e) are revised to read as follows:
 8 CFR § 392.4

**§ 392.4 Issuance of a certificate of citizenship.**

(a) Approval of application. When an application for posthumous citizenship under this part has been approved, USCIS will issue a Certificate of Citizenship to the applicant in the name of the decedent.
 * * * * *

(e) Replacement certificate. An application for a replacement Certificate of Citizenship must be submitted on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

**PART 499—[REMOVED]**

8 CFR § 499.1

268. Part 499 is removed.

Janet Napolitano,

Secretary.

[FR Doc. 2011-20990 Filed 8-26-11; 8:45 am]

BILLING CODE 9111-97-P

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEF-INTERV.

# EX. 53

80 FR 7912-01, 2015 WL 556870(F.R.)

RULES and REGULATIONS

Department of Health and Human Services

Centers for Medicare & Medicaid Services

42 CFR Parts 417, 422, and 423

[CMS-4159-F2]

RIN 0938-AS20

Medicare Program; Contract Year 2016 Policy and Technical Changes to the
Medicare Advantage and the Medicare Prescription Drug Benefit Programs

Thursday, February 12, 2015

AGENCY: Centers for Medicare & Medicaid Services (CMS), HHS.

**\*7912** ACTION: Final rule.

SUMMARY: This final rule amends the Medicare Advantage (MA) program (Part C) regulations and Medicare Prescription Drug Benefit Program (Part D) regulations to implement statutory requirements; improve program efficiencies; strengthen beneficiary protections; clarify program requirements; improve payment accuracy; and make various technical changes. Additionally, this rule finalizes two technical changes that reinstate previously approved but erroneously removed regulation text sections.

DATES: This rule is effective March 16, 2015, except amendments to § 423.154, which are effective January 1, 2016. Applicability Dates: Except as specified in Table 1, the applicability date of these provisions is January 1, 2016. In the Supplemental section of this final rule, we provide a table (Table 1) that lists changes in this final rule that have either an effective date other than March 16, 2015 or an applicability date other than January 1, 2016, for Contract Year 2016.

FOR FURTHER INFORMATION CONTACT: Christopher McClintick, (410) 786-4682, Part C issues. Marie Manteuffel, (410) 786-3447, Part D issues. Kristy Nishimoto, (206) 615-2367, Part C and D enrollment and appeals issues. Whitney Johnson, (410) 786-0490, Part C and D payment issues. Joscelyn Lissone, (410) 786-5116, Part C and D compliance issues.

SUPPLEMENTARY INFORMATION: The majority of the provisions listed in this rule are intended for implementation for contract year 2016. Changes in the Code of Federal Regulations (CFR) will be consistent with the effective date of the applicable provision. Table 1 lists those provisions with effective dates other than 30 days after the date of publication of this final rule or applicability dates other than January 1, 2016 for contract year 2016. The applicability and effective dates are discussed in the preamble for each of these items.

### Table 1—Applicability and Effective Dates of Select Provisions of the Final Rule

| Preamble section | Section title | Effective date | Applicability date |
| --- | --- | --- | --- |
| Part II | | | |

| II.A.2. | Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44) | | June 1, 2015. |
| II.A.5. | Efficient Dispensing in Long-Term Care Facilities and Other Changes (§ 423.154) | January 1, 2016 | |

**Table of Contents**

I. Executive Summary and Background

A. Executive Summary

1. Purpose

2. Summary of the Major Provisions

a. Changes To Audit and Inspection Authority (§§ 422.503(d)(2), 423.504(d)(2))

b. Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, 423.44)

c. Business Continuity for MA Organizations & PDP Sponsors (§§ 422.504(o) and 423.505(p))

d. Efficient Dispensing in Long Term Care Facilities and Other Changes (§ 423.154)

3. Summary of Costs and Benefits

B. Background

1. General Overview and Regulatory History

2. Issuance of the Proposed Rule

3. Public Comments Received in Response to the Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs Proposed Rule

II. Provisions of the Proposed Regulations

A. Clarifying Various Program Participation Requirements

1. Changes to Audit & Inspection Authority (§§ 422.503(d)(2), 423.504(d)(2))

2. Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, 423.44)

3. Part D Notice of Changes (§ 423.128(g))

4. Business Continuity for MA Organizations & PDP Sponsors (§§ 422.504(o), 423.505(p))

5. Efficient Dispensing in Long Term Care Facilities and Other Changes (§ 423.154)

6. Medicare Coverage Gap Discount Program and Employer Group Waiver Plans (§ 423.2325)

7. Transfer of TrOOP Between PDP Sponsors Due To Enrollment Changes During the Coverage Year (§ 423.464)

8. Expand Quality Improvement Program Regulations (§ 422.152)

B. Improving Payment Accuracy

1. Determination of Payments (§ 423.329)

2. Reopening (§ 423.346)

3. Payment Appeals (§ 423.350)

4. Payment Processes for Part D Sponsors (§ 423.2320)

5. Risk Adjustment Data Requirements—Proposal Regarding Annual Deadline for MAO Submission of Final Risk Adjustment Data (§ 422.310 (g)(2)(ii))

C. Strengthening Beneficiary Protections

1. MA-PD Coordination Requirements for Drugs Covered Under Parts A, B, and D (§ 422.112)

2. Good Cause Processes (§§ 417.460, 422.74, 423.44)

3. MA Organizations' Extension of Adjudication Timeframes for Organization Determinations and Reconsiderations (§§ 422.568, 422.572, 422.590, 422.618, 422.619)

D. Strengthening Our Ability To Distinguish Stronger Applicants for Part C and D Program Participation and To Remove Consistently Poor Performers

1. Two-Year Prohibition When Organizations Terminate Their Contracts (§ 422.502, § 422.503, § 422.506, § 422.508, § 422.512)

2. Withdrawal of Stand-Alone Prescription Drug Plan Bid Prior to Contract Execution (§ 423.503)

3. Essential Operations Test Requirement for Part D (§ 423.503(a) and (c), § 423.504(b)(10), § 423.505(b)(28), § 423.509)

E. Implementing Other Technical Changes

1. Requirements for Urgently Needed Services (§ 422.113)

2. Agent and Broker Training and Testing Requirements (§§ 422.2274, 423.2274)

3. Deemed Approval of Marketing Materials (§§ 422.2262, 422.2266, 423.2262, 423.2266)

4. Cross-Reference Change in the Part C Disclosure Requirements (§ 422.111)

5. Managing Disclosure and Recusal in P&T Conflicts of Interest (§ 423.120(b)(1))

6. Thirty-Six Month Coordination of Benefits (COB) Limit (§ 423.466(b))

7. Application and Calculation of Daily Cost-Sharing Rates (§ 423.153)

8. Technical Change To Align Regulatory Requirements for Delivery of Standardized Pharmacy Notice (§ 423.562)

 **\*7913**  9. MA Organization Responsibilities in Disasters and Emergencies (§ 422.100)

10. Technical Changes To Align Part C and Part D Contract Determination Appeal Provisions (§§ 422.641, 422.644)

11. Technical Changes To Align Parts C and D Appeal Provisions (§§ 422.660, 423.650)

12. Technical Change to the Restrictions on Use of Information Under Part D (§ 423.322)

13. Technical Changes to Regulation Text at § 423.104—Requirements Related to Qualified Prescription Drug Coverage

14. Technical Changes to Regulation Text at § 423.100—Definition of Supplemental Benefits

III. Collection of Information Requirements

A. ICRs Related to Eligibility of Enrollment for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44)

B. ICRs Related to Good Cause Processes (§§ 417.460, 422.74, 423.44)

C. ICRs Related To Expanding Quality Improvement Program Regulations (§ 422.152)

D. ICRs Related To Changes to Audit and Inspection Authority (§§ 422.503(d)(2) and 423.504(d)(2))

E. ICRs Related to Business Continuity for MA Organizations and PDP Sponsors (§§ 422.504(o) and 423.505(p))

F. Submission of PRA-Related Comments

IV. Regulatory Impact Statement

**Regulations Text**

**Acronyms**

ADS Automatic Dispensing System

AHFS American Hospital Formulary Service

AHFS-DI American Hospital Formulary Service-Drug Information

AHRQ Agency for Health Care Research and Quality

ANOC Annual Notice of Change

AO Accrediting Organization

ALR Assisted Living Residence

BBA Balanced Budget Act of 1997 (Pub. L. 105-33)

BBRA [Medicare, Medicaid and State Child Health Insurance Program] Balanced Budget Refinement Act of 1999 (Pub. L. 106-113)

BIPA [Medicare, Medicaid, and SCHIP] Benefits Improvement Protection Act of 2000 (Pub. L. 106-554)

BLA Biologics License Application

BLS Bureau of Labor Statistics

CAHPS Consumer Assessment Health Providers Survey

CAP Corrective Action Plan

CCIP Chronic Care Improvement Program

CC/MCC Complication/Comorbidity and Major Complication/Comorbidity

CCS Certified Coding Specialist

CDC Centers for Disease Control

CGDP Coverage Gap Discount Program

CHIP Children's Health Insurance Programs

CMP Civil Money Penalty

CMR Comprehensive Medical Review

CMS Centers for Medicare & Medicaid Services

CMS-HCC CMS Hierarchal Condition Category

CTM Complaints Tracking Module

COB Coordination of Benefits

CORF Comprehensive Outpatient Rehabilitation Facility

CPC Certified Professional Coder

CY Calendar Year

DEA Drug Enforcement Administration

DIR Direct and Indirect Remuneration

DHS Department of Homeland Security

DME Durable Medical Equipment

DMEPOS Durable Medical Equipment, Prosthetic, Orthotics, and Supplies

D-SNPs Dual Eligible SNPs

DOL U.S. Department of Labor

DUR Drug Utilization Review

EAJR Expedited Access to Judicial Review

EGWP Employer Group/Union-Sponsored Waiver Plan

EOB Explanation of Benefits

EOC Evidence of Coverage

ESRD End-Stage Renal Disease

FACA Federal Advisory Committee Act

FDA Food and Drug Administration

FDR First-tier, Downstream, and Related Entities

FEHBP Federal Employees Health Benefits Plan

FFS Fee-For-Service

FIDE Fully-integrated Dual Eligible

FIDE SNPs Fully-integrated Dual Eligible Special Needs Plans

FMV Fair Market Value

FY Fiscal Year

GAO Government Accountability Office

HAC Hospital-Acquired Conditions

HCPP Health Care Prepayment Plans

HEDIS HealthCare Effectiveness Data and Information Set

HHS [U.S. Department of] Health and Human Services

HIPAA Health Insurance Portability and Accountability Act of 1996 (Pub. L. 104-191)

HMO Health Maintenance Organization

HOS Health Outcome Survey

HPMS Health Plan Management System

ICFs/IID Intermediate care facilities for the mentally retarded

ICL Initial Coverage Limit

ICR Information Collection Requirement

ID Identification

IMD Institutes for mental disease

IT Information Technology

I/T/U Pharmacies Indian Health Service, Tribes and Tribal organizations, and urban Indian organizations (collectively referred to as "I/T/U").

IVC Initial Validation Contractor

LCD Local Coverage Determination

LEP Late Enrollment Penalty

LIS Low-Income Subsidy

LPPO Local Preferred Provider Organization

LTC Long Term Care

MA Medicare Advantage

MAAA Member of the American Academy of Actuaries

MA-PD Medicare Advantage-Prescription Drug Plan

MCO Managed Care Organization

MIPPA Medicare Improvements for Patients and Providers Act of 2008 (Pub. L. 110-275)

MOC Medicare Options Compare

MOOP Maximum Out-of-Pocket

MPDPF Medicare Prescription Drug Plan Finder

MMA Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. 108-173)

MS-DRG Medicare Severity Diagnosis Related Group

MSA Metropolitan Statistical Area

MSAs Medical Savings Accounts

MSP Medicare Secondary Payer

MTM Medication Therapy Management

MTMP Medication Therapy Management Program

NAIC National Association of Insurance Commissioners

NCPDP National Council for Prescription Drug Programs

NCQA National Committee for Quality Assurance

NDA New Drug Application

NDC National Drug Code

NGC National Guideline Clearinghouse

NIH National Institutes of Health

NOMNC Notice of Medicare Non-Coverage

NPI National Provider Identifier

OES Occupational Employment Statistics

OIG Office of Inspector General

OMB Office of Management and Budget

OPM Office of Personnel Management

OTC Over the Counter

PACE Programs of the All-Inclusive Care for the Elderly

Part C Medicare Advantage

Part D Medicare Prescription Drug Benefit Program

Part D IRMAA Part D Income Related Monthly Adjustment Amount

PBM Pharmacy Benefit Manager

PDE Prescription Drug Event

PDP Prescription Drug Plan

PFFS Private Fee For Service Plan

POA Present on Admission (Indicator)

POS Point-of-Sale

PPO Preferred Provider Organization

PPS Prospective Payment System

P&T Pharmacy & Therapeutics

QRS Quality Review Study

PACE Programs of All Inclusive Care for the Elderly

PRWORA Personal Responsibility and Work Opportunity Reconciliation Act of 1996

RADV Risk Adjustment Data Validation

RAC Recovery Audit Contractor

RAPS Risk Adjustment Payment System

RPPO Regional Preferred Provider Organization

RTO Return to Operations/Recovery Time Objective

SBA Small Business Association

SCORM Sharable Content Object Reference Model

SEP Special Enrollment Period

SHIP State Health Insurance Assistance Programs

SNF Skilled Nursing Facility

SNP Special Needs Plan

SNP MOC Special Needs Plan Model of Care

SPAP State Pharmaceutical Assistance Programs

SSA Social Security Administration

SSI Supplemental Security Income

T&C Terms and Conditions

TPA Third Party Administrator

TrOOP True Out-Of-Pocket

U&C Usual and Customary

UPIN Uniform Provider Identification Number
 **\*7914**  USP U.S. Pharmacopoeia

ZPIC Zone Program Integrity Contractor

## I. Executive Summary and Background

### A. Executive Summary

#### 1. Purpose

The purpose of this final rule is to revise the Medicare Advantage (MA) program (Part C) regulations and Medicare Prescription Drug Benefit Program (Part D) regulations to implement statutory requirements, improve program efficiencies, strengthen beneficiary protections, clarify program requirements, improve payment accuracy, and make various technical changes for contract year 2016.

#### 2. Summary of the Major Provisions

##### a. Changes to Audit and Inspection Authority (§§ 422.503(d)(2), 423.504(d)(2))

We proposed three changes to our audit and inspection authority. Due to significant concerns raised during the public comment period, we are finalizing only two of those three proposals. First, under section 6408 of the Affordable Care Act, new authority was provided to the Secretary that now requires that each contract provide the right to "timely" inspection and audit.

We are revising both §§ 422.503(d)(2) and 423.504(d)(2) to insert the word "timely" at the end of both of the introductory paragraphs.

We are also adding language to §§ 422.503(d)(2) and 423.504(d)(2) that will allow us to require that a sponsoring organization hire an independent auditor, working in accordance with CMS specifications, to validate if the deficiencies that were found during a CMS full or partial program audit have been corrected and provide CMS with a copy of the audit findings.

The proposal to require MA organizations and Part D plan sponsors to hire an independent auditor to conduct full or partial program audits will not be finalized.

### b. Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, 423.44)

After consideration of the public comments, we are finalizing the policies mostly as proposed, with the exception of changes to the regulation text at §§ 417.422, 417.460, 422.50, 423.1, 423.3 and 423.44 to clarify that any individual not lawfully present is no longer eligible to remain enrolled in a cost, MA, or Part D plan, to establish the disenrollment effective date to be the first of the month following notice by CMS of ineligibility, and to delete the term "qualified alien." Further, we are redesignating the current text at § 417.460(b)(2)(iv) as paragraph (b)(2)(v) and finalizing the provision establishing a lack of lawful presence as a basis for disenrollment from a cost plan at paragraph (b)(2)(iv). This provision is consistent with the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) and with recommendations made by the Office of the Inspector General (OIG) in its January 2013 and October 2013 reports.

### c. Business Continuity for MA Organizations & PDP Sponsors (§§ 422.504(o) and 423.505(p))

To respond to concerns raised during the comment period, we revised the regulation text by providing a 72, rather than 24 hour, restoration time period for MA organizations and Part D sponsors after a systems failure. We also revised text as necessary to make clear that we require MA organizations and sponsors to "plan to" restore essential functions within the 72-hour time period, rather than guarantee complete restoration within the timeframe. Some commenters thought our intent was to require continuous operations under all conditions, and we revised language from the proposed regulation to make clear that that was not the case in our final rule. Lastly commenters distinguished between Part C and D operations and noted, for instance, that provider payments are not a 24-hour critical function for MA plans since payment is allowed to be made within 30 days and that health and safety would not be put at risk by failure of Part C claims processing and appeals processing. We removed language related to that requirement for MA plans.

### d. Efficient Dispensing in Long Term Care Facilities and Other Changes (§ 423.154)

We are finalizing changes to the rule requiring efficient dispensing to Medicare Part D enrollees in long term care (LTC) facilities. Some Part D sponsors (or their pharmacy benefit managers) implemented the short-cycle dispensing requirement by pro-rating monthly dispensing fees, which penalize the offering and adoption of more efficient LTC dispensing techniques compared to less efficient LTC dispensing techniques. This is because when a medication is discontinued before a month's supply has been dispensed, a pharmacy that dispenses the maximum amount of the medication at a time permitted under § 423.154 (which is 14 days' supplies), collects more in dispensing fees than a pharmacy that utilizes dispensing techniques that result in less than maximum quantities being dispensed at a time. In other words, a less efficient pharmacy collects more in dispensing fees than a more efficient pharmacy. This is contrary to the Congress' intent in enacting section 3310 of the Affordable Care Act, which is to reduce medication waste. Therefore, we have finalized a prohibition on payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed. We have also finalized a requirement to ensure that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques. Other changes to the rule requiring efficient dispensing to Medicare Part D enrollees in LTC facilities are eliminating language that has been misinterpreted as requiring the proration of dispensing fees and making a technical change to the requirement that Part D sponsors report on the nature and quantity of unused brand and generic

drugs. We are not finalizing an additional waiver for LTC pharmacies using restock and reuse dispensing methodologies under certain conditions at this time.

### 3. Summary of Costs and Benefits

**Table 2—Summary of Costs and Benefits**

| Provision | Total costs | Transfers |
|-----------|-------------|-----------|
| Changes to Audit and Inspection | We estimate that this change would require an annual cost of $2 million for the time and effort for all MA organizations or Part D sponsors with audit results that reveal noncompliance with CMS requirements to hire independent auditors to validate that correction has occurred. The total cost for 2015-2019 is estimated to be $10 million | |
| Eligibility of enrollment for individuals not lawfully present in the U.S | N/A | We estimate that this change could save the MA program up to $5 million in 2015, increasing to $8 million in 2019 (total of $32 million over this period), and could save the Part D program (includes the Part D portion of MA-PD plans) up to $5 million in 2015, increasing to $9 million in 2019 (total of $35 million over this period). |
| Business Continuity Operations | We estimate that this change would require a first year cost of $8 million in 2015, for the time and effort for affected organizations to comply with the business continuity requirements. In subsequent years, 2016-2019, the cost for maintaining the business continuity is estimated to be $4 million. The total cost over the period 2015-2019 is estimated to be $24 million | |

### B. Background

### 1. General Overview and Regulatory History

The Balanced Budget Act of 1997 (BBA) (Pub. L. 105-33) created a new "Part C" in the Medicare statute (sections 1851 through 1859 of the Social Security Act (the Act)) which established what is now known as the MA program. The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Pub. L. 108-173), enacted on December 8, 2003, added a new "Part D" to the Medicare statute (sections 1860D-1 through 42 of the Act) entitled the Medicare Prescription Drug Benefit Program (Part D), and made significant changes to the existing Part C program, which it named the Medicare Advantage (MA) Program. The MMA directed that important aspects of the Part D program be similar to, and coordinated with, regulations for the MA program. Generally, the provisions enacted in the

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

MMA took effect January 1, 2006. The final rules implementing the MMA for the MA and Part D prescription drug programs appeared in the Federal Register on January 28, 2005 (70 FR 4588 through 4741 and 70 FR 4194 through 4585, respectively).

Since the inception of both Parts C and D, we have periodically revised our regulations either to implement statutory directives or to incorporate knowledge obtained through experience with both programs. For instance, in the September 18, 2008 and January 12, 2009 Federal Register (73 FR 54226 and 74 FR 1494, respectively), we issued Part C and D regulations to implement provisions in the Medicare Improvement for Patients and Providers Act (MIPPA) (Pub. L. 110-275). We promulgated a separate interim final rule on January 16, 2009 (74 FR 2881) to address MIPPA provisions related to Part D plan formularies. In the final rule that appeared in the April 15, 2010 Federal Register (75 FR 19678), we made changes to the Part C and D regulations which strengthened various program participation and exit requirements; strengthened beneficiary protections; ensured that plan offerings to beneficiaries included meaningful differences; improved plan payment rules and processes; improved data collection for oversight and quality assessment; implemented new policies; and clarified existing program policy.

In a final rule that appeared in the April 15, 2011 Federal Register (76 FR 21432), we continued our process of implementing improvements in policy consistent with those included in the April 2010 final rule, and also implemented changes to the Part C and Part D programs made by recent legislative changes. The Patient Protection and Affordable Care Act (Pub. L. 111-148), as amended by the Health Care and Education Reconciliation Act (Pub. L. 111-152) (collectively the Affordable Care Act or ACA) added a number of new Medicare provisions and modified many existing provisions. The Affordable Care Act included significant reforms to both the private health insurance industry and the Medicare and Medicaid programs. Provisions in the Affordable Care Act concerning the Part C and D programs largely focused on beneficiary protections, MA payments, and simplification of MA and Part D program processes. These provisions affected implementation of our policies regarding beneficiary cost-sharing, assessing bids for meaningful differences, and ensuring that cost-sharing structures in a plan are transparent to beneficiaries and not excessive. In the April 2011 final rule, we revised regulations on a variety of issues based on the Affordable Care Act and our experience in administering the MA and Part D programs. The rule covered areas such as marketing, including agent/broker training; payments to MA organizations based on quality ratings; standards for determining if organizations are fiscally sound; low income subsidy policy under the Part D program; payment rules for non-contract health care providers; extending current network adequacy standards to Medicare medical savings account (MSA) plans that employ a network of providers; establishing limits on out-of-pocket expenses for MA enrollees; and several revisions to the special needs plan requirements, including changes concerning SNP approvals.

In a final rule that appeared in the April 12, 2012 Federal Register (77 FR 22072 through 22175), we made several changes to the Part C and Part D **\*7916** programs required by statute, including the Affordable Care Act, and made improvements to both programs through modifications reflecting experience we have obtained administering the Part C and Part D programs. Key provisions of that final rule implemented changes closing the Part D coverage gap, or "donut hole," for Medicare beneficiaries who do not already receive low-income subsidies from us by establishing the Medicare Coverage Gap Discount Program. We also included provisions providing new benefit flexibility for fully-integrated dual eligible special needs plans, clarifying coverage of durable medical equipment, and combatting possible fraudulent activity by requiring Part D sponsors to include an active and valid prescriber National Provider Identifier on prescription drug event records.

## 2. Issuance of the Proposed Rule

In the proposed rule titled "Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs," which appeared in the January 10, 2014 Federal Register (79 FR 1918), we proposed to revise the MA program (Part C) regulations and Medicare Prescription Drug Benefit Program (Part D) regulations to implement statutory requirements; strengthen beneficiary protections; improve program efficiencies; and clarify program requirements. The proposed rule also included several provisions designed to improve payment accuracy.

**3. Public Comments Received in Response to the Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs Proposed Rule**

We received approximately 7,600 timely pieces of correspondence containing multiple comments on the CY 2015 proposed rule. The majority of correspondence received was in reference to provisions that were either finalized in the final rule that appeared in the Federal Register on May 23, 2014 (79 FR 29844) (May 2014 final rule) or that will not be finalized. While we are finalizing in whole or in part approximately 30 of the provisions from the proposed rule in this final rule, there remain a small number of provisions from the proposed rule that were not finalized in the May 2014 final rule and that we are not finalizing in this rule. These provisions are listed later in this section in Table 2.

Public comments on the provisions finalized in this rule were submitted between January 10, 2014 and March 7, 2014. We note that some of the public comments were outside of the scope of the proposed rule provisions that we are finalizing here. These out-of-scope public comments are not addressed in this final rule. Summaries of the public comments that are within the scope of the proposed rule and our responses to those public comments are set forth in the various sections of this final rule under the appropriate heading. However, we note that in this final rule we are not addressing comments received with respect to the provisions of the proposed rule that we are not finalizing.

**Table 2—Provisions Not Being Finalized**

| Proposed Rule<br><br>January 10, 2014 Federal Register (79 FR 1918),<br><br>section | Topic |
| --- | --- |
| Clarifying Various Program Participation Requirements | |
| III.A.2 | Two-year Limitation on Submitting a New Bid in an Area Where an MA has been Required to Terminate a Low-enrollment MA Plan (§ 422.504(a)(19)). |
| III.A.9 | Collections of Premiums and Cost Sharing (§ 423.294). |
| III.A.12 | Separating the Annual Notice of Change (ANOC) from the Evidence of Coverage (EOC) (§ 422.111(a)(3) and 423.128(a)(3)). |
| III.A.14 | Exceptions to Drug Categories or Classes of Clinical Concern (§ 423.120(b)(2)(vi)). |
| III.A.15 | Medication Therapy Management Program (MTMP) under Part D (§ 423.153(d)(1)(v)(A))—outreach strategies. |
| III.A.23 | Medicare Coverage Gap Discount Program and Employer Group Waiver Plans (§ 423.2325)—disclosure requirement for Part D sponsors. |
| III.A.26 | Payments to PDP Plan Sponsors For Qualified Prescription Drug Coverage (§ 423.308) and Payments to Sponsors of Retiree Prescription Drug Plans (§ 423.882). |

| | |
|---|---|
| III.A.38 | Authorization of Expansion of Automatic or Passive Enrollment Non-Renewing Dual Eligible SNPs (D-SNPs) to another D-SNP to Support Alignment Procedures (§ 422.60). |
| Strengthening Beneficiary Protections | |
| III.C.1 | Providing High Quality Health Care (§ 422.504(a)(3) and § 423.505(b)(27)). |
| III.C.4 | Definition of Organization Determination (§ 422.566). |
| Strengthening our Ability To Distinguish Stronger Applicants for Part C and D Program Participation and To Remove Consistently Poor Performers | |
| III.D.4 | Termination of the Contracts of Medicare Advantage Organizations Offering PDP for Failure for 3 Consecutive Years to Achieve 3 Stars on Both Part C and Part D Summary Star Ratings in the Same Contract Year (§ 422.510). |
| Implementing Other Technical Changes | |
| III.E.2 | Skilled Nursing Facility Stays (§§ 422.101 and 422.102). |

**\*7917  II. Provisions of the Proposed Regulations and Analysis of and Responses to Public Comments**

*A. Clarifying Various Program Participation Requirements*

**1. Changes to Audit and Inspection Authority (§§ 422.503(d)(2), 423.504(d)(2))**

Sections 1857(d)(2)(A) and 1860D-12(b)(3)(C) of the Act specify that each contract under these sections must state that CMS has the right to audit and inspect the facilities and records of each organization. We proposed three changes to our audit and inspection authority. First, under section 6408 of the Affordable Care Act, new authority was provided to the Secretary that now requires that each contract provide the right to "timely" inspection and audit.

We proposed to revise both §§ 422.503(d)(2) and 423.504(d)(2) to reflect this change. Specifically, we proposed to insert the word "timely" at the end of both of the introductory paragraphs for §§ 422.503(d)(2) and 423.504(d)(2).

We also proposed to add language to §§ 422.503(d)(2) and 423.504(d)(2) that will allow us to require an MA organization or Part D plan sponsor to hire an independent auditor, working in accordance with CMS specifications, to perform full or partial program audits to determine compliance with CMS requirements and provide to CMS an attestation affirming that the audit has been completed as required.

Lastly, we proposed to add language to §§ 422.503(d)(2) and 423.504(d)(2) that would allow us to require that a sponsoring organization hire an independent auditor, working in accordance with CMS specifications, to validate if the deficiencies that were found during a CMS full or partial program audit have been corrected and provide CMS with a copy of the audit findings.

We received the following comments and our responses follow:

Comment: Some commenters requested that CMS define "timely" as it is being added to § 422.503(d)(2) and § 423.504(d)(2) and that CMS define the existing language from paragraph (2) in that same section, specifically: "when there is reasonable evidence for some need for such inspection."

Response: We are following the exact working of the statute in adding the word "timely" to our current audit and inspection authority. We believe that the Congress recognized that what would be considered "timely" is based on a reasonableness standard that may change based on the specific circumstances leading up to the audit. For example, we currently give sponsors 4-weeks notice prior to the start of a routine program audit and we do not envision this change altering that practice. However, if we were to become aware of a situation where beneficiaries' health or safety may be at risk based on a plan's poor performance, we will reserve the right to request records or any needed documentation in an expedited fashion. Therefore, we will not put restrictions on the broadly stated statutory language and believe that this is in line with the spirit and intent of the statutory change. Similarly, the language in paragraph (2) in that same section is not a change, but existing language from our regulations. Again, we believe that the wording is appropriate and does not require additional definition or explanation.

Comment: One commenter suggested we utilize the NCPDP audit standard as a means of standardizing audit communications.

Response: We appreciate the commenter's suggestion and believe this would be a more appropriate approach if our audits largely focused on claim level audits between MA and Part D organizations and the providers or entities they pay. However, program audits cover a wide range of our program areas and corresponding programmatic requirements, many of which go well beyond claim determinations. We have received positive feedback from MA and Part D organizations in the past regarding the level of detail and useful information and feedback in our audit reports, which sponsors rely upon as they work towards implementing any necessary corrective actions. By limiting the communication to the codes and auditing standards used by NCPDP, we believe that—(1) many of our findings would not be adequately covered by these standards; and (2) they would not provide enough detail in many cases to allow for an organization to undertake meaningful correction.

Comment: A commenter suggested that CMS specify that the same organization that performed the audit also perform the validation in order to ensure consistency in interpretation and try to keep costs down, or at the very least require at least one member from the original audit team be a member of the validation team.

Response: We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that we may require an organization to hire an independent auditor to validate correction of audit deficiencies. We will consider the recommendation to include a member from the original audit team in any validation activities whether they be performed by CMS internally or by an independent auditor hired by the MA or Part D organization at CMS' request.

Comment: Some commenters' requested if CMS would set a time limit in which audits must be completed or conducted.

Response: We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing our proposal that we may require an organization to hire an independent auditor to validate correction of audit deficiencies. We will establish a timeframe in subregulatory guidance based on our current internal validation audit timeline. However, we recognize that some correction activities require more time than others, we will reserve the right to alter those timelines for deficiencies that we believe—(1) a more immediate correction is warranted due to the potential for beneficiary harm; or (2) require a longer correction timeline due to the technical or difficult nature of correction (for example, rebuilding or completely restructuring systems infrastructure).

Comment: A commenter requested if CMS would pay for the cost to hire an independent auditor.

Response: Our proposal was that an MA or Part D organization would retain the independent auditing firm to conduct the audit, but that the plan could account for the costs in their bid. However, we will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing our proposal that we may require an organization to hire an independent auditor to validate correction of audit deficiencies.

Comment: Some commenters requested that CMS cap fees that independent audit firms would charge MA and Part D organizations to perform program audits.

Response: If we decide to pursue this proposal in the future, we will explore our ability to cap the costs of performing these audit activities.

Comment: Many commenters suggested that instead of requiring MA and Part D organizations to hire independent auditors to expand the number of audits conducted each year that we look to the various other compliance and monitoring activities the Agency engages in, which could be used to better target audits or results could be utilized in lieu of audit activities.

 **\*7918** Response: We do utilize the data and information obtained about sponsor performance to target our audit efforts as part of the overall risk assessment used to select sponsors for audit. We have also utilized data and information from our various monitoring efforts to assist in determining if certain deficiencies discovered during an audit may have been corrected (for example, if a sponsor had multiple deficiencies in a program area that will at a later date be the subject of a monitoring activity, we may use passing results from that monitoring activity as proof of correction).

Comment: A commenter requested that CMS release the data driven elements of the risk assessment and define a sponsor who is high risk.

Response: We believe that this comment is outside the scope of this final rule. However, we use a variety of existing data points from Medicare Star ratings, past performance and plan reported data, as a few examples, to develop our risk assessment. We focus on metrics that have the potential to affect beneficiary access to medications and services, and also look for operational metrics that program experience has demonstrated can cause contracting organizations to develop performance problems in core program areas (that is, large increases in enrollment over a short period of time). We do not release our risk assessment in its entirety, but these are the areas we focus on when conducting the analysis. Organizations should note that it is our goal to audit all organizations in the MA and Part D program, and the risk assessment is one way plans are selected for audit.

Comment: Some commenters raised concerns over their available recourse if they disagreed with an independent auditor's findings, given the impact on Medicare Star ratings and past performance.

Response: We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that we may require an organization to hire an independent auditor to validate correction of audit deficiencies. Validation results have no impact on Medicare Star ratings or past performance. However, we stated in the proposal that organizations would have an opportunity to rebut audit findings, this would include during validation efforts, and CMS would be reviewing both draft and final reports from the independent auditor. Therefore, we would give organizations an avenue to dispute findings or policy interpretations that organizations believed to be erroneous, even in the more limited use of an independent auditor to validate correction of deficiencies.

Comment: A commenter stated that our proposal did not clarify how organizations hiring an independent auditor to conduct full or partial program audits would affect or involve the Zone Program Integrity Contractors (ZPICs) or the Recovery Audit Contractors (RACs).

Response: The proposal to utilize an independent auditor to conduct full or partial program audits or validations has no impact on ZPICs or RACs, which is why they are not mentioned in our proposal.

Comment: Several commenters suggested that CMS develop a core set of SNP auditors regardless of whether or not we implement our independent auditor proposal, given what the industry perceives as inexperienced or inconsistent SNP findings amongst auditors, which many SNPs believed would be aggravated if organizations were required to retain an independent audit firm. Some suggested that SNP auditors should be accredited by NCQA prior to being allowed to conduct SNP audits.

Response: We believe that this is outside the scope of this proposal, but we thank the commenter for their suggestion to continue to strengthen the CMS MA and Part D audit program. We have conducted additional training and continue to welcome feedback on all of our audit processes and protocols. After the piloting of the SNP MOC protocols in 2013, we conducted specialized feedback sessions with organizations subject to SNP MOC audits and made changes to our protocols, methods of evaluation and training of auditors based on the industry's feedback. We welcome additional feedback and hope that organizations will see continual improvements in our audit processes in 2014 and future years.

Comment: A commenter inquired if the independent auditor proposals applied to PACE organizations.

Response: No, these proposals do not apply to PACE organizations. These regulatory provisions do not apply to PACE plans because we are only proposing changes to Parts 422 and 423 which govern MA, other Managed care plans, and Part D organizations. PACE plans are governed by the regulations in part 460. With respect to this change applying to cost plans, we select sponsors for audit at their parent organization level, and if they have an 1876 cost plan, that contract would be included in our audit. Therefore, the parent organization may be requested to hire an independent auditor to validate the correction of their audit deficiencies. However, if an organization was a standalone cost plan, with no MA or Part D contracts under parts 422 or 423, this requirement would not apply to those organizations, as cost plans are governed by part 417.

Comment: A commenter suggested that CMS develop and implement a robust annual or biannual training program for independent auditors to ensure that they were competent to perform program audits properly.

Response: We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that CMS may require an organization to hire an independent auditor to validate correction of audit deficiencies. We will consider this suggestion if we repropose the larger full scale use of independent auditors to conduct full or partial program audits in the future. We will also share whatever materials we have developed and can provide technical assistance if we request an organization to retain an independent auditor to validate correction of audit deficiencies.

Comment: A commenter suggested that instead of requiring plans to hire an independent auditor we require plans to conduct a robust internal audit and share the results with CMS.

Response: We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that CMS may require an organization to hire an independent auditor to validate correction of audit deficiencies. We currently require organizations to conduct internal auditing and monitoring as part of having an effective compliance program, which we believe for purposes of a healthy and robust compliance program, such activities are appropriate.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Comment: A commenter recommended that much like CMS' use of independent auditors to conduct data validation audits, CMS should set criteria regarding who can conduct program audits. For example, the commenter suggested CMS clarify that organizations that currently assist plans with operations, compliance or consulting are disqualified from performing as independent auditors.

Response: We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that CMS may require an organization to hire an independent auditor to validate **\*7919** correction of audit deficiencies. We thank the commenter for their suggestion with respect to whom a contracting organization may retain to perform validation of correction of audit deficiencies. We will consider including any key criteria regarding who can perform these validations in subsequent subregulatory guidance.

Comment: A few commenters questioned whether CMS has the statutory authority to require contracting organizations to retain an independent auditor to conduct full or partial program audits. These commenters raised many related issues, such as CMS trying to inappropriately expand their appropriation by requiring contracting organizations to bear the cost of hiring an audit firm to perform a function that the Congress has tasked CMS with performing. Other commenters stated that to the extent these funds expended by plans were later reimbursed by CMS through the bid process, it could implicate the Anti-Deficiency Act.

Response: We will not finalize the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that we may require an organization to hire an independent auditor to validate correction of audit deficiencies. We do not agree that our proposal allowing us the option to request a plan sponsor to retain an independent auditor to verify that deficiencies that we determined existed during our audit have been corrected implicates the concerns that organizations previously raised regarding our current appropriation or statutory authority. The proposal simply mirrors our current authority where we may require organizations under sanction to retain an independent auditor to perform an independent review to validate that the deficiencies upon which the sanction was based have been corrected and are not likely to recur.

After consideration of all of the comments received, we are finalizing our proposal to revise both §§ 422.503(d)(2) and 423.504(d)(2) to insert the word "timely" at the end of both of the introductory paragraphs for §§ 422.503(d)(2) and 423.504(d)(2), and our proposal to have the option to require contracting organizations who were found to have deficiencies during a CMS program audit to hire an independent auditor to validate correction of those deficiencies.

However, based on the strong opposition and valid concerns raised by contracting organizations, we have decided at this time not to finalize our proposal to require plan sponsors to hire an independent auditor no less than every 3 years to conduct full or partial program audits.

**2. Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44)**

**a. Basic Enrollment Requirements**

Sections 226 and 226A of the Act establish the conditions for Medicare Part A entitlement for individuals who have attained age 65, are disabled or have end stage renal disease (ESRD), and are entitled to monthly Social Security benefits under section 202 of the Act; individuals entitled to Part A under these sections do not have to pay premiums for such coverage, and they may, but are not required to, enroll in Medicare Part B. Section 1818 of the Act establishes the conditions for Medicare enrollment for individuals who are not entitled to Medicare Part A without a premium under sections 226 or 226A of the Act. Individuals must have Part B (under section 1836 of the Act) and must also meet citizenship or alien status requirements in order to purchase Part A hospital insurance under section 1818 of the Act;

individuals covered under section 1836 of the Act must meet citizenship or alien status requirements, in addition to other requirements, in order to enroll in Part B if they are not entitled to premium-free Medicare under sections 226 or 226A.

Sections 1851(a)(3)(B), 1860D 1(a)(3)(A), and 1876(a)(1)(A) of the Act outline the eligibility requirements to enroll in MA (Part C), Medicare prescription drug coverage (Part D), and Medicare cost plans. To be eligible for MA, Part D, or cost plan coverage, individuals must have active Medicare coverage. Specifically, to enroll in MA, an individual must be entitled to benefits under Part A and be enrolled in Part B; to enroll in Part D, an individual must be entitled to Part A and/or enrolled in Part B; to enroll in a Medicare cost plan, an individual must be enrolled in Part B (Part A entitlement is not required).

#### b. Medicare Eligibility and Lawful Presence

Section 401 of the PRWORA, amended by section 5561 of the Balanced Budget Act, limits the eligibility of individuals who are not qualified aliens to receive benefits under certain federal programs, including benefits under Title XVIII of the Act (Medicare); these provisions are codified at 8 U.S.C. 1611 and 1641. In general pursuant to 8 U.S.C. 1611(a), an alien who is not a qualified alien is not eligible to receive any federal public benefit. The Congress has established some exceptions to this general rule. One exception, at 8 U.S.C. 1611(b)(3), permits certain aliens to obtain Medicare benefits and applies to an alien who is: (1) Lawfully present in the United States, as determined by the Attorney General and (2) was authorized to be employed with respect to wages attributable to employment, which were counted for the purpose of determining Medicare entitlement under Part A [FN1]. An alien who is eligible under this exception is able to receive any benefit payable under Medicare. In contrast, an alien that is not lawfully present in the United States is not eligible to receive benefits under Medicare.

---

1        This includes qualified aliens.

As a result, individuals meeting certain criteria are able to earn qualified credits towards Social Security retirement benefits as outlined in 8 U.S.C. 1631 (federal attribution of sponsor's income and resources to alien) and 8 U.S.C. 1645 (Qualifying quarters). Such individuals may earn the total number of qualified credits to be eligible under the Act to receive retirement benefits under sections 226 and 226A of the Act. However, should such individuals be unlawfully present in the United States, under PRWORA they are not eligible to receive the Social Security benefits they have earned for as long as they remain unlawfully present. When they are again lawfully present in the United States, or live outside the United States, they would regain eligibility to receive Social Security payments.

Similarly, when those not lawfully present become eligible for Medicare based on age or disability under the Act, they would also automatically be entitled under the Act to premium free Part A benefits and be eligible under the Act to enroll in Part B during a valid enrollment period. Furthermore, if these same individuals were receiving Social Security retirement benefits 4 months prior to turning 65, or are in their 21st month of receiving Social Security disability benefits, they would also automatically be enrolled into both Part A and Part B, consistent with section 1837 of the Act and the enrollment process outlined in § 407.17. However, again under the PRWORA limitations previously discussed, payments for Medicare benefits cannot be made on behalf of these individuals as long as they are not lawfully present in the United States. Only upon becoming lawfully present would they become  **\*7920**  eligible to receive the Medicare benefits to which they would otherwise be entitled by paying into Social Security for the requisite number of quarters or paying premiums.

We note that current regulations at §§ 406.28 and 407.27 outline the reasons for loss of premium Part A and Part B enrollment, and do not include the absence of lawful presence or citizenship as a reason for loss of entitlement. Similarly, individuals who are entitled to Part A and enrolled in Part B based on eligibility for Social Security benefits currently may be enrolled in Medicare even if they are not lawfully present in the United States. However, as previously outlined, Medicare benefits are not payable for individuals who are not lawfully present even if such individuals are enrolled in

Medicare. Thus, there is a distinction between being "entitled to Part A" or "enrolled in Part B" as provided for in the Act and being eligible to receive the Part A and Part B benefits that ordinarily flow from such entitlement and enrollment.

**c. Alignment of MA, Part D, and Cost Plan Eligibility With Fee for Service (FFS) Payment Exclusion Policy**

In order to implement 8 U.S.C. 1611 and ensure that benefits are not incorrectly paid for individuals who are present in the United States unlawfully, the Social Security Administration (SSA) established internal policies and procedures to suspend Social Security benefits during periods in which individuals are not lawfully present in the United States. Because Medicare entitlement flows from entitlement to Social Security retirement and disability benefits, Medicare has also implemented this provision through its own payment exclusion process.

Under Medicare's payment exclusion process, data on lawful presence are transmitted to CMS from the Department of Homeland Security (DHS) via regular data exchanges with SSA. Once the data are received by CMS, lawful presence status is noted on an individual's record and is retained in the FFS claims processing systems. As a result, payment of Part A and Part B claims for non-citizens is denied where lawful presence is not established on their record, and continues to be denied until these individuals regain lawful presence status. Although payment is being denied for claims, individuals who are entitled to Medicare per section 226 of the Act, maintain Part A entitlement and remain enrolled in Part B on Medicare's records as long as Part B premiums are paid. Similarly, individuals who are enrolled in premium Part A or Part B or both under sections 1818 and 1836 of the Act, maintain their enrollment status as long as premiums are paid.

We proposed to align eligibility for enrollment in MA, Part D, and cost plans (and resulting Medicare payments to plans and by plans that would violate PRWORA) with the FFS payment exclusion policy to ensure that Medicare is only paying for benefits and services rendered to individuals who are eligible to receive them. These steps align with the recommendations made by the Office of Inspector General (OIG) in its January 2013 report (A-07-12-01116) [FN2] regarding the need for CMS to maintain adequate controls to detect and prevent improper payments for Medicare services rendered to beneficiaries who are not lawfully present. Accordingly, we proposed to revise the regulations to establish U.S. citizenship and lawful presence as eligibility requirements for enrollment in MA, Part D, and cost plans. Further, we proposed that individuals who are not lawfully present in the United States would be involuntarily disenrolled from MA, Part D, and cost plans, based on the date on which they lose their lawful presence status. Under our proposal, disenrollments would have been effective the first of the month following the loss of lawful presence status, and the disenrollment process would follow the process currently set forth in the regulations for an individual who is no longer eligible to be enrolled in a plan. Such disenrolled individuals would continue to be considered entitled to Medicare Part A and (if enrolled) enrolled in Part B coverage, provided they continue to pay premiums, as applicable, but as noted payment of FFS claims would be denied based on unlawfully present status.

2       Medicare Improperly Paid Providers Millions of Dollars for Unlawfully Present Beneficiaries Who Received Services During 2009 Through 2011 (A-07-12-01116), available at http://oig.hhs.gov/oas/reports/region7/71201116.asp.

These proposed regulatory changes were intended to prevent an individual known not to be lawfully present in the United States from enrolling in a Part C, Part D, or cost plan and/or remaining enrolled in such a plan, meaning that payments would not be made to plans or by plans with respect to such individuals during that period. This policy was intended to facilitate compliance with 8 U.S.C. 1611. We proposed the following changes in the regulations to refine the eligibility requirements for the MA and Part D programs and give MA and Part D plans the ability to disenroll individuals who are not lawfully present in the United States:

• Sections 417.420, 417.422, 422.50, and 423.30 would be amended to add lawful presence or United States citizenship as eligibility criteria for enrollment in a cost, MA, or Part D plan.

• Sections 417.460, 422.74, and 423.44 would be amended to require the involuntary disenrollment of individuals from cost, MA or Part D plans if they lose lawful presence status.

• Conforming changes would be made to §§ 417.2, 422.1, and 423.1 to outline the authority for the aforementioned requirements, from 8 U.S.C. 1611 (Aliens who are not qualified aliens ineligible for federal public benefits).

We received the following comments on our proposals:

Comment: Overall we received general support for our proposal. Many commenters requested clarification about who would be responsible for verifying eligibility based on lawful presence. A few of these commenters stated specifically that CMS should verify this aspect of eligibility and that plans should not be expected or permitted to request proof of lawful presence from individuals. A commenter, who did not agree with the proposed change, expressed concern that plans do not have access to data to validate residency/lawful status for Medicare beneficiaries and requested what source would be used for status changes.

Response: We appreciate the support expressed by most commenters. We agree that CMS would have to provide lawful presence information to plans. In most cases, the DHS determines citizenship and lawful presence status and that information is passed to SSA. SSA also has mechanisms to address changes in lawful presence status reported by beneficiaries themselves or other third parties. CMS receives the lawful presence information from SSA after it completes its processes related to such changes in status. Then, we will notify the plan if an individual is not eligible for MA, Part D or cost plan enrollment based on lawful presence and the plan must either deny the enrollment request or process the involuntary disenrollment. Plans are not expected to independently determine lawful presence when processing the enrollment request, nor should they request proof of citizenship from the beneficiary or include lawful presence as an element on the enrollment form. We will notify plans of ineligibility due to unlawful presence, through the same administrative mechanisms currently utilized to notify plans about other **7921** involuntary disenrollments. Additionally, we will be providing more detailed information about the necessary processes and procedures in subregulatory guidance.

Comment: A few commenters suggested that we amend the regulations to require a notice for the beneficiaries if they are disenrolled for absence or loss of lawful presence status. Other commenters suggested revisions for the content of a disenrollment notice, specifically suggesting that it contain pertinent information regarding loss of eligibility for enrollment and related impacts to unlawfully present individuals.

Response: Under existing processes at SSA, individuals are notified of their potential change to lawful presence status and are provided an opportunity to be heard in advance of any final changes in status in SSA records (that is, before the information is transmitted to us [FN3]). We believe that this process by SSA provides adequate notification to the beneficiary and, at this time, CMS will not require an additional notice from the plan at the time of disenrollment. This policy on notification from the plan is similar to CMS processes and regulations for other involuntary disenrollments based on information from CMS,[FN4] but we will take into consideration the possibility of requiring notice in future rulemaking.

3    Social Security Administration Program Operations Manual System (POMS) RS 00204.010 Lawful Presence Payment Provisions and RS 00204.080 Postentitlement Suspension—Alien is no Longer Lawfully Present.
FN4 Notices are required from the plans in cases of certain disenrollments. See 42 CFR.417.430, 422.74(c), and 423.44(c).

In our existing subregulatory guidance, MA, Part D and cost plans are strongly encouraged to send confirmation of disenrollment to members even when it is not required. We agree that a notice regarding the reason for involuntary disenrollment and the impact unlawful presence status has on the payment of Medicare services would reinforce the messages already provided by SSA, and CMS encourages plans to send such notices in this situation. Sending

a confirmation of disenrollment would ensure that these beneficiaries understand the restrictions of their Medicare coverage as they transfer to the FFS program. We appreciate the suggested notice language provided by the commenters and will consider it as we establish a model notice in Chapter 2 and Chapter 17-Subchapter D of the Medicare Managed Care Manual and Chapter 3 of the Medicare Prescription Drug Benefit Manual.

Further, for instances where an unlawfully present individual is denied enrollment into a MA, Part D, or cost plan due to ineligibility, we currently require that the plan provide written notice of the denial.[FN5] We will consider the suggested language as we modify the existing model denial notices in these subregulatory chapters.

5    Notices are required from the plans in cases of enrollment denials. See 42 CFR 417.430(b)(3), 422.50(e)(3), and 423.32(d).

Comment: Several commenters expressed concern about the effective date of disenrollment if it is based on the date of loss of lawful presence status. Specifically, commenters suggested that involuntary disenrollments be prospective because the plan provides coverage on the reasonable assumption of eligibility to receive services. Further, commenters were concerned about the recoupment of capitation payments as a result of these retroactive disenrollments.

Response: In the proposed rule, we proposed that disenrollments would be effective the first of the month following the loss of eligibility to receive federal benefits because this is in line with the statutory requirement that individuals not receive federal benefits when they are not lawfully present in the United States. Operationally, we did not believe it was feasible to maintain enrollment in a Part C, Part D or cost plan for a period for which we would be required to recoup capitations retroactively. Therefore, we proposed a procedural mechanism to default enrollment for such individuals to Original Medicare, where the FFS payment exclusion policy would be applied. Any retroactive disenrollments would under our proposed approach result in recoupment of payments, as supported by existing regulations in §§ 417.464(a)(1), 422.308(f)(1), 423.315(f) and 423.343(a), which require CMS to retroactively adjust plan payments due to changes in enrollment status. At the time we made this proposal, it was consistent with the approach adopted under FFS Medicare, which also made retroactive recoupments in cases in which someone receiving Medicare benefits is determined not to have been eligible for them.

While we believed that this approach was the best way to implement our obligation to comply with PRWORA, in considering comments received on the proposal, we are reconsidering the issue of retroactive disenrollment. First, while our proposal was consistent at the time it was made with FFS policy on retroactive recoupments, we have revised that policy, based on section 1870 of the Act, and are now denying payments only prospectively. We are also aware of due process arguments that may apply to retroactive recoupment. Because, under our systems, retroactive disenrollment would automatically result in retroactive recoupment, and we are reconsidering the issue of whether such retroactive recoupment in the case of Part C, Part D and cost plans is appropriate, we are not finalizing the retroactive aspect of our proposal on disenrollment, and at this time are finalizing only the prospective period of disenrollment provided for in the proposed rule. We are moving forward with finalizing prospective disenrollment while reconsidering the issue of retroactive enrollment because we believe that prospective disenrollment should be put in place as soon as possible, both to implement the prohibition on benefit payments to individuals who are unlawfully present in the United States, and minimize the period of any potential retroactive recoupment in the event we decide at a future point to proceed with our original proposal to disenroll individuals retroactively.

Therefore, we are finalizing text different from our original proposal to make all disenrollments effective the first of the month following the loss of eligibility to receive federal benefits (that is, retroactively), and instead at this time will revise §§ 417.460(j), 422.74(d)(8), and 423.44(d)(8) to provide that disenrollments are effective the first of the month following notice by CMS that the individual is ineligible. This adjustment will ensure that CMS establishes the required mechanisms to permit prospective enrollment into MA, Part D and cost plans only for individuals eligible to receive Medicare benefits, and prospectively disenroll beneficiaries currently enrolled in plans as of this provision's applicability date.

As discussed in the proposed rule, the OIG noted in a January 2013 report that CMS needed to increase efforts to detect and prevent improper payments for Medicare services rendered to unlawfully present beneficiaries. In a subsequent report published in October 2013 [FN6], the OIG specifically recommended that CMS develop and implement controls to ensure that Medicare does not pay for prescription drugs for unlawfully present beneficiaries and that CMS do so by **\*7922** preventing enrollment of unlawfully present beneficiaries, disenrolling any currently enrolled unlawfully present beneficiaries, and automatically rejecting PDE records submitted by sponsors for prescription drugs provided to this population. We believe that prospective disenrollments address these recommendations, and serve as an initial step in ensuring that payment is made for only individuals eligible to receive services. As we move forward with implementation, we will carefully consider enrollment retroactivity and resulting recoupments, and if determined appropriate, propose changes or additional regulations through future rulemaking.

6        Medicare Improperly Paid Providers Millions of Dollars for Prescription Drugs Provided to Unlawfully Present Beneficiaries
         During 2009 Through 2011 (A-07-12-006038) (http://oig.hhs.gov/oas/reports/region7/71206038.pdf).

Lastly, we believe it is important to note while CMS is dependent upon the data received by the DHS through SSA, we ensure that the data are passed to the plans within 24 hours of receipt via the Daily Transaction Reply Report. In addition, we will work with these agencies to explore options for receiving these data in the most efficient and timely means possible.

Comment: A few commenters suggested that beneficiaries who are involuntarily disenrolled due to unlawful presence should be entitled to appeal their disenrollment.

Response: We thank these commenters for their suggestion to ensure that affected individuals have the opportunity to appeal the reason for their disenrollment from their plan. Currently, there is no right of appeal associated with MA, Part D or cost plans eligibility or enrollment, because enrollment in such plans is voluntary and involuntary disenrollments are not considered initial determinations as outlined in § 405.924(a). We reiterate that individuals disenrolled from MA, cost or Part D plans are defaulted to coverage under FFS Medicare unless Parts A and B entitlement and enrollment ends under 42 CFR part 406, subpart B and §§ 406.28 and 407.27. However, individuals who are subject to involuntary disenrollment from these plans due to lawful presence status are provided with due process prior to any change in their status by SSA and exchange of any data to CMS and loss of MA, Part D, or cost coverage (or denial of claims for an individual enrolled in the FFS program).

These individuals are provided with advance notification in writing of the possible status change and an opportunity to respond or submit the necessary documentation to maintain a lawful presence status under existing SSA processes. [FN7] Following a status change to lawful presence status by SSA, individuals are also provided an opportunity to appeal the determination as outlined in 20 CFR 404.902. SSA has existing processes to accept and review evidence from individuals who believe that they are lawfully present and to update SSA's records. These individuals, based on the date of regaining lawful presence status, would then have the opportunity to re-enroll and, in certain cases of government error, be reinstated into their former plans. As we prepare for implementation of this rule, we intend to consider these issues carefully to ensure beneficiaries are notified of the consequences to Medicare coverage that flow from changes in lawful presence status.

7        Social Security Administration, Policy and Operations Manual System (POMS): RS 00204.010. Lawful Presence Payment
         Provisions, GN 03001.005 Notice Requirements for Title II Due Process Actions, and GN 03001.015 Notices Required Before
         And After Taking a Title II Adverse Action.

Comment: A few commenters requested that CMS put in place a special enrollment period (SEP) for individuals who are disenrolled from their MA or Part D plan based on unlawful presence and then later regain lawful presence status

and wish to re-enroll in a Part D or MA plan. In addition, commenters requested that if an individual is involuntarily disenrolled from a Part D plan due to unlawful presence, and that individual later regains lawful presence status, the individual should not be subject to a late enrollment penalty (LEP) for the period of time they did not have Part D (or other creditable) coverage.

Response: We appreciate the concern expressed by the commenters about ensuring access to Medicare coverage and limiting financial consequences after a beneficiary gains, or regains, lawful presence status. Medicare beneficiaries may incur an LEP for Part D if there is a continuous period of 63 days or more at any time after the end of the individual's Part D initial enrollment period (IEP) during which they were eligible for, but did not enroll in, a Medicare Part D plan and were not covered under any creditable prescription drug coverage. If an individual is disenrolled from a Part D plan because of loss of lawful presence status, this is not considered a break in creditable prescription drug coverage because the individual is not eligible for Part D benefits during this time. Therefore, an LEP would not apply for that period of time. If an individual regains lawful presence status and, as a result, also regains Part C and/or Part D eligibility, the individual does not get a new IEP, but we acknowledge that an SEP is warranted to allow these individuals to enroll in an MA or Part D plan, including a cost plan's optional supplemental Part D benefit, under §§ 422.62(b)(4) and 423.36(c)(8)(ii) if the individual is not otherwise eligible for an SEP. The change in lawful presence status of an individual necessary to trigger a change in eligibility under these rules is extraordinary enough to justify the provision of a SEP under the existing authority of §§ 422.62(b)(4) and 423.36(c)(8)(ii), even without the additional concern that late enrollment penalties could be incurred by beneficiaries who are not able to enroll following their regained eligibility for Part D coverage. The parameters of this SEP will be outlined in subregulatory guidance. However, we note that in this scenario if the newly eligible individual does not take advantage of the SEP to enroll in a plan providing Part D coverage and has no other creditable prescription drug coverage, the individual may be subject to an LEP for any future Part D enrollment.

Comment: A few commenters provided feedback regarding the proposed use of the term "qualified alien" in the proposed text at §§ 417.422, 417.460, 422.50, 423.1, 423.3, and 423.44. Commenters suggested changing it to more accurately reflect the lawful presence eligibility requirements for Medicare benefits outlined in 8 CFR 1.3 so that we are not restricting eligibility to only qualified noncitizens to enroll in or maintain their benefits. The broader term "lawfully present" for this purpose includes "qualified aliens" as well as several other categories of non-citizens, whereas the proposed terminology only included "qualified aliens" which is one of the subcategories included in those lawfully present.

Response: We agree with the concern raised by commenters and are finalizing the regulatory language at §§ 417.422(h), 417.460(b)(2)(iv), 417.460(j), 422.50(a)(7), 422.74(b)(2)(v), 422.74(d)(8), 423.1(a)(3), 423.30(a)(1)(iii), 423.44(b)(2)(iv), and 423.44(d)(8) without references to qualified aliens; the final regulatory language encompasses all individuals who are lawfully present consistent with 8 CFR 1.3.

After consideration of the public comments received, we are finalizing the policies and regulations text as proposed, with the following exceptions:

• At §§ 417.422, 417.460, 422.50, 423.1, 423.3 and 423.44, we are deleting the term "qualified alien."

 **\*7923**  • At  §§ 417.460(j), 422.74(d)(8), and 423.44(d)(8), we are modifying the effective date of the involuntary disenrollment to be the first of the month following notification by CMS.

• At § 417.460, we are redesignating paragraph (b)(2)(iv) as paragraph (b)(2)(v) and finalizing the provision establishing a lack of lawful presence as a basis for disenrollment from a cost plan at paragraph (b)(2)(iv).

### 3. Part D Notice of Changes (§ 423.128(g))
Section 1860D-4(a) of the Act requires Part D sponsors to disclose to beneficiaries information about their Part D drug plans in standardized form. The Act further directs Part D sponsors to include, as appropriate, information that

MA organizations must disclose under section 1852(c)(1) of the Act, which includes a detailed description of benefits. (In guidance, we refer to the document containing this information and delivered to beneficiaries as the Evidence of Coverage (EOC).) To make informed decisions, enrollees need to understand how their benefits, including premiums and cost sharing, would change from one year to the next, should they reenroll in the same plan. (In guidance, we refer to the documents containing this information and delivered to beneficiaries as the Annual Notice of Change (ANOC).) Enrollees also need to be aware of changes that may take place during the course of the year as well. Part D regulations currently do not include language found in the Part C regulations at § 422.111(d) requiring notice of changes to the plan to be provided to CMS for review pursuant to procedures for marketing material review and to all enrollees at least 15 days prior to the annual coordinated election period. Given that guidance applicable to both programs discusses notice of changes, we proposed to require, for Part D, delivery of an ANOC.

Specifically, we proposed to adopt in Part D, with modifications, the language contained in § 422.111(d). As is the case with the MA regulation, proposed § 423.128(g) would require that Part D sponsors submit their changes to us under the procedures contained in subpart V of part 423, and, for those changes taking effect on January 1, provide a notice of changes to all enrollees 15 days before the beginning of the annual election period. While part 422 requires a minimum of 30 days notice before the effective date for all other changes, we proposed at § 423.128(g)(3) that Part D sponsors remain subject to all other notice requirements specified elsewhere in the Part D regulations. Our proposal reflected a programmatic difference between Parts C and D: Under Part D it is not unusual for access to drugs listed on a plan's formulary to change during the course of a year. Changes can include changes to formulary status, tier placement, and utilization management or other restrictions. It is vital that beneficiaries currently taking a drug receive timely notice before such changes take place in order that they can decide whether to, for instance, change drugs or request an exception to cover the drug. Accordingly, our regulations currently specify when sponsors must provide notice of these kinds of changes. Our proposal to require the delivery of an ANOC was not intended to disrupt or change those existing notice requirements.

In the proposed rule, we also took the opportunity to comment on the particular importance for Part D sponsors to provide notice in the ANOC of any changes they are making that will affect the amount of cost sharing that enrollees must pay for each drug belonging to a specific tier. As has been articulated in guidance for several years, we expect that sponsors will provide notice of such changes to all enrollees, including enrollees moved to a consolidated plan. Generally, sponsors compare information such as cost sharing for the same plan from one year to the next in the ANOC. However, comparing information for the same plan would not benefit individuals moved from one plan to another. For instance, when a sponsor crosswalks members from a non-renewing plan to a consolidated renewal plan from one year to the next, cost sharing may change at the drug-tier level. An enrollee who previously had zero cost sharing for all covered Part D drugs within the preferred generic tier may find that the consolidated plan now requires copays for drugs in that tier depending on how many months' supplies he or she orders, and whether he or she obtains those drugs at a retail level pharmacy or through mail order. We expect that enrollees will receive ANOCs that clearly compare the non-renewed and consolidated plans' copayments or coinsurance for all drugs within each tier.

We received the following comments on this proposal and our response follows:

Comment: Commenters supported this proposal for informing beneficiaries about their coverage options. Several pointed out that it was important and appropriate for CMS to communicate cost-sharing changes through the Part D ANOC in addition to formulary information. One commenter urged us to perform ongoing monitoring of formulary changes including cost sharing to ensure they are justified and appropriately communicated to beneficiaries.

Response: We thank the commenters for the support. While we appreciate the concerns about monitoring, we did not propose any changes with respect to monitoring of formulary changes, and we decline to address that issue in this final rule.

Comment: Several commenters observed that, while many Part D sponsors already provide this annual notice under CMS guidance, they thought it important that this requirement be made explicit through rulemaking. In contrast, a commenter noted that developing a Part D ANOC was not necessary because of information provided through other material. Another commenter suggested that, if possible, Part D information should be incorporated into the Part C ANOC to avoid the potential for confusion, missing information, and duplicate costs.

Response: We thank the commenters for the support and can confirm that our goal in revising § 423.128(g) is to codify existing guidance. Our existing model ANOC includes sections on both Parts C and D, and CMS produces nine standardized model ANOCs and EOCs for all plan types.

Comment: A commenter requested that CMS confirm that this provision would merely codify existing guidance and would not necessitate any changes in practice for Part D sponsors that already deliver ANOCs that address plan changes consistent with existing CMS guidance.

Response: Section 423.128(g) will not affect current practice for Part D sponsors that that already deliver ANOCs consistent with our model notices.

Comment: A few commenters pointed out that finalizing this revision would add costs due to increased printing and administration requirements, with one commenter noting premiums could possibly increase.

Response: We disagree. Because we did not propose here to change existing practices, but rather only to codify existing guidance, we do not believe the revision to § 423.128(g) will increase costs.

Comment: A commenter suggested that MA organizations and Part D sponsors be required to share ANOCs with LTC providers in plan networks to enable them to better coordinate and support the beneficiaries in making informed decisions when their health **\*7924** conditions limit their ability to effectively communicate about their coverage. Another commenter suggested that we add language to the Part D ANOC advising beneficiaries for the future that it was important to review the new contract year formulary.

Response: We appreciate these suggestions and will take them into consideration for the future for our guidance on the model notices. However we decline to accept the commenter's suggestion to add this to the regulation text because, as previously noted, our proposal was intended to codify existing guidance.

After review of the public comments received, we are finalizing this provision as proposed without modification.

### 4. Business Continuity for MA Organizations and Part D Sponsors (§ 422.504(o) and § 423.505(p))

A variety of events ranging from power outages to disasters and warnings of disasters can disrupt normal business operations, and when these events occur it is important that MA organizations and Part D sponsors have a plan to ensure beneficiary access to health care services and drugs. Sections 1852(d) and 1860D-4(b) of the Act, respectively applicable to Parts C and D, establish access to services and covered Part D drugs as a core beneficiary protection. After Hurricane Sandy it became apparent that a few entities, particularly those with operational centers and/or information technology (IT) resources physically located in the affected areas, did not have consistent continuity plans or back-up systems and processes to ensure ongoing coordinated deployment of critical staff to alternate locations.

Sections 1857(e)(1) and 1860D-12(b)(3)(D) of the Act authorize the Secretary to adopt additional contract terms for, respectively, MA organizations and Part D sponsors, including section 1876 cost contracts and Programs of the All-Inclusive Care for the Elderly (PACE) organizations that provide qualified prescription drug coverage, that are not inconsistent with Parts C and D, respectively, of Title XVIII of the Act, when the Secretary finds it necessary and appropriate. While a limited number of beneficiaries were affected by problems on the part of a small number of entities

as a result of Hurricane Sandy, we have a goal of consistent disaster response for plans within the scope of our proposal. Therefore, we proposed that all MA organizations and Part D sponsors limit the impact on beneficiaries of unavoidable disruptions and establish a plan to ensure rapid restoration of operations. The scope of our proposal included section 1876 cost contract and PACE organizations that provide qualified prescription drug coverage under Part D. We also proposed to add contract provisions to require that MA organizations and Part D sponsors develop and maintain business continuity plans in order to better anticipate the types of disruptions that could occur and implement policies and procedures to reduce interference with business operations. Our proposal was based on a belief that such planning is appropriate and necessary to better ensure that Medicare beneficiaries have access to the care and coverage contemplated by the statute.

The proposed provisions, in §§ 422.504(o)(1) and 423.505(p)(1), would require that every MA organization and Part D sponsor develop, maintain, and implement a business continuity plan that meets certain minimum standards. In §§ 422.504(o)(1)(i) and 423.505(p)(1)(i), we proposed that the business continuity plan assess risks posed to critical business operations by disasters and other disruptions to business as usual; in the preamble, we clarified that our proposal would apply regardless whether the risks, disasters or disruptions are natural, human, or environmental. In paragraph (1)(ii) of §§ 422.504(o) and 423.505(p), we proposed to require MA organizations and Part D sponsors to mitigate those risks through a variety of strategies, at a minimum by: (1) Identifying events (triggers) that would activate the business continuity plan; (2) developing contingency plans to maintain the availability and, as applicable, the confidentiality of hard copy and electronic essential records, including a disaster recovery plan for IT and beneficiary communication systems; (3) establishing a chain of command, which would better ensure that employees know the rules of succession; (4) creating a communications plan that includes emergency capabilities and means to communicate with employees and third parties; (5) establishing procedures to address management of space and transfer of employee functions; and (6) establishing a restoration plan with procedures to transition back to normal operations. Finally, we also proposed, in §§ 422.504(o)(1)(ii)(G) and 423.505(p)(1)(ii)(G), that the business continuity plan comply with all applicable federal, state, and local laws. In light of the nature of the records an MA organization or Part D sponsor would have in its possession, we proposed to emphasize continuing compliance with the contingency plan requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Security Rule (45 CFR parts 160 and 164, subparts A and C) by including a cross-reference to those requirements in paragraph (1)(ii)(B)(2) of each proposed regulation. These areas of responsibility are essential to continuing the business operations that allow beneficiaries to access health care services and covered Part D drugs.

To better ensure that a business continuity plan works as a practical matter, we next proposed in §§ 422.504(o)(1)(iii) and (iv) and 423.505(p)(1)(iii) and (iv) to require that on an annual basis, each MA organization and Part D sponsor test and revise the plan as necessary, and train employees on their responsibilities under the plan. Proposed §§ 422.504(o)(1)(v) and 423.505(p)(1)(v) would require that MA organizations and Part D sponsors keep records of their business continuity plans that would be available to CMS upon request.

We stated our belief that the broad list of areas that we proposed to cover as part of business continuity plans were not new to MA organizations and Part D sponsors. We stated these topics typically appear in standard business continuity plans and that we also were building on some requirements that already existed under federal and state laws. For instance, with respect to electronic protected health information, health plans have long had to comply with the contingency plan requirements found in the HIPAA Security Rule. We indicated our goal was to provide a list broad enough to align with the business contingency plans that we believed most, if not the vast majority, of MA organizations and Part D sponsors already had in place.

In contrast to the aforementioned list of broad content requirements, we stated that the need to protect beneficiary access required a prescriptive approach for some functions. In proposed §§ 422.504(o)(2) and 423.505(p)(2), as part of the proposal that essential functions must be restored within 24 hours of failure (whether due to disaster, emergency, or other disruption), we identified what we believed to be the minimum essential functions for both MA and Part D plans:

Benefit authorization, if authorization requirements have not been waived, and claims adjudication and processing; an exceptions and appeals process; and call center operations. We stated that given the mandate of the Act to ensure beneficiary access to health care and **\*7925** covered Part D drugs and the inability of many beneficiaries to pay for services or drugs without the Medicare benefit, we believed that the operations listed in the proposed regulations were the most essential operations because they directly supported the provision of Part C and D benefits. We stated that they ensured immediate electronic communication on the availability and extent of Part C and D benefits and also provided support that makes it more likely that Medicare benefits will be appropriately and timely provided (for example, by providing telephone assistance to beneficiaries with questions on how to obtain benefits and maintaining a forum in which beneficiaries can challenge benefit denials). We observed that without real time provision of Medicare benefits, beneficiaries might not pay for the entire cost of the services or drugs and therefore go without necessary treatment.

We also proposed a list of the operations that we believed were essential operations that had to be restored in a rapid time frame. We intended our proposed deadline of the proposed 24 hours to be the outside limit and at that time articulated an expectation that MA organizations and Part D sponsors restore operation of essential functions as soon as possible but not later than 24 hours after they fail or otherwise stop functioning as usual. We stated the clock would begin running in cases of total failure (for example, a computer or telecommunications system crashes or stops working after disruption of the power supply) and also when significant problems occur (for example, a central database is corrupted).

We stated that the need to ensure correct claims adjudication and benefit administration of health care services and drugs is no less acute during disasters or other emergencies, and that such disruptions in one part of the country might disable MA organization and Part D sponsor systems that affect enrollees in other regions. We noted that beneficiaries in those unaffected areas who are denied health care or drug benefits (that is, access to drugs or reimbursement for claims paid out of pocket) before the disruption took place should not be denied the right to immediately challenge those denials or to learn timely the resolution of earlier challenges. As proposed, §§ 422.504(o)(2)(i) and 423.505(p)(2)(i) identified benefit authorization (if not waived) and claim adjudication and processing as essential functions which had to be operational within 24 hours. Our proposal required restoration of those operations for services rendered at a hospital, clinic, provider office, or at the point of sale for Part D covered drugs. We also stated in the proposed rule that this function was essential for both MA and Part D plans.

In addition, we proposed standards specific to Part D sponsors in § 423.505(p)(2)(ii) and (iii) to ensure that a beneficiary who presents at a pharmacy with an appropriate prescription for a covered Part D drug during a disruption would be more likely to receive the drug at the point of sale. The first three prongs under proposed § 423.505(p)(2) classified as essential the following functions: (i) Authorization, adjudication, and processing of pharmacy claims at the point of sale; (ii) administration and tracking of enrollee's drug benefits in real time, including automated coordination of benefits with other payers; and (iii) provision of pharmacy technical assistance. We noted these essential tasks entail numerous subfunctions. For instance, we stated that Part D sponsors would need to restore within the 24 hour return to operations (RTO) all computer and other systems that meet all privacy and security requirements in order to communicate to pharmacies information about topics including: coverage under Part D and the specific plan; cost-sharing and deductibles; any restrictions such as prior authorization, step therapy, or quantity limit edits; and coordination of benefits from other insurers and any low income subsidies. Additionally, we noted that the sponsor would need to undertake a concurrent drug utilization review (DUR) to address, for instance, safety issues, as well as restore its pharmacy help desk to provide prompt answers to any questions pharmacies might have. (For more detail on some of these functions and sub-functions, as related to Part D, please see section III. A.10, "Requirement for Applicants or their Contracted First Tier, Downstream, or Related Entities to Have Experience in the Part D Program Providing Key Part D Functions" of the May 23, 2014 final rule (79 FR 29867)).

Proposed §§ 422.504(o)(2)(ii) and 423.505(p)(2)(iv) each classified as an essential operation an enrollee exceptions and appeals process including coverage determinations. Under these proposed rules we specified that, within 24 hours of

failure, MA organizations and Part D sponsors would need to restore all IT and workforce support necessary to maintain the "safety net" that ensures beneficiaries the rights to appeal or to seek a formulary exception.

Finally, for both MA organizations and Part D sponsors, we proposed that the operation of the call center be an essential function which must be restored within 24 hours. We stated that by classifying operation of the call center as essential, proposed §§ 422.504(o)(2)(iii) and 423.505(p)(2)(v) would ensure that beneficiaries could receive the information necessary to find out where they need to go to access benefits and learn about any special rules that might apply (for example, whether pre-authorization requirements are waived or beneficiaries can obtain benefits at out-of-network providers or pharmacies). We stated that enabling a beneficiary who has just been denied Part D coverage at his or her usual pharmacy to call immediately and speak to a customer service representative while still standing in that pharmacy could ensure that he or she obtained drugs appropriately covered by his or her Part D plan before returning home or moving to a safer area.

Furthermore, in the proposed rule we stated that because it might be difficult during a disaster to get to a provider's office or a pharmacy, we believed it was important that benefit authorization, claims adjudication, and call center operations be restored within 24 hours after failure. While our proposed provisions required both MA organizations and Part D sponsors to coordinate their workforce, facilities, and IT and other systems support to meet a 24 hour RTO, in the preamble to the proposed rule we noted our belief that the vast majority of MA organizations and Part D sponsors already met, or would be able to meet, this requirement with their current resources, based on our knowledge of the industry and as evidenced by the lack of widespread problems with MA organization and Part D operations after recent natural disasters in different parts of the country. We observed that MA organizations and Part D sponsors would not be required to take any prescribed specific actions (for example, there was no requirement for redundant systems located at certain distances apart) to meet these standards. Rather, we stated that the proposed 24-hour RTO would allow MA organizations and Part D sponsors the flexibility to continue to seek their own disaster preparedness solutions (for instance, vendor sites or functions spread across facilities).

We stated that our goal in proposing a contractual requirement for business continuity plans was to better ensure beneficiary access to health care services and Part D drugs during disasters and other interruptions to **7926** regular business operations, and we viewed prior planning as essential to achieving this goal. We specifically solicited comments regarding which functions should be identified as essential operations and the 24-hour timeframe for RTO and stated that we would appreciate any information unique to the role of MA organizations and Part D sponsors.

We received the following comments on these proposals and our response follows:

Comment: Some commenters strongly supported the proposed provision and noted that it was absolutely critical that MA organizations develop and test business continuity plans to ensure that beneficiary needs are met and commended CMS for its commitment to ensure beneficiary access to Medicare benefits. A number of commenters specifically approved that part of the proposed regulation that set forth minimum standards. Additionally, several commenters, including some who did not support the specific requirements of the proposed provision, agreed that there was a need for "robust" business continuity plans.

Response: We thank those commenters who support the proposal in its entirety or approved the general outline of minimum requirements, as well as those who recognized there is a need for MA organizations and Part D sponsors to have business continuity plans.

Comment: Noting that CMS acknowledged in the preamble there were relatively few problems in the past, some commenters stated that industry practices were adequate and questioned the need for detailed provisions that classified certain functions as essential which had to be restored within a 24-hour RTO deadline. A few commenters pointed to the fact, also acknowledged by CMS in the preamble, that the requirements overlapped with other existing federal,

state, and local requirements such as the HIPAA Security Rule and stated that they saw no need for an additional layer of regulation. In contrast, another commenter stated that developing a business continuity plan should not be overly burdensome because the HIPAA Security Rule already requires development of such a plan.

Response: We appreciate the fact that, as far as we are aware, only a limited number of beneficiaries experienced problems as the result of inadequate continuity planning in the wake of Hurricane Sandy. However, there were some beneficiaries who were unable to access benefits, and contingency planning might have prevented some of those problems. Having a business continuity plan to prepare for business disruptions is an established business practice; the fact that most MA organizations and Part D sponsors successfully handled the disaster does not excuse those entities that did not.

We do not believe that requiring a business continuity plan is imposing an unnecessary level of regulation. However, we would like to clarify that HIPAA requirements are distinct from our business continuity provision. As we noted previously, with respect to electronic protected health information, health plans have long had to comply with the contingency plan requirements found in the HIPAA Security Rule. Referencing this rule created no additional burden.

Comment: Commenters stated that the regulation was significantly more detailed than necessary. While some commenters pointed to concerns regarding paragraph (1) of §§ 422.504(o) and 423.505(p) which lists basic minimum requirements (addressed later in this section), most commenters noted concern with paragraph (2) of §§ 422.504(o) and 423.505(p) which identified as essential specific functions and required that MA organizations and Part D sponsors restore them within 24 hours of failure or loss of function.

• The majority of commenters opposed the requirement that MA organizations and Part D sponsors restore essential functions within 24 hours, with several stating this was not feasible. Many commenters noted that because catastrophes are by their nature hard to predict, out of the control of MA organizations and Part D sponsors, and result in major disruptions that have the potential to last for weeks (for instance, power outages), a 24-hour RTO deadline would hamper the flexibility of MA organizations and Part D sponsors to prioritize. A commenter suggested that we institute a "force majeure" clause to provide relief for causes beyond the control of MA organizations and Part D.

• Commenters indicated that they generally agreed with CMS that the emphasis should be on quickly getting care to those beneficiaries who need it, and there was some consensus that providing drugs and services at point-of-sale (POS) should remain an essential function. Several commenters observed that, consistent with industry standards, Part D sponsors were generally able to restore the systems necessary to allow beneficiaries to obtain drugs within approximately 24 hours. For instance, a commenter identified benefit authorization, claims adjudication, and pharmacy services as higher priorities. Some commenters specifically identified call center services as time-sensitive functions requiring a 24-hour recovery.

• However, there was no clear consensus on the specific functions that should be considered essential or even how to prioritize among all of them. For instance, a commenter noted normal appeals would fall into a longer category than 24 hours recovery, but that expedited appeals might possibly fall within the 24 hour time line. Several commenters suggested that different functions would require different RTO time frames. Several commenters mentioned a 72-hour timeframe, with one noting it restored functions less critical for health and safety within 72, rather than 24, hours.

• In evaluating essential functions, a number of commenters distinguished between the Part C and D programs. Commenters observed, for instance, that provider payments are not a 24-hour critical function for MA plans since payment is allowed to be made within 30 days and that in a disaster or emergency MA organizations should not be required to prioritize claims processing for services already rendered. In contrast, a few commenters agreed that the 24-hour restoration requirement could be applied to Part D point-of-sale claims that require immediate adjudication.

Response: These commenters persuaded us that we need to build more flexibility into our business continuity plan requirements for RTO for essential functions and we are accordingly finalizing the regulation with changes from our proposal. In paragraph (2) of §§ 422.504(o) and 423.505(p), we are providing that MA organizations and Part D sponsors must plan to restore essential functions within 72, rather than 24, hours after any one of the essential functions fail or otherwise stop functioning as usual. As discussed in more detail later in this section, we also finalize regulation text to clarify that we require MA organizations and sponsors to "plan to" restore essential functions within the 72-hour time period, rather than guarantee complete restoration within the time frame. Given the lack of a clear consensus on how to prioritize all essential functions, we believe that this will provide MA organizations and Part D sponsors with the flexibility the commenters advocated, and still address our concerns about planning to better ensure beneficiary access to the Medicare benefit.

However, we underscore that although we are finalizing a more flexible regulatory mandate, we expect that Part D sponsors will plan for a 24- **\*7927** hour RTO deadline for POS transactions. We are concerned that beneficiaries who are not able to access their Part D drug coverage may in fact suffer adverse health effects. Our decision not to explicitly require a plan for a 24-hour restoration for POS drug transactions is informed by the fact that commenters suggested that a 24-hour RTO for POS transactions is an industry standard already generally met, and that relatively few problems were reported in the aftermath of recent disasters. We want to ensure that that track record not only continues but improves. We will continue to closely monitor the timing of POS transaction in the aftermath of disasters, emergencies, and other disruptions and take any necessary actions. We also will revisit the regulation if necessary.

We also agreed with commenters that there are distinctions between the Part C and D programs relative to identifying what services are of the highest priority for speedy restoration. For instance, beneficiaries need to know whether they have Part D Medicare coverage at the POS because usually they rely on the benefit to obtain prescription drugs. For most beneficiaries, such claim denials may mean they leave pharmacies without medications or pay out-of-pocket for costs that are their plans' responsibility. In contrast, this is often not the case for Part C health care services. Provision of Part C services is not so closely tied to plan authorizations and a provider may not bill the MA organization for services until days or weeks after the service is furnished. Thus, because beneficiary health and safety would not be put at risk by failure of Part C claims processing and appeals processes, we agree with the commenters that those systems are not essential functions to which the 72-hour timeframe would apply. Furthermore, as finalized in section II.E.9. of this final rule (MA Organization Responsibilities in Disasters and Emergencies (§ 422.100)), beneficiary access to health care services is protected in the more limited circumstances of disasters and public health emergencies and we believe that provision, in conjunction with § 422.504(o)(2), ensures, to the extent possible, that beneficiaries enrolled in MA organizations will have continued access to needed health care services when there are disruptions to normal business operations.

Accordingly we are finalizing § 422.504(o)(2) to define as essential services, for Part C purposes, benefit authorization (if not waived) for services to be immediately furnished at a hospital, clinic, provider office, or other place of service instead of the broader requirement that was proposed. This final rule text would include benefit authorization to the extent that members and providers contact the MA organization to request such authorizations even when the MA organization has waived that requirement.

Similarly, we agree that restoration of Part C claims processing and appeals processes are not essential functions in that beneficiary health and safety is not put at risk by a failure of those systems that lasts for longer than 72 hours. We agree with the commenters that in a disaster or emergency, MA organizations should not be required to prioritize claims for services already rendered, but we do not want beneficiaries to lose access to necessary treatment at provider offices. Accordingly, for Part C, we are no longer characterizing "Operation of an enrollee exceptions and appeals process including coverage determinations" as an essential function and are not finalizing that part of our proposal for § 422.504(o)(2).

Lastly, we agree with the commenters that characterized call center services as high priorities for both Part C and Part D plans. In a disaster or other emergency, normal procedures may be disrupted and beneficiaries need to be able to find out how and where they can obtain health care services and drugs by having contact with the plan.

In contrast, for Part D we plan to finalize § 423.505(p)(2) as proposed. We discussed the importance of the elements in more detail in the preamble to the proposed rule, but would like to note here that a beneficiary cannot obtain Part D coverage without benefits authorization, adjudication, and processing of drug claims at the point of sale. A pharmacy's inability to obtain, for instance, coordination of benefits information may affect the beneficiary's ability to obtain the drug as well; and pharmacy technical assistance is critical in case the dispensing pharmacy has questions. We also believe the operation of the enrollee exceptions and appeals process is essential—a beneficiary who has been denied Part D coverage will want to resolve quickly any issues so he or she can obtain the drug timely. Lastly, as previously noted, we believe call center operations are essential.

Comment: A commenter suggested there was a need for more detail in addition to that provided in the regulation as to exactly when the 24-hour clock would start and that CMS would, for instance, need to clarify if the clock would begin running when the disaster was declared or when it occurred. Another commenter suggested the proposed 24-hour RTO should begin running when the incident management team made the determination of action or after a specified amount of time after the disruption was reported.

Response: We believe that the language we proposed, namely that the clock will start running "after any of the essential functions fail or otherwise stop functioning as usual," provides adequate direction to MA organizations and Part D sponsors. We are finalizing a clearly defined time period—72 hours (rather than the 24-hour time period proposed)—in which MA organizations and Part D sponsors must plan to restore essential operations. In contrast, we deliberately chose to provide more flexibility to MA organizations and Part D sponsors to determine the precise point at which the 72-hour clock starts running. Essential functions could fail in an infinite variety of ways depending on the circumstances and the systems and supports in place (for instance, claims processing systems might fail in different ways than operation of the exceptions and appeals process). We believe that MA organizations and Part D sponsors are in the best position to both learn about failures or disruptions in usual functions or the facts that might potentially cause them and, in the aftermath of such occurrences, gather as much information as possible internally and from outside sources (such as first-tier, downstream and related entities (FDRs) and local authorities and utilities). We will revisit this regulation if problems arise in the future.

Comment: A couple of commenters expressed concern that the requirement that MA organizations and Part D sponsors return functions to "normal" operations would not permit them to utilize temporary alternative workflows that could be more effective than normal business operations in preserving member access to care.

Response: We disagree with this conclusion. Our proposal does not require MA organizations and Part D sponsors to return immediately to normal operations but rather, views that as an ultimate goal in an ongoing transition process. Paragraph (1)(ii) of §§ 422.504(o) and 423.505(p) requires MA organizations and Part D sponsors to create a mitigation strategy to "prioritize the order in which to restore [essential and] other functions to normal operations", while paragraph (1)(ii)(F) of §§ 422.504(o) and 423.505(p) requires MA organizations and Part D sponsors to "[e]stablish a restoration plan including procedures to transition to normal operations." Additionally, we do not define "normal operations." In **\*7928** fact, depending on the severity of a disaster or emergency, "normal operations" certainly might not be operations performed exactly the same as they were before the event. We do not prescribe when or how normal functions are performed; an MA organization or Part D sponsor may achieve a comparable level of performance (for example, in terms of appeals being heard on a timely basis at the same rate as before the disaster) and consider normal operations achieved even if different personnel or offices now perform those functions. We view "normal operations" as an operational level at which MA organizations and Part D sponsors are able to administer the benefit correctly and fulfill contract requirements.

Comment: A commenter stated that the proposed provisions were inconsistent with Executive Order 13563 which requires that proposed rules specify performance objectives rather than the behavior or manner of compliance that regulated entities must adopt.

Response: We disagree with this commenter. The first part of our proposed provisions simply lists basic areas that business continuity plans must cover. We also view as performance objectives the list of essential functions for which we require MA organizations and Part D sponsors to plan a 72-hour RTO. As revised, the regulation requires that each entity plan to restore those functions that directly support the timely provision of Part C and D Medicare benefits to beneficiaries. We leave it to the MA organizations and Part D sponsors to determine the manner by which they plan to meet these requirements timely after a failure occurs.

Comment: Commenters took issue with the costs associated with the proposal. A number of commenters expressed concerns that we were requiring continuous service which would give rise to enormous costs to create systems redundancy, while several commenters were concerned about the cost of testing IT systems on an annual basis.

Response: Although we believe the proposed regulation was clear in paragraphs (1)(ii)(B)(1) of §§ 422.504(o) and 423.505(p) that we do not expect plans to be able to maintain continuous service under all circumstances, we are revising both of these regulation paragraphs in this final rule to clarify the language that we believe caused this confusion. We are revising the language in the proposed paragraph (1) of §§ 422.504(o) and 423.505(p) to require MA organizations and Part D sponsors to plan to restore business operations following disruptions, rather than plan to continue business operations during disruptions.

To clarify, we do not expect MA organizations and Part D sponsors to prevent any disruptions on an absolute basis but rather to plan to ensure operations are restored as best they can when business operations fail. It is understood that disasters, emergencies, and other events may cause severe disruptions outside of the control of MA organizations and Part D sponsors; the reason we are requiring business continuity plans is to ensure that MA organizations and Part D sponsors are better equipped to handle those problems when they occur.

Additionally, proposed §§ 422.504(o)(2) and 423.505(p)(2) required that MA organizations and Part D sponsors "restore" essential functions within the specified timeframe, which we believe raises the same concerns expressed by the commenter. We want to make it clear that the actual restoration of essential functions within 72 hours is the goal of the business continuity plan, not a requirement that is to be met in all circumstances. Accordingly, the regulation is being finalized to require that MA organizations and Part D sponsors plan to restore essential functions within the 72-hour time period. The business continuity plan must be designed with this 72-hour period as a deadline.

As to the commenters' concern about the cost of annual IT training, paragraph (1)(iii) of §§ 422.504(o) and 423.505(p) requires MA organizations and Part D sponsors to test and update the business operations continuity plan on at least an annual basis. This broad description does not detail specific kinds of testing but relies upon MA organizations and Part D sponsor discretion to adequately test and update the business continuity plan. This would include determining exactly what must be tested and how such testing must occur.

Comment: A commenter expressed concern that the rule would require annual training for "all" employees, which might not be necessary under all conditions.

Response: We agree that it is best left to MA organizations and Part D sponsors to determine which employees would most appropriately require annual training on the business continuity plan. We are finalizing the regulations to require annual training of appropriate employees rather than all employees, as well as making changes to make the language applying to both Parts C and D consistent. Specifically, we are removing the phrase "all employees, including contract

staff" from § 422.504(o)(1)(iv) and "all new and existing employees" from § 423.505(p)(1)(iv), and replacing them both with "appropriate employees".

Comment: Several commenters suggested that our regulatory impact analysis (RIA) significantly underestimated costs. Concerns were raised about the high cost of creating systems' redundancy to avoid any disruption of processing of claims; one commenter mentioned that the requirement would necessitate spending millions of dollars. Another commenter mentioned that many business continuity plans currently in place for MA organizations and Part D sponsors would not meet requirements such as the restoration of essential functions within 24 hours. A commenter was concerned that the estimate did not take into account resources needed to ascertain the extent of damage and evaluate options.

Response: We believe that the modifications, clarifications, and comments discussed previously about this final rule address the vast majority of concerns raised about the RIA. We are also well aware of the major expense of creating redundant computer systems to ensure there is no interruption in claims processing—and repeat that we are not requiring MA organizations and Part D sponsors to absolutely ensure that systems never fail or to build redundant systems to avoid any potential failure. We are requiring that MA organizations and Part D sponsors plan to avoid such system and other failures and, in the event they do occur, to be prepared to recover essential functions within a certain timeframe. We appreciate that while contracting organizations may plan—even plan well—to avoid such disruptions and to recover from them within 72 hours, there may be scenarios in which a return of functionality for essential operations within the timeframe of paragraph (2) of §§ 422.504(o) and 423.505(p) is impossible . We also believe that providing the greater flexibility to plan for a 72-hour, rather than 24-hour, RTO for MA organizations and Part D sponsors should further alleviate concerns about high costs.

In this final rule, we also are revising the regulations to clarify that we require annual training of "appropriate" rather than "all" employees. As noted earlier, our requirement for annual testing of the business continuity plan does not specify exactly what must be tested or how such testing must be conducted. As to the last comment, MA organizations and Part D sponsors need to assess damages and evaluate alternatives  *7929  regardless of whether they have business continuity plans.

Additionally, we have revised our cost estimates to account for costs of what we believe will be, at most, minimal changes to existing business continuity plans. We base this on: (1) The fact that we believe most MA organizations and Part D sponsors with existing business continuity plans already cover the same broad list of areas we require in this rule; and (2) revisions to our rule that provide flexibility that enables most MA organizations and Part D sponsors to follow the same industry standards commenters suggested they currently follow. (See section IV. Regulatory Impact Statement of this final rule.)

Comment: A commenter stated that MA organizations and Part D sponsors could incur potentially very large additional costs to come into compliance with the new requirements which would amount to unexpected expenses that would unfairly count against a plan's administrative expenses on its medical loss ratio (MLR) calculation.

Response: Items that count as MLR are outside of the scope of this final rule. However, we note that this final rule will apply to all MA organizations and Part D sponsors and that we believe strongly that planning for the least disruption to operations and better provision of health care and drug benefits during disasters is an important function for insurance companies, and that such work will also benefit the MA organizations and Part D sponsors themselves.

Comment: Noting that they are confidential and contain blueprint information on processes and supporting resources, a commenter requested that rather than make business continuity plans available to CMS upon request, that CMS require an in-camera review of certain elements. In contrast, another commenter recommended that CMS review such plans as part of the Medicare Part D application process as well as via regular CMS compliance audits. A third requested whether there would be an audit element that focuses on business continuity plans.

Response: We appreciate the commenter's concerns about confidentiality. First, we would like to note that we are not requiring MA organizations and Part D sponsors to submit these business continuity plans and materials as a matter of course or to make such plans publicly available. Furthermore, if we do request these documents, we do not intend to voluntarily disclose them to any parties outside of the government. Under the Freedom of Information Act (FOIA), members of the public may request government records, which may include documents submitted to us. MA organizations and Part D sponsors may seek to protect their information from disclosure under FOIA by claiming FOIA exemption 4 and taking the appropriate steps—including labelling the information in question as "confidential" or "proprietary." Furthermore, redaction of especially sensitive information is sometimes an option, depending on what information CMS needs and the nature of the information the organization seeks to redact. We will consider both compliance and confidentiality needs as we develop application and audit requirements related to this provision.

Comment: A commenter requested that CMS require PACE and long term care services and support providers (such as skilled nursing facilities (SNFs) and assisted living residences (ALRs)) to create plans that deal with natural and other disasters.

Response: As discussed in this final rule, the requirements in this regulation that are applicable to Part D sponsors also apply to 1876 cost contracts and PACE organizations that provide qualified prescription drug coverage. On December 27, 2013, we proposed regulations on emergency preparedness requirements for Medicare and Medicaid participating providers and suppliers (78 FR 79082). The emergency preparedness requirements of that regulation would apply to PACE organizations in their capacity as providers and, as we noted earlier, the Part D proposed requirements apply to PACE organizations to the extent they function as Part D sponsors.

Both that proposed rule and this finalized Part C and D rule have the same goal of ensuring the least interruption to beneficiary health care and drugs as a result of disasters and emergencies by requiring entities to assess possible risks and lessen their impact through planning. However, this final rule applies to the entities providing coverage of the benefits (MA organizations and Part D sponsors), while the other rule, "Medicare and Medicaid Programs; Emergency Preparedness Requirements for Medicare and Medicaid Participating Providers and Suppliers" would apply to entities directly providing the services. Specifically, this Part C and D rule applies to MA organizations and Part D sponsors to better ensure that beneficiaries enrolled in their plans have access in a timely manner to the Medicare covered items and services, supplemental benefits and prescription drugs. In contrast, the emergency preparedness rule would apply to both the Medicare and Medicaid programs and would require providers and suppliers to be adequately prepared to meet the direct health care needs of patients, residents, clients, and participants during disasters and emergencies.

Comment: Commenters expressed concerns that the proposed regulation did not take into account disparate circumstances. A commenter noted that MA organizations and Part D sponsors typically were located in the same area where members experiencing disasters or emergencies were living, while other commenters suggested the requirement would particularly burden smaller entities or entities with less experience that might, for example, need to contract with third parties to meet RTO obligations.

Response: We appreciate that different MA organizations and Part D sponsors will face different challenges during disasters and emergencies. However, we drafted broad areas of coverage to provide as much flexibility as possible to different entities. Given that emergencies and disasters are varied and unpredictable, we believe it would not be prudent for CMS to try and create different requirements based on different circumstances. We also believe that most of these concerns about costs and sufficient flexibility have been addressed through revisions or clarification of this proposed regulatory change.

Comment: A commenter stated that it was not aware of any reason that there should be different standards for the protection of Medicare beneficiaries during disasters than those generally applicable to the rest of the population.

Response: The treatment of individuals who are not Medicare beneficiaries is outside the scope of this regulation. However, we note that we are the steward of the Federal Trust Fund with direct authority over the Medicare program. Disasters, emergencies, and disruptions not only can limit beneficiary access to Medicare benefits, but they pose direct threats to the health of beneficiaries which in turn could create greater needs for health care services and drugs. Our core function is to ensure as best we can that beneficiaries are able to access their Medicare benefits; we believe the requirement that MA organizations and Part D sponsors establish business continuity plans that better enable them to deal with disasters is central to achieving this goal.

**\*7930**  After consideration of the public comments received, we are finalizing our business continuity proposal with the following modifications as discussed and as follows:

• In §§ 422.504(o)(1) and 423.505(p)(1) we are replacing the phrase "ensure the continuation of business operations during disruptions" with the phrase "ensure the restoration of business operations following disruptions".

• In § 422.504(o)(1)(iv) we are replacing the phrase "all employees, including contract staff" with the phrase "appropriate employees".

• In § 423.505(p)(1)(iv), we are replacing the phrase "all new and existing employees" with the phrase "appropriate employees".

• In §§ 422.504(o)(2) and§ 423.505(p)(2), we are inserting the words "plan to" before the phrase "restore essential functions" in order that it reads "plan to restore essential functions." We are also replacing the number "24" with "72".

• In § 422.504(o)(2)(i), we are replacing the phrase "Benefit authorization (if not waived), adjudication, and processing of health care claims for services furnished at a hospital, clinic, provider office or other place of service" with "Benefit authorization (if not waived) for services to be immediately furnished at a hospital, clinic, provider office, or other place of service."

• We are removing proposed paragraph (ii) of § 422.504(o)(2) ("Operation of an enrollee exceptions and appeals process including coverage determinations.") and renumbering proposed paragraph (iii).

## 5. Efficient Dispensing in Long Term Care Facilities and Other Changes (§ 423.154)

We proposed changes to the rule requiring efficient dispensing to Medicare Part D enrollees in long term care (LTC) facilities. For background, section 3310 of the Affordable Care Act amended the Act to add a new paragraph (3) to section 1860D-4(c) of the Act. Section 1860D-4(c)(3) of the Act provides that the Secretary shall require Medicare Part D sponsors of prescription drug plans to utilize specific, uniform dispensing techniques, such as weekly, daily or automated dose dispensing, when dispensing covered Part D drugs to enrollees who reside in an LTC facility in order to reduce waste associated with 30-day fills. The section states that the techniques shall be determined by the Secretary in consultation with relevant stakeholders.

After extensive consultation with stakeholders, in the April 15, 2011 Federal Register, we published a final rule entitled "Medicare Program; Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2012 and Other Changes" ("April 15, 2011 final rule"), which governs the dispensing of prescription drugs in LTC facilities under Part D plans. In accordance with § 423.154, Part D sponsors generally must require their network pharmacies to dispense certain solid oral brand covered Part D drugs in quantities of 14 days or less, unless an exemption applies. As a clarification to the April 15, 2011 final rule, we proposed in the January 2014 proposed rule the following specific changes to the LTC short cycle dispensing requirements:

• Add a prohibition on payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed, and a requirement to ensure that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques.

• Eliminate language that has been misinterpreted as requiring the proration of dispensing fees.

• Incorporate an additional waiver for LTC pharmacies using restock and reuse dispensing methodologies under certain conditions.

• Make a technical change to eliminate the requirement that Part D sponsors report on the nature and quantity of unused brand and generic drugs.

After providing a summary of the current LTC short cycle dispensing rule in the proposed rule, we addressed each proposed change in more detail.

### a. Prohibition on Payment Arrangements That Penalize the Offering and Adoption of More Efficient LTC Dispensing Techniques (§ 423.154)

Our first proposed change was to add a paragraph to § 423.154 prohibiting payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed, and a requirement to ensure that any difference in payment methodology among long-term care pharmacies incentivizes more efficient dispensing techniques. Certain dispensing fee payment arrangements, for example, some proration arrangements, penalize the offering and adoption of more efficient LTC dispensing. For instance, if a medication is discontinued before a month's supply has been dispensed, a pharmacy that dispenses the maximum amount of the medication at a time permitted under § 423.154 (for example, 14 days), collects more in dispensing fees than a pharmacy that utilizes dispensing techniques that result in less than maximum quantities being dispensed at a time. In other words, the least efficient pharmacy collects more in dispensing fees than a more efficient pharmacy.

In the proposed rule, we provided the following example of two pharmacies—one more efficient at dispensing than the other—to illustrate our concern: A monthly $4.00 dispensing fee for a 30-days' supply is prorated, and a medication is discontinued after 21 days. The first pharmacy dispenses 14-days' supply at a time and receives approximately $3.73 in total dispensing fees for a 28-days' supply ($0.1333 x 28), which results in 7 days' worth of medication waste. The second pharmacy dispenses 3-days' supply at a time and receives approximately $2.80 in dispensing fees for a 21-days' supply in total ($0.1333 x 21), which results in no medication waste.

We believe this example is contrary to the Congress' intent in enacting section 3310 of the Affordable Care Act, which was to reduce medication waste. In this example, the second pharmacy's more efficient dispensing techniques results in less medication waste, but the pharmacy itself receives less in dispensing fees than it would if it had dispensed in 14-day increments, which result in more medication waste. This approach creates a perverse incentive for LTC pharmacies to adopt the least efficient dispensing technique, if available, which is to dispense drugs in 14 days supplies. This encourages wasteful dispensing to the Part D program.

Given the clear intent of the Affordable Care Act to reduce wasteful dispensing in the LTC setting, we proposed to prohibit payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by adding a new requirement that would state a Part D sponsor must not, or must require its intermediary contracting organizations not to, penalize long term care facilities' choice of more efficient uniform dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed. We proposed that this requirement would also state that a sponsor or its intermediary contracting organizations must ensure that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques.

**\*7931  b. Misinterpretation of Language as Requiring the Proration of Dispensing Fees (§ 423.154)**

Our second proposed change to § 423.154 was to eliminate paragraph (e), which we believe has caused confusion. Section 423.154(e) currently states that regardless of the number of incremental dispensing events, the total cost sharing for a Part D drug to which the dispensing requirements under this paragraph (a) apply must be no greater than the total cost sharing that would be imposed for such Part D drug if the requirements under paragraph (a) of this section did not apply. The purpose of this language was to ensure that sponsors did not assess multiple monthly copayments for each incremental dispensing event in LTCs. We believe misinterpretation of paragraph (e) may have prompted some sponsors to prorate dispensing fees in a way that penalizes the offering and adoption of more efficient LTC dispensing techniques, even though the current regulation does not address dispensing fees.

Moreover, effective January 1, 2014, the daily cost-sharing rate requirement in § 423.153(b)(4)(i) applies whenever a prescription is dispensed by a network pharmacy for less than a month's supply, unless the drug is excepted, regardless of the setting in which the drug is dispensed. In other words, the daily cost-sharing rate requirement applies to brand drugs dispensed in LTC facilities to the extent they must be dispensed in supplies less than 30 days under § 423.154, and to generic drugs, to the extent a sponsor voluntarily dispenses generic drugs in LTC facilities in supplies less than a month's supply. Consequently, the requirement of § 423.153(b)(4)(i) makes § 423.154(e) unnecessary, and we believe retaining both provisions could cause further confusion. For these reasons, we proposed to delete § 423.154(e).

**c. Additional Waiver for LTC Pharmacies Using Restock and Reuse Dispensing Methodologies Under Certain Conditions (§ 423.154)**

Our third proposed change to § 423.154 was to waive the short-cycle dispensing requirements for LTC pharmacies meeting certain conditions. Currently, § 423.154(c) waives the requirements for pharmacies when they dispense brand name Part D drugs to enrollees residing in intermediate care facilities for the mentally retarded and institutes for mental disease, as well as for I/T/U pharmacies. We have learned that some institutional pharmacies maintain custody of medications within the LTC facilities through operating a closed pharmacy within the facility, and as a result can ensure sufficient quality control over these medications to return all unused medications to stock for reuse that are eligible for return and reuse under applicable law. This has led us to believe there is another category of pharmacies, such as some on site pharmacies in veterans' homes, for which a waiver from the LTC short-cycle dispensing requirement may be appropriate, if they meet certain conditions that demonstrate that applying the 14-day dispensing requirements in these instances would not serve to reduce waste.

In light of this, we proposed to waive the requirements of 423.154(a) for an LTC pharmacy that exclusively uses the dispensing technique of returning all unused medications to stock that can be restocked under applicable law for reuse and rebating full credit for the ingredient costs of the unused medication to the PDP sponsor. The proposed waiver also would require that for those drugs that cannot be returned for full credit and reuse under applicable law, such as controlled substances, the pharmacy uses a dispensing methodology that results in the delivery of no more than 14 days of a drug at a time. We proposed that the waiver would apply on a uniform basis to all similarly situated LTC pharmacies, but not to a pharmacy organization that is contracted to use this technique at some, but not all, of its pharmacies. Rather, the waiver would apply only to the qualifying pharmacies themselves. We proposed that we would not require the pharmacies to credit back any amount of the dispensing fee when the pharmacies return a drug to stock for reuse, since the level of effort for the pharmacies would not be expected to decrease. We stated that, if anything, the level of effort would be increased, since the pharmacies have to implement the appropriate internal controls for inspection and return to inventory of the unused medication.

We further solicited comments on our proposal that to qualify for the waiver, a pharmacy would have to dispense any drugs that cannot be restocked under applicable law, such as controlled substances, in no greater than 14-day supply increments. Our rationale in proposing this condition to the waiver is that we do not want the waiver to inadvertently

result in large quantities of medications being dispensed to Part D enrollees serviced by the pharmacies that would qualify for the waiver because they cannot be restocked under applicable law.

**d. Technical Change To Eliminate the Requirement That PDP Sponsors Report on the Nature and Quantity of Unused Brand and Generic Drugs (§ 423.154)**

Finally, we proposed to make a technical change to § 423.154(a)(2), which requires Part D sponsors to collect and report information, in a form and manner specified by CMS, on the dispensing methodology used for each dispensing event described by paragraph (a)(1) of this section, as well as on the nature and quantity of unused brand and generic drugs dispensed by the pharmacy to enrollees residing in an LTC facility. This latter reporting requirement is waived for sponsors for drugs dispensed by pharmacies that dispense both brand and generic drugs in no greater than 7-day increments.

In a memorandum titled, "Modifications to the Drug Data Processing System (DDPS) in Relation to Appropriate Dispensing of Prescription Drugs in Long Term Care Facilities," issued by CMS on August 3, 2012, we explained that we planned to use the PDE data in conjunction with other CMS data (such as MDS) to determine the extent to which 14 day or less dispensing to enrollees in LTC facilities reduces the amount of unused drugs in LTC. We did this to lessen the burden on sponsors that would be created by a separate reporting requirement. Therefore, it is no longer necessary to waive the reporting requirement for any Part D sponsor, because Part D sponsors comply with the requirement (in the form and manner we specified in the previously-referenced memorandum) via PDE submission. Thus, we proposed deleting the language in in § 423.154(a)(2) that appeared to require separate reporting, to eliminate any confusion.

We received the following comments on this proposal and our responses follow:

*Comment:* Numerous commenters support the proposal to add a prohibition on payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed, and a requirement to ensure that any difference in payment methodology among long term care pharmacies incentivizes more efficient dispensing. Many of these comments in particular supported CMS' view that there is not a justifiable reason for proration of monthly dispensing fees since the cost of dispensing is not directly related to the quantity dispensed. These commenters asserted that proration of dispensing fees ignored **\*7932** the clinical oversight and fixed costs for pharmacy professional services for each dispense. These commenters acknowledged that prorated professional fees have resulted in a perverse economic model that encourages pharmacies to dispense the maximum allowable quantity of drugs (for example, 14 days supplies) in each prescription drug event transaction.

Other commenters opposed this proposal, stating that it would increase costs by requiring a full dispensing fee with each dispensing event in an LTC facility, and that since the LTC pharmacies determine dispensing increments, this will incentivize them to select the system that provides the highest number of dispensing fees. These commenters also noted that the Affordable Care Act did not specify a new LTC dispensing fee structure.

A commenter provided an illustrative example of prorated monthly dispensing fees that may not penalize the offering and adoption of more efficient LTC dispensing techniques. Specifically, the example demonstrates how an increased dispensing fee with proration can create appropriate incentives to reduce waste and cost in LTC facilities. The example provided for a $10 base dispensing fee for a 30-day supply for a pharmacy with technology that dispenses in 7-day increments and a $4.00 base dispensing fee for a pharmacy that dispenses in 14-day increments. Under this scenario, the more efficient pharmacy would receive $2.31 for dispensing 7 days of medication ($10/30 = $0.33 x 7) and the less efficient pharmacy would receive $1.82 ($4/30 = $0.13 x 14) for dispensing 14 days of medication. This commenter urged us to allow for any dispensing structure where the daily dispensing fee encourages all pharmacies, regardless of their size or negotiation capabilities, to use the most efficient dispensing technologies.

Response: We thank the supportive commenters for their comments. With respect to the commenters that opposed the proposal, we note that the proposal did not require a full monthly dispensing fee with each dispensing event, or any specific dispensing fee or methodology for that matter. The intent of this rule is to prohibit dispensing fees that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed. This rule also adds a requirement to ensure that any difference in payment methodology among long-term care pharmacies incentivizes more efficient dispensing techniques.

With respect to the one commenter that pointed out that certain prorated dispensing fees may not penalize the offering and adoption of more efficient LTC dispensing techniques in certain instances, we take no position at this time on whether specific dispensing fee arrangements would be compliant with this rule. We reiterate that this rule does not require a specific dispensing fee or methodology, but rather, prohibits payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed. In addition, this rule requires that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques.

Comment: A commenter stated that because its data shows 80 percent of all LTC dispense claims are for generic medications, modifying dispensing fees will not truly affect the use of short-cycle methodology. This commenter requested that CMS provide any research demonstrating the increased utilization of short-cycle fill in dispensing in pharmacies whose dispensing fees did not change to a prorated fee. Alternatively, this commenter requested CMS' observations and supporting data demonstrating that a daily dispensing fee actively discourages pharmacies from short-cycle filling medications.

Response: We do not believe the research and data requested are necessary to finalizing this proposal. We believe it is self-evident that proration of the same monthly dispensing fee based on days' supply or quantity dispensed (which results in a type of daily dispensing fee or rate) penalizes more efficient pharmacies relative to less efficient ones—the more efficient pharmacy is reimbursed less per dispense because it dispenses in smaller increments. Moreover, that prorated dispensing fee decreases per dispense the more efficiently the pharmacy dispenses.

Comment: A commenter stated that CMS confuses prorated dispensing fees with daily dispensing fees that are not necessarily pro rata adjustments of otherwise applicable dispensing fees.

Response: Our prohibition of proration that penalizes more efficient dispensing would apply both to proration of a monthly dispensing fee amount and proration determined by setting a daily rate that is applied to the number of days dispensed. The intent is of our rule is to prohibit payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed, and to require that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques.

Comment: A commenter stated that PBMs have very little leverage in negotiating cost effective strategies with LTC pharmacies on behalf of Part D sponsors, as the LTC landscape is controlled by three very large LTC pharmacy organizations that make up an estimated 80 percent of the market share, and that in many cases, only one of them is the provider of prescription medications in LTC facilities. This commenter further stated that these LTC pharmacy organizations dictated the contractual requirement to prorate dispensing fees, asserting that their member LTC pharmacies needed compensation for every prescription fill.

Response: This rule prohibits payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed. For example, this rule prohibits payment arrangements that penalize LTC dispensing techniques of less than 14 days supplies of drugs at a time. This rule also requires that any difference in payment methodology among LTC pharmacies incentivizes more

efficient dispensing techniques. For example, this rule requires that differences in payment methodologies among LTC pharmacies incentivize dispensing techniques of less than 14 days supplies of drugs at a time. If the prorated dispensing fees by days' supply or quantity dispensed do not penalize the offering of more efficient dispensing techniques by these LTC pharmacies, and any difference in payment methodology relative to other LTC pharmacies incentivizes more efficient dispensing techniques, then this regulatory provision is not implicated.

Comment: Some commenters asserted that our proposal was a violation of the non-interference clause and exceeded our delegated authority.

Response: We disagree. Section 1860D-4(c)(3) of the Act provides that the Secretary shall require Medicare Part D sponsors of prescription drug plans to utilize specific, uniform dispensing techniques, such as weekly, daily, or automated dose dispensing, when dispensing covered Part D drugs to enrollees who reside in a LTC facility in order to reduce waste associated with 30-day fills. Thus, the Congress gave the Secretary authority to regulate with respect to reducing waste of covered Part D drugs in LTC facilities. Moreover, **7933** this requirement does not dictate any specific dispensing fee amounts or methodologies, but rather prohibits only those dispensing fees that penalize more efficient dispensing and requires that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques. For the reasons stated previously, we believe this is consistent with the statutory directive to reduce waste associated with 30-day fills in LTC facilities.

Comment: A commenter stated the regulatory text was vague.

Response: We disagree. The policy reflected in the preamble and regulatory text is clear—to prohibit the prorated LTC dispensing fees in the Part D market today that are financially penalizing more efficient LTC pharmacies. In addition, we believe the discussion in this preamble, with examples provided, makes clear how sponsors must not penalize more efficient dispensing techniques in LTC facilities by prorating dispensing fees based on days' supply or quantity dispensed and that any difference in payment methodologies among LTC pharmacies must incentivize more efficient dispensing techniques. We have deliberately struck a balance in drafting the regulatory text to be specific enough to accomplish the policy goal without being so specific as to dictate the particular dispensing fee arrangements that are permissible.

Comment: A commenter requested whether this new requirement applies to all payments to LTC pharmacies; whether it applies to all prescriptions in LTC facilities or only to those subject to the short-cycle dispensing methodology; and whether a Part D sponsor must prove to each LTC pharmacy how its payment methodology incentivizes more efficient dispensing techniques.

Response: The requirement in this final rule applies to payments to pharmacies related to the dispensing of Part D drugs to residents in LTC facilities, including those Part D drugs that are not subject to the short-cycle dispensing requirement. As noted previously, this rule does not address specific negotiations between Part D sponsors and pharmacies.

Comment: One commenter stated that the regulatory text was confusing and contained three negatives.

Response: We are moving the proposed language to § 423.154(a)(2) and (3) and revising the regulation text. We believe this will make the regulatory text less confusing. However, because we did not propose to waive this requirement with respect to pharmacies when they dispense Part D drugs to residents of intermediate care facilities for the mentally retarded (ICFs/IID) and institutes for mental disease (IMDs) and for I/T/U pharmacies, we are making conforming changes to § 423.154(c) to make clear that the requirements of paragraph (a)(2) and (3) are not waived for with respect to these pharmacies.

Comment: A commenter stated that it was unnecessary for CMS to memorialize the fact that the rule applies to contracting intermediaries in addition to Part D sponsors in the regulatory text.

Response: We agree. The reference to "intermediary contracting organizations" in the regulatory text is now unnecessary because we are moving the requirement to § 423.154(a)(2) and (3), as noted just previously.

Based on all the comments received, we are finalizing our proposal with the changes previously described in this section.

Comment: Some commenters supported the removal of the language in § 423,154(e) that CMS believes may have been misinterpreted as requiring the proration of dispensing fee. A few commenters opposed this proposal. One of these commenters that opposed this proposal stated that plans did not interpret the provision as requiring the proration of dispensing fees, but rather as permitting it.

Response: Based on the comments received, we are finalizing the removal of this language from the current regulatory text. As noted previously, this provision was intended to address cost sharing for short-cycle dispensing in LTC facilities, but the daily cost-sharing rate rule at § 423.153(b)(iv)(i) now addresses cost-sharing when less than a month's supply of a Part D drug is dispensed. Thus, this regulatory text is no longer necessary. Moreover, we believe the comments support our view that the language was confusing.

Comment: Several commenters supported CMS' proposal in principle for an additional waiver from the short-cycle dispensing requirements for certain LTC pharmacies that maintain custody of medications by operating a closed pharmacy within the facility, but these commenters expressed concerns about how the waiver would be implemented. Specifically, these commenters pointed out that there is no current transaction standard that accommodates transmitting a net quantity for payment following the acceptance of a returned medication applied against a quantity dispensed for ingredient cost credit, and that use of an existing transaction to accomplish this would violate HIPAA. These commenters stated that a new HIPAA standard transaction would be required to support a waiver based on return and reuse billing.

Response: In the proposed regulation, while we used an industry term of art "restock and reuse," we did not intend to implicate a billing standard that does not exist. This term, as used in the industry, encompasses a billing system that modifies pharmacy claims as unused medications are returned to stock. We are aware of the current limitations of this particular system.

The type of pharmacy that would qualify for the waiver, as we described in the proposed rule, is an institutional, on-site, closed pharmacy, such as a pharmacy in a veteran's home, which maintains custody of medications within the LTC facility, such that all unused medications that are eligible under applicable law are restocked and reused. In other words, such a pharmacy has such quality control over medications in the LTC facility that it does not have to dispense in 14-day supplies or less in order to reduce waste. Such pharmacies may use post-consumption billing, a reverse and rebill system, or some other billing method to only charge a Part D sponsor for the medications that are actually used.

Given the misunderstanding of our proposed additional waiver from the LTC short-cycle dispensing rule, we are not finalizing it as this time. We will consider proposing the waiver again in future rulemaking.

Comment: We received no comment on our proposal to delete language in § 423.154(a)(2) to eliminate any confusion about that there is a separate reporting requirement.

Response: We are finalizing this deletion, except that we are redesignating the remaining language in (a)(2) as (a)(4) in light of the other changes previously described.

Comment: Some commenters requested a delay in the effective date of this requirement until 2016, asserting that the requirement will necessitate significant changes in adjudication and network contracting logic to accommodate the

replacement of prorated dispensing fees with standard dispensing fees. One commenter requested clarification of the effective date of this requirement.

Response: The effective date of this requirement is January 1, 2016.

**6. Medicare Coverage Gap Discount Program and Employer Group Waiver Plans (§ 423.2325)**

Section 3301 of the Affordable Care Act, codified in section 1860D-43 and 1860D-14A of the Act, established the **\*7934** Medicare Coverage Gap Discount Program (Discount Program), beginning in 2011. Under the Discount Program, manufacturer discounts are made available to applicable Medicare beneficiaries receiving applicable covered Part D drugs while in the coverage gap. Section 1860D-14A(c)(1)(A)(ii) of the Act requires the manufacturer discount to be provided to beneficiaries at the point-of-sale. Employer Group Waiver Plans (EGWPs) are customized employer-offered plans available exclusively to employer/union health plan Part D eligible retirees and/or their Part D eligible spouse and dependents. Section 423.458(c)(4) requires sponsors offering EGWPs to comply with all Part D requirements unless those requirements have been specifically waived or modified by CMS using our authority under section 1860D-22(b) of the Act. The Affordable Care Act did not exclude EGWP enrollees that otherwise meet the definition of an applicable beneficiary (as defined in § 423.100) from the Discount Program. Therefore, in order for an applicable drug to be covered by EGWPs, it must be covered under a manufacturer agreement, and the manufacturer must pay applicable discounts for applicable beneficiaries as invoiced.

Beginning in 2014, all EGWP benefits beyond the parameters of the defined standard benefit will be treated as non-Medicare Other Health Insurance (OHI) that wraps around Part D. We excluded supplemental coverage offered through EGWPs from the definition of Part D supplemental benefits in § 423.100 in our 2012 rulemaking. However, as discussed in section II.E.14. of this final rule, the change was erroneously not included in the CFR. Therefore, we are making a technical change to rectify that problem. The change with respect to EGWPs was made so that the discount amount could be consistently and reliably determined. This was necessary to ensure that we can determine that the discount is always calculated accurately since we do not collect information on all EGWP retiree benefit arrangements to determine actual supplemental benefits. Not only would collecting such information be impractical, but we also believe instituting a requirement to collect the specific information on all such benefits would be so burdensome as to hinder the design of, the offering of, or the enrollment in employer plans. Consequently, the discount calculation is based upon the Part D Defined Standard benefit for all EGWPs beginning in 2014. While we believed that our justification for excluding any supplemental benefits offered through EGWPs from Part D benefits clearly indicated that the basic EGWP Part D benefits would be limited to Defined Standard benefit because that is the only way we can determine that the discount is calculated accurately, we took the opportunity to propose this specific requirement in § 423.2325(h)(1) to remove any ambiguity.

Comment: Some commenters strongly urged CMS to revise the policy established in our April 2012 rule that considers EGWP plan supplemental benefits to be outside of Part D, and therefore OHI. These commenters stated that treating EGWP benefits as OHI is inconsistent with the statute as it does not, on its face appear to result in direct reductions in beneficiary cost sharing. They state that since many EGWP enrollees do not experience a coverage gap the discounts are not used to offset beneficiary spending in the gap which is the original statutory intent. A few commenters stated that the current policy has led employer groups to migrate from Retiree Drug Subsidy plans to EGWPs which is costly to the taxpayer.

Response: We did not propose any changes to our existing policy with respect to EGWP supplemental benefits, and we decline to do so now. For the reasons set forth in our April 2012 rulemaking, we believe our current regulation is consistent with the statute. The purpose of this final rule is solely to clarify that basic EGWP benefits are to be based upon the Defined Standard benefit.

After considering the comments received, we are finalizing the portion of the provision which proposed that Part D sponsors offering employer group waiver plans must provide applicable discounts to EGWP plans as determined consistent with the Defined Standard benefit, except we are making a technical change to clarify that applicable discounts are available only to applicable beneficiaries enrolled in the EGWPs. We are not finalizing the proposed requirement that Part D sponsors of EGWPs disclose to each employer group the projected and actual manufacturer discount payments under the Discount Program attributable to the employer group's enrollees, at least annually or upon request.

**7. Transfer of TrOOP Between PDP Sponsors Due to Enrollment Changes During the Coverage Year (§ 423.464)**

Sections 1860D-23 and 1860D-24 of the Act specify that requirements for Part D sponsor coordination of benefits with State Pharmaceutical Assistance Programs and other plans providing prescription drug coverage, including treatment of expenses incurred by these payers toward a beneficiary's out-of-pocket (TrOOP) threshold. Part D coordination of benefit requirements are codified at § 423.464, which defines "other prescription drug coverage" for COB purposes to include, among other entities, other Part D plans, and specifies Part D plan requirements for determining when an enrollee has satisfied the out-of-pocket threshold.

Related regulations at § 423.104(d), codifying the requirements in section 1860D-2(b) of the Act, require sponsors to track beneficiary TrOOP and gross covered drug costs and correctly apply these costs to the benefit limits to correctly position the beneficiary in the benefit and provide the catastrophic level of coverage at the appropriate time. When a beneficiary transfers enrollment between Part D plans during the coverage year, the enrollee's gross covered drug costs and TrOOP must be transferred between plans and applied by the subsequent plan in its administration of the Part D benefit. The process for a prior plan to report these TrOOP-related data and for the new plan of record to receive, upload, and use the data position the beneficiary in the correct phase of the benefit was initially manual.

In 2009, this process was replaced by an automated process for TrOOP-related data transfer. Our guidance released in 2008 (HPMS memorandum dated October 21, 2008 titled, "Updated Part D Sponsor Automated TrOOP Balance Transfer Operational Guidance") described sponsor implementation of the automated TrOOP balance transfer process and reiterated sponsor requirements for data reporting by the prior plan and use of the data for proper positioning of the beneficiary in the benefit by the current plan. We have continued to specify these requirements in subsequent updated versions of the guidance.

To ensure Part D benefits are correctly administered when a beneficiary transfers enrollment during the coverage year, we proposed to codify these requirements in federal regulations. Specifically, we proposed to amend § 423.464(f)(2) by adding a new paragraph (C) requiring Part D sponsors to—

• Report benefit accumulator data in real time in accordance with the procedures established by CMS;

• Accept in real-time data reported in accordance with CMS-established procedures by any prior plans in which the beneficiary was enrolled, or that paid claims on the beneficiary's behalf, during the coverage year; and

**\*7935**  • Apply these costs promptly.

In our guidance on automated TrOOP balance transfer, we express our expectation that sponsors successfully transfer accumulator data for beneficiaries making enrollment changes during the coverage year in a timely manner 100 percent of the time. Although sponsors may be reporting and accepting these data in accordance with our expectations, we have been informed that some sponsors may not be promptly loading the data received into their systems so it is available for claims processing. As a result, the beneficiary's previously incurred costs and gross covered drug costs are not considered in the processing of claims received by the new plan sponsor soon after the enrollment change.

Comment: One commenter objected to the provision claiming it was vague and ill-defined and requested we include additional detail in lieu of deferring to sub-regulatory guidance.

Response: We disagree. The proposed regulatory text specifies the requirements for sponsors to report, accept and apply accumulator data. We believe the details of the transfer process are more appropriately addressed in guidance because they are procedural, and retaining them in guidance will preserve flexibility to adapt these procedures as the need arises. CMS and the industry developed the automated data transfer process in collaboration with National Council for Prescription Drug Programs (NCPDP) and have continued to work collaboratively to refine and improve the process. When a change in the transfer process is agreed upon and substantive requirements are unaffected, use of guidance permits us to issue updated instructions in a timely manner.

Comment: Three commenters expressed support for the provision.

Response: We appreciate the support for this provision and are adopting this provision as proposed with a minor change. That is, we are redesignating the current paragraph (B) in § 423.464(f)(2)(i)(B) as (C) and adding this provision as paragraph (B) to more logically sequence the requirements.


## 8. Expand Quality Improvement Program Regulations (§ 422.152)

Section 1852(e) of the Act requires MA organizations to have an ongoing quality improvement program for the purpose of improving the quality of care provided to enrollees.

We proposed revising paragraph (a) of § 422.152 in order to codify our recent expansion of the quality improvement program policies and revising paragraph (c) of § 422.152 to codify our recently expanded chronic care improvement program policies. The proposed revisions to these paragraphs more accurately reflect current quality care improvement program policies and requirements.

Additionally, paragraph (g) of § 422.152 lists quality improvement program requirements that are specific to special needs plans (SNPs). We proposed revising paragraph (g) to clarify that the requirements listed there are in addition to program requirements listed in paragraphs (a) and (f) of § 422.152 and are not instead of the regular quality improvement program requirements.

Finally, we proposed to delete paragraph (h)(2) of § 422.152 as it pertains to contract year 2010 and is no longer relevant.

We received the following comments and our responses are as follows:

Comment: We received several comments that supported § 422.152 overall and CMS efforts to implement policies that ensure high quality health care for enrollees.

Response: We thank the commenters for their support.

Comment: One commenter requested clarification as to what exactly has changed under § 422.152(c), "Chronic care improvement program requirements," as it appears to expand only one requirement and reorder the others.

Response: Our proposal, and the finalized rule here, revises paragraphs (c)(1)(ii) to add a requirement for the MA organization to evaluate participant outcomes (such as changes in health status), and add paragraphs (c)(1)(iii), (c)(1)(iv), and (c)(2). Paragraph (c)(1)(iii) requires performance assessments that use quality indicators that are objective, clearly and unambiguously defined, and based on current clinical knowledge or research, and (c)(1)(iv) requires systematic and ongoing follow-up on the effects of the chronic care improvement program. Finally, new paragraph (c)(2) requires

that the organization report to CMS on the results of each chronic care program. The proposed changes also included reorganization of the section to parallel requirements in paragraph (d), "Quality improvement projects."

Comment: One commenter requested whether recent changes to the SNP Model of Care (MOC) requirements would be the vehicle for evaluating compliance in relation to the effectiveness of a plan's Model of Care.

Response: This comment is outside the scope of the proposed changes to this provision because we did not propose, and are not finalizing in this rule, any changes to the SNP MOC requirements. Information about the MOC and associated requirements can be found in Chapter 5 of the Medicare Managed Care Manual.

Comment: One commenter requested clarification on the additional quality improvement program requirements for SNP plans.

Comment: The changes made to this provision do not create any new quality improvement program requirements for SNPs. The changes are to clarify the requirement that SNPs must comply with the requirements under paragraph (g) as well as those in paragraphs (a) through (f). The SNP-specific requirements in paragraph (g) do not replace the requirements in paragraphs (a) through (f), which apply to all plans, including SNPs.

Comment: A commenter requested whether Quality Improvement Project and Chronic Care Improvement Program results will be included in Star Rating measurements in the near future.

Response: This comment is outside the scope of the proposed changes to this provision as we did not propose, and are not finalizing in this rule, any Star Rating measures in connection with the quality improvement program requirement.

Comment: A commenter expressed opposition to expanded quality improvement requirements as a whole because MA organizations respond to such requirements by setting unrealistic targets for physicians. The commenter added that compliance must often be at 100 percent for a physician to qualify for a payment incentive.

Response: Our proposal codifies our recent expansion of the quality improvement program policies and revises paragraph (c) of § 422.152 to codify our recently expanded chronic care improvement program policies. The proposed revisions to these paragraphs more accurately reflect current quality care improvement program policies and requirements that are already in practice. While we understand the commenter's concern, we do not agree that codifying requirements that are already in practice will place any further burden on MA organizations and thus tangentially increase the burden on physicians. Additionally, while we understand that our recent expansion of our quality improvement program policies may have impacted MA organizations and, in turn, providers, the requirements do not specify any provider requirements or address payment incentives of any type. MA organizations and providers remain free to contract and make agreements on **\*7936** these topics without CMS interference, thus MA organizations have flexibility when shaping their provider processes, policies, and overall framework.

Comment: A commenter stated that CMS's guidance with respect to Quality Improvement Projects and Chronic Care Improvement Programs for SNP plans has been unclear.

Response: Our proposal, and this final rule, revises paragraph (g) to clarify that the requirements listed there are in addition to program requirements listed in paragraphs (a) and (f) of § 422.152 and are not in lieu of the quality improvement program requirements presented in paragraphs (a) and (f). We believe the revisions to the regulation clarify that Quality Improvement Project and Chronic Care Improvement Program requirements are the same for SNP and non-SNP plans.

After consideration of the public comments received, we are finalizing the proposed codification and clarification of our Quality Improvement Program regulation at § 422.152 without modification.

## B. Improving Payment Accuracy

### 1. Determination of Payments (§ 423.329)

In the January 2014 proposed rule, we proposed a technical change to § 423.329(d) to correctly describe the low-income cost-sharing subsidy payment amount as it is intended by statute and has been implemented and described in interpretive guidance by CMS. That amount had been defined in the regulation as the amount described in § 423.782. However, § 423.782 refers to the cost sharing paid by the beneficiary, not the cost-sharing subsidy paid on behalf of the low-income subsidy-eligible individual. The low-income cost-sharing subsidy amount is correctly described in Chapter 13 of our Medicare Prescription Drug Benefit Manual, Premium and Cost Sharing Subsidies for Low Income Individuals ((Rev. 13, 07-29-11), at http://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/Chapter13.pdf). As we stated in the proposed rule, under the basic benefit defined at § 423.100, the low-income cost-sharing subsidy payment amount is the difference between the Part D cost sharing for a non-LIS beneficiary under the Part D plan and the statutory cost-sharing for the LIS-eligible beneficiary. Under an enhanced alternative plan described at § 423.104(f), the cost-sharing subsidy applies to the beneficiary liability after the plan's supplemental benefit is applied. We proposed to amend § 423.329(d) consistent with this guidance.

We also explained in our proposed rule that pursuant to § 423.2305, any coverage or financial assistance other than basic prescription drug coverage, as defined in § 423.100, offered by an employer group health or waiver plan is considered "other health or prescription drug coverage." This definition applied to all of Medicare Part D. (See the April 12, 2012 final rule titled "Medicare Program; Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2013 and Other Changes" (77 FR 22082)). Therefore, the subsidy amount received by an employer group health or waiver plan is the subsidy amount received by a Part D plan offering defined standard coverage, as defined in § 423.100.

Based on the preceding, we proposed to amend § 423.329(d) by deleting the reference to §§ 423.782 and amending 423.329(d) to define the low-income cost-sharing subsidy payment amount on behalf of a low-income subsidy-eligible individual enrolled in a Part D plan for a coverage year as the difference between the cost sharing for a non low-income subsidy eligible beneficiary under the Part D plan and the statutory cost sharing for a low-income subsidy-eligible beneficiary.

In order to clarify that enhanced alternative benefits apply prior to determining the low-income cost-sharing subsidy payment amount, we clarify in this preamble and in the final regulation text that the low-income cost-sharing subsidy payment amount is the difference between the cost sharing (not the "Part D cost sharing," as proposed) for a non-LIS beneficiary under the Part D plan and the statutory cost sharing for the LIS-eligible beneficiary.

We received no comments on this proposal and are finalizing with a minor modification, as discussed previously.

### 2. Reopening (§ 423.346)

We proposed to amend the reopening provisions such that we may perform one reopening within 5 years after the date of the notice of the initial payment determination to the Part D sponsors. We also proposed to amend the provision to accommodate reopening the Coverage Gap Discount Reconciliation described at § 423.2320(b).

As we stated in the proposed rule, we had originally patterned the reopening provisions after the Medicare claims reopening regulations found in part 405, but now with a better understanding of the need for reopening a payment determination, we proposed to modify our regulation at § 423.346 to align with our experience. We stated that our

experience indicates to us that we will likely have to perform a reopening of the initial payment determination for every contract year, and we proposed to remove the current timeframes for a reopening described in § 423.346(a)(1) through (a)(3), remove paragraph (b) describing "good cause" referred to in paragraph (a)(2), modify paragraph (c) to eliminate the reference to "good cause," and amend paragraph (a) such that CMS may reopen one time within 5-years of notice of the initial payment determination.

As stated in the proposed rule, we believe that data stability will occur within 5 years of the notice of the initial payment determination. Within 5-years of the notice of the initial payment determination, additional prescription drug event (PDE) data or PDE adjustments associated with coordination of benefits will be submitted by Part D sponsors consistent with the timeframe described at § 423.466(b). We know that audits and other post reconciliation oversight activity often take place more than 5-years from notice of the initial payment determination. However, in light of the overpayment provision at section 6402(a) of the Affordable Care Act, which established section 1128J(d) of the Act and that we proposed to codify at § 423.360, we stated that we do not believe that it is necessary to reopen a payment reconciliation after that 5-year period, and that we believe it is not necessary to reopen a reconsidered payment determination. Therefore, we proposed to amend § 423.346(a) such that we will only reopen the initial payment determination and will not reopen a reconsidered payment determination.

With respect to determining whether to reopen a contract year, we stated that we will consider a number of issues, including, but not limited to, whether the contract has terminated and received a final settlement. We stated that we will not approve a request to reopen for a contract that has terminated and received a final settlement. We also stated that when we performed a reopening on our own initiative, contracts that have been terminated and settled will not be included in the reopening.

In addition, we proposed to establish a reopening provision for the Coverage Gap Discount Reconciliation for the same reasons and under the same authority that we established a reopening provision for the Part D payment reconciliation process described in our January 28, 2005 final **7937** rule titled, "Medicare Program; Medicare Prescription Drug Benefit" (70 FR 4316). We noted that in a Health Plan Management System (HPMS) memorandum dated April 30, 2010, we stated that the final reconciled discount program payments are subject to the reopening provision in § 423.346. Due to the invoicing process that continues to occur after the reconciliation process, we do not anticipate the need to reopen the Coverage Gap Discount Reconciliation. However, we want to leave open the option to reopen if unforeseen events result in underpayments or overpayments to Part D sponsors. Therefore, we proposed to amend § 423.346 to accommodate reopening a Coverage Gap Discount Reconciliation.

Based on the preceding, we proposed to revise § 423.346 by removing the phrase "or reconsidered" from paragraph (a), amending paragraph (a) to account for the proposed timing of the Part D reopening, removing paragraphs (a)(1) through (3) and (b)(1) through (3); adding a new paragraph (b) to accommodate a Coverage Gap Discount Reconciliation reopening; and revising paragraph (c) to eliminate the reference to "good cause."

We received the following comments and our responses follow:

Comment: A commenter stated that the past 6 years indicate that unforeseen issues arise and require multiple reopenings to address them properly. A commenter recommended that CMS relax the proposed regulation and not unnecessarily restrict CMS's ability to conduct more than one reopening. A commenter supported the goal of one reopening per contract year, but recommended that CMS set a threshold, such as a dollar amount, to restrict reopenings while preserving an appropriate amount of flexibility in the regulation to accommodate circumstances with a degree of materiality.

Response: We agree with the commenter that multiple reopenings may be necessary. We know from experience that there are unforeseen circumstances that require us to do multiple global or targeted reopenings for a contract year. Target

reopenings include reopening for a specific plan type (for example, PACE organizations) or for specific contracts or parent organizations. For this reason and also due to potential conflicts between the 5-year time frame of this proposed provision and the 6-year look-back period associated with the overpayment provision recently codified at § 423.360 (see 79 FR 29847), we are not finalizing the proposal to reopen one time within 5 years after the date of the notice of the initial determination to the Part D sponsors.

Our proposal to do one reopening within 5 years after the date of the notice of the initial determination may create difficulties for Part D sponsors to return overpayments that they identify and are required to report and return under § 423.360. Section 423.360 creates a 6-year look-back period at § 423.360(f). In accordance with § 423.360(f), a Part D sponsor must report and return any overpayment identified within the 6 most recent completed payment years. In our May 23, 2014 final rule, (79 FR 29843), we stated that CMS would recover plan-identified overpayment amounts through routine processing. For Part D, that means that if an overpayment is discovered, the Part D sponsor may fulfill its obligation to return the overpayment by requesting a reopening and submitting corrected data prior to CMS conducting the reopening. (For more information, see 79 FR 29923). To the extent possible, we want to allow for overpayments to be recovered through routine payment processes through the entire 6-year look-back period. The decision not to finalize our proposal to conduct one reopening within a 5-year period gives the Part D sponsor more flexibility to return overpayments and CMS more flexibility to collect overpayments through routine payment processes. Therefore, we are not finalizing the proposed provision that CMS will reopen one time within 5 years after the date of the notice of the initial determination to the Part D sponsors.

We note that we agree with the commenter that making the decision whether to reopen could be based on a dollar amount threshold. We currently consider several factors, including dollar amount, to determine whether to do a reopening. However, the decision of whether or not to do a reopening beyond the initial global reopening will be decided based on factors specific to the circumstance. For that reason, we will not codify a threshold or any other list of factors that would give rise to multiple reopenings.

Comment: A few commenters disagreed with our approach to do one global reopening. A commenter stated that unfocused reopenings would place a great burden on Part D sponsors, particularly when looking back as much as 5 years, and recommended that the current rule, requiring "good cause" for a reopening after 1 year after the final payment determination, remain in place. A commenter also considered the possibility of extending the timeframe beyond the current 4 years to 5 years for reopening with cause.

Response: Although we are not finalizing the proposed provision that we will reopen one time within 5 years after the date of the notice of the initial determination to the Part D sponsors, we disagree with the commenter's statement that unfocused reopenings will place a great burden on Part D sponsors. We conduct reopenings after we see stability in the PDE and DIR data. We track the number of PDEs that we receive for each contract year on a weekly basis. We know that the Part D sponsors and their contracted pharmacy benefit managers (PBMs) submit significant amounts of data after the Part D payment reconciliation cut-off date. The data continues to be submitted well after 1 year of the notice of the initial payment determination. Given the volume of new data that we receive after the notice of the initial payment determination, we believe that it is necessary to conduct at least 1 global reopening for every contract year in order to accurately reconcile the prospective payment made to Part D sponsors with the corresponding actual costs reported by the Part D sponsor on the PDEs.

In addition, and subsequent to our decision not to finalize the proposal that CMS perform one reopening within 5 year of the notice of the initial payment determination, we are not finalizing our proposal to remove the current timeframes for a reopening described in § 423.346 (a)(1) through (a)(3), remove paragraph (b) describing good cause referred to in paragraph (a)(2), or modify paragraph (c) to eliminate the reference to "good cause." In other words, Part D plan payment reopenings will continue to be conducted as described at the current regulation at § 423.346.

Comment: A commenter stated that experience would suggest that over the years since the Part D program's inception, we have all improved in our efforts at the reconciliation and reopening of the Part D financial books, and therefore, encouraged CMS to enforce a shorter reopening timeframe after plan year initial closure. Specifically, the commenter recommended that CMS decrease the amount of time that plan years remain not finally reconciled to 4 years, not 5 years. This commenter encouraged a shorter time frame than 5 years, because from financial and compliance perspectives, this commenter thought that it would be beneficial to have a true final "closure" of the plan year earlier rather than later, to reduce uncertainty and risk.

**\*7938** Response: We agree with the commenter that experience suggests that we have all improved our efforts at reconciliations and reopenings. We are also sympathetic to the Part D sponsors' desires to "close" a plan year. However, we are not finalizing the proposal that CMS will reopen one time within 5 years after the date of the notice of the initial determination to the Part D sponsors. As previously stated, we believe that the proposal, if finalized, may create difficulties for Part D sponsors to return overpayments that they identify and are required to report and return under § 423.360.

Comment: A commenter requested that CMS consider setting a time period for when global reopenings occur, so that the industry has some clarity and predictability around timing of the reopenings. This commenter thought that knowing when a reopening is expected would make planning for Part D sponsors and CMS much easier and more efficient.

Response: Although we are not finalizing the proposal to reopen one time within 5 years after the date of the notice of the initial payment determination to the Part D sponsors, we agree with the commenter that setting a time period for when global reopenings occur would provide clarity and predictability around timing of the reopenings. As our experience and efficiencies improve, we expect that the reopenings will fall into a predictable, yearly schedule. Based upon recent historical experience, we anticipate beginning the global reopening process for a benefit year 4 years after releasing the initial reconciliation reports. We, at our discretion, may conduct reopenings after this time to rectify overpayments or unexpected issues resulting from the initial reopening.

After consideration of the public comments we received, we are not finalizing the proposal that we will reopen one time within 5 years after the date of the notice of the initial payment determination to the Part D sponsors. Consequently, we are not finalizing our proposal to remove the current timeframes for a reopening described in § 423.346 (a)(1) through (a)(3), remove paragraphs (b) describing good cause referred to in paragraph (a)(2), or modify paragraph (c) to eliminate the reference to "good cause."

We did not receive specific comments on our proposal to modify § 423.346 to accommodate the Coverage Gap Discount Reconciliation. We proposed that, similar to the Part D plan payment reopening, the reopening for the Coverage Gap Discount would be conducted one time in a 5-year period. For the same reasons previously stated for the Part D plan payment reopening, we are not finalizing that the Coverage Gap Discount reopening be conducted once in a 5-year period. However, consistent with that proposal, we are incorporating the Coverage Gap Discount reopening into the reopening process described at § 423.346. Therefore, we finalize the Coverage Gap Discount Reconciliation reopening by modifying § 423.346(a) by adding the phrase "or the Coverage Gap Discount Reconciliation (as described at § 423.2320(b))" to the end of the introductory paragraph.

### 3. Payment Appeals (§ 423.350)

In our proposed rule, we proposed to revise § 423.350 to accommodate a Coverage Gap Discount Reconciliation appeals process under the same authority with which we established the Part D payment appeals process under section 1860D-15(d)(1) of the Act. Consistent with the Part D payment appeals process currently described at § 423.350, the proposed changes establish an appeals process where the final reconciliation of the interim Coverage Gap Discount Program (CGDP) payments may be subject to appeal. Consistent with the Part D payment appeals process, we also proposed to amend § 423.350(a)(2) to include information that is submitted and reconciled under § 423.2320(b) is final

and may not be appealed nor may the appeals process be used to submit new information after the submission of information necessary to determine retroactive adjustments and reconciliations. Also consistent with the Part D payment appeals process, we proposed that the request for a reconsideration of the Coverage Gap Discount Reconciliation must be filed within 15 days from the date of the final payment, which is the date of the final reconciled payment made under § 423.2320(b).

Based on the preceding, we proposed to revise § 423.350 by adding a new paragraph (a)(1)(v) to allow for an appeal of a reconciled coverage gap payment under § 423.2320(b), by revising paragraph (a)(2) to indicate that the payment information submitted to CMS and reconciled under § 423.2320(b) is final and may not be appealed, and by adding a new paragraph (b)(1)(iv) to define the timeframe for appealing the final reconciled payment under § 423.2320(b).

We received the following comment and our response follows:

Comment: A few commenters requested that CMS extend the proposed 15-day deadline to file a request for reconsideration to 30 days due to the complexity of the CGDP. A commenter noted that 30 days would be more consistent with the existing plan-to-plan process. Another commenter stated that the15-day deadline would result in more "defensive" appeal from plans attempting to protect their interest in payments prior to the expiration of the appeal period, even where the subject plan may not yet, at this time of appeal, conclude that any payment discrepancies were in fact the result of methodological errors. A commenter believed that the proposed 15-day deadline would increase the administrative burden for CMS in processing unnecessary appeals and impair the efficient use of plan resources, which raises overall plan administrative costs.

Response: We decline to modify § 423.350(b)(1) to extend the proposed 15-day deadline to file a request for reconsideration to 30 days for the CGDP. We believe that some commenters may think that the appeals process under § 423.350 is broader than it actually is. Section 423.350 describes the appeals process for the Part D payment reconciliation and, as we proposed, the Coverage Gap Discount Reconciliation. An appeal can be filed if a Part D sponsor believes that CMS did not correctly apply its stated payment methodology. An appeal for any other reason will be dismissed. If a sponsor identifies a data discrepancy, the sponsor would not file an appeal but would file a reopening request under § 423.346.

The Part D sponsors are in possession of the same data CMS uses to determine the Coverage Gap Discount Reconciliation. The Part D sponsors will have the data in advance of the reconciliation and can validate the data prior to the reconciliation. Therefore, we believe that the proposed 15-day deadline is an adequate time for a Part D sponsor to determine whether CMS has correctly applied its stated payment methodology and, if necessary, file a request for reconsideration.

After consideration of the public comments we received, we are finalizing § 423.350 as proposed.

### 4. Payment Processes for Part D Sponsors (§ 423.2320)

In our proposed rule, we proposed to amend § 423.2320 such that we will assume financial liability for the applicable discount by covering the costs of the quarterly invoices that go unpaid by a bankrupt manufacturer at the time of the Coverage Gap Discount Reconciliation described at **\*7939** § 423.2320(b). This will ensure that the Part D sponsors have the funds available to advance the gap discounts at the point of sale, as required under section 1860D-14A(c)(1)(A)(ii) of the Act. We also stated that we would file a proof of claim with the bankruptcy court to recover costs from the bankrupt manufacturer. We proposed that we would implement our policy by adjusting the Coverage Gap Discount Reconciliation for manufacturer discount amounts as they are reported on PDEs submitted by the submission deadline for the Part D reconciliation.

Based on the preceding, we proposed to add a new paragraph (c) to § 423.2320 to describe a process for accounting for quarterly invoiced amounts that go unpaid by a bankrupt manufacturer.

We received the following comment and our response follows:

Comment: Commenters strongly supported our proposal. One commenter requested that CMS expand upon the section to include scenarios other than bankruptcy.

Response: We appreciate the support expressed for our proposal. However, we will not be expanding § 423.2320(c) to include scenarios other than bankruptcy. We will cover the costs of unpaid quarterly invoices only in the event that a manufacturer becomes bankrupt and fails to pay the invoices. As stated in the proposed rule, if a manufacturer becomes bankrupt, we are concerned that a court will modify or reduce the amount of the civil money penalties (CMPs), rendering the CMPs ineffective for covering the cost of the invoices and leaving the Part D sponsor in the position of having to cover the costs of the gap discount. In all other scenarios, CMPs, described at § 423.2340, will cover the cost of the unpaid invoices.

In light of the comment that we received recommending that we expand our proposal to include scenarios other than bankruptcy, we clarify that this provision will apply only to adjust for quarterly invoices that go unpaid after the manufacturer has declared bankruptcy. As previously stated, in all other cases, CMPs will cover the costs of unpaid quarterly invoices.

Also, consistent with our proposal to adjust the Coverage Gap Discount Reconciliation amount of each of the affected Part D sponsors to account for the total unpaid quarterly invoiced amount owed to each of the Part D sponsors in the contract year being reconciled, we clarify in the regulation that we will only adjust the Coverage Gap Discount Reconciliation amount for unpaid quarterly invoices used for that particular Coverage Gap Reconciliation. Use of a particular set of quarterly invoices in a Coverage Gap Discount Reconciliation is consistent with our current process, and we are not modifying that process for the purposes of this provision. Therefore, we clarify that we will not adjust the Coverage Gap Reconciliation amount for unpaid quarterly invoices that are not specifically used in that contract year's Coverage Gap Reconciliation.

After consideration of the public comments we received, we are finalizing § 423.2320(c) as proposed, with the minor clarifications discussed.

### 5. Risk Adjustment Data Requirements (§ 422.310)

In addition to the provisions addressed in the May 23, 2014 final rule (79 FR 29847),[FN8] we proposed to align § 422.310 regarding submission of risk adjustment data with § 422.326 by making a change in paragraph (g); specifically, we proposed the deletion of the January 31 deadline in paragraph (g)(2)(ii) and replacing it with the statement that CMS will announce the deadline by which final risk adjustment data must be submitted to CMS or its contractor. This would allow the risk adjustment data submission deadline to also function as the Part C applicable reconciliation date for purposes of § 422.326 on overpayment rules because § 422.326(a) refers to the annual final deadline for risk adjustment data submission as a date "announced by CMS each year."

---

8    We proposed three amendments to § 422.310 in our January 10, 2014 proposed rule. In the May 23, 2014 final rule, we finalized one proposal, stated that we would not finalize the second proposal, and would finalize the third proposal at a later time. (See the May 23, 2014 final rule (79 FR 29848, 29925, and 29926). The third proposal is addressed in this final rule.

In response to the January 10, 2014 proposed rule, we received approximately six pieces of correspondence from organizations and individuals regarding this specific proposal to replace the January 31 deadline with a date announced annually by CMS. We received the following public comments and our responses follow.

Comment: A few commenters supported CMS' proposal to remove the current date of January 31 as the annual final risk adjustment data submission deadline and replace it with the provision that CMS will announce the deadline annually, with the proviso that CMS' timing of this annual deadline always allow sufficient opportunity for organizations to make final data submissions. Several other commenters stated their concern about this proposed change in deadline, including a concern that CMS might announce a deadline earlier than January 31 in some years. These commenters requested that CMS clarify that the annual deadline would never be before January 31, and a few commenters suggested that the regulation state that the deadline is January 31 but may be extended. Finally, a few commenters requested that CMS not change the January 31 date to a floating date, in order to allow operational stability.

Response: Our goal for eliminating January 31 as the final risk adjustment data submission deadline was to align this deadline at § 422.310(g)(2)(ii) with the overpayment provisions in § 422.326, so that the final risk adjustment data submission deadline would also function as the Part C applicable reconciliation date set forth in the overpayment provisions. As noted in the proposed rule, in order to align with the overpayment provisions, each year we expect to announce a date that would accommodate the current subregulatory guidance that MA organizations review the monthly enrollment and payment reports they receive from CMS within 45 days of the availability of the reports. We make these reports available to MA organizations each month according to an operational schedule that we release each year. Therefore, we expect to announce a final risk adjustment data submission deadline that falls on or just after the conclusion of this 45-day period for the January payment, which would be about 6 weeks after the end of the payment year, and no earlier than the current January 31 deadline.

We do not expect the date of the annual final risk adjustment data submission deadline to vary much from year to year but we believe that providing flexibility in the regulation text is necessary to accommodate the operational routines of our systems.

In response to comments, we are finalizing our provision at § 422.310(g)(ii) with modification, stating that the final risk adjustment data submission deadline will be announced by CMS each year and will be no earlier than January 31.

### C. Strengthening Beneficiary Protections

### 1. MA-PD Coordination Requirements for Drugs Covered Under Parts A, B, and D (§ 422.112)

Under § 422.112(b) of the MA program regulations, coordinated care plans must ensure continuity of care and integration of services through arrangements with contracted providers. We believe that an important aspect of **\*7940** this coordination is ensuring that all needed services, including drug therapies, are provided in a timely manner. Certain drug classes, including certain infusion agents, oral anticancer therapies, oral anti-emetics, immunosuppressants, and injectables, may be covered by Part D only when coverage under Parts A or B is not available. Because coverage of these drugs cannot generally be determined based solely on the drug, plan formularies often apply prior authorization criteria before claims can be paid at the point-of-sale (POS). Additionally, when an MA-PD plan issues an adverse Part D coverage determination because they have determined the drug is covered under Parts A or B, we expect MA-PD plans to ensure the drug is provided under the Parts A and B basic benefit.

In the January 2014 proposed rule, we proposed to add a new paragraph (b)(7)(i) to § 422.112 to require MA-PDs to establish and maintain a process to ensure that appropriate payment is assigned at the POS. In the preamble, we characterized this as a proposal to require MA-PDs to establish adequate messaging and processing standards with network pharmacies to achieve this goal.

We also proposed to add a new paragraph (b)(7)(ii) to § 422.112 to require that MA-PD plans issue the determination and authorize or provide the benefit under the applicable part (A, B or D)—which would require the MA-PD plan to proactively coordinate their enrollees' prescription drug coverage under Parts A, B and D—in order to ensure that enrollees receive Medicare covered prescription drugs as expeditiously as the enrollee's health condition requires. We stated in the preamble that if a denial under Part D is based on the existence of coverage under Parts A or B, the MA-PD plan should authorize or provide the drug under that other benefit without requiring the enrollee to make a subsequent request for coverage under that other benefit. Such determinations about the coverage of the drug would have to be provided in accordance with part 422, subpart M and part 423, subpart M, when a party requests a coverage determination.

We received the following comments on this proposal and our responses follow:

Comment: Beneficiary advocacy groups, some health plans, and pharmacy groups expressed their support for our proposal to strengthen coordination of benefit requirements applicable to MA-PD plans. Those commenters believe that requiring more appropriate messaging at the POS would decrease enrollees' confusion and serve to improve coordination of benefits.

One commenter urged CMS to adopt a policy to treat presentation of a prescription at the pharmacy counter by an enrollee as a request for a Part D coverage determination and the response from the plan as an initial coverage determination, giving the enrollee access to the appeals process. The commenter stated it is especially important for claims rejected at the POS under Part D because coverage may be available under Part A or Part B from the same MA entity, to be treated as a request for a coverage determination to avoid delays in access.

Another commenter stated that CMS' longstanding policy that presentation of a prescription at the pharmacy counter is not considered a request for a coverage determination may seem like CMS is requiring the enrollee to request an initial coverage determination twice, contrary to our statement in the proposed rule that enrollees should not have to make an initial request more than once. Furthermore, the comment states that many, if not most, plans do not choose to treat presentation of a prescription as a request for a coverage determination because the pharmacy is not a representative of the plan trained to accept such requests on the plan's behalf, including collecting all the necessary information from the enrollee, conveying it to the plan within the required timeframe, and documenting its activities in this regard.

Response: We appreciate the commenters' support for our proposal, but would like to clarify that we are not requiring MA-PDs to pay at the POS for all drugs that might be covered under Parts A, B or D in all circumstances, nor are we requiring plans to treat a POS claim transaction as a request for a coverage determination. As we have stated since the inception of the Part D program, neither the presentation of a prescription at the pharmacy, nor a POS claim transaction constitutes a coverage determination or a request for a coverage determination by the plan. If a rejected claim cannot be resolved at the POS, the Part D plan is required to transmit a code to the network pharmacy instructing the pharmacy to provide the enrollee with the standardized pharmacy notice that advises the enrollee of the right to request a coverage determination from the plan. A coverage determination request must be made directly to the Part D plan by the enrollee, the enrollee's representative, or the prescriber. Pharmacy staff does not have all of the information necessary to make a coverage determination on behalf of the plan.

Comment: A commenter requested that CMS clarify that it does not prevent pharmacies from accessing readily available information to assist with appropriate payment determinations at the POS.

Response: We would like to clarify that we do not prohibit pharmacies from using or transmitting to the MA-PD plan readily available information for purposes of determining appropriate payment at POS. This final rule does not change the guidance contained at section 20.2.2 of Chapter 6 of the Medicare Prescription Drug Benefit Manual, (Rev 10, 2-19-10), with respect to readily available information accessed by the pharmacy. The MA-PD plan will have

met appropriate due diligence standards under Part D and the regulations implemented via this final rule without further contacting a physician if necessary and sufficient information is provided on the prescription, and the contracted pharmacy is able to communicate this information to the sponsor to assist in assigning appropriate payment at the POS.

Comment: A few commenters requested that CMS extend this proposal to out-of-network pharmacies.

Response: We disagree with these commenters. Plans do not have an established relationship with out of network pharmacies and, therefore, applying this proposal to them would be impractical.

Comment: Most commenters expressed strong support regarding CMS' proposal to coordinate Parts A, B, and D drug coverage during the coverage determination process.

Response: We thank commenters for their support. We will continue to work with stakeholders to explore program enhancements that may be more uniquely suited for plans that offer both Parts A, B and D benefits. We are exploring the possibility for future subregulatory guidance on this topic.

Comment: Several commenters suggested that CMS work with the Congress to simplify Medicare drug coverage by establishing clearer and simpler rules such as covering all prescription drugs under Part D instead of having coverage also under Parts A and B. Furthermore, a commenter urged CMS to consider using its regulatory authority to achieve some simplification by, for example, covering exclusively under Part D all drugs that are currently covered under Part D in the vast majority of cases.

Response: We appreciate commenters' desire for simpler coverage policies for  **7941** Medicare-covered prescription drugs. However, as recognized in the comments, statutory changes would be needed to simplify coverage and payment rules, which is outside the scope of this rulemaking. We will evaluate what appropriate simplifications we may be able to make using current regulatory authority.

Comment: Many commenters stated that although they are supportive of CMS' intention to ensure that beneficiaries are able to obtain their prescriptions without the inconvenience and delays that are due to differences in the coverage rules for drugs under Parts A, B, and D, there are going to be circumstances that require the enrollee or someone on the enrollee's behalf to request a coverage determination from the MA-PD. They suggested that CMS revise the proposed rule language to recognize that "timely" adjudication might not, and often cannot, occur at the POS because information that is essential to determining whether a drug is covered under Parts A or B often is not available at the POS and must be obtained from the prescriber and sometimes an organization determination also is required from the MA-PD. Pharmacy groups say they follow up with prescribers and MA-PDs, but delays are inevitable when those steps have to be taken.

Response: As indicated in the proposed rule, our intention is to add proposed § 422.112(b)(7)(i) to our regulatory provisions in an effort to improve at the POS the care continuity and coordination between Part D drug benefits and Parts A and B drug benefits administered by the MA-PD, not to establish a requirement that pharmacies be responsible for making coverage determinations. Although plans have the discretion to treat POS transactions as coverage determinations, it is our understanding that network pharmacies do not receive all of the information needed to act on behalf of hundreds of Part D sponsors in making robust coverage determinations and generating the required denial notice with detailed formulary information and appeal rights. Additionally, the current HIPAA transaction standards do not support the type and volume of information that would be necessary to treat POS rejections as adverse coverage determinations.

We realize that there will be circumstances in which the information necessary to determine whether a drug that is not covered under Part D would be covered under Parts A or B will not be available at the POS. In those cases, enrollees will receive the standardized pharmacy notice that explains the right to contact the plan for a coverage determination.

However, we do believe that MA-PDs, by working with their network pharmacies and prescribers, are capable of a high degree of coordination and continuity. Through those collaborative efforts, the network pharmacy can often acquire information needed to obtain an edit override from the plan or otherwise ensure that the claim can be processed and paid at the POS.

Comment: Some commenters suggested that CMS adopt use of specific prior authorization codes, increased interoperability across electronic systems, and changes to Medicare's Common Working File (CWF) in order to make drug coverage determinations possible at the POS and decrease billing errors.

Response: We appreciate those suggestions and expect that MA-PDs and their network pharmacies will explore enhancements to their systems to improve communications and otherwise streamline their processes in order to ensure timely and accurate processing of POS transactions. We welcome suggestions for appropriate approaches that would support such improvements but decline to adopt rules to that effect at this time.

Comment: A few commenters stated that CMS' proposal to have plans pay for a drug and subsequently chase the responsible party for reimbursement would be inefficient and costly.

Response: We clarify for those commenters that neither our proposed nor this final rule include any provision that will require MA-PDs to pay for or cover a drug for an enrollee when another payor is responsible for that payment, or when a payment determination cannot be made at the POS. We agree that a "pay and chase" policy would not be efficient, and is not always in the best interest of the enrollee. As we discussed in the proposed rule, implementing a requirement to authorize all claims at the POS may interfere with medically appropriate pre-authorization requirements and may trigger retrospective enrollee liability depending on the difference in enrollee cost-sharing for coverage under Parts A, B, and D, retrospective TROOP adjustments and Part D reconciliation (79 FR 2009). We are finalizing the proposal to require MA-PDs to coordinate with their network pharmacies and prescribers to improve existing processes and develop new ones in order to ensure that enrollees receive their Medicare-covered prescribed medications, without delay, when they present at the network pharmacy.

After considering the comments, we are revising § 422.112(b)(7)(i) by deleting the reference to "claims adjudication" so there is a clearer distinction between the POS requirements addressed in paragraph (b)(7)(i) from the coverage determination requirements referenced in paragraph (b)(7)(ii). We are finalizing paragraph (b)(7)(i) to state that MA-PD plans must establish and maintain a process to ensure timely and accurate POS transactions. Compliance with this requirement may be achieved using adequate messaging and other procedures with network pharmacies to ensure care continuity and coordination at the POS between Part D drug benefits and Parts A or B drug benefits administered by the MA-PD.

When processing a coverage determination for a prescription drug that may be covered under Parts A, B or D, if the MA-PD determines, as part of the coverage determination process, that the requested drug is not covered under Part D, it must then evaluate whether the drug in question is covered under Parts A or B. The MA-PD is responsible for providing a clear explanation of its decision, including the decision to cover the requested drug under a different benefit and how to obtain the drug (for example, instructions to take the plan decision notice to the pharmacy to obtain the requested drug) in the Part D standardized denial notice. We expect to work with stakeholders to explore program enhancements that may be more uniquely suited for plans that offer both Parts A, B, and D benefits. We are finalizing, as proposed, § 422.112(b)(7)(ii) and are exploring possibilities for future subregulatory guidance on this topic.

## 2. Good Cause Processes (§§ 417.460, 422.74 and 423.44)

Section 1851(g)(3)(B)(i) of the Act provides that MA organizations may terminate the enrollment of individuals who fail to pay basic and supplemental premiums after a grace period established by the plan. Section 1860D-1(b)(1)(B) of the Act generally directs us to establish regulations related to enrollment, disenrollment, and termination for Part D plan

sponsors that are similar to those established for MA organizations under section 1851 of the Act. In addition, section 1860D-13(a)(7) of the Act mandates that the premiums paid by individuals with higher incomes be increased by the applicable Part D income related monthly adjustment amount (Part D IRMAA), for the months in which they **\*7942** are enrolled in Part D coverage. Consistent with these sections of the Act, subpart B in both the Part C and Part D regulations sets forth requirements with respect to involuntary disenrollment procedures at § 422.74 and § 423.44, respectively. An MA or Part D plan that chooses to disenroll beneficiaries for failure to pay premiums must be able to demonstrate that it made a reasonable effort to collect the unpaid amounts by notifying the beneficiary of the delinquency, providing the beneficiary a period of no less than 2 months in which to resolve the delinquency, and advising the beneficiary of the termination of coverage if the amounts owed are not paid by the end of the grace period.

In addition, current regulations at § 417.460(c) specify that a cost plan, specifically a health maintenance organization (HMO) or competitive medical plan may disenroll a member who fails to pay premiums or other charges imposed by the plan for deductible and coinsurance amounts. With the exception of the grace period, the procedural requirements for cost plans to disenroll a member for failure to pay premiums are similar to those for MA and Part D plans. The cost plan must demonstrate that it made reasonable efforts to collect the unpaid amount and sent the enrollee written notice of the pending disenrollment at least 20 days before the disenrollment effective date.

In the April 2011 final rule (76 FR 21432), we amended both the Parts C and D regulations at § 422.74(d)(1)(v), § 423.44(d)(1), and § 423.44(e)(3) regarding involuntary disenrollment for nonpayment of premiums or Part D IRMAA to allow for reinstatement of the beneficiary's enrollment into the plan for good cause. In the April 2012 final rule (77 FR 22071), we extended the policy of reinstatement for good cause to include beneficiaries enrolled in cost plans in § 417.460(c)(3), thus aligning the cost plan reinstatement provision with the MA and PDP provisions. These good cause provisions authorize us to reinstate a disenrolled individual's enrollment without an interruption in coverage in certain circumstances where the non-payment was due to circumstances that the individual could not reasonably foresee or could not control, such as an unexpected hospitalization. Since its inception, the process of accepting, reviewing, and processing beneficiary requests for reinstatement for good cause has been carried out exclusively by CMS. However, we have received feedback from plans on ways to improve the good cause process and make it more efficient for both the plans and CMS. Based on this feedback, we updated Chapter 2 of the Medicare Managed Care Manual and Chapter 3 of the Medicare Prescription Drug Benefit Manual to clarify the language of the notice provided to beneficiaries, and the process and timing of receiving payments during the extended grace period in connection with § 417.460(c)(3), § 422.74(d)(1)(v), and § 423.44(d)(1)(vi). In addition, we updated the Complaints Tracking Module (CTM) Standard Operating Procedures (SOP) to permit plans to transfer requests for reinstatement for good cause to CMS.

In light of ongoing feedback, in the January 2014 proposed rule we proposed to amend § 417.460(c)(3), § 422.74(d)(1)(v), and § 423.44(d)(1)(vi) to permit an entity acting on behalf of CMS to effectuate reinstatements when good cause criteria are met. This proposal would allow us to designate another entity, including a plan (MA organization, Part D sponsor, or entity offering a cost plan) to carry out portions or all of the good cause process. While we envisioned an expanded role for plans to accept incoming requests for reinstatement directly from former enrollees, which would allow them to be more responsive to their current and former members, we stated that ensuring objectivity in the review of these cases and equity among beneficiaries regarding the determination of good cause was critically important. Accordingly, we indicated that we would establish operational policy and processes in subregulatory guidance to set parameters for the application of the good cause standard, including the submission to us of certain cases for review to ensure that plans remain impartial and equitable in their assessment and treatment of former members who have been disenrolled for nonpayment of premiums. These changes would be accompanied by the development of an oversight protocol for any activities assigned to a designee that are currently carried out by CMS.

In addition, we proposed a technical change to the language in § 417.460 to clarify that good cause protections for enrollees in cost plans apply to instances where there was a failure to pay either plan premiums or other charges.

We received the following comments and our responses follow:

Comment: Commenters expressed both support for and opposition to our proposal to allow an entity acting on behalf of CMS to effectuate reinstatements when it is determined that good cause criteria are met. Several commenters agreed that plans or an independent contractor could perform this function if provided appropriate guidance and that this new process could produce efficiencies that would be advantageous to beneficiaries, plans and CMS. Other commenters believed that only CMS or an independent contractor would have the knowledge and impartiality to consider these cases appropriately. In addition, a few commenters expressed concerns with the quality of work currently performed by plans and CMS contractors and did not believe that their current performance warranted an increase in responsibility.

Response: We thank commenters for their feedback in response to this proposal. We continue to believe that with proper guidelines, instructions and oversight, entities to which we assign this activity could review and process good cause requests in an appropriate manner. Given the feedback we have received since establishing the good cause review process handled exclusively by us, we have learned that some good cause reinstatement requests could be resolved more efficiently by plans since they can readily access a former enrollee's premium billing and payment history, and as such, are well positioned to more easily resolve disenrollment disputes that are erroneously being treated, at least initially, as good cause requests.

We fully understand that impartiality would be a key concern if this function is performed by plans. That is why we noted in the January 2014 proposed rule that if we were to exercise the authority we proposed to include in these regulations, an oversight protocol would be developed and CMS would retain the right to review cases to ensure that determinations made by a CMS designee are in line with our guidance.

Comment: Under the assumption that plans would be given the responsibility to perform good cause reviews, a few commenters had questions about the plans' scope of responsibility. Specifically, a commenter questioned whether plans would be permitted to refer a case to CMS for review and decision. Another commenter questioned whether plans would be able to opt out of this work if they did not want to take on the burden or costs related to this activity. Lastly, a commenter questioned whether or not beneficiaries would be able to appeal the plan's decision.

Response: In the event we assign the good cause process to plans, the expectation would be that they perform the work from start to finish (that is, intake, research, decision, notification, **\*7943** and effectuation). We would provide guidance regarding these activities in our enrollment manuals (Chapter 2 and Chapter 17, Subchapter D, of the Medicare Managed Care Manual and Chapter 3 of the Medicare Prescription Drug Benefit Manual) and, as part of the designation, we would retain the authority to review both favorable and unfavorable decisions to ensure that results are fair and sound. In addition, as mentioned previously, we would develop an oversight protocol to ensure that plans are compliant with our guidelines. As with other MA and Part D policies, we realize that sometimes plans need feedback or guidance from us to address certain unique issues. That would continue to be the case for good cause reviews, but the expectation would be that once we assign this process to plans, they would develop their own internal processes for reviews, based on our guidance, and carry out the majority of this workload without involving us.

Beneficiaries do not currently have the right to appeal good cause determinations. Ultimately our goal is to streamline the good cause review process and make it easier for all parties (beneficiaries, plans, and CMS) to navigate. As such, we believe that the key to any successful delegation of this work to the plans would be providing clear and complete guidance to plans, but not adding another layer of review to the process.

Finally, should we conclude that plans are appropriate entities to perform good cause reviews, we would assign this function to all plans, and under the revisions to the regulations being finalized here, we would require plans to accept this additional responsibility. Specifically, we are finalizing the revisions to the applicable regulations to provide that a third party to which CMS has assigned this responsibility, such as an entity offering a cost plan, a MA organization,

or a Part D plan sponsor, may reinstate an enrollee based upon the good cause showing. We believe it would be more complicated operationally, and confusing to beneficiaries, if we did not implement a uniform process for handling requests for reinstatement.

Comment: A commenter expressed support for the proposed revision to include language regarding a cost plan enrollee's ability to request reinstatement for good cause not only for failure to pay premiums, but also for nonpayment of "other charges" including deductibles and cost-sharing.

Response: We thank the commenter for their support for this regulatory change and for confirmation of the need to expand this beneficiary protection to cost plan enrollees.

After careful consideration of these comments, we are finalizing the proposed amendments to the regulations with modifications to clarify that the third party to which CMS may assign this responsibility may be an MA organization, a Part D sponsor or an entity offering a cost plan.

**3. MA Organizations' Extension of Adjudication Timeframes for Organization Determinations and Reconsiderations (§ 422.568, § 422.572, § 422.590, § 422.618, § 422.619)**

Sections 1852(g)(1)(A) and 1852(g)(2) of the Act respectively require MA organizations to make all organization determinations on a timely basis, and to provide for reconsideration, or review, of organization determinations within a timeframe specified by the Secretary, but no later than 60 days from the date of receipt of the request for reconsideration. Section 1852(g)(3)(B) of the Act requires MA organizations to maintain procedures for expediting organization determinations and reconsiderations when a physician's request indicates that applying the standard timeframe could seriously jeopardize the life or health of the enrollee or the enrollee's ability to regain maximum function or when, in the case of an enrollee's request, the MA organization makes such a determination on its own. In expedited cases, the MA organization generally must issue its decision no later than 72 hours from receipt of the request. Section 1852(g)(3)(B) (iii) of the Act permits the Secretary to extend this 72-hour decision-making timeframe in certain cases.

Our existing regulations at 42 CFR part 422, subpart M, codify the procedures MA organizations must follow in issuing standard and expedited organization determinations and reconsiderations, including setting forth the required adjudication timeframes and the circumstances under which plans are permitted to extend those timeframes.

As we stated in the proposed rule (79 FR 2011), we believe the current language that permits extension of the adjudication timeframes set forth in § 422.568(b), § 422.572(b), § 422.590(a)(1), and § 422.590(d)(2) is being interpreted more broadly than we intended and that MA organizations are regularly invoking extensions of the adjudication timeframes for organization determinations and reconsiderations. Based on information ascertained during recent MA program audits, we have seen circumstances in which MA organizations are routinely and inappropriately invoking the 14-day extension in cases where the plan: (1) Lacks adequate internal controls to ensure coverage requests are reviewed and adjudicated within the required regulatory timeframe; and (2) is awaiting receipt of supporting clinical documentation from one of its contract providers.

Routinely invoking an extension of the applicable adjudication timeframe is counter to the intent of the statutory and regulatory requirements for timely determinations that emphasize the health needs of the beneficiary in determining the appropriate adjudication timeframe. Extensions that are not affirmatively requested by the enrollee should be permitted only in limited circumstances, and only if the extension is in the enrollee's interest. MA organizations are required by regulation to render all coverage decisions as expeditiously as the enrollee's health condition requires. When plans choose to subject an item or service to a prior authorization requirement, we expect them to have the resources to process those requests in a timely manner.

In the proposed rule, we suggested revising these regulatory provisions to clarify our intended standard for when it is appropriate for an MA organization to extend an adjudication timeframe. Specifically, we proposed the following changes:

• At § 422.568(b), § 422.572(b), and § 422.590(e), to add new text and to restructure the regulation paragraphs for clarity.

• At § 422.568(b)(1)(ii), § 422.572(b)(1)(ii), and § 422.590(e)(1)(ii), to clarify that an extension may be justified and in the enrollee's interest due to the need to obtain additional medical information, which may result in changing the MA organization's denial of coverage of an item or service only from a non-contract provider.

• At new § 422.568(b)(1)(iii), § 422.572(b)(1)(iii), and § 422.590(e)(1)(iii), to clarify that an extension of the adjudication timeframe may be permitted when the extension is justified due to extraordinary, exigent or other non-routine circumstances, and it is in the enrollee's interest.

• To make corresponding technical edits to subpart M to improve clarity in our guidance related to extensions and to remove duplicative language (that is, to remove § 422.590(d)(2) and add a new § 422.590(e), to update cross references in § 422.618(a)(1) and § 422.619(a), to make changes within § 422.568(b), § 422.572(b), and § 422.590(d) to ensure  **\*7944** consistency in the structure and language of these provisions).

We received the following comments on this proposal and our responses follow:

Comment: Several commenters expressed general agreement that extensions to adjudication timeframes for organization determinations and reconsiderations should not be invoked routinely. Some commenters expressed strong support for this proposal and stated that it would reduce inappropriate delays in coverage decision-making and, therefore, reduce current delays in access to needed care that result from more routine use of extensions.

Response: We appreciate the support expressed by these commenters. The clarifications we proposed reinforce longstanding statutory and regulatory program requirements for timely decision-making that emphasize the beneficiary's health condition and the urgency of the requested item or service.

Comment: A few commenters who did not support the proposal stated that both contract and noncontract providers are not always responsive to plan requests for clinical information. A commenter further stated that MA organizations should not be penalized for delays resulting from third parties' failure to provide documentation necessary for a timely coverage decision. Another commenter added that it is not realistic to expect contract providers to produce complete medical documentation in response to every coverage request, and that it is not reasonable to expect provider contracting to ensure that full documentation is produced without the need for extensions. Because of those concerns, these commenters did not believe MA organizations should be restricted from using extensions on the basis of the provider's contracting status.

Response: We have considered contract providers as agents of the MA organization offering the plan, and we believe it is reasonable to expect MA organizations to use provider contracting to establish a wide range of expectations for network providers to ensure compliance with program rules, including timely receipt of relevant clinical documentation. MA organizations remain responsible for compliance with MA rules and requirements, even when using contractors or other entities to fulfill those responsibilities. (For more detailed information, see § 422.504(i)). We expect the contract terms between MA organizations and their contract providers to properly incentivize contract providers, as necessary, to produce requested clinical records in a timely manner.

We appreciate that health care providers working with managed care plans must navigate a complex and changing health care environment and routinely contract with multiple plans. However, we do not agree that these challenges should

prevent MA organizations from rendering coverage decisions that are completed as expeditiously as the enrollee's health condition requires. The contractual arrangement with network providers is an important tool plans can use to ensure compliance with these beneficiary protections.

We expect plans to promptly solicit and obtain contract providers' clinical documentation when an enrollee requests coverage of an item or service. When the case file contains incomplete information, we expect plans to work diligently with contract providers to cure the defect while adhering to the requirement to issue all decisions as expeditiously as the enrollee's health condition requires. As stated previously and described in more detail later in this final rule, the new regulation text at § 422.568(b)(1)(iii), § 422.572(b)(1)(iii) and § 422.590(e)(1)(iii) clarifies that extensions are permitted—regardless of provider contracting status—if necessary clinical documentation is not readily available due to extraordinary, exigent or other non-routine circumstances.

We believe that plans can mitigate overuse of extensions by correcting other common compliance problems. For example, plans often receive audit findings for failure to conduct timely or sufficient outreach to providers to obtain necessary clinical information during the coverage determination process. Ensuring reasonable and diligent provider outreach will improve the plan's ability to issue timely decisions based on consideration of complete clinical information.

We expect plans to make reasonable, timely, and diligent efforts to obtain medical records from both contract and non-contract providers without having to extend the adjudication timeframe. However, we agree with the commenters that MA organizations have little control over a non-contract provider who does not respond to the plan's requests for documentation. For this reason, we are clarifying at § 422.568(b)(1)(ii), § 422.572(b)(1)(ii) and § 422.590(e)(1)(ii) that extensions are permitted when the plan is seeking clinical information from a noncontract provider, as long as the extension is in the enrollee's best interest. While we acknowledge this limitation, we nevertheless expect plans to make reasonable efforts to obtain necessary information from noncontract providers in a manner which affords the enrollee a timely decision.

We believe our proposed changes strike the appropriate balance between minimizing the burden on MA plans and providers (both contract and non-contract) and protecting enrollees' statutory right to timely decisions and to timely access to the appeals process.

Comment: A few commenters disagreed with our proposal because they believed that CMS was eliminating all extensions.

Response: It appears that these commenters misunderstood our proposed change. This change will not eliminate extensions. Extensions of up to 14 days will continue to exist for both standard and expedited requests for organization determinations and reconsiderations. As we stated in the proposed rule, we proposed these changes to clarify our existing intent that extensions at the MA organization's behest should only be taken on a limited basis and only when they are in the enrollee's interest.

Comment: Several commenters—both supportive and not supportive of CMS' proposal—noted that consideration of complete clinical documentation during the coverage decision process is in the best interest of the enrollee. Some of those commenters who disagreed with our proposal also stated that use of extensions to obtain missing clinical information when the plan is seeking that information is, therefore, also in the best interest of the enrollee. Likewise, some of these commenters expressed a belief that not taking an extension would be detrimental to enrollees by resulting in increased denials and delays in access to care.

Response: While we agree that it is in the best interest of an enrollee that the MA organization reviews complete clinical information when adjudicating a coverage request, we disagree with the commenters that use of extensions is in the best interest of the enrollee when such extensions are taken in the absence of extraordinary, exigent, or other non-routine

circumstances. Section 1852(d) of the Act requires reasonably prompt access to medically necessary services—including compliance with provider network adequacy requirements established at § 422.112 of the regulations—and section 1852(g) of the Act requires timely coverage decisions that emphasize the health needs of the beneficiary in determining the appropriate adjudication timeframe. We do not believe that complete consideration of clinical documentation **\*7945** and adjudication within the established timeframes are mutually exclusive activities. We established MA adjudication timeframes with strong support from stakeholders, including the managed care industry, and physician groups. (For a more detailed discussion, see the June 29, 2000 Federal Register (65 FR 40278)). Therefore, we do not believe that our proposed changes will cause a delay in access to care since MA organizations should be able to obtain the necessary information and render a decision within the established timeframes.

The new regulatory provisions at § 422.568(b)(1)(iii), § 422.572(b)(1)(iii) and § 422.590(e)(1)(iii) permits MA plans to invoke an extension in limited circumstances where timely receipt of necessary clinical information is not possible, for example, if a provider's office is flooded and additional time is needed to reach the provider and/or to obtain off-site or electronic records that would support a favorable coverage decision. We recognize that these extraordinary, exigent or other non-routine circumstances may arise regardless of whether the provider(s) involved has a contract with the plan; therefore, these extensions are not restricted to noncontract providers.

Comment: A commenter recommended that, instead of finalizing this proposal, CMS should use its existing oversight authority to take compliance or enforcement action against the MA organizations that over utilize extensions of adjudication timeframes.

Response: We agree with this commenter that imposing corrective action on MA organizations that are routinely noncompliant with required decision-making timeframes is an appropriate use of CMS' oversight authority, but we disagree that this should be done in lieu of our proposed changes. Based on recent program experience, we believe our intended restrictions from the original adoption of these rules on the use of extensions are broadly misinterpreted and that our proposed changes to clarify our policy will enhance beneficiary protections by reducing inappropriate delays in access to care and access to the appeals process.

Relying on compliance and enforcement authority alone is not a sufficient response to identification of a broadly misinterpreted policy. By clarifying our intent that extensions are appropriate only in a limited set of circumstances, we aim to assist MA plans in their development of operational policies and procedures related to processing coverage decisions and, ultimately, to meet our goal of overall program compliance in the absence of corrective action and the beneficiary risks that may come with it.

After consideration of the comments received on this proposal, and for the reasons noted in our January 2014 proposed rule, we are finalizing without modification the proposal to clarify that an extension to an adjudication timeframe for organization determinations and reconsiderations should be permitted only in limited circumstances.

### *D. Strengthening Our Ability To Distinguish Stronger Applicants for Part C and D Program Participation and To Remove Consistently Poor Performers*

### 1. Two-Year Prohibition When Organizations Terminate Their Contracts (§§ 422.502, 422.503, 422.506, 422.508, and 422.512)
Section 1857(c)(4)(A) of the Act prohibits organizations from re-entering the MA program in the event that a previous contract with the organization was terminated at the request of the organization within the preceding 2-year period, except in circumstances that warrant special consideration.

We proposed to amend the text of the regulations implementing these provisions to maintain consistency in their application and harmony with our policy. Specifically, we proposed to amend the regulations at §§ 422.502(b)(3),

422.506(a)(4), and 422.512(e)(1) to explicitly apply the 2-year prohibition to applications for service area expansions in addition to applications for new contracts. These changes to §§ 422.502(b)(3), 422.506(a)(4), and 422.512(e)(1) would make the text of these regulations consistent with the text at §§ 422.503(b)(7) and 422.508(c) with regard to the 2-year prohibition imposed as a condition of a mutual termination of an MA contract.

We also proposed to amend our policy on the current application of regulations implementing the 2-year prohibition to avoid unnecessarily narrowing the scope of the 2-year prohibition or precluding us from preventing poor performing MA organizations from reentering the MA program. We proposed to interpret §§ 422.503(b)(6) and 422.503(b)(7) as authorizing denials of new contracts and service area expansions, consistent with the proposed text for §§ 422.502, 422.506 and 422.512, regardless of the contract type, product type, or service area of the previous nonrenewal. We further proposed adding a sentence to paragraphs (c) and (d) of § 422.508 to make it clear that a mutual termination of a MA contract would result in a ban on all contract types and service area expansions.

We received the following comments on this proposal and our responses follow:

Comment: A commenter supported the proposal, stating that it will prevent poor performing organizations from re-entering the program through another product type of extension of an existing service area.

Response: We thank the commenter for this support.

Comment: A commenter supported CMS's interpretation of the 2-year prohibition rule to voluntary nonrenewals and mutual terminations and CMS's efforts to ensure poor performing MA organizations do not re-enter the marketplace.

Response: We thank the commenter for this support.

Comment: A commenter requested that CMS consider only applying the 2-year prohibition to the legal entity level, rather than applying the 2-year prohibition to the parent organization level, as this would be an overly broad application which could affect multiple legal entities and numerous contracts.

Response: We currently apply the 2-year prohibition at the legal entity level and will continue to do so.

We are finalizing the amendments to §§ 422.502(b)(3), 422.506(a)(4), 422.508(c) and 422.512(e) as proposed. Although we discussed the amendments to § 422.508(c) and § 422.508(d) in the preamble to the January 6, 2014 proposed rule, we inadvertently omitted the proposed amendments to §§ 422.508(c) and 422.508(d) from the proposed regulation text. We are including the revision to § 422.508(c) in this final rule. We are not finalizing the proposed amendment to § 422.508(d) as upon further consideration we believe that this amendment is not appropriate. We are also amending § 422.506(a)(4) by removing the word "special" before "circumstances warranting special consideration" in order to maintain consistency with the regulation text at § 422.503(b)(6), § 422.508(c) and § 422.512(e), as we do not differentiate between circumstances warranting special consideration and special circumstances warranting special consideration in our administration of these regulations. We believe the use of "special" in § 422.506(a)(4) is redundant and its removal does not affect our interpretation of the provision and its inclusion potentially leads to ambiguity in § 422.506(a)(4). We are also finalizing, without modification, our proposal regarding the interpretation of **\*7946** related regulations that implement the 2-year prohibition. We clarify here that the 2-year prohibition, for purposes of §§ 422.502, 422.506, 422.508, and 422.512, is applied at the legal entity level. We are further clarifying that the 2-year ban is applicable for the 2 contract years following the year in which the non-renewal or termination of an organization's contract is effective. For example, if an organization does not renew its contract for an effective date of December 31, 2015 then we would not enter into a contract with the organization for contract years 2016 and 2017 unless there are circumstances that warrant special consideration. The organization can apply to contract with us in contract year 2017 to operate in contract year 2018. Likewise, if an organization enters a mutual termination for a contract with CMS midyear during 2015, then we will not

enter into a contract with the organization for contract years 2016 and 2017 absent circumstances warranting special consideration, but the organization can apply to contract with us in 2017 to operate in contract year 2018. We understand there are a variety of reasons that an organization may decide to terminate or to renew a contract, and subsequently want to re-enter the program. We will consider these circumstances on a case-by-case basis.

**2. Withdrawal of Stand-Alone Prescription Drug Plan Bid Prior to Contract Execution (§ 423.503)**

Occasionally, organizations new to Part D that have qualified for a Medicare PDP sponsor contract withdraw their bids after we have announced the low-income subsidy (LIS) benchmark but prior to executing the contract for the coming plan year. These withdrawals interfere with our administration of the Part D program, in particular the auto-assignment of LIS beneficiaries. To address this problem, we proposed to adopt regulatory provisions that would impose a 2-year application ban on organizations not yet under contract with us as PDP sponsors that withdraw their applications and bids after we have issued our approvals. We made this proposal under our authority at section 1860D-12(b)(3)(D) of the Act to adopt additional contract terms, including the conditions under which we would enter into contracts, not inconsistent with the Part D statute.

In February of each year, we solicit applications from organizations seeking to qualify to enter into a contract to offer stand-alone PDPs in the upcoming plan year. These organizations, along with current PDP sponsors who wish to continue participating in the Part D program, submit bids in June for our review and approval. We review these applications and bids with the expectation that, upon approval, the organizations would enter into PDP sponsor contracts with us in September to provide the Part D benefit for the plan year starting the following January.

As part of the annual bid review, we calculate the LIS benchmark for each PDP Region based on the bids for basic PDPs submitted annually by current PDP sponsors that will operate in that region in the coming year. Sponsors whose monthly premiums fall at or below the benchmark in a region receive auto enrollments from us of LIS eligible beneficiaries in those regions. We normally announce the LIS benchmark in late July or early August.

In recent years, some organizations have withdrawn their applications and bids following the announcement of the LIS benchmark. Because these organizations withdrew prior to executing a contract, and we cannot compel them to sign the contract, they are not subject to our compliance or oversight authority, and nothing in our current regulations prevents these applicants from withdrawing their applications late enough in the process to cause significant disruption. In contrast, when an existing PDP sponsor withdraws its bid, we treat such an action as an election by the PDP sponsor to non-renew its contract in that PDP Region, which renders the sponsor ineligible to submit another application for 2 years, under our regulations at § 423.507(a)(3). We proposed to make a regulatory change to ensure equal treatment between new applicants and existing PDP plan sponsors, which would allow us to maintain an accurate depiction of the contracting landscape. Specifically, we proposed to amend § 423.503 by adding paragraph (d) which would impose a 2-year Part D application ban on organizations approved by CMS as qualified to enter into stand-alone PDP sponsor contracts but which elect, after our announcement of the LIS benchmark, not to enter into such contract and withdraw their PDP bids. This proposed regulatory change, in effect, would subject a withdrawing applicant to the same penalty we may apply to an organization already under contract that elects to terminate or not renew its PDP contract.

It is critical that we have an accurate portrayal of the number and type of plan benefit packages that would be available to beneficiaries in every PDP Region, especially during the end of the summer when much of the bid review, both the formulary and actuarial components, has been completed. During this period, we need to confirm that there is the required minimum number of plans available in each PDP region. We also need accurate plan information at the end of the summer so that we can meet the production deadlines associated with the annual election period, including publication of the Medicare & You handbook as well as updating the Medicare Plan Finder Web site and our payment and enrollment systems. An applicant that withdraws its application late in the process alters the contracting landscape, potentially disrupting preparations we have already made, including those related to the auto assignment of LIS beneficiaries, for the upcoming plan year. In adopting the proposed regulatory authority, we would place a

reasonable limit on prospective PDP sponsors' option to withdraw bids and applications without penalty. By imposing consequences on applicants that withdraw their bids following the announcement of the LIS benchmark, we also would discourage any "gaming" of the bid review and auto assignment processes (for example, by participating in the bid review process until it learns that it will not qualify for auto-assignments) that can occur when applicants opt out of participation in the PDP at the last minute.

We received the following comments and our response follows:

Comment: A number of commenters expressed support for CMS' proposal.

Response: We appreciate the commenters' support of our proposal.

We received only supportive comments for this proposal; therefore, we are finalizing this provision without modification.


**3. Essential Operations Test Requirement for Part D (§§ 423.503(a) and (c), 423.504(b)(10), 423.505(b)(28), and 423.509)**

We proposed to create, through regulation, an essential operations test, which will be a new step in the application and contracting process with newly contracted entities operating as stand-alone PDP sponsors or MA organizations offering Part D plans (MA-PDs). This step will be administered to "newly contracted entities." We used the term "newly contracted entity" in the proposed rule and in this final rule to describe an organization that has entered or applied to enter into a Part D contract with us for the first time for the upcoming plan year, and neither it, nor another subsidiary of the organization's parent organization, is offering Part D benefits during the current benefit year. This **\*7947** would include organizations that are offering EGWPs for the first time. Existing plan sponsors or new sponsors that are subsidiaries of a parent company that currently operates a Part D plan through another subsidiary would not be subject to the proposed essential operations test.

The essential operations test will allow us to test whether an organization's arrangements appear likely to allow the organization to effectively administer its contract. We proposed to require organizations to pass an essential operations test either— (1) as a qualification to contract, with failure to pass the test nullifying our approval of the application; or (2) after contract execution as a contract requirement but prior to the start of the benefit year, with a failure to pass the test triggering an immediate contract termination under § 423.509.

Pursuant to section 1860D-12(b)(3)(D) of the Act, which incorporates by reference section 1857(e)(1) of the Act, we have the authority to add contract provisions that are necessary and appropriate to carry out the Part D program; section 1860D-11(b) of the Act provides authority for the collection of additional information as part of the bid as we may require to carry out the Part D program. Based on this authority we proposed adding § 423.504(b)(10) and § 423.505(b)(28) to include passing an "essential operations test" as a condition to enter into and a term of the Part D contract. Additionally, pursuant to our authority at section 1860D-12(b)(3)(B) and (b)(3)(F) of the Act (which incorporate by reference section 1857(c)(2) and (h) of the Act, respectively, to apply to the Part D program), the current regulations at § 423.509(a) and (b)(2)(i), authorize immediate termination of contracts with Medicare Part D plan sponsors in certain circumstances. We believe that immediate termination would be authorized under the standard of section 1857(h)(2) of the Act because the inability of a plan sponsor to ensure future members' access their drug benefit, as evidenced by failure to pass the essential operations test, would constitute an imminent and serious risk to beneficiary health and safety. We proposed adding § 423.509(a)(4)(xii) and revising § 423.509(b)(2)(i)(C) to subpart K to reflect this new cause for immediate termination. Additionally, we proposed to explicitly include the essential operations test as a means to evaluate Part D applicants in § 423.503(a)(1) and to add § 423.503(c)(4) to subpart K to establish failure of an essential operations test as grounds for nullifying our approval of the application notice.

Given that the heart of the Part D benefit is the sponsor's ability to process claims for prescription drugs in real time, we proposed the essential operations test and associated regulatory changes because of our experience with certain newly

contracted entities in the Part D program that experienced significant operational difficulties at the start of the benefit year as a result of their inexperience administering Part D benefits. To prevent the recurrence of this problem and ensure that new sponsors are prepared to and actually can deliver Part D benefits at an acceptable level, starting with the 2015 contract year application cycle, we proposed that we may require newly contracted entities to pass an essential operations test conducted by us beginning in the fall of 2014. In response to the later anticipated date of the finalization of this provision, we expect to adjust our proposed timing and begin requiring newly contracted entities to pass an essential operations test with the 2016 contract year application cycle.

The essential operations test for newly contracted entities will entail testing of sponsors' command of Part D benefit administration rules and systems related to these areas. Initially, the testing will consist of scenario testing with sponsors' key staff to show us that they have a firm grasp of the Part D policies and essential operations. The test will be able to verify whether an applicant's administrative and management arrangements, as attested to in its application, are sufficient for the applicant to carry out functions listed in § 423.504(b)(4)(ii) such as furnishing prescription drug services and implementing utilization management programs.

Provided we have the resources, in the future, the test will likely become significantly more sophisticated and involve live testing of sponsors' systems with test data. The more involved test would also likely include testing the processes related to enrollment such as MARx communication and processing; LIS processing and determinations; coverage determinations, appeals, and grievances (CDAG) processing; and real-time coordination of benefits data exchange and processing. For instance, the sponsor would need to demonstrate the ability to pay test claims correctly in real-time consistent with its CMS-approved benefit packages (including formulary) and the Part D transition fill policy.

### a. Failing Essential Operations Test as Cause for Immediate Termination

Once a sponsor signs its contract, it is obligated to perform all of the required functions to support the benefits described in the contract even though the sponsor does not start offering benefits until January 1. If we find that, based on the results of the essential operations test, a sponsor does not have the requisite systems and processes in place to offer Part D benefits in real time, our proposal was to consider this cause for immediate termination of the sponsor's Part D contract in order to protect beneficiaries from harm at the start of the contract year.

In accordance with section 1857(h)(2) of the Act (incorporated by reference into PDP by section 1860D-12(b)(3)(F) of the Act), we have the authority to immediately terminate a contract with a sponsor (without notice and opportunity for a hearing) when a delay in termination would pose an imminent and serious risk to the health of beneficiaries enrolled in the sponsor's plans. Also, under §§ 423.509(b)(2)(i) and 423.652(b)(2), unlike standard CMS terminations, the effective date of an immediate termination is not stayed when the sponsor requests a hearing under § 423.650(a)(2). Because enrollment and accurate benefit administration through real time claims processing are so fundamental to the delivery of the Part D benefit, if a sponsor fails to demonstrate to us that it can perform these essential operations, we would view this as a substantial failure to meet the Part D contract requirements on the following grounds: (1) Evidence that the sponsor was carrying out the contract in a manner that was inconsistent with the effective and efficient administration of the plan; and (2) evidence that the sponsor did not substantially meet the applicable conditions set out in the Part D regulations which would ultimately justify, depending upon timing of the test, our termination of a contract consistent with § 423.509(a)(1) through (3) based on the sponsor's failure to meet our proposed contract terms at § 423.504(b)(10) and § 423.505(b)(28). We believe that a newly contracted entity's failure to demonstrate certain critical capabilities and failing the essential operations test represents a substantial failure to carry out its Part D contract. Such a failure poses an unacceptable risk to the new sponsor's future members' access to Part D drugs, which would constitute an imminent and serious risk to beneficiary health and safety, justifying our immediate termination of the sponsor's contract.   **\*7948** For MA organizations that must offer Part D benefits pursuant to § 423.104(f)(3)(i), failing the test would support the termination of the organization's Part D addendum as well as its MA contract under § 422.510(a)(3) because the inability to offer Part D benefits means that the organization no longer meets the applicable conditions associated with offering Part C benefits.

**b. Failing Essential Operations Test as Failure of a Qualification to Contract and Grounds for Nullification of Approval**

If an organization fails an essential operations test we conducted prior to contract signature, we proposed that no termination would be necessary and that we would nullify our previous conditional approval of the organization's Part D contract qualification application. We proposed to explicitly include the essential operations test as a qualification to contract at § 423.503(a)(1) to authorize our use of the test and any information learned in the course of the essential operations test in making the contract determination.

We would view failure of the essential operations test as evidence that the applicant is not qualified to contract with us. As a result, we would nullify our approval based on determining the entity is not qualified. Successful applicants receive a conditional approval at the end of May of their Part D application in accordance with § 423.503(c)(1). The letter informs applicants that the conditional approval is based on the information contained in their application, and if we subsequently determined that any of the information was inaccurate or that qualification requirements are not met, we would withdraw the approval of the application. Through that notice, we preserve the right to nullify our approval. If that occurs, we would not provide the appeal rights described in part 423, subpart N to applicants that have their approval nullified based on failing the essential operations test because an appeals process started at that point could not be completed by the September 1 deadline imposed by § 423.650(c) for contracts to be effective on January 1 of the following year.

We received the following comments and our response follows:

Comment: Most commenters strongly supported CMS' proposals.

Response: We appreciate the support for these proposals.

Comment: Several commenters requested that CMS elaborate on the content of the essential operations test.

Response: Our plan is to initially offer the essential operations test in scenario format rather than in real time. Scenario format means that we will provide the applicant or newly contracted sponsor with written scenarios or stories about fictional beneficiaries. The scenarios will describe the characteristics of the beneficiary such as plan enrollment, LIS level, prior drug claims data, prior authorization criteria information, application date, and any other details necessary for answering our questions. The questions would pertain to topics such as determining the correct effective date of coverage; the appropriate timeframes for specific notifications; drug dispensing formats and requirements; drug coverage and costs; coverage determination process; coordination of benefits; and demonstrating knowledge of new requirements for the upcoming year. The real time test, which may also be combined with scenario tests, would involve electronic data exchanges between CMS and the new organization and/or its PBM, claims processor, enrollment processor, and any other entity contracted with the new organization to carry out key Part D functions.

Comment: Several commenters expressed concern that CMS would expect the new organization to demonstrate full system readiness in September. Other commenters provided information about the development schedule that their organizations follow for the upcoming benefit year.

Response: It is not our expectation that a new organization would have all systems ready to implement the Part D benefit in September. We appreciated the information regarding the development schedule, and we will use the information to inform, in part, our expectations of system readiness when we administer a real time test.

Comment: Several commenters requested that CMS provide new organizations with information about the system requirements of the essential operations test no later than May of each year.

Response: We are aware that new organizations would need time to ensure that the proper infrastructure is in place for real time communication and electronic data exchange with CMS (and our contractors). Therefore, within sufficient time to allow it to make necessary arrangements prior to the test, we will inform the new organization of the types of data files that we will send or exchange. We are unlikely to provide this information before the end of May because, at that time, new organizations will have not yet submitted bids. The essential operations test criteria may be developed based upon areas of concern we identify during the application, bid, and formulary review processes; therefore, in May we may not be certain of the test contents and parameters.

Comment: Several commenters suggested that CMS complete the essential operations test before November 1 due to the heavy workload in the last quarter of the year.

Response: We are aware of the heavy workload at the end of the year created by the annual election period and preparations for the start of the new benefit year. We will try to complete essential operations tests prior to November 1.

Comment: A commenter, a current Part D sponsor, was concerned that this provision would apply to existing or experienced sponsors.

Response: We clarify that this provision would not apply to existing sponsors. Rather, as stated at § 423.503(c)(4)(ii), the essential operations test will only be required of new organizations that do not have any Part D experience or a subsidiary/parent relationship with an experienced organization. If the new organization's parent company currently has other subsidiary organizations that are already offering Part D plans, then the new organization would not be subject to the essential operations test.

We note that the proposed provisions of §§ 423.504(b)(10) and 423.505(b)(28) each began with the phrase, "Effective contract year 2015,". This language, originally published in January 2014 as part of a proposal that at the time was expected to be made final in the middle of 2014, has since become outdated and therefore has been deleted from the final version of the rule. The proposed language was intended to make clear that even though the rule was expected to be finalized during the CY 2015 application review cycle we would apply the essential operations test to eligible applicants during that cycle. These provisions are now being made final after the period during which CY 2015 essential operations tests would have been conducted (that is, the fall of 2014). They will also be finalized well in advance of the start of the CY 2016 application cycle in late February 2015, so there is no need to provide a special signal to CY 2016 applicants that they may be subject to the essential operations test other than through the publication of this final rule.

We also note that we are finalizing with modification the proposed provision of § 423.505(b)(28). We are finalizing this provision as  **7949** § 423.505(b)(27), instead of § 423.505(b)(28).

In summary, given the support for this proposal, we are finalizing these provisions with only the technical modifications described previously.


**E. Implementing Other Technical Changes**

*1. Requirements for Urgently Needed Services ( § 422.113)*
Many MA plans have responded to the need to provide urgently needed services outside of the network's business hours, for example, during the weekend or at night, by contracting with clinics that have hours of operation well beyond those of traditional physicians' offices to furnish services to their enrollees when the plan network is not available.

To better align the regulations with current practices regarding access to urgently needed care services, we proposed to revise the regulation by removing the phrase "under extraordinary and unusual circumstances" from the definition

of "urgently needed services" at § 422.113(b)(1)(iii). The revised regulatory language would ensure that enrollees have access to out-of-network facilities in non-extraordinary circumstances.

We received the following comments on this proposal and our response follows:

Comment: Several commenters supported the policy because it provides improved access to enrollees.

Response: We thank these commenters for their support.

Comment: A commenter stated that CMS' proposed revision would be burdensome on plans and would not improve health care to enrollees.

Response: In the January 10, 2014 proposed rule, we noted that many plans already contract with clinics that operate 24 hours/day, 7 days/week (24/7) to address the needs of enrollees who need care on weekends or after normal business hours (79 FR 2018). We also noted that there are a small number of appeals each year from enrollees who sought care out-of-network on weekends or after normal business hours and were denied coverage.

We do not believe our proposal adds any burden to health plans. Our proposed revision to the regulation aligns it with current practices for provision of urgently needed services and our intent that enrollees have access to needed care. In fact, we believe that plans could realize savings by making urgently needed services available in settings that are more appropriate to the enrollees' needs than more costly hospital emergency departments.

Comment: A commenter expressed concern that the proposed regulatory language does not specify the circumstances under which the organization's provider network is temporarily unavailable or inaccessible and that, as a result, enrollees might frequently leave the network to obtain care.

Response: Circumstances under which the organization's provider network is temporarily unavailable or inaccessible would largely include weekends or after normal business hours, which we believe is clearly understood from the discussion in the notice of proposed rulemaking. If more extreme situations, such as a natural disaster, result in the network being temporarily unavailable, this rule would apply in those situations as well.

Comment: A commenter requested greater clarification of the definition of urgently needed services.

Response: The definition of urgently needed services, provided at § 422.113(b)(1)(iii), presents several specific requirements for a service to be classified as urgently needed. Additional clarification of the definition of urgently needed services may be found in the preamble to the June 29, 2000 final rule establishing the Medicare+Choice program (65 FR 40198 and 40199). We believe this definition, as modified by the removal of the phrase "extraordinary and unusual circumstances," is sufficient.

After review of the public comments received, we are finalizing the proposed revision to § 422.113 without modification.

## 2. Agent and Broker Training and Testing Requirements (§§ 422.2274 and 423.2274)

We proposed to revise §§ 422.2274(b) and (c) and 423.2274 (b) and (c) to accomplish the following: (i) Remove CMS-endorsed or approved training and testing as an option; (ii) require that agents and brokers be trained annually on Medicare rules and regulations and details specific to the plan products they intend to sell; and (iii) require annual training to ensure appropriate knowledge and understanding of Medicare rules and specific plan products. Pursuant to our authority under sections 1851(h)(2), 1860D-1(b)(1)(B)(vi), 1851(j)(2)(E), and 1860D-4(l)(2) of the Act, we previously codified agent and broker training and testing requirements at §§ 422.2274 (b) and (c) and 423.2274 (b) and (c) to require

all agents and brokers selling Medicare products be trained and tested annually through a CMS-endorsed or approved training program, or as specified by us, on Medicare rules and regulations specific to the plan products they intend to sell.

As we noted in the preamble to the proposed rule, since the training and testing requirements were implemented, we have embarked on various activities to improve and ensure the efficacy of training and testing. We also noted that, through our monitoring efforts, plans are complying with the annual guidance and providing an adequate level of detailed information. Furthermore, our ability to nationally accommodate agents and brokers through various training and testing modules creates a significant burden. We also noted in the preamble to the proposed rule that our ability to maintain consistency with endorsing other entities that would facilitate the training and testing and oversee these entities is limited.

We also proposed that the provisions for "Reducing the Burden of the Compliance Program Training Requirements" (§§ 422.503(b)(4)(vi)(C) and 423.504(b)(4)(vi)(C)) require a standardized compliance training program and that, under those provisions, MA organizations and Part D sponsors would not be permitted to develop and implement plan specific training materials or supplemental materials. The requirement in this section is exclusive for agent and broker marketing activities under the MA and Part D program.

We received the following comments and our response follows:

Comment: A commenter supported the provision. However, the commenter requested clarification as to whether CMS will continue to provide annual guidance on training and testing requirements for agents and brokers.

Response: We appreciate the commenter's support and will continue to provide annual guidance on the training and testing requirements.

Comment: A commenter stated that the provision assigns responsibility for the annual agent/broker training to the MA organization, which is an operational burden and additional cost.

Response: We disagree. Since MA organizations and Part D sponsors currently facilitate the agent broker training and testing or contract with a third party, our proposal would not create an operational burden or cost.

Comment: A few commenters stated that this provision potentially conflicts with the proposed requirement under § 422.503 that MA organizations and Part D sponsors use only CMS training for general compliance. A commenter requested clarification on how the first  **\*7950**  tier, downstream, and related entities' standardized training applies to agents and brokers.

Response: We believe that this provision does not conflict with the proposed provision in § 422.503. The provision in this section is specific to marketing activities for MA organizations and Part D sponsors.

After review of the public comment received on this proposed provision, we are finalizing this provision without modification.

### 3. Deemed Approval of Marketing Materials (§§ 422.2262, 422.2266, 423.2262, and 423.2266)

In the January 10, 2014 proposed rule, we proposed to move the substance of the current requirements in §§ 422.2266 and 423.2266 to 422.2262(a)(2) and 423.2262(a)(2), respectively. As previously noted, §§ 422.2266 and 423.2266 provide the regulatory requirements for materials that are deemed approved. These requirements are part of the review and distribution process of marketing materials. Therefore, the provisions were moved to align with the requirements in §§ 422.2262 and 423.2262. Additionally, we proposed reserving §§ 422.2266 and 423.2266 to further clarify the requirements for deemed materials by revising them to state that, if CMS does not approve or disapprove marketing materials

within the specified review timeframe, the materials will be deemed approved. Deemed approved means that an MA organization or Part D sponsor may use the material. We believe that this change clarifies the present regulatory requirement for deemed marketing materials.

We received several comments regarding this provision, and our responses follow.

Comment: Several commenters supported this provision. However, a few commenters did request clarification, while others emphasized the importance of streamlining the review and approval process for FIDE SNPs. A commenter also stated that CMS, Medicaid, and the plans should work closer to benefit enrollees.

Response: We thank the commenters for supporting our proposal to revise this provision. In response to the request for further clarification, we will consider including additional guidance in the Medicare Marketing Guidelines as that is the appropriate vehicle for providing detail on the requirements. We also appreciate the concerns with streamlining the review and approval process for FIDE SNPs; however, the comment is outside the scope of this rule.

Comment: A commenter opposed this provision on the grounds that MA organizations are expanding and offering more plan offerings with higher penetration rates in certain counties and regions. The commenter also stated that CMS is responsible for ensuring that marketing practices and materials are carefully monitored.

Response: While we appreciate the commenter's concern, we do not believe that the expansion of plan offerings will have an impact on this provision. Since this provision has been in existence, our analysis of deemed materials has shown that very few marketing materials have been approved through this process. Furthermore, we have protocols in place to monitor marketing materials, including materials that are deemed approved. We note in the Medicare Marketing Guidelines that we may require an MA organization or Part D sponsor to change any previously approved marketing materials if found to be inaccurate, altered or otherwise noncompliant.

After review of the public comments received on this proposal, we are finalizing this proposed provision without modification.

### 4. Cross-Reference Change in the Part C Disclosure Requirements (§ 422.111)

In the January 10, 2014 proposed rule, we proposed a technical correction to § 422.111(d)(1) to reflect the correct cross reference for procedures that MA organizations must follow when submitting changes to their rules for review. Section 422.111(d)(1) currently references § 422.80, which was removed when the marketing requirements were moved to subpart V, Medicare Marketing Requirements. We noted previously that subpart V, Medicare Marketing Requirements, was published in the September 18, 2008, final rule (73 FR 54208).

We received no comments on our proposal and therefore are finalizing this provision without modification.

### 5. Managing Disclosure and Recusal in P&T Conflicts of Interest: Formulary Development and Revision by a Pharmacy and Therapeutics Committee Under Part D (§ 423.120(b)(1))

Section 1860D-4(b)(3)(A)(ii) of the Act requires Part D sponsors who use formularies to include on their P&T committees at least one practicing physician and at least one practicing pharmacist, each of whom is independent and free of conflict with respect to the sponsor and the plan and who has expertise in the care of elderly or disabled persons. In our August 3, 2004 proposed rule (69 FR 46659), we proposed to interpret "independent and free of conflict" to mean that such P&T committee members could have no stake, financial or otherwise, in formulary determinations. In our January 28, 2005 final rule (70 FR 4256), we adopted this interpretation, and clarified that we would consider a P&T committee member not to be free of conflict of interest if he or she had any direct or indirect financial interest in any entity—including Part D plans and pharmaceutical manufacturers—that would benefit from decisions regarding plan formularies.

In a recent report ("Gaps in Oversight of Conflicts Of Interest in Medicare Prescription Drug Decisions," OEI-05-10-00450), the HHS OIG recommended improvements in our requirements for Part D plan P&T committees. Specifically, the OIG report recommended that we establish minimum standards to ensure that these committees have clearly articulated and objective processes to determine whether disclosed financial interests are conflicts and to manage recusals due to conflicts of interests. The OIG report also suggested that we tell sponsors that they need to designate an objective party, such as a compliance officer, to flag and enforce the necessary recusals. In other words, the identification and evaluation of whether a disclosed financial interest represents a conflict of interest should be made by a knowledgeable and accountable representative of the sponsor's organization, such as the compliance officer, and not solely by the P&T committee members themselves. We concurred that P&T committees should have clearly articulated and objective processes to determine whether disclosed financial interests are conflicts, and to manage recusals arising from any such conflicts. Therefore, we proposed to revise our regulations at § 423.120(b)(1) to renumber the existing provisions and add a new paragraph (b)(1)(iv) to require that the sponsor's P&T committee clearly articulates and documents processes to determine that the requirements under paragraphs (b)(1)(i) through (iii) have been met, including the determination by an objective party of whether disclosed financial interests are conflicts of interest and the management of any recusals due to such conflicts.

We also solicited comment on the pros and cons of defining PBMs as entities that could benefit from formulary decisions from which one practicing physician and one practicing pharmacist on the P&T committee must be free of conflict of interest.

**\*7951** We received the following comments and our response follows:

Comment: A commenter noted that the current CMS formulary review process provides the necessary protections to beneficiaries and ensures that formularies are developed and managed in accordance with best practices. This commenter also pointed out that since the P&T committee members do not generally provide their services for free, it is standard practice that the PBM compensates the committee members for their committee-related activities; thereby, providing a financial conflict of interest. The commenter believes that without this financial compensation it would be difficult to engage qualified clinicians for the committee.

Response: While the compensation that P & T committee members receive from PBMs for performing committee-related activities could be seen as a potential conflict of interest, this practice is widely known and generally accepted as necessary to engage the most qualified clinicians. Moreover, we agree with the commenter that the current CMS formulary review process provides the necessary protections to beneficiaries and ensures that formularies are developed and managed in accordance with best practices. We have devoted extensive resources to the oversight of plan formularies and the audit of P&T committee proceedings to ensure that they comply with industry best practices and ensure beneficiaries' access to clinically appropriate therapies. As discussed more fully in the January 10, 2014 proposed rule (79 FR 2019), we believe that our current formulary review process confers appropriate protections to beneficiaries from any potential adverse effects of conflicts of interest.

The OIG report recommended that the P & T committee should have clearly articulated and objective processes to determine if disclosed financial interests are conflicts, and to manage any recusals if conflicts are found. We concur with this recommendation and proposed to revise our formulary requirements pertaining to the development and revision by a P & T committee at § 423.120(b)(1) to make it clear that the Part D sponsor must establish these processes. In our response to the OIG report, we noted that statutory and regulatory provisions (section 1860D-4(b)(3) of the Act and 42 CFR 423.120(b)) indicate that it is the plan's responsibility to meet the formulary requirements; which include the development of these processes.

Comment: Several commenters supported CMS' proposal that P&T committee processes must be clearly articulated, documented, and enforced by an objective party. However, a commenter requested that CMS better define the term "objective party" to include a knowledgeable and accountable person at the PBM.

Response: We agree with the commenter and clarify that the objective party may be a representative of the PBM, as long as that representative is not also a member of the sponsor's P&T committee. The objective party should be someone not on the P & T committee, and may include a representative from the PBM that is not on the P & T committee.

Comment: A commenter pointed out that while the proposed recusal process is logical, it is duplicative and the current P&T policy is sufficient for dealing with conflicts of interest.

Response: We disagree with the commenter and concurred with the OIG report's recommendation (as discussed in the January 2014 proposed rule) that P&T committees should have clearly articulated and objective processes to determine conflicts of interest and manage any recusals. We are implementing these requirements on the recommendation of OIG. These requirements are supplemental to the beneficiary protections outlined in existing P&T policy, which does not address recusal and only provides that committee members should sign a conflict of interest statement revealing economic or other relationships with entities affected by drug coverage decisions that could influence committee decisions.

After review of the comments received, we are finalizing this provision without modification.

### 6. Thirty-Six Month Coordination of Benefits (COB) Limit (§ 423.466(b))

In our April 15, 2010 final rule (75 FR 19819), we exercised our authority under sections 1860D-23 and 1860D-24 of the Act to impose a timeframe on the coordination of benefits between Part D sponsors and other payers including State Pharmaceutical Assistance Programs (SPAPs), other providers of prescription drug coverage, or other payers. In the April 15, 2010 final rule, we explained our approach to determining the 3-year timeframe, including the benefits derived from its establishment.

We stated in our regulation at § 423.466(b) that, Part D sponsors must coordinate benefits with SPAPs, other entities providing prescription drug coverage, beneficiaries, and others paying on the beneficiaries' behalf for a period not to exceed 3 years from the date on which the prescription for a covered Part D drug was filled. The phrase "a period not to exceed 3 years" has caused confusion among some sponsors, who interpreted this to mean that the coordination of benefits period could be shorter than 3 years and have consequently imposed tighter timeframes for coordination of benefits.

To clarify the requirement and avoid further confusion, we proposed to remove from the regulation the phrase "not to exceed," and add the word "of." This would clarify that sponsors must employ a coordination of benefits period of 3 years, and would remove any uncertainty about whether they may impose a shorter coordination of benefits period.

We also proposed to revise the heading of § 423.466 to reference claims adjustments, which are addressed in § 423.466(a).

Comment: A commenter indicated the proposed change was an appropriate modification.

Response: We appreciate the support for this provision.

Comment: A few commenters suggested we define the date on which the 3-year COB limit begins as the date the drug is dispensed or the first date of service.

Response: The regulation already specifies the 36-month period begins on the date the prescription for a covered Part D drug was filled. However, we note the date of fill as referenced in the regulation is synonymous with the NCPDP date

of service (Field 1B 401-D1) included in HIPAA standard transactions, such as the billing transaction, and required on the Part D prescription drug event record.

After review of the public comments received in response to this proposal, we are finalizing the provision as proposed.

**7. Application and Calculation of Daily Cost-Sharing Rates (§ 423.153)**

We proposed technical changes to the daily cost-sharing rate regulation to clarify the application and calculation of daily cost-sharing rates and cost sharing under the regulations. Section 423.153(b)(4)(i) requires sponsors to establish and apply a daily cost-sharing rate whenever a prescription is dispensed by a network pharmacy for less than a 30-days' supply, unless the drug is excepted in the regulation. Currently, under § 423.100, in cases when a copayment is applicable, "daily cost-sharing rate" is defined as the monthly copayment under the enrollee's Part D plan, divided by 30 or 31 and rounded to the nearest lower dollar amount, if any, or to another amount, **\*7952** but in no event to an amount that would require the enrollee to pay more for a month's supply of the prescription than would otherwise be the case. We proposed to replace the numbers with the phrase "the number of days in the approved month's supply for the drug dispensed" to address how Part D sponsors that have other days' supplies as their month's supplies are to calculate daily cost-sharing rates.

Also, under our existing definition of "daily cost-sharing rate" in § 423.100, as noted previously, and with respect to copayments, the daily copayment cannot be an amount that would require the enrollee to pay more for a month's supply of the prescription than would otherwise be the case. In other words, rounding up is not permitted under the current definition of "daily cost-sharing rate" and this has been another cause of confusion for some Part D sponsors. While our original intention was to prohibit significant increases in cost sharing, such as charging the full 30-day copay for both the trial supply and any subsequent refill of a medication, the current limitation on any increase in cost sharing over the 30-day supply amount has reportedly led to unnecessarily complicated programming, as well as proration of other amounts on the claim, such as the dispensing fees. Therefore, we proposed to replace the language "lower dollar amount, if any, or to another amount," with "the nearest cent." We believe this language better conveys the concept of rounding, while realizing this language allows Part D sponsors to round daily cost-sharing rates up or down to the nearest 2 decimal places.

We also proposed other technical changes to the daily cost-sharing rate regulation at § 423.153(b)(4)(i) to improve the regulation's clarity. First, we proposed to consolidate the language of § 423.153(b)(4)(i)(A) into § 423.153(b)(4)(i) and to consolidate § 423.153(b)(4)(i)(B)(1) and (2) into a new paragraph § 423.153(b)(4)(ii). Second, we proposed that the language in § 423.153(b)(4)(i) that addresses the application of the daily cost-sharing rate in the case of a monthly copayment be revised for clarity, and moved to a new paragraph (b)(4)(iii)(A). This paragraph states that in the case of a drug that would incur a copayment, the Part D sponsor must apply cost-sharing as calculated by multiplying the applicable daily cost sharing rate by the days' supply actually dispensed when the beneficiary receives less than a 30-days' supply. Third, we proposed that § 423.153(b)(4)(iii)(B) states that, in the case of a drug that would incur a coinsurance percentage, the Part D sponsor must apply the coinsurance percentage for the drug to the days' supply actually dispensed. We note that this means, with respect to dispensing fees, that the enrollee's portion of additional dispensing fees for the incremental supply is calculated by application of this percentage. These technical clarifications should assist sponsors in correctly setting, calculating, and applying daily cost-sharing rates in the retail and LTC settings whenever a prescription is dispensed by a network pharmacy for less than a 30-days' supply, unless the drug is excepted in the regulation. The proposal solicited comments on whether sponsors needed additional guidance surrounding the rounding methodology.

We received the following comments and our responses follow:

Comment: We received several comments in support of our proposal to clarify the daily cost sharing rule.

Response: We thank the commenters for their supportive comments on our proposal.

Comment: A commenter requesting that the application of the daily cost-sharing rule should be consistent with the changes CMS proposed to the definition of the "daily cost-sharing rate." In other words, the commenter recommended that the daily cost-sharing rule apply whenever less than the approved month's supply is dispensed; rather than, whenever less than a 30-day supply is dispensed. The commenter highlighted that this change would ensure beneficiaries are not required to pay more than they otherwise would have. This is consistent with CMS' intent that even when the member does receive the remainder of a month's supply, the total payment not exceed the 1-month's cost sharing, except by a nominal rounding amount. This commenter provided the following example: A plan's approved month's supply is 34 days, and the applicable copayment is $30. If a member first obtains a 30-day supply and then a 4-day supply, under the current regulatory language, which provides that the daily cost-sharing rule applies when a covered Part D drug is dispensed for a supply less than 30 days, the member would pay $30 for the first supply since it is not for "less than 30 days" and then $3.52 (4 x $0.88) for the second supply, for a total of $33.52. However, if the daily cost-sharing rule applied whenever less than the approved month's supply is dispensed, the member would pay $26.40 (30 x $0.88) for the first supply and $3.52 (4 x $0.88) for the second, for a total of $29.92.

Response: We were persuaded by the comments that this suggested change is necessary to avoid confusion with the technical change that we proposed, by making the terminology consistent with the regulatory text. Therefore, we are making the following change to the final regulatory text: Replace "30 days" with "approved month's supply" in § 423.153(b)(4)(i) and (iii).

Comment: Several commenters indicated that CMS guidance is needed regarding the rounding methodology.

Response: We will provide additional rounding guidance, if needed, after publication of this final rule.

Based on comments received, we are finalizing this proposal as proposed and with the following modification: replacing "30 days" with "approved month's supply" where applicable in § 423.153(b)(4)(i) and (iii).

### 8. Technical Change To Align Regulatory Requirements for Delivery of the Standardized Pharmacy Notice (§ 423.562)

The current regulations at § 423.562(a)(3) require Part D plan sponsors to make arrangements with their network pharmacies to distribute notices instructing enrollees how to contact their plans to obtain a coverage determination or request an exception. This is accomplished through delivery of a standardized notice, CMS-10147—"Medicare Prescription Drug Coverage and Your Rights" ("pharmacy notice"). Section 423.562(a)(3) cross-references § 423.128(b) (7)(iii), added in our April 2011 final rule (76 FR 21432), which requires plans to have a system in place that transmits codes to network pharmacies so the pharmacy is notified to deliver the pharmacy notice at the POS in designated circumstances where the prescription cannot be filled as written.

Pursuant to the 2011 regulatory change, we issued subsequent guidance (HPMS memoranda dated October 14, 2011 ("Revised Standardized Pharmacy Notice") and December 27, 2012 ("Revised Guidance for Distribution of Standardized Pharmacy Notice")) which clarifies that distribution of the pharmacy notice is required upon receipt of certain transaction responses indicating that the claim is not covered by Part D, as well as revised manual guidance in Chapter 18, section 40.3.1 of the Medicare Prescription Drug Benefit Manual related to operationalization of this requirement specific to a variety of specialty pharmacy settings.

In practice, we have never based distribution of or referral to the pharmacy notice on whether or not the **\*7953** enrollee disagrees with information provided by the pharmacist, but rather on whether the drug in question can be provided under Part D and whether the enrollee is able to obtain coverage for the drug at the pharmacy counter. Because the existing regulation text at § 423.562(a)(3) ties delivery of the pharmacy notice to the enrollee's disagreement with information provided by the pharmacist, we proposed to remove this reference.

This proposed technical change would not alter the circumstances under which the pharmacy notice must be delivered to an enrollee and will align the regulation and the operational requirements for distribution of the pharmacy notice. In addition, this proposed change would be consistent with both the current OMB-approved instructions regarding the pharmacy notice and current CMS manual guidance.

We do not prohibit distribution of the pharmacy notice in any circumstance, so pharmacies may choose to also provide a copy of the notice in circumstances where the enrollee disagrees with the information provided (for example, if the enrollee believes they are being charged an incorrect cost-sharing amount), but the notice is not required under the standards established in § 423.128(b)(7)(iii). Provision of the pharmacy notice is not a prerequisite for an enrollee to request a coverage determination or access the appeals process. Similarly, a plan sponsor's failure to comply with the requirements of § 423.128(b)(7)(iii) or § 423.562(a)(3) does not in any way limit an enrollee's right to request a coverage determination or appeal.

We received no comments on this proposal and therefore are finalizing the proposed revision to this provision without modification.

### 9. MA Organization Responsibilities in Disasters and Emergencies (§ 422.100)

We proposed to add paragraph (m) to § 422.100 to codify and further clarify an MA organization's responsibilities when health plan services are affected by public health emergencies or disasters in order to ensure that beneficiaries continue to have access to care in situations in which normal business operations are disrupted due to public health emergencies or disasters and enable out-of-network providers to be informed of the terms of payment for furnishing services to affected enrollees during public health emergencies or disasters.

The proposed new paragraph would require MA organizations to ensure access, at in-network cost sharing, to covered services even when furnished by noncontracted providers when disruption in the service area impedes enrollees' ability to access contracted providers and/or contracted providers' ability to provide needed services. The new paragraph also provides the basis for determining the beginning and end of a disaster or emergency, and requires that the organization annually post on its Web site and notify enrollees and contracted providers of its disaster and emergency policies.

We received the following comments on this proposal and our response follows:

Comment: A commenter requested clarification of whether this proposed requirement applies if plan service delivery is not affected even though in a declared disaster area.

Response: Generally, a disaster creates multiple disruptions. For example, although provider offices may be operating as usual, transportation, electricity and phone service may be disrupted. Consequently, the proposed requirements would apply to all MA plans from the time the disaster is declared and continue to apply until the end of the disaster, as described in the proposed paragraph (m)(3).

Comment: Several commenters stated that the proposed revision should only apply to emergency and urgently needed services that are sought during a public health emergency or disaster.

Response: To the extent possible, we expect MA plans to provide continued and uninterrupted access to all health care services covered by the plan, whether routine or unforeseen. Disruption to a plan's network does not relieve an MA plan from fulfilling its contractual obligation to furnish all covered services to enrollees, even if it must do so by covering services furnished to its enrollees by noncontracted providers.

Comment: A commenter suggested that reduced out-of-network cost sharing be required only if contracted providers are unavailable or not accessible.

Response: Availability of networks depends on several factors—the status of provider offices, transportation, phone service, electric service, etc.—which may be impacted to varying degrees during a disaster. The primary goal during a disaster is the provision of continued and uninterrupted access of health care to all enrollees. To achieve this goal, enrollees must be allowed to obtain medically necessary plan-covered services without prior approval, at in-network cost sharing, from qualified providers, even if those providers are out-of-network.

Comment: A commenter stated that CMS should reconsider how this proposed regulation may manipulate enrollee incentives, reduce access for enrollees that need services more urgently and increase costs to MA organizations and the MA program.

Response: We recognize that disasters can create unavoidable disruptions and increased costs for MA organizations. Our primary goal during a disaster is the provision of continued and uninterrupted access to medically necessary plan-covered services for all enrollees. Our intention is to facilitate achievement of this goal by ensuring that plans facilitate increased access to providers from whom enrollees in the disaster area may seek high quality services at in-network cost sharing. We do not believe that these temporary and unusual episodes of increased access will incentivize enrollees in a negative way or result in significant cost increases for affected MA organizations.

After review of the public comments received on this proposal, we are finalizing the proposed provisions with modification. To provide for greater readability, we are finalizing paragraph (m)(1)(iii) with slight revisions to the text from the proposed version.

### 10. Technical Changes To Align Part C and Part D Contract Determination Appeal Provisions (§§ 422.641 and 422.644)

Sections 1857(h) and 1860D-12(b)(3)(F) of the Act describe the procedures for termination for both MA organizations and Part D Plan sponsors, respectively. These statutory provisions provide a contracting organization with an opportunity for a hearing before its contract is terminated. Appeal procedures were established under sections 1856(b)(2) and 1860D-12(b)(3) of the Act for both Part C and Part D sponsors, respectively. Sections 422.641 and 423.641 list the types of Part C and Part D contract determinations that may be appealed.

#### a. Technical Change (§ 422.641)

Currently in § 422.641, the contract termination is discussed in paragraph (b) and contract non-renewal is discussed in (c). Conversely, in § 423.641 the contract terminations are discussed in paragraph (c) and contract non-renewal is discussed in (b). Therefore, we proposed to align § 423.641 with the current list order for (b) and (c) in the contract determinations section at § 422.641.

#### *7954  b. Technical Changes (§ 422.644(a) and (b))

Sections 1857(h)(1)(B) and 1860D-12(b)(3)(F) of the Act describe the procedures for contract terminations for both MA organizations and Part D sponsors, respectively. In § 423.642(a) we specify that the notice is based upon a contract determination made "under § 423.641." Therefore, since Part C and Part D language should be consistent, the same reference should be made in the corresponding Part C § 422.644(a). To remedy this, we proposed to insert "under § 422.641" into § 422.644(a) for Part C contract determinations.

In addition, the Part D plan sponsor language in § 423.642(b) states "(b) The notice specifies the—(1) Reasons for the determination; and". The corresponding Part C language in § 422.644(b) states that "(b) The notice specifies—(1) The reasons for the determination; and". We proposed to change § 422.644(b) by moving the word "the" and revising it to read "(b) The notice specifies the—(1) Reasons for the determination; and".

We received no comments on this proposal and therefore are finalizing these changes without modification.

### 11. Technical Changes To Align Parts C and D Appeal Provisions (§§ 422.660 and 423.650)

Sections 1857(h)(1)(B) and 1860D-12(b)(3)(F) of the Act provide organizations with an opportunity for a hearing before its contract is terminated in the Part C and Part D programs, respectively. Appeal procedures were established under section 1856(b)(2) of the Act for both MA organizations and Part D plan sponsors.

We proposed to replace the term "under" with the phrase "in accordance with" in § 422.660(a)(2), § 422.660(a)(3), and § 423.650(a)(2). We proposed to replace the word "and" with "through" in § 423.560(a)(4) to ensure consistency between § 422.660(a)(4) and § 423.650(a)(4). In addition, we proposed to modify § 422.660(b)(4) and § 423.650(b)(4) to add the language "§ 422.752(a) through (b)" and "§ 423.752(a) through (b)", respectively, to refer the reader to the applicable regulations for intermediate sanctions.

We received no comments on this proposal and therefore are finalizing this provision without modification.

### 12. Technical Change to the Restrictions on Use of Information Under Part D (§ 423.322)

We proposed a technical change to § 423.322 due to section 6402(b)(1) of the Affordable Care Act which amended section 1860D-15(f)(2) of the Act. For background, most of the payment provisions for the Part D program are found in section 1860D-15 of the Act, and as originally enacted, both subsections (d) and (f) authorized the Secretary to collect any information needed to carry out this section but also stated that information disclosed or obtained pursuant to section 1860D-15 of the Act may be used by officers, employees, and contractors of HHS only for the purposes of, and to the extent necessary in, carrying out section 1860D-15 of the Act.

Section 6402(b)(1) of the Affordable Care Act amended section 1860D-15(f)(2) of the Act to relax the limitation on the use of information that is disclosed or obtained under section 1860D-15 of the Act. Specifically, the Affordable Care Act removed the word "only" from subsection (f)(2)(A) and added a new subsection (ii) which states that information disclosed or obtained under section 1860D-15 of the Act may be used by officers, employees, and contractors of HHS for the purposes of, and to the extent necessary, in conducting oversight, evaluation, and enforcement under this title. Section 6402(b)(1) of the Affordable Care Act also added a new subsection (B) which states that information disclosed or obtained pursuant to section 1860D-15 of the Act may be used by the Attorney General and the Comptroller General of the United States for the purposes of, and to the extent necessary in, carrying out health oversight activities. Thus, the Affordable Care Act considerably broadened the purposes for which HHS, its contractors, and the Attorney General and Comptroller General may use such information. However, we note, that the Affordable Care Act did not change the existing restriction on the use of information under subsection (d).

In light of the Affordable Care Act amendment to section 1860D-15(f) of the Act, we proposed to make conforming changes to § 423.322.

We received no comments regarding this proposal and are finalizing the proposed amendments to this provision without modification.

### 13. Technical Changes to Requirements Related to Qualified Prescription Drug Coverage (§ 423.104)

In the April 15, 2010 Federal Register (75 FR 19711), we finalized new requirements at § 423.104 related to qualified prescription drug coverage. At that time, we codified a new paragraph, § 423.104(d)(2)(iii) stating that tiered cost sharing under (d)(2)(ii) of the same paragraph may not exceed levels annually determined by CMS to be discriminatory. In the April 15, 2011 Federal Register (76 FR 21432), the language at (d)(2)(iii) was inadvertently removed when making other revisions to § 423.104.

To reinstate the language that was removed, we are including a technical change to add this language back to § 423.104. This technical correction does not represent a change in policy.

### 14. Technical Changes to the Definition of Supplemental Benefits (§ 423.100)

In the April 12, 2012 Federal Register (77 FR 22169), we revised the definition of supplemental benefits at § 423.100 by defining supplemental benefits as benefits offered by Part D plans, other than employer group health or waiver plans, that meet the requirements of § 423.104(f)(1)(ii). We subsequently issued a correction notice in the June 1 2012 Federal Register (77 FR 32407) with unrelated changes that inadvertently resulted in the revised definition not being included in the CFR.

To address this omission, we are issuing a technical change at this time to include the definition of supplemental benefits finalized in the April 12, 2012 Federal Register (77 FR 22169). This technical correction does not represent a change in policy.

### III. Collection of Information Requirements

Under the Paperwork Reduction Act of 1995 (hereafter, "PRA"), we are required to provide 30-day notice in the Federal Register and solicit public comment before a collection of information requirement is submitted to the Office of Management and Budget (OMB) for review and approval. To fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the PRA requires that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

In the January 10, 2014, proposed rule (79 FR 1917) we solicited public comment on each of the following provisions that contained information collection requirements (ICRs).

### *7955  A. ICRs Related to Eligibility of Enrollment for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44)

As amended here sections 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44 set out the eligibility requirement of citizenship or lawful presence to enroll in MA, Part D, and cost plans. To implement these provisions, we will: (1) Relay data regarding an individual's lawful presence status to plans through the MARx system so that the plans will be aware of an individual's eligibility when requesting enrollment; and (2) notify plans of loss of eligibility for current members based on unlawful presence status. In this final rule, we explicitly direct MA organizations, Part D sponsors, and entities offering cost plans not to request or solicit information about lawful presence from Medicare beneficiaries in connection with this rule as CMS will provide the necessary information. This data is already available to us; thus no new data will be collected.

We received no comments on the proposed ICR assessment. Consequently, we are finalizing that assessment without modification.

**B. ICRs Related to Good Cause Processes (§ § 417.460, 422.74, and 423.44)**

Sections 417.460, 422.74, and 423.44 establish the ability for us to designate an entity other than CMS to implement the good cause process. If we assign the good cause process to entities operating a cost plan, MA organization, or a Part D sponsor, the plan would already have the enrollment data necessary to make the determinations required by the process. In addition, the former enrollee is already required by the applicable regulations to provide a credible statement to establish good cause for the failure to make timely payments. Thus no additional data will be collected by the plan. However, if we designate plans to implement good cause processes, there would be additional burden to each plan. The burden would consist of completing the operational process, such as—(1) responding to requests for reinstatement from former members; (2) gathering the attestation from the individual regarding his or her reason for not paying the plan premiums within the grace period; (3) making the determination as to whether the individual meets the good cause criteria; and (4) maintaining the case notes and documentation to support its determination should it need to be reviewed. As plans already provide customer service to their current and past members, we estimate 30 minutes for each reinstatement request. According to the most recent wage data provided by the Bureau of Labor Statistics (BLS) for May 2013, the mean hourly wage for the category of "Customer Service Representatives"—which we believe, considering the common point of entry for all issues at the plan, is the most appropriate category is $16.04/hr. With fringe benefits and overhead, the rate is $23.74/hr. It is calculated that the cost for 30 minutes would be $11.87. Not all plans disenroll for nonpayment of premiums. However, for those who do implement this voluntary policy, it results in an average of 20,000 disenrollments each month. In response, we receive an average of 698 requests for reinstatement per month. The plan representative cost of $11.87 for each case is multiplied by 698 cases. Therefore, under the revised regulations, handling of these requests would result in a total monthly cost of $8,285 (or $99,423 and 4,188 hours, annually) for all plans in the MA, Part D, and cost plan programs. The requirements and burden will be submitted to OMB under control number 0938—New (CMS-10544).

We received no comments on the proposed ICR assessment. Consequently, we are finalizing this assessment with only a minor modification in order to reflect the updated 2013 wage data.

**C. ICRs Related To Expanding Quality Improvement Program Regulations (§ 422.152)**

We explained in the proposed rule that we do not believe this provision would impose any new or revised collection requirements or burden because it codifies a submission process that currently applies for quality improvement program information. PRA approval is current under OMB control number 0938-1023 (CMS-10209).

We received no comments on the ICRs for this proposal and are finalizing these provisions without modification.

**D. ICRs Related To Changes to Audit and Inspection Authority (§ § 422.503(d)(2) and 423.504(d)(2))**

In §§ 422.503(d)(2) and 423.504(d)(2), MA organizations and Part D sponsors are required to hire an independent auditor to perform validation exercises to confirm correction of deficiencies found during an audit. We currently conduct these validation exercises and collect data associated with these activities under OMB control number 0938-1000 (CMS-10191). We believe the provision will not impose any additional burden on MA organizations or Part D sponsors.

**E. ICRs Related to Business Continuity for MA Organizations and PDP Sponsors (§ § 422.504(o) and 423.505(p))**

This provision requires MA organizations and Part D sponsors to develop, maintain, and implement business continuity plans that meet certain minimum standards. The proposed provision was modified due to public comment. Specifically, in this final rule MA organizations and Part D sponsors plan to restore essential operations within 72, rather than 24, hours of a failure. While the cost estimates are set out under this rule's Regulatory Impact Analysis, the PRA-related burden will be made available for public comment through a separate Federal Register notice under OMB control number 0938-0964 (CMS-10141).

*F. Submission of PRA-Related Comments*

We have submitted a copy of this rule to OMB for its review of the rule's information collection and recordkeeping requirements. These requirements are not effective until they have been approved by OMB.

To obtain copies of the supporting statement and any related forms for the paperwork collections referenced above, access CMS' Web site at http://www.cms.hhs.gov/PaperworkReductionActof1995; email your request, including your address, phone number, OMB number, and CMS document identifier, to Paperwork@cms.hhs.gov; or call the Reports Clearance Office at 410-786-1326.

When commenting on the stated information collections, please reference the document identifier or OMB control number. To be assured consideration, comments and recommendations must be received by the OMB desk officer via one of the following transmissions: Mail: OMB, Office of Information and Regulatory Affairs, Attention: CMS Desk Officer, Fax: (202) 395-5806, OR Email: OIRA5Fsubmission@omb.eop.gov.

PRA-related comments must be received on/by March 16, 2015.

**IV. Regulatory Impact Statement**

We examined the impact of this final rule as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the Regulatory Flexibility Act **\*7956** (RFA) (September 19, 1980, Pub. L. 96-354), Section 1102(b) of the Social Security Act, Section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995; Pub. L. 104-4), Executive Order 13132 on Federalism (August 4, 1999) and the Congressional Review Act (5 U.S.C. 804(2)).

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). A regulatory impact analysis (RIA) must be prepared for major rules with economically significant effects ($100 million or more in any 1 year).

We determined that this final rule does not reach the threshold for being considered economically significant, and thus, is not considered a major rule. There are five provisions with non-measurable impact: Efficient dispensing, requirements for drugs covered under Part D, two-year prohibition when organizations terminate their contract, requirements for urgently needed services, and MA organization responsibilities in disasters and emergencies.

Some of these provisions do not impose new requirements or costs but rather, clarify the necessary actions to meet existing regulatory requirements, and therefore, are expected to have no impact. Other provisions reflect widespread industry practices or would only impact a few plans and therefore are expected to have no, or minimal, impact.

There are three provisions with measurable impacts: Citizenship or lawful presence; audit and inspection authority; and business continuity operations. We discuss these three provisions as follows.

Citizenship or Lawful Presence. This final rule adds "citizenship or lawful presence" as an eligibility requirement to enroll and remain enrolled in MA, Part D, and section 1876 cost contracts to comply with section 401 of the Personal Responsibility and Work Opportunity Act, which mandates that aliens who are not lawfully present in the United States are not eligible to receive any federal benefit, including Medicare.

As indicated in the proposed rule of January 10, 2014 (79 FR 1918), based on estimates reflecting scoring by the CMS Office of the Actuary and 2012 lawful presence data provided by the SSA, this provision has an anticipated savings of $67 million over 5 years.

We estimate 10 million dollars expected savings for 2015 consisting of $5 million savings for Medicare Advantage (MA) and $5 million savings for Part D. These savings increase annually and by 2019, we estimate $17 million savings consisting of $8 million for MA and $9 million for Part D.

Audit and Inspection Authority. This rule finalizes some, but not all, proposed changes to the audit and inspection authority included in the proposed rule. We proposed two changes to §§ 422.503(d)(2) and 423.504(d)(2) that would allow CMS to require sponsors (MA organizations and Part D sponsors) to hire an independent auditor to conduct full or partial program audits of the sponsors' operational areas and/or correction validation exercises. Under the first proposal, each MA organization and/or Part D sponsor would have been required to hire an independent auditor to perform a full or partial program audit at least every 3 years. However, due to public comment, we are not finalizing this proposal.

We also proposed to revise our regulations to permit CMS to require MA organizations or Part D sponsors with audit results that reveal noncompliance with CMS requirements to hire an independent auditor to validate that correction has occurred. With our existing resources we currently conduct approximately 30 audits per year.

We received numerous comments indicating that our initial estimate was not accurate and considerably lower than the sponsors' actual costs. Based on the public comments, we revaluated our methods of estimating the sponsor costs associated with procuring an independent auditor to conduct validations and as a result we decreased: (1) The number of organizations that may be subject to a validation each year; and (2) the number of team members likely required to perform the validation exercise; and increased: (3) The estimated total cost per hour for the audit team. The estimate for 23 sponsors is closer to the maximum number of sponsors that would be expected to hire an independent auditor to validate correction of audit deficiencies that we identified. As additional organizations are subject to a CMS program audit or utilize CMS' audit protocols to perform their own internal auditing, we expect that the performance of these organizations and the industry in general will improve; this in turn will reduce the likelihood that an organization would need to hire an independent auditor to validate correction of audit deficiencies. Therefore, we expect the total number of organizations that may be required to hire an independent auditor to validate correction of audit deficiencies will decline over time.

While some sponsor audit findings can be validated through means other than a full-scale validation audit, we have found several organizations with significant performance deficiencies. We estimate that approximately 75 percent of the 30 organizations we audit per year (23 organizations) may be requested to retain an independent auditor to validate correction of their audit deficiencies.

Under these circumstances we estimated that the independent auditor hired would need to have a team consisting of the following professionals:

• Formulary and Benefits Administration—pharmacist, a senior claims analyst, and a senior auditor.

• Coverage Determinations, Part D Appeals, Part D Grievances—physician, pharmacist and senior auditor.

• Organization Determinations, Part C Appeals, Part C Grievances—physician, nurse practitioner, and senior auditor.

• Compliance Program effectiveness—two senior auditors.

• Special Needs Plan Model of Care (SNP MOC) implementation—nurse practitioner and senior auditor.

We used 2013 wage statistics supplied by the Bureau of Labor and Statistics, along with benefit and overhead included to develop estimates of direct wages. The estimated total cost per hour for each audit team is $1,202.00. A team of 13 professionals (listed previously) is necessary for the performance of each validation effort. The estimated total number of hours the team will need to perform the validation per sponsor is 80. The total cost per sponsor to procure and support the independent audit team is therefore: 80 (hours) x $1,202.00 = $96,160.00. The validation costs will be allowable costs in the plan's bid. Under existing regulations, the estimated total annual burden related to the time and effort for sponsors to perform the validation is $2,211,680.00 (23 sponsors x $96,160.00 per sponsor).

Since only 30 sponsors are audited per year and only those with the most serious findings would likely be subjected to hiring an independent auditor to conduct validation, the cost per sponsor per year is $2,211,680 / 193 (unique parent organizations) = $11,459 per year. The number 193 represents the 193 unique parent organizations as of June 2014. This figure includes all coordinated care plans (CCPs), private fee for service (PFFS) plans, section **7957** 1876 Medicare cost plans whose parent organizations also have an MA or Part D plan, stand-alone prescription drug plans (PDPs), and employer group waiver plans (800 series). Sponsors will be allowed to account for this cost in their bid.

Business Continuity. Commenters in general took issue with the costs associated with the proposal for Business Continuity for MA organizations and Part D Sponsors (§§ 422.504(o) and 423.505(p)). Several commenters suggested that our RIA significantly underestimated costs because requiring MA organizations and Part D sponsors to restore essential functions within 24 hours would necessitate systems redundancy. Other commenters were concerned about the cost of testing IT systems on an annual basis; another commenter questioned the need to train "all" employees.

As detailed in section II.A.4. of this final rule (Business Continuity for MA organizations and Part D Sponsors (§§ 422.504(o) and 423.505(p)), we believe that the modifications to regulatory text that we are finalizing in this final rule, as well as clarifications provided in our responses (for instance, we are not requiring systems redundancy), address the vast majority of concerns raised about the RIA.

Business continuity plans are well established in the business community, and we believe that most MA organizations and Part D sponsors already have business continuity plans in place which cover the basic proposed subject areas. We still estimate that 5 percent of MA organizations and Part D sponsors do not have business continuity plans, but are updating our estimates from our proposed rule to reflect the most recent data available. For 2015, there are 568 MA organizations and Part D sponsors, resulting in an estimated 28 (5 percent x 568) affected entities. More recent May 2013 wage data from the BLS OES sets the hourly rate for an emergency management director, General Medical and Surgical Hospitals, at $36.90. We now estimate the first year burden of a full time emergency management director to help design the plan to be 58,240 hours (28 entities x 2,080 hours). The estimated cost associated with such an expert is the estimated number of hours multiplied by the estimated hourly rate of $36.90, plus 100 percent for fringe benefits and overhead, which equals a first year estimated cost of $4,298,112.

In subsequent years, the estimated burden associated with this requirement will be the cost of an emergency management director working on a part time basis for an ongoing burden of 29,120 hours (28 entities x 1,040 hours). The estimated cost associated with such an expert would be the estimated number of hours multiplied by the estimated hourly rate of $36.90 plus 100 percent for fringe benefits and overhead, which equals an estimated annual cost of $2,149,056 for subsequent years.

Additionally, as discussed in section II.A.4. of this final rule, we agree with the commenters that the regulation may require some changes, which we believe are minimal, to existing business continuity plans and are adding estimates to cover those costs. We estimate that an additional 10 percent of the 568 contracting entities, or about 57 entities, will be affected by this requirement. This means the estimated first year burden of a part time emergency management director to conform the existing business continuity plans will be 59,280 hours (57 entities x 1,040 hours). The estimated cost

associated with such an expert is the estimated number of hours multiplied by the estimated hourly rate of $36.90 plus 100 percent for fringe benefits and overhead, which equals a first year estimated cost of $4,373,864.

In subsequent years, we estimate the burden associated with this requirement for MA organizations and Part D sponsors that are continuing to conform their business continuity plans with our regulation will decrease, for an ongoing burden of 29,640 hours (57 entities x 520 hours). The estimated cost associated with such an expert is the estimated number of hours multiplied by the estimated hourly rate of $36.90 plus 100 percent for fringe benefits and overhead, which equals a first year cost of $2,187,432.

Lastly, as previously discussed in our summary of the proposed effects, we believe that savings that we cannot capture will be realized by this regulation, especially for those MA organizations and Part D sponsors that do not currently have business continuity plans in place. Business continuity planning helps to protect resources and minimize losses. If as a consequence, MA organizations and Part D sponsors, that currently do not have these plans in place, provide Medicare benefits more efficiently after disasters and disruptions, this could result in fewer risks to beneficiary health.

Our analyses of the three provisions with measurable impact—unlawful presence, audit and inspection authority and business continuity operations—show that aggregate savings over 5 years is $33 million. Estimated savings for 2015 is $0 million and the savings increase annually to $11 million for 2019. Consequently, the savings do not reach the $100 million threshold and therefore this final rule is not a major rule.

The Regulatory Flexibility Analysis (RFA), as amended, requires agencies to analyze options for regulatory relief of small businesses, if a rule has a significant impact on a substantial number of small entities. For purposes of the RFA, small entities include small businesses, nonprofit organizations, and small governmental jurisdictions.

The health insurance industry was examined in depth in the RIA prepared for the proposed rule on establishment of the MA program (69 FR 46866, August 3, 2004). It was determined, in that analysis, that there were few, if any, "insurance firms," including HMOs that fell below the size thresholds for "small" business established by the Small Business Administration (SBA). We assume that the "insurance firms" are synonymous with health plans that conduct standard transactions with other covered entities and are, therefore, the entities that will have costs associated with the new requirements finalized in this rule. At the time the analysis for the MA program was conducted, the market for health insurance was and remains, dominated by a handful of firms with substantial market share.

However, we estimate that the costs of this rule on "small" health plans do not approach the amounts necessary to be a "significant economic impact" on firms with revenues of tens of millions of dollars. Therefore, this rule would not have a significant economic impact on a substantial number of small entities.

In addition, section 1102(b) of the Act requires us to prepare a regulatory analysis for any rule or regulation proposed under Title XVIII, Title XIX, or Part B of the Act that may have significant impact on the operations of a substantial number of small rural hospitals. We are not preparing an analysis for section 1102(b) of the Act because the Secretary certifies that this rule will not have a significant impact on the operations of a substantial number of small rural hospitals.

Section 202 of the Unfunded Mandates Reform Act of 1995 (UMRA) also requires that agencies assess anticipated costs and benefits before issuing any rule whose mandates require spending in any 1 year by state, local, or tribal governments, in the aggregate, or by the private sector of $100 million in 1995 dollars, updated annually for inflation. In 2014, that threshold is approximately $141 **\*7958** million. This final rule is not expected to reach this spending threshold.

Executive Order 13132 establishes certain requirements that an agency must meet when it promulgates a proposed rule (and subsequent final rule) that imposes substantial direct requirement costs on state and local governments, preempts

state law, or otherwise has federalism implications. Since this rule does not impose any substantial costs on state or local governments, the requirements of Executive Order 13132 are not applicable.

In accordance with the provisions of Executive Order 12866, this rule was reviewed by the Office of Management and Budget.

**List of Subjects**

*42 CFR Part 417*

Administrative practice and procedure, Grant programs-health, Health care, Health insurance, Health maintenance organizations (HMO), Loan programs-health, Medicare, Reporting and recordkeeping requirements.

*42 CFR Part 422*

Administrative practice and procedure, Health facilities, Health maintenance organizations (HMO), Medicare, Penalties, Privacy, Reporting and recordkeeping requirements.

*42 CFR Part 423*

Administrative practice and procedure, Emergency medical services, Health facilities, Health maintenance organizations (HMO), Health professionals, Medicare, Penalties, Privacy, Reporting and recordkeeping requirements.

For the reasons set forth in the preamble, the Centers for Medicare & Medicaid Services amends 42 CFR Chapter IV as follows:

**PART 417—HEALTH MAINTENANCE ORGANIZATION, COMPETITIVE MEDICAL PLANS, AND HEALTH CARE PREPAYMENT PLANS**

1. The authority citation for part 417 continues to read as follows:

Authority: Secs. 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395hh), secs. 1301, 1306, and 1310 of the Public Health Service Act (42 U.S.C. 300e, 300e-5, and 300e-9), and 31 U.S.C. 9701.
 42 CFR § 417.2

2. Amend § 417.2 by revising paragraph (b) to read as follows:
 42 CFR § 417.2

**§ 417.2 Basis and scope.**

* * * * *

(b) Subparts G through R of this part set forth the rules for Medicare contracts with, and payment to, HMOs and competitive medical plans (CMPs) under section 1876 of the Act and 8 U.S.C. 1611.
 * * * * *42 CFR § 417.420

**§ 417.420 [Amended]**
42 CFR § 417.420

3. Amend § 417.420, paragraph (a) by removing the phrase "Individuals who are entitled to" and adding in its place the phrase "Eligible individuals who are entitled to".
 42 CFR § 417.422

4. Amend § 417.422 as follows:

a. In the introductory text, by removing the phrase "any individual who—" and adding in its place the phrase "any individual who meets all of the following:"

b. In paragraphs (a) through (e), by removing the ";" and adding in its place ".".

c. In paragraph (f), by removing the "; and" and adding in its place ".".

d. Adding paragraph (h).

The addition reads as follows:

 42 CFR § 417.422

**§ 417.422 Eligibility to enroll in an HMO or CMP.**

\* \* \* \* \*

(h) Is a United States citizen or an individual who is lawfully present in the United States as determined in 8 CFR 1.3.

 42 CFR § 417.460

5. Amend § 417.460 as follows:

a. In paragraph (b)(2)(i) by removing "." and adding in its place ";".

b. In paragraph (b)(2)(iii) by removing "; or" and adding in its place ";".

c. Redesignating paragraph (b)(2)(iv) as paragraph (b)(2)(v).

d. Adding a new paragraph (b)(2)(iv).

e. In paragraph (b)(3), by removing the cross-reference "paragraphs (c) through (i)" and adding in its place the cross-reference "paragraphs (c) through (j)".

f. By revising paragraph (c)(3).

g. In paragraph (c)(4), by removing the phrase "non-payment of premiums." and adding in its place the phrase "non-payment of premiums or other charges."

h. By adding paragraph (j).

The revisions and the additions read as follows:

 42 CFR § 417.460

**§ 417.460 Disenrollment of beneficiaries by an HMO or CMP.**

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

(iv) Is not lawfully present in the United States; or

 \* \* \* \* \*

(c) \* \* \*

(3) Good cause and reinstatement. When an individual is disenrolled for failure to pay premiums or other charges imposed by the HMO or CMP for deductible and coinsurance amounts for which the enrollee is liable, CMS (or a third party to which CMS has assigned this responsibility, such as an HMO or CMP) may reinstate enrollment in the plan, without interruption of coverage, if the individual shows good cause for failure to pay and pays all overdue premiums or other charges within 3 calendar months after the disenrollment date. The individual must establish by a credible statement that failure to pay premiums or other charges was due to circumstances for which the individual had no control, or which the individual could not reasonably have been expected to foresee.

* * * * *

(j) Enrollee is not lawfully present in the United States. Disenrollment is effective the first day of the month following notice by CMS that the individual is ineligible in accordance with § 417.422(h).

**PART 422—MEDICARE ADVANTAGE PROGRAM**

6. The authority citation for part 422 continues to read as follows:

Authority: Secs. 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395hh).
42 CFR § 422.1

7. Amend § 422.1 by revising paragraph (a) to read as follows:
42 CFR § 422.1

**§ 422.1 Basis and scope.**

(a) Basis. This part is based on the indicated provisions of the following:

(1) The following provisions of the Act:

(i) 1128J(d)—Reporting and Returning of Overpayments.

(ii) 1851—Eligibility, election, and enrollment.

(iii) 1852—Benefits and beneficiary protections.

(iv) 1853—Payments to Medicare Advantage (MA) organizations.

(v) 1854—Premiums.

(vi) 1855—Organization, licensure, and solvency of MA organizations.

(vii) 1856—Standards.

(viii) 1857—Contract requirements.

(ix) 1858—Special rules for MA Regional Plans.

(x) 1859—Definitions; enrollment restriction for certain MA plans.

(2) 8 U.S.C. 1611—Aliens who are not qualified aliens ineligible for Federal public benefits.
* * * * *42 CFR § 422.50

8. Amend § 422.50 as follows:

a. In paragraph (a) introductory text, by removing the phrase " if he or she—" and adding in its place the phrase "if he or she meets all of the following:"

b. In paragraphs (a)(1) and (4), by removing ";" and adding in its place ".".

 **\*7959**  c. In paragraph (a)(5), by removing "; and" and adding in its place ".".

d. By adding paragraph (a)(7).

The addition reads as follows:
 42 CFR § 422.50

### § 422.50 Eligibility to elect an MA plan.
\* \* \* \* \*
(a) \* \* \*

(7) Is a United States citizen or is lawfully present in the United States as determined in 8 CFR 1.3.
 \* \* \* \* \*42 CFR § 422.74
9. Amend § 422.74 as follows:

a. By adding paragraph (b)(2)(v).

b. By revising paragraph (d)(1)(v).

c. By adding paragraph (d)(8).

The additions and revision read as follows:
 42 CFR § 422.74

### § 422.74 Disenrollment by the MA organization.
\* \* \* \* \*
(b) \* \* \*

(2) \* \* \*

(v) The individual is not lawfully present in the United States.
 \* \* \* \* \*
(d) \* \* \*

(1) \* \* \*

(v) Extension of grace period for good cause and reinstatement. When an individual is disenrolled for failure to pay the plan premium, CMS (or a third party to which CMS has assigned this responsibility, such as an MA organization) may reinstate enrollment in the MA plan, without interruption of coverage, if the individual—

(A) Shows good cause for failure to pay within the initial grace period; and

(B) Pays all overdue premiums within 3 calendar months after the disenrollment date; and

(C) Establishes by a credible statement that failure to pay premiums within the initial grace period was due to circumstances for which the individual had no control, or which the individual could not reasonably have been expected to foresee.

\* \* \* \* \*

(8) Enrollee is not lawfully present in the United States. Disenrollment is effective the first day of the month following notice by CMS that the individual is ineligible in accordance with § 417.422(h) of this chapter.

\* \* \* \* \*42 CFR § 422.100

10. Amend § 422.100 by adding paragraph (m) to read as follows:

42 CFR § 422.100

## § 422.100 General requirements.

\* \* \* \* \*

(m) Special requirements during a disaster or emergency. (1) When a state of disaster is declared as described in paragraph (m)(2) of this section, an MA organization offering an MA plan must, until one of the conditions described in paragraph (m)(3) of this section occurs, ensure access to benefits in the following manner:

(i) Cover Medicare Parts A and B services and supplemental Part C plan benefits furnished at non-contracted facilities subject to § 422.204(b)(3).

(ii) Waive, in full, requirements for gatekeeper referrals where applicable.

(iii) Provide the same cost-sharing for the enrollee as if the service or benefit had been furnished at a plan-contracted facility.

(iv) Make changes that benefit the enrollee effective immediately without the 30-day notification requirement at § 422.111(d)(3).

(2) Declarations of disasters. A declaration of disaster will identify the geographic area affected by the event and may be made as one of the following:

(i) Presidential declaration of a disaster or emergency under the either of the following:

(A) Stafford Act.

(B) National Emergencies Act.

(ii)(A) Secretarial declaration of a public health emergency under section 319 of the Public Health Service Act.

(B) If the President has declared a disaster as described in paragraph (m)(2)(i) or (ii) of this section, then the Secretary may also authorize waivers or modifications under section 1135 of the Act.

(iii) Declaration by the Governor of a State or Protectorate.

(3) End of the disaster. The public health emergency or state of disaster ends when any of the following occur:

(i) The source that declared the public health emergency or state of disaster declares an end.

(ii) The CMS declares an end of the public health emergency or state of disaster.

(iii) Thirty days have elapsed since the declaration of the public health emergency or state of disaster and no end date was identified in paragraph (m)(3)(i) or (ii) of this section.

(4) MA plans unable to operate. An MA plan that cannot resume normal operations by the end of the public health emergency or state of disaster must notify CMS.

(5) Disclosure. In addition to other requirements of annual disclosure under § 422.111, an organization must do all of the following:

(i) Indicate the terms and conditions of payment during the public health emergency or disaster for non-contracted providers furnishing benefits to plan enrollees residing in the state-of-disaster area.

(ii) Annually notify enrollees of the information listed in paragraphs (m)(1) through (3) and (m)(5) of this section.

(iii) Provide the information described in paragraphs (m)(1), (2), (3), and (4)(i) of this section on its Web site.

42 CFR § 422.111

11. Amend § 422.111 by revising paragraph (d)(1) to read as follows:

42 CFR § 422.111

**§ 422.111 Disclosure requirements.**

* * * * *

(d) * * *

(1) Submit the changes for CMS review under procedures of subpart V of this part.

* * * * *42 CFR § 422.112

12. Amend § 422.112 by adding paragraph (b)(7) to read as follows:

42 CFR § 422.112

**§ 422.112 Access to services.**

* * * * *

(b) * * *

(7) With respect to drugs for which payment as so prescribed and dispensed or administered to an individual may be available under Part A or Part B, or under Part D, MA-PD plans must coordinate all benefits administered by the plan and—

(i) Establish and maintain a process to ensure timely and accurate point-of-sale transactions; and

(ii) Issue the determination and authorize or provide the benefit under Part A or Part B or as a benefit under Part D as expeditiously as the enrollee's health condition requires, in accordance with the requirements of subpart M of this part and subpart M of part 423 of this chapter, as appropriate, when a party requests a coverage determination.

* * * * *42 CFR § 422.113

13. Amend § 422.113 by revising paragraph (b)(1)(iii) introductory text to read as follows:

42 CFR § 422.113

**§ 422.113 Special rules for ambulance services, emergency and urgently needed services, and maintenance and post-stabilization care services.**

* * * * *

(b) * * *

(1) * * *

(iii) Urgently needed services means covered services that are not emergency services as defined in this section, provided when an enrollee is temporarily absent from the MA plan's service (or, if applicable, continuation) area (or provided when the enrollee is in the service or continuation area but the organization's provider network is temporarily unavailable or inaccessible) when the services are medically necessary and immediately required—

* * * * *42 CFR § 422.152

14. Amend § 422.152 as follows:

a. Revising paragraph (a) introductory text.

**\*7960** b. Redesignating paragraphs (a)(1) through (3) as paragraphs (a)(2) through (4), respectively.

c. Adding new paragraph (a)(1).

d. In newly redesignated (a)(2), by removing the ";" and adding a ".".

e. In newly redesignated (a)(3), by removing the "; and" and adding a ".".

f. Revising paragraph (c).

g. Revising paragraph (g) introductory text.

h. Revising paragraph (h).

The revisions and addition read as follows:

42 CFR § 422.152

## § 422.152 Quality improvement program.

(a) General rule. Each MA organization that offers one or more MA plan must have, for each plan, an ongoing quality improvement program that meets applicable requirements of this section for the service it furnishes to its MA enrollees. As part of its ongoing quality improvement program, a plan must do all of the following:

(1) Create a quality improvement program plan that sufficiently outlines the elements of the plan's quality improvement program.

* * * * *

(c) Chronic care improvement program requirements. (1) Develop criteria for a chronic care improvement program. These criteria must include the following:

(i) Methods for identifying MA enrollees with multiple or sufficiently severe chronic conditions that would benefit from participating in a chronic care improvement program.

(ii) Mechanisms for monitoring MA enrollees that are participating in the chronic improvement program and evaluating participant outcomes such as changes in health status.

(iii) Performance assessments that use quality indicators that are objective, clearly and unambiguously defined, and based on current clinical knowledge or research.

(iv) Systematic and ongoing follow-up on the effect of the program.

(2) The organization must report the status and results of each program to CMS as requested.

\* \* \* \* \*

(g) Special requirements for specialized MA plans for special needs individuals. All special needs plans (SNPs) must be approved by the National Committee for Quality Assurance (NCQA) effective January 1, 2012 and subsequent years. SNPs must submit their model of care (MOC), as defined under § 422.101(f), to CMS for NCQA evaluation and approval, in accordance with CMS guidance. In addition to the requirements under paragraphs (a) and (f) of this section, a SNP must conduct a quality improvement program that does the following:

\* \* \* \* \*

(h) Requirements for MA private-fee-for-service plans and Medicare medical savings account plans. MA PFFS and MSA plans are subject to the requirement that may not exceed the requirement specified in § 422.152(e).

42 CFR § 422.310

15. Amend § 422.310 by revising paragraph (g)(2)(ii) to read as follows:

42 CFR § 422.310

### § 422.310 Risk adjustment data.

\* \* \* \* \*

(g) \* \* \*

(2) \* \* \*

(ii) After the final risk adjustment data submission deadline, which is a date announced by CMS that is no earlier than January 31 of the year following the payment year, an MA organization can submit data to correct overpayments but cannot submit diagnoses for additional payment.

\* \* \* \* \* 42 CFR § 422.502

### § 422.502 [Amended]

42 CFR § 422.502

16. Amend § 422.502(b)(3) by removing the phrase "CMS may deny an application based on the applicant's" and adding in its place the phrase "CMS may deny an application for a new contract or service area expansion based on the applicant's".

42 CFR § 422.503

17. Amend § 422.503 by adding paragraph (d)(2)(iv) to read as follows:

42 CFR § 422.503

### § 422.503 General provisions.

\* \* \* \* \*

(d) \* \* \*

(2) \* \* \*

(iv) CMS may require that the MA organization hire an independent auditor to provide CMS with additional information to determine if deficiencies found during an audit or inspection have been corrected and are not likely to recur. The independent auditor must work in accordance with CMS specifications and must be willing to attest that a complete and full independent review has been performed.

\* \* \* \* \* 42 CFR § 422.504

18. Amend § 422.504 by adding paragraph (o) to read as follows:

42 CFR § 422.504

### § 422.504 Contract provisions.

\* \* \* \* \*

(o) Business continuity. (1) The MA organization agrees to develop, maintain, and implement a business continuity plan containing policies and procedures to ensure the restoration of business operations following disruptions to business operations which would include natural or man-made disasters, system failures, emergencies, and other similar circumstances and the threat of such occurrences. To meet the requirement, the business continuity plan must, at a minimum, include the following:

(i) Risk assessment. Identify threats and vulnerabilities that might affect business operations.

(ii) Mitigation strategy. Design strategies to mitigate hazards. Identify essential functions in addition to those specified in paragraph (o)(2) of this section and prioritize the order in which to restore all other functions to normal operations. At a minimum, each MA organization must do the following:

(A) Identify specific events that will activate the business continuity plan.

(B) Develop a contingency plan to maintain, during any business disruption, the availability and, as applicable, confidentiality of communication systems and essential records in all forms (including electronic and paper copies). The contingency plan must do the following:

(1) Ensure that during any business disruption the following systems will operate continuously or, should they fail, be restored to operational capacity on a timely basis:

(i) Information technology (IT) systems including those supporting claims processing at point of service.

(ii) Provider and enrollee communication systems including telephone, Web site, and email.

(2) With respect to electronic protected health information, comply with the contingency plan requirements of the Health Insurance Portability and Accountability Act of 1996 Security Regulations at 45 CFR parts 160 and 164, subparts A and C.

(C) Establish a chain of command.

(D) Establish a business communication plan that includes emergency capabilities and procedures to contact and communicate with the following:

(1) Employees.

(2) First tier, downstream, and related entities.

(3) Other third parties (including pharmacies, providers, suppliers, and government and emergency management officials).

(E) Establish employee and facility management plans to ensure that essential operations and job responsibilities can be assumed by other employees or moved to alternate sites as necessary.

(F) Establish a restoration plan including procedures to transition to normal operations.

(G) Comply with all applicable Federal, State, and local laws.

**\*7961** (iii) Testing and revision. On at least an annual basis, test and update the business operations continuity plan to ensure the following:

(A) That it can be implemented in emergency situations.

(B) That employees understand how it is to be executed.

(iv) Training. On at least an annual basis, educate appropriate employees about the business continuity plan and their own respective roles.

(v) Records. (A) Develop and maintain records documenting the elements of the business continuity plan described in paragraphs (o)(1)(i) through (iv) of this section.

(B) Make the information specified in paragraph (o)(1)(v)(A) of this section available to CMS upon request.

(2) Restoration of essential functions. Every MA organization must plan to restore essential functions within 72 hours after any of the essential functions fail or otherwise stop functioning as usual. In addition to any essential functions that the MA organization identifies under paragraph (o)(1)(ii) of this section, for purposes of this paragraph (o)(2) of the section essential functions include, at a minimum, the following:

(i) Benefit authorization (if not waived) for services to be immediately furnished at a hospital, clinic, provider office, or other place of service.

(ii) Operation of call center customer services.

42 CFR § 422.506

19. Amend § 422.506 by revising paragraph (a)(4) to read as follows:

42 CFR § 422.506

**§ 422.506 Nonrenewal of contract.**

(a) \* \* \*

(4) If an MA organization does not renew a contract under paragraph (a) of this section, CMS may deny an application for a new contract or a service area expansion from the MA organization for 2 years unless there are circumstances that warrant special consideration, as determined by CMS. This prohibition may apply regardless of the product type, contract type or service area of the previous contract.

\* \* \* \* \*42 CFR § 422.508

20. Amend § 422.508 by revising paragraph (c) to read as follows:

42 CFR § 422.508

**§ 422.508 Modification or termination of contract by mutual consent.**

\* \* \* \* \*

(c) Agreement to limit new MA applications. As a condition of the consent to a mutual termination CMS will require, as a provision of the termination agreement language prohibiting the MA organization from applying for new contracts or service area expansions for a period of 2 years, absent circumstances warranting special consideration. This prohibition may apply regardless of the product type, contract type or service area of the previous contract.

\* \* \* \* \*42 CFR § 422.512

21. Amend § 422.512 by revising paragraph (e)(1) to read as follows:

42 CFR § 422.512

**§ 422.512 Termination of contract by the MA organization.**

* * * * *

(e) * * *

(1) CMS may deny an application for a new contract or a service area expansion from an MA organization that has terminated its contract within the preceding 2 years unless there are circumstances that warrant special consideration, as determined by CMS. This prohibition may apply regardless of the contract type, product type, or service area of the previous contract.

* * * * *42 CFR § 422.568

22. Amend § 422.568 by revising paragraph (b) to read as follows:

42 CFR § 422.568

**§ 422.568** **Standard timeframes and notice requirements for organization determinations.**

* * * * *

(b) Timeframe for requests for service. Except as provided in paragraph (b)(1) of this section, when a party has made a request for a service, the MA organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than 14 calendar days after the date the organization receives the request for a standard organization determination.

(1) Extensions. The MA organization may extend the timeframe by up to 14 calendar days if—

(i) The enrollee requests the extension;

(ii) The extension is justified and in the enrollee's interest due to the need for additional medical evidence from a noncontract provider that may change an MA organization's decision to deny an item or service; or

(iii) The extension is justified due to extraordinary, exigent, or other non-routine circumstances and is in the enrollee's interest.

(2) Notice of extension. When the MA organization extends the timeframe, it must notify the enrollee in writing of the reasons for the delay, and inform the enrollee of the right to file an expedited grievance if he or she disagrees with the MA organization's decision to grant an extension. The MA organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than upon expiration of the extension.

* * * * *42 CFR § 422.572

23. Amend § 422.572 by revising paragraph (b) to read as follows:

42 CFR § 422.572

**§ 422.572** **Timeframes and notice requirements for expedited organization determinations.**

* * * * *

(b) Extensions. (1) The MA organization may extend the 72-hour deadline by up to 14 calendar days if—

(i) The enrollee requests the extension;

(ii) The extension is justified and in the enrollee's interest due to the need for additional medical evidence from a noncontract provider that may change an MA organization's decision to deny an item or service; or

(iii) The extension is justified due to extraordinary, exigent, or other nonroutine circumstances and is in the enrollee's interest.

(2) Notice of extension. When the MA organization extends the deadline, it must notify the enrollee in writing of the reasons for the delay and inform the enrollee of the right to file an expedited grievance if he or she disagrees with the

MA organization's decision to grant an extension. The MA organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than upon expiration of the extension.

* * * * *42 CFR § 422.590

24. Amend § 422.590 as follows:

a. By revising paragraph (a)(1).

b. In paragraph (d)(1), by removing the cross reference "paragraph (d)(2) of this section" and adding in its place the cross-reference "paragraph (e) of this section".

c. By removing paragraph (d)(2).

d. By redesignating paragraphs (d)(3) through (5) as paragraphs (d)(2) through (4), respectively.

e. By redesignating paragraphs (e) through (g) as paragraphs (f) through (h), respectively;

f. By adding paragraph (e).

The addition and revision read as follows:

42 CFR § 422.590

**§ 422.590** Timeframes and responsibility for reconsiderations.

(a) * * *

(1) Except as provided in paragraph (e) of this section, if the MA organization makes a reconsidered determination that is completely favorable to the enrollee, the MA organization must issue the determination (and effectuate it in accordance with § 422.618(a)) as expeditiously as the enrollee's health condition requires, but no later than 30 **\*7962** calendar days from the date it receives the request for a standard reconsideration.

* * * * *

(e) Extensions. (1) As described in paragraphs (e)(1)(i) through (iii) of this section, the MA organization may extend the standard or expedited reconsideration deadline by up to 14 calendar days if—

(i) The enrollee requests the extension; or

(ii) The extension is justified and in the enrollee's interest due to the need for additional medical evidence from a noncontract provider that may change an MA organization's decision to deny an item or service; or

(iii) The extension is justified due to extraordinary, exigent or other non-routine circumstances and is in the enrollee's interest.

(2) Notice of extension. When the MA organization extends the deadline, it must notify the enrollee in writing of the reasons for the delay and inform the enrollee of the right to file an expedited grievance if he or she disagrees with the MA organization's decision to grant an extension. The MA organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than upon expiration of the extension.

* * * * *42 CFR § 422.618

**§ 422.618** [Amended]

42 CFR § 422.618

25. In § 422.618, amend paragraph (a)(1) by removing the cross-reference "§ 422.590(a)(1)" and adding in its place the cross-reference "§ 422.590(e)".

42 CFR § 422.619

**§ 422.619 [Amended]**

42 CFR § 422.619

26. In § 422.619, amend paragraph (a) by removing the cross-reference "§ 422.590(d)(2)" and adding in its place the cross-reference "§ 422.590(e)".

42 CFR § 422.641

27. Amend § 422.641 by revising paragraphs (b) and (c) to read as follows:

42 CFR § 422.641

**§ 422.641 Contract determinations.**

* * * * *

(b) A determination not to authorize a renewal of a contract with an MA organization in accordance with § 422.506(b).

(c) A determination to terminate a contract with an MA organization in accordance with § 422.510(a).

* * * * * 42 CFR § 422.644

28. Amend § 422.644 by revising paragraphs (a), (b)(1), and (c)(1) to read as follows:

42 CFR § 422.644

**§ 422.644 Notice of contract determination.**

* * * * *

(a) When CMS makes a contract determination under § 422.641, it gives the MA organization written notice.

(b) * * *

(1) Reasons for the determination; and

* * * * *

(c) * * *

(1) General rule. Except as provided in paragraph (c)(2) of this section, CMS mails notice to the MA organization 45 calendar days before the anticipated effective date of the termination.

* * * * * 42 CFR § 422.660

29. Amend § 422.660 by revising paragraphs (a)(2) and (3) and (b)(4) to read as follows:

42 CFR § 422.660

**§ 422.660 Right to a hearing, burden of proof, standard of proof, and standards of review.**

(a) * * *

(2) An MA organization whose contract has been terminated in accordance with § 422.510.

(3) An MA organization whose contract has not been renewed in accordance with § 422.506.

* * * * *

(b) * * *

(4) During a hearing to review the imposition of an intermediate sanction as described at § 422.750, the MA organization has the burden of proving by a preponderance of the evidence that CMS' determination was inconsistent with the requirements of § 422.752(a) and (b).

* * * * * 42 CFR § 422.2262

30. Amend § 422.2262 by adding paragraph (a)(2) to read as follows:

42 CFR § 422.2262

**§ 422.2262 Review and distribution of marketing materials.**

(a) * * *

(2) If CMS does not approve or disapprove marketing materials within the specified review timeframe, the materials will be deemed approved. Deemed approved means that the MA organization may use the material.

 * * * * *42 CFR § 422.2266

**§ 422.2266 [Removed and Reserved]**

42 CFR § 422.2266

31. Section 422.2266 is removed and reserved.

 42 CFR § 422.2274

32. Amend § 422.2274 by revising paragraphs (c) and (d) to read as follows:

 42 CFR § 422.2274

**§ 422.2274 Broker and agent requirements.**

* * * * *

(c) Annual training. The MA organization must ensure that all agents and brokers selling Medicare products are trained annually on the following:

(1) Medicare rules and regulations.

(2) Details specific to the plan products they intend to sell.

(d) Annual testing. It must ensure that all agents and brokers selling Medicare products are tested annually, to ensure the following:

(1) Appropriate knowledge and understanding of Medicare rules and regulations.

(2) Details specific to the plan products they intend to sell.

* * * * *

## PART 423—VOLUNTARY MEDICARE PRESCRIPTION DRUG BENEFIT

33. The authority citation for part 423 continues to read as follows:

Authority: Sections 1102, 1106, 1860D-1 through 1860D-42, and 1871 of the Social Security Act (42 U.S.C. 1302, 1306, 1395w-101 through 1395w-152, and 1395hh).

 42 CFR § 423.1

34. Amend § 423.1 by adding paragraph (a)(3) to read as follows:

 42 CFR § 423.1

**§ 423.1 Basis and scope.**

(a) * * *

(3) Section 1611 of Title 8 of the United States Code regarding individuals who are not lawfully present and ineligible for Federal public benefits.

 * * * * *42 CFR § 423.30

35. Amend § 423.30 as follows:

a. In paragraph (a)(1) introductory text, by removing the phrase "if he or she:" and adding in its place the phrase "if he or she does all of the following:".

b. In paragraph (a)(1)(i), by removing "; and" and adding in its place ".".

c. By adding paragraph (a)(1)(iii).

The addition reads as follows:

42 CFR § 423.30

**§ 423.30 Eligibility and enrollment.**

(a) * * *

(1) * * *

(iii) Is a United States citizen or is lawfully present in the United States as determined in 8 CFR 1.3.

* * * * *42 CFR § 423.44

36. Amend § 423.44 as follows:

a. Adding paragraph (b)(2)(vi).

b. Revising paragraph (d)(1)(vi).

c. Adding paragraph (d)(8).

The additions and revision read as follows:

42 CFR § 423.44

**§ 423.44 Involuntary disenrollment from Part D coverage.**

* * * * *

(b) * * *

(2) * * *

(vi) The individual is not lawfully present in the United States.

* * * * *

(d) * * *

(1) * * *

(vi) Extension of grace period for good cause and reinstatement. When an individual is disenrolled for failure to pay the plan premium, CMS (or a third party to which CMS has assigned this responsibility, such as a Part D sponsor) may reinstate enrollment in the PDP, **\*7963** without interruption of coverage, if the individual shows good cause for failure to pay within the initial grace period, and pays all overdue premiums within 3 calendar months after the disenrollment date. The individual must establish by a credible statement that failure to pay premiums within the initial grace period was due to circumstances for which the individual had no control, or which the individual could not reasonably have been expected to foresee.

* * * * *

(8) Individual is not lawfully present in the United States. Disenrollment is effective the first day of the month following notice by CMS that the individual is ineligible in accordance with § 423.30(a)(1)(iii).

* * * * *42 CFR § 423.100

37. Amend § 423.100 by revising the definitions of "Daily cost-sharing rate" and "Supplemental benefits" to read as follows:

42 CFR § 423.100

**§ 423.100 Definitions.**

* * * * *

Daily cost-sharing rate means, as applicable, the established—

(1) Monthly copayment under the enrollee's Part D plan, divided by the number of days in the approved month's supply for the drug dispensed and rounded to the nearest cent; or

(2) Coinsurance percentage under the enrollee's Part D plan.

* * * * *

Supplemental benefits means benefits offered by Part D plans, other than employer group health or waiver plans, that meet the requirements of § 423.104(f)(1)(ii).

* * * * * 42 CFR § 423.104

38. Amend § 423.104 by adding paragraph (d)(2)(iii) to read as follows:

42 CFR § 423.104

**§ 423.104 Requirements related to qualified prescription drug coverage.**

* * * * *

(d) * * *

(2) * * *

(iii) Tiered cost sharing under paragraph (d)(2)(ii) of this section may not exceed levels annually determined by CMS to be discriminatory.

* * * * * 42 CFR § 423.120

39. Amend § 423.120 by redesignating paragraphs (b)(1)(iv) through (x) as paragraphs (b)(1)(v) through (xi), respectively, and adding paragraph (b)(1)(iv) to read as follows:

42 CFR § 423.120

**§ 423.120 Access to covered Part D drugs.**

* * * * *

(b) * * *

(1) * * *

(iv) Clearly articulates and documents processes to determine that the requirements under paragraphs (b)(1)(i) through (iii) of this section have been met, including the determination by an objective party of whether disclosed financial interests are conflicts of interest and the management of any recusals due to such conflicts.

* * * * * 42 CFR § 423.128

40. Amend § 423.128 by adding paragraph (g) to read as follows:

42 CFR § 423.128

**§ 423.128 Dissemination of Part D information.**

* * * * *

(g) Changes in rules. If a Part D sponsor intends to change its rules for a Part D plan, it must do all of the following:

(1) Submit the changes for CMS review under the procedures of Subpart V of this part.

(2) For changes that take effect on January 1, notify all enrollees at least 15 days before the beginning of the Annual Coordinated Election Period as defined in section 1860D-1(b)(1)(B) of the Act.

(3) Provide notice of all other changes in accordance with notice requirements as specified in this part.

42 CFR § 423.153

41. Amend § 423.153 by revising paragraph (b)(4) to read as follows:

42 CFR § 423.153

**§ 423.153 Drug utilization management, quality assurance, and medication therapy management programs (MTMPs).**

* * * * *

(b) * * *

(4)(i) Daily cost sharing rate. Subject to paragraph (b)(4)(ii) of this section, establishes a daily cost-sharing rate (as defined in § 423.100) and applies it to a prescription presented to a network pharmacy for a covered Part D drug that is dispensed for a supply less than the approved month's supply, if the drug is in the form of a solid oral dose and may be dispensed for less than the approved month's supply under applicable law.

(ii) Exceptions. The requirements of paragraph (b)(4)(i) of this section do not apply to either of the following:

(A) Solid oral doses of antibiotics.

(B) Solid oral doses that are dispensed in their original container as indicated in the Food and Drug Administration Prescribing Information or are customarily dispensed in their original packaging to assist patients with compliance.

(iii) Cost-sharing—(A) Copayments. In the case of a drug that would incur a copayment, the Part D sponsor must apply cost-sharing as calculated by multiplying the applicable daily cost-sharing rate by the days' supply actually dispensed when the beneficiary receives less than the approved month's supply.

(B) Coinsurance. In the case of a drug that would incur a coinsurance percentage, the Part D sponsor must apply the coinsurance percentage for the drug to the days' supply actually dispensed.

* * * * * 42 CFR § 423.154

42. Amend § 423.154 as follows:

a. By redesignating paragraph (a)(2) as paragraph (a)(4).

b. By adding paragraphs (a)(2) and (3).

c. By revising newly designated paragraph (a)(4).

d. By revising paragraph (c).

e. By removing paragraph (e).

f. By redesignating paragraph (f) as paragraph (e).

The revisions and addition read as follows:

42 CFR § 423.154

**§ 423.154 Appropriate dispensing of prescription drugs in long-term care facilities under PDPs and MA-PD plans.**

(a) * * *

(2) Not penalize long-term care facilities' choice of more efficient uniform dispensing techniques described in paragraph (a)(1)(ii) of this section by prorating dispensing fees based on days' supply or quantity dispensed.

(3) Ensure that any difference in payment methodology among long-term care pharmacies incentivizes more efficient dispensing techniques.

(4) Collect and report information, in a form and manner specified by CMS, on the dispensing methodology used for each dispensing event described by paragraph (a)(1) of this section.

* * * * *

(c) Waivers. CMS waives the requirements under paragraph (a) of this section, except paragraphs (a)(2) and (3), for pharmacies when they service intermediate care facilities for the mentally retarded (ICFs/IID) and institutes for mental disease (IMDs) as defined in § 435.1010 and for I/T/U pharmacies (as defined in § 423.100).

* * * * *42 CFR § 423.322

43. Amend § 423.322 by revising paragraph (b) to read as follows:

42 CFR § 423.322

**§ 423.322 Requirement for disclosure of information.**

* * * * *

(b) Restrictions on use of information. (1) Officers, employees, and contractors of the Department of Health and Human Services may use the information disclosed or obtained in accordance with the provisions of this subpart for the purposes of, and to the extent necessary—

(i) In carrying out this subpart, including, but not limited to, determination of payments, and payment-related oversight and program integrity activities.

 **\*7964**  (ii) In conducting oversight, evaluation, and enforcement under Title XVIII of the Act.

(2) The United States Attorney General and the Comptroller General of the United States may use the information disclosed or obtained in accordance with the provisions of this subpart for purposes of, and to the extent necessary in, carrying out health oversight activities.

(3) The restrictions described in paragraphs (b)(1) and (2) of this section do not limit either of the following:

(i) OIG's authority to fulfill the Inspector General's responsibilities in accordance with applicable Federal law.

(ii) CMS' ability to use data regarding drug claims in accordance with section 1848(m) of the Act.

42 CFR § 423.329

**§ 423.329 [Amended]**

42 CFR § 423.329

44. Amend § 423.329(d)(1), by removing the phrase "the amount described in § 423.782." and adding in its place the phrase "the difference between the cost sharing for a non-low-income subsidy eligible beneficiary under the Part D plan and the statutory cost sharing for a low-income subsidy eligible beneficiary."

42 CFR § 423.346

**§ 423.346 [Amended]**

42 CFR § 423.346

45. Amend § 423.346(a) introductory text by removing the phrase "as described in § 423.336)—" and adding in its place the phrase "as described in § 423.336) or the Coverage Gap Discount Reconciliation (as described at § 423.2320(b))—" .

 42 CFR § 423.350

46. Amend § 423.350 as follows:

a. In paragraph (a)(1)(iii), by removing "; or" and adding in its place ".".

b. In paragraph (a)(1)(iv), by removing ")." adding in its place ".".

c. By adding paragraph (a)(1)(v).

d. By revising paragraph (a)(2).

e. By adding paragraph (b)(1)(iv).

The additions and revision read as follows:

 42 CFR § 423.350

### § 423.350 Payment appeals.

(a) * * *

(1) * * *

(v) The reconciled coverage gap discount payment under § 423.2320(b).

(2) Payment information not subject to appeal. Payment information submitted to CMS under § 423.322 and reconciled under § 423.343 or submitted and reconciled under § 423.2320(b) is final and may not be appealed nor may the appeals process be used to submit new information after the submission of information necessary to determine retroactive adjustments and reconciliations.

(b) * * *

(1) * * *

(iv) For the Coverage Gap Discount Program, the date of the final reconciled payment under § 423.2320(b).

 * * * * * 42 CFR § 423.464

47. Amend § 423.464 by redesignating paragraph (f)(2)(i)(B) as paragraph (f)(2)(i)(C) and adding paragraph (f)(2)(i)(B) to read as follows:

 42 CFR § 423.464

### § 423.464 Coordination of benefits with other providers of prescription drug coverage.

* * * * *

(f) * * *

(2) * * *

(i) * * *

(B) Report, accept and apply benefit accumulator data in a timeframe and manner determined by CMS.

 * * * * * 42 CFR § 423.466

48. Amend § 423.466 by revising the section heading and, in paragraph (b), removing the phrase "a period not to exceed 3 years" and adding in its place the phrase "a period of 3 years" to read as follows:

42 CFR § 423.466

**§ 423.466** **Timeframes for coordination of benefits and claims adjustments.**

* * * * *42 CFR § 423.503

49. Amend § 423.503 by revising paragraph (a)(1) and adding paragraphs (c)(4) and (d) to read as follows:

42 CFR § 423.503

**§ 423.503** **Evaluation and determination procedures for applications to be determined qualified to act as a sponsor.**

(a) * * *

(1) With the exception of evaluations conducted under paragraph (b) of this section, CMS evaluates an entity's application solely on the basis of information contained in the application itself and any additional information that CMS obtains through on-site visits and any essential operations test.

* * * * *

(c) * * *

(4) Nullification of approval of application. If CMS discovers through any means that an applicant is not qualified to contract based on information gained subsequent to application approval (for example, failure of an essential operations test, absence of required employees, etc.), CMS gives the applicant written notice indicating that the approval issued under paragraph (c)(1) of this section is nullified and the applicant no longer qualifies to contract as a Part D plan sponsor.

(i) This determination is not subject to the appeals provisions in subpart N of this part.

(ii) This provision only applies to applicants that have not previously entered into a Part D contract with CMS and neither it, nor another subsidiary of the applicant's parent organization, is offering Part D benefits during the current year.

(d) Withdrawal of application and bid in a previous year. An applicant that withdraws its application and corresponding bid after the release of the low-income subsidy benchmark is not eligible to be approved as a Part D plan sponsor for the 2 succeeding annual contracting cycles.

42 CFR § 423.504

50. Amend § 423.504 by adding paragraphs (b)(10) and (d)(2)(iv) to read as follows:

42 CFR § 423.504

**§ 423.504** **General provisions.**

* * * * *

(b) * * *

(10) Pass an essential operations test prior to the start of the benefit year. This provision only applies to new sponsors that have not previously entered into a Part D contract with CMS when neither it, nor another subsidiary of the applicant's parent organization, is offering Part D benefits during the current year.

* * * * *

(d) * * *

(2) * * *

(iv) CMS may require that the Part D Plan sponsor hire an independent auditor to provide CMS with additional information to determine if deficiencies found during an audit or inspection have been corrected and are not likely to

recur. The independent auditor must work in accordance with CMS specifications and must be willing to attest that a complete and full independent review has been performed.

* * * * *42 CFR § 423.505

51. Amend § 423.505 by adding paragraphs (b)(27) and (p) to read as follows:

42 CFR § 423.505

**§ 423.505** Contact provisions.

* * * * *

(b) * * *

(27) Pass an essential operations test prior to the start of the benefit year. This provision only applies to new sponsors that have not previously entered into a Part D contract with CMS and neither it, nor another subsidiary of the applicant's parent organization, is offering Part D benefits during the current year.

* * * * *

(p) Business continuity. (1) The Part D sponsor agrees to develop, maintain, and implement a business continuity plan containing policies and procedures to ensure the restoration of business operations following disruptions to business operations during disruptions to business operations which would **\*7965** include natural or man-made disasters, system failures, emergencies, and other similar circumstances and the threat of such occurrences. To meet the requirement, the business continuity plan must, at a minimum, include the following:

(i) Risk assessment. Identify threats and vulnerabilities that might affect business operations.

(ii) Mitigation strategy. Design strategies to mitigate hazards. Identify essential functions in addition to those specified in paragraph (p)(2) of this section and prioritize the order in which to restore all other functions to normal operations. At a minimum, each Part D sponsor must do the following:

(A) Identify specific events that will activate the business continuity plan.

(B) Develop a contingency plan to maintain, during any business disruption, the availability and, as applicable, confidentiality of communication systems and essential records in all forms (including electronic and paper copies). The contingency plan must do the following:

(1) Ensure that during any business disruption the following systems will operate continuously or, should they fail, be restored to operational capacity on a timely basis:

(i) Information technology (IT) systems including those supporting claims processing at point of service.

(ii) Provider and enrollee communication systems including telephone, Web site, and email.

(2) With respect to electronic protected health information, comply with the contingency plan requirements of the Health Insurance Portability and Accountability Act of 1996 Security Regulations at 45 CFR parts 160 and 164, subparts A and C.

(C) Establish a chain of command.

(D) Establish a business communication plan that includes emergency capabilities and procedures to contact and communicate with the following:

(1) Employees.

(2) First tier, downstream, and related entities.

(3) Other third parties (including pharmacies, providers, suppliers, and government and emergency management officials).

(E) Establish employee and facility management plans to ensure that essential operations and job responsibilities can be assumed by other employees or moved to alternate sites as necessary or both.

(F) Establish a restoration plan including procedures to transition to normal operations.

(G) Comply with all applicable Federal, State, and local laws.

(iii) Testing and revision. On at least an annual basis, test and update the business operations continuity plan to ensure the following:

(A) That it can be implemented in emergency situations.

(B) That employees understand how it is to be executed.

(iv) Training. On at least an annual basis, educate appropriate employees about the business continuity plan and their own respective roles.

(v) Records. (A) Develop and maintain records documenting the elements of the business continuity plan described in paragraph (p)(1)(i) through (iv) of this section.

(B) Make the information specified in paragraph (p)(1)(v)(A) of this section available to CMS upon request.

(2) Restoration of essential functions. Every Part D sponsor must plan to restore essential functions within 72 hours after any of the essential functions fail or otherwise stop functioning as usual. In addition to any essential functions that the Part D sponsor identifies under paragraph (p)(1)(ii) of this section, for purposes of this paragraph (p)(2) of this section essential functions include at a minimum, the following:

(i) Benefit authorization (if not waived), adjudication, and processing of prescription drug claims at the point of sale.

(ii) Administration and tracking of enrollees' drug benefits in real time, including automated coordination of benefits with other payers.

(iii) Provision of pharmacy technical assistance.

(iv) Operation of an enrollee exceptions and appeals process including coverage determinations.

(v) Operation of call center customer services.

42 CFR § 423.509

52. Amend § 423.509 by adding paragraph (a)(4)(xii) and revising paragraph (b)(2)(i)(C) to read as follows:

42 CFR § 423.509

**§ 423.509** Termination of a contract by CMS.

(a) * * *

(4) * * *

(xii) Failure of an essential operations test before the start of the benefit year by an organization that has entered into a Part D contract with CMS when neither it, nor another subsidiary of the organization's parent organization, is offering Part D benefits during the current year.

(b) * * *

(2) * * *

(i) * * *

(C) The contract is being terminated based on the grounds specified in paragraphs (a)(4)(i) and (xii) of this section.
 * * * * *42 CFR § 423.562

### § 423.562 [Amended]
42 CFR § 423.562
53. Amend § 423.562(a)(3) by removing the phrase "request an exception if they disagree with the information provided by the pharmacist." and adding in its place the phrase "request an exception.".
 42 CFR § 423.650

### § 423.650 [Amended]
42 CFR § 423.650
54. Amend § 423.650 as follows:

a. In paragraph (a)(2), by removing the term "under" and adding in its place the phrase "in accordance with".

b. In paragraph (a)(4), by removing the cross-reference "§ 423.752(a) and (b) of this part" and adding in its place the cross-reference "§ 423.752(a) through (b)".
 42 CFR § 423.2262
55. Amend § 423.2262 by adding paragraph (a)(2) to read as follows:
 42 CFR § 423.2262

### § 423.2262 Review and distribution of marketing materials.
(a) * * *

(2) If CMS does not approve or does not disapprove marketing materials within the specified review timeframe, the materials are deemed approved and the Part D sponsor may use the material.
 * * * * *42 CFR § 423.2266

### § 423.2266 [Removed and Reserved]
42 CFR § 423.2266
56. Section 423.2266 is removed and reserved.
 42 CFR § 423.2274
57. Amend § 423.2274 by revising paragraphs (c) and (d) to read as follows:
 42 CFR § 423.2274

### § 423.2274 Broker and agent requirements.
* * * * *
(c) Annual training. The Part D sponsor must ensure that all agents and brokers selling Medicare products are trained annually on the following:

(1) Medicare rules and regulations.

(2) Details specific to the plan products they intend to sell.

(d) Annual testing. The Part D sponsor must ensure that all agents and brokers selling Medicare products are tested annually, to ensure the following:

(1) Appropriate knowledge and understanding of Medicare rules and regulations.

(2) Details specific to the plan products they intend to sell.
 * * * * *42 CFR § 423.2320
58. Amend § 423.2320 by adding paragraph (c) to read as follows:
 42 CFR § 423.2320

## § 423.2320 Payment processes for Part D sponsors.
* * * * *

(c) Manufacturer bankruptcy. In the event that a manufacturer declares **\*7966** bankruptcy, as described in Title 11 of the United States Code, and as a result of the bankruptcy, does not pay the quarterly invoices described in § 423.2315(b)(10) used for a particular contract year's Coverage Gap Discount Reconciliation described in paragraph (b) of this section, CMS adjusts the Coverage Gap Discount Reconciliation amount of each of the affected Part D sponsors to account for the total unpaid quarterly invoiced amount owed to each of the Part D sponsors for that particular contract year being reconciled.
 42 CFR § 423.2325
59. Amend § 423.2325 by adding paragraph (h) to read as follows:
 42 CFR § 423.2325

## § 423.2325 Provision of applicable discounts.
* * * * *

(h) Treatment of employer group waiver plans. As of 2014, Part D sponsors offering employer group waiver plans must provide applicable discounts to applicable beneficiaries who are employer group waiver plan enrollees as determined consistent with the defined standard benefit.

Dated: December 18, 2014.

Marilyn Tavenner,

Administrator, Centers for Medicare & Medicaid Services.


Approved: February 4, 2015.

Sylvia M. Burwell,

Secretary, Department of Health and Human Services.


[FR Doc. 2015-02671 Filed 2-6-15; 4:15 pm]

BILLING CODE 4120-01-P

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   109

# DEF-INTERV.

# EX. 54

 Neutral
As of: June 12, 2019 2:19 PM Z

## *Dep't of Homeland Sec. v. Casa de Md.*

Supreme Court of the United States

June 3, 2019, Decided

No. 18-1469.

**Reporter**

2019 U.S. LEXIS 3892 *

Department of Homeland Security, et al., Petitioners v. Casa de Maryland, et al.

**Prior History:** *Casa De Md. v. United States Dep't of Homeland Sec., 2019 U.S. App. LEXIS 14600 (4th Cir. Md., May 17, 2019)*

**Judges:** **[*1]** Roberts, Thomas, Ginsburg, Breyer, Alito, Sotomayor, Kagan, Gorsuch, Kavanaugh.

## Opinion

The motion to expedite consideration of the petition for a writ of certiorari is denied.

---

End of Document

# DEF-INTERV.
# EX. 55

*Press Office*
**U.S. Department of Homeland Security**



# Press Release

November 25, 2005

### USCIS ANNOUNCES INTERIM RELIEF FOR FOREIGN STUDENTS ADVERSELY IMPACTED BY HURRICANE KATRINA

Washington, D.C. – U.S. Citizenship and Immigration Services (USCIS) announced specific interim relief today for the approximately 5,500 foreign academic students adversely impacted by Hurricane Katrina.  The Notice, which was published in the *Federal Register*, will allow Katrina-impacted foreign academic students (F-1 visa holders) to:

- Apply for immediate, short-term employment authorization;
- Work additional hours on-campus, or work off-campus if granted employment authorization; and
- Reduce normal course load requirements if granted employment authorization.

The interim relief will remain in effect until February 1, 2006.  Foreign vocational students (M-1 visa holders) and foreign exchange students (J-1 visa holders) are not eligible for this interim relief.  DHS will continue to monitor the adverse impact of Hurricane Katrina in the affected areas to determine if modification of the interim relief is warranted and will announce any modifications in the *Federal Register*.

Eligible foreign academic students wishing to work additional hours on-campus must obtain approval from their designated school official.  Eligible foreign academic students wishing to work off-campus must file an Application for Employment Authorization (Form I-765) directly with the Texas Service Center at:

> *U.S. Citizenship and Immigration Services, Texas Service Center,*
> *P.O. Box 853062, Mesquite, TX 75815-3062.*

Applicants should mark the front of the envelope on the bottom right-hand side with the phrase, "HURRICANE KATRINA SPECIAL STUDENT RELIEF."  Applicants who are unable to pay the Form I-756 filing fee may request a fee waiver. Read our Frequently Asked Questions.

Katrina-impacted foreign academic students not covered by the Notice and their dependents (F-2 visa holders) may request deferred action and apply for employment authorization based on economic necessity.  A grant of deferred action in this context means that, during the period that the grant of deferred action remains in effect, DHS will not seek the removal of the foreign academic student or his or her qualified dependents based upon the fact that the failure to maintain status is directly due to Hurricane Katrina.  Deferred action requests are decided on a case-by-case basis.  USCIS cannot provide any assurance that all such requests will be granted.  A grant of deferred action does not provide an individual any legal immigration status in the United States.  Therefore, in order to resume their nonimmigrant status, foreign academic students who are granted deferred action must apply for reinstatement following the period of deferred action, which shall expire no later than February 1, 2006.

Eligible foreign academic students and their qualified dependents wishing to request deferred action and apply for employment authorization based on economic necessity must submit a letter, substantiating their need for deferred action, and file an Application for Employment Authorization (Form I-765) directly with the Texas Service Center at the address above.  Applicants should mark the front of the envelope on the

bottom right-hand side with the phrase, "HURRICANE KATRINA SPECIAL STUDENT RELIEF." Applicants who are unable to pay the Form I-756 filing fee may request a fee waiver.

For additional information, please refer to the *Federal Register* Notice or visit the USCIS website at http://uscis.gov/.

– USCIS –

On March 1, 2003, U.S. Citizenship and Immigration Services became one of three legacy INS components to join the U.S. Department of Homeland Security.  USCIS is charged with fundamentally transforming and improving the delivery of immigration and citizenship services, while enhancing the integrity of our nation's security.

# DEF-INTERV. EX. 56

U.S. Department of Homeland Security
20 Massachusetts Ave., NW
Washington. DC 20529



**U.S. Citizenship
and Immigration
Services**

HQDOMO 70/6.1.1-P
70/6.1.3-P
*AFM* Update AD10-09

# Interoffice Memorandum

To:    Executive Leadership

From:  Donald Neufeld
        Acting Associate Director
        Domestic Operations Directorate

        Lori Scialabba
        Associate Director
        Refugee, Asylum, and International Operations Directorate

        Pearl Chang
        Acting Chief
        Office of Policy and Strategy

Date: **DEC - 2 2009**

SUBJECT:    Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and
              their Children (REVISED)

              Effect of FY2010 DHS Appropriations Act on eligibility to immigrate after death
              of visa petitioner

              Revisions to Adjudicator's Field Manual (AFM) Chapter(s) 21.2(a)(4) and
              (h)(1)(C)
              (AFM Update AD10-09)

## I. Purpose

This memorandum supersedes an earlier memorandum on this subject, dated November 13,
2009, and provides updated guidance to U.S. Citizenship and Immigration Services (USCIS)
field offices and service centers regarding the processing of Forms I-130, petitions for alien
relative, and I-485, application to register permanent residence or adjust status, filed by surviving
spouses of deceased U.S. citizens and the qualifying children of the surviving spouses. This new
guidance is based on the enactment of section 568(c) of the Department of Homeland Security
Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 4142, 4186 (2009), which provides

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 2

relief for these aliens.  Section 568(c) entered into force on October 28, 2009, the date of
enactment.

Sections 568(d) and (e) of the FY2010 DHS Appropriations Act, which provide relief for aliens
who are surviving beneficiaries of certain pending or approved petitions filed by certain
qualifying categories of noncitizens, will be addressed in a separate memorandum.

## II.  Background

### A.   Prior Policy and Related Litigation

For many years, U.S. immigration policy has been that a Form I-130 could not be approved if the
petitioner died while the Form I-130 was pending.  *See Matter of Sano,* 19 I&N Dec. 299 (BIA
1985); *Matter of Varela,* 13 I&N Dec. 453 (BIA 1970).  As far back as 1938, our immigration
regulations have provided for the revocation of the approval of a visa petition upon the
petitioner's death.  More recently, the regulations, while maintaining that general policy, have
provided for discretion, for "humanitarian reasons," to reinstate the approval.  8 C.F.R. §
205.1(a)(3)(i)(C)(2).  Also, since 2006, 8 C.F.R. § 204.2(i)(1)(iv) and 205.1(a)(3)(i)(C)(1) have
provided that the automatic revocation provision does not apply to a spousal immediate relative
visa petition, if the deceased petitioner and the alien widow(er) had been married at least two
years when the petitioner died.

Over the past several years, widow(er)s of citizens who had died before the second anniversary
of the underlying marriages have challenged this long-standing policy as being inconsistent with
the statute.  The federal courts of appeals have split on the legal issue.  *Compare Robinson v.
Napolitano,* 554 F.3d 358 (3d Cir. 2009) (sustaining agency view that petitioner's death while a
Form I-130 is pending ends the beneficiary's eligibility); *petition for cert. filed,* No. 09- 94 (U.S.
filed July 23, 2009), *with Taing v. Napolitano,* 567 F.3d 19 (1st Cir. 2009) (holding agency
policy violative of statute); *Lockhart v. Napolitano,* 561 F.3d 611 (6th Cir. 2009) (same); *and
Freeman v. Gonzales,* 444 F.3d 1031 (9th Cir. 2006) (same).  The issue has engendered much
litigation before the federal district courts in recent months, with most courts ruling against the
agency.  Among the unfavorable decisions is the class action ruling in *Hootkins v. Napolitano,*
___ F. Supp. 2d ___, 2009 WL 2222839 (C.D. Cal. Apr. 28, 2009), which is on appeal to the
Ninth Circuit Court of Appeals.  Other cases are pending in district courts throughout the United
States.

### B.  Section 568(c) of FY2010 DHS Appropriations Act

Congress, however, recently acted to resolve the issue.  On October 28, 2009, the President
signed into law the FY2010 DHS Appropriations Act.  Section 568(c) of the new law amends the
second sentence in section 201(b)(2)(A)(i) of the INA so that, for a widow(er) of a citizen to
qualify as an immediate relative, it is no longer necessary for the couple to have been married at
least two years when the citizen died.  The second sentence of section 201(b)(2)(A)(i) now reads,

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 3

> In the case of an alien who was the spouse of a citizen of the United States and
> was not legally separated from the citizen at the time of the citizen's death, the
> alien (and each child of the alien) shall be considered, for purposes of this
> subsection, to remain an immediate relative after the date of the citizen's death
> but only if the spouse files a petition under [section 204(a)(1)(A)(ii) of the INA]
> within 2 years after such date and only until the date the spouse remarries.

When a widow(er) qualifies as an immediate relative under the second sentence in section
201(b)(2)(A)(i) of the INA, his or her children, as defined in sections 101(b)(1) and 201(f) of the
INA, also qualify.  The amendment made by section 568(c) applies equally to aliens abroad who
are seeking immigrant visas and aliens in the United States who are seeking adjustment of status.
The amendment applies to any alien whose spouse died before October 28, 2009, and who had a
Form I-130 pending on October 28, 2009.  If no Form I-130 was pending, then an alien whose
U.S. citizen spouse died before October 28, 2009, and before the second anniversary of their
marriage, may file a visa petition under section 204(a)(1)(A)(ii) of the INA so long as (a) the
alien has not remarried, and (b) the petition is filed no later than October 28, 2011.

Section 568(c) relates only to the impact of the citizen's death on the alien's eligibility for
classification as an immediate relative.  All other requirements for approval of a visa petition
remain in force.  In particular, the alien must still establish that he or she was the citizen's legal
spouse, and that the marriage was a bona fide marriage and not an arrangement solely to confer
immigration benefits on the alien.  If the alien was in removal proceedings at the time of the
marriage, the "clear and convincing evidence" standard in section 245(e)(3) of the INA will still
apply to the adjudication of the visa petition.  If the necessary visa petition is approved, the alien
may then seek an immigrant visa or adjustment of status.  The alien must still establish that he or
she is admissible as an immigrant and, in an adjustment case, that he or she meets all other
adjustment eligibility requirements and merits a favorable exercise of discretion.

In light of this new legislation, the policy guidance stated in the November 8, 2007,
memorandum entitled "Effect of Form I-130 Petitioner's Death on Authority to Approve the
Form I-130" (*AFM* Update AD08-04) is obsolete.  This memorandum amends the Adjudicator's
Field Manual to remove the material added in that earlier memorandum.

## III. Policy Guidance and AFM Update

## *AFM* Update

1. Chapter 21.2 of the *AFM* entitled "Factors Common to the Adjudication of All Relative Visa
   Petitions" is amended by

   a. Removing chapter 21.2(a)(4)
   b. Removing the **Note** at the end of chapter 21.2(h)(1)(C).

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 4

## A. **Widow(er)s with pending cases**

Section 568(c)(2)(A) of the FY2010 DHS Appropriations Act makes the amendment to the
second sentence in INA section 201(b)(2)(A)(i) applicable to any visa petition or adjustment
application "pending on or after the date of enactment." As noted, the date of enactment is
October 28, 2009.

### *1. Reopening of pending Form I-130 cases*

For purposes of this amendment, a Form I-130 will be deemed "pending" on October 28 2009, if
the deceased citizen had filed a Form I-130 on or before that date but:

- USCIS has not adjudicated the Form I-130;

- USCIS denied the Form I-130, but USCIS granted a motion to reopen or reconsider, so
  that the Form I-130 is, again, pending;

- USCIS denied the Form I-130, but has not yet ruled on a motion to reopen or reconsider;

- USCIS denied the Form I-130, but the alien's appeal from that decision is pending before
  the Board of Immigration Appeals (BIA) or the period for appeal of the adverse USCIS
  decision to the BIA had not yet expired; or

- The USCIS or BIA decision denying the Form I-130 is the subject of pending litigation
  before a federal court (including cases in which the district court issued a decision before
  October 28, 2009, but the appeals period established by law had not yet expired).

Under 8 C.F.R. § 204.2(i), a citizen's spousal Form I-130 is automatically converted to a
widow(er)'s Form I-360 if, on the date of the citizen's death, the beneficiary qualifies as a
widow(er) under the second sentence in section 201(b)(2)(A)(i). Under section 568(c) of the
FY2010 DHS Appropriations Act, these aliens now qualify under the second sentence. Thus,
any Form I-130 that is "pending" as described in the preceding paragraph will be deemed to be,
and adjudicated as, a widow(er)'s Form I-360.

In any Form I-130 case in which a motion to reopen or for reconsideration was filed, but not
acted on, USCIS will grant the motion and make a new decision in light of section 568(c) of the
FY2010 DHS Appropriations Act.

Any Form I-130 that is the subject of litigation in any federal court on the issue of the effect of
the petitioner's death is, as of the date of this memorandum, reopened for a new decision in light
of section 568(c) of the FY2010 DHS Appropriations Act. The beneficiary need not file a
separate motion. Nor does it matter, for purposes of reopening the Form I-130, whether the
beneficiary is currently in the United States or abroad. If the decision denying or terminating
action on the Form I-130 was pending in any court on October 28, 2009, the decision is now

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 5

reopened.  USCIS will therefore make a new decision in light of section 568(c) of the FY2010
DHS Appropriations Act.

Cases challenging the denial of a spousal immediate relative Form I-130 based on the
petitioner's death have been filed in district courts throughout the United States.  USCIS officers
must consult with the appropriate regional or service center counsel to identify those cases that
are the subject of litigation that was pending on October 28, 2009.  Once a case is identified as
subject to reopening under this memorandum, the USCIS officer will notify the alien in writing
that the Form I-130 is reopened in light of section 568(c) of the FY2010 DHS Appropriations
Act, and will be readjudicated as a Form I-360.

If it is determined that a Form I-130 had been filed but was not "pending" on October 28, 2009,
because a USCIS decision denying the Form I-130 had become final before October 28, 2009
(and no administrative appeal or civil action challenging the denial was pending on October 28,
2009), please refer to part III(B) of this memorandum.

2.     <em>Reopening of pending Form I-485 cases</em>

Section 568(c)(2)(A) of the FY2010 DHS Appropriations Act also makes the amendment
applicable to any Form I-485 that was pending on the date of enactment.  A Form I-485 is
deemed "pending" on the date of enactment if it was filed before the deceased citizen's death
but:

- USCIS has not adjudicated the Form I-485

- USCIS denied the Form I-485, but USCIS granted a motion to reopen or reconsider, so
  that the Form I-485 is, again, pending

- USCIS denied the Form I-485, but has not yet ruled on a motion to reopen or reconsider;

- The Form I-485 is the subject of litigation before a federal court (including cases in
  which the district court issued a decision before October 28, 2009, but the appeals period
  established by law had not yet expired).

With this guidance memo, USCIS also reopens, without the need for a formal motion, any Form
I-485 that is the subject of litigation on this issue in any federal court, if USCIS still has
jurisdiction to act on the Form I-485.  As with the reopening of the related Form I-130, the
USCIS officer will notify the applicant in writing that the Form I-485 is reopened in light of
section 568(c) of the FY2010 DHS Appropriations Act.

In the case of a widow(er) who entered the United States as a K-1 nonimmigrant, and filed a
Form I-485 after marrying the deceased citizen who had filed the Form I-129F, ordinarily there
will not be a Form I-130.  If the Form I-485 is still "pending" as described in this memo, and
USCIS still has jurisdiction to act on it, the Form I-485 will also be reopened for a new decision
in light of section 568(c) of the FY2010 DHS Appropriations Act, without the need for a formal

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 6

motion.  Since no Form I-130 is required for a K-1 nonimmigrant to seek adjustment after
marrying the K petitioner within the period specified by statute, the K-1 nonimmigrant will also
be deemed the beneficiary of a Form I-360 if the K-1 nonimmigrant now qualifies as a
widow(er).  The K-1 nonimmigrant still may not adjust on any basis other than the K-1
nonimmigrant's having married the citizen petitioner who filed the Form I-129F.

Some aliens may have been placed into removal proceeding after USCIS denied their Forms I-
485.  Except for "arriving aliens," this factor would mean that USCIS no longer has jurisdiction
to adjudicate the Form I-485.  8 C.F.R. § 245.2(a)(1) and 1245.2(a)(1).  USCIS would have
jurisdiction to adjudicate the Form I-485 only if the Executive Office for Immigration Review
(EOIR) terminated the removal proceeding.  Whether to support or oppose terminating a removal
proceeding is a matter for U.S. Immigration and Customs Enforcement to decide, not USCIS.  If
a USCIS office reopens a Form I-130 involving an alien in removal proceedings, the USCIS
office must, through the appropriate USCIS counsel, advise the local counsel for U.S.
Immigration and Customs Enforcement.

Some aliens whose citizen spouses had died may have left the United States voluntarily, without
obtaining a grant of advance parole.  Others may have left after obtaining advance parole, but
may have remained abroad after expiration of the Form I-512.  Under 8 C.F.R. §
245.2(a)(ii)(4)(B), these aliens have abandoned their adjustment applications.  Also abandoned is
the adjustment application of an alien who left as the result of removal proceedings.  8 C.F.R. §
245.2(a)(4)(ii)(A).  In these situations, a Form I-485 will not be deemed "pending" for purposes
of section 568(c)(2)(A).  However, where section 568(c) applies to the approved Form I-130, and
the Form I-130 has been approved as a Form I-360, the alien approved on that I-360 who has left
the United States may apply for an immigrant visa abroad.

> 3.    *Petition already approved before death*

If a widow(er) is the beneficiary of a Form I-130 that was approved before the citizen
petitioner's death, it is not necessary for the widow(er) to request humanitarian reinstatement of
the approval.  Under 8 C.F.R. § 204.2(i)(1)(iv), the approved Form I-130 is automatically
converted to an approved Form I-360.  Any children of the widow(er) will also be eligible to
seek an immigrant visa or adjustment of status based on the converted petition.

There may be some cases in which a spousal immediate relative Form I-130 was approved, but
the approval was revoked automatically under 8 C.F.R. 205.1(a)(3)(i)(C) upon the citizen
petitioner's death.  If the alien is now eligible for classification as the widow(er) of a citizen
under section 568(c)(2)(A) of the  FY2010 DHS Appropriations Act , the approval will be
deemed to have been reinstated, effective October 28, 2009.  No separate request for
reinstatement is necessary.  Under 8 C.F.R. § 204.2(i)(1)(iv), the Form I-130 will be deemed to
be an approved Form I-360.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 7

>    4.    *Admissibility issues*

Whether an alien is actually admissible is not germane in adjudicating a Form I-130.  *Matter of O-*, 8 I&N Dec. 295 (BIA 1959).  The only issue resolved by enactment of section 568(c) of the FY2010 DHS Appropriations Act is that the death of the citizen spouse, by itself, does not make the widow(er) ineligible for immediate relative classification. Thus, the alien must still be admissible as an immigrant to obtain adjustment of status or an immigrant visa.

For those aliens, however, who had pending Form I-130 cases, and who now can benefit from section 568(c) of the FY2010 DHS Appropriations Act, two inadmissibility grounds warrant special consideration.  The first is section 212(a)(9)(B)(i) of the Act, under which an alien is inadmissible if the alien seeks admission within a specified period after the alien leaves the United States, if the alien has accrued a lengthy period of unlawful presence.  The second is section 212(a)(9)(A), under which an alien who has been removed (or who left the United States while under a final administrative order of removal) must obtain consent to reapply, if the alien seeks admission within the period set in section 212(a)(9)(A).

It is important to note that the special provisions in this memorandum relating to INA section 212(a)(9)(A) and (B) apply only to an alien who was the beneficiary of a Form I-130 that was filed by a now-deceased spouse petitioner, and that can now be approved as a Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act.  The purpose of these special provisions is simply to minimize the adverse effect on these aliens of the disputed, and now resolved, issue of the impact of the death of the petitioning spouse on the alien's eligibility.

>    a.  Unlawful presence

By specifying, in section 568(c)(2)(A) of the FY2010 DHS Appropriations Act, that the amendment should apply to pending cases, Congress indicated its desire to resolve these cases fully.  For this reason, for purposes of INA section 212(a)(9)(B)(i), if an alien remained in the United States while awaiting the outcome of Form I-130 that can now be approved as a Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act, the alien will be deemed *not* to have accrued any unlawful presence.  This protection applies even if the alien was not actually in a lawful status while the now-converted Form I-360 was pending.

An alien who had a Form I-130 pending on October 28, 2009, but who is present in the United States without a lawful admission or parole generally cannot obtain adjustment under INA section 245(a).  Rather, the alien must generally seek adjustment under INA section 245(i).  But this relief is not available to an alien who did not have a petition or labor certification filed before April 30, 2001.  Thus, even if the Form I-130 can now be approved as a Form I-360, the alien may need to leave the United States to obtain an immigrant visa.  But since, under this guidance memorandum, the alien will be deemed *not* to have accrued any unlawful presence, he or she will not be inadmissible under INA section 212(a)(9)(B)(i).

Again, these special provisions relating to the accrual of unlawful presence apply only to an alien who is the beneficiary of a spousal immediate relative Form I-130 that was pending on October

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 8

28, 2009, and that is now approved under section 568(c)(2)(A) of the FY2010 DHS
Appropriations Act and 8 C.F.R. § 204.2(i)(1)(iv) as a widow(er)'s Form I-360: the widow(er)
and his or her accompanying child(ren).  Ordinarily, the pendency of a visa petition, itself, does
not prevent accrual of unlawful presence.  A pending adjustment application, by contrast, does
prevent accrual of unlawful presence.  *Adjudicator's Field Manual* chapter 40.9(b)(3)(A).  Most
aliens who have been in litigation because the death of a spouse led to denial of the Form I-130
are probably already protected from unlawful presence under the ordinary provisions in the
AFM.  This broader protection against unlawful presence, for this narrow class of cases, is
designed to maximize the ability of those aliens whose specific situations gave rise to the new
legislation to fully benefit from it.

### b.  Consent to reapply for admission after removal

These protections against accrual of unlawful presence apply even if the alien was actually
removed from the United States under a removal order.  Still, because the alien was removed
under a valid order, the alien is inadmissible under INA section 212(a)(9)(A)(i) or (ii).  USCIS,
however, has discretion under section 212(a)(9)(A)(iii) to consent to the alien's re-application for
admission.  USCIS should generally exercise discretion favorably and grant an application for
consent to reapply under section 212(a)(9)(A)(iii), if:

- The Form I-130 that had been filed by the alien's spouse has now been approved as a
  Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act;

- The alien is otherwise admissible, and

- The alien's case does not present significant adverse factors beyond the removal itself.

A USCIS adjudicator will not deny a Form I-212 filed by an alien whose case was in litigation
on October 28, 2009, and whose Form I-130 has been approved as a Form I-360 under section
568(c)(2)(A) of the FY2010 DHS Appropriations Act without consulting USCIS Headquarters
through appropriate channels.

### 5.  *Remarriage*

Any immediate relative Form I-130 that was filed on behalf of the spouse of a U.S. citizen, and
that was pending on October 28, 2009, is no longer a spousal immediate relative Form I-130.
By operation of 8 C.F.R. § 204.2(i)(1)(iv), what was filed as a spousal immediate relative Form
I-130 is now a widow(er)'s Form I-360.  The converted Form I-360 may be approved only if the
beneficiary, who is now also deemed to be the petitioner, qualifies as the widow(er) of a citizen,
as described in INA section 201(b)(2)(A)(i).  Eligibility for classification as an immediate
relative continues "only until the date the spouse remarries."

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 9

### 6. Ninth Circuit cases

In acting on the guidance in this memorandum, USCIS adjudicators must keep in mind that the *Hootkins* case was certified as a class action. Thus, an individual need not be a *named* Plaintiff in *Hootkins* in order for his or her Form I-130 and Form I-485 to be reopened under this memorandum. If an individual has not already been identified as a member of the *Hootkins* class, that individual may make a written request to have his or her Form I-130 and Form I-485 reopened and readjudicated. The purpose of the written request is simply to *identify* the case as a *Hootkins* case. The individual is not required to pay the filing fee for a motion to reopen. The case will be considered a *Hootkins* class member case if the case was denied on or after August 30, 2001,[1] and:

- either the citizen spouse petitioner or the alien spouse beneficiary lived in the Ninth Circuit when the citizen spouse died; or

- a USCIS office in the Ninth Circuit made the prior decision on the Form I-130 or Form I-485.

### B.    Widow(er)s without pending cases

The alien widow(er) of a citizen who died before October 28, 2009, but who did not have a Form I-130 pending on that date, may now file a Form I-360, provided that he or she does so no later than October 28, 2011, and has not remarried. FY2010 DHS Appropriations Act § 568(c)(2)(B). Section 568(c)(2)(B) applies if the citizen spouse did not file a Form I-130 on the alien spouse's behalf before dying. But it also applies if there was a Form I-130 filed, but the decision denying the Form I-130 had become administratively final before October 28, 2009, because the decision was not the subject of any type of administrative or judicial review that was pending on October 28, 2009. Note that section 568(c)(2)(B)(i) says the Form I-360 must be filed "not later than the date that is 2 years after the date of the enactment." Thus, a Form I-360 that is filed *on* October 28, 2011, will still be timely. A Form I-360 filed on or after October 29, 2011, will be untimely.

For any case in which a citizen dies on or after October 28, 2009, the alien widow(er) must file the Form I-360 within 2 years of the citizen's death.

### C.    Children of widow(er)s

The child of a widow(er) whose Form I-360 is approved may, as specified in the second sentence of INA section 201(b)(2)(A)(i) and in INA section 204(a)(1)(A)(ii), be included in the widow(er)'s petition. Whether an individual qualifies as the widow(er)'s "child" is determined according to INA sections 101(b)(1) and 201(f).

---

[1] Any case denied before August 30, 2001, is time-barred under 28 U.S.C. § 2401(a). But even if a Ninth Circuit case is not considered "pending" because of *Hootkins*, the alien may still be eligible to immigrate as the widow(er) of a citizen, if the alien has not remarried and files the Form I-360 no later than October 28, 2011.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 10

In a case in which the deceased citizen had filed a Form I-130 for his or her spouse, and the
Form I-130 can now be adjudicated as a Form I-360 widow(er)'s petition, the child(ren) of the
widow(er) will be deemed to be included in the converted Form I-360. Thus, it will not be
necessary to act on any separate Form(s) I-130 that the deceased citizen may have filed for the
widow(er)'s children. And the child(ren) of the widow(er) will be deemed included in the
converted Form I-360 even if the deceased citizen had not filed any Form(s) I-130 for the
child(ren).

Note that, in light of INA section 201(f), whether an individual qualifies as the "child" of a
widow(er) depends on the individual's age when the visa petition was filed. For those cases that
were pending on October 28, 2009, the Form I-360 filing date is deemed to be the date on which
the deceased citizen filed the prior Form I-130. If a widow(er) has an unmarried son or daughter
who was under 21 when the deceased citizen filed the Form I-130, that individual will still be
deemed to be under 21 for purposes of the widow(er)'s now-converted Form I-360.

### D.  Affidavits of support

Under section 212(a)(4)(C)(i)(I) of the INA, a Form I-864 (Affidavit of Support under Section
213A of the Act) is *not* required in the case of the widow(er) of a citizen and the widow(er)'s
accompanying children.[2]

### E.  Conversion of deferred action applications filed under prior guidance

While remedial legislation was pending in Congress, the Secretary of Homeland Security
directed the use of deferred action relief to allow widow(er)s of citizen whose cases may have
been affected by the legislation to remain in the United States. In the September 4, 2009
Memorandum, "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their
Children," USCIS designated the Form I-360 as the form an individual would use to request
deferred action under the Secretary's policy.

Now that Congress has enacted the legislation, any Form I-360 that had been filed to obtain
deferred action relief, and that has not yet been adjudicated as a deferred action request, will now
be considered to be, and adjudicated as, a widow(er)'s visa petition under 8 C.F.R. § 204.2(b). If
the Form I-360 has already been approved as a deferred action request, it will be reopened and
adjudicated as a visa petition under 8 C.F.R. § 204.2(b). It is not necessary for the alien to file a
formal motion, nor to pay a new Form I-360 filing fee. Additionally, any prior grant of deferred
action relief need not be rescinded and should remain undisturbed.

---

[2] There may be an individual case in which, regardless of the Form I-864 issue, the factors specified in INA section
212(a)(4)(B) and the standard public charge guidance, as published at 64 Fed. Reg. 28689 (1999), will support a
finding that a widow(er) is inadmissible as an alien likely to become a public charge. Even in this case, a Form I-
864 is not required. Rather, since the statute does not specifically require the Form I-864, the Form I-134 can be
used instead. 8 C.F.R. § 213a.5. It is important to note that, on a Form I-134, the sponsor does not have to meet the
requirements in INA section 213A(f), and so does *not* need to be someone who could have been a "substitute
sponsor" in a case in which a Form I-864 actually is required.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 11

Under the deferred action guidance, an alien could file a Form I-765, application for employment authorization, only if the deferred action request had been granted.  Now that a Form I-360 that was filed to request deferred action is deemed to be a widow(er)'s visa petition, the alien can, if otherwise eligible, file a Form I-485 even before the approval of the Form I-360.  8 C.F.R § 245.2(a)(2)(i)(B).  Filing the Form I-485 permits the alien to file a Form I-765.  8 C.F.R. § 274a.12(c)(9).

## F.  Implementation

Section 568(c) of the FY2010 DHS Appropriations Act became effective on October 28, 2009, the date of enactment.  USCIS offices and centers, therefore, are to begin implementing the instructions established in this memorandum immediately.  USCIS adjudicators should note that Congress clearly intended to benefit the aliens affected by these provisions.

***AFM* Transmittal Memorandum Revisions.  The *AFM* Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:**

| AD 10-09<br><br>[Date of Signature] | **Chapter 21.2** | This memorandum removes chapter 21.2(a)(4) and the **Note** at the end of chapter 21.2(h)(1)(C) to reflect enactment of section 568(c) of Public Law 111-83. |
| --- | --- | --- |

## H.  Contact Information

Questions regarding this memorandum should be directed to the Office of Domestic Operations through appropriate channels.  For cases adjudicated overseas, questions should be directed to the International Operations Division, Programs Branch.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person.

**Distribution**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

# DEF-INTERV.
# EXS. 57-60

# INTENTIONALLY LEFT
# BLANK

# DEF-INTERV.
# EX. 61

NBER WORKING PAPER SERIES

THE LABOR DEMAND CURVE IS DOWNWARD SLOPING:
REEXAMINING THE IMPACT OF IMMIGRATION
ON THE LABOR MARKET

George J. Borjas

Working Paper 9755
http://www.nber.org/papers/w9755

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
June 2003

The views expressed herein are those of the authors and not necessarily those of the National Bureau of Economic Research.

©2003 by George J. Borjas.  All rights reserved. Short sections of text not to exceed two paragraphs, may be quoted without explicit permission provided that full credit including © notice, is given to the source.



DEPOSITION
EXHIBIT
5
DEERE

The Labor Demand Curve is Downward Sloping: Reexamining the Impact of Immigration on the
Labor Market
George J. Borjas
NBER Working Paper No. 9755
June 2003
JEL No. J1, J6

## ABSTRACT

Immigration is not evenly balanced across groups of workers that have the same education but differ
in their work experience, and the nature of the supply imbalance changes over time. This paper
develops a new approach for estimating the labor market impact of immigration by exploiting this
variation in supply shifts across education-experience groups. I assume that similarly educated
workers with different levels of experience participate in a national labor market and are not perfect
substitutes. The analysis indicates that immigration lowers the wage of competing workers: a 10
percent increase in supply reduces wages by 3 to 4 percent.

George J. Borjas
Kennedy School of Government
Harvard University
79 JFK Street
Cambridge, MA 02138
and NBER
gborjas@harvard.edu

2

### THE LABOR DEMAND CURVE *IS* DOWNWARD SLOPING:
### REEXAMINING THE IMPACT OF IMMIGRATION ON THE LABOR MARKET*

**George J. Borjas**

> "After World War I, laws were passed severely limiting immigration. Only a trickle of immigrants has been admitted since then. . .By keeping labor supply down, immigration policy tends to keep wages high"
>
> Paul Samuelson, *Economics* [1964]

#### I. Introduction

Do immigrants harm or improve the employment opportunities of native workers? As Paul Samuelson's assertion suggests, the textbook model of a competitive labor market predicts that an immigrant influx should lower the wage of competing factors.[1]

Despite the intuitive appeal of this theoretical implication and despite the large number of careful studies in the literature, the existing evidence provides a mixed and confusing set of results. The measured impact of immigration on the wage of native workers fluctuates widely from study to study (and sometimes even within the same study), but seems to cluster around zero. A widely cited survey by Friedberg and Hunt [1995, p. 42] concludes that "the effect of immigration on the labor market outcomes of natives is small." Similarly, the 1997 National Academy of Sciences report on the economic impact of immigration argues that "the weight of the empirical evidence suggests that the impact of immigration on the wages of competing native workers is small" [Smith and Edmonston 1997, p. 220]. These conclusions are potentially inconsistent with the textbook model because the immigrant supply shock in recent decades has

---

* I am grateful to Daron Acemoglu, Joshua Angrist, David Autor, Richard Freeman, Daniel Hamermesh, Lawrence Katz, Michael Kremer, Casey Mulligan, Stephen Trejo, and a referee for helpful comments and suggestions, and to the Smith-Richardson Foundation for financial support.

[1] The historical context of Samuelson's [1964, p. 552] assertion is interesting. He was writing just before the enactment of the 1965 Amendments to the Immigration and Nationality Act, the major policy shift that initiated the resurgence of large-scale immigration.

3

been very large, and most studies of labor demand (outside the immigration context) conclude that the labor demand curve is not perfectly elastic [Hamermesh 1993].

This paper presents a new approach for thinking about and estimating the labor market impact of immigration. Most existing studies exploit the geographic clustering of immigrants and use differences across local labor markets to identify the impact of immigration. This framework has been troublesome because it ignores the strong currents that tend to equalize economic conditions across cities and regions. In this paper, I argue that by paying closer attention to the characteristics that define a skill group—and, in particular, by using the insight that both schooling *and* work experience play a role in defining a skill group—one can make substantial progress in determining whether immigration influences the employment opportunities of native workers.

My analysis uses data drawn from the 1960-1990 U.S. Decennial Censuses, as well as the 1998-2001 Current Population Surveys, and assumes that workers with the same education but different levels of work experience participate in a national labor market and are not perfect substitutes. It turns out that immigration—even within a particular schooling group—is not balanced evenly across all experience cells in that group, and the nature of the supply imbalance changes over time. This fact generates a great deal of variation—across schooling groups, experience cells, and over time—that helps to identify the impact of immigration on the labor market. Most importantly, the size of the native workforce in each of the skill groups is relatively fixed, so that there is less potential for native flows to contaminate the comparison of outcomes across skill groups. In contrast to the confusing array of results that now permeate the literature, the evidence consistently suggests that immigration has indeed harmed the employment opportunities of competing native workers.

4

## II. Measuring the Labor Market Impact of Immigration

The laws of supply and demand have unambiguous implications for how immigration should affect labor market conditions in the short run. The shift in supply lowers the real wage of competing native workers. Further, as long as the native supply curve is upward sloping, immigration should also reduce the amount of labor supplied by the native workforce.

If one could observe a number of closed labor markets that immigrants penetrate randomly, one could then relate the change in the wage of workers in a particular skill group to the immigrant share in the relevant population. A negative correlation (i.e., native wages are lower in those markets penetrated by immigrants) would indicate that immigrants worsen the employment opportunities of competing native workers.

In the United States, immigrants cluster in a small number of geographic areas. In 1990, for example, 32.5 percent of the immigrant population lived in only three metropolitan areas (Los Angeles, New York, and Miami). In contrast, only 11.6 percent of the native population clustered in the three largest metropolitan areas housing natives (New York, Los Angeles, and Chicago). Practically all empirical studies in the literature, beginning with Grossman [1982], exploit this demographic feature to identify the labor market impact of immigration. The typical study defines a metropolitan area as the labor market that is being penetrated by immigrants. The study then goes on to calculate a "spatial correlation" measuring the relation between the native wage in a locality and the relative number of immigrants in that locality. These correlations are usually negative, but very weak.[2] The best known spatial correlations are reported in Card's

---

[2] Representative studies include Altonji and Card [1991], Borjas [1987], LaLonde and Topel [1991], Pischke and Velling [1997], and Schoeni [1997]. Friedberg [2001] presents a rare study that uses the supply shock in an occupation to identify the labor market impact of immigration in the Israeli labor market. Although the raw Israeli data suggest a substantial negative impact, correcting for the endogeneity of occupational choice leads to the usual result that immigration has little impact on the wage structure. Card [2001] uses data on occupation and metropolitan area to define skill groups and finds that immigration has a slight negative effect.

[1990] influential study of the Mariel flow. Card compared labor market conditions in Miami and in other cities before and after the *Marielitos* increased Miami's workforce by 7 percent. Card's difference-in-differences estimate of the spatial correlation indicated that this sudden and unexpected immigrant influx did not have a discernable effect on employment and wages in Miami's labor market.[3]

Recent studies have raised two questions about the validity of interpreting weak spatial correlations as evidence that immigration has no labor market impact. First, immigrants may not be randomly distributed across labor markets. If immigrants endogenously cluster in cities with thriving economies, there would be a spurious positive correlation between immigration and wages.[4] Second, natives may respond to the wage impact of immigration on a local labor market by moving their labor or capital to other cities. These factor flows would re-equilibrate the market. As a result, a comparison of the economic opportunities facing native workers in different cities would show little or no difference because, in the end, immigration affected *every* city, not just the ones that actually received immigrants.[5]

Because the local labor market may adjust to immigration, Borjas, Freeman, and Katz [1997] suggested changing the unit of analysis to the national level. If the aggregate technology can be described by a CES production function with two skill groups, the relative wage of the two

---

[3] Angrist and Krueger [1999] replicate Card's study using an alternative time period, and find that a "phantom" influx of immigrants (in the sense that had it not been for a policy intervention, many immigrants would likely have arrived) had a sizable adverse effect on Miami's labor market. This result suggests that many other factors influence labor market conditions in Miami and comparison cities. At the least, one should be cautious when interpreting the spatial correlations estimated from comparisons of specific localities.

[4] Borjas [2001] presents evidence indicating that new immigrants belonging to a particular schooling group tend to settle in those regions that offer the highest return for their skills.

[5] Borjas, Freeman, and Katz [1997] and Card [2001] provide the first attempts to jointly analyze labor market outcomes and native migration decisions. The two studies reach different conclusions. Card reports a slight positive correlation between the 1985-90 rate of growth in the native population and the immigrant supply shock by

6

groups depends linearly on their relative quantities. By restricting the analysis to two skill groups, the "factor proportions approach" precludes the estimation of the impact of immigration—there is only one observation at any point in time (usually a Census year), giving relative wages and relative employment. As a result, the typical application of this approach compares the actual supplies of workers in particular skill groups to those that would have been observed in the absence of immigration, and then uses outside information on labor demand elasticities to simulate the consequences of immigration. The immigrant flow to the United States in the 1980s and 1990s was relatively low-skill. Not surprisingly, the Borjas-Freeman-Katz [1997] simulation finds that immigration worsened the relative economic status of low-skill workers.

Despite all of the confusion in the literature, the available evidence teaches two important lessons. First, the study of the geographic dispersion in native employment opportunities is not an effective way for measuring the economic impact of immigration; the local labor market can adjust in far too many ways to provide a reasonable analogue to the "closed market" economy that underlies the textbook supply-and-demand framework. Second, the factor proportions approach is ultimately unsatisfactory. It departs from the valuable tradition of empirical research in labor economics that attempts to estimate the impact of labor market shocks by directly observing how those shocks affect some workers and not others. For a given elasticity of substitution, the approach mechanically predicts the relative wage consequences of supply shifts.

Ideally, one would want to estimate directly how immigration alters the employment opportunities of a particular skill group. As noted above, by aggregating workers into groups based on educational attainment, there is just too little variation to examine how supply shocks affect relative wages. However, the human capital literature emphasizes that schooling is not the

---

metropolitan area, while Borjas, Freeman, and Katz report a negative correlation between native net migration in 1970-90 and immigration by state—once one standardizes for the pre-existing migration trends.

7

only—and perhaps not even the most important—determinant of a worker's skills. The seminal work of Becker [1975] and Mincer [1974] stressed that skills are acquired both before and after a person enters the labor market. I will assume that workers who have the same schooling, but who have different levels of experience, are imperfect substitutes in production. As a result, a skill group should be defined in terms of both schooling and labor market experience.

To see how this insight can provide a fruitful approach to the empirical analysis of the labor market impact of immigration, consider the following example. Recent immigration has increased the relative supply of high school dropouts substantially. The labor market implications of this supply shock clearly depend on how the distribution of work experience in the immigrant population contrasts with that of natives. After all, one particular set of native high school dropouts would likely be affected if all of the new low-skill immigrants were very young, and a very different set would be affected if the immigrants were near retirement age.

It is unlikely that similarly educated workers with very different levels of work experience are perfect substitutes [Welch 1979; Card and Lemieux 2001]. The definition of a skill group in terms of both education and experience provides a great deal more independent variation in the immigrant supply shock that can be used to identify how immigration alters the economic opportunities facing particular groups of native workers.

### III. Data

The empirical analysis uses data drawn from the 1960, 1970, 1980, and 1990 Public Use Microdata Samples (PUMS) of the Decennial Census, and the 1999, 2000, and 2001 Annual Demographic Supplement of the Current Population Surveys (CPS). I pool all three of the CPS surveys and refer to these pooled data as the "2000" cross-section. The analysis is restricted to

men aged 18-64 who participate in the civilian labor force. A person is defined to be an immigrant if he was born abroad and is either a non-citizen or a naturalized citizen; all other persons are classified as natives. Appendix 1 provides a detailed description of the construction of the data extracts and of the variables used in the analysis.

As noted above, I use both educational attainment and work experience to sort workers into particular skill groups. In particular, I classify the men into four distinct education groups: persons who are high school dropouts (i.e., they have less than twelve years of completed schooling), high school graduates (they have exactly twelve years of schooling), persons who have some college (they have between thirteen and fifteen years of schooling), and college graduates (they have at least sixteen years of schooling).

The classification of workers into experience groups is bound to be imprecise because the Census does not provide any measure of labor market experience or of the age at which a worker first enters the labor market. I initially define work experience as the number of years that have elapsed since the person completed school. This approximation is reasonably accurate for most native men, but would surely contain serious measurement errors if the calculations were also conducted for women, particularly in the earlier cross-sections when the female labor force participation rate was much lower.

Equally important, this measure of experience is also likely to mis-measure "effective" experience in the sample of immigrants—i.e., the number of years of work experience that are valued by an American employer. After all, a variable that roughly approximates "Age – Education – 6" does not differentiate between experience acquired in the source country and experience acquired in the United States. I address this problem in Section VI below.

I assume that the age of entry into the labor market is 17 for the typical high school dropout, 19 for the typical high school graduate, 21 for the typical person with some college, and

9

23 for the typical college graduate. Let $A_T$ be the assumed entry age for workers in a particular schooling group. The measure of work experience is then given by $(\text{Age} - A_T)$. I restrict the analysis to persons who have between 1 and 40 years of experience.

As noted in Welch's [1979] study of the impact of cohort size on the earnings of baby boomers, workers in adjacent experience cells are more likely to influence each other's labor market opportunities than workers in cells that are further apart. Throughout much of the analysis, I will capture the similarity across workers with roughly similar years of experience by aggregating the data into five-year experience intervals, indicating if the worker has 1 to 5 years of experience, 6 to 10 years, and so on.

Consider a group of workers who have educational attainment $i$, experience level $j$, and are observed in calendar year $t$. The $(i, j, t)$ cell defines a skill group at a point in time. The measure of the immigrant supply shock for this skill group is defined by

$$(1) \qquad p_{ijt} = \frac{M_{ijt}}{(M_{ijt} + N_{ijt})},$$

where $M_{ijt}$ gives the number of immigrants in cell $(i, j, t)$, and $N_{ijt}$ gives the corresponding number of natives. The variable $p_{ijt}$ measures the foreign-born share of the labor force in a particular skill group.

The various panels of Figure I illustrate the supply shocks experienced by the different skill groups between 1960 and 2000 (Appendix 2 reports the underlying data). There is a great deal of dispersion in these shocks even within schooling categories. It is well known, for instance, that immigration greatly increased the supply of high school dropouts in recent decades. What is less well known, however, is that this supply shift did not affect equally all

10

experience groups within the population of high school dropouts. Moreover, the imbalance in the supply shock changes over time. As Panel A of the figure shows, immigrants made up half of all high school dropouts with 10 to 20 years of experience in 2000, but only 20 percent of those with less than 5 years. In 1960, however, the immigration of high school dropouts increased the supply of the most experienced workers the most. Similarly, Panel D shows that the immigrant supply shock for college graduates in 1990 was reasonably balanced across all experience groups, generally increasing supply by around 10 percent. But the supply shock for college graduates in 1960 was larger for the most experienced groups, while in 2000 it was largest for the groups with 5 to 20 years of experience.

The earnings data used in the paper are drawn from the sample of persons who worked in the year prior to the survey and reported positive annual earnings, are not enrolled in school, and are employed in the wage and salary sector. Earnings are deflated to 1999 dollars by using the CPI-U series. Table I summarizes the trends in log weekly wages for the various native groups. Not surprisingly, there is a great deal of dispersion in the rate of decadal wage growth by education and experience. Consider, for instance, the sample of college graduates. In the 1970s, wage growth was steepest for college graduates with 31-35 years of experience. In the 1990s, however, the wage of college graduates grew fastest for workers with 11-20 years of experience. In sum, the data reveal substantial variation in both the immigrant supply shock and native labor market outcomes across skill groups.

Before proceeding to a formal analysis, it is instructive to document the strong link that exists between log weekly wages and the immigrant share within schooling-experience cells. In particular, I use the data reported in Table I to calculate the decadal change in log weekly wages for each skill group, and the data summarized in the various panels of Figure I (and reported in Appendix 2) to calculate the decadal change in the group's immigrant share. Figure II presents

11

the scatter diagram relating these decadal changes after removing decade effects from the differenced data. The plot clearly illustrates a negative relation between wage growth and immigrant penetration into particular skill groups, and suggests that the regression line is not being driven by any particular outliers. Put simply, the raw data show that weekly wages grew fastest for workers in those education-experience groups that were least affected by immigration.

Finally, the validity of the empirical exercise reported below hinges on the assumption that similarly educated workers who have different levels of experience are not perfect substitutes. Studies that examine this question, including Welch [1979] and Card and Lemieux [2001], find less than perfect substitutability across experience groups. Nevertheless, it is of interest to document that (for given education) immigrants and natives with similar levels of experience are closer substitutes than immigrants and natives who differ in their experience.

I use Welch's [1999] index of congruence to measure the degree of similarity in the occupation distributions of immigrants and natives. The index for any two skill groups $k$ and $\ell$ is defined by

$$(2) \qquad G_{k\ell} = \frac{\sum_c (q_{kc} - \overline{q}_c)(q_{\ell c} - \overline{q}_c)/\overline{q}_c}{\sqrt{\left(\sum_c (q_{kc} - \overline{q}_c)^2/\overline{q}_c\right)\left(\sum_c (q_{\ell c} - \overline{q}_c)^2/\overline{q}_c\right)}},$$

where $q_{hc}$ gives the fraction of group $h$ ($h = k, \ell$) employed in occupation $c$, and $\overline{q}_c$ gives the fraction of the entire workforce employed in that occupation. The index $G_{k\ell}$, which is similar to a correlation coefficient, equals one when the two groups have identical occupation distributions and minus one when the two groups are clustered in completely different occupations.

12

I calculate the index of congruence in the 1990 Census. I use the three-digit Census Occupation Codes to classify male workers into the various occupations, and restrict the analysis to workers in non-military occupations. To minimize the problem of having many occupation-experience cells with few observations, I aggregate workers into 10-year experience bands. Table II reports the calculated indices for each of the education groups. The occupation distributions of immigrants and natives with the same experience are generally more similar than the distributions of immigrants and natives with different levels of experience. Moreover, the congruence index falls the larger the disparity in work experience between the two groups.

Consider the group of native workers who are high school dropouts and have 11 to 20 years of experience. The index of congruence with immigrants who have the same experience is 0.63. This index falls to 0.53 for immigrants who have 1 to 10 years of experience, and to 0.59 for immigrants with 31 to 40 years. Similarly, consider the native workers who are college graduates and have fewer than 10 years of experience. The index of congruence with immigrants who have the same experience is 0.76, but this index falls to 0.71 for immigrants who have 11 to 20 years of experience, to 0.64 for immigrants who have 21 to 30 years, and to 0.53 for immigrants who have more than 30 years. In sum, the occupation distributions of immigrants and natives (for a given level of education) are most similar when one compares workers who have roughly the same level of work experience.

## IV. Basic Results

Let $y_{ijt}$ denote the mean value of a particular labor market outcome for *native* men who have education $i$ ($i = 1, \ldots, 4$), experience $j$ ($j = 1, \ldots, 8$), and are observed at time $t$ ($t$=1960,

1970, 1980, 1990, 2000). Much of the empirical analysis reported in this paper stacks these data across skill groups and calendar years and estimates the model:[6]

$$(3) \qquad y_{ijt} = \theta \, p_{ijt} + s_i + x_j + \pi_t + (s_i \times x_j) + (s_i \times \pi_t) + (x_j \times \pi_t) + \varphi_{ijt},$$

where $s_i$ is a vector of fixed effects indicating the group's educational attainment; $x_j$ is a vector of fixed effects indicating the group's work experience; and $\pi_t$ is a vector of fixed effects indicating the time period. The linear fixed effects in equation (3) control for differences in labor market outcomes across schooling groups, experience groups, and over time. The interactions $(s_i \times \pi_t)$ and $(x_j \times \pi_t)$ control for the possibility that the impact of education and experience changed over time, and the interaction $(s_i \times x_j)$ controls for the fact that the experience profile for a particular labor market outcome differs across schooling groups.

The dependent variables are the mean of log annual earnings, the mean of log weekly earnings, and the mean of fraction of time worked (defined as weeks worked divided by 52 in the sample of all persons, including non-workers). Unless otherwise specified, the regressions are weighted by the sample size used to calculate $y_{ijt}$. The presence of the education-experience

---

[6] The generic regression of wages on some measure of immigrant penetration is used frequently in the literature. Suppose the labor demand function in the pre-immigration period is log $w_{kt} = D_{kt} + \varepsilon \log N_{kt} + \varphi$, where $k$ is a skill group. The wage change resulting from an exogenous influx of immigrants is

$$\Delta \log w_{kt} = \Delta D_{kt} + \varepsilon \log \left[ (N_{kt}(1 + n_{kt}) + M_{kt})/N_{kt} \right] + \xi \approx \Delta D_{kt} + \varepsilon \, (n_{kt} + m_{kt}) + \xi,$$

where $n_{kt}$ gives the percent change in the number of natives, and $m_{kt} = M_{kt}/N_{kt}$. The rate of change $n_{kt}$ is determined by the labor supply function, $n_{kt} = S_{kt} + \sigma \, \Delta \log w_{kt} + \mu$. The reduced-form wage equation is

$$\Delta \log w_{kt} = X_{kt} + \varepsilon^* \, m_{kt} + \xi^*,$$

where $X_{kt} = (\Delta D_{kt} + \varepsilon S_{kt})/(1 - \varepsilon \sigma)$ and $\varepsilon^* = \varepsilon/(1 - \varepsilon \sigma)$. Equation (3) is a transformation of this reduced-form equation that approximately uses log $m_{kt}$, rather than $m_{kt}$, as the measure of immigrant penetration. In particular, log $m \approx (M - N)/(0.5(M + N)) = 2\,(2p - 1)$. I opted for the immigrant share specification because the relation between wages and $m$ is nonlinear and $m$ has a large variance both over time and across groups.

14

interactions in (3) implies that the impact of immigration on labor market outcomes is identified from changes that occur within education-experience cells over time. The standard errors are clustered by education-experience cells to adjust for possible serial correlation.

The first row of Table III presents the basic estimates of the adjustment coefficient $\theta$. Consider initially the results when the dependent variable is the log of weekly earnings of native workers. The coefficient is -0.572, with a standard error of 0.162. It is easier to interpret this coefficient by converting it to an elasticity that gives the percent change in wages associated with a percent change in labor supply. Let $m_{ijt} = M_{ijt}/N_{ijt}$, or the percentage increase in the labor supply of group $(i, j, t)$ attributable to immigration. Define the "wage elasticity" as[7]

$$(4) \qquad \frac{\partial \log w_{ijt}}{\partial m_{ijt}} = \frac{\theta}{(1 + m_{ijt})^2}.$$

By 2000, immigration had increased the number of men in the labor force by 16.8 percent. Equation (4) implies that the wage elasticity—evaluated at the mean value of the immigrant supply increase—can be obtained by multiplying $\theta$ by approximately 0.7. The wage elasticity for weekly earnings is then -0.40 (or -0.572 × 0.7). Put differently, a 10 percent supply shock (i.e., an immigrant flow that increases the number of workers in the skill group by 10 percent) reduces weekly earnings by about 4 percent.

Table III indicates that immigration has an even stronger effect on annual earnings, suggesting that immigration reduces the labor supply of native male workers. A 10 percent

---

[7] As noted above, the immigrant share approximates log $m$. Because there are no cells with zero immigrants in the data used in Table III, the results are virtually identical (once properly interpreted) if log $m$ is used as the regressor. In the next section, however, where I categorize workers by state of residence, education, and experience, 15.7 percent of the cells have no immigrants, and using log $m$ would create a serious selection problem.

supply shock reduces annual earnings by 6.4 percent and the fraction of time worked by 3.7 percentage points. Note that the difference in the coefficients from the log annual earnings and the log weekly earnings regressions gives the coefficient from a log weeks worked specification. A simple supply-demand framework implies that the labor supply elasticity for workers can be estimated from the ratio of the immigration effect on log weeks worked and log weekly earnings. The point estimate for this ratio is 0.6. This estimate lies above the range reported by Juhn, Murphy, and Topel [1991], who report labor supply elasticities between 0.1 and 0.4.[8]

The remaining rows of Table III conduct a variety of specification tests to determine the sensitivity of the results. The coefficients reported in the second row, for example, indicate that the results are similar when the regressions are not weighted by the sample size of the skill group. In the third row, the regression redefines the measure of the immigrant share $p_{ijt}$ to include both male and female labor force participants. Despite the misclassification of many women into the various experience groups, the adjustment coefficients remain negative and significant, and have similar values to those reported in the first row. The last row of the table addresses the interpretation problem that arises because a rise in $p_{ijt}$ can represent either an increase in the number of immigrants or a decline in the number of native workers in that skill group (e.g., the secular decline in the number of natives who are high school dropouts). Row 4 of the table reports the adjustment coefficient when the regression adds the log of the size of the native workforce in cell $(i, j, t)$ as a regressor. The wage elasticity for log weekly earnings is -0.39 and

---

[8] The variable $p_{ijt}$ gives the immigrant share among labor force participants. The labor force participation decision may introduce some endogeneity in this variable. The problem can be addressed by using an instrument given by the immigrant share in the population of all men in cell $(i, j, t)$. The IV estimates of $\theta$ (and standard errors) are -0.803 (0.586) for log annual earnings, -0.541 (0.153) for log weekly earnings, and -0.493 (0.125) for the fraction of time worked. These coefficients are similar to those reported in the first row of Table III. The immigrant share may also be endogenous in a different sense. Suppose the labor market attracts foreign workers mainly in those skill cells where wages are relatively high. There would be a spurious positive correlation between $p_{ijt}$ and the wage. The results in Table III should then be interpreted as lower bounds of the true impact of immigration.

16

significant. In short, the parameter $\theta$ in equation (3) is indeed capturing the impact of an increase in the size of the immigrant population on native labor market outcomes.[9]

I also estimated the regression model within schooling groups to determine if the results are being driven by particular groups, such as the large influx of foreign-born high school dropouts. With only one exception, Table IV shows that the impact of immigration on the weekly earnings of particular schooling groups is negative and significant. The exception is the group of college graduates, where the adjustment coefficient is positive and has a large standard error. Note, however, that the regression estimated within a schooling group cannot include experience-period interactions to control for secular changes in the shape of the experience-earnings profile. As a result, the coefficient of the immigrant share variable may be measuring a spurious correlation between immigration and factors that changed the wage structure differentially within schooling groups. It is probably not coincidental that the adjustment coefficient is positive for college graduates, the group that experienced perhaps the most striking change in the wage structure in recent decades.[10]

Finally, the last column of Table IV estimates the regressions using only the groups of natives with at least a high school education. The coefficients generally suggest that the sample of high school dropouts is not the group that is driving much of the analysis. Although the

---

[9] The results would be roughly similar if the regressions were estimated separately using each set of two adjacent cross-sections, so that the regression models would be differencing the data over a decade. The adjustment coefficients (and standard errors) for log weekly earnings are: -1.042 (0.484) in 1960-1970, -0.427 (0.561) in 1970-1980, -0.277 (0.480) in 1980-1990, and -0.285 (0.270) in 1990-2000. This rough similarity contrasts with the inability of the spatial correlation approach to generate parameter estimates that even have the same sign over time; see Borjas, Freeman, and Katz [1997] and Schoeni [1997].

[10] I also estimated the regression model within experience groups. The adjustment coefficients (and standard errors) for log weekly earnings were: 1-5 years of experience, -0.403 (0.470); 6-10 years, -0.358 (0.286); 11-15 years; -0.475 (0.285); 16-20 years, -0.555 (0.244); 21-25 years, -0.568 (0.244); 26-30 years, -0.634 (0.193); 31-35 years, -0.495 (0.288); and 36-40 years, -0.147 (0.228). Although these regressions only have 20 observations, the point estimate of $\theta$ is negative and significant for many groups.

17

adjustment coefficients remain negative for all the dependent variables, it is insignificant for log

weekly earnings. In the case of log annual earnings, however, the wage elasticity is around -0.8,

suggesting that immigration had an adverse impact on native workers even when the regression

ignores the information provided by the workers who experienced the largest supply shock in the

past few decades.[11]


## V. A Comparison with the Spatial Correlation Approach

In contrast to the studies that calculate spatial correlations between wages in local labor

markets and measures of immigrant penetration, the evidence presented in the previous section

indicates that immigrants have a sizable adverse effect on the wage of competing workers. This

discrepancy suggests that it might be instructive to examine how the results of the generic spatial

correlation regression would change if that analysis defined skill groups in terms of both

education and experience.

Suppose that the relevant labor market for a typical worker is determined by his state of

residence ($r$), education, and experience.[12] I use the 1960-2000 Census and CPS files to calculate

both the immigrant share and the mean labor market outcomes for cell ($r, i, j, t$). I then use these

---

[11] It is of interest to use the labor market outcomes of immigrants as the dependent variable. I used the sample of immigrants with fewer than 30 years of experience because there are relatively few observations in the cells for older workers in 1970 and 2000; and did not use data from the 1960 Census because that survey does not provide information on the immigrant's year of entry into the United States. The estimates are imprecise, but the results resemble those found for native workers once I control for cohort and assimilation effects. If the regression is estimated on the sample of immigrants who have been in the United States for fewer than 10 years, the adjustment coefficients (and standard errors) are -0.506 (0.398) for log annual earnings, -0.290 (0.350) for log weekly earnings, and -0.192 (0.105) for the fraction of time worked.

[12] I use states to define the geographic boundary of the labor market because a worker's state of residence is the only geographic variable that is consistently coded across the entire 1960-2000 span. The 1960 Census does not report the person's metropolitan area of residence, and the metropolitan area identifiers for the 1970 Census differ substantially from those reported in later surveys.

aggregate data to estimate regressions similar to those presented above, but the unit of analysis is now a state-education-experience group at a particular point in time.

Table V reports the estimated coefficient of the immigrant share variable from this regression framework. The first column of the table presents the coefficient from the simplest specification, which includes the state, education, experience, and period fixed effects, as well as interactions between the state, education, and experience fixed effects with the vector of period fixed effects, and interactions between the state and education fixed effects. This regression, in effect, estimates the impact of immigration on the *change* in labor market outcomes experienced by a particular education group in a particular state. The adjustment coefficients for the various dependent variables are negative and mostly significant. The adjustment coefficient in the log weekly earnings regression is -0.124, with a standard error of 0.042. Note that the implied adverse impact of immigration resulting from this specification is far smaller than the effects reported in the previous section.

The second column of Table V adds a three-way interaction between the state, education, and experience fixed effects. This specification, therefore, examines the impact of immigration on the wage growth experienced by a particular education-experience group living in a particular state. The adjustment coefficients are more negative (-0.217 in the log weekly wage specification) and statistically significant. In short, defining a skill group in terms of both education and experience implies that immigration has a more adverse impact than a specification that ignores the experience component.

The third column of the table further expands the model by allowing for period effects to vary across education-experience cells, while the fourth column presents the full specification of the regression that allows for all possible three-way interactions between the state, education, experience, and period fixed effects. This regression specification effectively identifies the wage

impact by using only variation in immigration at the (state × education × experience × period) level. The coefficient is negative and significant (-0.183 in the log weekly wage specification), and it is numerically much smaller than the coefficients reported in the previous section.

In fact, it is instructive to contrast the difference in the results reported in the last column of Table V with the evidence reported in Table III. The key difference between the two sets of estimates is the assumption made about the geographic boundary of the labor market. The estimated wage elasticity for log weekly earnings is -0.13 when a state's geographic boundary limits the size of the market, and -0.40 when the worker participates in a national market. One interesting interpretation of this discrepancy is that there is sufficient spatial arbitrage—perhaps due to interstate flows of labor and capital—that tends to equalize opportunities for workers of given skills across regions. The spatial arbitrage effectively cuts the national estimate of the impact of immigration by two-thirds.[13] Put differently, even though immigration has a sizable adverse effect on the wage of competing workers at the national level, the analysis of wage differentials across regional labor markets conceals much of the impact.

## VI. Refining the Definition of Skills

*A. Measuring Effective Experience*

---

[13] The smaller wage effects estimated at the state level could also be due to attenuation bias from the measurement error that arises when I calculate the immigrant supply shock at such a detailed level of disaggregation. I reestimated the model using the nine Census regions (rather than states) as the geographic unit. The region-level regression coefficients corresponding to the last column of Table V are -.346 (.096) in the log annual earnings regression; -.289 (.070) in the log weekly earnings regression; and -.057 (.023) in the fraction of time worked regression. Even though the coefficients in the annual and weekly earnings regressions are numerically larger than those obtained in the state-level analysis, the coefficient in the log weekly earnings regression is still only half the size of the one reported in Table III. Moreover, it is unclear if the relatively larger effects estimated at the region level result from the partial elimination of attenuation bias or from the possibility that some of the native flows induced by immigration are intra-regional, and hence the region is a slightly better conceptual representation of the "closed market" required for measuring the local impact of immigration; see Borjas, Freeman, and Katz [1996] for related evidence.

Up to this point, labor market experience has been defined as the time elapsed since entry into the labor market for both immigrants and natives. The evidence indicates that U.S. firms attach different values to experience acquired abroad and experience acquired in the United States [Chiswick 1978]. These findings suggest that one should use the "effective experience" of an immigrant worker before assigning that worker to a particular schooling-experience group, where effective experience measures the years of work exposure that are valued in the U.S. labor market. Let $A$ denote age, $A_m$ the age of entry into the United States, and $A_T$ the age of entry into the labor market. The years of effective experience for an immigrant worker are given by

$$(5) \qquad X = \begin{cases} \alpha\,(A_M - A_T) + \beta\,(A - A_m), & \text{if } A_m > A_T \\ \gamma\,(A - A_T), & \text{if } A_m \leq A_T, \end{cases}$$

where $\alpha$ translates a year of source country experience acquired by immigrants who migrated as adults (i.e., $A_m > A_T$) into the equivalent value of experience acquired by a native worker; $\beta$ rescales the value of a year of U.S. experience acquired by these adult immigrants; and $\gamma$ rescales the experience acquired by immigrants who migrated as children (i.e., $A_m \leq A_T$).

The parameters $\alpha$, $\beta$, and $\gamma$ can be estimated by using the standard model of immigrant assimilation, a model that also accounts for differences in immigrant "quality" across cohorts [Borjas 1985]. Suppose we pool data for native and immigrant workers in two separate cross-sections (such as the 1980 and 1990 Censuses). A generic regression model that can identify all of the relevant parameters is

$$(6) \qquad \begin{aligned} \log w = {}& s_i + \phi_C\,I^C + \phi_D\,I^D + \lambda_N N(A - A_T) + \lambda_C\,I^C(A - A_T) \\ & + \lambda_{D0}\,I^D(A_m - A_T) + \lambda_{D1}\,I^D(A - A_m) + \kappa\,Y + \rho\pi + \varphi, \end{aligned}$$

21

where $w$ gives the weekly wage of a worker observed in a particular cross-section; $s_i$ gives a vector of education fixed effects; $I^C$ indicates if the immigrant entered the country as a child; $I^D$ indicates if the immigrant entered as an adult; $N$ indicates if the worker is native-born ($N = 1 - I^C - I^D$); $Y$ gives the calendar year of entry into the United States (set to zero for natives); and $\pi$ indicates if the observation is drawn from the 1990 Census.

The coefficient $\lambda_N$ gives the market value of a year of experience acquired by a native worker; $\lambda_C$ gives the value of a year of experience acquired in the United States by a "child immigrant"; and $\lambda_{D0}$ and $\lambda_{D1}$ give the value of a year of source country experience and of U.S. experience acquired by an adult immigrant, respectively. The weights that define an immigrant's effective experience are

$$(7) \qquad \alpha = \frac{\lambda_{D0}}{\lambda_N}, \quad \beta = \frac{\lambda_{D1}}{\lambda_N}, \quad \gamma = \frac{\lambda_C}{\lambda_N}.$$

Although the generic regression model in (6) is pedagogically useful, it ignores the curvature of the experience-earnings profile, and also ignores the possibility that the returns to education differ among the various groups. Further, it is preferable to define the calendar year of an immigrant's arrival as a vector of dummy variables indicating the year of arrival, rather than as a linear time trend. I estimated this more general model using the pooled 1980 and 1990 data. Table VI reports the relevant coefficients from this regression.

The experience coefficients for natives and for immigrants who migrated as children have almost identical numerical values, so that a marginal year of experience is valued at the same rate by employers (although the tiny numerical difference is statistically significant). This

implies that the weight $\gamma$ is estimated to be 1.0. In contrast, the value of an additional year of source country experience for adult immigrants (evaluated at the mean years of source country experience) is 0.006, while the value of an additional year of U.S. experience for these immigrants is 0.024. The value of a year of experience for a comparable native worker is 0.015. The implied weights are $\alpha = 0.4$ and $\beta = 1.6$.

I used these weights to calculate the effective experience of each immigrant, and then reclassified them into the schooling-experience cells using the predicted measure of effective experience.[14] The top row of Table VII reports the estimated adjustment coefficients. The effects are roughly similar to those reported in the previous section. For example, the weekly earnings regression implies that the wage elasticity is -.30, and the effect is statistically significant.

*B. Measuring Effective Skills*

The notion of effective experience raises a more general question about the overall comparability of the skills of immigrants and natives. The U.S. labor market differentiates the value of human capital embodied in immigrants and natives along many dimensions. For example, the value that firms attach to schooling will probably differ between the two groups, as well as among immigrants originating in different countries. It is of interest, therefore, to devise a simple way of summarizing the differences in "effective skills" that exist between immigrants and natives within a schooling category. It seems sensible to assume that similarly educated workers who fall in the same general location of the wage distribution have roughly the same

---

[14] Neither the Census nor the CPS report the exact year in which immigrants entered the United States, but instead report the year of entry within particular intervals (e.g., 1980-84). I used a uniform distribution to randomly assign workers in each interval to each year in the interval. Because the immigrant's year of arrival is not reported in the 1960 Census, the analysis is restricted to data drawn from the 1970 through 2000 cross-sections.

23

number of efficiency units because employers attach the same value to the *entire* package of skills embodied in these workers.

To conduct this classification of workers into skill groups, I restrict the analysis to workers who have valid wage data. In each cross-section and for each of the four schooling groups, I sliced the weekly wage distribution of *native* workers into 20 quantiles. By construction, five percent of natives in each schooling group fall into each of the quantiles. I then calculated how many of the immigrant workers in each schooling group fall into each of the 20 quantiles. The immigrant supply shock is defined by

$$(8) \qquad \hat{p}_{ikt} = \frac{M_{ikt}}{(M_{ikt} + N_{ikt})},$$

where $M_{ikt}$ and $N_{ikt}$ give the number of foreign-born and native-born workers in schooling group $i$, quantile $k$ ($k = 1, \ldots, 20$), at time $t$.

Consider the regression model:

$$(9) \qquad y_{ikt} = \theta\,\hat{p}_{ikt} + s_i + q_k + \pi_t + (q_k \times s_i) + (s_i \times \pi_t) + (q_k \times \pi_t) + \varphi_{ikt},$$

where $q_k$ is a vector of fixed effects indicating the quantile of the cell. The second row of Table VII reports the adjustment coefficients estimated from this specification of the model. Despite the very different methodological approach employed to define the skill groups, the estimated coefficient in the log weekly earnings regression is similar to those reported above. The estimate of $\theta$ is -0.606 (with a standard error of 0.158), implying a wage elasticity of -0.42. In sum, the evidence suggests that the clustering of immigrants into particular segments of the wage

24

distribution worsened the wage outcomes of native workers who happened to reside in those regions of the wage distribution.[15]

## VII. A Structural Approach to Immigration and Factor Demand

*A. Theory and Evidence*

Up to this point, I have not imposed any economic structure in the estimation of the wage effects of immigration. As in most of the studies in the spatial correlation literature, I have instead attempted to calculate the correlation that indicates if an increase in the number of immigrants lowers the wage of competing native workers.

An alternative approach would impose more structure by specifying the technology of the aggregate production function.[16] This structural approach would make it possible to estimate not only the effect of a particular immigrant influx on the wage of competing native workers, but also the cross-effects on the wage of other natives. An empirically useful approach assumes that the aggregate production function can be represented in terms of a three-level CES technology: Similarly educated workers with different levels of work experience are aggregated to form the

---

[15] The fraction of time worked variable used in the regression reported in the second row of Table VII has a different definition than elsewhere in this paper. To simplify the sorting of persons into the quantiles of the wage distribution, I restricted the analysis to working men. One could classify non-workers into the various quantiles by using a first-stage regression that predicts earnings based on a person's educational attainment, experience, and other variables. For native men, this approach leads to results that are similar to those reported in the text.

[16] Early empirical studies of the labor market impact of immigration [Grossman 1982; Borjas 1987] actually imposed a structure on the technology of the local labor market, such as the translog or the Generalized Leontief, and used the resulting estimates to calculate the various substitution elasticities. Although this approach fell out of favor in the early 1990s, the evidence reported by Card [2001] and the results presented in this section suggest that the structural approach may be due for a timely comeback.

Case 1:18-cv-00068   Document 225-5   Filed on 06/15/19 in TXSD   Page 300 of 329

25

effective supply of an education group; and workers across education groups are then aggregated to form the national workforce.[17]

Suppose the aggregate production function for the national economy at time $t$ is

$$(10) \qquad Q_t = \left[ \lambda_{Kt} K_t^{\nu} + \lambda_{Lt} L_t^{\nu} \right]^{1/\nu},$$

where $Q$ is output, $K$ is capital, $L$ denotes the aggregate labor input; and $\nu = 1 - 1/\sigma_{KL}$, with $\sigma_{KL}$ being the elasticity of substitution between capital and labor ($-\infty < \nu \le 1$). The vector $\lambda$ gives time-variant technology parameters that shift the production frontier, with $\lambda_{Kt} + \lambda_{Lt} = 1$. The aggregate $L_t$ incorporates the contributions of workers who differ in both education and experience. Let

$$(11) \qquad L_t = \left[ \sum_i \theta_{it} L_{it}^{\rho} \right]^{1/\rho},$$

where $L_{it}$ gives the number of workers with education $i$ at time $t$, and $\rho = 1 - 1/\sigma_E$, with $\sigma_E$ being the elasticity of substitution across these education aggregates ($-\infty < \rho \le 1$). The $\theta_{it}$ give time-variant technology parameters that shift the relative productivity of education groups, with $\Sigma_i \theta_{it} = 1$. Finally, the supply of workers in each education group is itself given by an aggregation of the contribution of similarly educated workers with different experience. In particular,

---

[17] The three-level CES technology slightly generalizes the two-level approach used in the labor demand context by Bowles [1970] and Card and Lemieux [2001].

26

$$(12) \qquad L_{it} = \left[ \sum_j \alpha_{ij} \, L_{ijt}^\eta \right]^{1/\eta},$$

where $L_{ijt}$ gives the number of workers in education group $i$ and experience group $j$ at time $t$; and $\eta = 1 - 1/\sigma_X$, with $\sigma_X$ being the elasticity of substitution across experience classes within an education group $(-\infty < \eta \leq 1)$. Equation (12) incorporates an important identifying assumption: the technology coefficients $\alpha_{ij}$ are constant over time, with $\Sigma_j \, \alpha_{ij} = 1$.

The marginal productivity condition implies that the wage for skill group $(i, j, t)$ is

$$(13) \qquad \log w_{ijt} = \log \lambda_{Lt} + (1 - v) \log Q_t + (v - \rho) \log L_t + \log \theta_{it} + (\rho - \eta) \log L_{it}$$
$$+ \log \alpha_{ij} + (\eta - 1) \log L_{ijt}.$$

As Card and Lemieux [2001] show in their recent study of the link between the wage structure and cohort size, it is straightforward to implement this approach empirically. In particular, note that the marginal productivity condition in (13) can be rewritten as

$$(14) \qquad \log w_{ijt} = \delta_t + \delta_{it} + \delta_{ij} - \frac{1}{\sigma_X} \log L_{ijt},$$

where $\delta_t = \log \lambda_{Lt} + (1 - v) \log Q_t + (v - \rho) \log L_t$, and is absorbed by period fixed effects; $\delta_{it} = \log \theta_{it} + (\rho - \eta) \log L_{it}$, and is absorbed by interactions between the education fixed effects and the period fixed effects; and $\delta_{ij} = \log \alpha_{ij}$, and is absorbed by interactions between education fixed

effects and experience fixed effects. The regression model in (14), therefore, identifies the elasticity of substitution across experience groups.

Moreover, the coefficients of the education-experience interactions in (14) identify the parameters $\log \alpha_{ij}$. I impose the restriction that $\Sigma_j \, \alpha_{ij} = 1$ when I estimate the $\alpha_{ij}$ from the fixed effect coefficients.[18] As indicated by equation (12), the estimates of $\alpha_{ij}$ and $\sigma_X$ permit the calculation of $L_{it}$, the CES-weighted labor aggregate for education group $i$. I can then move up one level in the CES technology, and recover an additional unknown parameter. Let $\log w_{it}$ be the mean log wage paid to the average worker in education group $i$ at time $t$. The marginal productivity condition determining the wage for this group is

$$(15) \qquad \log w_{it} = \delta_t + \log \theta_{it} - \frac{1}{\sigma_E} \log L_{it} \,.$$

This equation is closely related to the model estimated by Katz and Murphy [1992, p. 69] that examines how the wage differential between college and high school graduates varies with relative supplies. Note that $\sigma_E$ cannot be identified if the regression included interactions of education-period fixed effects to capture the term $\log \theta_{it}$. There would be 20 such interaction terms, but there are only 20 observations in the regression (four education groups observed at five different points in time). To identify $\sigma_E$, I adopt the Katz-Murphy assumption that the technology shifters can be approximated by a linear trend that varies across education groups.

It is important to note that ordinary least squares regressions of equations (14) and (15) may lead to biased estimates of $\sigma_X$ and $\sigma_E$ because the supply of workers to the various education

---

[18] If $\log \hat{\alpha}_{ij}$ is an estimated fixed effect coefficient, then $\hat{\alpha}_{ij} = \exp(\log \hat{\alpha}_{ij}) / \sum_j \exp(\log \hat{\alpha}_{ij})$.

groups is likely to be endogenous over the 40-year period spanned by the data. The economic question at the core this paper, however, suggests an instrument for the size of the workforce in each skill group: the number of immigrants in that group. In other words, the immigrant influx into particular skill groups provides the supply shifter required to identify the labor demand function. This instrument would be valid if the immigrant influx into particular skill groups were independent of the relative wages offered to the various skill categories. It is likely, however, that the number of immigrants in a skill group responds to shifts in the wage structure. Income-maximizing behavior on the part of potential immigrants would generate larger flows into those skill cells that had relatively high wages. This behavioral response would tend to build in a positive correlation between the size of the labor force and wages in a skill group. The regression coefficients, therefore, understate the negative wage impact of a relative supply increase.[19]

The three-level CES technology offers a crucial advantage for estimating the impact of immigration within a structural system of factor demand. My analysis defines 33 factors of production: 32 education-experience skill groups plus capital. A general specification of the technology, such as the translog, would require the estimation of 561 different parameters (or $n(n+1)/2$). The three-level CES approach drastically reduces the size of the parameter space; the technology can be summarized in terms of three elasticities of substitution. Obviously, this simplification comes at a cost: the CES specification restricts the types of substitution that can

---

[19] Consider the regression model given by $\log w = \beta \log L + u$. The IV estimate of $\beta$ has the property:

$$\text{plim } \hat{\beta} = \beta + \frac{\text{cov}(\log M, u)}{\text{cov}(\log M, \log L)},$$

where $\log M$ is the instrument. The total number of workers in a skill group is, in fact, positively correlated with the number of immigrants in that group, so that $\text{cov}(\log M, \log L) > 0$. Further, $\text{cov}(\log M, u) > 0$ because skill cells with

exist among the various factors. The elasticity of substitution across experience groups takes on the same value for workers in adjacent experience categories as for workers who differ greatly in their experience; the elasticity of substitution between high school dropouts and high school graduates is the same as that between high school dropouts and college graduates; and the elasticity of substitution between capital and labor is the same for all the different types of workers.

Finally, note that the empirical implementation of the three-level CES technology described above does not use any data on the aggregate capital stock, making it difficult to separately identify the value of $\sigma_{KL}$.[20] I will discuss below a plausible assumption that can be made about this parameter to simulate the impact of immigration on the labor market.

The first step in the empirical application of the model is to estimate equation (14) using the sample of 160 $(i, j, t)$ cells. The IV estimate of this regression equation is[21]

$$(16) \qquad \log w_{ijt} = \delta_t + \delta_{it} + \delta_{ij} - 0.288 \log L_{ijt}.$$
$$(0.115)$$

---

favorable demand shocks will probably attract larger numbers of income-maximizing immigrants. The IV regression coefficient then provides a lower bound for the wage reduction resulting from a supply increase.

[20] In principle, the elasticity $\sigma_{KL}$ could be estimated even without direct information on the aggregate capital stock by going up an additional level in the CES hierarchy. This exercise yields the marginal productivity condition for the average worker at time $t$. This marginal productivity condition depends on a time fixed effect and on $L_t$, the CES-weighted aggregate of the workforce. The coefficient of $L_t$ identifies $-1/\sigma_{KL}$. However, this regression would only have five observations in my data, and I would need to find a variable that could proxy for the movements in the period fixed effects.

[21] The instrument is $\log M_{ijt}$ and the standard errors are clustered by education-experience group. To avoid introducing errors due to composition effects, the regressions reported in this section use the mean log weekly wage of native workers as the dependent variable. The results would be very similar if the mean log wage was calculated in the pooled sample of natives and immigrants. The relevant coefficients (and standard errors) in equations (16), (17), and (17′) would be -0.281 (0.059), -0.676 (0.518), and -0.680 (0.462), respectively. The regressions estimated in this section are weighted by the size of the sample used to calculate the cell mean on the left-hand-side.

30

The implied elasticity of substitution across experience groups is 3.5. This estimate of $\sigma_X$ is similar to the Card-Lemieux [2001] estimate of the elasticity of substitution across age groups. The Card-Lemieux estimates for U.S. data range from 3.8 to 4.9.

I use the implied estimate of the elasticity of substitution and the (transformed) coefficients of the education-experience fixed effects to calculate the size of the CES-weighted labor aggregate for each education group. I then estimate the marginal productivity condition for the education group given by (15). The IV regression estimate is[22]

$$(17) \qquad \log w_{it} = \delta_t + \text{linear trend interacted with education fixed effects} - 0.741 \log L_{it}.$$
$$(0.646)$$

Alternatively, I can bypass the calculation of the CES-weighted labor aggregate for each education group, and simply use the actual number of workers in the group ($L_{it}^*$). The IV regression estimate is

$$(17') \qquad \log w_{it} = \delta_t + \text{linear trend interacted with education fixed effects} - 0.759 \log L_{it}^*.$$
$$(0.582)$$

Both specifications imply that $\sigma_E$ is around 1.3. The regressions reported in (17) and (17') have only 20 observations (four education groups observed at five different points in time), so that the elasticity of substitution is not measured precisely. Nevertheless, the implied elasticity is similar

---

[22] The "linear trend interacted with education fixed effects" vector includes the linear trend and education fixed effects, as well as the interactions. The instrument in (17) is $\log M_{it}$, where $M_{it} = [\sum_j \alpha_{ij} M_{ijt}^{\eta}]^{1/\eta}$. The alternative specification in (17') uses the instrument $\log M_{it}^*$, where $M_{it}^* = \sum_j M_{ijt}$.

31

to the Katz-Murphy [1992] estimate of 1.4, despite the different data and methodology.[23] In sum, the evidence indicates that workers within an experience group are not perfect substitutes, but there is clearly more substitution among similarly educated workers who differ in their experience than among workers with different levels of education.

*B. Simulating the Wage Effects of Immigration*

Hamermesh [1993, p. 37] shows that the factor price elasticity giving the impact on the wage of factor $y$ of an increase in the supply of factor $z$ is[24]

$$(18) \qquad \varepsilon_{yz} = \frac{d \log w_y}{d \log L_z} = s_z \frac{Q_{yz} Q}{Q_y Q_z}.$$

where $s_z$ is the share of income accruing to factor $z$; and $Q_y = \partial Q/\partial L_y$, $Q_z = \partial Q/\partial L_z$, and $Q_{yz} = \partial^2 Q/\partial L_y \partial L_z$.

The three-level CES technology implies that the own factor price elasticity giving the wage impact of an increase in the supply of workers with education $i$ and experience $j$ is

$$(19) \qquad \varepsilon_{ij,ij} = -\frac{1}{\sigma_X} + \left( \frac{1}{\sigma_X} - \frac{1}{\sigma_E} \right) \frac{s_{ij}}{s_i} + \left( \frac{1}{\sigma_E} - \frac{1}{\sigma_{KL}} \right) \frac{s_{ij}}{s_L} + \frac{1}{\sigma_{KL}} s_{ij},$$

---

[23] Card and Lemieux [2001] estimate the elasticity of substitution between high school and college equivalents to be between 1.1 and 3.1, depending on the sample composition.

[24] The factor price elasticity holds marginal cost and the quantities of other factors constant.

32

where $s_{ij}$ gives the share of income accruing to group $(i,j)$; $s_i$ gives the share of income accruing to education group $i$; and $s_L$ gives labor's share of income. Similarly, the (within-branch) cross factor price elasticity giving the impact on the wage of group $(i,j)$ of an increase in the supply of group $(i,j')$, with $j \neq j'$, is

$$(20) \qquad \varepsilon_{ij,ij'} = \left( \frac{1}{\sigma_X} - \frac{1}{\sigma_E} \right) \frac{s_{ij'}}{s_i} + \left( \frac{1}{\sigma_E} - \frac{1}{\sigma_{KL}} \right) \frac{s_{ij'}}{s_L} + \frac{1}{\sigma_{KL}} s_{ij'} \,.$$

Finally, the (across-branch) cross factor price elasticity giving the impact on the wage of group $(i,j)$ of an increase in the supply of group $(i',j')$, with $i \neq i'$ and $j' = (1, \ldots, j, \ldots 8)$, is

$$(21) \qquad \varepsilon_{ij,i'j'} = \left( \frac{1}{\sigma_E} - \frac{1}{\sigma_{KL}} \right) \frac{s_{i'j'}}{s_L} + \frac{1}{\sigma_{KL}} s_{i'j'} \,.$$

The calculations of the factor price elasticities in (19)-(21) require information on the factor shares. I assume that labor's share of income is 0.7, and use the 1990 Census to calculate the share of total annual earnings accruing to each education-experience cell. I use these total annual earnings to apportion the labor shares accruing to the various groups.[25] Based on the coefficients estimated above, I set $\sigma_X = 3.5$ and $\sigma_E = 1.3$. Finally, the calculations require an

---

[25] My calculation of the cell's income share uses all men and women who reported annual earnings in 1989. The estimated shares for the 8 experience groups within each education group are: high school dropouts (0.003, 0.004, 0.006, 0.005, 0.005, 0.007, 0.007, 0.007); high school graduates (0.018, 0.030, 0.034, 0.030, 0.028, 0.026, 0.022, 0.017); some college (0.018, 0.030, 0.036, 0.036, 0.030, 0.022, 0.016, 0.011); and college graduates (0.025, 0.039, 0.044, 0.049, 0.037, 0.025, 0.019, 0.013). These income shares, when aggregated to the level of the education group, are similar to the shares reported by Autor, Katz, and Krueger [1998, p. 1209]. The share of income accruing to high school dropouts is 4.5 percent; high school graduates, 20.5 percent; workers with some college, 19.9 percent; and college graduates, 25.1 percent.

assumption about $\sigma_{KL}$. Hamermesh [1993, p. 92] concludes that the aggregate U.S. economy can be reasonably described by a Cobb-Douglas production function, suggesting that $\sigma_{KL}$ equals one. I impose this restriction in the analysis.

Table VIII reports the estimated elasticities. The own elasticity varies from -0.30 to -0.36, with a weighted mean of -0.33 (where the weight is the size of the native labor force as of 2000).[26] The table also reports the cross-elasticities within an education branch. Without exception, these cross-elasticities are negative and their weighted mean is -0.05. Finally, the table reports the cross-elasticities across education branches. These cross-elasticities are positive and small, with a weighted mean of 0.02. It is worth noting that the cross-branch elasticities reported for high school dropouts are very close to zero. This result follows from the definition of the elasticity in equation (21). Because the share of income accruing to high school dropouts is small, an influx of low-skill immigrants is bound to have only a tiny impact on the wage of workers in other education groups.[27] As an example, consider the wage effects of a 10 percent increase in the number of college graduates who have 16-20 years of experience. The elasticities calculated for this group indicate that their own wage would drop by 3.5 percent; that the wage of other college graduates (with different levels of experience) would fall by -0.6 percent, and that the wage of all workers without a college degree would rise by 0.3 percent.

------

[26] The own elasticities reported in Table VIII are not directly comparable to the "wage elasticities" reported earlier. As noted in footnote 6, the regression model estimated in previous sections identifies the reduced-form effect of immigration on wages. This reduced form effect is $\varepsilon/(1 - \varepsilon\sigma)$, where $\varepsilon$ is the factor price elasticity and $\sigma$ is the labor supply elasticity. If $\varepsilon = -0.33$ and $\sigma = 0.4$, for example, the implied reduced-form effect estimated in this section is -0.29, which is somewhat smaller than the estimates that do not use a structural approach.

[27] Murphy and Welch [1992] report elasticities of complementarity (defined as $Q_{yz}Q/Q_yQ_z$) for a number of education-experience groups. In the Murphy-Welch exercise, the cross-elasticities between high school graduates and college graduates tend to be positive, but the within-branch elasticities for a given education group are not always negative.

I use the elasticity estimates reported in Table VIII to calculate the wage impact of the immigrant influx that entered the United States between 1980 and 2000. The marginal productivity condition for the typical worker in education group $s$ and experience group $x$ can be written as $w_{sx} = D(K, L_{11}, \ldots, L_{18}, \ldots, L_{41}, \ldots, L_{48})$. Assuming that the capital stock is constant, the net impact of immigration on the log wage of group $(s, x)$ is[28]

$$(22) \qquad \Delta \log w_{sx} = \varepsilon_{sx,sx}\, m_{sx} + \sum_{j \neq x} \varepsilon_{sx,sj}\, m_{sj} + \sum_{i \neq s} \sum_{j} \varepsilon_{sx,ij}\, m_{ij} \,,$$

where $m_{ij}$ gives the percentage change in labor supply due to immigration in cell $(i, j)$. Because the size of the native labor force in each skill group is shifting over time, I define $m_{ij}$ as

$$(23) \qquad m_{ij} = \frac{M_{ij,2000} - M_{ij,1980}}{0.5(N_{ij,1980} + N_{ij,2000}) + M_{ij,1980}} \,,$$

so that the baseline population used to calculate the percent increase in labor supply averages out the size of the native workforce in the skill cell and treats the pre-existing immigrant population as part of the "native" stock.

Table IX summarizes the results of the simulation. The large immigrant influx of the 1980s and 1990s adversely affected the wage of most native workers, particularly those workers at the bottom and top of the education distribution. The wage fell by 8.9 percent for high school dropouts and by 4.9 percent for college graduates. In contrast, the wage of high school graduates

---

[28] The assumption of a constant capital stock implies that the resulting wage consequences should be interpreted as short-run impacts. Over time, the changes in factor prices will fuel adjustments in the capital stock that attenuate the wage effects.

fell by only 2.6 percent, while the wage of workers with some college was barely affected. Overall, the immigrant influx reduced the wage of the average native worker by 3.2 percent.

These predictions assume that the elasticity of substitution between capital and labor equals one. Equations (19)-(21) imply that the adverse wage effects of immigration are larger if there is less substitution between capital and labor than implied by the aggregate Cobb-Douglas specification. For example, the predicted wage effect for each skill group is about one percentage point lower (i.e., more negative) when $\sigma_{KL} = 0.75$, so that the wage of the average native worker would then fall by 4.2 percent.

## VIII. Conclusion

The concern over the adverse labor market impact of immigration has always played a central role in the immigration debate. The resurgence of large-scale immigration in recent decades stimulated a great deal of research that attempts to measure these labor market effects. This research effort, based mainly on comparing native employment opportunities across regions, has not been entirely successful. The weak spatial correlations typically estimated in these studies, although often construed as showing that immigrants do not lower native wages, are difficult to interpret. In fact, economic theory implies that the more that firms and workers adjust to the immigrant supply shock, the smaller these cross-region correlations will be—regardless of the true impact of immigration on the national economy.

This paper introduces a new approach for estimating the labor market impact of immigration. The analysis builds on the assumption that similarly educated workers who have different levels of experience are not perfect substitutes. Defining skill groups in terms of educational attainment and work experience introduces a great deal of variation in the data. In

36

some years, the influx of immigrant with a particular level of schooling mainly affects younger workers, in other years it mainly affects older workers. In contrast to the existing literature, the evidence reported in this paper consistently indicates that immigration reduces the wage and labor supply of competing native workers, as suggested by the simplest textbook model of a competitive labor market. Moreover, the evidence indicates that spatial correlations conceal around two-thirds of the national impact of immigration on wages.

My estimates of the own factor price elasticity cluster between -0.3 and -0.4. These estimates, combined with the very large immigrant influx in recent decades, imply that immigration has substantially worsened the labor market opportunities faced by many native workers. Between 1980 and 2000, immigration increased the labor supply of working men by 11.0 percent. Even after accounting for the beneficial cross-effects of low-skill (high-skill) immigration on the earnings of high-skill (low-skill) workers, my analysis implies that this immigrant influx reduced the wage of the average native worker by 3.2 percent. The wage impact differed dramatically across education groups, with the wage falling by 8.9 percent for high school dropouts, 4.9 percent for college graduates, 2.6 percent for high school graduates, and barely changing for workers with some college.

Although the comparison of workers across narrowly defined skill classifications reveals a sizable adverse effect of immigration on native employment opportunities, it is worth noting that we still do not fully understand *why* the spatial correlation approach fails to find these effects. I suspect that we can learn a great deal more about the labor market impact of immigration by documenting the many adjustments that take place, by workers and firms, both inside and outside the labor market, as immigration alters economic opportunities in many sectors of the economy. For instance, my analysis ignored the long-run capital adjustments induced by immigration, the role played by capital-skill complementarities, and the possibility

37

that high-skill immigration (e.g., scientists and high-tech workers) is an important engine for endogenous technological change.

The adverse wage effects documented in this paper tell only part of the story of how the U.S. economy responded to the resurgence of large-scale immigration. The interpretation and policy implications of these findings require a more complete documentation and assessment of the many other consequences, including the potential benefits that immigrants impart on a host country.

## APPENDIX 1: VARIABLE DEFINITIONS

The data are drawn from the 1960, 1970, 1980, 1990 Public Use Microdata Samples of the U.S. Census, and the pooled 1999, 2000, 2001 Annual Demographic Supplement of the Current Population Surveys. In the 1960 and 1970 Censuses, the data extracts form a 1 percent random sample of the population. In 1980 and 1990, the immigrant extracts form a 5 percent random sample, and the native extracts form a 1 percent random sample. The analysis is restricted to men aged 18-64. A person is classified as an immigrant if he was born abroad and is either a non-citizen or a naturalized citizen; all other persons are classified as natives. Sampling weights are used in all calculations involving the 1990 Census and the CPS.

*Definition of education and experience:* I categorize workers into four education groups: high school dropouts, high school graduates, persons with some college, and college graduates, and use Jaeger's [1997, p. 304] algorithm for reconciling differences in the coding of the completed education variable across surveys. I assume that high school dropouts enter the labor market at age 17, high school graduates at age 19, persons with some college at age 21, and college graduates at age 23, and define work experience as the worker's age at the time of the survey minus the assumed age of entry into the labor market. I restrict the analysis to persons who have between 1 and 40 years of experience. Throughout much of the paper, workers are classified into one of 8 experience groups. The experience groups are defined in terms of five-year intervals (1-5 years of experience, 6-10, 11-15, 16-20, 21-25, 26-30, 31-35, and 36-40).

*Counts of persons in education-experience groups:* The counts are calculated in the sample of men who do not reside in group quarters and participate in the civilian labor force (according to the information provided by the labor force status variable for the reference week).

*Annual and weekly earnings:* These variables are calculated in the sample of men who do not reside in group quarters, are employed in the civilian labor force, are not enrolled in school,

Case 1:18-cv-00068 Document 225-5 Filed on 07/25/18 Page 314 of 329

39

report positive annual earnings, weeks worked, and weekly hours, and are not self-employed (as determined by the class of worker variable). In the 1960, 1970, and 1980 Censuses, the top coded annual salary is multiplied by 1.5. In the 1960 and 1970 Censuses, weeks worked in the calendar year prior to the survey are reported as a categorical variable. I impute weeks worked for each worker as follows: 6.5 weeks for 13 weeks or less, 20 for 14-26 weeks, 33 for 27-39 weeks, 43.5 for 40-47 weeks, 48.5 for 48-49 weeks, and 51 for 50-52 weeks. The average log annual earnings or average log weekly earnings for a particular education-experience cell is defined as the mean of log annual earnings or log weekly earnings over all workers in the relevant population.

*Fraction of time worked:* This variable is calculated in the sample of men who do not reside in group quarters, are not enrolled in school, and are not in the military (as indicated by the labor force status variable for the reference week). The fraction of time worked for each person is defined as the ratio of weeks worked (including zeros) to 52. The group mean used in the analysis is the mean of this variable over the relevant population, which includes persons with zero hours worked.

Case 1:18-cv-00068 Document 400-5 Filed on 06/15/19 in TXSD Page 315 of 329
Case 1:18-cv-00068 Document 225-5 Filed on 07/21/18 Page 315 of 329

40

**APPENDIX 2. PERCENT OF MALE LABOR FORCE THAT IS FOREIGN-BORN, BY EDUCATION AND EXPERIENCE, 1960-2000**

| Education | Years of experience | 1960 | 1970 | 1980 | 1990 | 2000 |
|---|---|---|---|---|---|---|
| High school dropouts | 1-5 | 2.6 | 3.9 | 8.5 | 18.4 | 20.8 |
| | 6-10 | 3.6 | 5.4 | 13.9 | 29.7 | 44.9 |
| | 11-15 | 3.6 | 6.2 | 15.8 | 28.1 | 49.8 |
| | 16-20 | 4.3 | 6.7 | 13.5 | 28.9 | 50.0 |
| | 21-25 | 4.4 | 6.0 | 12.5 | 28.5 | 40.5 |
| | 26-30 | 5.2 | 5.5 | 11.2 | 21.4 | 40.0 |
| | 31-35 | 8.0 | 5.4 | 8.8 | 17.7 | 37.1 |
| | 36-40 | 12.3 | 5.8 | 7.9 | 15.3 | 28.4 |
| High school graduates | 1-5 | 1.2 | 2.1 | 3.2 | 8.0 | 12.3 |
| | 6-10 | 1.6 | 2.4 | 3.8 | 7.8 | 14.0 |
| | 11-15 | 2.0 | 3.1 | 4.6 | 6.9 | 14.5 |
| | 16-20 | 3.1 | 3.0 | 4.3 | 7.3 | 11.5 |
| | 21-25 | 3.0 | 3.2 | 4.8 | 7.6 | 9.4 |
| | 26-30 | 4.8 | 4.0 | 4.8 | 6.8 | 9.5 |
| | 31-35 | 7.3 | 3.4 | 4.7 | 6.5 | 10.8 |
| | 36-40 | 13.0 | 5.3 | 5.2 | 6.6 | 9.7 |
| Some college | 1-5 | 2.3 | 3.5 | 5.2 | 7.9 | 9.1 |
| | 6-10 | 3.3 | 4.2 | 5.1 | 8.3 | 10.8 |
| | 11-15 | 3.7 | 4.9 | 5.6 | 7.4 | 11.6 |
| | 16-20 | 4.6 | 4.8 | 6.1 | 6.4 | 9.3 |
| | 21-25 | 4.9 | 4.5 | 6.3 | 6.6 | 7.6 |
| | 26-30 | 5.5 | 4.7 | 5.8 | 7.0 | 5.7 |
| | 31-35 | 9.6 | 4.7 | 6.1 | 7.2 | 6.3 |
| | 36-40 | 10.7 | 6.5 | 6.3 | 6.9 | 6.0 |
| College graduates | 1-5 | 3.4 | 4.1 | 5.0 | 9.0 | 12.4 |
| | 6-10 | 4.3 | 7.2 | 6.9 | 10.8 | 15.4 |
| | 11-15 | 4.8 | 6.5 | 8.5 | 10.3 | 17.5 |
| | 16-20 | 5.0 | 5.8 | 10.5 | 9.5 | 14.6 |
| | 21-25 | 6.4 | 5.6 | 8.5 | 10.2 | 11.5 |
| | 26-30 | 7.8 | 5.7 | 7.6 | 11.6 | 10.8 |
| | 31-35 | 10.0 | 6.9 | 7.2 | 9.6 | 12.4 |
| | 36-40 | 12.5 | 9.0 | 7.2 | 9.1 | 14.5 |

*Harvard University and National Bureau of Economic Research*

## References

Altonji, Joseph G., and David Card, "The Effects of Immigration on the Labor Market Outcomes of Less-Skilled Natives," in John M. Abowd and Richard B. Freeman, eds., *Immigration, Trade, and the Labor Market* (Chicago: University of Chicago Press, 1991).

Angrist, Joshua D., and Alan B. Krueger, "Empirical Strategies in Labor Economics," in Orley C. Ashenfelter and David Card, eds., *Handbook of Labor Economics*, Vol. 3A (Amsterdam: Elsevier, 1999).

Autor, David H., Lawrence F. Katz, and Alan B. Krueger, "Computing Inequality: Have Computers Changed the Labor Market?" *Quarterly Journal of Economics*, CXVII (1998), 1169-1213.

Becker, Gary S., *Human Capital*, 2nd edition (New York: Columbia University Press, 1975).

Borjas, George J., "Assimilation, Changes in Cohort Quality, and the Earnings of Immigrants," *Journal of Labor Economics*, III (1985), 463-489.

Borjas, George J., "Immigrants, Minorities, and Labor Market Competition," *Industrial and Labor Relations Review*, XL (1987), 382-392.

Borjas, George J., "Does Immigration Grease the Wheels of the Labor Market?" *Brookings Papers on Economic Activity*, 1 (2001), 69-119.

Borjas, George J., Richard B. Freeman, and Lawrence F. Katz, "Searching for the Effect of Immigration on the Labor Market," *American Economic Review Papers and Proceedings*, LXXXVI (1996), 246-251.

Borjas, George J., Richard B. Freeman, and Lawrence F. Katz, "How Much Do Immigration and Trade Affect Labor Market Outcomes?" *Brookings Papers on Economic Activity*, 1 (1997), 1-67.

Bowles, Samuel, "Aggregation of Labor Inputs in the Economics of Growth and Planning: Experiments with a Two-Level CES Function," *Journal of Political Economy*, LXXVIII (1970), 68-81.

Card, David, "The Impact of the Mariel Boatlift on the Miami Labor Market," *Industrial and Labor Relations Review*, XLIII (1990), 245-257.

Card, David, "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration," *Journal of Labor Economics*, XIX (2001), 22-64.

Card, David, and Thomas Lemieux, "Can Falling Supply Explain the Rising Return to College for Younger Men? A Cohort-Based Analysis," *Quarterly Journal of Economics*, CXVI (2001), 705-746.

42

Chiswick, Barry R., "The Effect of Americanization on the Earnings of Foreign-Born Men," *Journal of Political Economy*, LXXXVI (1978), 897-921.

Friedberg, Rachel M., "The Impact of Mass Migration on the Israeli Labor Market," *Quarterly Journal of Economics*, CXVI (2001), 1373-1408.

Friedberg, Rachel M., and Jennifer Hunt, "The Impact of Immigration on Host Country Wages, Employment and Growth," *Journal of Economic Perspectives*, IX (1995), 23-44.

Grossman, Jean Baldwin, "The Substitutability of Natives and Immigrants in Production," *Review of Economics and Statistics*, LIV (1982), 596-603.

Hamermesh, Daniel, *Labor Demand* (Princeton, N.J.: Princeton University Press, 1993).

Jaeger, David A., "Reconciling the Old and New Census Bureau Education Questions: Recommendations for Researchers," *Journal of Business and Economic Statistics*, XV (1997), 300-309.

Juhn, Chinhui, Kevin M. Murphy, and Robert H. Topel, "Why Has the Natural Rate of Unemployment Increased Over Time?" *Brookings Papers on Economic Activity*, 2 (1991), 75-126.

Katz, Lawrence F., and Kevin M. Murphy, "Changes in the Wage Structure, 1963-87: Supply and Demand Factors," *Quarterly Journal of Economics*, CVII (1992), 35-78.

LaLonde, Robert J., and Robert H. Topel, "Labor Market Adjustments to Increased Immigration," in John M. Abowd and Richard B. Freeman, eds., *Immigration, Trade, and the Labor Market* (Chicago: University of Chicago Press, 1991).

Mincer, Jacob, *Schooling, Experience, and Earnings* (New York: Columbia University Press, 1974).

Murphy, Kevin M., and Finis Welch, "The Structure of Wages," *Quarterly Journal of Economics*, CVII (1992), 285-326.

Pischke, Jörn-Steffen, and Johannes Velling, "Employment Effects of Immigration to Germany: An Analysis Based on Local Labor Markets," *Review of Economics and Statistics*, LXXIX (1997), 594-604.

Samuelson, Paul A., *Economics*, 6th Edition (New York: McGraw-Hill, 1964).

Schoeni, Robert F., "The Effect of Immigrants on the Employment and Wages of Native Workers: Evidence from the 1970s and 1980s," The RAND Corporation, March 1997.

Smith, James P., and Barry Edmonston, eds., *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration* (Washington, D.C.: National Academy Press, 1997).

43

Welch, Finis, "Effects of Cohort Size on Earnings: The Baby Boom Babies' Financial Bust,"
    *Journal of Political Economy*, LXXXVII (1979), S65-S97.

Welch, Finis, "In Defense of Inequality," *American Economic Review*, LXXXIX (1990), 1-17.

44

**TABLE I**
**Log Weekly Wage of Male Native Workers, 1960-2000**

| Education | Years of experience | 1960 | 1970 | 1980 | 1990 | 2000 |
|---|---|---|---|---|---|---|
| High school dropouts | 1-5 | 5.535 | 5.758 | 5.722 | 5.494 | 5.418 |
| | 6-10 | 5.920 | 6.157 | 6.021 | 5.839 | 5.751 |
| | 11-15 | 6.111 | 6.305 | 6.166 | 6.006 | 5.932 |
| | 16-20 | 6.188 | 6.360 | 6.286 | 6.087 | 5.989 |
| | 21-25 | 6.201 | 6.413 | 6.364 | 6.180 | 6.034 |
| | 26-30 | 6.212 | 6.439 | 6.368 | 6.268 | 6.036 |
| | 31-35 | 6.187 | 6.407 | 6.419 | 6.295 | 6.086 |
| | 36-40 | 6.175 | 6.377 | 6.418 | 6.295 | 6.168 |
| High school graduates | 1-5 | 5.940 | 6.132 | 6.090 | 5.837 | 5.773 |
| | 6-10 | 6.257 | 6.476 | 6.343 | 6.159 | 6.140 |
| | 11-15 | 6.392 | 6.587 | 6.497 | 6.309 | 6.273 |
| | 16-20 | 6.459 | 6.639 | 6.609 | 6.415 | 6.323 |
| | 21-25 | 6.487 | 6.664 | 6.638 | 6.495 | 6.406 |
| | 26-30 | 6.478 | 6.677 | 6.662 | 6.576 | 6.414 |
| | 31-35 | 6.450 | 6.674 | 6.667 | 6.572 | 6.493 |
| | 36-40 | 6.435 | 6.622 | 6.657 | 6.548 | 6.460 |
| Some college | 1-5 | 6.133 | 6.322 | 6.237 | 6.085 | 6.013 |
| | 6-10 | 6.412 | 6.633 | 6.472 | 6.387 | 6.366 |
| | 11-15 | 6.535 | 6.752 | 6.641 | 6.534 | 6.489 |
| | 16-20 | 6.604 | 6.805 | 6.762 | 6.613 | 6.591 |
| | 21-25 | 6.634 | 6.832 | 6.764 | 6.711 | 6.626 |
| | 26-30 | 6.620 | 6.841 | 6.789 | 6.771 | 6.648 |
| | 31-35 | 6.615 | 6.825 | 6.781 | 6.740 | 6.662 |
| | 36-40 | 6.575 | 6.728 | 6.718 | 6.658 | 6.623 |
| College graduates | 1-5 | 6.354 | 6.612 | 6.432 | 6.459 | 6.458 |
| | 6-10 | 6.625 | 6.891 | 6.702 | 6.766 | 6.747 |
| | 11-15 | 6.760 | 7.032 | 6.923 | 6.908 | 6.943 |
| | 16-20 | 6.852 | 7.109 | 7.043 | 7.005 | 7.046 |
| | 21-25 | 6.876 | 7.158 | 7.087 | 7.112 | 7.051 |
| | 26-30 | 6.881 | 7.146 | 7.085 | 7.122 | 7.084 |
| | 31-35 | 6.867 | 7.095 | 7.079 | 7.095 | 7.074 |
| | 36-40 | 6.821 | 7.070 | 6.985 | 6.950 | 6.944 |

The table reports the mean of the log weekly wage of workers in each education-experience group. All wages are deflated to 1999 dollars using the CPI-U series.

45

**TABLE II**
**Index of Congruence in Occupation Distributions within Education Groups, 1990**

| Education-experience of native groups: | Experience of corresponding immigrant group | | | |
|---|---|---|---|---|
| | 1-10 years | 11-20 years | 21-30 years | 31-40 years |
| High school dropouts | | | | |
| 1-10 years | 0.709 | 0.714 | 0.671 | 0.619 |
| 11-20 years | 0.525 | 0.631 | 0.628 | 0.585 |
| 21-30 years | 0.410 | 0.527 | 0.567 | 0.566 |
| 31-40 years | 0.311 | 0.435 | 0.496 | 0.518 |
| High school graduates | | | | |
| 1-10 years | 0.682 | 0.611 | 0.498 | 0.405 |
| 11-20 years | 0.279 | 0.379 | 0.387 | 0.338 |
| 21-30 years | 0.030 | 0.184 | 0.297 | 0.272 |
| 31-40 years | -0.035 | 0.126 | 0.276 | 0.311 |
| Some college | | | | |
| 1-10 years | 0.649 | 0.571 | 0.474 | 0.291 |
| 11-20 years | 0.147 | 0.401 | 0.492 | 0.336 |
| 21-30 years | -0.052 | 0.230 | 0.432 | 0.407 |
| 31-40 years | -0.066 | 0.217 | 0.458 | 0.489 |
| College graduates | | | | |
| 1-10 years | 0.756 | 0.710 | 0.639 | 0.531 |
| 11-20 years | 0.561 | 0.673 | 0.674 | 0.593 |
| 21-30 years | 0.430 | 0.597 | 0.661 | 0.619 |
| 31-40 years | 0.422 | 0.599 | 0.688 | 0.691 |

Equation (2) defines the index of congruence. The index is calculated separately for each pair of native and immigrant groups.

46

**TABLE III**
**Impact of Immigrant Share on Labor Market Outcomes**
**of Native Education-Experience Groups**

| Specification: | Dependent variable | | |
|---|---|---|---|
| | Log annual earnings | Log weekly earnings | Fraction of time worked |
| 1. Basic estimates | -0.919 | -0.572 | -0.529 |
| | (0.582) | (0.162) | (0.132) |
| 2. Unweighted regression | -0.725 | -0.546 | -0.382 |
| | (0.463) | (0.141) | (0.103) |
| 3. Includes women in labor force counts | -0.919 | -0.637 | -0.511 |
| | (0.661) | (0.159) | (0.148) |
| 4. Includes log native labor force as regressor | -1.231 | -0.552 | -0.567 |
| | (0.384) | (0.204) | (0.116) |

The table reports the coefficient of the immigrant share variable from regressions where the dependent variable is the mean labor market outcome for a native education-experience group at a particular point in time. Standard errors are reported in parentheses and are adjusted for clustering within education-experience cells. All regressions have 160 observations and, except for those reported in row 2, are weighted by the sample size of the education-experience-period cell. All regression models include education, experience, and period fixed effects, as well as interactions between education and experience fixed effects, education and period fixed effects, and experience and period fixed effects.

47

## TABLE IV
**Impact of Immigrant Share on Native Labor Market Outcomes,
by Education Group**

| Dependent variable: | High school dropouts | High school graduates | Some college | College graduates | At least high school graduates |
|---|---|---|---|---|---|
| 1. Log annual earnings | -1.416 | -2.225 | -0.567 | 1.134 | -1.184 |
| | (0.313) | (0.622) | (0.421) | (0.436) | (0.668) |
| 2. Log weekly earnings | -0.947 | -2.074 | -1.096 | 0.610 | -0.335 |
| | (0.164) | (0.510) | (0.461) | (0.440) | (0.612) |
| 3. Fraction of time worked | -0.086 | 0.393 | 0.567 | 0.300 | -1.040 |
| | (0.073) | (0.251) | (0.385) | (0.499) | (0.211) |

The table reports the coefficient of the immigrant share variable from regressions where the dependent variable is the mean labor market outcome for a native education-experience group at a particular point in time. Standard errors are reported in parentheses and are adjusted for clustering within experience cell (in the first four columns) and within education-experience cells (in the last column). All regression are weighted by the sample size of the education-experience-period cell. The regressions reported in the first four columns have 40 observations and include experience and period fixed effects. The regressions reported in the last column have 120 observations and include education, experience, and period fixed effects, as well as interactions between education and experience fixed effects, education and period fixed effects, and experience and period fixed effects.

48

**TABLE V**
**Impact of Immigrant Share on Labor Market Outcomes**
**of Native State-Education-Experience Groups**

| Dependent Variable: | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| 1. Log annual earnings | -0.115 | -0.276 | -.253 | -.217 |
| | (0.079) | (0.053) | (.046) | (.068) |
| 2. Log weekly earnings | -0.124 | -0.217 | -.203 | -.183 |
| | (0.042) | (0.039) | (.038) | (.050) |
| 3. Fraction of time worked | -0.038 | -0.100 | -.078 | -.119 |
| | (0.030) | (0.015) | (.015) | (.021) |
| Controls for: | | | | |
| (State × period), (education × period), (experience × period), (state × education) fixed effects | Yes | Yes | Yes | Yes |
| (State × education × experience) fixed effects | No | Yes | Yes | Yes |
| (Education × experience × period) fixed effects | No | No | Yes | Yes |
| (State × education × period), (state × experience × period) fixed effects | No | No | No | Yes |

The table reports the coefficient of the immigrant share variable from regressions where the dependent variable is the mean labor market outcome for a native state-education-experience group at a particular point in time. Standard errors are reported in parentheses and are adjusted for clustering within state-education-experience cells. All regressions are weighted by the sample size of the state-education-experience-period cell and include state, education, experience, and period fixed effects. The regressions on log annual earnings or log weekly earnings have 8,153 observations; the regressions on the fraction of time worked have 8,159 observations.

49

## TABLE VI
### Impact of Different Types of Labor Market Experience on the Log Weekly Earnings of Natives and Immigrants

| Coefficient of: | Group | | |
|---|---|---|---|
| | Natives | Child immigrants | Adult immigrants |
| Source country experience | --- | --- | 0.012 |
| | | | (0.001) |
| Source country experience squared ÷ 10 | --- | --- | -0.003 |
| | | | (0.000) |
| U.S. experience | 0.056 | 0.058 | 0.032 |
| | (0.000) | (0.001) | (0.002) |
| U.S. experience squared ÷ 10 | -0.010 | -0.010 | -0.004 |
| | (0.001) | (0.000) | (0.001) |
| | | | |
| Mean value of: | | | |
| Source country experience | --- | --- | 10.6 |
| U.S. experience | 16.7 | 13.0 | 10.8 |
| | | | |
| Marginal value of an additional year of experience for immigrants: | | | |
| Source country experience | --- | --- | 0.006 |
| | | | (0.001) |
| U.S. experience | --- | 0.033 | 0.024 |
| | | (0.001) | (0.001) |
| | | | |
| Marginal value of an additional year of experience for natives, evaluated at mean value of relevant sample of immigrants | --- | 0.031 | 0.015 |
| | | (0.000) | (0.000) |

Standard errors are reported in parentheses. The regression pools data from the 1980 and 1990 Census and has 1,141,609 observations. The dependent variable is the log of weekly earnings. The regressors include: dummy variables indicating if the worker is an adult immigrant or a child immigrant; a vector of variables indicating the worker's educational attainment, interacted with variables indicating if the worker is an adult or a child immigrant; experience (and its squared) for native workers; experience (and its square) for immigrants who arrived as children; source country experience (and its squared) for immigrants who arrived as adults; experience in the U.S. (and its squared) for immigrants who arrived as adults; dummy variables indicating the calendar year in which the immigrant arrived (1985-1989, 1980-1984, 1975-1979, 1970-1974, 1965-1969, 1960-1964, 1950-1959, and before 1950), and the interaction of this vector with a dummy variable indicating if the immigrant arrived as an adult; and a dummy variable indicating if the observation was drawn from the 1990 Census.

50

**TABLE VII**

**Impact of Immigrant Share on Labor Market Outcomes of Native Skill Groups, Using Effective Experience and Effective Skills**

| | Dependent variable | | |
|---|---|---|---|
| Specification: | Log annual earnings | Log weekly earnings | Fraction of time worked |
| 1. Effective experience | -1.025 | -0.422 | -0.611 |
| | (0.506) | (0.210) | (0.118) |
| 2. Using quantiles of wage distribution | -0.562 | -0.606 | -0.048 |
| | (0.329) | (0.158) | (0.167) |

The table reports the coefficient of the immigrant share variable from regressions where the dependent variable is the mean labor market outcome for a native skill group (defined in terms of education-experience in row 1 or education-quantile in row 2) at a particular point in time. The quantile definition of skill groups is based on the worker's placement in each of 20 quantiles of the (within-education) native weekly wage distribution. Standard errors are reported in parentheses and are adjusted for clustering within education-experience cells (row 1) or within education-quantile cells (row 2). All regressions are weighted by the sample size of the education-experience-period cell (row 1) or the education-quantile-period cell (row 2). The regressions reported in row 1 have 128 observations; those reported in row 2 have 400 observations. The models in row 1 include education, experience, and period fixed effects, as well as interactions between education and experience fixed effects, education and period fixed effects, and experience and period fixed effects. The models in row 2 include education, quantile, and period fixed effects, as well as interactions between education and quantile fixed effects, education and period fixed effects, and quantile and period fixed effects

51

**TABLE VIII**
**Estimated Factor Price Elasticities, By Skill Group**

| Education | Years of experience | Own elasticity | Cross elasticity (within education branch) | Cross elasticity (across education branches) |
|---|---|---|---|---|
| High school dropouts | 1-5 | -0.313 | -0.028 | 0.002 |
| | 6-10 | -0.330 | -0.044 | 0.003 |
| | 11-15 | -0.344 | -0.059 | 0.004 |
| | 16-20 | -0.341 | -0.056 | 0.004 |
| | 21-25 | -0.339 | -0.053 | 0.004 |
| | 26-30 | -0.352 | -0.066 | 0.004 |
| | 31-35 | -0.358 | -0.072 | 0.005 |
| | 36-40 | -0.361 | -0.076 | 0.005 |
| High school graduates | 1-5 | -0.316 | -0.030 | 0.012 |
| | 6-10 | -0.335 | -0.050 | 0.020 |
| | 11-15 | -0.343 | -0.057 | 0.023 |
| | 16-20 | -0.337 | -0.051 | 0.020 |
| | 21-25 | -0.333 | -0.047 | 0.019 |
| | 26-30 | -0.330 | -0.044 | 0.017 |
| | 31-35 | -0.323 | -0.037 | 0.015 |
| | 36-40 | -0.315 | -0.029 | 0.012 |
| Some college | 1-5 | -0.318 | -0.032 | 0.012 |
| | 6-10 | -0.339 | -0.054 | 0.020 |
| | 11-15 | -0.349 | -0.063 | 0.024 |
| | 16-20 | -0.348 | -0.063 | 0.024 |
| | 21-25 | -0.339 | -0.054 | 0.020 |
| | 26-30 | -0.324 | -0.038 | 0.015 |
| | 31-35 | -0.313 | -0.028 | 0.010 |
| | 36-40 | -0.305 | -0.019 | 0.007 |
| College graduates | 1-5 | -0.317 | -0.031 | 0.017 |
| | 6-10 | -0.335 | -0.049 | 0.026 |
| | 11-15 | -0.341 | -0.056 | 0.030 |
| | 16-20 | -0.348 | -0.062 | 0.033 |
| | 21-25 | -0.332 | -0.046 | 0.025 |
| | 26-30 | -0.318 | -0.032 | 0.017 |
| | 31-35 | -0.309 | -0.023 | 0.013 |
| | 36-40 | -0.302 | -0.016 | 0.009 |

Equations (19)-(21) define the factor price elasticities in the three-level CES framework. For a given percent change in the numbers of workers of any specific group: The own factor price elasticity gives the percent change in that group's wage; the cross-elasticity within an education branch gives the percent change in the wage of a group with the same education but with different experience; the cross-elasticity across education branches gives the percent change in the wage of groups that have different educational attainment.

52

**TABLE IX**
**Wage Consequences of Immigrant Influx of the 1980s and 1990s**
**(Predicted change in log weekly wage)**

| Years of experience | Education | | | | |
| | High school dropouts | High school graduates | Some college | College graduates | All workers |
|---|---|---|---|---|---|
| 1-5 | -0.065 | -0.021 | 0.004 | -0.035 | -0.024 |
| 6-10 | -0.101 | -0.027 | 0.001 | -0.042 | -0.029 |
| 11-15 | -0.128 | -0.036 | -0.009 | -0.059 | -0.041 |
| 16-20 | -0.136 | -0.033 | -0.011 | -0.055 | -0.039 |
| 21-25 | -0.108 | -0.025 | -0.008 | -0.049 | -0.033 |
| 26-30 | -0.087 | -0.023 | 0.000 | -0.049 | -0.029 |
| 31-35 | -0.066 | -0.022 | 0.001 | -0.050 | -0.027 |
| 36-40 | -0.044 | -0.013 | 0.008 | -0.056 | -0.022 |
| All workers | -0.089 | -0.026 | -0.003 | -0.049 | -0.032 |

The simulation uses the factor price elasticities reported in Table VIII to predict the wage effects of the immigrant influx that arrived between 1980 and 2000. The calculations assume that the capital stock is constant. The variable measuring the group-specific immigrant supply shock is defined as the number of immigrants arriving between 1980 and 2000 divided by a baseline population equal to the average size of the native workforce (over 1980-2000) plus the number of immigrants in 1980.

53



**Figure I**
**The Immigrant Supply Shock, 1960-2000**

Note: Within each education group, workers are aggregated into experience groups defined in five-year intervals. The figures use the midpoint of each experience interval to illustrate the trends.

54



**Figure II**
**Scatter Diagram Relating Wages and Immigration, 1960-2000**

Note: Each point in the scatter represents the decadal change in the log weekly wage and the immigrant share for a native education-experience group. The data have been adjusted to remove decade effects. The regression line in the figure weighs the data by $(n_0 \, n_1)/(n_0 + n_1)$, where $n_0$ is the sample size of the cell at the beginning of the decade, and $n_1$ the sample size at the end. The coefficient of the regression line is -.450, with a standard error of .172.