# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, ET AL.; | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| *v.* | ) Case No. 1:18-cv-00068 |
| | ) |
| UNITED STATES OF AMERICA, ET AL.; | ) |
| | ) |
| *Defendants,* | ) |
| | ) |
| *and* | ) |
| | ) |
| KARLA PEREZ, ET AL.; | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| *Defendants-Intervenors.* | ) |
| | ) |

## PLAINTIFF STATES' RESPONSE TO DEFENDANT-INTERVENORS'
## MOTION TO STRIKE PLAINTIFF STATES' EXPERTS

## INTRODUCTION

In their motion to strike Plaintiff States' experts, Defendant-Intervenors retry arguments that they have already made and lost. As the Court recognized when it ruled on the motion for preliminary injunction, Plaintiff States offer opinions from two well-qualified expert witnesses, and those opinions are confirmed by Defendant-Intervenors' own evidence.

To the extent that Defendant-Intervenors' arguments are reconsidered, they go to the weight that should be given to the opinions, not their admissibility. That is particularly so in this case, as this is a bench trial where the *Daubert* standards serve a lesser purpose. *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). Plaintiff States offer opinions on labor markets from an economist with a Ph.D. from the Massachusetts Institute of Technology and 30 years of experience in the field. And they offer opinions on demographic trends from the Texas State Demographer. Those opinions are confirmed by numerous other witnesses, including Defendant-Intervenors' own economists and demographer. The Court relied on Plaintiff States' experts when it ruled that Plaintiff States have standing, and Defendant-Intervenors offer no reason for the Court to depart from that reliance, let alone strike the experts completely.

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

1.      Whether, in advance of a bench trial, the Court should strike Plaintiff States' experts when they offer opinions that are confirmed by Defendant-Intervenors' own witnesses.

## SUMMARY OF THE ARGUMENT

2.     At the threshold, motions such as this are nearly useless in bench trials, let alone before the Court rules on a motion for summary judgment. This Court as both the trier of fact and evidentiary gatekeeper is more than equipped to consider the expert testimony and give it the weight it deserves.

3.     But even setting that aside, Defendant-Intervenors' motion also fails on its merits for several reasons. Both experts easily pass the bar for qualifications, and any complaints related to an alleged lack of a research specialization goes to the weight of the opinions, not their admissibility. Next, both experts utilized reliable methods by employing the level of intellectual rigor that is expected of an expert in their fields. In fact, the results of those methods are confirmed by Defendant-Intervenors' own experts. Defendant-Intervenors' attack on the factual basis for each opinion goes to the weight, not admissibility, of the opinions. And the relevance arguments in the motion fail because the opinions are helpful—and therefore relevant—to determining Plaintiff States' standing.

## ARGUMENT

4.     Since this case began, Plaintiff States have offered the expert opinions of Dr. Donald Deere, Ph.D., and Dr. Lloyd Potter, Ph.D., related to standing. These straightforward expert opinions are:

> 1. The addition of over a half-million work-eligible DACA recipients places downward pressure on labor markets and increases competition for citizens;
>
> 2. Because DACA recipients cost less to employ under the Affordable Care Act, an employer wishing to minimize

3

costs may rationally prefer to hire a DACA recipient as opposed to someone legally in the state;[1] and

3.  Some DACA recipients could be expected to migrate out of the United States if they lose work authorization.[2]

Even though they have already challenged those opinions at the preliminary injunction stage, Defendant-Intervenors have repackaged their unsuccessful arguments into this current motion. They once again attack based on arguments related to qualifications, reliability, and relevance. Yet each of these recycled arguments fail, just as they did before.

**1.  Motions to strike expert testimony serve little purpose in bench trials.**

5.  As an initial matter, motions to exclude expert testimony such as this serve little purpose in bench trials, let alone before the Court rules on a pending motion for summary judgment.

6.  In *Daubert*, the overriding concern was exposing a jury to confusing and unreliable expert testimony, not exposing a district court to such evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595-597 (1993). When a district court sits as the trier of fact, as is the case here, "[m]ost of the safeguards provided for in *Daubert* are not as essential . . . ." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). Defendant-Intervenors' motion calling for the rigid application of the *Daubert* factors should therefore be denied out of hand "because [this Court] is both gatekeeper and fact-finder and any taint to the fact-finder by admitting irrelevant or

---

[1] *See* Exhibit A attached hereto (Deere supplemental expert report).
[2] *See* Exhibit B attached hereto (Potter expert report).

unreliable evidence is mitigated." *Shafer v. LG Elecs. U.S.A., Inc.*, No. 4:09-CV-105-Y, 2010 WL 8757823, at \*3 (N.D. Tex. Sept. 30, 2010) (citing *Whitehouse Hotel Ltd. P'ship v. Comm'r of Internal Revenue*, 615 F.3d 321, 2010 WL 3133374, at \*7 (5th Cir. Aug. 10, 2010)).

7.    The Court should take the same tact it took at the preliminary injunction phase—admit the expert testimony and ascribe it the weight that it deserves. *Compare* Def.-Intervenors' Opp'n to Pls.' Mot. for Prelim. Inj. 25–26, ECF No. 224 (challenging Dr. Deere's opinions), *and id*. at 18–20 (challenging Dr. Potter's opinion), *with* ECF No. 319 at 38–39 (crediting Dr. Deere's opinions after considering Defendant-Intervenors' arguments), *and id*. at 49 (crediting Dr. Potter's testimony after considering Defendant-Intervenors' arguments); *see also Williams v. Illinois*, 567 U.S. 50, 69 (2012) ("When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose").

## 2.    Dr. Deere and Dr. Potter are qualified to offer opinions on basic concepts in fields they have been practicing in for decades.

8.    Defendant-Intervenors first argue that Dr. Deere lacks the qualifications to opine about basic concepts of labor economics and that Dr. Potter lacks the qualifications to opine about basic concepts in demography. Yet both experts are extremely qualified to provide these straightforward opinions.

9.    It is well-established that a witness can be qualified as an expert "by knowledge, skill, experience, training, or education . . . ." Fed. R. Evid. 702; *see also*

*Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded by statute on other grounds as noted in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002). And "[a]s long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function." *Rushing*, 185 F.3d at 507. Here, both experts easily pass this bar for qualification.

10.    Dr. Deere is a labor economist with over 30 years of experience in the field. *See* Ex. A at ¶¶ 2–3. He holds a Ph.D. in economics from the Massachusetts Institute of Technology and an undergraduate degree in economics from Texas A&M University. *Id*. at ¶ 3. He has taught labor economics, economic principles, and public finance at Texas A&M University, Massachusetts Institute of Technology, and the University of California Santa Barbara. *Id*. at ¶¶ 2–3. In addition to teaching, he has also served as the Associate Director of the George Bush School of Government and Public Service. *Id*. at ¶ 2. Dr. Deere's research concentrates on labor markets and public policy affecting wages and employment. *See* Donald R. Deere, Ph. D., available at http://www.welchcon.com/index.php/donald-r-deere-ph-d (last visited June 10, 2019). He's been published in numerous professional peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics,* and the *Journal of Labor Economics*. Ex. A at ¶ 3. There is little doubt that through this education, training, and experience, Dr. Deere is qualified to provide the limited opinions related to labor economics contained in his report.

11.     Likewise, Dr. Potter is the Texas State Demographer. He holds a Ph.D. in Demography and Sociology from The University of Texas at Austin along with several other advanced degrees. *See* Ex. B at ¶ 2. He is currently the Interim Dean of the College of Public Policy and tenured professor of demography at The University of Texas at San Antonio. *Id.*; *see also* Press Release, The Univ. of Tex. at San Antonio College of Public Policy, Lloyd Potter Named Interim Dean of the College of Public Policy (Jan. 23, 2019), available at http://copp.utsa.edu/lloyd-potter-named-interim-dean-of-the-college-of-public-policy/ (last visited June 10, 2019). He serves as the director of the University's Institute for Demographic and Socioeconomic Research. *Id.* His current research focuses on public policy and health-related demographic topics and training applied demographers. *Id.* As Texas State Demographer, a position he has held since 2010, Dr. Potter is responsible for producing and disseminating population estimates and projections for Texas, as well as other demographic information. Ex. B at ¶ 2; *see also* About Us, Texas Demographic Center, available at https://demographics.texas.gov/AboutUs (last visited June 10, 2019). As was the case with Dr. Deere, Dr. Potter has the robust education, training, and experience necessary to opine about straightforward concepts within his field.

12.     Because Defendant-Intervenors cannot challenge these credentials head on, they are left arguing that these experts do not have narrow research specializations related to immigration. Mot. to Strike Pls.' Experts 5, 13, ECF No. 390. Yet the lack of a specialization does not affect the admissibility of the opinion, but only its weight. *See Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I,*

*L.L.C.*, 753 F. App'x 191, 195 (5th Cir. 2018) ("'A lack of specialization should generally go to the weight of the evidence rather than its admissibility," and "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications.'") (first quoting *United States v. Wen Chyu Liu*, 716 F.3d 159, 168-69 (5th Cir. 2013); then quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)). Hence, Defendant-Intervenors' arguments about specializations does not justify exclusion.

## 3.    Dr. Deere's and Dr. Potter's methodology results in conclusions that are confirmed by Defendant-Intervenors' experts.

13.    Defendant-Intervenors' reliability arguments are similarly unavailing. As a general matter, expert testimony is admissible when it is reliable and it assists the trier of fact. *See* Fed. R. Evid. 702. "[T]he rejection of expert testimony is the exception rather than the rule." *See* Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. Courts "have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The test for reliability is flexible with no single factor being dispositive. *See id.* at 141–42 ("But, as the Court stated in *Daubert*, the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997))). Ultimately, the Court's responsibility "is to make certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) (quoting *Kumho Tire*, 526 U.S. at 152).

14.    Regardless of Defendant-Intervenors' criticism of their ultimate opinions, nothing about the methodology used by Dr. Deere and Dr. Potter is unreliable. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc) ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable"); *In re Crounse*, No. 1:14-cv-154-SA-DAS, 2016 WL 5108008, at *3 (N.D. Miss. Sept. 20, 2016) ("Under the *Daubert/Kumho* standards and their progeny, it is not the court's duty to determine in a motion *in limine* whether the expert in question is correct"). Both witnesses have undoubtedly exercised the same level of intellectual rigor that is customary in their respective social science. *See United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (explaining that the Fifth Circuit has concluded that certain "soft sciences" involve "necessarily diminished methodological precision" when compared to other scientific disciplines like mathematics and engineering). Dr. Deere looked at data related to the DACA population, reviewed relevant literature, and applied both to the facts at hand utilizing his "knowledge, skill, experience, training, or education" and basic concepts of labor economics. Similarly, Dr. Potter reviewed the relevant literature and reached his conclusion

about DACA recipients leaving the United States utilizing his "knowledge, skill, experience, training, or education" and basic concepts of demography.

15.     Notably, these methods produced opinions with which Defendant Intervenors' own experts and amici curiae agreed. For instance, Dr. Ike Brannon agreed with Dr. Deere that DACA increases "competition with other people who are citizens who are also competing for those low skilled jobs[.]" ECF No. 319 at 39 (citing ECF No. 289-3 at 141). Dr. Meg Wiehe and Dr. Misha Hill confirm that "the work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers." ECF No. 400-1 at 73. Additionally, amici curiae in this case admitted that they have previously hired DACA recipients in lieu of citizens and that "they would hire non-DACA employees if the DACA program ceased." ECF No. 319 at 39 (citing ECF No. 221-1 at 20). Similarly, Dr. Tom Wong's study conclusively puts to rest any issue with the accuracy of Dr. Potter's opinion that indeed some DACA recipients are either "likely or very likely to leave if the DACA program ended." *Id.* at 49 (citing ECF No. 219-2 at 4). Likewise, Defendant-Intervenors introduced an article relied on by Dr. Deere in their briefing on the motion for preliminary injunction. ECF No. 225-5 at 55. They selectively quote that article claiming that the studies regarding effect of illegal immigrants on wages hovers around zero. The author's conclusion just one page later, however, is much more explicit:

> In contrast to the confusing array of results that now permeate the literature, the evidence consistently suggests that immigration **has indeed harmed the employment opportunities** of competing native workers.

ECF No. 225-5 at 58 (emphasis added). Any arguments regarding the methodology of Plaintiff States' experts overlooks Defendant-Intervenors' own evidence that confirms the experts' conclusions.

16.     Despite this, Defendant Intervenors fixate on the fact that these experts did not interview DACA recipients or hiring managers or complete a quantitative analysis. Again, this argument misses the mark because "an attack on data relied on by an expert generally goes to the weight to be given, rather than the admissibility of, his testimony." *Nielsen v. Alcon, Inc.*, No. 3-08-CV-2239-B-BD, 2011 WL 4529762, at *7 (N.D. Tex. Sept. 2, 2011) (citing *Anascape, Ltd v. Microsoft Corp.*, No. 9-06-CV-158, 2008 WL 7180757, at *2 (E.D. Tex. Apr. 28, 2008)); *see also Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004); *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration"); *Thomas v. Deloitte Consulting LP*, No. 3-02-CV-0343-M, 2004 WL 5499955, at *4 (N.D. Tex. Nov. 30, 2004) (noting that to the extent a party disputes an experts ultimate opinions, such disagreement is "grist for the [tier of fact].") (quoting *Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994)). Defendant-Intervenors' arguments are better resolved through cross-examination and contrary evidence than a motion such as this. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence");

Fed. R. Evid. 702, advisory committee's notes to 2000 amendments (explaining that *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system") (quoting *14.38 Acres of Land*, 80 F.3d at 1078). Defendant-Intervenors have deposed both Dr. Potter and Dr. Deere, and they have presented expert opinions in response. Simply put, this Court is more than capable of giving expert testimony the weight that it deserves without the wholesale exclusion Defendant-Intervenors seek.

**4.    The Court has already ruled that the challenged expert opinions are relevant to Plaintiff States' standing.**

17.    Finally, Defendant Intervenors argue that the opinions are not helpful to the Court, so they are irrelevant. But the opinions are undoubtedly relevant to the issue of standing. *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 694 (5th Cir. 2012) (citing Fed. R. Evid. 702(a)). In fact, the Court has cited these opinions in deciding that standing exists. ECF No. 319 at 38–39, 49.

18.    Defendant-Intervenors' relevance arguments related to the absence of a quantitative analysis of the damage caused by DACA recipients are also wrong. As this Court has already held, Article III standing does not hinge on the damage caused by any specific DACA recipient but instead the damage caused by the entire program. *Id.* at 50–51; *see also OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("'[T]he injury in fact requirement under Article III is qualitative, not quantitative, in nature'" (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357–58 (5th Cir. 1999))). As a result, the fact that Dr. Deere and Dr. Potter did not

perform a quantitative analysis about the damages underpinning standing does not render their opinions somehow irrelevant.

## CONCLUSION

19.     At the heart of their motion to strike, Defendant-Intervenors complain about expert opinions that are confirmed by their own witnesses. Defendant-Intervenors' arguments all go to the weight to give the opinions, not their admissibility. And the Court has already afforded those opinions the proper weight in deciding that Plaintiff States have standing to bring this suit. As such, Plaintiff States respectfully request that the Court deny Defendant-Intervenors' motion to strike Dr. Deere and Dr. Potter.

June 26, 2019

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

DEREK SCHMIDT
Attorney General of Kansas

JEFF LANDRY
Attorney General of Louisiana

DOUGLAS J. PETERSON
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy Attorney General for Legal Counsel

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge
Trial Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

MICHAEL TOTH
Special Counsel for Civil Litigation

ADAM ARTHUR BIGGS
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

## CERTIFICATE OF SERVICE

I certify that on June 26, 2019, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Trial Counsel for Civil Litigation

**COUNSEL FOR PLAINTIFF STATES**

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| **UNITED STATES OF AMERICA**, et al., | ) | |
| | ) | |
| Defendants | ) | |

## SUPPLEMENTAL DECLARATION OF DONALD DEERE, Ph.D.

My name is Donald Deere, and I am over the age of 18 and fully competent in all respects to make this declaration.  I have personal knowledge and expertise of the matters herein stated.

## Qualifications

1.      I am a Senior Economist for Welch Consulting, a firm that provides expert services in economics and statistics to the legal community, as well as general consulting in economics and statistics.  Previously, I served as a Senior Economist for Unicon Research Corporation, a firm that conducted grant and contract research for U.S. government agencies.

2.      In 2007, I retired from the tenured faculty of the Department of Economics at Texas A&M University, where I taught courses in labor economics, statistics, and public finance.  I have since served as an Adjunct Associate Professor of Economics at Texas A&M University.  Formerly, I was Associate Director of the

1

George Bush School of Government and Public Service, where I also taught as a member of the visiting faculty in 2008.

3.     I received training in economics and statistics at the Massachusetts Institute of Technology, where I earned a Ph.D. in Economics in 1983.  I have taught at M.I.T., the University of California, Santa Barbara, and Texas A&M University. My research has been published in numerous professional, peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

4.     Attached to this declaration are true and correct copies of the following documents:

- Appendix 1 includes my curriculum vitae and a list of my publications.
- Appendix 2 sets forth the cases in which I have testified in deposition or at trial during the last four years.

### Scope of Inquiry

5.     I have been retained in this case by the Office of the Attorney General of Texas to examine the potential economic impact on the labor market of the Department of Homeland Security Memorandum dated June 15, 2012 ("DHS Memorandum")[1], with particular focus on the interaction between the DHS Memorandum and the employer mandate provisions in the Affordable Care Act ("ACA").

---

[1] The DHS Memorandum regards the exercise of "prosecutorial discretion" for certain immigrants who are not lawfully present.  The subject of the DHS Memorandum, from Janet Napolitano, Secretary of Homeland Security, is "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."

6.     My billing rate for this matter is $525 per hour.

## Background on the Affordable Care Act
## and the DHS Memorandum

7.     It is my understanding that as a result of the DHS Memorandum the number of immigrants who are not lawfully present with an Employment Authorization Document ("EAD") has expanded nationwide.[2] I also understand that these individuals authorized to work are not eligible for the premium subsidies provided by the ACA.[3]

8.     The Congressional Budget Office and the Joint Committee on Taxation in March 2012 estimated the impact of the ACA on nonelderly workers and their families who were projected to receive employment-based coverage in 2016 *in the absence of the ACA*. The resulting estimates are that 64 million of these individuals will be eligible for subsidies in the exchanges under the ACA.[4]

---

[2] DACA_Population_Data_Mar_31_2018, available at https://www.uscis.gov/tools/reports-studies/immigration-forms-data.

[3]  HealthCare.gov, Immigration status and the Marketplace, available at https://www.healthcare.gov/immigrants/immigration-status. See also, 8 U.S. Code § 1611 - Aliens who are not qualified aliens ineligible for Federal public benefits, and 45 CFR 152.2 – Definitions, Legal Information Institute.

[4] Congressional Budget Office, *CBO and JCT's Estimates of the Effects of the Affordable Care Act on the Number of People Obtaining Employment-Based Health Insurance* at 12-14 (Mar. 2012), available at http://www.cbo.gov/sites/default/files/03-15-ACA_and_Insurance_2.pdf. An estimated 8.7 million Marketplace Enrollees were receiving Advance Premium Tax Credits in February 2017. See Kaiser Family Foundation, *Estimated Total Premium Tax Credits Received by Marketplace Enrollees*, available at https://www.kff.org/state-category/health-reform/february-2017-marketplace-enrollment/.

9.    The ACA mandates that employers with 50 or more full-time employees offer health insurance that provides "minimum value" and is "affordable" to their full-time employees.[5]

10.    To my knowledge, "minimum value" requires that health insurance pay at least 60% of the cost of covered services for employees and their children up to age 26. The ACA does not require the employer to pay the entire cost of this coverage, but the mandate to be "affordable" requires that the cost to the employee for this coverage be no more than 9.56% of the employee's income.[6]

11.    An employer offering coverage that does not provide "minimum value" or is not "affordable" will owe a penalty under the ACA if any of its employees purchases coverage on the insurance exchange *and receives a premium subsidy*.  It is my understanding that this penalty is the lesser of a) $2,320 per year per employee after the first 30 employees, or b) $3,480 per year per employee receiving a premium subsidy.[7]

---

[5] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act at Question 1 (2018), available at https://www.irs.gov/affordable-care-act/employers/questions-and-answers-on-employer-shared-responsibility-provisions-under-the-affordable-care-act.

[6] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 38-41.

[7] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 52-54.  See also, Edward A. Morse, *Lifting the Fog: Navigating Penalties in the Affordable Care Act*, 46 CREIGHTON L. REV. 207, 221-22 (2013).  For the $3,480 penalty to apply, the employer must have less than a minimum of 26.7% of its employees receiving a premium subsidy.  This cutoff % rises with the number of employees—to 46.7% for an employer with 100 total employees and to a maximum of 66.7% (the cutoff % equals $2/3 - 20/\#$ employees).

12.    Because this penalty is not a deductible expense for the employer from federal (and possibly state) income taxes,[8] the before-tax penalty amount, which would be compared to the wage, is even larger.[9]

### Interaction of the DHS Memorandum and the ACA on the Labor Market

13.    As a threshold matter, the addition of some 694,000 work-eligible individuals nationwide, with 114,000 of these in Texas, will, other things equal, put downward pressure on wages and make it more difficult for some U.S. citizens to find employment.[10]   In addition, the interaction of the DHS Memorandum and the ACA will further impact employment and wages in the labor market.[11]

14.    Consider an employer facing this penalty that is considering hiring one of two prospective employees.  These two employees are equally productive and are the same in all relevant aspects to this employer, except that applicant A is a U.S. citizen and applicant B is a DACA recipient holding an EAD.

15.    Assume applicants A and B are relatively low skilled, so that the cost to the employee of the coverage offered by this employer exceeds 9.56% of the wage that would be offered to them.  Also assume that this employer expects less than 25% of its employees to obtain a premium subsidy.

---

[8] Morse, *supra*, at 223.
[9] For an employer facing a 21% federal corporate income tax rate and the $3,480 penalty, the equivalent annual before-tax amount is at least $4,405.06.
[10] See DACA_Population_Data_Mar_31_2018, *supra*.
[11] As an example, for the employer in footnote 9, the penalty would increase the relative annual cost of employing a worker for 30 hours per week at the federal minimum wage who receives a premium subsidy by almost 40%.

16.     In this scenario, the employer would expect applicant A to be more expensive to employ than applicant B because of the interaction of the ACA penalties described above and the DHS Memorandum.  There is an extra cost of $3,480 per year (plus the tax impact noted above) from hiring applicant A if applicant A will receive a premium subsidy.  In contrast, hiring applicant B entails no extra cost because applicant B is not eligible for a premium subsidy.

17.     An employer subject to the ACA penalties described above that is operating to minimize its expected cost of operations will hire applicant B instead of applicant A.  Applicant A, therefore, will take longer to find employment and the resulting employment is more likely to occur at a lower wage.

18.     Depending on the employee cost of insurance, the incentive to hire applicant B can occur at a range of wage levels, as illustrated in the following two examples.

*Example 1*

19.     In addition to the above facts, suppose that applicants A and B would be paid the federal minimum wage of $7.25 per hour.  Assuming 30 hours per week (the definition of full time in the ACA), a monthly employee cost of $90.10 or greater ($7.25 x 130 hours x 9.56%) would make the employer-provided coverage not "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.[12]  There is no extra cost from hiring applicant B.

---

[12] At 40 hours per week, the monthly employee cost would have to be no more than $120.13 to be "affordable."

20.     As a result, the employer will hire applicant B instead of applicant A if the employer is operating to minimize its expected cost of operations.

*Example 2*

21.     As an alternative, suppose that applicants A and B would be paid $30,000 per year (about twice the federal minimum wage for 40 hours per week).[13]  A monthly employee cost for employee and dependent coverage in excess of $239.00 (9.56% x $30,000/12) would not be "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.  Again, there is no extra cost from hiring applicant B.

22.     Similar to the previous example, the employer in this example would be expected to hire applicant B instead of applicant A in an effort to minimize costs.

### Other Aspects of the Impact of the DHS Memorandum on the Labor Market

23.     Economic theory implies that the demand curve for a labor input slopes downward.[14] In other words, as the price (or wage) of a labor input decreases, other things equal, more of that labor input will be used by employers.  Conversely, as more of a labor input is made available, such as via immigration, the wage of that labor

---

[13] Using 35 hours per week instead of the ACA limit of 30 to define full-time, the U.S. Census Bureau reports that more than 23.8 million persons were employed full-time and full-year in 2016 with annual earnings below $30,000.  U.S. Census Bureau, *Current Population Survey, 2017 Annual Social and Economic Supplement* at Table PINC-10, *available at* https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc/pinc-10.2016.html.

[14] See, for example, Hal R. Varian, *Intermediate Microeconomics: A Modern Approach*, W. W. Norton & Company: New York, 1987, p. 327.

7

input will fall, other things equal.  Although the theoretical implication that, other things equal, immigration reduces the wages of native workers with the same skills is clear, there is no consensus in the economic literature on the magnitude of this effect.[15]

## Conclusion

24.   The DHS Memorandum and its interaction with the mandate provisions of the ACA gives employers a financial incentive to hire an immigrant who is not lawfully present and who is authorized to work instead of an identically skilled citizen in certain instances.

25.   Based on my knowledge and expertise in labor economics, it is my expert opinion that as a result of DHS Memorandum and its interaction with the ACA, there will be relatively less hiring of U.S. citizens and relatively lower wages on average for those who are hired.  The interplay between the DHS Memorandum and the ACA makes some U.S citizens more expensive to hire than equally productive immigrants who are not lawfully present.

26.   This result will have adverse consequences for certain U.S. citizens because some employers will find it financially advantageous to hire an immigrant

---

[15] See, for example, George J. Borjas, "The Labor Demand Curve *Is* Downward Sloping: Reexamining the Impact of Immigration on the Labor Market," *The Quarterly Journal of Economics*, Vol. 118, No. 4 (2003), pp. 1335-1374, and David Card, "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration," *Journal of Labor Economics*, Vol. 19, No. 1 (2001), pp. 22-64.

who is not lawfully present and who is authorized to work in the U.S. instead of an equally productive U.S. citizen.

27.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this *14th* day of June, 2018.

DONALD DEERE

9

Appendix 1



# Donald R. Deere, Ph.D.

WELCH CONSULTING

1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## EDUCATION

Ph.D., Economics
Massachusetts Institute of Technology
Cambridge, Massachusetts
1983

B.S., Economics
Texas A&M University
College Station, Texas
1978

## PROFESSIONAL EXPERIENCE

Senior Economist
Welch Consulting
Bryan, Texas
2005 – Present

Senior Economist
Unicon Research Corporation
Bryan, Texas
2001 – 2016

Adjunct Associate Professor of Economics
Texas A&M University
College Station, Texas
2007 – 2009
2010 – Present

Visiting Faculty
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
2008

Associate Professor of Economics
Texas A&M University
College Station, Texas
1990 – 2007

Senior Consultant
Welch Consulting
Bryan, Texas
1991 – 2005

Associate Director for Academic Programs
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
1996 – 1999

Donald R. Deere is a Senior Economist in the Bryan, Texas office of Welch Consulting. Dr. Deere's work has included statistical and economic analysis in cases involving claims of discrimination in employment, housing, transportation and insurance, in cases involving wage and hour violations, and in cases involving lost earnings or commercial damages. He also has conducted analyses of compensation practices for internal and OFCCP audit purposes. Dr. Deere has provided testimony in cases in both state and federal courts.

Dr. Deere has a Ph.D. in economics from the Massachusetts Institute of Technology. In 2007, Dr. Deere retired from the tenured faculty of the Department of Economics at Texas A&M University, where he taught courses in labor economics, economic principles and public finance. While at Texas A&M University, he also taught graduate statistics in, and was Associate Director of the George Bush School of Government and Public Service. Dr. Deere also is Senior Economist for Unicon Research Corporation, where he served as Vice President from 2001-2004. Dr. Deere's research has concentrated primarily on labor markets and public policy affecting wages and employment. His research has been published in numerous professional peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

## PUBLICATIONS

"Analyzing Reductions in Force and Other Termination Decisions," with James E. Pearce in Adverse Impact Analysis:  Understanding Data, Statistics, and Risk, edited by Scott B. Morris and Eric M. Dunleavy, Routledge Taylor & Francis Group, (2017): 239-257.

"Minimum Sense," NBIZ Magazine, (Winter 2006):8-10.  Also found on NBIZMag.com.

"Educational Wage Premia and the U.S. Income Distribution: A Survey," with Jelena Vesovic in Handbook of the Economics of Education, edited by E. Hanushek and F. Welch, Elsevier Science, (2006):255-306.

"Inequality, Incentives, and Opportunity," with F. Welch.  Social Philosophy & Policy, 19, no. 1, (Winter 2002).  Also in Should Differences in Income and Wealth Matter? edited by E.F. Paul, F.D. Miller, Jr. and J. Paul. Cambridge University Press (2002):84-109.

"Trends in Wage Inequality in the United States," in Increasing Inequality in America: The Facts, Causes, and Consequences, edited by F. Welch. University of Chicago Press, (2001):9-35.

"Don't Raise the Minimum Wage - The Bar is Already Too High," Brief Analysis No. 270, NCPA, (June 1998).

"Evidence on Minimum Wages and Employment Following the 1990/91 Increase in the Federal Minimum Wage," with K. Murphy and F. Welch.  In Effects of the Minimum Wage, edited by M. Kosters.  AEI Press, (1996).

"Minimum Sense: Raising Wages from $4.25 to $5.15 an Hour Will Cause Lower Skilled Workers to Lose Their Jobs," Texas Business, (September 1996).

"Employment and the 1990/91 Minimum Wage Hike," with K. Murphy and F. Welch.  American Economic Review, 85, no. 2, (May 1995):232-37.

"Sense and Nonsense on the Minimum Wage," with K. Murphy and F. Welch.  Regulation, 18, no.1, (1995):47-56.



# Donald R. Deere, Ph.D.

WELCH CONSULTING
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## PROFESSIONAL EXPERIENCE
(continued)

Visiting Assistant Professor of Economics
University of California
Santa Barbara, California, 1988 – 1989

Assistant Professor of Economics
Texas A&M University
College Station, Texas
1983 –1990

## PUBLICATIONS (continued)

"Home Equity: Texas Should Unlock This Asset," The Dallas Morning News, April 23, 1995.

"Unionization and Profitability: Evidence of Spillover Effects," with S.G. Bronars,  Journal of Political Economy, (December 1994):1281-87.

"The Effects of Unions on Firm Behavior: An Empirical Analysis using Firm-Level Data," with S.G. Bronars and J.S. Tracy, Industrial Relations, (October 1994):426-51.

"A Study of Nonsubscription to the Texas Workers' Compensation System: The Employee Perspective," (July 1994) Texas Workers' Compensation Research Center.

"A Study of Nonsubscription to the Texas Workers' Compensation System," Texas Workers' Compensation Research Center, (August 1993).

"Union Organizing Activity, Firm Growth, and the Business Cycle," with S.G. Bronars. American Economic Review, (March 1993):203-20.

"Unionization, Incomplete Contracting, and Capital Investment," with S.G. Bronars. The Journal of Business, (January 1993):117-32.

Review of "Labor Unions and the Economic Performance of Firms," Industrial and Labor Relations Review, (July 1993):732-33.

"Unemployment Insurance and Employment." Journal of Labor Economics, (October 1991):307-24.

"The Threat of Unionization, the Use of Debt, and the Preservation of Shareholder Wealth," with S.G. Bronars.  Quarterly Journal of Economics, (February 1991):231-54.

"Union Representation Elections and Firm Profitability," with S.G. Bronars.  Industrial Relations, (Winter 1990):15-37.

"On the Potential for Private Insurers to Reduce the Inefficiencies of Moral Hazard."  International Review of Law and Economics, (December 1989):219-22.

"Internal Labor Markets, Large Personnel Systems, and the Military."  Economics of Defense Manpower Conference Final Report, United States Air Force Academy, (June 1988).

"Bilateral Trading as an Efficient Auction Over Time."  Journal of Political Economy, (February 1988):100-15.

"Labor Turnover, Job-Specific Skills, and Efficiency in a Search Model."  Quarterly Journal of Economics, (November 1987):815-33.

## SELECTED WORKING PAPERS

"Plant Closings, Large Layoffs, and Advance Notice Provision," with S.N. Wiggins.

"Tax Rates, Tax Complexity, and the Usage of Paid Tax Return Preparers," with C. Wolfe.

"Subscription to Workers' Compensation in Texas."

"Heads I Win, Tails You Lose:  The Economic Impact of the Texas Lottery on Demographic Groups," with J. Dyer.



# Donald R. Deere, Ph.D.

**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## SELECTED WORKING PAPERS (continued)

"The Cross Sectional Impact of Unemployment Insurance on Layoffs, Employment, and Wages," with J.A. Miron.

"Part-Time Employment," with S.G. Bronars.

"Union Organizing Activity and Union Membership 1973-1988," with S.G. Bronars.

"Union Membership, Union Organizing Activity, and the Union Wage Differential 1973-1988," with S.G. Bronars.

"Competitive Incentives: School Accountability and Student Outcomes in Texas," with W.E. Strayer.

"Climbing the Economic Ladder," with A.J. Rettenmaier.

## HONORS AND AWARDS

**Fellowships:**
   National Science Foundation Graduate Fellowship.
   Rotary Foundation Graduate Fellowship.
   Sloan Foundation Dissertation Research Fellowship.

**Research Grants/Contracts:**
   Grant from the Smith Richardson Foundation, "Social Security, Wages and Retirement," 1995.

   Four Contracts with the Texas Workers' Compensation Research Center, "Nonsubscription to the Texas Workers' Compensation System," 1992-1995.

   Grant from the Texas Advanced Research Program, "Unionization, Profitability, and Firm Behavior," 1988.

   Grant from the U.S. Department of Health and Human Services, "Demand Variability, Structural Changes in the Labor Market and the Growth of Part-Time Employment," with S.G. Bronars, 1984.

**Peer Review:**

Professional Journals:
   American Economic Review
   Journal of Political Economy
   Quarterly Journal of Economics
   Journal of Labor Economics
   Review of Economic Studies
   Rand Journal of Economics
   Review of Economics and Statistics
   Economic Journal
   Industrial Relations
   Economic Inquiry
   Industrial and Labor Relations Review
   Industrial Relations
   Journal of Labor Research

Grants Competition:
   National Science Foundation

**ABOUT WELCH CONSULTING**

Welch Consulting has more than 30 years experience assisting clients of every size in matters involving employment issues and complex business litigation across a broad spectrum of industries and public sector entities. Our track record in producing rigorous analyses meeting the highest standards of accuracy, clarity and punctuality makes Welch Consulting a consistent choice for industry leading companies and the nation's preeminent law firms.

Welch Consulting has offices in Los Angeles, Texas and Washington DC.

For more information about our professionals and services visit us online at www.welchcon.com

Appendix 2

**Testimony Given in Last 4 Years by Donald Deere**

United States of America and the State of Texas, Ex Rel. Keith Waldmann et al. v. McAllen Medical Center, et al.
Deposition: 11/10/16
In the United States District Court for the Southern District of Texas McAllen Division
Civil Action No. 7:13-cv-495(M)

AJP Oil Company, LLC, D/B/A Grapeland Fuel and BBQ v. Velvin Oil Company, Inc.
Deposition: 07/12/16
In the 3rd District Court of Houston County, Texas
Civil Action No. 14-0217

Kimberly A. Nice, a Personal Representative of the Estate of Shawn R. Nice v. L-3 Communications Vertex Aerospace, LLC, et al
Deposition:  06/17/16
In the United States District Court for the Northern District of Florida, Pensacola Division
Civil Action No. 3:12-CV-00009-MCR-CJK

Barbara Semons, as Next Friend and Guardian of William Warren v. Houston Party Rental, Inc. and Sam Houston Area Council Boy Scouts of America
Deposition: 06/12/15
In the 80th Judicial District Court, Harris County, Texas
Cause No. 201407399

Noll, et al. v. Ebay Inc., et al.
Deposition: 09/29/14
United States District Court Northern District of California, San Jose Division
Case No. 5:11-CV-04585-EJD

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| **UNITED STATES OF AMERICA**, et al., | ) | |
| | ) | |
| Defendants | ) | |

DECLARATION OF LLOYD B. POTTER, PH.D.

1.  My name is Lloyd B. Potter, and I am over the age of 18 and fully competent
    in all respects to make this declaration. I have personal knowledge and
    expertise of the matters herein stated.

2.  I was appointed State Demographer of Texas in June of 2010. I hold degrees
    of Ph.D. in sociology from The University of Texas at Austin, Master of
    Public Health in epidemiology from Emory University, Master of Science in
    education from the University of Houston at Clear Lake and Bachelor of
    Science in sociology from Texas A&M University. I have worked as an
    Assistant Professor at Fordham University, a post-doctoral fellow at Emory
    University and Centers for Disease Control and Prevention, a Behavior
    Scientist at the Centers for Disease Control and Prevention, and as a
    Research Scientist at the non-profit company Education Development

Center, Inc. I am currently a professor in the Department of Demography at The University of Texas at San Antonio where I also serve as the director of the Institute for Demographic and Socioeconomic Research (IDSER). I have extensive experience working as an applied demographer and my current work focuses on public policy related research and training applied demographers.

3.  Based on my education, qualifications, experience and knowledge of the relevant literature, I believe the following statements are true and accurate.

4.  Economic factors are strongly associated with many migrant flows. For example, differences in economic growth, wages, and the employment situation between the United States and Mexico are critical determinants of immigration, and migration of labor out of Mexico (Aguila, 2012). Most undocumented migrants coming to the U.S. are doing so to work. Massey et.al. found that that undocumented migration from Mexico appears to reflect U.S. labor demand and access to migrant networks (Massey, Durand, & Pren, 2014).

5.  Most migration (inter-county) within the United States is employment related. Analysis of data from the Current Population Survey indicates that about 43% of moves across county lines between 2012 and 2013 were employment related and 30% were family related (Ihrke, 2014).

6.  Kennan and Walker found that interstate migration decisions are influenced to a substantial extent by income prospects. Their research suggests that

the link between income and migration decisions is driven both by geographic differences in mean wages and by a tendency to move in search of a better locational match when the income realization in the current location is unfavorable (Kennan & Walker, 2011).

7. In part, the Immigration Reform and Control Act (IRCA) is intended to restrict unauthorized immigration into to the United States by making it illegal for employers to hire unauthorized immigrants and imposing sanctions on employers who employ unauthorized immigrants (Wishnie, 2007). Several states have adopted laws to require E-Verify to make hiring of undocumented immigrants more difficult. Orrenius and Zadvodny found that possible undocumented immigrants in states that had implemented such efforts may have more difficulty working and more difficulty changing jobs (Orrenius & Zavodny, 2016). They also found some evidence suggesting "…that most of the drop in the number of already-present unauthorized immigrants in states that adopt universal E-Verify laws is due to them leaving the USA entirely (Orrenius & Zavodny, 2016)."

8. While DACA participants have motivation to stay in the U.S. and to comply with DACA rules, it is reasonable to conclude that some DACA participants would return to their country of origin if they lose or are not given permission to work in the U.S. The causes of return migration are difficult to address because there is limited research and understanding of return migration. Among DACA participants there is variation in a number of

characteristics such as age at immigration, tenure in the U.S., educational attainment, language fluency, and others. Some of these characteristics and combinations would make it more or less likely for some DACA participants to emigrate if they were denied permission to work in the U.S.

9.   In a study of young immigrants to the U.S., Regan and Olsen found they were less likely than older immigrants to return to their country of origin (Reagan & Olsen, 2000). Child and young immigrants who migrated later in their childhood (having spent more time in their country of origin) were more likely to return to their country of origin than those who immigrated when they were younger. They also found that immigrants with college degrees were more likely to return to their country of origin than those without.

10.   In a study of characteristics associated with emigration of foreign born persons in the U.S. (return migration), Van Hook and Zhang found that "indicators of economic integration (home ownership, school enrollment, poverty) and social ties in the U.S. (citizenship, having young children, longer duration in the United States) deter emigration (Van Hook & Zhang, 2011)." They found that indicators favoring return migration to country of origin included having connections with the sending society, such having a spouse or close family there.

11.   With loss of permission to work in the U.S., some DACA participants could be expected to migrate out of the U.S. back to their country of origin or to

another country where they would be able to work. DACA participants who would be more likely to return to their country of origin, under conditions where they could not work legally in the U.S., could be expected be similar to undocumented migrants who return to country of origin. That is, those DACA participants who migrated to the U.S. when they were older, who have strong family relationships in their country of origin, those who had met savings goals, and those who had achieved higher levels of education would be more likely to emigrate under conditions of not being able to work in the U.S. The variation in characteristics within the DACA applicant population suggests that some do have characteristics that have been associated with higher probability of emigration from the U.S. among undocumented immigrants (i.e., migrating as older teenagers and obtaining higher levels of educational attainment).

12.    References:

13.    Aguila, E. (2012). United States and Mexico: Ties That Bind, Issues That Divide (2 ed.). Santa Monica, CA: RAND.

14.    Ihrke, D. (2014). Reason for Moving: 2012 to 2013. Current population reports. Washington, DC: US Census Bureau, 20, 574.

15.    Kennan, J., & Walker, J. R. (2011). The Effect of Expected Income on Individual Migration Decisions. Econometrica, 79(1), 211-251. doi:doi:10.3982/ECTA4657

16.   Massey, D. S., Durand, J., & Pren, K. A. (2014). Explaining Undocumented Migration to the U.S. International Migration Review, 48(4), 1028-1061. doi:doi:10.1111/imre.12151

17.   Orrenius, P. M., & Zavodny, M. (2016). Do state work eligibility verification laws reduce unauthorized immigration? IZA Journal of Migration, 5(1), 5. doi:10.1186/s40176-016-0053-3

18.   Reagan, P. B., & Olsen, R. J. (2000). You can go home again: Evidence from longitudinal data. Demography, 37(3), 339-350. doi:10.2307/2648046

19.   Van Hook, J., & Zhang, W. (2011). Who Stays? Who Goes? Selective Emigration Among the Foreign-Born. Population Research and Policy Review, 30(1), 1-24. doi:10.1007/s11113-010-9183-0

20.   Wishnie, M. J. (2007). Prohibiting the employment of unauthorized immigrants: The experiment fails. U. Chi. Legal F., 193.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _26_ day of April, 2018.


LLOYD POTTER, PH.D.

# Lloyd B. Potter

**Department of Demography and**
**Institute for Demographic and Socioeconomic Research**
University of Texas at San Antonio
501 W. César Chávez Blvd.
Monterey Bldg., 4th Floor
San Antonio, Texas 78207-4415
Phone: (210) 458-6530
Email: Lloyd.Potter@utsa.edu

**Educational Background:**

| | |
|---|---|
| M.P.H. | Epidemiology, Emory University, Rollins School of Public Health, spring 1993. |
| Ph.D. | Demography/Sociology, University of Texas at Austin, fall 1989. Dissertation: Proximate and Non-Proximate Causes of Racial Life Expectancy Differentials in the U.S., 1970 and 1980. Co-Chairs: Omar Galle and Teresa Sullivan |
| M.S. | Education, University of Houston Clear Lake, spring 1981. |
| B.S. | Sociology, Texas A&M University, fall 1979. |
| | Clear Lake High School, Houston, TX.  Clear Creek Independent School District, spring 1975 |

**Professional Positions:**

| | |
|---|---|
| 2010-present | State Demographer of Texas and Director of the Texas Demographic Center. |
| 2008-present | Director, Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, San Antonio, TX. |
| 2008-present | Professor, Department of Demography, University of Texas at San Antonio, San Antonio, TX. |
| 2008-present | Adjunct faculty, The University of Texas School of Public Health at Houston through the San Antonio Regional Campus. |
| 2014-2015 | Associate Dean for Research, College of Public Policy, University of Texas at San Antonio, San Antonio, TX. |
| 2009- 2011 | Interim-Chair, Department of Demography, University of Texas at San Antonio, San Antonio, TX. |
| 2001-2004 | Adjunct faculty member, University of Michigan School of Public Health, Summer Epidemiology Seminar. |
| 2000-2008 | Director, Center for the Study and Prevention of Injury, Violence, and Suicide. Education Development Center Inc., Newton, MA. |

| | |
|---|---|
| 1998-99 | Detail from CDC to Massachusetts Department of Public Health (9 months) – Injury Surveillance Program, Boston, Massachusetts. Developed surveillance report on suicide in the state. |
| 1997 | Detail from CDC to Hanoi School of Public Health, Field Epidemiology Training Program, Hanoi, Vietnam. Developed course on demographic methods in public health. |
| 1995-2000 | Team Leader (Branch Chief), Youth Violence and Suicide Prevention, Division of Violence Prevention, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, Georgia. Managed CDC's scientific and grant program portfolio on youth violence and suicide prevention. |
| 1993-1995 | Team Leader, Suicide Prevention, Division of Violence Prevention, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, Georgia. Manage CDC scientific program on suicide prevention. |
| 1992 | Consultant, Field Epidemiology Training Program, Taiwan Department of Health, Taipei, Taiwan, R.O.C. Provided training on research and survey methodology. |
| 1991-93 | National Institute of Mental Health HIV/AIDS Post-Doctoral Fellow, Emory University School of Public Health/Centers for Disease Control and Prevention, Atlanta, Georgia. Received Masters of Public Health and conducted HIV/AIDS prevention research at CDC. |
| 1989-91 | Assistant Professor of Sociology, Fordham University, Bronx, New York. |
| 1990 & 91 | Lecturer, summers, University of Texas at Austin, Department of Sociology. Managed and taught the NSF funded Research Experience for Undergraduates (REU) program. |
| 1989 | Research Associate, University of Texas at Austin, Departments of Social Work and Home Economics. Conducted research on adoption. |
| 1988 | Research Associate, University of Texas at Austin, Population Research Center. |
| 1987-88 | Research Associate, Texas A&M University, Department of Rural Sociology, College Station, Texas. Assisted with book on farm financial crisis, Texas population estimates and projections and socioeconomic impact assessments |
| 1986 | Social Science Analyst, summer, Center for International Research, U.S. Bureau of the Census, Washington D.C. Developed population estimates, projections, and profiles for various countries |
| 1985 | United Nations Intern, summer, Population Policy Section, New York, New York. Developed population estimates, projections, and profiles for various countries |
| 1984-87 | Research Assistant,, University of Texas at Austin, Population Research Center. Conducted research on consumer bankruptcy |
| 1983-84 | Research Assistant, Texas A&M University, Department of Rural Sociology, College Station, Texas. Assisted with population estimates and projections for Texas. |
| 1981-83 | Teacher, LaPorte Independent School District, LaPorte, Texas. |

**Awards and Honors**:

| | |
|---|---|
| 2017-present | Peter Flawn Professor |
| 2012 | Outstanding Clear Creek Independent School District (CCISD) Alumni Award, Clear Creek Education Foundation. |

| | |
|---|---|
| 2005 | Allies for Action Award, Suicide Prevention Action Network |
| 2000 | Special Act of Service Award, CDC. For leadership in the conceptualization and production of "Best Practices of Youth Violence Prevention." |
| 2002 | Surgeon General's Exemplary Service Award. For leadership in developing a National Strategy for Suicide Prevention. |
| 1998 | Builder Award for the National Strategy for Suicide Prevention, Suicide Prevention Advocacy Network |
| 1996 | Special Act of Service Award, CDC. For leadership toward establishing CDC's Behavioral and Social Science Working Group. |
| 1996 | Special Act of Service Award, CDC. For efforts to assess achievement of Healthy People 2000 objectives in the area of injury and violence. |
| 1993-96 | Equal Opportunity Award, CDC. For leadership toward creating a diverse and work environment. |
| 1986 | Professional Development Award, Graduate School, University of Texas at Austin |
| 1984-85 & | National Institute of Child Health and Development Trainee. |
| 1988-89 | University of Texas at Austin. |

**Research Activities Summary:**
*Peer Reviewed*

1. Valenzuela, C., Valencia, A., White, S., Jordan, J. J., Cano, S. L., Keating, J. P., Nagorski, J. J.,  Potter, L. B  An analysis of monthly household energy consumption among single-family residences in Texas, 2010, Energy Policy, 2014(69):263-272, ISSN 0301-4215, http://dx.doi.org/10.1016/j.enpol.2013.12.009. (senior and corresponding author with student as first).

2. Howard, J.T., Potter, L.B., An assessment of the relationships between overweight, obesity, related chronic health conditions and worker absenteeism. Obesity Research & Clinical Practice 2014(8):1-15. (student first author)

3. Goldston D, Walrath C, McKeon R, Puddy R, Lubell K, Potter L, Rodi M.. The Garrett Lee Smith Memorial Suicide Prevention Program. Suicide & Life-Threatening Behavior 2010;40 (3):245-256.

4. Durant T, Mercy J, Kresnow M, Simon T, Potter L, Hammond R. Racial Differences in Hopelessness as a Risk Factor for a Nearly Lethal Suicide. Journal of Black Psychology.2006; 32: 285-302

5. Stone D, Barber C, Potter L. Public health training online: the National Center for Suicide Prevention Training. American Journal of Preventive Medicine, 2005;29: 247–51.

6. Potter L, Stone D. Suicide prevention in schools: what can and should be done. American  Journal of Health Education,  2003, 34(5 Suppl): s35-s41

7. Powell K, Kresnow M, Mercy J, Potter L, Swann A, Frankowski R, Lee R, Bayer T. Alcohol Consumption and Nearly Lethal Suicide Attempts. Suicide and Life Threatening Behavior, 2001;31(5):SS 30-41.

8. Potter L, Kresnow M, Powell K, Simon T, Mercy J, Lee R, Frankowski R, Swann A, Bayer T, O'Carroll P. The Influence of Geographic Mobility on Nearly Lethal Suicide Attempts. Suicide and Life Threatening Behavior, 2001;31(5):SS 42-48.

9.   Kresnow M, Ikeda R, Mercy J, Powell K, Potter L, Simon T, Lee R, Frankowski R. An Unmatched Case-Control Study of Nearly Lethal Suicide Attempts in Houston, Texas: Research Methods and Measurements. Suicide and Life Threatening Behavior, 2001;31(5):SS 7-20.

10.  Swahn M, Potter L. Factors Associated with the Medical Severity of Suicide Attempts in Youths and Young Adults. Suicide and Life Threatening Behavior, 2001;31(5):SS 21-29.

11.  Simon T, Swann A, Powell K, Potter L, Kresnow M, O'Carroll P. Characteristics of Impulsive Suicide Attempts and Attempters. Suicide and Life Threatening Behavior, 2001;31(5):SS 49-59.

12.  Ikeda R, Kresnow M, Mercy J, Powell K, Simon T, Potter L, Durant T, Swahn M. Medical Conditions and Nearly Lethal Suicide Attempts. Suicide and Life Threatening Behavior, 2001;31(5):SS 60-68.

13.  Anderson M,  Kaufman J,  Simon T, Barrios L. Paulozzi L, Ryan G, Hammond R, Modzeleski W, Feucht T, Potter L, School-Associated Violent Deaths Study Group. "School-Associated Violent Deaths in the United States, 1994-1999," JAMA. 2001;286:2695-2702.

14.  Dahlberg LL., Potter LB. Youth violence: developmental pathways and prevention challenges. American Journal of Preventive Medicine 2001;20(1 Supl 1):3-14.

15.  Kresnow M, Powell KE, Webb KB, Mercy JA, Potter LB, Simon TR, Ikeda RM, Frankowski R. Assigning time-linked exposure status to controls in unmatched case-control studies: alcohol use and nearly lethal suicide attempts. Statistics in Medicine 2001;20(9/10):1479-85

16.  Mercy J, Kresnow M, O'Carroll P, Lee R, Powell K, Potter L, Swann A, Frankowski R, Bayer T. Is Suicide Contagious? A Study of the Relation between Exposure to the Suicidal Behavior of Others and Nearly Lethal Suicide Attempts. Am. J. Epidemiol. 2001 154: 120-127

17.  Johnson G, Krug E, Potter L. Suicide Among Adolescents And Young Adults: A Cross-National Comparison Of 34 Countries. Suicide and Life-Threatening Behavior, 2000 Spring; 30(1):74-82.

18.  Potter L, Sacks J, Kresnow M, Mercy J. Nonfatal Physical Violence, United States, 1994.  Public Health Reports. 1999 Jul-Aug;114(4):343-52.

19.  Potter L, Kresnow M, Powell K, O'Carroll P, Lee R, Frankowski R, Swann A, Bayer T, Bautista M, Briscoe M. Identification of nearly fatal suicide attempts: Self-Inflicted Injury Severity Form. Suicide and Life-Threatening Behavior. 28(2):174-186, 1998.

20.  Grabbie L, Demi A, Camann M, Potter L. Suicide and health status among the elderly: The National Mortality Followback Survey. American Journal of Public Health, 1997 Mar;87(3):434-7.

21.  Mercy J, Potter L.  Combining analysis and action to solve the problem of youth violence.  American Journal of Preventive Medicine 1996; Supplement to Volume 12(5):1-2.

22.  Kachur S., Potter L, Powell K, Rosenberg M. Suicide: Epidemiology, Prevention, Treatment. Adolescent Medicine: State of the Art Reviews, 25(2):171-182, 1995.

23.  Potter L, Powell K, Kachur S. Suicide Prevention from a Public Health Perspective. Suicide and Life Threatening Behavior, 25(1):83-92, 1995.

24. Potter L, Rogler L, Moscicki E. Depression Among Puerto Ricans in New York City: The Hispanic Health and Nutrition Examination Survey. Social Psychiatry and Psychiatric Epidemiology, 30:185-193, 1995.

25. Potter L, Anderson J.  Patterns of Condom Use, Sexual Behavior and STDs/HIV Among Never-Married Women. Sexually Transmitted Diseases, 20(4), 1993.

26. Burr J, Potter LB, Galle O, Fossett M.  Migration and Metropolitan Opportunity Structures: A Demographic Response to Racial Inequality. Social Science Research, 22, 1992.

27. Galle O, Burr J, Potter L.  Rethinking Measures of Migration: On the Decomposition of Net Migration. Social Indicators Research, 28, 1992.

28. Potter L.  Socioeconomic Determinants of Black-White Male Life Expectancy Differentials, 1980. Demography, 28(2):303-322, 1991.

29. Potter L, Galle O.  Residential and Racial Mortality Differentials in the South by Cause-of-Death.  Rural Sociology, Summer 1990.

**Edited Book**

1. Hoque, N., Potter, LB. (eds), Emerging Techniques in Applied Demography, Dordrecht Heidelberg New York London: Springer, (2014). ISBN 978-94-017-8989-9.

**Book Chapters**

1. Potter, L. Chapter 13 Youth Suicide. In Liller KD (ed), Injury Prevention for Children and Adolescents: Research, Practice, and Advocacy 2nd Edition. Washington, DC: American Public Health Association, 2012, eISBN: 978-0-87553-250-9

2. Potter L. Violence Prevention. In Gorin SS, Arnold J (eds), Health Promotion in Practice, Chapter 12 (pp. 392-426). San Francisco, CA: Jossey-Bass, 2006.

3. Potter L. Youth Suicide. In Liller KD (ed), Injury Prevention for Children and Adolescents: Research, Practice, and Advocacy, Chapter 13 (pp. 321-340). Washington, DC: American Public Health Association, 2006.

4. Potter L. Public Health and Suicide Prevention. In Lester D (ed), Suicide Prevention: Resources for the New Millennium, Chapter 5 (pp. 67-82). Ann Arbor, MI: Sheridan Books, 2000.

5. Potter L. Understanding the Incidence and Origins of Community Violence: Toward a Comprehensive Perspective of Violence Prevention.  In Gullota T (ed), Violence In Homes And Communities, Chapter 4 (pp. 101-132). Sage Publications, 1999.

6. Cohen L, Potter L.  Injuries and Violence: Risk Factors and Opportunities for Prevention During Violence. In: Fisher M, Juszczak L, Klerman L, eds. Adolescent Medicine: Prevention Issues in Adolescent Health Care. Philadelphia, PA: Hanley & Belfus, Inc., 1999:125-135.

7. Potter L, Mercy J.  Public health perspective on interpersonal violence among youths in the United States. In Stoff DM, Breiling J, Maser JD, editors.  Handbook of antisocial behavior.  New York: John Wiley & Sons, Inc; 1997

8. Potter L, Powell K. The Public Health Approach to Suicide Prevention in the United States. Pp.329-345, in Ramsey RF, Tanney BL (`eds), Global Trends in Suicide Prevention: Tow ard the Development of National Strategies for Suicide Prevention. Mumbai, India: Tata Institute of Social Sciences, 1996.

9. Murdock S, Leistritz F, Hamm R, Albrecht D, Potter L, Backman K.  Impacts of the Farm Financial Crisis of the 1980s on Resources and Poverty in Agriculturally

Dependent Counties in the United States. Pp. 67-94 in Rodgers H, Weiher G, (eds.). Rural Poverty: Special Causes and Policy Reforms. NY:Greenwood Press 1989.

10. Murdock S, Leistritz F, Hamm R, Albrecht D, Potter L, Backman K.  Impacts of the Farm Financial Crisis of the 1980s on Resources and Poverty in Agriculturally Dependent Counties in the United States. Policy Studies Review, 1988;7(4):810-827.

11. Murdock S, Potter L, Hamm R, Backman K, Albrecht D, Leistritz L.  The Implications of the Current Farm Crisis for Rural America.  Pp. 169-184 in Steve Murdock and Larry Leistritz (eds.)  The Farm Financial Crisis: Socioeconomic Dimensions and Implications for Producers and Rural Areas. Boulder, Colorado: Westview Press, 1988.

12. Murdock S, Potter L, Hamm R, Albrecht D. Demographic Characteristics of Rural Residents in Financial Distress and Social and Community Impacts of the Farm Crisis.  Pp. 113- 140 in Steve Murdock and Larry Leistritz (eds.) The Farm Financial Crisis: Socioeconomic Dimensions and Implications for Producers and Rural Areas. Boulder, Colorado: Westview Press, 1988.

13. Murdock S, Albrecht D, Potter L, Backman K, Hamm R.  Demographic, Socioeconomic and Service Characteristics of Rural Areas in the United States: The Human Resource Base for the Response to the Crisis. Pp. 45-73 in Murdock S, Leistritz L, (eds.)  The Farm Financial Crisis: Socioeconomic Dimensions and Implications for Producers and Rural Areas.  Boulder, Colorado: Westview Press, 1988.

14. Murdock S, Potter L, Backman K, Hamm R, Hwang S.  Patterns of Post-1980 Population Change in Towns and Cities in Texas: An Analysis of the U.S. Bureau of the Census Population Estimates for 1982, 1984 and 1986.  Department of Rural Sociology Technical Report No. 88-2. College Station, Texas: The Texas Agricultural Experiment Station, March 1988.

15. Murdock S, Schriner E, Hamm R, Jones L, Potter L.  An Analysis of Selected Human Resource and Environmental Impact Dimensions of the Amarillo and Dallas-Fort Worth Super-Conducting Super Collider Siting Areas.  Report submitted to The National Research Laboratory Commission, Office of the Governor, State of Texas, July 1987.

### *Commentary*

1. Rosenberg M, Mercy J, Potter L. Firearms and suicide. New England Journal of Medicine. 1999 Nov 18;341(21):1609-11

2. Potter L, Rosenberg M, Hammond W. Suicide in youth: a public health framework [comment]. Journal of the American Academy of Child & Adolescent Psychiatry. 37(5);484-7, 1998 May.

### *Other*

1. White, S., Potter, L. B., You, H., Valencia, A., Jordan, J., & Pecotte, B. (2016). Texas Mobility. demographics.texas.gov/Resources/publications/2016/2016_11_01_TexasMobility.pdf

2. Valencia, A., Potter, L. B., White, S., You, H., Jordan, J., & Pecotte, B. (2016). Aging in Texas: Introduction. demographics.texas.gov/Resources/publications/2016/2016_06_07_Aging.pdf

3. Potter, L. Community Assessment: Wintergarden Head Start and Early Head Start Program 2014. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2014.

4.	Potter, L. Community Assessment AVANCE-San Antonio Head Start and Early Head Start Program 2014. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2014.

5.	Potter, L., Valenzuela, C., Flores, M., Jordan, J., Valencia, l., White, S., Keating, J., Canos,S., Nagorski, J., Karuppusamy, S. Robinson. S. Modeling Household Energy Consumption in Bexar County, 2010, Confidential Research Report. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2014.

6.	Potter, L. Community Assessment Update, City of San Antonio Head Start Program. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2013

7.	Potter, L (Chair), Horowitz, R., Robin, D., Tillyer, R. Recommendations for Fostering Research Productivity and Creating a Research Culture at the University of Texas at San Antonio. UTSA Research Advisory Board - Sub-Committee on Macro Research Issues, 2013

8.	You, H., White, S., Potter, L. An Examination of Static and Dynamic Aspects of Uninsurance In Texas. Institute for Demographic and Socioeconomic Research. Report for Methodist Healthcare Ministries. University of Texas at San Antonio, 2012.

9.	Potter, L., Ozuna, C., Campbell, J. Community Assessment San Antonio & Bexar County Head Start Program 2012. . Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2012

10.	Garza, J., Flores, M., Jordan, J., Potter, L.  Community Assessment Report for San Antonio Head Start. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2010

11.	Garza, J., Potter, L., Jordon, J. Community Assessment Report for San Antonio Head Start. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2009.

12.	Malley E, Posner M, Potter L. Suicide risk and prevention for lesbian, gay, bisexual,and transgender youth. Suicide Prevention Resource Center. Newton, MA: Education Development Center, Inc. 2008.

13.	Potter L, Silverman M, Connorton E, Posner M. Promoting Mental Health and Preventing Suicide in College and University Settings. Suicide Prevention Resource Center, Newton, MA: Education Development Center, Inc., 2004.

14.	Potter L. Suicide Prevention: Prevention Effectiveness and Evaluation. Atlanta, GA: SPAN, USA, 2001.

15.	Silverman M, Davidson L, Potter L, (eds.) National Suicide Prevention Conference Background Papers, October 1998, Reno, Nevada. Suicide and Life-Threatening Behavior, 31(S), 2001.

16.	Potter L, Hasbrouk L. Influence of Homicide on Racial Disparity in Life Expectancy --- United States, 1998. MMWR, September 14, 2001 / 50(36);780-3.

17.	Davidson L, Potter L, Ross V. The Surgeon General's Call To Action To Prevent Suicide. Washington, DC: U.S. Public Health Service,1999.

18.	Moscicki E, Muehrer P, Potter L.  Introduction to Supplemental Issue: Research Issues in Suicide and Sexual Orientation. Suicide and Life-Threatening Behavior 1995;Supplement:25:1-3.

19.   Kachur S, Potter L, James S, Powell K.  Suicide in the United States, 1980-1992. Atlanta: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, 1995. Violence Surveillance Summary Series, No. 1.

20.   O'Carroll P, Potter L., Mercy J. Suicide Contagion and the Reporting of Suicide: Recommendations from a National Workshop. MMWR 43(No. RR-6):8-18, 1994

21.   O'Carroll P, Potter L. Programs for the Prevention of Suicide Among Adolescents and Young Adults. MMWR 43(No.RR-6):1-7, 1994

**Under review:**

Valenzuela, C., Potter, L., Differential Residential Energy Consumption Patterns by Race and Ethnicity and Implications for Addressing Inequalities through Conservation Strategies. Revised and resubmitted (March 2018), Journal of Energy Policy.

**Selected Funding History:**

9/15-8/20   The New 100th Meridian: Urban Water Resiliency in a Climatic and Demographic Hot Spot (Co-PI). Funder: National Science Foundation.

8/15-present Demographic Data and Assistance (PI). Funder: Texas Department of Transportation

1/12-8/13   SA2020 Indicators and Education Data (PI). Funder: City of San Antonio

1/12-6/13   Energy Efficiency in Residential Buildings (PI). Funder: CPS Energy

6/12-9/12   Demographic Profile and Projections of San Marcos, Texas (PI).  Funder: City of San Marcos.

2/09-present   Head Start Community Assessment (PI). City of San Antonio

8/09-present   Estimation Allocation Factors for Local Workforce Development Areas (PI). Funder: Texas Workforce Commission.

4/08-7/08   Development of Indicators for Violence Against Children (PI). Funder: World Health Organization and UNICEF.

9/07-9/09   TEACH-VIP E-Learning Initiative (PI). Funder: Centers for Disease Control and Prevention

9/02-9/10   Suicide Prevention Resource Center (PI). Funder: Substance Abuse and Mental Health Services Administration.

4/02-8/11   Children's Safety Network National Resource Center (PI). Health Resource and Services Administration, Maternal and Child Health Bureau.

**Teaching:**
*Dissertations chaired:*

Jewel Barnett, December 2017, Barriers to Health: Place and Food Insecurity as Determinants of Childhood Obesity

Pamela Willrodt, July 2016, Vietnam-Era Veteran Health:  A Life-Course Perspective at the End of Middle-Adulthood

Mikiko Oliver, August 2015, Population Aging and Economic Growth in the United States and Japan

Alexis Santos Lozono, April 2015, Inequalities in Human Papillomavirus Vaccination for Female Adolescents in the United States

John Garza, April 2014, Spatially Oriented Demographic Determinants of Foreclosures in Bexar County

Sadasivan Karuppusamy, September 2013, The Determinants and Trends in the Household Energy Consumption for Different End Uses in the United States During 2001-2009

Carlos Valenzuela, April 2013, An Analysis of Household Energy Consumption by Race/Ethnic Composition:  Incorporating Racial Stratification in the Lifestyle Perspective,

Frank Martinez III, December 2012, Las Colonias de la Frontera: A Study of Substandard Housing Settlements along the Texas-Mexico Border

*Dissertation Committee member:*

Dorian Galindo, May 2018

Sharon Goodwin, May 2017

Rebecca Adeigbe, May 2017

Clarissa Ozuna, December 2017

Xiaoling Liang, August, 2017

Paul Chance Kinnison, June 2016

Danielle Gordon, May 2016

Heidy Colon Lugo, December 2015

Romona Serban, August 2015

Mikiko Oliver, August 2015

Jeffrey Howard, April 2014

Susanne Schmidt, December 2013

Jinny Case , June 2013

Brian Munkombwe, April 2013

Rabindra K.C. ,December 2013

Mathew Martinez, December 2013

Ke Meng , December 2012

Samantha John, December 2012

Victoria Locke, May 2012

Alma Martinez-Jimenez, December 2011

Lila Valencia, May 2011

David Armstrong , May 2011

Emma Mancha, May 2011

Joseph Campbell, May 2011

Mary Hogan, May 2011
Gilbert Suarez, May 2011
Mike Cline, August 2010
Miguel Flores, August 2010
Deborah Perez, August 2010
Eliza Hernandez, August 2010
Jennifer Roth, August 2010
Marguerite Sagna, August 2010
Mary Bollinger, May 2010

*Courses taught at UTSA (all graduate):*
1. Applied Demography and Urban and Regional Planning
2. Applied Demography in Policy Settings
3. Demographic  Methods of Analysis I
4. Demographic  Methods of Analysis II
5. Social Demography and Community Trends
6. Social and Economic Impact Assessment
7. Survey Methods for Demographers
8. Special Topic Reading Courses (multiple)
9. Dissertation hours (multiple)

*Professional*
   *Co-Editor:* Population Research and Policy Review 2015 (peer-reviewed journal)
   *Peer reviewer:*
     Suicide and Life-Threatening Behavior
     American Journal of Preventive Medicine
     American Journal of Public Health
     Archives of General Psychiatry
     Demography
     Injury Prevention
     New England Journal of Medicine

*Membership:*
    Southern Demographic Association, Past-President
    Population Association of America
    American Sociological Association
    Rural Sociological Association.
    International Union for the Scientific Study of Population
    American Public Health Association

*Miscellaneous:*
    State Demographer of Texas, 2010 to Present
    Testimony on demographic topics for Texas House and Senate standing and special committees
    Consultation with Texas House and Senate members and staff members on various demographic topics
    Demographic analysis for San Antonio Mayor's Office for Pre-K for SA
    Public speaking on demographic topics (~35 per year http://demographics.texas.gov/Presentations)
    San Antonio P-16 Data Support Council Member
    San Antonio CI Now Board Chair
    Applied Demography Conference, organizer and program chair for 2010, 2012, 2014, 2017.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, ET AL.; | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| *v.* | ) Case No. 1:18-cv-00068 |
| | ) |
| UNITED STATES OF AMERICA, ET AL.; | ) |
| | ) |
| *Defendants,* | ) |
| | ) |
| *and* | ) |
| | ) |
| KARLA PEREZ, ET AL.; | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| *Defendant-Intervenors.* | ) |
| | ) |

**ORDER DENYING DEFENDANT-INTERVENORS' MOTION TO STRIKE
PLAINTIFFS' EXPERTS**

On this date, the Court considered Defendant-Intervenors' Motion to Strike Plaintiff States' Experts. After considering the motion, any responses thereto, and all other matters properly before the Court, the Court believes the motion is without merit and should be DENIED.

IT IS THEREFORE ORDERED that Defendant-Intervenors' Motion to Strike Plaintiff States' Experts is DENIED.

SIGNED on this the _____ day of _____, 2019.

_____
Andrew S. Hanen,
U.S. District Court Judge