**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY | § | |
| | § | |
| Defendant-Intervenor. | § | |

**PEREZ DEFENDANT-INTERVENORS' SUPPLEMENTAL BRIEF
<u>REGARDING THE ADMINISTRATIVE RECORD</u>**

# TABLE OF CONTENTS

**Page**

I.  STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ...................... 1

II.  SUMMARY OF THE ARGUMENT .................................................................... 1

III.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS...................... 4

IV.  ARGUMENT ................................................................................................. 5

    A.  The Court Must Look Beyond the Purported Administrative Record to Determine Its Jurisdiction and to Rule on the Plaintiffs' Procedural APA Claims, and It May Do So to Rule on Plaintiffs' Substantive APA Claims, Especially if the Court Will Consider the *Texas I* Ruling............................................................................................. 6

    B.  In Any Event, the Court Should Not Limit Its Review to Federal Defendants' Purported Administrative Record Without Both Supplementing the Record and Allowing Revised Summary Judgment Briefing............................................... 16

    C.  Summary Judgment Is Inappropriate at this Time ..................................... 19

V.  CONCLUSION................................................................................................ 20

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Anderson v. McCarthy*,
   No. C 16–00068 WHA, 2016 WL 6834215 (N.D. Cal. Nov. 21, 2016) ...............................10

*Califano v. Sanders*,
   430 U.S. 99 (1977)...................................................................................................................14

*Camp v. Pitts*,
   411 U.S. 138 (1973)...........................................................................................................6, 11

*Ctr. for Marine Conservation v. Brown*,
   917 F. Supp. 1128 (S.D. Tex. 1996) ......................................................................................11

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)................................................................................................................14

*City of Dallas v. Hall*,
   No. 3:07-CV-0060-P, 2007 WL 3257188 (N.D. Tex. Oct. 29, 2007) ..........................6, 15, 17

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019)......................................................................................................14, 15

*Gulf Coast Rod Reel and Gun Club, Inc. v. U.S. Army Corps of Eng'rs*,
   No. 3:13–CV–126, 2015 WL 1883522 (S.D. Tex. Apr. 20, 2015)............................................3

*Heckler v. Chaney*,
   470 U.S. 821 (1985)...................................................................................................................9

*La Union del Pueblo Entero v. FEMA*,
   141 F. Supp. 3d 681 (S.D. Tex. 2015) ........................................................................... *passim*

*Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*,
   602 F.3d 687 (5th Cir. 2010) ...............................................................................................6-7

*Pennell v. City of San Jose*,
   485 U.S. 1 (1988)......................................................................................................................8

*Prometheus Radio Project v. FCC*,
   939 F.3d 567 (3d Cir. 2019)......................................................................................................7

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
   No. C 17-05211 WHA, 2018 WL 1210551 (N.D. Cal. Mar. 8, 2018) ...............................3, 17

*Sierra Club v. Yeutter*,
    911 F.2d 1405 (10th Cir. 1990) ...........................................................................10

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ..................................................................... *passim*

*Texas v. United States*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ......................................................7, 11, 15

*United Student Aid Funds, Inc. v. Devos*,
    237 F. Supp. 3d 1 (D.D.C. 2017) .........................................................................11

*US Magnesium, LLC v. EPA*,
    690 F.3d 1157 (10th Cir. 2012) ......................................................................... 7-8

**Statutes**

Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* ........................................1

APA, 5 U.S.C. § 553(b)(A)...........................................................................................12

APA, 5 U.S.C. § 701(a)(2)..............................................................................................9

APA, 5 U.S.C. § 706......................................................................................................6

## I.  STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Pursuant to a status hearing on October 8, 2019, the Court entered an order, *see* Dkt. 435, requesting supplemental briefing regarding the substance and location of the administrative record, if any, contained in the summary judgment record before the Court; and whether, consistent with the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, the Court may consider evidence outside of the administrative record (or whether, conversely, the Court's summary judgment review is restricted to evidence in the administrative record).

## II.  SUMMARY OF THE ARGUMENT

Many issues that the Court must decide in this litigation raise questions of fact that *cannot* be resolved based on the administrative record alone.  The parties' briefing has not been limited to an administrative record thus far, and, in fact, the administrative record has not even been filed with the Court in any form, let alone as part of the summary judgment record.  In any event, the Court should look beyond the purported administrative record to resolve several key issues— including the threshold issues of Plaintiffs' standing and whether Deferred Action for Childhood Arrivals (DACA) is reviewable—because the *application* of DACA is critical to resolving them.

To decide Plaintiffs' procedural APA claims—and whether, in its application DACA amounts to a substantive rule—the Court should likewise consider extra-record evidence.  Federal Defendants have defined the "record" as materials regarding the *creation* of DACA, but they have omitted any documents showing how DACA *operates in practice*, which is directly relevant to a number of Plaintiffs' claims.  The Court must look beyond the administrative record designated by Federal Defendants to consider the evidence developed during discovery that demonstrates that United States Citizenship and Immigration Services (USCIS) adjudicators exercise case-by-case discretion.  *See La Union del Pueblo Entero v. FEMA*, 141 F. Supp. 3d 681, 697 (S.D. Tex. 2015) (appropriate to consider extra-record evidence to address whether rule should have been

promulgated through notice-and-comment rulemaking, where the record certified by the agency did "not address its de facto *usage* of those policies" (emphasis added)).

Courts typically do not look to extra-record evidence to resolve substantive APA claims, absent a showing of bad faith on the part of the agency. Plaintiffs have made no such showing here. To the contrary, the purported administrative record is clear that DACA does not create class-wide substantive rights and is entirely consistent with federal immigration law. Accordingly, that alone should be a sufficient basis to deny Plaintiffs' substantive APA claims.

Notably, however, the Fifth Circuit in the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) case did not limit its adjudication of the substantive APA claims to the administrative record, and instead relied on extra-record evidence. *See Texas v. United States*, 809 F.3d 134, 185 (5th Cir. 2015) ("*Texas I*"). Significantly, many of the Plaintiffs' factual assertions, upon which the DAPA decision rests, have been discredited in this litigation. Thus, to the extent the Court considers *Texas I* to be relevant authority with respect to the substantive APA claims here, Defendant-Intervenors should have the opportunity to rely on evidence developed in this case—evidence beyond the purported administrative record—to controvert the factual premises underlying the *Texas I* decision; the Court should consider the extra-record evidence developed through discovery in this case that confirms that DACA is discretionary and does not create substantive rights. We note that the Court has already considered and relied on such extra-record evidence in this case, in the course of assessing Plaintiffs' preliminary injunction motion.

In addition to looking beyond the administrative record, as explained below, the Court should *supplement* the current, purported administrative record with documents that "might have influenced" action by the Department of Homeland Security (DHS) regarding DACA but that

2

Federal Defendants nonetheless omitted from their certified administrative record.[1]   Federal Defendants' unilateral decision about what constitutes the record is not binding on the Court.   *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. C 17-05211 WHA, 2018 WL 1210551, at *2 (N.D. Cal. Mar. 8, 2018).

A further, practical reason for looking beyond the purported administrative record is that the parties' summary judgment briefing was not in any way limited to that administrative record; rather, many of the factual disputes cannot be resolved based on even a fully developed administrative record, much less the record compiled by Federal Defendants.[2]   Indeed, DHS did not certify the purported administrative record in this case until May 24, 2019, roughly a year after the litigation was filed, and months after Plaintiffs filed their motion for summary judgment on February 4, 2019.  Dkt. 356.  Moreover, the purported administrative record was produced only in discovery and has not been filed with the Court, as part of the summary judgment record or otherwise.  If the Court were to hold that its review is limited to the purported administrative record, then summary judgment briefing would, in effect, need to start again.

---

[1] The administrative record is "supplemented" when the court "add[s] something that should have properly been included in the administrative record but was not due to a clerical error or for any other reason." *La Union*, 141 F. Supp. 3d at 694 (internal quotations and alterations omitted). "Extra-record" evidence, in contrast, is not formally part of the administrative record at all because it neither was nor should have been considered by the agency at the time of its challenged action. Courts in the Fifth Circuit have outlined the same "exceptions" for both supplemental and extra-record evidence, *see, e.g.*, *id.*, though some exceptions clearly apply only to one or the other category (*e.g.*, "evidence arising *after* the agency action," *id.* (emphasis added), is extra-record evidence).  Courts have not always been clear in distinguishing and defining these and related terms.  *See id.*; *cf. Gulf Coast Rod Reel and Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:13–CV–126, 2015 WL 1883522, at *1 n.1 (S.D. Tex. Apr. 20, 2015).

[2] Defendant-Intervenors maintain that summary judgment is inappropriate at this time, on the purported administrative record or otherwise, because genuine disputes of material fact remain regarding standing, reviewability, and Plaintiffs' procedural and substantive claims under the APA.

Ultimately, regardless of what the record contains, the Court should reject Plaintiffs' motion for summary judgment, for the reasons described in Defendant-Intervenors' summary judgment briefing and summarized in this brief.

## III.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs filed a motion for summary judgment on February 4, 2019. *See* Dkt. 356. Federal Defendants filed their response on February 25, 2019. *See* Dkt. 366. At the time, Federal Defendants had not yet produced or certified the administrative record. *See* Dkt. 374 at 3 (noting that, as of March 18, 2019, Federal Defendants had not produced the administrative record); Dkt. 374-1 at Ex. A (February 25, 2019, letter from New Jersey to Federal Defendants requesting the administrative record).

On May 10, 2019—two months after Defendant-Intervenors noted that Federal Defendants had failed to produce an administrative record as required, *id.*—Federal Defendants produced the purported administrative record, which consists of 159 emails, letters, documents, and studies related to deferred action. On May 24, 2019, Federal Defendants supplemented the administrative record with three additional documents providing evidence of, and instructions related to, the pre-DACA exercise of prosecutorial discretion.

On June 14, 2019, the individual Defendant-Intervenors and the State of New Jersey filed briefs in opposition to Plaintiffs' motion for summary judgment. *See* Dkts. 397, 399. On June 28, 2019, Plaintiffs filed their reply. *See* Dkt. 413. None of the parties cited the recently produced administrative record in their summary judgment briefs.

At a status hearing on October 8, 2019, the Court cancelled the motion hearing on Plaintiffs' motion for summary judgment, which had been scheduled for October 28, 2019. The Court also instructed the parties to submit these supplemental briefs. *See* Dkt. 435.

## IV.    ARGUMENT

The Court cannot rule on the issues in this case based on the administrative record alone. Courts routinely look outside the administrative record to decide questions of standing and have also looked outside the administrative record when procedural claims and the reviewability of an agency's action hinge on the agency's actual implementation of its decision or guidance.  The Court should do so here—especially if the Court looks to findings from *Texas I* that are themselves grounded in extra-record evidence, but which have since been disproven by the extra-record evidence developed in this litigation.

Courts typically do not look outside the administrative record to decide substantive challenges to an agency's action under the APA unless the case involves complicated technical issues or the challengers show that the agency acted in bad faith or pretextually.  Plaintiffs have not met their burden to show that DHS acted in bad faith or that the DACA Memorandum means anything other than what it said.  Instead, the purported administrative record produced by Federal Defendants clearly shows that DACA establishes no substantive rights and requires USCIS adjudicators to exercise case-by-case prosecutorial discretion.  This alone is sufficient to defeat Plaintiffs' substantive APA claims.  But, if the Court considers relevant the findings of fact in *Texas I*, where the Fifth Circuit considered extra-record evidence, then the Court should also look to the extra-record evidence developed during discovery in this case.  That evidence confirms what the administrative record makes clear—that DACA "confers no substantive right, immigration status or pathway to citizenship" and instead "set[s] forth policy for the exercise of discretion within the framework of existing law," Dkt. 400-7, Ex. 36 at 3—and contradicts the factual findings in *Texas I*.

**A.      The Court Must Look Beyond the Purported Administrative Record to Determine Its Jurisdiction and to Rule on the Plaintiffs' Procedural APA Claims, and It May Do So to Rule on Plaintiffs' Substantive APA Claims, Especially if the Court Will Consider the *Texas I* Ruling**

The general "record rule" that judicial review of an agency's action under the APA is limited to "the administrative record already in existence, not some new record made initially in the reviewing court," *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *see* 5 U.S.C. § 706, does not apply to certain issues, such as whether the challengers have standing.  And even when the record rule *does* apply, courts in the Fifth Circuit recognize several well-established exceptions to it.  Indeed, courts will look to extra-record evidence (or will supplement an agency's certified administrative record) in a number of circumstances:

> (1) when agency action is not adequately explained in the record before the court; (2) when looking to determine whether the agency considered all relevant factors; (3) when a record is incomplete; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues; (5) when evidence arising after the agency action shows whether the decision was correct or not; (6) in certain NEPA cases; (7) in preliminary injunction cases; and (8) when an agency acts in bad faith.

*La Union*, 141 F. Supp. 3d at 694 (quoting *City of Dallas v. Hall*, No. 3:07-CV-0060-P, 2007 WL 3257188, at *5 (N.D. Tex. Oct. 29, 2007)).  Put differently, courts can supplement the administrative record when (1) "the agency deliberately or negligently excluded documents that may have been adverse to its decision"; (2) the court needs to "supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors"; or (3) when "the agency failed to explain administrative action so as to frustrate judicial

review." *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010).[3]

Applying the relevant standard here, the Court must look to extra-record evidence to resolve issues of standing, reviewability, and Plaintiffs' procedural APA claim.[4]  Plaintiffs have not satisfied their burden to show that DHS acted pretextually or in bad faith, but if the Court is inclined to consider any findings of the Fifth Circuit in *Texas I* based on extra-record evidence, the Court should also assess extra-record evidence developed here—namely, evidence that disproves findings from *Texas I* and confirms that DACA is applied in a way that is substantively lawful and does not in any way violate federal immigration law—in evaluating Plaintiffs' substantive APA claim.

1. *The Court plainly must look beyond the purported administrative record to resolve the threshold issue of standing.*

"It is well established that petitioners challenging agency action may supplement the administrative record for the purpose of establishing Article III standing, even though judicial review of agency action is usually limited to the administrative record." *Prometheus Radio Project v. FCC*, 939 F.3d 567, 578 (3d Cir. 2019); *see also US Magnesium, LLC v. EPA*, 690 F.3d 1157,

---

[3] A District Court in the Southern District of Texas has noted that the eight exceptions listed in *Hall* and the three *Medina* exceptions largely, if not entirely, overlap.  *See La Union*, 141 F. Supp. 3d at 694–95.

[4] The Court has to this point deferred a determination as to whether, as Plaintiffs allege, DACA violates the Take Care Clause.  328 F. Supp. 3d 662, 710–12 ("This Court therefore defers judgment on the Take Care Clause until a full hearing on the merits or until the appropriate court on appeal instructs it to decide the issue.").  If the Court decides that it is necessary to reach the Take Care Clause issue, the Court should likely look beyond the purported administrative record: Plaintiffs' Take Care Clause claim falls under their substantive APA challenge (rather than an independent cause of action).  Thus, the Court should apply the same legal framework as developed above and consider extra-record evidence responsive to the Take Care Clause claim.  However, the extent to which such extra-record evidence is appropriate will depend on the specific legal standards applied to the Take Care Clause claim, making extra-record evidence necessary or helpful for its resolution to varying degrees.

1164–65 (10th Cir. 2012).  Indeed, as the Supreme Court of the United States explained in *Pennell v. City of San Jose*, 485 U.S. 1 (1988), when the record lacks evidence of standing because, for example, a suit originated in a non–Article III court, parties should "take pains to supplement the record in any manner necessary to enable [the court] to address with as much precision as possible any question of standing that may be raised." *Id.* at 8.

Recognizing that there is no evidence in the administrative record that proves that DACA directly caused Plaintiffs' alleged harms, Plaintiffs have attempted to show standing through other extra-record evidence.  To decide Plaintiffs' arguments about standing with "as much precision as possible," *id.*, then, the Court must consider *all* the extra-record evidence developed during discovery that addresses injury, traceability, and redressability.

For example, Plaintiffs have relied on the expert testimony of Dr. Ray Perryman—not in the purported administrative record—to argue that DACA recipients cost the state millions of dollars in the form of social services expenditures, *see* Dkt. 357 at 27-28, but Defendant-Intervenors have demonstrated that Dr. Perryman performed no analysis of costs related to DACA recipients and that Texas's reliance on his analysis is misplaced, Dkt. 400-2, Ex. 7 ¶ 6.  Plaintiffs have also relied on expert testimony from Dr. Lloyd Potter and Dr. Tom Wong—again, not in the purported administrative record—to attempt to establish injury-in-fact based on their unproven theory that DACA recipients would "self-deport" if DACA were to end, thus supposedly alleviating Plaintiffs' purported harm.  Dkt. 357 at 28.  Again, Defendant-Intervenors have demonstrated that other materials beyond the purported administrative record reveal flaws in that testimony, *see* Dkt. 399 at 15–19, or contradict it, Dkt. 399 at 18 (citing Dkt. 400-2, Ex. 8 (testimony of Dr. Robert Smith that DACA recipients do not leave the United States to return to live in their country of origin)); *see also* Dkt. 288 at 11, 18.

Defendant-Intervenors have also used extra-record evidence to directly and materially dispute Plaintiffs' arguments that "labor market distortions" cause them to suffer economic injury, *see* Dkt. 399 at 21–28, and have shown that, contrary to Plaintiffs' claims, ending DACA would not redress Plaintiffs' alleged injuries because evidence developed during discovery shows that the presence of DACA recipients in Texas does not affect Texas's state spending.  *See* Dkt. 288 at 4–5.

Consideration of some of this evidence requires consideration of all of this evidence.

> 2.   *The Court must look outside the administrative record to decide whether DACA is a reviewable agency action.*

Because the APA bars judicial review of actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), courts presume that, when an agency exercises its prosecutorial discretion not to "take enforcement steps," the agency's decision is unreviewable.  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  Though DACA represents an "exercise of [DHS's] prosecutorial discretion," Dkt. 400-7, Ex. 36 at 1, Plaintiffs have attempted to rebut the "presumption [] that judicial review is not available," *Heckler*, 470 U.S. at 831, by arguing (in the context of arguing for "special solicitude standing") that DHS has "abdicated its responsibility" to enforce the Immigration and Nationality Act, *see* Dkt. 1 at ¶¶ 244, 255; *cf. Heckler*, 470 U.S. at 833 n.4 (expressing no opinion on whether an agency's "abdication of its statutory responsibilities . . . would be unreviewable under § 701(a)(2)").  Plaintiffs have also argued that DACA is an agency action (rather than inaction) because it "grant[s] applicants a status."  Dkt. 5 at 19.

When plaintiffs challenging an agency's exercise of its prosecutorial discretion seek to avoid *Heckler*'s presumption of non-reviewability, courts look outside the administrative record to determine whether they have jurisdiction over the challenge.  *See, e.g.*, *Texas I*, 809 F.3d at 165 (holding that DAPA and expanded DACA were reviewable because the government had not

provided "clear and convincing evidence that, *inter alia*, it is making case-by-case decisions"); *Sierra Club v. Yeutter*, 911 F.2d 1405, 1421 (10th Cir. 1990) (noting that "a district court may require an agency to supplement the administrative record . . . to determine whether the [agency] ha[s] consciously abdicated its statutory responsibilities" to such an extent that the presumption against the reviewability of an agency's non-enforcement decision is rebutted (citation omitted)); *see also Anderson v. McCarthy*, No. C 16–00068 WHA, 2016 WL 6834215, at *11 (N.D. Cal. Nov. 21, 2016) (reviewing the administrative record and "additional documents submitted" by the agency to confirm that the agency's non-enforcement decision was not reviewable).

Here, the evidence developed during discovery—including the evidence that, in practice, DHS continues to exercise case-by-case prosecutorial discretion—demonstrates that DACA is an unreviewable decision not to take enforcement action.  It is proper for this Court to review that evidence in assessing the validity of Plaintiffs' threshold claim to the contrary.

3.   *The Court must also look outside the administrative record to decide Plaintiffs' procedural APA claims.*

To assess a procedural APA claim, courts must determine "what the agency does in fact" in applying the challenged rule.  *Texas I*, 809 F.3d at 171 n.125 (internal quotation marks omitted); *La Union*, 141 F. Supp. 3d at 692 (internal quotation marks omitted).  To resolve Plaintiffs' procedural APA claims, then, the Court must look beyond the purported administrative record certified by Federal Defendants and consider information about the operation of DACA, such as DHS internal guidance (issued after DACA was announced) on how to implement DACA.

In *La Union*, for example, plaintiffs challenged a federal agency's use of internal policies that were not published through notice-and-comment but were allegedly binding in determining plaintiffs' applications for federal assistance.  *See id.* at 685–89.  The agency certified an administrative record that purported to include "all documents it considered or otherwise employed"

10

in establishing the policies. *Id.* at 697 (internal quotation marks omitted). However, because the agency's certified record "d[id] not address its *de facto usage* of those policies," *id.* (emphasis added), the court allowed plaintiffs to provide extra-record evidence of how the agency applied the challenged policies in practice. *See id.* As a result, the court found some of the supplemental materials helpful in "provid[ing] background and shed[ding] light on how [the agency], in fact, treated and implemented the challenged policies." *Id*; *see also United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 4 (D.D.C. 2017) ("[W]here the district court cannot determine from the administrative record whether the agency complied with its procedural obligations, the district court may consider extra-record evidence."). If the "true test" of Plaintiffs' procedural APA claims is how DACA is "actually administered," *Texas v. United States*, 328 F. Supp. 3d 662, 729 (S.D. Tex. 2018), excluding evidence of DACA's *de facto* usage would "effectively frustrate[] judicial review." *Cf. Ctr. for Marine Conservation v. Brown*, 917 F. Supp. 1128, 1144 n.10 (S.D. Tex. 1996) (citing *Camp*, 411 U.S. at 143).

Moreover, in line with this standard, the Fifth Circuit in *Texas I* considered evidence post-dating the agency's DAPA decision that was outside the administrative record. *See, e.g.*, *Texas I*, 809 F.3d at 172–76 (citing and finding material the December 31, 2014, declaration of Kenneth Palinkas regarding the purported "rubber-stamp[ing]" of DACA applications); *see also id.* at 171 (to determine whether agency action is a policy statement or substantive rule, the court focuses on whether, "as a practical matter," the action "either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding") (internal quotation marks omitted). Thus, to the extent this Court may rely (even in part) on *Texas I*'s findings and conclusions that are themselves partially or wholly grounded in extra-record evidence, the Court should undoubtedly

11

exercise its discretion to allow similar extra-record evidence in this case, including evidence rebutting the Fifth Circuit's preliminary *Texas I* findings regarding DACA.

In particular, to resolve the question of how DHS administers DACA in practice, the Court should look beyond information pre-dating DHS's decision to *create* DACA, and examine how DACA has been *implemented in practice*. This extra-record evidence "arising after the agency action" demonstrates that DHS's decision to implement DACA without notice-and-comment was "correct," and it provides helpful "background information." *See La Union*, 141 F. Supp. 3d at 694 (internal quotation marks omitted). In addition to the purported administrative record certified by Federal Defendants, the Court should consider the DHS internal guidance and training materials produced during discovery, as well as relevant expert testimony about DACA's operation in practice.

Here, materials beyond the certified administrative record confirm the agency's conclusion at the time that DACA was exempt from the APA's notice-and-comment requirement, because it leaves USCIS adjudicators free to exercise discretion and imposes no rights or obligations. *See* 5 U.S.C. § 553(b)(A); Dkt. 399 at 34–38 (collecting cases explaining legal standard). For example, extra-record evidence shows that USCIS adjudicators exercise case-by-case discretion when deciding whether to grant deferred action. *See* Dkt. 400-9, Ex. 62-H at 8 (2013 DACA Nat'l Standard Operating Procedures (SOP)).[5] DHS internal guidance and documents show that deciding whether certain of those criteria have been met inherently requires the adjudicator to

---

[5] *See also* Dkt. 400-9, Ex. 62-B at 6 (2012 DACA Training Presentation) ("[DACA] does not *confer* any status," nor does it "*lead* to any status; it "simply means that action to remove someone is deferred until a certain date and that the decision to pursue removal may be revisited at some point in the future"); Dkt. 226-1, Ex. 167 at 4 (USCIS Field Manual) ("As in all deferred action determinations, USCIS will make case-by-case, discretionary judgments based on the totality of the evidence.").

exercise individualized discretion by, for example, determining whether a person "otherwise poses a threat to national security," or whether a prior misdemeanor conviction is a "significant" one. Dkt. 6, Ex. 7 at App. 0586–87.  Indeed, as one USCIS officer put it, when determining whether a DACA applicant represents a threat to public safety, "[the] standard is whether or not you would want to live next door to the person."  Dkt. 400-9, Ex. 62-K at 1 (DACA Email Guidance, June 2, 2015).

The Court should also look to the significant and increasing denial rate for deferred action since the DACA Memorandum was first issued, which confirms the use of case-by-case, individualized discretion.  Dkt. 224-2, Ex. 25 at 1 (USCIS Data on Number of Form I-821D, Consideration of DACA) (showing that, during the first two quarters of fiscal year 2018, USCIS adjudicators denied about 20% of requests for initial grants of deferred action under DACA).

Finally, the Court should consider testimonial evidence that further confirms that USCIS adjudicators understand DACA to empower them to make discretionary decisions.  *See, e.g.*, Dkt. 400-2, Ex. 11 at App. 0583–92 (Decl. of Donald W. Neufeld); Dkt. 400-4, Ex. 27 (Tr. of Depo. of Michael Knowles).  Relatedly, the Court should look also at the further testimony of Mr. Palinkas from discovery in this case, in which he admitted he does *not* have any personal knowledge whether DACA adjudicators "rubber stamp" applications, Dkt. 397 at 12 n.4 (citing Dkt. 215 at 22–24), as he was quoted as saying in the DAPA litigation.  *See Texas I*, 809 F.3d at 172–73.  This recent testimony from Mr. Palinkas discredits preliminary findings of fact from *Texas I* that were based on his previous extra-record testimony in that case.

4.      *The Court can look outside the administrative record to decide Plaintiffs'*
        *substantive APA claims.*

In the substantive APA context, courts typically look at extra-record evidence only if plaintiffs first show bad faith or "pretext"; Plaintiffs have failed to justify any such resort to extra-

record evidence here.  If the Court limits its review to the administrative record on this claim, Plaintiffs' substantive APA claims necessarily fail, as DACA is, on its face, a matter of discretion that creates no rights and involves individual decision-making.  To the extent, however, that this Court believes it must consider the Fifth Circuit's factual findings in *Texas I*, which were partially grounded in extra-record evidence, the Court must likewise consider the extra-record evidence developed here to understand DHS's DACA action and determine whether it was correct.

In *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), the Supreme Court emphasized that a court reviewing a substantive challenge to an agency's action under the APA can allow "extra-record discovery" in order to "inquir[e] into 'the mental processes of administrative decisionmakers,'" but *only* "[o]n a 'strong showing of bad faith or improper behavior.'"  *Id.* at 2573–74 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 104–05 (1977)). There, the district court had ordered the Department of Commerce both to supplement the administrative record by including otherwise omitted materials the Secretary had considered before implementing a census question on citizenship and to respond to extra-record discovery. *Id.* The Court held that the district court's order requiring extra-record discovery was "premature" but "ultimately justified." *Id.* at 2574.  At the time the district court ordered extra-record discovery the plaintiffs had not shown pretext or bad faith.  But once the Department of Commerce supplemented the record, the additional material showed that the Secretary's justification for implementing the citizenship question was pretextual, meaning that extra-record discovery was appropriate. *Id.*

Plaintiffs have not made a "strong showing" of pretext here: neither the purported administrative record designated by Federal Defendants, nor any other evidence, creates any

inference of pretext, let alone a powerful one. *See id.* at 2573–74. To the contrary, the administrative record compiled by Federal Defendants clearly shows that DACA does not, and was not intended to, create substantive rights in contravention of the INA and Congress's statutory scheme on immigration. This alone is sufficient to end the inquiry into Plaintiffs' substantive APA claims.

Moreover, the extra-record evidence confirms what the administrative record discloses— that DACA is a matter of discretionary non-enforcement, not a rule giving rise to substantive rights. Should the Court determine to look beyond the administrative record to resolve the substantive APA claims, however, it should consider *all* extra-record evidence.

Reliance on *all* extra-record evidence developed in this action is necessary if the Court treats as relevant authority the Fifth Circuit's decision in *Texas I*. There, the Fifth Circuit's analysis was infused with evidence from beyond the record about why DAPA was implemented and how DAPA operated in practice. *See Texas I*, 809 F.3d at 181–86. Through discovery in this case, Defendant-Intervenors have since developed evidence that demonstrates that many of the factual premises of *Texas I* are incorrect. This Court would need to consider that evidence in conjunction with *Texas I* if it considers *Texas I* at all. This key extra-record evidence is helpful in "understand[ing]" DHS's DACA action and demonstrating that this agency action was "correct," *La Union*, 141 F. Supp. 3d at 694 (quoting *Hall*, 2007 WL 3257188, at *5), and ultimately confirms that DACA does not contravene Congress's statutory scheme on immigration.

Notably, this Court has already, at the preliminary injunction stage, considered and relied on extra-record evidence in assessing Plaintiffs' substantive APA claim, including by comparing the evidence in this case to the evidence in *Texas I*. *See* 328 F. Supp. 3d at 712–27 (citing various extra-record sources in its analysis of the substantive APA claim; noting, for example, the number

of individuals potentially affected by DACA, expanded DACA, and DAPA). If the Court believes this type of extra-record evidence was necessary to "enable [the Court] to understand the issues" and to "show[] whether the [agency] decision was correct or not," *see La Union*, 141 F. Supp. 3d at 694, it would be essential for the Court to continue to consider extra-record evidence in this litigation.

**B.      In Any Event, the Court Should Not Limit Its Review to Federal Defendants' Purported Administrative Record Without Both Supplementing the Record and Allowing Revised Summary Judgment Briefing**

Federal Defendants' purported administrative record lacks information that should have informed DHS's 2012 DACA actions, and requires supplementation. Moreover, Federal Defendants did not produce any part of that administrative record until May 10, 2019—months after Plaintiffs moved for summary judgment (on February 4, 2019) and months after Federal Defendants filed their response to the motion for summary judgment (on February 25, 2019). *See* Dkts. 356, 366. As such, the purported administrative record appears nowhere in the summary judgment record.

Both Plaintiffs and Defendant-Intervenors have routinely relied on materials outside of the administrative record in their summary judgment briefing, as justified by the issues in this case. If the Court holds that its review should be limited to an administrative record for some or all claims, the parties would need to supplement the record produced by Federal Defendants and submit revised summary judgment briefing based solely on that administrative record.

1.      *Federal Defendants' purported administrative record is incomplete.*

As discussed above, the Court should not limit its review to Federal Defendants' purported administrative record for many of the issues before the Court. If, however, the Court decides to do so, then it is imperative that the Court grant the other parties an opportunity to supplement that record.

The purported administrative record, which has not been filed with the Court, is, in any event, incomplete.  Federal Defendants finally produced documents they asserted constitute the administrative record on May 10 and May 24, 2019, only after repeated requests by Defendant-Intervenors, *see* Dkt. 374 at 3; *id.*, Ex. 1.  Even then, Federal Defendants caveated the completeness of their purported administrative record.  The certification accompanying the May 24 production noted that the administrative record was "prepared during the pendency of this action," which began "almost six years following publication of the DACA memo."  Ex. 5-1 at 2 n.1.  Moreover, the certification stated that "current DHS personnel used their best efforts to determine which documents to include in the administrative record based upon the content of the documents," but they "did not confer with former Secretary Napolitano herself or any former DHS officials involved in development of the policy regarding which documents to include."  *Id*.

Even though Federal Defendants have finally certified an administrative record, agencies may not unilaterally decide which documents constitute the record.  *See Regents*, 2018 WL 1210551, at *2 ("[T]he whole record is not necessarily those documents that the *agency* has compiled and submitted as 'the' administrative record.  Rather, it consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." (emphasis in original) (internal quotation marks and citation omitted)).  The complete record should include "all materials that 'might have influenced the agency's decision,' and not merely those upon which the agency relied in its final decision."  *La Union*, 141 F. Supp. 3d. at 694  (quoting *Hall*, 2007 WL 3257188, at *4).

Federal Defendants' purported administrative record excludes certain key documents that are relevant to DHS's decision.  For example, the summary judgment record developed through discovery references the Immigration and Naturalization Service General Counsel's Legal Opinion

Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976), but that document—which concludes that there is "authority for the plenary nature of [the agency's] prosecutorial discretion," particularly if guided by some standards—is absent from the purported certified administrative record. Dkt. 224-2, Ex. 14 at 8; *see also* Dkt. 400, Ex. 10 at 5, 8. Likewise, the summary judgment record includes 2005 and 2009 USCIS statements on deferred action for other groups. *See* Dkt. 400, Exs. 55, 56. Federal Defendants should have included these previous statements in the administrative record as well, as they provide context for DACA and demonstrate that DACA is merely a continuation of longstanding agency practice to exercise various forms of prosecutorial discretion.

Not only should the Court afford the parties an opportunity to augment the administrative record, but also, as discussed *supra*, at Part IV.A, the Court should look beyond the administrative record to consider information about the operation of DACA.

> 2. *The parties' summary judgment briefing focused on materials beyond the administrative record, and re-briefing would be necessary if the Court were to limit its review to the administrative record.*

The Court asked where within the summary judgment record the administrative record is. The answer is: nowhere. Federal Defendants first certified an administrative record months after Plaintiffs moved for summary judgment on February 4, 2019. *See* Dkt. 356; *see also* Dkt. 363 at 6 (noting Federal Defendants' failure to produce an administrative record); Dkt. 363-1, Ex. 9 at 1 (explaining that, as of December 26, 2018, Federal Defendants' production of an administrative record would be delayed). Even then, Federal Defendants did not file the administrative record with the Court. As a result, the administrative record is not yet a part of the summary judgment record, and both sides have routinely cited materials outside the administrative record in their summary judgment briefs.

Effectively, Federal Defendants—who are aligned with Plaintiffs in their opposition to DACA, *see* Dkt. 118 at 8–10—have been trying to have it both ways:  on the one hand, they have resisted responding to Defendant-Intervenors' discovery requests by arguing that the case can and must be decided on the administrative record alone, *see, e.g.*, Dkt. 392; yet, on the other hand, Federal Defendants neither produced nor relied on the administrative record when responding to Plaintiffs' motion for summary judgment.

If the Court were now to limit its review to Federal Defendants' purported administrative record, much of the summary judgment briefing—by Plaintiffs, individual Defendant-Intervenors, and Defendant-Intervenor New Jersey alike—would be excluded from consideration.  Ruling on Plaintiffs' summary judgment motion based solely on an administrative record would be inappropriate with respect to numerous issues for the multiple reasons discussed herein, and would be further inappropriate without revised summary judgment briefing limited to the administrative record.

## C.      Summary Judgment Is Inappropriate at this Time

Ultimately, regardless of what the record contains, the Court should reject Plaintiffs' motion for summary judgment.  Plaintiffs do not have standing to bring this case, DACA is not reviewable, and Plaintiffs' procedural and substantive APA claims are without merit.

Standing.  Both record and extra-record evidence show that Plaintiffs do not have standing to bring this case—because Plaintiffs cannot show injury, causation, or redressability—and the case should be dismissed.

Reviewability.   Both record and extra-record evidence demonstrate that DACA is an exercise of non-enforcement discretion.  Accordingly, DACA is not reviewable under the APA.

Procedural APA.   Both record and extra-record evidence confirm that DACA is procedurally lawful and did not require notice-and-comment rulemaking.  DACA adjudicators

decide whether to grant or deny DACA applications on a discretionary, case-by-case basis, and thus DACA is a lawful exercise of prosecutorial authority.  As such, Plaintiffs' procedural APA claim is without merit.

Substantive APA.  Both record and extra-record evidence show that DACA is substantively lawful, does not constitute arbitrary or capricious agency action, and does not conflict with—but rather is wholly consistent with—federal immigration law.

At the very least, summary judgment is inappropriate, because genuine disputes of material fact remain.

## V.   CONCLUSION

For the foregoing reasons, the Court should look beyond the administrative record to resolve Plaintiffs' motion for summary judgment on standing, reviewability, procedural APA, and, to the extent the Court considers the *Texas I* opinion, substantive APA.  In any event, the Court should afford the parties the opportunity to supplement the purported administrative record produced by Federal Defendants.  Because the parties' summary judgment briefing has not been limited to the administrative record thus far, the Court should not limit its review to the administrative record without allowing the parties to submit revised briefs.

Dated: October 28, 2019                    Respectfully Submitted,

                                           **MEXICAN AMERICAN LEGAL
                                           DEFENSE AND EDUCATIONAL FUND**
                                           By:  */s/ Nina Perales*
                                           Nina Perales (Tex. Bar No. 24005046);
                                           (SD of Tex. Bar No. 21127)
                                           Attorney-in-Charge
                                           Ramón A. Soto
                                           (Admitted pro hac vice)
                                           Ernest I. Herrera (Tex. Bar No. 24094718);
                                           (SD of Tex. Bar No. 2462211)

110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org

Denise Hulett
Mexican American Legal Defense and
Educational Fund
1512 14th Street
Sacramento, CA 95814
Phone: (916) 444-3031
Email: dhulett@maldef.org
(Admitted pro hac vice)

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC 20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-
Driemeier@ropesgray.com
(Admitted pro hac vice)

**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on the 28th day of October, 2019, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*
Nina Perales

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**PEREZ DEFENDANT-INTERVENORS' APPENDIX IN SUPPORT OF THEIR
SUPPLEMENTAL BRIEF REGARDING THE ADMINISTRATIVE RECORD**

| EX. NO. | DOCUMENT |
|---|---|
| 1 | *Regents of the Univ. of Cal. v. U. S. Dep't of Homeland Sec.*, No. C 17-05211 WHA, 2018 WL 1210551 (N.D. Cal. Mar. 8, 2018) |
| 2 | *Gulf Coast Rod Reel and Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:13–CV–126, 2015 WL 1883522 (S.D. Tex. Apr. 20, 2015) |
| 3 | *City of Dallas v. Hall*, No. 3:07-CV-0060-P, 2007 WL 3257188 (N.D. Tex. Oct. 29, 2007) |
| 4 | *Anderson v. McCarthy*, No. C 16–00068 WHA, 2016 WL 6834215 (N.D. Cal. Nov. 21, 2016) |
| 5 | Declaration of Nina Perales |
| 5-1 | Certification of Dep't of Homeland Security Administrative Record by Ariel C. Harrison (May 24, 2019) |

Dated: October 28, 2019                          Respectfully Submitted,

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**
By:  */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
Ramón A. Soto
(Admitted pro hac vice)
Ernest I. Herrera (Tex. Bar No. 24094718);
(SD of Tex. Bar No. 2462211)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org

Denise Hulett
Mexican American Legal Defense and
Educational Fund
1512 14th Street
Sacramento, CA 95814
Phone: (916) 444-3031
Email: dhulett@maldef.org
(Admitted pro hac vice)

Priscila Orta
Mexican American Legal Defense and
Educational Fund
11 East Adams, Suite 700
Chicago, IL 60603
Tel: (312) 427-0701
Email: porta@maldef.org
(Admitted pro hac vice)

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC 20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-
Driemeier@ropesgray.com
(Admitted pro hac vice)

**GARCÍA & GARCÍA,**
**ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

# EXHIBIT 1

Regents of the University of California v. United States..., Not Reported in Fed....

Case 1:18-cv-00068   Document 440-1   Filed on 10/28/19 in TXSD   Page 5 of 48

2018 WL 1210551

2018 WL 1210551
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

The REGENTS OF the UNIVERSITY OF
CALIFORNIA and Janet Napolitano,
in her official capacity as President of
the University of California, Plaintiffs,
v.
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and Kirstjen Nielsen,
in her official capacity as Secretary of the
Department of Homeland Security, Defendants.

No. C 17-05211 WHA, No. C 17-05235
WHA, No. C 17-05329 WHA, No. C
17-05380 WHA, No. C 17-05813 WHA
|
Signed 03/08/2018

**Attorneys and Law Firms**

Jeffrey Michael Davidson, Alan Douglas Bersin, Covington
& Burling LLP, San Francisco, CA, Alexander Berengaut,
Ashley Ciara Anguas Nyquist, Ivano Michael Ventresca,
Jonathan Yakov Mincer, Lanny A. Breuer, Mark H.
Lynch, Covington and Burling LLP, Megan A. Crowley,
U.S. Department of Justice, Washington, DC, Erika M.
Douglas, Covington and Burling LLP, Redwood Shores,
CA, Harpreet Kaur Chahal, Julia M.C. Friedlander, Michael
A. Troncoso, Norman J. Hamill, Sonya Una Sanchez,
Margaret Louisa Wu, University of California Office of the
General Counsel, Charles Furlonge Robinson, University of
California, Oakland, CA, Megan Louise Rodgers, Covington
and Burling LLP, Redwood City, CA, Monica Marie-Ramirez
Almadani, Covington & Burling LLP, Los Angeles, CA, for
Plaintiffs.

Brad Prescott Rosenberg, Stephen M. Pezzi, Brett A.
Shumate, Jeffrey S. Robins, Kate Bailey, United States
Department of Justice, Emma Leheny, National Education
Association, James Wells Harrell, Boies Schiller Flexner LLP,
Washington, DC, Albert Quoc Giang, Caldwell Leslie &
Proctor, PC, Los Angeles, CA, for Defendants.

**RENEWED ORDER TO COMPLETE
THE ADMINISTRATIVE RECORD**

WILLIAM ALSUP, UNITED STATES DISTRICT JUDGE

**INTRODUCTION**

**\*1** In these challenges to the government's rescission of the
Deferred Action for Childhood Arrivals program, this order
narrows a prior order directing the government to complete
the administrative record.

**STATEMENT**

The facts underlying these actions are discussed in more
detail in prior orders (*see, e.g.*, Dkt. No. 234). In brief,
these five lawsuits challenge the Acting Secretary of the
Department of Homeland Security's decision in September
2017 to terminate a deferred action policy known as Deferred
Action for Childhood Arrivals.

Pursuant to their own stipulation, defendants filed an
administrative record on October 6, 2017, consisting of
fourteen documents received by the Acting Secretary. These
documents spanned 256 pages, all of which were already
public. All other DACA materials actually received by the
Acting Secretary were withheld based on "deliberative
process" and other privileges. Plaintiffs immediately moved
to require completion of the administrative record, seeking
all materials considered "directly or indirectly" by the
Acting Secretary in reaching her decision to rescind DACA.
Plaintiffs' motion was granted in part and denied in part on
October 17 (Dkt. Nos. 64, 65, 79). [1]

The October 17 order directed defendants to complete the
administrative record by adding to it all emails, letters,
memoranda, notes, media items, opinions and other materials
directly or indirectly considered in the final agency decision
to rescind DACA, to the following extent:

1. All materials actually seen or considered, however
   briefly, by the Acting Secretary in connection with the
   potential or actual decision to rescind DACA;

2. All DACA-related materials considered by persons
   (anywhere in the government) who thereafter provided
   the Acting Secretary with written advice or input
   regarding the actual or potential rescission of DACA;

3. All DACA-related materials considered by persons
   (anywhere in the government) who thereafter provided

Case 1:18-cv-00068 Document 440-1 Filed on 10/28/19 in TXSD Page 6 of 48

Regents of the University of California v. United States..., Not Reported in Fed...

2018 WL 1210551

the Acting Secretary with verbal input regarding the actual or potential rescission of DACA;

4. All comments and questions propounded by the Acting Secretary to advisors or subordinates or others regarding the actual or potential rescission of DACA and their responses; and

5. All materials directly or indirectly considered by former Secretary of DHS John Kelly leading to his February 2017 memorandum not to rescind DACA.

The October 17 order also addressed various privileges—overruling defendants' claim of deliberative process privilege as to 35 documents and finding that defendants had waived the attorney-client privilege as to any materials bearing on whether or not DACA was an unlawful exercise of DHS authority.

Rather than submit a complete administrative record, defendants filed a petition for writ of mandamus with our court of appeals. Our court of appeals denied defendants' petition (over one dissent). Defendants were again ordered to complete the administrative record (Dkt. Nos. 86, 188, 197, 199).

**\*2** On December 1, defendants filed in the United States Supreme Court a petition for writ of mandamus and application for a stay, or, in the alternative, for writ of certiorari to our court of appeals. The Supreme Court did not reach the merits of defendants' petition but required that their jurisdictional defenses be adjudicated prior to consideration of completing the administrative record (Dkt. Nos. 214, 224).

An order dated January 9, 2018, ruled on defendants' threshold jurisdictional arguments and sustained jurisdiction, issues now before our court of appeals. The parties later submitted argument, at the Court's invitation, as to whether some narrowing of the October 17 order was necessary or appropriate (Dkt. Nos. 234, 242, 243). This order follows.

## ANALYSIS

### 1. SCOPE OF THE ADMINISTRATIVE RECORD.

The main question addressed in this order is the meaning of the term "the whole record" in the context of informal agency action. 5 U.S.C. § 706. This issue is important—not just to the instant dispute but to all informal agency decisions reviewable under the APA. Unlike formal agency

adjudication and notice-and-comment rulemaking, informal agency action has no readily-defined record. In a rulemaking case, for example, the record is "comprised of comments received, hearings held, if any, and the basis and purpose statement," among other things. *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 817 (D.C. Cir. 1975). And, the trial-type record in administrative adjudications consists of "[t]he transcript of testimony and exhibits, together with all papers and requests filed in the proceeding." 5 U.S.C. § 556.

The Supreme Court has never defined "the whole record" in the context of informal agency action, our instant setting. But our court of appeals has explained that the whole record "is not necessarily those documents that the *agency* has compiled and submitted as 'the' administrative record." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989). Rather, it "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Ibid.* The "whole record" accordingly includes documents that "literally pass[ed] before the eyes of the final agency decision maker" as well as those considered and relied upon by subordinates who provided recommendations to the decisionmaker. *California ex rel. Lockyer v. U.S. Dep't of Agriculture*, Nos. 05-cv-3508 & 05-cv-4038, 2006 WL 708914, at \*2 (N.D. Cal. Mar. 16, 2006) (Magistrate Judge Elizabeth Laporte) (internal citations and quotations omitted); *see also Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (Judge Royce Lamberth).

Although the administrative record submitted by defendants is entitled to a presumption of completeness, *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993), this order again finds that plaintiffs have shown, by clear evidence, that the administrative record filed by defendants lacks documents that were considered, directly or indirectly, by the Acting Secretary in deciding to rescind DACA. Again, the submitted record consists only of fourteen documents comprising a mere 256 pages—all already public—nearly 200 pages of which consist of the Supreme Court, Fifth Circuit, and district court opinions in the DAPA litigation. Our own Ninth Circuit and the Second Circuit have both agreed that it strains credulity that defendants terminated DACA based solely on fourteen publicly available documents. *See In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017), *judgment vacated on other grounds by In re United States*, 138 S. Ct. 443 (2017); *In Re: Kirstjen M. Nielsen*, No. 17-3345 (2d. Cir. Dec. 27, 2017).

Regents of the University of California v. United States..., Not Reported in Fed....

2018 WL 1210551

Case 1:18-cv-00068   Document 440-1   Filed on 10/28/19 in TXSD   Page 7 of 48

**\*3** But while completion of the administrative record is necessary, this order is mindful of the Supreme Court's concern that defendants have raised "serious arguments that at least portions of the [October 17] order are overly broad." *In re United States*, 138 S. Ct. at 445. After consideration of the parties' supplemental submissions on this point, this order will narrow the October 17 order.

*First*, even defendants agree that non-privileged materials considered by the Acting Secretary in connection with the decision to rescind DACA should be included in the record. Defendants' supplemental submission does not specifically address, however, whether the administrative record should include comments and questions propounded by the Acting Secretary to others (and their responses) regarding the rescission. This order restates that the first and fourth categories of materials outlined in the October 17 order should be included in the administrative record.

*Second*, because reasoned agency decision-making "ordinarily demand[s] that [the agency] display awareness that it *is* changing position" and "show that there are good reasons for the new policy," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), the October 17 order directed defendants to include in the administrative record all materials directly or indirectly considered by Secretary Kelly that led to his earlier decision to continue the DACA program.

Two events are relevant. In February 2017, Secretary Kelly issued guidance regarding the Trump Administration's immigration enforcement priorities which —despite rescinding "all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal"—explicitly left DACA in place. Then, in June 2017, Secretary Kelly rescinded the 2014 DAPA memo while again declaring that DACA would remain in effect. Materials considered by Secretary Kelly that led to his February and June 2017 decisions to continue DACA are pertinent here, and the inclusion of such documents in the administrative record remains required. [2]

*Third*, the Acting Secretary surely received both written and verbal input from her subordinates regarding the decision to rescind DACA. Yet the record lacks even a single communication from any of the Acting Secretary's subordinates. With respect to written input, the October 17 order sought to remedy this omission in two ways. One was to require inclusion of some materials sent to

the Acting Secretary that were previously withheld under a claim of deliberate process privilege. The other was to require inclusion of all DACA-related materials considered by persons (anywhere in the government) who, after such consideration, provided the Acting Secretary with written input regarding the rescission of DACA. In other words, anyone providing written input to the Acting Secretary on the rescission was required to produce their DACA materials (up to the date of their input) on the premise that such materials had informed their input. [3]

**\*4** Defendants argue that this category of materials should be narrowed so as to exclude any document originating from the White House, whether or not such documents are in the possession of DHS or another agency. For their part, plaintiffs suggest exempting from the administrative record any White House documents that never left the White House complex. This order accepts plaintiffs' narrower version.

Communications from the White House *residing at DHS* remain an important part of the administrative record (in part due to the White House's emphasis of the President's direct role in decisions concerning the program). Indeed, defendants concede that the Acting Secretary received advice from other members of the Executive Branch in making her decision and referred to "White House memorandum" in their privilege log (Dkt. No. 71-2). But to curtail any separation-of-powers concerns, defendants need not collect materials from White House personnel. The agency defendants need look no further than their own files. In all other respects, however, the second category of materials described in the October 17 order remains intact.

*Fourth*, with respect to verbal input to the Acting Secretary, to capture the factual information verbally conveyed and considered in connection with the decision to rescind DACA, the October 17 order similarly required inclusion of all DACA-related materials considered by persons (anywhere in the government) who thereafter provided the Acting Secretary with verbal input regarding the rescission. Defendants argue that the collection and review of documents from custodians who provided only verbal advice is overly burdensome and disproportionate to the needs of the case. Plaintiffs, in turn, suggest that this requirement be narrowed to apply only to materials located within or reviewed by DHS or DOJ personnel rather than anywhere in the government.

The appellate caselaw has never expressly considered how, if at all, verbal input to an agency decisionmaker should

Regents of the University of California v. United States..., Not Reported in Fed....

2018 WL 1210551

be reflected in the administrative record. Verbal input, of course, can be every bit as influential—perhaps more influential—in shaping informal agency decisions as written input. Yet despite government counsel's acknowledgment that verbal input likely occurred (Dkt. No. 78 at 31:5), the thin administrative record supplied thus far omits even a clue as to the verbal advice received by the Acting Secretary on the question of the rescission of DACA.

Nevertheless, this order narrows the October 17 order in that defendants need only add to the administrative record documents of the Acting Secretary's first-tier subordinates who provided verbal input regarding the rescission of DACA. Figuring out who gave verbal input will not be as hard as the government suggests. One method would be to ask the decisionmaker which first-tier subordinates provided verbal input and then include in the administrative record the relevant files and emails of such subordinates up to the date of their last input. Another would be to ask the first-tier subordinates if they gave verbal input and, if so, to include their DACA files and emails up to the date of their last input. Yet another method would be to review the emails of the Acting Secretary and first-tier subordinates for references to verbal input, such as references to a meeting on the subject or to follow up on a verbal recommendation. This order leaves it to government counsel to select the combination of methods best calculated to retrieve the relevant records. The government is not required to construct records that never existed but only to corral the records that plausibly informed the verbal input received by the Acting Secretary.[4]

**\*5** In sum, defendants are directed to complete the administrative record by adding to it all emails, letters, memoranda, notes, media items, opinions and other materials directly or indirectly considered in the final agency decision to rescind DACA, to the following extent:

1. All materials actually seen or considered, however briefly, by the Acting Secretary in connection with the potential or actual decision to rescind DACA;

2. All DACA-related materials considered by persons (anywhere in the government) who thereafter provided the Acting Secretary with written advice or input regarding the actual or potential rescission of DACA, with the exception that White House documents that never left the White House complex need not be included;

3. All DACA-related materials considered by the Acting Secretary's first-tier subordinates within DHS who thereafter provided the Acting Secretary with verbal input regarding the actual or potential rescission of DACA;

4. All comments and questions propounded by the Acting Secretary to advisors or subordinates or others regarding the actual or potential rescission of DACA and their responses; and

5. All materials directly or indirectly considered by former Secretary of DHS John Kelly leading to his February and June 2017 decisions not to rescind DACA.

\* \* \*

Because of the pendency of appellate review over the government's threshold jurisdictional arguments, this order postpones the deadline for completion of the administrative record until **FORTY-TWO CALENDAR DAYS** after any final appellate ruling that the agency action is reviewable. If either side seeks Supreme Court review of the threshold jurisdictional questions, then any ruling by our court of appeals will become final only upon refusal of the Supreme Court to review it or upon a ruling by the Supreme Court itself that the agency action is reviewable.

### 2. PRIVILEGE.

#### A. Waiver of Attorney-Client Privilege.

The October 17 order held that defendants waived attorney-client privilege over any materials that bore on whether or not DACA was an unlawful exercise of executive power and therefore should be rescinded. This holding was based on the well-established principle that parties are not permitted to advance conclusions that favor their position in litigation and at the same time shield the information that led to those conclusions from discovery. *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). Put differently, "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield." *Ibid.* Where a party raises a claim, which in fairness to its adversary requires it to reveal the information or communication that claim is predicated upon, it has implicitly waived any privilege over that communication.

Here, DHS's rationale for rescinding DACA was its purported illegality (*see* Dkt. No. 64-1 at 253–56 (Rescission Memorandum)). And although defendants included the September 4 legal opinion of the Attorney General in the administrative record, they sought to conceal all other legal analysis available to the Acting Secretary or the Attorney General. The October 17 order thus determined that defendants could not simultaneously refuse to disclose the legal research that led to that conclusion.

As explained in a later order dated January 9, however, the INA itself makes clear that once the Attorney General determined that DACA was illegal, the Acting Secretary had to accept his ruling as "controlling." Section 1103(a)(1) of Title 8, a provision that allocates immigration power and duties among the Secretary of Homeland Security, the Secretary of State, and the Attorney General, provides that "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." Therefore, once the Attorney General advised the Acting Secretary that DACA was illegal, that determination became controlling and any legal analysis provided by others would be irrelevant. Put differently, the Acting Secretary did not "rely" on the advice of counsel and thus waive the privilege (as to all other legal advice available to her). Instead, she became bound by the "controlling" Attorney General determination.

**\*6** On the other hand, the government has maintained that the basis of the rescission was not the legal determination that DACA was illegal but rather was a judgment call based on balancing litigation risk. Viewed in that light, the original waiver analysis would seem to remain valid, such that all legal advice on DACA's legality made available to the Acting Secretary and/or the Attorney General would be includable in the administrative record.

In light of this more nuanced analysis, this order finds it prudent to wait and decide the scope of defendants' waiver of attorney-client privilege until Section 1103(a)(1)'s import is considered by our court of appeals in connection with the currently pending interlocutory appeal of the January 9 order. For the time being, no waiver of the attorney-client privilege will be enforced (although any materials withheld on this ground must be logged). [5]

### B. Privilege Assertions.

While defendants did not file a privilege log with their original production, they later, pursuant to order, filed a privilege log claiming attorney-client, deliberative process, and other privileges over 84 documents considered by the Acting Secretary (Dkt. Nos. 67, 71-2). The October 17 order overruled the privilege assertions as to 35 of the withheld documents (although so far none have been produced). The October 17 order further required that defendants maintain a privilege log for all future documents withheld on grounds of privilege. In their supplemental submission, defendants repeat their objection to providing a privilege log.

To reiterate, our court of appeals has not spoken on this issue. Every court in this district to consider the issue, however, has required administrative agencies to provide a privilege log in withholding documents that otherwise belong in the administrative record. *See, e.g., Ctr. for Food Safety v. Vilsack*, No. 15-cv-01590, 2017 WL 1709318, at *5 (N.D. Cal. May 3, 2017) (Magistrate Judge Kandis Westmore); *Inst. for Fisheries Res. v. Burwell*, No. 16-cv-01574, 2017 WL 89003, at *1 (N.D. Cal. Jan. 10, 2017) (Judge Vince Chhabria); *Lockyer*, 2006 WL 708914, at *4. As a practical matter, if agencies were permitted to withhold materials from the administrative record on the basis of privilege, but were not required to submit a privilege log, their withholding based on privilege would never surface and would wholly evade review. This would invite all manner of mischief. Accordingly, this order holds once again that a privilege log is required. The privilege log shall comply with the supplemental order setting the initial case management conference in this case, and shall include all authors and recipients of privileged documents, as well as the other information set forth in that order (*see* Dkt. No. 23 ¶ 18).

With respect to documents previously identified on defendants' earlier privilege log, the Court has already ruled on each document following an *in camera* review. If, however, defendants wish to relitigate those rulings via a more thorough review than before (despite defendants' earlier request only for an *in camera* review), then the following procedures will apply. Within **TWENTY-EIGHT CALENDAR DAYS** of the finality of any appellate order sustaining reviewability of the rescission of DACA (as defined above), defendants may file a brief (on the public docket) presenting argument as to why the subject documents should remain withheld as privileged. Also at that time, defendants shall submit under seal declarations invoking and justifying the relevant privilege. These filings shall also be provided to plaintiffs, but may be redacted to the extent

(but only to the extent) necessary to maintain the privilege asserted. Within **FOURTEEN CALENDAR DAYS** of defendants' submission, plaintiffs may file a response. The Court will then review the materials and allow argument by defendants' counsel at an *ex parte* hearing. Plaintiffs' counsel shall standby outside the courtroom. Without revealing specifics of the withheld materials, the Court may invite plaintiffs' counsel to make one or more cameo appearances to argue as appropriate. The foregoing deadlines pertain only to the 35 documents previously ordered to be added to the administrative record (should the government want to relitigate that ruling). Should plaintiffs wish to relitigate the privilege issue as to the documents for which the privilege was previously sustained, the same procedures shall apply.

 **\*7** With respect to the larger administrative record yet to be provided, if defendants redact or withhold any material based on deliberative process or any other privilege, they shall simultaneously lodge for the Court's review full copies of all such materials, indicating by highlighting (or otherwise) the redactions and withholdings together with a privilege log for each. The parties shall follow the same procedures outlined above, and within **TWENTY-EIGHT CALENDAR DAYS** from the date on which the privilege log and withheld documents are submitted, defendants shall submit their brief and supporting declarations. Within **FOURTEEN CALENDAR DAYS** of defendants' submission, plaintiffs may file a response. The Court will again allow *ex parte* argument by defendants' counsel if requested and may invite argument from plaintiffs' counsel to the extent appropriate.

All privilege issues are hereby **REFERRED** to **MAGISTRATE JUDGE SALLIE KIM** to be heard and determined in accordance with the above procedures.

## CONCLUSION

Defendants shall file an amended administrative record in conformity with this order within **FORTY-TWO CALENDAR DAYS** of any final appellate ruling that the agency action terminating DACA is reviewable. Discovery remains stayed.

## CERTIFICATION UNDER 28 U.S.C. § 1292(b)

The district court hereby certifies for interlocutory appeal the issues of whether: (1) inclusion of the above-referenced materials in the complete administrative record is necessary and appropriate; and (2) defendants should be required to provide a privilege log with respect to documents withheld from the administrative record on the basis of deliberate process or other privileges. This order finds that these are controlling questions of law as to which there is substantial ground for difference of opinion and that their resolution by the court of appeals will materially advance the litigation.

If a petition is submitted for interlocutory review and is granted, then this order shall be deemed stayed and defendants need not complete the administrative record until a final appellate order requiring them to do so.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1210551

## Footnotes

1   All docket numbers herein refer to the docket in Case No. 17-cv-05211-WHA.
2   While the October 17 order only required defendants to include materials directly or indirectly considered by Secretary Kelly leading to his *February* 2017 decision, upon further reflection, defendants should also be required to include materials directly or indirectly considered by Secretary Kelly leading to his *June* 2017 decision.
3   Although the October 17 order overruled defendants' privilege assertions with respect to some of the written inputs received by the Acting Secretary from her subordinates, these materials have *not* yet been included in the administrative record.
4   The narrower administrative record set forth in this order more closely aligns with that required by Judge Nicholas Garaufis in the parallel DACA actions pending in the United States District Court for the Eastern District of New York. *See Batalla Vidal v. Duke*, No. 16-cv-4756, 2017 WL 4737280, at \*5 (E.D.N.Y. Oct. 19, 2017).
5   Notably, the parties did not raise or address the impact of Section 1103(a)(1) in any of their briefing. Accordingly, it was not considered in connection with the October 17 order.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-00068   Document 440-1   Filed on 10/28/19 in TXSD   Page 11 of 48

Regents of the University of California v. United States..., Not Reported in Fed....

2018 WL 1210551

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

Gulf Coast Rod Reel and Gun Club, Inc. v. U.S. Army..., Not Reported in...

2015 WL 1883522

2015 WL 1883522
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Galveston Division.

GULF COAST ROD REEL AND
GUN CLUB, INC., et al, Plaintiffs,
v.
UNITED STATES ARMY CORPS
OF ENGINEERS, Defendant.

Civil Action No. 3:13–CV–126.
|
Signed April 20, 2015.

**Attorneys and Law Firms**

David Alfred Kahne, Attorney at Law, James B. Blackburn, Jr., Blackburn Carter PC, Houston, TX, for Plaintiffs.

Carol L. Draper, Matthew A. Josephson, T. Monique Peoples, U.S. Department of Justice, Washington, DC, Charmaine Michele Aarons Holder, Office of the U.S. Attorney, Houston, TX, for Defendant.

*MEMORANDUM AND ORDER*

GREGG COSTA, District Judge.

 **\*1** Two community groups challenge the State's plan to close Rollover Pass—a manmade channel and "nationally-recognized fishing destination" that cuts across the Bolivar Peninsula. Rollover Pass was originally created in 1955 to improve the ecological health and salinity levels of the eastern part of Galveston Bay by connecting it directly to the Gulf of Mexico. Now, over fifty years after its creation, the State seeks to close the pass "to reduce coastal erosion by eliminating the sediment transport into Rollover Pass" and to "return Rollover Bay and East Bay to their historical salinity regimes" because of concerns that increased salinity is harming the Bay's estuarine system. In August 2012, the U.S. Army Corps of Engineers approved the Texas General Land Office's (GLO) request for a Clean Water Act permit to close Rollover Pass. Plaintiffs then filed suit, alleging that the Corps' decision to issue a finding of no significant impact for the closure was arbitrary and capricious. Plaintiffs further allege that the Corps violated the National Environmental

Policy Act (NEPA) and the Clean Water Act by failing to fully disclose the ecological and socioeconomic impacts that would result from closure of Rollover Pass

At this stage, Plaintiffs seek to supplement the administrative record and introduce extra-record evidence "in order to aid the court in reviewing the rationality of the Corps' decision." Docket Entry No. 51 at 9.

**I. LEGAL STANDARD**

In reviewing an agency's action, the Administrative Procedure Act requires a court to review "the whole record or those parts of it cited by a party." *5 U.S.C. § 706.* Courts must generally limit their review to the administrative record before the agency at the time the decision was made. *Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).* This principle is often referred to as the "record rule." *Indep. Turtle Farmers of La., Inc. v. United States, 703 F.Supp.2d 604, 610 (W.D.La.2010).* "[A]bsent clear evidence to the contrary, an agency is entitled to a presumption that it properly designated the administrative record." *Calloway v. Harvey, 590 F.Supp.2d 29, 37 (D.D.C.2008).*

However, in certain circumstances a court may permit supplementation of the record or the introduction of extra-record evidence to enable effective judicial review. The distinction between "supplementation" and "extra-record evidence" is a significant one that is sometimes overlooked in the case law. [1] Supplementation is "essentially a claim that some information that should have properly been included in the administrative record was not." *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior, 667 F.Supp.2d 111, 113–14 (D.D.C.2009).* In other words, supplementation seeks to correct a clerical error: the record submitted to the reviewing court failed to include something that was considered at the agency stage. On the other hand, extra-record evidence is, as its name indicates, "extra" or additional evidence "outside of or in addition to the administrative record that was not necessarily considered before the agency." *Calloway, 590 F.Supp.2d at 38* (internal citations omitted). Supplementation does not pose a difficult legal issue. It is consistent with the "record rule" to remedy an inadvertent failure to include part of the agency record in the record submitted with the reviewing court. See *Cape Hatteras Access Pres. Alliance, 667 F.Supp.2d at 114* ("There should be nothing controversial about this proposition. If for some reason, materials that were actually a part of the agency's

Case 1:18-cv-00068 Document 440-1 Filed on 10/28/19 in TXSD Page 14 of 48

Gulf Coast Rod, Reel and Gun Club, Inc. v. U.S. Army..., Not Reported in...

2015 WL 1883522

record were not properly included, whether by design or accident, they should be included in the record for the Court's review.”). A request for a reviewing court to consider extra-record evidence not considered by the agency is, however, at odds with “record rule” and thus presents a more challenging legal question.

**\*2** The parties dispute the number and scope of the recognized exceptions to the record rule that permit consideration of evidence not included in the administrative record the agency submits to the court. Plaintiffs assert that there are the following eight exceptions:

1. when agency action is not adequately explained in the record before the court;

2. when the agency failed to consider factors which are relevant to its final decision;

3. when an agency considered evidence which it failed to include in the record; [ 2 ]

4. when a case is so complex that a court needs more evidence to enable it to understand the issues clearly;

5. in cases where evidence arising after the agency action shows whether the decision was correct or not;

6. in cases where agencies are sued for a failure to take action;

7. in cases arising under NEPA; and

8. in cases where relief is at issue, especially at the preliminary injunction stage.

*Davis Mountains Trans–Pecos Heritage Ass'n v. U.S. Air Force, 249 F.Supp.2d 763, 776* (N.D.Tex.2003), vacated on other grounds sub nom. *Davis Mountains Trans–Pecos Heritage Ass'n v. Fed. Aviation Admin., 116 Fed. App'x 3, 16* (5th Cir.2004) (reversing on other grounds but confirming that “the district court correctly stated the law regarding extra-record evidence in NEPA cases”); *La Union del Pueblo Entero v. Fed. Emergency Mgmt. Agency, 2011 WL 1230099, at \*9* (S.D.Tex. March 30, 2011) (listing same eight exceptions). This list of exceptions stems from a law review article that summarized exceptions various courts have recognized, [3] and has been recognized by the D.C.

Circuit and other courts, *see, e.g., Esch v. Yeutter, 876 F.2d 976, 991 & n. 166* (D.C.Cir.1989) (citing cases that recognized the various exceptions). *But see Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380* (Fed.Cir.2009) (concluding that *“Esch's* vitality even within the D.C. Circuit is questionable in light of more recent opinions by that court which demonstrate a more restrictive approach to extra-record evidence”).

In particular, Plaintiffs highlight the importance of the so-called “NEPA exception”-that “[d]eviation from [the] ‘record rule’ occurs with more frequency in the review of [NEPA] decisions” than in the review of other agency decisions.” *Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14* (2d Cir.1997); *see also* Susannah T. French, Comment, *Judicial Review of the Administrative Record in NEPA Litigation, 81 CALIF. L.REV. 929, 951 & n. 156 (1993)* (collecting Fifth Circuit cases that refer to district courts' acceptance of extra-record evidence in NEPA cases “as a matter of course”). The rationale for this exception is that because NEPA calls for a comparative inquiry, *see, e.g., 42 U.S.C. § 4332,* deciding whether an agency has sufficiently considered environmental impacts requires some sense of the universe of information that was available for the agency to consider. *See Sierra Club v. Peterson, 185 F.3d 349* (5th Cir.1999) (explaining the rationale behind the NEPA exception and extending it to disputes involving the National Forest Management Act); *Davis Mountains, 116 F. App'x at 12* (“This court has recognized an exception to the general rule, however, where examination of extra-record materials is necessary to determine whether an agency has adequately considered environmental impacts under NEPA.”). *But see* II RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 11.6 (5th ed.2010) (casting doubt on rationale for NEPA exception and citing circuit split over its existence).

**\*3** The Corps, however, argues that a recent Fifth Circuit case recognized only three “ ‘unusual circumstances justifying a departure’ from the general presumption that review is limited to the record compiled by the agency”:

(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision,

(2) the district court needed to supplement the record with “background information” in order to determine whether the agency considered all of the relevant factors, or

(3) the agency failed to explain administrative action so as to frustrate judicial review.

Gulf Coast Rod, Reel and Gun Club, Inc. v. U.S. Army..., Not Reported in...

2015 WL 1883522

Case 1:18-cv-00068 Document 440-1 Filed on 10/28/19 in TXSD Page 15 of 48

*Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd., 602 F.3d 687, 706 (5th Cir.2010).* Note that the second *Medina* situation reflects the rationale for the "NEPA exception"-"determin[ing] whether the agency considered all of the relevant factors." *Id.*

Plaintiffs attempt to distinguish *Medina* as a mere supplementation case that does not change the longer list of exceptions for extra-record evidence. It is true that *Medina* involved what the petitioner called a "motion to supplement," so the court referred to it as an issue of "supplementation." *602 F.3d at 705–06.* But this is an example of the mixing of terminology noted above that has infected the case law in this area. The actual materials that the *Medina* petitioner sought to "supplement" the record with were clearly not part of the agency record. The documents were "scientific and commercial data" that the agency *"failed to consider." Id. at 705* (emphasis added). And at least the second and third exceptions to the record rule that *Medina* announced cover extra-record material, not intentionally or negligently omitted materials. Therefore, regardless of the labels used, *Medina* dealt with what is traditionally considered a request to add "extra-record" evidence, not an attempt to supplement with evidence that the agency considered but failed to include in the judicial record.

The Court also, however, does not agree with the Corps' reading of *Medina* as a sea change in this circuit's law on extra-record evidence. *Medina* did not explicitly purport to overrule prior decisions concerning exceptions, including the NEPA exception the circuit has repeatedly recognized. *See Peterson, 185 F.3d at 370* (citing Fifth Circuit cases recognizing that a district court may review evidence outside the administrative record to determine whether "an agency adequately considered the environmental impact under NEPA of a particular project"). More fundamentally, it does not seem that there will often be a significant practical distinction between the eight exceptions listed in *Davis Mountains* and the three listed in *Medina.*

Most, and perhaps all, of the eight *Davis Mountains* exceptions fit within the three broader categories in *Medina. See* Docket Entry No. 61 at 11 (Plaintiffs' Reply Brief) ("It is not at all clear that, upon examination, the *Medina* test would exclude use of any of the eight factors from *Davis Mountains,* or *vice versa.*"). For example, *Davis Mountains* exceptions # 2, # 4, # 5, and # 7 arguably fall within *Medina* exception # 2. And *Medina* was not a NEPA case, so it makes sense that there was no mention of a specific NEPA exception.

*4 The Court therefore concludes that the difference between the *Medina* and *Davis Mountains* lists does not have much practical significance for the materials Plaintiffs are seeking to add in this case. The more important consideration is the purpose for which the petitioner seeks to use the additional materials. Extra-record evidence may be permissible for certain types of challenges to agency action, but not others. And there is often not an all-or-nothing answer to the question. Even when it may be considered, its use by the reviewing court should be limited to the purpose which justified a departure from the record rule. As discussed above for the NEPA exception, the Fifth Circuit allows a court to consider additional documents to get a sense of the universe of potential information in deciding whether the agency conducted a sufficiently thorough assessment. For traditional arbitrary-and-capricious review, however, any use of extra records should be quite limited, such as to help the court gain a better understanding of the often technical subject matter at issue. *See Davis Mountains, 249 F.Supp.2d at 776* (recognizing exception "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly"). Once that background understanding is achieved, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camps v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); see also 5 U.S.C. § 706* (stating that the "court shall review the whole record or those parts of it cited by a party"). Thus, even when considered by a court, the additional material is "extra" and does not alter the record against which the agency's decision is reviewed.

## II. ANALYSIS

With this understanding, or attempt at understanding, the law in this area, the Court addresses the Plaintiffs' request to have the court consider three categories of evidence that are not included in the administrative record submitted by the Corps: (1) a scientific article about sand transport by Bales and Holley that they contend the Corps *actually relied upon* but erroneously left out of the record; (2) three studies by the Bureau of Economic Geology that were available *prior to* the Corps' decision but that the Corps did not rely upon; and (3) three expert reports about salinity and sedimentation created *after* the Corps' decision. *See* Docket Entry No. 51. At the request of both parties, the Court agreed to consider the motion to supplement prior to the merits briefing. This offered the potential benefit of establishing the scope of the record prior to merits briefing so that briefing would not

Case 1:18-cv-00068 Document 440-1 Filed on 10/28/19 in TXSD Page 16 of 48
Gulf Coast Rod Reel and Gun Club, Inc. v. U.S. Army..., Not Reported in...
2015 WL 1883522

have to be framed in contingencies. What sounded good in theory proved unworkable in practice. Having considered the free-standing motion to supplement, the Court concludes it is unable to conclusively rule on all of the requested additions to the record without the better understanding of how Plaintiffs would use that evidence that will come from the merits briefing. *See, e.g., Medina, 602 F.3d at 707* (denying petition for review of the agency's decision and motion to supplement simultaneously); *Mireles–Zapata v. Ridge, 76 F. App'x 546, 547* (5th Cir.2003) (per curiam) (granting motion to supplement in part but denying petition for review of INS decision); *Fliteline Maint. v. Hinson, 82 F.3d 415* (5th Cir.1996) (denying petition for review of FAA finding and motions to supplement simultaneously).

### a. Bales and Holley Article

**\*5** Of the three types of documents Plaintiffs seek to add, the Bales and Holley article is the only one that fits into the less controversial supplementation category. Their 1989 article "Sand Transport in Texas Tidal Inlet" was at least indirectly relied upon to support the GLO's primary stated purpose of "reduc[ing] coastal erosion by eliminating the sediment transport into Rollover Pass."

A report prepared by Taylor Engineering for the GLO is one of the most critical parts of the administrative record. The Taylor report heavily relies on the earlier Bales and Holley article for its sediment transport rates and analysis of Rollover Pass' impact on dredging. AR at COE000497–98 (four of seven studies relied upon and two figures came from the Bales and Holley article, as does the Corps' range of 80,000 to 290,000 cubic yards of additional sediment per year). The Corps' assessment thus either actually or constructively relied on the Bales and Holley data to support its conclusion that the closure of Rollover Pass will alleviate adverse sediment transport impacts. Even if the Corps did not examine the Bales and Holley article as a separate document, the Taylor report's reliance on its analysis warrants treating it as part of the record. "The complete administrative record consists of all documents and materials directly or *indirectly* considered by the agency." *Bar MK Ranches v. Yuetter, 994 F.3d 735, 739* (10th Cir.1993) (emphasis added); *Fund for Animals v. Williams, 391 F.Supp.2d 191, 196* (D.D.C.2005) (same).

### b. Bureau of Economic Geology Studies

Unlike the Bales and Holley article, Plaintiffs do not assert that the Corps actually relied–either directly or indirectly– on the Bureau of Economic Geology studies. The Bureau

functions as the State Geological Survey of Texas and " 'partners with federal, state, and local agencies,' among other institutions and organizations, to 'conduct high-quality research and disseminate the results to the scientific and engineering communities' and the public." Docket Entry No. 51 at 33. Plaintiffs seek to supplement the record with three publicly available Bureau studies on erosion that "represent 'background information' available to the Corps at the time of its decision that help determine whether the agency considered all of the relevant factors." *Id.* These studies, according to Plaintiffs, "tend to demonstrate that shoreline erosion is occurring along large sections of the shoreline, independent of the existence of Rollover Pass." *Id.* at 34.

These are the studies for which it will be most useful to gain a better understanding of Plaintiffs' substantive challenge to the Corps' decision and how these documents fit into that effort. Specifically, it will be helpful to see what the Corps considered regarding erosion before deciding whether the Court needs these three studies under *Medina'* s category of "background information." If the use is limited to the NEPA claim and just an attempt to show other available information that the Corps arguably neglected, the Court is more likely to consider the Bureau studies. The Court will thus wait to decide whether to consider these extra-record studies, and for what purpose, until it has the full merits briefing.

### c. Dunbar and Trungale Expert Reports

**\*6** Finally, Plaintiffs seek to introduce extra-record reports of Lawrence Dunbar and Trungale Engineering and Science on the issues of salinity and dredging to "illuminate and prove the consequences of flawed modeling" relied upon by the Corps. Docket Entry No. 51 at 16. As with the Bureau studies, the Court will wait to determine whether these reports will be considered when it has the benefit of the full briefing on the permitting decision.

The Court notes, however, its reluctance to consider these litigation-related expert reports created after the agency's decision. Courts have long refused to consider reports created at the litigation stage when reviewing agency action. *See Citizens to Preserve Overton Park, Inc., 401 U.S. at 419* (holding that "litigation affidavits" used by agency to defend its action in court were "merely 'post hoc' rationalizations, which have traditionally been found to be an inadequate basis for review" (citing *Burlington Truck Lines v. United States, 371 U.S. 156, 168*–69 (1962)); *Tri–Valley CARES v. U.S. Dep't of Energy, 671 F.3d 1113, 1130*–31 (9th Cir.2012) ("[P]ost-decision information 'may not be advanced as a new

Gulf Coast Rod, Reef and Gun Club, Inc. v. U.S. Army..., Not Reported in...

Case 1:18-cv-00068 Document 440-1 Filed on 10/28/19 in TXSD Page 17 of 48

2015 WL 1883522

rationalization either for sustaining or attacking an agency's decision' because 'it inevitably leads the reviewing court to substitute its judgment for that of the agency.' " (citation omitted)). Because these reports did not exist at the time the Corps issued the permit, for example, they could not have been information the Corps neglected to consider that would implicate the NEPA exception.

Plaintiffs' argument that they could not submit their expert reports during the comment period because "the specifics of the Corps' failures could not be known before careful review" of the administrative record, Docket Entry No. 61 at 19, would render the record rule meaningless. As the D.C. Circuit stated in a recent extra-record evidence case, "the dialogue between administrative agencies and the public is a two-way street[,] and [j]ust as the opportunity to comment is meaningless unless the agency responds to significant points raised by the public, so too is the agency's opportunity to *respond to* those comments meaningless unless the interested party clearly states its position." *CTS Corp. v. EPA, 759 F.3d 52, 65* (D.C.Cir.2014) (alterations and emphasis in original) (quoting *Northside Sanitary Landfill, Inc. v. Thomas, 849 F.2d 1516, 1520* (D.C.Cir.1988)) (internal quotation marks omitted)).

Therefore the only potential use the Court is likely to consider would be as extra-record background evidence to provide a basic understanding of the sediment and salinity models, *see Davis Mountains, 116 F. App'x at 12* ("In the present case we find it necessary to look at the Dwinnell text to determine whether the Air Force's use of the equation therein was sound. Because we lack technical expertise in aerodynamics, we also consider extra-record materials to aid our understanding of the science involved."); *Indep. Turtle Farmers of La., 703 F.Supp.2d at 613* n. 9 (allowing post-decision articles as extra-record evidence "to elucidate the ITFL's arguments and enlighten the Court as to the scientific foundation of those arguments"), *not* as evidence that the Court believes the agency should have relied on at the time of its decision or that could show that the agency's decision was arbitrary.

### III. CONCLUSION

**\*7** Accordingly, the Motion to Supplement the Administrative Record and Introduce Extra–Record Evidence (Docket Entry No. 51) is GRANTED IN PART as to the Bales and Holley article. The Court will take the remainder of the motion under advisement when it considers the parties' briefing on the merits of the permitting decision.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1883522

Footnotes

1    Courts also use different terminology-such as extra-record evidence, supplementing the record, completing the record, or going beyond the record. *See, e.g., Coliseum Square Ass'n, Inc. v. Jackson, 465 F.3d 215, 247* (5th Cir.2006) (plaintiffs' argument that record "does not contain certain documents that should be part of the record" analyzed as "extra-record evidence"); *Grunewald v. Jarvis, 924 F.Supp.2d 355, 358* (D.D.C.2013) ("There is a difference between 'supplementing the Record' and 'going beyond the Record.' The former seeks to add documents that were before the agency but not included in the Administrative Record, while the latter seeks to add documents not before the agency but that should nonetheless be in the Administrative Record." (internal citation omitted)); *see also* James N. Saul, Comment, *Overly Restrictive Administrative Records and the Frustration of Judicial Review,* 38 ENVTL. L. 1301, 1322 n. 162 (2008) ("What I call 'completing' the record the court calls 'supplementing' the record, and what I call 'supplementing' the court calls 'reviewing extra-record evidence.' ").

2    This is the "supplementation" previously mentioned. Inclusion of "supplementation" as an exception to the "record rule" is an example of the confusion previously noted in which courts have sometimes muddled these separate concepts.

3    Steven Stark & Sarah Wald, *Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Action,* 36 ADMIN. L.REV. 333, 345 (1984).

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 3

City of Dallas, Tex. v. Hall, Not Reported in F.Supp.2d (2007)
2007 WL 3257188
Case 1:18-cv-00068  Document 440-1  Filed on 10/28/19 in TXSD   Page 19 of 48

KeyCite Yellow Flag - Negative Treatment
Distinguished by Ali v. Pompeo, E.D.N.Y., May 2, 2018

2007 WL 3257188
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

CITY OF DALLAS, TEXAS, Plaintiff,
v.
H. Dale HALL et al., Defendants.
The Texas Water Development Board, Plaintiff,
v.
The United States Department
of the Interior et al., Defendants.

Civil Action Nos. 3:07-CV-0060-P, 3:07-CV-0213-P.
|
Oct. 29, 2007.

**Attorneys and Law Firms**

S. Cass Weiland, Constance Rose Ariagno, Robert A.
Hawkins, Patton Boggs, Christopher David Bowers, Thomas
P. Perkins, Jr., Dallas City Attorney's Office, Dallas, TX, Amy
B. Chasanov, John C. Martin, Patton Boggs, Washington, DC,
Thomas H. Edwards, Brian E. Berwick, Office of the Texas
Attorney General, Austin, TX, for Plaintiff.

Brian McLachlan, Guillermo Montero, Matthew J.
McKeown, US Department of Justice-Natural Resources,
Washington, DC, Justin Tade, US Department of the Interior
Southwest Regional Solicitor's Office, Albuquerque, NM,
Katherine Savers McGovern, US Attorney's Office, Thomas
W. Craddock, Steven Herb Thomas, McGuire Craddock &
Strother, Dallas, TX, for Defendants.

***MEMORANDUM OPINION AND ORDER***

JORGE A. SOLIS, United States District Judge.

**\*1** Now before the Court are (1) the City of Dallas's Motion
to Supplement the Administrative Record and for Discovery,
filed April 9, 2007; (2) the Texas Water Development
Board's Motion to Supplement Administrative Record, filed
April 10, 2007; (3) the Texas Water Development Board's
Motion for Discovery, filed April 10, 2007; (4) the Texas
Water Development Board's Second Motion to Supplement

Administrative Record, and for Enlargement of Time to File,
filed May 30, 2007; (5) the Texas Water Development Board's
Motion for Leave to File Supplemental Complaint, filed June
20, 2007; (6) the City of Dallas's Request to Add Recently-
Received FOIA Documents to the Documents Supplementing
the Administrative Record, filed July 19, 2007; and (7) the
Texas Water Development Board's Supplemental Brief in
Support of Motion to Supplement Administrative Record, and
Motion for Enlargement of Time to File, filed August 3, 2007.

After careful consideration of the Parties' briefing and
the applicable law, the Court hereby (1) GRANTS in
PART the City of Dallas's Motion to Supplement the
Administrative Record and for Discovery; (2) GRANTS
in PART the Texas Water Development Board's Motion
to Supplement Administrative Record; (3) DENIES the
Texas Water Development Board's Motion for Discovery; (4)
GRANTS the Texas Water Development Board's Motion for
Enlargement of Time to File and DENIES its Second Motion
to Supplement Administrative Record; (5) GRANTS the
Texas Water Development Board's Motion for Leave to File
Supplemental Complaint; (6) GRANTS in part the City of
Dallas' Request to Add Recently-Received FOIA Documents
to the Documents Supplementing the Administrative Record;
and (7) DENIES the Texas Water Development Board's
Supplemental Brief in Support of Motion to Supplement
Administrative Record, and Motion for Enlargement of Time
to File, filed August 3, 2007.

**I.**

On March 20, 2007, the Court entered an agreed order
instructing the Federal Defendants to file the Administrative
Record ("Record") in this case by March 26, 2007. The Court
gave Plaintiffs fourteen (14) days after the Record was filed
to file any motions regarding the sufficiency of the Record,
supplementation of the Record, or requests for traditional
discovery. (Court Order of Mar. 20, 2007.)

The Federal Defendants filed the Record and subsequently,
the City of Dallas (the "City") and the Texas Water
Development Board (the "State") filed motions requesting
that the Court allow supplementation of the Record and
traditional discovery. [1] Additionally, the Federal Defendants
filed a notice with the Court on April 6, 2007 seeking to
withdraw certain documents from the Record. On July 6,
2007, the Federal Defendants filed another notice/motion
with the Court seeking to add certain documents to the

Record. On May 30, 2007, the State filed a supplemental motion to add certain documents to the Record. On June 20, 2007, the State filed a motion for leave to amend its Complaint. On July 19, 2007, the City filed a motion seeking to add recently-received FOIA documents to its original motion to supplement the Record. These motions are now before the Court for determination.

## II.

**\*2** A brief overview of the statutes and case law creating the administrative framework and rules of judicial review helps to understand this case. After discussion of these legal principles, the Court will turn to its analysis and discussion of the pending motions. For a detailed discussion of the facts of this case, *see* this Court's order on the Federal Defendants' motions to dismiss.

### A. National Environmental Policy Act.

1. *Introduction.*

The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4361 (1982), requires all federal agencies to analyze the environmental impacts of their projects. *See Spiller v. White,* 352 F.3d 235, 237 (5th Cir.2004). To comply with NEPA, an agency must prepare certain documents that reflect its consideration of these environmental factors. *See* 42 U.S.C. § 4332(C). NEPA cases generally involve charges that an agency's preparation of the NEPA documents has been inadequate. *See* Susannah T. French, *Judicial Review of the Administrative Record in NEPA Litigation,* 81 Cal. L.Rev. 929, 929 (July 1993).

2. *NEPA Requirements.*

NEPA was established to promote the noble national policy of encouraging "productive and enjoyable harmony between man and his environment." *See Coliseum Square Assoc., Inc. v. Jackson,* 465 F.3d at 215, 223 (5th Cir.2006.) The act was intended to reduce or eliminate environmental damage and to promote the understanding of the ecological systems and natural resources important to the United States. *See id.; O'Reilly v. U.S. Army Corps of Eng'rs,* 477 F.3d 225, 228 (5th Cir.2007).

"NEPA operates to prevent a federal agency from taking any major action before that agency has considered the environmental effects of that action." *Citizen Advocates for*

*Responsible Expansion, Inc. (I-CARE) v. Dole,* 770 F.2d 423, 431 (5th Cir.1985) (citing H.R. Conf. Rep. No. 765, 91st Cong. 1st Sess. (1969), *reprinted in* 1969 U.S.Code Cong. & Ad. News 2751, 2756, 2757 & 2771) (emphasis in original). The preeminent purposes of the process are to cause federal agencies to take a "hard look" at the environmental consequences of a proposed project, consider viable alternatives to the method chosen to achieve the aims of the project, and endeavor to minimize adverse environmental consequences of the proposal. *See id.* at 431-32. NEPA is also designed to perform an educational function. *See* French, *supra,* at 929. NEPA's basic premise is that a better knowledge base will cause agencies to make less environmentally-damaging decisions. *See id.* "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

Despite these substantive goals, NEPA itself does not mandate particular results in order to accompli\* these ends. *See Coliseum Square,* 465 F.2d at 224; *O'Reilly,* 477 F.3d at 228. Rather, NEPA imposes procedural requirements on federal agencies, requiring them to analyze the environmental impact of their proposals and actions. *See Coliseum Square,* 465 F.2d at 224. Thus, "at base, NEPA is a procedural statute intended to prevent uninformed agency action. It does not require substantive, environmentally friendly results, merely that adverse environmental effects of a proposed action are identified and evaluated. An agency action resulting in harmful environmental effects will not be overturned where the agency has considered the environmental impact of that action and then determined that other benefits outweigh them." *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs,* 479 F.Supp.2d 607, 625 (S.D.W.Va.2007) (citing *Robertson,* 490 U.S. 350-51). "NEPA merely prohibits uninformed-rather than unwise-agency action." *Robertson,* 490 U.S. at 351.

**\*3** To this end, NEPA requires that federal agencies prepare a detailed Environmental Impact Statement("EIS")for "everyrecommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must describe the environmental impact of the proposed action, any adverse environmental effects that cannot be avoided should the proposal be implemented,

alternatives to the proposed action, and any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented. *See* 42 U.S.C. § 4332(2)(C).

If an agency is uncertain whether the impacts of a project are significant, an agency may prepare a more limited document, called an Environmental Assessment ("EA"). *See Coliseum Square,* 465 F.3d at 223 (allowing EA if the proposed action is categorically excluded from the requirement to produce an EIS or does not clearly require the production of an EIS). An EA, as opposed to an EIS, should be a "concise public document ... that serves to ... [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS]." 40 C.F.R. § 1508.9(a). An EA should consider both quasi-political factors (including the unique characteristics of the area and the controversy surrounding the decision) and scientific questions (such as the uncertainty of the environmental effects and the cumulative impact of the project). *See* 40 C.F.R. § 1508.27.

If, after completing the EA, the agency determines that the impacts of the project are not significant, the agency may issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action "will not have a significant impact on the human environment." 40 C.F.R. § 1508.13; *see id.* § 1508.27.

3. *Judicial Review in NEPA Cases.*

Legal challenges to agency decisions under NEPA, such as this one, often involve claims that an agency should have prepared an EIS. *See* French, *supra*, at 947. These claims in turn often lead to quasi-factual disagreements over whether the agency has properly analyzed the relevant impacts on the environment. *See id* . This query requires resolution of whether the environmental impact of a particular action requires further NEPA analysis, which almost always involves complicated scientific determinations, conflicting evidence, and incomplete data. *See id.* at 947-48.

Courts are not authorized to vacate an agency decision under NEPA because it is unwise or will have a negative effect on the environment. *See Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227-28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). Instead, a court's scrutiny is limited to determining whether an agency has followed NEPA procedures, *i.e.,* whether an agency has properly prepared, or reasonably failed to prepare, an EIS.

Because NEPA does not contain a provision for determining whether an agency action complies with NEPA's processes, compliance with NEPA is reviewed under the Administrative Procedures Act ("APA"). *See* 5 U.S.C. § 500, *et seq.* (1996).

**B. Judicial Review of Administrative Decisions.**

1. *Record Rule.*

**\*4** Judicial review of administrative decisions under the APA typically has been highly deferential-agencies are deemed to be the key fact-finders, while courts focus on the legality of their actions. *See* French, *supra,* at 930. The Supreme Court has held that while a court may not judge the substantive merits of an agency's decision, it must ensure the agency has taken a "hard look" at the data that is relevant to its final decision. This standard requires a court to make a "thorough, probing, in-depth review" of an agency action. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

According to the text of the APA, a court is to set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706. In order for a court to resolve whether an agency's decision is violative of the APA, the agency must prepare a reviewable administrative record for the court.

The APA states that a court may "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. Although the statute does not explicitly state that a court may not look beyond the record to review an agency action, it is generally accepted that judicial review is ordinarily confined to the administrative record. *See Overton Park,* 401 U.S. at 420. The Supreme Court has ruled that judicial review is to be based on the "full" administrative record that was before the agency at the time of the decision. *See id.; Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743-44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). While, on its face, the APA's simple reference to the "whole record" provides courts with little guidance as to what materials they are to review, a substantial body of case law has helped to develop standards for what constitutes the "whole record."

First and most basically, a complete administrative record should include all materials that "might have influenced the agency's decision," and not merely those upon which the agency relied in its final decision. *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior,* 143, F Supp.2d7, 12

(D.D.C.2001). Thus, the whole record should consist of the full administrative record that was before all decision makers at the time of the decision. *See Bar MK Ranches v. Yeutter,* 994 F.2d 735, 739 (10th Cir.1993). The complete administrative record consists of all documents and materials directly or indirectly considered by the agency and includes evidence contrary to the agency's position. *See id; Exxon Corp. v. Dep't of Energy,* 91 F.R.D. 26, 33 (N.D.Tex.1981) (Higginbotham, J.). Conversely, matters not considered by the agency are generally outside the record, are legally irrelevant, and are therefore not discoverable. *See Exxon,* 91 F.R.D. at 33.

An agency may not unilaterally determine what constitutes the administrative record. *See Bar MK Ranches,* 994 F.2d at 739-40. However, the designation of the administrative record, like any established administrative procedure, is entitled to a presumption of administrative regularity. *See id.* at 740. The court assumes the agency properly designated the administrative record absent clear evidence to the contrary. *See id.*

**\*5** The Supreme Court has long held that expansion of the administrative record is appropriate in certain cases where the record is insufficient, such as when the record submitted fails to explain the basis for the agency's action, thereby frustrating judicial review. *See Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In *Camp v. Pitts,* 411 U.S. 138, 142-43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Supreme Court endorsed off-the-record review of agency actions and held that where an agency's reasons for its actions are not sustainable from the record, the agency's action must be vacated and remanded to the agency. In *Florida Power and Light Co. v. Lorion,* the Court upheld this trend by noting that if the administrative record does not support the agency action, "if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

2. *Judicially-Created Exceptions to the Record Rule.*
Courts have recognized exceptions to the general rule that judicial review of a federal agency's decision is limited to the record already in evidence. For example, courts allow extra-record evidence: (1) when agency action is not adequately explained in the record before the court; (2) when looking to determine whether the agency considered all relevant factors; (3) when a record is incomplete; (4) when a case is so complex

that a court needs more evidence to enable it to understand the issues; (5) when evidence arising after the agency action shows whether the decision was correct or not; (6) in certain NEPA cases; (7) in preliminary injunction cases; and (8) when an agency acts in bad faith. *See, e.g., Davis Mountains Trans-Pecos Heritage Ass'n v. U.S. Air Force,* 249 F.Supp.2d 763, 776 (N.D.Tex.2003) (Cummings, J.); *Amfac,* 143, F.Supp.2d at 11; *see also* Frank B. Cross, NEPA Law and Litigation § 4:36 (2007).

When a court is trying to determine whether an agency action is adequately explained in the record or whether an agency has considered all the relevant factors, the record itself will reveal whether non-record review is merited. *See Amfac,* 143, F.Supp.2d at 12. "Thus, in these circumstances, a party seeking non-record review has everything at its disposal, (*i.e.,* the record) needed to successfully urge the Court to look beyond the record." *Id.*

A different situation is presented when analyzing the completeness of the record and the good faith behind a decision-these can only be grasped by looking beyond the record itself. *See Amfac,* 143, F.Supp.2d at 12; *see also Bar MK Ranches,* 994 F.2d at 740. For example, courts have held that plaintiffs are entitled to an opportunity to determine whether any other documents that are properly part of the administrative record have been withheld. *See Pension Benefit Guar. Corp. v. LTV Steel Corp.,* 119 F.R.D. 339, 341 (S.D.N.Y.1988). Courts have also permitted litigants to supplement the administrative record with additional material that explains the administrative officials' basis for their actions. *See id.* "Thus, in these circumstances, the only way a non-agency party can demonstrate to a court the need for extra-record judicial review is to first obtain discovery from the agency." *Amfac,* 143, F.Supp.2d at 12. In other words, an adequate record can sometimes only be determined "by looking outside the [record] to see what the agency may have ignored." *Davis,* 249 F.Supp.2d at 776 (citing *County of Suffolk v. Sec'y of the Interior,* 562 F.2d 1368, 1384 (2d Cir.1977)). In those cases, the administrative record may be "supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature." *Davis,* 249 F.Supp.2d at 776. " 'The new material, however, should be explanatory of the decisionmakers' action at the time it occurred. No new rationalizations for the agency's decision should be included.' " *Id.* (citation omitted).

**\*6** In NEPA cases in particular, courts routinely look outside the record when reviewing agency compliance. The

cornerstone case for the NEPA exception to the record rule
is *County of Suffolk v. Secretary of the Interior,* which
held that a primary function of the court is to insure that
the information available to the decisionmaker includes an
adequate discussion of environmental effects and alternatives,
which can sometimes be determined only by looking outside
the administrative record to see what the agency may have
ignored. *562 F.2d 1368, 1384 (2d Cir.1977).* In NEPA
cases where the plaintiff alleges that an agency decision
has failed to consider a serious environmental consequence,
failed adequately to discuss some reasonable alternative, or
otherwise "swept stubborn problems or serious criticism ...
under the rug," discovery may be permissible. *Id.* Evidence
will be admitted only if it tends to show either that the
agency's research or analysis was clearly inadequate or that
the agency improperly failed to set forth opposing views
widely shared in the relevant scientific community. *See id.*
at 1385. Moreover, it is the duty of the agency, not the
challengers, to present evidence in the first instance for
incorporation into the reports-the primary and nondelegable
responsibility for providing analysis lies with the agency. *See
id.* The *County of Suffolk* case laid the groundwork for wide
acceptance of the plaintiffs' use of such as evidentiary trials
and hearings, expert witnesses, and expert affidavits and other
evidentiary documents for challenging agency's compliance
with NEPA. *See* French, *supra,* at 950. In fact, commentators
have stated that the Fifth Circuit in particular "seem[s] to
accept extra-record evidence in NEPA cases almost as a
matter of course." *See id.* at 951.

#### 3. *Obtaining Discovery in APA Cases.*
"To obtain discovery from an agency in an APA case, a party
must overcome the standard presumption that the 'agency
properly designated the Administrative Record.' " *Amfac,*
143. F.Supp.2d at 12 (citing *Bar MK Ranches, 994 F.2d at
740).* That is, a party must provide good reason to believe
that discovery will uncover evidence relevant to the court's
decision to look beyond the record. *See id.* "Thus, a party must
make a significant showing-variously described as 'strong',
'substantial', or 'prima facie'-that it will find material in the
agency's possession indicative of bad faith or an incomplete
record." *Amfac,* 143, Fupp.2d at 12 (citations omitted).

#### 4. *Burden of Proof in APA Cases.*
It is well-established that the burden of proving that an agency
decision was arbitrary or capricious generally rests with the
party seeking to overturn the agency decision. *See Davis,*
249 F.Supp.2d at 776 (citing *Sierra Club v. Morton, 510*

*F.2d 813, 818 (5th Cir.1975)* (holding that plaintiffs bear
the burden of showing by a preponderance of the evidence
that defendants have failed to adhere to the requirements
of NEPA)). In determining whether an agency's action was
arbitrary or capricious, the court must consider whether the
decision was based on a consideration of the relevant factors
and whether there has been a clear error of judgment. *See
Davis,* 249 F.Supp.2d at 776-77. An agency must examine
the relevant data and articulate a satisfactory explanation for
its action including a "rational connection between the facts
found and the choice made." *Id.* at 777 (citing *Burlington
Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct.
239, 9 L.Ed.2d 207 (1962)).

**\*7** However, "the Court is not allowed to substitute its
judgment for that of the agency." *Citizens to Preserve Overton
Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28
L.Ed.2d 136 (1971). "It is also well established that a court
may not set aside an agency's action ... because the court might
reach a different result." *Davis,* 249 F.Supp.2d at 777.

### III.

#### A. Federal Defendants' Effort to Remove Documents from the Record.
On April 26, 2007, the Federal Defendants filed a Notice
of Correction to Administrative Record in which they seek
to withdraw two documents (AR 2793-95) from the Record
they submitted because the documents allegedly post-date the
final administrative decision to acquire the easement. The
Federal Defendants maintain that the Record should end on
the date FWS acquired and accepted the deed of conservation
easement.

The State objects to the withdrawal of these documents
because, it argues, the Record is unclear as to when the deed
was finally accepted by FWS. (State Mot. to Supplement
at 22.) Moreover, the State argues that these documents are
probative of that issue. In fact, the State maintains that not
only should these documents be retained, but the Record
should be expanded to include all relevant documents though
the date of final acceptance.

As the Court discusses *infra,* the Record does not adequately
explain FWS's process for accepting the deed. Thus, the
Court hereby SUSTAINS the State's objection to the Notice
of Correction and will retain those two documents as part
of the Record. Furthermore, the Court hereby directs FWS

to supplement the Record to include all materials and documents relating to (1) the DOI Solicitor's instruction that the deed must be accepted by the Secretary of the Interior or his authorized representative; (2) FWS's and the Solicitor's Office's subsequent conclusion that the FWS Regional Director could accept the easement donation and no higher level approval was required; (3) DOI's internal donation guidelines and FWS's decision that it did not need to comply with DOI's internal donation guidelines; (4) the reasons FWS had not incorporated relevant DOI guidelines into FWS policies; (5) the statement to the press that the deed was "sufficient" in December 2006. (City App. Ex. B.)

Once the date of acceptance is ascertained, the Court hereby instructs the Federal Defendants to supplement the record with all relevant documents through that date should that date be subsequent to August 23, 2006 (the date the deed was filed in Anderson County, Texas).

**B. State's Motion to Supplement the Administrative Record.**
On April 10, 2007, the State filed a motion to supplement the administrative record. The motion became ripe on April 27, 2007. On May 30, 2007, the State filed a second motion to supplement the Record. That motion became ripe on July 3, 2007. On August 3, 2007, the State filed yet another motion asking the Court to consider supplemental briefing on its original motion. The State bases that motion on the fact that it "addresses material filed after the deadline for filing the administrative record and thus, could not have been filed before the deadline." (State Mot. to Supp. at 10.)

**\*8** In its original motion to supplement the administrative record, the State argues that the Record is incomplete and moves to supplement it by adding two types of documents: those documents that were considered by FWS and those documents that were not considered by FWS in its decision-making process.

In a case like this, where an agency has presented a certified copy of the complete administrative record, "the court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary." *MK Ranches,* 994 F.2d at 740. Despite this assumption, however, a party is allowed to conduct discovery and/or complete or supplement the record where it demonstrates there is a reasonable basis to believe that materials considered by agency decisionmakers are not in the record. In order to provide such a "reasonable basis," a party must do more than simply allege that the

record is incomplete. *See Defenders of Wildlife v. Dalton,* No. 00-02-00060, 2000 WL 1562928, at *3 (C.I.T.2000). Rather, a party must provide the court with reasonable, non-speculative grounds to believe that materials considered in the decision-making process are not included in the record. *See id.*

1. *Documents in Possession of Federal Defendants.*

a. *Documents Not in Dispute.*
The State requests that the Federal Defendants be required to supplement the Record by providing certain documents believed to be in their possession or control. The Federal Defendants reviewed the State's list of documents and acknowledged that some of those documents were inadvertently omitted from the Record. (Resp. to State Mot. to Supp. at 1.) They have committed to supplement the Record with those documents. Therefore, the Court hereby GRANTS the State's Motion to Supplement with respect to (a) the Texas Bottomland Hardwood Concept Plan (FWS 1985); (b) Service NEPA Guidelines; (c) DOI Donation Guidelines; (d) FWS Donation Guidelines used by FWS at the time the donation was accepted in August 2006; (e) March 2006 Fastrill Reservoir Preliminary Yield and Feasibility Study, Draft; (f) August 17, 2006 letter from Joe Crutcher to Dale Hall; and (f) certain FWS emails offered in State's Supplement to Administrative Record (AR 1009-1048).

The Federal Defendants object to the Court's supplementation of the Record with any other documents. In its reply brief, the State explains that only the following documents remain in controversy: (Reply to State Mot. to Supp. at 2.)

b. *Documents Related to Executive Order.* (State Mot. to Supp. at 9.)
The State seeks to include all documents in the Federal Government's possession "showing the Federal Defendants' efforts to comply with the [Executive Order] ... or that should have been created pursuant to the [Executive Order] in preparing for the Refuge decision." (Reply at 2.) Count VIII of the City's Complaint asserts a NEPA claim for violation of certain executive orders. That claim has been dismissed by Court order. Additionally, the State has alleged that the Record is incomplete, but has failed to provide the Court with reasonable, non-speculative grounds to believe that such materials were considered by the Federal Defendants in preparing for the Refuge decision, but were omitted from the Record. Therefore, any request to supplement the Record with

documents relating to compliance with executive orders is hereby DENIED as MOOT.

c. *Acceptance of Deed.* (State Mot. to Supp. at 10.)
**\*9** The State seeks to add all documents showing final acceptance of the deed of conservation easement by the Secretary of the Interior or his authorized representative.[2] The State notes that the Record indicates that this final acceptance was required to effect acceptance of the easement. (AR 2798,2816, 2592). Yet there are no documents containing such acceptance in the Record.

The Federal Defendants respond by explaining that there was some confusion at FWS regarding how FWS was to formally accept the donation. According to the Federal Defendants' briefing, FWS was initially told that the Secretary of the Interior or his authorized representative must sign the deed for acceptance to be valid. Yet, it was later clarified that FWS's Regional Director could accept the donation and that no higher level of approval was required. "Accordingly, the administrative record concerning the FWS's acquisition is complete." (Defs.' Resp. to State Mot. to Supp. at 14.)

The State argues that the Record "as submitted" does not contain any documents to show that such clarification was made, by whom, or upon what grounds. (State Mot. to Supp. at 10.) However, the Record does contain a memo issued by the Assistant Director of FWS on October 6, 2006 to the Regional Director of FWS explaining that "[t]he direction from the Field Solicitor is clear in that the Regional Director can accept this donation. Therefore, there is no need for higher level approval." (AR 2796.)

The State challenges the usefulness of this memo by explaining first that the memo (dated October 6, 2006) post-dates the date the deed was filed (August 23, 2006). Second, the memo upon which the Federal Defendants rely is the precise document they seek to remove from the Record because it purportedly post-dates the date of acceptance.[3]

The evidence in the Record indicates that it is reasonable to believe that at the time the deed was signed, the Secretary of the Interior was required to effect acceptance thereof. The only evidence that the Field Solicitor changed this rule comes in the form of a self-serving memo drafted after the deed was signed by the Regional Director. For these reasons, the Court concludes that supplementation is appropriate to adequately ascertain the date of final acceptance for purposes

of having a complete Record in this case and for the purpose of ascertaining whether the easement is valid.[4]

The Federal Defendants argue that documents concerning FWS's acceptance of the easement are not required for the Court's adjudication of this action because the Court has dismissed the State's claim to invalidate the conservation easement. (Resp. at 24-25.) The State responds that these documents are relevant to the Refuge decision because the Federal Defendants consider the acceptance of the deed as part of FWS's overall agency decision to establish the Refuge. (Reply at 5-6.) The Court agrees that documents showing how and when FWS accepted the easement are relevant to the determinations of whether the Refuge was established and when a final agency decision was made. In order to ensure a complete Record, the Court will include all documents relating to the Federal Government's acceptance of the easement.

d. *The 2007 State Water Plan-Texas Water Development Board's Second Motion to Supplement Administrative Record and for Enlargement of Time to File.*
**\*10** In its Second Motion to Supplement Administrative Record and for Enlargement of Time to File, filed May 30, 2007, the State moves to supplement the Record with a draft of the 2007 State Water Plan that, the State recently discovered, was sent to the Federal Defendants on or soon after August 15, 2006-which is arguably before the close of the Record. The Court hereby GRANTS the State's motion for enlargement of time to file this motion to supplement the Record and will consider the motion to supplement below.

The Federal Defendants object to the State's attempt to add the 2007 State Water Plan to the Record because (1) it post-dates the agency decision to establish the Refuge and (2) it is irrelevant to the decision to acquire the easement. The Federal Defendants distinguish the two agency decisions at issue here: (1) the final agency approval to establish the Refuge, which occurred on June 11, 2006 and (2) the agency's acquisition of the conservation easement, the exact date of which is in dispute. The Federal Defendants argue that the State has failed to establish that the draft 2007 State Water Plan was provided to or received by FWS decisionmakers prior to the June 11, 2006 approval of establishment of the Refuge, which is the only decision to which it would be relevant.

There is no doubt that the draft 2007 State Water Plan was sent to FWS after the June 11, 2006 decision was made.

Because agency actions must be reviewed based on the record considered by the decision maker at the time it made its decision, the Court denies the State's motion to supplement the Record with the post-decision 2007 State Water Plan. *See State of La. ex rel. Guste v. Verity,* 853 F.2d 322, 327 n. 8 (5th Cir.1988). The State contends in a conclusory fashion that an exception should be made for this document because it falls within several of the exceptions for allowing extra-record evidence. (Reply to Second Mot. to Supp. at 7-8.) However, the State has not established that the draft 2007 State Water Plan is relevant or material to the agency decision to acquire the conservation easement. Therefore, the Court hereby DENIES the State's Second Motion to Supplement the Administrative Record.

e. *Documents Related to Ultra Vires Acts.*

In its Reply brief to its motion to supplement the record, the State asserts that acquisition of the easement was an *ultra vires* act and therefore, all documents relating to this *ultra vires* act should be added to the record. (Reply to Mot. to Supp. at 6-7.) The State also made this argument in its response to the Federal Defendants' motion to dismiss the State's Seventh Claim for Relief, which has been dismissed by separate order. (Resp. to Mot. to Dismiss at 17-18.) However, as explained *infra,* the Court has granted the State's motion for leave to amend its Complaint to add an Eighth Claim for Relief entitled *"Ultra Vires* Action." Therefore, the Court will allow supplementation of the Record with documents relating to the *ultra vires* acquisition of the easement.

2. *Documents in Possession of the State.*

**\*11** The State requests that the Court add certain documents to the Record that the Federal Defendants might not have reviewed or considered as part of their Refuge decision. (Mot. at 15-21.) The Federal Defendants respond by comparing the proffered exhibits with documents already in the record to show they merely duplicate information already before the Court. The State filed its reply on April 27, 2007 and then, on August 3, 2007, sought to file a supplemental brief to add additional argument to its earlier briefing. (*See* State's Supp. Br. in Support of Mot. to Supp. Admin. R. and Mot. for Enlargement of Time to File, filed Aug. 3, 2007.) Because the State had an adequate opportunity to make its arguments in its original briefing, because the State has not provided an adequate reason for granting leave to make additional argument, and because the State's supplemental brief does not add anything new for the Court to consider, the Court hereby

DENIES the State's Motion for Enlargement of Time to File supplemental brief.

The documents the State seeks to include illustrate the State and local perspectives on the land at issue and the State and local water conditions, needs, and plans. Reviewing these documents in their original context and from the perspective of the State and local entities is vital to understanding their position. The Court may conclude that these documents should have been considered by the Federal Defendants and the Court will include them in the Record in the interest of completeness and in order to aid the Court in determining whether the Federal Defendants adequately considered factors relevant to their decision. Therefore, the Court hereby GRANTS the State's motion to supplement with respect to (a) Report on Master Plan for Water Supply Reservoirs, dated February 1961; (b) The 1984 State Water Plan; (c) The 1997 State Water Plan; (d) The 2001 Water Plan for Region "I"; (e) The 2006 Water Plan for Region "I"; (f) Minutes of TWDB meeting on 5/16/06 showing State's approval of the 2006 Water Plan for Region "I"; (g) TWDB Resolution 06-52 showing State's approval of the 2006 Water Plan for Region "I"; (h) The 2006 Region "C" Water Plan showing State's awareness of potential conflict between the Fastrill Reservoir and the proposed Refuge and setting forth details about the proposed reservoir; (i) Minutes of the TWDB Meeting held April 18, 2006 showing State's approval of the 2006 Region "C" Water Plan; (j) TWDB Resolution 06-34 showing State approval of the 2006 Region "C" Water Plan; (1) Affidavit of Samuel V. Vaugh, P.E. of HDR Engineering, Inc., establishing business records exceptions of certain supplemental record documents and identifying attendees and general content of meetings of April 3, 2006, April 20, 2006, May 10, 2006, July 18, 2006. This affidavit is inadmissible for all other facts because those facts are already contained in the Record; (m) color copy of Presentation on Fastrill Reservoir Project and Wildlife & Habitat Preservation Opportunities; (n) Draft of *Fastrill Reservoir Preliminary Yield and Feasibility Study;* (o) Vaugh notes from April 3, 2006 meeting; (p) Vaugh notes from April 20, 2006 meeting; (q) documents and color maps used at meeting of May 10, 2006; and (t) maps of land at issue.

**\*12** The Court will not allow the State to supplement the Record with respect to certain items because they post-date the decision to establish the Refuge and the State has not established that an exception to the record rule applies to warrant inclusion of the document(s): (k) TWDB meeting minutes showing State approval of the 2007 State Water Plan,

dated Nov. 14, 2006; (u) The 2007 State Water Plan; (r) meeting notes and documents used at meeting of July 18, 2006; and (s) letter from Joe Crutcher, President, UNRWA to Dale Hall requesting reconsideration of approval of Refuge.

### D. City's Motion to Supplement the Administrative Record.

#### 1. *Documents C-1 through C-24.*

The City has proffered certain documents it argues should be considered part of the Record. (City App. Ex. C.) The Federal Defendants concede that documents C-10, and C-12 through C-16 were inadvertently excluded from the Record. (Resp. at 11.) They do not object to the inclusion of document C-9. The Federal Defendants also maintain that document C-11 is already part of the Record at AR 2080 and 2482. (Resp. at 11-12.)

With respect to the remaining documents the City seeks to add to the record, the Federal Defendants object to their inclusion because (1) the City has failed to carry its burden to identify and establish that those documents were considered by FWS in the course of its decision-making process and (2) the City has failed to show that any exceptions to the record-review doctrine apply. (Resp. at 12-15.)

In its reply, the City provides the Court with a detailed chart itemizing each document and the reason(s) why that document was improperly omitted from the Record and/or the bases for admitting each document as extra-record evidence. (Reply Table 1.) After a review of the chart and the corresponding documents the City seeks to add, the Court hereby GRANTS the City's motion to supplement the Record with respect to documents C-1 through C-8 and C-24. Documents C-9 through C-16 are admitted into the Record pursuant to agreement by the Federal Defendants.

The Federal Defendants argue that Documents C-17 through C-23 should not be included in the Record because they post-date the June 11, 2006 decision to establish the Refuge and the August 23, 2006 acquisition of the conservation easement. Thus, those documents could not have been considered by the Federal Defendants in their decision-making processes.

After reviewing Documents C-17 though C-23, the Court concludes that they post-date the June 11, 2006 decision to establish the Refuge. Because judicial review is based on the administrative record that was before the agency at the time of the decision, the Court will not consider those documents.

#### 2. *FOIA Documents*

On July 19, 2007, the City filed a second motion to supplement the Record to add recently-received FOIA documents that purportedly demonstrate that FWS did not follow agency procedure for acquiring the easement and publishing notice in the Federal Register, that FWS hid the existence of the easement from the public, and that FWS has been negotiating another 2,000-acre donation of land. (Request at 2.)

**\*13** The Federal Defendants argue that the documents should not be added to the Record because they post-date both FWS's approval of the Refuge and FWS's acquisition of the conservation easement. However, the City takes the position because the Secretary did not sign the deed to the conservation easement, as required by agency policy, the easement is invalid and thus, the Refuge has not been established. As stated *supra,* to the extent there is confusion about the DOI's/FWS's requirement(s) for acquiring land and FWS's compliance with those requirements in this case, the Court will admit to the Record all documents that will assist it in determining what the requirements are and whether the requirements have been met.

First, the City concedes that FOIA Documents 1 and 2 were inadvertently included in its motion to supplement despite already being part of the Record. The Court will deny the request to add FOIA Documents 1 and 2 as moot.

Second, Documents 3, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 21, 22, 23, 26, 27, 32, 34, 35, 38, 39, and 40 will be admitted as extra-record evidence because they fall within the recognized exceptions to the record rule. These documents discuss the DOI's and FWS's policies for accepting title to land and will be admitted to the Record because they constitute post-decision evidence that will assist the Court in determining whether FWS's acceptance of the deed and establishment of the Refuge was lawful. Likewise, it assists the Court because the agency action of establishing the Refuge is not adequately explained in the Record.

Likewise, FOIA Documents 5, 7, 17, 33 and 36 will be admitted as extra-record evidence because they fall within the recognized exceptions to the record rule. These documents discuss FWS's failure to publish notice in the Federal Register of FWS's decision approving the Refuge proposal. The Court will admit those documents because they constitute post-decision evidence that will assist the Court in determining

whether FWS's acceptance of the deed and establishment of the Refuge was lawful.

With respect to FOIA Document 4, the Court will admit this document because it falls within recognized exceptions to the record rule. This document discusses FWS's assessment of the value of the land, which may be contrary to its position and other evidence in the Record. This document will assist the Court in evaluating the lawfulness of the agency action of establishing the Refuge.

The Court will not admit FOIA Document 37 because it is no more indicative of bad faith in FWS's negotiations with the City of Dallas than it is consistent with the fact that FWS did negotiate with the City in good faith, which is the email's stated (and undisputed) reason for Hall's delay in signing off on the EA as Director long after he signed off on it as Regional Director.

The City also seeks to include FOIA Documents 20, 24, 25, 28, 29, 30, 31, and 41, which concern FWS's pre-lawsuit plans to acquire additional lands within the Refuge boundaries. The City contends that these documents should be admitted as extra-record evidence of the potential harm the City would suffer if it does not receive preliminary injunctive relief. Because there is some question as to whether the Refuge has been established, any acquisition of additional lands within the Refuge boundaries could have a major impact on the City's lawsuit and the future of the Fastrill Reservoir. The Court will include those documents in the Record due to the injunctive nature of this case.

### E. Motions for Discovery.

#### 1. Discovery on Substantive Claims.

**\*14** As a general rule, a district court reviewing an agency's decision pursuant to the APA is limited to the administrative record before that agency at the time of its decision, and parties seeking to reverse an agency decision are not commonly allowed to supplement the administrative record through discovery. *See Alabama-Tombigbee Rivers Coalition v. Norton,* NO. CIV. A. CV-01-S-0194-S, 2002 WL 227032, at \*3 (N.D.Ala., January 29, 2002). To obtain discovery from an agency in an APA case, a party must overcome the presumption that the agency properly designated the administrative record. *See Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior,* 143, F.Supp.2d 7, 12 (D.D.C.2001). The party must provide the court with reasonable, non-speculative grounds to believe that materials considered in the decision-

making process are not included in the record or the party must make a significant showing that it will find material in the agency's possession indicative of bad faith or an incomplete record. *See id.*

The City argues that the Record is incomplete and that resolution of this case warrants discovery and supplementation of the Record on the issues of whether FWS adequately considered the impacts of the Refuge and whether FWS prejudged the Refuge plan/failed to adequately consider alternatives. The City also seeks discovery on whether FWS had an improper motive/bad faith in acquiring the conservation easement. Finally, the City seeks discovery regarding FWS's compliance with its own policies and procedures with respect to acquiring the easement and publishing the establishment of the Refuge in the Federal Register.

There is no doubt that FWS was aware that it was incumbent upon it to evaluate the impact of the Refuge on the reservoir, if possible. According to the FONSI, "it would be incumbant upon the refuges assessment to consider any combined proposal's cumulative impacts." (AR 1966.) FWS determined it was unable to conduct a formal evaluation of the Refuge's impact on the reservoir due to the "speculative" nature of the reservoir and the fact that it lacked definitiveness in scope and purpose. The FONSI states that "because the Service considered any reservoir project speculative in the short term, and not definitive in its scope and purpose, and because such a project is far beyond the planning horizon for the refuge proposal (*i.e.* 20 years), the Service cannot formally evaluate combined or cumulative impacts or details of how the two projects might interface while not attenuating the mutual goals of each project." (AR 1966.)

The City argues that FWS acted arbitrarily and capriciously in making this finding of "speculativeness." The Court believes it can determine, based solely on the Record before it, whether FWS acted arbitrarily and capriciously in concluding that the reservoir project was speculative and whether FWS acted arbitrarily and capriciously in concluding that it could not have reasonably evaluated the combined environmental impacts of the Refuge and the reservoir at the time of Director Hall's signing of the EA and the FONSI. The City has not demonstrated a need for discovery and extra-record evidence on this issue.

**\*15** The City also believes that FWS acted arbitrarily and capriciously in deciding to issue an EA and a FONSI instead

City of Dallas, Tex. v. Hall, Not Reported in F.Supp.2d (2007)
Case 1:18-cv-00068 Document 440-1 Filed on 10/28/19 in TXSD Page 29 of 48
2007 WL 3257188

of an EIS. The Court believes it can determine, based solely on the Record before it, whether FWS violated the APA by choosing not to issue an EIS. The City has not demonstrated a need for discovery and extra-record evidence on this issue.

Therefore, the Court is inclined to solicit briefing from the Parties on the issues of whether FWS violated the APA by: (1) finding the reservoir was speculative and (2) issuing an EA and a FONSI instead of conducting an EIS. Further, the Court hereby DENIES the City's and the State's motions for discovery without prejudice. If the Court finds that discovery would aid it in resolving these issues, the Court will consider allowing discovery at the appropriate time. Additionally, if, after those issues are resolved, the Court finds that discovery would assist it in resolving any remaining/outstanding issues, the Court will consider allowing discovery at the appropriate time. The Court directs the Parties to attend a status conference in the chambers of Judge Jorge Solis, 1100 Commerce Street, 16th Floor to discuss these issues, the issue of a preliminary injunction, and other issues the Parties wish to discuss on **November 8, 2007 at 9:30 am.**

**F. State's Motion for Leave to File Supplemental Complaint.**

On June 20, 2007, the State filed a motion for leave to amend its Complaint to add an Eighth Claim for Relief entitled *"Ultra Vires"* Action." According to the State, the Supreme Court has held that sovereign immunity is waived for suits alleging a constitutional violation by federal agencies and their officers. (Resp. to Mot. to Dismiss at 17 citing *See Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).)

In *Larson,* the Court held that where an officer acts outside his authority (*ultra vires* ), either illegally or unconstitutionally, he may be sued individually for specific relief. *See Ala. Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221, 1226 (5th Cir.1976). The State seeks to amend its Complaint to add a claim against the Federal Defendants for FWS's *ultra vires* act of accepting the donation of the easement.

The Federal Defendants oppose the inclusion of this claim because adding the claim would be futile since it is barred by the Quiet Title Act. (Defs.' Resp. to Mot. for Leave to Amend at 4-5.) However, the Court has held in a separate order that the Quiet Title Act does not bar Plaintiffs' claims concerning acquisition of the easement. The Federal Defendants do not argue any other basis for futility or for refusing to allow leave to amend in this circumstance, and therefore, the Court hereby GRANTS the State's Motion for Leave to File Supplemental Complaint.

However, the Court will not file the State's 3-page "Supplemental Complaint" that accompanies its motion. Instead, the State is hereby instructed to file a complete amended complaint within ten days (10) from the date of this order containing all necessary information and claims.

**\*16** Therefore, for the reasons stated herein, the Court hereby GRANTS in part the City of Dallas's Motion to Supplement the Administrative Record and for Discovery, GRANTS in PART the Texas Water Development Board's Motion to Supplement Administrative Record, DENES the Parties' motions for discovery, GRANTS the Texas Water Development Board's Motion for Enlargement of Time to File and DENIES its Second Motion to Supplement Administrative Record, GRANTS the Texas Water Development Board's Motion for Leave to File Supplemental Complaint, GRANTS in part the City of Dallas' Request to Add Recently-Received FOIA Documents to the Documents Supplementing the Administrative Record, and DENIES the Texas Water Development Board's Supplemental Brief in Support of Motion to Supplement Administrative Record, and Motion for Enlargement of Time to File. Further, as stated *supra,* the Court directs the Parties to attend a status conference in the chambers of Judge Jorge Solis, 1100 Commerce Street, 16th Floor on **November 8, 2007 at 9:30 am.**

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 3257188

---

Footnotes

1    Local Rule 7.2(d)(2) requires a party filing a brief in excess of ten (10) pages to include a table of authorities therewith. The State did not include a table of authorities with its brief to its motion to supplement the Record. The Court expects the State to comply with the Local Rules of the Court with respect to future briefing. Additionally, the Federal Defendants, apparently

Case 1:18-cv-00068   Document 440-1   Filed on 10/28/19 in TXSD   Page 30 of 48

in an effort to circumvent Local Rule 7.2(c)'s page-limit requirement, use 1½ line spacing instead of the standard double-spacing. In the future, the Court expects all briefs filed in this case to utilize 12-point font and double-spacing in the text.

2       This request also extends to any acceptance signed by the Secretary of the Interior, any documents showing a delegation of authority from the Secretary of the Interior to another official, and any acceptance signed by another official with delegated authority. (State Mot. to Supp. at 10.)

3       The State also argues that it is unclear by looking at the deed if it was even signed by the Regional Director. No printed name appears on the deed and it appears as though the signature was made "for" the Regional Director. However, the notary public, by signing her name, swears that the signatory was Christopher Todd Jones, Acting Regional Director.

4       The City has stated that it intends to amend its Complaint to add the allegation that FWS failed to comply with agency policy by failing to obtain approval for acceptance of the easement from the Secretary of the Interior, thereby rendering the deed invalid and causing the Refuge to have not been established. (Request to Add Recently-Received FOIA Documents to the Documents Supplementing the Administrative Record at 3 n. 3.) The Court has allowed this amendment by separate order. In anticipation thereof, the Court will allow supplementation of the Record on this issue for the purpose of ascertaining whether the easement is valid.

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

2016 WL 6834215
United States District Court,
N.D. California.

Jeff Anderson, Bret Adee, David Hackenberg,
Lucas Criswell, Gail Fuller, Center for
Food Safety, American Bird Conservancy,
Pesticide Action Network North America, and
Pollinator Stewardship Council, Plaintiffs,
v.
Gina McCarthy and Environmental
Protection Agency, Defendants,
and
Croplife America, American Seed Trade
Association, Agricultural Retailers Association,
American Soybean Association, National Cotton
Council of America, National Association
of Wheat Growers, and National Corn
Growers Association, Defendant-Intervenors.

No. C 16-00068 WHA
|
Signed 11/21/2016

**Attorneys and Law Firms**

Adam Keats, Center for Food Safety, San Francisco, CA,
Amy L. Van Saun, Center for Food Safety, Portland, OR,
Peter Jenkins, Center for Food Safety, Washington, DC, for
Plaintiffs.

Martha Collins Mann, US Dept. of Justice, Karen E. Carr,
Stanley H. Abramson, Arent Fox LLP, Washington, DC,
Rochelle Leigh Russell, United States Department of Justice,
Envrironmental Defense Section, Joel Thomas Muchmore,
Arent Fox LLP, San Francisco, CA, for Defendants/
Defendant-Intervenors.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT,
DENYING AS MOOT DEFENDANT-
INTERVENORS' MOTION FOR SUMMARY
JUDGMENT, AND DENYING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

WILLIAM ALSUP, UNITED STATES DISTRICT JUDGE

**INTRODUCTION**

*\*1* In this challenge to federal agency action, all parties
move for summary judgment. For the reasons discussed
below, the agency's motion is **GRANTED**, defendant-
intervenors' motion is **DENIED AS MOOT**, and plaintiffs'
motion is **DENIED**.

**STATEMENT**

Plaintiffs are beekeepers, farmers, and organizations
concerned about the effect of pesticide-treated seeds on
bees and other pollinators. They brought this action to
challenge the alleged failure of the Environmental Protection
Agency and its Administrator, Gina McCarthy, to enforce
the Federal Insecticide, Fungicide, and Rodenticide Act with
respect to such seeds. According to plaintiffs, many seeds
planted in the United States are coated with neonicotinoids,
a type of pesticide that distributes throughout the resultant
plant and thus kills insects both by direct contact and
via the plants they ingest. Additionally, these seeds, when
planted, can release pesticidal "dust-off" that further spreads
neonicotinoids beyond the seeds themselves (Dkt. No. 90-1 at
4). Thus, plaintiffs allege, the practice of coating seeds with
neonicotinoids has had a systematic and catastrophic impact
on bees and the beekeeping industry throughout the United
States (*id.* at 1).

Under FIFRA, pesticides must be registered with the EPA
prior to use. 7 U.S.C. 136a. The Administrator, however, may
exempt from registration requirements "any pesticide which
the Administrator determines either (1) to be adequately
regulated by another Federal agency, or (2) to be of a
character which is unnecessary to be subject to this subchapter
in order to carry out the purposes of this subchapter." 7
U.S.C. 136w(b). In 1988, pursuant to this authority, the EPA
created an exemption from FIFRA registration requirements
for "articles or substances... treated with, or containing, a
pesticide to protect the article or substance itself...if the
pesticide is registered for such use." 40 C.F.R. 152.25(a).

In 2003, in a publication titled "Harmonization of Regulation
of Pesticide Seed Treatment in Canada and the United
States" (Dkt. No. 88-3), the EPA clarified the 1988 "treated
articles or substances" exemption applied to "pesticide-
treated seeds" as long as the pesticide is registered for such
use under FIFRA and "the pesticidal protection imparted to

Anderson v. McCarthy, Not Reported in F.Supp.3d (2016)
Case 1:18-cv-00068 Document 440-1 Filed on 10/28/19 in TXSD Page 33 of 48
2016 WL 6834215, 83 ERC 1657

the treated seed does not extend beyond the seed itself to offer pesticidal benefits or value attributable to the treated seed." Subject to those two conditions, "[s]eeds for planting which are treated with pesticides registered in the U.S. are exempt from registration as pesticides" (*id.* at 1–2).

In 2013, the EPA issued to FIFRA compliance and enforcement managers a document titled "Guidance for Inspecting Alleged Cases of Pesticide-Related Bee Incidents." The cover memorandum stated, "This guidance is a supplement to the [FIFRA] Inspection Manual...I request that you distribute this guidance to your state lead agencies and tribal pesticide programs and encourage you to discuss implementation of this guidance with them." A disclaimer at the beginning of the document cautioned (Dkt. No. 88-2):

> **\*2** This guidance represents EPA's recommended procedures for [FIFRA] inspectors when they are conducting FIFRA inspections as a result of an incident involving bee deaths. This guidance is not a regulation and, therefore, does not add, eliminate or change any existing regulatory requirements. The statements in this document are intended solely as guidance. This document is not intended, nor can it be relied on, to create any rights enforceable by any party in litigation with the United States. EPA, state and tribal officials may decide to follow the guidance provided in this document, or to act at variance with the guidance, based on analysis of site-specific circumstances.

The focal point of our lawsuit is a single passage within the guidance itself, which stated (*id.* at 7–8 & n.17):

> Note: Treated seed (and any resulting dust-off from treated seed) may be exempted from registration under FIFRA [pursuant to 40 C.F.R. 152.25(a)] as a treated article and as such its planting is not considered

a "pesticide use." However, if the inspector suspects or has reason to believe a treated seed is subject to registration (*i.e.*, the seed is not in compliance with the treated article exemption), plantings of that treated seed may nonetheless be investigated.

Plaintiffs filed this lawsuit in 2016, claiming the 2013 Guidance is reviewable under the Administrative Procedure Act. Their complaint asserted four claims for relief. The first, third, and fourth claims for relief asserted that the 2013 Guidance exceeded the EPA's statutory authority, failed to comply with the APA's rulemaking requirements, and was arbitrary and capricious (Dkt. No. 1 at 22–29). The second claim for relief asserted that the EPA's "non-enforcement policy" regarding neonicotinoid-coated seeds, as embodied in the 2013 Guidance, was an unlawful "abdication" of its responsibilities under FIFRA (*id.* at 25–26).

The EPA moved to dismiss for lack of subject-matter jurisdiction (Dkt. No. 21) and several trade organizations that would be affected by the outcome of this case moved to intervene (Dkt. No. 26). A previous order granted the motion to intervene and denied the EPA's motion to dismiss, finding that "the factual dispute between the parties—whether the 2013 Guidance constituted final agency action—is 'so intertwined' with the merits that a 'jurisdictional finding of genuinely disputed facts is inappropriate.' " The order acknowledged the EPA "put forth a strong argument in support of dismissal of the lawsuit at the Rule 12 stage" but noted that, in our circuit, "essentially all environmental cases concerning subject-matter jurisdiction are decided only after reviewing the administrative record, typically at the summary judgment stage" (Dkt. No. 62 at 4–6).

The EPA now moves for summary judgment on plaintiffs' first, third, and fourth claims for relief on the basis that the 2013 Guidance was not a reviewable final agency action, and on plaintiffs' second claim for relief on the basis that plaintiffs have failed to identify any nondiscretionary action that has been unlawfully withheld (Dkt. No. 88). Defendant-intervenors join in the motion and separately move for summary judgment on the basis that plaintiffs' lawsuit constitutes an improper programmatic challenge to the EPA's regulation of pesticides (Dkt. No. 89). Plaintiffs also move for summary judgment on their first, third, and fourth claims for relief on the basis that the 2013 Guidance was a reviewable

Anderson v. McCarthy, Not Reported in F.Supp.3d (2016)
Case 1:18-cv-00068 Document 440-1 Filed on 10/28/19 in TXSD Page 34 of 48
2016 WL 6834215, 83 ERC 1657

final agency action, and on their second claim for relief on the basis that the EPA's policy of non-enforcement as to neonicotinoid-coated seeds is an unlawful "abdication" of its responsibilities under FIFRA subject to judicial review (Dkt. No. 90-1).

## ANALYSIS

### 1. LEGAL STANDARD.

**\*3** Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. F.R.C.P. 56(a); *Conservation Congress v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014). When a court reviews a government agency's action, however, the standard for summary judgment is amplified by the APA, which provides the applicable standard of review. *Finley, supra*, at 617; *Good Samaritan Hosp., Corvallis v. Matthews*, 609 F.2d 949, 951 (9th Cir. 1979). The APA requires the reviewing court to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." The reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. 706(1)–(2). Thus, in considering motions for summary judgment, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769–70 (9th Cir. 1985).

### 2. NATURE OF PLAINTIFFS' CLAIMS.

As a preliminary matter, this order clarifies the current status of plaintiffs' four claims for relief. Plaintiffs' theory underlying their first, third, and fourth claims is that the 2013 Guidance constituted an unlawful "final agency action" under Section 706(2) (*e.g.*, Dkt. Nos. 90-1 at 16–25, 95 at 2–8). Plaintiffs' second claim for relief started out as a claim for "failure to act" under Section 706(1) (*see, e.g.*, Dkt. No. 81 at 4–5) but then evolved into claim under Section 706(2) instead. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (Section 706(1) provides relief for an agency's failure to act). Plaintiffs commit to this change

in their opposition brief where they say their second claim for relief "should properly be regarded as a claim under § 706(2), *not § 706(1)*, despite Plaintiffs having cited both in their Complaint and in briefing" (Dkt. No. 95 at 9) (emphasis added).

In attempting to defuse various arguments leveled by the EPA and defendant-intervenors against their second claim for relief, plaintiffs repeatedly emphasize that they are *not* bringing any claim under Section 706(1) (Dkt. No. 103 at 7, 11–12). Plaintiffs' counsel also reaffirmed this position at oral argument. Thus, despite plaintiffs' repeated use of the phrase "failure to act," this order construes all four of plaintiffs' claims for relief as challenging, *under Section 706(2) only*, the 2013 Guidance's alleged promulgation of a new policy applying the "treated articles and substances" exemption to pesticide-treated seeds and their dust-off. This order first addresses plaintiffs' first, third, and fourth claims for relief within the framework of final agency action analysis, reserving for later the nettlesome question of whether plaintiffs' "failure to act" claim can survive summary judgment.

### 3. FINAL AGENCY ACTION?

The APA permits judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. 704. Since plaintiffs seek review under the general provisions of the APA, they must challenge a "final agency action." *Ibid.*; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990); *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). An "agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. 551(13); *Norton, supra*, at 62. Moreover, to be final, an agency action must satisfy two conditions. *First*, "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Second*, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted); *Fairbanks North Star Borough v. U.S. Army Corps of Eng'rs.*, 543 F.3d 586, 591 (9th Cir. 2008). [1]

#### A. Agency Action.

Anderson v. McCarthy, Not Reported in F.Supp.3d (2016)
Case 1:18-cv-00068  Document 440-1  Filed on 10/28/19 in TXSD  Page 35 of 48
2016 WL 6834215, 83 ERC 1657

**\*4**  Having ruled out the possibility that plaintiffs claim a "failure to act" under Section 706(1), the next step of the inquiry is to determine whether the challenged 2013 Guidance is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof" so as to constitute "agency action." 5 U.S.C. 551(13); *Norton, supra*, at 62. To repeat, the relevant passage from the Guidance reads in its entirety (Dkt. No. 88-2 at 7–8):

> Inspectors may also take into account any locations of treated seed planting when identifying locations of potential pesticide sources. Note: Treated seed (and any resulting dust-off from treated seed) may be exempted from registration under FIFRA [pursuant to 40 C.F.R. 152.25(a)] as a treated article and as such its planting is not considered a "pesticide use." However, if the inspector suspects or has reason to believe a treated seed is subject to registration (*i.e.*, the seed is not in compliance with the treated article exemption), plantings of that treated seed may nonetheless be investigated.

The EPA characterizes this passage, and the 2013 Guidance as a whole, as "a set of non-binding recommendations for the use of federal, state, and tribal inspectors" rather than an agency action (Dkt. Nos. 88 at 11, 96 at 3, 100 at 5–6). The plain language of the 2013 Guidance supports the EPA's position in three ways.

*First*, the key passage quoted above reads like a recommendation, not a mandate. The first sentence discusses what inspectors "may" take into account during investigations. The customary meaning of "may" is permissive. *Sierra Club v. Johnson*, 614 F. Supp. 2d 998, 1003 (N.D. Cal. July 23, 2008). The "Note" about pesticide-treated seed states that both the seeds and resultant dust-off "*may* be exempted from registration under FIFRA," indicating that applicability of the "treated articles and substances" exemption is not a foregone conclusion but a mere possibility, *i.e.*, the exemption *may or may not apply.* This interpretation fits with the rest of the passage, which sets forth a corresponding scenario for each possibility: *If*

the inspector finds pesticide-treated seed (and resultant dust-off) exempt, *then* "as [a treated article] its planting is not considered a 'pesticide use.'" But *if* "the inspector suspects or has reason to believe a treated seed is subject to registration (*i.e.*, the seed is not in compliance with the treated article exemption), plantings of that treated seed may nonetheless be investigated."

Plaintiffs reply that this passage represents a "definitive statement" despite its permissive language because the phrase "its planting is not considered a 'pesticide use'" is "definitive" (Dkt. No. 95 at 4). That phrase would be definitive if it were its own sentence, but it is not. It is merely a fragment within a sentence. Plaintiffs' interpretation would completely omit not only the surrounding permissive language in the rest of that sentence and the rest of the passage, but also the *two immediately preceding words*, namely, "*as such* its planting is not considered a 'pesticide use'" (emphasis added)—with "as such" meaning "as a treated article." In other words, the planting of a seed is not considered a pesticide use *if* the seed is a treated article covered by the "treated articles or substances" exemption (*see* Dkt. No. 96 at 14–15). This order declines to interpret a single incomplete phrase inconsistently with the plain meaning of the rest of the relevant passage.

**\*5**  Plaintiffs further reply that it would make "no sense" to interpret this passage as making permissive and conditional statements because "a treated seed that has resulting dust-off" can *never* qualify for the "treated articles or substances" exemption, since "'[r]esulting dust-off from treated seed' necessarily includes the pesticidal coating and necessarily has pesticidal effects that extend beyond the seed itself" (Dkt. Nos. 95 at 4, 103 at 14–15). The premise is plaintiffs' interpretation of the 2003 Harmonization Document as applying the "treated articles or substances" exemption only to pesticide-treated seeds that cause no pesticidal effect beyond the seed itself. This argument would carry some weight if the 2003 Harmonization Document had interpreted the exemption to be inapplicable whenever a pesticide-treated seed's pesticidal effect extends in *any* way beyond the seed itself. The 2003 Harmonization Document, however, did not impose such a strict limitation. That document set forth two conditions for exemption, the second of which is that "the treatment is for the protection of the article or substance itself" (Dkt. No. 88-3 at 1).

Plaintiffs point out that the 2003 Harmonization Document explained the second condition for exemption as follows:

"The term 'for the protection of the [seed] itself' means that the pesticidal protection imparted to the pesticide-treated seed does not extend beyond the seed itself to offer pesticidal benefits or value attributable to the treated seed" (*id.* at 2). Plaintiffs read this sentence as rendering ineligible for exemption any "treated seed that has resulting dust-off" (Dkt. No. 103 at 14). Again, plaintiffs gloss over informing context and fail to read the phrase as a whole, *i.e.*, "*the treatment is for* the protection of the article or substance itself" (emphasis added)—wherein the words "the treatment is for" contemplate the pesticidal treatment's intended purpose rather than its entire range of potential but unintended effects. The plain meaning of these excerpts from the 2003 Harmonization Document, read together, is that the pesticidal treatment used on the seed must be for—*i.e.*, intended for—the protection of the seed itself as opposed to protection that extends beyond the seed to offer other pesticidal benefits or value.

This interpretation is consistent with the 2003 Harmonization Document's use of the phrase "pesticidal *benefits or value*"— as opposed to, *e.g.*, "pesticidal *effects*"—and with the immediately following sentence, which states, "Unless claims of pesticidal benefit or value attributable to the treated seed and extending beyond the treated seed are made in conjunction with the distribution or sale of the treated seed within the U.S., the EPA will presume that the seed will have been treated 'for the protection of the seed itself' " (Dkt. No. 88-3 at 2). This sentence highlights the distinction contemplated by the 2003 Harmonization Document between exempt pesticide-treated seeds and non-exempt pesticide-treated seeds—the latter would be distributed or sold with "claims of pesticidal benefit or value attributable to the treated seed and extending beyond the treated seed," while the former would ostensibly be distributed or sold with claims of pesticidal benefit or value *only* for the seed itself. In other words, the focus of the second condition for exemption described in the 2003 Harmonization Document is on the pesticidal treatment's intended purpose rather than on all its potential effects.

Nothing in the plain language of the 2003 Harmonization Document strictly limits the "treated articles and substances" exemption to pesticide-treated seeds that can never cause a pesticidal effect beyond the seed itself. Plaintiffs' claim that "treated seed that has resulting dust-off *cannot be exempted*" (Dkt. No. 103 at 14) (emphasis in original) is thus unsupported and fails to rebut the EPA's position that, as described by the plain language of the 2013 Guidance,

"[t]reated seed (and any resulting dust-off from treated seed)" may or may not be exempt from FIFRA registration requirements (*e.g.*, Dkt. No. 96 at 15). *See Sierra Club, supra*, at 1003 (customary meaning of "may" is permissive).

**\*6** *Second*, the EPA's position that the 2013 Guidance is "a set of non-binding recommendations for the use of federal, state, and tribal inspectors" is consistent with its cover memorandum. The cover memorandum, addressed to FIFRA Compliance and Enforcement Managers by the Office of Compliance, described the 2013 Guidance as a "guidance for inspecting alleged cases of pesticide-related bee incidents." Moreover, the cover memorandum stated, "I *request* that you distribute this guidance to your state lead agencies and tribal pesticide programs and *encourage* you to discuss implementation of this guidance with them" (Dkt. No. 88-2) (emphasis added). This sort of permissive language is consistent with the EPA's position, but inconsistent with plaintiffs' claim that the 2013 Guidance was a "rule" or equivalent thereof with the force of law (*e.g.*, Dkt. No. 103 at 13–15).

*Third*, the 2013 Guidance included an explicit disclaimer that stated in relevant part (Dkt. No. 88-2) (emphasis added):

> This guidance is an *inspection support tool* provided by the U.S. Environmental Protection Agency (EPA), for use by EPA regions, states and tribes conducting inspections under [FIFRA]. This guidance represents EPA's *recommended* procedures for these inspectors when they are conducting FIFRA inspections as a result of an incident involving bee deaths. *This guidance is not a regulation and, therefore, does not add, eliminate or change any existing regulatory requirements. The statements in this document are intended solely as guidance.* This document is not intended, nor can it be relied on, to create any rights enforceable by any party in litigation with the United States. EPA, state and tribal officials may decide to follow the guidance provided in this document, *or to act at variance with*

Anderson v. McCarthy, Not Reported in F.Supp.3d (2016)
Case 1:18-cv-00068   Document 440-1   Filed on 10/28/19 in TXSD   Page 37 of 48
2016 WL 6834215, 83 ERC 1657

*the guidance*, based on analysis of site-specific circumstances. This guidance may be revised without public notice to reflect changes in EPA's policy.

Plaintiffs offer two responses to this disclaimer. The first is that the disclaimer is "boilerplate" language, and the Court is not obliged to accept it at face value (Dkt. No. 90-1 at 23). As this order explains, however, the disclaimer—boilerplate or not—is consistent with the EPA's position and with the rest of the 2013 Guidance. Plaintiffs are correct that the disclaimer is not *dispositive* of the true nature of the 2013 Guidance, but that does not mean the disclaimer is not *relevant.*

In their reply brief, plaintiffs raise a second argument against the disclaimer, claiming it is "directly contradict[ed]" by the following page in the 2013 Guidance (Dkt. No. 103 at 3–4). That page stated in relevant part (Dkt. No. 88-2 at 1): "This guidance will aid in standardizing bee incident inspections across federal, state and tribal agencies when trying to determine if the deaths are related to the use of a pesticide in violation of FIFRA. The data gathered in these types of inspections will help determine if the death of the bees was associated with the legal or illegal use of a pesticide." Plaintiffs point out that if "the purpose of the 2013 Guidance is to help determine whether the particular use of a pesticide was legal or illegal under FIFRA," then it also helps determine "whether EPA should take enforcement action or not." Thus, plaintiffs argue, this language "reveal[ed] the true purpose of the document to be something much more substantive" than the disclaimer would suggest (Dkt. No. 103 at 3–4).

It does not follow that the disclaimer is "directly contradict[ed]" by the language quoted above. A disclaimer that essentially states the 2013 Guidance is non-binding does not contradict an acknowledgment that it will nonetheless be *helpful* to inspectors in conducting investigations and making determinations that may lead to discrete agency action. Moreover, plaintiffs' reasoning would lead to the untenable conclusion that virtually any guidance—no matter how non-binding or advisory—could be subject to judicial review on the vague theory that it informs some day-to-day activity that may somehow affect discrete agency action somewhere down the line. At best, plaintiffs possibly have shown a speculative degree of tension between the EPA's characterization of the 2013 Guidance's overall significance and the practical reality of its influence on the EPA's FIFRA enforcement efforts—

but this falls well short of a direct contradiction that would completely discredit the disclaimer.

**\*7** In summary, considering together the disclaimer, cover memorandum, and key passage that is the subject of plaintiffs' challenge, this order concludes the plain language of the 2013 Guidance supports the EPA's position that it was not an agency action.

Plaintiffs attempt to discredit the EPA's position by pointing out that "[a] reviewing court does not have to rubber stamp an agency's own characterization of its action (Dkt. No. 90-1 at 17)." The foregoing analysis, however, is not a rubber stamp.

Plaintiffs cite *CropLife Am. v. E.P.A.*, 329 F.3d 876, 883 (D.C. Cir. 2003), for the proposition that "the agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the 'force of law,' but the record indicates otherwise." *CropLife*, however, is distinguishable from this case. In *CropLife*, the EPA issued a press release stating "the Agency will not consider or rely on [third-party] human studies in its regulatory decision making, whether previously or newly submitted." *CropLife, supra*, at 878. The EPA claimed the statement was "nothing more than a 'policy statement,' and thus [was] not subject to judicial review." The reviewing court rejected the EPA's self-serving characterization of its own action as "not controlling" because "there [was] little doubt that the... Press Release [bound] private parties and the agency itself with the force of law, and thus constitute[d] a regulation rather than a policy statement. The directive clearly establishe[d] a substantive rule declaring that third-party human studies [were] deemed immaterial in EPA regulatory decisionmaking." *Id.* at 883. In other words, in *CropLife* the record clearly contradicted the agency's characterization of its own action.

No comparable facts present in this case. Here, as discussed above, the plain language of the 2013 Guidance supports the EPA's position that it is "a set of non-binding recommendations for the use of federal, state, and tribal inspectors" (Dkt. Nos. 88 at 11, 96 at 3, 100 at 5–6), not a rule with the force of law.

Plaintiffs also cite *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 553–54 (9th Cir. 2009), as an example of when "[t]he Ninth Circuit has found that statements within memoranda are final agency actions actionable under the APA." *Siskiyou* is also distinguishable from this case.

In *Siskiyou*, the agency memorandum at issue interpreted "*binding* standards and guidelines [restricting] certain activities within areas designated as riparian reserves or key watersheds." *Siskiyou, supra,* at 551–53. The jurisdictional question addressed by the court was whether the lawsuit constituted an improper "programmatic attack." The court found the plaintiff's allegations challenged "specific instances of the [agency's] actions taken pursuant to its interpretation of [the memorandum], and therefore constitute[d] more than a programmatic attack or a vague reference to [agency] action or inaction." *Id.* at 554. There was no dispute as to whether the memorandum was a non-binding recommendation or a binding document with the force of law. *Siskiyou* is thus unhelpful to plaintiffs' position that mere issuance of a non-binding guidance is agency action for purposes of APA review.

**\*8** Plaintiffs further contend the 2013 Guidance is an agency action because it effectively amended the "treated articles or substances" exemption as interpreted by the 2003 Harmonization Document (Dkt. No. 103 at 13). Specifically, plaintiffs claim the 2013 Guidance (1) "expand[ed] the... exemption from seeds to dust-off," (2) "stat[ed] definitively that the planting of treated seeds and dust-off is not considered a pesticide use," and (3) omitted the condition that "the pesticidal protection imparted to the treated seed does not extend beyond the seed itself to offer pesticidal benefits or value attributable to the treated seed" (*e.g.*, Dkt. Nos. 90-1 at 13–14, 95 at 4–5, 103 at 14). Plaintiffs cite *Hemp Indus. Ass'n v. D.E.A.*, 333 F.3d 1082, 1087 (9th Cir. 2003), as the "key Ninth Circuit precedent" (Dkt. No. 103 at 13) for the proposition that an agency guidance has the "force of law" when it "effectively amends a prior legislative rule."

It is important to note that *Hemp* is distinguishable from this case because the challenged agency in *Hemp* had actually issued a *rule* banning naturally occurring THC. *Hemp, supra,* at 1084. The issue before that court was whether that rule was "legislative," in which case the agency needed to follow certain procedures described in the APA, or "interpretive," in which case the agency did not. Within that context, the court concluded "a rule has the 'force of law' [*i.e.*, is legislative]...when [it] effectively amends a prior legislative rule." *Id.* at 1087.

Here, in contrast, the challenged 2013 Guidance was not a rule (*see* Dkt. No. 100 at 5). A "rule," as defined by the APA, is "the whole or a part of an agency statement of general or particular applicability and future effect designed to

implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. 551(4). Here, as discussed above, the 2013 Guidance did not "implement, interpret, or prescribe law or policy," nor did it describe any *requirements* of the EPA, since it comprised of recommendations with which compliance is permissive, not mandatory. There is thus no reason to conclude the 2013 Guidance was a "rule"—or rule "equivalent," as plaintiffs suggest (Dkt. No. 1 at 23)—of the sort contemplated by *Hemp*.

Plaintiffs attempt to overcome this distinction by claiming "an agency's interpretive rule or statement of policy can be a reviewable 'rule' within the meaning of the APA," citing *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1021 (D.C. Cir. 2000), which stated:

> If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding."

Plaintiffs provide no analysis as to why *Appalachian Power* applies in this case (Dkt. No. 90-1 at 19). Their bald statement that "an agency's interpretive rule or statement of policy *can* be a reviewable 'rule' within the meaning of the APA" (emphasis added) does not demonstrate that such is the situation here. As discussed above, the EPA did not act as if the 2013 Guidance was controlling in the field or a "legislative rule." In fact, an explicit disclaimer in the 2013 Guidance and the plain language of the document itself indicated otherwise. The EPA may base enforcement actions on the results of investigations conducted according to the 2013 Guidance, but nothing in the record indicates the EPA has taken discrete enforcement actions based directly on the 2013 Guidance itself. Finally, as discussed above, the 2013 Guidance would not lead its recipients to believe the EPA will "declare permits invalid," or take any action, "unless they

comply with the terms of the document." In fact, the cover memorandum, disclaimer, and plain language of the 2013 Guidance all indicated compliance was voluntary because the document offered a set of recommendations, not rules or mandates. *Appalachian Power* is thus unhelpful to show that the 2013 Guidance "is for all practical purposes 'binding.' "

**\*9** Even assuming for the sake of argument that *Hemp*'s reasoning applies, not only to actual rules issued by an agency, but also to non-binding guidance documents, *Hemp* would still not support plaintiffs' position. As discussed above, the 2013 Guidance did not amend the "treated articles or substances" exemption as interpreted by the 2003 Harmonization Document. The 2013 Guidance did not contradict the 2003 Harmonization Document, nor did the passage plaintiffs rely on definitively direct mandatory application or withholding of the "treated articles or substances" exemption.

### B. Finality.

The 2013 Guidance, moreover, lacked the finality required for judicial review under the APA. To be "final" for purposes of the APA, an action must (1) "mark the 'consummation' of the agency's decisionmaking process," *i.e.*, "it must not be of a merely tentative or interlocutory nature," and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.' " *Bennett, supra*, at 177–78 (citations omitted). Neither requirement is satisfied here.

*First*, the 2013 Guidance did not mark the "consummation" of the EPA's decisionmaking process with respect to applying the "treated articles or substances" exemption to pesticide-treated seeds. As explained, the 2013 Guidance recommended that inspectors investigating bee deaths consider *if* the exemption should apply on a case-by-case basis. It did not mandate the investigations, much less direct their outcomes. Insofar as the resulting determinations from these investigations potentially influence the EPA's enforcement decisions further down the line, they are necessarily "tentative" or "interlocutory" in nature. Thus, the 2013 Guidance, which merely assisted investigations that are themselves only "tentative" or "interlocutory," could not be the "consummation" of the EPA's decisionmaking process.

*Second*, and for similar reasons, the 2013 Guidance could not have been an action "by which 'rights or obligations

have been determined,' or from which 'legal consequences will flow.' " Based on the 2013 Guidance alone it would be impossible to determine if a particular investigator would conclude a particular pesticide-treated seed qualifies for the "treated articles or substances" exemption, if the seed would therefore be subject to FIFRA's registration requirements, or if the EPA would take further enforcement action. Thus the 2013 Guidance—the alleged agency action in this case—was not a final agency action that determined rights or obligations, or triggered legal consequences.

Plaintiffs' other arguments that the 2013 Guidance was sufficiently final for purposes of APA review are similarly unpersuasive. *First*, plaintiffs claim the 2013 Guidance "represents the final word by EPA on its decision to exempt neonicotinoid-coated seeds and pesticidal dust-off from the requirements of FIFRA" (Dkt. No. 90-1 at 19). Thus, plaintiffs contend, the legal consequence flows that "planting of treated seeds and any resulting dust-off are not considered pesticidal uses under FIFRA" (*id.* at 21–22). But as stated, the 2013 Guidance conveyed no such decision. Contrary to plaintiffs' bald assertions that "sellers and users of...treated seed with associated pesticidal dust-off...do not have to comply with [FIFRA]," and that the "EPA does not and will not enforce FIFRA against the sale or use of neonicotinoid-coated seeds" (*id.* at 19–20), the 2013 Guidance expressly contemplated scenarios in which pesticide-treated seeds could be subject to FIFRA's registration requirements and necessitate enforcement (Dkt. No. 88-2 at 7). The 2013 Guidance thus did not represent the EPA's "final word" as to any non-enforcement policy.

**\*10** *Second*, plaintiffs claim the 2013 Guidance "is clearly the consummation of EPA's decisionmaking process" because "it is explicitly 'a supplement to the national [FIFRA] Inspection Manual,'...which is described as 'an important element of the [EPA's] Pollinator Protection Strategic Plan.' " Plaintiffs also point out the 2013 Guidance "is not a draft or preliminary document, but rather a final document published by the agency" (Dkt. No. 90-1 at 20). These are non sequiturs. A "supplement" to an inspection manual is not necessarily a "consummation" of the decisionmaking process aided by that manual. An "important element" of the EPA's plan to protect pollinators is not necessarily a "consummation" of its decisionmaking process as to a specific exemption relevant to that plan. And it would be absurd to conclude that a document is "final" for purposes of judicial review under the APA just because it is a final published document, as opposed to a

preliminary draft. It is the document's nature, not the stage of its drafting, that is germane to the finality inquiry.[2]

### 4. FAILURE TO ACT?

As discussed, plaintiffs' second claim for relief is essentially a "failure to act" claim now brought under Section 706(2) instead of Section 706(1). At oral argument, plaintiffs focused solely on this claim, insisting they never abandoned their "failure to act" allegations and glossing over their previous flip-flopping from Section 706(1) to Section 706(2). Plaintiffs now stake their second claim for relief on an "exception" articulated in a footnote in *Heckler v. Chaney*, 470 U.S. 821 (1985).

#### A. *Heckler* Exception.

At oral argument, plaintiffs repeatedly emphasized that the "*Heckler* exception" authorizes judicial review of their second claim for relief. This begs the question: Exception to what? To answer this question, it is necessary to take a step back and clarify the context and holding of *Heckler*.

As stated, judicial review of claims like the ones in this case requires a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. 704. Where there is no such final agency action, judicial review is not available and the inquiry ends. *If* final agency action exists, however, then such action is nonetheless unreviewable unless it *also* clears the hurdle imposed by Section 701(a)(2), *i.e.*, that it is not agency action "committed to agency discretion by law." *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 & n.7, 246–47 (1980); *Aguayo v. Jewell*, 827 F.3d 1213, 1223 (9th Cir. 2016). In other words, Section 701 functions *in addition to*, but does not *replace*, Section 704. This is evident both in the case law applying these provisions and in the plain language of Section 701(a), which states, "This chapter applies, *according to the provisions thereof*, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." The *Heckler* decision, applying Section 701(a)(2), held that in situations where an agency "refus[es] to take enforcement steps...the presumption is that judicial review is not available" because "an agency's decision not to prosecute or enforce...is a decision generally committed to an agency's absolute discretion." *Heckler, supra*, at 831–33. In short, an agency's refusal to take enforcement action is generally unreviewable under Section 701(a)(2). The exception to this

general rule—*i.e.*, the "*Heckler* exception" plaintiffs rely on—is in a footnote to the aforementioned analysis, wherein *Heckler* stated the Court "express[ed] no opinion" on whether an agency's decision to "consciously and expressly adopt [ ] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities" would similarly be "unreviewable under § 701(a)(2)." *Id.* at 833 & n.4 (quotations omitted).

**\*11** That expression of "no opinion" left open the possibility that "[a] decision that is committed to agency discretion by law may nonetheless be reviewable where the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Garcia v. McCarthy*, 649 Fed.Appx. 589, 592 (9th Cir. 2016) (quotations omitted). Plaintiffs' application of this exception to their second claim for relief, however, suffers from two fatal flaws.

*First*, application of the *Heckler* exception requires an agency decision to "consciously and expressly" adopt a general policy. Plaintiffs claim the "EPA's failure to enforce FIFRA against neonicotinoid-coated seeds and pesticidal dust-off is a 'consciously and expressly adopted general policy,' which 'amounts to an abdication of [the EPA's] statutory responsibilities,' " but this is mere recitation of the *Heckler* exception coupled with a bald assertion that it is on point in this case. Plaintiffs have not identified a single document that contains such a decision. The administrative record and the Court's *in camera* review of additional documents submitted by the EPA also revealed nothing that would qualify as a decision "consciously and expressly" adopting any general policy, much less one "so extreme as to amount to an abdication of [the EPA's] statutory responsibilities." The bulk of those documents included multiple drafts, often attached to multiple email chains, of the 2013 Guidance as its contents were repeatedly and painstakingly discussed, reviewed, and edited in the long road to publication.

In their reply brief, plaintiffs argue judicial review is available for the EPA's "policy of non-enforcement [as to pesticide-treated seeds]...expressed in [the] EPA's 2013 Guidance" (Dkt. No. 103 at 8). This argument is unavailing. As stated, the 2013 Guidance—which plaintiffs characterize as the "focal point" that "expressed" the alleged policy— contained no language indicating the EPA took a definitive stand on the applicability of the "treated articles or substances" exemption to any pesticide-treated seeds. Indeed, the very fact that the relevant passage acknowledged two

possibilities—either pesticide-treated seed qualifies for the exemption or it does not—indicated the EPA had no standing policy on the matter.

To this end, the 2013 Guidance specifically informed investigators "plantings of... treated seed may...be investigated" if the pesticide-treated seed "is subject to registration (*i.e.*, the seed is not in compliance with the treated article exemption)" (Dkt. No. 88-2 at 7). This language indicated that the EPA in issuing the 2013 Guidance expressly contemplated *potential enforcement* of FIFRA requirements as to pesticide-treated seeds, which directly contradicts plaintiffs' allegations of a "policy of non-enforcement" and "abdication of duties." Thus, even assuming for the sake of argument that a blanket-exemption policy as to pesticide-treated seeds would constitute an abdication of the EPA's responsibilities under FIFRA as to such seeds, there is no basis for finding the EPA "consciously and expressly adopted a general policy" abdicating its statutory responsibilities here.

*Second*, plaintiffs' framing of their second claim for relief within the *Heckler* exception is predicated on flagrant mischaracterization of how the exception functions. At oral argument, plaintiffs' counsel repeatedly stated the *Heckler* exception dispenses with the APA's final agency action requirement for judicial review. That was and remains wrong. Plaintiffs could properly raise the *Heckler* exception to defend their second claim for relief *if* they had first alleged a final agency action that defendants had argued was nonetheless unreviewable because of the hurdle imposed by Section 701(a)(2). As explained, however, plaintiffs cannot even clear the initial Section 704 hurdle of identifying a final agency action. Thus, their claim cannot reach the additional requirements of Section 701(a)(2), let alone raise *Heckler* as a defense against said requirements. In short, the *Heckler* exception might save plaintiffs' claim from Section 701(a)(2) but does nothing to circumvent Section 704. [3]

**\*12** What plaintiffs need here is not an exception to Section 701(a)(2), but an exception to the "final agency requirement" of Section 704. Such an exception exists—in Section 706(1). "A court's review of an agency's failure to act [under Section 706(1)] has been referred to as an exception to the final agency action requirement." *ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998); *Indep. Min. Co., Inc. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997). Plaintiffs, however, have unequivocally foresworn any reliance on Section 706(1) (*e.g.*, Dkt. No. 95 at 9). The final agency action requirement for judicial review under the APA thus

applies squarely to their second claim for relief under Section 706(2). As stated, plaintiffs cannot meet this requirement. Thus, their second claim for relief—like their first, third, and fourth claims—is unreviewable under the APA.

### B. Administrative Record.

Finally, this order must address the parties' fight over the administrative record. Plaintiffs had previously moved to compel "completion and supplementation" of the administrative record, and to conduct limited discovery in support of their second claim for relief (Dkt. No. 81). A prior order instructed the EPA to submit under seal for *in camera* review "documents that relate to the development of the guidance that are *not* a part of the administrative record, including pre-decisional and deliberative documents," instructed plaintiffs to "lay out any alleged shortfalls in the administrative record" in their summary judgment briefs, and denied plaintiffs' request for limited discovery without prejudice (Dkt. No. 86). Plaintiffs now renew their request for limited discovery relevant to their second claim for relief (Dkt. No. 90-1 at 11). The original basis for this request was that, unlike plaintiffs' other claims for relief, a claim for failure to act under Section 706(1) is not predicated on an agency action for which there can be a clearly demarcated administrative record. Thus, plaintiffs argued, they should be allowed to take extra-record discovery (Dkt. No. 81 at 4–5). As stated, plaintiffs have since abandoned their claim under Section 706(1) and are proceeding on the theory that all four claims for relief challenge a final agency action under Section 706(2). The premise of their request for limited discovery is now defunct (*see* Dkt. No. 100 at 8 & n.4). Accordingly, the request is **DENIED**.

Plaintiffs also renew their request to compel the EPA to supplement the administrative record with additional materials. The prior order directing the EPA to lodge the administrative record stated, "The administrative record shall include all emails and memoranda discussing whether the agency should proceed by guidance versus some other procedure and/or discussing whether the guidance would constitute final agency action" (Dkt. No. 62 at 8–9). In claiming the EPA has failed to comply with that order, plaintiffs highlight the importance of three documents: (1) "Pros and Cons of Issues Surrounding Review and Release of the Guidance," (2) an email from the Chief Division of Plant Health, Ohio Department of Agriculture, and (3)

a PowerPoint presentation titled "2012 Indiana Bee Kill Investigations" (Dkt. No. 90-1 at 14–15).

The Court's *in camera* review of these unredacted documents, and others submitted by the EPA, revealed nothing that would weigh in plaintiffs' favor on the issue of "whether the agency should proceed by guidance versus some other procedure" or "whether the guidance would constitute final agency action." Nor did any document submitted for *in camera* review support application of the *Heckler* exception to this case. There is thus no reason to compel additional production. Plaintiffs also seek documents that would be relevant to the *merits* of their claims (*e.g.*, *id.* at 16; Dkt. No. 103 at 1–2) but, as discussed, have not satisfied the requirements for judicial review under the APA. Their request to supplement the administrative record is therefore **DENIED**.

**CONCLUSION**

*13  The Court is most sympathetic to the plight of our bee population and beekeepers. Perhaps the EPA should have done more to protect them, but such policy decisions are for the agency to make. A district judge's role is limited to judicial review of final agency actions, which do not include the type of guidance involved here.

For the foregoing reasons, defendants' motion for summary judgment, in which defendant-intervenors join, is **GRANTED**. Defendant-intervenors' separate motion for summary judgment is **DENIED AS MOOT**. Plaintiffs' motion for summary judgment is **DENIED**. Plaintiffs' request for judicial notice (Dkt. No. 93) of documents not relied upon in this order is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 6834215, 83 ERC 1657

Footnotes

1    In their complaint and opposition to defendants' motion to dismiss, plaintiffs had previously argued that FIFRA, 7 U.S.C. 136n(a), also authorizes judicial review (Dkt. Nos. 1 at 1–2, 57 at 24–25). In their motion for summary judgment, defendants contend "a cause of action may exist under either the APA or another judicial review provision, but not both" (Dkt. No. 88 at 10). Plaintiffs' briefs on summary judgment do not revive their contention that 7 U.S.C. 136n(a) authorizes judicial review.

2    Plaintiffs also claim the 2013 Guidance "represents EPA's last word for the purposes of the *Bennett* test even though the agency *could* take some other action in the future" (Dkt. No. 90-1 at 20) (emphasis in original), ostensibly attempting to preempt an argument by the EPA that the 2013 Guidance lacked finality because the agency could take future action on the guidance's subject matter. Since neither the EPA nor this order relies on the possibility of future agency action in concluding the 2013 Guidance lacked finality, plaintiffs' point does not affect the analysis herein.

3    Plaintiffs' briefing indicates they understood how to apply *Heckler* correctly, *i.e.*, to rebut the EPA's argument that any alleged decision to not enforce FIFRA would generally be unreviewable pursuant to Section 701(a)(2) as a decision committed to agency discretion (*see* Dkt. Nos. 95 at 8–13, 103 at 8). If so, plaintiffs' representation at oral argument that they relied on *Heckler* all along as an exception to the "final agency action" requirement of Section 704 was disingenuous.

End of Document                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

## <u>DECLARATION OF NINA PERALES</u>

I, Nina Perales, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am currently Vice President of Litigation at the Mexican American Legal Defense and Education Fund (MALDEF), counsel for Defendant-Intervenors, Karla Perez, *et al.* ("Defendant-Intervenors") in this action.  I submit this declaration in support of  Defendant-Intervenors' Supplemental Brief Regarding the Administrative Record in the above-referenced case.

2.      I am thoroughly familiar with the facts and arguments in this proceeding.  I have personal knowledge of the statements contained in this declaration and am fully competent to testify to the matters set forth herein.

1

3.      I received a copy of the document "Certification of Dep't of Homeland Security Administrative Record by Ariel C. Harrison" from counsel for Federal Defendants on May 24, 2019.  A true and correct copy is attached as **Exhibit 5-1**.

I declare under penalty of perjury pursuant to 28 U.S. C. § 1746 that the foregoing is true and correct.

Executed on this 28th day of October, 2019.


*/s/ Nina Perales*
Nina Perales

# EXHIBIT 5-1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-00068 |
| UNITED STATES OF AMERICA, *et al.*, | |
| Defendants, | |
| KARLA PEREZ, *et al.*, | |
| Defendant-Intervenors, | |
| and | |
| STATE OF NEW JERSEY, | |
| Defendant-Intervenor. | |

1.      My name is Ariel C. Harrison. I am employed with the U.S. Department of Homeland Security, as Assistant Executive Secretary for Administration. I am responsible for the Office of the Executive Secretary records. I have held this position since 2008.

2.      I am the custodian of the signed memorandum from former Secretary of Homeland Security Janet Napolitano dated June 15, 2012, regarding "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (the "Deferred Action for Childhood Arrivals" or "DACA" memo), as well as a copy of the administrative record for the DACA memo (copies of which appear at items 33 and 57 of the attached index), including the supplemental documents provided on May 23, 2019.  To the best of my knowledge, information, and belief, the attached index and the administrative record were prepared by the personnel who

1

reviewed information from the Office of the Executive Secretary, which is the custodian of written communication intended for and originated by the Secretary of Homeland Security, as well as electronically stored information of current and former DHS personnel who were involved in development of the DACA memo.  I certify that the documents listed in the attached index are true and correct copies of the documents contained in the administrative record, and, to the best of my knowledge, information, and belief, constitute the non-privileged documents that the Department considered in issuing the DACA memo.[1]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 24th day of May, 2019 in Washington, D.C.

Ariel C. Harrison
Assistant Executive Secretary for Administration

---

[1]  Upon information and belief, the complaint commencing this lawsuit was filed on May 1, 2018, almost six years following publication of the DACA memo, and this administrative record was prepared during the pendency of this action.  To the best of my knowledge, information and belief, because Secretary Napolitano and senior DHS officials with whom she consulted about development of the DACA policy are no longer employed by the agency, current DHS personnel used their best efforts to determine which documents to include in the administrative record based upon the content of the documents and did not confer with former Secretary Napolitano herself or any former DHS officials involved in development of the policy regarding which documents to include in the record.