## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |

## JOINT STATUS REPORT

In accordance with the Court's June 18, 2020 order, the parties have conferred multiple times regarding their perspectives on whether and how *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020) ("*Regents*"), affects this case, what motions are pending, and specific timelines for resolving those pending motions. Per the Court's instructions, this filing is not a comprehensive view of the parties' positions on the recent Supreme Court decision or the outstanding motions. The parties expect to lay out those full positions in later briefs pursuant to a new scheduling order.

### Position of Plaintiff States

The parties actively litigated this case for a year and a half before the Court entered its stay pending the outcome of *Regents*. In those eighteen months, the parties conducted two separate discovery periods, took 31 depositions, produced

thousands of pages of documents, and filed 552 pages of briefing related to the claims in this case. The issues in front of the Court have always been largely questions of law, and the Court has already ruled on those issues in its Order on Plaintiff States' motion for a preliminary injunction. *See* ECF 319. Raising those same points, the only motion left for the Court to rule on is Plaintiff States' pending motion for summary judgment. ECF 356.

DACA was due to be set aside when Plaintiff States filed their motion for summary judgment in February 2019, based largely on the Fifth Circuit's binding precedent in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) (*Texas I*). Now, the Supreme Court's *Regents* opinion is dispositive in favor of Plaintiff States' requested relief. It is beyond dispute that the Deferred Action for Childhood Arrivals ("DACA") program is reviewable under the Administrative Procedure Act ("APA"). Additionally, in holding that DACA affirmatively granted immigration relief and attendant benefits, *Regents* makes clear that DACA is in direct contravention to Congress's duly enacted immigration statutes, violates the U.S. Constitution, and was required—at the very least—to go through notice-and-comment rulemaking.

First, the Supreme Court held that the 2017 rescission of DACA was reviewable based on the reviewability of the DACA program itself. The Supreme Court recognized that "DACA is not simply a non-enforcement policy." *Regents*, 140 S. Ct. at 1906. Instead, DACA "created a program for conferring affirmative immigration relief." *Id.* "The creation of that program—and its rescission—is an action that provides a focus for judicial review." *Id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)) (internal quotation omitted). Also, the "benefits attendant

to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy." *Id.* "Unlike an agency's refusal to take requested enforcement action, access to these types of benefits is an interest courts often are called upon to protect." *Id.* (citing *Chaney*, 470 U.S. at 832) (internal quotation omitted). That is now binding precedent dispositive to the reviewability issue in this case. *See* ECF 357 at 30–31.

Second, in holding that DACA conferred "affirmative immigration relief" and "benefits attendant" to that relief, *Regents* confirms that DACA violates the substantive and procedural provisions of the APA as well as the Take Care Clause of the U.S. Constitution.

As this Court has held, DACA is substantively unlawful because the Federal Defendants do not have "the power to institute a program that gives lawful presence, work authorization, and multiple other benefits to 1.5 million people." ECF 319 at 71. The Supreme Court has now confirmed that DACA does exactly that. *Regents*, 140 S. Ct. at 1906. The Supreme Court set aside DACA's rescission because the 2017 rescission memorandum contained no discussion of "retaining forbearance *without benefits*." *Regents*, 140 S. Ct. at 1913 (emphasis added). The "problem" with DACA is that it *does* confer those benefits. *Id.* (citation omitted). And as this Court acknowledged in ruling on the preliminary injunction, granting those benefits "flies in the face of the INA's goals of deciding who comes to and stays in the United States, who works in the United States, and who qualifies for government-funded benefits." ECF 319 at 104. Thus, as the Supreme Court has now conclusively held that DACA grants immigration relief and attendant benefits, DACA must be set aside as

substantively unlawful under the APA and the Take Care Clause of the Constitution. *See Regents*, 140 S. Ct. at 1915, *see also id.* at 1929 n.13 (Thomas, J., concurring in part, dissenting in part).

Additionally, by confirming that DACA grants immigration relief and attendant benefits, the Supreme Court's holding means that DACA was required to go through notice-and-comment rulemaking. In its Order on the preliminary injunction, this Court held that DACA is a substantive rule requiring notice-and-comment rulemaking "given the overwhelming evidence concerning the rights conferred and the obligations imposed" by DACA. ECF 319 at 103. The Supreme Court has now agreed with this Court that DACA grants those rights and benefits. *Regents*, 140 S. Ct. at 1913. As such, allotting lawful presence and the corresponding benefits to 1.5 million unlawfully present aliens "must at least undergo the formalities of notice and comment." ECF 319 at 104.

Thus, *Regents* controls, and there are no ancillary issues preventing the Court from granting Plaintiff States' motion for summary judgment on the merits.

- The parties have already briefed the proper scope of this Court's review. *See* ECF 440, ECF 441, ECF 442, ECF 443. Defendant-Intervenors admit, as they must, that this Court "should look beyond the purported administrative record to resolve several key issues" to determine "how DACA *operates in practice*." ECF 440 at 1 (emphasis in original). That is exactly how the Fifth Circuit conducted its analysis in *Texas I*, 809 F.3d at 171–78. And to rule otherwise would insulate the Federal Defendants from any claim about how they implemented DACA after its inception. *See* ECF 441.

- Plaintiff States' standing is well-established, largely admitted by Defendant-Intervenors' own witnesses, and thoroughly analyzed and recognized by this Court. *See* ECF 319 at 30–55. To the extent that Defendant-Intervenors needed to test those theories, they had two separate periods of discovery to do so, one of which lasted nine months.

*See* ECF 337 and November 14, 2018 Docket Text. They largely failed to pursue any discovery for the first seven of those months. *See* ECF 387 at 4. But even regardless of Defendant-Intervenors slumbering on their rights, no additional discovery (or briefing) is needed on that point.

- Likewise, the parties have had adequate opportunity to do discovery on and brief the scope of this Court's remedy. Nothing limited the Defendant-Intervenors' right to conduct discovery on any alleged reliance interests during the normal discovery period—which is now closed. Plaintiff States have laid out their arguments regarding the Court's remedy in their motion for summary judgment. ECF 357 at 45. All other parties have had an opportunity to respond. ECF 366, ECF 397, ECF 399. And *Regents* does not change the analysis, as nothing in it grants this Court the authority to rule that DACA is unlawful and yet somehow allow portions of it to remain in place. *See Regents*, 140 S. Ct. at 1910 ("Those policy choices are for DHS.").

As the remaining issues are narrow and have been briefed extensively, Plaintiff States propose the following schedule for the Court to resolve their pending motion for summary judgment.

| | |
|---|---|
| August 14, 2020 | Deadline for supplemental briefing from all parties on Plaintiff States' pending motion. Such briefs are limited to 15 pages. |
| August 21, 2020 | Deadline for responses to supplemental briefing on Plaintiff States' motion for summary judgment. Such briefs are limited to 10 pages. |
| Week of August 31, 2020 | Hearing on Plaintiff States' motion for summary judgment |

## **Position of Federal Defendants**

Federal Defendants agree with the supplemental briefing schedule proposed by the Plaintiffs and disagree with Intervenors' proposed schedule. Federal

Defendants' supplemental briefing will address the impact, if any, of *Regents* on this case.

### Position of Defendant-Intervenors Individual DACA Recipients and New Jersey

### The Impact of DHS v. Regents of California

The recent decision by the Supreme Court of the United States in *Regents* works a monumental shift in this action in four different ways:

- First, in *Regents*, the Supreme Court emphasized that the Department of Homeland Security ("DHS") must exercise its discretion to determine next steps with respect to DACA, including responding to any conclusion that DACA is unlawful. Because further guidance from DHS or the Federal Defendants appears imminent, actions taken by the political branches of government in response to *Regents* may resolve this lawsuit without any need for intervention by this Court.

- Second, *Regents* underscores that, before the Court can rule on the merits, the parties must accurately define the administrative record.

- Third, and relatedly, even if the Court reaches a decision on the merits, the parties must, consistent with *Regents*, fully develop and update the facts and briefing about the Dreamers' and others' reliance interests, and DHS's discretion regarding the same before the Court decides on a remedy.

- Fourth, *Regents* changes the legal landscape governing the Plaintiff States' claims and their request for summary judgment.

Understanding that this Court has said the parties' current submissions should not be comprehensive and that there will be other opportunities for the parties to address the impacts of *Regents*, Karla Perez, *et al.* and New Jersey (together, "Defendant-Intervenors") briefly address each of these four points in turn.  Further detail on each of these points is set forth below.

**First**, the decision in *Regents* to vacate the Federal Defendants' memorandum rescinding DACA appears to have set into motion a chain of events that may impact

the resolution of this case, or even resolve it without need for intervention by this Court. *Regents* treated the determination by the Attorney General of the United States that DACA was unlawful as binding on DHS. *See* 591 U.S. ___ (slip op. at 18). However, the Supreme Court held that the Attorney General's determination regarding lawfulness did *not* eliminate the discretion DHS was *obligated* to exercise to determine next steps, especially with respect to how to remedy the assumed unlawfulness, including by taking into account the weighty reliance interests at stake. *See, e.g.*, *id.* (slip op. at 25) ("DHS has considerable flexibility in carrying out its responsibility."). In *Regents*, the Supreme Court in effect determined—as this Court indicated was the appropriate ultimate resolution in its Preliminary Injunction ruling, *see* Memo. Op. and Order at 5–6, 117, Dkt. 319—that the political branches must decide the appropriate, long-term solution for Dreamers, and must, when doing so, take account of the reliance interests Dreamers have in DACA.

According to all reports, the political branches of government are doing so right now. Indeed, earlier this month, the Federal Defendants announced support for legislation that would resolve a number of these issues. For example, on July 10, 2020, President Trump told Telemundo that, "over the next few weeks," he would either be "signing a big immigration bill," "do[ing] a big executive order," or "signing a very major immigration bill as an executive order." The President further indicated that "one of the aspects of the bill is going to be DACA. We're going to have a *road to citizenship*." *President Donald Trump to Noticias Telemundo: "I'm Taking Care of DACA . . . We're Going to Have a Road to Citizenship*," NOTICIERO TELEMUNDO (July

10, 2020).[1]  On July 14, 2020, President Trump reiterated that, "in the not-too-distant future," he planned to "sign[] a . . . very, very big merit-based immigration action" and hinted at an imminent legislative response that would "tak[e] care of people from DACA in a very Republican way."  *Remarks by President Trump in Press Conference*, WHITE HOUSE (July 14, 2020).[2]  Thus, the Court should exercise its discretion to allow this ongoing process within the political branches to run its course, yielding new agency guidance, which would then go into effect (and, potentially, be subject to further litigation).

**Second**, *Regents* makes clear that, before the Court can decide the merits, it must determine the appropriate administrative record.  In *Regents*, the Supreme Court emphasized the importance of reviewing the actual "grounds that the agency invoked when it took the action."  *Regents*, 591 U.S. ___ (slip op. at 13) (quotations omitted).  The Supreme Court's conclusion that the Nielsen Memo was outside of the scope of its review was part and parcel of its holding that DACA's rescission was unlawful.  *See id.* (slip op. at 13–17).  Likewise, here, the scope of the administrative

---

[1]    Available   at   https://www.nbcumv.com/news/president-donald-trump-noticias-telemundo-%E2%80%9Ci%        E2%80%99m-taking-care-daca-%E2%80%A6-we%E2%80%99re-going-have-road?division=1&network=33144&show=151292 (emphasis added).

[2]    Available  at  https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-conference-071420/.  Even assuming that no such law comes to fruition, the Federal Defendants may take additional action that bears upon DACA, whether to modify or rescind the program. *See* Astrid Galvan & Deb Riechmann, *Trump Tweets: He will again try to end DACA program after Supreme Court loss*, CHICAGO TRIBUNE (June 19, 2020), http://www.chicagotribune.com/nation-world/ct-nw-trump-daca-program-dreamers-20200619-77t7emnxibhdlmckciwc6qllly-story.html (quoting June 19, 2020, tweet from President Trump that "The Supreme Court asked us to resubmit on DACA, nothing was lost or won. . . . We will be submitting enhanced papers shortly."); Brett Samuels, *Trump expected to refile paperwork to end DACA this week*, THE HILL (July 6, 2020), https://thehill.com/homenews/administration/506018-trump-expected-to-refile-paperwork-to-end-daca-this-week.

record and of the Court's review of the evidence will be key to the outcome of its ultimate summary judgment ruling. This issue has been the subject of briefing by all parties, at the Court's request, and the parties have taken sharply different positions. *See* Order, Oct. 8, 2019, Dkt. 435; Dkt. 440 (Perez Def.-Ints.' brief); Dkt. 441 (Pls.' brief); Dkt. 442 (NJ Def.-Int.'s brief); Dkt. 443 (Fed. Defs.' brief). The Court should resolve that issue before further supplemental briefing on summary judgment, as the parties will need definitive guidance on the scope of the administrative record in order to submit comprehensive summary judgment briefs.

**Third**, if the Court ultimately rules on DACA's legality (and this will depend on the outcome of the ongoing political process described above), *Regents* also makes clear that the Court should take no action on remedies without additional discovery and briefing. In fact, even if the Court finds DACA unlawful (which it should not), the Supreme Court explained in *Regents* that it is appropriate for DHS, in the first instance, to fashion the appropriate remedy. *See* 591 U.S. ___ (slip op. at 25–26) (explaining that "nothing about th[e] determination" that DACA is unlawful "foreclosed or even addressed the options of retaining forbearance or accommodating particular reliance interests" and describing as examples of potential remedies "a broader renewal period based on the need for DACA recipients to reorder their affairs," or "accommodating termination dates for recipients caught in the middle of a time-bounded commitment, to allow them to, say, graduate from their course of study, complete their military service, or finish a medical treatment regimen," or "instruct[ing] immigration officials to give salient weight to any reliance interests engendered by DACA when exercising individualized enforcement discretion"); *id.*

(slip op. at 19) ("Those policy choices are for DHS").  As a result, if the Court were to conclude that DACA is unlawful (which it should not), it should remand to the agency to exercise its remedial discretion.  *See Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002); *cf. Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) (allowing remand to agency without vacatur where "disruptive consequences" would follow vacating agency action).  In turn, DHS must, consistent with *Regents*, consider the significant reliance interests stemming from DACA, per the Supreme Court's instruction.  *See Regents*, 591 U.S. ___ (slip op. at 19, 25–26); *cf. Wilderness Watch v. U.S. Forest Serv.*, 143 F. Supp. 2d 1186, 1210–11 (D. Mont. 2000) (concluding that an appropriate judicial remedy would require additional fact-finding regarding the parties' reliance interests and remanding to agency to craft a remedy).

If the Court were to assume the task of crafting a specific remedy, however, the reasoning in *Regents* also makes clear that the parties must conduct additional discovery and briefing before the Court were to do so (and, therefore, that the issues of legality and remedy should be bifurcated).  In particular, *Regents* instructs that any response to a conclusion that DACA is unlawful must take into account Dreamers' reliance interests.  *See Regents*, 591 U.S. ___ (slip op. at 23–25); *cf.* Memo. Op. and Order at 112–15, Dkt. 319.  Such an accounting would require enhanced discovery on questions of reliance, not only for the Dreamers, but also for the businesses, healthcare facilities, communities, states, and other third parties that depend on them, *see, e.g.*, Letter from Coalition for the American Dream to President

10

Donald J. Trump (July 11, 2020),[3] and supplemental briefing on those issues. Furthermore, the disruptive consequences of rescinding DACA are almost certainly magnified in the context of the current public-health emergency caused by COVID-19.[4]  These new and rapidly evolving facts warrant separate briefing and further discovery, which the parties have, to date, not yet undertaken.

**Fourth**, with respect to the determination of legality, *Regents* significantly changes the analysis of the central legal issues in this litigation.  The Plaintiff States have repeatedly promoted the legal theory that the Fifth Circuit decided in *Texas v. United States* ("*Texas I*"), 809 F.3d 134 (5th Cir. 2015), that DACA is unlawful.  *See e.g.*, Pl. States' Br. in Supp. of Mot. for Summ. J. at 32, Dkt. 357 (citing *Texas I*, 809 F.3d at 171–78 (regarding procedural unlawfulness)); *id.* at 36 (citing *Texas I*, 809 F.3d at 184 (regarding substantive unlawfulness)); *id.* at 27 (citing Dkt. 319 at 48–55, in turn relying on *Texas I*, 809 F.3d at 159-60 (regarding standing)).  Although Defendant-Intervenors have previously explained why that is incorrect, the Supreme Court itself has now weighed in directly on this issue.  In *Regents*, the Supreme Court emphasized that, because the Fifth Circuit's decision did *not* speak to the validity of conferring lawful presence on immigrants, neither the Attorney General nor the Fifth Circuit in *Texas I* concluded that removal-forbearance is unlawful.  *Regents*, 591 U.S.

---

[3]        Available      at      https://24j82zsm6hy2pkfkr1g3a8m1-wpengine.netdna-ssl.com/wp-content/uploads/2020/07/C4AD-Letter-July-11-2020-3.pdf.

[4] *See* Laurel Wamsley, *Texas Governor Hits 'Pause' On Further Reopening Amid COVID-19 Surge*, NPR        (June        25,        2020),        https://www.npr.org/sections/coronavirus-live-updates/2020/06/25/883311877/texas-governor-hits-pause-on-further-reopening-amid-covid-19-surge; *cf.* Laura Molinari, *Thousands of "Dreamers" are health care workers on the front lines – but fear they could soon face deportation*, CBS NEWS (Apr. 23, 2020), https://www.cbsnews.com/news/coronavirus-daca-health-care-workers-covid-19-deportation/.

___ (slip op. at 19–21).  In short, according to the Supreme Court, *Texas I* does not concern removal-forbearance, which the Supreme Court held constitutes the "centerpiece" of DACA.  *See id.* (slip op. at 23).  Accordingly, neither *Regents* nor *Texas I* provide any basis for declaring DACA as a whole unlawful.  Moreover, Texas has *not*, in its pleadings or at any other point in this litigation, formally asked the Court to invalidate separate regulations that confer the benefits identified by the Supreme Court in *Regents*.  *See* First Am. Compl. at ¶¶ 52, 352-56, Dkt. 104 (challenging only "DACA" in Plaintiffs' causes of action); *see* 591 U.S. ___ (slip op. at 22 n.6).  Thus, Plaintiffs' reliance on *Texas I*, which concerned only the benefits-eligibility portion of DACA, is misplaced, and is not dispositive.

## **Proposed Next Steps**

Given the monumental impact of the Supreme Court's decision, and the recent statements by the Federal Defendants, Defendant-Intervenors believe that it is premature to resume with supplemental summary judgment briefing immediately. Instead, this Court should issue a further stay for 60 days to allow the political process to run its course, with the parties returning to this Court with a status update at that time, or at any other interval requested by the Court.  As described below, Defendant-Intervenors request that, after the process described in Part I runs its course, (1) the parties and this Court settle the outstanding issues regarding the administrative record, and the outstanding issues regarding the relevant evidence appropriate for consideration in this case, (2) this Court allow for additional, limited, targeted, and sequential discovery, and then (3) the parties commence robust, orderly, and sequential supplementary summary judgment briefing.

***First***, the parties and this Court should settle the issues regarding the appropriate evidence to consider at summary judgment, as well as settle the materials in the administrative record.  As this Court is aware, *see* Dkt. 435, on October 8, 2019, shortly before issuing a stay in this matter, this Court required the parties to address the scope of the evidentiary record it may consider in resolving the summary judgment motion, particularly whether this Court is limited to reviewing the administrative record.  This order came months after Plaintiffs and Defendant-Intervenors submitted their summary judgment briefing, all of which incorporated evidence outside of the administrative record.  Additionally, the parties, with the Court's leave, were already planning to submit supplemental summary judgment briefing, which was specifically impelled by considerations of discovery and extra-record evidence.  *See* Perez Def.-Ints.' Mot. for Leave to File Suppl. Br., Dkt. 432.

The parties submitted their responses to the Court's order requesting additional briefing on the administrative record on October 28, 2019.  *See* Dkts. 440, 441, 442, 443.  In their briefs, Plaintiffs contend that the Court is not limited to the administrative record; Perez Defendant-Intervenors argue that the Court must consider extra-record evidence for the procedural APA challenge, and may do so for the substantive APA claims, especially if the Court chooses to rely on the Fifth Circuit's *Texas I* decision; New Jersey explained that this Court should not examine evidence outside the administrative record in evaluating the merits of the Plaintiff States' APA claim, but may do so in the context of determining standing, in evaluating constitutional claims, and in fashioning an appropriate remedy; and Federal Defendants state that review of APA claims should be limited to the

administrative record.  *Compare* Dkt. 440 at 6–15 (Perez Def.-Ints.' brief), *with* Dkt. 441 at 2 (Pls.' brief), *and* Dkt. 442 at 2 (NJ Def.-Int.'s brief), *and* Dkt. 443 at 2 (Fed. Defs.' brief).  Defendant-Intervenors have never had the chance to respond to Plaintiffs' arguments, nor to explain to this Court why their views have been bolstered by the recent *Regents* decision.  And, while Federal Defendants argue that the Court need not consider extra-record evidence to decide Plaintiffs' substantive APA claim specifically, Plaintiffs have in fact relied on significant amounts of extra-record evidence on that issue.  *See, e.g.*, Pl. States' Br. in Supp. of Mot. for Summ. J. at 39, Dkt. 357 (citing a 2019 version of USCIS's *DACA: Frequently Asked Questions* webpage [Ex. 3, App. 11]); *id.* at 34–43 (citing *Texas I*'s substantive APA analysis throughout, which in turn relies on extra-record evidence, *see Texas I*, 809 F.3d at 185 n.200 (citing a 2014 speech concerning DACA by President Obama)).  Perhaps of greater note, Federal Defendants have never even submitted the certified administrative record or a log of any materials they chose to withhold as privileged to this Court.

As a result, before proceeding to any further steps, this Court should resolve whether and what evidence will bear on its analysis of the APA claims, which will inform supplemental briefing on summary judgment.  This is a two-part process. Initially, the Federal Defendants should transmit to the Court a certified, completed copy of administrative record.  The proposed schedule set forth below sets a deadline for them to do so, and also to provide a privilege log.[5]  Once that happens, the

---

[5] District courts in this circuit follow the rule that if a federal agency wishes to claim privilege with respect to materials it considered but excluded from the record, it must produce a privilege log. *Exxon*

remaining parties must have an opportunity to challenge the sufficiency of the record, including to challenge the privilege designations, a step that has only grown in further importance because of *Regents*. At the conclusion of that part of the process, the parties and the Court can formally address the issue of what evidence this Court may consider when deciding each claim on which summary judgment is sought through motion practice or formal briefing (as New Jersey suggested would be necessary in its October 2019 submission).

***Second***, after this Court decides the scope of the administrative record—but before it can properly resolve the issues in this case—it should allow the parties to engage in a relatively brief and targeted, sequential discovery period to supplement the record, most importantly in light of the considerations that *Regents* makes relevant. To ensure that the parties timely engage in this process, the parties would be limited to addressing the following topics, in sequence:

- State Standing. In its opinion, the Supreme Court recognized the massive impact that a wholesale and immediate rescission of DACA would have on the United States' and states' economies. Indeed, the Supreme Court noted that rescinding DACA might cost $215 billion in nationwide economic activity, *see* 591 U.S. ___ (slip. op. at 25 (citing Brief for Regents at 6)). It also relied on figures in the Brief of 143 Businesses as *Amici Curiae, see id.* at 25, which further noted that Texas alone stands to lose $6.3 billion in GDP from DACA's

---

*Mobil Corp. v. Mnuchin*, 2018 WL 10396585, at *3 (N.D. Tex. June 26, 2018) (granting motion to compel federal agency to produce log of materials the agency deemed protected by the deliberative-process privilege, and noting that "district courts in this circuit have required agencies to substantiate claims of privilege") (citing cases). As the Northern District of Texas explained, the "agency has the burden of establishing that the deliberative-process privilege applies," and "excusing [the agency] from the requirement of providing a privilege log would essentially vitiate their burden of establishing the applicability of the privilege." *Id.* at 4. Indeed, "[w]ithout a log … Plaintiffs would lack the information necessary to overcome the privilege and [the agency's] invocation of privilege would essentially be absolute." *Id.*; *see also State v. U.S. Immigration & Customs Enforcement*, 438 F. Supp. 3d 216, 218 (S.D.N.Y. 2020) (holding that, while agency materials "that genuinely fall under the deliberative process privilege are not part of the administrative record," the agency must produce a privilege log to allow the court to determine whether the materials withheld truly come within the privilege). Federal Defendants have not yet produced to the parties or to this Court any such log.

rescission, according to research estimates. *See* Brief of 143 Businesses as *Amici Curiae* at 16, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. ___ (2020). The Supreme Court's recognition of this tremendous economic harm to Texas (and doubtless to other Plaintiff States as well) further bolsters the conclusion that Texas cannot establish *parens patriae* standing in this case on the basis of economic harm to citizens *from DACA*, were it even available in a suit against the Federal Government (which it is not). *See* Perez Def.-Ints.' Mot. in Opp. to Summary Judgment at 21-24, Dkt. 399.

Against that evidence, a single Plaintiff State—Arkansas—and the Federal Defendants provided standing-related documents. Perez Defendant-Intervenors received these highly complex documents only days before discovery closed. Because of this Court's stay, and the effects of the global pandemic, Perez Defendant-Intervenors have not yet been able to appropriately analyze the documents, and determine whether any additional follow-up inquiries are warranted. Additional analysis is particularly important and appropriate here because of the complex network of state and federal computer systems from which Arkansas drew its data. Because of that complexity, Perez Defendant-Intervenors may need to retain an expert to conduct additional analysis.

- <u>Reliance</u>. If the Court determines that the Plaintiff States have standing, the parties should be afforded the opportunity to conduct additional discovery to supplement the record regarding their reliance interests.[6] As noted above, *Regents* repeatedly makes clear that whatever the legality of DACA, DHS must take reliance interests into account in fashioning appropriate relief. If the Court undertakes that role, the Supreme Court's directive to take reliance interests into account is especially relevant here given the Plaintiff States' request for an injunction. *See Regents*, 591 U.S. ___ (slip op. at 26) (finding that "nothing about th[e] determination" that DACA is unlawful "foreclosed or even addressed . . . accommodating particular reliance interests" and then describing those interests). This Court will thus benefit considerably from a record that includes robust information on reliance by DACA recipients and by the State of New Jersey, including regarding the latter's reliance interests in creating or maintaining state programs that involve DACA recipient participation. That need has only been heightened by the current COVID-19 pandemic, an additional consideration that could only be addressed through additional discovery that yields a supplemental record. DACA recipients

---

[6] Both the Perez Defendant-Intervenors and the State of New Jersey believe that the parties must be allowed to engage in additional discovery on reliance interests before the Court reaches a final judgment. Perez Defendant-Intervenors believe that additional discovery on reliance should occur only if—and only after—the Court determines both that Plaintiff States have standing and that DACA is unlawful (which it should not). New Jersey recommends that the Court schedule additional discovery on reliance to take place along with discovery on Plaintiff States' standing and before the parties engage in supplemental briefing on standing and the merits.

number among the States' frontline or essential workers, another example of the disruption that would be wrought by an injunction.

Discovery on the first of these issues would help this Court decide whether there is a case or controversy to resolve, while discovery on the second would inform its efforts to decide on the appropriate remedy in the event it reaches the merits, ultimately agrees with the Plaintiff States' legal position, and decides to craft a remedy instead of remanding to DHS for further steps.

***Third***, this Court should allow the parties to provide robust, orderly, and sequential supplemental briefs to address the propriety of summary judgment. As this Court knows, the Plaintiff States' Motion for Summary Judgment (Dkt. 356) remains pending before the Court. Karla Perez, *et al.* and New Jersey filed their responses to that Motion on June 14, 2019 (Dkt. 399 and Dkt. 397 respectively), and the Plaintiff States replied to those submissions on June 28, 2019 (Dkt. 413). Two months of additional, as-scheduled discovery followed the completion of that briefing. Given that discovery, the Court already granted Defendant-Intervenors' Motion for Leave to File Supplemental Briefing. *See* Order, Dkt. 448. Given the intervening developments in this matter, supplemental briefing is necessary to address: (1) this Court's ruling on the appropriate evidence to consider, and the completion of the administrative record; (2) the issues raised in the months of already-conducted discovery that followed completion of summary judgment briefing; (3) the additional record evidence provided during the supplemental discovery discussed above; and (4) the significant impact of *Regents*.

As described below, that briefing should proceed sequentially.  First, the parties should brief, and the Court should decide, the appropriate evidence to consider.  Next, following additional discovery related to standing, the parties should brief, and the Court should decide, the issue of Plaintiff States' standing.  Then, if necessary, the parties should brief, and the Court should decide, the merits.  Finally, if necessary, the parties should brief, and the Court should decide, the next steps following a merits ruling.  Because *Regents* significantly reshapes the legal questions for this Court, during each phase of briefing, Defendant-Intervenors do not support any proposal that supplemental briefing be conducted simultaneously; instead, the Plaintiff States should share their views as to whether summary judgment remains proper in light of the Supreme Court's decision, Defendants should then have sufficient time to respond to the motion, and Plaintiff States should then be given a sufficient opportunity for a reply.  Oral argument would then follow.

***Finally***, allowing the parties to fully develop the supplemental record, and to appropriately complete orderly summary judgment briefing, will allow the Federal Defendants to take the steps the President has described that may obviate the need for resolution by this Court.

## Proposed Timeline for Completion of Next Steps

Given the above explanation, Defendant-Intervenors propose the following specific timeline:

1. Administrative Record Resolution.

   a. Federal Defendants file a certified copy of the complete administrative record, with a privilege log, by August 14.

18

    b. Parties have 21 days to move to challenge completeness and/or to supplement the administrative record, as well as to challenge privilege designations.

    c. If motion is made, Federal Defendants have 14 days to respond to motion.

    d. Moving parties have 7 days to reply.

    e. Court resolves remaining administrative record and privilege designation disputes.

2. <u>Resolution of Relevant Evidence</u>. On resolution of the completeness of the administrative record, this Court rules on the appropriate evidence bearing on each claim. Defendant-Intervenors are happy to provide supplemental briefing as to that question, both to respond to the Plaintiff States' claims and to address the relevant language from *Regents*.

3. <u>Reopening of Limited Discovery Period (standing)</u>. Upon this Court's resolution of the completeness of the administrative record and of the evidence that can be considered on summary judgment, Court sets 2 months of discovery, limited to:

    a. State Standing Issues, including determination of accuracy and potential expert analysis of Arkansas's and Federal Defendants' recent evidence.

4. <u>Proceed to supplemental summary judgment briefing (standing)</u>.

    a. Plaintiffs: No sooner than close of discovery, and up to 35 days after, may file supplemental brief in support, which, at a minimum, addresses impact of *Regents*.

    b. Defendants Respond: Up to 14 days after submission of the Plaintiffs States' brief.

    c. Reply: Up to 7 days after response.

    d. Oral argument.

5. <u>If necessary, proceed to supplemental summary judgment briefing (merits)</u>.

    a. Plaintiffs: If the Court determines that the Plaintiff States have standing, up to 35 days after the Court's decision, may file supplemental brief in support, which, at a minimum, addresses impact of *Regents*.

    b. Defendants Respond: Up to 14 days after submission of the Plaintiffs States' brief.

    c. Reply: Up to 7 days after response.

    d. Oral argument.

6. <u>If necessary, reopening of Limited Discovery Period (reliance).</u> Before this Court issues any final judgment,[7] Court sets 2 months of discovery, limited to:

    a. Issues of Reliance in light of *Regents* – including reliance in light of COVID-19

7. <u>If necessary, proceed to supplemental summary judgment briefing (remedies).</u>

    a. Plaintiffs: If the Court determines that the Plaintiff States have standing, up to 35 days after the Court's decision, may file supplemental brief in support, which, at a minimum, addresses impact of *Regents*.

    b. Defendants Respond: Up to 14 days after submission of the Plaintiffs States' brief.

    c. Reply: Up to 7 days after response.

    d. Oral argument.

---

[7] As described above, *see supra* note 6, Perez Defendant-Intervenors believe that additional discovery on reliance should occur only if and only after the Court decides both that Plaintiff States have standing and that DACA is unlawful (which it should not), whereas New Jersey recommends that the Court schedule additional discovery on reliance before the parties engage in supplemental briefing on standing and the merits. Perez Defendant-Intervenors and New Jersey agree, however, that, at all events, the parties must be allowed to engage in additional discovery on reliance interests before the Court issues a final judgment.

July 24, 2020

Respectfully submitted.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge
Deputy Chief, Special Litigation Unit
Tx. State Bar No. 24081854
Southern District of Texas No.
2985472
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 936-0545
todd.disher@oag.texas.gov

**COUNSEL FOR PLAINTIFF
STATES**

*/s/ Jeffrey S. Robins*
JEFFREY S. ROBINS
Deputy Director
*Lead Attorney*
U.S. Department of Justice, Civil
Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Washington, DC 20044
Telephone: (202) 616-1246
Facsimile: (202) 305-7000
jeffrey.robins@usdoj.gov

**COUNSEL FOR FEDERAL
DEFENDANTS**

*/s/ Nina Perales*
NINA PERALES
Tex. Bar No. 24005046
SD of Tex. Bar No. 21127
Attorney-in-Charge
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org

**COUNSEL FOR DEFENDANT-
INTERVENORS KARLA PEREZ,
ET AL.**

*/s/ Jeremy E. Hollander*
JEREMY E. HOLLANDER
Assistant Attorney General
Attorney-in-Charge
(admitted pro hac vice)
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Phone: (973) 648-7453
Fax: (973) 648-4887
Jeremy.hollander@law.njoag.gov

**COUNSEL FOR DEFENDANT-
INTERVENOR STATE OF NEW
JERSEY**