UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

STATE OF TEXAS et al. ,
Plaintiff,
v.
UNITED STATES OF AMERICA  et al.,
Defendant.

Civil Action No. 18-cv-068 (ASH)

AFFIRMATION IN SUPPORT OF MOTION TO INTERVENE UNDER FRcvP RULE

24 BY THE TRUSTEES OF THE AD HOC NEW YORKER REPUBLICAN

COMMITTEE

# Exhibit 6

*Ad Hoc New Yorker Republican Committee*
　Trustee Christopher Earl Strunk
　141 Harris Avenue
　Lake Luzerne, New York 12846-1721
　518-416-8743 Email: strunk@leader.com

John M. Domurad, Clerk of the UNITED STATES Court
for the Northern District Court Of New York
U.S. Courthouse and Federal Building
445 Broadway, the Clerk's Office Room 509
Albany, NY 12207-2936

Regarding: REV. STEVEN SOOS et al., V   ANDREW M. CUOMO et al., 20-cv-651   (GLS/DJS)

Subject:   Proposed Plaintiff-Intervener Petition for THE AD HOC NEW YORKER REPUBLICAN
COMMITTEE INTERVENTION TO ENLARGE THE PRELIMINARY INJUNCTION TO
RESOLVE DEFENDANTS' DEVICES FOR SOCIAL SCORING, TORTUOUS ELECTION
INTERFERENCE AND NANO-TECH SYSTEMS FOR UNCONSTITUTIONAL SURVEILLANCE
with Exhibits 1 through 21

The Honorable Clerk of the Court,

Pursuant to the Memorandum-Decision and Order of June 26, 2020 by the Honorable Senior Judge
Gary L. Sharpe, shown as Exhibit 1, because of the supporting evidence threat described in the
Subject Petition among the reasons listed at Petition Summary at paragraph 97 that the Proposed
Plaintiff-Intervener is a targeted NEW YORKER who individually and for the Committee seeks
relief of the Court with time of the essence with irreparable harm to enlarge restraint of Defendants'
malicious infliction of Plaintiffs' religious liberty injury and who are in conspiracy with listed
entities / persons to single out Petitioner vulnerabilities to physical threat and seeks to protect New
Yorkers from insidious unconstitutional surveillance; and

Accordingly, with due Notice of this Petition Request to the other Trustee Proposed Plaintiff-
Intervener for permission to file herewith for permission of the Court to intervene is the original
singled sided Petition with Exhibits so affirmed 17 July 2020 with two(2) back and front copies for
the court and having been duly served by regular mail upon counsels for Defendants, Plaintiffs and
NDNY US Attorney; and

Christopher Earl Strunk Trustee for *Ad Hoc New Yorker Republican Committee* declare, certify,
verify, and state under penalty of perjury that the foregoing is true and correct with 28 USC §1746.

Sincerely,　　　　　*Ad Hoc New Yorker Republican Committee*

Dated: July **18**, 2020
　　Lake Luzerne, New York _____

　　　　　　　　　　Christopher Earl Strunk in esse Sui Juris in propria persona
　　　　　　　　　　Trustee for the *Ad Hoc New Yorker Republican Committee*
　　　　　　　　　　All Rights Reserved Without Prejudice

Attached:  Original Petition for Intervention Relief
　　　　Two back and front copies,  Certificate of Service

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

REV. STEVEN SOOS et al.,                              20-cv-651   (GLS/DJS)
                              Plaintiffs,

v.

ANDREW M. CUOMO et al.,
                              Defendants.

## CERTIFICATE OF SERVICE BY U.S. MAIL

The Trustee of the *Ad Hoc New Yorker Republican Committee* HEREBY CERTIFIES that on
this 18th day July, 2020, caused a true and correct copy of The Petition for THE AD HOC NEW
YORKER REPUBLICAN COMMITTEE INTERVENTION TO ENLARGE THE
PRELIMINARY INJUNCTION TO RESOLVE DEFENDANTS' DEVICES FOR SOCIAL
SCORING, TORTUOUS ELECTION INTERFERENCE AND NANO-TECH SYSTEMS
FOR UNCONSTITUTIONAL SURVEILLANCE with Exhibits 1 through 21 so affirmed on 17
July 2020 along with a copy of the Petition Letter to the Honorable Clerk of the Court requesting to
Intervene annexed to be served upon Parties' Counsels by first class United States Postal Service
mail postage prepaid and by complimentary email marked for delivery to:

CHRISTOPHER A. FERRARA, ESQ.                HON. JAMES E. JOHNSON
148-29 Cross Island Parkway,                Corporation Counsel of the City of New York
Whitestone, NY 11357                        New York City Law Department
                                            100 Church Street
MICHAEL McHALE, ESQ                         New York, NY 10007
10506 Burt Circle , Ste 110
Omaha, NE 68114                             The Honorable Grant C. Jaquith
                                            the United States Attorney for the Northern
HON. LETITIA JAMES                          District of New York
New York State Attorney General             U.S. Attorney's Office
The Capitol                                 445 Broadway, Room 218
Albany, NY 12224                            Albany, NY 12207-2924

Christopher Earl Strunk Trustee for the *Ad Hoc New Yorker Republican Committee* declare,
certify, verify, and state under penalty of perjury that the foregoing is true and correct with 28
USC §1746.

Dated: July 18, 2020
        Lake Luzerne, New York

                                            Christopher Earl Strunk in esse Sui Juris in propria persona
                                            Trustee for the *Ad Hoc New Yorker Republican Committee*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

REV. STEVEN SOOS et al.,                          20-cv-651   (GLS/DJS)
                              Plaintiffs,

v.

ANDREW M. CUOMO et al.,
                              Defendants.

CERTIFICATE OF SERVICE BY U.S. MAIL

The Trustee of the *Ad Hoc New Yorker Republican Committee* HEREBY CERTIFIES that on this 18th day July, 2020, caused a true and correct copy of The Petition for THE AD HOC NEW YORKER REPUBLICAN COMMITTEE INTERVENTION TO ENLARGE THE PRELIMINARY INJUNCTION TO RESOLVE DEFENDANTS' DEVICES FOR SOCIAL SCORING, TORTUOUS ELECTION INTERFERENCE AND NANO-TECH SYSTEMS FOR UNCONSTITUTIONAL SURVEILLANCE with Exhibits 1 through 21 so affirmed on 17 July 2020 along with a copy of the Petition Letter to the Honorable Clerk of the Court requesting to Intervene annexed to be served upon Parties' Counsels by first class United States Postal Service mail postage prepaid and by complimentary email marked for delivery to:

CHRISTOPHER A. FERRARA, ESQ.                    HON. JAMES E. JOHNSON
148-29 Cross Island Parkway,                    Corporation Counsel of the City of New York
Whitestone, NY 11357                            New York City Law Department
                                                100 Church Street
MICHAEL McHALE, ESQ                             New York, NY 10007
10506 Burt Circle , Ste 110
Omaha, NE 68114                                 The Honorable Grant C. Jaquith
                                                the United States Attorney for the Northern
HON. LETITIA JAMES                              District of New York
New York State Attorney General                 U.S. Attorney's Office
The Capitol                                     445 Broadway, Room 218
Albany, NY 12224                                Albany, NY 12207-2924

Christopher Earl Strunk Trustee for the *Ad Hoc New Yorker Republican Committee* declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct with 28 USC §1746.

Dated: July 18, 2020
        Lake Luzerne, New York

                              Christopher Earl Strunk in esse Sui Juris in propria persona
                              Trustee for the *Ad Hoc New Yorker Republican Committee*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

REV. STEVEN SOOS et al.,                          20-cv-651   (GLS/DJS)
                            Plaintiffs,

v.

ANDREW M. CUOMO et al.,
                            Defendants.
_____

AD HOC NEW YORKER REPUBLICAN COMMITTEE INTERVENTION TO
ENLARGE THE PRELIMINARY INJUNCTION TO RESOLVE DEFENDANTS'
DEVICES FOR SOCIAL SCORING, TORTUOUS ELECTION INTERFERENCE
AND NANO-TECH SYSTEMS FOR UNCONSTITUTIONAL SURVEILLANCE

Although there is evidence of Defendants' malicious infliction of Plaintiffs' religious

liberty injury, Memorandum-Decision and Order (Exhibit 1) outrageously neglects

to protect NEW YORKERS from Defendants' malicious acts to prevent re-election of

Donald J. Trump (DJT) on 3 November 2020 by any means possible with tortuous

interference and propaganda to disrupt state / federal elections and commerce with

Deborah L. Birx, Anthony S. Fauci, Robert R. Redfield, Bill & Melinda Gates

Foundation, GAVI Vaccine Alliance, Imperial Chemical Industries, and investment

to facilitate unjust enrichment by NANO-TECH systems experimentation on NEW

YORKERS to: introduce global surveillance with eugenics / genocide capability, to

tortuously interfere under color of law to violate Constitutional 14th Amendment

rights under 42 USC §1983 and related law, infringe Plaintiffs / Intervener's 1st 4th

5th 9th 10th rights, and aid & abet Chinese Communist Party's illegal virus Gain-of-

Function Research (GOFR); despite treatments see https://americacanwetalk.org/dr-

richard-bartlett-acwt-interview-7-2-20/, and according to the following allegations:

## INTERVENER PLAINTIFF

1. Affirmant Christopher Earl Strunk in esse sui juris is a Private American Citizen Trustee of the AD HOC NEW YORKER REPUBLICAN COMMITTEE (Exhibit 2) registered to vote in Warren County New York; and

2. As such, after consideration from 1997 onward, in 2015 Affirmant celebrated his Bar Mitzvah pictured in front of the Brooklyn Public Library (Exhibit 3), who since 2018 became Brooklyn's wandering Jew in Warren County as a Veteran with Blood Type A according to the Department of Defense; and

Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV-2) plus Gain of Function Research (GOFR) done in WUHAN PRC under U.S. Patent No.: US 10,130,701 B2 named CORONAVIRUS is COVID-19?

3. On 20 November 2018 the Patent Office approved United States Patent No.: US 10,130,701 B2 named CORONAVIRUS by application of THE PIRBRIGHT



INSTITUTE of Pirbright Woking Great Britain that is acknowledged by Bill Gates; and

4. According to the PRC's World Health Organization partner, COVID 19 is CORONAVIRUS transmitted by symptomatic viremia positive persons; and

5. According to the New England Journal of Medicine June 17, 2020 study report (see Exhibit 4), confirmed in conclusion that persons with Blood Type A are the most vulnerable to fatality from the CORONAVIRUS infection [1], and

---

1. The Study concludes that: Non-genetic studies that were reported as preprints have previously implicated the involvement of ABO blood groups in Covid-19 susceptibility, and

2

6. According to the Oklahoma Blood Institute, Caucasians with Blood Type A compose 31% of the total United States Population (see <u>Exhibit 5</u>) are thus disproportionately vulnerable to CORONAVIRUS infection and vaccine death.

## DEFENDANTS AID AND ABET TERRORISM

7. Affirmant served his claim notice that NYS EXECUTIVE AIDS AND ABETS TERRORISM USING ITS REGISTERED ENTITIES to Defendants with authority over participant entities responsible for riot and mayhem (see <u>Exhibit 6</u>); and

8. Based upon Affirmant's search of the Division of Corporations and Business Entity Database with information contained in its database current through June 25, 2020, inter alia to the extent that the State CINC refused to act to prevent rioting and mayhem in the City of New York it is alleged that the NYS executive is aiding and abetting terrorism using its registered entities inter alia:

> BLACK LIVES MATTER GREATER NEW YORK INC
> BLACK LIVES MATTER INC
> BLACK LIVES MATTER JOBS LIMITED LIABILITY COMPANY
> BLACK LIVES MATTER REAL ESTATE FUND, LLC
> BLACK LIVES MATTER UNITED INC
> NEW YORK BLACK LIVES MATTER, INC.
> BLACK PANTHER, INC.
> INTERNATIONAL BLACK PANTHER FILM FESTIVAL, INC.
> THE NY BLACK PANTHER COMMITTEE FOR SOCIAL PROGRESS INC.

---

ABO blood groups have also been implicated in susceptibility to SARS-CoV-1 infection. Our genetic data confirm that blood group O is associated with a risk of acquiring Covid-19 that was lower than that in non-O blood groups, whereas blood group A was associated with a higher risk than non-A blood groups. The biologic mechanisms undergirding these findings may have to do with the ABO group per se (e.g., with the development of neutralizing antibodies against protein-linked N-glycans) or with other biologic effects of the identified variant, including the stabilization of von Willebrand factor. The *ABO* locus holds considerable risk for population stratification, which is increased by the inclusion of randomly selected blood donors in the current study (for which there is an inherent risk of blood group O enrichment). Alignment of the allele frequencies at the *ABO* locus in our control population with those in several non–blood-donor control populations would suggest that this is not a major bias, and at least one study that tested for association with blood type used disease controls with no affiliation to blood donors.

3

9. All listed entities operate with impunity under the jurisdiction of New York State as registered for profit and or non-profit corporations whose members commit mayhem and their leaders make statements as terrorist organizations that are ignored by Defendants and others who are accessories to crime in the recent City of New York riots; and that goes to the Executive arbitrary disaster and emergency parallel process that is ULTRA VIRES of state law / Constitution implementing a "VACCINE" with aid and abetting by Deborah L. Birx, Anthony S. Fauci, Robert R. Redfield, Bill & Melinda Gates Foundation, GAVI Vaccine Alliance, Imperial Chemical Industries and others unjust enrichment; and

   State within the State members are listed in the Plum Book

10. Further, in explanation regarding the 'Deep State' the State within the State[2] employees are listed in the Plum Book: The post civil war 14th Constitutional amendment administrative federal government that transformed the spoils system overlaid after the deaths of Lincoln, Garfield and McKinley from the 1913 temporary monetary emergency was made perpetual in 1928 and with the 1933 FDR Proclamation 2040 Military Government under the Emergency Banking Relief Act is now an extra-constitutional permanent state within a state of United States Government Policy and Supporting Positions the list of which, the Plum Book, originated in 1952 during the Eisenhower administration most important legacy disclosure; and

11. That for twenty years, the Democratic Party had controlled the federal

---

[2] Deep state. ... A deep state (from Turkish: derin devlet), also known as a state within a state, is a type of governance made up of networks of power operating independently of a state's political leadership in pursuit of their own agenda and goals.

4

government. When President Dwight Eisenhower took office, the Republican Party requested a list of government positions that the new president could fill.

12. The next edition of the Plum Book appeared in 1960 and has since been published every four years, just after the presidential election, as a publication of the Senate's Committee on Governmental Affairs and the House of Representatives' Committee on Government Reform; and

13. The Plum Book is published after each Presidential election, now lists over 10000 plus federal civil service leadership and support SENIOR EXECUTIVE SERVICE of 1978 (SES) positions in the legislative branch and the executive branch of the federal government that may be subject to noncompetitive appointment nationwide, commonly called political appointments.

14. The Plum Book covers positions such as agency heads and their immediate subordinates, policy executives and advisors, and aides who report to officials.

15. The Plum Book is used to identify presidentially nominally appointed SES positions within the present unconstitutional federal government.

## SENIOR EXECUTIVE SERVICE

16. Affirmant as a matter germane herein, explains the insidious nature of the SENIOR EXECUTIVE SERVICE of 1978 (SES) *state within the state* that is the unconstitutional fourth branch of government position classification in the civil service of the United States federal government, in that a member is equivalent to general officer or flag officer ranks in the U.S. Armed Forces was created in 1979 when the Civil Service Reform Act of 1978 went into effect

5

under the Trilateral Commission's corporatist President Jimmy Carter whose accommodation merger with the global Five-Eyes national security MIC apparatus best illustrated by the Queens Golden Share in her Privy council's Serco Inc. served by SES inside traders with impunity using the Office of Personnel Management and related offices designed to be a corps of executives selected for their leadership qualifications, serving in key positions just below the top Presidential appointees as a link between them and the rest of the Federal civil service, the SES workforce of whom the LTC Vindman twins are poster boys for why the *Natural Born Citizen*[3] requirement is important; and

17. Further, that SES positions are considered to be above the GS-15 level of the General Schedule, and below Level III of the Executive Schedule Career members of the SES ranks are eligible for the Presidential Rank Awards program that based upon information and belief SES remains the seditious foreign existential burr under DJT's saddle to be removed and disposed of; and

18. Further, that up to 10% of SES positions can be filled as political appointments rather than by career employees, and about half of the SES is designated "Career Reserved", which can only be filled by career employees, Defendants, Deborah L. Birx, Anthony S. Fauci, Robert R. Redfield, all of whom are SES members and or the retirement association; and

19. Further, the other half designated "General" can be filled by career employees or political appointments desired by the administration, and due to the 10%

---

[3] Term Natural Born Citizen is a person born on soil of citizen parents as matter of allegiance

limitation, most General positions are still filled by career appointees; and

20. Further, Senior level employees of several agencies are exempt from the SES but have their own senior executive positions that include the Federal Bureau of Investigation, Central Intelligence Agency, Defense Intelligence Agency, National Security Agency, Transportation Security Administration, Federal Aviation Administration, Government Accountability Office, Members of the Foreign Service, and government corporations.

## INDONESIAN WAHHABIST

21. Due to Affirmant's efforts in *Strunk v. DOS etal.* in DCD F.O.I.A. case 2008 cv 2234 (RJL) to protect the Constitutional term of art "Natural Born Citizen", we discovered that the Indonesian Barry Soetoro is also known by his Indonesian SUBUD cult name SOEBARKAH, and as such the Indonesian Wahhabist traveled on an Indonesian Passport kept secret by John O. Brennan; and

22. Further among the work of other researchers, according to the past New York Borough President Attorney Percy Sutton, Indonesian Barry Soetoro's education at Occidental College, Columbia University and Harvard University as a foreign student was at best paid for by the Saudi Kingdom and at worst by the CIA to which we have no access to sealed records for the Saudi's INDONESIAN WAHHABIST Jihadist Moslem Brother asset protected by his Jesuit Coadjutor John O. Brennan fellow Jihadist Moslem Brother; and

23. Based upon information and belief the Indonesian Barry Soetoro, Soebarkah became a SES member when working for the CIA's Business International

7

Corporation, and according to Col. Field McConnell (ret.) in 1996 his sister Kristine Marcy, SES President and Chief Executive Officer with U.S. Department of Justice: Assistant Director for Prisoner Services, U.S. Marshals Service changed Barry Soetoro's name to Barack Hussein Obama; and

24. Further, Affirmant is concerned with the treason / sedition of the INDONESIAN WAHHABIST's pursuit of American cultural deconstruction using propaganda along the lines devised by Benito Mussolini's main political competitor Antonio Gramsci, whose prolific writings were glommed by the seditious American communist Saul Alinsky with Cardinal Montini's help in the 1950s in pursuit of Harry Truman's *Iron Mountain Plan* that intended to destroy the Sovereignty of the United States of America to make peace in favor of governance by the United Nations (see Exhibit 7); and

### The State within the State: Propaganda - Fake News

25. Affirmant complains of Defendant SES members' ongoing Coup D'etat against DJT that since 2016 has harmed us all by criminal traps set for DJT and his NSC choice LTG. Michael T. Flynn, in which criminal case the Affirmant's Committee is in the DC District and Circuit Court record, see

https://www.scribd.com/document/462611349/NOTARIZED-AMICI-CURIAE-BRIEF-With-Exhibits-in-the-Case-of-United-States-of-America-v-Flynn-DCDC-17-Cr-232-EGS; and

26. Further as a motive of why the SES is going after DJT and Flynn, by his own admission LTG. Michael T. Flynn intends to audit the CIA / Intelligence

Community, and were it done threatens the Military Industrial Complex (MIC) with SES and SERCO INC. of the Queens Privy Council; and

27. Further, Affirmant complains of Defendants' tortuous interference with re-election of DJT by fraudulent participation in a manner characterized by the Cato Institute policy-report *The Criminalization of Almost Everything* https://www.cato.org/sites/cato.org/files/serials/files/policy-report/2012/2/cpr32n1-3.pdf (see EXHIBIT 8): that Alan Dershowitz references in the foreword to his 2006 book *Preemption: A Knife That Cuts Both Ways*, discusses his time litigating cases in the old Soviet Union. He was always taken by the fact that the Soviet Union could prosecute anybody they wanted because some of the statutes were so vague Alan Dershowitz points out that this was a technique developed by Lavrentiy Beria, the infamous sidekick of Stalin, who said, "Show me the man and I'll find you the crime." That really is something that has survived the Soviet Union and has arrived in the USA; and

28. Further, Lavrentiy Beria, like Walter Friedrich Schellenberg after the abolition of The Canaris / Von Papen Abwehr in 1944 worked for Hitler and the Grand Mufti of Jerusalem Haj Amin al-Husseini who initiated the Jewish Holocaust, from 1919 Beria started in the Georgian Cheka was the most ruthless and longest-serving secret police chief in Joseph Stalin's reign of terror in Russia and Eastern Europe who assumed Stalin's job in 1954 [4], bragged he could prove criminal conduct on anyone, even the innocent. "Show

---

[4] https://en.wikipedia.org/wiki/Lavrentiy_Beria

me the man and I'll show you the crime" was Beria's infamous boast; and

29. Further, at https://www.belfercenter.org/publication/trump-risks-making-stalins-disastrous-mistake-intelligence-analysis (see EXHIBIT 9), Harvard University laments that DJT does not trust the Intelligence Community, and especially so following the briefing of President Elect DJT at Trump Tower by NSA Chief Adm. Michael S. Rogers, the United States Navy admiral who served as the second commander of the U.S. Cyber Command concurrently as the 17th director of the National Security Agency (NSA) and chief of the Central Security Service from April 3, 2014; and

30. Further as background germane herein, the U.S. Information and Educational Exchange Act of 1948 (Public Law 80-402), popularly called the Smith–Mundt Act, is the basic legislative authorization for propaganda activities conducted by the U.S. Department of State, sometimes called "public diplomacy". The act was first introduced by Congressman Karl E. Mundt (R-SD) in January 1945 in the 79th Congress. It was subsequently passed by the 80th Congress and signed into law by President Harry S. Truman on January 27, 1948; and

31. Further, the noun PROPAGANDA *per se is* information, ideas, or rumors deliberately spread widely to help or harm a person, group, movement, institution, nation, etc. a.k.a. *Fake News*, that is the deliberate spreading of such information, rumors, etc. the particular doctrines or principles propagated by an organization or movement; and

32. Further, large-scale institutional propaganda derived from the 1534 Council of

10

Trent in reaction to the protestant reformation within the *Roman Catholic Church*. When the College of Propaganda - *Office Of The Congregation For The Doctrine Of The Faith* - was founded by Pope Paul III in 1542, and for whom the congregation's sole objective is to "spread sound Catholic doctrine and defend those points of Christian tradition which seem in danger because of new and unacceptable doctrines." Its headquarters are at the Palace of the Holy Office, just outside Vatican City and is a parallel to the PROPAGANDA DUE Lodge (P2) approved by Pope Paul VI https://www.abc.net.au/news/2015-12-17/mafia-boss-licio-gelli-dies-96/7037324 (see Exhibit 10); and

33. Further, as if following the strategy of Lavrentiy Beria. when the Saudi's INDONESIAN WAHHABIST goal in his 2008 campaign of Hope and Change Transformation of the USA Strategy needed to eliminate the 1948 Smith-Mundt Act protection of the American people against propaganda / fake news / accomplished with the 2013 National Defense Authorization Act; and

34. Further, according to the Smith-Mundt Modernization Act of 2012, which was contained within the National Defense Authorization Act for Fiscal Year 2013 (section 1078 (a)) amended the United States Information and Educational Exchange Act of 1948 and the Foreign Relations Authorization Act of 1987, allowing for materials produced by the State Department and the Broadcasting Board of Governors (BBG) to be available within the United States, see https://foreignpolicy.com/2013/07/14/u-s-repeals-propaganda-ban-spreads-government-made-news-to-americans/ (see Exhibit 11); and

11

35. Further as background, for decades the so-called anti-propaganda law prevented the U.S. government's mammoth broadcasting arm from delivering such programming to American audiences. But on July 2, 2012 that came silently to an end with the implementation of a new reform passed in January.

36. The result: an unleashing of thousands of hours per week of government-funded radio and TV programs for domestic U.S. consumption in a reform  initially criticized as a green light for U.S. domestic propaganda efforts; and

37. Further, the U.S. government's mammoth broadcasting arm has begun the "unleashing of thousands of hours per week of government-funded radio and TV programs for domestic U.S. consumption," reported by John Hudson; and

38. Further, so what happened? A vast ocean of U.S. programming produced by the Broadcasting Board of Governors such as Voice of America, Radio Free Europe/Radio Liberty, and the Middle East Broadcasting Networks could only be viewed or listened to at broadcast quality in foreign countries.

39. The programming varies in tone and quality, but its breadth is vast: It's viewed in more than 100 countries in 61 languages. The topics covered include human rights abuses in Iran, self-immolation in Tibet, human trafficking across Asia, and on-the-ground reporting in Egypt and Iraq; and

### *The UNI-PARTY* with its Business Advisory Council

40. With the peacenik DJT 2016 election, warmonger Republican  / Democratic *UNI-PARTY* with its Business Council[5] donors fear DJT re-election in 2020.

---

[5] https://en.wikipedia.org/wiki/The_Business_Council - The Business Council was founded by Secretary of Commerce Daniel C. Roper and investment banker Sidney Weinberg as the Business Advisory Council for the United States Department of Commerce in 1933, under President Franklin D. Roosevelt. It formed the Industrial Advisory Board for the National Recovery Administration

41. Further, as a strategy against DJT *the UNI-PARTY / SES* planned use of the CORONAVIRUS by exaggerating the potential range of influenza pandemics in terms of transmissibility and disease severity spread as partisan political psychological warfare propaganda to prevent DJT's re-election; and

42. Further, the CORONAVIRUS so-called COVID 19 epidemic was illegally prepared in 2014 by Dr. Fauci and the INDONESIAN WAHHABIST who financed the SARS COV-2 *Gain-of Function Research* transfer to the PRC / CCP Wuhan Military lab to enhance the bio-weapon to release as a pandemic.

## UNITED STATES CORONAVIRUS MORBIDITY RATE

43. Further, (https://www.who.int/bulletin/volumes/89/7/11-088815/en/) despite its characterization of the 2009 Influenza (H1N1) as to severity estimated by the case fatality ratio, probably ranged from 0.01 to 0.03%, COVID-19 values are very similar to those normally seen in the case of seasonal influenza when the number of deaths was higher in younger people, and is a recognized feature of previous influenza pandemics morbidity rate according to the CDC Data in the United States *Table 1* from 2/1/2020 zero deaths thru 7/11/2020 that had 272 deaths  and is dropping - warrants pandemic declassification (Exhibit 12); and

44. Further, for budget and political reasons Defendants maliciously sent highly

---

during the Great Depression. It also established committees to discuss the Securities Exchange Act of 1934, the Banking Act of 1935 under FDR's Proclamation 2040 and the Social Security Act.

It was renamed The Business Council as an organization independent from the Department of Commerce in 1961, under President John F. Kennedy.

Membership is limited to 200 active members, all of whom are CEOs of leading multinational businesses personally selected by fellow members of The Business Council.

The organization is strictly nonpartisan. It is headquartered in Washington, D.C.

infectious CORONAVIRUS / COVID-19 patients to New York State nursing homes where their obligation was to protect the most vulnerable at-risk population from the pandemic, and thousands were killed in New York State due to his deliberate malicious malfeasance despite the fact:

   a.   That DJT had sent the USNS Comfort to New York Harbor - Cuomo sent it away unused.

   b.  The Jacob Javits Center was prepared tpo handle COVID-19 patients - Cuomo elected not to use it.

   c.  A purpose built $21 million dollar facility at Red Hook Brooklyn was closed and never used.

45.  Despite the falling morbidity rate being fraudulently pumped up in New York by Governor Andrew Cuomo, in May met with Bill Gates of the Bill & Melinda Gates Foundation to promote their surveillance experimental efforts to use New Yorkers as their congressional protected liability free vaccine guinea pigs (see Exhibit 13).

### Bill Gates: *From Entrepreneur to Supervillain*

46.  On July 8, 2020, the American Institute for Economic Research (AIER) published the Article written by Barry Brownstein about Bill Gates: *From Entrepreneur to Supervillain* gives an informed balanced summary https://www.aier.org/article/bill-gates-from-entrepreneur-to-supervillain/ (see Exhibit 14); and

47.  AIER observes: when Gates the entrepreneur was wrong, he was held accountable by consumers and competitive forces;  however, when Gates the philanthropist is wrong, politicians and academics will evaluate him by different criteria; and

48.  Further AIER reports that: Gates the Philanthropist and Neil Ferguson of the Imperial College London had inordinate influence "advising national governments

14

on pathogen outbreaks."; and

49. AIER Reports: Ferguson listens to Gates, as his center receives "tens of millions of dollars in annual funding from the Bill & Melinda Gates Foundation."; and

50. AIER further reports that: the model Ferguson used to advise draconian lockdowns in response to CORONAVIRUS / COVID-19 has been thoroughly discredited both on theoretical and empirical grounds. To err is to be human, but this was not Ferguson's first disastrous prediction.

51. AIER president Edward Peter Stringham points out, "Ferguson rose to fame in 2005 when he predicted that up to 200 million people could be killed from the bird flu." The actual deaths was 50 persons; and

52. AIER reports that: Gates, the businessman, would have long ago cut off Ferguson. No successful entrepreneur insists on partnering with a dismal failure; and

53. AIER alleges that: Yet for Gates, Ferguson's performance as an epidemiologist didn't seem to matter; and

54. AIER alleges that: What matters to Gates is that Ferguson's view of the world is aligned with his own; and

55. Further AIER reports that: Both support quarantining healthy people without regard to the human and economic cost; and

56. Further AIER reports that: Bill Gates has enjoyed a partnership with Dr. Anthony Fauci;  and

57. AIER observes that: Of course, it is natural to partner with those who share your worldview; and

58. AIER reports: Problems arise when a partnership leads to the use of the coercive arm of government to implement what you believe is your superior vision; and

59. Further AIER reports that: according to Bill Gates' April blog post on CORONAVIRUS / COVID-19 vaccine development, Gates explains how a new rushed to market a COVID-19 vaccine is likely to be a RNA vaccine; and

60. Further Gates explains that: With an RNA vaccine, "rather than injecting a pathogen's antigen into your body, you instead give the body the genetic code needed to produce that antigen itself"; and

61. Further Gates admits that: the process is risky. "It's a bit like building your computer system and your first piece of software at the same time." ; and

62. Further Gates admits that: Rushed vaccines have unique safety concerns, and RNA vaccines deserve heightened scrutiny; and

63. Further Gates admits that the vaccine may not be both safe and effective:

   a. "If we were designing the perfect vaccine, we'd want it to be completely safe and 100 percent effective.

   b. It should be a single dose that gives you lifelong protection, and it should be easy to store and transport.

   c. I hope the COVID-19 vaccine has all of those qualities, but given the timeline we're on, it may not."

   d. Heightening potential risks, vaccines are shielded from liability when they turn out to be unsafe.

   e. Nobody is held accountable for the consequences of taking shortcuts in the development process.

   f. A COVID-19 vaccine has not even arrived and already some doctors are advocating for compulsory vaccination.

16

64. Gates says, "We need to manufacture and distribute at least 7 Bil doses of vaccine."

65. With polls showing only 50% of the population planning on taking a CORONAVIRUS / COVID-19 vaccine, presumably, Gates and vaccine manufactures are banking on the government making the vaccine mandatory and protecting it from liability:

    a. Gates is now actively stoking the fires of fear.

    b. He warns that this fall "COVID-19 will be back in big numbers, if we don't restrain our behavior more than it looks like we are right at the moment."

    c. He complained that we're not tough enough "on contact tracing or enforcing quarantine."

66. In short, obey Gates and his favored "experts" or doom will befall us all; and

67. Gates insists normalcy cannot return until "we have an almost perfect drug to treat CORONAVIRUS / COVID-19, or when almost every person on the planet has been vaccinated against coronavirus." ; and

68. Yet, death rates from the COVID-19 virus are falling as shown in Exhibit 12.

69. Without a deadly virus it is hard to sell a potentially dangerous vaccine; and

70. Further, Nobel laureate Michael Levitt repeatedly warned that the doomsday exponential models, such as Ferguson's, were wrong.

71. Instead of examining Levitt's analysis, Levitt received only "abuse" from other scientists. You need to "stop talking like that," he  was told; and

72. Further, another Nobel laureate, Saul Perlmutter, observed the "tendency to circle the wagons and hide all the conversations that need to happen."; and

73. With use of SES propaganda: Entrepreneurs don't hide conversations that need to

happen; it's bad for business; and

74. Those with a one-track agenda seek to maintain control by suppressing conversation of divergent viewpoints. AIER states, will leave it to others to parse Gates' philanthropic motives. His good intentions don't matter; and

75. What matters is that Gates has access to world leaders who have coercive power. Gates, undisciplined by consumers or business partners, will make errors.

### Windows 1984

76. On 20 June 2020, Greg Hunter's USA Watchdog broadcast with Catherine Austin Fitts characterized the Gates' Nanotech[6] Artificial Intelligence brain digital interface anti-virus injection as *Windows 1984* https://www.youtube.com/watch?v=1Pb5-qkMdFM.

77. May 14, 2020 - A flu shot does not make you healthy. Too many people are confused about this issue. It provides you with artificial immunity. Even if this protects you against a particular strain of flu, there may be another 200 viruses out there

---

[6] https://en.wikipedia.org/wiki/Nanotechnology Nanotechnology (or "nanotech") is manipulation of matter on an atomic, molecular, and supramolecular scale. The earliest, widespread description of nanotechnology referred to the particular technological goal of precisely manipulating atoms and molecules for fabrication of macroscale products, also now referred to as molecular nanotechnology. A more generalized description of nanotechnology was subsequently established by the National Nanotechnology Initiative, which defines nanotechnology as the manipulation of matter with at least one dimension sized from 1 to 100 nanometers. This definition reflects the fact that quantum mechanical effects are important at this quantum-realm scale, and so the definition shifted from a particular technological goal to a research category inclusive of all types of research and technologies that deal with the special properties of matter which occur below the given size threshold. It is therefore common to see the plural form "nanotechnologies" as well as "nanoscale technologies" to refer to the broad range of research and applications whose common trait is size.

Nanotechnology as defined by size is naturally very broad, including fields of science as diverse as surface science, organic chemistry, molecular biology, semiconductor physics, energy storage, microfabrication, molecular engineering, etc. The associated research and applications are equally diverse, ranging from extensions of conventional device physics to completely new approaches based upon molecular self-assembly, from developing new materials with dimensions on the nanoscale to direct control of matter on the atomic scale.

during any given flu season which you won't be protected against.

78. What the evidence says: Currently available flu vaccines unlike *Chem-trails* are aluminum-free and over 80% of flu vaccines today contain no mercury at all.

79. Some flu vaccines contain a tiny amount of formaldehyde that is less than 1% of the amount naturally found in people and is safely cleared from the body

80. For example, during 2017-2018, flu vaccination prevented an estimated 6.2 million influenza illnesses, 3.2 million influenza-associated medical visits, 91,000 influenza-associated hospitalizations, and 5,700 influenza deaths.

81. Feb 21, 2020 -During the 2018–19 influenza season, in which Influenza A(H3N2) and A(H1N1) viruses co-circulated, interim VE was estimated to be 29% against illnesses associated with any influenza virus and vaccination was estimated to prevent 4.4 million illnesses, 2.3 million medical visits, 58,000 hospitalizations.

82. Jan 22, 2020 - CDC estimates indicate that there have been 13 million influenza illnesses, 120000 hospitalizations, and 6600 flu-related deaths so far this season. It's possible that they haven't been exposed to as much Influenza B in their short lives. CDC notes that flu vaccine effectiveness estimates are not.

83. May 5, 2020 - CDC estimated that there were at least 24,000 deaths related to the flu during the 2019-2020 season.

84. Jun 5, 2020 - Several vaccines on the U.S. vaccination schedule are made in cells from fetuses aborted decades ago. They include vaccines against rubella,

85. Dr. Judy Mikovits and Dr. Sherri Tenpenny: A New COVID Vaccine Could Kill 50 Million People in the U.S.[7] see (Exhibit 15).

86. Several vaccines are produced using one of two cell lines that came originally from the lungs of aborted fetuses.

87. The Catholic Church opposes using fetal tissue derived from abortion for medical research and vaccine development.

88. However, the Church also recognizes that in the absence of ethically sourced alternatives, parents and individuals may use those vaccines until an alternative is available, explained Jozef Zalot, staff ethicist at the Philadelphia-based National Catholic Bioethics Center.

89. A 2005 instruction from the Pontifical Academy for Life stated  (see **Exhibit 16**) that people who have no access to ethically sourced vaccines would be "right to abstain from using these vaccines if it can be done without causing children, and indirectly the population as a whole, to undergo significant risks to their health."

## Over-the-Counter CORONAVIRUS TREATMENTS

90. Confirmed! The Absolute Science Behind Masks and the Proof That They Don't Work — Denis Rancourt, PhD see (Exhibit 17).

91. Defendants and SES demands the use of masks to maintain fear and control.

92. ACE2, which stands for angiotensin-converting enzyme 2, is a protein that sits on the surface of many types of cells in the human body, including in the heart, gut, lungs, and inside the nose. It's a key cog in a biochemical pathway that regulates

---

7      https://theplantstrongclub.org/2020/05/26/dr-judy-mikovits-and-dr-sherri-tenpenny-a-new-covid-vaccine-could-kill-50-million-people-in-the-u-s/

blood pressure, wound healing, and inflammation. ACE2's amino acids form a grooved pocket, allowing it to snag and chop up a destructive protein called angiotensin II, which drives up blood pressure and damages tissues. But angiotensin II isn't the only thing that fits in ACE2's pocket. So does the tip of the mace-like spike proteins that project from SARS-CoV-2, the coronavirus that causes Covid-19. Like a key turning in a latch, the virus gains entry to the cell through ACE2, then hijacks the cell's protein-making machinery to make copies of itself. An infection begins see Article from WIRED Magazine see (Exhibit 18).

93. July 02, 2020 - Henry Ford Health System Study shows treatment with Hydroxychloroquine[8] (not chloroquine) in conjunction with Zinc-sulfate[9] and an anti-biotic cut the death rate significantly in Covid-19 patients, see (Exhibit 19).

---

[8] https://en.wikipedia.org/wiki/Hydroxychloroquine - Hydroxychloroquine (HCQ), sold under the brand name Plaquenil among others, is a medication used to prevent and treat malaria in areas where malaria remains sensitive to chloroquine. Other uses include treatment of rheumatoid arthritis, lupus, and porphyria cutanea tarda. It is taken by mouth. HCQ is being studied to prevent and treat coronavirus disease 2019 (COVID-19). High-quality evidence of benefit for such use is lacking, with concerns of potential harms from side effects.

Common side effects may include vomiting, headache, changes in vision, and muscle weakness. Severe side effects may include allergic reactions, vision problems, and heart problems. Although all risk cannot be excluded, it remains a treatment for rheumatic disease during pregnancy. Hydroxychloroquine is in the antimalarial and 4-aminoquinoline families of medication.

Hydroxychloroquine was approved for medical use in the United States in 1955. It is on the World Health Organization's List of Essential Medicines, the safest and most effective medicines needed in a health system. In 2017, it was the 128th most commonly prescribed medication in the United States, with more than five million prescriptions. The speculative use of hydroxychloroquine for COVID-19 threatens its availability for people with established indications.

[9] https://en.wikipedia.org/wiki/Zinc_sulfate - Zinc sulfate is an inorganic compound  and dietary supplement. As a supplement it is used to treat zinc deficiency and to prevent the condition in those at high risk. Side effects of excess supplementation may include abdominal pain, vomiting, headache, and tiredness.

It has the formula $ZnSO_4$ as well as any of three hydrates. Was historically known as "white vitriol". All of the various forms are colourless solids. The heptahydrate form is commonly encountered.

94. In regards to the ACE2 protein explained in Exhibit 18, West Texas doctor, Richard Bartlett, claims he's found the best treatment for the so-called CORONAVIRUS, with the nebulizer administered *Budesonide[10], a* corticosteroid or steroid (cortisone-like medicine) that works by preventing inflammation (swelling) in the lungs that makes an asthma attack less severe, *has been touted as a "silver bullet" for treating COVID-19 by one West Texas doctor, but many other doctors say the drug needs to be studied before it's widely used* see (Exhibit 20).

95. The Case Study Report by Authors – Richard P. Bartlett, MD and Alexandria Watkins, DNP regarding SARS-CoV-2 and *The Case for Empirical Treatment* see (Exhibit 21) states in CONCLUSIONS:

> "It should be mentioned that telemedicine has been put to the test during these trying times. The success of these two cases and the safety permitted by monitoring remotely and providing real-time consultations by phone could not have been achieved without the integration of telemedicine. This experience has enabled us to witness the advancement of technology in medicine personally. Inhaled corticosteroids are a powerful tool. The evidence is currently under review in regards to the precision and power that inhaled

---

[10] **https://en.wikipedia.org/wiki/Budesonide** - Budesonide (BUD), brand name Pulmicort among others, is a medication of the corticosteroid type. It is available as an inhaler, pill, nasal spray, and rectal forms. The inhaled form is used in the long-term management of asthma and chronic obstructive pulmonary disease. The nasal spray is used for allergic rhinitis and nasal polyps. The pills in a delayed release form and rectal forms may be used for inflammatory bowel disease including Crohn's disease, ulcerative colitis and microscopic colitis.

Common side effects with the inhaled form include respiratory infections, cough, and headaches. Common side effects with the pills include feeling tired, vomiting, and joint pains. Serious side effects include an increased risk of infection, loss of bone strength, and cataracts. Long-term use of the pill form may cause adrenal insufficiency. Stopping the pills suddenly following long-term use may therefore be dangerous. The inhaled form is generally safe in pregnancy. Budesonide is mainly acting as a glucocorticoid.

Budesonide was initially patented in 1973. Commercial use as an asthma medication began in 1981. It is on the World Health Organization's List of Essential Medicines. Some forms are available as a generic medication. In 2019, generic budesonide was listed as involved in Teva's price fixing scheme in the United States. In 2017, it was the 190th most commonly prescribed medication in the United States, with more than three million prescriptions.

corticosteroids possess; these studies are being performed by France, Spain, Sweden the University of Oxford, and the National Institutes of Health (NIH). It is our understanding that there is more than one way to treat SARS-CoV-2, but it is with great respect to the studies that have come before and will come after ours that these case studies and the treatments provided be considered in the arsenal of powerful therapies to be used when treating SARS-CoV-2. A call to arms was sounded on January 20, 2020, when the first case of SARS-CoV-2 was first identified in the United States and in March 2020 a successful empirical treatment plan was put into place (budesonide 0.5mg nebulizer, twice daily, clarithromycin (Biaxin) 500mg tab, twice daily for ten days, Zinc 50mg tab, twice daily, and aspirin 81mg tab, daily). "

96. Affirmant complains that notwithstanding facts of a 90% effective virus treatment and the Nuremburg Code, Defendants conspire against human rights and effective treatment with Deborah L. Birx, Anthony S. Fauci, Robert R. Redfield, Bill & Melinda Gates Foundation, GAVI Vaccine Alliance, Imperial Chemical Industries, not just to facilitate unjust enrichment to be protected by Congress from liability for 50 Million deaths, outrageously mandate their NANO-TECH interactive RNA Robotic / A.I.[11] designed human injection EZ Pass type transformation system that is exponentially more sophisticated than a mere EZ Pass / Utility scanning billing technology, is a frequency tuned area denial weapon with FEMA camps, interactive surveillance and control system injected into targeted NEW YORKERS, who are labeled as if *Typhoid Mary zombies with fear porn* propaganda about their threat as if *Coronavirus zombies* that requires Defendants to mandate intra / interstate global surveillance disruption to commerce with eugenics / genocide capability.

---

[11] https://en.wikipedia.org/wiki/Artificial_intelligence - In computer science, Artificial Intelligence (AI), sometimes called machine intelligence, is intelligence demonstrated by machines, unlike the natural intelligence displayed by humans and animals. Leading AI textbooks define the field as the study of "intelligent agents": any device that perceives its environment and takes actions that maximize its chance of successfully achieving its goals. Colloquially, the term "artificial intelligence" is often used to describe machines (or computers) that mimic "cognitive" functions that humans associate with the human mind, such as "learning" and "problem solving".

97. In Summary Affirmant is a targeted NEW YORKER:

   a.   Affirmant chose the Jewish religion;

   b.  Affirmant refuses to wear a mask and or a star of David badge;

   c.  Affirmant is a Caucasian threatened by Defendants facilitation of terrorists;

   d.  Affirmant is disproportionally threatened by Defendants refusal to support alternative treatment regimens;

   e.  Affirmant is singled out with Type A Blood to die;

   f.  Affirmant is part of the 31% of those 50 Million U.S. Persons to be murdered; by injection under Defendants mandate;

   g.  Defendants disrupt intra / interstate commerce violate the Hobbs Act; and

Further, Defendants conspire with Deborah L. Birx, Anthony S. Fauci, Robert R. Redfield, Bill & Melinda Gates Foundation, GAVI Vaccine Alliance, Imperial Chemical Industries and others for unjust enrichment seek Congress' protection from Vaccine liability for causing 50 Million U.S. deaths and debilitating injury.

### PETITIONER PRAYER OF RELIEF THAT THE COURT GRANT

A. Petitioner - Affirmant Plaintiff-intervener standing;

B. A hearing on the above issues with briefing schedule;

C. An information subpoena of Defendants and named persons;

D. An order to allow NEW YORKERS to seek medical treatment if necessary;

E. An order prohibition of interactive surveillance and control system injections;

F. An order of Defendants to strictly adhere to the New York State Election law; and

G. Such other and different relief deemed necessary for Justice herein.

STATE OF NEW YORK )
                   ) ss.
COUNTY OF WARREN )

Accordingly, I, Christopher Earl Strunk, duly so affirm, depose and say under penalty of perjury:

    I have read the foregoing petition of the AD HOC NEW YORKER REPUBLICAN COMMITTEE INTERVENTION TO ENLARGE THE PRELIMINARY INJUNCTION TO RESOLVE DEFENDANTS' DEVICES FOR SOCIAL SCORING, TORTUOUS ELECTION INTERFERENCE AND NANO-TECH SYSTEMS FOR UNCONSTITUTIONAL SURVEILLANCE with Exhibit 1 thru 21 during the ongoing National Banking Emergency and related emergencies or time of war under the 12 USC 95a amended 50 USC App. 5b that comply with the Hague Convention and related law including judicial rules herein to safeguard rights.

    Pursuant to remedy provided by Congress under 50 USC App. 17, this affirmation supports perfecting evidence at trial in the respective district court under the ongoing Proclamation 2040 National Emergency or time of war that takes private property and infringes personal rights otherwise to be protected by others directly under the authority of the Commander-in-chief POTUS, in that time is of the essence with irreparable harm; and

    Affirmant knows the contents thereof apply to me and that the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe it to be true, am available for testimony. The grounds of my beliefs as to all matters not stated upon information and belief are as follows: 3rd parties, books and records, and personal knowledge.

                                 **Christopher Earl Strunk, in esse sui juris**
                                 **NY DL 388 435 714 Expires 1/23/2021**
                                 **All Rights Reserved without Prejudice**

That on the 17th day of July in the year 2020 before me the undersigned, a Notary Public in and for said State personally appeared, **Christopher Earl Strunk**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he affirmed and executed the name in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public, State of New York

RACHEL A. HAYSLETTE
Notary Public, State of New York
Warren County #01HA6378601
Commission Expires July 30, 2022

                                       25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

REV. STEVEN SOOS et al.,                                    20-cv-651   (GLS/DJS)
                              Plaintiffs,

v.

ANDREW M. CUOMO et al.,
                              Defendants.

---

AD HOC NEW YORKER REPUBLICAN COMMITTEE INTERVENTION TO
ENLARGE THE PRELIMINARY INJUNCTION TO RESOLVE DEFENDANTS'
DEVICES FOR SOCIAL SCORING, TORTUOUS ELECTION INTERFERENCE
AND NANO-TECH SYSTEMS FOR UNCONSTITUTIONAL SURVEILLANCE

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**REV. STEVEN SOOS et al.,**

                **Plaintiffs,**

       **v.**

**ANDREW M. CUOMO et al.,**

                **Defendants.**

**1:20-cv-651**
**(GLS/DJS)**

---

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFFS:**<br>148-29 Cross Island Parkway<br>Whitestone, NY 11357 | CHRISTOPHER A. FERRARA,<br>ESQ. |
| 10506 Burt Circle<br>Ste 110<br>Omaha, NE 68114 | MICHAEL McHALE, ESQ. |
| **FOR THE DEFENDANTS:**<br>*Andrew M. Cuomo & Letitia James*<br>HON. LETITIA JAMES<br>New York State Attorney General<br>The Capitol<br>Albany, NY 12224 | ADRIENNE J. KERWIN<br>Assistant Attorney General |
| *Bill de Blasio*<br>HON. JAMES E. JOHNSON<br>Corporation Counsel of the City of<br>New York<br>New York City Law Department<br>100 Church Street<br>New York, NY 10007 | MELANIE SADOK<br>ELLEN PARODI<br>HILARY M. MELTZER<br>Assistants Corporation Counsel |

**FOR THE PROSPECTIVE AMICUS CURIAE:**
*Ahuva Kleinman*
Mandelbaum Salsburg PC                    RONALD D. COLEMAN, ESQ.
3 Becker Farm Road
Roseland, NJ 07068

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Pending is an application for preliminary injunctive relief filed by plaintiffs Reverend Steven Soos, Reverend Nicholas Stamos, Daniel Schonbrun, Elchanan Perr, and Mayer Mayerfeld.[1]  (Dkt. Nos. 2, 7.)  In their most recent filing, plaintiffs seek an order restraining and enjoining defendants Andrew M. Cuomo, Governor of the State of New York; Letitia James, Attorney General of the State of New York; and Bill de Blasio, Mayor of the City of New York: (1) from enforcing any gathering limits to outdoor religious gatherings; and (2) from imposing any limitation on indoor gathering . . . for religious gatherings in parity

---

[1] Plaintiffs' initially sought a temporary restraining order, but, at the conclusion of the return on that application, the court discussed with the parties the preferability of allowing them to supplement the record and argument, and address the application for preliminary injunctive relief without resort to a further evidentiary hearing; the court's proposed course of action was acceptable to all the parties and obviates the need to consider the application for a temporary restraining order.  (Dkt. No. 31, Attach. 1 at 38-49.)

2

> with the 100% occupancy allowed for favored "essential businesses," day camps and special education classes, or, alternatively, at least 50% occupancy in keeping with what is permitted for "non-essential" businesses and every other indoor activity allowed to continue under Phases Two and Three except religious activity, which alone is still arbitrarily confined to 25% occupancy.

(Dkt. No. 32 at 10.)  For the reasons explained and to the extent described below, the application for a preliminary injunction is granted.

## II. Background

For the past several months, the United States, and, indeed, the entire world, has been suffering from a global pandemic brought about by COVID-19.  The State of New York, and particularly the New York City metropolitan area, have been described as the "epicenter" of the pandemic. *See* New York Coronavirus Map and Case Count, N.Y. Times (last visited June 26, 2020), https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html.  To date, there have been 395,168 cases, and 31,029 deaths because of COVID-19 in the State of New York. *See id.*

## A. The Executive Orders

Beginning in March 2020, in response to the COVID-19 pandemic

3

besieging New York, Governor Cuomo issued a series of executive orders,

placing restrictions on New Yorkers:

> (1) Order 202, issued on March 7, declared a disaster emergency in the State of New York. (Dkt. No. 1, Attach. 1 at 1-3.)

> (2) Order 202.1, issued on March 12, prohibited large gatherings of over 500 people. (*Id.* at 4-7.)

> (3) Order 202.3, issued on March 16, narrowed the prohibition on large gatherings to fifty persons. (*Id.* at 10-11.)

> (4) Order 202.6, issued on March 18, required all New York State businesses to "reduce the in-person workforce at any work locations by 50%," with exceptions for those businesses and entities that provided "essential services or functions." (*Id.* at 17-18.)

> (5) Order 202.8, issued on March 20, reduced the in-person workforces of non-essential businesses by 100%. (*Id.* at 21-22.)

> (6) Order 202.10, issued on March 23, declared a total ban on "non-essential gatherings of individuals of any size for any reason." (*Id.* at 25-28.)

> (7) Order 202.17, issued on April 15, required face-coverings to be worn "when in a public place and unable to maintain, or when not maintaining, social distance." (*Id.* at 46.)

> (8) Order 202.31, issued on May 14, extended the closure of non-essential businesses and entities, and the ban on non-essential gatherings. (*Id.* at 69-70.) The Order also provided that "[a]ll enforcement mechanisms by state or local governments shall continue to be in full force an[d] effect until June 13, 2020 unless later extended or amended by a future Executive Order." (*Id.*)

> (9) Order 202.32, issued on May 21, modified the previous ban on non-

4

essential gatherings "to permit a gathering of ten or fewer individuals for any religious service or ceremony," provided that certain social distancing and health protocols were adhered to, and ordered that "any drive-in or remote religious service may continue in excess of the ten person limit so long as there is no in-person contact between participants." (*Id.* at 71-73.)

(10) Order 202.33, issued on May 22, permitted non-essential gatherings of ten or fewer individuals "for any lawful purpose or reason," provided that certain social distancing and health protocols were adhered to. (*Id.* at 74.)

(11) Order 202.34, issued on May 28, continued the restriction, postponement, and/or cancellation, of all non-essential gatherings of more than ten individuals, but allowed for any region that met certain public health and safety metrics to begin "Phase One reopening." (*Id.* at 75-76.)

(12) Order 202.35, issued on May 29, ended workplace reductions and restrictions in certain regions for non-essential businesses, the "Phase Two industries," which include: professional services, administrative support, and information technology; real estate services, building and property management, leasing, rental, and sales services; retail in-store shopping, rental, repair, and cleaning; barbershops and hair salons; and motor vehicle leasing, rental, and sales. (*Id.* at 77-78.) The restriction on outdoor gatherings of groups of more than ten people remained in place. (*Id.*)

(13) Order 202.36, issued on June 2, declared that any region to meet certain public health and safety metrics "may allow outdoor, low-risk recreational activities and businesses providing such activities, as determined by Empire State Development Corporation, to be permitted to operate, in accordance with Department of Health guidance." (*Id.* at 79-80.)

(14) Order 202.37, issued on June 5, declared that "special education services and instruction required under Federal, state or local laws,

rules, or regulations, may be provided in person for the summer term in school districts." (*Id.* at 81.)

(15) Order 202.38, issued on June 6, modified Order 202.35, permitting any region to have entered "Phase Two" of New York's reopening plan to allow "non-essential gatherings for houses of worship at no greater than 25% of the indoor capacity of such location." (*Id.* at 82-83.) The restriction on outdoor gatherings of groups of more than ten people remained in place. (*Id.*)

(16) Order 202.42, issued on June 15, modified Order 202.35 and Order 202.38, permitting any region to have entered "Phase Three" of New York's reopening plan to allow "non-essential gatherings . . . [of] twenty-five (25) or fewer individuals, for any lawful purpose or reason." (Dkt. No. 33, Attach. 1 at 5.)

On June 17, 2020, Mayor de Blasio issued an "Emergency Executive Order" incorporating Governor Cuomo's executive orders, and "direct[ing] the Fire Department of the City of New York, the New York City Police Department, the Department of Buildings, the Sheriff, and other agencies as needed to immediately enforce the [orders]." (Dkt. No. 32, Attach. 3 at 1-2.)

## B.  The Guidance

A document entitled "Guidance for Determining Whether a Business Enterprise is Subject to a Workforce Reduction Under Recent Executive Orders," (hereinafter, the "Guidance Document"), was published and simultaneously updated by the State of New York with the issuance of the

6

executive orders described above.  (Dkt. No. 1, Attach. 1 at 94-125, 128-38.)

From March 20 through March 24, 2020 the Guidance Document provided that "worship services" are included among the enumerated businesses that "must remain closed and are not eligible for designation as an essential business for purposes of this guidance."  (*Id.* at 98.)

From March 25 through April 7, 2020 the Guidance Document provided that although "[h]ouses of worship are not ordered closed[,] . . . it is strongly recommended not to hold congregate services," and reiterated that "worship services . . . are not eligible for designation as an essential business for purposes of this guidance."  (*Id.* at 105.)  From April 8 through April 9, 2020 "worship services" continued to be listed as among the businesses that "must remain closed and are not eligible for designation as an essential business for purposes of this guidance."  (*Id.* at 113.)

From April 10 through May 20, 2020 the Guidance Document provided:

> Pursuant to Executive Order 202.10 . . . , all non-essential gatherings of individuals of any size for any reasons (e.g. worship services, parties, celebrations or other social events) are canceled or postponed. Congregate services within houses of worship are

7

> prohibited. Houses of worship may only be used by
> individuals and only where appropriate social
> distancing of, at least, six feet between people can be
> maintained. Further, individuals should not gather in
> houses of worship, homes, or other locations for
> religious services until the end of this public health
> emergency. If possible, religious leaders should
> consider alternative forms of worship, replacing in-
> person gatherings with virtual services, such as
> phone or conference calls, videoconference calls, or
> online streaming.

(*Id.* at 123.)

From May 21 through June 5, 2020, the Guidance Document

permitted a gathering of ten or fewer people for a religious service or

ceremony, provided that certain social distancing and health protocols were

adhered to, and permitted "any drive-in or remote religious service may

continue in excess of the ten person limit so long as there is no in-person

contact between participants." (*Id.* at 135-36.) It further provided that

"[f]aith leaders should continue to consider and use alternative forms of

worship," and that "congregations of groups for religious service or

ceremony in excess of ten in-person participants remain prohibited." (*Id.*)

Guidance for "Phase Two Industries" limit indoor capacity to no more

8

than 50% of maximum capacity.[2]  *See, e.g.*, Reopening New York:

Essential and Phase II Retail Business Guidelines for Employers and

Employees, https://www.governor.ny.gov/sites/governor.ny.gov/files/

atoms/files/GeneralRetailSummaryGuidance.pdf; Reopening New York:

Hair Salon and Barbershop Guidelines for Employers and Employees,

https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/HairSal

onsAndBarbershopSummaryGuidance.pdf.  And guidance for restaurants

in "Phase Three" limits indoor capacity to no more than 50% of maximum

occupancy, exclusive of employees.  (Dkt. No. 32, Attach. 6 at 1.)

Beginning today, on June 26, outdoor graduations of up to 150

people will be allowed.[3]  *See* New York State Department of Health,

Updated Interim Guidance for Graduation Celebrations During the COVID-

19 State of Emergency (June 14, 2020), https://coronavirus.health.ny.gov/

system/files/documents/2020/06/doh_covid19_updatedgraduationguidance

_061420.pdf; Governor Announces Outdoor Graduations of up to 150 Will

---

[2]  The court takes judicial notice of the information contained on New York State's official website as such public information is "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

[3]  The court takes judicial notice of the information contained on the New York State Department of Health's official website as such public information is "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

Be Allowed Beginning June 26th (June 7, 2020), https://on.ny.gov/311 JGWN.

## C.     The Protests

Mass race-related protests have erupted across the nation, including in the State of New York, in response to the death of African-American George Floyd on May 25, 2020.  (Compl. ¶ 22.)  Protesters, sometimes in groups of thousands, have taken to the streets of New York City as well as other major cities in the State of New York.  (*Id.* ¶¶ 22, 61, 69.)

During this time, a "social media campaign" has encouraged theaters in New York, which are to be closed until "Phase Four" of New York's reopening plan, to open their lobbies and restrooms for protesters.  (Dkt. No. 1, Attach. 1 at 160-64.)

## D.     Responses From Cuomo and de Blasio

### 1.     Governor Cuomo

During a press conference held on June 1, 2020, when asked if he would "suggest people not go out and protest," Governor Cuomo answered:

> No, I think you can protest, but do it smartly and
> intelligently. . . . There were protests all across the
> country.  Protest.  Just be smart about it.  With this

> virus, you can do many things now as long as you're
> smart about it, right? You can reopen, you can go
> into a store and you can do a lot of things, just be
> smart.

(*Id.* at 146.) When asked what the difference is "between protesting and a

business, say, in the city who wants to reopen smartly if it's not at the

phase yet that they're technically allowed to," Governor Cuomo answered:

> Well, that's where we're at, but it has to be a business
> where you can be smart. Be smart, meaning socially
> distant. You don't conduct business in a way where
> you have people within six feet. You have to wear the
> mask. You have to do the hand sanitizer. That's
> where we're going to be.

(*Id.* at 146-47.)

During a press conference held on June 4, 2020, when asked about

his reopening plans, and if there was a way to "allow high school

graduation ceremonies with social distancing," Governor Cuomo remarked:

"Did you hear anything that we've been talking about for the past 96

days? . . . [Y]eah I know everybody wants to go to a high school

graduation, I get it. Not if they're going to die." (*Id.* at 150-52.) When

asked how he is able to justify opening a patio for outside dining, but will

not allow high school graduation ceremonies with social distancing,

Governor Cuomo answered: "What difference does it make? . . . The issue

11

is a public health issue and you don't want people sick and dead. . . . It's about death, it's about balancing the risk versus the reward, balancing the desires and wants versus the consequences." (*Id.* at 151-52.)

During this same press briefing, Governor Cuomo also stated, "I want to thank the protestors. . . . I stand with the protestors on the point that we need meaningful reform." (Compl. ¶ 65 (emphasis omitted).)

When explaining the modification of non-essential gatherings for houses of worship to no greater than 25% of the indoor capacity of such location, provided in Order 202.38, Governor Cuomo explained, in part: "We are going to accelerate the opening of temples, mosques, [and] churches. . . . 25 percent occupancy is not as easy as 100 percent occupancy but 100 percent occupancy is a mass gathering and you really can't do social distancing." (Dkt. No. 1, Attach. 1 at 140.) He further advised New Yorkers to "[b]e smart. It does not mean you go to a temple or a mosque and you sit right next to a person. You have to socially distance." (*Id.*)

2.   *Mayor de Blasio*

On April 28, Mayor de Blasio appeared in Williamsburg at a Jewish funeral gathering, which was dispersed by the New York Police

12

Department (NYPD). (Compl. ¶ 53.) Via Twitter, Mayor de Blasio wrote: "Something absolutely unacceptable happened in Williamsburg tonite [sic]: a large funeral gathering in the middle of this pandemic. When I heard, I went there myself to ensure the crowd was dispersed. And what I saw WILL NOT be tolerated so long as we are fighting the Coronavirus." (Dkt. No. 1, Attach. 1 at 126.) This was followed by another tweet: "My message to the Jewish community, and all communities, is this simple: the time for warnings has passed. I have instructed the NYPD to proceed immediately to summons or even arrest those who gather in large groups. This is about stopping this disease and saving lives. Period." (*Id.* at 127.)

During a June 2, 2020 media conference, when asked: "What about the retail store owner facing imminent financial ruin or the religious person who cannot [attend a] house of worship? What about their pain and anger?" Mayor de Blasio replied, in part: "When you see a nation, an entire nation simultaneously grappling with an extraordinary crisis seeded in 400 years of American racism[,] I'm sorry[,] [t]hat is not the same question[] as the understandably aggrieved store owner, or the devout religious person who wants to go back to services." (*Id.* at 155-56.)

On June 4, 2020, Mayor de Blasio, without a mask, attended and

13

addressed a political gathering, held in memory of George Floyd. (Compl.

¶ 71.) Neither the ten-person limit on outdoor gatherings, nor the social

distancing protocols, were adhered to. (*Id.*)

### E.  **Executive Orders' Effect on Plaintiffs**

#### 1.  *Rev. Steven Soos and Rev. Nicholas Stamos*

Soos and Stamos are Catholic priests in the North Country region of

New York, "who offer[] Mass and provide[] the other Sacraments of the

Catholic Church to congregations located in Glens Falls, Massena[,] and

Nicholville[, New York]." (*Id.* ¶¶ 3-4, 77, 79.) Soos and Stamos have been

forbidden from offering Mass and the other Sacraments beyond an ever-

changing maximum number of people. (*Id.* ¶¶ 85-96.) Because of the

limitations proscribed in the executive orders, Soos and Stamos are forced

to either turn away parishioners who wish to attend Mass—a weekly

obligation that Catholics face "under pain of mortal sin"—or to hold more

Masses per day than are possible. (*Id.* ¶¶ 86-93.) Likewise, the

percentage-based capacity limit prevents Soos and Stamos from holding a

daily Mass for Massena students when they return to school. (*Id.* ¶ 95.)

The permitted "drive-in" Masses are of little help to Soos, Stamos,

and their congregation. (*Id.* ¶ 97.) Congregants are prohibited by the

executive orders from leaving their vehicles at these drive-in Masses,

which prevents congregants from kneeling while receiving Holy

Communion, as is commanded by the Catholic religion. (*Id.*) Thus, the

orders effectively "prohibit reception of Holy Communion itself—the very

essence of the Mass—except under threat of prosecution and fines." (*Id.*)

And although full outdoor masses are possible at the large churches at

which Soos and Stamos hold Mass, the executive orders "make[] that

impossible." (*Id.* ¶ 100.)

Finally, the executive orders burden the Catholic practices of Holy

Matrimony and of "outdoor burial services" where Soos and Stamos are

forced to bar a certain amount of family members and friends from

attending a wedding or a "graveside as their loved ones are laid to rest."

(*Id.* ¶¶ 96, 101.)

  2. *Daniel Schonbrun, Elchanan Perr, and Mayer Mayerfeld*

Schonbrun, Perr, and Mayerfeld are Orthodox Jewish congregants

who attend synagogues in Brooklyn, New York, where they reside. (*Id.*

¶¶ 5-7, 103.) "The synagogue prayers required by their religion must have

a minimum quorum of ten adult males (age thirteen or older), called the

*minyan*." (*Id.* ¶ 104.) Because of this requirement, in conjunction with the

15

executive orders, even though Schonbrun, Perr, and/or Mayerfeld can attend services if they are part of this quorum, their female and non-adult male family members are always prevented from attending the services. (*Id.* ¶ 108.)

The permittance of drive-in synagogue services is of no help to these plaintiffs either, because "the *minyan* must all be present in the same room, not in various motor vehicles," and "[m]oreover, any type of operation of a vehicle is prohibited on the Sabbath, which is the day the main weekly services take place." (*Id.* ¶¶ 109-10.)

Schonbrun is a congregant of Chabad of Marine Park in Brooklyn, whose Rabbi decided to remain open in mid-March, notwithstanding the executive orders. (*Id.* ¶¶ 117-18.) On one occasion, the congregation was holding a prayer service outside when a police officer arrived and informed them that they were conducting an "illegal gathering," despite the fact that only eight congregants were present, and they "were at least 20 feet apart from each other." (*Id.* ¶¶ 121-22.) When the congregants refused to disperse, the police officer threatened them with fines and arrest. (*Id.* ¶ 123.) Shortly thereafter, more police officers arrived on the scene, where they remained until they were certain that all members of the congregation

had left the area. (*Id.* ¶¶ 124-26.)

Because of the executive orders, and the accompanying fear of arrest and harassment from community activists and the police for violating them, "Schonbrun and his fellow congregants missed many religious services, including during Passover." (*Id.* ¶ 128.) Further, Schonbrun's son has not been able to attend synagogue services for months, as he is not yet old enough to be part of a *minyan*. (*Id.* ¶ 129.) "Schonbrun now lives in constant fear of police intervention in what remains of Jewish worship under the ten-person limit." (*Id.* ¶ 130.)

Perr is a member of a congregation in the Flatbush-Midwood section of Brooklyn, where "even before 'congregate worship' was prohibited . . . police were advising members of the Jewish community . . . that synagogues must close outright." (*Id.* ¶¶ 134-35.) Thus, Perr attended another synagogue, Congregation Zichron Aryeh Leib. (*Id.* ¶ 136.) Perr and his fellow congregants were subject to "constant police presence and interference," which caused them to live in fear and took from them the "tranquility of worship." (*Id.* ¶¶ 137-39, 144.)

At one point, Perr "observed that [the] synagogue had been locked and that there was a notice on the door from the Health Department that

the synagogue had been closed and that no services could be conducted there." (*Id.* ¶ 141.) On that same day, the police "broke up" a Jewish funeral that Perr attended, at which social distancing protocols had been followed. (*Id.* ¶ 142.) Perr was also unable to hold a Bar Mitzvah for his son, and his wife and children have been unable to attend synagogue services since March, due to the executive orders and the aforementioned quorum requirement. (*Id.* ¶ 148.)

Mayerfeld mainly attended two different synagogues, Shaarei Zion and Congregation Bnai Torah, where he and his fellow congregants were subject to repeated "harassment" and surveillance by the police, allegedly at the behest of Mayor de Blasio and Governor Cuomo. (*Id.* ¶¶ 153-57.) Accordingly, Mayerfeld attempted to hold services in his own backyard. (*Id.* ¶ 158.) However, he was subjected to harassment and "bullying" from his neighbors, which he alleges was "incited by . . . [Mayor] de Blasio, who vowed to crack down on the Jewish community for failing to observe [Governor] Cuomo's ban on religious gatherings." (*Id.* ¶¶ 159-60.) As is the case with Schonbrun and Perr, Mayerfeld's family has been unable to attend synagogue services due to the executive orders' capacity limit and his religion's quorum requirement for such services. (*Id.* ¶¶ 162-63.)

## F.   Procedural History

Plaintiffs commenced this action on June 10, 2020 by filing a verified complaint and an application for a temporary restraining order by order to show cause.  (Dkt. Nos. 1, 2, 7.)  The court set an expedited briefing schedule and a motion return via video conference.  (Dkt. No. 8.)  At the conclusion of the return, the court afforded the parties an opportunity to supplement the record and submit additional argument, which they all did. (Dkt. Nos. 31-33.)

Plaintiffs allege four enumerated causes of action based on the circumstances described above: (1) a violation of the Free Exercise Clause of the First Amendment pursuant to 42 U.S.C. § 1983; (2) a violation of the First Amendment rights of speech, assembly, and expressive association conduct pursuant to 42 U.S.C. § 1983; (3) a violation of the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; and (4) "Ultra Vires State Action in Violation of Federal Rights." (Compl. ¶¶ 164-210.)

## III.  Standard of Review

A party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits or . . . sufficiently serious questions going to the

> merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff[s'] favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff[s'] favor; and (4) that the public interest would not be disserved by the issuance of an injunction.

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotation marks and citation omitted).

## IV. Discussion

Legal challenges to executive branch responses to the COVID-19 outbreak have been numerous in the wake of the virus. Recently the Supreme Court weighed in on a California-based limitation for religious gatherings of "25% of building capacity or a maximum of 100 attendees." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020). Chief Justice Roberts concurred in a decision to deny injunctive relief, explaining:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). When those officials "undertake[] to act in areas fraught with

20

medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985).

*Newsom*, 140 S. Ct. at 1613-14. *Newsom*, following the guidance of *Jacobson*, instructs courts to refrain from Monday-morning quarterbacking the other co-equal, elected branches of government when those branches are responding to difficulties beyond those that are incidental to ordinary governance. *See id.* Chief Justice Roberts recognized, however, that there are "broad limits" which may not be eclipsed. *See id.* To determine whether the aforementioned broad limits have been exceeded, which *Newsom* did not address, the court turns to Free Exercise Clause jurisprudence within the framework of the applicable standard of review.

Having carefully reviewed the relevant issues, and with a firm understanding that the executive branch response to the pandemic has presented issues with a degree of complexity that is unrivaled in recent history, it is plain to this court that the broad limits of that executive latitude

21

have been exceeded.  That is not to say that Governor Cuomo or Mayor de

Blasio have utterly failed in their reaction to COVID-19.  To the contrary,

the State of New York, at the moment anyway, is among the best situated

states in terms of infection and mortality rates.  While there is more clarity

every day with respect to the best practices for slowing the spread of

COVID-19, there is wide and reasonable disagreement about exactly how

to implement rules and regulations to achieve those ends, and, as is

particularly present in this case, even more so with respect to reopening in

a way that promotes safety, economic viability, and the enjoyment of all the

rights that the people of this country and the State of New York are

guaranteed.  As the Chief Justice recognized in *Newsom*, it is not the

judiciary's role to second guess the likes of Governor Cuomo or Mayor de

Blasio when it comes to decisions they make in such troubling times, that

is, until those decisions result in the curtailment of fundamental rights

without compelling justification.

### A.    Success on the Merits[4]

If neutral and generally applicable, laws challenged as burdening the

---

[4] Plaintiffs argue that each of their four causes of action is likely to succeed on the merits.  (Dkt. No. 2, Attach. 4 at 6-23.)  Because each of the prongs is met with respect to plaintiffs' Free Exercise Clause claim, the court need not, and does not, analyze the remainders.

right to freely exercise religion are presumed valid. *See Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) ("A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny.").

> In addressing the constitutional protection for free exercise of religion, [the Supreme Court's] cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

*Lukumi*, 508 U.S. at 531-32 (citation omitted).

"Although a law targeting religious beliefs as such is never permissible, if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533 (citations omitted).

> To determine the object of a law, [the court] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face. A

23

> law lacks facial neutrality if it refers to a religious
> practice without a secular meaning discernable from
> the language or context.

*Id.*

"The general applicability requirement prohibits the government from 'in a selective manner impos[ing] burdens only on conduct motivated by religious belief.'" *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014) (quoting *Lukumi*, 508 U.S. at 543). "It 'protect[s] religious observers against unequal treatment, and inequality [that] results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation.'" *Id.* at 196-97 (quoting *Lukumi*, 508 U.S. at 542-43). "While '[a]ll laws are selective to some extent, . . . categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice.'" *Id.* at 197 (quoting *Lukumi*, 508 U.S. at 542). "A law is therefore not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." *Id.* at 197 (citation omitted); *see Lukumi*, 508 U.S. at 543.

24

"Individualized exemptions are [another] way in which a law can fail

to be generally applicable." Douglas Laycock & Steven T. Collis, *Generally*

*Applicable Law and the Free Exercise of Religion*, 95 Neb. L. Rev. 1, 10

(2016). In *Smith*, the Supreme Court explained that, "where the State has

in place a system of individual exemptions, it may not refuse to extend that

system to cases of 'religious hardship' without compelling reason." 494

U.S. at 884 (citation omitted). Case law within this Circuit supports the

notion that individualized de facto exemptions can demonstrate that a

challenged law is not generally applicable, and is therefore subject to

heightened scrutiny. *See Litzman v. N.Y.C. Police Dep't*, No. 12 Civ. 4681,

2013 WL 6049066, at *3 (S.D.N.Y. Nov. 15, 2013). Along these lines,

when the challenged law does not carve out an exemption on its face, the

history of enforcement is relevant to the existence of an exemption. *See*

*Stormans, Inc. v. Selecky*, 854 F. Supp. 2d 925, 956-57 (W.D. Wash.

2012), *rev'd on other grounds sub nom. Stormans, Inc. v. Wiesman*, 794

F.3d 1064 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2433 (2016).

Plaintiffs argue that the limitations and restrictions placed on them by

the executive orders and the Guidance Document (hereinafter collectively

referred to as "challenged laws") are not neutral or generally applicable,

25

and, therefore, strict scrutiny applies. (Dkt. No. 2, Attach. 4 at 8.) More specifically, they assert that the challenged laws are not generally applicable because they are "substantially underinclusive—that is [they] 'fail[] to prohibit nonreligious conduct that endangers [the government's interests] in a similar or greater degree than [the prohibited religious activity] does.'" (*Id.* at 9 (citations omitted).) Plaintiffs further claim that mass race protests have been granted "an individualized exemption" and that "the government may not refuse to extend that system to cases of religious hardship without compelling reason." (*Id.* at 9-10 (citation omitted).) That outdoor graduation ceremonies of 150 people or less or indoor special education services at summer schools without limitation are allowed also shows the unequal treatment and disfavoring of religion in plaintiffs' view. (Dkt. No. 32 at 9.)

Finally, plaintiffs assert that the challenged laws fail strict scrutiny even though general efforts to prevent the spread of COVID-19 are "compelling interests of the highest order" because defendants cannot show that their interest in applying the restrictions to these plaintiffs, who abide by all social distancing and hygiene rules, is compelling. (Dkt. No. 2, Attach. 4 at 16-17.)

26

The State argues, in overly-simplistic fashion, that the challenged laws only incidentally impose a burden on religious exercise, and they are neutral and generally applicable, and therefore, only rational basis need be shown, which is self-evident: preventing the spread of COVID-19. (Dkt. No. 18 at 11-12.) The State was silent with respect to the mass race protests in its written submissions until it filed a supplemental memorandum of law following the return on the motion. (Dkt. No. 33, Attach. 4.)[5] In that supplement, the State argues that Governor Cuomo's "political speech" cannot support a de facto exemption vis-à-vis the mass race protests. (*Id.* at 5.)

The City initially responded with respect to only the ten-person indoor/outdoor limitation that was applicable in New York City during Phase 1. (Dkt. No. 19, Attach. 7 at 2.) It argues, like the State, that the challenged laws are neutral and generally applicable, but, unlike the State, the City initially acknowledged the mass race protests and contended that

---

[5] The State argues, for the first time and in a submission to which plaintiffs have had no opportunity to respond, that, Governor Cuomo enjoys absolute legislative immunity and, in an argument much more fully developed than in its original papers, that, because of sovereign immunity, he and Attorney General James are not proper defendants. (Dkt. No. 33, Attach. 4 at 7-10.) Because it was not raised in time for plaintiffs to offer any response to it, the court will not consider the legislative immunity argument at this juncture. The same is true of the new sovereign immunity argument. The State is, of course, free to raise those arguments later in the litigation.

27

they are not comparable because protests occur outside and religious

activity typically occurs inside. (Dkt. No. 19, Attach. 7 at 7, note 4.) Further

the City asserts, relying on *Calvary Chapel Dayton Valley v. Sisolak*, 2020

U.S. Dist. LEXIS 103234 (D. Nev. June 11, 2020), that the enforcement of

the challenged laws against protesters creates safety concerns and, absent

clear patterns of unconstitutional selective enforcement, the court should

not second guess the State's determinations. (*Id.* at 8.) In its

supplemental submission, the City contends that the orthodox Jewish

plaintiffs "may no longer seek redress for their alleged injuries" because, as

of June 22, New York City has entered Phase 2, which lifts the ten-person

indoor/outdoor limitation and imposes a 25% indoor capacity limitation.

(Dkt. No. 31, Attach. 6 at 1-2). The City also amplifies its contention,

explained for the first time during the motion return, that a de facto

exemption has not been created for mass race protesters. (*Id.* at 3-6.)

In light of the developments and natural progression of the

challenged laws since the motion return, the restrictions and limitations at

issue are: (1) a 25% indoor capacity limitation for Phases 2 and 3; (2) a

twenty-five-person outdoor gathering limit in Phase 3 locations; and (3) a

ten-person outdoor gathering limit in Phase 1 and 2 locations. And the

City's argument that Schonbrun, Perr, and Mayerfeld "may no longer seek redress" because their region has gone into Phase 2, (Dkt. No. 31, Attach. 6 at 1-2), is rejected. While it is true that their allegations are tailored to the ten-person indoor/outdoor limitation that existed when this matter was commenced, it is readily and reasonably inferable from their allegations that the 25% indoor capacity limitation would continue to burden their free exercise of religion.

Assuming, without deciding, that the challenged laws are neutral, plaintiffs have demonstrated a likelihood of success on the merits with respect to their free exercise claim because it appears that the challenged laws are not generally applicable, and that they would fail strict scrutiny.

### 1. 25% Indoor Capacity Limitation

On its face, the 25% indoor capacity limitation applies only to houses of worship. *See* N.Y. Executive Order No. 202.38. Indeed, that limitation is the only one of its kind in the tangle of executive orders and the Guidance Document that have been issued in response to the pandemic; in other words, no other secular entity, save for those that remain closed in their entirety until Phase 4 or beyond, are limited to only 25% capacity. The "nonessential businesses," dubbed "Phase 2 industries" by executive order,

that enjoy a 50% capacity limitation are, however, not justifiably different than houses of worship.  (Dkt. No. 32, Attach. 1 ¶ 18.)

For example, offices, retail stores that are not inside of shopping malls, and salons were permitted to open at 50% capacity beginning in Phase 2.  To a greater or lesser degree, the Phase 2 industries involve the congregation of people for a length of time.  And restaurants in Phase 3 locations are permitted to open at 50% capacity indoors.  Restaurant patrons sit and congregate with family and friends in close proximity for a lengthy period of time, and have close contact with their hosts and servers. Face coverings may be removed while seated.  (Dkt. No. 32, Attach. 6 at 1.)  Additionally, special educational services will be permitted during "the summer term in school districts" with no indoor capacity limitations.

All of this is to demonstrate that these secular businesses/activities threaten defendants' interest in slowing the spread of COVID-19 to a similar or greater degree than those of plaintiffs', and demonstrate that the 25% indoor capacity limitation on houses of worship is underinclusive and triggers strict scrutiny review.[6]

---

[6] There is also an arguable basis to find a de facto exemption in light of the open lobbies social media campaign.  In light of the court's conclusion that the 25% indoor capacity limitation is not generally applicable because it is underinclusive, it need not reach the individualized exemption argument.  Admittedly, the basis of such an argument here is on far

2.    *Twenty-Five-Person Outdoor Limitation in Phase 3*; *Ten-Person*

*Outdoor Limitation in Phases 1 and 2*

Despite the State's claim that enforcement power rests with local

authorities in an effort to show that selective enforcement against mass

race protesters is not a de facto exemption imposed by Governor Cuomo

or Attorney General James, (Dkt. No. 33, Attach. 4 at 5-7), Governor

Cuomo clearly has authority over the New York State Police and broad

powers of enforcement, *see* N.Y. Exec. Law § 223 (explaining that the

superintendent of state police and its members "shall . . . be subject to the

call of the governor and are empowered to co-operate with any other

department of the state or with local authorities"). And, in any case,

Governor Cuomo's comments, which applauded and encouraged

protesting and discouraged others from violating the outdoor limitations,

likely demonstrate the creation of a de facto exemption.

Mayor de Blasio is a "local authority" with clear enforcement power

and has at his disposal one of the largest municipal police departments in

the world, (Dkt. No. 1, Attach. 1 at 127), and has also actively encouraged

---

shakier footing, given the lack of acknowledgment or endorsement by defendants, than it is
with respect to the mass race protests discussed below.

31

participation in protests and openly discouraged religious gatherings and threatened religious worshipers as set forth above. The City's argument that temporary selective enforcement of the challenged laws with respect to mass race protests is a matter of public safety based on the rationale of *Sisolak*, 2020 U.S. Dist. LEXIS 103234, would perhaps be legitimate but for Mayor de Blasio's simultaneous pro-protest/anti-religious gathering messages, which clearly undermine the legitimacy of the proffered reason for what seems to be a clear exemption, no matter the reason. Governor Cuomo and Mayor de Blasio could have just as easily discouraged protests, short of condemning their message, in the name of public health and exercised discretion to suspend enforcement for public safety reasons instead of encouraging what they knew was a flagrant disregard of the outdoor limits and social distancing rules. They could have also been silent. But by acting as they did, Governor Cuomo and Mayor de Blasio sent a clear message that mass protests are deserving of preferential treatment.

Another case of individualized exemption seems even more obvious. The State has specifically authorized outdoor, in-person graduation ceremonies of no more than 150 people beginning today, June 26. This is

32

an express exemption from the ten- or twenty-five-person outdoor limits
that apply across Phases 1, 2, and 3, and the State must extend a similar
exemption to plaintiffs absent a compelling reason to the contrary.  *See
Smith*, 494 U.S. at 884.  And there is nothing materially different about a
graduation ceremony and a religious gathering such that defendants'
justifications for a difference in treatment can be found compelling.

    3.    *Strict Scrutiny*

For the reasons articulated in plaintiffs' memorandum of law,
defendants' generally-stated compelling interest in controlling the spread of
COVID-19 is inadequate to demonstrate that they have a compelling
interest that is narrowly tailored to these specific plaintiffs.  (Dkt. No. 2,
Attach. 4 at 16-18.)  The City's attempt to demonstrate otherwise is
unavailing, (Dkt. No. 31, Attach. 6 at 5-6); and the State has made no
attempt to do so.

**B.**    <u>**Irreparable Harm, Balance of Hardships, and Public Interest**</u>

Plaintiffs contend that the fear of threatened arrest, prosecution and
fines demonstrate the irreparable harm necessary to support the second
prong of the preliminary injunction standard, and that the deprivation of
First Amendment rights is presumed to amount to irreparably injury.  (Dkt.

No. 2, Attach. 4 at 23-24.)  The State contends that, because plaintiffs are not being prevented from exercising their religious rights, and, instead, are only being required to do so in a different way, the presumption of irreparable harm does not apply.  (Dkt. No. 18 at 23-24.)  The City appears to concede that First Amendment violations are sufficient to demonstrate irreparable injuries for the purpose of a preliminary injunction.  (Dkt. No. 19, Attach. 7 at 1.)

As noted by plaintiffs and the City, the loss of plaintiffs' free exercise rights is alone adequate to demonstrate irreparable injury here.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996), *cert. denied*, 520 U.S. 1251 (1997).  Accordingly, plaintiffs have met their burden in this regard.

Plaintiffs have also satisfied the court with respect to the final two prongs.  (Dkt. No. 2, Attach. 4 at 24-25.)  The balance of hardships tips in plaintiffs' favor.  Indeed, in the absence of an injunction, plaintiffs' religious activities will be burdened and continue to be treated less favorably than comparable secular activities.  An injunction, on the other hand, does not undercut defendants' interest in controlling the spread of COVID-19, provided that plaintiffs abide by social distancing guidance.

34

"As for the public interest, treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees." *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020); *see N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

## C.   **Appropriate Remedy**

"District courts have broad authority in crafting equitable remedies such as injunctions." *Conn. Office of Prot. & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 245 (2d Cir. 2006) (citations omitted).  For the reasons explained above, appropriate injunctive relief here is a restraint on defendants from enforcement of any indoor gathering limitations against plaintiffs greater than imposed for Phase 2 industries and restraint from enforcement of any limitation for outdoor gatherings against plaintiffs.  However, the court is unpersuaded that defendants should be enjoined from the enforcement of the social distancing rules as set forth in the challenges laws.  The court dispenses with the security requirement of Rule 65(c) of the Federal Rules of Civil Procedure.  *See Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is

35

particularly appropriate where a plaintiff alleges the infringement of a

fundamental constitutional right." (citations omitted)).

## D.    Amicus Curiae

Ahuva Kleinman moves for leave to appear as amicus curiae.  (Dkt.

No. 27.)  "There is no governing standard, rule or statute prescribing the

procedure for obtaining leave to file an amicus brief in the district court."

*Lehman XS Tr., Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, No.

12 CIV. 7935, 2014 WL 265784, at *1 (S.D.N.Y. Jan. 23, 2014) (internal

quotation marks, alteration, and citation omitted).  Indeed, "[d]istrict courts

ha[ve] broad discretion to permit or deny the appearance of amici curiae in

a given case."  *Kearns v. Cuomo*, No. 1:19-CV-00902, 2019 WL 5060623,

at *4 (W.D.N.Y. Oct. 9, 2019) (citation omitted).  "The usual rationale for

amicus curiae submissions is that they are of aid to the court and offer

insights not available from the parties.  Thus, when those purposes are not

served, typically, courts deny motions seeking leave to appear amicus

curiae."  *Id.* at *5 (internal quotation marks, alterations, and citations

omitted).

The circumstances under which an amicus brief is considered to be

an aid to the court are limited: "An amicus brief should normally be allowed

36

when a party is not represented competently or is not represented at all,

when the amicus has an interest in some other case that may be affected

by the decision in the present case . . . or when the amicus has unique

information or perspective." *Best Payphones, Inc. v. Dobrin*, 410 F. Supp.

3d 457, 465 n.3 (E.D.N.Y. 2019) (alterations and citation omitted).

"Otherwise, leave to file an amicus brief should be denied." *Id.* (alterations

and citation omitted).

Here, the need for an amicus curiae is minimal to non-existent. The

competence and skill of plaintiffs' counsel obviates the need for additional

input. Accordingly, while the efforts of the prospective amicus are

admirable, her motion for leave to appear as amicus curiae, (Dkt. No. 27),

is denied.

## V. **Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that plaintiffs' application for a preliminary injunction

(Dkts. No. 2, 7) is **GRANTED**; and it is further

**ORDERED** that defendants are **ENJOINED** and **RESTRAINED** as

follows:

(1) from enforcing any indoor gathering limitations against plaintiffs

37

greater than imposed for Phase 2 industries, provided that plaintiffs

follow social distancing requirements as set forth in the applicable

executive orders and guidance; and

(2) from enforcing any limitation for outdoor gatherings provided that

participants in such gatherings follow social distancing requirements

as set forth in the applicable executive orders and guidance; and it is

further

**ORDERED** that Kleinman's motion for leave to appear as amicus

curiae (Dkt. No. 27) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

June 26, 2020
Albany, New York

Gary L. Sharpe
Gary L. Sharpe
U.S. District Judge

38

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

REV. STEVEN SOOS et al.,                          20-cv-651   (GLS/DJS)
                          Plaintiffs,

v.

ANDREW M. CUOMO et al.,
                          Defendants.

---

AD HOC NEW YORKER REPUBLICAN COMMITTEE INTERVENTION TO
ENLARGE THE PRELIMINARY INJUNCTION TO RESOLVE DEFENDANTS'
DEVICES FOR SOCIAL SCORING, TORTUOUS ELECTION INTERFERENCE
AND NANO-TECH SYSTEMS FOR UNCONSTITUTIONAL SURVEILLANCE

# Exhibit 2

426273        2020 Jun 26 PM10:27

## UCC FINANCING STATEMENT
FOLLOW  INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Christopher Earl Strunk 518-416-8743

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

STRUNK, CHRISTOPHER EARL
141 HARRIS AVENUE
LAKE LUZERNE, NY 12846, USA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME  AD HOC NEW YORKER REPUBLICAN COMMITTEE | | | |
|---|---|---|---|
| OR  1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 1c. MAILING ADDRESS  141 HARRIS AVENUE | CITY  LAKE LUZERNE | STATE NY  POSTAL CODE 128461721 | COUNTRY USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION ASSOCIATION TRUST | 1f. JURISDICTION OF ORGANIZATION STATE OF NEW YORK | 1g. ORGANIZATIONAL ID #, if any NONE   X NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any   NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  3b. INDIVIDUAL'S LAST NAME  Strunk | FIRST NAME  Christopher | MIDDLE NAME  Earl | SUFFIX TRUSTEE |
| 3c. MAILING ADDRESS  141 HARRIS AVENUE | CITY  LAKE LUZERNE | STATE NY  POSTAL CODE 128461721 | COUNTRY USA |

4. This FINANCING STATEMENT covers the following collateral:
THE FOLLOWING ITEMS ARE ENTERED INTO THE COMMERCIAL REGISTRY ACCEPTED FOR VALUE EXEMPT FROM LEVY –ALL PROPERTY OF DEBTOR INCLUDING ORGANIZATION NAME "HAROLD WILLIAM VAN ALLEN" NY UCC Filing Number-201908238380669, AS REFERENCED ON THE RECORD OF THE LAMAR COUNTY GEORGIA SUPERIOR COURT FILED AND RECORDED AUGUST 22, 2018 AT 2:39PM IN BPA BOOK 89 PAGES 389 THRU 394, AND "CHRISTOPHER EARL STRUNK" NY UCC Filing Number-201908208374945, ON THE RECORD OF LAMAR COUNTY GEORGIA SUPERIOR COURT RECORDED OCTOBER 15,2012 AT 4:44 PM IN BPA 28 PAGES 172 THRU 175, UPDATED DECEMBER 5, 2013 AT 9:54 AM IN BPA BOOK 30 PAGES 763 THRU 800, IS REGISTERED WITH THE UNITED STATES SECRETARY OF THE TREASURY ON 22 MAY 2013 BY CERT. MAIL #70103090000192293013, AND AMENDED BY CERT. MAIL 70123460000358729106.THAT DEBTOR ORGANIZATION IS A ASSOCIATION TRUST TRANSMITTING UTILITY.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum | | [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

## Filing Number-202006268275667

**426273          2020 Jun 26 PM10:27**

## UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

9a. ORGANIZATION'S NAME **AD HOC NEW YORKER REPUBLICAN COMMITTEE**

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|
| | | |

**10. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (11a or 11b) - do not abbreviate or combine names

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**12.** ☒ **ADDITIONAL SECURED PARTY'S** or ☐ **ASSIGNOR S/P'S NAME** - insert only one name (12a or 12b)

12a. ORGANIZATION'S NAME

OR

| 12b. INDIVIDUAL'S LAST NAME  **Van Allen** | FIRST NAME  **Harold** | MIDDLE NAME  **William** | SUFFIX  **TRUSTEE** |
|---|---|---|---|

| 12c. MAILING ADDRESS **351 NORTH ROAD** | CITY  **HURLEY** | STATE  **NY** | POSTAL CODE  **12443** | COUNTRY  **USA** |
|---|---|---|---|---|

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14.** Description of real estate:

**16:** Additional collateral description:

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**17.** Check only if applicable and check only one box.
Debtor is a ☒ Trust  or ☐ Trustee acting with respect to property held in trust  or ☐ Decedent's Estate

**18.** Check only if applicable and check only one box.
☒ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years
☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY— NATIONAL UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

REV. STEVEN SOOS et al.,                          20-cv-651   (GLS/DJS)
                        Plaintiffs,

v.

ANDREW M. CUOMO et al.,
                        Defendants.

---

AD HOC NEW YORKER REPUBLICAN COMMITTEE INTERVENTION TO
ENLARGE THE PRELIMINARY INJUNCTION TO RESOLVE DEFENDANTS'
DEVICES FOR SOCIAL SCORING, TORTUOUS ELECTION INTERFERENCE
AND NANO-TECH SYSTEMS FOR UNCONSTITUTIONAL SURVEILLANCE

# Exhibit 3



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

REV. STEVEN SOOS et al.,                              20-cv-651   (GLS/DJS)

Plaintiffs,

v.

ANDREW M. CUOMO et al.,

Defendants.

---

AD HOC NEW YORKER REPUBLICAN COMMITTEE INTERVENTION TO
ENLARGE THE PRELIMINARY INJUNCTION TO RESOLVE DEFENDANTS'
DEVICES FOR SOCIAL SCORING, TORTUOUS ELECTION INTERFERENCE
AND NANO-TECH SYSTEMS FOR UNCONSTITUTIONAL SURVEILLANCE

# Exhibit 4





The NEW ENGLAND JOURNAL *of* MEDICINE

## ORIGINAL ARTICLE

# Genomewide Association Study of Severe Covid-19 with Respiratory Failure

David Ellinghaus, Ph.D., Frauke Degenhardt, M.Sc., Luis Bujanda, M.D., Ph.D., Maria Buti, M.D., Ph.D., Agustín Albillos, M.D., Ph.D., Pietro Invernizzi, M.D., Ph.D., Javier Fernandez, M.D., Ph.D., Daniele Prati, M.D., Guido Baselli, Ph.D., Rosanna Asselta, Ph.D., Marit M. Grimsrud, M.D., Chiara Milani, Ph.D., Fátima Aziz, B.S., Jan Kässens, Ph.D., Sandra May, Ph.D., Mareike Wendorff, M.Sc., Lars Wienbrandt, Ph.D., Florian Uellendahl-Werth, M.Sc., Tenghao Zheng, M.D., Ph.D., Xiaoli Yi, Raúl de Pablo, M.D., Ph.D., Adolfo G. Chercoles, B.S., Adriana Palom, M.S., B.S., Alba-Estela Garcia-Fernandez, B.S., Francisco Rodriguez-Frias, M.S., Ph.D., Alberto Zanella, M.D., Alessandra Bandera, M.D., Ph.D., Alessandro Protti, M.D., Alessio Aghemo, M.D., Ph.D., Ana Lleo, M.D., Ph.D., Andrea Biondi, M.D., Andrea Caballero-Garralda, M.S., Ph.D., Andrea Gori, M.D., Ph.D., Anja Tanck, Anna Carreras Nolla, B.S., Anna Latiano, Ph.D., Anna Ludovica Fracanzani, M.D., Anna Peschuck, Antonio Julià, Ph.D., Antonio Pesenti, M.D., Antonio Voza, M.D., David Jiménez, M.D., Ph.D., Beatriz Mateos, M.D., Ph.D., Beatriz Nafria Jimenez, B.S., Carmen Quereda, M.D., Ph.D., Cinzia Paccapelo, M.Sc., Christoph Gassner, Ph.D., Claudio Angelini, M.D., Cristina Cea, B.S., Aurora Solier, M.D., David Pestaña, M.D., Ph.D., Eduardo Muñiz-Diaz, M.D., Ph.D., Elena Sandoval, M.D., Elvezia M. Paraboschi, Ph.D., Enrique Navas, M.D., Ph.D., Félix García Sánchez, Ph.D., Ferruccio Ceriotti, M.D., Filippo Martinelli-Boneschi, M.D., Ph.D., Flora Peyvandi, M.D., Ph.D., Francesco Blasi, M.D., Ph.D., Luis Téllez, M.D., Ph.D., Albert Blanco-Grau, B., Georg Hemmrich-Stanisak, Ph.D., Giacomo Grasselli, M.D., Giorgio Costantino, Giulia Cardamone, Ph.D., Giuseppe Foti, M.D., Serena Aneli, Ph.D., Hayato Kurihara, M.D., Hesham ElAbd, M.Sc., Ilaria My, M.D., Iván Galván-Femenia, M.Sc., Javier Martín, M.D., Ph.D., Jeanette Erdmann, Ph.D., Jose Ferrusquía-Acosta, M.D., Koldo Garcia-Etxebarria, Ph.D., Laura Izquierdo-Sanchez, B.S., Laura R. Bettini, M.D., Lauro Sumoy, Ph.D., Leonardo Terranova, Ph.D., Leticia Moreira, M.D., Ph.D., Luigi Santoro, M.S., Luigia Scudeller, M.D., Francisco Mesonero, M.D., Luisa Roade, M.D., Malte C. Rühlemann, Ph.D., Marco Schaefer, Ph.D., Maria Carrabba, M.D., Ph.D., Mar Riveiro-Barciela, M.D., Ph.D., Maria E. Figuera Basso, Maria G. Valsecchi, Ph.D., María Hernandez-Tejero, M.D., Marialbert Acosta-Herrera, Ph.D., Mariella D'Angiò, M.D., Marina Baldini, M.D., Marina Cazzaniga, M.D., Martin Schulzky, M.A., Maurizio Cecconi, M.D., Ph.D., Michael Wittig, M.Sc., Michele Ciccarelli,

PDF

Help

M.D., Miguel Rodríguez-Gandía, M.D., Monica Bocciolone, M.D., Monica Miozzo, Ph.D., Nicola Montano, M.D., Ph.D., Nicole Braun, Nicoletta Sacchi, Ph.D., Nilda Martínez, M.D., Onur Özer, M.Sc., Orazio Palmieri, Ph.D., Paola Faverio, M.D., Paoletta Preatoni, M.D., Paolo Bonfanti, M.D., Paolo Omodei, M.D., Paolo Tentorio, M.S., Pedro Castro, M.D., Ph.D., Pedro M. Rodrigues, Ph.D., Aaron Blandino Ortiz, M.D., Rafael de Cid, Ph.D., Ricard Ferrer, M.D., Roberta Gualtierotti, M.D., Rosa Nieto, M.D., Siegfried Goerg, M.D., Salvatore Badalamenti, M.D., Ph.D., Sara Marsal, Ph.D., Giuseppe Matullo, Ph.D., Serena Pelusi, M.D., Simonas Juzenas, Ph.D., Stefano Aliberti, M.D., Valter Monzani, M.D., Victor Moreno, Ph.D., Tanja Wesse, Tobias L. Lenz, Ph.D., Tomas Pumarola, M.D., Ph.D., Valeria Rimoldi, Ph.D., Silvano Bosari, M.D., Wolfgang Albrecht, Wolfgang Peter, Ph.D., Manuel Romero-Gómez, M.D., Ph.D., Mauro D'Amato, Ph.D., Stefano Duga, Ph.D., Jesus M. Banales, Ph.D., Johannes R Hov, M.D., Ph.D., Trine Folseraas, M.D., Ph.D., Luca Valenti, M.D., Andre Franke, Ph.D., and Tom H. Karlsen, M.D., Ph.D. et al., for The Severe Covid-19 GWAS Group*

June 17, 2020
DOI: 10.1056/NEJMoa2020283

| **Article** | **Figures/Media** |
| --- | --- |

Metrics

**42 References**

## Abstract

PDF

Help

**BACKGROUND**
There is considerable variation in disease behavior among patients infected with severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), the virus that causes coronavirus disease 2019 (Covid-19). Genomewide association analysis may allow for the identification of potential genetic factors involved in the development of Covid-19.

**METHODS**
We conducted a genomewide association study involving 1980 patients with Covid-19 and severe disease (defined as respiratory failure) at seven hospitals in the Italian and Spanish epicenters of the SARS-CoV-2 pandemic in Europe. After quality control and the exclusion of population outliers, 835 patients and 1255 control participants from Italy and 775 patients

and 950 control participants from Spain were included in the final analysis. In total, we analyzed 8,582,968 single-nucleotide polymorphisms and conducted a meta-analysis of the two case–control panels.

## RESULTS

We detected cross-replicating associations with rs11385942 at locus 3p21.31 and with rs657152 at locus 9q34.2, which were significant at the genomewide level ($P<5\times10^{-8}$) in the meta-analysis of the two case–control panels (odds ratio, 1.77; 95% confidence interval [CI], 1.48 to 2.11; $P=1.15\times10^{-10}$; and odds ratio, 1.32; 95% CI, 1.20 to 1.47; $P=4.95\times10^{-8}$, respectively). At locus 3p21.31, the association signal spanned the genes SLC6A20, LZTFL1, CCR9, FYCO1, CXCR6 and XCR1. The association signal at locus 9q34.2 coincided with the ABO blood group locus; in this cohort, a blood-group–specific analysis showed a higher risk in blood group A than in other blood groups (odds ratio, 1.45; 95% CI, 1.20 to 1.75; $P=1.48\times10^{-4}$) and a protective effect in blood group O as compared with other blood groups (odds ratio, 0.65; 95% CI, 0.53 to 0.79; $P=1.06\times10^{-5}$).

## CONCLUSIONS

We identified a 3p21.31 gene cluster as a genetic susceptibility locus in patients with Covid-19 with respiratory failure and confirmed a potential involvement of the ABO blood-group system. (Funded by Stein Erik Hagen and others.)

# Introduction ⌄

SEVERE ACUTE respiratory syndrome coronavirus 2 (SARS-CoV-2) was discovered in Wuhan, China, in late 2019, and coronavirus disease 2019 (Covid-19), the disease caused by SARS-CoV-2, rapidly evolved into a global pandemic.[1] As of



**Figure 1.**



Timeline of Rapid Covid-19 Genomewide Association Study (GWAS).

June 15, 2020, there were more than 8.03 million confirmed cases worldwide, with total deaths exceeding 436,900.[2] In Europe, Italy and Spain were severely affected early on, with epidemic peaks starting in the second half of February 2020 (Figure 1) and 61,507 deaths reported by June 15, 2020. Covid-19 has varied manifestations,[3] with the large majority of infected persons having only mild symptoms or even no symptoms.[4] Mortality rates are

driven predominantly by the subgroup of patients who have severe respiratory failure related to interstitial pneumonia in both lungs and acute respiratory distress syndrome.[5] Severe Covid-19 with respiratory failure requires early and prolonged support by mechanical ventilation.[6]

The pathogenesis of severe Covid-19 and the associated respiratory failure is poorly understood, but higher mortality is consistently associated with older age and male sex.[7,8] Clinical associations have also been reported for hypertension, diabetes, and other obesity-related and cardiovascular disease traits, but the relative role of clinical risk factors in determining the severity of Covid-19 has not yet been clarified.[7-11] Observational data on lymphocytic endotheliitis and diffuse microvascular and macrovascular thromboembolic complications suggest that Covid-19 is a systemic disease that involves injury to the vascular endothelium but provide little insight into the underlying pathogenesis.[12-14] At the peak of the epidemic in Italy and Spain in early 2020, we performed a genomewide association study (GWAS) in an attempt to delineate host genetic factors contributing to severe Covid-19 with respiratory failure. The relatively low disease burden of Covid-19 in Norway and Germany allowed for a complementary team to be set up, whereby genotyping and analysis could occur in parallel with the rapid recruitment of patients in the heavily affected Italian and Spanish epicenters.

## Methods ⌄

### STUDY PARTICIPANTS AND RECRUITMENT

We recruited 1980 patients with severe Covid-19, which was defined as hospitalization with respiratory failure and a confirmed SARS-CoV-2 viral RNA polymerase-chain-reaction test from nasopharyngeal swabs or other relevant biologic fluids, cross sectionally, in intensive care units and general wards at seven hospitals in four cities in the pandemic epicenters in Italy and Spain (Table S1A in Supplementary Appendix 1, available with the full text of this article at NEJM.org). The hospitals in Italy were the following: Fondazione IRCCS Cá Granda Ospedale Maggiore Policlinico in Milan (597 patients); Humanitas Clinical and Research Center, IRCCS, in Milan (154 patients); and UNIMIB (Università degli Studi di Milano–Bicocca) School of Medicine, San Gerardo Hospital, in Monza (a suburb of Milan) (200 patients). The hospitals in Spain were the following: Hospital Clínic and IDIBAPS (Instituto de Investigaciones Biomédicas August Pi i Sunyer) in Barcelona (56 patients), Hospital Universitario Vall d'Hebron in Barcelona (337 patients), Hospital Universitario Ramón y Cajal in Madrid (298 patients), and Donostia University Hospital in San Sebastian (338 patients).

Respiratory failure was defined in the simplest possible manner in order to ensure feasibility: the use of oxygen supplementation or mechanical ventilation, with severity graded according to the maximum respiratory support received at any point during hospitalization (supplemental oxygen therapy only, noninvasive ventilatory support, invasive ventilatory support, or extracorporeal membrane oxygenation). For severity assessments, severity was also dichotomized as no mechanical ventilation or mechanical ventilation. Whole-blood samples or buffy coats from diagnostic venipuncture were obtained for DNA extraction.

For comparison, we included 2381 control participants from Italy and Spain (Table S1B in Supplementary Appendix 1). We recruited 998 randomly selected blood donors at Fondazione IRCCS Cá Granda Ospedale Maggiore Policlinico, Milan, who underwent genotyping for the purpose of the present study. A total of 40 of these participants had evidence of the development of anti–SARS-CoV-2 antibodies, all of whom had mild or no Covid-19 symptoms. We also included two control panels with genotype data derived from previous studies and from persons with unknown SARS-CoV-2 infection status using the same genotyping array. The panels included 396 healthy volunteers, blood donors, and outpatients of gastroenterology departments in Italy[15] and 987 healthy blood donors in San Sebastián, Spain.

## ETHICS COMMITTEE APPROVAL

The project protocol involved the rapid recruitment of patient-participants and no additional project-related procedures (we primarily used material from clinically indicated venipunctures) and afforded anonymity, owing to the minimal data set collected. Differences in recruitment and consent procedures among the centers arose because some centers integrated the project into larger Covid-19 biobanking efforts, whereas other centers did not, and because there were differences in how local ethics committees provided guidance on the handling of anonymization or deidentification of data as well as consent procedure; informed consent was obtained, sometimes in a delayed fashion, from the study pa each center when possible. In some instances, informed consent was provided verbally or by the next of kin, depending on local ethics committee regulations and special policies issued for Covid-19 research. For some severely ill patients, an exemption from informed consent was obtained from a local ethics committee or according to local regulations in order to allow the use of completely anonymized surplus material from diagnostic venipuncture.

The following approvals of the project were obtained from the relevant ethics committees: Germany: Kiel (reference number, D464/20); Italy: Fondazione IRCCS Cá Granda Ospedale Maggiore Policlinico (reference numbers, 342_2020 for patients and 334-2020 for control participants), Humanitas Clinical and Research Center, IRCCS (reference number, 316/20), the University of Milano–Bicocca School of Medicine, San Gerardo Hospital, Monza (the

ethics committee of the National Institute of Infectious Diseases Lazzarro Spallanzani reference number, 84/2020); Norway: Regional Committee for Medical and Health Research Ethics in South-Eastern Norway (reference number, 132550); Spain: Hospital Clínic, Barcelona (reference number, HCB/2020/0405), Hospital Universitario Vall d'Hebron, Barcelona (reference number, PR[AG]244/2020), Hospital Universitario Ramón y Cajal, Madrid (reference number, 093/20) and Donostia University Hospital, San Sebastian (reference number, PI2020064).

### SAMPLE PROCESSING, GENOTYPING, AND IMPUTATION

We performed DNA extraction using a Chemagic 360 (PerkinElmer) with the use of the low-volume kit CMG-1491 and the buffy-coat kit CMG-714 (Chemagen), respectively. For genotyping, we used the Global Screening Array (GSA), version 2.0 (Illumina), which contains 712,189 variants before quality control. Details on genotyping and quality-control procedures are provided in the Supplementary Methods section in Supplementary Appendix 1. To maximize genetic coverage, we performed single-nucleotide polymorphism (SNP) imputation on genome build GRCh38 using the Michigan Imputation Server and 194,512 haplotypes generated by the Trans-Omics for Precision Medicine (TOPMed) program (freeze 5).[16]

After the exclusion of samples during quality control (the majority of which were due to population outliers; see the Supplementary Methods section and Table S1B and S1C), the final case–control data sets comprised 835 patients and 1255 control participants from Italy and 775 patients and 950 control participants from Spain. A total of 8,965,091 SNPs were included in the Italian cohort and 9,140,716 SNPs in the Spanish cohort.

### STATISTICAL ANALYSIS

To take imputation uncertainty into account, we tested for phenotypic associations allele dosage data separately for both the Italian and Spanish case–control panels w of the PLINK logistic-regression framework for dosage data (PLINK, version 1.9).[17] carried out two genomewide tests of association that included covariates from principal-component analyses, with adjustments to control for potential population stratification (main analysis) and potential population stratification and age and sex bias (analysis corrected for age and sex). A fixed-effects meta-analysis was conducted with the use of the meta-analysis tool METAL[18] on 8,582,968 variants that were common to both the Italian and Spanish data sets with the use of effect-size estimates and their standard errors from the study-specific association analyses.

For the genomewide meta-analysis, we used the commonly accepted threshold of $5\times10^{-8}$ for joint P values to determine statistical significance. Bayesian fine-mapping analysis was

performed for loci reaching genomewide significance (see the Supplementary Methods section). Genomewide summary statistics of our analyses are publicly available through our web browser (www.c19-genetics.eu) and have been submitted to the European Bioinformatics Institute (www.ebi.ac.uk/gwas; accession numbers, GCST90000255 and GCST90000256).

On the basis of the results from the TOPMed genotype imputation, we selected three ABO SNPs (rs8176747, rs41302905, and rs8176719)[19,20] to infer the ABO blood type and calculated odds ratios according to blood type (A vs. B, AB, or O; B vs. A, AB, or O; AB vs. A, B, or O; and O vs. A, AB, or B) (see the Supplementary Methods). To assess in detail the HLA complex at locus 6p21, we performed sequencing-based HLA typing of seven classical HLA loci (HLA-A, -C, -B, -DRB1, -DQA1, -DQB1, and -DPB1) in a subgroup of 835 patients and 891 control participants from Italy and 773 patients from Spain (see the Supplementary Methods). We also assessed allelic distribution according to no mechanical ventilation (supplemental oxygen only) as compared with mechanical ventilation of any type. A similar assessment was made for lead SNPs rs11385942 and rs657152 at loci 3p21.31 and 9q34.2, respectively.

## Results

### PATIENTS, GENOTYPING, AND QUALITY CONTROL

**Table 1.**



Overview of Patients Included in the Final Analysis.

The milestones of the study in the context of the peak outbreaks in Italy and Spain are shown in Figure 1. Data on the age, sex, maximum respiratory support at any point during hospitalization, and relevant coexisting conditions (type 2 diabetes, hypertension, and coronary heart disease) in the patients who were included in the final analysis are shown in Table 1 and in Table S2 in Supplementary Appendix 1. Because we used the same genotyping platform (GSA) to obtain both data sets, we were able to perform a uniform quality control of the merged Italian and Spanish SNP data sets, thus reducing technical confounders to a minimum. A quantile–quantile (Q–Q) plot of the two meta-analyses (the main analysis and

PDF

Help

the analysis corrected for age and sex) showed significant associations in the tail of the distribution with minimal genomic inflation ($\lambda_{GC}$=1.015 for main analysis and $\lambda_{GC}$=1.006 for analysis corrected for age and sex) (Fig. S2 in Supplementary Appendix 1). We also carried out separate association analyses for the Italian and Spanish data sets (see the Supplementary Methods section and Fig. S3).

**GENOMEWIDE ASSOCIATION ANALYSIS**

**Figure 2.**



GWAS Summary (Manhattan) Plot of the Meta-analysis Association Statistics Highlighting Two Susceptibility Loci with Genomewide Significance for Severe Covid-19 with Respiratory Failure.

**Table 2.**



Susceptibility Loci Associated with Severe Covid-19 with Respiratory Failure.

We found two loci to be associated with Covid-19–induced respiratory failure with genomewide significance ($P<5\times10^{-8}$) in the main meta-analysis: the rs11385942 insertion–deletion GA or G variant at locus 3p21.31 (odds ratio for the GA allele, 1.77; 95% confidence interval [CI], 1.48 to 2.11; P=$1.15\times10^{-10}$) and the rs657152 A or C SNP at locus 9q34.2 (odds ratio for the A allele, 1.32; 95% CI, 1.20 to 1.47; P=$4.95\times10^{-8}$) (Figure 2 and Table 2 and Supplementary Appendix 2, available at NEJM.org). Both loci showed nominally significant association in both the Spanish and Italian subanalyses (Table 2). The meta-analysis association results for recessive and heterozygous genetic models for the two meta-analyses (main analysis and the analysis corrected for age and sex) are provided in Supplementary Appendix 3, available at NEJM.org. The imputation quality of the associated markers was good (Table 2 and Supplementary Appendix 2), and manual inspection of genotype cluster plots of genotyped SNPs in these regions showed distinct genotype clouds for homozygous and heterozygous calls (Fig. S4 in Supplementary Appendix 1). Furthermore, the analyses that were corrected for age and sex corroborated the observations at both rs11385942 (meta-

analysis odds ratio, 2.11; 95% CI, 1.70 to 2.61; P=9.46×10⁻¹²) and rs657152 (meta-analysis odds ratio, 1.39; 95% CI, 1.22 to 1.59; P=5.35×10⁻⁷) (Table 2 and Fig. S5 in Supplementary Appendix 1).

**Figure 3.**



Regional Association Plots of Susceptibility Loci Associated with Severe Covid-19 with Respiratory Failure.

The allele frequencies in Spanish and Italian control data sets from previously published studies[21-27] are consistent with those we report here (Supplementary Appendix 2). A further 24 different genomic loci showed suggestive evidence (P<1×10⁻⁵) for association with Covid-19–induced respiratory failure in the main analysis (Supplementary Appendix 4, available at NEJM.org, and Fig. S6 in Supplementary Appendix 1). Association signals at loci 3p21.31 and 9q34.2 were fine-mapped to 22 and 38 variants, respectively, with greater than 95% certainty (Figure 3A and 3B and Supplementary Appendix 5, available at NEJM.org).

### CHROMOSOME 3P21.31

The association signal at locus 3p21.31 comprised six genes (*SLC6A20, LZTFL1, CCR9, FYCO1, CXCR6,* and *XCR1*) (Figure 3A). The risk allele GA of rs11385942 is associated with reduced expression of *CXCR6* and increased expression of *SLC6A20*, and *LZTFL1* is strongly expressed in human lung cells (Fig. S7 and Supplementary Appendix 6, available at NEJM.org). We found that the frequency of the risk allele of the lead variant at 3p21.31 (rs11385942) was higher among patients who received mechanical ventilation than among those who received oxygen supplementation only in both the main meta-analysis (odds ratio, 1.70; 95% CI, 1.27 to 2.26; P=3.30×10⁻⁴) and the meta-analysis corrected for age and sex (odds ratio, 1.56; 95% CI, 1.17 to 2.01; P=0.003) (Supplementary Appendix 7, available at NEJM.org). Furthermore, the 19 patients who were homozygous for the rs11385942 risk allele were younger than 1591 patients

who were heterozygous or homozygous for the nonrisk allele (median age, 59 years [interquartile range, 49 to 68] vs. 66 years [interquartile range, 56 to 75]; P=0.005). Available variant database entries suggest that the frequency of this risk allele varies among populations worldwide (Fig. S8 in Supplementary Appendix 1).

### *ABO* LOCUS

At locus 9q34.2 the association signal coincided with the *ABO* blood group locus (Figure 3B and Fig. S9 in Supplementary Appendix 1). Accordingly, the distribution of ABO blood groups (predicted from combinations of genotypes of three different SNPs) was skewed among patients with Covid-19 who had respiratory failure, as compared with the distribution among control participants. In the meta-analysis corrected for age and sex, we found a higher risk among persons with blood group A than among patients with other blood groups (odds ratio, 1.45; 95% CI, 1.20 to 1.75; P=$1.48×10^{-4}$) and a protective effect for blood group O as compared with the other blood groups (odds ratio, 0.65; 95% CI, 0.53 to 0.79; P=$1.06×10^{-5}$). Details are provided in Supplementary Appendix 8, available at NEJM.org. Both associations and effect directions were consistent in the separate Spanish and Italian case–control analyses. We found no significant difference in blood-group distribution between patients receiving supplemental oxygen only and those receiving mechanical ventilation of any kind. The ABO blood-group frequency distributions in public registries are provided for comparison in Supplementary Appendix 8, along with details of the results presented here, and corroborate our observations.

### HLA ANALYSIS

Given its important role in several viral infections, we scrutinized the extended HLA region (chromosome 6, 25 through 34 Mb). There were no SNP association signals at the HLA complex that met even the significance threshold of suggestive association: P<$1×10^{-5}$ (Fig. S10 in Supplementary Appendix 1). Dedicated analysis of the classical HLA loci showed significant allele associations with either Covid-19 or disease severity (oxygen supplementation only or mechanical ventilation of any kind), and further analysis of heterozygote and divergent allele advantage or predicted number of HLA-bound SARS-CoV-2 peptides did not show significant associations with Covid-19 in this data set (see the HLA Analyses section in Supplementary Appendix 1 and Supplementary Appendix 9, available at NEJM.org).

# Discussion

Using a pragmatic approach with simplified inclusion criteria and a complementary team of clinicians at the European Covid-19 epicenters in Italy and Spain and scientists in the less-burdened countries of Germany and Norway, we performed a GWAS that included de novo genotyping for Covid-19 with respiratory failure in approximately 2 months. We detected a novel susceptibility locus at a chromosome 3p21.31 gene cluster and confirmed a potential involvement of the ABO blood-group system in Covid-19.

On chromosome 3p21.31, the peak association signal covered a cluster of six genes (SLC6A20, LZTFL1, CCR9, FYCO1, CXCR6, and XCR1), several of which have functions that are potentially relevant to Covid-19. A causative gene cannot be reliably implicated by the present data. One candidate is SLC6A20, which encodes the sodium–imino acid (proline) transporter 1 (SIT1) and which functionally interacts with angiotensin-converting enzyme 2, the SARS-CoV-2 cell-surface receptor.[28,29] However, the locus also contains genes encoding chemokine receptors, including the CC motif chemokine receptor 9 (CCR9) and the C-X-C motif chemokine receptor 6 (CXCR6), the latter of which regulates the specific location of lung-resident memory CD8 T cells throughout the sustained immune response to airway pathogens, including influenza viruses.[30] Flanking genes (e.g., CCR1 and CCR2) also have relevant functions,[31] and further studies will be needed to delineate the functional consequences of detected associations.

The preliminary results from the Covid-19 Host Genetics Consortium[32] include suggestive associations within the same locus at chromosome 3p21.31, which lend considerable support to our findings (Fig. S11 in Supplementary Appendix 1). The consortium analysis also used population-based controls, but the patients included persons with mild Covid-19 and those with severe Covid-19. The parallel findings nevertheless underscore an important point about the ascertainment of patients and controls in genetic studies of Covid-19. Because the majority of patients with SARS-CoV-2 infection are asymptomatic, any sample invol patients with a positive nasopharyngeal RNA test is likely to hold a bias toward som of symptomatic burden. Two of the identifiers for inclusion in the current study were a positive result for the presence of SARS-CoV-2 according to PCR testing and receipt of respiratory support (an extreme Covid-19 phenotype). As such, it seems reasonable to conclude that the chromosome 3p21.31 locus is involved in Covid-19 susceptibility per se, with a possible enrichment in patients with severe disease. This latter interpretation is supported by the significantly higher frequency of the risk allele among patients who received mechanical ventilation than among those who received supplemental oxygen only as well as by the finding of younger age among patients who were homozygous for the risk allele than among patients who were heterozygous or homozygous for the nonrisk allele.

Nongenetic studies that were reported as preprints[33,34] have previously implicated the involvement of ABO blood groups in Covid-19 susceptibility, and ABO blood groups have also been implicated in susceptibility to SARS-CoV-1 infection.[35] Our genetic data confirm that blood group O is associated with a risk of acquiring Covid-19 that was lower than that in non-O blood groups, whereas blood group A was associated with a higher risk than non-A blood groups.[33,34] The biologic mechanisms undergirding these findings may have to do with the ABO group per se (e.g., with the development of neutralizing antibodies against protein-linked N-glycans)[36] or with other biologic effects of the identified variant,[37-39] including the stabilization of von Willebrand factor.[40,41] The ABO locus holds considerable risk for population stratification,[42] which is increased by the inclusion of randomly selected blood donors in the current study (for which there is an inherent risk of blood group O enrichment). Alignment of the allele frequencies at the ABO locus in our control population with those in several non–blood-donor control populations would suggest that this is not a major bias, and at least one study[34] that tested for association with blood type used disease controls with no affiliation to blood donors.

The pragmatic aspects leading to the feasibility of this massive undertaking in a very short period of time during the extreme clinical circumstances of the pandemic imposed limitations that will be important to explore in follow-up studies. For example, to enable the recruitment of study participants, a bare minimum of clinical metadata was requested. For this reason, extensive genotype–phenotype elaboration of current findings could not be conducted, and adjustments for all potential sources of bias (e.g., underlying cardiovascular and metabolic factors relevant to Covid-19) could not be performed. Furthermore, we have limited information about the SARS-CoV-2 infection status in the control participants; this concern is mitigated by the fact that the presence of susceptible persons in the control group would only bias the tests toward the null. In addition, few restrictions were imposed during inclusion, which led to genotyped samples having to be excluded owing to differing groups (population outliers). Further exploration of current findings, both as to their usefulness in clinical risk profiling of patients with Covid-19 and toward a mechanistic understanding of the underlying pathophysiology, is warranted.

PDF

Help

---

## Funding and Disclosures       ⌄

Supported by a philanthropic donation from Stein Erik Hagen and Canica; by a grant from the Deutsche Forschungsgemeinschaft Cluster of Excellence "Precision Medicine in Chronic Inflammation" (EXC2167); by a Fondazione IRCCS Ca' Granda Ospedale Maggiore Policlinico

Covid-19 Biobank grant (to Dr. Valenti); by grants from the Italian Ministry of Health (RF-2016-02364358, to Dr. Valenti) and Ministero dell'Istruzione, dell'Università e della Ricerca project "Dipartimenti di Eccellenza 2018–2022" (D15D18000410001 to the Department of Medical Sciences, University of Turin; by a grant from the Spanish Ministry of Science and Innovation JdC fellowship (IJC2018-035131-I, to Dr. Acosta-Herrera); and by the GCAT Cession Research Project PI-2020-01. HLA typing was performed and supported by the Stefan-Morsch-Stiftung.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

Dr. Ellinghaus and Ms. Degenhardt and Drs. Valenti, Franke, and Karlsen contributed equally to this article.

This article was published on June 17, 2020, at NEJM.org.

We thank all the patients who consented to participate in this study, and we express our condolences to the families of patients who died from Covid-19. We also thank the entire clinical staff during the outbreak situation at the different centers who were able to work on this scientific study in parallel with their clinical duties; all the members of the Humanitas Covid-19 Task Force for contributions to the recruitment of patients (see the Supplementary Notes section in Supplementary Appendix 1); Sören Brunak and Karina Banasik for discussions on the ABO association; Goncalo Abecasis and his team for providing the Michigan imputation server; Fabrizio Bossa and Francesca Tavano for contributions to control-sample acquisition; Maria Reig for help in the case-sample acquisition; the staff of the Basque Biobank in Spain for assistance in the acquisition of samples; the staff of GCAT|Genomes for Life, a cohort study of the Genomes of Catalonia, Institute for Health Science Research Germans Trias i Pujol, for data contribution; Alexander Eck, Jens Horst, and Jens Scholz for supporting the HLA typing in the project; and the members of ethics commissions, review boards, and consortia who fast-track reviewed our applications and enabled this rapid genetic discovery study.

## Author Affiliations

From the Institute of Clinical Molecular Biology, Christian-Albrechts-University (D.E., F.D., J.K., S. May, M. Wendorff, L.W., F.U.-W., X.Y., A.T., A. Peschuck, C.G., G.H.-S., H.E.A., M.C.R., M.E.F.B., M. Schulzky, M. Wittig, N.B., S.J., T.W., W.A., M. D'Amato, A.F.), and University Hospital Schleswig-Holstein, Campus Kiel (N.B., A.F.), Kiel, the Institute for Cardiogenetics, University of

Lübeck, Lübeck (J.E.), the German Research Center for Cardiovascular Research, partner site Hamburg–Lübeck–Kiel (J.E.), the University Heart Center Lübeck (J.E.), and the Institute of Transfusion Medicine, University Hospital Schleswig-Holstein (S.G.), Lübeck, Stefan-Morsch-Stiftung, Birkenfeld (M. Schaefer, W.P.), and the Research Group for Evolutionary Immunogenomics, Max Planck Institute for Evolutionary Biology, Plön (O.O., T.L.L.) — all in Germany; Novo Nordisk Foundation Center for Protein Research, Disease Systems Biology, Faculty of Health and Medical Sciences, University of Copenhagen, Copenhagen (D.E.); the Department of Liver and Gastrointestinal Diseases, Biodonostia Health Research Institute–Donostia University Hospital–University of the Basque Country (L.B., K.G.-E., L.I.-S., P.M.R., J.M.B.), Osakidetza Basque Health Service, Donostialdea Integrated Health Organization, Clinical Biochemistry Department (A.G.C., B.N.J.), and the Department of Liver and Gastrointestinal Diseases, Biodonostia Health Research Institute (M. D'Amato), San Sebastian, Centro de Investigación Biomédica en Red en Enfermedades Hepáticas y Digestivas, Instituto de Salud Carlos III (L.B., M. Buti, A. Albillos, A. Palom, F.R.-F., B.M., L. Téllez, K.G.-E., L.I.-S., F.M., L.R., M.R.-B., M. Rodríguez-Gandía, P.M.R., M. Romero-Gómez, J.M.B.), the Departments of Gastroenterology (A. Albillos, B.M., L. Téllez, F.M., M. Rodríguez-Gandía), Intensive Care (R.P., A.B.O.), Respiratory Diseases (D.J., A.S., R.N.), Infectious Diseases (C.Q., E.N.), and Anesthesiology (D. Pestaña, N. Martínez), Hospital Universitario Ramón y Cajal, Instituto Ramón y Cajal de Investigación Sanitaria, University of Alcalá, and Histocompatibilidad y Biología Molecular, Centro de Transfusion de Madrid (F.G.S.), Madrid, the Liver Unit, Department of Internal Medicine, Hospital Universitari Vall d'Hebron, Vall d'Hebron Barcelona Hospital Campus (M. Buti, A. Palom, L.R., M.R.-B.), Hospital Clinic, University of Barcelona, and the August Pi i Sunyer Biomedical Research Institute (J.F., F.A., E.S., J.F.-A., L.M., M.H.-T., P.C.), the European Foundation for the Study of Chronic Liver Failure (J.F.), Vall d'Hebron Institut de Recerca (A. Palom, F.R.-F., A.J., S. Marsal), and the Departments of Biochemistry (A.-E.G.-F., F.R.-F., A.C.-G., C.C., A.B.-G.), Intensive Care (R.F.), and Microbiology (T.P.), University Hospital Vall d'Hebron, the Immunohematology Department, Banc de Sang i Teixits, Autonomous University of Barcelona (E.M.-D.), Catalan Institute of Oncology, Bellvitge Biomedical Research Institute, Consortium for Biomedical Research in Epidemiology and Public Health and University of Barcelona, l'Hospitalet (V. Moreno), and Autonoma University of Barcelona (T.P.), Barcelona, Universitat Autònoma de Barcelona, Bellatera (M. Buti, F.R.-F., M.R.-B.), GenomesForLife–GCAT Lab Group, Germans Trias i Pujol Research Institute (A.C.N., I.G.-F., R.C.), and High Content Genomics and Bioinformati Germans Trias i Pujol Research Institute (L. Sumoy), Badalona, Institute of Parasitology Biomedicine Lopez-Neyra, Granada (J.M., M.A.-H.), the Digestive Diseases Unit, Virgen University Hospital, Institute of Biomedicine of Seville, University of Seville, Seville (M. Romero-Gómez), and Ikerbasque, Basque Foundation for Science, Bilbao (M. D'Amato, J.M.B.) — all in Spain; the Division of Gastroenterology, Center for Autoimmune Liver Diseases, Department of Medicine and Surgery, University of Milan Bicocca (P.I., C.M.), Fondazione IRCCS Ca' Granda Ospedale Maggiore Policlinico (D. Prati, G.B., A.Z., A. Bandera, A.G., A.L.F., A. Pesenti, C.P., F.C., F.M.-B., F.P., F.B., G.G., G. Costantino, L. Terranova, L. Santoro, L. Scudeller, M. Carrabba, M. Baldini, M.M., N. Montano, R.G., S.P., S. Aliberti, V. Monzani, S. Bosari, L.V.), the Department of Biomedical Sciences, Humanitas University (R.A., A. Protti, A. Aghemo, A. Lleo, E.M.P., G. Cardamone, M. Cecconi, V.R., S.D.), Humanitas Clinical and Research Center, IRCCS (R.A., A. Protti, A. Aghemo, A. Lleo, A.V., C.A., E.M.P., H.K., I.M., M. Cecconi, M. Ciccarelli, M. Bocciolone, P.P., P.O., P.T., S. Badalamenti, S.D.), University of Milan (A.Z., A. Bandera, A.G., A.L.F., A. Pesenti, F.M.-B., F.P., F.B., G.G., G. Costantino, M.M., N. Montano, R.G., S.P., S.

PDF

Help

Aliberti, S. Bosari, L.V.), and the Center of Bioinformatics, Biostatistics, and Bioimaging (M.G.V.) and the Phase 1 Research Center (M. Cazzaniga), School of Medicine and Surgery, and the Departments of Emergency, Anesthesia, and Intensive Care (G.F.), Pneumologia (P.F.), and Infectious Diseases (P.B.); University of Milano–Bicocca, Milan, the European Reference Network on Hepatological Diseases (P.I., C.M.) and the Infectious Diseases Unit (P.B.), San Gerardo Hospital, Monza, the Pediatric Departement and Centro Tettamanti–European Reference Network PaedCan, EuroBloodNet, MetabERN–University of Milano–Bicocca–Fondazione MBBM–Ospedale, San Gerardo (A. Biondi, L.R.B., M. D'Angiò), the Gastroenterology Unit, Fondazione IRCCS Casa Sollievo della Sofferenza, San Giovanni Rotondo (A. Latiano, O.P.), the Department of Medical Sciences, Università degli Studi di Torino, Turin (S. Aneli, G.M.), and the Italian Bone Marrow Donor Registry, E.O. Ospedali Galliera, Genoa (N.S.) — all in Italy; the Norwegian PSC Research Center, Department of Transplantation Medicine, Division of Surgery, Inflammatory Diseases, and Transplantation, and the Research Institute for Internal Medicine, Division of Surgery, Inflammatory Diseases, and Transplantation, Oslo University Hospital Rikshospitalet and University of Oslo (M.M.G., J.R.H., T.F., T.H.K.), and the Section for Gastroenterology, Department of Transplantation Medicine, Division for Cancer Medicine, Surgery, and Transplantation, Oslo University Hospital Rikshospitalet (J.R.H., T.F., T.H.K.), Oslo; the School of Biological Sciences, Monash University, Clayton, VIC, Australia (T.Z., M. D'Amato); Private University in the Principality of Liechtenstein (C.G.); the Institute of Biotechnology, Vilnius University, Vilnius, Lithuania (S.J.); and the Unit of Clinical Epidemiology, Department of Medicine Solna, Karolinska Institutet, Stockholm (M. D'Amato).

Address reprint requests to Dr. Franke at the Institute of Clinical Molecular Biology and University Hospital of Schleswig-Holstein, Christian-Albrechts-University, Rosalind-Franklin-Str. 12, D-24105 Kiel, Germany, or at a.franke@mucosa.de; or to Dr. Karlsen at the Division of Surgery, Inflammatory Diseases, and Transplantation, Oslo University Hospital Rikshospitalet and University of Oslo, Postboks 4950 Nydalen, N-0424 Oslo, Norway, or at t.h.karlsen@medisin.uio.no.

Dr. Franke serves as an author on behalf of the Covid-19 Host Genetics Initiative; members of the Initiative are listed in Supplementary Appendix 1, available at NEJM.org.

PDF

Help

## Supplementary Material     ⌄

| | | |
|---|---|---|
| Supplementary Appendix 1 | PDF | 4831KB |
| Supplementary Appendix 2 | MS Excel | 16KB |
| Supplementary Appendix 3 | MS Excel | 10KB |
| Supplementary Appendix 4 | MS Excel | 14KB |
| Supplementary Appendix 5 | MS Excel | 12KB |

| Supplementary Appendix 6 | MS Excel | 13KB |
| --- | --- | --- |
| Supplementary Appendix 7 | MS Excel | 15KB |
| Supplementary Appendix 8 | MS Excel | 40KB |
| Supplementary Appendix 9 | MS Excel | 92KB |
| Disclosure Forms | PDF | 1920KB |

## References (42)                                                ⌄

1.  Zhu N, Zhang D, Wang W, et al. A novel coronavirus from patients with pneumonia in China, 2019. N Engl J Med 2020;382:727-733.
    Free Full Text    Web of Science    Medline    Google Scholar

2.  Dong E, Du H, Gardner L. An interactive Web-based dashboard to track COVID-19 in real time. Lancet Infect Dis 2020;20:533-534.
    Crossref    Web of Science    Medline    Google Scholar

3.  Coronaviridae Study Group of the International Committee on Taxonomy of Viruses. The species Severe acute respiratory syndrome-related coronavirus: classifying 2019-nCoV and naming it SARS-CoV-2. Nat Microbiol 2020;5:536-544.
    Crossref    Web of Science    Medline    Google Scholar

4.  Wu Z, McGoogan JM. Characteristics of and important lessons from the coronavirus 2019 (COVID-19) outbreak in China: summary of a report of 72 314 cases from the Chinese Center for Disease Control and Prevention. JAMA 2020 February 24 (Epub ahead of print).
    Crossref    Web of Science    Medline    Google Scholar

5.  Berlin DA, Gulick RM, Martinez FJ. Severe Covid-19. N Engl J Med. DOI: 10.1056/NEJMcp2009575.
    Free Full Text    Web of Science    Google Scholar

6.  Marini JJ, Gattinoni L. Management of COVID-19 respiratory distress. JAMA 2020 April 24 (Epub ahead of print).

PDF

Help

Crossref     Medline     Google Scholar

7.  Zhou F, Yu T, Du R, et al. Clinical course and risk factors for mortality of adult inpatients with
    COVID-19 in Wuhan, China: a retrospective cohort study. Lancet 2020;395:1054-1062.
    Crossref     Web of Science     Medline     Google Scholar

8.  Li X, Xu S, Yu M, et al. Risk factors for severity and mortality in adult COVID-19 inpatients in
    Wuhan. J Allergy Clin Immunol 2020 April 12 (Epub ahead of print).
    Crossref     Medline     Google Scholar

9.  Chen R, Liang W, Jiang M, et al. Risk factors of fatal outcome in hospitalized subjects with
    coronavirus disease 2019 from a nationwide analysis in China. Chest 2020 April 15 (Epub
    ahead of print).
    Crossref     Medline     Google Scholar

10. Docherty AB, Harrison EM, Green CA, et al. Features of 20133 UK patients in hospital with
    covid-19 using the ISARIC WHO Clinical Characterisation Protocol: prospective observational
    cohort study. BMJ 2020;369:m1985-m1985.
    Crossref     Medline     Google Scholar

11. Richardson S, Hirsch JS, Narasimhan M, et al. Presenting characteristics, comorbidities, and
    outcomes among 5700 patients hospitalized with COVID-19 in the New York City area. JAMA
    2020;323(20):2052-2059.
    Crossref     Web of Science     Medline     Google Scholar

12. Levi M, Thachil J, Iba T, Levy JH. Coagulation abnormalities and thrombosis in pati
    COVID-19. Lancet Haematol 2020;7(6):e438-e440.
    Crossref     Web of Science     Medline     Google Scholar

13. Varga Z, Flammer AJ, Steiger P, et al. Endothelial cell infection and endotheliitis in COVID-19.
    Lancet 2020;395:1417-1418.
    Crossref     Web of Science     Medline     Google Scholar

14. Ackermann M, Verleden SE, Kuehnel M, et al. Pulmonary vascular endothelialitis, thrombosis,
    and angiogenesis in Covid-19. N Engl J Med. DOI: 10.1056/NEJMoa2015432.
    Free Full Text     Google Scholar

PDF

Help

15. Franke A, McGovern DP, Barrett JC, et al. Genome-wide meta-analysis increases to 71 the number of confirmed Crohn's disease susceptibility loci. Nat Genet 2010;42:1118-1125.
Crossref    Web of Science    Medline    Google Scholar

16. Taliun D, Harris DN, Kessler MD, et al. Sequencing of 53,831 diverse genomes from the NHLBI TOPMed Program. March 6, 2019 (https://www.biorxiv.org/content/10.1101/563866v1). preprint.
Google Scholar

17. Chang CC, Chow CC, Tellier LC, Vattikuti S, Purcell SM, Lee JJ. Second-generation PLINK: rising to the challenge of larger and richer datasets. Gigascience 2015;4:7-7.
Crossref    Web of Science    Medline    Google Scholar

18. Willer CJ, Li Y, Abecasis GR. METAL: fast and efficient meta-analysis of genomewide association scans. Bioinformatics 2010;26:2190-2191.
Crossref    Web of Science    Medline    Google Scholar

19. Bugert P, Rink G, Kemp K, Klüter H. Blood group ABO genotyping in paternity testing. Transfus Med Hemother 2012;39:182-186.
Crossref    Web of Science    Medline    Google Scholar

20. Robinson J, Barker DJ, Georgiou X, Cooper MA, Flicek P, Marsh SGE. IPD-IMGT/HLA database. Nucleic Acids Res 2020;48(D1):D948-D955.
Web of Science    Medline    Google Scholar

21. Dubois PC, Trynka G, Franke L, et al. Multiple common variants for celiac disease influencing immune gene expression. Nat Genet 2010;42:295-302.
Crossref    Web of Science    Medline    Google Scholar

22. Bentham J, Morris DL, Graham DSC, et al. Genetic association analyses implicate aberrant regulation of innate and adaptive immunity genes in the pathogenesis of systemic lupus erythematosus. Nat Genet 2015;47:1457-1464.
Crossref    Web of Science    Medline    Google Scholar

PDF

Help

23. Myocardial Infarction Genetics Consortium. Genome-wide association of early-onset myocardial infarction with single nucleotide polymorphisms and copy number variants. Nat Genet 2009;41:334-341.

Crossref    Web of Science    Medline    Google Scholar

24. Julià A, González I, Fernández-Nebro A, et al. A genome-wide association study identifies SLC8A3 as a susceptibility locus for ACPA-positive rheumatoid arthritis. Rheumatology (Oxford) 2016;55:1106-1111.

Crossref    Web of Science    Medline    Google Scholar

25. López-Isac E, Acosta-Herrera M, Kerick M, et al. GWAS for systemic sclerosis identifies multiple risk loci and highlights fibrotic and vasculopathy pathways. Nat Commun 2019;10:4955-4955.

Crossref    Web of Science    Medline    Google Scholar

26. Obón-Santacana M, Vilardell M, Carreras A, et al. GCAT|Genomes for life: a prospective cohort study of the genomes of Catalonia. BMJ Open 2018;8(3):e018324-e018324.

Medline    Google Scholar

27. Galván-Femenía I, Obón-Santacana M, Piñeyro D, et al. Multitrait genome association analysis identifies new susceptibility genes for human anthropometric variation in the GCAT cohort. J Med Genet 2018;55:765-778.

Crossref    Web of Science    Medline    Google Scholar

28. Vuille-dit-Bille RN, Camargo SM, Emmenegger L, et al. Human intestine luminal ACE and amino acid transporter expression increased by ACE-inhibitors. Amino Acids 2015; 705.

Crossref    Web of Science    Medline    Google Scholar

29. Kuba K, Imai Y, Ohto-Nakanishi T, Penninger JM. Trilogy of ACE2: a peptidase in the renin-angiotensin system, a SARS receptor, and a partner for amino acid transporters. Pharmacol Ther 2010;128:119-128.

Crossref    Web of Science    Medline    Google Scholar

30. Wein AN, McMaster SR, Takamura S, et al. CXCR6 regulates localization of tissue-resident memory CD8 T cells to the airways. J Exp Med 2019;216:2748-2762.

PDF

Help

Crossref    Web of Science    Medline    Google Scholar

31. Hickey MJ, Held KS, Baum E, Gao JL, Murphy PM, Lane TE. CCR1 deficiency increases susceptibility to fatal coronavirus infection of the central nervous system. Viral Immunol 2007;20:599-608.
Crossref    Web of Science    Medline    Google Scholar

32. COVID-19 Host Genetics Initiative. The COVID-19 Host Genetics Initiative, a global initiative to elucidate the role of host genetic factors in susceptibility and severity of the SARS-CoV-2 virus pandemic. Eur J Hum Genet 2020;28:715-718.
Crossref    Web of Science    Medline    Google Scholar

33. Zhao J, Yang Y, Huang H, et al. Relationship between the ABO blood group and the COVID-19 susceptibility. March 27, 2020 (https://www.medrxiv.org/content/10.1101/2020.03.11.20031096v2). preprint.
Google Scholar

34. Zietz M, Tatonetti NP. Testing the association between blood type and COVID-19 infection, intubation, and death. April 11, 2020 (https://www.medrxiv.org/content/10.1101/2020.04.08.20058073v1). preprint.
Google Scholar

35. Cheng Y, Cheng G, Chui CH, et al. ABO blood group and susceptibility to severe acute respiratory syndrome. JAMA 2005;293:1450-1451.
Web of Science    Medline    Google Scholar

36. Breiman A, Ruvën-Clouet N, Le Pendu J. Harnessing the natural anti-glycan immun to limit the transmission of enveloped viruses such as SARS-CoV-2. PLoS Pathog 2020;16(5):e1008556-e1008556.
Crossref    Medline    Google Scholar

37. Comuzzie AG, Cole SA, Laston SL, et al. Novel genetic loci identified for the pathophysiology of childhood obesity in the Hispanic population. PLoS One 2012;7(12):e51954-e51954.
Crossref    Web of Science    Medline    Google Scholar

PDF

Help

38. Aziz M, Fatima R, Assaly R. Elevated interleukin-6 and severe COVID-19: A meta-analysis. J Med Virol 2020 April 28 (Epub ahead of print).
Crossref    Web of Science    Medline    Google Scholar

39. Naitza S, Porcu E, Steri M, et al. A genome-wide association scan on the levels of markers of inflammation in Sardinians reveals associations that underpin its complex regulation. PLoS Genet 2012;8(1):e1002480-e1002480.
Crossref    Web of Science    Medline    Google Scholar

40. Franchini M, Crestani S, Frattini F, Sissa C, Bonfanti C. ABO blood group and von Willebrand factor: biological implications. Clin Chem Lab Med 2014;52:1273-1276.
Crossref    Web of Science    Medline    Google Scholar

41. Murray GP, Post SR, Post GR. ABO blood group is a determinant of von Willebrand factor protein levels in human pulmonary endothelial cells. J Clin Pathol 2020;73:347-349.
Crossref    Medline    Google Scholar

42. Thomson G, Bodmer WF. Letter: population stratification as an explanation of IQ and ABO association. Nature 1975;254:363-364.
Crossref    Web of Science    Medline    Google Scholar

Close References

**More about**    PULMONARY/CRITICAL CARE    GENETICS    INFECTIOUS DISEASE    PDF    Help

**More from the week of July 9, 2020**    ←   →

ORIGINAL ARTICLE                                                                                    ORIG

:ies  Trial of Nemolizumab and Topical Agents for Atopic Dermatitis with Pruritus    Phas

K. Kabashima and Others                                                               T. Mil

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

REV. STEVEN SOOS et al.,                    20-cv-651   (GLS/DJS)

Plaintiffs,

v.

ANDREW M. CUOMO et al.,

Defendants.

---

AD HOC NEW YORKER REPUBLICAN COMMITTEE INTERVENTION TO
ENLARGE THE PRELIMINARY INJUNCTION TO RESOLVE DEFENDANTS'
DEVICES FOR SOCIAL SCORING, TORTUOUS ELECTION INTERFERENCE
AND NANO-TECH SYSTEMS FOR UNCONSTITUTIONAL SURVEILLANCE

# Exhibit 5


Oklahoma Blood Institute

| Give Blood | Blood Donation | Volunteer |
| Donor Centers | Drive Coordinators | Financial Support |
| Blood Donors | Medical Professionals | About Us |

Donor Login    Regi

Search Website

# SCIENTIFIC FACTS

Although all blood types are needed, those with O Negative type blood are especially encouraged to donate.

Home // Blood Donation // You and Your Blood Type // Scientific Facts          Print

## SCIENTIFIC FACTS          81

### Negative blood types:

Only **18%** of people in the U.S. have a negative blood type. Yet, when someone with a negative blood type needs blood, **only** another person with a negative type can save his or her life.

O-negative is the **universal blood type.** This means anyone can receive O-negative blood.  It is needed in trauma accidents when life-saving blood is required immediately, before blood type is identified. However, people with O-negative blood can only receive O-negative blood.

### Can I donate?

Visit our FAQ page for answers to some common questions about blood donation eligibility.

### U.S. Population by blood type:

O Rh-positive—39 percent
**O Rh-negative—9 percent**
A Rh-positive—31 percent
**A Rh-negative—6 percent**
B Rh-positive—9 percent
**B Rh-negative—2 percent**
AB Rh-positive—3 percent
**AB Rh-negative—1 percent**

Reference: www.aabb.org/tm/Pages/bloodfaq.aspx#a8

### Just Your Type!

What will your baby's blood type be? Parents may be surprised to find their baby's blood type is not the same as either of them.



### Health Risks by blood type:

---

## Blood Donation

Blood Type Breakdown

Can I Donate?

From Donor to Patient

Iron Level Information

Special Donations

TRALI

Types of Donation

You and Your Blood Type

   Scientific Facts

   Fun Facts

---

Find A Blood D

**COVID-19: Blood Donations Urged**

Blood donation can't wait.


COVID-19:

Learn more.

**Oklahoma Blood Institute Testing Blood Donations for COVID-19 Antibodies**

June 3, 2020 (TULSA) — Oklahoma Blood Institute announced it will provide free COVID-19 antibody tests for all blood donors...
// Read More

**Gone Savin' Lives!**

Oklahoma Blood Institute knows this summer will be different, and it may be a time for stay-cations or camping trips. Oklahoma...
// Read More

Many scientific studies have found a connection between blood types and health risks.  For instance, studies have found that people with Type O blood were at less risk of heart disease than any other blood group.

See below for connections found in other studies as well as the percentage of the U.S. population with each type. For more information, click on the links provided.





References:
**medcitynews.com/2015/01/blood-type-say-something-potential-health-risks/**
**www.webmd.com/heart-disease/news/20120814/blood-type-may-impact-heart-risk**
**www.healthtestingcenters.com/health-risk-indicators-by-blood-type.aspx**
**news.health.com/2014/12/18/some-blood-types-might-raise-type-2-diabetes-risk-study/**

## Blood type by race/ethnicity:

O-positive is the most common blood type. Blood types vary by ethnic group. More Hispanic people, for example, have O blood type, while Asian people are more likely to be type B. In 2014, Oklahoma Blood Institute saw this ethnic diversity and blood types in its donors.

|  | Caucasian | African American | Native American | Hispanic | Asian |
|---|---|---|---|---|---|
| O+ | 30% | 2% | 4% | 3% | 1% |
| O- | 8% | 0.19% | 1% | 0.26% | 0.02% |
| A+ | 25% | 1% | 2% | 2% | 0.36% |
| A- | 6% | 0.07% | 0.34% | 0.13% | 0.01% |
| B+ | 6% | 1% | 1% | 1% | 0.34% |
| B- | 1% | 0.06% | 0.07% | 0.04% | 0.01% |
| AB+ | 2% | 0.18% | 0.15% | 0.11% | 0.10% |
| AB- | 1% | 0.01% | 0.03% | 0.01% | 0% |

Some patients require a closer blood match than that provided by ABO positive/negative blood typing. For example, the risk of a reaction to transfused blood can sometimes be reduced if a patient receives blood that is from a donor with the same ethnicity. That's why **African-American donors may be the best hope** for patients with sickle cell disease, 98 percent of whom are of African-American descent.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

REV. STEVEN SOOS et al.,                          20-cv-651   (GLS/DJS)
                          Plaintiffs,

v.

ANDREW M. CUOMO et al.,
                          Defendants.

---

AD HOC NEW YORKER REPUBLICAN COMMITTEE INTERVENTION TO
ENLARGE THE PRELIMINARY INJUNCTION TO RESOLVE DEFENDANTS'
DEVICES FOR SOCIAL SCORING, TORTUOUS ELECTION INTERFERENCE
AND NANO-TECH SYSTEMS FOR UNCONSTITUTIONAL SURVEILLANCE

# Exhibit 6

**AD HOC NEW YORKER REPUBLICAN COMMITTEE**
Christopher Earl Strunk, Trustee
141 Harris Avenue Lake Luzerne, New York 12846-1721
(518) 416-8743 email: strunk@leader.com

State of New York Department of State                    CertMail# 70171070000082509779
Division of Corporations                                CertMail# 70171070000082509786
One Commerce Plaza,
99 Washington Avenue,
Albany, NY 12231

RE: NYS EXECUTIVE AIDS AND ABETS TERRORISM USING ITS REGISTERED ENTITIES

SUBJECT: NOTICE OF CLAIM for estimated $50 million reparations

TO WHOM IT MAY CONCERN:

Based upon our search of the Division of Corporations and Business Entity Database with information contained in its database current through June 25, 2020, inter alias to the extent that the State CINC refused to act to prevent rioting and mayhem in the City of New York it is alleged that the NYS executive is aiding and abetting terrorism using its registered entities inter alia:

BLACK LIVES MATTER GREATER NEW YORK INC
BLACK LIVES MATTER INC
BLACK LIVES MATTER JOBS LIMITED LIABILITY COMPANY
BLACK LIVES MATTER REAL ESTATE FUND, LLC
BLACK LIVES MATTER UNITED INC
NEW YORK BLACK LIVES MATTER, INC.
BLACK PANTHER, INC. INTERNATIONAL
BLACK PANTHER FILM FESTIVAL, INC.
THE NY BLACK PANTHER COMMITTEE FOR SOCIAL PROGRESS INC.

All operate under the jurisdiction of New York State registered for profit and non-profit corporations are terrorist organizations generated by JESUIT coadjutors who like the Governor Cuomo and others in the executive are accessories to crime in the recent City of New York riots. Goes to the Executive arbitrary disaster and emergency parallel process that is ULTRA VIRES of state law / Constitution implementing a "VACCINE" with investor Jesuit Coadjutor Dr Anthony Fauci and Gates Foundation for financial gain; and it is alleged by Catherine Austin Fitts on the USA Watchdog broadcast with Greg Hunter that CUOMO while the HUD Secretary capitalized the CLINTON FOUNDATION in Chappaqua New York where Gov. CUOMO now lives.

Christopher Earl Strunk, in esse
NY DL 388 435 714 Expires 1/23/2021
All Right Reserved without Prejudice

That on the 26th day of June in the year 2020 before me the undersigned, a Notary Public in and for said State personally appeared, **Christopher Earl Strunk,** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he affirmed and executed the name in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public, State of New York

RACHEL A. HAYSLETTE
Notary Public, State of New York
Warren County #01HA6378601
Commission Expires July 30, 2022