**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, *et al.*, | Case No. 18-cv-00068 |
| Defendants, | |
| KARLA PEREZ, *et al.*, | |
| Defendant-Intervenors, | |
| and | |
| STATE OF NEW JERSEY, | |
| Defendant-Intervenor. | |

1.      My name is Ariel C. Harrison. I am employed with the U.S. Department of Homeland Security, as Assistant Executive Secretary for Administration. I am responsible for the Office of the Executive Secretary records. I have held this position since 2008.

2.      I am the custodian of the signed memorandum from former Secretary of Homeland Security Janet Napolitano dated June 15, 2012, regarding "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (the "Deferred Action for Childhood Arrivals" or "DACA" memo), as well as a copy of the administrative record for the DACA memo (copies of which appear at items 33 and 57 of the attached index), including the supplemental documents provided on May 23, 2019. To the best of my knowledge, information, and belief, the attached index and the administrative record were prepared by the personnel who

reviewed information from the Office of the Executive Secretary, which is the custodian of written communication intended for and originated by the Secretary of Homeland Security, as well as electronically stored information of current and former DHS personnel who were involved in development of the DACA memo.  I certify that the documents listed in the attached index are true and correct copies of the documents contained in the administrative record, and, to the best of my knowledge, information, and belief, constitute the non-privileged documents that the Department considered in issuing the DACA memo.[1]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 24th day of May, 2019 in Washington, D.C.

Ariel C. Harrison
Assistant Executive Secretary for Administration

---

[1]  Upon information and belief, the complaint commencing this lawsuit was filed on May 1, 2018, almost six years following publication of the DACA memo, and this administrative record was prepared during the pendency of this action.  To the best of my knowledge, information and belief, because Secretary Napolitano and senior DHS officials with whom she consulted about development of the DACA policy are no longer employed by the agency, current DHS personnel used their best efforts to determine which documents to include in the administrative record based upon the content of the documents and did not confer with former Secretary Napolitano herself or any former DHS officials involved in development of the policy regarding which documents to include in the record.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>      Plaintiffs,<br><br>     v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>      Defendants,<br><br>KARLA PEREZ, *et al.*,<br><br>      Defendant-Intervenors,<br><br>and<br><br>STATE OF NEW JERSEY,<br><br>      Defendant-Intervenor. | Case No. 18-cv-00068 |

**INDEX OF ADMINISTRATIVE RECORD AND
SUPPLEMENTAL ADMINISTRATIVE RECORD**

| | Page | Description |
|---|---|---|
| 1 | CAR 0001 | Summary of MPI Event on Prosecutorial Discretion: A Progress Report on Implementing New Guidelines and Policies (Feb. 10, 2012). |
| 2 | CAR 0003 | Recommendation from the USCIS Ombudsman to the Director, USCIS on Deferred Action (April 6, 2007). |
| 3 | CAR 0007 | USCIS Ombudsman, *Deferred Action: Recommendations to Improve Transparency and Consistency in the USCIS Process* (July 11, 2011). |
| 4 | CAR 0015 | E-mail from John Sandweg to Alejandro Mayorkas, John Morton, Rebecca Cason, Kim Baranof, Suzanne Barr, Seth Grossman (DHS Counsel), and Nelson Peacock re: Transcript of Secretary of Homeland Security Napolitano Testimony before Senate Judiciary Committee (April 25, 2012). |
| 5 | CAR 0016 | *Oversight of the Department of Homeland Security: Hearing Before the Senate Judiciary Committee*, 112th Cong. (April 25, 2012) (Testimony of Secretary of Homeland Security Janet Napolitano). |
| 6 | CAR 0055 | Letter from advocacy organizations to Secretary of Homeland Security Janet Napolitano, *Prosecutorial Discretion* (February 9, 2012). |

| 7 | CAR 0062 | E-mail from Immigration Policy Center to Alejandro Mayorkas, Director of USCIS re: A Comparison of the DREAM Act and Other Proposals for Undocumented Youth (June 1, 2012). |
|---|---|---|
| 8 | CAR 0064 | E-mail from Immigration Policy Center to Alejandro Mayorkas, Director of USCIS re: This Week in Immigration (January 20, 2012). |
| 9 | CAR 0066 | E-mail from Heather Wong to Nelson Peacock, Matthew Chandler, Noah Kroloff, John Sandweg, Peter Boogaard, and Seth Grossman (DHS Counsel) re: Draft Roll out Plan (June 13, 2012). |
| 10 | CAR 0072 | E-mail from Amy Shlossman to Seth Grossman (DHS Counsel), John Sandweg, and Noah Kroloff re: Deferred Action Stats (June 12, 2012). |
| 11 | CAR 0074 | Deferred Action Request Receipts, July 2010 – April 2012. |
| 12 | CAR 0075 | E-mail from Becca Sharp, Exec. Dir. Home Sec. Ad. Comm. to Nelson Peacock, Matthew Chandler, Noah Kroloff, John Sandweg, Peter Boogaard, and Seth Grossman (DHS Counsel) re: Call Time Request (June 13, 2012). |
| 13 | CAR 0076 | Memorandum from Cheryl Little, Exec. Dir., Americans for Immigrant Justice, *Summary Regarding Executive Branch Authority to Grant DREAMers Temporary Review* (May 2, 2012). |
| 14 | CAR 0082 | Joan Friedland, *Falling Through the Cracks: How Gaps in ICE's Prosecutorial Discretion Policies Affect Immigrants without Legal Representation* (May 2012). |
| 15 | CAR 0092 | E-mail from John Sandweg to Cecilia Munoz, Felicia Escobar, and Seth Grossman (DHS Counsel) re: Key Stats (May 22, 2012). |
| 16 | CAR 0094 | Case-by-Case Review Statistics (May 20, 2012). |
| 17 | CAR 0100 | E-mail from John Sandweg to Kim Baronof, Kelly Ryan, Esther Olavarria, Seth Grossman (DHS Counsel), and Matthew Chandler re: PD report (June 11, 2012). |
| 18 | CAR 0101 | The Fair Immigration Reform Movement, *Restore the Promise of Prosecutorial Discretion: An Assessment of DHS' Prosecutorial Discretion Initiative and its Impact on Families on the Anniversary of its Announcement Executive Summary* (June 2012). |
| 19 | CAR 0104 | The Fair Immigration Reform Movement, *Restore the Promise of Prosecutorial Discretion: An Assessment of DHS' Prosecutorial Discretion Initiative and its Impact on Families on the Anniversary of its Announcement* (June 2012). |
| 20 | CAR 0122 | Implementing an Effective Immigration Enforcement Strategy. |
| 21 | CAR 0124 | Case by Case Review of Administrative Closures. |
| 22 | CAR 0126 | E-mail from John Sandweg to Nelson Peacock, Amy Shlossman, Noah Kroloff, Matthew Chandler, and Seth Grossman (DHS Counsel) re: S1 statements to Congress regarding administrative action (May 31, 2012). |
| 23 | CAR 0129 | E-mail from John Sandweg to Amy Shlossman and Seth Grossman (DHS Counsel) re: costs (June 12, 2012). |
| 24 | CAR 0130 | E-mail from John Sandweg to Seth Grossman (DHS Counsel) re: Senator Reid Pushes President Obama to Grant Admin. Relief to Dreamers (May 14, 2012). |
| 25 | CAR 0131 | Letter from CASA de Maryland to Secretary of Homeland Security Janet Napolitano, re: Results of Prosecutorial Program Initiative (May 4, 2012). |

| 26 | CAR 0134 | National Immigration Program a Failure, *Families Gather in Front of ICE Offices Across Country to Decry Lack of Progress in Protecting Families* – English (May 7, 2012). |
| 27 | CAR 0136 | Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices ("Deferred Action SOP"), USCIS (March 7, 2012). |
| 28 | CAR 0149 | Memorandum from Alejandro N. Mayorkas to USCIS Ombudsman January Contreras, *Response to Recommendation 48, Deferred Action: Recommendations to Improve Transparency and Consistency in the USCIS Process* (October 27, 2011). |
| 29 | CAR 0151 | USCIS Ombudsman, *Deferred Action: Recommendations to Improve Transparency and Consistency in the USCIS Process* (July 11, 2011). |
| 30 | CAR 0159 | Significant Correspondence Report, DHS (February 9, 2012). |
| 31 | CAR 0171 | E-mail from Nelson Peacock to USCIS Colleagues re: fw: FINAL DOCUMENTS (June 15, 2012). |
| 32 | CAR 0173 | E-mail from Nelson Peacock to Jeremy Winkler re: fw: FINAL DOCUMENTS (June 15, 2012). |
| 33 | CAR 0174 | Memorandum from Secretary of Homeland Security Janet Napolitano to David V. Aguilar (Acting Commissioner, CBP), Alejandro Mayorkas (USCIS), and John Morton (ICE), *Exercising Prosecutorial Discretion with Report to Individuals Who Came to the United States as Children* (June 15, 2012). |
| 34 | CAR 0177 | DHS Press Release, *Secretary Napolitano Announces Deferred Action Process for Young People Who Are Low Enforcement Priorities* (June 15, 2012) (FINAL). |
| 35 | CAR 0179 | Public Affairs Guidance, DHS (June 15, 2012) (FINAL). |
| 36 | CAR 0183 | Frequently Asked Questions ("FAQs") (FINAL). |
| 37 | CAR 0191 | Fact Sheet, *Transforming the Immigration Enforcement System*, DHS Press Office (FINAL). |
| 38 | CAR 0194 | FAQS – External (FINAL). |
| 39 | CAR 0202 | DHS Press Release, *La Secretaria Napolitano Anuncia Proceso de Acción Diferida para Jóvenes que Sean de Baja Prioridad para la Aplicación de la Ley* (June 15, 2012) (FINAL – Spanish). |
| 40 | CAR 0206 | E-mail from Nelson Peacock to John Sandweg (DHS Counsel) re: today's roll call … (May 21, 2012). |
| 41 | CAR 0209 | Administrative Relief Memo to White House, *The American Children and Family Initiative* (February 2011). |
| 42 | CAR 0213 | E-mail from Esther Olavarria to Kelly Ryan re: FW: ICE Statistics Case-By-Case PD Review (April 25, 2012). |
| 43 | CAR 0215 | Case-by-Case Review Statistics (April 24, 2012). |
| 44 | CAR 0217 | Summit Summaries, White House. |
| 45 | CAR 0219 | Chapter 20: Removal Process: Relief From Removal, 10-7560 (August 10, 2010). |

| 46 | CAR 0242 | Deferred Action Internal Background Information (DRAFT). |
|----|----------|---------------------------------------------------------|
| 47 | CAR 0244 | Standard Operating Procedures ("SOPs") for Handling Parole Extension and Deferred Action Requests, USCIS. |
| 48 | CAR 0257 | Memorandum from Acting Associate Director of the Office of Domestic Operations Donald Neufeld to Field Leadership, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children* (June 12, 201) (FINAL). |
| 49 | CAR 0264 | E-mail re: H.R. 5281 - Passed House (Passed December 8, 2010) (sent December 16, 2010). |
| 50 | CAR 0274 | E-mail from Esther Olavarria to Felicia Escobar re: fw: (June 12, 2012). |
| 51 | CAR 0275 | E-mail from Esther Olavarria to Felicia Escobar re: House DREAM Act (June 13, 2012). |
| 52 | CAR 0276 | E-mail from Kimberly O'Connor to John Sandweg (DHS Counsel) re: Call me about this tomorrow (June 14, 2012). |
| 53 | CAR 0277 | Letter from Secretary of Homeland Security Janet Napolitano to Senator Dick Durbin (August 18, 2011). |
| 54 | CAR 0281 | E-mail from Kimberly O'Connor to John Sandweg (DHS Counsel) re: fw: Deferred departure form (June 11, 2012). |
| 55 | CAR 0283 | E-mail from Carlos Munoz-Acevedo to Esther Olavarria re: fw: ICE Statistics Case-By-Case PD Review (April 25, 2012). |
| 56 | CAR 0285 | Case-by-Case Review Statistics (April 24, 2012). |
| 57 | CAR 0287 | Memorandum from Secretary of Homeland Security Janet Napolitano to David Aguilar (Acting Commissioner, CBP), Alejandro Mayorkas (Director, USCIS), and John Morton (Director, ICE), *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012). |
| 58 | CAR 0290 | Letter from the Senator Lloyd Doggett to President Obama (June 24, 2011). |
| 59 | CAR 0295 | Letter response from OLA Assistant Secretary Nelson Peacock to Senator Lloyd Doggett (November 3, 2011). |
| 60 | CAR 0298 | Letter from Senator Harry Reid to President Obama (April 13, 2011). |
| 61 | CAR 0304 | Letter response from Secretary of Homeland Security Napolitano to Senator Harry Reid re: DREAM Act response (August 18, 2011). |
| 62 | CAR 0306 | Enclosure for Dream Act response, *Background: Implementing an Effective Immigration Enforcement Strategy* (August 18, 2011). |
| 63 | CAR 0308 | Letter from Senators Dick Durbin and Richard Lugar (April 21, 2010). |
| 64 | CAR 0310 | Letter Response from Secretary of Homeland Security Janet Napolitano to Senator Dick Durbin (June 7, 2010). |
| 65 | CAR 0311 | Letter Response from Secretary of Homeland Security Janet Napolitano to Senators Harry Reid and Mitch McConnell (September 21, 2010). |
| 66 | CAR 0313 | Letter Response from Secretary of Homeland Security Janet Napolitano to Senators Harry Reid and Mitch McConnell (December 6, 2010). |

| 67 | CAR 0315 | Memorandum, *Exercising Executive Authority* (April 29, 2011) (FINAL DRAFT). |
| 68 | CAR 0320 | E-mail from Jeanne Butterfield (the Raben Group) to Esther Olavarria re: fw: PD statistics in advance of meeting with DHS/Sandweg (June 6, 2012). |
| 69 | CAR 0323 | E-mail from Sarah Hartnett (Deputy Director, ICE OPLA Field Legal Operations-West) to Seth Grossman et al. re: Additional data (May 11, 2012). |
| 70 | CAR 0327 | E-mail from Sarah Hartnett (Deputy Director, ICE OPLA Field Legal Operations-West) to Seth Grossman et al. re: Additional data (May 16, 2012). |
| 71 | CAR 0329 | Letter from Various Organizations to Secretary of Homeland Security Janet Napolitano (March 2, 2012). |
| 72 | CAR 0332 | Liberian Deferred Enforced Departure ("DED") Supplement to Form I-765 (February 14, 2002). |
| 73 | CAR 0336 | Case-By-Case Review Statistics (DRAFT). |
| 74 | CAR 0339 | Case-By-Case Review Statistics (DRAFT). |
| 75 | CAR 0344 | Case-By-Case Review Statistics, Secretary of Homeland Security. |
| 76 | CAR 0347 | Memorandum from USCIS's Acting Associate Director of Domestic Operations Donald Neufeld to Field Leadership, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children* (June 15, 2009). |
| 77 | CAR 0354 | *DREAM Act 2011*, Senator Dick Durbin (DRAFT, clean). |
| 78 | CAR 0359 | *Dream Act 2011* Fact Sheet/Highlights (June 6, 2011) (DRAFT, clean). |
| 79 | CAR 0361 | Letter from UCLA Law Professor Hiroshi Motomura et al. to President Obama re: Executive authority to grant administrative relief for DREAM Act beneficiaries (May 28, 2012). |
| 80 | CAR 0371 | Summary from Executive Director at Americans for Immigrant Justice Cheryl Little to Interested Parties re: Summary Regarding Executive Branch Authority to Grant DREAMers Temporary Relief (May 2, 2012) (DRAFT). |
| 81 | CAR 0377 | E-mail from Executive Director at Americans for Immigrant Justice Cheryl Little to Esther Olavarria re: Tomorrow's mtg (May 28, 2012). |
| 82 | CAR 0378 | Memorandum from Bo Cooper (DHS Counsel) to the Deputy Commissioner, *INS Exercise of Prosecutorial Discretion*. |
| 83 | CAR 0390 | Practice Advisory, *DHS Review of Low Priority Cases for Prosecutorial Discretion*, Legal Action Center and Alexsa Alonzo (February 13, 2012). |
| 84 | CAR 0399 | *Next Steps in the Implementation of the PD Memorandum and the August 18th Announcement on Immigration Enforcement Priorities.* |
| 85 | CAR 0401 | Memorandum from ICE Director John Morton to All Field Office Directors et al., *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* (June 17, 2011). |
| 86 | CAR 0404 | Memorandum from ICE Director John Morton to All ICE Employees, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (March 2, 2011). |

| 87 | CAR 0408 | Memorandum from Assistant Secretary Julie Myers to All Field Office Directors et al., *Prosecutorial and Custody Discretion* (November 7, 2007). |
| 88 | CAR 0413 | Memorandum from Doris Meissner to Regional Directors et al., *Exercising Prosecutorial Discretion* (November 17, 2000). |
| 89 | CAR 0426 | Case-by-Case, *Update on the Administration's Progress in Implementing a New Process to Further Focus Immigration Enforcement Resources on High Priority Cases.* |
| 90 | CAR 0427 | Case-by-Case, *Update on the Administration's Progress in Implementing a New Process to Further Focus Immigration Enforcement Resources on High Priority Cases.* |
| 91 | CAR 0429 | E-mail from Kim Baron of to John Sandweg et al. (DHS Counsel) re: fw: Lamar Smith PD by Age and Citizenship (April 24, 2012). |
| 92 | CAR 0430 | ERO LES Statistical Tracking Unit, *FY2012 Monthly Prosecutorial Discretion (PD) Report – Administratively Closed Cases due to PD*, U.S. Rep. Lamar Smith (FINAL). |
| 93 | CAR 0434 | *Holding DHS Accountable on Prosecutorial Discretion*, AILA (November 10, 2011). |
| 94 | CAR 0459 | Memorandum from ICE Principal Legal Advisor Peter Vincent to All OPLA Chief Counsel, *Case-by-Case Review of Incoming and Certain Pending Cases* (November 17, 2011). |
| 95 | CAR 0462 | *Guidance to ICE Attorneys Reviewing the CBP, USCIS, and ICE Cases Before the Executive Office for Immigration Review* (November 17, 2011). |
| 96 | CAR 0465 | Statistics, DHS Parole and Deferred Action |
| 97 | CAR 0466 | Email from Amanda Baran to Esther Olavarria et al. re: NY TIMES: Students Press for Action on Immigration (May 31, 2012). |
| 98 | CAR 0468 | Letter from Richard Trumpka to President Obama re: Dream Act (June 14, 2012). |
| 99 | CAR 0470 | Letter from Senator Chuck Schumer to Secretary of Homeland Security Janet Napolitano and ICE Director John Morton (January 24, 2012). |
| 100 | CAR 0472 | E-mail from Adam Luna at America's Voice Education Fund to Esther Olavarria re: DREAMers made the cover! (June 14, 2012). |
| 101 | CAR 0473 | E-mail from John Sandweg (DHS Counsel) to Noah Kroloff (DHS Counsel) re: PD implementation meeting (February 7, 2012). |
| 102 | CAR 0475 | E-mail from John Sandweg (DHS Counsel) to Noah Kroloff (DHS Counsel) re: (March 9, 2012). |
| 103 | CAR 0477 | *Holding DHS Accountable on Prosecutorial Discretion*, AILA (November 9, 2011). |
| 104 | CAR 0505 | E-mail from Robert Pashcall (DHS Counsel) to Ivan Fong re: fw: Preliminary CQ Transcript (February 16, 2012). |
| 105 | CAR 0537 | E-mail from Esther Olavarria (DHS Counsel) to Felicia Escobar et al. (DHS Counsel) re: Legislative Request and MAVNI (UNCLASSIFIED) (June 13, 2012). |
| 106 | CAR 0540 | E-mail from Ali Noorani to John Sandweg (DHS Counsel) re: PD implementation meeting (February 8, 2012). |

| 107 | CAR 0543 | Letter from House Judiciary Committee Chairman Lamar Smith to Secretary of Homeland Security Janet Napolitano re: ICE use of PD (September 12, 2011). |
| 108 | CAR 0547 | Letter response from Assistant Secretary of the Office of Legal Affairs Nelson Peacock to the House Judiciary Committee Chairman Lamar Smith re: ICE use of PD (October 11, 2011). |
| 109 | CAR 0549 | *The Administration's New Inter-Agency Process to Further Focus on Immigration Enforcement Resources on High Priority Cases* (October 3, 2011) (FINAL). |
| 110 | CAR 0551 | Immigration Enforcement Facts, *Frequently Asked Questions on the Administration's Announcement Regarding a New Process to Further Focus Immigration Enforcement Resources on High Priority Cases* (October 3, 2011) (FINAL). |
| 111 | CAR 0554 | Letter from House Judiciary Committee Chairman Lamar Smith to Secretary of Homeland Security Janet Napolitano re: the issuance of two Morton memos (July 5, 2011). |
| 112 | CAR 0559 | Letter response from Assistant Secretary of the Office of Legal Affairs Nelson Peacock to House Judiciary Committee Chairman Lamar Smith re: the issuance of two Morton memos (July 27, 2011). |
| 113 | CAR 0561 | Letter from Senate Judiciary Committee Ranking Member Chuck Grassley and House Judiciary Committee Chairman Lamar Smith to Attorney General Eric Holder and Secretary of Homeland Security Janet Napolitano re: Ninth Circuit Order (March 1, 2012). |
| 114 | CAR 0564 | Letter from Senate Judiciary Committee Ranking Member Chuck Grassley to President Obama re: concerns about immigration policies and the DREAM Act (September 27, 2011). |
| 115 | CAR 0567 | Letter response from Assistant Secretary of the Office of Legislative Affairs Nelson Peacock to Senate Judiciary Committee Ranking Member Chuck Grassley re: concerns about immigration policies and the DREAM Act (October 17, 2011). |
| 116 | CAR 0569 | Immigration Enforcement Facts, *FAQs on the Administration's Announcement Regarding a New Process to Further Focus Immigration Enforcement Resources on High Priority Cases* (October 7, 2011) (FINAL). |
| 117 | CAR 0572 | Transcript of Secretary of Homeland Security Janet Napolitano before the Senate Judiciary Committee (June 28). |
| 118 | CAR 0574 | E-mail from Phil McNamara (Office of the Secretary of Homeland Security) to Seth Grossman (DHS Counsel) re: WH - Dream Act (June 14, 2012). |
| 119 | CAR 0576 | E-mail from Alejandro Mayorkas (USCIS Director) to John Sandweg (DHS Counsel) et al. re: US Conference of Catholic Bishops (March 13, 2012). |
| 120 | CAR 0577 | Testimony of Secretary of Homeland Security Janet Napolitano before the Senate Judiciary Committee. |
| 121 | CAR 0581 | Press Release – American University Speech, *Secretary Napolitano's Remarks on Smart Effective Border Security and Immigration Enforcement*, DHS Press Office (October 5, 2011). |
| 122 | CAR 0589 | *Secretary of Health, Education, and Welfare… To Authorize Continued Use of Nitrites as Food Additives*, 43 U.S. Op. Atty. Gen. 163 (March 30, 1979). |

| 123 | CAR 0607 | *Prosecution for Contempt of Congress of an Executive Branch Official who has Asserted a Claim of Executive Privilege*, 8 U.S. Op. Off. Legal Counsel 101 (May 30, 1984). |
|-----|----------|---|
| 124 | CAR 0637 | FAQs (FINAL). |
| 125 | CAR 0639 | *House Appropriations Subcommittee on Homeland Security Holds Hearing on the Fiscal 2013 Appropriations for the Homeland Security Department* (February 15, 2012) (Testimony of Secretary of Homeland Security Janet Napolitano). |
| 126 | CAR 0716 | E-mail from Peter Boogaard to Matthew Chandler re: Obama Administration Expands Backdoor Amnesty (March 29, 2012). |
| 127 | CAR 0720 | *Case-by-Case Review Statistics*. |
| 128 | CAR 0723 | E-mail from Jeremy Winkler to Nelson Peacock et al. re: Dream act (May 30, 2012). |
| 129 | CAR 0724 | E-mail attachment from Jeremy Winkler to Nelson Peacock et al. re: DREAM Act history (May 30, 2012). |
| 130 | CAR 0727 | E-mail from Jeremy Winkler to Nelson Peacock re: Dream Act (June 6, 2012). |
| 131 | CAR 0736 | Statistics, DHS Parole and Deferred Action. |
| 132 | CAR 0737 | Question 15 Attachment I-765 Deferred Action Request (FY 2006-2011). |
| 133 | CAR 0738 | E-mail from Betsy Markey to Matthew Chandler et al. (DHS Counsel) re: Conf Mayors meeting (June 14, 2012). |
| 134 | CAR 0739 | *House Appropriations Subcommittee on Homeland Security Holds Hearing on the Proposed Fiscal 2013 Appropriations for the Homeland Security Department's Immigration and Customs Enforcement*, Testimony of ICE Director John Morton (March 8, 2012). |
| 135 | CAR 0782 | Questions for the Record (QFRs), Senator Jeff Sessions to Secretary of Homeland Security Janet Napolitano. |
| 136 | CAR 0784 | *Next Steps in the Implementation of the PD Memorandum and the August 18th Announcement on Immigration Enforcement Priorities*. |
| 137 | CAR 0786 | FAQs. |
| 138 | CAR 0789 | Case-by-Case Review Statistics. |
| 139 | CAR 0792 | Memorandum from John Morton (ICE Director) to ICE Employees, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (March 2, 2011). |
| 140 | CAR 0824 | Memorandum from President George W. Bush for the Secretary of Homeland Security, *Measure Regarding Certain Liberians in the United States*, 2007 WL 2667997 (September 12, 2007). |
| 141 | CAR 0826 | USCIS Ombudsman, *Deferred Action: Recommendations to Improve Transparency and Consistency in the USCIS Process* (July 11, 2011). |
| 142 | CAR 0834 | Memorandum from William J. Clinton, *Deferred Enforced Departure for Haitians* (December 23, 1997). |

8

| 143 | CAR 0835 | *INS Exercise of Prosecutorial Discretion*, Bo Cooper (DHS Counsel), Legal Op. No. 99-5 (2001). |
|---|---|---|
| 144 | CAR 0844 | Memorandum from Michael Cronin (Acting Executive Associate Commissioner in the Office of Programs) to Michael Pearson (Executive Associate Commissioner, Office of Field Operations), *Victims of Trafficking and Violence Protection Act of 2000 Policy* (August 30, 2001). |
| 145 | CAR 0854 | Exec. Order. No. 12711, Policy Implementation With Respect to Nationals of the Peoples Republic of China, 55 FR 13897 (April 11, 1990). |
| 146 | CAR 0856 | *INS Defers Enforced Departure of PRC Nationals for One Year*, 66 No. 23 Interpreter Releases 645 (June 19, 1989). |
| 147 | CAR 0858 | *INS Warns of December 22 deadline for EVD Legalization Applications*, 66 No. 46 Interpreter Releases 1325 (December 4, 1989). |
| 148 | CAR 0859 | *Update on EVD*, 65 No. 36 Interpreter Releases 964 (September 19, 1988). |
| 149 | CAR 0861 | Memorandum from John Morton for All Field Office Directors et al., *Exercising Prosecutorial Discretion Consistency with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011). |
| 150 | CAR 0867 | Memorandum from USCIS Acting Associate Director in the Office of Domestic Operations Donald Neufeld to Field Leadership, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children* (June 15, 2009). |
| 151 | CAR 0874 | Notices, Filing Procedures and Automatic Extension of Employment Authorization and Related Documentation for Liberians Provided Deferred Enforced Departure, 75 FR 15715-03 (March 30, 2010). |
| 152 | CAR 0878 | OLA Memorandum, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* (May 30, 1984). |
| 153 | CAR 0920 | Lynda J. Oswald, Note, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152 (1986). |
| 154 | CAR 0955 | Statement by President George Bush Upon Signing S. 358, 1990 U.S.C.C.A.N. 6801-1 (November 29, 1990). |
| 155 | CAR 0957 | Statement of Paul W. Virtue, Esq. Before the House Committee on the Judiciary (October 12, 2011). |
| 156 | CAR 0968 | Cass R. Sunstein, Article, *Reviewing Agency Inaction After 'Heckler v. Chaney'*, 52 U. Chi. L. Rev. 653 (1985). |
| 157 | CAR 0991 | Shoba Sivaprasad Wadhia, Article, *The Role of Prosecutorial Discretion in Immigration Law*, 9 Conn. Pub. Int. L.J. 243 (2010). |
| 158 | CAR 1033 | Memorandum from William R. Yates to the Director of the Vermont Service Center, *Centralization of Interim Relief for U Nonimmigrant Status Applicants* (October 8, 2003). |
| 159 | CAR 1040 | Form I-765, Application for Employment Authorization (Revised January 19, 2011). |

## SUPPLEMENTAL ADMINISTRATIVE RECORD

|     | Page     | Description |
| --- | -------- | ----------- |
| 160 | CAR 1041 | Case-by-Case Review Statistics. |
| 161 | CAR 1043 | ERO LES Statistical Tracking Unit, *Non-Detained Deferred Action Cases: Summary* (April 16, 2012). |
| 162 | CAR 1046 | Memorandum from ICE Principal Legal Advisor William J. Howard, *Prosecutorial Discretion* (October 24, 2005). |



*Office of Public Engagement*

U.S. Citizenship
and Immigration
Services

# MPI Event on Prosecutorial Discretion: A Progress Report on Implementing New Guidelines and Policies
## February 10, 2012

## Background

- **Speakers:**
  Seth Grossman, Deputy General Counsel at the Department of Homeland Security (DHS)
  Jim Stolley, Director of Field Legal Operations for the Office of the Principal Legal Advisor (OPLA) in the Immigration and Customs Enforcement (ICE) Agency.
  Juan Osuna, Director of the Executive Office for Immigration Review (EOIR)
  Crystal Williams, Executive Director of the American Immigration Lawyers Association (AILA)
  **Moderator:**
  Doris Meissner, Senior Fellow at Migration Policy Institute (MPI)

- Building on existing guidelines for the exercise of prosecutorial discretion in immigration matters, DHS updated guidelines in 2011 and directed a review of all current cases in the removal pipeline and on the docket of immigration courts to reflect new guidance. This new guidance works to ensure that scarce enforcement resources are focused on removal of unauthorized immigrants who represent threats to security and public safety, and to alleviate large and growing backlogs in immigration courts. The review which began in late 2011 was started on a pending caseload of about 300,000.

  The reviews have been led by trial attorneys in Immigration and Customs Enforcement (ICE) offices around the country and in two pilot projects in immigration courts in Denver and Baltimore. Those pilots were completed in mid-January 2012 and were designed to test procedures and outcomes of reducing the backlog of removal cases pending before and incoming to the Executive Office for Immigration Review (EOIR) of the Department of Justice. In the pilot districts, the docket review resulted in 16 percent of cases being administratively closed, allowing individuals who have been deemed not to pose security or public safety risks to remain in the United States, although without a changed legal status. In addition, ICE trial attorneys have and are continuing to review thousands more cases to complete the review initiative.

## Meeting Notes

- AILA complemented USCIS on the Notices to Appear (NTA) Memo. It was stated that the NTA Memo was a relatively simple act that had high impact.
- AILA issued a call to action for USCIS to look further into issuing Employment Authorization Documents (EADs) to those whose cases have been administratively closed. They expressed concern that the U.S. Government is allowing individuals to remain in the U.S. temporarily, but without the ability to work legally and support themselves and their families.

CAR 0001

- AILA noted that nothing statutorily bars USCIS from issuing EADs to persons whose cases have been administratively closed.  However, they also understand that USCIS may have valid concerns about why issuing EADs could be problematic.  AILA suggested "drawing a box" of who is eligible, for instance, individuals who are already in removal proceedings. DHS and ICE responded that this is not a benefit oriented program.
- AILA stated that deferred action could be a way to make those granted prosecutorial discretion eligible to apply for EADs.  AILA also expressed disappointment that deferred actions seems to be used less after the new prosecutorial discretion initiatives.
- AILA and individual stakeholders encouraged DHS to use other measures other than administrative closure and noted that sometimes it would be more effective for the individual to be offered some other form or relief, like asylum.  Some individuals are taking the administrative closure because they are being told that if they decline it now, a future request for prosecutorial discretion will be denied. As a result, even individuals with the strong cases for relief, such as certain asylum seekers, may decide to accept administrative closure. This leaves immigrants who could have obtained legal status in limbo.
- AILA and individual stakeholders commented on the large amount of individuals that are unrepresented.  They noted that it was much easier for individuals with lawyers to get offers of prosecutorial discretion.  The stakeholders wanted to level out the playing field by having those that are Pro Se come to the courts on a specific day and then non-profits and advocates could prepare the individuals before they went into court.  Stakeholders also believed that Pro Se applicants would have a better chance of getting prosecutorial discretion if DHS had clearer messaging.
- AILA expressed great concern over the "zero communication on the part of the agency (DHS)" on prosecutorial discretion.  It was stated that DHS needs clear messaging on what prosecutorial discretion is and is not.  Many were worried about the lack of communication, because some actors are specifically messaging prosecutorial discretion as amnesty.  This lack of clear communication is creating an environment where unscrupulous actors are spreading misinformation and "fleecing" individuals who are uninformed.
- AILA and individual stakeholders expressed concern multiple times that ICE is largely excluding cases of detained persons from prosecutorial discretion reviews.  AILA encouraged DHS to abide by its own announcement and review all pending cases, including detained matters, for the application of appropriate prosecutorial discretion.  ICE maintained that they are looking at cases of detained individuals, but that ICE is generally finding that the right people are being detained and that these individuals are not eligible for their cases to be administratively closed.
- Stakeholders noted their belief Customs and Border Protection (CBP) is not doing enough to exercise prosecutorial discretion.  Some stakeholders asserted there was an increase in "junk" cases coming from CBP.  It was encouraged that CBP Officers have the necessary guidance and trainings to properly implement prosecutorial discretion.
- ICE announced that they named their first ever Public Advocate Andrew Lorenzen-Strait. Mr. Lorenzen-Strait will serve as a point of contact for individuals, including those in immigration proceedings, non-governmental organizations and other community and advocacy groups, who have concerns, questions, recommendations or other issues they would like to raise. ICE will provide additional information on the best way to contact Mr. Strait in the future.

*Office of the*
*Citizenship and Immigration Services Ombudsman*

**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland Security

## Recommendation from the CIS Ombudsman to the Director, USCIS

| | |
|---|---|
| To: | Dr. Emilio T. Gonzalez, Director, USCIS |
| | Cc: Michael P. Jackson, Deputy Secretary, DHS |
| From:: | Prakash Khatri, CIS Ombudsman |
| Date: | April 6, 2007 |
| Re: | Recommendation to USCIS that it 1) post general information on deferred action on its website; 2) maintain statistics on the issuance and denial of deferred action requests; and 3) designate a headquarters official to review grants and denials of deferred action requests on a quarterly basis to ensure that like cases are decided in like manner. |

## I.   RECOMMENDATION

Recommendation to USCIS that it 1) post general information on deferred action on its website; 2) maintain statistics on the issuance and denial of deferred action requests; and 3) designate a headquarters official to review grants and denials of deferred action requests on a quarterly basis to ensure that like cases are decided in like manner.

## II.   BACKGROUND

Deferred action is a discretionary form of relief provided for by the District Director's recommendation to the Regional Director.[1]  There is no statutory basis for deferred action, but the regulations reference this form of relief and provide a brief description: "[D]eferred action, an act of administrative convenience to the government which gives some cases lower priority…."[2]  Where USCIS grants a request for deferred action, the foreign national is provided employment authorization.[3]  According to informal USCIS estimates, the vast majority of cases in which deferred action is granted involve medical grounds.[4]

Deferred action cannot be granted by the Immigration Judge. *Johnson v. INS*, 962 F.2d 574, 579 (7th Cir. 1992).  There is no judicial review of decisions concerning deferred action. *Reno v. American Arab Anti-Discrimination Comm.*, 119 S.Ct. 936 (1999).

USCIS also grants deferred action relief in the U visa context, where the individual has suffered substantial physical or mental abuse as a result of having been a victim of a crime or similar

---

[1] USCIS response to Ombudsman (Dec. 18, 2006).
[2] 8 C.F.R. §274a.12(c)(14).
[3] *Id.*
[4] *See supra* note 1.

Recommendation from the CIS Ombudsman to the Director, USCIS
April 6, 2007
Page 2 of 4

activity involving rape, torture, trafficking, incest, and/or domestic violence.[5]  All approved self-petitioners not in proceedings are eligible for deferred action and work authorization, including abused spouses and children of lawful permanent residents.[6]  Deferred action for battered spouses and children, established in statute, is not within the scope of this recommendation.  This recommendation addresses deferred action not provided for by statute or in regulations.

Deferred action arises in other immigration contexts.  USCIS provided deferred action to Hurricane Katrina-impacted foreign academic students.  The USCIS press release stated the following:

> A grant of deferred action in this context means that, during the period that the grant of deferred action remains in effect, DHS will not seek the removal of the foreign academic student or his or her qualified dependents…Deferred action requests are decided on a case-by-case basis…A grant of deferred action does not provide an individual any legal immigration status in the United States.[7]

For these foreign students, USCIS made clear the general purpose, criteria, and limitations for deferred action relief, as well as where individuals were to file.

Although operations instructions for deferred action were withdrawn June 24, 1997, the relief continues to be available.[8]  Individual deferred action requests are recommended by District Directors to Regional Directors for approval.  Under the withdrawn instructions, the following were factors for the District Director to consider:

1) The likelihood of ultimately removing the alien;

2) The presence of sympathetic factors;

3) The likelihood that because of sympathetic factors a large amount of adverse publicity will be generated; and

4) Whether the individual is a member of a class of deportable aliens whose removal has been given high enforcement priority (*e.g.* terrorists, drug traffickers).

---

[5] 8 U.S.C. §1101(a)(15)(U); Memo, Cronin, Acting Assoc. Comm.., Office of Programs (HQ 204-P) (Dec. 22, 1998).
[6] 8 U.S.C. §1184(o)(3)(A).
[7] USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina (Nov. 25, 2005); *see also* 70 Fed. Reg. 70992-70996 (Nov. 25, 2005).
[8] Deferred action is "an act of administrative choice to give some cases lower priority and in no way an entitlement…" former O.I. §242.1(a)(22).  See also Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal (Standard Operating Procedures), Part X.; Meissner, Comm, Memo, HQOPP 50/4 (Nov. 17, 2000) [Regarding prosecutorial discretion].

CAR 0004

Recommendation from the CIS Ombudsman to the Director, USCIS
April 6, 2007
Page 3 of 4

The USCIS website provides information on humanitarian parole but not on deferred action.[9]

Customers and stakeholders have inquired with the CIS Ombudsman as to where to submit a request for deferred action.  Customers report instances in which they were told erroneously by USCIS that it does not have jurisdiction to provide this relief and were also told by officials from Immigration and Customs Enforcement that it only considers requests for deferred action that involve a compelling law enforcement nexus and/or where the individual is in removal proceedings.

## III.    JUSTIFICATION

USCIS should provide basic information on deferred action, including 1) general criteria for relief; 2) what information to include with the submission, and 3) where to submit a request.  A minimum level of transparency is appropriate even for extraordinary, discretionary relief such as deferred action.

Currently, USCIS does not maintain statistics or otherwise track the number of requests received and approved or denied for deferred action.  USCIS also does not review deferred action grants or denials between regions.  Thus USCIS can only estimate the number of requests and provide anecdotal information on the types of requests received and granted or denied.  Such an ad hoc approach may in part be necessary and appropriate because deferred action is extraordinary relief not based in statute or regulations.  However, minimal measures, including tracking requests for deferred action and regular review by USCIS headquarters of the requests and the determinations made, would help to ensure that there is no geographic disparity in approvals or denials of deferred action requests and that like cases are decided in like manner.

## IV.    BENEFITS

## A.  Customer Service

This recommendation seeks to improve customer service by making basic information on deferred action requests clear to the public: where to submit a request, what to include with a submission, and the general criteria for requests to be approvable.  Implementation of this recommendation would prevent customers from having to guess where and what information to submit.  It also would prevent officers in the field from providing misinformation about where a request for deferred action should be submitted.  This recommendation also seeks to ensure that over time and in different regions, cases are similarly decided.

## B.  USCIS Efficiency

---

[9] http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=b04596981298 d010VgnVCM10000048f3d6a1RCRD&vgnextchannel=828807b03d92b010VgnVCM10000045f3d6a1RCRD  (Last visited February 12, 2007).

CAR 0005

Recommendation from the CIS Ombudsman to the Director, USCIS
April 6, 2007
Page 4 of 4

If implemented, this recommendation would make USCIS more efficient by tracking requests for deferred action and helping to ensure consistency in adjudications.

## C. National Security

This recommendation has no national security impact. This recommendation does not seek to change the criteria under which deferred action is granted or otherwise to effect the grant of status. This recommendation would not expand an immigration program and would make no changes to current USCIS security screening procedures.

CAR 0006

# Citizenship and Immigration Services Ombudsman

## DEFERRED ACTION: RECOMMENDATIONS TO IMPROVE TRANSPARENCY AND CONSISTENCY IN THE USCIS PROCESS

July 11, 2011

Transparency and consistency are the primary objectives of these recommendations. The Federal Government, including the Department of Homeland Security, has, in recent years, steadily made efforts to provide more information to the public, and to enhance the efficient administration of government services. Here, U.S. Citizenship and Immigration Services (USCIS) is encouraged to carry these objectives into the administration of deferred action requests.

These recommendations focus on how USCIS processes deferred action requests and the steps that can be taken to ensure that an individual in compelling circumstances, whether or not represented, knows how to submit a deferred action request, receives a decision in a timely manner, and can be assured that the request will be processed in a consistent manner.

The recommendations do not delve into who should receive deferred action. Every day, USCIS officers and leadership apply their expertise and experience to make decisions that impact both individual lives and the public as a whole. As past administrations have acknowledged, along with this authority comes the responsibility to appropriately exercise discretion when compelling needs arise.

Above all, these recommendations are about good government. Building accessible, uniform, and transparent processes is critical to effective government services. In fact, these recommendations echo recommendations that this office made in 2007. While deferred action requests are a minute fraction of the millions of decisions USCIS makes every year, they warrant the same transparency and consistency that the Federal Government strives for across the board.

Most Sincerely,

January Contreras
Citizenship and Immigration Services
Ombudsman

## RECOMMENDATIONS

The Ombudsman recommends that USCIS:

1. Issue public information describing deferred action and the procedures for making a request for this temporary form of relief with USCIS;

2. Establish internal procedures for accepting and processing deferred action requests in order to promote consistency and assist local offices in responding to urgent, periodic increases in the demand for deferred action;

3. Inventory all pending deferred action requests to verify that each request received a confirmation of receipt with estimated processing timeframes and USCIS contact information; and

4. Consistently track data related to deferred action requests and make available statistics identifying the number of requests received and the numbers of requests approved and denied.

## REASONS FOR THE RECOMMENDATIONS

- Stakeholders lack clear, consistent information regarding requirements for submitting a deferred action request and what to expect following submission of the request.

- There is no formal national procedure for handling deferred action requests.

- When experiencing a change in the type or number of submissions, local USCIS offices often lack the necessary standardized process to handle such requests in a timely and consistent manner. As a result, many offices permit deferred action requests to remain pending for extended periods.

- Stakeholders lack information regarding the number and nature of deferred action requests submitted each year; and they are not provided with any information on the number of cases approved and denied, or the reasons underlying USCIS' decisions.


Homeland Security

*Office of the Citizenship and Immigration Services Ombudsman*
*U.S. Department of Homeland Security*
*Mail Stop 1225*
*Washington, DC 20528*
*www.dhs.gov/cisombudsman*

CAR 0007

# Citizenship and Immigration Services Ombudsman

## DEFERRED ACTION: RECOMMENDATIONS TO IMPROVE TRANSPARENCY AND CONSISTENCY IN THE USCIS PROCESS

### July 11, 2011

*The Citizenship and Immigration Services Ombudsman, established by the Homeland Security Act of 2002, provides independent analysis of problems encountered by individuals and employers interacting with U.S. Citizenship and Immigration Services, and proposes changes to mitigate those problems.*

## Executive Summary

For decades the U.S. Immigration and Naturalization Service (INS), followed by the Department of Homeland Security (DHS), has used deferred action to provide limited relief to foreign nationals who do not qualify for other immigration benefits that are typically available to individuals in exigent circumstances.[1]  Upon creation of the DHS in 2003, the power to grant deferred action was formally delegated to U.S. Citizenship and Immigration Services (USCIS), as well as U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP).[2]

When accorded deferred action, an individual is able to remain, temporarily, in the United States: USCIS declines to exercise its authority to issue a Notice to Appear and does not place the individual in removal proceedings.  USCIS has granted deferred action to individuals suffering serious medical conditions and to persons temporarily prevented from returning to their home country due to a natural disaster, among others.  The employment authorization regulations briefly describe this form of administrative relief, classifying deferred action as, "an act of administrative convenience to the government which gives some cases lower priority."[3]

Over the past year, stakeholders have expressed concerns to the Office of the Citizenship and Immigration Services Ombudsman (Ombudsman's Office) regarding long pending deferred action requests submitted by Haitian nationals following the earthquake in January 2010.[4]  These Haiti-related concerns led to broader conversations among stakeholders about the way USCIS processes deferred action requests at local offices.

Based on an analysis of USCIS' handling of deferred action requests, the Ombudsman's Office has made the following findings:

- Stakeholders lack clear, consistent information regarding requirements for submitting a deferred action request and what to expect following submission of the request.

- There is no formal national procedure for handling deferred action requests. Accordingly, it is difficult to track deferred action processing, in order to determine who receives deferred action, and under what circumstances.

---

[1] INS Commissioner Doris Meissner, *Exercising Prosecutorial Discretion*, HQOPP 50/4 (Nov. 17, 2000).
[2] Homeland Security Act of 2002, Pub. L. No. 107-296, § 442(c), 116 Stat. 2135, 2194 (2002); Department of Homeland Security (DHS) Secretary Tom Ridge, *Delegation to the Bureau of Citizenship and Immigration Services* (Mar. 1, 2003) (delegating authority to grant voluntary departure under section 240B of the INA. 8 U.S.C. §1229c, and deferred action); *See* U.S. Department of Justice, *Immigration Naturalization Service Fact Sheet, Prosecutorial Discretion Guidelines* (Nov. 28, 2000).
[3] 8 C.F.R. §274a.12(c)(14) (2011).
[4] Information provided by stakeholders (Mar. 28 and 29, 2011).

- When experiencing a change in the type or number of submissions, local USCIS offices often lack the necessary standardized process to handle such requests in a timely and consistent manner. As a result, many offices permit deferred action requests to remain pending for extended periods.

- Stakeholders lack information regarding the number and nature of deferred action requests submitted each year; and they are not provided with any information on the number of cases approved and denied, or the reasons underlying USCIS' decisions.

In response to its findings, the Ombudsman's Office recommends that USCIS take the following actions to improve the processing of requests for deferred action:

1) **Issue public information describing deferred action and the procedures for making a request for this temporary form of relief with USCIS;**

2) **Establish internal procedures for accepting and processing deferred action requests in order to promote consistency and assist local offices in responding to urgent, periodic increases in the demand for deferred action;**

3) **Inventory all pending deferred action requests to verify that each request received a confirmation of receipt with estimated processing timeframes and USCIS contact information; and**

4) **Consistently track data related to deferred action requests and make available statistics identifying the number of requests received and the numbers of requests approved and denied.**

## BACKGROUND

A grant of deferred action indicates that the government has, temporarily, declined to exercise its authority to remove a particular individual from the United States. As such, the named individual may remain, provisionally, in the United States. Deferred action is a form of relief that is typically granted to individuals whose cases raise compelling humanitarian concerns and to individuals whose removal is not in the best interests of the U.S. government. It does not provide a pathway to permanent residency.

Factors considered for this form of relief include: humanitarian issues, the likelihood of eligibility to gain legal status, family ties to the United States, criminal history, and immigration concerns.[5] USCIS has granted deferred action to individuals suffering from serious medical conditions and to those temporarily prevented from returning to their home country due to a natural disaster, among others.

While ICE and CBP also are provided with authority to grant deferred action, this review focuses solely on USCIS' communication about and processing of deferred action.

**Legal Framework.** For decades INS, followed by DHS, has used deferred action to provide limited relief to foreign nationals who do not qualify for other immigration benefits that are typically available to individuals in

---

[5] Meissner Memo, HQOPP 50/4 (Nov. 17, 2000) (the memorandum provides a more comprehensive list). USCIS reported that the Meissner memo is used as informal guidance for local offices reviewing a deferred action request. (Apr. 15, 2011). *See also Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal (Standard Operating Procedures)*, Part X.; Deferred action is "an act of administrative choice to give some cases lower priority and in no way an entitlement..." former O.I. §242.1(a)(22) (withdrawn June 24, 1997).

2

exigent circumstances.[6]  However, prior to 2000, neither the legacy INS, nor its predecessor agency had published any significant guidance regarding the use of this power.[7]

On November 17, 2000, INS Commissioner Doris Meissner issued a memorandum entitled, "Exercising Prosecutorial Discretion.[8]"  That memo set forth guidance on the exercise of prosecutorial discretion by immigration officials and described the process to be followed in making and monitoring discretionary decisions.  The memo states:

> The favorable exercise of prosecutorial discretion means a discretionary decision not to assert the full scope of the INS enforcement authority as permitted under the law.  Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an [Notice to Appear]…detaining an alien placed in proceedings and approving deferred action.[9]

In 2003, Secretary of DHS Tom Ridge formally delegated to USCIS the authority to grant deferred action.[10] USCIS continues to rely on the Meissner memo as guidance on exercising this and other forms of discretionary authority.[11]

**Methodology.**  In preparing this review, the Ombudsman's Office met with stakeholders. To determine the USCIS deferred action process, the Ombudsman's Office also conducted meetings and conference calls with local and regional USCIS offices[12] and requested statistical data from USCIS Headquarters regarding deferred action requests.[13]

**Individual Deferred Action Requests and USCIS Processing.**  USCIS processes two types of deferred action requests:  1) those submitted by individuals who qualify based on a USCIS decision to use deferred action as a pre-adjudication form of temporary relief for those who have filed certain petitions or applications (*e.g.*, widows of U.S. citizens, qualified victims of a crime or abuse); and 2) those submitted by individuals in exigent circumstances (*e.g.*, extreme medical cases, victims of the September 11th terrorist attacks), who may, or may not, have an application for immigration benefits pending.[14]  This study examines only USCIS processing of the latter type of request.

Currently, there are no official, national standard operating procedures for how to process a deferred action request. Nevertheless, most USCIS offices follow some sort of informal, standard process, rather than proceeding in an *ad hoc* fashion.[15]  Typically, an individual can submit a deferred action request in-person, or

---

[6] *Supra n. 2.*
[7] Meissner Memo, HQOPP 50/4 (Nov. 17, 2000).
[8] *Id.*
[9] *Id.*
[10] Secretary DHS Tom Ridge, *Delegation to the Bureau of Citizenship and Immigration Services* (Mar. 1, 2003).
[11] Information provided by USCIS (Mar. 30, 2011; Apr. 15, 2011).
[12] Information provided by USCIS (Mar. 29, 30, Apr. 19 and 20, 2011).
[13] The Ombudsman's Office received basic submission statistics, but the information was incomplete, providing information on grants of requests but not the actual submission and denial numbers.  Information provided by USCIS (Apr. 15, 2011).
[14] USCIS memorandum from William Yates, *Assessment of Deferred Action in Requests for Interim Relief from U Nonimmigrant Status Eligible Aliens in Removal Proceedings*, HQOPRD 70/6.2 (May 6, 2004); USCIS memorandum from Stuart Anderson, *Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status*, HQADN 70/6.2 (May 8, 2002).
[15] Information provided by site visits and teleconference calls with USCIS district offices. (Mar. 29, 2011; Apr. 19 and 20, 2011).  The North Eastern Regional Office has an SOP that went into effect on February 17, 2011.  Other local offices have guidelines on how to review a deferred action request.

CAR 0010

by mail, to a local USCIS office.[16]  USCIS does not have a nationwide process for acknowledging the receipt of deferred action requests, but many USCIS offices have implemented a local method for logging submissions and acknowledging their receipt.  Other offices do not issue a written acknowledgement of receipt for deferred action requests.

Normally, a deferred action request is reviewed at the local office.  A summary sheet explaining the positive and negative equities associated with the deferred action request is completed.[17]  The district director reviews the summary and makes a recommendation.  That recommendation is forwarded to the regional director.  The regional director issues a decision on the recommendation and returns the final decision to the district director so that he/she may deliver it to the requestor.[18]  Deferred action requests are not filed on a standardized application form and no fee is collected to defray the costs associated with processing deferred action requests.

Once granted deferred action, the requestor is eligible to apply for employment authorization.[19] When USCIS does grant deferred action, it is usually valid for one to two years.[20]

**Local Offices Responding to Increases in Deferred Action Submissions.**  The number of deferred action requests received by local offices can vary greatly.[21]  Certain local offices have evolved new processes when experiencing a rise in submissions.[22]  Nevertheless, there is no mechanism to hold local offices accountable for issuing decisions within a certain timeframe, and USCIS did not report any coordinated efforts across districts to share locally developed solutions for managing a significant deferred action workload.

Recently, USCIS Headquarters began tracking deferred action requests.  USCIS Headquarters has instructed district directors to send data on deferred action decisions to the National Benefits Center for tracking.[23]  In addition, USCIS devised a template acknowledgement letter for local offices to issue in response to requests for deferred action.  However, not all local offices use the template letter. [24]  Stakeholders have reported that some local offices do not issue any type of written acknowledgement that a deferred action request has been received.

Furthermore, the template letter includes a statement that the applicant will receive a response to the request within 60 days.  Stakeholders and USCIS officials report that many cases remain pending without a decision well beyond 60 days.[25]

**Prior Ombudsman's Office Recommendations.**  On April 9, 2007, the Ombudsman's Office published recommendations on deferred action.[26]  The recommendations were:  1) post general information on the USCIS website; 2) maintain deferred action statistics; and 3) designate a USCIS Headquarters official to review decisions to help ensure consistency in decision making.

---

[16] Information provided by USCIS site visit (Mar. 29, 2011).
[17] Form G-312, *Deferred Action Case Summary*, outlines the individual's biographical information, familial history, grounds of inadmissibility and deportability and physical and mental conditions requiring treatment in the United States.
[18] Information provided by USCIS (Mar. 29, 2011 and Apr. 15, 2011).
[19] 8 C.F.R. §274a.12(c)(14) (2011).
[20] Information provided by USCIS (Mar. 30, 2011).
[21] Information provided by USCIS (Mar. 29, 2011; Apr. 15, 19 and 20, 2011).
[22] *Id.*
[23] Information provided by USCIS site visit (Mar. 29 and 30, 2011).
[24] Field offices report issuing decisions from a time range of two weeks to indefinitely pending.  Information provided by USCIS (Mar. 29, 2011) and stakeholders (Mar. 28, 2011).
[25] Information provided by USCIS teleconference calls and site visits (Mar. 29-30 and Apr. 19-20, 2011).
[26] CIS Ombudsman Recommendation #32, Deferred Action (Apr. 9, 2007).

CAR 0011

USCIS responded that deferred action requests are reviewed on a case-by-case basis and that published guidance would not be a meaningful addition to USCIS' website.[27]   USCIS committed to collecting deferred action statistics on a quarterly basis.  USCIS did not find it necessary to review deferred action decisions at USCIS Headquarters.

**Stakeholder Concerns.**  Over the past year, stakeholders expressed concerns to the Ombudsman's Office regarding the delayed processing of numerous deferred action requests submitted by Haitian nationals following the earthquake in January 2010.  In public meetings, stakeholders from across the country repeatedly requested USCIS guidance and information regarding the handling of these deferred action requests.[28]   Stakeholders reported to the Ombudsman's Office that some individuals have waited for more than seven months for decisions on their requests.[29]   Recently, an extension and re-designation of Haiti Temporary Protected Status (TPS) provided certain individuals affected by the earthquake with relief; many of whom had requested deferred action.  In the process of waiting for USCIS to act on their deferred action requests, many individuals accrued unlawful presence, which may impact their eligibility for future immigration benefits.  These Haiti-related concerns led to broader conversations among stakeholders about the way that USCIS is processing deferred action requests.

Stakeholder meetings and inquiries have highlighted that USCIS is not communicating essential information on how to make or renew a deferred action request.[30]   While stakeholders acknowledge that a grant of deferred action by USCIS is a discretionary decision, they have expressed that general guidance from USCIS would be helpful to determine whether clients should be advised to step forward and seek this relief.  Stakeholders explain that preparing a deferred action request requires a significant investment of time and effort.  Due to the level of staff resources needed to submit requests, representatives and attorneys who assist people in seeking deferred action note that directions and guidance are especially critical.

**CASE PROBLEM:**  The United States Army medically evacuated an individual to the United States for a life-saving operation that was not available in her home country.  The individual had been in the care and custody of U.S. military personnel for many years due to her situation and had received deferred action from USCIS.  The U.S. Army identified that she needed continued medical treatment.  Military personnel could not find information on how the patient could renew her request for deferred action.  After contacting various resources, the Ombudsman's Office was contacted.  The Ombudsman's Office, in turn, worked with USCIS and the individual to submit a new request for deferred action and to file an employment authorization application.  USCIS granted the request, and the individual was permitted to remain temporarily in the United States to continue to receive life-saving treatment.

Stakeholders report difficulties in obtaining status updates on pending requests.  After filing the initial request, many individuals are not provided a USCIS point of contact or a written acknowledgement that the request has

---

[27] USCIS Response to Recommendation #32, Deferred Action (Aug. 7, 2007).
[28] Information provided by stakeholders (Mar. 28, 2011).
[29] Information provided by stakeholders (Mar. 29, 2011).
[30] Recent publications have highlighted the need for public guidance on how to submit a deferred action request to USCIS and to expect subsequent to the submission.  *See* Penn State Law School, Duane Morris & Maggio+Kattar, *Private Bills & Deferred Action, Toolkit* (May 17, 2011), http://law.psu.edu/_file/PBDA_Toolkit.pdf (accessed on July 5, 2011); Mary Kenney, *Prosecutorial Discretion:  How to Advocate for Your Client* (June 24, 2011), http://www.legalactioncenter.org/practice-advisories/prosecutorial-discretion-how-advocate-your-client (accessed on July 5, 2011); Donald M. Kerwin, Doris Meissner & Margie McHugh, *Executive Action on Immigration: Six Ways to Make the System Work Better* (Mar. 2011), http://www.migrationpolicy.org/pubs/administrativefixes.pdf (accessed on July 5, 2011).

CAR 0012

been filed.  This makes it difficult to submit additional supporting documentation or to obtain information regarding the processing of the request.

# ANALYSIS & RECOMMENDATIONS

The Ombudsman's Office makes the following recommendations to USCIS:

> **(1) Issue public information describing deferred action and the procedures for making a request for this temporary form of relief with USCIS.**

Although most local offices appear to follow a basic process, there is little public information explaining how to request deferred action and what type of supporting documentation should be submitted with a request.  USCIS posts humanitarian notices for victims of natural disasters, but does not always include information on deferred action. [31]  Some USCIS offices have provided local guidance, but this is often only visible to community-based organizations or legal representatives, and not to individuals who lack access to such aid networks, leaving the most vulnerable individuals – those who are not represented – without knowledge of how to be considered for this temporary form of relief.

> **LOCAL PRACTICE:**  The Miami Field Office published a checklist outlining the basic documentation that should be included in a deferred action request, which reduces the number of requests for additional evidence.

Public guidance would ensure that individuals in need of relief are aware of deferred action and know how to make a request.  Informative guidance would include:  1) information explaining what deferred action is and what it is not; 2) instructions for submitting a request for deferred action to a local office; 3) an explanation of what information and documentation should be included in the request; and 4) an indication of what to expect following the submission of a request for deferred action, including a point of contact able to provide processing updates and other relevant information.

Issuing public guidance would not impact USCIS' discretionary authority to decide a deferred action request.

> **(2) Establish internal procedures for accepting and processing deferred action requests in order to promote consistency and assist local offices in responding to urgent, periodic increases in the demand for deferred action.**

> **LOCAL PRACTICE:**  When an individual submits a deferred action request, officers in the Boston Field Office immediately determine the individual's previously assigned A-number, or generate a new A-number, as necessary.  This ensures that the individual leaves the office with a unique identifier that can be used to track the request and can be referenced when inquiring as to case status, required follow-up, etc.

---

[31] USCIS New Release, *Haiti Relief Measures: Questions and Answers*;
http://www.uscis.gov/portal/site/uscis/template.PRINT/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=855260f64f3362
10VgnVCM100000082ca60aRCRD&vgnextchannel=68439c7755cb9010VgnVCM10000045f3d6a1RCRD) (accessed on May 6,
2011); USCIS Reminds Japanese Nationals Impacted by Recent Disaster, *Questions and Answers*;
http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=9c6ac337ab5ce210VgnVCM1000
00082ca60aRCRD&vgnextchannel=6abe6d26d17df110VgnVCM1000004718190aRCRD) (accessed on May 6, 2011).

CAR 0013

Establishing nationwide USCIS procedures to guide local offices in responding to submission increases would optimize resources and ensure that individuals requesting deferred action are not subjected to unnecessary delays due to manpower shortages and other administrative impediments.

> **(3) Inventory all pending deferred action requests to verify that each request received a confirmation of receipt with estimated processing timeframes and USCIS contact information.**

Many USCIS offices have a backlog of deferred action requests which have been pending for extensive periods of time.[32]  Establishing a comprehensive national inventory of deferred action requests would identify cases that have been long pending and assist in the implementation of a national process for timely, consistent processing of deferred action requests.

Additionally, USCIS Headquarters should verify that pending deferred action requests were issued receipt confirmation with an estimated processing time from the responsible local office.  In recent months, USCIS Headquarters has started to track deferred action requests received at local field offices.  However, USCIS must be more proactive in providing the public with information obtained through its tracking activities.

> **(4) Consistently track data related to deferred action requests and make available statistics identifying: the number of requests received and the numbers of requests approved and denied.**

Tracking and releasing to the public data on the number of deferred action request submissions (*i.e.*, approvals, denials, pending requests, etc.) would help provide transparency demonstrating how often and in what types of circumstances deferred action is granted.

> **LOCAL PRACTICE:**  When regional directors started receiving an increase in deferred action requests from district offices due to the earthquake in Haiti, they met to discuss recent trends and attempted to facilitate consistent deferred action decisions coming from the four USCIS regions.  While the coordination so far does not appear to have resulted in the development of a centralized national process, the discussion was a positive step towards coordinating deferred action processing at the regional level.

# CONCLUSION

Issuing public guidance on the procedures for making a request for deferred action would ensure that those who may merit humanitarian relief know how to seek it, whether they are represented or not.  Establishing a standardized and responsive national procedure, as well as conducting an inventory of pending deferred action requests to verify that each individual who has made a request has received confirmation of receipt, would improve customer service, agency accountability, and help ensure consistency in deferred action decisions.  Finally, tracking submissions and releasing the data to the public would improve management of the deferred action process and provide transparency to the public.

---

[32] Stakeholders report that most deferred action requests remain pending without explanation.  Information provided at stakeholder meeting (Mar. 28, 2011).  Information provided at USCIS site visit (Mar. 29, 2011).

CAR 0014

**From:**       Sandweg, John ██████████████████████

**Sent:**       Wednesday, April 25, 2012 6:58 PM

**To:**         Mayorkas, Alejandro N ███████████████ Morton, John
                ██████████ Carson, Rebecca S ████████████████████
                Baronof, Kim ████████████████ Barr, Suzanne E
                █████████████████████

**Cc:**         Grossman, Seth ██████████████████, Peacock, Nelson
                ██████████████████

**Subject:**    Transcript

**Attach:**     transcript FNS - S1 DHS oversight (SJC) 04-25-12.docx

---

**SEN. DURBIN:** You and I had another conversation about work authorization and this is -- to me, is a very basic issue which we should discuss in this hearing.

Historically, as by interpretation of the department and under previous President George W. Bush, in cases where there was deferred action these individuals were allowed to work -- given a work authorization. Now, under the new policy, these individuals are offered administrative closure. And your department has taken the position that individuals whose cases are administratively closed cannot apply for work authorization.

This creates a real problem. You're saying to qualified individuals they will not be deported but they can't work to support themselves or their families. Many are going to end up in the underground economy, which puts them at risk of exploitation and undercuts the labor market. Only a few thousand people have had their deportations halted so far, so I can't imagine this will have any significant impact on employment in America. I ask you then why we are not at least making certain that if we have deferred action or administrative closure that a person is allowed to work.

**SEC. NAPOLITANO:** Well, first, just to make sure we have a common understanding of the record.

We have continued deferred actions and do that before cases get into the administrative system. The administrative closure are cases that are already on the docket -- and most of which are on the nondetained docket, but a certain number are on the detained docket -- and those are the ones we're going through in addition to evaluating new cases as they come in to see that they meet the priorities that we have set.

So with respect to the work authorization, we are going back now, in light of your concerns and in light of the fact that we now have some numbers to look at as opposed to when we started this whole process, to see if we should make some adjustments. So I'd be willing to keep you apprised of our efforts in that regard. But I think -- I thought about your concerns after we spoke and I thought they were serious concerns and we are exploring how best to address them.

John R. Sandweg
Department of Homeland Security
██████████████ (cell)
██████████████████

CAR 0015



**Hearing of the Senate Judiciary Committee Subject: "Oversight of the Department of Homeland Security" Chaired by: Senator Patrick Leahy (D-VT) Witness: Homeland Security Secretary Janet Napolitano Location: 226 Dirksen Senate Office Building, Washington, D.C. Time: 9:33 a.m. EDT Date: Wednesday, April 25, 2012**

Copyright ©2012 by Federal News Service, Inc., 1120 G Street, NW, Suite 990, Washington, DC 20005 USA. Federal News Service is a private firm not affiliated with the federal government. No portion of this transcript may be copied, sold or retransmitted without the written authority of Federal News Service, Inc. Copyright is not claimed as to any part of the original work prepared by a United States government officer or employee as a part of that person's official duties. For information on subscribing to the FNS Washington Transcripts Service, please email info@fednews.com or call 1-202-347-1400.

--This is a rush transcript--

**SENATOR PATRICK LEAHY (D-VT):** Good morning. We'll let the photographers get all their shots. But then I'm going to ask you, once you've done that, to step back so we can get started.

OK, I think we can get started. Senator Graham is here. I know Senator Schumer dropped in briefly before, and the Rules Committee, and will be back. Senator Grassley has told me he's over on the House side -- is that correct? -- and will be joining us. Senator Kyl is here. Senator Grassley said go ahead, and we will.

Secretary, you know Senator Kyl is from the state of Arizona, I believe.

**SENATOR JON KYL (R-AZ):** (Off mic.)

**SEN. LEAHY:** Yeah, I suspect you do.

I want to welcome Secretary Napolitano back to the Judiciary Committee. We are continuing our important oversight of the Department of Homeland Security. She's testified here before. And I think I speak for every member of the committee that she's also been responsive if we've called with questions in between the testimony.

This is our oversight of the Department of Homeland Security and the work that the women and men of the agencies within the department do every day to keep America safe.

Now, much attention has been focused on an incident prior to President Obama's attendance at the recent Summit of the Americas in Cartagena, Colombia. I've spoken a number of times with Secret Service Director Sullivan about this. In fact, we met privately for about an hour yesterday and have probably been on the phone half a dozen or a dozen times.

I've known the director from the time when he was an agent. I knew him when President Bush appointed him as director of the Secret Service and when President Obama reappointed him. I know that he shares my view that the alleged conduct was unacceptable. I think he's doing all he can to ensure a timely and thorough investigation, the accountability for behavior that failed to meet the standards he expects, and certainly the standards that the president of the United States and the American people deserve. He's taken action on 12 agents who have been (claimed ?) to have been involved in misconduct.

And last week I arranged for a bipartisan briefing for Judiciary Committee staff, Republican and Democratic, with the Secret Service and officials of the Department of Homeland Security's Office of Inspector General. I've asked the director to assure he's available to members of this committee as the investigation continues. He assured me he will be and that he will make sure that we know exactly, when they finish the investigation, everything they've found.

Now -- and I have no doubt you're treating this situation with equal seriousness. In my conversations with you, you've talked a great deal with the director during this time.

Nobody wants to see the president's security compromised. Nobody wants to see America embarrassed. I pointed out to the director we have -- they, of course, obviously protect the president of the

United States. They are also going to be and are protecting the man who's going to be the Republican nominee for president, Governor Romney.

I can't think of anything that would -- aside from the personal tragedy, anything that would look worse to the rest of the world if something happened either to President Obama or Governor Romney, especially during a presidential election. I think everybody here would agree with that.

Now, you told us, at your first appearance as secretary, you'd focus on using limited federal law enforcement resources in a smarter, more effective manner when enforcing our immigration laws. You and Immigration and Customs Enforcement Director John Morton are following through on implementation of ICE's prosecutorial discretion policies, a positive step forward.

This new policy has the effect of apprehending more individuals who are legitimate threats to public safety and provide some major relief to those who pose no threat. It's an improvement. And you are saying, by your commitment, to focus first and foremost on the most dangerous among the undocumented population. Mr. Morton was in Vermont. We discussed that then too.

And I think you're doing the best you can in the absence of Congress taking up meaningful and comprehensive immigration reform. As you know, I supported President Bush's efforts for meaningful and comprehensive immigration reform, and I still would like to see that.

Even though that has very little impact on my state of Vermont, it has enormous impact on the rest of the country. In fact, as we are holding this hearing today, the Supreme Court is hearing an argument on the constitutionality of an Arizona immigration enforcement law.

The Constitution of the U.S. declares the Congress and the federal government shall have the power to establish a uniform rule of (naturalization ?). So national immigration policy is properly a subject we should act upon. It shouldn't be left to a hodgepodge of conflicting state laws. I hope we can get back to where we can do good, strong, comprehensive, bipartisan immigration policy.

In 2010 we passed an emergency appropriations measure to provide $600 million for border security enhancements. You've reported that we've made significant strides there. I understand illegal border crossings on the southern border have declined. We've seen a steady increase in the numbers of Border Patrol and Customs & Border Protection officers monitoring our borders. And I take special notice that you're working with Canadian officials on the Beyond the Border initiative, coordinating on our shared northern border.

And I am impressed with that.

And to (invite ?) the parochial answer -- it's very rare that someone is parochial in any one of these committees, but in Vermont, many people look forward to our friends from Canada visiting and enjoying all that Vermont has to offer.

And at least when I was a youngster, you just -- the thought of going to a different -- another state, it's that easy going back and forth across the border. We take that for granted, and I hope that we can work on that to keep it -- protect our security but keep that border as open as possible.

I was pleased to see the EB-5 Regional Center program is among your recommendations. Those are the president's council on jobs and competitiveness. We've worked with that in Vermont. I look forward to work for reauthorization of this program.

And Senator Grassley and I have been working to get this and other expiring visa programs reauthorized, a bipartisan measure. We'll continue to work with you and USCIS Director Mayorkas to strengthen and improve the EB-5 program.

I have raised the issue that's creating procedures and technology in our airports. I continue to have questions about these policies and their impact with the privacy and health of Americans. Whether this technology is the most effective use of resources, I -- it's the obvious thing when you see an elderly person

CAR 0017

in a wheelchair going through all kind of screening, I'm not quite sure how that is keeping us safer, but we can talk about it.

I want to make sure that, as we go to the national cybersecurity, we protect our rights and civil liberties.

And finally, I want to commend the women and men who work in the agencies in your department. I've met so many of them -- all different branches. I know they work very, very hard and care about our country. Many of Vermonters work in our adjudicated immigration benefits at the Vermont Service Center, but that can be said of all our states.

We'll expand the workforce in Saint Albans, Vermont -- the Vermont Service Center. But I just am constantly impressed every time I see the men and women who work there.

Absent Senator Grassley, Senator Kyl, did you wish to make an opening statement before we go to the secretary?

**SEN. KYL:** No, Mr. Chairman. I think we want to hear from the secretary and then we'll all have questions. But thank you.

**SEN. LEAHY:** Well, Madam Secretary, it's your -- it's open to you, and then we will go to seven-minute rounds. We'll rotate in the usual manner from side to side in the order in which people arrived.

Secretary Napolitano, please go ahead.

**SECRETARY NAPOLITANO:** Thank you, Chairman Leahy, and members of the committee. I'm pleased to be with you today.

I thank the committee for your support of the department over these past three years and, indeed, since the department was founded more than nine years ago.

Before I begin, I want to address the allegations of misconduct by Secret Service agents in Colombia. The allegations are inexcusable, and we take them very seriously.

Since the allegations first surfaced, I've been in close touch with Director Sullivan. The director took immediate action to remove the agents involved, and a full and thorough investigation is under way to determine exactly what transpired and actions we need to take to ensure that this kind of conduct doesn't happen again.

Director Sullivan has the president's and my full confidence as this investigation proceeds. The investigation will be complete and thorough, and we will leave no stone unturned.

Thus far, the investigation has implicated 12 Secret Service personnel. Eight individuals are now separated from the agency. The Secret Service is moving to permanently revoke the security clearance of another. And three of the employees involved have been cleared of serious misconduct but will face appropriate administrative action.

At this time, therefore, all 12 Secret Service personnel identified in the investigation have either faced personnel action or been cleared of serious misconduct.

Let me be clear. We will not allow the actions of a few to tarnish the proud legacy of the Secret Service, an agency that has served numerous presidents and whose men and women execute their mission with great professionalism, honor and integrity every single day. I have nothing but respect for these men and women, many of whom put their own lives at risk for the president and many other public leaders.

CAR 0018

We expect all DHS employees in the Secret Service and throughout the department to adhere to the highest professional and ethical standards, and we will continue to update the committee as the investigation proceeds and more information becomes available.

Let me now move to the department's progress since 9/11. Ten years after the terrorist attacks of September 11th, America is stronger and more secure today thanks to the support of the Congress, the work of the men and women of the DHS, our federal, state, local partners who work across the homeland security enterprise.

As I've said many times, homeland security begins with hometown security. As part of our commitment to strengthening hometown security, we have worked to get information, tools and resources out of Washington, D.C., and into the hands of state and local officials and first responders. This has led to significant advances.

For example, we've made great progress in improving our domestic capabilities to detect and prevent terrorist attacks against our people, our communities and our critical infrastructure. We have increased our ability to analyze and distribute threat information at all levels through fusion centers, the Nationwide Suspicious Activity Reporting Initiative, the National Terrorism Advisory System and other means.

We've invested in training for local law enforcement and first responders in order to increase expertise and capacity at the local level. We've supported preparedness and response across our country through approximately $35 billion in homeland security grants since 2002. And we have proposed important adjustments to our grant programs for fiscal year 2013 to continue to develop, sustain and leverage these core capabilities.

Our experience over the past several years has made us smarter about the terrorist threats we face and how best to deal with them. We've learned that an engaged, vigilant public is essential to efforts to prevent acts of terrorism, which is why we've continued to expand the "If You See Something, Say Something" campaign nationally.

We've also expanded our risk-based, intelligence-driven security efforts across the transportation sector, the global supply chain and critical infrastructure. By sharing and leveraging information with our many partners, we can make better-informed decisions about how to best mitigate risk.

Over the past several years, we also have deployed unprecedented levels of personnel, technology and resources to protect our nation's borders. These efforts, too, have achieved significant results, including historic decreases in illegal immigration as measured by total apprehensions and increases in seizures of illegal drugs, weapons, cash and other contraband.

In fact, illegal immigration attempts are at their lowest levels since 1971, while violent crime in U.S. border communities has remained flat or has fallen over the past decade.

We also have focused on smart and effective enforcement of immigration laws while streamlining and facilitating the legal immigration process. Last year, ICE removed record numbers of illegal aliens from the country -- 90 percent of whom fell within our priority categories of criminal aliens and repeat immigration law violators, recently border entrants and immigration fugitives.

We have focused on identifying and sanctioning employers who knowingly hire workers not authorized to work in the United States. We've made important reforms in our immigration detention system so that every individual in custody is treated in a fair, safe and humane manner consistent with ICE detention standards.

And we have worked to reduce bureaucratic inefficiencies in visa programs, streamlined the path for entrepreneurs who wish to bring business to the United States and improved systems for immigration benefits and services.

In the critical area of cybersecurity, we also continue to lead the federal government's efforts to secure civilian government networks while working with industry, state and local governments to secure critical

CAR 0019

infrastructure and information systems. We are deploying the latest tools across the federal government to protect critical civilian systems while sharing timely and actionable security information with public and private sector partners to help them protect their own operations.

With these partners, we are also protecting the systems and networks that support the financial services industry, the electric power industry and the telecommunications industry, to name just a few.

We stand ready to work with the Congress to pass legislation that will further enhance our ability to combat threats in the cyberdomain.

Specifically, we support legislation that would, among other things, establish baseline performance standards for the nation's critical, core infrastructure; remove barriers to information sharing between government and industry so that we can more quickly respond to and mitigate cyberthreats or intrusions; ensure robust privacy oversight to ensure that voluntarily shared information does not impinge on individual privacy and civil liberties, including criminal penalties for misuse; and provide DHS with the hiring flexibility to attract and retain the cybersecurity professionals we need to execute our complex and challenging mission.

Mr. Chairman, threats against our nation, whether from terrorists, criminals or cyber-adversaries, continue to evolve, and DHS must continue to evolve as well. I look forward to working with you and members of the committee to build on the progress we have achieved across these and many other mission areas. We remain ever vigilant to threats as we continue to promote the free movement of goods and peoples essential to our economy and protect our essential rights and liberties.

Thank you, Mr. Chairman.

**SEN. LEAHY:** Thank you. Thank you, and of course, we'll put your full statement in the record.

As I told you, with our jurisdiction over the U.S. Secret Service, we did want to ask you some questions there. I'm of course, like all Americans, concerned about the safety of our president, whether it could have been jeopardized by this kind of behavior, just as I'm concerned about the safety of any of the protectees. I mentioned Governor Romney, but there are several others.

The -- with the misconduct we've heard about, did that pose any risk to the president's security within Colombia or to national security?

**SEC. NAPOLITANO:** Mr. Chairman that was my first question to Director Sullivan when he called me, and the answer is no. There was no risk to the president.

**SEN. LEAHY:** And you made that assessment?

**SEC. NAPOLITANO:** Yes, based on the information supplied to me by the director.

**SEN. LEAHY:** And is the Secret Service coordinating its internal investigation with the Department of Defense or any other U.S. agency that might have been involved in Cartagena preparing for the president's arrival?

**SEC. NAPOLITANO:** Mr. Chairman, we are coordinating the investigation with the inspector general. We have a existing MOA with the IG, between the Secret Service and the IG, so they are in effect supervising the investigation, even though it's being done by Secret Service agents.

**SEN. LEAHY:** And was there any evidence that the president's advance team was involved in this misconduct?

**SEC. NAPOLITANO:** I've not been informed of any such evidence.

**SEN. LEAHY:** Thank you. As we continue to look at this, I mean, we're -- we know the agents are trained as to what is acceptable and what's unacceptable. Are there standards in place governing appropriate conduct for agents on foreign trips as to how they may interact with locals when they're on foreign assignments? And if there are such standards, how are they conveyed to the agents?

**SEC. NAPOLITANO:** There are standards. They are conveyed through training and through supervision. But one of the things we are doing, Mr. Chairman, is looking at the standards, the training, the supervision, to see what, if anything, needs to be tightened up. Because again, we don't want this to be repeated.

**SEN. LEAHY:** Well, is there -- is there training given to agents relating to private or intimate contact with foreign nationals when traveling for security work?

**SEC. NAPOLITANO:** The training is focused on professionalism, on conduct consistent with the highest moral values and standards, and I think that would include your question.

**SEN. LEAHY:** Well, Madam Secretary, I know that when we travel, when members of Congress travel, the different countries we go to, we're given security and foreign intelligence threat advisories. I've been in some countries where, for example, we'll leave all our communication gear dismantled, with U.S. security officers, and so forth.

Are agents given training in security and foreign intelligence threats for a particular country they might go into?

**SEC. NAPOLITANO:** I think that's part of the advance process, Mr. Chairman.

**SEN. LEAHY:** So if they thought there was an intelligence threat in a particular country, they'd be advised of that?

**SEC. NAPOLITANO:** Yes. Yes.

**SEN. LEAHY:** And I -- I began my career here during the Cold War period, and we had -- some of the assessments we were given then are somewhat different than they are today. But then some of the assessments today, because of our increased types of communication gear and electronic gear are different, I assume that is geared based on today's real threats?

**SEC. NAPOLITANO:** Yes. How to secure -- you mean how to secure our communications equipment and the other types of --

**SEN. LEAHY:** Yeah. And what things that the individual must look for. Is it -- I mean, is this a country, is there -- are they going to be -- a threat from agents of another -- of another country?

**SEC. NAPOLITANO:** The agents are informed as to what the intel is, what specific -- or country-specific measures need to be taken. And again, in this instance, Mr. Chairman, there was no impinging on the security of the president and no access to any secure information by the people involved.

**SEN. LEAHY:** You know, like you, I've been on many occasions with the Secret Service around. Wise, very professional men and women. I've traveled with several different presidents over the course of my career and watched the Secret Service, again with very professional men and women there. So that when I heard the number of the agents involved in this, I found it particularly alarming when I got my first call at home from the director. And as my staff looked into it and the bipartisan staff of this committee looked into it, the numbers I found shocking.

To your knowledge, is this the first time something like this has happened, or have you had reports of similar incidences in the past?

**SEC. NAPOLITANO:** Mr. Chairman, I asked the same question. And over the past two and a half years, the Secret Service Office of Professional Responsibility has not received any such complaint. Over that same period, the Secret Service has provided protection to over 900 foreign trips and over 13,000 domestic trips. So from that standpoint, there was nothing in the record to suggest that this behavior would happen and it -- and it really was, I think, a huge disappointment to the men and women of the Secret Service to begin with, who uphold very high standards and who feel their own reputations are now besmirched by the actions of a few.

**SEN. LEAHY:** Well, and to the extent that any of them are listening to this hearing, I would hope they will not be distracted from their job, those who are protecting Governor Romney, those that are protecting President Obama and all the other protectees. That's got to be job first.

But then you and the director have the job of seeing where we go from here. Can you assure us that there will not be -- or can you assure us it'll be made very clear to Secret Service agents in their training and elsewhere that this kind of conduct would not be condoned?

**SEC. NAPOLITANO:** That is our goal, Mr. Chairman. There's really three things that I immediately discussed with the director. One was to make sure the president's security was never at risk. Two was to make sure that we instituted a prompt and thorough investigation into the actual allegations in Colombia, and three, what other steps we need to take for the future to make sure this behavior is not repeated.

**SEN. LEAHY:** Different matter. The -- we're going to turn to the reauthorization of VALA, the Violence Against Women Act. A provision in this year's reauthorization would modestly increase the number of U Visas, temporary visas available to immigrant victims who have cooperated with law enforcement officers in the prosecution of criminal offenses. Sometimes they're our best sources of information, including domestic violence and sexual assault cases.

I've heard from law enforcement all over the country saying they support this. Does the Department of Homeland Security support this provision of this increase of U Visas for the purpose of cooperating in criminal cases?

**SEC. NAPOLITANO:** Absolutely.

**SEN. LEAHY:** Thank you. And I've told you -- and I have gone over my time -- but -- so we had the question I've raised with you before about the technology used for screening. I was very concerned about the earlier ones, the X-ray type machines, that in effect -- my words, not yours -- did a virtual strip search of people with very graphic images of the people going through.

Now, those first machines, how much did DHS spend on acquiring them?

**SEC. NAPOLITANO:** Well, Mr. Chairman, the machines themselves are at a unit cost of approximately $130,000. And I think -- we can get you the exact number. But I think the expenditure is probably, total -- with some installation and other things -- about $130 million.

**SEN. LEAHY:** And then the changes -- I'm told the changes when they -- after the reaction on the original ones, the retrofits and upgrades cost about 12 million (dollars)?

**SEC. NAPOLITANO:** Well, I'm not sure they cost that much because part of the contract with the vendor was, as the software changed, that the hardware would be able to accept the software. But I'll verify if it was 12 million (dollars) or not.

**SEN. LEAHY:** What -- what companies were awarded contracts to provide this?

**SEC. NAPOLITANO:** Rapidscan and L-3 are the two major vendors.

**SEN. LEAHY:** Thank you.

CAR 0022

Senator Graham, I apologize for taking the extra time. Please go ahead, sir.

**SENATOR LINDSEY GRAHAM (R-SC):** (Off mic.) Welcome, Madam Secretary. I really enjoyed working with your office on things unique to South Carolina in the country and security issues as a whole.

And my experience with the Secret Service is very similar to what Senator Leahy said. Really, it's basically the time I traveled with Senator McCain during the last presidential election, and I was very impressed by the people, very hardworking, a lot of time away from families and long hours.

So just as anytime you have military discipline problems, you don't want to paint with a broad brush the 99 percent. And let's start with that baseline.

**SEC. NAPOLITANO:** I concur, yes.

**SEN. GRAHAM:** I just very much -- but just like in the military -- Abu Ghraib and other situations -- systems, obviously, failed then and, obviously, there's a system failure here.

The likelihood that this was the first and only time that such behavior occurred, do you think that's great or not so great?

**SEC. NAPOLITANO:** Well, I think part of our investigation is confirming that this was an aberration -- or not. But I agree with you, Senator, the Secret Service does a marvelous job, and I have worked closely with them --

**SEN. GRAHAM:** And the only reason I suggest that we need to maybe look at little harder is because we're lucky to have found out about this. If there hadn't been an argument between one of the agents and, I guess, a prostitute -- for lack of a better word -- about money, we'd probably have never known about this.

So the point is that I think you've got a good order-and- discipline problem. Do you believe the agents were confused that their conduct was wrong?

**SEC. NAPOLITANO:** They should not have been.

**SEN. GRAHAM:** No, I don't think it's a lack of training. I don't think anybody --

**SEC. NAPOLITANO:** I mean -- you know, I think the conduct was unacceptable. It was unprofessional.

**SEN. GRAHAM:** Right.

**SEC. NAPOLITANO:** And as I said in my statement, I think that the people who are most disappointed are the other men and women of the Secret Service.

**SEN. GRAHAM:** I couldn't agree more, but, you know, human beings being human beings, we all make mistakes. And sometimes, organizations can get loose.

Being a military lawyer for 30 years, one of the first things that we would advise new commanders, a new squadron commander, is you've got a bunch of the young people in the military for the first time away from home. Go to the barracks when they least expect you to go. Show up at 3:00 in the morning with the first sergeant, and word will get out pretty quick you've got to watch what you do in the barracks because you never know when the commander is going to show up.

Is there any similar program where supervisors from the home duty station would go out and visit people in the field on a random basis?

CAR 0023

**SEC. NAPOLITANO:** You know, I'm not aware of that, which is not to say there isn't one. I just -- I don't know the answer. But that's one of the reasons that we're continuing our work and want to continue to brief the committee.

**SEN. GRAHAM:** Could I suggest -- could i suggest that you may looking at a program very similar to what the military does for people from the command, the central body, would show up on an unannounced basis throughout the world and just to let people know that somebody back home is watching -- might do some good in the future.

Is there any exit interviews done for people who are leaving the organization when you ask them does anything bother you, have you seen anything during your time to bothers you? Because we do that in the military, trying to find out how the unit actually works with people that are leaving.

**SEC. NAPOLITANO:** Right, under a civilian agency. Senator, I know there are exit interviews done. Whether that specific question is asked or something like it -- again, I'm not -- I don't know the answer, but I can find the answer out for you.

**SEN. GRAHAM:** I would just suggest that maybe we look at changing the system a bit so that people who are away from home never really believe they're away from home; that somebody is always watching.

**SEC. NAPOLITANO:** Senator, we are looking at this from the aspect of, as I said earlier: one, was the president's security impinged; two, discipline for the agents involved; and, three, what do we need to do to tighten any standards that need to be tightened

And so I take your suggestions very seriously.

**SEN. GRAHAM:** Right. And I think this is a bipartisan -- nobody -- you know, Mr. Sullivan, I've never met the man, but everybody who knows him seems to have nothing but good things to say about him. And we want to get this behind us and not have the problem emerge again.

Homegrown terrorism, you mentioned that in your opening statement. Would you agree that probably the idea of homegrown terrorism -- an attack from within -- is greater today than it was, say, maybe five years ago? The radicalization?

**SEC. NAPOLITANO:** I think that's right. I think we have seen -- it's one of the -- when I say terrorism continues to evolve, that's one of the evolutions that we're seeing; radicalization, radicalization to the point of terrorist violence. And we've seen several episodes across the United States in the past several years.

**SEN. GRAHAM:** Well, let's go to the recent tragedy in France where you had a young French citizen, Muslim, who went to, I think, Pakistan to study at a madrassa a there, came back to France and engaged in horrific acts of terrorism.

Do you worry about that happening here in the United States?

**SEC. NAPOLITANO:** One of the things we did in the wake of the Merah incident in Toulouse was to analyze what happened in that case and where there any early signs, indicators -- anything that would give us an early tripwire that somebody in the United States was getting ready to do the same thing.

**SEN. GRAHAM:** Well, I think some of these terrorist organizations are actually trying to come to our country and recruit within our own. Is that a fair statement?

**SEC. NAPOLITANO:** I think there is recruitments. It doesn't really require visit. You can do it online.

**SEN. GRAHAM:** That's exactly right. You don't have to come here, but you can talk to our people through the Internet and through the cyber world to try to recruit them to their cause. And, unfortunately, there's some takers, and we need to be vigilant about that.

CAR 0024

Now, immigration has got a case before the Supreme Court today. Each person can make their own mind up about, you know, South Carolina, Arizona and the laws and what we need to be doing.

But President Obama, in his campaign in 2008, promised comprehensive immigration reform in his first year. Do you believe there was a real, genuine effort to make that happen?

**SEC. NAPOLITANO:** As someone who's spent a lot of hours visiting members of Congress on the Hill to see if there was any room for negotiation of a comprehensive bill, I would say, yeah, there was a serious effort.

**SEN. GRAHAM:** So it's Congress's fault?

**SEC. NAPOLITANO:** Senator, I think all of us have a responsibility to deal in a bipartisan way with a national problem.

**SEN. GRAHAM:** Well, we didn't deal in a bipartisan way with health care. Not one Republican in the Senate voted for the health care bill. You had 60 U.S. senators on the Democratic side. You had a huge majority in the House.

So I guess my point is that I don't believe there was much of an effort to deliver comprehensive immigration reform in the first year. And I don't think it's Congress' fault. I think the president failed the country by not making this a priority. He had a large majority he could have worked with, and he chose health care over immigration. And here we are.

So not to say that my party is blameless. We're not. But I'm just -- want to understand that, when people talk about this issue, that we remember exactly what happened. Sixty Democratic senators -- large majority in the House -- do you remember any bills coming out of the House of Representatives dealing with immigration reform?

**SEC. NAPOLITANO:** You know, Senator, I'm not familiar with any. And I obviously disagree with kind of how you are putting the issue, but I think we can both agree that, at some point, we are going to have to deal with comprehensive immigration reform.

**SEN. GRAHAM:** Thank you very much for your service.

**SEN. LEAHY:** Thank you.

Well, I would just note parenthetically I sat in on the meetings with former President Bush on immigration reform. I strongly supported his efforts. I sat in the bipartisan meetings that President Obama had with some of the same people who were at the President Bush ones and the follow-up, and I recall them being told, don't bring it up because it's not going to go anywhere.

But I hoped -- and I still hope -- at least while I'm still in the Senate that we will have comprehensive immigration policy. We need it.

Senator Feinstein and then -- Senator Feinstein?

**SENATOR DIANNE FEINSTEIN (D-CA):** Thank you very much.

Madam Secretary, I'm one that thinks you're doing a very good job --

**SEC. NAPOLITANO:** Thank you.

**SEN. FEINSTEIN:** -- in an agency that's perhaps too large. I think it's 22 departments and over a couple hundred thousand people. It's a very big job.

CAR 0025

I wanted to concentrate my questioning on three areas. The first is student visa and fraud. And earlier last year, I joined in a letter with Senator Schumer on this program. And I am concerned that ICE is not adequately certifying each educational institution. In May of '11, we have a case of Tri Valley University in Pleasanton -- a sham school -- certified for 30 students, bringing 1,555 students, making $4 million. The head is now being prosecuted.

To make a long story short, the United States Immigration and Customs Enforcement -- known around here as ICE -- wrote an interesting letter of May 3rd, 2011 saying this: The student -- SEVP does not have the statutory authority to close noncompliance schools immediately, nor does it have the authority to restrict DSO access to SEVIS.

And it goes on to say they've done a risk analysis of the 6,487 SEVP-certified schools with active records, and they had schools fitting into low, medium or high-risk categories.

Here's the breakdown: low risk, 4,794 -- 74 percent; medium risk, 1,276 schools -- 20 percent; and then there's high risk, 417 schools or 6 percent of all the schools examined.

Now here's what they say: Many of the noncompliant schools are already the subject of criminal investigations, forestalling any administrative action to limit access to SEVIS to issue the form I-20. Please know that SEVP can begin immediately such assessments and site reviews, once cleared to do so.

Can't they be cleared to do this early on?

**SEC. NAPOLITANO:** I think --

**SEN. FEINSTEIN:** I think we have -- let me just -- I think we have to remember, the 9/11 hijackers came in on student visas, went to schools that taught them how to fly but not to land, and nobody thought it was unusual. So I'm really concerned about sham schools, and that we have a good sense of who's coming in on a foreign student visa -- whether they're attending the school at all.

I've been at this, Madam Secretary, for about 12 years. And you know, initially everybody objected to it, then they began to do it. Now I see it easing up. So I wanted to bring it to your attention.

**SEC. NAPOLITANO:** I share that concern. These sham schools shouldn't be allowed to operate. We have increased our efforts against them. I haven't -- that particular letter, I suspect, is that we are coordinating with U.S. attorney offices in the relevant districts, and they've asked us to postpone administrative action till their criminal case was ready to go. But I will follow up on that.

**SEN. FEINSTEIN:** Will you take a look at it --

**SEC. NAPOLITANO:** Absolutely.

**SEN. FEINSTEIN:** -- and let me know?

**SEC. NAPOLITANO:** Yep.

**SEN. FEINSTEIN:** OK. The second thing is agriculture enforcement audits. Obviously, I have a bias. We have 81,000 farms in California. Virtually all of the labor is undocumented. What happens is in harvest season, canning season, ICE swoops in. We've got a problem. I've tried for 10 years to get an Ag jobs bill through and I can't get it through. The fact of the matter is, that if we want American produce, the labor is generally undocumented. And we have to find a solution to this.

So I am hopeful -- and I know that you're doing aggressive I9 audits of Ag employers. I'm very concerned that these are going to decimate on-farm and farm-dependent jobs.

**SEC. NAPOLITANO:** I think --

**SEN. FEINSTEIN:** Your thoughts?

**SEC. NAPOLITANO:** Yeah. I think the base of the problem is that there is no provision under the current immigration law that enables more agricultural workers to be documented. And so we have some employers -- and we try to pick those who are really knowingly and intentionally violating the law when they have other options -- trying to focus on them through the audit process. But the underlying issue goes back to the immigration law itself.

**SEN. FEINSTEIN:** Senator Schumer just murmured to me: most don't have any other options. California is a state that can't use the H-2A program -- the visitor program. So it depends on a large, skilled, rotating, generally-undocumented coterie of about 600,000 workers for 81,000 farms. If ICE swoops in, farmers can't plant; they can't harvest; they can't can. And this has been happening. I want to bring it to your attention. And you know, it's a hard problem, but if this body won't take action, you're going to put Ag -- we're going to put Ag out of business. And I'm really concerned about it. So if there is any thoughts you might have, I would very much appreciate them.

And the last point I wanted to raise with you is another longstanding issue of mine and it's the Visa Waiver Program and biometric exit. For many years, I've been trying to get data on visa overstays for each country, to no avail thus far. Last month, DHS assistant secretary, David Heyman, informed me that by June of this year DHS will have a fully operational biographic exit system in place that's going to provide real-time information on those who exit United States' airports. This new exit system is expected to allow you to calculate overstays per country by May of this year.

Here's the question. I think this is very important, because we've got 15 million people that come in every year. We don't know whether they leave or not, on a visa waiver.

Is DHS on track to have a fully operational biographic exit system by June of 2012?

**SEC. NAPOLITANO:** Senator, I believe we are. The final plan is in the clearance process with OMB. But that is our intent.

**SEN. FEINSTEIN:** Good.

**SEN. LEAHY:** Thank you.

**SEN. FEINSTEIN:** Will DHS be able to provide overstay rates per country by May of 2012?

**SEC. NAPOLITANO:** We should be able to provide some of that information if not all.

**SEN. FEINSTEIN:** Good.

Thank you.

**SEN. LEAHY:** Thank you. And we will -- now we will go to Senator Grassley. Senator Kyl would have been next, but Senator -- no. We'll go to Senator Kyl next. Senator Grassley would have been next, but he's yielding to Senator Kyl. And then we'll go to Senator Schumer.

**SEN. KYL:** Thank you, Mr. Chairman; thank you, Senator Grassley.

This isn't the first time that Senator Feinstein and I seem to have been thinking about exactly the same thing. So let me just quickly touch on the three things that she mentioned, which were also of concern to me.

On student visas, I think it's not just a matter of the sham schools, but also the failure of ICE to follow up with students who have overstayed their visas, and the very poor record of schools providing information to ICE.

Second, on the Ag workers. The H-2A regs could be reformed. It's not just a matter of our failure to pass legislation here. H-2A regulations were reformed at the -- toward the end of the Bush administration. They were more workable, I'm told. That was then changed with the Obama administration. If we could work more toward the kind of regs that existed toward the end of the Bush administration, I think that might be at least a help for some.

And on the visa overstays and the exit system, I was going to ask about that. I think your budget, actually, was denied $30 million by the Appropriations Committee, because of its frustration with the lack of a plan. We need to get that plan implemented, as well as up here.

Let me go onto something --

**SEC. NAPOLITANO:** If I might, Senator?

**SEN. KYL:** Yeah, sure.

**SEC. NAPOLITANO:** Can I talk about the visa overstay issue with you a bit?

**SEN. KYL:** Sure.

**SEC. NAPOLITANO:** One of the things that we have done over the last few years is that we have added databases and been able to link them, so that before visas are issued there's a check against our data, NCTC's data and certain NSA data.

We have done now the same thing. We've gone backwards to find visa overstays. And we have looked at and prioritized those that provide any kind of public safety or security risk. And so -- and we have now looked at the entire backlog. And I will give you the inventory of what we have found. And we are prioritizing those visa overstays --

**SEN. KYL:** I understand. What is your estimate now, just approximately, of the number of the visa overstayers as a percentage of the total of illegal immigrants in the country today, as opposed to those who have crossed the border illegally?

**SEC. NAPOLITANO:** Well --

**SEN. KYL:** The number you usually hear is around 40 percent. Is that --

**SEC. NAPOLITANO:** That may be a high number, because what we have found is a lot of people who were marked as visa overstays had, in fact, left.

**SEN. KYL:** So 40 percent might be too high an estimate. That's the number that is usually given when we complain about the lack of security at the border. They say, well, remember, 40 percent of the people here illegally actually overstay visas.

**SEC. NAPOLITANO:** Yeah.

**SEN. KYL:** You think that number is a little high?

**SEC. NAPOLITANO:** It may be a little high.

**SEN. KYL:** All right. In either event, it's a big problem. And it's fine to prioritize for criminals, but that's a very small percentage of people who overstay visas.

**SEC. NAPOLITANO:** Senator, what we have done is say, look, we have to make the best use of those ICE resources we have --

CAR 0028

**SEN. KYL:** Well, that's fine. And Madam Secretary, excuse me for interrupting, but every year I say if you need more resources, ask for them. No, we've got everything we need. And then the excuse of not moving forward on something is we don't have enough resources. You can't have it both ways. If you need more resources, ask for them.

**SEC. NAPOLITANO:** Senator, thank you. As you know, we're all working under the constraints of the Budget Control Act. That's the deal that was struck. But to your point, yes, and to Senator Feinstein's point, yes. We believe visa overstays are a keen interest.

**SEN. KYL:** So do we. And we appreciate that.

Another very parochial but very important point -- and I know you appreciate this -- every time I go to the border, the first thing people talk about is not illegal immigration; it's the incredible delays at the ports of entry. We need a lot of things, including more officials at the border on the American side.

That's not the total solution to the problem. A lot has to do with the inadequate linkup on the Mexican side of the border. But at the Mariposa point of entry and San Luis, both of which I know you're intimately familiar with, we need more agents. That's what they tell us down there. And yet that was not in the budget request.

I would just ask you to please either ask for the agents that we need there -- and this is just to facilitate commerce between the two countries --

**SEC. NAPOLITANO:** Yes.

**SEN. KYL:** -- and to make life a little bit easier for people that have to cross every day. Either ask for it in the budget or find some other place where we can get it, or make a recommendation to us as to how we can move money around to provide for those additional agents. The estimate at Mariposa, for example, is about 250. It doesn't seem like that many. We ought to be able to find the money for that. Would you agree to help try to work with us on that?

**SEC. NAPOLITANO:** We will definitely work with you on that, Senator.

**SEN. KYL:** I appreciate it, because I know you know the problem.

**SEC. NAPOLITANO:** Very well.

**SEN. KYL:** And it's not a partisan problem. We all agree we need to resolve it.

**SEC. NAPOLITANO:** Well, we want to -- and we want to facilitate that trade and commerce.

**SEN. KYL:** Absolutely.

**SEC. NAPOLITANO:** There are a lot of jobs dependent on it.

**SEN. KYL:** Absolutely.

Now, last point that I want to make. Six months ago you were written a letter, and then another three months ago, about the lack of enforcement of federal detainers, specifically, for example, in Cook County.

Last night at 6:30 we finally received a response to our letter. And it certainly is a good response in terms of pointing out the problem. Where I fail to see the response is in what you're doing about it other than writing letters.

This letter, dated April 24th, from Nelson Peacock -- I'll ask unanimous consent to put it in the record, because, as I said, I think it lays out the problem from ICE's perspective and your perspective very well.

Cook County is simply not abiding by federal law in detaining officials who have criminal records that you've asked them to detain.

For example, since the ordinance was enacted, ICE has -- according to this letter, lodged detainers against more than 432 removable aliens in Cook County's custodies have been charged or convicted of a crime, including serious and violent offenses. Cook County has not honored any of these 432 detainers. And they point out a case of particular gravity recently reported in the Chicago Tribune. And Mr. Peacock notes that this probably violates federal law.

The only action that I can see taken here is that two letters have been written and that Cook County has been encouraged to change its policy and has been advised that if it continues this policy, it may result in denial of reimbursement to the state of costs under the SCAP program.

You know, the federal government has been very aggressive in filing lawsuits against states that are trying to actually do something about illegal immigration, but it doesn't look to me like the government is doing that much to enforce the law that currently exists with respect to detainers.

What more do you plan to do with entities like Cook County who are obviously flouting federal law and jeopardizing American security in the process?

**SEC. NAPOLITANO:** Yeah, I agree. I think Cook County's ordinance is terribly misguided and is a public safety issue. We're evaluating a lot of options right now. We are -- you know, we always start off trying to work with the local authorities and work things out. We to date have had no success there, so we are evaluating all options.

**SEN. KYL:** And I hope, more than evaluating, you'll take some action pretty soon. Will you report to us as soon as you've decided what kind of action to take, just kind of keep us advised rather than waiting for correspondence from us?

**SEC. NAPOLITANO:** We will keep the committee staff -- I think that's probably the best way to do it --

**SEN. KYL:** That's fine.

**SEC. NAPOLITANO:** -- advised of how we're proceeding there.

**SEN. KYL:** Appreciate that very much.

Thank you, Mr. Chairman.

**SEN. LEAHY:** Thank you, Senator Kyl.

I also note today is Senator Kyl's birthday.

**SEN. :** Happy birthday.

**SEC. NAPOLITANO:** (Laughs.)

**SEN. LEAHY:** Happy birthday to you. Please don't sing.

**SEN. SCHUMER:** Last birthday as a senator.

**SEN. KYL:** Something you and I can agree on.

**SEN. LEAHY:** It is his birthday, and I appreciate him being here.

CAR 0030

Senator Schumer.

**SEN. SCHUMER:** Thank you, Mr. Chairman.

I wish Senator Kyl a happy birthday. I guess it'll be the last one as senator, so your next birthday may be much -- even happier than this one. (Laughter.)

**SEN. KYL:** (Off mic.)

**SEN. SCHUMER:** Thank you. Mutually, seriously. Senator Feinstein and I were just mentioning that a second ago.

First, two points of housekeeping. I am not going to -- good news for you. I'm not going to ask you any questions on the Secret Service. I have a lot of faith in your ability to get to the bottom of this. All of us are shocked and terribly troubled by it. But I think the kind of investigation you and your department will do, I have a lot of faith in.

**SEC. NAPOLITANO:** Thank you.

**SEN. SCHUMER:** Second, Senator Feinstein mentioned the student visa issue. And I believe she mentioned -- I came in in the middle of her testimony, unfortunately. She and I have asked for a GAO report, which is coming out in about a month. And our Subcommittee on Immigration, with the chairman's permission, will have hearings on that GAO report when it comes out.

**SEC. NAPOLITANO:** Very good.

**SEN. SCHUMER:** So let you know about that.

OK, I have two questions here on other issues in your vast jurisdiction. The first relates to passenger advocates. Over the past several months, there have been increasing number of news stories about passenger complaints over TSA screening procedures.

And these complaints include, for instance, a female passenger being told she could not carry her breast pump on board the plane while milk bottles -- while the milk bottles were empty -- imagine how her child is that way; asking female passengers to submit to repeated inspections through body scanner machines for non-security reasons; asking elderly and disabled passengers to remove critical medical equipment and undergo strip searches prior to security -- clearing security.

I like the TSA and I think they do a good job. And I was involved in setting them up. It's a hard job to balance security and commerce, but you can always make it better without impeding -- without one impeding the other.

TSA's original response at the lower levels here was to first deny wrongdoing and then issue apologies. So in light of these incidences, Senator Collins and I decided to introduce legislation called the RIGHTS Act. And the RIGHTS Act will help curb abuses in TSA screening simply by requiring the TSA ombudsman's office to establish a passenger advocate program to resolve public complaints and conduct training of TSA officers to resolve frequently occurring passenger complaints; would also require that every category X airport -- is that category X or 10? Big airport. Let's strike -- category X? X. It's a funny category. What are A through V? (Laughs.) We don't know. Anyway, every category X airport to at least have one TSA passenger advocate on duty at all times.

So somebody's faced with the choice. They're lined up. They're asked for an intrusive exam. They think that's uncalled for. I don't expect every TSA agent to be schooled in each thing. But if -- you know, at Kennedy Airport, a large airport that handles tens of thousands a week, there's someone who's trained, who can just come over within 10 minutes -- just one -- no new people, no new cost -- one of the existing employees who knows about how to do this and can resolve a sticky situation.

CAR 0031

It avoids the passenger the choice of undergoing an examination that they think is intrusive or humiliating or not going on the flight.

So do you support the creation of passenger advocates at airports and will you work to roll those out at airports without the need for an act of Congress?

**SEC. NAPOLITANO:** Absolutely, and if I -- if I might, just to go through, first, as you know, TSA, I think, does a very good job and it's a very difficult job. You know, every morning I start my morning with a threat brief of what's facing us in the evolving world of terrorism, and aviation security still remains the number-one threat. But we've taken steps to try to make it less onerous.

We've taken those over 75, children under 12, out of the routine lines. The breast pump incident you mentioned was not in accord with how we do that and the employee received appropriate retraining. So we keep trying to do that. But the idea of having cross-trained advocates among our TSA personnel in the Category X airports is something we support and TSA is already moving toward that goal.

**SEN. SCHUMER:** That's great news. Thank you. And it'll avoid Senator Collins and I having to pass legislation, which is good.

**SEC. NAPOLITANO:** Well, we'll -- happy to keep you informed on the process.

**SEN. SCHUMER:** Since legislation moves so quickly these days through the Senate. OK. Second is a parochial issue but of great importance to western New York. It's the Niagara Air Force Base -- Air Base. I want to ask you about the possibility of constructing a new Border Patrol station at Niagara Air Base to replace the existing Niagara Falls Border Patrol station. As you know, the existing station is insufficient for your current needs -- we all agree to that, given all the new security.

We have had terrorists cross over the Buffalo border. It lacks the capacity needed to accommodate the number of agents now housed at the station. Doesn't have the space and resources your agents need to do the job. A new station at Niagara Air Base can comfortably accommodate 50 agents, could be modified to accommodate even 75. It'll also include critical items that the Border Patrol needs, such as the main administration building will be suited for mustering and training, will include an armory and necessary storage space, ancillary buildings that will house vehicle maintenance and closed parking and kennels. Obviously, we have the dogs at the border too.

This new station would be a win for the Border Patrol and the Niagara Air Force Base, which -- his mission is being curtailed because of the cutbacks in the military. Would you support the creation of a new Border Patrol station at the Niagara Air Base?

**SEC. NAPOLITANO:** Yeah. Niagara is very much under consideration, Senator. The issue is money for construction of a new facility but, certainly, Niagara is under consideration.

**SEN. SCHUMER:** OK. So in other words, you think it's a good idea to have it there and we have to find the funds for it?

**SEC. NAPOLITANO:** That's one way to put it. Yes, sir.

**SEN. SCHUMER:** Yes. I like the yes part of that answer. Thank you. Mr. Chairman, I am finished with my -- I would yield back my remaining time.

**SEN. LEAHY:** (Off mic.)

**SEN. GRASSLEY:** Thank you, Mr. Chairman. First, just a statement -- I want to give you an update on some of the -- well, first of all, I want to put a statement in the record. I was going to have a long thing --

**SEN. LEAHY:** Without objection, so ordered.

**SEN. GRASSLEY:** Yeah.

**SEC. NAPOLITANO:** Senator, I don't know that your microphone is on.

**SEN. GRASSLEY:** I'm not talking into it. That's the problem.

**SEC. NAPOLITANO:** Thank you.

**SEN. GRASSLEY:** I'm surprised you want to hear me but thank you. (Laughter.) First, an update -- about 99 percent of the time when I write you I don't get a response directly from you. The response comes from leg affairs. Second, and more frustrating, many times my questions are rarely if ever answered. Third, the delays are unacceptable, and just last night I received a response from the department about Cook (sp) County six months after my initial letter of inquiry, and also you just responded to questions we posed at last Judiciary Committee Oversight hearing, which took place last October.

That's just to bring you up to date. That's not a question or I don't want a response to that. Both the chairman and I want to get to the bottom of this Secret Service matter and I know the chairman has covered a lot of the issues I wanted to cover so I'm not going to go back over that. And I thank the chairman for asking those questions.

I was briefed by the Secret Service director and he responded about the inspector general being involved, and I've asked for that involvement but he said he was already involved before I asked for it so I compliment Director Sullivan on that. Director Sullivan has included the inspector general in the investigation up to this point but I want to know if the inspector general is truly conducting an independent and impartial investigation.

I think the same independent investigation is necessary from the inspector general in Defense and from the White House to get to the bottom of the story for all the advanced team staff that was in Colombia. You mentioned -- in previous answer to questions you mentioned that the IG is supervising the investigation. Do you agree that the inspector general should conduct a full-scope investigation to determine if this is a cultural problem routinely occurring in additional cities instead of just reviewing what occurred in Colombia -- question number one.

Question number two -- do you have any reason to believe that the inspector general isn't receiving full and complete access to the Secret Service investigation; and three, you referred to previous answers that as far as you know in the last two and a half years this has not been a cultural issue. Why do you keep -- stay in just two and a half years and don't you think we ought to make sure before two and a half years that it wasn't a problem as much as not being in the last two and a half years?

**SEC. NAPOLITANO:** Yeah, Senator. Let me address that. I used that time frame because, you know, we're going back now through all of the records and we've gone back that far, probably even further at this point.

**SEN. GRASSLEY:** OK.

**SEC. NAPOLITANO:** In terms of the IG's involvement and supervision of the investigation, I'm sure the IG would be willing to answer those questions. But we have an MOA, memorandum of agreement, with the IG and the Secret Service that they are, in these kinds of cases where there's alleged misconduct, they actually -- they, meaning the IG -- supervise the investigation but they use the investigatory resources of the Secret Service. That's how we're managing this one and I believe the IG has been with the director during the congressional briefings to confirm that point. So we expect the IG to be conducting a full investigation.

**SEN. GRASSLEY:** OK. On another matter, dealing with cybersecurity, specifically, one cybersecurity proposal would place at your department the lead agency in overseeing regulations for covered critical infrastructure. I have concerns that this proposal -- because it creates a new regulatory bureaucracy. I'm also concerned that this new regulatory power, given DHS background on overseeing the chemical facilities' security, CFATS program. Congress gave your department regulatory power over chemical facilities.

Regulations were issued 2007. Five years later, nearly 4,200 chemical facilities have complied with the regulations but your department has yet to approve a single security plan, so far spending a half a billion dollars and not getting anything approved. I've obtained a copy of an internal review by Under Secretary Rand Beers by two subordinates that details the problems DHS faces in implementing CFATS. This memorandum is the most candid review of a failed federal government program I've seen.

This memorandum details failures at an unprecedented level -- poor hiring, hiring people not skilled, poor staff morale, management leadership failures, lack of subject matter expertise, union problems and, quote, "catastrophic failure to ensure personal and professional accountability." The memorandum also states that inspectors lack expertise to effectively evaluate site compliance with cybersecurity requirements. On top of this memorandum the department has failed to implement ten outstanding GAO recommendations.

So taken together, these reports paint an agency that cannot control costs, manage employees and effectively implement mission. If it costs DHS 480 million (dollars) to effectively regulate zero chemical facilities, how much can we expect it to cost the taxpayers to -- for the department to regulate cybersecurity among thousands of private businesses?

**SEC. NAPOLITANO:** Senator, let me take those issues, both of them -- first, the CFATS, or chemical facilities.

First, the CFATS, or chemical facilities. Yes, we did a candid internal review because we were not satisfied that we were achieving the results that we need to achieve which is the safety and security of our chemical facilities and their possible security issues with them.

We now have a very aggressive corrective plan in place. I'd be happy to brief you or your staff on that. We have been approving site-specific plans. They're not at final approval; they just about are. But that process is really moving forward with great alacrity.

So we've learned a lot from CFATS, and we are fixing those problems. We've put new people in charge, done all the things one needs to do to make sure that a program moves forward effectively.

With respect to cyber, this is an area where our deep concern is that the nation's core critical infrastructure on which farmers depend and small business depend and everyone depends on is very susceptible to attack. And the attacks can occur in a variety of ways.

And we are seeking some means to, A, have basic performance standards by that core critical infrastructure; have real-time information sharing so that we can swiftly move in to help mitigate and share information if need be. And we're actually asking the Congress to give us some hiring authority so it's easier for us to hire people who are experts in the cyber field.

So as the Congress begins to consider and -- the Senate begins to consider this legislation, we hope they do it in the sense of what the risk posed is, really, to the country right now.

**SEN. LEAHY:** Next, Senator Klobuchar.

**SENATOR AMY KLOBUCHAR (D-MN):** Well, thank you very much, Mr. Chairman.

And thank you, Secretary Napolitano, for being here and the good work that you've done. I share in Senator Feinstein's views that you have done a good job with very difficult challenges.

And I also wanted to thank you for being here to answer questions about what happened in Colombia. In my old job as a prosecutor, I had very positive interactions with the Secret Service, and I am hopeful that the actions of a few won't overshadow all the good work that they do every single day.

**SEC. NAPOLITANO:** Indeed.

CAR 0034

**SEN. KLOBUCHAR:** But I do want to ask some questions about that, because I think it really shook the trust of a lot of people. And I think the way you make sure that the actions of a few don't overshadow the actions of many -- the good actions, and how they sacrifice their lives every day and put them on the line -- is by making sure that we clear up what happened but also make sure that it doesn't happen again --

**SEC. NAPOLITANO:** That's right.

**SEN. KLOBUCHAR:** -- and that we have a clear understanding of what's going on. And I know one of the senators asked about this, but there was a Washington Post report recently that talked about the fact that this may have been going on before. In fact, one of the -- this is not -- person isn't identified, but one agent that was not implicated in the matter remarked that, of course, it has happened before; this is not the first time. It really only blew up in this case because the U.S. Embassy was alerted.

And I just wondered if you could comment on that how you think we need to move forward and how -- you know, to me, this does seem to create a risk when you're in a country like Colombia and you have people doing things where they could potentially be bribed.

And, if you, could just generally comment about that?

**SEC. NAPOLITANO:** Right. Well, again, the actions were unacceptable, and they were unacceptable taken by themselves. I think every mother of a teenager knows that a common defense is, well, everybody else was doing it, you know, so I get to do it. First, not everybody else was doing it. And, second, this behavior is not part of the Secret Service way of doing business. They're very professional.

But we are going to get to the bottom of this. We are going to make sure that standards and training, if they need to be tightened up, are tightened. And we have moved with great speed to deal in a disciplinary fashion with the 12 agents involved.

**SEN. KLOBUCHAR:** And I don't expect you to reveal things that aren't public, but have there been other incidents where people have tried to bribe or blackmail agents because they believed or they had some kind of interaction with prostitutes or someone with some kind of illegal activity?

**SEC. NAPOLITANO:** Senator, I'm not aware of any. As I said before, the Office of Professional Responsibility in the Secret Service went back two and a half years -- that covers 900 foreign trips and 13,000 domestic trips -- and did not have in that period any kind of a complaint. That doesn't, obviously, include the IG. That's an independent entity.

But we are looking to see and make sure this was not some kind of systemic problem. And, most importantly, to fix it.

**SEN. KLOBUCHAR:** And there was one agent that was in the president's hotel. Is that correct? That was also -- that was just identified?

**SEC. NAPOLITANO:** I believe that's correct.

**SEN. KLOBUCHAR:** OK. Another question. It was a completely different incident. And I think every employer has had incidents of people posting things on the Internet and pictures of themselves, like maybe in their boss's chair drinking a beer. That happened to me five years ago with an intern. It was innocent -- but I never think he thought we would see it.

But these are things that happen. And so but when they happen with law enforcement, it seems a step above and I think much more of a security risk. And I know that recently one of the Secret Service agents reportedly posted photos on Facebook depicting himself on duty protecting, I think it was then vice presidential candidate, Sarah Palin.

And could you talk about the Secret Service rules regarding agents sharing details of their assignments online or otherwise? And does the Secret Service have policies regarding agents' use of Facebook and other social media websites?

**SEC. NAPOLITANO:** Yes, we do have a social media policy. And we'd be happy to provide you with a copy of that.

And, yes, to the extent there was such a posting -- unprofessional and unacceptable.

**SEN. KLOBUCHAR:** OK. Very good.

I wanted to ask you a little bit about, you know, we're working very hard on cybersecurity initiatives here going forward. And can you talk about how Homeland Security is currently working with state and local law enforcement to prevent and mitigate cyberthreats and discuss the Stop. Think. Connect. Campaign and your efforts to educate the public on the role that they have to play in this important fight?

**SEC. NAPOLITANO:** Right. We are trying -- just as we had the "See Something, Say Something Campaign," Stop. Think. Connect. is one of our efforts to educate the public about everyone's shared responsibility who's on the Internet. Everyone has a responsibility to have good cyber habits just like when you get into a car, you should buckle your seatbelt. It should be reflexive of something else.

So we'll continue to push on that.

With respect to our coordination with state and local governments, we do that quite a bit, Senator. We have the NCCIC out in northern Virginia. We actually have state and local representatives on the floor. That's our 24/7 watch center, where cyber is concerned.

So we're working with them very extensively on that.

**SEN. KLOBUCHAR:** Very good. And now, turning to our borders. I'm chair, as you know, of the U.S.-Canadian Inter-Parliamentarian Group. They're actually coming to Washington next month, and we've been looking at -- I know you've been working on some cross-border crime issues.

But I did want to thank you for an issue that I've been raising for a few years, and that is the issue of the Canadian baggage screening which has finally been resolved as part of the Beyond the Border Action Plan. So thank you for working on that.

And then I wanted to ask -- I know Senator Schumer asked some things about the TSA. Again, I understand that there's always incidents that need to be resolved, and new things come up. But overall, I think they also, like yourself, have a very challenging job, and I've been proud of the work that they do at least in the Minneapolis Airport where I work with them.

You just brought in the pre-check pilot program in our state. Do you know how that's been going?

**SEC. NAPOLITANO:** The pre-check pilot programs are very popular. This is the domestic branch of the kind of trusted traveler programs that we began with the Global Entry program internationally.

So we are expanding that pre-check program as rapidly as we can.

**SEN. KLOBUCHAR:** Very good. And then, last, the JOLT Act -- just to call your attention to that. This is bipartisan legislation that we've introduced with Senator Schumer and Rubio, Blunt, Mikulski, Kirk and Lee.

And I think it's very important to move ahead with that. We've appreciated some of the work you've done on tourism. And as you know, we're working with the State Department to improve the visa wait times. But there's also other things that we can do that are contained in this act.

CAR 0036

So we would love to have your help and support with that bill.

**SEC. NAPOLITANO:** I'm happy to take a look at it.

**SEN. KLOBUCHAR:** Thank you.

**SEN. LEAHY:** Senator Cornyn?

**SENATOR JOHN CORNYN (R-TX):** Thank you.

Madam Secretary, good morning.

**SEC. NAPOLITANO:** Good morning.

**SEN. CORNYN:** Good to see you.

We can all stipulate you have an extraordinarily challenging job. I want to ask you a question about the DNA testing of detainees. And I know you're a former federal prosecutor and attorney general, so you know how powerful a tool DNA can be in a law enforcement investigation.

As a matter of fact, to digress a moment, we have an important Violence Against Women reauthorization on the bill, probably this afternoon or tomorrow, and I'm offering a bipartisan amendment that will address the 400,000 estimated untested rape kits that currently are sitting in police lockers and elsewhere which, as we all know, is a powerful tool to help identify what in many instances are serial perpetrators of sexual assault.

But let me bring you back to 2005. Senator Kyl and I sponsored the DNA Fingerprint Act during the last reauthorization of the Violence Against Women Act. This legislation gave federal law enforcement authority to collect small DNA samples from all federal arrestees and detainees, just like we take fingerprints but, as you know, more accurate.

These DNA samples, again as you know, can be checked against the FBI's nationwide DNA database, CODIS, to determine whether the arrestee or detainee has committed other crimes, perhaps in other jurisdictions. So far, CODIS, we're told, has assisted law enforcement officials with more than 169,000 investigations, including 10,000 in my state, in Texas. So we've seen it to be a powerful tool.

At your 2009 confirmation hearing, I asked if you would see to it that the alien deportee DNA testing regulations are fully and promptly implemented by the department, and you replied, appropriately, that DHS will fully comply with the applicable statutory and regulatory framework. Nearly three years after the hearing, how do you feel like that's going?

**SEC. NAPOLITANO:** Well, I think, Senator, we have deported a record number of individuals, as you know. I will be happy to go back and look at all of the regulations governing that to make sure we're in compliance, but we have had a very aggressive plan to deport those who should be removed from the country.

**SEN. CORNYN:** And my question is a little more narrow, not -- because what we want to do is identify whether these detainees have perhaps committed other crimes and aid those law enforcement agencies in the course of those other investigations, not just enforce the immigration laws -- which is important, but is not the complete rationale.

Would you be willing to, on a voluntary basis, submit to the committee sort of the department's evaluation of how it has complied and handled this requirement of 2005 into the DNA Fingerprint Act?

**SEC. NAPOLITANO:** I'd be happy to supply that.

CAR 0037

**SEN. CORNYN:** That'd be -- that would be very helpful.

Let me tell you, the reason for my concern is of course the -- we know the FBI has used a great deal of taxpayer money and crime lab resources to prepare for hundreds of thousands of DNA samples as a result of the passage of this act in 2005. We're told that the FBI has prepared for and expected to receive between 120,000 and 240,000 samples from the Department of Homeland Security in the year 2012. To date, they report only having received 4,000 samples.

So I hope you'll help us --

**SEC. NAPOLITANO:** Yeah. Let's get to the bottom of that.

**SEN. CORNYN:** -- identify what the disparity is between the number of samples and the number anticipated by the FBI as a result of this.

Because while I'm aware that, for example, in Afghanistan and Iraq, when our military captures high-value detainees, they do get biometric identifiers from them that could be used, can be used by law enforcement agencies and the department in the United States, when identifying people coming across -- let's say the Southwestern border, without the appropriate visas, to make sure that they're not coming in for -- you know, to commit acts of terrorism and other violence.

**SEC. NAPOLITANO:** Senator, that's -- if I might, it's a somewhat --

(Cross talk.)

**SEN. CORNYN:** It strikes me -- it strikes me that this DNA evidence -- and I'll be glad to let you answer --

**SEC. NAPOLITANO:** Sure.

**SEN. CORNYN:** -- that this DNA information would be vitally important and enormously useful, not only in assisting your department in terms of border security and immigration enforcement, but also to help law enforcement writ large in terms of identifying people who've come into the country and commit crimes that currently are unsolved.

Please go ahead.

**SEC. NAPOLITANO:** Thank you, Senator, and I didn't mean to interrupt.

But we do run illegal immigrants against a variety of databases, and I think I should supply you with that information, and then I will look specifically into the issue of DNA with the FBI.

**SEN. CORNYN:** My -- to my knowledge, and I'll look forward to your report, that is more in the nature of fingerprint and other biometric identifiers and does not extend -- did not extend to DNA testing of detainees until Congress passed the DNA Fingerprint Law in 2005. So you understand, I know, the issue and I would very much welcome your response to me and the committee so we can help get to the bottom of that.

**SEC. NAPOLITANO:** Good.

**SEN. CORNYN:** Mr. Chairman, I'll yield back my remaining time. Thank you.

**SEN. LEAHY:** Thank you very much.

Senator Whitehouse.

CAR 0038

**SENATOR SHELDON WHITEHOUSE (D-RI) :** Thank you, Mr. Chairman. Welcome, Secretary Napolitano.

**SEC. NAPOLITANO:** Thank you.

**SEN. WHITEHOUSE:** Just one question on the Secret Service episode. What opportunities did this behavior create for compromise of the president's security, for instance, had the prostitutes had connections with Colombian criminal networks or foreign intelligence services? I'm not saying that it did, but it seems like it's the kind of behavior that would render an agent vulnerable to blackmail and influence if criminal networks and foreign intelligence services were aware of it, and that is a potential avenue for compromise of the president's security.

**SEC. NAPOLITANO:** Senator, we are still completing the entire investigation and there are still interviews to be conducted. But I think we have planned to keep the committee briefed on what we find and whether there could, on a future basis, be that kind of risk. But as I --

**SEN. WHITEHOUSE:** There's certainly a risk.

**SEC. NAPOLITANO:** -- as I testified earlier, the first question I posed to the director was, was there any breach to the president's security in this instance? And the answer was no.

**SEN. WHITEHOUSE:** But there was a risk of breach along those lines if those connections existed, correct?

**SEC. NAPOLITANO:** There may be a risk, and that's why this behavior cannot be tolerated.

**SEN. WHITEHOUSE:** Yeah. Let me switch to cyber, and let me thank you for your energetic work and persistence on this issue as we in Congress try to pass the legislation that we need. There are a variety of different approaches that are being looked at here. Let me ask you this.

If we were to pass a bill that failed to protect American critical infrastructure in private hands, like our electric grid, our financial processing systems, our communications networks and so forth, and indeed if that bill even failed to define critical infrastructure or provide a process for defining critical infrastructure so we actually knew what it was and what it wasn't, how well would that bill have met the threat that you see us facing in this realm?

**SEC. NAPOLITANO:** Well, it would leave a significant gap, given the kinds of attacks we already see. That's why we think the nation's core critical infrastructure should have some basic performance standards to meet. That's why we think a bill needs to have real-time information sharing in it, and incentivize that information sharing.

And so those are the kinds of things that really should go into a comprehensive cyber bill.

**SEN. WHITEHOUSE:** And would you be able to say that the national security needs of the United States had been met by a bill that did not include any protection for our critical infrastructure?

**SEC. NAPOLITANO:** Senator, I would say, based on what we know now and the risks that we already see now and the kinds of attacks that we already see now, the failure to address core critical infrastructure would be a significant gap in any legislation.

**SEN. WHITEHOUSE:** Thank you.

My last question, on the same subject but switching from the national security and public safety side of cyber-attack to the intellectual property and the economic competitiveness side of our cyber-vulnerability, I said about two years ago that I thought were on the losing end of the biggest transfer of wealth in the history of humankind through theft and piracy, because of the attacks on our industrial base and our technological base from overseas for the purpose of industrial espionage and stealing intellectual property.

CAR 0039

Since then, General Alexander has used virtually the same language. McAfee has issued a report that uses virtually the same language.

Mike McConnell has used virtually the same language.

This is a very big deal for us from a point of view of economic competitiveness, and you've been an attorney general. In fact, we were attorneys general together. You've been a U.S. attorney. In fact, we were U.S. attorneys together. You've had a lot of experience with law enforcement, also, as governor and in your role as secretary of Homeland Security.

I do not yet believe that we are resourced adequately in law enforcement to address that aspect of our cyber liability. And I hear from companies in all sorts of industries that, when they can get, for instance, the FBI's attention, they are very impressed with the capabilities that are involved. But it's very rare that you can turn over a case of intellectual property theft to the FBI and say go. They simply don't have the staff. They simply don't have the resources as much as this part of law enforcement has grown, both in U.S. attorneys' offices and at the FBI.

So I would like to ask that you participate in discussions that we're going to be having around cybersecurity legislation about how we should better organize our cyber resources. It's both criminal and civil because a lot of what gets done is done through civil law. The course-led botnet was taken down by a civil case. A lot of the cleanup on the Net of crooked websites can be done through civil proceedings, but it's a law enforcement function because you're getting rid of very bad actors on the Net who are attacking American businesses and the American economy.

So that was a little bit more of a speech than a question. But what I would like to do is to invite you to, based on your experience, participate in that discussion. I don't know if we need an equivalent of a cyber DEA or ATF, an entire organization, or if we need the equivalent of a cyber OCDETF, a different way organizing law enforcement activity or whether we immediate the cyber equivalent of an organized crime strike force. Those were set up many, many years ago and you -- there are a variety of different structures, but I don't think the private sector is getting the support it needs from law enforcement because of lack of resources. And there's an awful lot of money going out the door.

We are standing by one of the biggest robberies in history, and we'd love to have your support in pursuing that concern.

**SEC. NAPOLITANO:** Senator, first of all, I agree with your statement of the scope of the problem. It is -- it is severe. It is endemic. And it is a transfer of wealth, as you put it.

We work with the FBI. Secret Service and ICE all have cybersecurity and do criminal cases in that area as well as some others.

So I would be happy to participate as we -- I think in the context of comprehensively looking at the protection of the country in cyber, how we organize our law enforcement resources and make sure particularly the FBI has what it needs to handle some of this work is a good question, and I'd be happy to participate.

**SEN. WHITEHOUSE:** (Off mic.)

**SEN. LEAHY:** Thank you.

Madam Secretary, as you noticed, we've had senators from both sides of the aisle that have come in and have left during this hearing because most of us have about three different committee meetings going on. You don't get that luxury, and I do want to applaud you, one, for keeping your answers as brief and to the point and, I might say, as accurate as you have, which is typical of your appearance. And I appreciate that.

CAR 0040

I am going to have to leave. I'd just note that Senator Lee will go next. I'm going to turn the gavel over to Senator Coons. I'm doing this so that we're trying to keep similar hairlines -- (laughter) -- sorry about that.

But we're -- Senator Coons, who has worked very, very hard on this subject, I've asked him to take over the chair. And then we'll go -- and we'll go to Senator Lee next.

But I do appreciate what you said. I would add -- I think I can speak for Senator Grassley and others on here -- we will want to keep in touch with you and the director of the Secret Service as this whole matter goes on, not just on what's happened now but what's happening in the future, what will happen in the future.

We'll do it because of our obvious oversight and the need to do it, the protection of key people and, in this case, in a presidential election year, both the president and the Republican nominee but, also, because we have so many good men and women in the Secret Service that I hope will be able to demonstrate that there are a few bad apples that were weeded out so that the other who are extraordinarily dedicated, highly trained professionals can continue on the work they do.

**SEC. NAPOLITANO:** Absolutely.

**SEN. LEAHY:** Senator Lee, thank you for that. Please go ahead, sir.

**SENATOR MIKE LEE (R-UT):** Thank you, Mr. Chairman.

Thank you, Secretary Napolitano, for joining us.

In March of this year, John Cohen, who I believe is your principal deputy coordinator for counterterrorism, testified before a House subcommittee that the department should have a biometric exit system designed and ready to go or at least ready to roll out and announce and described something within the next few weeks, in the coming weeks.

In your written testimony today, I believe you said that a biometric exit system should be ready for deployment and use within four years. How confident are you about that time frame?

**SEC. NAPOLITANO:** We had. What we are planning -- and, Senator, the actual plan is in final clearance with OMB, so it should be out shortly.

But given our ability now to do enhanced biographic exit immediately moving and deploying that, and then we will move and use that as the platform for adding on the biometric. But the plan is done from our standpoint. We're just working through the final nuts and bolts with OMB.

**SEN. LEE:** And why does it take so long to get it deployed? Is it just the development of the technology? In other words, the fact that it takes four years to get it going, is that --

**SEC. NAPOLITANO:** Well, it's cost, it's the scope of the issue. We have so many ways that people can exit the United States. We're very different from other countries in that regard. And manpower, other resources, yes.

**SEN. LEE:** What kind of -- what kind of an impact do you think this will have on visa overstays once you get it deployed?

**SEC. NAPOLITANO:** I think it will -- it will help us. Although we have already used our enhanced biographic to go backwards to identify overstays and to prioritize those that we want ICE to really focus on finding and removing.

**SEN. LEE:** Can you give us any sort of brief specifics -- a brief thumbnail sketch on how the system will work?

**SEC. NAPOLITANO:** I would prefer to do that in a classified setting, Senator. And we would be able to do that, yes.

**SEN. LEE:** Understood. Understood.

Now, on a different topic, last year, John Morton, the director of U.S. Customs -- Immigration and Customs Enforcement -- issued a couple of memoranda that, between them, set out certain priorities that would govern the use of -- the exercise of prosecutorial discretion within ICE.

Within that memorandum, there were a number of considerations outlined which ended up mirroring to a very significant degree the same factors that were outlined in the DREAM Act -- the same version of the DREAM Act that the Senate refused to pass a couple of years ago. It came up for a vote and didn't get the necessary number of votes to pass.

Among those factors that the acts were instructed to consider in exercising prosecutorial discretion included the alien's length of presence in the United States which mirrored the fact in Section 3(b)(1)(A) of the DREAM Act. The circumstances of the alien's arrival in the United States, particularly if it happened at a time when the alien was a young child which mirrors what can be found in 3(b)(1)(B) of the DREAM Act. The alien's criminal history, mirroring the factor in 3(b)(1)(D) of the DREAM Act. The alien's pursuit of education in the United States with particular consideration given to those who have graduated from a U.S. high school or who have successfully pursued or are pursuing college or advanced degrees at a legitimate institution of higher education of United States. That, of course, mirrors Section 3(b)(1)(E) of the DREAM Act. The alien's age with particular consideration given for minors, mirroring, Section 3(b)(1)(F) of the DREAM Act. And whether the alien has served in the military of the United States, mirroring Section 5(a)(1)(D)(2) of the DREAM Act.

So given these prosecutorial discretion standards which match up somewhat closely to the same factors put forth in the DREAM Act.

And given the fact that the DREAM Act was not passed into law, what assurances can you give us or what assurances can I give to my constituents when they approach me and suggest that perhaps there might be an effort under way to back-door these same factors in -- through regulatory channels that couldn't be passed through Congress?

**SEC. NAPOLITANO:** Senator, first, let me begin by saying, having worked in this field for decades now, we strongly need overall reform. And we strongly support the DREAM Act as a legislative enactment. You are right. It failed by four or five votes to get cloture here. It was passed by the House.

That being said, what we have the capacity or only jurisdiction to do is to administratively close a case. That doesn't give the person involved any kind of a green card or anything of that sort. It simply means their case is effectively suspended and they can remain in the United States.

That's very different from the DREAM Act, which would allow an actual pathway to citizenship. And that's, you know, one of the things I think we should be doing is really focusing our enforcement resources on those who are real risks to the public safety of the United States. And those who meet the standards of the DREAM Act, if they really meet those standards, are not.

**SEN. LEE:** OK, so the overlap between them is coincidental, and you would say -- your response to that is essentially that these are two different layers of analysis. One in the DREAM Act would be focusing on a pathway toward citizenship. This is focused on how to allocate scarce prosecutorial and law enforcement resources.

**SEC. NAPOLITANO:** I think that's an accurate statement.

**SEN. LEE:** OK. And you're not concerned or convinced that these could spill over into something larger.

CAR 0042

**SEC. NAPOLITANO:** We are in the process of looking at all of the cases on the immigration docket to see which, if any, should be administratively closed. And those that meet the criteria you just named are those that we would consider for administrative closure.

**SEN. LEE:** OK. Finally, is there any chance that in my lifetime we'll see a time when passengers, before boarding a plane, don't have to remove their shoes going through TSA?

**SEC. NAPOLITANO:** Well, Senator, we have already -- you know, we're looking at everything from what is the threat and what is the risk. And we have already made changes for passengers over the age of 75 and children under the age of 12 where, except for on a random basis -- and we always have to have some unpredictability in the system -- they can be expedited through the lines without their shoes being taken off.

From a technology standpoint, the technology still does not exist that allows us to easily identify nonmetallic matter in shoes or in liquids, which is why we're doing some of the things we are doing. And it's all based on the intelligence we have about the terrorist threats we face.

**SEN. LEE:** I see my time has expired. Thank you.

**SEC. NAPOLITANO:** Thank you, Senator.

**SEN. LEE:** Thank you, Chairman.

**SEN. COONS:** Thank you, Senator Lee.

Senator Franken.

**SENATOR AL FRANKEN (D-MN):** Thank you, Mr. Chairman.

Madam Secretary, this week the House of Representatives is considering several cybersecurity proposals. But this morning I want to talk about -- with you about the cybersecurity proposals that are here in the Senate, because while there's been a lot of talk about privacy and civil liberties implications of the House proposals, and rightly so, fewer people are talking about the two bills here in the Senate.

The fact is that, as they are currently drafted, both of the cybersecurity proposals here in the Senate present very serious threats to our privacy and civil liberties. Both bills allow companies the near-unfettered ability to monitor the emails and files of their customers.

Both bills may allow companies to share that information directly with the military. Both bills generally allow the federal government to freely share that information with law enforcement. And both bills immunize companies against grossly negligent and knowing violations of the few privacy protections that apply to this process.

In doing all of this, both of these bills sweep aside decades of privacy laws, many of which this committee wrote, in many cases with Chairman Leahy at the helm. I'm talking about the Wiretap Act, the Stored Communications Act and the pen register statute.

Now, I've been working, together with Senator Durbin, with the sponsors of the Cybersecurity Act of 2012, and they've been working with us in good faith. And I sincerely hope that we can fix these problems before the bill even gets to the floor. But I think it's really important that everyone know that we have real civil liberties problems, not just in the House but also here in the Senate bills.

I'm saying all of this to you, Madam Secretary, because the administration's cybersecurity proposal from last May does not have many of these problems. It is, in several ways, more protective of our privacy than either proposal here in the Senate. I want to use the remaining time I have here to tease out those differences and frankly just make the case that we should pay attention to what the administration did in its proposals.

CAR 0043

First of all, Madam Secretary, as I mentioned, both the Cybersecurity Act and the Secure IT Act would allow the military to be the initial recipient of any information being shared by a private company. But it is my understanding that it is the official position of this administration that a civilian entity, not a military entity, should always be the initial recipient of cybersecurity data from the private sector. Can you explain why this is the administration's position?

**SEC. NAPOLITANO:** Well, the administration's position mirrors how we have actually organized ourselves in the absence of cyber legislation. And the way we've organized ourselves is that DOD has responsibility for military networks, but DHS has responsibility for civilian and for the intersection with the private sector.

We both use the technology resources of the NSA, but we use them under different authorities and with more restrictions, particularly on the privacy side, than you would in an international military sort of context. So the position that we have is to make sure that the statute mirrors what actually is happening on the ground.

**SEN. FRANKEN:** Well, thank you.

Second, Madam Secretary, both of the bills in the Senate give private companies a new authority to freely monitor the communications and files on their systems, many of which would be private. These bills create this new sweeping authority, despite existing provisions in the Wiretap Act that allow companies to perform monitoring to protect their systems.

The administration's proposal does not contain that broad new authority. Can you tell us why it does not?

**SEC. NAPOLITANO:** What we are looking for in part of the protection of critical infrastructure, we're looking for the code. We're looking for the fact of the attack, the methodology used, the code or signatures that were employed, so that we can then check and see whether that's being done elsewhere, and also mitigate and also communicate with other companies about this type of attack. So we're not looking at content. We're looking at the how.

**SEN. FRANKEN:** Great. Thank you.

Why does the administration -- let me back up. The administration's proposal only allows the federal Cybersecurity Center to share the information it receives from private company with law enforcement authorities if the information constitutes actual evidence of a crime. (I think that's good ?).

In comparison, one of the Senate bills allows the disclosure of information received by the federal government to law enforcement if it, quote, "appears to relate" to a crime. Why does the administration have a heightened standard for disclosures to law enforcement? Was this done to protect civil liberties?

**SEC. NAPOLITANO:** Right. Senator, I don't know the reason for the difference in the language between those two things. I think what both are getting at is use of information for a non-law enforcement purpose would not be immunized or would not be permitted. But I'd have to follow up with you on why the difference between the two phrases.

**SEN. FRANKEN:** OK, thank you. Let's do that.

I want to thank you, Madam Secretary.

Before I finish, I do want to say that I agree with my colleagues who say that we need to do something about cybersecurity. There's no question about that. I just think we need to get the legislation right, such that the bill does not unnecessarily sacrifice civil liberties.

And I thank you so much for your service and for being here and for your answers.

**SEC. NAPOLITANO:** Thank you.

**SEN. FRANKEN:** Thank you.

**SEN. COONS:** Thank you, Senator Franken.

Senator Sessions. I should go down?

**SENATOR JEFF SESSIONS (R-AL):** Thank you, Mr. Chairman. Your meteoric rise to the chairmanship exceeds even Senator Franken's.

**SEN. FRANKEN:** Mine was actually -- (off mic.) (Laughter.) But that's neither here nor there, for the purposes of this hearing. We have the secretary and I don't think we should squabble over that. (Laughter.)

**SEN. SESSIONS:** And we're glad to have both of you fine senators here.

Madam Chairman, this is -- Homeland Security is a big operation. I guess it's the third largest personnel operation -- or second -- in our government.

**SEC. NAPOLITANO:** I think it's the third largest. Yes, sir.

**SEN. SESSIONS:** Third? Over 200,000 people. It's cobbled together. And I've got to say, I was uneasy about that bill. As I recall, a Democrat said, we should consolidate and President Bush said no. And then he finally said yes and did it. And we passed it without a whole lot of consideration, in my view.

So you have a lot of agencies. You've got Coast Guard, Secret Service, TSA -- all sorts of agencies with different histories, cultures, and so --

So I know the challenge is hard. I just truly believe you haven't -- I don't think that it's completely together yet. Do you agree that there are still cultural and bureaucratic efficiencies that could be obtained if focused on today?

**SEC. NAPOLITANO:** Senator, we continue to -- we operate under the caption, "One DHS." And we continue to excavate differences and systems and cultures and protocols and procedures. There has been a lot accomplished over the past nine years by my two predecessors and over the past three-plus years now that I've been secretary.

But given the size and scope of the merger that is under way, it does -- it does take time. The Department of Defense took, by most accounts, 40 years to really become unified as a department. My goal is to substantially beat that record.

**SEN. SESSIONS:** Well, I -- think so. And I just would say, every dollar the taxpayers send us, they need and have a right to expect it's widely spent. And we've got duplication, mismanagement and competition, unwisely, within departments and agencies. It just needs to be confronted. And strong leadership -- I'll just throw that out. I would suggest that you focus on that.

Senator Kyl, I believe, raised the question of Chicago and their refusal to honor detainers placed on prisoners, which I find is -- Cook County's policy, at least -- is unacceptable. You have written letters about it. I hope that you will follow through on it. They are, I believe, on track to obtain their secure communities monies and program through 2013. But Alabama, who's been sued by the administration for trying to have laws that help America enforce its immigration laws -- not block the enforcement of immigration laws -- has had its Secure Communities monies stopped or not continued for counties that have asked for it.

Can you tell us where you stand on that, and when can Alabama expect that they would be able to have their Secure -- fundings?

CAR 0045

**SEC. NAPOLITANO:** Well, as I shared with Senator Kyl, I believe the Cook County ordinance is unwise; it's overbroad. We are evaluating all options there. We have been trying to work with the county to see if there is a resolution.

With respect to Alabama, given the litigation and what was enjoined and not enjoined, what we did was simply to stop the expansion of secure communities to the final -- I think it covers -- I think we've covered now 75 percent of the foreign-born population, so it's the final quarter. But our plan, Senator, is to complete implementation of Secure Communities nationwide by the end of 2013.

**SEN. SESSIONS:** And that would include Alabama?

**SEC. NAPOLITANO:** That would include Alabama.

**SEN. SESSIONS:** Well, it's a problem for me. And maybe I'll follow some written -- file some written questions to make sure we're clear about where that's heading. I'm uneasy about it. It seems to me the state was targeted because their law was not popular with the department -- with the president -- whereas he's not taken to date any firm action against Cook County, which clearly endangers, I think, the people of Cook County and the country.

But with regard to the visa -- visa exit program, this is a plan that was designed and required by law in 1996. I have observed it and seen it since I've been in the Senate and the difficulties that have occurred. We have the Visa Waiver Plan up and working, the entry program up and working. I do not believe it's that difficult to implement an exit program. I said that when the Bush administration was in office, and I'll say it again. I think reports from the Government Accountability Office, GAO, validate that. And I hope that we can make some progress on it.

First, you indicated earlier that you have a biographic plan that has some capabilities. But is it not true that biometric -- fingerprint, DNA or some other such system -- fingerprint clearly being the most logical from my perspective -- that a fingerprint or other biometric exit system is what's needed to have this system up and working? Otherwise, somebody could walk out with a card that has their name on it and their biographical data, but there'd be no way to verify the person holding that card is the person actually exiting.

**SEC. NAPOLITANO:** Senator, let me offer to have our staff come and brief you personally on -- it's enhanced biographic. It's not simply a card. But I will make sure that you get briefed on that.

With the biometric, the issue is going to be whether the Congress wants to appropriate the money for whatever margin is left after the enhanced biographic. Our plan, and our plan to use the enhanced biographic as a platform for that is in final clearance. And we'll share that with you, as well.

**SEN. SESSIONS:** Well, I had a long -- a year or more -- intense discussion on this subject with Secretary Ridge. And they met with international stakeholders and it went on in months and months and months. And I insisted that the only system that really works -- based on your experience as a federal and state prosecutor, as I've had that same experience -- it's the fingerprints that's in every police officer's file. It's the fingerprint that's taken when a person is arrested somewhere in the United States and becomes a fugitive. And the fingerprint is the basic basis for identifying fugitives.

So when he left -- after refusing to commit -- he left one bit of advice. He said we should have a biographic system. It should be -- the biometric should be the fingerprint -- and onto his successors. And I do believe that that's the system that works. So you -- is there any plan not to have that?

**SEC. NAPOLITANO:** No. What we are planning is to go in phases. The first phase is the enhanced biographic, which we are a long way toward implementing right now, and then use that as a platform for the biometric.

**SEN. SESSIONS:** Well, I would say that -- in my view, it should have been the biometric all along. You should have been working on that and we'd have had that done a lot sooner than four years. And otherwise, when you indicate you're not going to look for people who've overstayed, then you basically are saying we don't intend to take any effort to enforce really an entry-exit system in the United States. And

CAR 0046

that allows the countries that are approved for visa waiver, I think, to have an unfair, unlimited entry to the United States.

**SEC. NAPOLITANO:** Senator, we have gone back and looked at these overstays, and we have racked and stacked them according to biographic information we have about the overstays -- turning that information over to ICE to prioritize its enforcement operations. And that work in already under way.

The problem or the logistical -- the reason why there's no biometric system at exit, quite frankly, is it is not easy. The lanes and the ports have never -- they've always been designed for entry. The architecture has never really been designed for exit so that's an issue, and then cost and manpower are issues.

**SEN. SESSIONS:** Maybe a briefing from your staff would be helpful to me. So I --

**SEC. NAPOLITANO:** Be happy to provide that.

**SEN. SESSIONS:** Thank you, Mr. Chairman. I'm over -- time.

**SEN. COONS:** Thank you, Senator Sessions. Senator Blumenthal, I'll defer to you.

**SENATOR RICHARD BLUMENTHAL (D-CT):** Thank you. Thank you, Madam Secretary, for your service and for your very steadfast and effective work on behalf of our national security and your words earlier on behalf of the Secret Service.

I think all of us share your view that they do, to use your word, a marvelous job of protecting the president and many other law enforcement functions.

I want to follow up on a line of questioning that Senator Graham began in terms of looking forward the kinds of systems -- maybe analogizing the Secret Service to the military -- that are used in that context. And I wonder if you've given any thought to additional steps that can be taken to safeguard against but also monitor the kinds of abuses that obviously occurred or allegedly occurred here.

**SEC. NAPOLITANO:** We are intent, Senator, on doing a thorough examination of how we do it now and what we need to do to improve to make sure this never happens again. So all those kinds of options are on the table.

**SEN. BLUMENTHAL:** Thank you. Switching to a different subject, I was recently approached by a couple, a same-sex couple, who are married under Connecticut law. One of them is a citizen of the United States. The other is not, and I wrote to you and I want to thank you for your assistance in connection with their application for a Green card to be held in abeyance. You are probably familiar with the problems that arise under these circumstances. But eventually we need a solution like the Uniting Families in America Act (sic) that can provide some longer-term solution to this problem.

But I wonder whether we can establish a policy of not deporting or, in other words, holding Green cards for same-sex couples -- one of whom is here, the other seeking a Green card.

**SEC. NAPOLITANO:** Senator, the legal advice we have been given is that unless and until the law is overturned by the court, and I'm talking as to DOMA, which we have -- the Department of Justice has urged be done, but until that happens we cannot unilaterally give Green cards based on that. What we have done, however, is when we have same-sex couples, if they fall within the other criteria of our priority memo -- our prosecutorial discretion memo -- that allows us to intercede with removal and some of the other actions.

**SEN. BLUMENTHAL:** I'm a strong supporter, as are other members of this committee, in repealing DOMA -- the Respect for Marriage Act, which would provide a comprehensive solution. I've been approached by other similar couples who have enormous contributions to make to this country and whose families are every bit deserving of the kind of recognition that we accord to heterosexual couples.

And so I hope that I can work with you on this area of trying to devise solutions in the meantime that will enable those couples to continue to be families here, as we need and they deserve. Thank you.

**SEC. NAPOLITANO:** Yes. Absolutely.

**SEN. BLUMENTHAL:** Thank you, Madam Secretary. Thank you, Mr. Chairman.

**SEN. COONS:** Thank you, Senator Blumenthal. Senator Durbin, I'll defer to you.

**SENATOR RICHARD DURBIN (D-IL):** Madam Secretary, thank you. I've been trying to juggle schedules and you've been very patient waiting here. Thank you for your service. I'd like to ask you a few questions about DREAM Act, which you and I have talked about from time to time.

Yesterday, Senator Schumer and I held a hearing on S.B. 1070, the controversial Arizona law, and I talked about seven Arizona residents who would qualify for the DREAM Act but also would be the targets of the Arizona law. It's beyond reasonable suspicion that they're undocumented. They've stated it publicly. All of them are either attending college or graduates of Arizona State University -- with degrees in engineering, as an example.

You were asked by a bipartisan group of senators to suspend deportations of DREAM Act students and in response you and the president have established a new deportation policy, and under this policy, as I understand it, it's a high priority to deport those who've committed serious crimes or are a threat to the public while it is a low priority to deport individuals who've been in the United States since childhood, like those who are eligible for the DREAM Act.

Last night, we received updated statistics I requested on the review of deportations that DHS is conducting under your policy. There are currently more than 300,000 pending deportation cases. Of these, ICE has reviewed 219,554. Approximately 16,544 cases, 7.5 percent, have been identified as eligible for administrative closure. Of these cases, 2,722, or 1.2 percent, have actually been closed.

Please explain the difference between the 7.5 percent of deportation cases eligibly (sic) be closed and the 1.2 percent of cases actually closed. When do you expect the percentage of cases being closed to rise -- or do you expect it to rise as the review progresses? And when do you expect the review to be complete?

**SEC. NAPOLITANO:** Right. I think -- I think the difference is primarily attributable to time. You know, we have been doing this case-by-case review. We just started the pilots right after Christmas. And we've moved now to go, you know, across the country since then. So that's part of it, and part of it is that as we offer administrative closure oftentimes the recipient of the offer will ask for time to think about it. So I think that will catch up and I think we will be closed with the case review by the end of the calendar year and then we'll see what the numbers show.

**SEN. DURBIN:** You and I had another conversation about work authorization and this is -- to me, is a very basic issue which we should discuss in this hearing.

Historically, as by interpretation of the department and under previous President George W. Bush, in cases where there was deferred action these individuals were allowed to work -- given a work authorization. Now, under the new policy, these individuals are offered administrative closure. And your department has taken the position that individuals whose cases are administratively closed cannot apply for work authorization.

This creates a real problem. You're saying to qualified individuals they will not be deported but they can't work to support themselves or their families. Many are going to end up in the underground economy, which puts them at risk of exploitation and undercuts the labor market. Only a few thousand people have had their deportations halted so far, so I can't imagine this will have any significant impact on employment in America. I ask you then why we are not at least making certain that if we have deferred action or administrative closure that a person is allowed to work.

**SEC. NAPOLITANO:** Well, first, just to make sure we have a common understanding of the record.

CAR 0048

We have continued deferred actions and do that before cases get into the administrative system. The administrative closure are cases that are already on the docket -- and most of which are on the nondetained docket, but a certain number are on the detained docket -- and those are the ones we're going through in addition to evaluating new cases as they come in to see that they meet the priorities that we have set.

So with respect to the work authorization, we are going back now, in light of your concerns and in light of the fact that we now have some numbers to look at as opposed to when we started this whole process, to see if we should make some adjustments. So I'd be willing to keep you apprised of our efforts in that regard. But I think -- I thought about your concerns after we spoke and I thought they were serious concerns and we are exploring how best to address them.

**SEN. DURBIN:** Thank you, Madam Secretary. You and I both know that the president is committed to the DREAM Act. He was a co-sponsor when he served in the United States Senate and he has made some important decisions to help these DREAM Act students.

**SEN. DURBIN:** Thank you, Madam Secretary.

You and I both know that the president is committed to the DREAM Act. He was co-sponsor when he served in the United States Senate. And he has made some important decisions to help these DREAM Act students. So I hope that we can find a way to go further when it comes to giving them an opportunity to work.

I also asked you about the special registration program that was created after 9/11. Arab-Americans, American Muslims, South-Asian- Americans faced national origin and religious profiling -- at least that was what was suggested at a recently hearing I held in this same room two weeks ago.

The special registration program targeted Arab and Muslim visitors, requiring them to promptly register with the INS or face deportation. At the time, I called for the program to be terminated because there were serious doubts it would even help combat terrorism.

We heard testimony that terrorism experts have concluded that special registration wasted homeland security resources and ended up alienating Arab-Americans and some Muslims. More than 80,000 people registered. More than 13,000 placed in deportation. How much terrorist were identified by special registration? None.

So last year, DHS terminated all special registration requirements, however, because of special registration, many innocent Arabs and Muslims system face deportation or are barred from applying for citizenship.

Last week, you issued a memo to address the situation with these individuals. It provides the individuals who fail to comply that they wouldn't be penalized in their noncompliance was involuntary, unintentional or otherwise reasonably excusable.

Will you ensure that the standards for noncompliance with special registration are going to be applied fairly and generously?

**SEC. NAPOLITANO:** Yes, I will. And I will make sure that ICE reports to me how that is being implemented.

**SEN. DURBIN:** I visited an immigration detention facility in my state, the Tri-County Detention Center in deep southern Illinois, and I applaud ICE for issuing its revised detention standards recently. I'm in the process of looking those over.

I'm still concerned about some of the conditions I noted. Some of them will take a deep investigation before I can say with any certainty that there are violations that need to be addressed.

CAR 0049

But there was one thing that was very basic that caught my attention, and that was lack of access to the telephone. It turns out many of these people who are being detained, not charged with a crime but being detained, are basically 2(00) or 300 miles away from family. It may seem like a small issue, but to these immigration detainees, it's not.

Currently, these immigration detainees don't have the right to an appointed attorney, and approximately 80 percent go forward without one. And basically, none of them have access to email, unlike federal prisoners. And many of them are in remote facilities such as the one I visited.

They repeatedly raised with me the concern about their inability to communicate with the outside world, including their family. They said they couldn't afford the phone calls that cost well upwards of a dollar or $2 a minute that they're being charged.

Those are not wealthy people. You can imagine. They are very poor.

We tried to use the phones -- local phones -- just to see how they would work, and they didn't. So there was spotty service and high cost.

A large number of county jails with which ICE contracts actually profit by taking a cut of the exorbitant fees that phone companies charge detainees, commissions of 30 (percent) to 60 percent on phone call charges.

My office has been working with your staff to come up with a solution. Do you have any report of progress on this issue?

**SEC. NAPOLITANO:** Not as I sit here, but I will follow up. You are right to raise the concern. So let me follow up with our staff, and I will be happy to get back to you.

**SEN. DURBIN:** Thank you. Thanks for appearing today. And thank you, Mr. Chairman.

**SEN. COONS:** Thank you, Senator Durbin.

Madam Secretary, I think I have the honor of the last questions of the oversight hearing today, and I appreciate your patience and your diligence before the committee today.

I was reminded in your opening testimony just how challenging your job is by the fact that you casually reference that you have a daily threat brief, you supervise the third largest federal agency, you have a scope of responsibility that I think is awesome.

And the challenge that you and your leadership team face of striking an appropriate balance between security, private, commerce, is a very difficult and delicate balance, and I just wanted to start by thanking you for your service. I've known you since you were an attorney general and always been impressed with your record of service.

First, just on the Secret Service scandal, if I might. There's been some suggestion in the press today -- I think in The Washington Post -- that this is actually part of a longstanding pattern or practice. And in my previous role, I had the honor of supervising a local law enforcement agency, and I know how devastating to morale and even to operations such incidents can be.

This particular incident is very troubling, and I know that there is an aggressive and far-reaching investigation under way.

But have there been allegations of comparably serious misconduct relayed to the Office of Professional Responsibility in the past? And what steps specifically have you directed Secret Service Director Sullivan to take to ensure that this particular type of misconduct doesn't occur again?

CAR 0050

**SEC. NAPOLITANO:** To my knowledge, there have been no similar type incidents reported to the Office of Professional Responsibility. I cannot speak to the inspector general. That's a separate department. But not as to OPR.

What the director is doing is really reviewing training, supervision, going back, talking to other agents, really trying to ferret out whether this is a systemic problem. If it is, that would be a surprise to me, I must say, as someone who has been the service secretary for three and a half years now.

I have found the men and women I work with to be extremely professional and the men and women I come into contact with to be extremely professional.

But we want to make sure that we get to the bottom of this; that we deal strongly with those who committed the misconduct. And I gave the report. That's already been done with quite a lot of speed. And that we ferret out any other problems because, you know, the men and women of the Secret Service doesn't deserve to have their reputations besmirched.

**SEN. COONS:** And I want to commend you for how swiftly the investigation has proceeded. I just wanted to reassert what I think we share, which is a conviction that it needs to be not just this incident but a far-reaching investigation that can reassure the American public that this is not somehow an agency where this was routinely tolerated or broadly practiced; that this truly is an outlier incident.

I also, at the outset, just wanted to thank you. The last time you were before us, I asked a question about Customs and Border Patrol and the interdiction of counterfeit or allegedly counterfeit materials.

You've just implemented a new administration policy that allows CBP acts, when they seize goods at the border that are believed to be possibly counterfeit, to share that information with the rights holders. And I think that's a good and strong advance.

I had introduced legislation, but given how swiftly legislation is moving here, I'm glad that the administration has embraced that change in practice and policy.

I wanted to dedicate most of our time to cybersecurity. I share Senator Franken's deep concerns about privacy and how we strike an appropriate balance but, also, Senator Whitehouse's grave concerns that, if we fail to effectively legislate in this field, we leave our critical national infrastructure gravely vulnerable and at risk.

I note that, in your FY '13 budget, cybersecurity gets a nearly 75 percent increase in funding while the rest of the department overall stays flat. So I just want to commend that you are, in fact, prioritizing delivering appropriate resources.

First, if I could, we talked about partnerships, fusion centers. US-CERT is an impressive DHS cyber resource, and I wondered how you see state and local resources in the law enforcement community, in the National Guard -- as we have discussed before, Delaware and Rhode Island have network warfare squadrons in the National Guard that I think can and should play a positive role here.

What sorts of resource constraints do we have in terms of effectively responding in the law enforcement community, in the first responder community? My concern about a cyberthreat is that it will emerge -- well, A, it's very broad and a very serious threat today. But, second, a critical infrastructure threat will emerge very quickly and require very rapid response.

**SEC. NAPOLITANO:** I think a couple of things, Senator. I have, obviously, I share your concern. Working with state and locals who are on the floor at the NCCIC, the 24-7 watch center, but it's helping with training. It's providing lots of information. I think we provided 5,000 actionable bulletins last year. CERT responded to 106,000 incidents itself.

And so training, information sharing and then, across the country in certain locations, we have centers of excellence which are helping us refine what we are doing but, also, think ahead. You know, what's the next thing that's going to happen in the cyber world?

CAR 0051

**SEN. COONS:** I also am familiar with the CFATS program which has had some challenges. I think it has been successful in promoting site safety at those sites that deal with dangerous chemicals but really has significantly underperformed particularly in cybersecurity and just wanted to encourage attention on that particular area that was brought up in previous questioning by Senator Grassley.

Given the evolving cybertech risk to our nation's critical infrastructure, and giving -- given the debated provisions in different bills, please just, if you would, explain for us the particular strengths that DHS has regarding its capability and capacity to administer potential regulations and protect our infrastructure. Are you confident that DHS has the capacity, as opposed to NSA or DOD, required to handle this critical national threat?

**SEC. NAPOLITANO:** Yes. And in fact, as you noted, the budget increases has (sic) been requested. We've had a -- multiple additions in the cyber area over the last few years.

We already are the department that deals primarily with the private sector and with critical infrastructure, and those mechanisms with which to do that are already in place. And so on the civilian side and on the dot-com side, as it were, DHS already has that systemic protection role.

I think General Alexander testified to that several times. DOD has it, of course -- has to the dot-mil environment. So the resources are there; the experience is there, meaning at DHS. We do have lessons learned from CFATS, no doubt. But those lessons have been learned and those lessons learned give us greater confidence that we can administer this properly.

**SEN. COONS:** And last, if I could, some concerns about privacy and then about bringing the public into this conversation. I think it was Senator Lee -- previously asked about Future Attribute Screening Technology and its development, something I'd be happy to get a briefing on about its trajectory.

Recognizing that a lot of what's going on in the dialogue between the administration and Congress about the cyberthreat is occurring in secure briefings -- and that a lot of the information that at least I and I think many other senators have received, that makes it clear to us just how big a threat this is and just how much loss there is here of intellectual property and how much potential risk there is -- most of that critical information is shared with us in a secure setting.

My concern is that this committee previously legislated on intellectual property theft through the Protect IP Act. And the comparable committee in the House legislated -- some would argue, overreached -- in the Stop Online Piracy Act. And there was a very broad and unexpectedly strong national response to that by engaged and motivated citizens who were deeply concerned, with some legitimacy, that there was some real threat to their privacy and to the vibrancy of the Internet.

My real concern here is that if we're not sufficiently bringing the public along in striking an appropriate balance here between privacy, security and commerce, that we may face a comparable unexpected, abrupt, national backlash against these legislative efforts. And given how rarely we legislate on issues this critical, I'm deeply concerned that we not then lose a moment -- that we not create a moment of real vulnerability when you've worked so hard to craft a structure that works.

Senator Franken asked you previously about how the administration, in its proposals, maybe has done a stronger job of recognizing validating privacy concerns. Any advice for me about how we can, while recognizing the limitations of information that must be held secure, more effectively engage the public in this dialogue, on the balance between security and liberty?

**SEC. NAPOLITANO:** Well, we have tried to do it by sharing information with the public through a variety of means. I think it's significant that when there have been briefings in a classified setting, you had sitting there the head of the Joint Chiefs, the head of the NSA, the head of the FBI, the second in charge of the DNI, the second in charge of the DOJ, and myself -- all saying the same thing: This is a big risk. It's on us. We need some way to protect the nation's core critical infrastructure. We need some way to have information sharing. We need to update and streamline some of the statutes that exist now.

In terms of privacy, I think that was built into particularly the Collins-Lieberman bill, the bipartisan bill out of -- in this chamber, providing for privacy -- for independent privacy oversight, limitations on how information can be used and the like. I think we just need to continue to emphasize the differences between that and some of the other approaches.

**SEN. COONS:** I just -- I agree with you; those secure briefings have been successful. They've been in my case hair-raising, at times alarming, but the unified and broad engagement by this administration in ensuring that the Senate is briefed is commendable. I just am concerned that when I go and talk in my home state of Delaware, I don't hear the same level of broadly shared understanding of just how real, just how constant, just how present a threat this is to intellectual property, to our critical infrastructure and to the vibrancy of our -- of our nation.

Let me just -- the last question -- or area -- would be immigration. I was struck; there was a recent Pew report that came out, I believe, saying that for the first time in 30 years there are more illegal immigrants returning to Mexico from the United States than coming here. And I think that is in part due to strengthening in the economy there, but it's also, I think, the unprecedented action of this administration to hire more border guards, deport more undocumented workers than ever before and really bear down and engage in strong, smart and effective border security and enforcement. And I wondered if you had any comment on that.

**SEC. NAPOLITANO:** I do. And in fact I looked at the Pew study yesterday. And it does -- you know, what it's talking about are long- term migration trends. And what it identifies is exactly what you said, that the trend now is more out-migration to Mexico than in- migration.

And it attributes at least part of that to the record amount of personnel and technology infrastructure put on the border -- in part because there was bipartisan agreement by the Congress to appropriate an additional $600 million to let us do that job. Our efforts now are sustaining that and making sure we stay ahead of any surge or movement in illegal traffic along that border and keep that border as safe and secure as we can.

**SEN. COONS:** It's -- I think you've done a commendable job on this, and it's, I think, important that the general public realize that my side of the aisle -- which is sometimes mischaracterized as not being sufficiently vigorous in our support of enforcement -- shares that, that this was a bipartisan effort.

I hope you'll make real progress in the enhanced biographic exit program. And there was some real dialogue about that, but I do think I am cautiously optimistic we will find a new common ground on a host of immigration issues, whether the DREAM Act -- I'm a co-sponsor, along with Senator Durbin -- H1B reform, STEM immigration or Uniting Families.

Last -- just a question on FEMA response. I think that retaining airlift capacity in local National Guards and state National Guards was critical in the state of Vermont, represented by the real chairman of this committee, as well as my state in the past when there were hurricanes or flooding or other issues.

And I wondered if you had any comment about how the president's funding request might affect the ability of state National Guards to play an active, supportive role in disaster response.

**SEC. NAPOLITANO:** Senator, let me get back to you on that, because -- are you asking about how our request with respect to reforming the grants overall would affect first responders? Are you asking specific to the National Guard?

**SEN. COONS:** I think this is more a National Guard capacity- within-the-branch issue. So I may have asked a question that's not directly in your --

**SEC. NAPOLITANO:** Yeah, I think -- I think that's probably more appropriately addressed to the Department of Defense.

CAR 0053

But I will say, our entire work with FEMA has been to be in a team with local and state responders, as opposed to the feds being in charge. And I think that teamwork approach has been well received and has worked very effectively.

**SEN. COONS:** I would agree, and I hear all the time from our first responder community in Delaware how grateful they've been for the shared training, the equipment. The grants programs actually helped one of our local volunteer fire companies write their annual grant in a memorable all-nighter.

**SEC. NAPOLITANO:** (Laughs.)

**SEN. COONS:** And I just wanted to close by thanking you for your strong leadership of the department and for the department's sustained and significant contribution to the security and liberty of the people of the United States.

Thank you very much for your testimony, Madam Secretary. I will leave the record open for a week for members of the committee who were not able to join us but might want to submit additional questions for the record.

**SEC. NAPOLITANO:** Thank you, Chairman.

**SEN. COONS:** This hearing is adjourned. (Sounds gavel.)

END.

CAR 0054

February 9, 2012

The Honorable Janet Napolitano
Secretary
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Napolitano:

The undersigned organizations are encouraged by the recent prosecutorial discretion initiatives undertaken by the Department of Homeland Security (DHS).  A robust prosecutorial discretion policy is essential to the smart enforcement of immigration law and to the fair adjudication of immigration cases.  The memos and announcements that DHS issued last fall are important steps toward achieving these aims.

We do have concerns, however, about the implementation of this new policy.  The way DHS is conducting the prosecutorial discretion review has departed significantly from what was initially announced, most notably the failure to grant work permits to those who receive a favorable exercise of discretion.  We offer the following recommendations to ensure DHS fulfills its pledge of implementing an effective and fair prosecutorial discretion policy nationwide in the upcoming months.

1.   **Eligibility to Apply for an Employment Authorization Document (EAD):**  First and foremost, it is imperative that immigrants granted prosecutorial discretion be eligible to apply for an EAD.  Statements made by you and other key DHS personnel to advocates and to members of Congress following the August 18, 2011 announcement made clear that individuals whose cases were administratively closed under this initiative would be eligible to apply for an EAD.  In its FAQ following the announcement, DHS wrote:

> Per longstanding federal law, *individuals affected by an exercise of prosecutorial discretion will be able to request work authorization*, (emphasis added) including paying associated fees, and their requests will be separately considered by USCIS on a case-by-case basis.

However, more recent statements by DHS officials suggest that only those who have an *independent* basis for applying for an EAD will be able to do so.  This is a clear change from what was originally announced and a break from the long-standing practice of granting work permits to removable individuals who are temporarily permitted to remain in the U.S.  It makes little sense to allow individuals to remain temporarily in the U.S., but to then prevent them from working legally and supporting themselves and their families.  The current practice will force these individuals to work in the shadows.  By failing to establish a mechanism to apply for work authorization for those found to merit prosecutorial discretion, DHS is undermining its own prosecutorial discretion initiative.

CAR 0055

2.   **DHS Should Continue the Use of Deferred Action on a Generous Basis:**  The exercise of prosecutorial discretion encompasses a broad range of possible agency actions, and for years DHS and legacy INS have used deferred action as an important tool to manage cases which are not prosecutorial priorities. Deferred action is listed in the June 17, 2011 ICE memorandum (Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens, hereinafter "Prosecutorial Discretion Memorandum") as being among the types of prosecutorial discretion that should be considered in low priority cases.

In practice, however, we have observed that ICE is almost exclusively using administrative closure when it exercises prosecutorial discretion, and in fact, is more reluctant now than before to entertain requests for deferred action.  Immigration attorneys report that grants of deferred action have actually *decreased* following the new prosecutorial discretion initiatives.  Several Enforcement and Removal Operations (ERO) field offices have stated that deferred action can now only be granted to individuals with final removal orders. This is a change in policy from just a few months ago (and one not supported by statute or regulation).  As a result, the implementation of the new prosecutorial discretion policy has actually placed some individuals in a *worse* situation than prior to the announcement in August.

DHS should utilize deferred action much more frequently when exercising prosecutorial discretion.  Specifically, it should offer deferred action to those individuals whose cases have been administratively closed under the current case review and, as a matter of course, in other low priority cases.

As discussed above, DHS has not yet established a mechanism to provide work authorization for those who have been granted administrative closure.  Granting deferred action could be the way for DHS to make those granted prosecutorial discretion eligible to apply for EADs.

3.   **Detained Individuals:**  In August, DHS announced that it would conduct a case-by-case review of *all* cases pending before the Executive Office of Immigration Review (EOIR).  However, cases of detained individuals have largely been excluded from the prosecutorial discretion reviews currently under way.  Although detained cases were to be included in the nationwide review being conducted by the Office of Principal Legal Advisor, we have learned that chief counsels in many jurisdictions have chosen to include only the non-detained docket in their reviews.  Further, the pilot programs in Baltimore and Denver were explicitly limited to non-detained cases.  DHS has not explained how the detained docket will be incorporated into future review processes.

There is a general assumption among ICE and DHS officials that detained individuals are *de facto* high priority cases.  Yet many with highly compelling equities remain in detention.  Some are simply unable to scrape together money for bond while others are subject to mandatory detention for minor convictions—possession of trace amounts of marijuana or pulling another woman's hair.  As you are aware, more than 80 percent of detained individuals are *pro se* and many lack the skill or information necessary to apply for prosecutorial discretion on their own.  We were pleased to hear ICE officials reiterate

recently that the cases of all individuals in detention will be reviewed. DHS should abide by its own announcement and review *all* pending cases—including detained matters—for the application of appropriate prosecutorial discretion. Not only is this the fair and equitable approach, it may also be the most cost-effective as detention is extremely expensive.

4. **Public Information and Pro Se Respondents:** DHS will review hundreds of thousands of cases in the upcoming months as part of the prosecutorial discretion initiative, yet the Department has disseminated very little information that is accessible to the general public and respondents who are unrepresented by counsel. DHS should engage in a public information campaign and broad stakeholder meetings to explain the prosecutorial discretion policy to the public. Information in plain, simple language—translated into Spanish and other languages—explaining what the policy is and how individuals can obtain more information is urgently needed. Information is also needed to help ensure that immigrant communities can protect themselves against notarios and other unscrupulous operators.

Although the Offices of Chief Counsel (OCCs) have set-up email addresses for receiving prosecutorial discretion requests or documents to supplement files, the email addresses are difficult to obtain and have not been posted publicly, making it more difficult for *pro se* respondents to provide relevant information about their cases to ICE counsel. This public information campaign should involve the Department of Justice as individuals may approach immigration court staff for information about how prosecutorial discretion affects their case.

5. **June Memorandum Versus November Memorandum:** The November 2011 *Guidance to ICE Attorneys* which accompanied the November 17 ICE memorandum has been described as a fast-track means for OPLA attorneys to quickly identify those cases most obviously meriting prosecutorial discretion. While the November *Guidance* references the June ICE Prosecutorial Discretion Memorandum stating that it does not "replace or supersede" it, DHS has not explained how or when ICE will apply the June factors if a case is not found eligible under the November *Guidance*. We are concerned that in practice the November Guidance will become the primary tool for review of cases for prosecutorial discretion. The Baltimore and Denver pilots were also largely limited to these much narrower criteria.

If the November *Guidance* becomes the primary basis upon which cases are reviewed for prosecutorial discretion, DHS will expend more time on duplicative case review. Cases found ineligible under the November *Guidance* that would nonetheless merit prosecutorial discretion under the June 17 memorandum will continue to clog the immigration court docket. Cases not found eligible under the November *Guidance* will need to be reevaluated under the June factors, at a later date, assuming a process is even established for subsequent review. DHS is expending considerable resources conducting these reviews, but many cases that should qualify for prosecutorial discretion will be placed or remain in proceedings if the November *Guidance* becomes the primary tool for review. It is important that the primacy of the June 17 memorandum be made clear to all ICE personnel and the public.

6. **DHS Should Encourage Attorneys to Stipulate to Grants of Relief:** In strong cases for relief that are also low priority cases, an ICE offer to stipulate to an application for relief or to indicate that a grant of relief will not be opposed makes more sense than administrative

closure. Indeed, offering only administrative closure in such cases may prove counterproductive to unclogging the court docket. Those offered administrative closure are being told that it is a one-time offer; if declined now, a future request for prosecutorial discretion will be denied. As a result, even respondents with the strongest cases for relief may decide to accept administrative closure, leaving immigrants who should have obtained legal status in limbo and cases lingering on the court docket. Instead, ICE attorneys should be directed to offer to stipulate to a grant of relief or come to agreement on resolving certain aspects of a particular case, as appropriate, instead of merely putting a case on hold for another day.

7. **Prosecutorial Discretion and Customs and Border Protection (CBP):** In June, DHS announced that all DHS agencies would be issuing prosecutorial discretion policies. ICE has taken a number of steps, including trainings and the docket review, to implement prosecutorial discretion and U.S. Citizenship and Immigration Services (USCIS) has issued guidance regarding issuance of Notices to Appear. However, no such steps have been evident from CBP. Since each agency within DHS has certain enforcement-related functions and can initiate removal proceedings in individual cases, each agency must consistently be applying the same prosecutorial discretion guidelines for the policy to be meaningful. ICE cannot be seen as the oversight mechanism for CBP merely because ICE attorneys review Notices to Appear issued by CBP. The reality is that many individuals are turned away at a port of entry, voluntarily returned, or referred for prosecution by CBP without any ICE involvement or oversight. CBP should be required to issue guidance, conduct trainings, and implement monitoring to ensure that its agents are also exercising prosecutorial discretion.

8. **The Inclusion of Lesbian Gay Bisexual and Transgender (LGBT) Family Members Must Be Put in Writing:** A key positive factor in exercising prosecutorial discretion is a person's family ties to the U.S. In August 2011, high-ranking DHS officials participating in several community forums and phone calls stated that, for purposes of exercising prosecutorial discretion, ICE would include LGBT relationships in the definition of family relationships. However, this decision has not yet been put in writing. Without specific, written guidance, there remains the very real risk that agency officers, agents, and attorneys making decisions about individual cases will overlook LGBT family ties and decline to exercise prosecutorial discretion. DHS should issue written guidance explicitly including LGBT relationships in the definition of family relationships for purposes of prosecutorial discretion.

9. **Implementation of June 17, 2011 ICE "Victims Memo":** A second ICE memorandum also issued on June 17, 2011 (Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs, hereinafter "Victims Memorandum") sets forth categories of immigrants who are presumptively eligible for prosecutorial discretion absent "special circumstances," or "serious" adverse factors, such as "serious" crimes. This "presumptive" standard is more favorable to the exercise of prosecutorial discretion than the standard set forth in the Prosecutorial Discretion Memorandum. The categories referred to in the victims memorandum include "individuals engaging in a protected activity related to civil or other rights (for example, union organizing or complaining to authorities about employment discrimination or housing conditions) who may be in a non-frivolous dispute with an employer, landlord, or contractor." The memorandum suggests

that deferred action or a stay of removal are the appropriate remedies in such cases, although administrative closure is also mentioned.

As yet, DHS and ICE have not announced what steps they have taken to implement the Victims Memorandum. We recommend that steps be taken to ensure this memorandum is fully implemented in the field and that training on the memorandum be incorporated or supplemented in the trainings for all ICE trial attorneys and ERO personnel.

Thank you for your time and attention. We look forward to working with DHS on the issue of prosecutorial discretion. If you have questions or concerns please contact Gregory Chen, AILA Director of Advocacy, 202/507-7615, gchen@aila.org.

Sincerely,

AIDS Foundation of Chicago
American Civil Liberties Union
American Friends Service Committee
American Immigration Council
American Immigration Lawyers Association
Americans for Immigrant Justice, formerly Florida Immigrant Advocacy Center
APALA Education Fund
Asian American Justice Center, member of the Asian American Center for Advancing Justice
Asian Pacific American Labor Alliance, AFL-CIO
ASISTA Immigration Assistance
Casa Cornelia Law Center
Casa de Esperanza: National Latin@ Network for Healthy Families and Communities
Catholic Charities Archdiocese of San Antonio
CenterLink: The Community of LGBT Centers
Central American Refugee Center, CARECEN, NY
Central American Resource Center, CARECEN, Los Angeles
Disciples Justice Action Network
Diocesan Migrant & Refugee Services
Domestic Violence Immigration Clinic, University of Wisconsin Law School
First Focus
FORGE
Franciscan Action Network
Gay, Lesbian & Straight Education Network
Gulfcoast Legal Services
Heartland Alliance's National Immigrant Justice Center
HIV Law Project, Inc.
HIV Prevention Justice Alliance (HIV PJA)
Human Rights Campaign
Illinois Coalition for Immigrant and Refugee Rights
Immigrant Defense Project
Immigrant Law Center of Minnesota
Immigrant Legal Advocacy Project

Immigrant Legal Resource Center
Immigration Equality
InMotion
Kentucky Coalition for Immigrant and Refugee Rights
Lambda Legal
The Leadership Conference on Civil and Human Rights
Legal Advocacy Center of Central Florida
LGBT Humanist Council
Lutheran Immigration and Refugee Service
Massachusetts Law Reform Institute
Michigan Coalition for Immigrant and Refugee Rights
Michigan Immigrant Rights Center
Muslim Public Affairs Council
National Advocacy Center of the Sisters of the Good Shepherd
National Asian Pacific American Women's Forum
National Black Justice Coalition
National Center for Transgender Equality
National Coalition for LGBT Health
National Coalition of Anti-Violence Programs (NCAVP)
National Council of La Raza (NCLR)
National Employment Law Project
National Gay & Lesbian Chamber of Commerce® (NGLCC)
National Gay and Lesbian Task Force
National Immigration Forum
National Immigration Law Center
National Latina Institute for Reproductive Health
National Minority AIDS Council
National Queer Asian Pacific Islander Alliance
National Senior Citizens Law Center
NC Immigrant Rights Project
Neighbors In Support of Immigrants (NISI)
New York Immigration Coalition
People For the American Way
PFLAG National (Parents, Families and Friends of Lesbians and Gays)
Physicians for Human Rights
Rights Working Group
Salvadoran American National Network
Sisters of Mercy of the Americas
South Asian Americans Leading Together (SAALT)
Service Employees International Union
The United Church of Christ, Justice and Witness Ministries
Transgender Law Center
Unid@s, The National Latin@ LGBT Human Rights Organization
United We Dream
Washington Defender Association's Immigration Project – Seattle, WA

cc:    Cecilia Munoz, Director, White House Domestic Policy Council
Felicia Escobar, Senior Advisor for Immigration Policy, White House Domestic
       Policy Council
Julie Rodriguez, Associate Director of Public Engagement, White House
John Morton, Director, ICE
Peter Vincent, Principal Legal Advisor, ICE
Ali Mayorkas, Director, USCIS
Noah Kroloff, Chief of Staff, DHS
John Sandweg, Senior Counselor to the Secretary, DHS
Seth Grossman, Acting Chief of Staff, Office of the General Counsel, DHS
Esther Olavarria, Counsel to the Secretary, DHS
Kelly Ryan, Acting Deputy Assistant Secretary for Policy, DHS
Juan Osuna, Director, Executive Office for Immigration Review, DOJ
Monica Ramirez, Senior Counsel to the Deputy Attorney General, DOJ

CAR 0061

**From:**      Immigration Policy Center ███████████
**Sent:**      Friday, June 1, 2012 11:03 AM
**To:**        Alejandro Mayorkas
**Subject:**   A Comparison of the DREAM Act and Other Proposals for Undocumented Youth

---

🗙

*For Immediate Release*

**A Comparison of the DREAM Act and Other Proposals for Undocumented Youth**

**June 1, 2012**

**Washington D.C.** - Today, the Immigration Policy Center releases *A Comparison of the DREAM Act and Other Proposals for Undocumented Youth*, a fact sheet comparing various proposals that attempt to address the plight of undocumented students. The fact sheet focuses particularly on the availability of a dedicated path to lawful permanent residence and the policy implications of legislation that does not include such a path.

There is a growing consensus that undocumented youth who graduate from American high schools should not face deportation from the United States. While the DREAM Act—the oldest and best known legislative solution to this problem—has been introduced in both the House and the Senate during the 112th Congress, the once bipartisan support for it in Congress has waned, leaving undocumented youth in limbo.

Meanwhile, Sen. Marco Rubio (R-FL) continues to promote an alternative to the DREAM Act which, according to his public statements, would offer temporary legal status but not provide a dedicated path to permanent residency. Although Sen. Rubio has yet to introduce a bill, continued speculation over its contents has further heightened the sense that a solution for undocumented youth is necessary.

This week, Rep. David Rivera (R-FL) introduced part two of his own solution, the Studying Towards Adjusted Residency Status (STARS) Act, which would provide a path to permanent residency to graduates of a four-year college or university. In January 2012, Rivera introduced the Adjusted Residency Status (ARMS) Act, which would provide a path to permanent residency to undocumented youth who serve in the military.

**These current proposals are all discussed in the following fact sheet:**

- *A Comparison of the DREAM Act and Other Proposals for Undocumented Youth* (IPC Fact Check, June 2012)

**###**

For futher information contact, Wendy Sefsaf at wsefsaf@immcouncil.org of 202-507-7524

---

The Immigration Policy Center (IPC), established in 2003, is the policy arm of the American Immigration Council. IPC's mission is to shape a rational conversation on immigration and immigrant integration. Through its research and analysis, IPC provides policymakers, the media, and the general public with accurate information about the role of immigrants and immigration policy on U.S. society. IPC reports and materials are widely disseminated and relied upon by press and policy makers. IPC staff regularly serves as experts to leaders on Capitol Hill, opinion-makers and the media. IPC is a non-partisan organization that neither supports nor opposes any political party or candidate for office.

**Division of the American Immigration Council.**



You have received this email through your subscription to the American Immigration Council's email list. If you did not subscribe, or would no longer like to receive email updates, <u>unsubscribe here</u>.



**From:**        American Immigration Council <shoy█████████████
**Sent:**        Friday, January 20, 2012 12:25 PM
**To:**          Alejandro.Mayorkas█████████████
**Subject:**     This Week in Immigration



# THIS WEEK IN IMMIGRATION
## www.immigrationimpact.com

### Holding the Obama Administration to Its Word on Prosecutorial Discretion
Signs that ICE is invested in the "Morton Memo" and subsequent guidance on prosecutorial discretion are beginning to show up at both ends of the legal spectrum. At one end, the *New York Times* reported yesterday that approximately one in six cases reviewed in a pilot program at the Denver immigration court may be indefinitely suspended. At the other end, a government attorney invoked ICE's prosecutorial discretion policy during an argument this week before the Supreme Court. While both instances offer encouraging signs, they also demonstrate that the strength of the policy depends not on what's been said in the past, but on how it will be implemented in the future.

### Border Patrol to Roll Out New "Get Tough" Policy on Unauthorized Immigrants
This month, the U.S. Border Patrol is set to end the practice of sending unauthorized Mexican immigrants back to Mexico without any sort of punishment. As reported by the *Associated Press*, the Border Patrol believes it now has sufficient resources and personnel "to begin imposing more serious consequences on almost everyone it catches from Texas to San Diego." This new policy, however, is as misguided as it is ambitious. While protecting our borders is certainly important, the Border Patrol will waste even more resources than it already does on criminalizing unauthorized immigration rather than targeting the dangerous cartels that smuggle unauthorized immigrants into the country. Furthermore, the Border Patrol's new policy threatens to inundate federal courts and prisons with even more non-violent immigration offenders.

### New Report Says Legalization Would Result in $1.4 billion in Revenues for Houston, Texas
A new report issued this month by the Greater Houston Partnership (GHP), a business advocacy organization, confirms that legalization of unauthorized workers would result in those workers earning higher wages and paying more taxes. *Potential Tax Revenues from Unauthorized Workers in Houston's Economy* uses data from the Pew Hispanic Center to estimate the number of unauthorized immigrant workers, by industry, in the Houston area. Then, assuming that legalized workers would earn the prevailing wage in their industry, GHP estimates their projected incomes to which it applies the standard tax rate.

### Advocates Call Romney's Relationship with Anti-Immigrant Hawk "Political Suicide"
As if Mitt Romney's repeated promise to veto the DREAM Act wasn't alienating enough, advocates warn that Romney's continued relationship with famed anti-immigrant hawk Kris Kobach is killing future support from Latino voters, especially in key states like New Mexico, Nevada, Colorado and Florida. Kobach, co-author of Arizona and Alabama's extreme immigration enforcement laws, appeared in South Carolina Monday night to spin for the Romney campaign following the GOP debate.

**This week in Council Publications:**

- **USCIS Takes Steps to Improve Noncitizens' Access to Legal Counsel** (Council Statement, January 19, 2012)

CAR 0064



**Facts matter!**

Help us share the facts about how much immigrants, Latinos and Asians contribute to the US by clicking on the map, finding your state and posting the link on Facebook!

You have received this email through your subscription to the American Immigration Council's email list. If you did not subscribe, or would no longer like to receive email updates, unsubscribe here.



| | |
|---|---|
| **From:** | Wong, Heather <██████████@HQ.DHS.GOV> |
| **Sent:** | Wednesday, June 13, 2012 12:23 PM |
| **To:** | Peacock, Nelson <██████████@HQ.DHS.GOV>; Chandler, Matthew <██████████@HQ.DHS.GOV>; Kroloff, Noah <██████████@HQ.DHS.GOV>; Shlossman, Amy <██████████@HQ.DHS.GOV>; Sandweg, John <██████████@HQ.DHS.GOV>; Boogaard, Peter <██████████@HQ.DHS.GOV>; Grossman, Seth <██████████@HQ.DHS.GOV> |
| **Subject:** | RE: Draft Roll out Plan |

---

Will do.

---

**From:** Peacock, Nelson
**Sent:** Wednesday, June 13, 2012 12:22 PM
**To:** Chandler, Matthew; Kroloff, Noah; Shlossman, Amy; Sandweg, John; Boogaard, Peter; Wong, Heather; Grossman, Seth
**Subject:** Re: Draft Roll out Plan

I have one add from WH OLA...please add Rep. Cleaver, CBC to list for e-mail.

Thx

---

**From:** Chandler, Matthew
**Sent**: Wednesday, June 13, 2012 04:31 PM
**To:** Kroloff, Noah; Shlossman, Amy; Sandweg, John; Boogaard, Peter; Wong, Heather; Peacock, Nelson; Grossman, Seth
**Subject**: RE: Draft Roll out Plan

# DP



# DP

**OUTREACH**

<u>Press/Media (DHS/S1)</u>
- S1 on-the-record, pen and pad with DHS beat press corps and targeted reporter(s) – embargoed
- Television: S1 round of on-camera interviews with select news stations
- Press Release
- S1 Memo (to be made public)
- Fact sheet
- Internal/External PAG and Q&A
  - For OPA/If-asked
  - Call centers
- Editorial writer outreach

<u>Stakeholder Outreach</u>
- Hill notifications
  - Calls by S1
  - Calls by DHS Staff
  - Email notifications
- VIP Calls
- Conference call(s) with groups

<u>Web Postings</u>
- Web Script/FAQ on DHS/USCIS/ICE Websites
- Press release

**TICK-TOCK FOR ANNOUNCEMENT**

<u>Wednesday, June 13, 2012</u>
Collateral to be produced and approved by FO and WH:
- Final S1 memo (to be made public)
- Press release (public)
- PAG (internal)
- FAQ (external) for DHS component websites and call centers
- Fact sheet for the web
- PM Pen and pad invite send out

<u>Thursday, June 14, 2012</u>

| | |
|---|---|
| AM | TV pitching as needed for S1 sit-downs |
| 9:00AM | S1 on-the-record, pen and pad with targeted reporter(s) – embargoed for noon |
| 10:00AM | Hill notifications begin (see call and email lists below) |
| 10:30AM | VIP calls are made |
| 11:00AM | Stake holder call(s) begin |
| 11:55AM | All documents go live on DHS, ICE, USCIS websites |
| 12:00PM | Press release is sent (with appropriate links to web information) |

| 12:00PM | Press embargo lifted |
| Afternoon | S1 on-camera interviews |
| TBD | Background calls with editorial writers from targeted newspapers |

## HILL NOTIFICATIONS

S1 Calls
- Senator Durbin
- Senator Schumer
- Representative Zoe Lofgren
- Representative Charlie Gonzalez, CHC Chair
- Representative David Price

Calls by Director Morton, Ali Mayorkas, Aguilar
- TBD

DHS Staff Calls
- Democratic Senate Leadership
- Democratic House Leadership
- Select Immigration Working Group Staff (Schumer, Menendez, Reid, Lofgren, Feinstein, Bennett, Leahy)

DHS e-mails S1 memo and other cleared documents
- House and Senate Leadership
- Senate Judiciary Committee
- Senator Patrick Leahy (D-Vt), Chairman
- Senator Chuck Grassley (R-IA), Ranking Member
- Senator Charles Schumer (D-NY)
- Senator John Cornyn (R-TX)
- Senate Appropriations Committee, Subcommittee on Homeland Security
    - Senator Mary Landrieu (D-LA), Chairman
    - Senator Dan Coats (R-IND), Ranking Member
- House Judiciary Committee
    - Rep. Lamar Smith (R-TX), Chairman
    - Rep. John Conyers (D-MI), Ranking Member
    - Rep. Zoe Lofgren (D-CA)
- House Appropriations Committee, Subcommittee on Homeland Security
    - Rep. Robert Aderholt (R-AL), Chairman
    - Rep. David Price (D-NC), Ranking Member
- Congressional Hispanic Caucus
    - Rep. Charlie Gonzalez (D-TX)
    - Rep. Luis Gutierrez (D-IL)
    - Rep. Xavier Becerra (D-CA)
    - Rep. Silvestre Reyes (D-TX)
    - Sen. Robert Menendez (D-NJ)
- Congressional Asian Pacific American Caucus
    - Rep. Judy Chu (D-CA)
    - Rep. Michael Honda (D-CA)

**From:** Kroloff, Noah
**Sent:** Wednesday, June 13, 2012 11:31 AM
**To:** Chandler, Matthew; Shlossman, Amy; Sandweg, John; Boogaard, Peter; Wong, Heather; Peacock, Nelson; Grossman, Seth
**Subject:** RE: Draft Roll out Plan

CAR 0068

Also take off the congressional conf call section.  Then we r done

**From:** Chandler, Matthew
**Sent:** Wednesday, June 13, 2012 11:25 AM
**To:** Kroloff, Noah; Shlossman, Amy; Sandweg, John; Boogaard, Peter; Wong, Heather; Peacock, Nelson; Grossman, Seth
**Subject:** Draft Roll out Plan

DRAFT/PREDECISIONAL



**OUTREACH**
Press/Media (DHS/S1)
- S1 on-the-record, pen and pad with DHS beat press corps and targeted reporter(s) – embargoed
- Television: S1 round of on-camera interviews with select news stations
- Press Release

CAR 0069

- S1 Memo (to be made public)
- Fact sheet
- Internal/External PAG and Q&A
  - For OPA/If-asked
  - Call centers
- Editorial writer outreach

Stakeholder Outreach
- Hill notifications
  - Calls by S1
  - Calls by DHS Staff
  - Calls by component heads [TBD]
  - Email notifications
- VIP Calls
- Conference call(s) with groups
- [DO WE NEED IGA NOTIFICATIONS?]

Web Postings
- Web Script/FAQ on DHS/USCIS/ICE Websites
- Press release

**TICK-TOCK FOR ANNOUNCEMENT**

Wednesday, June 13, 2012
Collateral to be produced and approved by FO and WH:
- Final S1 memo (to be made public)
- Press release (public)
- PAG (internal)
- FAQ (external) for DHS component websites and call centers
- Fact sheet for the web
- PM Pen and pad invite send out

Thursday, June 14, 2012

| | |
|---|---|
| AM | TV pitching as needed for S1 sit-downs |
| 9:00AM | S1 on-the-record, pen and pad with targeted reporter(s) – embargoed for noon |
| 10:00AM | Hill notifications begin (see call and email lists below) |
| 10:30AM | VIP calls are made |
| 11:00AM | Stake holder call(s) begin |
| 11:55AM | All documents go live on DHS, ICE, USCIS websites |
| 12:00PM | Press release is sent (with appropriate links to web information) |
| 12:00PM | Press embargo lifted |
| Afternoon | S1 on-camera interviews |
| TBD | Background calls with editorial writers from targeted newspapers |

**IIILL NOTIFICATIONS**

S1 Calls
- Senator Durbin
- Senator Schumer
- Representative Zoe Lofgren
- Representative Charlie Gonzalez, CHC Chair
- Representative David Price

Calls by Director Morton, Ali Mayorkas, Aguilar
- TBD

CAR 0070

<u>DHS Staff Calls</u>
- Democratic Senate Leadership
- Democratic House Leadership
- Select Immigration Working Group Staff (Schumer, Menendez, Reid, Lofgren, Feinstein, Bennett, Leahy)

<u>DHS e-mails S1 memo and other cleared documents</u>
- House and Senate Leadership
- Senate Judiciary Committee
- Senator Patrick Leahy (D-Vt), Chairman
- Senator Chuck Grassley (R-IA), Ranking Member
- Senator Charles Schumer (D-NY)
- Senator John Cornyn (R-TX)
- Senate Appropriations Committee, Subcommittee on Homeland Security
  - Senator Mary Landrieu (D-LA), Chairman
  - Senator Dan Coats (R-IND), Ranking Member
- House Judiciary Committee
  - Rep. Lamar Smith (R-TX), Chairman
  - Rep. John Conyers (D-MI), Ranking Member
  - Rep. Zoe Lofgren (D-CA)
- House Appropriations Committee, Subcommittee on Homeland Security
  - Rep. Robert Aderholt (R-AL), Chairman
  - Rep. David Price (D-NC), Ranking Member
- Congressional Hispanic Caucus
  - Rep. Charlie Gonzalez (D-TX)
  - Rep. Luis Gutierrez (D-IL)
  - Rep. Xavier Becerra (D-CA)
  - Rep. Silvestre Reyes (D-TX)
  - Sen. Robert Menendez (D-NJ)
- Congressional Asian Pacific American Caucus
  - Rep. Judy Chu (D-CA)
  - Rep. Michael Honda (D-CA)

<u>Congressional Conference Calls</u>
TBD

CAR 0071

| | |
|---|---|
| **From:** | Shlossman, Amy ███████████████████ |
| **Sent:** | Tuesday, June 12, 2012 7:11 PM |
| **To:** | Grossman, Seth ███████████████  Sandweg, John |
| | ████████████  Kroloff, Noah ██████████████████ |
| **Subject:** | FW: Deferred Action Stats |
| **Attach:** | Deferred Action.xlsx |

---

Approx 1600 since July 2010, but the last year only makes up less than 250 of that.

---

**From:** Carson, Rebecca S
**Sent:** Tuesday, June 12, 2012 7:04 PM
**To:** Shlossman, Amy
**Subject:** FW: Deferred Action Stats

Deferred action numbers.

---

**From:** Moore, Joseph
**Sent:** Tuesday, June 12, 2012 6:14 PM
**To:** Carson, Rebecca S
**Subject:** FW: Deferred Action Stats

Rebecca,

Attached is the data we have on Deferred Action (DA) Receipts.  This data is being provided to my office each month by Field Operations who began collecting DA stats from local offices in July 2010 through manual collection methods.  OPQ has been using this data to report out via the monthly National Performance Report.

Please let me know if you have any questions.

Thanks.

Joseph Moore
Chief, Office of Performance and Quality
U.S. Citizenship and Immigration Services
Department of Homeland Security
███████████████████████
Washington, DC 20529-2220
███████████████

---

**From:** Obusan, Abygail
**Sent:** Tuesday, June 12, 2012 1:33 PM
**To:** Moore, Joseph
**Cc:** Afflerbach, Cheryl; Vita, Diana
**Subject:** RE: Deferred Action Stats

Joe-

Field Offices report their Deferred Action (DA) data directly to us in their PRT.  We started collecting this information in July 2010 so we have part of FY2011 and FY2012 YTD (through April 2012).  Prior to Jul-10, Offices were instructed to report only their DA hours to PAS Activity Line 206 – Adjudication Hours to other Offices/Programs.

The DA data we've collected is as reliable as any of our PRT-sourced data.  We can contact the Regions for concurrence before publishing to external sources. Diana mentioned that DA's are adjudicated at the Field Offices and then

forwarded with a recommendation for final approval or denial to the Regions.

SCOPS do not provide DA data. It is my understanding that Service Centers do not work this request type. Cheryl is helping me verify this.

Regards,

**Abygail Obusan**
Management & Program Analyst



---

**From:** Moore, Joseph
**Sent:** Tuesday, June 12, 2012 11:58 AM
**To:** Obusan, Abygail
**Subject:** Deferred Action Stats

Hi Aby,

I understand that you are the best person to speak with regarding Deferred Actions statistics collected by PMB.  It is my understanding that FOD collects DA stats from its field offices and provides PMB a report each month that is loaded into a database.

Can you tell me if we have a complete dataset for deferred actions "requested by applicants" for FY11 and FY12 through April?  By complete I mean do we have confidence that the stats provided by FOD are inclusive of all field offices? Or is the data incomplete and thus unfit for external reporting?  Also, what about SCOPS, do they provide us data on deferred action?

Thank you.
Joe

Joseph Moore
Chief, Office of Performance and Quality
U.S. Citizenship and Immigration Services
Department of Homeland Security

Washington, DC 20529-2220

**Deferred Action Requests**

| Fiscal Year | Month | Receipts |
|---|---|---|
| 2010 | Jul-10 | 153 |
| 2010 | Aug-10 | 120 |
| 2010 | Sep-10 | 187 |
| 2011 | Oct-10 | 166 |
| 2011 | Nov-10 | 118 |
| 2011 | Dec-10 | 131 |
| 2011 | Jan-11 | 83 |
| 2011 | Feb-11 | 99 |
| 2011 | Mar-11 | 172 |
| 2011 | Apr-11 | 126 |
| 2011 | May-11 | 28 |
| 2011 | Jun-11 | 18 |
| 2011 | Jul-11 | 42 |
| 2011 | Aug-11 | 14 |
| 2011 | Sep-11 | 25 |
| 2012 | Oct-11 | 9 |
| 2012 | Nov-11 | 13 |
| 2012 | Dec-11 | 5 |
| 2012 | Jan-12 | 16 |
| 2012 | Feb-12 | 47 |
| 2012 | Mar-12 | 12 |
| 2012 | Apr-12 | 19 |

Source: PRT-PASEXEC, April 2012 Final
Date: June 12, 2012
AO

CAR 0074

| | |
|---|---|
| **From:** | Sharp, Becca ███████████████████████ |
| **Sent:** | Thursday, June 7, 2012 2:30 PM |
| **To:** | Brown, Mary Ellen ███████████@HQ.DHS.GOV>; Sandweg, John ███████████@HQ.DHS.GOV> |
| **Cc:** | McQuillan, Patrick <███████████@HQ.DHS.GOV> |
| **Subject:** | Call Time Request |
| **Attach:** | Dreamers.ExecutiveBranchAuthority.1.docx; friedland_-_unrepresented_immigrants_051412.pdf |

---

Hi ME and Sandweg,

I just found out S1 will be meeting with immigration experts on 6/13.

Former mayor of Miami and HSAC member, Manny Diaz, has been in close contact with government officials and media outlets regarding Senator Rubio's "Dream Act Lite" and its political implications.  Manny has also told me he's reaching out to friends within the White House to discuss the matter.

FYI, Manny has also recently shared the attached with us.

I would be happy to work with you to set-up a call between Manny and S1 before her 6/13 meeting if the Front Office thinks it would be helpful.  I know Manny would be appreciative of the opportunity to speak with S1.

Thanks,

Becca

Becca Sharp
Executive Director
Homeland Security Advisory Council and Homeland Security Advisory Committees
U.S. Department of Homeland Security
██████████████

# Summary Regarding Executive Branch Authority
# to Grant DREAMers Temporary Relief

**To:**   Interested Parties

**From:** Cheryl Little, Esq, Executive Director, Americans for Immigrant Justice
**Date:** May 2, 2012

## Background

65,000 undocumented students graduate from high school each year. They constantly fear deportation, and despite their talent and potential to contribute to the country, they face bleak prospects in both employment and education. Without legal status, they cannot drive or work legally, and they are forced to take dead-end jobs. They cannot qualify for most college scholarships and loans; only a few states offer in-state tuition for these students. Unsurprisingly, many must leave higher education due to prohibitively high costs.

The DREAM Act provides a promising solution. Legislation pending in Congress would offer these students greater access to higher education and a reasonable path to citizenship. In addition to allowing immigrant youth to participate more fully in American society, the bill would substantially benefit states and communities across the country.

The DREAM Act would stop the colossal brain drain that occurs when ambitious youth are deported or blocked from achieving their full potential as doctors, scientists, academics, entrepreneurs, and military officers. Unleashing their talents will allow them to earn, spend, and invest more in the American economy. At a time when employers increasingly demand highly-skilled "knowledge workers" to compete in a global economy, legalizing bicultural and multilingual youth will pay enormous dividends.

U.S. Senator Marco Rubio (R-FL) is working on a bill that would offer undocumented youth a nonimmigrant visa that could be renewed indefinitely. It would not provide a pathway to citizenship. Yet Congress does not have to pass Senator Rubio's bill in order to allow the government to grant relief to undocumented youth, one of the proposal's most important features. The U.S. Department of Homeland Security (DHS) already has the discretionary power necessary to grant DREAMers temporary authorization to remain in the country that can be renewed indefinitely and would allow them to work and drive legally.

Until Congress can pass the DREAM Act (S. 952), DHS should create a program allowing DREAM Act eligible youth to apply for provisional status on a case-by-case basis. This program would allow immigrant youth to pursue their dreams while contributing their considerable talents to the country they love and consider home.

A DHS program offering DREAMers temporary authorization to remain in the country would provide more benefits than a bill, such as Senator Rubio's proposal, that confers similar relief. Of course, neither would offer an opportunity to adjust to legal permanent residency directly. However, the law easily could transform into a permanent fix it was never intended to become

CAR 0076

and dilute or preempt future campaigns for immigration reform, both for undocumented youth and for the population as a whole.

In the American legal system, law enforcement agencies have the fundamental authority to exercise discretion in deciding which cases to investigate and prosecute under existing criminal and civil laws, including immigration law.

The Executive Branch has long exercised this power in immigration law and policy. This memo summarizes the scope of this power, demonstrating how the government has employed it in the past.

This memo is based in large part on an April 29, 2011, memo from former AILA Executive Director, Jeanne Butterfield, Esq.; Former INS General Counsel, Bo Cooper, Esq.; Center for American Progress, Director of Immigration Policy, Marshall Fitz, Esq.; American Immigration Council, Executive Director, Benjamin Johnson, Esq.; Former INS General Counsel, Paul Virtue, Esq.; and AILA Executive Director, Crystal Williams, Esq.

## Exercising Executive Authority

The Supreme Court has held that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney 470 U.S. 821, 831 (1985).

In the immigration context, ICE exercises prosecutorial discretion at every stage in the enforcement process, from deciding whom to arrest and whom to release on bond to whom to bring forth for removal proceedings or criminal prosecution.

Despite Congress' decision to allocate substantial resources to immigration enforcement, funding has its limits, and ICE must determine its prosecutorial priorities. Indeed, the President has repeatedly announced that interior enforcement prioritizes prosecuting and removing noncitizens that have committed serious crimes.

Once individuals come into contact with law enforcement, authorities can exercise prosecutorial discretion on a case-by-case basis.  The government may also exercise this authority and allow individuals from certain groups not within its enforcement priorities to request favorable relief affirmatively.

DHS and INS have issued numerous memorandums over the years that outline agency priorities and provide their officers with clear guidance for carrying out these priorities.  The challenge often lies in ensuring that officers on the frontlines of immigration enforcement understand and follow such guidance.

ICE Director John Morton's June 17, 2011, memorandum on prosecutorial discretion focuses on low enforcement priorities and which factors to consider on a case-by-case basis when deciding to close a case administratively. Individuals cannot qualify for work authorization solely because they have received administrative closure.  The government can exercise prosecutorial discretion favorably in pending cases, whether the noncitizen is detained or not, though in most cases that ICE has closed administratively, the noncitizen was not detained.

CAR 0077

**Deferred Action**

While the Administration has primarily exercised its discretion through administrative closure, deferred action can also achieve this end.

The Executive Branch, through the Secretary of the Department of Homeland Security (DHS), can decide not to prosecute a case, granting "deferred action" to removable persons. The former Immigration and Naturalization Service (INS) had "Operations Instructions" regarding deferred action. *See* (Legacy) Immigration and Naturalization Service, Operations Instructions, 0.1 § 103.1(a) (1) (ii) (1975). Currently, deferred action is considered "a discretionary action initiated at the discretion of the agency or at the request of the alien." Http://www.dhs.gov/xlibrary/assets/cisombudsman_rr_32_o_deferred_action_uscis_response_08 -07-07.pdf.

This relief allows a person to remain temporarily in the U.S. and is "an act of administrative convenience to the government which gives some cases lower priority." (*See* 8 C.F.R. §274a.12(c) (14). DHS says that officers should consider sympathetic or compelling factors when deciding whether to grant deferred action. The government could terminate this relief at any time, though it rarely chooses to terminate deferred action status. While in deferred action, beneficiaries can apply for employment authorization. With an employment authorization document, they can apply for a driver's license in states that require applicants to have legal status.

In AI Justice's experience, deferred action is granted only to DREAMers with final orders of removal whose deportation is imminent, even though the government could grant them deferred action at any time throughout removal proceedings. Typically, deferred action status is valid from 12 to 18 months; beneficiaries must requests renewals when their status is close to expiring. ICE has recently shied away from granting deferred action and has instead released DREAMers with orders of supervision (can apply for work permit) or stayed their removal (not eligible for work permit). ICE frequently requires in-person reporting for individuals under orders of supervision.

While ICE generally makes deferred action decisions on a case-by-case basis, these decisions can affect discrete classes of noncitizens. Each case, however, is reviewed individually. In June 2009, for example, Secretary Napolitano granted deferred action to widows of U.S. citizens who could not adjust status due to a statutory restriction. In 2010, DHS granted deferred action to nearly 12,000 VAWA applicants whose cases were on hold awaiting new DHS regulations. After Hurricane Katrina, USCIS granted deferred action to non-immigrants affected by the disaster. Certain military dependents for which a visa number was not current and ineligible for Parole-in-Place were also granted deferred action.

USCIS, ICE, and CBP all have the authority to grant deferred action. Deferred action may be extended indefinitely. There is no application form or filing fee required at this time, although if USCIS significantly increases the use of this exercise of prosecutorial discretion they could require a separate appropriation or independent funding stream. Another option is for USCIS to design and seek expedited approval of a dedicated deferred action form and require a filing fee.

USCIS could also tailor the use of deferred action for DREAMers based on the Registry program. *See* section 249 of the INA. Currently this relief is limited to persons who entered before January 1, 1972 but it could be extended, for example, to persons who have resided in the US since 1995.

Nicaraguans present in the United States in the early 1990's were eligible for temporary relief under the Nicaraguan Review Program, pursuant to regulation. They were also eligible for work permits. The program was terminated in June 1995. *See* 60FR31168.  Some Nicaraguans affected by termination of the NRP, were eligible to apply for suspension of deportation pursuant to INA Section 244, 8U.S.C. 1254 and INS extended the transitional work permit until June 12, 1997.

**Deferred Enforced Departure (DED)**

Prior to the enactment of Temporary Protected Status (TPS), the Attorney General provided relief by suspending enforcement of immigration laws against a particular group of individuals. One of the two most common discretionary procedures to provide relief from deportation has been deferred departure or deferred enforced departure (DED).

The President has the authority to grant DED to a class or group of foreign nationals pursuant to his foreign relations and prosecutorial discretion powers.  The Attorney General has therefore provided that under certain conditions persons who have not been legally admitted to the United States may remain in the country either temporarily or permanently.  *See* §240 of INA (8 U.S.C. § 1229a); §240B (8 U.S.C. §1229c).

The discretionary procedures of DED are used to provide relief the Administration feels is appropriate. The executive branch's position is that all blanket relief decisions require a balance of judgment regarding foreign policy, humanitarian, and immigration concerns.

DED can be granted for any specific amount of time and typically comes with a work permit. Unlike TPS, there is no application fee and persons who benefit from DED do not necessarily register for this status with USCIS, but protection is triggered when they are identified for deportation. If, however, they wish to be employed in the United States, they must apply for a work permit from USCIS.

Executive authority granting Deferred Enforced Departure was also exercised by President George H.W. Bush for Chinese nationals in the wake of Tiananmen Square events.  *See Executive Order 12,711, April11, 1990, at http://www.uscis.gov/ilink/docView/FR/HTML/FR/0-0-0-1/0-0-0-30133/0-0-0-39631/0-0-0-39863.html* and by President Clinton for certain Haitian nationals. *See "Deferred Enforced Departure for Certain Haitian Nationals," December 23, 1997,                                                                                    at http://www.ice.gov/doclib/foia/dro_policy_memos/deferredenforceddepartureforcertainhaitiannationals12231997.pdf.*  President George W. Bush granted DED to certain Liberian nationals in 2007. *See "Fact Sheet:  Liberians Provided Deferred Enforced Departure (DED)," September 12, 2007, at http://www.dhs.gov/xnews/releases/pr_1189693482537.shtm ; see also "Deferred Enforced                                   Departure"                                   at http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=fbff3e4d77d73210VgnVCM100000082ca60aRCRD&vgnextchannel=fbff3e4d77d73210VgnVCM100000082ca60aRCRD.*  President Obama extended this relief in 2009

**Humanitarian Parole or Parole-in-Place**

The Executive Branch, through the Secretary of Homeland Security, has the authority to "parole" persons for "urgent humanitarian reasons or significant public benefit." (See INA§212(d) (s) (A). If that person is in the United States and has not already been admitted or paroled, this relief is called "Paroled in Place" (PIP). PIP has been granted by USCIS without requiring the filing of any form or fee, but that could be altered.

For years, USCIS has granted PIP on a limited basis. Under the Clinton Administration, PIP was granted to Cuban boat persons who made it to dry land (dry foot/wet foot policy). More recently a broader use of PIP was approved for certain qualified military dependents to, among other things, preserve family unity and address Department of Defense concerns about soldier safety and readiness for duty. Parole has also been granted to Cuban beneficiaries of I-130 relative petitions (renewed recently). Workers in the N. Mariana Islands also have benefited from this relief.

Persons who were lawfully admitted to the U.S. but whose authorized period of admission is about to expire or has expired are not eligible for PIP. Since many DREAMers arrived with their parents who had valid visas, PIP is not a practical solution. However, USCIS can increase the use of deferred action for these persons.

**In Sum**

While the Administration may be concerned that exercising prosecutorial discretion to grant DREAMers provisional status would be controversial, it clearly has the authority to do so. In 2010, USCIS wrote a memo, "Administrative Alternatives to Comprehensive Immigration Reform," detailing ways in which the Administration could provide relief options to promote family unity, foster economic growth, achieve significant process improvements and reduce the threat of removal for certain persons present in the U.S. without authorization. This memo was leaked, some Republicans accused the Administration of trying to bring about "back door amnesty" and the Administration quickly retreated.

More recently, an April 26, 2012 Washington Post article, "Shift on Executive Power lets Obama bypass Rivals," discusses President Obama's desire "to more aggressively use executive power to govern in the face of Congressional obstructionism." Aides say President Obama coined a "We Can't Wait" slogan at a recent meeting, where reportedly dozens of new ideas were rolled out. In February 2011, President Obama directed the Justice Department to stop defending the Defense of Marriage Act. As Jack Goldsmith, the former head of DOJ's Office of Legal Counsel, has said: "You can't be in that (President's) office with all its enormous responsibilities…and not exercise all the powers that accrued to it over time."

We continue to see DREAMers in ICE detention. Shamir Ali, a bright 25 year old from Bangladesh came to the U.S. when he was age 7. In November 2011, he was detained and initially denied relief by ICE despite a compelling case and widespread public support. AI Justice learned of his case and submitted a renewed request, which thankfully led to his release. Yet DREAMers like Shamir too often end up in ICE detention. Currently we know of at least one DREAMer who is detained at the Broward Transitional Center in Pompano, Florida.

CAR 0080

Countless DREAMers have been deported. Currently, only those whose deportation is imminent have an opportunity to get temporary legal status and a work permit. The vast majority of DREAMers, therefore, remain in legal limbo. These DREAMers have been patiently waiting years for Congress to pass the DREAM Act.

The Administration needs to give DREAMers who would be eligible for relief under S.952 a lifeline, and should do so now. There is no doubt that the Administration has the authority to do so. It's also the moral imperative and the smart thing to do. According to a White House Fact Sheet as well as many studies, DREAMers would contribute important economic and other benefits if afforded legal status. Even if with provisional status, the economic benefits would be significant.

The only question is whether the Administration has the will to do this. Tens of thousands of DREAMers and millions of U.S. Latinos are hoping and praying the answer is yes.



CAR 0081

# FALLING THROUGH THE CRACKS

## HOW GAPS IN ICE'S PROSECUTORIAL DISCRETION POLICIES AFFECT IMMIGRANTS WITHOUT LEGAL REPRESENTATION

By Joan Friedland

CAR 8082

MAY 2012

# FALLING THROUGH THE CRACKS

## How Gaps in ICE's Prosecutorial Discretion Policies Affect Immigrants without Legal Representation

## By Joan Friedland

MAY 2012

## ABOUT PERSPECTIVES ON IMMIGRATION

The Immigration Policy Center's Perspectives are thoughtful narratives written by leading academics and researchers who bring a wide range of multi-disciplinary knowledge to the issue of immigration policy.

## ABOUT THE AUTHOR

Joan Friedland, formerly a Managing Attorney at the National Immigration Law Center in Washington, D.C., is a Senior Fellow at the Immigration Policy Center. Joan worked for many years with non-profits and in private practice in New Mexico and Florida, practicing primarily in the areas of civil rights, immigration and criminal law. She is a graduate of Harvard Law School and currently lives in New Mexico.

## ABOUT THE IMMIGRATION POLICY CENTER

The Immigration Policy Center, established in 2003, is the policy arm of the American Immigration Council. IPC's mission is to shape a rational conversation on immigration and immigrant integration. Through its research and analysis, IPC provides policymakers, the media, and the general public with accurate information about the role of immigrants and immigration policy on U.S. society. IPC reports and materials are widely disseminated and relied upon by press and policymakers. IPC staff regularly serves as experts to leaders on Capitol Hill, opinion-makers, and the media. IPC is a non-partisan organization that neither supports nor opposes any political party or candidate for office. Visit our website at www.immigrationpolicy.org and our blog at www.immigrationimpact.com.

CAR 0083

# INTRODUCTION

An unresolved issue in discussions about the Obama administration's expanded use of prosecutorial discretion is that in FY 2011[1], nearly half of all immigrants in removal proceedings appeared "*pro se*," or without legal representation. While immigration attorneys can explain the effect of these policies to their clients, *pro se* immigrants may be unaware that new policies are even in effect. Immigrant advocates have thus been rightly concerned about whether *pro se* immigrants in removal proceedings will benefit from Immigration and Customs Enforcement's (ICE) prosecutorial discretion policies.

Unlike immigrants who have legal representation, *pro se* immigrants do not have access to information specifically directed at them explaining the exercise of prosecutorial discretion, how to obtain it, or what it means. This compounds the already serious problem that most *pro se* immigrants do not have access to information about what relief might be available to them. Moreover, whether or not they are aware of possible options for relief, they may be unaware of the implications of either accepting or foregoing an offer of prosecutorial discretion from ICE.

Underlying all of these deficiencies is a fundamental inequity—immigrants who cannot hire or find scarce *pro bono* attorneys are not entitled to government-provided representation in a deportation process that has devastating consequences, including separation from family for decades or forever.

To prevent *pro se* immigrants from falling through the cracks, immigration authorities can take a number of steps to ensure they understand what prosecutorial discretion is, how they can seek it, and what they should do after receiving (or not receiving) an offer of it. First, ICE should advise *pro se* respondents prior to reviewing their files and explain how to submit documentation for agency officials to consider. Second, if ICE declines to offer a favorable exercise of discretion, agency officials should inform *pro se* respondents how they can "appeal" the decision to higher agency officials. Third, when ICE offers a favorable exercise of discretion, the agency should provide information explaining the consequences of accepting such an offer. And finally, prior to approving a favorable exercise of discretion, Immigration Judges should affirmatively confirm that *pro se* immigrants understand these consequences.

By adopting these recommendations, immigration officials can help alleviate one of the most fundamental inequities of the removal process: that the government does not provide attorneys to immigrants who cannot afford one.

## BACKGROUND

In June 2011, ICE Director John Morton released long-awaiting memoranda emphasizing the importance of prosecutorial discretion and specifying a list of factors to be taken into consideration in determining whether to pursue removal in individual cases. The following November, the agency announced a nationwide initiative to eventually review all pending and incoming cases in immigration courts around the country, with a view toward suspending those cases that did not meet agency priorities. According to ICE, these policies are aimed at focusing immigration enforcement resources on higher priority cases and unclogging immigration court caseloads.[2]

In the first phases of implementation of the 2011 policies, ICE attorneys with the Office of Chief Counsel (OCC) were required to conduct a nationwide review of all <u>incoming</u> cases in Immigration Court and to conduct a review of all <u>pending</u> cases in two jurisdictions (Baltimore and Denver). "Incoming" cases includes cases already on the docket but still in the preliminary procedural stages as well as new cases before they are filed with immigration courts. Cases that were favorably reviewed would not be filed with the Immigration Court or would be eligible for "administrative closure" if already pending.

These pilots were set to end on January 13, 2012. ICE would then "promptly" review data from the review processes "to determine, on an expedited basis, the best methods to implement these processes on an ongoing basis nationwide." ICE has not announced the results of the review. However, on April 3, EOIR announced its schedule for temporarily suspending hearings in the non-detained docket in seven additional courts (Seattle, Detroit, New Orleans, Orlando, Los Angeles, San Francisco and New York City) to enable ICE to conduct a review of cases in those courts, although ICE has made no official announcement of this expansion of the review process.

As of April 16, DHS attorneys had reviewed the cases of nearly 220,000 immigrants in deportation proceedings and had found more than 16,500 (approximately 7.5%) eligible for a favorable exercise of prosecutorial discretion. Of the cases reviewed, approximately 2,700 had been administratively closed. The data does not distinguish between persons represented by an attorney and those appearing pro se, so it is unknown to what extent cases of *pro se* immigrants have been administratively closed or under what circumstances.

# THE NEED FOR GREATER TRANSPARENCY WHEN DEALING WITH *PRO SE* IMMIGRANTS

## Understanding Administrative Closure

There has been a general lack of transparency as ICE implements its new prosecutorial discretion guidelines, but there has thus far been a complete dearth of information from ICE aimed specifically at *pro se* immigrants, explaining how reviews would be conducted, how to ask for a favorable exercise of discretion, and what an offer of prosecutorial discretion actually entails. The primary method of exercising prosecutorial discretion for immigrants in proceedings has been through an offer to agree to "administrative closure" of a case. But without an explanation of what that means, *pro se* immigrants may accept or reject an offer without understanding the options and limitations of administrative closure.

When a case is administratively closed, removal proceedings against the individual are not terminated. Instead, they are put on hold until either the government or the individual files a motion to have the case "recalendered."  In the interim, immigrants whose cases have been administratively closed remain in whatever immigration status they possessed prior to the initiation of proceedings. When a case is administratively closed, applications for relief (such as cancellation of removal or asylum) cannot be adjudicated unless the case is put back on the calendar.

Adding to the confusion, although ICE initially indicated that persons offered administrative closure would be eligible to obtain an employment authorization document (EAD), the Department of Homeland Security (DHS) currently maintains that administrative closure itself does not entitle an immigrant to work authorization. Instead, DHS currently entertains motion for work authorization only from those who filed applications for relief from removal prior to the case being administratively closed, if such applications provide an independent basis for work authorization.

Acceptance of administrative closure has significant consequences, especially if an immigrant has the possibility of applying for some form of relief before the judge, and  "unclogging" the administrative court caseload does not necessarily translate into a beneficial result for an individual immigrant. At the same time, and despite the drawbacks, administrative closure may be a positive result for an immigrant who does not have a strong legal claim for relief but has equities which warrant staying in the U.S. Even if it means remaining in immigration limbo, many *pro se* immigrants would find administrative closure preferable to near-certain deportation. Without a full appreciation of the benefits and drawbacks of accepting an offer of administrative closure, however, *pro se* immigrants will not have the tools they need to determine the right course of action in their case.

## Making the case for Prosecutorial Discretion

To date, there has been little opportunity for *pro se* immigrants to influence—or even be aware of—the decision-making process regarding the exercise of prosecutorial discretion. The review process conducted by ICE has been decidedly lawyer-centric, relying on a file review conducted by ICE attorneys in the Office of Chief Counsel (OCC). In some cases, ICE may determine on its own accord (*sua sponte*) that an offer of administrative closure is warranted, or may be warranted if additional documents are made available. In other cases, an individual, usually represented by an attorney, may affirmatively ask for prosecutorial discretion and submit supporting documentation to ICE.

The *sua sponte* method depends on ICE making a determination on an immigrant's eligibility for a favorable grant of discretion. But *pro se* immigrants would have no way of even knowing that OCC attorneys were considering their cases, unless OCC advised them. With respect to an affirmative request to ICE, *pro se* individuals do not have access to information (since ICE has not provided it) about how to present their cases to OCC attorneys.

Attorneys, on the other hand, may learn how to apply for prosecutorial discretion through meetings with ICE in which *pro se* immigrants do not participate, with procedures, criteria and results that vary by district. In some districts, such as Dallas, attorneys have received specific information about applying for an exercise of discretion, including the names of OCC attorneys conducting reviews, the email address for submitting a request and the information to be included on the subject line, and examples of documentation to be included with the request, such as a university transcript or short summary of medical issues from a doctor. On the other hand, in the El Paso District, where advocates report resistance from ICE to implementing the policies, the announced procedures are minimal. Either way, *pro se* immigrants are at a disadvantage.

As ICE has made clear, a favorable exercise of prosecutorial discretion can be more than a decision not to file a "Notice to Appear" in Immigration Court or to offer to administratively close a pending case. It includes canceling a detainer, releasing a detained immigrant on bond, joining a motion to terminate proceedings, or stipulated to a grant of immigration relief or deferred action. An attorney would know to ask for the broader – albeit difficult to obtain – range of prosecutorial discretion avenues beyond administrative closure. But information regarding the availability or even existence of the wider range is not necessarily available to *pro se* immigrants.

## Defining the Universe of Eligible Candidates

The overall lack of clarity in the prosecutorial discretion process is compounded for particular subsets of the overall *pro se* population. For instance, ICE has not been forthcoming with information about when and how it would review the cases of the overwhelmingly unrepresented detained population, of which about 84% are unrepresented.

ICE initially announced that it would *not* review the cases of detained persons, but recently told Congress that it had in fact begun to review such cases. The agency has not made any public announcements to that effect, and attorneys serving detainees or providing know-your-rights presentations in some major immigration detention centers are unaware of any change in policy. In other places, such as Miami and Washington state, advocates have only learned of a review of detained cases in informal discussions with ICE attorneys, but with no details about the nature or timing of the reviews. ICE has not indicated which cases of detained persons are being reviewed or what the review entails, or if the review could lead to an offer of administrative closure or simply release on bond.

ICE has told advocates in Washington state that a review of the detained files has identified few cases that meet the criteria but without a transparent process, it is impossible to know what that means. ICE's reported expansion of the review of existing cases to additional cities does not include detained cases. In general, ICE has been consistently negative about the likelihood of detained persons being granted a favorable exercise of discretion. Similarly, ICE continues to exclude *pro se* immigrants from other aspects of its review. The agency has also told advocates that it has begun to review cases that are pending before the Board of Immigration Appeals, but will not review of the cases of *pro se* appellants.

## CREATING A PROCESS THAT ACCOMMODATES THE *PRO SE* APPLICANT

Reports from various immigration courts suggest that ICE and EOIR have not created a process that allows *pro se* immigrants to make a knowledgeable decision about whether or not to pursue, or to agree to an offer of, administrative closure. While the ICE Public Advocate has indicated that the agency may be preparing educational materials for *pro se* immigrants, nothing has been made public.

Miami advocates report that some non-detained *pro se* immigrants have been given a "soft" offer of prosecutorial discretion at master calendar hearings, with a request that they present supporting evidence within ten days. But ten days may not be enough time to gather information or to make an informed decision about whether an offer of administrative closure is worth accepting. Within that time period, for example, *pro se* immigrants in Miami are unlikely to be able to schedule a consultation with one of the few organizations providing free legal services. In addition, accepting such an "exploding" offer could effectively foreclose an immigrant from filing an application for relief that might independently warrant a grant of work authorization.

Acceptance of administrative closure requires delaying – and in some cases perhaps even abandoning – a claim for relief, without an evaluation of the strength of the claim or even being advised that a claim for relief might be possible. ICE has compounded the lack of information by issuing confusing and conflicting information about eligibility for work authorization, the

availability or non-availability of which could be a decisive factor in a decision to accept an offer of administrative closure.

ICE has also said that the offer of administrative closure is a one-time offer, so an immigrant who cannot meet the short time frame may not get another chance. ICE has recently indicated to some advocates  that a second review may be possible if circumstances change, but has made no public announcement to this effect, and it is not clear if this is official policy or has been communicated to OCC attorneys who will decide whether an offer will be made.

ICE has told advocates in Miami that it is not the agency's responsibility to tell immigrants that they might be eligible for relief from deportation, which they give up during the period when their cases are administratively closed. And Immigration Judges seem to be under no obligation to do that either. While Immigration Judges are required to advise respondents at a master calendar hearing about relief that may be available to them, an offer of administrative closure could well be made before that hearing occurs. To date, EOIR has not issued any instructions to immigration judges requiring them to explain what administrative closure entails before they sign an order administratively closing a case. EOIR's Master Calendar Checklist for the Immigration Judge for Pro Se Respondents includes no information regarding administrative closure.

ICE's *sua sponte* offers made on the basis of largely biographical information in an immigration file (such as length of time in the country or absence of criminal convictions) could leave out immigrants whose equities have not yet been presented, such as a single mother with children with special needs.

The ICE memos outline a broader range of factors to consider than are likely to be evidenced in an immigration file. The November 17, 2011, guidance to ICE attorneys and the June 17 Memorandum outline a long list of factors to be taken into consideration, ranging from health conditions to contributions to the community to military service of an immediate relative. An additional June 17  Memorandum from John Morton regarding prosecutorial discretion for vulnerable immigrants allows for the exercise of prosecutorial discretion for victims and witnesses to crimes and persons enforcing civil rights or engaged in protected activities like union organizing or complaining about housing discrimination.

As a result, *pro se* immigrants whose immigration files have been deemed to provide an insufficient basis for administrative closure might not have the opportunity to present evidence of compelling factors listed in the above memos.

In at least one district, the local OCC has asked the local AILA chapter to prepare a pamphlet describing administrative closure. But that is not national policy, and in any event good legal advice is necessary to understand whether it is advisable in a particular case.

## RECOMMENDATIONS TO IMPROVE THE PROCESS FOR *PRO SE* IMMIGRANTS

The fact that immigrants are largely unrepresented in immigration proceedings can only be remedied by availability of counsel. But there are some steps that ICE and EOIR can take to mitigate against the unfairness.

- ICE must be totally transparent in when, how and under what circumstances it is reviewing files and granting or denying the exercise of discretion.

- ICE should develop uniform policies and practices so that access to the grant of prosecutorial discretion does not differ from jurisdiction to jurisdiction.

- ICE should develop materials to educate immigrants about its prosecutorial discretion policies, including how to affirmatively request prosecutorial discretion. These materials should be available online, in detention facilities, and in ICE field offices.

- ICE should advise *pro se* immigrants that their files are being reviewed for consideration of prosecutorial discretion, the criteria for a favorable grant, and how to supplement their files to present compelling factors.

- ICE should advise *pro se* immigrants when the agency has decided to not favorably exercise prosecutorial after a review of their file, and should allow *pro se* immigrants to object to the denial of prosecutorial discretion and to submit evidence in support of it.

- ICE should establish a checklist for information to be provided to *pro se* immigrants when an offer of administrative closure is made, including:

  - An explanation of administrative closure;
  - The availability or non-availability of work authorization;
  - The availability of forms of prosecutorial discretion other than administrative closure, for example, termination of proceedings, stipulating to a grant of relief, or an offer of deferred action.

- Prior to administratively closing a case, immigration judges should conduct a hearing to ensure that *pro se* immigrants understand the consequences of administrative closure, providing:

  - An explanation of administrative closure;
  - The availability of relief from removal and effect of not filing or abandoning a claim for relief;
  - The availability or non-availability of work authorization;
  - The availability of forms of prosecutorial discretion other than administrative closure, for example, termination, grant of relief or deferred action.

- USCIS should grant work authorization to persons whose cases have been administratively closed, likening administrative closure to a grant of deferred action.

- An independent review should be conducted of the effect of the prosecutorial discretion policies on the due process rights of *pro se* immigrants.

# ENDNOTES

---

[1] According to the Executive Office for Immigration Review (EOIR), FY 2011 is the first year in which more than half of the immigrants in immigration proceedings were represented by counsel. EOIR recently revised its methodology for calculating the number of persons represented in immigration proceedings, however, and upwardly adjusted its calculations for FY 2007 to FY 2010. In FY 2010 and the years before, EOIR determined representation rates by looking at whether a particular respondent was represented at a particular <u>proceeding</u>. For example, if a respondent appeared pro se in FY 2007, but subsequently obtained counsel for a proceeding in FY 2008, the respondent would be considered "unrepresented" for the first proceeding but "represented" for the second proceeding. In the FY 2011 Statistical Yearbook, EOIR determined representation rates by looking at whether a particular respondent was represented at any point of a particular <u>case</u>. Thus, if a respondent appeared pro se in FY 2007, but subsequently obtained counsel for a proceeding in FY 2008, the respondent would be considered "represented" in both FY 2007 *and* FY 2008.

[2] June 17, 2011 <u>Memorandum</u> from John Morton regarding "Exercising Prosecutorial Discretion Consistent  with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention and Removal of Aliens;

June 17, 2011 <u>Memorandum</u> from John Morton regarding "Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs;

August 18, 2011 <u>letter</u> from Janet Napolitano announcing a review of all administrative removal cases before the Executive Office for Immigration Review to identify cases that are high enforcement priority;

November 17, 2011 <u>Memorandum</u> from Peter S. Vincent regarding Case-by-Case Review of Incoming and Certain Pending Cases, accompanied by updated <u>Next Steps</u> in the Implementation of the Prosecutorial Discretion Memorandum
Undated <u>Guidance</u> to ICE Attorneys Reviewing the CBP, USCIS, and ICE Cases Before the Executive Office for Immigration Review

| | |
|---|---|
| **From:** | Sandweg, John ████████████████████ |
| **Sent:** | Tuesday, May 22, 2012 10:13 PM |
| **To:** | Munoz, Cecilia ███████████████ |
| **Cc:** | Escobar, Felicia < ████████████████ ; Grossman, Seth ██████████████████ |
| **Subject:** | FW: Key stats |
| **Attach:** | Data Sheet-Case By Case-5 20 12-v2.docx |

Cecilia-

Prior to your meeting, wanted to highlight some key stats and explain a couple points related to those stats. Most of this data is in the materials we provided the other day - I have attached a copy here for your convenience:

*Case by case review*:

- ICE has reviewed 184,779 **non-detained** cases with approximately 17,025, or 9%, identified as amenable for prosecutorial discretion. 2,974 of these cases have been administratively closed.

As we discussed the other day, the overall percentage of cases that have been identified as eligible for closure is somewhat misleading. A significant percentage of the 184,779 cases reviewed thus far involved cases where the NTA was issued **after** we issued the prosecutorial discretion memo and after USCIS issued their NTA memo. Because these NTAs were issued after our new policies, we expect that most of these NTAs will adhere to our priorities and that only a very small percentage of these cases will be eligible for discretion. Conversely, because most of the backlogged NTAs were issued long before we implemented clear priorities, we expect to see a higher percentage of these cases being offered discretion.

The analysis to determine which of the reviewed cases involve NTAs issued before the implementation of the new policies and which involve NTAs issued after these policies is underway. Unfortunately, this analysis requires a significant amount of work and is not yet complete. However, the initial data suggests that ICE is likely closing more than 12% of the backlogged cases as ICE and USCIS are not issuing low priority NTAs. (A review of 900 closed cases revealed that 99.7% of the closed cases were older than six months. Less than one percent of the NTAs in closed cases had been issued after the PD memo).

*Work Authorization:*

- Of the 2,974 individuals whose cases have been administratively closed, 1,881 have received employment authorization in the past and 1,257, or over 40%, currently have employment authorization.

- 2,710 individuals have declined an offer of prosecutorial discretion. Of these individuals, 2,052 have received employment authorization in the past and 1,483, or over 54%, currently have employment authorization.

As we discussed in our meeting, the Secretary will be meeting with Ali and John to discuss work authorization issues when she returns from her international travel. Additionally, USCIS will be clarifying that individuals whose cases are administratively closed will remain eligible for work authorization if they had a pending application at the time of their closure. In other words, accepting an offer of discretion will not make you ineligible for work authorization if you were

already eligible.

***Deferred Actions:***

- ICE has granted deferred actions or issued a stay in 1,273 cases thus far in fiscal year 2012 as of March 19, 2012.  In fiscal year 2010, ERO officers granted deferred actions or issued a stay of a final order in a total of 486 cases.

As noted above, as of the first few months of the fiscal year, ICE is issuing deferred actions and administrative closures in three times as many cases as they had done in 2010.

***NTAs Issued:***

- In the first four months of calendar 2012, there were 75,044 NTA's filed.  By comparison, there were 85,337 new NTA's filed in the first four months of calendar 2011.

The effects of the new policies can be seen in the number of new NTAs filed at EOIR.  As noted above, NTAs have dropped about 12 percent YTD.  This reflects both the new USCIS NTA policy as well as the direction that DHS has provided to ICE to tighten the focus of fugitive operations and other enforcement activities on at large Level 1 and Level 2 criminal aliens.  Because this work is more labor intensive, it has resulted in a decline in the number of NTAs filed.

We anticipate that this number will continue to drop as the new SC policy takes effect and as ICE field offices take additional steps to focus resources on the most serious offenders.

CAR 0093

*Draft*
*Pre-Decisional/Deliberative*

## Case-by-Case Review Statistics

### *Executive Summary*

- In total, ICE has reviewed 227,733 pending cases with approximately 17,051, or 8%, identified as amenable for prosecutorial discretion as of April 23, 2012.

- 184,779 pending non-detained cases have been reviewed with approximately 17,025, or 9%, identified as amenable for prosecutorial discretion. 2,974 of these cases have been administratively closed.

- Of the 2,974 individuals whose cases have been administratively closed, 1,881 have received employment authorization in the past and 1,257, or over 40%, currently have employment authorization.

- 2,710 individuals have declined an offer of prosecutorial discretion. Of these individuals, 2,052 have received employment authorization in the past and 1,483, or over 54%, currently have employment authorization.

- Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,273 cases thus far in fiscal year 2012 as of March 19, 2012. In fiscal year 2010, ERO officers granted deferred actions or issued a stay of a final order in 486 cases.

- 11 of ICE's Chief Counsel Offices have completed the review of the pending cases in their jurisdictions.

### *Case-by-Case Review and Administrative Closures*

- In total, ICE has reviewed 227,733 pending cases with approximately 17,051, or 8%, identified as amenable for prosecutorial discretion as of April 23, 2012.

- 184,779 pending non-detained cases have been reviewed with approximately 17,025, or 9%, identified as amenable for prosecutorial discretion.

- 42,954 pending detained cases have been reviewed with approximately 26, or less than 1%, identified as amenable for prosecutorial discretion.

- Of the 17,025 pending non-detained cases identified as amenable for prosecutorial discretion, 2,974 cases have been administratively closed. These cases involve –

  - 9 individuals who are a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;

CAR 0094

- o   197 individuals who are a child, have been in the United States for more than five years, and are either in school or have successfully completed high school (or its equivalent);
- o   198 individuals who came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States;
- o   23 individuals who are over the age of sixty-five and have been in the United States for more than ten years;
- o   62 individuals who have been the victim of domestic violence in the United States, human trafficking to the United States; or of any serious crime in the United States;
- o   18 individuals who have been lawful permanent residents for ten years or more and have a single, minor conviction for a non-violent offense;
- o   101 individuals who suffer from a serious mental physical condition that would require significant medical or detention resources;
- o   2,256 who have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States; and
- o   110 individuals who constitute a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

- Approximately 150,000 cases remain to be reviewed.[1]

### Deferred Action and Stays

- While administrative closure is the "preferred mechanism" for exercising discretion in the case-by-case review process, deferred action will be continue to be utilized in appropriate cases as is set forth in Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

- As of March 19, 2012, Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,273 cases in fiscal year 2012.

- Of those 1,273 deferred actions or stays, 1,233 involved individuals subject to a final order of removal.

- In fiscal year 2010, ERO officers granted deferred actions or issued a stay of a final order in 486 cases; in fiscal year 2009 ERO officers granted 740 deferred actions; in fiscal year

---

[1] The 300,000 figure cited for the backlog was an estimate based on past filings.  The actual number of cases, including both detained and non-detained, pending before EOIR at the time the review was commenced was in fact higher and the overall number of pending cases has grown as new cases enter the system.

CAR 0095

2008 ERO officers granted 1006 deferred actions; in fiscal year 2007 ERO officers granted 598 deferred actions.[2]

## *Termination*

- As part of the case-by-case review, ICE has terminated 32 cases.  These cases involve –

  - o   2 individuals who are a child, have been in the United States for more than five years, and are either in school or have successfully completed high school (or its equivalent);
  - o   1 individual who came to the United States under the age of sixteen, has been in the United States for more than five years, has completed high school (or its equivalent), and is now pursuing or have successfully completed higher education in the United States;
  - o   1 individual who is over the age of sixty-five and has been in the United States for more than ten years;
  - o   4 individuals who have been the victim of domestic violence in the United States, human trafficking to the United States; or of any serious crime in the United States;
  - o   2 individuals who have been lawful permanent residents for ten years or more and have a single, minor conviction for a non-violent offense;
  - o   4 individuals who suffer from a serious mental physical condition that would require significant medical or detention resources;
  - o   13 individuals who have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States; and
  - o   5 individuals who constitute a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

## *Employment Authorization Cards Issued Pursuant to Prosecutorial Discretion Policies*

- Eligibility for employment authorization is governed by longstanding law.  Individuals are not eligible for work authorization on the basis of receiving administrative closure alone.  Similarly, individuals who were eligible for a work authorization card prior to the case-by-case review remain eligible after their case has been administratively closed.

- Of the 2,974 individuals whose cases have been administratively closed, 1,881 have received employment authorization in the past and 1,257, or over 40%, currently have employment authorization.
  - o   Of 197 individuals whose cases were administratively closed on the ground that they are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent), 76

---

[2] Due to upgrades to ICE's electronic system for tracking enforcement actions which affected how this data is recorded, the data from FY2012 are not directly comparable to the data from FY2008-FY2010.  Because of these upgrades, ICE is not currently able to calculate FY2011 deferred action numbers.

CAR 0096

have received employment authorization in the past, and 39 currently have employment authorization;

o   Of 198 individuals whose cases were administratively closed on the ground that they came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States, 104 have received employment authorization in the past, and 58 currently have employment authorization;

o   Of the 2,256 individuals whose cases were administratively closed on the ground that they have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States, 1,546 have received employment authorization in the past, and 1,079 currently have employment authorization.

### *Priority Cases Accelerated Pursuant to this Process and the Implementation of Enforcement Priorities*

- In fiscal year 2012 YTD, ICE removed over 102,000 individuals convicted of a crime.

- In fiscal year 2011, ICE removed 216,698 criminals, an 89 percent increase in the removal of criminals from fiscal year 2008.

- Overall, over 90 percent of all ICE removals in fiscal year 2011 fell into one of ICE's categories for priority enforcement.

### *NTAs Issued*

- In the first four months of calendar 2011 (January through April) there were 85,337 new NTAs filed in the immigration courts.  By comparison, in the first four months of calendar 2012 there were 75,044 new NTAs filed.

### *Individuals Who Have Declined an Offer of Prosecutorial Discretion*

- 2,710 individuals have declined an offer of prosecutorial discretion as of April 23, 2012. These cases involve –

  o   5 individuals who are a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;

  o   78 individuals who are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent);

CAR 0097

- o 90 individuals who came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States;
- o 14 individuals who are over the age of sixty-five and have been in the United States for more than ten years;
- o 37 individuals who have been the victim of domestic violence in the United States, human trafficking to the United States; or of any serious crime in the United States;
- o 23 individuals who have been lawful permanent residents for ten years or more and have a single, minor conviction for a non-violent offense;
- o 48 individuals who suffer from a serious mental physical condition that would require significant medical or detention resources;
- o 2,248 who have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States; and
- o 167 individuals who constitute a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

- Of the 2,710 individuals that declined an offer of prosecutorial discretion, 2,052 have received employment authorization in the past and 1,483, or over 54%, currently have employment authorization.
  - o Of 78 individuals who declined an offer of administrative closure that was based on the ground that they are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent), 52 have received employment authorization in the past, and 32 currently have employment authorization;
  - o Of 90 individuals who declined an offer of administrative closure that was based on the ground that they came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States, 57 have received employment authorization in the past, and 34 currently have employment authorization;
  - o Of the 2,244 individuals who declined an offer of administrative closure that was based on the ground that they have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States, 1,742 have received employment authorization in the past, and 1,282 currently have employment authorization.

- ICE reviewed a sample of 100 cases where the individual declined the offer of prosecutorial discretion to determine their reasons for doing so. Based on this analysis, ICE determined that individuals declined an offer of prosecutorial discretion for the following reasons:
  - o 82 individuals declined to pursue permanent relief in the immigration courts;

*Draft*
*Pre-Decisional/Deliberative*

- o  3 individuals declined administrative closure and instead joined with the Office of Chief Counsel to terminate the case to allow USCIS to adjudicate the case;
- o  2 individuals declined on the ground that they needed a driver's license and would not be issued one based on an administrative closure order;
- o  2 individuals declined on the ground that they sought work authorization; and
- o  11 individuals did not respond to ICE inquiries about the reason for their declination.

- o  Of the 13 individuals who declined an offer of administrative closure that was based on the ground that they are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent), 12 declined in order to pursue relief and 1 provided no response.
- o  Of 11 individuals who declined an offer of administrative closure that was based on the ground that they came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States, 6 declined in order to pursue permanent relief and 5 provided no response; and
- o  Of the 44 declinations involving individuals who were offered administrative closure based on the ground that they have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States, 38 declined in order to pursue permanent relief, 2 declined on the ground that they needed a driver's license, and 4 did not respond.

**From:**    Sandweg, John ███████████████████

**Sent:**    Monday, June 11, 2012 12:41 PM

**To:**    Baronof, Kim ██████████████

**Cc:**    Ryan, Kelly ██████████ Olavarria, Esther

                █████████████ Grossman, Seth

                Chandler, Matthew

**Subject:**    FW: PD report

**Attach:**    RESTORE THE PROMISE Executive Summary.pdf; RESTORE THE PROMISE Full Report.pdf

Kim-

Almost all of these seem to fall into the fugitive/absconder/final order bucket.  As such, they are not part of the case by case review. **DP/ACP**

John R. Sandweg
Department of Homeland Security
████████████ (cell)

---

**From:** Kate Kahan ████████████communitychange.org]
**Sent:** Monday, June 11, 2012 11:50 AM
**To:** Ryan, Kelly; Olavarria, Esther; Sandweg, John
**Subject:** PD report

Attached are the executive summary and full report on PD.

**RESTORE THE PROMISE OF PROSECUTORIAL DISCRETION**

**An Assessment of DHS' Prosecutorial Discretion Initiative and its Impact on Families on the Anniversary of its Announcement**

*Executive Summary*

After a growing outcry by immigrants, allies, and Members of Congress who were outraged at the record number of deportations carried out by the Obama Administration, last June the Department of Homeland Security (DHS) announced a new policy that was supposed to focus limited immigration enforcement resources on public safety threats and spare individuals who have been in the U.S. for years, raising families.

These policy changes, detailed in memos from ICE Director John Morton and DHS Secretary Janet Napolitano beginning in June 2011, involved an unprecedented review of hundreds of thousands of pending deportation cases.  The Department pledged to close the cases of individuals who didn't meet their enforcement "priorities" and allow those whose cases were closed to apply for work authorization.

In 2011, the Fair Immigration Reform Movement (FIRM) played an important role in advocating for administrative relief through its 'Change Takes Courage' campaign. FIRM and its allies welcomed these changes and hoped they would be implemented fairly, finally allowing long-time U.S. residents, parents of U.S. citizen children, and young people eligible for the DREAM Act to live their lives with less fear.  Unfortunately, a year has passed since the policy was announced, and very little has changed.  In some cases, the situation has even gotten worse.

By failing to properly implement the year-old Prosecutorial Discretion (PD) policy for immigrant deportations, the Department of Homeland Security is threatening to undermine the credibility of President Obama's policies and standing with Latino and immigrant communities nationwide.



**DHS Still Tearing Families Apart, Despite Its Stated Focus on "High Priority" Cases:**

*The Case of Cayla Roberts of Grand Haven, Michigan*: After Cayla Roberts' mother died when she was only 14 years old, her own biological father sold her to human trafficking smugglers who brought her from China to the United States.  She was soon arrested, and spent 10 months in detention. She was then fortunate enough to be placed with a foster family in Michigan, who have raised her since as their own daughter.  Cayla, now 24, has been a straight-A student throughout high school and college in Michigan.

She is now married to her high school sweetheart, Seth Roberts, a United States Air Force veteran.  Inexplicably, Cayla was denied special immigrant juvenile status and later she was denied asylum.  Now, in a clear violation of the spirit of the administration's stated policies, ICE is refusing to invoke

prosecutorial discretion in her case. Cayla's story is one example of thousands and thousands across the country which exemplify why advocates consider the prosecutorial discretion policy, as implemented by DHS and ICE a failure.



*The Case of Marvin Corado of Florida*: Marvin came to this country from Guatemala 12 years ago when he was still only a teenager. Marvin's life now revolves around his 5-year old daughter Madelyn, a U.S. Citizen. Marvin and his wife, Leslie, have been married since 2009 and are active members of their church. In October 2011, Marvin was stopped by a police officer and detained because he didn't have a driver's license because it is illegal for him to obtain one. Marvin has now been in detention for 7 months; his daughter and wife are suffering emotionally and financially without Marvin at home with them. With two U.S. Citizen sisters as well as his daughter, his strong ties his community, and many years here, Marvin is also a clear example of the kind of person and family for whom the prosecutorial discretion policy was supposed to provide relief. But ICE continues to keep him from his family and try to deport him.

The full report describes the stories of Cayla and Marvin and their families, and three others, in detail.

**The Facts: How Prosecutorial Discretion Is Failing, By the Numbers**

This report outlines several shocking statistics about the scale of the failure of DHS' implementation of prosecutorial discretion one year after it was announced. After the Congressional demise of comprehensive immigration reform, one of President Obama's signature promises in his landmark 2008 campaign, this new effort by DHS under Secretary Janet Napolitano threatens to become another big disappointment for Latino and immigrant communities. This disappointment is palpable in communities like the ones where Cayla Roberts and Marvin Corado live in Michigan and Florida, respectively. Here are some vital statistics through which immigrant families are viewing the Obama Administration and how DHS is implementing the prosecutorial discretion policy:

- In Fiscal Years 2009, 2010 and 2011, <u>over one million</u> immigrants were deported - vastly outstripping the scale or pace of deportations in previous years.

- As described in the Applied Research Center's November 2011 report, "Shattered Families," over 46,000 mothers and fathers of U.S. Citizen children were deported in the first six months of 2011.

- Under the DHS' Prosecutorial Discretion initiative, begun in Summer 2011, almost 300,000 individuals' cases have been reviewed. Out of these, an abysmal 1.5% (or fewer than 5,000) cases have actually been administratively closed.

- Despite widely announced new priorities of the administration to re-focus immigration enforcement resources on deporting individuals who posed a threat to public safety, a recent analysis

CAR 0102

by the Transactional Records Access Clearinghouse (TRAC) at Syracuse University shows the reality has been very different. According to TRAC, "...official court records show that rather than increasing, the number of deportations ordered on the basis of criminal activity has continued to decrease. Evidence from the most recent quarter show that the agency continues to be headed in the opposite direction from its stated goal."

**DHS Must Utilize Prosecutorial Discretion to Bring Administrative Relief**

In the coming weeks, DHS has an opportunity to improve how it implements its own prosecutorial discretion policy.  The following broad steps are critical to restoring the credibility of this program for concerned communities and constituencies expecting the program to bring relief to immigrants and their families. More detailed recommendations are outlined toward the end of this report.

---

**KEY  RECOMMENDATIONS TO MAKE PROSECUTORIAL DISCRETION A SUCCESS**

- The authority and responsibility to exercise prosecutorial discretion must be clarified and enforced to ensure that families are protected from separation and those who stand up for their labor and civil rights are not punished.
- Ensure favorable treatment of all young people entering the system through use of Deferred Action, Parole-in-Place or Deferred Enforced Departure, and issuing employment authorization.
- Stop the so-called "Secure Communities" program, which condones racial profiling, outsources federal immigration enforcement to local police and undermines public safety by fostering distrust of those same police by local low-income immigrant communities.
- The Department of Justice (DOJ) must take a number of important steps to ensure immigrants' civil, due process, and labor rights are protected by providing adequate legal representation for all individuals facing action in immigration courts; monitoring activities involving state and local law enforcement of immigration law; and strengthening the Racial Profiling Guidance by eliminating the border and national security loophole, to include profiling based on religion and ethnic origin, and ensuring that the guidance is enforceable.

---

CAR 0103

# RESTORE THE PROMISE OF PROSECUTORIAL DISCRETION

**An Assessment of DHS' Prosecutorial Discretion Initiative and its Impact on Families on the Anniversary of its Announcement**

**The Fair Immigration Reform Movement, June 2012**

CAR 0104

**RESTORE THE PROMISE OF PROSECUTORIAL DISCRETION**

**An Assessment of DHS' Prosecutorial Discretion Initiative and its Impact on Families on the Anniversary of its Announcement**

*Executive Summary*

After a growing outcry by immigrants, allies, and Members of Congress who were outraged at the record number of deportations carried out by the Obama Administration, last June the Department of Homeland Security (DHS) announced a new policy that was supposed to focus limited immigration enforcement resources on public safety threats and spare individuals who have been in the U.S. for years, raising families.

These policy changes, detailed in memos from ICE Director John Morton and DHS Secretary Janet Napolitano beginning in June 2011, involved an unprecedented review of hundreds of thousands of pending deportation cases.  The Department pledged to close the cases of individuals who didn't meet their enforcement "priorities" and allow those whose cases were closed to apply for work authorization.

In 2011, the Fair Immigration Reform Movement (FIRM) played an important role in advocating for administrative relief through its 'Change Takes Courage' campaign. FIRM and its allies welcomed these changes and hoped they would be implemented fairly, finally allowing long-time U.S. residents, parents of U.S. citizen children, and young people eligible for the DREAM Act to live their lives with less fear.  Unfortunately, a year has passed since the policy was announced, and very little has changed.  In some cases, the situation has even gotten worse.

By failing to properly implement the year-old Prosecutorial Discretion (PD) policy for immigrant deportations, the Department of Homeland Security is threatening to undermine the credibility of President Obama's policies and standing with Latino and immigrant communities nationwide.

**DHS Still Tearing Families Apart, Despite Its Stated Focus on "High Priority" Cases:**

*The Case of Cayla Roberts of Grand Haven, Michigan*: After Cayla Roberts' mother died when she was only 14 years old, her own biological father sold her to human trafficking smugglers who brought her from China to the United States.  She was soon arrested, and spent 10 months in detention. She was then

 fortunate enough to be placed with a foster family in Michigan, who have raised her since as their own daughter.  Cayla, now 24, has been a straight-A student throughout high school and college in Michigan.

She is now married to her high school sweetheart, Seth Roberts, a United States Air Force veteran. Inexplicably, Cayla was denied special immigrant juvenile status and later she was denied asylum.  Now, in a clear violation of the spirit of the administration's stated policies, ICE is refusing to invoke prosecutorial discretion in her case. Cayla's story is one example of thousands and thousands across the country which exemplify why advocates consider the prosecutorial discretion policy, as implemented by DHS and ICE a failure.

CAR 0105

***The Case of Marvin Corado of Florida***:  Marvin came to this country from Guatemala 12 years ago when he was still only a teenager. Marvin's life now revolves around his 5-year old daughter Madelyn, a U.S. Citizen. Marvin and his wife, Leslie, have been married since 2009 and are active members of their church.  In October 2011, Marvin was stopped by a police officer and detained because he didn't have a driver's license because it is illegal for him to obtain one.  Marvin has now been in detention for 7 months; his daughter and wife are suffering emotionally and financially without Marvin at home with them.  With two U.S. Citizen sisters as well as his daughter, his strong ties to his community, and many years here, Marvin is also a clear example of the kind of person and family for whom the prosecutorial discretion policy was supposed to provide relief.  But ICE continues to keep him from his family and try to deport him.



The full report describes the stories of Cayla and Marvin and their families, and three others, in detail.

## The Facts: How Prosecutorial Discretion Is Failing, By the Numbers

This report outlines several shocking statistics about the scale of the failure of DHS' implementation of prosecutorial discretion one year after it was announced.  After the Congressional demise of comprehensive immigration reform, one of President Obama's signature promises in his landmark 2008 campaign, this new effort by DHS under Secretary Janet Napolitano threatens to become another big disappointment for Latino and immigrant communities. This disappointment is palpable in communities like the ones where Cayla Roberts and Marvin Corado live in Michigan and Florida, respectively. Here are some vital statistics through which immigrant families are viewing the Obama Administration and how DHS is implementing the prosecutorial discretion policy:

- In Fiscal Years 2009, 2010 and 2011, <u>over one million</u> immigrants were deported - vastly outstripping the scale or pace of deportations in previous years.

- As described in the Applied Research Center's November 2011 report, "Shattered Families," over 46,000 mothers and fathers of U.S. Citizen children were deported in the first six months of 2011.

- Under the DHS' Prosecutorial Discretion initiative, begun in Summer 2011, almost 300,000 individuals' cases have been reviewed.  Out of these, an abysmal 1.5% (or fewer than 5,000) cases have actually been administratively closed.

- Despite widely announced new priorities of the administration to re-focus immigration enforcement resources on deporting individuals who posed a threat to public safety, a recent analysis by the Transactional Records Access Clearinghouse (TRAC) at Syracuse University shows the reality has been very different. According to TRAC, "...official court records show that rather than increasing, the number of deportations ordered on the basis of criminal activity has continued to decrease. Evidence from the most recent quarter show that the agency continues to be headed in the opposite direction from its stated goal."

## DHS Must Utilize Prosecutorial Discretion to Bring Administrative Relief

In the coming weeks, DHS has an opportunity to improve how it implements its own prosecutorial discretion policy.  The following broad steps are critical to restoring the credibility of this program for concerned communities and constituencies expecting the program to bring relief to immigrants and their families. More detailed recommendations are outlined toward the end of this report.

CAR 0106

**KEY  RECOMMENDATIONS TO MAKE PROSECUTORIAL DISCRETION A SUCCESS**

- The authority and responsibility to exercise prosecutorial discretion must be clarified and enforced to ensure that families are protected from separation and those who stand up for their labor and civil rights are not punished.

- Ensure favorable treatment of all young people entering the system through use of Deferred Action, Parole-in-Place or Deferred Enforced Departure, and issuing employment authorization.

- Stop the so-called "Secure Communities" program, which condones racial profiling, outsources federal immigration enforcement to local police and undermines public safety by fostering distrust of those same police by local low-income immigrant communities.

- The Department of Justice (DOJ) must take a number of important steps to ensure immigrants' civil, due process, and labor rights are protected by providing adequate legal representation for all individuals facing action in immigration courts; monitoring activities involving state and local law enforcement of immigration law; and strengthening the Racial Profiling Guidance by eliminating the border and national security loophole, to include profiling based on religion and ethnic origin, and ensuring that the guidance is enforceable.

CAR 0107

**RESTORE THE PROMISE OF PROSECUTORIAL DISCRETION**

**An Assessment of DHS' Prosecutorial Discretion Initiative and its Impact on Families on the Anniversary of its Announcement**

After a growing outcry by immigrants, allies, and Members of Congress who were outraged at the record number of deportations carried out by the Obama Administration, last June the Department of Homeland Security (DHS) announced a new policy that was supposed to focus limited immigration enforcement resources on public safety threats and spare individuals who have been in the U.S. for years, raising families.

These policy changes, detailed in memos from ICE Director John Morton and DHS Secretary Janet Napolitano in the summer of 2011, involved an unprecedented review of hundreds of thousands of pending deportation cases. The Department pledged to close the cases of individuals who didn't meet their enforcement "priorities" and allow those whose cases were closed to apply for work authorization.

The Fair Immigration Reform Movement (FIRM) played an important role in advocating for administrative relief through its 'Change Takes Courage' campaign. FIRM and its allies welcomed these changes and hoped they would be implemented fairly, finally allowing long-time U.S. residents, parents of U.S. citizen children, and young people eligible for the DREAM Act to live their lives with less fear. Unfortunately, a year has passed since the policy was announced, and very little has changed. In some cases, the situation has even gotten worse.

By failing to properly implement the year-old Prosecutorial Discretion (PD) policy for immigrant deportations, the Department of Homeland Security is threatening to undermine the credibility of President Obama's policies and standing with Latino and immigrant communities nationwide.

This failure is further compounded by other significant concerns identified throughout the DHS immigration enforcement regime not detailed in this report.

For example, the controversial Secure Communities program has created a vast deportation dragnet in those jurisdictions where it is active. This dragnet intrudes on the lives of immigrants and citizens alike, with a minority of cases applying to actual criminal activity. Even the term 'criminal activity' must be further analyzed, as described in the data-section of this report, since minor traffic violations may be deemed a criminal offense by ICE and its officers. A report by the Chief Justice Earl Warren Institute on Law and Social Policy at the University of California found that more than 3,600 US citizens had been detained by ICE through the Secure Communities program. That report also found that Latinos comprise 93 percent of individuals arrested through Secure Communities though they comprise 77 percent of the estimated undocumented population in the United States. Such programs put greater pressure on DHS to effectively implement the goal and purpose of prosecutorial discretion.

CAR 0108

**STORIES OF IMMIGRANTS AND THEIR FAMILIES STRUGGLING FOR RELIEF UNDER DHS' PROSECUTORIAL DISCRETION POLICY**

Recent data demonstrate that less than 2 percent of cases reviewed by DHS under its prosecutorial discretion policy have had their cases closed administratively.  DHS has also deemed that 7 percent of cases reviewed to date are eligible for the use of prosecutorial discretion.  By defending this abysmal rate of case eligibility and closure, DHS is essentially arguing that 93 percent of all immigrants reviewed to date are potential security threats or are otherwise categorically ineligible for the use of prosecutorial discretion.  The experience of immigrant families and organizations acting on their behalf demonstrate otherwise.  Here are 5 stories representing thousands of families facing imminent separation due to DHS' failure to effectively implement its own policies.

**CAYLA ROBERTS** was born in China and at age 14, her biological mother died.  Her biological father sold her to smugglers to work in the US and send him money.  Smuggled in through San Diego, CA, she was arrested there and spent 10 months at a detention center for children.  While there, Cayla says, "My



biological father threatened to kill me over the phone if I returned to China because I had dishonored him."  She also received threats from the smugglers at the detention center.  Cayla eventually was placed into foster care through Bethany Christian Services in Grand Haven, Michigan to live with the people who accepted her as their daughter, raised her and became her family.

Cayla is now 24 years old and is graduating from Western Michigan University with a 3.97 GPA, graduating with honors just as she had done in high school.  She constantly volunteers in the community, going on mission trips to Kentucky and New York City to work at vacation bible school summer camps for children, rebuilding houses in Lake Charles after Hurricane Katrina, volunteering at Occupational Therapy clinics for adults and children, working at a homeless shelter, and an assisted living facility. She has done this without the benefit of being able to work, or drive a car.  Cayla is now married to Seth Roberts, her high school sweetheart, who is an Air Force veteran.

Although Cayla is a survivor of human trafficking and has been represented by an attorney, she has spent the last ten years trying to remedy her immigration status.  What was formerly known as Immigration and Naturalization Services (INS) and its successor, Immigration and Customs Enforcement (ICE), denied Cayla an opportunity to apply for Special Immigrant Juvenile status, which would have solved her status problems a decade ago.  The court denied her application for asylum, and now, she faces being uprooted from her adopted home, returning to China to face a hostile father and the smugglers seeking repayment. Furthermore, she is considered a defector by the Chinese government because she left without permission, leaving her stateless.

CAR 0109

Cayla is a clear example of a person deserving of a favorable exercise of prosecutorial discretion. In fact, she is in deportation proceedings because of an INS legacy that left many young victims of trafficking without protection. She poses no public safety threat, is married to a U.S. Citizen who has served our country in time of war, has a stellar academic record and has been a victim of trafficking. As the Alliance for Immigration Reform and Rights in Michigan has supported her case questions, Why would the U.S. Government turn their back on someone who has so much to offer our country and so much at stake in remaining here?

+++++++

**MARVIN CORADO** is 29 years old and originally from Guatemala. He has been living in the United States for the past 12 years. He arrived as a teenager to live with his mother and his stepfather. Marvin reunited with his high school sweetheart, Leslie, in Florida and got married in 2009. Their life as a family with their 5 year-old daughter, Madelyn, is very happy. They are all very active in their church, Segadores de Vida and during church services, Marvin plays a leadership role, welcoming members and coordinating activities for the day.



In October of 2011, Marvin was on his way to work to remodel a house, when he was stopped by a police officer. Marvin asked the police officer for an interpreter, but the officer told him to shut up and asked him for his driver's license. When Marvin said he didn't have one, the police officer handcuffed him right away. Marvin had never been arrested before, and Florida does not permit him to have a driver's license because he is out of status. His bail was set at $125, but an ICE hold was immediately placed on him, so his wife sought an attorney's services.

His wife, Leslie, paid a defense attorney $3000 to get Marvin released with promises he would be home soon. Marvin was eventually released for time served, but into ICE custody and has been in detention at Broward Transitional Center in Florida ever since. Leslie paid another $4,000 to an immigration attorney that did not yield better results. It turns out that an attorney working for Marvin's mother many years ago had filed an asylum petition for Marvin instead of the family petition the attorney had promised further complicating Marvin's case.

Leslie and Madelyn have been devastated by Marvin's absence. Leslie has had to rent out her daughter's bedroom and sell some of her belongings just to pay the rent. She reports that her daughter's personality has totally changed. A once happy little girl has become angry and rebellious, asking, "Where is my daddy? It's your fault he's gone away!" The conditions at the detention center are harsh. Marvin complained of a toothache for two months before he finally got to see a dentist and by then, they had to

CAR 0110

pull the tooth out.  Officers at the detention center consistently intimidate him, saying he should not waste his time fighting his case and have tried to trick him into signing a voluntary departure.

Marvin and Leslie are now working with the Florida Immigrant Coalition to fight his deportation.  Marvin is a low priority as defined by the prosecutorial discretion memo.  He has two siblings who are American citizens, as well as his daughter. He has deep ties to the community.  But ICE officials have continued to try to deport him.

++++++++

**HELIA DE LA CRUZ PALENCIA** came to this country 16 years ago as a young woman, attempting to start a new life after being mistreated by her family.  She has three U.S. Citizen children.  The oldest is 14 and from a previous union, and the younger ones from her current marriage are 13 and 10 years old.  She sought to adjust her status through her legal permanent resident husband. Her marriage was difficult. Her husband was very controlling and violent when he did not get his way.  The police were called on at least two occasions, but the police only spoke to her husband because she did not speak English well.   In 2004 she separated from her husband and learned that he had sexually abused her eldest daughter.  Devastated, she filed a police report, but the police failed to locate her husband.  Six months later, her husband came to their church and repented.  Outside of her home her church has been her main source of strength and comfort. She agreed to give him another chance.

During this time, Helia was called to her country due to a medical emergency with her father. While she was there, her husband cut off communication.  Helia ended up stranded outside of the country and separated from her three children.   She could not bear to be separated from them so she decided to re-enter the country in order to fight to regain custody of her children.

On December 16, 2012 CASA de Maryland attorneys requested a Stay of Removal on behalf of Helia as a victim of abuse and abandonment in her attempts to obtain permanent residence through her now US citizen spouse.  ICE officials in Baltimore have been informed of her circumstances, but nonetheless have been slow and callous in their response.  Informed that her passport had been lost from her removal case file, she had to obtain another at her own expense, despite having no source of income.  Her attorneys also asked that her check-in date in May be postponed because she had just given birth to her baby.  Multiple communications attempts went



CAR 0111

unanswered and she went to her check-in with her five-day old baby, only to have it postponed to six months later, with no decision in her case.

Helia is resolved to gain custody of her children and obtain justice for herself.  She poses no public safety threat, has four U.S. Citizen children, and is also a survivor of domestic violence.  Yet, as is all too common with meritorious prosecutorial discretion requests, ICE officials have made it very difficult for Helia to pursue relief.  Her tremendously traumatic experience has been made that much more difficult through added hurdles required by ICE.  The government's unresponsiveness has left her in a state of limbo at this incredibly difficult time. As a result, Helia's effort to gain custody of her children is at risk, since she may be removed from the US at any time.

For each story like Helia's there are thousands more who have not had the luck of encountering competent legal services to help them navigate the system.

++++++++

**HUMAYUN KABIR CHOWDHURY** is a native of Bangladesh who has been living in the United States for nearly twenty years, working as a cab driver and raising a family.  He was paroled into the country so that he could file his claim for asylum because of the persecution he experienced in Bangladesh. Despite the fact that he had been beaten and tortured, an immigration judge callously denied his asylum claim stating that "everybody should break some bone at some point in their lives just to know what it's like".  On appeal, the judge in the case was criticized for his "sarcastic" and "offensive" remarks. Yet incredibly the Board of Immigration Appeals found that the outcome of Mr. Chowdhury's case was not prejudiced.  Mr. Chowdhury was arrested by ICE in his home in June 2011 because he had an outstanding deportation order from a decade ago.  Since that time, he has been transferred to nine different detention facilities in seven states across the country.

For the past twenty years, Mr. Chowdhury has been a model member of his community. He works hard as a taxi driver in New York City, owns his own home, and pays his taxes. He volunteers and donates to charity and is an active member of his mosque. He has been a devoted husband to his wife, Dilruba and a devoted father to his thirteen-year-old U.S. citizen son, Maheen. He cared for Dilruba when she faced crippling depression after the couple's newborn daughter passed away. He is extremely close with Maheen and has been a motivating force in his son's education. With his father's encouragement and support, Maheen has become a top student and has won many academic honors and awards.

Despite all this, ICE came to Mr. Chowdhury's house around 5:00 AM one morning last year.  He had just gotten off his shift and his wife was awake, although Maheen was sleeping.  He took his medication for his high blood pressure and was about to go to bed when they heard a knock.  Three ICE agents came through the door.  Maheen was roused by the commotion and saw the agents with his father.  They told him that they just wanted to talk to him and to go back to sleep.  He listened and went back to his room. He hasn't seen his father since.

Sadly, Dilruba and Maheen are struggling while Mr. Chowdhury is in detention. Dilruba does her best to support the family, but Mr. Chowdhury has always been the family breadwinner. Without his taxi driver's salary, they have been forced to borrow money from family members and to sell the family car in order to pay the mortgage and other expenses. Dilruba's depression has returned. She cries often and rarely sleeps. Maheen has been suffering from symptoms of PTSD as a result of witnessing his father's arrest. Recently

CAR 0112

he has had several episodes during which he "yells uncontrollably, his body shakes and he pulls his hair. These episodes last fifteen to twenty minutes." Maheen is terrified that his mother will be taken away by ICE, too, and that he may never see his father again. The emotional strain that Maheen is under as a result of being separated from his father is severe.

ICE has the ability to end the Chowdhury family's suffering; but the agency repeatedly has denied his requests for prosecutorial discretion.  Mr. Chowdhury has a strong support network fighting for him, including the New York Immigration Coalition, which has taken up his case.  He has no criminal history and is not a public safety threat. He is raising his thirteen-year-old U.S. citizen son and providing for his wife.  He has longstanding ties to his community and makes valuable contributions to society. However, Mr. Chowdhury has an outstanding removal order dating back to January14, 2000 so ICE claims that he is a "high priority" for deportation. His lawyer has moved to reopen his case and his appeal is pending before the 2nd Circuit Court of Appeals.


++++++

**CARMEN** has resided in the United States for over 20 years, has 2 US Citizen children, Brian, age 13 and Angelo, age 9. Carmen[1] has no criminal record. She had paid a fraudulent immigration advisor, a *notario*, over $10,000 in order to regularize her status, believing she was going to be able to legally stay in the country.  After the *notario* defrauded her of her hard-earned income, he filed a petition for her that she was ineligible for.  Instead of the promised immigration benefits, unbeknownst to her, she was ordered deported in absentia in May 1996.  And all Carmen received was the cold, hard knock of ICE's hand at her door.

On January 6, 2012, Carmen and family were having dinner and getting ready to cut the Rosca de Reyes, the King's Cake.  The occasion was to mark the end of the holiday season on the Day of Kings (Epiphany), her two boys and her husband were beaming with anticipation. Suddenly, the thunderous thumping of armed ICE officers interrupted the family gathering.  Carmen's oldest son was terrified, and the younger of the two boys sat in front of his dinner plate paralyzed and speechless. She ran towards the back door following her son's instructions that she run and hide in the next door neighbor's back yard. When ICE finally entered the house, Carmen was gone.

Carmen is a dedicated mother and partner, and this devotion to her children and her husband was eventually used against her.  When ICE finally caught up to her next door, she tried to protect her husband and told the arresting officers she was a single mother.  From that moment forward, ICE labeled Carmen a liar, and therefore deportable.  But Carmen's response to ICE in those terrifying moments was one of panic, fear and utter powerlessness.

Following her arrest, Carmen was detained for over 7 months.   Her concern was mostly over the well-being of her boys. She has become shaken and fearful, and this has added to the traumatic stress of Brian and Angelo. Both boys are currently in counseling with a therapist due to the trauma of separation. Like many children whose parents are threatened with deportation, their mental health deteriorates in line with that of their parents, which has been similarly documented in a 2010 report published by the law schools

---

[1] Carmen has requested that we not use her last name.

of The University of California Berkeley and The University of California Davis, called "In the Child's Best Interest.".

Carmen's attorney Jessica Dominguez filed a motion for a stay of deportation in February 2012, and an extension was filed in March. After a press event with the Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA) in commemoration of Mother's Day, ICE granted a stay until June 1st, 2012. Just before this new fleeting deadline passed – riding the scariest roller coaster of emotions imaginable – Carmen obtained a form of stay of deportation after a further legal motion, based on newly obtained evidence that was filed with the Board of Immigration Appeals. It is hard to understand why all these hoops had to be jumped through – putting Carmen and her family through this pain – before this decision was reached. It should have been reached independent of the media's attention and outside intervention.

+++++

## THE FACTS: HOW PROSECUTORIAL DISCRETION IS FAILING SO FAR

The stories of the immigrants and their families described in this report are by no means exceptional. Many thousands of families across the country are facing similar challenges and far too few of them are receiving any relief under DHS' prosecutorial discretion initiative. The failing implementation of prosecutorial discretion is tearing apart untold numbers of families, while DHS resources continue to be misdirected, targeting upstanding contributors to our communities.

As reported in the <u>New York Times</u> on June 7, 2012, the Department of Homeland Security has reviewed nearly 300,000 pending deportation cases over the past seven months in search of low-priority cases deserving prosecutorial discretion. While immigrant communities cheered the policy when it was announced in June 2011, figures just released by DHS suggest that the program is failing.

### Despite Big Expectations, DHS' Prosecutorial Discretion Has Offered Very Little Relief
- To put this analysis and these few statistics about prosecutorial discretion in proper context, it is important to remember that in just the last 3 years (fiscal years 2009, 2010 and 2011) a total of more than 1 million immigrants have been deported by DHS.
- As described in the Applied Research Center's November 2011 report, "Shattered Families," over 46,000 mothers and fathers of U.S. Citizen children (more than 20 percent of deportations during that period) were deported in the first six months of 2011 alone.[2]



---

[2] "Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System." Applied Research Center, November 2011.  http://arc.org/shatteredfamilies

CAR 0115

- Under the current prosecutorial discretion initiative, 288,631 individuals' cases have been reviewed. Of these cases reviewed so far (according to analysis from the Immigration Policy Center[3]):
  - ONLY 7.2% (or 20,648) have even been deemed "amenable" for administrative closure by DHS under prosecutorial discretion
  - ONLY 2.9% (or 8361 people) have received offers of administratively closure of their cases.
  - ONLY 1.5% (or 4363 people) have actually accepted these case closure offers.

According to DHS, over 75% of these immigrants who have declined offers of administrative closure are those who are most likely to prevail before an immigration judge. In other words, they would have legal relief that would allow them to remain in the U.S. This raises serious questions about DHS' use of prosecutorial discretion. DHS has so narrowly applied discretion that half of the immigrants offered to have their cases *temporarily* closed already have legal relief allowing them to remain in the country.

**DHS Still Failing To Uphold Commitment to Redirect Resources and Spare Immigrants with Strong Ties and Their Families the Pain of Deportation**

Despite widely announced new priorities of the administration to re-focus immigration enforcement resources on deporting individuals who pose a public safety threat, a recent analysis by the Transactional Records Access Clearinghouse (TRAC) at Syracuse University shows the reality has been very different. According to TRAC, "...official court records show that rather than increasing, the number of deportations ordered on the basis of criminal activity has continued to decrease. Evidence from the most recent quarter show that the agency continues to be headed in the opposite direction from its stated goal."[4]

- According to TRAC, the total number of deportations ordered on the basis of "criminal" activity has actually gone down in each of the 3-month periods since Director Morton's June 2011 memo outlining the new prosecutorial discretion program and priorities. (See table)
- Additionally, the percentage of all deportations that these "criminal" activity-based orders represented has also gone down or stayed flat in each of those quarters. It was 15% in Apr-Jun 2011, and 14% in each of the succeeding quarters (Jul-Sep 2011, Oct-Dec 2011, and Jan-Mar 2012).



---

[3] More critical analysis, by the Immigration Policy Center, of DHS' most recently released statistics can be found at: http://immigrationimpact.com/2012/06/07/updated-figures-highlight-shortfalls-of-prosecutorial-discretion-program/
[4] "ICE Charges Criminal Activity in Fewer Deportation Proceedings." Transactional Records Access Clearinghouse (TRAC). May 8, 2012. http://trac.syr.edu/immigration/reports/281/

CAR 0116

- Lastly, as reported by America's Voice in April 2012, ICE's signature program for finding and deporting "criminals," Secure Communities (or S-Comm), has a poor track record of actually targeting criminals. Of all immigrants who've been deported as a result of S-Comm since the program began in 2008, over a quarter—26.2%–didn't commit any crime at all. Only 26.9% have been what ICE calls "Level 1" offenders (people who have, in theory, been convicted of the most serious crimes). And it's not just dangerous and violent criminals who get classified as "Level 1." ICE records obtained by the Transactional Records Access Clearinghouse (TRAC) show that everything from cashing a check with insufficient funds to traffic offenses can get someone labeled a "high priority" "Level 1." In fact, traffic offenses were the second-most-common charge in detention according to the records TRAC analyzed.[5]

**Insufficient Protections for Immigrants Appearing in Court _Pro Se_ (without representation)**

As the Immigration Policy Center recently exposed in its report, _Falling Through the Cracks_, "While the Obama administration has expanded use of prosecutorial discretion in immigration cases, the subject of immigrants without legal representation and their ability to access this discretion remains unresolved. In 2011, almost 50% of all immigrants in removal proceedings appeared _pro se_, or without legal representation. While immigration attorneys can explain the effect of these policies to their clients, _pro se_ immigrants may be unaware that new policies are even in effect. Immigrant advocates have thus been rightly concerned about whether _pro se_ immigrants in removal proceedings will benefit from Immigration and Customs Enforcement's (ICE) prosecutorial discretion policies."[6]

---

[5] "Who Is a Criminal? ICE's Less-Than-Reliable Numbers on 'Criminal Offenders.'" America's Voice blog. April 4, 2012.  http://americasvoiceonline.org/blog/ices_less-than-stellar_record_on_prosecutorial_discretion-2/
[6] "Falling Through the Cracks: How Gaps in ICE's Prosecutorial Discretion Policies Affect Immigrants Without Legal Representation," by Joan Friedland.  Immigration Policy Center.  May 2012.

CAR 0117

# RECOMMENDATIONS

In the coming weeks, DHS has an opportunity to improve how it implements its own prosecutorial discretion policy. The following broad steps are critical to restoring the credibility of this program for concerned communities and constituencies expecting the program to bring relief to immigrants and their families.

---

**KEY RECOMMENDATIONS TO MAKE PROSECUTORIAL DISCRETION A SUCCESS**

- The authority and responsibility to exercise prosecutorial discretion must be clarified and enforced to ensure that families are protected from separation and those who stand up for their labor and civil rights are not punished.

- Ensure favorable treatment of all young people entering the system through use of Deferred Action, Parole-in-Place or Deferred Enforced Departure, and issuing employment authorization.

- Stop the so-called "Secure Communities" program, which condones racial profiling, outsources federal immigration enforcement to local police and undermines public safety by fostering distrust of those same police by local low-income immigrant communities.

- The Department of Justice (DOJ) must take a number of important steps to ensure immigrants' civil, due process, and labor rights are protected by providing adequate legal representation for all individuals facing action in immigration courts; monitoring activities involving state and local law enforcement of immigration law; and strengthening the Racial Profiling Guidance by eliminating the border and national security loophole, to include profiling based on religion and ethnic origin, and ensuring that the guidance is enforceable.

---

**Concrete Changes to Make Prosecutorial Discretion (PD) Work**

To ensure that Department of Homeland Security (DHS) Immigration and Customs Enforcement (ICE) adheres to the spirit of Director John Morton's June 17, 2011 guidance and exercises this discretion appropriately at all stages of the deportation process, evaluating the totality of the circumstances in each individual case, and ensuring individuals are fully informed of their options, we propose:

1. DHS provide clearer guidance directing relevant personnel at all levels to conduct a more balanced and consistent review of all cases, utilizing the June 17th, 2011 memo issued by Director Morton to ensure more careful consideration of the totality of circumstances in cases involving negative factors. In addition, individuals granted relief through the Prosecutorial Discretion process obtain work authorization.

2. DHS provide a clearly defined mechanism for individuals, attorneys and accredited representatives to submit requests for discretion to ICE field offices and counsel, and provide clear, uniform instruction to its field offices and counsel on how to handle such requests. This mechanism should include: (a) a simple one-page application; (b) a basic guide to "How PD works" for all applicants; and (c) a process for individuals to seek review of their cases at higher levels of DHS to address inconsistent application of the policy and outright resistance in the field.

3. Easy to understand and widely available information about PD, translated into Spanish and other languages, be developed and disseminated by DHS immediately. Know your rights materials should also be made available to individuals seeking PD.

CAR 0118

*DHS & ICE Should Ensure Key Factors Are Considered As Part of the Totality of Circumstances in Assessing Individual Cases, as Outlined in DHS' Own Memoranda*

4. "Absconders": Too many "absconders" in fact received their removal order in absentia. Because of faulty information in ICE databases, the agency often mails Notices to Appear to incorrect or old addresses.  As a result, the immigrant is not aware of her court hearing and gets ordered removed without the opportunity to defend herself, and is then inaccurately labeled as an "absconder."

5. Re-entry:  Often, immigrants penalized for "unlawful re-entry" are merely workers who seek to reunite with their families and pose no threat to the community. Unlawful re-entry should not automatically disqualify the use of discretion in case reviews.

6. Lawful permanent residents: Many immigrants with long-ago convictions have since kept clean records, started families, and become model members of their communities. These people pose no risk to public safety and therefore fall outside the agency's stated enforcement priorities and the totality of circumstances for this population should be taken into consideration.

7. Asylum seekers should qualify for prosecutorial discretion without being forced to drop their application for asylum to ensure safety and compliance with international law.

8. Workers and others defending their labor rights and civil rights should be included for relief under prosecutorial discretion.

## Recommendations on Broader DHS Policies and Practices

9. DHS follow through on the commitment to focus its enforcement resources appropriately by providing guidance that minor infractions alone (for example, traffic violations) should not lead to people being considered "high-priorities" for deportation. ICE's signature program for finding and deporting "high priority" individuals, Secure Communities (or S-Comm), has a poor track record of meeting its stated goal of promoting public safety and instead has served as a deportation dragnet for hardworking immigrants and their families.

10. DHS, in the context of its Secure Communities program, should ensure the issuance of immigration detainers is conducted within the framework of DHS's enforcement rather than the broad issuance of detainers currently being utilized.

11. DHS' risk and custody classification tool should be fully implemented immediately to ensure people subject to immigration detention are treated fairly and decisions regarding release are in compliance with DHS' PD guidance.

## Leadership and Accountability Needed at All Levels of DHS and Across ICE, USCIS, and CBP

12. DHS leadership must engage in a broad public information and education campaign designed to explain the PD initiative's goals and processes and achieve its successful implementation.

13. Secretary Napolitano must ensure accountability through the ranks and should communicate to all involved DHS personnel that the program is not yet meeting its goals, that a demonstrable improvement in the number of cases getting relief is needed, and that the policy's objectives have the full backing of the Secretary. Resistance and "business as usual" in the field must be stopped.

14. US Citizenship and Immigration Services (USCIS) & Customs and Border Patrol (CBP): While ICE is taking steps to train its own personnel and hold them accountable to DHS's priorities and prosecutorial discretion guidelines, and USCIS has issued guidance regarding issuance of

CAR 0119

"Notices to Appear," no such steps have been evident from CBP. CBP should be required to issue guidance, and USCIS should be held accountable to consistently apply the guidance they have issued.

**Department of Justice (DoJ) Role in Ensuring the Success of Prosecutorial Discretion (PD)**

Department of Justice must take a number of important steps to ensure that DHS and state/local government enforcement policies and actions are consistent with protecting civil and labor rights, including ensuring due process and adequate legal representation for all individuals facing action in immigration courts.  Among the steps DoJ should take are:

15. Monitor immigration enforcement and application of PD to ensure protection of civil rights, labor rights, and due process rights.

16. The Department of Justice should be involved in the case-by-case review process to ensure the process is fair and balanced. For the remainder of the ongoing review of the case backlog and outstanding deportation cases, immigration courts should be closed during reviews of cases to ensure full and proper consideration of all cases and informed due process for all individuals.

17. As noted earlier in this report, nearly half of all immigrants appearing in immigration court in 2011 were *pro se*, or without any representation. As the Immigration Policy Center's report, "Falling Through the Cracks," noted, "The fact that immigrants are largely unrepresented in immigration proceedings can only be remedied by availability of counsel. But there are some steps that ICE and EOIR can take to mitigate against the unfairness."[7]  The IPC report's specific recommendations would significantly increase the efficiency and fairness of the proceedings and assist in achieving the objectives of prosecutorial discretion.

18. Strengthen Racial Profiling Guidance by eliminating the border and national security loophole, to include profiling based on religion and ethnic origin, and to ensure that the guidance is enforceable.

**CONCLUSION**

DHS' prosecutorial discretion policy as announced one year ago brought with it the promise that immigrants and their families would have the opportunity to obtain relief from deportation.  The program's implementation to date has dashed such hopes, to the detriment of immigrant families and the credibility of the Obama Administration.  In the coming weeks, FIRM and its allies across the immigrant movement, will be following closely whether DHS will implement these recommendations and ensure that prosecutorial discretion will be used for the tens of thousands of families excluded thus far.

---

[7]  "Falling Through the Cracks: How Gaps in ICE's Prosecutorial Discretion Policies Affect Immigrants Without Legal Representation," by Joan Friedland.  Immigration Policy Center.  May 2012.

CAR 0120

**Acknowledgements**

Center for Community Change
Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA)
CASA de Maryland
Make the Road New York
Immigration Policy Center
America's Voice Education Fund
Florida Immigrant Coalition
Colorado Immigrant Rights Coalition
New York Immigration Coalition

And a special acknowledgement to the courageous individuals profiled in this report, to their families, and the organizations and community members who are fighting so that they may stay together.

Fair Immigration Reform Movement
www.fairimmigration.org

CAR 0121

**Implementing an Effective Immigration Enforcement Strategy**

- ***Prosecutorial Discretion Memo:*** On June 17, 2011, ICE issued a policy memorandum directing the use of prosecutorial discretion for individuals who constitute a low enforcement priority in order to better focus agency resources on high priority individuals. These factors include whether:

  - The person was brought to the United States as a young child;
  - The person is pursuing an education;
  - The person has served in the U.S. military, reserves, or national guard;
  - The person's has U.S. citizen family members or is the sole provider to a minor child;
  - The person is a victim of a serious crime, including domestic violence;
  - The person is suffering from a serious illness;
  - The person is elderly or is a young child;

- ***Impact of Policy Changes:*** Since implementing these policy changes, ICE has dramatically changed the composition of who is removed from the US:
  - In 2008, ICE removed 121,593 convicted criminals.
  - In 2011, ICE removed 216,698 convicted criminals.
  - In 2008, more than 25% of ICE removals fell under no priority category. These removals often consisted of very low priority cases, like students and parents.
  - In 2011, over 90% of all ICE removals fell into high priority categories.
  - Many of those who are not clearly categorized as high priority are convicted criminals whose conviction records are not updated at the time of their removal.

- ***Case by Case Review:*** To ensure that cases pending in the immigration court system complied with ICE priorities, ICE initiated a comprehensive review of the more than 300,000 cases pending in immigration courts. In every field office, teams of ICE lawyers are reviewing every pending case, closing those cases that constitute a low enforcement priority based on the criteria described above. To date:
  - Over 219,554 cases have been reviewed, with approximately 16,544 or 8%, identified as appropriate for an exercise of prosecutorial discretion;
  - ICE has also granted over 1,230 deferred actions and stays to low priority individuals who previously had been ordered removed by an immigration judge.
  - Approximately 150,000 pending cases remain to be reviewed.

- ***Who has been Administratively Closed:***
  - 2,722 cases have been administratively closed.
  - 8 cases were closed as the individual was a member or honorably discharged veteran of the Armed Forces of the United States, or the spouse or child of a member or veteran;
  - 175 cases were closed as the individual was a child who has been in the United States for more than five years and is either in school or successfully completed high school;
  - 182 cases were closed as the individual came to the united States under the age of sixteen and is pursuing higher education in the United States;
  - 23 cases were closed as the individual is over the age of sixty-five and has been present in the United States for more than ten years;
  - 60 cases were closed as the individual was a victim of a serious crime, to include domestic violence or human trafficking;

- o 16 cases were closed as the individual has been in the United States for ten years or more and has a single, minor criminal conviction for a non-violent offense;
- o 100 cases were closed as the individual suffers from a serious medical condition;
- o 2055 cases were closed as the individual has a very long-term presence in the United States, has an immediate family member who is a United States citizen and has established compelling ties and made compelling contributions to the United States;
- o 103 cases were closed as the individual constituted a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

- **How many deferred Actions Issued?**
  - o This year, ICE has issued 1,273 deferred actions or stays.
  - o We expect our officers and agents to utilize deferred action on a case by case basis as is called for in Director Morton's Prosecutorial Discretion memorandum.

*Case by Case Review and Administrative Closures*

- In total, ICE has reviewed 219,554 cases with approximately 16,544 or 8%, identified as eligible for prosecutorial discretion.

- 179,518 non-detained cases have been reviewed with approximately 16,518, or 9%, identified as eligible for prosecutorial discretion.

- 40,036 detained cases have been reviewed with approximately 26, or less than 1%, identified as amenable for prosecutorial discretion.

- Of the 16,518 non-detained cases identified as amenable for prosecutorial discretion, 2,722 cases have been administratively closed.

  - 8 cases were closed as the individual was a member or honorably discharged veteran of the Armed Forces of the United States, or the spouse or child of a member or veteran;
  - 175 cases were closed as the individual was a child who has been in the United States for more than five years and is either in school or successfully completed high school;
  - 182 cases were closed as the individual came to the united States under the age of sixteen and is pursuing higher education in the United States;
  - 23 cases were closed as the individual is over the age of sixty-five and has been present in the United States for more than ten years;
  - 60 cases were closed as the individual was a victim of a serious crime, to include domestic violence or human trafficking;
  - 16 cases were closed as the individual has been in the United States for ten years or more and has a single, minor criminal conviction for a non-violent offense;
  - 100 cases were closed as the individual suffers from a serious medical condition;
  - 2055 cases were closed as the individual has a very long-term presence in the United States, has an immediate family member who is a United States citizen and has established compelling ties and made compelling contributions to the United States;
  - 103 cases were closed as the individual constituted a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

*Deferred Action and Stays*

- As of March 19, 2012, Enforcement and Removal Operations (ERO) officers and agents have granted 1,273 deferred actions or issued a stay of a final order of removal.

- Of those 1,273 deferred actions and/or stays, 1,233 involved individuals subject to a final order of removal.

*Cases Not Placed Into Removal Proceedings or not Pursued*

CAR 0124

- During fiscal year 2012, as of March 19, 2012 ICE identified 797 encounters and 347 arrests where no additional action was taken, 11 detainers that were lifted and 1,336 instances where charging documents were cancelled.

*Work Authorization Cards Issued Pursuant to Prosecutorial Discretion Policies*

- Work authorization cards are governed by longstanding law.  The fact that an individual case has been administratively closed alone does not make that individual eligible for a work authorization card.  Similarly, individuals who were eligible for a work authorization card prior to the case by case review remain eligible after their case has been closed.

*Cases Accelerated Pursuant to this Process*

- Since implementation of the case by case removal process, the Office of Chief Counsel has obtained a XX% in the number of final orders for criminal and other priority aliens.

**From:**       Sandweg, John <█████████████████████████>
**Sent:**       Thursday, May 31, 2012 8:28 PM
**To:**         Peacock, Nelson <████████████████████████>Shlossman, Amy
                ████████████████████████ Kroloff, Noah <r███████████████████████
                Chandler, Matthew ████████████████████████Grossman, Seth
                ████████████████████████
**Subject:**    FW: info

FYI:

**Aug 18, 2011 Letter to DURBIN**
"It will not provide categorical relief for any group. Thus, this process will not alleviate the need for passage of the DREAM Act or for larger reforms to our immigration laws."

**June 28, 2011 DREAM Act Senate Hearing**
GRASSLEY:
If, Secretary, again, if the Congress fails to enact a version of the DREAM Act, will the president and/or the department bypass Congress and implement it administratively? Can you give this committee assurances a mass amnesty will not be done administratively under President Obama?

NAPOLITANO:
Yes. And the president has been very firm on this. In meeting with groups that very much want him to do or accomplish a DREAM Act administratively, he has said no. This is for the Congress to debate and to decide. But what is within the executive prerogative is to set prosecution priorities, which is what -- what we have done.

GRASSLEY:
Are you aware of -- well, no. Let's back up. You use the words "prosecution priorities." I was asking about would there be any mass amnesty done, which...

NAPOLITANO:
Perhaps we're just thinking about the same thing and using different words. There is no mass amnesty here.

GRASSLEY:
OK. Are you aware of any discussions within the department to extend deferred action or humanitarian parole on a categorical basis such as those who would benefit under the DREAM Act?

NAPOLITANO:
I am aware that there were some lower-level discussions, but the policy of the department is that there can be no categorical amnesty and there will not be, which is why the Congress needs to act.

NAPOLITANO:
There is some urgency here with these -- with these young people.

GRASSLEY:
Would you be willing to give the committee notification of every instance the department grants deferred action to a DREAM Act-eligible person so that we know that you're truly doing this on a case-by-case basis?

NAPOLITANO:
We would be willing to discuss that with you, a process for that, yes.

NAPOLITANO:

Senator, we've had an awful lot of correspondence with the committee on various issues. But I think the point of the question is would we agree to some oversight of how the deferred action process is being administered?

And the answer is we want to be very transparent about how we are exercising the authorities the statutes give us.

GRASSLEY:
OK. In response to the discretionary memo of June 23, 2011, Chris Crane, president of the National ICE Council, stated, quote, "Any American concerned about immigration needs to brace themselves for what's coming. This is just one of many new ICE policies aimed at stopping the enforcement of U.S. immigration laws in the United States. Unable to pass its immigration agenda through legislation, the administration is now implementing it through agency policy," end of quote.

I'd like to have you rebut the assertion that the department is -- this assertion that the department is bypassing Congress.

NAPOLITANO:
I think he could not be more wrong. And I -- and I don't know where he gets his information, but the enforcement record of this administration is unparalleled. We have enforced the law. We have improved the -- the removal of criminal aliens. We have removed more people from the country.

And we get criticized for that. In fact, I suspect we've been criticized by some of the people attending in this room in support of the DREAM Act.
But it is our belief that enforcement of the immigration law is very important, done smartly, intelligently, effectively and fairly.

We also believe, however, that the DREAM Act-eligible students, or applicants for the military, are -- are not those against whom the full force of the immigration law and removal from the country is appropriate.

That's why we believe that Congress should address this and provide a legislative -- legislative fix for this problem.

LEAHY:
And the current estimates are approximately 2 million individuals currently in the United States qualify for the DREAM Act if it was enacted.

If it was enacted and the steps were being followed, would that free up some of your personnel in your -- in Homeland Security to go off to do what most of us would consider better law enforcement actions in identifying and removing criminal aliens?

NAPOLITANO:
Yes, it would. And that is the whole point of -- I mean, clear guidelines, clear priorities, but what we would urge the Congress to do is to take this group of young people who are no risk to public safety, no risk to security, who have no individual culpability, and take them out of the universe of those against whom any enforcement action should be taken, so that we can focus on others who are a more serious risk to our -- to our nation.

**House Judiciary 10.26.11**

REP. JOHNSON:  Certainly -- and no intent to do that, Mr.
Chairman, and the letter and the article will speak for themselves and
you have made your duly noted -- your position from the record.  And I
look at the immigration laws that were creating unfairness and
injustice in 1999 and they look like the same -- they look like the
same laws that we're dealing with today.  Small wonder that the need

CAR 0127

for prosecutorial discretion has not diminished during that period.
You have spoken about the need for prosecutorial discretion in order
to meet smart law enforcement priorities but what about the cases
that, quote, "cry out for compassion," to use Chairman Smith's words?

SEC. NAPOLITANO:  Well, thank you, and thank you for your opening
comments, and I would simply say that nothing in Director Morton's
memo suggests a categorical amnesty for any group.  What is suggests
is that there be a case-by-case evaluation of the individual
circumstances in -- there are very clear cases that require immediate
deportation.  There are very clear cases where we know the nation's
public safety is involved.  We have repeat violators.  We have
fugitives.  But there are other cases that are different in context
and kind, and part of having a reasonable immigration system is the
ability to look at those.

CAR 0128

**From:** Sandweg, John <███████████████████>
**Sent:** Tuesday, June 12, 2012 4:29 PM
**To:** Shlossman, Amy <███████████████████>; Grossman, Seth
<███████████████>

**Subject:** Re: costs

---

Yep.

**From**: Shlossman, Amy
**Sent**: Tuesday, June 12, 2012 04:11 PM
**To**: Grossman, Seth; Sandweg, John
**Subject**: FW: costs

To discuss at the mtg   can you call me direct ███████ when ready?

Thanks.


What does the $380 employment authorization fee currently pay for?
The adjudication + USCIS overhead

Does it include a biometric or other background check?
No. The biometric fee is $85 on top of the $380.  We do a basic systems check that is included in the $380 but the separate $85 covers the biometrics.  Individuals who are granted deferred action then apply for employment authorization, and pay the $380 + $85



# DP

What does the $85 biometric check cost go towards   how much to USCIS, FBI, etc?
7% is USCIS overhead. The remainder is the cost to administer the program, including the costs of the actual checks.

Does this reflect the actual cost of performing the check?
Yes, plus the 7% overhead

How many biometric checks for deferred action does USCIS currently process each year?
I do not have an exact number, but we generally receive less than 200 D/A requests per year. Haiti earthquake, however, created a significant number more.

Thanks.

CAR 0129

**From:**      Sandweg, John <​███████████████​>
**Sent:**      Monday, May 14, 2012 11:31 AM
**To:**        Grossman, Seth <​███████████████​>
**Subject:**   Senator Reid Pushes President Obama to Grant Admin. Relief to Dreamers

---

## PLEASE JOIN AMERICAN PROGRESS FOR THE
## 2012 ★ PROGRESSIVE PARTY
Tuesday, May 15 | 7:00p.m. – 9:30p.m. | Corcoran Gallery of Art

This morning <u>Senator Reid was on the morning spanish show Al Punto</u>--this interview was about an array of issues.  They focused on Rubio's proposal, the dream act and surprisingly Senator Reid said this:

***Jorge Ramos:*** *Senator Reid, do you think President Barack Obama has a Hispanic problem because he has deported more immigrants than any other Presidetn in the history of the United States and because he didn't keep his word on presenting an immigration proposal during his first year?  Is there a Hispanic problem for President Obama?*

***Harry Reid:*** *Well, Jorge, the polls, because of what the Republicans have done on wide-ranging issues, to be anti-Hispanic, the polls show Democrats leading by significant numbers, including President Obama.  President Obama is not a perfect man.* **He hasn't been a perfect President.  He's been a very, very good President.  And we've done some extremely good things, especially as it relates to the "Dreamers", to make sure that they're not taken away in the middle of the night.  There's a lot more that can be done.  There's more the President is going to do administratively.  And that should happen fairly quickly.**



May 4, 2012

Secretary Janet Napolitano
Department of Homeland Security
U.S. Department of Homeland Security
Washington, D.C. 20528

Re:  Results of Prosecutorial Program Initiative

Honorable Secretary Napolitano:

We regret to have to inform you of our deep disappointment with the unfolding of the Prosecutorial Discretion initiative you announced last August.  The announcement led to hopes that the Administration would ease its pressure on immigrant families bearing the pain of traumatic separations through aggressive, indiscriminate enforcement actions in unprecedented numbers under your administration.

At this date the Prosecutorial Discretion initiative has barely made a perceptible dent in the overwhelming pain that is suffered by our community.  The results of the much-anticipated case review for application of the criteria detailed in the June 17 Morton memorandums are dismaying. Based on Syracuse University's Transactional Records Access Clearinghouse (TRAC), relief was offered to less than one percent of the nearly 300,000 individuals whose cases were reviewed. Cases such as that of ███████████████████ mother of a three-year-old US citizen with no criminal record who was arrested by the very police she called for protection against domestic violence, were found unworthy of relief.

We were particularly hopeful that the initiative would bring relief to young "DREAMERs" who were brought to this country as children, are pursuing an education and live in fear of being separated from the only home they have ever known.   About this time last year President Obama told a group of youth at Bell Multicultural High School that, "We aren't going around rounding up students," and "we have refocused our efforts on those who have engaged in criminal activity."  Yet we have situations such as that of ███████████████████, a high school student who was arrested (but not charged) at school while attempting to break up a fight between classmates; ███████████████████████ an 11th grader arrested for driving without a license,  and ███████████████████████ who came to the US when he was 15 years old to reunite with parents who have TPS and has been here for nine years.  The fact that each of them meets the DREAMER profile appears to carry no weight in determining whether to proceed with the current enforcement actions against them.





We have yet to see the anticipated agency-promoted decrease in enforcement actions against non-criminal foreign nationals materialize. Youth and other low-priority individuals continue to be a target of aggressive enforcement actions, particularly as the nefarious Secure Communities Program remains unabated, using local law enforcement resources as an indiscriminate dragnet against innocent individuals.

Instead, we are forced to dedicate precious few community resources on legal services for individual cases, many of which cannot even find an attorney willing to pursue prosecutorial discretion through the agencies many, cumbersome barriers. In the small hand-full of cases we address with desperate, last minute attempts to prevent deportations, we encounter the types of disparate, often times arbitrary responses from immigration officials that serve to dissuade immigration practitioners from even attempting to seek prosecutorial discretion.  The following cases serve as examples:

a) ████████████ application for Stay of Removal ████████████ was at first not accepted and then accepted only after getting him to sign a document indicating he would leave. He was forced to sign that document through intimidation and harassment (for example referring to the application as "spitting in the Judge's face").  He was arrested in retaliation for having complained of this conduct and kept in detention for two months before removing him. ICE refused to grant his extremely meritorious application – including USC children, operating a business that provided employment to many people - based on a six year old misdemeanor. Counsel was not even notified of the decision until after contacting the office of Public Advocate, Andrew Strait.

b) ████████████████████ – These sisters with extremely meritorious cases were almost deported because the Washington District ICE office would not even receive their applications for Stay of Removal. With their scheduled departure approaching, ICE rejected their applications repeatedly because they were not personally accompanied by their attorney.  Finally, after appeal to Washington, their application was accepted at 3:00 pm on date prior to scheduled departure at which point they were told "if we don't call your attorney tonight, show up at Dulles at 8:00 am tomorrow for removal."

c) On December 16, 2012 CASA attorneys requested a Stay of Removal on behalf ████████ ████████████ a victim of abuse and abandonment in her attempts to obtain permanent residence through her US citizen spouse.  Informed that her passport had been lost from her removal case file, she had to obtain another at her own expense. For almost a month we have been trying to get word on whether the new passport she delivered to the Baltimore office has been received and whether her next check-in date, scheduled with seven days of her (now past) birth-delivery date can be postponed.  Multiple communications attempts have gone unanswered.



CASA DE MARYLAND MULTICULTURAL CENTER
8151 15TH AVENUE, HYATTSVILLE, MD 20783
TEL: 301.431.4185 FAX: 301.270.8659 WWW.CASADEMARYLAND.ORG
CAR 0132



d) We have received no response to March 22, 2012 request for Stay of Removal for ████ ██████████ whose four-month-old US citizen infant is in need of liver surgery. As the sole financial support of the infant ████████ needs the security of knowing he will not be apprehended and removed upon any of his frequent required check-ins in order to secure the medical services his daughter needs.

e) ████████████████████████████ spent three months in a local detention center in Annapolis pending a hearing on charges for minor traffic violations as posting bail would have been useless given that he had an immigration detainer. Now in ICE custody, we are unable to file a Request for Stay of Removal on his behalf because the Baltimore office refuses to receive such applications if the individual does not have a currently valid passport. Procuring a passport is impossible because it requires he apply in person at his country's embassy. ICE has given no response to an April 25 emergency request for his release on prosecutorial discretion. Among other considerable equities, ████████ represents ANIS (association of indigenous people of El Salvador), in seeking redress for a massacre against his people before the OAS International Human Rights Commission.

As illustrated by the difficulties encountered in these cases, the Prosecutorial Discretion initiative has not served to mitigate the dramatic impact of deportations resulting especially form the intensely aggressive Secure Communities program. Next Monday CASA will convene a press conference in Washington, one of several being held simultaneously around the country, with family members of immigrants affected by these policies to call for fulfillment of the Obama administration's promise to focus enforcement efforts on cases with criminal convictions.

Sincerely,

Gustavo Torres
Executive Director

Inc. Press Advisory

CC: Seth Grossman
    Andrew Strait



For Immediate Release

**Press contact:**

Susana Flores
(240) 706-2624
sflores@casamd.org
www.casademaryland.org

**TWITTER:**

@CASAdeMaryland

# FAMILIES GATHER OUTSIDE ICE OFFICES ACROSS COUNTRY TO DECRY LACK OF PROGRESS IN PROTECTING FAMILIES

- **Before National ICE Headquarters, local families will describe the Failed Promise of Napolitano's Prosecutorial Discretion Program -**

**WHAT:**     PRESS CONFERENCE
**WHERE:**   Department of Homeland Security, 500 12th St., SW, Washington, DC
**WHEN:**     MONDAY, MAY 7, 2012 11:00 A.M.
**WHO:**       Families Directly Impacted by Napolitano's Failed Promises of Relief

**Washington, DC** - On Monday, families from the Washington DC region will join families in cities across the country to decry the failure of commitments made by Secretary Janet Napolitano to provide relief to families at risk of separation.  Families in Washington DC will represent DREAMers at risk of deportation, mothers caught up in ICE enforcement practices while confronting domestic violence, and an indigenous rights leader currently challenging a government massacre before the OAS.

In late August of last year, DHS Secretary Napolitano announced that the agency planned to review cases of people currently in removal proceedings and focus their resources only on the highest priorities. In other words, DREAM ACT- students, relatives of veterans, victims of domestic violence,

**CAR 0134**

caretakers of U.S. citizens and legal permanent residents, and other individuals with compelling life circumstances will qualify for prosecutorial discretion.  The local example of the Baltimore ICE office mirrors the failure of the program across the country.  ICE-Baltimore's review of pending cases, pursuant to the new prosecutorial discretion initiative, netted a pitiful number of 230 grants, less than 5% of cases on the deportation docket and 11% less than the number of cases in which immigrants usually prevail against deportation charges. At the same time, the number of deportations have sky-rocketed due to programs such as the much-criticized "Secure Communities" which, at a cost of over $200 million in 2011, has resulted in record-breaking numbers of deportations - over a million - since Obama took office.

Actions on Monday being held in cities including Chicago, New York, Boston, San Francisco, and in states including North Carolina and Texas among others will highlight egregious cases across the country and call on Secretary Napolitano to provide relief to families and communities impacted by the broken immigration system.

CAR 0135

# United States Citizenship and Immigration Services



## STANDARD OPERATING PROCEDURES FOR HANDLING DEFERRED ACTION REQUESTS AT USCIS FIELD OFFICES

United States Citizenship and Immigration Services
111 Massachusetts Avenue, NW, Second Floor
Washington, DC  20529-2030

Version 1.0
3/7/2012

CAR 0136

# Table of Contents

**Introduction** ..............................................................................................3

    I.    General Information ...............................................................3

    II.   Request for Deferred Action .................................................3

    III.  Field Office Intake ..............................................................4

    IV.  Field Office Review .............................................................5

    V.   Security Checks ...................................................................5

    VI.  Recommendation and Determination ....................................5

    VII. Employment Authorization ..................................................6

    VIII. Data Collection ..................................................................6

    IX.  Termination of Deferred Action ...........................................7

# Appendices

Appendix A: Approval Notice Template ...................................................8

Appendix B: Non-Approval Notice Template ..........................................10

Appendix C: Non-Approval Notice Template (Requestor in Removal Proceedings)..................12

| Introduction | This Standard Operating Procedure (SOP) applies to all requests for deferred action (initial and renewal) handled at USCIS Field Offices. This SOP is not intended to supersede any existing policy or guidance related to deferred action handled at USCIS Service Centers (Violence Against Women Act (VAWA); A-3, G-5, T and U nonimmigrant visa related deferred action). |
|---|---|
| **I.  General Information** | Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. A USCIS Field Office Director (FOD) may, in his or her discretion, recommend deferral of removal, but the recommendation must also be reviewed and recommended by the USCIS District Director (DD). Deferred action requests received and recommended by a DD directly do not require review and recommendation by the FOD. The final determination to defer action rests solely with the USCIS Regional Director (RD). Deferred action:<br>• is an exercise of prosecutorial discretion *not* an application for a benefit<br>• does not confer any immigration status upon an alien<br>• if granted, stops accrual of unlawful presence, as defined in section 212(a)(9) of the Immigration and Nationality Act (INA)<br>• does not eliminate any periods of unlawful presence accrued prior to approval of or after the effective date that deferred action is terminated<br>• does not alter the status of any alien who is present in the United States without being inspected and admitted or the status of any other alien statutorily ineligible to adjust |
| **II. Request for Deferred Action** | <u>**Formal Request by Individual and/or Legal Representative**</u><br>A request for deferred action can be made in writing and signed by the requestor.[1] No fee is required for a deferred action request. The requestor or his or her legal representative may either make an INFOPASS appointment to present the request, or submit the request by mail to the USCIS field office having jurisdiction over the requestor's place of residence. To support a deferred action request, the requestor may provide:<br>• An explanation as to why he or she is seeking deferred action including any supporting documentation (e.g., medical information, evidence of community and familial ties and equities, conditions in the requestor's country of origin, etc.)<br>• Proof of identity and nationality, including a birth certificate, a passport and/or Identification Card, driver's license, notarized affidavit(s), school or medical records, etc.<br>• Any document the requestor used to lawfully enter the United States including, but not limited to, Form I-94, Arrival/Departure Record, a passport with visa and/or admission stamp, and any other documents issued by other components of DHS or legacy INS<br>• <u>Form G-325A</u> Biographic Information<br>• A requestor who has legal representation must submit a properly completed Form G-28, Notice of Entry as Attorney or Accredited Representative<br><br>Prior to accepting a request, if a requestor reveals that they are in removal |

---

[1] For purposes of this SOP "requestor" means the actual person who seeks deferral of any removal action against him/her, not an attorney or representative making the request on their behalf. The requestor may be making the request for his/her entire family unit.

| | |
|---|---|
| | proceedings, direct them to U.S. Immigration and Customs Enforcement (ICE) for submission of the deferred action request.<br><br>**Requests Initiated by USCIS**<br>An Immigration Services Officer (ISO), Supervisory ISO (SISO), FOD, or DD, may encounter cases during his or her normal course of business that they feel warrant deferred action. Cases encountered by the FOD or DD that they feel warrant deferred action will follow the procedures provided in this SOP. Cases encountered by an ISO/SISO that they believe merit deferred action:<br>• Must have all of the file searches and security checks completed (No referral will be made for fingerprints until after the FOD concurs with the ISO/SISO)<br>• Must be presented by the ISO/SISO to the FOD for his or her recommendation (the FOD may require a memo from ISO/SISO with justification);<br>**Then**,<br>• If the FOD makes a favorable recommendation, follow the procedures provided in this SOP<br>• If the FOD does not concur with the ISO/SISO recommendation, the FOD will annotate the A/T-file with a brief description of the reason for not favorably recommending deferred action, then forward to the DD for review. If the DD concurs with the FOD not to recommend deferred action, the file does not need to go to the RD. If, however, the DD feels that deferred action is warranted, follow the procedures provided in this SOP. |
| **III. Field Office Intake** | Upon receiving the deferred action request and supporting document(s), the USCIS field office will:<br><br>1. Verify that the requestor resides in the jurisdiction of the field office.<br>2. Search for and request any A/T-files associated with the requestor and any family member(s) included in the request.<br>3. If no existing A-file was located after a thorough search of the Computer Linked Application Information Management System version 3 (CLAIMS3), Central Index System (CIS) and the National File Tracking System (NFTS), create a new A-file.<br>4. Create a T-file for temporary storage of the deferred action request and supporting documents if an A-file exists but has not yet been received, is lost, or is digitized.<br>5. Initiate TECS checks for requestor and any family member(s) included in the request who are 14 years of age or older.<br>6. Schedule the requestor and any included family member(s) who are 14 years of age or older for fingerprints as appropriate.*<br>7. Notify the USCIS Regional Office of the receipt of the deferred action request (see section VIII "Data Collection").<br>8. Record into the Enterprise Performance Analysis System (ePAS) "Inventory" for statistical purposes (see section VIII "Data Collection").<br><br>*If fingerprints are expired or were not previously captured, schedule for an appointment at the Application Support Center (ASC) for a 10-print biometrics capture (Code 1).  No fee will be charged for the capture of such biometrics. As appropriate, the capture of biometrics may be waived pursuant to the ASC SOP.<br><br>*A-File not Received or Lost*<br>After two weeks from the initial A-file(s) request, if the requested A-file(s) is/are |

| | |
|---|---|
| | not received, the field office should notify its local records supervisor to seek express shipment of the A-file(s) from the other File Control Office (FCO). Where a related A-file has been determined to exist, no action on the request shall be made until all of the permanent A-file(s) has/have been obtained and reviewed. Where an A-file cannot be found and has been officially recorded as lost, the FOD will make a notation in the recommendation that the file is lost and proceed with the recommendation. Create a substitute file in accordance with Chapter II-05 of the Records Operations Handbook (ROH).<br><br>***Digitized A-file***<br>If the A-file has been digitized, the file will be reviewed in Enterprise Document Management System (EDMS). The recommendation and action on the request will be made as if the office had the physical file. The deferred action request and any documents relating to the request will remain in the T-file. Upon completion of the request, the local field office will send the T-file to the Records Digitization Facility (RDF), for interfiling of material, in accordance with Digitization Customer Guide. |
| **IV. Field Office Review** | Upon receipt of all A/T-files associated with the requestor and any included family member(s), the field office will ensure that NFTS and CIS are updated to show receipt of the file(s) and will consolidate all files per the ROH. Field office review of the deferred action request will include, but not be limited to:<br>• A review of the request, supporting documents, and contents of all file(s) to check for other forms of available relief<br>• A search of CIS, NFTS, CLAIMS3 to ensure that all other files have been located and to see if the requestor has submitted any applications<br>• A review of any additional files or applications located in the above search<br>• The completion of security checks and resolution of any issues as provided in the "Security Checks" section of this SOP<br>• A determination of whether the requestor has ever been in deportation, removal or exclusion proceedings, to determine how such proceedings will impact the request<br>• An interview if deemed necessary by the field office<br><br>After the deferred action request is accepted by the field office and if it is determined that removal proceedings are pending against the requestor or included family member(s), follow the instructions in section VI for "Deferred Action Not Granted". |
| **V. Security Checks** | The following must be done before a recommendation for deferred action can be completed:<br>1.<br><br>2.<br><br>3.<br><br>4.<br><br>5.               **LE** |

|  | 6. **LE** |
| --- | --- |
| **VI. Recommendation and Determination** | Field offices will make every effort to ensure that deferred action requests are completed within 90 days. The request along with any supporting documents will remain in the A-file, or T-file if the A-file is lost or digitized, and be routed as follows: |

1. The FOD will prepare a memo with a case summary and recommendation. If recommending grant, the memo will also include a recommended duration of deferred action not to exceed (2) two years. A completed Form G-312, Deferred Action Case Summary, (Attachment 1) will also be submitted with the memo. If deferred action is recommended, the FOD will sign and date the appropriate section at the bottom of Form G-312. If not recommended, the FOD will strike out "Recommended" and write "Not Recommended" then sign and date. The case will then be sent to the DD.
2. The DD will then review the FOD recommendation, the deferred action request, and A/T-file to make his or her recommendation. If deferred action is recommended, the DD will sign and date the appropriate section at the bottom of Form G-312. If not recommended, the DD will strike out "Recommended" and write "Not Recommended" then sign and date. The DD may attach a separate sheet of paper or memo to Form G-312 if he or she has any additional comments. The A-file with Form G-312 and all attachments will then be sent to the RD.
3. The RD will review and make the final determination. If deferred action is granted, they will then sign and date the appropriate section at the bottom of Form G-312 and notate the duration of the deferred action (1 year, 2 years, etc., not to exceed 2 years). If not granted, the RD will strike out "Granted" and write "Not Granted" then sign and date. The RD will notify the DD and the FOD of the final determination, update the deferred action spreadsheet, and return the file to the appropriate field office. The Form G-312 containing the final determination and any attachments will remain in the A-file or T-file.

*Deferred Action Granted:*
1. Update ePAS for statistical count (see "Data Collection").
2. Provide the requestor and any included family member(s) with a grant notice (Appendix A).
3. Deferred action is not an admission, however for tracking purposes; update the CIS Class of Admission (COA) code to reflect Deferred Action Status (DAS).

*Deferred Action Not Granted:*
1. Update ePAS for statistical count (see "Data Collection").
2. Provide the requestor and any included family member(s) with a non-grant notice (if the requestor or included family member(s) is/are currently in removal proceedings, use the template in Appendix C. The template in Appendix B will be used for all others).
3. The field office will review and determine whether issuance of a Notice to Appear (NTA) is appropriate. (See most current NTA Policy.)

There is no appeal to a request that is not granted, but the requestor can submit additional evidence to request reconsideration of the determination or a new request for deferred action can be submitted.

| | |
|---|---|
| **VII. Employment Authorization** | Persons granted deferred action may apply for an Employment Authorization Document (EAD) under Title 8 Code of Federal Regulations (8 CFR) section 274a.12(c)(14). To apply, they must file Form I-765, Application for Work Authorization, in accordance with the form instructions. |
| **VIII. Data Collection** | Deferred action requests and final determination information will be reported in both ePAS and on the regional deferred action spreadsheet:<br><br>***ePAS Reporting***<br>The "USCIS ePAS Administrative Manual for Data Entry (version 1.0), July 15, 2011," provides guidance for USCIS employees on activity and time reporting in ePAS. In accordance with this manual the counts and time for deferred action will be captured as follows:<br><br>• Upon initial receipt of any deferred action request, the field office will capture the receipt via the "Inventory" section of ePAS<br>• A deferred action determination is not an adjudication; however, the field office will use the "Adjudication" section to capture the final determination information. Any officer or clerical hours spent on review and/or processing of deferred action requests will also be captured in this section<br>• The "Transfer In" and "Transfer Out" portion will not be used when forwarded to the DD and RD. It is only for use when transfers to other field offices are necessary due to jurisdictional changes<br><br>***Deferred Action Spreadsheet Reporting***<br>Field offices will notify the regional office POC when receiving deferred action requests. The regional office POC will update all pertinent data fields on the deferred action spreadsheet when a case is received and granted, not granted, or terminated. The deferred action spreadsheet will be posted to the ECN website, available for the regional offices to make their monthly updates under their specific tab. The National Benefits Center (NBC) will collect the data monthly and create a master rollup report by region. |
| **IX. Termination of Deferred Action** | If the RD determines that deferred action is no longer warranted, he or she will terminate the deferred action and notify the FOD and DD of the termination. There is no appeal of the decision to terminate deferred action. Upon termination the field office will:<br>• Retrieve the A-file<br>• Notify the individual, in writing, of the termination of the deferred action. This notice will also include information regarding the termination of any advance parole document obtained under the condition of deferred action<br>• Notify the individual, in writing, of the revocation of any EAD obtained under the condition of deferred action in accordance with 8 CFR 274a.14(b)<br>• Place a copy of the above notifications in the A-file<br>• Update the COA code in CIS to reflect Deferred Action Terminated (DAT). As noted previously deferred action is not an admission, however for tracking purposes CIS will be updated.<br>• Notify the NBC once the final EAD revocation is completed, via the NBCFIELD mailbox.  Attach a copy of the termination and revocation notices to the email.<br>• Review current NTA Policy to determine whether issuance of a NTA is appropriate. |

| | Once the NBC receives notification from a field office of an EAD revocation, they will update CLAIMS 3 to reflect that the EAD has been revoked. |
|---|---|

# **Appendix A:**

# **Grant Notice Template**

CAR 0143

**U.S. Citizenship
and Immigration
Services**

DATE


NAME
STEET
CITY, STATE ZIP

Re: Name; A#

Dear NAME:

This is to advise you that effective [date] you have been granted deferred action for a period of (fill in date, not to exceed two years).  The action will expire on [fill in date, not to exceed two years].

Deferred action is an exercise of prosecutorial discretion by U.S. Citizenship and Immigration Services (USCIS) not to pursue the removal of an individual from the United States. A grant of deferred action by USCIS does not confer or alter any immigration status and does not affect any period of prior unlawful presence. A grant of deferred action does not convey or imply eligibility for any waivers of inadmissibility that may exist, regardless of whether or not that inadmissibility is known to the U.S. Department of Homeland Security (DHS) at the time of the request for deferred action.  Likewise, deferred action cannot be used to establish eligibility for any immigration benefit that requires maintenance of lawful status.  Periods of time in deferred action do, however, qualify as periods of stay authorized by the Secretary of DHS for purposes of section 212(a)(9)(B) and (C) of the Immigration and Nationality Act.

As a person granted deferred action, you are eligible to apply for employment authorization if you can establish an economic necessity for employment.  If you wish to apply, please submit Form I-765, Application for Employment Authorization. The form and filing instructions can be found on the USCIS website at www.uscis.gov.  A copy of this letter and the required fee must accompany the I-765 at the time of application.

You may request continuation of deferred action by submitting a request to your local USCIS office. To avoid accruing unlawful presence we recommend that you submit your request ninety (90) days prior to the expiration of any currently authorized period of deferred action.  The request should include current evidence to support deferred action continuation.

Please note, you are required to notify USCIS if you change your address.  To report your change of address you must submit Form AR-11, Alien's Change of Address Card. This form and filing instructions can be found on the USCIS website mentioned above.  There is no fee associated with this form.

If you leave the United States, this grant of deferred action will be automatically terminated. A criminal conviction may also result in the termination of deferred action.


Sincerely,
NAME
District Director

# Appendix B:

# Non-Grant Notice Template

CAR 0145

10



**U.S. Citizenship
and Immigration
Services**

DATE

NAME
STEET
CITY, STATE ZIP

Re: Name; A#

Dear NAME:

Thank you for your request for deferred action, an exercise of prosecutorial discretion by USCIS.  We have carefully considered your request and we are not able to extend deferred action to you at this time.

Denial of a request for deferred action does not necessarily mean that USCIS intends affirmatively to pursue your removal.

[If applicable also include: USCIS will forward your approved I-130 petition to the National Visa Center for consular processing. or if your pending I-130 petition is approved, USCIS will forward it to the National Visa Center for consular processing.]

If you require additional assistance, forms or filing instructions, we invite you to visit our website at www.uscis.gov or contact USCIS National Customer Service Center at 1-800-375-5283.

This determination may not be appealed. However, if your circumstances change in a way that you believe materially affects the merits of your request for deferred action, you may bring those circumstances to our attention in a new request.

Sincerely,


NAME
District Director

# <u>Appendix C:</u>

# Non-Grant Notice Template (Requestor in Removal Proceedings)



DATE


NAME
STEET
CITY, STATE ZIP

Re: Name; A#

Dear NAME:

Thank you for your request for deferred action, an exercise of prosecutorial discretion by USCIS.  We have carefully considered your request and we are not able to extend deferred action to you at this time.

Our records show that you are currently in immigration removal proceedings, therefore please direct your request for deferred action to U.S. Immigration and Customs Enforcement (ICE).

[If applicable also include: USCIS will forward your approved I-130 petition to the National Visa Center for consular processing, or if your pending I-130 petition is approved, USCIS will forward it to the National Visa Center for consular processing.]

If you require additional assistance, forms or filing instructions, we invite you to visit our website at www.uscis.gov or contact USCIS National Customer Service Center at 1-800-375-5283.

This determination may not be appealed. However, if your circumstances change in a way that you believe materially affects the merits of your request for deferred action, you may bring those circumstances to our attention in a new request.

Sincerely,



NAME
District Director



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director (MS 2000)*
Washington, DC  20529-2000

**U.S. Citizenship
and Immigration
Services**

OCT  2 7  2011

# Memorandum

TO:      January Contreras
           Citizenship and Immigration Services Ombudsman

FROM:   Alejandro N. Mayorkas
           Director

SUBJECT:  Response to Recommendation 48, Deferred Action: Recommendations to Improve
           Transparency and Consistency in the USCIS Process

Recommendations

The Ombudsman recommends that U.S. Citizenship and Immigration Services (USCIS):

- Issue public information describing deferred action and the procedures for making a request for this temporary form of relief with USCIS;

- Establish internal procedures for accepting and processing deferred action requests in order to promote consistency and assist local offices in responding to urgent, periodic increases in the demand for deferred action;

- Inventory all pending deferred action requests to verify that each request received a confirmation of receipt with estimated processing timeframes and USCIS contact information; and

- Consistently track data related to deferred action requests and make available statistics identifying the number of requests received and the numbers of requests approved and denied.

USCIS Response to Recommendations

USCIS acknowledges and appreciates the Ombudsman's recommendations regarding how USCIS administers deferred action requests.  In response to the Ombudsman's recommendations, USCIS notes the following:

Response to Recommendation 48
Page 2

1. USCIS will shortly issue internal standard operating procedures to ensure consistency in the processing and determination of deferred action requests.

2. USCIS is tracking data regarding the number of deferred action requests, the disposition of those requests, and other relevant metrics.

3. Deferred action is not an immigration benefit, but rather a case-specific (not categorical) exercise of prosecutorial discretion. In this regard, certain Ombudsman's recommendations regarding application processes, including the publication of processing times, are not tailored to deferred action and instead meant for the administration of immigration benefits. Nevertheless, USCIS will further consider the Ombudsman's recommendations.

# Citizenship and Immigration Services Ombudsman

## DEFERRED ACTION: RECOMMENDATIONS TO IMPROVE TRANSPARENCY AND CONSISTENCY IN THE USCIS PROCESS

July 11, 2011

Transparency and consistency are the primary objectives of these recommendations. The Federal Government, including the Department of Homeland Security, has, in recent years, steadily made efforts to provide more information to the public, and to enhance the efficient administration of government services. Here, U.S. Citizenship and Immigration Services (USCIS) is encouraged to carry these objectives into the administration of deferred action requests.

These recommendations focus on how USCIS processes deferred action requests and the steps that can be taken to ensure that an individual in compelling circumstances, whether or not represented, knows how to submit a deferred action request, receives a decision in a timely manner, and can be assured that the request will be processed in a consistent manner.

The recommendations do not delve into who should receive deferred action. Every day, USCIS officers and leadership apply their expertise and experience to make decisions that impact both individual lives and the public as a whole. As past administrations have acknowledged, along with this authority comes the responsibility to appropriately exercise discretion when compelling needs arise.

Above all, these recommendations are about good government. Building accessible, uniform, and transparent processes is critical to effective government services. In fact, these recommendations echo recommendations that this office made in 2007. While deferred action requests are a minute fraction of the millions of decisions USCIS makes every year, they warrant the same transparency and consistency that the Federal Government strives for across the board.

Most Sincerely,

January Contreras
Citizenship and Immigration Services
Ombudsman

## RECOMMENDATIONS

The Ombudsman recommends that USCIS:

1. Issue public information describing deferred action and the procedures for making a request for this temporary form of relief with USCIS;

2. Establish internal procedures for accepting and processing deferred action requests in order to promote consistency and assist local offices in responding to urgent, periodic increases in the demand for deferred action;

3. Inventory all pending deferred action requests to verify that each request received a confirmation of receipt with estimated processing timeframes and USCIS contact information; and

4. Consistently track data related to deferred action requests and make available statistics identifying the number of requests received and the numbers of requests approved and denied.

## REASONS FOR THE RECOMMENDATIONS

- Stakeholders lack clear, consistent information regarding requirements for submitting a deferred action request and what to expect following submission of the request.

- There is no formal national procedure for handling deferred action requests.

- When experiencing a change in the type or number of submissions, local USCIS offices often lack the necessary standardized process to handle such requests in a timely and consistent manner. As a result, many offices permit deferred action requests to remain pending for extended periods.

- Stakeholders lack information regarding the number and nature of deferred action requests submitted each year; and they are not provided with any information on the number of cases approved and denied, or the reasons underlying USCIS' decisions.



Homeland
Security

*Office of the Citizenship and Immigration Services Ombudsman*
*U.S. Department of Homeland Security*
*Mail Stop 1225*
*Washington, DC 20528*
*www.dhs.gov/cisombudsman*

**CAR 0151**

# Citizenship and Immigration Services Ombudsman

## DEFERRED ACTION: RECOMMENDATIONS TO IMPROVE TRANSPARENCY AND CONSISTENCY IN THE USCIS PROCESS

### July 11, 2011

*The Citizenship and Immigration Services Ombudsman, established by the Homeland Security Act of 2002, provides independent analysis of problems encountered by individuals and employers interacting with U.S. Citizenship and Immigration Services, and proposes changes to mitigate those problems.*

## Executive Summary

For decades the U.S. Immigration and Naturalization Service (INS), followed by the Department of Homeland Security (DHS), has used deferred action to provide limited relief to foreign nationals who do not qualify for other immigration benefits that are typically available to individuals in exigent circumstances.[1]  Upon creation of the DHS in 2003, the power to grant deferred action was formally delegated to U.S. Citizenship and Immigration Services (USCIS), as well as U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP).[2]

When accorded deferred action, an individual is able to remain, temporarily, in the United States: USCIS declines to exercise its authority to issue a Notice to Appear and does not place the individual in removal proceedings.  USCIS has granted deferred action to individuals suffering serious medical conditions and to persons temporarily prevented from returning to their home country due to a natural disaster, among others.  The employment authorization regulations briefly describe this form of administrative relief, classifying deferred action as, "an act of administrative convenience to the government which gives some cases lower priority."[3]

Over the past year, stakeholders have expressed concerns to the Office of the Citizenship and Immigration Services Ombudsman (Ombudsman's Office) regarding long pending deferred action requests submitted by Haitian nationals following the earthquake in January 2010.[4]  These Haiti-related concerns led to broader conversations among stakeholders about the way USCIS processes deferred action requests at local offices.

Based on an analysis of USCIS' handling of deferred action requests, the Ombudsman's Office has made the following findings:

- Stakeholders lack clear, consistent information regarding requirements for submitting a deferred action request and what to expect following submission of the request.

- There is no formal national procedure for handling deferred action requests.
  Accordingly, it is difficult to track deferred action processing, in order to determine who receives deferred action, and under what circumstances.

[1] INS Commissioner Doris Meissner, *Exercising Prosecutorial Discretion*, HQOPP 50/4 (Nov. 17, 2000).
[2] Homeland Security Act of 2002, Pub. L. No. 107-296, § 442(c), 116 Stat. 2135, 2194 (2002); Department of Homeland Security (DHS) Secretary Tom Ridge, *Delegation to the Bureau of Citizenship and Immigration Services* (Mar. 1, 2003) (delegating authority to grant voluntary departure under section 240B of the INA. 8 U.S.C. §1229c, and deferred action); *See* U.S. Department of Justice, *Immigration Naturalization Service Fact Sheet, Prosecutorial Discretion Guidelines* (Nov. 28, 2000).
[3] 8 C.F.R. §274a.12(c)(14) (2011).
[4] Information provided by stakeholders (Mar. 28 and 29, 2011).

CAR 0152

- When experiencing a change in the type or number of submissions, local USCIS offices often lack the necessary standardized process to handle such requests in a timely and consistent manner.  As a result, many offices permit deferred action requests to remain pending for extended periods.

- Stakeholders lack information regarding the number and nature of deferred action requests submitted each year; and they are not provided with any information on the number of cases approved and denied, or the reasons underlying USCIS' decisions.

In response to its findings, the Ombudsman's Office recommends that USCIS take the following actions to improve the processing of requests for deferred action:

1) **Issue public information describing deferred action and the procedures for making a request for this temporary form of relief with USCIS;**

2) **Establish internal procedures for accepting and processing deferred action requests in order to promote consistency and assist local offices in responding to urgent, periodic increases in the demand for deferred action;**

3) **Inventory all pending deferred action requests to verify that each request received a confirmation of receipt with estimated processing timeframes and USCIS contact information; and**

4) **Consistently track data related to deferred action requests and make available statistics identifying the number of requests received and the numbers of requests approved and denied.**

## BACKGROUND

A grant of deferred action indicates that the government has, temporarily, declined to exercise its authority to remove a particular individual from the United States.  As such, the named individual may remain, provisionally, in the United States.  Deferred action is a form of relief that is typically granted to individuals whose cases raise compelling humanitarian concerns and to individuals whose removal is not in the best interests of the U.S. government.  It does not provide a pathway to permanent residency.

Factors considered for this form of relief include:  humanitarian issues, the likelihood of eligibility to gain legal status, family ties to the United States, criminal history, and immigration concerns.[5]  USCIS has granted deferred action to individuals suffering from serious medical conditions and to those temporarily prevented from returning to their home country due to a natural disaster, among others.

While ICE and CBP also are provided with authority to grant deferred action, this review focuses solely on USCIS' communication about and processing of deferred action.

**Legal Framework.**  For decades INS, followed by DHS, has used deferred action to provide limited relief to foreign nationals who do not qualify for other immigration benefits that are typically available to individuals in

---

[5] Meissner Memo, HQOPP 50/4 (Nov. 17, 2000) (the memorandum provides a more comprehensive list).  USCIS reported that the Meissner memo is used as informal guidance for local offices reviewing a deferred action request.  (Apr. 15, 2011).  *See also Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal (Standard Operating Procedures)*, Part X.; Deferred action is "an act of administrative choice to give some cases lower priority and in no way an entitlement..." former O.I. §242.1(a)(22) (withdrawn June 24, 1997).

2

exigent circumstances.[6]  However, prior to 2000, neither the legacy INS, nor its predecessor agency had published any significant guidance regarding the use of this power.[7]

On November 17, 2000, INS Commissioner Doris Meissner issued a memorandum entitled, "Exercising Prosecutorial Discretion.[8]"  That memo set forth guidance on the exercise of prosecutorial discretion by immigration officials and described the process to be followed in making and monitoring discretionary decisions.  The memo states:

> The favorable exercise of prosecutorial discretion means a discretionary decision not to assert the full scope of the INS enforcement authority as permitted under the law.  Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an [Notice to Appear]…detaining an alien placed in proceedings and approving deferred action.[9]

In 2003, Secretary of DHS Tom Ridge formally delegated to USCIS the authority to grant deferred action.[10]  USCIS continues to rely on the Meissner memo as guidance on exercising this and other forms of discretionary authority.[11]

**Methodology.**  In preparing this review, the Ombudsman's Office met with stakeholders. To determine the USCIS deferred action process, the Ombudsman's Office also conducted meetings and conference calls with local and regional USCIS offices[12] and requested statistical data from USCIS Headquarters regarding deferred action requests.[13]

**Individual Deferred Action Requests and USCIS Processing.**  USCIS processes two types of deferred action requests:  1) those submitted by individuals who qualify based on a USCIS decision to use deferred action as a pre-adjudication form of temporary relief for those who have filed certain petitions or applications (*e.g.*, widows of U.S. citizens, qualified victims of a crime or abuse); and 2) those submitted by individuals in exigent circumstances (*e.g.*, extreme medical cases, victims of the September 11th terrorist attacks), who may, or may not, have an application for immigration benefits pending.[14]  This study examines only USCIS processing of the latter type of request.

Currently, there are no official, national standard operating procedures for how to process a deferred action request. Nevertheless, most USCIS offices follow some sort of informal, standard process, rather than proceeding in an *ad hoc* fashion.[15]  Typically, an individual can submit a deferred action request in-person, or

---

[6] *Supra n. 2.*
[7] Meissner Memo, HQOPP 50/4 (Nov. 17, 2000).
[8] *Id.*
[9] *Id.*
[10] Secretary DHS Tom Ridge, *Delegation to the Bureau of Citizenship and Immigration Services* (Mar. 1, 2003).
[11] Information provided by USCIS (Mar. 30, 2011; Apr. 15, 2011).
[12] Information provided by USCIS (Mar. 29, 30, Apr. 19 and 20, 2011).
[13] The Ombudsman's Office received basic submission statistics, but the information was incomplete, providing information on grants of requests but not the actual submission and denial numbers.  Information provided by USCIS (Apr. 15, 2011).
[14] USCIS memorandum from William Yates, *Assessment of Deferred Action in Requests for Interim Relief from U Nonimmigrant Status Eligible Aliens in Removal Proceedings*, HQOPRD 70/6.2 (May 6, 2004); USCIS memorandum from Stuart Anderson, *Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status*, HQADN 70/6.2 (May 8, 2002).
[15] Information provided by site visits and teleconference calls with USCIS district offices. (Mar. 29, 2011; Apr. 19 and 20, 2011).  The North Eastern Regional Office has an SOP that went into effect on February 17, 2011.  Other local offices have guidelines on how to review a deferred action request.

3

CAR 0154

by mail, to a local USCIS office.[16]  USCIS does not have a nationwide process for acknowledging the receipt of deferred action requests, but many USCIS offices have implemented a local method for logging submissions and acknowledging their receipt.  Other offices do not issue a written acknowledgement of receipt for deferred action requests.

Normally, a deferred action request is reviewed at the local office.  A summary sheet explaining the positive and negative equities associated with the deferred action request is completed.[17]  The district director reviews the summary and makes a recommendation.  That recommendation is forwarded to the regional director.  The regional director issues a decision on the recommendation and returns the final decision to the district director so that he/she may deliver it to the requestor.[18]  Deferred action requests are not filed on a standardized application form and no fee is collected to defray the costs associated with processing deferred action requests.

Once granted deferred action, the requestor is eligible to apply for employment authorization.[19] When USCIS does grant deferred action, it is usually valid for one to two years.[20]

**Local Offices Responding to Increases in Deferred Action Submissions.**  The number of deferred action requests received by local offices can vary greatly.[21]  Certain local offices have evolved new processes when experiencing a rise in submissions.[22]  Nevertheless, there is no mechanism to hold local offices accountable for issuing decisions within a certain timeframe, and USCIS did not report any coordinated efforts across districts to share locally developed solutions for managing a significant deferred action workload.

Recently, USCIS Headquarters began tracking deferred action requests.  USCIS Headquarters has instructed district directors to send data on deferred action decisions to the National Benefits Center for tracking.[23]  In addition, USCIS devised a template acknowledgement letter for local offices to issue in response to requests for deferred action.  However, not all local offices use the template letter. [24]  Stakeholders have reported that some local offices do not issue any type of written acknowledgement that a deferred action request has been received.

Furthermore, the template letter includes a statement that the applicant will receive a response to the request within 60 days.  Stakeholders and USCIS officials report that many cases remain pending without a decision well beyond 60 days.[25]

**Prior Ombudsman's Office Recommendations.**  On April 9, 2007, the Ombudsman's Office published recommendations on deferred action.[26]  The recommendations were:  1) post general information on the USCIS website; 2) maintain deferred action statistics; and 3) designate a USCIS Headquarters official to review decisions to help ensure consistency in decision making.

---

[16] Information provided by USCIS site visit (Mar. 29, 2011).
[17] Form G-312, *Deferred Action Case Summary*, outlines the individual's biographical information, familial history, grounds of inadmissibility and deportability and physical and mental conditions requiring treatment in the United States.
[18] Information provided by USCIS (Mar. 29, 2011 and Apr. 15, 2011).
[19] 8 C.F.R. §274a.12(c)(14) (2011).
[20] Information provided by USCIS (Mar. 30, 2011).
[21] Information provided by USCIS (Mar. 29, 2011; Apr. 15, 19 and 20, 2011).
[22] *Id.*
[23] Information provided by USCIS site visit (Mar. 29 and 30, 2011).
[24] Field offices report issuing decisions from a time range of two weeks to indefinitely pending.  Information provided by USCIS (Mar. 29, 2011) and stakeholders (Mar. 28, 2011).
[25] Information provided by USCIS teleconference calls and site visits (Mar. 29-30 and Apr. 19-20, 2011).
[26] CIS Ombudsman Recommendation #32, Deferred Action (Apr. 9, 2007).

CAR 0155

USCIS responded that deferred action requests are reviewed on a case-by-case basis and that published guidance would not be a meaningful addition to USCIS' website.[27]  USCIS committed to collecting deferred action statistics on a quarterly basis.  USCIS did not find it necessary to review deferred action decisions at USCIS Headquarters.

**Stakeholder Concerns.**  Over the past year, stakeholders expressed concerns to the Ombudsman's Office regarding the delayed processing of numerous deferred action requests submitted by Haitian nationals following the earthquake in January 2010.  In public meetings, stakeholders from across the country repeatedly requested USCIS guidance and information regarding the handling of these deferred action requests.[28]  Stakeholders reported to the Ombudsman's Office that some individuals have waited for more than seven months for decisions on their requests.[29]   Recently, an extension and re-designation of Haiti Temporary Protected Status (TPS) provided certain individuals affected by the earthquake with relief; many of whom had requested deferred action.  In the process of waiting for USCIS to act on their deferred action requests, many individuals accrued unlawful presence, which may impact their eligibility for future immigration benefits.  These Haiti-related concerns led to broader conversations among stakeholders about the way that USCIS is processing deferred action requests.

Stakeholder meetings and inquiries have highlighted that USCIS is not communicating essential information on how to make or renew a deferred action request.[30]  While stakeholders acknowledge that a grant of deferred action by USCIS is a discretionary decision, they have expressed that general guidance from USCIS would be helpful to determine whether clients should be advised to step forward and seek this relief.  Stakeholders explain that preparing a deferred action request requires a significant investment of time and effort.  Due to the level of staff resources needed to submit requests, representatives and attorneys who assist people in seeking deferred action note that directions and guidance are especially critical.

> **CASE PROBLEM:**  The United States Army medically evacuated an individual to the United States for a life-saving operation that was not available in her home country.  The individual had been in the care and custody of U.S. military personnel for many years due to her situation and had received deferred action from USCIS.  The U.S. Army identified that she needed continued medical treatment.  Military personnel could not find information on how the patient could renew her request for deferred action.  After contacting various resources, the Ombudsman's Office was contacted.  The Ombudsman's Office, in turn, worked with USCIS and the individual to submit a new request for deferred action and to file an employment authorization application.  USCIS granted the request, and the individual was permitted to remain temporarily in the United States to continue to receive life-saving treatment.

Stakeholders report difficulties in obtaining status updates on pending requests.  After filing the initial request, many individuals are not provided a USCIS point of contact or a written acknowledgement that the request has

---

[27] USCIS Response to Recommendation #32, Deferred Action (Aug. 7, 2007).
[28] Information provided by stakeholders (Mar. 28, 2011).
[29] Information provided by stakeholders (Mar. 29, 2011).
[30] Recent publications have highlighted the need for public guidance on how to submit a deferred action request to USCIS and to expect subsequent to the submission.  *See* Penn State Law School, Duane Morris & Maggio+Kattar, *Private Bills & Deferred Action, Toolkit* (May 17, 2011), http://law.psu.edu/_file/PBDA_Toolkit.pdf (accessed on July 5, 2011); Mary Kenney, *Prosecutorial Discretion:  How to Advocate for Your Client* (June 24, 2011), http://www.legalactioncenter.org/practice-advisories/prosecutorial-discretion-how-advocate-your-client (accessed on July 5, 2011); Donald M. Kerwin, Doris Meissner & Margie McHugh, *Executive Action on Immigration: Six Ways to Make the System Work Better* (Mar. 2011), http://www.migrationpolicy.org/pubs/administrativefixes.pdf (accessed on July 5, 2011).

CAR 0156

been filed.  This makes it difficult to submit additional supporting documentation or to obtain information regarding the processing of the request.

## ANALYSIS & RECOMMENDATIONS

The Ombudsman's Office makes the following recommendations to USCIS:

    **(1) Issue public information describing deferred action and the procedures for making a request for this temporary form of relief with USCIS.**

Although most local offices appear to follow a basic process, there is little public information explaining how to request deferred action and what type of supporting documentation should be submitted with a request.  USCIS posts humanitarian notices for victims of natural disasters, but does not always include information on deferred action. [31]  Some USCIS offices have provided local guidance, but this is often only visible to community-based organizations or legal representatives, and not to individuals who lack access to such aid networks, leaving the most vulnerable individuals – those who are not represented – without knowledge of how to be considered for this temporary form of relief.

> **LOCAL PRACTICE:**  The Miami Field Office published a checklist outlining the basic documentation that should be included in a deferred action request, which reduces the number of requests for additional evidence.

Public guidance would ensure that individuals in need of relief are aware of deferred action and know how to make a request.  Informative guidance would include:  1) information explaining what deferred action is and what it is not; 2) instructions for submitting a request for deferred action to a local office; 3) an explanation of what information and documentation should be included in the request; and 4) an indication of what to expect following the submission of a request for deferred action, including a point of contact able to provide processing updates and other relevant information.

Issuing public guidance would not impact USCIS' discretionary authority to decide a deferred action request.

    **(2) Establish internal procedures for accepting and processing deferred action requests in order to promote consistency and assist local offices in responding to urgent, periodic increases in the demand for deferred action.**

> **LOCAL PRACTICE:**  When an individual submits a deferred action request, officers in the Boston Field Office immediately determine the individual's previously assigned A-number, or generate a new A-number, as necessary.  This ensures that the individual leaves the office with a unique identifier that can be used to track the request and can be referenced when inquiring as to case status, required follow-up, etc.

---

[31] USCIS New Release, *Haiti Relief Measures: Questions and Answers*; http://www.uscis.gov/portal/site/uscis/template.PRINT/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=855260f64f3362 10VgnVCM100000082ca60aRCRD&vgnextchannel=68439c7755cb9010VgnVCM10000045f3d6a1RCRD) (accessed on May 6, 2011); USCIS Reminds Japanese Nationals Impacted by Recent Disaster, *Questions and Answers*; http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=9c6ac337ab5ce210VgnVCM1000 00082ca60aRCRD&vgnextchannel=6abe6d26d17df110VgnVCM1000004718190aRCRD) (accessed on May 6, 2011).

CAR 0157

Establishing nationwide USCIS procedures to guide local offices in responding to submission increases would optimize resources and ensure that individuals requesting deferred action are not subjected to unnecessary delays due to manpower shortages and other administrative impediments.

> **(3) Inventory all pending deferred action requests to verify that each request received a confirmation of receipt with estimated processing timeframes and USCIS contact information.**

Many USCIS offices have a backlog of deferred action requests which have been pending for extensive periods of time.[32]  Establishing a comprehensive national inventory of deferred action requests would identify cases that have been long pending and assist in the implementation of a national process for timely, consistent processing of deferred action requests.

Additionally, USCIS Headquarters should verify that pending deferred action requests were issued receipt confirmation with an estimated processing time from the responsible local office.  In recent months, USCIS Headquarters has started to track deferred action requests received at local field offices.  However, USCIS must be more proactive in providing the public with information obtained through its tracking activities.

> **(4) Consistently track data related to deferred action requests and make available statistics identifying: the number of requests received and the numbers of requests approved and denied.**

Tracking and releasing to the public data on the number of deferred action request submissions (*i.e.*, approvals, denials, pending requests, etc.) would help provide transparency demonstrating how often and in what types of circumstances deferred action is granted.

> **LOCAL PRACTICE:**  When regional directors started receiving an increase in deferred action requests from district offices due to the earthquake in Haiti, they met to discuss recent trends and attempted to facilitate consistent deferred action decisions coming from the four USCIS regions.  While the coordination so far does not appear to have resulted in the development of a centralized national process, the discussion was a positive step towards coordinating deferred action processing at the regional level.

# CONCLUSION

Issuing public guidance on the procedures for making a request for deferred action would ensure that those who may merit humanitarian relief know how to seek it, whether they are represented or not.  Establishing a standardized and responsive national procedure, as well as conducting an inventory of pending deferred action requests to verify that each individual who has made a request has received confirmation of receipt, would improve customer service, agency accountability, and help ensure consistency in deferred action decisions.  Finally, tracking submissions and releasing the data to the public would improve management of the deferred action process and provide transparency to the public.

---

[32] Stakeholders report that most deferred action requests remain pending without explanation.  Information provided at stakeholder meeting (Mar. 28, 2011).  Information provided at USCIS site visit (Mar. 29, 2011).

CAR 0158

# Significant Correspondence Report



**2/9/2012**

CAR 0159

| Control Number | Date Received | To | From | Summary | Tasked | Signature Level | Final Due |
|---|---|---|---|---|---|---|---|
| 936253 | 2/8/2012 | S1 | Sabine Leutheusser-Schnarrenberger Federal Minister of Justice Germany | **LES** | NPPD | S1 | 2/23/2012 |
| 936334 | 2/8/2012 | S1 | Sen. Bennet (CO) | Highlights issues for consideration regarding the six-week prosecutorial discretion pilot program in Denver, CO. | ICE | A/S OLA | 2/23/2012 |
| 936401 | 2/9/2012 | S1 & Director Morton | Rep. Gutierrez (IL) | Expresses concern about the lack of prosecutorial discretion in certain cases, and asks that a meeting be scheduled with key staff from DHS and DoJ and the Congressional Hispanic Caucus. | ICE | A/S OLA | 2/23/2012 |
| 936521 | 2/9/2012 | S1 | Secretary Clinton Department of State | **DP** | PLCY | Handle as Appropriate | 2/23/2011 |
| 936525 | 2/9/2012 | S1 & James Clapper Director of National Intelligence | Sen. Feinstein (CA) Chairman  Sen. Chambliss (GA) Vice Chairman  Select Committee on Intelligence | Inform the Secretary that I&A, in accordance with Committee rules, will be under a detailed mission review. | I&A/OLA | Handle as Appropriate | 2/23/2011 |

CAR 0160

02/07/2012  12:53  ▮▮▮▮▮                     HOM GERMAN EMBASSY                    PAGE  02/05

**Courtesy Translation**

Ms. Sabine Leutheusser-Schnarrenberger
Federal Minister of Justice


Her Excellency
Secretary Janet Napolitano
Department of Homeland Security
U.S. Department of Homeland Security
WASHINGTON, D.C. 20528


Dear Colleague,

# LES

Yours sincerely,

(*sgd.*) Sabine Leutheusser-Schnarrenberger

2012 FEB -8  PM 3: 30

CAR 0161

Division R B 3                    Berlin, 12      January 2012

# LES

CAR 0162

MICHAEL F. BENNET
COLORADO

COMMITTEES:
AGRICULTURE, NUTRITION, AND FORESTRY

BANKING, HOUSING, AND
URBAN AFFAIRS

HEALTH, EDUCATION, LABOR,
AND PENSIONS

SPECIAL COMMITTEE ON AGING

# United States Senate

WASHINGTON, DC 20510–0609

WASHINGTON, DC,
458 Russell Senate Office Building
Washington, DC 20510
(202) 224-5852

COLORADO
2300 15th Street
Suite 450
Denver, CO 80202
(303) 455-7600

http://www.bennet.senate.gov

January 23, 2012

The Honorable Janet Napolitano
Department of Homeland Security Secretary
U.S. Department of Homeland Security
Washington, DC 20528

Dear Madame Secretary,

On December 4, 2011, the Department of Homeland Security (hereinafter, "the Department") initiated a six week pilot program in Denver, Colorado to begin testing improvements that standardize the use of prosecutorial discretion as outlined in the Department's memoranda dated June 17, 2011, August 18, 2011, and November 17, 2011.

These efforts are appropriately designed to focus limited law enforcement resources on high priority cases involving individuals who pose safety and national security risks to our nation's communities. On April 13, 2011, I sent a letter to President Obama with 22 Senate colleagues asking him to provide deferred action for students who would qualify under the DREAM Act ("DREAMers"). The subsequent steps that the administration has taken on prosecutorial discretion provide much needed relief for low priority persons such as veterans, DREAMers and victims of domestic violence.

The immigration court pilot program offers the Department the opportunity to ensure that prosecutorial discretion meets intended goals through a system that is as uniform, transparent and accountable as possible. I ask that you consider the following issues as you review the pilot program to develop best practices for prosecutorial discretion moving forward.

- Program Accountability and Measurability: Immigration and Customs Enforcement (hereinafter, "ICE") has noted that the pilot program allows the agency the ability to "run various methods for affirmatively reviewing cases at the different stages of immigration enforcement cycle and to gather data and other information related to implementation of these methods." ICE has issued guidance to its attorneys and field agents to develop standard operating procedures for prosecutorial review to ensure program continuity.

  It is critical that ICE collect from each immigration court and field office the appropriate data for ongoing review to best achieve program objectives. This should at the very least include quarterly reports on the number of cases reviewed for prosecutorial discretion,

CAR 0163

the profiles of those cases reviewed and those passed over for review, the number of cases recommended for closure, the number of cases closed in an exercise of discretion, and the number of employment authorization documents granted. Concurrently, the Department should develop clear and consistent policies to ensure staff accountability in carrying out program guidelines and objectives. This will provide for equitable application of the policy across district offices.

- Cases for Review: The memoranda referenced above are understandably general, answering some questions about the criteria for application of prosecutorial discretion, but leaving other questions for the implementation phase. The pilot program restricted review for prosecutorial discretion to non-detained cases. According to ICE statements, of the approximately 33,000 individuals ICE detains each day, nearly half do not have a criminal conviction. This means that among the ranks of ICE detainees on any given day, it is certain that there are thousands of individuals with low priority cases and no criminal histories, such as DREAMers, lingering in overburdened detention centers at high cost to taxpayers. As the overarching goal of prosecutorial discretion is to amplify limited resources to target security threats in our communities, the Department should maximize its overall review for prosecutorial discretion by ensuring detained cases are not overlooked.

- Community Awareness, Education, and Communications: As the Department readies the full implementation of prosecutorial discretion across the nation; it should develop and execute a comprehensive public awareness campaign to ensure that communities are informed about the overall program including policies and process. Such an effort should include initial and follow-up meetings with community stakeholders with material presented in both English and Spanish to present information, respond to questions and address concerns on an ongoing basis.

Additionally, the Department should contemplate at an early stage uniform guidelines around communication with respondents whose cases are reviewed. In order to conduct the most thorough and fair review possible, it is important that respondents are given the opportunity to present relevant information regarding the exercise of prosecutorial discretion and that they understand the review process. This is particularly true for *pro se* respondents who lack legal representation, may not have strong English language communication skills and may be intimidated by the legal process. These respondents may also be particularly vulnerable to disreputable brokers offering misleading or unlawful services purporting to be able to navigate the process for prosecutorial discretion.

CAR 0164

Given the importance of this issue, I would urge you — in the next 60 days — to offer a timetable for national implementation with the goal of full implementation in all immigration courts by year's end.

Again, the common sense, cost-effective and equitable measures that the Administration has taken to more effectively execute immigration enforcement policies provide much needed relief for vulnerable populations suffering in our broken immigration system, and more effectively keep our communities and nation safe. Further, recommendations enumerated herein would strengthen the overall exercise of prosecutorial discretion and more robustly achieve the *policy*'s laudable goals.

Sincerely,

Michael F Bennet
United States Senator

LUIS V. GUTIERREZ

MEMBER OF CONGRESS
4TH DISTRICT, ILLINOIS

2266 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-8203

DISTRICT OFFICE:
3219 WEST NORTH AVENUE
CHICAGO, IL 60647
(773) 342-0774

COMMITTEES

FINANCIAL SERVICES

SUBCOMMITTEES:
INSURANCE, HOUSING, AND COMMUNITY OPPORTUNITY
RANKING MEMBER

FINANCIAL INSTITUTIONS AND CONSUMER CREDIT

PERMANENT SELECT COMMITTEE ON
INTELLIGENCE

SUBCOMMITTEE:
TERRORISM, HUMINT, ANALYSIS AND COUNTERINTELLIGENCE

# Congress of the United States
## House of Representatives
### Washington, DC 20515-1304

February 8, 2012

The Honorable Janet Napolitano
U.S. Department of Homeland Security
Washington, DC 20528

The Honorable John T. Morton
Director
U.S. Immigration and Customs Enforcement
Washington, DC 20528

Dear Secretary Napolitano and Director Morton:

I write to express my concerns about the lack of prosecutorial discretion (PD) in certain
sympathetic cases, and their broader implications for the successful application of the
meritorious policy. I also wanted to follow up on an offer the Secretary made to me and the
members of the Congressional Hispanic Caucus last December to sit down with DHS' and DOJ's
key advisors on PD to review the progress of implementing PD agency-wide and ongoing
concerns and questions we have.

Today, Immigration and Customs Enforcement (ICE) denied a request for a Stay of Removal for
an individual I thought merited discretion. Cesar Baltazar PEREZ VASQUEZ, A# [PII] ███
entered the U.S. as a minor and has been in the U.S. for more than 10 years. He has no criminal
record and has 3 U.S. citizen children to support. While he did illegally re-enter the United
States, and I understand that should not be taken lightly, I find his equities compelling. I am also
gravely concerned with the circumstances of his 2 arrests by local police, both of which led to his
contact with ICE.

The first time he came to ICE's attention, he was arrested by local police in Kansas City while
parked on the side of the road while watching a soccer game. The second time, in January of this
year, Alabama police arrested him for inappropriate window tinting. Given the nature of these
arrests, I am concerned about the possibility that Mr. Perez was racially profiled--something we
are all concerned about, especially in the state of Alabama.

For this particular case, I ask you to reconsider the decision to deny discretion. That Mr. Perez'
equities here are insufficient to overcome re-entry also concerns me. I simply do not see that any
public interest is served by separating this responsible father from his three children. I also fear
the implications of this case and others like it for a broader community of people whose only
hope right now is true case-by-case discretion, with a fair weighing of all circumstances and
without categorical denials based on past immigration violations.

RECEIVED
2012 FEB -9 PM 4:58

CAR 0166

I intend to bring this case before the Congressional Hispanic Caucus members tomorrow as the basis for discussion about the progress of and my concerns with the implementation of the PD policy. As you know, we have a vested interest in ensuring this policy, though targeted and narrow, benefits our communities as much as possible. I ask that you not take adverse action against Mr. Perez before I have an opportunity to vet this case with my colleagues.

I would also like to pursue the rescheduling of the meeting Secretary Napolitano offered to me and the CHC, to meet with key DHS and DOJ staff about the discretion policy. You may recall that, due to the passing of my father, it was cancelled in December. Never-the-less, I would welcome the opportunity to sit down with counsel and discuss this case and others like it, the implementation of PD beyond the pilot programs and other concerns and questions I and other Members have about the PD policies.

As you know, I have worked hard in my District and throughout the country to defend the recent memos and actions on discretion, because I recognize how meaningful they are, and their potential to provide immigrants and their families needed relief in the face of record-level removals. I am committed to the memos' success and this letter is an extension of my commitment.

Thank you for revisiting the case of Mr. Perez, and for working with me to arrange the meeting we discussed. To follow up with either request, you may contact me or my legislative director, Susan Collins, at 202-225-8203. Thank you.

Sincerely,

Luis V. Gutierrez
Member of Congress

THE SECRETARY OF STATE

WASHINGTON

February 8, 2012

The Honorable Janet Napolitano
Secretary of Homeland Security
Washington, DC  20528

Dear Madam Secretary:

**DP**

CAR 0168



Sincerely yours,

Hillary Rodham Clinton

Enclosures:
    As stated.

CAR 0169

SSCI #2012-0

**United States Senate**

SELECT COMMITTEE ON INTELLIGENCE
WASHINGTON, DC 20510-6475

February 3, 2012

2012 FEB -9 PH 2:59

The Honorable Janet Napolitano
Secretary of Homeland Security
Department of Homeland Security
Washington, D.C. 20520

The Honorable James Clapper
Director of National Intelligence
Washington, D.C. 20511

Dear Secretary Napolitano and Director Clapper:

As stated in our letter to Director Clapper on April 18, 2011, the Senate Select Committee on Intelligence reestablished an Audits & Oversight team on the staff to perform the Committee's audit function first established in 1988.

We write to notify you that, in accordance with Committee rules, we have jointly directed this team to conduct a detailed mission review of the Office of Intelligence and Analysis (I&A) within the Department of Homeland Security (DHS).

The team has begun preliminary work and will officially begin the study immediately. Since this review will involve detailed requests for data and interviews of Intelligence Community officials, we ask that your office consider the requests of the Audits & Oversight team to be on behalf of the Committee and cooperate fully and expeditiously to facilitate these requests.

Thank you in advance for your assistance and cooperation. The team will soon be in touch with your respective Offices of Legislative Affairs. In the interim, if you have any questions about the Audits & Oversight team, please have your staff contact Jared Rieckewald or David Luckey of the Audits & Oversight staff at (202) 224-1700.

Sincerely,

Dianne Feinstein
Chairman

Saxby Chambliss
Vice Chairman

| | |
|---|---|
| **From:** | Peacock, Nelson ███████████@HQ.DHS.GOV> |
| **Sent:** | Friday, June 15, 2012 8:45 AM |
| **To:** | McCament, James W ███████████@uscis.dhs.gov>; Williams, Elliot C ████████@ice.dhs.gov>; YEAGER, MICHAEL ███████████@cbp.dhs.gov>; Mills, Kate ███████████@ice.dhs.gov> |
| **Cc:** | Winkler, Jeremy ███████████@HQ.DHS.GOV>; Lovett, Edward ███████████@HQ.DHS.GOV>; Gross-Davis, Leslie ███████████@HQ.DHS.GOV>; Stroud, Michael ███████████@HQ.DHS.GOV>; Higgins-Bloom, Kate ███████████@HQ.DHS.GOV> |
| **Subject:** | FW: DOCUMENTS |
| **Attach:** | DHS Press Release June 15th 2012 FINAL.docx; FINAL Web Text FAQ.docx; FINAL PD PAG.docx; Master Q&A FINAL.docx; FINAL PD Fact Sheet.doc |

These are not final docs, but may help you to get a feel for what is going out in a bit.

Please do not forward these materials as they are not final.

Again, Jeremy will send finals once they are available.

the operative timeline for today is at the bottom.

Nelson

---

**From:** Chandler, Matthew
**Sent:** Thursday, June 14, 2012 9:57 PM
**To:** Sandweg, John; Grossman, Seth; Kroloff, Noah; Shlossman, Amy; Peacock, Nelson; Morton, John; Barr, Suzanne E; Mayorkas, Alejandro N; Carson, Rebecca S; AGUILAR, DAVID V; O'CONNOR, KIMBERLY; McNamara, Phil; Ramanathan, Sue; Boogaard, Peter; Wong, Heather
**Subject:** DOCUMENTS

Attached are final copies of:

1.) Press Release
2.) Public FAQ/Web Text
3.) Internal PAG
4.) Master FAQ
5.) Fact Sheet

There still are a few places where we need to drop in links or phone numbers. We will recirculate in the morning with those details, but for substantive purposes, these are final. Will distro to appropriate public affairs staffs at 9:30 AM as well.

For everyone's awareness, the schedule for the AM is below:

Friday, June 15, 2012

| | |
|---|---|
| 9:00 AM | Key Congressional Notifications/Key VIP Stakeholder notifications |
| 9:30 AM | AP Story posts, DHS OPA issues advisory for S1 Press Conference Call |
| 10:00AM | DHS issues press release/all documents go live on sites |
| 10:30AM | S1 Press Conference Call |
| 11:00AM | S1 tapes TV interviews (NBC, ABC, CBS, FOX, CNN) |

11:00 AM          Stakeholder Engagement Call
12:00 PM       WH Press Briefing
1:15PM          POTUS Statement
TBD               Background calls with editorial writers from targeted newspapers


Please let me know if there are any additional questions.

Thanks,

Matt

CAR 0172

| | |
|---|---|
| **From:** | Peacock, Nelson &lt;░░░░░░@HQ.DHS.GOV&gt; |
| **Sent:** | Friday, June 15, 2012 9:06 AM |
| **To:** | Winkler, Jeremy &lt;░░░░░░@HQ.DHS.GOV&gt; |
| **Subject:** | FW: FINAL DOCUMENTS |
| **Attach:** | S1 memo - PD-certain young children 6 15 12.pdf; DHS Press Release June 15th FINAL.pdf; FINAL PD PAG.pdf; FINAL Web Text FAQ.pdf; FINAL PD Fact Sheet.pdf; Master Q&A FINAL.pdf; DHS Press Release June 15th FINAL Spanish.pdf |

You can send, PD memo, Press release, and final web text...the others are internal.

(do not send PAG or Master Q and A)

---

**From:** Chandler, Matthew
**Sent:** Friday, June 15, 2012 8:59 AM
**To:** Sandweg, John; Grossman, Seth; Kroloff, Noah; Shlossman, Amy; Peacock, Nelson; Morton, John; Barr, Suzanne E; Mayorkas, Alejandro N; Carson, Rebecca S; AGUILAR, DAVID V; O'CONNOR, KIMBERLY; McNamara, Phil; Ramanathan, Sue; Boogaard, Peter; Wong, Heather
**Subject:** FINAL DOCUMENTS

All –

Full PDF'd package is attached.

1.) Memo
2.) Press Release
3.) Press Release in Spanish
4.) Public FAQ/Web Text
5.) Internal PAG
6.) Master FAQ
7.) Fact Sheet

For everyone's awareness, the schedule is below:

Friday, June 15, 2012

| | |
|---|---|
| 9:00 AM | Key Congressional Notifications/Key VIP Stakeholder notifications |
| 9:30 AM | AP Story posts, DHS OPA issues advisory for S1 Press Conference Call |
| 10:00AM | DHS issues press release/all documents go live on sites |
| 10:30AM | S1 Press Conference Call |
| 11:00AM | S1 tapes TV interviews (NBC, ABC, CBS, FOX, CNN) |
| 11:00 AM | Stakeholder Engagement Call |
| 12:00 PM | WH Press Briefing |
| 1:15PM | POTUS Statement |
| TBD | Background calls with editorial writers from targeted newspapers |

Good luck!

-Matt



Secretary

U.S. Department of Homeland Security
Washington, DC 20528

Homeland
Security

June 15, 2012

MEMORANDUM FOR:    David V. Aguilar
Acting Commissioner, U.S. Customs and Border Protection

Alejandro Mayorkas
Director, U.S. Citizenship and Immigration Services

John Morton
Director, U.S. Immigration and Customs Enforcement

FROM:    Janet Napolitano
Secretary of Homeland Security

SUBJECT:    Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

www.dhs.gov    CAR 0174

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

CAR 0175

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.  It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law.  I have done so here.

Janet Napolitano

3

CAR 0176

*Press Office*
**U.S. Department of Homeland Security**

# Press Release

June 15, 2012
Contact: DHS Press Office, (202) 282-8010

### SECRETARY NAPOLITANO ANNOUNCES DEFERRED ACTION PROCESS FOR YOUNG PEOPLE WHO ARE LOW ENFORCEMENT PRIORITIES

WASHINGTON— Secretary of Homeland Security Janet Napolitano today underlined announced that effective immediately, certain young people who were brought to the United States as young children, do not present a risk to national security or public safety, and meet several key criteria will be considered for relief from removal from the country or from entering into removal proceedings. Those who demonstrate that they meet the criteria will be eligible to receive deferred action for a period of two years, subject to renewal, and will be eligible to apply for work authorization.

"Our nation's immigration laws must be enforced in a firm and sensible manner," said Secretary Napolitano. "But they are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Discretion, which is used in so many other areas, is especially justified here."

DHS continues to focus its enforcement resources on the removal of individuals who pose a national security or public safety risk, including immigrants convicted of crimes, violent criminals, felons, and repeat immigration law offenders. Today's action further enhances the Department's ability to focus on these priority removals.

Under this directive, individuals who demonstrate that they meet the following criteria will be eligible for an exercise of discretion, specifically deferred action, on a case-by-case basis:

1.) Came to the United States under the age of sixteen;

2.) Have continuously resided in the United States for a least five years preceding the date of this memorandum and are present in the United States on the date of this memorandum;

3.) Are currently in school, have graduated from high school, have obtained a general education development certificate, or are honorably discharged veterans of the Coast Guard or Armed Forces of the United States;

4.) Have not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety;

5.)  Are not above the age of thirty.

Only those individuals who can prove through verifiable documentation that they meet these criteria will be eligible for deferred action.  Individuals will not be eligible if they are not currently in the United States and cannot prove that they have been physically present in the United States for a period of not less than 5 years immediately preceding today's date.  Deferred action requests are decided on a case-by-case basis.  DHS cannot provide any assurance that all such requests will be granted. The use of prosecutorial discretion confers no substantive right, immigration status, or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.

While this guidance takes effect immediately, USCIS and ICE expect to begin implementation of the application processes within sixty days.  In the meantime, individuals seeking more information on the new policy should visit USCIS's website (at www.uscis.gov), ICE's website (at www.ice.gov), or DHS's website (at www.dhs.gov).  Beginning Monday, individuals can also call USCIS' hotline at 1-800-375-5283 or ICE's hotline at 1-888-351-4024 during business hours with questions or to request more information on the forthcoming process.

For individuals who are in removal proceedings and have already been identified as meeting the eligibility criteria and have been offered an exercise of discretion as part of ICE's ongoing case-by-case review, ICE will immediately begin to offer them deferred action for a period of two years, subject to renewal.

For more information on the Administration policy reforms to date, please see this fact sheet.

<p style="text-align:center">###</p>

CAR 0178

*Office of Public Affairs*
**U.S. Department of Homeland Security**



# Public Affairs Guidance

**June 15, 2012**

**BACKGROUND**

Over the past three years, this Administration has undertaken an unprecedented effort to transform the immigration enforcement system into one that focuses on public safety, border security and the integrity of the immigration system.  As DHS continues to focus its limited enforcement resources on the removal of individuals who pose a danger to national security or a risk to public safety, including aliens convicted of crimes, with particular emphasis on violent criminals, felons, and repeat offenders, DHS will move to exercise prosecutorial discretion to ensure that enforcement resources are not expended on low priority cases, such as individuals who were brought to this country through no fault of their own as children, have not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, and meet other key criteria.

Effective immediately, certain young people who were brought to the United States through no fault of their own as young children and meet several key criteria will no longer be removed from the country or entered into removal proceedings. Those who demonstrate that they meet the criteria will be eligible to receive deferred action for a period of two years, subject to renewal.

The exercise of discretion will be made on a case by case basis for individuals who:

1.) Came to the United States under the age of sixteen;

2.) Have continuously resided in the United States for a least five years preceding the date of this memorandum and are present in the United States on the date of this memorandum;

3.) Are currently in school, have graduated from high school, have obtained a general education development certificate, or are honorably discharged veterans of the Coast Guard or Armed Forces of the United States;

4.) Have not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety;

5.) Are not above the age of thirty.

Only those individuals who can prove through verifiable documentation that they meet these criteria will be eligible for deferred action.  Individuals will not be eligible if they are not currently in the United States and cannot prove that they have been physically present in the United States for a continuous period of not less than 5 years immediately preceding today's date.

## GUIDANCE

- Media calls should go to the DHS Office of Public Affairs, 202-282-8010

## GENERAL TALKING POINTS

- Today Secretary Napolitano announced that effective immediately, young people who were brought to the United States through no fault of their own as children and meet several key criteria will no longer be removed from the country or entered into removal proceedings.

- This action, which is consistent with the Department's existing use of prosecutorial discretion, will ensure that enforcement resources are not expended on low priority individuals but are appropriately focused on individuals who pose a danger to national security or represent a risk to public safety.

- Those who demonstrate that they meet the criteria will be eligible to receive deferred action for a period of two years, subject to renewal.  To be eligible, individuals must:

   o  have come to the United States under the age of sixteen;
   o  have continuously resided in the United States for a least five years preceding today's date and be present in the United States as of today;
   o  be currently in school, have graduated from high school, have obtained a general education development certificate, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
   o  have not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
   o  not be above the age of thirty.

- Individuals must also complete a background check and, for the process to be developed by USCIS, must be 15 years or older unless they are subject to a final order of removal. Only those individuals who can prove through verifiable documentation that they meet these criteria will be eligible for deferred action.

- The granting of deferred action under this directive will help DHS continue to streamline our immigration enforcement system and ensure that our resources are not spent pursuing