the removal of the lowest priority cases involving productive young people.   More importantly, it is the right thing to do.

- This policy represents the next logical step in our efforts to transform the immigration enforcement system into one that focuses on public safety, border security and the integrity of the immigration system, while allowing productive young people to continue to contribute to our country in significant ways.

**FAQ**

**Why are you announcing these changes now?**
Over the past three years, this Administration has undertaken an unprecedented effort to make the immigration enforcement system more effective and efficient by focusing on public safety threats, border security and the integrity of the immigration system.  In June 2010, ICE issued its civil enforcement priorities.  In June 2011, U.S. Immigration and Customs Enforcement Director John Morton issued two memoranda on the appropriate exercise of prosecutorial discretion.  In November 2011, the Department began the case-by-case review of all individuals in removal proceedings to ensure consistency with the Administration's priorities.  DHS has analyzed the effect of these policies to date and determined that additional steps are necessary to ensure that the Department's enforcement resources are focused on criminal aliens and other high priority cases.

**Does the new policy constitute administrative amnesty?**
No.  This process will not result in any individuals receiving permanent lawful status but will provide for temporary grants of deferred action in appropriate cases.  It will help streamline the immigration enforcement system, increasing the focus on the removal of criminal aliens, repeat immigration law violators and recent border crossers while ensuring that resources are not spent pursuing productive young people who were brought to this country as a child.  It is an appropriate exercise of prosecutorial discretion within the framework of the existing law.  Only the Congress, acting through its legislative authority, can confer the right to permanent lawful status.  It remains for the executive branch, however, to exercise discretion within the framework of the existing law, which is what this new process does.

**Is this process consistent with the Secretary's statement that DHS cannot provide categorical relief for individuals who meet the criteria of the DREAM Act?**
Yes. This policy is an exercise of prosecutorial discretion designed to ensure that our immigration laws are enforced in a strong and sensible manner.  It confers neither substantive rights nor a pathway to citizenship.  It will result in temporary grants of deferred action, and only after a case-by-case review.  It is consistent with our enforcement priorities, which put a low priority on young people who came here as children and are now contributing to our country.

**Why not simply provide eligible individuals with Temporary Protected Status?**
The Secretary has determined that deferred action is appropriate here.  Temporary Protected Status (TPS) is designed to allow the Secretary of Homeland Security to permit citizens of a foreign country to lawfully remain in the U.S. due to conditions in their home country that temporarily prevent individuals from returning safely or because the country is unable to adequately handle the return of its nationals.  Typically, the Secretary may designate a country

CAR 0181

for TPS due to the existence of temporary conditions like an ongoing armed conflict, an environmental disaster (such as earthquake or hurricane), or an epidemic.

CAR 0182

Over the past three years, this Administration has undertaken an unprecedented effort to transform the immigration enforcement system into one that focuses on public safety, border security and the integrity of the immigration system.  As DHS continues to focus its limited enforcement resources on the removal of individuals who pose a danger to national security or a risk to public safety, including aliens convicted of crimes, with particular emphasis on violent criminals, felons, and repeat offenders, DHS will move to exercise prosecutorial discretion to ensure that enforcement resources are not expended on low priority cases, such as individuals who were brought to this country through no fault of their own as children, have not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, and meet other key criteria.

Effective immediately, certain young people who were brought to the United States through no fault of their own as young children and meet several key criteria will no longer be removed from the country or entered into removal proceedings. Those who demonstrate that they meet the criteria will be eligible to receive deferred action for a period of two years, subject to renewal.

Only those individuals who can prove through verifiable documentation that they meet these criteria will be eligible for deferred action.  Individuals will not be eligible if they are not currently in the United States and cannot prove that they have been physically present in the United States for a continuous period of not less than 5 years immediately preceding today's date.  The use of prosecutorial discretion confers no substantive right or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.

While this guidance takes effect immediately, USCIS and ICE expect to begin implementation of the application processes within sixty days.  In the meantime, individuals seeking more information on the new policy should visit USCIS's website (at www.uscis.gov), ICE's website (at www.ice.gov), or DHS's website (at www.dhs.gov).  Beginning Monday, individuals can also call USCIS' hotline at 1-800-375-5283 or ICE's hotline at 1-888-351-4024 during business hours with questions or to request more information on the forthcoming process.

## FREQUENTLY ASKED QUESTIONS

**Who is eligible to receive deferred action under the Department's new directive?**
Pursuant to the Secretary's June 15, 2012 memorandum, in order to be eligible for deferred action, individuals must:

1.) Have come to the United States under the age of sixteen;

2.) Have continuously resided in the United States for at least five years preceding the date of this memorandum and are present in the United States on the date of this memorandum;

3.) Currently be in school, have graduated from high school, have obtained a general education development certificate, or are honorably discharged veterans of the Coast Guard or Armed Forces of the United States;

1

CAR 0183

4.) Have not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety;

5.) Not be above the age of thirty.

Individuals must also complete a background check and, for those individuals who make a request to USCIS and are not subject to a final order of removal, must be 15 years old or older.

**What is deferred action?**
Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. Deferred action does not confer lawful status upon an individual. In addition, although an alien granted deferred action will not be considered to be accruing unlawful presence in the United States during the period deferred action is in effect, deferred action does not absolve individuals of any previous or subsequent periods of unlawful presence.

Under existing regulations, an individual who has been granted deferred action is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate "an economic necessity for employment." Deferred action can be terminated at any time at the agency's discretion or renewed by the agency.

**How will the new directive be implemented?**
Individuals who are not in removal proceedings or who are subject to a final order of removal will need to submit a request for a review of their case and supporting evidence to U.S. Citizenship and Immigration Services (USCIS). Individuals may request deferred action if they meet the eligibility criteria. In the coming weeks, USCIS will outline and announce the procedures by which individuals can engage in this process. This process is not yet in effect and requests should not be submitted at this time. Beginning June 18, individuals may call the USCIS hotline at 1-800-375-5283, from 8 a.m. to 8 p.m., with questions or to request more information on the new process. The hotline offers assistance in English and Spanish. Individuals seeking more information on the new process should visit USCIS's website (at http://www.uscis.gov).

For individuals who are in removal proceedings before the Executive Office for Immigration Review, ICE will, in the coming weeks, announce the process by which qualified individuals may request a review of their case. Additional information is available from the ICE Office of the Public Advocate at http://www.ice.gov/about/offices/enforcement-removal-operations/publicadvocate/Beginning June 18, individuals may call the ICE hotline at 1-888-351-4024, from 9 a.m. to 5 p.m., with questions or to request more information on the new process.

For individuals who are in removal proceedings and have already been identified as meeting the eligibility criteria as part of ICE's case-by-case review, ICE will immediately begin to offer deferred action for a period of two years, subject to renewal.

**Are individuals who receive deferred action pursuant to the new directive eligible for employment authorization?**
Yes. Pursuant to existing regulations, individuals who receive deferred action may apply for and may obtain employment authorization from USCIS provided they can demonstrate an economic necessity for their employment. Information about employment authorization requests is available on USCIS's website at http://www.uscis.gov/i-765.

2

CAR 0184

**Does the process result in permanent lawful status for beneficiaries?**
No.  The grant of deferred action under this new directive does not provide an individual with permanent lawful status or a pathway to obtaining permanent lawful status.  Only the Congress, acting through its legislative authority, can confer the right to permanent lawful status.

**Why will deferred actions only be granted for two years?**
Grants of deferred action will be issued in increments of two years.  At the expiration of the two year period, the grant of deferred action can be renewed, pending a review of the individual case.

**If an individual's period of deferred action is extended, will individuals need to re-apply for an extension of their employment authorization?**
Yes.  If an individual applies for and receives an extension of the period for which he or she was granted deferred action, he or she must also request an extension of his or her employment authorization.

**Does this policy apply to those who are subject to a final order of removal?**
Yes.  An individual subject to a final order of removal who can demonstrate that he or she meets the eligibility criteria can request a review of his or her case and receive deferred action for a period of two years, subject to renewal.  All cases will be considered on an individualized basis.

This process is not yet in effect and requests should not be submitted at this time.  In the coming weeks, USCIS will outline and announce the procedures by which individuals can engage in this process.  Beginning June 18, individuals may call the USCIS hotline at 1-800-375-5283, from 8 a.m. to 8 p.m., with questions or to request more information on the new process.  The hotline offers assistance in English and Spanish.  Individuals seeking more information on the new process should visit USCIS's website (at http://www.uscis.gov).

**How soon after USCIS receives a request to review a case will the individual receive a decision on his or her request?**
USCIS will provide additional information on this issue in the coming weeks.  Information will be made publicly available at http://www.uscis.gov/.

**If an individual who is about to be removed by ICE believes he or she satisfies the eligibility criteria for the new process, what steps should he or she take to ensure his or her case is reviewed before removal?**
Individuals who believe they can demonstrate that they satisfy the eligibility criteria and are about to be removed should immediately contact either the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week) or the ICE Office of the Public Advocate through the Office's hotline at 1-888-351-4024 (staffed 9am – 5pm, Monday – Friday) or by e-mail at EROPublicAdvocate@ice.dhs.gov.

**If an individual who satisfies the eligibility criteria is encountered by Customs and Border Protection (CBP) or ICE, will he or she be placed into removal proceedings?**
This policy is intended to allow ICE and CBP to focus on priority cases.  Pursuant to the direction of the Secretary of Homeland Security, for individuals who satisfy the eligibility criteria, CBP or ICE should exercise their discretion to prevent them from being apprehended, placed into removal proceedings, or removed.  If individuals, including individuals in detention, believe they were placed into removal proceedings in violation of this policy, they should contact either the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week) or the ICE Office of the Public Advocate through the Office's hotline at 1-888-351-4024 (staffed 9am – 5pm, Monday – Friday) or by e-mail at EROPublicAdvocate@ice.dhs.gov.

CAR 0185

**If an individual accepted an offer of administrative closure under the case-by-case review process or if his or her case was terminated as part of the case-by-case review process, can he or she receive deferred action under the new process?**

Yes.  Individuals who can demonstrate that they meet the eligibility criteria will be eligible for deferred action even if they had accepted an offer of administrative closure or termination under the case-by-case review process.  For individuals who are in removal proceedings and have already been identified as meeting the eligibility criteria as part of ICE's case-by-case review, ICE will immediately begin to offer deferred action for a period of two years, subject to renewal.

**If an individual declined an offer of administrative closure under the case-by-case review process, can he or she receive deferred action under the new process?**

Yes.  Individuals who can demonstrate that they meet the eligibility criteria will be eligible for deferred action even if they declined an offer of administrative closure under the case-by-case review process.

**If an individual's case was reviewed as part of the case-by-case review process but he or she was not offered administrative closure, can he or she receive deferred action under the new process?**

Yes.  Individuals who can demonstrate that they meet the eligibility criteria will be eligible for deferred action even if they were not offered administrative closure following review of their case as part of the case-by-case review process.

**Will DHS personnel responsible for reviewing requests for an exercise of prosecutorial discretion under this process receive special training?**

Yes.  ICE and USCIS personnel responsible for considering requests for an exercise of prosecutorial discretion under the Secretary's directive will receive special training.

**Will individuals be subject to background checks before they can receive an exercise of prosecutorial discretion?**

Yes.  All individuals will undergo biographic and biometric background checks prior to receiving an exercise of prosecutorial discretion.  Individuals who have been convicted of any felony, a significant misdemeanor offense, three or more misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety are not eligible to be considered for deferred action under the new process.

**What do background checks involve?**

Background checks involve checking biographic and biometric information provided by the individuals against a variety of databases maintained by DHS and other federal government agencies.

**What documentation will be sufficient to demonstrate that an individual came to the United States before the age of 16?**

Documentation sufficient for an individual to demonstrate that he or she came to the United States before the age of 16 includes, but is not limited to: financial records, medical records, school records, employment records, and military records.

**What documentation will be sufficient to demonstrate that an individual has resided in the United States for a least five years preceding June 15, 2012?**

Documentation sufficient for an individual to demonstrate that he or she has resided in the United States for at five years immediately preceding June 15, 2012 includes, but is not limited to: financial records, medical records, school records, employment records, and military records.

**What documentation will be sufficient to demonstrate that an individual was physically present in the United States as of June 15, 2012?**

4

CAR 0186

Documentation sufficient for an individual to demonstrate that he or she was physically present on June 15, 2012, the date the memorandum was issued, includes, but is not limited to: financial records, medical records, school records, employment records, and military records.

**What documentation will be sufficient to demonstrate that an individual is currently in school, has graduated from high school, or has obtained a general education development certificate (GED)?**
Documentation sufficient for an individual to demonstrate that he or she is currently in school, has graduated from high school, or has obtained a GED certificate includes, but is not limited to: diplomas, GED certificates, report cards, and school transcripts.

**What documentation will be sufficient to demonstrate that an individual is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States?**
Documentation sufficient for an individual to demonstrate that he or she is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States includes, but is not limited to: report of separation forms, military personnel records, and military health records.

**What steps will USCIS and ICE take to prevent fraud in the new processes?**
An individual who knowingly makes a misrepresentation to USCIS or ICE, or knowingly fails to disclose facts to USCIS or ICE, in an effort to receive deferred action or work authorization in this new process will be treated as an immigration enforcement priority to the fullest extent permitted by law, subjecting the individual to criminal prosecution and/or removal from the United States.

**Are individuals with a conviction for a felony offense, a significant misdemeanor offense, or multiple misdemeanors eligible for an exercise of prosecutorial discretion under this new process?**
No.  Individuals who have been convicted of a felony offense, a significant misdemeanor offense, or three or more other misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct are not eligible to be considered for deferred action under the new process.

**What offenses qualify as a felony?**
A felony is a federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year.

**What offenses qualify as a "significant misdemeanor"?**
A significant misdemeanor is a federal, state, or local criminal offense punishable by no more than one year of imprisonment or even no imprisonment that involves: violence, threats, or assault, including domestic violence; sexual abuse or exploitation; burglary, larceny, or fraud; driving under the influence of alcohol or drugs; obstruction of justice or bribery; unlawful flight from arrest, prosecution, or the scene of an accident; unlawful possession or use of a firearm; drug distribution or trafficking; or unlawful possession of drugs.

**How many non-significant misdemeanors constitute "multiple misdemeanors" making an individual ineligible for an exercise of prosecutorial discretion under this new process?**
An individual who is not convicted of a significant misdemeanor but is convicted of three or more other misdemeanors not occurring on the same day and not arising out of the same act, omission, or scheme of misconduct is not eligible to be considered for deferred action under this new process.

**What qualifies as a national security or public safety threat?**
If the background check or other information uncovered during the review of an individual's request for deferred action indicates that the individual's presence in the United States threatens public safety or national security, he or she will be ineligible for an exercise of prosecutorial discretion.  Indicia that an

5

individual poses such a threat include, but are not limited to, gang membership, participation in criminal activities, or participation in activities that threaten the United States.

**How will ICE and USCIS handle cases involving individuals who do not satisfy the eligibility criteria under this new process but may be eligible for an exercise of prosecutorial discretion under the June 2011 Prosecutorial Discretion Memoranda?**

If an individual has a final order of removal and USCIS determines that he or she does not satisfy the eligibility criteria, then it will reject the individual's request for deferred action. That individual may then request an exercise of prosecutorial discretion under the ICE June 2011 Prosecutorial Discretion Memoranda through any of the established channels at ICE, including through a request to the ICE Office of the Public Advocate or to the local Field Office Director. USCIS will not consider requests for review under the ICE June 2011 Prosecutorial Discretion Memoranda.

If an individual is currently in removal proceedings and ICE determines that he or she does not satisfy the eligibility criteria for deferred action under this process, it will then consider whether the individual is otherwise eligible for an exercise of prosecutorial discretion under its current practices for assessing eligibility under the June 2011 Prosecutorial Discretion Memoranda.

**Will there be supervisory review of decisions by ICE and USCIS under this process?**

Yes. Both ICE and USCIS will develop protocols for supervisory review as part of their implementation of the new process.

**Can individuals appeal a denial by ICE or USCIS of their request for an exercise of prosecutorial discretion under the new process?**

No. Individuals may not appeal a denial by ICE or USCIS of their request for an exercise of prosecutorial discretion. However, ICE and USCIS will develop protocols for supervisory review as part of their implementation of the new process. Although there is no right for appeal, individuals in removal proceedings who believe their cases were not correctly handled may contact the ICE Office of the Public Advocate either by phone at 1-888-351-4024 or by e-mail at EROPublicAdvocate@ice.dhs.gov.

**Will dependents and other immediate relatives of individuals who receive deferred action pursuant to this process also be eligible to receive deferred action?**

No. The new process is available only to those who satisfy the eligibility criteria. As a result, the immediate relatives, including dependents, of individuals who receive deferred action pursuant to this process are not eligible to apply for deferred action as part of this process unless they independently satisfy the eligibility criteria.

**If an individual's request to USCIS for deferred action is denied, will he or she be placed in removal proceedings?**

For individuals whose requests for deferred action are denied by USCIS, USCIS will apply its existing Notice to Appear guidance governing USCIS's referral of cases to ICE and issuance of notices to appear. Under this guidance, individuals whose requests are denied under this process will be referred to ICE if they have a criminal conviction or there is a finding of fraud in their request.

**Should individuals who are not in removal proceedings but believe themselves to be eligible for an exercise of deferred action under this process seek to place themselves into removal proceedings through encounters with ICE or CBP?**

No. Individuals who are not in removal proceedings but believe that they satisfy the eligibility criteria should submit their request for review of their case to USCIS under the procedures that USCIS will implement.

6

CAR 0188

This process is not yet in effect and requests should not be submitted at this time. Beginning June 18, individuals may call the USCIS hotline at 1-800-375-5283, from 8 a.m. to 8 p.m., with questions or to request more information on the new process. The hotline offers assistance in English and Spanish. Individuals seeking more information on the new process should visit USCIS's website (at http://www.uscis.gov).

**If I receive deferred action through this process, will I be able to travel outside the United States?**
USCIS is exploring this issue and will resolve it in the coming weeks as part of its implementation plan.

**Will there be any exceptions to the requirement that an individual must have resided in the United States for a least five years preceding June 15, 2012?**
An individual must demonstrate that he or she has resided in the United States for a least five years preceding June 15, 2012. Brief and innocent absences undertaken for humanitarian purposes will not violate this requirement.

**What should I do if I am eligible under this process and have been issued an ICE detainer following an arrest by a state or local law enforcement officer?**
If you meet the eligibility criteria and have been served a detainer, you should immediately contact either the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week) or the ICE Office of the Public Advocate either through the Office's hotline at 1-888-351-4024 (staffed 9am – 5pm, Monday – Friday) or by e-mail at EROPublicAdvocate@ice.dhs.gov.

**Does deferred action provide individuals with a path to citizenship or permanent legal status?**
No. A grant of deferred action is a form of prosecutorial discretion that does not confer a path to citizenship or lawful permanent resident status. Only the Congress, acting through its legislative authority, can confer these rights.

**Why isn't DHS allowing other individuals to request deferred action under this process?**
As a general matter, young people who, through no fault of their own, were brought to this country as children, lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

**Does this Administration remain committed to comprehensive immigration reform?**
Yes. The Administration has consistently pressed for passage of comprehensive immigration reform, including the DREAM Act, because the President believes these steps are critical to building a 21st century immigration system that meets our nation's economic and security needs.

**Is passage of the DREAM Act still necessary in light of the new process?**
Yes. As the President has stated, individuals who would qualify for the DREAM Act deserve certainty about their status, and this new process does not provide that certainty. Only the Congress, acting through its legislative authority, can confer the certainty that comes with a pathway to permanent lawful status.

**How can I get more information on the new process?**
Individuals seeking more information on the new process should visit ICE's website (at www.ice.gov), USCIS's website (at www.uscis.gov), or DHS's website (at www.dhs.gov). Beginning June 18, individuals can also call ICE's hotline (at 1-888-351-4024) or USCIS's hotline (at 1-800-375-5283) during business hours with questions or to request more information on the new process.

CAR 0189

**Where can I find more information about where to go for Deferred Action?**

| I... | Who to submit a request to review my case: | Where can I get more information: |
|---|---|---|
| ...am subject to a final order of removal. | U.S. Citizenship and Immigration Services (USCIS) when the application period opens | USCIS website at http://www.uscis.gov.<br><br>Beginning June 18: USCIS hotline at 1-800-375-5283 (8 am-8 pm; English & Spanish) |
| ...have a case pending before the Executive Office for Immigration Review or a federal court. | U.S. Immigration and Customs Enforcement (ICE) when the process for accepting requests is announced | ICE website at: http://www.ice.gov.<br><br>Beginning June 18: ICE hotline at 1-888-351-4024 (9am – 5pm; English and Spanish) |
| ...have never been apprehended or placed into removal proceedings. | U.S. Citizenship and Immigration Services (USCIS) when the application period opens | USCIS website at http://www.uscis.gov.<br><br>Beginning June 18: USCIS hotline at 1-800-375-5283 (8 am-8 pm; English & Spanish) |

CAR 0190

*Press Office*
**U.S. Department of Homeland Security**

**Homeland Security**

# Fact Sheet

### Transforming the Immigration Enforcement System

Over the past three years, this Administration has undertaken an unprecedented effort to transform the immigration enforcement system into one that focuses on public safety, border security and the integrity of the immigration system.  As the Department of Homeland Security (DHS) continues to focus its enforcement resources on the removal of individuals who pose a national security or public safety risk, including immigrants convicted of crimes, violent criminals, felons, and repeat immigration law offenders, we have taken a number of steps to transform our immigration enforcement system.

- **April 30, 2009:** U.S. Immigration and Customs Enforcement (ICE) released a new worksite enforcement strategy which moved away from large worksite raids and toward more effective auditing and investigations.
- **July 10, 2009:** Secretary Napolitano announced reforms to the 287(g) program, including increased training, data collection, and the standardization of the agreements with state and local law enforcement agencies.
- **August 2009:** DHS created two new offices within ICE, the Office of Detention Policy and Planning as well as an independent Office of Detention Oversight, to focus on oversight and provide specific attention to detainee care. ICE also established two advisory boards of national and local stakeholders.  These working groups have met for nearly three years and provide feedback to ICE on a variety of detention issues. You can learn more about the numerous detention reforms implemented by ICE, by clicking here.
- **September 2009:** ICE issued new protocols to increase transparency in the reporting and notification of detainee deaths.
- **January 4, 2010:** ICE revised its policy for granting parole to individuals found to have a credible fear of persecution if they establish their identities, pose neither a flight risk nor a danger to the community, and have no additional factors weighing against release.
- **June 30, 2010:** ICE Director John Morton issued a Memorandum entitled "Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens" articulating ICE's commitment to prioritizing the use of its enforcement personnel, detention space, and removal resources to promote national security, public safety, and border security—with the removal of aliens who pose a danger to national security or a risk to public safety constituting the highest enforcement priority.
- **July 2010:** ICE launched the first-ever online detainee locator system enabling attorneys, family, and friends to find a detainee in ICE custody and to access information about the facility, including its location and visiting hours.

- **August 20, 2010:** ICE issued a Memorandum entitled "Guidance Regarding the Handling of Removal Proceedings of Aliens with Pending or Approved Applications or Petitions"— outlining a framework for ICE to request expedited adjudication of an application or petition (I-130) for an alien in removal proceedings that is pending before U.S. Citizenship and Immigration Services (USCIS) if the approval of such an application or petition would provide an immediate basis for relief for the alien.
- **June 17, 2011:** On June 17, 2011, ICE Director Morton issued <u>a new memorandum that provides guidance for ICE law enforcement personnel and attorneys</u> regarding their authority to exercise prosecutorial discretion where appropriate to ensure greater consistency in the treatment of individuals who do not fit within ICE's enforcement priorities.
- **June 17, 2011:** ICE, in consultation with the DHS Office of Civil Rights and Civil Liberties, developed <u>a new policy designed to protect victims of domestic violence and other crimes</u> and to ensure that these crimes continue to be reported and prosecuted. This policy directs all ICE officers and attorneys to exercise appropriate discretion to ensure that victims of and witnesses to crimes are not penalized by removal.
- **August 18, 2011:** ICE initiated an unprecedented review of all immigration cases pending in the immigration courts and incoming cases. <u>fact sheet</u>
- **November 7, 2011:** USCIS issued <u>revised guidance on referral of cases to ICE and issuance of NTAs</u>.
- **November 17, 2011:** ICE issued <u>further guidance</u> on how they would conduct the case by case review.
- **January 4, 2012:** ICE issued a <u>new policy</u> related to transferring individuals between detention facilities that established that if an individual has family-members or counsel nearby, he/ she will not be transferred absent extraordinary circumstances.
- **February 2012:** ICE issued its detention standards, now known as the <u>Performance-Based National Detention Standards</u> 2011, to improve medical and mental health services, increase access to legal services and religious opportunities, improve communication with detainees with limited English proficiency, improve the process for reporting and responding to complaints, and increase recreation and visitation.
- **February 7, 2012:** ICE announced the creation of their first Public Advocate to assist individuals and community organizations in addressing complaints and inform stakeholders of ICE policies and initiatives.
- **March 13, 2012:** ICE <u>opened</u> its first-ever designed and built civil detention center in Karnes City, Texas. The Karnes County Civil Detention Center is a civil immigration detention facility for low-risk, minimum security detainees.
- **May 2012**:  ICE, in collaboration with the DHS Office for Civil Rights and Civil Liberties <u>created new trainings</u> for state and local law enforcement on issues related Secure Communities. The goal is to provide actionable information to state and local law enforcement about the civil rights and civil liberties issues that may arise when ICE begins using federal information sharing capability through Secure Communities in their jurisdictions.
- **May 2012:** ICE, after consultation with the DHS Office for Civil Rights and Civil Liberties, promulgated a new directive on <u>Sexual Abuse and Assault Prevention and Response</u> in order to comprehensively address and clarify procedures at the agency level relating to investigation, coordination, and response of sexual assault and abuse in immigration detention facilities.

CAR 0192

- **May 17, 2012:** DHS announced it would undertake its own rulemaking to apply the Prison Rape Elimination Act (PREA) to immigrant confinement facilities, building upon the zero tolerance policy for sexual assault and abuse in confinement facilities that DHS previously adopted.
- **June 15, 2012**: Secretary Napolitano announces that effective immediately, certain young people who were brought to the United States through no fault of their own as children, do not present a risk to national security or public safety, and meet several key criteria will be eligible for relief from removal from the country or from entering into removal proceedings. Those who demonstrate that they meet the criteria will be eligible to receive deferred action for a period of two years, subject to renewal. Click here for the press release.

## FAQs -- External

**Who is eligible to receive deferred action under the Department's new directive?**
Pursuant to the Secretary's June 15, 2012 memorandum, in order to be eligible for deferred action, individuals must:

    (1) have come to the United States under the age of sixteen;
    (2) has continuously resided in the United States for a least five years preceding June 15, 2012 and be physically present in the United States as of June 15, 2012;
    (3) either be currently in school, a high school graduate, a recipient of a general education development certificate, or an honorably discharged veteran of the Coast Guard or the Armed Forces of the United States;
    (4) not have been convicted of either a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety; and
    (5) not be above the age of 30.

Individuals must also complete a background check and, for those individuals who make a request to USCIS and are not subject to a final order of removal, must be 15 years old or older.

**What is deferred action?**
Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. Deferred action does not confer lawful status upon an individual.  In addition, although an alien granted deferred action will not be considered to be accruing unlawful presence in the United States during the period deferred action is in effect, deferred action does not absolve individuals of any previous or subsequent periods of unlawful presence.

Under existing regulations, an individual who has been granted deferred action is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate "an economic necessity for employment."  Deferred action can be terminated at any time at the agency's discretion or renewed by the agency.

**How will the new directive be implemented?**
Individuals who are not in removal proceedings or who are subject to a final order of removal will need to submit a request for a review of their case and supporting evidence to U.S. Citizenship and Immigration Services (USCIS).  Individuals may request deferred action if they meet the eligibility criteria.  In the coming weeks, USCIS will outline and announce the procedures by which individuals can engage in this process.  This process is not yet in effect and requests should not be submitted at this time.  Beginning June 18, individuals may call the USCIS hotline at 1-800-375-5283, from 8 a.m. to 8 p.m., with questions or to request more information on the new process.  The hotline offers assistance in English and Spanish.  Individuals seeking more information on the new process should visit USCIS's website (at http://www.uscis.gov).

For individuals who are in removal proceedings before the Executive Office for Immigration Review, ICE will, in the coming weeks, announce the process by which qualified individuals may request a review of their case.  Additional information is available from the ICE Office of the Public Advocate at http://www.ice.gov/about/offices/enforcement-removal-operations/publicadvocate/Beginning June 18, individuals may call the ICE hotline at 1-888-351-4024, from 9 a.m. to 5 p.m., with questions or to request more information on the new process.

CAR 0194

For individuals who are in removal proceedings and have already been identified as meeting the eligibility criteria as part of ICE's case-by-case review, ICE will immediately begin to offer deferred action for a period of two years, subject to renewal.

**Are individuals who receive deferred action pursuant to the new directive eligible for employment authorization?**
Yes.  Pursuant to existing regulations, individuals who receive deferred action may apply for and may obtain employment authorization from USCIS provided they can demonstrate an economic necessity for their employment.  Information about employment authorization requests is available on USCIS's website at http://www.uscis.gov/i-765.

**Does the process result in permanent lawful status for beneficiaries?**
No.  The grant of deferred action under this new directive does not provide an individual with permanent lawful status or a pathway to obtaining permanent lawful status.  Only the Congress, acting through its legislative authority, can confer the right to permanent lawful status.

**Why will deferred actions only be granted for two years?**
Grants of deferred action will be issued in increments of two years.  At the expiration of the two year period, the grant of deferred action can be renewed, pending a review of the individual case.

**If an individual's period of deferred action is extended, will individuals need to re-apply for an extension of their employment authorization?**
Yes.  If an individual applies for and receives an extension of the period for which he or she was granted deferred action, he or she must also request an extension of his or her employment authorization.

**Does this policy apply to those who are subject to a final order of removal?**
Yes.  An individual subject to a final order of removal who can demonstrate that he or she meets the eligibility criteria can request a review of his or her case and receive deferred action for a period of two years, subject to renewal.  All cases will be considered on an individualized basis.

This process is not yet in effect and requests should not be submitted at this time.  In the coming weeks, USCIS will outline and announce the procedures by which individuals can engage in this process.  Beginning June 18, individuals may call the USCIS hotline at 1-800-375-5283, from 8 a.m. to 8 p.m., with questions or to request more information on the new process.  The hotline offers assistance in English and Spanish.  Individuals seeking more information on the new process should visit USCIS's website (at http://www.uscis.gov).

**How soon after USCIS receives a request to review a case will the individual receive a decision on his or her request?**
USCIS will provide additional information on this issue in the coming weeks.  Information will be made publicly available at http://www.uscis.gov/.

**If an individual who is about to be removed by ICE believes he or she satisfies the eligibility criteria for the new process, what steps should he or she take to ensure his or her case is reviewed before removal?**
Individuals who believe they can demonstrate that they satisfy the eligibility criteria and are about to be removed should immediately contact either the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week) or the ICE Office of the Public Advocate through the Office's hotline at 1-888-351-4024 (staffed 9am – 5pm, Monday – Friday) or by e-mail at EROPublicAdvocate@ice.dhs.gov.

2

CAR 0195

**If an individual who satisfies the eligibility criteria is encountered by Customs and Border Protection (CBP) or ICE, will he or she be placed into removal proceedings?**
This policy is intended to allow ICE and CBP to focus on priority cases.  Pursuant to the direction of the Secretary of Homeland Security, for individuals who satisfy the eligibility criteria, CBP or ICE should exercise their discretion to prevent them from being apprehended, placed into removal proceedings, or removed.  If individuals, including individuals in detention, believe they were placed into removal proceedings in violation of this policy, they should contact either the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week) or the ICE Office of the Public Advocate through the Office's hotline at 1-888-351-4024 (staffed 9am – 5pm, Monday – Friday) or by e-mail at EROPublicAdvocate@ice.dhs.gov.

**If an individual accepted an offer of administrative closure under the case-by-case review process or if his or her case was terminated as part of the case-by-case review process, can he or she receive deferred action under the new process?**
Yes.  Individuals who can demonstrate that they meet the eligibility criteria will be eligible for deferred action even if they had accepted an offer of administrative closure or termination under the case-by-case review process.  For individuals who are in removal proceedings and have already been identified as meeting the eligibility criteria as part of ICE's case-by-case review, ICE will immediately begin to offer deferred action for a period of two years, subject to renewal.

**If an individual declined an offer of administrative closure under the case-by-case review process, can he or she receive deferred action under the new process?**
Yes.  Individuals who can demonstrate that they meet the eligibility criteria will be eligible for deferred action even if they declined an offer of administrative closure under the case-by-case review process.

**If an individual's case was reviewed as part of the case-by-case review process but he or she was not offered administrative closure, can he or she receive deferred action under the new process?**
Yes.  Individuals who can demonstrate that they meet the eligibility criteria will be eligible for deferred action even if they were not offered administrative closure following review of their case as part of the case-by-case review process.

**Will DHS personnel responsible for reviewing requests for an exercise of prosecutorial discretion under this process receive special training?**
Yes.  ICE and USCIS personnel responsible for considering requests for an exercise of prosecutorial discretion under the Secretary's directive will receive special training.

**Will individuals be subject to background checks before they can receive an exercise of prosecutorial discretion?**
Yes.  All individuals will undergo biographic and biometric background checks prior to receiving an exercise of prosecutorial discretion.  Individuals who have been convicted of any felony, a significant misdemeanor offense, three or more misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety are not eligible to be considered for deferred action under the new process.

**What do background checks involve?**
Background checks involve checking biographic and biometric information provided by the individuals against a variety of databases maintained by DHS and other federal government agencies.

**What documentation will be sufficient to demonstrate that an individual came to the United States before the age of 16?**

3

CAR 0196

Documentation sufficient for an individual to demonstrate that he or she came to the United States before the age of 16 includes, but is not limited to: financial records, medical records, school records, employment records, and military records.

**What documentation will be sufficient to demonstrate that an individual has resided in the United States for a least five years preceding June 15, 2012?**
Documentation sufficient for an individual to demonstrate that he or she has resided in the United States for at five years immediately preceding June 15, 2012 includes, but is not limited to: financial records, medical records, school records, employment records, and military records.

**What documentation will be sufficient to demonstrate that an individual was physically present in the United States as of June 15, 2012?**
Documentation sufficient for an individual to demonstrate that he or she was physically present on June 15, 2012, the date the memorandum was issued, includes, but is not limited to: financial records, medical records, school records, employment records, and military records.

**What documentation will be sufficient to demonstrate that an individual is currently in school, has graduated from high school, or has obtained a general education development certificate (GED)?**
Documentation sufficient for an individual to demonstrate that he or she is currently in school, has graduated from high school, or has obtained a GED certificate includes, but is not limited to: diplomas, GED certificates, report cards, and school transcripts.

**What documentation will be sufficient to demonstrate that an individual is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States?**
Documentation sufficient for an individual to demonstrate that he or she is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States includes, but is not limited to: report of separation forms, military personnel records, and military health records.

**What steps will USCIS and ICE take to prevent fraud in the new processes?**
An individual who knowingly makes a misrepresentation to USCIS or ICE, or knowingly fails to disclose facts to USCIS or ICE, in an effort to receive deferred action or work authorization in this new process will be treated as an immigration enforcement priority to the fullest extent permitted by law, subjecting the individual to criminal prosecution and/or removal from the United States.

**Are individuals with a conviction for a felony offense, a significant misdemeanor offense, or multiple misdemeanors eligible for an exercise of prosecutorial discretion under this new process?**
No.  Individuals who have been convicted of a felony offense, a significant misdemeanor offense, or three or more other misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct are not eligible to be considered for deferred action under the new process.

**What offenses qualify as a felony?**
A felony is a federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year.

**What offenses qualify as a "significant misdemeanor"?**
A significant misdemeanor is a federal, state, or local criminal offense punishable by no more than one year of imprisonment or even no imprisonment that involves: violence, threats, or assault, including domestic violence; sexual abuse or exploitation; burglary, larceny, or fraud; driving under the influence of alcohol or drugs; obstruction of justice or bribery; unlawful flight from arrest, prosecution, or the scene of

4

CAR 0197

an accident; unlawful possession or use of a firearm; drug distribution or trafficking; or unlawful possession of drugs.

**How many non-significant misdemeanors constitute "multiple misdemeanors" making an individual ineligible for an exercise of prosecutorial discretion under this new process?**
An individual who is not convicted of a significant misdemeanor but is convicted of three or more other misdemeanors not occurring on the same day and not arising out of the same act, omission, or scheme of misconduct is not eligible to be considered for deferred action under this new process.

**What qualifies as a national security or public safety threat?**
If the background check or other information uncovered during the review of an individual's request for deferred action indicates that the individual's presence in the United States threatens public safety or national security, he or she will be ineligible for an exercise of prosecutorial discretion. Indicia that an individual poses such a threat include, but are not limited to, gang membership, participation in criminal activities, or participation in activities that threaten the United States.

**How will ICE and USCIS handle cases involving individuals who do not satisfy the eligibility criteria under this new process but may be eligible for an exercise of prosecutorial discretion under the June 2011 Prosecutorial Discretion Memoranda?**
If an individual has a final order of removal and USCIS determines that he or she does not satisfy the eligibility criteria, then it will reject the individual's request for deferred action. That individual may then request an exercise of prosecutorial discretion under the ICE June 2011 Prosecutorial Discretion Memoranda through any of the established channels at ICE, including through a request to the ICE Office of the Public Advocate or to the local Field Office Director. USCIS will not consider requests for review under the ICE June 2011 Prosecutorial Discretion Memoranda.

If an individual is currently in removal proceedings and ICE determines that he or she does not satisfy the eligibility criteria for deferred action under this process, it will then consider whether the individual is otherwise eligible for an exercise of prosecutorial discretion under its current practices for assessing eligibility under the June 2011 Prosecutorial Discretion Memoranda.

**Will there be supervisory review of decisions by ICE and USCIS under this process?**
Yes. Both ICE and USCIS will develop protocols for supervisory review as part of their implementation of the new process.

**Can individuals appeal a denial by ICE or USCIS of their request for an exercise of prosecutorial discretion under the new process?**
No. Individuals may not appeal a denial by ICE or USCIS of their request for an exercise of prosecutorial discretion. However, ICE and USCIS will develop protocols for supervisory review as part of their implementation of the new process. Although there is no right for appeal, individuals in removal proceedings who believe their cases were not correctly handled may contact the ICE Office of the Public Advocate either by phone at 1-888-351-4024 or by e-mail at EROPublicAdvocate@ice.dhs.gov.

**Will dependents and other immediate relatives of individuals who receive deferred action pursuant to this process also be eligible to receive deferred action?**
No. The new process is available only to those who satisfy the eligibility criteria. As a result, the immediate relatives, including dependents, of individuals who receive deferred action pursuant to this process are not eligible to apply for deferred action as part of this process unless they independently satisfy the eligibility criteria.

5

CAR 0198

**If an individual's request to USCIS for deferred action is denied, will he or she be placed in removal proceedings?**
For individuals whose requests for deferred action are denied by USCIS, USCIS will apply its existing Notice to Appear guidance governing USCIS's referral of cases to ICE and issuance of notices to appear. Under this guidance, individuals whose requests are denied under this process will be referred to ICE if they have a criminal conviction or there is a finding of fraud in their request.

**Should individuals who are not in removal proceedings but believe themselves to be eligible for an exercise of deferred action under this process seek to place themselves into removal proceedings through encounters with ICE or CBP?**
No.  Individuals who are not in removal proceedings but believe that they satisfy the eligibility criteria should submit their request for review of their case to USCIS under the procedures that USCIS will implement.

This process is not yet in effect and requests should not be submitted at this time.  Beginning June 18, individuals may call the USCIS hotline at 1-800-375-5283, from 8 a.m. to 8 p.m., with questions or to request more information on the new process.  The hotline offers assistance in English and Spanish. Individuals seeking more information on the new process should visit USCIS's website (at http://www.uscis.gov).

**If I receive deferred action through this process, will I be able to travel outside the United States?**
USCIS is exploring this issue and will resolve it in the coming weeks as part of its implementation plan.

**Will there be any exceptions to the requirement that an individual must have resided in the United States for a least five years preceding June 15, 2012?**
An individual must demonstrate that he or she has resided in the United States for a least five years preceding June 15, 2012.  Brief and innocent absences undertaken for humanitarian purposes will not violate this requirement.

**What should I do if I am eligible under this process and have been issued an ICE detainer following an arrest by a state or local law enforcement officer?**
If you meet the eligibility criteria and have been served a detainer, you should immediately contact either the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week) or the ICE Office of the Public Advocate either through the Office's hotline at 1-888-351-4024 (staffed 9am – 5pm, Monday – Friday) or by e-mail at EROPublicAdvocate@ice.dhs.gov.

**Does deferred action provide individuals with a path to citizenship or permanent legal status?**
No.  A grant of deferred action is a form of prosecutorial discretion that does not confer a path to citizenship or lawful permanent resident status.  Only the Congress, acting through its legislative authority, can confer these rights.

**Why isn't DHS allowing other individuals to request deferred action under this process?**
As a general matter, young people who, through no fault of their own, were brought to this country as children, lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

**Does this Administration remain committed to comprehensive immigration reform?**

6

CAR 0199

Yes. The Administration has consistently pressed for passage of comprehensive immigration reform, including the DREAM Act, because the President believes these steps are critical to building a 21st century immigration system that meets our nation's economic and security needs.

**Is passage of the DREAM Act still necessary in light of the new process?**
Yes. As the President has stated, individuals who would qualify for the DREAM Act deserve certainty about their status, and this new process does not provide that certainty. Only the Congress, acting through its legislative authority, can confer the certainty that comes with a pathway to permanent lawful status.

**How can I get more information on the new process?**
Individuals seeking more information on the new process should visit ICE's website (at www.ice.gov), USCIS's website (at www.uscis.gov), or DHS's website (at www.dhs.gov). Beginning June 18, individuals can also call ICE's hotline (at 1-888-351-4024) or USCIS's hotline (at 1-800-375-5283) during business hours with questions or to request more information on the new process.

**Where can I find more information about where to go for Deferred Action?**

| I... | Who to submit a request to review my case: | Where can I get more information: |
|------|---------------------------------------------|------------------------------------|
| ...am subject to a final order of removal. | U.S. Citizenship and Immigration Services (USCIS) when the application period opens | USCIS website at http://www.uscis.gov. <br><br> Beginning June 18: USCIS hotline at 1-800-375-5283 (8 am-8 pm; English & Spanish) |
| ...have a case pending before the Executive Office for Immigration Review or a federal court. | U.S. Immigration and Customs Enforcement (ICE) when the process for accepting requests is announced | ICE website at: http://www.ice.gov. <br><br> Beginning June 18: ICE hotline at 1-888-351-4024 (9am – 5pm; English and Spanish) |
| ...have never been apprehended or placed into removal proceedings. | U.S. Citizenship and Immigration Services (USCIS) when the application period opens | USCIS website at http://www.uscis.gov. <br><br> Beginning June 18: USCIS hotline at 1-800-375-5283 (8 am-8 pm; English & Spanish) |

## FAQs -- Internal

**Why are you announcing these changes now?**
Over the past three years, this Administration has undertaken an unprecedented effort to make the immigration enforcement system more effective and efficient by focusing on public safety threats, border security and the integrity of the immigration system. In June 2010, ICE issued its civil enforcement priorities. In June 2011, U.S. Immigration and Customs Enforcement Director John Morton issued two memoranda on the appropriate exercise of prosecutorial discretion. In November 2011, the Department

CAR 0200

began the case-by-case review of all individuals in removal proceedings to ensure consistency with the Administration's priorities. DHS has analyzed the effect of these policies to date and determined that additional steps are necessary to ensure that the Department's enforcement resources are focused on criminal aliens and other high priority cases.

**Does the new policy constitute administrative amnesty?**
No. This process will not result in any individuals receiving permanent lawful status but will provide for temporary grants of deferred action in appropriate cases. It will help streamline the immigration enforcement system, increasing the focus on the removal of criminal aliens, repeat immigration law violators and recent border crossers while ensuring that resources are not spent pursuing productive young people who were brought to this country as a child. It is an appropriate exercise of prosecutorial discretion within the framework of the existing law. Only the Congress, acting through its legislative authority, can confer the right to permanent lawful status. It remains for the executive branch, however, to exercise discretion within the framework of the existing law, which is what this new process does.

**Is this process consistent with the Secretary's statement that DHS cannot provide categorical relief for individuals who meet the criteria of the DREAM Act?**
Yes. This policy is an exercise of prosecutorial discretion designed to ensure that our immigration laws are enforced in a strong and sensible manner. It confers neither substantive rights nor a pathway to citizenship. It will result in temporary grants of deferred action, and only after a case-by-case review. It is consistent with our enforcement priorities, which put a low priority on young people who came here as children and are now contributing to our country.

**Why not simply provide eligible individuals with Temporary Protected Status?**
The Secretary has determined that deferred action is appropriate here. Temporary Protected Status (TPS) is designed to allow the Secretary of Homeland Security to permit citizens of a foreign country to lawfully remain in the U.S. due to conditions in their home country that temporarily prevent individuals from returning safely or because the country is unable to adequately handle the return of its nationals. Typically, the Secretary may designate a country for TPS due to the existence of temporary conditions like an ongoing armed conflict, an environmental disaster (such as earthquake or hurricane), or an epidemic.

8

CAR 0201

Versión en español.

*Oficina de Prensa*
**Departamento de Seguridad Nacional de Estados Unidos**

# Comunicado de Prensa

June 15, 2012
Contacto: Oficina de Prensa del DHS, (202) 282-8010

## LA SECRETARIA NAPOLITANO ANUNCIA PROCESO DE ACCIÓN DIFERIDA PARA JÓVENES QUE SEAN DE BAJA PRIORIDAD PARA LA APLICACIÓN DE LA LEY

WASHINGTON— La Secretaria de Seguridad Nacional, Janet Napolitano, <u>anunció</u> hoy que con vigencia inmediata, ciertos jóvenes que entraron en los Estados Unidos siendo niños jóvenes, que no presentan un riesgo para la seguridad nacional ni para la seguridad pública y que cumplen con varios criterios clave serán considerados para recibir alivio contra la deportación o contra el inicio del proceso de deportación. Aquéllos que demuestren que cumplen con los criterios serán elegibles para recibir la acción diferida durante un período de dos años, sujeto a renovación, y serán elegibles para solicitar la autorización de empleo.

"Las leyes de inmigración de nuestro país deben hacerse cumplir de una manera firme y sensata", comentó la Secretaria Napolitano. "Pero no están diseñadas para hacerse cumplir ciegamente sin tener en cuenta las circunstancias individuales de cada caso. Ni están diseñadas para deportar a jóvenes productivos a países donde puede que no hayan vivido nunca o que ni siquiera hablen el idioma. En estos casos, la discreción, la cual se utiliza en tantas otras áreas, está especialmente justificada".

El DHS continúa centrando sus recursos de aplicación de la ley en la deportación de individuos que presentan un peligro para la seguridad nacional o la seguridad pública, incluidos inmigrantes condenados por delitos, criminales violentos, delincuentes y transgresores reincidentes de la ley de inmigración. La acción de hoy mejora aún más la capacidad del Departamento para centrarse en estas deportaciones de máxima prioridad.

Bajo esta directiva, los individuos que demuestren que cumplen con los siguientes criterios serán elegibles para el ejercicio de la discreción, específicamente la acción diferida, considerado caso-por-caso:

1.)   vino a los Estados Unidos siendo menor de dieciséis años de edad;

2.)   ha residido ininterrumpidamente en los Estados Unidos durante al menos cinco años antes de la fecha de este memorándum y está presente en los Estados Unidos en la fecha de este memorándum;

CAR 0202

3.)  está asistiendo actualmente a la escuela, se ha graduado de la enseñanza secundaria, ha obtenido un certificado de desarrollo de educación general, o es un veterano que ha sido dado de alta con honores de los Guardacostas o las Fuerzas Armadas de los Estados Unidos;

4.)  no ha sido condenado por un delito mayor, un delito menor significativo, múltiples delitos menores ni representa una amenaza para la seguridad nacional o la seguridad pública;

5.)  no es mayor de treinta años de edad.

Sólo aquellos individuos que puedan demostrar mediante documentación verificable que cumplen con estos criterios serán elegibles para la acción diferida.  Los individuos no serán elegibles si no se encuentran actualmente en los Estados Unidos y no pueden probar que han estado presentes físicamente en los Estados Unidos durante un período no inferior a 5 años inmediatamente anterior a la fecha de hoy.  Las solicitudes de acción diferida se decidirán individualmente caso por caso.  El DHS no puede dar ninguna garantía de que dichas solicitudes sean concedidas. El uso de la discreción procesal no otorga ningún derecho fundamental, estatus migratorio ni camino hacia la ciudadanía. Solo el Congreso, actuando a través de su autoridad legislativa, puede otorgar estos derechos.

Aunque esta guía entra en vigor inmediatamente, se espera que USCIS e ICE comiencen la implementación del proceso de solicitud en un plazo de sesenta días.  Mientras tanto, los individuos que quieran más información sobre la nueva política deberán visitar la página web de USCIS (en www.uscis.gov), la página web de ICE (en www.ice.gov) o la página web del DHS (en www.dhs.gov).  Comenzando el lunes, los individuos podrán llamar también a la línea de acceso directo de USCIS (al [insert number]) o a la línea de acceso directo de ICE (al [insert number]) durante el horario de trabajo si tienen preguntas o para pedir más información sobre el proceso próximo.

A los individuos que ya estén en el proceso de deportación y se haya demostrado que cumplen con los criterios de elegibilidad y se les haya ofrecido el ejercicio de la discreción como parte de la revisión individual en curso de casos de ICE, ICE comenzará a ofrecerles inmediatamente la acción diferida durante un período de dos años, sujeto a renovación.

Para obtener más información sobre las reformas de la política de la Administración hasta la fecha, consulte esta hoja de datos.

###

*Press Office*
**U.S. Department of Homeland Security**

# Press Release

CAR 0203

June 15, 2012
Contact: DHS Press Office, (202) 282-8010

**SECRETARY NAPOLITANO ANNOUNCES DEFERRED ACTION PROCESS FOR YOUNG PEOPLE WHO ARE LOW ENFORCEMENT PRIORITIES**

WASHINGTON— Secretary of Homeland Security Janet Napolitano today <u>announced</u> that effective immediately, certain young people who were brought to the United States as young children**,** do not present a risk to national security or public safety, and meet several key criteria will be considered for relief from removal from the country or from entering into removal proceedings. Those who demonstrate that they meet the criteria will be eligible to receive deferred action for a period of two years, subject to renewal, and will be eligible to apply for work authorization.

"Our nation's immigration laws must be enforced in a firm and sensible manner," said Secretary Napolitano. "But they are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Discretion, which is used in so many other areas, is especially justified here."

DHS continues to focus its enforcement resources on the removal of individuals who pose a national security or public safety risk, including immigrants convicted of crimes, violent criminals, felons, and repeat immigration law offenders. Today's action further enhances the Department's ability to focus on these priority removals.

Under this directive, individuals who demonstrate that they meet the following criteria will be eligible for an exercise of discretion, specifically deferred action, on a case-by-case basis:

1.) Came to the United States under the age of sixteen;

2.) Have continuously resided in the United States for a least five years preceding the date of this memorandum and are present in the United States on the date of this memorandum;

3.) Are currently in school, have graduated from high school, have obtained a general education development certificate, or are honorably discharged veterans of the Coast Guard or Armed Forces of the United States;

4.) Have not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety;

5.) Are not above the age of thirty.

Only those individuals who can prove through verifiable documentation that they meet these criteria will be eligible for deferred action.  Individuals will not be eligible if they are not currently in the United States and cannot prove that they have been physically present in the

CAR 0204

United States for a period of not less than 5 years immediately preceding today's date. Deferred action requests are decided on a case-by-case basis. DHS cannot provide any assurance that all such requests will be granted. The use of prosecutorial discretion confers no substantive right, immigration status, or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.

While this guidance takes effect immediately, USCIS and ICE expect to begin implementation of the application processes within sixty days. In the meantime, individuals seeking more information on the new policy should visit USCIS's website (at www.uscis.gov), ICE's website (at www.ice.gov), or DHS's website (at www.dhs.gov). Beginning Monday, individuals can also call USCIS' hotline at 1-800-375-5283 or ICE's hotline at 1-888-351-4024 during business hours with questions or to request more information on the forthcoming process.

For individuals who are in removal proceedings and have already been identified as meeting the eligibility criteria and have been offered an exercise of discretion as part of ICE's ongoing case-by-case review, ICE will immediately begin to offer them deferred action for a period of two years, subject to renewal.

For more information on the Administration policy reforms to date, please see this fact sheet.

###

CAR 0205

**From:**      Peacock, Nelson ███████████████████████
**Sent:**      Monday, May 21, 2012 2:15 PM
**To:**        Sandweg, John <█████████████ ████████ Grossman, Seth
               <██████████████████████████
**Subject:**   today's roll call....

# Deportations Create Quandaries

By Humberto Sanchez
Roll Call Staff
May 21, 2012, Midnight



Bill Clark/CQ Roll Call File Photo

Rep. Luis Gutierrez said last week that many immigrant voters think of a friend or neighbor who has been deported when they think of President Barack Obama.

Democrats run the risk of hurting their election prospects and discouraging Latino voter turnout in November unless the White House can better implement its policy to deport only illegal immigrants with criminal backgrounds, some Democrats and pro-immigration groups believe.

"I think that there are a large number of voters, both immigrant and Latino voters, that when they first think of the president, they don't think of additional Pell Grants, or expansion of health care, or revamping of Wall Street, or a fairer tax [system]. They think of someone they knew, either personally or related to them, or a neighbor or friend, who has been deported. And that is what first and foremost comes to mind," Rep. Luis Gutierrez (D-Ill.) said last week.

Frank Sharry, executive director of left-leaning immigration advocacy group America's Voice, said the failure to properly implement the policy has wreaked havoc on the Latino community and — along with a weak economy and the unmet expectation of immigration reform — could discourage them to turn out to vote for Democrats.

"For low-propensity voters, it doesn't take much to keep them at home rather than get them turned out," Sharry said, adding that it is too early to tell whether the issue will affect Latino voter turnout.

Senate Majority Whip Dick Durbin (D-Ill.), who has championed a Latino community priority — the DREAM Act — in the Senate, agreed that the disconnect between the White House and Immigration and Customs Enforcement could hurt Democrats in the fall, but he defended the president.

"It may," Durbin said. "We can't let it happen, because there is no question that this president and this administration have worked harder to pass the DREAM Act, to move forward on immigration than any other administration. I know [Latinos] are discouraged, and they should be; the system is disappointing and heartbreaking on many days, but we just have to keep working on it."

Part of the frustration among Hispanic activists is the fact that some illegal immigrants who arrived in the U.S. as children and who consider themselves Americans are getting caught up in ICE's deportations. Those children in some cases would benefit from the DREAM Act, which would provide a path to citizenship for some illegal immigrant children who go to college or join the military.

Senate Majority Leader Harry Reid (D-Nev.) indicated in a recent interview on Univision's Al Punto that he, too, wants the White House to do a better job of implementing the policy.

"We've done some extremely good things, especially as it relates to the 'dreamers' to make sure they are not taken away in the middle of the night," Reid said. "There's a lot more that can be done. There's more the president is going to do administratively, and that should happen fairly quickly."

Durbin and Gutierrez have been among the leading voices in Congress on immigration issues and the "go-to" offices to help kids facing deportation. Both have pushed the DREAM Act, which passed the House in 2010, but came up short in the Senate.

Durbin said that he is "in frequent contact" with the White House as they seek to better implement the roughly year-old policy giving prosecutorial discretion to ICE and to Customs and Border Protection agents.

The idea was to target illegal immigrants with criminal records rather than going after people who are not considered threats to their communities or the nation.

With immigration legislation unlikely to pass the divided Congress, the policy was also developed to help kids eligible for the DREAM Act. It came in response to a letter from 22 Senators, including Durbin.

A senior administration official said the policy is meant not for political gain but because Obama believes it's the right thing to do in the absence of Congressional action.

In a speech last week, White House Domestic Policy Council Director Celia Munoz said, "The simple fact is that Republicans, including those who believe in this issue, have abandoned immigration reform and the DREAM Act. And until they find a way back to the conversation, immigration reform will remain stalled."

But deportations of otherwise law-abiding illegal immigrants have continued, immigration groups and Democrats have said.

"When it was first announced, many of us were really pleased and thought this would be an enlightened approach to the very difficult issue of immigration enforcement," Sharry said. "A year later, many of us are extremely disappointed with the implementation of this policy."

Nearly 400,000 individuals were removed from the country in fiscal 2011, which ended Sept. 30, according to ICE. That is the largest number in the agency's history.

Gutierrez said he was in Charlotte, N.C., on Wednesday on behalf of Gabino Sanchez, who is facing deportation

because local police have repeatedly issued him tickets for driving without a license during the past decade or so.

"Fourteen years old when he came here, two American citizen children, no criminal record, but they don't use discretion," Gutierrez said. "It seems like they are walking away from the letter and the spirit" of the policy.

There have also been charges from immigrant rights groups that ICE has even abused illegal immigrants.

At a hearing last October, Durbin asked Homeland Security Secretary Janet Napolitano about "troubling reports that there are ICE and CBP field offices that have announced that that these new deportation priorities do not apply to them."

Napolitano said, "If there are some, I would like to know about it. I have personally ... spoken with the heads of the ICE [Enforcement and Removal Operations] across the country and the heads of the [ICE Office of the Principal Legal Advisor] across the country, which are the regional counsel; my understanding is that they are very excited about having priorities, that the priorities are the right ones."

Asked last week why the policy was not properly being carried out, Durbin said local ICE and CBP employees might oppose the president's position.

"Even when the president puts out a directive to the immigration authorities saying 'Don't deport those people who are no threat to us, particularly don't deport those eligible for the DREAM Act,' it still happens," Durbin said. "It reflects a bureaucratic mess and many times local employees that ignore the president's order.

"They have their own personal points of view, and they may be different from the president's," Durbin said.

Sharry suggested that the problem lies with the leadership at DHS, which may be afraid of taking on law enforcement and the National ICE Council, the union that represents the agency's roughly 7,000 immigration officers.

"I think it is because of the culture at ICE and the leadership at DHS," Sharry said.

At a House Judiciary subcommittee hearing last October, ICE union President Chris Crane said the prosecutorial discretion policy "cannot be effectively applied in the field and has the potential to completely overwhelm ICE's limited manpower resources or result in the indiscriminate and large scale release of aliens encountered in all ICE law enforcement operations."

But if the problem isn't solved soon, Sharry said, it could end up benefiting presumptive GOP presidential nominee Mitt Romney.

"The question is not are they going to vote for Romney, the question is are they going to turn out to vote," Sharry said.

*HumbertoSanchez* 

*Nelson Peacock*
*Assistant Secretary*
*Office of Legislative Affairs*
*Department of Homeland Security*

**The American Children and Family Initiative**

**Overview**

In the absence of legislative reform of our immigration laws our current immigration laws could and should be applied to better protect our children and secure our nation's future.  Where it is in the public interest to remove criminals and dangerous individuals, we should do so -- and we are. But where it is in the public interest to keep a family together to raise a child or to help a child reach their dreams, we also should do so.  Instead, the enforcement regime is used indiscriminately, treating children and their families like criminals and sentencing them to years of separation with no hope of relief in sight.  In no other area of American society are so many resources being devoted to preventing the parents of U.S. citizens from raising their own children or to preventing those raised in this country from contributing to our defense and to our economic success.

Under current law, there is another way.  As we know from the leaked Spring 2010 memo addressed to USCIS Director Mayorkas (the "Mayorkas memo"), DHS has the authority under current law to provide relief to unauthorized individuals whose circumstances are determined to be worthy or compelling enough.  We advocate administrative changes in the way individuals with families and strong ties to the U.S. are treated under the current practices of DHS.  This is to ensure that U.S. citizen children are raised by their parents, families are kept together and young aspiring students and service members can reach their dreams.

**Administrative Actions that Benefit Individuals with Strong Ties to the Community:**

**Parole-In-Place for families of U.S. citizens and residents, DREAM students and certain individuals in the Commonwealth of the Northern Mariana Islands (CNMI):**
DHS has the authority to "parole"-or admit-a person into the United States for urgent humanitarian reasons or significant public benefit (INA section 212(d)(5)(A)).  When an undocumented individual living in the U.S. is paroled into the U.S. under this authority it is called parole-in-place (PIP).  PIP allows deserving individuals, who are no threat to public safety or national security, to remain in the U.S.  And, unlike other options for administrative relief, PIP also allows the beneficiary to pursue adjustment of status where he or she has a legitimate claim under current law to apply for LPR status, such as through their spouse and, to a far lesser degree, their employer.

To provide parole in place to a targeted community, DHS would have to issue guidance that defines who would be eligible for this targeted relief.  Children and families are by far the most vulnerable among those impacted by our broken immigration system and represent the most sympathetic group deserving protection in the eyes of the public.  They are innocent of wrong-doing and our future prosperity as a nation depends on their well-being and success.

To be eligible for PIP, the individual:
- Shall be a DREAM Act-eligible person (as determined by the recently passed House bill), the parent of a DREAMer or the immediate family member of a U.S. citizen or resident.
- Must be physically present in the U.S. (before the policy is announced)
- Must submit an application and fees sufficient to cover, at minimum, processing costs.
- Must have a clean criminal record and is able to pass a background check.

CAR 0209

If approved, the following benefits come with PIP:
- Protection from deportation, allowing (1) DREAM kids--with the emotional, moral and financial support of their parents--to pursue their education or join the military and (2) families can live without fear of being torn apart or having their children become wards of the state.
- Work authorization, allowing beneficiaries to pay for their education, support their families and pay taxes.
- "Admission" into the U.S.--for those with legitimate claims to a family-based visa (mostly spouses of USCs and LPRs), they will have the ability to apply for a green card without having to leave the country for consular processing and without triggering the unlawful presence bars to admission.

**PIP and special consideration for certain individuals living in CNMI:**  In November of 2009, U.S. immigration laws were extended to CNMI.  With the transition from local to Federal immigration control, an estimated 4,000 legal residents on the Islands are at risk of losing their status.  They include persons born on the Islands between January 1, 1974 and January 9, 1978, those who were permanent residents under local law, the spouses and children of these groups, and immediate relatives of U.S. citizens.  Given the life-long and familial ties of this community, DHS should, as a matter of policy, grant this community of individuals and families parole-in-place until a permanent solution is found and implemented.  Without this action, these long-time legal residents of the islands are at risk of losing their status through no fault of their own, and face an uncertain future and possible removal from the only home they have ever known.  PIP in the case of CNMI should be crafted to specifically address the needs of this deserving community and include the benefits described above.

**<u>Deferred Action for DREAM-eligible individuals, their parents and the parents of U.S. citizen children who are undocumented as a result of overstaying their visa:</u>**
Deferred action is a more appropriate form of relief for individuals who have overstayed their visas than PIP, because visa overstayers were already admitted to the U.S. when they entered legally with their U.S. visa or for individuals who have a final order of removal.  Deferred action could be made available to visa-overstayers who are DREAM-eligible, their parents, or the parent of a U.S citizen.

Eligibility and benefits would mirror the bullets above for PIP, except these individuals would not be "admitted."  And given that they initially entered legally, they, too, may be allowed to pursue family-based immigration avenues that are legitimately available to them.

**<u>U.S. citizen children whose parents have been deported or are stuck outside the U.S.</u>**
DHS should issue guidance that lessens the standard for demonstrating "extreme hardship," extends relief to individuals who have U.S. children, and allows waiver applicants to process their application in the U.S.  The waiver available to spouses, sons and daughters of U.S. citizens for the 3- and 10-year bars are only granted in cases of "extreme hardship" to a citizen or resident parent or spouse which has been interpreted in impossibly narrow terms, putting the waiver too far out of reach for most deserving families.  USCIS should issue guidance to make the standard for "extreme hardship" easier to meet, such that more family members of U.S. citizens and

CAR 0210

residents qualify for the waiver and are allowed to return to the U.S. to join their families.

## Arguments & Justification
### Who Is At Stake?

- In supporting the DREAM Act, Americans and the majority of Representatives and Senators clearly support the idea that children should not be punished because of the immigration status of their parents.
- DREAMers and U.S. citizen children are a clearly defined group for whom deportation is not a suitable, sensible, or cost-effective outcome in the eyes of most Americans and a difficult target group for which restrictionists must argue for continued mass deportation.
- Legal residents of CNMI, many who have been born on the islands, who have no other home should not suffer punitive immigration consequences simply because of the transition to Federal immigration control
- Those opposed to granting relief to this cohort are probably opposed to any form of legalization for any undocumented immigrants under any circumstances and are therefore wed to an unrealistic policy premised on the mass exodus of more than 12 million undocumented immigrants and their families.

### Abiding By Current Law

- This is a law and order solution based on current law and not a "back-door" amnesty or anything else.  PIP and deferred action are backed by statute and it is up to the Administration to provide appropriate guidance on 3- and 10-year bar waivers.  In fact, the law would have to be changed to take this existing authority away from the President.
- In the case of CNMI residents caught in the transition to Federal immigration control, they have committed no wrong and violated no laws: ensuring this community does not fall out of status is consistent with a law and order solution.
- Current law supports sensible enforcement of our immigration laws, prosecutorial discretion, and efficient targeting of resources towards removing serious criminals and threats to society.
- Current law also supports consideration of the specific circumstances of those in undocumented status and allows spouses and their children to remain together as a family and for certain groups of undocumented individuals to pursue their dreams.
- By enforcing the laws on the books, we will approach deportation in a balanced way that drives out criminals but keeps families with deep American roots together.

### Making Our Immigration Choices Clear

- Parole-in-place and deferred action would require people to come forward, report to authorities, take steps to resolve their illegal status, and take personal responsibility for conforming with the law.  In the case of CNMI, it will prevent forcing people into unauthorized status simply to live where they have always called home.
- These policies would therefore distinguish between those who are here unlawfully and those who are here in order to engage in unlawful activity.  Those who are simply here unlawfully will come forward; those who are engaged in unlawful activity will not and will

therefore stand apart.

- They would enhance public safety in two important ways: 1) by prioritizing criminals for deportation and reducing the burden that massive non-criminal deportation is putting on courts, detention facilities, state and local law enforcement, and budgets; and 2) By removing barriers between immigrant communities and local law enforcement that prevent crime victims and witnesses from coming forward.

- Such administrative relief would begin to address how the system is broken and how even a broken system could work far better for deserving people--including affected U.S. citizens, children, soldiers, and DREAM-eligible students--if DHS would just exercise authorities available to the agency right now under current law.

- It is a stark counterpoint to the effort to end the birthright citizenship enshrined in the Constitution.  Most Americans find the debate about checking parents' immigration status, deporting babies, and creating a permanent non-citizen underclass both distasteful and wrong--not to mention unconstitutional.

The best way to fight for our position and marginalize the extreme attacks from the GOP is to go on offense.  Support and advocacy for administrative relief shows how we want to treat the American citizens, future citizens, and future leaders caught up in our broken immigration system.

CAR 0212

| | |
|---|---|
| **From:** | Olavarria, Esther ███████████████████████ |
| **Sent:** | Wednesday, April 25, 2012 1:15 PM |
| **To:** | Ryan, Kelly ██████████████ |
| **Subject:** | FW: ICE Statistics Case-By-Case PD Review |
| **Attach:** | Case-by-Case Review Statistics 04 24 12.pdf |

**From:** Munoz-Acevedo, Carlos
**Sent:** Wednesday, April 25, 2012 1:02 PM
**To:** Olavarria, Esther
**Subject:** FW: ICE Statistics Case-By-Case PD Review
**Importance:** High

Esther FYI updates on PD. I assume you probably have received this already but sending just in case. It may be helpful tomorrow.

Best,

Carlos Muñoz-Acevedo
DHS CRCL
W: ██████████████
C: ██████████████

This message may contain agency deliberative communications, privacy information or other information that may be privileged and exempt from disclosure outside the agency or to the public.  Please consult with the US Department of Homeland Security, Office for Civil Rights and Civil Liberties and the Office of General Counsel before disclosing any information contained in this email.

**From:** Strait, Andrew R ████████████████████████
**Sent:** Wednesday, April 25, 2012 8:12 AM
**To:** Kessler, Tamara; Shuchart, Scott
**Subject:** FW: ICE Statistics Case-By-Case PD Review
**Importance:** High

FYI
**From:** Strait, Andrew R
**Sent:** Wednesday, April 25, 2012 8:08 AM
**To:** 'Jane Zurnamer'; 'Nystrom, Brittney'; Alexis Perlmutter
**Cc:** jlin@██████████ 'Greg Chen'; Mack, Megan (████████████████████████); McNulty, Claire; Jaramillo, Melissa A
**Subject:** ICE Statistics Case-By-Case PD Review
**Importance:** High

Jane et al.

Given that our next meeting is not until May 18, 2012 I did want to share some information with working groups members on where ICE was with the case-by-case prosecutorial discretion review.  Please see attached.  Some highlights include:

- In total, ICE has reviewed 219,554 pending cases with approximately 16,544, or 7.5%, identified as amenable for

prosecutorial discretion as of April 16, 2012.

- 179,518 pending non-detained cases have been reviewed with approximately 16,518, or 9%, identified as amenable for prosecutorial discretion.
- As of March 19, 2012, Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,273 cases in fiscal year 2012.
- In fiscal year 2012 YTD, ICE removed over 102,000 individuals convicted of a crime.

**Please share with Working Group Members Only**.  In addition, the statistics in the attached document are the full extent of what we can share, so I will not be able to provide further breakdowns.

Thank you,
Andrew
_____

**Andrew Lorenzen-Strait**
Public Advocate
Office of Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

 - Direct
- BlackBerry
- Cell

- Direct Email
EROPublicAdvocate@ice.dhs.gov – General Email
www.ice.gov/about/offices/enforcement-removal-operations/publicadvocate/

CAR 0214

## Case-by-Case Review Statistics

### Case-by-Case Review and Administrative Closures

- In total, ICE has reviewed 219,554 pending cases with approximately 16,544, or 7.5%, identified as amenable for prosecutorial discretion as of April 16, 2012.

- 179,518 pending non-detained cases have been reviewed with approximately 16,518, or 9%, identified as amenable for prosecutorial discretion.

- 40,036 pending detained cases have been reviewed with approximately 26, or less than 1%, identified as amenable for prosecutorial discretion.

- Of the 16,518 pending non-detained cases identified as amenable for prosecutorial discretion, 2,722 cases have been administratively closed.  These cases involve –

  - 8 individuals who are a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;
  - 175 individuals who are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent);
  - 182 individuals who came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States;
  - 23 individuals who are over the age of sixty-five and have been in the United States for more than ten years;
  - 60 individuals who have been the victim of domestic violence in the United States, human trafficking to the United States; or of any serious crime in the United States;
  - 16 individuals who have been lawful permanent residents for ten years or more and have a single, minor conviction for a non-violent offense;
  - 100 individuals who suffer from a serious mental physical condition that would require significant medical or detention resources;
  - 2,055 who have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States; and
  - 103 individuals who constitute a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

### Deferred Action and Stays

- While administrative closure is the "preferred mechanism" for exercising discretion in the case-by-case review process, deferred action will be continue to be utilized in

CAR 0215

appropriate cases as is set forth in Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

- As of March 19, 2012, Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,273 cases in fiscal year 2012.
- Of those 1,273 deferred actions or stays, 1,233 involved individuals subject to a final order of removal.
- In fiscal year 2010, ERO officers granted deferred actions or issued a stay of a final order in 486 cases; in fiscal year 2009 ERO officers granted 740 deferred actions; in fiscal year 2008 ERO officers granted 1006 deferred actions; in fiscal year 2007 ERO officers granted 598 deferred actions.*

### *Employment Authorization Cards Issued Pursuant to Prosecutorial Discretion Policies*

- Eligibility for employment authorization is governed by longstanding law.  Individuals are not eligible for work authorization on the basis of receiving administrative closure alone.  Similarly, individuals who were eligible for a work authorization card prior to the case-by-case review remain eligible after their case has been administratively closed.

### *Priority Cases Accelerated Pursuant to this Process and the Implementation of Enforcement Priorities*

- In fiscal year 2012 YTD, ICE removed over 102,000 individuals convicted of a crime.
- In fiscal year 2011, ICE removed 216,698 criminals, an 89 percent increase in the removal of criminals from fiscal year 2008.
- Overall, over 90 percent of all ICE removals in fiscal year 2011 fell into one of ICE's categories for priority enforcement.

* Due to upgrades to ICE's electronic system for tracking enforcement actions which affected how this data is recorded, the data from FY2012 are not directly comparable to the data from FY2008-FY2010.  Because of these upgrades, ICE is not currently able to calculate FY2011 deferred action numbers.

CAR 0216

In the open session in Orlando, participants voiced many complaints about our current immigration laws and expressed frustration that the Administration was not doing enough to change those laws. In listening to the audience, it became apparent that the Administration's efforts on immigration reform were not well known.   On behalf of DHS, Esther Olavarria reiterated the President's deep commitment to comprehensive immigration reform and the DREAM Act, provided the audience with an overview of the Administration's aggressive efforts to seek Congressional partners to work on immigration reform legislation and to enact the DREAM Act, and explained the difficulties we had encountered in both endeavors.  She also provided more information on the President's new administrative policies to enforce our immigration laws in a smarter and more effective way, prioritizing the removal of people who have been convicted of crimes over persons who simply come to the U.S. work.  Esther also participated in frank discussions with the participants about the challenges faced in implementing these new policies, the Administration's need to better inform Hispanic communities of new policies, and need to establish better lines of communication so Administration officials hear about both problems and successes in a timely manner.  At the conclusion of the session, several participants decided to form their own community organization to provide accurate information and assistance to Hispanics living in Central Florida.  Administration officials have had subsequent conversations with these leaders to answer their questions and provide them with guidance in exploring sources of existing federal funding for their work.


A few of the participants in the Las Vegas open session had been detained by Immigration and Customs Enforcement and were recently released.  In a very emotional session, these individuals spoke about their many years living the U.S., their strong community ties and deep love of this country.  But also they also talked about their daily fears living here without legal status, the treatment they received while in ICE custody and their frustration with the President in not passing an immigration reform bill.  Other participants expressed similar anger that individuals who had not committed crimes were being targeted for enforcement and irritation that promises on immigration reform had been broken.  After listening to their stories, DHS representative Esther Olavarria provided the group with a detailed explanation of efforts taken by the President and his Administration to find bipartisan Congressional support for immigration reform and the DREAM Act passed and the President's frustration that these efforts had failed.  The participants came away with a better understanding of the legislative process and the importance of their vote. Esther also provided the group with information on recent administrative measures that the President and his Administration were undertaking to change enforcement priorities, focusing on the arrest of individuals who are public safety threats, and not families like the participants in the session.  After the open session, Esther followed up with the families who had been detained by ICE, to learn more about their cases and assist them in finding legal representation.  She also helped a local Assemblywoman representing the jurisdiction to set up a subsequent meeting with senior ICE officials to further discuss enforcement priorities and prosecutorial discretion for low priority cases like those highlighted in the open session.

CAR 0217

The White House summit in Miami occurred shortly after the Administration's most recent immigration announcement to review removal cases and identify those meriting a favor exercise of prosecutorial discretion.  Participants in the open session had many questions about the new policy. DHS representatives Betsy Markey and Esther Olavarria provided the group with more information on the program, answering questions about the review criteria that would be employed and who was covered under the policy.  It became apparent in the discussions that there was a misunderstanding about the extent of the program.  DHS officials were able to clear up the misunderstanding. They also asked the participants for their help in informing others in the community about the extent of policy.  Participants also asked that the Administration do a better job of disseminating its new policy announcements to the Hispanic community.  DHS officials committed to improving its website so information was more easily accessible and materials were provided in Spanish.  After the open session, Esther Olavarria participated in a Spanish-language radio program to provide listeners with accurate information on the prosecutorial discretion policy.

At one of the open space sessions on immigration issues, the attendees expressed concerns about the mistreatment of immigrants arrested under the 287(g) and Secure Communities  programs - -- two DHS enforcement programs operated with local law enforcement.  The participants believed that some of the arrests being carried out by police and sheriffs were the result of racial profiling.  The federal government official from DHS told the attendees that the Obama Administration took these allegations very seriously and provided them with requisite information  to report such abuses to the Departments of Justice and Homeland Security.

In another open session on immigration, participants complained about our broken immigration system and expressed frustration that the Administration was not doing enough to change those laws. In listening to the audience, it became apparent that the Administration's efforts on immigration reform were not well known.   The federal government official from DHS reiterated the President's deep commitment to comprehensive immigration reform and the DREAM Act and provided the audience with an overview of the Administration's aggressive efforts to seek Congressional partners to enact immigration reform.  The official also provided the audience with information on recent administrative policies on immigration enforcement priorities and the exercise prosecutorial discretion in low priority cases.

# Chapter 20: Removal Process: Relief From Removal

References:

INA: 101, 208, 212, 236, 237, 240A, 241, 242, 244, 245, 248, 249

Regulations: 8 CFR 10

03.43, 208, 1240.20, 1240.21, 1240.33, 1240.34, 241.6, 245, 249, 274A

*20.1  Relief from Removal.* _____ 2

*20.2  Cancellation of Removal.* _____ 3

*20.3  Asylum.* _____ 4

*20.4  Withholding or Deferral of Removal.* _____ 5

*20.5  Private Bills.* _____ 7

*20.6  Restoration or Adjustment of Status and Waivers.* _____ 8

*20.7  Stay of Deportation or Removal.* _____ 9

*20.8 Deferred Action.* _____ 11

*20.9  Exercising Discretion.* _____ 14

*20.10  Temporary Protected Status vs. Deferred Enforced Departure.* ___ 17

*20.11  Nicaraguan Adjustment and Central American Relief Act (NACARA) and Haitian Refugee Immigration Fairness Act (HRIFA).* _____ 19

*20.12  Voluntary Departure.* _____ 23

CAR 0219

## 20.1  Relief from Removal.

Aliens in removal proceedings and those with final orders of removal may be eligible for certain forms of relief. It is important for you to be familiar with these forms of relief because aliens under your docket control may be eligible. You may be required to cease all removal actions on eligible detained and non-detained aliens. Additionally, certain forms of relief may require the administrative closure of removal proceedings or the release of aliens in custody. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) eliminated some forms of relief and created others. You may encounter an alien under docket control whose removal proceedings were initiated prior to the enactment of IIRIRA. Therefore, you must know the forms of relief that were available prior to IIRIRA and know what actions each Service officer should take to facilitate each particular form of relief.

> First, consider the alien's immigration status and criminal history before pursuing relief from removal. Run a criminal-history check if you cannot find one conducted during the past 90 days.

The Office of the Principal Legal Adviser reviews the contents of each A file before presenting the case to the Executive Office for Immigration Review. If the file does not contain a current criminal history (within 90 days), the attorney will not proceed with the case and inform you of the incomplete record. You will then run the required criminal-history check so the Office of the Principal Legal Advisor can verify the record and proceed with the request for relief.

CAR 0220

## 20.2  Cancellation of Removal.

(a) General. Cancellation of removal is a discretionary form of relief that may be granted to an alien during the course of a removal hearing. A detailed description of cancellation of removal may be found at INA 240A and 8 CFR 1240.20. Cancellation of removal applies to aliens placed in removal proceedings after April 1, 1997. Normally, cancellation of removal can be granted only by an immigration judge or by the Board of Immigration Appeals. However, a special class of aliens, defined by section 203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), Pub. L. 105-100 is eligible to have cancellation of removal (or suspension of deportation) favorably adjudicated by an asylum officer. Before IIRIRA became effective, suspension of deportation was the form of relief very similar to cancellation of removal for nonpermanent residents. The eligibility criteria for suspension of deportation can be found at 8 CFR 1240.21. This regulation refers to section 244(a) of the Act, as in effect prior to April 1, 1997.

(b) Eligibility Criteria. An eligible alien may apply for cancellation of removal on Form EOIR-42A, Application for Cancellation of Removal for Certain Permanent Residents, or Form EOIR-42B, Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents. Eligibility criteria for permanent residents may be found in section 240A(a) of the Act. Eligibility criteria for non-permanent residents may be found in section 240A(b) of the Act.

(c) Closing Actions. Once a decision to grant cancellation of removal has been rendered, and that decision becomes final, the case must be closed in DACS. Departure Cleared Status code B in DACS should be used to close the case.

(1) Cancellation of Removal Denied. If cancellation is denied, and voluntary departure has not been granted, the deportation officer should proceed with normal removal actions, including DACS update.

(2) Cancellation Granted to Permanent Resident. If cancellation of removal is granted to a Lawful Permanent Resident Alien, the alien retains status and the case must be closed in DACS to reflect the relief granted. Departure Cleared Status code B in DACS should be used to close the case.

(3) Cancellation Granted to Nonpermanent Resident. If cancellation of removal is granted to a nonpermanent resident, the alien becomes eligible for adjustment of status and should be processed accordingly. The Deportation Branch may assist the Examinations Branch in processing these cases. The case must be closed in DACS to reflect the relief granted. Departure Cleared Status code B in DACS should be used to close the case.

## 20.3  Asylum.

Asylum, pursuant to section 208 of the Act, is among the most common forms of relief sought by aliens who are in removal proceedings. Regulations governing jurisdiction, filing, employment authorization, and adjudication are found in 8 CFR Part 208. Except as otherwise provided in section 208(a)(2) of the Act, asylum claims must be filed within one year of entry into the United States. Asylum claims are ordinarily first adjudicated by an Asylum officer. However, once an alien is placed into removal proceedings, an initial asylum claim may also be filed with the immigration judge.

If an alien in custody indicates they would like to apply for asylum, provide them with Form I-589, Application for Asylum and Withholding of Removal, and supporting forms. You are required to advise all aliens of the availability of free legal services. [See detention standards in Appendix 26-1 of this manual.]

Once an alien is granted asylum by an immigration judge during the course of a removal hearing, the proceedings are terminated. Once asylum is granted, employment authorization may be granted pursuant to 8 CFR 274a.12(a)(5). The case must be closed to reflect the relief granted. Departure Cleared Status code B in DACS should be used to close the case.

Motions to Reopen or Reconsider. The Service is not prohibited from filing a motion to reopen or reconsider in accordance with 8 CFR 3.2 (Motions before BIA) and 3.23 (Motions before the Immigration Judge). If conditions change in the country from which asylum has been granted, there was fraud in the application, or other conditions exist, the BIA or an immigration judge may terminate the prior grant of asylum (see 8 CFR 208.24).

## 20.4  Withholding or Deferral of Removal.

(a) General. Other forms of relief, similar to asylum, are withholding of removal and deferral of removal. Normally, an immigration judge or the Board of Immigration Appeals makes the decision on withholding or deferral of removal. An alien will be considered for these forms of relief if the alien has filed Form I-589 for asylum in removal proceedings.

(b) Withholding of Removal Based on Protected Characteristic in the Refugee Definition. Section 241(b)(3) of the Act restricts the removal of an alien to a country where the alien's life or freedom would be threatened because of the alien's race, religion, nationality, membership in a particular social group, or political opinion. Aliens convicted of particularly serious crimes both inside and outside of the United States, aliens deemed to pose a security risk to the United States, and aliens who have participated in the persecution of others are ineligible for withholding of removal.

(c) Withholding of Removal under the Convention Against Torture. The United States is obligated to abide by the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture). Section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub L. 105-277, provides for how the U.S. will comply with the Convention Against Torture. Under Article 3 of the Convention Against Torture, the United States has agreed not to return a person to another state where he or she would be tortured. The regulations regarding claims under the Convention Against Torture are found at 8 CFR 208.16, 208.17 and 208.18. Aliens under docket control may qualify to apply for withholding under these regulations. An alien granted withholding of removal may be granted employment authorization.

(d) Limitations of Withholding of Removal. The following are limitations to this form of relief:

(1) Removal to Third Country. Withholding of removal is country specific. There is no prohibition on removing an alien to a third country where the alien would be safe from persecution or torture.

(2) Does Not Qualify an Alien for Adjustment of Status. There is no provision for an alien who has been granted withholding of removal to adjust status to that of a Lawful Permanent Resident based on the grant.

(3) Motions to Reopen or Reconsider. The Service is not prohibited from filing a motion to reopen or reconsider in accordance with 8 CFR 3.2 (Motions before BIA) and 3.23 (Motions before the Immigration Judge). If conditions change in the country to which withholding of removal has been granted, there was fraud in the application, or other

conditions exist, the BIA or an immigration judge may terminate withholding previously granted by an immigration judge (see 8 CFR 208.24).

(e) Deferral of Removal under the Convention Against Torture can be found in 8 CFR 208.17. An alien who is ineligible for withholding of removal because of criminal activity, security reasons or persecution of others, may be granted deferral of removal to the country where it is more likely than not the alien would be tortured. There is no prohibition on removing an alien to a third country where the alien would be safe from torture. Deferral of removal does not negate or limit the application of law, regulation, or policy relating to the detention of the alien. Adjustment of status is not available to an alien granted deferral of removal. Deferral of Removal may be terminated in accordance with 8 CFR 208.17(d), 8 CFR 208.17(f) and 8 CFR 208.18(c). The alien can request that deferral be terminated under 8 CFR 208.17(e).

## 20.5  Private Bills.

This subject is discussed in detail in Chapter 23 of the Special Agent's Field Manual.

CAR 0225

## 20.6  Restoration or Adjustment of Status and Waivers.

(a) General. If an alien is granted adjustment of status or relief by an immigration judge, the Deportation Branch must close the case in DACS. Departure cleared status B should be used to close these cases. Depending on local office policy, deportation officers may assist in further processing of the alien for an alien registration card if applicable.

(b) Adjustment of Status. Some aliens in or subject to removal proceedings may seek relief from deportation through adjustment of status to permanent residency. Such adjustment may be granted by an immigration judge during the course of removal proceedings. Additionally, actual commencement of removal proceedings may be deferred by the arresting or processing officer where it appears the alien may be entitled to some form of relief. Section 245 of the Act is the principal authority for adjustment of status to permanent resident. Occasionally, adjustment may be granted pursuant to section 249 of the Act, Creation of Records of Lawful Admission for Permanent Residence, or one of several other special adjustment provisions set by Congress from time to time.

Not all aliens, even those with an approved visa petition, are eligible for adjustment. If an alien has an approved visa petition, but no visa number is available, he or she may not apply for adjustment. Section 204(a) of the Act specifies those aliens who have immediate relative status, as well as those with preference status. Categories of those who are not eligible are described in detail within section 245 of the Act. Each of the other special provisions also has specific conditions and restrictions.

(c) Discretionary Waivers Which May Apply in Removal Proceedings. An alien in removal proceedings may apply for certain waivers which overcome the grounds for removal. Section 237 of the Act contains the terms and conditions of waivers which apply to certain classes of deportable aliens. Section 212 of the Act contains the terms and conditions of waivers which apply to certain classes of aliens who are inadmissible or were inadmissible at time of entry or adjustment of status.

(d) Reinstatement to Status and Change of Status. In some instances, an alien who has fallen out of status may be eligible for reinstatement to his or her original status or may be eligible for a change to another nonimmigrant status. Questions regarding such matters should be referred to the local Examinations Branch for consideration.

(e) Temporary Protected Status (TPS). Section 244 of the Act provides for "Temporary Protected Status" for nationals of countries designated by the Attorney General, based on natural disasters, civil unrest, etc. Section 20.9 of this chapter contains more information on TPS. Also, you may want to view the

information on TPS found at
http://www.immigration.gov/graphics/services/tps_inter.htm.

# 20.7  Stay of Deportation or Removal.

(a) General. A stay of deportation or removal reflects an administrative decision by the Service or a reviewing body that removal against an alien should not proceed. It may be granted after the completion of a removal proceeding when the only remaining step in a case is the physical removal of the alien. A stay of deportation or removal is not considered an immigration benefit or waiver because it only bestows temporary relief from removal upon the alien.

(b) Stays Granted by the Service. If a final order has been entered based on deportability, the District Director has wide discretion to grant a stay of deportation or removal. If the final order has been entered against an inadmissible arriving alien, the District Director may stay immediate execution of the order as explained in 20.7(b)(2) below.

(1) Deportable Aliens Ordered Removed. When there are compelling humanitarian factors, or when a stay is deemed to be in the interest of the government, a District Director may grant a stay of deportation or removal for such period of time and under such conditions as he or she deems necessary. A stay of deportation or removal under this paragraph may also be granted by a District Director upon his or her own initiative without application being made by the alien. The detention rules found at 8 CFR Part 241 are applicable to a deportable alien granted a stay of deportation or removal.

(2) Inadmissible Arriving Aliens Ordered Removed. Section 241(c)(2) of the Act allows the Attorney General to stay the removal of an alien arriving at a port of entry. However, a stay of removal under this section requires a determination either that immediate removal is not practicable or proper, or the alien is needed to testify in the prosecution of another person in a criminal trial. Aliens granted a stay because their removal is impracticable or improper must be detained. Aliens who are granted a stay to testify in a criminal prosecution, however, may be released if certain conditions are met. The alien must post a bond of at least $500, must agree to appear when required to testify and for removal, and must agree to any other conditions prescribed by the Attorney General.

(c) Stays for Appeals or Judicial Review. Timely filed requests for post hearing reviews may stay removal depending on the case. However, the District Director may, in his or her discretion, remove an alien who has filed an untimely appeal, unless the court, an immigration judge, or the BIA has affirmatively stayed removal.

(1) Appeals to the Board of Immigration Appeals (BIA). Under 8 CFR 3.6, the timely filing of an appeal of a decision by the Immigration Court will operate as an automatic stay. This applies to appeals of all decisions by the Immigration Court except an appeal

CAR 0227

of a denial of a motion reopen or reconsider or denial of a request for a stay of deportation or removal. The Service shall take all reasonable steps to comply with a stay granted by an immigration judge or the BIA. However, such a stay shall cease to have effect if granted (or communicated) after the alien has been placed aboard an aircraft or other conveyance for removal and the normal boarding has been completed. See 8 CFR 241.6(c).

(2) Requests for Judicial Review. The filing of a petition seeking review in federal court does not stay the removal of an alien unless the reviewing court affirmatively orders a stay. See 8 CFR 241.3 and section 242(b)(3)(B) of the Act.

(3) Motions to Reopen or Reconsider. The filing of a motion to reopen or motion to reconsider before the Immigration Court or BIA does not operate as an automatic stay of deportation or removal, unless the removal order was issued in absentia. See 8 CFR 1003.2(f) and 8 CFR 1003.23(b)(1)(v).

(d) Injunctive Relief from Removal. In conjunction with other proceedings, a U.S. District Court Judge or other judge will sometimes issue an order that prohibits a Service action. On occasion the removal of an alien or class of aliens will be stayed by a temporary restraining order or an injunction. A temporary restraining order is an emergency remedy of short duration. There are many kinds of injunctions and the period of time covered by an injunction may vary. Close communication with the United States Attorney and the Office of General Counsel through your District Counsels office is essential to insure compliance with the order of the court.

(e) Adjudication and Decision. Title 8 CFR 241.6 governs administrative stays of removal. An alien ordered removed may apply for a stay of deportation or removal on Form I-246, Application for Stay of Deportation or Removal. The application for administrative stay of removal should be filed with the District Director having jurisdiction over where the alien resides. There are a multitude of reasons for filing for a stay. Common reasons include the need for urgent medical treatment, disposition of property, and unrelated legal proceedings. The adjudication of a stay of deportation or removal is often delegated to a deportation officer. Care should be exercised to verify any claimed facts, such as serious medical problems, etc. The decision of the District Director is final and may not be appealed administratively. Neither the filing of the application request nor the failure to receive notice of disposition of the request shall delay removal or relieve the alien from strict compliance with any outstanding notice to surrender for deportation or removal.

(f) Employment Authorization. There is no statutory or regulatory authority to grant employment authorization to an alien based on a grant of a stay of deportation or removal.

CAR 0228

## 20.8 Deferred Action.

(a) General. A District Director may, in his or her discretion, recommend deferral of (removal) action, an act of administrative choice to give some cases lower priority and in no way an entitlement, in appropriate cases. The deferred action category recognizes that the Service has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws. In making deferred action determinations, the factors listed in paragraph (b), among others, should be considered.

Deferred action does not confer any immigration status upon an alien, nor is it in any way a reflection of an alien's immigration status. It does not affect periods of unlawful presence as defined in section 212(a)(9) of the Act, and does not alter the status of any alien who is present in the United States without being inspected and admitted. Under no circumstances does deferred action operate to cure any defect in status under any section of the Act for any purpose. Since deferred action is not an immigration status, no alien has the right to deferred action. It is used solely in the discretion of the Service and confers no protection or benefit upon an alien. Deferred action does not preclude the Service from commencing removal proceedings at any time against an alien. Any request by an alien (or another party on behalf of such alien) for deferred action should be considered in the same manner as other correspondence. The alien should be advised that he or she may not apply for deferred action, but that the Service will review the facts presented and consider deferred action as well as any other appropriate course of action.

(b) Factors to be Considered. The following factors, among others, should be evaluated as part of a deferred action determination:

(1) The Likelihood That the Service Will Ultimately Remove the Alien Based on Factors Including:

likelihood that the alien will depart without formal proceedings (e.g., minor child who will accompany deportable parents);

age or physical condition affecting ability to travel;

the likelihood that another country will accept the alien;

the likelihood that the alien will be able to qualify for some form of relief which would prevent or indefinitely delay removal.

(2) Sympathetic Factors: The presence of sympathetic factors which, because of a desire on the part of administrative or judicial authorities to reach a favorable decision, could result in a distortion of the law with unfavorable implications for future cases.

CAR 0229

(3) Priority Given to a Class of Deportable Aliens: Whether or not the individual is a member of a class of deportable aliens whose removal has been given a high enforcement priority (e.g., dangerous criminals, alien smugglers, drug traffickers, terrorists, war criminals, habitual immigration violators).

(4) Service Cooperation with Other Agencies: Whether the alien's continued presence in the U.S. is desired by local, state, or federal law enforcement authorities for purposes of ongoing criminal or civil investigation or prosecution.

(c) Procedures. Normally a decision to recommend deferred action is made by the District Director, but in limited circumstances, the decision may be made by the Eastern Service Center Director.

(1) District Director. If the District Director recommends that removal action in an alien's case be deferred, the Director shall advise the Regional Director of such recommendation using Form G-312, Deferred Action Case Summary. The District Director shall sign the recommendation and shall explain the basis for his or her recommendation. The Regional Director shall consider the recommendation and determine whether further action on the alien's case should be deferred. The decision whether or not to defer action shall be communicated in writing by the Regional Director to the District Director. Upon receipt of notification of deferral by the Regional Director, the District Director shall notify the applicant, by letter, of the action taken and advise the alien that he or she may apply for employment authorization in accordance with 8 CFR 274a.12(c)(14). A decision not to defer action in such a case does not need to be separately communicated to the alien.

(2) Center Director (Eastern). In limited circumstances, Eastern Service Center Director may defer action on removal of an alien. Upon approval of an Form I-360 petition by a battered or abused spouse or child in his or her own behalf, the director shall separately consider the particular facts of each case and determine if deferred action is appropriate. Although the approval of such a petition will weigh in favor of deferred action, each decision must be considered individually, based on all the facts present and the factors discussed above. Upon deferral of action, the Center Director shall advise the alien, by letter, of the action taken and advise him or her of eligibility to request employment authorization. A decision not to defer action in such a case does not need to be separately communicated to the alien. Upon deferral of removal action, the Center Director shall include a copy of the G-312 in the alien's A-file and forward the file to the local Service office having jurisdiction over the alien's residence for docket control.

(d) Employment Authorization. Although deferred action is not an immigration status, an alien may be granted work authorization based on deferred action in his or her case, pursuant to 8 CFR 274a.12(c)(14).

(e) Periodic Review. Interim or biennial reviews should be conducted by both District and Regional Directors to determine whether deferred action cases should be continued or the alien removed from the deferred action category. District

reviews must determine if there is any change in the circumstances of the case and report any pertinent facts to the Regional Director. Results of the review and a recommendation to continue or terminate deferred action shall be reported to the Regional Director via memorandum. The Regional Director shall endorse the memorandum with his or her decision and return it to the District Director for inclusion in the alien's file.

District Directors must also review deferred action cases within their jurisdiction which were originally granted by the Eastern Service Center Director. Changed circumstances in such cases must be reported to the Center Director for consideration of terminating the deferred action.

Regions should compare statistics among their districts to ensure consistent application of this highly sensitive program.

(f) Termination of Deferred Action. During the course of the periodic review, or at any other time if the District Director determines that circumstances of the case no longer warrant deferred action, he or she shall notify the Regional Director of the changed circumstances and recommend termination. The Regional Director shall determine if the deferred action should be terminated and notify the District Director of the decision. The District Director shall, in turn, notify the alien of the decision by letter. The alien is not entitled to an appeal of this decision. The Eastern Service Center Director may also terminate deferred action in any case he or she originally granted. If the Eastern Service Center Director terminates deferred action, he or she must report the decision to the Regional Director and to the appropriate District Director.

Upon termination of deferred action, any relating employment authorization must be revoked.

CAR 0231

## 20.9  Exercising Discretion.

(a) Distinguishing Prosecutorial from Adjudicative Discretion. In the course of their duties, Service officers are likely to encounter a variety of situations in which they may be called upon to make discretionary decisions. The legal requirements, and the available scope of discretion, will depend upon the type of discretionary decision being made. There are two general types of discretion: prosecutorial (or enforcement) discretion, and adjudicative discretion.

Prosecutorial discretion is a decision by an agency charged with enforcing the law to enforce, or not enforce, the law against someone. To put it another way, a prosecutorial decision is a choice whether to exercise the coercive power of the state in order to deprive an individual of a liberty or property interest, under a law that provides the agency with authority to take such an action. The term "prosecutorial" can be deceptive, because the scope of decisions covered by this doctrine include decisions, such as whether to arrest a suspected violator, other than the specifically "prosecutorial" decision whether to file legal charges against someone. Adjudicative discretion, by contrast, involves the affirmative decision whether to grant a benefit under adjudicative standards and procedures provided by statute, regulation or policy that provide the agency with a measure of discretion in determining whether to provide the benefit.

The distinction between the discretion exercised in an adjudicative decision regarding an affirmative grant of a benefit and a prosecutorial decision is a fundamental one; yet, it is sometimes blurred and difficult to determine in the immigration context. Some decisions that may, on their face, look like a benefit grant -- such as an INS stay of removal or grant of deferred action -- really are just mechanisms for formalizing an exercise of prosecutorial discretion. Others, such as voluntary departure, include elements of both "benefit" and enforcement. Many proceedings combine both adjudicative and prosecutorial discretion, such as a removal proceeding in which an asylum application, adjustment of status, or a request for cancellation of removal, is at issue. Officers who are in doubt about what standards may apply to a decision because of uncertainty about what type of discretion is involved should consult their supervisor and/or Service counsel.

Service enforcement decisions involving prosecutorial discretion may involve either a liberty or a property interest. Decisions involving a liberty interest that are likely to be relevant to a deportation officer's duties include:

whom to arrest;

whom to refer for criminal prosecution;

whether or not to put an alien in removal proceedings, as opposed to or offering some lesser consequence of his or her immigration violation such as voluntary departure or voluntary return, or simply not pursuing the matter further;

> whether to place an alien in detention (but note that detention discretion has been limited by statute, such as section 236(c) of the Act) and

> whether to execute an order of removal.

INS prosecutorial decisions involving property interests include whether to seek a carrier fine, civil document fraud or employer sanctions money penalty, or forfeiture against INA violators.

Adjudicative discretion, on the other hand, is exercised in certain specific types of benefit applications such as:

> adjustment of status;

> change of nonimmigrant status;

> extension of nonimmigrant stay;

> asylum;

> cancellation of removal;

> voluntary departure

> certain employment authorization requests; and

> various waivers of inadmissibility.

Such discretionary action is specifically provided in statute or regulation for these cases. Other types of adjudicative actions, such as visa petitions, may not have any discretionary component.

> (b) Exercising Prosecutorial Discretion. The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to review or reversal by the courts, except in extremely narrow circumstances. For this reason, it is a powerful tool that must be used responsibly. Because the Service has only limited resources, decisions must regularly be made concerning which cases are the most appropriate use of these resources. INS officers are not only authorized by law but also expected to exercise discretion in a judicious manner at all stages of the enforcement process -- from planning investigations to enforcing final orders -- subject to their chains of command and to the particular responsibilities and authorities applicable to their specific position. Decisions whether or not to initiate removal cases or take other enforcement action must be made consistently and the officer must be able to articulate their reasoning behind their actions. Each exercise of prosecutorial discretion must consider the individual facts of the case. Arbitrary application of enforcement tools must be avoided.

CAR 0233

For a legal opinion on the exercise and limitations of prosecutorial discretion within the Service, see the Special Agent's Field Manual Appendix 14-5. A memorandum from the Commissioner, dated Nov. 17, 2000, also discusses prosecutorial discretion (see Special Agent's Field Manual Appendix 14-6).

(c) Exercising Adjudicative Discretion. Each type of adjudicative benefit has specific eligibility requirements and includes certain restrictions. Individuals denied some benefits (such as asylum) as a result of a discretionary decision by the Service might have further opportunities for review of the decision, while other discretionary decisions (such as denial of employment authorization) may not be subject to appeal. In an adjudicative decision involving an exercise of discretion, the criteria that should be applied may be found in precedent decisions or in Service regulations. These regulations and decisions should always be consulted for guidance. Whenever an adverse adjudicative decision involving an exercise of discretion is made, the grounds for such denial must be given in the notice of denial. Failure to do so may result in judicial review premised on an abuse of discretion. [See Jarecha v. INS, 417 F. 2nd 220 (5th Cir. 1979).] (Revised DD00-06)

## 20.10  Temporary Protected Status vs. Deferred Enforced Departure.

Section 244 of the INA contains information concerning Temporary Protected Status (TPS). The Attorney General of the United States, after consultation with appropriate agencies of the Government, may designate nationals of any foreign state (or a part of such foreign state) as deserving of TPS. In addition to nationals, the Attorney General may also include aliens who have no nationality but last resided in the designated foreign state. Aliens who have been granted TPS may not be removed from the United States during the designated protected period and qualify for work authorization. The initial period of designation is not less than 6 months and not more than 18 months. At least 60 days prior to the expiration of the designated period, the Attorney General must review the conditions of the designated state to determine if TPS is still warranted. Extensions of TPS designations normally are in 6 to 18 month increments at the Attorney Generals discretion. Applications for TPS are made on Form I-821.

(a) Conditions that may warrant TPS designation for a particular state. The Attorney General may grant TPS if there is an on-going armed conflict within the state that may cause harm to aliens that are returned to that state. Earthquakes, floods, droughts, epidemics or other environmental disasters that would result in temporary, but substantial, disruptions of living conditions may result in TPS designations. A foreign state being temporarily unable to handle the return of nationals of that state may also result in a designation. Granting a TPS designation to a particular state must not be contrary to the interests of the United States.

(b) TPS Impact on Removals. Aliens who have registered for TPS may not be removed from the United States. Denial of TPS benefits results in the continuation of the removal process. Aliens who have been granted TPS benefits receive an automatic stay of removal and cannot be removed until the expiration of the designated removal period. A grant of TPS does not affect the detention status of an alien who is subject to mandatory detention; however, it should be considered when determining the custody of an alien who may be releasable. Aliens who are in removal proceedings normally have their case administratively closed. The decision screen in DACS should be updated but the case remains open under docket control.

(c) Deferred Enforced Departure (DED). Unlike TPS, DED is not statutory and emanates from the United States Presidents constitutional powers to conduct foreign relations. TPS may be granted by the Attorney General but DED must come from the President in the form of an Executive Order. Presidential orders of DED are published in the Federal Register. Aliens who have been granted DED are normally granted work authorization per 8 CFR 274A.12(A)(11). Aliens who have been granted DED may not be removed from the United States until the designated period of DED has expired. If an alien falls under the protection of DED, the comment screen in DACS should be updated.

CAR 0236

## 20.11   Nicaraguan Adjustment and Central American Relief Act (NACARA) and Haitian Refugee Immigration Fairness Act (HRIFA).

(a) Nicaraguan Adjustment and Central American Relief Act (NACARA). The NACARA amending the INA through Public Law 105-100 was signed into law on November 19, 1997. It provides various immigration benefits and relief from removal to certain Central Americans, Cubans and nationals of former Soviet bloc countries. Specifically, the law provides that eligible Nicaraguans or Cubans can be considered for adjustment of status to that of a permanent resident alien. Additionally, certain Guatemalans, Salvadorans and nationals of former Soviet bloc countries were eligible to apply for suspension of deportation or special rule cancellation of removal under the criteria that existed for suspension of deportation prior to the enactment of IIRIRA.

(b) Nicaraguans and Cubans eligible for adjustment to lawful permanent residence (LPR). Nicaraguans or Cubans who could establish they had been physically present in the United States for a continuous period beginning not later than December 1, 1995, and ending not earlier than the date the application for adjustment is granted, and who were not inadmissible to the United States under any provision of Section 212(a) of the INA except paragraphs (4), (5), (6)(A), (7)(A) and (9)(B), could apply for adjustment of status to that of an LPR. See 8 CFR 245.13(a). A spouse, minor child, or unmarried son or daughter of an eligible principal beneficiary may also apply for benefits as a dependent provided the qualifying relationship existed when the principal beneficiary was granted adjustment of status. Under 8 CFR 245.13(c), certain waivers of inadmissibility may be available to aliens who are otherwise inadmissible under section of 212 of the Act, if applicable, in accordance with 8 CFR 212.7. Pursuant to 8 CFR 245.13(c)(2), a regulatory waiver may be available to aliens who are inadmissible under sections 212(a)(9)(A) and 212(a)(9)(C) of the Act.

(c) Benefits for Guatemalans, Salvadorans. In order to be eligible for suspension of deportation or special rule cancellation of removal, Guatemalans and Salvadorans must demonstrate that they were ABC class members who had not been apprehended at the time of entry after December 19, 1990, or who filed an application for asylum on or before April 1, 1990, either by filing an application with the Service or filing the application with the Immigration Court and serving a copy of that application on the Service. In addition, the applicant shall not have been convicted of an aggravated felony. Such a qualifying alien may apply for special rule cancellation of removal by the process discussed below.

(d) Former Soviet Bloc Nationals. Aliens who have not been convicted of a aggravated felony, and who entered the United States on or before December 31, 1990, applied for asylum on or before December 31, 1991, and, at the time of

CAR 0237

filing the asylum application, were nationals of the Soviet Union, Russia, any republic of the former Soviet Union, Latvia, Estonia, Lithuania, Poland, Czechoslovakia, Romania, Hungary, Bulgaria, Albania, East Germany, Yugoslavia or any former state of Yugoslavia, may apply for special rule cancellation of removal by the process discussed section 20.11(e).

(e) Application Process for Special Rule Cancellation of Removal. Special rule cancellation of removal is adjudicated under the same standards that existed for suspension of deportation prior to enactment of IIRIRA. In order to be eligible, an alien may not have been convicted of an aggravated felony. A principal applicant for special rule cancellation of removal (an alien described in paragraphs (a)(1) or (a)(2) of 8 CFR 240.61) shall be presumed to have established that deportation or removal from the United States would result in extreme hardship to the applicant or to a qualifying relative. See 8 CFR 240.64(d). The Service can rebut the presumption of extreme hardship by proving that it is more likely than not that neither the applicant nor a qualifying relative would suffer extreme hardship if the applicant were deported or removed from the United States. See 8 CFR 240.64(d)(2) and (3). Where an application is filed with the Service, if the presumption of hardship is rebutted, the application can be dismissed and the case can be referred to the Immigration Court where the applicant can have another review of the application. If the Immigration Court determines that extreme hardship will not result from deportation or removal from the United States, the application will be denied. The applicant has the burden of also proving that he or she has been continuously physically present in the United States for a period of not less than 7 years immediately preceding the date the application was filed, and that s/he has been a person of good moral character during that period.

(f) Derivative Applicants for Special Rule Cancellation of Removal. An alien who is the spouse, child, or unmarried son or daughter of an individual described in 8 CFR 240.61(a)(1), (2), or (3), at the time a decision is made to suspend the deportation or cancel the removal of that individual may also apply for suspension of deportation or special rule cancellation of removal. Such derivative applicants do not get the presumption of extreme hardship, and accordingly have the burden of proving that their deportation or removal would result in extreme hardship to themselves or to a qualifying relative. The applicant has the burden of also proving that he or she has been continuously physically present in the untied States for a period of not less than 7 years immediately preceding the date the application was filed, and that s/he has been a person of good moral character during that period.

(g) Detention and Removal actions regarding NACARA applicants. Although the deadline for filing the applications expired on March 31, 2000, 8 CFR 3.43 allowed certain aliens to file a motion to reopen under section 203(c) of Public Law 105-100. The deadline for filing the motions to reopen expired on June 19, 2001. Regardless of the expired deadlines, you may encounter aliens who still have pending applications for benefits under NACARA. If you encounter an alien

CAR 0238

who claims to have a NACARA application pending you should check all applicable Service databases to determine whether the application is still pending. In addition, criminal record checks must be conducted to determine if the alien is subject to mandatory detention. If the alien has no criminal record and the NACARA application is still pending, s/he should not be detained. The following are three scenarios involving aliens whose applications have been denied and the actions that should be taken in each case:

(1) Removal proceedings have never been initiated. In this case, the aliens application has been denied and the alien should be referred to Investigations for the processing of a Form I-862, Notice to Appear.

(2) Removal proceedings were initiated at one time but were administratively closed to allow the alien an opportunity to apply for NACARA benefits. The Service should file a motion to recalendar with the Immigration Court to allow the hearing process to continue. Custody determinations should be made on each case individually using existing custody determination guidelines and the guidance found in the December 18, 1997 memorandum signed by the Executive Associate Commissioner, Office of Field Operations. See Interim Guidance Nicaraguan Adjustment and Central American Relief Act.

(3) The alien has a pre-existing Order of Removal that was held in abeyance due to the NACARA application. Custody determinations should be made on a case-by-case basis utilizing existing custody determination guidelines and the guidance found in the December 18, 1997 memorandum signed by the Executive Associate Commissioner, Office of Field Operations. The Service must complete a Form I-290(c) and serve it on the Immigration Court. The court will make the determination if the NACARA benefit was properly denied. If the court determines the benefit was properly denied, the removal actions may proceed. If the determination is made that the denial was not proper, the court will adjudicate the application.

Aliens who had been ordered deported were eligible to apply for adjustment under the NACARA. The filing of an application automatically held the removal of the alien in abeyance. If an alien was a mandatory detention case, the filing of the application did not affect the aliens custody.

Additional information about NACARA 203 rules may be found in 8 CFR 240.60 and 8 CFR 3.43. If questions arise involving NACARA applicants, consult the District Counsels office or the Examinations branch.

(h) Haitian Refugee Immigration Fairness Act (HRIFA). The HRIFA became law on October 21, 1998, under Public Law L. 105-277. Division A, Title IX of the law dealt specifically with HRIFA. Section 902 of the HRIFA provided for the adjustment of status to that of lawful permanent resident for certain Haitians. Haitians wishing to apply for adjustment of status under HRIFA must have submitted their applications on Form I-485, Application to Register Permanent Residence or Adjust Status using I-485 Supplement C, HRIFA Supplement to

CAR 0239

Form I-485 Instructions, prior to March 31, 2000. Although the deadline has passed, officers may still encounter Haitians who have applications pending for this relief.

(i) Detention and Removal actions regarding applicants for benefits under HRIFA. The removal of Haitians who were clearly eligible for adjustment under HRIFA was held in abeyance. Officers encountering aliens who claim to have a HRIFA application pending should check all applicable Service databases to determine whether the application is still pending. In addition, criminal record checks must be conducted to determine if the alien is subject to mandatory detention. If the alien has no criminal record and the HRIFA application is still pending, s/he should not be detained. The following are three scenarios involving aliens whose applications have been denied and the actions that should be taken in each case:

(1) Removal proceedings have never been initiated. In this case, the aliens application has been denied and the alien should be referred to Investigations for the processing of a Form I-862, Notice to Appear.

(2) Removal proceedings were initiated at one time but were administratively closed to allow the alien an opportunity to apply for HRIFA benefits. The Service should file a motion to recalendar with the Immigration Court to allow the hearing process to continue. Custody determinations should be made on each case individually using existing custody determination guidelines and the guidance found in the December 22, 1998 memorandum signed by the Executive Associate Commissioner, Office of Field Operations. See Interim Guidance Haitian Refugee Immigration Fairness Act of 1998 (HRIFA).

(3) The alien has a pre-existing Order of Removal that was held in abeyance due to the HRIFA application. Custody determinations should be made on a case-by-case basis utilizing existing custody determination guidelines and the guidance found in the December 22, 1998, memorandum signed by the Executive Associate Commissioner, Office of Field Operations. The Service completes a Form I-290(c) in order to certify the denial of HRIFA benefits to the Immigration Court. The court then determines whether HRIFA adjustment was properly denied.

The filing of an application automatically held the removal of the alien in abeyance. If an alien was a mandatory detention case, the filing of the application did not affect the aliens custody. Additional information about HRIFA rules may be found in Section 902 of the HRIFA and 8 CFR 245.15. If questions arise involving HRIFA applicants, consult the District Counsels office or the Examinations branch.

## 20.12  Voluntary Departure.

Voluntary departure may be granted by the INS or an immigration judge under the conditions specified in section 240B of the Immigration and Nationality Act. See Chapter 13 of this Manual for an explanation of voluntary departure.

CAR 0241

# For Internal Use Only

## Deferred Action – Internal Background Information

1.     What is Deferred Action (DA)?

Deferred action is an exercise of agency discretion to allow an individual to remain with authorization in the U.S. without fear of removal.  *See* 8 C.F.R. 274a.12(c)(14).  Factors to be considered in evaluating a request for deferred action include (but are not limited to) the presence of sympathetic or compelling factors related to the applicant's health, ability to travel, home country conditions, family ties and length of time in the U.S., history of employment and/or community service, military service, and overall priority for, as well as the likelihood of removal.  *See* November 17, 2000 memorandum entitled "Exercising Prosecutorial Discretion" by former Immigration and Naturalization Services Commissioner, Doris Meissner.

2.     How long does DA last?

Deferred action may be granted and/or extended for any period of time deemed necessary to address the circumstances presented, but is typically granted in one year increments. Once granted deferred action, the recipient can apply for, and receive, employment authorization for a period commensurate with the grant of deferred action assuming they establish an economic need.

3.     Is DA an immigration "status"?

A grant of deferred action does not confer any immigration status, nor does it cure any bases of inadmissibility that may exist and affect future immigration applications. Periods of time in deferred action do, however, qualify as periods of stay authorized by the DHS Secretary (and so do not create unlawful presence).

4.     How does a person request DA?

A request for deferred action should be made to the USCIS Field Office Director in writing with supporting documentation.  The request can be submitted in person at the local office during an INFOPASS appointment or by mail.   A request for deferred action must include:
•      An explanation in writing as to why the individual is seeking deferred action as well as supporting documentation,
•      Any available primary or secondary proof of identity and nationality, including a birth certificate, a passport and/or Identification Card, notarized affidavit(s), school or medical records, etc.,
•      A copy of any previously issued visa used by the individual to gain admission to the United States and evidence of such admission, and
•      Two passport style photos.
•      Where the individual requesting deferred action is represented, he or she should also submit a completed G-28, Notice of Entry as Attorney or Accredited Representative.

# For Internal Use Only

For Internal Use Only

5.    How much does it cost to request DA?

A request for deferred action does not require payment of a fee.

6.    How long does it take for USCIS to render a decision on a specific DA request?

The time required to render a decision may vary depending on the specific facts of each case, and the need for documentation.  Before deciding any deferred action request, USCIS must complete and resolve favorably all required security checks; **DP**

**DP**

7.    After receiving DA, can an individual request employment authorization and is there a fee for doing so?

Individuals granted deferred action may file the Form I-765, Request for Employment Authorization, via the USCIS Chicago Lockbox.  The form includes filing instructions and the Lockbox address.  The current fee to file the Form I-765 is $340.  All checks must be made payable to the DHS or USCIS.  USCIS may as a matter of discretion waive the Form I-765 filing fee if the individual establishes that he/she is unable to pay it.  Guidance related to requesting a fee waiver is available at www.uscis.gov.

8.    Must an applicant be out of status before applying for DA?

No.  In fact, USCIS encourages those seeking deferred action to do before the expiration of their authorized period of stay.  This will help minimize or avoid entirely periods of unlawful presence.  An applicant may request deferred action in anticipation of his or her status expiring, or after such status has expired.  A grant of deferred action should typically be conferred in the former case effective upon expiration of the applicant's earlier authorized stay; in the latter case, the grant would be conferred upon adjudication of the deferred action request.

For Internal Use Only

CAR 0243

**United States Citizenship and Immigration Services**



**STANDARD OPERATING PROCEDURES FOR HANDLING
PAROLE EXTENSION AND DEFERRED ACTION REQUESTS**

United States Citizenship and Immigration Services
111 Massachusetts Avenue, NW, Second Floor
Washington, D.C. 20529-2030

CAR 0244

## Table of Contents

Introduction…..……………………………………………………………………4

I. Extension of Parole ……………………………………………………………4

    Formal Request……………………………………………………………4

    Review……………………………………………………………………5 Hi

    Conducting Security Checks………………………………………………6

    Adjudication………………………………………………………………6

    Approvals…………………………………………………………………7

    Denials……………………………………………………………………8

II. Deferred Action …………………………………………………………………8

    Background…………………………………………………………………8

    Request ……………………………………………………………………9

    Review……………………………………………………………………10 Hi

    Conducting Security Checks………………………………………………11

    Adjudication………………………………………………………………11

    Approvals…………………………………………………………………11

    Denials……………………………………………………………………12


CAR 0245

## Appendices

Appendix A: 2/3/2009 USCIS memorandum from John M. Bulger entitled *"Amended Guidance Regarding Processing of Initial Parole or Renewal Parole Requests Presented by Natives or Citizens of Cuba to USCIS Field Offices"* ............................................................ 13

Appendix B: 9/28/2008 Memorandum of Agreement between USCIS, ICE, and CBP for the Purpose of Coordinating the Concurrent Exercise of Secretary's Parole Authority under INA 212(d)(5) ................................................................................................................ 14

Appendix C:  Doris Meissner memo.



US Citizenship
and Immigration Services

SOP for Extending Parole
or Granting Deferred Action

CAR 0246

**Introduction**    This Standard Operating Procedure (SOP) applies to requests for extension of parole ("re-parole") or deferred action requests.

## I. Extension of Parole

**Formal Request**    A request for extension of parole, commonly referred to as re-parole, may be made in person via the applicant's USCIS field office during an INFOPASS appointment or in writing.[1]  To support a re-parole request, the applicant must submit:

- A completed Form I-131, Application for Travel Document, with filing and biometrics fees, requesting parole under category f. (Per 8 CFR 103.7(c), a fee waiver is not available for Form I-131,
- Any available primary or secondary proof of identity and nationality, including a birth certificate, a passport and/or Identification Card, notarized affidavit(s), school or medical records, etc.,
- A copy of documentation previously issued by DHS indicating a prior parole, including an original I-94[2], and
- Two passport-style photos.
- Biometric fee (standard fee waiver rules apply)
- Completed G-28, Notice of Entry as Attorney or Accredited Representative (if applicable).

Upon receiving original document(s) related to a re-parole request, the USCIS field office should:

- Verify address and contact information for the applicant,
- Verify spelling of applicant's name and any aliases,
- Make copies of original documents and note on each "original seen and returned on [date],"
- Return all original documents to the applicant, and
- Require the applicant to indicate with his or her initials on the copies maintained by USCIS that the originals were returned.

Field office staff shall arrange an appointment for the applicant to provide biometrics at the nearest Application Support Center (ASC).

**Review**    Following receipt of the re-parole request and related documents, field office staff should identify and seek to secure any existing A-file(s) for the applicant or create a new A-file if one does not exist.  Staff should complete all required

---

[1] USCIS's Refugee, Asylum, and International Operations (RAIO) also has the authority to re-parole an individual who was previously paroled into the United States for humanitarian purposes.
[2] If an applicant does have this or has lost previously issued documents officer should search available electronic records for this evidence.



US Citizenship
and Immigration Services

SOP for Extending Parole
or Granting Deferred Action

CAR 0247

security checks, as specified below, and notify the applicant of the adjudication decision of the re-parole request.  Evidence of the notification should be placed in the A-file. While the application is pending, USCIS should direct any general questions from applicants to the USCIS National Customer Service Center at 1 800 375-5283.

**A.  Obtaining and/or Creating the A-File**

Field office staff should first search the Central Index System (CIS) to identify any existing A-file related to an applicant. Where an A-file is found and appears to be within the field office, staff should use the National File Transfer System (NFTS) to secure the file.  For A-files in a different file control office, the field office should initiate a file transfer request.  Since file transfer requests generally take one week to complete, the field office should wait this amount of time before commencing action on the re-parole request.  In the interim, the field office should create a Temporary file (T-file) to store the re-parole request until the A-file is received and the files may be merged.  Where no A-file exists, a new file must be created for the applicant.

If after one week the requested A-file has not been received, the Field Office should notify their local records division and seek via UPS Express to secure the A-file. This will help ensure timely adjudication.

If multiple A-files exist pertaining to the applicant, they should all be requested and consolidated upon receipt.

Where a field office, after following the steps set forth above, remains unable to secure an applicant's permanent A-file, the field office may adjudicate a request for re-parole in accordance with the February 3, 2009, USCIS memorandum entitled, "*Amended Guidance Regarding Processing of Initial Parole or Renewal Parole Requests Presented by Natives or Citizens of Cuba to USCIS Field Offices,*" attached as Appendix A.  That memorandum provides instructions concerning the "Request to Obtain the A-file" that may be applied to Haitians paroled into the United States after the January 12, 2010 earthquake who are now seeking re-parole

**Conducting Security Checks**

Before adjudicating the re-parole request, the field office must complete and resolve the applicant's FBI fingerprint and Interagency Border Inspection System (IBIS) security checks.  If these checks were never previously initiated or have expired, the field office must initiate them as soon as possible after receiving the re-parole request.

Where an applicant, due to medical circumstances, is unable to appear at a field office or ASC to submit biometric information, the field office shall make every effort to visit the applicant to secure such data.



US Citizenship
and Immigration Services

SOP for Extending Parole
or Granting Deferred Action

CAR 0248

FBI name checks are not required for the adjudication of a re-parole request. In addition, the field office should determine whether the applicant has ever been in deportation, removal or exclusion proceedings as such proceedings may impact eligibility for re-parole.

In any case where an applicant is determined to be in removal proceedings, have a final order, or have deferred action at any point after commencement of removal proceedings, the re-parole request must be adjudicated by ICE.  *See* Addendum 1 to the Memorandum of Agreement between USCIS, ICE, and CBP for the purpose of coordinating the concurrent exercise of parole authority under 212(d)(5) of the Act (9/28/08), attached as Appendix B.

**Adjudication**

**Approvals**          **Where a field office approves re-parole, the office shall**:

1. Retain the fomerly issued Form I-94, Arrival and Departure Record, and complete a new one extending parole for one year from the date of the initial I-94 expiration.

2. Place a "parole" stamp on the Form I-94 with the code CH (designating parole related to Cubans or Haitians).  This designation should be applied regardless of the code appearing on the original I-94.

3. Authorized re-parole for up to but not exceeding one year.

4. Include a copy of the completed Form I-94 in the applicant's permanent A-file or, if the A-file is not available, in the T-file created to store the re-parole package.

5. Give the departure portion (bottom section) of Form I-94 to the applicant, including on the back in the right hand corner (reverse side) one of two original passport photos attached with a dry seal.  In an effort to curtail fraud, the USCIS officer should ensure that the dry seal covers part of the photo and the I-94 document.

6. Retain a copy of the arrival portion (top section) of Form I-94 for USCIS records and mail the original arrival portion of the Form I-94 to:

   **DHS/ASC**
   **1084 S. Laurel Road**
   **London, Kentucky 40744**

7. Inform the applicant in the same written decision as to his or her



US Citizenship
and Immigration Services

CAR 0249

potential eligibility for employment authorization.  Form I-765 applications filed under 8 CFR 274a.12(c)(11) are mailed to the Chicago Lockbox at[3]:

USCIS Chicago Lockbox
For U.S. Postal Service:
USCIS
PO Box 805887
Chicago, IL 60680-4120

For Express mail and courier deliveries:
USCIS
Attn: FBAS
131 South Dearborn-3[rd] Floor
Chicago, IL 60603-5517

8. Forwarded a copy of the completed Form I-131 to the National Benefits Center for input into CLAIMS.

**Denials**          **Where a field office denies a re-parole request, the office shall:**

1. Explain fully and in writing the basis for the denial decision.  As indicated previously, where the reason for the denial indicates the applicant poses a threat to national security or public safety, the case should be referred to ICE for review and possible issuance of an NTA.

2. Retain in the A or T-file a copy of the denial decision.

3. Update all USCIS electronic databases as appropriate, including ENFORCE/IDENT.

4. Forward a copy of the completed Form I-131 to the National Benefits Center for input into CLAIMS.

NOTE: Where the field office denies a re-parole request and there is reason to believe the applicant poses a threat to national security or public safety, the field office should refer the case through FDNS to ICE for review and possible issuance of a Notice to Appear (NTA).

---

[3] I-765 applications for individuals granted parole may also be filed online.

 US Citizenship and Immigration Services

SOP for Extending Parole or Granting Deferred Action

CAR 0250

## II. Deferred Action

**Background**   USCIS should review requests for deferred action  on a case-by-case basis following the principles outlined in the Doris Meissner memo

> **Commented [u1]:** Placeholder...need the official  name of the memo

While a grant of deferred action does not confer any immigration status, it does halt the accrual of time counted toward the unlawful presence inadmissibility bar, and permits the individual to apply for work authorization.

A request for deferred action made at a local USCIS field office must be reviewed by the District Director and, if recommended, forwarded to the Regional Director for a final decision.[4]

**Request**   A request for deferred action may be made in person via the applicant's USCIS field office during an INFOPASS appointment or in writing.  To support a deferred action request, the applicant must submit:

- An explanation as to why he or she is seeking deferred action including any supporting documentation (e.g., medical information, evidence of community and familial ties and equities, conditions in the applicant's country of origin, etc.),
- Any available primary or secondary proof of identity and nationality, including a birth certificate, a passport and/or Identification Card, notarized affidavit(s), school or medical records, etc.,
- A copy of any previously issued visa used by the applicant to gain admission to the United States and evidence of such admission, and
- Two passport-style photos.

An applicant who has legal representation must submit a completed G-28, Notice of Entry as Attorney or Accredited Representative.

Upon receiving original document(s) related to a deferred action request, the USCIS field office should:

- Verify address and contact information for the applicant,
- Verify spelling of applicant's name and any aliases,
- Make copies of original documents and note on each "original seen and returned on [date]," and
- Return all original documents to the applicant.

If the applicant's biometrics have not previously been collected by USCIS, or if biometrics collected from the applicant by ICE or CBP are not available to USCIS, the field office should arrange for the applicant to provide biometrics pursuant to 8 C.F.R. § 103.2(b)(9).  No fee shall be charged for the submission

---

[4]  This is consistent with existing agency policy and practice for individuals requesting deferred action from USCIS.



US Citizenship
and Immigration Services

SOP for Extending Parole
or Granting Deferred Action

CAR 0251

of such biometrics. The field office should further explain to the applicant that he or she will be notified in writing within 30 days of a final decision on his or her deferred action request.

**Review**

Following receipt of the deferred action request and related documents, field office staff should identify and seek to secure any existing A-file(s) for the applicant, or create a new A-file if one does not exist. Staff should complete all required security checks, as specified below, and notify the applicant of decision of the deferred action request. Evidence of the notification should be placed in the A-file. While the application is pending, USCIS should direct any general questions from applicants to the USCIS National Customer Service Center at 1-800-375-5283.

### A.  Obtaining and/or Creating the A-File

Field office staff should first search the Central Index System (CIS) to identify any existing A-file related to an applicant. Where an A-file is found and appears to be within the field office, staff should use the National File Transfer System (NFTS) to secure the file. For A-files in a different file control office, the field office should initiate a file transfer request. Since file transfer requests generally take one week to complete, the field office should wait this amount of time before commencing action on the deferred action request. In the interim, the field office should create a Temporary file (T-file) to store the deferred action request until the A-file is received and the files may be merged. Where no A-file exists, a new file must be created for the applicant.

If after one week the requested A-file has not been received, the Field Office should notify their local records division and seek via UPS Express to secure the A-file. This will help ensure timely adjudication.

If multiple A-files exist pertaining to the applicant, they should all be requested and consolidated upon receipt. Where an A-file has been determined to exist related to a deferred action applicant, no decision on the request shall be made until the permanent A-file has been obtained and reviewed.

**Conducting Security Checks**

Before forwarding a deferred action request to the District Director for review, the field office must complete and resolve the FBI fingerprint and Interagency Border Inspection System (IBIS) security checks conducted on the applicant. The field office should also determine whether the applicant has ever been in deportation, removal or exclusion proceedings since such proceedings may impact the outcome of the deferred action request.

**Adjudication**

Where the field office denies a deferred action request and there is reason to believe the applicant poses a threat to national security or public safety, the



US Citizenship
and Immigration Services

SOP for Extending Parole
or Granting Deferred Action

CAR 0252

field office should refer the case through FDNS to ICE for review and possible issuance of an NTA.

**Approvals**       **Where USCIS approves a deferred action request, the office shall:**

1. Deferred action should be authorized following final approval by the Regional Director for up to but not exceeding two years.

Notify the applicant through his or her field office in writing of the decision, and retain a copy of such decision in the applicant's permanent A-file or, if the A-file is not available, in the T-file created to store the deferred action request.

2. Inform the applicant in the same written decision as to his or her potential eligibility for employment authorization. Form I-765 applications filed under 8 CFR 274a.12(c)(14) are mailed to the Chicago Lockbox at[5]:

USCIS Chicago Lockbox
For U.S. Postal Service:
USCIS
PO Box 805887
Chicago, IL 60680-4120

For Express mail and courier deliveries:
USCIS
Attn: FBAS
131 South Dearborn-3rd Floor
Chicago, IL 60603-5517

**Denials**       **Where a field office denies a deferred action request, the office shall:**

1. Explain fully and in writing the basis for the denial decision. As indicated previously, where the reason for the denial indicates the applicant is poses a threat to national security or public safety, the case should be referred to ICE for review and possible issuance of an NTA.

2. Retain in the A or T-file a copy of the denial decision.

3. Update all USCIS electronic databases as appropriate, including ENFORCE/IDENT.

---

[5] E-filing the I-765 for individuals granted deferred action is not available at this time.

 US Citizenship
and Immigration Services

SOP for Extending Parole
or Granting Deferred Action

CAR 0253



US Citizenship
and Immigration Services

SOP for Extending Parole
or Granting Deferred Action

CAR 0254

## Appendix A:

**2/3/2009 USCIS memorandum from John M. Bulger entitled** *"Amended Guidance Regarding Processing of Initial Parole or Renewal Parole Requests Presented by Natives or Citizens of Cuba to USCIS Field Offices"*



US Citizenship
and Immigration Services

SOP for Extending Parole
or Granting Deferred Action

CAR 0255

## **Appendix B:**

**9/28/2008 Memorandum of Agreement between USCIS, ICE, and CBP for the Purpose of Coordinating the Concurrent Exercise of Secretary's Parole Authority under INA 212(d)(5)**

 US Citizenship
and Immigration Services

SOP for Extending Parole
or Granting Deferred Action

Page 13

CAR 0256

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of Domestic Operations (MS-2110)*
Washington, DC  20529



U.S. Citizenship
and Immigration
Services

# Memorandum

TO:          Field Leadership

FROM:        Donald Neufeld
             Acting Associate Director, Office of Domestic Operations

SUBJECT:     Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children

## I.  Purpose

This memorandum provides guidance to U.S. Citizenship and Immigration Services (USCIS) field offices and service centers regarding the processing of surviving spouses of deceased U.S. citizens and qualifying children of the surviving spouses.  It affords a new process by which they may apply for deferred action.  This policy guidance will be in effect until further notice and may be revised as needed.

## II.  Background

Section 205.1(a)(3)(i)(C) of title 8 of the Code of Federal Regulations (8 CFR) requires that the approval of  Form I-130, *Petition for Alien Relative*, be automatically revoked upon the death of the petitioner if the beneficiary[1] has not adjusted status in the United States or been inspected and admitted as an immigrant.  In such instances, the beneficiary may request a reinstatement of the approval and USCIS, in its discretion, may grant such a request for humanitarian reasons.  8 CFR 205.1(a)(3)(i)(C)(2).

However, no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death and (1) the immigrant petition filed by the citizen on behalf of the surviving spouse has not been adjudicated by USCIS at the time of the citizen's death, or (2) no petition was filed by the citizen before the citizen's death.  This issue has caused a split among the circuit courts of appeal and is also the subject of proposed legislation in the U.S. Congress (bills S. 815 and H.R. 1870).

---

[1] Depending on context, the term beneficiary in this guidance may include both actual and potential beneficiaries of Forms I-130 filed on their behalf.

CAR 0257

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 2

**III. Policy Guidance**

This policy guidance covers only (1) surviving spouses of U.S. citizens who died before the second anniversary of the marriage, who have not remarried and were not legally separated from the citizen spouse at the time of the citizen's death, and who are residing in the United States,[2] and (2) such surviving spouses' qualifying children.  For purposes of this policy guidance, "qualifying children" are any children of the surviving spouse of the deceased U.S. citizen who remain unmarried and under 21 years of age (age determinations for beneficiaries of Forms I-130 should be made as provided in section 201(f) of the INA).

This guidance applies to the aforementioned beneficiaries without regard to their manner of entry into the United States.  Such surviving spouses are covered without restrictions on how long the U.S. citizen spouse has been deceased as long as the surviving spouse has not remarried.[3]

This guidance does not cover surviving spouses or qualifying children of deceased U.S. citizens who are residing outside the United States or surviving spouses and children of a lawful permanent resident or other non-U.S. citizen.  This guidance also does not cover surviving spouses or qualifying children of deceased U.S. citizens if the surviving spouse remarried at any time after the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated).  This guidance does not cover any beneficiary who was legally separated from his or her U.S. citizen spouse at the time of the citizen's death, or such beneficiary's children.

Since current section 201(b)(2)(A)(i) of the Immigration and Nationality Act (INA) treats covered widow(er)s of U.S. citizens and their children as immediate relatives based upon a self-petition, they are not covered by this guidance.  They may file a Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, in accordance with the instructions on the Form.

In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens, USCIS is instituting the following policy guidance, which is effective immediately and until further notice.

**A.  Form I-130 Approved Prior to the Death of the U.S. Citizen Spouse (Petitioner)**

Upon the death of the U.S. citizen petitioner, the approved Form I-130 is automatically revoked pursuant to 8 CFR 205.1(a)(3)(i)(C).  The beneficiary, however, may request reinstatement of the revoked petition pursuant to 8 CFR 205.1(a)(3)(i)(C)(2).  USCIS may then exercise discretion and grant the reinstatement after considering the facts and humanitarian considerations of the particular

---

[2] Section III(A) of this memorandum, however, regarding humanitarian reinstatement, shall apply to surviving spouses outside the United States.

[3] This guidance is also applicable to a beneficiary who entered the United States on a K-1 Nonimmigrant Visa and married a U.S. citizen other than the U.S. citizen petitioner who filed the I-129F.  If the U.S. citizen spouse died before the second anniversary of the marriage, the widow(er) is eligible for deferred action or humanitarian reinstatement as described herein.

CAR 0258

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 3

case. If the request for humanitarian reinstatement is approved, the beneficiary may proceed to the adjustment of status or consular processing stage.

This memorandum does not alter the process for reviewing a Form I-130 returned to USCIS by a U.S. Consular Officer overseas when the beneficiary is seeking a humanitarian reinstatement. If USCIS reinstates the Form I-130 returned by the consular officer, the I-130 should be forwarded to the National Visa Center to allow the beneficiary to resume consular processing. Section III(A) of this guidance, relating to humanitarian reinstatement, applies to beneficiaries who are within or outside the United States.

If a beneficiary covered by this guidance requests humanitarian reinstatement, adjudicators should presume that humanitarian reasons support a grant of the request. Absent extraordinary factors or a failure to meet the regulatory requirements of 8 CFR 205.1(a)(3)(i)(C)(2), adjudicators should favorably exercise discretion accordingly. If the request for reinstatement cannot be granted for any reason other than confirmed or suspected fraud or issues of criminality or national security, the beneficiary should be informed that he or she may request deferred action in the manner described in III(E) below.

In a case governed by First, Sixth or Ninth Circuit law, officers should consult with local USCIS counsel before treating an approved spousal immediate relative petition as "revoked" under 8 CFR 205.1(a)(3)(i)(C). Courts in those jurisdictions have held that the visa petitioner's death does *not* end a surviving spouse's eligibility for classification as an immediate relative. Taing v. Napolitano, ___ F.3d ___, 2009 WL 1395836 (1st Cir. 2009); Lockhart v. Napolitano, 561 F.3d 611 (6th Cir. 2009); Freeman v. Gonzales, 444 F.3d 1031 (9th Cir. 2006).

**B. Form I-130 Pending at the Time of Death of the U.S. Citizen Spouse (Petitioner) – Married Less than 2 Years at Time of Death**

Once USCIS has received a copy of the U.S. citizen petitioner's death certificate, the pending, stand-alone Form I-130 should be held in abeyance at the pending location. Petitions may be transferred to the Vermont Service Center to be consolidated with the A-file housing a deferred action request, if such a request is made by the beneficiary (see further guidance below).

Any concurrently filed Form I-485, *Application to Register Permanent Residence or Adjust Status*, and Form I-130, should be held in abeyance at the National Benefits Center until further guidance. The beneficiary will remain eligible to receive the interim benefits of advance parole and employment authorization on the basis of the pending adjustment of status application.

If a Form I-485 was not concurrently filed, the beneficiary should be informed that he or she may request deferred action in the manner described in section III(E) below.

Note: In instances where the beneficiary and deceased U.S. citizen petitioner were married for at least two years at the time of the petitioner's death, the Form I-130 should be denied under existing

CAR 0259

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 4

procedures.  Instructions should be provided to the beneficiary regarding the availability of the Form I-360 as a special immigrant widow/widower.  Any associated Form I-485 should also be denied.

## C.  Form I-130 Denied (Prior to the Issuance of this Guidance) due to the Death of the U.S. Citizen Spouse (Petitioner)

A beneficiary who is the surviving spouse of a U.S. citizen petitioner and whose petition was denied by USCIS (1) due to the death of the U.S. citizen petitioner, and (2) prior to the issuance of this guidance, may request deferred action in the manner described in section III(E) below.

## D.  Form I-130 Not Filed Prior to the Death of the U.S. Citizen Spouse

A beneficiary who was legally married to a now deceased U.S. citizen at the time of the U.S. citizen's death, but for whom no Form I-130 was filed, may request deferred action in the manner described in section III(E) below.

If the beneficiary was not legally married to, or was legally separated from, the deceased U.S. citizen at the time of the U.S. citizen's death, a qualifying relationship does not exist.  The beneficiary is therefore not eligible to submit Form I-360 based on the specific policy guidance set forth in section III(E) below.

## E.  Required Documentation for Requests for Deferred Action

Beneficiaries may request deferred action by submitting the following:

1)  A Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, with the appropriate, nonwaivable filing fee (currently $375), completed in the format explained below; and
2)  All of the documents requested in the Form I-360 filing instructions for widow/widowers.

The beneficiary of the Form I-360 must check box "**m.  Other, explain:**" in Part 2 of the petition and cite the basis for eligibility as "**Deferred Action -- Surviving spouse of a deceased U.S. citizen, married less than 2 years.**"  The Form I-360 must be submitted to the Vermont Service Center for deferred action consideration.  Note that while USCIS is utilizing Form I-360 for these deferred action requests, such filings are NOT immigrant self-petitions under current law.  They should be adjudicated as requests for deferred action only.  In addition to the Part 2 information described above, the applicant must complete Parts 1, 3, 4, 7, 9, 10 and 11 of the Form I-360.

## F.  Decision on Requests for Deferred Action

Requests for deferred action based on the specific policy guidance set forth in this memorandum may only be considered for:  1) surviving spouses of U.S. citizens whose U.S. citizen spouse died before the second anniversary of the marriage and who are unmarried and residing in the United States; and 2) their qualifying children who are residing in the United States.

CAR 0260

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 5

The following persons are ineligible for deferred action: 1) beneficiaries whose visa petition was denied or revoked for any reason other than or in addition to the death of the petitioning U.S. citizen spouse; 2) widow(er)s who have remarried or were legally separated from the U.S. citizen spouse at the time of the U.S. citizen's death; and 3) beneficiaries with other serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons.   A grant of deferred action is a discretionary action on the part of USCIS.  It is intended that this discretion should be liberally applied to provide a humanitarian benefit to eligible beneficiaries.  However, deferred action may be denied for serious adverse factors, whether or not such factors are specifically identified in this guidance.

Requests for deferred action based on the specific policy guidance set forth in this memorandum will not be considered for beneficiaries who: 1) are surviving spouses or qualifying children of non-U.S. citizens; 2) are residing outside the United States; 3) meet the conditional marriage period set forth in INA 201(b)(2)(A)(i); or 4) have remarried subsequent to the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated).

Once a decision on the request for deferred action has been made, the decision must be communicated to the beneficiary via a decision letter.  If the request has been granted, the deferred action grant letter must state that the beneficiary is eligible to file Form I-765, *Application for Employment Authorization*.  If the request has been denied, the deferred action denial letter must cite the reasons for the denial.  A decision on a request for deferred action falls within the discretion of the Secretary.  A denial of a request for deferred action is not subject to administrative appeal or judicial review, see INA § 242(a)(2)(B), and (g).

## G.  Validity Period for Deferred Action

The validity period of deferred action based on the policy guidance set forth in this memorandum is two (2) years from the date of grant of the Form I-360 request for deferred action.

## H.  Eligibility for Employment Authorization

The appropriate classification for Form I-765 filed on the basis of a deferred action grant is (C)(14) pursuant to 8 CFR 274a.12(c)(14).  Beneficiaries may submit Form I-765, with the appropriate filing fee (currently $340), using this classification at any time after the grant (but prior to the expiration) of deferred action.  However, they must demonstrate an economic necessity.  The validity period for an employment authorization document (EAD) under the classification (C)(14), based on the specific policy guidance set forth in this memorandum is two (2) years, not to exceed the expiration date of the grant of deferred action.

All requests for employment authorization based on the policy guidance set forth in this memorandum must contain the appropriate required supporting documentation.  Applicants must follow currently established filing procedures for the Form I-765 in accordance with the instructions on the form.  Fee waiver of the Form I-765 fee is available on a case-by-case basis for substantiated inability to pay as provided in 8 CFR 103.7(c)(1).

CAR 0261

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 6

A beneficiary whose Form I-485 is being held in abeyance may also file a Form I-765, with the appropriate filing fee. The appropriate classification for employment authorization filed on such a basis is (C)(9) pursuant to 8 CFR 274a.12(c)(9). Evidence of an economic necessity is not required if using this classification. A beneficiary whose application is being held in abeyance may have been issued an employment authorization document valid for one year under category (C)(9). When such an applicant files a Form I-765 for renewal of his or her EAD under the classification (C)(9), based on the specific policy guidance set forth in this memorandum, the validity period will be **two (2) years**. An applicant with a valid EAD under the classification (C)(9) may file for renewal no more than 90 days prior to the expiration date of the valid document. The employment authorization may then be granted for two (2) years based on the specific policy guidance set forth in this memorandum.

## I. Effect of Grant of Deferred Action

The grant of deferred action by USCIS does not confer or alter any immigration status. It does not convey or imply any waivers of inadmissibility that may exist, regardless of whether that inadmissibility is known to DHS or other agencies at the time of the request for deferred action. A grant of deferred action also does not eliminate any period of prior unlawful presence. However, periods of time in deferred action do not count as unlawful presence for the purposes of sections 212(a)(9)(B) and (C) of the INA. Any period of time in deferred action qualifies as a period of stay authorized by the Secretary of Homeland Security for those purposes.

## J. Eligibility for Advance Parole

Beneficiaries granted deferred action based on the policy guidance set forth in this memorandum or whose applications for adjustment of status are being held in abeyance may request advance parole. Such request may be made by filing Form I-131, *Application for Travel Document*, in accordance with the Form I-131 instructions and with the appropriate fee. Note, however, that departure from the United States and return, even under a grant of advance parole, may adversely affect eligibility for adjustment of status of aliens with past periods of unlawful presence.

## K. Implementation

USCIS offices and centers are to begin implementing the instructions established in this memorandum immediately.

## L. Contact Information

Questions regarding this memorandum should be directed to the Office of Domestic Operations through appropriate channels.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 7

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person.

**<u>Distribution</u>**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

CAR 0263

| | |
|---|---|
| **From:** | Saved by Windows Internet Explorer 7 |
| **Sent:** | Thursday, December 16, 2010 3:59 PM |
| **Subject:** | Bill Text - 111th Congress (2009-2010) - THOMAS (Library of Congress) |
| **Attachments:** | Untitled attachment 00002.gif; Untitled attachment 00005.gif; Untitled attachment 00008.gif; Untitled attachment 00011.gif; Untitled attachment 00014.gif; Untitled attachment 00017.css; Untitled attachment 00020.css; Untitled attachment 00023.css; Untitled attachment 00026.dat; Untitled attachment 00029.dat; Untitled attachment 00032.dat; Untitled attachment 00035.dat; Untitled attachment 00038.dat; Untitled attachment 00041.dat |

- 
- 

HR 5281 EAH

### *In the House of Representatives, U. S.,*
*December 8, 2010.*

*Resolved,* That the House agree to the amendments numbered 1 and 2 of the Senate to the bill (H.R. 5281) entitled `An Act to amend title 28, United States Code, to clarify and improve certain provisions relating to the removal of litigation against Federal officers or agencies to Federal courts, and for other purposes.' and be it further

*Resolved,* That the House agree to the amendment numbered 3 of the Senate to the aformentioned bill, with the following

HOUSE AMENDMENT TO SENATE AMENDMENT:

At the end of the matter proposed to be inserted by the Senate amendment numbered 3, add the following:

## *SEC. 4. SHORT TITLE.*

*Notwithstanding section 1, sections 5 through 16 of this Act may be cited as the `Development, Relief, and Education for Alien Minors Act of 2010' or the `DREAM Act of 2010'.*

## *SEC. 5. DEFINITIONS.*

*In this section and sections 6 through 16 of this Act:*
> *(1) IN GENERAL- Except as otherwise specifically provided, a term used in this section and section 6 through 16 of this Act that is used in the immigration laws shall have the meaning given such term in the immigration laws.*
> *(2) ARMED FORCES- The term `Armed Forces' has the meaning given the term `armed forces' in section 101(a) of title 10, United States Code.*
> *(3) CONDITIONAL NONIMMIGRANT-*

1

CAR 0264

(A) DEFINITION- The term `conditional nonimmigrant' means an alien who is granted conditional nonimmigrant status under this Act.

(B) DESCRIPTION- A conditional nonimmigrant--

(i) shall be considered to be an alien within a nonimmigrant class for purposes of the immigration laws;

(ii) may have the intention permanently to reside in the United States; and

(iii) is not required to have a foreign residence which the alien has no intention of abandoning.

(4) IMMIGRATION LAWS- The term `immigration laws' has the meaning given such term in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17)).

(5) INSTITUTION OF HIGHER EDUCATION- The term `institution of higher education' has the meaning given such term in section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002), except that the term does not include an institution of higher education outside the United States.

## SEC. 6. CANCELLATION OF REMOVAL OF CERTAIN LONG-TERM RESIDENTS WHO ENTERED THE UNITED STATES AS CHILDREN.

(a) Special Rule for Certain Long-term Residents Who Entered the United States as Children-

(1) IN GENERAL- Notwithstanding any other provision of law and except as otherwise provided in this section and sections 7 through 16 of this Act, the Secretary of Homeland Security may cancel removal of an alien who is inadmissible or deportable from the United States, and grant the alien conditional nonimmigrant status, if the alien demonstrates by a preponderance of the evidence that--

(A) the alien has been physically present in the United States for a continuous period of not less than 5 years immediately preceding the date of the enactment of this Act and was younger than 16 years of age on the date the alien initially entered the United States;

(B) the alien has been a person of good moral character since the date the alien initially entered the United States;

(C) subject to paragraph (2), the alien--

(i) is not inadmissible under paragraph (1), (2), (3), (4), (6)(E), (6)(G), (8), (10)(A), (10)(C), or (10)(D) of section 212(a) of the Immigration and Nationality Act (8 U.S.C. 1182(a));

(ii) is not deportable under paragraph (1)(E), (1)(G), (2), (4), (5), or (6) of section 237(a) of the Immigration and Nationality Act (8 U.S.C. 1227(a));

(iii) has not ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(iv) has not been convicted of--

(I) any offense under Federal or State law punishable by a maximum term of imprisonment of more than 1 year; or

(II) 3 or more offenses under Federal or State law, for which the alien was convicted on different dates for each of the 3 offenses and sentenced to imprisonment for an aggregate of 90 days or more;

(D) the alien--

(i) has been admitted to an institution of higher education in the United States; or

(ii) has earned a high school diploma or obtained a general education development certificate in the United States;

(E) the alien has never been under a final administrative or judicial order of exclusion, deportation, or removal, unless the alien--

(i) has remained in the United States under color of law after such order was issued; or

2

CAR 0265

*(ii) received the order before attaining the age of 16 years; and*

*(F) the alien was younger than 30 years of age on the date of the enactment of this Act.*

*(2) WAIVER- With respect to any benefit under this section and sections 7 through 16 of this Act, the Secretary of Homeland Security may waive the ground of inadmissibility under paragraph (1), (4), or (6) of section 212(a) of the Immigration and Nationality Act (8 U.S.C. 1182(a)) and the ground of deportability under paragraph (1) of section 237(a) of that Act (8 U.S.C. 1227(a)) for humanitarian purposes or family unity or when it is otherwise in the public interest.*

*(3) PROCEDURES- The Secretary of Homeland Security shall provide a procedure by regulation allowing eligible individuals to apply affirmatively for the relief available under this subsection without being placed in removal proceedings.*

*(4) SURCHARGE- The Secretary of Homeland Security shall charge and collect a surcharge of $525 per application on all applications for relief under this subsection. Such surcharge shall be in addition to the otherwise applicable application fee imposed for the purpose of recovering the full costs of providing adjudication and processing services. Notwithstanding any other provision of law, including section 286 of the Immigration and Nationality Act (8 U.S.C. 1356), any surcharge collected under this paragraph shall be deposited as offsetting receipts in the General Fund of the Treasury and shall not be available for obligation or expenditure.*

*(5) DEADLINE FOR SUBMISSION OF APPLICATION- An alien shall submit an application for cancellation of removal and conditional nonimmigrant status under this subsection no later than the date that is 1 year after the later of--*

*(A) the date the alien earned a high school diploma or obtained a general education development certificate in the United States; or*

*(B) the effective date of the interim regulations under subsection (d).*

*(6) SUBMISSION OF BIOMETRIC AND BIOGRAPHIC DATA- The Secretary of Homeland Security may not cancel the removal of an alien or grant conditional nonimmigrant status to the alien under this subsection unless the alien submits biometric and biographic data, in accordance with procedures established by the Secretary. The Secretary shall provide an alternative procedure for applicants who are unable to provide such biometric or biographic data because of a physical impairment.*

*(7) BACKGROUND CHECKS-*

*(A) REQUIREMENT FOR BACKGROUND CHECKS- The Secretary of Homeland Security shall utilize biometric, biographic, and other data that the Secretary determines is appropriate--*

*(i) to conduct security and law enforcement background checks of an alien seeking relief available under this subsection; and*

*(ii) to determine whether there is any criminal, national security, or other factor that would render the alien ineligible for such relief.*

*(B) COMPLETION OF BACKGROUND CHECKS- The security and law enforcement background checks required by subparagraph (A) shall be completed, to the satisfaction of the Secretary, prior to the date the Secretary cancels the removal of the alien under this subsection.*

*(8) MEDICAL EXAMINATION- An alien applying for relief available under this subsection shall undergo a medical observation and examination. The Secretary of Homeland Security, with the concurrence of the Secretary of Health and Human Services, shall prescribe policies and procedures for the nature and timing of such observation and examination.*

*(9) MILITARY SELECTIVE SERVICE- An alien applying for relief available under this subsection shall establish that the alien has registered under the Military Selective Service Act (50 U.S.C. App. 451 et seq.), if the alien is subject to such registration under that Act.*

*(b) Termination of Continuous Period- For purposes of this section, any period of continuous residence or continuous physical presence in the United States of an alien who applies for cancellation of removal*

3

CAR 0266

*under subsection (a) shall not terminate when the alien is served a notice to appear under section 239(a) of the Immigration and Nationality Act (8 U.S.C. 1229(a)).*

*(c) Treatment of Certain Breaks in Presence-*

*(1) IN GENERAL- An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsection (a) if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.*

*(2) EXTENSIONS FOR EXCEPTIONAL CIRCUMSTANCES- The Secretary of Homeland Security may extend the time periods described in paragraph (1) if the alien demonstrates that the failure to timely return to the United States was due to exceptional circumstances. The exceptional circumstances determined sufficient to justify an extension should be no less compelling than serious illness of the alien, or death or serious illness of a parent, grandparent, sibling, or child.*

*(d) Regulations-*

*(1) INITIAL PUBLICATION- Not later than 180 days after the date of the enactment of this Act, the Secretary of Homeland Security shall publish regulations implementing this section.*

*(2) INTERIM REGULATIONS- Notwithstanding section 553 of title 5, United States Code, the regulations required by paragraph (1) shall be effective, on an interim basis, immediately upon publication but may be subject to change and revision after public notice and opportunity for a period of public comment.*

*(3) FINAL REGULATIONS- Within a reasonable time after publication of the interim regulations in accordance with paragraph (1), the Secretary of Homeland Security shall publish final regulations implementing this section.*

*(e) Removal of Alien- The Secretary of Homeland Security may not remove any alien who--*

*(1) has a pending application for conditional nonimmigrant status under this Act; and*

*(2) establishes prima facie eligibility for cancellation of removal and conditional nonimmigrant status under subsection (a).*

## SEC. 7. CONDITIONAL NONIMMIGRANT STATUS.

*(a) Length of Status- Conditional nonimmigrant status granted under section 6 shall be valid for an initial period of 5 years, subject to termination under subsection (c) of this section.*

*(b) Terms of Conditional Nonimmigrant Status-*

*(1) EMPLOYMENT- A conditional nonimmigrant shall be authorized to be employed in the United States incident to conditional nonimmigrant status.*

*(2) TRAVEL- A conditional nonimmigrant may travel outside the United States and may be admitted (if otherwise admissible) upon return to the United States without having to obtain a visa if--*

*(A) the alien is the bearer of valid, unexpired documentary evidence of conditional nonimmigrant status; and*

*(B) the alien's absence from the United States was not for a period exceeding 180 days.*

*(c) Termination of Status-*

*(1) IN GENERAL- The Secretary of Homeland Security shall terminate the conditional nonimmigrant status of any alien if the Secretary determines that the alien--*

*(A) ceases to meet the requirements of subparagraph (B) or (C) of section 6(a)(1);*

*(B) has become a public charge; or*

*(C) has received a dishonorable or other than honorable discharge from the Armed Forces.*

*(2) RETURN TO PREVIOUS IMMIGRATION STATUS- Any alien whose conditional nonimmigrant status is terminated under paragraph (1) shall return to the immigration status the alien had immediately prior to receiving conditional nonimmigrant status.*

CAR 0267

*(d) Extension of Status-*

*(1) ELIGIBILITY- The Secretary of Homeland Security shall extend the conditional nonimmigrant status of an alien for a second period of 5 years if the following requirements are met:*

*(A) The alien has demonstrated good moral character during the entire period the alien has been a conditional nonimmigrant.*

*(B) The alien is in compliance with section 6(a)(1)(C).*

*(C) The alien has not abandoned the alien's residence in the United States. For purposes of this subparagraph--*

*(i) the Secretary shall presume that the alien has abandoned such residence if the alien is absent from the United States for more than 365 days, in the aggregate, during the period of conditional nonimmigrant status, unless the alien demonstrates that the alien has not abandoned the alien's residence; and*

*(ii) an alien who is absent from the United States due to active service in the Armed Forces has not abandoned the alien's residence in the United States during the period of such service.*

*(D) The alien--*

*(i) has acquired a degree from an institution of higher education in the United States or has completed at least 2 years, in good standing, in a program for a bachelor's degree or higher degree in the United States; or*

*(ii) has served in the Armed Forces for at least 2 years and, if discharged, has received an honorable discharge.*

*(E) The alien has provided a list of each secondary school (as that term is defined in section 9101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801)) that the alien attended in the United States.*

*(2) SURCHARGE- The Secretary of Homeland Security shall charge and collect a surcharge of $2,000 per application on all applications for an extension under this subsection. Such surcharge shall be in addition to the otherwise applicable application fee imposed for the purpose of recovering the full costs of providing adjudication and processing services. Notwithstanding any other provision of law, including section 286 of the Immigration and Nationality Act (8 U.S.C. 1356), any surcharge collected under this paragraph shall be deposited as offsetting receipts in the General Fund of the Treasury and shall not be available for obligation or expenditure.*

*(3) HARDSHIP EXCEPTION- The Secretary of Homeland Security may, in the Secretary's discretion, extend the conditional nonimmigrant status of an alien if the alien--*

*(A) satisfies the requirements of subparagraphs (A), (B), and (C) of paragraph (1);*

*(B) demonstrates compelling circumstances for the inability to complete the requirements described in paragraph (1)(D); and*

*(C) demonstrates that the alien's removal from the United States would result in exceptional and extremely unusual hardship to the alien or the alien's spouse, parent, or child who is a citizen or a lawful permanent resident of the United States.*

## SEC. 8. ADJUSTMENT OF STATUS.

*(a) In General- A conditional nonimmigrant may file with the Secretary of Homeland Security, in accordance with subsection (c), an application to have the alien's status adjusted to that of an alien lawfully admitted for permanent residence. The application shall provide, under penalty of perjury, the facts and information so that the Secretary may make the determination described in subsection (b)(1).*

*(b) Adjudication of Application for Adjustment of Status-*

CAR 0268

(1) IN GENERAL- If an application is filed in accordance with subsection (a) for an alien, the Secretary of Homeland Security shall make a determination as to whether the alien meets the requirements set out in paragraphs (1) through (4) of subsection (d).

(2) ADJUSTMENT OF STATUS IF FAVORABLE DETERMINATION- If the Secretary determines that the alien meets such requirements, the Secretary shall notify the alien of such determination and adjust the alien's status to that of an alien lawfully admitted for permanent residence, effective as of the date of approval of the application.

(3) TERMINATION IF ADVERSE DETERMINATION- If the Secretary determines that the alien does not meet such requirements, the Secretary shall notify the alien of such determination and terminate the conditional nonimmigrant status of the alien as of the date of the determination.

(c) Time to File Application- An alien shall file an application for adjustment of status during the period beginning 1 year before and ending on either the date that is 10 years after the date of the initial grant of conditional nonimmigrant status or any other expiration date of the conditional nonimmigrant status as extended by the Secretary of Homeland Security in accordance with this Act. The alien shall be deemed to be in conditional nonimmigrant status in the United States during the period in which such application is pending.

(d) Contents of Application- Each application for an alien under subsection (a) shall contain information to permit the Secretary of Homeland Security to determine whether each of the following requirements is met:

(1) The alien has demonstrated good moral character during the entire period the alien has been a conditional nonimmigrant.

(2) The alien is in compliance with section 6(a)(1)(C).

(3) The alien has not abandoned the alien's residence in the United States. For purposes of this paragraph--

(A) the Secretary shall presume that the alien has abandoned such residence if the alien is absent from the United States for more than 730 days, in the aggregate, during the period of conditional nonimmigrant status, unless the alien demonstrates that the alien has not abandoned the alien's residence; and

(B) an alien who is absent from the United States due to active service in the Armed Forces has not abandoned the alien's residence in the United States during the period of such service.

(4) If previously granted a hardship exception under section 7(d)(3) from the requirements of section 7(d)(1)(D) with respect to extension of conditional nonimmigrant status, the alien has subsequently complied with such requirements, unless the alien is granted a hardship exception with respect to adjustment of status under the criteria described in section 7(d)(3).

(e) Citizenship Requirement-

(1) IN GENERAL- Except as provided in paragraph (2), the status of a conditional nonimmigrant shall not be adjusted to permanent resident status unless the alien demonstrates that the alien satisfies the requirements of section 312(a) of the Immigration and Nationality Act (8 U.S.C. 1423(a)).

(2) EXCEPTION- Paragraph (1) shall not apply to an alien who is unable because of a physical or developmental disability or mental impairment to meet the requirements of such paragraph.

(f) Payment of Federal Taxes-

(1) IN GENERAL- Not later than the date on which an application is filed under subsection (a) for adjustment of status, the alien shall satisfy any applicable Federal tax liability due and owing on such date.

(2) APPLICABLE FEDERAL TAX LIABILITY- For purposes of paragraph (1), the term `applicable Federal tax liability' means liability for Federal taxes imposed under the Internal Revenue Code of 1986, including any penalties and interest thereon.

(g) Submission of Biometric and Biographic Data- The Secretary of Homeland Security may not adjust the status of an alien under this section unless the alien submits biometric and biographic data, in

CAR 0269

*accordance with procedures established by the Secretary. The Secretary shall provide an alternative procedure for applicants who are unable to provide such biometric or biographic data because of a physical impairment.*

*(h) Background Checks-*

 *(1) REQUIREMENT FOR BACKGROUND CHECKS- The Secretary of Homeland Security shall utilize biometric, biographic, and other data that the Secretary determines appropriate--*

  *(A) to conduct security and law enforcement background checks of an alien applying for adjustment of status under this section; and*

  *(B) to determine whether there is any criminal, national security, or other factor that would render the alien ineligible for such adjustment of status.*

 *(2) COMPLETION OF BACKGROUND CHECKS- The security and law enforcement background checks required by paragraph (1) shall be completed, to the satisfaction of the Secretary, prior to the date the Secretary grants adjustment of status.*

*(i) Exemption From Numerical Limitations- Nothing in this section or in any other law may be construed to apply a numerical limitation on the number of aliens who may be eligible for adjustment of status under this section.*

*(j) Eligibility for Naturalization- An alien whose status is adjusted under this section to that of an alien lawfully admitted for permanent residence may be naturalized upon compliance with all the requirements of the immigration laws except the provisions of paragraph (1) of section 316(a) of the Immigration and Nationality Act (8 U.S.C. 1427(a)), if such person immediately preceding the date of filing the application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least 3 years, and has been physically present in the United States for periods totaling at least half of that time and has resided within the State or the district of U.S. Citizenship and Immigration Services in the United States in which the applicant filed the application for at least 3 months. An alien described in this subsection may file the application for naturalization as provided in the second sentence of subsection (a) of section 334 of the Immigration and Nationality Act (8 U.S.C. 1445).*

## SEC. 9. TREATMENT OF ALIENS MEETING REQUIREMENTS FOR EXTENSION OF CONDITIONAL NONIMMIGRANT STATUS.

*If, on the date of the enactment of this Act, an alien has satisfied all the requirements of section 6(a)(1) and section 7(d)(1)(D), the Secretary of Homeland Security may cancel removal and grant conditional nonimmigrant status in accordance with section 6, and may extend conditional nonimmigrant status in accordance with section 7(d). The alien may apply for adjustment of status in accordance with section 8(a) if the alien has met the requirements of subparagraphs (A), (B), and (C) of section 7(d)(1) during the entire period of conditional nonimmigrant status.*

## SEC. 10. EXCLUSIVE JURISDICTION.

*(a) In General- The Secretary of Homeland Security shall have exclusive jurisdiction to determine eligibility for relief under sections 6 through 16 of this Act, except where the alien has been placed into deportation, exclusion, or removal proceedings either prior to or after filing an application for cancellation of removal and conditional nonimmigrant status or adjustment of status under this Act, in which case the Attorney General shall have exclusive jurisdiction and shall assume all the powers and duties of the Secretary until proceedings are terminated, or if a final order of deportation, exclusion, or removal is entered the Secretary shall resume all powers and duties delegated to the Secretary under this Act. If the Secretary grants relief under sections 6 through 16 of this Act, the final order of deportation, exclusion, or removal shall be terminated.*

*(b) Stay of Removal of Certain Aliens Enrolled in Primary or Secondary School-*

CAR 0270

(1) IN GENERAL- The Attorney General shall stay the removal proceedings of any alien who--
(A) meets all the requirements of subparagraphs (A), (B), (C), and (E) of section 6(a)(1);
(B) is at least 12 years of age; and
(C) is enrolled full-time in a primary or secondary school.
(2) ALIENS NOT IN REMOVAL PROCEEDINGS- For aliens who are not in removal proceedings, the Secretary of Homeland Security shall not commence such proceedings with respect to the alien if the alien meets the requirements of subparagraphs (A) through (C) of paragraph (1).
(c) Employment- An alien whose removal is stayed pursuant to subsection (b)(1) may be engaged in employment in the United States consistent with the Fair Labor Standards Act (29 U.S.C. 201 et seq.) and State and local laws governing minimum age for employment.
(d) Lift of Stay- The Attorney General shall lift the stay granted pursuant to subsection (b)(1) if the alien--
(1) is no longer enrolled in a primary or secondary school; or
(2) ceases to meet the requirements of such subsection.

## SEC. 11. PENALTIES FOR FALSE STATEMENTS.

Whoever files an application for any benefit under sections 6 through 16 of this Act and willfully and knowingly falsifies, misrepresents, or conceals a material fact or makes any false or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any false or fraudulent statement or entry, shall be fined in accordance with title 18, United States Code, imprisoned not more than 5 years, or both.

## SEC. 12. CONFIDENTIALITY OF INFORMATION.

(a) Prohibition- Except as provided in subsection (b), no officer or employee of the United States may--
(1) use the information furnished by an individual pursuant to an application filed under sections 6 through 16 of this Act to initiate removal proceedings against any person identified in the application;
(2) make any publication whereby the information furnished by any particular individual pursuant to an application under sections 6 through 16 of this Act can be identified; or
(3) permit anyone other than an officer or employee of the United States Government or, in the case of an application filed under sections 6 through 16 of this Act with a designated entity, that designated entity, to examine such application filed under such sections.
(b) Required Disclosure- The Attorney General or the Secretary of Homeland Security shall provide the information furnished under sections 6 through 16 of this Act, and any other information derived from such furnished information, to--
(1) a Federal, State, tribal, or local law enforcement agency, intelligence agency, national security agency, component of the Department of Homeland Security, court, or grand jury in connection with a criminal investigation or prosecution, a background check conducted pursuant to the Brady Handgun Violence Protection Act (Public Law 103-159; 107 Stat. 1536) or an amendment made by that Act, or for homeland security or national security purposes, if such information is requested by such entity or consistent with an information sharing agreement or mechanism; or
(2) an official coroner for purposes of affirmatively identifying a deceased individual (whether or not such individual is deceased as a result of a crime).
(c) Fraud in Application Process or Criminal Conduct- Notwithstanding any other provision of this section, information concerning whether an alien seeking relief under sections 6 through 16 of this Act has engaged in fraud in an application for such relief or at any time committed a crime may be used or released for immigration enforcement, law enforcement, or national security purposes.

CAR 0271

*(d) Penalty- Whoever knowingly uses, publishes, or permits information to be examined in violation of this section shall be fined not more than $10,000.*

## SEC. 13. HIGHER EDUCATION ASSISTANCE.

*Notwithstanding any provision of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.), with respect to assistance provided under title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.), an alien who is granted conditional nonimmigrant status or lawful permanent resident status under this Act shall be eligible only for the following assistance under such title:*

*(1) Student loans under parts D and E of such title IV (20 U.S.C. 1087a et seq., 1087aa et seq.), subject to the requirements of such parts.*

*(2) Federal work-study programs under part C of such title IV (42 U.S.C. 2751 et seq.), subject to the requirements of such part.*

*(3) Services under such title IV (20 U.S.C. 1070 et seq.), subject to the requirements for such services.*

## SEC. 14. TREATMENT OF CONDITIONAL NONIMMIGRANTS FOR CERTAIN PURPOSES.

*(a) In General- An individual granted conditional nonimmigrant status under this Act shall, while such individual remains in such status, be considered lawfully present for all purposes except--*

*(1) section 36B of the Internal Revenue Code of 1986 (concerning premium tax credits), as added by section 1401 of the Patient Protection and Affordable Care Act (Public Law 111-148); and*

*(2) section 1402 of the Patient Protection and Affordable Care Act (concerning reduced cost sharing; 42 U.S.C. 18071).*

*(b) For Purposes of the 5-year Eligibility Waiting Period Under PRWORA- An individual who has met the requirements under this Act for adjustment from conditional nonimmigrant status to lawful permanent resident status shall be considered, as of the date of such adjustment, to have completed the 5-year period specified in section 403 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. 1613).*

## SEC. 15. MILITARY ENLISTMENT.

*Section 504(b)(1) of title 10, United States Code, is amended by adding at the end the following new subparagraph:*

*`(D) An alien who is a conditional nonimmigrant (as that term is defined in section 5 of the DREAM Act of 2010).'.*

## SEC. 16. GAO REPORT.

*Not later than 7 years after the date of the enactment of this Act, the Comptroller General of the United States shall submit to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives a report setting forth--*

*(1) the number of aliens who were eligible for cancellation of removal and grant of conditional nonimmigrant status under section 6(a);*

*(2) the number of aliens who applied for cancellation of removal and grant of conditional nonimmigrant status under section 6(a);*

*(3) the number of aliens who were granted conditional nonimmigrant status under section 6(a); and*

CAR 0272

*(4) the number of aliens whose status was adjusted to that of an alien lawfully admitted for permanent residence under section 8.*

Attest:

Clerk.

111th CONGRESS
2d Session
**H.R. 5281**
**HOUSE AMENDMENT TO SENATE AMENDMENT**

*END*

## Stay Connected with the Library <u>All ways to connect »</u>

**Find us on**



**Subscribe & Comment**

- <u>RSS & E-Mail</u>
- <u>Blogs</u>

**Download & Play**

- <u>Podcasts</u>
- <u>Webcasts</u>
- <u>iTunes U</u>

<u>About</u> | <u>Press</u> | <u>Site Map</u> | <u>Contact</u> | <u>Accessibility</u> | <u>Legal</u> | <u>External Link Disclaimer</u> | <u>USA.gov</u><u>Speech Enabled</u> ◄»)

CAR 0273

| From: | Olavarria, Esther █████████████████████████████████████████████ |
|-------|------|
| Sent: | Tuesday, June 12, 2012 8:07 AM |
| To: | Escobar, Felicia ███████████████████████ |
| Subject: | FW: |

Below is the section of the law outlining immigration status required for enlistment in armed services.  Basically under 504(b)(1) – nationals (which is defined as citizens), LPRS, and Compact of Free Association folks (Micronesians, etc.). 504(b)(2) allows the Secretary of Defense to enlist others if it is determined to be in the national interest. This is the statutory authority for the creation of the MANVI program – which allows non-immigrants with special skills to enlist and later become citizens.

I will send separately a section from Margaret Stock's testimony on the DREAM Act, which goes into more detail.

## Search 10 U.S.C. § 504 : US Code - Section 504: Persons not qualified

Search by Keyword or Citation

[ Search]

(a) Insanity, Desertion, Felons, Etc. - No person who is insane, intoxicated, or a deserter from an armed force, or who has been convicted of a felony, may be enlisted in any armed force. However, the Secretary concerned may authorize exceptions, in meritorious cases, for the enlistment of deserters and persons convicted of felonies.

(b) Citizenship or Residency. - (1) A person may be enlisted in any armed force only if the person is one of the following:

(A) A national of the United States, as defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).

(B) An alien who is lawfully admitted for permanent residence, as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)).

(C) A person described in section 341 of one of the following compacts:

(i) The Compact of Free Association between the Federated States of Micronesia and the United States (section 201(a) of Public Law 108-188 (117 Stat. 2784; 48 U.S.C. 1921 note)).

(ii) The Compact of Free Association between the Republic of the Marshall Islands and the United States (section 201(b) of Public Law 108-188 (117 Stat. 2823; 48 U.S.C. 1921 note)).

(iii) The Compact of Free Association between Palau and the United States (section 201 of Public Law 99-658 (100 Stat. 3678; 48 U.S.C. 1931 note)).

(2) Notwithstanding paragraph (1), the Secretary concerned may authorize the enlistment of a person not described in paragraph (1) if the Secretary determines that such enlistment is vital to the national interest.

| From: | Olavarria, Esther < ██████████████████████████ > |
|---|---|
| Sent: | Wednesday, June 13, 2012 9:43 AM |
| To: | Escobar, Felicia <██████████████████ ; Moran, Tyler ████████████████████ > |
| Subject: | House DREAM Act |

HR 5281 – [                          **DP**                        ]
[    **DP**    ]

*(iv) has not been convicted of--*
*(I) any offense under Federal or State law punishable by a maximum term of imprisonment of more than 1 year; or*
*(II) 3 or more offenses under Federal or State law, for which the alien was convicted on different dates for each of the 3 offenses and sentenced to imprisonment for an aggregate of 90 days or more;*

| | |
|---|---|
| **From:** | O'CONNOR, KIMBERLY ████████████████████ |
| **Sent:** | Thursday, June 14, 2012 8:56 AM |
| **To:** | Sandweg, John ████████████ |
| **Subject:** | RE: Call me about this tomorrow |
| **Attach:** | CBP.docx |

DRAFT – WORKING DOCUMENT – NOT FOR DISTRIBUTION

A couple of edits.  We will be in the SCIF for the next hour, if you need us call and they will pull us out.

Thanks.

**From:** Sandweg, John ████████████████████
**Sent:** Wednesday, June 13, 2012 11:33 PM
**To:** O'CONNOR, KIMBERLY
**Subject:** Call me about this tomorrow

**CBP**



If CBP personnel have questions about the exercise of prosecutorial discretion described in this memorandum, they should contact their local chief counsel.

John R. Sandweg
Department of Homeland Security
████████████ (cell)

CAR 0276



Secretary

U.S. Department of Homeland Security
Washington, DC 20528

August 18, 2011

The Honorable Dick Durbin
United States Senate
Washington, DC  20510

Dear Senator Durbin:

Thank you for your letter to President Obama regarding the Administration's immigration enforcement policies and the Development, Relief, and Education for Alien Minors (DREAM) Act.  The President has asked me to respond on his behalf.

Over the past two years, the Department of Homeland Security (DHS) has established clear and well-reasoned priorities that govern how DHS uses its immigration enforcement resources.  These priorities focus our resources on enhancing border security and identifying and removing criminal aliens, those who pose a threat to public safety and national security, repeat immigration law violators and other individuals prioritized for removal.  Initially set forth in a March 2010 memorandum from U.S. Immigration and Customs Enforcement (ICE) Director John Morton, these priorities were recently reiterated and clarified in Director Morton's June 17, 2011 memorandum regarding the exercise of prosecutorial discretion by ICE personnel.

While additional work remains, we have made tremendous progress in our effort to focus DHS resources on these enforcement priorities.  Our FY 2010 statistics are illustrative.  In FY 2010, ICE removed 79,000 more aliens who had been convicted of a crime than it did in FY 2008.  As a result, for the first time ever and due to the expansion of the Secure Communities program, over 50 percent of the aliens removed by ICE in a fiscal year were convicted criminals. Of those removed with no confirmed criminal conviction, more than two-thirds were either apprehended at the border or were repeat violators of our immigration laws.  As enforcement directives continue to be implemented, we anticipate that these trends will increase in FY 2011.

The President has said on numerous occasions that it makes no sense to expend our enforcement resources on low-priority cases, such as individuals like those you reference in your letter, who were brought to this country as young children and know no other home.   From a law enforcement and public safety perspective, DHS enforcement resources must continue to be focused on our highest priorities. Doing otherwise hinders our public safety mission—clogging immigration court dockets and diverting DHS enforcement resources away from individuals who pose a threat to public safety.

Accordingly, the June 17, 2011 prosecutorial discretion memorandum is being implemented to ensure that resources are uniformly focused on our highest priorities. Together

CAR 0277

The Honorable Dick Durbin
Page 2

with the Department of Justice (DOJ), we have initiated an interagency working group to execute a case-by-case review of all individuals currently in removal proceedings to ensure that they constitute our highest priorities. The working group will also initiate a case-by-case review to ensure that new cases placed in removal proceedings similarly meet such priorities. In addition, the working group will issue guidance on how to provide for appropriate discretionary consideration to be given to compelling cases involving a final order of removal. Finally, we will work to ensure that the resources saved as a result of the efficiencies generated through this process are dedicated to further enhancing the identification and removal of aliens who pose a threat to public safety.

This case-by-case approach will enhance public safety. Immigration judges will be able to more swiftly adjudicate high priority cases, such as those involving convicted felons. This process will also allow additional federal enforcement resources to be focused on border security and the removal of public safety threats.

Although the process for implementing the June 17 memorandum will focus the Administration's immigration enforcement efforts on high priority cases, it will not provide categorical relief for any group. Thus, this process will not alleviate the need for passage of the DREAM Act or for larger reforms to our immigration laws. President Obama has called the DREAM Act the right thing to do for the young people it would affect, and the right thing to do for the country. Last December, I joined the President and several members of his Cabinet in urging the Congress to pass this important legislation. Earlier this year I was fortunate to be able to testify in favor of the Act. I continue to urge the 112th Congress to pass the DREAM Act as well as other necessary immigration reforms.

Thank you again for your letter. My office would be pleased to provide you with a briefing to discuss this process in greater detail. Identical responses have been sent to the Senators that co-signed your letter. Should you wish additional assistance, please do not hesitate to contact me at (202) 282-8203.

Yours very truly,

Janet Napolitano

Enclosure

CAR 0278

**Background: Implementing an Effective Immigration Enforcement Strategy**

*The Department of Homeland Security (DHS) is focused on smart and effective enforcement of U.S. immigration laws in a manner that best promotes public safety, border security, and the integrity of the immigration system. U.S. Immigration and Customs Enforcement (ICE) has made a number of improvements to better advance its efforts to focus ICE's resources on the removal of individuals who fit within their highest priorities, such as those who pose a threat to public safety or who have flagrantly violated the nation's immigration laws, and to do so in a way that respects civil rights and civil liberties.*

---

- In June 2010, ICE Director John Morton issued a Memorandum entitled "Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens" articulating ICE's commitment to prioritizing the use of its enforcement personnel, detention space, and removal resources to ensure that the removals conducted by the agency promote national security, public safety, and border security—with the removal of aliens who pose a danger to national security or a risk to public safety constituting the highest enforcement priority.

- In August 2010, ICE issued a Memorandum entitled "Guidance Regarding the Handling of Removal Proceedings of Aliens with Pending or Approved Applications or Petitions"—outlining a framework for ICE to request expedited adjudication of an application or petition (I-130) for an alien in removal proceedings that is pending before U.S. Citizenship and Immigration Services (USCIS) if the approval of such an application or petition would provide an immediate basis for relief for the alien.

- On June 17, 2011, ICE Director Morton issued <u>a new memorandum that provides guidance for ICE law enforcement personnel and attorneys</u> regarding their authority to exercise prosecutorial discretion when appropriate – authority designed to help ICE better focus on meeting the priorities of both the agency and the Secure Communities program to use limited resources to target criminals and those that put public safety at risk. This memorandum also directs the exercise of prosecutorial discretion where appropriate to ensure greater consistency in the treatment of individuals who do not fit within ICE's enforcement priorities. Finally, it clarifies that the exercise of discretion is inappropriate in cases involving threats to public safety, national security and other agency priorities.

- On June 17, 2011, ICE announced key improvements to the Secure Communities program.  Secure Communities has proven to be a critical tool for carrying out ICE's enforcement priorities.  To continue to improve the program, DHS and ICE are committed to addressing concerns that have been raised about its operation, including the following reforms:

  - ➤ **Advisory Task Force:** ICE created a new advisory task force that will advise on ways to improve Secure Communities, including making recommendations on how to best focus on individuals who pose a true public safety or national security threat.  This panel is composed of chiefs of police, sheriffs, ICE agents from the field, immigration advocates, and leading academics. The report of this advisory group will provide recommendations on how ICE can adjust the Secure Communities program to mitigate potential impacts on community policing practices and better effectuate ICE priorities.  Currently, the Task Force is conducting field hearings to obtain feedback from communities across the country.  DHS anticipates that their report will be issued in early September. For a full list of committee members, visit: http://www.dhs.gov/files/committees/task-force-on-secure-communities-membership.shtm.

CAR 0279

➢ **Training for States:** ICE and the DHS Office for Civil Rights and Civil Liberties (CRCL) developed new training programs for state and local law enforcement agencies to provide more information about how Secure Communities works and how it relates to civil rights and aliens' rights in the criminal justice system.  <u>The first set of training materials can be accessed here.</u>

➢ **Protecting Victims & Witnesses of Crimes:** At the direction of Secretary of Homeland Security Janet Napolitano, ICE, in consultation with CRCL, developed <u>a new policy specifically to protect victims of domestic violence and other crimes</u> and to ensure that these crimes continue to be reported and prosecuted.  This policy directs all ICE officers and attorneys to exercise appropriate discretion to ensure that immediate victims of and witnesses to crimes are not penalized by removal.  ICE is also working to develop additional tools that will help identify people who may be victims, witnesses, or members of a vulnerable class so officers can exercise appropriate discretion.

➢ **Detainer Form:** ICE <u>revised the detainer form</u> that it sends to local jurisdictions to request that an alien be held for ICE to interview, to emphasize the longstanding guidance that state and local authorities are not to detain an individual for more than 48 hours (excluding weekends and holidays).  Once implemented (likely in September 2011) the form will also require local law enforcement to provide arrestees with a copy, which includes an explanation of how to make a complaint in six languages and a number to call if the arrestee believes his or her civil rights have been violated in a manner connected to immigration enforcement.

➢ **Civil Rights Complaints:**  ICE and CRCL created a <u>new complaint system</u> whereby individuals or organizations who believe civil rights violations connected to Secure Communities have occurred can <u>file a complaint</u>. For example, CRCL will investigate complaints of racial or ethnic discrimination by policing jurisdictions for which Secure Communities has been activated, and DHS will take steps to ensure that bias or other abuses do not affect immigration enforcement.

➢ **Data Collection and Monitoring:**  ICE and CRCL created an ongoing quarterly <u>statistical review</u> of the program to examine data for each jurisdiction where Secure Communities is activated to identify effectiveness and any indications of potentially improper use of the program.  Statistical outliers in local jurisdictions will be subject to an in-depth analysis, and DHS and ICE will take appropriate steps to resolve any issues.

• On August 18, 2011, DHS unveiled a new interagency process to ensure that resources are focused on the Administration's highest enforcement priorities.  As part of this process, an interagency team of DHS and Department of Justice (DOJ) officers and attorneys, including representatives from throughout DHS and from the Executive Office for Immigration Review (EOIR) and the Office of Immigration Litigation at DOJ, will identify low-priority removal cases that should be considered for an exercise of discretion.  This review will be conducted on a case-by-case basis and will consider cases that are at the various stages of enforcement proceedings, including charging, hearing, and after a final order of removal.  The interagency working group will also issue guidance to prevent low priority cases from entering the system on a case-by-case basis.  Resources that are saved as a result of this process will be used to accelerate the removal of high priority cases.

**From:**    O'CONNOR, KIMBERLY █████████████████

**Sent:**    Monday, June 11, 2012 10:58 AM

**To:**    Sandweg, John ███████████████

**Subject:**    Fw: Deferred departure form

**Attach:**    CISOmbudsman_RR_32_O_Deferred_Action_04-06-07.pdf

---

Sorry for forwarding, haven't had a chance to review.

Will be in the Dubai meeting for the next 90 min.

---

**From:** HARN, GRADY J
**To**: O'CONNOR, KIMBERLY
**Sent:** Mon Jun 11 10:31:36 2012
**Subject:** FW: Deferred departure form

Is this what you are looking for?

---

**From:** HORNE, PETRA
**Sent:** Monday, June 11, 2012 10:31 AM
**To:** HARN, GRADY J
**Cc:** WAGNER, JOHN P; HORNE, PETRA
**Subject:** RE: Deferred departure form

Grady – Below is the definition of deferred action.  Example attached.


 Q. What is deferred action?
A. Deferred action is an exercise of prosecutorial discretion not to pursue removal from the United States of a particular foreigner for a specific period. Deferred action is not intended to be a permanent remedy for this situation; rather it is a temporary discretionary solution. The grant of deferred action by USCIS does not confer or alter any immigration status. It does not affect any period of prior unlawful presence. The grant of deferred action does not convey or imply any waivers of inadmissibility that may exist, regardless of whether or not that inadmissibility is known to DHS at the time of the request for deferred action. Likewise, deferred action cannot be used to establish eligibility for any immigration benefit that requires maintenance of lawful status. Periods of time in deferred action do, however, qualify as periods of stay authorized by the Secretary for purposes of sections 212(a)(9)(B) and (C) of the Immigration and Nationality Act [INA]. Aliens with deferred action may apply for an Employment Authorization Document (EAD) if they can establish an economic necessity for employment.


Petra Horne
Director, Enforcement Programs
Office of Field Operations
Customs and Border Protection

██████████ (bb)
-----Original Message-----
From: HARN, GRADY J
Sent: Monday, June 11, 2012 10:13 AM
To: HORNE, PETRA
Subject: RE: Deffered departure form

CAR 0281

Yea do you have any background on this?  Is there a form or something?

Grady Harn

Senior Advisor

Office of the Commissioner

U.S. Customs and Border Protection

D: ████████████

████████████████

-----Original Message-----
From: HORNE, PETRA
Sent: Monday, June 11, 2012 10:09 AM
To: HARN, GRADY J
Subject: Re: Deffered departure form

Deferred enforced departure?

----- Original Message -----
From: HARN, GRADY J
To: HORNE, PETRA
Sent: Mon Jun 11 10:02:26 2012
Subject: Deffered departure form

Are you familiar with this?

CAR 0282

| **From:** | Munoz-Acevedo, Carlos ███████████████████████ |
| **Sent:** | Wednesday, April 25, 2012 1:02 PM |
| **To:** | Olavarria, Esther ████████████████████████ |
| **Subject:** | FW: ICE Statistics Case-By-Case PD Review |
| **Attach:** | Case-by-Case Review Statistics 04 24 12.pdf |

Esther FYI updates on PD. I assume you probably have received this already but sending just in case. It may be helpful tomorrow.

Best,

Carlos Muñoz-Acevedo
DHS CRCL
W: ████████████
C: ████████████

```
This message may contain agency deliberative communications, privacy information or other
information that may be privileged and exempt from disclosure outside the agency or to the
public.  Please consult with the US Department of Homeland Security, Office for Civil
Rights and Civil Liberties and the Office of General Counsel before disclosing any
information contained in this email.
```

**From:** Strait, Andrew R ████████████████████████
**Sent:** Wednesday, April 25, 2012 8:12 AM
**To:** Kessler, Tamara; Shuchart, Scott
**Subject:** FW: ICE Statistics Case-By-Case PD Review
**Importance:** High

FYI

**From:** Strait, Andrew R
**Sent:** Wednesday, April 25, 2012 8:08 AM
**To:** 'Jane Zurnamer'; 'Nystrom, Brittney'; Alexis Perlmutter
**Cc:** jlin@████████ 'Greg Chen'; Mack, Megan ████████████████████ McNulty, Claire; Jaramillo, Melissa A
**Subject:** ICE Statistics Case-By-Case PD Review
**Importance:** High

Jane et al.

Given that our next meeting is not until May 18, 2012 I did want to share some information with working groups members on where ICE was with the case-by-case prosecutorial discretion review.  Please see attached.  Some highlights include:

- In total, ICE has reviewed 219,554 pending cases with approximately 16,544, or 7.5%, identified as amenable for prosecutorial discretion as of April 16, 2012.
- 179,518 pending non-detained cases have been reviewed with approximately 16,518, or 9%, identified as amenable for prosecutorial discretion.
- As of March 19, 2012, Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,273 cases in fiscal year 2012.
- In fiscal year 2012 YTD, ICE removed over 102,000 individuals convicted of a crime.

CAR 0283

**<u>Please share with Working Group Members Only</u>**.  In addition, the statistics in the attached document are the full extent of what we can share, so I will not be able to provide further breakdowns.

Thank you,
Andrew

_____

**Andrew Lorenzen-Strait**
Public Advocate
Office of Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

 - Direct
- BlackBerry
- Cell

- Direct Email
EROPublicAdvocate@ice.dhs.gov - General Email
www.ice.gov/about/offices/enforcement-removal-operations/publicadvocate/

## **Case-by-Case Review Statistics**

### *Case-by-Case Review and Administrative Closures*

- In total, ICE has reviewed 219,554 pending cases with approximately 16,544, or 7.5%, identified as amenable for prosecutorial discretion as of April 16, 2012.

- 179,518 pending non-detained cases have been reviewed with approximately 16,518, or 9%, identified as amenable for prosecutorial discretion.

- 40,036 pending detained cases have been reviewed with approximately 26, or less than 1%, identified as amenable for prosecutorial discretion.

- Of the 16,518 pending non-detained cases identified as amenable for prosecutorial discretion, 2,722 cases have been administratively closed.  These cases involve –

  o 8 individuals who are a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;
  o 175 individuals who are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent);
  o 182 individuals who came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States;
  o 23 individuals who are over the age of sixty-five and have been in the United States for more than ten years;
  o 60 individuals who have been the victim of domestic violence in the United States, human trafficking to the United States; or of any serious crime in the United States;
  o 16 individuals who have been lawful permanent residents for ten years or more and have a single, minor conviction for a non-violent offense;
  o 100 individuals who suffer from a serious mental physical condition that would require significant medical or detention resources;
  o 2,055 who have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States; and
  o 103 individuals who constitute a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

### *Deferred Action and Stays*

- While administrative closure is the "preferred mechanism" for exercising discretion in the case-by-case review process, deferred action will be continue to be utilized in

appropriate cases as is set forth in Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

- As of March 19, 2012, Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,273 cases in fiscal year 2012.
- Of those 1,273 deferred actions or stays, 1,233 involved individuals subject to a final order of removal.
- In fiscal year 2010, ERO officers granted deferred actions or issued a stay of a final order in 486 cases; in fiscal year 2009 ERO officers granted 740 deferred actions; in fiscal year 2008 ERO officers granted 1006 deferred actions; in fiscal year 2007 ERO officers granted 598 deferred actions.*

***Employment Authorization Cards Issued Pursuant to Prosecutorial Discretion Policies***

- Eligibility for employment authorization is governed by longstanding law.  Individuals are not eligible for work authorization on the basis of receiving administrative closure alone.  Similarly, individuals who were eligible for a work authorization card prior to the case-by-case review remain eligible after their case has been administratively closed.

***Priority Cases Accelerated Pursuant to this Process and the Implementation of Enforcement Priorities***

- In fiscal year 2012 YTD, ICE removed over 102,000 individuals convicted of a crime.
- In fiscal year 2011, ICE removed 216,698 criminals, an 89 percent increase in the removal of criminals from fiscal year 2008.
- Overall, over 90 percent of all ICE removals in fiscal year 2011 fell into one of ICE's categories for priority enforcement.

* Due to upgrades to ICE's electronic system for tracking enforcement actions which affected how this data is recorded, the data from FY2012 are not directly comparable to the data from FY2008-FY2010.  Because of these upgrades, ICE is not currently able to calculate FY2011 deferred action numbers.

CAR 0286



Secretary

U.S. Department of Homeland Security
Washington, DC 20528

## Homeland Security

June 15, 2012

MEMORANDUM FOR:    David V. Aguilar
                   Acting Commissioner, U.S. Customs and Border Protection

                   Alejandro Mayorkas
                   Director, U.S. Citizenship and Immigration Services

                   John Morton
                   Director, U.S. Immigration and Customs Enforcement

FROM:              Janet Napolitano
                   Secretary of Homeland Security

SUBJECT:           Exercising Prosecutorial Discretion with Respect to Individuals
                   Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

www.dhs.gov    CAR 0287

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

2

CAR 0288

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.  It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law.  I have done so here.

Janet Napolitano

3

CAR 0289

# THE WHITE HOUSE OFFICE
## REFERRAL

July 01, 2011

TO:  DEPARTMENT OF HOMELAND SECURITY

**ACTION COMMENTS:**

**ACTION REQUESTED:**   DIRECT REPLY W/COPY

**REFERRAL COMMENTS:**

**DESCRIPTION OF INCOMING:**

| | |
|---|---|
| **ID:** | 1058491 |
| **MEDIA:** | LETTER |
| **DOCUMENT DATE:** | June 24, 2011 |
| **TO:** | PRESIDENT OBAMA |
| **FROM:** | THE HONORABLE LLOYD DOGGETT<br>U.S. HOUSE OF REPRESENTATIVES<br>WASHINGTON, DC 20515 |
| **SUBJECT:** | WRITES WITH COMMENT CONCERNING THE DREAM ACT |

RECEIVED BY DHS EXEC SE
2011 JUL 12  AM 9: 53

**COMMENTS:** _____

_____

_____

PROMPT ACTION IS ESSENTIAL -- IF REQUIRED ACTION HAS NOT BEEN TAKEN WITHIN 9 WORKING DAYS OF RECEIPT, UNLESS OTHERWISE STATED, PLEASE TELEPHONE THE UNDERSIGNED AT (202) 456-2590.

RETURN ORIGINAL CORRESPONDENCE, WORKSHEET AND COPY OF RESPONSE (OR DRAFT) TO: DOCUMENT TRACKING UNIT, ROOM 86, OFFICE OF RECORDS MANAGEMENT - THE WHITE HOUSE, 20500
FAX A COPY OF REPONSE TO: (202) 456-6981

CAR 0290

# THE WHITE HOUSE
## DOCUMENT MANAGEMENT AND
## TRACKING WORKSHEET



**DATE RECEIVED:** June 30, 2011                                    **CASE ID: 1058491**

**NAME OF CORRESPONDENT:** THE HONORABLE LLOYD DOGGETT

**SUBJECT:**       WRITES WITH COMMENT CONCERNING THE DREAM ACT

| ROUTE TO: AGENCY/OFFICE | (STAFF NAME) | ACTION | | DISPOSITION | | |
|---|---|---|---|---|---|---|
| | | CODE | DATE | TYPE RESPONSE | CODE | DATE COMPLETED |
| LEGISLATIVE AFFAIRS | ROB NABORS | ORG | 06/30/2011 | | | |

ACTION COMMENTS:  √ DHS                              R  7/1/11

ACTION COMMENTS:

ACTION COMMENTS:

ACTION COMMENTS:

ACTION COMMENTS:

**COMMENTS:**

**MEDIA TYPE:** LETTER                          **USER CODE:**

| ACTION CODES | DISPOSITION | | |
|---|---|---|---|
| | TYPE RESPONSE | DISPOSITION CODES | COMPLETED DATE |
| A = APPROPRIATE ACTION<br>B = RESEARCH AND REPORT BACK<br>D = DRAFT RESPONSE<br>I = INFO COPY/NO ACT NECESSARY<br>R = DIRECT REPLY W/ COPY<br>ORG = ORIGINATING OFFICE | INITIALS OF SIGNER (W.H. STAFF)<br>NRN = NO RESPONSE NEEDED<br>OTBE = OVERTAKEN BY EVENTS | A = ANSWERED OR ACKNOWLEDGED<br>C = CLOSED<br>X = INTERIM REPLY | DATE OF ACKNOWLEDGEMENT OR CLOSEOUT DATE (MM/DD/YY) |

KEEP THIS WORKSHEET ATTACHED TO THE ORIGINAL INCOMING LETTER AT ALL TIMES
REFER QUESTIONS TO DOCUMENT TRACKING UNIT (202)-456-2590
SEND ROUTING UPDATES AND COMPLETED RECORDS TO OFFICE OF RECORDS MANAGEMENT - DOCUMENT TRACKING UNIT ROOM 85, EEOB.

Scanned By
ORM



LLOYD DOGGETT
25TH DISTRICT, TEXAS

COMMITTEE ON WAYS AND MEANS

SUBCOMMITTEE ON
HUMAN RESOURCES
RANKING MEMBER

SUBCOMMITTEE ON
TRADE

SUBCOMMITTEE ON
SOCIAL SECURITY

COMMITTEE ON THE BUDGET

WASHINGTON OFFICE:
201 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-4865

DISTRICT OFFICE:
300 EAST 8TH STREET, SUITE 763
AUSTIN, TX 78701
(512) 916-5921

LLOYD.DOGGETT@MAIL.HOUSE.GOV
www.house.gov/doggett
1-866-916-5921

## Congress of the United States
## House of Representatives

June 24, 2011

President Barack Obama
The White House
Washington, DC 20500

Dear Mr. President:

I write to discuss our mutual interest in a talented group of responsible young people with the potential to further enrich our great nation: individuals eligible for immigration relief under the DREAM Act.

I know that you share the desire to enact comprehensive immigration reform legislation as soon as possible, and I appreciate your support for efforts to find solutions to this critical problem facing our nation. While I continue to work toward enactment of comprehensive reform of our immigration system, I have also worked to enact the DREAM Act. This legislation would give a select group of students the chance to earn legal status if they arrived in the United States when they were 15 or younger, have lived in this country for at least five years, have good moral character, are not inadmissible or removable under a number of specified grounds, have graduated from high school or obtained a GED, and attend college or serve in the military for two years.

As you know, the DREAM Act passed the U.S. House of Representatives and received a bipartisan majority vote in the U.S. Senate in December. Unfortunately, the support of 55 senators was not enough to overcome a filibuster by the bill's opponents.

You are the nation's chief law enforcement officer and are, of course, obligated to enforce the law. However, the exercise of prosecutorial discretion in light of law enforcement priorities and limited resources has a long history in this nation and is fully consistent with our strong interest in the rule of law. Your Administration has a strong record of enforcement, having deported a record number of undocumented immigrants last year. At the same time, you have granted deferred action to a small number of DREAM Act students on a case-by-case basis, just as the Bush Administration did. Granting deferred action to DREAM Act students, who are not an enforcement priority for DHS, helps to conserve limited enforcement resources.

I would support a grant of deferred action to all young people who meet the rigorous requirements necessary to be eligible for cancellation of removal or a stay of removal under the DREAM Act, as requested by twenty-two Senators earlier this year. I strongly believe that

CAR 0292

DREAM Act students should not be removed from the United States, because they have great potential to contribute to our country and children should not be punished for their parents' mistakes. As you said in your State of the Union Address, "let's stop expelling talented, responsible young people who could be staffing our research labs or starting a new business, who could be further enriching this nation."

One such example is a young student in my district who plans to graduate from the University of Texas with a degree in Urban Studies and Architecture. Raul Zamora came to the United States with his family at the age of ten and although he considers this great country his home, he is at risk of deportation.

While I applaud the steps you have taken to address concerns with the Secure Communities program, I would also support additional steps short of this that you can take to establish a more orderly and consistent process for handling individual DREAM Act cases.

For example, your administration could establish and publicize a process for DREAM Act students to apply for deferred action. Currently, there is no formal process for applying for deferred action, and many DREAM Act students are unaware of this option. Indeed, the Bush Administration's U.S. Citizenship and Immigration Services Ombudsmen recommended establishing a process for applying for deferred action.

Your administration could also require reporting and tracking of DREAM Act cases. It is my understanding that the Department of Homeland Security (DHS) does not have a process for reporting and tracking DREAM Act cases. As a result, there is no mechanism for ensuring consistent handling of cases by different field offices around the country; no one knows how many DREAM Act eligible individuals are in removal proceedings, how many have applied for deferred action, and how many have been removed. Immigration and Customs Enforcement (ICE) field offices frequently deny requests for deferred action in DREAM Act cases without ICE headquarters' knowledge. Headquarters often only learns about DREAM Act cases from Congressional offices, immigration advocates, or the media, and often requires a private bill or other Congressional action prior to granting deferred action. The Bush Administration's USCIS Ombudsmen also recommended tracking and headquarters review of deferred action requests to help ensure that there is no geographic disparity in approvals or denials of deferred action requests and that like cases are decided in like manner.

Finally, your administration could decide whether to grant deferred action as early as possible in the process of each individual case. Under current practice, DHS typically will not grant deferred action in a DREAM Act case until an individual receives a final order of deportation and frequently not until days or hours before the removal date. This is an inefficient use of limited resources and is inconsistent with long-standing DHS policy. As then-INS Commissioner Doris Meissner explained in "Exercising Prosecutorial Discretion," a November 17, 2000 memorandum that is still official DHS policy: "As a general matter, it is better to exercise favorable discretion as early in the process as possible, once the relevant facts have been determined, in order to conserve the Service's resources and in recognition of the alien's interest in avoiding unnecessary legal proceedings."

Thank you for considering these and other measures that would help to provide a more orderly process for handling the cases of young people who would be eligible for relief under the DREAM Act.  I look forward to working with you on ways I can enable this talented group of young people to contribute to this nation they call home.

Sincerely,

Lloyd Doggett

*Office of Legislative Affairs*

**U.S. Department of Homeland Security**
Washington, DC 20528



**NOV 0 3 2011**

The Honorable Lloyd Doggett
U.S. House of Representatives
Washington, DC 20515

Dear Representative Doggett:

Thank you for your letter to President Obama regarding students who would be eligible for certain types of relief under the Development, Relief, and Education for Alien Minors (DREAM) Act. The White House has asked the Department of Homeland Security (DHS) to respond.

Over the past two years, the Department has established clear and well-reasoned priorities that govern how DHS uses its immigration enforcement resources. These priorities focus our resources on enhancing border security and identifying and removing criminal aliens, those who pose a threat to public safety and national security, repeat immigration law violators and other individuals prioritized for removal. Initially set forth in a March 2010 memorandum from U.S. Immigration and Customs Enforcement (ICE) Director John Morton, these priorities were reiterated and clarified in Director Morton's June 17, 2011 memorandum regarding the exercise of prosecutorial discretion by ICE personnel.

While additional work remains, we have made tremendous progress in our effort to focus DHS resources on these enforcement priorities. In fiscal year (FY) 2011, ICE removed almost 103,000 more aliens who had been convicted of a crime than it did in FY 2008. For the first time, and due in part to the expansion of the Secure Communities Program, nearly 55 percent of the aliens removed by ICE in a fiscal year were convicted criminals. Of those removed with no confirmed criminal conviction, more than two thirds were either apprehended at the border or were repeat violators of our immigration laws. In total, 90 percent of the removals in FY 2011 fell within one of our enforcement priorities.

The President has said on numerous occasions that it does not make sense to expend our enforcement resources on low-priority cases, such as individuals like those referenced in your letter, who were brought to this country as young children and know no other home. Accordingly, the June 17 prosecutorial discretion memorandum is being implemented to ensure that resources are being focused to the greatest extent possible on ICE's immigration enforcement priorities. Together with the Department of Justice, we have initiated an interagency working group to design a case-by-case process for reviewing cases currently pending in immigration court to identify very low priority cases that are clogging the immigration courts' dockets and preventing the quick resolution of high priority cases. The resources saved as a result of the efficiencies generated through this process will be dedicated to further enhancing the identification and removal of aliens who meet ICE's enforcement priorities, including criminal aliens, those who pose a threat to national security or public safety, repeat

CAR 0295

The Honorable Lloyd Doggett
Page 2

immigration law violators, and recent border crossers.  By doing so, this approach will enhance public safety and permit immigration judges to more swiftly adjudicate high priority cases.  It will also allow additional federal enforcement resources to be focused on border security and the removal of public safety threats.

This process will not provide categorical relief for any group, nor will it alleviate the need for passage of the DREAM Act or for larger reforms to our immigration laws.  President Obama has called the DREAM Act the right thing to do for the young people it would affect, and the right thing to do for the country.  The Secretary of Homeland Security joins the President and other members of the Administration in urging the Congress to pass the DREAM Act as well as other necessary immigration reforms.

Thank you again for your letter.  Should you need additional assistance, please do not hesitate to contact me at (202)███████.

Respectfully,

Nelson Peacock
Assistant Secretary
Office of Legislative Affairs

CAR 0296

```
┌─────────────────────────────────────────┐
│     TRANSMISSION VERIFICATION REPORT     │
└─────────────────────────────────────────┘
                              TIME  : 11/01/2011 13:08
                              NAME  :
                              FAX   : 2024475437
                              TEL   : 2024475437
                              SER.# : 000K5J908052
```

```
┌──────────────────────────────────────────────────────────────────┐
│   DATE,TIME              11/01  13:07                               │
│   FAX NO./NAME           92022253073                               │
│   DURATION               00:01:00                                  │
│   PAGE(S)                03                                         │
│   RESULT                 OK                                         │
│   MODE                   STANDARD                                  │
│                          ECM                                       │
└──────────────────────────────────────────────────────────────────┘
```



*Office of Legislative Affairs*
**US Department of Homeland Security**
*Washington, DC 20528*
PHONE: 202-447-5890
*FAX: 202-447-5437*

## FACSIMILE TRANSMITTAL SHEET

| | | |
|---|---|---|
| **TO:** *The Honorable Lloyd Doggett* | **FROM:** | |
| **OFFICE:** | **DATE:** | *3-Nov-11* |
| **FAX #:** *202 225 3073* | **TOTAL # OF PAGES INCL. COVER:** | *3* |
| **VOICE #:** | **VOICE NUMBER:** | |

**REF:** *Signed Response Letter*

__ URGENT     __ FOR REVIEW     __ PLEASE COMMENT     __ PLEASE REPLY

**COMMENTS:**

CAR 0297

# THE WHITE HOUSE OFFICE
## REFERRAL

May 20, 2011

TO:  DEPARTMENT OF HOMELAND SECURITY

**ACTION COMMENTS:**

**ACTION REQUESTED:**  APPROPRIATE ACTION

**REFERRAL COMMENTS:**

**DESCRIPTION OF INCOMING:**

ID:                        1055840

**MEDIA:**                 EMAIL

**DOCUMENT DATE:**  April 13, 2011

TO:                        PRESIDENT OBAMA

FROM:                    THE HONORABLE HARRY REID
                          UNITED STATES SENATE
                          WASHINGTON, DC 20510

SUBJECT:               EXPRESSES COMMENT ABOUT THE DREAM ACT

COMMENTS:  _____

_____

_____

PROMPT ACTION IS ESSENTIAL -- IF REQUIRED ACTION HAS NOT BEEN TAKEN WITHIN 9 WORKING DAYS OF RECEIPT, UNLESS OTHERWISE STATED, PLEASE TELEPHONE THE UNDERSIGNED AT (202) 456-2590.

RETURN ORIGINAL CORRESPONDENCE, WORKSHEET AND COPY OF RESPONSE (OR DRAFT) TO: DOCUMENT TRACKING UNIT, ROOM 85, OFFICE OF RECORDS MANAGEMENT - THE WHITE HOUSE, 20500
FAX A COPY OF REPONSE TO: (202) 456-5881

CAR 0298

## THE WHITE HOUSE
## DOCUMENT MANAGEMENT AND
## TRACKING WORKSHEET



**DATE RECEIVED:** May 20, 2011                                            **CASE ID:** 1055840

**NAME OF CORRESPONDENT:** THE HONORABLE HARRY REID

**SUBJECT:**     EXPRESSES COMMENT ABOUT THE DREAM ACT

| ROUTE TO: AGENCY/OFFICE | (STAFF NAME) | ACTION CODE | ACTION DATE | DISPOSITION TYPE RESPONSE | DISPOSITION CODE | DATE COMPLETED |
|---|---|---|---|---|---|---|
| LEGISLATIVE AFFAIRS | ROB NABORS | ORG | 05/20/2011 | | | |
| ACTION COMMENTS: | | | | | | |
| DEPARTMENT OF HOMELAND SECURITY | | A | 05/20/2011 | | | |
| ACTION COMMENTS: | | | | | | |
| | | | | | | |
| ACTION COMMENTS: | | | | | | |
| | | | | | | |
| ACTION COMMENTS: | | | | | | |
| | | | | | | |
| ACTION COMMENTS: | | | | | | |

**COMMENTS:** 21 ADDL SIGNEES

**MEDIA TYPE:** EMAIL                              **USER CODE:**

| ACTION CODES | DISPOSITION | | |
|---|---|---|---|
| | TYPE RESPONSE | DISPOSITION CODES | COMPLETED DATE |
| A = APPROPRIATE ACTION B = RESEARCH AND REPORT BACK D = DRAFT RESPONSE I = INFO COPY/NO ACT NECESSARY R = DIRECT REPLY W/ COPY ORG = ORIGINATING OFFICE | INITIALS OF SIGNER (W.H. STAFF) NRN = NO RESPONSE NEEDED OTBE = OVERTAKEN BY EVENTS | A = ANSWERED OR ACKNOWLEDGED C = CLOSED X = INTERIM REPLY | DATE OF ACKNOWLEDGEMENT OR CLOSEOUT DATE (MM/DD/YY) |

KEEP THIS WORKSHEET ATTACHED TO THE ORIGINAL INCOMING LETTER AT ALL TIMES
REFER QUESTIONS TO DOCUMENT TRACKING UNIT (202)-456-2590
SEND ROUTING UPDATES AND COMPLETED RECORDS TO OFFICE OF RECORDS MANAGEMENT - DOCUMENT TRACKING UNIT ROOM
85, EEOB.

CAR 0299

# United States Senate
WASHINGTON, DC 20510

April 13, 2011

President Barack Obama
The White House
Washington, DC 20500

Dear Mr. President:

We write to discuss our mutual interest in a talented group of responsible young people with the potential to further enrich our great nation: individuals eligible for immigration relief under the DREAM Act.

We know that you share our desire to enact comprehensive immigration reform legislation as soon as possible, and we appreciate your support for our efforts to find solutions to this critical problem facing our nation.  While we continue to work toward enactment of comprehensive reform of our immigration system, we have also fought to enact the DREAM Act.  This legislation would give a select group of students the chance to earn legal status if they arrived in the United States when they were 15 or younger, have lived in this country for at least five years, have good moral character, are not inadmissible or removable under a number of specified grounds, have graduated from high school or obtained a GED, and attend college or serve in the military for two years.

As you know, the DREAM Act passed the U.S. House of Representatives and received a bipartisan majority vote in the U.S. Senate in December.  Unfortunately, the support of 55 senators was not enough to overcome a filibuster by the bill's opponents.  We greatly appreciated your strong support for the DREAM Act last year and look forward to working with you to enact it into law in the 112th Congress.

You are the nation's chief law enforcement officer and are, of course, obligated to enforce the law.  However, the exercise of prosecutorial discretion in light of law enforcement priorities and limited resources has a long history in this nation and is fully consistent with our strong interest in the rule of law.  Your Administration has a strong record of enforcement, having deported a record number of undocumented immigrants last year.  At the same time, you have granted deferred action to a small number of DREAM Act students on a case-by-case basis, just as the Bush Administration did.  Granting deferred action to DREAM Act students, who are not an enforcement priority for DHS, helps to conserve limited enforcement resources.

We would support a grant of deferred action to all young people who meet the rigorous requirements necessary to be eligible for cancellation of removal or a stay of removal under the DREAM Act, as requested on a bipartisan basis by Senators Durbin and Lugar last April. We strongly believe that DREAM Act students should not be removed from the United States, because they have great potential to contribute to our country and children should not be punished for their parents' mistakes. As you said in your State of the Union Address, "let's stop expelling talented, responsible young people who could be staffing our research labs or starting a new business, who could be further enriching this nation."

We would also support steps short of this that you can take to establish a more orderly and consistent process for handling individual DREAM Act cases.

For example, your administration could establish and publicize a process for DREAM Act students to apply for deferred action. Currently, there is no formal process for applying for deferred action, and many DREAM Act students are unaware of this option. Indeed, the Bush Administration's U.S. Citizenship and Immigration Services Ombudsmen recommended establishing a process for applying for deferred action.

Your administration could also require reporting and tracking of DREAM Act cases. It is our understanding that the Department of Homeland Security (DHS) does not have a process for reporting and tracking DREAM Act cases. As a result, there is no mechanism for ensuring consistent handling of cases by different field offices around the country; no one knows how many DREAM Act eligible individuals are in removal proceedings, how many have applied for deferred action, and how many have been removed. Immigration and Customs Enforcement (ICE) field offices frequently deny requests for deferred action in DREAM Act cases without ICE headquarters' knowledge. Headquarters often only learns about DREAM Act cases from Congressional offices, immigration advocates, or the media, and often requires a private bill or other Congressional action prior to granting deferred action. The Bush Administration's USCIS Ombudsmen also recommended tracking and headquarters review of deferred action requests to help ensure that there is no geographic disparity in approvals or denials of deferred action requests and that like cases are decided in like manner.

Finally, your administration could decide whether to grant deferred action as early as possible in the process of each individual case. Under current practice, DHS typically will not grant deferred action in a DREAM Act case until an individual receives a final order of deportation and frequently not until days or hours before the removal date. This is an inefficient use of limited resources and is inconsistent with long-standing DHS policy. As then-INS Commissioner Doris Meissner explained in "Exercising Prosecutorial Discretion," a November 17, 2000 memorandum that is still official DHS policy: "As a general matter, it is better to exercise favorable discretion as early in the process as possible, once the relevant facts have been determined, in order to conserve the Service's resources and in recognition of the alien's interest in avoiding unnecessary legal proceedings."

Thank you for considering these and other measures that would help to provide a more orderly process for handling the cases of young people who would be eligible for relief under

the DREAM Act. We look forward to working with you on ways we can enable this talented group of young people to contribute to this nation they call home.

Sincerely,

Harry Reid
Majority Leader

Dick Durbin
Assistant Majority Leader

Patrick J. Leahy
Chairman, Judiciary Committee

Carl Levin
Chairman, Armed Services Committee

Daniel K. Akaka
U.S. Senator

Mark Begich
U.S. Senator

Michael F. Bennet
U.S. Senator

Jeff Bingaman
U.S. Senator

Richard Blumenthal
U.S. Senator

Barbara Boxer
U.S. Senator

Maria Cantwell
U.S. Senator

Christopher A. Coons
U.S. Senator

CAR 0302

Dianne Feinstein
U.S. Senator

Kirsten E. Gillibrand
U.S. Senator

John F. Kerry
U.S. Senator

Frank R. Lautenberg
U.S. Senator

Joseph I. Lieberman
U.S. Senator

Barbara A. Mikulski
U.S. Senator

Patty Murray
U.S. Senator

Bill Nelson
U.S. Senator

Jack Reed
U.S. Senator

Sheldon Whitehouse
U.S. Senator

CAR 0303



*Secretary*

U.S. Department of Homeland Security
Washington, DC 20528

August 18, 2011

The Honorable Harry Reid
Majority Leader
United States Senate
Washington, DC  20510

Dear Senator Reid:

Thank you for your letter to President Obama regarding the Administration's immigration enforcement policies and the Development, Relief, and Education for Alien Minors (DREAM) Act.  The President has asked me to respond on his behalf.

Over the past two years, the Department of Homeland Security (DHS) has established clear and well-reasoned priorities that govern how DHS uses its immigration enforcement resources.  These priorities focus our resources on enhancing border security and identifying and removing criminal aliens, those who pose a threat to public safety and national security, repeat immigration law violators and other individuals prioritized for removal.  Initially set forth in a March 2010 memorandum from U.S. Immigration and Customs Enforcement (ICE) Director John Morton, these priorities were recently reiterated and clarified in Director Morton's June 17, 2011 memorandum regarding the exercise of prosecutorial discretion by ICE personnel.

While additional work remains, we have made tremendous progress in our effort to focus DHS resources on these enforcement priorities.  Our FY 2010 statistics are illustrative.  In FY 2010, ICE removed 79,000 more aliens who had been convicted of a crime than it did in FY 2008.  As a result, for the first time ever and due to the expansion of the Secure Communities program, over 50 percent of the aliens removed by ICE in a fiscal year were convicted criminals.  Of those removed with no confirmed criminal conviction, more than two-thirds were either apprehended at the border or were repeat violators of our immigration laws.  As enforcement directives continue to be implemented, we anticipate that these trends will increase in FY 2011.

The President has said on numerous occasions that it makes no sense to expend our enforcement resources on low-priority cases, such as individuals like those you reference in your letter, who were brought to this country as young children and know no other home.   From a law enforcement and public safety perspective, DHS enforcement resources must continue to be focused on our highest priorities. Doing otherwise hinders our public safety mission—clogging immigration court dockets and diverting DHS enforcement resources away from individuals who pose a threat to public safety.

CAR 0304

The Honorable Harry Reid
Page 2

Accordingly, the June 17, 2011 prosecutorial discretion memorandum is being implemented to ensure that resources are uniformly focused on our highest priorities. Together with the Department of Justice (DOJ), we have initiated an interagency working group to execute a case-by-case review of all individuals currently in removal proceedings to ensure that they constitute our highest priorities. The working group will also initiate a case-by-case review to ensure that new cases placed in removal proceedings similarly meet such priorities. In addition, the working group will issue guidance on how to provide for appropriate discretionary consideration to be given to compelling cases involving a final order of removal. Finally, we will work to ensure that the resources saved as a result of the efficiencies generated through this process are dedicated to further enhancing the identification and removal of aliens who pose a threat to public safety.

This case-by-case approach will enhance public safety. Immigration judges will be able to more swiftly adjudicate high priority cases, such as those involving convicted felons. This process will also allow additional federal enforcement resources to be focused on border security and the removal of public safety threats.

Although the process for implementing the June 17 memorandum will focus the Administration's immigration enforcement efforts on high priority cases, it will not provide categorical relief for any group. Thus, this process will not alleviate the need for passage of the DREAM Act or for larger reforms to our immigration laws. President Obama has called the DREAM Act the right thing to do for the young people it would affect, and the right thing to do for the country. Last December, I joined the President and several members of his Cabinet in urging the Congress to pass this important legislation. Earlier this year I was fortunate to be able to testify in favor of the Act. I continue to urge the 112th Congress to pass the DREAM Act as well as other necessary immigration reforms.

Thank you again for your letter. My office would be pleased to provide you with a briefing to discuss this process in greater detail. Identical responses have been sent to the Senators that co-signed your letter. Should you wish additional assistance, please do not hesitate to contact me at (202) ███.

Yours very truly,

Janet Napolitano

Enclosure

## Background: Implementing an Effective Immigration Enforcement Strategy

*The Department of Homeland Security (DHS) is focused on smart and effective enforcement of U.S. immigration laws in a manner that best promotes public safety, border security, and the integrity of the immigration system. U.S. Immigration and Customs Enforcement (ICE) has made a number of improvements to better advance its efforts to focus ICE's resources on the removal of individuals who fit within their highest priorities, such as those who pose a threat to public safety or who have flagrantly violated the nation's immigration laws, and to do so in a way that respects civil rights and civil liberties.*

---

- In June 2010, ICE Director John Morton issued a Memorandum entitled "Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens" articulating ICE's commitment to prioritizing the use of its enforcement personnel, detention space, and removal resources to ensure that the removals conducted by the agency promote national security, public safety, and border security—with the removal of aliens who pose a danger to national security or a risk to public safety constituting the highest enforcement priority.

- In August 2010, ICE issued a Memorandum entitled "Guidance Regarding the Handling of Removal Proceedings of Aliens with Pending or Approved Applications or Petitions"—outlining a framework for ICE to request expedited adjudication of an application or petition (I-130) for an alien in removal proceedings that is pending before U.S. Citizenship and Immigration Services (USCIS) if the approval of such an application or petition would provide an immediate basis for relief for the alien.

- On June 17, 2011, ICE Director Morton issued <u>a new memorandum that provides guidance for ICE law enforcement personnel and attorneys</u> regarding their authority to exercise prosecutorial discretion when appropriate – authority designed to help ICE better focus on meeting the priorities of both the agency and the Secure Communities program to use limited resources to target criminals and those that put public safety at risk. This memorandum also directs the exercise of prosecutorial discretion where appropriate to ensure greater consistency in the treatment of individuals who do not fit within ICE's enforcement priorities. Finally, it clarifies that the exercise of discretion is inappropriate in cases involving threats to public safety, national security and other agency priorities.

- On June 17, 2011, ICE announced key improvements to the Secure Communities program.  Secure Communities has proven to be a critical tool for carrying out ICE's enforcement priorities.  To continue to improve the program, DHS and ICE are committed to addressing concerns that have been raised about its operation, including the following reforms:

  ➤ **Advisory Task Force:** ICE created a new advisory task force that will advise on ways to improve Secure Communities, including making recommendations on how to best focus on individuals who pose a true public safety or national security threat.  This panel is composed of chiefs of police, sheriffs, ICE agents from the field, immigration advocates, and leading academics. The report of this advisory group will provide recommendations on how ICE can adjust the Secure Communities program to mitigate potential impacts on community policing practices and better effectuate ICE priorities.  Currently, the Task Force is conducting field hearings to obtain feedback from communities across the country.  DHS anticipates that their report will be issued in early September. For a full list of committee members, visit: http://www.dhs.gov/files/committees/task-force-on-secure-communities-membership.shtm.

CAR 0306

> ➢ **Training for States:** ICE and the DHS Office for Civil Rights and Civil Liberties (CRCL) developed new training programs for state and local law enforcement agencies to provide more information about how Secure Communities works and how it relates to civil rights and aliens' rights in the criminal justice system.  <u>The first set of training materials can be accessed here.</u>

> ➢ **Protecting Victims & Witnesses of Crimes:** At the direction of Secretary of Homeland Security Janet Napolitano, ICE, in consultation with CRCL, developed <u>a new policy specifically to protect victims of domestic violence and other crimes</u> and to ensure that these crimes continue to be reported and prosecuted.  This policy directs all ICE officers and attorneys to exercise appropriate discretion to ensure that immediate victims of and witnesses to crimes are not penalized by removal.  ICE is also working to develop additional tools that will help identify people who may be victims, witnesses, or members of a vulnerable class so officers can exercise appropriate discretion.

> ➢ **Detainer Form:** ICE <u>revised the detainer form</u> that it sends to local jurisdictions to request that an alien be held for ICE to interview, to emphasize the longstanding guidance that state and local authorities are not to detain an individual for more than 48 hours (excluding weekends and holidays).  Once implemented (likely in September 2011) the form will also require local law enforcement to provide arrestees with a copy, which includes an explanation of how to make a complaint in six languages and a number to call if the arrestee believes his or her civil rights have been violated in a manner connected to immigration enforcement.

> ➢ **Civil Rights Complaints:**  ICE and CRCL created a <u>new complaint system</u> whereby individuals or organizations who believe civil rights violations connected to Secure Communities have occurred can <u>file a complaint</u>. For example, CRCL will investigate complaints of racial or ethnic discrimination by policing jurisdictions for which Secure Communities has been activated, and DHS will take steps to ensure that bias or other abuses do not affect immigration enforcement.

> ➢ **Data Collection and Monitoring:**  ICE and CRCL created an ongoing quarterly <u>statistical review</u> of the program to examine data for each jurisdiction where Secure Communities is activated to identify effectiveness and any indications of potentially improper use of the program.  Statistical outliers in local jurisdictions will be subject to an in-depth analysis, and DHS and ICE will take appropriate steps to resolve any issues.

- On August 18, 2011, DHS unveiled a new interagency process to ensure that resources are focused on the Administration's highest enforcement priorities.  As part of this process, an interagency team of DHS and Department of Justice (DOJ) officers and attorneys, including representatives from throughout DHS and from the Executive Office for Immigration Review (EOIR) and the Office of Immigration Litigation at DOJ, will identify low-priority removal cases that should be considered for an exercise of discretion.  This review will be conducted on a case-by-case basis and will consider cases that are at the various stages of enforcement proceedings, including charging, hearing, and after a final order of removal.  The interagency working group will also issue guidance to prevent low priority cases from entering the system on a case-by-case basis.  Resources that are saved as a result of this process will be used to accelerate the removal of high priority cases.

# United States Senate
### WASHINGTON, DC 20510



April 21, 2010

Secretary Janet Napolitano
Department of Homeland Security
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Napolitano:

We respectfully request that you grant deferred action to individuals who would be eligible for cancellation of removal or a stay of removal under S. 729, the DREAM Act, bipartisan immigration reform legislation that we have introduced.

As you know, the DREAM Act would provide immigration relief to a select group of students who arrived in the U.S. when they were 15 or under, have lived in the U.S. for at least five years, have good moral character, are not inadmissible or removable under a number of specified grounds, have graduated from high school or obtained a GED, and attend college or serve in the military for two years.

At a hearing of the Senate Judiciary Committee on May 6, 2009, you testified, "the Dream Act is a good piece of legislation and a good idea." We greatly appreciate your support for the DREAM Act. However, pending enactment, individuals who would be eligible for the DREAM Act are subject to removal, and such cases are currently handled on an ad hoc basis.

Though they are technically out of status, DREAM Act students should not be removed from the United States. The DREAM Act is narrowly tailored to assist only a select group of young people, many of whom came here with their parents at an age when they were too young to understand the consequences of their actions.

Deferred action for DREAM Act students would conserve limited enforcement resources. DREAM Act students are not, and should not be, an enforcement priority for DHS. As then-INS Commissioner Doris Meissner explained in a November 17, 2000 memorandum on "Exercising Prosecutorial Discretion":

Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations. … As a general matter, INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial.

The Meissner memorandum suggests developing a list of "triggers" to "identify cases at an early stage that may be suitable for the exercise of prosecutorial discretion." A number of these factors apply to DREAM Act students, including "Juveniles," "Aliens with lengthy presence in United States," and "Aliens present in the United States since childhood."

CAR 0308

Deferred action for DREAM Act students would not apply to a large number of individuals. Based on information gathered by Senator Durbin's office over the last several years, only a small number of DREAM Act students are placed in removal proceedings. This is probably because these students are well integrated into American society and do not typically engage in behavior that makes them an enforcement priority for DHS.

The current leadership at Immigration and Customs Enforcement has been very helpful in addressing individual DREAM Act cases that have come to our attention. However, deferred action for DREAM Act students would be more efficient than the existing ad hoc system. The decision to grant deferred removal in a DREAM Act case is frequently made shortly before the removal date. This is an inefficient use of limited resources. As the Meissner memorandum states:

> As a general matter, it is better to exercise favorable discretion as early in the process as possible, once the relevant facts have been determined, in order to conserve the Service's resources and in recognition of the alien's interest in avoiding unnecessary legal proceedings.

There is a recent precedent for deferred action for DREAM Act students. In June 2009, DHS granted deferred action to widows of U.S. citizens who were married for less than two years prior to their spouses' death. As you said at the time, "Smart immigration policy balances strong enforcement practices with common-sense, practical solutions to complicated issues." The situation of DREAM Act students is just such a complicated issue which requires the common-sense, practical solution of deferred action.

Thank you for your support of the DREAM Act and for considering our request that you grant deferred action to individuals who would be eligible for the DREAM Act.

Sincerely,

Senator Dick Durbin

Senator Richard Lugar

*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528

 Homeland Security

June 7, 2010

The Honorable Richard Durbin
United States Senate
Washington, DC 20510

Dear Senator Durbin:

Thank you for your April 21, 2010 letter regarding students who would be eligible for certain types of relief under S. 729, the Development, Relief, and Education for Alien Minors (DREAM) Act, were the bill enacted.

U.S. Immigration and Customs Enforcement (ICE) uses its discretion in addressing cases that involve students described in the DREAM Act and has the authority to grant deferred action based on the merits of an individual's case after a review of specific facts. Your proposal for a more systematic solution for these students merits careful consideration.

The plight of students who would be eligible for relief under the DREAM Act illustrates the pressing need for a comprehensive approach to immigration reform—one that includes a commitment to serious and effective enforcement, improved legal flows for families and workers, and a firm but fair way to deal with those who are already here. All three aspects are crucial to building a successful system. If the millions of people currently living in the U.S. with no legal status—including students who would be eligible under the DREAM Act—do not have an opportunity to come out of the shadows and register their presence, other enforcement efforts will be undermined. I am encouraged by the recently unveiled Senate proposal for comprehensive immigration reform, which is an important step in the right direction.

Thank you again for your letter. Should you need additional assistance, please do not hesitate to contact me at (202) ███████ An identical response was sent to Senator Lugar, who co-signed your letter.

Yours very truly,

*Janet Napolitano*

Janet Napolitano

www.dhs.gov

CAR 0310



*Secretary*

U.S. Department of Homeland Security
Washington, DC 20528

September 21, 2010

The Honorable Harry Reid
Majority Leader
United States Senate
Washington, DC  20510

The Honorable Mitch McConnell
Minority Leader
United States Senate
Washington, DC  20510

Dear Senators Reid and McConnell:

Recently, with support from both Democrats and Republicans, the Administration implemented reforms to allow qualified spouses and children of U.S. citizens serving in the U.S. military to become legal permanent residents so that those fighting for our country abroad do not have to worry about their families at home.  Now, I understand that the United States Senate, in conjunction with pending legislation, is considering the Development, Relief, and Education for Alien Minors Act of 2009, the DREAM Act (S. 729), to address the immigration status of persons who, because they were brought here at a young age, know no other home than the United States.

The DREAM Act is targeted legislation, providing immigration relief for students who have been raised and educated in the United States and applying primarily to those individuals who:  came to the United States when they were under 16 years of age; have lived in the United States for at least five years; have good moral character; are not inadmissible or removable under a number of key grounds; and have graduated from high school, obtained a GED, or have been admitted to an institution of higher education. Individuals who meet these requirements and then attend college or serve in the military for two years would be eligible to obtain permanent resident status.

Indeed, the students who would be eligible for relief under the DREAM Act illustrate the need for a comprehensive approach to immigration reform.  I am encouraged by the bipartisan Senate proposal for comprehensive immigration reform, which includes provisions that demonstrate a commitment to serious and effective enforcement, improvements to our family- and employment-based systems, and a firm but fair way to deal with those who are already here as an important step in the right direction.

CAR 0311

The Honorable Harry Reid
The Honorable Mitch McConnell
Page 2

This bill underscores the need for comprehensive immigration reform.  While the broader immigration debate continues, I urge the Senate to pass the DREAM Act, and allow those who were brought to this country as children to adjust their immigration status.  I look forward to working with you on this important piece of legislation.

The Office of Management and Budget advises that there is no objection to the submission of this letter from the standpoint of the Administration's program.

Yours very truly,

Janet Napolitano

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland Security

December 6, 2010

The Honorable Harry Reid
Majority Leader
United States Senate
Washington, DC  20510

The Honorable Mitch McConnell
Minority Leader
United States Senate
Washington, DC  20510

Dear Senators Reid and McConnell:

I understand that the Congress is expected to consider the "Development, Relief, and Education for Alien Minors Act of 2010" (the "DREAM Act") to address the immigration status of persons who know no other home than the United States.  I write again to urge you to pass this important bill.

While there are many good reasons to support the DREAM Act, I write to highlight the manner in which the DREAM Act would further enhance our immigration enforcement efforts. The Department of Homeland Security is committed to the smart and effective enforcement of our immigration laws — prioritizing the identification and removal of criminal aliens who pose a threat to public safety.  Over the past two years, U.S. Immigration and Customs Enforcement has engaged in record breaking immigration enforcement, removing more than 195,000 convicted criminal aliens.  The 2010 statistics represent a more than 70 percent increase in removal of criminal aliens compared to 2008.

Passage of the DREAM Act would further enhance these efforts by providing a firm, but fair, means for those individuals who were brought to the United States as children to obtain a legal status.  The Act would bolster the Department's ability to focus its enforcement resources on detaining and removing criminal aliens and those who pose a threat to our national security and public safety.  All applicants will undergo rigorous background checks to determine DREAM Act eligibility. The criminal and security-related grounds of inadmissibility and deportability would apply to these applications.

The Honorable Harry Reid
The Honorable Mitch McConnell
Page 2


     Passage of this bill will not resolve the need for comprehensive immigration reform.
While the broader immigration debate continues, however, I urge the Congress to pass the
DREAM Act and allow those who arrived in this country as children to adjust their immigration
status.  I look forward to working with you on this critical piece of legislation.

     The Office of Management and Budget advises that there is no objection to the
submission of this letter from the standpoint of the Administration's program.

                Yours very truly,

                Janet Napolitano

To:      Interested Parties

From:   Jeanne Butterfield, Esq.
        former Executive Director, American Immigration Lawyers Association

        Bo Cooper, Esq.
        Former INS General Counsel

        Marshall Fitz, Esq.
        Director of Immigration Policy, Center for American Progress

        Benjamin Johnson, Esq.
        Executive Director, American Immigration Council

        Paul Virtue, Esq.
        Former INS General Counsel

        Crystal Williams, Esq.
         Executive Director, American Immigration Lawyers Association

Date:    April 29, 2011

The role of executive branch authority with respect to the implementation of immigration laws
and policies has been well documented.  This memorandum offers a short overview of the scope
of executive branch authority and provides examples of its use in the immigration context.

**Exercising Executive Authority**

The authority of law enforcement agencies to exercise discretion in deciding what cases to
investigate and prosecute under existing civil and criminal law, including immigration law, is
fundamental to the American legal system.  Every prosecutor and police officer in the nation
makes daily decisions about how to allocate enforcement resources, based on judgments about
which cases are the most egregious, which cases have the strongest evidence, which cases should
be settled and which should be brought forward to trial.

The Supreme Court has made it clear that "an agency's decision not to prosecute or enforce,
whether through civil or criminal process, is a decision generally committed to an agency's
absolute discretion." Heckler v. Chaney 470 U.S. 821, 831 (1985).

In the immigration context, prosecutorial discretion is exercised at every stage in the
enforcement process—which tips or leads will be investigated, which arrests will be made,
which persons will be detained, which persons will be released on bond, which cases will be
brought forward for removal hearings or criminal prosecution, and which removal orders will be
executed.

Despite the massive allocation of resources Congress has dedicated to immigration enforcement
activities, the funding has limits and the agency must make thoughtful decisions about

CAR 0315

prosecutorial priorities.  In fact, the President has repeatedly announced that the Administration's interior enforcement priority is the prosecution and removal of immigrants who have committed serious crimes. To ensure that this and other prioritization decisions are followed and implemented, it is not uncommon for law enforcement agencies within and outside of the immigration context to provide clear guidance and training to its officers about the exercise of prosecutorial discretion. This type of guidance is not unusual. In fact, numerous memos have been issued by the DHS and its predecessor INS over the years setting forth agency priorities and seeking to provide its officers with clear guideposts for carrying out those priorities. The challenge is often in ensuring that such guidance is understood and followed on the frontlines of immigration enforcement.

Prosecutorial discretion can be exercised on a case-by-case basis with respect to individuals who have come into contact with law enforcement authorities. Or the government can exercise prosecutorial discretion by allowing individuals from explicitly defined groups that it does not consider to be enforcement priorities to ask affirmatively that discretion be applied in their case. This exercise of executive authority is not contrary to current law, but rather a matter of the extension and application of current law to contemporary national needs, values and priorities.

**Deferred Action**

The executive branch, through the Secretary of Homeland Security, can exercise discretion not to prosecute a case by granting "deferred action" to an otherwise removable (colloquially referred to as "deportable") immigrant.

The former INS had guidelines in the form of "Operations Instructions" regarding the granting of deferred action.   These guidelines provided for deferred action in cases where "adverse action would be unconscionable because of the existence of appealing humanitarian factors." *(See (LEGACY) IMMIGRATION AND NATURALIZATION SERVICE, OPERATIONS INSTRUCTIONS, O.I. § 103.1(a) (1) (ii) (1975).)*

Currently, deferred action is considered to be "a discretionary action initiated at the discretion of the agency or at the request of the alien, rather than an application process." *(See "Response to Recommendation #32, Deferred Action", August 7, 2007, at* http://www.dhs.gov/xlibrary/assets/cisombudsman_rr_32_o_deferred_action_uscis_response_08 -07-07.pdf*.)*

DHS has also described deferred action as an exercise of agency discretion that authorizes an individual to temporarily remain in the U.S.  8 C.F.R. 274a.12(c) (14) describes deferred action as "an act of administrative convenience to the government which gives some cases lower priority" (for enforcement action).  DHS has stated in recent correspondence with the Hill that factors to be considered in evaluating a request for deferred action include the presence of sympathetic or compelling factors.

Deferred action does not confer any specific status on the individual and can be terminated at any time pursuant to the agency's discretion.  DHS regulations, however, do permit deferred action recipients to be granted employment authorization.  *(See 8 C.F.R. § 274a.12(c) (14).)*

CAR 0316

Deferred action determinations are made on a case-by-case basis, but they can be applied to discrete classes of non-citizens. Individualized determinations that deferred action is appropriate are always made,

For example, in June 2009, the Secretary of DHS granted deferred action to individuals who fell in to the following class: widows of U.S. citizens who were unable to adjust their status due to a statutory restriction (related to duration of marriage at time of sponsor's death). *(See "Guidance Regarding Surviving Spouse of Deceased U.S. Citizens and their Children", June 15, 2009, at http://www.uscis.gov/USCIS/Laws/Memoranda/2009/June%202009/surviving-spouses-deferred-action-guidance.pdf.* Congress subsequently enacted a change in the law to address this particular problem.

Another recent example of the exercise of such executive authority to a class is the grant of deferred action in 2010 to VAWA applicants whose cases were awaiting the promulgation of regulations by DHS.  Nearly 12,000 individuals were granted deferred action under this exercise of executive authority

**Extended Voluntary Departure/Deferred Enforced Departure**

Before the addition of "Temporary Protected Status" to the Immigration and Nationality Act in 1990, the Attorney General used his/her executive authority to temporarily suspend the removal of people from particular countries from the United States because of political strife, natural disasters, or other crises.  Temporary relief known as "Extended Voluntary Departure" (EVD) was granted to citizens of Poland, Cuba, the Dominican Republic, Czechoslovakia, Chile, Vietnam, Lebanon, Hungary, Romania, Uganda, Iran, Nicaragua, Afghanistan, Ethiopia, and China in response to various periods of political upheaval and natural disaster between 1960 and 1990.

In the Immigration Act of 1990, Congress enacted the temporary protected status (TPS) program. It set forth guidelines restricting the Secretary's authority to grant relief from removal exclusively on the basis of nationality *(See INA § 244)*.  TPS can only be granted if, after consultation with the foreign government, there is a determination that it is unsafe for foreign nationals to return home due to armed conflict, natural disasters, or other extraordinary conditions.

Those TPS restrictions, however, only limit the exercise of agency discretion when the sole criterion for providing protection from removal is nationality.  They do not limit the ***President's*** exercise of class or group-based discretion under what has come to be known as "deferred enforced departure" (DED). The president may direct that DED be granted to any group of foreign nationals pursuant to his foreign relations powers and his prosecutorial discretion authority. The president may grant DED for any specific amount of time and it typically is accompanied by employment authorization.

Executive authority in the form of "Deferred Enforced Departure" (DED) relief was exercised by President George W. Bush in 2007, and extended by President Obama in 2009 for certain

nationals of Liberia. (*See "Fact Sheet: Liberians Provided Deferred Enforced Departure (DED," September 12, 2007, at http://www.dhs.gov/xnews/releases/pr_1189693482537.shtm; see also "Deferred Enforced Departure" at http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnexto id=fbff3e4d77d73210VgnVCM100000082ca60aRCRD&vgnextchannel=fbff3e4d77d73210VgnV CM100000082ca60aRCRD*).

Executive authority granting Deferred Enforced Departure was also exercised by President George H.W. Bush for Chinese nationals in the wake of Tiananmen Square events. *(See Executive Order 12,711, April 11, 1990, at http://www.uscis.gov/ilink/docView/FR/HTML/FR/0-0-0-1/0-0-0-30133/0-0-0-39631/0-0-0-39863.html.)* and by President Clinton for certain Haitian nationals.  *(See "Deferred Enforced Departure for Certain Haitian Nationals," December 23, 1997, at http://www.ice.gov/doclib/foia/dro_policy_memos/deferredenforceddepartureforcertainhaitianna lionals12231997.pdf.)*

**Humanitarian Parole or Parole in Place**

Under current law, the executive branch, through the Secretary of Homeland Security, has the authority to "parole" or permit the entry of a person into the United States for "urgent humanitarian reasons or significant public benefit." *(See INA§ 212(d) (5) (A).*  When applied to persons already living in the U.S., this authority is referred to as "parole in place" (PIP). Congress has limited this authority to individual, "case-by-case" determinations, precluding prior practice of using parole authority to admit certain classes of refugees.

**Signing Statements**

Another example of how every Administration makes interpretive judgments regarding how they view and plan to enforce the law is through signing statements.

Every Administration brings its own view and interpretations to bear as it implements newly-enacted laws.  These views have commonly been expressed in Presidential "signing statements" that indicate how the President intends to implement any given law and whether he considers any specific provisions of a law to be unconstitutional. For example, when President George H.W. Bush signed the Immigration Act of 1990 into law, he took specific exception to the provision of law making Temporary Protected Status the sole basis for allowing noncitizens to remain temporarily in the United States based on nationality or region of origin.  He stated, "I do not interpret this provision as detracting from any authority of the executive branch to exercise prosecutorial discretion in suitable immigration cases. Any attempt to do so would raise serious constitutional questions. "Statement on the Signing of the Immigration Act of 1990, November 29, 1990, available from the American Presidency Project: www.presidency.ucsb.edu , http://www.presidency.ucsb.edu/ws/index.php?pid=19117#ixzz1KvDlYZql.

Signing statements often serve as the basis for shaping regulations and other administration policy determinations.  Thus, when President Clinton expressed his displeasure over the unequal treatment of different nationalities in the Nicaraguan Adjustment and Central American Relief

Act of 1997 (NACARA), he directed the Attorney General to take the history and background of the people covered as well as  the "ameliorative" nature of the law into account when drafting regulations.  Statement on the Signing of District of Columbia Appropriations Legislation, November 19, 1997, available at http://www.presidency.ucsb.edu/ws/index.php?pid=53588#axzz1KvDSsLP8.

More recently, President George W. Bush issued 161 signing statements affecting over 1,100 provisions of law in 160 Congressional enactments.  Similarly, President Obama most recently indicated in a signing statement that he considered a budget rider concerning the appointment of certain personnel unconstitutional, writing "Legislative efforts that significantly impede the President's ability to exercise his supervisory and coordinating authorities or to obtain the views of the appropriate senior advisers violate the separation of powers by undermining the President's ability to exercise his constitutional responsibilities and take care that the laws be faithfully executed."  Statement by the President on H.R. 1473, April 15, 2011, http://www.whitehouse.gov/the-press-office/2011/04/15/statement-president-hr-1473

| **From:** | Jeanne Butterfield ███████████████████████ |
|---|---|
| **Sent:** | Wednesday, June 6, 2012 11:44 AM |
| **To:** | Olavarria, Esther ███████████████████████ |
| **Subject:** | FW: PD statistics in advance of meeting with DHS/Sandweg |

What do you make of the fact that the stats Greg quotes below are so different from the doc you shot around to me and Marshall and Patty earlier today???  The number of actual offers of PD is doubled below, and that results in near 50% acceptance of PD offer rate...

rather than the tiny percent in the earlier doc...hmmmmm.  Are you going to be at the Sandweg meeting this afternoon???

*Jeanne A. Butterfield, Esq.*
*The Raben Group*

████████████████████

---

**From:** Greg Chen ███████████████
**Sent:** Wednesday, June 06, 2012 11:37 AM
**To:** Marshall Fitz; Ben Johnson; Nystrom, Brittney; joshua.bernstein@██████████  Clarissa Martinez; Kevin Appleby; Mary Giovagnoli; Patty First; Angela Kelley; Kate Kahan; Jeanne Butterfield
**Cc:** Crystal Williams; Alexsa Alonzo; Robert Deasy
**Subject:** PD statistics in advance of meeting with DHS/Sandweg

Everyone,

I'm including on this email those Sandweg invited to meet today.   The main purpose of the meeting will be to share some updated statistics about PD.  I was able to obtain the statistics in advance--note this is not DHS's document so be careful not to attribute this document to DHS.  See below.

In summary - this info is extremely disappointing.  Since March AILA has been increasingly critical of the PD initiative, and these statistics will compel us further in that direction.

The big picture is that they have reviewed 288,361 cases as of May 29, 2012 out of a current total of 411,000 pending cases.  Of all the cases reviewed (288,361), 20,648 or 7% have been identified as being amenable for administrative closure (that's the DHS term for cases for which ICE has made an offer or plans to make an offer pending background check).  Of the 20,648 that have been identified as amenable for AC, 8,361 have actually received offers for AC.  Of those 8,361 who got offers just over half accepted AC and slightly less than half declined.

The current figure for cases that have been AC'd is 1.5 percent of all cases reviewed.  THAT IS ABYSMAL.  Even if we assume that the same rate of acceptance will continue for those cases that are still undergoing background checks (12,287), that gives them about a 4% rate of granting administrative closure.  STILL ABYSMAL.

- The low number of detained cases identified as amenable for prosecutorial discretion (a total of 40 out of 56,180 reviewed) is appalling.
- no pro se figures are given at all.
- And nearly half (48%) said NO to the offer of administrative closure.  By itself, that low number should compel DHS to conclude that they have crafted PD so narrowly as to make it inappropriate for the class identified for relief.

Greg

## PROSECUTORIAL DISCRETION INITIATIVE

### Case-by-Case Review

On August 2011, DHS announced the case-by-case review initiative.  When the review began in November 2011, some 300,000 cases were pending before the immigration courts.  Since then, approximately 111,000 new cases have been filed and added to the immigration court docket.

CAR 0320

- Of these **411,000** cases, ICE reviewed **288,361** as of May 29, 2012.  These 288,361 cases include:
    - 232,181 non-detained cases; and
    - 56,180 detained cases.

- Of the **288,631** cases reviewed by ICE thus far, **20,648 cases (7%)** have been identified by ICE as being amenable for administrative closure.  This includes:
    - 20,608 (9%) of the 232,181 non-detained cases reviewed; and
    - 40 (less than 1%) of the 56,180 detained cases reviewed.

- Of these **20,648** cases that so far have been identified by ICE:
    - **8,361** have received actual offers of administrative closure, and
    - **12,287** are still pending background checks.

- Of the **8,361** cases that have so far been offered administrative closure:
    - **4,363 (52%) have accepted the offer**; and
    - **3,998 (48%) have refused the offer**.

*If offers are made in each of the 20,648 cases identified for closure and the acceptance-to-refusal rate stays at 52% to 48%, then we will see closure of 10,737 total cases, comprising 4% of the 288,361 cases so far reviewed.*

- Of the 4,363 cases that have thus far been administratively closed:
    - 3,300 are aliens who have close USC relatives, "long-term presence," and compelling ties to the United States;
    - 290 are DREAM-Act eligible youth (under 16, in U.S. for longer than 5 years, graduated from high school, and in college);
    - 303 are children who have been in the U.S. for longer than 5 years;
    - 138 are aliens with mental or physical issues;
    - 91 are domestic violence or trafficking victims;
    - 33 are elderly;
    - 10 are veterans; and
    - 173 are other aliens.

- Of the 3,998 cases that have thus far refused an offer of administrative closure, the vast majority (more than 3,000) are of people who appear eligible for cancellation of removal (aliens who have been in the U.S. for 10 years and can show "exceptional and extremely unusual hardship" to their USC or LPR spouse, parent, or child).

## Filings of Notices to Appear (NTAs)

While the case-by-case review process has been underway, the number of NTAs issued to aliens has decreased about 12%.

- In the first four months of calendar year 2011, a total of 85,337 NTAs were filed with the immigration courts.

- In the first four months of 2012, that number is 75,044.  This is a decrease of about 12%.

According to DHS officials, the decrease is largely a result of fewer NTAs from USCIS:

CAR 0321

- USCIS has issued 20% fewer NTAs this year than the year before *(USCIS can issue an NTA when an application for benefits is denied)*.

- The number of NTAs issued by ICE has also dropped, but by a smaller percentage.

CAR 0322

| | |
|---|---|
| **From:** | Hartnett, Sarah L ███████████@ice.dhs.gov> |
| **Sent:** | Friday, May 11, 2012 6:17 PM |
| **To:** | Grossman, Seth████████@HQ.DHS.GOV>; Baronof, Kim ████████@ice.dhs.gov> |
| **Cc:** | Ragsdale, Daniel H <████████@ice.dhs.gov>; Ramlogan, Riah <████████████>; Downer, Matthew M <████████@ice.dhs.gov>; Peppard, Colleen <████████@ice.dhs.gov> |
| **Subject:** | RE: Additional data |

Seth,

We are still working on your request.

OPLA is complying the data for the terminations and should have that soon.

As to the deferred action information, we are working with ERO to figure out the best way to get this information.  This may take another day or so.

Sarah L. Hartnett

Deputy Director
Field Legal Operations-West
Office of the Principal Legal Advisor

 tel
bb

*** Warning *** Attorney/Client Privilege *** Attorney Work Product ***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

-----Original Message-----
From: Grossman, Seth
Sent: Thursday, May 10, 2012 4:00 PM
To: Hartnett, Sarah L; Baronof, Kim
Cc: Ragsdale, Daniel H; Ramlogan, Riah; Downer, Matthew M; Peppard, Colleen
Subject: Re: Additional data

Great, thanks Sarah

----- Original Message -----
From: Hartnett, Sarah L
Sent: Thursday, May 10, 2012 03:58 PM
To: Grossman, Seth; Baronof, Kim
Cc: Ragsdale, Daniel H; Ramlogan, Riah; Downer, Matthew M; Peppard, Colleen

CAR 0323

Subject: RE: Additional data

Seth,

We are working on getting you this information.

Sarah L. Hartnett

Deputy Director
Field Legal Operations-West
Office of the Principal Legal Advisor

  tel
bb

*** Warning *** Attorney/Client Privilege *** Attorney Work Product *** This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552 (b)(5), (b)(7).

-----Original Message-----
From: Grossman, Seth
Sent: Thursday, May 10, 2012 3:17 PM
To: Hartnett, Sarah L; Baronof, Kim
Cc: Ragsdale, Daniel H; Ramlogan, Riah; Downer, Matthew M; Peppard, Colleen
Subject: RE: Additional data

Yes, if you could get us the terminations for all reasons from previous years (as well as the total terminations for this FY so far, whether related to case-by-case or not), that would be great.

-----Original Message-----
From: Hartnett, Sarah L [mailto███████████████]
Sent: Thursday, May 10, 2012 2:28 PM
To: Grossman, Seth; Baronof, Kim
Cc: Ragsdale, Daniel H; Ramlogan, Riah; Downer, Matthew M; Peppard, Colleen
Subject: RE: Additional data

Seth,

On your first point, OPLA does not have the number of terminations from previous years that would correlate to the 32 we sent you early.  We did not track terminations as they related to prosecutorial discretion.  We would only have the number of terminations total.  Meaning we could give you numbers that would include terminations for all reasons.

Is this the data you are requesting?

Also, we will reach out to ERO to see what we can gather for the other two points.

CAR 0324

Sarah L. Hartnett

Deputy Director
Field Legal Operations-West
Office of the Principal Legal Advisor

 tel
bb

*** Warning *** Attorney/Client Privilege *** Attorney Work Product *** This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552 (b)(5), (b)(7).

-----Original Message-----
From: Grossman, Seth
Sent: Thursday, May 10, 2012 1:31 PM
To: Hartnett, Sarah L; Baronof, Kim
Cc: Ragsdale, Daniel H; Ramlogan, Riah; Downer, Matthew M; Peppard, Colleen
Subject: RE: Additional data

This is really helpful.  A few follow-up data requests:

- Is it possible to get numbers of how many cases were terminated in prior years?

- Can you identify how many of the total deferred action or stays granted thus far in FY12 were to individuals who had pending proceedings before EOIR.  (The information we previous received stated that of the 1,273 deferred actions or stays granted in FY12, 1,233 involved individuals subject to a final order of removal.  We're trying to get at the status of the remaining 40 individuals.)

- Can you similarly break down the deferred actions granted in previous years between individuals who had final orders and individuals still in proceedings or with other circumstances?

Thanks so much.

-----Original Message-----
From: Hartnett, Sarah L
Sent: Thursday, May 10, 2012 12:48 PM
To: Baronof, Kim; Grossman, Seth
Cc: Ragsdale, Daniel H; Ramlogan, Riah; Downer, Matthew M; Peppard, Colleen
Subject: FW: Additional data

Kim, Seth,

We have terminated 32 cases since the case-by-case review began.  Attached is a breakdown of these numbers.

Please let us know if you need anything else.

Sarah L. Hartnett

Deputy Director

Field Legal Operations-West
Office of the Principal Legal Advisor

tel
bb

*** Warning *** Attorney/Client Privilege *** Attorney Work Product *** This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552 (b)(5), (b)(7).

| **From:** | Hartnett, Sarah L ▮▮▮▮▮▮▮@ice.dhs.gov> |
|---|---|
| **Sent:** | Wednesday, May 16, 2012 5:58 PM |
| **To:** | Grossman, Seth ▮▮▮▮▮@HQ.DHS.GOV>; Baronof, Kim ▮▮▮▮@ice.dhs.gov> |
| **Cc:** | Ragsdale, Daniel H ▮▮▮▮▮@ice.dhs.gov>; Ramlogan, Riah ▮▮▮▮@ice.dhs.gov>; Downer, Matthew M ▮▮▮▮@ice.dhs.gov>; Peppard, Colleen ▮▮▮▮@ice.dhs.gov>; Stolley, Jim ▮▮▮▮@ice.dhs.gov> |
| **Subject:** | RE: Additional data |

Seth,

Below are ERO's responses to these two deferred action questions:

\*      Can you identify how many of the total deferred action or stays granted thus far in FY12 were to individuals who had pending proceedings before EOIR.

Of the 1,273 total deferred actions or stays that were reported (IIDS v.1.10 as of 03/19/2012 as reported by the Statistical Tracking Unit.), 1,098 cases were granted stays/deferred action post-final order.  There are 175 cases where a pending final order exists and are currently being examined as a data quality issue. All but one of the 175, that were reviewed, did in fact have a final order of removal in the system; however, these cases do not have the requisite Case Action and Decision or appropriate dates.

\*      Can you similarly break down the deferred actions granted in previous years between individuals who had final orders and individuals still in proceedings or with other circumstances?

ERO cannot currently provide this answer.

Please let us know if you need anything else.

Sarah L. Hartnett

Deputy Director
Field Legal Operations-West
Office of the Principal Legal Advisor

tel
bb

*** Warning *** Attorney/Client Privilege *** Attorney Work Product ***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

-----Original Message-----
From: Grossman, Seth
Sent: Thursday, May 10, 2012 1:31 PM
To: Hartnett, Sarah L; Baronof, Kim
Cc: Ragsdale, Daniel H; Ramlogan, Riah; Downer, Matthew M; Peppard, Colleen

Subject: RE: Additional data

This is really helpful.  A few follow-up data requests:

- Is it possible to get numbers of how many cases were terminated in prior years?

- Can you identify how many of the total deferred action or stays granted thus far in FY12 were to individuals who had pending proceedings before EOIR.  (The information we previous received stated that of the 1,273 deferred actions or stays granted in FY12, 1,233 involved individuals subject to a final order of removal.  We're trying to get at the status of the remaining 40 individuals.)

- Can you similarly break down the deferred actions granted in previous years between individuals who had final orders and individuals still in proceedings or with other circumstances?

Thanks so much.

-----Original Message-----
From: Hartnett, Sarah L
Sent: Thursday, May 10, 2012 12:48 PM
To: Baronof, Kim; Grossman, Seth
Cc: Ragsdale, Daniel H; Ramlogan, Riah; Downer, Matthew M; Peppard, Colleen
Subject: FW: Additional data

Kim, Seth,

We have terminated 32 cases since the case-by-case review began.  Attached is a breakdown of these numbers.

Please let us know if you need anything else.

Sarah L. Hartnett

Deputy Director
Field Legal Operations-West
Office of the Principal Legal Advisor

 tel
bb

*** Warning *** Attorney/Client Privilege *** Attorney Work Product *** This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552 (b)(5), (b)(7).

March 2, 2012

RECEIVED BY DHS EXEC 1

2012 MAR 20  PM 4: 45

The Honorable Janet Napolitano
Secretary
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Napolitano:

We, the undersigned faith-based organizations, are deeply concerned by the broken immigration system's impact on families, communities, and the U.S. economy. When immigration enforcement actions tear apart families, our churches, synagogues, mosques, and other local organizations are on the front lines to provide housing, food, counseling, and other forms of support and ministry.

We therefore welcome the Administration's process to review all pending cases before U.S. Immigration Courts and administratively close low priority cases, such as individuals who are close family members of U.S. citizens, have lived in the United States since a young age, or are military service members. However, we write to express the following concerns about the implementation of this new policy as a nationwide expansion begins to take place:

- **Individuals whose cases are closed should be eligible to receive work authorization.** It does not make sense to allow immigrants to remain temporarily in the United States, but then prevent them from working legally and supporting themselves and their families.

- **The U.S. government must make information publicly available to immigrants and communities, including detained individuals whose cases have not yet been reviewed.** While some immigrants have legal representation, many do not. An estimated 84% of immigrant detainees lack legal representation. DHS should engage in a public information campaign to explain the policy and how individuals can obtain more information. Misinformation about the review will undermine the process and expose individuals to harm from unethical notarios.

- **Individuals who continue to pursue their legal claims or are not eligible for prosecutorial discretion, while retaining full access to due process, should not face prolonged court delays.** During the initial pilot review, the Baltimore Immigration Court rescheduled some immigration hearings up to two years later. These kinds of delays are emotionally, mentally, and financially taxing on immigrants waiting to have their cases heard by the immigration courts.

As people of faith, we urge the government to employ this prosecutorial discretion initiative consistently and fairly to protect families and the God-given dignity of every person. If implemented correctly, we hope that this review process leads to a more humane and fiscally responsible immigration enforcement strategy.

Sincerely,

National Organizations
American Friends Service Committee
American Jewish Committee

**CAR 0329**

Bread for the World
Church World Service, Immigration and Refugee Program
Franciscan Action Network
Friends Committee on National Legislation
Hebrew Immigrant Aid Society
Jubilee Campaign USA
Lutheran Immigration and Refugee Service
Mennonite Central Committee U.S. Washington Office
Muslim Public Affairs Council
National Advocacy Center of the Sisters of the Good Shepherd
Network, A National Catholic Social Justice Lobby
PICO National Network
Sisters of Mercy of the Americas
Union for Reform Judaism
World Relief

Organizations by State

**Arkansas**
Arkansas Interfaith Alliance, State-wide

**Arizona**
Arizona Ecumenical Council, Public Policy Commission
Most Holy Trinity Catholic Church, Tucson, AZ
Tuscon Samaritans, Southern Arizona

**California**
African Methodist Episcopal Church, Los Angeles District
Clergy and Laity United for Economic Justice, Los Angeles — CLUE-LA
Justice For Our Neighbors Regional Office & Clinic the Bay Area Immigration Taskforce

**Florida**
Gainesville Interfaith Alliance for Immigrant Justice, Gainesville, FL
Emmanuel Mennonite Church, Gainesville, FL

**Iowa**
Sisters of St. Francis, Clinton, Iowa

**Minnesota**
Immigration Task Force of the Minnesota Conference United Church of Christ
Interfaith Coalition on Immigration — Minnesota (ICOM)

**New York**
American Jewish Committee, New York
Sisters of the Presentation, New Windsor, NY

**North Carolina**
Episcopal Campus Ministry Raleigh, Raleigh, NC

Sisters of Mercy South Central Community, North Carolina

**Pennsylvania**
Advocacy for Justice and Peace Committee of the Sisters of St. Francis of Philadelphia
Pennsylvania Council of Churches

**Texas**
Dominican Sisters of Houston, Houston, TX

**Wisconsin**
Sinsinawa Dominicans, Office of Peace and Justice, Sinsinawa, Wisconsin

Regional
**Central/Southwest**
Southwest Conference of the United Church of Christ, Arizona, New Mexico and El Paso County in Texas

**Northeast**
Sisters of Mercy New York, Pennsylvania, Pacific West Justice Team State of New York

CAR 0331

OMB Approval No. 1115-0220

**U.S. Department of Justice**
Immigration and Naturalization Service

**Liberian Deferred Enforced Departure
(DED) Supplement to Form I-765**

### What is the purpose of this form?

On September 27, 1999, the President of the United States granted certain Liberian nationals protection from removal from the United States until September 29, 2000.  This is referred to as Deferred Enforced Departure (DED).  The President also directed that these Liberians be granted employment authorization for the same time period.  This is referred to as DED-related employment authorization.

This supplemental form allows Liberian nationals to apply for DED-related employment authorization.  This form must be filed with Form I-765, Application for Employment Authorization, and the evidence and documentation listed below, if available.  The Form I-765, item #16, should be filled in "(a)(11)" to indicate that you are filing for DED-related employment authorization.

### Who is eligible for Liberian DED-related employment authorization?

With certain exceptions, the eligible class for Liberian DED-related employment authrozation consists of Liberian nationals who are present in the United States as of September 29, 2001.

For Liberian DED-related employment authorization eligibility, "present" is defined to mean no absences from the United States after September 29, 2001, or if there were absences from the United States since that date: (1) the total time period of such absences does not exceed 180 days; **AND** (2) for each absence the Liberian national either returned to the United States with advance parole or was inspected and admitted to the United States.

### What documentation should you file with this supplemental form?

You must submit two photographs meeting the specifications described in page four (4) of the instructions of the Form I-765, Application for Employment Authorization.  Applicants must submit a copy of the documents requested below, if available.  For purposes of simplification, this section includes the photographs and all relevant documents requested on pages two (2) and four (4) of Form I-765.  You should only submit the requested materials once and not duplicate I-765 requirements.

- Form I-94, Arrival/Departure Record

- Your last Employment Authorization Document (EAD Card).

- Any documentation you may have which was issued by the Immigration and Naturalization Service (INS) evidencing that you were registered for TPS prior to September 29, 2001, or were in the United States as of September 29, 2001.

- If no EAD is available, submit any other photo identity document issued by a governmental entity.  Prepare a copy with the clearest facial image possible.  Examples include the photo page of your passport, your state driver's license or identity card, or school identification card.

- Any documentation you have to establish that you are a citizen or national of Liberia.

- If you cannot provide documentation, you may submit an affidavit affirming that you are a national of Liberia who was present in the United States as of September 29, 2001, and you are otherwise eligible for DED.

Every applicant must file his or her own I-765 application.  All approved applicants will receive an employment authorization document (EAD) as proof of employment authorization.

Submission of copies of the documents may speed the processing of your application and may eliminate the need for a personal interview.  (However the two (2) photographs **must** be submitted).

### What effect will the receipt of a DED-based employment authorization document have on my immigration status?

Employment authorization is a benefit granted for a limited period of time to correspond with the authorized period of DED.  It does not establish eligibility for permanent residence in the United States.
[Note:  An EAD is issued to a variety of qualifying aliens to evidence their authorization for employment.  The EAD may also be used as evidence that INS has allowed the holder to remain in the United States for a specific period of time.  Thus, an EAD may  be issued to a person for whom employment is not a legal option, such as a minor child.]

### What is the filing fee for the Form I-765 filed jointly with this supplemental form?

There is no fee for the Form I-765 file jointly with this form as part of the Liberian DED program.  Applicants will need to submit a fifty ($50) dollar fingerprinting fee.

**How should you prepare this form?**

A.  Type or print legibly in black or blue ink or ball point pen.

B.  If you need extra space to complete any item, attach a continuation sheet, indicate the item number, and date and sign each sheet.

C.  Answer all questions fully and accurately.  If any item does not apply, please write "N/A."

**Where should you file this form?**

This form must be filed along with Form I-765 at the INS District Office or Suboffice having jurisdiction over the applicant's place of residence.

**What are the penalties for perjury?**

All statements contained in response to questions in this application are declared to be true and correct under penalty of perjury.  Title 18 United States Code, Section 1546, provides in part:

> ...Whoever knowingly makes under oath, or as permitted under penalty of perjury under 1746 of Title 28 of the United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit or other document containing any such false statement - shall be fined in accordance with this title or imprisoned not more than five years, or both.

**What is the authority for collecting this information?**

We request the information on the form to carry out the immigration laws contained in Title 8 of the United States Code, Section 1154(a).  We need this information to determine whether you are eligible for immigration benefits.  This information you provide may also be disclosed to other Federal, state, local and foreign law enforcement and regulatory agencies.  Furnishing this information on this form is voluntary, however, if you do not give some or all of it, your application may be denied.

**Reporting Burden.**

An agency may not conduct or sponsor an information collection and a person is not required to respond to an information collection unless it contains a currently valid OMB control number.  We try to create forms that are accurate, can easily be understood, and which impose the least possible burden on you to provide us with the information.  Often this is difficult because some immigration laws are very complex.  Public reporting burden for this information collection is estimated to average 1 hour, computed as follows:  1) learning about the form, and understanding the instructions; 2) collecting the necessary supporting documents; 3) completing the form; and 4) traveling to and waiting at a preparer's office (for example, attorney or voluntary agency).  If you have comments regarding the accuracy of this estimate or suggestions for making this form simpler, you can write to the Immigration and Naturalization Service, 425 I Street, N.W., Room 4304, Washington, DC  20536; OMB No. 1115-0220.  **DO NOT MAIL YOUR COMPLETED APPLICATION TO THIS ADDRESS.**

OMB Approval No. 1115-0220

**U.S. Department of Justice**
Immigration and Naturalization Service

**Liberian Deferred Enforced Departure**
**(DED) Supplement to Form I-765**

I am applying for an employment authorization document (EAD) based on Liberian Deferred Enforced Departure (DED):

## Part A.  Information About You.

| 1.  Complete Last Name | 2.  First Name | 3.  Middle Name |
|---|---|---|
| 4.  Alien Registration Number (A-Number) or I-94 Number *(if known)* | | |

## Part B.  Application Type.

I am applying for an employment authorization based upon the fact that I am a national or citizen of Liberia who was present in the United States as of September 29, 2001.  Since that date I have been continuously present in the United States, or if I departed from the United States, I obtained advance parole prior to all departures, or was inspected or admitted. *(If you traveled outside the United States after September 29, 2001, explain below.)*

## Part C.  Additional Eligibility Information.

1.  Have you ever been arrested, convicted and sentenced or imprisoned in your country, any other country, or the United States?

☐ NO  ☐ YES *(If YES, for each instance specify below the dates, locations, and reasons or charges.  Attach documents, if available, referring to these incidents.  Documents showing the disposition of a conviction may be valuable in expediting processing and eliminating the need for personal interview.  Do not report non-criminal traffic or immigration arrests and violations.)*

2.  Have you ever ordered, incited, assisted or otherwise participated in the persecution of any person because of his or her race, religion, nationality, membership in a particular social group, or political opinion?  ☐ NO  ☐ YES *(If YES, describe below each such incident and your own involvement in it.)*

3.  Did you settle in a country other than Liberia prior to arriving in the United States?  ☐ NO  ☐ YES

4.  Have you ever returned to Liberia or your country of last residence outside the United States since September 29, 2001?
☐ NO  ☐ YES *(If YES, specify below your departure and return dates, countries visited, reason for travel, and description of INS travel authorization for each such trip.  Provide copies of available related documentation, especially INS documents and the pages of your passport indicating your identity and all entries and departures.)*

Form I-765D (02/14/02)Y

5. Have you ever been deported, excluded, or removed from the United States before September 29, 2001? *(Only answer YES to this question if there has been an actual departure from the United States.)*

☐ NO   ☐ YES *(If YES, specify below to the best of your knowledge whether deported, excluded, or removed and give the departure and return dates. Provide copies of available related documentation, especially INS documents and the pages of your passport indicating your identity and all entries and departures.)*

6. Have you ever been the subject of extradition proceedings?

☐ NO   ☐ YES *(If YES, specify below the date, location, and reasons or charges. Attach documents, if available referring to the extradition.)*

**Part D. Signature.** Read the information on penalties before completing this section.

I certify under penalty of perjury under the laws of the United States of America, that this information is true and correct. I authorize release of any information from my records which the Immigration and Naturalization Service needs to determine my eligibility for the benefit being sought.

| Signature | Print Name | Date |
|-----------|-----------|------|
|           |           |      |

**Part E. Signature of person preparing form if other than above.**

I declare that I prepared this form at the request of the above person and it is based on all information of which I have any knowledge.

| Signature | Print Name | Date |
|-----------|-----------|------|
|           |           |      |
| Firm Name and Address | | |

GAR 0335

*Draft*
*Pre-Decisional/Deliberative*

Formatted: Font: 10 pt, Bold, Italic

Formatted: Right

### Case-by-Case Review Statistics

***Case-by-Case Review and Administrative Closures***

- In total, ICE has reviewed 227,733 pending cases with approximately 17,051, or 8%, identified as amenable for prosecutorial discretion as of April 23, 2012.

- 184,779 pending non-detained cases have been reviewed with approximately 17,025, or 9%, identified as amenable for prosecutorial discretion.

- 42,954 pending detained cases have been reviewed with approximately 26, or less than 1%, identified as amenable for prosecutorial discretion.

- Of the 17,025 pending non-detained cases identified as amenable for prosecutorial discretion, 2,974 cases have been administratively closed.  These cases involve –

  o 9 individuals who are a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;
  o 197 individuals who are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent);
  o 198 individuals who came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States;
  o 23 individuals who are over the age of sixty-five and have been in the United States for more than ten years;
  o 62 individuals who have been the victim of domestic violence in the United States, human trafficking to the United States; or of any serious crime in the United States;
  o 18 individuals who have been lawful permanent residents for ten years or more and have a single, minor conviction for a non-violent offense;
  o 101 individuals who suffer from a serious mental physical condition that would require significant medical or detention resources;
  o 2,256 who have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States; and
  o 110 individuals who constitute a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

***Deferred Action and Stays***

- While administrative closure is the "preferred mechanism" for exercising discretion in the case-by-case review process, deferred action will be continue to be utilized in

| Formatted: Font: 10 pt, Bold, Italic |
| Formatted: Right |

appropriate cases as is set forth in Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

- As of March 19, 2012, Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,273 cases in fiscal year 2012.
- Of those 1,273 deferred actions or stays, 1,233 involved individuals subject to a final order of removal.
- In fiscal year 2010, ERO officers granted deferred actions or issued a stay of a final order in 486 cases; in fiscal year 2009 ERO officers granted 740 deferred actions; in fiscal year 2008 ERO officers granted 1006 deferred actions; in fiscal year 2007 ERO officers granted 598 deferred actions.[1]

*Employment Authorization Cards Issued Pursuant to Prosecutorial Discretion Policies*

- Eligibility for employment authorization is governed by longstanding law. Individuals are not eligible for work authorization on the basis of receiving administrative closure alone. Similarly, individuals who were eligible for a work authorization card prior to the case-by-case review remain eligible after their case has been administratively closed.
- Of the 2,974 individuals whose cases have been administratively closed, 2,052 have received employment authorization in the past and 1,483, or nearly 50%, currently have employment authorization.
    - Of 197 individuals whose cases were administratively closed on the ground that they are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent), 52 have received employment authorization in the past, and 32 currently have employment authorization;
    - Of 198 individuals whose cases were administratively closed on the ground that they came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States, 57 have received employment authorization in the past, and 34 currently have employment authorization;
    - Of the 2,256 individuals whose cases were administratively closed on the ground that they have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States, 1,742 have received employment authorization in the past, and 1,282 currently have employment authorization.

*Priority Cases Accelerated Pursuant to this Process and the Implementation of Enforcement Priorities*

- In fiscal year 2012 YTD, ICE removed over 102,000 individuals convicted of a crime.

---

[1] Due to upgrades to ICE's electronic system for tracking enforcement actions which affected how this data is recorded, the data from FY2012 are not directly comparable to the data from FY2008-FY2010. Because of these upgrades, ICE is not currently able to calculate FY2011 deferred action numbers.

CAR 0337

*Draft*
*Pre-Decisional/Deliberative*

Formatted: Font: 10 pt, Bold, Italic

Formatted: Right

- In fiscal year 2011, ICE removed 216,698 criminals, an 89 percent increase in the removal of criminals from fiscal year 2008.
- Overall, over 90 percent of all ICE removals in fiscal year 2011 fell into one of ICE's categories for priority enforcement.

*Progress By Office*

- As of May 4, 2012, the following Chief Counsel Offices have completed their review of the pending cases in their jurisdictions:
  - Atlanta
  - Baltimore
  - Buffalo
  - Denver
  - Detroit (but not Cleveland)
  - Honolulu
  - Houston
  - Miami
  - Orlando
  - Philadelphia
  - San Juan

*Draft*
*Pre-Decisional/Deliberative*

## Case-by-Case Review Statistics

*Executive Summary*

- In total, ICE has reviewed 227,733 pending cases with approximately 17,051, or 8%, identified as amenable for prosecutorial discretion as of April 23, 2012.

- 184,779 pending non-detained cases have been reviewed with approximately 17,025, or 9%, identified as amenable for prosecutorial discretion. 2,974 of these cases have been administratively closed.

- Of the 2,974 individuals whose cases have been administratively closed, 1,881 have received employment authorization in the past and 1,257, or over 40%, currently have employment authorization.

- 2,710 individuals have declined an offer of prosecutorial discretion. Of these individuals, 2,052 have received employment authorization in the past and 1,483, or over 54%, currently have employment authorization.

- Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,273 cases thus far in fiscal year 2012 as of March 19, 2012. In fiscal year 2010, ERO officers granted deferred actions or issued a stay of a final order in 486 cases.

- 11 of ICE's Chief Counsel Offices have completed their review of the pending cases in their jurisdictions.

*Case-by-Case Review and Administrative Closures*

- In total, ICE has reviewed 227,733 pending cases with approximately 17,051, or 8%, identified as amenable for prosecutorial discretion as of April 23, 2012.

- 184,779 pending non-detained cases have been reviewed with approximately 17,025, or 9%, identified as amenable for prosecutorial discretion.

- 42,954 pending detained cases have been reviewed with approximately 26, or less than 1%, identified as amenable for prosecutorial discretion.

- Of the 17,025 pending non-detained cases identified as amenable for prosecutorial discretion, 2,974 cases have been administratively closed. These cases involve –

  o 9 individuals who are a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;

CAR 0339

*Draft*
*Pre-Decisional/Deliberative*

- o 197 individuals who are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent);
- o 198 individuals who came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States;
- o 23 individuals who are over the age of sixty-five and have been in the United States for more than ten years;
- o 62 individuals who have been the victim of domestic violence in the United States, human trafficking to the United States; or of any serious crime in the United States;
- o 18 individuals who have been lawful permanent residents for ten years or more and have a single, minor conviction for a non-violent offense;
- o 101 individuals who suffer from a serious mental physical condition that would require significant medical or detention resources;
- o 2,256 who have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States; and
- o 110 individuals who constitute a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

- Approximately 150,000 cases remain to be reviewed.[1]

### Deferred Action and Stays

- While administrative closure is the "preferred mechanism" for exercising discretion in the case-by-case review process, deferred action will be continue to be utilized in appropriate cases as is set forth in Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

- As of March 19, 2012, Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,273 cases in fiscal year 2012.

- Of those 1,273 deferred actions or stays, 1,233 involved individuals subject to a final order of removal.

- In fiscal year 2010, ERO officers granted deferred actions or issued a stay of a final order in 486 cases; in fiscal year 2009 ERO officers granted 740 deferred actions; in fiscal year

---

[1] The 300,000 figure cited for the backlog was based on estimate of past filings. The actual number of cases, including both detained and non-detained, pending before EOIR at the time the review was commenced was in fact higher and has grown as new cases enter the system.

2008 ERO officers granted 1006 deferred actions; in fiscal year 2007 ERO officers granted 598 deferred actions.[2]

### *Employment Authorization Cards Issued Pursuant to Prosecutorial Discretion Policies*

- Eligibility for employment authorization is governed by longstanding law.  Individuals are not eligible for work authorization on the basis of receiving administrative closure alone.  Similarly, individuals who were eligible for a work authorization card prior to the case-by-case review remain eligible after their case has been administratively closed.

- Of the 2,974 individuals whose cases have been administratively closed, 1,881 have received employment authorization in the past and 1,257, or over 40%, currently have employment authorization.
    - Of 197 individuals whose cases were administratively closed on the ground that they are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent), 76 have received employment authorization in the past, and 39 currently have employment authorization;
    - Of 198 individuals whose cases were administratively closed on the ground that they came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States, 104 have received employment authorization in the past, and 58 currently have employment authorization;
    - Of the 2,256 individuals whose cases were administratively closed on the ground that they have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States, 1,546 have received employment authorization in the past, and 1,079 currently have employment authorization.

### *Priority Cases Accelerated Pursuant to this Process and the Implementation of Enforcement Priorities*

- In fiscal year 2012 YTD, ICE removed over 102,000 individuals convicted of a crime.

- In fiscal year 2011, ICE removed 216,698 criminals, an 89 percent increase in the removal of criminals from fiscal year 2008.

- Overall, over 90 percent of all ICE removals in fiscal year 2011 fell into one of ICE's categories for priority enforcement.

---

[2] Due to upgrades to ICE's electronic system for tracking enforcement actions which affected how this data is recorded, the data from FY2012 are not directly comparable to the data from FY2008-FY2010.  Because of these upgrades, ICE is not currently able to calculate FY2011 deferred action numbers.

*Draft*
*Pre-Decisional/Deliberative*

### NTAs Issued

- [Waiting for data from DOJ on data on the filing of NTAs in the first half of FY12 as compared to filings in the first half of FY11.]

### Progress By Office

- As of May 4, 2012, the following Chief Counsel Offices have completed their review of the pending cases in their jurisdictions:
  - Atlanta
  - Baltimore
  - Buffalo
  - Denver
  - Detroit (but not Cleveland)
  - Honolulu
  - Houston
  - Miami
  - Orlando
  - Philadelphia
  - San Juan

### Individuals Who Have Declined an Offer of Prosecutorial Discretion

- 2,710 individuals have declined an offer of prosecutorial discretion as of April 23, 2012. These cases involve –

  - 5 individuals who are a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;
  - 78 individuals who are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent);
  - 90 individuals who came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States;
  - 14 individuals who are over the age of sixty-five and have been in the United States for more than ten years;
  - 37 individuals who have been the victim of domestic violence in the United States, human trafficking to the United States; or of any serious crime in the United States;
  - 23 individuals who have been lawful permanent residents for ten years or more and have a single, minor conviction for a non-violent offense;
  - 48 individuals who suffer from a serious mental physical condition that would require significant medical or detention resources;

CAR 0342

- o 2,248 who have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States; and
- o 167 individuals who constitute a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

- Of the 2,710 individuals that declined an offer of prosecutorial discretion, 2,052 have received employment authorization in the past and 1,483, or over 54%, currently have employment authorization.
  - o Of 78 individuals who declined an offer of administrative closure that was based on the ground that they are a child, have been in the United States for more than five years, and are either in school or has successfully completed high school (or its equivalent), 52 have received employment authorization in the past, and 32 currently have employment authorization;
  - o Of 90 individuals who declined an offer of administrative closure that was based on the ground that they came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States, 57 have received employment authorization in the past, and 34 currently have employment authorization;
  - o Of the 2,244 individuals who declined an offer of administrative closure that was based on the ground that they have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States, 1,742 have received employment authorization in the past, and 1,282 currently have employment authorization.

## **Case-by-Case Review Statistics**

### *Case-by-Case Review and Administrative Closures*

- In total, ICE has reviewed 219,554 cases with approximately 16,544, or 7.5%, identified as eligible for prosecutorial discretion as of April 16, 2012.

- 179,518 non-detained cases have been reviewed with approximately 16,518, or 9%, identified as eligible for prosecutorial discretion.

- 40,036 detained cases have been reviewed with approximately 26, or less than 1%, identified as amenable for prosecutorial discretion.

- Of the 16,518 non-detained cases identified as amenable for prosecutorial discretion, 2,722 cases have been administratively closed.

  - 8 cases were closed as the individual was a member or honorably discharged veteran of the Armed Forces of the United States, or the spouse or child of a member or veteran;
  - 175 cases were closed as the individual was a child who has been in the United States for more than five years and is either in school or successfully completed high school;
  - 182 cases were closed as the individual came to the United States under the age of sixteen and is pursuing higher education in the United States;
  - 23 cases were closed as the individual is over the age of sixty-five and has been present in the United States for more than ten years;
  - 60 cases were closed as the individual was a victim of a serious crime, including domestic violence or human trafficking;
  - 16 cases were closed as the individual has been in the United States for ten years or more and has a single, minor criminal conviction for a non-violent offense;
  - 100 cases were closed as the individual suffers from a serious medical condition;
  - 2,055 cases were closed as the individual has a very long-term presence in the United States, has an immediate family member who is a United States citizen and has established compelling ties and made compelling contributions to the United States; and
  - 103 cases were closed as the individual constituted a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

CAR 0344

*Deferred Action and Stays*

- As of March 19, 2012, Enforcement and Removal Operations (ERO) officers and agents have granted 1,273 deferred actions or issued a stay of a final order of removal in fiscal year 2012.

- Of those 1,273 deferred actions and/or stays, 1,233 involved individuals subject to a final order of removal.
- In fiscal year 2011, Enforcement and Removal Operations (ERO) officers granted 486 deferred actions or issued a stay of a final order.*

*Cases Not Placed Into Removal Proceedings or Not Pursued*

- As of March 19, 2012, ICE identified 797 encounters and 347 arrests where no additional action was taken, 11 detainers that were lifted, and 1,336 instances where charging documents were cancelled during fiscal year 2012.

*Employment Authorization Cards Issued Pursuant to Prosecutorial Discretion Policies*

- Eligibility for employment authorization is governed by longstanding law. Individuals are not eligible for work authorization on the basis of receiving administrative closure alone. Similarly, individuals who were eligible for a work authorization card prior to the case-by-case review remain eligible after their case has been closed.

*Priority Cases Accelerated Pursuant to this Process and the Implementation of Enforcement Priorities*

- In fiscal year 2012 YTD, ICE removed over 102,000 individuals convicted of a crime.
- In fiscal year 2011, ICE removed 216,698 criminals, an 89 percent increase in the removal of criminals from fiscal year 2008.
- Overall, over 90 percent of all ICE removals in fiscal year 2011 fell into one of ICE's categories for priority enforcement.

*Secure Communities*

- Since the creation of Secure Communities, more than 135,400 immigrants convicted of crimes, including more than 49,500 convicted of aggravated felony offenses like murder, rape and the sexual abuse of children were removed after identification through Secure Communities.
- In FY 2012 (through April 17, 2012), there were 38,858 removals through Secure Communities.
  - 29,085 were criminals, including 11,212 who were convicted of an aggravated felony or multiple felonies.
  - The remaining 9,773 fell into another priority category.
- Currently, Secure Communities is in 2,670 total jurisdictions.

CAR 0345

*Cross Check*

- ICE's most recent Cross Check operation resulted in 3168 arrests, including 1296 Level 1 offenders, 1427 Level 2 offenders, and 111 Level 3 offenders.

*Deterring Illegal Employment*

- Since January 2009, ICE has audited more than 7,533 employers suspected of hiring illegal labor, debarred 605 companies and individuals, and imposed more than $80.1 million in financial sanctions—more than the total amount of audits and debarments than during the entire previous administration.
- Employer enrollment in E-Verify has more than doubled since January 2009, with more than 302,529 participating companies representing more than 982,956 hiring sites. More than 17 million queries were processed in E-Verify in FY 2011, allowing businesses to determine the eligibility of their employees to work in the United States.

* Due to upgrades to ICE's electronic system for tracking enforcement actions which affected how this data is recorded, the data from FY2011 and FY2012 are not directly comparable.

CAR 0346



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Domestic Operations (MS-2110)*
Washington, DC   20529

**U.S. Citizenship
and Immigration
Services**

June 15, 2009

# Memorandum

TO:          Field Leadership

FROM:        Donald Neufeld
             Acting Associate Director, Office of Domestic Operations

SUBJECT:     Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children

## I.  Purpose

This memorandum provides guidance to U.S. Citizenship and Immigration Services (USCIS) field
offices and service centers regarding the processing of surviving spouses of deceased U.S. citizens
and qualifying children of the surviving spouses.  It affords a new process by which they may apply
for deferred action.  This policy guidance will be in effect until further notice and may be revised as
needed.

## II.  Background

Section 205.1(a)(3)(i)(C) of title 8 of the Code of Federal Regulations (8 CFR) requires that the
approval of Form I-130, *Petition for Alien Relative*, be automatically revoked upon the death of the
petitioner if the beneficiary[1] has not adjusted status in the United States or been inspected and
admitted as an immigrant.  In such instances, the beneficiary may request a reinstatement of the
approval and USCIS, in its discretion, may grant such a request for humanitarian reasons.  8 CFR
205.1(a)(3)(i)(C)(2).

However, no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen
if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's
death and (1) the immigrant petition filed by the citizen on behalf of the surviving spouse has not
been adjudicated by USCIS at the time of the citizen's death, or (2) no petition was filed by the
citizen before the citizen's death.  This issue has caused a split among the circuit courts of appeal
and is also the subject of proposed legislation in the U.S. Congress (bills S. 815 and H.R. 1870).

---

[1] Depending on context, the term beneficiary in this guidance may include both actual and potential beneficiaries of
Forms I-130 filed on their behalf.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 2

## III. Policy Guidance

This policy guidance covers only (1) surviving spouses of U.S. citizens who died before the second anniversary of the marriage, who have not remarried and were not legally separated from the citizen spouse at the time of the citizen's death, and who are residing in the United States,[2] and (2) such surviving spouses' qualifying children.  For purposes of this policy guidance, "qualifying children" are any children of the surviving spouse of the deceased U.S. citizen who remain unmarried and under 21 years of age (age determinations for beneficiaries of Forms I-130 should be made as provided in section 201(f) of the INA).

This guidance applies to the aforementioned beneficiaries without regard to their manner of entry into the United States.  Such surviving spouses are covered without restrictions on how long the U.S. citizen spouse has been deceased as long as the surviving spouse has not remarried.[3]

This guidance does not cover surviving spouses or qualifying children of deceased U.S. citizens who are residing outside the United States or surviving spouses and children of a lawful permanent resident or other non-U.S. citizen.  This guidance also does not cover surviving spouses or qualifying children of deceased U.S. citizens if the surviving spouse remarried at any time after the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated).  This guidance does not cover any beneficiary who was legally separated from his or her U.S. citizen spouse at the time of the citizen's death, or such beneficiary's children.

Since current section 201(b)(2)(A)(i) of the Immigration and Nationality Act (INA) treats covered widow(er)s of U.S. citizens and their children as immediate relatives based upon a self-petition, they are not covered by this guidance.  They may file a Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, in accordance with the instructions on the Form.

In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens, USCIS is instituting the following policy guidance, which is effective immediately and until further notice.

## A. __Form I-130 Approved Prior to the Death of the U.S. Citizen Spouse (Petitioner)__

Upon the death of the U.S. citizen petitioner, the approved Form I-130 is automatically revoked pursuant to 8 CFR 205.1(a)(3)(i)(C).  The beneficiary, however, may request reinstatement of the revoked petition pursuant to 8 CFR 205.1(a)(3)(i)(C)(2).  USCIS may then exercise discretion and grant the reinstatement after considering the facts and humanitarian considerations of the particular

---

[2] Section III(A) of this memorandum, however, regarding humanitarian reinstatement, shall apply to surviving spouses outside the United States.

[3] This guidance is also applicable to a beneficiary who entered the United States on a K-1 Nonimmigrant Visa and married a U.S. citizen other than the U.S. citizen petitioner who filed the I-129F.  If the U.S. citizen spouse died before the second anniversary of the marriage, the widow(er) is eligible for deferred action or humanitarian reinstatement as described herein.

CAR 0348

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 3

case.  If the request for humanitarian reinstatement is approved, the beneficiary may proceed to the adjustment of status or consular processing stage.

This memorandum does not alter the process for reviewing a Form I-130 returned to USCIS by a U.S. Consular Officer overseas when the beneficiary is seeking a humanitarian reinstatement.  If USCIS reinstates the Form I-130 returned by the consular officer, the I-130 should be forwarded to the National Visa Center to allow the beneficiary to resume consular processing.  Section III(A) of this guidance, relating to humanitarian reinstatement, applies to beneficiaries who are within or outside the United States.

If a beneficiary covered by this guidance requests humanitarian reinstatement, adjudicators should presume that humanitarian reasons support a grant of the request.  Absent extraordinary factors or a failure to meet the regulatory requirements of 8 CFR 205.1(a)(3)(i)(C)(2), adjudicators should favorably exercise discretion accordingly.  If the request for reinstatement cannot be granted for any reason other than confirmed or suspected fraud or issues of criminality or national security, the beneficiary should be informed that he or she may request deferred action in the manner described in III(E) below.

In a case governed by First, Sixth or Ninth Circuit law, officers should consult with local USCIS counsel before treating an approved spousal immediate relative petition as "revoked" under 8 CFR 205.1(a)(3)(i)(C).  Courts in those jurisdictions have held that the visa petitioner's death does *not* end a surviving spouse's eligibility for classification as an immediate relative.  Taing v. Napolitano, ___ F.3d ___, 2009 WL 1395836 (1st Cir. 2009); Lockhart v. Napolitano, 561 F.3d 611 (6th Cir. 2009); Freeman v. Gonzales, 444 F.3d 1031 (9th Cir. 2006).

**B.  Form I-130 Pending at the Time of Death of the U.S. Citizen Spouse (Petitioner) – Married Less than 2 Years at Time of Death**

Once USCIS has received a copy of the U.S. citizen petitioner's death certificate, the pending, stand-alone Form I-130 should be held in abeyance at the pending location.  Petitions may be transferred to the Vermont Service Center to be consolidated with the A-file housing a deferred action request, if such a request is made by the beneficiary (see further guidance below).

Any concurrently filed Form I-485, *Application to Register Permanent Residence or Adjust Status*, and Form I-130, should be held in abeyance at the National Benefits Center until further guidance.  The beneficiary will remain eligible to receive the interim benefits of advance parole and employment authorization on the basis of the pending adjustment of status application.

If a Form I-485 was not concurrently filed, the beneficiary should be informed that he or she may request deferred action in the manner described in section III(E) below.

Note:  In instances where the beneficiary and deceased U.S. citizen petitioner were married for at least two years at the time of the petitioner's death, the Form I-130 should be denied under existing

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 4

procedures.  Instructions should be provided to the beneficiary regarding the availability of the Form I-360 as a special immigrant widow/widower.  Any associated Form I-485 should also be denied.

## C.  Form I-130 Denied (Prior to the Issuance of this Guidance) due to the Death of the U.S. Citizen Spouse (Petitioner)

A beneficiary who is the surviving spouse of a U.S. citizen petitioner and whose petition was denied by USCIS (1) due to the death of the U.S. citizen petitioner, and (2) prior to the issuance of this guidance, may request deferred action in the manner described in section III(E) below.

## D.  Form I-130 Not Filed Prior to the Death of the U.S. Citizen Spouse

A beneficiary who was legally married to a now deceased U.S. citizen at the time of the U.S. citizen's death, but for whom no Form I-130 was filed, may request deferred action in the manner described in section III(E) below.

If the beneficiary was not legally married to, or was legally separated from, the deceased U.S. citizen at the time of the U.S. citizen's death, a qualifying relationship does not exist.  The beneficiary is therefore not eligible to submit Form I-360 based on the specific policy guidance set forth in section III(E) below.

## E.  Required Documentation for Requests for Deferred Action

Beneficiaries may request deferred action by submitting the following:

1) A Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, with the appropriate, nonwaivable filing fee (currently $375), completed in the format explained below; and
2) All of the documents requested in the Form I-360 filing instructions for widow/widowers.

The beneficiary of the Form I-360 must check box "**m.  Other, explain:**" in Part 2 of the petition and cite the basis for eligibility as "**Deferred Action -- Surviving spouse of a deceased U.S. citizen, married less than 2 years.**"  The Form I-360 must be submitted to the Vermont Service Center for deferred action consideration.  Note that while USCIS is utilizing Form I-360 for these deferred action requests, such filings are NOT immigrant self-petitions under current law.  They should be adjudicated as requests for deferred action only.  In addition to the Part 2 information described above, the applicant must complete Parts 1, 3, 4, 7, 9, 10 and 11 of the Form I-360.

## F.  Decision on Requests for Deferred Action

Requests for deferred action based on the specific policy guidance set forth in this memorandum may only be considered for:  1) surviving spouses of U.S. citizens whose U.S. citizen spouse died before the second anniversary of the marriage and who are unmarried and residing in the United States; and 2) their qualifying children who are residing in the United States.

CAR 0350

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 5

The following persons are ineligible for deferred action: 1) beneficiaries whose visa petition was denied or revoked for any reason other than or in addition to the death of the petitioning U.S. citizen spouse; 2) widow(er)s who have remarried or were legally separated from the U.S. citizen spouse at the time of the U.S. citizen's death; and 3) beneficiaries with other serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons.   A grant of deferred action is a discretionary action on the part of USCIS.  It is intended that this discretion should be liberally applied to provide a humanitarian benefit to eligible beneficiaries.  However, deferred action may be denied for serious adverse factors, whether or not such factors are specifically identified in this guidance.

Requests for deferred action based on the specific policy guidance set forth in this memorandum will not be considered for beneficiaries who: 1) are surviving spouses or qualifying children of non-U.S. citizens; 2) are residing outside the United States; 3) meet the conditional marriage period set forth in INA 201(b)(2)(A)(i); or 4) have remarried subsequent to the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated).

Once a decision on the request for deferred action has been made, the decision must be communicated to the beneficiary via a decision letter.  If the request has been granted, the deferred action grant letter must state that the beneficiary is eligible to file Form I-765, *Application for Employment Authorization*.  If the request has been denied, the deferred action denial letter must cite the reasons for the denial.  A decision on a request for deferred action falls within the discretion of the Secretary.  A denial of a request for deferred action is not subject to administrative appeal or judicial review, see INA § 242(a)(2)(B), and (g).

## G.  Validity Period for Deferred Action

The validity period of deferred action based on the policy guidance set forth in this memorandum is two (2) years from the date of grant of the Form I-360 request for deferred action.

## H.  Eligibility for Employment Authorization

The appropriate classification for Form I-765 filed on the basis of a deferred action grant is (C)(14) pursuant to 8 CFR 274a.12(c)(14).  Beneficiaries may submit Form I-765, with the appropriate filing fee (currently $340), using this classification at any time after the grant (but prior to the expiration) of deferred action.  However, they must demonstrate an economic necessity.  The validity period for an employment authorization document (EAD) under the classification (C)(14), based on the specific policy guidance set forth in this memorandum is two (2) years, not to exceed the expiration date of the grant of deferred action.

All requests for employment authorization based on the policy guidance set forth in this memorandum must contain the appropriate required supporting documentation.  Applicants must follow currently established filing procedures for the Form I-765 in accordance with the instructions on the form.  Fee waiver of the Form I-765 fee is available on a case-by-case basis for substantiated inability to pay as provided in 8 CFR 103.7(c)(1).

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 6

A beneficiary whose Form I-485 is being held in abeyance may also file a Form I-765, with the appropriate filing fee.  The appropriate classification for employment authorization filed on such a basis is (C)(9) pursuant to 8 CFR 274a.12(c)(9).  Evidence of an economic necessity is not required if using this classification.  A beneficiary whose application is being held in abeyance may have been issued an employment authorization document valid for one year under category (C)(9).  When such an applicant files a Form I-765 for renewal of his or her EAD under the classification (C)(9), based on the specific policy guidance set forth in this memorandum, the validity period will be **two (2) years**.  An applicant with a valid EAD under the classification (C)(9) may file for renewal no more than 90 days prior to the expiration date of the valid document.  The employment authorization may then be granted for two (2) years based on the specific policy guidance set forth in this memorandum.

## I.  Effect of Grant of Deferred Action

The grant of deferred action by USCIS does not confer or alter any immigration status.  It does not convey or imply any waivers of inadmissibility that may exist, regardless of whether that inadmissibility is known to DHS or other agencies at the time of the request for deferred action.  A grant of deferred action also does not eliminate any period of prior unlawful presence.  However, periods of time in deferred action do not count as unlawful presence for the purposes of sections 212(a)(9)(B) and (C) of the INA.  Any period of time in deferred action qualifies as a period of stay authorized by the Secretary of Homeland Security for those purposes.

## J.  Eligibility for Advance Parole

Beneficiaries granted deferred action based on the policy guidance set forth in this memorandum or whose applications for adjustment of status are being held in abeyance may request advance parole.  Such request may be made by filing Form I-131, *Application for Travel Document*, in accordance with the Form I-131 instructions and with the appropriate fee.  Note, however, that departure from the United States and return, even under a grant of advance parole, may adversely affect eligibility for adjustment of status of aliens with past periods of unlawful presence.

## K.  Implementation

USCIS offices and centers are to begin implementing the instructions established in this memorandum immediately.

## L.  Contact Information

Questions regarding this memorandum should be directed to the Office of Domestic Operations through appropriate channels.

CAR 0352

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 7

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person.

**<u>Distribution</u>**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

CAR 0353

**Senator Durbin's "Development, Relief, and Education for
Alien Minors Act of 2011" or the "DREAM Act of 2011"**

**Sec. 1. Short Title; table of contents**
Provides the title and table of contents of this bill.

**Sec. 2. Definitions**
- "Immigration Laws": includes the Immigration and Nationality Act (INA) and other laws relating to immigration, as defined by the INA.
- "Institution of higher education": defined consistent with Federal education law, except that the term does not include institutions of higher education located outside of the United States.
- "Secretary":  defined to mean the Secretary of Homeland Security, except as otherwise specified.
- "Uniformed Services": the Army, Navy, Air Force, Marine Corps, and Coast Guard.

**Sec. 3. Conditional Permanent Resident Status for Certain Long-Term Residents who entered the U.S. as Children**
- Authorizes the discretionary cancellation of removal and adjustment to the status of lawfully admitted for permanent residence on a conditional basis to aliens who are inadmissible or deportable or in temporary protected status (TPS) who establish by a preponderance of the evidence that they:
  - have been continuously physically present in the U.S. for at least 5 years immediately preceding the date of the enactment;
  - were younger 15 years old or younger at the time of initial entry into the United States;
  - have been of good moral character since initial date of entry into the United States;
  - are not inadmissible under the following grounds: criminal, security and terrorism, smuggling, student visa abuser, ineligible for citizenship, polygamy, international child abduction, or unlawful voting;
  - have not participated in persecution;
  - have never been convicted of any federal or state law punishable by a term of imprisonment of more than one year, or three or more offenses on separate occasions with an aggregate term of imprisonment of 90 days or more;
  - have graduated from high school, obtained a GED, or been admitted to an institution of higher education at time of application; and
  - are 35 years old or younger on the date of enactment.
- There is a waiver from the following bars for humanitarian and family unity reasons or if doing so would be in the public interest: ineligibility based on smuggling, or student visa abuser grounds, or unlawful voting.
- Aliens applying for conditional permanent resident (PR) status are required to submit biometric and biographic data and undergo security and law enforcement background checks.  The background checks shall be completed prior to the date the Secretary of Homeland Security grants the alien's PR status on a conditional basis.

1

For Official Use Only – Deliberative

CAR 0354

- Aliens applying for conditional PR status must have a medical examination, under requirements developed by DHS and HHS.
- Aliens applying for status must establish that they registered under the Military Selective Service Act (50 U.S.C. App. 451 et seq.), if subject to such registration.
- Continuous physical presence does not terminate upon service of a notice to appear (NTA) (i.e., no "stop time rule"), and an alien may be considered continuously physically present as long as departures have not exceeded 90 days at a time or an aggregate of more than 180 days.  The Secretary may extend these time periods if the alien demonstrates that the failure to timely return to the United States is due to "extenuating circumstances beyond the alien's control".
- An application is required to be filed by an alien seeking PR status on a conditional basis in a manner required by the Secretary.
- The deadline for an alien to apply is not later than one year after the later of—
    - the date the alien earned a high school diploma or obtained a GED certificate in the United States; or
    - the effective date of the interim regulations under section 6.
- The Secretary may not remove an alien who has established prima facie eligibility for conditional PR status under this Act while his or her application is pending.
- The AG must stay removal proceedings for an alien enrolled full time in primary or secondary school who has satisfied all the items listed in Section 3 above (minus the requirement to be under age 30 and educational requirement) and who is at least 5 years old; the Secretary shall not commence removal proceedings with respect to any alien who meets these requirements and is not in removal proceedings.
- An alien meeting these requirements whose removal is stayed or who may not be placed in removal proceedings shall be granted an employment authorization document upon application to the Secretary.  The Secretary or AG can lift the stay if the alien is no longer enrolled in primary or secondary school or if the alien stops meeting the other requirements.
- Numerical limitations on the number of aliens who may be eligible for cancellation of removal do not apply to aliens under this section.

**Sec. 4. Terms of Conditional Permanent Resident Status**
- Conditional PR status granted under sec. 3 shall be valid for an initial period of six years, subject to termination or extension as described below.
- The Secretary shall provide notice to aliens obtaining conditional PR status regarding the Act and requirements to have the conditional basis removed.  Failure to provide such notice shall neither effect enforcement of the Act nor give rise to any private right of action.
- The alien's conditional PR status can be terminated if the Secretary determines that the alien:
    - is no longer a person of good moral character;
    - is inadmissible for the reasons listed in Sec. 3 above;
    - has been involved in the persecution of others;
    - has been convicted of crimes as described in Sec. 3 above; or

2
For Official Use Only – Deliberative

CAR 0355

- o received a dishonorable or other than honorable discharge from the Uniformed Services.
- Upon losing the conditional PR status, the alien will revert to the immigration status held prior to receiving the conditional PR status.  If the alien held TPS prior to receiving the conditional PR status, the alien may not return to TPS status if the relevant designation has been terminated or the Secretary determines that the reason for terminating the conditional PR status renders the alien ineligible for TPS.
- The Secretary shall use Departmental information systems to maintain current information on aliens granted conditional PR status.

## Sec. 5. Removal of Conditional Basis of Permanent Resident Status

- The Secretary of Homeland Security may remove the conditional basis of an alien's LPR status if the alien demonstrates by a preponderance of the evidence that—
  - A. the alien maintained good moral character during the conditional PR status period;
  - B. the alien is not inadmissible for the reasons listed in Sec. 3 above;
  - C. the alien has not been involved in persecution as described in Sec. 3 above;
  - D. the alien has not been convicted of the crimes described in Sec. 3 above;
  - E. the alien has not abandoned residence in the U.S.;
  - F. the alien has either:
    - i. acquired a degree at a U.S. institution of higher education or completed in good standing at least two years in a bachelor's or higher degree program in the U.S., or
    - ii. at least two years of service in the Uniformed Services, and if discharged, received an honorable discharge; and
  - G. the alien provided a list of each secondary school attended in the U.S.
- The Secretary can extend the conditional PR status under a hardship exception if the alien—
  - o satisfies A, B, C, and E, above;
  - o shows compelling evidence why the alien could not meet requirement D, above; and
  - o demonstrates that his removal from the U.S. would cause "exceptional and extremely unusual hardship" to the alien or the alien's immediate family member who is a U.S. citizen or PR.
- The Secretary may extend the period of conditional PR status  upon a showing of good cause in order for the alien to complete the requirements of D, above.
- A alien shall be presumed to have abandoned his residence in the U.S. if the alien is absent from the country for over 365 days, in the aggregate, during the conditional LPR status period unless the alien can provide evidence that the alien has not abandoned residence or unless the alien was absent due to active service in the Uniformed Services.
- The conditional basis of an alien's PR status may not be removed until the alien has met the English language and civics requirements that apply to applicants for naturalization, unless the alien is unable to do so because of a physical or developmental disability or mental impairment.

3

For Official Use Only – Deliberative

CAR 0356

- The Secretary shall utilize biometric, biographic, and other data to conduct security and law enforcement background checks of an alien applying for removal of the conditional basis of the PR status, and determine whether there is any criminal, national security, or other factor that would render the alien ineligible for removal of the conditional basis.  The background checks shall be completed prior to the date the Secretary of Homeland Security removes the conditional basis of the PR status.
- An alien seeking to have the conditional basis of his PR status removed shall file with the Secretary an application for such removal.
- The alien's application for removal of the conditional basis for PR status must be filed during the time period beginning six months before and ending on that date that is the later of:
    - six years after the date of the granting of conditional PR status, or
    - any other expiration date of the conditional PR status as extended by the Secretary.
- The alien will remain in conditional PR status while the application is pending.
- The Secretary shall make a determination on each application as to whether the alien meets the requirements for removal of the conditional basis of PR status.
- If the Secretary determines that the alien meets these requirements, the Secretary shall notify the alien of such determination and remove the conditional basis of PR status, effective on the date of determination.
- If the Secretary determines that the alien does not meet these requirements, the Secretary shall notify the alien and terminate the conditional PR status if the period has ended.
- An alien granted PR status on a conditional basis shall be considered to have been admitted as an alien lawfully admitted for permanent residence and to be in the U.S. as an alien lawfully admitted to the U.S. for permanent residence.
- An alien may not apply for naturalization during the period of conditional PR status.

**Sec. 6. Regulations**
- The Secretary shall publish regulations implementing this Act no later than 180 days after the date of enactment, which shall allow eligible individuals to apply affirmatively for the relief available under section 3 without being placed in removal proceedings.
- These regulations shall be effective on an interim basis immediately upon publication but may be subject to change and revision after public notice and comment.
- The Secretary shall publish final regulations within a reasonable time.
- The requirements of the Paperwork Reduction Act shall not apply to any action to implement this Act.

**Sec. 7. Penalties for False Statements**
Any alien who knowingly makes a false statement, misrepresents or conceals a material fact, or knowingly uses a false document in applying for DREAM Act benefits will be subject to fines or up to five years of imprisonment or both.

**Sec. 8. Confidentiality of Information**

4

For Official Use Only – Deliberative

CAR 0357

- No U.S. government official may use any information furnished by the applicant to initiate removal proceedings against the alien or any other person identified in the application.  Government officials also cannot publish any information about the application that identifies the individual nor can they allow anybody other than government officials (or their designees) to examine the applications.
- Upon written request, the AG or the Secretary shall share this information with law enforcement in connection with a criminal investigation, a Brady Act firearms background check, or for homeland security or national security purposes.  The AG or the Secretary can also share this information with a coroner to identify a deceased individual.
- However, information concerning whether an alien seeking relief under this Act has (1) engaged in fraud in an application or (2) at any time committed a crime may be used or released for immigration enforcement, law enforcement, or national security purposes.
- There is up to a $10,000 criminal fine provided for violating these requirements.

**Sec. 9. Higher Education Assistance**
- An alien who is granted conditional PR status under this Act qualifies only for certain specified types of Federal higher education assistance such as federal student loans and federal work-study programs.  Such aliens do not qualify for Pell Grants.
- The state option to determine residency for purposes of higher education is restored (Section 505 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) (8 U.S.C. 1623) is repealed).  This shall take effect as if included in IIRIRA.

For Official Use Only – Deliberative

CAR 0358

**HIGHLIGHTS OF THE DREAM ACT OF 2011, S. 952**

- Senator Durbin introduced the DREAM Act in 2009, a slightly modified version in September 2010 that the Senate failed to pass, and another slightly modified version in 2011.

- The DREAM Act is bipartisan, targeted legislation that provides a rigorous process for those who entered the U.S. illegally as children to obtain conditional permanent resident status if they are able to meet several strict requirements.  Specifically, they must prove that they:
  - came to the United States when they were 15 years of age or younger;
  - have been continuously physically present in the United States for at least five years immediately preceding the date of enactment;
  - have had good moral character since the date of entry into the United States;
  - are not inadmissible under certain specified grounds in existing immigration laws, including criminal, security, and terrorism-related grounds;
  - have graduated from a U.S. high school, obtained a GED, or been admitted to an institution of higher education;
  - are 35 years of age or younger on the date of enactment; and
  - in addition to satisfying the criminal, security, and terrorism-related grounds of removability, have never been convicted of any federal or state law punishable by a term of imprisonment of more than one year, or three or more offenses with an aggregate term of imprisonment of 90 days or more.

- Aliens applying for conditional permanent resident status would also need to submit biometric and biographic data and undergo security and law enforcement background checks and a medical examination.

- Conditional permanent resident status will be terminated if the alien becomes inadmissible based on criminal activity, is no longer a person of good moral charter, or receives a dishonorable or other than honorable discharge from the Uniformed Services.

- After an initial period of six years, those individuals with conditional permanent resident status would need to meet *additional* requirements in order to move onto the next phase of this process and qualify to have the conditional basis of the permanent resident status removed.  Specifically, they must demonstrate by a preponderance of the evidence that during the period of conditional permanent status the alien:
  - continued not to be inadmissible under certain criminal, security, and terrorism-related grounds;
  - acquired a degree from an institution of higher education in the United States or completed at least two years in good standing, or served in the Uniformed Services for at least two years without receiving a dishonorable or other than honorable discharge;
  - continued to demonstrate good moral character during the entire six year period; and
  - met the English language and civics requirements that apply to applicants for naturalization.

- The DREAM Act would further enhance DHS's immigration enforcement efforts.

CAR 0359

- o Over the past two years, U.S. Immigration and Customs Enforcement (ICE) has engaged in record enforcement, removing or returning more criminal aliens over the last two years than at any point in the history of our country, including over 194,000 criminal aliens last year.
- o By providing a firm, but fair, means for those individuals who were brought to the United States as children to adjust their status, the DREAM Act would bolster DHS's efforts to prioritize the identification, apprehension, and removal of criminal aliens, gang members, and others who pose a threat to our national security and public safety.
- o All applicants will undergo a rigorous background check and only those with good moral character will be eligible for DREAM Act relief. Criminal, security, and terrorism-related grounds of inadmissibility under current immigration laws would continue to apply throughout the process.

- The DREAM Act has been strongly embraced by the military as an important element in furthering our nation's readiness and providing children of nonresident immigrants a clear path to U.S. citizenship through service in the military.

- Many of the individuals who would be covered under the DREAM Act came to the United States as very young children, know no other country, and now hope to serve in the Uniformed Services or contribute to our economic competitiveness by pursuing a college education.

CAR 0360

28 May 2012

The President
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

re: Executive authority to grant administrative relief
for DREAM Act beneficiaries

Dear Mr. President,

We write as law professors whose teaching and scholarship focus on matters of U.S. immigration and citizenship law. This letter addresses an issue that may arise as agencies and officials within the Executive Branch consider various administrative options in cases involving potential beneficiaries of the Development, Relief, and Education for Alien Minors (DREAM) Act.

In assessing the options that may be available to the Executive Branch, the threshold question is whether there is executive authority to grant administrative relief. This is the question addressed in this letter. Though your Administration has considered various forms of prosecutorial discretion for individual DREAM-eligible applicants, this letter highlights the administrative authority that is available to potential DREAM Act beneficiaries as a group. We offer no views on the policy dimensions of a decision to exercise or to not exercise this authority. We write only to explain that there is clear executive authority for several forms of administrative relief for DREAM Act beneficiaries: deferred action, parole–in–place, and deferred enforced departure.

**Deferred action** is a long–standing form of administrative relief, originally known as "nonpriority enforcement status."[1] It is one of many forms of prosecutorial discretion available to the Executive Branch. A grant of deferred action can have any of several effects, depending on the timing of the grant. It can prevent an individual from being placed in removal proceedings, suspend any proceedings that have commenced, or stay the enforcement of any existing removal order.[2] It also makes the recipient eligible to apply

---

[1] *See generally* T.A. Aleinikoff, David A. Martin, Hiroshi Motomura, and Maryellen Fullerton, *Immigration and Citizenship: Process and Policy* 780 (7th ed. 2012); Shoba Sivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 Conn. Pub. Int. L.J. 243, 248-65 (2010).

[2] Practitioners have reported that, in recent months, some DHS officials have taken the position that deferred action is available only to individuals who are in removal proceedings. At the same time, these officials maintain that once a removal case has been administratively closed, deferred action is no longer available. This position is inconsistent with DHS's prior practice. *See* Citizenship and Immigration Services

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 2

for employment authorization.[3] General authority for deferred action exists under Immigration and Nationality Act (INA) § 103(a), 8 U.S.C. § 1103(a), which grants the Secretary of Homeland Security the authority to enforce the immigration laws. Though no statutes or regulations delineate deferred action in specific terms, the U.S. Supreme Court has made clear that decisions to initiate or terminate enforcement proceedings fall squarely within the authority of the Executive.[4] In the immigration context, the Executive Branch has exercised its general enforcement authority to grant deferred action since at least 1971. Federal courts have acknowledged the existence of this executive power at least as far back as the mid–1970s.[5] More recently, this Administration granted deferred action in June 2009 to widows and children of U.S. citizens while legislation to grant them statutory relief was under consideration.[6]

**Parole–in–place** refers to a form of parole granted by the Executive Branch under the authority of INA § 212(d)(5), 8 U.S.C. § 1182(d)(5). Under this provision, the Attorney General "may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case–by–case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."[7] Parole permits a noncitizen to remain lawfully in the United States, although parole does not constitute an "admission" under the INA. Individuals who have been paroled are eligible for work authorization.[8] Under this express authority, previous Presidents have granted parole to noncitizens who did not qualify for admission under existing immigration law. For example, President Jimmy Carter exercised parole authority

---

Ombudsman, *Deferred Action:  Recommendations to Improve Transparency and Consistency in the USCIS Process*, July 11, 2011, at 3-4; Citizenship and Immigration Services, *Fact Sheet: USCIS Provides Interim Deferred Action Relief for Surviving Spouses*, Aug. 31, 2009.  It is also inconsistent with case law and with DHS's own regulations.  As the Supreme Court has explained, through deferred action: "[T]he INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation. . . . *A case may be selected for deferred action treatment at any stage of the administrative process.*" *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999) (quoting 6 C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure §72.03[2][h] (1998)) (quotation marks removed) (emphasis added); *see also* 8 C.F.R. § 274a.12(c)(14) (describing deferred action as "an act of administrative convenience to the government which gives some cases lower priority").

[3] *See* 8 C.F.R. § 274a.12(c)(14).

[4] *See, e.g., Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

[5] *See, e.g., Soon Bok Yoon v. INS*, 538 F.2d 1211, 1213 (5th Cir. 1976); *Vergel v. INS*, 536 F.2d 755, 757-58 (8th Cir. 1976); *David v. INS*, 548 F.2d 219, 223 & n.5 (8th Cir. 1977); *Nicholas v. INS*, 590 F.2d 802, 806-08 (9th Cir. 1979), *superseded by rule on other grounds*, as stated in *Romeiro de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985).

[6] *See* DHS Establishes Interim Relief for Widows of U.S. Citizens, June 9, 2009, *available at* http://www.dhs.gov/ynews/releases/pr_1244578412501.shtm.

[7] Although the INA gives the parole authority to the Attorney General, the statutes creating DHS in 2003 essentially transferred the parole–granting authority to DHS.

[8] 8 C.F.R. § 274a.12(c)(11).

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 3

to allow Cubans into the United States in 1980.[9] President Bill Clinton did the same in
1994.[10] More recently, this Administration granted parole in January 2010 to Haitian
orphans who were in the process of being adopted by U.S. citizens.[11] In May 2010, this
Administration adopted the current practice of granting parole to spouses, parents, and
children of U.S. citizens serving in the military.[12] Though the text of the statute calls for
case–by–case discretion, both historical and current practice make clear that such
discretionary judgments may be based on group circumstances.[13] And, as the Supreme
Court has made plain, the Administration's use of group circumstances as a basis for
decision–making would be entitled to deference.[14]

*Deferred enforced departure*, often referred to as DED, is a form of prosecutorial
discretion that is closely related to deferred action. Almost every Administration since
President Dwight D. Eisenhower has granted DED or the analogous "Extended Voluntary
Departure" to at least one group of noncitizens.[15] As with deferred action, executive
authority to grant deferred enforced departure and extended voluntary departure exists
under the general authority to enforce the immigration laws as set out in INA § 103(a), 8
U.S.C. § 1103(a).[16] Though Temporary Protected Status (TPS) in INA § 244, 8 U.S.C.
§ 1254a, has largely superseded the use of DED in practice, DHS's statutory authority for
granting DED on bases other than nationality remains intact, and the President retains his
inherent authority with respect to DED. Most recently, this Administration granted DED to
Liberians in March 2009.[17] Though DED has been used in response to disturbed conditions
in specific countries, there is nothing in the statutory authority for DED that limits its use
to such situations. Recipients of DED are eligible to apply for work authorization.[18]

---

[9] *See* T.A. Aleinikoff, David A. Martin, Hiroshi Motomura, and Maryellen Fullerton, *Immigration and Citizenship: Process and Policy* 520 (7th ed. 2012).

[10] *See id.*

[11] *See* Secretary Napolitano Announces Humanitarian Parole Policy for Certain Haitian Orphans, January 18, 2010, *available at* http://www.dhs.gov/ynews/releases/pr_1263861907258.shtm

[12] *See* Julia Preston, *Immigration Policy Aims to Help Military Families*, N.Y. Times, August 1, 2010, at A15.

[13] For a discussion of the historical use of the parole power, *see, e.g.,* Arthur C. Helton, *Immigration Parole Power: Toward Flexible Responses to Migration Emergencies*, 71 Interpreter Releases 1637 (Dec. 12, 1994). For examples of more recent categorical grants of parole, *see supra* notes 11 and 12.

[14] *See generally Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

[15] *See* Ari Weitzhandler, Comment, *Temporary Protected Status: The Congressional Response to the Plight of Salvadoran Aliens*, 64 U. Colo. L. Rev. 249, 256 & nn. 41–43 (1993).

[16] *Hotel and Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc) (opinion of Mikva, J.), *affirming by an equally divided court* 594 F. Supp. 502 (D.D.C. 1984); *see also American Baptist Churches in the U.S.A. v. Meese*, 712 F. Supp. 756, 768 (N.D. Cal. 1989).

[17] *See* Deferred Enforced Departure of Liberians, March 23, 2009, *available at* http://www.whitehouse.gov/the-press-office/presidential-memorandum-regarding-deferred-enforced-departure-liberians

[18] 8 C.F.R. § 274a.12(c)(14).

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 4


These three forms of administrative relief differ in their requirements and consequences. In this letter, we do not reach these questions of specific application. Our purpose in writing is more limited and straightforward: to explain that the Executive Branch has the authority to grant these three forms of administrative relief to some significant number of DREAM Act beneficiaries, and that it has done so both historically and recently in similar situations.

Respectfully yours,

Hiroshi Motomura
Susan Westerberg Prager Professor of Law
UCLA School of Law*

David Abraham
Professor of Law
University of Miami School of Law

Muneer I. Ahmad
Clinical Professor of Law
Yale Law School

Raquel Aldana
Professor of Law
University of the Pacific
McGeorge School of Law

Deborah Anker
Clinical Professor of Law
Director, Harvard Immigration and Refugee
   Clinical Program
Harvard Law School

Angela M. Banks
Associate Professor
William & Mary School of Law

---

[*] All institutional affiliations indicated for identification purposes only.

CAR 0364

*Signatures continued**

Melynda H. Barnhart
Associate Professor
New York Law School

Linda Bosniak
Professor of Law
Rutgers University School of Law-
    Camden

Richard Boswell
Professor of Law
University of California, Hastings
    College of the Law

Allison Brownell Tirres
Assistant Professor
DePaul University College of Law

Kristina M. Campbell
Assistant Professor of Law
Director, Immigration and Human Rights
    Clinic
University of the District of Columbia
David A. Clarke School of Law

Stacy Caplow
Professor of Law
Brooklyn Law School

Ming Hsu Chen
Associate Professor
University of Colorado Law School

Gabriel J. Chin
Professor of Law
University of California, Davis School of
    Law

Michael J. Churgin
Raybourne Thompson Centennial
    Professor in Law
The University of Texas at Austin

Marisa S. Cianciarulo
Associate Professor of Law
Director, Bette & Wylie Aitken Family
    Violence Clinic
Chapman University

Adam B. Cox
Professor of Law
New York University School of Law

Keith Cunningham-Parmeter
Associate Professor of Law
Willamette University College of Law

Alina Das
Assistant Professor of Clinical Law
New York University School of Law

Johanna K.P. Dennis
Associate Professor of Law
Southern University Law Center

Ingrid V. Eagly
Acting Professor of Law
UCLA School of Law

Jill E. Family
Associate Professor of Law
Widener University School of Law

Niels W. Frenzen
Clinical Professor of Law
Gould School of Law
University of Southern California

Maryellen Fullerton
Professor of Law
Brooklyn Law School

---

[*] All institutional affiliations indicated for
identification purposes only.

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 6

*Signatures continued*\*

César Cuauhtémoc García Hernández
Assistant Professor
Capital University Law School

Lauren Gilbert
Professor of Law
St. Thomas University School of Law

Denise Gilman
Clinical Professor
Co-Director, Immigration Clinic
University of Texas School of Law

Jennifer Gordon
Professor of Law
Fordham University School of Law

Pratheepan Gulasekaram
Assistant Professor of Law
Santa Clara University

Anjum Gupta
Assistant Professor of Law
Director, Immigrant Rights Clinic
Rutgers School of Law - Newark

Jonathan Hafetz
Associate Professor of Law
Seton Hall University School of Law

Barbara Hines
Clinical Professor of Law
Co-Director, Immigration Clinic
University of Texas School of Law

Geoffrey A. Hoffman
Clinical Associate Professor and
Director, University of Houston
    Immigration Clinic
University of Houston Law Center

Alan Hyde
Distinguished Professor and Sidney
    Reitman Scholar
Rutgers University School of Law

Kate Jastram
Lecturer in Residence
Senior Fellow, Miller Institute for Global
    Challenges and the Law
University of California, Berkeley School
    of Law

Michael Kagan
Associate Professor
William S. Boyd School of Law
University of Nevada, Las Vegas

Daniel Kanstroom
Professor of Law and
Director, International Human Rights
    Program
Boston College Law School

Kathleen Kim
Professor of Law
Loyola Law School, Los Angeles

David C. Koelsch
Associate Professor and
Director, Immigration Law Clinic
University of Detroit Mercy School of
    Law

Sylvia R. Lazos
Justice Myron Leavitt Professor
William S. Boyd School of Law
University of Nevada, Las Vegas

Stephen Lee
Assistant Professor of Law
University of California, Irvine

---

\* All institutional affiliations indicated for
  identification purposes only.

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 7

*Signatures continued**

Jennifer Lee Koh
Assistant Professor of Law
Western State University College of Law

Beth Lyon
Professor of Law
Villanova University School of Law

Lynn Marcus
Professor of the Practice
Co-Director, Immigration Law Clinic
University of Arizona Rogers College of
     Law

Peter L. Markowitz
Associate Clinical Professor of Law
Benjamin N. Cardozo School of Law

Fatma E. Marouf
Associate Professor of Law
Co-Director of the Immigration Clinic
William S. Boyd School of Law
University of Nevada, Las Vegas

Elizabeth McCormick
Associate Clinical Professor of Law
University of Tulsa College of Law

Karla McKanders
Associate Professor of Law
University of Tennessee, College of Law

Michelle McKinley
Associate Professor
University of Oregon School of Law

M. Isabel Medina
Ferris Family Distinguished Professor of
     Law
Loyola University New Orleans College
     of Law

Jennifer Moore
Regents Professor of Law
University of New Mexico School of
     Law

Daniel Morales
Assistant Professor
DePaul University College of Law

Nancy Morawetz
Professor of Clinical Law
New York University School of Law

Karen Musalo
Clinical Professor of Law &
Director, Center for Gender & Refugee
     Studies
University of California, Hastings
     College of the Law

Noah Benjamin Novogrodsky
Associate Professor of Law
University of Wyoming College of Law

Mariela Olivares
Assistant Professor of Law
Howard University School of Law

Michael A. Olivas
William B. Bates Distinguished Chair in
     Law
University of Houston Law Center

Sarah H. Paoletti
Practice Associate Professor
Director, Transnational Legal Clinic
University of Pennsylvania School of
     Law

---

[*] All institutional affiliations indicated for
     identification purposes only.

CAR 0367

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 8

*Signatures continued\**

Huyen Pham
Professor of Law
Texas Wesleyan University School of
Law

Polly J. Price
Professor of Law
Emory University School of Law

Nina Rabin
Associate Clinical Professor of Law
Director, Bacon Immigration Law and
Policy Program
James E. Rogers College of Law,
University of Arizona

Jaya Ramji-Nogales
Associate Professor of Law
Temple University, Beasley School of
Law

Jayesh Rathod
Assistant Professor of Law
American University Washington
College of Law

Maritza Reyes
Assistant Professor of Law
Florida A&M University College of Law

Ediberto Roman
Professor of Law &
Director of Citizenship and Immigration
Initiatives
Florida International University

Victor C. Romero
Maureen B. Cavanaugh Distinguished
Faculty Scholar & Professor of Law
The Pennsylvania State University,
Dickinson School of Law

Rachel E. Rosenbloom
Assistant Professor
Northeastern University School of Law

Kevin Ruser
M.S. Hevelone Professor of Law
Director of Clinical Programs
University of Nebraska-Lincoln College
of Law

Leticia M. Saucedo
Professor of Law
University of California, Davis School of
Law

Michael Scaperlanda
Edwards Family Chair in Law
University of Oklahoma College of Law

Irene Scharf
Professor of Law
University of Massachusetts School of
Law – Dartmouth

Andrew I. Schoenholtz
Visiting Professor of Law
Georgetown University Law Center

Philip G. Schrag
Delaney Family Professor of Public
Interest Law
Georgetown University Law Center

Rachel Settlage
Assistant Professor
Wayne State Law School

---

\* All institutional affiliations indicated for
identification purposes only.

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 9

*Signatures continued**

Ragini Shah
Associate Clinical Professor of Law
Suffolk University Law School

Rebecca Sharpless
Associate Clinical Professor
University of Miami School of Law

Dan R. Smulian
Associate Professor of Clinical Law
Safe Harbor Project
BLS Legal Services Corporation
Brooklyn Law School

Gemma Solimene
Clinical Associate Professor of Law
Fordham University School of Law

Jayashri Srikantiah
Professor of Law &
Director, Immigrants' Rights Clinic
Stanford Law School

Juliet P. Stumpf
Professor of Law
Lewis & Clark Law School

Maureen A. Sweeney
Clinical Instructor
Immigration Clinic
University of Maryland Francis King
   Carey School of Law

Margaret Taylor
Professor of Law
Wake Forest University School of Law

David B. Thronson
Professor of Law
Michigan State University College of
   Law

Enid Trucios-Haynes
Professor of Law &
University Faculty Grievance Officer
Brandeis School of Law
University of Louisville

Diane Uchimiya
Professor of Law
Director of the Justice and Immigration
   Clinic
University of LaVerne College of Law

Katherine L. Vaughns
Professor of Law
University of Maryland Francis King
   Carey School of Law

Prof. Sheila I Vélez Martínez
Immigration Law Clinic
University of Pittsburgh School of Law

Leti Volpp
Professor
University of California, Berkeley
   School of Law

Shoba Sivaprasad Wadhia, Esq.
Clinical Professor and
Director, Center for Immigrants' Rights
The Pennsylvania State University
The Dickinson School of Law

David P. Weber
Associate Professor of Law
Creighton Law School

Jonathan Weinberg
Professor of Law
Wayne State University

---

* All institutional affiliations indicated for
  identification purposes only.

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 10

*Signatures continued**

Deborah M. Weissman
Reef C. Ivey II Distinguished Professor
    of Law
University of North Carolina School of
    Law

Virgil Wiebe
Professor of Law
University of St. Thomas School of Law
    (Minneapolis)

Michael Wishnie
William O. Douglas Clinical Professor of
    Law and
Director of the Jerome N. Frank Legal
    Services Organization
Yale Law School

Elizabeth L. Young
Associate Professor of Law
University of Arkansas School of Law –
    Fayetteville

---

[*] All institutional affiliations indicated for
    identification purposes only.

## Summary Regarding Executive Branch Authority
## to Grant DREAMers Temporary Relief

**To:**      Interested Parties

**From:**  Cheryl Little, Esq, Executive Director
             Americans for Immigrant Justice
**Date:**  May 2, 2012

### Background

How much talent can the United States afford to waste?  Some 65,000 students graduate high school each year to face bleak prospects regardless of their talent and potential to significantly contribute to the United States.  Without a path to legal status, their principal options are dead-end jobs.  They live in fear of deportation.  They cannot drive or work legally.  They are ineligible for most college scholarships and loans and, in most states, in-state tuition.  Consequently, many drop out of higher education due to prohibitively high costs.

There is a promising fix, however.  DREAM Act legislation in Congress would offer those students a path to legal status and higher education.  Beyond helping deserving youth improve their prospects for prosperous lives, the bill would do much more for the nation as a whole.

The DREAM act would stop the colossal brain drain that occurs when ambitious young people are deported or blocked from achieving their full potential as doctors, scientists, academics, entrepreneurs, military officers—and in other careers that require higher education.  Were there talents unleashed, these new Americans will earn, spend and invest more in the U.S. economy.  At a time of increasing demand for highly skilled "knowledge workers" in a global economy, the legalization of bicultural and multilingual youth will pay enormous dividends.

Florida's U.S. Senator Marco Rubio is working on a bill that would offer DREAMers a nonimmigrant visa that could be renewed indefinitely.  It wouldn't lead to U.S. residency or citizenship. Yet the type of limited status Sen. Rubio envisions doesn't have to be passed by Congress and signed into law by the president.  The U.S. Department of Homeland Security (DHS) already has the discretionary power to grant potential DREAMers temporary legal status that can be renewed indefinitely and allows them to work and drive legally.

Such provisional status can serve as a bridge to the future.  Some day, Congress could approve the pending DREAM Act (S.952), which would allow immigrant youth who attend college or serve in the U.S. military to eventually become citizens. Until that day arrives, DHS should create a program allowing

CAR 0371

DREAM Act youth to apply for provisional status on a case by case basis. Thus, immigrant youth could pursue their dreams while contributing their considerable talents to the country they love and consider home.

A DHS program offering DREAMers provisional status would be more advantageous than a law that provides similar benefits. Neither would offer a path to permanent legal status. However, the law easily could become a permanent fix and dilute or preempt potential paths to permanent legal status.

The authority of law enforcement agencies to exercise discretion in deciding what cases to investigate and prosecute under existing civil and criminal law, including immigration law, is fundamental to the American legal system.

The authority granted the Executive Branch regarding immigration laws and policies is well documented. This memo provides a short overview of the scope of this power, with specific examples of its past use.

This memo is based in large part on an April 29, 2011 memo from former American Immigration Lawyers Association Executive Director, Jeanne Butterfield, Esq.; Former INS General Counsel, Bo Cooper, Esq.; Center for American Progress, Director of Immigration Policy, Marshall Fitz, Esq.; American Immigration Council, Executive Director, Benjamin Johnson, Esq.; Former INS General Counsel, Paul Virtue, Esq.; and American Immigration Lawyers Association, Executive Director, Crystal Williams, Esq.

**Exercising Executive Authority**

The Supreme Court has made it clear that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney 470 U.S. 821, 831 (1985).

In the immigration context, prosecutorial discretion is exercised at every stage in the enforcement process—which arrests will be made, which persons will be detained, which persons will be released on bond, which cases will be brought forward for removal hearings or criminal prosecution, and which removal orders will be executed.

Despite the massive allocation of resources Congress has dedicated to immigration enforcement activities, funding has limits, and the agency must make thoughtful decisions about prosecutorial priorities.  Indeed, The President has repeatedly announced that the Administration's interior enforcement priority is the prosecution and removal of immigrants who have committed serious crimes.

Prosecutorial discretion can be exercised on a case-by-case basis once individuals come into contact with law enforcement.  The government may also exercise this authority by allowing individuals from explicitly defined groups not considered as enforcement priorities to affirmatively request favorable relief.

Numerous memos have been issued by DHS and its predecessor INS over the years, outlining agency priorities and seeking to provide its officers with clear guideposts for carrying out those priorities.  The

CAR 0372

challenge is often in ensuring that such guidance is understood and followed on the frontlines of immigration enforcement.

ICE Director John Morton's June 17, 2011 memorandum on prosecutorial discretion focuses on low enforcement priorities and what specific factors are to be considered on a case-by-case basis when deciding to administratively close a case.  Individuals are not eligible for work authorization on the basis of receiving administrative closure alone.  Prosecutorial discretion can be exercised favorably in both pending non-detained and detained cases, although non-detained cases represent the vast majority of these cases thus far.

**Deferred Action**

While administrative closure is currently the focus of the Administration's exercise of discretion not to remove someone, deferred action is also an appropriate mechanism to achieve this end.

The Executive Branch, through the Secretary of the Department of Homeland Security (DHS), can exercise discretion not to prosecute a case by granting "deferred action" to persons subject to removal. The former Immigration and Naturalization Service (INS) had "Operations Instructions" regarding deferred action.  *See* (Legacy) Immigration and Naturalization Service, Operations Instructions, 0.1 § 103.1(a) (1) (ii) (1975).  Currently, deferred action is considered "a discretionary action initiated at the discretion of the agency or at the request of the alien." Http://www.dhs.gov/xlibrary/assets/cisombudsman_rr_32_o_deferred_action_uscis_response_08-07-07.pdf.

 This relief allows a person to temporarily remain in the U.S. and is "an act of administrative convenience to the government which gives some cases lower priority." (*See* 8 C.F.R. §274a.12(c) (14). DHS says that the presence of sympathetic or compelling factors should be considered in making a decision whether to grant deferred action.  While this relief can be terminated at any time, beneficiaries can get a work permit during the period when beneficiaries are allowed to remain in the U.S.  With a work permit they can apply for a driver's license in states requiring applicants to have legal status.

In AI Justice's experience, deferred action is only being granted to DREAMers with final removal orders, whose deportation is imminent.  Typically clients are granted this relief for 12-18 months; requests for renewals must be submitted.  Recently ICE has been reluctant to grant deferred action and is instead releasing DREAMers with an order of supervision (can apply for work permit) or is simply staying their removal (not eligible for work permit).  In-person reporting requirements are frequently required with orders of supervision.

While deferred action decisions generally are made on a case-by-case basis, they can be applied to discrete classes of non-citizens.  Each case, however, is individually reviewed.  In June 2009, for example, DHS Secretary Napolitano granted deferred action to widows of U.S. citizens who were unable to adjust their status due to a statutory restriction.  In 2010 deferred action was granted to nearly 12,000 VAWA applicants whose cases were on hold pending the promulgation of DHS regulations.  In the aftermath of Hurricane Katrina, USCIS granted deferred action to non-immigrants impacted by the disaster.  They

have also done so for certain military dependents for whom a visa number was not current and who were ineligible for Parole-in-Place.

USCIS, ICE and CBP all have the authority to grant deferred action. Deferred action may be extended indefinitely.  There is no application form or filing fee required at this time, although if USCIS significantly increases the use of this exercise of prosecutorial discretion they could require a separate appropriation or independent funding stream.  Another option is for USCIS to design and seek expedited approval of a dedicated deferred action form and require a filing fee.

USCIS could also tailor the use of deferred action for DREAMers based on the Registry program.  *See* section 249 of the INA.  Currently this relief is limited to persons who entered before January 1, 1972 but it could be extended, for example, to persons who have resided in the US since 1995.

**Deferred Enforced Departure (DED)**

Prior to the enactment of Temporary Protected Status (TPS), the Attorney General provided relief by suspending enforcement of immigration laws against a particular group of individuals.  One of the two most common discretionary procedures to provide relief from deportation has been deferred departure or deferred enforced departure (DED).

The President has the authority to grant DED to a class or group of foreign nationals pursuant to his foreign relations and prosecutorial discretion powers.  The Attorney General has therefore provided that under certain conditions persons who have not been legally admitted to the United States may remain in the country either temporarily or permanently.  *See* §240 of INA (8 U.S.C. § 1229a); §240B (8 U.S.C. §1229c).

The discretionary procedures of DED are used to provide relief the Administration feels is appropriate. The executive branch's position is that all blanket relief decisions require a balance of judgment regarding foreign policy, humanitarian, and immigration concerns.

DED can be granted for any specific amount of time and typically comes with a work permit.  Unlike TPS, there is no application fee and persons who benefit from DED do not necessarily register for this status with USCIS, but protection is triggered when they are identified for deportation.  If, however, they wish to be employed in the United States, they must apply for a work permit from USCIS.

President Clinton instructed the Attorney General to grant DED to Haitian nationals already in the U.S. without legal status in December 1997, due to country conditions.  President George W. Bush granted DED to certain Liberian nationals in 2007 and President Obama extended this relief in 2009.

**Humanitarian Parole or Parole-in-Place**

The Executive Branch, through the Secretary of Homeland Security, has the authority to "parole" persons for "urgent humanitarian reasons or significant public benefit."  (See INA§212(d)(s)(A).  If that person is in the United States and has not already been admitted or paroled, this relief is called "Paroled

CAR 0374

in Place (PIP).  PIP has been granted by USCIS without requiring the filing of any form or fee, but that could be altered.

For years, USCIS has granted PIP on a limited basis.  Under the Clinton Administration, PIP was granted to Cuban boat persons who made it to dry land (dry foot/wet foot policy).  More recently a broader use of PIP was approved for certain qualified military dependents to, among other things, preserve family unity and address Department of Defense concerns about soldier safety and readiness for duty.  Parole has also been granted to Cuban beneficiaries of I-130 relative petitions (renewed recently) and workers in the N. Mariana Islands also have benefited from this relief.

Persons who were lawfully admitted to the U.S. but whose authorized period of admission is about to expire or has expired are not eligible for PIP.  Since many DREAMers arrived with their parents who had valid visas, PIP is not a practical solution.  However, USCIS can increase the use of deferred action for these persons.

**In Sum**

While the Administration may be concerned that exercising prosecutorial discretion to grant DREAMers provisional status would be controversial, it clearly has the authority to do so.  In 2010, USCIS wrote a memo, "Administrative Alternatives to Comprehensive Immigration Reform," detailing ways in which the Administration could provide relief options to promote family unity, foster economic growth, achieve significant process improvements and reduce the threat of removal for certain persons present in the U.S. without authorization.  This memo was leaked, some Republicans accused the Administration of trying to bring about "back door amnesty" and the Administration quickly retreated.

More recently, an April 26, 2012 Washington Post article, "Shift on Executive Power lets Obama bypass Rivals," discusses President Obama's desire "to more aggressively use executive power to govern in the face of Congressional obstructionism."  Aides say President Obama coined a "We Can't Wait" slogan at a recent meeting, where reportedly dozens of new ideas were rolled out.  In February 2011, President Obama directed the Justice Department to stop defending the Defense of Marriage Act.  As Jack Goldsmith, the former head of DOJ's Office of Legal Counsel, has said:  "You can't be in that (President's) office with all its enormous responsibilities…and not exercise all the powers that accrued to it over time."

 We continue to see DREAMers in ICE detention.  Shamir Ali, a bright 25 year old from Bangladesh came to the U.S. when he was age 7. In November 2011, he was detained and initially denied relief by ICE despite a compelling case and widespread public support.  AI Justice learned of his case and submitted a Request for Reconsideration, which thankfully led to his release.  Yet DREAMers like Shamir too often end up in ICE detention.  Currently we know of at least one DREAMer who is detained at the Broward Transitional Center in Pompano, Florida.

Countless DREAMers have been deported.   Currently, only those whose deportation is imminent have an opportunity to get temporary legal status and a work permit.  The vast majority of DREAMers, therefore, remain in legal limbo.  These DREAMers have been patiently waiting years for Congress to

CAR 0375

pass the DREAM Act.  The Administration needs to give these DREAMers a lifeline, and should do so now.  There is no doubt that the Administration has the authority to do so.  It's also the moral and right imperative.  The only question is whether the Administration has the will to do this.  Tens of thousands of DREAMers and millions of U.S. Latinos are hoping and praying the answer is yes.



CAR 0376

**From:**     Cheryl Little ██████████████████

**Sent:**     Monday, May 28, 2012 1:22 PM

**To:**       Olavarria, Esther ████████████████████████

**Subject:**  Tomorrow's mtg

Scheduled for 10:15. Any additional advice abt what we should focus on--have sense Admin knows they have authority to grant deferred action so hopefully don't have to dwell on this. Think lawyers shd say as little as possible--let DREAMers do the talking. (Am in N Carolina waiting for connecting flight to DC.).                 Thanks!

-------------------------
Sent using BlackBerry

NOTICE: This electronic message transmission was sent by an attorney or at the direction of an attorney and contains information which may be confidential and/or privileged.  The electronic message and any attachments are confidential property of the sender.  The information contained herein is intended only for the use of the intended recipient(s).  Interception, copying, accessing, disclosure, distribution, or use of this message or any attachments by any person other than an intended recipient is prohibited.

HQCOU 90/16-P

MEMORANDUM FOR THE COMMISSIONER

THROUGH:   THE DEPUTY COMMISSIONER

FROM:        Bo Cooper
                    General Counsel

SUBJECT:    <u>INS Exercise of Prosecutorial Discretion</u>

## I.        <u>Summary</u>

This memorandum sets out the legal basis upon which, and the extent to which, the Immigration and Naturalization Service (INS) may exercise prosecutorial discretion in its enforcement activities, including placing aliens in removal proceedings by serving them with Notices to Appear (NTAs). The structure of the memorandum is a series of questions and answers about prosecutorial discretion and the application of the doctrine to INS operations. It is our opinion that the INS has prosecutorial discretion to place a removable alien in proceedings, or not to do so, but it does not have prosecutorial discretion to admit an alien into the United States who is inadmissible under the immigration laws, or to provide any immigration benefit to any alien ineligible to receive it.

The memorandum is intended to be the first step in the INS' examination of its use of prosecutorial discretion. As such, the analysis is confined to laying out the legal basis for guidelines or other policy action that may be considered or undertaken in the future. It is not intended to serve as policy guidance itself on the use of prosecutorial discretion. Instead, this memorandum will provide the agency with a foundation to develop such guidance after consultation among the appropriate INS components. In particular, our legal conclusion that the INS has prosecutorial discretion to determine not to put a removable alien in proceedings is not intended to suggest that in any particular case such a determination should be made as a policy matter, or to supersede any current INS policy or procedures for charging removable aliens.

CAR 0378

## II.   Discussion of INS Prosecutorial Discretion

### Question 1.  What is "prosecutorial discretion?"

Prosecutorial discretion is a decision by an individual or law enforcement agency charged with enforcing a law to enforce -- or not to enforce -- that law against someone; in other words, to decide to proceed against person A, but not person B, even though the law would authorize action against both.  Although prosecutorial discretion is sometimes viewed solely as the decision of a prosecutor whether or not to bring charges against an individual, the term also can apply to a broad spectrum of discretionary enforcement decisions taken by a law enforcement agency, including:  the decision to focus investigative resources on particular offenses or conduct; the decision of an investigating officer whether to stop or arrest a suspect; the decision of a prosecutor whether to charge an individual believed to have broken the law; the selection of what charge to bring in the very frequent situations in which more than one is available; the decision to drop some or all charges in an ongoing case; and the decision whether or not to seek to settle a case by plea bargain.  Often, an individual who is not actually a prosecutor has broad "prosecutorial" discretion; for example, police officers have broad prosecutorial authority to charge minor offenses such as traffic violations.

For these reasons, the term "prosecutorial discretion" can be something of a misnomer, unless the focus is specifically on the decision of a prosecutor to bring a charge.  Other applicable terms could include "enforcement discretion" or "administrative discretion" (generally), or "investigative discretion" (the discretion to focus investigative resources on particular priorities or targets).

### Question 2:  Why do law enforcement agencies have prosecutorial discretion?

The idea that the prosecutor is vested with broad discretion in deciding when to prosecute, and when not to prosecute, is firmly entrenched in American law.  W. LaFave and J. Israel, Criminal Procedure § 13.2 (2d ed. 1992).  Reasons for discretionary enforcement include (1) legislative "overcriminalization," such as the continued existence of crimes on the statute books that society does not wish to enforce, or does not wish to enforce as broadly as they are written (for example, morals offenses such as adultery); (2) limitations in available enforcement resources that make it impossible for a law enforcement agency to prosecute all offenses that come to its attention; and (3) the need to address the equities of individual cases in a way that rigid application of a broadly-drawn statute often cannot do.

The courts have recognized that attempting to review the discretionary enforcement decisions that prosecutors necessarily must make is a task "particularly ill-suited to judicial review."  Wayte v. United States, 470 U.S. 598, 607 (1985).  As the Supreme Court has stated, "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake . . . Examining the basis of a prosecution delays the criminal proceeding, threatens to

chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." Id. at 607-08.

**Question 3:  How does the general concept of prosecutorial discretion apply in the immigration enforcement context?**

The INS is often involved, as the investigating agency that presents suspected criminal offenses involving the immigration laws to U.S. Attorneys for possible prosecution, in questions of prosecutorial discretion in the classic context of a criminal prosecutor's decision to charge. However, this answer focuses on the INS' exercise of discretion in the administrative context, when the INS itself is the decisionmaker.  Because the INS is simultaneously in removal and detention matters the investigating agency, the prosecuting agency, the custodian, and the removing agency, the administrative enforcement discretion generally deferred to by courts extends far more broadly to a wide variety of INS decisions than the strictly "prosecutorial" decision to institute removal proceedings.

The concept of prosecutorial discretion applies in the civil, administrative arena as much as it does in criminal law.  The Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney, 470 U.S. 821, 831 (1985).  Courts have long recognized that the INS may exercise prosecutorial discretion in its enforcement activities. E.g., Johns v. Department of Justice, 653 F.2d 884, 890 (5th Cir. 1981); Matter of Geronimo, 13 I & N 680, 681 (BIA 1971).  In a case decided last term, the Supreme Court specifically reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activity such as a decision to place a particular alien in deportation proceedings.  Reno v. American-Arab Anti-Discrimination Committee, 119 S. Ct. 936 (1999) ("AADC").  In AADC, the Court stated that the IIRIRA provision (section 242(g) of the INA) at issue in the case "was directed against a particular evil:  attempts to impose judicial constraints upon prosecutorial discretion." Id. at 944 n. 9.

Because -- like other law enforcement agencies -- the INS does not have the resources fully and completely to enforce the immigration laws against every violator, it exercises prosecutorial discretion thousands of times every day.  INS enforcement priorities, including the removal of criminal aliens and the deterrence of alien smuggling, are examples of discretionary enforcement decisions on the broad, general level that focus INS enforcement resources in the areas of greatest need.  When illegal border crossers are voluntarily returned to Mexico, or removable aliens are allowed to withdraw their applications for admission at a port of entry, without being placed in removal proceedings, those are exercises of prosecutorial discretion. Similarly, an INS grant of deferred action is an act of prosecutorial discretion. AADC, 119 S. Ct at 943.

Agencies may exercise enforcement discretion in individual cases based on the particular facts or on enforcement priorities, or prosecutorial discretion may be more formalized and

generalized through agency regulations or procedures, such as those that govern decisions to
place aliens in deferred action status or to grant them voluntary departure.

**Question 4:  What are the limits on INS prosecutorial discretion?**

Under the Supreme Court's decision in Chaney, there is a rebuttable presumption that an
agency's discretionary decision not to take enforcement action is not reviewable by the courts
under the Administrative Procedure Act (APA), 5 U.S.C. § 501 et seq.  Chaney, 470 U.S. at 832-
33; see Texas v. United States, 106 F.2d 661, 667 (5th Cir. 1997) (rejecting "out-of-hand" Texas'
argument that the INS failed to enforce the INA adequately, and that the alleged breach was
reviewable under the APA for abuse of discretion).  AADC confirms that affirmative
discretionary decisions to select an individual violator for enforcement proceedings are also
generally unreviewable.  In other words, unlike discretionary decisions that are reviewable for
abuse of discretion based on the facts of the case -- such as a grant or denial of a waiver by an
immigration judge -- courts will not review an exercise of prosecutorial discretion for abuse of
discretion.  There are significant limitations to prosecutorial discretion, however.

First, in order to be a nonreviewable exercise of prosecutorial discretion, the decision
must be a decision to enforce, or not to enforce, the law.  An enforcement decision must be
distinguished from an affirmative act of approval, or grant of a benefit, under a statute or other
applicable law that sets guidelines for determining when the approval should be given.  Chaney,
470 U.S. at 831.  An enforcement decision is an exercise -- or nonexercise -- of an agency's
coercive power over an individual's liberty or property.  Id. at 832.

The doctrine of prosecutorial discretion applies to enforcement decisions, not benefit
decisions.  For example, a decision to charge, or not to charge, an alien with a ground of
deportability is clearly a prosecutorial enforcement decision.  By contrast, a grant of an
immigration benefit, such as naturalization or adjustment of status, is a benefit decision that is
not a subject for prosecutorial discretion.  See Chaney, 470 U.S. at 831 (distinguishing Citizens
to Preserve Overton Park v. Volpe, 401 U.S. 402  (1971)).  An agency must grant or deny a
benefit based on its application of the criteria established by statute and implementing
regulations.  For example, if the INS selectively applied the naturalization requirements by
granting some applications filed by aliens who had been lawful permanent residents less than
five years, but denying others, it would be difficult to defend that action on the ground that the
agency had "prosecutorial discretion" not to "enforce" the five-year requirement; rather, its
application of the law would be vulnerable to a claim that it was arbitrary and capricious in
violation of the APA.

It is important not to confuse the discretion that the INS has with respect to many benefit
decisions with unreviewable prosecutorial discretion.  For example, a grant of asylum under
section 208 of the INA to an applicant meeting the statutory requirements is a discretionary
action, but an applicant denied asylum by the INS will be given the opportunity to have his or
her claim considered by an immigration judge, and an immigration judge's exercise of the
Attorney General's discretionary authority to deny asylum is reviewable for abuse of discretion

MEMORANDUM FOR THE COMMISSIONER                                    Page 5
SUBJECT:        INS Exercise of Prosecutorial Discretion

on appeal to the Board of Immigration Appeals and a Circuit Court of Appeals.  This type of discretion is not prosecutorial discretion.  There are also situations in which the INS' discretionary grant or denial of an immigration benefit is not reviewable.  For example, 8 C.F.R. § 274.13(c) provides that a denial of an application for employment authorization may not be appealed, but that unreviewability does not make such a denial an act of prosecutorial discretion.

Chaney's distinction between decisions involving the exercise of coercive power over liberty or property, and those involving administrative systems for the adjudication of affirmative approvals or benefits, provides substantial assistance in attempting to define the scope of the INS' prosecutorial discretion.  This distinction is not always an easy, bright-line rule to apply, however.  The distinction between an enforcement decision and an affirmative act of approval is often blurred.  A decision not to enforce the immigration laws by placing an alien present in the United States in proceedings will (although it is not a grant of an immigration benefit per se) result in the alien's continued presence in violation of law, and in some cases to the eventual grant of a benefit such as adjustment of status.  In some situations, the exercise of INS prosecutorial discretion serves directly as the basis for benefit eligibility.  For example, aliens who are the beneficiaries of deferred action are considered "lawfully present" for the purpose of eligibility for Title II Social Security benefits under 8 C.F.R. § 103.12(a)(4)(vi), and are eligible for employment authorization under 8 C.F.R. § 274a.12(c)(14).  Furthermore, a removal proceeding often combines both an affirmative adjudication of a benefit (such as a request for asylum) and the exercise of the coercive power of the agency.

There are also situations in which the INS cannot as a practical matter exercise its legal authority to refrain from placing an alien in proceedings, because alternatives to proceedings are not reasonably available.  For example, a lawful permanent resident alien seeking admission at a port-of-entry who is found to be inadmissible with no available waiver cannot be admitted, so there is no satisfactory alternative to removal proceedings (this topic is discussed further in the answers to questions 7 and 8 below).

Second, the presumption that agency prosecutorial discretion is unreviewable may be rebutted where the substantive statute has provided clear guidelines for the agency to follow in exercising its enforcement powers.  Chaney, 470 U.S. at 832-33.  "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue."  Id. at 833.  Although extreme examples of legislative control of executive enforcement activity -- such as, to take a hypothetical example, a statute directing an agency to commence an enforcement action against a specific individual -- would raise Constitutional concerns regarding the separation of powers, Congress may as a general matter direct and guide agency action by statute.  Because a decision not to take enforcement action is presumptively unreviewable, however, only Congress' clear legislative intention to circumscribe agency enforcement discretion, and its provision of "meaningful standards for defining the limits of that discretion," will overcome the presumption against judicial review of a decision not to enforce the law.  Id. at 834.

MEMORANDUM FOR THE COMMISSIONER                                          Page 6
SUBJECT:      INS Exercise of Prosecutorial Discretion

Section 242(g) of the INA, as interpreted by the Supreme Court in AADC, provides that INS enforcement decisions whether or not to commence proceedings or execute removal orders against any alien are not judicially reviewable.  AADC, 119 S. Ct. at 943-44.  With respect to those discretionary enforcement decisions, then, not only has Congress not clearly circumscribed the INS' enforcement discretion while providing meaningful standards defining the limits of that discretion, but it has firmly and specifically preserved INS discretion in this area.

With respect to detention, however, Congress made it clear in IIRIRA that, in order to ensure the removal of certain aliens, it intended to limit the enforcement discretion previously provided by the INA to INS decisions not to detain certain aliens under the INA's detention authority.  The subject of detention is discussed more thoroughly in the answer to question 9, below.

Third, prosecutorial discretion is subject to constitutional constraints.  Equal protection prohibits a decision to prosecute that is based upon an unjustifiable standard such as race, religion, or other arbitrary classification.  United States v. Armstrong, 517 U.S. 456, 464 (1996).  Because of the broad discretion granted to prosecutorial decisions, however, a "selective prosecution" case is a very difficult one to make (selective prosecution is further discussed in the answer to question 5).

Fourth, prosecutorial discretion to enforce the law can extend only up to the substantive and jurisdictional limits of that law.  Although a law enforcement agency can strictly enforce the law as written against every violator if it wishes to do so and has sufficient resources, it cannot go beyond the law.  For example, the INS cannot pursue a removal case against someone it knows to be a U.S. citizen because removing that individual is not an action within the substantive limits of the INA.  Nor may the INS pursue an enforcement action that might be entirely appropriate if done by some other agency, but is not within the legal jurisdiction of the INS.

We also emphasize the important distinction between prosecutorial discretion to enforce the law, and the legal requirements applicable to the enforcement proceeding itself.  See Geronimo, 13 I & N at 681 (it is the district director's discretionary decision whether to institute deportation proceedings; the immigration judge's function is not to review the wisdom of the district director's initiation of the proceedings, but to determine whether the deportation charge is sustained by the requisite evidence).  Those legal requirements must always be followed, and INS compliance with them may be reviewed by the appropriate court.

An example of this distinction is an INS arrest of an alien believed to be present in the United States in violation of the INA.  The INS has the discretionary authority not to arrest such an alien, even if there is probable cause to believe he is in the United States unlawfully.  If the INS encounters several aliens and has probable cause to believe all of them are present unlawfully, the INS has the discretionary authority to arrest some of them, but not others, and the arrested aliens do not have a cognizable claim that their arrests were illegal merely because they were singled out -- just as a speeder pulled over on the highway will not be heard to complain

CAR 0383

that his ticket should be dismissed because others were speeding, but were not pulled over.  What the INS does <u>not</u> have the authority to do, under prosecutorial discretion or any other rule of law, is to arrest someone without probable cause to do so.

**Question 5:  Who enforces the limitations on INS prosecutorial discretion?**

Another way of examining the limitations on INS' prosecutorial discretion is to ask, who may question an INS decision to enforce, or not to enforce, the immigration laws with respect to an alien, or category of aliens?  There are basically three possible sources of legal limitation on INS' discretion:  The federal courts, Congress, and INS or the Department of Justice itself.

Court challenges to prosecutorial discretion come in two forms.  First, and most common, is a claim by someone who is the subject of enforcement that the enforcement is illegal because he has been improperly singled out for prosecution.  For example, in <u>AADC</u>, aliens who had failed to maintain lawful immigration status complained that the INS sought to deport them, as opposed to other similarly situated aliens not placed in proceedings, because of their exercise of First Amendment rights.  The Supreme Court rejected the claim, holding that when an alien's continued presence in the United States is in violation of the immigration laws, the INS does not violate the Constitution by selecting his case for enforcement because it believes him to be a member of an organization that supports terrorist activity.  <u>AADC</u>, 119 S. Ct. at 946.  As a result of the broad discretion courts grant to prosecutors' exercise of discretion, selective enforcement claims very rarely succeed, and then only when the defendant is able to produce clear evidence displacing the presumption that the prosecutor has acted lawfully.  <u>Id.</u>; <u>Armstrong</u>, 517 U.S. at 464.  In order to prevail on a selective prosecution claim that he was singled out on the basis of his race, the defendant must prove that the government's prosecutorial policy declined to prosecute similarly situated suspects of other races, and that the policy was motivated by a discriminatory purpose.  <u>Armstrong</u>, 517 U.S. at  465.

Although federal courts generally have upheld INS prosecutorial discretion by rejecting selective prosecution arguments in immigration cases, <u>Pasquini v. Howerton</u>, 700 F.2d 658, 662 (11th Cir. 1983), they have on occasion been receptive to such arguments.  <u>Lennon v. INS</u>, 527 F.2d 187, 195 (2d Cir. 1975).  <u>AADC</u>'s firm rejection of a selective prosecution argument raises the bar for such arguments in removal cases, however, even higher than the already extremely deferential <u>Armstrong</u> standard applicable to criminal cases.  <u>AADC</u>, 119 S.Ct at 946-47.  For several reasons, the concerns that make courts properly hesitant to examine the decision whether to prosecute are "greatly magnified in the deportation context."  <u>Id.</u>  Consequently, although the Supreme Court did not rule out the possibility of "a rare case in which the alleged basis of discrimination is so outrageous" that these concerns can be overcome, <u>AADC</u> has made selective prosecution claims in immigration cases substantially more difficult to prevail upon than was previously the case.

Less common than a selective prosecution claim, but not unknown, is a judicial claim by someone asking a court to order an agency to take enforcement action against someone else.  For example, in <u>Chaney</u>, death row inmates sought an order requiring the FDA to enforce the drug

laws in ways that would make it essentially impossible for states to use any drugs for lethal injections.  Chaney, 470 U.S. at 823.  These claims likewise usually fail, if not for threshhold grounds of judicial standing (i.e., that the claimant does not have a sufficient personal stake in the issue to raise the claim), then as a result of courts' deference to an agency decision not to enforce.

Congress may also limit an agency's prosecutorial discretion by a variety of means, ranging from changes in the substantive law of the offense to channeling funding through the budget process to particular areas of concern.  A basic legal question common to prosecutorial discretion issues, then, is whether the relevant statute limits discretion with respect to a particular enforcement activity.  As prosecutorial discretion is an authority inherent in the law enforcement function, a statutory limitation must be clear and specific.  If prosecutorial discretion is specifically limited by law, that limitation is likely to be enforceable in court by a person aggrieved by its violation, returning the question to a judicial forum.  If the law does not limit discretion, however, then the only question for the Executive agency -- and it is not a legal one -- is whether the manner in which it exercises its enforcement authority is likely to invite future statutory limitations.

The third source of limitation on prosecutorial discretion comes from within the law enforcement agency itself, or from higher Executive Branch authorities (such as, in the case of INS, the Attorney General or the President).  Whether by regulation or policy directive, an agency may channel and guide the discretion of its employees entrusted with the responsibility of making discretionary enforcement decisions in order to ensure that such decisions are made fairly and judiciously.  Indeed, appropriate policy guidance, reinforced by training, is necessary in order for a law enforcement agency to carry out an enforcement function properly.  Such guidance serves a variety of policy goals, including promoting public confidence in the fairness and consistency of the agency's enforcement action; ensuring that employees carrying out the agency's discretionary functions are delegated the degree of discretionary authority appropriate to their position, training, qualifications and experience; maintaining proper chains of command and accountability; removing potential opportunities for corruption or misconduct; and protecting employees from false accusations of corruption or misconduct.

The INS has provided a variety of materials, of differing legal formality, to instruct and guide its officers on how and when removal proceedings should be instituted, and who has authority to institute them.  For example, INS regulations at 8 C.F.R. § 239.1 and 239.2 identify which INS officers are authorized to issue NTAs, and describe who may cancel them and on what grounds.  INS enforcement priorities that focus INS prosecutorial resources where they will do the most good, such as removing criminal aliens and deterring alien smuggling, are examples of informal guidance that broadly govern the exercise of prosecutorial discretion.  (By "informal" we mean only that enforcement priorities are not legally codified and binding substantive law -- nor are they required to be under the APA -- not that they are unimportant, or need not be adhered to by INS personnel.)  The INS also provides field manuals and other enforcement procedure documents for detention and deportation officers, special agents, and others who must make investigative and prosecutorial decisions.  See, e.g., Interim Enforcement

CAR 0385

MEMORANDUM FOR THE COMMISSIONER                                          Page 9
SUBJECT:      INS Exercise of Prosecutorial Discretion

Procedures (June 5, 1997) (discussing, among other things, factors to be considered in granting voluntary departure or deferred action).

The need for suitable policy guidance must be balanced, however, with the realization that if the agency provides regulations or instructions on the exercise of prosecutorial discretion that are so strict, formalized, or rigid as to establish a substantive process conferring a benefit on an alien, the otherwise discretionary enforcement decisions in that process may be considered judicially reviewable, on the ground that the law now provides workable standards for a court to apply.  See Nicholas v. INS, 590 F.2d 802, 805-08 (9th Cir. 1979).  As Justice Scalia's opinion for the Court in AADC noted with respect to pre-IIRIRA litigation involving INS decisions regarding grant or denial of deferred action, "since no generous act goes unpunished . . . the INS's exercise of this discretion opened the door to litigation in instances where the INS chose not to exercise it."  AADC, 119 S. Ct. at 944.

It sometimes is appropriate for the INS to bind itself with rules (such as 8 C.F.R. § 239.1) upon which the public reasonably may rely, even if those rules limit the exercise of prosecutorial discretion in a particular case.  Generally, however, policies that affect prosecutorial discretion -- especially those that address the prosecutorial discretion of the agency as a whole -- are properly classified and issued as general statements of policy that do not impose rights and obligations on the public, and are not subject to the rulemaking requirements of the APA.  See, e.g., Romeiro de Silva v. Smith, 773 F.2d 1021, 1024 (9th Cir. 1985); Pasquini, 700 F.2d at 662; J. Stein, G. Mitchell & B. Mezines, Administrative Law § 15.07[4] (1999).  Therefore, they may be changed at any time, and do not legally bind the agency or provide any substantive or procedural rights to aliens.  For example, it would not be in order for an alien to move to terminate his immigration proceeding on the ground that his case does not fall within one of the INS' enforcement priorities, or for an immigration judge to entertain such a claim.

**Question 6:  Does the INS have prosecutorial discretion not to pursue a removal proceeding against a removable alien?**

Yes.  Section 242(g) of the INA, as interpreted by the Supreme Court in AADC, provides that the INS' decision not to pursue a removal proceeding against an alien is an exercise of prosecutorial discretion that is not judicially reviewable.

**Question 7:  Does the INS have prosecutorial discretion to admit an inadmissible alien at a port-of-entry?**

No.  Inspection and admission of aliens involves elements of both enforcement and benefit adjudication.  Admitting an alien with an authorized status and length of stay is an affirmative act of approval under the INA.   Section 235(b)(2) of the INA prohibits an immigration officer from admitting an applicant for admission unless the alien is clearly and beyond a doubt entitled to be admitted.  If there is any such doubt, section 240(a)(3) provides that (unless otherwise specified in the INA, such as expedited removal or stowaways) a removal

CAR 0386

proceeding before an immigration judge is the sole and exclusive procedure for determining whether an alien may be admitted to the United States.

Serving an NTA on an inadmissible alien is an enforcement decision that is subject to prosecutorial discretion. In the exercise of prosecutorial discretion, the INS also may allow an alien applicant for admission to withdraw his or her application and depart immediately from the United States. What the INS may not do, however, is admit an inadmissible alien as an exercise of prosecutorial discretion. This is true both because the doctrine of prosecutorial discretion is limited under cases such as Chaney to decisions to exercise the enforcement power of the agency rather than affirmative acts that grant a status, and because the statutory provisions relating to admission clearly limit any such discretion on the part of the agency. If there is any doubt about the admissibility of an alien, the INS cannot admit the alien. At that point it has the discretionary option to allow the alien voluntarily to withdraw his application for admission, or to place him in proceedings. (Parole is also an option if the alien qualifies under section 212(d) of the INA, but is neither an admission nor a permanent answer to the question of the alien's admissibility.)

**Question 8:  What  other concerns or  practical difficulties are relevant to the exercise of the INS'  prosecutorial discretion not to place removable aliens in proceedings?**

First, the fact that a violation of the immigration laws is a continuing violation leads to practical difficulties with the exercise of prosecutorial discretion. In particular, an INS decision to forego placing an alien -- such as an LPR with a criminal record making him or her removable -- in proceedings does not cure the violation, and is likely to cause future problems. If the alien travels outside the United States and attempts to reenter, the alien will not be admissible. Admission to the United States as the result of immigration inspection is not a matter of prosecutorial discretion. An inadmissible alien for whom a waiver is not available may not be admitted.

In other words, the fact that the INS can forego commencing a removal proceeding does not mean that the INS can grant a status for which an alien is not eligible, so the alien remains in a continuing, difficult state of limbo and illegality. Unlike criminal law, immigration law does not contain generally applicable statutes of limitation that grant repose to past violators of law to go on with their lives without fear of prosecution after sufficient time has elapsed.

Second, unlike a typical criminal prosecution decision that involves making the decision whether an individual should be punished for past, completed misconduct, a decision not to bring a removal proceeding perpetuates a continuing violation of the immigration laws. Removal from the United States is not a punishment; rather, it is a civil correction of an ongoing violation. AADC, 119 S. Ct. at 947.  This is a factor the INS should consider when it declines to place in proceedings an alien whom Congress has declared by law to be removable.

Third, INS prosecutors lack much of the flexibility that criminal prosecutors possess to make, as a discretionary matter, the consequences of misconduct fit the offense. For example, as removal from the United States is not a punishment, immigration law does not contain criminal

law concepts of gradualized sentencing based upon the specific facts of the individual's offense or, for the most part, different consequences based upon the specific ground of removability. This gives INS prosecutors little of the discretion criminal prosecutors have to select appropriate charges from a range of offenses covering the defendants' misconduct, or to "plea bargain" a case.

**Question 9:  How does the concept of prosecutorial discretion relate to detention questions such as mandatory detention?**

Section 236(a) of the INA provides the INS with the general authority -- and the discretion -- to detain an alien pending a decision on whether the alien is to be removed from the United States.  As detaining aliens is an exercise of the coercive authority of a law enforcement agency over liberty, legal concepts of enforcement discretion apply despite the fact that detention is not a strictly "prosecutorial" decision.  Detention decisions (whether in individual cases or collectively as a matter of agency policy) typically involve consideration of factors not dissimilar from those a prosecutor considers in deciding whether to prosecute, including the adequacy of agency resources available for the task, competing agency mandates or priorities, and other relevant legal or policy considerations (such as, in the case of detention, ensuring that detainees are not subjected to unlawful overcrowding or other conditions adversely affecting their health and safety).   The INS traditionally has had the discretion to choose not to detain a removable alien.  That discretion has been tempered with other legal authority and policies, such as bond determinations, designed to ensure that such decisions have been made based on a determination that the alien is not a threat to public safety and is likely to appear for further proceedings. Whether an alien should be detained without bond, and conditions of release such as the appropriate amount of bond, are INS and/or immigration judge determinations reviewable by the Executive Office for Immigration Review.

In short, an INS determination to exercise its detention authority over an alien is reviewable on the merits, just as an INS decision to seek the removal of an alien by placing him or her in proceedings will be adjudicated on the merits in most categories of cases by the immigration judge.  An INS decision to release an alien whom the agency otherwise might seek to detain was, until the enactment of IIRIRA, an unreviewable act of enforcement discretion under the INA in the same way a decision not to charge a removable alien was, and is, an unreviewable discretionary act.

In IIRIRA, however, Congress expressly limited the INS' administrative discretion under the INA not to detain criminal aliens, once the decision is made to place them in removal proceedings.  The mandatory detention provisions, sections 236(c) and 241(a)(2) of the INA, require the INS (with limited exceptions) to detain criminal aliens during the pendency of their removal proceedings, and during the 90-day removal period following the entry of their removal order.

Thus, although Congress reaffirmed in IIRIRA the INS' prosecutorial discretion to commence removal proceedings against an alien, it did the opposite with respect to the agency's

CAR 0388