MEMORANDUM FOR THE COMMISSIONER                                        Page 12
SUBJECT:      INS Exercise of Prosecutorial Discretion

enforcement discretion to release criminal aliens once the INS has determined to institute
proceedings, and the proceeding is pending or has concluded with the entry of a removal order.
Congress stated a clear intention expressly to limit the discretion the INS otherwise would
presumptively have had to make discretionary determinations regarding the need to detain a
criminal alien, and provided meaningful standards regarding mandatory detention categories.

## III.    Conclusion

        The INS has broad prosecutorial discretion in its law enforcement activities, although that
discretion is not unlimited.  This authority includes the prosecutorial discretion not to place a
removable alien in proceedings, but the INS does not have prosecutorial discretion to admit an
inadmissible alien into the United States.  The INS does not have prosecutorial discretion to
provide any benefit under the INA to an alien who is not eligible to receive it.

CAR 0389



LEGAL
ACTION
CENTER

AMERICAN IMMIGRATION COUNCIL

**PRACTICE ADVISORY**[1]
Updated: February 13, 2012

## DHS REVIEW OF LOW PRIORITY CASES FOR PROSECUTORIAL DISCRETION

By The Legal Action Center and Alexsa Alonzo[2]

Over the last several months, the Department of Homeland Security (DHS) has made a series of announcements regarding its intent to eliminate low priority cases from the immigration court dockets and instead focus on its highest immigration enforcement priorities—national security, public safety, border security, and the integrity of our immigration system. First, on June 17, 2011, ICE Director John Morton issued two memoranda encouraging the expanded exercise of prosecutorial discretion in all phases of immigration enforcement.[3] Subsequently, on August 18, 2011, DHS announced the establishment of a joint DHS-Department of Justice (DOJ) working group charged with reviewing the approximately 300,000 cases pending before the Executive Office for Immigration Review (EOIR) to identify candidates for administrative closure. Most recently, on November 17, 2011, DHS issued three documents detailing how the agency will implement the review process.

The November 17 documents describe new procedures DHS will use to implement its prosecutorial discretion policy as well as new standards and criteria to be used by ICE officials. At the same time, however, the November announcements also leave many questions unanswered about the scope and logistics of the review process. Additionally, some guidance included in the November documents is inconsistent with the June 17 memo. Accordingly, this practice advisory not only summarizes DHS's current policies on prosecutorial discretion but also explains some of the ambiguities and contradictions that the recent announcements have created.

## OVERVIEW OF THE AUGUST AND NOVEMBER ANNOUNCEMENTS

**August 18, 2011 Announcement.** *See* Napolitano Letter and Backgrounder.

---

[1]     Copyright (c) 2011 American Immigration Council. Click here for information on reprinting this practice advisory. This Practice Advisory is intended for lawyers and is not a substitute for independent legal advice supplied by a lawyer familiar with a client's case.

[2]     Alexsa Alonzo is an Associate Director of Advocacy with the American Immigration Lawyers Association (AILA).

[3]     *See Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* and *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs.* For a detailed analysis of these memoranda, see the Legal Action Center's practice advisory, Prosecutorial Discretion: How to Get DHS to Act in Favor of Your Client.

CAR 0390

In August, DHS announced the establishment of a high-level joint DHS-DOJ working group to review removal cases currently pending before the immigration courts, the Board of Immigration Appeals (BIA), and the federal courts of appeals.  Removal cases identified as "low priority" will be administratively closed and the respondents may be eligible to apply for an employment authorization document (EAD) with USCIS.  The working group also will initiate a case-by-case review to ensure that new cases placed in removal proceedings meet DHS's enforcement priorities, and will issue guidance to prevent, on a case-by-case basis, low priority cases from entering the system.  Additionally, the working group will issue department-wide guidance on prosecutorial discretion, including for respondents who already have final orders of removal.

> **November 17, 2011 Document,** *Next Steps in the Implementation of the Prosecutorial Discretion Memorandum and the August 18 Announcement on Immigration Enforcement Priorities* **("**Next Steps Document**").**

This unattributed document describes ICE's plans to implement the review process announced on August 18.  First, it explains that the agency has launched a "comprehensive training program on the appropriate use of the June 17, 2011 Prosecutorial Discretion Memorandum."  The document describes the training as "scenario-based" and states that all ICE enforcement officers and attorneys will have completed the training by January 13, 2012.

Second, the document describes the launch of two pilot programs.  The first ("Pilot 1"), is a nationwide fast-track review process running through January 13, 2012.  The purpose of this pilot is to "prevent[ ] *new* low priority cases from clogging the immigration court dockets." (emphasis added)  As such, ICE attorneys are directed to review all "*incoming* cases in immigration court"[4] (emphasis added) and all cases appearing on the master calendar docket using the Prosecutorial Discretion Memorandum[5] and "a set of more focused criteria"[6] to identify cases "most clearly eligible and ineligible for a favorable exercise of discretion."

The second pilot ("Pilot 2"), set to run from December 4, 2011, to January 13, 2012, is intended to test processes for the systematic review of *all* cases pending in the immigration court.  Unlike Pilot 1, Pilot 2 will be launched in only two jurisdictions (Baltimore and Denver).  In this pilot program, a team of attorneys from ICE, USCIS, and CBP will review cases on the non-detained dockets in the two immigration courts.  It is unclear whether the attorneys will be from local DHS offices or from elsewhere.  The review will be based on the factors outlined in the June 17 memo, as well as "a set of more focused criteria."[7]  During Pilot 2, EOIR will shift judges from the non-detained dockets in the Denver and Baltimore immigration courts to the detained dockets

---

[4]        Presumably "incoming cases in immigration court" refers to cases in which NTAs have been issued but not filed with EOIR.

[5]        The memo is not specified but presumably this is a reference to the June 17, 2011, memorandum issued by ICE Director John Morton, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens.*  ("June 17 Memo").  It is unclear whether this also encompasses the second memo issued on June 17, 2011, focusing on victims, witnesses, and plaintiffs.

[6]        The focused criteria are not specified, but presumably this is a reference to the Guidance to ICE Attorneys discussed in this practice advisory.

[7]        It is unclear whether the criteria are the same as or different from the criteria in the Guidance to ICE Attorneys, discussed below.

CAR 0391

to expedite the processing of detained cases.[8]  AILA members who practice in the Baltimore and Denver immigration courts should contact the local chapters for specific guidance relating to implementation of the pilot project.

Once both pilot projects end, DHS will assess the data and implement the processes on a nationwide basis.  Importantly, during the duration of the pilot projects, ICE officers are not precluded from favorably exercising prosecutorial discretion in cases outside the pilot projects.  Indeed, the memo specifically directs ICE employees to continue applying the full range of factors set forth in the June 17 memo during this pilot period.

> **November 17, 2011 Memorandum from Principal Legal Advisor Peter Vincent, *Case-by-Case Review of Incoming and Certain Pending Cases* ("OPLA memo").**

This memorandum provides details about Pilot 1, the fast-track review of incoming cases and cases on the master calendar docket (described above).  However, unlike the description of Pilot 1 contained in the *Next Steps Document* above, the categories of cases to be reviewed also includes non-detained cases with merits hearings scheduled through June 2012.  The OPLA memo specifies that in conducting its review, each Office of the Chief Counsel (OCC) should focus on criteria from the June 17 memo and the *Guidance to ICE Attorneys* ("Guidance" described below).[9]  According to the OPLA memo, the criteria in the Guidance are intended to help attorneys identify those cases most likely eligible or ineligible for favorable discretion.  The type of discretion contemplated is administrative closure.[10]

To implement the OPLA memo, each OCC is directed to immediately draft and implement a standard operating procedure (SOP) establishing a process for the review.  Each SOP must be approved by headquarters[11] and must include several specified provisions, such as a supervisory review, a notice process in cases where OCC decides to exercise discretion, and a national security and public safety check.  The OCC also must establish an electronic mailbox for receipt of additional documents from respondents, and establish a system to inform respondents when a favorable exercise of prosecutorial discretion has been made.  (AILA members should keep in contact with their local chapter to learn the email address to which documentation can be sent.)

---

[8]      *See* Notice from Brenda L. Cook, Administrator for Baltimore Immigration Court, AILA InfoNet Doc. No. 11112963; Notice from Alec Revelle, Administrator for Denver Immigration Court, AILA InfoNet Doc. No. 11120169.

[9]      The OPLA memo also directs attorneys to consider the following memos:  *Civil Enforcement:  Priorities for the Apprehension, Detention, and Removal of Aliens* (republished on March 2, 2011); *Guidance Regarding the Handling of Removal Proceedings of Aliens with Pending or Approved Applications or Petitions* (August 20, 2010); and *Prosecutorial Discretion:  Certain Victims, Witnesses, and Plaintiffs* (June 17, 2011).  For a discussion of these memos, see the Legal Action Center's practice advisory, Prosecutorial Discretion: How to Get DHS to Act in Favor of Your Client.

[10]      The memo explains that in other places in the OPLA memo and the Guidance to ICE Attorneys, case dismissal is also mentioned.  It is unclear exactly what this reference to case dismissal means.  Under existing policy, certain cases with applications or petitions for relief pending with USCIS may be entitled to have their cases dismissed and the memo could simply be referencing this.  *See Guidance Regarding the Handling of Removal Proceedings of Aliens with Pending or Approved Applications or Petitions* (August 20, 2010). It also is possible that the memo is referring to cases that fall within Pilot 1 in which an NTA is served but not filed yet.

[11]      Reportedly, as of the date of this Practice Advisory, the SOP from the Denver ICE office is being reviewed by DHS headquarters.  It is likely that this and other office's SOPs will issue in the near future.

CAR 0392

For cases where discretion is favorably exercised, the OCC is to file a joint motion for administrative closure or make an oral motion before the immigration court.

The OPLA memo also says that OPLA will issue a revised policy for the review of cases following the initial implementation period (from November 17, 2011, through January 13, 2012), incorporating any needed changes to the process.  Finally, the memo notes that "at all stages of the immigration enforcement process, attorneys should consider . . . the full range of factors set forth in the [June 17 memo]," thus indicating that ICE attorneys are to continue to consider all cases for prosecutorial discretion, including those that do not fall within this fast-track review (Pilot 1).

> **November 17, 2011, *Guidance to ICE Attorneys Reviewing the CBP, USCIS, and ICE Cases Before the Executive Office for Immigration Review* ("<u>Guidance to ICE Attorneys</u>" or "Guidance").**

This unattributed document was likely an internal ICE document intended to accompany the OPLA memo as further instruction to OCC regarding the fast-track review process.  The Guidance to ICE Attorneys is referenced in the OPLA memo and sets out focused criteria for exercising prosecutorial discretion through this process.[12]  The Guidance divides cases into "enforcement priorities" and "not enforcement priorities."  Cases in the first category "should generally be pursued in an accelerated manner before EOIR."  By contrast, cases in the second category should be carefully considered for prosecutorial discretion.

According to the Guidance, the enforcement priorities include individuals with nearly any type of criminal conviction, without regard to how long ago the offense occurred or the circumstances of the crime.  Individuals with *any* felony conviction or multiple misdemeanor convictions, as well as individuals with a *single misdemeanor violation* involving DUI, violence or threats, assault, or flight from the scene of an accident are all included in this category.  Other misdemeanor convictions mentioned are those involving sexual abuse or exploitation, drug distribution or trafficking, or "other significant threat to public safety."  In addition to those with criminal convictions, this category also includes persons who entered without inspection or violated the terms of their visas during the last three years; are gang members/human rights violators or otherwise pose a "clear threat to public safety"; were previously removed from the country; committed immigration fraud; or "who otherwise has an egregious record of immigration violations."

Cases that are "not enforcement priorities" include (1) current members or veterans of the military or the spouse or children of such members; (2) youths who have been in the United States for more than five years and have pursued educational opportunities in the United States; (3) individuals over 65 in the United States for 10 years or longer; (4) crime victims; (5) individuals who have been LPRs for 10 years or longer who have a single, "minor" conviction for a non-violent offense; (6) individuals with serious mental or physical conditions but only if

---

[12] The OPLA memo makes clear that this Guidance is to be used during the Pilot I fast track review of cases. Whether the guidance also is to be used in all other review of cases for prosecutorial discretion is unclear.  The reference in the guidance to cases pending before the BIA would indicate a broader application than just the Pilot I fast track cases.

CAR 0393

the condition "would require significant medical or detention resources"; and (7) individuals who have a "very long-term presence" in the United States, an immediate family member who is a U.S. citizen, have established compelling ties to the United States, and have made compelling contributions to the United States.

According to the Guidance, when an ICE attorney decides to exercise prosecutorial discretion, he or she must notify a supervisory charging official at CBP, USCIS, or ICE of the decision.  If the supervisory official disagrees with the decision, the dispute is to be taken to the ICE Chief Counsel.  If local resolution proves impossible, the matter is to be elevated to the Deputy Director of ICE.

Finally, the Guidance reminds ICE attorneys that decisions to exercise prosecutorial discretion are to be made on a case-by-case basis under the totality of the circumstances, and reaffirms that "the cornerstone for assessing whether prosecutorial discretion is appropriate in any circumstance" is the June 17 memo.  Presumably, this paragraph refers to cases that do not fall within this fast-track review, such as cases with merits hearing after June 2012, cases which fall outside the criteria set forth in the Guidance for ICE Attorneys, and requests for motions to reopen.  However, when and how these other reviews are to take place is unclear.  This paragraph and other similar statements in the Next Steps Document and the OPLA Memo may engender confusion as the pilots move forward.

## QUESTIONS AND ANSWERS

### What are DHS's enforcement priorities?

In the June 17, 2011 memo and a subsequent question and answer guide (FAQ) regarding the August 18 announcement, DHS explained that its enforcement priorities are national security, public safety, border security, and recent and repeat immigration law violators.  These terms were not fully defined.  However, the June 17 memo did explain that, while criminal history is a factor to be considered in all cases, "particular care and concern" is warranted only in those cases involving serious felons, repeat offenders, those with lengthy criminal records, or known gang members.  Similarly, the June 17 memo explained that while past immigration history was a factor to be considered in all cases, "particular care and concern" is warranted only in cases of "egregious" immigration violators.

The documents issued on November 17 say that the June 17 memo sets forth the standard to be followed.  Despite this, these documents contain contradictory information regarding how those with criminal histories or past immigration violations are to be considered.  For example, the FAQ stated for the first time that DHS will have "zero tolerance" for those apprehended at the border and that removal cases involving recent border crossers will not be included in the review of cases carried out by the working group.  The November Guidance goes one step further, stating that noncitizens who entered the country illegally or violated the terms of their admission *within the last three years* are deemed high priority.  Because not all individuals who violated the terms of their admission within the last three years are either repeat immigration law violators or "egregious immigration violators," this new guidance appears on its face to conflict with the June 17 memo.  As a result, it is unclear to what extent an individual who entered illegally within

5

CAR 0394

the last three years but who has compelling equities will be considered for prosecutorial discretion.

Similarly, the recent guidance conflicts with the June 17 memo by labeling "criminal aliens" as a high priority when the memo limits the high priority category to serious felons, repeat offenders and those with lengthy criminal histories.  It is unclear to what extent an individual's prior criminal history, no matter if minor or from the distant past, will preclude prosecutorial discretion from this point on.

### What are low priority cases?

Under the June 17 memo, low priority cases are to be identified in accord with a list of factors that DHS should weigh in all cases.  While the June 17 memo made clear that no category of cases will receive a blanket exercise of favorable prosecutorial discretion, the memo does identify categories of individuals who are to receive particular care and attention due to certain favorable factors.  These include: veterans; long-time permanent residents; minors and the elderly; individuals who have been present since childhood; individual with serious disabilities or health issues; women who are nursing or pregnant; and victims of domestic violence or other serious crimes.  In all cases, DHS is to weigh the totality of the circumstances.  For a full discussion of the factors in the June 17 memo, *see* the LAC practice advisory, <u>Prosecutorial Discretion: How to Get DHS to Act in Favor of Your Client</u>.

The November Guidance states that the June 17 memo applies and that the totality of the circumstances should be considered in all cases.  Despite these general statements, however, the Guidance appears to deem at least two categories of individuals "high priority" that were not identified in the June 17 memo as such: all individuals with a criminal history (apparently without regard to the severity of past crimes) and individuals who violated the terms of their admission within the last three years.  It remains to be seen whether these become categorical designations such that DHS will not exercise prosecutorial discretion in any case that falls within them.

### Is it possible for cases with criminal convictions to be considered low priority?

The June 17, 2011 memo makes clear that cases will be reviewed on a case-by-case basis and considered based on the totality of the circumstances presented in each individual case.  There is no bright-line rule that would automatically disqualify any case.  However, the memo does contain a list of negative factors that will be looked at with particular care.  This list includes "serious felons, repeat offenders, and individuals with a lengthy criminal record of any kind," as well as "known gang members."

Nonetheless, the November Guidance lists as enforcement priorities any noncitizen with a felony conviction or multiple misdemeanor convictions, or a single misdemeanor conviction involving "violence, threats, or assault"; "sexual abuse or exploitation"; "driving under the influence of alcohol or drugs"; "flight from the scene of an accident"; "drug distribution or trafficking"; or "other significant threat to public safety." The November Guidance thus includes as "high priority" cases unlikely to receive a favorable exercise of prosecutorial discretion many deportable offenses that would not be classified as such under the June 17 memo. As a

CAR 0395

consequence, longtime LPRs whose cases might otherwise be considered "positive" might instead be deemed an enforcement priority based upon a prior criminal conviction. In cases such as this, attorneys should emphasize the positive factors in the case that are found in the June 17 memo and argue that the list of crimes in the November Guidance is not dispositive where favorable factors are strong.

### What will happen to cases deemed low priority?

According to the August 18 announcement, all cases currently before the immigration courts and the BIA will be reviewed and those that are deemed low priority will be administratively closed. Removal cases currently pending in federal court also will be reviewed, and low priority cases will be considered for a favorable exercise of prosecutorial discretion, although it is not clear what this will be. The November 17 documents provide some explanation about how DHS will proceed with the review, and we anticipate that DHS will provide additional guidance in 2012 following the completion and assessment of the pilot projects. At this point, it is unclear whether DHS will forgo initiating removal proceedings in new cases that are identified as low priority, or whether proceedings will be initiated and then administratively closed.

For matters presently before USCIS, a memorandum released by the agency in early November provides additional guidance regarding the exercise of prosecutorial discretion in the referral of cases to immigration court through Notices to Appear.[13]

### What is the difference between administrative closure and termination of proceedings?

Administrative closure is a procedural mechanism used to temporarily remove a case from the immigration court's calendar. *Matter of Avetisyan*, 25 I&N Dec. 688, 690 (BIA 2012). Until recently, Board precedent held that neither the Board nor an immigration judge could administratively close a case over a party's objection. *Matter of Gutierrez*, 21 I&N Dec. 479 (BIA 1996). In *Matter of Avetisyan*, however, the Board overruled *Matter of Gutierrez* on this point, and instead held that the Board and immigration judges have the authority to administratively close a case over a party's objection where it is "otherwise appropriate under the circumstances." *Matter of Avetisyan*, 25 I&N Dec. at 690, 692-93, 697. In evaluating a request for administrative closure, the Board or immigration judge should consider all the relevant factors including, the reason for administrative closure; the basis of any opposition; the likelihood the respondent will succeed on any petition or application being pursued outside removal proceedings; the anticipated duration of the closure; the responsibility of either party for any delay; and the ultimate outcome of removal proceedings once the case is re-calendared. *Id.* at 696.

*Matter of Avetisyan* opens the door for a respondent to request administrative closure independent of an offer of prosecutorial discretion from the government. However, the reverse is also true. DHS could move for administrative closure even where a respondent refused an offer of prosecutorial discretion which suggested such closure. In opposition to such a government

---

[13]     See USCIS Policy Memorandum, *Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens* (Nov. 7, 2011), AILA InfoNet Doc. No. 11110830.

CAR 0396

motion, a respondent could argue that it is never appropriate to administratively close a case where the respondent wishes to proceed with an application for relief.

A person whose case has been administratively closed remains in removal proceedings, and either party can request that the case be placed back on the court's calendar at any time.  By contrast, termination of proceedings means that the case has ended and the respondent is no longer in removal proceedings.  Upon termination, the individual will revert to the same status he or she was in prior to commencement of proceedings.  If the government wants to place the individual back into removal proceedings after a case is terminated, it must file a new Notice to Appear (NTA).

Should an individual (other than an "arriving alien") whose case has been administratively closed eventually become eligible for adjustment of status, he or she must have the removal proceedings terminated to enable USCIS to exercise jurisdiction over the adjustment application.

### Will individuals whose cases have been administratively closed receive EADs?

In its FAQ following the August 18 announcement, DHS stated, "Per longstanding federal law, individuals affected by an exercise of prosecutorial discretion will be able to request work authorization, including paying associated fees, and their requests will be separately considered by USCIS on a case-by-case basis."

The November 17 OPLA memo states that administrative closure is the primary form of prosecutorial discretion that will be exercised for incoming and certain pending cases.  Despite what was said in the August 18 FAQ, DHS more recently has stated that those whose cases are administratively closed will only be able to apply for employment authorization documents (EAD) if they have an independent basis for work authorization (e.g., a pending adjustment or asylum application).

AILA and other advocates are seeking additional guidance on the issuance of EADs and are advocating for EAD eligibility for those without an independent basis for work authorization. Until further guidance is provided, those who do not have an independent basis to apply for work authorization should consider requesting deferred action, which does allow the recipient to apply for an EAD (8 C.F.R. § 274.12(c)(14)).

Importantly, the Guidance states that respondents with pending asylum applications who agree to administrative closure will have their asylum clock stop upon the filing of the joint request. Consequently, asylum applicants who have not met the 180-day waiting period for EAD eligibility may want to consider the impact of administrative closure on their eligibility for work authorization before they agree to any offer of this from DHS.

### What should I be doing now?

With the exception of non-detained cases rescheduled by the Baltimore and Denver immigration courts, both removal proceedings and removals are expected to continue while the working group carries out its review.  During this time, ICE attorneys and officers have been told to consider all cases in light of DHS enforcement priorities.  Thus, you should continue to make

CAR 0397

requests for prosecutorial discretion.  Requests should be made in writing and include as much supporting documentation as possible, and should be sent to the email address established by the local ICE office to receive requests for prosecutorial discretion.[14]  (AILA members should keep in contact with their local chapter to learn the email address to which documentation can be sent.)  For pending cases that will be subject to review, this will ensure that there is favorable information in the client's file when the working group review takes place.  It does not appear that respondents or their attorneys will know in advance when the review of their cases will take place.  To learn more about local implementation of the guidance, attorneys may wish to consult their local AILA chapters to arrange meetings with ICE officials in their jurisdiction.

Moreover, although the working group will conduct a systematic review of all pending cases, other avenues for requesting prosecutorial discretion remain open.  ICE attorneys and officers still retain the authority to exercise prosecutorial discretion and now may be more amenable to exercising it favorably than in the past.  Additionally, the announced review process does not include cases with final removal orders, so no systematic review of these cases is expected.  For that reason, individual advocacy for prosecutorial discretion on behalf of these clients is all the more important.

You should also ensure that your clients understand that their obligations under the immigration laws remain the same.  There has been much confusion and misinformation over the significance of the August and November announcements.  It is important that your clients understand that the announcement is not an amnesty.  For example, some individuals granted voluntary departure have been reported to believe that they no longer need to leave the country.  This is simply wrong.  The August and November announcements have no impact on an existing voluntary departure orders; anyone under such an order who fails to timely depart will face the consequences.[15]

Additionally, individuals should not seek to turn themselves into immigration authorities to obtain an EAD or otherwise test the extent to which DHS is favorably exercising prosecutorial discretion.  As the DHS FAQ explains, such action carries a high risk that the individual will be placed in removal proceedings and may be ordered removed.  For helpful guidance for clients, *see* <u>AILA Consumer Advisory</u>.

### What can I do to assist AILA and LAC in monitoring implementation of the new guidance?

In order to monitor how the new guidance is being implemented in the field, we need to hear your experiences with your local office.  Please complete this <u>survey</u> and tell us about your cases.  Doing so will help our ongoing liaison and advocacy efforts with DHS.  Thank you!

---

[14]     For more on preparing a request for prosecutorial discretion, *see* <u>Prosecutorial Discretion: How to Get DHS</u> <u>to Act in Favor of Your Client</u>.

[15]     For more on these consequences, *see* the Legal Action Center's practice advisory <u>Voluntary Departure:</u> <u>Automatic Termination and the Harsh Consequences of Failing to Depart</u>.

CAR 0398

### Next Steps in the Implementation of the Prosecutorial Discretion Memorandum and the August 18th Announcement on Immigration Enforcement Priorities

On August 18, 2011, the Administration announced an effort to better focus the immigration enforcement system on the removal of criminal aliens, the promotion of public safety and border security, and the integrity of the immigration system.  This effort began with the establishment of a working group, comprised of officials from the Department of Homeland Security (DHS), including Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and Customs and Border Protection (CBP), as well as representatives from the Department of Justice (DOJ), tasked with identifying best practices to accelerate the apprehension and removal of high priority aliens by, in part, limiting the initiation or pursuit of low priority cases.  As a result of this process, ICE is implementing the following initiatives:

- *Prosecutorial Discretion Training:* On November 17, ICE launched a comprehensive training program on the appropriate use of the June 17, 2011 Prosecutorial Discretion Memorandum.  This program consists of scenario-based training that emphasizes how the Prosecutorial Discretion Memorandum should be utilized in order to focus immigration enforcement resources on ICE priorities.

  This program builds on training that has already occurred since the June 17, 2011 memorandum was issued.  On September 29 and October 24, Secretary Napolitano met with supervisory ICE officers and attorneys to discuss the agency's enforcement priorities and the importance of these initiatives.  ICE Director Morton, along with other members of ICE's senior leadership team, have traveled around the country to discuss the importance of consistent application of prosecutorial discretion.  Over the last month, Director Morton and his senior leadership have traveled to Los Angeles, Chicago, San Francisco, San Diego, Miami, New York, and Newark to personally instruct enforcement officers and attorneys on the appropriate use of this policy.  Over the next several weeks, Director Morton and other members of the ICE senior leadership will travel to New Orleans and other jurisdictions to conduct additional training.  By January 13, all ICE enforcement officers and attorneys nationwide will have completed scenario based prosecutorial discretion training.

- *Review of Incoming Cases:* Beginning immediately, ICE attorneys nationwide will review all incoming cases in immigration court.  This review, based on the Prosecutorial Discretion Memorandum and guided by a set of more focused criteria, will help reduce inefficiencies that delay the removal of criminal aliens and other priority cases by preventing new low priority cases from clogging the immigration court dockets.  This process is designed to identify the cases most clearly eligible and ineligible for a favorable exercise of discretion and will focus on cases appearing on the master calendar and those cases that have not yet been filed in immigration court.  The initial test run of this review of incoming cases will last until January 13.

CAR 0399

- ***Review of Cases Pending in Immigration Court***:  Beginning December 4, DHS and DOJ will launch pilot programs in two jurisdictions to test run the process for reviewing all cases pending in immigration court.  Over the course of the six week pilot, an intra-agency team of attorneys from ICE, USCIS, and CBP will review the cases on the non-detained dockets in the Denver and Baltimore immigration courts based on the Prosecutorial Discretion Memorandum and guided by a set of more focused criteria.  During this time, DOJ's Executive Office for Immigration Review (EOIR) has agreed to shift judges from the non-detained docket in those jurisdictions to hear detained cases, in order to enhance the processing of such detained cases.

Both the review of incoming and pending cases will initially take place over the course of approximately two months, lasting until January 13.  The purpose of the initial timing and scope limitations is to allow DHS to test run various methods for affirmatively reviewing cases at the different stages of the immigration enforcement cycle, and to gather data and other information related to the implementation of these methods.

At the end of the period, DHS will promptly review that data and other implementation outcomes and, where appropriate, consult with DOJ to determine, on an expedited basis, the best methods to implement these processes on an ongoing basis nationwide.  During the entire period of these initiatives, ICE attorneys, officers, and agents will be applying, on a case-by-case basis, the full range of factors set forth in the June 17, 2011 Prosecutorial Discretion memorandum in the course of their regular duties.

Policy Number: 10076.1
FEA Number: 306-112-002b

*Office of the Director*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536

JUN 17 2011



U.S. Immigration
and Customs
Enforcement

MEMORANDUM FOR:     All Field Office Directors
                    All Special Agents in Charge
                    All Chief Counsel

FROM:               John Morton
                    Director

SUBJECT:            Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs

Purpose:

This memorandum sets forth agency policy regarding the exercise of prosecutorial discretion in
removal cases involving the victims and witnesses of crime, including domestic violence, and
individuals involved in non-frivolous efforts related to the protection of their civil rights and
liberties.  In these cases, ICE officers, special agents, and attorneys should exercise all
appropriate prosecutorial discretion to minimize any effect that immigration enforcement may
have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue
justice.  This memorandum builds on prior guidance on the handling of cases involving T and U
visas and the exercise of prosecutorial discretion.[1]

Discussion:

Absent special circumstances or aggravating factors, it is against ICE policy to initiate removal
proceedings against an individual known to be the immediate victim or witness to a crime.  In
practice, the vast majority of state and local law enforcement agencies do not generally arrest
victims or witnesses of crime as part of an investigation.  However, ICE regularly hears concerns
that in some instances a state or local law enforcement officer may arrest and book multiple
people at the scene of alleged domestic violence.  In these cases, an arrested victim or witness of
domestic violence may be booked and fingerprinted and, through the operation of the Secure

---

[1] For a thorough explanation of prosecutorial discretion, see the following: Memorandum from Peter S. Vincent,
Principal Legal Advisor, Guidance Regarding U Nonimmigrant Status (U visa) Applicants in Removal Proceedings
or with Final Orders of Deportation or Removal (Sept. 25, 2009); Memorandum from William J. Howard, Principal
Legal Advisor, VAWA 2005 Amendments to Immigration and Nationality Act and 8 U.S.C. § 1367 (Feb. 1, 2007);
Memorandum from Julie L. Myers, Assistant Secretary of ICE, Prosecutorial and Custody Discretion (Nov. 7,
2007); Memorandum from William J. Howard, Principal Legal Advisor, Prosecutorial Discretion (Oct. 24, 2005);
Memorandum from Doris Meissner, Commissioner, Immigration and Naturalization Service, Exercising
Prosecutorial Discretion (Nov. 17, 2000).

CAR 0401

Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs
Page 2

Communities program or another ICE enforcement program, may come to the attention of ICE. Absent special circumstances, it is similarly against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties.

To avoid deterring individuals from reporting crimes and from pursuing actions to protect their civil rights, ICE officers, special agents, and attorneys are reminded to exercise all appropriate discretion on a case-by-case basis when making detention and enforcement decisions in the cases of victims of crime, witnesses to crime, and individuals pursuing legitimate civil rights complaints.  Particular attention should be paid to:

* victims of domestic violence, human trafficking, or other serious crimes;
* witnesses involved in pending criminal investigations or prosecutions;
* plaintiffs in non-frivolous lawsuits regarding civil rights or liberties violations; and
* individuals engaging in a protected activity related to civil or other rights (for example, union organizing or complaining to authorities about employment discrimination or housing conditions) who may be in a non-frivolous dispute with an employer, landlord, or contractor.

In deciding whether or not to exercise discretion, ICE officers, agents, and attorneys should consider all serious adverse factors.  Those factors include national security concerns or evidence the alien has a serious criminal history, is involved in a serious crime, or poses a threat to public safety.  Other adverse factors include evidence the alien is a human rights violator or has engaged in significant immigration fraud.  In the absence of these or other serious adverse factors, exercising favorable discretion, such as release from detention and deferral or a stay of removal generally, will be appropriate.  Discretion may also take different forms and extend to decisions to place or withdraw a detainer, to issue a Notice to Appear, to detain or release an alien, to grant a stay or deferral of removal, to seek termination of proceedings, or to join a motion to administratively close a case.

In addition to exercising prosecutorial discretion on a case-by-case basis in these scenarios, ICE officers, agents, and attorneys are reminded of the existing provisions of the Trafficking Victims Protection Act (TVPA),[2] its subsequent reauthorization,[3] and the Violence Against Women Act (VAWA).[4]  These provide several protections for the victims of crime and include specific provisions for victims of domestic violence, victims of certain other crimes,[5] and victims of human trafficking.

Victims of domestic violence who are the child, parent, or current/former spouse of a U.S. citizen or permanent resident may be able to self-petition for permanent residency.[6]  A U nonimmigrant visa provides legal status for the victims of substantial mental or physical abuse as

---

[2] Pub. L. No. 106-386, §§101-113, 114 Stat. 1464, 1466 (codified as amended in scattered sections of the U.S.C.).
[3] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 1464, 1491 (codified as amended in scattered sections of the U.S.C.).
[4] Pub. L. No. 106-386, §§1001-1603, 114 Stat. 1464, 1491 (codified as amended in scattered sections of the U.S.C.).
[5] For a list of the qualifying crimes, see INA §101(a)(15)(U)(iii).
[6] See INA §101(a)(51).

CAR 0402

Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs
Page 3

a result of domestic violence, sexual assault, trafficking, and other certain crimes.[7]  A T nonimmigrant visa provides legal status to victims of severe forms of trafficking who assist law enforcement in the investigation and/or prosecution of human trafficking cases.[8]  ICE has important existing guidance regarding the exercise of discretion in these cases that remains in effect.  Please review it and apply as appropriate.[9]

Please also be advised that a flag now exists in the Central Index System (CIS) to identify those victims of domestic violence, trafficking, or other crimes who already have filed for, or have been granted, victim-based immigration relief.  These cases are reflected with a Class of Admission Code "384."  When officers or agents see this flag, they are encouraged to contact the local ICE Office of Chief Counsel, especially in light of the confidentiality provisions set forth at 8 U.S.C. § 1367.

No Private Right of Action

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[7] See INA §101(a)(15)(U).
[8] See INA §101(a)(15)(T).
[9] See Memorandum from John P. Torres, Director, Office of Detention and Removal Operations and Marcy M. Forman, Director, Office of Investigations, Interim Guidance Relating to Officers Procedure Following Enactment of VAWA 2005 (Jan. 22, 2007).

CAR 0403

Policy Number: 10072.1
FEA Number: 601-14

*Office of the Director*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536

MAR 0 2 2011



U.S. Immigration
and Customs
Enforcement

MEMORANDUM FOR:   All ICE Employees

FROM:   John Morton
Director

SUBJECT:   Civil Immigration Enforcement: Priorities for the Apprehension,
Detention, and Removal of Aliens

Purpose

This memorandum outlines the civil immigration enforcement priorities of U.S. Immigration and
Customs Enforcement (ICE) as they relate to the apprehension, detention, and removal of aliens.
These priorities shall apply across all ICE programs and shall inform enforcement activity,
detention decisions, budget requests and execution, and strategic planning.

*A.  Priorities for the apprehension, detention, and removal of aliens*

In addition to our important criminal investigative responsibilities, ICE is charged with enforcing
the nation's civil immigration laws.  This is a critical mission and one with direct significance for
our national security, public safety, and the integrity of our border and immigration controls.
ICE, however, only has resources to remove approximately 400,000 aliens per year, less than 4
percent of the estimated illegal alien population in the United States.  In light of the large number
of administrative violations the agency is charged with addressing and the limited enforcement
resources the agency has available, ICE must prioritize the use of its enforcement personnel,
detention space, and removal resources to ensure that the removals the agency does conduct
promote the agency's highest enforcement priorities, namely national security, public safety, and
border security.

To that end, the following shall constitute ICE's civil enforcement priorities, with the first being
the highest priority and the second and third constituting equal, but lower, priorities.

**Priority 1.  Aliens who pose a danger to national security or a risk to public safety**

The removal of aliens who pose a danger to national security or a risk to public safety shall be
ICE's highest immigration enforcement priority.  These aliens include, but are not limited to:

- aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger
  to national security;

CAR 0404

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of Aliens
Page 2

- aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders;
- aliens not younger than 16 years of age who participated in organized criminal gangs;
- aliens subject to outstanding criminal warrants; and
- aliens who otherwise pose a serious risk to public safety.[1]

For purposes of prioritizing the removal of aliens convicted of crimes, ICE personnel should refer to the following new offense levels defined by the Secure Communities Program, with Level 1 and Level 2 offenders receiving principal attention.  These new Secure Communities levels are given in rank order and shall replace the existing Secure Communities levels of offenses.[2]

- Level 1 offenders: aliens convicted of "aggravated felonies," as defined in § 101(a)(43) of the Immigration and Nationality Act,[3] or two or more crimes each punishable by more than one year, commonly referred to as "felonies";
- Level 2 offenders: aliens convicted of any felony or three or more crimes each punishable by less than one year, commonly referred to as "misdemeanors"; and
- Level 3 offenders: aliens convicted of crimes punishable by less than one year.[4]

### Priority 2.  Recent illegal entrants

In order to maintain control at the border and at ports of entry, and to avoid a return to the prior practice commonly and historically referred to as "catch and release," the removal of aliens who have recently violated immigration controls at the border, at ports of entry, or through the knowing abuse of the visa and visa waiver programs shall be a priority.

### Priority 3.  Aliens who are fugitives or otherwise obstruct immigration controls

In order to ensure the integrity of the removal and immigration adjudication processes, the removal of aliens who are subject to a final order of removal and abscond, fail to depart, or intentionally obstruct immigration controls, shall be a priority.  These aliens include:

- fugitive aliens, in descending priority as follows:[5]

---

[1] This provision is not intended to be read broadly, and officers, agents, and attorneys should rely on this provision only when serious and articulable public safety issues exist.

[2] The new levels should be used immediately for purposes of enforcement operations.  DRO will work with Secure Communities and the Office of the Chief Information Officer to revise the related computer coding by October 1, 2010.

[3] As the definition of "aggravated felony" includes serious, violent offenses and less serious, non-violent offenses, agents, officers, and attorneys should focus particular attention on the most serious of the aggravated felonies when prioritizing among level one offenses.

[4] Some misdemeanors are relatively minor and do not warrant the same degree of focus as others.  ICE agents and officers should exercise particular discretion when dealing with minor traffic offenses such as driving without a license.

[5] Some fugitives may fall into both this priority and priority 1.

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of
Aliens
Page 3

- o   fugitive aliens who pose a danger to national security;
- o   fugitives aliens convicted of violent crimes or who otherwise pose a threat to the community;
- o   fugitive aliens with criminal convictions other than a violent crime;
- o   fugitive aliens who have not been convicted of a crime;
- aliens who reenter the country illegally after removal, in descending priority as follows:
  - o   previously removed aliens who pose a danger to national security;
  - o   previously removed aliens convicted of violent crimes or who otherwise pose a threat to the community;
  - o   previously removed aliens with criminal convictions other than a violent crime;
  - o   previously removed aliens who have not been convicted of a crime; and
- aliens who obtain admission or status by visa, identification, or immigration benefit fraud.[6]

The guidance to the National Fugitive Operations Program: Priorities, Goals and Expectations, issued on December 8, 2009, remains in effect and shall continue to apply for all purposes, including how Fugitive Operation Teams allocate resources among fugitive aliens, previously removed aliens, and criminal aliens.

*B.  Apprehension, detention, and removal of other aliens unlawfully in the United States*

Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of other aliens unlawfully in the United States.  ICE special agents, officers, and attorneys may pursue the removal of any alien unlawfully in the United States, although attention to these aliens should not displace or disrupt the resources needed to remove aliens who are a higher priority.  Resources should be committed primarily to advancing the priorities set forth above in order to best protect national security and public safety and to secure the border.

*C.  Detention*

As a general rule, ICE detention resources should be used to support the enforcement priorities noted above or for aliens subject to mandatory detention by law.  <u>Absent extraordinary circumstances or the requirements of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, or who are disabled, elderly, pregnant, or nursing, or demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest.</u>  To detain aliens in those categories who are not subject to mandatory detention, ICE officers or special agents must obtain approval from the field office director.  If an alien falls

---

[6] ICE officers and special agents should proceed cautiously when encountering aliens who may have engaged in fraud in an attempt to enter but present themselves without delay to the authorities and indicate a fear of persecution or torture. *See* Convention relating to the Status of Refugees, art. 31, *opened for signature* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137.  In such instances, officers and agents should contact their local Office of the Chief Counsel.

CAR 0406

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of
Aliens
Page 4

within the above categories and is subject to mandatory detention, field office directors are
encouraged to contact their local Office of Chief Counsel for guidance.

*D.  Prosecutorial discretion*

The rapidly increasing number of criminal aliens who may come to ICE's attention heightens the
need for ICE employees to exercise sound judgment and discretion consistent with these
priorities when conducting enforcement operations, making detention decisions, making
decisions about release on supervision pursuant to the Alternatives to Detention Program, and
litigating cases.  Particular care should be given when dealing with lawful permanent residents,
juveniles, and the immediate family members of U.S. citizens.  Additional guidance on
prosecutorial discretion is forthcoming.  In the meantime, ICE officers and attorneys should
continue to be guided by the November 17, 2000 prosecutorial discretion memorandum from
then-INS Commissioner Doris Meissner; the October 24, 2005 Memorandum from Principal
Legal Advisor William Howard; and the November 7, 2007 Memorandum from then Assistant
Secretary Julie Myers.

*E.  Implementation*

ICE personnel shall follow the priorities set forth in this memorandum immediately.  Further,
ICE programs shall develop appropriate measures and methods for recording and evaluating their
effectiveness in implementing the priorities.  As this may require updates to data tracking
systems and methods, ICE will ensure that reporting capabilities for these priorities allow for
such reporting as soon as practicable, but not later than October 1, 2010.

*F.  No Private Right Statement*[7]

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right
or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or
criminal matter.

---

[7] This statement was added to ICE Policy 10072.1, "Civil Immigration Enforcement: Priorities for the
Apprehension, Detention, and Removal of Aliens" on February 7, 2011.  The policy contained in this memorandum
has not been altered or changed.

CAR 0407

*Office of the Assistant Secretary*

U.S. Department of Homeland Security
425 I Street, NW
Washington, DC  20536



U.S. Immigration
and Customs
Enforcement

NOV - 7 2007

MEMORANDUM FOR:       All Field Office Directors
                       All Special Agents in Charge

FROM:                  Julie L. Myers
                       Assistant Secretary

SUBJECT:               Prosecutorial and Custody Discretion

This memorandum serves to highlight the importance of exercising prosecutorial discretion
when making administrative arrest and custody determinations for aliens who are nursing
mothers. The commitment by ICE to facilitate an end to the "catch and release" procedure for
illegal aliens does not diminish the responsibility of ICE agents and officers to use discretion in
identifying and responding to meritorious health related cases and caregiver issues.

The process for making discretionary decisions is outlined in the attached memorandum of
November 7, 2000, entitled "Exercising Prosecutorial Discretion." Field agents and officers
are not only authorized by law to exercise discretion within the authority of the agency, but are
expected to do so in a judicious manner at all stages of the enforcement process.

For example, in situations where officers are considering taking a nursing mother into custody,
the senior ICE field managers should consider:

* Absent any statutory detention requirement or concerns such as national security,
  threats to public safety or other investigative interests, the nursing mother should be
  released on an Order of Recognizance or Order of Supervision and the Alternatives to
  Detention programs should be considered as an additional enforcement tool;
* In situations where ICE has determined, due to one of the above listed concerns or a
  statutory detention requirement to take a nursing mother into custody, the field
  personnel should consider placing a mother with her non-U.S. citizen child in the T.
  Don Hutto or Berks family residential center, provided there are no medical or legal
  issues that preclude their removal and they meet the placement factors of the facility.
  For a nursing mother with a U.S. citizen child, the pertinent state social service agencies
  should be contacted to identify and address any caregiver issues the alien mother might
  have in order to maintain the unity of the mother and child if the above listed release
  condition can be met;
* The decision to detain nursing mothers shall be reported through the programs'
  operational chain of command.

Requests for Headquarters assistance to address arrests and custody determinations as they
relate to this issue may be addressed to the appropriate Assistant Director for Operations within
OI or DRO.

Attachment

**CAR 0408**

11/27/00   16:50   ☎202 514 1776          INS PRESS OFFICE                                    ☑002



U.S. Department of Justice
Immigration and Naturalization Service

HQOPP 50/4

Office of the Commissioner                          425 I Street NW
                                                    Washington, DC 20536

NOV   7 2000

MEMORANDUM TO REGIONAL DIRECTORS
                    DISTRICT DIRECTORS
                    CHIEF PATROL AGENTS
                    REGIONAL AND DISTRICT COUNSEL

FROM         Doris Meissner
             Commissioner
             Immigration and Naturalization Service

SUBJECT:     Exercising Prosecutorial Discretion

        Since the 1996 amendments to the Immigration and Nationality Act (INA) which limited
the authority of immigration judges to provide relief from removal in many cases, there has been
increased attention to the scope and exercise of the Immigration and Naturalization Service's
(INS or the Service) prosecutorial discretion.  This memorandum describes the principles with
which INS exercises prosecutorial discretion and the process to be followed in making and
monitoring discretionary decisions.  Service officers are not only authorized by law but expected
to exercise discretion in a judicious manner at all stages of the enforcement process–from
planning investigations to enforcing final orders–subject to their chains of command and to the
particular responsibilities and authority applicable to their specific position.  In exercising this
discretion, officers must take into account the principles described below in order to promote the
efficient and effective enforcement of the immigration laws and the interests of justice.

        More specific guidance geared to exercising discretion in particular program areas
already exists in some instances,[1] and other program-specific guidance will follow separately

---

[1] For example, standards and procedures for placing an alien in deferred action status are provided in the Standard
Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal (Standard Operating
Procedures), Part X.  This memorandum is intended to provide general principles, and does not replace any previous
specific guidance provided about particular INS actions, such as "Supplemental Guidelines on the Use of
Cooperating Individuals and Confidential Informants Following the Enactment of IIRIRA," dated December 29,
1997.  This memorandum is not intended to address every situation in which the exercise of prosecutorial discretion
may be appropriate.  If INS personnel in the exercise of their duties recognize apparent conflict between any of their
specific policy requirements and these general guidelines, they are encouraged to bring the matter to their
supervisor's attention, and any conflict between policies should be raised through the appropriate chain of command
for resolution.

**CAR 0409**

11/27/00 18:50 ☎202 514 1776 INS PRESS OFFICE ☷003

Memorandum for Regional Directors, et al.                                    Page 2
Subject:  Exercising Prosecutorial Discretion

However, INS officers should continue to exercise their prosecutorial discretion in appropriate cases during the period before more specific program guidance is issued.

A statement of principles concerning discretion serves a number of important purposes. As described in the "Principles of Federal Prosecution,"[1] part of the U.S. Attorneys' manual, such principles provide convenient reference points for the process of making prosecutorial decisions; facilitate the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made.

Legal and Policy Background

"Prosecutorial discretion" is the authority of an agency charged with enforcing a law to decide whether to enforce, or not to enforce, the law against someone. The INS, like other law enforcement agencies, has prosecutorial discretion and exercises it every day. In the immigration context, the term applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions, including among others: Focusing investigative resources on particular offenses or conduct; deciding whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order.

The "favorable exercise of prosecutorial discretion" means a discretionary decision not to assert the full scope of the INS' enforcement authority as permitted under the law. Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an NTA (discussed in more detail below under "Initiating Proceedings"), not detaining an alien placed in proceedings (where discretion remains despite mandatory detention requirements), and approving deferred action.

---

[1] For this discussion, and much else in this memorandum, we have relied heavily upon the Principles of Federal Prosecution, chapter 9-27.000 of the U.S. Department of Justice's United States Attorneys' Manual (Oct. 1997). There are significant differences, of course, between the role of the U.S. Attorneys' offices in the criminal justice system, and INS responsibilities to enforce the immigration laws, but the general approach to prosecutorial discretion stated in this memorandum reflects that taken by the Principles of Federal Prosecution.

CAR 0410

11/27/00   16:51   ☎202 514 1775         INS PRESS OFFICE                          ☻004

Memorandum for Regional Directors, et al.                                      Page 3
Subject:  Exercising Prosecutorial Discretion

Courts recognize that prosecutorial discretion applies in the civil, administrative arena just as it does in criminal law. Moreover, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney, 470 U.S. 821, 831 (1985). Both Congress and the Supreme Court have recently reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activities, such as whether to place an individual in deportation proceedings. INA section 242(g); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999). The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to judicial review or reversal, except in extremely narrow circumstances. Consequently, it is a powerful tool that must be used responsibly.

As a law enforcement agency, the INS generally has prosecutorial discretion within its area of law enforcement responsibility unless that discretion has been clearly limited by statute in a way that goes beyond standard terminology. For example, a statute directing that the INS "shall" remove removable aliens would not be construed by itself to limit prosecutorial discretion, but the specific limitation on releasing certain criminal aliens in section 236(c)(2) of the INA evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist. Personnel who are unsure whether the INS has discretion to take a particular action should consult their supervisor and legal counsel to the extent necessary.

It is important to recognize not only what prosecutorial discretion is, but also what it is not. The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law. Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given. For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.

This distinction is not always an easy, bright-line rule to apply. In many cases, INS decisionmaking involves both a prosecutorial decision to take or not to take enforcement action, such as placing an alien in removal proceedings, and a decision whether or not the alien is substantively eligible for a benefit under the INA. In many cases, benefit decisions involve the exercise of significant discretion which in some cases is not judicially reviewable, but which is not prosecutorial discretion.

Prosecutorial discretion can extend only up to the substantive and jurisdictional limits of the law. It can never justify an action that is illegal under the substantive law pertaining to the

CAR 0411

11/27/80   16:51   ☎202 514 1778      INS PRESS OFFICE                      ☎005

Memorandum for Regional Directors, et al.                                      Page 4
Subject:  Exercising Prosecutorial Discretion

conduct, or one that while legal in other contexts, is not within the authority of the agency or
officer taking it.  Prosecutorial discretion to take an enforcement action does not modify or waive
any legal requirements that apply to the action itself.  For example, an enforcement decision to
focus on certain types of immigration violators for arrest and removal does not mean that the INS
may arrest any person without probable cause to do so for an offense within its jurisdiction.
Service officers who are in doubt whether a particular action complies with applicable
constitutional, statutory, or case law requirements should consult with their supervisor and obtain
advice from the district or sector counsel or representative of the Office of General Counsel to
the extent necessary.

Finally, exercising prosecutorial discretion does not lessen the INS' commitment to
enforce the immigration laws to the best of our ability.  It is not an invitation to violate or ignore
the law.  Rather, it is a means to use the resources we have in a way that best accomplishes our
mission of administering and enforcing the immigration laws of the United States.

Principles of Prosecutorial Discretion

Like all law enforcement agencies, the INS has finite resources, and it is not possible to
investigate and prosecute all immigration violations.  The INS historically has responded to this
limitation by setting priorities in order to achieve a variety of goals.  These goals include
protecting public safety, promoting the integrity of the legal immigration system, and deterring
violations of the immigration law.

It is an appropriate exercise of prosecutorial discretion to give priority to investigating,
charging, and prosecuting those immigration violations that will have the greatest impact on
achieving these goals.  The INS has used this principle in the design and execution of its border
enforcement strategy, its refocus on criminal smuggling networks, and its concentration on fixing
benefit-granting processes to prevent fraud.  An agency's focus on maximizing its impact under
appropriate principles, rather than devoting resources to cases that will do less to advance these
overall interests, is a crucial element in effective law enforcement management.

The Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the
concept of a "substantial Federal interest."  A U.S. Attorney may properly decline a prosecution
if "no substantial Federal interest would be served by prosecution."  This principle provides a
useful frame of reference for the INS, although applying it presents challenges that differ from
those facing a U.S. Attorney.  In particular, as immigration is an exclusively Federal
responsibility, the option of an adequate alternative remedy under state law is not available.  In
an immigration case, the interest at stake will always be Federal.  Therefore, we must place
particular emphasis on the element of substantiality.  How important is the Federal interest in the
case, as compared to other cases and priorities?  That is the overriding question, and answering it
requires examining a number of factors that may differ according to the stage of the case.

CAR 0412



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPP 50/4

---

Office of the Commissioner

*425 I Street NW*
*Washington, DC 20536*

NOV 17 2000

MEMORANDUM TO REGIONAL DIRECTORS
                  DISTRICT DIRECTORS
                  CHIEF PATROL AGENTS
                  REGIONAL AND DISTRICT COUNSEL

FROM:     Doris Meissner
              Commissioner
              Immigration and Naturalization Service

SUBJECT:   <u>Exercising Prosecutorial Discretion</u>

       Since the 1996 amendments to the Immigration and Nationality Act (INA) which limited the authority of immigration judges to provide relief from removal in many cases, there has been increased attention to the scope and exercise of the Immigration and Naturalization Service's (INS or the Service) prosecutorial discretion.  This memorandum describes the principles with which INS exercises prosecutorial discretion and the process to be followed in making and monitoring discretionary decisions.  <u>Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process–from planning investigations to enforcing final orders–subject to their chains of command and to the particular responsibilities and authority applicable to their specific position.  In exercising this discretion, officers must take into account the principles described below in order to promote the efficient and effective enforcement of the immigration laws and the interests of justice.</u>

       More specific guidance geared to exercising discretion in particular program areas already exists in some instances,[1] and other program-specific guidance will follow separately.

---

[1] For example, standards and procedures for placing an alien in deferred action status are provided in the <u>Standard Operating Procedures for Enforcement Officers:  Arrest, Detention, Processing, and Removal</u> (Standard Operating Procedures), Part X.  This memorandum is intended to provide general principles, and does not replace any previous specific guidance provided about particular INS actions, such as "Supplemental Guidelines on the Use of Cooperating Individuals and Confidential Informants Following the Enactment of IIRIRA," dated December 29, 1997.  This memorandum is not intended to address every situation in which the exercise of prosecutorial discretion may be appropriate.  If INS personnel in the exercise of their duties recognize apparent conflict between any of their specific policy requirements and these general guidelines, they are encouraged to bring the matter to their supervisor's attention, and any conflict between policies should be raised through the appropriate chain of command for resolution.

CAR 0413

Memorandum for Regional Directors, et al.                                    Page 2
Subject:  Exercising Prosecutorial Discretion

However, INS officers should continue to exercise their prosecutorial discretion in appropriate cases during the period before more specific program guidance is issued.

A statement of principles concerning discretion serves a number of important purposes. As described in the "Principles of Federal Prosecution," [2] part of the U.S. Attorneys' manual, such principles provide convenient reference points for the process of making prosecutorial decisions; facilitate the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made.

**Legal and Policy Background**

"Prosecutorial discretion" is the authority of an agency charged with enforcing a law to decide whether to enforce, or not to enforce, the law against someone. The INS, like other law enforcement agencies, has prosecutorial discretion and exercises it every day.  In the immigration context, the term applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions, including among others:  Focusing investigative resources on particular offenses or conduct; deciding whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order.

The "favorable exercise of prosecutorial discretion" means a discretionary decision not to assert the full scope of the INS' enforcement authority as permitted under the law.  Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an NTA (discussed in more detail below under "Initiating Proceedings"), not detaining an alien placed in proceedings (where discretion remains despite mandatory detention requirements), and approving deferred action.

---

[2] For this discussion, and much else in this memorandum, we have relied heavily upon the Principles of Federal Prosecution, chapter 9-27.000 in the U.S. Department of Justice's United States Attorneys' Manual (Oct. 1997). There are significant differences, of course, between the role of the U.S. Attorneys' offices in the criminal justice system, and INS responsibilities to enforce the immigration laws, but the general approach to prosecutorial discretion stated in this memorandum reflects that taken by the Principles of Federal Prosecution.

CAR 0414

Memorandum for Regional Directors, et al.                                    Page 3
Subject:  Exercising Prosecutorial Discretion

Courts recognize that prosecutorial discretion applies in the civil, administrative arena just as it does in criminal law.  Moreover, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  Heckler v. Chaney, 470 U.S. 821, 831 (1985).  Both Congress and the Supreme Court have recently reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activities, such as whether to place an individual in deportation proceedings. INA section 242(g); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999).  The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to judicial review or reversal, except in extremely narrow circumstances.  Consequently, it is a powerful tool that must be used responsibly.

As a law enforcement agency, the INS generally has prosecutorial discretion within its area of law enforcement responsibility unless that discretion has been clearly limited by statute in a way that goes beyond standard terminology.  For example, a statute directing that the INS "shall" remove removable aliens would not be construed by itself to limit prosecutorial discretion, but the specific limitation on releasing certain criminal aliens in section 236(c)(2) of the INA evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist.  Personnel who are unsure whether the INS has discretion to take a particular action should consult their supervisor and legal counsel to the extent necessary.

It is important to recognize not only what prosecutorial discretion is, but also what it is not.  The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law.  Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given.  For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.

This distinction is not always an easy, bright-line rule to apply.  In many cases, INS decisionmaking involves both a prosecutorial decision to take or not to take enforcement action, such as placing an alien in removal proceedings, and a decision whether or not the alien is substantively eligible for a benefit under the INA.  In many cases, benefit decisions involve the exercise of significant discretion which in some cases is not judicially reviewable, but which is not prosecutorial discretion.

Prosecutorial discretion can extend only up to the substantive and jurisdictional limits of the law.  It can never justify an action that is illegal under the substantive law pertaining to the

CAR 0415

Memorandum for Regional Directors, et al.                                    Page 4
Subject:  Exercising Prosecutorial Discretion

conduct, or one that while legal in other contexts, is not within the authority of the agency or
officer taking it.  Prosecutorial discretion to take an enforcement action does not modify or waive
any legal requirements that apply to the action itself.  For example, an enforcement decision to
focus on certain types of immigration violators for arrest and removal does not mean that the INS
may arrest any person without probable cause to do so for an offense within its jurisdiction.
Service officers who are in doubt whether a particular action complies with applicable
constitutional, statutory, or case law requirements should consult with their supervisor and obtain
advice from the district or sector counsel or representative of the Office of General Counsel to
the extent necessary.

        Finally, exercising prosecutorial discretion does not lessen the INS' commitment to
enforce the immigration laws to the best of our ability.  It is not an invitation to violate or ignore
the law.  Rather, it is a means to use the resources we have in a way that best accomplishes our
mission of administering and enforcing the immigration laws of the United States.

**Principles of Prosecutorial Discretion**

        Like all law enforcement agencies, the INS has finite resources, and it is not possible to
investigate and prosecute all immigration violations.  The INS historically has responded to this
limitation by setting priorities in order to achieve a variety of goals.  These goals include
protecting public safety, promoting the integrity of the legal immigration system, and deterring
violations of the immigration law.

        It is an appropriate exercise of prosecutorial discretion to give priority to investigating,
charging, and prosecuting those immigration violations that will have the greatest impact on
achieving these goals.  The INS has used this principle in the design and execution of its border
enforcement strategy, its refocus on criminal smuggling networks, and its concentration on fixing
benefit-granting processes to prevent fraud.  An agency's focus on maximizing its impact under
appropriate principles, rather than devoting resources to cases that will do less to advance these
overall interests, is a crucial element in effective law enforcement management.

        The Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the
concept of a "substantial Federal interest."  A U.S. Attorney may properly decline a prosecution
if "*no substantial Federal interest would be served by prosecution.*"  This principle provides a
useful frame of reference for the INS, although applying it presents challenges that differ from
those facing a U.S. Attorney.  In particular, as immigration is an exclusively Federal
responsibility, the option of an adequate alternative remedy under state law is not available.  In
an immigration case, the interest at stake will always be Federal.  Therefore, we must place
particular emphasis on the element of substantiality.  How important is the Federal interest in the
case, as compared to other cases and priorities?  That is the overriding question, and answering it
requires examining a number of factors that may differ according to the stage of the case.

Memorandum for Regional Directors, et al.                                    Page 5
Subject:  Exercising Prosecutorial Discretion

As a general matter, INS officers may decline to prosecute a legally sufficient
immigration case if the Federal immigration enforcement interest that would be served by
prosecution is not substantial.[3]  Except as may be provided specifically in other policy statements
or directives, the responsibility for exercising prosecutorial discretion in this manner rests with
the District Director (DD) or Chief Patrol Agent (CPA) based on his or her common sense and
sound judgment.[4]  The DD or CPA should obtain legal advice from the District or Sector Counsel
to the extent that such advice may be necessary and appropriate to ensure the sound and lawful
exercise of discretion, particularly with respect to cases pending before the Executive Office for
Immigration Review (EOIR).[5]  The DD's or CPA's authority may be delegated to the extent
necessary and proper, except that decisions not to place a removable alien in removal
proceedings, or decisions to move to terminate a proceeding which in the opinion of the District
or Sector Counsel is legally sufficient, may not be delegated to an officer who is not authorized
under 8 C.F.R. § 239.1 to issue an NTA.  A DD's or CPA's exercise of prosecutorial discretion
will not normally be reviewed by Regional or Headquarters authority.  However, DDs and CPAs
remain subject to their chains of command and may be supervised as necessary in their exercise
of prosecutorial discretion.

*Investigations*

Priorities for deploying investigative resources are discussed in other documents, such as
the interior enforcement strategy, and will not be discussed in detail in this memorandum. These
previously identified priorities include identifying and removing criminal and terrorist aliens,
deterring and dismantling alien smuggling, minimizing benefit fraud and document abuse,
responding to community complaints about illegal immigration and building partnerships to
solve local problems, and blocking and removing employers' access to undocumented workers.
Even within these broad priority areas, however, the Service must make decisions about how
best to expend its resources.

Managers should plan and design operations to maximize the likelihood that serious
offenders will be identified.  Supervisors should ensure that front-line investigators understand
that it is not mandatory to issue an NTA in every case where they have reason to believe that an
alien is removable, and agents should be encouraged to bring questionable cases to a supervisor's
attention.  Operational planning for investigations should include consideration of appropriate
procedures for supervisory and legal review of individual NTA issuing decisions.

---

[3] In some cases even a substantial immigration enforcement interest in prosecuting a case could be outweighed by
other interests, such as the foreign policy of the United States.  Decisions that require weighing such other interests
should be made at the level of responsibility within the INS or the Department of Justice that is appropriate in light
of the circumstances and interests involved.
[4] This general reference to DDs and CPAs is not intended to exclude from coverage by this memorandum other INS
personnel, such as Service Center directors, who may be called upon to exercise prosecutorial discretion and do not
report to DDs or CPAs, or to change any INS chains of command.
[5] Exercising prosecutorial discretion with respect to cases pending before EOIR involves procedures set forth at 8
CFR 239.2 and 8 CFR Part 3, such as obtaining the court's approval of a motion to terminate proceedings.

Memorandum for Regional Directors, et al.                                          Page 6
Subject:  Exercising Prosecutorial Discretion

Careful design of enforcement operations is a key element in the INS' exercise of prosecutorial discretion.  Managers should consider not simply whether a particular effort is legally supportable, but whether it best advances the INS' goals, compared with other possible uses of those resources.  As a general matter, investigations that are specifically focused to identify aliens who represent a high priority for removal should be favored over investigations which, by their nature, will identify a broader variety of removable aliens.  Even an operation that is designed based on high-priority criteria, however, may still identify individual aliens who warrant a favorable exercise of prosecutorial discretion.[6]

#### *Initiating and Pursuing Proceedings*

Aliens who are subject to removal may come to the Service's attention in a variety of ways.  For example, some aliens are identified as a result of INS investigations, while others are identified when they apply for immigration benefits or seek admission at a port-of-entry.  While the context in which the INS encounters an alien may, as a practical matter, affect the Service's options, it does not change the underlying principle that the INS has discretion and should exercise that discretion appropriately given the circumstances of the case.

Even when an immigration officer has reason to believe that an alien is removable and that there is sufficient evidence to obtain a final order of removal, it may be appropriate to decline to proceed with that case.  This is true even when an alien is removable based on his or her criminal history and when the alien–if served with an NTA–would be subject to mandatory detention. The INS may exercise its discretion throughout the enforcement process.  Thus, the INS can choose whether to issue an NTA, whether to cancel an NTA prior to filing with the immigration court or move for dismissal in immigration court (under 8 CFR 239.2), whether to detain (for those aliens not subject to mandatory detention), whether to offer an alternative to removal such as voluntary departure or withdrawal of an application for admission, and whether to stay an order of deportation.

The decision to exercise any of these options or other alternatives in a particular case requires an individualized determination, based on the facts and the law.  As a general matter, it is better to exercise favorable discretion as early in the process as possible, once the relevant facts have been determined, in order to conserve the Service's resources and in recognition of the alien's interest in avoiding unnecessary legal proceedings.  However, there is often a conflict

---

[6] For example, operations in county jails are designed to identify and remove criminal aliens, a high priority for the Service.  Nonetheless, an investigator working at a county jail and his or her supervisor should still consider whether the exercise of prosecutorial discretion would be appropriate in individual cases.

CAR 0418

Memorandum for Regional Directors, et al.                                    Page 7
Subject:  Exercising Prosecutorial Discretion

between making decisions as soon as possible, and making them based on evaluating as many relevant, credible facts as possible.  Developing an extensive factual record prior to making a charging decision may itself consume INS resources in a way that negates any saving from forgoing a removal proceeding.

Generally, adjudicators may have a better opportunity to develop a credible factual record at an earlier stage than investigative or other enforcement personnel.  It is simply not practicable to require officers at the arrest stage to develop a full investigative record on the equities of each case (particularly since the alien file may not yet be available to the charging office), and this memorandum does not require such an analysis.  Rather, what is needed is knowledge that the INS is not legally required to institute proceedings in every case, openness to that possibility in appropriate cases, development of facts relevant to the factors discussed below to the extent that it is reasonably possible to do so under the circumstances and in the timeframe that decisions must be made, and implementation of any decision to exercise prosecutorial discretion.

There is no precise formula for identifying which cases warrant a favorable exercise of discretion.  Factors that should be taken into account in deciding whether to exercise prosecutorial discretion include, but are not limited to, the following:

- Immigration status: Lawful permanent residents generally warrant greater consideration.  However, other removable aliens may also warrant the favorable exercise of discretion, depending on all the relevant circumstances.
- Length of residence in the United States:  The longer an alien has lived in the United States, particularly in legal status, the more this factor may be considered a positive equity.
- Criminal history: Officers should take into account the nature and severity of any criminal conduct, as well as the time elapsed since the offense occurred and evidence of rehabilitation.  It is appropriate to take into account the actual sentence or fine that was imposed, as an indicator of the seriousness attributed to the conduct by the court.  Other factors relevant to assessing criminal history include the alien's age at the time the crime was committed and whether or not he or she is a repeat offender.
- Humanitarian concerns:  Relevant humanitarian concerns include, but are not limited to, family ties in the United States; medical conditions affecting the alien or the alien's family; the fact that an alien entered the United States at a very young age; ties to one's home country (e.g., whether the alien speaks the language or has relatives in the home country); extreme youth or advanced age; and home country conditions.
- Immigration history:  Aliens without a past history of violating the immigration laws (particularly violations such as reentering after removal, failing to appear at hearing, or resisting arrest that show heightened disregard for the legal process) warrant favorable consideration to a greater extent than those with such a history.  The seriousness of any such violations should also be taken into account.

CAR 0419

Memorandum for Regional Directors, et al.                                      Page 8
Subject:  Exercising Prosecutorial Discretion

- <u>Likelihood of ultimately removing the alien</u>:  Whether a removal proceeding would have a reasonable likelihood of ultimately achieving its intended effect, in light of the case circumstances such as the alien's nationality, is a factor that should be considered.
- <u>Likelihood of achieving enforcement goal by other means</u>:  In many cases, the alien's departure from the United States may be achieved more expeditiously and economically by means other than removal, such as voluntary return, withdrawal of an application for admission, or voluntary departure.
- <u>Whether the alien is eligible or is likely to become eligible for other relief</u>:  Although not determinative on its own, it is relevant to consider whether there is a legal avenue for the alien to regularize his or her status if not removed from the United States.  The fact that the Service cannot confer complete or permanent relief, however, does not mean that discretion should not be exercised favorably if warranted by other factors.
- <u>Effect of action on future admissibility</u>:  The effect an action such as removal may have on an alien can vary–for example, a time-limited as opposed to an indefinite bar to future admissibility–and these effects may be considered.
- <u>Current or past cooperation with law enforcement authorities</u>:  Current or past cooperation with the INS or other law enforcement authorities, such as the U.S. Attorneys, the Department of Labor, or National Labor Relations Board, among others, weighs in favor of discretion.
- <u>Honorable U.S. military service</u>:  Military service with an honorable discharge should be considered as a favorable factor.  See Standard Operating Procedures Part V.D.8 (issuing an NTA against current or former member of armed forces requires advance approval of Regional Director).
- <u>Community attention</u>:  Expressions of opinion, in favor of or in opposition to removal, may be considered, particularly for relevant facts or perspectives on the case that may not have been known to or considered by the INS.  Public opinion or publicity (including media or congressional attention) should not, however, be used to justify a decision that cannot be supported on other grounds.  Public and professional responsibility will sometimes require the choice of an unpopular course.
- <u>Resources available to the INS</u>:  As in planning operations, the resources available to the INS to take enforcement action in the case, compared with other uses of the resources to fulfill national or regional priorities, are an appropriate factor to consider, but it should not be determinative.  For example, when prosecutorial discretion should be favorably exercised under these factors in a particular case, that decision should prevail even if there is detention space available.

Obviously, not all of the factors will be applicable to every case, and in any particular case one factor may deserve more weight than it might in another case.  There may be other factors, not on the list above, that are appropriate to consider.  The decision should be based on the totality of the circumstances, not on any one factor considered in isolation.  General guidance such as this cannot provide a "bright line" test that may easily be applied to determine the "right" answer in every case.  In many cases, minds reasonably can differ, different factors may point in different directions, and there is no clearly "right" answer.  Choosing a course of action in difficult

Memorandum for Regional Directors, et al.                                         Page 9
Subject:  Exercising Prosecutorial Discretion

cases must be an exercise of judgment by the responsible officer based on his or her experience, good sense, and consideration of the relevant factors to the best of his or her ability.

There are factors that may <u>not</u> be considered.  Impermissible factors include:

- An individual's race, religion, sex, national origin, or political association, activities or beliefs;[7]
- The officer's own personal feelings regarding the individual; or
- The possible effect of the decision on the officer's own professional or personal circumstances.

In many cases, the procedural posture of the case, and the state of the factual record, will affect the ability of the INS to use prosecutorial discretion.  For example, since the INS cannot admit an inadmissible alien to the United States unless a waiver is available, in many cases the INS' options are more limited in the admission context at a port-of-entry than in the deportation context.

Similarly, the INS may consider the range of options and information likely to be available at a later time.  For example, an officer called upon to make a charging decision may reasonably determine that he or she does not have a sufficient, credible factual record upon which to base a favorable exercise of prosecutorial discretion not to put the alien in proceedings, that the record cannot be developed in the timeframe in which the decision must be made, that a more informed prosecutorial decision likely could be made at a later time during the course of proceedings, and that if the alien is not served with an NTA now, it will be difficult or impossible to do so later.

Such decisions must be made, however, with due regard for the principles of these guidelines, and in light of the other factors discussed here.  For example, if there is no relief available to the alien in a removal proceeding and the alien is subject to mandatory detention if

---

[7] This general guidance on factors that should not be relied upon in making a decision whether to enforce the law against an individual is not intended to prohibit their consideration to the extent they are directly relevant to an alien's status under the immigration laws or eligibility for a benefit.  For example, religion and political beliefs are often directly relevant in asylum cases and need to be assessed as part of a prosecutorial determination regarding the strength of the case, but it would be improper for an INS officer to treat aliens differently based on his personal opinion about a religion or belief.  Political activities may be relevant to a ground of removal on national security or terrorism grounds.  An alien's nationality often directly affects his or her eligibility for adjustment or other relief, the likelihood that he or she can be removed, or the availability of prosecutorial options such as voluntary return, and may be considered to the extent these concerns are pertinent.

CAR 0421

Memorandum for Regional Directors, et al.                                    Page 10
Subject:  Exercising Prosecutorial Discretion

placed in proceedings, that situation suggests that the exercise of prosecutorial discretion, if appropriate, would be more useful to the INS if done sooner rather than later.  It would be improper for an officer to assume that someone else at some later time will always be able to make a more informed decision, and therefore never to consider exercising discretion.

Factors relevant to exercising prosecutorial discretion may come to the Service's attention in various ways.  For example, aliens may make requests to the INS to exercise prosecutorial discretion by declining to pursue removal proceedings.  Alternatively, there may be cases in which an alien asks to be put in proceedings (for example, to pursue a remedy such as cancellation of removal that may only be available in that forum).  In either case, the INS may consider the request, but the fact that it is made should not determine the outcome, and the prosecutorial decision should be based upon the facts and circumstances of the case.  Similarly, the fact that an alien has <u>not</u> requested prosecutorial discretion should not influence the analysis of the case.  Whether, and to what extent, any request should be considered is also a matter of discretion.  Although INS officers should be open to new facts and arguments, attempts to exploit prosecutorial discretion as a delay tactic, as a means merely to revisit matters that have been thoroughly considered and decided, or for other improper tactical reasons should be rejected.  There is no legal right to the exercise of prosecutorial discretion, and (as stated at the close of this memorandum) this memorandum creates no right or obligation enforceable at law by any alien or any other party.

**Process for Decisions**

*Identification of Suitable Cases*

No single process of exercising discretion will fit the multiple contexts in which the need to exercise discretion may arise.  Although this guidance is designed to promote consistency in the application of the immigration laws, it is not intended to produce rigid uniformity among INS officers in all areas of the country at the expense of the fair administration of the law.  Different offices face different conditions and have different requirements.  Service managers and supervisors, including DDs and CPAs, and Regional, District, and Sector Counsel must develop mechanisms appropriate to the various contexts and priorities, keeping in mind that it is better to exercise discretion as early in process as possible once the factual record has been identified.[8]  In particular, in cases where it is clear that no statutory relief will be available at the immigration hearing and where detention will be mandatory, it best conserves the Service's resources to make a decision early.

Enforcement and benefits personnel at all levels should understand that prosecutorial discretion exists and that it is appropriate and expected that the INS will exercise this authority in appropriate cases.  DDs, CPAs, and other supervisory officials (such as District and

---

[8] DDs, CPAs, and other INS personnel should also be open, however, to possible reconsideration of decisions (either for or against the exercise of discretion) based upon further development of the facts.

Memorandum for Regional Directors, et al.                                    Page 11
Subject:  Exercising Prosecutorial Discretion

Sector Counsels) should encourage their personnel to bring potentially suitable cases for the favorable exercise of discretion to their attention for appropriate resolution.  To assist in exercising their authority, DDs and CPAs may wish to convene a group to provide advice on difficult cases that have been identified as potential candidates for prosecutorial discretion.

It is also appropriate for DDs and CPAs to develop a list of "triggers" to help their personnel identify cases at an early stage that may be suitable for the exercise of prosecutorial discretion.  These cases should then be reviewed at a supervisory level where a decision can be made as to whether to proceed in the ordinary course of business, to develop additional facts, or to recommend a favorable exercise of discretion.  Such triggers could include the following facts (whether proven or alleged):

Lawful permanent residents;
Aliens with a serious health condition;
Juveniles;
Elderly aliens;
Adopted children of U.S. citizens;
U.S. military veterans;
Aliens with lengthy presence in United States (i.e., 10 years or more); or
Aliens present in the United States since childhood.

Since workloads and the type of removable aliens encountered may vary significantly both within and between INS offices, this list of possible trigger factors for supervisory review is intended neither to be comprehensive nor mandatory in all situations.  Nor is it intended to suggest that the presence or absence of "trigger" facts should itself determine whether prosecutorial discretion should be exercised, as compared to review of all the relevant factors as discussed elsewhere in these guidelines.  Rather, development of trigger criteria is intended solely as a suggested means of facilitating identification of potential cases that may be suitable for prosecutorial review as early as possible in the process.

*Documenting Decisions*

When a DD or CPA decides to exercise prosecutorial discretion favorably, that decision should be clearly documented in the alien file, including the specific decision taken and its factual and legal basis.  DDs and CPAs may also document decisions based on a specific set of facts not to exercise prosecutorial discretion favorably, but this is not required by this guidance.

The alien should also be informed in writing of a decision to exercise prosecutorial discretion favorably, such as not placing him or her in removal proceedings or not pursuing a case.  This normally should be done by letter to the alien and/or his or her attorney of record, briefly stating the decision made and its consequences.  It is not necessary to recite the facts of the case or the INS' evaluation of the facts in such letters.  Although the specifics of the letter

CAR 0423

Memorandum for Regional Directors, et al.                                          Page 12
Subject:  Exercising Prosecutorial Discretion

will vary depending on the circumstances of the case and the action taken, it must make it clear
to the alien that exercising prosecutorial discretion does not confer any immigration status,
ability to travel to the United States (unless the alien applies for and receives advance parole),
immunity from future removal proceedings, or any enforceable right or benefit upon the alien.
If, however, there is a potential benefit that is linked to the action (for example, the availability
of employment authorization for beneficiaries of deferred action), it is appropriate to identify it.

     The obligation to notify an individual is limited to situations in which a specific,
identifiable decision to refrain from action is taken in a situation in which the alien normally
would expect enforcement action to proceed.  For example, it is not necessary to notify aliens
that the INS has refrained from focusing investigative resources on them, but a specific decision
not to proceed with removal proceedings against an alien who has come into INS custody should
be communicated to the alien in writing.  This guideline is not intended to replace existing
standard procedures or forms for deferred action, voluntary return, voluntary departure, or other
currently existing and standardized processes involving prosecutorial discretion.

     *Future Impact*

     An issue of particular complexity is the future effect of prosecutorial discretion decisions
in later encounters with the alien.  Unlike the criminal context, in which statutes of limitation and
venue requirements often preclude one U.S. Attorney's office from prosecuting an offense that
another office has declined, immigration violations are continuing offenses that, as a general
principle of immigration law, continue to make an alien legally removable regardless of
a decision not to pursue removal on a previous occasion.  An alien may come to the attention of
the INS in the future through seeking admission or in other ways.  An INS office should abide by
a favorable prosecutorial decision taken by another office as a matter of INS policy, absent new
facts or changed circumstances.  However, if a removal proceeding is transferred from one INS
district to another, the district assuming responsibility for the case is not bound by the charging
district's decision to proceed with an NTA, if the facts and circumstances at a later stage suggest
that a favorable exercise of prosecutorial discretion is appropriate.

     Service offices should review alien files for information on previous exercises of
prosecutorial discretion at the earliest opportunity that is practicable and reasonable and take any
such information into account.  In particular, the office encountering the alien must carefully
assess to what extent the relevant facts and circumstances are the same or have changed either
procedurally or substantively (either with respect to later developments, or more detailed
knowledge of past circumstances) from the basis for the original exercise of discretion. A
decision by an INS office to take enforcement action against the subject of a previous
documented exercise of favorable prosecutorial discretion should be memorialized with a
memorandum to the file explaining the basis for the decision, unless the charging documents on
their face show a material difference in facts and circumstances (such as a different ground of
deportability).

CAR 0424

Memorandum for Regional Directors, et al.                                                    Page 13
Subject:  Exercising Prosecutorial Discretion

**Legal Liability and Enforceability**

The question of liability may arise in the implementation of this memorandum.  Some
INS personnel have expressed concerns that, if they exercise prosecutorial discretion favorably,
they may become subject to suit and personal liability for the possible consequences of that
decision.  We cannot promise INS officers that they will never be sued.  However, we can assure
our employees that Federal law shields INS employees who act in reasonable reliance upon
properly promulgated agency guidance within the agency's legal authority – such as this
memorandum–from personal legal liability for those actions.

The principles set forth in this memorandum, and internal office procedures adopted
hereto, are intended solely for the guidance of INS personnel in performing their duties.  They
are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or
procedural, enforceable at law by any individual or other party in removal proceedings, in
litigation with the United States, or in any other form or manner.

**Training and Implementation**

Training on the implementation of this memorandum for DDs, CPAs, and Regional,
District, and Sector Counsel will be conducted at the regional level.  This training will include
discussion of accountability and periodic feedback on implementation issues.  In addition,
following these regional sessions, separate training on prosecutorial discretion will be conducted
at the district level for other staff, to be designated.  The regions will report to the Office of Field
Operations when this training has been completed.

CAR 0425

**Update on the Administration's Progress in Implementing a New Process to Further Focus Immigration Enforcement Resources on High Priority Cases**

On November 17, 2011, U.S. Immigration and Customs Enforcement (ICE) Principal Legal Advisor Peter S. Vincent disseminated a memorandum directing all twenty-six ICE Offices of Chief Counsel (OCCs) to conduct a review of the 300,000 cases pending before the Executive Office for Immigration Review (EOIR), and all incoming cases.   The purpose of the review is to ensure that the cases pending before EOIR conform to the civil enforcement priorities detailed in ICE Director John Morton's June 17, 2011 memorandum, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens.*

As of April 2, 2012, ICE attorneys have reviewed **203,470** of the approximately **300,000** cases pending before EOIR. Of the cases reviewed:

- **15,474** cases, or approximately **8%,** were determined to be low priority and have been provisionally identified as amenable to the exercise of prosecutorial discretion. Of the cases identified as amenable for prosecutorial discretion, **15,453** are non-detained cases and **21** are detained cases.
- ICE attorneys have filed motions for administrative closure or dismissal in more than **2,300** of the **15,474** cases identified as amenable for prosecutorial discretion. In the remaining cases, ICE attorneys are awaiting the completion of background checks, drafting and filing joint motions for administrative closure or dismissal with aliens' counsel, or have been informed that the alien has declined ICE's offer to exercise prosecutorial discretion in his or her case.
- The low priority categories most often recognized for prosecutorial discretion were (1) long-term illegal residents with an immediate U.S. citizen family member, (2) minors present illegally in the United States for more than five years, and (3) aliens who entered the United States under the age of sixteen and who are attending or have completed higher education.

Beginning on April 23, 2012, EOIR will suspend the non-detained dockets in four additional jurisdictions for two weeks.  The four jurisdictions are Detroit, New Orleans, Orlando and Seattle.  During those two weeks, the immigration judges assigned to the non-detained dockets in those locations will be re-assigned to hear detained cases.  ICE attorneys assigned to the non-detained dockets in those locations will dedicate their time to reviewing pending cases for the potential exercise of prosecutorial discretion.

Next, in May, EOIR will partially suspend the non-detained docket in New York City, during which time its non-detained immigration judges will be re-assigned to hear detained dockets at other locations, and ICE attorneys will devote their time to the review of the remaining cases in New York.  EOIR and ICE will implement the same procedures in San Francisco in June and Los Angeles in July.

CAR 0426

**<u>Update on the Administration's Progress in Implementing a New Process to Further Focus Immigration Enforcement Resources<br>on High Priority Cases</u>**

On November 17, 2011, U.S. Immigration and Customs Enforcement (ICE) Principal Legal Advisor Peter S. Vincent disseminated a memorandum directing all twenty-six ICE Offices of Chief Counsel (OCCs) to conduct a review of the 300,000 cases pending before the Executive Office for Immigration Review (EOIR), and all incoming cases.   The purpose of the review is to ensure that the cases pending before EOIR conform to the civil enforcement priorities detailed in ICE Director John Morton's June 17, 2011 memorandum, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens.*

Pursuant to the guidance, the following cases were generally not enforcement priorities for the Department. An alien:

> ➢ Who is a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such member or veteran;
> ➢ Who is a child, has been in the United States for more than five years, and is either in school or successfully completed high school (or its equivalent);
> ➢ Who came to the United States under the age of sixteen, has been in the United States for more than five years, has completed high school (or its equivalent), and is now pursuing or has successfully pursued higher education in the United States;
> ➢ Who is over the age of sixty-five and has been present in the United States for more than ten years;
> ➢ Who is a victim of domestic violence in the United States, human trafficking to the United States, or of any other serious crime in the United States;
> ➢ Who has been a lawful permanent resident for ten years or more and has a single, minor conviction for a non-violent offense;
> ➢ Who suffers from a serious mental or physical condition that would require significant medical or detention resources; or
> ➢ Who has very long-term presence in the United States, has an immediate family member who is a United States citizen, and has established compelling ties and made compelling contributions to the United States.

A ninth category, "Other," was reserved for those very few aliens whose unique circumstances, despite not falling squarely within the above criteria, established their eligibility for the exercise of prosecutorial discretion.

As of April 2, 2012, ICE attorneys have reviewed **203,470** of the approximately **300,000** cases pending before EOIR. Of the cases reviewed:

- **15,474** cases, or approximately **8%,** were determined to be low priority and have been provisionally identified as amenable to the exercise of prosecutorial discretion. Of the cases identified as amenable for prosecutorial discretion, **15,453** are non-detained cases and **21** are detained cases.

CAR 0427

- ICE attorneys have filed motions for administrative closure or dismissal in more than **2,300** of the **15,474** cases identified as amenable for prosecutorial discretion. In the remaining cases, ICE attorneys are awaiting the completion of background checks, drafting and filing joint motions for administrative closure or dismissal with aliens' counsel, or have been informed that the alien has declined ICE's offer to exercise prosecutorial discretion in his or her case.
- The low priority categories most often recognized for prosecutorial discretion were (1) long-term illegal residents with an immediate U.S. citizen family member, (2) minors present illegally in the United States for more than five years, and (3) aliens who entered the United States under the age of sixteen and who are attending or have completed higher education.

Beginning on April 23, 2012, EOIR will suspend the non-detained dockets in four additional jurisdictions for two weeks. The four jurisdictions are Detroit, New Orleans, Orlando and Seattle. During those two weeks, the immigration judges assigned to the non-detained dockets in those locations will be re-assigned to hear detained cases. ICE attorneys assigned to the non-detained dockets in those locations will dedicate their time to reviewing pending cases for the potential exercise of prosecutorial discretion.

Next, in May, EOIR will partially suspend the non-detained docket in New York City, during which time its non-detained immigration judges will be re-assigned to hear detained dockets at other locations, and ICE attorneys will devote their time to the review of the remaining cases in New York. EOIR and ICE will implement the same procedures in San Francisco in June and Los Angeles in July.

| **From:** | Baronof, Kim ███████████████████████ |
|---|---|
| **Sent:** | Tuesday, April 24, 2012 8:30 AM |
| **To:** | Sandweg, John ███████████████████ Grossman, Seth ██████████████████████ Peacock, Nelson ██████████████████████ |
| **Subject:** | FW: Lamar Smith PD by Age and Citizenship |
| **Attach:** | FY12 PD Report_Age,Citizenship_LESA-STU_FINAL.xlsx |

Here is the revised age and citizenship breakdown of the 1,273 deferred actions and/or stays in FY12. ERO is still working on getting more granularity. I will send updated version as soon as possible.

**From:** Sheriff, Jennifer L
**Sent:** Monday, April 23, 2012 7:37 PM
**To:** Baronof, Kim; Rogers, Andrea R; ERO Taskings
**Cc:** Rapp, Marc A; Anderson, Jamia T; Stephens, Sean M
**Subject:** FW: Lamar Smith PD by Age and Citizenship
**Importance:** High

Attached is the original population that was reported in the Lamar Smith response letter broken out by citizenship and age range.  In our hast to provide this information this morning, we inadvertently included data from prior fiscal years and double counted a small data set.  The attached has been reviewed and cleared by LESA AD Rapp.

Jennifer Lincoln Sheriff
Chief, Statistical Tracking Unit
DHS/ICE/ERO Law Enforcement Systems & Analysis
████████████████ 2 or ████████████████████
Imagining urself enjoying your new cheese leads you to it!

**From:** Hofer, Ann-Marie P (CTR)
**Sent:** Monday, April 23, 2012 7:32 PM
**To:** Sheriff, Jennifer L; Stephens, Sean M
**Cc:** Wolfe, Melanie L (CTR); Anderson, Jamia T; ICE LESA TASKING
**Subject:** Lamar Smith PD by Age and Citizenship

Hi Jennifer,

Please see attached breakout of the 1,273 from the Lamar Smith submission by Age and Citizenship for clearance.

Kind Regards,

Ann-Marie

*Ann-Marie Hofer*
Contract Support to DHS / ICE / ERO

# ERO LES Statistical Tracking Unit

## FY2012 Monthly Prosecutorial Discretion (PD) Report (U.S. Rep Lamar Smith)

**Administratively Closed Cases due to PD**

| ERO Citizenship Country | Active Cases with Deferred Action or Stays by FOD |
|---|---|
| MEXICO | 294 |
| INDONESIA | 101 |
| EL SALVADOR | 100 |
| GUATEMALA | 97 |
| HONDURAS | 70 |
| COLOMBIA | 64 |
| CHINA, PEOPLES REPUBLIC OF | 58 |
| ALBANIA | 36 |
| ECUADOR | 36 |
| PERU | 32 |
| BRAZIL | 30 |
| BANGLADESH | 24 |
| PHILIPPINES | 19 |
| VENEZUELA | 17 |
| PAKISTAN | 16 |
| INDIA | 15 |
| DOMINICAN REPUBLIC | 14 |
| JAMAICA | 14 |
| BELGIUM | 10 |
| POLAND | 10 |
| ISRAEL | 9 |
| NICARAGUA | 9 |
| UKRAINE | 9 |
| GUYANA | 8 |
| KENYA | 8 |
| HAITI | 7 |
| NIGERIA | 7 |
| UZBEKISTAN | 7 |
| ARGENTINA | 6 |
| GERMANY | 6 |
| GHANA | 6 |
| TRINIDAD AND TOBAGO | 6 |
| UNITED KINGDOM | 6 |
| CUBA | 5 |
| ETHIOPIA | 5 |
| JORDAN | 5 |
| YUGOSLAVIA | 5 |
| ZIMBABWE | 5 |
| EGYPT | 4 |
| GEORGIA | 4 |
| KOREA | 4 |

CAR 0430

| | |
|---|---|
| ROMANIA | 4 |
| ARMENIA | 3 |
| BULGARIA | 3 |
| COSTA RICA | 3 |
| ITALY | 3 |
| MOROCCO | 3 |
| RUSSIA | 3 |
| SOUTH KOREA | 3 |
| YEMEN | 3 |
| BAHRAIN | 2 |
| CAMBODIA | 2 |
| CAMEROON | 2 |
| CHILE | 2 |
| GUINEA | 2 |
| KOSOVO | 2 |
| LITHUANIA | 2 |
| MACEDONIA | 2 |
| MALAYSIA | 2 |
| NEPAL | 2 |
| PARAGUAY | 2 |
| SENEGAL | 2 |
| TOGO | 2 |
| TURKEY | 2 |
| URUGUAY | 2 |
| BAHAMAS | 1 |
| BOLIVIA | 1 |
| BOSNIA-HERZEGOVINA | 1 |
| BURUNDI | 1 |
| CAPE VERDE | 1 |
| CROATIA | 1 |
| DOMINICA | 1 |
| ERITREA | 1 |
| FIJI | 1 |
| FINLAND | 1 |
| GABON | 1 |
| GAMBIA | 1 |
| GREECE | 1 |
| IRAN | 1 |
| IRAQ | 1 |
| IVORY COAST | 1 |
| MALAWI | 1 |
| MALI | 1 |
| MAURITANIA | 1 |
| NETHERLANDS | 1 |
| SERBIA AND MONTENEGRO | 1 |
| SIERRA LEONE | 1 |
| SLOVAKIA | 1 |
| SPAIN | 1 |

CAR 0431

| | |
|---|---|
| SRI LANKA | 1 |
| TONGA | 1 |
| ZAMBIA | 1 |
| **Total** | **1,273** |

IIDS v.1.10 as of 03/19/2012 as reported by the Statistical Tracking Unit.

Prosecutorial discretion may be exercised at various points in the alien's removal lifecycle.  ICE began tracking PD within Enforce in December 2011; therefore all reporting will be on FY2012 or greater.

Administratively Closed Cases with PD are measured per the guidance given to the Field as active, non-detained cases and located on the 'Prosecutorial Discretion by IJ' dockets established by the AORs.   These cases contain administrative closures based on EOIR actions.

Deferred Action Cases: These cases include active, non-detained cases that have either a case category 5D (Deferred Action Granted) or case action of stay granted by Field Office Director (FOD) within FY2012 as measured by the case action & decision date.

Please note that a case may be administratively closed by the IJ and then issue a deferred action.  These populations are not mutually exclusive.

CAR 0432

# ERO LES Statistical Tracking Unit
## FY2012 Monthly Prosecutorial Discretion (PD) Report (U.S. Rep Lamar Smith)
### Administratively Closed Cases due to PD

| Age Grouping | Active Cases with Deferred Action or Stays by FOD |
|---|---|
| Less Than 18 | 54 |
| 18-30 | 293 |
| 31-40 | 424 |
| 41-50 | 340 |
| 51-60 | 134 |
| Over 60 | 28 |
| **TOTAL** | **1,273** |

IIDS v.1.10 as of 03/19/2012 as reported by the Statistical Tracking Unit.

Prosecutorial discretion may be exercised at various points in the alien's removal lifecycle.  ICE began tracking PD within Enforce in December 2011; therefore all reporting will be on FY2012 or greater.

Field as active, non-detained cases and located on the 'Prosecutorial Discretion by IJ' dockets established by the AORs.   These cases contain administrative closures based on EOIR actions.

Deferred Action Cases: These cases include active, non-detained cases that have either a case category 5D (Deferred Action Granted) or case action of stay granted by Field Office Director (FOD) within FY2012 as measured by the case action & decision date.

Please note that a case may be administratively closed by the IJ and then issue a deferred action.  These populations are not mutually exclusive.



# Holding DHS Accountable on Prosecutorial Discretion

November 2011

 

### About the American Immigration Lawyers Association and the American Immigration Council

**The American Immigration Lawyers Association** (AILA) is the national association of immigration lawyers established to promote justice, advocate for fair and reasonable immigration law and policy, and advance the quality of immigration law practice. AILA has over 11,000 attorney and law professor members who practice and teach immigration law. Founded in 1946, AILA is a nonpartisan, not-for-profit organization that provides continuing legal education, information, professional services, and expertise through its 36 chapters and over 50 national committees.

**The American Immigration Council** (Immigration Council) is a 501(c)(3) not-for-profit organization that works tirelessly to achieve justice and fairness under the law for immigrants. The Council stands up for sensible and humane immigration policies, educates others about the enduring contributions of America's immigrants, and insists that our immigration laws be enacted and implemented in a way that honors fundamental constitutional and human rights.

*Acknowledgements*

*This report was written by the following AILA staff:  Alexsa Alonzo, Associate Director of Advocacy; Gregory Chen, Director of Advocacy; Su Kim, Advocacy Associate; and Betsy Lawrence, Associate Director Liaison and Information.*

*Report Design: Bobby Bequeaith, Manager of Creative Services.  Copy editing: Amanda Walkins, Communications Associate.*

*AILA is grateful to our member attorneys and other immigration advocates and their clients who shared their experiences and made this report possible.*

CAR 0435

# Holding DHS Accountable on Prosecutorial Discretion

## TABLE OF CONTENTS

Executive Summary ................................................................ 4

I.  Background ..................................................................... 5

II.  Survey Results:
    Implementation at Local ICE Offices
    and Immigration Courts ................................................... 6

III.  Survey Results:
    Grants and Denials at ICE Offices
    with the Most Responses ................................................. 12

## GLOSSARY

CBP ................ Customs and Border Protection
DHS ............... Department of Homeland Security
DOJ ................ Department of Justice
DOMA ........... Defense of Marriage Act
ERO ................ ICE Enforcement and Removal Operations
EWI ................ Entry without inspection
ICE ................. Immigration and Customs Enforcement
IJ .................... Immigration Judge
HSI ................. ICE Homeland Security Investigations
LPR ................ Legal Permanent Resident
NTA ................ Notice to Appear
OCC ............... ICE Office of Chief Counsel
OPLA ............. ICE Office of the Principal Legal Advisor
PD .................. Prosecutorial Discretion
USC ............... U.S. Citizen

# EXECUTIVE SUMMARY AND RECOMMENDATIONS

On June 30, 2011, the American Immigration Lawyers Association (AILA) and the American Immigration Council (Immigration Council) launched a survey of AILA lawyers and other immigration practitioners regarding the Department of Homeland Security's (DHS) exercise of prosecutorial discretion. The survey was designed to gather feedback regarding the implementation of two memoranda on prosecutorial discretion issued by Immigration and Customs Enforcement (ICE) on June 17 and a subsequent announcement by DHS on August 18 of plans to review the approximately 300,000 cases pending before the Executive Office for Immigration Review (EOIR).

As of October 18, 2011, AILA received 252 case submissions, representing all ICE Field Offices and Offices of Chief Counsel (OCC). Based on these responses, the overwhelming conclusion is that most ICE offices have not changed their practices since the issuance of these new directives. While the June memoranda provided considerable clarity on the criteria for exercise of prosecutorial discretion, it has become clear that, to ensure consistent implementation nationwide, DHS and ICE leadership should issue further guidance and instruction immediately to all ICE field offices, putting the full weight of the agency behind implementation.

At this point, the Obama Administration has clearly established its robust record on immigration enforcement. Since President Obama entered office, DHS has deported record-breaking numbers of people: close to 400,000 annually and over 1 million in total. American taxpayers have seen increases every year in spending on border security, immigration detention, and removal operations. Every day, 33,400 people are detained by DHS for civil immigration purposes costing about $5 million per day.

But the Obama Administration has pledged to do more than record-level enforcement. This administration also claims it is conducting enforcement in a targeted and humane manner. This spring, at a speech in El Paso, TX, President Obama said: "[W]e are focusing our limited resources on violent offenders and people convicted of crimes; not families, not folks who are just looking to scrape together an income." Secretary Napolitano said this October that the Bush administration "allowed as many resources, if not more, to be spent tracking down and deporting the college student as were spent on apprehending criminal aliens and gang members." Such an approach she said "made no sense" and she pledged that the composition of deportations under her watch will "be fundamentally changed."

The prosecutorial discretion memoranda were introduced as an essential component of this targeted enforcement strategy. Four months after the release of the memoranda, the preliminary results are far from promising. While practices have improved

in a few ICE offices, in the majority of offices ICE agents, trial attorneys and supervisors admitted that they had not implemented the memoranda and there had been no changes in policy or practice. Many called for additional guidance or instruction from headquarters while others felt that they were already exercising discretion sufficiently. Several said they have no intention of complying and indicated their jobs are to arrest and deport people. A few ICE attorneys expressed concern about changing current practice for fear that it would negatively impact their careers. These responses are a strong indication of how nascent and fragile the prosecutorial discretion plan is. DHS must take immediate steps to ensure that the field follows the policies articulated in the June memoranda or risk jeopardizing this key component of its immigration agenda.

Equally troublesome, ICE offices are inconsistently interpreting the prosecutorial discretion standards set forth in the June memoranda. Many ICE offices described the criteria in more narrow terms than the memoranda, and some even refused to consider whole categories of cases no matter the equities. Several said discretion would not be granted unless issues are life threatening or the individual is eligible for adjustment of status or other legal relief. Other offices gave the impression that individuals with any criminal history, including even minor offenses or offenses committed long ago, could not be considered. Still others indicated that people subject to expedited removal or who illegally re-entered after previously being deported were not eligible for prosecutorial discretion.

In May, when the President spoke in Texas, he emphasized the protection of public safety and national security. That emphasis should govern the prioritization of cases for action nationwide. When ICE announced its fiscal year 2011 statistics on the removal of "criminal aliens," it made no distinction between people convicted of petty misdemeanors and violent felons, putting a person convicted of loitering on par with a drug kingpin. But those distinctions must be a key part of how prosecutorial discretion is exercised.

Should people picked up for minor offenses like driving without a license or loitering be high priorities for civil immigration enforcement? Should DHS refuse to consider the equities of someone with an in absentia removal order from years ago who now has a family and a job, when the law provides no other remedy? Should a long term lawful permanent resident, loving husband, and dedicated father, who was convicted of burglary in his youth still be an enforcement priority twenty years after the crime, when that crime was not even a ground of removal at the time?  Many who fall into these "priority" categories are precisely the family members and wage-earners the President was referring to in El Paso. In fact many of these people fit squarely within the prosecutorial discretion memoranda.

The field needs to fully understand that certain individuals who fall into enforcement priorities are nonetheless eligible for the favorable exercise of prosecutorial discretion. By definition, prosecutorial discretion requires the balancing of favorable and unfavorable factors in each case. Until DHS instructs ICE officers and trial attorneys that they are authorized to balance such factors in every case, the implementation of prosecutorial discretion will continue to founder. Clarifying guidance must also be given to the personnel of Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). It is clear from the experience of the past four months that, for DHS to  target its enforcement efforts, it must take concrete steps to ensure that field agents and trial attorneys implement the priorities set forth in the memoranda.

**Recommendation**: By early November, DHS and ICE should issue implementing guidance and hands-on training instructing all ICE agents and trial attorneys that they are obligated to exercise discretion pursuant to the guidelines set forth in the June 17 ICE memoranda. Secretary Napolitano should convey to all DHS personnel that this policy has the full backing of her office and that all ICE offices are responsible for its implementation.

**Recommendation**: By mid-November, DHS should issue similar guidance governing Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS).

**Recommendation**: DHS should clarify to its rank and file that cases which fall into the enforcement priorities may nonetheless be considered for prosecutorial discretion. If DHS policy categorically excludes certain types of cases from the favorable exercise of prosecutorial discretion, DHS should state that clearly.

**Recommendation**: The Department of Justice (DOJ), specifically EOIR, should issue guidance to immigration judges explaining their role in cases where prosecutorial discretion has been requested. Specifically, immigration judges should be authorized to grant requests for continuances when prosecutorial discretion is requested.

# I.  BACKGROUND

On June 17, 2011, ICE issued two memoranda on prosecutorial discretion. The first memo sets forth comprehensive instructions to ICE agents, officers, and attorneys about exercising discretion at all stages of the immigration enforcement process.  The second memo focuses exclusively on victims, witnesses, and plaintiffs in civil rights actions.

On August 18, 2011, DHS announced the creation of a high-level inter-agency working group to review all removal cases currently pending before EOIR with the goal of identifying and administratively closing low priority cases.  The working group is also charged with issuing further guidance on prosecutorial discretion for individuals with final orders of removal, and issuing guidance on prosecutorial discretion for USCIS and CBP.

In June, AILA and the Immigration Council created a survey to assess the implementation of the ICE memos and record attorneys' experiences with prosecutorial discretion.  In August, the survey was updated to include questions about the new developments announced by DHS.  Of the 252 case submissions we received, the number of responses was highest from: **Detroit** (21 responses), **New York** (17 responses), **San Francisco** (18 responses), **Atlanta** (18 responses), **Seattle** (15 responses), **Boston** (16 responses), **Chicago** (15 responses), and **Miami** (15 responses).

The survey results are broken into two sections.  The first section summarizes the responses regarding general implementation of the policies at each of the local district offices of ICE, Enforcement and Removal Operations (ERO), or Offices of Chief Counsel (OCC).  The second section reports the grant and denial rates of prosecutorial discretion requests at the offices where we have received 15 or more case examples.  It tallies the positive and negative equities involved in each case, as well as the discretion being requested.

# II.  SURVEY RESULTS:
# IMPLEMENTATION AT LOCAL ICE OFFICES AND IMMIGRATION COURTS

The following accounts regarding local practices were reported to AILA by attorney respondents over the course of the four month period following the release of the June 17 memos.  The information provided is based on both formal and informal interactions between attorney respondents and ICE agents, officers, attorneys, supervisors, deputies, and directors.  Each account is referenced by the date it was received.

## Arlington/Washington, DC
## (and Farmville, VA, Detention Center)
*ICE ERO:*
- ICE ERO told attorneys that ICE Headquarters (HQ) has not provided any implementing instructions on the June 17 memos or working group review and has no system, training, or guidance for prioritizing cases. Until instruction is received, it is business as usual. (Sept. 19, 2011).
- ICE officers reportedly stated that the June 17 memos "don't mean anything." "If we can arrest you, we will arrest you." (Aug. 11, 2011, *Farmville, VA*).
- A supervisor told an attorney that the June 17 memos apply in the detention context only where there are insufficient resources to detain an individual. (July 28, 2011).
- Two ICE officers told an attorney that they do not review custody determinations. It is a waste of time to request redetermination because the request will not be taken to a supervisor. (July 28, 2011).
- An attorney was told by a DHS employee that the ICE union had told them to ignore the June 17 memo. (July 7, 2011).

*ICE OCC:*
- OCC told attorneys that it has received internal guidance on the memos and provided training to its attorneys, but the exercise of prosecutorial discretion (PD) varies among ICE attorneys and its high case volume is a significant barrier to processing PD requests.  The more comprehensive the request for discretion (in terms of documents, affidavits, and other materials), the more likely it will be resolved expeditiously.  ICE attorneys are receiving two to five requests per day, but have received no requests from pro se respondents.  Although there is no categorical rule excluding anyone from consideration for relief, a person convicted of a crime of violence is unlikely to be granted relief. (Oct. 21, 2011).
- ICE told one attorney that because CBP issued the NTA, it had no authority to exercise discretion.  CBP told the attorney that it had no authority either. (Aug. 12, 2011).

*Immigration Court:*
- An immigration judge (IJ) told attorneys he would consider granting a continuance for PD if there is a written

motion asking the ICE attorney to consider administrative closure or termination and asking for time to negotiate. PD developments had not impacted the IJ's caseload. (Oct. 21, 2011).

## Atlanta
## (including Stewart Detention Center and Charlotte, NC
Office of the Principal Legal Advisor (OPLA))
*Generally:*
- ICE attorneys and officers have both stated informally that they do not intend to comply with the June 17 memos absent specific rules to do so. (3 responses from Sept. 20, 2011).

*ICE ERO:*
- ICE's initial response to a PD request was to *accelerate* removal, but after further advocacy, ICE permitted the client to continue on an order of supervision while awaiting approval of a family-based petition. (Oct. 19, 2011).
- An officer reportedly stated that he did not care about "any of this" and that he is in the business of arresting and deporting. (Aug. 21, 2011).
- ICE encouraged an attorney to request deferred action in a particular case. (Aug. 9, 2011).

*ICE OCC:*
- One attorney reports that while proceedings have been terminated for a few DREAM candidates, nothing else has changed. (Sept. 30, 2011).
- One attorney was told that OCC already reviews cases for discretion and HQ has not provided any guidance specific to the June 17 memos or the August 18 case review announcement. (Sept. 30, 2011, *Charlotte, NC*).
- OCC is operating no differently than before. (Sept. 20, 2011).
- ICE was willing to administratively close (but not terminate) a case in which the client would be eligible for adjustment of status through a family-based petition in a couple of years (Aug. 3, 2011), however, another attorney reports having a similar request denied. (Aug. 3, 2011).

*Immigration Court (Charlotte, NC):*
- An IJ agreed to a continuance over ICE counsel's objection to allow the attorney time to request discretion. (Aug. 22, 2011).

## Baltimore

*ICE ERO:*

- ICE officers told an attorney that "a decision was made not to follow the memo." (Aug. 1, 2011).

*ICE OCC/Immigration Court:*

- Two attorneys report being granted continuances to allow time to submit a written PD request or to give ICE time to consider such a request. (Oct. 6 and 10, 2011).
- ICE told attorneys that the June 17 memos reflect the authority ICE has always had and do not provide new authority or discretion.  No further instructions have been given by HQ. There has been an increase in oral requests for discretion during hearings but written requests are preferred and will be reviewed. (Sept. 30, 2011).
- ICE counsel opposed an oral motion to continue to allow time for the working group to conduct its case review on grounds that ICE is not involved in the case review and it is unknown how long it will take.  The IJ agreed and denied the motion. (Sept. 12, 2011).
- One attorney reports that ICE is opposing all continuances based on the working group review. (Aug. 30, 2011).
- ICE attorney advised attorney that OCC has no intention of following the June 17 memos. (July 1, 2011).

## Boston

*Generally:*

- Attorneys were told by ICE that they are waiting on further guidance from HQ regarding the June 17 memos and the August 18 announcement and until then, it is business as usual.  (Sept. 30, 2011).

*ICE ERO:*

- Two Congressional offices reportedly stated that ICE is very reluctant to implement the memos and that their offices have been flooded with PD requests. A stay of removal was granted only after congressional intervention at the HQ level. (Oct. 5, 2011).

*ICE OCC:*

- Attorney was told by ICE counsel that they are awaiting further guidance on the August 18 announcement (Sept. 23, 2011).
- One ICE attorney stated that if a case involves negative factors, ICE prefers to have it decided by an IJ. (Sept. 8, 2011).

## Buffalo

*ICE OCC:*

- One attorney observes that ICE has always been willing to exercise PD in compelling cases or where immediate relief is available. However, absent a process directed from HQ, ICE will continue to exercise discretion in this same manner and will exclude those without compelling factors or a means to apply for legal status. (Aug. 31, 2011).

## Chicago

*ICE ERO:*

- An attorney has had success with ERO placing a few children and their families on orders of supervision. (Sept. 30, 2011).
- An attorney reports being told by ERO that they have been instructed to review each case individually and that attorneys should request PD where relief is possible. (Sept. 9, 2011).
- A supervisor reportedly stated that PD will continue as before until guidance from HQ is received, noting that no one wants to be the first to extend him or herself. (Sept. 9, 2011).
- One attorney was told that ICE will not exercise discretion to *place* clients into §240 removal proceedings. (Sept. 9, 2011).

*ICE OCC:*

- An attorney commented that OCC practice has not changed. OCC will not oppose termination if the respondent is immediately eligible to adjust. (Sept. 30, 2011).
- An attorney states that the standard response from OCC is that the June 17 memos do not change their policy because they were already exercising PD. (Aug. 17, 2011).

## Dallas

*ICE OCC:*

- An attorney was told that OCC had determined they were already exercising PD and do not need to change anything. (Oct. 11, 2011).
- One ICE attorney reportedly expressed the opinion that the June 17 memo should not apply where the client has a criminal conviction. (Oct. 10, 2011).
- One ICE attorney reportedly stated that in order to get PD, the respondent must be a DREAM Act candidate. (Aug. 30, 2011).

## Denver

*Generally:*

- Several attorneys commented that the June 17 memos have not been implemented; ICE counsel reportedly stated that there has always been PD. (July 6–12, 2011).

*ICE OCC/Immigration Court:*

- ICE initially opposed a continuance for PD, but later agreed to administrative closure. (Oct. 11, 2011).
- One attorney was told that OCC is handling PD requests for cases in proceedings on a case-by-case basis, following the factors in the June 17 memos. (Oct. 10, 2011).
- An attorney commented that OCC is objecting to any continuance based on pending PD requests and IJs are not granting continuances. (Oct. 4, 2011).
- One attorney was told that if lawful permanent resident (LPR) status is requested in proceedings, OCC will only consider PD if and when LPR status is denied. (Sept. 19, 2011).
- IJs have reportedly been instructed to deny PD continuances unless DHS joins in the motion. (Sept. 2, 2011).

## Detroit

*Generally:*

- A lengthy PD request was denied the same day it was received by ICE, thereby giving the appearance that ICE had not thoroughly considered it. (Oct. 14, 2011).
- One attorney commented that ICE does not appear to be following the memos; both ICE officers and attorneys have refused PD requests, even in very meritorious cases. (Sept. 20, 2011).
- One attorney reports that ICE employees "have been positive so far." (July 3, 2011).

*ICE ERO:*

- An ICE agent told one attorney that PD is not available where an alien had been granted voluntary departure. (Sept. 9, 2011).

*ICE OCC:*

- The rationale provided to one attorney for not exercising discretion on cases has included a lack of guidance, lack of available relief, resources have already been expended litigating the case, and/or ICE counsel does not have time to review the request. (Sept. 28, 2011).
- One ICE attorney reportedly expressed concern about keeping his/her job and seemed reluctant to exercise discretion absent guidance. (Sept. 28, 2011).
- An attorney was told by one ICE attorney that PD is not available in cases involving a final order of removal. (Sept. 19, 2011).

- ICE counsel told an attorney that OCC is not conducting an individualized review of each case in proceedings because it is waiting on guidance from HQ. However, it will consider PD requests submitted in individual cases. (Sept. 8, 2011).

*Immigration Court:*

- An IJ in Cleveland is granting one-month continuances to permit the submission of written PD requests but has stated that further continuances will not be granted unless ICE joins in the motion. The IJ also reportedly stated that at some point, he will no longer grant PD continuances because "the memo has been out long enough that attorneys should have had time to pursue it if they wanted to do so." (Sept. 22, 2011, and Oct. 7, 2011).

## El Paso
## (and Albuquerque, NM)

*Generally:*

- It is "business as usual" and ICE will continue to issue NTAs until it receives guidance. ICE views the DOJ/DHS review of 300,000 cases as separate from its work. (Aug. 30, 2011, *Albuquerque*).

## Honolulu

*Generally:*

- One attorney commented that there has been no change in policy; PD is denied unless issues are life threatening. (Aug. 23, 2011).

*ICE ERO:*

- ERO told an attorney that it is "business as usual." ERO has given no indication that the PD directives mean anything new. (Oct. 14, 2011).

## Houston

*Generally:*

- Attorneys commented that ICE continues to be very strict with PD, especially if any criminal activity (even very minor offenses) is involved. (Aug. 11, 2011).

*ICE ERO:*

- One attorney observed that ICE agents are refusing to exercise discretion. (July 1, 2011).

*ICE OCC:*

- An ICE attorney reportedly stated that the Chief Counsel is taking a conservative stance on PD until there is guidance from HQ. (Oct. 18, 2011).
- One attorney reports that in Cuban Adjustment Act (CAA) cases, ICE attorneys are requiring proof that the client has filed for adjustment under the CAA before agreeing to terminate. Even where USCIS has *granted* CAA adjustment, ICE attorneys routinely request the file and seek permission before agreeing to terminate. (Oct. 13, 2011).

- ICE attorneys have been heard to comment that without guidelines implementing the memos, OCC cannot follow them. They have also indicated that Chief Counsel is not permitting them to exercise discretion. (Oct. 10, 2011).
- One attorney reported that the August 18 announcement has not been implemented and ICE continues to say it is "business as usual." (Oct. 4, 2011).
- An ICE attorney reportedly commented that they must jump through hoops to get approval to exercise PD. (Aug. 12, 2011).
- One attorney noted that ICE appears to be waiting for further PD guidance. (Aug. 11, 2011).

*Immigration Court:*
- One attorney commented that IJs will not grant continuances for PD review. (Oct. 4, 2011).

**Los Angeles
(and Las Vegas, NV)**
*Generally:*
- One attorney commented that the June 17 memo has not significantly changed the way PD is exercised. (July 1, 2011).

*ICE OCC:*
- One attorney was successful in getting administrative closure for a DREAM candidate with a non-current family petition. (Sept. 23, 2011).
- One attorney reports *less* discretion after the memos. Though previous termination requests where a U-visa application had been filed were successful, ICE is now requiring the application to be approved before agreeing to terminate. (Sept. 9, 2011).
- An attorney reported that ICE will generally not oppose termination if the respondent can apply for status through USCIS. (Aug. 10, 2011).

**Miami**
*Generally:*
- Several ICE officers and counsel reportedly stated that there is no new guidance and therefore no change in policy, or that the guidance is being discussed by supervisors. (Sept. 28, 2011).
- Two attorneys reported that ICE counsel and ERO have said they are awaiting further instruction. (Sept. 6, and Sept. 22, 2011).
- One attorney reported that ICE is asking for a detailed memo listing all or most of the June 17 factors. (Aug. 15, 2011).

*ICE ERO:*
- One attorney commented that ERO says it is "business as usual," but they appear to be more open to releasing individuals without criminal histories. (Oct. 10, 2011).

- An ICE agent reportedly commented, "There is no new memo." (Sept. 6, 2011).
- Attorneys observed that ICE agents did not appear to be aware of the June 17 memos. (Aug. 27, 2011, and July 12, 2011).
- One attorney has been successful in securing release of crime victims from detention. (July 6, 2011).

*ICE OCC:*
- One attorney observed that there has been no change. ICE may agree to terminate only if relief is immediately available and there are no adverse factors; ICE is awaiting further instructions on motions to reopen or cases with compelling equities but no relief. (Oct. 10, 2011).
- An ICE attorney reportedly told an IJ in court that to request PD, attorneys must file a written motion with OCC, but noted that they will only consider PD at the beginning of a case, not at any stage of the proceedings. (Sept. 28, 2011).
- Many attorneys have heard comments such as, "This doesn't change anything." (July 15, 2011).

**New Orleans
(and Hoover, AL)**
*ICE ERO:*
- ICE officers seemed reluctant to review a PD request and tried to direct the attorney to other ICE components, emphasizing the lack of HQ guidance. (Oct. 11, 2011).
- An attorney reports several cases where ICE detainers were not acted upon and no Notice To Appear (NTA) was issued for individuals picked up in minor incidents once ICE was informed of the positive equities, including long residence in the U.S., LPR/USC family members, no criminal record. (Oct. 10, 2011).
- An attorney reports having success working with ICE in Hoover, AL, and that ICE has favorably exercised discretion for clients that "meet the criteria." (July 7, 2011).

*ICE OCC:*
- An attorney received continuances for two cases for DREAM candidates where there were pending PD requests for administrative closure. (Oct. 10, 2011).
- One ICE attorney reportedly stated that her office had not been given any guidance on the new policy and would not agree to a continuance based on the working group review. (Sept. 21, 2011).
- An ICE attorney reportedly stated that OCC is still awaiting guidance from HQ but will agree to terminate cases involving minors, persons who have been in the U.S. since they were very young, or other hardship cases, but not individuals who entered without inspection (EWI) with no outstanding equities, even if there is no criminal history. (Aug. 25, 2011).

**New York**

*ICE ERO:*

- One attorney observed that ICE is giving orders of supervision to "bag and baggage surrenders" if there is no criminal history. (Sept. 30, 2011).

*ICE OCC:*

- ICE counsel reportedly advised that they will terminate cases with approved I-130 or I-360 petitions. (Oct. 11, 2011).
- An attorney reported that ICE is terminating cases if there is an approved visa petition. (Sept. 30, 2011).
- One ICE attorney reportedly stated that if he exercised PD in one case, he would have to exercise it in every case. (Sept. 7, 2011).
- One attorney commented that ICE is willing to exercise PD if the person is eligible for adjustment, however, requests meet resistance where admissibility questions are raised or where the person needs a waiver. (July 1, 2011).

**Newark**

*ICE ERO:*

- One attorney commented that visa waiver overstays are excluded from PD, regardless of the equities. (Aug. 9, 2011).
- A request for deferred action was recommended for a grant, after the attorney was initially told that he could not even submit the request. (July 21, 2011).

*ICE OCC:*

- One ICE attorney reportedly confirmed that there are no PD procedures yet. (Sept. 19, 2011).
- One attorney observed that the general ICE response to PD has been, "We are anticipating further instruction, but feel free to submit materials as you see fit." (Sept. 12, 2011).
- An ICE attorney reportedly stated that three senior attorneys will be handling PD requests. (Sept.12, 2011).
- An ICE attorney stated in court that further PD instructions would be released in 45 days. (Sept. 6, 2011).

**Orlando**

*Generally:*

- ICE has not received any directions on implementing the June 17 memos and will operate under the old rules until further instruction is given. (Sept. 28, 2011).

*ICE OCC:*

- ICE is reportedly "awaiting further guidance from the higher ups" but PD requests should be put in writing. (Aug. 30, 2011).
- One attorney commented that ICE is not heeding the memo and does not consider it binding. (July 29, 2011).

**Philadelphia**

*ICE OCC:*

- OCC is actively considering PD requests on a case-by-case basis if requested by the respondent's attorney. (Oct. 12, 2011).

**Phoenix**

*Generally:*

- Though ICE officers and attorneys maintain that the memos reflect what has always been ICE policy in Arizona, several attorneys report positive developments including clients being released from detention and ICE employees contacting attorneys about cases that might be good candidates for discretion. (Aug. 25, and 30, 2011).
- An attorney reports significant improvement in ICE's use of discretion. (Sept. 30, 2011).

**Salt Lake City**
**(and Las Vegas, NV)**

*ICE ERO:*

- In what appears to be a change in practice, ICE withdrew a detainer and indicated that it would consider PD requests on a case-by-case basis. (Oct. 12, 2011).
- ERO appear to welcome requests for PD but seems conflicted as to what it is going to do if it receives them. (Sept. 5, 2011, *Las Vegas*).

*ICE OCC:*

- OCC indicated that it had been exercising PD all along, so there is no change. (Oct. 21, 2011).
- ICE counsel openly maintains that the June 17 memos do not apply because they do not have implementing procedures from HQ. (Oct. 4, 2011, *Las Vegas*).
- OCC has not received any new PD guidance. (Sept. 5, 2011, *Las Vegas*).
- OCC interpreted the August 18 announcement as *narrowing* the cases in which PD can be exercised and takes the position that no discretion can be exercised in reentry cases involving an expedited removal order. (Sept. 5, 2011, *Las Vegas*).
- OCC seems willing to close cases if relief is available in the next few years. (Aug. 29, 2011).

**San Antonio**

*ICE OCC/Immigration Court:*

- An ICE attorney refused to consider a request for termination or deferred action and instead offered voluntary departure. The IJ expressed frustration at not receiving any guidance on what to do with this and similar cases. (Sept. 9, 2011).

**San Diego**

*Generally:*

- Attorneys report little change since the June 17 memos. One attorney is finding a universal reluctance to PD in even the most meritorious cases. (Aug. 16, 2011).

*ICE OCC:*

- An attorney expressed frustration with inconsistent practices among ICE attorneys, even regarding the same case. (Aug. 1, 2011).

**San Francisco**

*Generally:*

- One attorney commented that the standard reason for denial of PD is a lack of "extenuating circumstances." (Sept. 22, 2011).
- USCIS and CBP officials told attorneys that they had received no PD guidance and that it was "business as usual." (Sept. 21, 2011).
- Attorneys observed no change in practice after June 17 memos. (July 6 and 29, 2011).

*ICE ERO:*

- One attorney was told that ERO is not considering PD requests (i.e., deferred action) until the end of proceedings but ICE counsel might take a different view. (Sept. 12, 2011).
- After the attorney sent a copy of the June 17 memo to ICE, the agent held off on serving the NTA. (June 30, 2011).

*ICE OCC:*

- One ICE attorney expressed concern about negative press regarding Defense of Marriage Act (DOMA) and asked that the attorney contact him before going to the media. (Sept. 9, 2011).
- ICE agreed to administrative closure after receiving a letter of support from the mayor, but other PD requests have been denied. (Aug. 18, 2011).

**San Juan**

*Generally:*

- One attorney commented that ICE generally lacks knowledge of the June 17 memos and is unwilling to exercise discretion because the District Director generally opposes PD grants. (Sept. 9, 2011).

**Seattle**

*Generally:*

- One attorney was told by ICE that they will not grant PD if the person is not eligible for relief, regardless of any positive factors. (Aug. 3, 2011).

*ICE ERO:*

- ERO told attorneys that the June 17 memos and August 18 announcement simply put the existing policy in writing and neither broadened nor encouraged the positive exercise of discretion. (Sept. 29, 2011).
- ERO reportedly claims discretionary authority only when a detention center is full; if there are beds available, release requests are denied. (Sept. 19, 2011).
- One attorney observed that grants of stay requests appeared to be extremely random. (Aug. 19, 2011).

*ICE OCC:*

- OCC reportedly told one attorney that the June 17 memo guidance regarding family petitions was to decline prosecutions only if the petition fell within the LIFE Act (i.e., was filed on or before 2001) but that the guidance did not extend to petitions filed later. They are awaiting further guidance from HQ, which is expected in 3 to 4 months, but until then, there was no basis to defer or close such a case. (Sept. 19, 2011).
- One attorney reports that ICE has made unofficial comments that the Administration's policy is not going to happen in the field; ICE has declined to use discretion to administratively close cases involving children. (Sept. 19, 2011).

*Immigration Court:*

- One IJ reportedly stated that neither he nor ICE counsel were doing anything about PD due to a lack of implementing guidelines or standards. (Aug. 31, 2011).

**St. Paul/Minneapolis**

*ICE ERO:*

- A supervisor reportedly stated that ICE does not have the authority to entertain requests for deferred action unless there is a final removal order. (Sept. 21, 2011).
- ERO informed attorneys that once the interagency working group is created and starts reviewing pending cases, ERO will better understand its role. (Sept. 8, 2011).

*ICE OCC:*

- A "go-to" person has been designated in OCC to handle PD requests. (Sept. 28, 2011).

## III. SURVEY RESULTS:  GRANTS AND DENIALS AT ICE OFFICES WITH MOST RESPONSES

The following charts records the type of prosecutorial discretion requested, the outcome of the request[1], and the positive[2] and negative[3] factors for each case.  The categories of positive and negative factors are the same as those listed in the June 17 memos. Pending cases are included in the total number of responses but are not listed in the charts.

### Detroit
### (21 responses – 2 granted, 16 denied, 3 pending)

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | OCC | ▪ Termination of proceedings;<br>▪ Agreeing to join in request for relief | **Granted** | ▪ Long time LPR<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | Criminal history |
| 2 | ERO | ▪ Deferred Action;<br>▪ Stay of Removal | **Granted**<br>(to have time to obtain passport for child) | ▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ USC/LPR family member | ▪ EWI or other illegal/ fraudulent entry<br>▪ Immigration fraud<br>▪ Little likelihood for relief |
| 3 | OCC | Release from Detention | **Denied** | ▪ Present for a long time<br>▪ U.S high school/college graduate<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ Strong family/community ties in U.S. | ▪ Little likelihood for relief<br>▪ No USC/LPR family member |
| 4 | ERO OCC | ▪ Release from detention;<br>▪ Termination of proceedings;<br>▪ Deferred Action;<br>▪ Parole;<br>▪ Stay of Removal | **Denied** | ▪ Long time LPR<br>▪ Victim of DV/other serious crime<br>▪ Immediate relative who served in the U.S. military<br>▪ USC/LPR family member<br>▪ Primary caretaker of disabled/ill or minor relative<br>▪ Pregnant/nursing spouse | Criminal history |
| 5 | HSI | Issuance of NTA | **Denied** | ▪ Present for a long time<br>▪ USC/LPR family member<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ Eligible for relief (cancellation) | None |

---

[1] The chart lists the outcome of the case at the office indicated.

[2] "*USC/LPR family member*" only includes parents, spouses, or children.

[3] Regarding "*Criminal history,*" in some cases, there are discrepancies as to how the attorney versus ICE viewed the crime.  Some attorneys checked off criminal history for misdemeanors such as shoplifting or DUI stating that they were minor but noting that ICE weighed the factor as decisive in denying requests for discretion.  The offense is listed for cases where the attorneys provided the information.

| 6 | ERO | • Release from detention;<br>• Parole | **Denied** | • No prior removal/fraud | • Present for a brief period of time<br>• Strong ties to home country<br>• Favorable conditions in home country<br>• No USC/LPR family member<br>• Little likelihood of relief |
|---|---|---|---|---|---|
| 7 | ERO | Stay of Removal | **Denied** | • No criminal history or only minor offenses<br>• No prior removal/fraud<br>• Few ties to home country<br>• Strong family/community ties in U.S. | • EWI or other illegal/fraudulent entry<br>• No USC/LPR family member |
| 8 | OCC | • Release from detention;<br>• Termination of proceedings;<br>• Agreeing to join in motion to continue for adjudication;<br>• Stay of removal;<br>• Agreeing to join in motion to reopen;<br>• Agreeing to join in request for relief | **Denied** | • No criminal history/only minor offenses<br>• No prior removal/ fraud<br>• Strong family/community ties to U.S.<br>• Primary caretaker of disabled/ill or minor relative<br>• Nationality renders removal unlikely<br>• Likely to be granted relief | • Present for a brief period of time<br>• No USC/LPR family member |
| 9 | ERO | Termination of proceedings | **Denied** | • Minor/elderly<br>• No criminal history or only minor offenses<br>• USC/LPR family member<br>• Few ties to home country | • Record of immigration violations<br>• Outstanding/prior order of removal |
| 10 | ERO | • Termination of proceedings;<br>• Stay of Removal | **Denied** | • Minor/elderly<br>• Present since childhood<br>• Suffers from serious disability<br>• U.S. high school/college graduate<br>• No criminal history or only minor offenses<br>• No fraud<br>• Few ties to home country<br>• USC/LPR family member | Outstanding/prior order of removal |
| 11 | OCC | • Administrative closure;<br>• Agreeing in motion to reopen | **Denied** | • Present for a long time/ since childhood<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Likely to be granted relief | None |
| 12 | OCC | • Termination of proceedings;<br>• Agreeing in motion to reopen | **Denied** | • Present since childhood<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Likely to be granted relief | Criminal history<br><small>(traffic offense, one previous dismissed charge)</small> |
| 13 | OCC | Decision not to issue NTA | **Denied** | • No criminal history or only minor offenses<br>• No prior removal/fraud | No USC/LPR family member |

| 14 | OCC | Agreeing in motion to reopen | **Denied** | • Present in U.S. for a long time<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member | None |
| 15 | OCC | Administrative closure | **Denied** | • Minor or elderly<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• Strong ties to U.S.<br>• Primary caretaker of disabled/ill or minor relative<br>• Likely to be granted relief | Present in the U.S. for a brief period of time |
| 16 | ERO | • Termination of proceedings;<br>• Stay of Removal;<br>• Release of detention;<br>• Administrative closure;<br>• Agreeing in motion to continue for adjudication;<br>• Deferred action | **Denied** | • Present for a long time<br>• No fraud<br>• USC/LPR family member<br>• Primary caretaker of ill/ disabled or minor relative | • Criminal history (1 DUI, 1 firearm possession)<br>• Record of immigration violations<br>• EWI or other illegal/ fraudulent entry |
| 17 | OCC | Administrative closure | **Denied** | • Present for a long time<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Pregnant/nursing spouse<br>• Few ties to home country | Criminal history |
| 18 | OCC | Administrative closure | **Denied** | • Lawfully present for a long time<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Likely to be granted relief | None |

## New York
**(17 responses – 7 granted, 8 denied, 2 pending)**

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|---|---|---|---|---|
| 1 | OCC | • Agreeing to join to continue to allow for adjudication of petition;<br>• Agreeing to join in request for relief | **Granted** (Agreeing to join in request for relief) | • Suffers from serious disability<br>• Present for a long time<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Likely to be granted relief | None |
| 2 | OCC | Termination of proceedings | **Granted** | • USC/LPR family member<br>• Likely to be granted relief | Criminal history |

| 3 | ERO OCC | Agreeing in motion to reopen | **Granted** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ USC/LPR family member<br>▪ Strong family/community ties in U.S.<br>▪ Few ties to home country | Outstanding/prior order of removal |
| 4 | ERO | Deferred Action | **Granted** | ▪ Present since childhood<br>▪ Present for a long time<br>▪ No fraud<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Likely to be granted relief | ▪ Outstanding/prior order of removal<br>▪ Criminal history |
| 5 | OCC | Decision not to pursue/ withdraw appeal | **Granted** | ▪ Long time LPR<br>▪ Elderly<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Nationality makes removal unlikely<br>▪ Chronic/debilitating health issues<br>▪ Strong family/community ties in U.S. | No USC/LPR family member |
| 6 | OCC | Termination of proceedings | **Granted** | ▪ Present since childhood<br>▪ U.S. High school/college graduate<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Strong family/community ties in U.S. | Little likelihood of being granted relief |
| 7 | ERO OCC | ▪ Decision not to issue an NTA;<br>▪ Decision not to file NTA;<br>▪ Release from detention;<br>▪ Agreeing in motion to reopen | **Granted**<br>(Release from detention; IJ granted motion to reopen) | ▪ Victim of DV/serious crime;<br>▪ Present for a long time;<br>▪ No criminal history or only minor offenses<br>▪ No fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Likely to be granted relief | Outstanding/prior order of removal |
| 8 | OCC | ▪ Termination of proceedings;<br>▪ Agreeing to join request for relief | **Denied** | ▪ Long time LPR<br>▪ Present in U.S. for a long time<br>▪ No criminal history or only minor offenses;<br>▪ USC/LPR family member (4 adult USC children)<br>▪ Strong family/community ties in U.S. | ▪ Outstanding/prior order of removal (disputed)<br>▪ Immigration fraud (disputed)<br>▪ Little likelihood of relief |

| 9 | OCC | Termination of proceedings | **Denied** | ▪ Elderly<br>▪ Suffers from serious health condition<br>▪ No criminal history or only minor offenses<br>▪ No prior removal or fraud<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | None<br>(stayed in home country over 1 yr as LPR) |
| 10 | OCC | ▪ Decision not to file NTA;<br>▪ Termination of proceedings;<br>▪ Agreeing in request for relief | **Denied** | ▪ Long time LPR<br>▪ Victim of DV/serious crime<br>▪ U.S. High school/college graduate<br>▪ No criminal history or only minor offenses<br>▪ No prior removal or fraud;<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Spouse has severe illness<br>▪ Likely to granted relief | None<br>(2 pre-IIRIRA misdemeanors) |
| 11 | ERO | Release from detention | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Few ties to home country<br>▪ Nationality makes removal unlikely<br>▪ Cooperating with law enforcement<br>▪ Likely to be granted relief | Outstanding/prior order of removal |
| 12 | ERO | Stay of removal | **Denied** | ▪ Plaintiff in lawsuit (civil rights violation)<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No fraud<br>▪ Cooperating with law enforcement | Outstanding/prior order of removal |
| 13 | OCC | Administrative closure | **Denied** | ▪ Present for a long time<br>▪ No prior removal/fraud<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ U.S. High school/college graduate<br>▪ Strong family/community ties in U.S. | Criminal history<br>(1 shoplifting) |
| 14 | OCC | ▪ Release from detention;<br>▪ Agreeing in motion to reopen | **Denied** | ▪ Present for a long time<br>▪ Suffers from a serious health condition<br>▪ No criminal history or only minor offenses<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Likely to be granted relief | Outstanding/prior order of removal |

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 15 | OCC | Termination of removal proceedings | **Denied** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC or LPR family member | Present in the U.S. for a brief period of time |

## San Francisco
### (17 responses – 5 granted, 10 denied, 1 mixed, 1 pending)

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | OCC | Administrative closure | **Granted** | ▪ Minor<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ U.S. High school/college graduate<br>▪ Few ties to home country<br>▪ Strong family/community ties in U.S. | ▪ EWI or other illegal/ fraudulent entry<br>▪ Little likelihood for relief |
| 2 | OCC | ▪ Administrative closure;<br>▪ Decision not to pursue/ withdraw appeal | **Granted**<br>(ICE offered administrative closure; attorney declined and IJ granted asylum) | ▪ Suffers from serious disability<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Likely to be granted relief | ▪ Present for a brief period of time<br>▪ EWI or other illegal/ fraudulent entry<br>▪ Lacks family/ community ties |
| 3 | HSI | Decision not to issue NTA | **Granted** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ VAWA applicant | None |
| 4 | OCC | ▪ Administrative closure;<br>▪ Agreeing to continue to allow adjudication of petition | **Granted**<br>(Administrative closure) | ▪ Lawfully present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ U.S. High school/college graduate<br>▪ USC/LPR family member (LGBT) | None |
| 5 | ERO | Termination of proceedings | **Granted** | ▪ No criminal history or only minor offenses<br>▪ Strong family/community ties in U.S.<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | None |
| 6 | ERO | ▪ Deferred action;<br>▪ Stay of removal | **Mixed**<br>(Stay of removal granted for 2 out of 5 family members) | ▪ No criminal history or only minor offense (4 out of 5 family members)<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ USC/LPR family member<br>▪ Strong family/community ties in U.S.<br>▪ Few ties to home country<br>▪ Present for a long time<br>▪ Suffers from serious health condition | ▪ Criminal history (felony DUI from 16 years ago)<br>▪ EWI or other illegal/ fraudulent entry<br>▪ Outstanding/ prior order of removal |

| 7 | ERO | Stay of removal | **Denied** | ▪ No criminal history or only minor offenses<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Strong family/community ties in U.S. | No USC/LPR family member |
|---|---|---|---|---|---|
| 8 | OCC | Termination of proceedings | **Denied** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | None<br>(LPR abandonment charge) |
| 9 | OCC | Termination of proceedings | **Denied** | ▪ Minor<br>▪ Suffers from serious disability/ health condition<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud | ▪ Present for a brief time<br>▪ No family/ community ties in US<br>**(detained on way to Canada to reunite with relatives; does not wish to remain in U.S.)** |
| 10 | OCC | Termination of proceedings | **Denied** | ▪ Minor/elderly<br>▪ Suffers from serious disability<br>▪ No prior removal/fraud<br>▪ Present for a long time<br>▪ Few ties to home country | ▪ Record of immigration violations<br>▪ Criminal history (1 assault 15 years ago)<br>▪ No USC/LPR family member<br>▪ Little likelihood for relief |
| 11 | OCC | Termination of proceedings | **Denied** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Present for a long time | ▪ No USC/LPR family member<br>▪ Strong ties to home country<br>▪ EWI or other illegal/ fraudulent entry |
| 12 | ERO | Stay of removal | **Denied** | ▪ Minor<br>▪ Suffers from serious health condition<br>▪ U.S. High school/college graduate<br>▪ No criminal history or only minor offenses | ▪ Outstanding/ prior order of removal<br>▪ Little likelihood for relief |
| 13 | ERO | Release from detention | **Denied** | ▪ Victim of DV/serious crime<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Cooperating with law enforcement | Lengthy criminal record |
| 14 | OCC | Termination of proceedings | **Denied** | ▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ U.S. high school/college graduate<br>▪ Few ties to home country<br>▪ Likely to be granted relief | EWI or other illegal/ fraudulent entry |

| 15 | ERO | • Deferred Action<br>• Stay of Removal | **Denied** | • Present in U.S. for long time<br>• No criminal history or only minor offenses<br>• No fraud<br>• USC/LPR family member<br>• Spouse has severe illness<br>• Strong family/community ties in U.S. | • Outstanding/ prior order of removal<br>• Little likelihood for relief |
| 16 | OCC | • Termination of proceedings<br>• Agreeing to join in motion to continue to allow adjudication of petition | **Denied** | • Present in U.S. for long time<br>• No criminal history oronly minor offenses<br>• USC/LPR family member<br>• Likely to be granted relief | Outstanding/prior order of removal |

## Atlanta
**(17 responses- 6 granted, 8 denied, 3 pending)**

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | OCC | Agreeing to join in motion to continue for adjudication of petition/apply for benefits | **Granted** | • USC/LPR family member<br>• No criminal history or only minor offenses<br>• No prior removal /fraud | None |
| 2 | ERO | • Release from detention;<br>• Deferred Action | **Granted** | • USC/LPR family member<br>• No criminal history or only minor offenses<br>• No fraud<br>• Strong family/community ties | • EWI or other illegal/ fraudulent entry<br>• Outstanding/prior order of removal<br>• Little likelihood for relief |
| 3 | OCC | • Termination of proceedings;<br>• Administrative closure | **Granted** (Administrative Closure) | • U.S. High school/college graduate;<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Likely to be granted relief | None |
| 4 | ERO | Decision to place into §240 proceedings | **Granted** | • Present since childhood<br>• USC/LPR family member<br>• Few ties to home country<br>• Likely to be granted relief | Criminal history |
| 5 | OCC | Termination of proceedings | **Granted** | • Present for a long time<br>• No criminal history or only minor<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Pregnant/nursing spouse<br>• Likely to be granted relief | None |
| 6 | ERO | • Decision not to issue NTA;<br>• Release from detention;<br>• Stay of Removal | **Granted** | • Victim of DV/crime<br>• Present for a long time<br>• No criminal history or only minor offenses<br>• Strong family/community ties<br>• USC/LPR family member<br>• Likely to be granted relief | Outstanding/prior order of removal |

| 7 | OCC | Termination of proceedings | **Denied** | ▪ Elderly<br>▪ Serious health condition<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Strong family/community ties<br>▪ Few ties to home country<br>▪ Likely to be granted relief | No USC/LPR family member; |
|---|---|---|---|---|---|
| 8 | ERO | ▪ Deferred Action;<br>▪ Issuance of NTA | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Strong family/community ties<br>▪ Primary caretaker for disabled/ill or minor relative<br>▪ Likely to be granted relief | None |
| 9 | OCC | Reissuance of an NTA at a later date (cancellation) | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker for disabled/ill or minor relative<br>▪ Few ties to home country | None |
| 10 | OCC | Termination of proceedings | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Spouse with severe illness<br>▪ Primary caretaker of disabled/ill relative | EWI or other illegal/fraudulent entry |
| 11 | OCC | Termination of proceedings | **Denied** | ▪ Suffers from serious disability<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Strong family/communities ties<br>▪ Few ties to home country | ▪ EWI or other illegal/ fraudulent entry<br>▪ Little likelihood for relief |
| 12 | OCC | Termination of proceedings | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | EWI or other illegal/ fraudulent entry (in dispute) |
| 13 | OCC | Decision to place into §240 proceedings | **Denied** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Few ties to home country<br>▪ Nationality renders removal unlikely<br>▪ Likely to be granted relief | None |

| 14 | OCC | Administrative closure | **Denied** | ▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Few ties to home country<br>▪ USC/LPR family member | ▪ EWI or other illegal/fraudulent entry<br>▪ Little likelihood for relief |

## Seattle
**(15 responses – 5 granted, 7 denied, 3 pending)**

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | OCC | Termination of proceedings | **Granted** | ▪ Present since childhood<br>▪ Present for a long time<br>▪ U.S. high school/college graduate<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Few ties to home country | None |
| 2 | ERO | Release from detention | **Granted** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Likely to be granted relief<br>▪ Few ties to home country | None |
| 3 | OCC | ▪ Decision not to pursue/ withdraw appeal;<br>▪ Termination of proceedings;<br>▪ Decision not to amend charges | **Granted**<br>(Decision not to pursue/ withdraw appeal; IJ granted termination) | ▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ U.S. high school/college graduate<br>▪ Few ties to home country | ▪ EWI or other illegal/ fraudulent entry<br>▪ No USC/LPR family member<br>▪ Little likelihood for immediate relief |
| 4 | ERO | Release from detention | **Granted** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Primary caretaker of ill/disabled or minor relative | EWI or other illegal/ fraudulent entry |
| 5 | OCC | ▪ Termination of proceedings;<br>▪ Deferred action;<br>▪ Parole | **Granted**<br>(Termination of proceedings) | ▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative | None |
| 6 | ERO | ▪ Release from detention;<br>▪ Reissuance of NTA at later date;<br>▪ Place into §240 proceedings | **Denied** | ▪ Present since childhood<br>▪ Present for a long time<br>▪ Suffers from serious disability/ health condition<br>▪ No criminal history or only minor offenses<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Likely to be granted relief | ▪ Outstanding/prior order of removal<br>▪ Unresolved criminal charges |

| 7 | ERO | ▪ Release from detention;<br>▪ Decision not to issue NTA | **Denied** | ▪ Pregnant/nursing<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ USC/LPR family member | ▪ Present for a brief period of time<br>▪ EWI or other illegal/ fraudulent entry |
| 8 | OCC | ▪ Deferred action;<br>▪ Termination of proceedings | **Denied** | ▪ Present since childhood<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ Strong family/community ties in U.S.<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ U.S. high school/college graduate<br>▪ Few ties to home country | ▪ EWI or other illegal /fraudulent entry<br>▪ No USC/LPR family member<br>▪ Little likelihood for relief<br>▪ Criminal history (theft) |
| 9 | ERO | Release from detention | **Denied** | ▪ Present for a long time<br>▪ No removal/fraud<br>▪ U.S. high school/college graduate<br>▪ Strong family/community ties in U.S.<br>▪ Cooperating with law enforcement | Criminal history (3 DUI arrests) |
| 10 | OCC | Decision not to issue NTA | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | EWI or other illegal/ fraudulent entry |
| 11 | ERO | ▪ Release from detention;<br>▪ Termination of proceedings | **Denied** | ▪ Present since childhood<br>▪ Present for a long time<br>▪ Pregant/nursing<br>▪ U.S. high school/college graduate<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Nationality makes removal unlikely<br>▪ Likely to be granted relief | EWI or other illegal/ fraudulent entry |
| 12 | OCC | ▪ Administrative closure;<br>▪ Termination of proceedings | **Denied** | ▪ Present since childhood<br>▪ High school student in U.S.<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud | ▪ EWI or other illegal/ fraudulent entry<br>▪ Present for a brief period of time<br>▪ No USC/LPR family member<br>▪ Little likelihood for relief |

**Boston**
**(15 responses – 7 granted, 7 denied, 1 pending)**

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|-----------------|------------------|
| 1 | ERO | Stay of removal | **Granted** | ▪ Parent of minor who is cooperating with law enforcement<br>▪ No criminal history or only minor offenses | ▪ EWI or other illegal/ fraudulent entry<br>▪ Outstanding/prior order of removal<br>▪ No USC/LPR family member |
| 2 | OCC | Termination of proceedings | **Granted** | ▪ USC/LPR family member<br>▪ No prior removal/fraud<br>▪ Likely to be granted relief | None |
| 3 | OCC | Termination of proceedings | **Granted**<br>(Administrative closure) | ▪ Minor<br>▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Strong family/community ties in U.S. | Little likelihood for relief |
| 4 | OCC | ▪ Termination of proceedings;<br>▪ Administrative closure;<br>▪ Agreeing to motion to continue for adjudication | **Granted**<br>(Termination of proceedings) | ▪ Present since childhood<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Cooperating with LEA<br>▪ Likely to be granted relief | None |
| 5 | OCC | Termination of proceedings | **Granted** | ▪ Lawfully present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker of disabled/ill or minor relative | None |
| 6 | OCC | Termination of proceedings | **Granted** | ▪ Lawfully present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker of disabled/ill or minor relative<br>▪ Likely to be granted relief | None |
| 7 | OCC | Administrative closure | **Granted** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member | EWI or other illegal/ fraudulent entry |
| 8 | OCC | ▪ Termination of proceedings;<br>▪ Administrative closure | **Denied** | ▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Strong family/community ties in U.S.<br>▪ Few ties to home country | Little likelihood for relief |

| 9 | OCC | Reissuance of an NTA | **Denied** | <ul><li>Present for a long time</li><li>No criminal history or only minor offenses</li><li>No prior removal</li><li>USC/LPR family member</li><li>Strong family/community ties in U.S.</li><li>Primary caretaker of disabled/ill or minor relative</li><li>Likely to be granted relief</li></ul> | Client engaged in immigration fraud |
|---|---|---|---|---|---|
| 10 | OCC | Termination of proceedings | **Denied** | <ul><li>Present for a long time</li><li>No criminal history or only minor offenses</li><li>No prior removal/fraud</li><li>USC/LPR family member</li><li>Strong family/community ties to U.S.</li><li>Likely to be granted relief</li></ul> | None |
| 11 | OCC | Termination of proceedings | **Denied** | <ul><li>Present for a long time</li><li>No criminal history or only minor offenses</li><li>No prior removal/fraud</li><li>Caretaker for elderly (non-relatives)</li></ul> | <ul><li>No USC/LPR family member</li><li>Little likelihood for relief</li></ul> |
| 12 | OCC | Termination of proceedings | **Denied** | <ul><li>Veteran/member of military</li><li>Family member in military</li><li>Long time LPR</li><li>Present since childhood</li><li>Witness in pending criminal investigation/prosecution</li><li>No prior removal/fraud</li><li>USC/LPR family member</li><li>Primary caretaker of disabled/ill or minor relative</li><li>Spouse with severe illness</li><li>Few ties to home country</li><li>Likely to be granted relief</li></ul> | <ul><li>Criminal history</li><li>Favorable conditions in home country</li></ul> |
| 13 | ERO | Stay of removal | **Denied (granted after Congressional intervention)** | <ul><li>Present for a long time</li><li>No criminal history or only minor offenses</li><li>USC/LPR family member</li><li>Primary caretaker of ill/disabled or minor relative</li><li>Spouse with severe illness</li></ul> | <ul><li>Record of immigration violations/fraud (in dispute)</li><li>Outstanding/prior order of removal</li></ul> |
| 14 | OCC | <ul><li>Reissuance of NTA;</li><li>Administrative closure</li></ul> | **Denied** | <ul><li>Present for a long time</li><li>No criminal history or only minor offenses</li><li>No prior removal/fraud</li><li>USC/LPR family member</li><li>Primary caretaker of ill/disabled or minor relative</li><li>Likely to be granted relief</li></ul> | None |

## Chicago
### (15 responses – 5 granted, 6 denied, 4 pending)

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | ERO | Release from detention | **Granted** | ▪ No criminal history or only minor offenses<br>▪ Formerly minor (aged out of ORR custody) | ▪ EWI or other illegal/ fraudulent entry<br>▪ Record of immigration violations<br>▪ Outstanding/prior order of removal<br>▪ Criminal history<br>▪ Lacks family/ community ties |
| 2 | ERO | Termination of proceedings | **Granted** | ▪ Victim of DV/crime<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Likely to be granted relief<br>▪ Cooperating with LEA | None |
| 3 | OCC | Decision to place into §240 proceedings | **Granted** | ▪ Present for a long time<br>▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Spouse with severe illness<br>▪ Likely to be granted relief | ▪ EWI or other illegal/ fraudulent entry<br>▪ Criminal history (20 years ago) |
| 4 | ERO | Deferred action | **Granted** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No fraud<br>▪ Strong family/community ties in U.S.<br>▪ Few ties to home country | Outstanding/prior order of removal |
| 5 | OCC | ▪ Reissuance of NTA;<br>▪ Termination of proceedings;<br>▪ Administrative closure | **Granted**<br>(Termination of proceedings) | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Few ties to home country | ▪ EWI or other illegal/ fraudulent entry<br>▪ Criminal history (DUI/battery)<br>▪ Little likelihood for relief |
| 6 | OCC | ▪ Termination of proceedings;<br>▪ Administrative closure;<br>▪ Agreeing in motion to continue for adjudication | **Denied** | ▪ Lawfully present for a long time<br>▪ U.S. high school/college graduate<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Strong family/community ties to U.S.<br>▪ Few ties to home country | None |

*Office of the Principal Legal Advisor*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536



U.S. Immigration
and Customs
Enforcement

November 17, 2011

MEMORANDUM FOR:    All Chief Counsel
                   Office of the Principal Legal Advisor

FROM:              Peter S. Vincent
                   Principal Legal Advisor

SUBJECT:           Case-by-Case Review of Incoming and Certain Pending Cases

<u>Purpose</u>

In order to ensure that the cases before the Executive Office for Immigration Review (EOIR)
conform to the U.S. Immigration and Customs Enforcement (ICE) civil enforcement priorities as
described in ICE Director John Morton's memorandum *Exercising Prosecutorial Discretion
Consistent with the Civil Immigration Enforcement Priorities of the Agency for the
Apprehension, Detention, and Removal of Aliens* (June 17, 2011) (July 17, 2011 Prosecutorial
Discretion Memorandum), the Office of the Principal Legal Advisor (OPLA) will conduct a
review of the EOIR immigration court docket in each Office of Chief Counsel (OCC).

<u>Scope of the Review</u>

OPLA has been directed to begin a review of incoming cases and cases pending in immigration
court. Each OCC must immediately review three categories of cases: (1) cases in which the
Notices to Appear have not been filed with EOIR; (2) all cases on the master docket; and (3) all
non-detained cases with merits hearings scheduled up to seven months from the date of issuance
of this memorandum.[1]

The initial implementation of the review set forth in this memorandum will last for
approximately the next two months, until January 13, 2012. At the end of that period, we will
assess the data and other implementation outcomes related to this review and make any
necessary adjustments to the process before implementing a revised policy for the continuation
of this review.

---

[1] If a case is transferred from a detained to a non-detained immigration court docket, the case should also be
reviewed for prosecutorial discretion. Oftentimes, these cases will remain an ICE priority.

CAR 0459

Case-by-Case Review of Incoming and Certain Pending Cases
Page 2

Criteria

This review process does not replace or supersede the June 17, 2011 Prosecutorial Discretion Memorandum, which remains the cornerstone for assessing whether prosecutorial discretion is appropriate in any circumstance.  During the course of review, attorneys should focus on the factors discussed in the June 17, 2011 Prosecutorial Discretion Memorandum, as well as the criteria contained in the *Guidance to ICE Attorneys Reviewing CBP, USCIS, and ICE Cases Pending Before the Executive Office for Immigration Review* (Guidance).  Moreover, at all stages of the immigration enforcement process, attorneys should consider, on a case-by-case basis, the full range of factors set forth in the June 17, 2011 Prosecutorial Discretion Memorandum.

The criteria set forth in the Guidance should prompt particular care and consideration and are intended to aid attorneys in identifying the cases most likely to be either eligible or ineligible for a favorable exercise of discretion.  Based on this review, ICE attorneys should decide whether the proceedings before EOIR should continue or whether prosecutorial discretion in the form of administrative closure is appropriate.

In making a decision on whether to exercise prosecutorial discretion, attorneys should also consider the following memoranda from Director Morton: *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011); *Guidance Regarding the Handling of Removal Proceedings of Aliens with Pending or Approved Applications or Petitions* (Aug. 20, 2010); and *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* (June 17, 2011).

Standard Operating Procedure

Each OCC shall immediately draft and implement a standard operating procedure (SOP) establishing a process for the review of all matters described in the previous section.  Before implementation, each SOP must be reviewed by the Director of Field Legal Operations at headquarters.

Each SOP must include:

- Assistant Chief Counsel/Senior Attorney initial review;
- Supervisory review;
- Notification process to individuals where the OCC decides to exercise prosecutorial discretion in the absence of a request;
- Use and monitoring of an electronic mailbox for the receipt of additional documentation that individuals wish to be considered during the prosecutorial discretion review process;[2]
- Notification to a supervisory official at Enforcement and Removal Operations, Homeland Security Investigations, U.S. Citizenship and Immigration Services (USCIS), or U.S. Customs and Border Protection of the decision to exercise prosecutorial discretion;[3] and

---

[2] The mailbox should be named OPLA-PD-(*3-letter office abbreviation*)-OCC, e.g., OPLA-PD-WAS-OCC.
[3] Pursuant to each OCC's established SOP regarding cases that involve an application or petition pending before USCIS, notification to USCIS may not be needed.

CAR 0460

Case-by-Case Review of Incoming and Certain Pending Cases
Page 3

- National security and public safety checks for any case being considered for administrative closure or dismissal.[4]

Each SOP should also contain the following language:

"Some individuals may decline prosecutorial discretion and elect to proceed before the immigration court. In some instances, applicants for immigration benefits whose applications are denied by USCIS are entitled to a *de novo* review before an immigration judge (IJ). Asylum and Temporary Protected Status are two examples. *See, e.g.,* 8 C.F.R. § 208.14(c)(1) (2011); 244.10(c)(1)—(2) (2011). Moreover, some adjustment of status provisions also provide for renewal of a USCIS-denied application before an IJ. *See, e.g., id.* §§ 209.1(e), 209.2(f), 245.2(a)(5)(ii). In addition, some forms of immigration relief or protection may be granted only in immigration court, including cancellation of removal under section 240A of the Immigration and Nationality Act, 8 U.S.C. § 1229b, as well as withholding and deferral of removal under 8 C.F.R. §§ 1208.16—17."

Motions to EOIR

A standard joint motion package should be filed with EOIR or an oral motion made before the immigration court for those cases in which, pursuant to this review process, the exercise of prosecutorial discretion is deemed appropriate.[5] A template for a joint motion to administratively close proceedings can be found on SharePoint.

Disclaimer

As there is no right to the exercise of discretion by the agency, nothing in this memorandum should be construed to prohibit the apprehension, detention, or removal of any alien unlawfully in the United States or to limit the legal authority of ICE or any of its personnel to enforce federal immigration law. Similarly, this memorandum, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[4] The existing OCC's SOPs regarding cases that involve an application or petition pending before USCIS should remain in effect.

[5] ICE attorneys may agree to the administrative closure of removal proceedings of an individual with an underlying asylum application under this process if the individual jointly requests administrative closure with the immigration judge. Upon the filing of such a joint request, however, the individual will be subject to 8 CFR 208.7(a)(2) which tolls the 180-day clock for employment authorization eligibility.

CAR 0461

*Guidance to ICE Attorneys Reviewing the CBP, USCIS, and ICE Cases Before the Executive Office for Immigration Review*

## I. Introduction

On August 18, 2011, the Department of Homeland Security announced a review of all administrative removal cases pending before and incoming to the Executive Office for Immigration Review (EOIR) of the Department of Justice. The purpose of the review is to identify those cases that reflect a high enforcement priority for the Department of Homeland Security. This review covers all CBP, USCIS, and ICE removal cases, whether the cases are before immigration judges or the Board of Immigration Appeals. The review to which this guidance applies shall focus on the criteria laid out in Section II, but nothing in this guidance should be construed to prohibit or discourage the consideration of all of the factors laid out in the June 17, 2011 Prosecutorial Discretion Memorandum.

## II. Criteria for Review

The following removal cases are enforcement priorities for the Department of Homeland Security and should generally be pursued in an accelerated manner before EOIR. These cases involve an alien—

- who is a suspected terrorist or national security risk;
- who has a conviction for—
    - a felony or multiple misdemeanors,
    - illegal entry, re-entry, or immigration fraud, or
    - a misdemeanor violation involving—
        - violence, threats, or assault,
        - sexual abuse or exploitation,
        - driving under the influence of alcohol or drugs,
        - flight from the scene of an accident,
        - drug distribution or trafficking, or
        - other significant threat to public safety;
- who is a gang member, human rights violator, or other clear threat to public safety;
- who entered the country illegally or violated the terms of their admission within the last three years;
- who has previously been removed from the country;
- who has been found by an immigration officer or immigration judge to have committed immigration fraud; or
- who otherwise has an egregious record of immigration violations.

1

CAR 0462

The following cases are generally not enforcement priorities for the Department of Homeland Security and should be carefully considered for prosecutorial discretion on a case-by-case basis to avoid unnecessary diversion of resources from the enforcement priorities identified above. These cases involve an alien—

- who is a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;
- who is a child, has been in the United States for more than five years, and is either in school or has successfully completed high school (or its equivalent);
- who came to the United States under the age of sixteen, has been in the United States for more than five years, has completed high school (or its equivalent), and is now pursuing or has successfully completed higher education in the United States;
- who is over the age of sixty-five and has been present in the United States for more than ten years;
- who is a victim of domestic violence in the United States, human trafficking to the United States; or of any other serious crime in the United States;
- who has been a lawful permanent resident for ten years or more and has a single, minor conviction for a non-violent offense;
- who suffers from a serious mental or physical condition that would require significant medical or detention resources; or
- who has very long-term presence in the United States, has an immediate family member who is a United States citizen, and has established compelling ties and made compelling contributions to the United States.

## III. National Security and Public Safety Checks

If an ICE attorney decides to exercise prosecutorial discretion to dismiss or administratively close a particular case or matter, the attorney must first ensure that the alien in question is vetted for national security and public safety concerns. No exercise of discretion under this case review may proceed without this vetting.

## IV. Special Rule for Asylum Cases

ICE attorneys may agree to the administrative closure of removal proceedings of an individual who filed an asylum application if the individual jointly requests administrative closure with the immigration judge. Upon the filing of such a joint request, however, the individual will be subject to 8 CFR 208.7(a)(2) which tolls the 180-day clock for employment authorization eligibility.

CAR 0463

## V. Individual Case Review

ICE attorneys are reminded that the decision to exercise prosecutorial discretion should be made on a case-by-case basis and on the totality of the circumstances presented by the individual case in question.  The factors discussed in section II do not replace or supersede the June 17, 2011 Prosecutorial Discretion Memorandum, which remains the cornerstone for assessing whether prosecutorial discretion is appropriate in any circumstance.  No one positive factor is determinative, and no one factor should be considered solely in isolation.  General guidance such as this guidance cannot provide a "bright line" test, and many cases will require a balancing of the various factors laid out in the June 17, 2011 Prosecutorial Discretion Memorandum and earlier memoranda on the same subject.  Reasonable minds can differ on close cases, and ICE attorneys should consult closely with their ICE supervisors whenever questions, concerns, or issues arise.  ICE attorneys should base their decisions on the information in the record and are not expected to conduct additional investigation, although they may seek additional information if easily and timely available. Similarly, individuals may submit to ICE attorneys additional information relevant to their case for consideration under this process.

## VI. Notice to Charging Component

If an ICE attorney decides to exercise prosecutorial discretion to dismiss or administratively close a particular case or matter, the attorney must notify a relevant supervisory charging official at CBP, USCIS, or ICE about the decision.  In the event there is a dispute between the supervisory official and the ICE attorney regarding the attorney's decision to exercise prosecutorial discretion, the ICE Chief Counsel should attempt to resolve the dispute locally.  If local resolution is not possible, the matter should be elevated to the Deputy Director of ICE for resolution.

## VII. Disclaimer

As there is no right to the favorable exercise of discretion by the agency, nothing in this guidance should be construed to prohibit the apprehension, detention, or removal of any alien unlawfully in the United States or to limit the legal authority of ICE, CBP, or USCIS or any of their respective personnel to enforce Federal immigration law.  Similarly, this memorandum, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

CAR 0464

**CHART 1: Total Number of Employment Authorization Applications, FY 2006-2010**

U.S. Citizenship and Immigration Services
Total Number of Employment Authorization Applications (I-765)
Approved and Denied with Class Preference C11 and C14
Fiscal Year 2006 -2010*

| Fiscal Year | Class Preference - C11/Parole Approved | Class Preference - C11/Parole Denied | Class Preference - C14/Deferred Action (DA)** Approved | Class Preference - C14/Deferred Action (DA)** Denied | Approved TOTAL | Denied TOTAL |
|---|---|---|---|---|---|---|
| 2006 | 14,358 | 3,345 | 13,885 | 883 | 28,243 | 4,228 |
| 2007 | 34,549 | 2,276 | 17,059 | 2,127 | 51,608 | 4,403 |
| 2008 | 29,012 | 1,332 | 18,092 | 1,227 | 47,104 | 2,559 |
| 2009 | 24,683 | 982 | 15,525 | 933 | 40,208 | 1,915 |
| 2010 | 23,931 | 751 | 12,021 | 2,148 | 35,952 | 2,899 |
| Total | 126,533 | 8,686 | 76,582 | 7,318 | 203,115 | 16,004 |

* USCIS grants EADs for USCIS, ICE and CBP beneficiaries.
**Includes ICE Stays of Removal, Law Enforcement Requests and Lawsuits.
**Note:** Total I-765 approval and denial numbers include CNMI and Guam parole paroles but are not reflected in the component chart below.

**CHART 2: Deferred Action and Parole Numbers by DHS Component**

| | ICE DA | ICE Paroled | ICE TOTAL | CBP Paroled | CIS DA-Field Office | CIS DA - VAWA and T & U visas | CIS Paroled - HP | CIS Paroled - Haitian Orphans | CIS TOTAL | DHS PAROLE TOTAL | DHS DA TOTAL | DHS YEARLY TOTAL PAROLE & DA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004 | | | | | | 5324 | | | 5324 | 0 | 5324 | 5324 |
| 2005 | 831 | 5424 | 6255 | | 10 | 9881 | | | 9891 | 5424 | 10722 | 16146 |
| 2006 | 636 | 1406 | 2042 | 20125 | 4 | 8394 | | | 8398 | 21531 | 9034 | 30565 |
| 2007 | 598 | 571 | 1169 | 17014 | 6 | 9552 | 381 | | 9939 | 17966 | 10156 | 28122 |
| 2008 | 1006 | 634 | 1640 | 15610 | 23 | 7037 | 229 | | 7289 | 16473 | 8066 | 24539 |
| 2009 | 740 | 739 | 1479 | 16477 | 40 | 6075 | 343 | | 6458 | 17559 | 6855 | 24414 |
| 2010 | 486 | **2540 | 3026 | 17895 | 56 | 11796 | 524 | 1151 | 13527 | 22110 | 12338 | 34448 |
| Multi-Year TOTAL | 4297 | 11314 | 15611 | 87121 | 139 | 58059 | 1477 | 1151 | 60826 | 101063 | 62495 | 163558 |

NOTE: ICE numbers reflect Calendar Year; CBP and CIS numbers reflect Fiscal Year

**In December 2009, Assistant Secretary Morton issued an ICE directive that mandates release consideration on parole for arriving aliens subsequent to a positive credible fear finding.  This directive became effective January 2010.  Data indicates that the ICE credible fear parole policy appears to have directly increased the number of aliens released on parole by 447% during calendar year 2010.

Definitions:

**Parole:** The authority to parole an alien into the U.S. is contained in Section 212(d)(5)(A) of the Immigration and Nationality Act.  Parole is a discretionary act based on "urgent humanitarian reasons" or where the parole would serve a "significant public benefit." For example, humanitarian parole was used as the basis for the Haiti Orphan Parole Program.

**Deferred Action:** Deferred Action is an exercise of agency discretion that authorizes an individual to temporarily remain in the U.S.  8 C.F.R. 274a.12(c)(14) describes deferred action as "an act of administrative convenience to the government which gives some cases lower priority" (for enforcement action).  As a matter of policy, factors to be considered in evaluating a request for deferred action include but are not limited to the presence of sympathetic or compelling factors.  Deferred Action has also been used in the case of VAWA (T and U visas) when an individual is likely eligible for a benefit but agency action such as promulgating regulations, must be done before the benefit can be granted.

CAR 0465

| | |
|---|---|
| **From:** | Baran, Amanda |
| **Sent:** | Thursday, May 31, 2012 8:05:20 AM |
| **To:** | Olavarria, Esther; Ryan, Kelly; Desta, Fana |
| **Subject:** | NY TIMES: Students Press for Action on Immigration |

# Students Press for Action on Immigration

By JULIA PRESTON

Published: May 30, 2012

Young illegal immigrants, saying President Obama has done little to diminish the threat of deportations they face despite repeated promises, have started a campaign to press him to use executive powers to allow them to remain legally in the country.

The campaign is led by the United We Dream Network, the largest organization of young immigrants here illegally who would be eligible for legal status under a proposal in Congress known as the Dream Act.

The young people are among the most visible activists in a growing immigrant movement. Their push to focus pressure on the White House reflects deep frustration with Congress for its lack of action on the legislation and with the administration for continuing to deport illegal immigrant students, although Mr. Obama says he supports them.

This week student leaders presented White House officials with a letter signed by more than 90 immigration law professors who argued that the president has "clear executive authority" to halt deportations of illegal immigrants who might benefit from the student legislation. The professors, from universities across the country, pointed to several measures the president could take under existing laws to defer deportations and permit young immigrants to stay temporarily.

On May 17 the students held small-scale actions to publicize their demands in 19 locations around the country, including at the Obama re-election campaign offices in Miami. Gaby Pacheco, a leader of the student network, said Wednesday that they were preparing larger protests for mid-June if the White House did not respond.

"They say all the time that Dreamers shouldn't be deported," Ms. Pacheco said, referring to the young immigrants. "We've heard a lot of talk, but we have not seen action."

The students' escalating actions could be a problem for Mr. Obama, who is counting on strong support from Latino voters to win again in several states that supported him in 2008, particularly Colorado, Florida, Nevada and New Mexico. Polls show very high support among Latinos for some version of the Dream Act, including 91 percent in the 2011 National Survey of Latinos from the Pew Hispanic Center.

The law professors' letter, which reads like a legal brief, was intended as a response to administration officials who have said Mr. Obama does not have the authority to issue a reprieve for large groups of illegal immigrants. One measure they cite was used by President Jimmy Carter to admit thousands of Cubans to the United States in 1980, during the mass exodus known as the Mariel boatlift.

"We did not want doubt about the president's legal authority to muddy the waters of the debate," said Hiroshi Motomura, a law professor at the University of California, Los Angeles, who was an author of the letter.

Young illegal immigrants say they are impatient because each year more of them graduate from high school and cannot attend college because of high tuition rates and barriers to financial aid they face because of their status. More recently, students who did attend college are graduating and facing larger obstacles because they cannot legally work in the United States.

"It's not a question of whether the president can or can't, " said Lorella Praeli, 23, a student from Peru here illegally who also is a leader of the immigrant student network. "It's a question of whether he will or he won't."

Administration officials said this week that Mr. Obama was not likely to take sweeping action on illegal immigrant students before the election. Officials fear an angry reaction from Republicans in Congress, who have warned the White House against what they see as an amnesty by fiat. The officials fear Republican opposition would ruin any chance for future legislation.

In a speech this month at an immigration forum in Washington, Cecilia Muñoz, the director of the White House Domestic Policy Council, referred to more limited actions Mr. Obama had already taken to avoid deporting students. "It is unreasonable to expect that these tools, no matter how faithfully applied, can fix what is broken about our immigration system," she said.

A senior administration official added on Wednesday, "The main focus needs to be on Congress, because only legislation they pass can provide Dream students with a permanent solution, which is what they deserve."

The current proposal of the Dream Act would give legal status to foreign-born high school graduates who came to the United States illegally as children, if they complete two years of college or military service. Mr. Obama pushed Congress to pass the legislation in 2010. It passed the House but was blocked by Republicans in the Senate.

Opposition to the measure has since grown among Republicans, and the party's presumptive presidential nominee, Mitt Romney, has said he would veto some versions of it.

Last month Senator Marco Rubio, Republican of Florida, said he was preparing a new bill that would give temporary status to illegal immigrant students, but might not include a path to citizenship. Details of Mr. Rubio's proposal remain unclear because he has not yet submitted a written bill.

CAR 0467

# American Federation of Labor and Congress of Industrial Organizations



815 Sixteenth Street, N.W.
Washington, D.C. 20006
(202) 637-5000
www.aflcio.org

**EXECUTIVE COUNCIL**

**RICHARD L. TRUMKA**
PRESIDENT

**ELIZABETH H. SHULER**
SECRETARY-TREASURER

**ARLENE HOLT BAKER**
EXECUTIVE VICE PRESIDENT

Gerald W. McEntee
William Lucy
Edwin D. Hill
James Williams
Gregory J. Junemann
Richard P. Hughes Jr.
Rogelio "Roy" A. Flores
Malcolm B. Futhey Jr.
Roberta Reardon
James Boland
Lee A. Saunders
Veda Shook
Lorretta Johnson
DeMaurice Smith

Michael Sacco
Robert A. Scardelletti
Clyde Rivers
William Hite
Nancy Wohlforth
Fred Redmond
Fredric V. Rolando
Newton B. Jones
Baldemar Velasquez
Bruce R. Smith
James Andrews
Walter W. Wise
Capt. Lee Moak

Frank Hurt
R. Thomas Buffenbarger
Cecil Roberts
John Gage
James C. Little
Matthew Loeb
Diann Woodard
D. Michael Langford
John W. Wilhelm
Bob King
Maria Elena Durazo
Cliff Guffey
Joseph J. Nigro

Michael Goodwin
Harold Schaitberger
Leo W. Gerard
Larry Cohen
Rose Ann DeMoro
Randi Weingarten
Patrick D. Finley
Robert McEllrath
Ken Howard
General Holiefield
Terry O'Sullivan
Lawrence J. Hanley
James Callahan

June 13, 2012

The Honorable Barack Obama
President of the United States
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C.  20500

Dear Mr. President:

I write to express the AFL-CIO's concern about the situation of potential beneficiaries of the Development, Relief and Education for Alien Minors (DREAM) Act, and to urgently call on the Administration to exercise its authority to grant these young people temporary administrative relief.  Such relief would provide a talented group of young people who stand to contribute greatly to our nation's economy with a small measure of security that they will be able to remain in the place they call home.

Every year, thousands of our nation's brightest and best students graduating high school find that the path to decent jobs and the doors of higher education and the military are essentially shut tight against them for one reason alone: They lack legal immigration status because as young children, they were brought to this country by their parents.

These children have grown up in the United States, attended local schools, and have demonstrated a sustained commitment to succeed in the educational system, but immigration laws provide no avenue for these students to become legal residents.  Instead of being allowed to continue to excel in college as they have in high school, these promising children will be forced into a job where they will have to either lie about their status, or work off the books.  Neither outcome is just, nor is it good for our society.

It is ironic that at the same time that business is calling for immigration reform that makes it easier for foreign high skilled workers to come to the US, America is sending some of our best and brightest into the underground economy.  Our nation has already made an investment in the education of these students.  Forcing them into the underground economy is an extensive loss of human capital.

CAR 0468

Letter to The Honorable Barack Obama
Page Two
June 13, 2012

While ultimate responsibility for fixing out nation's broken immigration rests with the Congress, the Administration can take an important intermediate step to protect a class of individuals whose cases are particularly compelling. DREAM Act beneficiaries merit particular attention because many were brought here as children and have no other place to call home. Providing temporary administrative relief and employment authorization to these young people will ensure that they do not sink further into the underclass while we wait for Congress to act.

The executive branch has a number of tools at its disposal to grant such relief to DREAM Act beneficiaries, and has utilized these tools in the past to grant relief to other groups. As a group of law professors recently outlined in a letter to you, your Administration could choose to grant deferred action, parole in place, or deferred enforced departure to protect this vulnerable group.[1] Deferred action is an exercise of the Administration's prosecutorial discretion authority that can prevent an individual from being placed in removal proceedings, suspend any proceedings that have commenced, or stay the enforcement of any existing removal order. Deferred enforced departure is a form of prosecutorial discretion that is closely related to deferred action. Similarly, parole in place permits individuals to remain in the United States temporarily for reasons of significant public benefit. Recipients of these forms of administrative relief would also be eligible to apply for employment authorization. Adopting a program to grant any of these forms of administrative relief to DREAM Act beneficiaries would give great hope to our nation's youth, and the AFL-CIO strongly urges your Administration to do so immediately.

The AFL-CIO remains committed to comprehensive immigration reform, and we believe that passage of the DREAM Act is within reach.   In the meantime, however, the failure of Congress to act has left potential future beneficiaries extremely vulnerable.

We are prepared to stand with your Administration as we together seek to protect the interests of our children and working families.

Sincerely,

Richard L. Trumka
President

cc: Janet Napolitano, Secretary, Department of Homeland Security

---

[1] *See* Editorial, *A Start on the DREAM Act*, N.Y. TIMES (Jun. 3, 2012), http://www.nytimes.com/2012/06/04/opinion/a-start-on-the-dream-act.html.

PATRICK J. LEAHY, VERMONT, Chairman

HERB KOHL, WISCONSIN
DIANNE FEINSTEIN, CALIFORNIA
CHARLES E. SCHUMER, NEW YORK
RICHARD J. DURBIN, ILLINOIS
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
AL FRANKEN, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT

CHARLES E. GRASSLEY, IOWA
ORRIN G. HATCH, UTAH
JON KYL, ARIZONA
JEFF SESSIONS, ALABAMA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TOM COBURN, OKLAHOMA



United States Senate
COMMITTEE ON THE JUDICIARY
WASHINGTON, DC 20510-6275

Bruce A. Cohen, Chief Counsel and Staff Director
Kolan L. Davis, Republican Chief Counsel and Staff Director

January 24, 2012

Secretary Janet Napolitano
Department of Homeland Security
U.S. Department of Homeland Security
Washington, DC 20528

The Honorable John T. Morton
Director
United States Immigration and Customs
Enforcement
500 12th Street, SW
Washington, DC 20536

Dear Secretary Napolitano and Director Morton:

As Chairman of the Senate Judiciary Subcommittee on Immigration, Refugees and Border Security, I am responsible for directing the Senate's oversight of the immigration functions of the Department of Homeland Security, including U.S. Immigration and Customs Enforcement (ICE). It is in this capacity that I write to you today asking you to confer a one-time one-year grant of deferred action status for individuals whose cases you administratively close as part of DHS's prosecutorial discretion initiative.

Firstly, I would like to complement the work you are doing on immigration enforcement. Your administration is the first to take a rational approach to enforcing America's immigration laws. The statistics speak for themselves--you are using your scarce enforcement resources to deport many more dangerous criminals than prior administrations, and you are focused on making us safer rather than causing disruptions to the economy or to families with deep roots in the United States.

I sent each of you a letter on April 14, 2011 which asked you to use your scarce resources to prioritize criminal deportations and de-prioritize non-criminal deportations. I commend you for following this course of action in your June 17, 2011 announcement regarding the use of prosecutorial discretion in non-priority removal cases and your November 17, 2011 guidance to ICE attorneys implementing this guidance.

As part of your implementation of the prosecutorial discretion initiative, you conducted pilot programs in the Denver and Baltimore immigration courts. The data from these pilots shows that ICE attorneys reviewed 3,759 cases in Baltimore and recommended that 366 of those cases be administratively closed provided they clear a comprehensive background check. With regard to the Denver pilot, the data also indicates that ICE reviewed 7,923 cases and recommended that 1,301 of those cases be administratively closed pending a background check. If those numbers are extrapolated nationwide, approximately 40,000 immigrants nationwide could see their removal cases administratively closed.

For those individuals, however, administrative closure often presents a new set of complications. These individuals continue to lack legal status, and have no ability to work here lawfully to

CAR 0470

support the very family members that often merited the grant of prosecutorial discretion.  The inability to work and support oneself and one's family would make a favorable exercise of discretion a potentially hollow victory to the vast majority of those who may otherwise benefit from this discretionary exercise of law enforcement priorities.  The inability to seek work authorization will also have the added negative effect of forcing individuals who are otherwise granted a temporary reprieve from deportation to seek work in an underground economy from unscrupulous employers in order to support themselves and their family members.   This is a suboptimal solution both for these individuals and for the American economy.

Given that the average immigration removal case takes nearly 1 year to complete from the date a removal notice is served to the foreign national at issue, it stands to reason that any individual who is granted an administrative closure as part of your prosecutorial discretion initiative is essentially being conferred the ability to remain in the United States for at least one year.  If a small number of individuals are being permitted to remain in the United States for one year, this one year status should also contain the ability to work.  That is why I respectfully ask you to confer the status of deferred action for a one-year period to the immigrants you identify as meriting an award of prosecutorial discretion due to deep roots and family ties in the United States. Deferred action also has the additional advantage of not requiring DHS to waste resources potentially rounding up individuals it has just given prosecutorial discretion to—only to give these individuals prosecutorial discretion again—squandering enforcement resources that should have been expended on other higher-priority foreign nationals requiring removal.

I thank you for your attention to this important matter, and look forward to working with you in any manner necessary to further our joint mission of improving the functioning of our immigration system.

Sincerely,

Charles E. Schumer
Chairman
Senate Judiciary Subcommittee on Immigration, Refugees and Border Security

CAR 0471

| | |
|---|---|
| **From:** | Adam Luna, America's Voice Education Fund ███████████ |
| **Sent:** | Thursday, June 14, 2012 6:56 PM |
| **To:** | Olavarria, Esther ███████████████ > |
| **Subject:** | DREAMers made the cover! |

 Take Action Now!

--

**Have you seen the latest issue of TIME Magazine?
DREAMers made the cover! Check it out here.**

This issue of TIME Magazine -- which has over 20 million readers in the US -- highlights the stories you and I know all too well.

The pages are filled with students who have worked hard to succeed, yet are being held back by our corrosive immigration system and live in constant fear of deportation.

The article also highlights the reality that President Obama can stop the senseless deportation of DREAMers and give these deserving young people the opportunity to live and thrive in America.

**Will you take a minute to sign our petition to the President?**

This week, 20 million Americans will be reading and talking about the DREAMer story. It is vital that the President and his top advisors know that providing relief for DREAMers is a critical issue they can't ignore.

**Please take 60 seconds to co-sign this important statement to President Obama.**

Thanks for your help.

Adam Luna
America's Voice Education Fund



Today, DREAMers made the cover of TIME Magazine. Now we're telling President Obama to take a stand and provide relief for young people that would qualify for the DREAM Act.

**Tell President Obama to protect DREAMers**

You received this email because you are subscribe to important email alerts from America's Voice Education Fund. To cancel your subscription, please click here.

CAR 0472

**From:**      Sandweg, John <████████████████████████>
**Sent:**      Tuesday, February 7, 2012 4:16 PM
**To:**        Kroloff, Noah <████████████████████████
**Cc:**        Noah.Kroloff████████████; John.Sandweg████████████
**Subject:**   RE: PD implementation meeting

The case by case process couldn't be moving more expeditiously. ICE and CIS aren't pointing fingers at each other. To the contrary, CIS has been focused on implementing its new NTA policy while simultaneously doing the 3/10 implementation correctly. ICE has been focused on the application of its priorities within the numerous policy transformations that have been effectuated, training its officers and lawyers and reviewing over a hundred thousand cases in all 50 states. We are monitoring their numbers and are seeing the results.

CBP, too, is refining its operations to more effectively target transnational crime and illegal border crossers and is working with ICE to best ensure that the aliens it puts into immigration proceedings are consistent with ICE policies. Given the diversity of their missions, and the different legal framework under which they operate, the notion that CBP can simply adopt or mimic ICE's policies is exceptionally misguided. That said, the cases of all individuals placed in removal proceedings by CBP are reviewed by an ICE attorney for consistency with ICE policies before they move forward in immigration court. In other words, ICE priorities are being implemented in cases where CBP made the arrest as those cases go straight to ICE attorneys. There is little doubt that ICE, CIS and CBP are cooperatively undertaking enormous operational changes with record speed.

With regard to the EAD issue, we are reviewing the concerns that have been expressed to us. In order to obtain a better understanding of those concerns, as well as other concerns about the case by case process, we are happy to host a meeting here with Morton and Mayorkas (and possibly DOJ) to discuss. We would anticipate this meeting being held early next week and prior to any additional decisions being made about the case by case process.

John R. Sandweg

Department of Homeland Security

(cell)

████████████████████

-----Original Message-----
From: Noorani, Ali [███████████████mmigrationforum.org]
Sent: Tuesday, February 07, 2012 7:42 AM
To: Kroloff, Noah
Cc: Noah.Kroloff@████████; John.Sandweg@████████
Subject: Re: PD implementation meeting

Biggest issue is the application for Employment Authorization Documentation. ICE/USCIS seem to be pointing at each other. ICE is administratively closing a case, but USCIS is not providing them an opportunity to apply for an EAD. And, with the numbers of deferred action decisions decreasing by ICE, the application for an EAD only becomes more difficult. Neither director seems to want to move.

In terms of obstruction, we have learned of no changes at CBP in line with the PD memos.

I believe a letter from advos went up last week, if not going this week, that lists out more details. I'll track it down and forward.

CAR 0473

On Feb 6, 2012, at 10:19 PM, "Kroloff, Noah" <​███████████████████> wrote:

> How is this stuck?  Where is the obstruction?
>
> ----- Original Message -----
> From: Noorani, Ali ███████████immigrationforum.org]
> Sent: Monday, February 06, 2012 10:13 PM
> To: Noah Kroloff <████████████; John Sandweg <​███████████████>
> Subject: PD implementation meeting
>
> Hey Noah and John,
>
> I know you all are cranking the wheels as hard as possible with regards to PD implementation.  And, based on the conversation with the Secretary in December, it is clear it is something weighing heavy on her mind.
>
> But, given the roadblocks we are hitting with ICE and USCIS, I think a conversation with the Secretary is necessary.  From national implementation to employment authorization, confusion and obstruction are beginning to define the effort.  To be honest, you all took way too big a step forward to get stuck now.
>
> I don't think this is going to be like conversations we've had in the past.  People are frustrated, but want to support full implementation.  In that way, I think this is an opportunity to support the Secretary's leadership in implementing these changes and develop a collective way forward.
>
> Based on previous experience, this isn't going to get unstuck unless the Secretary moves it up the priority list.
>
> Thanks for pushing this forward.  Much appreciated.
>
> Ali
>
>
>

CAR 0474

**From:**       Sandweg, John █████████████████████████ >
**Sent:**       Friday, March 9, 2012 3:25 PM
**To:**         Kroloff, Noah < ███████████████████████ >
**Subject:**    RE:

---

Congressman Guitierrez quoted from our rollout materials on EADs – but he interpreted them in a broad context not in a limited context.  In other words, he felt that that language suggested all who benefit from closure would be entitled to an EAD.  I didn't disagree with him that the language could have and should have been clearer, but the Congressman's concerns were that **everyone** is not getting an EAD,  not that the lowest profile cases are not getting deferred (and thus not getting an EAD).

In any event, I am going to get ICE to pull stats on how many people are getting deferrals over the past quarter.  I am not convinced it has declined significantly.  If it has, ┌─────────────────────────────────── **DP** ──────┐
└──────────────────── **DP** ────────────────────────────┘

To be clear, however, the only quote was offered by Guitierrez  and was about his belief that we said all recipients of PD would get an EAD.

John R. Sandweg
Department of Homeland Security
████████████████ (cell)
████████████████████

---
**From:** Kroloff, Noah
**Sent:** Friday, March 09, 2012 3:13 PM
**To:** Sandweg, John
**Subject:** Fw:

---

**From:** Munoz, Cecilia ████████████████████████
**Sent:** Friday, March 09, 2012 02:42 PM
**To:** Kroloff, Noah
**Subject:** RE:                                              .

THe problem is the discrepancy between  what we're doing and what we said we'd do when we rolled the policy out.  Evidently the worst part of the CHC conversation yesterday was them quoting from our own rollout materials on this point.

_____
*Cecilia Muñoz*
*Director, Domestic Policy Council*
*The White House*
████████████████

---
**From:** Kroloff, Noah ████████████████████████
**Sent:** Friday, March 09, 2012 1:36 PM
**To:** Munoz, Cecilia
**Subject:** FW:

**From:** Sandweg, John
**Sent:** Friday, March 09, 2012 1:33 PM
**To:** Kroloff, Noah
**Subject:**

Because ICE would defer in isolated cases when the case was brought to their attention by advocates. Now, before they can bring a case to ICE's attention ICE is finding all the cases (and thousands more) and closing them.  They will still defer in cases where equities merit it.  Also, the number of deferrals may be down a bit, but it is being replaced by tens of thousands of cases being closed.

---

**From**: Kroloff, Noah
**Sent**: Friday, March 09, 2012 01:29 PM
**To**: Sandweg, John
**Subject**:

Why decline

---

**From:** Sandweg, John
**Sent:** Friday, March 09, 2012 1:27 PM
**To:** Kroloff, Noah
**Subject:**

No. Absolutely not. We still give but it has declined a little.

---

**From**: Kroloff, Noah
**Sent**: Friday, March 09, 2012 01:26 PM
**To**: Sandweg, John
**Subject**:

Have we shut down deferred action completely?

CAR 0476



# Holding DHS Accountable on Prosecutorial Discretion

November 2011





AMERICAN
IMMIGRATION
COUNCIL

AILA InfoNet Doc. No. 11110947. (Posted 11/9/11)       CAR 0477

**About the American Immigration Lawyers Association and the American Immigration Council**

**The American Immigration Lawyers Association** (AILA) is the national association of immigration lawyers established to promote justice, advocate for fair and reasonable immigration law and policy, and advance the quality of immigration law practice. AILA has over 11,000 attorney and law professor members who practice and teach immigration law. Founded in 1946, AILA is a nonpartisan, not-for-profit organization that provides continuing legal education, information, professional services, and expertise through its 36 chapters and over 50 national committees.

**The American Immigration Council** (Immigration Council) is a 501(c)(3) not-for-profit organization that works tirelessly to achieve justice and fairness under the law for immigrants. The Council stands up for sensible and humane immigration policies, educates others about the enduring contributions of America's immigrants, and insists that our immigration laws be enacted and implemented in a way that honors fundamental constitutional and human rights.

***Acknowledgements***

*This report was written by the following AILA staff:  Alexsa Alonzo, Associate Director of Advocacy; Gregory Chen, Director of Advocacy; Su Kim, Advocacy Associate; and Betsy Lawrence, Associate Director Liaison and Information.*

*Report Design: Bobby Bequeaith, Manager of Creative Services.  Copy editing: Amanda Walkins, Communications Associate.*

*AILA is grateful to our member attorneys and other immigration advocates and their clients who shared their experiences and made this report possible.*

AILA InfoNet Doc. No. 11110947. (Posted 11/9/11)

CAR 0478

# Holding DHS Accountable on Prosecutorial Discretion

## TABLE OF CONTENTS

Executive Summary.................................................................4

I.   Background ...................................................................5

II.  Survey Results:
     Implementation at Local ICE Offices
     and Immigration Courts...................................................6

III. Survey Results:
     Grants and Denials at ICE Offices
     with the Most Responses................................................12

### GLOSSARY

CBP .................Customs and Border Protection
DHS ...............Department of Homeland Security
DOJ.................Department of Justice
DOMA ...........Defense of Marriage Act
ERO.................ICE Enforcement and Removal Operations
EWI ................Entry without inspection
ICE .................Immigration and Customs Enforcement
IJ .....................Immigration Judge
HSI..................ICE Homeland Security Investigations
LPR..................Legal Permanent Resident
NTA.................Notice to Appear
OCC...............ICE Office of Chief Counsel
OPLA .............ICE Office of the Principal Legal Advisor
PD...................Prosecutorial Discretion
USC ...............U.S. Citizen

# EXECUTIVE SUMMARY AND RECOMMENDATIONS

On June 30, 2011, the American Immigration Lawyers Association (AILA) and the American Immigration Council (Immigration Council) launched a survey of AILA lawyers and other immigration practitioners regarding the Department of Homeland Security's (DHS) exercise of prosecutorial discretion. The survey was designed to gather feedback regarding the implementation of two memoranda on prosecutorial discretion issued by Immigration and Customs Enforcement (ICE) on June 17 and a subsequent announcement by DHS on August 18 of plans to review the approximately 300,000 cases pending before the Executive Office for Immigration Review (EOIR).

As of October 18, 2011, AILA received 252 case submissions, representing all ICE Field Offices and Offices of Chief Counsel (OCC). Based on these responses, the overwhelming conclusion is that most ICE offices have not changed their practices since the issuance of these new directives. While the June memoranda provided considerable clarity on the criteria for exercise of prosecutorial discretion, it has become clear that, to ensure consistent implementation nationwide, DHS and ICE leadership should issue further guidance and instruction immediately to all ICE field offices, putting the full weight of the agency behind implementation.

At this point, the Obama Administration has clearly established its robust record on immigration enforcement. Since President Obama entered office, DHS has deported record-breaking numbers of people: close to 400,000 annually and over 1 million in total. American taxpayers have seen increases every year in spending on border security, immigration detention, and removal operations. Every day, 33,400 people are detained by DHS for civil immigration purposes costing about $5 million per day.

But the Obama Administration has pledged to do more than record-level enforcement. This administration also claims it is conducting enforcement in a targeted and humane manner. This spring, at a speech in El Paso, TX, President Obama said: "[W]e are focusing our limited resources on violent offenders and people convicted of crimes; not families, not folks who are just looking to scrape together an income." Secretary Napolitano said this October that the Bush administration "allowed as many resources, if not more, to be spent tracking down and deporting the college student as were spent on apprehending criminal aliens and gang members." Such an approach she said "made no sense" and she pledged that the composition of deportations under her watch will "be fundamentally changed."

The prosecutorial discretion memoranda were introduced as an essential component of this targeted enforcement strategy. Four months after the release of the memoranda, the preliminary results are far from promising. While practices have improved

in a few ICE offices, in the majority of offices ICE agents, trial attorneys and supervisors admitted that they had not implemented the memoranda and there had been no changes in policy or practice. Many called for additional guidance or instruction from headquarters while others felt that they were already exercising discretion sufficiently. Several said they have no intention of complying and indicated their jobs are to arrest and deport people. A few ICE attorneys expressed concern about changing current practice for fear that it would negatively impact their careers. These responses are a strong indication of how nascent and fragile the prosecutorial discretion plan is. DHS must take immediate steps to ensure that the field follows the policies articulated in the June memoranda or risk jeopardizing this key component of its immigration agenda.

Equally troublesome, ICE offices are inconsistently interpreting the prosecutorial discretion standards set forth in the June memoranda. Many ICE offices described the criteria in more narrow terms than the memoranda, and some even refused to consider whole categories of cases no matter the equities. Several said discretion would not be granted unless issues are life threatening or the individual is eligible for adjustment of status or other legal relief. Other offices gave the impression that individuals with any criminal history, including even minor offenses or offenses committed long ago, could not be considered. Still others indicated that people subject to expedited removal or who illegally re-entered after previously being deported were not eligible for prosecutorial discretion.

In May, when the President spoke in Texas, he emphasized the protection of public safety and national security. That emphasis should govern the prioritization of cases for action nationwide. When ICE announced its fiscal year 2011 statistics on the removal of "criminal aliens," it made no distinction between people convicted of petty misdemeanors and violent felons, putting a person convicted of loitering on par with a drug kingpin. But those distinctions must be a key part of how prosecutorial discretion is exercised.

Should people picked up for minor offenses like driving without a license or loitering be high priorities for civil immigration enforcement? Should DHS refuse to consider the equities of someone with an in absentia removal order from years ago who now has a family and a job, when the law provides no other remedy? Should a long term lawful permanent resident, loving husband, and dedicated father, who was convicted of burglary in his youth still be an enforcement priority twenty years after the crime, when that crime was not even a ground of removal at the time? Many who fall into these "priority" categories are precisely the family members and wage-earners the President was referring to in El Paso. In fact many of these people fit squarely within the prosecutorial discretion memoranda.

CAR 0480

The field needs to fully understand that certain individuals who fall into enforcement priorities are nonetheless eligible for the favorable exercise of prosecutorial discretion. By definition, prosecutorial discretion requires the balancing of favorable and unfavorable factors in each case. Until DHS instructs ICE officers and trial attorneys that they are authorized to balance such factors in every case, the implementation of prosecutorial discretion will continue to founder. Clarifying guidance must also be given to the personnel of Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). It is clear from the experience of the past four months that, for DHS to  target its enforcement efforts, it must take concrete steps to ensure that field agents and trial attorneys implement the priorities set forth in the memoranda.

**Recommendation**: By early November, DHS and ICE should issue implementing guidance and hands-on training instructing all ICE agents and trial attorneys that they are obligated to exercise discretion pursuant to the guidelines set forth in the June 17 ICE memoranda. Secretary Napolitano should convey to all DHS personnel that this policy has the full backing of her office and that all ICE offices are responsible for its implementation.

**Recommendation**: By mid-November, DHS should issue similar guidance governing Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS).

**Recommendation**: DHS should clarify to its rank and file that cases which fall into the enforcement priorities may nonetheless be considered for prosecutorial discretion. If DHS policy categorically excludes certain types of cases from the favorable exercise of prosecutorial discretion, DHS should state that clearly.

**Recommendation**: The Department of Justice (DOJ), specifically EOIR, should issue guidance to immigration judges explaining their role in cases where prosecutorial discretion has been requested. Specifically, immigration judges should be authorized to grant requests for continuances when prosecutorial discretion is requested.

# I.  BACKGROUND

On June 17, 2011, ICE issued two memoranda on prosecutorial discretion. The first memo sets forth comprehensive instructions to ICE agents, officers, and attorneys about exercising discretion at all stages of the immigration enforcement process.  The second memo focuses exclusively on victims, witnesses, and plaintiffs in civil rights actions.

On August 18, 2011, DHS announced the creation of a high-level inter-agency working group to review all removal cases currently pending before EOIR with the goal of identifying and administratively closing low priority cases.  The working group is also charged with issuing further guidance on prosecutorial discretion for individuals with final orders of removal, and issuing guidance on prosecutorial discretion for USCIS and CBP.

In June, AILA and the Immigration Council created a survey to assess the implementation of the ICE memos and record attorneys' experiences with prosecutorial discretion.  In August, the survey was updated to include questions about the new developments announced by DHS.  Of the 252 case submissions we received, the number of responses was highest from: **Detroit** (21 responses), **New York** (17 responses), **San Francisco** (18 responses), **Atlanta** (18 responses), **Seattle** (15 responses), **Boston** (16 responses), **Chicago** (15 responses), and **Miami** (15 responses).

The survey results are broken into two sections.  The first section summarizes the responses regarding general implementation of the policies at each of the local district offices of ICE, Enforcement and Removal Operations (ERO), or Offices of Chief Counsel (OCC).  The second section reports the grant and denial rates of prosecutorial discretion requests at the offices where we have received 15 or more case examples.  It tallies the positive and negative equities involved in each case, as well as the discretion being requested.

## II.  SURVEY RESULTS:
## IMPLEMENTATION AT LOCAL ICE OFFICES AND IMMIGRATION COURTS

The following accounts regarding local practices were reported to AILA by attorney respondents over the course of the four month period following the release of the June 17 memos.  The information provided is based on both formal and informal interactions between attorney respondents and ICE agents, officers, attorneys, supervisors, deputies, and directors.  Each account is referenced by the date it was received.

### Arlington/Washington, DC
### (and Farmville, VA, Detention Center)
*ICE ERO:*

- ICE ERO told attorneys that ICE Headquarters (HQ) has not provided any implementing instructions on the June 17 memos or working group review and has no system, training, or guidance for prioritizing cases. Until instruction is received, it is business as usual. (Sept. 19, 2011).
- ICE officers reportedly stated that the June 17 memos "don't mean anything." "If we can arrest you, we will arrest you." (Aug. 11, 2011, *Farmville, VA*).
- A supervisor told an attorney that the June 17 memos apply in the detention context only where there are insufficient resources to detain an individual. (July 28, 2011).
- Two ICE officers told an attorney that they do not review custody determinations. It is a waste of time to request redetermination because the request will not be taken to a supervisor. (July 28, 2011).
- An attorney was told by a DHS employee that the ICE union had told them to ignore the June 17 memo. (July 7, 2011).

*ICE OCC:*

- OCC told attorneys that it has received internal guidance on the memos and provided training to its attorneys, but the exercise of prosecutorial discretion (PD) varies among ICE attorneys and its high case volume is a significant barrier to processing PD requests.  The more comprehensive the request for discretion (in terms of documents, affidavits, and other materials), the more likely it will be resolved expeditiously.  ICE attorneys are receiving two to five requests per day, but have received no requests from pro se respondents.  Although there is no categorical rule excluding anyone from consideration for relief, a person convicted of a crime of violence is unlikely to be granted relief. (Oct. 21, 2011).
- ICE told one attorney that because CBP issued the NTA, it had no authority to exercise discretion.  CBP told the attorney that it had no authority either. (Aug. 12, 2011).

*Immigration Court:*

- An immigration judge (IJ) told attorneys he would consider granting a continuance for PD if there is a written

motion asking the ICE attorney to consider administrative closure or termination and asking for time to negotiate. PD developments had not impacted the IJ's caseload. (Oct. 21, 2011).

### Atlanta
### (including Stewart Detention Center and Charlotte, NC Office of the Principal Legal Advisor (OPLA))
*Generally:*

- ICE attorneys and officers have both stated informally that they do not intend to comply with the June 17 memos absent special rules to do so. (3 responses from Sept. 20, 2011).

*ICE ERO:*

- ICE's initial response to a PD request was to *accelerate* removal, but after further advocacy, ICE permitted the client to continue on an order of supervision while awaiting approval of a family-based petition. (Oct. 19, 2011).
- An officer reportedly stated that he did not care about "any of this" and that he is in the business of arresting and deporting. (Aug. 21, 2011).
- ICE encouraged an attorney to request deferred action in a particular case. (Aug. 9, 2011).

*ICE OCC:*

- One attorney reports that while proceedings have been terminated for a few DREAM candidates, nothing else has changed. (Sept. 30, 2011).
- One attorney was told that OCC already reviews cases for discretion and HQ has not provided any guidance specific to the June 17 memos or the August 18 case review announcement. (Sept. 30, 2011, *Charlotte, NC*).
- OCC is operating no differently than before. (Sept. 20, 2011).
- ICE was willing to administratively close (but not terminate) a case in which the client would be eligible for adjustment of status through a family-based petition in a couple of years (Aug. 3, 2011), however, another attorney reports having a similar request denied. (Aug. 3, 2011).

*Immigration Court (Charlotte, NC):*

- An IJ agreed to a continuance over ICE counsel's objection to allow the attorney time to request discretion. (Aug. 22, 2011).

## Baltimore

*ICE ERO:*

- ICE officers told an attorney that "a decision was made not to follow the memo." (Aug. 1, 2011).

*ICE OCC/Immigration Court:*

- Two attorneys report being granted continuances to allow time to submit a written PD request or to give ICE time to consider such a request. (Oct. 6 and 10, 2011).
- ICE told attorneys that the June 17 memos reflect the authority ICE has always had and do not provide new authority or discretion.  No further instructions have been given by HQ.  There has been an increase in oral requests for discretion during hearings but written requests are preferred and will be reviewed. (Sept. 30, 2011).
- ICE counsel opposed an oral motion to continue to allow time for the working group to conduct its case review on grounds that ICE is not involved in the case review and it is unknown how long it will take.  The IJ agreed and denied the motion. (Sept. 12, 2011).
- One attorney reports that ICE is opposing all continuances based on the working group review. (Aug. 30, 2011).
- ICE attorney advised attorney that OCC has no intention of following the June 17 memos. (July 1, 2011).

## Boston

*Generally:*

- Attorneys were told by ICE that they are waiting on further guidance from HQ regarding the June 17 memos and the August 18 announcement and until then, it is business as usual.  (Sept. 30, 2011).

*ICE ERO:*

- Two Congressional offices reportedly stated that ICE is very reluctant to implement the memos and that their offices have been flooded with PD requests. A stay of removal was granted only after congressional intervention at the HQ level. (Oct. 5, 2011).

*ICE OCC:*

- Attorney was told by ICE counsel that they are awaiting further guidance on the August 18 announcement (Sept. 23, 2011).
- One ICE attorney stated that if a case involves negative factors, ICE prefers to have it decided by an IJ. (Sept. 8, 2011).

## Buffalo

*ICE OCC:*

- One attorney observes that ICE has always been willing to exercise PD in compelling cases or where immediate relief is available. However, absent a process directed from HQ, ICE will continue to exercise discretion in this same manner and will exclude those without compelling factors or a means to apply for legal status. (Aug. 31, 2011).

## Chicago

*ICE ERO:*

- An attorney has had success with ERO placing a few children and their families on orders of supervision. (Sept. 30, 2011).
- An attorney reports being told by ERO that they have been instructed to review each case individually and that attorneys should request PD where relief is possible. (Sept. 9, 2011).
- A supervisor reportedly stated that PD will continue as before until guidance from HQ is received, noting that no one wants to be the first to extend him or herself. (Sept. 9, 2011).
- One attorney was told that ICE will not exercise discretion to *place* clients into §240 removal proceedings. (Sept. 9, 2011).

*ICE OCC:*

- An attorney commented that OCC practice has not changed. OCC will not oppose termination if the respondent is immediately eligible to adjust. (Sept. 30, 2011).
- An attorney states that the standard response from OCC is that the June 17 memos do not change their policy because they were already exercising PD. (Aug. 17, 2011).

## Dallas

*ICE OCC:*

- An attorney was told that OCC had determined they were already exercising PD and do not need to change anything. (Oct. 11, 2011).
- One ICE attorney reportedly expressed the opinion that the June 17 memo should not apply where the client has a criminal conviction. (Oct. 10, 2011).
- One ICE attorney reportedly stated that in order to get PD, the respondent must be a DREAM Act candidate. (Aug. 30, 2011).

**Denver**

*Generally:*

- Several attorneys commented that the June 17 memos have not been implemented; ICE counsel reportedly stated that there has always been PD. (July 6–12, 2011).

*ICE OCC/Immigration Court:*

- ICE initially opposed a continuance for PD, but later agreed to administrative closure. (Oct. 11, 2011).
- After the June memo but before the August announcement, an IJ reportedly stated that they had been told to ignore the June memos, and the ICE attorney reportedly said, "That's what our office is doing." (Oct. 11, 2011).
- One attorney was told that OCC is handling PD requests for cases in proceedings on a case-by-case basis, following the factors in the June 17 memos. (Oct. 10, 2011).
- An attorney commented that OCC is objecting to any continuance based on pending PD requests and IJs are not granting continuances. (Oct. 4, 2011).
- One attorney was told that if lawful permanent resident (LPR) status is requested in proceedings, OCC will only consider PD if and when LPR status is denied. (Sept. 19, 2011).
- IJs have reportedly been instructed to deny PD continuances unless DHS joins in the motion. (Sept. 2, 2011).

**Detroit**

*Generally:*

- A lengthy PD request was denied the same day it was received by ICE, thereby giving the appearance that ICE had not thoroughly considered it. (Oct. 14, 2011).
- One attorney commented that ICE does not appear to be following the memos; both ICE officers and attorneys have refused PD requests, even in very meritorious cases. (Sept. 20, 2011).
- One attorney reports that ICE employees "have been positive so far." (July 3, 2011).

*ICE ERO:*

- An ICE agent told one attorney that PD is not available where an alien had been granted voluntary departure. (Sept. 9, 2011).

*ICE OCC:*

- The rationale provided to one attorney for not exercising discretion on cases has included a lack of guidance, lack of available relief, resources have already been expended litigating the case, and/or ICE counsel does not have time to review the request. (Sept. 28, 2011).
- One ICE attorney reportedly expressed concern about keeping his/her job and seemed reluctant to exercise discretion absent guidance. (Sept. 28, 2011).
- An attorney was told by one ICE attorney that PD is not available in cases involving a final order of removal. (Sept. 19, 2011).

- ICE counsel told an attorney that OCC is not conducting an individualized review of each case in proceedings because it is waiting on guidance from HQ. However, it will consider PD requests submitted in individual cases. (Sept. 8, 2011).

*Immigration Court:*

- An IJ in Cleveland is granting one-month continuances to permit the submission of written PD requests but has stated that further continuances will not be granted unless ICE joins in the motion. The IJ also reportedly stated that at some point, he will no longer grant PD continuances because "the memo has been out long enough that attorneys should have had time to pursue it if they wanted to do so." (Sept. 22, 2011, and Oct. 7, 2011).

**El Paso**
**(and Albuquerque, NM)**

*Generally:*

- It is "business as usual" and ICE will continue to issue NTAs until it receives guidance. ICE views the DOJ/DHS review of 300,000 cases as separate from its work. (Aug. 30, 2011, *Albuquerque*).

**Honolulu**

*Generally:*

- One attorney commented that there has been no change in policy; PD is denied unless issues are life threatening. (Aug. 23, 2011).

*ICE ERO:*

- ERO told an attorney that it is "business as usual." ERO has given no indication that the PD directives mean anything new. (Oct. 14, 2011).

**Houston**

*Generally:*

- Attorneys commented that ICE continues to be very strict with PD, especially if any criminal activity (even very minor offenses) is involved. (Aug. 11, 2011).

*ICE ERO:*

- One attorney observed that ICE agents are refusing to exercise discretion. (July 1, 2011).

*ICE OCC:*

- An ICE attorney reportedly stated that the Chief Counsel is taking a conservative stance on PD until there is guidance from HQ. (Oct. 18, 2011).
- One attorney reports that in Cuban Adjustment Act (CAA) cases, ICE attorneys are requiring proof that the client has filed for adjustment under the CAA before agreeing to terminate. Even where USCIS has *granted* CAA adjustment, ICE attorneys routinely request the file and seek permission before agreeing to terminate. (Oct. 13, 2011).

- ICE attorneys have been heard to comment that without guidelines implementing the memos, OCC cannot follow them. They have also indicated that Chief Counsel is not permitting them to exercise discretion. (Oct. 10, 2011).
- One attorney reported that the August 18 announcement has not been implemented and ICE continues to say it is "business as usual." (Oct. 4, 2011).
- An ICE attorney reportedly commented that they must jump through hoops to get approval to exercise PD. (Aug. 12, 2011).
- One attorney noted that ICE appears to be waiting for further PD guidance. (Aug. 11, 2011).

*Immigration Court:*
- One attorney commented that IJs will not grant continuances for PD review. (Oct. 4, 2011).

## Los Angeles
## (and Las Vegas, NV)
*Generally:*
- One attorney commented that the June 17 memo has not significantly changed the way PD is exercised. (July 1, 2011).

*ICE OCC:*
- One attorney was successful in getting administrative closure for a DREAM candidate with a non-current family petition. (Sept. 23, 2011).
- One attorney reports *less* discretion after the memos. Though previous termination requests where a U-visa application had been filed were successful, ICE is now requiring the application to be approved before agreeing to terminate. (Sept. 9, 2011).
- An attorney reported that ICE will generally not oppose termination if the respondent can apply for status through USCIS. (Aug. 10, 2011).

## Miami
*Generally:*
- Several ICE officers and counsel reportedly stated that there is no new guidance and therefore no change in policy, or that the guidance is being discussed by supervisors. (Sept. 28, 2011).
- Two attorneys reported that ICE counsel and ERO have said they are awaiting further instruction. (Sept. 6, and Sept. 22, 2011).
- One attorney reported that ICE is asking for a detailed memo listing all or most of the June 17 factors. (Aug. 15, 2011).

*ICE ERO:*
- One attorney commented that ERO says it is "business as usual," but they appear to be more open to releasing individuals without criminal histories. (Oct. 10, 2011).

- An ICE agent reportedly commented, "There is no new memo." (Sept. 6, 2011).
- Attorneys observed that ICE agents did not appear to be aware of the June 17 memos. (Aug. 27, 2011, and July 12, 2011).
- One attorney has been successful in securing release of crime victims from detention. (July 6, 2011).

*ICE OCC:*
- One attorney observed that there has been no change. ICE may agree to terminate only if relief is immediately available and there are no adverse factors; ICE is awaiting further instructions on motions to reopen or cases with compelling equities but no relief. (Oct. 10, 2011).
- An ICE attorney reportedly told an IJ in court that to request PD, attorneys must file a written motion with OCC, but noted that they will only consider PD at the beginning of a case, not at any stage of the proceedings. (Sept. 28, 2011).
- Many attorneys have heard comments such as, "This doesn't change anything." (July 15, 2011).

## New Orleans
## (and Hoover, AL)
*ICE ERO:*
- ICE officers seemed reluctant to review a PD request and tried to direct the attorney to other ICE components, emphasizing the lack of HQ guidance. (Oct. 11, 2011).
- An attorney reports several cases where ICE detainers were not acted upon and no Notice To Appear (NTA) was issued for individuals picked up in minor incidents once ICE was informed of the positive equities, including long residence in the U.S., LPR/USC family members, no criminal record. (Oct. 10, 2011).
- An attorney reports having success working with ICE in Hoover, AL, and that ICE has favorably exercised discretion for clients that "meet the criteria." (July 7, 2011).

*ICE OCC:*
- An attorney received continuances for two cases for DREAM candidates where there were pending PD requests for administrative closure. (Oct. 10, 2011).
- One ICE attorney reportedly stated that her office had not been given any guidance on the new policy and would not agree to a continuance based on the working group review. (Sept. 21, 2011).
- An ICE attorney reportedly stated that OCC is still awaiting guidance from HQ but will agree to terminate cases involving minors, persons who have been in the U.S. since they were very young, or other hardship cases, but not individuals who entered without inspection (EWI) with no outstanding equities, even if there is no criminal history. (Aug. 25, 2011).

## New York

*ICE ERO*:

- One attorney observed that ICE is giving orders of supervision to "bag and baggage surrenders" if there is no criminal history. (Sept. 30, 2011).

*ICE OCC*:

- ICE counsel reportedly advised that they will terminate cases with approved I-130 or I-360 petitions. (Oct. 11, 2011).
- An attorney reported that ICE is terminating cases if there is an approved visa petition. (Sept. 30, 2011).
- One ICE attorney reportedly stated that if he exercised PD in one case, he would have to exercise it in every case. (Sept. 7, 2011).
- One attorney commented that ICE is willing to exercise PD if the person is eligible for adjustment, however, requests meet resistance where admissibility questions are raised or where the person needs a waiver. (July 1, 2011).

## Newark

*ICE ERO*:

- One attorney commented that visa waiver overstays are excluded from PD, regardless of the equities. (Aug. 9, 2011).
- A request for deferred action was recommended for a grant, after the attorney was initially told that he could not even submit the request. (July 21, 2011).

*ICE OCC*:

- One ICE attorney reportedly confirmed that there are no PD procedures yet. (Sept. 19, 2011).
- One attorney observed that the general ICE response to PD has been, "We are anticipating further instruction, but feel free to submit materials as you see fit." (Sept. 12, 2011).
- An ICE attorney reportedly stated that three senior attorneys will be handling PD requests. (Sept.12, 2011).
- An ICE attorney stated in court that further PD instructions would be released in 45 days. (Sept. 6, 2011).

## Orlando

*Generally:*

- ICE has not received any directions on implementing the June 17 memos and will operate under the old rules until further instruction is given. (Sept. 28, 2011).

*ICE OCC*:

- ICE is reportedly "awaiting further guidance from the higher ups" but PD requests should be put in writing. (Aug. 30, 2011).
- One attorney commented that ICE is not heeding the memo and does not consider it binding. (July 29, 2011).

## Philadelphia

*ICE OCC*:

- OCC is actively considering PD requests on a case-by-case basis if requested by the respondent's attorney. (Oct. 12, 2011).

## Phoenix

*Generally*:

- Though ICE officers and attorneys maintain that the memos reflect what has always been ICE policy in Arizona, several attorneys report positive developments including clients being released from detention and ICE employees contacting attorneys about cases that might be good candidates for discretion. (Aug. 25, and 30, 2011).
- An attorney reports significant improvement in ICE's use of discretion. (Sept. 30, 2011).

## Salt Lake City
## (and Las Vegas, NV)

*ICE ERO*:

- In what appears to be a change in practice, ICE withdrew a detainer and indicated that it would consider PD requests on a case-by-case basis. (Oct. 12, 2011).
- ERO appear to welcome requests for PD but seems conflicted as to what it is going to do if it receives them. (Sept. 5, 2011, *Las Vegas*).

*ICE OCC*:

- OCC indicated that it had been exercising PD all along, so there is no change. (Oct. 21, 2011).
- ICE counsel openly maintains that the June 17 memos do not apply because they do not have implementing procedures from HQ. (Oct. 4, 2011, *Las Vegas*).
- OCC has not received any new PD guidance. (Sept. 5, 2011, *Las Vegas*).
- OCC interpreted the August 18 announcement as *narrowing* the cases in which PD can be exercised and takes the position that no discretion can be exercised in reentry cases involving an expedited removal order. (Sept. 5, 2011, *Las Vegas*).
- OCC seems willing to close cases if relief is available in the next few years. (Aug. 29, 2011).

## San Antonio

*ICE OCC/Immigration Court*:

- An ICE attorney refused to consider a request for termination or deferred action and instead offered voluntary departure. The IJ expressed frustration at not receiving any guidance on what to do with this and similar cases. (Sept. 9, 2011).

**San Diego**
*Generally:*
- Attorneys report little change since the June 17 memos. One attorney is finding a universal reluctance to PD in even the most meritorious cases. (Aug. 16, 2011).
*ICE OCC:*
- An attorney expressed frustration with inconsistent practices among ICE attorneys, even regarding the same case. (Aug. 1, 2011).

**San Francisco**
*Generally:*
- One attorney commented that the standard reason for denial of PD is a lack of "extenuating circumstances." (Sept. 22, 2011).
- USCIS and CBP officials told attorneys that they had received no PD guidance and that it was "business as usual." (Sept. 21, 2011).
- Attorneys observed no change in practice after June 17 memos. (July 6 and 29, 2011).
*ICE ERO:*
- One attorney was told that ERO is not considering PD requests (i.e., deferred action) until the end of proceedings but ICE counsel might take a different view. (Sept. 12, 2011).
- After the attorney sent a copy of the June 17 memo to ICE, the agent held off on serving the NTA. (June 30, 2011).
*ICE OCC:*
- One ICE attorney expressed concern about negative press regarding Defense of Marriage Act (DOMA) and asked that the attorney contact him before going to the media. (Sept. 9, 2011).
- ICE agreed to administrative closure after receiving a letter of support from the mayor, but other PD requests have been denied. (Aug. 18, 2011).

**San Juan**
*Generally:*
- One attorney commented that ICE generally lacks knowledge of the June 17 memos and is unwilling to exercise discretion because the District Director generally opposes PD grants. (Sept. 9, 2011).

**Seattle**
*Generally:*
- One attorney was told by ICE that they will not grant PD if the person is not eligible for relief, regardless of any positive factors. (Aug. 3, 2011).
*ICE ERO:*
- ERO told attorneys that the June 17 memos and August 18 announcement simply put the existing policy in writing and neither broadened nor encouraged the positive exercise of discretion. (Sept. 29, 2011).
- ERO reportedly claims discretionary authority only when a detention center is full; if there are beds available, release requests are denied. (Sept. 19, 2011).
- One attorney observed that grants of stay requests appeared to be extremely random. (Aug. 19, 2011).
*ICE OCC:*
- OCC reportedly told one attorney that the June 17 memo guidance regarding family petitions was to decline prosecutions only if the petition fell within the LIFE Act (i.e., was filed on or before 2001) but that the guidance did not extend to petitions filed later. They are awaiting further guidance from HQ, which is expected in 3 to 4 months, but until then, there was no basis to defer or close such a case. (Sept. 19, 2011).
- One attorney reports that ICE has made unofficial comments that the Administration's policy is not going to happen in the field; ICE has declined to use discretion to administratively close cases involving children. (Sept. 19, 2011).
*Immigration Court:*
- One IJ reportedly stated that neither he nor ICE counsel were doing anything about PD due to a lack of implementing guidelines or standards. (Aug. 31, 2011).

**St. Paul/Minneapolis**
*ICE ERO:*
- A supervisor reportedly stated that ICE does not have the authority to entertain requests for deferred action unless there is a final removal order. (Sept. 21, 2011).
- ERO informed attorneys that once the interagency working group is created and starts reviewing pending cases, ERO will better understand its role. (Sept. 8, 2011).
*ICE OCC:*
- A "go-to" person has been designated in OCC to handle PD requests. (Sept. 28, 2011).

# III. SURVEY RESULTS:  GRANTS AND DENIALS AT ICE OFFICES
# WITH MOST RESPONSES

The following charts records the type of prosecutorial discretion requested, the outcome of the request[1], and the positive[2] and negative[3] factors for each case.  The categories of positive and negative factors are the same as those listed in the June 17 memos.  Pending cases are included in the total number of responses but are not listed in the charts.

## Detroit
**(21 responses – 2 granted, 16 denied, 3 pending)**

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | OCC | ▪ Termination of proceedings; ▪ Agreeing to join in request for relief | **Granted** | ▪ Long time LPR ▪ USC/LPR family member ▪ Likely to be granted relief | Criminal history |
| 2 | ERO | ▪ Deferred Action; ▪ Stay of Removal | **Granted** (to have time to obtain passport for child) | ▪ Present since childhood ▪ No criminal history or only minor offenses ▪ USC/LPR family member | ▪ EWI or other illegal/ fraudulent entry ▪ Immigration fraud ▪ Little likelihood for relief |
| 3 | OCC | Release from Detention | **Denied** | ▪ Present for a long time ▪ U.S high school/college graduate ▪ No criminal history or only minor offenses ▪ No prior removal ▪ Strong family/community ties in U.S. | ▪ Little likelihood for relief ▪ No USC/LPR family member |
| 4 | ERO OCC | ▪ Release from detention; ▪ Termination of proceedings; ▪ Deferred Action; ▪ Parole; ▪ Stay of Removal | **Denied** | ▪ Long time LPR ▪ Victim of DV/other serious crime ▪ Immediate relative who served in the U.S. military ▪ USC/LPR family member ▪ Primary caretaker of disabled/ill or minor relative ▪ Pregnant/nursing spouse | Criminal history |
| 5 | HSI | Issuance of NTA | **Denied** | ▪ Present for a long time ▪ USC/LPR family member ▪ No criminal history or only minor offenses ▪ No prior removal ▪ Eligible for relief (cancellation) | None |

---

[1] The chart lists the outcome of the case at the office indicated.

[2] "*USC/LPR family member*" only includes parents, spouses, or children.

[3] Regarding "*Criminal history*," in some cases, there are discrepancies as to how the attorney versus ICE viewed the crime.  Some attorneys checked off criminal history for misdemeanors such as shoplifting or DUI stating that they were minor but noting that ICE weighed the factor as decisive in denying requests for discretion.  The offense is listed for cases where the attorneys provided the information.

| | | | | | |
|---|---|---|---|---|---|
| 6 | ERO | • Release from detention;<br>• Parole | **Denied** | • No prior removal/fraud | • Present for a brief period of time<br>• Strong ties to home country<br>• Favorable conditions in home country<br>• No USC/LPR family member<br>• Little likelihood of relief |
| 7 | ERO | Stay of Removal | **Denied** | • No criminal history or only minor offenses<br>• No prior removal/fraud<br>• Few ties to home country<br>• Strong family/community ties in U.S. | • EWI or other illegal/ fraudulent entry<br>• No USC/LPR family member |
| 8 | OCC | • Release from detention;<br>• Termination of proceedings;<br>• Agreeing to join in motion to continue for adjudication;<br>• Stay of removal;<br>• Agreeing to join in motion to reopen;<br>• Agreeing to join in request for relief | **Denied** | • No criminal history/only minor offenses<br>• No prior removal/ fraud<br>• Strong family/community ties to U.S.<br>• Primary caretaker of disabled/ill or minor relative<br>• Nationality renders removal unlikely<br>• Likely to be granted relief | • Present for a brief period of time<br>• No USC/LPR family member |
| 9 | ERO | Termination of proceedings | **Denied** | • Minor/elderly<br>• No criminal history or only minor offenses<br>• USC/LPR family member<br>• Few ties to home country | • Record of immigration violations<br>• Outstanding/prior order of removal |
| 10 | ERO | • Termination of proceedings;<br>• Stay of Removal | **Denied** | • Minor/elderly<br>• Present since childhood<br>• Suffers from serious disability<br>• U.S. high school/college graduate<br>• No criminal history or only minor offenses<br>• No fraud<br>• Few ties to home country<br>• USC/LPR family member | Outstanding/prior order of removal |
| 11 | OCC | • Administrative closure;<br>• Agreeing in motion to reopen | **Denied** | • Present for a long time/ since childhood<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Likely to be granted relief | None |
| 12 | OCC | • Termination of proceedings;<br>• Agreeing in motion to reopen | **Denied** | • Present since childhood<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Likely to be granted relief | Criminal history<br>(traffic offense, one previous dismissed charge) |
| 13 | OCC | Decision not to issue NTA | **Denied** | • No criminal history or only minor offenses<br>• No prior removal/fraud | No USC/LPR family member |

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|---|---|---|---|---|
| 14 | OCC | Agreeing in motion to reopen | **Denied** | • Present in U.S. for a long time<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member | None |
| 15 | OCC | Administrative closure | **Denied** | • Minor or elderly<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• Strong ties to U.S.<br>• Primary caretaker of disabled/ill or minor relative<br>• Likely to be granted relief | Present in the U.S. for a brief period of time |
| 16 | ERO | • Termination of proceedings;<br>• Stay of Removal;<br>• Release of detention;<br>• Administrative closure;<br>• Agreeing in motion to continue for adjudication;<br>• Deferred action | **Denied** | • Present for a long time<br>• No fraud<br>• USC/LPR family member<br>• Primary caretaker of ill/ disabled or minor relative | • Criminal history (1 DUI, 1 firearm possession)<br>• Record of immigration violations<br>• EWI or other illegal/ fraudulent entry |
| 17 | OCC | Administrative closure | **Denied** | • Present for a long time<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Pregnant/nursing spouse<br>• Few ties to home country | Criminal history |
| 18 | OCC | Administrative closure | **Denied** | • Lawfully present for a long time<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Likely to be granted relief | None |

## New York
### (17 responses – 7 granted, 8 denied, 2 pending)

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|---|---|---|---|---|
| 1 | OCC | • Agreeing to join to continue to allow for adjudication of petition;<br>• Agreeing to join in request for relief | **Granted** (Agreeing to join in request for relief) | • Suffers from serious disability<br>• Present for a long time<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Likely to be granted relief | None |
| 2 | OCC | Termination of proceedings | **Granted** | • USC/LPR family member<br>• Likely to be granted relief | Criminal history |

| 3 | ERO OCC | Agreeing in motion to reopen | **Granted** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ USC/LPR family member<br>▪ Strong family/community ties in U.S.<br>▪ Few ties to home country | Outstanding/prior order of removal |
| 4 | ERO | Deferred Action | **Granted** | ▪ Present since childhood<br>▪ Present for a long time<br>▪ No fraud<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Likely to be granted relief | ▪ Outstanding/prior order of removal<br>▪ Criminal history |
| 5 | OCC | Decision not to pursue/ withdraw appeal | **Granted** | ▪ Long time LPR<br>▪ Elderly<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Nationality makes removal unlikely<br>▪ Chronic/debilitating health issues<br>▪ Strong family/community ties in U.S. | No USC/LPR family member |
| 6 | OCC | Termination of proceedings | **Granted** | ▪ Present since childhood<br>▪ U.S. High school/college graduate<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Strong family/community ties in U.S. | Little likelihood of being granted relief |
| 7 | ERO OCC | ▪ Decision not to issue an NTA;<br>▪ Decision not to file NTA;<br>▪ Release from detention;<br>▪ Agreeing in motion to reopen | **Granted**<br>(Release from detention; IJ granted motion to reopen) | ▪ Victim of DV/serious crime;<br>▪ Present for a long time;<br>▪ No criminal history or only minor offenses<br>▪ No fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Likely to be granted relief | Outstanding/prior order of removal |
| 8 | OCC | ▪ Termination of proceedings;<br>▪ Agreeing to join request for relief | **Denied** | ▪ Long time LPR<br>▪ Present in U.S. for a long time<br>▪ No criminal history or only minor offenses;<br>▪ USC/LPR family member (4 adult USC children)<br>▪ Strong family/community ties in U.S. | ▪ Outstanding/prior order of removal (disputed)<br>▪ Immigration fraud (disputed)<br>▪ Little likelihood of relief |

| 9 | OCC | Termination of proceedings | **Denied** | ▪ Elderly<br>▪ Suffers from serious health condition<br>▪ No criminal history or only minor offenses<br>▪ No prior removal or fraud<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | None<br>(stayed in home country over 1 yr as LPR) |
|---|---|---|---|---|---|
| 10 | OCC | ▪ Decision not to file NTA;<br>▪ Termination of proceedings;<br>▪ Agreeing in request for relief | **Denied** | ▪ Long time LPR<br>▪ Victim of DV/serious crime<br>▪ U.S. High school/college graduate<br>▪ No criminal history or only minor offenses<br>▪ No prior removal or fraud;<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Spouse has severe illness<br>▪ Likely to granted relief | None<br>(2 pre-IIRIRA misdemeanors) |
| 11 | ERO | Release from detention | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Few ties to home country<br>▪ Nationality makes removal unlikely<br>▪ Cooperating with law enforcement<br>▪ Likely to be granted relief | Outstanding/prior order of removal |
| 12 | ERO | Stay of removal | **Denied** | ▪ Plaintiff in lawsuit (civil rights violation)<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No fraud<br>▪ Cooperating with law enforcement | Outstanding/prior order of removal |
| 13 | OCC | Administrative closure | **Denied** | ▪ Present for a long time<br>▪ No prior removal/fraud<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ U.S. High school/college graduate<br>▪ Strong family/community ties in U.S. | Criminal history<br>(1 shoplifting) |
| 14 | OCC | ▪ Release from detention;<br>▪ Agreeing in motion to reopen | **Denied** | ▪ Present for a long time<br>▪ Suffers from a serious health condition<br>▪ No criminal history or only minor offenses<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Likely to be granted relief | Outstanding/prior order of removal |

*Holding DHS Accountable on Prosecutorial Discretion* 16                           **CAR 0492**

| 15 | OCC | Termination of removal proceedings | **Denied** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC or LPR family member | Present in the U.S. for a brief period of time |

## San Francisco
**(17 responses – 5 granted, 10 denied, 1 mixed, 1 pending)**

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | OCC | Administrative closure | **Granted** | ▪ Minor<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ U.S. High school/college graduate<br>▪ Few ties to home country<br>▪ Strong family/community ties in U.S. | ▪ EWI or other illegal/ fraudulent entry<br>▪ Little likelihood for relief |
| 2 | OCC | ▪ Administrative closure;<br>▪ Decision not to pursue/ withdraw appeal | **Granted**<br>(ICE offered administrative closure; attorney declined and IJ granted asylum) | ▪ Suffers from serious disability<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Likely to be granted relief | ▪ Present for a brief period of time<br>▪ EWI or other illegal/ fraudulent entry<br>▪ Lacks family/ community ties |
| 3 | HSI | Decision not to issue NTA | **Granted** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ VAWA applicant | None |
| 4 | OCC | ▪ Administrative closure;<br>▪ Agreeing to continue to allow adjudication of petition | **Granted**<br>(Administrative closure) | ▪ Lawfully present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ U.S. High school/college graduate<br>▪ USC/LPR family member (LGBT) | None |
| 5 | ERO | Termination of proceedings | **Granted** | ▪ No criminal history or only minor offenses<br>▪ Strong family/community ties in U.S.<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | None |
| 6 | ERO | ▪ Deferred action;<br>▪ Stay of removal | **Mixed**<br>(Stay of removal granted for 2 out of 5 family members) | ▪ No criminal history or only minor offense (4 out of 5 family members)<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ USC/LPR family member<br>▪ Strong family/community ties in U.S.<br>▪ Few ties to home country<br>▪ Present for a long time<br>▪ Suffers from serious health condition | ▪ Criminal history (felony DUI from 16 years ago)<br>▪ EWI or other illegal/ fraudulent entry<br>▪ Outstanding/ prior order of removal |

| 7 | ERO | Stay of removal | **Denied** | ▪ No criminal history or only minor offenses<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Strong family/community ties in U.S. | No USC/LPR family member |
|---|---|---|---|---|---|
| 8 | OCC | Termination of proceedings | **Denied** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | None<br>(LPR abandonment charge) |
| 9 | OCC | Termination of proceedings | **Denied** | ▪ Minor<br>▪ Suffers from serious disability/ health condition<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud | ▪ Present for a brief time<br>▪ No family/ community ties in US<br>**(detained on way to Canada to reunite with relatives; does not wish to remain in U.S.)** |
| 10 | OCC | Termination of proceedings | **Denied** | ▪ Minor/elderly<br>▪ Suffers from serious disability<br>▪ No prior removal/fraud<br>▪ Present for a long time<br>▪ Few ties to home country | ▪ Record of immigration violations<br>▪ Criminal history (1 assault 15 years ago)<br>▪ No USC/LPR family member<br>▪ Little likelihood for relief |
| 11 | OCC | Termination of proceedings | **Denied** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Present for a long time | ▪ No USC/LPR family member<br>▪ Strong ties to home country<br>▪ EWI or other illegal/ fraudulent entry |
| 12 | ERO | Stay of removal | **Denied** | ▪ Minor<br>▪ Suffers from serious health condition<br>▪ U.S. High school/college graduate<br>▪ No criminal history or only minor offenses | ▪ Outstanding/ prior order of removal<br>▪ Little likelihood for relief |
| 13 | ERO | Release from detention | **Denied** | ▪ Victim of DV/serious crime<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Cooperating with law enforcement | Lengthy criminal record |
| 14 | OCC | Termination of proceedings | **Denied** | ▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ U.S. high school/college graduate<br>▪ Few ties to home country<br>▪ Likely to be granted relief | EWI or other illegal/ fraudulent entry |

| 15 | ERO | ▪ Deferred Action<br>▪ Stay of Removal | **Denied** | ▪ Present in U.S. for long time<br>▪ No criminal history or only minor offenses<br>▪ No fraud<br>▪ USC/LPR family member<br>▪ Spouse has severe illness<br>▪ Strong family/community ties in U.S. | ▪ Outstanding/ prior order of removal<br>▪ Little likelihood for relief |
| 16 | OCC | ▪ Termination of proceedings<br>▪ Agreeing to join in motion to continue to allow adjudication of petition | **Denied** | ▪ Present in U.S. for long time<br>▪ No criminal history oronly minor offenses<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | Outstanding/prior order of removal |

## Atlanta
## (17 responses- 6 granted, 8 denied, 3 pending)

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | OCC | Agreeing to join in motion to continue for adjudication of petition/apply for benefits | **Granted** | ▪ USC/LPR family member<br>▪ No criminal history or only minor offenses<br>▪ No prior removal /fraud | None |
| 2 | ERO | ▪ Release from detention;<br>▪ Deferred Action | **Granted** | ▪ USC/LPR family member<br>▪ No criminal history or only minor offenses<br>▪ No fraud<br>▪ Strong family/community ties | ▪ EWI or other illegal/ fraudulent entry<br>▪ Outstanding/prior order of removal<br>▪ Little likelihood for relief |
| 3 | OCC | ▪ Termination of proceedings;<br>▪ Administrative closure | **Granted** (Administrative Closure) | ▪ U.S. High school/college graduate;<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | None |
| 4 | ERO | Decision to place into §240 proceedings | **Granted** | ▪ Present since childhood<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Likely to be granted relief | Criminal history |
| 5 | OCC | Termination of proceedings | **Granted** | ▪ Present for a long time<br>▪ No criminal history or only minor<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Pregnant/nursing spouse<br>▪ Likely to be granted relief | None |
| 6 | ERO | ▪ Decision not to issue NTA;<br>▪ Release from detention;<br>▪ Stay of Removal | **Granted** | ▪ Victim of DV/crime<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ Strong family/community ties<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | Outstanding/prior order of removal |

| 7 | OCC | Termination of proceedings | **Denied** | ▪ Elderly<br>▪ Serious health condition<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Strong family/community ties<br>▪ Few ties to home country<br>▪ Likely to be granted relief | No USC/LPR family member; |
| 8 | ERO | ▪ Deferred Action;<br>▪ Issuance of NTA | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Strong family/community ties<br>▪ Primary caretaker for disabled/ill or minor relative<br>▪ Likely to be granted relief | None |
| 9 | OCC | Reissuance of an NTA at a later date (cancellation) | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker for disabled/ill or minor relative<br>▪ Few ties to home country | None |
| 10 | OCC | Termination of proceedings | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Spouse with severe illness<br>▪ Primary caretaker of disabled/ill relative | EWI or other illegal/fraudulent entry |
| 11 | OCC | Termination of proceedings | **Denied** | ▪ Suffers from serious disability<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Strong family/communities ties<br>▪ Few ties to home country | ▪ EWI or other illegal/ fraudulent entry<br>▪ Little likelihood for relief |
| 12 | OCC | Termination of proceedings | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | EWI or other illegal/ fraudulent entry<br>(in dispute) |
| 13 | OCC | Decision to place into §240 proceedings | **Denied** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Few ties to home country<br>▪ Nationality renders removal unlikely<br>▪ Likely to be granted relief | None |

| 14 | OCC | Administrative closure | **Denied** | ▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Few ties to home country<br>▪ USC/LPR family member | ▪ EWI or other illegal/fraudulent entry<br>▪ Little likelihood for relief |

## Seattle
**(15 responses – 5 granted, 7 denied, 3 pending)**

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | OCC | Termination of proceedings | **Granted** | ▪ Present since childhood<br>▪ Present for a long time<br>▪ U.S. high school/college graduate<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Few ties to home country | None |
| 2 | ERO | Release from detention | **Granted** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Likely to be granted relief<br>▪ Few ties to home country | None |
| 3 | OCC | ▪ Decision not to pursue/ withdraw appeal;<br>▪ Termination of proceedings;<br>▪ Decision not to amend charges | **Granted**<br>(Decision not to pursue/ withdraw appeal; IJ granted termination) | ▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ U.S. high school/college graduate<br>▪ Few ties to home country | ▪ EWI or other illegal/ fraudulent entry<br>▪ No USC/LPR family member<br>▪ Little likelihood for immediate relief |
| 4 | ERO | Release from detention | **Granted** | ▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Primary caretaker of ill/disabled or minor relative | EWI or other illegal/ fraudulent entry |
| 5 | OCC | ▪ Termination of proceedings;<br>▪ Deferred action;<br>▪ Parole | **Granted**<br>(Termination of proceedings) | ▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative | None |
| 6 | ERO | ▪ Release from detention;<br>▪ Reissuance of NTA at later date;<br>▪ Place into §240 proceedings | **Denied** | ▪ Present since childhood<br>▪ Present for a long time<br>▪ Suffers from serious disability/ health condition<br>▪ No criminal history or only minor offenses<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Likely to be granted relief | ▪ Outstanding/prior order of removal<br>▪ Unresolved criminal charges |

| 7 | ERO | ▪ Release from detention;<br>▪ Decision not to issue NTA | **Denied** | ▪ Pregnant/nursing<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ USC/LPR family member | ▪ Present for a brief period of time<br>▪ EWI or other illegal/ fraudulent entry |
| 8 | OCC | ▪ Deferred action;<br>▪ Termination of proceedings | **Denied** | ▪ Present since childhood<br>▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ Strong family/community ties in U.S.<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ U.S. high school/college graduate<br>▪ Few ties to home country | ▪ EWI or other illegal /fraudulent entry<br>▪ No USC/LPR family member<br>▪ Little likelihood for relief<br>▪ Criminal history (theft) |
| 9 | ERO | Release from detention | **Denied** | ▪ Present for a long time<br>▪ No removal/fraud<br>▪ U.S. high school/college graduate<br>▪ Strong family/community ties in U.S.<br>▪ Cooperating with law enforcement | Criminal history (3 DUI arrests) |
| 10 | OCC | Decision not to issue NTA | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ USC/LPR family member<br>▪ Likely to be granted relief | EWI or other illegal/ fraudulent entry |
| 11 | ERO | ▪ Release from detention;<br>▪ Termination of proceedings | **Denied** | ▪ Present since childhood<br>▪ Present for a long time<br>▪ Pregant/nursing<br>▪ U.S. high school/college graduate<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ Nationality makes removal unlikely<br>▪ Likely to be granted relief | EWI or other illegal/ fraudulent entry |
| 12 | OCC | ▪ Administrative closure;<br>▪ Termination of proceedings | **Denied** | ▪ Present since childhood<br>▪ High school student in U.S.<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud | ▪ EWI or other illegal/ fraudulent entry<br>▪ Present for a brief period of time<br>▪ No USC/LPR family member<br>▪ Little likelihood for relief |

**Boston**
**(15 responses – 7 granted, 7 denied, 1 pending)**

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | ERO | Stay of removal | **Granted** | ▪ Parent of minor who is cooperating with law enforcement<br>▪ No criminal history or only minor offenses | ▪ EWI or other illegal/ fraudulent entry<br>▪ Outstanding/prior order of removal<br>▪ No USC/LPR family member |
| 2 | OCC | Termination of proceedings | **Granted** | ▪ USC/LPR family member<br>▪ No prior removal/fraud<br>▪ Likely to be granted relief | None |
| 3 | OCC | Termination of proceedings | **Granted** (Administrative closure) | ▪ Minor<br>▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Strong family/community ties in U.S. | Little likelihood for relief |
| 4 | OCC | ▪ Termination of proceedings;<br>▪ Administrative closure;<br>▪ Agreeing to motion to continue for adjudication | **Granted** (Termination of proceedings) | ▪ Present since childhood<br>▪ USC/LPR family member<br>▪ Few ties to home country<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Cooperating with LEA<br>▪ Likely to be granted relief | None |
| 5 | OCC | Termination of proceedings | **Granted** | ▪ Lawfully present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker of disabled/ill or minor relative | None |
| 6 | OCC | Termination of proceedings | **Granted** | ▪ Lawfully present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker of disabled/ill or minor relative<br>▪ Likely to be granted relief | None |
| 7 | OCC | Administrative closure | **Granted** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member | EWI or other illegal/ fraudulent entry |
| 8 | OCC | ▪ Termination of proceedings;<br>▪ Administrative closure | **Denied** | ▪ Present since childhood<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Strong family/community ties in U.S.<br>▪ Few ties to home country | Little likelihood for relief |

| 9 | OCC | Reissuance of an NTA | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal<br>▪ USC/LPR family member<br>▪ Strong family/community ties in U.S.<br>▪ Primary caretaker of disabled/ill or minor relative<br>▪ Likely to be granted relief | Client engaged in immigration fraud |
|---|---|---|---|---|---|
| 10 | OCC | Termination of proceedings | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Strong family/community ties to U.S.<br>▪ Likely to be granted relief | None |
| 11 | OCC | Termination of proceedings | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ Caretaker for elderly (non-relatives) | ▪ No USC/LPR family member<br>▪ Little likelihood for relief |
| 12 | OCC | Termination of proceedings | **Denied** | ▪ Veteran/member of military<br>▪ Family member in military<br>▪ Long time LPR<br>▪ Present since childhood<br>▪ Witness in pending criminal investigation/prosecution<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker of disabled/ill or minor relative<br>▪ Spouse with severe illness<br>▪ Few ties to home country<br>▪ Likely to be granted relief | ▪ Criminal history<br>▪ Favorable conditions in home country |
| 13 | ERO | Stay of removal | **Denied (granted after Congressional intervention)** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Spouse with severe illness | ▪ Record of immigration violations/fraud (in dispute)<br>▪ Outstanding/prior order of removal |
| 14 | OCC | ▪ Reissuance of NTA;<br>▪ Administrative closure | **Denied** | ▪ Present for a long time<br>▪ No criminal history or only minor offenses<br>▪ No prior removal/fraud<br>▪ USC/LPR family member<br>▪ Primary caretaker of ill/disabled or minor relative<br>▪ Likely to be granted relief | None |

**Chicago**
**(15 responses – 5 granted, 6 denied, 4 pending)**

| # | Office | Requested | Outcome | Positive Factors | Negative Factors |
|---|--------|-----------|---------|------------------|------------------|
| 1 | ERO | Release from detention | **Granted** | • No criminal history or only minor offenses<br>• Formerly minor (aged out of ORR custody) | • EWI or other illegal/ fraudulent entry<br>• Record of immigration violations<br>• Outstanding/prior order of removal<br>• Criminal history<br>• Lacks family/ community ties |
| 2 | ERO | Termination of proceedings | **Granted** | • Victim of DV/crime<br>• Present for a long time<br>• No criminal history or only minor offenses<br>• No prior removal<br>• USC/LPR family member<br>• Primary caretaker of ill/disabled or minor relative<br>• Likely to be granted relief<br>• Cooperating with LEA | None |
| 3 | OCC | Decision to place into §240 proceedings | **Granted** | • Present for a long time<br>• USC/LPR family member<br>• Primary caretaker of ill/disabled or minor relative<br>• Spouse with severe illness<br>• Likely to be granted relief | • EWI or other illegal/ fraudulent entry<br>• Criminal history (20 years ago) |
| 4 | ERO | Deferred action | **Granted** | • Present for a long time<br>• No criminal history or only minor offenses<br>• No fraud<br>• Strong family/community ties in U.S.<br>• Few ties to home country | Outstanding/prior order of removal |
| 5 | OCC | • Reissuance of NTA;<br>• Termination of proceedings;<br>• Administrative closure | **Granted**<br>(Termination of proceedings) | • Present for a long time<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Primary caretaker of ill/disabled or minor relative<br>• Few ties to home country | • EWI or other illegal/ fraudulent entry<br>• Criminal history (DUI/battery)<br>• Little likelihood for relief |
| 6 | OCC | • Termination of proceedings;<br>• Administrative closure;<br>• Agreeing in motion to continue for adjudication | **Denied** | • Lawfully present for a long time<br>• U.S. high school/college graduate<br>• No criminal history or only minor offenses<br>• No prior removal/fraud<br>• USC/LPR family member<br>• Strong family/community ties to U.S.<br>• Few ties to home country | None |

CAR 0503

CAR 0504

| | |
|---|---|
| **From:** | Paschall, Robert ███████████████ |
| | ████████████████████ |
| **Sent:** | Thursday, February 16, 2012 10:17 AM |
| **To:** | Fong, Ivan ████████████████ |
| **Subject:** | FW: Preliminary CQ Transcript |

Ivan;

Second email.  This is the testimony from the House Appropriations Subcommittee.

Bob

Robert D. Paschall
Acting Associate General Counsel
for General Law
General Law Division
Office of the General Counsel
Department of Homeland Security
Office Phone: ████████████
Cell Phone: ████████████

**From:** Gelfer, Elizabeth
**Sent:** Wednesday, February 15, 2012 5:54 PM
**To:** CFO Council Members; DHS Budget Officers
**Cc:** DHS Budget Division; Shlossman, Amy; Borras, Rafael; Cummiskey, Chris; Micone, Vincent; Sherry, Peggy; Marcott, Stacy
**Subject:** FW: Preliminary CQ Transcript

Provided below for your information is a CQ (unofficial) transcript from the Secretary's hearing on the FY 2013 budget before the House Appropriations Committee today.

This is being provided for your review and to ensure consistency as you and your components heads go to brief and testify on the budget request.   We will get the official transcript within the next week or so from the Committee.

Thanks.

**From:** Nicholson, Ben ████████████████████
**Sent:** Wednesday, February 15, 2012 3:41 PM
**To:** Gelfer, Elizabeth
**Subject:** FW: Preliminary CQ Transcript

CQ CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
Feb. 15, 2012

# House Appropriations Subcommittee on Homeland Security Holds Hearing on the Fiscal 2013 Appropriations for the Homeland Security Department

**LIST OF PANEL MEMBERS AND WITNESSES**

**Partial Text - complete transcript not yet available**

ADERHOLT:

Good morning. Hearing is called to order.

Today we welcome back Secretary Napolitano.

Madam Secretary, thank you for being here today. We look forward to hearing your testimony and also the president's budget for the Department of Homeland Security for F.Y. '13.

Over the past year we've seen some extraordinary security-related events. We've seen the demise of Osama Bin Laden and Anwar al-Awlaki. Growing concerns over Hezbollah's global reach and Al Qaida's influence in Northern Africa. (Inaudible) drug cartels continue to threaten our border as well as the rule of law of Mexico.

The persistent threat of home grown violent extremism and certainly last but not least the horrific natural disasters including flooding and the violent tornadoes that struck Missouri and my home State of Alabama, a devastation that you and I were both able to witness first hand.

Despite the significance of these developments, perhaps the greatest threat to our nation over this past year has been our ballooning debt and crippling over-reliance upon deficit spending.

This leaves us the question of how do we sustain and support vital security programs in a physical environment that is both profoundly and necessarily constrained. The short answer for this subcommittee is discipline, demanding that funds provide tangible results for our nation's security.

The exercise of such discipline is not new. In fact, appropriators have always worked within the confines of finite resources and competing priorities. What's changed is the urgency and the skill of this discipline. There are no more shortcuts out of the budget's red ink, and homeland security cannot be immune from physical restraint.

The (inaudible) does not mean that we should embrace the flawed overused expression doing more with less. Rather it means we must get the most out of each and every scarce dollar to fill the department's mission.

This approach of linking funds to result is exactly what this subcommittee did in a recently enacted F.Y. '12 comfort support. I would reject the mischaracterization of the F.Y. '12 spending decision as being predisposed to cut programs such as famous grants or science and technology.

That is a flawed claim -- a flawed claim that fails to acknowledge the blatant inadequacy of the administration's original F.Y. '12 budget request.

Madam Secretary, this subcommittee makes no apologies for making it a priority to limit funding to vital operations in front line personnel at the expense of scalable activities and programs that are failing to demonstrate tangible results or execute their budgets.

And in spite of last year's significant budgetary challenges, we manage to increase funding above the request for potentially gain changing risk-based programs at CBT and TSA, programs you have strongly supported as crucial to the department's success.

Sadly, the fiscal year 2013 budget for the H.S. before today fails to adequately sustain such operational authorities and repeats many of the same inadequacies as last year's quest using phony offsets and budget gimmicks while lowballing critical operational programs does not mean the nation's -- does not meet the nation's pressing needs for security and physical discipline.

Madam Secretary, it is incumbent upon the administration to submit a responsible budget, one that does not rely upon a fiction of unauthorized fees, unrealistic assumptions and flagrant contradictions. But rather a budget that adequately supports the department's mission of funding needed detention capacity for (inaudible) supporting the necessary modernization Coast Guard and CBP assets and keeping our research efforts on agricultural and biological threats on track.

Whereas this administration chose to apply the term priorities as a convenient excuse to avoid enforcing our immigrant laws and ignore legislative mandates, this subcommittee is obligated within real world constraints with the law as it is currently written and to actually fund vital operations.

ADERHOLT:

This has to be and is the standard by which we will evaluate the F.Y. '13 budget request, a standard that demands accountability as well as the direct alignment of funding to result (inaudible) homeland security. And the American taxpayer deserves no less.

Madam Secretary, it is clear that we have a lot to go over this morning for this hearing. Before I recognize the ranking member for this subcommittee, let me first address an important issue pertaining to the department's compliance with the law.

CAR 0506

There were 12 reports and plans required by statute to be submitted with the F.Y. '13 budget. As of today, 11 of those reports and plans have not been submitted. Only the FEMA DRF report that we received last night at 9:30 has been submitted and we have a few questions about that -- this report.

Also, Madam Secretary, these reports and plans were required by law and they're late. By the end of this hearing, this subcommittee would like an answer from you, on the record, when the department will comply with the law and submit these reports to the subcommittee.

Now, let me return to the distinguished ranking member who has served previously as chairman of this subcommittee, Mr. Price, for any remarks that he may like to make. Mr. Price.

PRICE:

Thank you, Mr. Chairman. Welcome, Madam Secretary, we're glad to see you and it's a pleasure to have you kick off our hearing season.

The 2013 discretionary budget requests for the Department of Homeland Security is $39.5 billion plus an addition $5.5 billion in disaster relief funding that does not count toward the discretionary cap.

At roughly the same level as 2012, this budget represents the first time an administration has not sought an increase for Homeland Security activities since the department was formed. Like all federal agencies, you've been asked to do more with less and this has required some tough decisions.

I was pleased to see this budget prioritize current and future threats by including significant increases for FEMA grants and for science and technology, albeit against a base, which, in both cases, has been significantly and, in my opinion, excessively reduced in the last two years.

The budget also produces reductions to Coast Guard personnel and acquisitions, a realignment of some current DHS programs and a significant reorganization of Homeland Security grant programs, many things that we are going to need to explore to see how the department is prioritizing risks and allocating funds in this era of shrinking budgets.

It's also a time to reflect about where the department has been and where you're heading. This includes the department's efforts to enforce our nation's immigration laws, which we all know to be in dire need of comprehensive reform despite Congress' failure to act.

The more I, as chairman and ranking member, have looked at targeted efforts to improve immigration enforcement and otherwise work on this issue, the more I have become convinced that we simply must have comprehensive reform. This cannot be fixed from the appropriations side alone.

You're well aware that illegal immigration attempts have decreased by 36 percent in the past two years and are one-third of what they were during their peak. This is impressive and this decline is due, in large part, to the doubling of border patrol agents along the Southwest border and the significant increase in immigration personnel working in the same region, along with improvements in detection technologies.

These changes -- this subcommittee had a lot to do with these changes and we're proud of this progress. In addition, the Administration has taken positive steps to improve its immigration enforcement policies.

Now, some have been quick to criticize these efforts, but I believe it's both prudent and entirely appropriate for the Administration on the removal of criminal aliens, first and foremost, while providing prosecutorial discretion on less pressing cases.

I also support your effort to better focus the Secure Communities program to make sure it's fulfilling its intended mission and is not being applied indiscriminately.

And I'm pleased that the Administration continues to carefully oversee the 287(g) program to revoke authorities and contracts at poorly performing detention facilities when it's clear that problems are not being resolved.

I must also commend you on the job FEMA did over the past year nimbly dealing with 99 major disasters. FEMA did a remarkable job of working with affected areas to make sure that our citizens and localities had the resources to remove damaged structures and debris as well as to begin the rebuilding process.

This confirms that much of the lost capacity we witnessed following Hurricane Katrina has been rebuilt, also a priority over past years of this subcommittee.

This impressive performance was even more laudable since it occurred during a period of great funding uncertainty. Hopefully, the new disaster funding mechanism, provided in the Budget Control Act, will ensure long-term stability for the Disaster Relief Fund.

That being said, there's some areas of your budget request that concern me. I see over 1,000 Coast Guard personnel leaving, significant reductions in mission support staff at both CBP and ICE, large reductions to

CAR 0507

Coast Guard and CBP aviation and maritime assets which could impair both agency's operational tempos.

These reductions and coupled with the assumed collection of $317 million in new aviation security fees that have not been authorized by Congress, this leaves us with several holes to fill at the offset and that doesn't even get to commitments that you've already made, such as completing construction of a new DHS headquarters, which, unfortunately, it not funded in 2013 at all.

I also have concerns about the growing pains that DHS components continue to experience nearly a decade into the department's existence when it comes to effective oversight of personnel and procurement decisions.

Last December, an internal review of the National Protection and Programs Directorate found mismanagement of and by NPPD personnel and issues of funds. And, similarly, an Inspector General report suggests that U.S. CIS officials are unduly pressuring adjudicators to approve applications from petitions which could potentially lead to defraud.

And we've seen too many Anti-Deficiency Act violations recently where appropriated funds are diverted to different uses than permitted. So the department needs to hold its personnel accountable to ensure that issues raised by internal reviews or audits or the Inspector General are addressed promptly and effectively.

I think we've made some progress, but we're not fully there yet and, as secretary, I'm sure you'll keep working on it. Madam Secretary, I look forward to your testimony and working with you again this year.

ADERHOLT:

At this time, I'd like to recognize the full Appropriations Chairman, Mr. Rogers.

ROGERS:

Thank you, Mr. Chairman, for yielding. Thank you, Madam Secretary, for being here. This subcommittee has special meaning for all of us, but especially myself, having been around when it first was brought into being, and we've worked with the department all of these eight years I guess it is.

Anyway, your appearance today marks your first before this subcommittee since the tenth anniversary of 9/11. Since that unforgettable day, our country has taken necessary and impressive strides to protect our people from threats, manmade or natural.

As the Chairman noted, our brave soldiers and those in the intelligence community have surgically rid this earth of two of our greatest threats, Osama bin Laden and Anwar al-Awlaki. However, when we pause this week to honor the memory and legacy of ICE agents, Jamie Zapata and Victor Avila, it will serve as an apt reminder that our country, our freedom and our way of life remain under constant siege, and our job is not done nor shall it ever be.

In recent years, we've seen a different kind of threat to our sovereignty as it emerges in our escalating fiscal crisis. This committee has been front-and-center in attempting to address the very real security threat posed by out of control Washington spending and trillion dollar deficits year-in and year-out.

Last year, this committee worked to restore transparency, posterity and tough oversight to the appropriations process. And we succeeded in reducing discretionary spending by some $98 billion compared to fiscal '10. That hasn't happened since World War II.

While DHS was spared some of the more dramatic cuts, agencies across the board are being expected to make scarce dollars count, increase efficiencies, prioritize the mission, reduce redundancies and budget responsibly.

Your department may be the best at this, which is why I have some strong concerns about the budget you put forth today. It demonstrates a reticence to prioritize front-line operations so vital to our drug interdiction efforts along the border, cutting CBP air and marine procurement by 52 percent as well as reducing Coast Guard patrol boat hours by 40 percent and active duty military by 500 billets.

It offsets hundreds of millions of dollars with an aviation security fee, which you know will never be enacted. It's a budget gimmick that Congress has rejected year-in and year-out ever since this subcommittee has existed.

It also fails to include a meaningful and forward-looking acquisition program for the Coast Guard, reducing this important program by 20 percent, and it proposes to add layers to the already bureaucracy at your headquarters.

Needless to say, this gives me great concern. Madam Secretary, I hope your testimony today will allay my concerns as we work together in protecting our homeland. We're on the same team. Thank you.

ADERHOLT:

CAR 0508

Thank you, Mr. Chairman.

Now, I'd like to recognize ranking member of the full committee, Mr. Dicks.

DICKS:

Thank you, Madam Secretary. We welcome you here today.

And, in reviewing your statement, I note that you make a significant statement on safeguarding and securing cyberspace. I serve as the ranking Democrat on the Defense Appropriations Subcommittee.

This is an issue that has major implications for our government, both the military side and the civilian side, and the private sector. And I hope that -- and I know you realize just how important this is. I mean it's been estimated in the public press that over a trillion dollars of intellectual property has been stolen by cybercriminals, some of which are nation-states that we are aware of.

And I just hope that in your -- in your statement today and in answering questions, you'll address these issues and what Homeland Security is doing about it. We know about the agreement you reached with Secretary Gates, you know, to combine the efforts of the Defense Department and NSA with Homeland Security, but I think this is one of the paramount issues of our time.


DICKS:

When Admiral Mullen was doing his farewell tour around the former chairman of the Joint Chiefs, he feels that this is right up there with the most important defense issues there are and that we are vulnerable and we have got to do more about it. And there's been concern expressed before the Senate Intelligence Committee, the House Intelligence Committee -- I happen to serve on it, an ex-officio basis -- that the country isn't doing enough about this issue, and that we have got to alert the American people to the possible -- I mean, Secretary Panetta has said that this could be the Pearl Harbor of our time, or another 9/11, in terms of an attack on the infrastructure of the United States, which could be crippling.

So I hope you will address this today in your statement. Thank you, Mr. Chairman.

ADERHOLT:

Thank you, Mr. Dicks. At this time, Secretary Napolitano, we look forward to hearing your testimony.

NAPOLITANO:

(OFF-MIKE) Thank you, Mr. Chairman. (Inaudible).

ADERHOLT:

Madam, mike.

NAPOLITANO:

I'm on now? All right. Technology. As I was saying, this is the first of three hearings that I will be testifying at between today and tomorrow. The third, which is on a cybersecurity bill being introduced in the Senate, co-sponsored by Senators Lieberman, Collins, and Feinstein, among others, a matter that we do consider of utmost urgency as this Congress moves forward. So Representatives Dicks, I really appreciate your comments there.

Ten years after the September 11th attacks, America is stronger and more secure today, thanks to the strong support of the president and the Congress. The work of the men and the women of the Department of Homeland Security, and local state and federal partners across the homeland security enterprise. We have made significant progress. Threats from terrorism, including, but not limited to al-Qaida, and al-Qaida-related groups persist, and continually evolve. And the demands on DHS continue to grow.

Today's threats are not limited to any one individual group or ideology, and are not defined or contained by international borders. Terrorists' tactics can be as simple as a homemade bomb, or as sophisticated as a biological threat, or a coordinated cyber attack.

We've had success in thwarting numerous terrorist plots, including the attempted bombings of the New York City subway and Times Square, foiled attacks against air cargo, and other attempts across the country. Nonetheless, continued threats from abroad and at home demonstrate how we must constantly remain vigilant and prepared.

The president's F.Y. 2013 budget for DHS allows us to continue to meet these evolving threats and

CAR 0509

challenges by preserving core frontline operational priorities through the redirection of over $850 million in base resources from administrative to mission areas. This continues our unprecedented commitment to fiscal discipline, which has led to over $3 billion in cost avoidances and reductions over the past three years through our efficiency review, and other initiatives.

Given the fiscal challenges to the department's state and local partners, DHS is also approaching these partnerships in new and innovative ways. For nine years, DHS has been supporting state and local efforts across the homeland security enterprise to build capabilities, awarding more than $35 billion in funding. As we look ahead in order to address evolving threats and make the most of limited resources, the administration has proposed a new vision for homeland security grants through the National Preparedness Grant Program to create a robust national preparedness capacity based on a cross-jurisdictional and readily-deployable state and local assets.

Using a competitive risk-based model, this grant's program will use a comprehensive process to assess gaps, identify and prioritize deployable capabilities, put funding to work quickly, and require grantees to regulate, report their progress. My written testimony includes a comprehensive list of the operational priorities in our budget. Today, I'd like to highlight just a few of them.

First, preventing terrorism and enhancing security. This was the founding mission of DHS. It remains our top priority today. The F.Y. 2013 budget safeguards to nation's transportation systems, through a layered detection system, focus on risk-based screening, enhanced targeting, and information sharing, to interdict threats and dangerous persons at the earliest point possible.

The budget supports the administration's global supply chain security strategy across air, land, and sea modes of transportation by strengthening efforts to prescreen and evaluate high-risk containers before they are shipped to the United States. We also continue our strong support for state and local partners through training, fusion centers, and intelligence analysis, and information sharing on a wide range of critical homeland security issues.

To secure and manage our borders, the budget continues the administration's unprecedented focus on border security, travel and trade, by supporting our border patrol agents and CBP officers on the front lines, as well as the deployment of proven, effective surveillance technology along the highest trafficked areas of the Southwest border, and also continues security improvements along the Northern border.

And to secure the nation's maritime borders, the budget invests in recapitalization of Coast Guard assets, including the sixth National Security Cutter, Fast Response Cutters, as well as the renovation and restoration of shore facilities.

The budget request also continues the department's focus on smart, prioritized, and effective enforcement of U.S. immigration laws. In F.Y. 2013, we will complete nationwide implementation of secure communities. Through this initiative, and our continued collaboration with the Department of Justice, we expect to continue to increase the number of criminal aliens, and other priority individuals who are identified and removed from our country.

This budget provides the resources necessary to address this changing population, while continuing to support alternatives to detention, detention reform, and immigrant integration efforts. The budget also focuses on monitoring and compliance, promoting adherence to worksite-related laws through criminal prosecution of egregious employers, and expansion of the E-Verify system.

To safeguard and secure cyberspace, the budget makes significant investments to strengthen cybersecurity, including funds to expedite the employment of Einstein 3 to prevent and detect intrusion on government computer systems, increase federal network security across the federal government, and continue to develop a robust cybersecurity workforce to protect and respond to national cybersecurity threats.

In 2011, as noted, the department responded to a record number of disasters. To ensure continued resilience to disasters, the president's budget focuses on a whole of community approach to emergency management. It includes resources for the Disaster Relief Fund, the DRF, which provides a significant portion of the federal response to victims in presidentially-declared disasters or emergencies, and is funded largely through authority provided under the Budget Control Act.

The budget also continues to provide essential support to national and economic security, by among other things, supporting the Coast Guard's operations in the polar regions, and by continuing to support ICE and CBP's efforts to protect U.S. intellectual property rights, and collection of customs revenue.

The F.Y. 2013 Budget Proposal reflects this administration's strong commitment to protecting the homeland and the American people through the effective and efficient use of DHS resources. As outlined in my testimony today, we will continue to preserve frontline priorities across the department by cutting costs, sharing resources

CAR 0510

across components, and streamlining operations wherever possible.

Mr. Chairman Aderholt, Representative Price, members of the committee, thank you for the opportunity to testify, and I'll be pleased to answer your questions.

ADERHOLT:

Thank you, Madam Secretary, for your testimony. And again, we appreciate your presence here this morning. Want to get right into the questions. And let me just mention to the members of the subcommittee, since we do have a pretty full house today, we'll -- we will go by the five-minute rule. So we'll appreciate you sticking by that as close as possible.

Madam Secretary, I would like to address an issue that we have talked about some, that you're aware of, you mentioned in your opening comments. I received your letter you sent to me yesterday in response to the January 17th letter, which I sent you about the administration's delay in deploying the Secure Communities in Alabama.

Unfortunately, your letter did not actually address the simple, straightforward question in the letter. Today, on behalf of the people of Alabama, I really need an answer. And the question is, will we allow ICE to fully deploy the program in Alabama?

NAPOLITANO:

Mr. Chairman, Secure Communities, as I've noted, is an important tool in our immigration enforcement prioritization efforts. It has been turned on in a number of Alabama jurisdictions, covering, we estimate, 75 percent of the foreign-born population of Alabama. It has been deployed in over half of Alabama's counties.

As you note, there are a few remaining counties left. We anticipate that nationwide deployment of Secure Communities across all remaining jurisdictions will be finished in F.Y. '13.

ADERHOLT:

I understand that there are a -- there, you say 75 percent of the foreign-born population. There are still close to half of the counties in Alabama that have not been. And I would -- you know. I think if you look at it, there's a lot of people who would look at it and say that the delay has been taken for political reasons. And it would be that I request that you reverse that decision, that you move swiftly in Alabama, and across the nation. I know that it has been decided before, the fact that there is an ongoing lawsuit.

But I would submit to you that Arizona and South Carolina are fully deployed, despite the lawsuit against those states, for enacting immigration enforcement law. And I think the safety of Alabamans is certainly not a lesser concern in those states.

NAPOLITANO:

Thank you, Mr. Chairman. I think one of the differences between the remaining Alabama counties, and Arizona and South Carolina, is that those states were basically turned on before litigation commenced. And as you know, the Alabama law has been upheld in part, and joined in part. It's a somewhat confusing situation due to be argued in the 11th Circuit Court of Appeals in the near future, and I believe it prudent to await the 11th Circuit's guidance on this issue.

ADERHOLT:

So you said there's a legal reason?

NAPOLITANO:

Among other things.

ADERHOLT:

Well, my understanding of secured communities, and we've discussed this quite a bit, it's about get arrest information to (inaudible) for federal law enforcement action. And the lawsuit is about arguing that the federal government has preeminence in immigration enforcement.

So it seems to me like deploying secure communities is more consistent with the government's position in a lawsuit. So, you know, if there is a legal reasoning for delaying deployment, I can't really see where that argument would come in.

CAR 0511

NAPOLITANO:

Well, I'm not sure, and again, these questions are probably more appropriately addressed to the attorney general, but I believe that Alabama in its papers probably doesn't concur with the predemption (ph) argument there.

ADERHOLT:

Well, one can only conclude, as I say, that the delay in Alabama has been taken for political reasons. And so this morning I would request that you reverse the decision and move out swiftly in Alabama and really -- and actually across the nation.

Secured communities, in your words, is the single best tool for identifying criminal aliens for removal. That only makes our community safer and the people of Alabama, in my opinion, deserve your commitment on this vital issue.

The budget -- let me switch to another issue. The budgeting includes request -- includes $35 million for the SAFER Grant Program for Firefighters. This request, combined with the $1 billion you discuss in your testimony that is referenced in the official budget appendix to hire post-911 veterans is an unprecedented amount for this program.

Everyone that you see on the dais from the Democrats to the Republicans supports our local community firefighters and supports the hiring of veterans which the president has stated will be a program's objective.

But this subcommittee has concerns about the amount of funds requested in these programs when other programs integral to our nation's security has been cut back substantially.

Is it correct that you have not awarded any fiscal 2012 or 2011 funds thus far?

NAPOLITANO:

In the SAFER grants, Mr. Chairman?

ADERHOLT:

Yes, in the SAFER grants.

NAPOLITANO:

I'll get back to you on that. If they have not been awarded, part of the delay in getting grants and grant guidance out of course is that we didn't get the F.Y.'12 actual budget until fairly recently.

We will be releasing right around this week the grant awards for F.Y.'12 for the (inaudible) and state homeland security grants, and I will get the date of the projected awards for SAFER.

ADERHOLT:

Okay. It's according to our information the program just announced the guidance, the guidelines on January the 25th for the F.Y.'11 funds. But other than that that we've looked at it means that you -- that you have almost 744 million of grants from F.Y.'11 and F.Y.'12 for SAFER programs that have not been awarded. And that would be on top of the over 500 million that has been awarded but not gone down.

Does that sound correct?

NAPOLITANO:

That could be, I will look into it, Mr. Chairman, and report back to you.

ADERHOLT:

Okay. If it is the case, that, you know, those funds are out there and as -- like you said according to the map of the subcommittee on how we've looked at it, if this is such a priority for the administration, then our question is why wasn't it included in F.Y.'11 guidelines that were just released a little over two weeks ago.

Also, I'm puzzled by how you can say that you want to hire veterans, which would be new hires, yet you ask for waiver of the requirement that the funds be used for new hires.

NAPOLITANO:

Well, we've asked in a number of grant programs for some flexibility on how personal -- personnel costs are

accounted for. But the department for the last years has really focused on veterans hiring. There's a great pool of people, they have already demonstrated a public service mission. A lot of their military training has some cross-over application to some of the jobs we have in the department.

So we have now, excluding the Coast Guard, active duty, 50,000 some odd veterans that are on staff in the department including in leadership positions, and we intend to continue that record.

ADERHOLT:

Well, as I say, I look forward to getting back with you but it seems like according to our map of what we've looked at and information that we've been given that there could be some good news here, that you may not really be aware of.

You could direct the $744 million in unobligated firefighter grant dollars towards the new hires with the focus upon veterans, and then it wouldn't cost the taxpayers a single (inaudible) cent.

NAPOLITANO:

We'll look into that, Mr. Chairman.

ADERHOLT:

Okay, I'd like to recognize Mr. Price.

PRICE:

Thank you, Mr. Chairman. Let me continue to ask the secretary about first responder grants, looking now more broadly of what you're proposing under FEMA for the 2013 budget.

You're requesting $2.9 billion for first responder grants, that's an increase of $525 million above 2012.

NAPOLITANO:

Above 2012 and active, yes, sir.

PRICE:

Similar to what Congress enacted for 2012, you're proposing some restricting of state and local grant programs in the broad categories, and that's what I'd like to clarify here.

We have $1.54 billion for a national -- for a national preparedness grant program which the secretary will allocate to the highest risk projects limiting the availability of funds to 24 months, as I understand, to deal with this drawdown program.

This grant program will incorporate the expiring authorized grant programs currently funded under the state, home and security grant program which includes (inaudible), transit and port and a few other grant programs.

You're proposing $607 million for firefighter grants equally divided between SAFER and equipment with waivers to deal with the layoffs and the need for rehires, and I'd just say in, parenthetically, that the full statement does clarify the relationship of the veterans hiring and the one billion and the jobs act to this basic request.

We probably need that elaborated but I do think your full statement makes that -- makes that clear.

You're also proposing $350 million for emergency management performance grants, $60 million for a new training partnership grant, that's the old national domestic preparedness consortium renamed.

And then $279 million for management administration of grant programs, exercises, technical assistance, evaluation and the Center for Domestic Preparedness.

Now as you know, Madam Secretary, this committee's expressed concern over consolidating FEMA grants in the past. These grant programs operate under different authorities. They have a variety of purposes as reflected most graphically in the differing allocation formulas that have applied to a number of these programs.

Last year Congress disregarded these concerns, consolidated all FEMA grant programs into one budget line do, one assumes, to the drastic overall cuts to grants and the difficulty with deciding how to allocate what was left.

But what you're proposing for 2013 continues grant consolidation and in some respects actually takes it beyond what we did in 2012.

So could you first walk me through your new FEMA grant proposal in more detail? For example, if the national preparedness grant program will be focused on risk and quickly procuring deployable assets, does that

CAR 0513

mean you'll be eliminating funding for previously authorized grants that focused on longer term security enhancements and hardening projects such as port and security grants? Which might well take more than 24 months to drawdown.

And then secondly, I wonder if you could give us examples of areas you think should continue to be funding with the 2013 request and then maybe distinguish that from areas that you think might now be deemed nice to fund when the budgets are more robust but for the moment deferrable?

NAPOLITANO:

Well, Representative Price, what we are proposing is that 16 grant programs be consolidated under the national preparedness grant name. The name comes from the national preparedness goal. A lot of the stake holders, the grantees helped draft that goal and the material that goes with it.

We provide in there -- would provide in there and this is only going to work with the Congress on, appropriate exceptions or waivers for longer term projects. But we have also seen that it's important to continually incentivize our grantees to get money out of the door once it's been allocated.

So one of the arguments made in favor of drastically cutting our grant award F.Y.'12 was the $8 billion or so that was deemed unspent across the country. We've really scrubbed those numbers to see what really is already out there. It's been allocated but it just hasn't been spent yet and we provided and intend to provide a schedule to the grantees on how to get the old money out.

But as the grant -- as we have matured as a department, so have the grants and the grantees. So we already start from a $35 billion base across the country. And we believe that now it would be prudent and effective and efficient to be able to look regionally and nationally about where we have gaps in the security framework that we must have, how we fill those in best.

That it ought to be primarily risk-based in its assessment, and that it have at least at the outset a 24-month deadline to help facilitate grantees actually moving the money from the awardees to the actual street and to the front line.


PRICE:

Well, just by way of elaborating the differences that are involved here, the most graphic difference probably is the allocation principles that have governed the state grants and the (inaudible) grants which are much more risk-based, much more targeted on the areas of greatest risk.

Can you help us understand proportionly where this money's going to go in this combined -- with this combined approach and how those different allocation approaches get blended?

NAPOLITANO:

Well, again, this is a proposal for the Congress with some explanatory language in the budget documents we've presented. But my vision would be that there'd be a somewhat smaller amount that in the past that is dedicated and spread across the country, primarily based on population, and using that formula. But that the overwhelming bulk of the National Preparedness Grant be based on risk.

PRICE:

Thank you, Mr. Chairman.

ADERHOLT:

Mr. Rogers?

ROGERS:

I want to ask you about our illegal immigration deportation policy. I know that you are deporting criminal aliens. I congratulate you on that. That's what we all want. My question though deals with those non-criminal illegal aliens, people who have not committed a crime in this country, or at least convicted of it. Are we deporting any of those people?

NAPOLITANO:

Yes.

CAR 0514

ROGERS:
    How many?

NAPOLITANO:
    Well, in F.Y. '11, the last year we have numbers for, we removed from the country roughly 400,000 individuals. Of those, 55 percent had criminal convictions. That's a much higher number than a couple years ago when it was in the low 30s. But the remainder fit within other priorities. They were fugitives from existing warrants. They were recent border crossers. They were repeat violators. They meet other our priority guidelines in ICE.

ROGERS:
    But were there any deported that were just simply here illegally?

NAPOLITANO:
    There were a small number that would have been picked up. And, yes.

ROGERS:
    Yes?

NAPOLITANO:
    I would -- well, in F.Y. '11, 90 percent of all of those deported were in one of our categories. They were criminal aliens, recent border crossers, repeat violators, fugitives from warrants. And that remainder, 10 percent, had a variety of reasons why they were deported. Some of them were deported because they were picked up in conjunction with others who were being arrested. There's a variety of reasons, as you know.

ROGERS:
    What do you mean recent border crossers?

NAPOLITANO:
    Excuse me, please?

ROGERS:
    What do you mean recent border crossers?

NAPOLITANO:
    Those that we picked up near the border. We are actually making -- we are not just turning them around and busing them back across the border. We're actually putting them into the system. They get a record. They are actually removed from the country. That's helpful in a number of ways. One of which is it gives us greater flexibility on how to deal with them if we find them as a repeat violator.

ROGERS:
    There are an estimated 13, 14 million or whatever illegal aliens in the country, the great bulk of whom have not committed a crime. What is the policy of the administration on -- on dealing with those illegal aliens who have not committed a crime and are not recent border crossers?

NAPOLITANO:
    Or in another category of priorities. Well, as you said in your opening statement, you know, one of the things we must do in DHS is prioritize the mission. And those that have committed no other crime, and when we look at other factors, length of time in the United States, family relation, they have (ph) ties in the United States, service in the military, and the like, those would be low priority matters.

ROGERS:
    Well, some people say you've given those people amnesty. That they no longer need worry about being here

CAR 0515

illegally. What do you say to that?

NAPOLITANO:

Well, I think the amnesty term is, quite frankly, way too overused with respect to immigration. This is an area that profoundly needs to be reexamined by the Congress for a whole host of reasons. But the fact of the matter is the numbers were, as I laid out to you, F.Y. '11, 90 percent of those removed did fall within mission priorities, as we have stated them. Ten percent did not, but they were still removed from the country.

ROGERS:

Switching subjects, the aviation security passenger fees were established in the Aviation Transportation Security Act of 2001. Your budget proposal for this coming year would change the collection of that aviation passenger fee, would realize $317 million by charging each passenger, what, $5 per trip?

NAPOLITANO:

Yes.

ROGERS:

And that would erase $317 million. The department has proposed that for every year it's been a department. And every year the Congress says, "Don't do that again. It's not going to happen."

And I -- I'm here to tell you again, it's not going to happen. And yet you have included that $117 million of that in your budget to be spent by the department for all sorts of purposes. And if that fee doesn't come into being, you're short $117 million. Assuming that to be the case, where do you propose to cut $117 million?

NAPOLITANO:

Well, I'd like to go back to the fee because that fee hasn't been addressed or raised since 2002. And as we all can appreciate, the costs of aviation security have risen dramatically.

The fact that the airlines now charge to check a bag has put more -- more into the carry-on baggage that we have to screen for. That's increased costs for the department. And it seems to us, both as a matter of fairness, but also a matter of deficit reduction, that it's appropriate to raise the fee.

Now last year, one of the arguments against the fee was that we had said we were going to deploy it on a enplanement basis, meaning each leg you would pay a fee. Congress objected to that, and so we have reformed the proposal to say, all right, we'll just charge it once for the whole trip.

But both for matters of making sure that we support the aviation security system and for deficit reduction, we think Congress ought to readdress that issue.

ROGERS:

Well, I understand what your position is, but what -- if we don't do it, where are you going to cut $117 million?

NAPOLITANO:

Well, Representative Rogers, I don't play what-ifs. We're at the beginning of a process...

ROGERS:

Well, we do. We have to play what-ifs on this committee. We have to find the money to fund your department. Now if there's a $117 million shortfall because we don't enact this tax, which I don't think we will, where do you propose to cut that amount of money? We need to know.

NAPOLITANO:

Well, Representative Rogers, it's not a tax. It's a fee. It's a fee that hasn't been increased for almost 10 years.

ROGERS:

Please answer the question.

NAPOLITANO:

CAR 0516

And we will work with the Congress on all matters related to the budget. But how and why we would have to replace that hole, to me it doesn't make sense. This is an aviation security fee. The costs of that have risen dramatically. It's a small fee, a small price to pay.

ROGERS:
Well, when TSA Director Kip Hawley in 2006 came here again with that proposal, as every agent -- every secretary has since I've been here, since the committee's been here, when he came in 2006 with that same proposal, I told Kip Hawley at that time, "The next time you come up here and propose a tax you know you can't pass, dumping the problem in the lap of Congress, I want you to pay the price." I repeat.

NAPOLITANO:
Well, Representative, I think the fact that the prior administration also requested an increase in the fee shows that it has bipartisan support.

ROGERS:
And I would tell you that the change of Congress that's taken place over these eight or nine years, year in and year out rejects it. And it's not going to happen this year. So be prepared. And you'll have to pay the price.
I yield.

ADERHOLT (?):
Going back to cyber security, why don't you give us -- tell us what you're doing with other government agencies, and with the private sector? And there's a lot of concern that the private sector isn't being candid about their problem here, and that we've got to do something to have regulations to make people report cyber attacks. Where is the administration in all of this?

NAPOLITANO:
Well, the administration supports the bill that was introduced in the Senate this week. That does have information sharing as part of it. Indeed, the information sharing provisions I think were migrated from Senator Feinstein's bill in the intel community.
It -- it has within it a process by which the Department of Homeland Security will work with the private sector that comprises critical infrastructure of the country to share information and report incidents of cyber intrusions, cyber attack and the like.
This is an area that's been a growth area within DHS. The -- we work across the interagency. We work with critical infrastructure already. But as you -- as you note, that can be more episodic than systemic. And given the size of the problem, we really need much more involvement by the private sector.

ADERHOLT:
And the private sector has not been totally willing to be involved. Isn't that correct?

NAPOLITANO:
As I said, it's episodic. It's not overall. And we're just talking core critical infrastructure.

ADERHOLT:
What about the other civilian agencies in the federal government? How are we doing with them?

NAPOLITANO:
We have now deployed Einstein 2 to 17 of the 19 agencies to which it's to be deployed. The 18 is...

ADERHOLT:
Give the committee just a quick definition of Einstein 2.

NAPOLITANO:
It -- it is a system -- I don't want to go too much into matters that are classified -- but it is a system that detects any sort of network intrusion.

CAR 0517

ADERHOLT:

But it isn't totally perfect, right? I mean, in other words, even where Einstein's been deployed, as I understand it, there's still ways to work around it.

NAPOLITANO:

There -- Representative, this is an area of constant creativity by our adversaries. But we're already working on Einstein 3. One of the things the budget request does, it would allow us to accelerate the development and deployment of Einstein 3.

ADERHOLT:

Now how is your relationship with NSA and the Defense Department on these issues?

NAPOLITANO:

Very good. As noted earlier, Secretary Gates and I reached an agreement between our two departments, which really have the overwhelming bulk of the work.

DOJ does a lot of the criminal investigations. Commerce has some work. Energy has work. We recognize that. But the bulk of the protection and preventive work that needs to occur is between DOD and DHS. And we reached an agreement on how to do that, how to cross- deploy some individuals, and how we both can utilize the resources of the NSA, albeit, and the civilian contacts you have to build in much more robust privacy and other protections when you're talking about using NSA methodology.

DICKS:

Good. Let me switch to another subject, polar icebreakers.

NAPOLITANO:

Yes.

DICKS:

There was a study done in 2010 that concluded that three heavy and three medium icebreakers are the minimum needed for the Coast Guard to fulfill its statutory missions. Currently, we have only one medium icebreaker, the Healy, in service with one heavy icebreaker, the Polar Star, expected to come back into service during the next fiscal year.

DICKS:

Can you tell us what your plans are? I know you've got -- I think one in the budget for this year, right?

NAPOLITANO:

We have $8 million in the budget to begin the design and plan of another icebreaker. I'm glad you raised this because these are going to be essential resources that we will need. There's going to be increased oil drilling in the North, up in the Arctic, in fact, the Healy just was the -- the ship that helped bring the oil to Gnome, Alaska, which was running out of heating oil for the winter.

And you are right, we only have the Healy and we have the Polar Star that's in dry dock so our hope is that the budget request will approved and we can move to the design and plan of third icebreaker.

DICKS:

Why not -- why not repair the Polar Sea (sic) as well?

NAPOLITANO:

Well, we would intend to do that, but the problem is when you do repairs or maintenance there, they're in dry dock and they're not operational. We certainly need at least one more operational icebreaker.

DICKS:

CAR 0518

OK. I'd like to work with you on this and I appreciate your testimony today and keep working in the cyber-security issue, it's a big big problem for the country.

NAPOLITANO:
   Indeed.

DICKS:
   Thank you.

ADERHOLT:
   Thank you, Mr. Dicks.
   Mr. Frelinghuysen?

FRELINGHUYSEN:
   Thank you, Mr. Chairman. Madam Secretary, first of all, I want to thank you for coming up to New Jersey with Director Fugate and some of the FEMA people when we had our hurricane disaster along the Passaic River. It was good to have you up there. Appreciate all the good work and FEMA gets high marks from a lot of people that I represent.
   I'd also like to associate myself with some of the remarks that Mr. Dicks made initially in terms of cyber, "who's doing what" I think is pretty important. So my questions sort of focus on a lot of what happens in this country depends on investments and research and development.
   What are your department's priorities in that area? I've been looking over your budget. There's some reductions in R&D. You have, I think, something called a, "Science and Technology Directorate." It sounds sort of ominous, but what -- what -- what are your priorities in terms of research and development?

NAPOLITANO:
   I think because it sounds ominous, we just call it, "S&T" and what we do with and propose for S&T is that we restore the research and development funds it has to the F.Y. '11 levels. Those funds were cut dramatically in the F.Y. '12 budget.
   That was a cut that we opposed, continue to oppose because, particularly in the Homeland Security area, research and development, long-term, needs to have -- needs to be done. The research cycle is not an annual cycle or even a bi-annual cycle. It takes a while, but we are focused on biodefense, we are focusing it on explosive detection devices, we are focused on research in the cyber area. Those are the three areas of focus within the S&T Directorate.

FRELINGHUYSEN:
   So how can you assure us, since both -- some of us serve on other committees, Mr. Dicks and I serve on Defense and Intel, that what you're doing has any relation to what, shall we say, others are doing across the spectrum here.
   What level of assurance can you give us that we're not, even though your -- some reductions in your R&D budget, fairly substantial, you've raised several priorities including explosives and biologics. How do you -- Who's out there as sort of the gate-keeper in terms of assuring that we're making the investments we need to do and they aren't in any way duplicative.

NAPOLITANO:
   With respect to the other major funded department that receives monies for these things, we are constantly working with them looking to see whether there are technologies or things that have been deployed, for example in the military context, that can be altered or adjusted to use for our work so that we don't unnecessarily reinvent the wheel, so-to-speak. So there's a constant interaction at the agency staff level on that regard.

FRELINGHUYSEN:
   So you're assuring us that -- that you work with all these other -- with the DOD, FBI ...

NAPOLITANO:

CAR 0519

Yes.

FRELINGHUYSEN:
... and other agencies to make sure that we are not duplicating.

NAPOLITANO:
Yes.

FRELINGHUYSEN:
OK. What's the -- a lot of the colleges and universities are involved in this research and development. What is their role?

NAPOLITANO:
Well, we have ...

FRELINGHUYSEN:
The so-called "Centers of Excellence."

NAPOLITANO:
That's right and ...

FRELINGHUYSEN:
And how do they relate to this particular issue?

NAPOLITANO:
Well, we reach out into the academic community. I think, this year, we have $32 million or so there. It's a competitive process for a university or so to be named, but we are looking there for basic, as opposed -- basic research. For example, in Representative Price's district, there is a large center ...

FRELINGHUYSEN:
Good choice.

NAPOLITANO:
University of Ohio. But he left.

FRELINGHUYSEN:
Yes, he did. He was assured of ...

NAPOLITANO:
Would you let him know that I referenced it? Thank you.
There is a biocenter that -- there. So what we do is identify where we need to begin the research cycle, where there are things that we would like that are really -- that academics can do and, then, the money is awarded appropriately.

FRELINGHUYSEN:
And, lastly, you have about 230,000 employees under your Department of Homeland Security umbrella. They have a lot of systems, information systems, and I'd like to know, I'm sure other members would like to know, how those systems interact and, more importantly, how well they're protected from the sort of attacks we're talking about here?
And do those systems talk to one another? One of the things I think we found out here, there -- a lot of systems are sold and there are a lot of vendors protecting, obviously, their systems. What are you doing to assure us that -- that the systems that are -- sorry, legacy systems or new systems that may be bought, that there's actually what we'd call -- used to call interoperability and such?

NAPOLITANO:

Let me take it in two bites, Representative. There are -- there is money in the budget to continue consolidation of data systems within the department. As you know, we're compromised of what were formally 22 different agencies and we have lots of legacy systems and the like. So that process continues to be funded under the president's request. That's one set of systems.

The other one I think you're referring to is all the data we collect, TSA, CVP, ICE, criminal data from the FBI, I would invite you to visit the National Targeting Center if you wish, but we have now been able to consolidate, not necessarily consolidate, but to make inoperable all of those data systems so on a real-time basis, we can target and monitor cargo and passengers traveling to-and-from the United States.

FRELINGHUYSEN:

And, lastly, we used to call it, "need to know." What exists today to assure, certainly, that people's privacy is protected under the Constitution, but that we also achieve what we want to achieve which is to have instant communication which would keep us safer?

NAPOLITANO:

Well, you're right about the privacy issues and they are important. We operate under a need to share information and one of the more important things we do is take intel that has been generated in Washington, D.C. and translate it into product that can be shared to private sector that may be implicated and to state and local law enforcement.

FRELINGHUYSEN:

Thank you, Mr. Chairman.

ADERHOLT:

Ms. Lowey?

LOWEY:

Welcome, Madam Secretary. I wanted to follow up on the cyber-security issue for just a moment first. New York's and the nation's economy depend on the health of our financial system and the free flow of credit and capital. A successful cyber-attack, as you know, on American's financial systems could have devastating effects on our nation's economy.

How is DHS working with the private sector and, specifically, the financial system, to ensure they have the tools necessary to combat cyber-threats?

NAPOLITANO:

Well, right now -- it is a critical sector of the economy. Right now, if we learn of a breach or are informed of a breach or intrusion, we immediately offer aid in response to repair, to patch, to mitigate and we also look for whether there could be other systems around the country that could be affected by the same, say virus and that is underway.

But, as I mentioned to Representative Dicks, there -- there's no requirement for information exchange in that regard so we don't know that we actually get all the information we need from that critical piece of the economy.

LOWEY:

Well, if necessary, we could have a classified briefing, but I think it's absolutely essential that we try and put plans in place when we know there have been threats on the New York Stock Exchange and other major corporations that affect our economy. So I think once it's been hacked, it's kind of late. I'd be interested to know what, in fact, we're doing to prevent.

NAPOLITANO:

Well, again, we work with -- we've worked with NASDAQ and others in the financial sector in terms of overall protection and prevention, but a lot of this tipped off or keyed off of intrusions or attacks that occur and what we want to do is quickly stop, mitigate the damage, minimize the damage and see if we can make sure

CAR 0521

other entities are not infiltrated as well using the same methodology.

LOWEY:

On to another issue on block grants, when you distribute the F.Y. '12 funds, will you continue the structure of awarding funds in a manner that provides directly to high-risk urban areas as well as setting aside other funding for states? I believe it's important to provide funds for both high-risk urban areas as well as states to help coordinate state/regional capabilities and that's why I've been supportive of both UASI and SHSGAP.

NAPOLITANO:

The F.Y. '12 grant awards will come out at the end of the week and they will continue that method of how we get the money out.

LOWEY:

And, as you know, UASI was created for high-risk urban areas, but has since been distributed to areas that are not high-risk. Would you support more targeted investments to ensure that the highest risk cities receive the funding they need?

NAPOLITANO:

We have really carefully looked at the UASI list (sic), particularly in light of the dramatic cuts to UASI funding in the F.Y. '12 budget, and looked at how best to make use of those monies in a targeted way for the -- we've also looked at the FBI's analysis of risk and security of our communities to help inform our decisions.

LOWEY:

Thank you.

And I want to thank you for recognizing the importance of the Secure the Cities program, which is the joint effort between federal and local governments to prevent radiological or nuclear material from being detonated in New York. And I've seen it work with the police department and Ray Kelly, and what procedures they put in place. This is so very important.

The president's budget request provides $22 million for Securing the Cities, which is level funding from the prior year. Last year, Securing the Cities in Manhattan received $20 million of the $22 million provided, with an additional $2 million set aside to establish a new pilot program in a second city. Will the Department of Homeland Security continue the commitment to New York as the primary and most at-risk recipient?

NAPOLITANO:

That's our intent, yes.

LOWEY:

And as the program looks to expand to a second pilot region, will the New York program continue to receive $20 million under the request?

NAPOLITANO:

I don't know what their request is in F.Y. '12. But our intent is to continue full funding for the New York pilot.

LOWEY:

We'll continue that discussion. I thank you. As you know, we've been talking about collective bargaining. And I've been very pleased that attention has been given to that issue. Could you tell me how DHS plans to go forward to provide collective bargaining rights to the Transportation Security Offices? You know, the rest of DH has it, and I know they're working on it. Perhaps you could elaborate.

NAPOLITANO:

The TSA workers had their election last year. They selected their union representative. We are -- by "we," I mean leadership of TSA -- has been in discussions with their leadership over the -- over the last months. And I

think formal bargaining begins in another week or two.

LOWEY:

I think just to bring it to your attention, I'm sure you're aware, they do not yet have full collective bargaining rights. And there shouldn't be two sets of rules for employees of the same agency; one for TSOs, another for all TSA employees. So I would hope you would give this additional attention. Do you have an update on the ongoing discussion between TSA and its employees?

NAPOLITANO:

Yes. I've been kept up to date. I would note, however, that they were organized pursuant to a different statute than the other employees of DHS. And so that does make some differences in terms of what can be within the scope of the bargaining process.

LOWEY:

But I think we've agreed the collective -- collective bargaining is a fair way to proceed. And I'm glad you're on top of it. And I hope that it becomes reality soon.

NAPOLITANO:

Thank you.

LOWEY:

Oh. How will the new consolidation of assistance -- my time is up? Thank you. I didn't hear the tap-tap. And I thought I'd get an additional...

ADERHOLT:

I'll try to tap a little louder next time.
Mr. Crenshaw?

CRENSHAW:

Thank you, Mr. Chairman. And welcome, Madam Secretary. I want to ask you about this Arizona Border Technology Plan. As I understand it, you froze activities under, I guess, SBInet about a year and a half ago, and put in a new plan, which, as I understand it, was to get the technology out quicker, more immediately by off-the-shelf type programs, and then help the border patrol meet their mission.

But it's my understanding that all that technology hasn't kind of been put in place yet. There's $800 million, as I understand it, that you have available. And since this technology's not being utilized yet, I wonder if you could -- is that -- it must not be a budget issue. Is that right?

NAPOLITANO:

It's a prudent procurement issue. And if I might explain, we froze SBInet because -- we froze the fixed-tower aspect of it that was border-wide, because it was over -- over cost and behind time-wise, and not operational for a number of our agents -- different parts of the border require different things -- and moved to a sector- specific planning for technology, and put an emphasis on purchasing technologies that were already available.

The integrated fixed towers across -- Arizona does have some use for the integrated fixed towers. Those are underway. The other sector plans, including Arizona's, have now been developed through CBP. They are in the final phases, and then we will go out and buy technology.

But we wanted to be careful here, because we had been burned once by a rush to procurement here. And we want to make sure we get the right things that really fit the needs of a particular area. Those plans are now, like I said, they have been developed, and we will begin with Arizona first.

CRENSHAW:

But I mean, $800 million is a lot of money. And if it's sitting there, sounds like there's been a lot of delay. I can appreciate you want to do a good job of what you do. When you talk to the border agents, they're ready to have this technology. You've added some new agents, and they're doing a great job. But if there's a delay in all of this acquisition, these requests for proposals, whatever, is there any kind of bureaucratic problem?

CAR 0523

Is it simply you just trying to do a really good job, and it takes a lot longer than we might think? Because it seems to me, it's hard enough to appropriate money. And when the money's sitting there, and it's not being utilized, and we're not doing the job that we're supposed to do, then we need to understand why it's taking so long?

NAPOLITANO:

That's right. And I appreciate that promise. One of the reasons on the FEMA Grant process, where we're asking the states, and putting some deadlines on when they get their money out the door, but the planning process is complete with the use of that technology. It has been careful. I really wanted to look at how the technology would inter-relate with the operational needs of our agents, make sure we buy the things they could actually use, and also maintain, repair, use over time. And those plans are now complete, and we're ready to go.

CRENSHAW:

Was it like -- I'm just looking at this. There's something called remote video surveillance system. And I mean I guess that's kind of an understandable system that's available. Is there a reason why that hadn't been acquired yet?

NAPOLITANO:

Well, there -- there are different needs at the border. There are places where there the remote video surveillance just won't work. And we can buy it, but it really doesn't help us. There are places that are so rugged that we can't get to it regularly to...

CRENSHAW:

Does that mean that you're not going to -- you don't need the radio surveillance, or you're just slow acquiring it?

NAPOLITANO:

No. It means that we've got to use different things in different areas, because different areas have different requirements.

CRENSHAW:

You're going to use the radio surveillance?

NAPOLITANO:

In some areas, yes.

CRENSHAW:

Then why haven't you gotten around to acquiring it?

NAPOLITANO:

Well, sir, we're not going to acquire it -- the reason you do a plan, sector-specific plan, is to say, well, what is it that we need to acquire, and how much of it do we need to acquire? And what does it need to be able to do to be useful in that particular environment?

CRENSHAW:

Don't you put that in the plan when you develop this Arizona technology plan?

NAPOLITANO:

That's what -- that part of the planning, really looking at what was there, what we already have, what we need, what would work, what wouldn't work, that's what has been involved in the technology planning process that we started when I put the freeze on SBInet.

CRENSHAW:

I got you. Just turning to the, I guess, the personnel side, we got a lot of new agents that have been border

patrol. And things are going really well in Arizona. But as you know, it's kind of like that (inaudible) or whatever, you hit one, Arizona's doing good, and then it pops up down in Texas border. So I mean, how does all that fit in when you -- when you do a good job in one area, that you anticipate the smuggling routes are going to change, people are going to go different places? Are you're dealing with that now?

NAPOLITANO:

We -- yes. And we've seen it before on the border. This is a historical pattern. It's like a bedspread. You know, you move one corner, the other corner moves. And I'm actually going to the South Texas border over the holiday weekend, or Monday, I think, I'm going down there to see where we're at, and look at the numbers, and what our needs are there.

The important thing we need to do, and this Congress has been very helpful in this regard, is to sustain the record number of border patrol agents that we have. Because that allows us to secure that border, and gives us some flexibility to move people around without sacrificing yet another sector of the border.

So we don't want to, just because we put a lot of resources in Arizona, move them all to Texas, and then Arizona becomes a problem. The way Congress has appropriated money to the border patrol, I think, has led to one of the success stories of the last three years, which is really making material progress on that Southwest border.

CRENSHAW:

Thank you. Thank you, Mr. Chairman.

ADERHOLT:

Mr. Olver?

OLVER:

Thank you, Mr. Chairman. And thank you for being here with us today, Madam Secretary. I -- I'm trying to get a handle on the whole budget, which of course, you've had a lot of time to get a handle of.

One of the previous speakers had mentioned that there were 230,000. Is that the number of employees of the Homeland Security Department?

NAPOLITANO:

Roughly, yes.

OLVER:

Roughly. Can you -- would you like to sharpen that closer?

NAPOLITANO:

No. I think 230,000 is the number we commonly use.

OLVER:

All right. I notice that the budget in its totality is very similar to last year, in its totality, $39.5 billion down just a little bit, but at only about a half a percent. Is there a job impact on that number, 230,000, that comes with that half-percent reduction?

NAPOLITANO:

There are no layoffs within that half a percent reduction. There are -- we've been able to make some decisions with respect to limiting some recruitment, or not replacing employees that retire. But that...

OLVER:

What would be the total impact of that? Or that's an attrition that's a policy? What would that be in the course of the year?

NAPOLITANO:

Well, well...

CAR 0525

OLVER:
Within your budget?


NAPOLITANO:
The budget -- there's normal attrition, which is just -- that just happens. But then we replace those employees. But there are some targeted areas where we don't anticipate replacing employees. One of those would be the Coast Guard.

OLVER:
What then is the net impact of that -- of the policy that you would -- would follow in the total employment of the agency, of the Homeland Security Department?

NAPOLITANO:
It's minimal. I think for the Coast Guard, it's around 1,000 FTE. And there's a little hair-cutting in some other areas, but it is a minimal employment impact.

OLVER:
OK. Can I get anything closer to what the total would be? You've given 1,000 for the Coast Guard. Is it likely to be 2,000, 3,000 total (inaudible) whatever your thinking of that -- whatever your definition is for minimal.

NAPOLITANO:
Well, I'm trying to distinguish between normal attrition, which I thought you were asking for, which varies across the department.

OLVER:
I want to know the net reduction in the department.

NAPOLITANO:
I would say no more than 2,000.

OLVER:
No more than 2,000. OK. That's good.
I notice that half of the budget basically is in TSA and the Coast Guard and immigration and ICE, essentially. Virtually half of the budget. And in those issues -- in those areas, the budget is down by, in TSA it's slightly over 6 percent. And Coast Guard, right around 4 percent. And also for ICE, right around 4 percent.
Is there -- what's the -- what is the job impact of those reductions in those three major departments -- major sub-areas that comprise virtually half the budget? What -- what -- how do you get those cuts without having a major job impact?

NAPOLITANO:
Well, there's no impact to front-line personnel. Part of the reason there are reductions is because investments in capital for those departments have now been made. And we don't need the same amount of money because we're not continuing to purchase at the same rate that we were purchasing before.
So it would be what I would see as a normal decline in size of budgets where you have a lot of capital expenditures for explosive detection machinery, or installing secure communities and the like. We're now pretty well -- we're almost to the completion of some of those streams. And so therefore we don't need the same amount of money.
But as I mentioned to you, the budget request of the president has a reduction of roughly 1,000 of the Coast Guard. It has, we anticipate, a couple of hundred in ICE. Those would be backroom and clerical, administrative type personnel, and the same in TSA. But no reduction in the front-line operation of the departments.

OLVER:

CAR 0526

OK. I realize that you had said that there were roughly a -- pardon? Time is up?

ADERHOLT:
   Your time has expired.

OLVER:
   Oh my goodness.

ADERHOLT:
   It goes by fast.
   Mr. Dent?

DENT:
   Thank you, Mr. Chairman.
   And thank you, Madam Secretary, for being with us today. I wanted to talk a little bit about the CFATS program. As you know, protecting our nation's chemical facilities is a daunting task, one that requires not just assessing the level of risk, but working with the private sector to coordinate and share information.
   I'm sure you've seen the internal memo concerning CFATS that was produced for Under Secretary Beers at the end of last year regarding the current challenges to the CFATS program. I don't think anyone can be pleased with the issues that are raised in that particular memo.
   Madam Secretary, from what I understand, this memo articulates that the mission budget, staffing, and workplace culture with the infrastructure security compliance division, as it relates to CFATS, are not in any sort of working order.
   We've spoken on a number of occasions in the past and over the years regarding authorization of (ph) conflicts over inherently safer technologies. And accordingly, a review that shows this level of dysfunction of a program that is vital to our nation's security is disconcerting, to say the least.
   The American people are shouting at Congress and the administration to get our fiscal house in order, and yet we see where their finite dollars have been spent on things like unneeded equipment and an excess of contractors. Or even more concerning is that today, five years after the program was initiated, not one site security plant has been finalized, even though industry has submitted over 4,000 of them to DHS for approval.
   So I guess my main question, Madam Secretary, is what's your honest response to this internal assessment of the program, and what is -- what is the path forward?

NAPOLITANO:
   Representative, I was not happy when I read that report, as you might imagine. We have done a number of things in -- in the interim since that reported was generated. We have developed an action plan for the CFATS program. It involves training of personnel. It involves changing some of the business -- the systems with the CFATS program to move the SSPs along.
   And as you know, as you correctly noted, they seem to have been held up in the works with the tier ones, and we want to move those through. We've made some personnel changes and some administrative changes to have more oversight of the CFATS program.
   And I personally have the action plan. And its dimensions are that it's same (ph) on my desk right -- right now. I share your concern.

DENT:
   So you're committed to making it work?

NAPOLITANO:
   Absolutely. It's necessary. These chemical facilities can be a big security risk, so we need to make this work.

DENT:
   One more issue. And it's on the issue of personal surety. It's my understanding that a final rule is with OMB. The industry experts on the ground who have committed time and money toward meeting CFATS deadlines continue to express concern over the path that the department is pursuing with respect to personal surety.

Some have suggested industry use the TWIC cards, but the -- your administration is proposing to create an entire new credentialing system that's going to cost millions of dollars. And I'm just hoping, Madam Secretary, why can't we use -- why can't TWIC satisfy the CFATS personal surety requirements? And you aware of this cost to industry if the current proposal is implemented? I'd like to see this done in a reasonable manner.

NAPOLITANO:
Representative, I will look into that. That's -- that's an interesting suggestion.

DENT:
It's a very big concern. And TWIC is a good credential that I think we all have embraced.

NAPOLITANO:
Yes, sir.

DENT:
I yield back.

ADELHOLT:
Thank you. Ms. Roybal-Allard?

ROYBAL-ALLARD:
Welcome, Madam Secretary. First of all, let me begin by acknowledging that you have had success in improving aspects of our immigration detention system. However, I remain deeply concerned about the slow pace of detention reform because we continue to hear credible reports of sexual assaults, racism, random beatings, and management cover-ups in detention facilities.

Also of concern is ICE's failure to make better use of alternatives to detention for immigrants who don't pose a threat to public safety either in their communities or to our country. And so I'm pleased that your budget would dramatically increase funding for ATD and allow your department the flexibility to shift money from detention beds (ph) to these safe, effective programs.

My question is that given the seriousness of the reported abuses at some of these detention facilities, will detention reform be a top priority for your department this year? And also, can you elaborate on the importance of increasing your budget to allow more flexibility in your reform efforts?

NAPOLITANO:
Well, I think operating a safe and secure detention environment is -- is a responsibility that we have. We've done a lot in the detention area, as you noted. We've consolidated. We've added more oversight. We have issued proposed standards that exceed anything that would be, I think, issued under the Prison Rape Elimination Act.

We're moving forward very, very carefully and aggressively there. And it's part and parcel of running an effective immigration system. You've got to have good detention centers. We also are in the process of opening a detention center that will be used only for civil violators in the immigration context. So that is -- if they haven't cut the ribbon, they will be shortly.

With respect to ATD, you're correct. The budget does request additional funding for that. That will allow us to, I think, provide more oversight in the ATD population. It will also I think enable us to move some of those cases through more quickly so that individuals don't sit on the non-detained ATD docket for so long. And that would be an overall cost savings.

ROYBAL-ALLARD:
Madam Secretary, I think most of us could agree that we need comprehensive immigration reform. I am pleased that your department has made some progress in instituting smarter and more effective enforcement policies.

And one of those efforts is the ongoing review of the 300,000 deportation cases currently pending in our immigration system. Your department's effort will help to relieve our backlogged immigration courts and allow ICE to focus more of its scarce resources on violent criminals.

It is my understanding that the pilot programs in Denver and Baltimore, which are part of that effort, resulted

CAR 0528

in the dismissal of more than 1,600 cases because those arrested had deep ties to the United States and posed no threat to our communities or to our country.

What lessons did DHS learn from the pilots, and what is your department's timetable for undertaking this review of all the outstanding deportation cases?

NAPOLITANO:

First, just a technical correction, Representative. Any cases that we found that were a very low priority were not dismissed. They were administratively closed. And all that means is that if there is subsequent activity by the individual, they immediately can be reopened and restored to their place on the docket. So it's an important, I think, distinction to make.

ROYBAL-ALLARD:

Yes. Thank you for that.

NAPOLITANO:

Lessons learned. We were really looking at how the -- what, you know, how long a review took, what were some of the problems, how do we -- what kind of guidance the lawyers in the department, the OCLA (ph) lawyers, needed to fill out things. And we completed the pilot within about six weeks. Our intent is to have the whole backlogged of the detain docket reviewed no later than the end of this year.

ROYBAL-ALLARD:

OK. And under your leadership, has been noted, DHS has made remarkable progress in securing our southwest border. And as the president stated in the State of the Union, lax border security is no longer a valid reason to oppose comprehensive immigration reform. In part, these gains have been achieved through the rapid expansion of the Border Patrol.

However, I remain concerned about reports of Border Patrol corruption and of agents mistreating immigrants, including children, in their custody. In fact, in a recent NGO report, investigators documented more than 30,000 separate incidents at the Border Patrol. What steps is your department taking to include the training and oversight of its personnel at the border in order to end this unacceptable pattern of abuse?

NAPOLITANO:

Well, I would dispute any NGO report that use those kind of numbers. From time-to-time there are incidents and we deal with them very firmly and swiftly. There's no reason for it within the Border Patrol system and -- but there's a lot of stuff said about what happens at the border that does not, in fact, pan out when you actually look at the facts.

Beyond that, however, we have stepped up relatively quickly. We thank the Congress for the funds to do that. That's one of the ways we've been able to secure that southwest border. We want to sustain those agents down at the border. It's a record number of agents at the border, and the Acting Commissioner David Aguilar has now looked at and has said that making sure that training and supervision and anti-corruption measures are going to be some of his top priority particularly for those new agents and -- and -- and agents they move through the system.

ROYBAL-ALLARD:

Okay, I've run out of time, but I would like to follow up with your department on the NGO report. Okay, thank you.

ADERHOLT:

Thank you. Judge Carter?

CARTER:

Thank you. Thank you, Madam Secretary, I appreciate you being here. (Inaudible) budget request speak to fundamentally reform the FEMA grant program. While strong -- I support this, I think that you're competent -- competition and procurement process is a good idea.

CAR 0529

But I have a couple of questions on this training partnership grant that concerns me. They seem to negate significant investment Congress has made to the national development -- domestic preparedness consortium.

It seems to me that this new direction is more concerned about starting up duplicative programs rather than bolstering existing programs. I've been told the current backlog of first responders seeking training of existing programs is over 20,000. And awarding funds to these new folks still have to go through (inaudible) approval and a lot of other startups which will seem to create some kind of a lag in this.

I guess first question is has the national domestic preparedness consortium failed to meet the training needs of first responders in this area? If not, then why do we need the diverse funding so it takes significant cause to standing up new programs when grant funds are already scarce.

And then secondly, now does the newly proposed structure of the training partnership grant and your request for $60 million address the backlog better than the existing training program?

NAPOLITANO:

Well, with respect to all grants, we are seeking to consolidate and to streamline and to focus where the dollars will do the most good. I think we can all agree that that's an appropriate thing for us to do from a management perspective.

With respect to eliminating redundancies, we will look at that. If you believe that to be a redundancy, we'll be happy to look at that. But our overall goal is to take what before had been 15 different grant programs all with different administrators and administrative guidelines and formulas and this and that and say, we are focused on the national preparedness goal and. . .

CARTER:

Yes, I understand that, but I really am curious about whether national domestic preparedness consortium is starting to meet their (inaudible).

NAPOLITANO:

You know, I'll look -- you know, not that I know of but I'll be happy to look into that for you.

CARTER:

Well, I mean, if we're going to start a duplicative program to do the same thing, if they're doing their job we're not opposed to those people that are doing the job.

NAPOLITANO:

Representative, I don't want to prejudge that and we'll take a look at that.

CARTER:

It's funny, just a minute ago I heard you talking about this -- one of the programs, either the Denver or the Baltimore pilot program where you were examining caseload and seeing what's there and this is -- this concerns all your non-detained cases. It's taken six weeks and endless hours of attorney time to look into this resulting in administration closing only 14 of the cases.

Those individuals may be grateful their cases were stopped, but the bulk of these people are still living and working illegally in the United States, isn't that correct?

NAPOLITANO:

Well, the -- no, the -- I don't think you can say that they are working in the United States. I don't. . .

CARTER:

Well, they're living or existing or. . .

NAPOLITANO:

They're in the United States. They're in the United States illegally. They're in the United States illegally.

CARTER:

Now what this has resulted in, I think, is sort of an issues of prosecutorial discretion. The prosecutors under

your authority are making selections and quite honestly I think this is resulting and we are not going forward on anything other than the criminal element which everybody at this (inaudible) agrees should be kicked out of our country as quick as humanly possible.

But we still have, as the chairman pointed out, somewhere between 12 and 14 million people that under our rules and our agreements are in our country illegally and illegally by definition means they've broken a law. Okay?

Now this slowdown in dealing with these people, which is what this is, these two projects allowed for a slowdown or almost cessation of dealing with this element. There's 14 million compared to the criminal element that we have deported, which is good.

That seems to be making a choice of what laws you're going to enforce and what you're not. And I think it would be arguable they're not meeting the duty and responsibility of this office. Would you like to respond to that?

NAPOLITANO:

I obviously disagree with that characterization.

CARTER:

(Inaudible) But why?

NAPOLITANO:

I'll tell you why. Listen, and I haven't heard the 14 million number but it's a number that's a big number, 10 million, 11 million are in the country illegally. Many have longstanding ties to their community, they are taxpayers, they are married to U.S. citizens, they have families here.

I mean, there are a whole variety of individual circumstances that fall within that big umbrella. The Congress, you know, they give us resources that enable us to remove, you know, 350 to 400,000 people per year, and within that number we have prioritized.

And when you prioritize, the prioritize the mission. You end up really focused on the criminal aliens and the repeat violators and the ones you can get before they enter the interior of the country and we want to focus on that part of the docket and the detained part of the docket and move those through more swiftly and more effectively than we have heretofore.

And that's the reason why the administrator has allowed his agents and his lawyers to act like agents and lawyers and every other criminal justice agency in the federal government.

CARTER:

So you're -- just if I could ask one more question. So what you're saying is that you could -- you have evidence that shows that neglecting this other part of the document's allowed you to speed up the other -- your success ratio is better than previous years because you're ignoring this, I don't care if it's five million, ten million, 12 million, 14 million, they're getting in and we're speeding up the process. Is that what you're saying?

NAPOLITANO:

What I'm saying, they're not -- they are not ignored, as I explained earlier. We still will have ten percent or so removals last year were not within the criminal or other priorities of the department, they were still removed.

But, yes, we want to make sure that we increase the number and the percentage of criminal removals within the removal universe and we've gone, Representative, I think when I started as the secretary it was roughly 30 percent of the removed docket were criminal aliens, now we're at 55 after '11. It will be higher in F.Y.'12.

CARTER:

Could you show -- can you send that to me and maybe through the chair we can take a look at it?

NAPOLITANO:

Yes, sir.

CARTER:

Okay, thanks.

CAR 0531

ADERHOLT:
   Mr. Latham.

LATHAM:
   I thank the chairman and welcome Madam Secretary.
   We have a lot of entrepreneurs -- entrepreneurial individuals in this country have great ideas that want to make the country safer. And obviously they want to contract with DHS and with one of the small companies, large companies.
   I can tell you that I'm hearing a lot from these businesses, these individuals about frustration they have trying to break through DHS. A couple of examples, there's the small business that made $100,000 investment and submitted its response to a very broad DHS multiple award contract solicitation notice.
   And the DHS has had the proposal since March of 2011. The award is delayed until December of 2012. So the first pass order will come at the earliest about two years after this business made the offer and invested in this.
   Another case there's a mid-sized defense company who thinks they have some great ideas for you, and as to the responses to 18 requests for information, but has never gotten a response back, never heard a word back.
   Basically this company is sending money into a black hole and with just totally non-responsive and is very, very frustrated. I just wonder if you're aware of the various contracting and acquisition problems at the department and if so, do you know what efforts you're doing to work to correct the problems at the -- at the department.

NAPOLITANO:
   Well, first, last year almost 30 percent of our contracts were awarded to small business well exceeding the federal government --

LATHAM:
   Obviously not these.

NAPOLITANO:
   Obviously not those. But I wanted to give you the overall. Small business does contract with us. With respect to your first example, I suspect without knowing for sure, but I suspect the reason there was the delay was we didn't get the F.Y.'12 budget which allowed us to issue contracts until December of last year.
   And so a lot of contracting across the federal government had to wait for the actual budget and appropriation to be passed, and we didn't have it until December.
   With respect to the company that says they have submitted 18 requests for information, I'll ask my staff to follow up with your office and we will make sure they get a response.

LATHAM:
   Well, I mean, this proposals you've had -- they've never gotten a response from March of 2011.

NAPOLITANO:
   Sir, I'll be happy to drill down on that for you.

LATHAM:
   And this is the first example I cited. It's just, I mean, it's not a matter of funding, I don't believe, because you've got an increase in funding for acquisition personnel.

NAPOLITANO:
   It's not the funding, it's the appropriation, and we didn't have appropriation until December. But they were new contracts, the continuing resolution may not necessarily cover them. This is why we need to look at each instance individually.

CAR 0532

LATHAM:

It would not stop you on a continuing resolution.

NAPOLITANO:

Issuing new contracts without a new appropriation, there are rules there that we have to abide by. I think the Department of Defense probably had some of the same issues.

LATHAM:

It's an extension of the current authorization.

NAPOLITANO:

Sir, we'll be happy to look at that for you. But I'm pretty sure on that, that that's what happened.

LATHAM:

I would just ask you to go back and have somebody look at it and be able to report to the committee and to myself, if we could, on any actions that are -- you're going to be taking. It's very -- very frustrating obviously for a lot of folks.

I -- did I hear earlier with, I think Judge Carter (ph), talking about a lot of these people are working in the United States that are here undocumented, paying taxes and the taxpayers...

NAPOLITANO:

They may be working. They may be paying taxes. They may not be working. There's a big difference there.

LATHAM:

How do they get IRS, Social Security numbers, all of that, if they're here undocumented?

NAPOLITANO:

There's a variety of ways, Representative, that they pay taxes. They certainly pay sales taxes and other use taxes.

LATHAM:

I thought you said they were working here, so they would actually have to pay...

NAPOLITANO:

They get tax ID numbers and they have taxes withheld, yes.

LATHAM:

Obviously it's a huge question, but you're obviously aware of the people using the same number, multiple people using the same numbers, and all of -- all of those issues.

NAPOLITANO:

That's been -- we've been working with the Social Security Administration on that, and to develop, you know -- their computer systems are beyond belief at SSA -- but to develop a flagging system so if we see a duplicate number, that can immediately be flagged. E-Verify, also. To the extent that employers use that, is an incredibly helpful tool to allow us to make sure that they are hiring only those legally present in the country.

LATHAM:

That -- doesn't that though just say that there is a Social Security number that doesn't necessarily match up with the individual who's sitting maybe across the desk? My time is expired.

NAPOLITANO:

If I might, Representative, there are other aspects of E-Verify that go into actual verification of identity.

LATHAM:

CAR 0533

Thank you.

ADERHOLT:
   Mr. Culberson?

CULBERSON:
   Thank you, Mr. Chairman. And thank you for appearing today and for your testimony, your service to the country. I want to focus first on detention beds. And I'm sure you're aware that the Congress has of course appropriated every request that the agency's made for immigration enforcement.
   We've been very generous within obviously the money that we have available to us, and been good stewards to the public's money, but we have fully funded every request that Homeland Security has made for immigration enforcement operations, and provided increases of course as well for detention beds. That's a key component of course in being able to actually hold people that the department picks up.
   And in the 2012 appropriations bill, Congress required -- I mean, it's not discretionary on your part. It is mandatory that ICE maintain 34,000 beds -- detention beds -- for incarcerating those who were here in the country illegally. Yet now only four months into fiscal year '12, we see that ICE is only maintaining 33,200 beds.
   You've got the money to do it. You've got the obligation to do it. You're sworn to uphold the law. Why won't you use the beds? Why won't you comply with the law that Congress has passed and use at least the 34,000 beds that we've required you to do?

NAPOLITANO:
   Well, Representative, we do comply with the law. We enforce the law. And we have been enforcing it much to the concern of others in -- with numbers that haven't ever been seen before. With respect to beds, it depends on whether you need the bed. We have the beds available so that if we need them, we can use them.
   The president's budget for F.Y. '13, as you note, does reduce somewhat the number of beds in favor of trying to put some more money in the alternative to detention area with the hope that we can make that more robust and save some money down the long road.

CULBERSON:
   But you'd agree the subcommittee's made every request you submitted to the Congress for ICE custody operations, and specifically to detention beds. We've funded those.

NAPOLITANO:
   Yes. Congress and the committee have -- have been very helpful.

CULBERSON:
   Super. And in fiscal year '12, we provided an increase to make sure you had the resources to fill 34,000 beds.

NAPOLITANO:
   In fiscal '12, you appropriated money for beds over and above the president's request. That's correct.

CULBERSON:
   Right. And the law requires you to maintain no more -- no less than 34,000. Why aren't you fulfilling that obligation?

NAPOLITANO:
   Representative, I believe we have beds available. The question is do we have the detained population at any given moment in time? It goes up and down. You know, you hold some people. Some are held five days. Some are held three weeks. It varies.

CULBERSON:
   You don't have enough -- you don't have enough customers essentially. You don't have enough people to fill those beds.

CAR 0534

NAPOLITANO:

It really depends on where you are. We need beds in some areas more than we need them in other areas of the country. It just depends. But right now, you are correct. We are not suffering from a bed shortage.

CULBERSON:

You don't need the -- you don't need the capacity?

NAPOLITANO:

Right now, yes. Today as I sit here before you, we have enough beds to handle the detained population.

CULBERSON:

You don't need that extra capacity.

NAPOLITANO:

I think that's another way to put it, yes.

CULBERSON:

I mean, it really is unbelievable for here -- for you to testify that you don't need those extra beds when the violence in Mexico's out of control. It really is so inconsistent with reality. It reminds me of your statement that the border's under operational control. For you to say you don't need the detention beds, that the border's under operational control, that the, you know, the -- that's from a statement you made last year in El Paso, Texas, which caused all of us in Texas a lot of concern because the...

DICKS:

Would the gentleman yield? I think she said she had the 800 beds. They just don't -- and she would use them if they were needed. So I don't see what the purpose of this harangue is.

CULBERSON:

Well, the concern is that, my good friend from Washington, is that the -- there are so many illegal aliens in the country. You said yourself it's 11 million to 12 million. And among that population, you've got a tremendous number that have committed crimes against Americans, violent crimes, and all sorts of other crimes.

The capacities -- I'm sure the demand is there. I know the demand is there. There's no shortage. But you've directed the agency to look elsewhere. That was my concern, Mr. Dicks, is that the -- as secretary just testified, they are prioritizing -- you've asked ICE agents to prioritize the cases that they pursue.

NAPOLITANO:

That's correct.

CULBERSON:

And you're dropping off low-priority cases. That's where I was going with it, Mr. Dicks, is the concern is they're -- I suspect they've got plenty of people that they could put in those beds. And actually, there's even additional bed space available above and beyond the 34,000.

NAPOLITANO:

I would suggest, Representative, that the things that we had defined as low priorities are cases that wouldn't go onto the detained docket, so they would not be in detention. You have fully funded our bed requests in the past, and we appreciate that. The president has requested an amount we think we will need in F.Y. '12, and has also requested an amount to increase our alternative to detention system.

ADERHOLT:

Thank you, Mr. Culberson. Madam Secretary, as I mentioned to you earlier this week, I want to commend the men and women of FEMA who have been on the ground in my home state of Alabama over the past year and

their efforts to help the recovery from the devastation, the tornadoes that occurred on April 27 in 2011.

Also commend you, and I thank you for making at least, I know, a couple trips to Alabama during that time to look at the disaster first hand. Much progress has been made. Much work remains to be accomplished. And I look forward to working with you over the next year to try to accomplish as much as possible.

I do have one question that is included in the request -- about what is included in the request. Your budget includes a request of $6.1 billion for the DRF, but we're having difficulty figuring out what this request contains since the required documentation justifying the request, as required in law to be submitted with the -- be submitted with the budget, was submitted at 9:30 last night, so not in time for a thorough review.

One thing did come up this morning. Based on the report that we received last night, the Department of Homeland Security estimates that no funds will be needed for recovery efforts after F.Y. '13 for the spring tornadoes, or the flooding in the Midwest, or from Hurricane Irene in the northeast. Typically we have seen FEMA continue recovery efforts for years after a disaster occurs, but it appears that this is not the case for the disasters that occurred last year. Is this an accurate statement?

NAPOLITANO:

Yeah. I think what that reflects, Mr. Chairman, is that we have really focused within FEMA at streamlining getting the money out to the communities that need it.

And so as we are able to speed that up, we're able to reduce the number of years for which we need to ask for additional appropriations. The way the DRF request is structured this year for F.Y. '13 is we have asked for $600-some-odd million in FEMA's base budget for disaster management.

We have asked then that $5.1 billion be so-called above the line to handle disaster payments for non-catastrophic disasters, and also catastrophic disasters that -- for which we already know we have payments due in F.Y. '13. If we were to have a catastrophic disaster above and beyond that in F.Y. '13, we would seek an emergency supplemental.

ADERHOLT:

Do we have your assurance that this request is sufficient to cover all normal costs for F.Y. '13?

NAPOLITANO:

As far as I know, but we will make double sure. We had so many states, yours included, some of the other states on the panel included, that suffered grievous damage in the spring and summer. Our folks are working very hard with those communities to get that money out.
CQ Transcriptions, Feb. 15, 2012

List of Panel Members and Witnesses

PANEL MEMBERS:
   REP. ROBERT B. ADERHOLT, R-ALA. CHAIRMAN
   REP. JOHN CARTER, R-TEXAS
   REP. JOHN CULBERSON, R-TEXAS
   REP. RODNEY FRELINGHUYSEN, R-N.J.
   REP. TOM LATHAM, R-IOWA
   REP. ANDER CRENSHAW, R-FLA.
   REP. CHARLIE DENT, R-PA.
   REP. HAROLD ROGERS, R-KY. EX OFFICIO
   REP. DAVID E. PRICE, D-N.C. RANKING MEMBER
   REP. NITA M. LOWEY, D-N.Y.
   REP. LUCILLE ROYBAL-ALLARD, D-CALIF.
   REP. JOHN W. OLVER, D-MASS.
   REP. NORM DICKS, D-WASH. EX OFFICIO
WITNESSES:
   SECRETARY OF HOMELAND SECURITY JANET NAPOLITANO

CAR 0536

| **From:** | Olavarria, Esther < █████████████████████ |
| **Sent:** | Wednesday, June 13, 2012 2:37 PM |
| **To:** | Escobar, Felicia < ████████████████████ ; Moran, Tyler |
| | < ██████████ > |
| **Cc:** | Ryan, Kelly < ███████████████████ |
| **Subject:** | RE: Legislative Request and MAVNI (UNCLASSIFIED) |
| **Attach:** | FAQ Part 2.docx; Deferred Action Internal Background Information draft (2).doc; DHS Timeline of Operational Implementation.docx; COMMUNICATIONS ROLL OUT PLAN.docx; Draft - Project X Release - 6 13 12 v2.docx |

Here are my comments.

-----Original Message-----
From: Escobar, Felicia █████████████████████
Sent: Wednesday, June 13, 2012 2:28 PM
To: Olavarria, Esther; Moran, Tyler
Cc: Ryan, Kelly
Subject: RE: Legislative Request and MAVNI (UNCLASSIFIED)

Thanks! Very helpful.

-----Original Message-----
From: Olavarria, Esther ██████████████████████████ ]
Sent: Wednesday, June 13, 2012 12:37 PM
To: Moran, Tyler; Escobar, Felicia
Cc: Ryan, Kelly
Subject: FW: Legislative Request and MAVNI (UNCLASSIFIED)

-----Original Message-----
From: Verdugo, Naomi B (Dr. Naomi) CIV (US) ██████████████████████████
Sent: Wednesday, June 13, 2012 12:34 PM
To: Olavarria, Esther
Subject: RE: Legislative Request and MAVNI (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Army accessed 789 enlisted members and 143 healthcare professionals (officers).

We are only aware of one MAVNI who was discharged from the Army for an unforeseen medical disqualifying condition prior to obtaining citizenship.  That doesn't mean this was the only case, just the only case we are aware of.

V/r,
Naomi

Naomi Verdugo
Asst Deputy for Recruiting
Office: ████████
Phone: ███████████████
New Email: ████████████████████

CAR 0537

-----Original Message-----
From: Olavarria, Esther ███████████████████████
Sent: Wednesday, June 13, 2012 11:05 AM
To: Verdugo, Naomi B (Dr. Naomi) CIV (US)
Subject: RE: Legislative Request and MAVNI (UNCLASSIFIED)

Naomi
Do you have statistics on how many people have served under the MAVNI program so far.
Also do we have any record of persons serving but subsequently falling out of status?
Thanks
Esther

-----Original Message-----
From: Verdugo, Naomi B (Dr. Naomi) CIV (US) ███████████████████
Sent: Wednesday, June 13, 2012 9:55 AM
To: Olavarria, Esther
Subject: RE: Legislative Request and MAVNI (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Esther, as requested, here it is.

V/r,
Naomi

Naomi Verdugo
Asst Deputy for Recruiting
Office: █████████████
Phone: █████████████
New Email: ██████████████████████

-----Original Message-----
From: Olavarria, Esther ███████████████████████
Sent: Wednesday, June 13, 2012 8:19 AM
To: Verdugo, Naomi B (Dr. Naomi) CIV (US)
Subject: RE: Legislative Request and MAVNI (UNCLASSIFIED)

Naomi,
Could you send me a copy of the May 16th letter from Ashton Carter reauthorizing the MAVNI program, and the attachments to the letter.

Thanks
Esther

-----Original Message-----
From: Verdugo, Naomi B (Dr. Naomi) CIV (US) ███████████████████
Sent: Tuesday, May 15, 2012 11:19 AM
To: Olavarria, Esther
Subject: Legislative Request and MAVNI (UNCLASSIFIED)

Classification: UNCLASSIFIED

Caveats: NONE

Ms. Olivarria,

# DP

I look forward to speaking with you!

V/r,
Naomi

Naomi Verdugo
Asst Deputy for Recruiting
Office: ███████
Phone: ███████
New Email: ████████████████████

Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

CAR 0539

**From:**   Noorani, Ali <███████████████████>
**Sent:**   Wednesday, February 8, 2012 12:25 PM
**To:**     Sandweg, John <███████████████████>; Kroloff, Noah
            <███████████████>
**Cc:**     Noah.Kroloff(███████████; John.Sandweg████████████
**Subject:** RE: PD implementation meeting

_____

Hey guys,

Sorry for the less than expeditious response on my end.  Rather than getting into an email back and forth, review the letter on its way to you all in the next day or so, and let's do the meeting w/ Mayorkas and Morton next week.

(For the record, I do appreciate any assessment of our work as "exceptional" even if it is rather backhanded.)

Talk soon,

Ali

-----Original Message-----
From: Sandweg, John ███████████████████████
Sent: Tuesday, February 07, 2012 4:19 PM
To: Noorani, Ali; Kroloff, Noah
Cc: Noah.Kroloff████████ John.Sandweg██████
Subject: RE: PD implementation meeting

Ali-

Sorry for the slow response, but the case by case process couldn't be moving more expeditiously.  ICE and CIS aren't pointing fingers at each other.  To the contrary, CIS has been focused on implementing its new NTA policy while simultaneously doing the 3/10 implementation correctly.

ICE has been focused on the application of its priorities within the numerous policy transformations that have been effectuated, training its officers and lawyers and reviewing over a hundred thousand cases in all

50 states.  We are monitoring their numbers and are seeing the results.


CBP, too, is refining its operations to more effectively target transnational crime and illegal border crossers and is working with ICE to best ensure that the aliens it puts into immigration proceedings are consistent with ICE policies.  Given the diversity of their missions, and the different legal framework under which they operate, the notion that CBP can simply adopt or mimic ICE's policies is exceptionally misguided.  That said, the cases of all individuals placed in removal proceedings by CBP are reviewed by an ICE attorney for consistency with ICE policies before they move forward in immigration court.  In other words, ICE priorities are being implemented in cases where CBP made the arrest as those cases go straight to ICE attorneys.  There is little doubt that ICE, CIS and CBP are cooperatively undertaking enormous operational changes with record speed.

With regard to the EAD issue, we are reviewing the concerns that have been expressed to us.  In order to obtain a better understanding of those concerns, as well as other concerns about the case by case process, we are happy to host a meeting here with Morton and Mayorkas (and possibly DOJ) to discuss.  We would anticipate this meeting being held early next week and prior to any additional decisions being made about the case by case process.

John R. Sandweg

Department of Homeland Security

CAR 0540

 (cell)

-----Original Message-----
From: Noorani, Ali [mailto:anoorani@█████████████]
Sent: Tuesday, February 07, 2012 7:42 AM
To: Kroloff, Noah
Cc: Noah.Kroloff@████████ John.Sandweg@████████
Subject: Re: PD implementation meeting

Biggest issue is the application for Employment Authorization Documentation.  ICE/USCIS seem to be pointing at each other.  ICE is administratively closing a case, but USCIS is not providing them an opportunity to apply for an EAD.  And, with the numbers of deferred action decisions decreasing by ICE, the application for an EAD only becomes more difficult.  Neither director seems to want to move.

In terms of obstruction, we have learned of no changes at CBP in line with the PD memos.

I believe a letter from advos went up last week, if not going this week, that lists out more details.  I'll track it down and forward.

On Feb 6, 2012, at 10:19 PM, "Kroloff, Noah" <███████████████████> wrote:

> How is this stuck?  Where is the obstruction?
>
> ----- Original Message -----
> From: Noorani, Ali [mailto:anoorani@███████████]
> Sent: Monday, February 06, 2012 10:13 PM
> To: Noah Kroloff <█████████████████>; John Sandweg <█████████████████>
> Subject: PD implementation meeting
>
> Hey Noah and John,
>
> I know you all are cranking the wheels as hard as possible with
regards to PD implementation.  And, based on the conversation with the Secretary in December, it is clear it is something weighing heavy on her mind.
>
> But, given the roadblocks we are hitting with ICE and USCIS, I think a
conversation with the Secretary is necessary.  From national implementation to employment authorization, confusion and obstruction are beginning to define the effort.  To be honest, you all took way too big a step forward to get stuck now.
>
> I don't think this is going to be like conversations we've had in the
past.  People are frustrated, but want to support full implementation.
In that way, I think this is an opportunity to support the Secretary's leadership in implementing these changes and develop a collective way forward.

CAR 0541

>
> Based on previous experience, this isn't going to get unstuck unless
the Secretary moves it up the priority list.
>
> Thanks for pushing this forward.  Much appreciated.
>
> Ali
>
>
>

CAR 0542

LAMAR S. SMITH, Texas
CHAIRMAN

F. JAMES SENSENBRENNER, JR., Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
DANIEL E. LUNGREN, California
STEVE CHABOT, Ohio
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio
TED POE, Texas
JASON CHAFFETZ, Utah
TOM REED, New York
TIM GRIFFIN, Arkansas
TOM MARINO, Pennsylvania
TREY GOWDY, South Carolina
DENNIS ROSS, Florida
SANDY ADAMS, Florida
BEN QUAYLE, Arizona

JOHN CONYERS, JR., Michigan
RANKING MEMBER

HOWARD L. BERMAN, California
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR., Georgia
PEDRO R. PIERLUISI, Puerto Rico
MIKE QUIGLEY, Illinois
JUDY CHU, California
TED DEUTCH, Florida
LINDA T. SÁNCHEZ, California
DEBBIE WASSERMAN SCHULTZ, Florida

ONE HUNDRED TWELFTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–3951

http://www.house.gov/judiciary

September 12, 2011

RECEIVED BY DHS EXEC SEC
2011 SEP 12 PM 2:00

The Honorable Janet Napolitano
Secretary of Homeland Security
Department of Homeland Security
Washington, DC 20850

Dear Secretary Napolitano,

We last wrote to you expressing our serious reservations about new guidance directing wanton use of prosecutorial discretion in immigration enforcement. As we continue to pursue additional information regarding implementation of that guidance by U.S. Immigration and Customs Enforcement (ICE), our concerns have only been compounded by the latest announcement. On August 19, 2011, the Department of Homeland Security (DHS) announced that it will initiate a "case-by-case review" of removal cases of aliens already placed in proceedings and ensure that "appropriate discretionary consideration" be given to "compelling cases with final orders of removal."

According to information provided to Judiciary staff on August 19, 2011 by DHS, the purpose of these changes is to limit cases initiated for removal in the future. Specifically, DHS indicated that one of its main reasons for the new procedures is to "tweak who we are putting in the removal process in the first place." In addition to our concerns about the administration's apparent abandonment of immigration enforcement, we also have significant concerns about how this new policy was developed. Accordingly, we write to request information and documents about the development and operation of these new policies.

This announcement by DHS seemingly represents the culmination of the administration's plans to shield millions of illegal immigrants from removal. The initial release on June 17 of two memos by ICE Director John Morton took the historically unprecedented step of relying on "prosecutorial discretion" to justify the abandonment of immigration enforcement against millions of illegal immigrants deemed a "low priority." The memos dealt with the charging phase of the immigration removal process, i.e. before individuals are placed in removal proceedings. Now, DHS has expanded this policy to cover not only individuals already charged with violating the immigration laws and placed in removal proceedings, but even to illegal immigrants who already have final orders of removal issued by an Immigration Judge.

CAR 0543

The Honorable Janet Napolitano
Page Two
September 12, 2011

This new policy is a perversion of our immigration laws. It is alarming that a significant percentage of the 300,000 aliens currently in removal proceedings can now avoid removal despite being present in the United States in violation of the law. In this manner, the Obama administration again chooses to ignore immigration laws under the guise of prosecutorial discretion. Despite the administration's claims that there is nothing new with respect to this policy, it represents a drastic and unprecedented shift.

No previous administration, irrespective of political party, has chosen, en masse, to place restrictions on the types of removable aliens that may be processed (or, in this case, not be processed) for removal before the immigration courts. Previous administrations have processed for removal those removable aliens who came to the attention of law enforcement. In other administrations, prosecutorial discretion was properly implemented on a case-by-case basis for a small number of aliens under especially compelling circumstances, but it was never used to circumvent the Immigration and Nationality Act (INA).

The Obama administration recognizes that it cannot sell amnesty for illegal immigrants to a skeptical Congress. Hence, it continues to circumvent Congress and immigration law by implementing administrative changes. The administration chooses not to enforce the law under the guise of its "priorities" while pointing to its possibly suspect removal numbers. The Judiciary Committee has asked numerous questions about the administration's removal numbers and how they were calculated. Some of these requests were submitted in writing. Not one of these requests has yet been answered. Additionally, as Chairman of the Judiciary Committee, I question whether the various memos introduced by the administration comport with the requirements of the Administrative Procedure Act. This issue has also been raised previously, and once again the administration has failed to respond.

One of the most disturbing aspects of the August 19, 2011, announcement is that it allows for deferred action on illegal immigrants. We are well aware that deferred action is not a form of immigration relief, but simply puts an alien's case on hold for a potentially indefinite period of time. We support the use of prosecutorial discretion under compelling circumstances, as intended in the INA. Like prosecutorial discretion, administrative closure of removal proceedings is not a form of immigration relief. However, the administration's actions allow illegal immigrants en masse to remain in the United States. The new policy undermines the rule of the law and intrudes on the role of Congress to make the law, while denigrating the role of the executive to carry out the laws enacted by Congress.

As we know, aliens who receive deferred action are eligible to receive work authorization. Ultimately, these memos may allow millions of illegal immigrants to remain in the United States in violation of existing law and regulations and compete with unemployed American and legal immigrant workers for scarce jobs. In the current environment, this effect is unconscionable. The new policy demonstrates the administration's apparent contempt for American workers, despite the President's repeated, if empty, calls for more jobs.

The Honorable Janet Napolitano
Page Three
September 12, 2011

The recent announcement also allows for administrative closure for cases in proceedings. Like deferred action, administrative closure was never meant to be used for the mass abandonment of viable cases. Specifically, the Board of Immigration Appeals (BIA) has encouraged DHS to administratively close cases in appropriate circumstances where there is a pending visa petition that is prima facie approvable.[1] This means that administrative closure should be utilized when the alien is actually eligible for statutory immigration relief. For instance, DHS previously utilized administrative closure where the respondent is prima facie eligible for Temporary Protected Status.[2]

Additionally, this new policy fails to take into account the large appellate body that is available to determine whether an alien is correctly in removal proceedings. As such case-by-case review by DHS is unnecessary. The BIA has nationwide jurisdiction to review decisions of IJs.[3] Furthermore, pursuant to INA §242, aliens can appeal adverse decisions to a federal appeals court.

According to DHS, an interagency working group has been created consisting of DHS and Department of Justice attorneys (including the Executive Office of Immigration Review (EOIR)) to review which cases are to be dismissed from removal proceedings and which final orders of removal are to be executed. There is a possible conflict of interest for EOIR, i.e., the immigration courts, to a have a role in determining the cases that are filed before it. Such involvement undermines the impartiality of the courts and makes them an interested party in the scope of the litigation before them.

Following DHS's recent announcement, our staffs asked several questions of DHS regarding the process for implementation that could not be answered by agency officials. These officials deferred to the prospective and unknown decisions of the interagency working group. When asked why a policy was announced without implementation plans, officials could not provide an adequate response. Thus, please provide the following information no later than Friday, September 30, 2011:

1. All correspondence electronic or otherwise, regarding this new policy between DHS officers and employees (including all its components), and between the White House and DHS officers and employees.
2. All DHS documents and memorandum regarding this new policy and its formulation.
3. All documents, electronic or otherwise, to be issued by the interagency working group as guidance to DHS components, attorneys, and employees.
4. When will the first case be subject to this process?
5. Who are the members of this interagency working group by name?

---

[1] See Matter of Rajah, 25 I&N Dec. 127 (BIA 2009) and Matter of Hashmi, 24, I&N Dec. 785.
[2] See Memo, Carpenter, Deputy Gen. Co. HQCOU 120/12.2 (Feb. 7, 2002, reported in 79 No.15 Interpreter Releases 524, 530-38.
[3] See 8 C.F.R. § 1003.1.

CAR 0545

The Honorable Janet Napolitano
Page Four
September 12, 2011

6. A monthly report on cases that are deferred/administratively closed under this process. Please provide separate information on deferred actions and administrative closure and provide the rationale for why each case has been deferred or administratively closed. According to DHS, this process will apply to "low hanging fruit" such as nursing mothers, pregnant women, minors, people with serious health conditions, veterans, those with physical or mental disabilities, etc.
7. A monthly report of all cases that receive work authorization under this process.
8. A monthly report of any individuals who have been paroled into the country based on this policy. We were informed that individuals already ordered removed could be paroled back into the country in order to benefit from this new process.
9. A monthly report of individuals who are not put into proceedings based on this process.

If you have any additional questions or concerns about this issue please contact Judiciary Committee Counsel Dimple R. Shah at 202-226-1978 or Appropriations Professional Staff Member Kathy Kraninger at 202-225-5834. Thank you for your attention to this request.

Sincerely,

Lamar Smith
Chairman
House Judiciary Committee

Robert A. Aderholt
Chairman
Appropriations Subcommittee on
Homeland Security

Cc: The Honorable John Conyers, Jr.



*Office of Legislative Affairs*

**U.S. Department of Homeland Security**
Washington, DC 20528

**OCT 11 2011**

The Honorable Robert A. Aderholt
Chairman
Subcommittee on Homeland Security
Committee on Appropriations
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

I am writing in response to your September 12, 2011 letter regarding the Department's immigration enforcement policies.  The Department, including U.S. Immigration and Customs Enforcement (ICE), is more focused than ever on serious enforcement of the Nation's immigration laws.  Our recent announcement regarding the appropriate use of prosecutorial discretion is part of our common sense approach to ensuring that our immigration enforcement efforts are focused on individuals who pose a threat to public safety such as criminal aliens and national security threats, as well as repeat immigration law violators, recent border entrants, and immigration fugitives.

As you know, the Department has undertaken a historic effort to secure the border and enforce immigration laws in a manner that is smart, effective, and maximizes the impact of the resources that Congress has made available.  We established as a top priority the identification and removal of public safety and national security threats.  To this end, we expanded the use and frequency of investigations and programs, like Secure Communities, that track down convicted criminals and gang members on our streets and in our jails and prisons.  We will continue those operations that focus on criminal aliens and will implement Secure Communities nationwide by the end of 2013.

As part of our commitment to border security, we have also prioritized the removal of recent border crossers.  In part because of the resource savings generated by the implementation of our enforcement priorities, ICE has been able to increase its direct support of the U.S. Border Patrol along the southwest border, dedicating more agents and detention space to border operations than ever before.  In addition, ICE has continued its focus on removing those that repeatedly violate our immigration laws and immigration fugitives.

Our record is clear.  In 2009 and 2010, ICE removed more aliens than ever before in the agency's history.  More importantly, the composition of those removals changed significantly, aligning our removals with our priorities.  In fiscal year 2010, ICE removed 195,772 criminal aliens, over 81,000 more than were removed in FY 2008.  We have had similar success with regard to our other priorities, as more than two-thirds of our other removals were of recent border entrants or repeat immigration law violators.  These enforcement efforts have made communities across the United States safer and will be enhanced by the recently announced process for reviewing the immigration case backlog that will be conducted by DHS and Department of Justice.

CAR 0547

The Honorable Robert A. Aderholt
Page 2

This strategy is complemented by the success of ICE's worksite enforcement efforts. The Department of Homeland Security has implemented a smart and effective approach to worksite enforcement. By focusing on employers who knowingly and repeatedly hire illegal labor, we are targeting the root cause of illegal immigration, utilizing robust Form I-9 inspections, civil fines, and debarment, and enhancing compliance tools like E-Verify. Since January 2009, ICE has audited more than 5,876 employers suspected of hiring illegal labor, debarred 428 companies and individuals, and imposed more than $69.3 million in financial sanctions—more than the total amount of audits and debarments during the entire previous administration. In short, our approach to worksite enforcement has been working, and has been successful at bringing employers into compliance with the law.

Thank you again for your letter. The enclosed white paper addresses your specific requests. I have also enclosed a response to frequently asked questions about the new interagency process. Chairman Smith, who co-signed your letter, will receive a separate, identical response. Should you wish to discuss the Administration's immigration enforcement record further, please do not hesitate to contact me at (202) █████

Respectfully,

Nelson Peacock
Assistant Secretary
Office of Legislative Affairs

Enclosures

**The Administration's New Inter-Agency Process to Further Focus
Immigration Enforcement Resources on High Priority Cases**

- <u>The Rationale for the New Process</u>:  DHS must ensure its immigration enforcement resources are focused on the removal of those who constitute our highest priorities, specifically individuals who pose a threat to public safety such as criminal aliens and national security threats, as well as repeat immigration law violators, recent border entrants, and immigration fugitives.
    - The expenditure of resources on cases that fall outside our enforcement priorities hinders our public safety mission by clogging immigration court dockets and diverting resources away from individuals who constitute our highest priorities.
    - Although DHS has been successful in focusing its enforcement resources on criminal aliens, repeat violators, border entrants, and other priorities, additional efforts are required to streamline immigration and federal court dockets and ensure that resources are not being diverted away from the identification, apprehension, and removal of high priority aliens.

- <u>The Design of the New Process</u>:  This process is designed to allow immigration and federal judges to more swiftly adjudicate high priority cases and free up additional resources that DHS will dedicate to further enhancing the identification and removal of those individuals who pose a threat to public safety or meet another enforcement priority.
    - In part, the process will accomplish this by identifying and accelerating the removal of high priority aliens from the United States.  The process will also identify very low priority cases and, on a case-by-case basis, set those cases aside to allow for additional resources to be focused on high priority aliens.

- <u>The Implementation of the New Process</u>:  DHS and DOJ have established an interagency working group to design how the new process will be implemented.
    - The working group is made up of senior professionals from DHS headquarters, ICE, USCIS, CBP, DOJ headquarters, the Office of Immigration Litigation, and the Executive Office for Immigration Review, all of whom have significant experience in immigration enforcement and other related issues.
    - The working group is operationalizing the criteria set forth in the June 2011 Prosecutorial Discretion Memo and the June 2010 Civil Enforcement Memo across the different stages of the removal process.
    - The decision about how to proceed in an individual matter will be made on a case-by-case basis, considering the totality of the circumstances.  No populations will be provided categorical relief.

- <u>The Scope of the Process</u>
    - The process will not result in permanent lawful status for beneficiaries.
    - The process does not mean that individuals without a criminal conviction will not be removed from the United States.  Many individuals who do not have criminal convictions meet other DHS priorities and will be removed from the United States.

CAR 0549

- o The process does not apply to recent border crossers.
- o The process does not apply to anyone who is not in enforcement proceedings or has not been encountered by an enforcement agent.
- o This process does not create any rights and there is no ability to apply for or appeal decisions.
- o The beneficiaries of an exercise of prosecutorial discretion will not automatically receive work authorization.  Per longstanding law, some who receive an exercise of prosecutorial discretion may be able to apply for work authorization and their requests will be considered separately by USCIS on a case-by-case basis.

- The Timeline for the Process
  - o The working group has held several meetings, but final decisions have not yet been made about how to implement the process.
  - o Once the process is implemented, DHS and DOJ will track outcomes and share information with interested Congressional offices.

**<u>Frequently Asked Questions on the Administration's Announcement Regarding a New Process to</u>**
**<u>Further Focus Immigration Enforcement Resources on High Priority Cases</u>**

**Why did the Administration create this process?**
DHS must ensure its immigration enforcement resources are focused on the removal of those who constitute our highest priorities, specifically individuals who pose a threat to public safety such as criminal aliens and national security threats, as well as repeat immigration law violators and recent border entrants.  In fact, the expenditure of resources on cases that fall outside our enforcement priorities hinders our public safety mission by clogging immigration court dockets and diverting resources away from individuals who constitute our highest priorities.  Although DHS has been successful in focusing its enforcement resources on criminal aliens, repeat violators, border entrants and other priorities, this process further strengthens these efforts.

**How does this process enhance border security?**
As part of the Obama Administration's historic approach along the Southwest Border, Immigration and Customs Enforcement (ICE) has partnered with Customs and Border Protection (CBP) to further enhance efforts to prevent illicit trade and travel across our borders.  This partnership includes the dedication of ICE officers, agents, and detention facilities to the apprehension and detention of recent border crossers.  The historic results achieved along the Southwest Border are attributable, in part, to this unprecedented partnership.  This process will allow DHS to further enhance this partnership by freeing up additional ICE resources that will be dedicated to the Southwest Border.

**How will this process help DHS effectuate its other priorities?**
This process is designed to allow immigration and federal judges to more swiftly adjudicate high priority cases and free up additional resources that DHS and DOJ will dedicate to further enhancing the identification and removal of those individuals who pose a threat to public safety.  In part, the process will accomplish this by identifying and accelerating the removal of high priority aliens from the United States.  The process will also identify very low priority cases and, on a case-by-case basis, set those cases aside to allow for additional resources to be focused on high priority aliens.

**Does the process constitute administrative amnesty?**
No.  This process is simply smart law enforcement policy that will help DHS and DOJ effectuate their priorities and make effective use of our immigration enforcement resources.  This process will not result in a reduction in immigration enforcement.  Rather, it will increase the number of criminal aliens and repeat immigration violators removed from the country and further focus our immigration enforcement efforts on the highest priority cases.

**Does the process represent an abdication of DHS's responsibility to enforce the immigration laws?**
No.  For decades, DHS, and previously INS, has exercised prosecutorial discretion in order to prioritize the use of its immigration enforcement resources.  This process ensures that DHS and DOJ are using their immigration resources in a smart and effective manner.  Over the past two years, DHS has demonstrated that the use of priorities does not limit immigration enforcement, but rather strengthens it.

**Will the process result in permanent lawful status for beneficiaries?**
No.  The exercise of prosecutorial discretion through this process would not provide an individual with permanent lawful status.

CAR 0551

**What is the role of DOJ in the process?**

DOJ's role in the removal process is to adjudicate removal cases through the Executive Office for Immigration Review and to litigate removal cases in the federal courts through the Office of Immigration Litigation.  DOJ will participate in the interagency working group that will identify high priority removal cases that should be accelerated.  DOJ will also participate in the process that will consider very low priority cases for an exercise of prosecutorial discretion on a case-by-case basis at the various stages of enforcement proceedings, including those cases pending before immigration courts and federal courts.

**Will beneficiaries of an exercise of prosecutorial discretion automatically receive work authorization?**

No.  Nothing about this process is automatic and nobody who goes through this process is automatically entitled to work authorization.  Per longstanding federal law, individuals affected by an exercise of prosecutorial discretion will be able to request work authorization, including paying associated fees, and their requests will be separately considered by USCIS on a case-by-case basis.

**How will the process help DHS and DOJ focus increased resources on high priority cases?**

The process will save resources as a result of exercising prosecutorial discretion.  DHS will devote these resources to more expeditiously pursuing the removal of threats to public safety and border security.  In addition, by better prioritizing the dockets of immigration and federal courts, the courts will be able to more swiftly adjudicate cases.

**Is the process consistent with the President and Secretary's statements that no population of individuals will receive categorical administrative relief?**

Yes.  DHS will not provide categorical relief to any population, including those that would have qualified under the DREAM Act.  Instead, each determination will be made on a case-by-case basis.  All decisions will be based on the June 17, 2011 Prosecutorial Discretion memorandum as implemented by the working group.

**How much will be saved through this process?**

Closure of these cases will allow for additional resources to be dedicated to enforcement priorities. Outside estimates suggest that the United States spends over $23,000 to formally remove an alien.  By redirecting these expenditures, more resources can be utilized to identify and remove public safety threats or individuals who repeatedly violate our immigration laws.

**Will removal proceedings or removals be halted while the interagency working group completes its review?**

No.  DHS will continue to enforce immigration laws.  ICE attorneys and agents, however, will be tasked to review each case prior to the expenditure of resources to determine whether it is a priority case as defined in the June 30, 2010 Civil Enforcement Priorities memorandum and the June 17, 2011 Prosecutorial Discretion memorandum.  Removals will continue while the working group undertakes its review.

**Can individuals affirmatively apply for an exercise of discretion through this process?**

No.  This process does not involve the creation of an affirmative application process, although, consistent with longstanding practice, individuals in removal proceedings and their representatives remain free to submit information relevant to their case to the appropriate ICE field offices or attorneys. Any attorney or representative who purports to be able to secure an individual relief through an affirmative application to ICE or DOJ as part of this process is engaged in a scam and should be reported

CAR 0552

to the relevant authorities at DOJ, the Federal Trade Commission (FTC), or DHS.  More information on the recently launched DHS-DOJ-FTC effort to combat immigration services scams is available <u>here</u>.

**Does an individual have a right to appeal a determination made pursuant to this process that his or her case is not appropriate for an exercise of discretion?**
No.  This process does not create any right, substantive or procedural, enforceable in any administrative, civil, or criminal proceeding for individuals whose cases are reviewed as part of the process.  As a result, individuals have no right to appeal a determination made pursuant to this process.

**Does this process apply to cases involving immigration-related criminal offenses that are prosecuted in federal court?**
No.  This process does not apply to decisions about whether to initiate or continue prosecutions of individuals charged with immigration-related criminal offenses in federal court, including individuals charged under 8 U.S.C. § 1325 and § 1326.

**Does this process apply to individuals apprehended at the border?**
No.  As DHS has long made clear, we will continue to enforce a zero tolerance policy for individuals apprehended at the border.  Accordingly, the working group's review will not include recent border crossers.

**When will the working group complete its review?**
An interagency working group consisting of representatives from DHS and DOJ is now working to define the method for the review. The review is expected to begin in the coming months. In the interim, ICE and DOJ agents, officers, and attorneys continue to exercise discretion, as they always have, in accordance with existing enforcement priorities as defined in the June 17, 2011 Prosecutorial Discretion memorandum.

**Does the implementation of the process mean that only individuals with criminal convictions will be removed?**
No.  Many individuals who have violated civil immigration law but lack a criminal conviction are a DHS priority for removal from the United States.  This process is designed to free up additional resources to process and remove high priority cases.  DHS priorities include threats to public safety and national security, repeat violators of immigration law, recent illegal border entrants, and immigration fugitives.

**Should unlawfully present individuals who do not consider themselves high priority cases voluntarily surrender to ICE to avail themselves of this process?**
No.   Any individual who self surrenders due to a belief that they will benefit from an exercise of discretion is very likely to be placed in removal proceedings and runs a serious risk that they will be removed from the United States.  Nothing in this process creates a right or an entitlement to any person regardless of their individual circumstances.

CAR 0553

# Congress of the United States

## Washington, DC 20515

July 5, 2011

The Honorable Janet Napolitano
Secretary of Homeland Security
Department of Homeland Security
Washington, DC 20850

Dear Secretary Napolitano,

We are concerned that the Obama administration continues to circumvent Congress and use executive branch authority to allow illegal immigrants to remain in the United States. Our concerns have risen to a new level based on the recent issuance of two memos by John Morton, Director of U.S. Immigration and Customs Enforcement ("ICE"). As you know, the Constitution grants Congress the authority to determine our immigration policies.[1] Because decisions of such magnitude must only be made by Congress, we urge you in the strongest terms to ensure that the Department of Homeland Security ("DHS") halt any current or planned administrative actions that will result in mass legalization of illegal immigrants and that imply that immigration law should not be fully enforced.

Our concerns were first raised by the dissemination of a draft memo last year to the Director of U.S. Citizenship and Immigration Services ("USCIS"), written by top political and career agency officials.[2] The memo suggested that DHS take steps to legalize literally millions of illegal immigrants. For instance, the memo indicated that DHS could "grant deferred action to an unrestricted number of unlawfully present individuals" and suggested that it grant deferred action to illegal immigrants "who would be eligible for relief under the DREAM Act" or those who have lived in the U.S. since some particular date.

As ICE describes, "deferred action" is "not a specific form of relief but rather a term used to describe the decision-making authority of ICE to allocate resources in the best possible manner to focus on high priority cases, potentially deferring action on [removal] cases with a lower priority",

---

[1] Article I, section 8, clause 4 of the Constitution provides that Congress shall have power to "establish an uniform Rule of Naturalization". The Supreme Court has long found that this provision of the Constitution grants Congress plenary power over immigration policy. As the Court found in Galvan v. Press, 347 U.S. 522, 531 (1954), "that the formulation of policies [pertaining to the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government." And, as the Court found in Kleindienst v. Mandel, 408 U.S. 753, 766 (1972) (quoting Boutilier v. INS, 387 U.S. 118, 123 (1967)), "[t]he Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.'"

[2] See Administrative Alternatives to Comprehensive Immigration Reform, memo to Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Services, from Denise Vanison, Policy and Strategy, Roxana Bacon, Office of the Chief Counsel, Debra Rogers, Field Operations, and Donald Neufeld, Service Center Operations (undated)(A copy of the memo is contained in the files of the Judiciary Committee.).

1

PRINTED ON RECYCLED PAPER

CAR 0554

"such as [by] not placing an individual in removal proceedings."[3]  However, DHS can grant work authorization to illegal and deportable immigrants who have received deferred action -- making it in essence a grant of administrative legalization.[4] It is not based on any specific statutory authority.[5]

The memo also suggested that parole be used to legalize illegal immigrants "who entered the U.S. as minors without inspection" or who have "lived for many years in the U.S."  As you know, Congress in 1996 limited the Administration's parole authority to use "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."[6]  The House Report stated that this limitation was "intended to end the use of parole authority to create an ad hoc immigration policy or to supplement current immigration categories without Congressional approval."[7]

USCIS claimed that it had rejected many of the suggestions in the memo.  But, more recently, a seemingly-authentic draft DHS memo was disseminated that proposed the grant of deferred action to "the entire potential legalization population" – and if that was not possible, then to DREAM Act-eligible aliens or to illegal immigrants who claim to have worked in agriculture.[8]  In addition, the memo proposed to use the parole power to allow the sudden influx of over three million immigrants on extended family green card waiting lists – which would dramatically increase chain migration at a time when millions of Americans are out of work.

These memos were drafted in the context of great political pressure on the Obama administration to legalize countless illegal immigrants through administrative action.[9]

More recently, on June 17, 2011, ICE Director John Morton issued two memos expounding on the scope of DHS's prosecutorial discretion.[10]  These memos were not drafts, but explicit expressions of DHS policy.  These memos represent a grossly irresponsible expansion of the use of prosecutorial discretion for the apparent purpose of administrative amnesty.  Ultimately, these memos could potentially make millions of deportable illegal and criminal immigrants eligible for administrative amnesty.  They also violate the will of Congress as expressed through law and undermine Congress' constitutional authority.

---

[3] ICE, Toolkit for Prosecutors at 4 (2011) and ICE, Continued Presence: Temporary Immigration Status for Victims of Human Trafficking (2010).

[4] See 8 C.F.R. sec. 274a.12(c)(14).

[5] See Toolkit for Prosecutors at 4.

[6] See sec. 602 of division C of title IV of Pub. L. No. 104-208 (sec. 212(d)(5)(A) of the Immigration and Nationality Act).

[7] See H.Rept. No. 104-469, part 1, at 175 (1996).

[8] A copy of the memo is contained in the files of the Judiciary Committee.

[9] See letter from Senator Harry Reid and 21 other senators to President Obama (April 13, 2011)(The letter asked that DHS grant deferred action to all illegal immigrants who would qualify for amnesty under the DREAM Act.)(A copy of the letter is contained in the files of the Judiciary Committee.).

[10] See Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs, memo from John Morton, Director, ICE, to all field office directors, all special agents in charge, and all chief counsel (June 17, 2011); Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens, memo from John Morton, Director, ICE, to all field office directors, all special agents in charge, and all chief counsels (June 17, 2011).

2

CAR 0555

Director Morton's memo entitled *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* gives instructions to ICE personnel on how to exercise prosecutorial discretion such as by granting deferred action, "deciding whom to stop, question, or arrest", deciding "whom to detain", and "dismissing" a removal proceeding.[11] The memo states that "[w]hen weighing whether an exercise of prosecutorial discretion may be warranted for a given alien, ICE officers, agents and attorneys should consider all relevant factors",[12] such as:

- ICE's "immigration enforcement priorities" (ICE has expressed little interest in deporting illegal immigrants who have not yet been convicted of "serious" crimes.[13]);

- the person's "pursuit of education in the United States" (The Migration Policy Institute estimates that more than two million illegal immigrants would be eligible for the DREAM Act amnesty.[14]);

- "[w]hether the person has a U.S. citizen or permanent resident spouse, child or parent. . . . "[w]hether the person or the person's spouse is pregnant . . . ." (The Pew Hispanic Center estimates that illegal immigrants have four million U.S.-born and thus U.S. citizen children.[15]);

- the person's length of presence in the U.S. (The Pew Hispanic Center has estimated that millions of illegal immigrants have been in the U.S. since the 1990s.[16] Indeed, it would be very easy for illegal immigrants to provide fraudulent evidence that they have been present in the U.S. for any particular length of time – such as with counterfeit rent receipts, etc. This was a hard lesson we learned from the 1986 amnesty.);

- long-time lawful permanent residents (In the interest of public safety, <u>all</u> aliens who have committed aggravated felonies are subject to deportation.[17]); and

- individuals with serious health conditions (Part of the huge fiscal drain caused by illegal immigration is the cost of uncompensated health care for illegal immigrant families. About 62% of illegal immigrants do not have health insurance – over seven million people.[18] However, federal law requires that any hospital with an emergency room must provide care to all for emergency medical conditions.[19] Consequently, the hospitals in the 24 southwest border counties in Texas, New Mexico, Arizona and California alone

---

[11] <u>Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens</u> at 2-3.
[12] <u>Id.</u> at 4.
[13] <u>See</u> <u>Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens</u>, memo from John Morton, Director, ICE, to all ICE employees (March 2, 2011).
[14] <u>See</u> Jeanne Batalova and Margie McHugh, <u>DREAM vs. Reality: An Analysis of Potential DREAM Act Beneficiaries</u>, 2010 Migration Policy Institute at 1.
[15] <u>See</u> Jeffrey Passel and D'Vera Cohn, <u>A Portrait of Unauthorized Immigrants in the United States</u>, 2009 Pew Hispanic Center at ii (figure 3).
[16] <u>See</u> Jeffrey Passel, <u>Unauthorized Migrants: Numbers and Characteristics</u>, 2005 Pew Hispanic Center at 5.
[17] <u>See</u> section 237(2)(A)(iii) of the Immigration and Nationality Act.
[18] Steven Camarota, <u>Illegal Immigrants and HR 3200: Estimate of Potential Costs to Taxpayers</u>, 2009 Center for Immigration Studies at 3.
[19] <u>See</u> 42 U.S.C. sec. 1395dd.

CAR 0556

incur a $190 million per year cost for uncompensated emergency medical treatment to illegal immigrants.[20]  The president of the California Hospital Association believes that "care for illegal immigrants could tip some hospitals into bankruptcy."[21]).[22]

The other Morton memo, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs*, actually urges the exercise of prosecutorial discretion in the case of illegal immigrants who are plaintiffs in civil rights lawsuits or who have disputes "with an employer, landlord, or contractor."[23]  We can only conclude from this statement that DHS believes that the American court system is sufficiently under-burdened that we should encourage the filing of additional lawsuits by illegal immigrants against American businessmen and women.

Prosecutorial discretion has very justifiable uses when exercised responsibly in "true hardship cases."[24]  Prosecutorial discretion has very justifiable uses when exercised responsibly in "true hardship cases" or when furthering national security and law enforcement interests.  However, these memos make clear that DHS plans not to use, but rather abuse these powers – to grant mass legalization without any Congressional authorization, to saddle American communities with the costs of providing medical care to illegal immigrants and with the risks of having criminal immigrants living in their midst.

Congress has repeatedly rejected mass amnesty legislation in recent years.  Most recently, the Senate defeated the DREAM Act amnesty in last year's lame duck session.  DHS's plans to open the door to mass administrative legalization represent a rejection of Congress's constitutional prerogatives and an utter disdain towards the wishes of the American people as expressed by their elected representatives.  We urge you to abandon any plans to apply prosecutorial discretion on anything other than a case-by-case basis and withdraw these profoundly irresponsible memos.

Furthermore, we are concerned that DHS continues to use the excuse of "limited resources" as a justification for its flagrant disregard of the law.  The Congress has consistently provided every dollar requested since ICE's creation for immigration enforcement efforts, particularly Enforcement and Removal Operations, in spite of poor justifications for detention bed costs.  In fact, Congress provided increases above the amounts requested in fiscal year 2011 to make up for a shortfall in the DHS budget submittal, and the House-passed fiscal year 2012 bill supports no fewer than 34,000 detention beds.  Further, the bill funds ICE at a level above the fiscal year 2012 request and at the highest level ever, including 600 additional beds – even in a time of fiscal restraint.  We request that ICE utilize the extensive resources available to rigorously enforce the immigration laws of the United States and that ICE's future budget

---

[20] See U.S./Mexico Border Counties Coalition, Medical Emergency: Costs of Uncompensated Care in Southwest Border Counties at 26, 31 (2002)(costs are for 2000).
[21] Julia Preston, Texas Hospitals Reflect the Debate on Immigration, N. Y. Times, July 18, 2006.
[22] See Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens at 4-5.
[23] Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs at 2.
[24] See letter from Lamar Smith and 27 other U.S. Representatives to Janet Reno, Attorney General, U.S. Department of Justice, and Doris Meissner, Commissioner, Immigration and Naturalization Service, at 2 (November 4, 1999)(A copy of the letter is contained in the files of the Judiciary Committee.).

4

CAR 0557

requests include the funds necessary to effectively support the men and women of ICE in executing their critical mission.

Sincerely,


Lamar Smith
Chairman
Committee on the Judiciary

Robert B. Aderholt
Chairman
Subcommittee on Homeland Security
Committee on Appropriations


CC: John Conyers, Jr., Ranking Member, Committee on the Judiciary
     David Price, Ranking Member, Subcommittee on Homeland Security, Committee on
     Appropriations

5

CAR 0558

*Assistant Secretary for Legislative Affairs*

**U.S. Department of Homeland Security**
Washington, DC 20528

**JUL 2 7 2011**

 **Homeland Security**

The Honorable Robert B. Aderholt
Chairman
Subcommittee on Homeland Security
Committee on Appropriations
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

I write in response to your July 5, 2011 letter regarding the enforcement of immigration laws by the Department of Homeland Security.

U.S. Immigration and Customs Enforcement (ICE) is engaged in serious and sustained immigration enforcement effort that prioritizes the use of its resources in a manner that best enhances public safety, promotes border security and protects the integrity of the immigration system. In order to implement these priorities, and to ensure consistent enforcement across the country, ICE must provide clear guidance to its agents, officers and attorneys in the field. The recent guidance issued by Director John Morton provides this guidance and re-emphasizes agency priorities.

This guidance does not constitute an abdication of our responsibilities to enforce immigration laws enacted by Congress. Rather, it enhances the manner in which we execute those responsibilities by focusing our resources in a way that also furthers our overarching goals of enhancing public safety and promoting border security.

Our FY 2010 statistics are illustrative. In March 2010, Director Morton issued a memo that clarified the same agency priorities that are discussed in the prosecutorial discretion memo. In the year that followed, ICE removed more aliens than it had in FY 2008. Moreover, the makeup of these removals changed dramatically. In FY 2010, ICE removed 79,000 more aliens who had been convicted of a crime then it had in FY 2008 and, for the first time ever, 50 percent of the aliens removed by ICE in a fiscal year were convicted criminals.

These numbers clearly demonstrate that the implementation of priorities does not in any way limit enforcement. It only makes it smarter and more effective. As such, ICE will continue to make every effort to prioritize the enhancement of public safety and border security through the identification, apprehension, and removal of criminal aliens, repeat immigration violators, and recent border crossers.

CAR 0559

The Honorable Robert B. Aderholt
Page 2

     Should you wish to discuss the Administration's immigration enforcement record further, please do not hesitate to contact me at (202)████████ Chairman Robert Aderholt, who co-signed your letter, will receive a separate, identical response.

     Respectfully,

Nelson Peacock
Assistant Secretary
Office of Legislative Affairs

cc:    The Honorable John Conyers, Jr.
      Ranking Member
      Committee on the Judiciary

      The Honorable David Price
      Ranking Member, Subcommittee on Homeland Security
      Committee on Appropriations

# Congress of the United States
## Washington, DC 20515

March 1, 2012

The Honorable Eric H. Holder, Jr.
Attorney General
U.S. Department of Justice
Washington, DC 20530

The Honorable Janet Napolitano
Secretary
Department of Homeland Security
Washington, DC 20528

Dear Attorney General Holder and Secretary Napolitano:

We write to express our concerns about a recent order issued by the United States Court of Appeals for the Ninth Circuit and the government's forthcoming response, which is due by March 19, 2012. The Ninth Circuit's decision to put several deportation cases on hold is an overreach of judicial authority and shows the inherent danger in this administration's backdoor amnesty policies.

On February 6, 2012, the Ninth Circuit put five deportation cases on hold and asked the government how the illegal aliens in the cases[1] fit into the administration's immigration enforcement priorities announced via agency memorandum. The order in each case says:

> In light of Immigration and Customs Enforcement (ICE) Director
> John Morton's June 17, 2011 memo regarding prosecutorial
> discretion, and the November 17, 2011 follow-up memo providing
> guidance to ICE Attorneys, the government shall advise the court by
> March 19, 2012, whether the government intends to exercise
> prosecutorial discretion in this case and, if so, the effect, if any, of the
> exercise of such discretion on any action to be taken by this court
> with regard to Petitioner's pending petition for rehearing.

Instead of deciding these cases under the law of the land, the Ninth Circuit has asked the Obama administration whether it intends to grant the illegal immigrants amnesty under the prosecutorial discretion initiative announced last year.

The orders appear to be the court's attempt to suspend its everyday review of immigration cases due to the administration's plans to close tens of thousands of cases for the 300,000 aliens who are in removal proceedings. The Ninth Circuit has acted beyond the bounds of its judicial role and is inserting itself into an area – prosecutorial discretion - reserved solely to the executive branch. Using prosecutorial discretion to justify the stay of deportation is an outrageous overreach by the court and shows the danger inherent in the administration's policy.

---

[1] *Rodriguez v. Holder*, Nos. 06-74444, 06-75524, 2012 WL 360759, at *1 (9th Cir. Feb. 6, 2012); *San Agustin v. Holder*, No. 09-72910, 2012 WL 360761, at *1 (9th Cir. Feb. 6, 2012); *Jex v. Holder*, No. 09-74038, 2012 WL 360764, at *1 (9th Cir. Feb. 6, 2012); *Pocasangre v. Holder*, No. 10-70629, 2012 WL 360774, at *1 (9th Cir. Feb. 6, 2012); *Mata-Fasardo v. Holder*, No. 10-71869, 2012 WL 360776, at *1 (9th Cir. Feb. 6, 2012).

1

PRINTED ON RECYCLED PAPER

CAR 0561

From the onset, we note that the administration's prosecutorial discretion policy is circumvents our immigration laws. Alarmingly, a significant percentage of the 300,000 aliens currently in removal proceedings can now seek to have removal suspended despite being present in the United States in violation of the law, removable for violating the terms of their visas, or committing removable acts. In this manner, the Obama administration again chooses to ignore immigration laws under the guise of prosecutorial discretion. Despite the administration's claim that there is nothing new with respect to this policy, it represents a drastic and unprecedented shift.

No previous administration, irrespective of political party, has chosen, en masse, to place restrictions on the type of removable aliens that may be processed (or, in this case, not be processed) for removal before the immigration courts. Previous administrations have processed for removal those removable aliens who came to the attention of law enforcement. In other administrations, prosecutorial discretion was properly implemented on a case-by-case basis for a small number of aliens under especially compelling circumstances, but it was never used to circumvent the Immigration and Nationality Act.

Line attorneys from the DOJ and DHS spend a considerable amount of time and resources working on these cases. Simultaneously, immigration judges and federal judges, assisted by court staff, spend time and resources adjudicating these cases. Millions of taxpayer dollars, if not more, are spent to pay the salaries of those attorneys, judges, and court staff. It makes no sense to squander these efforts by abandoning cases that have already generated removal orders.

In all immigration cases pending before the immigration courts, BIA and federal courts of appeals, the government should do what it has always done irrespective of administration: advocate for the entry of or affirmance of deportation orders or the equivalent. Upon receiving a removal order, the government should promptly carry out the deportation. The personal dictates of the administration should not trump the rule of law.

In responding to the Ninth Circuit's question, the administration will be required to reveal whether it intends to manipulate our legal system and waste taxpayer dollars, as part of it efforts to grant amnesty to illegal immigrants.

Accordingly, your response to the Ninth Circuit's order must clearly and unequivocally indicate that the government will enforce the immigration laws, including promptly deporting all removable aliens who lose their cases in the federal courts of appeals.

If the administration responds to the Ninth Circuit orders by indicating that the illegal and other removable aliens will be granted relief via amnesty, then it must explain to the American people what that answer means for the integrity of our legal system and why their tax dollars are being spent on prosecutions that the Obama administration has no intention of enforcing with deportation.

We are seriously concerned that the Ninth Circuit's order ignores the rule of law and confounds constitutional principles, and we would like to know who how you plan to respond to the Court's actions. Additionally, we ask that you please respond to the following requests for information:

2

CAR 0562

1.  For each of the cases that is subject to the order(s) issued by the Ninth Circuit on February 6, 2012, identify the following: (a) the date the case was commenced before an immigration judge or trial judge, (b) the date the appeal to the Ninth Circuit was filed, (c) the date the government's merits brief in the Ninth Circuit was filed, (d) the status of the case in the Ninth Circuit, (e) whether the government has argued that the Ninth Circuit should affirm a removal order, (f) the number of hours worked on the case by government attorneys before the case reached the Ninth Circuit, (g) the number of hours worked on the case by government attorneys since the case was filed in the Ninth Circuit, (h) an estimate of the number of hours worked on the case by immigration judges, BIA judges and federal judges and (i) the amount of tax payer dollars spent on the case to date, including the portion of the salaries of the government attorneys, judges and court staff who have worked on the case.

2.  Does the government seek to have immigration judges enter removal orders even though those orders may subsequently be disregarded pursuant to prosecutorial discretion? If so, how does the administration justify wasting millions in taxpayer dollars and wasting the time of the government attorneys working to achieve removal orders and the immigration judges presiding over the cases?

3.  Does the government seek to have the BIA affirm removal orders even though the affirmances may subsequently be disregarded pursuant to prosecutorial discretion? If so, how does the administration justify wasting millions in taxpayer dollars and wasting the time of the government attorneys working to achieve removal orders and the BIA judges presiding over the cases?

4.  Does the government seek to have federal courts of appeals affirm removal orders, even though those orders may subsequently be disregard pursuant to prosecutorial discretion? If so, how does the administration justify wasting millions in taxpayer dollars and wasting the time of the government attorneys working to achieve removal orders and the federal judges presiding over the cases?

The answer to these questions should be readily available and should have been resolved before the implementation of the prosecutorial discretion initiative last year. Accordingly, we ask that you provide written answers to us by March 12, 2012.

Sincerely,

Charles E. Grassley
Ranking Member
Senate Judiciary Committee

Lamar Smith
Chairman
House Judiciary Committee

3

CAR 0563

# United States Senate

WASHINGTON, DC 20510

September 26, 2011

President Barack Obama
The White House
Washington, D.C. 20500

Dear Mr. President:

We write to express serious concern about your immigration policies and ask that you require the Department of Homeland Security to overturn recent directives regarding the increased use of prosecutorial discretion. We also request that the Administration halt any initiative, whether through regulation or otherwise, that circumvents Congress or aims to ensure that illegal immigrants are afforded every possibility to remain in this country.

After the release of the June 17th Immigration and Customs Enforcement (ICE) memorandum, which called for the increased use of prosecutorial discretion, several members of the Senate wrote to Assistant Secretary John Morton. While prosecutorial discretion is justifiable in certain cases, this initiative may result in an impermissible intrusion on Congress's plenary authority over immigration law. Accordingly, we asked Assistant Secretary Morton to rescind the memorandum outlining ICE's prosecutorial discretion policies. That request has been ignored.

We are also concerned that the initiative announced by Secretary Napolitano on August 18th will result in the administrative closure of an untold number of cases currently pending before our immigration and federal courts. In combination with the June 17th ICE memo, these new policies send the message that your Administration is turning a blind eye to those who have broken our immigration laws. We are also concerned that these policies appear to be a direct attempt to categorically legalize those who are unlawfully in the country and to allow undocumented individuals to remain in violation of the law without fear of apprehension or deportation. The security of our country depends on our ability to prevent unlawful entry and to respond when such criminals have overstayed their visa or avoided inspection. These policies have the potential to undermine the rule of law and threaten our nation's security.

While we appreciate Secretary Napolitano's assurances that these initiatives will not provide categorical relief for any group, we remain concerned about statements being made by certain advocates and members of Congress. For example, in a September 20th speech on the floor of the U.S. Senate, Senator Dick Durbin stated that these initiatives "pave the way" for DREAM Act students. He further stated that "[the Administration] said recently that those eligible for the DREAM Act, good moral character, graduates of high school and pursuing college degrees are not going to be their targets." The United States Senate and the American people have rejected the DREAM Act and the Executive Branch is not entitled to bypass that determination by administrative fiat.

CAR 0564

Further, in a recent speech before the Congressional Hispanic Caucus Institute, Congressman Luis Gutierrez stated: "[President Obama] said, 'But I can't bypass Congress,' and people in the audience said, 'Yes you can,' and you want to know something? They were right – he could and he did." Such statements will only create a rush to the border and encourage the undocumented population to come forward in hopes of receiving a benefit.

There is still time to correct this path. We request that you promptly rescind these initiatives, dismantle the working group designed to identify "low priority" cases before our immigration and federal courts, and direct the agencies within the Department of Homeland Security to abide by our Nation's immigration laws. We also ask that you make Secretary Napolitano available to members of the Senate for questioning about the Department's immigration enforcement policies, including granting parole, deferred action, and prosecutorial discretion to keep unlawful immigrants in this country.

Finally, we reiterate our strong commitment to ensuring that the Administration has all of the resources it needs to carry out and enforce our immigration laws. It is unjustifiable for the Administration to sidestep Congress to implement policies that are contrary to the law and the wishes of the American people. We look forward to your timely response.

Sincerely,

Charles E. Grassley
United States Senator

David Vitter
United States Senator

Jeff Sessions
United States Senator

Orrin G. Hatch
United States Senator

Jim DeMint
United States Senator

Tom Coburn
United States Senator

James E. Risch
United States Senator

Mike Crapo
United States Senator

John Boozman
United States Senator

Mike Lee
United States Senator

CAR 0565

James M. Inhofe
United States Senator

Saxby Chambliss
United States Senator

Johnny Isakson
United States Senator

Michael B. Enzi
United States Senator

Rand Paul
United States Senator

Roy Blunt
United States Senator

Mike Johanns
United States Senator

John Barrasso
United States Senator

Ron Johnson
United States Senator

cc:   The Honorable Janet Napolitano
      Secretary, Department of Homeland Security

      The Honorable John Morton
      Director, Immigration and Customs Enforcement

CAR 0566

*Office of Legislative Affairs*
**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

OCT 1 7 2011

The Honorable Charles E. Grassley
United States Senate
Washington, DC 20510

Dear Senator Grassley:

I am writing in response to your letter to President Obama regarding the Department's immigration enforcement policies. The White House has asked the Department of Homeland Security to respond.

The Department, including U.S. Immigration and Customs Enforcement (ICE), is more focused than ever on serious enforcement of the Nation's immigration laws. Our recent announcement regarding the appropriate use of prosecutorial discretion is part of our common sense approach to ensuring that our immigration enforcement efforts prioritize individuals who pose a threat to public safety such as criminal aliens and national security threats, as well as repeat immigration law violators, recent border entrants, and immigration fugitives.

As you know, the Department has undertaken a historic effort to secure the border and enforce immigration laws in a manner that is smart, effective, and maximizes the impact of the resources that Congress has made available. We established as a top priority the identification and removal of public safety and national security threats. To this end, we expanded the use and frequency of investigations and programs, like Secure Communities, that track down convicted criminals and gang members on our streets and in our jails and prisons. We will continue those operations that focus on criminal aliens and will implement Secure Communities nationwide by the end of 2013.

As part of our commitment to border security, we have also prioritized the removal of recent border crossers. In part because of the resource savings generated by the implementation of our enforcement priorities, ICE has been able to increase its direct support of the U.S. Border Patrol along the southwest border, dedicating more agents and detention space to border operations than ever before. In addition, ICE has continued its focus on removing those that repeatedly violate our immigration laws and immigration fugitives.

Our record is clear. In 2009 and 2010, ICE removed more aliens than ever before in the agency's history. More importantly, the composition of those removals changed significantly, aligning our removals with our priorities. In fiscal year 2010, ICE removed 195,772 criminal aliens, over 81,000 more than were removed in FY2008. We have had similar success with regard to our other priorities, as more than two-thirds of our other removals were of recent

CAR 0567

The Honorable Charles E. Grassley
Page 2

border entrants or repeat immigration law violators.  These enforcement efforts have made communities across the United States safer and will be enhanced by the recently announced process for reviewing the immigration case backlog that will be conducted by DHS and the Department of Justice.

This strategy is complemented by the success of ICE's worksite enforcement efforts.  The Department of Homeland Security has implemented a smart and effective approach to worksite enforcement.  By focusing on employers who knowingly and repeatedly hire illegal labor, we are targeting the root cause of illegal immigration, utilizing robust Form I-9 inspections, civil fines, and debarment, and enhancing compliance tools like E-Verify.  Since January 2009, ICE has audited more than 5,876 employers suspected of hiring illegal labor, debarred 428 companies and individuals, and imposed more than $69.3 million in financial sanctions—more than the total amount of audits and debarments during the entire previous administration.  In short, our approach to worksite enforcement has been working, and has been successful at bringing employers into compliance with the law.

Thank you again for your letter.  The enclosed white paper addresses your specific requests.  I have also enclosed responses to frequently asked questions about the new interagency process.  The co-signatories of your letter will each receive a separate, identical response.  Should you wish to discuss the Administration's immigration enforcement record further, please do not hesitate to contact me at (202) ███████.

Respectfully,

Nelson Peacock
Assistant Secretary
Office of Legislative Affairs


Enclosures

CAR 0568

## Frequently Asked Questions on the Administration's Announcement Regarding a New Process to Further Focus Immigration Enforcement Resources on High Priority Cases

**Why did the Administration create this process?**
DHS must ensure its immigration enforcement resources are focused on the removal of those who constitute our highest priorities, specifically individuals who pose a threat to public safety such as criminal aliens and national security threats, as well as repeat immigration law violators and recent border entrants.  In fact, the expenditure of resources on cases that fall outside our enforcement priorities hinders our public safety mission by clogging immigration court dockets and diverting resources away from individuals who constitute our highest priorities.  Although DHS has been successful in focusing its enforcement resources on criminal aliens, repeat violators, border entrants and other priorities, this process further strengthens these efforts.

**How does this process enhance border security?**
As part of the Obama Administration's historic approach along the Southwest Border, Immigration and Customs Enforcement (ICE) has partnered with Customs and Border Protection (CBP) to further enhance efforts to prevent illicit trade and travel across our borders.  This partnership includes the dedication of ICE officers, agents, and detention facilities to the apprehension and detention of recent border crossers.  The historic results achieved along the Southwest Border are attributable, in part, to this unprecedented partnership.  This process will allow DHS to further enhance this partnership by freeing up additional ICE resources that will be dedicated to the Southwest Border.

**How will this process help DHS effectuate its other priorities?**
This process is designed to allow immigration and federal judges to more swiftly adjudicate high priority cases and free up additional resources that DHS and DOJ will dedicate to further enhancing the identification and removal of those individuals who pose a threat to public safety.  In part, the process will accomplish this by identifying and accelerating the removal of high priority aliens from the United States.  The process will also identify very low priority cases and, on a case-by-case basis, set those cases aside to allow for additional resources to be focused on high priority aliens.

**Does the process constitute administrative amnesty?**
No.  This process is simply smart law enforcement policy that will help DHS and DOJ effectuate their priorities and make effective use of our immigration enforcement resources.  This process will not result in a reduction in immigration enforcement.  Rather, it will increase the number of criminal aliens and repeat immigration violators removed from the country and further focus our immigration enforcement efforts on the highest priority cases.

**Does the process represent an abdication of DHS's responsibility to enforce the immigration laws?**
No.  For decades, DHS, and previously INS, has exercised prosecutorial discretion in order to prioritize the use of its immigration enforcement resources.  This process ensures that DHS and DOJ are using their immigration resources in a smart and effective manner.  Over the past two years, DHS has demonstrated that the use of priorities does not limit immigration enforcement, but rather strengthens it.

**Will the process result in permanent lawful status for beneficiaries?**
No.  The exercise of prosecutorial discretion through this process would not provide an individual with permanent lawful status.

CAR 0569

**What is the role of DOJ in the process?**
DOJ's role in the removal process is to adjudicate removal cases through the Executive Office for Immigration Review and to litigate removal cases in the federal courts through the Office of Immigration Litigation.  DOJ will participate in the interagency working group that will identify high priority removal cases that should be accelerated.  DOJ will also participate in the process that will consider very low priority cases for an exercise of prosecutorial discretion on a case-by-case basis at the various stages of enforcement proceedings, including those cases pending before immigration courts and federal courts.

**Will beneficiaries of an exercise of prosecutorial discretion automatically receive work authorization?**
No.  Nothing about this process is automatic and nobody who goes through this process is automatically entitled to work authorization.  Per longstanding federal law, individuals affected by an exercise of prosecutorial discretion will be able to request work authorization, including paying associated fees, and their requests will be separately considered by USCIS on a case-by-case basis.

**How will the process help DHS and DOJ focus increased resources on high priority cases?**
The process will save resources as a result of exercising prosecutorial discretion.  DHS will devote these resources to more expeditiously pursuing the removal of threats to public safety and border security.  In addition, by better prioritizing the dockets of immigration and federal courts, the courts will be able to more swiftly adjudicate cases.

**Is the process consistent with the President and Secretary's statements that no population of individuals will receive categorical administrative relief?**
Yes.  DHS will not provide categorical relief to any population, including those that would have qualified under the DREAM Act.  Instead, each determination will be made on a case-by-case basis.  All decisions will be based on the June 17, 2011 Prosecutorial Discretion memorandum as implemented by the working group.

**How much will be saved through this process?**
Closure of these cases will allow for additional resources to be dedicated to enforcement priorities. Outside estimates suggest that the United States spends over $23,000 to formally remove an alien.  By redirecting these expenditures, more resources can be utilized to identify and remove public safety threats or individuals who repeatedly violate our immigration laws.

**Will removal proceedings or removals be halted while the interagency working group completes its review?**
No.  DHS will continue to enforce immigration laws.  ICE attorneys and agents, however, will be tasked to review each case prior to the expenditure of resources to determine whether it is a priority case as defined in the June 30, 2010 Civil Enforcement Priorities memorandum and the June 17, 2011 Prosecutorial Discretion memorandum.  Removals will continue while the working group undertakes its review.

**Can individuals affirmatively apply for an exercise of discretion through this process?**
No.  This process does not involve the creation of an affirmative application process, although, consistent with longstanding practice, individuals in removal proceedings and their representatives remain free to submit information relevant to their case to the appropriate ICE field offices or attorneys. Any attorney or representative who purports to be able to secure an individual relief through an affirmative application to ICE or DOJ as part of this process is engaged in a scam and should be reported

CAR 0570

to the relevant authorities at DOJ, the Federal Trade Commission (FTC), or DHS.  More information on the recently launched DHS-DOJ-FTC effort to combat immigration services scams is available <u>here</u>.

**Does an individual have a right to appeal a determination made pursuant to this process that his or her case is not appropriate for an exercise of discretion?**
No.  This process does not create any right, substantive or procedural, enforceable in any administrative, civil, or criminal proceeding for individuals whose cases are reviewed as part of the process.  As a result, individuals have no right to appeal a determination made pursuant to this process.

**Does this process apply to cases involving immigration-related criminal offenses that are prosecuted in federal court?**
No.  This process does not apply to decisions about whether to initiate or continue prosecutions of individuals charged with immigration-related criminal offenses in federal court, including individuals charged under 8 U.S.C. § 1325 and § 1326.

**Does this process apply to individuals apprehended at the border?**
No.  As DHS has long made clear, we will continue to enforce a zero tolerance policy for individuals apprehended at the border.  Accordingly, the working group's review will not include recent border crossers.

**When will the working group complete its review?**
An interagency working group consisting of representatives from DHS and DOJ is now working to define the method for the review. The review is expected to begin in the coming months. In the interim, ICE and DOJ agents, officers, and attorneys continue to exercise discretion, as they always have, in accordance with existing enforcement priorities as defined in the June 17, 2011 Prosecutorial Discretion memorandum.

**Does the implementation of the process mean that only individuals with criminal convictions will be removed?**
No.  Many individuals who have violated civil immigration law but lack a criminal conviction are a DHS priority for removal from the United States.  This process is designed to free up additional resources to process and remove high priority cases.  DHS priorities include threats to public safety and national security, repeat violators of immigration law, recent illegal border entrants, and immigration fugitives.

**Should unlawfully present individuals who do not consider themselves high priority cases voluntarily surrender to ICE to avail themselves of this process?**
No.   Any individual who self surrenders due to a belief that they will benefit from an exercise of discretion is very likely to be placed in removal proceedings and runs a serious risk that they will be removed from the United States.  Nothing in this process creates a right or an entitlement to any person regardless of their individual circumstances.

GRASSLEY:

Unrelated to the DREAM Act, but because I promised -- I'm not going to ask you a question for answer orally, but I'd like to have an answer in writing. And this is because I promised the Brian Terry family that every time I got an opportunity to ask somebody that had anything to do with Fast and Furious or immigration, that I would ask this question.

Last week, Chairman Issa and I sent a letter regarding your department's involvement in that. It's a follow-up letter that I sent in March that Customs and Border Protection refused to answer. I'd like to have you give a complete and thorough, timely response to that letter.

In addition to that, what's in that letter, I'd like to ask you to comment, not now but in writing -- U.S. Attorney Arizona Dennis Burke is your former chief of staff. Have you had any communications with him about Operation Fast and Furious or about Agent Terry's death at the time? And if so, I'd like to have you describe that communication.

Now, I've got an opportunity for one more question.

The legislation broadly allows the secretary to set forth the manner in which those seeking benefits under the DREAM Act to apply. This concerns me. One requirement is the -- the undocumented person must initially enter the U.S. before the age of 16.

As you know, many countries do not keep accurate records of birth and fraudulent documents are rampant. What documents would you require to determine age? And how will you determine when the undocumented person actually entered the United States? And what steps will you take to ensure this legislation does not exacerbate black-market or fraudulent documents?

NAPOLITANO:

We will obviously take that up administratively, but one of the things we have done in the last two years is greatly increase our anti-fraud efforts in the entire immigration benefit process.

So, for example, we now have anti-fraud officers in all of the 184 field offices that we have. We have special anti-fraud units that are in some of the higher-use offices. We have a lot better way of checking records and verifying records in part because of the greater use of biometrics, biometric passports and the like.

So we have a number of different ways to address that particular issue to make sure that the DREAM Act is not used as a vehicle for fraud.

GRASSLEY:

Thank you, Mr. Chairman.

Thank you, Madam Secretary.

CAR 0573

**From:** McNamara, Phil - ███████████████████████████

**Sent:** Thursday, June 14, 2012 1:58 PM

**To:** Grossman, Seth - ████████████████████

**Subject:** WH - Dream Act

---

**FROM POTUS – EL PASO SPEECH, MAY 2011**

And we should stop punishing innocent young people for the actions of their parents.  (Applause.)  We should stop denying them the chance to earn an education or serve in the military.  And that's why we need to pass the DREAM Act.  (Applause.)  Now, we passed the DREAM Act through the House last year when Democrats were in control.  But even though it received a majority of votes in the Senate, it was blocked when several Republicans who had previously supported the DREAM Act voted no.

That was a tremendous disappointment to get so close and then see politics get in the way.  And as I gave that commencement at Miami Dade, it broke my heart knowing that a number of those promising, bright students -- young people who worked so hard and who speak about what's best in America -- are at risk of facing the agony of deportation.  These are kids who grew up in this country.  They love this country.  They know no other place to call home.  The idea that we'd punish them is cruel.  It makes no sense.  We're a better nation than that.  (Applause.)

So we're going to keep fighting for the DREAM Act. We're going to keep up the fight for reform.  (Applause.)  And that's where you come in.  I'm going to do my part to lead a constructive and civil debate on these issues.  And we've already had a series of meetings about this at the White House in recent weeks.  We've got leaders here and around the country helping to move the debate forward.

**LUIS MIRANDA – WH BLOG POSTING – DECEMBER 2010**

THE DREAM ACT: GOOD FOR OUR ECONOMY, GOOD FOR OUR SECURITY, GOOD FOR OUR NATION

The DREAM Act is common-sense legislation drafted by both Republicans and Democrats that would give students who grew up in the United States a chance to contribute to our country's well-being by serving in the U.S. armed forces or pursuing a higher education. It's good for our economy, our security, and our nation. That's why the DREAM Act has long enjoyed bipartisan support. It's limited, targeted legislation that will allow only the best and brightest young people to earn their legal status after a rigorous and lengthy process, and applies to those brought to the United States as minors through no fault of their own by their parents, and who know no other home.

Our country will reap enormous benefits when the DREAM Act is finally enacted:

- The DREAM Act will contribute to our military's recruitment efforts and readiness.Secretary of Defense Gates has written to DREAM Act sponsors citing the rich precedent of non-citizens serving in the U.S. military and stating that "the DREAM Act represents an opportunity to expand [the recruiting] pool, to the advantage of military recruiting and readiness."  The DREAM Act is also a part of the Department of Defense's 2010-2012 Strategic Planto assist the military in its recruiting efforts.
- The DREAM Act will make our country more competitive in the global economy.  Secretary of Education Arne Duncan has stated that passing the DREAM Act will allow "these young people to live up to their fullest potential and contribute to the economic growth of our country."  In particular, the DREAM Act

CAR 0574

will play an important part in the nation's efforts to have the highest proportion of college graduates in the world by 2020," something vital for America to remain competitive in today's global economy.

- The DREAM Act will have important economic benefits.  According to the nonpartisan Congressional Budget Office, the DREAM Act in its current form will cut the deficit by $1.4 billion and increase government revenues by $2.3 billion over the next 10 years. According to a recent UCLA study, students that would be impacted by the DREAM Act could add between $1.4 to $3.6 trillion in taxable income to our economy over the course of careers, depending on how many ultimately gain legal status. This income is substantially higher than the income they would earn if they were unable to attend and complete a college education. In fact, research indicates that the average college graduate earned nearly 60 percent more than a high-school graduate. We have much to gain from doing right by these young people.

- The DREAM Act will allow our immigration and border security experts to focus on those who pose a serious threat to our nation's security.  Secretary Napolitano believes this targeted legislation provides a firm but fair way to deal with innocent children brought to the U.S. at a young age so that the Department of Homeland Security can dedicate their enforcement resources to detaining and deporting criminals and those who pose a threat to our country.

**Philip A. McNamara**
**Executive Secretary**
Office of the Secretary
U.S. Department of Homeland Security
Office: 202-███████
Cell: 202-███████

**From:**      Mayorkas, Alejandro N <█████████████████████>
**Sent:**      Tuesday, March 13, 2012 12:51 PM
**To:**        Sandweg, John <█████████████████>; Grossman, Seth
               <███████████>
**Cc:**        Kroloff, Noah <███████████████████>; Shlossman, Amy
               <████████████████████████████>; Carson, Rebecca S
               <███████████████████████████>
**Subject:**   US Conference of Catholic Bishops

---

Sorry for the lack of a formal memo, but I am out of the office today.

I understand S1 will be meeting with the Conference tomorrow.  I met with the Conference yesterday.  Here are the major points raised:

1.  CIR: They want to know whether the President, if reelected, will commit to making CIR his first priority in the first year.  They were disappointed it was not in the first term.

2.  Prosecutorial discretion: they urged the grant of work authorization and the use of deferred action.

3.  601 Waiver:  They urged its expansion to LPRs and other grounds of inadmissibility.  I responded that we made the policy decisions to limit its scope as currently framed, we anticipate that their views will be echoed in the public coment period, and that they should not underestimate the operational challenges as framed.  We are focused on successful implementation.

4.  Refugees:  They are very concerned that the low admission numbers of last year, due to new interagency checks, will be repeated this year.  I informed them that we have made significant progress with the interagency checks and are committed to supporting DOS in working through its SAO challenges.

5.  Cubans and Haitians coming through the SW border:  they want CBP to look at this and see if some accommodations can be made, rather than compelling them to travel to Miami to receive assistance.  In addition, they hope that refugee rather than parole status can be used for some.  I was not aware of this issue and said I would follow up.

Thanks.  Ali

SEN. GRASSLEY:  Thank you, Madam Secretary, for coming.

I'm going to start out by asking you for some memos that you just referred to that previous administrations have exercised prosecutorial discretion, both in Republican and Democrat administrations.  I would like to have copies of those, if I could, please.

SEC. NAPOLITANO:  Absolutely, Senator.  And these memos are actually referred to by date and author in the P.D. memo that Director Morton issued, but we'll give you copies of all of them.

SEN. GRASSLEY:  Thank you.

Exactly two months ago you announced the prosecutorial discretion initiative focusing on high-priority cases.  While you say that the working group is still finalizing the implementation details, this committee needs some answers about what has been discussed and decided up to this point.  We hear estimates of 300,000 cases could be reviewed; some say it's upward to 1 million.  Could you give us an estimate of how many individuals or cases could be reviewed, at least roughly as you can?

SEC. NAPOLITANO:  Yes, Senator.  Just referring to the master docket of what's pending in immigration courts now, it's roughly 300,000.

SEN. GRASSLEY:  OK.  Will those with final orders of removal be eligible for relief through this process?

SEC. NAPOLITANO:  Absent unusual circumstances, no.  This is for cases that are pending that are clogging up the docket and preventing us from getting to the higher-priority cases.

SEN. GRASSLEY:  According to the information from your department, some individuals who are given relief will obtain work

authorizations, so people with no right to be in the country will be allowed to work here.  Is that correct?

SEC. NAPOLITANO:  Well, Senator, since around 1986, there has been a process where those who are technically unlawfully in the country may apply for work authorization.  This goes to CIS.  It's not an ICE or CBP function.  And those cases are reviewed by CIS on a case-by-case basis.  So there's no change in that process -- like I said, that goes back to the mid-'80s -- that is contemplated now.

CAR 0577

SEN. GRASSLEY:  Well, yeah, some of them could have an opportunity to work here, even though that they are here illegally.

SEC. NAPOLITANO:  Well, that happens now, Senator.

SEN. GRASSLEY:  OK.  My staff sent over a request for answers about this new process.  I would like to have those questions answered in a timely manner, please.  Would you do that?

SEC. NAPOLITANO:  I'd be happy to.

SEN. GRASSLEY:  OK.  Will you commit to keeping the committee informed as the process unfolds, including providing real-time data on how many people are considered and how many are provided relief, biographical information and the number of work authorizations approved?

SEC. NAPOLITANO:  We will be happy to keep the committee staff apprised.  I don't know what you mean by real time.  With 300,000 cases, obviously, you can't apprise the committee each time a decision is made.  But I think we can reach an agreement as to how to keep the committee appropriately briefed.

SEN. DURBIN:  Thank you, Senator Sessions, and thank you, Madam Secretary.  Congress has dealt you and the president an impossible

hand.  The United States has a confusing, dysfunctional and often cruel immigration system and you're charged with executing the laws that are associated with it.

We all know, as senators and Americans, that undocumented workers are an essential part of our economy from the fields and orchards of California, Arizona, Utah and Florida to the meat and poultry plants of Iowa, Illinois and across the Midwest to the major restaurants in Washington, D.C. and Chicago.  We avert our eyes and pretend these workers are all legal.

We know better.  They're an essential part of our economy and yet there is this revulsion, aversion and negative feeling about this, and you're caught in the middle.  You're given these laws and said make them work.  I think you were right to speak about the issue of prosecutorial discretion.

Every president and members of the Cabinet under the president have that responsibility, even recognized by the Supreme Court, and I certainly think you were right on August 17th when you sent me a

letter saying that DHS will review all pending deportation cases, and the cases involving criminals and threats to public safety will be given priority while low-priority cases will be closed in many instances.

You also said DHS would issue guidance to prevent low-priority cases from being put into deportation proceedings in the future.  I appreciate your commitment to this process, but I'm concerned.  It's been four months since the Morton memo was issued and two months since you announced the process for implementing it.

The review of pending deportation cases, as I understand it -- correct me if I'm wrong -- has not yet begun.  In fact, we do not even know what the criteria will be for the review, and you have not issued guidance on who will be put into deportation proceedings in the future.

So when will your review of pending deportation cases begin?

SEC. NAPOLITANO:  Well, the review of the pending deportation cases -- I think it's important to segregate cases coming into the system versus those that are on the master docket already.  That's the 300,000 that I was referring to with Senator Grassley earlier.

Those cases -- that process involves not just DHS but DOJ as well.  There has been an interagency group working on how you actually accomplish that.  My understanding is that, within the next few weeks, they will begin piloting in certain districts the actual review, and our hope very shortly thereafter to begin going through the master docket cases.

You know, the goal, of course, is to administratively close some of the low-priority cases so that we can facilitate handling the higher-priority cases.  In a way, we're kind of trying to adjust the line in terms of who goes through.  Now, in terms of --

SEN. DURBIN:  What's the time frame?  I'm trying to --

SEC. NAPOLITANO:  I don't have an end time frame, but I can share with you that I would expect the full review process to be -- well, the pilot will start in a few weeks, I would say, two to three weeks.  The pilot is not going to be one of these six- or 12-month typical pilots.  It will be very short in its design to find logistical issues that happen when you're trying to do massive review of lots of cases all at the same time.

CAR 0579

So we all want to move as quickly as possible once we've kind of identified that we've got the logistics down.

SEN. DURBIN:  So let me ask you this.  There are troubling reports that there are ICE and CBP field offices which have announced that these new deportation priorities do not apply to them.  Is that true?

SEC. NAPOLITANO:  Well, if there are some, I would like to know about it.  I have personally, by VTC, spoken with the heads of the ICE ERO offices across the country and the heads of the OPLA offices across the country which are the regional counsel.  My understanding is that they are very excited about having clear priorities, that the priorities are the right ones.

The priorities actually, Senator, I gave this committee in May of '09.  I said we were going to start moving the system so it could focus on criminal aliens.  And that's what we are doing.

SEN. DURBIN:  I was going to, at this point, to show the faces and tell the stories of three DREAM Act students whom I believe most people who agree, having been brought to this country at a very early age, have made an amazing record in their short lives and are being held back from contributing to the United States.  And I certainly believe the president's criteria and your criteria are the right criteria.  Let us focus on removing those people who are a threat to our nation.  That should be our highest priority, and it certainly will not include these college graduates desperate to go to work and make this a better nation.

So I hope that you'll continue along this line on an expedited basis.

CAR 0580

*Press Office*
**U.S. Department of Homeland Security**

# Press Release

Oct. 5, 2011
Contact: DHS Press Office, (202) 282-8010

### SECRETARY NAPOLITANO'S REMARKS ON SMART EFFECTIVE BORDER SECURITY AND IMMIGRATION ENFORCEMENT

Release Date: October 5, 2011

Washington, D.C.
American University
(Remarks as Prepared)

*Click here for a fact sheet on Smart Effective Border Security and Immigration Enforcement*

Thank you and good morning.  The last time I was at American University I had the honor of giving the commencement address to the Class of 2010.  I want to thank you for welcoming me back to campus today to talk about the enforcement of our nation's immigration laws and border security.

The United States is a nation of immigrants and a nation of laws.  Our very founding is rooted in immigration.  And at every great and momentous occasion throughout our proud history, the immigrant, and the immigrant experience, has contributed to the richness of our culture, the strength of our moral character, and the advancement of our society.

At the same time, the reaction to new waves of immigration—whether recent or in the past—has given rise to pieces of our history about which we are considerably less proud.

Little more than a century ago, postings that became known as "NINA signs," and read "Help Wanted: No Irish Need Apply," were not uncommon in this country.  German, Polish, Italian, Jewish, Chinese, Japanese, Mexican, and other immigrants have faced similar discrimination at various points in our history.

And when times have been hard, it has been far too easy, as former President Clinton has said, "just to blame the immigrant."

We have learned from our past, and we are better than that today as a nation.  But lessons afforded us by our own history must be a constant reminder, and guide post, for how we approach these and other difficult issues.

**CAR 0581**

Nearly three years ago, when President Obama came into office and nominated me for this position, he and I both knew that we were inheriting a broken immigration system with a patchwork of laws and outdated requirements that were in desperate need of updating.

He said two things at the time and has maintained this position ever since:

First, we took an oath of office to uphold the laws of the United States of America, and we will do that by enforcing them in the smartest, fairest, and most efficient way possible.

Second, we know the immigration system needs to be updated, and we committed then, and continue today, to seek reforms that make sense and are meaningful.

But Congress hasn't acted and states continue to pass a patchwork of their own laws in an attempt to fill the void.  It is this Administration's position that Congress needs to take up immigration reform once and for all.  We have put forward our ideas and are ready to act quickly and collaboratively to support passage of reforms that make sense.

While doing everything we can to encourage Congressional action, we have undertaken a historic effort to secure the border and enforce our immigration laws in a cohesive way that is smart, effective, and that maximizes the resources that Congress has given us to do this job.

This Administration's approach to immigration enforcement has been widely discussed among those who like to debate the topic.  Not surprisingly, our policies have been simultaneously described as engaging in a mean-spirited effort to blindly deport record numbers of illegal immigrants from the country and alternatively as comprehensive amnesty that ignores our responsibility to enforce the immigration laws.

These incongruent reactions make two things clear:

First, two opposites can't simultaneously be true; and second, it's time for a reality check when it comes to talking about immigration enforcement.

We know that amidst all of the rhetoric surrounding the issue of illegal immigration, it's often difficult to keep track of the facts.  So let's start there, with the facts.

As the President and I each said in El Paso earlier this year – and as mayors, police chiefs, community leaders, and recently an array of publications including USA Today, the Washington Post, and the Wall Street Journal have reiterated – security along the US border with Mexico is at an apex and, indeed, those who live and work along it continue to say it is safe and open for business.

And as someone who grew up in New Mexico and spent most of my adult life in Arizona, and who has walked the border, flown it, ridden it on horseback, and worked with border communities from Brownsville to San Diego, I can say that the border security measures we have taken constitute the most innovative and effective approach our country has ever deployed.

CAR 0582

So, using the claim that the border is not secure as a reason to block immigration reform is not reasonable.  We are continuing to answer the call, and for the last two and a half years, have seen dramatic declines in illegal immigration and dramatic increases in seizures.

And I, for one, have grown weary of hearing the profound efforts of our men and women serving along the border minimized.  They are wearing the uniform of United States law enforcement and are deeply committed to their mission and to their country. They continue to achieve record results.  Sometimes—like all law enforcement—they even give their lives.

The least we owe them is an honest appraisal of their hard work and that appraisal is that, thanks to them, the border is safer than it has been in decades.

We have committed unprecedented resources to this effort and, this year, will see yet again a historic drop in illegal crossings and more and more contraband seized.  So let's take the "border is out of control" myth out of the equation.

At the same time, we have refined how we go about immigration enforcement in this country. Simply put, we have worked, and continue to work, to make sure that the limited resources we have been given are applied in a way that enhances public safety, border security, and the integrity of the immigration system, while respecting the rule of law.

As part of that process, ICE has adopted new policies, including a new process that ensures that those enforcing immigration laws make appropriate use of the discretion they already have in deciding the types of individuals we prioritize for removal from the country.

There has never been, nor will there be in these tight fiscal times, sufficient resources to remove all of those unlawfully in the country.  That is why it is so important to set clear priorities.

The priorities we have set, however, do not mean that we will stop enforcing immigration laws. We have an obligation to enforce those laws.  And over the past two years we have achieved record levels of enforcement, even as we have moved to focus our efforts in line with our priorities.

This year, I expect removals will again be at historic levels.  When we announce these year-end removal numbers, some will undoubtedly say that DHS, and the Administration more broadly, are doing our jobs too effectively.

What those critics will ignore is that while the overall number of individuals removed will exceed prior years, the composition of that number will have fundamentally changed.  It will consist of more convicted criminals, recent border crossers, egregious immigration law violators, and immigration fugitives than ever before.

There are approximately ten million undocumented immigrants in the United States.  While all of these people are in our country unlawfully, their individual stories can differ dramatically. Some were brought here when they were children.  They have spent almost their entire lives in

CAR 0583

the United States and have gone on to graduate from college or serve in our military.  Others illegally crossed our borders for the purpose of committing crimes against our citizens.

When we came into office, the then-exiting immigration enforcement policies we inherited allowed as many resources, if not more, to be spent tracking down and deporting the college student as were spent on apprehending criminal aliens and gang members.

ICE would conduct large scale worksite raids – and would not consistently punish the employer, nor target individuals who posed a public safety threat.  Public safety wasn't enhanced by these raids, and they sometimes required hundreds of agents and thousands of hours to complete.  As a result, while the agents were busy conducting these high profile raids, criminal aliens were free to roam our streets.  This made no sense.

Agents were also directed to conduct sweeping operations, even though they siphoned away resources and failed to enhance public safety.  Cordoning off an area suspected to contain a large population of illegal immigrants, these operations failed to net any meaningful number of criminals or public safety threats. This made no sense.

Finally, US Citizenship and Immigration Services placed into removal proceedings thousands of individuals who mistakenly applied for a green card, believing that their marriage to a US Citizen immediately entitled them to stay in the United States.  Few of these cases have a nexus to public safety.  Nevertheless, agency policy required ICE prosecutors and immigration agents to spend just as much time and resources pursuing these cases as those involving convicted felons.  This also made no sense.

Accordingly, one of the first steps we took was the implementation of common sense policies that govern the allocation of our enforcement resources.

We established, as a top priority, the identification and removal of public safety and national security threats.

To execute on this, we expanded the use and frequency of investigations and programs, like Secure Communities, that track down criminals and gang members on our streets and in our jails

To further deter individuals from illegally crossing our southwest border, we also directed ICE to prioritize the apprehension of recent border crossers, and support and supplement Border Patrol operations.

In no small measure, the historic results we have seen along the southwest border are attributable to the joint efforts of Border Patrol agents and ICE officers and agents, and the emphasis we have placed on the removal of recent border crossers.

In the worksite category, we eliminated raids that did nothing to enhance public safety.  Instead, we focused on targeted worksite enforcement programs like I-9 audits and criminal prosecutions of employers who egregiously violate employment laws.

CAR 0584

Finally, we prioritized the removal of those who repeatedly violate our immigration laws and immigration fugitives.  These are individuals who repeatedly return to our country after having been previously removed or who flagrantly ignore an immigration court's order to leave the country.

These priorities are simple common sense.  They enhance public safety, help secure the border, and promote the integrity of our immigration laws.

Now, while it is easy to establish new priorities, you have to implement them in a way that achieves results.

After nearly three years of managing the immigration enforcement system, I am proud to say that we have achieved real results that match our priorities.

In 2010, ICE removed over 195,000 convicted criminals, more than had ever been previously removed by ICE, and 81,000 more than it removed in FY 2008.  For the first time in decades, 50% of the aliens removed by ICE had been convicted of a criminal offense.  In 2011, ICE will again remove a record number of convicted criminals from our country.

We have achieved similar results with regard to setting priorities for the removal of those termed "non-criminals."  More than two-thirds of those in this category who were removed in 2010 were either recent border crossers or repeat violators.

The number of individuals removed who could not definitively be placed into one of our priority categories dropped from more than 19% in 2008 to less than 10% in 2010.  These trends will also continue in 2011.

Now, let me take a moment to mention one program that helped us achieve these results, Secure Communities.

Secure Communities is a program that helps ICE identify those who have been arrested by state and local law enforcement for non-immigration state or local crimes, who are also in the country unlawfully.  It bestows no additional authorities onto local law enforcement and only identifies those who have been booked into jails.  Literally, in jails.

I know there has been a lot of discussion about Secure Communities – and to be perfectly candid, this program got off to a bad start.  We did not explain clearly how it works and who is required to participate.

But as flawed as the beginnings of this program were, it has already helped accomplish a great deal toward ensuring that we use our enforcement resources where they do the most good.  It is also highly misleading to suggest that Secure Communities is the reason why the agency has achieved record-breaking enforcement.

The reality is that the immigration enforcement agencies will always encounter more aliens than they can possibly pursue in a given year.  Secure Communities hasn't increased the number of

CAR 0585

individuals who are removed, but it has helped change the composition – helping ICE to dramatically increase the number of convicted criminals and egregious immigration law violators.

Despite the misleading commentary about this program, it has proven to be the single best tool at focusing our immigration enforcement resources on criminals and egregious immigration law violators.

Termination of this program would do nothing to decrease the amount of enforcement.  It would only weaken public safety, and move the immigration enforcement system back towards the ad hoc approach where non-criminal aliens are more likely to be removed than criminals.

I have said many times that we can always do a better job and should always be looking to improve how we exercise our enforcement operations.  For example, this summer ICE announced some key improvements to Secure Communities because we heard with an open mind some of the concerns expressed about the program.  Our job is to listen and make adjustments consistent with our best law enforcement judgment.  That's why Secure Communities now has new training for state and local law enforcement, and additional steps are being taken to protect witnesses, domestic violence victims, and victims of other violent crime.

While these improvements were necessary, and additional ones may still be required, removing people unlawfully in the country who have been booked into jail on non-immigration crimes will continue to be a top priority.

And while the President and I have both said that relief will not be granted to broad classes of individuals, we will exercise discretion on a case by case basis where we feel it is appropriate and responsible to do so, and when it enhances our ability to meet our priorities.

It makes sense to prioritize our finite resources on removing a Mexican citizen who is wanted for murder in his home country ahead of a Mexican national who is the sole provider for his American citizen spouse; It makes sense to remove a Costa Rican man convicted of  sexual assault against a minor before we spend the time and money to send a mother back to her violent and abusive husband in Jamaica, separating her from her American-born children; finally, it makes sense to prioritize resources on the removal of a Chinese man convicted of aggravated assault and weapons offenses before removing a 10th grade student who was brought to this country when he was a child;

These are actual examples of the recent use of discretion.  They do not constitute amnesty.  They reflect the judicious and intelligent use of resources, common sense and prioritization.

So to support our priorities, DHS and DOJ recently announced a new process to further implement the appropriate use of prosecutorial discretion.  Together, DHS and DOJ will review existing caseloads to ensure they correspond with our enforcement priorities.

This process has taken some time to design, but when implemented, will enable us to better execute on our mission to protect public safety and ensure border security.  It will also establish

an unprecedented cohesion of federal agencies to focus taxpayer resources on our enforcement priorities.

So, let me put it a little more directly.  We cannot, on the one hand, be on the verge of removing, for the third consecutive year, a record-breaking number of unlawful individuals from this country, with the highest number of criminal removals in American history and, at the same time, be abrogating our law enforcement responsibilities.

Similarly, exercising discretion with more speed and better prioritization than at any time in history, protecting victims of domestic violence, engaging in worksite enforcement rather than workforce raids is not cosmetic tinkering.  It is real change, with real results.

Vesting discretion in our immigration enforcement officers and immigration lawyers is not amnesty.  It is a prioritization system that begins with finding and removing individuals who are criminals and repeat offenders.  At the same time, our officers have the legal responsibility to remove unlawful individuals from this country.  They will do so according to our priorities.  But they will do their jobs.

I am proud to serve with the men and women of DHS who do this work every day, and I refuse to see them dragged into the rhetoric of daily political combat.  They are protecting our country, just like the honorable men and women of our military, and I salute them for that.

And just as I am resolute in supporting the men and women of this Department, I am resolute in believing in the efficacy of the course we are charting on the mission we have been asked to perform.

We held a naturalization ceremony just a few weeks ago to honor the signing of the U.S. Constitution on September 17, 1787.  The groundwork laid by the framers of our Constitution 224 years ago ensures that being an American is not about one's religion, ethnicity, or place of birth.

New Americans take on all the rights, as well as all the responsibilities, our Constitution guarantees.  And, indeed, we have a strong tradition as a welcoming nation, and continue to find ways to improve the administration of the legal immigration system, and support those on the path to citizenship.

However, we will and must enforce our immigration laws.  Doing otherwise is not an option. Enforcing those laws in a way that makes sense is neither simple nor easy, and we are committed to getting it right.  We can all agree that we need fair, consistent, and enforceable immigration laws that encourage the free flow of commerce, while respecting both security and the rights of individuals.  We will continue to work toward that common goal.

But we can't do it alone—which is why I am calling on advocates on all sides of this issue to work with us and the Congress on these issues, rather than attacking the system, or the people who work in it, as a whole.

CAR 0587

In the meantime, it should not come as a surprise when we continue to outstrip historical trends on removals, or the numbers of criminals and egregious immigration law violators contained within that population.

It should be similarly expected that DHS will be just as focused in how we exercise discretion. Reform is needed, and the limitations of what we can do, both from an enforcement and discretion standpoint, are defined by the patchwork of laws we currently have on the books.  We need legislative solutions to address these challenges.

So we will continue to be smart and effective in how we enforce the laws of this country, while at the same time asking Congress to amend and improve them where they need to be changed.

That is our commitment to the American people, to the men and women of DHS who keep our borders and our country safe, and to our heritage as a nation of immigrants and a nation of laws.

Thank you.

###

Westlaw

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                    Page 1

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)

United States Attorney General

**1 *163 SECRETARY OF HEALTH, EDUCATION, AND WELFARE, AND SECRETARY OF AGRICUL-
TURE—AUTHORITY UNDER THE FEDERAL FOOD, DRUG AND COSMETIC ACT, MEAT INSPECTION
ACT, AND POULTRY PRODUCTS INSPECTION ACT, TO AUTHORIZE CONTINUED USE OF NITRITES AS
FOOD ADDITIVES.

MARCH 30, 1979.

The central purposes of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. 301–392, the Meat Inspection Act, 21
U.S.C. 601–695, and the Poultry Products Inspection Act, 21 U.S.C. 451–470, are the prevention of the adulteration of
food and the introduction into or receipt in interstate commerce of adulterated food.

Food additives, if not exempted by 21 U.S.C. 321(s)(4), and color additives are subject to the Delaney Clause, 21
U.S.C. 348(c)(A), which provides that an additive shall be deemed unsafe if it is found to be a carcinogen.

In determining whether addition of nitrites adulterates food under the Meat Act or the Poultry Act, the Secretary of
Agriculture may not balance the beneficial effects of nitrites against their possible carcinogenic properties. 21 U.S.C.
453(g)(1), 2(A), (3); 601(m)(1), (2)(A), (3).

If the Secretary of Health, Education, and Welfare determines that the addition of nitrites adulterates food within the
meaning of the Food and Drug Act, he may not use his enforcement discretion to authorize continued use of nitrites
during a gradual phase-out period. 21 U.S.C. 348, 371(a).

Balancing of competing health risks under the Food and Drug Act is a matter for the Congress.

If the Secretaries of Health, Education, and Welfare, and Agriculture, find that nitrites are carcinogens, they have the
discretion to adopt timetables and procedures to assure the orderly removal of the nitrites from commerce.

THE SECRETARY
DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE.

THE SECRETARY
DEPARTMENT OF AGRICULTURE.

GENTLEMEN:

This letter responds to your requests for the opinion of the Department of Justice with respect to the continued pres-
ence of sodium and potassium nitrite in food products regulated by your Departments. You advised me that certain
private studies indicate that nitrites have been found to cause cancer in laboratory animals. I understand that neither
*164 Department has yet concluded that these studies are in fact accurate, and that, in advance of making any such
finding, both Departments would undertake a thorough, independent examination of the question and would provide
ample opportunity for public comment by interested parties. The responsibility and the authority to decide whether

CAR 0589