Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 1 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                   Page 2

nitrites are in fact carcinogenic rest exclusively with your two Departments. The question you have posed is whether—assuming that you eventually find that nitrites do induce cancer in man or animal—you are authorized under applicable law to adopt an extended procedure for phasing out the use of nitrites over whatever time period may be necessary to develop a feasible substitute.

As you know, I have asked the Office of Legal Counsel for its views on this question. Enclosed you will find a memorandum to me from John Harmon, the Assistant Attorney General in charge of that Office, in which he examines the relevant statutes in some detail. He has carefully considered your written submissions and your comments in the meetings we have had on this question. His conclusion, with which I agree, is that at bottom the issue you have raised is one of construing and applying the will of Congress as expressed in the statutes that govern food and color additives. This is the essence of the Executive's duty under the Constitution to 'take care that the laws be faithfully executed.'

**2** Upon a close evaluation it now appears clear that your Departments do possess some discretion to fashion appropriate procedures and timetables for complying with the pertinent statutes. The critical question, however, is whether in so doing, you have the discretion to consider and rely upon the assertion that, in addition to whatever carcinogenic properties nitrites may possess, they also have the salutary effect of combating the growth of botulism as a basis for postponing the prohibition against their use until a feasible substitute can be found. For the reasons stated in the memorandum, I conclude that Congress has not given either of your Departments this prerogative.

We have found no evidence in the pertinent statutes or legislative history that Congress intended to authorize your respective Departments to weigh the positive effects against the carcinogenic or other injurious effects of additives and determine that those additives will not be banned, at least **165** not until a feasible substitute can be developed and put in place; to the contrary, there is substantial evidence that Congress reserved that authority exclusively to itself. Upon a finding by your Departments that a substance is carcinogenic, the statutes contemplate that Congress will make the ultimate determination whether its continued use will be permitted.

I would like to emphasize that, as this question is one of statutory construction, Congress is free to change its command to your Departments. I understand that you are preparing to submit a proposal on this matter to Congress, and I wish to make clear that nothing in this opinion should be read as opposing such a solution.

Sincerely,
GRIFFIN B. BELL.

Enclosure

MARCH 30, 1979.

MEMORANDUM FOR THE ATTORNEY GENERAL

Re: Proposed Phasing Out of Nitrites in Foods

You have asked this Office to consider inquiries by the Secretaries of Agriculture and of Health, Education, and Welfare (HEW) whether either may provide for the gradual phasing out over a period of years of the use of sodium and potassium nitrites in foods until such time as a feasible substitute is developed. It appears that a ban on the use of nitrites might be mandated in the foreseeably near future because of health standards made applicable to nitrites by the Federal Food, Drug and Cosmetic Act [Food and Drug Act], 21 U.S.C. §§ 301–392; Meat Inspection Act [Meat Act], 21 U.S.C. § 601–695 (1976); and the Poultry Products Inspection Act [Poultry Act], 21 U.S.C. §§ 451–470 (1976).

The Acting Secretary of Agriculture inquired in a letter to you whether the ban may be inapplicable in this case because nitrites also affect food in a way that is beneficial to health. The Secretary of HEW has asked whether the ap-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 2 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                    Page 3

plicability of the standards notwithstanding, he has discretion, as a **166** matter of administrative enforcement, to permit phasing out instead of a ban because of nitrites' beneficial effect. As we explain in detail below, it is our conclusion that an extended or indefinite period of phasing out nitrite use is not permissible under either of these theories.

## I. Applicability of Statutes

**\*\*3** The Secretaries' inquiry arose because of test results they have received that suggest that nitrites induce cancer in laboratory animals. These results, if confirmed, would call into question the safety of the continued use of nitrites in foods. FN;B1[FN1]FN;F1

The Food and Drug, Meat, and Poultry Acts cited above determine the relevance of the Secretaries' information concerning cancer to their regulation of nitrites. Depending on the use of nitrites in question, nitrites might fall within the definitions of unsafe 'food additive' or 'color additive' under the Food and Drug Act, 21 U.S.C. § 321(s)–(t) (1976), which, for purposes relevant to this inquiry, are imported into the Poultry and Meat Acts, as well. Nitrites are subject to other standards under these Acts, even if they do not fall within these definitions. 21 U.S.C. § 453(g)(2)(C)–(D); 21 U.S.C. § 601(m)(2)(C)–(D) 1976).

Central purposes of all three acts are the prevention of the adulteration of food, and the introduction into or receipt in interstate commerce of adulterated food. *See* Food and Drug Act, 21 U.S.C. §§ 331(a)–(c), 332–334 (1976); Meat Act, **\*167** 21 U.S.C. §§ 601(m), 602–606, 608, 610, 624, 672–676 (1976); and Poultry Act, 21 U.S.C. §§ 451–452, 453(g), 455–456, 457(a), 458, 461, 463, 466, 467a–c (1976).

The Food and Drug Act provides in 21 U.S.C. § 342 (1976) that a food shall be deemed to be adulterated if, *inter alia*, it bears or contains an unsafe 'food additive' or 'color additive;' it bears or contains any poisonous or deleterious substance which may render it injurious to health; or it consists in whole or in part of any filthy, putrid, or decomposed substance or is otherwise unfit for food. Both the Poultry and Meat Acts contain standards of adulteration largely similar to those contained in the Food and Drug Act. 21 U.S.C. §§ 453(g), 601(m) (1976). Thus, food that contains nitrites would be adulterated under these Acts if nitrites are unsafe food or color additives, or, otherwise, substances 'injurious to health.'

### A. Food and Color Additives

Food additives are defined under 21 U.S.C. § 321(s) (1976). A food additive is deemed to be unsafe with respect to any particular use unless: 'there is in effect, and it and its use or intended use are in conformity with, a regulation issued under this section prescribing the conditions under which such additive may be safely used.' 21 U.S.C. § 348(a)(2) (1976). In determining whether a proposed use of an additive is safe, and thus, the conditions under which an additive may be safely used, the Secretary of HEW is to consider, among other relevant factors, the probable consumption of the additive, the cumulative effect of the additive in the diet, and safety factors generally recognized as appropriate for the use of animal experimentation data. 21 U.S.C. § 348(c)(5) (1976). However, the so-called Delaney Clause, 21 U.S.C. § 348(c)(3)(A) (1976), provides that an additive shall be deemed to be unsafe if it is found to induce cancer when ingested by man or animal, or if it is found after appropriate tests to induce cancer in man or animal. Thus, if nitrites are food affitives under the Food and Drug Act, and if it is found after appropriate tests that nitrites induce cancer in man or animal, then nitrites are unsafe food additives. Consequently, no regulation for their safe use may issue, and food containing nitrites is adulterated within the meaning of 'adulteration' under the Food and Drug, Meat, or Poultry Acts.

**\*\*4 \*168** The Color Additive Amendment, 21 U.S.C. § 376 (1976), contains provisions similar to those for food additives, for determining the safety of additives, including an anticancer proviso. 21 U.S.C. § 376(b)(5) (B) (1976). The term 'color additive' is defined broadly to include any substance which, 'when added or applied to a food . . . is capable (alone or through reaction with other substance) of imparting color thereto,' 21 U.S.C. § 321(t)(1)(B) (1976),

CAR 0591

Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 3 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                                 Page 4

but 'does not include any material which the Secretary, by regulation, determines is used (or intended to be used) solely for a purpose or purposes other than coloring.' 21 U.S.C. § 321(t)(1) (1976).

Although the operative definition of the term 'food additive' is broad enough in general to embrace nitrites, Congress excluded from the general definitions of food additive 'any substance used in accordance with a sanction or approval granted' pursuant to the Food and Drug, Meat, or Poultry Acts prior to the date of enactment of the Food Additives Amendment of 1958, Pub. L. No. 85–929, 72 Stat. 1784 (codified at 21 U.S.C. § 321(s)(4) (1976)). The quoted language is a type of grandfather clause which exempts from the definition of food additive, and thus, from the Delaney Clause, substances granted a sanction or approval prior to September 6, 1958, under any of the three acts and the other safety standards contained in 21 U.S.C. § 348 (1976). However, a substance that is not a 'food additive' for a particular use because of a prior sanction or approval must still be judged against the more general adulteration standards in the Food and Drug, Meat, or Poultry Acts. In contrast, there is no exclusion from the definition of 'color additive' for substances which received a prior sanction or approval by the Department of Agriculture (USDA) or the Food and Drug Administration (FDA). The anticancer proviso for color additives, 21 U.S.C. § 376(b)(5)(B) (1976), thus applies to all color additives, whether or not they were also approved as food additives, and thus exempted from the Delaney Clause.

Thus, for uses of nitrites not having a prior sanction or approval under the Food Additives Amendment, it would make little difference for present purposes whether nitrites were regarded as food additives or color additives (or both): these uses would be subject to an anticancer clause in either event. On the other hand, if nitrites are color additives in meat products, they would be subject to the anticancer proviso of the **169** Color Additive Amendment despite any prior sanction or approval under the Food Additives Amendment.

### B. Standards Applicable to Nitrites

Before considering the applicability of the standards just discussed to nitrites, it must be noted that the classification of nitries under the relevant Acts is itself a matter of dispute.

USDA has advised the FDA that it granted a prior sanction for the use of nitrites in cured red meat products under the Meat Act. See 9 C.F.R. §§ 317.8(b)(6), 318.7(c)(4) (1978). However, the conclusion that the use of nitrites in red meat enjoys a prior sanction by USDA has been challenged in the case of *Public Citizen* v. *Foreman*, Civ. No. 78–1064 (D.D.C., filed June 12, 1978), in which plaintiffs seek a declaratory judgment that the USDA regulation requiring the addition of certain amounts of nitrites to bacon is unlawful. See 9 C.F.R. 318.7(b), (c)(4) (1978), *as amended*, 43 Fed. Reg. 20,992 (1978), *and clarified*, 43 Fed. Reg. 32,136 (1978).

**5** Conversely, although current USDA regulations permit the use of nitrites to fix color in cured poultry products and to inhibit corrosion on the exterior of canned goods, 9 C.F.R. § 381. 147 (1978), USDA has concluded that a sanction or approval for such uses did not exist under the Poultry Act, prior to September 6, 1958. USDA's conclusion that the addition of nitrites to poultry products does not enjoy a prior sanction has been challenged in the case of *Tysons Food, Inc.* v. *United States Department of Agriculture*, Civ. No. F–77–5059 (W.D. Ark., filed Nov. 2, 1977).

Because it would not be appropriate for you to render an opinion on the prior sanction question in view of the pending litigation, this memorandum will assume that the use of nitrites in cured meat products does enjoy a valid prior sanction within the meaning of 21 U.S.C. § 321(s)(4) (1976) but that use of nitrites in poultry products does not. We shall therefore further assume that nitrites are 'food additives' in poultry—as well as in smoked fish, where its use is permitted by an existing food additive regulation—subject to the Delaney Clause.

The Government has further taken the position in *Public Citizen* that the nitrites are not color additives when used in **170** curing bacon because the effect of nitrites is to fix or preserve the natural red color, not to 'impart' color to the bacon within the meaning of 21 U.S.C. § 321(t)(1) (1976), and because the color effect of nitrites is merely incidental

CAR 0592

to the primary antimicrobial or preservative function. Because the application of the color additive provisions to processed read meat is involved in the pending litigation relating to bacon, we will not address that issue here. This memorandum will proceed on the assumption that nitrites would not have to be considered as color additives in processed red meat during the suggested phasing out of nitrite use and would therefore not be subject to the anticancer proviso of the Color Additive Amendment or the Food Additives Amendment.

## II. Health Benefits from Nitrites

The immediate problem posed, against the statutory background just outlined, is that nitrites, when added to food, may have an effect beneficial to health. Specifically, nitrites inhibit the development of the spore-forming bacterium, *Clostridium botulinum*, and its toxin, botulin, the direct cause of the acute and frequently fatal food poisoning botulism. Indeed, it is the Secretaries' opinion that the addition of nitrites to certain foods is the only currently available, economically feasible way of satisfactorily controlling the risk of botulism attendant to the consumption of certain processed read meat and poultry products and smoked fish. They have advanced the possibility of a gradual phasing out of nitrites in these products, rather than an immediate ban, in order to permit the continued use of nitrites for this beneficial purpose. Phasing out nitrite use, they suggest, would allow time for the development of alternative means of inhibiting the growth of *Clostridium botulinum* in these products without disrupting the Nation's food supply, of which processed read meat and poultry products constitute some seven percent. FN;B2[FN2]FN;F2

**6 *171 The Secretaries have advanced somewhat differing legal theories for phasing out the use of nitrites in those products in which they believe the continued use of nitrites is warranted, subject to their respective regulatory jurisdictions. In her letter of August 22, 1978, the Acting Secretary of Agriculture suggested that USDA may properly consider, in determining whether meat to which nitrites are added is adulterated under the Meat Act, the benefits of nitrites in preventing the growth of *Clostridium botulinum*. Letter from Carol Tucker Foreman, Acting Secretary of Agriculture, to Griffin B. Bell, Attorney General, (August 22, 1978). If benefits may be weighed against or offset possible harmful effects in this manner, USDA might conclude that certain levels of nitrites do not adulterate meat despite their possible carcinogenic characteristics. If meat is not adulterated by nitrites, there would be no legal requirement to ban its use. Accordingly, under this theory, the level of nitrites in cured meats could be reduced over a period of time as substitutes were developed.

On the other hand, although the Secretary of HEW concedes that nitrites adulterate foods, he suggests that phasing out is permissible as a matter of discretionary enforcement. The Secretary of HEW concedes that benefits may not be weighed against indicated carcinogenic properties with respect to meat under the Delaney Clause. However, the Secretary urges that the Food and Drug Administration (FDA) could continue as a matter of enforcement discretion, to balance all health-related factors and permit nitrites in foods under its jurisdiction in order to prevent the risk of botulism.

## III. Suggested Phasing Out

### A. USDA phasing out of use of nitrites in red meat products

Although we assume, for purposes of this memorandum, that nitrites are not food additives or color additives when used in red meat—and therefore do not automatically render meat adulterated if found to induce cancer when ingested by man or animal—the use of nitrites must still be judged against the more general adulteration standards in the Meat *172 Act. A meat is adulterated under that Act if it bears any added poisonous or deleterious substance that may render it 'injurious to health' or if it consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food. 21 U.S.C. § 601(m)(3).FN;B3[FN3]FN;F3

In her letter of August 22, the Acting Secretary of Agriculture states that there are no other substances that could be

CAR 0593

Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 5 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                                           Page 6

used on a sufficiently broad scale at the present time to prevent botulism in commercially processed meat, and that the consumption of such products as hot dogs and ham would pose severe health hazards unless botulism could be prevented. She therefore suggests that permitting the possible harmful effects of nitrites to be balanced against their beneficial effects in preventing botulism in determining whether their addition causes meat products to be adulterated accords with the overriding purpose of the Meat Act of protecting the public health. Although these health concerns are significant, this approach would not be consistent with the requirements of the Meat Act.

**7 The Acting Secretary informed you that USDA regards nitrites, because of their indicated carcinogenicity, to be poisonous and deleterious substances. A finding that the substance may render meat 'injurious to healthh is an essential element of the adulteration standard under 21 U.S.C. § 601(m)(1) (1976).*See United States* v. *Lexington Mill & Elevator Co.*, 232 U.S. 399 (1914). We thus assume that if only the indicated carcinogenic or harmful effects of nitrites were considered, the Secretary of Agriculture would conclude that nitrites may render meat 'injurious to health' and that they therefore adulterate meat. Nothing on the face of 21 U.S.C. § 601(m)(1) (1976) suggests that concededly injurious properties *173 of a substance may be ignored, forgiven, or offset by its health-related benefits in this fashion. The ordinary meaning of the word 'injurious' is 'harmful, hurtful, or detrimental.' *Random House Dictionary of the English Language* 732 (1966). The capacity of nitrites to cause cancer or other injury, which we assumed for purposes of this memorandum, would presumably be unaffected by a reduced incidence of botulism. Giving the statutory language its ordinary meaning, then, unrelated benefits resulting from the presence of a substance would appear to be irrelevant.

The Supreme Court considered the meaning of language comparable to that now contained in section 601(m)(1) in *Lexington Mill & Elevator Co.*, which concerned whether nitrites or nitrite-reacting material or other poisonous or deleterious substances adulterated flour under section 7 of the Food and Drug Act of 1906, 34 Stat. 769, on the ground that these substances 'may' have rendered the flour 'injurious to health:' FN;B4[FN4]FN;F4

> In thus describing the offense Congress doubtless took into consideration that flour may be used in many ways, in bread, cake, gravy, broth, etc. It may be consumed, when prepared as a food, by the strong and the weak, the old and the young, the well and the sick; and it is intended that if any flour, because of any added poisonous or other deleterious ingredient, may possibly injure the health of any of these, it shall come within the ban of the statute. If it cannot by any possibility, when the facts are reasonably considered, injure the health of any consumer, such flour, though having a small addition of poisonous or deleterious ingredients, may not be condemned under the Act.232 U.S. at 411.

The Court's discussion, like the language of 21 U.S.C. § 601(m)(1) (1976), appears to attach significance only to the *174 direct detrimental impact of the food additive. It was not considered whether food additives that may 'come within the ban of the statute' because it 'may possibly injure the health' of 'any consumer' may be removed from the ban of the statute if distinct health-related benefits of an added substance are discovered—here, benefits that may well accrue to persons other than those who might contract cancer.

The suggested balancing of benefit and harm must also be placed in proper perspective. The current method of preserving red meats through the use of nitrites is apparently of long standing, and is relied upon by industry and consumers. Nonetheless, it is important to emphasize that the risk of botulism with which we are here concerned is occasioned by the manner in which the industry chooses to prepare, distribute, and market processed meat; it is not an independently created health risk.

**8 No indication appears in the legislative history of 21 U.S.C. § 601(m)(1) (1976) or in the extensive legislative history of 21 U.S.C. § 342(a)(1) (1976) of the Food and Drug Act, after which section 601(m)(1) of the Meat Act was patterned, that the beneficial effects of a substance may be taken into account in the fashion suggested by USDA. The structure and background of this section of the Food and Drug Act, in fact, point to just the opposite conclusion.

The Food and Drug Act placed stringent restrictions on the addition of substances to food. Under the provisions of 21 U.S.C. §§ 342(a)(2), 346, a food containing any added poisonous or deleterious substance was adulterated unless the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0594

Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 6 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                                   Page 7

Secretary concluded that the substance was 'required in the production' of the food or 'cannot be avoided by good manufacturing practice.' In that event, the Secretary was required to establish tolerances for the substance 'to such extent as he finds necessary for the protection of public health,' taking into account the degree to which the substance is 'required' or 'cannot be avoided' and the other ways in which the consumer may be affected by the same or other poisonous or deleterious substances.

The provision permitting tolerances for substances that could not be avoided by good manufacturing practice applies to contaminants or other substances that may unavoidably be added to food in the production process, *see, e.g.*, S. Rep. No. 361, 74th Cong., 1st Sess. 5–6 (1935), and is of little relevance **\*175** here. The authorization of tolerances for added substances required in the production of food was designed to permit some residue of toxic insecticides and fungicides on agricultural products because of Congress' belief that 'an adequate fruit and vegetable supply could not be brought to maturity without the use of toxic insecticides or fungicides.' H.R. Rep. No. 2139, 75th Cong., 3d Sess. 6 (1938). The expected operation of the section was explained as follows:

> This authorization will permit the establishment of comparatively liberal tolerances for any food where poison is unavoidable or is required by the necessities of production, and less liberal tolerances or complete prohibitions where it is practicable to limit the amount of poison in a particular food to very small quantities, or to eliminate it completely. It will likewise afford adequate control of those situations where irresponsible manufacturers, for some fancied or real commercial advantage, add dangerously toxic substances to foods, as, for example, the addition of maleic acid to fats and oils to prevent rancidity when preservation can be accomplished by observance of sanitary conditions in manufacture and packaging and by use of refrigeration for the finished product.
> In approaching the problem of control from this angle the amount of added poisons can be so allocated to different foods, in accordance with the practical necessities, that on the basis of the probable consumption of the various foods consumers will not receive an aggregate quantity of poisons sufficient to jeopardize health.
> **\*\*9** S. Rep. No. 493, 73d Cong., 2d Sess. 4 (1934).

Thus, under the Food and Drug Act as enacted in 1938, Congress expressly provided a mechanism and standards for allowing poisonous and deleterious substances to be added to food. This section contemplated the consideration of the beneficial effects of pesticides, for example, in ensuring an adequate food supply. FN;B5[FN5]FN;F5 Even then, however, added substances **\*176** could not be permitted in a manner that jeopardized public health.

The existence and background of section 346 strongly suggests that beneficial effects of an added substance cannot be considered under another section of the Food and Drug Act, 21 U.S.C. § 342(a)(1), which does not contain express authorization or standards for doing so and is, in fact, written in terms which suggest that only detrimental effects may be considered, particularly if there would be a risk to the public health as a result of the addition of nitrites. FN;B6[FN6]FN;F6 Because the Meat Act, 21 U.S.C. § 601(m)(1) (1976), was drawn directly from section 342(a)(2) of the Food and Drug Act, the conclusion—drawn from the structure and legislative history of the Food and Drug Act—that possible detrimental effects cannot be balanced against beneficial effects would appear to apply equally to that section.

Finally, no significant administrative or judicial precedent appears to support such a balancing approach. Indeed, the opinion in *Schuck* v. *Butz*, 500 F.2d 810 (D.C. Cir. 1974) suggests just the opposite conclusion. In *Schuck*, the plaintiffs sought to require the Secretary of Agriculture to ban the addition of sodium nitrate and sodium nitrite to meat products on the ground that their alleged carcinogenic characteristics rendered the meat adulterated under section 601(m)(1). After express reference to USDA's view that these substances prevent the development of *Clostridium botulinum*, 500 F.2d at 811 n. 5, the court noted with seeming approval:

> **\*177** . . . the Department's apparent acceptance, on appeal, of appellant's assertions that possible beneficial effects are not relevant to a determination whether a product is adulterated, and that the proper standard of proof is whether there is convincing evidence that the product 'contains any poisonous or deleterious substance which *may* render it injurious to health.' 21 U.S.C. § 601(m)(1) (emphasis added).

500 F.2d at 812 n. 6. FN;B7[FN7]FN;F7 *Cf. Community Nutrition Institute* v. *Butz*, 420 F. Supp. 751, 755–56 (D.D. C.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 7 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                             Page 8

1976).

USDA has concluded that there are no substances aside from nitrites and nitrates and no processes which could be used on a sufficiently broad scale at the present time to prevent botulism in commercially processed meat products, and that, without nitrites and nitrates, common usage of products such as hot dogs or ham would not be possible without severe health hazards. These factors, cannot, however, alter the legal conclusion, which we believe clearly to be required.

For the foregoing reasons, we conclude that the Secretary of Agriculture may not balance the beneficial effects of nitrites and nitrates against their possible carcinogenic properties in determining whether these substances may render meat products injurious to health under 21 U.S.C. § 601(m)(1) (1976). We are unaware also of any basis for interpreting 21 U.S.C. §§ 601(m)(2)(A) or 601(m)(3) to authorize the Secretary to conclude that a substance which would be deemed to render meat unsound, unhealthful, unwholesome, or unfit for food based on its harmful effects is nevertheless not adulterated because of apparent beneficial effects.

**10 If the Secretary determines that nitrites adulterate meat, he would be obliged to revoke existing regulations authorizing their use and to take appropriate enforcement action if nitrites continue to be added after that time. *Community Nutrition Institute* v. *Butz*, 420 F. Supp. at 757.

### *178 B. Phasing out in products under FDA jurisdiction by exercise of enforcement discretion

The Secretary of HEW, acting through the Commissioner of FDA, proposes, should he finally determine that the addition of nitrites adulterates foods under his jurisdiction within the meaning of the Food and Drug Act, to exercise enforcement discretion to permit nitrites to be added to these foods over the period of gradual and indefinite phasing out of their use.

The proposed exercise of enforcement discretion by the Commissioner could presumably be effective only with respect to products other than meat and poultry subject to the Meat and Poultry Act. The Secretary of Agriculture is responsible for enforcing the latter two acts in the course of the mandatory inspections of meat and poultry carcasses and products. Any meat or poultry products that are found after inspection to be adulterated 'shall be condemned and destroyed.' 21 U.S.C. §§ 455(c), 604 (1976). This would appear to be a clear and mandatory duty, FN;B8[FN8]FN;F8 leaving little room for the exercise of discretion to permit adulterated products to enter commerce. FN;B9[FN9]FN;F9*See also* 21 U.S.C. §§ 452, 602 (1976); *compare Kendall* v. *United States*, 37 U.S. (12 Pet.) 524, 613 (1838); *National Treasury Employees Union* v. *Nixon*, 492 F.2d 587 (D.C. Cir. 1974). Any exercise of enforcement discretion by *179 FDA would likewise not appear to excuse USDA from these mandatory duties. FN;B10[FN10]FN;F10

If evidence is presented or comes to the attention of the Secretary indicating that a food additive currently permitted under existing regulations is unsafe, the Secretary must initiate proceedings to amend or repeal those regulations. 21 U.S.C. § 348(b), (d), (h) (1976).*See also*104 Cong. Rec. 17,421 (1958). We are informed that FDA intends, based on the evidence of the carcinogenicity of nitrites, to initiate proceedings to revoke existing food additive regulations authorizing their addition in certain products.

If it determines as a result of this process that nitrites are an unsafe food additive, FDA, to implement the proposed phasing out of nitrites, would replace these food additives regulations with regulations specifying the schedule and details of the suggested 'phase-out' of the use of nitrites, which, in effect will permit the continued addition of nitrites until a feasible substitute is developed. These regulations would not be food additive regulations, but a formalization of FDA's enforcement policy. They would be issued on the authority of 21 U.S.C. § 371 (1976), which provides for the Secretary to issue regulations for the efficient enforcement of the Act, and under the authority of 21 U.S.C. § 342 (1976), the adulteration section. The 'phase-out' regulations, as prepared by FDA, would be designed to permit the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0596

Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 8 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                    Page 9

addition of nitrites up to the level deemed necessary to prevent the development of *Clostridium botulinum* until the time that feasible alternative methods of prevention are developed.

**\*\*11** For the reasons that follow, we do not believe that the proposed phasing out through the withholding of enforcement is consistent with the Secretary's obligations under the Act.

As discussed earlier, 21 U.S.C. § 348(c)(3) (1976) provides that no food additive regulation shall issue (or, by implication, remain in effect) if a fair evaluation of the data before **\*180** the Commissioner fails to establish that the proposed use of the additive will be safe. The safety determination 'requires proof to a reasonable certainty that no harm will result from the proposed use of an additive,' S. Rep. No. 2422, 85th Cong., 2d Sess. 6 (1958), and does not permit harmful effects to be offset by beneficial effects. In addition, Congress chose to treat potentially carcinogenic substances with extreme caution by enacting the Delaney Clause, which prohibits the Secretary from establishing tolerances for any substance found to induce cancer when ingested by man or animal. Such a substance is therefore unsafe in whatever amount it may be added.

The immediate legislative history of the Delaney Clause of the Food Additives Amendment itself is somewhat sparse. However, the Secretary of HEW explained the reasoning for the absolute ban on carcinogenic substances during his testimony in 1960—less than two years after passage of the Food Additive Amendment—relating to a proposal to include the similar clause in the Color Additive Amendment.
> Our advocacy of the anticancer proviso in the proposed color additives amendment is based on the simple fact that no one knows how to set a safe tolerance for substances in human foods when these substances are known to cause cancer when added to the diet of animals . . ..

\*\*\*

> Unless and until there is a sound scientific basis for the establishment of tolerances for carcinogens, I believe the Government has a duty to make clear—*in law as well as in administrative policy*—that it will do everyting possible to put persons in a position where they will not unnecessarily be adding residues of carcinogens to their diet.

\*\*\*

> *Whenever a sound scientific basis is developed for the establishment of tolerances for carcinogens, we will request the Congress to give us that authority. We believe, however, that the issue is so important that the elected representatives of the people should have the opportunity of examining the evidence and* **\*181** *determining whether or not the authority should be granted to the executive branch.*

> *Hearings on Color Additives before the House Committee on Interstate and Foreign Commerce*, 86th Cong., 2d Sess. 61 (1960) [hereafter, cited as 'Color Additive Hearing'].*See also id.* at 500–01. FN;B11[FN11]FN;F11

This defense by the Secretary of the principle embodied in the Delaney Clause was quoted in the report of the House Interstate and Foreign Commerce Committee and relied upon by the Committee to support its decision to include a similar clause in the Color Additive Amendment. H.R. Rep. No. 1761, 86th Cong., 2d Sess. 11–14 (1960).FN;B12[FN12]FN;F12 The Committee expressly rejected proposals to weaken the anticancer clause in the Color Additive Amendment by allowing the Secretary to establish tolerance levels for carcinogenic substances or to permit a minute amount of a cancer-producing chemical to be added to food if a group of scientists concluded that the quantity to be tolerated was 'probably without hazard.' *Id.* at 13–14.

**\*\*12** In view of the fact that the anticancer clause in the Color Additive Amendment was patterned after that in the Food Additives Amendment, and was enacted on the basis of the Secretary's statement of its intended scope and rationale, based on his familiarity with and contemporaneous interpretation of the parallel clause in the Food Additives

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0597

Amendment, the foregoing represents a reliable indication of the purpose and effect of the clause in the Food Additives Amendment as well. *See also EDF* v. *HEW*, 428 F.2d 1083, 1091 (D.C. Cir. 1970).

The proposed regulations withholding enforcement for an indefinite and probably extended period of time with respect **\*182** to the addition of nitrites up to a certain level would, according to FDA, be issued pursuant to 21 U.S.C. § 371(a) (1976), which authorizes the Secretary of HEW to issue regulations for the 'efficient enforcement' of the Food and Drug Act. But a grant of authority such as this is only 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.' *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 213, 214 (1976). 'For regulations, in order to be valid, must be consistent with the statute under which they are promulgated.' *United States* v. *Larionoff*, 431 U.S. 864, 873 (1977). The regulations proposed here would ignore the statutory requirement of a finding to a reasonable certainty that no harm will result from the addition of a food additive and constitute the establishment of a tolerance in direct contravention of the edivent congressional judgment that there should be no tolerance for substances found, after appropriate tests, to induce cancer in man or animal. Such regulations would therefore not be consistent with the Food and Drug Act or further its 'efficient enforcement.'

FDA suggests, however, that while the Delaney Clause states an unequivocal standard with respect to the approval or disapproval of a food additive, it establishes no particular time frame or other requirements or procedures for the implementation or enforcement of a ban of a substance found to cause cancer. FDA points out that there is nothing in the legislative history, judicial interpretation, or commentary on the Delaney Clause addressing the scope of agency enforcement discretion or the manner of implementing a ban on a carcinogenic substance already in use. FDA infers from this silence that Congress did not intend to interfere with normal agency discretion in administering a statute, which FDA believes would permit the proposed phasing out of nitrite use over an indefinite period of time.

We do not believe that the scope of the Commissioner's implementation and enforcement discretion may be so readily divorced from the substantive provisions he is implementing and enforcing. The evident purpose of the Delaney Clause is to prohibit the *use* of additives which induce cancer in test animals, *cf. Bell* v. *Goddard*, 366 F.2d 177, 181, (7th Cir. 1966), not merely to furnish a procedural guidepost for the Commissioner in issuing or revoking regulations.

**\*\*13** FDA finds initial support for its argumemt in these provisions **\*183** of the Food and Drug Act, 21 U.S.C. § 348 (1976), establishing procedures for the issuance and revocation of food additive regulations. Under section 348(e), an order promulating or revoking such a regulation is effective upon publication, but the Secretary may stay the effectiveness of the order if a party adversely affected requests a hearing. Section 348(f)(3) then provides that the final order issued after the hearing may not go into effect prior to the 90th day after its publication unless the Secretary finds that emergency conditions exist necessitating an earlier effective date. FDA finds in this last provision a statutory basis for the view that the Commissioner has discretion to determine how to implement his orders, even if that implementation results in the continued use of an additive found to be unsafe.

We may assume that section 348(f)(3) does grant the Commissioner some discretion to establish a reasonable effective date for a final order revoking an existing food additive regulation, *cf. Niagara Mohawk Power Corp.* v. *FPC*, 379 F.2d 153 (D.C. Cir. 1967), and that a delayed effective date therefore might result in the continued use of an unsafe additive prior to that date. It would be a considerable leap, however, to conclude that this statutory language providing that an order may not go into effect for 90 days authorizes the Commissioner to permit continued use of a substance over a period of years. This is particularly so where, as here, the revocation is basis on a finding that the additive is unsafe, rather, for example, than a finding that the additive does not have the functional properties ascribed to it or that the tolerance level established in the regulation is in excess of that required to accomplish the function. The provision in section 348(f)(3) for an effective date before 90 days expire in 'emergency conditions' itself indicates that a finding that an additive is unsafe should result in a relatively early effective date.

Moreover, although the procedures for revoking a food additive regulation are, on their face, the same irrespective of the basis for concluding an additive is unsafe, it would seem that Congress' strong disfavor of carcinogenic substances, reflected in the Delaney Clause, necessarily circumscribes the Commissioner's authority to permit the continued use of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0598

Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 10 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                    Page 11

such a substance and establish a distant effective date of a final order revoking a food additive regulation. *Certified *184 Color Manufacturers Ass'n* v. *Mathews*, 543 F.2d 284, 297–98 (D.C. Cir. 1976); *EDF* v. *EPA*, 510 F.2d 1292, 1302 (D.C. Cir. 1975); *EDF* v. *Ruckelshaus*, 439 F.2d 584, 596 n.41 (D.C. Cir. 1971).*Cf. EDF* v. *HEW*, 428 F.2d at 1901–92. The effective date provisions of 21 U.S.C. § 348 do not furnish significant support for the proposed phase out. FN;B13[FN13]FN;F13

FDA does not rest its argument in favor of the phasing out solely, or even primarily, upon the effective date provisions of the Act, however. The phasing out proposal would apparently involve the final revocation of existing food additive regulations and substitution of other regulations setting forth the levels of nitrite which will not trigger enforcement by FDA. This, it is suggested, would constitute a permissible exercise of enforcement discretion. We disagree.

**14 *185** The principle of prosecutorial or enforcement discretion is frequently considered in the context of judicial review of decisions by Executive Branch officials to refuse to institute or continue specific administrative, civil and criminal proceedings. *See, e.g., Dunlop* v. *Bachowski*, 421 U.S. 560, 567 n.7 (1975); *Moog Industries, Inc.* v. *FTC*, 355 U.S. 411 (1958); *The Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1869); *Nader* v. *Saxbe*, 497 F.2d 676, 679 n.18 (D.C. Cir. 1974); *United States* v. *Cox*, 342 F.2d 167 (5th Cir. 1965), *cert. denied*, 381 U.S. 935 (1965). For example, the courts have customarily refused to order the criminal prosecution of particular individuals at the instance of private persons. These cases proceed on the assumption that the prosecutor is intended to have a certain discretion in enforcing the criminal law, legitimately taking into account factors other than the existence of probable cause, *Oyler* v. *Boles*, 368 U.S. 448, 456 (1962), such as the degree of culpability of the violator, the resulting harm, allocation of prosecutorial resources, the availability of other sanctions, and so on, *see, e.g., Nader* v. *Saxbe*, 497 F.2d at 679, n. 18;*Inmates of Attica Correctional Facility* v. *Rockfeller*, 477 F.2d 375, 379–82 (2d Cir. 1973); *Newman* v. *United States*, 382 F.2d 479 (D.C. Cir. 1967) (Burger, J.).

The doctrine that courts should not interfere with particular decisions not to prosecute is also thought to be an incident of separation of powers under the Constitution, which vests in the President, not the Judiciary, the duty to 'take Care that the Laws be faithfully executed.'U.S. Const., Art. II, § 3.*See, e.g., Nader* v. *Saxbe*, 497 F.2d 679 n. 18;*Newman* v. *United States*, 382 F.2d at 481;*cf. Dunlop* v. *Bachouski*, 421 U.S. at 575–76. These same principles no doubt underlie a judicial reluctance to review individual decisions declining to seek administrative or civil enforcement, *The Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1868); *Vaca* v. *Sipes* 386 U.S. 171, 182 (1967); *Moog Industries, Inc.* v. *FTC*, 355 U.S. 411 (1958), although limited review may be available in some such cases, *see Dunlop* v. *Bachowski*, 421 U.S. 560 (1975).

The question of reviewability of the proposed withholding of enforcement is not involved in this memorandum. Even in the absence of such review, however, the President has a constitutional duty to 'take Care that the Laws be faithfully executed.'The Secretary of HEW, the Commissioner, and the *186 Attorney General perform their duties in the administration and enforcement of the Food and Drug Act under the general superintendence of the President, and are his agents in fulfillment of his obligation to take care that the Food and Drug Act is faithfully executed, *Myers* v. *United States*, 272 U.S. 52, 135 (1926); *Ponzi* v. *Fessenden*, 258 U.S. 254, 262 (1922); *United States* v. *Cox* 342 F.2d at 171.

**15** We may assume that faithful execution of the laws ordinarily does permit the exercise of judgment in deciding how best to implement that law in the myriad of factual situations with which an agency is confronted. K. David, *Discretionary Justice* 38–39 (1969. This discretion ordinarily may be assumed to extend to the design of the most effective enforcement mechanism and to the decision whether the purposes of the statute concerned and that ends of justice require the initiation or termination of proceedings in particular case, Abrams, *Internal Policy: Guiding the Exercise of Prosecutorial Discretion*, 19 U.C.L.A. L. Rev. 1, 3 (1971); Kadish, *Legal Norm and Discretion in the Police and Sentencing Processes*, 75 Harv. L. Rev. 904, 906–19 (1962); Note, *The Special Prosecutor in the Federal System: A Proposal*, 11 Amer. Crim. L. Rev. 577, 591–92, 609–10 (1973), although Congress can presumably limit agency discretion when it chooses, *see, e.g., The Confiscation Cases*, 74 U.S. at 457; *United States* v. *Morgan*, 222 U.S. 274, 280–81 (1911); FN;B14[FN14]FN;F14*Bachowski* v. *Brennan*, 502 F.2d 79, 88 & nn. 12, 13 (3d Cir. 1974), *modified on other *187 grounds sub nom. Dunlop* v. *Bachowski*, 421 U.S. 560 (1975); *Adams* v. *Richardson*, 480 F.2d

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 11 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                    Page 12

1159, 1162–63 (D.C. Cir. 1973) (enbanc); 2 Op. Att'y Gen. 482, 486 (1831).

There are, for example, particular cases arising under any statutory scheme in which an alleged violation is merely minor and technical or difficult of proof or in which the prudent allocation of resources or equitable factors weigh against the initiation of administrative, civil, or criminal proceedings, even where it appears there may have been a violation of the literal terms of the statute. *See, e.g., ABA Standards Relating to the Administration of Criminal Justice, The Prosecution Function* § 39 (1974) [hereinafter cited as ABA Standards].*See generally* S. Cox, *Prosecutorial Discretion: An Overview*, 13 Amer. Crim. L. Rev. 383, 411–34 (1977). In the absence of an indication to the contrary, we may assume that Congress does not expect responsible agency officials to act in all such cases, Cox, *supra* at 385–89.This type of enforcement or prosecutorial discretion may ordinarily be considered consistent with the faithful execution of the laws. The legitimacy of the factors entering into the enforcement decision and the realization that courts cannot readily supervise their consideration no doubt explain the reluctance of courts to review individual prosecution decisions. *Bachowski* v. *Brennan*, 502 F.2d at 88,*citing* Davis, *Administrative Law Treatise*, § 28.16 at 984 (1970 Supp.); *Nader* v. *Saxbe*, 497 F.2d at 679 n. 18.

Congress expressly sanctioned at least a degree of this type of discretion in enacting the Food and Drug Act. **\*188**Section 336 of Title 21 provides that the Secretary is not required: 'to report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this [Act] whenever he believes that the public interest will be adequately served by a suitable written notice or warning.'The purpose of this provision was described by the Senate Committee as follows:

> **\*\*16** Violations of the law sometimes occur which are of technical or formal nature only and which do not result in deception or other imposition on public welfare. Usually such violations are inadvertent and their correction can be promptly effected by calling them to the attention of the manufacturer. This section would authorize the enforcing agency to follow this course. It is not intended that this procedure should apply where the violation is more than merely technical and becomes one of substance rather than form. In no event is the conventional legal procedure denied if such action is necessary to effect compliance.
> S. Rep. No. 361, 74th Cong., 1st Sess. 28–29 (1935).*See also*S. Rep. No. 493, 83d Cong., 2d Sess. 19 (1934).

Congressman Lea defended this provision on the House floor by noting: 'there is nothing more common in the administration of justice than the exercise of discretion of a prosecuting attorney where he knows it is impracticable to prosecute purely technical violations of the law.'83 Cong. Rec. 7794 (1938).*See also id.*, at 7793;H.R. Rep. No. 2139, 75th Cong., 3d Sess. 5 (1938).

The FDA has informed you that it would not regard the deliberate, continued additions of a carcinogenic substance to food—even at a controlled level—as minor violations within the meaning of 21 U.S.C. § 336 (1976). This conclusion is compatible with the legislative history of the Delaney Clause expressing a clear congressional purpose to prevent the establishment of *any* tolerance level for a substance found to cause cancer when ingested by man or animals. Such violations would appear to be ones of 'substance rather than form' for which enforcement 'action is necessary to effect compliance.'S. Rep. No. 361, 74th Cong., 1st Sess. 28–29 (1935). Therefore, the proposed phasing out of nitrite use does not conform to the scope of enforcement discretion contemplated **\*189** by the Congress when it enacted the Food and Drug Act. The fact that Congress has expressly sanctioned and established standards for the exercise of enforcement discretion in underline section 336 should itself caution against a broad assertion of discretion in a situation not covered by that section.

We do not at all question the authority of agencies generally to establish guidelines for enforcement in certain categories of cases. Such a formalized policy may have the purpose or effect of ensuring consistency while allocating scarce agency resources to the most serious types of violations. *See, e.g., Redmond* v. *United States*, 384 U.S. 264 (1966) (policy of declining to prosecute under statute prohibiting mailing of obscene matter where correspondence is between two private individuals); *Petite* v. *United States*, 361 U.S. 529 (1960) (policy of declining prosecution where there has been a State prosecution); *United States* v. *Atlantic Richfield Co.*, 297 F. Supp. 1061, 1072–73 (S.D.N.Y. 1969); *Discretionary Justice* 198–203 (antitrust merger guidelines); Civil Service Commission, Department of Jus-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0600

Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 12 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                              Page 13

tice, EEOC, Department of Labor Uniform Guidelines on Employee Selection Procedures, 43 Fed. Reg. 38,310–38,315 (1958) (statements of enforcement) policy with respect to selection criteria that have disproportionate impact on minority hiring); ABA Standards, *supra*, § 3.9(b)(ii)–(iii). The courts have expressly sanctioned formal and informal enforcement policies of this type designed by the FDA to weed out minor violations of the Food and Drug Act, relying on the minor violation provision in 21 U.S.C. § 336 (1976), *See, e.g., United States* v. *484 Bags, More or Less,* 423 F.2d 839, 841 (5th Cir. 1970); *United States* v. *449 Cases, Etc.,* 212 F.2d 567, 572–73 (2d Cir. 1954).*See also United States* v. *Goodman,* 486 F.2d 847 (7th Cir. 1973).FN;B15[FN15]FN;F15*190 As in the case of the Uniform Guidelines on Employee Selection Procedures and the Merger Guidelines, a formalized policy may also serve to inform the public of the agency's view of a statute that is vague and capable of broad application, thereby giving an element of certainty to interested parties in the private sector. K. David, *Discretionary Justice, supra* at 198–203; *United States* v. *Ewig Bros. Co. Inc.,* 502 F.2d 715, 724 (7th Cir. 1974), *cert. denied,* 420 U.S. 945 (1975).

**\*\*17** The proposed phasing out of nitrites through the withholding of enforcement is of a different order. It would not be a mere formalization of FDA policy on the allocation of scarce enforcement resources, an identification of minor violations, or an effort to give content or limits to a vague statute. The effect of the policy—indeed its purpose—would be to authorize the continued use of nitrites in certain products under circumstances that would concededly constitute non-minor violations of the specific terms of the Food and Drug Act.

The courts that have recognized that Executive Branch officials must have some discretion in the enforcement of laws have recognized that there are legal limitations on the exercise of discretion that the officials are bound to follow. *See, e.g., Dunlop* v. *Bachowski,* 421 U.S. at 574;*Joint Tribal Council of the Passamaquoddy Tribe* v. *Morton,* 528 F.2d 370, 379–80 (1st Cir. 1975); *Nader* v. *Saxbe,* 497 F.2d at 679–80 n. 19;*Adams* v. *Richardson* 480 F. 2d at 1161– 62. Congress has imposed just such limitations on FDA, prohibiting the approval of a substance absent a finding of 'no harm,' the consideration of beneficial effects, and the establishment of a tolerance for a carcinogenic substance. Phasing out nitrites through the withholding of enforcement based on these considerations would therefore not constitute the exercise of discretion, but a contravention of limitations Congress deliberately placed on administrative discretion. To decline to seek enforcement in the manner proposed would constitute an abdication of enforcement responsibilities. *Dunlop* v. *Bachowski,* 421 U.S. at 574,*Office Employes Local 11* v. *NLRB,* 353 U.S. 313 (1957); *Adams* v. *Richardson,* **480 F. 2d 1159** ( **D.C. Cir. 1973)**; *Nader* v. *Saxbe,* 497 F.2d at 679–80.

The public health considerations underlying the desire to permit the continued addition of nitrites and nitrates to certain foods are clearly important. But the balancing of these competing health risks is a matter for the Congress in determining whether to amend the Food and Drug Act, not for the Secretary in administering the law.

Secretary Flemming addressed this issue during his testimony before the House Committee in 1960 regarding the anticancer clause of the proposed Color Additive Amendment. At the Secretary's request, a report by the National Cancer Institute was inserted in the record. The report in turn cited the conclusion of a report entitled 'Problems in the Evaluation of Carcinogenic Hazard From Use of Food Additives' prepared by a subcommittee of the Food Protection Committee of the National Academy of Sciences—National Research Council:

> Because of the vagueness of present knowledge concerning quantitative aspects of the carcinogenic process, use of any amount of a carcinogen as a food additive probably is justified only if (1) values to the public are such that banning the use would constitute an important loss or hardship, and (2) there is no reasonably good noncarcinogenic alternative.

**\*\*18 \*192** Secretary Flemming then stated:

> In connection with the statement just quoted from the Food Protection Committee report, I want to call attention to the fact that the two criteria recommended by the Committee are connected, not by an 'or' but by an 'and.' I am advised by Commissioner of Foods and Drugs George P. Larrick that he and his associates know of no situation in this country which meets both of these criteria. If and when such a situation does develop, we will present the facts to the Congress with a request for appropriate action. We believe such situations—if they occur at all—will be so few and far between that a decision to subject the public to the risk involved should be a joint decision on the part of both the legislative and executive branches. *Color: Additives Hearing,* at 60–61.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0601

Case 1:18-cv-00068    Document 472-4    Filed on 08/21/20 in TXSD    Page 13 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                        Page 14

Accordingly, if the Secretaries take the view that circumstances warrant, for an indefinite period of time, the addition of nitrites and nitrates to the foods in question because of a public interest in the continued availability of the foods and because of the absence of alternative, noncarcinogenic preservatives, the course to be taken, as contemplated when the statute was enacted in 1960, would be to seek special legislation.

Congress last year took just this approach with respect to saccharin, although not at the instance of FDA. The Saccharin Study and Labeling Act, P.L. 95–203, 91 Stat. 1451 (1977), postponed the effective date of a proposed Saccharin test under the Delaney Clause on the ground that there was an important public interest in its continued availability, at least for a period of further study, despite tests indicating it caused cancer in animals. *See* H.R. Rep. No. 658, 95th Cong., 1st Sess. 8 (1977); S. Rep. No. 353, 95th Cong., 1st Sess. 5, 7 (1977). The inflexibility of the Delaney Clause was a principal issue in the Saccharin debate, H.R. Rep. No. 658, *supra* at 4–5, 7, 36–37; S. Rep. No. 353, *supra* at 7; *Hearing on the Banning of Saccharin before a Subcommittee of the Senate Committee on Human Resources*, 95th Cong., 1st Sess. 7, 37, 54, 95, 99–100, 129 (1977) [hereafter, cited as 1977 Senate Hearing]; *Hearing on Moratorium on Saccharin Ban before a Subcommittee of the House Interstate and Foreign Commerce* *193 *Committee*, 95th Cong., 1st Sess. 64, 77, 82 (1977) [hereafter, cited as 1977 House Hearing], particularly because, in that case, as with nitrites, there was not alternative noncarcinogenic substance available. *1977 Senate Hearing, supra* at 37, 127–29; *1977 House Hearing, supra* at 83–84. Accordingly, in section 2(a)(1) of the Saccharin Study and Labeling Act, Congress directed the Secretary of HEW to conduct a study of the current regulatory policy regarding substances found to induce cancer in animals, including a consideration of how the benefits of such substances could be weighed against their harmful effects. There was agreement that the Delaney Clause, as currently in effect, did not permit a weighing of benefits and risks, S. Rep. No. 353, *supra* at 4, 7; H.R. Rep. No. 658, *supra*, at 5, 37, and Commissioner Kennedy expressly eschewed the existence of any such authority, either under the Delaney Clause or the Food Additives Amendment generally, *1977 House Hearing, supra* at 64, 69; *1977 Senate Hearing* at 132.

**19 There is, moreover, no suggestion in the legislative history of the Saccharin Study and Labeling Act that the Secretary would or could avoid the automatic impact of the Delaney Clause by withholding enforcement. Indeed, although the question of enforcement was never directly raised, FN;B16[FN16]FN;F16 the Delaney Clause was on a number of occasions said to require that food containing a carcinogen be removed from the market, H.R. Rep. No. 658, *supra* at 7, or to prohibit FDA from authorizing 'further use of an additive based on a judgment that the benefits of continued use outweigh the risks involved,' *id.* at 5. *See also id.* at 17, 19, 36; S. Rep. No. 353, *supra* at 3, 5, 7.

Conclusion

The Secretaries of HEW and Agriculture have the discretion, upon making a finding that nitrites are carcinogenic, to adopt timetables and procedures to assure the orderly removal of that substance from commerce. It is our opinion that the Secretaries, however, do not have the authority to balance *194 the benefits of nitrites against their potential harm and determine that their continued use will be permitted until such time as a feasible substitute is developed and put in place. Upon a determination by the Secretaries that an additive causes cancer in man or animals, the decision whether the statutory ban shall be postponed or eliminated is reserved to the Congress.

JOHN M. HARMON

Assistant Attorney General, Office of Legal Counsel.

FN1 As is this Office's traditional practice, we have limited our factual review in this memorandum according to the standards applicable to formal opinions of the Attorney General. Consequently, we do not purport to resolve any questions of fact that may under lie the present inquiry. *See* 6 Op. Att'y. Gen. 326, 334 (1854). It is properly for the Departments of Agriculture and of HEW, in matters within their respective jurisdictions, to determine whether nitrites do induce cancer in laboratory animals, whether they have the beneficial effects discussed below in preventing the development of *Clostridium botulinum*, and whether nitrites, under the applicable legal standards, adulterate food to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

which they are added. Other questions, such as whether the use of nitrites in meat or poultry products was sanctioned by the Department of Agriculture prior to 1958 and whether nitrites constitute 'color additives,' are involved in on-going litigation, and it would similarly be inappropriate to discuss them in our memorandum. *See, e.g.*, 41 Op. Att'y. Gen. 266, 272 (1956); 32 Op. Att'y. Gen. 472, 473 (1921). This memorandum, therefore, must not be viewed as suggesting any final determination on any of the issues mentioned above, on which members of the public may still have an opportunity to comment or, in certain circumstances, to request a hearing. We shall, however, make certain necessary assumptions regarding the factual and legal issues mentioned in order to address fully the questions raised by the Secretaries.

FN2 The Secretaries are apparently of the view that nitrites are not essential for inhibiting the growth of *Clostridium botulinum* in other contexts, such as in home cures and pet foods and as an 'indirect food additive' which may be added to food as a result of its use in articles that contact the food. They, therefore, propose to ban nitrites for those uses as soon as possible. *See* 21 C.F.R. § 174.5(a)(1) (1978).

FN3 As explained above, we have assumed that the use of nitrites in poultry and poultry products does not enjoy a prior sanction exempting that use from the definition of the term 'food additive.' Thus, if FDA determines that nitrites are unsafe food additives, this will automatically render poultry and poultry products to which they are added adulterated, 21 U.S.C. § 453(g)(2)(C) (1976), without reference to the more general adulteration standards in the Poultry Act which are identical to those in the Meat Act discussed in the text. 21 U.S.C. § 453(g)(1), (2)(A), (3) (1976). If nitrites used in poultry products are found to enjoy a prior sanction, the discussion in the text would be relevant to a determination whether nitrites adulterate poultry under the more general adulteration standards in the Poultry Act, which were revised in 1968 to conform to the comparable provisions of the Meat Act.

FN4 The standard of adulteration involved in *Lexington Mill* was carried forward in the Food and Drug Act, 21 U.S.C. § 342(a)(1) (1976). *Flemming* v. *Florida Citrus Exchange*, 358 U.S. 153, 161 (1958). The adulteration provisions of the Meat Act were expressly patterned after those in the Food and Drug Act. S. Rep. No. 799, 90th Cong., 1st Sess. 6–7 (1967). We may assume, therefore, that the discussion in *Lexington Mill* applies equally to the essentially similar language in 21 U.S.C. § 601(m)(1) (1976).

FN5 Because our basic concern here is with the Meat Act, we need not consider whether the authority under section 346(a) of the Food and Drug Act to establish tolerances for a substance required in the 'production' of food would extend to tolerances for a substance added at the processing stage for preservation purposes, as is the case with nitrites.

FN6 Under the Food Additives Amendment of 1958, the finding that an additive is safe 'requires proof of a reasonable certainty that no harm will result from the proposed use of an additive.' S. Rep. No. 2422, 85th Cong., 2d Sess. 6 (1958). Also, the Secretary is permitted by the Food Additives Amendment to establish a tolerance for an added substance at a level no higher than that required to 'accomplish the [intended] physical or other technical effect.' 21 U.S.C. § 348(c)(4)(A) (1976). The last-quoted phrase 'refers to the objective effect which the additive may have on the appearance, flavor, texture, or other aspects of a food. The question of whether an additive produces such effect . . . is a factual one, *and does not involve any judgment on the part of the Secretary of whether such effect results in any added 'value' to the consumer . . .*.' S. Rep. No. 2422, *supra* at 7 (emphasis added.)
Thus, in 1958, Congress expressly limited the safety determination to a consideration of whether harm would result and likewise prohibited the Secretary of HEW (through FDA) from making the difficult value judgments that would be required under a balancing approach. There is no indication that these requirements were viewed as departures from prior law.

FN7 The court affirmed the grant of summary judgment in favor of the Secretary noting that the proper procedure for the plaintiffs to follow was to petition the Secretary to initiate rulemaking proceedings under 7 C.F.R. § 1.27 (1977) to repeal the USDA regulation permitting the addition of nitrate and nitrite to fix color in red meat.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0603

Case 1:18-cv-00068   Document 472-4   Filed on 08/21/20 in TXSD   Page 15 of 221

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                          Page 16

FN8 In addition, 21 U.S.C. § 604 (1976) requires that any meat product found not to be adulterated be stamped 'Inspected and passed,' and any product found to be adulterated be stamped 'Inspected and condemned.' The exercise of enforcement discretion by USDA would therefore also require the inspector to ignore these statutory labeling requirements.

FN9 We need not consider here whether, notwithstanding the inspection, condemnation, and destruction requirements, the Secretary of Agriculture has implied authority—derived from his authority to decline to refer minor violations of the acts, 21 U.S.C. §§ 462. 676(b) (1976), or elsewhere—to set tolerance limits for *de minimus* or technical adulteration of poultry or meat products under 21 U.S.C. §§ 453(g)(3)–(4) and 601(3)–(4) (1976).*See, e.g., United States* v. *Ewig Bros. Co. Inc.*, 502 F.2d 715, 720 (7th Cir. 1974) (Stevens, J.) *Cert. denied*, 420 U.S. 945 (1975), and cases cited. For reasons set forth later in this opinion, if nitrites are determined to be unsafe food or color additives or otherwise to adulterate food because of possible carcinogenic properties, their widespread continued use could likely not be considered mere minor or technical violations, and USDA would apparently not regard them as such.

FN10 The discussion that follows regarding FDA's enforcement discretion would cast considerable doubt on the ability of the Secretary of Agriculture to permit the continued addition of nitrites to meat and poultry products even in the absence of the statutory requirement that adulterated meat and poultry products be condemned and destroyed. *See also Certified Color Manufacturers Ass'n* v. *Mathews*, 543 F.2d 284, 297–98 (D.C. Cir. 1976); *EDF* v. *EPA*, 510 F.2d 1292, 1302 (D.C. Cir. 1975); *EDF* v. *Ruckelshaus*, 439 F.2d 584, 596 n. 41 (D.C. Cir. 1971); *EDF* v. *HEW*, 428 F.2d 1083, 1091–92 (D.C. Cir. 1970).

FN11 The absence of a scientific basis for establishing tolerances for carcinogenic substances was also given, in a paper inserted in the Congressional Record by Representative Delaney shortly after the House in 1958 passed the food additive bill containing the Delaney Clause, as a reason for supporting a ban on carcinogenic additives. 104 Cong. Rec. A7738–7740 (1958) (Remarks of Representative Delaney).*See also EDF* v. *HEW*, 428 F.2d 1083, 1091 (D.C. Cir. 1970).

FN12 The Senate-passed version of the color additive bill did not contain the anticancer clause, *see*S. Rep. No. 795, 86th Cong., 1st Sess. 25–28 (1959), and there were no hearings or debates on the bill on the Senate side, *see*106 Cong. Rec. 14,349 (1960) (Remarks of Representative Delaney). The pertinent legislative history of the Delaney Clause in the Color Additive Amendment, then, is the rather extensive record on the House side.

FN13 FDA cite a number of situations in which orders revoking the authorization for use of a substance in food have permitted existing stocks of food to which the substance has already been added to be used up. *See, e.g.*, 34 Fed. Reg. 17063 (1969), 19547 (1969); 41 Fed. Reg. 5823 (1976); 41 Fed. Reg. 41852 (1976); 41 Fed. Reg. 41857 (1976). You have not been asked for your opinion on the validity of such a policy with respect to foods to which nitrites have been added if the Commissioner should finally determine that nitrites are unsafe food additives. But a policy of exempting existing stocks of food, presumably because of the problems and equitable factors attendant to a recall of foods, would not furnish a precential basis for a phasing out that would permit the continued addition of nitrites to foods.

FDA also cites two cases involving EPA's decision under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) to provide in an interim suspension order prohibiting the use of the pesticides aldrin and dieldrin that existing stocks of the pesticides could be used up. In *EDF* v. *EPA*, 510 F.2d 1292 (D.C. Cir. 1975), the court noted EPA's justification for these exemptions was that 'no appreciable and realistically retrievable stocks existed at the time of the order.' EPA later informed the court that approximately 5 percent of the total 1974 amount of aldrin granules would be available for 1975 and that EPA intended to investigate the matter further, a re-evaluation the court found 'entirely appropriate.' *Id.* at 1306.In *EDF* v. *EPA*, 548 F.2d 998 (D.C. Cir. 1976), *cert. denied*, 431 U.S. 925 (1977), the court had 'no doubt' of EPA's authority to exempt existing stocks from a suspension order under FIFRA, even though the statute did not expressly authorize it, but concluded that the Administrator acted arbitrarily in doing so without even inquiring into the amount of stocks left and the feasibility of returning and disposing of them. *Id.* at 998.Both cases therefore suggest that there were limitations to the Administrator's authority to permit all existing stocks to be used up. Moreover, the FIFRA, unlike the Food and Drug Act, does not contain an anticancer clause, and, by contrast, af-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0604

firmatively requires a weighing of risks and benefits in making a suspension determination. 7 U.S.C. §§ 136(l), 136(bb)136d(c)(1) (1976).See EDF v. EPA, 548 F.2d at 1003. These cases lend little support to the phasing out proposal, which would permit continued additions of nitrites to foods over an extended period of time—not under an interim suspension order, but after a final determination that they are unsafe.

FN14 Section 5 of the Food and Drugs Act of 1906 provided that it 'shall be the duty of each United States attorney to whom the Secretary . . . reports any violation for institution of criminal, libel of information for condemnation or other proceedings . . . to cause appropriate proceedings to be instituted in the proper courts of the United States without delay.'This provision was interpreted in *United States* v. *Morgan* as creating a mandatory duty to act on the Secretary's recommendation. *See also* United States v. 75 Barrels of Vinegar, 192 F. 350, 352 (N.D. Iowa 1911).

As it passed the Senate, section 9 of S. 5, 75th Cong., 1st Sess. (1937), the bill eventually enacted as the Food and Drug Act, would have carried forward this section. C. W. Dunn, *Federal Food, Drug and Cosmetic Act* 781 (1938). The Senate also adopted an amendment to the section that became section 305 of the Food and Drug Act providing that if, after the required notice and hearing prior to referral of a criminal case 'it appears that any of the provisions of this act have been violated by such person, then the Secretary shall at once certify the facts to the proper United States at-torney.' 81 Cong. Rec. 2008 (1937).Compare21 U.S.C. § 336 (1976). These two provisions would have greatly cur-tailed the Secretary's and the Attorney General's discretion.

The provision imposing a duty on U.S. Attorneys to institute proceedings was deleted by the House committee without explanation. The requirement that the Secretary at once certify facts to the U.S. Attorney if he concluded after a hearing that a violation had occurred was deleted by the House committee as 'unnecessary.' H.R. Rep. No. 2139, 75th Cong., 3d Sess. 5 (1938). This might have meant that imposition of an express referral duty was 'unnecessary' because the Secretary would be expected to refer such cases in any event, or it could have been thought 'unnecessary' because it went too far in limiting the Secretary's discretion, particularly in view of the authorization in the secceeding section of the Senate bill to decline to refer minor violations. In any event, the provisions of the Senate-passed bill reflect a concern for enforcement that we cannot, in the absence of any contrary indication in the legislative history, conclude had abated by the time of enactment of the Food and Drug Act.

FN15 FDA has cited United States v. Goodman, 486 F.2d 847 (7th Cir. 1973), as support for phasing out nitrites. That was an action seeking to enjoin the shipment of chubs containing DDT in excess of 5 ppm., the amount established in interim FDA enforcement guidelines. DDT is a pesticide chemical for which the Administrator of EPA had banned almost all agricultural commodities affected by DDT effective December 31, 1972, after intensive study indicated that DDT may be carcinogenic. 486 F.2d at 854. EPA was authorized to establish tolerances for DDT, taking into account the need to ensure an adequate food supply, on one hand, and the carcinogenic or other harmful properties of DDT, on the other. EPA had not established a tolerance for DDT in fish because the amount derived from other sources was expected to decline as a result of the ban and because studies were still outstanding on its carcinogenic properties. Id. at 854–55.In the absence of a tolerance, any amount of DDT on any agricultural commodity would, as a technical matter, adulterate the commodity for purposes of the Food and Drug Act. 21 U.S.C. §§ 342(a)(2)(B), 346a (1976). All fish and apparently all food, apparently contained some traces of DDT, and to enforce the Act literally would have been impossible. The court held that FDA had authority to abide by its interim enforcement guidelines for fish, citing 21 U.S.C. § 336 (1976), the provision permitting the Secretary to excuse minor violations. 486 F.2d at 855.

*Goodman* does not support the phasing out proposed. Nitrites are deliverately added to some foods, whereas residues of DDT were present in most foods at the time of *Goodman* notwithstanding a near-total ban against new additions of the substance. Moreover, FDA's establishment of a 'tolerance' in enforcement guidelines was consistent with the statutory scheme which permitted EPA to establish tolerances. 486 F.2d at 855. *See also* United States v. Ewig Bros. Co. Inc. 502 F.2d 715, 720–21 (7th Cir. 1974), *cert. denied.* 420 U.S. 945 (1975). No administrative agency has au-thority to establish tolerances for nitrites if FDA concludes they have been found to cause cancer when ingested by man or animal, and the Food Additives Amendment, 21 U.S.C. § 348 (1976), unlike the Pesticide Chemical Amendment, 21 U.S.C. § 346a (1976), contains no authorization to consider beneficial effects of a substance in producing an adequate food supply.

FN16 There would have been no occasion to consider the issue, because the FDA's notice of proposal to revoke the

CAR 0605

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)                                         Page 18

interim food additive regulation for saccharin indicated an intention to enforce the ban immediately following the effective date of the order. H.R. Rep. No. 658, 95th Cong., 1st Sess. 17, 44–45 (1977).

43 U.S. Op. Atty. Gen. 163, 1979 WL 16530 (U.S.A.G.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0606



8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)                                    Page 1

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)

Office of Legal Counsel
U.S. Department of Justice

**\*\*1 \*101** PROSECUTION FOR CONTEMPT OF CONGRESS OF AN EXECUTIVE BRANCH OFFICIAL WHO
HAS ASSERTED A CLAIM OF EXECUTIVE PRIVILEGE

May 30, 1984

As a matter of statutory construction and separation of powers analysis, a United States Attorney is not required to refer a congressional contempt citation to a grand jury or otherwise to prosecute an Executive Branch official who carries out the President's instruction to invoke the President's claim of executive privilege before a committee of Congress.

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

I. Introduction

This memorandum memorializes our formal response to your request for our opinion whether, pursuant to the criminal contempt of Congress statute, 2 U.S.C. ss 192, 194, a United States Attorney must prosecute or refer to a grand jury a citation for contempt of Congress issued with respect to an executive official who has asserted a claim of executive privilege in response to written instructions from the President of the United States. Your inquiry originally arose in the context of a resolution adopted by the House of Representatives on December 16, 1982, during the final days of the 97th Congress, which instructed the Speaker of the House of Representatives to certify the report of the Committee on Public Works and Transportation concerning the "contumacious conduct of the Administrator, United States Environmental Protection Agency, in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee . . . to the United States Attorney for the District of Columbia, to the end that the Administrator . . . may be proceeded against in the manner and form provided by law." H.R. Res. 632, 97th Cong., 2d Sess. (1982).FN:B1[FN1]FN:F1 Section 192 of Title 2, United States Code, provides, in general, that willful failure to produce documents in response to a congressional subpoena shall be a misdemeanor. Section 194 provides that if such a failure is reported to either house of Congress it "shall" be certified to the "appropriate United States attorney whose duty it shall be to bring the matter before the grand jury for its action."

**\*102** Your inquiry presents a number of complex issues that will be considered in this memorandum. The first issue is whether the Executive retains some discretion with respect to referral of a contempt of Congress citation to a grand jury. This issue raises questions of statutory construction and the separation of powers with respect to the scope of the Executive's exercise of prosecutorial discretion. The second issue is whether the criminal contempt of Congress statute applies to an Executive Branch official who, on the orders of the President, asserts the President's claim of executive privilege. This issue also involves questions of statutory interpretation and the constitutional separation of powers.

As we have previously discussed with you, and as we explain in detail in this memorandum, we have concluded that, as a matter of both statutory construction and the Constitution's structural separation of powers, a United States Attorney is not required to refer a contempt citation in these circumstances to a grand jury or otherwise to prosecute an Executive Branch official who is carrying out the President's instruction in a factual context such as that presented by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the December 16, 1982, contempt citation. First, as a matter of statutory interpretation reinforced by compelling separation of powers considerations, we believe that Congress may not direct the Executive to prosecute a particular individual without leaving any discretion to the Executive to determine whether a violation of the law has occurred. Second, as a matter of statutory interpretation and the constitutional separation of powers, we believe that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege in this context.

**2 Our conclusions are predicated upon the proposition, endorsed by a unanimous Supreme Court less than a decade ago, that the President has the authority, rooted inextricably in the separation of powers under the Constitution, to preserve the confidentiality of certain Executive Branch documents. The President's exercise of this privilege, particularly when based upon the written legal advice of the Attorney General, is presumptively valid. Because many of the documents over which the President may wish to assert a privilege are in the custody of a department head, a claim of privilege over those documents can be perfected only with the assistance of that official. If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution.

Before setting out a more detailed explanation of our analysis and conclusions, we offer the caveat that our conclusions are limited to the unique circumstances that gave rise to these questions in late 1982 and early 1983. *103 Constitutional conflicts within the federal government must be resolved carefully, based upon the facts of each specific case. Although tensions and friction between coordinate branches of our government are not novel and were, in fact, anticipated by the Framers of the Constitution, they have seldom led to major confrontations with clear and dispositive resolutions.

The accommodations among the three branches of the government are not automatic. They are undefined, and in the very nature of things could not have been defined, by the Constitution. To speak of lines of demarcation is to use an inapt figure. There are vast stretches of ambiguous territory.

Frankfurter and Landis, Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts, 37 Harv. L. Rev. 1010, 1016 (1924) (emphasis in original)."The great ordinances of the Constitution do not establish and divide fields of black and white."Springer v. Philippine Islands, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting). Therefore, although we are confident of our conclusions, prudence suggests that they should be limited to controversies similar to the one to which this memorandum expressly relates, and the general statements of legal principles should be applied in other contexts only after careful analysis.

## II. Background

Because the difficult and sensitive constitutional issues that we consider in this opinion could conceivably be resolved differently depending upon the specific facts of a controversy, this analysis is presented in the context of the December 16, 1982, actions of the House of Representatives. The facts surrounding this dispute will be set out in detail in the following pages.

### A. EPA's Enforcement of the Superfund Act

**3 On December 16, 1982, the House of Representatives cited the Administrator of the Environmental Protection Agency (EPA) because she declined to produce, in response to a broad subcommittee subpoena, a small portion of the subpoenaed documents concerning the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. ss 9601, 9657 (Supp. V 1981) (Superfund Act). The Superfund Act, adopted in December of 1980, authorizes the federal government to take steps to remedy the hazards posed by abandoned and inactive hazardous waste

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0608

sites throughout the United States. FN;B2[FN2]FN;F2 The EPA, which was delegated part of the President's authority to enforce the Superfund Act in August of 1981, FN;B3[FN3]FN;F3 has considerable flexibility with respect to *104 how this goal may be accomplished. EPA may request the Department of Justice to proceed immediately against those responsible for the hazardous waste sites to "secure such relief as may be necessary to abate" an " imminent and substantial endangerment to the public health or welfare or the environment." See 42 U.S.C. s 9606. Alternatively, EPA may initiate clean-up efforts itself by using funds from the $1.6 billion Superfund. See 42 U.S.C. s 9631. If EPA itself implements the clean-up efforts, it may subsequently sue those responsible for the hazardous waste to recover the clean up cost and, in some instances, may obtain treble damages. See 42 U.S.C. s 9607. These two basic enforcement mechanisms are supplemented by other broad enforcement powers, which authorize the issuance of administrative orders "necessary to protect the public health and welfare and the environment" and to require designated persons to furnish information about the storage, treatment, handling, or disposal of hazardous substances. See 42 U.S.C. ss 9606, 9604(e)(1). Finally, the Superfund Act imposes criminal liability on a person in charge of a facility from which a hazardous substance is released, if that person fails to notify the government of the release. See 42 U.S.C. s 9603.

Prior to the initiation of judicial proceedings, EPA must undertake intensive investigation and case preparation, including studying the nature and the extent of the hazard present at sites, identifying potentially responsible parties, and evaluating the evidence that exists or that must be generated to support government action. See Amended Declaration of Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel, EPA, filed in United States v. House of Representatives, Civ. No. 82-3583 (D.D.C. Jan. 14, 1983). Many sites apparently involve hundreds of waste generators; hence, the initial investigation of a site can take months and involve the examination of tens of thousands of documents. Id.

Based on its initial investigations of hazardous waste sites throughout the country, EPA created a comprehensive national enforcement scheme and developed during 1982 an interim priorities list, which identified the 160 sites that posed the greatest risk to the public health and welfare and the environment. FN;B4[FN4]FN;F4 EPA also promulgated enforcement guidelines to direct the implementation of the Superfund Act against these potentially hazardous sites. See 47 Fed. Reg. 20664 (1982).

**4 Under this basic enforcement scheme, EPA commenced actual enforcement of the Superfund Act. As part of the enforcement effort with respect to each site, EPA generally develops a strategy for conducting negotiations and litigation consistent with its overall enforcement goals and the individual facts of each particular case. Once a case strategy has been developed, EPA notifies responsible parties that it intends to take action at a site unless the parties undertake an adequate clean up program on their own. Following the issuance of notice letters, EPA typically negotiates with responsible parties to agree on a *105 clean up plan. These negotiations may involve hundreds of potentially responsible parties and millions of dollars in clean up costs. Depending upon the strengths and weaknesses of individual cases and the effect on the overall enforcement effort, EPA may decide to settle with some but not all parties and proceed to litigation with a certain number of potential defendants. If EPA decides to bring a lawsuit, it refers the case to the Land and Natural Resources Division of this Department, which is responsible for conducting the actual litigation. FN;B5[FN5]FN;F5

During EPA's enforcement of the Superfund Act, the agency created or received hundreds of thousands of documents concerning various aspects of the enforcement process. Many of these documents concerned the facts relating to specific hazardous waste sites; others involved general agency strategy and policies with respect to the Superfund Act; still others, a small portion of the enforcement files, were attorney and investigator memoranda and notes that contained discussions of subjects such as EPA's enforcement strategy against particular defendants, analyses of the strengths and weaknesses of the government's case against actual or potential defendants, consideration of negotiation and settlement strategy, lists of potential witnesses and their anticipated testimony, and other litigation planning matters. Enforcement officials at both the career and policy level at EPA and in the Land and Natural Resources Division at the Department of Justice determined that some of those documents, which concerned the legal merits and tactics with respect to individual defendants in open enforcement files, were particularly sensitive to the enforcement

CAR 0609

process and could not be revealed outside the agencies directly involved in the enforcement effort without risking injury to EPA's cases against these actual and potential defendants in particular and the EPA enforcement process in general. FN:B6[FN6]FN:F6

B. The House Subcommittee's Demands for Enforcement Files
In the midst of EPA's ongoing enforcement efforts under the Superfund Act, the Subcommittee on Oversight and Investigations of the House Committee on Public Works and Transportation (Public Works Subcommittee), chaired by Rep. Levitas, began hearings to review EPA enforcement of the Act. In the course of these hearings, the Public Works Subcommittee first demanded access to, and then subpoenaed, a wide range of documents concerning enforcement of the Superfund Act with respect to the 160 sites that were on the *106 agency's interim priorities list. The documents demanded by the Public Works Subcommittee included not only documents concerning the facts relating to these sites and EPA's general policies, but also the sensitive material contained in open case files that set out discussions concerning case strategy with respect to actual and potential defendants. FN:B7[FN7]FN:F7 The Public Works Subcommittee subpoena was dated November 16, 1982, and was served on November 22, 1982. It called for production of the subpoenaed documents eleven days later on December 2, 1982. The EPA Administrator responded to the Public Works Subcommittee's subpoena by offering to provide the Public Works Subcommittee with access to an estimated 787,000 pages of documents within the scope of the subpoena. FN:B8[FN8]FN:F8 The EPA and the Land and Natural Resources Division officials responsible for conducting EPA enforcement litigation determined, however, that release outside the enforcement agencies of a limited number of the most sensitive enforcement documents contained in open files concerning current and prospective defendants would impair EPA's ongoing enforcement efforts and prevent EPA and the Department of Justice from effectively implementing the Superfund Act.

**5 Therefore, in accordance with the explicit guidelines adopted by the President to govern possible claims of executive privilege, see Memorandum re: Procedures Governing Responses to Congressional Requests for Information (Nov. 4, 1982), EPA suggested that some of the documents be withheld under a claim of executive privilege and consulted with this Office and the Office of the Counsel to the President in order to determine whether such a claim might be asserted to avoid impairing the constitutional responsibility of the President to take care that the laws be faithfully executed. A further review of the documents in question by enforcement officials at EPA and the Land and Natural Resources Division was then undertaken to confirm that the particular documents selected for consideration for an executive privilege claim were, in the judgment of those officials, sufficiently sensitive that their disclosure outside the Executive Branch might adversely affect the law enforcement process. The documents were then reviewed by officials in this Office and officials in the Office of the Counsel to the President to confirm that the documents were of the type described by the enforcement officials. Various unsuccessful efforts were thereafter made to resolve the dispute short of a final confrontation. The President, based upon the unanimous recommendation of all Executive Branch officials involved in the process, ultimately determined to assert a claim of executive privilege with respect to 64 documents from open enforcement files that had been identified as sufficiently enforcement sensitive *107 as of the return date of the subpoena that their disclosure might adversely affect pending investigations and open enforcement proceedings. The President implemented this decision in a memorandum dated November 30, 1982, to the EPA Administrator, which instructed her to withhold the particularly sensitive documents from disclosure outside the Executive Branch as long as the documents remained critical to ongoing or developing enforcement actions. The legal basis for this decision was explained in letters from the Attorney General on November 30, 1982, to the House Public Works Subcommittee and one other House subcommittee. FN:B9[FN9]FN:F9 On December 2, 1982, 64 of the most sensitive documents were withheld from the subcommittee. FN:B10[FN10]FN:F10

C. The Contempt of Congress Proceedings in the House of Representatives
The President's assertion of executive privilege, and the Attorney General's explanation of the law enforcement considerations and constitutional justification for the decision not to release the documents outside the Executive Branch while enforcement proceedings were ongoing, did not dissuade the congressional subcommittees from pressing their demands for the withheld material. After the EPA Administrator asserted the President's claim of privilege at a December 2, 1982, Public Works Subcommittee hearing, the Subcommittee immediately approved a contempt of Congress resolution against her. The full Committee did likewise on December 10, 1982, and rejected a further proposal

CAR 0610

by the Department of Justice to establish a formal screening process and briefings regarding the contents of the documents. FN;B11[FN11]FN;F11 The full House adopted the contempt of Congress resolution on December 16, 1982, FN;B12[FN12]FN;F12 and the following**108** day Speaker O'Neill certified the contempt citation to the United States Attorney for the District of Columbia for prosecution under the criminal contempt of Congress statute.

### D. The Criminal Contempt of Congress Statute

**\*\*6** The criminal contempt of Congress statute contains two principal sections, 2 U.S.C. ss 192 & 194. FN;B13[FN13]FN;F13 Section 192, which sets forth the criminal offense of contempt of Congress, provides in pertinent part:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House . . . or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

Section 194 purports to impose mandatory duties on the Speaker of the House or the President of the Senate, as the case may be, and the United States Attorney, to take certain actions leading to the prosecution of persons certified by a house of Congress to have failed to produce information in response to a subpoena. It provides:

> Whenever a witness summoned as mentioned in section 192 of this title fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House . . . or any committee or subcommittee of either House of Congress, and the fact of such failure or failures is reported to either House while Congress is in session or when Congress is not in session, a statement of fact constituting such failure is reported and filed with the President of the Senate or the Speaker of the House, it shall be the duty of the said President of the Senate or the Speaker of the House, as the case may be, to certify, and he shall so certify, the statement of facts aforesaid under the seal of the **\*109** Senate or House, as the case may be, to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action.

(Emphasis added.)

### E. The Department of Justice Civil Suit

Immediately after the House passed the resolution adopting the finding that the EPA Administrator was in contempt of Congress, the Department of Justice filed a civil suit in the United States District Court for the District of Columbia to obtain a ruling that "insofar as the EPA Administrator . . . did not comply with the Subpoena, her non- compliance was lawful" because of a valid Presidential claim of executive privilege. FN;B14[FN14]FN;F14 The House moved to dismiss the Department's complaint on jurisdictional grounds, and the Department cross moved for summary judgment on the merits. In a letter to Speaker O'Neill dated December 27, 1982, the United States Attorney indicated that during the pendency of the lawsuit, he would take no further action with respect to the Speaker's referral of the contempt citation. The Speaker responded in a letter dated January 4, 1983, in which he took the position that the United States Attorney must, as a matter of law, immediately refer the matter to a grand jury.

**\*\*7** The trial court responded to the cross-motions for dismissal and summary judgment by exercising its discretion under equitable rules of judicial restraint not to accept jurisdiction over the lawsuit, and it dismissed the suit. The court concluded:

> When constitutional disputes arise concerning the respective powers of the Legislative and Executive Branches, judicial intervention should be delayed until all possibilities for settlement have been exhausted. . . .
> The difficulties apparent in prosecuting the Administrator . . . for contempt of Congress should encourage the two branches to settle their differences without further judicial involvement.

United States v. House of Representatives, 556 F. Supp. 150, 152-53 (D.D.C. 1983). No appeal was taken. FN;B15[FN15]FN;F15

CAR 0611

**\*110** F. Resolution of the EPA Dispute

Subsequent to the trial court decision, the two branches engaged in negotiations to reach a compromise settlement. The parties eventually reached an agreement under which the Public Works Subcommittee would have limited access to the withheld documents and would sponsor a resolution to "withdraw" the contempt citation against the EPA Administrator. Pursuant to the agreement, the Subcommittee reviewed the documents, and the House later adopted a resolution withdrawing the contempt citation. H.R. Res. 180, 98th Cong., 1st Sess. (Aug. 3, 1983). The issue whether the House of Representatives in the 98th Congress could "withdraw" the contempt citation of the House during the 97th Congress was never resolved.

During the pendency of the lawsuit and the subsequent settlement negotiations, the United States Attorney for the District of Columbia refrained from referring the contempt citation to the grand jury. The United States Attorney took the position that referral would have been inappropriate during that period and that the statute left him with discretion to withhold referral. See Testimony of Stanley S. Harris before the House Committee on Public Works and Transportation, 98th Cong., 1st Sess. 100-07 (June 16, 1983). Following the passage of the resolution withdrawing the contempt citation, "the relevant facts and documents were presented . . . to a federal grand jury, which voted unanimously not to indict the EPA Administrator." Letter from Stanley S. Harris, United States Attorney, District of Columbia, to Honorable Thomas P. O'Neill, Jr., Speaker of the House of Representatives (Aug. 5, 1983).

III. Generally Applicable Legal Principles: The Separation of Powers, the Duties of the Executive to Enforce the Law, and the Derivation and Scope of the Principles of Prosecutorial Discretion and Executive Privilege

A. The Separation of Powers

The basic structural concept of the United States Constitution is the division of federal power among three branches of government. Although the expression "separation of powers" does not actually appear in the Constitution, the Supreme Court has emphasized that the separation of powers "is at the heart of our Constitution," and has recognized "the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another." Buckley v. Valeo, 424 U.S. 1, 119-20 (1976). It needs little emphasis that the separation of powers doctrine is vital to any analysis of the relative responsibilities of the branches of our government, interse. In The Federalist No. 47, James Madison, who believed that "no political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty" than the concept of the separation of powers, defended this tripartite arrangement in the Constitution by citing **\*111** Montesquieu's well-known maxim that the legislative, executive, and judicial departments should be separate and distinct:

**\*\*8** The reasons on which Montesquieu grounds his maxim are a further demonstration of his meaning. "When the legislative and executive powers are united in the same person or body," says he, "there can be no liberty, because apprehensions may arise lest the same monarch or senate should enact tyrannical laws to execute them in a tyrannical manner." Again: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator. Were it joined to the executive power, the judge might behave with all the violence of an oppressor."

The Federalist No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961); seeBuckley v. Valeo, 424 U.S. at 120-21. FN;B16[FN16]FN;F16

Of the three branches of the new government created in Philadelphia in 1787, the legislature was regarded as the most intrinsically powerful, and the branch with powers that required the exercise of the greatest precautions.

Madison warned that the "legislative department is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex." The Federalist No. 48, supra, at 309. He admonished that because of their experiences in England, the founders of the thirteen colonies had focused keenly on the danger to liberty from an "overgrown and all-grasping prerogative of an hereditary magistrate, supported and fortified by an hereditary branch of the legislative authority," but had tended to ignore the very real dangers from "legislative usurpations, which, by assembling all power in the same hands, must lead to the same tyranny as is threatened by executive usurpations." Id. Reflecting the

CAR 0612

views of many of his colleagues, Madison believed that although the risk of tyranny would naturally come from the King in an hereditary monarchy, in a representative republic, like that created by the constitutional convention, in which executive power was "carefully limited, both in the extent and duration of its power," the threat to liberty would come from the legislature,

> which is inspired, by a supposed influence over the people, with an intrepid confidence in its own strength; which is sufficiently numerous to feel all the passions which actuate a multitude, yet not so numerous as to be incapable of pursuing the objects of its passions by means which reason prescribes; it is against the enterprising ambition of this department that the people ought to indulge all their jealousy and exhaust all their precautions.

Id.

*112 The Framers feared that the legislature's power over the purse would foster a dependence by the executive departments on the legislature "which gives still greater facility to encroachments" by the legislature on the powers of the Executive. Id. at 310.The concerns of the Framers with respect to the power of the legislature have been recognized by the Supreme Court. The Court, citing many of the above statements, has observed that because of the Framers' concerns about the potential abuse of legislative power, "barriers had to be erected to ensure that the legislature would not overstep the bounds of its authority and perform functions of the other departments."United States v. Brown, 381 U.S. 437, 444 (1965). Justice Powell noted that "during the Confederation, the States reacted by removing power from the executive and placing it in the hands of elected legislators. But many legislators proved to be little better than the Crown."INS v. Chadha, 462 U.S. 917, 961 (1983) (Powell, J. concurring). After citing several specific legislative abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches."Id. at 962.

**9 Thus, the careful separation of governmental functions among three branches of government was a very deliberate and vital structural step in building the Constitution. The Framers understood human nature and anticipated that well-intentioned impulses would lead each of the branches to attempt to encroach on the powers allocated to the others. They accordingly designed the structure of the Constitution to contain intrinsic checks to prevent undue encroachment wherever possible. Particular care was taken with respect to the anticipated tendency of the Legislative Branch to swallow up the Executive. The Framers did not wish the Legislative Branch to have excessive authority over the individual decisions respecting the execution of the laws: "An elective despotism was not the government we fought for." T. Jefferson, Notes on the State of Virginia 120 (Univ. N.C. Press ed. 1955) FN;B17[FN17]FN;F17 The constitutionally prescribed separation of powers creates enforceable abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." Id. The division of delegated powers was designed "to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." INS v. Chadha, 462 U.S. at 951. The doctrine of separated powers "may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally**113 assigned function. Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another.Id. at 963 (Powell, J. concurring) (citations omitted). Although the Supreme Court has recognized that "a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively," it has also emphasized that the Court "has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decision of cases or controversies properly before it." Buckley v. Valeo, 424 U.S. at 121, 123. Therefore, although the Constitution does not contemplate "a complete division of authority between the three branches," each branch retains certain core prerogatives upon which the other branches may not transgress.Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 443 (1977). Each branch must not only perform its own delegated functions, but each has an additional duty to resist encroachment by the other branches. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." INS v. Chadha, 462 U.S. at 951 (emphasis added).

B. The Duties of the Executive to Enforce the Law

CAR 0613

**10 The fundamental responsibility and power of the Executive Branch is the duty to execute the law. Article II, s 1 of the Constitution expressly vests the executive power in the President. Article II, s 3 commands that the President "take Care that the Laws be faithfully executed." Enforcement of the laws is an inherently executive function, and by virtue of these constitutional provisions, the Executive Branch has the exclusive constitutional authority to enforce federal laws. Since the adoption of the Constitution, these verities have been at the heart of the general understanding of the Executive's constitutional authority. During the debates on the Constitution, James Wilson noted that the "only powers he conceived strictly executive were those of executing the laws." 1 M. Farrand, The Records of the Federal Convention of 1787, at 65-66 (1937). During the first Congress, James Madison stated that "if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Congress 481 (1789). The Supreme Court has recognized this fundamental constitutional principle. In Springer v. Philippine Islands, 277 U.S. 189 (1928), the Court observed:

> Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions.

Id. at 202. More recently, Judge Wilkey, writing for a unanimous panel of the United States Court of Appeals for the District of Columbia Circuit in a decision later affirmed by the Supreme Court, recognized that the Constitution *114 prevents Congress from exercising its power of "oversight, with an eye to legislative revision," in a manner that amounts to "shared administration" of the law. Consumer Energy Council of America v. Federal Energy Regulatory Commission, 673 F.2d 425, 474 (D.C. Cir. 1982), aff'd sub nom. Process Gas Consumers Group v. Consumer Energy Council of America, 43 U.S. 1216 (1983). It thus seems apparent that the drafters of the Constitution intended clearly to separate the power to adopt laws and the power to enforce them and intended to place the latter power exclusively in the Executive Branch. FN;B18[FN18]FN;F18 As a practical matter, this means that there are constitutional limits on Congress' ability to take actions that either disrupt the ability of the Executive Branch to enforce the law or effectively arrogate to Congress the power of enforcing the laws.

C. The Derivation and Scope of Prosecutorial Discretion and Executive Privilege
The issues addressed by this memorandum involve two important constitutional doctrines that spring from the constitutional limits imposed by the separation of powers and the Executive's duty to enforce the laws: prosecutorial discretion and executive privilege.

1. Prosecutorial Discretion
The doctrine of prosecutorial discretion is based on the premise that because the essential core of the President's constitutional responsibility is the duty to enforce the laws, the Executive Branch has exclusive authority to initiate and prosecute actions to enforce the laws adopted by Congress. That principle was reaffirmed by the Supreme Court in Buckley v. Valeo, 424 U.S. 1 (1976), in which the Court invalidated the provision of the Federal Election Act that vested the appointment of certain members of the Federal Election Commission in the President pro tempore of the Senate and the Speaker of the House. In so holding, the Court recognized the exclusively executive nature of some of the Commission's powers, including the right to commence litigation:

> **11 The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress. A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to "take care that the laws be faithfully executed." Art. II, s 3.

424 U.S. at 138.

*115 The Executive's exclusive authority to prosecute violations of the law gives rise to the corollary that neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the Executive Branch to prosecute particular individuals. This principle was explained in Smith v. United States, 375 F.2d 243 (5th Cir.), cert. denied, 389 U.S. 841 (1967), in which the court considered the applicability of the Federal Tort Claims Act to a prosecutorial decision not to arrest or prosecute persons injuring plaintiff's business. The court ruled that the government was immune from suit under the discretionary decision exception of the Act on the ground that the Executive's prosecutorial discretion was rooted in the separation of powers under the Constitution:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The President of the United States is charged in Article 2, Section 3, of the Constitution with the duty to "take Care that the Laws be faithfully executed." The Attorney General is the President's surrogate in the prosecution of all offenses against the United States. . . . The discretion of the Attorney General in choosing whether to prosecute or not to prosecute, or to abandon a prosecution already started, is absolute. . . . This discretion is required in all cases.

We emphasize that this discretion, exercised in even the lowliest and least consequential cases, can affect the policies, duties, and success of a function placed under the control of the Attorney General by our Constitution and statutes.

375 F.2d at 246-47. The court went on to state that this prosecutorial discretion is protected "no matter whether these decisions are made during the investigation or prosecution of offenses." Id. at 248.

The limits and precise nature of the Executive's prosecutorial discretion are discussed in greater detail below. At this point in our examination of the issues considered in this memorandum, it is sufficient to observe that meaningful and significant separation of powers issues are raised by a statute that purports to direct the Executive to take specified, mandatory prosecutorial action against a specific individual designated by the Legislative Branch.

2. Executive Privilege

The doctrine of executive privilege is founded upon the basic principle that in order for the President to carry out his constitutional responsibility to enforce the laws, he must be able to protect the confidentiality of certain types of documents and communications within the Executive Branch. If disclosure of certain documents outside the Executive Branch would impair the President's ability to fulfill his constitutional duties or result in the impermissible involvement of other branches in the enforcement of the law, then the President must be able to claim some form of privilege to preserve his constitutional prerogatives. *116 This "executive privilege" has been explicitly recognized by the Supreme Court, which has stated that the privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." United States v. Nixon, 418 U.S. 683, 708 (1974). We believe that it is beyond peradventure that the constitutionally mandated separation of powers permits the President to prevent disclosure of certain Executive Branch documents under the doctrine of executive privilege and that the ability to assert this privilege is fundamental to the President's ability to carry out his constitutionally prescribed duties.

**12 The Supreme Court has suggested that in some areas the President's executive privilege may be absolute and in some circumstances it is a qualified privilege that may be overcome by a compelling interest of another branch. United States v. Nixon, 418 U.S. at 713; see also Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974) (en banc). Nevertheless, the unanimous Supreme Court decision in Nixon clearly stands for the proposition that there is a privilege, that it stems from the separation of powers, and that it may be invoked (although perhaps overridden by a court) whenever the President finds it necessary to maintain the confidentiality of information within the Executive Branch in order to perform his constitutionally assigned responsibilities. FN;B19[FN19]FN;F19

The scope of executive privilege includes several related areas in which confidentiality within the Executive Branch is necessary for the effective execution of the laws. First, as the Supreme Court has held, the privilege protects deliberative communications between the President and his advisors. The Court has identified the rationale for this aspect of the privilege as the valid need for protection of communications between high government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. United States v. Nixon, 418 U.S. at 705 (footnotes omitted).

Another category of Executive Branch material that is subject to a President's claim of privilege is material necessary "to protect military, diplomatic, or sensitive national security secrets." United States v. Nixon, 418 U.S. 683, 706 (1974). In Nixon, the Court stated:

As to those areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities. In *117 C.& S. Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948), dealing with Presi-

CAR 0615

dential authority involving foreign policy considerations, the Court said:

"The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."

In United States v. Reynolds, 345 U.S. 1 (1953), dealing with a claimant's demand for evidence in a Tort Claims Act case against the Government, the Court said:

"It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." Id. at 10.

**13 No case of the Court, however, has extended this high degree of deference to a President's generalized interest in confidentiality. Nowhere in the Constitution, as we have noted earlier, is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based.

418 U.S. at 710-11.

An additional important application of executive privilege, which, as noted earlier, relates centrally to the discharge of the President's constitutional duties, involves open law enforcement files. Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature. FN;B20[FN20]FN;F20 The basis for this application *118 of the privilege is essentially the same as for all aspects of executive privilege; the Executive's ability to enforce the law would be seriously impaired, and the impermissible involvement of other branches in the execution and enforcement of the law would be intolerably expanded, if the Executive were forced to disclose sensitive information on case investigations and strategy from open enforcement files.

IV. The Duty of the Executive Branch When an Executive Official Has Been Cited for Contempt of Congress for Asserting the President's Claim of Executive Privilege

A. Prosecutorial Discretion

The first specific question that is presented by the circumstances that gave rise to this memorandum is whether the United States Attorney is required to refer every contempt of Congress citation to a grand jury. This question raises issues of statutory construction as well as the constitutional limits of prosecutorial discretion. We deal first with the statutory questions.

As a preliminary matter, we note that s 194 does not on its face actually purport to require the United States Attorney to proceed with the prosecution of a person cited by a house of Congress for contempt; by its express terms the statute discusses only referral to a grand jury. Even if a grand jury were to return a true bill, the United States Attorney could refuse to sign the indictment and thereby prevent the case from going forward. United States v. Cox, 342 F.2d 167 (5th Cir.) (en banc), cert. denied, 381 U.S. 935 (1965); In re Grand Jury, January, 1969, 315 F. Supp. 662 (D. Md. 1970). See Hamilton & Grabow, A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas, 21 Harv. J. on Legis. 145, 155 (1984). Thus, as a matter of statutory interpretation, there is no doubt that the contempt of Congress statute does not require a prosecution; the only question is whether it requires referral to the grand jury. FN;B21[FN21]FN;F21

*119 1. Previous Department of Justice Positions Concerning Prosecutorial Discretion Under the Contempt of Congress Statute

**14 In the past, the Department of Justice has taken the position that if Congress cited an executive officer for contempt because of an assertion of executive privilege and "the Department determined to its satisfaction that the claim

CAR 0616

was rightfully made, it would not, in the exercise of its prosecutorial discre- tion, present the matter to a grand jury."Testimony of Assistant Attorney General (now Solicitor General) Rex Lee, <u>Hearings on Representation of Congress and Congressional Interests in Court, Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary</u>, 94th Cong., 2d Sess. 8 (1976).

This principle of prosecutorial discretion under the contempt of Congress statute was followed by the Department in the cases of three officials of the Port of New York Authority who were cited for contempt of Congress in 1960 for refusing to produce documents to the House Judiciary Committee. As a part of an investigation of the Port Authority, which had been established by an interstate compact approved by Congress, the Judiciary Committee subpoenaed a large number of documents concerning the Port Authority's operations, most of which the Port Authority declined to produce on the orders of the governors of New York and New Jersey (the states within which the Port Authority was located). Because of the failure to produce the documents, the Committee recommended, and the House adopted, contempt resolutions against three principal officials of the Port Authority. FN:B22[FN22]FN:F22 On August 23, 1960, these resolutions were referred to the United States Attorney for prosecution.See N.Y. Times, Aug. 24, 1960, at 1. The United States Attorney never referred any of these citations to the grand jury. On November 16, 1960, the Department of Justice announced that it would proceed against the officials by information **120** rather than indictment, and therefore would not present the citations to a grand jury.See N.Y. Times, Nov. 17, 1960, at 1. On November 25, 1960, the Department announced that it would file an information against only one of the Port Authority officials, Executive Director Austin Tobin, and would not prosecute the remaining two officials. See N.Y. Times, Nov. 26, 1960, at 1. The trial began in January 1961 and continued under the supervision of the new Attorney General, Robert F. Kennedy, who never altered the decision not to prosecute the two remaining officials, in spite of a congressional request to do so. Ultimately Tobin's conviction was reversed by the United States Court of Appeals for the District of Columbia Circuit. <u>Tobin</u> v. <u>United States</u>, 306 F.2d 270 (D.C. Cir.), <u>cert</u>. <u>denied</u>, 371 U.S. 902 (1962).FN:B23[FN23]FN:F23

In the foregoing instance, the Department (under two administrations) exercised its prosecutorial discretion not to refer contempt of Congress citations to a grand jury, notwithstanding the seemingly mandatory phrasing of the statute. FN:B24[FN24]FN:F24 For the reasons set forth more fully below, we continue to adhere to the conclusion that the Department retains prosecutorial discretion not to refer contempt citations to a grand jury.

2. Judicial Opinions Interpreting the Language of s 194

**15** Section 194 imposes similarly worded, nominally mandatory, referral obligations on both the Speaker of the House (or the President of the Senate) and the United States Attorney once a contempt of Congress resolution has been adopted by the House or Senate:

<u>it shall be the duty</u> of the said President of the Senate or the Speaker of the House as the case may be, to certify, <u>and he shall so certify</u>, the statement of facts aforesaid under the seal of the Senate or House, as the case may be, to the appropriate United States attorney, <u>whose duty it shall be</u> to bring the matter before the grand jury for itss action.

(Emphasis added.)

Although the language, "it shall be the duty of" and "whose duty it shall be," might suggest a nondiscretionary obligation, the United States Court of Appeals for the District of Columbia Circuit has expressly held, at least with respect to the Speaker of the House, that the duty is <u>not</u> mandatory, and that, in fact, the Speaker has an obligation under the law, at least in some cases, to exercise his discretion in determining whether to refer a contempt citation. <u>Wilson</u> v. <u>United States</u>, 369 F.2d 198 (D.C. Cir. 1966). In <u>Wilson</u>, the court reversed a conviction for contempt of Congress on the ground that the Speaker had assumed that the statute did not permit any exercise of discretion by him **121** and he had therefore automatically referred a contempt citation to the United States Attorney while Congress was not in session. The court based its conclusion that the Speaker was required to exercise his discretion on the longstanding practice of both the House and Senate and on congressional debates on contempt citations in which the houses had recognized their own discretion not to approve a contempt resolution. The court concluded that because full House approval of a contempt citation is necessary when Congress is in session, the Speaker is required to exercise some

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)                                  Page 12

discretion when the House is not in session.369 F.2d at 203-04.

Although the reasons underlying the court's decision not to impose a mandatory duty on the Speaker in Wilson do not necessarily require the same conclusion with respect to the United States Attorney, the decision at least supports the proposition that the seemingly mandatory language of s 194 need not be construed as divesting either the Speaker or the United States Attorney of all discretion. FN;B25[FN25]FN;F25

In several cases, the United States Court of Appeals for the District of Columbia Circuit has at least assumed that the United States Attorney retains discretion not to refer a contempt of Congress citation to a grand jury. In these cases, the court refused to entertain challenges to congressional subpoenas, at least in part on the ground that the prospective witnesses would have adequate subsequent opportunities to challenge a committee's contempt finding, including the opportunity to persuade the United States Attorney not to refer the case to a grand jury. For example, in Ansara v. Eastland, 442 F.2d 751 (D.C. Cir. 1971), the court declined to entertain a suit to quash a congressional subpoena on the ground that it would be inappropriate, as a matter of the exercise of its equitable power, to interfere with an ongoing congressional process. The court stated that protections were available "within the legislative branch or elsewhere," and then in a footnote indicated that these protections resided "perhaps in the Executive Branch which may decide not to present the matter to the grand jury (as occurred in the case of the officials of the New York Port Authority); or perhaps in the Grand Jury which may decide not to return a true bill." 442 F.2d at 754 n.6 (emphasis added).FN;B26[FN26]FN;F26SeealsoSanders v. McClellan, *122 463 F.2d 894 (D.C. Cir. 1972). In United States Servicemen's Fund v. Eastland, 488 F.2d 1252 (D.C. Cir. 1973), rev'd on other grounds, 421 U.S. 491 (1974), the court agreed to review a challenge to a congressional subpoena brought by a third party, and it distinguished Ansara and McClellan on the ground that, because the congressional subpoena was issued to a third party, the plaintiffs had no alternative means to vindicate their rights. 488 F.2d at 1260. Among the alternative means the court cited was the right to "seek to convince the executive (the attorney general's representative) not to prosecute." Id.

**16 These cases emphasize the particular significance of prosecutorial discretion in the context of the contempt of Congress statute. In general, with respect to any criminal allegation, prosecutorial discretion plays an important role in protecting the rights of the accused by providing an additional level of review with respect to the factual and legal sufficiency of the charges. This role is even more important when dealing with the contempt of Congress statute because, as the above cases demonstrate, witnesses generally have no opportunity to challenge congressional subpoenas directly. Thus, as the cases indicate, prosecutorial discretion serves a vital purpose in protecting the rights of the accused in contempt cases by mitigating the otherwise stern consequences of asserting a right not to respond to a congressional subpoena.

Thus, the practice of the Congress and the available judicial authority support the proposition that the seemingly mandatory duties imposed on congressional officials by 2 U.S.C. s 194 are and were intended to be discretionary. The practice of the Executive Branch and the court decisions reflect a similarly discretionary role under the statute for the United States Attorney. Because, as the balance of this memorandum reveals, these interpretations are consistent with other common-law principles and avoid conclusions that would be at odds with the separation of powers, we believe that a correct reading of 2 U.S.C. s 194 requires recognition of the prosecutor's discretion with respect to referral to a grand jury.

3. Common-Law Prosecutorial Discretion
In addition to the court decisions that suggest that the United States Attorney may decide not to refer a contempt citation to a grand jury, the common-law doctrine of prosecutorial discretion weighs heavily against and, in our opinion, precludes an interpretation that the statute requires automatic referral. Because of the wide scope of a prosecutor's discretion in determining which cases to bring, courts, as a matter of law, do not ordinarily interpret a statute to limit that discretion unless the intent to do so is clearly and unequivocally stated. The general rule is that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."United States v. Nixon, 418 U.S. 683, 693 (1974).SeealsoConfiscation Cases, 74 U.S. (7 Wall.) 454 (1869). The Attorney General and his subordinates, including the United States Attorneys, have the authority to exercise this discretion reserved to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0618

Executive.United States v. San Jacinto Tin Co., 125 U.S. 273 (1888); The*123Gray Jacket, 72 U.S. (5 Wall.) 370 (1866). In general, courts have agreed with the view of Judge (now Chief Justice) Burger:

> Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.

**17 Newman v. United States, 382 F.2d 479, 480 (D.C. Cir. 1967).See alsoUnited States v. Batchelder, 442 U.S. 114 (1979); Bordenkircher v. Hayes, 434 U.S. 357 (1978).

Courts have applied this general principle of prosecutorial discretion in refusing to interfere with a prosecutor's decision not to initiate a case, despite the specific language of 28 U.S.C. s 547, which states in part that "each United States Attorney, within his district, shall . . . prosecute for all offenses against the United States."(Emphasis added.) For example, in Powell v. Katzenbach, 359 F.2d 234 (D.C. Cir. 1965), cert. denied, 384 U.S. 906 (1966), the court denied a mandamus petition that sought to force the Attorney General to prosecute a national bank. The court ruled: "It is well settled that the question of whether and when prosecution is to be instituted is within the discretion of the Attorney General. Mandamus will not lie to control the exercise of this discretion."Id. at 234.SeealsoUnited States v. Brown, 481 F.2d 1035 (8th Cir. 1973); Bass Anglers Sportsman's Society v. Scholze Tannery, Inc., 329 F. Supp. 339 (E.D. Tenn. 1971); Pugach v. Klein, 193 F. Supp. 630 (S.D.N.Y. 1961); United States v. Brokaw, 60 F. Supp. 100 (S.D. Ill. 1945).

Courts exhibit the same deference to prosecutorial discretion even when the specific statute involved uses words that would otherwise have mandatory, nondiscretionary implications. For example, 42 U.S.C. s 1987 states that United States Attorneys are "authorized andrequired . . . to initiate prosecutions against all persons violating any of the provisions of the federal criminal civil rights statutes."(Emphasis added.) Although a number of cases have been initiated to force a United States Attorney to bring civil rights actions on the ground that this statute imposes a nondiscretionary duty to prosecute, see Note, Discretion to Prosecute Federal Civil Rights Crimes, 74 Yale L.J. 1297 (1965), the courts uniformly have rejected the contention that the statute limits a prosecutor's normal discretion to decide not to bring a particular case. For example, in Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375 (2d Cir. 1973), the court ruled that the "mandatory nature of the word 'required' as it appears in s 1987 is insufficient to evince a broad Congressional purpose to bar the exercise of executive discretion in the prosecution of federal civil rights crimes."477 F.2d at 381. The court noted that although similar mandatory language was contained in other statutes, "(s)uch language has never been thought to preclude the exercise of prosecutorial discretion."Id.AccordPeek v. Mitchell, 419 F.2d 575 (6th Cir. 1970); Moses v. Kennedy, 219 F. Supp. 762 (D.D.C. 1963), aff'd sub nom.Moses v. Katzenbach, 342 F.2d 931 (D.C. Cir. 1965). The language employed in 2 U.S.C. s 194 is neither stronger *124 nor more clearly mandatory than the language of s 1987, which the courts have decided is insufficient to limit the normal prosecutorial discretion.

**18 In fact, there is nothing to distinguish the contempt of Congress statute from any other statute where the prosecutor retains discretion with respect to who shall be prosecuted. Since the early part of the 19th century, it has been recognized that offenses against Congress that are punishable by Congress through its inherent contempt power may also be violations of the criminal laws and, as such, offenses against the United States, with respect to which the normal rules governing criminal prosecutions apply. See2 Op. Att'y Gen. 655 (1834) (concluding that an assault against a congressman could be prosecuted consistent with the Double Jeopardy Clause under the criminal laws, even if the defendant had already been punished by Congress, because the act created two separate offenses, one against Congress and one against the United States). This principle was adopted by the Supreme Court when it upheld the constitutionality of the contempt of Congress statute. In re Chapman, 166 U.S. 661 (1897). In Chapman, the Court held that the contempt statute did not violate the Double Jeopardy Clause even though a defendant could be punished through Congress' inherent contempt power as well as under the contempt statute. The Court concluded that a refusal to testify involved two separate offenses, one against Congress and one against the United States, and that

> it is quite clear that the contumacious witness is not subjected to jeopardy twice for the same offence, since the same act may be an offence against one jurisdiction and also an offence against another; and indictable statutory offenses may be punished as such, while the offenders may likewise be subjected to punishment for the same acts

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0619

as contempts, the two being diversointuitu and capable of standing together.
166 U.S. at 672.

The import of the Court's conclusion in this context is clear. Congress' inherent contempt power is the remedy for the offense against Congress, and that remedy remains within Congress' control. The crime of contempt of Congress, like any other federal statutory crime, is an offense against the United States that should be prosecuted as is any other crime. This criminal offense against the United States properly remains subject to the prosecutorial control of the Executive Branch. Therefore, because the contempt statute should be treated as are other federal criminal statutes, we do not believe that s 194 should be read to limit the common law prosecutorial discretion of the United States Attorney. There is nothing in the legislative history of the contempt of Congress statute that is inconsistent with this conclusion.See 42 Cong. Globe, 34th Cong., 3d Sess. 4030-44 (1857).

4. Constitutional Considerations
Our construction of s 194 is reinforced by the need to avoid the constitutional problems that would result if s 194 were read to require referral to a *125 grand jury. As discussed above, the constitutionally prescribed separation of powers requires that the Executive retain discretion with respect to whom it will prosecute for violations of the law. Although most cases expressly avoid this constitutional question by construing statutes not to limit prosecutorial discretion, the cases that do discuss the subject make it clear that common law prosecutorial discretion is strongly reinforced by the constitutional separation of powers.See, e.g., Inmates of Attica CorrectionalFacility v. Rockefeller, 477 F.2d 375 (2d Cir. 1973); Powell v. Katzenbach, 359 F.2d 234 (D.C. Cir. 1965), cert. denied, 384 U.S. 906 (1966).

**19 A number of courts have expressly relied upon the constitutional separation of powers in refusing to force a United States Attorney to proceed with a prosecution. For example, in Pugach v. Klein, 193 F. Supp. 630 (S.D.N.Y. 1961), the court declined to order the United States Attorney to commence a prosecution for violation of federal wiretap laws on the ground that it was

   clear beyond question that it is not the business of the Courts to tell the United States Attorney to perform what they conceive to be his duties.
   Article II, s 3 of the Constitution, provides that "the President shall take Care that the Laws shall be faithfully executed."The prerogative of enforcing the criminal law was vested by the Constitution, therefore, not in the Courts, nor in private citizens, but squarely in the executive arm of the government.

193 F. Supp. at 634.SeealsoGoldberg v. Hoffman, 225 F.2d 463, 464-65 (7th Cir. 1955).FN;B27[FN27]FN;F27

The Fifth Circuit, sitting en banc, has underscored the constitutional foundations of prosecutorial discretion. United States v. Cox, 342 F.2d 167 (5th Cir.) (en banc), cert. denied, 381 U.S. 935 (1965). In Cox, the court overturned a district court's order that a United States Attorney prepare and sign an indictment that a grand jury had voted to return. The plurality opinion stated:

   The executive power is vested in the President of the United States, who is required to take care that the laws be faithfully executed. The Attorney General is the hand of the President in taking care that the laws of the United States in legal proceedings*126 and in the prosecution of offenses, be faithfully executed. The role of the grand jury is restricted to a finding as to whether or not there is probable cause to believe that an offense has been committed. The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.

342 F.2d at 171 (footnotes omitted).Seealso id. at 182-83 (Brown, J. concurring); id. at 190-93 (Wisdom, J., concurring). Even the three dissenting judges in Cox conceded that, although they believed that the United States Attorney could be required to sign the indictment, "once the indictment is returned, the Attorney General or the United States

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0620

Attorney can refuse to go forward."Id. at 179.SeeUnited States v. Nixon, 418 U.S. 683, 693 (1974) ( "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case") (citing, interalia, Cox).

**20 Although prosecutorial discretion may be regulated to a certain extent by Congress and in some instances by the Constitution, the decision not to prosecute an individual may not be controlled because it is fundamental to the Executive's prerogative. For example, the individual prosecutorial decision is distinguishable from instances in which courts have reviewed the legality of general Executive Branch policies.SeeNader v. Saxbe, 497 F.2d 676 (D.C. Cir. 1974); **Adams v. Richardson**, 480 F. 2d 1159 ( D.C. Cir. 1973) (en banc) (per curiam); NAACP v. Levi, 418 F. Supp. 1109 (D.D.C. 1976). In these cases the courts accepted jurisdiction to rule whether an entire enforcement program was being implemented based on an improper reading of the law. The cases expressly recognize, however, both that a decision to prosecute in an individual case involves many factors other than merely probable cause, and that "the balancing of these permissible factors in individual cases is an executive, rather than a judicial function which follows from the need to keep the courts as neutral arbiters in the criminal law generally . . . and from Art. II, s 3 of the Constitution, which charges the President to 'take Care that the Laws be faithfully executed.' "Nader v. Saxbe, 497 F.2d at 679 n.18. Similarly distinguishable are the cases concerning the constitutional limits on selective prosecution, which hold that prosecutorial discretion may not be exercised on the basis of impermissible factors such as race, religion, or the exercise of free *127 speech.See, e.g., Marshall v. Jerrico, Inc., 446 U.S. 238, 249 (1980); Oyler v. Boles, 368 U.S. 448 (1962).

If the congressional contempt statute were interpreted to divest the United States Attorney of discretion, then the statute would create two distinct problems with respect to the separation of powers. "The doctrine of separated powers is implemented by a number of constitutional provisions, some of which entrust certain jobs exclusively to certain branches while others say that a given task is not to be performed by a given branch."United States v. Brown, 381 U.S. 437, 443 (1965). Divesting the United States Attorney of discretion would run afoul of both aspects of the separation of powers by stripping the Executive of its proper constitutional authority and by vesting improper power in Congress.

First, as the cases cited above demonstrate, Congress may not deprive the Executive of its prosecutorial discretion. In areas where the President has specific executive authority, Congress may establish standards for the exercise of that authority, but it may not remove all Presidential authority. For example, Congress may require the President to make appointments to certain executive positions and may define the qualifications for those positions, but it may not select the particular individuals whom the President must appoint to those positions.SeeBuckley v. Valeo, 424 U.S. 1 (1976). Similarly, Congress may adopt the criminal provisions for which individuals may be prosecuted and impose certain qualifications on how the Executive should select individuals for prosecution, but it may not identify the particular individuals who must be prosecuted. The courts have declared that the ultimate decision with respect to prosecution of individuals must remain an executive function under the Constitution.

**21 Second, if Congress could specify an individual to be prosecuted, it would be exercising powers that the Framers intended not be vested in the legislature. A legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based.SeeUnited States v. Brown, 381 U.S. 437 (1965); United States v. Lovett, 328 U.S. 303 (1946). The constitutional role of Congress is to adopt general legislation that will be applied and implemented by the Executive Branch."It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments."Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 136 (1810); seeUnited States v. Brown, 381 U.S. 437, 446 (1965). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific individuals. As the Supreme Court stated in Lovett:

> Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons, because the legislature thinks them guilty of conduct which deserves punishment.

*128 328 U.S. at 317. Justice Powell has echoed this concern: "The Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the 'tyranny of shifting majorities.' "INS v. Chadha, 462

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0621

U.S. 917, 961 (1983) (Powell, J. concurring). As we have shown above, courts may not require prosecution of specific individuals, even though the Judicial Branch is expressly assigned the role of adjudicating individual guilt. A fortiori, the Legislative Branch, which is assigned the role of passing laws of general applicability and specifically excluded from questions of individual guilt or innocence, may not decide on an individual basis who will be prosecuted.

These constitutional principles of prosecutorial discretion apply even though the issue here is referral to the grand jury and not commencement of a criminal case after indictment. A referral to a grand jury commences the criminal prosecution process. That step is as much a part of the function of executing the laws as is the decision to sign an indictment. The cases expressly recognize that prosecutorial discretion applies at any stage of the investigative process, even to the decision whether to begin an investigation at all. See Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375 (2d Cir. 1973); Smith v. United States, 375 F.2d 243, 248 (5th Cir.), cert. denied, 389 U.S. 841 (1967). In the latter case, the court emphasized that prosecutorial discretion was protected "no matter whether these decisions are made during the investigation or prosecution of offenses." 375 F.2d at 248. Moreover, if the Executive has already determined that, as a matter of law, no violation of the law has occurred, it would serve no practical purpose to refer a case to the grand jury. Given the importance of these constitutional principles and the fundamental need to preserve the Executive's power to enforce the laws, we see no reason for distinguishing between the decision to prosecute and the decision to refer to the grand jury in this case. FN;B28[FN28]FN;F28

**22 For all of the above reasons, as a matter of statutory construction strongly reinforced by constitutional separation of powers principles, we believe that the United States Attorney and the Attorney General, to whom the United States Attorney is responsible, retain their discretion not to refer a contempt of Congress citation to a grand jury. It follows, of course, that we believe that even if the provision of a statute requiring reference to a grand jury were to be upheld, the balance of the prosecutorial process could not be mandated.

*129 B. Whether the Criminal Contempt of Congress Statute Applies to an Executive Official Who Asserts, On Direct Orders of the President, the President's Claim of Executive Privilege
We next consider, aside from the issue of prosecutorial discretion, whether the criminal contempt of Congress statute is intended to apply, or constitutionally could be applied, to Presidential claims of executive privilege.

1. Previous Department of Justice Interpretations of the Contempt of Congress Statute
The Department of Justice has previously taken the position that the criminal contempt of Congress statute does not apply to executive officials who assert claims of executive privilege at the direction of the President. In 1956, Deputy Attorney General (subsequently Attorney General) William P. Rogers took this position before a congressional subcommittee investigating the availability of information from federal departments and agencies. In a lengthy memorandum of law, Deputy Attorney General Rogers set forth the historical basis of executive privilege and concluded that in the context of Presidential assertions of the privilege, the contempt of Congress statute was "inapplicable to the executive departments." See Hearings Before a Subcommittee of the House Committee on Government Operations, 84th Cong., 2d Sess. 2933 (1956). FN;B29[FN29]FN;F29 We are not aware of any subsequent Department position that reverses or weakens this conclusion, and we have found no earlier Department position to the contrary.

We believe that the Department's long- standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it. Our conclusion is based upon the following factors: (1) the legislative history of the contempt of Congress statute demonstrates that it was not intended to apply to Presidential assertions of executive privilege; and (2) if the statute were construed to apply to Presidential assertions of executive privilege, it would so inhibit the President's ability to make such claims as to violate the separation of powers.

2. The Legislative History of the Contempt of Congress Statute
Neither the legislative history nor the historical implementation of the contempt statute supports the proposition that Congress intended the statute to apply to executive officials who carry out a Presidential assertion of executive privilege. The criminal contempt statute was originally enacted in 1857 during proceedings in the House of Representa-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0622

tives to consider a contempt of Congress citation against a New York Times correspondent who had refused to **130** answer questions put to him by a select committee appointed by the House to investigate charges of bribery of certain Representatives. As a result of the committee's unavailing efforts to obtain the reporter's testimony, the committee chairman introduced a bill designed "more effectually to enforce the attendance of witnesses on the summons of either House of Congress, and to compel them to deliver testimony." 42 Cong. Globe 404 (1857). The bill was supported as a necessary tool in the House's efforts to investigate the allegations of bribery. Seeid. at 405 (remarks of the Speaker), 426 (remarks of Sen. Toombs), 427 (remarks of Rep. Davis), 445 (remarks of Sen. Brown). The bill was rushed through Congress in less than a week in order to permit the House to bring greater pressure on the reporter to reveal the alleged source of the congressional corruption. That the bill was sponsored by the select committee, and not the Judiciary Committee, further demonstrates that the bill was not the result of a general consideration of Congress' contempt power, but was enacted as an expedient to aid a specific investigation. Thus, the circumstances of the bill's passage certainly do not affirmatively suggest that Congress anticipated application of the statute to instances in which the President asserted a claim of executive privilege.

**23** In fact, the sponsor of the bill disclaimed any such far-reaching implications. Representative Dunn asked the sponsor, Representative Orr, what impact the proposed bill would have on diplomatic secrets, one of the principal areas in which the President had historically asserted a privilege of confidentiality. Representative Dunn stated that use of the contempt statute by Congress to force disclosure of such material "might be productive of great mischief, and in time of war of absolute ruin of the country." 42 Cong. Globe 431 (remarks of Rep. Dunn). Representative Orr replied, "I can hardly conceive such a case" and emphasized that the bill should not be attacked "by putting instances of the extremest cases" because the "object which this committee had in view was, where there was corruption in either House of Congress, to reach it." Id. at 431 (remarks of Rep. Orr). The implication is that Congress did not intend the bill to apply to Presidential assertions of privilege. FN;B30[FN30]FN;F30

*131** In the years preceding the adoption of the statute, the President had, on a number of occasions, withheld documents from Congress under a claim of executive privilege, and many of these instances had been hotly contested in the public arena, and at least five of these instances occurred within the decade immediately preceding the enactment of the congressional contempt statute. Seesupra note 19 (collecting authorities). In spite of these highly visible battles over the subject of executive privilege, we have located no indication in the legislative history of the criminal contempt statute that Congress intended the statute to provide a remedy for refusals to produce documents pursuant to a Presidential claim of executive privilege.

The natural inference to be drawn from this vacuum in the legislative history is reinforced by Congress' failure, as far as we know, ever to utilize its inherent power of arrest to imprison Executive Branch officials for contempt of Congress for asserting claims of executive privilege, even though Congress had previously asserted and exercised its clearly recognized right to do so with respect to other instances of contempt by private citizens. SeeAnderson v. Dunn, 19 U.S. (6 Wheat.) 204 (1821); Ex Parte Nugent, 18 F. Cas. 471 (C.C.D.C. 1848). The absence of any congressional discussion of the use of the contempt power against Presidential claims of executive privilege and Congress' previous failure ever to attempt to use its inherent contempt power in such cases, strongly suggest that the statute was not intended to apply to such assertions.

This conclusion is supported by the subsequent history of the congressional contempt statute. Since enactment of the statute in 1857, there have been numerous instances in which the President has withheld documents from Congress under a claim of executive privilege. Despite the fact that many of these disputes were extraordinarily controversial, until the citation of the EPA Administrator in December 1982, 125 years after the contempt statute was enacted, neither house of Congress had ever voted to utilize the contempt statute against a Presidential assertion of executive privilege. In fact, during congressional debates over Presidential refusals to produce documents to Congress, there have been express acknowledgements by members of Congress that Congress had no recourse against the Executive if the President asserted executive privilege. In 1886, the Senate engaged in a prolonged debate over President Cleveland's order to his Attorney General not to produce to Congress documents concerning the dismissal of a United States Attorney. The debate was intense, controversial, and memorable; 23 years after the debate a Senator termed it the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0623

"most remarkable discussion which was ever had upon this question of the President's right to withhold documents from Congress." 43 Cong. Rec. 841 (1909) (remarks of Sen. Bacon). During this debate, even Senators who insisted upon the Senate's right to receive the documents recognized that if the President ordered them not to be produced, "there is no remedy." 17 Cong. Rec. 2800 (1886) (remarks of Sen. Logan); seealsoid. at 2737 (1886) (remarks of Sen. Voorhees).FN;B31[FN31]FN;F31

**24 *132 Congress' failure to resort to the contempt statute during any of the multitude of robust conflicts over executive privilege during the previous century and one quarter and Congress' own explicit recognition that it was without a remedy should the President order the withholding of documents, strongly suggest that Congress never understood the statute to apply to an executive official who asserted the President's claim of executive privilege. FN;B32[FN32]FN;F32

3. Prudential Reasons for Construing the Contempt Statute Not To Apply to Presidential Assertions of Privilege
Courts traditionally construe statutes in order to avoid serious doubts about a statute's constitutionality. Califano v. Yamasaki, 442 U.S. 682, 693 (1979); Crowell v. Benson, 285 U.S. 22, 62 (1932). As stated by the United States Court of Appeals for the District of Columbia Circuit, "when one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a 'clear statement' of contrary legislative intent."United States v. Brown, 483 F.2d 1314, 1317 (D.C. Cir. 1973) (quoting United States v. Thompson, 452 F.2d 1333, 1337 (D.C. Cir. 1971), cert. denied, 405 U.S. 998 (1972)).

When a possible conflict with the President's constitutional prerogatives is involved, the courts are even more careful to construe statutes to avoid a constitutional confrontation. A highly significant example may be found in the procedural history and holding of United States v. Nixon, 418 U.S. 683 (1974), in which the Court construed the limitation in 28 U.S.C. s 1291 (that appeals be taken only from "final" decisions of a district court) in order to permit the President to appeal an adverse ruling on his claim of executive privilege without having to place himself in contempt of court. Although the plain language of that statute seemed to preclude an appeal of a lower court's *133 interlocutory ruling on an evidentiary matter, the Court construed the statute to permit an immediate appeal, without going through the otherwise required contempt proceeding:
> The traditional contempt avenue to immediate appeal is peculiarly inappropriate due to the unique setting in which the question arises. To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism of the ruling would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the government.
418 U.S. at 691-92.

Congress itself has previously recognized the impropriety of resolving executive privilege disputes in the context of criminal contempt proceedings. During the dispute over the Watergate tapes, Congress provided a civil enforcement mechanism through which to test the President's claim of executive privilege. Senator Ervin, the sponsor of the bill, noted in his explanatory statement to the Senate that the use of criminal contempt "may be inappropriate, unseemly, or nonefficacious where executive officers are involved."119 Cong. Rec. 35715 (1973). In defending the civil enforcement procedure before the district court, Congress argued that in that case the contempt procedures would be "inappropriate methods for the presentation and resolution of the executive privilege issue," and that a criminal proceeding would be "a manifestly awkward vehicle for determining the serious constitutional question here presented."Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, Senate Select Committee on Presidential Campaign Activities v. Nixon, Civ. No. 1593-73, at 5 (D.D.C. Aug. 28, 1973).

**25 The United States Court of Appeals for the District of Columbia Circuit has stated on several occasions that criminal contempt proceedings are an inappropriate means for resolving document disputes, especially when they involve another governmental entity. In Tobin v. United States, 306 F.2d 270 (D.C. Cir.), cert. denied, 371 U.S. 902 (1962), the court reversed a contempt of Congress conviction on the ground that the congressional subpoena had gone beyond the investigative authority delegated to the committee that issued the subpoena. After deciding this issue, however, the court felt "inclined to add a few words in conclusion" concerning the problems involved in a criminal

CAR 0624

contempt of Congress case against a public official. In dictum, the court noted that the "conflicting duality inherent in a request of this nature is not particularly conducive to the giving of any satisfactory answer, no matter what the answer should prove to be," and it cited the "eloquent plea" of District Judge Youngdahl in the case below, which read in part:

> Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights.**134** Moreover, to raise these issues in the context of a contempt case is to force the courts to decide many questions that are not really relevant to the underlying problem of accommodating the interest of two sovereigns.

306 F.2d at 276.SeealsoUnited States v. Fort, 443 F.2d 670, 677 78 (D.C. Cir. 1970), cert. denied, 403 U.S. 932 (1971).

The analysis contained in United States v. Nixon demonstrates that principles of the separation of powers compel the application of special rules when a Presidential claim of a constitutional privilege is in tension with the request of another branch for confidential Executive Branch records. In discussing the issue of executive privilege in that case in response to a judicial subpoena, the Court stressed that the President's assertion of privilege was not to be treated as would a claim of a statutory or common law privilege by a private citizen.418 U.S. at 708, 715. The President's constitutional role as head of one of three separate branches of government means that special care must be taken to construe statutes so as not to conflict with his ability to carry out his constitutional responsibilities. See, e.g., Myers v. United States, 272 U.S. 52 (1926) (upholding the President's removal power against limitations Congress sought to impose). The same special attention is provided, of course, to the other two branches when they assert responsibilities or prerogatives peculiar to their constitutional duties.See, e.g., Gravel v. United States, 408 U.S. 606 (1972) (extending immunity of Speech and Debate Clause to congressional assistants); Pierson v. Ray, 386 U.S. 547 (1967) (granting absolute civil immunity for judges' official actions).

**26** In this case, the congressional contempt statute must be interpreted in light of the specific constitutional problems that would be created if the statute were interpreted to reach an Executive Branch official such as the EPA Administrator in the context considered here. FN;B33[FN33]FN;F33 As explained more fully below, if executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties. Therefore, the separation of powers principles that underlie the doctrine of executive privilege also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege. FN;B34[FN34]FN;F34

*135 4. The Constitutional Implications of Application of the Contempt of Congress Statute to Executive Branch

Officials Who Assert the President's Claim of Privilege
The Supreme Court has stated that, in determining whether a particular statute

> disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions.United States v. Nixon, 418 U.S. at 711-712. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

Nixon v. Administrator of General Services, 433 U.S. 425, 443 (1977). Thus, in analyzing this separation of powers issue, one must look first to the impact that application of the congressional contempt statute to Presidential assertions of executive privilege would have on the President's ability to carry out his constitutionally assigned functions. Then, if there is a potential for disruption, it is necessary to determine whether Congress' need to impose criminal contempt sanctions in executive privilege disputes is strong enough to outweigh the impact on the Executive's constitutional role.

In this instance, at stake is the President's constitutional responsibility to enforce the laws of the United States and the necessarily included ability to protect the confidentiality of information vital to the performance of that task. As explained earlier in this memorandum, the authority to maintain the integrity of certain information within the Executive

CAR 0625

Branch has been considered by virtually every President to be essential to his capacity to fulfill the responsibilities assigned to him by the Constitution. Thus, as discussed above, and as the Supreme Court has recognized, the capacity to protect the confidentiality of some information is integral to the constitutional role of the President.

For these reasons, the Supreme Court has ruled that the President's assertion of executive privilege is presumptive-lyvalid and can be overcome only by a clear showing that another branch cannot responsibly carry out its assigned constitutional function without the privileged information. United States v. Nixon, 418 U.S. at 708. In Nixon, the Court stated that "upon receiving a claim *136 of privilege from the Chief Executive, it became the further duty of the District Court to treat the subpoenaed material as presumptively privileged." 418 U.S. at 713. The United States Court of Appeals for the District of Columbia Circuit has stated that this presumptive privilege initially protects documents "even from the first intrusion represented by incamera examination of the conversations by a court." Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 730 (D.C. Cir. 1974) (en banc). The court went on to note:

> **27 So long as the presumption that the public interest favors confidentiality can be defeated only by a strong showing of need by another institution of government a showing that the responsibilities of that institution cannot responsibly be fulfilled without access to records of the President's deliberations we believed in Nixon v. Sirica, and continue to believe, that the effective functioning of the presidential office will not be impaired.

Id. at 730. In order to overcome the presumptively privileged nature of the documents, a congressional committee must show that "the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions." Id. at 731 (emphasis added). Thus, the President's assertion of executive privilege is far different from a private person's individual assertion of privilege; it is entitled to special deference due to the critical connection between the privilege and the President's ability to carry out his constitutional duties.

Application of the criminal contempt statute to Presidential assertions of executive privilege would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions. If the statute were construed to apply to Presidential assertions of privilege, the President would be in the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility that he found necessary to the performance of his constitutional duty. Even if the privilege were upheld, the executive official would be put to the risk and burden of a criminal trial in order to vindicate the President's assertion of his constitutional privilege. As Judge Learned Hand stated with respect to the policy justifications for a prosecutor's immunity from civil liability for official actions,

> to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to sic satisfy a jury of his good faith.

Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949), cert.denied, 339 U.S. 949 (1950). The Supreme Court has noted, with respect to the similar issue of *137 executive immunity from civil suits, that "among the most persuasive reasons supporting official immunity is the prospect that damages liability may render an official unduly cautious in the discharge of his official duties." Nixon v. Fitzgerald, 457 U.S. 731, 752 n.32 (1982); seealsoHarlow v. Fitzgerald, 457 U.S. 800 (1982); Butz v. Economou, 438 U.S. 478 (1978). Thus, the courts have recognized that the risk of civil liability places a pronounced burden on the ability of government officials to accomplish their assigned duties, and have restricted such liability in a variety of contexts. Id. FN;B35[FN35]FN;F35 The even greater threat of criminal liability, simply for obeying a Presidential command to assert the President's constitutionally based and presumptively valid privilege against disclosures that would impair his ability to enforce the law, would unquestionably create a significant obstacle to the assertion of that privilege. SeeUnited States v. Nixon, 418 U.S. 683 (1974).

**28 By contrast, the congressional interest in applying the criminal contempt sanctions to a Presidential assertion of executive privilege is comparatively slight. Although Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function, Congress could obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforce-

CAR 0626

ment of a congressional subpoena. FN;B36[FN36]FN;F36 Congress' use of civil enforcement power instead of the criminal contempt statute would not adversely affect Congress' ultimate interest in obtaining the documents. Indeed, a conviction of an Executive Branch official for contempt of Congress for failing to produce subpoenaed documents would not result in any order for the production of the documents. FN;B37[FN37]FN;F37 A civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them. Thus, even if criminal sanctions were not available against an executive official who asserted the President's claim of privilege, Congress would be able to vindicate a legitimate desire to obtain documents if it could establish that its need for the records outweighed the Executive's interest in preserving confidentiality.

The most potent effect of the potential application of criminal sanctions would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process. Although **\*138** this significant underline interrorem effect would surely reduce claims of executive privilege and, from Congress' perspective, would have the salutary impact of virtually eliminating the obstacles to the obtaining of records, it would be incon- sistent with the constitutional principles that underlie executive privilege to impose a criminal prosecution and criminal penalties on the President's exercise of a presumptively valid constitutional responsibility. The underline interrorem effect may be adequate justification for Congress' use of criminal contempt against private individuals, but it is an inappropriate basis in the context of the President's exercise of his constitutional duties. In this respect it is important to recall the statement of Chief Justice Marshall, sitting as a trial judge in the Burr case, concerning the ability of a court to demand documents from a President: "In no case of this kind would a court be required to proceed against the President as against an ordinary individual." United States v. Burr, 25 F. Cas. 187, 192 (C.C. Va. 1807).FN;B38[FN38]FN;F38 This fundamental principle, arising from the constitutionally prescribed separation of powers, precludes Congress' use against the Executive of coercive measures that might be permissible with respect to private citizens. The Supreme Court has stated that the fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the sep- aration of the powers of these departments by the Constitution; and in the rule which recognizes their essential equality.Humphrey's Executor v. United States, 295 U.S. 602, 629-30 (1935).

**\*\*29** Congress' use of the coercive power of criminal contempt to prevent Presidential assertions of executive privi- lege is especially inappropriate given the presumptive nature of the privilege. In cases involving congressional sub- poenas against private individuals, courts start with the presumption that Congress has a right to all testimony that is within the scope of a proper legislative inquiry. SeeBarenblatt v. United States, 360 U.S. 109 (1959); McGrain v. Daugherty, 273 U.S. 135 (1927). As noted above, however, the President's assertion of executive privilege is pre- sumptively valid, and that presumption may be overcome only if Congress establishes that the requested information "is demonstrably critical to the responsible fulfillment of the Committee's functions."SeeSenate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d at 731;seealsoUnited States v. Nixon, 418 U.S. at 708-09. If Congress could use the power of criminal contempt to coerce the President either not to assert or to abandon his right to assert executive privilege, this clearly established presumption would be reversed and the presumptivee privilege nullified.

Congress has many weapons at its disposal in the political arena, where it has clear constitutional authority to act and where the President has corresponding political weapons with which to do battle against Congress on equal terms. By wielding the cudgel of criminal contempt, however, Congress seeks to invoke **\*139** the power of the third branch, not to resolve a dispute between the Executive and Legislative Branches and to obtain the documents it claims it needs, but to punish the Executive, indeed to punish the official who carried out the President's constitutionally authorized commands, FN;B39[FN39]FN;F39 for asserting a constitutional privilege. That effort is inconsistent with the " spirit of dynamic compromise" that requires accommodation of the interests of both branches in disputes over executive privilege.SeeUnited States v. American Telephone & Telegraph Co., 567 F.2d 121, 127 (D.C. Cir. 1977). In the AT&T case, the court insisted on further efforts by the two branches to reach a compromise arrangement on an ex- ecutive privilege dispute and emphasized that

CAR 0627

the resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive modus vivendi, which positively promotes the functioning of our system. The Constitution contemplates such accommodation. Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme.

Id. at 130. Congress' use of the threat of criminal penalties against an executive official who asserts the President's claim of executive privilege, flatly contradicts this fundamental principle. FN;B40[FN40]FN;F40

The balancing required by the separation of powers demonstrates that the contempt of Congress statute cannot be constitutionally applied to an executive official in the context under consideration. On the one hand, Congress has no *140 compelling need to employ criminal prosecution in order to vindicate its rights. The Executive, however, must be free from the threat of criminal prosecution if its right to assert executive privilege is to have any practical substance. Thus, when the major impact on the President's ability to exercise his constitutionally mandated function is balanced against the relatively slight imposition on Congress in requiring it to resort to a civil rather than a criminal remedy to pursue its legitimate needs, FN;B41[FN41]FN;F41 we believe that the constitutionally mandated separation of powers requires the statute to be interpreted so as not to apply to Presidential assertions of executive privilege. FN;B42[FN42]FN;F42

**30 The construction of the statute that is dictated by the separation of powers is consistent with the legislative history of the statute and the subsequent legislative implementation of the statute. Although at the time the criminal statute was enacted, Congress was well aware of the recurring assertions of the right to protect the confidentiality of certain Executive Branch materials, it gave no indication that it intended the contempt statute to tread upon that constitutionally sensitive area. In the many debates on executive privilege since the adoption of the statute, Congress at times has questioned the validity of a Presidential assertion of privilege, but, until December of 1982, it never attempted to utilize the criminal contempt sanction to punish someone for a President's assertion of privilege. Regardless of the merits of the President's action, the fundamental balance required by the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution. We therefore conclude that the contempt of Congress statute does not apply to an executive official who carries out the President's claim of executive privilege.

Nearly every President since George Washington has found that in order to perform his constitutional duties it is necessary to protect the confidentiality of certain materials, including predecisional Executive Branch deliberations, national security information, and sensitive law enforcement proceedings, from disclosure to Congress. No President has rejected the doctrine of executive privilege; all who have addressed the issue have either exercised the privilege, attested to its importance, or done both. Every Supreme Court Justice and every Judge of the United States Court of Appeals for the District of Columbia Circuit who has considered the question of executive privilege has recognized its validity and importance in the constitutional scheme. Executive privilege, properly asserted, is as important to the President as is the need for confidentiality*141 at certain times in the deliberations of the Justices of the Supreme Court and in the communications between members of Congress and their aides and colleagues. Congress itself has respected the President's need for confidentiality; it has never arrested an executive official for contempt of Congress for failing to produce subpoenaed documents and never, prior to the heated closing moments of the 97th Congress in December of 1982, did a House of Congress seek to punish criminally an executive official for asserting a President's claim of privilege.

Naturally, Congress has and always will resist claims of executive privilege with passion and vigor. Congress aggressively asserts its perceived institutional prerogatives, and it will surely oppose any effort by the President to withhold information from it. If it could eliminate claims of executive privilege by requiring that an official who asserts such a claim on behalf of the President be prosecuted criminally, it would surely be in favor of doing so. Thus, the tension between the relative strengths and institutional prerogatives of Congress and the President necessarily reaches a high level of intensity in any case involving a claim of executive privilege. The specter of mandatory criminal prosecution for the good-faith exercise of the President's constitutional privilege adds a highly inflammatory

CAR 0628

element to an already explosive environment. We believe that the courts, if presented the issue in a context similar to that discussed in this memorandum, would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution. The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual.

**31 In some respects, the tensions between the branches, which become exacerbated during these conflicts, and the pressure placed on the President and his subordinates in this context, call to mind the comments of Chief Justice Chase concerning the impeachment trial of President Andrew Johnson, over which the Chief Justice presided. One of the charges against President Johnson was that he had fired Secretary of War Stanton in violation of the Tenure of Office Act, which purported to strip the President of his removal power over certain Executive Branch officials. FN;B43[FN43]FN;F43 Chief Justice Chase declared that the President had a duty to execute a statute passed by Congress which he believed to be unconstitutional "precisely as if he held it to be constitutional." However, he added, the President's duty changed in the case of a statute which

> directly attacks and impairs the executive power confided to him by the Constitution. In that case it appears to me to be the clear duty of the President to disregard the law, so far at least as it may be necessary to bring the question of its constitutionality before the judicial tribunals.

\* \* \*

*142 How can the President fulfill his oath to preserve, protect, and defend the Constitution, if he has no right to defend it against an act of Congress, sincerely believed by him to have been passed in violation of it? FN;B44[FN44]FN;F44

If the President is to preserve, protect, and defend the Constitution, if he is faithfully to execute the laws, there may come a time when it is necessary for him both to resist a congressional demand for documents and to refuse to prosecute those who assist him in the exercise of his duty. To yield information that he in good conscience believes he must protect in order to perform his obligation, would abdicate the responsibilities of his office and deny his oath. To seek criminal punishment for those who have acted to aid the President's performance of his duty would be equally inconsistent with the Constitution.

In the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt. Congress does not have the statutory or constitutional authority to require a particular case to be referred to the grand jury. In addition, because the Congress has an alternative remedy both to test the validity of the Executive's claim of privilege and to obtain the documents if the courts decide that the privilege is outweighed by a valid and compelling legislative need, a criminal prosecution and the concomitant chilling effect that it would have on the ability of a President to assert a privilege, is an unnecessary and unjustified burden that, in our judgment, is inconsistent with the Constitution.

**32 Theodore B. Olson
Assistant Attorney General
Office of Legal Counsel

FN1 Although the December 1982 dispute is now a matter of history, it raises recurring issues.

FN2 Another statute, the Resource Conservation and Recovery Act, 42 U.S.C. ss 6901 et seq., provides federal au-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0629

thority to deal with the current disposal of hazardous industrial wastes.

FN3 See Executive Order No. 12316, "Responses to Environmental Damage" (Aug. 14, 1981).

FN4 Subsequently, EPA published a proposed national priorities list (to replace the interim list), which identified the 418 sites that, in EPA's judgment, required priority in use of the Superfund to effect clean up. See 47 Fed. Reg. 58476 (1982).

FN5 We understand that as of January 14, 1983, EPA had sent more than 1,760 notice letters, undertaken Superfund financed action at 112 sites involving the obligation of in excess of $236 million, instituted Superfund claims in 25 judicial actions, and obtained one criminal conviction. As of the early months of 1983, EPA and the Department of Justice had reached settlements in 23 civil actions providing for the expenditure of more than $121 million to conduct clean up operations and were actively negotiating with responsible parties concerning the clean up of 56 sites throughout the country. See Amended Declaration of Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel of the EPA, filed in United States v. House of Representatives, Civ. No. 82-3583 (D.D.C. Jan. 14, 1983).

FN6 Id.

FN7 The subpoena required the EPA Administrator to produce all books, records, correspondence, memorandums, papers, notes and documents drawn or received by the Administrator and/or her representatives since December 11, 1980 the date of enactment of the Superfund Act, including duplicates and excepting shipping papers and other commercial or business documents, contractor and/or other technical documents, for those sites listed as national priorities pursuant to Section 105(8)(B) of the Superfund Act.
See United States v. House of Representatives, 556 F. Supp. 150, 151 (D.D.C. 1983).

FN8 See Testimony of Administrator Gorsuch before the Public Works Subcommittee, attached as Exhibit C to Declaration of Robert M. Perry, supra.

FN9 See Letters to Hon. Elliott H. Levitas and Hon. John D. Dingell from Attorney General William French Smith (Nov. 30, 1982). The Subcommittee on Oversight and Investigations of the House Energy and Commerce Committee (Energy and Commerce Subcommittee), chaired by Representative John D. Dingell, was pursuing a parallel demand for similar documents relating to enforcement of the Superfund Act with respect to certain specific sites that were among the 160 on the interim priorities list. While the Energy and Commerce Subcommittee sought documents relative to three specific hazardous waste sites, the Public Works Subcommittee subpoena demanded production of virtually all documents for all 160 sites. The President's assertion of executive privilege applied to both subpoenas. Although the Energy and Commerce Subcommittee approved a contempt of Congress resolution against the EPA Administrator, this resolution never reached the full Committee or the floor of the House of Representatives.

FN10 As of that date, EPA had been able to examine only a portion of the hundreds of thousands of pages of documents that had been subpoenaed. The 64 documents that were withheld were those among the subpoenaed documents that had been reviewed and determined to fall within the President's instruction not to produce documents the release of that would adversely affect ongoing enforcement proceedings. See Amended Declaration of Robert M. Perry, supra.

FN11 See Letter to Hon. Elliott H. Levitas from Robert A. McConnell, Assistant Attorney General, Office of Legislative Affairs (Dec. 9, 1982).

FN12 The contempt resolution stated:
        Resolved, That the Speaker of the House of Representatives certify the report of the Committee on Public Works

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0630

and Transportation as to the contumacious conduct of Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee served upon Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, and as ordered by the subcommittee, together with all of the facts in connection therewith, under seal of the House of Representatives, to the United States attorney for the District of Columbia, to the end that Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, may be proceeded against in the manner and form provided by law.
128 Cong. Rec. 31754 (1982).

FN13 A third provision, 2 U.S.C. s 193, which denies the existence of any testimonial privilege for a witness to refuse to testify on the ground that this testimony would disgrace him, is not relevant to the issues discussed in this memorandum.

FN14 See Amended Complaint in United States v. House of Representatives, Civ. No. 82-3583 (D.D.C. Dec. 29, 1982).

FN15 Although the United States Court of Appeals for the District of Columbia Circuit previously had been willing to entertain a civil action to resolve a conflict between a congressional subpoena for documents and a Presidential claim of executive privilege when the action was brought by a congressional committee, Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974) (en banc), the trial court decision in the EPA matter casts some doubt on the viability of such an action when Congress, as in this case, does not wish to resolve the controversy in a civil suit. We must assume, for the purpose of this opinion, that a civil suit is an avenue that is open to Congress, but closed to the Executive, absent a legislature willing to have the matter resolved in a civil proceeding.
    Of course, the courts might be more amenable to a civil action challenging a contempt citation if they felt that a criminal prosecution in this context was untenable. The district court judge in the EPA matter noted but did not attempt to consider in depth the "difficulties" of prosecuting an executive official for carrying out the President's constitutional responsibility.

FN16 Madison characterized Montesquieu as the "oracle who is always consulted and cited on (the) subject (of the separation of powers)." See The Federalist No. 47, supra, at 301.

FN17 It is noteworthy, at least from an historical perspective, that the House of Representatives, because of its immense powers, was considered to be the governmental body least vulnerable to encroachments by other segments of government and, at the same time, because of its popular origin and frequent renewal of authority by the people, the body whose encroachment on the other branches would be least distrusted by the public. The Supreme Court later noted:
    It is all the more necessary, therefore, that the exercise of power by this body, when acting separately from and independently of all other depositories of power, should be watched with vigilance, and when called in question before any other tribunal having the right to pass upon it that it should receive the most careful scrutiny.
Kilbourn v. Thompson, 103 U.S. 168, 192 (1881).

FN18 Of equal concern was the need to separate the judicial power from the executive power. The drafters intended to preserve the impartiality of the judiciary as "neutral arbiters in the criminal law" by separating the judiciary from the prosecutorial function. Nader v. Saxbe, 497 F.2d 676, 679 n.18 (D.C. Cir. 1974).

FN19 Presidents have invoked the privilege throughout our history for a variety of reasons. See, e.g., "History of Refusals by Executive Branch to Provide Information Demanded by Congress," 6 Op. O.L.C. 751 (1982); Memorandum from John Harmon, Assistant Attorney General, Office of Legal Counsel, to Robert Lipschutz, Counsel to the President (June 8, 1977); Position of the Executive Department Regarding Investigative Reports, 40 Op. Att'y Gen. 45 (1941).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN20 As explained by Attorney General (later, Supreme Court Justice) Robert Jackson in April 1941:

> Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon.

40 Op. Att'y Gen. 45, 46 (1941). As similarly expressed a few years later by Deputy Assistant Attorney General Kauper:

> Over a number of years, a number of reasons have been advanced for the traditional refusal of the Executive to supply Congress with information from open investigational files. Most important, the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation.

Memorandum for the Deputy Counsel to the President from Deputy Assistant Attorney General Kauper re: Submission of Open CID Investigation Files (Dec. 19, 1969). This significant constitutional privilege provides a foundation for our discussion below of the penalties that Congress may attach to the President's assertion of the privilege in response to a congressional subpoena.

FN21 Although it is by no means certain as a matter of law, if the case were referred to a grand jury, the United States Attorney might be required to take certain steps short of signing the indictment, and the grand jury's decision might well become public. In Cox, a majority of the court (made up of the three dissenting judges and one concurring judge) took the view that the United States Attorney could be required to prepare an indictment for use by the grand jury. In addition, the district court in In re Grand Jury, supra, held that even though the United States Attorney could not be required to sign an indictment, in the circumstances of that case "the substance of the charges in the indictment should be disclosed, omitting certain portions as to which the Court, in the exercise of its discretion, concludes that the public interest in disclosure is outweighed by the private prejudice to the persons involved, none of whom are charged with any crime in the proposed indictment." 315 F. Supp. at 678-79. Under this analysis, if the contempt citation were to reach a grand jury and the grand jury were to vote a true bill, a court might be able to require the United States Attorney to prepare an indictment and then might order the disclosure of that indictment as voted by the grand jury. For the reasons set out in our discussion of prosecutorial discretion, the court could not, however, order the United States Attorney to prosecute.

> Because the contempt of Congress statute does not require the United States Attorney to refer to a grand jury a citation for contempt of Congress issued to an executive official who has asserted the President's claim of executive privilege, we have not attempted to determine definitively what additional steps, if any, the United States Attorney could be required to take if such a matter were referred to a grand jury.

FN22 See 106 Cong. Rec. 17313 (1960) (citation against Austin J. Tobin, Executive Director of the Authority); id. at 17316 (citation against S. Sloan Colt, Chairman of the Board); id. at 17319 (citation against Joseph G. Carty, Secretary). The contempt resolution in each case read as follows:

> Resolved, That the Speaker of the House of Representatives certify the report of the Committee on the Judiciary as to the contumacious conduct of name in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee served upon him and as ordered by the subcommittee, together with all of the facts in connection therewith, under seal of the House of Representatives, to the United States attorney for the District of Columbia, to the end that name may be proceeded against in the manner and form provided by law.

FN23 The Court of Appeals ruled that the documents requested by the Committee went beyond the investigative authority delegated to the Committee by the House.

FN24 We know of at least two other individuals who were cited for contempt of Congress, but whose cases were not referred to a grand jury by the Department of Justice. See Department of Justice File No. 51-51-484 (1956). The file was closed because the Department concluded that there was an insufficient basis for prosecution.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN25 In this respect, we believe that Wilson implicitly disapproved the dictum of Ex parte Frankfeld, 32 F. Supp. 915 (D.D.C. 1940), in which the district court stated:

> It seems quite apparent that Congress intended to leave no measure of discretion to either the Speaker of the House or the President of the Senate, under such circumstances, but made the certification of facts to the district attorney a mandatory proceeding, and it left no discretion with the district attorney as to what he should do about it. He is required, under the language of the statute, to submit the facts to the grand jury.

Id. at 916. The Frankfeld court expressly linked the responsibilities of the Speaker and the United States Attorney. Wilson ruled that the Speaker's duty is discretionary, at least when the House is not in session. Therefore, since the Speaker's duty is in pari materia with the duty of the United States Attorney, the law, at least in the District of Columbia Circuit, seems to be that both duties should be viewed as containing some elements of discretion.

FN26 Ansara v. Eastland was cited with approval three times by Judge Smith in United States v. House of Representatives, 556 F. Supp. 150, 152-53 (D.D.C. 1983). Thus, although the opinion made a passing reference to the mandatory nature of referral, Judge Smith must have recognized that the United States Attorney retained prosecutorial discretion.

FN27 These conclusions are not inconsistent with Rule 48(a) of the Federal Rules of Criminal Procedure, which requires leave of court before dismissal of a criminal action. This provision is intended primarily to protect defendants against repeated prosecutions for the same offense, and a court's power to deny leave under this provision is extremely limited. See Rinaldi v. United States, 434 U.S. 22 (1977); United States v. Hamm, 659 F.2d 624 (5th Cir. 1981); United States v. Ammidown, 497 F.2d 615 (D.C. Cir. 1973). The United States Court of Appeals for the Fifth Circuit has stated that the constitutionality of Rule 48(a) is dependent upon the prosecutor's unfettered ability to decide not to commence a case in the first place. United States v. Cox, 342 F.2d 167 (5th Cir.) (en banc), cert. denied, 381 U.S. 935 (1965). Moreover, Judge Weinfeld has stated that even if a court denied leave to dismiss an indictment, a court "in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine." United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n, 228 F. Supp. 483 (S.D.N.Y. 1964).

FN28 These conclusions are not inconsistent with Rule 48(a) of the Federal Rules of Criminal Procedure, which requires leave of court before dismissal of a criminal action. This provision is intended primarily to protect defendants against repeated prosecutions for the same offense, and a court's power to deny leave under this provision is extremely limited. See Rinaldi v. United States, 434 U.S. 22 (1977); United States v. Hamm, 659 F.2d 624 (5th Cir. 1981); United States v. Ammidown, 497 F.2d 615 (D.C. Cir. 1973). The Fifth Circuit has stated that the constitutionality of Rule 48(a) is dependent upon the prosecutor's unfettered ability to decide not to commence a case in the first place. United States v. Cox, 342 F.2d 167 (5th Cir.) (en banc), cert. denied, 381 U.S. 935 (1965). Moreover, Judge Weinfeld has stated that even if a court denied leave to dismiss an indictment, a court "in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine." United States v. Greater Blouse, Skirt & Neckwear Contractors Association, Inc., 228 F. Supp. 483 (S.D.N.Y. 1964).

FN29 The memorandum cited, inter alia, a 1909 Senate debate over the issue of executive privilege in which Senator Dolliver questioned "where Congress gets authority either out of the Constitution or the laws of the United States to order an executive department about like a servant." 43 Cong. Rec. 3732 (1909). Other historical examples cited by the report are discussed below.

FN30 The legislative history contains one reference to the application of the statute against executive officials. During the floor debates, Representative Marshall attacked the bill by claiming that it "proposes to punish equally the Cabinet officer and the culprit who may have insulted the dignity of this House by an attempt to corrupt a Representative of the people." 42 Cong. Globe at 429. This statement does not, however, suggest that the statute was intended to apply to Presidential assertions of executive privilege. Indeed, virtually all previous assertions of executive privilege against

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0633

Congress had been made by the President himself, and Congress expressed no intent to utilize the criminal contempt provisions against the President. Representative Marshall's statement, therefore, simply lends support to the proposition, with which we agree, that there are certain circumstances in which the congressional contempt statute might be utilized against an executive official, such as instances in which an executive official, acting on his own, engaged in disruptive and contumacious conduct during a congressional hearing, or in which an executive official, acting on his own, committed an offense. See Marshall v. Gordon, 243 U.S. 521 (1917). As the remainder of Representative Marshall's remarks demonstrate, the principal force driving the bill was Congress' desire to obtain an expeditious method for investigating questions regarding the integrity of Congress and not to provide Congress with a statute requiring the President to prosecute criminally those who had asserted the President's constitutionally based claim of executive privilege. We have found no evidence in the legislative history that supports an intention to apply the proposed statute in such a context.

FN31 The only remedy then recognized by the Senators was the ultimate sanction of impeachment. See 17 Cong. Rec. 2737, 2800 (1886). As we note below, a much more effective and less controversial remedy is available -- a civil suit to enforce the subpoena -- which would permit Congress to acquire the disputed records by judicial order. See also Senate Select Committee on Presidential Campaign Practices v. Nixon, 498 F.2d 725 (D.C. Cir. 1974) (en banc).

FN32 Congress' practices with respect to the contempt statute and the absence of any previous application of the statute to an Executive Branch official in these circumstances are highly probative of the meaning and applicability of the statute. In general, the Supreme Court has examined historical practice to determine the scope of Congress' powers. For example, in determining the scope of Congress' power to call and examine witnesses, the Court looked to the historical experience with respect to investigations and concluded that when Congress' practice in the matter is appraised according to the circumstances in which it was begun and to those in which it has been continued, it falls nothing short of a practical construction, long continued, of the constitutional provisions respecting their powers; and therefore should be taken as fixing the meaning of those provisions, if otherwise doubtful. McGrain v. Daugherty, 273 U.S. 135, 174 (1927); see also Fairbank v. United States, 181 U.S. 283, 308 (1901). Moreover, the Court traditionally gives great weight to a contemporaneous construction of a statute by the agency charged with its execution. See Power Reactor Development Co. v. Electricians, 367 U.S. 396, 408 (1961); Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153 (1946). In this instance, Congress is responsible for taking the first step in implementing the contempt statute. Therefore, Congress' previous interpretations and past uses of the statute are analogous to the contemporaneous construction of the agency charged with implementation of the statute, and are of significance in determining the meaning of the statute.

FN33 The same principle applies to protect the constitutional functions of the other branches. The separation of powers would similarly seem to require that a statute that made it a crime to disregard a statute passed by Congress be read not to apply to a judge who struck down a congressional enactment as unconstitutional.

FN34 In addition to the encroachment on the constitutionally required separation of powers that prosecution of an Executive Branch official in this context would entail, there could be a serious due process problem if such an official were subjected to criminal penalties for obeying an express Presidential order, an order which was accompanied by advice from the Attorney General that compliance with the Presidential directive was not only consistent with the constitutional duties of the Executive Branch, but also affirmatively necessary in order to aid the President in the performance of his constitutional obligations to take care that the law was faithfully executed. See Cox v. Louisiana, 379 U.S. 559 (1965); Raley v. Ohio, 360 U.S. 423 (1959).

> Furthermore, a person can be prosecuted under s 192 only for a "willful" failure to produce documents in response to a congressional subpoena. See United States v. Murdock, 290 U.S. 389, 397 98 (1933); Townsend v. United States, 95 F.2d 352, 359 (D.C. Cir.), cert. denied, 303 U.S. 664 (1938). There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute. Moreover, reliance on an explicit opinion of the Attorney General may negate the required mens rea even in the case of a statute without a willfulness requirement. See Model Penal Code s 2.04(3)(b); United States v. Barker, 546 F.2d 940, 955 (D.C. Cir. 1976) (Mehrige J., concurring).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

CAR 0634

FN35 See also Barr v. Matteo, 360 U.S. 564 (1959); Spalding v. Vilas, 161 U.S. 483 (1896). Some officials, such as judges and prosecutors, have been given absolute immunity from civil suits arising out of their official acts. Imbler v. Pachtman, 424 U.S. 409 (1976); Pierson v. Ray, 386 U.S. 547 (1967).

FN36 It is arguable that Congress already has the power to apply for such civil enforcement, since 28 U.S.C. s 1331 has been amended to eliminate the amount in controversy requirement, which was the only obstacle cited to foreclose jurisdiction under s 1331 in a previous civil enforcement action brought by the Senate. See Senate Select Committee on Presidential Campaign Activities v. Nixon, 366 F. Supp. 51 (D.D.C. 1973). In any event, there is little doubt that, at the very least, Congress may authorize civil enforcement of its subpoenas and grant jurisdiction to the courts to entertain such cases. See Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974) (en banc); Hamilton and Grabow, A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas, 21 Harv. J. on Legis. 145 (1984).

FN37 See Hamilton and Grabow, supra, 21 Harv. J. on Legis. at 151.

FN38 The Nixon Court thought this statement significant enough in the context of an executive privilege dispute to quote it in full at two separate places in its decision. United States v. Nixon, 418 U.S. at 708, 715.

FN39 One scholar (former Assistant Attorney General for the Civil Division, and now Solicitor General, Rex Lee) has noted that

> when the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted for conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for vindicating congressional investigative interests and for getting the legal issues into court.

Lee, Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships, 1978 B.Y.U. L. Rev. 231, 259.

FN40 Even when a privilege is asserted by a cabinet official, and not the President, courts are extremely reluctant to impose a contempt sanction and are willing to resort to it only in extraordinary cases and only after all other remedies have failed. In In re Attorney General, 596 F.2d 58 (2d Cir.), cert. denied, 444 U.S. 903 (1979), the court granted the government's mandamus petition to overturn a district court's civil contempt citation against the Attorney General for failing to turn over documents for which he had asserted a claim of privilege. The court recognized that even a civil contempt sanction imposed on an Executive Branch official "has greater public importance, with separation of powers overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant." 596 F.2d at 64. Therefore, the court held that holding the Attorney General of the United States in contempt to ensure compliance with a court order should be a last resort, to be undertaken only after all other means to achieve the ends legitimately sought by the court have been exhausted. Id. at 65. In the case of a Presidential claim of executive privilege, there is even more reason to avoid contempt proceedings because the privilege claim has been made as a constitutionally based claim by the President himself and the sanction involved is criminal and not civil contempt. The use of criminal contempt is especially inappropriate in the context under discussion because Congress has the clearly available alternative of civil enforcement proceedings.

FN41 See Hamilton and Grabow, A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas, 21 Harv. J. on Legis. 145 (1984).

FN42 We believe that this same conclusion would apply to any attempt by Congress to utilize its inherent "civil"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

contempt powers to arrest, bring to trial, and punish an executive official who asserted a Presidential claim of executive privilege. The legislative history of the criminal contempt statute indicates that the reach of the statute was intended to be coextensive with Congress' inherent civil contempt powers (except with respect to the penalties imposed). See 42 Cong. Globe 406 (remarks of Rep. Davis). Therefore, the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well.

FN43 The Tenure of Office Act was, of course, later declared to have been unconstitutional. Myers v. United States, 272 U.S. 52 (1926).

FN44 R. Warden, An Account of the Private Life and Public Services of Salmon Portland Chase 685 (1874). Chief Justice Chase's comments were made in a letter written the day after the Senate had voted to exclude evidence that the entire cabinet had advised President Johnson that the Tenure of Office Act was unconstitutional. Id. See M. Benedict, The Impeachment and Trial of Andrew Johnson 154-55 (1973). Ultimately, the Senate did admit evidence that the President had desired to initiate a court test of the law. Id. at 156.

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)

END OF DOCUMENT

CAR 0636

**FAQs – FOR INTERNAL USE ONLY**

**Why did DHS create this process?**
From a law enforcement and public safety perspective, it does not make sense to devote immigration enforcement resources to the removal of those who constitute our lowest priorities.  In fact, the placement of these individuals in removal proceedings hinders our public safety mission by clogging immigration court dockets and diverting DHS enforcement resources away from individuals who do pose a threat to public safety.  Although DHS has been incredibly successful in focusing its enforcement resources on criminal aliens, repeat violators, border entrants and other priorities, low priority cases continue to clog the enforcement system and hinder the removal of the highest priority aliens.

**How will this process help DHS effectuate its priorities?**
This process will remove very low priority cases from the system, thereby allowing immigration and federal judges to more swiftly adjudicate high priority cases and freeing up additional resources that DHS and DOJ will dedicate to further enhance the identification and removal of those individuals who pose a threat to our public safety.

**Does the process constitute administrative amnesty?**
No.  This process constitutes smart law enforcement policy that will help DHS and DOJ effectuate their priorities and wisely use our immigration enforcement, adjudication and litigation resources.  This process will not result in a reduction in immigration enforcement.  Rather, it will continue to focus our immigration enforcement efforts– further emphasizing the identification and removal of criminal aliens and other priority cases.

**Does the process represent an abdication of DHS's responsibility to enforcement immigration law?**
No.   For decades, DHS, and previously INS, have exercised prosecutorial discretion in order to prioritize the use of immigration enforcement resources; indeed, the exercise of this discretion in this way has long enjoyed bipartisan support.  This process ensures that DHS and DOJ are using their immigration resources in a smart and effective manner.  Over the past two years, DHS has demonstrated that the use of priorities does not limit immigration enforcement, but rather enhances it.

**Will the process result in permanent lawful status for beneficiaries?**
No.  The exercise of prosecutorial discretion through this process would not provide an individual with permanent lawful status.

**What is the role of DOJ in the process?**
DOJ's role in the removal process is to adjudicate removal cases through the Executive Office for Immigration Review and to litigate removal cases in the federal courts through the Office of Immigration Litigation.  DOJ will participate in the interagency working group that will identify low priority removal cases that should be considered for an exercise of prosecutorial discretion at the various stages of enforcement proceedings per the June 17, 2011 Morton memorandum.  The working group also will identify on a case-by-case basis those cases pending before immigration courts and federal courts that should be considered for an exercise of prosecutorial discretion.

**Will beneficiaries of an exercise of prosecutorial discretion automatically receive work authorization?**
Nothing about this process is automatic.  Individuals affected by an exercise of prosecutorial discretion will be able to request work authorization and their requests will be considered on a case-by-case basis.

**How will the process focus increased resources on high priority cases?**
The process will save resources as a result of exercising prosecutorial discretion in low priority cases. DHS and DOJ will devote these resources to more expeditiously pursuing the removal of public safety threats and border security.  In addition, by suspending or removing low priority cases from the dockets of immigration and federal courts, these courts will be able to more swiftly adjudicate high priority cases.

**Will a criminal conviction preclude an individual from receiving an exercise of prosecutorial discretion under the process?**
Each case will be considered on its own merits, and the working group will look at the totality of the circumstances surrounding each case in its review.

**Is the process consistent with the President and Secretary Napolitano's statements that no population of individuals will receive categorical administrative relief?**
Yes.  DHS will not provide categorical relief to those that would have qualified under the DREAM Act, or to any other populations.  Instead, each determination will be made on a case-by-case basis based on the prosecutorial discretion memorandum as implemented by  the working group.

**Will the process apply to individuals who already have a final order of removal?**
Yes.   The working group will create a mechanism for appropriate discretionary consideration to be given to compelling cases involving a final order of removal.

**Will this apply to LGBT couples, such as the CA case that's currently in the news**?
We cannot comment on individual cases.  However, as a general matter, the terms of the prosecutorial discretion memorandum allow for the exercise of discretion based on an individual's ties and contributions to the community, including family relationships such as committed same-sex relationships.  That discretion will be exercised on a case-by-case basis.

**How much will be saved through this process?**
Closure of these cases will allow for significantly more resources to be dedicated to high priority cases. It costs DHS and DOJ thousands of dollars to prosecute and adjudicate a single alien through the removal process.  By administratively closing low priority cases, these resources can be utilized to identify and remove high priority cases, like those that present a public safety threat.  That is the responsible and smart way to use taxpayer money.

<strong>FOR INTERNAL USE ONLY</strong>

CAR 0638

CQ CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
Feb. 15, 2012

# House Appropriations Subcommittee on Homeland Security Holds Hearing on the Fiscal 2013 Appropriations for the Homeland Security Department

### LIST OF PANEL MEMBERS AND WITNESSES

ADERHOLT:

Good morning. Hearing is called to order.

Today we welcome back Secretary Napolitano.

Madam Secretary, thank you for being here today. We look forward to hearing your testimony and also the president's budget for the Department of Homeland Security for F.Y. '13.

Over the past year we've seen some extraordinary security-related events. We've seen the demise of Osama Bin Laden and Anwar al-Awlaki. Growing concerns over Hezbollah's global reach and Al Qaida's influence in Northern Africa. (Inaudible) drug cartels continue to threaten our border as well as the rule of law of Mexico.

The persistent threat of home grown violent extremism and certainly last but not least the horrific natural disasters including flooding and the violent tornadoes that struck Missouri and my home State of Alabama, a devastation that you and I were both able to witness first hand.

Despite the significance of these developments, perhaps the greatest threat to our nation over this past year has been our ballooning debt and crippling over-reliance upon deficit spending.

This leaves us the question of how do we sustain and support vital security programs in a physical environment that is both profoundly and necessarily constrained. The short answer for this subcommittee is discipline, demanding that funds provide tangible results for our nation's security.

The exercise of such discipline is not new. In fact, appropriators have always worked within the confines of finite resources and competing priorities. What's changed is the urgency and the skill of this discipline. There are no more shortcuts out of the budget's red ink, and homeland security cannot be immune from physical restraint.

The (inaudible) does not mean that we should embrace the flawed overused expression doing more with less. Rather it means we must get the most out of each and every scarce dollar to fill the department's mission.

CAR 0639

This approach of linking funds to result is exactly what this subcommittee did in a recently enacted F.Y. '12 comfort support. I would reject the mischaracterization of the F.Y. '12 spending decision as being predisposed to cut programs such as famous grants or science and technology.

That is a flawed claim -- a flawed claim that fails to acknowledge the blatant inadequacy of the administration's original F.Y. '12 budget request.

Madam Secretary, this subcommittee makes no apologies for making it a priority to limit funding to vital operations in front line personnel at the expense of scalable activities and programs that are failing to demonstrate tangible results or execute their budgets.

And in spite of last year's significant budgetary challenges, we manage to increase funding above the request for potentially gain changing risk-based programs at CBT and TSA, programs you have strongly supported as crucial to the department's success.

Sadly, the fiscal year 2013 budget for the H.S. before today fails to adequately sustain such operational authorities and repeats many of the same inadequacies as last year's quest using phony offsets and budget gimmicks while lowballing critical operational programs does not mean the nation's -- does not meet the nation's pressing needs for security and physical discipline.

Madam Secretary, it is incumbent upon the administration to submit a responsible budget, one that does not rely upon a fiction of unauthorized fees, unrealistic assumptions and flagrant contradictions. But rather a budget that adequately supports the department's mission of funding needed detention capacity for (inaudible) supporting the necessary modernization Coast Guard and CBP assets and keeping our research efforts on agricultural and biological threats on track.

Whereas this administration chose to apply the term priorities as a convenient excuse to avoid enforcing our immigrant laws and ignore legislative mandates, this subcommittee is obligated within real world constraints with the law as it is currently written and to actually fund vital operations.


ADERHOLT:

This has to be and is the standard by which we will evaluate the F.Y. '13 budget request, a standard that demands accountability as well as the direct alignment of funding to result (inaudible) homeland security. And the American taxpayer deserves no less.

Madam Secretary, it is clear that we have a lot to go over this morning for this hearing. Before I recognize the ranking member for this subcommittee, let me first address an important issue pertaining to the department's compliance with the law.

There were 12 reports and plans required by statute to be submitted with the F.Y. '13 budget. As of today, 11 of those reports and plans have not been submitted. Only the FEMA

DRF report that we received last night at 9:30 has been submitted and we have a few questions about that -- this report.

Also, Madam Secretary, these reports and plans were required by law and they're late. By the end of this hearing, this subcommittee would like an answer from you, on the record, when the department will comply with the law and submit these reports to the subcommittee.

Now, let me return to the distinguished ranking member who has served previously as chairman of this subcommittee, Mr. Price, for any remarks that he may like to make. Mr. Price.

PRICE:

Thank you, Mr. Chairman. Welcome, Madam Secretary, we're glad to see you and it's a pleasure to have you kick off our hearing season.

The 2013 discretionary budget requests for the Department of Homeland Security is $39.5 billion plus an addition $5.5 billion in disaster relief funding that does not count toward the discretionary cap.

At roughly the same level as 2012, this budget represents the first time an administration has not sought an increase for Homeland Security activities since the department was formed. Like all federal agencies, you've been asked to do more with less and this has required some tough decisions.

I was pleased to see this budget prioritize current and future threats by including significant increases for FEMA grants and for science and technology, albeit against a base, which, in both cases, has been significantly and, in my opinion, excessively reduced in the last two years.

The budget also produces reductions to Coast Guard personnel and acquisitions, a realignment of some current DHS programs and a significant reorganization of Homeland Security grant programs, many things that we are going to need to explore to see how the department is prioritizing risks and allocating funds in this era of shrinking budgets.

It's also a time to reflect about where the department has been and where you're heading. This includes the department's efforts to enforce our nation's immigration laws, which we all know to be in dire need of comprehensive reform despite Congress' failure to act.

The more I, as chairman and ranking member, have looked at targeted efforts to improve immigration enforcement and otherwise work on this issue, the more I have become convinced that we simply must have comprehensive reform. This cannot be fixed from the appropriations side alone.

You're well aware that illegal immigration attempts have decreased by 36 percent in the past two years and are one-third of what they were during their peak. This is impressive and this decline is due, in large part, to the doubling of border patrol agents along the Southwest border

CAR 0641

and the significant increase in immigration personnel working in the same region, along with improvements in detection technologies.

These changes -- this subcommittee had a lot to do with these changes and we're proud of this progress. In addition, the Administration has taken positive steps to improve its immigration enforcement policies.

Now, some have been quick to criticize these efforts, but I believe it's both prudent and entirely appropriate for the Administration on the removal of criminal aliens, first and foremost, while providing prosecutorial discretion on less pressing cases.

I also support your effort to better focus the Secure Communities program to make sure it's fulfilling its intended mission and is not being applied indiscriminately.

And I'm pleased that the Administration continues to carefully oversee the 287(g) program to revoke authorities and contracts at poorly performing detention facilities when it's clear that problems are not being resolved.

I must also commend you on the job FEMA did over the past year nimbly dealing with 99 major disasters. FEMA did a remarkable job of working with affected areas to make sure that our citizens and localities had the resources to remove damaged structures and debris as well as to begin the rebuilding process.

This confirms that much of the lost capacity we witnessed following Hurricane Katrina has been rebuilt, also a priority over past years of this subcommittee.

This impressive performance was even more laudable since it occurred during a period of great funding uncertainty. Hopefully, the new disaster funding mechanism, provided in the Budget Control Act, will ensure long-term stability for the Disaster Relief Fund.

That being said, there's some areas of your budget request that concern me. I see over 1,000 Coast Guard personnel leaving, significant reductions in mission support staff at both CBP and ICE, large reductions to Coast Guard and CBP aviation and maritime assets which could impair both agency's operational tempos.

These reductions and coupled with the assumed collection of $317 million in new aviation security fees that have not been authorized by Congress, this leaves us with several holes to fill at the offset and that doesn't even get to commitments that you've already made, such as completing construction of a new DHS headquarters, which, unfortunately, it not funded in 2013 at all.

I also have concerns about the growing pains that DHS components continue to experience nearly a decade into the department's existence when it comes to effective oversight of personnel and procurement decisions.

Last December, an internal review of the National Protection and Programs Directorate found mismanagement of and by NPPD personnel and issues of funds. And, similarly, an

Inspector General report suggests that U.S. CIS officials are unduly pressuring adjudicators to approve applications from petitions which could potentially lead to defraud.

And we've seen too many Anti-Deficiency Act violations recently where appropriated funds are diverted to different uses than permitted. So the department needs to hold its personnel accountable to ensure that issues raised by internal reviews or audits or the Inspector General are addressed promptly and effectively.

I think we've made some progress, but we're not fully there yet and, as secretary, I'm sure you'll keep working on it. Madam Secretary, I look forward to your testimony and working with you again this year.


ADERHOLT:

At this time, I'd like to recognize the full Appropriations Chairman, Mr. Rogers.


ROGERS:

Thank you, Mr. Chairman, for yielding. Thank you, Madam Secretary, for being here. This subcommittee has special meaning for all of us, but especially myself, having been around when it first was brought into being, and we've worked with the department all of these eight years I guess it is.

Anyway, your appearance today marks your first before this subcommittee since the tenth anniversary of 9/11. Since that unforgettable day, our country has taken necessary and impressive strides to protect our people from threats, manmade or natural.

As the Chairman noted, our brave soldiers and those in the intelligence community have surgically rid this earth of two of our greatest threats, Osama bin Laden and Anwar al-Awlaki. However, when we pause this week to honor the memory and legacy of ICE agents, Jamie Zapata and Victor Avila, it will serve as an apt reminder that our country, our freedom and our way of life remain under constant siege, and our job is not done nor shall it ever be.

In recent years, we've seen a different kind of threat to our sovereignty as it emerges in our escalating fiscal crisis. This committee has been front-and-center in attempting to address the very real security threat posed by out of control Washington spending and trillion dollar deficits year-in and year-out.

Last year, this committee worked to restore transparency, posterity and tough oversight to the appropriations process. And we succeeded in reducing discretionary spending by some $98 billion compared to fiscal '10. That hasn't happened since World War II.

CAR 0643

While DHS was spared some of the more dramatic cuts, agencies across the board are being expected to make scarce dollars count, increase efficiencies, prioritize the mission, reduce redundancies and budget responsibly.

Your department may be the best at this, which is why I have some strong concerns about the budget you put forth today. It demonstrates a reticence to prioritize front-line operations so vital to our drug interdiction efforts along the border, cutting CBP air and marine procurement by 52 percent as well as reducing Coast Guard patrol boat hours by 40 percent and active duty military by 500 billets.

It offsets hundreds of millions of dollars with an aviation security fee, which you know will never be enacted. It's a budget gimmick that Congress has rejected year-in and year-out ever since this subcommittee has existed.

It also fails to include a meaningful and forward-looking acquisition program for the Coast Guard, reducing this important program by 20 percent, and it proposes to add layers to the already bureaucracy at your headquarters.

Needless to say, this gives me great concern. Madam Secretary, I hope your testimony today will allay my concerns as we work together in protecting our homeland. We're on the same team. Thank you.


ADERHOLT:

Thank you, Mr. Chairman.

Now, I'd like to recognize ranking member of the full committee, Mr. Dicks.


DICKS:

Thank you, Madam Secretary. We welcome you here today.

And, in reviewing your statement, I note that you make a significant statement on safeguarding and securing cyberspace. I serve as the ranking Democrat on the Defense Appropriations Subcommittee.

This is an issue that has major implications for our government, both the military side and the civilian side, and the private sector. And I hope that -- and I know you realize just how important this is. I mean it's been estimated in the public press that over a trillion dollars of intellectual property has been stolen by cybercriminals, some of which are nation-states that we are aware of.

And I just hope that in your -- in your statement today and in answering questions, you'll address these issues and what Homeland Security is doing about it. We know about the

CAR 0644

agreement you reached with Secretary Gates, you know, to combine the efforts of the Defense Department and NSA with Homeland Security, but I think this is one of the paramount issues of our time.

DICKS:

When Admiral Mullen was doing his farewell tour around the former chairman of the Joint Chiefs, he feels that this is right up there with the most important defense issues there are and that we are vulnerable and we have got to do more about it. And there's been concern expressed before the Senate Intelligence Committee, the House Intelligence Committee -- I happen to serve on it, an ex-officio basis -- that the country isn't doing enough about this issue, and that we have got to alert the American people to the possible -- I mean, Secretary Panetta has said that this could be the Pearl Harbor of our time, or another 9/11, in terms of an attack on the infrastructure of the United States, which could be crippling.

So I hope you will address this today in your statement. Thank you, Mr. Chairman.

ADERHOLT:

Thank you, Mr. Dicks. At this time, Secretary Napolitano, we look forward to hearing your testimony.

NAPOLITANO:

(OFF-MIKE) Thank you, Mr. Chairman. (Inaudible).

ADERHOLT:

Madam, mike.

NAPOLITANO:

I'm on now? All right. Technology. As I was saying, this is the first of three hearings that I will be testifying at between today and tomorrow. The third, which is on a cybersecurity bill being introduced in the Senate, co-sponsored by Senators Lieberman, Collins, and Feinstein, among others, a matter that we do consider of utmost urgency as this Congress moves forward. So Representatives Dicks, I really appreciate your comments there.

Ten years after the September 11th attacks, America is stronger and more secure today, thanks to the strong support of the president and the Congress. The work of the men and the

CAR 0645

women of the Department of Homeland Security, and local state and federal partners across the homeland security enterprise. We have made significant progress. Threats from terrorism, including, but not limited to al-Qaida, and al-Qaida-related groups persist, and continually evolve. And the demands on DHS continue to grow.

Today's threats are not limited to any one individual group or ideology, and are not defined or contained by international borders. Terrorists' tactics can be as simple as a homemade bomb, or as sophisticated as a biological threat, or a coordinated cyber attack.

We've had success in thwarting numerous terrorist plots, including the attempted bombings of the New York City subway and Times Square, foiled attacks against air cargo, and other attempts across the country. Nonetheless, continued threats from abroad and at home demonstrate how we must constantly remain vigilant and prepared.

The president's F.Y. 2013 budget for DHS allows us to continue to meet these evolving threats and challenges by preserving core frontline operational priorities through the redirection of over $850 million in base resources from administrative to mission areas. This continues our unprecedented commitment to fiscal discipline, which has led to over $3 billion in cost avoidances and reductions over the past three years through our efficiency review, and other initiatives.

Given the fiscal challenges to the department's state and local partners, DHS is also approaching these partnerships in new and innovative ways. For nine years, DHS has been supporting state and local efforts across the homeland security enterprise to build capabilities, awarding more than $35 billion in funding. As we look ahead in order to address evolving threats and make the most of limited resources, the administration has proposed a new vision for homeland security grants through the National Preparedness Grant Program to create a robust national preparedness capacity based on a cross-jurisdictional and readily-deployable state and local assets.

Using a competitive risk-based model, this grant's program will use a comprehensive process to assess gaps, identify and prioritize deployable capabilities, put funding to work quickly, and require grantees to regulate, report their progress. My written testimony includes a comprehensive list of the operational priorities in our budget. Today, I'd like to highlight just a few of them.

First, preventing terrorism and enhancing security. This was the founding mission of DHS. It remains our top priority today. The F.Y. 2013 budget safeguards to nation's transportation systems, through a layered detection system, focus on risk-based screening, enhanced targeting, and information sharing, to interdict threats and dangerous persons at the earliest point possible.

The budget supports the administration's global supply chain security strategy across air, land, and sea modes of transportation by strengthening efforts to prescreen and evaluate high-risk containers before they are shipped to the United States. We also continue our strong support for state and local partners through training, fusion centers, and intelligence analysis, and information sharing on a wide range of critical homeland security issues.

CAR 0646

To secure and manage our borders, the budget continues the administration's unprecedented focus on border security, travel and trade, by supporting our border patrol agents and CBP officers on the front lines, as well as the deployment of proven, effective surveillance technology along the highest trafficked areas of the Southwest border, and also continues security improvements along the Northern border.

And to secure the nation's maritime borders, the budget invests in recapitalization of Coast Guard assets, including the sixth National Security Cutter, Fast Response Cutters, as well as the renovation and restoration of shore facilities.

The budget request also continues the department's focus on smart, prioritized, and effective enforcement of U.S. immigration laws. In F.Y. 2013, we will complete nationwide implementation of secure communities. Through this initiative, and our continued collaboration with the Department of Justice, we expect to continue to increase the number of criminal aliens, and other priority individuals who are identified and removed from our country.

This budget provides the resources necessary to address this changing population, while continuing to support alternatives to detention, detention reform, and immigrant integration efforts. The budget also focuses on monitoring and compliance, promoting adherence to worksite-related laws through criminal prosecution of egregious employers, and expansion of the E-Verify system.

To safeguard and secure cyberspace, the budget makes significant investments to strengthen cybersecurity, including funds to expedite the employment of Einstein 3 to prevent and detect intrusion on government computer systems, increase federal network security across the federal government, and continue to develop a robust cybersecurity workforce to protect and respond to national cybersecurity threats.

In 2011, as noted, the department responded to a record number of disasters. To ensure continued resilience to disasters, the president's budget focuses on a whole of community approach to emergency management. It includes resources for the Disaster Relief Fund, the DRF, which provides a significant portion of the federal response to victims in presidentially-declared disasters or emergencies, and is funded largely through authority provided under the Budget Control Act.

The budget also continues to provide essential support to national and economic security, by among other things, supporting the Coast Guard's operations in the polar regions, and by continuing to support ICE and CBP's efforts to protect U.S. intellectual property rights, and collection of customs revenue.

The F.Y. 2013 Budget Proposal reflects this administration's strong commitment to protecting the homeland and the American people through the effective and efficient use of DHS resources. As outlined in my testimony today, we will continue to preserve frontline priorities across the department by cutting costs, sharing resources across components, and streamlining operations wherever possible.

CAR 0647

Mr. Chairman Aderholt, Representative Price, members of the committee, thank you for the opportunity to testify, and I'll be pleased to answer your questions.

ADERHOLT:

Thank you, Madam Secretary, for your testimony. And again, we appreciate your presence here this morning. Want to get right into the questions. And let me just mention to the members of the subcommittee, since we do have a pretty full house today, we'll -- we will go by the five-minute rule. So we'll appreciate you sticking by that as close as possible.

Madam Secretary, I would like to address an issue that we have talked about some, that you're aware of, you mentioned in your opening comments. I received your letter you sent to me yesterday in response to the January 17th letter, which I sent you about the administration's delay in deploying the Secure Communities in Alabama.

Unfortunately, your letter did not actually address the simple, straightforward question in the letter. Today, on behalf of the people of Alabama, I really need an answer. And the question is, will we allow ICE to fully deploy the program in Alabama?

NAPOLITANO:

Mr. Chairman, Secure Communities, as I've noted, is an important tool in our immigration enforcement prioritization efforts. It has been turned on in a number of Alabama jurisdictions, covering, we estimate, 75 percent of the foreign-born population of Alabama. It has been deployed in over half of Alabama's counties.

As you note, there are a few remaining counties left. We anticipate that nationwide deployment of Secure Communities across all remaining jurisdictions will be finished in F.Y. '13.

ADERHOLT:

I understand that there are a -- there, you say 75 percent of the foreign-born population. There are still close to half of the counties in Alabama that have not been. And I would -- you know. I think if you look at it, there's a lot of people who would look at it and say that the delay has been taken for political reasons. And it would be that I request that you reverse that decision, that you move swiftly in Alabama, and across the nation. I know that it has been decided before, the fact that there is an ongoing lawsuit.

But I would submit to you that Arizona and South Carolina are fully deployed, despite the lawsuit against those states, for enacting immigration enforcement law. And I think the safety of Alabamans is certainly not a lesser concern in those states.

CAR 0648

NAPOLITANO:

Thank you, Mr. Chairman. I think one of the differences between the remaining Alabama counties, and Arizona and South Carolina, is that those states were basically turned on before litigation commenced. And as you know, the Alabama law has been upheld in part, and joined in part. It's a somewhat confusing situation due to be argued in the 11th Circuit Court of Appeals in the near future, and I believe it prudent to await the 11th Circuit's guidance on this issue.

ADERHOLT:

So you said there's a legal reason?

NAPOLITANO:

Among other things.

ADERHOLT:

Well, my understanding of secured communities, and we've discussed this quite a bit, it's about get arrest information to (inaudible) for federal law enforcement action. And the lawsuit is about arguing that the federal government has preeminence in immigration enforcement.

So it seems to me like deploying secure communities is more consistent with the government's position in a lawsuit. So, you know, if there is a legal reasoning for delaying deployment, I can't really see where that argument would come in.

NAPOLITANO:

Well, I'm not sure, and again, these questions are probably more appropriately addressed to the attorney general, but I believe that Alabama in its papers probably doesn't concur with the predemption (ph) argument there.

ADERHOLT:

Well, one can only conclude, as I say, that the delay in Alabama has been taken for political reasons. And so this morning I would request that you reverse the decision and move out swiftly in Alabama and really -- and actually across the nation.

CAR 0649

Secured communities, in your words, is the single best tool for identifying criminal aliens for removal. That only makes our community safer and the people of Alabama, in my opinion, deserve your commitment on this vital issue.

The budget -- let me switch to another issue. The budgeting includes request -- includes $35 million for the SAFER Grant Program for Firefighters. This request, combined with the $1 billion you discuss in your testimony that is referenced in the official budget appendix to hire post-911 veterans is an unprecedented amount for this program.

Everyone that you see on the dais from the Democrats to the Republicans supports our local community firefighters and supports the hiring of veterans which the president has stated will be a program's objective.

But this subcommittee has concerns about the amount of funds requested in these programs when other programs integral to our nation's security has been cut back substantially.

Is it correct that you have not awarded any fiscal 2012 or 2011 funds thus far?

NAPOLITANO:

In the SAFER grants, Mr. Chairman?

ADERHOLT:

Yes, in the SAFER grants.

NAPOLITANO:

I'll get back to you on that. If they have not been awarded, part of the delay in getting grants and grant guidance out of course is that we didn't get the F.Y.'12 actual budget until fairly recently.

We will be releasing right around this week the grant awards for F.Y.'12 for the (inaudible) and state homeland security grants, and I will get the date of the projected awards for SAFER.

ADERHOLT:

Okay. It's according to our information the program just announced the guidance, the guidelines on January the 25th for the F.Y.'11 funds. But other than that that we've looked at it means that you -- that you have almost 744 million of grants from F.Y.'11 and F.Y.'12 for SAFER programs that have not been awarded. And that would be on top of the over 500 million that has been awarded but not gone down.

Does that sound correct?

NAPOLITANO:

That could be, I will look into it, Mr. Chairman, and report back to you.

ADERHOLT:

Okay. If it is the case, that, you know, those funds are out there and as -- like you said according to the map of the subcommittee on how we've looked at it, if this is such a priority for the administration, then our question is why wasn't it included in F.Y.'11 guidelines that were just released a little over two weeks ago.

Also, I'm puzzled by how you can say that you want to hire veterans, which would be new hires, yet you ask for waiver of the requirement that the funds be used for new hires.

NAPOLITANO:

Well, we've asked in a number of grant programs for some flexibility on how personal -- personnel costs are accounted for. But the department for the last years has really focused on veterans hiring. There's a great pool of people, they have already demonstrated a public service mission. A lot of their military training has some cross-over application to some of the jobs we have in the department.

So we have now, excluding the Coast Guard, active duty, 50,000 some odd veterans that are on staff in the department including in leadership positions, and we intend to continue that record.

ADERHOLT:

Well, as I say, I look forward to getting back with you but it seems like according to our map of what we've looked at and information that we've been given that there could be some good news here, that you may not really be aware of.

You could direct the $744 million in unobligated firefighter grant dollars towards the new hires with the focus upon veterans, and then it wouldn't cost the taxpayers a single (inaudible) cent.

NAPOLITANO:

We'll look into that, Mr. Chairman.

ADERHOLT:

Okay, I'd like to recognize Mr. Price.

PRICE:

Thank you, Mr. Chairman. Let me continue to ask the secretary about first responder grants, looking now more broadly of what you're proposing under FEMA for the 2013 budget.

You're requesting $2.9 billion for first responder grants, that's an increase of $525 million above 2012.

NAPOLITANO:

Above 2012 and active, yes, sir.

PRICE:

Similar to what Congress enacted for 2012, you're proposing some restricting of state and local grant programs in the broad categories, and that's what I'd like to clarify here.

We have $1.54 billion for a national -- for a national preparedness grant program which the secretary will allocate to the highest risk projects limiting the availability of funds to 24 months, as I understand, to deal with this drawdown program.

This grant program will incorporate the expiring authorized grant programs currently funded under the state, home and security grant program which includes (inaudible), transit and port and a few other grant programs.

You're proposing $607 million for firefighter grants equally divided between SAFER and equipment with waivers to deal with the layoffs and the need for rehires, and I'd just say in, parenthetically, that the full statement does clarify the relationship of the veterans hiring and the one billion and the jobs act to this basic request.

We probably need that elaborated but I do think your full statement makes that -- makes that clear.

You're also proposing $350 million for emergency management performance grants, $60 million for a new training partnership grant, that's the old national domestic preparedness consortium renamed.

And then $279 million for management administration of grant programs, exercises, technical assistance, evaluation and the Center for Domestic Preparedness.

Now as you know, Madam Secretary, this committee's expressed concern over consolidating FEMA grants in the past. These grant programs operate under different authorities. They have a variety of purposes as reflected most graphically in the differing allocation formulas that have applied to a number of these programs.

Last year Congress disregarded these concerns, consolidated all FEMA grant programs into one budget line do, one assumes, to the drastic overall cuts to grants and the difficulty with deciding how to allocate what was left.

But what you're proposing for 2013 continues grant consolidation and in some respects actually takes it beyond what we did in 2012.

So could you first walk me through your new FEMA grant proposal in more detail? For example, if the national preparedness grant program will be focused on risk and quickly procuring deployable assets, does that mean you'll be eliminating funding for previously authorized grants that focused on longer term security enhancements and hardening projects such as port and security grants? Which might well take more than 24 months to drawdown.

And then secondly, I wonder if you could give us examples of areas you think should continue to be funding with the 2013 request and then maybe distinguish that from areas that you think might now be deemed nice to fund when the budgets are more robust but for the moment deferrable?

NAPOLITANO:

Well, Representative Price, what we are proposing is that 16 grant programs be consolidated under the national preparedness grant name. The name comes from the national preparedness goal. A lot of the stake holders, the grantees helped draft that goal and the material that goes with it.

We provide in there -- would provide in there and this is only going to work with the Congress on, appropriate exceptions or waivers for longer term projects. But we have also seen that it's important to continually incentivize our grantees to get money out of the door once it's been allocated.

So one of the arguments made in favor of drastically cutting our grant award F.Y.'12 was the $8 billion or so that was deemed unspent across the country. We've really scrubbed those numbers to see what really is already out there. It's been allocated but it just hasn't been spent yet and we provided and intend to provide a schedule to the grantees on how to get the old money out.

But as the grant -- as we have matured as a department, so have the grants and the grantees. So we already start from a $35 billion base across the country. And we believe that now it would be prudent and effective and efficient to be able to look regionally and nationally about where we have gaps in the security framework that we must have, how we fill those in best.

That it ought to be primarily risk-based in its assessment, and that it have at least at the outset a 24-month deadline to help facilitate grantees actually moving the money from the awardees to the actual street and to the front line.

PRICE:

Well, just by way of elaborating the differences that are involved here, the most graphic difference probably is the allocation principles that have governed the state grants and the (inaudible) grants which are much more risk-based, much more targeted on the areas of greatest risk.

Can you help us understand proportionally where this money's going to go in this combined -- with this combined approach and how those different allocation approaches get blended?

NAPOLITANO:

Well, again, this is a proposal for the Congress with some explanatory language in the budget documents we've presented. But my vision would be that there'd be a somewhat smaller amount that in the past that is dedicated and spread across the country, primarily based on population, and using that formula. But that the overwhelming bulk of the National Preparedness Grant be based on risk.

PRICE:

Thank you, Mr. Chairman.

ADERHOLT:

Mr. Rogers?

ROGERS:

I want to ask you about our illegal immigration deportation policy. I know that you are deporting criminal aliens. I congratulate you on that. That's what we all want. My question

CAR 0654

though deals with those non-criminal illegal aliens, people who have not committed a crime in this country, or at least convicted of it. Are we deporting any of those people?

NAPOLITANO:

Yes.

ROGERS:

How many?

NAPOLITANO:

Well, in F.Y. '11, the last year we have numbers for, we removed from the country roughly 400,000 individuals. Of those, 55 percent had criminal convictions. That's a much higher number than a couple years ago when it was in the low 30s. But the remainder fit within other priorities. They were fugitives from existing warrants. They were recent border crossers. They were repeat violators. They meet other our priority guidelines in ICE.

ROGERS:

But were there any deported that were just simply here illegally?

NAPOLITANO:

There were a small number that would have been picked up. And, yes.

ROGERS:

Yes?

NAPOLITANO:

I would -- well, in F.Y. '11, 90 percent of all of those deported were in one of our categories. They were criminal aliens, recent border crossers, repeat violators, fugitives from warrants. And that remainder, 10 percent, had a variety of reasons why they were deported. Some of them were deported because they were picked up in conjunction with others who were being arrested. There's a variety of reasons, as you know.

CAR 0655

ROGERS:

What do you mean recent border crossers?

NAPOLITANO:

Excuse me, please?

ROGERS:

What do you mean recent border crossers?

NAPOLITANO:

Those that we picked up near the border. We are actually making -- we are not just turning them around and busing them back across the border. We're actually putting them into the system. They get a record. They are actually removed from the country. That's helpful in a number of ways. One of which is it gives us greater flexibility on how to deal with them if we find them as a repeat violator.

ROGERS:

There are an estimated 13, 14 million or whatever illegal aliens in the country, the great bulk of whom have not committed a crime. What is the policy of the administration on -- on dealing with those illegal aliens who have not committed a crime and are not recent border crossers?

NAPOLITANO:

Or in another category of priorities. Well, as you said in your opening statement, you know, one of the things we must do in DHS is prioritize the mission. And those that have committed no other crime, and when we look at other factors, length of time in the United States, family relation, they have (ph) ties in the United States, service in the military, and the like, those would be low priority matters.

ROGERS:

Well, some people say you've given those people amnesty. That they no longer need worry about being here illegally. What do you say to that?

CAR 0656

NAPOLITANO:

Well, I think the amnesty term is, quite frankly, way too overused with respect to immigration. This is an area that profoundly needs to be reexamined by the Congress for a whole host of reasons. But the fact of the matter is the numbers were, as I laid out to you, F.Y. '11, 90 percent of those removed did fall within mission priorities, as we have stated them. Ten percent did not, but they were still removed from the country.

ROGERS:

Switching subjects, the aviation security passenger fees were established in the Aviation Transportation Security Act of 2001. Your budget proposal for this coming year would change the collection of that aviation passenger fee, would realize $317 million by charging each passenger, what, $5 per trip?

NAPOLITANO:

Yes.

ROGERS:

And that would erase $317 million. The department has proposed that for every year it's been a department. And every year the Congress says, "Don't do that again. It's not going to happen."

And I -- I'm here to tell you again, it's not going to happen. And yet you have included that $117 million of that in your budget to be spent by the department for all sorts of purposes. And if that fee doesn't come into being, you're short $117 million. Assuming that to be the case, where do you propose to cut $117 million?

NAPOLITANO:

Well, I'd like to go back to the fee because that fee hasn't been addressed or raised since 2002. And as we all can appreciate, the costs of aviation security have risen dramatically.

The fact that the airlines now charge to check a bag has put more -- more into the carry-on baggage that we have to screen for. That's increased costs for the department. And it seems to us, both as a matter of fairness, but also a matter of deficit reduction, that it's appropriate to raise the fee.

CAR 0657

Now last year, one of the arguments against the fee was that we had said we were going to deploy it on a enplanement basis, meaning each leg you would pay a fee. Congress objected to that, and so we have reformed the proposal to say, all right, we'll just charge it once for the whole trip.

But both for matters of making sure that we support the aviation security system and for deficit reduction, we think Congress ought to readdress that issue.

ROGERS:

Well, I understand what your position is, but what -- if we don't do it, where are you going to cut $117 million?

NAPOLITANO:

Well, Representative Rogers, I don't play what-ifs. We're at the beginning of a process...

ROGERS:

Well, we do. We have to play what-ifs on this committee. We have to find the money to fund your department. Now if there's a $117 million shortfall because we don't enact this tax, which I don't think we will, where do you propose to cut that amount of money? We need to know.

NAPOLITANO:

Well, Representative Rogers, it's not a tax. It's a fee. It's a fee that hasn't been increased for almost 10 years.

ROGERS:

Please answer the question.

NAPOLITANO:

And we will work with the Congress on all matters related to the budget. But how and why we would have to replace that hole, to me it doesn't make sense. This is an aviation security fee. The costs of that have risen dramatically. It's a small fee, a small price to pay.

CAR 0658

ROGERS:

Well, when TSA Director Kip Hawley in 2006 came here again with that proposal, as every agent -- every secretary has since I've been here, since the committee's been here, when he came in 2006 with that same proposal, I told Kip Hawley at that time, "The next time you come up here and propose a tax you know you can't pass, dumping the problem in the lap of Congress, I want you to pay the price." I repeat.

NAPOLITANO:

Well, Representative, I think the fact that the prior administration also requested an increase in the fee shows that it has bipartisan support.

ROGERS:

And I would tell you that the change of Congress that's taken place over these eight or nine years, year in and year out rejects it. And it's not going to happen this year. So be prepared. And you'll have to pay the price.

I yield.

ADERHOLT (?):

Going back to cyber security, why don't you give us -- tell us what you're doing with other government agencies, and with the private sector? And there's a lot of concern that the private sector isn't being candid about their problem here, and that we've got to do something to have regulations to make people report cyber attacks. Where is the administration in all of this?

NAPOLITANO:

Well, the administration supports the bill that was introduced in the Senate this week. That does have information sharing as part of it. Indeed, the information sharing provisions I think were migrated from Senator Feinstein's bill in the intel community.

It -- it has within it a process by which the Department of Homeland Security will work with the private sector that comprises critical infrastructure of the country to share information and report incidents of cyber intrusions, cyber attack and the like.

This is an area that's been a growth area within DHS. The -- we work across the interagency. We work with critical infrastructure already. But as you -- as you note, that can be

CAR 0659

more episodic than systemic. And given the size of the problem, we really need much more involvement by the private sector.

ADERHOLT:

And the private sector has not been totally willing to be involved. Isn't that correct?

NAPOLITANO:

As I said, it's episodic. It's not overall. And we're just talking core critical infrastructure.

ADERHOLT:

What about the other civilian agencies in the federal government? How are we doing with them?

NAPOLITANO:

We have now deployed Einstein 2 to 17 of the 19 agencies to which it's to be deployed. The 18 is...

ADERHOLT:

Give the committee just a quick definition of Einstein 2.

NAPOLITANO:

It -- it is a system -- I don't want to go too much into matters that are classified -- but it is a system that detects any sort of network intrusion.

ADERHOLT:

But it isn't totally perfect, right? I mean, in other words, even where Einstein's been deployed, as I understand it, there's still ways to work around it.

NAPOLITANO:

There -- Representative, this is an area of constant creativity by our adversaries. But we're already working on Einstein 3. One of the things the budget request does, it would allow us to accelerate the development and deployment of Einstein 3.

ADERHOLT:

Now how is your relationship with NSA and the Defense Department on these issues?

NAPOLITANO:

Very good. As noted earlier, Secretary Gates and I reached an agreement between our two departments, which really have the overwhelming bulk of the work.

DOJ does a lot of the criminal investigations. Commerce has some work. Energy has work. We recognize that. But the bulk of the protection and preventive work that needs to occur is between DOD and DHS. And we reached an agreement on how to do that, how to cross- deploy some individuals, and how we both can utilize the resources of the NSA, albeit, and the civilian contacts you have to build in much more robust privacy and other protections when you're talking about using NSA methodology.

DICKS:

Good. Let me switch to another subject, polar icebreakers.

NAPOLITANO:

Yes.

DICKS:

There was a study done in 2010 that concluded that three heavy and three medium icebreakers are the minimum needed for the Coast Guard to fulfill its statutory missions. Currently, we have only one medium icebreaker, the Healy, in service with one heavy icebreaker, the Polar Star, expected to come back into service during the next fiscal year.

DICKS:

Can you tell us what your plans are? I know you've got -- I think one in the budget for this year, right?

CAR 0661

NAPOLITANO:

We have $8 million in the budget to begin the design and plan of another icebreaker. I'm glad you raised this because these are going to be essential resources that we will need. There's going to be increased oil drilling in the North, up in the Arctic, in fact, the Healy just was the -- the ship that helped bring the oil to Gnome, Alaska, which was running out of heating oil for the winter.

And you are right, we only have the Healy and we have the Polar Star that's in dry dock so our hope is that the budget request will approved and we can move to the design and plan of third icebreaker.

DICKS:

Why not -- why not repair the Polar Sea (sic) as well?

NAPOLITANO:

Well, we would intend to do that, but the problem is when you do repairs or maintenance there, they're in dry dock and they're not operational. We certainly need at least one more operational icebreaker.

DICKS:

OK. I'd like to work with you on this and I appreciate your testimony today and keep working in the cyber- security issue, it's a big big problem for the country.

NAPOLITANO:

Indeed.

DICKS:

Thank you.

ADERHOLT:

Thank you, Mr. Dicks.

Mr. Frelinghuysen?

FRELINGHUYSEN:

Thank you, Mr. Chairman. Madam Secretary, first of all, I want to thank you for coming up to New Jersey with Director Fugate and some of the FEMA people when we had our hurricane disaster along the Passaic River. It was good to have you up there. Appreciate all the good work and FEMA gets high marks from a lot of people that I represent.

I'd also like to associate myself with some of the remarks that Mr. Dicks made initially in terms of cyber, "who's doing what" I think is pretty important. So my questions sort of focus on a lot of what happens in this country depends on investments and research and development.

What are your department's priorities in that area? I've been looking over your budget. There's some reductions in R&D. You have, I think, something called a, "Science and Technology Directorate." It sounds sort of ominous, but what -- what -- what are your priorities in terms of research and development?

NAPOLITANO:

I think because it sounds ominous, we just call it, "S&T" and what we do with and propose for S&T is that we restore the research and development funds it has to the F.Y. '11 levels. Those funds were cut dramatically in the F.Y. '12 budget.

That was a cut that we opposed, continue to oppose because, particularly in the Homeland Security area, research and development, long-term, needs to have -- needs to be done. The research cycle is not an annual cycle or even a bi-annual cycle. It takes a while, but we are focused on biodefense, we are focusing it on explosive detection devices, we are focused on research in the cyber area. Those are the three areas of focus within the S&T Directorate.

FRELINGHUYSEN:

So how can you assure us, since both -- some of us serve on other committees, Mr. Dicks and I serve on Defense and Intel, that what you're doing has any relation to what, shall we say, others are doing across the spectrum here.

What level of assurance can you give us that we're not, even though your -- some reductions in your R&D budget, fairly substantial, you've raised several priorities including explosives and biologics. How do you -- Who's out there as sort of the gate-keeper in terms of assuring that we're making the investments we need to do and they aren't in any way duplicative.

NAPOLITANO:

CAR 0663

With respect to the other major funded department that receives monies for these things, we are constantly working with them looking to see whether there are technologies or things that have been deployed, for example in the military context, that can be altered or adjusted to use for our work so that we don't unnecessarily reinvent the wheel, so-to-speak. So there's a constant interaction at the agency staff level on that regard.

FRELINGHUYSEN:

So you're assuring us that -- that you work with all these other -- with the DOD, FBI ...

NAPOLITANO:

Yes.

FRELINGHUYSEN:

... and other agencies to make sure that we are not duplicating.

NAPOLITANO:

Yes.

FRELINGHUYSEN:

OK. What's the -- a lot of the colleges and universities are involved in this research and development. What is their role?

NAPOLITANO:

Well, we have ...

FRELINGHUYSEN:

The so-called "Centers of Excellence."

NAPOLITANO:

That's right and ...

FRELINGHUYSEN:

And how do they relate to this particular issue?


NAPOLITANO:

Well, we reach out into the academic community. I think, this year, we have $32 million or so there. It's a competitive process for a university or so to be named, but we are looking there for basic, as opposed -- basic research. For example, in Representative Price's district, there is a large center ...


FRELINGHUYSEN:

Good choice.


NAPOLITANO:

University of Ohio. But he left.


FRELINGHUYSEN:

Yes, he did. He was assured of ...


NAPOLITANO:

Would you let him know that I referenced it? Thank you.

There is a biocenter that -- there. So what we do is identify where we need to begin the research cycle, where there are things that we would like that are really -- that academics can do and, then, the money is awarded appropriately.


FRELINGHUYSEN:

And, lastly, you have about 230,000 employees under your Department of Homeland Security umbrella. They have a lot of systems, information systems, and I'd like to know, I'm sure other members would like to know, how those systems interact and, more importantly, how well they're protected from the sort of attacks we're talking about here?

CAR 0665

And do those systems talk to one another? One of the things I think we found out here, there -- a lot of systems are sold and there are a lot of vendors protecting, obviously, their systems. What are you doing to assure us that -- that the systems that are -- sorry, legacy systems or new systems that may be bought, that there's actually what we'd call -- used to call interoperability and such?

NAPOLITANO:

Let me take it in two bites, Representative. There are -- there is money in the budget to continue consolidation of data systems within the department. As you know, we're compromised of what were formally 22 different agencies and we have lots of legacy systems and the like. So that process continues to be funded under the president's request. That's one set of systems.

The other one I think you're referring to is all the data we collect, TSA, CVP, ICE, criminal data from the FBI, I would invite you to visit the National Targeting Center if you wish, but we have now been able to consolidate, not necessarily consolidate, but to make inoperable all of those data systems so on a real-time basis, we can target and monitor cargo and passengers traveling to-and-from the United States.

FRELINGHUYSEN:

And, lastly, we used to call it, "need to know." What exists today to assure, certainly, that people's privacy is protected under the Constitution, but that we also achieve what we want to achieve which is to have instant communication which would keep us safer?

NAPOLITANO:

Well, you're right about the privacy issues and they are important. We operate under a need to share information and one of the more important things we do is take intel that has been generated in Washington, D.C. and translate it into product that can be shared to private sector that may be implicated and to state and local law enforcement.

FRELINGHUYSEN:

Thank you, Mr. Chairman.

ADERHOLT:

Ms. Lowey?

CAR 0666

LOWEY:

Welcome, Madam Secretary. I wanted to follow up on the cyber-security issue for just a moment first. New York's and the nation's economy depend on the health of our financial system and the free flow of credit and capital. A successful cyber-attack, as you know, on American's financial systems could have devastating effects on our nation's economy.

How is DHS working with the private sector and, specifically, the financial system, to ensure they have the tools necessary to combat cyber-threats?

NAPOLITANO:

Well, right now -- it is a critical sector of the economy. Right now, if we learn of a breach or are informed of a breach or intrusion, we immediately offer aid in response to repair, to patch, to mitigate and we also look for whether there could be other systems around the country that could be affected by the same, say virus and that is underway.

But, as I mentioned to Representative Dicks, there -- there's no requirement for information exchange in that regard so we don't know that we actually get all the information we need from that critical piece of the economy.

LOWEY:

Well, if necessary, we could have a classified briefing, but I think it's absolutely essential that we try and put plans in place when we know there have been threats on the New York Stock Exchange and other major corporations that affect our economy. So I think once it's been hacked, it's kind of late. I'd be interested to know what, in fact, we're doing to prevent.

NAPOLITANO:

Well, again, we work with -- we've worked with NASDAQ and others in the financial sector in terms of overall protection and prevention, but a lot of this tipped off or keyed off of intrusions or attacks that occur and what we want to do is quickly stop, mitigate the damage, minimize the damage and see if we can make sure other entities are not infiltrated as well using the same methodology.

LOWEY:

On to another issue on block grants, when you distribute the F.Y. '12 funds, will you continue the structure of awarding funds in a manner that provides directly to high-risk urban areas as well as setting aside other funding for states? I believe it's important to provide funds for

CAR 0667

both high-risk urban areas as well as states to help coordinate state/regional capabilities and that's why I've been supportive of both UASI and SHSGAP.

NAPOLITANO:

The F.Y. '12 grant awards will come out at the end of the week and they will continue that method of how we get the money out.

LOWEY:

And, as you know, UASI was created for high-risk urban areas, but has since been distributed to areas that are not high-risk. Would you support more targeted investments to ensure that the highest risk cities receive the funding they need?

NAPOLITANO:

We have really carefully looked at the UASI list (sic), particularly in light of the dramatic cuts to UASI funding in the F.Y. '12 budget, and looked at how best to make use of those monies in a targeted way for the -- we've also looked at the FBI's analysis of risk and security of our communities to help inform our decisions.

LOWEY:

Thank you.

And I want to thank you for recognizing the importance of the Secure the Cities program, which is the joint effort between federal and local governments to prevent radiological or nuclear material from being detonated in New York. And I've seen it work with the police department and Ray Kelly, and what procedures they put in place. This is so very important.

The president's budget request provides $22 million for Securing the Cities, which is level funding from the prior year. Last year, Securing the Cities in Manhattan received $20 million of the $22 million provided, with an additional $2 million set aside to establish a new pilot program in a second city. Will the Department of Homeland Security continue the commitment to New York as the primary and most at-risk recipient?

NAPOLITANO:

That's our intent, yes.

CAR 0668

LOWEY:

And as the program looks to expand to a second pilot region, will the New York program continue to receive $20 million under the request?

NAPOLITANO:

I don't know what their request is in F.Y. '12. But our intent is to continue full funding for the New York pilot.

LOWEY:

We'll continue that discussion. I thank you. As you know, we've been talking about collective bargaining. And I've been very pleased that attention has been given to that issue. Could you tell me how DHS plans to go forward to provide collective bargaining rights to the Transportation Security Offices? You know, the rest of DH has it, and I know they're working on it. Perhaps you could elaborate.

NAPOLITANO:

The TSA workers had their election last year. They selected their union representative. We are -- by "we," I mean leadership of TSA -- has been in discussions with their leadership over the -- over the last months. And I think formal bargaining begins in another week or two.

LOWEY:

I think just to bring it to your attention, I'm sure you're aware, they do not yet have full collective bargaining rights. And there shouldn't be two sets of rules for employees of the same agency; one for TSOs, another for all TSA employees. So I would hope you would give this additional attention. Do you have an update on the ongoing discussion between TSA and its employees?

NAPOLITANO:

Yes. I've been kept up to date. I would note, however, that they were organized pursuant to a different statute than the other employees of DHS. And so that does make some differences in terms of what can be within the scope of the bargaining process.

LOWEY:

CAR 0669

But I think we've agreed the collective -- collective bargaining is a fair way to proceed. And I'm glad you're on top of it. And I hope that it becomes reality soon.

NAPOLITANO:

Thank you.

LOWEY:

Oh. How will the new consolidation of assistance -- my time is up? Thank you. I didn't hear the tap-tap. And I thought I'd get an additional...

ADERHOLT:

I'll try to tap a little louder next time.

Mr. Crenshaw?

CRENSHAW:

Thank you, Mr. Chairman. And welcome, Madam Secretary. I want to ask you about this Arizona Border Technology Plan. As I understand it, you froze activities under, I guess, SBInet about a year and a half ago, and put in a new plan, which, as I understand it, was to get the technology out quicker, more immediately by off-the-shelf type programs, and then help the border patrol meet their mission.

But it's my understanding that all that technology hasn't kind of been put in place yet. There's $800 million, as I understand it, that you have available. And since this technology's not being utilized yet, I wonder if you could -- is that -- it must not be a budget issue. Is that right?

NAPOLITANO:

It's a prudent procurement issue. And if I might explain, we froze SBInet because -- we froze the fixed-tower aspect of it that was border-wide, because it was over -- over cost and behind time-wise, and not operational for a number of our agents -- different parts of the border require different things -- and moved to a sector- specific planning for technology, and put an emphasis on purchasing technologies that were already available.

The integrated fixed towers across -- Arizona does have some use for the integrated fixed towers. Those are underway. The other sector plans, including Arizona's, have now been

developed through CBP. They are in the final phases, and then we will go out and buy technology.

But we wanted to be careful here, because we had been burned once by a rush to procurement here. And we want to make sure we get the right things that really fit the needs of a particular area. Those plans are now, like I said, they have been developed, and we will begin with Arizona first.

CRENSHAW:

But I mean, $800 million is a lot of money. And if it's sitting there, sounds like there's been a lot of delay. I can appreciate you want to do a good job of what you do. When you talk to the border agents, they're ready to have this technology. You've added some new agents, and they're doing a great job. But if there's a delay in all of this acquisition, these requests for proposals, whatever, is there any kind of bureaucratic problem?

Is it simply you just trying to do a really good job, and it takes a lot longer than we might think? Because it seems to me, it's hard enough to appropriate money. And when the money's sitting there, and it's not being utilized, and we're not doing the job that we're supposed to do, then we need to understand why it's taking so long?

NAPOLITANO:

That's right. And I appreciate that promise. One of the reasons on the FEMA Grant process, where we're asking the states, and putting some deadlines on when they get their money out the door, but the planning process is complete with the use of that technology. It has been careful. I really wanted to look at how the technology would inter-relate with the operational needs of our agents, make sure we buy the things they could actually use, and also maintain, repair, use over time. And those plans are now complete, and we're ready to go.

CRENSHAW:

Was it like -- I'm just looking at this. There's something called remote video surveillance system. And I mean I guess that's kind of an understandable system that's available. Is there a reason why that hadn't been acquired yet?

NAPOLITANO:

Well, there -- there are different needs at the border. There are places where there the remote video surveillance just won't work. And we can buy it, but it really doesn't help us. There are places that are so rugged that we can't get to it regularly to...

CRENSHAW:

Does that mean that you're not going to -- you don't need the radio surveillance, or you're just slow acquiring it?

NAPOLITANO:

No. It means that we've got to use different things in different areas, because different areas have different requirements.

CRENSHAW:

You're going to use the radio surveillance?

NAPOLITANO:

In some areas, yes.

CRENSHAW:

Then why haven't you gotten around to acquiring it?

NAPOLITANO:

Well, sir, we're not going to acquire it -- the reason you do a plan, sector-specific plan, is to say, well, what is it that we need to acquire, and how much of it do we need to acquire? And what does it need to be able to do to be useful in that particular environment?

CRENSHAW:

Don't you put that in the plan when you develop this Arizona technology plan?

NAPOLITANO:

That's what -- that part of the planning, really looking at what was there, what we already have, what we need, what would work, what wouldn't work, that's what has been involved in the technology planning process that we started when I put the freeze on SBInet.

CAR 0672

CRENSHAW:

I got you. Just turning to the, I guess, the personnel side, we got a lot of new agents that have been border patrol. And things are going really well in Arizona. But as you know, it's kind of like that (inaudible) or whatever, you hit one, Arizona's doing good, and then it pops up down in Texas border. So I mean, how does all that fit in when you -- when you do a good job in one area, that you anticipate the smuggling routes are going to change, people are going to go different places? Are you're dealing with that now?

NAPOLITANO:

We -- yes. And we've seen it before on the border. This is a historical pattern. It's like a bedspread. You know, you move one corner, the other corner moves. And I'm actually going to the South Texas border over the holiday weekend, or Monday, I think, I'm going down there to see where we're at, and look at the numbers, and what our needs are there.

The important thing we need to do, and this Congress has been very helpful in this regard, is to sustain the record number of border patrol agents that we have. Because that allows us to secure that border, and gives us some flexibility to move people around without sacrificing yet another sector of the border.

So we don't want to, just because we put a lot of resources in Arizona, move them all to Texas, and then Arizona becomes a problem. The way Congress has appropriated money to the border patrol, I think, has led to one of the success stories of the last three years, which is really making material progress on that Southwest border.

CRENSHAW:

Thank you. Thank you, Mr. Chairman.

ADERHOLT:

Mr. Olver?

OLVER:

Thank you, Mr. Chairman. And thank you for being here with us today, Madam Secretary. I -- I'm trying to get a handle on the whole budget, which of course, you've had a lot of time to get a handle of.

One of the previous speakers had mentioned that there were 230,000. Is that the number of employees of the Homeland Security Department?

NAPOLITANO:

Roughly, yes.

OLVER:

Roughly. Can you -- would you like to sharpen that closer?

NAPOLITANO:

No. I think 230,000 is the number we commonly use.

OLVER:

All right. I notice that the budget in its totality is very similar to last year, in its totality, $39.5 billion down just a little bit, but at only about a half a percent. Is there a job impact on that number, 230,000, that comes with that half-percent reduction?

NAPOLITANO:

There are no layoffs within that half a percent reduction. There are -- we've been able to make some decisions with respect to limiting some recruitment, or not replacing employees that retire. But that...

OLVER:

What would be the total impact of that? Or that's an attrition that's a policy? What would that be in the course of the year?

NAPOLITANO:

Well, well...

OLVER:

CAR 0674

Within your budget?


NAPOLITANO:

The budget -- there's normal attrition, which is just -- that just happens. But then we replace those employees. But there are some targeted areas where we don't anticipate replacing employees. One of those would be the Coast Guard.


OLVER:

What then is the net impact of that -- of the policy that you would -- would follow in the total employment of the agency, of the Homeland Security Department?


NAPOLITANO:

It's minimal. I think for the Coast Guard, it's around 1,000 FTE. And there's a little hair-cutting in some other areas, but it is a minimal employment impact.


OLVER:

OK. Can I get anything closer to what the total would be? You've given 1,000 for the Coast Guard. Is it likely to be 2,000, 3,000 total (inaudible) whatever your thinking of that -- whatever your definition is for minimal.


NAPOLITANO:

Well, I'm trying to distinguish between normal attrition, which I thought you were asking for, which varies across the department.


OLVER:

I want to know the net reduction in the department.


NAPOLITANO:

I would say no more than 2,000.


CAR 0675

OLVER:

No more than 2,000. OK. That's good.

I notice that half of the budget basically is in TSA and the Coast Guard and immigration and ICE, essentially. Virtually half of the budget. And in those issues -- in those areas, the budget is down by, in TSA it's slightly over 6 percent. And Coast Guard, right around 4 percent. And also for ICE, right around 4 percent.

Is there -- what's the -- what is the job impact of those reductions in those three major departments -- major sub-areas that comprise virtually half the budget? What -- what -- how do you get those cuts without having a major job impact?

NAPOLITANO:

Well, there's no impact to front-line personnel. Part of the reason there are reductions is because investments in capital for those departments have now been made. And we don't need the same amount of money because we're not continuing to purchase at the same rate that we were purchasing before.

So it would be what I would see as a normal decline in size of budgets where you have a lot of capital expenditures for explosive detection machinery, or installing secure communities and the like. We're now pretty well -- we're almost to the completion of some of those streams. And so therefore we don't need the same amount of money.

But as I mentioned to you, the budget request of the president has a reduction of roughly 1,000 of the Coast Guard. It has, we anticipate, a couple of hundred in ICE. Those would be backroom and clerical, administrative type personnel, and the same in TSA. But no reduction in the front-line operation of the departments.

OLVER:

OK. I realize that you had said that there was roughly a -- pardon? Time is up?

ADERHOLT:

Your time has expired.

OLVER:

Oh my goodness.

ADERHOLT:

It goes by fast.

Mr. Dent?

DENT:

Thank you, Mr. Chairman.

And thank you, Madam Secretary, for being with us today. I wanted to talk a little bit about the CFATS program. As you know, protecting our nation's chemical facilities is a daunting task, one that requires not just assessing the level of risk, but working with the private sector to coordinate and share information.

I'm sure you've seen the internal memo concerning CFATS that was produced for Under Secretary Beers at the end of last year regarding the current challenges to the CFATS program. I don't think anyone can be pleased with the issues that are raised in that particular memo.

Madam Secretary, from what I understand, this memo articulates that the mission budget, staffing, and workplace culture with the infrastructure security compliance division, as it relates to CFATS, are not in any sort of working order.

We've spoken on a number of occasions in the past and over the years regarding authorization of (ph) conflicts over inherently safer technologies. And accordingly, a review that shows this level of dysfunction of a program that is vital to our nation's security is disconcerting, to say the least.

The American people are shouting at Congress and the administration to get our fiscal house in order, and yet we see where their finite dollars have been spent on things like unneeded equipment and an excess of contractors. Or even more concerning is that today, five years after the program was initiated, not one site security plant has been finalized, even though industry has submitted over 4,000 of them to DHS for approval.

So I guess my main question, Madam Secretary, is what's your honest response to this internal assessment of the program, and what is -- what is the path forward?

NAPOLITANO:

Representative, I was not happy when I read that report, as you might imagine. We have done a number of things in -- in the interim since that reported was generated. We have developed an action plan for the CFATS program. It involves training of personnel. It involves changing some of the business -- the systems with the CFATS program to move the SSPs along.

And as you know, as you correctly noted, they seem to have been held up in the works with the tier ones, and we want to move those through. We've made some personnel changes and some administrative changes to have more oversight of the CFATS program.

And I personally have the action plan. And its dimensions are that it's same (ph) on my desk right -- right now. I share your concern.


DENT:

So you're committed to making it work?


NAPOLITANO:

Absolutely. It's necessary. These chemical facilities can be a big security risk, so we need to make this work.


DENT:

One more issue. And it's on the issue of personal surety. It's my understanding that a final rule is with OMB. The industry experts on the ground who have committed time and money toward meeting CFATS deadlines continue to express concern over the path that the department is pursuing with respect to personal surety.

Some have suggested industry use the TWIC cards, but the -- your administration is proposing to create an entire new credentialing system that's going to cost millions of dollars. And I'm just hoping, Madam Secretary, why can't we use -- why can't TWIC satisfy the CFATS personal surety requirements? And you aware of this cost to industry if the current proposal is implemented? I'd like to see this done in a reasonable manner.


NAPOLITANO:

Representative, I will look into that. That's -- that's an interesting suggestion.


DENT:

It's a very big concern. And TWIC is a good credential that I think we all have embraced.


NAPOLITANO:

Yes, sir.

CAR 0678

DENT:

I yield back.

ADELHOLT:

Thank you. Ms. Roybal-Allard?

ROYBAL-ALLARD:

Welcome, Madam Secretary. First of all, let me begin by acknowledging that you have had success in improving aspects of our immigration detention system. However, I remain deeply concerned about the slow pace of detention reform because we continue to hear credible reports of sexual assaults, racism, random beatings, and management cover-ups in detention facilities.

Also of concern is ICE's failure to make better use of alternatives to detention for immigrants who don't pose a threat to public safety either in their communities or to our country. And so I'm pleased that your budget would dramatically increase funding for ATD and allow your department the flexibility to shift money from detention beds (ph) to these safe, effective programs.

My question is that given the seriousness of the reported abuses at some of these detention facilities, will detention reform be a top priority for your department this year? And also, can you elaborate on the importance of increasing your budget to allow more flexibility in your reform efforts?

NAPOLITANO:

Well, I think operating a safe and secure detention environment is -- is a responsibility that we have. We've done a lot in the detention area, as you noted. We've consolidated. We've added more oversight. We have issued proposed standards that exceed anything that would be, I think, issued under the Prison Rape Elimination Act.

We're moving forward very, very carefully and aggressively there. And it's part and parcel of running an effective immigration system. You've got to have good detention centers. We also are in the process of opening a detention center that will be used only for civil violators in the immigration context. So that is -- if they haven't cut the ribbon, they will be shortly.

With respect to ATD, you're correct. The budget does request additional funding for that. That will allow us to, I think, provide more oversight in the ATD population. It will also I think enable us to move some of those cases through more quickly so that individuals don't sit on the non-detained ATD docket for so long. And that would be an overall cost savings.

CAR 0679

ROYBAL-ALLARD:

Madam Secretary, I think most of us could agree that we need comprehensive immigration reform. I am pleased that your department has made some progress in instituting smarter and more effective enforcement policies.

And one of those efforts is the ongoing review of the 300,000 deportation cases currently pending in our immigration system. Your department's effort will help to relieve our backlogged immigration courts and allow ICE to focus more of its scarce resources on violent criminals.

It is my understanding that the pilot programs in Denver and Baltimore, which are part of that effort, resulted in the dismissal of more than 1,600 cases because those arrested had deep ties to the United States and posed no threat to our communities or to our country.

What lessons did DHS learn from the pilots, and what is your department's timetable for undertaking this review of all the outstanding deportation cases?

NAPOLITANO:

First, just a technical correction, Representative. Any cases that we found that were a very low priority were not dismissed. They were administratively closed. And all that means is that if there is subsequent activity by the individual, they immediately can be reopened and restored to their place on the docket. So it's an important, I think, distinction to make.

ROYBAL-ALLARD:

Yes. Thank you for that.

NAPOLITANO:

Lessons learned. We were really looking at how the -- what, you know, how long a review took, what were some of the problems, how do we -- what kind of guidance the lawyers in the department, the OCLA (ph) lawyers, needed to fill out things. And we completed the pilot within about six weeks. Our intent is to have the whole backlogged of the detain docket reviewed no later than the end of this year.

ROYBAL-ALLARD:

OK. And under your leadership, has been noted, DHS has made remarkable progress in securing our southwest border. And as the president stated in the State of the Union, lax border

security is no longer a valid reason to oppose comprehensive immigration reform. In part, these gains have been achieved through the rapid expansion of the Border Patrol.

However, I remain concerned about reports of Border Patrol corruption and of agents mistreating immigrants, including children, in their custody. In fact, in a recent NGO report, investigators documented more than 30,000 separate incidents at the Border Patrol. What steps is your department taking to include the training and oversight of its personnel at the border in order to end this unacceptable pattern of abuse?

NAPOLITANO:

Well, I would dispute any NGO report that use those kind of numbers. From time-to-time there are incidents and we deal with them very firmly and swiftly. There's no reason for it within the Border Patrol system and -- but there's a lot of stuff said about what happens at the border that does not, in fact, pan out when you actually look at the facts.

Beyond that, however, we have stepped up relatively quickly. We thank the Congress for the funds to do that. That's one of the ways we've been able to secure that southwest border. We want to sustain those agents down at the border. It's a record number of agents at the border, and the Acting Commissioner David Aguilar has now looked at and has said that making sure that training and supervision and anti-corruption measures are going to be some of his top priority particularly for those new agents and -- and -- and agents they move through the system.

ROYBAL-ALLARD:

Okay, I've run out of time, but I would like to follow up with your department on the NGO report. Okay, thank you.

ADERHOLT:

Thank you. Judge Carter?

CARTER:

Thank you. Thank you, Madam Secretary, I appreciate you being here. (Inaudible) budget request speak to fundamentally reform the FEMA grant program. While strong -- I support this, I think that you're competent -- competition and procurement process is a good idea.

But I have a couple of questions on this training partnership grant that concerns me. They seem to negate significant investment Congress has made to the national development -- domestic preparedness consortium.

CAR 0681

It seems to me that this new direction is more concerned about starting up duplicative programs rather than bolstering existing programs. I've been told the current backlog of first responders seeking training of existing programs is over 20,000. And awarding funds to these new folks still have to go through (inaudible) approval and a lot of other startups which will seem to create some kind of a lag in this.

I guess first question is has the national domestic preparedness consortium failed to meet the training needs of first responders in this area? If not, then why do we need the diverse funding so it takes significant cause to standing up new programs when grant funds are already scarce.

And then secondly, now does the newly proposed structure of the training partnership grant and your request for $60 million address the backlog better than the existing training program?

NAPOLITANO:

Well, with respect to all grants, we are seeking to consolidate and to streamline and to focus where the dollars will do the most good. I think we can all agree that that's an appropriate thing for us to do from a management perspective.

With respect to eliminating redundancies, we will look at that. If you believe that to be a redundancy, we'll be happy to look at that. But our overall goal is to take what before had been 15 different grant programs all with different administrators and administrative guidelines and formulas and this and that and say, we are focused on the national preparedness goal and. . .

CARTER:

Yes, I understand that, but I really am curious about whether national domestic preparedness consortium is starting to meet their (inaudible).

NAPOLITANO:

You know, I'll look -- you know, not that I know of but I'll be happy to look into that for you.

CARTER:

Well, I mean, if we're going to start a duplicative program to do the same thing, if they're doing their job we're not opposed to those people that are doing the job.

NAPOLITANO:

CAR 0682

Representative, I don't want to prejudge that and we'll take a look at that.

CARTER:

It's funny, just a minute ago I heard you talking about this -- one of the programs, either the Denver or the Baltimore pilot program where you were examining caseload and seeing what's there and this is -- this concerns all your non-detained cases. It's taken six weeks and endless hours of attorney time to look into this resulting in administration closing only 14 of the cases.

Those individuals may be grateful their cases were stopped, but the bulk of these people are still living and working illegally in the United States, isn't that correct?

NAPOLITANO:

Well, the -- no, the -- I don't think you can say that they are working in the United States. I don't. . .

CARTER:

Well, they're living or existing or. . .

NAPOLITANO:

They're in the United States. They're in the United States illegally. They're in the United States illegally.

CARTER:

Now what this has resulted in, I think, is sort of an issues of prosecutorial discretion. The prosecutors under your authority are making selections and quite honestly I think this is resulting and we are not going forward on anything other than the criminal element which everybody at this (inaudible) agrees should be kicked out of our country as quick as humanly possible.

But we still have, as the chairman pointed out, somewhere between 12 and 14 million people that under our rules and our agreements are in our country illegally and illegally by definition means they've broken a law. Okay?

Now this slowdown in dealing with these people, which is what this is, these two projects allowed for a slowdown or almost cessation of dealing with this element. There's 14 million compared to the criminal element that we have deported, which is good.

CAR 0683

That seems to be making a choice of what laws you're going to enforce and what you're not. And I think it would be arguable they're not meeting the duty and responsibility of this office. Would you like to respond to that?

NAPOLITANO:

I obviously disagree with that characterization.

CARTER:

(Inaudible) But why?

NAPOLITANO:

I'll tell you why. Listen, and I haven't heard the 14 million number but it's a number that's a big number, 10 million, 11 million are in the country illegally. Many have longstanding ties to their community, they are taxpayers, they are married to U.S. citizens, they have families here.

I mean, there are a whole variety of individual circumstances that fall within that big umbrella. The Congress, you know, they give us resources that enable us to remove, you know, 350 to 400,000 people per year, and within that number we have prioritized.

And when you prioritize, the prioritize the mission. You end up really focused on the criminal aliens and the repeat violators and the ones you can get before they enter the interior of the country and we want to focus on that part of the docket and the detained part of the docket and move those through more swiftly and more effectively than we have heretofore.

And that's the reason why the administrator has allowed his agents and his lawyers to act like agents and lawyers and every other criminal justice agency in the federal government.

CARTER:

So you're -- just if I could ask one more question. So what you're saying is that you could -- you have evidence that shows that neglecting this other part of the document's allowed you to speed up the other -- your success ratio is better than previous years because you're ignoring this, I don't care if it's five million, ten million, 12 million, 14 million, they're getting in and we're speeding up the process. Is that what you're saying?

NAPOLITANO:

CAR 0684

What I'm saying, they're not -- they are not ignored, as I explained earlier. We still will have ten percent or so removals last year were not within the criminal or other priorities of the department, they were still removed.

But, yes, we want to make sure that we increase the number and the percentage of criminal removals within the removal universe and we've gone, Representative, I think when I started as the secretary it was roughly 30 percent of the removed docket were criminal aliens, now we're at 55 after '11. It will be higher in F.Y.'12.

CARTER:

Could you show -- can you send that to me and maybe through the chair we can take a look at it?

NAPOLITANO:

Yes, sir.

CARTER:

Okay, thanks.

ADERHOLT:

Mr. Latham.

LATHAM:

I thank the chairman and welcome Madam Secretary.

We have a lot of entrepreneurs -- entrepreneurial individuals in this country have great ideas that want to make the country safer. And obviously they want to contract with DHS and with one of the small companies, large companies.

I can tell you that I'm hearing a lot from these businesses, these individuals about frustration they have trying to break through DHS. A couple of examples, there's the small business that made $100,000 investment and submitted its response to a very broad DHS multiple award contract solicitation notice.

And the DHS has had the proposal since March of 2011. The award is delayed until December of 2012. So the first pass order will come at the earliest about two years after this business made the offer and invested in this.

Another case there's a mid-sized defense company who thinks they have some great ideas for you, and as to the responses to 18 requests for information, but has never gotten a response back, never heard a word back.

Basically this company is sending money into a black hole and with just totally non-responsive and is very, very frustrated. I just wonder if you're aware of the various contracting and acquisition problems at the department and if so, do you know what efforts you're doing to work to correct the problems at the -- at the department.

NAPOLITANO:

Well, first, last year almost 30 percent of our contracts were awarded to small business well exceeding the federal government --

LATHAM:

Obviously not these.

NAPOLITANO:

Obviously not those. But I wanted to give you the overall. Small business does contract with us. With respect to your first example, I suspect without knowing for sure, but I suspect the reason there was the delay was we didn't get the F.Y.'12 budget which allowed us to issue contracts until December of last year.

And so a lot of contracting across the federal government had to wait for the actual budget and appropriation to be passed, and we didn't have it until December.

With respect to the company that says they have submitted 18 requests for information, I'll ask my staff to follow up with your office and we will make sure they get a response.

LATHAM:

Well, I mean, this proposals you've had -- they've never gotten a response from March of 2011.

CAR 0686

NAPOLITANO:

Sir, I'll be happy to drill down on that for you.

LATHAM:

And this is the first example I cited. It's just, I mean, it's not a matter of funding, I don't believe, because you've got an increase in funding for acquisition personnel.

NAPOLITANO:

It's not the funding, it's the appropriation, and we didn't have appropriation until December. But they were new contracts, the continuing resolution may not necessarily cover them. This is why we need to look at each instance individually.

LATHAM:

It would not stop you on a continuing resolution.

NAPOLITANO:

Issuing new contracts without a new appropriation, there are rules there that we have to abide by. I think the Department of Defense probably had some of the same issues.

LATHAM:

It's an extension of the current authorization.

NAPOLITANO:

Sir, we'll be happy to look at that for you. But I'm pretty sure on that, that that's what happened.

LATHAM:

I would just ask you to go back and have somebody look at it and be able to report to the committee and to myself, if we could, on any actions that are -- you're going to be taking. It's very -- very frustrating obviously for a lot of folks.

CAR 0687

I -- did I hear earlier with, I think Judge Carter (ph), talking about a lot of these people are working in the United States that are here undocumented, paying taxes and the taxpayers...

NAPOLITANO:

They may be working. They may be paying taxes. They may not be working. There's a big difference there.

LATHAM:

How do they get IRS, Social Security numbers, all of that, if they're here undocumented?

NAPOLITANO:

There's a variety of ways, Representative, that they pay taxes. They certainly pay sales taxes and other use taxes.

LATHAM:

I thought you said they were working here, so they would actually have to pay...

NAPOLITANO:

They get tax ID numbers and they have taxes withheld, yes.

LATHAM:

Obviously it's a huge question, but you're obviously aware of the people using the same number, multiple people using the same numbers, and all of -- all of those issues.

NAPOLITANO:

That's been -- we've been working with the Social Security Administration on that, and to develop, you know -- their computer systems are beyond belief at SSA -- but to develop a flagging system so if we see a duplicate number, that can immediately be flagged. E-Verify, also. To the extent that employers use that, is an incredibly helpful tool to allow us to make sure that they are hiring only those legally present in the country.

CAR 0688

LATHAM:

That -- doesn't that though just say that there is a Social Security number that doesn't necessarily match up with the individual who's sitting maybe across the desk? My time is expired.


NAPOLITANO:

If I might, Representative, there are other aspects of E-Verify that go into actual verification of identity.


LATHAM:

Thank you.


ADERHOLT:

Mr. Culberson?


CULBERSON:

Thank you, Mr. Chairman. And thank you for appearing today and for your testimony, your service to the country. I want to focus first on detention beds. And I'm sure you're aware that the Congress has of course appropriated every request that the agency's made for immigration enforcement.

We've been very generous within obviously the money that we have available to us, and been good stewards to the public's money, but we have fully funded every request that Homeland Security has made for immigration enforcement operations, and provided increases of course as well for detention beds. That's a key component of course in being able to actually hold people that the department picks up.

And in the 2012 appropriations bill, Congress required -- I mean, it's not discretionary on your part. It is mandatory that ICE maintain 34,000 beds -- detention beds -- for incarcerating those who were here in the country illegally. Yet now only four months into fiscal year '12, we see that ICE is only maintaining 33,200 beds.

You've got the money to do it. You've got the obligation to do it. You're sworn to uphold the law. Why won't you use the beds? Why won't you comply with the law that Congress has passed and use at least the 34,000 beds that we've required you to do?

CAR 0689

NAPOLITANO:

Well, Representative, we do comply with the law. We enforce the law. And we have been enforcing it much to the concern of others in -- with numbers that haven't ever been seen before. With respect to beds, it depends on whether you need the bed. We have the beds available so that if we need them, we can use them.

The president's budget for F.Y. '13, as you note, does reduce somewhat the number of beds in favor of trying to put some more money in the alternative to detention area with the hope that we can make that more robust and save some money down the long road.

CULBERSON:

But you'd agree the subcommittee's made every request you submitted to the Congress for ICE custody operations, and specifically to detention beds. We've funded those.

NAPOLITANO:

Yes. Congress and the committee have -- have been very helpful.

CULBERSON:

Super. And in fiscal year '12, we provided an increase to make sure you had the resources to fill 34,000 beds.

NAPOLITANO:

In fiscal '12, you appropriated money for beds over and above the president's request. That's correct.

CULBERSON:

Right. And the law requires you to maintain no more -- no less than 34,000. Why aren't you fulfilling that obligation?

NAPOLITANO:

CAR 0690

Representative, I believe we have beds available. The question is do we have the detained population at any given moment in time? It goes up and down. You know, you hold some people. Some are held five days. Some are held three weeks. It varies.

CULBERSON:

You don't have enough -- you don't have enough customers essentially. You don't have enough people to fill those beds.

NAPOLITANO:

It really depends on where you are. We need beds in some areas more than we need them in other areas of the country. It just depends. But right now, you are correct. We are not suffering from a bed shortage.

CULBERSON:

You don't need the -- you don't need the capacity?

NAPOLITANO:

Right now, yes. Today as I sit here before you, we have enough beds to handle the detained population.

CULBERSON:

You don't need that extra capacity.

NAPOLITANO:

I think that's another way to put it, yes.

CULBERSON:

I mean, it really is unbelievable for here -- for you to testify that you don't need those extra beds when the violence in Mexico's out of control. It really is so inconsistent with reality. It reminds me of your statement that the border's under operational control. For you to say you don't need the detention beds, that the border's under operational control, that the, you know, the

CAR 0691

-- that's from a statement you made last year in El Paso, Texas, which caused all of us in Texas a lot of concern because the...


DICKS:

Would the gentleman yield? I think she said she had the 800 beds. They just don't -- and she would use them if they were needed. So I don't see what the purpose of this harangue is.


CULBERSON:

Well, the concern is that, my good friend from Washington, is that the -- there are so many illegal aliens in the country. You said yourself it's 11 million to 12 million. And among that population, you've got a tremendous number that have committed crimes against Americans, violent crimes, and all sorts of other crimes.

The capacities -- I'm sure the demand is there. I know the demand is there. There's no shortage. But you've directed the agency to look elsewhere. That was my concern, Mr. Dicks, is that the -- as secretary just testified, they are prioritizing -- you've asked ICE agents to prioritize the cases that they pursue.


NAPOLITANO:

That's correct.


CULBERSON:

And you're dropping off low-priority cases. That's where I was going with it, Mr. Dicks, is the concern is they're -- I suspect they've got plenty of people that they could put in those beds. And actually, there's even additional bed space available above and beyond the 34,000.


NAPOLITANO:

I would suggest, Representative, that the things that we had defined as low priorities are cases that wouldn't go onto the detained docket, so they would not be in detention. You have fully funded our bed requests in the past, and we appreciate that. The president has requested an amount we think we will need in F.Y. '12, and has also requested an amount to increase our alternative to detention system.


ADERHOLT:

Thank you, Mr. Culberson. Madam Secretary, as I mentioned to you earlier this week, I want to commend the men and women of FEMA who have been on the ground in my home state of Alabama over the past year and their efforts to help the recovery from the devastation, the tornadoes that occurred on April 27 in 2011.

Also commend you, and I thank you for making at least, I know, a couple trips to Alabama during that time to look at the disaster first hand. Much progress has been made. Much work remains to be accomplished. And I look forward to working with you over the next year to try to accomplish as much as possible.

I do have one question that is included in the request -- about what is included in the request. Your budget includes a request of $6.1 billion for the DRF, but we're having difficulty figuring out what this request contains since the required documentation justifying the request, as required in law to be submitted with the -- be submitted with the budget, was submitted at 9:30 last night, so not in time for a thorough review.

One thing did come up this morning. Based on the report that we received last night, the Department of Homeland Security estimates that no funds will be needed for recovery efforts after F.Y. '13 for the spring tornadoes, or the flooding in the Midwest, or from Hurricane Irene in the northeast. Typically we have seen FEMA continue recovery efforts for years after a disaster occurs, but it appears that this is not the case for the disasters that occurred last year. Is this an accurate statement?

NAPOLITANO:

Yeah. I think what that reflects, Mr. Chairman, is that we have really focused within FEMA at streamlining getting the money out to the communities that need it.

And so as we are able to speed that up, we're able to reduce the number of years for which we need to ask for additional appropriations. The way the DRF request is structured this year for F.Y. '13 is we have asked for $600-some-odd million in FEMA's base budget for disaster management.

We have asked then that $5.1 billion be so-called above the line to handle disaster payments for non-catastrophic disasters, and also catastrophic disasters that -- for which we already know we have payments due in F.Y. '13. If we were to have a catastrophic disaster above and beyond that in F.Y. '13, we would seek an emergency supplemental.

ADERHOLT:

Do we have your assurance that this request is sufficient to cover all normal costs for F.Y. '13?

CAR 0693

NAPOLITANO:

As far as I know, but we will make double sure. We had so many states, yours included, some of the other states on the panel included, that suffered grievous damage in the spring and summer. Our folks are working very hard with those communities to get that money out.

ADERHOLT:

But we do have your assurance that...

NAPOLITANO:

We're not going to shortchange Alabama.

ADERHOLT:

Thank you for your commitment for your recovery -- for your commitment on that. And I look forward to discussion -- discussions with you over the next year as we continue down the road to recovery.

Let me switch gears, go to another issue. The F.Y. '13 budget supports significant reform to the grant programs, as you mentioned in your opening statement, that is administered by FEMA. Just two days ago, you issued a new guidance to expedite the expenditures of previously awarded grant funds. First, I'd like to commend you for tackling the -- more than the $10 billion in unobligated funds and unexpended balances that sit unused in these programs. It is extremely hard for Congress to continue to justify allocating billions of dollars of taxpayers' funds when so much remains unspent.

The memo you signed out this week provides multiple ways to address the backlogs of funds in the FEMA Grant program. For those who are unfamiliar, first of all, you will permit grant funds to be used for additional expenses, such as general-purpose equipment, and non-construction-related operational costs. Also, you allow certain restrictions to be waived, such as the 50 percent cost cap on personal and various (inaudible) requirements.

In addition, you allow for grant funds to be used for the maintenance and the sustainment of equipment that was not acquired with grant funds. And also, you've shortened the period of performance.

Madam Secretary, some of these new allowances raise concerns that the grant funds will become operating subsidies, and not be expended in a manner that could be wasteful. So I'm

wondering, did you consider pulling back, or de-obligating funds, such as the $2 billion that remains on the books, from F.Y. '07 and F.Y. '08?

NAPOLITANO:

What we did, Mr. Chairman, was we listened, we explored the reasons why money was not -- was being allocated, but was not yet out the door. What were the -- what were the holdups, and what were things that we were routinely approving anyway, that if we just said at the outset, "We're going to waive the match on port security grants," for example, almost every community in the country that has a port has asked for a waiver of that match. And given the security needs of the ports, we -- we have been routinely granting those waivers on a case-by-case basis.

And so what we have tried to do is take into account what our grantees have said, to put that into, just for these years, back to '07 where we have, you know, money still in the pipeline, to help get that money out -- out of the grantees' door. This is not money that's held in the federal government now. This has already been allocated to the -- to the grantees.

ADERHOLT:

My time is -- is up. But I would like to ask one last question. Tell us about how you're working with the appropriate authorizing committees to address the reform efforts.

NAPOLITANO:

Well, we'll be working with -- there'll be -- the Homeland Security Authorizing Committee, I think I have my budget hearing with them this afternoon, and the House. And we'll be working with them on the Senate side. And we have put legislative language in the budget request for how we would go about this. But we will work with, and be happy to work with the Congress on how we do this reform as we prepare the F.Y. '13 actual appropriation.

ALDERHOLT:

All right. My time is expired. Mr. Price?

PRICE:

Thank you, Mr. Chairman. Madam Secretary, let me return to this question of immigration enforcement. You rightly stated a few moments ago that when your feasible deportation level is 300,000 to 400,000 people a year, you've got to set priorities.

This subcommittee, beginning in 2007, and your administration, have attempted to impose some priorities on a scattershot process of deportation. That's the -- that's what's -- has gone on here. And it's what's at stake, I think, in the discussion we're having this morning. Anybody who wants to object to your priorities I think has a certain burden of proof to name their priorities, as opposed to implying you can deport 11 million people indiscriminately.

So I commend you for this. And I know that this Secure Communities Program is the main instrument for achieving some kind of prioritization in immigration enforcement. You've now had a task force to evaluate the program. And the charge was -- was, quote, "to see how ICE can adjust your communities, secure communities, to mitigate potential impacts on community policing practices, including whether and how to implement policy regarding the removals of individuals charged with, but not convicted of minor traffic offenses, who have no other criminal history." That's part of the charge.

Now, not all members were in agreement on the findings and recommendations. But the task force provided a report to DHS Homeland Security Advisory Council, and to you, on September of last year. It's my understanding that the secretary and ICE, and the advisory council are now considering, still, these recommendations.

Now, during this time frame, the administration's taken various actions -- various actions to clarify its enforcement policies. And I'll be brief here.

But I do want you to -- to respond as to the current state of these efforts: (1) Making clear that states and cities can't opt out of Secure Communities; (2) undertaking a large-scale review of all existing deportation cases to focus more effectively on removing high- priority offenders; (3) issuing guidance on prosecutorial direction for attorneys and immigration judges; (4) improving training and best practices dissemination for local jurisdictions; and (5) revoking some 287(g) authorities, Maricopa County, Arizona, for example.

Now Secure Communities is going to be activated nationwide by 2013. So we clearly need to stay abreast of these ongoing efforts, and hence, my questions. First, what further actions have you taken over the past year to ensure that Secure Communities adheres to its stated enforcement objectives of prioritizing those who pose a risk to public safety or national security, and that those charged with minor offenses, such as traffic violations, are not top-enforcement priorities unless there are other indicators of risk?

And then secondly, what actions has your department taken in response to the recommendations of this task force convened last year?

NAPOLITANO:

Well, those two things blend together, are representative. And the five things you have noted all are underway, or have already been completed. So there's been a lot of work done in ICE to really make sure that we weren't doing scattershot enforcement, but that we were doing focus, smart, effective enforcement on -- within the universe of those in the country illegally.

CAR 0696

The work continues. Other things we have done within -- as Secure Communities has gotten turned on in various jurisdictions, we just turned on Minnesota, Maryland, Connecticut and New Jersey in the last 10 days or so, statewide in those -- in those instances. As it has gotten turned on, we can now begin to see the data's coming in as to who's -- who's picked up, and what does that mean?

And we are going to evaluate seriously whether all of -- all of those will actually have a detainer put on them by ICE. And that -- that would be the recommendation of the evaluation committee; that we -- that we not put a detainer on those who are only in jail because of a minor offense.

PRICE:

You may want to add here, or you can add for the record, are there other aspects of the -- of these recommendations that -- that you're -- you have under consideration at this moment? Are there more aspects of this beyond the question of the minor offenders?

NAPOLITANO:

Well, we have, as noted, undertaken, we call it the "case-by-case review," but it's the review of all the cases on the non-detained docket. We anticipate having that done by the end of the year.

We have made changes in the detainer form that individuals get, so that they know better what -- what their rights are, and also where they can call. For example, they believe they are actually a U.S. person, and they should not be put into the ICE detention, or have an ICE detainer placed on them.

We have instituted a kind of cross-department very significant statistical review within Secure Communities to identify jurisdictions that may not be deploying it properly, or also jurisdictions where we need to put more of our own resources. So that's all of a set of activities underway, under ICE's jurisdiction.

PRICE:

Thank you. Thank you, Mr. Chairman.

ADERHOLT:

Chairman Rogers?

ROGERS:

Madam Secretary, on TSA, last year, fiscal '12, current year, we re-established the cap on the number of screeners at 46,000 full-time screeners. I'm told as of November, TSA has some 51,000 screeners, full and part-time, which certainly would exceed the cap. Can you help us on understanding those numbers?

NAPOLITANO:

I'll have to provide you some supplemental information, Representative Rogers. But as you know, we are -- we have screeners where we have lanes. And that's really where the numbers are generated from.

ROGERS:

Well, that cap has been, at the outset of the department, in place for several years. And then -- then it was lifted. But it's been reinstated now. And we are insisting that that cap be enforced.

NAPOLITANO:

Thank you.

ROGERS:

The budget request, again, reduced frontline personnel, air and marine acquisitions, and Coast Guard drug interdiction capacity. The budget proposal cuts critical Coast Guard frontline personnel by over 500 military billets, even while we were increasing headquarters funding and FEMA Grants by 22 percent.

In addition, the budget proposes to slash current and future capabilities for drug interdiction for Coast Guard and CBP. CBP, air and marine procurement is reduced by 52 percent, Coast Guard's patrol boat hours slashed by as much as 40 percent in the Caribbean.

We've rejected that kind of budget slashing in the past. And while the Mexican drug wars rage out of control, and the Calderon administration is coming to an end, how can we justify those kinds of cuts on the drug interdiction capacity?

NAPOLITANO:

CAR 0698

Well, if I -- if I might, Representative, we start with fitting the president's budget request into the Budget Control Act, which, as you know, has significant cuts in all kinds of areas of government. What we've done with the Coast Guard is to prioritize the acquisition of the NSC 6, National Security Cutter 6. We also have for the Fast Response Cutters, we are only acquiring two this year. Why? Because F.Y. '12 provided for six and the production line is basically four a year. So, '11, we had four, we got six in the '12 budget, we asked for 2 in the '13 budget, the average is four, and that is what the Coast Guard says that -- that it needs.

With respect to the 500 billets, one of the things that's happening is we are decommissioning some of the really really old vessels and substituting for them newer acquisitions which generally require fewer crew in order to operate.

ROGERS:

While the budget includes funding as you suggested for the sixth National Security Cutter, but the snapshot that gave to us shows that the program is essentially terminated after fiscal '13 even though the mission needs statement for the Coast Guard and the program of record supports the need for eight cutters. So where are we on the eight cutters?

NAPOLITANO:

Seven and eight?

ROGERS:

Yes.

NAPOLITANO:

What we are going to do, and this is all guided by really looking at the nation's resources and the Budget Control Act and how it works, but, and there's language in the budget request to this effect, we will look at seven and eight in light of what the Navy is doing.

So we need to look at what the Department of Defense is doing with request to their own force lay down to see what we need to be putting in the acquisition pipeline.

And, obviously, areas like the Caribbean, South American, areas where we must be constantly vigilant will be in that mix, but rather than just look at the NSCs in isolation from everything, and I think this is actually a better way to go about it, we're really going to be working with the Department of Defense so when they have their revised lay down, we'll put ours next to it and see where we are.

CAR 0699

ROGERS:

Well, the mission needs statement is very plain about the need for eight cutters as well as the program of record.

NAPOLITANO:

The program of record was drafted in 2004. It hasn't been updated. And I think in light of the Budget Control Act and other change circumstances, we need to be able to look at seven and eight. I have fought very hard for those cutters in the three years. We had a fight about getting four and five and six and the president has fully funded six. But we need to make sure that our resources are correlated with what the, particularly, the Navy is going to do moving -- moving forward after that.

ROGERS:

Well, the Coast Guard is taking a pretty good hit. One quick question, Mr. Chairman, or comment, we can't talk about this in the open, but I want to get an update from you on the Federal Air Marshall Service, FAMs. We'll have to do that quietly because it is classified.

However, I am concerned about the efficiency and efficacy even of that program and the cost and I'd like to -- I'd like to have a report, a confidential report of course, classified report, on all aspects of FAMs.

NAPOLITANO:

All right. No problem.

ROGERS:

Thank you.

ADERHOLT:

Mr. Dicks?

DICKS:

You know, last year, in my state, we had a group of citizens come in from Eastern Washington. I'm over on the west side. This is our agricultural area. And they couldn't get workers to pick the apples, the pears, and a lot of these crops just were left in the field.

So what do we do about the guest worker program? Is there -- how is that functioning from your perspective, you're a former Governor, Attorney General ...

NAPOLITANO:

U.S. Attorney.

DICKS:

U.S. Attorney. How's the guest worker program operating?

NAPOLITANO:

Well, ...

DICKS:

What can we do to try to -- to bring people in legally to help with this agricultural issue?

NAPOLITANO:

You know, Representative, I think it's another illustration of why immigration reform is needed. It's -- I hear from growers all the time. They can't get workers. We have acres lying fallow. We have agriculture jobs moving to Mexico where they can get workers.

We have other businesses that can't get workers of the type that they need, but I think we have done as much as we can at the administrative level. Legislative action is going to be required.

DICKS:

Is there a limit on a guest worker program?

NAPOLITANO:

CAR 0701

Well, there's a limit on visas for people coming in to work and that limit is a very -- very low. This is something that has been troublesome in the Ag industry for a long time among the growers, but we're really reaching almost crisis proportions with it.

DICKS:

Yes. I would hope that, you know, as much as there seems to be a temptation to treat this thing politically that we have a serious economic problem here that has to be addressed and I just hope that we can, on a bipartisan basis, finally comes to grips with this issue because, you know, the problems are getting worse and worse.

NAPOLITANO:

I think we're seeing now, erupting around the country, all sorts of individuals from different aspects of the economy coming forward and saying, and they come to me, you know, they say can't you do this and can't you do that and the answer is that most times, I have to say no.

DICKS:

And these are not -- these are business people that -- small business people, farmers, people who've got a big stake in their orchards and that. It's a real tragedy. We can't get people in our own country to do the work.

NAPOLITANO:

Sadly, that is so and, also, a lot of these businesses create other jobs that are filled by American citizens so there is a big economic aspect to this debate.

DICKS. Thank you. Thank you, Mr. Chairman.

ADERHOLT:

Mr. Carter?

CARTER:

(OFF-MIKE) Thank you, Mr. Chairman. Talked about other priorities, let me ask you a couple of questions. I know you're a lawyer.

CAR 0702

NAPOLITANO:

Yes.

CARTER:

(OFF-MIKE) You don't practice law right now? (inaudible)

NAPOLITANO:

Thankfully.

CARTER:

I don't practice law right now. (OFF-MIKE) (inaudible).

NAPOLITANO:

I do indeed.

CARTER:

(OFF-MIKE)(inaudible). I think -- I think it's (inaudible) federal (inaudible). I think it's -- I'm sorry.

Repeat, I think it's a crime to obtain a social security card under false pretenses. I think it's a crime to utilize somebody else's social security card. I don't know at what level, it may only be a misdemeanor. I doubt -- I would imagine it would be more than a traffic citation, but maybe not. So check that out for me.

In Texas, I do know we have a law called Theft of Services. It is felony offense in Texas depending on the amount of services you steal and I think felonies should be on your list of people you ought to looking at, but maybe you disagree.

I think it's against the law to make false statements and swear to false statements on certain documents in the United States both at the federal level and the state level. And I know it's -- it's a violation of the law to obtain food stamps when you're not entitled to them because I've actually tried those cases so I happen to know that's against the law and I was a felony judge.

So I don't think we are addressing any of those issues which might reach possibly as many as half of these people in the -- our category of somewhere between 8 and 14 million people that are in country illegally.

But, so I would at least make an argument that you are making it a prosecutorial determination as to what is an important crime and isn't an important crime both at the investigative side as well as at the prosecutorial side.

NAPOLITANO:

Well, we general ...

CARTER:

In answer to Mr. Price's, being a law and order type of guy, I believe if you violated a felony, whatever that felony law is, whether it's possession of marijuana, which everybody thinks ought to be legal these days, or whether it's something like, you know, armed -- not armed robbery it's a big felony, just theft in general, both those ought to be prosecuted. That's my opinion.

I have a question that I want to ask you, that's really to answer what I was -- said I didn't give my priority, that's my priority, Mr. Price. I didn't want to interrupt you when you were talking.

You've mentioned a couple of things that I'd like you to define. In your opening statement, you talk about immigration integration efforts. I'd like to know what that is. You've also mentioned alternative to detention. I know what alternative to detention was in my court. Could you tell me what alternative to detention is in your agency?

NAPOLITANO:

Immigration integration is the phrase used for how we integrate legal immigrants into the country and so that's what that refers to. ATD actually covers a broad range, it can be anything from simple requirements that people report on a regular basis to a designated place all the way to full-time ankle bracelets with, you know, call-in requirements and the like.

So there's a whole continuum of activity that falls under the rubric ATD. One of things we want to do is really look at what forms of ATD make sense for the non-detained illegal immigrant population because that may be very different for the immigrant population versus the criminal population as a whole. One of the things the president's budget request allows us to do is to make that evaluation on an ongoing basis.

CARTER:

And -- and the -- many years ago, when I first got this job, not that many years ago, I had a little meeting with the folks in Houston and they were talking about the no-shows coming back to the immigration courts. They were released, told to report back, they didn't report back, and they never saw them again. And, just in Houston, it was like 14,000.

NAPOLITANO:

That's why we have to carefully evaluate ATD because we want to make sure that we are not increasing that population. It's also a reason, by the way, why we are proceeding on formal removal of recent border-crossers because we don't -- and repeat offenders because individuals who are using that border as a revolving door we're shutting that down.

CARTER:

That's good. That's good because, you know, I looked it up one time and maybe I was looking at old code or something, I think the third crossing with group and the first two crossing kind of like the level of crime that it is is point from a --

NAPOLITANO:

Thirteen twenty-five to a 1326.

PRICE:

Yes, 1325 to 1326.

NAPOLITANO:

That's correct.

PRICE:

And so that's information you ought to have but on these no-shows in court, whatever court it is there should be a certain amount of respect for the order of the judge of that court. And you've been ordered to come back and you don't come back and there's no consequences of not coming back, there's no reason for anybody to ever obey the order of that court.

CAR 0705

NAPOLITANO:

Representative, I'll just answer this question. If there is a no show and a warrant, that person under our rubric becomes a fugitive and a fugitive is within the priority definition of the ICE.

PRICE:

So he would be a deportable person?

NAPOLITANO:

He would be a deportable person.

PRICE:

Thank you.

ADERHOLT:

Representative Roybal-Allard.

ROYBAL-ALLARD:

Well, first I'd like to see credible evidence that would show that at least half of those who are here illegally that don't pose a threat to their community are, in fact, are on food stamps or whatever other assistance that was referred to.

Also, as part of the discussion that you had with members of the other side of the aisle, I would like to add to the record that estimates from a Princeton's Mexican migration project indicate that undocumented immigration to the United States from Mexico has declined to net zero of possibly negative levels and that means that in basic terms that last year more undocumented Mexicans left the U.S. to return home than entered the country illegally.

And I believe that is partly due to your successful efforts at the border.

I'd like to shift to what's happening in Puerto Rico. The reports I've gotten that in response to the success that you've had at the southwest border, that it appears that drug traffickers have increasingly shifted their operations to the Caribbean, and that since 2009 cocaine seizures in Puerto Rico are up by 30 percent.

At the same time drug related violence on the island has continued to climb and the murder rate in Puerto Rico now stands at six times the national average.

Because Puerto Ricans are U.S. citizens, I am concerned that the federal government has focused more on preventing illegal drugs from entering the U.S. mainland from Puerto Rico than preventing these drugs from reaching the island in the first place.

So on behalf of my friend and colleague, Congressman Pierluisi, and the 3.7 million Americans living in Puerto Rico, I'd like to ask whether your department intends to devote greater resources to the regions who address these troubling trends which have been reported.


NAPOLITANO:

The answer is yes. It's actually a sign of the progress, substantial progress made on the southwest border that we are seeing some increase in both the Atlantic and Pacific sides of the country and trying to bring drugs in.

And so we're altering, you know, and moving resources appropriately to deal with that ongoing threat, yes.


ROYBAL-ALLARD:

Thank you.


ADERHOLT:

Let me just say that, Madam Secretary, that Puerto Rico has been a big priority for this subcommittee, so thank you for mentioning that. Mr. Culberson.


CULBERSON:

Thank you, Mr. Chairman. Madam Secretary, I wonder if I could to try to get a handle on how you classify, how you're prioritizing the individuals that are picked up in the country either by local law enforcement or by the -- or by border patrol or ICE.

You said a moment ago that you don't issue detainers on individuals arrested for minor offenses.


NAPOLITANO:

No, I said that was the recommendation of the advisory committee. The recommendation is still being evaluated.


CULBERSON:

Still being evaluated. What's your -- when you say you're prioritizing individuals that are picked up, could you help us understand how you're prioritizing them?

For example, I understand from the New York Times report from January 7th, that the union representing immigrations and customs enforcement officers have refused so far to participate in this training that you've set up to guide ICE officers in prioritizing who is prosecuted, who is removed, deported, et cetera.

The ICE agents are, I gather, still refusing so far to participate in the training?


NAPOLITANO:

Well, I think that was a statement by the union president and you're right, he has been recalcitrant but the agents, and I've been working with immigration agents 20 years now. I supervised 6,000 immigration prosecutions at one point.

So I know this community fairly well. They want to work on the more serious cases. They want to know they took a murderer off the street or an armed robber or somebody that was committing -- repeated drug crimes. So they're there and the training is ongoing and we are seeing in the numbers, if you just look physically at what's happening, we are seeing a change in the numbers of the composition of those we are returning.


CULBERSON:

Sure, and we all want you to focus on the most serious offenders. But I'm trying to get a handle on who the administration has decided to basically turn a blind eye to. I see from this article that training ICE agents what they should do, for example, with a young illegal immigrant who was arrested without a license who's been living, the example is, in this country since 1993 illegally and has an infant son, an American citizen because he was born here. But she lied to ICE officers failing to tell them that she had a conviction for shoplifting in 1995. And the training states, she -- answer, she's not a threatening criminal who may still be nursing her American baby, an officer should close the case. Do you agree with that?


NAPOLITANO:

Well, I do and I'll tell you why. Because if you don't, first of all, you have to make the assessment the person doesn't pose a safety -- physical safety. Secondly, the conviction was very old. Third, if she's deported, what happens to her small child? There's a small . . .

CULBERSON:

Sure.

NAPOLITANO:

. . . child. If she's a single parent now do we have to assume the cost of taking care of the child? And they go into the child welfare system, or do we have to split up the family?

CULBERSON:

Right.

NAPOLITANO:

So those are the kinds of considerations at that lower end of the docket that need to be taken into account.

CULBERSON:

What I'm trying to get a handle on, and all of us agree, A, we want you to focus on the most serious cases and, B, nobody is suggesting that you should deport all the folks that are here illegally. We want you to enforce the laws as they're written and the law states very clearly that if a person is, for example, entered the country illegally under 1325, it's six months in jail, first offense.

Second offense is two years in jail under Title U.S. Code Section 1325. And we're trying to understand who are you -- who's at the lower end of the scale?

NAPOLITANO:

Well, one . . .

CULBERSON:

CAR 0709

(Inaudible) of the cases which you would recommend to your officers not -- that'd be administratively closed? What type of cases?

NAPOLITANO:

One would be a young person who was brought here by their parents or an adult as a small child, raised here, went to school here, has gotten good grades, done everything they're supposed to do. They actually have served in the military.

CULBERSON:

Okay.

NAPOLITANO:

But because they were not actually born here they are not construed as legally (inaudible).

CULBERSON:

Essentially those people defined by the DREAM Act, which did not pass Congress?

NAPOLITANO:

It did not pass a cloture vote in the Senate. That is correct.

CULBERSON:

It's not the law, but you're making it the law through your -- well, you just said you're making it...

NAPOLITANO:

I said they were low priority. We still get...

CULBERSON:

But you're not going to close them administratively?

NAPOLITANO:

Some of them we're closing administratively, which means, if that person commits another crime or in another way comes into the system, that file probably would be reopened.

CULBERSON:

If it's a misdemeanor?

NAPOLITANO:

It depends on the misdemeanors. Misdemeanors -- you know, that could be a traffic ticket.

CULBERSON:

So your policy, then, it's fair to say, if they fall under the classification of the DREAM Act, the -- your agency's position is that that case should be closed administratively?

NAPOLITANO:

Our administration's position is we're going to focus on those who have committed serious crimes.

CULBERSON:

And not on those people who are found, for example, a low priority or a...

NAPOLITANO:

No, but that doesn't mean they won't still get into the system. I mean, it -- it really is how you direct your agents, the operations you put together. You know, we put together, for example, something we call Operation Cross Check, and it's designed to go out in many states and -- and find fugitives from warrants, as was being mentioned earlier today.

So, you know, it's how you use the resources we have to have the best impact on public safety.

CULBERSON:

CAR 0711

I thank the chairman for the extra time, but it does sound like the administration's implemented de facto amnesty for a large segment of those who are here illegally.

ADERHOLT:

Thank you, Mr. Culberson.

Let me -- I know you've got a hearing just in another few minutes. You're back on in just a few minutes. Let me just...

(CROSSTALK)

ADERHOLT:

In closing, just let me just touch on one issue. The National Academy of Sciences, in the analysis of NBAF, estimates there is a need for a facility like NBAF to be constructed in the United States.

However, what is confusing is that there's no construction funding. And your statement, in which you say you plan to reassess whether or why a BSL4 facility should be stood up, let me just ask, is there any doubt that the Department of Homeland Security still plans to establish a modern BSL4 facility in the U.S. mainland?

NAPOLITANO:

That is our intent, Mr. Chairman. And this is one of those issues that, I think, requires serious conversation with the Congress because, for example, last year the president asked for $150 million for the so-called NBAF. This -- this House recommended $75 million. The Senate zeroed it out. We ultimately ended up with $50 million.

And we've had trouble with getting the money for the NBAF for the last three years. This nation needs a BSL Level 4 facility. It has been peer-reviewed and put in Kansas, near a lot of other resources. That makes sense to put it there. What we have asked for us $8 million to do research in Kansas that is consistent with work in this area, but also to assess scope and cost of the NBAF in light of the Budget Control Act and other constraints that are being placed on us.

ADERHOLT:

But it's your contention that it's absolutely needed and plans are to move forward with that?

NAPOLITANO:

CAR 0712

That is our position.

ADERHOLT:

We just need to make sure that we square the budget with that, make sure that we...

NAPOLITANO:

That is my hope.

ADERHOLT:

Yes.

Well, we appreciate you testifying before us today. And to close, let me say we certainly have a lot of work cut for us this year. We do have before us a budget that, once again, relies upon fictitious offsets by way of unauthorized inquiries. It neatly cuts Coast Guard front line operations by 500 military billets, Coast Guard acquisitions by 20 percent, CBP air and marine procurement is cut by 52 percent, detention bed space by 1,200 beds.

As I just mentioned, zeroes out the MPATH (ph) facility, and while at the same time increases headquarters functions as well as proposes $525 million increase in grants that will take years to spend out. This type of budget proposal, you know, raises a lot of questions and a lot of significant concerns.

Also, I must return to an issue that I addressed in my opening remarks in regard to compliance with our statutory reporting requirements. Can - would you tell us for the record when we will receive the FY '11 report - I'm sorry, the 11 reports - and the plans that were required by statute to be submitted with the FY '13 budget?

NAPOLITANO:

We will submit them as soon as we can. I think there are some that are on their way right now. And we'll be happy to give your staff the status report on those reports. But we know your committee wants them, and would like them to help them inform the decisions for FY '13.

ADERHOLT:

OK. Well, the - as I mentioned, these reports are required by law, and they are largely made up of material the department ought to have in order for these vital programs. So I would submit to you that we need an answer today on that.

NAPOLITANO:

I will try to get you a schedule; yes, sir.

ADERHOLT:

So we'll expect your staff to get back with us regarding that.

And again, thank you for the hearing and...

(UNKNOWN)

Just, I've got some information on bed space capacity that I think would be useful, just to have for the record.

We're going to get the director of ICE on Friday?

ADERHOLT:

It'll be included in the record, yes.

(UNKNOWN)

OK.

ADERHOLT:

OK.

Thank you, Mr. Culberson.

Thank you again, Madame Secretary.

And the hearing is adjourned.

NAPOLITANO:

Thank you.

CQ Transcriptions, Feb. 15, 2012

List of Panel Members and Witnesses

PANEL MEMBERS:

REP. ROBERT B. ADERHOLT, R-ALA. CHAIRMAN

REP. JOHN CARTER, R-TEXAS

REP. JOHN CULBERSON, R-TEXAS

REP. RODNEY FRELINGHUYSEN, R-N.J.

REP. TOM LATHAM, R-IOWA

REP. ANDER CRENSHAW, R-FLA.

REP. CHARLIE DENT, R-PA.

REP. HAROLD ROGERS, R-KY. EX OFFICIO

REP. DAVID E. PRICE, D-N.C. RANKING MEMBER

REP. NITA M. LOWEY, D-N.Y.

REP. LUCILLE ROYBAL-ALLARD, D-CALIF.

REP. JOHN W. OLVER, D-MASS.

REP. NORM DICKS, D-WASH. EX OFFICIO

WITNESSES:

SECRETARY OF HOMELAND SECURITY JANET NAPOLITANO

CAR 0715

**From:** Boogaard, Peter ███████████████████
███████████████████████

**Sent:** Thursday, March 29, 2012 5:34 PM

**To:** Chandler, Matthew <███████████████████>

**Subject:** Re: Obama Administration Expands Backdoor Amnesty

---

I am meeting with alicia tonight. Fyi.

**From:** Chandler, Matthew
**Sent:** Thursday, March 29, 2012 05:31 PM
**To:** Grossman, Seth; Gonzalez, Barbara M; Sandweg, John; Boogaard, Peter; Stolley, Jim; Ramlogan, Riah; Baronof, Kim; Stickel, Nicole; Gibson, Beth N; Christensen, Gillian M; Milhoan, Catherine L
**Subject:** RE: Obama Administration Expands Backdoor Amnesty

```
ACP
```

**From:** Grossman, Seth
**Sent:** Thursday, March 29, 2012 5:30 PM
**To:** Gonzalez, Barbara M; Chandler, Matthew; Sandweg, John; Boogaard, Peter; Stolley, Jim; Ramlogan, Riah; Baronof, Kim; Stickel, Nicole; Gibson, Beth N; Christensen, Gillian M; Milhoan, Catherine L
**Subject:** RE: Obama Administration Expands Backdoor Amnesty

```
ACP
```

**From:** Gonzalez, Barbara M
**Sent:** Thursday, March 29, 2012 5:27 PM
**To:** Chandler, Matthew; Sandweg, John; Boogaard, Peter; Stolley, Jim; Ramlogan, Riah; Baronof, Kim; Stickel, Nicole; Gibson, Beth N; Grossman, Seth; Christensen, Gillian M; Milhoan, Catherine L
**Subject:** RE: Obama Administration Expands Backdoor Amnesty

```
ACP
```

Thanks,

Barbara Gonzalez
Press Secretary
U.S. Immigration and Customs Enforcement (ICE)
████████████ (office)
████████████ (cell)

**From:** Chandler, Matthew
**Sent:** Thursday, March 29, 2012 5:24 PM
**To:** Gonzalez, Barbara M; Sandweg, John; Boogaard, Peter; Stolley, Jim; Ramlogan, Riah; Baronof, Kim; Stickel, Nicole; Gibson, Beth N
**Subject:** RE: Obama Administration Expands Backdoor Amnesty

```
ACP
```

**From:** Gonzalez, Barbara M
**Sent:** Thursday, March 29, 2012 5:23 PM
**To:** Chandler, Matthew; Sandweg, John; Boogaard, Peter; Stolley, Jim; Ramlogan, Riah; Baronof, Kim; Stickel, Nicole;

Gibson, Beth N
**Subject:** RE: Obama Administration Expands Backdoor Amnesty



Thoughts?

Barbara Gonzalez
Press Secretary
U.S. Immigration and Customs Enforcement (ICE)
███████████ (office)
███████████ (cell)

---

**From:** Chandler, Matthew
**Sent:** Thursday, March 29, 2012 4:16 PM
**To:** Gonzalez, Barbara M; Sandweg, John; Boogaard, Peter; Stolley, Jim; Ramlogan, Riah; Baronof, Kim; Stickel, Nicole; Gibson, Beth N
**Subject:** Re: Obama Administration Expands Backdoor Amnesty

Can you guys propose a statement?

This is all about the case by case review

We spoke to alicia on bground

---

**From:** Gonzalez, Barbara M
**Sent:** Thursday, March 29, 2012 04:14 PM
**To:** Sandweg, John; Boogaard, Peter; Chandler, Matthew; Stolley, Jim; Ramlogan, Riah; Baronof, Kim; Stickel, Nicole; Gibson, Beth N
**Subject:** FW: Obama Administration Expands Backdoor Amnesty



Barbara Gonzalez
Press Secretary
U.S. Immigration and Customs Enforcement (ICE)
███████████ (office)

███████(cell)

**From:** Antonieta Cadiz [████████████████████]
**Sent:** Thursday, March 29, 2012 4:00 PM
**To:** brian.p.hale████████████
**Cc:** Barbara Gonzalez
**Subject:** Fwd: Obama Administration Expands Backdoor Amnesty

Hi Brian and Barbara
Is this correct?

---------- Forwarded message ----------
**From:** **Baker, Jessica** <████████████████████>
**Date:** Thu, Mar 29, 2012 at 3:54 PM
**Subject:** Obama Administration Expands Backdoor Amnesty
**To:** "Baker, Jessica" <████████████████████>



FOR IMMEDIATE RELEASE: March 29, 2012                    CONTACT:  Jessica Baker, (202) 225-3951

### Obama Administration Expands Backdoor Amnesty

**Washington, D.C.** – The Department of Homeland Security (DHS) and Executive Office for Immigration Review (EOIR) today announced its plans to expand backdoor amnesty.  Beginning in late April, DHS will suspend all non-detained dockets for illegal immigrants in four additional jurisdictions, as it previously did in Baltimore and Denver, for two weeks.  These jurisdictions include Detroit, New Orleans, Orlando, and Seattle. In May, DHS will partially suspend the non-detained docket in New York City and then in July, it will implement the same procedures in San Francisco and Los Angeles.

This means that DHS intends to solely focus on detained cases in these jurisdictions, meaning those who come to the attention of law enforcement.  But if the illegal or criminal immigrant bonds out of jail, they can be put on the non-detained docket and could potentially remain in the U.S.  This decision is just another part of the Obama administration's plan to grant administrative amnesty to potentially millions of illegal immigrants.

House Judiciary Committee Chairman Lamar Smith (R-Texas) issued the following statement criticizing the Obama administration's decision to expand backdoor amnesty.

CAR 0718

**Chairman Smith:**  "The Obama administration's decision to expand its backdoor amnesty plan to cities across the United States endangers Americans and insults law enforcement officials.

"The Obama administration's refusal to enforce immigration law encourages more illegal immigration and rewards those who have broken our laws by allowing them to remain here and apply for work authorization. And the Department of Homeland Security could let some criminal illegal immigrants, such as those charged with drunk driving, stay in the U.S.  Why would the Obama administration knowingly jeopardize the health and lives of Americans?

"A recent poll found that two-thirds of the American people want to see our immigration laws enforced.  The Obama administration should put the interests of the American people ahead of those who have broken our immigration laws."

**Background:**  In November, the Obama administration issued new deportation guidance instructing U.S. Immigration and Customs Enforcement (ICE) attorneys to review all incoming and most pending cases before an immigration court.  These changes could potentially allow millions of illegal immigrants to remain in the U.S. without a vote of Congress.

In reviewing the cases, the Obama administration has made clear that many illegal immigrants are not considered "priorities" for removal, including potential DREAM Act beneficiaries, an illegal immigrant who has had a long-term presence in the U.S., has an immediate family member who is a U.S. citizen, and/or has compelling ties to the U.S.

###

--

Saludos

Antonieta Cádiz
Washington DC Correspondent
La Opinion/Impremedia
213-369-8006
twitter: AntonietaCadiz
Facebook: ImpremediaDC

**Case-by-Case Review Statistics**

***Case by Case Reviews***

- In August of 2011, Secretary Napolitano directed that the approximately 300,000 backlogged cases pending in the immigration courts be reviewed for the exercise of prosecutorial discretion.  Secretary Napolitano also directed that all newly filed immigration cases be reviewed for prosecutorial discretion.  In late November 2011, ICE began this review.

- As of May 29, 2012, ICE has reviewed 232,181 non-detained cases with approximately 20,608, or 9%, identified as amenable for prosecutorial discretion.

- Provided they clear a background check, all 20,608 will be offered prosecutorial discretion.  To date, 4,363 of these cases have been administratively closed or dismissed.

- As of May 29, 2012, 56,180 detained cases have been reviewed with approximately 40, or less than 1%, identified as amenable for prosecutorial discretion.

- To date, 3,998 individuals have declined an offer of prosecutorial discretion.

- 12,247 offers of prosecutorial discretion remain either under consideration by the individual or in the process of undergoing a background check.

***Review of New Cases***

- Since the beginning of the case by case review to May 29, 2012, approximately 111,000 new cases have been filed with the immigration court.  All 111,000 of these new cases have also been reviewed as part of the case by case review[1].

- DHS is currently calculating the precise number of these new cases that have been determined to be eligible for PD.  As of May 15, 2012, approximately 95% of all the cases eligible for prosecutorial discretion were backlogged cases that had been pending in the immigration court for more than six months.

- Less than 5% of the cases eligible for prosecutorial discretion had been placed into immigration court within the last six months.

---

[1] Because these new cases were initiated following the implementation of DHS prosecutorial discretion policies, DHS anticipates that fewer of these cases actually filed in immigration court will constitute a very low enforcement priority.

CAR 0720

*Deferred Actions*

- Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,973 cases thus far in fiscal year 2012 as of May 26, 2012.

- Of those 1,973 deferred actions or stays, 1,687 involved individuals subject to a final order of removal.

- In fiscal year 2010, ERO officers granted deferred actions or issued a stay of a final order in 486 cases; in fiscal year 2009 ERO officers granted 740 deferred actions; in fiscal year 2008 ERO officers granted 1006 deferred actions; in fiscal year 2007 ERO officers granted 598 deferred actions.[2].

*Work Authorization*

- On April 23, 2012, DHS reviewed 2,974 cases that had been administratively closed. Of those 2,974 cases, 1,881 have received employment authorization in the past and 1,257, or over 40%, currently have employment authorization.

- On April 23, 2012, DHS also reviewed 2,710 cases where an individual declined an offer of prosecutorial discretion. Of these individuals, 2,052 have received employment authorization in the past and 1,483, or over 54%, currently have employment authorization.

*Recipients of Prosecutorial Discretion*
- Of the 4,363 cases that have been administratively closed or dismissed. These cases involve –

  - 10 individuals who are a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;
  - 303 individuals who are a child, have been in the United States for more than five years, and are either in school or have successfully completed high school (or its equivalent);
  - 290 individuals who came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States;
  - 33 individuals who are over the age of sixty-five and have been in the United States for more than ten years;

---

[2] Due to upgrades to ICE's electronic system for tracking enforcement actions which affected how this data is recorded, the data from FY2012 are not directly comparable to the data from FY2008-FY2010. Because of these upgrades, ICE is not currently able to calculate FY2011 deferred action numbers.

CAR 0721

- o 91 individuals who have been the victim of domestic violence in the United States, human trafficking to the United States; or of any serious crime in the United States;
- o 23 individuals who have been lawful permanent residents for ten years or more and have a single, minor conviction for a non-violent offense;
- o 138 individuals who suffer from a serious mental physical condition that would require significant medical or detention resources;
- o 3,302 who have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States; and
- o 173 individuals who constitute a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

**From:**  Winkler, Jeremy █████████████████████████████████████████
█████████████████████████████████████████

**Sent:**  Wednesday, May 30, 2012 12:24 PM

**To:**  Peacock, Nelson █████████@HQ.DHS.GOV>

**Cc:**  Lovett, Edward █████ Higgins-Bloom, Kate <███████████@HQ.DHS.GOV>

**Subject:**  RE: Dream act

**Attach:**  DREAM Act history.docx

Yes.  112th Congress.   Durbin has introduced it every Congress since the 109th (2005-2006).

If interested, see attached for detailed history of all versions of DREAM.

-----Original Message-----
From: Peacock, Nelson
Sent: Wednesday, May 30, 2012 12:21 PM
To: Winkler, Jeremy; Lovett, Edward
Cc: Higgins-Bloom, Kate
Subject: Re: Dream act

Ok. That was this Congress?

----- Original Message -----
From: Winkler, Jeremy
Sent: Wednesday, May 30, 2012 05:18 PM
To: Winkler, Jeremy; Peacock, Nelson; Lovett, Edward
Cc: Higgins-Bloom, Kate
Subject: RE: Dream act

FYI... introduced on 5/11/11.  S1 participated in a SJC hearing on this bill, along with Arnie Duncan and DOD on 6/28/11.

-----Original Message-----
From: Winkler, Jeremy
Sent: Wednesday, May 30, 2012 12:08 PM
To: Peacock, Nelson; Lovett, Edward; Winkler, Jeremy
Cc: Higgins-Bloom, Kate
Subject: RE: Dream act

Yes, S 952.

-----Original Message-----
From: Peacock, Nelson
Sent: Wednesday, May 30, 2012 12:01 PM
To: Lovett, Edward; Winkler, Jeremy
Cc: Higgins-Bloom, Kate
Subject: Dream act

Has Durbin introduced it this Congress? Need to know this AM, thx.

Nelson

CAR 0723

- **109th Congress**
  - **S. 2075 – Development, Relief, and Education for Alien Minors (DREAM) Act of 2005** (Durbin)
    - Bipartisan co-sponsors
    - No Committee action
    - No floor action
  - **H.R. 5131 – American Dream Act** (Lincoln Diaz-Balart)
    - Bipartisan co-sponsors
    - No Committee action
    - No floor action
  - **S. 2611 – Comprehensive Immigration Reform Act of 2006** (Specter)
    - Incorporated S. 2075, DREAM Act, as Title VI, Subtitle C.
    - Passed the Senate, as amended, by vote of 62-36 on May 26, 2006.
    - No House action
  - **H.R. 4437 – Border Protection, Antiterrorism, and Illegal Immigration Control Act of 2005** (Sensenbrenner)
    - Only major immigration bill passed by House in 109th Congress
    - Did not contain any DREAM Act provisions
- **110th Congress**
  - **S. 774 – DREAM Act of 2007** (Durbin)
    - Bipartisan co-sponsors
    - No Committee action
    - No floor action
  - **H.R. 1275 – American Dream Act** (Berman)
    - Bipartisan co-sponsors
    - No Committee action
    - No floor action
  - **H.R. 1645 – Security Through Regularized Immigration and a Vibrant Economy (STRIVE) Act of 2007** (Gutierrez)
    - Contained DREAM Act provisions in Title VI, Subtitle B
    - Bipartisan co-sponsors
    - Subcommittee Hearing held September 6, 2007– House Judiciary Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law
    - No Committee votes
    - No floor votes
  - **H.R. 1221 – Education Access for Rightful Noncitizens (EARN) Act** (Gillmor)
    - Contained some similar DREAM provisions
    - No Committee action
    - No floor action
  - **S. 1639 - A bill to provide for comprehensive immigration reform and for other purposes** (Kennedy)
    - Contained DREAM Act provisions in Title VI, Subtitle B
    - Debated in Senate on June 26-28, 2007
    - Senate failed to invoke cloture on the bill by vote of 46-53 (June 28, 2007); the bill was pulled from the floor
  - **S. 2205 – DREAM Act of 2007** (Durbin)

CAR 0724

- No Committee action
- Cloture on the motion to proceed not invoked in Senate by Yea-Nay Vote of 52 - 44 (October 24, 2007)

- **111th Congress**
  - S. **729 – DREAM Act of 2009** (Durbin) – introduced March 26, 2009
    - No Committee action
    - No floor action
  - **S. 3827 – DREAM Act of 2010** (Durbin) – introduced September 22, 2010
    - No Committee action
    - No floor action
  - **S. 3962 – DREAM Act of 2010** (Durbin) – introduced November 17, 2010
    - No Committee action
    - No floor action
  - **S. 3963 – DREAM Act of 2010** (Durbin) – introduced November 17, 2010
    - No Committee action
    - No floor action
  - **S. 3992 – DREAM Act of 2010** (Durbin) – introduced November 30, 2010
    - No Committee action
    - Senate tabled the motion to proceed to the bill by Yea-Nay Vote of 59 – 40 (December 9, 2010)
  - **H.R. 1751 – American Dream Act** (Berman)
    - No Committee action
    - No floor action
  - **H.R. 6497 – DREAM Act of 2010** (Berman)
    - No Committee action
    - No floor action
  - **H.R. 6327 – Citizenship and Service Act of 2010** (Djou)
    - Contained some DREAM Act provisions
    - No Committee action
    - No floor action
  - **H.R. 5281 – Removal Clarification Act of 2010** (Henry Johnson)
    - House attached DREAM Act provisions as an Amendment to the bill
    - Passed the House, as amended, by vote of 216-198 (December 8, 2010)
    - Senate failed to invoke cloture on the bill by vote of 55-41 (December 18, 2010)

- **112th Congress**
  - **S. 952 – DREAM Act of 2011** (Durbin)
    - Senate Judiciary Subcommittee on Immigration, Refugees and Border Security hearing held on June 28, 2011
    - No floor action to date
  - **S. 1258 - Comprehensive Immigration Reform Act of 2011** (Menendez)
    - Contains DREAM Act provisions in Title I
    - No Committee action to date
    - No floor action to date
  - **H.R. 1842 – DREAM Act of 2011** (Berman)
    - No Committee action to date

CAR 0725

- No floor action to date

CAR 0726

**From:**       Winkler, Jeremy ████████████████████████████████████████
                ████████████████████████████████████████

**Sent:**       Wednesday, June 6, 2012 1:07 PM

**To:**         Peacock, Nelson ████████████████@HQ.DHS.GOV>

**Subject:**    RE: Dream Act

---

The bill that came to a vote in the House, containing DREAM Act provisions, was:

H.R.5281
Latest Title: Removal Clarification Act of 2010
Sponsor: Rep Johnson, Henry C. "Hank," Jr. [GA-4] (introduced 5/12/2010)

Agreed to by the Yeas and Nays: 216 - 198

---- YEAS   216 ---
Ackerman
Adler (NJ)
Andrews
Baca
Baldwin
Bean
Becerra
Berkley
Berman
Bishop (GA)
Bishop (NY)
Blumenauer
Boswell
Boyd
Brady (PA)
Braley (IA)
Brown, Corrine
Butterfield
Cao
Capps
Capuano
Cardoza
Carnahan
Carson (IN)
Castle
Castor (FL)
Chu
Clarke
Clay
Cleaver
Clyburn
Connolly (VA)
Conyers
Cooper
Costa
Courtney
Crowley

Cuellar
Cummings
Davis (AL)
Davis (CA)
Davis (IL)
Davis (TN)
DeFazio
DeGette
DeLauro
Deutch
Diaz-Balart, L.
Diaz-Balart, M.
Dicks
Dingell
Djou
Doggett
Doyle
Driehaus
Edwards (MD)
Edwards (TX)
Ehlers
Ellison
Engel
Eshoo
Etheridge
Farr
Fattah
Filner
Foster
Frank (MA)
Fudge
Garamendi
Giffords
Gonzalez
Gordon (TN)
 Grayson
Green, Al
Green, Gene
Grijalva
Gutierrez
Hall (NY)
Halvorson
Hare
Harman
Hastings (FL)
Heinrich
Herseth Sandlin
Hill
Himes
Hinchey
Hinojosa
Hirono
Hodes
Holt

CAR 0728

Honda
Hoyer
Inglis
Inslee
Israel
Jackson (IL)
Jackson Lee (TX)
Johnson (GA)
Johnson, E. B.
Kagen
Kennedy
Kildee
Kilroy
Kind
Klein (FL)
Kosmas
Kucinich
Langevin
Larsen (WA)
Larson (CT)
Lee (CA)
Levin
Lewis (GA)
Loebsack
Lofgren, Zoe
Lowey
Luján
Lynch
Maffei
Maloney
Markey (CO)
Markey (MA)
Matsui
McCarthy (NY)
McCollum
McDermott
McGovern
McMahon
McNerney
Meek (FL)
Meeks (NY)
Melancon
Michaud
Miller (NC)
Miller, George
Minnick
Mitchell
Moore (KS)
Moore (WI)
Moran (VA)
Murphy (CT)
Murphy (NY)
Nadler (NY)
 Napolitano

CAR 0729

Neal (MA)
Oberstar
Obey
Olver
Ortiz
Pallone
Pascrell
Pastor (AZ)
Payne
Pelosi
Perlmutter
Perriello
Peters
Pingree (ME)
Polis (CO)
Pomeroy
Price (NC)
Quigley
Rangel
Reyes
Richardson
Rodriguez
Ros-Lehtinen
Rothman (NJ)
Roybal-Allard
Ruppersberger
Rush
Ryan (OH)
Salazar
Sánchez, Linda T.
Sanchez, Loretta
Sarbanes
Schakowsky
Schauer
Schwartz
Scott (GA)
Scott (VA)
Serrano
Sestak
Shea-Porter
Sherman
Sires
Skelton
Slaughter
Smith (WA)
Snyder
Speier
Spratt
Stark
Sutton
Tanner
Teague
Thompson (CA)
Thompson (MS)

CAR 0730

Tierney
Titus
Tonko
Towns
Tsongas
Van Hollen
Velázquez
Walz
Wasserman Schultz
Waters
Watson
Watt
Waxman
Weiner
Welch
Woolsey
Yarmuth


---- NAYS   198 ---

Aderholt
Akin
Alexander
Altmire
Arcuri
Austria
Bachmann
Bachus
Baird
Barrett (SC)
Barrow
Bartlett
Barton (TX)
Biggert
Bilirakis
Bishop (UT)
Blackburn
Boccieri
Boehner
Bonner
Bono Mack
Boozman
Boren
Boucher
Boustany
Brady (TX)
Bright
Broun (GA)
Brown (SC)
Brown-Waite, Ginny
Buchanan
Burgess
Burton (IN)
Calvert

CAR 0731

Camp
Campbell
Cantor
Capito
Carney
Carter
Cassidy
Chaffetz
Chandler
Childers
Coble
Coffman (CO)
Cole
Conaway
Costello
Crenshaw
Critz
Culberson
Dahlkemper
Davis (KY)
Dent
Donnelly (IN)
Dreier
Duncan
Ellsworth
Emerson
Flake
Fleming
Forbes
Fortenberry
Foxx
Franks (AZ)
 Frelinghuysen
Gallegly
Garrett (NJ)
Gerlach
Gohmert
Goodlatte
Graves (GA)
Graves (MO)
Guthrie
Hall (TX)
Harper
Hastings (WA)
Heller
Hensarling
Herger
Higgins
Hoekstra
Holden
Hunter
Issa
Jenkins
Johnson (IL)

CAR 0732

Johnson, Sam
Jones
Jordan (OH)
Kanjorski
Kaptur
King (IA)
King (NY)
Kingston
Kissell
Kline (MN)
Kratovil
Lamborn
Lance
Latham
LaTourette
Latta
Lee (NY)
Lewis (CA)
Linder
Lipinski
LoBiondo
Lucas
Luetkemeyer
Lummis
Lungren, Daniel E.
Mack
Manzullo
Matheson
McCarthy (CA)
McCaul
McClintock
McCotter
McHenry
McIntyre
McKeon
Mica
Miller (FL)
Miller (MI)
Miller, Gary
Moran (KS)
Murphy, Patrick
Murphy, Tim
Myrick
Neugebauer
 Nunes
Nye
Olson
Owens
Paul
Paulsen
Pence
Peterson
Petri
Pitts

Platts
Poe (TX)
Posey
Price (GA)
Putnam
Rahall
Reed
Rehberg
Reichert
Roe (TN)
Rogers (AL)
Rogers (KY)
Rogers (MI)
Rohrabacher
Rooney
Roskam
Ross
Royce
Ryan (WI)
Scalise
Schmidt
Schock
Schrader
Sensenbrenner
Sessions
Shadegg
Shimkus
Shuler
Shuster
Simpson
Smith (NE)
Smith (NJ)
Smith (TX)
Space
Stearns
Stupak
Sullivan
Taylor
Terry
Thompson (PA)
Thornberry
Tiahrt
Tiberi
Turner
Upton
Visclosky
Walden
Wamp
Westmoreland
Whitfield
Wilson (OH)
Wilson (SC)
Wittman
Wolf

CAR 0734

Young (AK)
Young (FL)


---- NOT VOTING   20 ---
Berry
Bilbray
Blunt
Buyer
Cohen
Delahunt
Fallin
 Gingrey (GA)
Granger
Griffith
Kilpatrick (MI)
Kirkpatrick (AZ)
Marchant
Marshall
 McMorris Rodgers
Mollohan
Radanovich
Schiff
Stutzman
Wu


_____

From: Peacock, Nelson
Sent: Wednesday, June 06, 2012 12:53 PM
To: Winkler, Jeremy
Subject: Dream Act

Can you pull the House vote on DREAM Act in the last Congress and send to me, thx.

Just by COB.

CAR 0735

## CHART 1: Total Number of Employment Authorization Applications, FY 2006-2010

U.S. Citizenship and Immigration Services
Total Number of Employment Authorization Applications (I-765)
Approved and Denied with Class Preference C11 and C14
Fiscal Year 2006 -2010*

| Fiscal Year | Class Preference - C11/Parole Approved | Class Preference - C11/Parole Denied | Class Preference - C14/Deferred Action (DA)** Approved | Class Preference - C14/Deferred Action (DA)** Denied | Approved TOTAL | Denied TOTAL |
|---|---|---|---|---|---|---|
| 2006 | 14,358 | 3,345 | 13,885 | 883 | 28,243 | 4,228 |
| 2007 | 34,549 | 2,276 | 17,059 | 2,127 | 51,608 | 4,403 |
| 2008 | 29,012 | 1,332 | 18,092 | 1,227 | 47,104 | 2,559 |
| 2009 | 24,683 | 982 | 15,525 | 933 | 40,208 | 1,915 |
| 2010 | 23,931 | 751 | 12,021 | 2,148 | 35,952 | 2,899 |
| Total | 126,533 | 8,686 | 76,582 | 7,318 | 203,115 | 16,004 |

\* USCIS grants EADs for USCIS, ICE and CBP beneficiaries.
\*\*Includes ICE Stays of Removal, Law Enforcement Requests and Lawsuits.
**Note:** Total I-765 approval and denial numbers include CNMI and Guam paroles but are not reflected in the component chart below.

## CHART 2: Deferred Action and Parole Numbers by DHS Component

| | ICE DA | ICE Paroled | ICE TOTAL | CBP Paroled | CIS DA-Field Office | CIS DA - VAWA and T & U visas | CIS Paroled - HP | CIS Paroled - Haitian Orphans | CIS TOTAL | DHS PAROLE TOTAL | DHS DA TOTAL | DHS YEARLY TOTAL PAROLE + DA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2004 | | | | | | 5324 | | | 5324 | 0 | 5324 | 5324 |
| 2005 | 831 | 5424 | 6255 | | 10 | 9881 | | | 9891 | 5424 | 10722 | 16146 |
| 2006 | 636 | 1406 | 2042 | 20125 | 4 | 8394 | | | 8398 | 21531 | 9034 | 30565 |
| 2007 | 598 | 571 | 1169 | 17014 | 6 | 9552 | 381 | | 9939 | 17966 | 10156 | 28122 |
| 2008 | 1006 | 634 | 1640 | 15610 | 23 | 7037 | 229 | | 7289 | 16473 | 8066 | 24539 |
| 2009 | 740 | 739 | 1479 | 16477 | 40 | 6075 | 343 | | 6458 | 17559 | 6855 | 2441.0 |
| 2010 | 486 | \*\*2540 | 3026 | 17895 | 56 | 11796 | 524 | 1151 | 13537 | 22110 | 12338 | 34448 |
| Multi-Year TOTAL | 4297 | 11314 | 15611 | 87121 | 139 | 58059 | 1477 | 1151 | 60826 | 101063 | 62495 | 165558 |

**NOTE: ICE numbers reflect Calendar Year; CBP and CIS numbers reflect Fiscal Year**

\*\*In December 2009, Assistant Secretary Morton issued an ICE directive that mandates release consideration on parole for arriving aliens subsequent to a positive credible fear finding. This directive became effective January 2010. Data indicates that the ICE credible fear parole policy appears to have directly increased the number of aliens released on parole by 447% during calendar year 2010.

**Definitions:**

**Parole:** The authority to parole an alien into the U.S. is contained in Section 212(d)(5)(A) of the Immigration and Nationality Act. Parole is a discretionary act based on "urgent humanitarian reasons" or where the parole would serve a "significant public benefit." For example, humanitarian parole was used as the basis for the Haiti Orphan Parole Program.

**Deferred Action:** Deferred Action is an exercise of agency discretion that authorizes an individual to temporarily remain in the U.S.  8 C.F.R. 274a.12(c)(14) describes deferred action as "an act of administrative convenience to the government which gives some cases lower priority" (for enforcement action).  As a matter of policy, factors to be considered in evaluating a request for deferred action include but are not limited to the presence of sympathetic or compelling factors. Deferred Action has also been used in the case of VAWA (T and U visas) when an individual is likely eligible for a benefit but agency action such as promulgating regulations, must be done before the benefit can be granted.

CAR 0736

**U.S. Citizenship and Immigration Services**
**Total Number of Employment Authorization Applications (I-765)**
**Approved and Denied with Class Preference C14**
**Fiscal Year 2006 - 2011**

| Fiscal Year | Class Preference - C14, Adjudicated at NBC* | | | | Class Preference - C14 Total** | | | |
|---|---|---|---|---|---|---|---|---|
| | Received | Approved | Denied_Fraud | Denied_Other | Received | Approved | Denied_Fraud | Denied_Other |
| 2006 | 669 | 372 | - | 297 | 14,768 | 13,885 | | 883 |
| 2007 | 1,842 | 1,277 | - | 565 | 19,186 | 17,059 | | 2,127 |
| 2008 | 2,149 | 1,605 | - | 544 | 19,319 | 18,092 | | 1,227 |
| 2009 | 2,149 | 1,771 | - | 378 | 16,458 | 15,525 | 2 | 931 |
| 2010 | 2,117 | 1,831 | - | 286 | 14,169 | 12,021 | | 2,148 |
| 2011 | 2,598 | 2,288 | - | 310 | 11,100 | 9,162 | | 1,938 |
| Total | 11,524 | 9,144 | - | 2,380 | 95,000 | 85,744 | 2 | 9,254 |

*C14 - Deferred Action, adjudicated at the National Benefits Center
** C14 - Deferred Action, adjudicated at other Service Centers and the NBC

Report Created: October 31, 2011
System: CIS Consolidated Operational Repository (CISCOR)
By: Office of Performance and Quality (OPQ), Data Analysis and Reporting Branch (DARB), ST
Parameter
Date: Update with FY2011data
Form Type: I-765
Class: C-14
Data Type: Receipts, Approved, Denied_Fraud, and Denied_Other

CAR 0737

**From:**       Markey, Betsy █████████████████████████████
         █████████████████████████████████

**Sent:**       Thursday, June 14, 2012 9:23 AM
**To:**         Chandler, Matthew ████████████████████
**Cc:**         Kroloff, Noah █████████████████   Sandweg, John
         ████████████████████

**Subject:**    Conf Mayors meeting

---

I just attended an immigration meeting at us conf mayors meeting in Orlando. The speaker was Marshall Fitz from CAP. The mayors passed a resolution asking DHS to use provisional status for Dreamers.

We both thought it was closed press but Barbara Lipston with Reuters was present and came up to me afterwards. Marshall noted that the administration was looking closely at doing something for dreamers and I said the resolution was important and I'd get to S1 today. Reuters left with impression action imminent.

You may want to follow up with Barbara and please call me if you have questions. ████████████

CAR 0738

CQ CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
March 8, 2012

# House Appropriations Subcommittee on Homeland Security Holds Hearing on the Proposed Fiscal 2013 Appropriations for the Homeland Security Department's Immigration and Customs Enforcement

### LIST OF PANEL MEMBERS AND WITNESSES

---

ADERHOLT:

Good afternoon. Hearing is called to order.

This afternoon we welcome John Morton, Director of U.S. Immigration and Customs Enforcement, as we consider the president's F.Y. '13 budget request. Mr. Director, we thank you for being here today. We appreciate you cooperating in rescheduling the hearing for today.

I know it was difficult for you a couple of weeks ago, the same day that you were commemorating the death of Agent Jaime Zapata, who made the ultimate sacrifice in the line of duty, you had another tragic event in Long Beach. And our sincere thoughts and prayers are with the families and also with the ICE family in general.

But as I just said to the Coast Guard who is mourning the loss of helicopter crew, we do not let tragedy define us. We have to carry on.

So turning to the focus for today, we have many concerns with the budget request to discuss. Last year, I noted the progress that ICE has made as an organization is in relatively short history. Unfortunately, it is difficult echo that sentiment. Hiding behind the excuse of limited resources, the current administration has sought to diminish and degrade ICE's immigration enforcement mission through abuse of prosecutorial discretion, micro-management and frontline operations and interference in immigration proceedings.

While our current fiscal crisis dictates that we all think and set priorities, it is not an excuse to ignore the law. And immigration law matters to our national security, to our public safety and to all of the men and women who come to the United States lawfully in search of the freedoms and opportunities that this nation provides.

The 9/11 Commission report repeatedly notes the importance of immigration enforcement to the national security and the weaknesses in our immigration system that contributed to our inability to defend against the 9/11 attacks. And particularly, the report states that before September 11th, 2001, we had immigration system-had an immigration system that was not able to deliver on basic commitments, much less support counterterrorism.

CAR 0739

This subcommittee took those words to heart. On a bipartisan basis over the past nine years, we have bolstered ICE's capabilities to enforce our nation's immigration laws. As the Secretary acknowledged in her testimony just a couple weeks ago, Congress has funded every request for ICE since its creation. In fact, this subcommittee has provided increases above the requests to ensure strong support for frontline operations, such as for Secure Communities and to maintain detention bed spaces. Last year, ICE was funded for 34,000 beds, its highest level in history.

Despite the heated discourse in the country over immigration enforcement and reform, this subcommittee has not been bogged down in tough politics. Instead, we've focused on the resources needed to enforce the letter of the law and meet ICE's vital missions. In short, the appropriations process should not be the forum for immigration reform.

This administration, however, has too many times politicized ICE's operation and budget. From last year's policy memos expanding the use of prosecutorial discretion, to delay in Secure Communities deployment in my home state of Alabama, to the 18 287(g) denials that were sent to state and local law enforcement three weeks ago. These actions constituted abuse of the law and quite (ph) honestly this subcommittee cannot tolerate.

Turning to the F.Y. '13 request, we see more of the same disturbing trend, including proposed cuts to detention bed space by 1,200 beds, reducing the 287(g) program by 25%, as well as contradicting claims about the appropriate use of Alternatives to Detention.

Further reducing the beds ICE can afford, ICE announced new detention standards. These standards provide full service, on-demand health care benefits for detainees and other niceties at unknown, though likely significant, cost increase. While I strongly support ICE's efforts to ensure appropriate facilities and appropriate health care for detainees, we would question the necessity of these new standards.

Again, I appreciate you appearing before us today. Thank you for your explaining the ICE's budget in a very candor way this afternoon.

And at this point I would like to recognize the ranking member of this subcommittee, Mr. Price, for his opening remarks.

PRICE:

Thank you, Mr. Chairman.

Today, we're happy to welcome back Assistant Secretary John Morton from the U.S. Immigration and Customs Enforcement or ICE to discuss his agency's budget request for the fiscal year 2013.

At $5.3 billion, this request is 4 percent lower than the current fiscal year. So, Mr. Assistant Secretary, like everybody else at DHS and throughout the government, you're being asked to do more with less this year.

2

CAR 0740

I, too, want to begin by expressing my sympathies to you for the ICE agents that were lost or injured on February 16th, to the families and to the ICE workforce. We give thanks for their brave service to the nation and we mourn in this loss with you.

So, Secretary Morton, since you assumed the leadership of ICE, I've enjoyed our good working relationship. We shared the goal of making our nation's immigration enforcement policies as effective as possible. Despite the infirmities of the system, we all recognized to be broke. From 2004 to 2011, Congress has more than doubled the number of deportation and immigration enforcement agents and has added more than 1,000 new criminal investigators during the same period, making ICE special agents the second largest group of federal investigators after the FBI.

Just under your tenure, we've increased funding for ICE's investigation activities by 13 percent and ICE detention by 11 percent. And over the same period, we significantly enhanced workplace enforcement efforts through employer audits and the expansion of E-Verify. It's also included focusing ICE'S investigative and removal resources on individuals who pose the greatest danger to our communities; gang members, drug traffickers, weapon smugglers and other serious criminals.

It was five years ago when this subcommittee first brought to the department's attention the large number of aliens convicted of serious crimes who were being turned back on to the streets sometimes without ICE even knowing who they were. And that was the result of a scatter- shot, one-size-fits-all approach to immigration enforcement. So we acted on this. We enacted statutory language requiring ICE to devote a larger portion of its enforcement budget to criminals and the results have been significant.

ICE's removals of criminal aliens have increased by 89 percent from fiscal year 2008. And criminals or other serious offenders now represent a majority of those who were removed from our country.

One major reason for this trend was the establishment of the Secure Communities program. As you know, the record rolled out of Secure Communities has not been without its goals. And ICE could have done a better job of communicating the goals and scope of the program both stayed in local jurisdictions and to immigrant communities. But overall, I've been impressed with the results of the program and pleased that ICE is continuing to refine it to address the concerns that ever risen.

At the end of fiscal year 2011, 75 percent of undocumented individuals are arrested or charged with crimes for being electronically screened. Over the past year, you've clarified the role of the states and local jurisdictions play in the program. You've improved training and oversight of implementation. You've issued guidance to ICE field agents, attorneys and immigration judges to ensure the program is meeting its stated goals.

And recently, you appointed the first ever public advocate to handle all questions and complaints about immigration. There's more to be done. There's always more to be done. And I

CAR 0741

remained particularly concerned about the department's lack of clarity on handling minor offenses such as traffic violations.

DHS commissioned the taskforce to review and make recommendations on this issue last year. But today, I've not seen decision has changed based on this taskforce's review. It will be critical for ICE to critically-to fully address these issues as the program moves toward full operational capacity nationwide. And I look forward to exploring how you intend to do this to date.

Your budget request highlights many tough decisions you had to make results to your times. I applaud your proposal to reduce the 287(g) program recognizing that Secure Communities will be implemented nationwide by the spring of 2013. I also support your requested increase of $39.9 million for the Alternatives to Detention program. I've longed push ICE to explore more cost effective and humane programs for detainees who posed no danger to society rather than relying on expensive detention operations that must often be outsourced to private concerns.

And I'm intrigued by your proposal to transfer funding between immigration detention and the Alternatives to Detention program commensurate with the risk level that each detainee presents. This appears to be proven in cost effective concept and it is consistent with other reforms ICE has pursued.

Finally, I'm curious about the administration's proposal to transfer $17.6 million from U.S.-VISIT to ICE so that your agency can better align your enforcement over state mission with other DHS's components and we may want to discuss that further as well. Have some concerns about other areas of your 2013 request. The budget proposes significant reductions to mission support staff personnel. This subcommittee has made a point of growing in recent years to free up your agents to focus on their critical enforcement missions such as dismantling drug trafficking and human smuggling organizations along the southwest border.

I also have concerns about the $238 million and management and technical efficiencies you've been asked to absorb. And we assume that a 5 percent efficiency reduction does not eliminate critical activities or does not defer our priority needs only accrue greater cross down the road. Of course, such a course would be penniless and found foolish despite budget pressures we're facing and we're going to want to have more details about the implications of this budget items.

So, Assistant Secretary Morton, we do-we do value the work ICE does day in a day out to keep our nation secured to enforce our immigration and customs laws. Many of your personnel operate in dangerous areas working everyday to detect and (inaudible) to individuals and to the goods we rely on daily. It's a tough job with no margin for error. Your decisions have lasting consequences.

We look forward to continue to work with you to help your agency fulfill its mission beginning with this review of your fiscal year 2013 budget.

Thank you, Mr. Chairman.

CAR 0742

ADERHOLT:

Thank you, Mr. Price.

Director Morton, we look forward to your comments and then followed by question by the panel. Thanks.

MORTON:

Thank you very much Chairman Aderholt, Ranking Member Price and members of the committee.

Let me start by thanking you all for the bipartisan and consistent support we've had from this subcommittee, as both the chairman and ranking member have noted. We have received steady appropriations from this subcommittee and I am very appreciative of it. Despite the occasional difference of opinion on a given matter, the members of this subcommittee have always been strong supportive of ICE. And the record enforcement levels we have achieved these past three years are direct result.

I also wanna note the stayed leadership of this subcommittee. I have found both Chairman Aderholt and former Chairman Price to be fair and powerful and I commend them both for this approach.

As has been noted already, since our creation in 2003, we have become the principal investigative arm of the Department of Homeland Security and the second largest investigative agency in the federal government. And we now have more than 20,000 employees in all 50 states and 47 countries overseas. Our core investigative functions are carried out by our Office of Homeland Security Investigations or HIS and/or immigration enforcement functions by the Office of Enforcement and Removal Operations.

The 7,000 special agents of HSI carried out 41,000 criminal arrests last year across of wide variety of criminal offenses such as drug and weapons smuggling, trade and IP crimes, child pornography, money laundering and sex trafficking and the over 6,000 officers and agents of the ERO, more than 396,000 people including a record of 216,000 criminal offenders.

As it has been noted, the president's budget for fiscal year '13 represents a 4 percent reduction of what was enacted for F.Y. '12. The request seeks to maintain light operation simultaneously addressing the need to reduce federal spending. The request balances several enhancements against program reductions and agency efficiencies.

The main enhancements are $40 million to expand the Alternatives to Detention program, $18 million to accomplish the transfer of the analytical functions for visa overstays from U.S.-VISIT to ICE and $31 million to continue modernization of various mission critical IT systems also a modest enhancement for ICE-wide co-location strategy.

5

Recognizing the top line consents that we all live under, the request also includes $354 million in program reductions and efficiencies, more than 60 percent of our total budget authority. The key reductions from the programs are $41 million from Secure Communities as we complete nationwide deployment by 2013, $53 million from the proposed reduction in the average daily population of the detained alien population to 32,800 and $17 million from the realignment of the 287(g) program. An additional $238 million will come from efficiencies and administrative spending, IT operations and maintenance and a reduction of approximately 200 missions for FTEs, as Mr. Price has noted.

We think that this budget while posing some significant challenges in terms of the efficiencies will still support strong line operations and immigration enforcement results that are similar to those that we have achieved to date. In particular, we will be able to achieve nationwide deployment of Secure Communities program that this subcommittee created and continue to believe as one of the great reforms in recent immigration enforcement history.

We also believe that we can make the Alternatives to Detention program work, work in a way that actually achieves removals at a reduced cost while at the same time maintaining basic public safety. And I'd like to note that the increase in ATD is dependent on expedite consideration of ATD cases by the Department of Justice.

And we intend to work closely with the Department of Justice to achieve efficiencies that we would need. And we also like the committee to allow us to reprogram ATD funds for the hard detention purposes even if more than 32,800 beds were in fact needed during the fiscal year.

With that, Mr. Chairman, I will close my opening remarks. I'll take any questions that you may have. I-I'd-I'd just like to add up a note of personal thanks to the committee for rescheduling the original hearing under circumstances that I wished had not existed but none of us. I-I appreciate the permission in gesture on the committee's part.


ADERHOLT:

Thank you. And certainly we were glad to accommodate that and (inaudible) our thoughts and prayers with everyone who was involved there.

I want to-first thing I wanna ask bout is Secure Communities. Secretary Napolitano was before the subcommittee about two weeks ago, two to three weeks ago here in this room. And I asked her about Secure Communities deployment. As you know, it's late in Alabama and my question was why Alabama was different from Arizona? In other states, they have pending against their pro-immigration enforcement bills that these law suits that were currently on the-on the books

Her reasoning was that the deployment was completed in Arizona before the federal law suits were filed. But we went back and look- the staff to look at that the filing dates of the law suits against Arizona and Utah and deployment had continued; and when I say deployment, deployment of Secure Communities; had continued after the law suits were filed in Arizona three

CAR 0744

months in past. And I just wanted to see if you could clarify that and tell us a little bit about what reason is there.

MORTON:

You're right. I think the secretary misspoke as to the timing of the deployments and that the principle that want to state was that the principle outlined in her letter to you of February 14th which is that the litigation in Alabama is the unique and then it is the only place in which the Department of Justice has challenged the state law on constitutional grounds and the two verification provisions in questions.

Section 12 and Section 18 of H.B. 56 were not enjoined and on that basis the department believes that it would be imprudent to have full deployment of Secure Communities until the constitutional questions are fully resolved while not enjoined. I would note that the 11th Circuit, I believe, began consideration of the Alabama case this month and the Supreme Court is due to take the Arizona litigation up in April. So I anticipate a resolution of this question once and for all on the constitutional level by the end of the year.

ADERHOLT:

Yeah. The letter from February 14th actually noted both of those issues. So if I understand you correctly, the lawsuit in Arizona and other states is not constitutional questions involve there?

MORTON:

No. The constitutional questions are raised there. The difference is that the verification provisions-Alabama is the only state in which the verification provision were not enjoined by the federal court.

ADERHOLT:

When will Security Communities be deployed in Alabama?

MORTON:

My sense of it is-is as soon as we have a ruling from the 11th Circuit. And I think the corresponding ruling from the Supreme Court in the Arizona litigation I anticipate that that would be some time by the end of the year. You see, we have to see what the Supreme Court says. I think ultimately theses issues will be resolved by the Supreme Court and that 11th Circuit

CAR 0745

may in fact wait on its decision until the Supreme Court rules, but that again should be by the end of the year.

ADERHOLT:

You know, one of the things that, you know, we've felt like Security Communities was implemented because of from the words of ICE because of the safety aspect of it and certainly we think Alabama should be just as safe as in the other state. And no one that, you know, ICE is ready to pull away and that the delay is back for public safety and national security-it really doesn't make any sense. And to be honest with you, we're very disappointed what you tell us here today.

Let me move on. Great progress has been made is establishing and forcing standards for detention facilities. I recognized the significant management challenge given the variety of facilities that ICE has responsibility for it. At the same time, there's concern that the effort to ensure frontline makes that these standards has resulted in the escalating bureaucracy. Could you tell us what the role of various offices involved in setting detention standards is and how many have interactions with frontline officers and field-based managers?

MORTON:

So we have an Office of Detention Policy and Planning that has led the charge for the last three years. The office looks a lot like an office that was in a Senate bill a few years back. And the main focus has been trying to create a set of uniform detention standards. And it came in a time when the agency was being very strongly criticized for a lack of uniformity particularly with regard to medical care.

We had had a high number of deaths in 2004. There were 24 deaths in our custody. We have steadily worked those down and so that when the administration came in 2009 creating uniform standards again, with heavy emphasis on medical care was very important, we've done through the Office of Detention Policy and Planning.

We have our new detention standards. This is the subject of frequent litigation for us. There are these separate requirements that are coming from the Prison Rape Elimination Act. We're also trying to address those in our standards and it's a lot of work. It does cover a lot of different facilities, but we're trying slowly but surely to have a uniform set of standards where all of our detention facilities if there is a basic set of minimum standard that everybody receive.

ADERHOLT:

My time expired.

Mr. Price?

8

CAR 0746

PRICE:

Thank you, Mr. Chairman.

Let me continue, Mr. Secretary, with the Secure Communities this time focusing on the taskforce recommendations that I mentioned in my opening statement. The taskforce came out with this report in September of 2011. Some of the taskforce's recommendations including withholding ICE enforcement action that will be based solely on minor traffic offenses, not including the U.S., ensuring the systematic exercise of prosecutorial direct discretion and working with local law enforcement to implement the program in a manner that supports the community policy.

Now we've seen concrete developments on the prosecutorial discretion front recently. We haven't seen action taken on a number of the other recommendations made by the task force. I just want to ask you specifically about two. One has to do with this review of the treatment of minor traffic offenses. What-what can we expect-when we expect further action on-on-on that front?

And then secondly, there are major recommendations regarding domestic violence, as you know. Last year, you issued a memo to ICE agents about protecting the victims, the victims of crimes, witnesses, civil rights plaintiffs and so forth. That-that of course is a good first step. But we do continue to hear from advocates and from organizations that served victims of domestic violence from around the country about the concerns that some of the victims are being picked up by ICE through the Secure Communities after they arrested in connection with the domestic disturbance where they were the victim.

So what can you tell us about that? What-where are you in the process of implementing the taskforce's recommendations that the victims of domestic violence should not be subject to immigration enforcement actions? And any additional steps you're taking to address concerns over the victims of domestic violence?

MORTON:

on the question of minor traffic offenses, I think you can-you will see something from us shortly. Mr. Price, I know it has been somewhat longer in the making than-than we had anticipated. The real challenge there is deciding what offenses are appropriate for immediate initiation of removal proceedings and minor offense we should wait for a conviction.

And it-it's not simply a question of minor traffic offenses because we're different-dealing with 50 different state criminal regimes. There are a number of very, very minor offenses that in some states are criminal offense and others are just a fraction or an administrative offense. But I think you will see something from us shortly and I think you will see a full response to all of the taskforce's recommendations here shortly, I'd say within a month.

CAR 0747

On the question of domestic violence, as you noted that we have put out our memorandum. I am not aware of any cases coming to out attention since we have put that out. If you are aware of-of any specific concerns, if you're staff is aware of-of any specific concerns, we'd be happy to take a look into them. But I will tell you just on my own knowledge we have not received any in quite some time.

PRICE:

Well, we-we all know that it doesn't take more than enough-a few incidents to start the-start the conversation is going around the country and the concerns being kind of contagious concerns in the-in the immigrant community. So may be these-I'm sure these are based on a relatively few cases.

On the other hand to the extent you not only you can deal with the core problem but also deal with the perception and-and communicate in a way that indicate your intentions. I think that-that's may be something you should think about. Because I can tell you, these-these fears and these rumors are still out there.

MORTON:

I think on the question of principle, we're in complete agreement and I-I take your point. You know, what your point goes to even Secure Communities more generally, I am a huge advocate of the program. I think it is one of the biggest reforms and I am very open in recognizing that we wouldn't have done Secure Communities if it hadn't been for some prodding from this subcommittee.

And I think there is a lot of misinformation about out there about how Secure Communities works and who picks up. Much of that is the agency's fault that there was a poor communication in those early days. And so one of the things that we have got to do over and over and over again is make it clear. How the, you know, program works and make clear all the various policies that we have out there addressing things like domestic violence victims, victims in general, witnesses in general and, you know, demonstrate to people that the concerns that have been raised either are not in fact true or are being addressed and address in a thoughtful way. That's part of the reason that we have the public advocate going around receiving complaints and concerns and really trying to demonstrate to people we're trying to this right.

PRICE:

Thank you.

Thank you, Mr. Chairman.

10

CAR 0748

ADERHOLT:

Mr. Carter?

CARTER:

Thank you, Mr. Chairman. I got so many questions I don't know where to begin. But I'll start with the last comment, domestic violence. You know who make that domestic violence call, do you?

MORTON:

No, we don't.

CARTER:

No. If a domestic violence is called (inaudible) lot of enforcer.

MORTON:

That's right.

CARTER:

And in most of our states now we have a policy that when there is an allegation of domestic violence, the person accused of domestic violence usually in every state you need an announcement 24 to 48 hours or more in general even if the partner who is abused got worried to go to jail (inaudible) go to jail.

And the other policy in most states is now that if the-it's kind of amazing somebody can get beaten up (inaudible) this is just fat (ph). And they verified, somebody gets beaten up, the cops arrived, the first thing the person says who get beaten up, "Don't you think my husband is out of here," you know, "or my wife." And they get violent with the police officers and they go to jail.

And so you need to inquire deeply in the domestic violence allegations to make sure the local arresting officer didn't to take them both because both did something wrong. Just a comment from my long-time personal experience with that.

Policy directives came down for prosecutorial discretion, from whom?

11

CAR 0749

MORTON:

They came from the-there was-the memo was written by me.

CARTER:

So this was your-this was your idea.

MORTON:

This was my idea and it was done obviously in coordination and collaboration with the department and the secretary. They are the administrations' priorities. They are the department's priorities but they are done by me as the head of ICE.

CARTER:

You know, you can have-you can have deferred prosecution. You can have-a prosecutorial discretion is basically a mental state of the prosecuting officer in its simplest form. You look across the table of the defendant and you're looking what you got out of the way of case and decide whether or not to go forward on it.

Are there specific directions-did your directives say specifics as to what they're looking for or do you know we say I'm now running you the authority to do instigate prosecutorial discretion at the trial level?

MORTON:

You know, there were specific criteria to be considered and then with regard to the review of all the cases that we've done, the very well-defined low priority categories that we instructed to all of our attorneys to look for.

CARTER:

And, listen, in our state the ability to set up to allow your prosecutor to have the expanded authority to make his own decision with directives usually comes out to some kind of criminal procedure that has been passed by some legislative body. There's nothing-and that this is just a department-driven prosecutorial discretion that should be done not by statute otherwise.

MORTON:

CAR 0750

It's not by statute. I mean, the-the-the basic premise is well-established in Supreme Court law and also there is-we-we do have the direction from this committee when it comes to criminal offenders to prioritize by severity. But you're right. The principal policy is coming from the department and not from any specific statutory provision.

CARTER:

So secretary can you give me a copy of...

MORTON:

Absolutely.

CARTER:

...the policy of prosecutorial discretion.

MORTON:

Yes, sir.

CARTER:

I'll appreciate it if you would.

The authority to create an Office of Public Advocacy, where does that come from?

MORTON:

Well, that is-we've always had a liaison office where we just centralized the duties. We put it in Enforcement and Removal Operations and we gave the person the title of public advocate as opposed to simply outreach officer.

CARTER:

So it's just a change in title?

MORTON:

13

Change in title and a consolidation of the functions, but it is a part of this general administration of the agency.

CARTER:

OK. That's kind of important. Because at some place the prosecutorial advocate is actually a court officer.

MORTON:

No-yes. In our case, no sir. It's just simply government...

CARTER:

Just some advisory position? I look this case and you need to look at this.

MORTON:

That's right. He serves as a liaison to receive complaints, for example somebody wants to come in and say, "Hey, I think you got it wrong. My cousin is in fact a citizen. My cousin shouldn't be deported." But then he is an adviser to the operational commanders he does not have prosecutorial discretion authority himself.

CARTER:

How many individuals have requested deferred action status from the department?

MORTON:

Well, the way it is working is we're actually looking at every case. So we don't typically track or receive individual request. So far, out of 300,000 cases, we're about halfway through the review. We have administratively closed about 1,500 of them out of-out of the 150,000 that we have looked at. The vast majority of those cases are very long-term residents who have either U.S. citizen spouse or a U.S. citizen child.

CARTER:

So you've busted the 1,500 that-the 300,000 less 1,500 that are waiting process?

14

CAR 0752

MORTON:

With another 150,000 ago, we've got a fair number of cases that are going through their various spaces and that we have to run back random checks on everybody (inaudible) national security checks on everybody. But so far, we have administratively closed about 1,500.

CARTER:

Just one followup.

MORTON:

Yes, sir.

CARTER:

These people aren't in detention, are they?

MORTON:

They are not. The-the-with a tiny handful I think and we can get you the numbers. There's only about six or seven cases that have been detained. The vast majority of these people are on the non-detained side.

CARTER:

Thank you, Mr. Chairman.

ADERHOLT:

Ms. Roybal-Allard.

ROYBAL-ALLARD:

Let me first to say domestic violence is a very complicated issue and the memo that address the wife being taken in as well-not taken in t he victim of domestic violence. I believe it was intended to address the fact that very often when the police would arrive and the husband was beating his wife that when they were taking him away he would then say, "She hit me, too," and

15

CAR 0753

then the police would take them both in. And I think that's what the issue was that cause the memo.


MORTON:

That's correct.


ROYBAL-ALLARD:

Mr. Morton, well, I have taken several crosses of steps to improve the oversight of the Secure Communities program. The fact remains that there are still some major problems. And we still have U.S. citizens that are being unlawfully detained under the Secure Communities program and the program is still operating in law enforcement jurisdictions currently under investigation for racial profiling.

In addition, I have yet to release the results of the statistical analysis of arrest data intended to identify police department guilty of improperly using this program. Until these issues are addressed, I'm concerned that the program will continue to undermine relations between law enforcement officers and the minority communities that they serve.

So can you explain why you haven't at least temporarily suspended Secure Communities and jurisdictions that are under federal investigation for racial profiling? And also give that in June of 2011 when DHS announced the series of reforms, one of the reforms that was announced was that there well-developed be an ongoing statistical analysis of the program and that the information would be released reportedly to guard against racial profiling. And it would be happened at least four times a year and to my knowledge that information has not been released and I'd like to know why and when it will be.


MORTON:

Let me start with the last question first. Your right we did commit to that statistical analysis. We are doing it with the Office of Civil Rights and Civil Liberties and main DHS. In fact, they're leading the charge. So I don't have a good answer of you, but I'll commit to getting you an answer as to one have we put out any analysis yet and if not why not and when can you expect it.

The question of have we suspended Secure Communities in any place it is under investigation...


ROYBAL-ALLARD:

My question is why you haven't?


16

MORTON:

Yeah. So we have not and the reason that we have not is from our perspective that is a fairly draconian step and we're very concerned about the public safety implications of not identifying very serious offenders who would otherwise be released to streets.

We're very cognizant of the concern that you raised. It is conceivable that we would do take the drastic step of turning Secure Communities off that that would need to be done in consultation with the Civil Rights Division and the Office of Civil Rights and Civil Liberties in our own department and fully cognizant of the real risk that would come with that particularly for-for violent serious offenders who would then be released in the streets.

ROYBAL-ALLARD:

Can you answer if there's some increased oversight in these areas where they are under investigation?

MORTON:

We only have-we have reached out to the Department of Justice. Obviously, ICE does not have any civil rights investigative authority. That resides at the Department of Justice and in particular Civil Rights Division. But we have committed as part of the statistical analysis that we are doing with Civil Rights and Civil Liberties and as part of our oversight process to have a much closer relationship with the Department of Justice and the administration of our programs.

It's not completely one point but it's-it's related. If you will remember the Department of Justice recently found systemic abuses in the administration of the Merrick (ph) county detention system and we suspended our 287(g) operation there immediately upon that finding and we did that coordination with the department.

ROYBAL-ALLARD:

Now the budget you've submitted increases funding for the Alternatives to Detention program. And it allows your agency the flexibility to shift money from detention bed to alternative program.

Expanding the safe and effective programs make sense especially given the deficits that we're dealing with, because this program cost more than 90 percent less than traditional incarceration. So can you elaborate on-on your budget request and its importance to helping you balance your budget and to your detention reform efforts?

CAR 0755

MORTON:

The whole idea is that in the time of, you know, fiscal restraint all around, we need to identify cost effective means of ensuring the removal of people who might not need to be detained if there was an alternative means of ensuring their appearance and-and ultimate compliance.

So the trick is achieving the promise of Alternatives to Detention. It is much, much less expensive on a daily rate and it can be quite effective. The challenge for us is that it's quite cost effective on a daily comparison if the person stays in the program too long. And otherwise-in other words their underlying hearing takes a very long time to be completed than in a perverse way it actually becomes more expensive.

And that's why the key to this effort is to work with the Department of Justice to ensure that Alternatives to Detention cases get swift hearing. If they can get swift hearing, we're confident that we can actually ensure rule and do it much cheaper than had we detained the person. But obviously, there's some work to be done there and that is what we're trying to achieve through the budget.

ADERHOLT:

Mr. Frelinghuysen?

FRELINGHUYSEN:

Thank you, Mr. Chairman.

Director Morton, it's good to see you again. Tell me about some of your identity trafficking operation that's part of your portfolio. If you had some successes there...

MORTON:

We have. It's a huge problem, as you know, around the country we tend to focus a lot on fraudulent driver's license schemes, social security numbers. There are, you know, document mails all over the country. We have seen an alarming rise in the number of these documents that can now given over the internet. They have been, you know, produced in China and you just-you just...

FRELINGHUYSEN:

They're as good as the originals in many cases.

CAR 0756

MORTON:

In many cases, if you are not, you know, state DMD examiner, it's hard to tell the difference. But we're doing a lot of these cases. We're gonna continue to do a lot of these cases. We're actually seeing just in the case of Newark. We're-we're having corporate identity staff where the export identities of major corporations were being stolen to bring in counterfeit duds making them appear as if they were legitimate corporate imports when in fact they were counterfeits and the companies had no idea whatsoever that they were being done.

FRELINGHUYSEN:

You're good on your feet. I appreciate you're invoking Newark. I assumed you're assuming Newark, New Jersey.

MORTON:

Indeed, $300 million.

FRELINGHUYSEN:

So how much money we're spending in this-in this area? Are we making the type of investments? And where does it relates since, you know, sort of have a cyber-centric bureaucracy these days? Where does it fit in to our-where do you fit in into the so called cyber command?

MORTON:

We spend a lot of money on this. We will get you the exact rate down. So we have a Cyber Crime Center that we run just across the river here in northern Virginia. So much of our work as the criminal investigative agency is moving from the street to the internet.

FRELINGHUYSEN:

Because obviously the forging of documents has been going on probably since the passage of, you know, centuries has been going forged documents. But in reality, cyber is sort of where the-where a lot of the public fixation is. So you're-you're involved in that. You spend some money, considerable amount of money in this area?

MORTON:

19

CAR 0757

An enormous amount of money both in terms of child pornography which is now almost exclusively online, counterfeiting piracy is all moved online, identity theft increasingly online. I would say that the-in overall half of our cases now involved some cyber connection.

FRELINGHUYSEN:

So just say there's been obviously a focus on cyber. You work with the private sector, business community in this area?

MORTON:

We do. I'm a big believer in public-private partnership. I don't...

FRELINGHUYSEN:

And you're aware of obviously the whole issue of, you know, the desire to protect proprietary information. So you're- you're part of the group who would be supportive of enhancing systems to protect them from penetration/

MORTON:

Absolutely. I...

FRELINGHUYSEN:

I just sort of wondered from your perspective. This is not a hard ball, question whether all of the interested parties are working together? You have IT section in your statement and, you know, sometimes when I say that you've got new IT, you always wonder whether he's married to anybody else's system. So give us may be some level of assurance that whenever you're investing in that it may relate to the storage and dissimilation in the review of a data that systems talk to one another.

MORTON:

I will tell you in all candor, while there are some works still to be done I have been my entire career has been in federal law enforcement, I have never seen the level of exchange between agencies and databases. It is as truly impressive much of it obviously brought on by the tragedy of 9/11. But you would be pleasantly surprised to see how much information we use everyday that isn't stored and collected by ICE, but we have access to it and we use it to go after all (inaudible).

CAR 0758

FRELINGHUYSEN:

Of course, we're pleased to hear that. But in reality, there are some people that have been objecting to the collection of this type of data. So I assume you are, you know, I know the Department of Justice intervened the other day relative to certain actions. But one of our federal agents, I assumed you are, you know, following some course of action here which, you know, respect the constitution but also shall we say errors on the side of getting information and analyzing it and acting to protect us.

MORTON:

Absolutely. I mean, good law enforcement is a balance of trying to go out and-and get (inaudible) but doing it away that is constitutional respects the privacy of the people...

FRELINGHUYSEN:

At your convenience for the record, this is the appropriations committee I'd like to know what you're spending in some of these areas. So for the record if you can provide those...

MORTON:

I'll be happy to do it.

FRELINGHUYSEN:

Thank you, Mr. Chairman.

ADERHOLT:

(OFF-MIKE)

LOWEY:

Thank you, Mr. Chairman.

Welcome director.

MORTON:

CAR 0759

Thank you.

LOWEY:

Since 2006, over 20,000 people have been murdered at the hands of drug cartel violence in Mexico nearly 10 percent of which are police, military or security officers. This violence has resulted in the deaths of over 200 Americans in Mexico. According to Mayors Against Illegal Guns, 90 percent, 90 percent of guns recovered and traced from these Mexican crime scenes came from gun dealers in the United States.

What is ICE doing to prevent the smuggling of illegal weapons across the border/

MORTON:

Well, first, I will not that one of the Americans killed in Mexico was our own agent, Jaime Zapata, who was killed by armed gunmen in San Luis Potosi. So obviously take this issue very seriously.

Our efforts when it comes to arms trafficking are focused on across-border trafficking. Obviously, the ATF has the lead domestically on firearms investigations. We do a lot of joint south bound inspection with CBP where we do random inspections of people going south using our Border Search Authority, literally searched people's cars and see if they have firearms going south which they have not declared. And we conduct investigations into attempts to illegally export all manner of firearms and weaponry. That's one of our principal responsibilities.

LOWEY:

Well, I hope you're much successful in the future than you had been in the past. Because when you see the deaths that occurring and realized that the guns are traced back to us, it's pretty upsetting.

But on another issue, according to the Department of Justice, human trafficking is now the second fastest growing criminal industry second only to the narcotics trade. In 2010, of the 2,515 cases that are under investigation, over 1,000 involved children. The National Human Trafficking Resource Center estimated that these cases represent a $32 billion industry. How does the president's request address this growing trend that what we saw is this will ICE use to combat human trafficking and in particular the illegal traffic of children?

MORTON:

There is not a specific enhancement is our budget, but let me say this. First, ICE runs the Human Smuggling and Trafficking Center so we're the lead agency with principle investigator of

CAR 0760

most overseas child exploitation offenses including sex trafficking and-and child forced labor. The FBI is the other big investigator along with us.

We've never had a higher number of open investigations and prosecutions in our history and I think you can-I agree with you that that this is one of the great problems of our time. There are far too many children being abused or far too many Americans going overseas to do things with other people's children that they shouldn't be doing. And regardless of the budget constraints that we have to live within, I can promise our child exploitation efforts which turned an all time high right now are not gonna suffer.

LOWEY:

Thank you.

Is that it? Oh, two more minutes. I got another question.

The Department of Justice recently announced that ICE managed detention facilities would not be covered under the Prison Rate Elimination Act signed in to law by President Bush in 2003 with bipartisan support. This legislation acquires the development of national standards to prevent sexual violence in prisons and juvenile detention facilities.

Now, in light of the report of sexual violence in ICE facilities, will you request that the administration reconsider its decision to limit the scope of this Act?

MORTON:

What was the idea was we're gonna comply on our own with PREA. So ICE in fact were a little bit ahead of the rest of the government on this core because our standards which we have just issued have a specific standard on the prevention investigation of sexual abuse and we will be fully pre-comply and with a little luck I think ICE will be the first of the major detention systems to be fully compliant.

So I think you will see good new there. It will take us some time because we operate in so many different facilities and we have to negotiate some of the standards with the people that run the facilities. But there is no daylight between PREA and where we want to be as an agency.

LOWEY:

Thank you.

Thank you, Mr. Chairman.

CAR 0761

ADERHOLT:

Mr. Latham?

LATHAM:

Thank you very much, Mr. Chairman.

I'll go back to question previously from Ms. Lowey and I want good and fast and furious or anything. But guns come from other places than the United States, right?

MORTON:

Yes.

LATHAM:

Can you tell me where?

MORTON:

I'm not an expert on all of the various locations and manufacturing, but obviously there are many firearms manufacturers in countries other than the United States and there's a lot of smuggling into Mexico and other places from the south as well as from the United States.

LATHAM:

Thank you very much. I just want to talk about the 287(g) program. And I have real concern about the reduction of about 25 percent reduction in that program, $17 million. And your own website says that that program is one of the top partnership programs and additionally, you've referenced the program as a force multiplier and implied that it helps add the limited ICE resources and the secretary has said that the 287(g) program should focus on removal of criminal aliens and recent border entrance who gained the system.

If your resources are tight and one of your main missions is to track criminal aliens, as the secretary said, why would you wanna dump a program that is a force multiplier for helping ICE track criminal aliens and it's-it's not program that's redundant with the Secure Communities Programs. And before you say that, I don't accept that at all because they're-it's kind of like comparing apples and oranges but why the reduction of such a good program?

24

CAR 0762

MORTON:

So, a few things just to clarify. The proposed reduction focuses on 287(g) task forces. There is no proposed reduction for jail models and on the contrary, I just approved two new jail model authorizations.

So, the reason for the reduction on the task force is that at just at the end of the day, they have not proven to be particularly productive. We had-we spent a lot of money to oversee them. We spent a lot of money to set up training in the initial connections and on the task forces, only the task forces. While there are a few notable exceptions among the existing ones, the vast majority of them have only a handful of arrest each year.

And the principal reason for that is that in these tough times, a lot of the officers that we originally designated at the 287(g) task force offices, the underlined jurisdictions had to redivert them and to put them to other uses.

And so we have a number of 287(g) task forces that have-many of them, no removals each year and others is just a handful.

LATHAM:

Well, what's the purpose of the program for this if not the task force?

MORTON:

So, we have-there's two versions. One is the task force, and the purpose there was to go out on the street and look for gang members and people that are outside of an incarcerated setting. And then we have the jail model which is where we delegate our authority to people who run the penal institutions. That has worked very well. We are continuing to do that. I again, just approved two more and that is the lion share of the removals that come out of the 287(g) program, by far. I think, it's 90 percent come out of the jail model side.

LATHAM:

OK. I supposed with the task force be counted (ph) for like 10 to 20 percent of all the arrest, is that right?

MORTON:

Yes.

CAR 0763

LATHAM:

But are you saying that that's more of the jail model?

MORTON:

The jail model is all the rest. The jail model is much larger in terms of the numbers of arrests and removals. It's much more efficient.

LATHAM:

So, how do you cut one part and not the other?

MORTON:

Because from our perspective the jail model works so much better and the task force model, at the end of the day, has not been...

LATHAM:

You're cutting the entire budget which you're just-and just...

(CROSSTALK)

MORTON:

Yes. That was-the point of my clarification was to say that when we say that we are going to cut the overall budget, the focus is going to be on task force delegations. We are not proposing to eliminate any jail delegations.

LATHAM:

Apparently, the committee's heard from the fugitive operations personnel how important state and local participation is on the-for the task forces. And that this program is the key for those task forces to get funded, isn't that correct?

MORTON:

26

CAR 0764

We do provide funding but I-I'm pretty confident that if we were to come and give you a briefing and to show you what we have spent to authorize the task forces and to show you the actual removals from those task forces, you would see that a great number of the task forces, don't in fact produce many removals. The jail, on the other hand produces quite a lot.

LATHAM:

I-I'd love to get a briefing from you sometimes. Thank you, Mr. Chairman.

ADERHOLT:

Thank you, Mr. Latham. Let me go back to the enforcement of removal operations that I left off on the first round. How many offices actually go out and do audit in some of the facilities?

MORTON:

Of the jail facilities?

ADERHOLT:

For the enforcement of removal operations, yes. The facilities, yes. Detention facilities.

MORTON:

The facilities. So, we have our Office of Detention Oversight that goes out. The inspector general separately does some inspections and we now have (inaudible) officers in most of the very large ones to do just sort of day-to-day oversight.

We're proposing, Mr. Chairman to reduce some of the inspections in the very small or short-term facilities recognizing that there has been a burden that hasn't been particularly efficient from a taxpayer's perspective. But to use -- (inaudible) County for example, I mean we would inspect there regularly because it's a major facility that we use regionally.

ADERHOLT:

For you to have them, you say-you mentioned Office of the Inspector General and also Office of Detention Policy and Planning?

MORTON:

27

CAR 0765

The Office of Detention Oversight.

ADERHOLT:

OK. And then, Civil Rights and Civil Liberties?

MORTON:

They do separately from us. They can go in and-they typically look at individual complaints but yes, from the department.

ADERHOLT:

There's very heavy oversight in this particular area. So, now does that-what about the chain of command for accreditation of organizations, is that-will that be an addition to that?

MORTON:

So, the-the accrediting-we have separate standards. We try to follow as much as we can the standards of the accreditation services. The challenges in a place where-many of the detention facilities we use house both criminal and non-criminal detainees out in the county. Let's say, you know, the penal institution in addition to housing ICE detainees.

And so that's the trick, is where we're holding two different sets of people and so we have two different standards. Wherever we can, we try to use the ACA Standards as a model and not have our standards too far different because we recognize it's a challenge for the facilities.

ADERHOLT:

We-on the F.Y. '13 budget proposal it would expand the Office of Civil and Civil Liberties role? Is that correct, and direct the audit team of the facilities in investigating fugitive operation teams?

MORTON:

I'm not aware of one in ICE's budget maybe in main DHS's budget but ICE is not proposing that.

ADERHOLT:

CAR 0766

Oh, DHS budget. We understand that the public advocate that we've talked about a little bit earlier would actually- the ombudsman receiving case files from private attorneys and putting ICE in jeopardy when it comes to litigation. What about the eight complaints processes in ICE and DHS already have for detention removal operation?

MORTON:

So, the idea was just to have a place that people could go on a national level either for a general concerns or a case that they just didn't feel was getting the attention it deserved locally. So, sort of imagine it as both outreach and just a national escape path (ph). We've-as I mentioned earlier, we've already had a position that was similar to this. We added to its authorities and we really wanted to bring an attention and focus to U.S. citizen claims because we've-that has been a strong concern lately in a number of the immigration advocacy circles and we just wanted to make sure that we were doing everything we could to be responsive to those concerns because obviously we don't have any power to detain or remove a United States citizen in any time and if we would do that, that would be improper and it needs to be addressed immediately.

ADERHOLT:

I think the concern is just the bureaucracy that's you know, out of control on accountability especially when we're at a time we're trying to find cost-effective ways to manage detention debts and consolidation and most effective way to-so, that's where the concern is, just out of control bureaucracy that's involved. I got just a- just a little bit long-let me get to one more question I wanna ask.

We discussed a topic with the secretary when she was here and I wanna bring that up to you and that's according to the weekly to this subcommittee that you all do, ICE is not meeting the statutory mandate to maintain no fewer than 34,000 detention based in the current fiscal year. Could you give us clarification on that?

MORTON:

You-so, a couple of things. You're right. We are at 32,200 as of last week that is below our mandate. Just so we're clear. I view it as a mandate. And last year, we got to 33,300. Our mandate was 33.400. Missed it by a hundred but that's the highest the agency has ever had in its history. So, there should be no concern that I don't view an instruction from the committee as exactly what it is. It's an instruction to us.

We have seasonal variation. The heavy months of illegal migration along the Southwest border are yet to occur and so, I think you'll see our bed rate go up pretty significantly and I am more than happy to make sure that we are reporting on this every week and that we're doing everything that we can to meet the mandate. One minor point of clarification, we have actually two mandates because for the first quarter, we were under 33,400 and then for the last three

CAR 0767

quarters, we were under 34,000 but we're gonna do our level-headed best to get there. It's an instruction to us and we don't treat it any differently.


ADERHOLT:

    Thank you. Mr. Price?


PRICE:

    Thank you, Mr. Chairman. Let me just make one further comment about the exchange we had earlier about domestic violence. As I understand it, the question is of course not ICE answering domestic violence calls. We understand that doesn't take place. But in the situation of-of following up when-when legal authorities-when law enforcement authorities make this arrest, you have to make a determination as to who to put in-who to deport when-when-when these people have been picked up, understanding that they-they may have been picked up under-under very ambiguous circumstances as to who the victim was or whether the victim had any part in it and all the rest.

    So, the concern here is of course, that-that we have some realistic sense of-of priorities here and I'm not victimizing the victim but also, what law enforcement constantly tells me and I think it's probably told all of us that if there is a fear in the immigrant community or a sense in the immigrant community that the result of reporting an incident is going to be that the-the person reporting it or the victim would-would themselves then face deportation of something like it or some dire consequence that of course the incident goes down-to report the incident in the first place, and law enforcement finds it's-it's (inaudible). That's-that's what we're trying to deal with, right?


MORTON:

    That's correct and I mean-and I'm happy to get our policy to you. I mean, it is our stated policy that we do not put immediate victims or witnesses to a crime into proceedings absent extraordinary circumstances, and it is directed exactly the situation where we have to do a little homework and we need sometimes, you know, local law enforcement will arrest both people.


PRICE:

    You have to do some homework, that doesn't mean you have to be totally-you don't have to wait for the-for the criminal process to work itself out.


MORTON:

CAR 0768

Absolutely.

(CROSSTALK)

MORTON:

And so we-our policy says, do that homework in domestic violence cases and in other cases. Do the homework to make sure that you are not inadvertently putting someone into proceedings who was arrested and to use your phrase, where the circumstances were ambiguous.

PRICE:

Right. That's what I wanted to clarify. Let me talk about the plans you have for nationwide deployment. Your scheduled complete nationwide deployment of Secure Communities by March 2013, your budget reduces the specific funding for the program from $189 million in 2012 to $139 million in 2013 anticipating this-this building out of the-of the system. Are you still on track to meet that national participation by March 2013? What have you done and what are you doing about these states and localities that have offered some resistance, that have-have expressed misgivings about-about this program or about their own participation in it? What kind of communication improvements are you-are you working on there before this program's fully deployed? And what kind of update can you give us on-on the response from those states and localities that earlier professed their-their belief that the Secure Communities was voluntary and they attempted to opt out?

MORTON:

So, we are going to be fully deployed by March 2013. It is full steam ahead from our perspective on this. As I said earlier, I think it's a good program. It was the right thing to do and we believe in it. We're gonna move forward.

We are cognizant of the many concerns that have been raised. We've taken a number of steps to address them. We have removed any ambiguity as to whether or not the state or local jurisdictions need to do anything. They don't. We have removed any requirement for a memorandum of agreement or understanding. We are in 45 of 50 states as we speak. Forty-five or fifty states have Secure Communities; 2,300 jurisdictions. We're gonna be close to 3,000 by the end and while there have been some jurisdictions that have raised concerns, I will tell you that it is a very small number and even in those jurisdictions of concern tends to be about very low level offenders. There is almost no disagreement that a place-a good place for ICE to be looking for people to remove from the country is the nation's penal system.

It makes sense. It's good policy and that's what Secure Communities is all about. So, I think we will be, in all 50 states, Mr. Price, by 2013, I think you will see the agency respond to the criticism. We have done a lot to clarify what the program is about. I will be the first to say that-

31

CAR 0769

that the agency in particular, when we got things rolling in 2008 didn't do the best job of it. There was extremely rapid expansion of the program and we've-we've done a lot to address those deficiencies. We're can always do more. We're gonna do more.

But at the end of the day, I think the judgment of this committee that looking for criminal offenders in each and every jail and prison in this country, to remove them from our streets so they can't go out and commit another crime was the right call.

PRICE:

Thank you. Do I have any time remaining?

(OFF-MIKE)

PRICE:

All right. I'll-I'll wait until the next round. Thank you.

ADERHOLT:

Mr. Carter?

CARTER:

Thank you, Mr. Chairman. I really appreciate what you do. You got a real, tough job. We have a saying, "you're as busy as a wallpaper hanger on a windstorm." And so, I've got a lot more questions and you and I gonna have a chance to answer, and I'm gonna submit those and ask you folks to give me an expedited answer. I've waited a long time on some of these and will ask you later on your views (ph) and these are things that I think both the chairman-the chairman of the judiciary and I are concerned about. And so, I'm gonna go through some of these very briefly.

The secretary told us that we are removing illegal aliens who have committed serious crimes. We need to know some-more clear definitions of serious crimes. We've heard some of that today. Who's making these determinations as to whether it is serious or not? Is it trained law enforcement folks or is bureaucrats from some outside location that has set up the standard? We need to know who's running the show. Some people might look at the case and say, "Oh, this person is running a red light." Then noted a warrant check was run, and there were pending aggravated sexual assault on a child and missing on their bond. I mean, there's a lot of things that bureaucrats don't see but law enforcement officers obviously do.

Do you have your-yeah, second-guessing the frontline, folks.

CAR 0770

We had some information given to us. The secretary's advisory committee advocated that you set up panels, in particular jurisdictions to review the cases your personnel are bringing forward and making those decisions for you. Are you considering doing that? What would that do to the morality of officers, agents, and attorneys? I have real concern about the morality of the officers, agents, and attorneys-attorneys on this. What would that do to your authority? And quite honestly, wouldn't that undermine the authority of these agents that are risking their lives every day in the field? And I'm well aware of what ICE has to put up with. So, I have a real concern about that.

I understand Smith, Lamar Smith in Judiciary and Chairman Aderholt here have asked for exact numbers on (inaudible) or discretion and they have not received no answers. We were on a (inaudible) to get these-get us these numbers. You need-you need to push your people to get us these numbers because they are important at how we analyze the program and we need to know, are you tracking these folks that have been quote "let off" if you will? Because quite honestly, they are still have illegal status in this country.

All these things are the kind of things that we gotta have a clear picture of this. I'm not-I've done lots of alternative to incarceration in my day and I'm not anti-alternatives to incarceration or alternatives to deportation and intelligent (ph) cases. But we don't have good guidelines. So, I don't expect you to answer all those questions today. Hope somebody wrote them down for you, if not, I'm gonna give them to you. And there'll probably gonna be some more because we need to clarify this.

If it's a good idea, let's make sure it's a good idea. And I also like to remind you, I don't know what you do with (inaudible) when you-when you reduce the number. The contract for most of your detention because there's quite a few of them...


MORTON:

Yes, sir.


CARTER:

What does that do to your contracts, do you have to cancel contracts and renegotiate when you reduce detention in a facility wherever that facility may be? And you pointed it out that just the (inaudible) elevation is coming, but more importantly, if what we are all hoping for, believe it or not, even in this adverse political environment, is it-GEPs going up and we're gonna have-and we're gonna start coming out of this deal. The minute the jobs are available, the numbers are going up. These are not stupid people coming across this border. They'll come over here to be-to not work. They come over here to work. And if we don't have the jobs, you got low numbers. If we got the jobs, we go get high numbers. And I just wonder if we save you any money by-if we're shutting down facilities- shutting down and reauthorizing, will the numbers go up? Need those kinds of questions answered.

33

CAR 0771

MORTON:

Why don't I suggest that rather than you have to put this to us, we'll be in touch with your staff and make sure that we get them right. The one thing I think I'll need a little clarification on is-is the proposal on panels. I have not heard that and as described, it doesn't sound like I would be for. But lemme...

CARTER:

The secretary mentioned it in her testimony, I believe.

MORTON:

OK. And I-I-I-that one is new to me. On the prosecutorial discretion review, we are keeping very good statistics and numbers and I think we will be more than happy to give you and the chairman an update.

CARTER:

I have some more time. One more thing I'm worried about. Our employers or at least where I come from are jumping through every hoop they could jump through to make sure when they hire somebody, they're following the law and they do not want the consequences of not following the law on them. And when this process we're talking about here-this-this deferred prosecution or prosecutorial discretion, the first question they ask, "OK, what is really the status of this guy? Can I hire this guy?" If somebody just-word of mouth says, "Oh, yeah. It's OK. You can hire him." He may be eligible for work permit there or wherever he could be.

It just got them into a quandary and in the construction industry which we hope to pass a highway bill sometime before the end of the world, and those guys are all be hiring. And that's who these-that's who are hired. The Hispanic community is a large hire in the construction industry in Texas, at least. I want my employers to have a place to go to get the answers about what this prosecutorial discretion does to the status of that person we're dealing with.

MORTON:

I'll tell you right here for most of them, it doesn't give them any status. It leaves them in administrative closure but is does not grant any status whatsoever. E-verify remains the place to go electronically to figure out if the person has work authorization. There could conceivably be a circumstance in which you know, a rare case a person has work authorization, we close our case. They still have work authorization but that's gonna be one in a thousand in most of these folks.

CAR 0772

CARTER:

And in reality, did you-my employer's asking this employer who's maybe worked for him and several times, very successfully. Now, you would think this discretion, does that make you OK? Oh, yeah, I'm OK.

So, I mean, they need to know where to go to (inaudible). E- verify is the solution. Thanks for what you're doing.

MORTON:

Thank you.

ADERHOLT:

Ms. Roybal-Allard?

ROYBAL-ALLARD:

Director Morton, I'd like to go back to the-the issue of the disparities that exist in state and local jails, and that-that are in conflict with even ICE's own standards is very, very often. These disparities between the rules that governed jails in different jurisdictions across the country are concerned especially since 70 percent of the people in ICE custody are actually housed in- in these jails.

And I'm told by correctional experts that these disparities will continue to be presenting major challenge until they are addressed hopefully as you work to implement these long-overdue national standards. Can you explain how the performance-based National Detention Standards will address these conflicts between the rules that governed jails in different jurisdictions including ICE's own standards? And what will you do if a jail refuses to comply with the standards?

And secondly, there's been some concerns raised that the standards themselves do not include some very important areas. For example, it does not address the issue of a Taser so that if someone is arrested in one city, they get Tasered. If they're arrested somewhere else, the do not. Also, the rules that-that deal with the standards relating to search and seizures, strip searches, visitation, and other key issues, I am told are not adequately, if addressed at all in these standards.

So, if you could also explain that because those-there's things like they should be actually highlighted and put into the standards and made very, very clear that this should be a national standard.

35

CAR 0773

MORTON:

So, here's how it works. So, for all of the-so, there are a few facilities that we completely control and those implementation can be immediate. The vast majority of the facilities that we use, we use by contract.

ROYBAL-ALLARD:

Seventy percent.

MORTON:

And so that-those facilities we impose the standards by way of a contract renegotiation, and that is what we will do. If anyone refuses to comply, then they no longer have our business. This is not optional. And you know, with regard to concerns that some of the areas that you mentioned are not adequately addressed, I haven't heard that-the Taser one in particular but what I would suggest is maybe if we could-if you have a list of the ones that you are concerned about that-that-that people have given you where you feel or others feel that our standards are not up to snuff...

ROYBAL-ALLARD:

This is actually a statement by Stephen Martin is the former general counsel of the Texas Prison System, and who is now a consultant to the Los Angeles Sheriff's Department and the DHS Office of Civil Rights and Civil Liberties. And this was a statement that was made at a conference on detention issues and I'll give you that information.

MORTON:

If you will, because I don't believe ICE uses Tasers even though...

ROYBAL-ALLARD:

No, ICE does not. No, no. The issue-the concern raise that for example if a-if someone is arrested in-in Denver that they can use a Taser but if they're arrested in Fort Knot, Lauderdale then a Taser would not be used and that's the differences in the various jurisdictions and that these standards, the national standards that have been put forward do not include those specific kinds of things. That was the concern that was raised.

36

CAR 0774

MORTON:

Understood. If we could follow up with your staff, I would appreciate it.

ROYBAL-ALLARD:

I'd appreciate it. Thank you.

ADERHOLT:

There is some concern about several jurisdictions that have passed ordinances and precluding their law enforcement for monitoring ICE detainers. How many individuals have been released from local custody before ICE has been able to pick them up?

MORTON:

As a matter of sanctuary movements, I mean, there are-a lot of people are released because you know, we're from far away and by the time we get there, they're released and it's not a matter of the sanctuary movement. But in terms of sanctuary cities, a considerable number-we're right now in a very, as you know, significant discussions with Cook County, Illinois. They have ceased honoring all of our detainers. They released literally thousands of very serious offenders every year that we would want to take and put into immigration proceedings, so that is a jurisdiction of particular concern right now.

It's the one jurisdiction I would say where the issue is most pronounced, Mr. Chairman. Most the other jurisdictions where we have this issue, it tends to be more focused on lower-level offenders and the detainers are honored for all of the major offenders but we could you-we're tracking all of the detainers that are not honored in Cook County right now. We could get you that number. I already know it's several hundred, and-and I just don't know the answer with regard to the other sanctuary cities that we face but there are a number of them.

ADERHOLT:

Do you-do you try to all jurisdictions?

MORTON:

I don't know the answer to that. I know that we're tracking Cook County very carefully but let me get back to you on that and let you know. I mean, my position on this has been clear.

CAR 0775

Obviously I think that federal law is-is bringing them in here and-and we need cooperation from the jurisdictions.

ADERHOLT:

I understand you've exchanged letters with Cook County, Illinois on the seriousness of this issue and have offered to refund certain costs. Is that type of arrangement unusual?

MORTON:

It is-one thing I don't think will actually-our proposal is essentially that there would no cost to anybody. We're committing to-if-if Cook County is concerned that there is an additional cost of detaining people because we're taking a day or two to get there, we're committing the same fund. We pick people up the moment of their release, and we don't believe there's any cost and we're so confident of that. Were there any additional cost? We'll reimburse you.

I've seen that reported in the paper that we're offering to pay- we're only offering to pay if we don't meet our obligation of showing up at the moment of release which we're willing to do.

ADERHOLT:

And that would be routine anywhere?

MORTON:

Anywhere. And so, I don't think that we would be-the one thing that we would be doing a little bit differently in Cook County is that we would agree to a response on the day of release. Cook County is one of the two largest releasers of serious offenders in the country, the other being the New York Prison System. And so, even though there is a commitment there that's a little more aggressive on timing, it's well-worth it given the number of serious offenders that are coming out of Cook County. It's a very serious concern for us. We do not think it's a good idea that hardened felons are being released to the streets of Cook County.

ADERHOLT:

What's the next steps in terms of the administration's position on state and local jurisdictions that are undermining federal law, will there be any judicial action taken?

MORTON:

CAR 0776

Well, I'm trying as you know to get to a good place short of that. Federal law prohibits these sorts of sanctuary provision particularly ones as strong as is the case in Cook County. The enforcement of it under federal law though is not entirely clear and probably we would need to get to the Department of Justice's assistance to enjoin a given city if they persisted in refusing to cooperate with us, in a way that violates federal law.

We've never actually gotten there. Cook County is the first jurisdiction that has actually refused to cooperate or cross all classes of offenders, and so I would say, I wanna try to get to a good place with them first and then, if necessary, we will go to the Department of Justice and consider what options we have under the law, and I said as much in my letter to Mrs. Preckwinkle.


ADERHOLT:

ICE has made great strides in taking strategic approach to its investigation in cease and desist. The impact of its success is-I don't know, disrupting and dismantling transnational criminal activity. Can you provide us with some particular examples of how ICE has seen these kinds of results?


MORTON:

So, we arrested-criminally arrested 41,000 people last year. And we have seen a very strong increase in our overseas criminal investigations particularly those focused on transnational criminal organizations. The-most people probably don't realize that one of the most common charges we bring is a narcotics offense. We're very, very involved in organized narcotics smuggling. We're involved in organized child pornography, particularly rings over the internet. A lot of that is overseas. The intellectual property enforcement is increasingly...


ADERHOLT:

What about human trafficking?


MORTON:

Human trafficking, well, we had the highest number of human trafficking cases we ever investigated and prosecuted last year. And as I mentioned earlier, at least while I'm in charge, we're gonna continue to do that come hell or high water.

So, I-I think that the transnational organized crime threat is very serious. I'm very worried about some of the trends over the internet, and so, you're gonna see from our end continued focus on trying to dismantle these organizations and take them out by the roots.

39

CAR 0777

ADERHOLT:

Thank you. Mr. Price?

PRICE:

Thank you. In this final round, let me bring up this rather strange phenomenon that we have in-in the statute governing your activity, that is to say a statutory requirement that you have so many detention beds, statutory bed requirements. That's a real outlier. As far as I know, the Bureau of Prisons doesn't have any minimum number of required beds. The marshal service doesn't have a minimum number of required beds. I don't know of any state Department of Corrections that has a minimum number of required beds. But yet, ICE has a minimum number of-of required beds.

Now, you're trying to develop a more rational and a more flexible policy as to who occupies those beds. And I wanna ask you just by this rigid statutory minimum makes any sense given-given the kind of decisions you need to make and whether it's even consistent with the kind of decisions you're trying to make.

You're now required by the fiscal 2012 Appropriations Bill to utilize no less than 34,000 detention beds at a cost of about $1.5 billion. Now, your 2013 budget requests fewer detention beds, 32,800 detention beds. But, then you may clear your-your proposal as to the flexibility you want to develop to transfer funds between immigration and detention, and the alternatives to detention program which of course would be commenced with the level of risk a detainee (inaudible).

Now, if these transfers were to occur, of course it could mean more or less detention beds being utilized to 2013. So, I don't know how this flexibility proposal is gonna work. Does it mean that ICE could utilize fewer than the 32,800 detention beds in 2013? If so, of course, is why do you wanna have a-why do you need a floor at all or why do you need to have a statutory bed floor at all?

And then, I-I also know you're developing this risk classification assessment tool that-that sounds like a very good idea to me. The idea is to get a uniform means for ICE agents and officers to decide whom to detain and whom to release from detention.

Now, if that-if that automated risk assessment tool is deployed as planned this spring, it'll of course, would have a real impact- could have a real impact on our detention practices and our cost.

Is that compatible with the current or really any per day statutory bed requirement? Does that threaten the effectiveness of your-of this risk classification assessment that you're developing? I think, you see where I'm-I'm going with this. What-what-what do you have to say

40

CAR 0778

about the efforts that you have underway to make these decisions intelligently? And what can you report about that? And then also, is that compatible with the-with the statutory floor?

MORTON:

So, on risk classification, you're exactly right. We are about to implement nationwide a uniform standard of risk classification for detention purposes and when we do this, it's going to be a major reform because it is gonna bring great uniformity to the question of whether or not somebody gets detained which is important for the individual involved. It's important to us in terms of whether or not somebody gets removed and it's important in terms of budgetary considerations.

So, I think we will look back on risk classification as-as one of the more important reforms in the last couple of years.

The idea behind the budget as you noted is to try to build in a sense of flexibility. And alternatives to the detention hold great promise if we can achieve expedited consideration of them. And it is not at all inconceivable that we could have a very large number of people on ATD assuming we can get their cases heard well and that means that there's less of a need for hard detention which is much more expensive.

We came-obviously, we're operating in the context of the last couple of budgets so that the proposal was to begin this conversation with the committee, with a reduced number of hard beds and this concept of flexibility. And we'd be more than willing to work with the committee to sort of continue that conversation and build in more flexible and less reliance on a particular hard number.

The challenge is gonna be for us, is to demonstrate that ATD works and works well for the committee and so that the committee has confidence when we say we're gonna remove people, we will.

PRICE:

Well, of course, that is the larger issue having a-having a risk assessment tool that-that does the job and also having a-an alternative where that is-where that is called for, having a-a-a viable alternative to hard bed, hard detention as you call it, the utilization of these beds. And in my view as-as-as that policy is developed, so as alternatives are developed. The case for a statutory floor on the number of beds is going to become less and less necessary.

Thank you, Mr. Chairman.

ADERHOLT:

CAR 0779

Thank you, Mr. Price. And Director Morton, we-we appreciate you testifying for us today. Clearly, we've got a number of concerns with the budget execution in the current fiscal year as well as a request for F.Y. '13.

As Mr. Carter had mentioned, we do have questions about the use of prosecutorial discretion and I expect to receive data on its use. Can you provide us that data to the subcommittee by the end of the week?

MORTON:

Sure. I don't see why not. (Inaudible) submit to your oversight.

ADERHOLT:

And-and given the workload, just to follow with what Mr. Price had mentioned, given the workload for detention removal operation, as a result of the Secured Communities, the Criminal Alien Program as well as the significant illegal population that now exists in this country, you know, I don't see there's any reason that ICE could not utilize 34,000 beds and I appreciate your commitment to say and realize, you know, you're commitment that that is part of the law. And perhaps, you could work with your staff and to provide a plan, by the end of next week say, that how you plan to utilize those 34,000 beds and until we can make that happen. As you say, because it is part of the law.

So, again, thanks for being here today and your candor before the subcommittee. And at this point, the hearing is adjourned. Thank you.

CQ Transcriptions, March 8, 2012

List of Panel Members and Witnesses

PANEL MEMBERS:

REP. ROBERT B. ADERHOLT, R-ALA. CHAIRMAN

REP. JOHN CARTER, R-TEXAS

REP. JOHN CULBERSON, R-TEXAS

REP. RODNEY FRELINGHUYSEN, R-N.J.

REP. TOM LATHAM, R-IOWA

REP. ANDER CRENSHAW, R-FLA.

CAR 0780

REP. CHARLIE DENT, R-PA.

REP. HAROLD ROGERS, R-KY. EX OFFICIO

REP. DAVID E. PRICE, D-N.C. RANKING MEMBER

REP. NITA M. LOWEY, D-N.Y.

REP. LUCILLE ROYBAL-ALLARD, D-CALIF.

REP. JOHN W. OLVER, D-MASS.

REP. NORM DICKS, D-WASH. EX OFFICIO

WITNESSES:

JOHN MORTON, ASSISTANT SECRETARY OF HOMELAND SECURITY FOR
IMMIGRATION AND CUSTOMS ENFORCEMENT

CAR 0781

**Senator Jeff Sessions**
**Questions for the Record**
**Janet Napolitano**

1.   After your appearance before the Judiciary Committee last October, I submitted a
question to you regarding those aliens whose cases have been administratively closed
under the Department's prosecutorial discretion policy.  Part of my question asked
whether any analysis was conducted to determine the effect that providing work
authorizations to these individuals would have on the job market and American workers.
You stated in response: "Individuals whose cases are administratively closed, the
preferred mechanism for exercising prosecutorial discretion in the case-by-case review
initiative, are not eligible to receive employment authorization on the basis of the
administrative closure alone."  Your answer did not address the question asked.  Has your
Department or any other agency of the federal government done any analysis to
determine how the work authorizations issued to illegal aliens whose cases are
administratively closed will affect the job market and American workers?  If so, please
provide the details of that analysis.

2.   In implementing the prosecutorial discretion policy, how many incoming immigration
cases have been reviewed, and how many have been administratively closed?

3.   How many of the illegal aliens who have had their case administratively closed have ever
been convicted of a crime?

4.   Has your Department established a way to keep track of the aliens whose cases are
administratively closed?

5.   How much in total has the Department spent on implementing the prosecutorial
discretion policy, including the cost of training ICE agents and attorneys, establishing a
working group with members from the Departments of Homeland Security and Justice,
conducting a nationwide review of all incoming cases, and the pilot programs that have
been launched to implement this policy?  If you do not know the exact dollar amount,
please provide an estimate.

6.   You have testified that establishing a biometric exit program has proven more
challenging for DHS, "largely because infrastructure present at ports of entry is
completely absent on departure."  What infrastructure changes are necessary to complete
the system?  What is the estimated cost to implement a completed biometric exit system?

7.   You estimated that implementation of a biometric exit system would cost around $3
billion over 10 years. Nearly 170 million foreign visitors enter the country each year.  If
these numbers remain unchanged, in ten years, around 1.7 billion foreign visitors will
enter the country.  Each of these visitors must register their fingerprints upon entry and
would do so upon exiting if an exit program is established.  Do you agree that if each
foreign visitor was charged a fee, those funds could be used to pay for a biometric exit

1

CAR 0782

system?  In your estimation, how much would that fee have to be in order to cover the cost of a biometric exit system?

8.      In the interest of national security, DHS is required to evaluate all Visa Waiver countries at least every two years and report their findings to Congress.  Currently, the Department has completed evaluations and reports on only half of the required countries.  Nine reports are more than a year overdue and two are four years overdue.  Why has DHS failed to submit these reports to Congress and when do you plan to submit them?

9.      You testified that that the first step that DHS takes to address problems caused by the actions of local governments is to attempt to work with them directly.  You testified that you were taking this approach in dealing with Cook County's refusal to honor ICE detainers.  What steps were taken by DHS to work with the counties in Alabama that requested and expected Secure Communities to be implemented by the end of last year to address the Department's concerns as you have expressed them to this Committee?

CAR 0783

**<u>Next Steps in the Implementation of the Prosecutorial Discretion Memorandum and</u>**
**<u>the August 18th Announcement on Immigration Enforcement Priorities</u>**

On August 18, 2011, the Administration announced an effort to better focus the immigration enforcement system on the removal of criminal aliens, the promotion of public safety and border security, and the integrity of the immigration system.  This effort began with the establishment of a working group, comprised of officials from the Department of Homeland Security (DHS), including Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and Customs and Border Protection (CBP), as well as representatives from the Department of Justice (DOJ), tasked with identifying best practices to accelerate the apprehension and removal of high priority aliens by, in part, limiting the initiation or pursuit of low priority cases.  As a result of this process, ICE is implementing the following initiatives:

- *Prosecutorial Discretion Training:* On November 17, ICE launched a comprehensive training program on the appropriate use of the June 17, 2011 Prosecutorial Discretion Memorandum.  This program consists of scenario-based training that emphasizes how the Prosecutorial Discretion Memorandum should be utilized in order to focus immigration enforcement resources on ICE priorities.

  This program builds on training that has already occurred since the June 17, 2011 memorandum was issued.  On September 29 and October 24, Secretary Napolitano met with supervisory ICE officers and attorneys to discuss the agency's enforcement priorities and the importance of these initiatives.  ICE Director Morton, along with other members of ICE's senior leadership team, have traveled around the country to discuss the importance of consistent application of prosecutorial discretion.  Over the last month, Director Morton and his senior leadership have traveled to Los Angeles, Chicago, San Francisco, San Diego, Miami, New York, and Newark to personally instruct enforcement officers and attorneys on the appropriate use of this policy.  Over the next several weeks, Director Morton and other members of the ICE senior leadership will travel to New Orleans and other jurisdictions to conduct additional training.  By January 13, all ICE enforcement officers and attorneys nationwide will have completed scenario based prosecutorial discretion training.

- *Review of Incoming Cases:* Beginning immediately, ICE attorneys nationwide will review all incoming cases in immigration court.  This review, based on the Prosecutorial Discretion Memorandum and guided by a set of more focused criteria, will help reduce inefficiencies that delay the removal of criminal aliens and other priority cases by preventing new low priority cases from clogging the immigration court dockets.  This process is designed to identify the cases most clearly eligible and ineligible for a favorable exercise of discretion and will focus on cases appearing on the master calendar and those cases that have not yet been filed in immigration court.  The initial test run of this review of incoming cases will last until January 13.

CAR 0784

- ***Review of Cases Pending in Immigration Court***:  Beginning December 4, DHS and DOJ will launch pilot programs in two jurisdictions to test run the process for reviewing all cases pending in immigration court.  Over the course of the six week pilot, an intra-agency team of attorneys from ICE, USCIS, and CBP will review the cases on the non-detained dockets in the Denver and Baltimore immigration courts based on the Prosecutorial Discretion Memorandum and guided by a set of more focused criteria.  During this time, DOJ's Executive Office for Immigration Review (EOIR) has agreed to shift judges from the non-detained docket in those jurisdictions to hear detained cases, in order to enhance the processing of such detained cases.

Both the review of incoming and pending cases will initially take place over the course of approximately two months, lasting until January 13.  The purpose of the initial timing and scope limitations is to allow DHS to test run various methods for affirmatively reviewing cases at the different stages of the immigration enforcement cycle, and to gather data and other information related to the implementation of these methods.

At the end of the period, DHS will promptly review that data and other implementation outcomes and, where appropriate, consult with DOJ to determine, on an expedited basis, the best methods to implement these processes on an ongoing basis nationwide.  During the entire period of these initiatives, ICE attorneys, officers, and agents will be applying, on a case-by-case basis, the full range of factors set forth in the June 17, 2011 Prosecutorial Discretion memorandum in the course of their regular duties.

**Frequently Asked Questions on the Administration's Announcement Regarding a New Process to Further Focus Immigration Enforcement Resources on High Priority Cases**

**Why did the Administration create this process?**

DHS must ensure its immigration enforcement resources are focused on the removal of those who constitute our highest priorities, specifically individuals who pose a threat to public safety such as criminal aliens and national security threats, as well as repeat immigration law violators and recent border entrants. In fact, the expenditure of resources on cases that fall outside our enforcement priorities hinders our public safety mission by clogging immigration court dockets and diverting resources away from individuals who constitute our highest priorities. Although DHS has been successful in focusing its enforcement resources on criminal aliens, repeat violators, border entrants and other priorities, this process further strengthens these efforts.

**How does this process enhance border security?**

As part of the Obama Administration's historic approach along the Southwest Border, Immigration and Customs Enforcement (ICE) has partnered with Customs and Border Protection (CBP) to further enhance efforts to prevent illicit trade and travel across our borders. This partnership includes the dedication of ICE officers, agents, and detention facilities to the apprehension and detention of recent border crossers. The historic results achieved along the Southwest Border are attributable, in part, to this unprecedented partnership. This process will allow DHS to further enhance this partnership by freeing up additional ICE resources that will be dedicated to the Southwest Border.

**How will this process help DHS effectuate its other priorities?**

This process is designed to allow immigration and federal judges to more swiftly adjudicate high priority cases and free up additional resources that DHS and DOJ will dedicate to further enhancing the identification and removal of those individuals who pose a threat to public safety. In part, the process will accomplish this by identifying and accelerating the removal of high priority aliens from the United States. The process will also identify very low priority cases and, on a case-by-case basis, set those cases aside to allow for additional resources to be focused on high priority aliens.

**Does the process constitute administrative amnesty?**

No. This process is simply smart law enforcement policy that will help DHS and DOJ effectuate their priorities and make effective use of our immigration enforcement resources. This process will not result in a reduction in immigration enforcement. Rather, it will increase the number of criminal aliens and repeat immigration violators removed from the country and further focus our immigration enforcement efforts on the highest priority cases.

**Does the process represent an abdication of DHS's responsibility to enforce the immigration laws?**

No. For decades, DHS, and previously INS, has exercised prosecutorial discretion in order to prioritize the use of its immigration enforcement resources. This process ensures that DHS and DOJ are using their immigration resources in a smart and effective manner. Over the past two years, DHS has demonstrated that the use of priorities does not limit immigration enforcement, but rather strengthens it.

**Will the process result in permanent lawful status for beneficiaries?**

No. The exercise of prosecutorial discretion through this process would not provide an individual with permanent lawful status.

CAR 0786

**What is the role of DOJ in the process?**
DOJ's role in the removal process is to adjudicate removal cases through the Executive Office for Immigration Review and to litigate removal cases in the federal courts through the Office of Immigration Litigation.  DOJ will participate in the interagency working group that will identify high priority removal cases that should be accelerated.  DOJ will also participate in the process that will consider very low priority cases for an exercise of prosecutorial discretion on a case-by-case basis at the various stages of enforcement proceedings, including those cases pending before immigration courts and federal courts.

**Will beneficiaries of an exercise of prosecutorial discretion automatically receive work authorization?**
No.  Nothing about this process is automatic and nobody who goes through this process is automatically entitled to work authorization.  Per longstanding federal law, individuals affected by an exercise of prosecutorial discretion will be able to request work authorization, including paying associated fees, and their requests will be separately considered by USCIS on a case-by-case basis.

**How will the process help DHS and DOJ focus increased resources on high priority cases?**
The process will save resources as a result of exercising prosecutorial discretion.  DHS will devote these resources to more expeditiously pursuing the removal of threats to public safety and border security.  In addition, by better prioritizing the dockets of immigration and federal courts, the courts will be able to more swiftly adjudicate cases.

**Is the process consistent with the President and Secretary's statements that no population of individuals will receive categorical administrative relief?**
Yes.  DHS will not provide categorical relief to any population, including those that would have qualified under the DREAM Act.  Instead, each determination will be made on a case-by-case basis.  All decisions will be based on the June 17, 2011 Prosecutorial Discretion memorandum as implemented by the working group.

**How much will be saved through this process?**
Closure of these cases will allow for additional resources to be dedicated to enforcement priorities.  Outside estimates suggest that the United States spends over $23,000 to formally remove an alien.  By redirecting these expenditures, more resources can be utilized to identify and remove public safety threats or individuals who repeatedly violate our immigration laws.

**Will removal proceedings or removals be halted while the interagency working group completes its review?**
No.  DHS will continue to enforce immigration laws.  ICE attorneys and agents, however, will be tasked to review each case prior to the expenditure of resources to determine whether it is a priority case as defined in the June 30, 2010 Civil Enforcement Priorities memorandum and the June 17, 2011 Prosecutorial Discretion memorandum.  Removals will continue while the working group undertakes its review.

**Can individuals affirmatively apply for an exercise of discretion through this process?**
No.  This process does not involve the creation of an affirmative application process, although, consistent with longstanding practice, individuals in removal proceedings and their representatives remain free to submit information relevant to their case to the appropriate ICE field offices or attorneys.  Any attorney or representative who purports to be able to secure an individual relief through an affirmative application to ICE or DOJ as part of this process is engaged in a scam and should be reported

CAR 0787

to the relevant authorities at DOJ, the Federal Trade Commission (FTC), or DHS.  More information on the recently launched DHS-DOJ-FTC effort to combat immigration services scams is available here.

**Does an individual have a right to appeal a determination made pursuant to this process that his or her case is not appropriate for an exercise of discretion?**
No.  This process does not create any right, substantive or procedural, enforceable in any administrative, civil, or criminal proceeding for individuals whose cases are reviewed as part of the process.  As a result, individuals have no right to appeal a determination made pursuant to this process.

**Does this process apply to cases involving immigration-related criminal offenses that are prosecuted in federal court?**
No.  This process does not apply to decisions about whether to initiate or continue prosecutions of individuals charged with immigration-related criminal offenses in federal court, including individuals charged under 8 U.S.C. § 1325 and § 1326.

**Does this process apply to individuals apprehended at the border?**
No.  As DHS has long made clear, we will continue to enforce a zero tolerance policy for individuals apprehended at the border.  Accordingly, the working group's review will not include recent border crossers.

**When will the working group complete its review?**
An interagency working group consisting of representatives from DHS and DOJ is now working to define the method for the review. The review is expected to begin in the coming months. In the interim, ICE and DOJ agents, officers, and attorneys continue to exercise discretion, as they always have, in accordance with existing enforcement priorities as defined in the June 17, 2011 Prosecutorial Discretion memorandum.

**Does the implementation of the process mean that only individuals with criminal convictions will be removed?**
No.  Many individuals who have violated civil immigration law but lack a criminal conviction are a DHS priority for removal from the United States.  This process is designed to free up additional resources to process and remove high priority cases.  DHS priorities include threats to public safety and national security, repeat violators of immigration law, recent illegal border entrants, and immigration fugitives.

**Should unlawfully present individuals who do not consider themselves high priority cases voluntarily surrender to ICE to avail themselves of this process?**
No.   Any individual who self surrenders due to a belief that they will benefit from an exercise of discretion is very likely to be placed in removal proceedings and runs a serious risk that they will be removed from the United States.  Nothing in this process creates a right or an entitlement to any person regardless of their individual circumstances.

**<u>Case-by-Case Review Statistics</u>**

***Case by Case Reviews***

- In August of 2011, Secretary Napolitano directed that the approximately 300,000 backlogged cases pending in the immigration courts be reviewed for the exercise of prosecutorial discretion.  Secretary Napolitano also directed that all newly filed immigration cases be reviewed for prosecutorial discretion.  In late November 2011, ICE began this review.

- As of May 29, 2012, ICE has reviewed 232,181 non-detained cases with approximately 20,608, or 9%, identified as amenable for prosecutorial discretion.

- Provided they clear a background check, all 20,608 will be offered prosecutorial discretion.  To date, 4,363 of these cases have been administratively closed or dismissed.

- As of May 29, 2012, 56,180 detained cases have been reviewed with approximately 40, or less than 1%, identified as amenable for prosecutorial discretion.

- To date, 3,998 individuals have declined an offer of prosecutorial discretion.

- 12,247 offers of prosecutorial discretion remain either under consideration by the individual or in the process of undergoing a background check.

***Review of New Cases***

- Since the beginning of the case by case review to May 29, 2012, approximately 111,000 new cases have been filed with the immigration court.  These cases are also being reviewed as part of the case by case review[1].

- DHS is currently calculating the precise number of these new cases that have been determined to be eligible for PD.  As of May 15, 2012, of a sampling of 4,000 cases, approximately 95% of all the cases eligible for prosecutorial discretion were backlogged cases that had been pending in the immigration court for more than six months.

- Of the 4,000 cases sampled, less than 5% eligible for prosecutorial discretion had been placed into immigration court within the last six months.

---

[1] Because these new cases were initiated following the implementation of DHS prosecutorial discretion policies, DHS anticipates that fewer of these cases actually filed in immigration court will constitute a very low enforcement priority.

CAR 0789

*Deferred Actions*

- Enforcement and Removal Operations (ERO) officers and agents have granted deferred actions or issued a stay of a final order of removal in 1,973 cases thus far in fiscal year 2012 as of May 26, 2012.

- Of those 1,973 deferred actions or stays, 1,687 involved individuals subject to a final order of removal.

- In fiscal year 2010, ERO officers granted deferred actions or issued a stay of a final order in 486 cases; in fiscal year 2009 ERO officers granted 740 deferred actions; in fiscal year 2008 ERO officers granted 1006 deferred actions; in fiscal year 2007 ERO officers granted 598 deferred actions.[2].

*Work Authorization*

- On April 23, 2012, DHS reviewed 2,974 cases that had been administratively closed.  Of those 2,974 cases, 1,881 have received employment authorization in the past and 1,257, or over 40%, currently have employment authorization.

- On April 23, 2012, DHS also reviewed 2,710 cases where an individual declined an offer of prosecutorial discretion.  Of these individuals, 2,052 have received employment authorization in the past and 1,483, or over 54%, currently have employment authorization.

*Recipients of Prosecutorial Discretion*
- Of the 4,363 cases that have been administratively closed or dismissed.  These cases involve –

  - 10 individuals who are a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;
  - 303 individuals who are a child, have been in the United States for more than five years, and are either in school or have successfully completed high school (or its equivalent);
  - 290 individuals who came to the United States under the age of sixteen, have been in the United States for more than five years, have completed high school (or its equivalent), and are now pursuing or have successfully completed higher education in the United States;
  - 33 individuals who are over the age of sixty-five and have been in the United States for more than ten years;

---

[2] Due to upgrades to ICE's electronic system for tracking enforcement actions which affected how this data is recorded, the data from FY2012 are not directly comparable to the data from FY2008-FY2010.  Because of these upgrades, ICE is not currently able to calculate FY2011 deferred action numbers.

- o 91 individuals who have been the victim of domestic violence in the United States, human trafficking to the United States; or of any serious crime in the United States;
- o 23 individuals who have been lawful permanent residents for ten years or more and have a single, minor conviction for a non-violent offense;
- o 138 individuals who suffer from a serious mental physical condition that would require significant medical or detention resources;
- o 3,302 who have a very long-term presence in the United States, have an immediate family member who is a United States citizen, and have established compelling ties and made compelling contributions to the United States; and
- o 173 individuals who constitute a very low enforcement priority as defined by Director Morton's June 17, 2011 memorandum on prosecutorial discretion.

CAR 0791

Policy Number: 10072.1
FEA Number: 601-14

*Office of the Director*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536

MAR 0 2 2011



U.S. Immigration
and Customs
Enforcement

MEMORANDUM FOR:    All ICE Employees

FROM:              John Morton
                   Director

SUBJECT:           Civil Immigration Enforcement: Priorities for the Apprehension,
                   Detention, and Removal of Aliens

<u>Purpose</u>

This memorandum outlines the civil immigration enforcement priorities of U.S. Immigration and
Customs Enforcement (ICE) as they relate to the apprehension, detention, and removal of aliens.
These priorities shall apply across all ICE programs and shall inform enforcement activity,
detention decisions, budget requests and execution, and strategic planning.

*A. Priorities for the apprehension, detention, and removal of aliens*

In addition to our important criminal investigative responsibilities, ICE is charged with enforcing
the nation's civil immigration laws. This is a critical mission and one with direct significance for
our national security, public safety, and the integrity of our border and immigration controls.
ICE, however, only has resources to remove approximately 400,000 aliens per year, less than 4
percent of the estimated illegal alien population in the United States. In light of the large number
of administrative violations the agency is charged with addressing and the limited enforcement
resources the agency has available, ICE must prioritize the use of its enforcement personnel,
detention space, and removal resources to ensure that the removals the agency does conduct
promote the agency's highest enforcement priorities, namely national security, public safety, and
border security.

To that end, the following shall constitute ICE's civil enforcement priorities, with the first being
the highest priority and the second and third constituting equal, but lower, priorities.

> **Priority 1. Aliens who pose a danger to national security or a risk to public safety**

The removal of aliens who pose a danger to national security or a risk to public safety shall be
ICE's highest immigration enforcement priority. These aliens include, but are not limited to:

- aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger
  to national security;

CAR 0792

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of Aliens
Page 2

- aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders;
- aliens not younger than 16 years of age who participated in organized criminal gangs;
- aliens subject to outstanding criminal warrants; and
- aliens who otherwise pose a serious risk to public safety.[1]

For purposes of prioritizing the removal of aliens convicted of crimes, ICE personnel should refer to the following new offense levels defined by the Secure Communities Program, with Level 1 and Level 2 offenders receiving principal attention.  These new Secure Communities levels are given in rank order and shall replace the existing Secure Communities levels of offenses.[2]

- Level 1 offenders: aliens convicted of "aggravated felonies," as defined in § 101(a)(43) of the Immigration and Nationality Act,[3] or two or more crimes each punishable by more than one year, commonly referred to as "felonies";
- Level 2 offenders: aliens convicted of any felony or three or more crimes each punishable by less than one year, commonly referred to as "misdemeanors"; and
- Level 3 offenders: aliens convicted of crimes punishable by less than one year.[4]

### Priority 2.  Recent illegal entrants

In order to maintain control at the border and at ports of entry, and to avoid a return to the prior practice commonly and historically referred to as "catch and release," the removal of aliens who have recently violated immigration controls at the border, at ports of entry, or through the knowing abuse of the visa and visa waiver programs shall be a priority.

### Priority 3.  Aliens who are fugitives or otherwise obstruct immigration controls

In order to ensure the integrity of the removal and immigration adjudication processes, the removal of aliens who are subject to a final order of removal and abscond, fail to depart, or intentionally obstruct immigration controls, shall be a priority.  These aliens include:

- fugitive aliens, in descending priority as follows:[5]

---

[1] This provision is not intended to be read broadly, and officers, agents, and attorneys should rely on this provision only when serious and articulable public safety issues exist.

[2] The new levels should be used immediately for purposes of enforcement operations.  DRO will work with Secure Communities and the Office of the Chief Information Officer to revise the related computer coding by October 1, 2010.

[3] As the definition of "aggravated felony" includes serious, violent offenses and less serious, non-violent offenses, agents, officers, and attorneys should focus particular attention on the most serious of the aggravated felonies when prioritizing among level one offenses.

[4] Some misdemeanors are relatively minor and do not warrant the same degree of focus as others.  ICE agents and officers should exercise particular discretion when dealing with minor traffic offenses such as driving without a license.

[5] Some fugitives may fall into both this priority and priority 1.

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of
Aliens
Page 3

- o  fugitive aliens who pose a danger to national security;
- o  fugitives aliens convicted of violent crimes or who otherwise pose a threat to the
     community;
- o  fugitive aliens with criminal convictions other than a violent crime;
- o  fugitive aliens who have not been convicted of a crime;
- aliens who reenter the country illegally after removal, in descending priority as follows:
  - o  previously removed aliens who pose a danger to national security;
  - o  previously removed aliens convicted of violent crimes or who otherwise pose a
       threat to the community;
  - o  previously removed aliens with criminal convictions other than a violent crime;
  - o  previously removed aliens who have not been convicted of a crime; and
- aliens who obtain admission or status by visa, identification, or immigration benefit
  fraud.[6]

The guidance to the National Fugitive Operations Program: Priorities, Goals and Expectations,
issued on December 8, 2009, remains in effect and shall continue to apply for all purposes,
including how Fugitive Operation Teams allocate resources among fugitive aliens, previously
removed aliens, and criminal aliens.

*B. Apprehension, detention, and removal of other aliens unlawfully in the United States*

Nothing in this memorandum should be construed to prohibit or discourage the apprehension,
detention, or removal of other aliens unlawfully in the United States. ICE special agents,
officers, and attorneys may pursue the removal of any alien unlawfully in the United States,
although attention to these aliens should not displace or disrupt the resources needed to remove
aliens who are a higher priority. Resources should be committed primarily to advancing the
priorities set forth above in order to best protect national security and public safety and to secure
the border.

*C. Detention*

As a general rule, ICE detention resources should be used to support the enforcement priorities
noted above or for aliens subject to mandatory detention by law. Absent extraordinary
circumstances or the requirements of mandatory detention, field office directors should not
expend detention resources on aliens who are known to be suffering from serious physical or
mental illness, or who are disabled, elderly, pregnant, or nursing, or demonstrate that they are
primary caretakers of children or an infirm person, or whose detention is otherwise not in the
public interest. To detain aliens in those categories who are not subject to mandatory detention,
ICE officers or special agents must obtain approval from the field office director. If an alien falls

---

[6] ICE officers and special agents should proceed cautiously when encountering aliens who may have engaged in
fraud in an attempt to enter but present themselves without delay to the authorities and indicate a fear of persecution
or torture. *See* Convention relating to the Status of Refugees, art. 31, *opened for signature* July 28, 1951, 19 U.S.T.
6259, 189 U.N.T.S. 137. In such instances, officers and agents should contact their local Office of the Chief
Counsel.

CAR 0794

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of
Aliens
Page 4

within the above categories and is subject to mandatory detention, field office directors are
encouraged to contact their local Office of Chief Counsel for guidance.

## D. *Prosecutorial discretion*

The rapidly increasing number of criminal aliens who may come to ICE's attention heightens the
need for ICE employees to exercise sound judgment and discretion consistent with these
priorities when conducting enforcement operations, making detention decisions, making
decisions about release on supervision pursuant to the Alternatives to Detention Program, and
litigating cases.  Particular care should be given when dealing with lawful permanent residents,
juveniles, and the immediate family members of U.S. citizens.  Additional guidance on
prosecutorial discretion is forthcoming.  In the meantime, ICE officers and attorneys should
continue to be guided by the November 17, 2000 prosecutorial discretion memorandum from
then-INS Commissioner Doris Meissner; the October 24, 2005 Memorandum from Principal
Legal Advisor William Howard; and the November 7, 2007 Memorandum from then Assistant
Secretary Julie Myers.

## E. *Implementation*

ICE personnel shall follow the priorities set forth in this memorandum immediately.  Further,
ICE programs shall develop appropriate measures and methods for recording and evaluating their
effectiveness in implementing the priorities.  As this may require updates to data tracking
systems and methods, ICE will ensure that reporting capabilities for these priorities allow for
such reporting as soon as practicable, but not later than October 1, 2010.

## F. *No Private Right Statement*[7]

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right
or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or
criminal matter.

---

[7] This statement was added to ICE Policy 10072.1, "Civil Immigration Enforcement: Priorities for the
Apprehension, Detention, and Removal of Aliens" on February 7, 2011.  The policy contained in this memorandum
has not been altered or changed.

CAR 0795

# EXHIBIT
# P

CAR 0796



**U.S. Department of Justice**
Immigration and Naturalization Service

HQOPP 50/4

Office of the Commissioner                    *425 I Street NW*
                                              *Washington, DC 20536*

NOV 17 2000

MEMORANDUM TO REGIONAL DIRECTORS
                       DISTRICT DIRECTORS
                       CHIEF PATROL AGENTS
                       REGIONAL AND DISTRICT COUNSEL

FROM:        Doris Meissner
             Commissioner
             Immigration and Naturalization Service

SUBJECT:     Exercising Prosecutorial Discretion

Since the 1996 amendments to the Immigration and Nationality Act (INA) which limited the authority of immigration judges to provide relief from removal in many cases, there has been increased attention to the scope and exercise of the Immigration and Naturalization Service's (INS or the Service) prosecutorial discretion. This memorandum describes the principles with which INS exercises prosecutorial discretion and the process to be followed in making and monitoring discretionary decisions. <u>Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process–from planning investigations to enforcing final orders–subject to their chains of command and to the particular responsibilities and authority applicable to their specific position. In exercising this discretion, officers must take into account the principles described below in order to promote the efficient and effective enforcement of the immigration laws and the interests of justice.</u>

More specific guidance geared to exercising discretion in particular program areas already exists in some instances,[1] and other program-specific guidance will follow separately.

---

[1] For example, standards and procedures for placing an alien in deferred action status are provided in the <u>Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal</u> (Standard Operating Procedures), Part X. This memorandum is intended to provide general principles, and does not replace any previous specific guidance provided about particular INS actions, such as "Supplemental Guidelines on the Use of Cooperating Individuals and Confidential Informants Following the Enactment of IIRIRA," dated December 29, 1997. This memorandum is not intended to address every situation in which the exercise of prosecutorial discretion may be appropriate. If INS personnel in the exercise of their duties recognize apparent conflict between any of their specific policy requirements and these general guidelines, they are encouraged to bring the matter to their supervisor's attention, and any conflict between policies should be raised through the appropriate chain of command for resolution.

CAR 0797

However, INS officers should continue to exercise their prosecutorial discretion in appropriate cases during the period before more specific program guidance is issued.

A statement of principles concerning discretion serves a number of important purposes. As described in the "Principles of Federal Prosecution,"[2] part of the U.S. Attorneys' manual, such principles provide convenient reference points for the process of making prosecutorial decisions; facilitate the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made.

**Legal and Policy Background**

"Prosecutorial discretion" is the authority of an agency charged with enforcing a law to decide whether to enforce, or not to enforce, the law against someone. The INS, like other law enforcement agencies, has prosecutorial discretion and exercises it every day. In the immigration context, the term applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions, including among others: Focusing investigative resources on particular offenses or conduct; deciding whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order.

The "favorable exercise of prosecutorial discretion" means a discretionary decision not to assert the full scope of the INS' enforcement authority as permitted under the law. Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an NTA (discussed in more detail below under "Initiating Proceedings"), not detaining an alien placed in proceedings (where discretion remains despite mandatory detention requirements), and approving deferred action.

---

[2] For this discussion, and much else in this memorandum, we have relied heavily upon the Principles of Federal Prosecution, chapter 9-27.000 in the U.S. Department of Justice's United States Attorneys' Manual (Oct. 1997). There are significant differences, of course, between the role of the U.S. Attorneys' offices in the criminal justice system, and INS responsibilities to enforce the immigration laws, but the general approach to prosecutorial discretion stated in this memorandum reflects that taken by the Principles of Federal Prosecution.

CAR 0798

Courts recognize that prosecutorial discretion applies in the civil, administrative arena just as it does in criminal law. Moreover, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney, 470 U.S. 821, 831 (1985). Both Congress and the Supreme Court have recently reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activities, such as whether to place an individual in deportation proceedings. INA section 242(g); Reno v. American-Arab Anti-Discrimination Committee, 525 U.S. 471 (1999). The "discretion" in prosecutorial discretion means that prosecutorial decisions are not subject to judicial review or reversal, except in extremely narrow circumstances. Consequently, it is a powerful tool that must be used responsibly.

As a law enforcement agency, the INS generally has prosecutorial discretion within its area of law enforcement responsibility unless that discretion has been clearly limited by statute in a way that goes beyond standard terminology. For example, a statute directing that the INS "shall" remove removable aliens would not be construed by itself to limit prosecutorial discretion, but the specific limitation on releasing certain criminal aliens in section 236(c)(2) of the INA evidences a specific congressional intention to limit discretion not to detain certain criminal aliens in removal proceedings that would otherwise exist. Personnel who are unsure whether the INS has discretion to take a particular action should consult their supervisor and legal counsel to the extent necessary.

It is important to recognize not only what prosecutorial discretion is, but also what it is not. The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law. Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other applicable law that provides requirements for determining when the approval should be given. For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.

This distinction is not always an easy, bright-line rule to apply. In many cases, INS decisionmaking involves both a prosecutorial decision to take or not to take enforcement action, such as placing an alien in removal proceedings, and a decision whether or not the alien is substantively eligible for a benefit under the INA. In many cases, benefit decisions involve the exercise of significant discretion which in some cases is not judicially reviewable, but which is not prosecutorial discretion.

Prosecutorial discretion can extend only up to the substantive and jurisdictional limits of the law. It can never justify an action that is illegal under the substantive law pertaining to the

CAR 0799

conduct, or one that while legal in other contexts, is not within the authority of the agency or officer taking it.  Prosecutorial discretion to take an enforcement action does not modify or waive any legal requirements that apply to the action itself.  For example, an enforcement decision to focus on certain types of immigration violators for arrest and removal does not mean that the INS may arrest any person without probable cause to do so for an offense within its jurisdiction.  Service officers who are in doubt whether a particular action complies with applicable constitutional, statutory, or case law requirements should consult with their supervisor and obtain advice from the district or sector counsel or representative of the Office of General Counsel to the extent necessary.

Finally, exercising prosecutorial discretion does not lessen the INS' commitment to enforce the immigration laws to the best of our ability.  It is not an invitation to violate or ignore the law.  Rather, it is a means to use the resources we have in a way that best accomplishes our mission of administering and enforcing the immigration laws of the United States.

**Principles of Prosecutorial Discretion**

Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations.  The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals.  These goals include protecting public safety, promoting the integrity of the legal immigration system, and deterring violations of the immigration law.

It is an appropriate exercise of prosecutorial discretion to give priority to investigating, charging, and prosecuting those immigration violations that will have the greatest impact on achieving these goals.  The INS has used this principle in the design and execution of its border enforcement strategy, its refocus on criminal smuggling networks, and its concentration on fixing benefit-granting processes to prevent fraud.  An agency's focus on maximizing its impact under appropriate principles, rather than devoting resources to cases that will do less to advance these overall interests, is a crucial element in effective law enforcement management.

The Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the concept of a "substantial Federal interest."  A U.S. Attorney may properly decline a prosecution if *"no substantial Federal interest would be served by prosecution."*  This principle provides a useful frame of reference for the INS, although applying it presents challenges that differ from those facing a U.S. Attorney.  In particular, as immigration is an exclusively Federal responsibility, the option of an adequate alternative remedy under state law is not available.  In an immigration case, the interest at stake will always be Federal.  Therefore, we must place particular emphasis on the element of substantiality.  How important is the Federal interest in the case, as compared to other cases and priorities?  That is the overriding question, and answering it requires examining a number of factors that may differ according to the stage of the case.

CAR 0800

Memorandum for Regional Directors, et al.                                    Page 5
Subject: Exercising Prosecutorial Discretion

As a general matter, INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial.[3]  Except as may be provided specifically in other policy statements or directives, the responsibility for exercising prosecutorial discretion in this manner rests with the District Director (DD) or Chief Patrol Agent (CPA) based on his or her common sense and sound judgment.[4] The DD or CPA should obtain legal advice from the District or Sector Counsel to the extent that such advice may be necessary and appropriate to ensure the sound and lawful exercise of discretion, particularly with respect to cases pending before the Executive Office for Immigration Review (EOIR).[5]  The DD's or CPA's authority may be delegated to the extent necessary and proper, except that decisions not to place a removable alien in removal proceedings, or decisions to move to terminate a proceeding which in the opinion of the District or Sector Counsel is legally sufficient, may not be delegated to an officer who is not authorized under 8 C.F.R. § 239.1 to issue an NTA.  A DD's or CPA's exercise of prosecutorial discretion will not normally be reviewed by Regional or Headquarters authority.  However, DDs and CPAs remain subject to their chains of command and may be supervised as necessary in their exercise of prosecutorial discretion.

*Investigations*

Priorities for deploying investigative resources are discussed in other documents, such as the interior enforcement strategy, and will not be discussed in detail in this memorandum. These previously identified priorities include identifying and removing criminal and terrorist aliens, deterring and dismantling alien smuggling, minimizing benefit fraud and document abuse, responding to community complaints about illegal immigration and building partnerships to solve local problems, and blocking and removing employers' access to undocumented workers. Even within these broad priority areas, however, the Service must make decisions about how best to expend its resources.

Managers should plan and design operations to maximize the likelihood that serious offenders will be identified.  Supervisors should ensure that front-line investigators understand that it is not mandatory to issue an NTA in every case where they have reason to believe that an alien is removable, and agents should be encouraged to bring questionable cases to a supervisor's attention.  Operational planning for investigations should include consideration of appropriate procedures for supervisory and legal review of individual NTA issuing decisions.

---

[3] In some cases even a substantial immigration enforcement interest in prosecuting a case could be outweighed by other interests, such as the foreign policy of the United States.  Decisions that require weighing such other interests should be made at the level of responsibility within the INS or the Department of Justice that is appropriate in light of the circumstances and interests involved.

[4] This general reference to DDs and CPAs is not intended to exclude from coverage by this memorandum other INS personnel, such as Service Center directors, who may be called upon to exercise prosecutorial discretion and do not report to DDs or CPAs, or to change any INS chains of command.

[5] Exercising prosecutorial discretion with respect to cases pending before EOIR involves procedures set forth at 8 CFR 239.2 and 8 CFR Part 3, such as obtaining the court's approval of a motion to terminate proceedings.

Memorandum for Regional Directors, et al.                                            Page 6
Subject: Exercising Prosecutorial Discretion

Careful design of enforcement operations is a key element in the INS' exercise of prosecutorial discretion. Managers should consider not simply whether a particular effort is legally supportable, but whether it best advances the INS' goals, compared with other possible uses of those resources. As a general matter, investigations that are specifically focused to identify aliens who represent a high priority for removal should be favored over investigations which, by their nature, will identify a broader variety of removable aliens. Even an operation that is designed based on high-priority criteria, however, may still identify individual aliens who warrant a favorable exercise of prosecutorial discretion.[6]

### *Initiating and Pursuing Proceedings*

Aliens who are subject to removal may come to the Service's attention in a variety of ways. For example, some aliens are identified as a result of INS investigations, while others are identified when they apply for immigration benefits or seek admission at a port-of-entry. While the context in which the INS encounters an alien may, as a practical matter, affect the Service's options, it does not change the underlying principle that the INS has discretion and should exercise that discretion appropriately given the circumstances of the case.

Even when an immigration officer has reason to believe that an alien is removable and that there is sufficient evidence to obtain a final order of removal, it may be appropriate to decline to proceed with that case. This is true even when an alien is removable based on his or her criminal history and when the alien–if served with an NTA–would be subject to mandatory detention. The INS may exercise its discretion throughout the enforcement process. Thus, the INS can choose whether to issue an NTA, whether to cancel an NTA prior to filing with the immigration court or move for dismissal in immigration court (under 8 CFR 239.2), whether to detain (for those aliens not subject to mandatory detention), whether to offer an alternative to removal such as voluntary departure or withdrawal of an application for admission, and whether to stay an order of deportation.

The decision to exercise any of these options or other alternatives in a particular case requires an individualized determination, based on the facts and the law. As a general matter, it is better to exercise favorable discretion as early in the process as possible, once the relevant facts have been determined, in order to conserve the Service's resources and in recognition of the alien's interest in avoiding unnecessary legal proceedings. However, there is often a conflict

---

[6] For example, operations in county jails are designed to identify and remove criminal aliens, a high priority for the Service. Nonetheless, an investigator working at a county jail and his or her supervisor should still consider whether the exercise of prosecutorial discretion would be appropriate in individual cases.

between making decisions as soon as possible, and making them based on evaluating as many relevant, credible facts as possible. Developing an extensive factual record prior to making a charging decision may itself consume INS resources in a way that negates any saving from forgoing a removal proceeding.

Generally, adjudicators may have a better opportunity to develop a credible factual record at an earlier stage than investigative or other enforcement personnel. It is simply not practicable to require officers at the arrest stage to develop a full investigative record on the equities of each case (particularly since the alien file may not yet be available to the charging office), and this memorandum does not require such an analysis. Rather, what is needed is knowledge that the INS is not legally required to institute proceedings in every case, openness to that possibility in appropriate cases, development of facts relevant to the factors discussed below to the extent that it is reasonably possible to do so under the circumstances and in the timeframe that decisions must be made, and implementation of any decision to exercise prosecutorial discretion.

There is no precise formula for identifying which cases warrant a favorable exercise of discretion. Factors that should be taken into account in deciding whether to exercise prosecutorial discretion include, but are not limited to, the following:

- Immigration status: Lawful permanent residents generally warrant greater consideration. However, other removable aliens may also warrant the favorable exercise of discretion, depending on all the relevant circumstances.
- Length of residence in the United States: The longer an alien has lived in the United States, particularly in legal status, the more this factor may be considered a positive equity.
- Criminal history: Officers should take into account the nature and severity of any criminal conduct, as well as the time elapsed since the offense occurred and evidence of rehabilitation. It is appropriate to take into account the actual sentence or fine that was imposed, as an indicator of the seriousness attributed to the conduct by the court. Other factors relevant to assessing criminal history include the alien's age at the time the crime was committed and whether or not he or she is a repeat offender.
- Humanitarian concerns: Relevant humanitarian concerns include, but are not limited to, family ties in the United States; medical conditions affecting the alien or the alien's family; the fact that an alien entered the United States at a very young age; ties to one's home country (e.g., whether the alien speaks the language or has relatives in the home country); extreme youth or advanced age; and home country conditions.
- Immigration history: Aliens without a past history of violating the immigration laws (particularly violations such as reentering after removal, failing to appear at hearing, or resisting arrest that show heightened disregard for the legal process) warrant favorable consideration to a greater extent than those with such a history. The seriousness of any such violations should also be taken into account.

CAR 0803

- Likelihood of ultimately removing the alien:  Whether a removal proceeding would have a reasonable likelihood of ultimately achieving its intended effect, in light of the case circumstances such as the alien's nationality, is a factor that should be considered.
- Likelihood of achieving enforcement goal by other means:  In many cases, the alien's departure from the United States may be achieved more expeditiously and economically by means other than removal, such as voluntary return, withdrawal of an application for admission, or voluntary departure.
- Whether the alien is eligible or is likely to become eligible for other relief:  Although not determinative on its own, it is relevant to consider whether there is a legal avenue for the alien to regularize his or her status if not removed from the United States.  The fact that the Service cannot confer complete or permanent relief, however, does not mean that discretion should not be exercised favorably if warranted by other factors.
- Effect of action on future admissibility:  The effect an action such as removal may have on an alien can vary–for example, a time-limited as opposed to an indefinite bar to future admissibility–and these effects may be considered.
- Current or past cooperation with law enforcement authorities:  Current or past cooperation with the INS or other law enforcement authorities, such as the U.S. Attorneys, the Department of Labor, or National Labor Relations Board, among others, weighs in favor of discretion.
- Honorable U.S. military service:  Military service with an honorable discharge should be considered as a favorable factor.  See Standard Operating Procedures Part V.D.8 (issuing an NTA against current or former member of armed forces requires advance approval of Regional Director).
- Community attention:  Expressions of opinion, in favor of or in opposition to removal, may be considered, particularly for relevant facts or perspectives on the case that may not have been known to or considered by the INS.  Public opinion or publicity (including media or congressional attention) should not, however, be used to justify a decision that cannot be supported on other grounds.  Public and professional responsibility will sometimes require the choice of an unpopular course.
- Resources available to the INS:  As in planning operations, the resources available to the INS to take enforcement action in the case, compared with other uses of the resources to fulfill national or regional priorities, are an appropriate factor to consider, but it should not be determinative.  For example, when prosecutorial discretion should be favorably exercised under these factors in a particular case, that decision should prevail even if there is detention space available.

Obviously, not all of the factors will be applicable to every case, and in any particular case one factor may deserve more weight than it might in another case.  There may be other factors, not on the list above, that are appropriate to consider.  The decision should be based on the totality of the circumstances, not on any one factor considered in isolation.  General guidance such as this cannot provide a "bright line" test that may easily be applied to determine the "right" answer in every case.  In many cases, minds reasonably can differ, different factors may point in different directions, and there is no clearly "right" answer.  Choosing a course of action in difficult

cases must be an exercise of judgment by the responsible officer based on his or her experience, good sense, and consideration of the relevant factors to the best of his or her ability.

There are factors that may not be considered. Impermissible factors include:

- An individual's race, religion, sex, national origin, or political association, activities or beliefs;[7]
- The officer's own personal feelings regarding the individual; or
- The possible effect of the decision on the officer's own professional or personal circumstances.

In many cases, the procedural posture of the case, and the state of the factual record, will affect the ability of the INS to use prosecutorial discretion. For example, since the INS cannot admit an inadmissible alien to the United States unless a waiver is available, in many cases the INS' options are more limited in the admission context at a port-of-entry than in the deportation context.

Similarly, the INS may consider the range of options and information likely to be available at a later time. For example, an officer called upon to make a charging decision may reasonably determine that he or she does not have a sufficient, credible factual record upon which to base a favorable exercise of prosecutorial discretion not to put the alien in proceedings, that the record cannot be developed in the timeframe in which the decision must be made, that a more informed prosecutorial decision likely could be made at a later time during the course of proceedings, and that if the alien is not served with an NTA now, it will be difficult or impossible to do so later.

Such decisions must be made, however, with due regard for the principles of these guidelines, and in light of the other factors discussed here. For example, if there is no relief available to the alien in a removal proceeding and the alien is subject to mandatory detention if

---

[7] This general guidance on factors that should not be relied upon in making a decision whether to enforce the law against an individual is not intended to prohibit their consideration to the extent they are directly relevant to an alien's status under the immigration laws or eligibility for a benefit. For example, religion and political beliefs are often directly relevant in asylum cases and need to be assessed as part of a prosecutorial determination regarding the strength of the case, but it would be improper for an INS officer to treat aliens differently based on his personal opinion about a religion or belief. Political activities may be relevant to a ground of removal on national security or terrorism grounds. An alien's nationality often directly affects his or her eligibility for adjustment or other relief, the likelihood that he or she can be removed, or the availability of prosecutorial options such as voluntary return, and may be considered to the extent these concerns are pertinent.

placed in proceedings, that situation suggests that the exercise of prosecutorial discretion, if appropriate, would be more useful to the INS if done sooner rather than later. It would be improper for an officer to assume that someone else at some later time will always be able to make a more informed decision, and therefore never to consider exercising discretion.

Factors relevant to exercising prosecutorial discretion may come to the Service's attention in various ways. For example, aliens may make requests to the INS to exercise prosecutorial discretion by declining to pursue removal proceedings. Alternatively, there may be cases in which an alien asks to be put in proceedings (for example, to pursue a remedy such as cancellation of removal that may only be available in that forum). In either case, the INS may consider the request, but the fact that it is made should not determine the outcome, and the prosecutorial decision should be based upon the facts and circumstances of the case. Similarly, the fact that an alien has <u>not</u> requested prosecutorial discretion should not influence the analysis of the case. Whether, and to what extent, any request should be considered is also a matter of discretion. Although INS officers should be open to new facts and arguments, attempts to exploit prosecutorial discretion as a delay tactic, as a means merely to revisit matters that have been thoroughly considered and decided, or for other improper tactical reasons should be rejected. There is no legal right to the exercise of prosecutorial discretion, and (as stated at the close of this memorandum) this memorandum creates no right or obligation enforceable at law by any alien or any other party.

**Process for Decisions**

*Identification of Suitable Cases*

No single process of exercising discretion will fit the multiple contexts in which the need to exercise discretion may arise. Although this guidance is designed to promote consistency in the application of the immigration laws, it is not intended to produce rigid uniformity among INS officers in all areas of the country at the expense of the fair administration of the law. Different offices face different conditions and have different requirements. Service managers and supervisors, including DDs and CPAs, and Regional, District, and Sector Counsel must develop mechanisms appropriate to the various contexts and priorities, keeping in mind that it is better to exercise discretion as early in process as possible once the factual record has been identified.[8] In particular, in cases where it is clear that no statutory relief will be available at the immigration hearing and where detention will be mandatory, it best conserves the Service's resources to make a decision early.

Enforcement and benefits personnel at all levels should understand that prosecutorial discretion exists and that it is appropriate and expected that the INS will exercise this authority in appropriate cases. DDs, CPAs, and other supervisory officials (such as District and

---

[8] DDs, CPAs, and other INS personnel should also be open, however, to possible reconsideration of decisions (either for or against the exercise of discretion) based upon further development of the facts.

Sector Counsels) should encourage their personnel to bring potentially suitable cases for the favorable exercise of discretion to their attention for appropriate resolution.  To assist in exercising their authority, DDs and CPAs may wish to convene a group to provide advice on difficult cases that have been identified as potential candidates for prosecutorial discretion.

It is also appropriate for DDs and CPAs to develop a list of "triggers" to help their personnel identify cases at an early stage that may be suitable for the exercise of prosecutorial discretion.  These cases should then be reviewed at a supervisory level where a decision can be made as to whether to proceed in the ordinary course of business, to develop additional facts, or to recommend a favorable exercise of discretion.  Such triggers could include the following facts (whether proven or alleged):

Lawful permanent residents;
Aliens with a serious health condition;
Juveniles;
Elderly aliens;
Adopted children of U.S. citizens;
U.S. military veterans;
Aliens with lengthy presence in United States (i.e., 10 years or more); or
Aliens present in the United States since childhood.

Since workloads and the type of removable aliens encountered may vary significantly both within and between INS offices, this list of possible trigger factors for supervisory review is intended neither to be comprehensive nor mandatory in all situations.  Nor is it intended to suggest that the presence or absence of "trigger" facts should itself determine whether prosecutorial discretion should be exercised, as compared to review of all the relevant factors as discussed elsewhere in these guidelines.  Rather, development of trigger criteria is intended solely as a suggested means of facilitating identification of potential cases that may be suitable for prosecutorial review as early as possible in the process.

### Documenting Decisions

When a DD or CPA decides to exercise prosecutorial discretion favorably, that decision should be clearly documented in the alien file, including the specific decision taken and its factual and legal basis.  DDs and CPAs may also document decisions based on a specific set of facts not to exercise prosecutorial discretion favorably, but this is not required by this guidance.

The alien should also be informed in writing of a decision to exercise prosecutorial discretion favorably, such as not placing him or her in removal proceedings or not pursuing a case.  This normally should be done by letter to the alien and/or his or her attorney of record, briefly stating the decision made and its consequences.  It is not necessary to recite the facts of the case or the INS' evaluation of the facts in such letters.  Although the specifics of the letter

will vary depending on the circumstances of the case and the action taken, it must make it clear to the alien that exercising prosecutorial discretion does not confer any immigration status, ability to travel to the United States (unless the alien applies for and receives advance parole), immunity from future removal proceedings, or any enforceable right or benefit upon the alien. If, however, there is a potential benefit that is linked to the action (for example, the availability of employment authorization for beneficiaries of deferred action), it is appropriate to identify it.

The obligation to notify an individual is limited to situations in which a specific, identifiable decision to refrain from action is taken in a situation in which the alien normally would expect enforcement action to proceed. For example, it is not necessary to notify aliens that the INS has refrained from focusing investigative resources on them, but a specific decision not to proceed with removal proceedings against an alien who has come into INS custody should be communicated to the alien in writing. This guideline is not intended to replace existing standard procedures or forms for deferred action, voluntary return, voluntary departure, or other currently existing and standardized processes involving prosecutorial discretion.

### Future Impact

An issue of particular complexity is the future effect of prosecutorial discretion decisions in later encounters with the alien. Unlike the criminal context, in which statutes of limitation and venue requirements often preclude one U.S. Attorney's office from prosecuting an offense that another office has declined, immigration violations are continuing offenses that, as a general principle of immigration law, continue to make an alien legally removable regardless of a decision not to pursue removal on a previous occasion. An alien may come to the attention of the INS in the future through seeking admission or in other ways. An INS office should abide by a favorable prosecutorial decision taken by another office as a matter of INS policy, absent new facts or changed circumstances. However, if a removal proceeding is transferred from one INS district to another, the district assuming responsibility for the case is not bound by the charging district's decision to proceed with an NTA, if the facts and circumstances at a later stage suggest that a favorable exercise of prosecutorial discretion is appropriate.

Service offices should review alien files for information on previous exercises of prosecutorial discretion at the earliest opportunity that is practicable and reasonable and take any such information into account. In particular, the office encountering the alien must carefully assess to what extent the relevant facts and circumstances are the same or have changed either procedurally or substantively (either with respect to later developments, or more detailed knowledge of past circumstances) from the basis for the original exercise of discretion. A decision by an INS office to take enforcement action against the subject of a previous documented exercise of favorable prosecutorial discretion should be memorialized with a memorandum to the file explaining the basis for the decision, unless the charging documents on their face show a material difference in facts and circumstances (such as a different ground of deportability).

CAR 0808

Memorandum for Regional Directors, et al.                                      Page 13
Subject: Exercising Prosecutorial Discretion

### Legal Liability and Enforceability

The question of liability may arise in the implementation of this memorandum. Some INS personnel have expressed concerns that, if they exercise prosecutorial discretion favorably, they may become subject to suit and personal liability for the possible consequences of that decision. We cannot promise INS officers that they will never be sued. However, we can assure our employees that Federal law shields INS employees who act in reasonable reliance upon properly promulgated agency guidance within the agency's legal authority – such as this memorandum–from personal legal liability for those actions.

The principles set forth in this memorandum, and internal office procedures adopted hereto, are intended solely for the guidance of INS personnel in performing their duties. They are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

### Training and Implementation

Training on the implementation of this memorandum for DDs, CPAs, and Regional, District, and Sector Counsel will be conducted at the regional level. This training will include discussion of accountability and periodic feedback on implementation issues. In addition, following these regional sessions, separate training on prosecutorial discretion will be conducted at the district level for other staff, to be designated. The regions will report to the Office of Field Operations when this training has been completed.

CAR 0809

# EXHIBIT
# Q

CAR 0810