LAW OFFICES OF

# ALEJANDRO GUTIERREZ PLLC

MAIN OFFICE - 745 ENGLEWOOD AVENUE, BUFFALO, NEW YORK 14223-2406
(716) 877-4276 • TOLL-FREE FAX (855) 260-1323 • AGLAW01@GMAIL.COM
BRANCH OFFICE - 110 WALL STREET, 11TH FLOOR, NEW YORK, NY 10005-3817
MAIL DELIVERY TO MAIN OFFICE ONLY • FAX NOT FOR SERVICE OF PROCESS

F. ALEJANDRO GUTIÉRREZ, ESQ.
ADMITTED IN NEW YORK
LICENCIADO EN NUEVA YORK

## VIA FIRST CLASS MAIL

September 21, 2011

Michelle Henriques
Assistant Chief Counsel
DHS-USICE
Chief Counsel's Office
130 Delaware Avenue, Room 203
Buffalo, NY 14202

Re:         **Individual Hearing, October 3, 2011 at 9:00 a.m.**
            **REQUEST FOR PROSECUTORIAL DISCRETION**
Client:
File No.:

Dear Mr. Joe:

Mr. ▆▆▆ is requesting the favorable exercise of prosecutorial discretion in his pending matter before Judge Montante.   The matter is scheduled for a hearing on voluntary departure.

Mr. ▆▆▆ entered the United States without inspection in January of 2003 after repeated threats by gang members and has not since departed the United States.  He has not committed any crimes or done anything for which he could have been arrested for. He is a deeply religious individual who has not used or abused alcohol or drugs.

He dreams of becoming an architect.  At the tender age of 9, he began working at a carpentry shop, working every morning during the weekdays and all day on the weekends.  He would go to school in the afternoons and study in the evenings, but realized that he was not able to save nearly enough to be able to afford an education, so he decided to leave Guatemala at the age of 16.

Since his entry to the United States he has become fully fluent in the English language and has dedicated himself to spreading the word of God.  As a member of The Church of Jesus Christ of Latter-Day Saints, Mr. ▆▆▆ has done missionary work for 2 years, full-time, in the Chicago South Mission.  See attached certificate and letter from Mission

**CAR 0811**

LAW OFFICES OF ALEJANDRO GUTIERREZ PLLC
PAGE 2 OF 2
9/21/11

President ▮▮▮▮▮▮▮▮ as Exhibit A.  Some of the people that he helped have written letters of support, attached as Exhibit B.  He was ordained as an Elder in the Melchiezedek Priesthood on May 22, 2005, see attached certificate, attached as Exhibit C.

He is engaged to be married, and his fiance, ▮▮▮▮▮▮▮▮ and future step-father ▮▮▮ ▮▮▮▮▮▮ have written letters of support, attached as Exhibit D.  He has attempted to join the U.S. Air Force and to enroll in college in Utah, but his uncertain immigration status has impeded him.

As an individual that entered the United States at a young age and who is interested in pursuing his college education in the US, he is an individual who clearly qualifies for the DREAM Act, should it be passed by congress.

Mr. ▮▮▮▮▮▮ is not a danger to this community, and forcing a separation from his fiance at this time would have devastating psychological and emotional effects on this young couple.  It would make it very difficult for their relationship to survive.

It is for these reasons that Mr. ▮▮▮▮▮▮ respectfully requests that you consider the facts and circumstances of his case and exercise favorable prosecutorial discretion by allowing him to remain in this country to pursue his college education under a grant deferred enforced removal.

Sincerely Yours,

Alejandro Gutierrez, Esq.

# EXHIBIT
# R

**CAR 0813**



# Marriage Certificate

## MARRIAGE FOR TIME AND ETERNITY

### THIS CERTIFIES THAT

WERE JOINED IN THE HOLY BONDS OF MATRIMONY FOR TIME AND ETERNITY, ACCORDING TO THE ORDINANCE OF GOD AND THE LAWS OF THE LAND, IN THE SALT LAKE TEMPLE IN SALT LAKE CITY, UTAH ON SEPTEMBER 24, 2011.



DAVIS COUNTY
LOCATION LICENSE ISSUED

SEPTEMBER 22, 2011
DATE LICENSE ISSUED

LICENSE NUMBER

WITNESS

WITNESS

AUTHORIZED REPRESENTATIVE OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

CAR 0814

# EXHIBIT S

CAR 0815



country summary

# Guatemala

Guatemala's weak and corrupt law enforcement institutions have proved incapable of containing the powerful organized crime groups and criminal gangs that contribute to one the highest violent crime rates in the Americas. Illegal armed groups, which appear to have partly evolved from counterinsurgency forces operating during the civil war that ended in 1996, are believed to be responsible for targeted attacks on civil society actors and justice officials. More than a decade after the end of the conflict, impunity remains the norm for human rights violations. The ongoing violence and intimidation threaten to reverse the little progress that has been made toward promoting accountability.

## Public Security, Police Conduct, and the Criminal Justice System

Illegal armed groups and criminal gangs contribute significantly to violence and intimidation, which they use to further political objectives and illicit economic interests, including drug trafficking.

Powerful and well-organized youth gangs, including the "Mara Salvatrucha" and "Barrio 18," have also contributed to escalating violence in Guatemala. The gangs use lethal violence against those who defy their control, including gang rivals and former members, individuals who collaborate with police, and those who refuse to pay extortion money. The gangs are believed to be responsible for the widespread killings of bus drivers targeted for extortion. According to the National Police, 57 drivers and 30 drivers' assistants were murdered in the first seven months of 2010.

Police have used repressive measures to curb gang activity, including arbitrary detentions and extrajudicial killings. Investigations by the Human Rights Ombudsman's Office and NGOs have found police involvement in "social cleansing," killings intended to eliminate alleged gang members and criminals. Moreover, abuses committed by police officers routinely go uninvestigated.

Guatemala's justice system has proved largely incapable of curbing violence and containing criminal mafias and gangs. According to official figures, there was 99.75 percent impunity for violent crime as of 2009. Deficient and corrupt police, prosecutorial, and judicial systems, as well as the absence of an adequate witness protection program, all contribute to

CAR 0816

Guatemala's alarmingly low prosecution rate. In addition, members of the justice system are routinely subject to attacks and intimidation.

## Accountability for Past Abuses

Guatemala continues to suffer the effects of the 36-year civil war. A United Nations-sponsored Commission on Historical Clarification (CEH) estimated that as many as 200,000 people were killed during the conflict. The CEH attributed 93 percent of the human rights abuses it documented to state security forces and concluded that the military had carried out "acts of genocide." Very few of those responsible for the grave human rights violations during the civil war have been held accountable. Of the 626 massacres documented by the commission, only three cases have been successfully prosecuted in Guatemalan courts.

Guatemala's first conviction for the crime of enforced disappearance occurred in August 2009, when an ex-paramilitary leader was sentenced to 150 years in prison for his role in "disappearing" individuals between 1982 and 1984. The verdict was made possible by a landmark ruling by the country's Constitutional Court in July 2009, which established that enforced disappearance is a continuing crime not subject to a statute of limitations so long as the victims are still unknown.

The July 2005 discovery of approximately 80 million documents of the disbanded National Police, including files on Guatemalans who were killed or "disappeared" during the conflict, could play a key role in prosecuting past human rights abuses. Documents in the archive led to the March 2009 arrest of two former National Police agents for their alleged participation in the 1984 "disappearance" of student leader and activist Edgar Fernando García.

In September 2008 Congress passed the Law of Access to Public Information, which orders that "in no circumstances can information related to investigations of violations of fundamental human rights or crimes against humanity" be classified as confidential or reserved. In March 2009 President Alvaro Colom created the Military Archive Declassification Commission, tasked with sorting and declassifying military documents from 1954-1996.

## Human Rights Defenders and Journalists

Attacks and threats against human rights defenders are common, significantly hampering human rights work throughout the country. Journalists, especially those covering corruption, drug trafficking, and accountability for abuses committed during the civil war, also face threats and attacks. Rolando Santiz, a reporter for the national television station Telecentro

CAR 0817

13, was shot to death in Guatemala City on April 1. Antonio de León, a station cameraman, was injured in the attack.

## Labor Rights and Child Labor

Freedom of association and the right to organize and bargain collectively are endangered by increasing anti-union violence, including attacks on union offices, and threats, harassment, and killings of trade unionists. The International Trade Union Confederation reports that 16 trade unionists were killed in 2009, the second highest total in the Americas. Seven trade unionists were reportedly killed in the first eight months of 2010.

Workers pressing for their rights in labor cases must rely on labor courts, whose work is stymied by dilatory legal measures, lengthy backlogs, and an inability to enforce rulings. According to a 2009 United States Department of State report, only two of the 216 companies operating in export processing zones (where export-processing factories known as "maquilas" are located) had recognized labor unions, and none had a collective bargaining agreement.

Guatemala has one of the highest rates of child labor in the Americas. The International Labour Organization reported in 2008 that 16.1 percent of children aged five to fourteen are obliged to work, many in unsafe conditions. Some of these children are employed in the construction, mining, and sex industries.

## Sexual and Gender-Based Violence

Violence against women is a chronic problem in Guatemala, and most perpetrators are never brought to trial. Despite legislative efforts to address this violence, there has been wide impunity for crimes against women.

According to the UN special rapporteur on extrajudicial, arbitrary, and summary executions, investigations into crimes against women, including transgender women, are often inadequate and obstructed by investigating police operating with a gender bias.

## Reproductive Rights

In a positive development, in September 2010 Guatemala's Congress adopted a law guaranteeing pre-natal and maternal health care. The law also mandates the appropriation of public funds for contraceptives to be distributed in the public health care system.

3

CAR 0818

## Key International Actors

In September 2007 the UN secretary-general appointed Carlos Castresana, a Spanish former prosecutor and judge, to lead the newly-founded International Commission Against Impunity in Guatemala (CICIG). The commission's unique mandate allows it to work with the Guatemalan Attorney General's Office, the police, and other government agencies to investigate, prosecute, and dismantle the criminal organizations operating in Guatemala. The CICIG can participate in criminal proceedings as a complementary prosecutor, provide technical assistance, and promote legislative reforms. As of September 2010 the commission has undertaken 56 investigations and participated in 11 prosecutions. An investigation by CICIG led to the March 2010 arrest of Baltazar Gómez, Guatemala's national police chief, and Nelly Bonilla, the head of its antinarcotics unit, who were charged with drug trafficking and obstruction of justice, as well as involvement in a gunfight that resulted in the death of five antidrug police officers. CICIG also helped to improve the witness protection program and purge 1,700 officers from the National Civilian Police.

Originally set to expire in 2009, CICIG's mandate was extended by Congress for another two years until the end of 2011. However, on June 7, 2010, Castresana abruptly resigned, citing lack of cooperation from several high ranking government officials, including the then-attorney general. The UN has since appointed Francisco Dall'Anese, who was Costa Rica's attorney general, as CICIG's new head.

In October 2010 Spanish police arrested Carlos Vielmann, Guatemala's former interior minister, in Madrid. Vielmann was allegedly involved in the extrajudicial killing of seven detainees in 2006. CICIG had requested his capture some months earlier.

The UN high commissioner for human rights has maintained an office in Guatemala since 2005 that provides observation and technical assistance on human rights practices in the country.

In June 2010 James Anaya, UN special rapporteur on the situation of human rights and fundamental freedoms of indigenous people, visited Guatemala to investigate alleged human rights violations affecting the country's indigenous people. Anaya concluded that the right to previous consultation, according to which indigenous people are entitled to be consulted before any commercial enterprise occurs in their territory, is not being adequately protected.

In July 2010 the Office of the US Trade Representative announced it would file a case against Guatemala under the Dominican Republic-Central America-United States Free Trade Agreement (CAFTA-DR) alleging that it has failed to meet its obligations on labor rights.

CAR 0819

# EXHIBIT
# T

CAR 0820

# THE CHURCH OF JESUS CHRIST
# OF LATTER-DAY SAINTS

Illinois Chicago South Mission

_____
MISSIONARY

*You are honorably released from your sacred calling as a full-time missionary.*

*No greater service can be rendered than to labor faithfully for the Savior in the salvation of human souls. The gratitude of those who have benefited from your unselfish labors will always be a source of satisfaction and encouragement to you.*

*May the joy that has come from conscientiously performing your duties as a missionary abide with you and inspire you with a constant devotion to the Lord Jesus Christ, whom you have served.*

_____
MISSION PRESIDENT

**19 February 2010**

RELEASE DATE

**CAR 0821**

# EXHIBIT U

CAR 0822

 **The Embassy of the United States of America**
**Guatemala City, Guatemala**

**Emergency Message to U.S. Citizens**

August 26, 2011

Dear American Citizen:

The following is an Emergency Message for U.S. citizens regarding violence in Antigua. Please share the following information with any other U.S. citizens you know, as soon as possible. We hope to have this message disseminated as widely as possible within the U.S. citizen community. Please contact the American Citizen Services Unit via e-mail (amcitsguatemala@state.gov), fax (2331-3804), or telephone (2326-4501) if you have any questions. Thank you very much for your support and assistance.

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

In response to a rash of knife attacks and theft committed against U.S. and foreign tourists that occurred in Antigua on August 18, 2011, Guatemalan authorities have pledged to increase police patrols and install surveillance cameras in critical areas around Antigua. While initial investigations appear to indicate that these incidents were isolated acts of violence, there has recently been an increase in armed assaults and robberies in Antigua, particularly after sunset and on less-trafficked side streets. We encourage tourists and residents to maintain a state of heightened vigilance and promptly report any incidents to the police.

*Americans traveling abroad should regularly monitor the U.S. Embassy's website, the U.S. Department of State's Bureau of Consular Affairs' website www.travel.state.gov, where the current Worldwide Caution, Travel Warnings, Travel Alerts, and Country Specific Information can be found. The U.S. Embassy also encourages U.S. citizens to review "A Safe Trip Abroad," found at http://travel.state.gov/travel/tips/safety/safety_1747.html, which includes valuable security information for those both living and traveling abroad. In addition to information on the Internet, travelers may obtain up-to-date information on security conditions by calling 1-888-407-4747 toll-free in the U.S. and Canada, or outside the U.S. and Canada on a regular toll line at 1-202-501-4444.*

*The U.S. Embassy in Guatemala is located at Avenida Reforma 7-01, Zone 10, Guatemala City. Please contact the American Citizen Services Unit by email to amcitsguatemala@state.gov, by phone at 011-(502)2326-4501, or by fax at (502)2331-3804. The after-hours emergency number is 011-502-2331-2354 or (502)2331-2354.*

CAR 0823

2007 WL 2667997 (White House)

The White House

Office of Communications

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

September 12, 2007

Office of the Press Secretary

For Immediate Release

**\*1**  SUBJECT: Measures Regarding Certain Liberians in the United States

Since 1991, the United States has provided safe haven for Liberians who were forced to flee their country as a result of armed conflict and widespread civil strife. Eventually, many Liberians were granted Temporary Protected Status (TPS) and permitted to remain and obtain work eligibility in the United States temporarily. Although the armed conflict in Liberia ended in 2003 and conditions have improved, I have found that the political and economic situation in Liberia continues to be fragile.

While acknowledging the progress ongoing in Liberia under that country's current administration, I have determined that there are compelling foreign policy reasons not to enforce the removal of Liberians presently residing in the United States under TPS. In particular, Liberia is struggling to implement reconstruction and economic stabilization programs for the population, including the thousands of former Liberian refugees who have returned from the West African region and elsewhere.

Pursuant to my constitutional authority to conduct the foreign relations of the United States, I have determined that it is in the foreign policy interest of the United States to defer for 18 months the removal of any Liberian national (or person without nationality who last habitually resided in Liberia) who is present in the United States and who is under a grant of TPS as of September 30, 2007, and who has continuously resided in the United States since October 1, 2002, except for the categories of individuals listed below.

Accordingly, I now direct you to take the necessary steps to implement for these Liberians:

1. deferral of enforced departure from the United States for 18 months from October 1, 2007; and

2. authorization for employment for 18 months from October 1, 2007.

This directive shall not apply to any Liberian national (or person without nationality who last habitually resided in Liberia): (1) who is ineligible for TPS for the reasons provided in section 244(c)(2)(B) of the Immigration and

Nationality Act, 8 U.S.C. 1254a(c)(2)(B); (2) whose removal you determine is in the interest of the United States; (3) whose presence or activities in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States; (4) who has voluntarily returned to Liberia or his or her country of last habitual residence outside the United States; (5) who was deported, excluded, or removed prior to the date of this memorandum; or (6) who is subject to extradition.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

GEORGE W. BUSH

2007 WL 2667997 (White House)

End of Document                                                  © 20 9 Thomson Reuters. No c a m to or g na  U.S. Government Works.

# Citizenship and Immigration Services Ombudsman

## DEFERRED ACTION:
## RECOMMENDATIONS TO IMPROVE TRANSPARENCY AND
## CONSISTENCY IN THE USCIS PROCESS

July 11, 2011

Transparency and consistency are the primary objectives of these recommendations. The Federal Government, including the Department of Homeland Security, has, in recent years, steadily made efforts to provide more information to the public, and to enhance the efficient administration of government services. Here, U.S. Citizenship and Immigration Services (USCIS) is encouraged to carry these objectives into the administration of deferred action requests.

These recommendations focus on how USCIS processes deferred action requests and the steps that can be taken to ensure that an individual in compelling circumstances, whether or not represented, knows how to submit a deferred action request, receives a decision in a timely manner, and can be assured that the request will be processed in a consistent manner.

The recommendations do not delve into who should receive deferred action. Every day, USCIS officers and leadership apply their expertise and experience to make decisions that impact both individual lives and the public as a whole. As past administrations have acknowledged, along with this authority comes the responsibility to appropriately exercise discretion when compelling needs arise.

Above all, these recommendations are about good government. Building accessible, uniform, and transparent processes is critical to effective government services. In fact, these recommendations echo recommendations that this office made in 2007. While deferred action requests are a minute fraction of the millions of decisions USCIS makes every year, they warrant the same transparency and consistency that the Federal Government strives for across the board.

Most Sincerely,

January Contreras
Citizenship and Immigration Services
Ombudsman

### RECOMMENDATIONS

The Ombudsman recommends that USCIS:

1. Issue public information describing deferred action and the procedures for making a request for this temporary form of relief with USCIS;

2. Establish internal procedures for accepting and processing deferred action requests in order to promote consistency and assist local offices in responding to urgent, periodic increases in the demand for deferred action;

3. Inventory all pending deferred action requests to verify that each request received a confirmation of receipt with estimated processing timeframes and USCIS contact information; and

4. Consistently track data related to deferred action requests and make available statistics identifying the number of requests received and the numbers of requests approved and denied.

### REASONS FOR THE RECOMMENDATIONS

- Stakeholders lack clear, consistent information regarding requirements for submitting a deferred action request and what to expect following submission of the request.

- There is no formal national procedure for handling deferred action requests.

- When experiencing a change in the type or number of submissions, local USCIS offices often lack the necessary standardized process to handle such requests in a timely and consistent manner. As a result, many offices permit deferred action requests to remain pending for extended periods.

- Stakeholders lack information regarding the number and nature of deferred action requests submitted each year; and they are not provided with any information on the number of cases approved and denied, or the reasons underlying USCIS' decisions.



Homeland
Security

Office of the Citizenship and Immigration Services Ombudsman
U.S. Department of Homeland Security
Mail Stop 1225
Washington, DC 20528
www.dhs.gov/cisombudsman

CAR 0826

# Citizenship and Immigration Services Ombudsman

## DEFERRED ACTION: RECOMMENDATIONS TO IMPROVE TRANSPARENCY AND CONSISTENCY IN THE USCIS PROCESS

### July 11, 2011

*The Citizenship and Immigration Services Ombudsman, established by the Homeland Security Act of 2002, provides independent analysis of problems encountered by individuals and employers interacting with U.S. Citizenship and Immigration Services, and proposes changes to mitigate those problems.*

## Executive Summary

For decades the U.S. Immigration and Naturalization Service (INS), followed by the Department of Homeland Security (DHS), has used deferred action to provide limited relief to foreign nationals who do not qualify for other immigration benefits that are typically available to individuals in exigent circumstances.[1]  Upon creation of the DHS in 2003, the power to grant deferred action was formally delegated to U.S. Citizenship and Immigration Services (USCIS), as well as U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP).[2]

When accorded deferred action, an individual is able to remain, temporarily, in the United States: USCIS declines to exercise its authority to issue a Notice to Appear and does not place the individual in removal proceedings.  USCIS has granted deferred action to individuals suffering serious medical conditions and to persons temporarily prevented from returning to their home country due to a natural disaster, among others. The employment authorization regulations briefly describe this form of administrative relief, classifying deferred action as, "an act of administrative convenience to the government which gives some cases lower priority."[3]

Over the past year, stakeholders have expressed concerns to the Office of the Citizenship and Immigration Services Ombudsman (Ombudsman's Office) regarding long pending deferred action requests submitted by Haitian nationals following the earthquake in January 2010.[4]  These Haiti-related concerns led to broader conversations among stakeholders about the way USCIS processes deferred action requests at local offices.

Based on an analysis of USCIS' handling of deferred action requests, the Ombudsman's Office has made the following findings:

- Stakeholders lack clear, consistent information regarding requirements for submitting a deferred action request and what to expect following submission of the request.

- There is no formal national procedure for handling deferred action requests. Accordingly, it is difficult to track deferred action processing, in order to determine who receives deferred action, and under what circumstances.

---

[1] INS Commissioner Doris Meissner, *Exercising Prosecutorial Discretion*, HQOPP 50/4 (Nov. 17, 2000).
[2] Homeland Security Act of 2002, Pub. L. No. 107-296, § 442(c), 116 Stat. 2135, 2194 (2002); Department of Homeland Security (DHS) Secretary Tom Ridge, *Delegation to the Bureau of Citizenship and Immigration Services* (Mar. 1, 2003) (delegating authority to grant voluntary departure under section 240B of the INA. 8 U.S.C. §1229c, and deferred action); *See* U.S. Department of Justice, *Immigration Naturalization Service Fact Sheet, Prosecutorial Discretion Guidelines* (Nov. 28, 2000).
[3] 8 C.F.R. §274a.12(c)(14) (2011).
[4] Information provided by stakeholders (Mar. 28 and 29, 2011).

CAR 0827

- When experiencing a change in the type or number of submissions, local USCIS offices often lack the necessary standardized process to handle such requests in a timely and consistent manner.  As a result, many offices permit deferred action requests to remain pending for extended periods.

- Stakeholders lack information regarding the number and nature of deferred action requests submitted each year; and they are not provided with any information on the number of cases approved and denied, or the reasons underlying USCIS' decisions.

In response to its findings, the Ombudsman's Office recommends that USCIS take the following actions to improve the processing of requests for deferred action:

1) **Issue public information describing deferred action and the procedures for making a request for this temporary form of relief with USCIS;**

2) **Establish internal procedures for accepting and processing deferred action requests in order to promote consistency and assist local offices in responding to urgent, periodic increases in the demand for deferred action;**

3) **Inventory all pending deferred action requests to verify that each request received a confirmation of receipt with estimated processing timeframes and USCIS contact information; and**

4) **Consistently track data related to deferred action requests and make available statistics identifying the number of requests received and the numbers of requests approved and denied.**

## BACKGROUND

A grant of deferred action indicates that the government has, temporarily, declined to exercise its authority to remove a particular individual from the United States.  As such, the named individual may remain, provisionally, in the United States.  Deferred action is a form of relief that is typically granted to individuals whose cases raise compelling humanitarian concerns and to individuals whose removal is not in the best interests of the U.S. government.  It does not provide a pathway to permanent residency.

Factors considered for this form of relief include:  humanitarian issues, the likelihood of eligibility to gain legal status, family ties to the United States, criminal history, and immigration concerns.[5]  USCIS has granted deferred action to individuals suffering from serious medical conditions and to those temporarily prevented from returning to their home country due to a natural disaster, among others.

While ICE and CBP also are provided with authority to grant deferred action, this review focuses solely on USCIS' communication about and processing of deferred action.

**Legal Framework.**  For decades INS, followed by DHS, has used deferred action to provide limited relief to foreign nationals who do not qualify for other immigration benefits that are typically available to individuals in

---

[5] Meissner Memo, HQOPP 50/4 (Nov. 17, 2000) (the memorandum provides a more comprehensive list).  USCIS reported that the Meissner memo is used as informal guidance for local offices reviewing a deferred action request.  (Apr. 15, 2011).  *See also Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal (Standard Operating Procedures)*, Part X.; Deferred action is "an act of administrative choice to give some cases lower priority and in no way an entitlement..." former O.I. §242.1(a)(22) (withdrawn June 24, 1997).

2

CAR 0828

exigent circumstances.[6]  However, prior to 2000, neither the legacy INS, nor its predecessor agency had published any significant guidance regarding the use of this power.[7]

On November 17, 2000, INS Commissioner Doris Meissner issued a memorandum entitled, "Exercising Prosecutorial Discretion.[8]"  That memo set forth guidance on the exercise of prosecutorial discretion by immigration officials and described the process to be followed in making and monitoring discretionary decisions.  The memo states:

> The favorable exercise of prosecutorial discretion means a discretionary decision not to assert the full scope of the INS enforcement authority as permitted under the law.  Such decisions will take different forms, depending on the status of a particular matter, but include decisions such as not issuing an [Notice to Appear]…detaining an alien placed in proceedings and approving deferred action.[9]

In 2003, Secretary of DHS Tom Ridge formally delegated to USCIS the authority to grant deferred action.[10]  USCIS continues to rely on the Meissner memo as guidance on exercising this and other forms of discretionary authority.[11]

**Methodology.**  In preparing this review, the Ombudsman's Office met with stakeholders. To determine the USCIS deferred action process, the Ombudsman's Office also conducted meetings and conference calls with local and regional USCIS offices[12] and requested statistical data from USCIS Headquarters regarding deferred action requests.[13]

**Individual Deferred Action Requests and USCIS Processing.**  USCIS processes two types of deferred action requests:  1) those submitted by individuals who qualify based on a USCIS decision to use deferred action as a pre-adjudication form of temporary relief for those who have filed certain petitions or applications (*e.g.*, widows of U.S. citizens, qualified victims of a crime or abuse); and 2) those submitted by individuals in exigent circumstances (*e.g.*, extreme medical cases, victims of the September 11th terrorist attacks), who may, or may not, have an application for immigration benefits pending.[14]  This study examines only USCIS processing of the latter type of request.

Currently, there are no official, national standard operating procedures for how to process a deferred action request. Nevertheless, most USCIS offices follow some sort of informal, standard process, rather than proceeding in an *ad hoc* fashion.[15]  Typically, an individual can submit a deferred action request in-person, or

---

[6] *Supra n. 2.*
[7] Meissner Memo, HQOPP 50/4 (Nov. 17, 2000).
[8] *Id.*
[9] *Id.*
[10] Secretary DHS Tom Ridge, *Delegation to the Bureau of Citizenship and Immigration Services* (Mar. 1, 2003).
[11] Information provided by USCIS (Mar. 30, 2011; Apr. 15, 2011).
[12] Information provided by USCIS (Mar. 29, 30, Apr. 19 and 20, 2011).
[13] The Ombudsman's Office received basic submission statistics, but the information was incomplete, providing information on grants of requests but not the actual submission and denial numbers.  Information provided by USCIS (Apr. 15, 2011).
[14] USCIS memorandum from William Yates, *Assessment of Deferred Action in Requests for Interim Relief from U Nonimmigrant Status Eligible Aliens in Removal Proceedings*, HQOPRD 70/6.2 (May 6, 2004); USCIS memorandum from Stuart Anderson, *Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status*, HQADN 70/6.2 (May 8, 2002).
[15] Information provided by site visits and teleconference calls with USCIS district offices. (Mar. 29, 2011; Apr. 19 and 20, 2011).  The North Eastern Regional Office has an SOP that went into effect on February 17, 2011.  Other local offices have guidelines on how to review a deferred action request.

CAR 0829

by mail, to a local USCIS office.[16]  USCIS does not have a nationwide process for acknowledging the receipt of deferred action requests, but many USCIS offices have implemented a local method for logging submissions and acknowledging their receipt.  Other offices do not issue a written acknowledgement of receipt for deferred action requests.

Normally, a deferred action request is reviewed at the local office.  A summary sheet explaining the positive and negative equities associated with the deferred action request is completed.[17]  The district director reviews the summary and makes a recommendation.  That recommendation is forwarded to the regional director.  The regional director issues a decision on the recommendation and returns the final decision to the district director so that he/she may deliver it to the requestor.[18]  Deferred action requests are not filed on a standardized application form and no fee is collected to defray the costs associated with processing deferred action requests.

Once granted deferred action, the requestor is eligible to apply for employment authorization.[19] When USCIS does grant deferred action, it is usually valid for one to two years.[20]

**Local Offices Responding to Increases in Deferred Action Submissions.**  The number of deferred action requests received by local offices can vary greatly.[21]  Certain local offices have evolved new processes when experiencing a rise in submissions.[22]  Nevertheless, there is no mechanism to hold local offices accountable for issuing decisions within a certain timeframe, and USCIS did not report any coordinated efforts across districts to share locally developed solutions for managing a significant deferred action workload.

Recently, USCIS Headquarters began tracking deferred action requests.  USCIS Headquarters has instructed district directors to send data on deferred action decisions to the National Benefits Center for tracking.[23]  In addition, USCIS devised a template acknowledgement letter for local offices to issue in response to requests for deferred action.  However, not all local offices use the template letter.[24]  Stakeholders have reported that some local offices do not issue any type of written acknowledgement that a deferred action request has been received.

Furthermore, the template letter includes a statement that the applicant will receive a response to the request within 60 days.  Stakeholders and USCIS officials report that many cases remain pending without a decision well beyond 60 days.[25]

**Prior Ombudsman's Office Recommendations.**  On April 9, 2007, the Ombudsman's Office published recommendations on deferred action.[26]  The recommendations were:  1) post general information on the USCIS website; 2) maintain deferred action statistics; and 3) designate a USCIS Headquarters official to review decisions to help ensure consistency in decision making.

---

[16] Information provided by USCIS site visit (Mar. 29, 2011).
[17] Form G-312, *Deferred Action Case Summary*, outlines the individual's biographical information, familial history, grounds of inadmissibility and deportability and physical and mental conditions requiring treatment in the United States.
[18] Information provided by USCIS (Mar. 29, 2011 and Apr. 15, 2011).
[19] 8 C.F.R. §274a.12(c)(14) (2011).
[20] Information provided by USCIS (Mar. 30, 2011).
[21] Information provided by USCIS (Mar. 29, 2011; Apr. 15, 19 and 20, 2011).
[22] *Id.*
[23] Information provided by USCIS site visit (Mar. 29 and 30, 2011).
[24] Field offices report issuing decisions from a time range of two weeks to indefinitely pending.  Information provided by USCIS (Mar. 29, 2011) and stakeholders (Mar. 28, 2011).
[25] Information provided by USCIS teleconference calls and site visits (Mar. 29-30 and Apr. 19-20, 2011).
[26] CIS Ombudsman Recommendation #32, Deferred Action (Apr. 9, 2007).

CAR 0830

USCIS responded that deferred action requests are reviewed on a case-by-case basis and that published guidance would not be a meaningful addition to USCIS' website.[27]  USCIS committed to collecting deferred action statistics on a quarterly basis.  USCIS did not find it necessary to review deferred action decisions at USCIS Headquarters.

**Stakeholder Concerns.**  Over the past year, stakeholders expressed concerns to the Ombudsman's Office regarding the delayed processing of numerous deferred action requests submitted by Haitian nationals following the earthquake in January 2010.  In public meetings, stakeholders from across the country repeatedly requested USCIS guidance and information regarding the handling of these deferred action requests.[28]  Stakeholders reported to the Ombudsman's Office that some individuals have waited for more than seven months for decisions on their requests.[29]   Recently, an extension and re-designation of Haiti Temporary Protected Status (TPS) provided certain individuals affected by the earthquake with relief; many of whom had requested deferred action.  In the process of waiting for USCIS to act on their deferred action requests, many individuals accrued unlawful presence, which may impact their eligibility for future immigration benefits.  These Haiti-related concerns led to broader conversations among stakeholders about the way that USCIS is processing deferred action requests.

Stakeholder meetings and inquiries have highlighted that USCIS is not communicating essential information on how to make or renew a deferred action request.[30]   While stakeholders acknowledge that a grant of deferred action by USCIS is a discretionary decision, they have expressed that general guidance from USCIS would be helpful to determine whether clients should be advised to step forward and seek this relief.  Stakeholders explain that preparing a deferred action request requires a significant investment of time and effort.  Due to the level of staff resources needed to submit requests, representatives and attorneys who assist people in seeking deferred action note that directions and guidance are especially critical.

**CASE PROBLEM:**  The United States Army medically evacuated an individual to the United States for a life-saving operation that was not available in her home country.  The individual had been in the care and custody of U.S. military personnel for many years due to her situation and had received deferred action from USCIS.  The U.S. Army identified that she needed continued medical treatment.  Military personnel could not find information on how the patient could renew her request for deferred action.  After contacting various resources, the Ombudsman's Office was contacted.  The Ombudsman's Office, in turn, worked with USCIS and the individual to submit a new request for deferred action and to file an employment authorization application.  USCIS granted the request, and the individual was permitted to remain temporarily in the United States to continue to receive life-saving treatment.

Stakeholders report difficulties in obtaining status updates on pending requests.  After filing the initial request, many individuals are not provided a USCIS point of contact or a written acknowledgement that the request has

---

[27] USCIS Response to Recommendation #32, Deferred Action (Aug. 7, 2007).

[28] Information provided by stakeholders (Mar. 28, 2011).

[29] Information provided by stakeholders (Mar. 29, 2011).

[30] Recent publications have highlighted the need for public guidance on how to submit a deferred action request to USCIS and to expect subsequent to the submission.  *See* Penn State Law School, Duane Morris & Maggio+Kattar, *Private Bills & Deferred Action, Toolkit* (May 17, 2011), http://law.psu.edu/_file/PBDA_Toolkit.pdf (accessed on July 5, 2011); Mary Kenney, *Prosecutorial Discretion:  How to Advocate for Your Client* (June 24, 2011), http://www.legalactioncenter.org/practice-advisories/prosecutorial-discretion-how-advocate-your-client (accessed on July 5, 2011); Donald M. Kerwin, Doris Meissner & Margie McHugh, *Executive Action on Immigration: Six Ways to Make the System Work Better* (Mar. 2011), http://www.migrationpolicy.org/pubs/administrativefixes.pdf (accessed on July 5, 2011).

CAR 0831

been filed.  This makes it difficult to submit additional supporting documentation or to obtain information regarding the processing of the request.

## ANALYSIS & RECOMMENDATIONS

The Ombudsman's Office makes the following recommendations to USCIS:

**(1) Issue public information describing deferred action and the procedures for making a request for this temporary form of relief with USCIS.**

Although most local offices appear to follow a basic process, there is little public information explaining how to request deferred action and what type of supporting documentation should be submitted with a request.  USCIS posts humanitarian notices for victims of natural disasters, but does not always include information on deferred action. [31]  Some USCIS offices have provided local guidance, but this is often only visible to community-based organizations or legal representatives, and not to individuals who lack access to such aid networks, leaving the most vulnerable individuals – those who are not represented – without knowledge of how to be considered for this temporary form of relief.

> **LOCAL PRACTICE:**  The Miami Field Office published a checklist outlining the basic documentation that should be included in a deferred action request, which reduces the number of requests for additional evidence.

Public guidance would ensure that individuals in need of relief are aware of deferred action and know how to make a request.  Informative guidance would include:  1) information explaining what deferred action is and what it is not; 2) instructions for submitting a request for deferred action to a local office; 3) an explanation of what information and documentation should be included in the request; and 4) an indication of what to expect following the submission of a request for deferred action, including a point of contact able to provide processing updates and other relevant information.

Issuing public guidance would not impact USCIS' discretionary authority to decide a deferred action request.

**(2) Establish internal procedures for accepting and processing deferred action requests in order to promote consistency and assist local offices in responding to urgent, periodic increases in the demand for deferred action.**

> **LOCAL PRACTICE:**  When an individual submits a deferred action request, officers in the Boston Field Office immediately determine the individual's previously assigned A-number, or generate a new A-number, as necessary.  This ensures that the individual leaves the office with a unique identifier that can be used to track the request and can be referenced when inquiring as to case status, required follow-up, etc.

---

[31] USCIS New Release, *Haiti Relief Measures: Questions and Answers;*
http://www.uscis.gov/portal/site/uscis/template.PRINT/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=855260f64f3362 10VgnVCM100000082ca60aRCRD&vgnextchannel=68439c7755cb9010VgnVCM10000045f3d6a1RCRD) (accessed on May 6, 2011); USCIS Reminds Japanese Nationals Impacted by Recent Disaster, *Questions and Answers;*
http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=9c6ac337ab5ce210VgnVCM1000 00082ca60aRCRD&vgnextchannel=6abe6d26d17df110VgnVCM1000004718190aRCRD) (accessed on May 6, 2011).

6

Establishing nationwide USCIS procedures to guide local offices in responding to submission increases would optimize resources and ensure that individuals requesting deferred action are not subjected to unnecessary delays due to manpower shortages and other administrative impediments.

> **(3) Inventory all pending deferred action requests to verify that each request received a confirmation of receipt with estimated processing timeframes and USCIS contact information.**

Many USCIS offices have a backlog of deferred action requests which have been pending for extensive periods of time.[32]  Establishing a comprehensive national inventory of deferred action requests would identify cases that have been long pending and assist in the implementation of a national process for timely, consistent processing of deferred action requests.

Additionally, USCIS Headquarters should verify that pending deferred action requests were issued receipt confirmation with an estimated processing time from the responsible local office.  In recent months, USCIS Headquarters has started to track deferred action requests received at local field offices.  However, USCIS must be more proactive in providing the public with information obtained through its tracking activities.

> **(4) Consistently track data related to deferred action requests and make available statistics identifying: the number of requests received and the numbers of requests approved and denied.**

Tracking and releasing to the public data on the number of deferred action request submissions (*i.e.*, approvals, denials, pending requests, etc.) would help provide transparency demonstrating how often and in what types of circumstances deferred action is granted.

> **LOCAL PRACTICE:**  When regional directors started receiving an increase in deferred action requests from district offices due to the earthquake in Haiti, they met to discuss recent trends and attempted to facilitate consistent deferred action decisions coming from the four USCIS regions.  While the coordination so far does not appear to have resulted in the development of a centralized national process, the discussion was a positive step towards coordinating deferred action processing at the regional level.

## CONCLUSION

Issuing public guidance on the procedures for making a request for deferred action would ensure that those who may merit humanitarian relief know how to seek it, whether they are represented or not.  Establishing a standardized and responsive national procedure, as well as conducting an inventory of pending deferred action requests to verify that each individual who has made a request has received confirmation of receipt, would improve customer service, agency accountability, and help ensure consistency in deferred action decisions.  Finally, tracking submissions and releasing the data to the public would improve management of the deferred action process and provide transparency to the public.

---

[32] Stakeholders report that most deferred action requests remain pending without explanation.  Information provided at stakeholder meeting (Mar. 28, 2011).  Information provided at USCIS site visit (Mar. 29, 2011).

CAR 0833

Haitians deserve the same treatment we sought for Central Americans. Like Central Americans, Haitians for many years were forced to seek the protection of the United States because of oppression, human rights abuses, and civil strife at home. Many of them have established strong ties and made significant contributions to our communities. And, while we have been encouraged by Haiti's progress following the restoration of democratic government in 1994, the situation there remains fragile. Staying the deportation of these Haitians and obtaining for them permanent legislative relief will help support a stable and democratic Haiti—which, in turn, is the best safeguard against a renewed flow of Haitian migrants to the United States.

## Memorandum on Deferred Enforced Departure for Haitians
*December 23, 1997*

*Memorandum for the Attorney General*

*Subject:* Deferred Enforced Departure (DED) for Haitians

Over the past several decades, many Haitians have been forced to flee their country because of human rights abuses and civil strife and have sought the protection of the United States. A significant number of these Haitians were brought into the United States from Guantanamo Bay Naval Base by President Bush following the overthrow of President Aristide in 1991. Other Haitians arrived here through other means and were paroled or applied for asylum. Many of these Haitians continue to be without legal status in the United States.

Pursuant to my constitutional authority to conduct the foreign relations of the United States, I have determined that it is in the foreign policy interest of the United States to defer for 1 year the deportation of any Haitian national who was paroled into the United States before December 31, 1995, or who filed for asylum before December 31, 1995, and who has been continuously present in the United States since that date.

Accordingly, I now direct you to take the necessary steps to implement for these Haitians:

1. deferral of enforced departure from the United States for 1 year from the date of this memorandum; and
2. authorization for employment for 1 year from the date of this memorandum.

This directive shall not apply to any Haitian national: (1) who has been convicted of an aggravated felony; (2) who is found to be a persecutor of others within the meaning of 8 U.S.C. 1101(a)(42); (3) whose removal you determine is in the interest of the United States; (4) whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States; (5) who voluntarily returned or returns to Haiti or his or her country of last habitual residence outside the United States; (6) who was deported, excluded, or removed prior to the date of this memorandum; or (7) who is subject to extradition.

These measures shall be taken as of the date of this memorandum.

**William J. Clinton**

## Letter to Congressional Leaders Transmitting a Report on the Comprehensive Trade and Development Policy for Africa
*December 23, 1997*

*Dear Mr. _____:*

I am pleased to submit the third of five annual reports on the Administration's Comprehensive Trade and Development Policy for Africa as required by section 134 of the Uruguay Round Agreements Act. This year marks a watershed in our economic and trade relations with the countries of Africa.

On June 17, I announced a new strategy to promote economic growth and opportunity in Africa. The Partnership for Growth and Opportunity in Africa opens the door to real, positive change, as only nations carrying out serious reforms will reap the full benefits. Those that strengthen their democracies, reform their trade regimes, and invest in their people will see their efforts pay off in increased trade that will create new jobs, increase wages, spur growth, and improve the

CAR 0834

Legal Op. No. 99-5 (INS), 2001 WL 1047687

U.S. Department of Justice

Immigration and Naturalization Service

General Counsel's Office

MEMORANDUM FOR: THE COMMISSIONER THROUGH: THE DEPUTY COMMISSIONER

**FROM: Bo Cooper, General Counsel**

SUBJECT: INS Exercise of Prosecutorial Discretion

HQCOU 90/16-P

**\*1**  (No date on document.)

**I. Summary**

This memorandum sets out the legal basis upon which, and the extent to which, the Immigration and Naturalization Service (INS) may exercise prosecutorial discretion in its enforcement activities, including placing aliens in removal proceedings by serving them with Notices to Appear (NTAs). The structure of the memorandum is a series of questions and answers about prosecutorial discretion and the application of the doctrine to INS operations. It is our opinion that the INS has prosecutorial discretion to place a removable alien in proceedings, or not to do so, but it does not have prosecutorial discretion to admit an alien into the United States who is inadmissible under the immigration laws, or to provide any immigration benefit to any alien ineligible to receive it.

The memorandum is intended to be the first step in the INS' examination of its use of prosecutorial discretion. As such, the analysis is confined to laying out the legal basis for guidelines or other policy action that may be considered or undertaken in the future. It is not intended to serve as policy guidance itself on the use of prosecutorial discretion. Instead, this memorandum will provide the agency with a foundation to develop such guidance after consultation among the appropriate INS components. In particular, our legal conclusion that the INS has prosecutorial discretion to determine not to put a removable alien in proceedings is not intended to suggest that in any particular case such a determination should be made as a policy matter, or to supersede any current INS policy or procedures for charging removable aliens.

**II. Discussion of INS Prosecutorial Discretion**

**Question 1. What is "prosecutorial discretion?"**

Prosecutorial discretion is a decision by an individual or law enforcement agency charged with enforcing a law to enforce or not to enforce  that law against someone; in other words, to decide to proceed against person A, but not person B, even though the law would authorize action against both. Although prosecutorial discretion is sometimes viewed solely as the decision of a prosecutor whether or not to bring charges against an individual, the term also can apply to a broad spectrum of discretionary enforcement decisions taken by a law enforcement agency, including: the decision to focus investigative resources on particular offenses or conduct; the decision of an investigating officer whether to stop or arrest a suspect; the decision of a prosecutor whether to charge an individual believed to have broken the law; the selection of what charge to bring in the very frequent situations in which more than one is available; the decision to drop some or all charges in an ongoing case; and the decision whether or not to seek to settle a case by plea bargain. Often, an

CAR 0835

individual who is not actually a prosecutor has broad "prosecutorial" discretion; for example, police officers have broad prosecutorial authority to charge minor offenses such as traffic violations.

**\*2**  For these reasons, the term "prosecutorial discretion" can be something of a misnomer, unless the focus is specifically on the decision of a prosecutor to bring a charge. Other applicable terms could include "enforcement discretion" or "administrative discretion" (generally), or "investigative discretion" (the discretion to focus investigative resources on particular priorities or targets).

**Question 2: Why do law enforcement agencies have prosecutorial discretion?**

The idea that the prosecutor is vested with broad discretion in deciding when to prosecute, and when not to prosecute, is firmly entrenched in American law. W. LaFave and J. Israel, Criminal Procedure § 13.2 (2d ed. 1992). Reasons for discretionary enforcement include (1) legislative "overcriminalization," such as the continued existence of crimes on the statute books that society does not wish to enforce, or does not wish to enforce as broadly as they are written (for example, morals offenses such as adultery); (2) limitations in available enforcement resources that make it impossible for a law enforcement agency to prosecute all offenses that come to its attention; and (3) the need to address the equities of individual cases in a way that rigid application of a broadly-drawn statute often cannot do.

The courts have recognized that attempting to review the discretionary enforcement decisions that prosecutors necessarily must make is a task "particularly ill-suited to judicial review." Wayte v. United States, 470 U.S. 598, 607 (1985). As the Supreme Court has stated, "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake . . . Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." Id. at 607-08.

**Question 3: How does the general concept of prosecutorial discretion apply in the immigration enforcement context?**

The INS is often involved, as the investigating agency that presents suspected criminal offenses involving the immigration laws to U.S. Attorneys for possible prosecution, in questions of prosecutorial discretion in the classic context of a criminal prosecutor's decision to charge. However, this answer focuses on the INS' exercise of discretion in the administrative context, when the INS itself is the decisionmaker. Because the INS is simultaneously in removal and detention matters the investigating agency, the prosecuting agency, the custodian, and the removing agency, the administrative enforcement discretion generally deferred to by courts extends far more broadly to a wide variety of INS decisions than the strictly "prosecutorial" decision to institute removal proceedings.

**\*3**  The concept of prosecutorial discretion applies in the civil, administrative arena as much as it does in criminal law. The Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney, 470 U.S. 821, 831 (1985). Courts have long recognized that the INS may exercise prosecutorial discretion in its enforcement activities. E.g., Johns v. Department of Justice, 653 F.2d 884, 890 (5th Cir. 1981); Matter of Geronimo, 13 I & N 680, 681 (BIA 1971). In a case decided last term, the Supreme Court specifically reaffirmed that the concept of prosecutorial discretion applies to INS enforcement activity such as a decision to place a particular alien in deportation proceedings. Reno v. American-Arab Anti-Discrimination Committee, 119 S. Ct. 936 (1999) ("AADC"). In AADC, the Court stated that the IIRIRA provision (section 242(g) of the INA) at issue in the case "was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." Id. at 944 n. 9.

CAR 0836

Because like other law enforcement agencies the INS does not have the resources fully and completely to enforce the immigration laws against every violator, it exercises prosecutorial discretion thousands of times every day. INS enforcement priorities, including the removal of criminal aliens and the deterrence of alien smuggling, are examples of discretionary enforcement decisions on the broad, general level that focus INS enforcement resources in the areas of greatest need. When illegal border crossers are voluntarily returned to Mexico, or removable aliens are allowed to withdraw their applications for admission at a port of entry, without being placed in removal proceedings, those are exercises of prosecutorial discretion. Similarly, an INS grant of deferred action is an act of prosecutorial discretion. AADC, 119 S. Ct at 943.

Agencies may exercise enforcement discretion in individual cases based on the particular facts or on enforcement priorities, or prosecutorial discretion may be more formalized and generalized through agency regulations or procedures, such as those that govern decisions to place aliens in deferred action status or to grant them voluntary departure.

**Question 4: What are the limits on INS prosecutorial discretion?**

Under the Supreme Court's decision in Chaney, there is a rebuttable presumption that an agency's discretionary decision not to take enforcement action is not reviewable by the courts under the Administrative Procedure Act (APA), 5 U.S.C. § 501 et seq. Chaney, 470 U.S. at 832-33; see Texas v. United States, 106 F.2d 661, 667 (5th Cir. 1997) (rejecting "out-of-hand" Texas' argument that the INS failed to enforce the INA adequately, and that the alleged breach was reviewable under the APA for abuse of discretion). AADC confirms that affirmative discretionary decisions to select an individual violator for enforcement proceedings are also generally unreviewable. In other words, unlike discretionary decisions that are reviewable for abuse of discretion based on the facts of the case  such as a grant or denial of a waiver by an immigration judge  courts will not review an exercise of prosecutorial discretion for abuse of discretion. There are significant limitations to prosecutorial discretion, however.

 **\*4**  First, in order to be a nonreviewable exercise of prosecutorial discretion, the decision must be a decision to enforce, or not to enforce, the law. An enforcement decision must be distinguished from an affirmative act of approval, or grant of a benefit, under a statute or other applicable law that sets guidelines for determining when the approval should be given. Chaney, 470 U.S. at 831. An enforcement decision is an exercise  or nonexercise  of an agency's coercive power over an individual's liberty or property. Id. at 832.

The doctrine of prosecutorial discretion applies to enforcement decisions, not benefit decisions. For example, a decision to charge, or not to charge, an alien with a ground of deportability is clearly a prosecutorial enforcement decision. By contrast, a grant of an immigration benefit, such as naturalization or adjustment of status, is a benefit decision that is not a subject for prosecutorial discretion. See Chaney, 470 U.S. at 831 (distinguishing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971)). An agency must grant or deny a benefit based on its application of the criteria established by statute and implementing regulations. For example, if the INS selectively applied the naturalization requirements by granting some applications filed by aliens who had been lawful permanent residents less than five years, but denying others, it would be difficult to defend that action on the ground that the agency had "prosecutorial discretion" not to "enforce" the five-year requirement; rather, its application of the law would be vulnerable to a claim that it was arbitrary and capricious in violation of the APA.

It is important not to confuse the discretion that the INS has with respect to many benefit decisions with unreviewable prosecutorial discretion. For example, a grant of asylum under section 208 of the INA to an applicant meeting the statutory requirements is a discretionary action, but an applicant denied asylum by the INS will be given the opportunity to have his or her claim considered by an immigration judge, and an immigration judge's exercise of the Attorney General's discretionary authority to deny asylum is reviewable for abuse of discretion on appeal to the Board of Immigration Appeals and a Circuit Court of Appeals. This type of discretion is not prosecutorial discretion. There are also situations in which the INS' discretionary grant or denial of an immigration benefit is not reviewable. For example,

8 C.F.R. § 274.13(c) provides that a denial of an application for employment authorization may not be appealed, but that unreviewability does not make such a denial an act of prosecutorial discretion.

Chaney's distinction between decisions involving the exercise of coercive power over liberty or property, and those involving administrative systems for the adjudication of affirmative approvals or benefits, provides substantial assistance in attempting to define the scope of the INS' prosecutorial discretion. This distinction is not always an easy, bright-line rule to apply, however. The distinction between an enforcement decision and an affirmative act of approval is often blurred. A decision not to enforce the immigration laws by placing an alien present in the United States in proceedings will (although it is not a grant of an immigration benefit per se) result in the alien's continued presence in violation of law, and in some cases to the eventual grant of a benefit such as adjustment of status. In some situations, the exercise of INS prosecutorial discretion serves directly as the basis for benefit eligibility. For example, aliens who are the beneficiaries of deferred action are considered "lawfully present" for the purpose of eligibility for Title II Social Security benefits under 8 C.F.R. § 103.12(a)(4)(vi), and are eligible for employment authorization under 8 C.F.R. § 274a.12(c)(14). Furthermore, a removal proceeding often combines both an affirmative adjudication of a benefit (such as a request for asylum) and the exercise of the coercive power of the agency.

**\*5** There are also situations in which the INS cannot as a practical matter exercise its legal authority to refrain from placing an alien in proceedings, because alternatives to proceedings are not reasonably available. For example, a lawful permanent resident alien seeking admission at a port-of-entry who is found to be inadmissible with no available waiver cannot be admitted, so there is no satisfactory alternative to removal proceedings (this topic is discussed further in the answers to questions 7 and 8 below).

Second, the presumption that agency prosecutorial discretion is unreviewable may be rebutted where the substantive statute has provided clear guidelines for the agency to follow in exercising its enforcement powers. Chaney, 470 U.S. at 832-33. "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." Id. at 833. Although extreme examples of legislative control of executive enforcement activity such as, to take a hypothetical example, a statute directing an agency to commence an enforcement action against a specific individual would raise Constitutional concerns regarding the separation of powers, Congress may as a general matter direct and guide agency action by statute. Because a decision not to take enforcement action is presumptively unreviewable, however, only Congress' clear legislative intention to circumscribe agency enforcement discretion, and its provision of "meaningful standards for defining the limits of that discretion," will overcome the presumption against judicial review of a decision not to enforce the law. Id. at 834.

Section 242(g) of the INA, as interpreted by the Supreme Court in AADC, provides that INS enforcement decisions whether or not to commence proceedings or execute removal orders against any alien are not judicially reviewable. AADC, 119 S. Ct. at 943-44. With respect to those discretionary enforcement decisions, then, not only has Congress not clearly circumscribed the INS' enforcement discretion while providing meaningful standards defining the limits of that discretion, but it has firmly and specifically preserved INS discretion in this area.

With respect to detention, however, Congress made it clear in IIRIRA that, in order to ensure the removal of certain aliens, it intended to limit the enforcement discretion previously provided by the INA to INS decisions not to detain certain aliens under the INA's detention authority. The subject of detention is discussed more thoroughly in the answer to question 9, below.

Third, prosecutorial discretion is subject to constitutional constraints. Equal protection prohibits a decision to prosecute that is based upon an unjustifiable standard such as race, religion, or other arbitrary classification. United States v. Armstrong, 517 U.S. 456, 464 (1996). Because of the broad discretion granted to prosecutorial decisions, however, a

"selective prosecution" case is a very difficult one to make (selective prosecution is further discussed in the answer to question 5).

**\*6**  Fourth, prosecutorial discretion to enforce the law can extend only up to the substantive and jurisdictional limits of that law. Although a law enforcement agency can strictly enforce the law as written against every violator if it wishes to do so and has sufficient resources, it cannot go beyond the law. For example, the INS cannot pursue a removal case against someone it knows to be a U.S. citizen because removing that individual is not an action within the substantive limits of the INA. Nor may the INS pursue an enforcement action that might be entirely appropriate if done by some other agency, but is not within the legal jurisdiction of the INS.

We also emphasize the important distinction between prosecutorial discretion to enforce the law, and the legal requirements applicable to the enforcement proceeding itself. See Geronimo, 13 I & N at 681 (it is the district director's discretionary decision whether to institute deportation proceedings; the immigration judge's function is not to review the wisdom of the district director's initiation of the proceedings, but to determine whether the deportation charge is sustained by the requisite evidence). Those legal requirements must always be followed, and INS compliance with them may be reviewed by the appropriate court.

An example of this distinction is an INS arrest of an alien believed to be present in the United States in violation of the INA. The INS has the discretionary authority not to arrest such an alien, even if there is probable cause to believe he is in the United States unlawfully. If the INS encounters several aliens and has probable cause to believe all of them are present unlawfully, the INS has the discretionary authority to arrest some of them, but not others, and the arrested aliens do not have a cognizable claim that their arrests were illegal merely because they were singled out  just as a speeder pulled over on the highway will not be heard to complain that his ticket should be dismissed because others were speeding, but were not pulled over. What the INS does not have the authority to do, under prosecutorial discretion or any other rule of law, is to arrest someone without probable cause to do so.

**Question 5: Who enforces the limitations on INS prosecutorial discretion?**

Another way of examining the limitations on INS' prosecutorial discretion is to ask, who may question an INS decision to enforce, or not to enforce, the immigration laws with respect to an alien, or category of aliens? There are basically three possible sources of legal limitation on INS' discretion: The federal courts, Congress, and INS or the Department of Justice itself.

Court challenges to prosecutorial discretion come in two forms. First, and most common, is a claim by someone who is the subject of enforcement that the enforcement is illegal because he has been improperly singled out for prosecution. For example, in AADC, aliens who had failed to maintain lawful immigration status complained that the INS sought to deport them, as opposed to other similarly situated aliens not placed in proceedings, because of their exercise of First Amendment rights. The Supreme Court rejected the claim, holding that when an alien's continued presence in the United States is in violation of the immigration laws, the INS does not violate the Constitution by selecting his case for enforcement because it believes him to be a member of an organization that supports terrorist activity. AADC, 119 S. Ct. at 946. As a result of the broad discretion courts grant to prosecutors' exercise of discretion, selective enforcement claims very rarely succeed, and then only when the defendant is able to produce clear evidence displacing the presumption that the prosecutor has acted lawfully. Id.; Armstrong, 517 U.S. at 464. In order to prevail on a selective prosecution claim that he was singled out on the basis of his race, the defendant must prove that the government's prosecutorial policy declined to prosecute similarly situated suspects of other races, and that the policy was motivated by a discriminatory purpose. Armstrong, 517 U.S. at 465.

**\*7**  Although federal courts generally have upheld INS prosecutorial discretion by rejecting selective prosecution arguments in immigration cases, Pasquini v. Howerton, 700 F.2d 658, 662 (11th Cir. 1983), they have on occasion

been receptive to such arguments. Lennon v. INS, 527 F.2d 187, 195 (2d Cir. 1975). AADC's firm rejection of a selective prosecution argument raises the bar for such arguments in removal cases, however, even higher than the already extremely deferential Armstrong standard applicable to criminal cases. AADC, 119 S.Ct at 946-47. For several reasons, the concerns that make courts properly hesitant to examine the decision whether to prosecute are "greatly magnified in the deportation context." Id. Consequently, although the Supreme Court did not rule out the possibility of "a rare case in which the alleged basis of discrimination is so outrageous" that these concerns can be overcome, AADC has made selective prosecution claims in immigration cases substantially more difficult to prevail upon than was previously the case.

Less common than a selective prosecution claim, but not unknown, is a judicial claim by someone asking a court to order an agency to take enforcement action against someone else. For example, in Chaney, death row inmates sought an order requiring the FDA to enforce the drug laws in ways that would make it essentially impossible for states to use any drugs for lethal injections. Chaney, 470 U.S. at 823. These claims likewise usually fail, if not for threshhold grounds of judicial standing (i.e., that the claimant does not have a sufficient personal stake in the issue to raise the claim), then as a result of courts' deference to an agency decision not to enforce.

Congress may also limit an agency's prosecutorial discretion by a variety of means, ranging from changes in the substantive law of the offense to channeling funding through the budget process to particular areas of concern. A basic legal question common to prosecutorial discretion issues, then, is whether the relevant statute limits discretion with respect to a particular enforcement activity. As prosecutorial discretion is an authority inherent in the law enforcement function, a statutory limitation must be clear and specific. If prosecutorial discretion is specifically limited by law, that limitation is likely to be enforceable in court by a person aggrieved by its violation, returning the question to a judicial forum. If the law does not limit discretion, however, then the only question for the Executive agency and it is not a legal one is whether the manner in which it exercises its enforcement authority is likely to invite future statutory limitations.

The third source of limitation on prosecutorial discretion comes from within the law enforcement agency itself, or from higher Executive Branch authorities (such as, in the case of INS, the Attorney General or the President). Whether by regulation or policy directive, an agency may channel and guide the discretion of its employees entrusted with the responsibility of making discretionary enforcement decisions in order to ensure that such decisions are made fairly and judiciously. Indeed, appropriate policy guidance, reinforced by training, is necessary in order for a law enforcement agency to carry out an enforcement function properly. Such guidance serves a variety of policy goals, including promoting public confidence in the fairness and consistency of the agency's enforcement action; ensuring that employees carrying out the agency's discretionary functions are delegated the degree of discretionary authority appropriate to their position, training, qualifications and experience; maintaining proper chains of command and accountability; removing potential opportunities for corruption or misconduct; and protecting employees from false accusations of corruption or misconduct.

  **8** The INS has provided a variety of materials, of differing legal formality, to instruct and guide its officers on how and when removal proceedings should be instituted, and who has authority to institute them. For example, INS regulations at 8 C.F.R. §§ 239.1 and 239.2 identify which INS officers are authorized to issue NTAs, and describe who may cancel them and on what grounds. INS enforcement priorities that focus INS prosecutorial resources where they will do the most good, such as removing criminal aliens and deterring alien smuggling, are examples of informal guidance that broadly govern the exercise of prosecutorial discretion. (By "informal" we mean only that enforcement priorities are not legally codified and binding substantive law nor are they required to be under the APA not that they are unimportant, or need not be adhered to by INS personnel.) The INS also provides field manuals and other enforcement procedure documents for detention and deportation officers, special agents, and others who must make investigative and prosecutorial decisions. See, e.g., Interim Enforcement Procedures (June 5, 1997) (discussing, among other things, factors to be considered in granting voluntary departure or deferred action).

The need for suitable policy guidance must be balanced, however, with the realization that if the agency provides regulations or instructions on the exercise of prosecutorial discretion that are so strict, formalized, or rigid as to establish a substantive process conferring a benefit on an alien, the otherwise discretionary enforcement decisions in that process may be considered judicially reviewable, on the ground that the law now provides workable standards for a court to apply. See Nicholas v. INS, 590 F.2d 802, 805-08 (9th Cir. 1979). As Justice Scalia's opinion for the Court in AADC noted with respect to pre-IIRIRA litigation involving INS decisions regarding grant or denial of deferred action, "since no generous act goes unpunished . . . the INS's exercise of this discretion opened the door to litigation in instances where the INS chose not to exercise it." AADC, 119 S. Ct. at 944.

It sometimes is appropriate for the INS to bind itself with rules (such as 8 C.F.R. § 239.1) upon which the public reasonably may rely, even if those rules limit the exercise of prosecutorial discretion in a particular case. Generally, however, policies that affect prosecutorial discretion  especially those that address the prosecutorial discretion of the agency as a whole  are properly classified and issued as general statements of policy that do not impose rights and obligations on the public, and are not subject to the rulemaking requirements of the APA. See, e.g., Romeiro de Silva v. Smith, 773 F.2d 1021, 1024 (9th Cir. 1985); Pasquini, 700 F.2d at 662; J. Stein, G. Mitchell & B. Mezines, Administrative Law § 15.07[4] (1999). Therefore, they may be changed at any time, and do not legally bind the agency or provide any substantive or procedural rights to aliens. For example, it would not be in order for an alien to move to terminate his immigration proceeding on the ground that his case does not fall within one of the INS' enforcement priorities, or for an immigration judge to entertain such a claim.

**Question 6: Does the INS have prosecutorial discretion not to pursue a removal proceeding against a removable alien?**

 *9  Yes. Section 242(g) of the INA, as interpreted by the Supreme Court in AADC, provides that the INS' decision not to pursue a removal proceeding against an alien is an exercise of prosecutorial discretion that is not judicially reviewable.

**Question 7: Does the INS have prosecutorial discretion to admit an inadmissible alien at a port-of-entry?**

No. Inspection and admission of aliens involves elements of both enforcement and benefit adjudication. Admitting an alien with an authorized status and length of stay is an affirmative act of approval under the INA. Section 235(b)(2) of the INA prohibits an immigration officer from admitting an applicant for admission unless the alien is clearly and beyond a doubt entitled to be admitted. If there is any such doubt, section 240(a)(3) provides that (unless otherwise specified in the INA, such as expedited removal or stowaways) a removal proceeding before an immigration judge is the sole and exclusive procedure for determining whether an alien may be admitted to the United States.

Serving an NTA on an inadmissible alien is an enforcement decision that is subject to prosecutorial discretion. In the exercise of prosecutorial discretion, the INS also may allow an alien applicant for admission to withdraw his or her application and depart immediately from the United States. What the INS may not do, however, is admit an inadmissible alien as an exercise of prosecutorial discretion. This is true both because the doctrine of prosecutorial discretion is limited under cases such as Chaney to decisions to exercise the enforcement power of the agency rather than affirmative acts that grant a status, and because the statutory provisions relating to admission clearly limit any such discretion on the part of the agency. If there is any doubt about the admissibility of an alien, the INS cannot admit the alien. At that point it has the discretionary option to allow the alien voluntarily to withdraw his application for admission, or to place him in proceedings. (Parole is also an option if the alien qualifies under section 212(d) of the INA, but is neither an admission nor a permanent answer to the question of the alien's admissibility.)

**Question 8: What other concerns or practical difficulties are relevant to the exercise of the INS' prosecutorial discretion not to place removable aliens in proceedings?**

First, the fact that a violation of the immigration laws is a continuing violation leads to practical difficulties with the exercise of prosecutorial discretion. In particular, an INS decision to forego placing an alien such as an LPR with a criminal record making him or her removable in proceedings does not cure the violation, and is likely to cause future problems. If the alien travels outside the United States and attempts to reenter, the alien will not be admissible. Admission to the United States as the result of immigration inspection is not a matter of prosecutorial discretion. An inadmissible alien for whom a waiver is not available may not be admitted.

 **\*10**  In other words, the fact that the INS can forego commencing a removal proceeding does not mean that the INS can grant a status for which an alien is not eligible, so the alien remains in a continuing, difficult state of limbo and illegality. Unlike criminal law, immigration law does not contain generally applicable statutes of limitation that grant repose to past violators of law to go on with their lives without fear of prosecution after sufficient time has elapsed.

Second, unlike a typical criminal prosecution decision that involves making the decision whether an individual should be punished for past, completed misconduct, a decision not to bring a removal proceeding perpetuates a continuing violation of the immigration laws. Removal from the United States is not a punishment; rather, it is a civil correction of an ongoing violation. <u>AADC</u>, 119 S. Ct. at 947. This is a factor the INS should consider when it declines to place in proceedings an alien whom Congress has declared by law to be removable.

Third, INS prosecutors lack much of the flexibility that criminal prosecutors possess to make, as a discretionary matter, the consequences of misconduct fit the offense. For example, as removal from the United States is not a punishment, immigration law does not contain criminal law concepts of gradualized sentencing based upon the specific facts of the individual's offense or, for the most part, different consequences based upon the specific ground of removability. This gives INS prosecutors little of the discretion criminal prosecutors have to select appropriate charges from a range of offenses covering the defendants' misconduct, or to "plea bargain" a case.

**Question 9: How does the concept of prosecutorial discretion relate to detention questions such as mandatory detention?**

Section 236(a) of the INA provides the INS with the general authority and the discretion to detain an alien pending a decision on whether the alien is to be removed from the United States. As detaining aliens is an exercise of the coercive authority of a law enforcement agency over liberty, legal concepts of enforcement discretion apply despite the fact that detention is not a strictly "prosecutorial" decision. Detention decisions (whether in individual cases or collectively as a matter of agency policy) typically involve consideration of factors not dissimilar from those a prosecutor considers in deciding whether to prosecute, including the adequacy of agency resources available for the task, competing agency mandates or priorities, and other relevant legal or policy considerations (such as, in the case of detention, ensuring that detainees are not subjected to unlawful overcrowding or other conditions adversely affecting their health and safety). The INS traditionally has had the discretion to choose not to detain a removable alien. That discretion has been tempered with other legal authority and policies, such as bond determinations, designed to ensure that such decisions have been made based on a determination that the alien is not a threat to public safety and is likely to appear for further proceedings. Whether an alien should be detained without bond, and conditions of release such as the appropriate amount of bond, are INS and/or immigration judge determinations reviewable by the Executive Office for Immigration Review.

 **\*11**  In short, an INS determination to exercise its detention authority over an alien is reviewable on the merits, just as an INS decision to seek the removal of an alien by placing him or her in proceedings will be adjudicated on the merits in most categories of cases by the immigration judge. An INS decision to release an alien whom the agency otherwise might seek to detain was, until the enactment of IIRIRA, an unreviewable act of enforcement discretion under the INA in the same way a decision not to charge a removable alien was, and is, an unreviewable discretionary act.

In IIRIRA, however, Congress expressly limited the INS' administrative discretion under the INA not to detain criminal aliens, once the decision is made to place them in removal proceedings. The mandatory detention provisions, sections

236(c) and 241(a)(2) of the INA, require the INS (with limited exceptions) to detain criminal aliens during the pendency of their removal proceedings, and during the 90-day removal period following the entry of their removal order.

Thus, although Congress reaffirmed in IIRIRA the INS' prosecutorial discretion to commence removal proceedings against an alien, it did the opposite with respect to the agency's enforcement discretion to release criminal aliens once the INS has determined to institute proceedings, and the proceeding is pending or has concluded with the entry of a removal order. Congress stated a clear intention expressly to limit the discretion the INS otherwise would presumptively have had to make discretionary determinations regarding the need to detain a criminal alien, and provided meaningful standards regarding mandatory detention categories.

### III. Conclusion

The INS has broad prosecutorial discretion in its law enforcement activities, although that discretion is not unlimited. This authority includes the prosecutorial discretion not to place a removable alien in proceedings, but the INS does not have prosecutorial discretion to admit an inadmissible alien into the United States. The INS does not have prosecutorial discretion to provide any benefit under the INA to an alien who is not eligible to receive it.

Bo Cooper
General Counsel

Legal Op. No. 99-5 (INS), 2001 WL 1047687

© 20 9 Thomson Reuters. No c a m to or g na  U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

229

| [SEAL OMITTED] | **U.S. Department of Justice**<br>Immigration and<br>Naturalization Service |
|---|---|

HQINV 50/1

*425 I Street NW*
*Washington, DC 20536*

[Aug. 30, 2001]

MEMORANDUM FOR:   MICHAEL A. PEARSON
EXECUTIVE ASSOCIATE
COMMISSIONER
OFFICE of FIELD
   OPERATIONS

FROM:      /s/   <u>MICHAEL D. CRONIN</u>
MICHAEL D. CRONIN
Acting Executive Associate
Commissioner
Office of Programs

SUBJECT:      Victims of Trafficking and
Violence Protection Act of
2000 (VTVPA) Policy
<u>Memorandum #2—"T" and
"U" Nonimmigrant Visas</u>

   The following instructions provide interim guidance to INS relating to the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Pub. L. No. 106-386, 114 Stat 1464, (October 28, 2000).   This memorandum established interim procedures to be followed while the regulations implementing the T and U visa status are being promulgated by INS.   <u>The guidance in this memorandum is effective immediately</u>, and will

CAR 0844

230

remain in effect until regulations on T and U visa status are in place.   This guidance supercedes or augments any previous national or local guidance on T and U visas.

## BACKGROUND

The VTVPA reflects the United States Government's strong stance against trafficking and its intent to vigorously pursue the prosecution of traffickers and the protection of victims.   It provides access to social services and benefits for some victims, creates stronger criminal penalties and enhanced sentencing for traffickers, and creates a new nonimmigrant classification for victims of severe forms of trafficking ("T Visa" or "T").[1]   The VTVPA also reauthorizes and amends the Violence Against Women Act (VAWA) and adds a second new nonimmigrant classification for victims of other specific crimes ("U Visa" or "U").[2]

## DEFINITIONS

Following are several definitions critical to the understanding of this guidance.

---

[1]   The statutory purposes of the Trafficking Victims Protection division of the VTVPA "are to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."   VTVPA §102(a)

[2]   The "U Visa" related statutory purpose includes that intent "to create a new nonimmigrant visa classification that will strengthen the ability of law enforcement agencies to detect, investigate and prosecute cases of domestic violence, sexual assault, trafficking of aliens and other crimes   . . .   committed against aliens, while offering protection to victims of such offenses in keeping with the humanitarian interests of the United States   . . .   "   VTVPA § 1513(a)(2)(A)

CAR 0845

231

**Severe Forms of Trafficking in Persons** as defined by VTVPA § 103(8).  The term "severe forms of trafficking in persons" means—

    (A)   sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or

    (B)   the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

**Certain Criminal Activity for "U Visa" Purposes** as defined by VTVPA § 1513(b)(3) refers to one or more of the following or any similar activity in violation of Federal, State, or local criminal law; rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes.

**Possible Victim** is any alien who may be eligible for benefits under the "T" or "U" visa categories.

**GENERAL GUIDANCE**
The VTVPA creates two new nonimmigrant classifications.  These two classifications provide an immigration mechanism for cooperating victims to remain tem-

CAR 0846

232

porarily in the United States to assist in investigations and prosecutions and provide humanitarian protection to victims.   The "T" classification is available to victims of severe forms of trafficking and their families and is limited to 5,000 principle aliens per year.   The "U" classification is available to victims of certain criminal activity (see Definitions) and their families and is limited to 10,000 principals per year.

The "T" and "U" provisions of the VTVPA went into effect upon enactment, but regulations for implementation and for the processing of applications have not yet been finalized.   In the interim, aliens who are identified as possible victims in the above categories **should not be removed from the United States until they have had the opportunity to avail themselves of the provisions of the VTVPA**.   Existing authority and mechanisms such as parole, deferred action, and stays of removal will be used to achieve this objective, including continued presence for victims of severe forms of trafficking, as described in interim policy guidelines for continued presence and in the regulations implementing Section 107(c) of the VTVPA.

## <u>IDENTIFICATION OF POSSIBLE VICTIMS</u>

In the absence of governing regulations, Service personnel should ensure broad interpretation of the guidance to ensure an alien is not removed from the United States if it appears that they fit into one of these victim categories.   This guidance is an interim measure aimed only at identifying possible victims who may be eligible for relief under the new nonimmigrant classifications.

CAR 0847

233

Service personnel may encounter possible victims in a variety of circumstances, such as at a Port of Entry (POE), between POEs, in detention, in adjudication processes, in Immigration Court, and/or in the course of investigative activities.   At times, Service personnel will be the first point of contact with the possible victim; at other times contact may be established through a prosecutor's office, through a local or federal law enforcement agency, or thorugh an attorney.   Regardless of the manner of encounter, if the individual is identified as a possible victim, Service personnel should take the necessary steps to ensure that the individual is not prematurely removed.   Circumstances will vary from case to case, and INS personnel should keep in mind that it is better to err on the side of caution than to remove a possible victim to a country where he or she may be harmed by the trafficker or abuser, or by their associates.

**Possible "T" Victims**:   The VTVPA specifies that four conditions must be satisfied to classify an alien as a principal "T" nonimmigrant.

1.  The alien is or has been a victim of a severe form of trafficking in persons; and

2.  The alien is physically present in the United States, American Samoa, or the Commonwealth of the Northern Marina Islands, or at a POE, on account of such trafficking; and

3.  The alien has complied with any reasonable request for assistance in the investigation or prosecution of acts of trafficking –or- the alien is under the age of 15; and

234

4. The alien would suffer extreme hardship involving unusual and severe harm upon removal.

Additionally, to avoid extreme hardship, the Attorney General may provide "T" nonimmigrant status to the spouses, children, and, in the case of those under age 21, the parents of "T" nonimmigrants.

**Possible "U" Victims**:   The VTVPA specifies that four conditions must be satisfied to classify an alien as a principal "U" nonimmigrant:

1. The alien has suffered substantial physical or mental abuse as a result of having been a victim of the certain criminal activity (see Definitions); and

2. The alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) possesses information concerning that certain criminal activity described in Definitions;

3. The alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a Federal, State, or local law enforcement official; to a Federal, State, or local prosecutor; to a Federal or State judge, to the Service; or to other Federal, State, or local authorities investigating or prosecuting one of the certain criminal activities described in Definitions; and

4. The criminal activity described violated the laws of the United States or occurred in the United States (including in Indian country and military

CAR 0849

235

installations) or the territories and possessions of the United States.

Additionally, to avoid extreme hardship, the Attorney General may provide "U" nonimmigrant status to the spouses, children, and, in the case of a child under the age of 16, the parents of "U" nonimmigrants. This would require certification by a government official that an investigation or prosecution would be harmed without the assistance of the spouse, the child, or in the case of an alien child, the parent of the alien. It should be noted that trafficking victims might also be eligible for "U" nonimmigrant classification.

## WORK AUTHORIZATION

Service personnel are instructed to use existing authority and mechanisms to prevent removal of possible "T" and "U" victims. These mechanisms include parole, deferred action, continuances, and stays of removal. Individuals who are identifies as possible "T" or "U" victims may be granted work authorization pursuant to existing authority and utilizing existing application procedures. For instance, potential applicants that are paroled may be granted work authorization pursuant to 8 C.F.R. § 274a.12(c)(11); potential applicants that are placed on deferred action may be granted work authorization pursuant to 8 C.F.R. § 274a.12(c)(14); and potential applicants that are granted a stay of removal may be granted work authorization in accordance with the provisions of 8 C.F.R. § 274a.12(c)(18). Governing regulations concerning continued presence for victims and other information related to this topic are also contained in the Department of Justice and Department of State interim rule published in the Federal Register on July 24, 2001

236

concerning the Protection and Assistance for Victims of Trafficking.

## JUVENILES

Each District has a juvenile coordinator who should be contacted regarding juvenile victims.

## RECORD KEEPING

It is imperative that documentation is maintained on possible victims.   As such, information about the possible victim including all pertinent information surrounding the possible victim's circumstances must be maintained in the alien's A-file.   If no A-file exists for the individual, one should be created.   The use of standard sworn statements and/or applicable question and answer forms must be maintained for the record.   As evidence of contact with the possible victim, the INS investigator and/or officer will include any necessary notes and memorandum for the record.

## CONTINUED PRESENCE

Aliens who are victims of severe forms of trafficking and are potential witnesses may be eligible for a "T" nonimmigrant classification and shall be processed in accordance with the guidance contained in the policy memorandum dated August 20, 2001, entitled Interim Guidance #1—Continued Presence.   Governing regulations concerning continued presence are also contained in the Department of Justice and Department of State interim rule published in the Federal Register on July 24, 2001 concerning the Protection and Assistance for Victims of Trafficking, as 28 CFR Part 1100.35.

## LEGAL PROCEEDINGS

No alien identified as a possible victim eligible for "T" or "U" nonimmigrant classification should be removed

237

from the United States until they have had the oppor-
tunity to avail themselves of the provisions of the
VTVPA. When a possible "T" or "U" victim is encoun-
tered during the course of proceedings, the District
Counsel's office should contact the District Victim-
Witness Coordinator so that appropriate action can be
taken in accordance with the instructions in this memo.
The District Counsel's office has the discretion to seek
a continuance of the proceedings or to request admin-
istrative closure or termination.

**FEDERAL OBLIGATIONS TO VICTIMS**

Some of the provisions included in the VTVPA replicate
INS responsibilities that are currently included in 42
U.S.C. 10606-10607 (the Victim's Rights and Restitu-
tion Act) and the *Attorney General Guidelines for
Victim and Witness Assistance, 2000 edition*. This in-
cludes the referral of victims of Federal crime to medi-
cal care and assistance and the provision of reasonable
protection. Victims who fall into the statutory defini-
tion of victim found in the *Attorney General Guidelines
for Victim and Witness Assistance* must be afforded all
the rights contained in that directive.[3] Service per-
sonnel should continue to involve the District and Sec-

---

[3] For purposes of the Attorney General Guidelines for Victim and
Witness Assistance, the term "victim" means a person that has suf-
fered direct physical, emotional, or pecuniary harm as the result of a
(federal) crime, including . . . . in the case of a victim who is
under 18 years of age, incompetent, incapacitated, or deceased,
another person or persons as listed in 42 U.S.C. 10607. The At-
torney General designated District Directors and Chief Patrol
Agents of the office having primary responsibility for conducting a
Federal investigation as the responsible officials to identify victims
of Federal crime.

CAR 0852

238

tor Victim-Witness coordinators in referring these vic-
tims for services.

This guidance is to be followed until such time as the
alien's status has been confirmed, and, where the alien
is an actual or possible material witness, the alien has
had an opportunity to be considered for a "T" or a "U"
nonimmigrant classification, as appropriate.

The principles set forth in this memorandum, and in-
ternal office procedures adopted hereto, are intended
solely to guide INS personnel in performing their du-
ties.   They are not intended to, do not, and may not be
relied upon to create a right or benefit, substantive or
procedural, enforceable at law by any individual or
other party in removal proceedings, in litigation with
the United States, or in any other form or manner.

CAR 0853

55 FR 13897, Exec. Order No. 12711, 1990 WL 10088774(Pres.)
Executive Order 12711

Policy Implementation With Respect to Nationals of the People's Republic of China

April 11, 1990

**\*13897**  By the authority vested in me as President by the Constitution and laws of the United States of America, the Attorney General and the Secretary of State are hereby ordered to exercise their authority, including that under the Immigration and Nationality Act (8 U.S.C. 1101-1557), as follows:

**Section 1.** The Attorney General is directed to take any steps necessary to defer until January 1, 1994, the enforced departure of all nationals of the People's Republic of China (PRC) and their dependents who were in the United States on or after June 5, 1989, up to and including the date of this order (hereinafter "such PRC nationals").

**Sec. 2.** The Secretary of State and the Attorney General are directed to take all steps necessary with respect to such PRC nationals (a) to waive through January 1, 1994, the requirement of a valid passport and (b) to process and provide necessary documents, both within the United States and at U.S. consulates overseas, to facilitate travel across the borders of other nations and reentry into the United States in the same status such PRC nationals had upon departure.

**Sec. 3.** The Secretary of State and the Attorney General are directed to provide the following protections:

(a) irrevocable waiver of the 2-year home country residence requirement that may be exercised until January 1, 1994, for such PRC nationals;

(b) maintenance of lawful status for purposes of adjustment of status or change of nonimmigrant status for such PRC nationals who were in lawful status at any time on or after June 5, 1989, up to and including the date of this order;

(c) authorization for employment of such PRC nationals through January 1, 1994; and

(d) notice of expiration of nonimmigrant status (if applicable) rather than the institution of deportation proceedings, and explanation of options available for such PRC nationals eligible for deferral of enforced departure whose nonimmigrant status has expired.

**Sec. 4.** The Secretary of State and the Attorney General are directed to provide for enhanced consideration under the immigration laws for individuals from any country who express a fear of persecution upon return to their country related to that country's policy of forced abortion or coerced sterilization, as implemented by the Attorney General's regulation effective January 29, 1990.

**Sec. 5.** The Attorney General is directed to ensure that the Immigration and Naturalization Service finalizes and makes public its position on the issue of training for individuals in F-1 visa status and on the issue of reinstatement into lawful nonimmigrant status of such PRC nationals who have withdrawn their applications for asylum.

**\*13898  Sec. 6.** The Departments of Justice and State are directed to consider other steps to assist such PRC nationals in their efforts to utilize the protections that I have extended pursuant to this order.

**Sec. 7.** This order shall be effective immediately.

 CAR 0854   1

GEORGE BUSH

THE WHITE HOUSE, April 11, 1990.

**End of Document**                                                                                    © 20 9 Thomson Reuters. No c a m to or g na  U.S. Government Works.

Case 1:18-cv-00068   Document 472-5   Filed on 08/21/20 in TXSD   Page 46 of 101

INS DEFERS ENFORCED DEPARTURE OF PRC..., 66 No. 23 Interpreter...

66 No. 23 Interpreter Releases 645

**Interpreter Releases**

June 19, 1989

INS DEFERS ENFORCED DEPARTURE OF PRC NATIONALS FOR ONE YEAR

Copyright (c) 1989 Federal Publications Inc.

Implementing President Bush's June 5 announcement that the U.S. government will give "sympathetic review" to requests by students from the People's Republic of China (PRC) for extensions of stay,[2] on June 6 Attorney General Dick Thornburgh directed INS Commissioner Alan C. Nelson to defer the enforced departure of nearly all PRC nationals in the U.S. until June 5, 1990. The Attorney General's directive, which is reproduced in Appendix I of this Release, specifically makes the directive inapplicable to any PRC nationals who: (1) have not evidenced an unwillingness to return to the PRC; (2) are residents of a third country; (3) have been convicted of any criminal act in the U.S.; or (4) arrive in the U.S. after June 6, 1989.

In a press release on June 6 announcing the directive, Attorney General Thornburgh noted that his action had been taken after consultation with the White House and Secretary of State James Baker in light of the uncertainty of current conditions in China. According to the INS, there are some 73,000 Chinese students attending U.S. schools and nearly 250,000 Chinese nationals in the U.S. as nonimmigrant visitors or business persons.

On June 7, INS Deputy Commissioner James L. Buck sent a cable to all field offices (File CO 243.69-P) implementing the Attorney General's directive. The text of that cable is reproduced in Appendix II of this Release. The cable contains instructions governing the following subjects and categories of aliens: (1) PRC nationals maintaining nonimmigrant status; (2) deportable PRC nationals; (3) excludable **\*646** PRC nationals; (4) requests for clearance of removal to PRC; (5) work authorization; (6) asylum requests; and (7) arrivals after June 6, 1989.

Attorneys and others counselling PRC nonimmigrants now in the U.S. in lawful status will have to be very careful in weighing the various alternatives made available by the new policy. It might seem to some that the turn of events in the PRC renders this a propitious time to apply for asylum under INA §208. At the same time, concern has been expressed at the possibility that an asylum application by an alien in valid nonimmigrant status might be considered by the INS as an abandonment of that status and might result in the denial of some form of relief (such as an extension of stay or adjustment of status under INA §245(a)) for which a valid nonimmigrant status is a prerequisite.

As far as we are aware, there has been no categorical ruling on this issue so far, either by way of a precedent decision or a binding regulation or instruction. The June 7 INS cable says nothing about it. From OI 208.5, it is inferable that only by withdrawing the asylum application can an in-status nonimmigrant qualify "for extension of stay, adjustment of status, or any other benefit for which he/she may otherwise be eligible." (It is also inferable therefrom that the filing of an asylum application does not automatically terminate lawful nonimmigrant status). We are told that at least one INS District Director immediately issues an Order to Show Cause in deportation proceedings upon denial of an asylum application. On the other hand, the proposed INS asylum regulations would provide that in-status nonimmigrants denied asylum may continue in or be restored to status. Proposed 8 CFR 208.23.[3]

It seems to us that it can tenably be argued that the "dual intent" principle is as applicable to an asylum application as to other applications made by nonimmigrants. An alien's desire to remain in the U.S., if there develops an opportunity to do so legally, is not necessarily inconsistent with lawful nonimmigrant status.[4] Moreover, even a grant of asylum does

Case 1:18-cv-00068   Document 472-5   Filed on 08/21/20 in TXSD   Page 47 of 101

INS DEFERS ENFORCED DEPARTURE OF PRC..., 66 No. 23 Interpreter...

not confer an absolute right to remain here indefinitely. Asylum grants are reviewed periodically by the INS and may end if warranted by changed conditions in the pertinent country.

A more troublesome question may be presented by the requirement that the PRC national must "indicate an unwillingness to return to the PRC at the present time" to qualify under the new policy. Many PRC nationals now in the U.S., both those in and out of status, will be understandably reluctant to have their unwillingness to return recorded, lest this information be used against them by vindictive PRC officials if they ever have to return there. Certainly, the recent crackdown on dissidents in the PRC furnishes ample basis for fear. [5]

Members of the House immigration subcommittee asked INS Deputy Commissioner Buck about the administration's new PRC policy at a June 8 hearing on Haitians. (See related article in this issue.) Subcommittee chairman Rep. Bruce A. Morrison (D-CT) asked Mr. Buck whether the INS cable amounted to a grant of extended voluntary departure (EVD) for PRC nationals in the U.S. Mr. Buck and Assistant INS Commissioner for Refugee, Asylum and Parole Delia Combs, responded that the proper term was not EVD but "deferred departure." Although no one from the PRC will be deported, Ms. Combs said, those who need to should seek to extend their stay in any case, to be formally in "legal" status. Under further questioning by Rep. Morrison, the INS officials acknowledged that PRC nationals do not really need to take any action to avail themselves of the deferred departure benefit.

Rep. Morrison also asked about work authorization. The INS officials said that it will be determined on a case-by-case basis, as with any deferred departure group. Therefore, Rep. Morrison said, if the 350,000 PRC nationals in the U.S. need to work, will they be given authorization? Theoretically yes, Ms. Combs replied, although in many cases the issue of work authorization will never be raised. For example, a student in the U.S. on a J-1 exchange visitor's visa will not be eligible for either work authorization or even deferred departure because he or she does not need it.

Rep. Morrison expressed some general concerns. Although he has no problem with the INS policy, he **\*647** is concerned that there is no legislative framework for EVD/deferred departure. Also, he asked why the Justice Department was so quick to offer this benefit to PRC nationals but has not been equally generous to other nationalities, such as Haitians.

Footnotes

[2]     Reported in Interpreter Releases, Vol. 66, No. 22, June 6, 1989, pp. 617.

[3]     See Interpreter Releases, Vol. 65, No. 14, April 11, 1988, pp. 386 396.Proposed 8 CFR 208.23 appears on p. 394.

[4]     For a discussion of dual intent, see Interpreter Releases, Vol. 63, No. 18, May 2, 1986, pp. 392 393.

[5]     See "After Bloodshed, Many Fear Returning,   Washington Post, June 11, 1989, at A33, col. 1.

**End of Document**                                                      © 20  9 Thomson Reuters. No c a m to or g na  U.S. Government Works.

Case 1:18-cv-00068 Document 472-5 Filed on 08/21/20 in TXSD Page 48 of 101

INS WARNS OF DECEMBER 22 DEADLINE FOR EVD..., 66 No. 46 Interpreter...

66 No. 46 Interpreter Releases 1325

**Interpreter Releases**
December 4, 1989

INS WARNS OF DECEMBER 22 DEADLINE FOR EVD LEGALIZATION APPLICATIONS

Copyright (c) 1989 Federal Publications Inc.

In a news release dated December 1, 1989, the INS calls attention to the approaching December 22, 1989 deadline for filing applications for adjustment of status under §902 of the Department of State Authorization Bill, Pub. L. No. 100-204, 101 Stat. 1331. [3] The text of the release follows:

Nationals of Poland, Afghanistan, Ethiopia or Uganda who have been in the United States and eligible for extended voluntary departure have until December 22, 1989 to apply for permanent resident status, Gene McNary, commissioner of the Immigration and Naturalization Service, announced today.

To be eligible for permanent status, applicants from those nations must have entered the United States prior to July 21, 1984 and resided continuously here since that date.

Congress passed special legislation in December 1987 that provided two years during which eligible persons could seek permanent status. Persons who have been convicted of criminal acts in the U.S. are not eligible to apply.

Successful applicants are initially granted temporary resident status, and may apply for **\*1326** permanent residence 18 months later. To date, about 6,000 have applied.

Footnotes

[31]   For further information on this subject, see Interpreter Releases, Vol. 66, No. 7, February 13, 1989, pp. 180 181, 196 204; *Vol. 65, No. 1, January 4, 1988, pp. 1 2, 7 8; *Vol. 64, No. 48, December 21, 1987, pp. 1391 1392, 1402 1403.

End of Document                                    © 20 9 Thomson Reuters. No c a m to or g na  U.S. Government Works.

65 No. 36 Interpreter Releases 964

**Interpreter Releases**
September 19, 1988

UPDATE ON EVD

Copyright (c) 1988 Federal Publications Inc.

From time to time the INS designates classes of aliens entitled to "extended voluntary departure" (EVD), which allows them to stay in the U.S. on an indefinite basis. EVD is usually granted in one-year increments. INS Operations Instruction 242.10e(3). Like other forms of prosecutorial discretion, EVD is a purely discretionary relief.

Members of classes designated as eligible for EVD so far have always been specific nationalities. [2] EVD groups are not entitled to relief by virtue of published regulations or INS Operations Instructions, although EVD-qualified groups are recognized in documents such as official cables. [22] Rather, EVD status is administered as a policy matter by the INS Central Office.

EVD has been granted to natives of areas whose lives would be endangered if they returned to their **\*965** homeland. Aliens from those areas who enter after the announced EVD date usually do not qualify because the INS does not want the announcement to encourage more people to come to the U.S. In the past five years, EVD has been extended to only four groups: Poles, Ethiopians, Afghans and Ugandans. [23]

According to a September 8, 1988 conversation with the INS Central Office Detention and Deportation Section, EVD status is currently only available for Poles who arrived before July 21, 1984; Afghans who arrived before December 2, 1980; and Ethiopians who arrived before June 30, 1980. EVD status for Ugandans, which was announced on June 8, 1978, expired on September 30, 1986. There never was an established cutoff date for Ugandans, unlike for most other groups.

For Poles, but not for Afghans and Ethiopians, the INS has followed a policy of announcing one-year extensions of EVD status after receiving advisory opinions from the State Department. For Afghans and Ethiopians, extensions are handled on a case-by-case basis.

Congress has recently considered proposals to grant legislative EVD to undocumented aliens from El Salvador and Nicaragua, but prospects remain uncertain. [24] So far there have been no legislative EVD grants, although Congress has authorized temporary residence status, with an opportunity to qualify for permanent residence status, to certain aliens who have received administrative EVD. [25]

Footnotes

[21]   See Interpreter Releases, Vol. 64, No. 36, September 21, 1987, pp. 1084, 1093(historical chart of EVD grants).

[22]   E.g., INS Central Office cable, reproduced in Interpreter Releases, Vol. 65, No. 1, January 4, 1988, pp. 7 8(extending Polish EVD to end of 1988).

[23]   133 Cong. Rec. H11297, H11344 (daily ed. Dec. 14, 1987), reproduced in Interpreter Releases, Vol. 64, No. 48, December 21, 1987, pp. 1403.

[24]   See, e.g., Interpreter Releases, Vol. 65, No. 32, August 22, 1988, pp. 849 850.

25    Foreign Relations Authorization Act, H.R. 1777, §902, enacted as Pub. L. No. 100 204, 101 Stat. 1331, reported in Interpreter
      Releases, Vol. 65, No. 1, January 4, 1988, pp. 1 2; see also No. 11, March 21, 1988, p. 269; No. 15, April 18, 1988, p. 411
      (reporting on implementation of EVD legalization program).

**End of Document**                                    © 20  9 Thomson Reuters. No c a m to or g na  U.S. Government Works.

Policy Number: 10075.1
FEA Number: 306-112-0026

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

June 17, 2011

MEMORANDUM FOR:     All Field Office Directors
                    All Special Agents in Charge
                    All Chief Counsel

FROM:               John Morton
                    Director

SUBJECT:            Exercising Prosecutorial Discretion Consistent with the Civil
                    Immigration Enforcement Priorities of the Agency for the
                    Apprehension, Detention, and Removal of Aliens

Purpose

This memorandum provides U.S. Immigration and Customs Enforcement (ICE) personnel
guidance on the exercise of prosecutorial discretion to ensure that the agency's immigration
enforcement resources are focused on the agency's enforcement priorities. The memorandum
also serves to make clear which agency employees may exercise prosecutorial discretion and
what factors should be considered.

This memorandum builds on several existing memoranda related to prosecutorial discretion with
special emphasis on the following:

- Sam Bernsen, Immigration and Naturalization Service (INS) General Counsel, Legal
  Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976);
- Bo Cooper, INS General Counsel, INS Exercise of Prosecutorial Discretion (July 11,
  2000);
- Doris Meissner, INS Commissioner, Exercising Prosecutorial Discretion (November 17,
  2000);
- Bo Cooper, INS General Counsel, Motions to Reopen for Considerations of Adjustment
  of Status (May 17, 2001);
- William J. Howard, Principal Legal Advisor, Prosecutorial Discretion (October 24,
  2005);
- Julie L. Myers, Assistant Secretary, Prosecutorial and Custody Discretion (November 7,
  2007);
- John Morton, Director, Civil Immigration Enforcement Priorities for the Apprehension,
  Detention, and Removal of Aliens (March 2, 2011); and
- John Morton, Director, Prosecutorial Discretion: Certain Victims, Witnesses, and
  Plaintiffs (June 17, 2011).

www.ice.gov

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

The following memoranda related to prosecutorial discretion are rescinded:

- Johnny N. Williams, Executive Associate Commissioner (EAC) for Field Operations, Supplemental Guidance Regarding Discretionary Referrals for Special Registration (October 31, 2002); and
- Johnny N. Williams, EAC for Field Operations, Supplemental NSEERS Guidance for Call-In Registrants (January 8, 2003).

Background

One of ICE's central responsibilities is to enforce the nation's civil immigration laws in coordination with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). ICE, however, has limited resources to remove those illegally in the United States. ICE must prioritize the use of its enforcement personnel, detention space, and removal assets to ensure that the aliens it removes represent, as much as reasonably possible, the agency's enforcement priorities, namely the promotion of national security, border security, public safety, and the integrity of the immigration system. These priorities are outlined in the ICE Civil Immigration Enforcement Priorities memorandum of March 2, 2011, which this memorandum is intended to support.

Because the agency is confronted with more administrative violations than its resources can address, the agency must regularly exercise "prosecutorial discretion" if it is to prioritize its efforts. In basic terms, prosecutorial discretion is the authority of an agency charged with enforcing a law to decide to what degree to enforce the law against a particular individual. ICE, like any other law enforcement agency, has prosecutorial discretion and may exercise it in the ordinary course of enforcement[1]. When ICE favorably exercises prosecutorial discretion, it essentially decides not to assert the full scope of the enforcement authority available to the agency in a given case.

In the civil immigration enforcement context, the term "prosecutorial discretion" applies to a broad range of discretionary enforcement decisions, including but not limited to the following:

- deciding to issue or cancel a notice of detainer;
- deciding to issue, reissue, serve, file, or cancel a Notice to Appear (NTA);
- focusing enforcement resources on particular administrative violations or conduct;
- deciding whom to stop, question, or arrest for an administrative violation;
- deciding whom to detain or to release on bond, supervision, personal recognizance, or other condition;
- seeking expedited removal or other forms of removal by means other than a formal removal proceeding in immigration court;

---

[1] The Meissner memorandum's standard for prosecutorial discretion in a given case turned principally on whether a substantial federal interest was present. Under this memorandum, the standard is principally one of pursuing those cases that meet the agency's priorities for federal immigration enforcement generally.

CAR 0862

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

- settling or dismissing a proceeding;
- granting deferred action, granting parole, or staying a final order of removal;
- agreeing to voluntary departure, the withdrawal of an application for admission, or other action in lieu of obtaining a formal order of removal;
- pursuing an appeal;
- executing a removal order; and
- responding to or joining in a motion to reopen removal proceedings and to consider joining in a motion to grant relief or a benefit.

Authorized ICE Personnel

Prosecutorial discretion in civil immigration enforcement matters is held by the Director[2] and may be exercised, with appropriate supervisory oversight, by the following ICE employees according to their specific responsibilities and authorities:

- officers, agents, and their respective supervisors within Enforcement and Removal Operations (ERO) who have authority to institute immigration removal proceedings or to otherwise engage in civil immigration enforcement;

- officers, special agents, and their respective supervisors within Homeland Security Investigations (HSI) who have authority to institute immigration removal proceedings or to otherwise engage in civil immigration enforcement;

- attorneys and their respective supervisors within the Office of the Principal Legal Advisor (OPLA) who have authority to represent ICE in immigration removal proceedings before the Executive Office for Immigration Review (EOIR); and

- the Director, the Deputy Director, and their senior staff.

ICE attorneys may exercise prosecutorial discretion in any immigration removal proceeding before EOIR, on referral of the case from EOIR to the Attorney General, or during the pendency of an appeal to the federal courts, including a proceeding proposed or initiated by CBP or USCIS. If an ICE attorney decides to exercise prosecutorial discretion to dismiss, suspend, or close a particular case or matter, the attorney should notify the relevant ERO, HSI, CBP, or USCIS charging official about the decision. In the event there is a dispute between the charging official and the ICE attorney regarding the attorney's decision to exercise prosecutorial discretion, the ICE Chief Counsel should attempt to resolve the dispute with the local supervisors of the charging official. If local resolution is not possible, the matter should be elevated to the Deputy Director of ICE for resolution.

---

[2] Delegation of Authority to the Assistant Secretary, Immigration and Customs Enforcement, Delegation No. 7030.2 (November 13, 2004), delegating among other authorities, the authority to exercise prosecutorial discretion in immigration enforcement matters (as defined in 8 U.S.C. § 1101(a)(17)).

CAR 0863

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

Factors to Consider When Exercising Prosecutorial Discretion

When weighing whether an exercise of prosecutorial discretion may be warranted for a given alien, ICE officers, agents, and attorneys should consider all relevant factors, including, but not limited to—

- the agency's civil immigration enforcement priorities;
- the person's length of presence in the United States, with particular consideration given to presence while in lawful status;
- the circumstances of the person's arrival in the United States and the manner of his or her entry, particularly if the alien came to the United States as a young child;
- the person's pursuit of education in the United States, with particular consideration given to those who have graduated from a U.S. high school or have successfully pursued or are pursuing a college or advanced degrees at a legitimate institution of higher education in the United States;
- whether the person, or the person's immediate relative, has served in the U.S. military, reserves, or national guard, with particular consideration given to those who served in combat;
- the person's criminal history, including arrests, prior convictions, or outstanding arrest warrants;
- the person's immigration history, including any prior removal, outstanding order of removal, prior denial of status, or evidence of fraud;
- whether the person poses a national security or public safety concern;
- the person's ties and contributions to the community, including family relationships;
- the person's ties to the home country and conditions in the country;
- the person's age, with particular consideration given to minors and the elderly;
- whether the person has a U.S. citizen or permanent resident spouse, child, or parent;
- whether the person is the primary caretaker of a person with a mental or physical disability, minor, or seriously ill relative;
- whether the person or the person's spouse is pregnant or nursing;
- whether the person or the person's spouse suffers from severe mental or physical illness;
- whether the person's nationality renders removal unlikely;
- whether the person is likely to be granted temporary or permanent status or other relief from removal, including as a relative of a U.S. citizen or permanent resident;
- whether the person is likely to be granted temporary or permanent status or other relief from removal, including as an asylum seeker, or a victim of domestic violence, human trafficking, or other crime; and
- whether the person is currently cooperating or has cooperated with federal, state or local law enforcement authorities, such as ICE, the U.S Attorneys or Department of Justice, the Department of Labor, or National Labor Relations Board, among others.

This list is not exhaustive and no one factor is determinative. ICE officers, agents, and attorneys should always consider prosecutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities.

4

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

That said, there are certain classes of individuals that warrant particular care. As was stated in the Meissner memorandum on Exercising Prosecutorial Discretion, there are factors that can help ICE officers, agents, and attorneys identify these cases so that they can be reviewed as early as possible in the process.

The following positive factors should prompt particular care and consideration:

- veterans and members of the U.S. armed forces;
- long-time lawful permanent residents;
- minors and elderly individuals;
- individuals present in the United States since childhood;
- pregnant or nursing women;
- victims of domestic violence, trafficking, or other serious crimes;
- individuals who suffer from a serious mental or physical disability; and
- individuals with serious health conditions.

In exercising prosecutorial discretion in furtherance of ICE's enforcement priorities, the following negative factors should also prompt particular care and consideration by ICE officers, agents, and attorneys:

- individuals who pose a clear risk to national security;
- serious felons, repeat offenders, or individuals with a lengthy criminal record of any kind;
- known gang members or other individuals who pose a clear danger to public safety; and
- individuals with an egregious record of immigration violations, including those with a record of illegal re-entry and those who have engaged in immigration fraud.

Timing

While ICE may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing the enforcement proceeding. As was more extensively elaborated on in the Howard Memorandum on Prosecutorial Discretion, the universe of opportunities to exercise prosecutorial discretion is large. It may be exercised at any stage of the proceedings. It is also preferable for ICE officers, agents, and attorneys to consider prosecutorial discretion in cases without waiting for an alien or alien's advocate or counsel to request a favorable exercise of discretion. Although affirmative requests from an alien or his or her representative may prompt an evaluation of whether a favorable exercise of discretion is appropriate in a given case, ICE officers, agents, and attorneys should examine each such case independently to determine whether a favorable exercise of discretion may be appropriate.

In cases where, based upon an officer's, agent's, or attorney's initial examination, an exercise of prosecutorial discretion may be warranted but additional information would assist in reaching a final decision, additional information may be requested from the alien or his or her representative. Such requests should be made in conformity with ethics rules governing

5

CAR 0865

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the*
*Apprehension, Detention, and Removal of Aliens*

communication with represented individuals[3] and should always emphasize that, while ICE may be considering whether to exercise discretion in the case, there is no guarantee that the agency will ultimately exercise discretion favorably. Responsive information from the alien or his or her representative need not take any particular form and can range from a simple letter or e-mail message to a memorandum with supporting attachments.

Disclaimer

As there is no right to the favorable exercise of discretion by the agency, nothing in this memorandum should be construed to prohibit the apprehension, detention, or removal of any alien unlawfully in the United States or to limit the legal authority of ICE or any of its personnel to enforce federal immigration law. Similarly, this memorandum, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[3] For questions concerning such rules, officers or agents should consult their local Office of Chief Counsel.

6

CAR 0866

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Domestic Operations (MS-2110)*
Washington, DC  20529



**U.S. Citizenship
and Immigration
Services**

June 15, 2009

# Memorandum

TO:        Field Leadership

FROM:      Donald Neufeld
           Acting Associate Director, Office of Domestic Operations

SUBJECT:   Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children

## I. Purpose

This memorandum provides guidance to U.S. Citizenship and Immigration Services (USCIS) field offices and service centers regarding the processing of surviving spouses of deceased U.S. citizens and qualifying children of the surviving spouses. It affords a new process by which they may apply for deferred action. This policy guidance will be in effect until further notice and may be revised as needed.

## II. Background

Section 205.1(a)(3)(i)(C) of title 8 of the Code of Federal Regulations (8 CFR) requires that the approval of  Form I-130, *Petition for Alien Relative*, be automatically revoked upon the death of the petitioner if the beneficiary[1] has not adjusted status in the United States or been inspected and admitted as an immigrant. In such instances, the beneficiary may request a reinstatement of the approval and USCIS, in its discretion, may grant such a request for humanitarian reasons.  8 CFR 205.1(a)(3)(i)(C)(2).

However, no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death and (1) the immigrant petition filed by the citizen on behalf of the surviving spouse has not been adjudicated by USCIS at the time of the citizen's death, or (2) no petition was filed by the citizen before the citizen's death. This issue has caused a split among the circuit courts of appeal and is also the subject of proposed legislation in the U.S. Congress (bills S. 815 and H.R. 1870).

---

[1] Depending on context, the term beneficiary in this guidance may include both actual and potential beneficiaries of Forms I-130 filed on their behalf.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 2

## III. Policy Guidance

This policy guidance covers only (1) surviving spouses of U.S. citizens who died before the second anniversary of the marriage, who have not remarried and were not legally separated from the citizen spouse at the time of the citizen's death, and who are residing in the United States,[2] and (2) such surviving spouses' qualifying children.  For purposes of this policy guidance, "qualifying children" are any children of the surviving spouse of the deceased U.S. citizen who remain unmarried and under 21 years of age (age determinations for beneficiaries of Forms I-130 should be made as provided in section 201(f) of the INA).

This guidance applies to the aforementioned beneficiaries without regard to their manner of entry into the United States.  Such surviving spouses are covered without restrictions on how long the U.S. citizen spouse has been deceased as long as the surviving spouse has not remarried.[3]

This guidance does not cover surviving spouses or qualifying children of deceased U.S. citizens who are residing outside the United States or surviving spouses and children of a lawful permanent resident or other non-U.S. citizen.  This guidance also does not cover surviving spouses or qualifying children of deceased U.S. citizens if the surviving spouse remarried at any time after the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated).  This guidance does not cover any beneficiary who was legally separated from his or her U.S. citizen spouse at the time of the citizen's death, or such beneficiary's children.

Since current section 201(b)(2)(A)(i) of the Immigration and Nationality Act (INA) treats covered widow(er)s of U.S. citizens and their children as immediate relatives based upon a self-petition, they are not covered by this guidance.  They may file a Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, in accordance with the instructions on the Form.

In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens, USCIS is instituting the following policy guidance, which is effective immediately and until further notice.

## A. <u>Form I-130 Approved Prior to the Death of the U.S. Citizen Spouse (Petitioner)</u>

Upon the death of the U.S. citizen petitioner, the approved Form I-130 is automatically revoked pursuant to 8 CFR 205.1(a)(3)(i)(C).  The beneficiary, however, may request reinstatement of the revoked petition pursuant to 8 CFR 205.1(a)(3)(i)(C)(2).  USCIS may then exercise discretion and grant the reinstatement after considering the facts and humanitarian considerations of the particular

---

[2] Section III(A) of this memorandum, however, regarding humanitarian reinstatement, shall apply to surviving spouses outside the United States.

[3] This guidance is also applicable to a beneficiary who entered the United States on a K-1 Nonimmigrant Visa and married a U.S. citizen other than the U.S. citizen petitioner who filed the I-129F.  If the U.S. citizen spouse died before the second anniversary of the marriage, the widow(er) is eligible for deferred action or humanitarian reinstatement as described herein.

CAR 0868

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 3

case.  If the request for humanitarian reinstatement is approved, the beneficiary may proceed to the adjustment of status or consular processing stage.

This memorandum does not alter the process for reviewing a Form I-130 returned to USCIS by a U.S. Consular Officer overseas when the beneficiary is seeking a humanitarian reinstatement.  If USCIS reinstates the Form I-130 returned by the consular officer, the I-130 should be forwarded to the National Visa Center to allow the beneficiary to resume consular processing.  Section III(A) of this guidance, relating to humanitarian reinstatement, applies to beneficiaries who are within or outside the United States.

If a beneficiary covered by this guidance requests humanitarian reinstatement, adjudicators should presume that humanitarian reasons support a grant of the request.  Absent extraordinary factors or a failure to meet the regulatory requirements of 8 CFR 205.1(a)(3)(i)(C)(2), adjudicators should favorably exercise discretion accordingly.  If the request for reinstatement cannot be granted for any reason other than confirmed or suspected fraud or issues of criminality or national security, the beneficiary should be informed that he or she may request deferred action in the manner described in III(E) below.

In a case governed by First, Sixth or Ninth Circuit law, officers should consult with local USCIS counsel before treating an approved spousal immediate relative petition as "revoked" under 8 CFR 205.1(a)(3)(i)(C).  Courts in those jurisdictions have held that the visa petitioner's death does *not* end a surviving spouse's eligibility for classification as an immediate relative.  Taing v. Napolitano, ___ F.3d ___, 2009 WL 1395836 (1st Cir. 2009); Lockhart v. Napolitano, 561 F.3d 611 (6th Cir. 2009); Freeman v. Gonzales, 444 F.3d 1031 (9th Cir. 2006).

**B.   Form I-130 Pending at the Time of Death of the U.S. Citizen Spouse (Petitioner) – Married Less than 2 Years at Time of Death**

Once USCIS has received a copy of the U.S. citizen petitioner's death certificate, the pending, stand-alone Form I-130 should be held in abeyance at the pending location.  Petitions may be transferred to the Vermont Service Center to be consolidated with the A-file housing a deferred action request, if such a request is made by the beneficiary (see further guidance below).

Any concurrently filed Form I-485, *Application to Register Permanent Residence or Adjust Status*, and Form I-130, should be held in abeyance at the National Benefits Center until further guidance.  The beneficiary will remain eligible to receive the interim benefits of advance parole and employment authorization on the basis of the pending adjustment of status application.

If a Form I-485 was not concurrently filed, the beneficiary should be informed that he or she may request deferred action in the manner described in section III(E) below.

Note:  In instances where the beneficiary and deceased U.S. citizen petitioner were married for at least two years at the time of the petitioner's death, the Form I-130 should be denied under existing

CAR 0869

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 4

procedures.  Instructions should be provided to the beneficiary regarding the availability of the Form I-360 as a special immigrant widow/widower.  Any associated Form I-485 should also be denied.

**C.   Form I-130 Denied (Prior to the Issuance of this Guidance) due to the Death of the U.S. Citizen Spouse (Petitioner)**

A beneficiary who is the surviving spouse of a U.S. citizen petitioner and whose petition was denied by USCIS (1) due to the death of the U.S. citizen petitioner, and (2) prior to the issuance of this guidance, may request deferred action in the manner described in section III(E) below.

**D.   Form I-130 Not Filed Prior to the Death of the U.S. Citizen Spouse**

A beneficiary who was legally married to a now deceased U.S. citizen at the time of the U.S. citizen's death, but for whom no Form I-130 was filed, may request deferred action in the manner described in section III(E) below.

If the beneficiary was not legally married to, or was legally separated from, the deceased U.S. citizen at the time of the U.S. citizen's death, a qualifying relationship does not exist.  The beneficiary is therefore not eligible to submit Form I-360 based on the specific policy guidance set forth in section III(E) below.

**E.   Required Documentation for Requests for Deferred Action**

Beneficiaries may request deferred action by submitting the following:

   1)   A Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, with the appropriate, nonwaivable filing fee (currently $375), completed in the format explained below; and
   2)   All of the documents requested in the Form I-360 filing instructions for widow/widowers.

The beneficiary of the Form I-360 must check box "**m.  Other, explain:**" in Part 2 of the petition and cite the basis for eligibility as "**Deferred Action -- Surviving spouse of a deceased U.S. citizen, married less than 2 years**."  The Form I-360 must be submitted to the Vermont Service Center for deferred action consideration.  Note that while USCIS is utilizing Form I-360 for these deferred action requests, such filings are NOT immigrant self-petitions under current law.  They should be adjudicated as requests for deferred action only.  In addition to the Part 2 information described above, the applicant must complete Parts 1, 3, 4, 7, 9, 10 and 11 of the Form I-360.

**F.   Decision on Requests for Deferred Action**

Requests for deferred action based on the specific policy guidance set forth in this memorandum may only be considered for:  1) surviving spouses of U.S. citizens whose U.S. citizen spouse died before the second anniversary of the marriage and who are unmarried and residing in the United States; and 2) their qualifying children who are residing in the United States.

CAR 0870

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 5

The following persons are ineligible for deferred action: 1) beneficiaries whose visa petition was denied or revoked for any reason other than or in addition to the death of the petitioning U.S. citizen spouse; 2) widow(er)s who have remarried or were legally separated from the U.S. citizen spouse at the time of the U.S. citizen's death; and 3) beneficiaries with other serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons.   A grant of deferred action is a discretionary action on the part of USCIS.  It is intended that this discretion should be liberally applied to provide a humanitarian benefit to eligible beneficiaries.  However, deferred action may be denied for serious adverse factors, whether or not such factors are specifically identified in this guidance.

Requests for deferred action based on the specific policy guidance set forth in this memorandum will not be considered for beneficiaries who: 1) are surviving spouses or qualifying children of non-U.S. citizens; 2) are residing outside the United States; 3) meet the conditional marriage period set forth in INA 201(b)(2)(A)(i); or 4) have remarried subsequent to the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated).

Once a decision on the request for deferred action has been made, the decision must be communicated to the beneficiary via a decision letter.  If the request has been granted, the deferred action grant letter must state that the beneficiary is eligible to file Form I-765, *Application for Employment Authorization*.  If the request has been denied, the deferred action denial letter must cite the reasons for the denial.  A decision on a request for deferred action falls within the discretion of the Secretary.  A denial of a request for deferred action is not subject to administrative appeal or judicial review, see INA § 242(a)(2)(B), and (g).

## G. Validity Period for Deferred Action

The validity period of deferred action based on the policy guidance set forth in this memorandum is two (2) years from the date of grant of the Form I-360 request for deferred action.

## H. Eligibility for Employment Authorization

The appropriate classification for Form I-765 filed on the basis of a deferred action grant is (C)(14) pursuant to 8 CFR 274a.12(c)(14).  Beneficiaries may submit Form I-765, with the appropriate filing fee (currently $340), using this classification at any time after the grant (but prior to the expiration) of deferred action.  However, they must demonstrate an economic necessity.  The validity period for an employment authorization document (EAD) under the classification (C)(14), based on the specific policy guidance set forth in this memorandum is two (2) years, not to exceed the expiration date of the grant of deferred action.

All requests for employment authorization based on the policy guidance set forth in this memorandum must contain the appropriate required supporting documentation.  Applicants must follow currently established filing procedures for the Form I-765 in accordance with the instructions on the form.  Fee waiver of the Form I-765 fee is available on a case-by-case basis for substantiated inability to pay as provided in 8 CFR 103.7(c)(1).

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 6

A beneficiary whose Form I-485 is being held in abeyance may also file a Form I-765, with the appropriate filing fee. The appropriate classification for employment authorization filed on such a basis is (C)(9) pursuant to 8 CFR 274a.12(c)(9). Evidence of an economic necessity is not required if using this classification. A beneficiary whose application is being held in abeyance may have been issued an employment authorization document valid for one year under category (C)(9). When such an applicant files a Form I-765 for renewal of his or her EAD under the classification (C)(9), based on the specific policy guidance set forth in this memorandum, the validity period will be **two (2) years**. An applicant with a valid EAD under the classification (C)(9) may file for renewal no more than 90 days prior to the expiration date of the valid document. The employment authorization may then be granted for two (2) years based on the specific policy guidance set forth in this memorandum.

## I.  Effect of Grant of Deferred Action

The grant of deferred action by USCIS does not confer or alter any immigration status. It does not convey or imply any waivers of inadmissibility that may exist, regardless of whether that inadmissibility is known to DHS or other agencies at the time of the request for deferred action. A grant of deferred action also does not eliminate any period of prior unlawful presence. However, periods of time in deferred action do not count as unlawful presence for the purposes of sections 212(a)(9)(B) and (C) of the INA. Any period of time in deferred action qualifies as a period of stay authorized by the Secretary of Homeland Security for those purposes.

## J.  Eligibility for Advance Parole

Beneficiaries granted deferred action based on the policy guidance set forth in this memorandum or whose applications for adjustment of status are being held in abeyance may request advance parole. Such request may be made by filing Form I-131, *Application for Travel Document*, in accordance with the Form I-131 instructions and with the appropriate fee. Note, however, that departure from the United States and return, even under a grant of advance parole, may adversely affect eligibility for adjustment of status of aliens with past periods of unlawful presence.

## K.  Implementation

USCIS offices and centers are to begin implementing the instructions established in this memorandum immediately.

## L.  Contact Information

Questions regarding this memorandum should be directed to the Office of Domestic Operations through appropriate channels.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 7

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person.


**<u>Distribution</u>**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

CAR 0873

75 FR 15715-03, 2010 WL 1186082(F.R.)

NOTICES

DEPARTMENT OF HOMELAND SECURITY

U.S. Citizenship and Immigration Services

[CIS No. 2493-10; DHS Docket No. USCIS-2010-0005]

RIN 1615-ZA97

Filing Procedures and Automatic Extension of Employment Authorization and
Related Documentation for Liberians Provided Deferred Enforced Departure

Tuesday, March 30, 2010

AGENCY: U.S. Citizenship and Immigration Services, Department of Homeland Security.

**\*15715**  ACTION: Notice.

SUMMARY: On March 18, 2010, President Obama issued a memorandum to the Secretary of Homeland Security
(the Secretary), Janet Napolitano, directing the Secretary to extend for an additional 18 months the deferred enforced
departure (DED) of certain Liberians and to provide for work authorization during that period. The extension runs
from April 1, 2010, through September 30, 2011. This notice announces an automatic 6-month extension of current
employment authorization documents (EADs) held by Liberians whose DED has been extended under the presidential
memorandum and informs eligible Liberians and their employers how to determine which EADs are automatically
extended. This notice also provides instructions for eligible Liberians on how to apply for the full 18-month extension
of employment authorization. Finally, this notice provides instructions for DED-eligible Liberians on how to apply for
permission to travel outside the United States during the 18-month DED period.

DATES: This notice is effective April 1, 2010. The 6-month automatic extension of employment authorization for
Liberians who are eligible for DED, including the extension of their EADs, as specified in this notice, is effective on
April 1, 2010. This automatic extension will expire on September 30, 2010. The 18-month extension of DED is valid
through September 30, 2011.

FOR FURTHER INFORMATION CONTACT:

• For further information on DED, including guidance on the application process for employment authorization and
additional information on eligibility, please visit the USCIS Web site at http://www.uscis.gov. Under the heading
"Humanitarian" select "Temporary Protected Status" from the homepage. You can then choose the DED page or the
Liberian-specific page.  **\*15716**  You can find detailed information about this DED extension on our Web site at the
Liberian Questions & Answers Section.

• You can also contact the DED Operations Program Manager, Service Center Operations Directorate, U.S. Citizenship
and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Washington, DC
20529-2060, telephone (202) 272-1533. This is not a toll-free call. Note: the phone number provided here is solely
for questions regarding this Federal Register notice. It is not for individual case status inquiries. Applicants seeking
information about the status of individual cases can check Case Status Online available at the USCIS Web site at http://
www.uscis.gov, or call the USCIS National Customer Service Center at 1-800-375-5283 (TTY 1-800-767-1833).

• Further information will also be available at local USCIS offices upon publication of this notice.

SUPPLEMENTARY INFORMATION:

**Presidential Memorandum Extending DED for Certain Liberians**

In accordance with his constitutional authority to conduct the foreign relations of the United States, President Obama has directed that Liberians (and eligible persons without nationality who last resided in Liberia) who are physically present in the United States and who held TPS on September 30, 2007, and are under a grant of DED through March 31, 2010, be provided DED for an additional 18-month period after their current DED status ends. See Memorandum from President Obama to the Secretary of Homeland Security dated March 18, 2010 ("Presidential Memorandum"). The President also directed the Secretary to implement the necessary steps to authorize employment authorization for eligible Liberians for 18 months from April 1, 2010, through September 30, 2011.

**Employment Authorization and Filing Requirements**

*How Will I Know if I Am Eligible for Employment Authorization Under the Presidential Memorandum That Extended DED for Certain Liberians for 18 Months?*

The DED extension and the procedures for employment authorization in this notice apply to Liberian nationals (and persons without nationality who last habitually resided in Liberia) who were covered by DED through March 31, 2010. Such individuals include only Liberians who are physically present in the United States, held TPS on September 30, 2007, and are under a grant of DED through March 31, 2010.

This DED extension does not include any individual:

• Who would be ineligible for TPS for the reasons provided in section 244(c)(2)(B) of the Immigration and Nationality Act (INA), 8 U.S.C. 1254a(c)(2)(B);

• Whose removal the Secretary of Homeland Security determines is in the interest of the United States;

• Whose presence or activities in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States;

• Who has voluntarily returned to Liberia or his or her country of last habitual residence outside the United States;

• Who was deported, excluded, or removed prior to March 18, 2010; or

• Who is subject to extradition.

*What Will I Need To File if I Am Covered by DED and Would Like To Have Evidence of Employment Authorization?*

If you are covered under DED for Liberia, and would like employment authorization during the 18-month extension of DED, you must apply for an Employment Authorization Document (EAD) on Form I-765, Application for Employment Authorization. You must file Form I-765 with USCIS during the DED extension period that begins on April 1, 2010. Please carefully follow the Form I-765 instructions when completing the application for an EAD. On Form I-765, you must:

• Indicate that you are eligible for DED; and

• Include a copy of your last Form I-797, Notice of Action, showing that you were approved for TPS as of September 30, 2007, if such copy is available. (Please note that evidence of TPS as of September 30, 2007, is necessary to show that you were covered under the previous DED for Liberia through March 31, 2010.

*How Will I Know if I Will Need To Obtain Biometrics?*
If biometrics are required to produce the secure EAD, you will be notified by USCIS and scheduled for an appointment at a USCIS Application Support Center. The new EAD will be valid through September 30, 2011.

*Where Do I Submit My Completed Form I-765?*
Please submit your completed Form I-765 and supporting documentation to: USCIS, Attn: DED Liberia, P.O. Box 8677, Chicago, IL 60680-8677.

*Can I File My Form I-765 Electronically?*
No. Electronic filing is not available for filing Form I-765 based on DED.

**Extension of Employment Authorization and EADs**

*May I Request an Interim EAD at My Local Office?*
No. Local USCIS offices will not issue interim EADs to individuals eligible for DED under the Presidential Memorandum.

*Am I Eligible To Receive an Automatic 6-Month EAD Extension From April 1, 2010, Through September 30, 2010?*
You are eligible for an automatic 6-month extension of your EAD if you are a national of Liberia (or person having no nationality who last habitually resided in Liberia), and you are currently covered by DED through March 31, 2010.

This automatic extension covers EADs issued on Form I-766, Employment Authorization Document, bearing an expiration date of March 31, 2010. These EADs must also bear the notation "A-11" on the face of the card under "Category."

*What Documents May a Qualified Individual Show to His or Her Employer through September 30, 2010, as Proof of Employment Authorization and Identity When Completing Form I-9?*
During the first 6 months, qualified individuals who have received a 6-month automatic extension of their EADs covered under this Federal Register notice may present their automatically extended Form I-766 with an expiration date of March 31, 2010, to their employers as proof of employment authorization and identity. The EAD must bear the notation "A-11" on the face of the card under "Category." To minimize confusion over this automatic extension at the time of hire or re-verification, qualified individuals may also present a copy of this Federal Register notice regarding the automatic extension of EADs through September 30, 2010.

*What Documents May a Qualified Individual Show to His or Her Employer After September 30, 2010, as Proof of Employment Authorization and Identity When Completing Form I-9?*
After September 30, 2010, individuals covered under this notice may present their EADs on Form I-766 with an expiration date of September 30, 2011, to their employers as proof of employment authorization and identity. **\*15717** The EAD will bear the notation "A-11" on the face of the card under "Category." After September 30, 2010, employers may not accept EADs without a valid date.

Employers should not request proof of Liberian citizenship. Employers should accept EADs as valid "List A" documents. Employers should not ask for additional Form I-9 documentation if presented with an EAD that is valid pursuant to this Federal Register notice, and the EAD reasonably appears on its face to be genuine and to relate to the employee.

Employees also may present any other legally acceptable document or combination of documents listed on Form I-9 as proof of identity and employment eligibility.

Note to Employers: Employers are reminded that the laws requiring employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth re-verification requirements. For questions, employers may call the USCIS Customer Assistance Office at 1-800-357-2099. Employers may also call the U.S. Department of Justice Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) Employer Hotline at 1-800-255-8155. Additional information is available on the OSC Web site at http:// www.justice.gov/crt/osc/.

Note to Employees: Employees or applicants may call the OSC Employee Hotline at 1-800-255-7688 for information. Additional information is available on the OSC Web site at http://www.justice.gov/crt/osc/.


**Travel Authorization and Advance Parole**

Individuals covered under DED who want to travel outside of the United States must apply for and receive advance parole by filing Form I-131, Application for Travel Document, with required fees before departing the United States. See 8 CFR 223.2(a). The determination whether to grant advance parole is within the discretion of the Department of Homeland Security and is not guaranteed in all cases. If you seek advance parole in order to go to Liberia, you may risk being found ineligible to re-enter the United States under DED because the President's memorandum excludes persons "who have voluntarily returned to Liberia."

You may submit your completed Form I-131 with your Form I-765. If you choose to file a Form I-131 separately, please submit the application along with supporting documentation that you qualify for DED to: USCIS, Attn: DED Liberia, P.O. Box 8677, Chicago, IL 60680-8677.

If you have a pending or approved I-765, please submit the I-797 notice of receipt or approval along with your Form I-131 and supporting documentation.

Dated: March 24, 2010.

Alejandro Mayorkas,

Director, U.S. Citzenship and Immigration Services.


[FR Doc. 2010-7115 Filed 3-29-10; 8:45 am]

BILLING CODE 9111-97-P

---

**End of Document**                    © 20 9 Thomson Reuters. No c a m to or g na  U.S. Government Works.

## Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege

As a matter of statutory construction and separation of powers analysis, a United States Attorney is not required to refer a congressional contempt citation to a grand jury or otherwise to prosecute an Executive Branch official who carries out the President's instruction to invoke the President's claim of executive privilege before a committee of Congress.

May 30, 1984

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### I. Introduction

This memorandum memorializes our formal response to your request for our opinion whether, pursuant to the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194, a United States Attorney must prosecute or refer to a grand jury a citation for contempt of Congress issued with respect to an Executive Branch official who has asserted a claim of executive privilege in response to written instructions from the President of the United States. Your inquiry originally arose in the context of a resolution adopted by the House of Representatives on December 16, 1982, during the final days of the 97th Congress, which instructed the Speaker of the House of Representatives to certify the report of the Committee on Public Works and Transportation concerning the "contumacious conduct of [the] Administrator, United States Environmental Protection Agency, in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee . . . to the United States Attorney for the District of Columbia, to the end that the Administrator . . . may be proceeded against in the manner and form provided by law." H.R. Res. 632, 97th Cong., 2d Sess. (1982).[1] Section 192 of Title 2, United States Code, provides, in general, that willful failure to produce documents in response to a congressional subpoena shall be a misdemeanor. Section 194 provides that if such a failure is reported to either house of Congress it "shall" be certified to the "appropriate United States attorney whose duty it shall be to bring the matter before the grand jury for its action."

---

[1] Although the December 1982 dispute is now a matter of history, it raises recurring issues.

101

CAR 0878

Your inquiry presents a number of complex issues that will be considered in this memorandum. The first issue is whether the Executive retains some discretion with respect to referral of a contempt of Congress citation to a grand jury. This issue raises questions of statutory construction and the separation of powers with respect to the scope of the Executive's exercise of prosecutorial discretion. The second issue is whether the criminal contempt of Congress statute applies to an Executive Branch official who, on the orders of the President, asserts the President's claim of executive privilege. This issue also involves questions of statutory interpretation and the constitutional separation of powers.

As we have previously discussed with you, and as we explain in detail in this memorandum, we have concluded that, as a matter of both statutory construction and the Constitution's structural separation of powers, a United States Attorney is not required to refer a contempt citation in these circumstances to a grand jury or otherwise to prosecute an Executive Branch official who is carrying out the President's instruction in a factual context such as that presented by the December 16, 1982, contempt citation. First, as a matter of statutory interpretation reinforced by compelling separation of powers considerations, we believe that Congress may not direct the Executive to prosecute a particular individual without leaving any discretion to the Executive to determine whether a violation of the law has occurred. Second, as a matter of statutory interpretation and the constitutional separation of powers, we believe that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege in this context.

Our conclusions are predicated upon the proposition, endorsed by a unanimous Supreme Court less than a decade ago, that the President has the authority, rooted inextricably in the separation of powers under the Constitution, to preserve the confidentiality of certain Executive Branch documents. The President's exercise of this privilege, particularly when based upon the written legal advice of the Attorney General, is presumptively valid. Because many of the documents over which the President may wish to assert a privilege are in the custody of a department head, a claim of privilege over those documents can be perfected only with the assistance of that official. If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution.

Before setting out a more detailed explanation of our analysis and conclusions, we offer the caveat that our conclusions are limited to the unique circumstances that gave rise to these questions in late 1982 and early 1983.

102

CAR 0879

Constitutional conflicts within the federal government must be resolved care-
fully, based upon the facts of each specific case. Although tensions and friction
between coordinate branches of our government are not novel and were, in fact,
anticipated by the Framers of the Constitution, they have seldom led to major
confrontations with clear and dispositive resolutions.

> The accommodations among the three branches of the govern-
> ment are not automatic. They are undefined, and in the very
> nature of things could not have been defined, by the Constitu-
> tion. To speak of *lines* of demarcation is to use an inapt figure.
> There are vast stretches of ambiguous territory.

Frankfurter and Landis, *Power of Congress Over Procedure in Criminal
Contempts in "Inferior" Federal Courts*, 37 Harv. L. Rev. 1010, 1016 (1924)
(emphasis in original). "The great ordinances of the Constitution do not estab-
lish and divide fields of black and white." *Springer* v. *Philippine Islands*, 277
U.S. 189, 209 (1928) (Holmes, J., dissenting). Therefore, although we are
confident of our conclusions, prudence suggests that they should be limited to
controversies similar to the one to which this memorandum expressly relates,
and the general statements of legal principles should be applied in other
contexts only after careful analysis.

## II. Background

Because the difficult and sensitive constitutional issues that we consider in
this opinion could conceivably be resolved differently depending upon the
specific facts of a controversy, this analysis is presented in the context of the
December 16, 1982, actions of the House of Representatives. The facts sur-
rounding this dispute will be set out in detail in the following pages.

### A. EPA's Enforcement of the Superfund Act

On December 16, 1982, the House of Representatives cited the Administra-
tor of the Environmental Protection Agency (EPA) because she declined to
produce, in response to a broad subcommittee subpoena, a small portion of the
subpoenaed documents concerning the Comprehensive Environmental Re-
sponse, Compensation, and Liability Act, 42 U.S.C. §§ 9601, 9657 (Supp. V
1981) (Superfund Act). The Superfund Act, adopted in December of 1980,
authorizes the federal government to take steps to remedy the hazards posed by
abandoned and inactive hazardous waste sites throughout the United States.[2]
The EPA, which was delegated part of the President's authority to enforce the
Superfund Act in August of 1981,[3] has considerable flexibility with respect to

---

[2] Another statute, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, provides federal
authority to deal with the current disposal of hazardous industrial wastes.

[3] See Executive Order No. 12316, "Responses to Environmental Damage" (Aug. 14, 1981).

CAR 0880

how this goal may be accomplished. EPA may request the Department of Justice to proceed immediately against those responsible for the hazardous waste sites to "secure such relief as may be necessary to abate" an "imminent and substantial endangerment to the public health or welfare or the environment." *See* 42 U.S.C. § 9606. Alternatively, EPA may initiate clean-up efforts itself by using funds from the $1.6 billion Superfund. *See* 42 U.S.C. § 9631. If EPA itself implements the clean-up efforts, it may subsequently sue those responsible for the hazardous waste to recover the clean up cost and, in some instances, may obtain treble damages. *See* 42 U.S.C. § 9607. These two basic enforcement mechanisms are supplemented by other broad enforcement powers, which authorize the issuance of administrative orders "necessary to protect the public health and welfare and the environment" and to require designated persons to furnish information about the storage, treatment, handling, or disposal of hazardous substances. *See* 42 U.S.C. §§ 9606, 9604(e)(1). Finally, the Superfund Act imposes criminal liability on a person in charge of a facility from which a hazardous substance is released, if that person fails to notify the government of the release. *See* 42 U.S.C. § 9603.

Prior to the initiation of judicial proceedings, EPA must undertake intensive investigation and case preparation, including studying the nature and the extent of the hazard present at sites, identifying potentially responsible parties, and evaluating the evidence that exists or that must be generated to support government action. *See* Amended Declaration of Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel, EPA, filed in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Jan. 14, 1983). Many sites apparently involve hundreds of waste generators; hence, the initial investigation of a site can take months and involve the examination of tens of thousands of documents. *Id.*

Based on its initial investigations of hazardous waste sites throughout the country, EPA created a comprehensive national enforcement scheme and developed during 1982 an interim priorities list, which identified the 160 sites that posed the greatest risk to the public health and welfare and the environment.[4] EPA also promulgated enforcement guidelines to direct the implementation of the Superfund Act against these potentially hazardous sites. *See* 47 Fed. Reg. 20664 (1982).

Under this basic enforcement scheme, EPA commenced actual enforcement of the Superfund Act. As part of the enforcement effort with respect to each site, EPA generally develops a strategy for conducting negotiations and litigation consistent with its overall enforcement goals and the individual facts of each particular case. Once a case strategy has been developed, EPA notifies responsible parties that it intends to take action at a site unless the parties undertake an adequate clean up program on their own. Following the issuance of notice letters, EPA typically negotiates with responsible parties to agree on a

---

[4] Subsequently, EPA published a proposed national priorities list (to replace the interim list), which identified the 418 sites that, in EPA's judgment, required priority in use of the Superfund to effect clean up. *See* 47 Fed. Reg. 58476 (1982)

104

CAR 0881

clean up plan. These negotiations may involve hundreds of potentially respon-
sible parties and millions of dollars in clean up costs. Depending upon the
strengths and weaknesses of individual cases and the effect on the overall
enforcement effort, EPA may decide to settle with some but not all parties and
proceed to litigation with a certain number of potential defendants. If EPA
decides to bring a lawsuit, it refers the case to the Land and Natural Resources
Division of this Department, which is responsible for conducting the actual
litigation.[5]

During EPA's enforcement of the Superfund Act, the agency created or
received hundreds of thousands of documents concerning various aspects of
the enforcement process. Many of these documents concerned the facts relating
to specific hazardous waste sites; others involved general agency strategy and
policies with respect to the Superfund Act; still others, a small portion of the
enforcement files, were attorney and investigator memoranda and notes that
contained discussions of subjects such as EPA's enforcement strategy against
particular defendants, analyses of the strengths and weaknesses of the
government's case against actual or potential defendants, consideration of
negotiation and settlement strategy, lists of potential witnesses and their antici-
pated testimony, and other litigation planning matters. Enforcement officials at
both the career and policy level at EPA and in the Land and Natural Resources
Division at the Department of Justice determined that some of those docu-
ments, which concerned the legal merits and tactics with respect to individual
defendants in open enforcement files, were particularly sensitive to the en-
forcement process and could not be revealed outside the agencies directly
involved in the enforcement effort without risking injury to EPA's cases
against these actual and potential defendants in particular and the EPA enforce-
ment process in general.[6]

### B. The House Subcommittee's Demands for Enforcement Files

In the midst of EPA's ongoing enforcement efforts under the Superfund Act,
the Subcommittee on Oversight and Investigations of the House Committee on
Public Works and Transportation (Public Works Subcommittee), chaired by
Rep. Levitas, began hearings to review EPA enforcement of the Act. In the
course of these hearings, the Public Works Subcommittee first demanded
access to, and then subpoenaed, a wide range of documents concerning en-
forcement of the Superfund Act with respect to the 160 sites that were on the

---

[5] We understand that as of January 14, 1983, EPA had sent more than 1,760 notice letters, undertaken
Superfund financed action at 112 sites involving the obligation of in excess of $236 million, instituted
Superfund claims in 25 judicial actions, and obtained one criminal conviction. As of the early months of
1983, EPA and the Department of Justice had reached settlements in 23 civil actions providing for the
expenditure of more than $121 million to conduct clean up operations and were actively negotiating with
responsible parties concerning the clean up of 56 sites throughout the country. *See* Amended Declaration of
Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel of the
EPA, filed in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Jan. 14, 1983).
[6] *Id.*

105

CAR 0882

agency's interim priorities list. The documents demanded by the Public Works Subcommittee included not only documents concerning the facts relating to these sites and EPA's general policies, but also the sensitive material contained in open case files that set out discussions concerning case strategy with respect to actual and potential defendants.[7] The Public Works Subcommittee subpoena was dated November 16, 1982, and was served on November 22, 1982. It called for production of the subpoenaed documents eleven days later on December 2, 1982. The EPA Administrator responded to the Public Works Subcommittee's subpoena by offering to provide the Public Works Subcommittee with access to an estimated 787,000 pages of documents within the scope of the subpoena.[8] The EPA and the Land and Natural Resources Division officials responsible for conducting EPA enforcement litigation determined, however, that release outside the enforcement agencies of a limited number of the most sensitive enforcement documents contained in open files concerning current and prospective defendants would impair EPA's ongoing enforcement efforts and prevent EPA and the Department of Justice from effectively implementing the Superfund Act.

Therefore, in accordance with the explicit guidelines adopted by the President to govern possible claims of executive privilege, *see* Memorandum re: Procedures Governing Responses to Congressional Requests for Information (Nov. 4, 1982), EPA suggested that some of the documents be withheld under a claim of executive privilege and consulted with this Office and the Office of the Counsel to the President in order to determine whether such a claim might be asserted to avoid impairing the constitutional responsibility of the President to take care that the laws be faithfully executed. A further review of the documents in question by enforcement officials at EPA and the Land and Natural Resources Division was then undertaken to confirm that the particular documents selected for consideration for an executive privilege claim were, in the judgment of those officials, sufficiently sensitive that their disclosure outside the Executive Branch might adversely affect the law enforcement process. The documents were then reviewed by officials in this Office and officials in the Office of the Counsel to the President to confirm that the documents were of the type described by the enforcement officials. Various unsuccessful efforts were thereafter made to resolve the dispute short of a final confrontation. The President, based upon the unanimous recommendation of all Executive Branch officials involved in the process, ultimately determined to assert a claim of executive privilege with respect to 64 documents from open enforcement files that had been identified as sufficiently enforcement sensitive

---

[7] The subpoena required the EPA Administrator to produce: all books, records, correspondence, memoranda, papers, notes and documents drawn or received by the Administrator and/or her representatives since December 11, 1980, the date of enactment of the Superfund Act, including duplicates and excepting shipping papers and other commercial or business documents, contractor and/or other technical documents, for those sites listed as national priorities pursuant to Section 105(8)(B) of the Superfund Act. *See United States* v. *House of Representatives*, 556 F. Supp. 150, 151 (D.D.C. 1983).

[8] *See* Testimony of Administrator Gorsuch before the Public Works Subcommittee, attached as Exhibit C to Declaration of Robert M. Perry, *supra*.

CAR 0883

as of the return date of the subpoena that their disclosure might adversely affect pending investigations and open enforcement proceedings. The President implemented this decision in a memorandum dated November 30, 1982, to the EPA Administrator, which instructed her to withhold the particularly sensitive documents from disclosure outside the Executive Branch as long as the documents remained critical to ongoing or developing enforcement actions. The legal basis for this decision was explained in letters from the Attorney General on November 30, 1982, to the House Public Works Subcommittee and one other House subcommittee.[9] On December 2, 1982, 64 of the most sensitive documents were withheld from the Subcommittee.[10]

## C. The Contempt of Congress Proceedings in the House of Representatives

The President's assertion of executive privilege, and the Attorney General's explanation of the law enforcement considerations and constitutional justification for the decision not to release the documents outside the Executive Branch while enforcement proceedings were ongoing, did not dissuade the congressional subcommittees from pressing their demands for the withheld material. After the EPA Administrator asserted the President's claim of privilege at a December 2, 1982, Public Works Subcommittee hearing, the Subcommittee immediately approved a contempt of Congress resolution against her. The full Committee did likewise on December 10, 1982, and rejected a further proposal by the Department of Justice to establish a formal screening process and briefings regarding the contents of the documents.[11] The full House adopted the contempt of Congress resolution on December 16, 1982,[12] and the follow-

---

[9] *See* Letters to Hon. Elliott H. Levitas and Hon. John D. Dingell from Attorney General William French Smith (Nov. 30, 1982). The Subcommittee on Oversight and Investigations of the House Energy and Commerce Committee (Energy and Commerce Subcommittee), chaired by Representative John D. Dingell, was pursuing a parallel demand for similar documents relating to enforcement of the Superfund Act with respect to certain specific sites that were among the 160 on the interim priorities list. While the Energy and Commerce Subcommittee sought documents relative to three specific hazardous waste sites, the Public Works Subcommittee subpoena demanded production of virtually all documents for all 160 sites. The President's assertion of executive privilege applied to both subpoenas. Although the Energy and Commerce Subcommittee approved a contempt of Congress resolution against the EPA Administrator, this resolution never reached the full Committee or the floor of the House of Representatives.

[10] As of that date, EPA had been able to examine only a portion of the hundreds of thousands of pages of documents that had been subpoenaed. The 64 documents that were withheld were those among the subpoenaed documents that had been reviewed and determined to fall within the President's instruction not to produce documents the release of which would adversely affect ongoing enforcement proceedings *See* Amended Declaration of Robert M. Perry, *supra*

[11] *See* Letter to Hon. Elliott H. Levitas from Robert A. McConnell, Assistant Attorney General, Office of Legislative Affairs (Dec. 9, 1982).

[12] The contempt resolution stated:

Resolved, That the Speaker of the House of Representatives certify the report of the Committee on Public Works and Transportation as to the contumacious conduct of Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee served upon Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, and as ordered by the subcommittee, together with all of the facts in

Continued

107

CAR 0884

ing day Speaker O'Neill certified the contempt citation to the United States Attorney for the District of Columbia for prosecution under the criminal contempt of Congress statute.

### D. The Criminal Contempt of Congress Statute

The criminal contempt of Congress statute contains two principal sections, 2 U.S.C. §§ 192 & 194.[13] Section 192, which sets forth the criminal offense of contempt of Congress, provides in pertinent part:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House . . . or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

Section 194 purports to impose mandatory duties on the Speaker of the House or the President of the Senate, as the case may be, and the United States Attorney, to take certain actions leading to the prosecution of persons certified by a house of Congress to have failed to produce information in response to a subpoena. It provides:

> Whenever a witness summoned as mentioned in section 192 of this title fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House . . . or any committee or subcommittee of either House of Congress, and the fact of such failure or failures is reported to either House while Congress is in session or when Congress is not in session, a statement of fact constituting such failure is reported and filed with the President of the Senate or the Speaker of the House, *it shall be the duty of the said President of the Senate or the Speaker of the House*, as the case may be, *to certify, and he shall so certify, the statement of facts* aforesaid under the seal of the

---

[12] (. . . continued)

> connection therewith, under seal of the House of Representatives, to the United States attorney for the District of Columbia, to the end that Anne M. Gorsuch, as Administrator, United States Environmental Protection Agency, may be proceeded against in the manner and form provided by law.

128 Cong. Rec. 31754 (1982).

[13] A third provision, 2 U.S.C. § 193, which denies the existence of any testimonial privilege for a witness to refuse to testify on the ground that this testimony would disgrace him, is not relevant to the issues discussed in this memorandum.

108

CAR 0885

> Senate or House, as the case may be, *to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action.*

(Emphasis added.)

### E. The Department of Justice Civil Suit

Immediately after the House passed the resolution adopting the finding that the EPA Administrator was in contempt of Congress, the Department of Justice filed a civil suit in the United States District Court for the District of Columbia to obtain a ruling that "insofar as [the EPA] Administrator . . . did not comply with the Subpoena, her non-compliance was lawful" because of a valid Presidential claim of executive privilege.[14] The House moved to dismiss the Department's complaint on jurisdictional grounds, and the Department cross moved for summary judgment on the merits. In a letter to Speaker O'Neill dated December 27, 1982, the United States Attorney indicated that during the pendency of the lawsuit, he would take no further action with respect to the Speaker's referral of the contempt citation. The Speaker responded in a letter dated January 4, 1983, in which he took the position that the United States Attorney must, as a matter of law, immediately refer the matter to a grand jury.

The trial court responded to the cross-motions for dismissal and summary judgment by exercising its discretion under equitable rules of judicial restraint not to accept jurisdiction over the lawsuit, and it dismissed the suit. The court concluded:

> When constitutional disputes arise concerning the respective powers of the Legislative and Executive Branches, judicial intervention should be delayed until all possibilities for settlement have been exhausted. . . .

> The difficulties apparent in prosecuting [the] Administrator . . . for contempt of Congress should encourage the two branches to settle their differences without further judicial involvement.

*United States* v. *House of Representatives*, 556 F. Supp. 150, 152–53 (D.D.C. 1983). No appeal was taken.[15]

---

[14] *See* Amended Complaint in *United States* v. *House of Representatives*, Civ. No. 82–3583 (D.D.C. Dec. 29, 1982).

[15] Although the United States Court of Appeals for the District of Columbia Circuit previously had been willing to entertain a civil action to resolve a conflict between a congressional subpoena for documents and a Presidential claim of executive privilege when the action was brought by a congressional committee, *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir 1974) (en banc), the trial court decision in the EPA matter casts some doubt on the viability of such an action when Congress, as in this case, does not wish to resolve the controversy in a civil suit. We must assume, for the purpose of this opinion, that a civil suit is an avenue that is open to Congress, but closed to the Executive, absent a legislature willing to have the matter resolved in a civil proceeding.

Of course, the courts might be more amenable to a civil action challenging a contempt citation if they felt that a criminal prosecution in this context was untenable. The district court judge in the EPA matter noted but did not attempt to consider in depth the "difficulties" of prosecuting an executive official for carrying out the President's constitutional responsibility.

CAR 0886

*F. Resolution of the EPA Dispute*

Subsequent to the trial court decision, the two branches engaged in negotiations to reach a compromise settlement. The parties eventually reached an agreement under which the Public Works Subcommittee would have limited access to the withheld documents and would sponsor a resolution to "withdraw" the contempt citation against the EPA Administrator. Pursuant to the agreement, the Subcommittee reviewed the documents, and the House later adopted a resolution withdrawing the contempt citation. H.R. Res. 180, 98th Cong., 1st Sess. (Aug. 3, 1983). The issue whether the House of Representatives in the 98th Congress could "withdraw" the contempt citation of the House during the 97th Congress was never resolved.

During the pendency of the lawsuit and the subsequent settlement negotiations, the United States Attorney for the District of Columbia refrained from referring the contempt citation to the grand jury. The United States Attorney took the position that referral would have been inappropriate during that period and that the statute left him with discretion to withhold referral. *See* Testimony of Stanley S. Harris before the House Committee on Public Works and Transportation, 98th Cong., 1st Sess. 100–07 (June 16, 1983). Following the passage of the resolution withdrawing the contempt citation, "the relevant facts and documents were presented . . . to a federal grand jury, which voted unanimously not to indict [the EPA Administrator]." Letter from Stanley S. Harris, United States Attorney, District of Columbia, to Honorable Thomas P. O'Neill, Jr., Speaker of the House of Representatives (Aug. 5, 1983).

### III. Generally Applicable Legal Principles: The Separation of Powers, the Duties of the Executive to Enforce the Law, and the Derivation and Scope of the Principles of Prosecutorial Discretion and Executive Privilege

*A. The Separation of Powers*

The basic structural concept of the United States Constitution is the division of federal power among three branches of government. Although the expression "separation of powers" does not actually appear in the Constitution, the Supreme Court has emphasized that the separation of powers "is at the heart of our Constitution," and has recognized "the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another." *Buckley* v. *Valeo*, 424 U.S. 1, 119–20 (1976). It needs little emphasis that the separation of powers doctrine is vital to any analysis of the relative responsibilities of the branches of our government, *inter se*. In *The Federalist* No. 47, James Madison, who believed that "no political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty" than the concept of the separation of powers, defended this tripartite arrangement in the Constitution by citing

110

CAR 0887

Montesquieu's well-known maxim that the legislative, executive, and judicial departments should be separate and distinct:

> The reasons on which Montesquieu grounds his maxim are a further demonstration of his meaning. "When the legislative and executive powers are united in the same person or body," says he, "there can be no liberty, because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner." Again: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator*. Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor*."

*The Federalist* No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961); *see Buckley* v. *Valeo*, 424 U.S. at 120–21.[16]

Of the three branches of the new government created in Philadelphia in 1787, the legislature was regarded as the most intrinsically powerful, and the branch with powers that required the exercise of the greatest precautions.

Madison warned that the "legislative department is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex." *The Federalist* No. 48, *supra*, at 309. He admonished that because of their experiences in England, the founders of the thirteen colonies had focused keenly on the danger to liberty from an "overgrown and all-grasping prerogative of an hereditary magistrate, supported and fortified by an hereditary branch of the legislative authority," but had tended to ignore the very real dangers from "legislative usurpations, which, by assembling all power in the same hands, must lead to the same tyranny as is threatened by executive usurpations." *Id.* Reflecting the views of many of his colleagues, Madison believed that although the risk of tyranny would naturally come from the King in an hereditary monarchy, in a representative republic, like that created by the constitutional convention, in which executive power was "carefully limited, both in the extent and duration of its power," the threat to liberty would come from the legislature,

> which is inspired, by a supposed influence over the people, with an intrepid confidence in its own strength; which is sufficiently numerous to feel all the passions which actuate a multitude, yet not so numerous as to be incapable of pursuing the objects of its passions by means which reason prescribes; it is against the enterprising ambition of this department that the people ought to indulge all their jealousy and exhaust all their precautions.

*Id.*

---

[16] Madison characterized Montesquieu as the "oracle who is always consulted and cited on [the] subject [of the separation of powers]." *See The Federalist* No. 47, *supra*, at 301.

111

CAR 0888

The Framers feared that the legislature's power over the purse would foster a dependence by the executive departments on the legislature "which gives still greater facility to encroachments" by the legislature on the powers of the Executive. *Id*. at 310. The concerns of the Framers with respect to the power of the legislature have been recognized by the Supreme Court. The Court, citing many of the above statements, has observed that because of the Framers' concerns about the potential abuse of legislative power, "barriers had to be erected to ensure that the legislature would not overstep the bounds of its authority and perform functions of the other departments." *United States* v. *Brown*, 381 U.S. 437, 444 (1965). Justice Powell noted that "during the Confederation, the States reacted by removing power from the executive and placing it in the hands of elected legislators. But many legislators proved to be little better than the Crown." *INS* v. *Chadha*, 462 U.S. 917, 961 (1983) (Powell, J. concurring). After citing several specific legislative abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." *Id*. at 962.

Thus, the careful separation of governmental functions among three branches of government was a very deliberate and vital structural step in building the Constitution. The Framers understood human nature and anticipated that well-intentioned impulses would lead each of the branches to attempt to encroach on the powers allocated to the others. They accordingly designed the structure of the Constitution to contain intrinsic checks to prevent undue encroachment wherever possible. Particular care was taken with respect to the anticipated tendency of the Legislative Branch to swallow up the Executive. The Framers did not wish the Legislative Branch to have excessive authority over the individual decisions respecting the execution of the laws: "An *elective despotism* was not the government we fought for." T. Jefferson, *Notes on the State of Virginia* 120 (Univ. N.C. Press ed. 1955)[17] The constitutionally prescribed separation of powers creates enforceable abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." *Id*. The division of delegated powers was designed "to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS* v. *Chadha*, 462 U.S. at 951. The doctrine of separated powers "may be violated in two ways. One branch may interfere impermissibly with the other's performance of its consti-

---

[17] It is noteworthy, at least from an historical perspective, that the House of Representatives, because of its immense powers, was considered to be the governmental body least vulnerable to encroachments by other segments of government and, at the same time, because of its popular origin and frequent renewal of authority by the people, the body whose encroachment on the other branches would be least distrusted by the public. The Supreme Court later noted:

> It is all the more necessary, therefore, that the exercise of power by this body, when acting separately from and independently of all other depositories of power, should be watched with vigilance, and when called in question before any other tribunal having the right to pass upon it that it should receive the most careful scrutiny.

*Kilbourn* v. *Thompson*, 103 U.S. 168, 192 (1881).

112

CAR 0889

tutionally assigned function. Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another. *Id.* at 963 (Powell, J. concurring) (citations omitted). Although the Supreme Court has recognized that "a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively," it has also emphasized that the Court "has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decision of cases or controversies properly before it." *Buckley* v. *Valeo*, 424 U.S. at 121, 123. Therefore, although the Constitution does not contemplate "a complete division of authority between the three branches," each branch retains certain core prerogatives upon which the other branches may not transgress. *Nixon* v. *Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977). Each branch must not only perform its own delegated functions, but each has an additional duty to resist encroachment by the other branches. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, *must* be resisted." *INS* v. *Chadha*, 462 U.S. at 951 (emphasis added).

### B. The Duties of the Executive to Enforce the Law

The fundamental responsibility and power of the Executive Branch is the duty to execute the law. Article II, § 1 of the Constitution expressly vests the executive power in the President. Article II, § 3 commands that the President "take Care that the Laws be faithfully executed." Enforcement of the laws is an inherently executive function, and by virtue of these constitutional provisions, the Executive Branch has the exclusive constitutional authority to enforce federal laws. Since the adoption of the Constitution, these verities have been at the heart of the general understanding of the Executive's constitutional authority. During the debates on the Constitution, James Wilson noted that the "only powers he conceived strictly executive were those of executing the laws." 1 M. Farrand, *The Records of the Federal Convention of 1787*, at 65–66 (1937). During the first Congress, James Madison stated that "if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 *Annals of Congress* 481 (1789). The Supreme Court has recognized this fundamental constitutional principle. In *Springer* v. *Philippine Islands*, 277 U.S. 189 (1928), the Court observed:

> Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions.

*Id.* at 202. More recently, Judge Wilkey, writing for a unanimous panel of the United States Court of Appeals for the District of Columbia Circuit in a decision later affirmed by the Supreme Court, recognized that the Constitution

113

CAR 0890

prevents Congress from exercising its power of "oversight, with an eye to legislative revision," in a manner that amounts to "shared administration" of the law. *Consumer Energy Council of America* v. *Federal Energy Regulatory Commission*, 673 F.2d 425, 474 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Group* v. *Consumer Energy Council of America*, 43 U.S. 1216 (1983). It thus seems apparent that the drafters of the Constitution intended clearly to separate the power to adopt laws and the power to enforce them and intended to place the latter power exclusively in the Executive Branch.[18] As a practical matter, this means that there are constitutional limits on Congress' ability to take actions that either disrupt the ability of the Executive Branch to enforce the law or effectively arrogate to Congress the power of enforcing the laws.

### C. The Derivation and Scope of Prosecutorial Discretion and Executive Privilege

The issues addressed by this memorandum involve two important constitutional doctrines that spring from the constitutional limits imposed by the separation of powers and the Executive's duty to enforce the laws: prosecutorial discretion and executive privilege.

#### 1. Prosecutorial Discretion

The doctrine of prosecutorial discretion is based on the premise that because the essential core of the President's constitutional responsibility is the duty to enforce the laws, the Executive Branch has exclusive authority to initiate and prosecute actions to enforce the laws adopted by Congress. That principle was reaffirmed by the Supreme Court in *Buckley* v. *Valeo*, 424 U.S. 1 (1976), in which the Court invalidated the provision of the Federal Election Act that vested the appointment of certain members of the Federal Election Commission in the President *pro tempore* of the Senate and the Speaker of the House. In so holding, the Court recognized the exclusively executive nature of some of the Commission's powers, including the right to commence litigation:

> The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress. A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to "take care that the laws be faithfully executed." Art. II, § 3.

424 U.S. at 138.

---

[18] Of equal concern was the need to separate the judicial power from the executive power. The drafters intended to preserve the impartiality of the judiciary as "neutral arbiters in the criminal law" by separating the judiciary from the prosecutorial function. *Nader v. Saxbe*, 497 F.2d 676, 679 n.18 (D.C Cir. 1974).

CAR 0891

The Executive's exclusive authority to prosecute violations of the law gives rise to the corollary that neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the Executive Branch to prosecute particular individuals. This principle was explained in *Smith* v. *United States*, 375 F.2d 243 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967), in which the court considered the applicability of the Federal Tort Claims Act to a prosecutorial decision not to arrest or prosecute persons injuring plaintiff's business. The court ruled that the government was immune from suit under the discretionary decision exception of the Act on the ground that the Executive's prosecutorial discretion was rooted in the separation of powers under the Constitution:

> The President of the United States is charged in Article 2, Section 3, of the Constitution with the duty to "take Care that the Laws be faithfully executed." The Attorney General is the President's surrogate in the prosecution of all offenses against the United States. . . . The discretion of the Attorney General in choosing whether to prosecute or not to prosecute, or to abandon a prosecution already started, is absolute. . . . This discretion is required in all cases.

> We emphasize that this discretion, exercised in even the lowliest and least consequential cases, can affect the policies, duties, and success of a function placed under the control of the Attorney General by our Constitution and statutes.

375 F.2d at 246–47. The court went on to state that this prosecutorial discretion is protected "no matter whether these decisions are made during the investigation or prosecution of offenses." *Id*. at 248.

The limits and precise nature of the Executive's prosecutorial discretion are discussed in greater detail below. At this point in our examination of the issues considered in this memorandum, it is sufficient to observe that meaningful and significant separation of powers issues are raised by a statute that purports to direct the Executive to take specified, mandatory prosecutorial action against a specific individual designated by the Legislative Branch.

### 2. Executive Privilege

The doctrine of executive privilege is founded upon the basic principle that in order for the President to carry out his constitutional responsibility to enforce the laws, he must be able to protect the confidentiality of certain types of documents and communications within the Executive Branch. If disclosure of certain documents outside the Executive Branch would impair the President's ability to fulfill his constitutional duties or result in the impermissible involvement of other branches in the enforcement of the law, then the President must be able to claim some form of privilege to preserve his constitutional preroga-

115

CAR 0892

tives. This "executive privilege" has been explicitly recognized by the Supreme Court, which has stated that the privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States* v. *Nixon*, 418 U.S. 683, 708 (1974). We believe that it is beyond peradventure that the constitutionally mandated separation of powers permits the President to prevent disclosure of certain Executive Branch documents under the doctrine of executive privilege and that the ability to assert this privilege is fundamental to the President's ability to carry out his constitutionally prescribed duties.

The Supreme Court has suggested that in some areas the President's executive privilege may be absolute and in some circumstances it is a qualified privilege that may be overcome by a compelling interest of another branch. *United States* v. *Nixon*, 418 U.S. at 713; *see also Senate Select Comm. on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc). Nevertheless, the unanimous Supreme Court decision in *Nixon* clearly stands for the proposition that there is a privilege, that it stems from the separation of powers, and that it may be invoked (although perhaps overridden by a court) whenever the President finds it necessary to maintain the confidentiality of information within the Executive Branch in order to perform his constitutionally assigned responsibilities.[19]

The scope of executive privilege includes several related areas in which confidentiality within the Executive Branch is necessary for the effective execution of the laws. First, as the Supreme Court has held, the privilege protects deliberative communications between the President and his advisors. The Court has identified the rationale for this aspect of the privilege as the valid need for protection of communications between high government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. *United States* v. *Nixon*, 418 U.S. at 705 (footnotes omitted).

Another category of Executive Branch material that is subject to a President's claim of privilege is material necessary "to protect military, diplomatic, or sensitive national security secrets." *United States* v. *Nixon*, 418 U.S. 683, 706 (1974). In *Nixon*, the Court stated:

> As to those areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities. In *C.& S. Air Lines* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111

---

[19] Presidents have invoked the privilege throughout our history for a variety of reasons. *See, e.g.,* "History of Refusals by Executive Branch to Provide Information Demanded by Congress," 6 Op. O.L.C. 751 (1982); Memorandum from John Harmon, Assistant Attorney General, Office of Legal Counsel, to Robert Lipschutz, Counsel to the President (June 8, 1977); Position of the Executive Department Regarding Investigative Reports, 40 Op. Att'y Gen. 45 (1941).

116

CAR 0893

(1948), dealing with Presidential authority involving foreign policy considerations, the Court said:

"The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."

In *United States* v. *Reynolds*, 345 U.S. 1 (1953), dealing with a claimant's demand for evidence in a Tort Claims Act case against the Government, the Court said:

"It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." *Id.* at 10.

No case of the Court, however, has extended this high degree of deference to a President's generalized interest in confidentiality. Nowhere in the Constitution, as we have noted earlier, is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based.

418 U.S. at 710–11.

An additional important application of executive privilege, which, as noted earlier, relates centrally to the discharge of the President's constitutional duties, involves open law enforcement files. Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature.[20] The basis for this application

---

[20] As explained by Attorney General (later, Supreme Court Justice) Robert Jackson in April 1941:

Disclosure of the reports could not do otherwise than seriously prejudice law enforcement. Counsel for a defendant or prospective defendant, could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon.

40 Op. Att'y Gen. 45, 46 (1941). As similarly expressed a few years later by Deputy Assistant Attorney General Kauper:

Over a number of years, a number of reasons have been advanced for the traditional refusal of the Executive to supply Congress with information from open investigational files. Most impor-

Continued

117

CAR 0894

of the privilege is essentially the same as for all aspects of executive privilege; the Executive's ability to enforce the law would be seriously impaired, and the impermissible involvement of other branches in the execution and enforcement of the law would be intolerably expanded, if the Executive were forced to disclose sensitive information on case investigations and strategy from open enforcement files.

### IV. The Duty of the Executive Branch When an Executive Official Has Been Cited for Contempt of Congress for Asserting the President's Claim of Executive Privilege

#### A. Prosecutorial Discretion

The first specific question that is presented by the circumstances that gave rise to this memorandum is whether the United States Attorney is required to refer every contempt of Congress citation to a grand jury. This question raises issues of statutory construction as well as the constitutional limits of prosecutorial discretion. We deal first with the statutory questions.

As a preliminary matter, we note that § 194 does not on its face actually purport to require the United States Attorney to proceed with the prosecution of a person cited by a house of Congress for contempt; by its express terms the statute discusses only referral to a grand jury. Even if a grand jury were to return a true bill, the United States Attorney could refuse to sign the indictment and thereby prevent the case from going forward. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965); *In re Grand Jury, January, 1969*, 315 F. Supp. 662 (D. Md. 1970). *See* Hamilton & Grabow, *A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas*, 21 Harv. J. on Legis. 145, 155 (1984). Thus, as a matter of statutory interpretation, there is no doubt that the contempt of Congress statute does not require a prosecution; the only question is whether it requires referral to the grand jury.[21]

---

[20] (. . . continued)

tant, the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation.

Memorandum for the Deputy Counsel to the President from Deputy Assistant Attorney General Kauper re: Submission of Open CID Investigation Files (Dec. 19, 1969). This significant constitutional privilege provides a foundation for our discussion below of the penalties that Congress may attach to the President's assertion of the privilege in response to a congressional subpoena.

[21] Although it is by no means certain as a matter of law, if the case were referred to a grand jury, the United States Attorney might be required to take certain steps short of signing the indictment, and the grand jury's decision might well become public. In *Cox*, a majority of the court (made up of the three dissenting judges and one concurring judge) took the view that the United States Attorney could be required to prepare an indictment for use by the grand jury. In addition, the district court in *In re Grand Jury, supra*, held that even though the United States Attorney could not be required to sign an indictment, in the circumstances of that case "the substance of the charges in the indictment should be disclosed, omitting certain portions as to which

Continued

118

CAR 0895

1. Previous Department of Justice Positions Concerning Prosecutorial
   Discretion Under the Contempt of Congress Statute

In the past, the Department of Justice has taken the position that if Congress
cited an executive officer for contempt because of an assertion of executive
privilege and "the Department determined to its satisfaction that the claim was
rightfully made, it would not, in the exercise of its prosecutorial discretion,
present the matter to a grand jury." Testimony of Assistant Attorney General
(now Solicitor General) Rex Lee, *Hearings on Representation of Congress and
Congressional Interests in Court, Before the Subcomm. on Separation of
Powers of the Senate Committee on the Judiciary*, 94th Cong., 2d Sess. 8
(1976).

This principle of prosecutorial discretion under the contempt of Congress
statute was followed by the Department in the cases of three officials of the
Port of New York Authority who were cited for contempt of Congress in 1960
for refusing to produce documents to the House Judiciary Committee. As a part
of an investigation of the Port Authority, which had been established by an
interstate compact approved by Congress, the Judiciary Committee subpoe-
naed a large number of documents concerning the Port Authority's operations,
most of which the Port Authority declined to produce on the orders of the
governors of New York and New Jersey (the states within which the Port
Authority was located). Because of the failure to produce the documents, the
Committee recommended, and the House adopted, contempt resolutions against
three principal officials of the Port Authority.[22] On August 23, 1960, these
resolutions were referred to the United States Attorney for prosecution. *See*
N.Y. Times, Aug. 24, 1960, at 1. The United States Attorney never referred any
of these citations to the grand jury. On November 16, 1960, the Department of
Justice announced that it would proceed against the officials by information

---

[21] (. . . continued)

the Court, in the exercise of its discretion, concludes that the public interest in disclosure is outweighed by the
private prejudice to the persons involved, none of whom are charged with any crime in the proposed
indictment." 315 F Supp. at 678–79. Under this analysis, if the contempt citation were to reach a grand jury
and the grand jury were to vote a true bill, a court might be able to require the United States Attorney to
prepare an indictment and then might order the disclosure of that indictment as voted by the grand jury. For
the reasons set out in our discussion of prosecutorial discretion, the court could not, however, order the
United States Attorney to prosecute.

Because the contempt of Congress statute does not require the United States Attorney to refer to a grand
jury a citation for contempt of Congress issued to an executive official who has asserted the President's claim
of executive privilege, we have not attempted to determine definitively what additional steps, if any, the
United States Attorney could be required to take if such a matter were referred to a grand jury.

[22] See 106 Cong. Rec. 17313 (1960) (citation against Austin J. Tobin, Executive Director of the Authority);
*id.* at 17316 (citation against S. Sloan Colt, Chairman of the Board); *id.* at 17319 (citation against Joseph G.
Carty, Secretary). The contempt resolution in each case read as follows:

Resolved, That the Speaker of the House of Representatives certify the report of the Committee
on the Judiciary as to the contumacious conduct of [name] in failing and refusing to furnish
certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee
of said committee served upon him and as ordered by the subcommittee, together with all of the
facts in connection therewith, under seal of the House of Representatives, to the United States
attorney for the District of Columbia, to the end that [name] may be proceeded against in the
manner and form provided by law.

119

CAR 0896

rather than indictment, and therefore would not present the citations to a grand jury. *See* N.Y. Times, Nov. 17, 1960, at 1. On November 25, 1960, the Department announced that it would file an information against only one of the Port Authority officials, Executive Director Austin Tobin, and would not prosecute the remaining two officials. *See* N.Y. Times, Nov. 26, 1960, at 1. The trial began in January 1961 and continued under the supervision of the new Attorney General, Robert F. Kennedy, who never altered the decision not to prosecute the two remaining officials, in spite of a congressional request to do so. Ultimately Tobin's conviction was reversed by the United States Court of Appeals for the District of Columbia Circuit. *Tobin* v. *United States*, 306 F.2d 270 (D.C. Cir.), *cert. denied*, 371 U.S. 902 (1962).[23]

In the foregoing instance, the Department (under two administrations) exercised its prosecutorial discretion not to refer contempt of Congress citations to a grand jury, notwithstanding the seemingly mandatory phrasing of the statute.[24] For the reasons set forth more fully below, we continue to adhere to the conclusion that the Department retains prosecutorial discretion not to refer contempt citations to a grand jury.

2. Judicial Opinions Interpreting the Language of § 194

Section 194 imposes similarly worded, nominally mandatory, referral obligations on both the Speaker of the House (or the President of the Senate) and the United States Attorney once a contempt of Congress resolution has been adopted by the House or Senate:

> *it shall be the duty* of the said President of the Senate or the Speaker of the House as the case may be, to certify, *and he shall so certify*, the statement of facts aforesaid under the seal of the Senate or House, as the case may be, to the appropriate United States attorney, *whose duty it shall be* to bring the matter before the grand jury for its action.

(Emphasis added.)

Although the language, "it shall be the duty of" and "whose duty it shall be," might suggest a nondiscretionary obligation, the United States Court of Appeals for the District of Columbia Circuit has expressly held, at least with respect to the Speaker of the House, that the duty is *not* mandatory, and that, in fact, the Speaker has an obligation under the law, at least in some cases, to exercise his discretion in determining whether to refer a contempt citation. *Wilson* v. *United States*, 369 F.2d 198 (D.C. Cir. 1966). In *Wilson*, the court reversed a conviction for contempt of Congress on the ground that the Speaker had assumed that the statute did not permit any exercise of discretion by him

---

[23] The Court of Appeals ruled that the documents requested by the Committee went beyond the investigative authority delegated to the Committee by the House.

[24] We know of at least two other individuals who were cited for contempt of Congress, but whose cases were not referred to a grand jury by the Department of Justice. *See* Department of Justice File No. 51–51–484 (1956). The file was closed because the Department concluded that there was an insufficient basis for prosecution.

120

CAR 0897

and he had therefore automatically referred a contempt citation to the United States Attorney while Congress was not in session. The court based its conclusion that the Speaker was required to exercise his discretion on the longstanding practice of both the House and Senate and on congressional debates on contempt citations in which the houses had recognized their own discretion not to approve a contempt resolution. The court concluded that because full House approval of a contempt citation is necessary when Congress was in session, the Speaker is required to exercise some discretion when the House is not in session. 369 F.2d at 203–04.

Although the reasons underlying the court's decision not to impose a mandatory duty on the Speaker in *Wilson* do not necessarily require the same conclusion with respect to the United States Attorney, the decision at least supports the proposition that the seemingly mandatory language of § 194 need not be construed as divesting either the Speaker or the United States Attorney of all discretion.[25]

In several cases, the United States Court of Appeals for the District of Columbia Circuit has at least assumed that the United States Attorney retains discretion not to refer a contempt of Congress citation to a grand jury. In these cases, the court refused to entertain challenges to congressional subpoenas, at least in part on the ground that the prospective witnesses would have adequate subsequent opportunities to challenge a committee's contempt finding, including the opportunity to persuade the United States Attorney not to refer the case to a grand jury. For example, in *Ansara* v. *Eastland*, 442 F.2d 751 (D.C. Cir. 1971), the court declined to entertain a suit to quash a congressional subpoena on the ground that it would be inappropriate, as a matter of the exercise of its equitable power, to interfere with an ongoing congressional process. The court stated that protections were available "within the legislative branch or elsewhere," and then in a footnote indicated that these protections resided "perhaps in the Executive Branch *which may decide not to present the matter to the grand jury* (as occurred in the case of the officials of the New York Port Authority); or perhaps in the Grand Jury which may decide not to return a true bill." 442 F.2d at 754 n.6 (emphasis added).[26] *See also Sanders* v. *McClellan*,

---

[25] In this respect, we believe that *Wilson* implicitly disapproved the *dictum* of *Ex parte Frankfeld*, 32 F. Supp. 915 (D.D.C. 1940), in which the district court stated:

It seems quite apparent that Congress intended to leave no measure of discretion to either the Speaker of the House or the President of the Senate, under such circumstances, but made the certification of facts to the district attorney a mandatory proceeding, and it left no discretion with the district attorney as to what he should do about it. He is required, under the language of the statute, to submit the facts to the grand jury.

*Id* at 916. The *Frankfeld* court expressly linked the responsibilities of the Speaker and the United States Attorney. *Wilson* ruled that the Speaker's duty is discretionary, at least when the House is not in session. Therefore, since the Speaker's duty is *in pari materia* with the duty of the United States Attorney, the law, at least in the District of Columbia Circuit, seems to be that both duties should be viewed as containing some elements of discretion.

[26] *Ansara* v. *Eastland* was cited with approval three times by Judge Smith in *United States* v. *House of Representatives*, 556 F. Supp. 150, 152–53 (D.D.C 1983). Thus, although the opinion made a passing reference to the mandatory nature of referral, Judge Smith must have recognized that the United States Attorney retained prosecutorial discretion.

121

CAR 0898

463 F.2d 894 (D.C. Cir. 1972). In *United States Servicemen's Fund* v. *Eastland*, 488 F.2d 1252 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 491 (1974), the court agreed to review a challenge to a congressional subpoena brought by a third party, and it distinguished *Ansara* and *McClellan* on the ground that, because the congressional subpoena was issued to a third party, the plaintiffs had no alternative means to vindicate their rights. 488 F.2d at 1260. Among the alternative means the court cited was the right to "seek to convince the executive (the attorney general's representative) not to prosecute." *Id*.

These cases emphasize the particular significance of prosecutorial discretion in the context of the contempt of Congress statute. In general, with respect to any criminal allegation, prosecutorial discretion plays an important role in protecting the rights of the accused by providing an additional level of review with respect to the factual and legal sufficiency of the charges. This role is even more important when dealing with the contempt of Congress statute because, as the above cases demonstrate, witnesses generally have no opportunity to challenge congressional subpoenas directly. Thus, as the cases indicate, prosecutorial discretion serves a vital purpose in protecting the rights of the accused in contempt cases by mitigating the otherwise stern consequences of asserting a right not to respond to a congressional subpoena.

Thus, the practice of the Congress and the available judicial authority support the proposition that the seemingly mandatory duties imposed on congressional officials by 2 U.S.C. § 194 are and were intended to be discretionary. The practice of the Executive Branch and the court decisions reflect a similarly discretionary role under the statute for the United States Attorney. Because, as the balance of this memorandum reveals, these interpretations are consistent with other common-law principles and avoid conclusions that would be at odds with the separation of powers, we believe that a correct reading of 2 U.S.C. § 194 requires recognition of the prosecutor's discretion with respect to referral to a grand jury.

### 3. Common-Law Prosecutorial Discretion

In addition to the court decisions that suggest that the United States Attorney may decide not to refer a contempt citation to a grand jury, the common-law doctrine of prosecutorial discretion weighs heavily against and, in our opinion, precludes an interpretation that the statute requires automatic referral. Because of the wide scope of a prosecutor's discretion in determining which cases to bring, courts, as a matter of law, do not ordinarily interpret a statute to limit that discretion unless the intent to do so is clearly and unequivocally stated. The general rule is that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States* v. *Nixon*, 418 U.S. 683, 693 (1974). *See also Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1869). The Attorney General and his subordinates, including the United States Attorneys, have the authority to exercise this discretion reserved to the Executive. *United States* v. *San Jacinto Tin Co.*, 125 U.S. 273 (1888); *The Gray*

122

CAR 0899

*Jacket*, 72 U.S. (5 Wall.) 370 (1866). In general, courts have agreed with the view of Judge (now Chief Justice) Burger:

> Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.

*Newman* v. *United States*, 382 F.2d 479, 480 (D.C. Cir. 1967). *See also United States* v. *Batchelder*, 442 U.S. 114 (1979); *Bordenkircher* v. *Hayes*, 434 U.S. 357 (1978).

Courts have applied this general principle of prosecutorial discretion in refusing to interfere with a prosecutor's decision not to initiate a case, despite the specific language of 28 U.S.C. § 547, which states in part that "each United States Attorney, within his district, *shall* . . . prosecute *for all* offenses against the United States." (Emphasis added.) For example, in *Powell* v. *Katzenbach*, 359 F.2d 234 (D.C. Cir. 1965), *cert. denied*, 384 U.S. 906 (1966), the court denied a mandamus petition that sought to force the Attorney General to prosecute a national bank. The court ruled: "It is well settled that the question of whether and when prosecution is to be instituted is within the discretion of the Attorney General. Mandamus will not lie to control the exercise of this discretion." *Id.* at 234. *See also United States* v. *Brown*, 481 F.2d 1035 (8th Cir. 1973); *Bass Anglers Sportsman's Society* v. *Scholze Tannery, Inc.*, 329 F. Supp. 339 (E.D. Tenn. 1971); *Pugach* v. *Klein*, 193 F. Supp. 630 (S.D.N.Y. 1961); *United States* v. *Brokaw*, 60 F. Supp. 100 (S.D. Ill. 1945).

Courts exhibit the same deference to prosecutorial discretion even when the specific statute involved uses words that would otherwise have mandatory, nondiscretionary implications. For example, 42 U.S.C. § 1987 states that United States Attorneys are "authorized *and required* . . . to initiate prosecutions against all persons violating any of the provisions of [the federal criminal civil rights statutes]." (Emphasis added.) Although a number of cases have been initiated to force a United States Attorney to bring civil rights actions on the ground that this statute imposes a nondiscretionary duty to prosecute, *see* Note, *Discretion to Prosecute Federal Civil Rights Crimes*, 74 Yale L.J. 1297 (1965), the courts uniformly have rejected the contention that the statute limits a prosecutor's normal discretion to decide not to bring a particular case. For example, in *Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973), the court ruled that the "mandatory nature of the word 'required' as it appears in § 1987 is insufficient to evince a broad Congressional purpose to bar the exercise of executive discretion in the prosecution of federal civil rights crimes." 477 F.2d at 381. The court noted that although similar mandatory language was contained in other statutes, "[s]uch language has never been thought to preclude the exercise of prosecutorial discretion." *Id. Accord Peek* v. *Mitchell*, 419 F.2d 575 (6th Cir. 1970); *Moses* v. *Kennedy*, 219 F. Supp. 762 (D.D.C. 1963), *aff'd sub nom. Moses* v. *Katzenbach*, 342 F.2d 931 (D.C. Cir. 1965). The language employed in 2 U.S.C. § 194 is neither stronger

123

CAR 0900

nor more clearly mandatory than the language of § 1987, which the courts have decided is insufficient to limit the normal prosecutorial discretion.

In fact, there is nothing to distinguish the contempt of Congress statute from any other statute where the prosecutor retains discretion with respect to who shall be prosecuted. Since the early part of the 19th century, it has been recognized that offenses against Congress that are punishable by Congress through its inherent contempt power may also be violations of the criminal laws and, as such, offenses against the United States, with respect to which the normal rules governing criminal prosecutions apply. *See* 2 Op. Att'y Gen. 655 (1834) (concluding that an assault against a congressman could be prosecuted consistent with the Double Jeopardy Clause under the criminal laws, even if the defendant had already been punished by Congress, because the act created two separate offenses, one against Congress and one against the United States). This principle was adopted by the Supreme Court when it upheld the constitutionality of the contempt of Congress statute. *In re Chapman*, 166 U.S. 661 (1897). In *Chapman*, the Court held that the contempt statute did not violate the Double Jeopardy Clause even though a defendant could be punished through Congress' inherent contempt power as well as under the contempt statute. The Court concluded that a refusal to testify involved two separate offenses, one against Congress and one against the United States, and that

> it is quite clear that the contumacious witness is not subjected to jeopardy twice for the same offence, since the same act may be an offence against one jurisdiction and also an offence against another; and indictable statutory offenses may be punished as such, while the offenders may likewise be subjected to punishment for the same acts as contempts, the two being *diverso intuitu* and capable of standing together.

166 U.S. at 672.

The import of the Court's conclusion in this context is clear. Congress' inherent contempt power is the remedy for the offense against Congress, and that remedy remains within Congress' control. The crime of contempt of Congress, like any other federal statutory crime, is an offense against the United States that should be prosecuted as is any other crime. This criminal offense against the United States properly remains subject to the prosecutorial control of the Executive Branch. Therefore, because the contempt statute should be treated as are other federal criminal statutes, we do not believe that § 194 should be read to limit the common law prosecutorial discretion of the United States Attorney. There is nothing in the legislative history of the contempt of Congress statute that is inconsistent with this conclusion. *See* 42 Cong. Globe, 34th Cong., 3d Sess. 4030–44 (1857).

### 4. Constitutional Considerations

Our construction of § 194 is reinforced by the need to avoid the constitutional problems that would result if § 194 were read to require referral to a

124

CAR 0901

grand jury. As discussed above, the constitutionally prescribed separation of powers requires that the Executive retain discretion with respect to whom it will prosecute for violations of the law. Although most cases expressly avoid this constitutional question by construing statutes not to limit prosecutorial discretion, the cases that do discuss the subject make it clear that common law prosecutorial discretion is strongly reinforced by the constitutional separation of powers. *See, e.g.*, *Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973); *Powell* v. *Katzenbach*, 359 F.2d 234 (D.C. Cir. 1965), *cert. denied*, 384 U.S. 906 (1966).

A number of courts have expressly relied upon the constitutional separation of powers in refusing to force a United States Attorney to proceed with a prosecution. For example, in *Pugach* v. *Klein*, 193 F. Supp. 630 (S.D.N.Y. 1961), the court declined to order the United States Attorney to commence a prosecution for violation of federal wiretap laws on the ground that it was

> clear beyond question that it is not the business of the Courts to tell the United States Attorney to perform what they conceive to be his duties.
>
> Article II, § 3 of the Constitution, provides that "[the President] shall take Care that the Laws [shall] be faithfully executed." The prerogative of enforcing the criminal law was vested by the Constitution, therefore, not in the Courts, nor in private citizens, but squarely in the executive arm of the government.

193 F. Supp. at 634. *See also Goldberg* v. *Hoffman*, 225 F.2d 463, 464–65 (7th Cir. 1955).[27]

The Fifth Circuit, sitting en banc, has underscored the constitutional foundations of prosecutorial discretion. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965). In *Cox*, the court overturned a district court's order that a United States Attorney prepare and sign an indictment that a grand jury had voted to return. The plurality opinion stated:

> The executive power is vested in the President of the United States, who is required to take care that the laws be faithfully executed. The Attorney General is the hand of the President in taking care that the laws of the United States in legal proceed-

---

[27] These conclusions are not inconsistent with Rule 48(a) of the Federal Rules of Criminal Procedure, which requires leave of court before dismissal of a criminal action. This provision is intended primarily to protect defendants against repeated prosecutions for the same offense, and a court's power to deny leave under this provision is extremely limited. *See Rinaldi* v. *United States*, 434 U.S. 22 (1977); *United States* v. *Hamm*, 659 F.2d 624 (5th Cir. 1981); *United States* v. *Ammidown*, 497 F.2d 615 (D.C. Cir. 1973). The United States Court of Appeals for the Fifth Circuit has stated that the constitutionality of Rule 48(a) is dependent upon the prosecutor's unfettered ability to decide not to commence a case in the first place. *United States* v. *Cox*, 342 F.2d 167 (5th Cir.) (en banc), *cert. denied*, 381 U.S. 935 (1965). Moreover, Judge Weinfeld has stated that even if a court denied leave to dismiss an indictment, a court "in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine." *United States* v. *Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483 (S.D.N.Y. 1964).

125

CAR 0902

ings and in the prosecution of offenses, be faithfully executed. The role of the grand jury is restricted to a finding as to whether or not there is probable cause to believe that an offense has been committed. The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.

342 F.2d at 171 (footnotes omitted). *See also id.* at 182–83 (Brown, J. concurring); *id.* at 190–93 (Wisdom, J., concurring). Even the three dissenting judges in *Cox* conceded that, although they believed that the United States Attorney could be required to sign the indictment, "once the indictment is returned, the Attorney General or the United States Attorney can refuse to go forward." *Id.* at 179. *See United States* v. *Nixon*, 418 U.S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case") (citing, *inter alia, Cox*).

Although prosecutorial discretion may be regulated to a certain extent by Congress and in some instances by the Constitution, the decision not to prosecute an individual may not be controlled because it is fundamental to the Executive's prerogative. For example, the individual prosecutorial decision is distinguishable from instances in which courts have reviewed the legality of general Executive Branch policies. *See Nader* v. *Saxbe,* 497 F.2d 676 (D.C. Cir. 1974); *Adams* v. *Richardson,* 480 F.2d 1159 (D.C. Cir. 1973) (en banc) (per curiam); *NAACP* v. *Levi,* 418 F. Supp. 1109 (D.D.C. 1976). In these cases the courts accepted jurisdiction to rule whether an entire enforcement program was being implemented based on an improper reading of the law. The cases expressly recognize, however, both that a decision to prosecute in an individual case involves many factors other than merely probable cause, and that "the balancing of these permissible factors in individual cases is an executive, rather than a judicial function which follows from the need to keep the courts as neutral arbiters in the criminal law generally . . . and from Art. II, § 3 of the Constitution, which charges the President to 'take Care that the Laws be faithfully executed.'" *Nader* v. *Saxbe,* 497 F.2d at 679 n.18. Similarly distinguishable are the cases concerning the constitutional limits on selective prosecution, which hold that prosecutorial discretion may not be exercised on the basis of impermissible factors such as race, religion, or the exercise of free

126

CAR 0903

speech. *See, e.g., Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 249 (1980); *Oyler* v. *Boles*, 368 U.S. 448 (1962).

If the congressional contempt statute were interpreted to divest the United States Attorney of discretion, then the statute would create two distinct problems with respect to the separation of powers. "The doctrine of separated powers is implemented by a number of constitutional provisions, some of which entrust certain jobs exclusively to certain branches while others say that a given task is *not* to be performed by a given branch." *United States* v. *Brown*, 381 U.S. 437, 443 (1965). Divesting the United States Attorney of discretion would run afoul of both aspects of the separation of powers by stripping the Executive of its proper constitutional authority and by vesting improper power in Congress.

First, as the cases cited above demonstrate, Congress may not deprive the Executive of its prosecutorial discretion. In areas where the President has specific executive authority, Congress may establish standards for the exercise of that authority, but it may not remove all Presidential authority. For example, Congress may require the President to make appointments to certain executive positions and may define the qualifications for those positions, but it may not select the particular individuals whom the President must appoint to those positions. *See Buckley* v. *Valeo*, 424 U.S. 1 (1976). Similarly, Congress may adopt the criminal provisions for which individuals may be prosecuted and impose certain qualifications on how the Executive should select individuals for prosecution, but it may not identify the particular individuals who must be prosecuted. The courts have declared that the ultimate decision with respect to prosecution of individuals must remain an executive function under the Constitution.

Second, if Congress could specify an individual to be prosecuted, it would be exercising powers that the Framers intended not be vested in the legislature. A legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based. *See United States* v. *Brown*, 381 U.S. 437 (1965); *United States* v. *Lovett*, 328 U.S. 303 (1946). The constitutional role of Congress is to adopt general legislation that will be applied and implemented by the Executive Branch. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." *Fletcher* v. *Peck*, 10 U.S. (6 Cranch) 87, 136 (1810); *see United States* v. *Brown*, 381 U.S. 437, 446 (1965). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific individuals. As the Supreme Court stated in *Lovett*:

> Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons, because the legislature thinks them guilty of conduct which deserves punishment.

127

CAR 0904

328 U.S. at 317. Justice Powell has echoed this concern: "The Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the 'tyranny of shifting majorities.'" *INS* v. *Chadha*, 462 U.S. 917, 961 (1983) (Powell, J. concurring). As we have shown above, courts may not require prosecution of specific individuals, even though the Judicial Branch is expressly assigned the role of adjudicating individual guilt. *A fortiori*, the Legislative Branch, which is assigned the role of passing laws of general applicability and specifically excluded from questions of individual guilt or innocence, may not decide on an individual basis who will be prosecuted.

These constitutional principles of prosecutorial discretion apply even though the issue here is referral to the grand jury and not commencement of a criminal case after indictment. A referral to a grand jury commences the criminal prosecution process. That step is as much a part of the function of executing the laws as is the decision to sign an indictment. The cases expressly recognize that prosecutorial discretion applies at any stage of the investigative process, even to the decision whether to begin an investigation at all. *See Inmates of Attica Correctional Facility* v. *Rockefeller*, 477 F.2d 375 (2d Cir. 1973); *Smith* v. *United States*, 375 F.2d 243, 248 (5th Cir.), *cert. denied*, 389 U.S. 841 (1967). In the latter case, the court emphasized that prosecutorial discretion was protected "no matter whether these decisions are made during the investigation or prosecution of offenses." 375 F.2d at 248. Moreover, if the Executive has already determined that, as a matter of law, no violation of the law has occurred, it would serve no practical purpose to refer a case to the grand jury. Given the importance of these constitutional principles and the fundamental need to preserve the Executive's power to enforce the laws, we see no reason for distinguishing between the decision to prosecute and the decision to refer to the grand jury in this case.[28]

For all of the above reasons, as a matter of statutory construction strongly reinforced by constitutional separation of powers principles, we believe that the United States Attorney and the Attorney General, to whom the United States Attorney is responsible, retain their discretion not to refer a contempt of Congress citation to a grand jury. It follows, of course, that we believe that even if the provision of a statute requiring reference to a grand jury were to be upheld, the balance of the prosecutorial process could not be mandated.

---

[28] A statute giving one house of Congress the power to *direct* an Executive Branch official to take any particular action also raises a separate issue under the Supreme Court's decision in *INS* v. *Chadha*, 462 U.S. 917 (1983). Under the current contempt statute, the role of the House or Senate in simply referring a matter to the United States Attorney for possible prosecution raises no substantial issue under *Chadha* because the House or Senate is acting, in a sense, as a private citizen would — by reporting a possible violation of federal criminal law. Thus, *Chadha's* proscription of actions by one house (or two houses or a congressional committee) that are designed to have "the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch" would be inapplicable. *Id* at 952. If the contempt statute precluded prosecutorial discretion, however, one house would be empowered to impose on the United States Attorney an affirmative legal duty to initiate a prosecution and to take certain steps in that prosecution. To empower one house of Congress in that manner would appear to be contrary to the clear language and rationale of *Chadha*. This is not, of course, to say that Congress' attempt to impose such an obligation on the United States Attorney by plenary legislation in a specific case would be constitutional; it is to say that a permanent mechanism to be triggered by the vote of one house raises a significant additional constitutional concern.

128

CAR 0905

*B. Whether the Criminal Contempt of Congress Statute Applies to an*
   *Executive Official Who Asserts, On Direct Orders of the President,*
   *the President's Claim of Executive Privilege*

We next consider, aside from the issue of prosecutorial discretion, whether the criminal contempt of Congress statute is intended to apply, or constitutionally could be applied, to Presidential claims of executive privilege.

### 1. Previous Department of Justice Interpretations of the Contempt of Congress Statute

The Department of Justice has previously taken the position that the criminal contempt of Congress statute does not apply to executive officials who assert claims of executive privilege at the direction of the President. In 1956, Deputy Attorney General (subsequently Attorney General) William P. Rogers took this position before a congressional subcommittee investigating the availability of information from federal departments and agencies. In a lengthy memorandum of law, Deputy Attorney General Rogers set forth the historical basis of executive privilege and concluded that in the context of Presidential assertions of the privilege, the contempt of Congress statute was "inapplicable to the executive departments." *See Hearings Before a Subcommittee of the House Committee on Government Operations*, 84th Cong., 2d Sess. 2933 (1956).[29] We are not aware of any subsequent Department position that reverses or weakens this conclusion, and we have found no earlier Department position to the contrary.

We believe that the Department's long-standing position that the contempt of Congress statute does not apply to executive officials who assert Presidential claims of executive privilege is sound, and we concur with it. Our conclusion is based upon the following factors: (1) the legislative history of the contempt of Congress statute demonstrates that it was not intended to apply to Presidential assertions of executive privilege; and (2) if the statute were construed to apply to Presidential assertions of executive privilege, it would so inhibit the President's ability to make such claims as to violate the separation of powers.

### 2. The Legislative History of the Contempt of Congress Statute

Neither the legislative history nor the historical implementation of the contempt statute supports the proposition that Congress intended the statute to apply to executive officials who carry out a Presidential assertion of executive privilege. The criminal contempt statute was originally enacted in 1857 during proceedings in the House of Representatives to consider a contempt of Congress citation against a New York Times correspondent who had refused to

---

[29] The memorandum cited, *inter alia*, a 1909 Senate debate over the issue of executive privilege in which Senator Dolliver questioned "where Congress gets authority either out of the Constitution or the laws of the United States to order an executive department about like a servant." 43 Cong. Rec. 3732 (1909) Other historical examples cited by the report are discussed below.

129

CAR 0906

answer questions put to him by a select committee appointed by the House to investigate charges of bribery of certain Representatives. As a result of the committee's unavailing efforts to obtain the reporter's testimony, the committee chairman introduced a bill designed "more effectually to enforce the attendance of witnesses on the summons of either House of Congress, and to compel them to deliver testimony." 42 Cong. Globe 404 (1857). The bill was supported as a necessary tool in the House's efforts to investigate the allegations of bribery. *See id.* at 405 (remarks of the Speaker), 426 (remarks of Sen. Toombs), 427 (remarks of Rep. Davis), 445 (remarks of Sen. Brown). The bill was rushed through Congress in less than a week in order to permit the House to bring greater pressure on the reporter to reveal the alleged source of the congressional corruption. That the bill was sponsored by the select committee, and not the Judiciary Committee, further demonstrates that the bill was not the result of a general consideration of Congress' contempt power, but was enacted as an expedient to aid a specific investigation. Thus, the circumstances of the bill's passage certainly do not affirmatively suggest that Congress anticipated application of the statute to instances in which the President asserted a claim of executive privilege.

In fact, the sponsor of the bill disclaimed any such far-reaching implications. Representative Dunn asked the sponsor, Representative Orr, what impact the proposed bill would have on diplomatic secrets, one of the principal areas in which the President had historically asserted a privilege of confidentiality. Representative Dunn stated that use of the contempt statute by Congress to force disclosure of such material "might be productive of great mischief, and in time of war of absolute ruin of the country." 42 Cong. Globe 431 (remarks of Rep. Dunn). Representative Orr replied, "I can hardly conceive such a case" and emphasized that the bill should not be attacked "by putting instances of the extremest cases" because the "object which this committee had in view was, where there was corruption in either House of Congress, to reach it." *Id.* at 431 (remarks of Rep. Orr). The implication is that Congress did not intend the bill to apply to Presidential assertions of privilege.[30]

---

[30] The legislative history contains one reference to the application of the statute against executive officials. During the floor debates, Representative Marshall attacked the bill by claiming that it "proposes to punish equally the Cabinet officer and the culprit who may have insulted the dignity of this House by an attempt to corrupt a Representative of the people." 42 Cong. Globe at 429. This statement does not, however, suggest that the statute was intended to apply to Presidential assertions of executive privilege. Indeed, virtually all previous assertions of executive privilege against Congress had been made by the President himself, and Congress expressed no intent to utilize the criminal contempt provisions against the President. Representative Marshall's statement, therefore, simply lends support to the proposition, with which we agree, that there are certain circumstances in which the congressional contempt statute might be utilized against an executive official, such as instances in which an executive official, acting on his own, engaged in disruptive and contumacious conduct during a congressional hearing, or in which an executive official, acting on his own, committed an offense. *See Marshall v. Gordon,* 243 U.S. 521 (1917). As the remainder of Representative Marshall's remarks demonstrate, the principal force driving the bill was Congress' desire to obtain an expeditious method for investigating questions regarding the integrity of Congress and not to provide Congress with a statute requiring the President to prosecute criminally those who had asserted the President's constitutionally based claim of executive privilege. We have found no evidence in the legislative history that supports an intention to apply the proposed statute in such a context.

130

CAR 0907

In the years preceding the adoption of the statute, the President had, on a number of occasions, withheld documents from Congress under a claim of executive privilege, and many of these instances had been hotly contested in the public arena, and at least five of these instances occurred within the decade immediately preceding the enactment of the congressional contempt statute. *See supra* note 19 (collecting authorities). In spite of these highly visible battles over the subject of executive privilege, we have located no indication in the legislative history of the criminal contempt statute that Congress intended the statute to provide a remedy for refusals to produce documents pursuant to a Presidential claim of executive privilege.

The natural inference to be drawn from this vacuum in the legislative history is reinforced by Congress' failure, as far as we know, *ever* to utilize its inherent power of arrest to imprison Executive Branch officials for contempt of Congress for asserting claims of executive privilege, even though Congress had previously asserted and exercised its clearly recognized right to do so with respect to other instances of contempt by private citizens. *See Anderson* v. *Dunn*, 19 U.S. (6 Wheat.) 204 (1821); *Ex Parte Nugent*, 18 F. Cas. 471 (C.C.D.C. 1848). The absence of any congressional discussion of the use of the contempt power against Presidential claims of executive privilege and Congress' previous failure ever to attempt to use its inherent contempt power in such cases, strongly suggest that the statute was not intended to apply to such assertions.

This conclusion is supported by the subsequent history of the congressional contempt statute. Since enactment of the statute in 1857, there have been numerous instances in which the President has withheld documents from Congress under a claim of executive privilege. Despite the fact that many of these disputes were extraordinarily controversial, until the citation of the EPA Administrator in December 1982, 125 years after the contempt statute was enacted, neither house of Congress had ever voted to utilize the contempt statute against a Presidential assertion of executive privilege. In fact, during congressional debates over Presidential refusals to produce documents to Congress, there have been express acknowledgements by members of Congress that Congress had no recourse against the Executive if the President asserted executive privilege. In 1886, the Senate engaged in a prolonged debate over President Cleveland's order to his Attorney General not to produce to Congress documents concerning the dismissal of a United States Attorney. The debate was intense, controversial, and memorable; 23 years after the debate a Senator termed it the "most remarkable discussion which was ever had upon this question [of the President's right to withhold documents from Congress]." 43 Cong. Rec. 841 (1909) (remarks of Sen. Bacon). During this debate, even Senators who insisted upon the Senate's right to receive the documents recognized that if the President ordered them not to be produced, "there is no remedy." 17 Cong. Rec. 2800 (1886) (remarks of Sen. Logan); *see also id.* at 2737 (1886) (remarks of Sen. Voorhees).[31]

---

[31] The only remedy then recognized by the Senators was the ultimate sanction of impeachment. *See* 17

Continued

131

CAR 0908

Congress' failure to resort to the contempt statute during any of the multitude of robust conflicts over executive privilege during the previous century and one quarter and Congress' own explicit recognition that it was without a remedy should the President order the withholding of documents, strongly suggest that Congress never understood the statute to apply to an executive official who asserted the President's claim of executive privilege.[32]

### 3. Prudential Reasons for Construing the Contempt Statute Not To Apply to Presidential Assertions of Privilege

Courts traditionally construe statutes in order to avoid serious doubts about a statute's constitutionality. *Califano* v. *Yamasaki*, 442 U.S. 682, 693 (1979); *Crowell* v. *Benson*, 285 U.S. 22, 62 (1932). As stated by the United States Court of Appeals for the District of Columbia Circuit, "when one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a 'clear statement' of contrary legislative intent." *United States* v. *Brown*, 483 F.2d 1314, 1317 (D.C. Cir. 1973) (quoting *United States* v. *Thompson*, 452 F.2d 1333, 1337 (D.C. Cir. 1971), *cert. denied*, 405 U.S. 998 (1972)).

When a possible conflict with the President's constitutional prerogatives is involved, the courts are even more careful to construe statutes to avoid a constitutional confrontation. A highly significant example may be found in the procedural history and holding of *United States* v. *Nixon*, 418 U.S. 683 (1974), in which the Court construed the limitation in 28 U.S.C. § 1291 (that appeals be taken only from "final" decisions of a district court) in order to permit the President to appeal an adverse ruling on his claim of executive privilege without having to place himself in contempt of court. Although the plain language of that statute seemed to preclude an appeal of a lower court's

---

[31] ( . . . continued)

Cong. Rec. 2737, 2800 (1886). As we note below, a much more effective and less controversial remedy is available — a civil suit to enforce the subpoena — which would permit Congress to acquire the disputed records by judicial order. *See also Senate Select Committee on Presidential Campaign Practices* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc).

[32] Congress' practices with respect to the contempt statute and the absence of any previous application of the statute to an Executive Branch official in these circumstances are highly probative of the meaning and applicability of the statute. In general, the Supreme Court has examined historical practice to determine the scope of Congress' powers. For example, in determining the scope of Congress' power to call and examine witnesses, the Court looked to the historical experience with respect to investigations and concluded:

    when [Congress'] practice in the matter is appraised according to the circumstances in which it
    was begun and to those in which it has been continued, it falls nothing short of a practical
    construction, long continued, of the constitutional provisions respecting their powers; and
    therefore should be taken as fixing the meaning of those provisions, if otherwise doubtful.

*McGrain* v. *Daugherty*, 273 U.S. 135, 174 (1927); *see also Fairbank* v. *United States*, 181 U.S. 283, 308 (1901). Moreover, the Court traditionally gives great weight to a contemporaneous construction of a statute by the agency charged with its execution. *See Power Reactor Development Co.* v. *Electricians*, 367 U.S. 396, 408 (1961); *Unemployment Compensation Comm'n* v. *Aragon*, 329 U.S. 143, 153 (1946). In this instance, Congress is responsible for taking the first step in implementing the contempt statute. Therefore, Congress' previous interpretations and past uses of the statute are analogous to the contemporaneous construction of the agency charged with implementation of the statute, and are of significance in determining the meaning of the statute.

CAR 0909

interlocutory ruling on an evidentiary matter, the Court construed the statute to permit an immediate appeal, without going through the otherwise required contempt proceeding:

> The traditional contempt avenue to immediate appeal is peculiarly inappropriate due to the unique setting in which the question arises. To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism of the ruling would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the government.

418 U.S. at 691–92.

Congress itself has previously recognized the impropriety of resolving executive privilege disputes in the context of criminal contempt proceedings. During the dispute over the Watergate tapes, Congress provided a civil enforcement mechanism through which to test the President's claim of executive privilege. Senator Ervin, the sponsor of the bill, noted in his explanatory statement to the Senate that the use of criminal contempt "may be inappropriate, unseemly, or nonefficacious where executive officers are involved." 119 Cong. Rec. 35715 (1973). In defending the civil enforcement procedure before the district court, Congress argued that in that case the contempt procedures would be "inappropriate methods for the presentation and resolution of the executive privilege issue," and that a criminal proceeding would be "a manifestly awkward vehicle for determining the serious constitutional question here presented." Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, Civ. No. 1593–73, at 5 (D.D.C. Aug. 28, 1973).

The United States Court of Appeals for the District of Columbia Circuit has stated on several occasions that criminal contempt proceedings are an inappropriate means for resolving document disputes, especially when they involve another governmental entity. In *Tobin* v. *United States*, 306 F.2d 270 (D.C. Cir.), *cert. denied*, 371 U.S. 902 (1962), the court reversed a contempt of Congress conviction on the ground that the congressional subpoena had gone beyond the investigative authority delegated to the committee that issued the subpoena. After deciding this issue, however, the court felt "inclined to add a few words in conclusion" concerning the problems involved in a criminal contempt of Congress case against a public official. In *dictum*, the court noted that the "conflicting duality inherent in a request of this nature is not particularly conducive to the giving of any satisfactory answer, no matter what the answer should prove to be," and it cited the "eloquent plea" of District Judge Youngdahl in the case below, which read in part:

> Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights.

133

CAR 0910

> Moreover, to raise these issues in the context of a contempt case is to force the courts to decide many questions that are not really relevant to the underlying problem of accommodating the interest of two sovereigns.

306 F.2d at 276. *See also United States* v. *Fort*, 443 F.2d 670, 677–78 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 932 (1971).

The analysis contained in *United States* v. *Nixon* demonstrates that principles of the separation of powers compel the application of special rules when a Presidential claim of a constitutional privilege is in tension with the request of another branch for confidential Executive Branch records. In discussing the issue of executive privilege in that case in response to a judicial subpoena, the Court stressed that the President's assertion of privilege was not to be treated as would a claim of a statutory or common law privilege by a private citizen. 418 U.S. at 708, 715. The President's constitutional role as head of one of three separate branches of government means that special care must be taken to construe statutes so as not to conflict with his ability to carry out his constitutional responsibilities. *See, e.g., Myers* v. *United States*, 272 U.S. 52 (1926) (upholding the President's removal power against limitations Congress sought to impose). The same special attention is provided, of course, to the other two branches when they assert responsibilities or prerogatives peculiar to their constitutional duties. *See, e.g., Gravel* v. *United States*, 408 U.S. 606 (1972) (extending immunity of Speech and Debate Clause to congressional assistants); *Pierson* v. *Ray*, 386 U.S. 547 (1967) (granting absolute civil immunity for judges' official actions).

In this case, the congressional contempt statute must be interpreted in light of the specific constitutional problems that would be created if the statute were interpreted to reach an Executive Branch official such as the EPA Administrator in the context considered here.[33] As explained more fully below, if executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties. Therefore, the separation of powers principles that underlie the doctrine of executive privilege also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege.[34]

---

[33] The same principle applies to protect the constitutional functions of the other branches. The separation of powers would similarly seem to require that a statute that made it a crime to disregard a statute passed by Congress be read not to apply to a judge who struck down a congressional enactment as unconstitutional.

[34] In addition to the encroachment on the constitutionally required separation of powers that prosecution of an Executive Branch official in this context would entail, there could be a serious due process problem if such an official were subjected to criminal penalties for obeying an express Presidential order, an order which was accompanied by advice from the Attorney General that compliance with the Presidential directive was not only consistent with the constitutional duties of the Executive Branch, but also affirmatively necessary in order to aid the President in the performance of his constitutional obligations to take care that the law was faithfully executed. *See Cox* v. *Lousiana*, 379 U.S. 559 (1965); *Raley* v. *Ohio*, 360 U.S. 423 (1959).

Continued

134