4. The Constitutional Implications of Application of the Contempt of Congress Statute to Executive Branch Officials Who Assert the President's Claim of Privilege

The Supreme Court has stated that, in determining whether a particular statute

> disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. *United States* v. *Nixon*, 418 U.S. at 711–712. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

*Nixon* v. *Administrator of General Services*, 433 U.S. 425, 443 (1977). Thus, in analyzing this separation of powers issue, one must look first to the impact that application of the congressional contempt statute to Presidential assertions of executive privilege would have on the President's ability to carry out his constitutionally assigned functions. Then, if there is a potential for disruption, it is necessary to determine whether Congress' need to impose criminal contempt sanctions in executive privilege disputes is strong enough to outweigh the impact on the Executive's constitutional role.

In this instance, at stake is the President's constitutional responsibility to enforce the laws of the United States and the necessarily included ability to protect the confidentiality of information vital to the performance of that task. As explained earlier in this memorandum, the authority to maintain the integrity of certain information within the Executive Branch has been considered by virtually every President to be essential to his capacity to fulfill the responsibilities assigned to him by the Constitution. Thus, as discussed above, and as the Supreme Court has recognized, the capacity to protect the confidentiality of some information is integral to the constitutional role of the President.

For these reasons, the Supreme Court has ruled that the President's assertion of executive privilege is *presumptively valid* and can be overcome only by a clear showing that another branch cannot responsibly carry out its assigned constitutional function without the privileged information. *United States* v. *Nixon*, 418 U.S. at 708. In *Nixon*, the Court stated that "upon receiving a claim

---

[34] (. . . continued)

Furthermore, a person can be prosecuted under § 192 only for a "willful" failure to produce documents in response to a congressional subpoena. *See United States* v. *Murdock*, 290 U.S. 389, 397–98 (1933); *Townsend* v. *United States*, 95 F.2d 352, 359 (D.C. Cir.), *cert. denied*, 303 U.S. 664 (1938). There is some doubt whether obeying the President's direct order to assert his constitutional claim of executive privilege would amount to a "willful" violation of the statute. Moreover, reliance on an explicit opinion of the Attorney General may negate the required *mens rea* even in the case of a statute without a willfulness requirement. *See* Model Penal Code § 2.04(3)(b); *United States* v. *Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976) (Mehrige J., concurring).

CAR 0912

of privilege from the Chief Executive, it became the further duty of the District Court to treat the subpoenaed material as presumptively privileged." 418 U.S. at 713. The United States Court of Appeals for the District of Columbia Circuit has stated that this presumptive privilege initially protects documents "even from the limited intrusion represented by *in camera* examination of the conversations by a court." *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974) (en banc). The court went on to note:

> So long as the presumption that the public interest favors confidentiality can be defeated only by a strong showing of need by another institution of government a showing that the responsibilities of that institution cannot responsibly be fulfilled without access to records of the President's deliberations we believed in Nixon v. Sirica, and continue to believe, that the effective functioning of the presidential office will not be impaired.

*Id.* at 730. In order to overcome the presumptively privileged nature of the documents, a congressional committee must show that "the subpoenaed evidence is *demonstrably critical* to the responsible fulfillment of the Committee's functions." *Id.* at 731 (emphasis added). Thus, the President's assertion of executive privilege is far different from a private person's individual assertion of privilege; it is entitled to special deference due to the critical connection between the privilege and the President's ability to carry out his constitutional duties.

Application of the criminal contempt statute to Presidential assertions of executive privilege would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions. If the statute were construed to apply to Presidential assertions of privilege, the President would be in the untenable position of having to place a subordinate at the risk of a criminal conviction and possible jail sentence in order for the President to exercise a responsibility that he found necessary to the performance of his constitutional duty. Even if the privilege were upheld, the executive official would be put to the risk and burden of a criminal trial in order to vindicate the President's assertion of his constitutional privilege. As Judge Learned Hand stated with respect to the policy justifications for a prosecutor's immunity from civil liability for official actions,

> to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to [sic] satisfy a jury of his good faith.

*Gregoire* v. *Biddle*, 177 F.2d 579, 581 (2d Cir. 1949), *cert. denied*, 339 U.S. 949 (1950). The Supreme Court has noted, with respect to the similar issue of

CAR 0913

executive immunity from civil suits, that "among the most persuasive reasons supporting official immunity is the prospect that damages liability may render an official unduly cautious in the discharge of his official duties." *Nixon* v. *Fitzgerald*, 457 U.S. 731, 752 n.32 (1982); *see also Harlow* v. *Fitzgerald*, 457 U.S. 800 (1982); *Butz* v. *Economou*, 438 U.S. 478 (1978). Thus, the courts have recognized that the risk of civil liability places a pronounced burden on the ability of government officials to accomplish their assigned duties, and have restricted such liability in a variety of contexts. *Id.*[35] The even greater threat of criminal liability, simply for obeying a Presidential command to assert the President's constitutionally based and presumptively valid privilege against disclosures that would impair his ability to enforce the law, would unquestionably create a significant obstacle to the assertion of that privilege. *See United States* v. *Nixon*, 418 U.S. 683 (1974).

By contrast, the congressional interest in applying the criminal contempt sanctions to a Presidential assertion of executive privilege is comparatively slight. Although Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function, Congress could obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena.[36] Congress' use of civil enforcement power instead of the criminal contempt statute would not adversely affect Congress' ultimate interest in obtaining the documents. Indeed, a conviction of an Executive Branch official for contempt of Congress for failing to produce subpoenaed documents would not result in any order for the production of the documents.[37] A civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them. Thus, even if criminal sanctions were not available against an executive official who asserted the President's claim of privilege, Congress would be able to vindicate a legitimate desire to obtain documents if it could establish that its need for the records outweighed the Executive's interest in preserving confidentiality.

The most potent effect of the potential application of criminal sanctions would be to deter the President from asserting executive privilege and to make it difficult for him to enlist the aid of his subordinates in the process. Although

[35] *See also Barr* v. *Matteo*, 360 U.S. 564 (1959), *Spalding* v. *Vilas*, 161 U.S. 483 (1896) Some officials, such as judges and prosecutors, have been given absolute immunity from civil suits arising out of their official acts. *Imbler* v. *Pachtman*, 424 U.S. 409 (1976), *Pierson* v. *Ray*, 386 U.S. 547 (1967).

[36] It is arguable that Congress already has the power to apply for such civil enforcement, since 28 U.S.C. § 1331 has been amended to eliminate the amount in controversy requirement, which was the only obstacle cited to foreclose jurisdiction under § 1331 in a previous civil enforcement action brought by the Senate. *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 366 F. Supp. 51 (D.D.C. 1973). In any event, there is little doubt that, at the very least, Congress may authorize civil enforcement of its subpoenas and grant jurisdiction to the courts to entertain such cases. *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C Cir. 1974) (en banc); Hamilton and Grabow, *A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas*, 21 Harv. J on Legis. 145 (1984).

[37] *See* Hamilton and Grabow, *supra*, 21 Harv J. on Legis. at 151.

137

CAR 0914

this significant *in terrorem* effect would surely reduce claims of executive privilege and, from Congress' perspective, would have the salutary impact of virtually eliminating the obstacles to the obtaining of records, it would be inconsistent with the constitutional principles that underlie executive privilege to impose a criminal prosecution and criminal penalties on the President's exercise of a presumptively valid constitutional responsibility. The *in terrorem* effect may be adequate justification for Congress' use of criminal contempt against private individuals, but it is an inappropriate basis in the context of the President's exercise of his constitutional duties. In this respect it is important to recall the statement of Chief Justice Marshall, sitting as a trial judge in the *Burr* case, concerning the ability of a court to demand documents from a President: "In no case of this kind would a court be required to proceed against the President as against an ordinary individual." *United States* v. *Burr*, 25 F. Cas. 187, 192 (C.C. Va. 1807).[38] This fundamental principle, arising from the constitutionally prescribed separation of powers, precludes Congress' use against the Executive of coercive measures that might be permissible with respect to private citizens. The Supreme Court has stated that the fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential equality. *Humphrey's Executor* v. *United States*, 295 U.S. 602, 629–30 (1935).

Congress' use of the coercive power of criminal contempt to prevent Presidential assertions of executive privilege is especially inappropriate given the presumptive nature of the privilege. In cases involving congressional subpoenas against private individuals, courts start with the presumption that Congress has a right to all testimony that is within the scope of a proper legislative inquiry. *See Barenblatt* v. *United States*, 360 U.S. 109 (1959); *McGrain* v. *Daugherty*, 273 U.S. 135 (1927). As noted above, however, the President's assertion of executive privilege is presumptively valid, and that presumption may be overcome only if Congress establishes that the requested information "is demonstrably critical to the responsible fulfillment of the Committee's functions." *See Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d at 731; *see also United States* v. *Nixon*, 418 U.S. at 708–09. If Congress could use the power of criminal contempt to coerce the President either not to assert or to abandon his right to assert executive privilege, this clearly established presumption would be reversed and the presumptive privilege nullified.

Congress has many weapons at its disposal in the political arena, where it has clear constitutional authority to act and where the President has corresponding political weapons with which to do battle against Congress on equal terms. By wielding the cudgel of criminal contempt, however, Congress seeks to invoke

---

[38] The *Nixon* Court thought this statement significant enough in the context of an executive privilege dispute to quote it in full at two separate places in its decision *United States* v. *Nixon*, 418 U.S. at 708, 715.

138

the power of the third branch, not to resolve a dispute between the Executive and Legislative Branches and to obtain the documents it claims it needs, but to punish the Executive, indeed to punish the official who carried out the President's constitutionally authorized commands,[39] for asserting a constitutional privilege. That effort is inconsistent with the "spirit of dynamic compromise" that requires accommodation of the interests of both branches in disputes over executive privilege. *See United States* v. *American Telephone & Telegraph Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). In the AT&T case, the court insisted on further efforts by the two branches to reach a compromise arrangement on an executive privilege dispute and emphasized that

> the resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi*, which positively promotes the functioning of our system. The Constitution contemplates such accommodation. Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme.

*Id.* at 130. Congress' use of the threat of criminal penalties against an executive official who asserts the President's claim of executive privilege, flatly contradicts this fundamental principle.[40]

The balancing required by the separation of powers demonstrates that the contempt of Congress statute cannot be constitutionally applied to an executive official in the context under consideration. On the one hand, Congress has no

---

[39] One scholar (former Assistant Attorney General for the Civil Division, and now Solicitor General, Rex Lee) has noted that

> when the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted for conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for vindicating congressional investigative interests and for getting the legal issues into court.

Lee, *Executive Privilege, Congressional Subpoena Power, and Judicial Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y U. L. Rev. 231, 259.

[40] Even when a privilege is asserted by a cabinet official, and not the President, courts are extremely reluctant to impose a contempt sanction and are willing to resort to it only in extraordinary cases and only after all other remedies have failed. In *In re Attorney General*, 596 F.2d 58 (2d Cir.), *cert. denied*, 444 U.S. 903 (1979), the court granted the government's mandamus petition to overturn a district court's civil contempt citation against the Attorney General for failing to turn over documents for which he had asserted a claim of privilege. The court recognized that even a *civil* contempt sanction imposed on an Executive Branch official "has greater public importance, with separation of powers overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant." 596 F.2d at 64. Therefore, the court held that holding the Attorney General of the United States in contempt to ensure compliance with a court order should be a last resort, to be undertaken only after all other means to achieve the ends legitimately sought by the court have been exhausted. *Id.* at 65. In the case of a Presidential claim of executive privilege, there is even more reason to avoid contempt proceedings because the privilege claim has been made as a constitutionally based claim by the President himself and the sanction involved is criminal and not civil contempt. The use of criminal contempt is especially inappropriate in the context under discussion because Congress has the clearly available alternative of civil enforcement proceedings.

CAR 0916

compelling need to employ criminal prosecution in order to vindicate its rights. The Executive, however, must be free from the threat of criminal prosecution if its right to assert executive privilege is to have any practical substance. Thus, when the major impact on the President's ability to exercise his constitutionally mandated function is balanced against the relatively slight imposition on Congress in requiring it to resort to a civil rather than a criminal remedy to pursue its legitimate needs,[41] we believe that the constitutionally mandated separation of powers requires the statute to be interpreted so as not to apply to Presidential assertions of executive privilege.[42]

The construction of the statute that is dictated by the separation of powers is consistent with the legislative history of the statute and the subsequent legislative implementation of the statute. Although at the time the criminal statute was enacted, Congress was well aware of the recurring assertions of the right to protect the confidentiality of certain Executive Branch materials, it gave no indication that it intended the contempt statute to tread upon that constitutionally sensitive area. In the many debates on executive privilege since the adoption of the statute, Congress at times has questioned the validity of a Presidential assertion of privilege, but, until December of 1982, it never attempted to utilize the criminal contempt sanction to punish someone for a President's assertion of privilege. Regardless of the merits of the President's action, the fundamental balance required by the Constitution does not permit Congress to make it a crime for an official to assist the President in asserting a constitutional privilege that is an integral part of the President's responsibilities under the Constitution. We therefore conclude that the contempt of Congress statute does not apply to an executive official who carries out the President's claim of executive privilege.

Nearly every President since George Washington has found that in order to perform his constitutional duties it is necessary to protect the confidentiality of certain materials, including predecisional Executive Branch deliberations, national security information, and sensitive law enforcement proceedings, from disclosure to Congress. No President has rejected the doctrine of executive privilege; all who have addressed the issue have either exercised the privilege, attested to its importance, or done both. Every Supreme Court Justice and every Judge of the United States Court of Appeals for the District of Columbia Circuit who has considered the question of executive privilege has recognized its validity and importance in the constitutional scheme. Executive privilege, properly asserted, is as important to the President as is the need for confidenti-

---

[41] See Hamilton and Grabow, A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas, 21 Harv. J. on Legis. 145 (1984).

[42] We believe that this same conclusion would apply to any attempt by Congress to utilize its inherent "civil" contempt powers to arrest, bring to trial, and punish an executive official who asserted a Presidential claim of executive privilege. The legislative history of the criminal contempt statute indicates that the reach of the statute was intended to be coextensive with Congress' inherent civil contempt powers (except with respect to the penalties imposed). See 42 Cong. Globe 406 (remarks of Rep. Davis). Therefore, the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well.

140

CAR 0917

ality at certain times in the deliberations of the Justices of the Supreme Court and in the communications between members of Congress and their aides and colleagues. Congress itself has respected the President's need for confidentiality; it has never arrested an executive official for contempt of Congress for failing to produce subpoenaed documents and never, prior to the heated closing moments of the 97th Congress in December of 1982, did a House of Congress seek to punish criminally an executive official for asserting a President's claim of privilege.

Naturally, Congress has and always will resist claims of executive privilege with passion and vigor. Congress aggressively asserts its perceived institutional prerogatives, and it will surely oppose any effort by the President to withhold information from it. If it could eliminate claims of executive privilege by requiring that an official who asserts such a claim on behalf of the President be prosecuted criminally, it would surely be in favor of doing so. Thus, the tension between the relative strengths and institutional prerogatives of Congress and the President necessarily reaches a high level of intensity in any case involving a claim of executive privilege. The specter of mandatory criminal prosecution for the good-faith exercise of the President's constitutional privilege adds a highly inflammatory element to an already explosive environment. We believe that the courts, if presented the issue in a context similar to that discussed in this memorandum, would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution. The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual.

In some respects, the tensions between the branches, which become exacerbated during these conflicts, and the pressure placed on the President and his subordinates in this context, call to mind the comments of Chief Justice Chase concerning the impeachment trial of President Andrew Johnson, over which the Chief Justice presided. One of the charges against President Johnson was that he had fired Secretary of War Stanton in violation of the Tenure of Office Act, which purported to strip the President of his removal power over certain Executive Branch officials.[43] Chief Justice Chase declared that the President had a duty to execute a statute passed by Congress which he believed to be unconstitutional "precisely as if he held it to be constitutional." However, he added, the President's duty changed in the case of a statute which

> directly attacks and impairs the executive power confided to
> him by [the Constitution]. In that case it appears to me to be the
> clear duty of the President to disregard the law, so far at least as
> it may be necessary to bring the question of its constitutionality
> before the judicial tribunals.

---

[43] The Tenure of Office Act was, of course, later declared to have been unconstitutional. *Myers* v. *United States*, 272 U.S. 52 (1926).

141

CAR 0918

\*　　　　\*　　　　\*

> How can the President fulfill his oath to preserve, protect, and defend the Constitution, if he has no *right* to *defend* it against an act of Congress, sincerely believed by him to have been passed in violation of it?[44]

If the President is to preserve, protect, and defend the Constitution, if he is faithfully to execute the laws, there may come a time when it is necessary for him both to resist a congressional demand for documents and to refuse to prosecute those who assist him in the exercise of his duty. To yield information that he in good conscience believes he must protect in order to perform his obligation, would abdicate the responsibilities of his office and deny his oath. To seek criminal punishment for those who have acted to aid the President's performance of his duty would be equally inconsistent with the Constitution.

In the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt. Congress does not have the statutory or constitutional authority to require a particular case to be referred to the grand jury. In addition, because the Congress has an alternative remedy both to test the validity of the Executive's claim of privilege and to obtain the documents if the courts decide that the privilege is outweighed by a valid and compelling legislative need, a criminal prosecution and the concomitant chilling effect that it would have on the ability of a President to assert a privilege, is an unnecessary and unjustified burden that, in our judgment, is inconsistent with the Constitution.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[44] R. Warden, *An Account of the Private Life and Public Services of Salmon Portland Chase* 685 (1874). Chief Justice Chase's comments were made in a letter written the day after the Senate had voted to exclude evidence that the entire cabinet had advised President Johnson that the Tenure of Office Act was unconstitutional. *Id. See* M. Benedict, *The Impeachment and Trial of Andrew Johnson* 154–55 (1973). Ultimately, the Senate did admit evidence that the President had desired to initiate a court test of the law. *Id.* at 156.

142

**85 Mich. L. Rev. 152**

**Michigan Law Review**
October, 1986

Note
Lynda J. Oswald

Copyright 1987 by the Michigan Law Review Association; Lynda J. Oswald

# EXTENDED VOLUNTARY DEPARTURE: LIMITING THE ATTORNEY GENERAL'S DISCRETION IN IMMIGRATION MATTERS

Fifteen times in the past quarter-century, the Attorney General has decreed that aliens of certain nationalities could temporarily remain in the United States regardless of their visa status. Government officials have characterized these grants of blanket extended voluntary departure (EVD)[2] as a means of protecting aliens from life-threatening conditions in their homelands.[3] The Attorney General's actions were apparently undertaken for humanitarian reasons[4] and went largely unnoticed **\*153** by the public.[5]

Recently, however, the Attorney General denied EVD status to Salvadoran nationals,[6] despite the perilous conditions faced by those forced to return to El Salvador.[7] This denial has sparked controversy in the press[8] and one court case *Hotel & Restaurant Employees Union, Local 25 v. Smith*.[9] For the first time, the source and nature of **\*154** EVD status are being examined and questioned. Unfortunately for Salvadorans and similarly situated aliens, the United States District Court for the District of Columbia granted summary judgment for the defendants in *Employees Union*, finding that EVD is 'a matter of the Attorney General's absolute discretion on issues of foreign and prosecutorial policy'[0] and thus not subject to judicial review beyond an initial examination into whether the Attorney General's decision had a rational basis. In so holding, the *Employees Union* court ratified the extrastatutory nature of this status and recognized broad, nearly unbridled discretion in the Attorney General.

In refusing to review the Attorney General's decision, the *Employees Union* court followed the traditional restrictive view of judicial involvement in immigration law, which assumes that immigration matters are entitled to substantial judicial deference.[2] This view, which has dominated our legal tradition for the past century, is now being challenged by a new vision of immigration law marked by heightened judicial scrutiny and a recognition of the rights accruing to aliens simply because of their intrinsic human worth.[3] This Note argues that, because of the important interests at stake, EVD is more properly examined under this incipient legal tradition.

Part I of this Note defines EVD and distinguishes it from related forms of deportation relief. Part II describes the *Employees Union* court's holding. The evolution of American perceptions of immigration law is laid out in Part III and the concept of 'communitarianism' is explored. Part IV investigates the source of EVD and concludes that EVD arises not from the discretionary enforcement of the immigration laws, but from the voluntary departure provisions of the Immigration and Nationality Act of 1952 (INA).[4] Thus, Part V finds that EVD determinations should be subject to narrow judicial review for abuse of discretion under the Administrative Procedure Act (APA)[5] and urges that a 'reasons requirement' be imposed on the Attorney General. Part VI concludes by integrating EVD into the communitarian model.

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 10 of 129

**\*155  I. VOLUNTARY DEPARTURE, EXTENSIONS OF VOLUNTARY DEPARTURE, AND EVD DEFINED AND DISTINGUISHED**

The concept of EVD is not well-understood. [6] A major cause of the confusion surrounding this relief is the terminology used; even the INS staff apparently has difficulty distinguishing voluntary departure, extensions of voluntary departure, and extended voluntary departure from each other. [7] Although these forms of deportation relief are conceptually related, they have different objectives and effects.

The INA gives the Attorney General discretionary authority to grant voluntary departure status to deportable aliens. [8] The Act permits the Attorney General to grant this status both to aliens already involved in deportation proceedings [9] and to aliens for whom deportation hearings have not yet been held. [20] An alien who voluntarily departs the United States avoids several discommodious legal consequences [2]   and, unlike a deported alien, need not obtain special permission to reapply for admission within the next year. [22] Aliens granted this status who do not fall into one of the special categories  **\*156**  discussed below [23] (which allow for 'extensions') must leave the United States within thirty days unless 'meritorious circumstances' are present. [24]

INS regulations permit the granting of extensions of voluntary departure status to certain aliens. [25] For example, an alien who meets the other statutory requirements and 'in whose case the district director has determined there are compelling factors warranting grant of voluntary departure' [26] may be granted an extension of voluntary departure. [27] Other classes of aliens who may receive extensions of voluntary departure status include aliens who have been granted asylum but who have not been granted parole or stay of deportation, [28] certain nonimmigrant aliens who have lost such status solely because of private bills introduced on their behalf, [29] and certain aliens admissible to the United States who meet other conditions as well. [30] The INS officer must generally grant the status in specific increments of time [3]   and his or her decision is not subject to administrative appeal. [32]

**\*157**  No statute or regulation explicitly sanctions the granting of 'blanket' extended voluntary departure (EVD) to all nationals of a specific country. Rather, the privilege has evolved through INS practice since 1960, when the INS conferred EVD status upon Cubans. [33] EVD differs from extensions of voluntary departure in two significant respects: (1) EVD is granted to aliens who are temporarily unable to return to their home country because of dangerous conditions there [34] and (2) the determination does not usually involve individual evaluations, but rather applies to all nationals of the country involved who are within the United States. [35] Grants of EVD status permit the United States to extend temporary aid to aliens without requiring it to grant them permanent status. [36] EVD grants also conserve the Attorney **\*158**  General's enforcement resources since an individual response to each dislocated alien is no longer required. [37] The aliens benefit by being allowed to stay in the United States until conditions in their home country improve [38] even though they may not have met the more stringent requirements for refugee status. [39]

EVD status has been granted to nationals from fifteen countries and today still applies to nationals from five countries. [40] The Attorney  **\*159**  General's procedure for granting this status is simple. Upon receiving a State Department recommendation, [4]   the Attorney General  **\*160**  authorizes EVD status for a specific period of time for all aliens affected. The Attorney General usually conveys his decision by a directive either (1) instructing INS officials to consider 'sympathetically' requests for discretionary relief by the affected aliens [42] or (2) instructing INS officials not to begin deportation proceedings against those aliens or, if an alien has already received a deportion order, not to enforce departure. [43]

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 11 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

## II. *HOTEL & RESTAURANT EMPLOYEES UNION, LOCAL 25 V. SMITH*

Despite the lack of explicit authority for his actions, [44] the Attorney General granted EVD status to various groups of aliens over a **\*161** twenty-three-year period beginning in 1960. [45] His actions went unchallenged in the courts [46] until 1983, when *Hotel & Restaurant Employees Union, Local 25 v. Smith* [47] was filed. The case was initiated by a union whose membership consisted primarily of Salvadoran nationals. [48] The impetus for the suit was the adamant refusal of the Attorney General to grant EVD status to Salvadoran nationals despite urgings by Congress [49] and the public [50] to do so. [5] The plaintiff **\*162** claimed that 'the denial by the INS of extended voluntary departure to Salvadorans was arbitrary and capricious, violative of the Fifth Amendment, and contrary to the rule-making procedures of 5 U.S.C. § 553.' [52] The defendants filed motions to dismiss, arguing that (1) the plaintiff lacked standing to sue, (2) the decision to grant or deny EVD was nonjusticiable as a political question, and (3) the complaint did not state a claim upon which relief could be granted. [53] The court rejected each of these motions and ordered the case to proceed either to motions for summary judgment or to trial. [54]

The defendants prevailed on their subsequent motion for summary judgment. [55] In its second *Employees Union* opinion, the court characterized **\*163** EVD as an exercise of prosecutorial discretion [56] and found that it was not subject to judicial review under the provisions of the APA. [57] Therefore, in the court's view, the plaintiff had no grounds for claiming relief.

As the first judicial pronouncement on EVD, *Employees Union* is an important indication of how this status is viewed in the judiciary. The court interpreted grants of EVD as responses to foreign and domestic policy considerations, [58] rather than as manifestations of humanitarian concern for the safety and well-being of the aliens involved. The court found both constitutional [59] and statutory [60] bases for the Attorney General's power to grant EVD, despite the clear extrastatutory nature of EVD status. [6]

The court began by stating that '[t]he Constitutional foundation **\*164** for grants of EVD derives from the Executive's express and inherent authority in the areas of both foreign and prosecutorial policy.' [62] The court noted that the 'regulation of aliens' was "intricately interwoven" with the plenary power over foreign affairs constitutionally vested in the Executive branch. [63] Moreover, regulation over immigration is 'an 'inherent executive power.'' [64] Thus, in the court's eyes, the Attorney General was constitutionally authorized to execute foreign policy by granting this status to aliens.

The court then noted that under the Constitution, discretionary matters, including those in the immigration area, are governed by 'the plenary, if not exclusive authority' of the executive branch. [65] The decision to deport (or not to deport) is a matter of 'prosecutorial discretion' [66] and, as the Supreme Court has noted, the constitutional authority to exercise such discretion reaches its zenith in the area of immigration law. [67]

Finally, the *Employees Union* court found a statutory basis for grants of EVD in the INA, which authorizes the Attorney General to 'establish such regulations . . . and perform such other acts as he deems necessary for carrying out [the administration and enforcement of the Act].' [68] Since, in the court's view, grants of EVD were "rationally related" [69] to the duties imposed upon the Attorney General by the Act, his exercise of discretion in this area was valid, even though EVD is neither statutorily condoned or mandated. [70]

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 12 of 129

**\*165**  Having located the source of the Attorney General's power to grant EVD status, the court went on to state that two provisions of the APA prevented judicial review of the Attorney General's decision to deny this relief to Salvadoran nationals. [7]  First, the APA subjects to review only ' a gency action made reviewable by statute a final agency action for which there is no other adequate remedy in a court . . . .' [72]  Since EVD is not made reviewable by statute and since aliens denied this status retain the full panoply of procedures and appeals available in deportation proceedings, the *Employees Union* court found that the APA precluded judicial review. [73]

Second, the APA also prohibits judicial review of agency action 'committed to agency discretion by law.' [74]  This provision applies where "statutes are drawn in such broad terms that in a given case there is no law to apply." [75]  The court found that, because of EVD's extrastatutory nature, there was 'indeed 'no law to apply.'' [76]

The court thus concluded that EVD was simply not the type of agency action in which courts should interfere. [77]  It emphasized that because EVD involves prosecutorial discretion, which is necessarily broad, [78] and because immigration is intertwined with the conduct of foreign affairs, an area in which the courts are loath to intervene, [79] the Attorney General's decision could be subject to no more than limited review for abuse of discretion. [80]  The court went on to find that even  **\*166**  this narrow review was unavailable, noting that a court can review for abuse of discretion only where a standard exists by which to gauge the executive's action. [8]   The *Employees Union* court found that no such standard exists for EVD, rejecting plaintiff's argument that a 'humanitarian' standard had evolved as a result of the pattern of past EVD grants by the Attorney General. [82]  Therefore, the court found that the Attorney General's decision not to grant EVD status to Salvadoran nationals was not subject to judicial review. [83]

The *Employees Union* court's analysis of the scope of judicial review available to EVD claims is consistent with the teachings of the past century of immigration law. [84]  As the next Part discusses, however, immigration law is undergoing a gradual transformation. Determination of the scope of judicial review available in cases such as *Employees Union* depends at least in part upon how the American legal system views the status of aliens. In dismissing EVD as an unreviewable exercise of prosecutorial discretion, the *Employees Union* court embraced the traditional conception of immigration law, which emphasizes the limited rights of aliens and affords extreme judicial deference to the legislative and executive branches in immigration matters. [85]  This view is ultimately unsatisfying because it ignores both the substantive nature of EVD and the impact of the Attorney General's decision on aliens such as the Salvadorans. The nascent concept of 'communitarianism,' [86] on the other hand, suggests a more sensitive way of analyzing the competing interests involved in EVD claims.

### III. THE EVOLUTION OF IMMIGRATION LAW

Immigration law has long occupied a unique place in American jurisprudence. Despite the transformations wrought by increased judicial  **\*167**  activism and the expansion of constitutional protections in other areas of law in recent decades, immigration law has remained surprisingly untouched. [87]  The 'insularity' of immigration law has, however, come under increasing attack by legal scholars. [88]  As a result, immigration law is slowly changing as perceptions of aliens and thier relationship to American society change. This evolution has important implications for the nature of EVD and the procedural safeguards due it.

#### A. *The Development of American Immigration Policy*

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 13 of 129

The evolution of American immigration policy is closely tied to the changing social, economic, and political milieus of the country. Professor Schuck has identified three stages in the development of American immigration policy. [89] From the beginning of the Republic to the 1880s, a 'liberal ideology,' which recognized the 'moral worth and dignity' of the individual and his right to a role in society, resulted in an immigration policy that actively recruited mass immigration. [90]

As the United States ceased being a land of endless frontiers and **\*168** limitless growth and developed instead into an urban and industrial society with more restricted growth, liberal ideology faded. Fundamental economic, political, and social changes gave birth to a new ideology of 'restrictive nationalism,' which manifested itself in a legal order Schuck terms 'classical immigration law.' [9] Exclusionary reactions to immigrants [92] resulted in an ideology which altered the source of aliens' rights and duties. Under liberal ideology, an alien's rights and duties were seen to stem from his or her right to freely contract with others. Under restrictive nationalism, however, the alien's legal status was defined by 'the national government's consent to allow the alien to enter and remain, which consent could be denied or withdrawn on the basis of arbitrary criteria and summary procedures that often transgressed liberal principles.' [93]

Not surprisingly, the first pronouncements of judicial restraint in the immigration area came in the early years of classical immigration law. The Supreme Court recognized early the plenary power of Congress in the immigration field [94] and made sweeping denials of its own power to control the legislature's actions. [95] The result is an exaggerated **\*169** judicial deference to laws governing the admission, exclusion, and deportation of aliens which persists to the present. [96]

The restrictive tide of classical immigration law has only recently shown signs of receding. Professor Schuck has identified an emerging ideological shift in immigration law, in which the focus is not on the government's omnipotent sovereignty, but rather on the 'essential and equal humanity' of individuals. [97] Under this 'communitarian' vision of immigration law, the government's duties extend 'to all individuals who manage to reach America's shores, even to strangers whom it has never undertaken, and has no wish, to protect.' [98] Communitarianism reaches back to liberal ideology to find that all individuals possess certain universal rights simply because they are human beings. This new view emphasizes the 'social interactions and commitments' between **\*170** aliens and the government as the source of the government's duty toward those aliens, rather than governmental consent. [99]

Communitarianism is by no means an established approach to immigration law. [00] Yet the pressures for change [0] are mounting, and the first faint flickerings of this new ideology are apparent. [02] Thus, we see decisions that imply that long-term resident aliens are members of our national community and thus entitled to various rights, [03] decisions evidencing increased judicial assertiveness, [04] and decisions creating increased procedural and substantive rights for deportable and detained aliens. [05]

**\*171** The increased infusion of moral values into law that necessarily accompanies communitarianism has important procedural implications. [06] Traditionally, aliens were perceived as having few or no procedural rights. [07] If we admit that aliens are entitled to some procedural protection, however   either by virtue of their ties to the United States [08] or simply because of their basic humanity   we are forced to consider competing interests: the alien's interest in avoiding arbitrary government decisionmaking [09] versus the government's interest in avoiding fiscal and administrative burdens [0] and in preventing the entry of aliens not entitled to the benefits of our society.   EVD presents a revealing opportunity to consider these individual and governmental concerns in the context of discretionary decisionmaking by the Attorney General.

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 14 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

## B. *The Application of Communitarianism to EVD*

In denying judicial review in *Employees Union*, the court adopted the classical view of immigration law. EVD, like most forms of discretionary relief, has no procedural safeguards provided by statute or regulation. [2] Moreover, discretionary decisions to suspend enforcement of the deportation laws have traditionally been considered nonreviewable exercises of prosecutorial discretion. [3] In effect, the *Employees Union* court weighed the interests of the two parties involved and found the scales grossly lopsided. On one side, it had an exercise of prosecutorial discretion by the Attorney General involving immigration and, impliedly, foreign affairs   interests traditionally subject to extremely narrow review. On the other side, it had a demand for judicial review by a group traditionally deemed to have only those limited rights the government chooses to grant it.

An examination of EVD through the lens of the communitarianism **\*172** view of immigration law, however, reveals that the Salvadoran nationals have important interests at stake that can be protected only by judicial review. Salvadoran nationals, though present illegally in the United States, have a very strong interest in not being returned to the dangers of their homeland. [4] That interest should not be disregarded and, at the very least, entitles the Salvadorans to procedural fairness. Though few would argue that these aliens have an incontrovertible right to remain in the United States, the judicial deference traditionally accorded immigration law seems misplaced in this instance. If we examine the nature of EVD grants more critically, we see that *Employees Union* involved precisely the sort of governmental action which should be subject to judicial review.

## IV. THE SOURCE OF EVD

An examination of the source of the Attorney General's power to grant EVD status reveals that this relief is not merely a gratuitous decision not to enforce the immigration laws, but rather an affirmative action conferring special benefits on the aliens involved. Thus, the *Employees Union* court's characterization of EVD as 'prosecutorial discretion' is conclusory; application of such a label enables the court to avoid examining the underlying reasons for the Attorney General's decision and to ignore the substantive impacts of this status on the aliens who receive it. [5]

## A. *EVD as Prosecutorial Discretion*

The *Employees Union* court's characterization of EVD as an exercise of prosecutorial discretion is accurate in one sense. The INS has neither the fiscal nor the administrative resources to initiate deportation hearings against every illegal alien it finds in the United States. [6] Thus, the INS exercises prosecutorial discretion in deciding which aliens will be excused from deportation proceedings and in setting the terms and duration of their stay. [7] This discretion has become more focused as the INS has created specific forms of discretionary deportation relief and has promulgated standards for granting that relief. [8] It **\*173** is misleading, however, to analogize too closely these forms of discretionary relief to the most common form of prosecutorial discretion   that which arises in the criminal context.

The judiciary has generally accorded great deference to exercises of prosecutorial discretion in the criminal setting. [9] Courts assume that a prosecutor's resources are so limited that he or she cannot prosecute all offenders [20] and that, in any event, leniency is warranted in some cases. [2] A number of other factors may influence the prosecutor's decision to charge, including uncertainty about the defendant's guilt, [22] the perceived likelihood of conviction, [23] and the potential for deterrence of others. [24] Because the courts consider these matters to be exclusively within the prosecutor's discretion, his or her decision is virtually unreviewable. [25]

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 15 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

An agency's determination to enforce or not 'involves a complicated balancing of a number of factors' [26] similar to those found in the criminal setting:

> [T]he agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake the action **\*174** at all. [27]

Likewise, agency exercises of prosecutorial discretion are subject to very limited review for abuse of discretion. [28]

The analogy between prosecutorial discretion in the criminal context and prosecutorial discretion in the agency context collapses upon close examination, however. The two settings give rise to exercises of discretion which are fundamentally different. An exercise of prosecutorial discretion in a criminal setting is directed toward past behavior; the act has already occurred and only the societal interest in punishing the guilty remains. [29] Exercises of prosecutorial discretion in the agency setting, on the other hand, can be proactive, not merely reactive, in effect. [30] As Justice Marshall noted, ' t he interests at stake in review of administrative enforcement decisions are . . . more focused and in many circumstances more pressing than those at stake in criminal prosecutorial decisions.' [3]

The Attorney General's decision to grant or deny EVD status well exemplifies this phenomenon. A decision to forego prosecution in a criminal case preserves the status quo; the potential defendant, who is presumed innocent until proven guilty, remains innocent. [32] A grant of EVD, on the other hand, is not merely a decision 'to suspend enforcement **\*175** of the immigration laws,' [33] but rather is an affirmative action conferring important legal privileges on the aliens involved. All aliens in the relevant class, regardless of their legal status, are entitled to remain in the United States while the grant remains in effect and are eligible to receive work authorization from the INS during their stay. [34] Although the aliens are technically deportable, a grant of EVD allows them to conduct their affairs in any manner they choose as long as they remain in the United States. [35] Recipients of EVD thus acquire significant advantages which belie the notion that they are merely passive beneficiaries of the Attorney General's discretionary decision to eschew prosecution.

The *Employees Union* court's failure to investigate fully the nature of EVD did a grave disservice to the Salvadoran nationals by allowing the Attorney General to hide behind the cloak of prosecutorial discretion. **\*176** Though most forms of deportation relief are properly termed 'prosecutorial discretion,' [36] this term does not mean that the actions are automatically immune from judicial review. Despite the judiciary's general reluctance to review discretionary decisions, [37] the courts will intervene in cases of 'clear abuse of discretion.' [38] To determine the scope of judicial review that should be applied to EVD decisions, it is necessary to identify the underlying statutory authority for the grants.

## B. *The Statutory Source of EVD*

The Attorney General's authority to grant EVD has never been challenged; therefore, the source of this power has never been fully examined. Closer scrutiny reveals that EVD is actually a group application of another form of administratively-provided deportation relief   extensions of voluntary departure.

EVD, like all other variations of voluntary departure, originates in the INA provisions which empower the Attorney General with discretionary authority to grant voluntary departure. [39] The Act sets basic eligibility requirements which

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 16 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

the alien must meet before he or she will be considered for this relief. [40] Award of the status to eligible aliens is solely within the discretion of the immigration authorities. [4]

In addition to this 'routine' type of voluntary departure, [42] the INS has created extensions of voluntary departure. [43] As mentioned in Part I, this relief is granted in a number of situations, [44] including cases where deportation of the alien would result in excessive hardship. [45] Although the regulations are vague, [46] the Operations Instructions indicate that aliens who are temporarily unable 'to return to their home country because of civil war or catastrophic circumstances there' [47] may receive a one-year extension of voluntary departure **177** and employment authorization.

The Attorney General has delegated his authority to grant these various types of voluntary departure to certain INS officials. [48] Their determinations are made on an individual basis and, like grants of voluntary departure, involve a two-step process. The official must first determine whether the alien meets the preliminary standards for eligibility set forth in the statute and regulations. Once the alien has been found to meet the criteria for consideration, the official then has discretion to grant him or her relief. [49]

EVD is nothing more than an *en masse* grant of extensions of voluntary departure made by the Attorney General, rather than by his subordinates. Although the wording of the statutory authority for voluntary departure seems to contemplate individual [50] rather than *en masse* determinations, the Attorney General is entitled to make blanket grants as well. [5] What the Attorney General is *not* entitled to do is to alter the parameters of his discretion at will and without adequate explanation.

Although the Attorney General has never formulated any standards regarding his exercise of discretion in this area, he has nonetheless created a de facto standard through his past grants of EVD. Past grants of this status have always been accompanied by explanations of the 'humanitarian' reasons militating for such status. [52] The criteria **178** used in granting this status have effectively defined the class to which the Attorney General may, in his discretion, extend EVD. [53]

**179** In denying EVD to Salvadorans, however, the Attorney General has attempted to redefine the class. Foreign and domestic policy concerns, **180** as well as other, less well-articulated considerations, formed the basis of the decision to deny EVD status to the Salvadorans. [54] The *Employees Union* court found that, because the Attorney General was exercising his discretion, his decision to shift the parameters of the class eligible for EVD status was one that necessarily was not subject to judicial review. [55]

Although discretionary actions, particularly those taken by the immigration authorities, are subject to limited review, they are not entirely precluded from judicial review. As has often been noted, '[d]iscretion does not mean license.' [56] Agency action which abuses the discretion granted to it by Congress is impermissible. In failing to examine the Attorney General's decision for abuse of discretion, the *Employees Union* court ignored the significant interest of the Salvadorans in ensuring that their status be determined fairly.

## V. REVIEWING EVD DETERMINATIONS UNDER THE APA

The *Employees Union* court stated that the APA precluded it from reviewing EVD determinations. Yet the provisions it cited do not necessarily foreclose judicial scrutiny of the Attorney General's actions. First, the court claimed that since the protections of the deportation process were still available to aliens denied EVD, judicial review was unavailable because EVD was not a 'final agency action.' [57] The APA's requirement that final agency action be taken before judicial review

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 17 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

is available 'is designed to avoid premature judicial involvement in the agency decision making process.' [58] In addition to satisfying the pragmatic concern of providing the court with a sufficient basis for judicial review, [59] the requirement also ensures the agency ample opportunity to exercise the decisionmaking authority the legislature granted it.

EVD does not present these jurisprudential concerns. If the Attorney General denies certain aliens EVD status based on impermissible grounds, he has taken a final action for which there is no other adequate remedy. [60] The use of inappropriate criteria in the EVD determination **\*181** will deny the aliens access to a valuable status despite the availability of other types of individualized deportation relief. [6]

The *Employees Union* court also found that the APA precluded judicial review of the Attorney General's decision to deny EVD to Salvadorans because EVD was an extrastatutory status and thus presented no standard for review. [62] In so holding, however, the court ignored the standard set by the Attorney General himself through his past grants of EVD. The court should have reviewed his determination to see if it departed from his past practices in such a way as to constitute an abuse of discretion.

The APA divides all administrative actions into three categories: quasi-judicial adjudication, quasi-legislative rulemaking, and a residual category 'informal action.' [63] While the APA outlines specific procedural rules and standards of judicial review for rulemaking and adjudication, [64] no such standards are provided for informal agency action. Thus, discretionary actions, which fall into this residuum, are typically reviewed for 'abuse of discretion' in accordance with the APA's 'catchall' provision. [65]

**\*182** The judicial review provided for discretionary actions is extremely narrow. A court 'can interfere only when there has been a clear abuse of discretion or a clear failure to exercise discretion.' [66] The courts reason that where Congress has entrusted an administrator or agency with discretionary authority, the judiciary will not substitute its judgment for that of the administrator. [67] Nonetheless, a court can intervene to correct actions it considers 'manifestly illegal, unfair, or unjust.' [68]

Although the APA does not define 'abuse of discretion,' courts have developed standards for this type of judicial review. In *Wong Wing Hang v. INS*, [69] Judge Friendly defined abuse of discretion as an action 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group, or . . . on other 'considerations that Congress could not have intended to make relevant.'' [70] The courts have established that an agency must either follow its own precedents or explain why it departs from them: [7] ' A n agency changing its course must supply a reasoned **\*183** analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.' [72] Thus, actions by the Attorney General that violate standards of fairness and rationality abuse the discretion granted him by Congress.

The *Employees Union* court, therefore, should have reviewed the Attorney General's decision to see (1) whether the determination to deny EVD status to Salvadoran nationals represented a change in policy, and (2) if the Attorney General did alter his policy, whether his alteration had a rational explanation. The court never got to the first inquiry, however. Although the Attorney General had always espoused humanitarian concerns when granting EVD in the past, [73] the *Employees Union* court declined to find that these prior practices had established a 'humanitarian' standard, fearing that such a standard would 'open up irresponsibly the floodgates to illegal aliens' in disregard of immigration and foreign policy considerations. [74]

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 18 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

The *Employees Union* court's fear that a humanitarian standard would deprive the Attorney General of the ability to make necessary distinctions in the immigration area is unfounded. The court erroneously assumed that finding a humanitarian standard in past grants of EVD would mandate the granting of the status to all future aliens who fell within this category. But, as described earlier, most forms of discretionary immigration relief involve a two-step process.' [75] The immigration official must first determine whether the alien meets the statutory or administrative requirements for relief. Only if the answer **184** is in the affirmative does the official go on to decide whether he or she will exercise his or her discretion favorably. [76]

Thus, making the Attorney General exercise his discretion in conformance with his past practices does not necessarily provide automatic entrance into the United States for all aliens whose countries are undergoing some sort of turmoil. The standard does not create an entitlement to the status; rather, it ensures that similarly situated aliens will have their eligibility for the status evaluated according to the same criteria. Moreover, reviewing the Attorney General's decision for abuse of discretion in this way would not create an inexorable eligibility standard which would shackle his discretion and eliminate the flexibility he needs to deal with unanticipated situations. Departures from existing precedents are permissible when they are accompanied by a rational explanation. [77] If factors necessitate a change in policy, the Attorney General can easily accommodate them.

Subjecting the Attorney General's decision to deny EVD to Salvadoran nationals to judicial review runs counter to the teachings of classical immigration law. However, if we look at the competing interests at stake, we see that the scales lean heavily toward affording the aliens some administrative process. [78] The aliens involved here have an interest in receiving accurate, nonarbitrary decisionmaking. Although the relief they seek is discretionary and they have no absolute right to that relief, these aliens deserve to receive a procedure equivalent to that afforded other similarly situated aliens. [79]

Of course, the aliens' interest in receiving consistent, fair determinations competes with that of the government in adopting procedures which ensure fiscal and administrative efficiency, [80] speed, and accuracy. [8] **185** Because of these governmental interests, the courts are hesitant to require any agency, including the INS, to create standards or to make rules. [82] Yet EVD graphically illustrates the dangers inherent in such a deferential approach. The Attorney General has never articulated standards for grants of EVD; indeed, he has never formalized the status in any way. Allowing the Attorney General to exercise unfettered discretion in this area simply because he chooses not to circumscribe his discretion creates a *reductio ad absurdum:* the Attorney General has unlimited discretion because he has stated that he has unlimited discretion. If there are no standards, formal or otherwise, guiding his discretion and no judicial review is available, the Attorney General in effect has unchecked power to allow any groups of aliens he selects to stay in the United States for indeterminate periods. The potential for abuse   through discriminatory decisions or decisions based on factors not contemplated by Congress when it drafted the INA   is great.

The INS has long been criticized for its deficiency in articulating standards to constrain and guide its discretion. [83] Although not all types of administrative discretion need to be checked, [84] EVD is precisely the type of status that requires such limitations. Unless the Attorney General sets standards for the granting of EVD status, the public has no means of evaluating his decisions or of determining whether he is acting in a discriminatory manner. The result is a decision that is not perceived as fair or legitimate, either by the public or by the aliens involved.

Making the Attorney General publicly articulate the reasons for his modification or exception would provide legitimacy for that decision. First, a 'reasons requirement' would force the Attorney General to consider his decision more carefully, and force him to confront his own motives for modifying the standards for relief. [85] Second, it would increase his sense

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 19 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

of accountability by forcing him to bear the full political costs of his decision. Such a requirement would place a burden on the Attorney General only where his policy change is based on impermissible grounds. [86]

**\*186** Requiring the Attorney General to state his reasons for departing from his standard would also yield important safeguards for the aliens involved. First, it would provide a basis for judicial review to ensure that the departure was not an abuse of discretion. [87] Second, an open record of past criteria would help ensure that similarly situated aliens would be able to obtain equivalent treatment in the future. [88]

Aliens, like all other participants in our society, have a fundamental interest in being free from arbitrary governmental action. [89] When standards are not present, the affected aliens have no idea what type of proof they should marshal to support their requests for relief, [90] nor do they have any way of gauging whether their applications were treated fairly. The end result is increased costs, both for the eligible aliens, who may have been discriminated against, and for the INS, which faces potentially stricter judicial scrutiny as a result of its lack of standards. [9]

## VI. COMMUNITARIANISM REVISITED

How, then, is judicial review of EVD decisions consistent with the current infusion of communitarian standards in immigration law? As noted earlier, [92] immigration law presents an opportunity for 'administrative abuse and lawlessness' unparalleled in other areas of public law. [93] The *Employees Union* court's decision that EVD is an unreviewable exercise of prosecutorial discretion illustrates the potential dangers caused by unwarranted judicial deference. In effect, the court said that the Attorney General was free to create a form of deportation relief not sanctioned by the INA and that he could, by virtue of his own refusal to articulate standards or other criteria, grant or deny that status unhindered by any legal constraints.

**\*187** Such unbridled discretion may be countenanced by those embracing the traditional restrictive view of immigration law. But in view of the essential life and liberty interests at stake in EVD decisions, anyone who admits the fundamental humanity of aliens must be offended by the notion that the Attorney General has boundless discretion to bestow such an important status in any manner he wishes.

Increased judicial assertiveness in this area is necessary to preserve the integrity of immigration law. The solution is not to surround EVD with inflexible constitutional requirements. [94] Rather, the courts should require the Attorney General to state clearly his criteria for determining EVD eligibility and should demand rational explanations for any deviations from the stated policy. [95] Determinations as to which aliens will receive EVD status must ultimately rest with the Attorney General. The courts nonetheless should play an active role in ensuring that the procedures by which those determinations are made are perceived as accurate, fair, and legitimate, both by the aliens affected and by the public as a whole.

## CONCLUSION

Requiring the Attorney General to apply an administratively fair procedure to his EVD eligibility determinations will enhance the perceived legitimacy of his actions and will force him to bear the full public costs of his actions   both undeniably important interests. In the end, however, aliens such as the Salvadorans will gain little practical benefit from such a requirement. The Attorney General will still have the discretionary power to deny them the relief they seek even though they qualify for the status   he will just have to do it in a procedurally fair way.

Many have urged that Congress enact special legislation granting EVD status to Salvadorans. [96] While such a suggestion would solve the dilemma that these particular aliens currently face, it would do nothing for future aliens who

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 20 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

find themselves in a similar situation. Rather, comprehensive new legislation is needed to combat the problems now associated with EVD.

First, EVD should be renamed to alleviate the confusion now associated with the name. [97] 'Temporary safe haven' has been suggested **188** by many, since this term 'highlight s the temporary nature of the program and its humanitarian intent.' [98] More than just cosmetic changes are needed, however. Congress should specifically grant the Attorney General the power to grant this status, thus removing any doubts as to either the legitimacy or the source of his authority. [99] The humanitarian objective of the status should be made clear, and perhaps its scope should be broadened to include aliens whose countries are experiencing natural catastrophes, not just political upheaval. [200] It would be undesirable and impractical to set concrete legislative standards for determining when EVD status should be granted. The United States cannot possibly grant relief to nationals from every country undergoing civil unrest. Congress can, however, by articulating guidelines and by requiring the Attorney General to issue findings along with his determination, curtail the likelihood of EVD being reduced to a mere foreign policy tool in the hands of the executive branch. Finally, the procedures governing grants of EVD should be standardized. A cut-off date should be assigned to each grant to deter further illegal emigration from that country, [20] and INS **189** officials should be well-informed as to the Attorney General's decisions. [202]

EVD will always carry political overtones simply because it is impossible for the United States to grant EVD status to all of the multitude of aliens whose countries are experiencing political or other internal disruptions. But even though the United States cannot grant relief to all, it can ensure that its decisions are fair and evenhanded. Only open acknowledgement of the standards for this relief can preserve its integrity, for '[s]ecret law . . . has no place in any decent system of justice.' [203]

## AUTHOR'S POSTSCRIPT

As this Note was going to press, the Court of Appeals for the District of Columbia Circuit handed down its decision in the *Employees Union* appeal. [204] The appellate court, like the lower court, applied the traditional view of immigration law, finding that 'EVD is an extra-statutory remedy and that the decision to award or to withhold it for citizens of a particular nation lies squarely within the discretion of the Attorney General.' [205] The court of appeals agreed with the district court that the APA precluded judicial review of EVD determinations, noting that such determinations were neither made reviewable by statute nor were final agency actions for which there was no other adequate judicial remedy. [206] The appellate court also declined to find that EVD grants were controlled by a 'humanitarian' standard, fearing that imposition of such a standard would 'impermissibly curtail' the exercise of the Attorney General's discretion. [207] Although the court **190** acknowledged that 'an agency may not arbitrarily grant or withhold statutorily created and defined remedies,' [208] it found that ' a n agency's exercise of inherent, extra-statutory discretion . . . is quite another matter.' [209] Thus, the court of appeals, like the district court, refused to limit the Attorney General's discretion, or even to require him to articulate his standards for granting EVD status.

Footnotes

[1]    Government figures vary on this point. According to H.R. REP. NO. 1142, 98th Cong., 2d Sess., pt. 1, at 54 (1984), blanket extended voluntary departure (EVD) has been granted to nationals from Cuba, the Dominican Republic, Czechoslovakia, Chile, Cambodia, Vietnam, Laos, Lebanon, Ethiopia, Uganda, Iran, Nicaragua, Afghanistan, and Poland. The Immigration and Naturalization Service (INS) excludes the Dominican Republic from the list, but adds Hungary and Rumania. Immigration and Naturalization Service, U.S. Dept. of Justice, Asylum Adjudications: An Evolving Concept and

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 21 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

Responsibility for the Immigration and Naturalization Service 67 68 (June and Dec. 1982) (mimeo)  hereinafter INS, Asylum Adjudications] (copy on file at *Michigan Law Review )*. *See* note 40 *infra*. Gordon and Rosenfield state that extended voluntary departure was also granted to Yugoslavians, but they provide no documentation for this inclusion. 1A C. GORDON & H. ROSENFIELD, IMMIGRATION LAW AND PROCEDURE § 5.3e(6a) (1981).

2   Case by case extensions of voluntary departure, *see* notes 25 32 *infra* and accompanying text, under 8 C.F.R. § 242.5(a)(3) (1986), *see* note 24 *infra*, are sometimes referred to as 'extended voluntary departure. *See, e.g.*, Bolanos v. Kiley, 509 F.2d 1023, 1026 (2d Cir. 1975); United States *ex rel.* Bartsch v. Watkins, 175 F.2d 245, 247 (2d Cir. 1949); Akbari v. Godshall, 524 F. Supp. 635, 644 (D. Colo. 1981); 2 C. GORDON & H. ROSENFIELD, *supra* note 1, § 7.2a. *En masse* grants of indefinite voluntary departure are also referred to as 'extended voluntary departure. *See, e.g.*, Hotel & Restaurant Employees Union, Local 25 v. Smith, 594 F. Supp. 502, 505 (D.D.C. 1984), *affd. in part, revd. in part*, 804 F.2d 1256 (D.C. Cir. 1986); 1A C. GORDON & H. ROSENFIELD, *supra* note 1, § 5.3e(6a); INS, Asylum Adjudications, *supra* note 1, at 65. This Note uses EVD to refer only to this latter type of relief.

3   *See* note 152 *infra*. The INS describes EVD status as follows:
Nationals from many countries visit, study, or do business in the United States regularly. From time to time unexpected crises war, political upheaval, etc.   occur in the home country which could jeopardize the lives of visitors in the United States if they returned during the crises. In such situations, acting on specific State Department recommendation, the Attorney General has permitted foreign nationals in the United States to remain until conditions in their home country stabilize. Usually the State Department cites civil war, invasion by foreign nationals, etc., as precipitating factors in its recommendations to the Justice Department. The Attorney General then authorizes extended voluntary departure status for a specified period for nationals of the requisite country.
The status is a temporary one, granted for varying periods, reviewed and then extended or terminated at the end of that time. The action is a blanket determination, that is, all nationals of a particular country who are in the United States are covered. INS, Asylum Adjudications, *supra* note 1, at 65.

4   *See* note 152 *infra* and accompanying text; *see also* 1A C. GORDON & H. ROSENFIELD, *supra* note 1, § 5.3e(6a) (describing EVD as 'temporary sanctuary ). *But see* note 153 *infra* (government has asserted that EVD is granted for other reasons).

5   This lack of public notice is exemplified by the dearth of published material on the subject. *See generally* T. A. ALEINIKOFF & D. MARTIN, IMMIGRATION: PROCESS AND POLICY 726 43 (1985) (presentation of general EVD concept and study of proposed use of EVD for Salvadoran aliens); 1A C. GORDON & H. ROSENFIELD, *supra* note 1, § 5.3e(6a) (one page summary of EVD concept in an eight volume treatise on immigration law); A. LEIBOWITZ, IMMIGRATION LAW AND REFUGEE POLICY § 5.05, at 5 156 to 5 160 (1983) (one page synopsis with reproductions of two news articles on specific instances where EVD was granted); Note, *Salvadoran Illegal Aliens: A Struggle to Obtain Refuge in the United States*, 47 U. PITT. L. REV. 295, 309 33 (1985) (historical look at the issue and discussion of the potential for extending EVD to Salvadorans). The denial of EVD status to Salvadorans did cause a flurry of articles in the press. *See* note 8 *infra*.

6   *See* Hotel & Restaurant Employees Union, Local 25 v. Smith, 563 F. Supp. 157, 159 (D.D.C. 1983), *motion for summary judgment granted*, 594 F. Supp. 502 (D.D.C. 1984) ('Plaintiff seeks to challenge . . . the failure of the Attorney General and the Immigration and Naturalization Service (INS) to grant  Salvadorans] extended voluntary departure. ); Letter from William F. Smith, Attorney General, to Representative Lawrence J. Smith (July 19, 1983), *reprinted in* Memorandum of Points and Authorities in Support of Defendants' Motion for Partial Summary Judgment at Exhibit D, Hotel & Restaurant Employees Union, Local 25 v. Smith, 563 F. Supp. 157 (D.D.C. 1983) (No. 82 2203)  hereinafter Defendants' Memorandum] ('I have concluded that the present circumstances do not warrant a granting of 'extended voluntary departure  to El Salvadorans presently in the United States illegally.').

7   The Department of State's 1984 Country Report on El Salvador states:
Human rights conditions in El Salvador are strongly affected by the ongoing civil strife. The achievement of a stable public order sufficient to protect individual rights has been disrupted by guerrilla and military operations, partisan hatreds, acts of revenge, fear, and a prevailing uncertainty characterized by violence. This situation contributes to, and is complicated by, the ineffective operation of the judicial system, caused in part by corruption and intimidation.
DEPT. OF STATE, 99TH CONG., 1ST SESS., COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 1984, at 512 13 (Joint Comm. Print 1985). Authorities agree that over 40,000 noncombatants have been killed in El Salvador over the last five years. *See, e.g., Extended Voluntary Departure Issues: Hearings on § 377 Before the Subcomm. on Immigration*

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 22 of 129

*Refugee Policy of the Senate Comm. on the Judiciary*, 99th Cong., 1st Sess. 111 (1985); *Temporary Suspension of Deportation of Certain Aliens, 1984: Hearing on H.R. 4447 Before the Subcomm. on Immigration, Refugees, and International Law*, 98th Cong., 2d Sess. 29 30 (1984) hereinafter *Hearing on H.R. 4447]. See generally* Note, *The Agony and the Exodus: Deporting Salvadorans in Violation of the Fourth Geneva Convention*, 18 N.Y.U. J. INTL. L. & POLITICS 703, 719 25 (1986) (description of human rights abuses in El Salvador). Reports suggest that Salvadorans forced to return to El Salvador from the United States face even greater dangers than those who never left the country. ACLU, NATIONAL IMMIGRATION AND ALIEN RIGHTS PROJECT, SALVADORANS IN THE UNITED STATES: THE CASE FOR EXTENDED VOLUNTARY DEPARTURE, appendix III (Rpt. No. 1, Dec. 1983).

[8]   *See, e.g., Shelter for Refugees*, L.A. Times, Apr. 29, 1985, at 4, col. 1; *Insensitivity on Refugees*, L.A. Times, Feb. 25, 1985, § 2, at 4, col. 1; *Salvadorans Rebuffed on Special Immigration Status*, Wash. Post, Sept. 27, 1984, at A9, col. 1; *It s Wrong to Deport Salvadorans Right Now*, N.Y. Times, Aug. 19, 1983, at A20, col. 4; Abrams, *Diluting Compassion*, N.Y. Times, Aug. 5, 1983, at A23, col. 1; *Restaurant Union Challenges Federal Immigration Policy*, Wash. Post, June 16, 1983, at A1, col. 1; *Why Poles but Not Salvadorans?*, N.Y. Times, May 31, 1983, at A20, col. 1; *U.S. is Condemned Over Salvadorans*, N.Y. Times, May 21, 1983, at A5, col. 1; *Deporting Salvadorans*, Wash. Post, Apr. 2, 1983, at A14, col. 1; *Salvadorans Forced Back into 'Hell*, N.Y. Times, Mar. 3, 1983, at A26, col. 5.

[9]   563 F. Supp. 157 (D.D.C. 1983), *motion for summary judgment granted*, 594 F. Supp. 502 (D.D.C. 1984), *affd. in part, revd. in part*, 804 F.2d 1256 (D.C. Cir. 1986). The court noted that 'the issue presented . . ., that of judicial review of the Attorney General's determination regarding a grant of EVD, is one of first impression in the Courts. 594 F. Supp. at 505. As this Note was going to press, the Court of Appeals for the District of Columbia Circuit affirmed the district court's grant of summary judgment to the defendants on the EVD issue in the *Employees Union* case. *See* Author's Postscript, notes 204 09 *infra* and accompanying text.   Ed.]

[10]   594 F. Supp. at 504.

[11]   594 F. Supp. at 508.

[12]   *See* notes 91 96 *infra* and accompanying text.

[13]   *See* notes 97 105 *infra* and accompanying text.

[14]   8 U.S.C. §§ 1101 1503 (1982).

[15]   Administrative Procedure Act of 1946, 5 U.S.C. §§ 551 559, 701 706 (1982 & Supp. II 1984).

[16]   Over one half of the 40 INS staff members interviewed for an INS report stated that they had never heard of EVD. Not a single field officer was able to name the countries to which EVD then applied. INS, Asylum Adjudications, *supra* note 1, at 66.

[17]   *See* INS Wire of Feb. 6, 1984, *reprinted in* 61 INTERPRETER RELEASES 103 (1984) (internal memorandum distinguishing 'extensions' of voluntary departure from EVD). Several commentators have urged the renaming of EVD as a solution to the confusion. *See* notes 197 98 *infra* and accompanying text.

[18]   *See* 8 U.S.C. § 1252(b) (1982), quoted in note 20 *infra*, and 8 U.S.C. § 1254(e) (1982), quoted in note 19 *infra*. Voluntary departure originally evolved through the ad hoc practices of administrative officers. The Alien Registration Act codified the practice in 1940. 2 C. GORDON & H. ROSENFIELD, *supra* note 1, § 7.2a.

[19]   With exceptions not relevant here,
  t*]he Attorney General may, in his discretion, permit any alien under deportation proceedings . . . to depart voluntarily from the United States* at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure under this subsection.
  8 U.S.C. § 1254(e) (1982) (emphasis added).

[20]   In the discretion of the Attorney General, and under such regulations as he may prescribe, deportation proceedings . . . need not be required in the case of any alien who admits to belonging to a class of aliens who are deportable under section 1251

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 23 of 129

of this title *if such alien voluntarily departs from the United States* at his own expense, or is removed at Government expense as hereinafter authorized . . ..
8 U.S.C. § 1252(b) (1982) (emphasis added).

21   Unlike deportation, voluntary departure (1) 'avoids the stigma of compulsory ejection; (2) 'facilitates the possibility of return to the United States; (3) 'often entails the certainty of speedy return; and (4) 'enables the applicant to select his own destination.  2 C. GORDON & H. ROSENFIELD, *supra* note 1, § 7.2a, at pp. 7 18 to 7 19; *see also* Tzantarmas v. United States, 402 F.2d 163, 165 n.1 (9th Cir. 1968) (discussing benefits of voluntary departure), *cert. denied*, 394 U.S. 966 (1969); Comment, *Suspension of Deportation: Illusory Relief*, 14 SAN DIEGO L. REV. 229, 253 54 (1976) (same).

22   8 U.S.C. § 1182(a)(16) (1982) provides that aliens who have been deported are excluded from admission into the United States for one year unless the Attorney General consents to their application for readmission.

23   *See* text at notes 25 32 *infra*.

24   With exceptions not relevant here, 'any grant of voluntary departure shall contain a time limitation of usually not more than 30 days, and an extension of the original voluntary departure time shall not be authorized except under meritorious circumstances.  8 C.F.R. § 242.5(a)(3) (1986).

25   8 C.F.R. § 242.5(a)(3) (1986).

26   8 C.F.R. § 242.5(a)(2)(viii) (1986).

27   8 C.F.R. § 242.5(a)(3) (1986); *see also* note 147 *infra* and accompanying text (describing provisions of INS Operations Instructions on extensions of voluntary departure).

28   8 C.F.R. § 242.5(a)(2)(vii) (1986).

29   8 C.F.R. § 242.5(a)(2)(v) (1986).

30   Voluntary departure may be granted to any alien who is statutorily eligible: . . . (vi) who is admissible to the United States as an immigrant and: (A) Who is an immediate relative of a U.S. citizen, or (B) is otherwise exempt from the numerical limitation on immigrant visa issuance, or (C) has a priority date for an immigrant visa not more than 60 days later than the date show  sic] in the latest Visa Office Bulletin and has applied for an immigrant visa at an American Consulate which has accepted jurisdiction over the case, or (D) who is a third preference alien with a priority date earlier than August 9, 1978, or (E) who is the beneficiary of an approved sixth preference petition who satisfies Examinations without another petition that he/she can qualify for third preference and who cannot obtain a visa solely because a visa number is unavailable, and who has a priority date earlier than August 9, 1978 . . ..
8 C.F.R. § 242.5(a)(2) (1986). Other classes of aliens who are eligible for voluntary departure include aliens who are natives of contiguous territories who are not within the class described above, 8 C.F.R. § 242.5(a)(2)(i) (1986), any alien whose application for extension for stay as a nonimmigrant is being denied, 8 C.F.R. § 242.5(a)(2)(ii) (1986), aliens who have voluntarily surrendered to the INS, 8 C.F.R. § 242.5(a)(2)(iii) (1986), and aliens with valid travel documents and confirmed reservations to leave the United States within 30 days, 8 C.F.R. § 242.5(a)(2)(iv) (1986).

31   The status usually may be granted in increments of one year. *See* 8 C.F.R. § 242.5(a)(3) (1986). However, certain categories of aliens who are admissible as immigrants may receive the status in increments of 30 days, while other categories of aliens may receive an indefinite grant of that status. *Id.*

32   'An appeal shall not lie from a denial of an application of voluntary departure under this section, but the denial shall be without prejudice to the alien's right to apply for relief from deportation under any provision of law.  8 C.F.R. § 242.5(b) (1986).

33   *See* note 40 *infra*.

34   *See* 1A C. GORDON & H. ROSENFIELD, *supra* note 1, § 5.3e(6a), at pp. 5 47 to 5 48; INS, Asylum Adjudications, *supra* note 1, at 65. *But see* note 153 *infra* (Attorney General has recently asserted that foreign policy considerations control EVD determinations); note 43 *infra* (EVD granted to Silva letterholders for domestic policy reasons).

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 24 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

35      *See* INS, Asylum Adjudications, *supra* note 1, at 65 ('The action is a blanket determination, that is, all nationals of a particular country who are in the United States are covered. ); 1A C. GORDON & H. ROSENFIELD, *supra* note 1, § 5.3e(6a), at pp. 5 47 to 5 48; A. LEIBOWITZ, *supra* note 5, § 5.05, at p. 5 156.

EVD is not always granted on a 'blanket  basis, however. On occasion it has been granted on a 'case by case  basis. For example, INS instructions regarding Lebanese nationals stated:

In view of the continuing civil strife in Lebanon, INS officers, on a case by case basis, should view sympathetically requests for extended voluntary departure received from nationals of Lebanon in the United States who have overstayed, where such requests are based upon compelling humanitarian need. There is no blanket policy to grant extended voluntary departure in these cases.

INS Policy Statement No. 016 (Feb. 12, 1976), *reprinted in INS Declines EVD for Lebanese but Re Issues 1976 Policy Memo*, 62 INTERPRETER RELEASES 899 (1985). The INS Commissioner stated that case by case EVD grants were more appropriate in this instance 'because of the highly adverse immigration effects of a blanket grant of extended voluntary departure, and the availability of other remedies for nationals of Lebanon.  Letter from Alan C. Nelson, INS Commissioner, to James Abourezk (Aug. 13, 1985), *reprinted in* 62 INTERPRETER RELEASES 920 (1985).

36      Through grants of EVD,

 t]he United States is able to meet its international treaty obligations regarding potential refugees and provide a 'safe haven while at the same time not granting permanent residency to large groups of aliens outside of regular immigration channels or forcing foreign nationals to renounce their homeland in order to avoid what may be a relatively short lived crisis.

A. LEIBOWITZ, *supra* note 5, § 5.05, at p. 5 157; *see also* INS, Asylum Adjudications, *supra* note 1, at 66. Aliens granted EVD status are still eligible to apply for other types of deportation relief. *See* INS Wire of Feb. 6, 1984, *supra* note 17, at 104 ('While the Attorney General's determinations to grant 'EVD  are binding as to enforcement actions involving individuals of the specified nationality, both favorable and unfavorable determinations on EVD leave unchanged the availability of discretionary relief for individual aliens under the Act and regulations.'). The INS has a standard letter which informs aliens who have been denied asylum, but who are of a nationality covered by EVD, of their eligibility for that status. *See* 62 INTERPRETER RELEASES 256 (1985) (reprint of letter). INS officers believe that asylum applications from nationals who have been afforded EVD should not be processed while the aliens retain that status. One officer stated: 'A few people might have problems, . . . but overall it would save us a whole lot of trouble. Right now it's almost impossible to adjudicate these claims. If you turn them down, you can't deport them. They only file again, saying conditions in the home country have changed.  INS, Asylum Adjudications, *supra* note 1, at 70. State Department personnel disagree, however. 'It would be a bigger pull factor. Adjudicating the claims, even though you can't send anyone back, is a big deterrent.  *Id.*

37      *See* Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment on the Issue of Extended Voluntary Departure at 32, Hotel & Restaurant Employees Union, Local 25 v. Smith, 563 F. Supp. 163 (D.D.C. 1983) (No. 82 2203)  hereinafter Plaintiffs' Opposition].

38      *See also* note 134 *infra* (work authorization and other benefits available to aliens granted EVD status).

39      'Refugee  is defined as a person who is either outside his or her country of nationality or habitual residency, or, under special circumstances, within that country, and who suffers from 'persecution or a well founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.  8 U.S.C. § 1101(a)(42) (1982). The procedure by which asylum may be granted to an alien found to be a refugee within the meaning of 8 U.S.C. § 1101(a)(42)(A) (1982) is outlined in 8 U.S.C. § 1158 (1982). In addition, the Refugee Act of 1980 further provides that: 'The Attorney General shall not deport or return any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.  8 U.S.C. § 1253(h)(1) (1982). For a general discussion of U.S. law regarding refugees, see T.A. ALEINIKOFF & D. MARTIN, *supra* note 5, at ch. 8; Martin, *The Refugee Act of 1980: Its Past and Future*, 1982 MICH. Y.B. INTL. LEGAL STUD. 90; Note, *Membership in a Social Group: Salvadoran Refugees and the 1980 Refugee Act*, 8 HASTINGS INTL. & COMP. L. REV. 305 (1985).

40      As stated in note 1 *supra*, government statistics vary. The chart below reflects the information submitted by the United States as Exhibit E attached to Defendants' Memorandum, *supra* note 6. The information in parentheses indicates areas in which INS, Asylum Adjudications, *supra* note 1, at 67 68, differs significantly from the Government's data.

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 25 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

| COUNTRY | DATE EVD GRANTED | DATE EVD TERMINATED | NOTES |
|---|---|---|---|
| Cuba | 11/29/60 | 11/02/66 | See Pub. L. No. 89-732. |
| Dominican Republic [a] | 10/18/66 | 04/26/78 | For aliens arriving between 04/24/65 and 06/03/66. |
| 'Western Hemisphere'* | 07/01/68 | 12/31/76 | Granted to certain individuals with visa preference dates from 07/01/68 to 12/31/76 in response to an order entered in Silva v. Levi, Civ. Action No. 76-C-4268 (N.D. Ill.). [aa] |
| 'Western Hemisphere' | $^{08}/_{82}$ | 01/31/83 | 'Second grant.' |
| Czechoslovakia | 08/21/68 | 12/30/77 | (From 1977-1981, EVD granted in one-year increments. Extensions now determined on case-by-case basis.) |
| Chile | 04/09/71 | 12/30/77 (05/18/71) | |
| Cambodia | 04/04/75 | 10/28/77 | See Pub. L. No. 95-145. |
| Vietnam | 04/04/75 | 10/28/77 | See Pub. L. No. 95-145. |
| Laos | 07/09/75 | 10/28/77 | See Pub. L. No. 95-145. |
| (Lebanon) | (02/12/76) | (Still in effect) | (INS views requests 'sympathetically' on a case-by-case basis.) [See Legislative Relief For Salvadorans and Nicaraguans Receives Renewed Consideration, 63 INTERPRETER RELEASES 626, 627 [hereinafter Legislative Relief] (EVD still in effect as of 07/28/86).] |
| Ethiopia | 07/12/77 | Still in effect. | [See Legislative Relief, supra (EVD still in effect as of 07/28/86).] |
| (Hungary) | (12/30/77) | ($^{04}/_8$) | (From 12/30/77 to $^{04}/_8$, EVD granted in one-year increments. Since 04/29/81, extensions decided on case-by-case basis.) |
| (Rumania) | (12/30/77) | ($^{04}/_8$) | (From 12/30/77, to $^{04}/_8$, EVD granted in one-year increments. Since 04/29/81, extensions decided on case-by-case basis.) |
| Uganda | 06/08/78 | Still in effect. | [Scheduled to expire 09/30/86; see INS Wire of July 31, 1986, reprinted in 63 INTERPRETER RELEASES 649 (1986).] |

CAR 0936

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 26 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

| | | | |
|---|---|---|---|
| Iran | 04/16/79 Renewed: 08/06/79 | 12/13/79 | (Case-by-case determinations still in effect today.) |
| Nicaragua | 07/03/79 Renewed: 08/29/79 01/04/80 07/01/80 | 09/28/80 | (Case-by-case determinations in effect today.) |
| Mexico | 12/31/79 | 08/25/81 | Granted for certain second preference visa holders in response to an order entered in Contreras v. Bell, Civ. Action No. 80-1590 (N.D. Ill.). |
| Afghanistan | 12/02/80 | Still in effect. | [See INS Wire of Dec. 2, 1980, reprinted in 62 INTERPRETER RELEASES 106 (1985) (current policy on Afghans); Legislative Relief, supra (EVD still in effect as of 07/28/86).] |
| Poland | 12/23/81 Renewed: 03/25/82 06/21/82 12/20/82 06/30/83 | Still in effect. | [Scheduled to expire 12/30/86; see INS Wire of June 18, 1986, reprinted in 63 INTERPRETER RELEASES 539 (1986)] |

## Footnotes

\*        These countries were not included on the INS list.

\*\*      See note 43 infra.

41      The INS states that the Attorney General acts 'on a specific State Department recommendation,  INS, Asylum Adjudications, *supra* note 1, at 65, and that ' t]he Attorney General has always accepted the State Department's recommendation, even though it might be only a brief paragraph or two.  *Id.* at 70 71.
Government officials accept the role of the State Department in these determinations as proper, even though Congress has neither mandated nor sanctioned the practice. *See, e.g.*, Letter from Senator Edward Kennedy to Alexander Haig, Secretary of State (Apr. 6, 1981), *reprinted in* 128 CONG. REC. 1702 (1982) ('Clearly, the Immigration Service must await a formal recommendation from the Department of State prior to initiating a policy of automatically granting stays of voluntary departure. ); Letter from William F. Smith, Attorney General, to Representative Lawrence J. Smith (July 19, 1983), *reprinted in* Defendants' Memorandum, *supra* note 6, at Exhibit D ('There have been occasions when the Attorney General, in consultation with the Secretary of State, has determined to delay temporarily expulsion of aliens  of] particular nationalities. ).

42      *See, e.g.*, INS Wire of Dec. 12, 1978, *reprinted in* 55 INTERPRETER RELEASES 85 (1978) ('The civil strife in  Lebanon] continues and this is to reaffirm that officers should, on a case by case basis, view sympathetically requests for extended voluntary departure where such requests are based on compelling humanitarian need. ).

43      *See, e.g.*, INS Wire of Jan. 21, 1982, *reprinted in* 59 INTERPRETER RELEASES 85 (1982) (emphasis in original):
Service action shall not be taken to enforce departure to Poland, prior to March 31, 1982, of Polish nationals who are residents or former residents of Poland and *who indicate an unwillingness to return to Poland* at the present time under the unstable conditions currently existing there. Extensions of temporary stay may be granted to those non immigrants who qualify for such extensions. If an application is denied, the Polish national's departure shall not be enforced prior to March 31, 1982. Polish nationals who are located as deportable aliens will be permitted to remain until March 31, 1982. Deportation hearings will be postponed until after March 31, 1982, for those Polish nationals for whom OSC's  orders to show cause] have been issued and hearings have not commenced. Those hearings for Polish nationals which have commenced shall go forward;

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 27 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

however, departure shall not be enforced prior to March 31, 1982. In those cases where a final order of deportation has been entered, departure shall not be enforced prior to March 31, 1982.

*See also* INS Wire of July 12, 1982, *reprinted in* 59 INTERPRETER RELEASES 456 (1982) (INS instructions on EVD for Ethiopians).

The Attorney General did deviate from his usual practice when, after the Senate passed an immigration bill, he granted EVD to Silva letterholders (most of whom were Mexican nationals) in anticipation of the House passing a similar bill legalizing their presence in the United States. As INS, Asylum Adjudications, *supra* note 1, at 68 n.*, notes:

This action was unique in that it was the first time blanket extended voluntary departure was granted primarily for domestic policy considerations rather than a crisis in the foreign national's homeland; it was also the first time the Attorney General acted unilaterally without a specific recommendation from the Department of State.

*See generally* Staff Report, *The Silva Case*, in U.S. IMMIGRATION POLICY AND THE NATIONAL INTEREST, STAFF REPORT OF THE SELECT COMMISSION ON IMMIGRATION & REFUGEE POLICY, app. D at 71 (1981) [hereinafter SCIRP].

44    *See* Part IV *infra*.

45    *See* notes 1 & 40 *supra* and accompanying text.

46    *See* note 9 *supra*.

47    563 F. Supp. 157 (D.D.C. 1983).

48    594 F. Supp. at 504.

49    In May, 1981, the Justice Department responded to a request from Senator Edward Kennedy that it grant EVD status to Salvadoran nationals by stating that it had 'received word from the Department of State that it was] not in a position to recommend a blanket granting of voluntary departure for illegal Salvadorans presently in the United States. Letter from David Crosland, Acting Commissioner of INS, to Senator Edward M. Kennedy (May 1, 1981), *reprinted in* 128 CONG. REC. 1703 (1982). Congress then included a provision in the International Security and Development Cooperation Act, Pub. L. No. 97 113, § 731, 95 Stat. 1557 (1981), which stated:

It is the sense of the Congress that the administration should continue to review, on a case by case basis, petitions for extended voluntary departure made by citizens of El Salvador who claim that they are subject to persecution in their homeland, and should take full account of the civil strife in El Salvador in making decisions on such petitions.

A similar request from 89 members of the House of Representatives in April 1983 was also rejected by the Attorney General and the Secretary of State. *See* letters reprinted in *Hearing on H.R. 4447, supra* note 7, at 84 88. Again, Congress responded with a 'sense of the Congress' resolution. Department of State Authorization Act, Fiscal Years 1984 and 1985, Pub. L. No. 98 164, § 1012, 97 Stat. 1062 (1983), provided:

(a) The Congress finds that

(1) ongoing fighting between the military forces of the Government of El Salvador and opposition forces is creating potentially life threatening situations for innocent nationals of El Salvador;

(2) thousands of El Salvadoran nationals have fled from El Salvador and entered the United States since January 1980;

(3) currently the United States Government is detaining these nationals of El Salvador for the purpose of deporting or otherwise returning them to El Salvador, thereby irreparably harming the foreign policy image of the United States;

(4) deportation of these nationals could be temporarily suspended, until it became safe to return to El Salvador, if they are provided with extended voluntary departure status; and

(5) such extended voluntary departure status has been granted in recent history in cases of nationals who fled from Vietnam, Laos, Iran, and Nicaragua.

(b) Therefore, it is the sense of the Congress that

(1) the Secretary of State should recommend that extended voluntary departure status be granted to aliens

(A) who are nationals of El Salvador,

(B) who have been in the United States since before January 1, 1983,

(C) who otherwise qualify for voluntary departure (in lieu of deportation) under section 242(b) or 244(e) of the INA] (8 U.S.C. 1252(b) and 1254(e)), and

(D) who were not excludable from the United States at the time of their entry on any ground specified in section 212(a) of the INA] (8 U.S.C. 1182(a)) other than the grounds described in paragraphs (14), (15), (20), (21), and (25); and

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 28 of 129

(2) such status should be granted to those aliens until the situation in El Salvador has changed sufficiently to permit their safely residing in that country.

Another 'sense of the Congress' provision crept into title IV of the Simpson Mazzoli Bill, H.R. 1510, 98th Cong., 1st Sess. § 401 (1983) (passed by the House, June 20, 1984):

It is the sense of Congress that in the case of nationals of El Salvador who otherwise qualify for voluntary departure (in lieu of deportation) under the Immigration and Nationality Act, the Attorney General shall extend the date such aliens are required to depart voluntarily until such date as the Secretary of State determines that the situation in El Salvador has changed sufficiently to permit their safely returning to El Salvador.

Bills requiring the Attorney General to grant EVD status to Salvadoran nationals were introduced in both houses during the second session of the 98th Congress, *see* S. 2131, 98th Cong., 2d Sess. (1984); H.R. 447, 98th Cong., 2d Sess. (1984), and the first session of the 99th Congress, *see* S. 377, 99th Cong., 1st Sess. (1985); H.R. 822, 99th Cong., 1st Sess. (1985).

50    *See* note 8 *supra*.

51    Relatively few Salvadorans receive any kind of immigration relief in the United States. Approximately 4000 Salvadorans enter the United States illegally each months, one quarter of whom are apprehended by the INS. S. STEPHEN, EDUCATION AND PUBLIC WELFARE DIVISION, CONGRESSIONAL RESEARCH SERVICE, LIBRARY OF CONGRESS, U.S. POLICY TOWARDS UNDOCUMENTED SALVADORANS 1 (MB82223) (May 6, 1986); UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES MISSION TO MONITOR INS ASYLUM PROCESSING OF SALVADORAN ILLEGAL ENTRANTS, Sept. 13 18, 1981  hereinafter UNHCR REPORT], *reprinted in* 128 CONG. REC. 1698, 1699 (1982) (only one of every four illegal Salvadorans is apprehended). There are an estimated 300,000 to 500,000 Salvadorans currently residing illegally in the United States. H.R. REP. NO. 1142, 98th Cong., 2d Sess. pt I, at 2 (1984). The great majority of those caught by the INS depart voluntarily from the United States. UNHCR REPORT, *supra*, at 1701 (90% of all apprehended Salvadorans return 'voluntarily  to El Salvador). Very few Salvadorans are granted asylum relief. Only one Salvadoran received asylum in Fiscal Year 1981, *id.* at 1698, prompting the UNHCR to conclude that the United States was violating its responsibilities under the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267. *See* UNHCR REPORT, *supra*, at 1698. The Salvadorans have fared somewhat better in recent years. In Fiscal Year 1983, 163 requests by Salvadoran nationals for asylum relief were granted and 6576 were denied. In Fiscal Year 1984, 328 were granted and 13,045 were denied. *See* S. STEPHEN, *supra*, at 2. Nonetheless, only 2.28% of asylum requests by Salvadoran nationals were granted in Fiscal Year 1984 as compared to an average of 30% for all other nationalities. *See* Note, *supra* note 39, at 330; *see also* Note, *supra* note 7, at 705 & nn. 11, 12 (statistics on asylum applications). A number of suits were brought on behalf of Salvadorans denied refugee status, alleging various discriminatory practices and procedural improprieties by the government. For a discussion of these cases, see Note, *supra* note 5, at 304 09.

52    563 F. Supp. at 162. The plaintiff sought a declaratory judgment and injunctive relief. It also alleged that the State Department routinely denied asylum applications of Salvadorans without regard to the merit of the individual claims, in violation of 'the Fifth Amendment to the Constitution, the United Nations Convention and Protocol on the Status of Refugees, 8 U.S.C. § 1158, and Department of State Notice 351.  563 F. Supp. at 161.

53    563 F. Supp. at 159.

54    563 F. Supp. at 163.

55    Hotel & Restaurant Employees Union, Local 25 v. Smith, 594 F. Supp. 502 (D.D.C. 1984). The defendants filed two motions for summary judgment: one pertaining to the EVD claim and the other pertaining to the asylum procedures claim. Both were granted.

56    The court stated that EVD is 'a matter of the Attorney General's prosecutorial discretion, after his review of the evidence, to suspend, or . . . not to suspend enforcement of the immigration laws in a specific case. 594 F. Supp. at 507. The court followed the parties' leads in classifying EVD in this manner. The defendants had characterized EVD as 'an extraordinary form of relief arising not from the various rights and remedies specifically provided by the  Immigration and Nationality Act of 1952], but from the Executive's discretionary authority in the formulation and implementation of prosecutorial and foreign policy.  Defendants' Memorandum, *supra* note 6, at 2. They asserted that ' t]he 'benefit  enjoyed by members of an alien class for which  EVD] has been granted is the ability, through deferred prosecution of the deportation provisions, to extend their stay in the United States.' *Id.* at 26. Hence, they argued, the authority to grant EVD lies in 'the Executive's broad

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 29 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

constitutional authority to exercise] prosecutorial discretion as to the proper enforcement of federal law. *Id.* at 19 n.13. The plaintiff acquiesced in the defendants' description of EVD as an exercise in prosecutorial discretion, stating that the issue presented was 'the reviewability of an agency's enforcement discretion. Plaintiffs' Opposition, *supra* note 37, at 13; *see also* T. A. ALEINIKOFF & D. MARTIN, *supra* note 5, at 727 (EVD 'is essentially an exercise of prosecutorial discretion ). This Note argues that EVD is not properly viewed as an exercise of prosecutorial discretion. *See* Part IV.A *infra*.

57   *See* notes 71 76 *infra* and accompanying text. The court dis review the Attorney General's decision to determine if it was 'rationally based in accordance with the rule laid out in Fiallo v. Bell, 430 U.S. 787, 794 96 (1977). The court found that the Attorney General's decision was rationally based upon 'foreign policy considerations' as well as several other factors, including: (i) the number of illegal Salvadoran aliens currently in the United States, (ii) the current crisis in generally controlling the 'floodtide of illegal immigration, (iii) the prospect of encouraging further illegal immigration, (iv) the effect of such illegal immigration upon this country's limited law enforcement capabilities, social services and economic resources, and (v) the availability under the Immigration and Nationality Act of alternate avenues of relief, such as asylum. 594 F. Supp. at 508.

58   594 F. Supp. at 505. The court stated that EVD
is a term not found anywhere in the Immigration and Nationality Act or in the applicable regulations. Rather, the term Extended Voluntary Departure describes the Attorney General's discretion in determining the circumstances of both foreign and domestic policy which may give rise to a discretionary decision to grant a temporary suspension of deportation proceedings to members of a particular class of illegal aliens. As such, EVD is based on the prosecutorial discretion of the Attorney General after consultation or advice received from the State Department.
594 F. Supp. at 505.

59   *See* note 65 *infra* and accompanying text.

60   *See* note 68 *infra* and accompanying text.

61   *See* note 70 *infra* and accompanying text.

62   594 F. Supp. at 505.

63   594 F. Supp. at 505 (quoting Harisiades v. Shaughnessy, 342 U.S. 580, 588 89 (1952)). Article II, § 2 of the Constitution places responsibility for the conduct of foreign affairs in the executive branch.

64   594 F. Supp. at 505 (quoting United States *ex rel.* Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950)).

65   594 F. Supp. at 505 (citing United States v. Nixon, 418 U.S. 683, 693 (1974)).

66   594 F. Supp. at 505 (citing Johns v. Department of Justice, 653 F.2d 884, 893 (5th Cir. 1981); Weisburg v. Department of Justice, 489 F.2d 1195, 1201 (D.C. Cir. 1973), *cert. denied*, 416 U.S. 993 (1974)).

67   594 F. Supp. at 505 (citing Harisiades v. Shaughnessy, 342 U.S. 580, 596 97 (1952); Ludecke v. Watkins, 335 U.S. 160, 164 (1948)). Since EVD status merely postpones application of the deportation provisions of the INA, the court found EVD to be no more than 'an exercise of the Executives sic] 'pure enforcement power. 594 F. Supp. at 505 (quoting Attorney Gen. v. Irish People, Inc., 684 F.2d 928, 948 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1172 (1983)).

68   594 F. Supp. at 505 06 (quoting 8 U.S.C. § 1103(a) (1982)).

69   594 F. Supp. at 506 (quoting Fook Hong Mak v. INS, 435 F.2d 728, 730 (2d Cir. 1970)). The federal courts have used this reasonable relationship test in the immigration law area to uphold the Attorney General's discretionary decisions to impose differing reporting requirements on nonimmigrant alien students on the basis of nationality, Narenji v. Civiletti, 617 F.2d 745, 747 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 957 (1980), to extend the stay of a nonimmigrant alien, Unification Church v. Attorney Gen., 581 F.2d 870, 877 78 (D.C. Cir.), *cert. denied*, 439 U.S. 828 (1978), to restrict employment of nonimmigrant alien students, *see* Ahmed v. United States, 480 F.2d 531, 533 34 (2d Cir. 1973); Pilapil v. INS, 424 F.2d 6, 11 (10th Cir.), *cert. denied*, 400 U.S. 908 (1970), and to deny aliens admitted without a visa eligibility to apply for permanent resident status, Fook Hong Mak v. INS, 435 F.2d 728, 730 (2d Cir. 1970).

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 30 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 752

70    The court stated that 'the fact that EVD is extrastatutory in no way effects  sic] its validity as a discretionary action under the Act.  594 F. Supp. at 506. Further, the court noted, ' t]his Circuit has held that the Act 'need not specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed on him. ' 594 F. Supp. at 506 (quoting Narenji v. Civiletti. 617 F.2d 745, 747 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 957 (1980)).

71    594 F. Supp. at 506.

72    5 U.S.C. § 704 (1982).

73    594 F. Supp. at 506.

74    5 U.S.C. § 701(a)(2) (1982).

75    594 F. Supp. at 506 (quoting S. REP. NO. 752, 79th Cong., 1st Sess. 26 (1945)).

76    594 F. Supp. at 507. The court noted that:
      The factors involved in determining the propriety of judicial review of an agency's exercise of discretion are the breadth of the discretionary power, the administrative expertise as balanced against judicial competence to evaluate the action at issue, whether there exists meaningful criteria by which a court may evaluate the action, and whether the decision is one based on policies to which a court must defer to the political branches.
      594 F. Supp. at 507 (citations omitted).

77    594 F. Supp. at 507.

78    594 F. Supp. at 507.

79    ' M]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference. ' Regan v. Wald, 468 U.S. 222, 242 (1984) (citation omitted), *quoted in Employees Union*, 594 F. Supp. at 507; *see also* notes 62 & 63 *supra* and accompanying text.

80    This Court cannot claim to have the expertise needed to decide such issues of foreign policy, and will defer to the Executive, to whom this area has been Constitutionally entrusted. Only in the case of a clear abuse of discretion may a Court impose its judgment over that of the Executive in a case such as the one at bar.
      594 F. Supp. at 507 (citations omitted).

81    594 F. Supp. at 507.

82    594 F. Supp. at 508. The court stated that not only did the standard not exist, but that the standard would be too difficult to define and enforce if it did:
      For a Court to order EVD in this case would set a far reaching precedent, wholly within the perogatives  sic] of Congress, and might then apply to all situations of widespread fighting, destruction and the breakdown of public services and order throughout the world. Also, such situations as famine, drought, or other natural disasters might at any time also raise 'humanitarian  concerns, wherever they might occur. To require the Attorney General to grant blanket EVD status to all such nationals would be to open up irresponsibly the floodgates to illegal aliens, without regard to foreign policy and internal immigration concerns, or, of equal importance, to the concerns of American working men and women in the United States and our taxpayers generally.
      594 F. Supp. at 508.

83    594 F. Supp. at 508. The court also found that the Salvadorans had not been denied due process as a result of the Attorney General's refusal to grant them EVD status, 594 F. Supp. at 508 09, and that summary judgment was appropriate since plaintiff failed to refute defendants' statement of material facts. 594 F. Supp. at 509 10.

84    *See* Part III.A *infra*.

85    *See* notes 91 96 *infra* and accompanying text.

86    *See* notes 97 105 *infra* and accompanying text.

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 31 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

87     Immigration has long been a maverick, a wild card, in our public law. Probably no other area of American law has been so radically insulated and divergent from those fundamental norms of constitutional right, administrative procedure, and judicial role that animate the rest of our legal system. In a legal firmament transformed by revolutions in due process and equal protection doctrine and by a new conception of judicial role, immigration law remains the realm in which government authority is at the zenith, and individual entitlement is at the nadir.

    Schuck, *The Transformation of Immigration Law*, 84 COLUM. L. REV. 1, 1 (1984); *see also* Verkuil, *A Study of Immigration Procedures*, 31 UCLA L. REV. 1141, 1144 (1984) (' u]ntil recently law has been the handmaiden of immigration policy ).

88     *See, e.g.,* Legomsky, *Immigration Law and the Principle of Plenary Congressional Power*, 1984 SUP. CT. REV. 255, 255 (Supreme Court should cease affording special deference to Congress in immigration matters); Ludd, *The Essentiality of Judicial Review: Toward a More Balanced Understanding of Administrative Discretion in American Government*, in ADMINISTRATIVE DISCRETION AND PUBLIC POLICY IMPLEMENTATION 14 (1986) hereinafter Ludd, *Balanced Understanding*]; Ludd, *Administrative Discretion and the Immigration and Naturalization Service: To Review or Not to Review?*, 8 THURGOOD MARSHALL L. REV. 65, 65 (1983); Schuck, *supra* note 87, at 3 n.12 (citing scholars who have attacked the current privileged position of immigration law); Verkuil, *supra* note 87, at 1144.

89     Schuck, *supra* note 87, at 2 4.

90     *Id.* at 2. Schuck states:

    The liberalism of America's first century conceived of persons as autonomous, self defining individuals possessing equal moral worth and dignity and equally entitled to society's consideration and respect. This entitlement was in principle universally shared, a natural right deriving not from the particularities of one's time, place, or status, but from one's irreducible humanity. *Id.; see also Development in the Law Immigration Policy and the Rights of Aliens*, 96 HARV. L. REV. 1286, 1292 93 (1983) hereinafter *Developments*] ('The liberal view is that the fulfillment of the individual comes not in participating in the public life of the State, but in choosing and pursuing her own goals in private life. ) (footnotes omitted).

    Schuck perhaps paints too rosy a picture of early immigration policy. As a government study noted, a certain measure of xenophobia existed in the United States from its first days. This distrust manifested itself in restrictive naturalization laws and virulent rhetoric against certain ethnic and religious groups. *See* SCIRP, *supra* note 43, at 161 200.

91     Schuck, *supra* note 87, at 3.

92     *Id.* ('Liberal values were challenged by an array of exclusionary impulses  racist and class based opposition to Chinese laborers, nativist xenophobia, religious bigotry, and political reaction against radical movements drawing upon new immigrant groups. ) (footnote omitted). *See generally* Note, *supra* note 39, at 306 09 (describing early immigration legislation).

93     Schuck, *supra* note 87, at 3 (footnote omitted). Schuck identifies three causes of the shift to classical immigration law. First, the focus of immigration shifted from Protestant, northern or western European nations to Catholic, eastern or southern European countries, and the Orient. Americans reacted with a rising well of distrust of these racially and religiously 'different aliens. *Id.* at 5 6. For a more detailed account of the reaction to the changing face of American immigration, see SCIRP, *supra* note 43, at 161 200. The reaction to Asian immigration was particularly violent. In fact, the start of the classical immigration period can almost be marked by the passage of the Chinese Exclusion Act, ch. 126, 22 Stat. 58 (1882), the first racist, restrictionist immigration statute enacted in the United States.

    Second, American society developed a new 'nationalistic sense as it matured into an industrialized world power, leading to an increased sense of national autonomy and world leadership. Schuck, *supra* note 87, at 6. Finally, restrictionist immigration policy grew out of the nation's conception of its own sovereignty: 'Sovereignty entailed the unlimited power of the nation, like that of the free individual, to decide whether, under what conditions, and with what effects it would consent to enter into a relationship with a stranger. *Id.* Thus, the only obligations the government was perceived as owing to an alien were those it voluntarily undertook. *Id.*

94     *See, e.g.,* Fong Yue Ting v. United States, 149 U.S. 698, 724 (1893) (aliens are 'subject to the power of Congress to expel them or to order them to be removed and deported from the country, whenever in its judgment their removal is necessary or expedient for the public interest ); Nishimura Ekiu v. United States, 142 U.S. 651, 659 (1892) ('It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe. ).

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 32 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

The immigration power has historically been vested in the legislative branch of the government. *See* Kleindienst v. Mandel, 408 U.S. 753, 767 (1972) (quoting Galvan v. Press, 347 U.S. 522, 531 (1954)) (' T]hat the formulation of  immigration and naturalization] policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our federal government. ); 1 C. GORDON & H. ROSENFIELD, *supra* note 1, §§ 1.5a, 2.2a.

95    The Chinese Exclusion Case, 130 U.S. 581, 606 (1889) (' If Congress] considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security, . . . its determination is conclusive upon the judiciary. ). The Court's denial of its own power in this area remains good law today:

At the outset, it is important to underscore the limited scope of judicial inquiry into immigration legislation. This Court has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens. Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.  Our recent decisions have not departed from this long established rule.

Fiallo v. Bell, 430 U.S. 787, 792 (1977) (citations omitted); *accord* Kleindienst v. Mandel, 408 U.S. 753, 766 (1972); Oceanic Stream Navigation Co. v. Stranahan, 214 U.S. 320, 340 (1909). The Court has afforded similar deference to administrative officials as well. *See* INS v. Miranda, 459 U.S. 14, 19 (1982) (per curiam) (' T]he INS is the agency primarily charged by Congress to implement the public policy underlying  immigration] laws. Appropriate deference must be accorded its decisions. ) (citations omitted); INS v. John Ha Wang, 450 U.S. 139, 145 (1981) (per curiam).

96    This judicial deference has been termed the 'plenary power  doctrine. *See generally* Legomsky, *supra* note 88 (discussing plenary power doctrine, which the Supreme Court has cited in declining to review immigration laws for compliance with substantive constitutional limits). Laws affecting aliens' rights and obligations (*e.g.*, their eligibility for welfare programs or their duty to serve in the armed forces) are subject to limited review for rationality if challenged as discriminatory. Mathews v. Diaz, 426 U.S. 67, 82 83 (1976); Flemming v. Nestor, 363 U.S. 603, 611 (1960); *see also* Legomsky, *supra* note 88, at 256. The courts will also review congressional actions regarding deportation to ensure that the aliens are afforded procedural due process. Wong Yang Sung v. McGrath, 339 U.S. 33 (1950); The Japanese Immigrant Cases, 189 U.S. 86, 100 (1903) (dictum); *see also* Legomsky, *supra* note 88, at 259. Although the plenary power doctrine applies only to congressional actions, its effects have been extended to cover INS actions in some instances. *Id.* at 257. In reviewing administrative decisions in the immigration field, courts generally will inquire only as to whether the decision was irrational or in bad faith. *See, e.g.*, Bertrand v. Sava, 684 F.2d 204, 211 13 (2d Cir. 1982); El Werfalli v. Smith, 547 F. Supp. 152, 153 (S.D.N.Y. 1982). For a discussion of the possible rationales for this deference, see Schuck, *supra* note 87, at 14 18; *Developments, supra* note 90, at 1314 22.

97    Schuck, *supra* note 87, at 4. This shift has been noted by other authors as well. *See, e.g.*, Legomsky, *supra* note 88, at 306 07; Martin, *Due Process and Membership in the National Community: Political Asylum and Beyond*, 44 U. PITT. L. REV. 165, 193 200 (1983); Verkuil, *supra* note, 87, at 1143 44 (adopting Schuck's classification of the history of immigration law); *Developments, supra* note 90, at 1289 90 (adopting a somewhat different classification, but stating that aliens' rights can be viewed in two ways: as augmenting the national welfare or as intrinsic to their human worth).

98    Schuck, *supra* note 89, at 4.

99    Communitarianism is, of course, subject to varying definitions. As one scholar noted:

Communitarianism is a hazy term used to describe any number of different political theories, which may range from conservative Burkean notions to radical left conceptions of the state. Several ideas, however, that seem central to most accounts, are relevant to an understanding of citizenship. Communitarian theory begins with individuals situated in a real society, not in a hypothetical state of nature or on the brink of contract. The individual is seen as an 'encumbered  self. He is defined   or constituted   in part by his relationships, roles, and allegiances. His relationship with the state is based on his identification with and immersion in the society's history, traditions, and core assumptions and purposes. If the bywords of liberal theory are freedom, choice, and consent, the bywords of communitarian theory are solidarity, responsibility, and civic virtue. The operative metaphors for the state are 'family,  'community,  or 'a people.  From the communitarian perspective, citizenship is seen as an organic relationship between the citizen and the state.

Aleinikoff, *Theories of Loss of Citizenship*, 84 MICH. L. REV. 1471, 1494 (1986) (footnote omitted). An analysis of the merits of the competing definitions is beyond the scope of this Note. Thus, this Note adopts Professor Schuck's definition.

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 33 of 129

100    Schuck notes that 'communitarianism in immigration law is as yet only embryonic, tentative, and fragmentary. Schuck, *Immigration Law and the Problem of Community*, in CLAMOR AT THE GATES 298 (N. Glazer ed. 1985). Certainly, this ideological shift is apparent only at the lower federal court level and has shown no signs of appearing in the Supreme Court yet. *See* Legomsky, *supra* note 88, at 304; Schuck, *supra* note 87, at 58 59; *Developments, supra* note 90, at 1313. Moreover, since the executive branch actually sets immigration policy, it should be noted that the Reagan adminsitration has thus far shown little intention of adopting this view.

101    Schuck discusses five structural pressures for changes: the constraining of American foreign policy, economic changes, increases in refugee and asylum claims, large numbers of illegal aliens, and political shifts caused by changes in the ethnic make up and geographical concentration of minority groups. Schuck, *supra* note 87, at 35 47. He identifies several ideological pressures for change as well: 'altered beliefs about the meaning of justice, the rightness or wrongness of certain actions, and the proper role of law and of particular legal institutions in society. *Id.* at 34. *See generally id.* at 47 53.

102    Schuck identifies seven elements of classical immigration law undergoing this ideological transformation:
(1) the restrictive ideal of national community; (2) the principle of judicial deference; (3) the extraconstitutional status of exclusion; (4) the broad federal power to classify aliens; (5) the civil nature of the deportation sanction; (6) the detention power; and (7) the integration of adjudication and enforcement.
*Id.* at 7 8.

103    *See* Plyler v. Doe, 457 U.S. 202 (1982) (states obligated to provide public education to undocumented school age aliens). Although, as Schuck notes, *Plyler* involved invalidation of a state, not a federal, law, it nonetheless has important implications for the notion of a national community, since the Court ordered a state to provide a social benefit to aliens whose presence in the United States was in direct violation of federal law. *See* Schuck, *supra* note 87, at 54 58.

104    Schuck discusses *Employees Union* in this context. *See* note 178 *infra*.

105    *See* Schuck, *supra* note 87, at 62 65.

106    *See generally* Verkuil, *supra* note 87.

107    The Supreme Court has long held that aliens being deported are entitled to a modicum of procedure. *See* The Japanese Immigrant Cases, 189 U.S. 86 (1903) (aliens in deportation process entitled to due process protection). Aliens seeking entry to the United States have no such right, however. *See* Landon v. Plasencia, 459 U.S. 21, 32 (1982) ('This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative. ) (citations omitted); Shaughnessy v. United States *ex rel.* Mezei, 345 U.S. 206, 212 (1953); United States *ex rel.* Knauff v. Shaughnessy, 338 U.S. 537 (1950).

108    See Verkuil, *supra* note 87, at 1149 53 for a suggestion of how those ties might be measured.

109    *Id.* at 1149.

110    *Id.*

111    *Id.* at 1155.

112    *See generally* Sofaer, *Judicial Control of Informal Discretionary Adjudication and Enforcement*, 72 COLUM. L. REV. 1293 (1972).

113    *See* Soon Bok Yoon v. INS, 538 F.2d 1211, 1213 (5th Cir. 1976) (no judicial review of decision to deny deferred departure status); *cf.* notes 56 & 67 *supra* and accompanying text.

114    *See* note 7 *supra*.

115    In all fairness to the *Employees Union* court, it had no reason not to classify EVD as prosecutorial discretion, since the parties themselves used that label. *See* note 56 *supra*. The arguments set forth in this Note, for example, were not before the court.

116    The National Academy of Sciences estimates that there are 2 to 4 million illegal aliens in the United States. *See* N.Y. Times, June 25, 1985, at A14, col. 1. Other studies estimate that illegal aliens number about 3.5 to 6 million. *See, e.g.*, S. REP. NO. 485,

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 34 of 129

97th Cong., 2d Sess. 4 (1982); GENERAL ACCOUNTING OFFICE, PROBLEMS AND OPTIONS IN ESTIMATING THE SIZE OF THE ILLEGAL ALIEN POPULATION ii (1982).

[117] *See* Roberts, *The Exercise of Administrative Discretion Under the Immigration Laws*, 13 SAN DIEGO L. REV. 144, 146 (1975).

[118] *See* 1A C. GORDON & H. ROSENFIELD, *supra* note 1, § 5.3e (discussing various forms of prosecutive relief for aliens facing deportation); *see also* Gordon, *Ameliorating Hardships Under the Immigration Laws*, 367 ANNALS 85 (1966); Keane, *Changing Concepts in Discretionary Relief*, 12 I & N REP. 30 (1964); Roberts, *Relief from Deportation: Discretion and Waivers*, 55 INTERPRETER RELEASES 184, 187 (1978).

[119] *See, e.g.*, United States v. Lovasco, 431 U.S. 783, 784 85, 792 96 (1977) (affirming prosecutor's discretion to delay filing charges for eighteen months pending results of good faith investigation); United States v. Thompson, 251 U.S. 407, 412 15 (1920) (affirming prosecutor's discretion to present charges to second grand jury after first grand jury has declined to indict); United States v. Ruggiero, 472 F.2d 599, 606 (2d Cir. 1973) (affirming prosecutor's discretion in determining what to charge), *cert. denied*, 412 U.S. 939 (1973).

[120] *See, e.g.*, United States v. Saade, 652 F.2d 1126, 1136 (1st Cir. 1981); United States v. Catlett, 584 F.2d 864, 868 (8th Cir. 1978); Vorenberg, *Decent Restraint of Prosecutorial Power*, 94 HARV. L. REV. 1521, 1525 (1981).

[121] *See, e.g.*, Newman v. United States, 382 F.2d 479, 481 82 (D.C. Cir. 1967); Givelber, *The Application of Equal Protection Principles to Selective Enforcement of the Criminal Law*, 1973 U. ILL. L.F. 88, 101 02.

[122] Kaplan, *The Prosecutorial Discretion A Comment*, 60 NW. U. L. REV. 174, 178 (1965).

[123] *See, e.g.*, United States v. Heilman, 614 F.2d 1133, 1139 (7th Cir. 1980), *cert. denied*, 447 U.S. 922 (1980); United States v. Scott, 521 F.2d 1188, 1195 (9th Cir. 1975), *cert. denied*, 424 U.S. 955 (1976); Kaplan, *supra* note 122, at 180.

[124] *See, e.g.*, United States v. Saade, 652 F.2d 1126, 1136 (1st Cir. 1981); United States v. Catlett, 584 F.2d 864, 868 (8th Cir. 1978).

[125] *See, e.g.*, United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974) (judicial review of prosecutorial discretion available only where defendant meets the 'heavy burden of showing both that others similarly situated were not prosecuted and that he was selected for prosecution on an unconstitutional basis); Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 380 (2d Cir. 1973) (' T]he manifold imponderables which enter into the prosecutor's decision to prosecute or not to prosecute make the choice not readily amenable to judicial supervision. ); 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 9.1, at 217 18 (2d ed. 1979).

[126] Heckler v. Chaney, 470 U.S. 821, 831 (1985).

[127] 470 U.S. at 831.

[128] *See, e.g.*, Heckler v. Chaney, 470 U.S. 821, 832 33 (1985) (court can review agency decision to enforce to determine whether agency exceeded its statutory powers); United States v. Sacco, 428 F.2d 264, 271 (9th Cir. 1970) ('The conscious exercise of selectivity in enforcement of alien registration laws] is not in itself a constitutional violation where it is not further alleged that 'the selection was deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification. ') (citation omitted), *cert. denied*, 400 U.S. 903 (1970). The Supreme Court has erected a presumption of nonreviewability for agency decisions *not* to enforce, stating that 'when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect. *Heckler*, 470 U.S. at 832 (emphasis in original). *See also* Shapiro, *Administrative Discretion: The Next Stage*, 92 YALE L.J. 1487, 1509 11 (1983).

[129] Heckler v. Chaney, 470 U.S. 821, 847 (1985) (Marshall, J., concurring) ('Criminal prosecutorial decisions vindicate only intangible interests, common to society as a whole, in the enforcement of the criminal law. The conduct at issue has already occurred; all that remains is society's general interest in assuring that the guilty are punished. ).

[130] *Cf.* Wildes, *The Nonpriority Program of the Immigration and Naturalization Service Goes Public: The Litigative Use of the Freedom of Information Act*, 14 SAN DIEGO L. REV. 42, 72 (1976) (arguing that nonpriority program is unlike criminal prosecutorial discretion in that the program is a special program conferring benefits 'based on individual equities').

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 35 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

131    *Heckler*, 470 U.S. at 848. In this case, Justice Marshall noted in response to an agency refusal to act that
       requests for administrative enforcement typically seek to prevent concrete and future injuries that Congress has made
       cognizable . . . or to obtain palpable benefits that Congress has intended to bestow . . .. Entitlements to receive these benefits or
       to be free of these injuries often run to specific classes of individuals whom Congress has singled out as statutory beneficiaries.
       470 U.S. at 847 48 (citations omitted). A similar rationale would apply to agency decisions to act.

132    *See* Vorenberg, *supra* note 120, at 1525.

133    *Employees Union*, 594 F. Supp. at 507; *see* note 56 *supra* and accompanying text; *cf.* Letter from William F. Smith, Attorney
       General, to Representative Lawrence J. Smith (July 19, 1983), *reprinted in* Defendants' Memorandum, *supra* note 6, at Exhibit
       D (describing EVD as a temporary delay in the expulsion of aliens of a certain nationality).

134    INS regulations provide that certain classes of aliens are eligible to be employed in the United States without specific
       employment authorization. 8 C.F.R. § 109.1(a) (1986). Aliens granted voluntary departure under 8 C.F.R. § 242.5(a)(2)(viii)
       (1986), *see* text at note 26 *supra*, must apply for work authorization under 8 C.F.R. § 109.1(b)(6) (1986) and
       may be granted permission to be employed for that period of time prior to the date set for voluntary departure including any
       extension granted beyond such date. Factors which may be considered in granting employment authorization to an alien who
       has been granted voluntary departure:
       (i) Length of voluntary departure granted;
       (ii) Dependent spouse and/or children in the United States who rely on the alien for support;
       (iii) Reasonable chance that legal status may ensue in the near future; and
       (iv) Reasonable basis for consideration of discretionary relief. 8 C.F.R. § 109.1(b)(6) (1986). The INS manual reveals
       that work authorizations are issued automatically to aliens granted extensions of voluntary departure: 'Aliens who have
       been granted . . . voluntary departure due to temporary inability to return to their home country because of civil war or
       catastrophic circumstances there, should be advised of their status by letter . . .. The letter should state that . . . employment
       has been authorized . . .. IMMIGRATION AND NATURALIZATION SERVICE, OPERATING INSTRUCTIONS,
       REGULATIONS & INTERPRETATIONS § 242. 10(e)(3) (Apr. 4, 1979). Likewise, the directives notifying the INS field
       offices of the Attorney General's decision to grant EVD typically provide for work authorization in accordance with the
       voluntary departure provisions. *See, e.g.*, INS Wire of June 15, 1983, *reprinted in* 60 INTERPRETER RELEASES 484 (1983)
       ('Those Polish nationals whose departure has been deferred until December 31, 1983 and who establish appropriate need
       may be authorized permission to work, as provided in 8 C.F.R. 109.1(b). ); *see also* INS Wire of May 1, 1984, *reprinted in*
       61 INTERPRETER RELEASES 330 (1984) (work authorizations for Ugandans granted EVD); INS Wire of July 12, 1982,
       *reprinted in* 59 INTERPRETER RELEASES 456 (1982) (work authorizations for Ethiopians granted EVD). The authors of
       one book noted that 'there is no special program  available to aliens granted EVD] for federal assistance like that available
       to refugees . . ., but it may be that EVD beneficiaries qualify for other general public assistance programs otherwise closed to
       'illegal aliens.  T.A. ALEINIKOFF & D. MARTIN, *supra* note 5, at 728 (citations omitted).

135    *See Resettlement of Cuban Refugees*, 41 INTERPRETER RELEASES 98, 99 (1964); *cf.* SENATE COMM. ON THE
       JUDICIARY, SUBCOMM. TO INVESTIGATE PROBLEMS CONNECTED WITH REFUGEES AND ESCAPEES
       PURSUANT TO S. RES. 66, 88TH CONG., 1ST SESS., RESETTLEMENT OF CUBAN REFUGEES 1 (Comm. Print
       1963) (introduction by Sen. Hart).

136    *See* note 117 *supra* and accompanying text.

137    *See* note 167 *infra* and accompanying text.

138    *See* note 166 *infra* and accompanying text.

139    *See* note 18 *supra*.

140    These requirements vary, depending upon whether the alien is requesting voluntary departure before, during, or after
       deportation proceedings, but, in general, they go to the moral worthiness of the alien. *See* notes 19 & 20 *supra*. *See generally*
       2 C. GORDON & H. ROSENFIELD, *supra* note 1, § 7.2.

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 36 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

141    *See, e.g.*, Gomez Fernandez v. INS, 316 F.2d 732 (5th Cir.), *cert. denied*, 375 U.S. 942 (1963); Hegerich v. Del Guercio, 255 F.2d 701 (9th Cir. 1958); United States *ex rel.* Ciannamea v. Neely, 202 F.2d 289 (7th Cir. 1953).

142    *See* notes 18 24 *supra* and accompanying text.

143    *See* notes 25 32 *supra* and accompanying text.

144    *See* notes 25 30 *supra* and accompanying text.

145    *See* notes 26 & 27 *supra* and accompanying text.

146    *See* text at note 26 *supra*.

147    INS, OPERATIONS INSTRUCTIONS, REGULATIONS & INTERPRETATIONS § 242.10(e)(3) (Apr. 4, 1979).

148    *See* 8 C.F.R. § 242.5(a)(1) (1986).

149    *See* 2 C. GORDON & H. ROSENFIELD, *supra* note 1, § 7.1b, at pp. 7 9 to 7 13.

150    *See* notes 19 & 20 *supra*.

151    In Fook Hong Mak v. INS, 435 F.2d 728 (2d Cir. 1970), the Second Circuit established that administrators vested with discretionary authority may exercise that authority through blanket, rather than individual, determinations. 435 F.2d at 730; *see also* Yuk Ling Wu Jew v. Attorney General, 524 F. Supp. 1258, 1260 61 (D.D.C. 1981) ('A congressional grant of discretion to accord or revoke an immigration privilege does not trigger a requirement that each such proceeding be considered on a case by case basis. ); *cf.* Kurlan v. Callaway, 381 F. Supp. 594, 596 (S.D.N.Y.), *affd. in part and revd. in part*, 510 F.2d 274 (2d Cir. 1974) (state executive may exercise his discretion on either a blanket or a case by case basis). The Attorney General may determine that 'one paramount element creates such 'likeness' that other elements cannot be so legally significant as to warrant a difference in treatment. *Fook Hong Mak*, 435 F.2d at 730. This principle is particularly applicable to EVD, since the 'one characteristic  which entitles the 'group to favorable treatment despite minor variables,  435 F.2d at 730, is readily apparent. If conditions in the home country are so dangerous as to warrant EVD status for the nationals, case by case determinations become a time consuming administrative burden. A blanket grant is an efficient and sensible response, since it relieves the field officers from the procedural formalities of individual determinations in cases in which the outcome is certain.

152    *See, e.g.*, Letter from A. P. Drischler, Acting Assistant Secretary of State for Congressional Relations, to Senator Edward Kennedy (Apr. 17, 1981), *reprinted in* 128 CONG. REC. 1702 (1982) ('While fighting in some areas has been severe, El Salvador has not suffered the same level of wide spread fighting, destruction and breakdown of public services and order as did for example, Nicaragua, Lebanon or Uganda at the time when voluntary departure was recommended by the Department  of Justice] and granted by INS for nationals of those countries. ); INS Wire of Jan. 21, 1982, *reprinted in* 59 INTERPRETER RELEASES 85 (1982) ('Service action shall not be taken to enforce departure to Poland, . . . at the present time under the unstable conditions currently existing there. ); INS Wire of July 3, 1979, *reprinted in* 56 INTERPRETER RELEASES 325a (1979) ('Service action shall not be taken to enforce departure to Nicaragua, prior to December 31, 1979, of Nicaraguan nationals . . . *who indicate an unwillingness to return to that country* at the present time under the unstable conditions currently existing there. ) (emphasis in original); INS Wire of Aug. 29, 1979, *reprinted in* 56 INTERPRETER RELEASES 436 (1979) ('The Department of State has recommended against the forcible return to Nicaragua of any Nicaraguan nationals . . . due to the unsettled conditions in Nicaragua. ); INS Wire of Dec. 4, 1978 (copy on file at *Michigan Law Review*) ('The civil strife in that country  Lebanon] continues. ); Letter of William P. Clark, Deputy Secretary of State, to Doris Meissner, Acting Commissioner of INS (Aug. 8, 1981) (copy on file at *Michigan Law Review*) ('Since Ethiopia's revolution took place in 1974 the Department of State has been recommending to the INS that . . . because of unsettled conditions in Ethiopia, Ethiopians whose asylum applications were not approved should not be deported to Ethiopia . . . ).
Gordon and Rosenfield have also noted that the Attorney General sometimes grants EVD status to 'nationals of countries undergoing active hostilities or other dangerous conditions. 1A C. GORDON & H. ROSENFIELD, *supra* note 1, § 5.3e(6a), at p. 5 48. The INS itself has described EVD as 'an administratively clean and effective response for our government to make to what are generally temporary but unsafe circumstances in other countries that are likely to improve with time.  INS, Asylum Adjudications, *supra* note 1, at 71. This also seems to be the view taken by many members of Congress. *See, e.g., Hearing on H.R. 4447, supra* note 7, at 10 (statement of Rep. Moakley) ('The issue here is not administration foreign policy

toward El Salvador . . .. The issue today is a humanitarian one. . . . W]e are deciding, in light of all of the documented human rights violations in El Salvador, whether it is safe, humane, and just to deport Salvadoran refugees back to their homeland. ); *id.* at 49 (statement of Rep. Gejdenson) (EVD 'is a humanitarian decision, not a political one. ). Congressmen expressed this view in connection with earlier grants of EVD as well. For example, debate on H. Res. 304 (urging EVD status for Poles) exemplified congressional preoccupation with the humanitarian aspects of EVD. *See* 127 CONG. REC. 31,493 (1981) (statement of Mr. Rodino) (' F]avorable action on this resolution would be a clear expression of our humanitarian commitment to these individuals and a recognition of our obligation not to return them, at this time, to Poland. ); *id.*, at 31,494 (statement of Mr. Richmond) ('Our Nation's humanitarian tradition demands that we not expel those whose lives would be threatened by deportation and it is, therefore, imperative that we permit Polish citizens to remain here until they can safely return home. ); *id.* (statement of Mr. Broomfield) (' I]t is the humanitarian obligation of the United States to insure that Poles visiting or working in the United States are not thrust back into Poland now. ).

153    The Attorney General has denied that any criteria for granting the status exist. *See, e.g.*, Defendants' Memorandum, *supra* note 6, at 16 ('Plaintiffs erroneously assume that grants of 'extended voluntary departure  are governed exclusively by conditions within the country(ies) in question . . . and that it is both possible and proper to draw country  by  country comparisons between the Executive's determinations concerning 'extended voluntary departure.  ); Letter from George P. Shultz, Secretary of State, to William F. Smith, Attorney General (June 23, 1983) *reprinted in* Defendants' Memorandum, *supra* note 6, at Exhibit C (' T]he extent of civil unrest alone does not determine the Department's view toward the granting of EVD to nationals of a particular country. The Department invariably considers a number of factors in deciding whether to recommend the granting of EVD in any particular case, and the granting of EVD may meet different objectives in different cases. ). The Attorney General stated that:

I]t is true . . . that 'extended voluntary departure  has been granted to nationals of Ethiopia, Nicaragua, Poland, and Uganda, at times when such contries were experiencing significant civil disturbances. It is inaccurate, however, to assume that there exists any specific criterion or criteria, such as the occurrence of violence or political instability, by which grants of 'extended voluntary departure  are determined. . . . The decisions made as to 'extended voluntary departure  are reached on a situation by situation basis and are not readily susceptible to comparison or generalization. Each determination is based on examination of a variety of factors unique to each country's situation.

Letter from William F. Smith, Attorney General, to Representative Lawrence J. Smith (July 19, 1983) *reprinted in* Defendants' Memorandum, *supra* note 6, at Exhibit D.

The government has asserted that EVD serves primarily as a foreign policy tool. *See* Memorandum from William F. Smith, Attorney General, to William Clark (Apr. 16, 1983), *quoted in* Plaintiffs' Opposition, *supra* note 37, at 63 n.14 (emphasis added):

Historically, a grant of extended voluntary departure to a particular national group by the Attorney General has always been based on a recommendation of the Department of State resulting from its assessment of conditions in a particular country and the foreign policy implications of U.S. Government action in repatriating nationals of that country who are in the United States.

. . . .

The Department of] Justice has never independently established an extended voluntary departure program as the need for and implications of such a decision are fundamentally foreign policy in nature.

*Granting extended voluntary departure to nationals of one country does not justify or require such a grant to nationals of another country where, while the situation may or may not be similar, the foreign policy benefits or issues may be adjudged to be different.* The general perception of extended voluntary departure is that it is invoked as a humanitarian gesture to protect temporarily persons who are in the U.S. and subject to return when conditions of civil strife or social or political turmoil arise in their homeland. While humanitarian factors have always loomed large in extended voluntary departure decisions, State's recommendation has, with varying degrees, been based on foreign policy grounds.

The plaintiffs in *Employees Union* argued, however, that the government's assertion that EVD is merely a foreign policy tool is no more than a post hoc rationalization formulated after the filing of the complaint in that case, *see* Plaintiffs' Opposition, *supra* note 37, at 63 64, since humanitarian concerns, not foreign policy objectives, were asserted in connection with earlier grants of EVD. *See* not 152 *supra*. While it is true that the granting of EVD may have some influence upon relations between the United States and the involved country, the impact is likely negligible, as the government itself has recognized. *See, e.g.*,

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 38 of 129

Draft Questions and Answers for Elliot Abrams (Feb. 5, 1982, 3:00 p.m. press briefing), *quoted in* Plaintiffs' Opposition, *supra* note 37, at 62:

QUESTION]: Is it not true that if you were to grant asylum or voluntary departure status to a high proportion of applicants for many or all of the Salvadorans in the US sic], in effect you would be disparaging the stability and ability of the Salvadoran Government to protect its citizens? Would this not undermine the Administration's policy of support for the Duarte government?

. . . .

ANSWER]: The decision to grant asylum or voluntary departure unavoidably reflects upon the conditions currently existing in the homeland of the persons affected. In the case of El Salvador, you must remember that a civil war is occurring. That the government cannot maintain perfect order in such circumstances is unsurprising and does not necessarily reflect poorly on it or its leaders. When these facts are considered, I cannot see how the Administration's policy could be harmed.

The granting of EVD to nationals of both Nicaragua and Lebanon at a time when these countries were engaged in favorable relations with the United States further illustrates that EVD has, in the past, functioned as humanitarian relief and not as a pejorative denouncement of the governments involved. In fact, the Salvadoran Ambassador to the United States stated that El Salvador 'view s] with great sympathy the U.S. policy of granting 'extended departure status' to Salvadoran nationals, thus diminishing the likelihood that a grant of EVD would be deleterious to U.S. Salvadoran relations. Eastham, *Salvadorans Seek U.S. Asylum from U.S. Backed Regime*, United Press International, Mr. 20, 1982 (available on NEXIS). Moreover, as one commentator noted, the Salvadoran government 'should not be too surprised or offended to find out that the U.S. government believes El Salvador to be unsafe for civilians, given the critical State Department reports on human rights in that country filed with Congress. *See* Note, *supra* note 5, at 330 31.

Finally, EVD grants, unlike grants of refugee status, can be framed in terms that do not condemn the government of the aliens involved:

Since a refugee is defined contentiously as victim or potential victim of persecution, to accept the claim of someone to qualify for refugee status is publicly to accuse some other state of engaging in persecution; to accept large numbers of refugees is to call attention to the extent of other states' misdeeds and to exhibit one's own contrasting humanitarianism. This of course is why there is official reluctance to receive refugees from friendly or allied states, however oppressive to certain of their citizens they may be . . . .

Whelan, *Principles of U.S. Immigration Policy*, 44 U. PITT. L. REV. 447, 479 80 (1983).

154   *See* note 153 *supra*.

155   *See* note 76 *supra* and accompanying text.

156   Sang Seup Shin v. INS, 750 F.2d 122, 127 (D.C. Cir. 1984); *see also* Dworkin, *The Model of Rules*, 35 U. CHI. L. REV. 14, 33 (1967) ( 'discretion is not tantamount to license '). Indeed, ' w]hile the extent of power possessed by one exercising discretion varies, in our legal system discretion usually means judgment 'guided by sound legal principles, producing decisions made 'according to the rules of reason and justice, not according to private opinion . . .. ' Sofaer, *supra* note 112, at 1349 (footnote omitted).

157   *See* notes 72 & 73 *supra* and accompanying text.

158   R. PIERCE, JR., S. SHAPIRO & P. VERKUIL, ADMINISTRATIVE LAW AND PROCESS 182 (1985).

159   *Id.* at 182 83.

160   *Cf.* 2 C. GORDON & H. ROSENFIELD, *supra* note 1, § 7.2d, at 7 31 (denials of voluntary departure or arbitrary restrictions on the privilege are subject to judicial review).

161   The *Employees Union* court's preemptive dismissal of judicial review on this basis ignores the very real advantages accruing to aliens from a favorable exercise of EVD discretion. First, aliens derive a substantial benefit from not having to undergo deportation proceedings, regardless of the various forms of relief that may be available in that process. *Cf.* Verkuil, *supra* note 87, at 1153 n.61 (' A] favorable discretionary action is a very valuable advantage, since it renders the deportation process unnecessary. ). Second, and more important, aliens granted EVD receive a group status; each individual alien need not

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 39 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 752

convince an immigration official to exercise his or her discretion in the alien's favor. Given the vagaries of the immigration relief processes, *see* Sofaer, *supra* note 112, at 1295 (finding that 'inconsistency, arbitrariness and . . . waste correlate with INS] discretionary power ), the benefits of group relief should not be underestimated.

162    *See* notes 81 & 82 *supra* and accompanying text.

163    *See* Shapiro, *supra* note 128, at 1488.

164    *See* 5 U.S.C. §§ 553 557, 706(2)(E) (1982).

165    5 U.S.C. § 706 (1982) provides in relevant part: 'The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .. *See generally* Shapiro, *supra* note 128, at 1488 89. As Shapiro notes, it has become 'commonplace to point out that § 706 is in apparent conflict with § 701, which excepts 'agency action . . . committed to agency discretion by law from judicial review. *Id.* at 1489 n.11. By subjecting all agency action to judicial review except where review is barred by statute or committed to agency discretion by law, however, § 701 creates a 'strong presumption of reviewability. *See also* Dunlop v. Bachowski, 421 U.S. 560, 567 (1975); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971); Abbot Laboratories v. Gardner, 387 U.S. 136, 140 41 (1967). The Supreme Court has stated that the 'committed to agency discretion exception is 'very narrow, *Overton Park*, 401 U.S. at 410, and that 'it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply. ' 401 U.S. at 410 (quoting S. REP. NO. 752, 79th Cong., 1st Sess. 26 (1945)). *See also* Barlow v. Collins, 397 U.S. 159, 166 (1970) ( 'judicial review of such administrative action is the rule, and nonreviewability an exception which must be demonstrated ); Local 1219, American Fedn. of Govt. Employees v. Donovan, 683 F.2d 511, 515 (D.C. Cir. 1982) (citations omitted):

T]he APA's exception for 'agency action committed to agency discretion shields from review only those matters for which 'a fair appraisal of the legislative scheme, including a weighing of practical and policy implications of reviewability, persuasively indicates that judicial review should be circumscribed. Only when 'the considerations in favor of nonreviewability . . . are sufficiently compelling to rebut the strong presumption of judicial review will we conclude that judicial review is foreclosed. Thus, ' c]ourts have continuously narrowed the category of actions considered to be so discretionary as to be exempted from review. Shapiro, *supra* note 128, at 1489 n.11.

166    United States *ex rel.* Adel v. Shaughnessy, 183 F.2d 371, 372 (2d Cir 1950) (footnotes omitted); *see also* Foti v. INS, 375 U.S. 217, 228 (1963); MacKay v. McAlexander, 268 F.2d 35, 40 (9th Cir. 1959), *cert. denied*, 362 U.S. 961 (1960).

167    *See, e.g.*, Kleindienst v. Mandel, 408 U.S. 753, 770 (1972); Kimm v. Rosenberg, 363 U.S. 405 (1960) (per curiam); Goon Wing Wah v. INS, 386 F.2d 292, 294 (1st Cir. 1967); Chen v. Foley, 385 F.2d 929, 934 (6th Cir. 1967), *cert. denied*, 393 U.S. 838 (1968); Kam Ng v. Pilliod, 279 F.2d 207, 210 (7th Cir. 1960), *cert. denied*, 365 U.S. 860 (1961); United States *ex rel.* Ciannamea v. Neelly, 202 F.2d 289, 292 (7th Cir. 1953).

168    2 C. GORDON & H. ROSENFIELD, *supra* note 1, § 8.14, at 8 123.

169    360 F.2d 715 (2d Cir. 1966).

170    360 F.2d at 719 (quoting United States *ex rel.* Kaloudis v. Shaughnessy, 180 F.2d 489, 491 (2d Cir. 1950)); *see also* Bertrand v. Sava, 684 F.2d 204, 212 (2d Cir. 1982) (standard adopted in challenge of denial of parole to Haitians); Conceiro v. Marks, 360 F. Supp. 454, 457 (S.D.N.Y. 1973) (standard applied to district director's denial of parole to an excludable political asylum applicant). Other courts have articulated similar standards in other immigration cases. *See, e.g.*, Osuchukwu v. INS, 744 F.2d 1136, 1142 (5th Cir. 1984):

It is our duty to allow decision  sic] to be made by the Attorney General's delegate, even a decision that we deem in error, so long as it is not capricious, racially invidious, utterly without foundation in the evidence, or otherwise so aberrational that it is arbitrary rather than the result of any perceptible rational approach.

*See also* Sang Seup Shin v. INS, 750 F.2d 122, 125, 127 (D.C. Cir. 1984) (citations and footnote omitted):

Broad as the  Bureau of Immigration Appeals'] discretion is, however, that tribunal may not act arbitrarily or irrationally. It may not proceed at whim, shedding its grace unevenly from case to case. It must explain departures from settled policies . . . and it may not unaccountably disregard on one day considerations it held relevant on another day. . . . What determines rights in one case the Board may not ignore in the next. Discretion does not mean license.

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 40 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

171 *See, e.g.*, Atchison, T. & S.F. Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973) (ICC departures from settled precedent regarding rate increases) (emphasis added):

The agency may flatly repudiate  prior] norms, deciding, for example, that changed circumstances mean that they are no longer required in order to effectuate congressional policy. Or it may narrow the zone in which some rule will be applied, because it appears that a more discriminating invocation of the rule will best serve congressional policy. Or it may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggests that the rule not be applied in that case. *Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency s action and so may judge the consistency of that action with the agency s mandate.*

172 Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 923 (1971) (footnotes omitted). This view has been consistently adopted by the courts. *See, e.g.*, Atchison, T. & S.F. Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973) (agency has a 'duty to explain its departure from prior norms'); Greyhound Corp. v. ICC, 551 F.2d 414, 416 (D.C. Cir. 1977) ('This court emphatically requires that administrative agencies adhere to their own precedents or explain any deviations from them. ); Contractors Transp. Corp. v. United States, 537 F.2d 1160, 1162 (4th Cir. 1976); Frozen Food Express, Inc. v. United States, 535 F.2d 877, 880 (5th Cir. 1976); Columbia Broadcasting Sys. v. FCC, 454 F.2d 1018, 1027 (D.C. Cir. 1971) (agency 'duty bound to justify  facially conflicting decisions).

173 *See* note 152 *supra*. It is possible, of course, that humanitarian concerns were not the true motivation for the Attorney General's earlier grants of EVD. Nonetheless, he should be held to his own stated reasons and should not be allowed to offer post hoc rationalizations for his actions. *See* FTC v. Atlantic Richfield Co., 567 F.2d 96, 100 (D.C. Cir. 1977); *see also* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971).

174 594 F. Supp. at 508; *see* note 82 *supra* and accompanying text.

175 *See* notes 140 & 141 *supra* and accompanying text.

176 *See generally* 2 C. GORDON & H. ROSENFIELD, *supra* note 1, § 7.1(b)(3), at 7 9 to 7 13.

177 *See, e.g.*, Marine Space Enclosures, Inc. v. Federal Maritime Commn., 420 F.2d 577, 585 (D.C. Cir. 1969) (footnote omitted): An agency may modify or even reverse its past policies and announcements, but the confidence of a reviewing court that these adjustments are made in accordance with the requirements of law is not enhanced when the prior precedents are not discussed, the swerves and reversals are not identified, and the entire matter is brushed off once over lightly.

178 *Cf.* Verkuil, *supra* note 87, at 1152 53 & n.61. This Note does not argue that aliens denied EVD should be allowed to assert due process or equal protection claims. As a discretionary relief for extraordinary situations, EVD does not warrant such constitutional protection. *See, e.g., id.* at 1178 79. Schuck, in fact, criticized the first *Employees Union* opinion on precisely this ground, noting that ' t]o surround  EVD] with constitutional constraints not applicable to excludable aliens generally could reduce and perhaps even eliminate its usefulness to the government and to aliens. Schuck, *supra* note 87, at 60. But, as Verkuil points out, discretionary decisions, such as EVD, do demand 'some check on the regularity of agency behavior. Verkuil, *supra* note 87, at 1179. This need can be accommodated through (1) 'the use of standards and rules to guide agency deciders,  and (2) limited judicial and adminstrative review. Verkuil, *supra* note 87, at 1179 n.233.

179 *See* Verkuil, *supra* note 87, at 1152 53 & n.61.

180 *Id.* at 1149.

181 *Id.* at 1164.

182 *Id.* at 1178.

183 *See, e.g.*, Ameeriar v. INS, 438 F.2d 1028 (3d Cir.), *cert. dismissed*, 404 U.S. 801 (1971); Diver, *The Optimal Precision of Administrative Rules*, 93 YALE L.J. 65, 92 97 (1983); Roberts, *supra* note 117, at 158 & n.60; Sofaer, *supra* note 112, at 1313.

184 *See e.g.*, Sofaer, *supra* note 112, at 1295 97 (constraints on discretion not required where consequences of discretion are unimportant, other controls are present or standards cannot be effectively articulated).

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 41 of 129

185   *See* Rabin, *Job Security and Due Process: Monitoring Administrative Discretion Through a Reasons Requirement*, 44 U. CHI. L. REV. 60, 78 (1976).

186   *See* Note, *Violations By Agencies of Their Own Regulations*, 87 HARV. L. REV. 629, 649 (1974).

187   *See id.* at 642.

188   *See id.*

189   *Cf.* K. LLEWELLYN, THE BRAMBLE BUSH: ON OUR LAW AND ITS STUDY 43 (1951) ( 'justice demands . . . that like men be treated alike in like conditions'); Ludd, *Balanced Understanding, supra* note 88, at 22; *Developments, supra* note 90, at 1297 98.

190   *See* Roberts, *supra* note 117, at 152.

191   *See* Verkuil, *supra* note 87, at 1205.

192   *See* note 88 *supra* and accompanying text.

193   Schuck, *supra* note 87, at 81 82:
Few areas of public law are so susceptible to administrative abuse and lawlessness as immigration law. The INS is among the most insular and chronically understaffed of federal agencies; it is vulnerable to manipulation and neglect by Congress and to political reprisals by powerful employer interests opposed to vigorous law enforcement. Aliens, the nominal clients of the system, are politically and economically weak, unfamiliar with legal forms, procedures, and the language, and often reluctant or unable to assert their rights. . . . A]liens often exist in a kind of social vacuum, outside any structures of institutional, programmatic, administrative, or professional support.
INS decisions, moreover, have low visibility; they occur in isolated adjudicatory contexts in which their larger policy consequences, if any, are fragmented and thus difficult to discern or monitor.

194   *See* note 178 *supra*.

195   *See* Schuck, *supra* note 87, at 84 (footnote omitted):
Where life and liberty interests collide with powerful foreign policy, law enforcement, or other governmental interests, courts should seek relatively flexible solutions, such as 'clear statement requirements or remands to the agency with instructions to develop new approaches, rather than finding refuge in rigid constitutional rulings.

196   *See, e.g.*, Note, *supra* note 5, at 331 33.

197   *See* notes 16 & 17 *supra* and accompanying text. INS, Asylum Adjudications, *supra* note 1, at 69, also made this point: 'Extended voluntary departure sounds like jargon, said one individual. 'If we have a program where we grant people temporary safe refuge or safe haven for limited periods of time, why not call it that. Safe haven or temporary refuge is something people can understand.

198   INS, Asylum Adjudications, *supra* note 1, at 72. The INS suggested using either the term 'temporary refuge or 'safe haven, but noted that ' t]he term temporary refugee is also used by the State Department for those foreign nationals given refuge in U.S. embassies and consulates overseas. *Id.* 'Safe haven has been proposed by others as well. *See, e.g., Refugee Assistance: Hearings on H.R. 3195 Before the Subcomm. on Immigration, Refugees, and International Law of the Comm. on the Judiciary*, 98th Cong., 1st Sess. 103 (1983) hereinafter *Refugee Assistance*] (statement of T. A. Aleinikoff).

199   As Professor Aleinikoff has noted, congressional establishment of EVD
would allow the United States to extend temporary protection to persons of humanitarian concern without either distorting the definition of 'refugee in our laws or increasing the number of aliens who seek permanent residence here. It would provide a statutory basis for administrative practices that have developed without careful thought or congressional oversight. It would foster public debate on issues that have previously been handled out of the public eye.
*Refugee Assistance, supra* note 198, at 103.

Case 1:18-cv-00068  Document 472-6  Filed on 08/21/20 in TXSD  Page 42 of 129

EXTENDED VOLUNTARY DEPARTURE: LIMITING THE..., 85 Mich. L. Rev. 152

200   Although EVD has never been defined as applying to nationals of countries suffering from natural disasters, this appears to be a logical extension of EVD's scope. At one time, United States immigration law provided for 'conditional entry  of aliens who had 'been forced to flee their homes as a result of serious natural disasters, such as earthquakes, volcanic eruptions, tidal waves, and in any similar natural catastrophes.  S. REP. NO. 748, 89th Cong., 1st Sess. 16, *reprinted in* 1965 U.S. CODE CONG. & ADMIN. NEWS 3328, 3335; *see* Act of Oct. 3, 1965, Pub. L. No. 89 236, § 203(a)(7)(B), 79 STAT. 911, 913 (1965). Aliens were never able to use this provision because of the regulatory and statutory barriers erected. *See* Note, *Victims of Natural Disasters in U.S. Refugee Law and Policy*, 1982 MICH. Y.B. INTL. LEGAL STUD. 137, 140. The provision was repealed by the Refugee Act of 1980, § 203(c)(3), leaving the victims of natural disasters without relief under U.S. law. One commentator has suggested that such aliens should be granted refugee status: ' W]hen the disaster constitutes a continuing threat to human life, and aid to the stricken area cannot restore an acceptable standard of living, then the distinction between natural disaster victims and refugees fearing persecution becomes arbitrary and inhumane.  Note, *supra*, at 137 38. A better solution would be to permit these aliens to enter the United States under a grant of EVD, thus enabling the U.S. government to require them to leave when conditions in the home country have stabilized.

201   This was one of the major concerns espoused by the Attorney General and the Secretary of State in connection with the Salvadoran petition for EVD. *See, e.g.*, Letter from William F. Smith, Attorney General, to George P. Shultz, Secretary of State (June 23, 1983), *reprinted in* Defendants' Memorandum, *supra* note 6, at Exhibit C (' B]ased on past experience, the Department has concluded that a grant of EVD is, if not a magnet, at least an inducement to members of the beneficiary nationality to seek to enter the United States by any means, since they can avoid deportation. ); Letter from William F. Smith, Attorney General, to Representative Lawrence S. Smith (July 19, 1983), *reprinted in* Defendants' Memorandum, *supra* note 6, at Exhibit D (' T]here are hundreds of thousands of illegal Salvadoran aliens already in the United States. This is but one facet of the current crisis in which our country is experiencing a floodtide of illegal immigrants. A grant of 'extended voluntary departure  to the Salvadorans undoubtedly would encourage the migration of many more such aliens.').

202   *See* note 16 *supra*.

203   K. DAVIS, DISCRETIONARY JUSTICE 110 (1969).

204   Hotel & Restaurant Employees Union, Local 25 v. Attorney General, 804 F.2d 1256 (D.C. Cir. 1986).

205   804 F.2d at 1272. Although the court of appeals affirmed the district court's grant of summary judgment to the defendants on the EVD issue, it reversed the district court's grant of summary judgment on the asylum issue. The appellate court found that the district court should have stayed the defendants' motion for summary judgment on the asylum issue, pending completion of discovery on the procedures used to process asylum claims. The court remanded the asylum issue to the district court. 804 F.2d at 1270.

206   804 F.2d at 1271.

207   804 F.2d at 1271.

208   804 F.2d at 1271 (citations omitted).

209   804 F.2d at 1271. The court did contemplate a narrow standard of review for EVD decisions. The majority opinion rejected Judge Silberman's concurring argument that EVD is nonreviewable under the APA because EVD is 'committed to agency discretion by law  within the meaning of 5 U.S.C. § 701(a)(2) (1982). Instead, the majority stated:
We agree that there is no meaningful standard in this case, but decline to insulate all decisions concerning EVD from review on the far reaching theory that they are 'committed to agency discretion by law.  That position would effectively insulate all EVD decisions, even ones that may be animated by illegal discriminatory amimus, from review. Instead, . . . decisions made by the Congress or the President in the area of immigration are subject to a narrow standard of review.
804 F.2d at 1272 (citing Fiallo v. Bell, 430 U.S. 787, 796 (1977); Mathews v. Diaz, 426 U.S. 67, 81 82 (1976)). It appears that the court might limit this review to determinations which are not facially legitimate. *See* 804 F.2d at 1271 72 ('Where Congress has not seen fit to limit the agency's discretion to suspend enforcement of a statute as to particular groups of aliens, we cannot review facially legitimate exercises of that discretion. ).

85 MILR 152

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

1990 U.S.C.C.A.N. 6801-1, 1990 WL 300998 (Leg.Hist.)
**\*6801-1**  P.L. 101-649, IMMIGRATION ACT OF 1990

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

STATEMENT BY PRESIDENT OF THE UNITED STATES

STATEMENT BY PRESIDENT GEORGE BUSH UPON SIGNING S. 358

26 Weekly Compilation of Presidential Documents 1946, December 3, 1990

November 29, 1990

Today I am pleased to sign S. 358, the "Immigration Act of 1990"   the most comprehensive reform of our immigration laws in 66 years. This Act recognizes the fundamental importance and historic contributions of immigrants to our country. S. 358 accomplishes what this Administration sought from the outset of the immigration reform process: a complementary blending of our tradition of family reunification with increased immigration of skilled individuals to meet our economic needs.

The legislation meets several objectives of this Administration's domestic policy agenda   cultivation of a more competitive economy, support for the family as the essential unit of society, and swift and effective punishment for drug-related and other violent crime.

S. 358 provides for a significant increase in the overall number of immigrants permitted to enter the United States each year. The Act maintains our Nation's historic commitment to family reunification by increasing the number of immigrant visas allocated on the basis of family ties.

At the same time, S. 358 dramatically increases the number of immigrants who may be admitted to the United States because of the skills they have and the needs of our economy. This legislation will encourage the immigration of exceptionally talented people, such as scientists, engineers, and educators. Other provisions of S. 358 will promote the initiation of new business in rural areas and the investment of foreign capital in our economy.

I am also pleased to note that this Act facilitates immigration not just in numerical terms, but also in terms of basic entry rights of those beyond our borders. S. 358 revises the politically related "exclusion grounds" for the first time since their enactment in 1952. These revised grounds lift unnecessary restrictions on those who may enter the United States. At the same time, they retain important administrative checks in the interest of national security as well as the health and welfare of U.S. citizens.

Immigration reform began in 1986 with an effort to close the "back door" on illegal immigration through enactment of the 1986 Immigration Reform and Control Act (IRCA). Now, as we open the "front door" to increased legal immigration, I am pleased that this Act also provides needed enforcement authority.

S. 358 meets several objectives of my Administration's war on drugs and violent crime. Specifically, it provides for the expeditious deportation of aliens who, by their violent criminal acts, forfeit their right to remain in this country. These offenders, comprising nearly a quarter of our Federal prison population, jeopardize the safety and well-being of every American resident. In addition, S. 358 improves this Administration's ability to secure the U.S. border   the front

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 45 of 129

lines of the war on drugs   by clarifying the authority of Immigration and Naturalization Service enforcement officers to make arrests and carry firearms.

S. 358 also improves the antidiscrimination provisions of the IRCA. These amendments will help deter discrimination that might be related to the **\*6801-2** implementation of "employer sanctions" under the 1986 law. In this regard, S. 358 helps to remedy unfortunate side effects of this important deterrent to illegal immigration.

In signing this legislation, I am concerned with the provision of S. 358 that creates a new form of relief known as "temporary protected status." The power to grant temporary protected status would be, except as specifically provided, the "exclusive authority" by which the Attorney General could allow otherwise deportable aliens to remain here temporarily because of their nationality or their region of origin. I do not interpret this provision as detracting from any authority of the executive branch to exercise prosecutorial discretion in suitable immigration cases. Any attempt to do so would raise serious constitutional questions.

GEORGE BUSH

The White House
November 29, 1990

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: \*\*\*\*\*. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

1990 U.S.C.C.A.N. 6801-1, 1990 WL 300998 (Leg.Hist.)

 © 20  9 Thomson Reuters. No c a m to or g na  U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

74

STATEMENT OF
PAUL W. VIRTUE, ESQ.

PARTNER, BAKER & MCKENZIE, LLP

OVERSIGHT HEARING ON U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT:
PRIORITIES AND THE RULE OF LAW

BEFORE THE
U.S. HOUSE OF REPRESENTATIVES
COMMITTEE ON THE JUDICIARY

Wednesday, October 12, 2011 – 3:00 p.m.
Room 2141 Rayburn House Office Building

CAR 0957

75

## Introduction

Chairman Smith, Ranking Member Conyers and Members of the House Judiciary
Committee, I am honored to testify before you today on the important issue of
immigration enforcement priorities.  Having served as Deputy General Counsel,
Executive Associate Commissioner and General Counsel, respectively, of the United
States Immigration and Naturalization Service (INS) I have a good understanding of the
challenges facing United States Immigration and Customs Enforcement (ICE) in
managing its resources to promote homeland security and public safety through the
enforcement of federal laws governing border control, customs, trade and immigration.

In June 2010, John Morton, the director of ICE, explained that given present funding
levels, the maximum capacity of the removal system is about "400,000 aliens per year,
less than 4 percent of the illegal alien population in the United States."[1]  Recognizing that
resources are finite, the Department of Homeland Security (DHS) and ICE, like their
predecessor agencies before them, must prioritize the use of those resources in order to
fulfill their mission.

The process of establishing enforcement priorities necessarily involves identifying
characteristics that make some cases a higher priority than others.  In other words, there
are necessarily some trade offs.  For example, the decision by INS during the 1990s to
focus on the removal of aliens who have been convicted of crimes resulted in a lower
priority and fewer resources being applied to worksite enforcement operations.  The same
is true today.  Even at the seemingly high rate of 400,000 removals per year, judgments
have to be made on a case-by-case basis to ensure that the goals of homeland security,
border protection and public safety are being met.

My testimony will focus on the legal authority for the exercise of prosecutorial discretion
in the removal of noncitizens and the reasonableness and legality of the recent DHS
guidelines for the exercise of that discretion.  While the focus of this hearing is the
memoranda issued last summer by ICE and DHS, these guidelines are only the latest in a
long tradition of outlining the factors to be considered in exercising prosecutions
discretion.  The uniform application of such guidelines to law enforcement decisions is,
in my view, as important to good government as the authority to arrest, detain, charge and
remove non-citizens.

---

[1] *See* Memorandum From John Morton, Assistant Secretary, U.S. Immigration & Customs Enforcement, on
Civil Immigration Enforcement (June 30, 2010), *available at* http://www.ice.gov/doclib/detention-
reform/pdf/civil_enforcement_priorities.pdf. This memo was reissued in March 2011, to include a
disclaimer that it does not create any enforceable rights or benefits. *See* Memorandum From John Morton,
Assistant Secretary, U.S. Immigration & Customs Enforcement, on Civil Immigration Enforcement (March
2, 2011), *available at* http://www.ice.gov/doclib/news/releases/2011/110302washingtondc.pdf

1

CAR 0958

76

**Prosecutorial Authority**

The number of criminal aliens who have been removed has risen sharply in recent years. According to the DHS Office of Immigration Statistics presented in Table 1, the number of criminal aliens removed from the United States has gone from 73,298 in 2001 to 168,532 in 2010. These numbers constitute a 138% increase in the removal of criminal aliens over the past decade. Criminal aliens made up 44% of all removals in 2010, the largest portion of removals since 2002.[2]

Despite the significant allocation of resources Congress has dedicated to immigration enforcement activities, the funding has limits and the agency must make thoughtful decisions about prosecutorial priorities in order to make effective use of available resources. The President has repeatedly announced that the Administration's interior enforcement priority is the prosecution and removal of immigrants who have committed serious crimes. To ensure that this and other prioritization decisions are followed and implemented, it is not uncommon for law enforcement agencies within and outside of the immigration context to provide clear guidance and training to its officers about the exercise of prosecutorial discretion. This type of guidance is not unusual. In fact, numerous memos have been issued by the DHS and its predecessor INS over the years setting forth agency priorities and seeking to provide officers with clear guideposts for carrying out those priorities. The challenge is often in ensuring that such guidance is understood and followed on the frontlines of immigration enforcement.

The authority of law enforcement agencies to exercise discretion in deciding what cases to investigate and prosecute under existing civil and criminal law, including immigration law, is fundamental to the American legal system. Every prosecutor and police officer in the nation makes daily decisions about how to allocate enforcement resources, based on judgments about which cases are the most egregious, which cases have the strongest evidence, which cases should be settled and which should be brought forward to trial. Border Patrol agents, Immigration officers and DHS attorneys must do the same every day.

The Supreme Court has made it clear that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."[3]  The Court writes:

> The reasons for this general unsuitability are many.  First, an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and,

---

[2] See testimony of Ruth Ellen Wasem, Specialist in Immigration Policy, Congressional Research Service, October 4, 2011, Committee on Homeland Security, Subcommittee on Border and Maritime Security, data from DHS Office of Immigration Statistics Yearbook, 2010, table 38.
[3] Heckler v. Chaney 470 U.S. 821, 831 (1985).

CAR 0959

77

> indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities. . . . Finally, we recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict -- a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to "take Care that the Laws be faithfully executed."
> U.S.Const., Art. II, § 3.

[470 U.S. 831, 832]. It bears noting that the Supreme Court cares so deeply about administrative discretion and expertise in this area that it invoked it in a case involving the FDA's decision to not regulate at all the drugs used to execute a human being.

Since its enactment in 1952, the Immigration and Nationality Act has given the Attorney General and more recently the Secretary of Homeland Security prosecutorial discretion to exercise the power to remove foreign nationals. In 1959, a major textbook of immigration law wrote, "Congress traditionally has entrusted the enforcement of its deportation policies to executive officers and this arrangement has been approved by the courts."[4] Generally, prosecutorial discretion is the authority that an enforcement agency has in deciding whether to enforce or not enforce the law against someone. In the immigration context, prosecutorial discretion exists across a range of decisions that include: prioritizing certain types of investigations; deciding whom to stop, question and arrest; detaining an alien; issuing a notice to appear (NTA); granting deferred action; agreeing to allow the alien to depart voluntarily; and executing a removal order.

Prosecutorial discretion is normally exercised on a case-by-case basis with respect to individuals who have come into contact with law enforcement authorities. The government can also exercise prosecutorial discretion by allowing individuals from explicitly defined groups that it does not consider to be enforcement priorities to ask affirmatively that discretion be applied in their case. Examples include Temporary Protected Status and Deferred Enforced Departure. This exercise of executive authority is not contrary to current law, but rather a matter of the extension and application of current law to contemporary national needs, values and priorities.

**Guidance for the Exercise of Prosecutorial Discretion**

As early as 1975, legacy INS issued guidance on a specific form of prosecutorial discretion known as deferred action, which cited "appealing humanitarian factors." The initial guidelines used by INS to grant deferred action status, originally known as "nonpriority enforcement status," came to light in the midst of INS attempts to remove

---

[4] Charles Gordon and Harry N. Rosenfield, *Immigration Law and Procedure*, Albany, New York: Banks and Company, 1959, p. 406.

3

CAR 0960

78

former Beatle John Lennon for a British drug conviction.[5] Those granted deferred action may obtain work authorization upon a showing of need, 8 C.F.R. § 274a.12(c)(14), but they receive few other benefits. They have no family reunification rights, and the status is subject to withdrawal at any time. Significantly, a grant of deferred action will not allow a person to adjust their status to that of a lawful permanent resident and also will not cure any prior accrual of unlawful presence for purposes of the three- and ten-year bars on future admission imposed by INA § 212(a)(9)(B).

The executive branch, through the Secretary of Homeland Security, can exercise discretion not to prosecute a case by granting "deferred action" to an otherwise removable non-citizen. The former INS had guidelines in the form of "Operations Instructions" regarding the granting of deferred action. These guidelines provided for deferred action in cases where "adverse action would be unconscionable because of the existence of appealing humanitarian factors."[6] Currently, deferred action is considered to be "a discretionary action initiated at the discretion of the agency or at the request of the alien, rather than an application process."[7]

DHS has also described deferred action as an exercise of agency discretion that authorizes an individual to temporarily remain in the U.S. Regulations describe deferred action as "an act of administrative convenience to the government which gives some cases lower priority" (for enforcement action).[8] DHS has stated in recent correspondence with the Hill that factors to be considered in evaluating a request for deferred action include the presence of sympathetic or compelling factors.

Deferred action does not confer any specific status on the individual and can be terminated at any time pursuant to the agency's discretion. DHS regulations, however, do permit deferred action recipients to be granted employment authorization upon establishing an economic necessity to work.[9]

Deferred action determinations are made on a case-by-case basis, but eligibility for such discretionary relief can be extended to individuals based on their membership in a discrete class. For example, in June 2009, the Secretary of DHS granted deferred action to individuals who fell in to the following class: widows of U.S. citizens who were unable to adjust their status due to a statutory restriction (related to duration of marriage

---

[5] *See* Wildes, *The Nonpriority Program of the Immigration and Naturalization Service Goes Public: The Litigative Use of the Freedom of Information Act*, 14 San Diego L. Rev. 42, 42–49 (1976). Lennon escaped deportation (but based on judicial interpretation of the removal ground with which he was charged) and eventually became a lawful permanent resident. *Lennon v. INS*, 527 F.2d 187 (2d Cir. 1975).
[6] *See* (Legacy) Immigration and Naturalization Service, Operations Instructions, O.I. § 103.1(a)(1)(ii)(1975).
[7] (See *"Response to Recommendation #32, Deferred Action"*, August 7, 2007, at http://www.dhs.gov/xlibrary/assets/cisombudsman_rr_32_o_deferred_action_uscis_response_08-07-07.pdf.
[8] 8 C.F.R. 274a.12(c)(14).
[9] *Id.*

4

CAR 0961

79

at time of sponsor's death).[10] Congress subsequently enacted a change in the law to address this particular problem.

Another recent example of the exercise of such executive authority to a class is the grant of deferred action to VAWA (Violence Against Women Act) applicants whose cases were awaiting the promulgation of regulations by DHS. Nearly 12,000 individuals were granted deferred action in 2010 under this exercise of executive authority.

Another specific form of prosecutorial discretion is a stay of removal, which would be issued at a later step in the process, after a removal order. In practical effect, it can provide the same type of relief to noncitizens as deferred action. Though a discretionary stay of removal was traditionally used to give the noncitizen a reasonable amount of time to make arrangements prior to removal, or to forestall removal pending the outcome of a motion to reopen removal proceedings, it can be used more broadly, as rough equivalent to deferred action for persons who already have an order of removal.

In 1986, Congress made deporting aliens who had been convicted of certain crimes an enforcement priority. The Immigration Reform and Control Act of 1986 (IRCA) required the Attorney General "In the case of an alien who is convicted of an offense which makes the alien subject to deportation … [to] begin any deportation proceeding as expeditiously as possible after the date of the conviction."[11] Between 1988 and 1996, Congress enacted a series of measures, including the Illegal Immigrant Reform and Immigrant Responsibility Act of 1996 (P.L. 104-208), expanding the definition of aggravated felons, creating additional criminal grounds for removal and substantially cutting back on relief from removal.[12]

Publicity surrounding a number of highly sympathetic cases that earlier would have generated a grant of relief prompted some 28 members of the House to write a letter to the Attorney General and INS Commissioner Doris Meissner calling attention to the existence of cases where removal was "unfair and resulted in unjustifiable hardship." The signatories included some of the leaders in adopting the restrictive 1996 legislation. They urged the adoption of guidelines for the use of prosecutorial discretion to avoid the hardship inflicted in such cases. 76 Interp. Rel. 1720 (1999).

In November 2000, Meissner issued a memorandum to INS field offices[13] with guidance on prosecutorial discretion, explaining:

---

[10] See "Guidance Regarding Surviving Spouse of Deceased U.S. Citizens and their Children", June 15, 2009, at http://www.uscis.gov/USCIS/Laws/Memoranda/2009/June%202009/surviving-spouses-deferred-action-guidance.pdf.

[11] P.L. 99-603, §701.

[12] Anti-Drug Abuse Act of 1988 (P.L. 100-690); Immigration Act of 1990, P.L. 101-649 (1990); Immigration and Nationality Technical Correction Act of 1994, P.L. 103-416 (1994); Antiterrorism and Effective Death Penalty Act of 1996, P.L. 104-132 (1996); Illegal Immigrant Reform and Immigrant Responsibility Act of 1996, P.L. 104-208, Div. C (1996).

[13] Doris Meissner, Commissioner of the Immigration and Naturalization Service, *Exercising Prosecutorial Discretion*, memorandum to regional directors, district directors, chief patrol agents, and the regional and district counsels, November 7, 2000.

CAR 0962

80

Service officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process—from planning investigations to enforcing final orders. * * * [Furthermore] INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial.

77 Interp. Rel. 1661 (2000). The memo, a first draft of which I authored while INS General Counsel, identified factors to be considered in the exercise of prosecutorial discretion, including immigration history and status, length of stay in the United States, criminal history, humanitarian concerns, likelihood of ultimately removing the alien, likelihood of achieving the enforcement goal by other means, the effect on future admissibility, cooperation with law enforcement officials, community attention, U.S. military service, and available INS resources.

Meissner further stated that prosecutorial discretion should not become "an invitation to violate or ignore the law." She concluded by citing the "substantial federal interest" principle governing the conduct of U.S. Attorneys when determining whether to pursue criminal charges in a particular instance, and claimed that this principle was pertinent to immigration removal decisions as well. According to the memorandum, immigration enforcement officers "must place particular emphasis on the element of substantiality. How important is the Federal interest in the case, as compared to other cases and priorities?"

In an October 24, 2005 memorandum, then-ICE Principal Legal Advisor William Howard cited several policy factors on needs to exercise prosecutorial discretion. Another issue Howard raised was resources, as he pointed out that the Office of Principal Legal Advisor (OPLA) was "handling about 300,000 cases in the immigration courts, 42,000 appeals before the Board of Immigration Appeals (BIA or Board) and 12,000 motions to re-open each year." He further stated:

Since 2001, federal immigration court cases have tripled. That year there were 5,435 federal court cases. Four years later, in fiscal year 2004, that number had risen to 14,699 federal court cases. Fiscal year 2005 federal court immigration cases will approximate 15,000.

AILA InfoNet Doc. No. 11100463. (Posted 10/04/11).

Howard offered examples of the types of cases to consider for prosecutorial discretion, such as someone who had a clearly approvable petition to adjust to legal permanent resident status, someone who was an immediate relative of military personnel, or

CAR 0963

81

someone for whom sympathetic humanitarian circumstances "cry for an exercise of prosecutorial discretion."[14]

In November 2007, then-DHS Assistant Secretary Julie L. Myers issued a memorandum in which she clarified that the replacement of the "catch and release" procedure with the "catch and return" policy for apprehended aliens (i.e., a zero-tolerance policy for all aliens apprehended at the border) did not "diminish the responsibility of ICE agents and officers to use discretion in identifying and responding to meritorious health-related cases and caregiver issues."

**Current DHS Guidelines**

On June 17, 2011, John Morton, Director of Immigration and Customs Enforcement, issued two memoranda to agency personnel clarifying the role of prosecutorial discretion in immigration agency enforcement actions. The two memoranda serve to clarify the role of prosecutorial discretion in immigration enforcement actions. Neither document represents in any respect a change to existing law or departure from permissible policy, but instead clarifies responsibilities inherent in the exercise of prosecutorial discretion.

The first memorandum, "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens," builds upon prior prosecutorial discretion guidance reaching back to 1976 and outlines the nature of prosecutorial discretion, the personnel empowered to exercise discretion, and both positive and negative factors to consider in deciding whether to proceed with an immigration enforcement action against an individual. The memorandum provides, in pertinent part, as follows:

> In the civil immigration enforcement context, the term "prosecutorial discretion" applies to a broad range of discretionary enforcement decisions, including but not limited to the following:
>
> • deciding to issue or cancel a notice of detainer;
> • deciding to issue, reissue, serve, file, or cancel a Notice to Appear (NTA);
> • focusing enforcement resources on particular administrative violations or conduct;
> • deciding whom to stop, question, or arrest for an administrative violation;
> • deciding whom to detain or to release on bond, supervision, personal recognizance, or other condition;
> • seeking expedited removal or other forms of removal by means other than a formal removal proceeding in immigration court;
> • settling or dismissing a proceeding;

---

[14] William J. Howard, Principal Legal Advisor, U.S. Immigration and Customs Enforcement, *Prosecutorial Discretion*, memorandum to all Office of the Principal legal Advisor Chief Counsel, October 24, 2005.

7

CAR 0964

82

- granting deferred action, granting parole, or staying a final order of removal;
- agreeing to voluntary departure, the withdrawal of an application for admission, or other action in lieu of obtaining a formal order of removal;
- pursuing an appeal;
- executing a removal order; and
- responding to or joining in a motion to reopen removal proceedings and to consider joining in a motion to grant relief or a benefit.

*****

When weighing whether an exercise of prosecutorial discretion may be warranted for a given alien, ICE officers, agents, and attorneys should consider all relevant factors, including, but not limited to—

- the agency's civil immigration enforcement priorities;
- the person's length of presence in the United States, with particular consideration given to presence while in lawful status;
- the circumstances of the person's arrival in the United States and the manner of his or her entry, particularly if the alien came to the United States as a young child;
- the person's pursuit of education in the United States, with particular consideration given to those who have graduated from a U.S. high school or have successfully pursued or are pursuing a college or advanced degrees at a legitimate institution of higher education in the United States;
- whether the person, or the person's immediate relative, has served in the U.S. military, reserves, or national guard, with particular consideration given to those who served in combat;
- the person's criminal history, including arrests, prior convictions, or outstanding arrest warrants;
- the person's immigration history, including any prior removal, outstanding order of removal, prior denial of status, or evidence of fraud;
- whether the person poses a national security or public safety concern;
- the person's ties and contributions to the community, including family relationships;
- the person's ties to the home country and condition~ in the country;
- the person's age, with particular consideration given to minors and the elderly;
- whether the person has a U.S. citizen or permanent resident spouse, child, or parent;
- whether the person is the primary caretaker of a person with a mental or physical disability, minor, or seriously ill relative;
- whether the person or the person's spouse is pregnant or nursing;
- whether the person or the person's spouse suffers from severe mental or physical illness;
- whether the person's nationality renders removal unlikely;

8

83

• whether the person is likely to be granted temporary or permanent status or other relief from removal, including as a relative of a U.S. citizen or permanent resident;

• whether the person is likely to be granted temporary or permanent status or other relief from removal, including as an asylum seeker, or a victim of domestic violence, human trafficking, or other crime; and

• whether the person is currently cooperating or has cooperated with federal, state or local law enforcement authorities, such as ICE, the U.S. Attorneys or Department of Justice, the Department of Labor, or National Labor Relations Board, among others.

This list is not exhaustive and no one factor is determinative. ICE officers, agents, and attorneys should always consider prosecutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities.

That said, there are certain classes of individuals that warrant particular care. As was stated in the Meissner memorandum on Exercising Prosecutorial Discretion, there are factors that can help ICE officers, agents, and attorneys identify these cases so that they can be reviewed as early as possible in the process.

The following positive factors should prompt particular care and consideration:

• veterans and members of the U.S. armed forces;
• long-time lawful permanent residents;
• minors and elderly individuals;
• individuals present in the United States since childhood;
• pregnant or nursing women;
• victims of domestic violence, trafficking, or other serious crimes;
• individuals who suffer from a serious mental or physical disability; and
• individuals with serious health conditions.

In exercising prosecutorial discretion in furtherance of ICE's enforcement priorities, the following negative factors should also prompt particular care and consideration by ICE officers, agents, and attorneys:

• individuals who pose a clear risk to national security;
• serious felons, repeat offenders, or individuals with a lengthy criminal record of any kind;
• known gang members or other individuals who pose a clear danger to public safety; and
• individuals with an egregious record of immigration violations, including those with a record of illegal re-entry and those who have engaged in immigration fraud.

9

CAR 0966

84

The second memorandum, "Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs," locates the use of prosecutorial discretion within specific enforcement situations involving witnesses or victims of crimes who may be eligible for immigration benefits. This memo largely serves as a reminder to ICE personnel that it is generally against ICE policy to initiate removal proceedings against such persons, even if they are encountered as a result of programs such as Secure Communities.

As noted, neither memorandum changes any law, nor does either provide any new form of relief to persons here in violation of the immigration laws. The first, more general memo simply emphasizes that the exercise of discretion in determining whether to initiate or terminate an action must be guided by an understanding of existing agency priorities. The memo explains that limited agency resources require ICE personnel to consider whether prosecution of an individual case is consistent with the agency's priorities of promoting national security, border security, public safety, and the integrity of the immigration system. The memo does not dictate a particular result in any case or category of cases; instead it encourages ICE personnel to consider a wide range of positive and negative factors, to review charging decisions made by other agencies as appropriate, and to act affirmatively in appropriate cases. Thus, the primary effect of the memo, if followed by ICE personnel, will be to empower individual officers and attorneys to act in the best interests of the agency by limiting the prosecution of cases that do not fit within the agency's stated priorities, allowing the agency to focus more specifically on individuals who do fit within those priorities.

Similarly, the second memo on treatment of victims and witnesses creates no new requirements or obligations for ICE personnel. Instead, the memo serves as a reminder of the special immigration benefits authorized by Congress for victims or witnesses of crime who cooperate with law enforcement and the possible conflict with Congress's purposes in authorizing those benefits that may occur if removal proceedings are initiated against such individuals.

On August 18, 2011, in a letter to Senator Dick Durbin and 21 other Senators, DHS Secretary Janet Napolitano announced a new process for implementation of the June 17, 2011, prosecutorial discretion memorandum. The letter included a background two-pager that summarized DHS efforts to date at establishing enforcement priorities and described the role of a new interagency working group tasked with reviewing individual cases currently in removal proceedings as well as issuing guidance for the introduction of new cases:

> On August 18, 2011, DHS unveiled a new interagency process to ensure that resources are focused on the Administration's highest enforcement priorities. As part of this process, an interagency team of DHS and Department of Justice (DOJ) officers and attorneys, including representatives from throughout DHS and from the Executive Office for Immigration Review (EOIR) and the Office of Immigration Litigation at DOJ, will identify low-priority removal cases that should be considered for an exercise of discretion. This review will be conducted on a case-by-case basis and will consider cases that are at the various stages of

10

CAR 0967

52 U. Chi. L. Rev. 653

University of Chicago Law Review
Summer, 1985

*Cass R. Sunstein* [a]

Copyright 1985 by The University of Chicago; Cass R. Sunstein

# REVIEWING AGENCY INACTION AFTER *HECKLER v. CHANEY*

Of the many innovations in modern administrative law, the recognition of a private right to initiate administrative action may be the most important. In the last twenty years, courts have made substantial inroads on principles of prosecutorial discretion, which have traditionally shielded agency inaction from judicial review. For example, courts have required agencies to promulgate rules, [2] to issue regulatory standards, [3] and to undertake enforcement activity. [4] These rulings are part of a more general movement in public law doctrine, which has abandoned the traditional focus on private autonomy in favor of an effort to ensure the identification and implementation of the values set out in the governing statute. [5]

**\*654** The Supreme Court itself has had little occasion to evaluate this trend. In *Dunlop v. Bachowski*, [6] decided a decade ago, the Court held that the decision of the Secretary of Labor not to file suit to set aside a union election was subject to judicial review, but the most difficult issue raised by the case was disposed of in an obscure footnote. [7] It was thus not until its recent decision in *Heckler v. Chaney* [8] that the Court set out some general conclusions on the reviewability of agency inaction. Those conclusions prompted a vigorous separate opinion from Justice Marshall, who expressed concern that the Court had created a "presumption of unreviewability"[9] that endangered "a firmly entrenched'" body of law providing judicial review of agency refusals to act. [0]

There is little risk in predicting that the rationale and reach of the *Chaney* decision will provoke considerable controversy in the courts and elsewhere. This article explores the implications of *Chaney* for judicial review of agency enforcement decisions, attempting in the process to develop a set of guidelines for resolving claims of unlawful administrative inaction. That inquiry will be based on an analysis of the role of regulatory agencies and reviewing courts in the modern era.

## I. REVIEWABILITY: A PRIMER

Under the Administrative Procedure Act (APA), agency action is generally subject to judicial review. The presumption of reviewability is reflected in the legislative history of the APA, [2] producing the understanding, frequently repeated by the courts, that statutes will not be held to preclude review unless there is "clear **\*655** and convincing'" evidence that Congress intended to do so. [3]

The presumption of reviewability under the APA is based on a set of considerations, loosely captured in the notion of the rule of law, that relate to the perceived need to constrain the exercise of discretionary power by administrative agencies. [4] Judicial review serves important goals in promoting fidelity to statutory requirements and, where those requirements are ambiguous or vague, in increasing the likelihood that the regulatory process will be a reasonable exercise of discretion instead of a bow in the direction of powerful private groups. [5]

These concerns are especially powerful in light of the awkward constitutional position of the administrative agency. The absence of the ordinary safeguards of electoral accountability and separation of powers has generated, in the administrative context, especially intense fears of factional influence over governmental processes and of decision free from public scrutiny and review. Such fears were a prime reason behind the nondelegation doctrine. [6] After the demise of that doctrine, [7] surrogate safeguards   judicial *656 review prominent among them   have been developed to protect the coherence and the integrity of the regulatory process. [8]

In this regard it is important to keep in mind the fact, traditionally overlooked in discussions of judicial review of agency action, [9] that the availability of review will often serve as an important constraint on regulators during the decisionmaking process long before review actually comes into play. The prospect of review increases the likelihood of fidelity to substantive and procedural norms   a fact that will be missed if one focuses only on the reported cases, where, to be sure, the courts make their share of mistakes. [20]

The concerns that support the APA's presumption of reviewability appear no less applicable to review of inaction than to review of action. Review at the behest of statutory beneficiaries may perform a critical function in ensuring against unduly lax enforcement that would violate statutory requirements. Such requirements may be undone through inadequate implementation as well as through overzealous enforcement. In both contexts, judicial review serves to vindicate the will of Congress as against the executive branch and may guard against the undue influence of powerful private groups over the regulatory process. [2] In the case of inaction, as well as in that of action, it is appropriate to take into account *657 the deterrent effect of the prospect of review on administrators during the implementation process. The affirmative case for judicial review thus appears identical in the two contexts.

On its face, moreover, the APA treats agency inaction the same as agency action. Indeed, the statute defines agency action to include "failure to act" [22] and says that courts shall "compel agency action unlawfully withheld or unreasonably delayed." [23] But it would be a mistake to understand this language as an across-the-board repudiation of principles of prosecutorial discretion. To understand how those principles interact with the APA, it is necessary to explore the exceptions to the general rule of reviewability.

The APA provides that agency decisions are unreviewable in two categories of cases: (1) those in which the statute precludes review, [24] and (2) those in which agency action "is committed to agency discretion by law." [25] The first exception is not difficult to understand, though in particular cases it may be difficult to decide whether there has been statutory preclusion of review. [26] The second exception creates two puzzles. First, a conclusion that agency action is committed to agency discretion "by law" appears substantially identical to a conclusion that a statute has precluded review. Second, there is an obvious tension between the idea that some exercises of discretion are unreviewable [27] and the fact that the APA allows courts to review agency action for "abuse of discretion." [28]

In *Citizens to Preserve Overton Park, Inc. v. Volpe*, [29] the Supreme Court attempted to resolve both of these puzzles. According to the Court, the "'committed to agency discretion'" exception precludes review "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" [30] This interpretation, based on the legislative history of the APA, *658 has provoked sharp criticism. [3] As we shall see, however, the Court's interpretation is consistent with sensible understandings of when agency action should be subject to judicial supervision.

The principal question raised by *Overton Park* is how one decides whether, in a given case, there is "law to apply." The answer turns on two considerations   one familiar, the other frequently ignored. The familiar consideration is the governing substantive statute, which is the major source of the "law to apply." *Overton Park* itself illustrates the point.

The issue there was the legality of a decision by the Secretary of Transportation to approve the building of an interstate highway through a park in Memphis, Tennessee. The Court concluded that there was "law to apply"' because the statute provided that the Secretary "'shall not approve"' construction through a public park unless "no feasible and prudent"' alternative was available. That provision imposed constraints on the Secretary's decision by which a court might assess its legality. [32] The same conclusion is appropriate with respect to the great proportion of administrative law cases, at least in the context of review of action. Governing statutes almost always set out standards by which to assess the legality of agency behavior or to evaluate a claim of arbitrariness.

The second consideration in deciding whether there is "law to apply"' is the precise allegation made by the plaintiff. The importance of this point cannot be overstated, particularly in the context of review of agency inaction. For example, if a plaintiff claims that an agency has taken constitutionally impermissible factors into account, there is always "law to apply"'  no matter what the governing statute may say. [33] Similarly, if the plaintiff alleges that the agency's conduct has been based on factors that are irrelevant under the governing statute, there is always law to apply, even if the agency has especially broad discretion in weighing those factors that are statutorily relevant. [34] Judicial evaluation of these claims will be equally straightforward whether the government has chosen to take or to refrain from taking enforcement action on the basis of these factors. On the other hand, if the plaintiff makes a generalized claim of agency "arbitrariness"' in failing to act, there may sometimes be no judicially administrable standards by which to assess **\*659** the claim. [35] The central point is that the "law to apply"' inquiry can be made coherent only by measuring the plaintiff's allegation against the governing substantive statute. There may be review with respect to one allegation, but no review with respect to another, under the same statute.

Understood in these terms, the *Overton Park* test for reviewability  the "law to apply"' inquiry  looks very much like a decision on the merits. Once one has said that an action is unreviewable because there are no legal constraints on the exercise of discretion with respect to the particular allegation, one might as well say that, with respect to that allegation, there is no legal violation. In this respect, the distinction between a conclusion that a decision is not reviewable and a conclusion that a decision is lawful is easy to collapse. [36] In both cases, one is saying the same thing: that the governing statute does not impose legal constraints on the action at issue.

The APA does, however, distinguish the issue of reviewability from that of the merits, and so long as the underlying considerations are understood, the distinction need not cause significant difficulties. The important point is that agency actions are "committed to agency discretion by law"' whenever the governing statute imposes no legal constraints on the agency with respect to the particular allegation made by the plaintiff. [37]

The framework provided by *Overton Park* thus provides courts with workable standards for deciding the reviewability of both agency action and agency inaction. Since *Overton Park*, the Supreme Court and lower courts have used these standards to review agency enforcement decisions. [38] The mere fact that inaction is **\*660** involved is insufficient to preclude review; inaction, no less than action, might be unlawful. The question turns on the nature of the governing statute and of the plaintiff's allegation.

Despite *Overton Park* and its progeny, one might readily have predicted that the Supreme Court would not be entirely receptive to efforts to obtain judicial review of the enforcement decisions of administrative agencies. In a number of areas of administrative law, the Court has recently confined the supervisory role of the federal courts, especially in suits brought by the beneficiaries of regulatory statutes. For example, the Court has held that federal courts may not impose procedural requirements on administrative agencies beyond those set out in the APA. [39] The Court also has slightly weakened the ordinary presumption of reviewability of agency action by lowering the standard required to demonstrate congressional intent to preclude judicial review. [40] In addition, the Court has stated that courts should accord considerable deference to executive constructions of regulatory statutes whenever "Congress has not directly addressed the precise question

at issue.'" [4]   Finally, the Court has indirectly limited the role of judicial review through the doctrine of standing. In a decision of particular importance, the Court held that parents of children attending segregated schools did not have standing to challenge the failure of the IRS to deny tax-exempt status to private schools that discriminated on the basis of race. [42]  Relying in part on the "take Care'" clause, [43]  the Court concluded that separation-of-powers concerns require plaintiffs seeking a "restructuring'" of executive-branch operations to  **\*661**  meet especially stringent standing requirements. [44]

This is not to say that the recent cases form an unbroken line of deference to executive authority. In one case, the Court applied the "hard-look'" doctrine [45]  with considerable rigor, overturning an administrative decision to rescind an existing regulatory standard. [46]  And elsewhere the Court has shown a willingness to supervise the regulatory process with some care. [47]  But the basic pattern is unmistakable. The Court's decisions reflect skepticism about the appropriateness of judicial supervision of the regulatory process at the behest of statutory beneficiaries. [48]  Such skepticism has resulted in a willingness either to deny review entirely or to restrict its scope, often through "clear statement'" principles of statutory construction. [49]  It was against this background that the Supreme Court decided *Heckler v. Chaney*.

## II. THE *Chaney* DECISION

The *Chaney* case involved a suit by inmates on death row to require the Food and Drug Administration (FDA) to take enforcement action to prevent particular drugs from being used in executions by lethal injection. [50]  The FDA had approved the drugs at issue for some purposes, but not for use in executions. The inmates contended that the drugs had not been tested and labeled for use in human executions and that in the hands of untrained personnel the drugs would cause "torturous pain'" rather than the intended quick and painless death. [5]   According to the inmates, the use of the drugs in human execution thus violated the "misbranding'" and  **\*662**  "new drug'" provisions of the Food, Drug and Cosmetic Act. [52]  The FDA had declined to act, claiming that it did not have jurisdiction over the use of drugs for human execution [53]  and that, even if it did, it had the "'inherent discretion"DD" not to act unless there was "'a serious danger to the public health or a blatant scheme to defraud."DD" [54]  According to the FDA, neither of the conditions that would require action was present in *Chaney*.

The Supreme Court, in an opinion by Justice Rehnquist, held that the FDA's inaction was an unreviewable exercise of prosecutorial discretion. [55]  In thus reversing the decision of the court of appeals, the Court said that there was often "no law to apply'" to enforcement decisions. Such decisions should therefore be presumed unreviewable under the "committed to agency discretion'" exception to the general rule of reviewability under the APA. [56]

The Court marshaled four considerations in favor of this conclusion. First, it said that because of limited administrative resources, agencies must evaluate a wide range of factors in setting enforcement priorities and that such decisions are ill-suited to judicial review. [57]  Second, it observed that "when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect.'" [58]  Third, it indicated that inaction, unlike action, does not provide a focus for judicial review. [59]  Fourth, it said that "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict'"   a decision that, the Court noted, is entrusted to the executive under the "take Care'" clause of article II. [60]

In the Court's view, these considerations were sufficient to justify a "'conclusion that an agency's decision not to take enforcement action should be presumed immune from judicial review."' [6]   But the Court emphasized that the

presumption could be rebutted **663** "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."[62] The Court found that the presumption of unreviewability had not been rebutted in *Chaney* because the Food, Drug and Cosmetic Act provided no statutory constraints on the exercise of discretion.[63] The Court distinguished *Dunlop v. Bachowski*[64] on this ground. In that case, the Court said, the Labor-Management Reporting and Disclosure Act required the Secretary of Labor to file suit if certain "clearly defined" factors were present, and this requirement was an adequate basis for judicial review.[65]

The result in *Chaney* is easy to defend. The FDA's failure to investigate the unapproved use of the drugs was not constrained by the governing statute. There were various possible sources of statutory and regulatory "law" in *Chaney*, but the Court was probably correct in concluding that none formed a sufficient basis for judicial review. The court of appeals had relied on a policy statement indicating that the agency considered itself "obligated" to act against unapproved uses of approved drugs,[66] but the statement was ambiguous and was in any event appended to a rule that the agency never adopted.[67] The plaintiffs had also invoked a provision in the substantive statute stating that the Secretary of Health and Human Services need not prosecute "minor violations" if she "believes that the public interest will be adequately served by a suitable written notice."[68] They argued for the negative implication that this provision was intended to require prosecution of "major" violations. But the Supreme Court read the provision as applicable to situations in which a violation had already been established to the agency's satisfaction, not as an effort to require investigation of possible violations.[69] Furthermore, the plaintiff's allegations did **664** not indicate specific deficiencies in agency decisionmaking that distinguished their claim from that of many others who could assert an interest in how the FDA's investigatory authority is used.[70] The plaintiffs were thus left with precisely the kind of generalized claim of "arbitrariness" that is often so difficult to sustain.[7]

On all this the Court was unanimous. The controversial character of the decision stems from the adoption of a seemingly broad presumption against review of enforcement decisions. Justice Brennan issued a short concurrence, noting that the majority opinion left open the possibility that agency inaction might be reviewable in a wide variety of circumstances.[72] In an extensive separate concurrence, Justice Marshall took issue with the Court's creation of a "presumption of unreviewability" for enforcement decisions. In his view, decisions not to act will frequently survive on the merits, largely for the reasons identified by the Court. But that conclusion should not imply a refusal to review the particular bases for inaction    review that will generally serve as a safeguard against "caprice and lawlessness."[73] In Justice Marshall's view, the traditional principles of prosecutorial discretion are inconsistent with "one of the very purposes fueling the birth of administrative agencies"   the "reality that governmental refusal to act could have just as devastating an effect upon life, liberty, and the pursuit of happiness as coercive governmental action."[74] The FDA's conduct in *Chaney*, according to Justice Marshall, was lawful only because it was reasonable on the merits.

### *665  III. THE LIMITS OF "PROSECUTORIAL DISCRETION" IN THE REGULATORY STATETE

The *Chaney* Court's presumption against judicial review of agency enforcement decisions is based on principles of "prosecutorial discretion." Prosecutorial discretion has traditionally been thought to immunize decisions of criminal prosecutors from judicial review;[75] it has sometimes been extended to the administrative context, shielding agency inaction from legal control.[76] As Justice Marshall emphasized in *Chaney*, these principles are at odds with the general presumption of reviewability.

Judicial control of agency inaction has its origins in the law of mandamus, which allows courts to compel "nondiscretionary" agency decisions.[77] In an early case, however, the Supreme Court held that the federal courts had no general mandamus authority.[78] That authority has now been conferred on the courts by statute,[79] but

"discretionary" decisions are immunized from judicial review. [80] This state of affairs, in conjunction with standing limitations, [8] explains why judicial review of agency inaction has generally occurred under the APA rather than the federal mandamus statute. [82] Under the APA, however, the *Chaney* Court's invocation of prosecutorial discretion does not justify the adoption of a presumption against review. This conclusion becomes apparent by scrutinizing the four central considerations on which refusal to review agency inaction is based: judicial solicitude for private rights, deference to executive discretion, the existence of alternative remedies, and various prudential concerns. Whatever their original merit, these considerations no longer carry significant weight. [83]

**\*666  A. Judicial Solicitude for Private Rights**

The original role of judicial review of administrative conduct was based on two related understandings. The first was that market ordering within the constraints of the common law was normal and natural. [84] In light of this assumption, government intervention in the market appeared exceptional and was subject to special judicial control. For this reason, courts adopted what was in effect a one-way ratchet, consisting of legally enforceable constraints on regulation but no such constraints on inaction. [85] The second understanding was that the purpose of judicial review was to safeguard traditional private rights as defined by the common law. [86] The interests of those who were likely to benefit from administrative action were not traditional liberty or property interests and were thus not entitled to judicial protection. [87] The political process  **\*667**  was seen as the appropriate safeguard against unlawful inaction, especially since large numbers of people were often affected by failure to act. [88] Together, these two understandings represent a *Lochner*-like view of the judicial role. [89] The *Lochner* Court, too, saw the judicial role as the vindication of private rights, defined by reference to market ordering within the common law, against government "intervention."D'

With the rise of the regulatory state, however, this *Lochner*-era approach to judicial review of administrative inaction is no longer tenable. And it should be unsurprising to find that this view arose and declined in constitutional and administrative law in parallel fashion. [90] In the constitutional context, the Court recognized in *West Coast Hotel v. Parrish* [9] that common law ordering was in no sense "natural," but was the product of governmental choice: both action and inaction amount to decisions. It was pursuant to this view that a failure to act might be seen as, in the Court's words, a "subsidy" to those who benefited from the inaction. Similarly, in the administrative context, the notion that judicial review is limited in purpose to safeguarding traditional private rights and in scope to the promotion of traditional private autonomy has become unacceptable.

This doctrinal shift is reflected in changes in three related aspects of administrative law, changes which undermine the *Lochner*-like deference to agency inaction. The first of these changes is the growth of public rights. The creation of administrative agencies was based on an understanding that interests unrecognized by the common law nonetheless merit governmental protection. [92] Regulatory  **\*668**  interests, representing public "rights," [93] are created by congressional or administrative action and are entitled to judicial protection under the APA. The fact that inaction does not affect traditional private rights is therefore an insufficient basis for distinguishing between action and inaction.

The second change is in the law of standing. It is no longer necessary to show a traditional private right in order to obtain review of agency conduct; [94] beneficiaries of regulatory programs may bring suit if they can show "'injury in fact'" and demonstrate that a judicial decree will remedy the harm alleged. [95] Private autonomy, as it was understood at common law, need not be involved at all.

The third change is authorization of judicial review of agency action by the APA. Under the APA, the function of judicial review is to ensure governmental conformity with legal requirements, whether such requirements require or

forbid regulation. [96] This conformity is to be achieved in two ways. First, courts are charged with promoting adherence to the governing statute   with adherence understood to include identification and implementation of the values set out in that statute. Statutorily irrelevant factors may not be considered, [97] and those factors made relevant by statute must be taken into account. [98] Second, where the statute is ambiguous, as is frequently the case, courts must ensure that there has been a reasoned exercise of discretion on the part of administrators. [99] These purposes apply with equal force to action and  **\*669**  inaction.

Moreover, the availability of political remedies does not, as a general rule, distinguish inaction from action. The possibility of political redress has not been thought sufficient to justify the elimination of judicial review of agency action. [00] The same conclusion is properly reached in the context of inaction. Often political remedies are more readily used by well-organized members of regulated classes than by regulatory beneficiaries, who must overcome substantial barriers to the exercise of political power. [0]   At least in some contexts, differential access to the political process may well make judicial review of agency inaction a particularly necessary safeguard.


## B. Reviewing Discretion and Usurpation of the Executive Function

Reluctance to review inaction has traditionally been based in part on a set of considerations counseling against judicial usurpation of the executive function. Indeed, it is sometimes suggested that a court engaging in judicial review of executive inaction or issuing an order compelling an agency to act would be undertaking to "take Care that the Laws be faithfully executed" [02]   an executive rather than a judicial task. [03] The suggestion is based on the understanding that enforcement activity is entrusted to the executive,  **\*670**  not to the courts, and that judicial involvement   in the form of a decree compelling prosecution   would violate the separation of powers. While this basic understanding is correct, the conclusion does not follow. The "take Care" clause is a duty, not a license; it imposes an obligation on the President to enforce duly enacted laws. If judicial involvement is based on a statutory violation by the executive, review promotes rather than undermines the separation of powers, for it helps to prevent the executive branch from ignoring congressional directives. [04]

This is not to deny that the executive has the power to set enforcement priorities and to allocate resources to those problems that, in the judgment of the executive, seem most severe. [05] Congress frequently appropriates a smaller amount than would be necessary to redress all private violations of the law, in the expectation that the executive will use its discretion to allocate funds to the most pressing problems. Exercising discretion in this way is ordinarily consistent with congressional will. But there is a distinction between exercising such discretion and refusing to carry out obligations that Congress has imposed on the executive. The distinction turns, here as elsewhere, on interpretation of the substantive statute. Although there will be difficult intermediate cases, the "take Care" clause does not authorize the executive to fail to enforce those laws of which it disapproves. [06]

Sometimes the separation-of-powers objections to review of agency inaction are supplemented with a reference to the remedial problems that may result whenever a court requires someone to act. [07] The executive may, for example, simply refuse; or it may decide to acquiesce in the court's ruling by bringing an enforcement proceeding, but do so without much vigor. Any judicial remedies for such executive misconduct, it might be thought, would constitute impermissible judicial entanglement in the executive  **\*671**  function. The principal answer to such objections is that they assume intransigence on the part of the executive in the face of a court order, an assumption that is inconsistent with the general willingness of executive officials to obey the law as it has been interpreted by the courts. [08] Moreover, the defendants in these cases are institutions, not individuals; the people who are assigned the task of bringing the court ordered enforcement proceedings may well not object to them. Finally, the same objections are applicable to the wide range of cases requiring action by state officials in the last quarter-century and have no more force here than there.

In the early period of administrative law, these concerns were more forceful in light of the fact that courts had not developed techniques to review the exercise of discretion on the part of administrators. Because courts lacked methods to review discretion without usurping it, review of inaction threatened to transform courts into prosecutors. The absence of such techniques buttressed traditional separation-of-powers concerns about judicial review of agency inaction. But the modern period has seen the rise of a number of strategies by which courts might review the exercise of discretion without usurping the executive function. Courts may require explanations for decisions, [09] and in reviewing those explanations, they may be quite deferential. The "arbitrary and capricious" standard of review under the APA, [0] for example, authorizes review of discretion in order to assure reasoned decisionmaking within the confines of a statute. That standard, properly applied, does not involve usurpation of the executive function.

### C. Alternative Remedies

As a historical matter, the pressure for judicial review of prosecutorial decisions was relieved by the existence of alternative remedies by which to enforce the law if the prosecutor failed to act. Indeed, the notion of prosecutorial discretion developed in large part because of the availability of private prosecution. [2] Moreover, common law remedies were traditionally available for **\*672** the same harms that were redressed by criminal prosecutors.

These considerations carry much less force in the modern period. In general, affected citizens have no right to proceed directly against the private person whose conduct violates a statutory standard. The modern Court's skeptical attitude toward implied causes of action [3] has guaranteed this result. Even if it is available, a private right of action is often an inadequate surrogate remedy. [4]

### D. Prudential Concerns

The final consideration is that review of inaction imposes unique burdens on courts. Agencies are almost always funded at levels that prevent them from redressing all violations of the law. A decision not to act is a choice of how to allocate these limited resources. This decision turns not only on the legality of the private conduct, but also on a wide variety of managerial considerations that are not well suited to judicial review. [5] A decision not to act may be based on competing priorities, the desire to establish favorable precedents in an orderly fashion, the reaction of the public and of relevant officials in Congress and the executive branch, and so forth. When a plaintiff alleges that an agency has acted "arbitrarily" in failing to take action in a particular case, the court must consult all of these factors in order to make a reasoned decision. The fact of resource constraints thus makes review of prosecutorial decisions different from review of ordinary administrative action.

This consideration might be buttressed with other institutional concerns. Inaction may be the result of delay in agency decisionmaking rather than evidence of a decision not to act. [6] Again, in light of budgetary constraints, failure to act is more frequent **\*673** than action. [7] Decisions not to act are likely to have been reached informally [8] and will often be unaccompanied by a record that a court might examine to assess the legality of the agency's conduct. If judicial review were available, it might become necessary to formalize inaction decisions, a step that could have considerable costs.

These considerations do serve to distinguish action from inaction, and they must be taken into account. Most important, the breadth of the considerations that may lawfully be considered by an administrative prosecutor suggests that judicially administrable standards are less likely to be available for assessing a plaintiff's claim. Consider, for example, an allegation by a consumer that the Federal Trade Commission (FTC) acted unlawfully in failing to initiate proceedings against a particular advertiser. Suppose that the ground of the complaint is that the advertisement is deceptive and misleading

within the meaning of the Federal Trade Commission Act, or indeed that it is especially so and should be a high priority for the agency. In order to assess that claim, the court must evaluate the FTC's enforcement program to see where the advertisement in question "fits"' in light of competing priorities. That inquiry must be undertaken without statutory guidance. In general there is "no law to apply"' to such an allegation.

The matter may be different if the private conduct at issue can be shown to be especially egregious, or if the plaintiff is able to demonstrate that inaction is based on unconstitutional or statutorily irrelevant considerations. [9] But a generalized allegation of arbitrariness will often be an insufficient basis for judicial review.

The other institutional concerns, which stress the informal character of inaction decisions, carry less weight. The courts have developed a number of techniques by which to review informal action, [20] *674 so long as the various other prerequisites for review   finality, standing, ripeness, exhaustion   are satisfied. In this regard, inaction does not stand on a substantially different footing from action. While the frequently informal character of such decisions must be taken into account in conducting review, it does not justify a presumption against review.

It follows from this discussion that it is no longer possible to justify a general rule that enforcement decisions are unreviewable. To say this is hardly to say that inaction will often be found unlawful on the merits; it is not even to say that inaction is always reviewable. But it is to say that enforcement decisions should be subject to the same principles governing reviewability as are applied to other administrative decisions, formal and informal. Those general principles, it will be recalled, make the availability of review turn on an assessment of whether the statutory standards, measured against the plaintiff's allegation, furnish law that courts might apply to assess the claim.

To be sure, the distinctive features of inaction decisions   the numerous factors that must be taken into account   will mean that claims of arbitrariness are often an insufficient basis for judicial review. But claims of other sorts might well be enough to provide justiciable standards. [2] In short, the application of generalized notions of prosecutorial discretion to the administrative context is often inappropriate, for the force of the considerations supporting deference to prosecutorial discretion will vary substantially with the statutory scheme and the plaintiff's allegation. The concept of prosecutorial discretion should, in this light, be understood as a metaphor that tends to conceal the underlying reasons for and against review in particular contexts.

These considerations suggest that the *Chaney* Court's reasoning was unpersuasive insofar as it indicated a general rule that inaction ought to be treated differently from other agency decisions. The "take Care"' clause does not justify special judicial deference if the administrator's failure to act is in violation of duly enacted laws. The analogy to the discretion of the criminal prosecutor is largely unavailing. The fact that inaction does not appear "coercive"' is also an unpersuasive distinction; unlawful governmental failure to act can be as harmful as unlawful action and is equally *675 subject to judicial review under APA standards. And while inaction may not involve traditional property or liberty interests, the existence of a constitutionally protected interest is not a necessary predicate for the invocation of judicial review.

Of course, failure to act may be based on limited prosecutorial resources, and that factor provides an important consideration in evaluating claims of unlawful agency inaction. But the problem of limited resources does not justify a broad rule immunizing inaction from judicial review. Whether these institutional concerns carry force depends, as always, on the relationship between the statutory standard and the plaintiff's allegation. For example, an allegation that the FDA had failed to act because of a bribe from state officials seeking to use the drugs in question to administer the death penalty would be reviewable [22]   no matter how many competing priorities one could find before the agency, and no matter how sparse the record.

## IV. THE LIMITS OF *CHANEY:* UNANSWERED QUESTIONS

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 66 of 129

It would probably be a mistake to read *Chaney* as establishing a general rule of nonreviewability for enforcement decisions. The opinion is filled with more than the usual number of disclaimers. The Court expressly puts to one side the following cases: (1) review of a refusal to undertake rulemaking; [23] (2) inaction based on a conclusion that statutory jurisdiction is lacking; [24] (3) cases in which an "agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities"; [25] (4) refusal to enforce properly adopted agency rules; [26] (5) nonenforcement that violates constitutional rights; [27] and   the catch-all category   (6) cases in which the governing substantive statute sets priorities or circumscribes "an agency's power to discriminate among issues or cases it will pursue.'" [28] The breadth of the decision will depend on how cases falling in these categories are treated, and how large the categories are **\*676** themselves said to be.

*Chaney* thus leaves unanswered a number of questions. The answers to those questions will determine the fate of the private right to initiate administrative proceedings. This section discusses the various categories left open in *Chaney*, in descending order of the strength of the case for review of inaction.

### A. Inaction Based on Constitutionally Impermissible Factors

If agency inaction is based on constitutionally impermissible factors, such as race or exercise of first amendment rights, there is "law to apply'" and the failure to act, or selective action, is reviewable. [29] Suppose, for example, that a plaintiff contends that an agency has failed to bring an enforcement proceeding because the potential defendants are white, or because the defendants were willing to waive their right to free speech in exchange for immunity from prosecution. In such cases, there are judicially administrable standards by which to evaluate the plaintiff's allegation; the Constitution furnishes the relevant constraints. [30] A case decided the day before *Chaney* reflects the same point by subjecting the discretion of criminal prosecutors to constitutional constraints. [3] The remedial issue may turn out to be troublesome, [32] but the issue of reviewability is not.

### B. Inaction Based on Asserted Absence of Statutory Jurisdiction

In a case decided over two decades ago, the Supreme Court made clear that review is generally available when an agency's failure to act depends on a conclusion that it lacks jurisdiction over a particular class of cases. [33] The underlying reason is clear and **\*677** straightforward. Assume, for example, that the FDA had declined to act in *Chaney* on the sole ground that the governing substantive statute did not authorize the FDA to regulate the unapproved use of approved drugs. If the plaintiffs challenged that jurisdictional conclusion, the court could review the conclusion on the basis of "law'"   that is, the governing statute. Allocation of scarce prosecutorial resources is not an issue   even if the agency may decide, after the issue of statutory jurisdiction has been resolved, not to bring enforcement proceedings notwithstanding its power to do so. [34] The considerations invoked in *Chaney* are thus inapplicable to questions of statutory jurisdiction. This conclusion follows naturally from the Court's statement that review of inaction is available when Congress has imposed constraints on enforcement discretion.

### C. Inaction Based on Statutorily Irrelevant Factors or Otherwise in Violation of Statutory Constraints on Enforcement Discretion

Suppose a plaintiff alleges that agency inaction is based on a factor that is not relevant under the governing statute. For example, the claim may be that nonenforcement resulted from a bribe [35] or, to take a less extreme case, that an agency decided not to act because of the costs of regulation in a case in which costs are not a relevant consideration under the statute. [36] The most important exception in *Chaney* becomes relevant here. It will be recalled that the Court endorsed

review of agency enforcement decisions when the governing statute "provided guidelines for the agency to follow in exercising its enforcement powers."' [37] Whenever a plaintiff can allege that statutorily irrelevant factors have entered into a decision not to act, there are by hypothesis such guidelines to control the exercise of prosecutorial discretion.

This understanding captures a large number of the cases that have reviewed agency inaction before *Chaney*. [38] Indeed, this is the ground on which the *Chaney* Court distinguished and preserved **\*678** *Dunlop v. Bachowski*. [39] The same conclusion is appropriate whenever the plaintiff has alleged that irrelevant factors have influenced the decision [40] or that inaction is inconsistent with statutory constraints on enforcement discretion.

### D. "Abdication"' of Statutory Duty or a "Pattern"' of Nonenforcement

In a number of cases in recent years, the courts have reviewed claims that agencies have abdicated their statutory obligations by failing to undertake enforcement action in a substantial category of cases. The most celebrated of these decisions, *Adams v. Richardson*, [4] involved an alleged failure to enforce Title VI of the Civil Rights Act of 1964. According to the court, abdication of authority to enforce the statute was subject to judicial review. *Adams* was cited with apparent approval in *Chaney*. [42]

The question remains why a "pattern"' of nonenforcement, or "abdication"' of statutory duty, should be treated differently from an isolated decision not to act. At least some of the factors referred to by the *Chaney* Court apply in both contexts. But the difference lies in a differing assessment of congressional intent, and thus of available "law to apply,"' in the two categories of cases. For example, if an agency announces that it will no longer enforce a particular statute to take an extreme case it is not difficult to conclude, at least as a general rule, that this decision is contrary to the will of the legislature that enacted the statute. Such a decision raises the possibility that the executive's inaction is based on its underlying disagreement with the goals of the statute and thus on executive usurpation of the legislative function. [43] With an isolated failure **\*679** to act, it is difficult to draw that conclusion.

While the principal characteristic of a "pattern"' of nonenforcement or "'abdication"' is a refusal to act in a large number of cases, an approach based on sheer magnitude is incomplete. If the agency's jurisdiction is extensive, a refusal to act in a large number of cases might be the result of legitimate processes of setting priorities in light of the pertinent statutory standards. To conclude that abdication has occurred, it may therefore be necessary to find that the refusal to act applies in a large number of cases weighed against the total jurisdiction of the agency under the relevant statute.

Of course, it will not always be easy to tell whether a particular case falls in the category of "abdication"' or of isolated refusal to act. The plaintiffs in *Chaney* might have argued that their claims belonged to the former category. The argument would be unavailing, however, in light of the breadth of the enforcement opportunities before the FDA opportunities of which the inmates' claim was but a small part. Of course, hard intermediate cases will inevitably arise, but here as elsewhere, the existence of such cases is not a reason to abandon an otherwise sensible distinction.

### E. Refusal to Enforce Agency Regulations

A refusal to enforce an agency regulation is different from a refusal to enforce a statute in the important sense that in the former context, the principal basis for judicial intervention appears unavailable. That basis, as we have seen, is agency action or inaction that is inconsistent with "law,"' understood to mean the statute that Congress enacted. When failure to act violates a duty imposed on the executive branch by Congress, separation-of-powers concerns counsel in favor of, not against, an aggressive judicial role.

The matter is different when an agency complies with the will of Congress but refuses to enforce its own voluntarily adopted regulation. To be sure, there is a general principle requiring agencies   **680**  to follow their regulations. [44] If a regulation evinces an intention to require an agency to act or otherwise to confine its enforcement discretion, this principle may in most instances be invoked by private parties. [45]  The *Chaney* Court left open the possibility that a regulation that obligates an agency to act might provide "law to apply" in the same way as does a statute. [46]

Nonetheless, the fact that a regulation indicates that certain private conduct is unlawful does not, in and of itself, impose on the agency any duty of enforcement. Such a regulation does not purport to require the agency to act but only sets out standards to guide regulated class members and regulatory beneficiaries. A failure to enforce such a regulation should not be grounds for judicial intervention. In short, the difference is between a regulation that purports to bind an agency to undertake certain enforcement actions and a regulation that merely describes what conduct is unlawful under a statutory program.

## F. Failure to Initiate Rulemaking

In an important opinion by Judge McGowan, the Court of Appeals for the District of Columbia Circuit granted judicial review of a decision not to promulgate a rule. [47]  The court emphasized that such review should be unusually deferential, [48]  but said that in certain cases decisions not to issue rules might be reversed. A later decision applied this reasoning to allow review of failure to initiate rulemaking proceedings. [49]  These decisions are thrown into question by *Chaney*. Many of the considerations that justify refusal to   **681**  review in that case are applicable in cases involving a refusal to issue a rule or to initiate rulemaking proceedings.

There are two grounds on which one might contend that judicial review should be available for refusals to initiate rulemaking. The first would rely on the legislative history of the APA. The Senate committee report said that the "'refusal of an agency to grant the petition [for rulemaking] or to hold rulemaking proceedings . . . would not per se be subject to judicial *reversal*.'" [50]  This language has been read to mean that generally such refusals would be subject to review and at least sometimes to reversal. [5]  But the language probably cannot bear that weight. It is an isolated statement in the legislative history; it is contradicted by the influential report of the Attorney General on the APA; [52]  and, perhaps most important, it is too ambiguous to support a general rule of reviewability.

The second ground for seeking review of a decision to deny rulemaking petitions is more plausible. A refusal to initiate rulemaking should be reviewable if there is "law to apply" in light of the allegation measured against the substantive statutory standard. Here as elsewhere, the reviewability of inaction will turn on whether the statute provides constraints on the agency's failure to act in the particular circumstances. Significantly, a refusal to engage in rulemaking is likely to affect a broader range of people than is an isolated enforcement decision; such a refusal is therefore more likely to implicate the concerns associated with a pattern of nonenforcement.

A recent example is provided by *Community Nutrition Institute v. Young*. [53]  The case involved an effort to require the FDA to ban the use of aflatoxins, carcinogenic substances. The relevant statute reads:

> Any poisonous or deleterious substance added to any food, except where such substance is required in the production thereof or cannot be avoided by good manufacturing practice, shall be deemed to be unsafe . . . ; but when such substance is so required or cannot be so avoided, the Secretary shall promulgate   **682**  regulations limiting the quantity therein or thereon to such extent as he finds necessary for the protection of public health, and any quantity exceeding the limits so fixed shall also be deemed to be unsafe . . . . [54]

According to the court, the word "shall" was indicative of a congressional instruction, established as well by the statutory structure and history, to establish a tolerance level for foods with unavoidable poisonous or deleterious substances. [55] The FDA was therefore required to issue the regulation in question.

Whether or not the court's interpretation of the statute was correct, its approach is entirely consistent with *Chaney* and suggests a more general principle. Some statutes may require agencies to undertake enforcement action, including rulemaking, in certain circumstances. When a court vindicates such requirements, it is acting consistently with the APA.

### G. Generalized Arbitrariness

An allegation that an agency has acted arbitrarily because it has failed to take action against a particular violation of the governing statute presents the weakest claim for reviewability. Such cases implicate all the concerns emphasized by the *Chaney* Court about judicial involvement in the allocation of scarce prosecutorial resources.

The matter may be different if the plaintiff is able to make a persuasive showing, in light of the statutory standard, that the violation in question poses an especially powerful case for regulatory action. Assume, for example, that a plaintiff can demonstrate that a particular substance causes special risks to life and health and that the costs of inaction are substantial in terms of both. [56] Such a demonstration may be sufficient to justify review of enforcement decisions, for the situation has features in common both with inaction in violation of statutory standards and with inaction that amounts to abdication of statutory authority. Cases in which review  **\*683**  is justified under this rationale should, however, be relatively rare in light of the difficulty of assessing the agency's enforcement program that such review would entail.

### CONCLUSION

The trend in the direction of judicial review of agency inaction is a salutary one. That trend is in keeping with the general movement of modern public law, which has increasingly abandoned the assumption that reviewing courts should act on the basis of a presumption against government regulation. The rise of the modern regulatory state results in large part from an understanding that government "inaction" is itself a decision and may have serious adverse consequences for affected citizens. It should not be surprising to find that judicial doctrines have moved in the same direction.

In the modern era, the judicial role is to ensure the identification and implementation of statutory values and to guard against factional power over the regulatory process. That role applies regardless of whether the agency is increasing or decreasing the scope of regulation. Judicial review is, to be sure, only one of a number of mechanisms for controlling agency performance, and it has serious disadvantages. Exclusive reliance must not be placed on the courts. [57] But judicial review has served as an important source of constraints on administrative action. Whatever the defects of judicial review, they do not justify a one-way ratchet against regulation, which may skew regulatory processes in directions inconsistent with the governing statute.

Notwithstanding these considerations, *Heckler v. Chaney*, the Court's first major encounter with the problem in the last decade, presented a weak case for review. The plaintiff's allegation, measured against the statutory standard, furnished little basis on which to assess the legality of the agency's decision not to act. But the *Chaney* decision, in keeping with the general direction of lower court cases over the past decade, made clear that judicial review of agency inaction is available when the agency's enforcement decision violates statutory constraints. Over time, one may expect that understanding to become increasingly prominent, as the problem of agency inaction is assimilated to the rest of the law governing judicial review of the conduct of administrative agencies.

Footnotes

a   Professor of Law, University of Chicago. The author would like to thank Bruce A. Ackerman, Albert W. Alschuler, Douglas
    G. Baird, Mary E. Becker, David P. Currie, E. Donald Elliott, Ronald Levin, Carol M. Rose, Richard Shweder, Geoffrey
    R. Stone, David A. Strauss, and Peter L. Strauss for helpful comments on a previous draft. Richard A. Hertling provided
    valuable research assistance.

1   *See, e.g.*, Vaca v. Sipes, 386 U.S. 171, 182 (1967) (dictum) (discussing NLRB's "unreviewable discretion ' to refuse to institute
    an unfair labor practice complaint); United Elec. Contractors Ass'n v. Ordman, 366 F.2d 776 (2d Cir. 1966) (same), *cert.
    denied*, 385 U.S. 1026 (1967); Pendleton v. Trans Union Sys. Corp., 430 F. Supp. 95, 97 98 (E.D. Pa. 1977) (denying mandamus
    to compel FTC enforcement action on grounds of executive discretion). The unavailability of review stemmed also from
    restrictive standing doctrines that limited review to those with a "legal interest. ' *See infra* notes 84 101 and accompanying text.

2   *See* Community Nutrition Inst. v. Young, 757 F.2d 354, 361 62 (D.C. Cir. 1985) (requiring FDA to establish aflatoxin
    tolerances through rulemaking); Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1043 (D.C. Cir. 1979)
    (judicial review of denial of rulemaking petition available absent clear and convincing evidence of contrary legislative intent).

3   *See* Sierra Club v. Ruckelshaus, 61 AD. L. REP. 2D (P & F) 65, 70 (N.D. Cal. Dec. 11, 1984) (holding Administrator of EPA
    in civil contempt for failing to make findings or issue standards for radionuclides); Public Citizen Health Research Group v.
    Auchter, 554 F. Supp. 242, 251 (D.D.C.) (ordering OSHA to issue emergency standard for ethyline oxide exposure), *aff d*,
    702 F.2d 1150 (D.C. Cir. 1983).

4   *See* Carpet, Linoleum & Resilient Tile Layers Local 419 v. Brown, 656 F.2d 564 (10th Cir. 1981) (holding mandamus available
    to require Secretary of Defense to enforce Davis Bacon Act against contractors); Adams v. Richardson, 480 F.2d 1159,
    1162 63 (D.C. Cir. 1973) (ordering enforcement program to secure HEW enforcement of Title VI); Environmental Defense
    Fund, Inc. v. Hardin, 428 F.2d 1093, 1097 98 (D.C. Cir. 1970) (holding decision not to cancel registration of DDT reviewable
    despite permissive statutory language).

5   *See* JOSEPH VINING, LEGAL IDENTITY 52 (1978) (discussing conception of the judicial process as a means of achieving
    public or statutory values); Garland, *Deregulation and Judicial Review*, 98 HARV. L. REV. 505, 512 (1985) (contrasting
    interest representation and fidelity models of administrative law). For an elaboration of this transformation, see *infra* notes
    84 101 and accompanying text.

6   421 U.S. 560, 566 68 (1975).

7   *Id.* at 567 n.7 ("We agree with the Court of Appeals, for the reasons stated in its opinion, that there is no merit in the Secretary's
    contention that his decision is an unreviewable exercise of prosecutorial discretion. ') (citation omitted). For a discussion of
    the limits of the analogy of administrative discretion to prosecutorial discretion, see *infra* notes 75 122 and accompanying text.

8   105 S. Ct. 1649 (1985).

9   *Id.* at 1660 (Marshall, J., concurring in the judgment).

10  *Id.* at 1665.

11  5 U.S.C. §§ 551 706 (1982).

12  *See* H.R. REP. No. 1980, 79th Cong., 2d Sess. 41 (1946), *quoted in* Abbott Laboratories v. Gardner, 387 U.S. 136, 140 n.2
    (1967) ("To preclude judicial review under this bill a statute, if not specific in withholding such review, must upon its face give
    clear and convincing evidence of an intent to withhold it. ').

13  *See, e.g.*, Block v. Community Nutrition Inst., 104 S. Ct. 2450, 2457 (1984) ("clear and convincing ' test controls unless
    congressional intent to preclude review is "fairly discernible in the statutory scheme. '); Southern Ry. v. Seaboard Allied
    Milling Corp., 442 U.S. 444, 462 (1979); Dunlop v. Bachowski, 421 U.S. 560, 568 (1975); Abbott Laboratories v. Gardner,
    387 U.S. 136, 140 n.2 (1967).

[14] *See* LOUIS JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 320 27 (1965). *See generally* Stewart & Sunstein, *Public Programs and Private Rights*, 95 HARV. L. REV. 1193, 1203 (1982) (discussing functions of the rule of law).

[15] *See* Monaghan, Marbury *and the Administrative State*, 83 COLUM. L. REV. 1, 33 (1983). *But see* R. SHEP MELNICK, REGULATION AND THE COURTS: THE CASE OF THE CLEAN AIR ACT (1983) (criticizing certain effects of the judicial role). On agency "capture, ' see Stewart, *The Reformation of American Administrative Law*, 88 HARV. L. REV. 1667, 1684 87 (1975); Stewart & Sunstein, *supra* note 14, at 1226 27.

[16] It is thus unsurprising that the primary case invoking that doctrine involved a delegation of government power to private groups. *See* A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935). *See generally* Jaffe, *Law Making by Private Groups*, 51 HARV. L. REV. 201 (1937) (discussing advantages and dangers of participation by private groups in the administrative process).

[17] While the nondelegation doctrine has never been expressly repudiated by the Court, it has not been used to strike down a statute since *Schechter Poultry*. In fact, broad legislative delegations of power to the executive branch were upheld prior to the New Deal period. *See, e.g.*, United States v. Grimaud, 220 U.S. 506, 521 (1911) (upholding statute that permitted executive to make regulations declaring conduct criminal as a proper delegation of administrative power rather than an improper delegation of legislative power); Field v. Clark, 143 U.S. 649, 692 94 (1892) (upholding Tariff Act authorization of presidential suspension of favorable tariff status as not constituting grant of legislative power). Since *Schechter Poultry*, the Court has often found very broad "standards ' to be an adequate basis for judicial review. *See, e.g.*, Industrial Union Dep't v. American Petroleum Inst., 448 U.S. 607, 611 15 (1980) (reviewing exercise by OSHA of power to regulate toxics "to the extent feasible '); Yakus v. United States, 321 U.S. 414, 420 25 (1944) (sustaining broad grant of price fixing powers). But some Justices have indicated a renewed interest in the doctrine. *See* American Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 543 48 (1981) (Rehnquist, J., joined by Burger, C.J., dissenting).

[18] While much stress has traditionally been placed on judicial review, *see, e.g.*, L. JAFFE, *supra* note 14, at 327, it is important not to disregard the potential of nonjudicial mechanisms for fulfilling these functions. *See* Elliott, INS v. Chadha: *The Administrative Constitution, the Constitution, and the Legislative Veto*, 1983 SUP. CT. REV. 125, 150 60 (discussing legislative veto and other modes of legislative control). Nonjudicial mechanisms are particularly crucial for assuring presidential control and interagency coordination. For important modern illustrations, see Exec. Order No. 12,498, 50 Fed. Reg. 1036 (1985), and Exec. Order No. 12,291, 3 C.F.R. 127 (1982), which attempt to coordinate the regulatory process through supervision by the Office of Management and Budget.

[19] For criticisms of judicial review that do not discuss the phenomenon of "'anticipated reaction,  CARL FRIEDRICH, CONSTITUTIONAL GOVERNMENT AND POLITICS 16 18 (1937), *see, e.g.*, JERRY MASHAW, BUREAUCRATIC JUSTICE 8 11 (1983) (arguing that judicial review is irrelevant to internal agency decisionmaking, without reference to effect of prospect of review); R. MELNICK, *supra* note 15, at 379 83 (discussing impact of courts on EPA solely in terms of court ordered action).

[20] *See generally* R. MELNICK, *supra* note 15 (contending that judicial review under Clean Air Act has had undesirable consequences for environmental policy).

[21] *See, e.g.*, Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 103 S. Ct. 2856, 2870 (1983) ("that the regulated industry has eschewed a given safety device . . . hardly constitutes cause to revoke the standard ' requiring it).

[22] 5 U.S.C. § 551(13) (1982). The definition of agency action also includes the denial of a rule, order, license, sanction, or other relief. *Id.*

[23] *Id.* § 706(1).

[24] *Id.* § 701(a)(1).

[25] *Id.* § 701(a)(2).

[26] *See, e.g.*, Morris v. Gressette, 432 U.S. 491 (1977) (holding by a divided Court that Attorney General's approval of reapportionment under Voting Rights Act was unreviewable).

27   *Compare* Davis, *Administrative Arbitrariness is Not Always Reviewable*, 51 MINN. L. REV. 643, 643 (1967) (administrative arbitrariness is sometimes unreviewable), *with* Berger, *Administrative Arbitrariness: A Synthesis*, 78 YALE L.J. 965, 999 (1969) (only non arbitrary use of discretion is potentially unreviewable).

28   5 U.S.C. § 706(2)(A) (1982).

29   401 U.S. 402 (1971).

30   *Id.* at 410 (quoting S. REP. No. 752, 79th Cong., 1st Sess. 26 (1945)).

31   *See* KENNETH CULP DAVIS, ADMINISTRATIVE LAW OF THE SEVENTIES § 28.16, at 638 41 (1976).

32   401 U.S. at 411 13.

33   *See infra* notes 129 32 and accompanying text.

34   *See infra* notes 135 40 and accompanying text.

35   *See infra* note 156 and accompanying text.

36   This point is parallel to the idea, raised in connection with the political question doctrine, that a conclusion that a matter presents a "'political question' is equivalent to a conclusion that there is no constitutional violation on the merits. *See* Henkin, *Is There a "Political Question' Doctrine?*, 85 YALE L.J. 597, 606, 622 23 (1976).

37   This formulation raises the question of how one decides that it is appropriate to dispose of a case on the merits rather than on grounds of reviewability. The decided cases furnish no clear criteria by which to make that decision. To some extent, they suggest that the question is to be answered on the basis of whether the statutory standard, measured against the plaintiff's allegation, furnishes ascertainable standards by which to assess the legal question. If it does not, a decision on reviewability grounds is more likely. *See, e.g.*, Hahn v. Gottlieb, 430 F.2d 1243, 1249 (1st Cir. 1970) (holding that statute provides inadequate standards for judicial review of FHA rental rates). To some extent, however, the decision is likely to be cast in terms of reviewability rather than the merits simply because of tradition. *But see* Pendleton v. Trans Union Sys. Corp., 430 F. Supp. 95 (E.D. Pa. 1977) (dismissing mandamus action against FTC on the merits).

38   *See* cases cited *supra* notes 2 4.

39   Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 544 46 (1978) (rejecting judicial addition of procedural requirements for APA informal rulemaking).

40   *Compare* Block v. Community Nutrition Inst., 104 S. Ct. 2450, 2456 58 (1984) (intent to preclude review must be "fairly discernible ' from legislative scheme), *with* Abbott Laboratories v. Gardner, 387 U.S. 136, 141 (1967) (requiring "clear and convincing evidence ' of intent to preclude review).

41   *See* Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 104 S. Ct. 2778, 2782 (1984); *see also* Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., 105 S. Ct. 1102, 1108, 1110 (1985) (requiring clear, unambiguous expression of intent contrary to that of agency). Decisions of this sort may herald a quite general return to a variation of "formalism ' in statutory interpretation. For critical appraisals of the "formalist ' approach, see Stewart & Sunstein, *supra* note 14, at 1199 1201, 1220 32; Note, *Intent, Clear Statements, and the Common Law*, 95 HARV. L. REV. 892, 899 907 (1982). For a defense, see Diver, *Statutory Interpretation in the Administrative State*, 133 U. PA. L. REV. 549, 582 92 (1985).

42   Allen v. Wright, 104 S. Ct. 3315 (1984).

43   U.S. CONST. art. II, § 3 (the Executive shall "take Care that the Laws be faithfully executed ').

44   104 S. Ct. at 3330. For a critical appraisal, see Nichol, *Abusing Standing: A Comment on* Allen v. Wright, 133 U. PA. L. REV. 635 (1985).

45    For discussion of the doctrine, see Greater Boston Television Corp. v. FCC, 444 F.2d 841, 850 53 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 923 (1971). *See generally* Sunstein, *Deregulation and the Hard Look Doctrine*, 1983 SUP. CT. REV. 177, 181 82 (collecting cases).

46    Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 103 S. Ct. 2856, 2862 (1983).

47    *See* Industrial Union Dep't v. American Petroleum Inst., 448 U.S. 607, 658 59 (1980) (plurality opinion) (rejecting OSHA benzene standard after "a more detailed examination of the record than is customary ').

48    For suggestions that this skepticism is misplaced, at least if the judicial role is suitably cabined, see Stewart & Sunstein, *supra* note 14, at 1316 22; L. JAFFE, *supra* note 14, at 320 27, 589 92. Most of the recent cases restricting the judicial role involved suits by beneficiaries, and the restrictions on the law of standing and reviewability will primarily affect beneficiaries rather than regulated entities. It remains uncertain whether the Court will similarly limit judicial power when the plaintiff is a member of the regulated class.

49    *See supra* note 41.

50    105 S. Ct. at 1651 52. The requested enforcement actions were detailed in the opinion below, Chaney v. Heckler, 718 F.2d 1174, 1178 (D.C. Cir. 1983).

51    718 F.2d at 1177.

52    21 U.S.C. §§ 352(f), 355 (1982).

53    105 S. Ct. at 1652.

54    *Id.* (quoting statement by FDA Commissioner).

55    *Id.* at 1659.

56    5 U.S.C. § 701(a)(2) (1982).

57    105 S. Ct. at 1656.

58    *Id.* (emphasis in original).

59    *Id.*

60    *Id. See infra* notes 102 11 and accompanying text (evaluating the "'executive function    argument).

61    105 S. Ct. at 1656.

62    *Id.*

63    *Id.* at 1658 59.

64    421 U.S. 560 (1975).

65    105 S. Ct. at 1657. This was not an accurate reading of the understanding of the Court in *Dunlop* itself. In *Dunlop*, 421 U.S. at 567 n.7 (quoted *supra* note 7), the Court endorsed the reasoning of the lower court, which had said that principles of prosecutorial discretion should operate as a bar to review only when the interests represented by plaintiffs were those of the public as a whole (as in the case of a criminal prosecution), rather than those of identifiable individuals, Bachowski v. Brennan, 502 F.2d 79, 87 (3d Cir. 1974). Of course, *Chaney* itself involved the interests of identifiable individuals.

66    Chaney v. Heckler, 718 F.2d 1174, 1186 (D.C. Cir. 1983).

67    105 S. Ct. at 1658. The court of appeals had suggested that the fact that the rule was not adopted was "not decisive ' and that the statement itself constituted a "rule ' under the APA. 718 F.2d at 1186 & n.28.

68  21 U.S.C. § 336 (1982) (quoted in *Chaney*, 105 S. Ct. at 1659).

69  105 S. Ct. at 1659.

70  Such deficiencies would require special allegations — for example, a claim that agency inaction was based on constitutionally or statutorily irrelevant factors, see *infra* notes 129 32, 135 40 and accompanying text, or a showing that the inaction involved a matter that, because of the nature of the private conduct at issue, had a special claim on the agency's resources.

71  This is not to say that the case was quite as easy as the Court seems to have thought. A response to the foregoing line of reasoning might be that the Court should have looked more carefully at the nature of the plaintiffs' claim and at the FDA's enforcement priorities, in order to assure itself that the allocation of limited resources was reasonable in light of the various options before the agency. But such an examination is, in the absence of unusual circumstances, extremely difficult for a court to undertake. In light of the nature of the statute and the allegation, a posture of deference was appropriate.

72  105 S. Ct. at 1659 60 (Brennan, J., concurring).

73  *Id.* at 1665 (Marshall, J., concurring in the judgment).

74  *Id.* at 1666. In constitutional law, this perception is reflected in West Coast Hotel v. Parrish, 300 U.S. 379, 399 (1937) (suggesting that government refusal to enact minimum wage law would amount to government subsidy to employers), and Miller v. Schoene, 276 U.S. 272, 279 (1928) (describing governmental inaction as "none the less a choice '). *See infra* notes 84 91 and accompanying text.

75  *See, e.g.*, Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375 (2d Cir. 1973). For a discussion and critique of prosecutorial discretion in the criminal context, see KENNETH CULP DAVIS, DISCRETIONARY JUSTICE 188 214 (1969).

76  *See* cases cited *supra* note 1.

77  *See generally* L. JAFFE, *supra* note 14, at 178 92.

78  McIntire v. Wood, 11 U.S. (7 Cranch) 504 (1813).

79  28 U.S.C. § 1651 (1982).

80  Wilbur v. United States *ex rel.* Kadrie, 281 U.S. 206, 218 19 (1930).

81  *See infra* note 87.

82  *But see* Carpet, Linoleum & Resilient Tile Layers Local 419 v. Brown, 656 F.2d 564 (10th Cir. 1981) (holding mandamus available under Davis Bacon Act).

83  For additional treatment of some of these considerations, see Stewart & Sunstein, *supra* note 14, at 1202 20 (discussing traditional concepts as obstacle to development of judicial remedies for administrative misconduct); Note, *Judicial Review of Administrative Inaction*, 83 COLUM. L. REV. 627, 630 38 (1983) (discounting traditional obstacles to review).

84  *Compare* Lochner v. New York, 198 U.S. 45 (1905) (reflecting a similar understanding), *with* West Coast Hotel v. Parrish, 300 U.S. 379 (1937) (rejecting this understanding).

85  Indeed, the very concepts of "inaction ' and "action ' are coherent only if one has a background understanding of the normal or desirable functions of government. *Cf.* LAURENCE TRIBE, CONSTITUTIONAL CHOICES 246 48 (1985) (discussing dependence of notion of "state action ' on *Lochner* like understandings of private and public spheres); Brest, *State Action and Liberal Theory: A Casenote on* Flagg Brothers v. Brooks, 130 U. PA. L. REV. 1296, 1297 99 (1982) (same). See also Justice Frankfurter's suggestion, in interpreting the "negative order ' doctrine, that "negative order ' and "affirmative order ' are not appropriate terms of art. . . . "Negative ' has really been an obfuscating adjective in that it implied a search for a distinction nonaction as against action — which does not involve the real considerations on which rest, as we have seen, the reviewability of Commission orders within the framework of its discretionary authority and within the general criteria of justiciability.

"Negative ' and "affirmative, ' in the context of these problems, is as unilluminating and mischief making a distinction as the outmoded line between "nonfeasance ' and "malfeasance. D'
Rochester Tel. Corp. v. United States, 307 U.S. 125, 140 42 (1939) (citations omitted).

[86]   *See* Stewart, *supra* note 15, at 1671 76.

[87]   This notion was most important under the law of standing, where early cases involved claims of competitive disadvantage as a result of government action; standing was denied because of failure to allege violation of a "legal right ' or "protected interest. ' *See, e.g.*, Alabama Power Co. v. Ickes, 302 U.S. 464, 479 80 (1938). *See generally* Stewart, *supra* note 15, at 1723 24 (recognized "legal rights ' were common law contract and property rights). With the rejection of the "legal interest ' test, *see, e.g.*, Association of Data Processing Serv. Orgs., Inc., v. Camp, 397 U.S. 150, 153 54 & n.1 (1970) (competitor standing), standing was broadened to include the interests of regulatory beneficiaries, *see, e.g.*, Barlow v. Collins, 397 U.S. 159, 164 65 (1970) (tenant farmer beneficiaries of upland cotton program). Since a wide range of beneficiary injuries have been held to be "fairly traceable ' to government conduct and to satisfy the "injury in fact ' test, *see, e.g.*, Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 74 75 (1978) (local citizens have standing to challenge the effect of federal liability limit on the building of nuclear power plants), standing is a barrier to beneficiary actions in much more limited circumstances. *But cf.* Allen v. Wright, 104 U.S. 3315, 3329 30, 3333 (1984) (holding plaintiffs' claim of injury to strict causality standard where special circumstances raise separation of powers concerns).

[88]   *Cf.* Bi Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441, 445 (1915) (due process does not require individual hearings for determinations that affect large numbers of people, in part on ground that legislature is the appropriate forum for redress).

[89]   Lochner v. New York, 198 U.S. 45 (1905). *See* Kennedy, *Form and Substance in Private Law Litigation*, 89 HARV. L. REV. 1685, 1746 48 (1976) (discussing theory of "naturalness ' of economic interaction under common law).

[90]   *See* Sunstein, *Interest Groups in American Public Law*, STAN. L. REV. (forthcoming).

[91]   300 U.S. 379 (1937).

[92]   This conclusion was alternately based on (1) the notion that the common law catalogue of private rights was insufficient to protect private autonomy, and that new rights should be added to the list; (2) a conclusion that important decisions ought to be subject to collective control in the service of democratic ends of self government; or (3) an economic rationale pointing to the externalities not taken care of by an unregulated market. *See generally* Stewart & Sunstein, *supra* note 14, at 1235 39 (discussing the entitlement, production, and public value accounts of the rise of administrative regulation). At times, of course, the creation of a regulatory scheme might be understood as an interest group deal. *See* Stigler, *The Theory of Economic Regulation*, 2 BELL J. ECON. & MGMT. SCI. 3 (1971).

[93]   It may be misleading to treat such interests as "rights ' at all. *See* Mashaw, *"Rights  in the Federal Administrative State*, 92 YALE L.J. 1129, 1173 (1983) (discussing "rights ' as epiphenomena of political choice under "statist ' concept of administrative law); Stewart, *Regulation in a Liberal State: The Role of Non commodity Values*, 92 YALE L.J. 1537, 1556 59 (1983) (discussing limits of entitlement conception of regulation).

[94]   This was the traditional requirement of the "legal interest ' test. *See supra* note 87. *See generally* J. VINING, *supra* note 5, at 20 33 (discussing the test and its limits); Stewart, *supra* note 15, at 1723 25 (discussing the traditional standing model).

[95]   This is something of an oversimplification of current doctrine. *See supra* note 87; *cf.* Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 475 (1982) (suggesting that a "zone of interests ' requirement may also be an element of current standing doctrine under article III).

[96]   *See* Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 103 S. Ct. 2856, 2866 (1983) (" T]he direction in which an agency chooses to move does not alter the standard of judicial review established by law. ').

[97]   *See infra* notes 135 40 and accompanying text.

[98]   *See infra* notes 141 43 and accompanying text.

99    The notion of reasoned decisionmaking has often been invoked by courts in recent years. *See, e.g.*, Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co., 103 S. Ct. 2856, 2874 (1983); Office of Communication of the United Church of Christ v. FCC, 707 F.2d 1413, 1425 26 (D.C. Cir. 1983); NAACP v. FCC, 682 F.2d 993, 998 (D.C. Cir. 1982). That notion has three components. First, regulatory decisions should be based on a detailed inquiry into the advantages and disadvantages of proposed courses of action. Second, issues involving values must be resolved in accordance with the governing statute. Sometimes that statute will require consideration of particular factors; sometimes it will exclude consideration of other factors; and sometimes it will indicate that some factors, although relevant, are of secondary importance. Third, to the extent that issues of value are to be resolved through an exercise of discretion by administrators within the confines of the statute, it is important to ensure that the relevant considerations    and the actual bases for decision    are explicitly identified, are subject to public scrutiny and review, and reflect a reasonable weighing of the relevant factors. *See* Sunstein, *supra* note 45, at 181 82 (collecting cases).

100    The reason lies in the fact that political remedies are too crude to be a reliable basis for preventing or redressing unauthorized or arbitrary regulatory action. *Cf.* R. LITAN & W. NORDHAUS, REFORMING FEDERAL REGULATION 60 81 (1983) (discussing the imperfections of congressional and presidential control of bureaucracy).

101    *See generally* RUSSELL HARDIN, COLLECTIVE ACTION (1983); *cf.* Fiorina, *Legislative Choice of Regulatory Forms: Legal Process or Administrative Process?*, 39 PUB. CHOICE 33, 49 (1982) (suggesting that legislators, concerned with reelection, will be most likely to delegate responsibility when regulation has diffuse rather than concentrated benefits).

102    U.S. CONST. art. II, § 3.

103    *See* Note, Dunlop v. Bachowski *and the Limits of Judicial Review under Title IV of the LMRDA: A Proposal for Administrative Reform*, 86 YALE L.J. 885, 901 02 (1977); *see also* Allen v. Wright, 104 S. Ct. 3315, 3330 (1984) (using "'take Care    clause as a basis for denying standing to claimants objecting to alleged IRS failure to deny tax exempt status to racially discriminatory private schools).

104    *Accord* Allen v. Wright, 104 S. Ct. 3315, 3348 (1984) (Stevens, J., dissenting) (relying on power of courts to say "what the law is  '); *see also* Nichol, *supra* note 44.

105    *See* Easterbrook, *On Not Enforcing the Law*, REGULATION, Jan. Feb. 1983, at 14 16.

106    The parallel here is to the impoundment controversy, which arose when President Nixon asserted an authority to decline to spend funds appropriated by Congress. That assertion was properly rejected. *See* Mikva & Hertz, *Impoundment of Funds The Courts, the Congress, and the President: A Constitutional Triangle*, 69 NW. U.L. REV. 335 (1974).

107    This debate has focused on the question of whether courts would be required to undertake the management of institutions whose policies they sought to reform. *Compare* Easterbrook, *Foreword: The Court and the Economic System*, 98 HARV. L. REV. 4, 40 42 (1984) (arguing that granting standing in *Allen v. Wright* would have in effect required judicial management of IRS), *with* Tribe, *Constitutional Calculus: Equal Justice or Economic Efficiency?*, 98 HARV. L. REV. 592, 603 04 (1985) (denying same).

108    In the school desegregation area, for example, courts have ordered action by executive officials, generally without having to usurp executive functions. *See* Swann v. Charlotte Mecklenburg Bd. of Educ., 402 U.S. 1 (1971); Brown v. Board of Educ., 349 U.S. 294 (1955).

109    *See, e.g.*, Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 103 S. Ct. 2856, 2871 74 (1983); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971).

110    5 U.S.C. § 706(2)(A) (1982).

111    *See supra* note 99.

112    *See* Langbein, *Controlling Prosecutorial Discretion in Germany*, 41 U. CHI. L. REV. 439, 443 46 (1974).

113    *See, e.g.*, Universities Research Ass'n. v. Coutu, 450 U.S. 754 (1981) (no implied employee right of action for back wages absent administrative determination that Davis Bacon Act applies); Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11,

19 25 (1979) (no implied right of action for monetary relief where statute contains express enforcement mechanisms); Touche Ross & Co. v. Redington, 442 U.S. 560, 568 71 (1979) (no implied right of action against accountant performing audit required by statute). *But see* Cannon v. University of Chicago, 441 U.S. 677, 696 98 (1979) (granting implied right of action under Title IX in part because statute passed during period when Congress would have expected Court to imply cause of action).

114    *Cf.* Stewart & Sunstein, *supra* note 14, at 1305, 1312 13 (arguing that private rights of action are inappropriate under some regulatory statutes).

115    *See* Fuller, *The Forms and Limits of Adjudication*, 92 HARV. L. REV. 353, 394 404 (1978) (discussing "polycentric ' questions not readily susceptible to judicial resolution).

116    The fact that there may be no decision at all raises questions of ripeness and finality. *See* Note, *supra* note 83, at 647 & n.131, 652 55, 683 84.

117    This point raises the concern that the creation of private rights to initiate regulatory action might impose significant burdens on the federal courts. *Cf.* RICHARD POSNER, THE FEDERAL COURTS: CRISIS AND REFORM 59 166 (1985) (discussing caseload explosion). But initiating litigation against the government is expensive, and experience suggests that the incremental increase in litigation would be insubstantial. *See* 2 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 9:5, at 229 35 (2d ed. 1979) (arguing that a mandatory enforcement system can be viable); Dimento, *Citizen Environmental Legislation in the States: An Overview*, 53 J. URB. L. 413 (1976) (examining the effect of state environmental citizen suit provisions); Fadil, *Citizen Suits Against Polluters: Picking up the Pace*, 9 HARV. ENV. L. REV. 23 (1985) (examining the effect of federal environmental citizen suit provisions). Of course, it is by no means clear that it would be undesirable to increase the federal caseload if the increase produces greater administrative compliance with the APA and governing substantive statutes.

118    "Informal ' decisionmaking here means the use of methods that, while reviewable under the APA, are not subjected to special procedural requirements by the APA.

119    *See infra* notes 129 32, 135 40 and accompanying text.

120    *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971) (requiring Secretary of Transportation to provide statement of reasons for informal decision in order to establish basis for judicial review).

121    *See infra* notes 123 55 and accompanying text.

122    *Cf.* Marshall v. Jerrico, Inc., 446 U.S. 238, 249 250 (1980) ("A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions. ').

123    105 S. Ct. at 1652 n.2.

124    *Id.* at 1656 n.4.

125    *Id.* (quoting Adams v. Richardson, 480 F.2d 1159, 1162 (D.C. Cir. 1973)).

126    105 S. Ct. at 1658.

127    *Id.* at 1659.

128    *Id.* at 1657.

129    The APA requires reviewing courts to set aside agency actions found to be "contrary to constitutional right, power, privilege, or immunity. ' 5 U.S.C. § 706(2)(B) (1982).

130    *Cf.* Switchmen's Union v. National Mediation Bd., 320 U.S. 297, 301 (1943) (indicating in dictum that constitutional questions are exceptions to rule that agency decisions are unreviewable); Russell v. National Mediation Bd., 714 F.2d 1332, 1338 39 (5th Cir. 1983) (same), *cert. denied*, 104 S. Ct. 2385 (1984); United States v. Feaster, 410 F.2d 1354, 1366 (5th Cir. 1969) (same); Fay v. Douds, 172 F.2d 720, 723 (2d Cir. 1949) (district court has jurisdiction to review NLRB certification decision if plaintiff raises constitutional question that is "not transparently frivolous ').

131     *See* Wayte v. United States, 105 S. Ct. 1524, 1531 (1985) (subjecting selective prosecution of vocal draft resisters to review for first and fifth amendment violations).

132     The problem arises from the awkwardness of one possible remedy     compelling prosecution. *See supra* notes 105 11 and accompanying text.

133     Office Employes Int'l Union Local 11 v. NLRB, 353 U.S. 313, 318 20 (1957); *see also* Russell v. National Mediation Bd., 714 F.2d 1332, 1339 40 (5th Cir. 1983) (court can review agency methods of enforcement where Congress determined how the rights it created should be enforced), *cert. denied*, 104 S. Ct. 2385 (1984).

134     That there may be nonjurisdictional reasons for failing to act is not relevant here. Under SEC v. Chenery Corp., 318 U.S. 80, 92 94 (1943), a court may not uphold an agency decision on grounds not articulated by the agency.

135     *See supra* note 122.

136     *See, e.g.*, Lead Indus. Ass'n, Inc. v. EPA, 647 F.2d 1130, 1150 (D.C. Cir. 1980) (prohibiting EPA from considering costs in setting lead standards under Clean Air Act).

137     105 S. Ct. at 1656.

138     *See supra* notes 2 4.

139     *See supra* note 65 and accompanying text.

140     This conclusion assumes that the agency has made some decision not to act. If there is no "decision, ' judicial relief should generally be unavailable in the absence of statutory requirements for action. Such requirements may take the form of statutory deadlines, which render delay in enforcement actionable. *See, e.g.*, Clean Air Act, 42 U.S.C. § 7408(a)(2) (1982) (setting deadline for EPA issuance of air quality criteria). The use of deadlines is a familiar example of legislative action creating an active role for judicial review.

141     480 F.2d 1159 (D.C. Cir. 1973). The *Adams* litigation has had a complex history. *See* Note, *Judicial Control of Systemic Inadequacies in Federal Administrative Enforcement*, 88 YALE L.J. 407, 423 25 (1978). For the latest episode, see Women's Equity Action League v. Bell, 743 F.2d 42 (D.C. Cir. 1984) (remanding for consideration of issue of standing, raised by the court sua sponte, in light of Allen v. Wright, 104 S. Ct. 3315 (1984)).

142     105 S. Ct. at 1656 n.4 (noting that the governing statute might constrain discretion in such a case).

143     Traditions of prosecutorial discretion have served, in the criminal context, as a safeguard against enforcement of outmoded or unpopular statutory prohibitions. Congress or a state legislature need not repeal such proscriptions; in the enforcement process, prosecutors may achieve most of the benefits of a repeal through refusal to enforce. Recognition of a private right to initiate administrative action might remove this safeguard and intrude on desirable prosecutorial flexibility. To a large extent, however, the executive's authority to allocate limited prosecutorial resources to the most egregious violations should ensure that most inaction under obsolescent statutes will survive review. *See supra* notes 115 18 and accompanying text (discussing resource limitations as a basis for deference). Moreover, in some contexts the appropriate remedy for obsolescence is repeal by the legislature. And in any event, the dangers of effective repeal of statutes through executive inaction outweigh the risks produced by diminished flexibility.

144     *See, e.g.*, Arizona Grocery Co. v. Atchison, T. & S.F. Ry., 284 U.S. 370, 389 (1932) (regulatory agency may not ignore its own quasi legislative pronouncements); Nader v. Bork, 366 F. Supp. 104, 108 (D.D.C. 1974) (Watergate special prosecutor regulation has force and effect of law and binds its issuer); Note, *Violation by Agencies of Their Own Regulations*, 87 HARV. L. REV. 629 (1974) (examining interests supporting requirement that agencies observe their own rules).

145     Once a rule is found to have been made pursuant to a proper statutory authorization, as will be the case for most rules, the question is whether the rule creates judicially enforceable private rights. *See, e.g.*, Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 236 (8th Cir. 1975), *cert. denied*, 424 U.S. 966 (1976); Brown v. Lynn, 392 F. Supp. 559, 562 (N.D. Ill. 1978). *But cf.* Legal Aid Soc'y v. Brennan, 608 F.2d 1319, 1332 (9th Cir. 1979), *cert. denied*, 447 U.S. 921 (1980) (doubting whether executive order may deny private rights of action and thus make itself unenforceable).

146   *See* 105 S. Ct. at 1658.

147   Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1043 44 (D.C. Cir. 1979).

148   *Id.* at 1047 (such cases amenable to "at least a minimal level of judicial scrutiny ').

149   WWHT, Inc. v. FCC, 656 F.2d 807, 809 (D.C. Cir. 1981) (availability of review acknowledged, but its scope said to be necessarily narrow).

150   ADMINISTRATIVE PROCEDURE ACT: LEGISLATIVE HISTORY, S. DOC. NO. 248, 79th Cong., 2d Sess. 201 (1946) hereinafter cited as LEGISLATIVE HISTORY]), *quoted in* Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1043 n.14 (D.C. Cir. 1979) (emphasis added by the court).

151   *See* Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1043 n.14 (D.C. Cir. 1979).

152   *See* LEGISLATIVE HISTORY, *supra* note 150, at 229 30.

153   757 F.2d 354 (D.C. Cir. 1985).

154   21 U.S.C. § 346 (1982).

155   757 F.2d at 357 58. At the same time, a statute that is phrased in permissive terms   stating, for example, than an agency "may ' act in a category of cases   should not immunize inaction from review. In some circumstances, inaction may be based on factors that are impermissible under even "permissive ' statutes. Decisions resting on impermissible factors are unlawful even if the agency has discretion not to act when the proper factors are taken into account.

156   *See, e.g.*, Environmental Defense Fund, Inc. v. Ruckelshaus, 439 F.2d 584, 594 95 (D.C. Cir. 1971) (plaintiffs utilized EPA findings of dangerousness of DDT as basis for review of EPA inaction).

157   *See supra* note 18.

52 UCHILR 653

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

9 Conn. Pub. Int. L.J. 243

Connecticut Public Interest Law Journal
Spring, 2010

Articles
Shoba Sivaprasad Wadhia [a]

Copyright (c) 2010 Connecticut Public Interest Law Journal; Shoba Sivaprasad Wadhia

# THE ROLE OF PROSECUTORIAL DISCRETION IN IMMIGRATION LAW

## I. Introduction

The year was 2002. Joy sat motionless at the corner of my desk; a glass vase of flowers wrapped in thick plastic and tagged with a card from two brothers whose journey spanned from South Asia to the United States. Imprinted in the brothers' file was an impressive list of accolades that overshadowed a history of transgressions with a credit card. "My" two brothers were resilient and over many years built many things-a business, families, and friendships along the East coast. They won the praise of a local Congresswoman and made me smile often. Their case was not a "win" in the sense of gaining a formal immigration status like a green card or work visa. Instead, the case was a success because an immigration officer told them (and me) that limbo in the United States was preferable to deportation to a land where they would feel like strangers. The officer's decision to place their case on hold was a favorable exercise of prosecutorial discretion.

The concept of "prosecutorial discretion" appears in the immigration **\*244** statute, agency memoranda, and court decisions about select immigration enforcement decisions. Prosecutorial discretion extends to decisions about which offenses or populations to target; whom to stop, interrogate, and arrest; whether to detain or to release a noncitizen; whether to initiate removal proceedings; whether to execute a removal order; and various other decisions. Similar to the criminal context, prosecutorial discretion in the immigration context is an important tool for achieving cost-effective law enforcement and relief for individuals who present desirable qualities or humanitarian circumstances. Unlike the criminal system, prosecutorial discretion in the immigration system is a civil matter, and it is exercised with minimal safeguards or incentives.

While many scholars have written articles about undocumented immigration, restrictions on immigration, and immigrants' rights, there is a dearth of literature on the role of prosecutorial discretion in immigration law. This article describes the theory, history, and current standard of prosecutorial discretion in immigration matters. This article argues that prosecutorial discretion is both a welcome and a necessary component of immigration law. Drawing important and relevant lessons from the criminal and administrative law, this article shows why the existing model of prosecutorial discretion in immigration affairs is inadequate and, in some instances, misguided. The damaging impact of arbitrary immigration enforcement actions on the daily lives of undocumented noncitizens and their families is striking. This article advocates for a bolder standard on prosecutorial discretion and greater mechanisms for oversight and accountability when such standards are ignored. Moreover, this article recommends that DHS recognize select acts of prosecutorial discretion as a substantive rule, where the actions operate as a de facto benefit to individuals who satisfy an identifiable set of criteria and favorable equities. This article is divided into five sections: 1) Legal Background and History, 2) Lessons from Criminal Law, 3) Lessons from Administrative Law, 4) Limitations of Prosecutorial Discretion, and 5) Recommendations.

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 81 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

The theory behind prosecutorial discretion is seemingly simple and two-fold. The first theory is monetary. Because the government has limited resources to spend, permitting the agency and its officers to refrain from asserting the full scope of their enforcement authority against particular populations or individuals is cost saving and arguably allows the agency to focus their work on the "truly" hazardous. [2] The second theory is **\*245** humanitarian. Some individuals who are in technical violation of the law may nonetheless have redeeming qualities such as a loving marriage, continued employment as an office manager, status as a mother of three, and faithfulness to prayer and the payment of taxes. Often, these humanitarian considerations are weighed against moral deservedness, namely the gravity of a person's immigration transgression. Allowing such persons to live free from apprehension, detention, or removal is in some ways a reward for their good deeds and in part a judgment by society that some people are morally desirable and more likely to succeed in the future.

This article is limited to an analysis of prosecutorial discretion by immigration personnel employed by DHS, including but not limited to officers, attorneys and supervisors. Beyond the scope of this article is a scrutiny of the discretion exercised by administrative judges under the Department of Justice's Executive Office of Immigration Review in the context of formal applications for relief from removal. Similarly, this article does not address the discretion exercised by immigration officers as part of the formal adjudicatory process. Furthermore, although I attempt to distill prosecutorial discretion in the criminal and administrative contexts, the analysis is by no means exhaustive. Finally, while the grant of "deferred action" status represents just one among many exercises of prosecutorial discretion by the immigration agency, the author devotes disproportionate detail to deferred action for two reasons. First, deferred action serves as a good model from which to discuss prosecutorial discretion and analyze with administrative and criminal law. Second, practically speaking, focusing on deferred action enables the author to describe the history and evolution of prosecutorial discretion in a more fluid and chronological manner.

As to the terminology, the terms "deferred action" and "nonpriority" statuses are used interchangeably throughout this article. Moreover, unless otherwise indicated the term "Department of Homeland Security" will be referred to by its full name or by the abbreviation "DHS." Also, the term "1996 immigration laws" will be used to refer to amendments made to the Immigration and Nationality Act in 1996, and specifically, the Illegal Immigration Reform and Immigrant Responsibility Act (IIRAIRA) and the Antiterrorism and Effective Death Penalty Act (AEDPA).

**\*246  II. Legal Background and History**

Prosecutorial discretion is an awesome power that affects the fate of more noncitizens than any other government action. As defined by the former Immigration and Naturalization Service (INS) in 2000, "[p]rosecutorial discretion is the authority that every law enforcement agency has to decide whether to exercise its enforcement powers against someone." [3] Prosecutorial discretion is applied at both a categorical and an individual level. [4] Beneficiaries of prosecutorial discretion avoid removal and in some cases are eligible to apply for work authorization. One of the most common forms of prosecutorial discretion is "deferred action" and is discussed in greater detail below. Neither the immigration statute nor the regulations contain eligibility criteria for seeking a favorable grant of prosecutorial discretion. Similarly, unlike most formal applications for discretionary forms of relief from removal, acts of prosecutorial discretion have no written application form. Prosecutorial discretion can be exercised in a wide array of situations. [5]

The use of prosecutorial discretion and the "nonpriority program" specifically was revealed by INS in 1975 as a consequence of a lawsuit involving John Lennon and Yoko Ono. [6] Before this time, the nonpriority program was a secret operation of the INS. [7] Leon Wildes represented the **\*247** couple and has since written extensively about the nonpriority program. [8] As described by Wildes, John Lennon entered the United States in the summer of 1971 as a visitor and was thereafter placed in deportation proceedings for overstaying his visa. Lennon and his wife came to the United States in order to assume custody of Kyoko, Yoko Ono's daughter from a previous marriage. [9] While Lennon and Ono were

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 82 of 129

awarded custody over Kyoko by the family court, their situation was complicated by the fact that the child's father had kidnapped Kyoko and could not be found. [0] Because he believed he was charged with deportation for political reasons, Lennon requested for nonpriority status, among other forms of relief.     Through his attorney, Lennon spent more than one year trying to gather information from INS about the nonpriority status program and related procedures. [2] At the time, INS contended that data on the nonpriority status program was "not compiled." [3] Even when Lennon motioned his immigration judge to depose a member of the Government who was informed about the nonpriority status program, the immigration judge denied his request. [4] Ultimately, Lennon was able to obtain information through a Freedom Of Information Act (FOIA) action. [5] Specifically, information about the nonpriority program was available under the INS's "Operations Instructions" which, until the Lennon lawsuit, remained **248** private information on the INS "Blue Sheets." [6] As a consequence of the FOIA Action, and despite the numerous statutory exceptions to the publication of information, INS migrated information about the nonpriority program from the INS "Blue Sheets" to the published "White Sheets," signifying the newly public nature and existence of the program. [7]

## A. The Evolution of Deferred Action: 1975-1997

In 1975, following the Lennon case, the INS issued guidance on deferred action under its "Operations Instructions." The governing section stated: "(ii) Deferred action. In every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors, he shall recommend consideration for deferred action category." [8] The Operations Instructions also listed factors that should be considered in determining whether a case should be designated for deferred action:

> When determining whether a case should be recommended for deferred action category, consideration should include the following: (1) advanced or tender age; (2) many years' presence in the United States; (3) physical or mental condition requiring care or treatment in the United States; (4) family situation in the United States effect of expulsion; (5) criminal, immoral or subversive activities or affiliations recent conduct. If the district director's recommendation is approved by the regional commissioner the alien shall be notified that no action will be taken by the Service to disturb his immigration status, or that his departure from the United States has been deferred indefinitely, whichever is appropriate. [9]

While John Lennon ultimately achieved lawful permanent resident "green card" status, therefore mooting out the decision of whether or not to grant him nonpriority status, his related Second Circuit case was the first to discuss nonpriority status, articulating it as an "informal administrative stay of deportation." [20] One year after the Lennon decision, the Fifth **249** Circuit construed nonpriority status as a program of pure administrative convenience, concluding that INS has the authority to operate deferred action for its own convenience without having to formalize it into a body of law. [2] The Fifth Circuit's "convenience-only" definition of the nonpriority program ignored the overriding humanitarian grounds upon which many of the cases were ultimately granted. [22] In contrast to the Fifth Circuit, the Eighth Circuit stayed deportation in two cases in order to afford the petitioners the opportunity to apply for deferred action pursuant to the Operations Instructions. [23] Notably, the Eighth Circuit cited to humanitarian considerations as a foundation upon which INS could grant the petitioners deferred action status. [24] According to the Eighth Circuit in David v. INS, "[w]e think there is presented here a substantial basis upon which a district director could place petitioner in a "deferred action category" allowing him to remain in this country on humanitarian grounds." [25]

CAR 0993

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 83 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

The Eighth Circuit's conclusion is significant to the extent that it contains an implication that applying for nonpriority or deferred action status is a "right."[26] Building upon the Eighth Circuit, the Ninth Circuit in Nicholas v. INS held that the Operations Instruction on deferred action operated like a substantive rule.[27] Turning to the language of the Operations Instruction, the court in Nicholas concluded:

> Three points become readily apparent upon examination: (1) The sole basis for granting relief is the presence of humanitarian factors; (2) The Instruction is directive in nature; and (3) The effect of such relief upon a deportation order is to defer it indefinitely.It is obvious that this procedure exists out of consideration for the convenience of the petitioner, and not that of the INS. In this aspect, it far more closely resembles a substantive provision for **\*250** relief than an internal procedural guideline.[28]

The implications of treating deferred action as a substantive rule are significant and analyzed in greater detail later in the article.

Leon Wildes examined 1,843 nonpriority cases approved by the Immigration and Naturalization Service (INS) through December 31, 1974.[29] Wildes found that humanitarian considerations (as opposed to the nature of the individual's deportation ground or activity which gave rise to such a ground) played an overriding role in an immigration officer's decision to grant or deny nonpriority status.[30] Wildes found that noncitizens who risked being separated from family, were elderly, young, mentally disabled or incompetent were granted nonpriority status in high numbers.[3] In profiling a handful of the more than 1,800 cases, Wildes made the somewhat ironic point that many of the noncitizens were granted nonpriority status on the very same ground for which they were deportable.[32] This was especially true of those deemed mentally incompetent or infirm.[33] Within these 1,843 cases, Wildes found that more than 100 cases involved noncitizens with previous drug convictions ranging from misdemeanor offenses to more serious ones such as the trafficking of cocaine and heroin.[34] Notably, Wildes found that the humanitarian factors utilized in the so-called "drug cases" were largely similar to the consideration applied to the remaining case types.[35]

The Operations Instruction on deferred action has been amended over the years. Importantly, following the Nicholas decision, INS amended the Operations Instruction to affirmatively state that grants of deferred action status were an administrative choice by the agency and in no way an "entitlement" to the noncitizen.[36] The INS's decision to amend the **\*251** Operations Instruction after Nicholas was most likely connected to the Nicholas court's compassion-based theory for upholding judicial review. By recasting the Operations Instruction as a measure of pure administrative convenience, the agency was able to avoid future judicial review.[37] In 1996, the Operations Instruction was moved into a new publication titled "Standard Operating Procedures."[38] The Operations Instruction was eventually rescinded in 1997 through a memorandum issued by former INS Acting Executive Associate Commissioner Paul Virtue.[39] Titled "Cancellation of Operations Instructions," the memo identified a series of Operations Instructions that were rescinded as a consequence of the 1996 immigration laws.[40] Virtue recalls that in cancelling the Operations Instructions, there was no intention by the agency to eliminate deferred action relief.[4] Rather, the purpose of cancelling the rule was "housekeeping" related-there was an internal effort to take the Operations Instructions and place them into policy manuals like the Standard Operating Procedures manual.[42]

Consistent with the INS's intent, even after the Operations Instruction on deferred action was removed, the factors outlined in the Instruction for "deferred action" continued to be utilized. As described in a leading treatise on immigration law and procedure, "[w]hile the deferred action program is still an internal administrative arrangement, with no provision for an application or participation by the alien, it is appropriate for the alien or the alien's counsel to call to the attention

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 84 of 129

of the district director the circumstances of a particular case, with appropriate documentation, and to **\*252** request that consideration be given to placing it in deferred action status." [43] The treatise's inclusion of the description and process for applying deferred action underscores the agency's recognition of deferred action even after the O.I. was formally rescinded.

### B. The 1996 Immigration Laws and Prosecutorial Discretion

Legislative amendments to the Immigration and Nationality Act in 1996 heightened the need for renewed guidance on prosecutorial discretion. [44] For example, the 1996 immigration laws eliminated opportunities for certain individuals deemed "arriving" or those subject to removal based on certain activities classified as criminal or terrorist-related to apply for removal relief, or if held in custody by immigration, to submit a request to an immigration judge for release on their own or on a bond. [45] Individuals classified into these special categories are incarcerated mandatorily without a bond hearing. [46] The 1996 laws also expanded the list of activities that could be classified as an "aggravated felony" and applied this new definition retroactively. [47] Additionally, the 1996 immigration laws meaningfully limited individual review in a federal court by placing statutory bars to review on certain noncitizens with criminal histories or with denials from the lower court that were related to the statutory bars on asylum and discretion, among others. [48] In a letter by then Assistant Attorney General Robert Raben to Massachusetts Congressman Barney Frank date January 19, 2000, Raben admitted:

> The IIRAIRA eliminated both the possibility of relief from deportation and the possibility of bond for many criminal and other aliens placed in deportation and/or removal proceedings who previously would have been eligible for relief. Consequently, the IIRAIRA rendered the exercise of prosecutorial discretion by the INS the only means for averting the extreme hardship associated with certain **\*253** deportation and/or removal cases. [49]

Recognizing the limits of his own agency's discretion Raben stated, "Unfortunately, prosecutorial discretion guidelines-without carefully drafted substantive amendments to the INA remain an inadequate tool to alleviate the excessively harsh consequences of the 1996 amendments in truly exceptional cases." [50]

The literature criticizing the 1996 immigration laws, and its consequences, is plentiful. [5] This article does not seek to rehash this critique here but instead highlights some of the provisions for purposes of analyzing it against the principle of prosecutorial discretion. A modified transcript from a 2001 symposium on immigration and criminal law hosted by the Association of the Bar of the City of New York, reveals the complexity and controversy of the 1996 IIRAIRA provisions and its relationship with prosecutorial discretion. [52] Former INS General Counsel Owen ("Bo") Cooper highlighted the fine line between the limits of prosecutorial discretion, as well as the politics of select Members of Congress who both created stern restrictions to the immigration statute, and then held INS accountable for failing to refrain from enforcing them against individuals who presented compelling equities. [53]

**\*254** In a written response to statutory changes made to the Immigration and Nationality Act by Congress in 1996, Bo Cooper issued a memorandum to former INS Commissioner Doris Meissner. [54] The purpose of the Cooper memo was to enable INS to study the use of prosecutorial discretion and provide a legal foundation for any guidance produced by INS in the future. [55] The memo itself reads like a short lesson plan, describing the principle, purpose, and limitations of prosecutorial discretion, and also identifying criminal law jurisprudence as a leading source. [56] The Cooper memo

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 85 of 129

explains that, while immigration officers are not "prosecutors" in the literal sense, they nevertheless enjoy broad prosecutorial authority over enforcement decisions. [57]

On her last day as INS Commissioner, Doris Meissner issued a memorandum to all personnel regarding the use of prosecutorial discretion. [58] In many ways, the Meissner memo became the modern day "Operations Instruction" for practitioners to utilize in compelling cases. The Meissner memo is more expansive than the Operations Instruction to the extent that it identifies a range of possible actions (one of which is deferred action) to which prosecutorial discretion may apply. [59] Similarly, the Meissner memo reveals the government's theory for why prosecutorial discretion is necessary. Titled "Exercising Prosecutorial Discretion," the Meissner memo describes various acts that might fall under prosecutorial discretion:

> [Prosecutorial discretion] applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), [60] but also to a broad range of other discretionary enforcement decisions, including among others: Focusing investigative resources on particular offenses or conduct; deciding **\*255** whom to stop, question, and arrest; maintaining an alien in custody; seeking expedited removal or other forms of removal by means other than a removal proceeding; settling or dismissing a proceeding; granting deferred action or staying a final order; agreeing to voluntary departure, withdrawal of an application for admission, or other action in lieu of removing the alien; pursuing an appeal; and executing a removal order. [6]

The Meissner memo details the cost-related arguments behind prosecutorial discretion. "Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations.the Service must make decisions about how best to expend its resources. Managers should plan and design operations to maximize the likelihood that serious offenders will be identified." [62] The Meissner memo also puts the humanitarian theory behind prosecutorial discretion to paper by listing a number of largely compassionate factors that may be considered by an immigration officer in deciding whether to exercise prosecutorial discretion. [63] While the list at first appears long and unachievable the Meissner memo suggests that an individual need not show every factor to qualify and clarifies that an officer's decision must be based on a "totality of the circumstances, not on any one factor considered in isolation." [64] The non-exhaustive list of factors identified by Meissner includes: 1) immigration status, 2) length of residence in the United States, 3) criminal history, 4) humanitarian concerns, 5) immigration history, 6) likelihood of ultimately removing the alien, 7) likelihood of achieving enforcement goal by other means, 8) whether the alien is eligible or is likely to become eligible for other relief, 9) effect of action on future admissibility, 10) current or past cooperation with law enforcement authorities, 11) honorable U.S. military service, 12) community attention, and 13) resources available to the INS. [65] Notably, the Meissner memo instructs that discretionary judgments must be made astutely and consistently. Specifically, Meissner notes, "[s]ervice officers are not only authorized by law but expected to exercise discretion in a judicious manner at all stages of the enforcement process-from planning investigations to enforcing final orders-subject to their chains of command and to the particular responsibilities and authority applicable to their specific **\*256** position." [66] This language suggests that while the act of discretion is an option, exercising such discretion in a fair and evenhanded manner is an obligation. This is similar to the obligatory language of the former Operations Instruction on deferred action. [67]

According to some scholars, the statutory reduction or near-elimination of judicial and agency discretion as a consequence of the 1996 laws was not necessarily eliminated. Instead, the government's ability to grant a reprieve to desirable individuals and groups have been transferred to the Executive branch in the form of prosecutorial discretion. [68] As noted by immigration scholars Adam B. Cox and Christina Rodriguez:

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 86 of 129

> [I]t is important to see that the Executive still has de facto delegated authority to grant relief from removal on a case-by-case basis. The Executive simply exercises this authority through its prosecutorial discretion, rather than by evaluating eligibility pursuant to a statutory framework at the end of removal proceedings. In fact, because these decisions are no longer guided by the INA's statutory framework for discretionary relief, the changes may actually have increased the Executive's authority. [69]

Cox and Rodriguez conclude that the scope of DHS's prosecutorial discretion may have actually expanded as a consequence of the 1996 immigration laws. If their conclusion is accurate, then the importance of having an agency that exercises prosecutorial discretion in manner that incorporates the various humanitarian-related factors once utilized in the formal adjudicatory context cannot be overstated.

## C. Agency Reorganization and Reaffirmation of Prosecutorial Discretion

The September 11, 2001 attacks launched a national discussion on border security and immigration law. A wide variety of stakeholders, among them congressional members, leaders in the White House and Executive Branch, individuals who favor restrictions to immigration, and public policy think tanks linked the September 11, 2001 attacks to failures **\*257** in the United States immigration system, pointing to border vulnerabilities and deficiencies at the Department of State and Immigration and Naturalization Service. What followed was a quick but passionate debate in Congress about overhauling the Immigration and Naturalization Service, then a component of the Department of Justice, and moving many of its units into a new cabinet-level agency. [70]

With the passage of the Homeland Security Act of 2002, the INS was abolished by statute and immigration services, enforcement, and related policymaking (including visa policies) were transferred to a new "Department of Homeland Security." [7] The "services" unit known as the United States Citizenship and Immigration Services (USCIS) is responsible for processing affirmative applications and petitions such as lawful permanent resident ("green card"), asylum, and citizenship applications. [72] Similarly, the USCIS includes a citizenship office, congressional relations office, chief counsel's office and asylum and refugee affairs office. [73] As a consequence of meaningful tweaking by the former George W. Bush Administration, the immigration "enforcement" unit is comprised of two divisions: Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE). [74] As the name suggests, CBP reflects a merger of the U.S. Border Patrol, U.S. Customs, and other agencies. [75] The immigration-related functions managed by CBP include inspections at ports of entry, and arrests and seizures of people and things at and between ports of entry, among other functions. [76] Like USCIS, CBP houses a congressional relations office and chief counsel's office, as well as multiple offices focused on trade, border patrol, and international affairs, among others. [77] The second enforcement unit, ICE, is charged with a range of activities on the interior of the United States including investigating, arresting, detaining and charging noncitizens who are in violation of the immigration law. [78] ICE has the largest budget among the **\*258** three immigration units and more than 17,000 employees. [79] ICE has five key divisions, including the Federal Protective Service, an intelligence office, an investigations office, an international affairs office and an office devoted to detention and removal. [80]

Following reorganization, the immigration court system was retained in the Department of Justice under a unit called the Executive Office for Immigration Review (EOIR) while the function of issuing visas remained at the State Department. [8] The Homeland Security Act resulted in additional jurisdictional and substantive changes with regard to the care and custody of unaccompanied minor children, oversight of individual and systemic abuses or misconduct by DHS officers

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 87 of 129

and its contractors, and related matters. [82]  While the transfer of immigration enforcement authorities out of the Department of Justice and into the Department of Homeland Security may have provided the EOIR with a higher degree of decisional independence, the shift did not necessarily provide EOIR with greater authority to exercise this independence. [83]  As described by Cox and Rodriguez:

> [T]his effort to insulate decisions regarding relief from the prosecutorial arm of the immigration agencies has been undermined by the recent changes to the relief provisions. Those changes have had the effect of shifting more aspects of the deportation decision back to ICE. Thus, far from eliminating discretion, the statutory restrictions on discretionary relief have simply consolidated this discretion in the agency officials responsible for charging decisions. Prosecutorial discretion, rather than the exercise of discretion by immigration judges has become the norm. [84]

Despite the transfer and merger of core immigration units into a new  **\*259**  cabinet level department, and absence of a particular individual to oversee the arguably competing missions and cultures of the new immigration units, the Meissner memo and principle of prosecutorial discretion survived the move. [85]

The foregoing summary about how INS was overhauled and reorganized into the DHS is by no means complete but provides an important foundation for understanding the varying locations and individuals who possess the great power of prosecutorial discretion. Subsequent written memos issued by UCIS, CBP and ICE have been in keeping with, referenced, or in some cases explicitly reaffirmed the Meissner memo. [86]  For example, in January 2003, former USCIS Executive Associate Commissioner Johnny N. Williams issued a memo to Regional Directors, Deputy Executive Associate Commissioner, Immigration Services and General Counsel advising officers of their authority to refrain from bringing charges against noncitizens who are both a beneficiary of such benefits and potentially in violation of immigration laws as a consequence of their unlawful presence. [87]  In this scenario, the Williams memo reminds officers that they may refrain from charging such noncitizens and calculate humanitarian and other factors when making such a determination. [88]  The Williams memo also instructs officers to review the Meissner memo. [89]  Moreover, in September 2003, former USCIS Associate Director for Operations William Yates issued a memo to Regional Directors and Service Center Directors discussing their authority to issue charging documents to noncitizens, and reminding Directors that every decision must be made in accordance with the Meissner memo. [90]

Similarly, in October 2005, former ICE Principal Legal Advisor William J. Howard issued a memo to all OPLA (Office of the Principal Legal Advisor) Chief Counsel highlighting the limited resources of ICE and position that "the universe of opportunities to exercise prosecutorial discretion is large." [9]  The Howard memo lists scenarios during which an  **\*260**  officer's "favorable" exercise of discretion would be appropriate such as discouraging the issuance of charging papers to noncitizens with viable family petitions or green card applications and those with sympathetic factors such as parents of citizen children with a serious medical condition. [92]  The Howard memo also offers possible scenarios for deferring enforcement even after charging papers have been filed. [93]  Overall, the Howard memo preserves many of the same principles echoed by the former INS. "Prosecutorial discretion is a very significant tool to deal with the difficult, complex and contradictory provisions of the immigration laws and cases involving human suffering and hardship." [94]

More recently, in November 2007, former ICE Assistant Secretary Julie Myers issued guidance to all field office directors and special agents in charge, advising them to release apprehended nursing mothers absent national security or public safety or other investigative interests. [95]  In the memo, Myers reminds officers that "[t]he process for making discretionary decisions is outlined in the [Meissner memo] Field agents and officers are not only authorized by law to exercise discretion within the authority of the agency but are expected to do so in a judicious manner at all stages of

Case 1:18-cv-00068  Document 472-6  Filed on 08/21/20 in TXSD  Page 88 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

the enforcement process." [96]  In response to criticisms surrounding ICE's large scale arrest of 250 workers at a leather shoe factory in New Bedford, MA and following meaningful negotiations with the late Senator Edward Kennedy, a Democrat from Massachusetts and then Chairman of the Senate Judiciary Committee, and Representative William Delahunt, a Democrat from Massachusetts, ICE issued a memo in November 2007 entitled "Guidelines for Identifying Humanitarian Concerns among Administrative Arrestees When Conducting Worksite Enforcement Operations." [97] While the guidelines were crafted more as instructions to front line officers after ICE exercised its authority to investigate and carryout what were largely worksite enforcement actions, (which arguably is, in and of itself a discretionary determination) some of the guideline's language relates squarely with exercising prosecutorial discretion based on **261** individual circumstances. [98]

### D. Deferred Action under the Department of Homeland Security

Notably, the Department of Homeland Security has maintained the deferred action program of the former INS. [99] Pursuant to FOIA requests, Leon Wildes obtained deferred action records from the Eastern and Central Regional Offices of the Bureau of Citizenship and Immigration Services (now United States Citizenship and Immigration Services, or USCIS). [00]  Specifically, Wildes studied data on 499 approved, removed and denied cases under the deferred action program. [0]  This data is current through April 2003. [02]  In both the central and eastern regional offices, approximately eighty-nine percent of the cases were approved. [03]  In most of the cases reviewed by Wildes, decisions took the form of a terse statement without explaining the overriding factor influencing the decision. [04]  Nevertheless, the existence of potential separation from family and/or an existing physical infirmity was a major factor in deferred action adjudications. [05]  Wildes observes:

> In light of the fact that these cases involve alien spouses who are completely reliant on public assistance and receive state-funded medical care, it is striking that the government approved them for deferred action status. This fact exemplifies that the humanitarian goal of deferred action take precedence over the usual concerns of the INS, which removes aliens who have become a burden upon United States resources and thus become subject to the public charge provision, another distinct ground removal. [06]

**262** The 2003 data also reveals that separation from family and negative publicity, when coupled with other factors such as a medical condition, influenced grants of deferred action. [07]  One striking difference in Wildes' 1976 study is the higher number of grants for noncitizens who were mentally infirm, or who had criminal histories due to drug convictions, as compared to the 2003 data. [08]  Ultimately, comparing the 1976 data with the 2003 data provides limited utility since the sample collected in the former contained only grants of deferred action while the sample collected in the latter was quantitatively smaller and contained grants, denials and removals. [09]

In April 2007, Prakash Khatri, then Ombudsman of the United States Citizenship and Immigration Services issued a "Recommendation" on deferred action, highlighting the history and authority for deferred action and recommending that the USCIS publicize and maintain statistics on the deferred action program. [0]  The Recommendation reasoned that tracking deferred action cases would increase consistency in adjudications.     As to the public benefit, Khatri noted:

> This recommendation seeks to improve customer service by making basic information on deferred action requests clear to the public: where to submit a request, what to include with a submission, and the general criteria for requests to be approvable. Implementation of this recommendation would prevent customers from having to guess where and what information to submit. It also would prevent officers in the field

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 89 of 129

from providing misinformation about where a request for deferred action should be submitted. This recommendation also seeks to ensure that over time and in different regions, cases are similarly decided. [2]

Then USCIS Director Emilio Gonzalez issued a response in August 2007. [3] With regard to posting information about the deferred action **263** program on the USCIS website, Gonzalez responded:

> Deferred action is a discretionary action initiated at the discretion of the agency or at the request of the alien, rather than an application process. Since deferred action requests are reviewed on a case-by-case basis and granted only in extraordinary circumstances, USCIS does not believe that general information about the deferred action process would be a meaningful addition to the website. [4]

As to tracking deferred action cases, Gonzalez concluded that future deferred action grants would be monitored by the Regional Directors and reported to USCIS Headquarters. [5] However, Gonzalez did not believe it was necessary for USCIS Headquarters to track and review deferred action cases to ensure consistency among regions. [6] Finally, USCIS agreed that clarifying guidelines on deferred action for USCIS and ICE officers would be beneficial. [7] The foregoing correspondence is notable and reflects a tension about whether deferred action should operate as an internal guideline or a rule. Whereas Khatri recommended a policy on deferred action that would appear like a rule and benefit, Gonzalez cautiously avoided this characterization.

More recently, deferred action has been applied at a macro level. In June 2009, DHS publicly announced that it would extend deferred action to widows and widowers of U.S. citizens-as well as their unmarried children under 21 years old-who reside in the United States and who were married for less than two years prior to their spouse's death. [8] In a related press release, DHS identified the contours of deferred action: "Deferred action is generally an act of prosecutorial discretion to suspend removal proceedings against a particular individual or group of individuals for a specific timeframe; it cannot resolve an individual's underlying immigration status." [9] Deferred action has also been granted on an individual basis to select "DREAM Act" students. [20] The Development, **264** Relief, and Education for Alien Minors Act, or DREAM Act, refers to pending federal legislation that would regularize the immigration status of select immigrant students who have graduated from a United States high school, have a record of "good moral character," have been continuously present in the United States, and entered the United States at a tender age. [2]

Prosecutorial discretion has also historically been applied to groups or classes of individuals through "Extended Voluntary Departure," or EVD. Like with deferred action, EVD does not have a statutory basis nor is there an application form or process. Instead, the program "permits the AG in his discretion to temporarily enjoin the removal from particular countries who fear return because of sudden political changes in their countries of origin or other reasons." [22] In the past, the Attorney General has established an EVD program for citizens of Poland, Cuba, the Dominican Republic, Chile, Cambodia, Vietnam, among others. [23] Another formulation of the EVD program is called "Deferred Enforcement Departure," or DED. DED can be utilized by the President to temporarily safeguard classes of individuals from removal. As described by DHS: "Although DED is not a specific immigration status, individuals covered by DED are not subject to enforcement actions to remove them from the United States, usually for a designated period of time." [24] Notably, President Barack Obama signed a Memorandum for the Secretary of Homeland Security in March 2009 extending DED for qualified Liberians. [25] It is worth noting that EVD is rarely used today due in part

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 90 of 129

to the fact that many of the benefits of EVD now have a statutory basis **\*265** through a program called "Temporary Protected Status." [26]

For more than sixty years, the immigration agency has applied the theory of prosecutorial discretion to individuals and groups. While the agency's historical application of prosecutorial discretion has in many cases been legitimately driven by resource and humanitarian considerations, the absence of oversight, accountability and transparency by the agency has negatively impacted undocumented noncitizens and their families. Moreover, the agency's unwillingness to recognize deferred action as an available benefit worthy of public disclosure is troubling. The practical implication is that undocumented noncitizens are prevented from requesting for deferred action or challenging instances where the agency has failed to grant deferred action.

### III. Lessons from Criminal Law

### A. History and Description of Prosecutorial Discretion in the Criminal System

There is little disagreement among criminal law and justice scholars that the American prosecutor enjoys wide power and discretion. In fact, one scholar has relied on historical analyses to conclude that the American prosecutor holds discretionary power "unmatched in the world." [27] The prosecutor carries a discretionary role at many important stages of the criminal process including whether to bring an arrest, when to file charges, whether to bring charges under federal or state law, or whether an existing charge should be dissolved. [28] As articulated by Angela Davis, "Prosecutors are the most powerful officials in the criminal justice system because they alone decide whether to charge a person with a crime, what charges to bring, and when to accept a plea to a lesser offense." [29]

For years, criminal law scholars have written about the history, power **\*266** and abuse of prosecutorial discretion. [30] The term prosecution was developed in England and America in the context of a private prosecution system. Before the American Revolution, the arrest and prosecution of potential wrongdoers fell on the crime victims' as such victims literally performed the role of the prosecutor (or hired a private advocate to do the same), investigating and building a case before a trial. [3] Punishment was in the form of services to the victim or imprisonment at the victim's expense. [32] The population growth in colonial America came with a growth in criminal activity, causing private victims to resort to settlements instead of trial and overall chaos in the system. The birth of public prosecutions was preceded by a practical desire to prevent abuses and a philosophical position about crime and society. [33]

The first public prosecutor was an "Attorney General" appointment in Virginia in 1643. [34] The Judiciary Act of 1789 created the first federal office of the attorney general and district attorneys, though without a clear configuration or hierarchy. [35] Thereafter, "crime" commissions were developed to study the criminal justice system. [36] In particular, the Wickersham Commission identified abuses with prosecutorial power and discretion and made practical recommendations. [37] In 1931 the Wickersham Commission wrote, "[i]n every way the prosecutor has more power over the administration of justice than the judges, with much less public appreciation of his power. We have been jealous of the power of the trial judge, but careless of the continual growth of the power of the prosecuting attorney." [38] Davis argues that despite the findings and recommendations of the Wickersham Commission, other commissions, and legal scholars, there has been no significant reform of the prosecutorial process. [39] According to Davis, prosecutors retain even more power, **\*267** independence, and discretion than they did in the nineteenth century. [40]

Like with immigration enforcement, there are many stages of the criminal process. The police officer carries the power to arrest. Thereafter, the prosecutor decides whether and what kind of charges to file. If a prosecutor decides not to bring charges, the person is free to go. [4] Federal courts must utilize the grand jury process for felony charges. This means

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 91 of 129

that the citizen-jurors together must decide whether there is probable cause to believe that a defendant committed a felony offense. [42] While it may appear that the grand jury serves as an important "check" to the arresting police officer and prosecutor in determining whether a formal charge should be made, some scholars argue that it is the prosecutor who actually controls the grand jury process. [43] Another routine practice among prosecutors is "overcharging," which places the prosecutor in a greater bargaining position during the "plea bargaining" stage and also provides him with a "plan B" in case the defendant is not convicted on the primary charge. [44]

Plea bargaining is another stage during which prosecutors hold a great amount of discretion. In light of the fact that most criminal defendants enter into guilty pleas, if the crimes carry a mandatory minimum sentence, it is accurate to conclude, as Davis does, that the charging and plea bargaining stages of the criminal process largely determine the defendant's fate. [45] Another complex issue in criminal cases is the relationship between the crime victim and the prosecutor. Davis advises that while the prosecutor should support crime victims, his obligations are broader and may potentially conflict with the victim's goals. [46] Notably, prosecutors also control "death penalty" cases to the extent that only a prosecutor, as **268** opposed to a judge or a more neutral party, can decide whether to seek the death penalty in a particular case. [47]

## B. Application of Criminal Prosecutorial Discretion to Immigration Context

An analysis of prosecutorial discretion in the criminal context is valuable on at least four levels. First, the cost and justice-related theories behind prosecutorial discretion in the criminal justice context and the civil immigration context are similar. Second, both the criminal and civil immigration arenas have witnessed an explosion of activities that qualify as infractions subject to penalties. Third, the immigration agency INS/DHS has historically relied on documents produced and utilized in the criminal context to create guidance for immigration officers. Finally, the surge in immigration-related criminal prosecution raises a number of questions about how prosecutorial discretion is exercised against noncitizens in both the criminal and civil contexts. These four points are discussed in turn below.

## 1. Cost and Justice-Related Theories are Similar

As in the civil immigration context, the historical arguments and rationale for prosecutorial discretion in the criminal context are largely grounded in efficiency and justice. As stated by former Attorney General Robert H. Jackson before the Conference of United States Attorneys in 1940, "[n]o prosecutor can even investigate all of the cases in which he receives complaints. If the Department of Justice were to make even a pretense of reaching every probable violation of federal law, ten times its present staff would be inadequate. . .." [48] The justice-related rationale behind prosecutorial discretion is explained in the United States Attorney Manual's opening chapter on principles of federal prosecution:

> The manner in which Federal prosecutors exercise their decision-making authority has far-reaching implications, both in terms of justice and effectiveness in law enforcement and in terms of the consequences for individual citizens. A determination to prosecute represents a policy judgment that the fundamental interests of society require the application of the criminal laws to a particular set of circumstances-recognizing both that serious violations of Federal law must be prosecution, and **269** that prosecution entails profound consequences for the accused and the family of the accused whether or not a conviction ultimately results. [49]

The USAM highlights the importance for each Federal prosecutor to be guided by the principles set forth in the manual, but permits a departure from such principles if necessary in "the interests of fair and effective law enforcement within the district." [50]

CAR 1002

Case 1:18-cv-00068  Document 472-6  Filed on 08/21/20 in TXSD  Page 92 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Both the USAM and the Meissner memo utilize a "substantial federal interest" standard focusing on both costs and justice. [5] Specifically, the standard identifies the following considerations for determining whether prosecution should be declined: 1) federal law enforcement priorities, 2) nature and seriousness of the offense, 3) the deterrent effect of prosecution, 4) sufficiency of evidence to prove culpability, 5) prior criminal history, 6) willingness to cooperate with investigations or prosecutions of others, and 7) the potential sentence and related consequences if convicted. [52]

As in the Meissner memo, the USAM notes that not every factor needs to be complied with in order for a federal prosecutor to decline prosecution. [53] In discussing the nature and seriousness of offense, the USAM notes that "[i]t is important that limited federal resources not be wasted in prosecuting inconsequential cases or cases in which the violation was technical." [54] Illustrating this point, Davis comments on the discretion used by police each time someone commits a traffic violation. [55] She argues that few people would be supportive of a law that required police officers to issue tickets to every person who committed a traffic violation. [56] Davis also argues that the populace would assent that officers should preserve their limited resources for "more serious offenses" than traffic-related ones. [57] Moreover, the USAM states that "[e]conomic, physical, and psychological considerations are also important in assessing the impact of the offense on the victim. In making this connection, it is appropriate for the prosecutor to take into account such matters as the victim's age or health, and whether full or partial restitution has been **270 made." [58] It also describes personal factors of the accused such as "extreme youth, advanced age, mental or physical impairment" as potential reasons to decline prosecution. [59] While the content of the USAM guidelines are notable, Davis critically notes that these guidelines are not legally binding, and therefore do not establish accountability. [60]

## 2. Explosion of Activities that Qualify as Infractions

Much like the 1996 immigration laws heightened the importance of prosecutorial discretion in the immigration context, so too did the preservation and growth of criminal statutes in the criminal context. Davis describes an instance in which prosecutorial discretion can affect the application of a preserved criminal statute:

> Legislatures pass laws criminalizing a vast array of behaviors, and some of these laws, such as fornication and adultery for example, stay on the books long after social mores about these behaviors have changed. In addition, some offenses warrant prosecution in some instances but not others. For example, it may be reasonable to bring a prosecution in a jurisdiction that criminalized gambling for someone engaged in a large scale operation but not for individuals placing small bets during a Saturday night poker game in a private home. [6]

Cox and Rodriguez argue that the President has assumed enormous power over immigration matters primarily through: 1) inherent executive authority, 2) formal mechanisms of congressional delegation, and 3) de facto delegation. [62] Focusing on de facto delegation, they conclude that the criminal justice system bears a meaningful resemblance to the civil immigration one to the extent that the "laws on the books makes everyone a felon." [63] Namely, it is the sheer breadth of immigration sanctions and the under-enforcement of these sanctions that have together created broad de facto delegation. [64] Cox and Rodriguez conclude, "[t]he trends have **271 made administration of immigration law look more and more like the administration of criminal law, where charging decisions rather than either the formal legal rules or the exercise of judicial discretion determine who is deported and what collateral consequences attach to deportation." [65]

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 93 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

### 3. Reliance on Documents Utilized in the Criminal Context

As a practical matter, in developing the prosecutorial guidelines applicable to immigration officers, the former INS General Counsel and the former Commissioner have relied heavily on principles of prosecutorial discretion in the criminal context. [66] For example, former General Counsel for the Immigration and Naturalization Service Bo Cooper drafted a memorandum on prosecutorial discretion noting that, "[t]he idea that prosecutor is vested with broad discretion in deciding when to prosecute and when not to prosecute is firmly entrenched in American law." [67] In addition to the costs and justice arguments, the memorandum identifies a third important rationale for discretion in the criminal context, namely the legislative "overcriminalization," which means the longevity of criminal statutes that in modern society may not necessarily be conceived of as a "crime." [68]

Similarly, the Meissner memo relies on the U.S. Department of Justice's United States Attorneys' Manual's Principles of Federal Prosecution. [69] As explained earlier, the Principles of Federal Prosecution governing the conduct of U.S. Attorneys use the concept of a "substantial Federal interest." [70] Based on this principle, the Meissner memo states, "As a general matter, INS officers may decline to prosecute a legally sufficient immigration case if the Federal immigration enforcement interest that would be served by prosecution is not substantial." [7] Referencing the USAM, The Meissner memo lists some beneficial aspects of such principles:

> [s]uch principles provide convenient reference points for the process of making prosecutorial decisions; facilitate **\*272** the task of training new officers in the discharge of their duties; contribute to more effective management of the Government's limited prosecutorial resources by promoting greater consistency among the prosecutorial activities of different offices and between their activities and the INS's law enforcement priorities; make possible better coordination of investigative and prosecutorial activity by enhancing the understanding between the investigative and prosecutorial components; and inform the public of the careful process by which prosecutorial decisions are made. [72]

### 4. Surge in Immigration-Related Criminal Prosecutions

Related to the foregoing discussion about the application of prosecutorial discretion in the criminal and immigration contexts, is the striking increase of criminal immigration prosecutions over the last decade. [73] Contrast this with civil immigration violations, which as the name suggests, are not classified as "crimes" in the formal sense. For example, an individual who enters the United States as a full-time student and who during the second semester works without authorization can be charged civilly based on her failure to maintain the terms of her visa. [74] However, the nature of some offenses that are legally classified as a "criminal" immigration violation is not necessarily violent or "criminal" in the ordinary meaning of the word. To illustrate, an individual who enters the United States one time without inspection can be prosecuted under the criminal law. [75] Finally, some immigration-related transgressions can be prosecuted as both a civil immigration offense and a criminal one. [76] For instance, the immigration statute makes the failure to notify the government of a change of address within 10 days of moving both a civil offense, for which a noncitizen may be removed, as well as a criminal offense, for which a noncitizen may be fined up to $200 and imprisoned **\*273** for up to 30 days. [77]

Notably, there are nearly 5,800 federal prosecutors in the more than 90 United States attorney's offices. [78] In 2007, 68,000 federal criminal cases were filed, of which 17,000 were immigration-related. [79] The percentage of immigration-

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 94 of 129

related prosecutions increased in 2008, reaching an all time high of 49.2 percent of all prosecutions. [80] Moreover, data from the United States Department of Justice and analyzed by the Syracuse University-based Transactional Records Access Clearinghouse (TRAC) shows that the government reported 8,813 new immigration convictions during January 2009, reflecting an 97 percent increase from similar convictions of the same time period in the previous year. [8] The TRAC study highlights the spike in immigration convictions, stating that such convictions increased by 219 percent from 2004. [82]

Most immigration-related prosecutions are brought by components of DHS under three sections contained in Title 8 of the United States Code: Bringing in and harboring certain aliens, Entry of alien at improper time or place, and Reentry of deported aliens. [83] Talking to the Dallas Morning News in early 2009, former U.S. Attorney Richard Roper stated that as the docket of immigration cases increases, "[t]he practical effect is it hurt our ability to prosecute white-collar fraud." He continued, "If we don't do them in the U.S. attorney's office they won't get done because they are so **\*274** labor-intensive. It is difficult for the local district attorney's office to handle that." [84]

The foregoing analysis raises important questions about prosecutorial discretion in both the criminal and civil contexts. For example, what does the fact that nearly one half of federal prosecutions have been immigration-related which, in effect reduced the number of white-collar prosecutions, suggest about the government's use of resources and priorities? As in the criminal context, are there outdated or somewhat excessive civil immigration punishments in the INA that call for DHS to modify the current guidance on prosecutorial discretion? Does the surge in immigration-related prosecutions call for the Department of Justice to modify its current guidance on prosecutorial discretion so that precious criminal law enforcement resources are not disproportionately spent on immigration-related misdemeanors at the expense of prosecuting serious felonies?

## C. Differences Between Prosecutorial Discretion in the Criminal and Immigration Contexts

There are two important differences between prosecutorial discretion in the criminal context and the immigration arena. First, the differing legal procedures and standards between criminal and civil immigration systems are notable. In the criminal context, police officers bear the power to arrest while the prosecutor holds authority to bring charges against a particular individual. Contrast this with the immigration context, where the immigration officer bears both the power to arrest and the power to bring charges. [85] Moreover, in the criminal system, a defendant is generally required to come before a judge or magistrate within 48 hours. [86] Under the immigration system, the regulations contain a 48 hour timeframe for making a charging or custody determination. [87] However, the regulation also contains an exception to the 48 hour rule "in the event of an emergency or other extraordinary circumstance in which case a determination will be made within an additional reasonable period of time." [88] Similarly, neither the regulations nor the INA contain a timeframe for serving an arrested noncitizen with charging papers, or NTA, or filing such papers with the immigration court. In most cases, **\*275** immigration defendants will not see a judge until the NTA is filed with the court and the initial hearing is scheduled. Furthermore, unlike the criminal system, the civil immigration system does not include a grand jury to secure felony charges. Finally, people who are charged with crimes are normally represented by a public defender at the government's expense. [89] Contrast this with the civil immigration system, where noncitizens facing removal are not provided a government attorney but may secure counsel at their own expense. The practical effect is that most noncitizens and unlawfully held United States citizens navigate the removal process and related court hearings alone. [90]

Second, there are meaningful differences in the factors influencing whether to prosecute a crime that do not necessarily apply to the immigration context. Some of the variables that exist with respect to a criminal prosecutor's decision to prosecute include: the existence of exculpatory evidence, the possession of physical evidence, the number of witnesses, the availability of corroborative evidence, the relationship between the victim and the defendant, the use of a weapon at

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 95 of 129

the scene of the crime, and whether the case involved victim provocation. [9] One set of research reveals a significant link between the initial decision to prosecute and the desire to avoid uncertainty. [92] Reviewing the basis of uncertainty in the criminal context is beyond the scope of this article. Nonetheless, such sources of research are by no means free from subjectivity and **\*276** socially defined factors. Political considerations also influence prosecutorial decisionmaking. As described by one scholar, "[p]rosecutorial success, which is defined in terms of achieving a favorable ratio of convictions to acquittals, is crucial to a prosecutor's prestige, upward mobility within the office and entrance into the political arena." [93]

Not surprisingly, the above-described variables do not apply neatly to the civil immigration context. For example, most immigration-related arrests do not involve a "victim" (the same can be said for some criminal offenses such as possession). Another key difference might rest on priority-for example, if the government's priority is to arrest and prosecute noncitizens working with fictitious social security numbers, or those from a particular nationality or religion, some of the variables outlined above are irrelevant. Moreover, the burden of proof on the government in a civil immigration proceeding is lower than the criminal burden of proof standard. [94] By extension, it could be argued that the pieces of evidence required to prove guilt in the criminal context are greater.

Some research also points to "extralegal" factors, such as race and gender, which influence prosecutorial decisionmaking. [95] On the other hand, a synopsis of research from Lauren O'Neill Shermer and Brian D. Johnson suggests that the empirical data is mixed. [96] For example, they point to a study of 400 burglary and robbery cases in Jacksonville, Florida by Celesta Abonetti finding no evidence of race or gender influencing the prosecutor's decision to reduce initial charges. [97] Shermer and Johnson also identify studies in which minority offenders were treated more favorably than their non-minority counterparts in charging decisions. [98] Relying on data from the Federal Justice Statistics Program, Shermer and Johnson's own research analyzed potential social inequalities related to prosecutorial decisions in the federal courts and found that extralegal characteristics such as age, race and gender had little influence on charge reduction decisions. [99] Importantly, the Shermer and Johnson analysis is **\*277** limited to charge reduction decisions, and therefore does not address potential disparities during other critical stages of prosecutorial decisionmaking. [200] To the extent that prosecutorial discretion in the immigration context operates with similar cost and justice-related theories as the criminal one but with far fewer safeguards, oversight and accountability of prosecutorial decisionmaking in immigration matters is vital.

Despite the important lessons to be drawn from the criminal context, there are four potential drawbacks of using the criminal system to analyze how the immigration agency should implement prosecutorial discretion. First, unlike criminal defendants, noncitizens are subject to civil immigration laws and by extension do not have the guarantee of court appointed counsel if they are unable to afford one, and do not benefit from a division of power between the arresting officer, prosecutor and grand jury. Second, due to the absence of a legal standard, or in some cases the latitude of certain rules, noncitizens are vulnerable to prolonged detention without timely charges, service of charges, or scheduling of a hearing before a judge. Moreover, noncitizens confined by DHS are typically incarcerated in correctional facilities used to hold the criminal population, raising significant questions about the appropriateness and conditions of such confinement. Third, even if the government were to consider applying the safeguards and processes in the criminal system to the civil immigration one, the costs associated with such an application, among them a grand jury process and a trial by jury, would pose serious resource constraints to the government given the large number of noncitizens who interact with immigration law enforcement each fiscal year. [20] Fourth, and related to the foregoing analysis about the factors influencing prosecution, are the diminished incentives by DHS to forgo prosecution and avoid **\*278** removal. Immigration scholar and professor Nancy Morawetz highlights the differences between criminal and immigration cases:

> I think there is a false analogy with the criminal cases. In criminal cases the criminal prosecutor has to think about the strength of the evidence, the difficulty of proceeding with the case, and the prosecutorial priorities

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 96 of 129

of the office. In contrast in immigration, it tends to be little work to have the case proceed in court. As a result, there are no institutional disincentives to having the immigration court dispose of the case. As a practical matter, once someone is in [removal] proceedings, it is easier for the ICE trial attorney to prove removal than it is to write a memo to get superiors to agree to exercise discretion. [202]

Even more striking than the practical similarities and differences between prosecutorial discretion in immigration affairs and criminal matters, is the relationship between the argument of this article, namely that the enormous impact of immigration enforcement actions on the noncitizens and their families requires prosecutorial discretion to be administered with strong guidelines and safeguards, and the premise of the criminal prosecutor's manual, namely that the enormous impact of prosecution on the accused and his family call for a sound policy on prosecutorial discretion. While scholars and lawyers can debate the meaningful differences between the consequences of civil deportation on the one hand and criminal punishment on the other, the shared normative question about how these consequences affect the individual and his family is exceptional.

### IV. Lessons from Administrative Law

#### A. Prosecutorial Discretion and Judicial Review

A discussion about rulemaking in administrative law serves as an important foundation for the recommendation that rulemaking should be utilized to clarify the criteria and process for deferred action. Enacted in 1946, the Administrative Procedures Act is the leading statute governing the administrative process. Stephen G. Breyer, Richard B. Stewart, Cass R. Sunstein and Adrian Vermeule identify four kinds of agency decisionmaking: 1) formal on the record adjudication, 2) formal on the record rulemaking, 3) informal notice and comment rulemaking, 4)   **\*279**  informal adjudication. [203] The APA contains multiple sections related to the rulemaking process. [204]

Under the APA, notice of proposed rulemaking by the agency must be published in the Federal Register or personally served on affected individuals not less than 30 days before the effective date of the rule. [205] In addition, section 553 of the APA requires that individuals be given an opportunity to comment on a proposed rule, after which the agency is required to consider relevant factors and include a statement of purpose in the newly minted rule. [206] While the procedures outlined in 553(c) of the APA are identified by administrative law scholars as "informal rulemaking," the process itself is by no means informal and in fact may be more appropriately classified as "substantive rulemaking." Importantly, the APA contains the following exceptions to the substantive rulemaking requirements: 1) interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or 2) when the agency makes a good cause showing that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest. [207] Kenneth Culp Davis declared the notice and comment rulemaking procedures of the APA "one of the greatest inventions of modern government," and advocated for greater rulemaking in order to increase public participation in and judicial review of agency decisions and policy. [208]

#### B. Agency Rulemaking and Judicial Review

As a general matter, the APA provides for comprehensive judicial review over agency actions. [209] There are two notable exceptions that apply when "statutes preclude judicial review or agency action is committed to agency discretion by law." [2 0] As elucidated in the next section, the   **\*280**  Supreme Court has also recognized the statutory provision eliminating judicial review over deferred action and general acts of prosecutorial discretion. [2]  The relationship between informal rulemaking and judicial review has been analyzed by the courts under two paradigms. According to Richard

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 97 of 129

Thomas, the first paradigm, known as the "old 'new administrative law' paradigm," is consistent with the rule-making proposition by Wildes. [2] [2]

The second paradigm, identified by Thomas as the "newer" administrative law paradigm, is more tolerant of agency discretion and limited judicial review. [2] [3] This newer model is reflected in the seminal decision Heckler v. Chaney. [2] [4] In that case, the Petitioner was the Food and Drug Administration (FDA) and the Respondents were inmates who had been sentenced to death by lethal injection of drugs. [2] [5] The Respondents argued that the use of such drugs violated another statute called the Federal Food, Drug, and Cosmetic Act (FDCA) and therefore requested that the FDA take "enforcement actions" in order to prevent these violations. [2] [6] The FDA "refused their request." [2] [7] The question for the Court was whether the FDA's refusal to take the enforcement actions was precluded from judicial review under the Administrative Procedure Act. The Court answered this question in the affirmative, concluding that the FDA's decision not to take the enforcement actions was "presumptively unreviewable." [2] [8]

On the other hand, the older "rule-based" model was reflected in the D.C. Circuit case Community Institute v. Young (CNI II). [2] [9] The District Circuit Court of Appeals (DC Circuit Court) analyzed whether the FDA policy controlling aflatoxin levels in corn operated as a rule subject to the normal notice and comment procedures. [220] The FDA argued that the formal notice and comments requirements under section 553 of the APA did not apply because of the exception contained in that same section for **\*281** "interpretative rules or policy statements." [22] In the FDA's view, the contamination levels published in the Federal Register constituted general statements of policy. On the other hand, CNI argued that the FDA action levels operated as a rule and therefore was subject to notice and comment rulemaking. Agreeing with CNI, the Circuit Court held the following:

> We conclude that in the circumstances of this case, FDA by virtue of its own course of conduct has chosen to limit its discretion and promulgated action levels which it gives a present, binding effect. Having accorded such substantive significance to action levels, FDA is compelled by the APA to utilize notice-and-comment procedures in promulgating them. [222]

Critics of the CNI II decision argue that by imposing notice and comment requirements on FDA, the court created a disincentive for agencies to self-regulate. Thomas explains how such an imposition can create a disincentive:

> By subjecting agencies not only to the threat of judicial review but also to notice and comment requirements whenever an agency's own prosecutorial policy begins to take on a self-binding character, the court actually encourages agencies to rely on less binding, and potentially more arbitrary and hidden, case-by-case discretion, which involves none of the burdens of APA rulemaking and judicial review. [223]

Thomas also argues that even the greatest advocates of a "rule based" model would agree that a strong internal rule administered by the agency may be more effective in preventing discretionary abuse and misconduct than external checks. [224] He sees the articulation of Chaney and CNI II as a reflection of the unfinished debate between the two administrative law models: one that favors unchecked agency discretion, and the other which supports rulemaking subject to external checks by the judiciary and public. [225] While Thomas' call for Congress and the courts to support sound agency self-regulation is a potentially beneficial one, it is far from **\*282** clear that this alone will achieve the fairness and regularity possible through notice and comment rulemaking.

## C. Application of Notice and Comment Rulemaking to Deferred Action

Early opinions by the courts have analyzed whether the Operations Instruction on deferred action operates as a substantive rule subject to notice and comment rulemaking under the APA. In most cases, the courts have held that the Operations Instruction does not create a substantive right, but instead operates as an internal guideline or general statement of policy. [226] One exception is the Ninth Circuit case Nicholas v. INS in which the court found that the 1978 Operations Instruction operated like a substantive benefit:

> It is obvious that this procedure exists out of consideration for the convenience of the petitioner, and not that of the INS. In this aspect, it far more closely resembles a substantive provision for relief than an internal procedural guideline. Delay in deportation is expressly the remedy provided by the Instruction. It is the precise advantage to be gained by seeking non-priority status. Clearly, the Instruction, in this way, confers a substantive benefit upon the alien, rather than setting up an administrative convenience. [227]

As recounted earlier, the INS modified the Operations Instruction in 1981 to clarify that deferred action was a discretionary act as opposed to a formal benefit. The impact of treating the Operations Instruction as a general statement of policy allowed the INS to amend and to remove the once "mandatory" nature of the Operations Instruction without public notice or comment. Likewise, it permitted the courts to uphold decisions by the agency to deferred action status to particular individuals regardless of their equities. Finally, the court traffic over the question of whether the Operations Instruction was a substantive rule inspired the explicit language contained in current agency memoranda that prosecutorial acts are discretionary, immune from judicial review and under no terms an **\*283** "entitlement" to the noncitizen. [228]

Based on his scholarship on deferred action, administrative law jurisprudence, data from more than 1800 approved deferred action cases, and the Nicholas holding, Leon Wildes argues that the Operations Instruction should be recognized as a substantive rule under the APA:

> In accordance with a well-established principle of administrative law, a written expression of "policy" may be a rule and have the impact of a rule, regardless of how the agency attempts to designate or describe it. The Operations Instructions thus appears to be a firm rule. As such, it should probably be subject to the notice and publication requirements of the Administrative Procedure Act. [229]

With a spirit similar to Kenneth Davis, Leon Wildes highlights the need for subjecting deferred action to notice and comment rulemaking:

> The Service should rightfully be constrained by all the safeguards of the Administrative Procedure Act with respect to its policies, whether they be published or promulgated through the Operations Instructions, regulations, or other means. With the weight of the entire government against the alien, he should be entitled to rely upon the fact that the government will at least be bound by its own directives. [230]

Following the Wildes proposal, courts continued to interpret the deferred action program as a general statement of policy exempt from the **\*284** APA's notice and comment requirements. [23] Nevertheless, select agency acts of prosecutorial

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 99 of 129

discretion, such as deferred action, which utilize prescribed criteria to enable individuals to avoid removal and in some cases be gainfully employed, should be subject to APA rulemaking and meaningful judicial review.

### D. Proposed Rulemaking on Administrative Discretion

In an effort to create clearer guidelines for INS officers and employees, INS issued a notice of proposed rulemaking intended to at least specify the relevant factors to be considered in applying several kinds of discretionary benefits. [232] Published in 1979, the proposed rules included amendments to Chapter 1 of Title 8 of the Code of Federal Regulations. [233] Several provisions of these proposed regulations would have required a favorable exercise of discretion in the absence of adverse factors. For example, with regard to the exercise of discretion under the former 212(c) waiver, [234] the rule identified the following factors for consideration in the exercise of discretion: "alien is likely to continue type of activity which gave rise to the grounds of excludability; alien has a history of criminal, immoral, narcotic, or subversive activity; act giving rise to grounds of excludability was relatively recent; no unusual hardship would accrue to alien or family members if the waiver is denied." [235]

The rulemaking effort was abandoned in January 1981. The INS concluded that "[l]isting some factors, even with the caveat that such list is not all inclusive, poses a danger that use of guidelines may become so rigid as to amount to an abuse of discretion." [236] The agency insisted that it was "impossible to list or foresee all of the adverse or favorable factors which may be present in a given set of circumstances," and cancelled the proposal "[t]o avoid the possibility of hampering the free exercise of discretionary authority." [237] The INS also argued that the rules would "eliminate discretionary powers by converting discretionary powers into a body of **\*285** law." [238] The tension described by the INS between taking steps to limit arbitrary discretion on one hand, and the difficulty of multiple relevant factors on the other is an important one. Nevertheless, some scholars and practitioners have questioned the INS's decision to abandon the rule and the notable absence of empirical data to show that rulemaking on administrative discretion led to administrative paralysis. [239] Moreover, to the extent that the proposed rules would have created a new "body of law" such a creation may not be entirely without merit. [240] Administrative law scholar Steven Ludd claims that the denial and granting of petition for relief from the INS should receive greater protection:

> Following the [INS's] own logic, aren't the substantive issues surrounding the application of administrative discretion "benefits" in the truest sense of the word? Certainly the denial and granting of petition for relief from the INS through its discretionary mechanisms should receive at least as much due process protection as those accorded a petitioner within the quasi-adjudicative hearing process of the agency where other types of "benefits" accrue. [24]

Similarly, the INS-created correlation between the creation of a rule and minimizing abuse of discretion claims is tenuous as it is equally possible that the absence of such a rule would expand random decisionmaking. [242] Although a broader theoretical discussion about whether consistency leads to greater justice is beyond the scope of this article, it is necessary to note that uniformity and equity were the very concerns identified by the INS when proposing the rules in 1979. [243]

While the proposed rule analyzed above pertains primarily to formal applications for particular immigration benefits or relief from deportation, it remains relevant to prosecutorial discretion for at least two reasons. First, the content of the rule listed criteria and factors for exercising discretion that are similar in nature to the factors used in exercising prosecutorial discretion. Second, the history and intentions of the INS to create a rule through the notice and comment

Case 1:18-cv-00068  Document 472-6  Filed on 08/21/20 in TXSD  Page 100 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

process and later to rescind it without explanation both highlight the relevance of administrative law and **\*286** strengthen the argument for subjecting select actions of prosecutorial discretion to notice and comment rulemaking.

DHS's failure to recognize deferred action as a rule has left noncitizen grantees vulnerable to removal at a future date while alienating a countless number of qualified noncitizens from having knowledge about deferred action. The APA provides a sound structure and process for implementing deferred action as a rule. In light of the personal consequences of capricious immigration enforcement and the indefinite status deferred action provides to individuals who present humanitarian equities, promulgating a rule on deferred action is essential.

### V. Limitations of Prosecutorial Discretion

### A. Prosecutorial Discretion and Judicial Review

The limitations of prosecutorial discretion have been spelled out by the federal agency and by the courts. [244] Perhaps the greatest limitation is the agency's virtual immunity from judicial review. [245] The Supreme Court's reluctance to permit judicial review over prosecutorial discretion dates back to the nineteenth century with the Confiscation Cases. [246] Administrative Law scholar Richard Pierce rationalizes the Court's historical refusal to recognize judicial review over a prosecutor's decision:

> The list of reasons is long and formidable. It begins with the Court's awareness that no prosecutor has access to all of the investigative and prosecutorial resources required to prosecute all violations of law within his jurisdiction. That problem has increased over the years as legislative bodies have added tens of thousands of new statutory commands and prohibitions. Every prosecutor must engage in selective investigation of prosecution. [247]

**\*287** The Court recognized an exception to the general presumption against reviewability in Yick Wo v. Hopkins, based on a claim that the agency's selective enforcement of an ordinance against two hundred Chinese (and zero non-Chinese) was racially motivated. [248] Beginning in the 1960's the Supreme Court began to uphold court review over prosecutorial discretion as a general principle. The Court attributed this transition to the Administrative Procedures Act. [249]

More recently, the Supreme Court has reasoned that an agency's discretionary decisions are generally "presumptively unreviewable" because of the multiple and largely unknown factors considered by the agency in rendering a decision. [250] The Court in Chaney reasoned, in explaining why review of an agency's decision not to enforce a particular area of law is "unsuitable," that the agency is better equipped than the courts to deal with such a situation:

> [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarity within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with the many variables involved. [25]

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 101 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Hotel & Restaurant Employee Union v. Smith is an important immigration-related case on the standard of judicial review of the former INS's prosecutorial discretion to grant Extended Voluntary Departure. [252] In a legal challenge over the Attorney General's decision not to extend EVD to Salvadorans, the D.C. Court of Appeals held that his decision constituted "extra-statutory" discretion and was therefore immune from judicial review. The court held, "Where Congress has not seen fit to limit the agency's discretion to suspend enforcement of a statute as to particular **\*288** groups of aliens, we cannot review facially legitimate exercises of that discretion." [253]

Reno v. AADC is another defining Supreme Court case on the limits of judicial review over discretionary decisions by the immigration agency. [254] The respondents in Reno argued that the immigration laws were selectively enforced against them in violation of the First and Fifth Amendments of the Constitution based on their membership in Popular Front for the Liberation of Palestine. [255] The Reno Court analyzed section 242(g) of the INA. INA 242(g) states the following:

> Exclusive Jurisdiction-Except as provided in this section and notwithstanding any other provision of law no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act. [256]

Rather than adopt the respondents' and petitioner's view that the provision covers "all or nearly all deportation claims," the Reno Court instead held that 242(g) of the Immigration and Nationality Act extends to three discrete actions-whether to "commence proceedings, adjudicate cases, or execute removal orders." The Court identified these three acts as discretionary in nature, and went on to cite to one of the leading immigration treatise's formulation of deferred action:

> To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation. This commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action treatment. . . Approval of deferred action status means that, for the humanitarian reasons described below, no action will thereafter be taken to proceed against an apparently deportable alien, even on **\*289** grounded normally regarded as aggravated. [257]

In the view of the Reno Court, section 242(g) was "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." [258] As to the constitutional challenge, the Reno Court concluded that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." [259]

In furtherance of their holding that selective discretion by the former INS to commence proceedings was not subject to judicial review, the Reno Court discussed the role of prosecutorial discretion in the criminal context, and cited the "substantial" concerns such as costs to the courts and the chilling effect on examining the basis of a criminal prosecution. [260] The Reno Court suggested that the government stakes are much higher in the immigration context because unlike the criminal context where the delay in criminal prosecution may simply delay the punishment, in the immigration context "the consequence is to permit and prolong the continuing violation of the United States law." [26] The Reno Court also highlighted potential foreign policy and intelligence-based rationales behind prosecutorial decisions in the immigration context and the related damage of such disclosure:

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 102 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

The Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat--or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals-and even if it did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy. [262]

The Reno Court's reasoning is consistent with the Government's position that selective prosecutions based on nationality may be permissible in the immigration context. [263]  The Reno Court concluded that while the consequence of deportation is a grave one, it is not  **\*290**  punishment. [264]  The Court left a small door open for judicial review:

To resolve the present controversy, we need not rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome. Whether or not there be such exceptions, the general rule certainly applies here. When an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity. [265]

As the sole dissenter in Reno, Justice Souter disagreed with the court that selective prosecution and special rules are permitted in the immigration context. In Souter's view, whether an immigration violation is "ongoing" or whether deportation is "punishment" has no bearing on the interest of avoiding selective prosecution. [266]  Souter further concludes that the majority's analysis on selective prosecution in the immigration context is dictum and irrelevant to the question before the Court. [267]  Notwithstanding Souter's belief that the Reno court's discussion on selective enforcement was dicta, the practical impact of Reno is significant. Gerald Neuman summarizes the implications of the Reno decision:

The general lesson of AADC is that so long as an alien is deportable, she is not entitled to know why she was chosen for deportation, and (with a possible exception for especially 'outrageous' reasons, which do not include mere First Amendment objections) the reason is irrelevant to enforcement of removal. Rephrased in the plural, there are large pools of potentially removable aliens, such as illegal entrants and overstays, aliens allowed in through a retractable grant of 'parole' status and even lawful temporary and permanent residents may be or become removable for technical reasons; all of these are subject to selective enforcement. Immigration officials may choose deportees among these pools on (at least many) bases that would otherwise be constitutionally suspect, and they may  **\*291**  choose based on standards of conduct that are never revealed and cannot be challenged. [268]

Responding to Neuman's commentary and as an alternative to judicial review, David Martin suggests that the agency's own watchdogs such as the Justice Department's Office of Internal Audit and the Office of the Inspector General are effective venues for oversight and review of potential misconduct or discretionary abuse by INS officers. [269]  He also suggests that the independent authority of the Office of the Inspector General and the potential negative exposure that an abusive officer faces on Capitol Hill and in the media provide real mechanisms for self-control of such misconduct. [270]  While administrative ombudsmen and Congress should take a more robust oversight role, such a role cannot substitute for judicial review. Leaving aside the commentary and reflections on Reno v. AADC, a plethora of subsequent decisions by the federal district and appellate courts have cited the decision itself, largely to support a conclusion that selective

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 103 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

enforcement is constitutional and that prosecutorial discretion is nearly barred from court review. [27] Notably, the Meissner memo also cites the Reno decision. [272] Meanwhile, immigration scholar and author Daniel Kanstroom questions the impact of immunizing prosecutorial discretion from judicial review:

> The general disinclination of courts to second-guess such decisions follows patterns established by the criminal justice system. But in the deportation realm, this deferential posture is exacerbated by the plenary power doctrine-if noncitizens have no substantive right to challenge deportation laws on equal protection grounds, then how can they challenge enforcement decisions based on national origin or race? [273]

**\*292 B. Additional Concerns with the Current Prosecutorial Discretion Model**

While the evolution of prosecutorial discretion in the immigration context has been largely commendable, concerns exist on at least two levels. First, to the extent that the Meissner memo is arguably the most authoritative on prosecutorial discretion, enforcement decisions exercised at a macro level by the agency seem inconsistent with the principles outlined in the memo. For example, in the aftermath of September 11, 2001, former Attorney General Ashcroft rolled out a program titled the "National Security Entry and Exit Registration Program (NSEERS)" largely resulting in the "registration" of thousands of visitors from Muslim-majority countries. [274] The domestic component of the NSEERS program subjected more than 80,000 men living in the United States to interrogations by immigration officers and fingerprinting and the taking of photographs to document identity. According to the government's own statistics, nearly 14,000 registrants were charged with immigration violations and nearly 3,000 were detained under this domestic scheme. [275] The NSEERS program contained several ironies, including the agency's discretionary decision to arrest nearly 14,000 young men who voluntary complied with NSEERS. [276] The impact of these arrests on domestic and foreign policy is striking, as is the arguable chilling effect it may have in encouraging others from coming forward to register in the future. A review of subsequent court cases reveals that many men arrested through NSEERS entered the United States on a valid visa, had meaningful family and economic ties to the United States, and had little to no history or indication of future criminal activity, all of which are cited in the Meissner memo as favorable factors. [277] In fact, many of the men who were arrested under NSEERS were the very kinds of individuals the Meissner memo suggests should not be targeted for prosecution in the first place. [278] It is difficult to align the Meissner memo with the immigration arrests under NSEERS.

**\*293** Similarly, DHS's overwhelming focus on undocumented individuals in households and the workplace replaced any meaningful reliance on the factors discussed in the Meissner memo. According to its website, ICE has deployed about 100 teams nationwide to pursue "fugitive" aliens, defined by ICE as "an alien who has failed to leave the United States based upon a final order of removal, deportation, or exclusion; or who has failed to report to ICE after receiving notice to do so." [279] As a practical matter, a meaningful number of these "fugitive aliens" may be unaware of the fact that they received a final order of removal, or may reside in the United States with knowledge of such removal order but otherwise be contributing to an American family, the local economy or their church in significant ways. [280] ICE documented the fugitive operations teams' record of more than 34,000 related arrests during fiscal year 2008, more than double those reported in 2006. [28] In addition to "Fugitive Operations Teams," ICE has devoted a significant number of resources to worksite enforcement. [282] According to the ICE Annual Report for 2008 "In FY08, ICE worksite enforcement actions resulted in 1,103 criminal arrests and 5,184 administrative arrests-taken together, a twenty-seven percent increase over the previous year's total arrests in worksite enforcement actions." [283] Together, the surge in residential and workplace enforcement actions has been breathtaking and inconsistent with the agency's historical focus on serious offenders and genuine threats to national security. The priority shift is both troubling and inconsistent with the Meissner memo's own cautionary note about utilizing resources wisely:

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 104 of 129

Careful design of enforcement operations is a key element in the INS's exercise of prosecutorial discretion. Managers should consider not simply whether a particular effort is legally supportable, but whether it best advances the INS's goals, compared with other possible uses of those resources. As a general matter, investigations that are specifically focused to identify aliens who represent a high priority for removal should be favored over **\*294** investigations which, by their nature, will identify a broader variety of removable aliens. [284]

Notwithstanding the foregoing concerns with the current formulation and application of prosecutorial discretion, there exists one remaining challenge. To the extent that an act of prosecutorial discretion indefinitely delays removal and in some cases provides work authorization for groups of individuals who meet the same or similar criteria, it is difficult to conclude that such an act does not constitute a right or benefit for which any individual who appears to possess similar criteria should be eligible to seek or in the case when such a benefit is arbitrarily denied by the agency, challenge in a court of law. This challenge is not overcome simply by virtue of a "no benefit" construction clause contained in the Meissner memo.

The aforementioned analysis elucidates the various limits on prosecutorial discretion with particular focus on the availability of judicial review. While the author appreciates the various arguments against such review, the immigration context presents unique and compelling reasons for strengthening judicial review over prosecutorial discretion decisions. In situations where such discretion is ignored by individual immigration officers or by the agency at a macro level, the impact on individuals and their families can include prolonged incarceration or execution of a removal order, among other actions. Even more troubling is the Court's extreme definition of the threshold required to prove that enforcement was discriminatory or selective based on race, color, religion, sex, or national origin. Immigration officers should be held accountable when their actions or inactions significantly impact the lives of noncitizens and their families.

**VI. Recommendations**

**A. Improving Standard on Prosecutorial Discretion; Codifying Deferred Action**

The Department of Homeland Security should review the array of existing memoranda on prosecutorial discretion and, as practicable, consolidate them into a single memorandum. Unless and until broader structural changes are made to DHS, the new memorandum should clarify that every officer in DHS, including CBP, ICE and USCIS has the authority to exercise prosecutorial discretion. The new memorandum should reaffirm the Meissner memo with an updated narrative **\*295** contextualizing the impact of immigration policies following the September 11, 2001 attacks, the emphasis on worksite and residential enforcement over the last eight years, the continued effects of the 1996 immigration laws, and the need for broader legislative reforms. The memorandum should adopt many of the principles outlined in the Meissner memo and also update the list of factors to be considered in the exercise of discretion. This list should identify both macro and micro situations during which favorable discretion should be exercised, among them: 1) during and after a man-made or national disaster; 2) third parties identified in the course of a worksite or residential raid; 3) individuals potentially eligible for an existing or future immigration benefit; 4) individuals impacted by the National Security Entry and Exit Registration program who are otherwise eligible for a legal immigration benefit; 5) individuals who claim to be a United States citizen; 6) "special populations" including but not limited to children, the elderly, mentally or physically disabled, pregnant women and nursing mothers, sole or primary breadwinners, and asylum seekers or those seeking fear-based protection; and 7) others who present compelling humanitarian equities. Moreover, DHS should disseminate the new memorandum to all relevant personnel. Finally, the memorandum should be published on DHS letterhead and posted on DHS's website.

In addition, DHS should promulgate a regulation on deferred action for notice and comment under section 553 of the Administrative Procedures Act. The regulation should identify the substantive criteria and procedures for applying for deferred action. The regulation should clarify that beneficiaries of deferred action are eligible for work authorization and travel under "advance parole." Similarly, DHS should consider providing such benefits for individuals who indefinitely reside in the United States as a consequence of an officer's favorable exercise of prosecutorial discretion. Finally, the regulation should enable applicants for deferred action to include an immediate family member as a derivative applicant.

### B. Strengthening Procedures for Prosecutorial Discretion

### 1. Identify Cases for Prosecutorial Discretion Early

In keeping with the former Operations Instructions, Meissner memo, and basic economic arguments, the DHS should identify potential cases that may be suitable for prosecutorial review as early as possible in the process. [285] For example, DHS should refrain from automatically issuing a Notice to Appear when an individual has humanitarian and public interest- **\*296** related equities, available relief available before an immigration officer, or when the individual is willing to accept an offer of voluntary departure from ICE. [286]

### 2. Provide Notice and Training to DHS Personnel on Prosecutorial Discretion

DHS should provide adequate training on prosecutorial discretion. The training should include a forum for exchanging best practices and creating mechanisms for accountability. DHS should ensure that relevant personnel are provided with updates on statutory changes in the law and related guidance in a timely manner. [287]

### 3. Require DHS Officers to Document Decisions

In keeping with the Meissner memo, DHS personnel should be required to document decisions to enforce or to refrain from enforcement in the noncitizen's file. [288]

### 4. Notice to Noncitizen and Attorney After a Decision is Made

Individuals who receive a favorable exercise of prosecutorial discretion should be notified in writing. The correspondence should also identify the existence and process for any related benefits, such as work authorization. Moreover, it should include an explanation about the limitations of prosecutorial discretion. Finally, a similar letter should be sent to the individual's attorney when applicable.

### 5. Sustain Favorable Grants of Prosecutorial Discretion by Another Office

DHS personnel should honor cases in which another office has made a favorable exercise of discretion absent a material change in circumstances in the individual's case. DHS must bear the burden of proving such material change.

### \*297 C. Increasing Oversight and Accountability

### 1. Create a Professional Code of Conduct for DHS Officers

Similar to what Angela Davis has recommended for the criminal system, a separate code of conduct for immigration officers should be considered. [289] This code should be created by an agent outside of ICE, CBP, and USCIS. For example, the code could be created by DHS's Office of Policy or even by an outside entity such as the American Bar Association

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 106 of 129

or possibly the EOIR. The content for this professional code should include not only a description of the different stages during which an officer may exercise prosecutorial discretion but also a set of guidelines that are consistent with the newly proposed memorandum identified above. Similarly, the code should create a process whereby public and government employees may file complaints against officers who are alleged to have engaged in prosecutorial misconduct as well as language about the potential repercussions an officer may face for knowingly violating the code.

**2. Improve Oversight of Prosecutorial Discretion**

In addition to the potential oversight that emanates from a new professional code of conduct, DHS should enhance the internal oversight of prosecutorial discretion. For example, DHS's Officer of the Inspector General, Office of Policy, or Ombudsman could issue an annual report on the number of cases that were considered for prosecutorial discretion. In addition, the Government Accountability Office, Vera Institute for Justice, or American Bar Association could compile similar data. [290] Data compiled by DHS or a third party should be reported to Congress and made available to the public.

**D. Legislative Reforms Beyond Prosecutorial Discretion**

Prosecutorial discretion is a powerful tool that should be driven by sound principles and be consistent with broader immigration reforms. Prosecutorial discretion itself is a limited function that by its nature is **\*298** aimed at decision-making on a case-by-case basis, in light of broader policy decisions about where to focus resources. By contrast, there are nearly 12 million individuals residing in the United States in violation of the immigration laws. [29] This estimate captures noncitizens who entered without inspection, and those who entered the United States on a valid visa but did not continue to meet the terms of their visa or allowed their visa to expire. [292] Notably, this estimate does not necessarily cover certain permanent residents (green card holders) vulnerable to removal for reasons largely related to legal indiscretions. Given the sheer size of the unauthorized immigrant population, prosecutorial discretion is not the most effective tool for recognizing their presence in the United States in the long run. To the extent that broad exercises of prosecutorial discretion have historically enabled large numbers of the unauthorized population to reside in "limbo" inside the United States, the affected individuals remain vulnerable to removal in the future and without permission to travel and in many cases work inside the United States. Moreover, when DHS's exercise of prosecutorial discretion results in the non-enforcement of the immigration laws against millions of unauthorized immigrants, public criticism is sharpened. As expressed by Cox and Rodriguez, "It is hard for the public to grasp what the executive is doing when it appears to be tolerating unauthorized immigration and engaging in seemingly haphazard enforcement of the immigration laws." [293]

Legalizing the undocumented noncitizens working and residing in the United States by creating legal avenues is more effectively reached through legislative reforms and is a subject of much debate by members of Congress, the Administration, the mainstream and ethnic media, labor unions, civil rights groups, economists, and faith-based groups, among others. [294] While the topic of legalization is beyond the scope of this article, the fine line between DHS's broad exercise of prosecutorial discretion and Congress's enactment of a workable legalization program is striking.

**\*299** Congress must also reform the restrictions placed on noncitizens and immigration adjudicators as a consequence of the 1996 immigration laws. Indeed, the officers who crafted the agency's guidance on prosecutorial discretion have conceded that prosecutorial discretion is insufficient to redress congressional restrictions emanating from the 1996 immigration laws. Congress should strongly consider the following reforms, by no means a comprehensive list, for adoption: 1) restore the "212(c)" discretionary waiver for certain lawful permanent residents; 2) modify the existing statutory waivers of relief from removal to an achievable standard; 3) repeal or modify sections of the Immigration and Nationality Act that define terminology and/or penalize particular conduct too harshly, among them "unlawful presence," "admission," and "aggravated felony;" 4) modify the statutory restrictions that categorically mandate detention without bond and effectively prevent immigration judges from adjudicating individual requests for release

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 107 of 129

or release on bond; 5) replenish restrictions placed on federal court review, including the blanket restriction on acts of prosecutorial discretion.

Even with legislative reforms, prosecutorial discretion will remain an important tool for DHS personnel. Reforming prosecutorial discretion in a manner that resolves compelling situations in favor of noncitizens and their families is an important principle that is consistent with the Supreme Court's conclusion more than sixty years ago that deportation is a drastic measure and at times the equivalent of banishment or exile. [295] Moreover, by enacting reforms that recognize deferred action as a binding rule, permitting unauthorized immigrants to participate in a legal system, and replenishing basic protections and fairness into the removal process, DHS will be better positioned to administer the immigration laws with fairness and efficiency.

## Footnotes

[a1]    Clinical Professor of Law and Director of the Center for Immigrants' Rights at Pennsylvania State University Dickinson School of Law. I am grateful to Steven Legomsky, Victor Romero, Kit Kinports, and Jamison ("Jamie ) E. Colburn, and participants at the 2009 Big 10 Young Aspiring Scholars conference for their meaningful feedback on earlier drafts of this article. I also thank my research assistant Nicole Comstock for her diligent work and the editorial staff at the Connecticut Public Interest Law Journal for their editorial assistance. I thank Paul Virtue, Leon Wildes and Nancy Morawetz for sharing their historical perspective and insights about the topic of prosecutorial discretion. I send my gratitude to Phillip J. McConnaughay for supporting my scholarship and overall professional development. Finally, I am indebted to my husband, Hemal; children, Devyani and Neelesh; and parents, Geetha and Siva for their unconditional support and love.

[1]    See Stephen H. Legomsky, Portraits of the Undocumented Immigrant: Epiphany through Dialectic, 44 Georgia L. Rev. 65 (2009).

[2]    As described by the late Maurice Roberts more than thirty years ago: "In the fiscal year ending June 30, 1974, the Service apprehended a record 788,000 deportable aliens and it has estimated that the total number of illegal aliens 'is possibly as great as 10 or 12 million. While the accuracy of these high estimates has been questioned, it is clear that the Service has identified many more aliens here unlawfully than it has proceeded against. In determining which illegal aliens should be singled out for the initiation of deportation proceedings and which should be permitted to remain unmolested, for how long they should be permitted to remain and under what conditions, the Service exercises what is tantamount to prosecutorial discretion. Maurice Roberts, The Exercise of Administrative Discretion Under Immigration Laws, 13 San Diego L. Rev. 144, 146 (1975 76).

[3]    U.S. Dep't of Justice, Immigration and Naturalization Service Fact Sheet on Prosecutorial Discretion Guidelines (2000). See also Memorandum from Doris Meissner, Commissioner of Immigration and Naturalization Service, on Exercising Prosecutorial Discretion (Nov. 17, 2000), available at http:// drop.io/iceprosecutorialdiscretion.

[4]    See T. Alexander Aleinikoff, David A. Martin, Hiroshi Motomura & Maryellen Fullerton, Immigration and Citizenship: Process and Policy 776 (6th ed. 2008) (describing that prosecutorial discretion occurs at both macro and micro levels, and greatly influences which noncitizens are likely to be removed).

[5]    As summarized by the Government Accountability Office in 2007, "ICE officers exercise discretion when they decide whom to stop, question, and arrest; how to initiate removal; whether to grant voluntary departure (whereby aliens agree to waive their rights to a hearing and are escorted out of the United States to their home countries by ICE officers); and whether to detain an alien in custody. O]nce an ICE officer has made a decision to pursue removal, ICE attorneys exercise discretion when they decide whether and how to settle or dismiss a removal proceeding or to appeal a decision rendered by an immigration judge. See U.S. Gov't Accountability Office, Report to Congressional Requesters, Immigration Enforcement: ICE Could Improve Controls to Help Guide Alien removal Decision Making 2 3 (2007), available at http:// www.gao.gov/new.items/d0867.pdf.

[6]    Leon Wildes, The Operations Instructions of the Immigration Service: Internal Guides or Binding Rules?, 17 San Diego L. Rev. 99, 101 (1979 80) hereinafter Wildes, Operations Instructions]. See also Lennon v. Richardson, 378 F. Supp. 39

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 108 of 129

(S.D.N.Y. 1974); See also Leon Wildes, The United States Immigration Service v. John Lennon: The Cultural Lag, 40 Brook. L. Rev. 279 (1973 74)  hereinafter Wildes, The Cultural Lag].

[7]   See Leon Wildes, The Nonpriority Program of the Immigration and Naturalization Service Goes Public: The Litigative Use of the Freedom of Information Act, 14 San Diego L. Rev. 42 (1976 77)  hereinafter Wildes, Nonpriority Goes Public]. See also Bill Ong Hing, Defining America Through Immigration Policy 226 (2004).

[8]   See, e.g., Wildes, Nonpriority Goes Public, supra note 7; Wildes, Operations Instructions, supra note 6; Leon Wildes, The Deferred Action Program of the Bureau of Citizenship and Immigration Services: A Possible Remedy for Impossible Immigration Cases, 41 San Diego L. Rev. 819 (2004)  hereinafter Wildes, Deferred Action]; Wildes, The Cultural Lag, supra note 6; Leon Wildes, The Nonpriority Program of the Immigration and Naturalization Service  A Measure of the Attorney General's Concern for Aliens, Part I, 53 Interpreter Releases 25 (January 26, 1976)  hereinafter Wildes, Nonpriority Part I]; Leon Wildes, The Nonpriority Program of the Immigration and Naturalization Service  A Measure of the Attorney General's Concern for Aliens, Part II, 53 Interpreter Releases 33 (January 30, 1976)  hereinafter Wildes, Nonpriority Part II].

[9]   Wildes, Nonpriority Goes Public, supra note 7, at 44 45. See also Lennon v. INS, 527 F. 2d 187, 189 (2nd Cir 1975); Wildes, The Cultural Lag, supra note 6; Wildes, Nonpriority Part I, supra note 8; Wildes, Nonpriority Part II, supra note 8.

[10]   Wildes, Nonpriority Goes Public, supra note 7, at 45; Wildes, The Cultural Lag, supra note 6; Wildes, Nonpriority Part I, supra note 8; Wildes, Nonpriority Part II, supra note 8.

[11]   Wildes, Nonpriority Goes Public, supra note 7, at 45. See also Lennon v. INS, 527 F.2d 187, 191 (2d Cir. 1975); Wildes, The Cultural Lag, supra note 6; Wildes, Nonpriority Part I, supra note 8; Wildes, Nonpriority Part II, supra note 8.

[12]   Wildes, Nonpriority Goes Public, supra note 7, at 45. See also Wildes, Nonpriority Part I, supra note 8; Wildes, Nonpriority Part II, supra note 8.

[13]   Wildes, Nonpriority Goes Public, supra note 7, at 45. See also Wildes, The Cultural Lag, supra note 6; Wildes, Nonpriority Part I, supra note 8; Wildes, Nonpriority Part II, supra note 8.

[14]   Wildes, Nonpriority Goes Public, supra note 7, at 46.

[15]   Wildes, Nonpriority Goes Public, supra note 7, at 49 (The distinguishing feature of "private  information was the so called "blue sheets  of the officer's manual used to identify the classified and internal policies of INS.). See also Lennon v. U.S., 378 F. Supp. at 42 n.11 (S.D.N.Y. 1974).

[16]   Wildes, Nonpriority Goes Public, supra note 7, at 46 47.

[17]   Wildes, Nonpriority Goes Public, supra note 7, at 47. See also Wildes, Deferred Action, supra note 8, at 820.

[18]   (Legacy) Immigration and Naturalization Service, Operations Instructions, O.I. § 103.1(a)(1)(ii) (1975).

[19]   Id.

[20]   Lennon v. INS, 527 F.2d 187, 191 n.7 (2d Cir. 1975); Of note, John Lennon was approved for nonpriority status one week before the circuit decision, on September 23, 1975. Wildes, Operations Instructions, supra note 6, at n.10. See also Wildes, Deferred Action, supra note 8, at 821 n.10.

[21]   Soon Bok Yoon v. INS, 538 F.2d 1211, 1211 (5th Cir. 1976). See also Wildes, Operations Instructions, supra note 6, at 102.

[22]   Wildes, Operations Instructions, supra note 6, at 102.

[23]   See Vergel v. INS, 536 F.2d 755 (8th Cir. 1976); David v. INS, 548 F.2d 219 (8th Cir. 1977).

[24]   Vergel, 536 F.2d 755; David, 548 F.2d 219. Vergel, 536 F.2d 755; David, 548 F.2d 219.

[25]   David, 548 F.2d at 223.

[26]   Wildes, Operations Instructions, supra note 6, at 103 04.

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 109 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

27 Id. at 105 (citing Nicholas v. INS, 590 F.2d 802 (9th Cir. 1979)). See also Wildes, Deferred Action, supra note 8, at 821.

28 Nicholas v. INS, 590 F.2d at 806 07.

29 Wildes, Nonpriority Goes Public, supra note 7, at 51. See also Wildes, Nonpriority Part I, supra note 8, at 29.

30 Wildes, Nonpriority Goes Public, supra note 7, at 52. See also Wildes, Nonpriority Part I, supra note 8, at 31; see generally Wildes, Nonpriority Part II, supra note 8.

31 Wildes, Nonpriority Goes Public, supra note 7, at 53. See also Wildes, Nonpriority Part II, supra note 8.

32 Wildes, Nonpriority Goes Public, supra note 7, at 57; See also Wildes, Nonpriority Part II, supra note 8, at 37.

33 Wildes, Nonpriority Goes Public, supra note 7, at 57. See also Wildes, Nonpriority Part II, supra note 8, at 36 37.

34 Wildes, Nonpriority Goes Public, supra note 7, at 61. See also Wildes, Nonpriority Part II, supra note 8, at 40.

35 Wildes, Nonpriority Goes Public, supra note 7, at 62. See also Wildes, Nonpriority Part II, supra note 8, at 40.

36 Wildes, Deferred Action, supra note 8, at 822 (citing to Aleinikoff, supra note 4, at 769). Notably, many courts have concluded that the Operations Instruction is an intra agency guideline that confers no substantive benefit on aliens seeking inclusion in the deferred action category. See De Romiero v. Smith, 773 F.2d 1021 (9th Cir. 1985); Pasquini v. Morris, 700 F.2d 658, 661 (11th Cir.1983); Soon Bok Yoon v. INS, 538 F.2d 1211, 1213 (5th Cir. 1976); Lennon v. INS, 527 F.2d 187 (2d. Cir. 1975); Wan Chung Wen v. Ferro, 543 F. Supp. 1016, 1017 18 (D.N.Y. 1982); Zacharakis v. Howerton, 517 F. Supp. 1026, 1027 28 (D.Fla. 1981). See Velasco Gutierrez v. Crossland, 732 F.2d 792, 798 (10th Cir. 1984). See also Siverts v. Craig, 602 F. Supp. 50, 53 (D.Haw. 1985) (construing 1981 instruction).

37 Email from Stephen Legomsky, John S. Lehmann University Professor, Washington University School of Law in St. Louis, to Shoba Sivaprasad Wadhia (August 1, 2009) (on file with author).

38 Aleinikoff, supra note 4, at 780. See also Memorandum from Doris Meissner, supra note 3, at 1 n.1 (referencing the Standard Operating Procedures that pertain to deferred action cases).

39 Memorandum from Paul W. Virtue, Acting Executive Associate Commissioner, Immigration and Naturalization Service, on INS Cancellation of Operations Instructions (June 27, 1997) (available at 2 Bender's Immigr. Bull. 867).

40 Id.

41 Interview with Paul Virtue, former Executive Associate Commissioner, Immigration and Naturalization Service, in Washington, D.C. (July 23, 2009).

42 Id. It was Virtue's vision that the Standard Operating Procedures manual would be made publicly available and operate with subregulatory authority like the Department of State's Foreign Affairs Manual.

43 Charles Gordon, Stanley Mailman, & Stephen Yale Loehr, Immigration Law and Procedure § 72.03(2)(h) (2009).

44 See Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRAIRA), 8 U.S.C.S. § 1103 (2008); Anti Terrorism and Effective Death Penalty Act of 1996 (AEDPA), 8 U.S.C.C. § 1105 (2006).

45 See IIRAIRA, 8 U.S.C.S. § 1103 (2008); Immigration and Nationality Act (INA) §§ 235(b), 236(c), 8 U.S.C. §§ 1324(a), 1185 (2006).

46 See IIRAIRA, 8 U.S.C.S. § 1103 (2008); INA §§ 235(b), 236(c), 8 U.S.C. §§ 1324(a), 1185 (2006).

47 See IIRAIRA, 8 U.S.C.S. § 1103 (2008); AEDPA, 8 U.S.C.C. § 1105 (2006).

48 Letter from Robert Raben, Assistant Attorney General, to Rep. Barney Frank, U.S. H.R., on Use of Prosecutorial Discretion to Avoid Harsh Consequences of IIRAIRA (Jan. 19, 2000).

49    Id.

50    Id. Arguably, one provision created by IIRAIRA that was partially improved by Congress years later with the passage of the REAL ID Act of 2005, 8 U.S.C.S § 1101 (2008), corresponds to judicial review. Congress created a subsection 242(a)(2)(D) titled "Judicial Review of Certain Legal Claims   which now reads: "Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.   See INA § 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D)(2006). While this change opened the door for certain decisions previously barred under IIRIRA to be reviewed in federal court if the decision raised a legal question, the majority of restrictions created by IIRAIRA remains.

51    See, e.g., Daniel Kanstroom, Deportation, Social Control, and Punishment: Some Thoughts About Why Hard Laws Make Bad Cases, 113 Harv. L. Rev. 1890 (2000); Nancy Morawetz, Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms, 113 Harv. L. Rev. 1936 (2000); Shoba Sivaprasad Wadhia, The Policy and Politics of Immigrant Rights, 16 Temp. Pol. & Civ. Rts. L. Rev. 387 (2007).

52    Symposium, Immigration and Criminal Law, 4 N.Y. City L. Rev. 9 (2001).

53    Id. at 31. Meanwhile, Massachusetts Congressman Barney Frank shared his perspective on the politics of IIRAIRA and its relationship to INS's prosecutorial power: "What Congress said was 'We are going to take away all of your discretion.  The bill that passed purported to take away prosecutorial discretion. The purpose of the bill was to say to INS 'Deport them all. It is none of your business to say, 'Stay here, or not to stay here. Get rid of all of them.  The INS should have said 'You can't make us do that.  The INS should have said 'We always have prosecutorial discretion.  No law enforcement body in the history of the world has ever enforced every law against everybody. But in the early stages the INS was terrified and they did go and scoop up some people whom no national person would have scooped up because they were afraid of Congress yelling at them. Next, the horror stories came out. The first reaction, as Mr. Cooper said, was that some of the members of Congress who supported a bill which had the very purpose of telling the INS not to use it discretion, then criticized the INS for not using the discretion which they had taken away.   Id. at 32 33.

54    Memorandum from Bo Cooper, General Counsel, U.S. Immigration and Naturalization Service, on INS Exercise of Prosecutorial Discretion, (available at INS and DOJ Legal Opinions §99 5 MB 2006).

55    Id.

56    Id.

57    Id.

58    Memorandum from Doris Meissner, supra note 3.

59    Id. at 7 8.

60    The Notice to Appear or NTA acts like a "charging   document. Procedurally, the NTA is served on the noncitizen and filed with the Immigration Court. Removal proceedings against a noncitizen commence once the NTA has been filed with the Immigration Court. The NTA itself contains important information about the government's alleged charges against the noncitizen, the latter's right to secure counsel at no expense to the government, and other important matters. The statutory section governing NTAs is INA § 239, 8 U.S.C. 1229 (2006). For a broader discussion about NTAs and related issues, see Wadhia, supra note 51.

61    Memorandum from Doris, supra note 3, at 2.

62    Id. at 4 5.

63    Id. at 7 8.

64    Id. at 8.

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 111 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

65    Id. at 7 8.

66    Memorandum from Doris Meissner, supra note 3, at 1.

67    O.I., supra note 18.. "In every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors, he shall recommend consideration for deferred action category.   (emphasis added). See also Deferred Action, supra note 9, at 821.

68    See Adam B. Cox & Cristina M. Rodriguez, The President and Immigration Law (U. Chi. Law Sch. Pub. Law & Legal Theory Working Paper No. 262, 2009), available at http://ssrn.com/abstract   1356963.

69    Id. at 49.

70    See, e.g., Homeland Security Act of 2002, 6 U.S.C. § 101 (2006).

71    Id.

72    U.S. Citizenship and Immigration Services, http:// www.uscis.gov/portal/site/uscis (last visited Apr. 15, 2010).

73    See generally id.

74    U.S. Customs and Border Patrol, http://www.cbp.gov/xp/cgov/home.xml (last visited Apr. 15, 2010); U.S. Immigration and Customs Enforcement, http:// www.ice.gov/ (last visited Apr. 15, 2010).

75    See generally U.S. Customs and Border Patrol, id.

76    See generally id.

77    Customs & Border Patrol (CBP), Organization Chart, http:// www.cbp.gov/linkhandler/cgov/about/organization/orgcha1.ctt/ orgcha1.pdf (2009).

78    See generally U.S. Immigration and Customs Enforcement, supra note 74.

79    See generally U.S. ICE, Management and Budget Fact Sheets, http:// www.ice.gov/pi/news/factsheets/index.htm (last visited Apr. 15, 2010).

80    About U.S. ICE, http://www.ice.gov/about/index.htm (last visited Apr. 15, 2010).

81    See generally U.S. Dep't of Justice, Executive Office of Immigration Review, http://www.usdoj.gov/eoir/ (last visited Apr. 15, 2010); U.S. Dep't of State, Visa Documents, http://www.state.gov/misc/59452.htm (last visited Apr. 15, 2010).

82    U.S. Dep't of Health & Human Serv., Admin. for Children & Families, http://www.acf.hhs.gov/programs/orr/ (last visited Apr. 15, 2010); Dep't of Homeland Sec., Office for Civil Rights and Civil Liberties, http:// www.dhs.gov/xabout/structure/ editorial  0371.shtm (last visited Apr. 15, 2010); U.S. Dep't of Justice, Executive Office of Immigration Review, id.

83    Cox & Rodriguez, supra note 68, at 49.

84    Id. at 50.

85    For an excellent discussion and critique of the INS reorganization and related recommendations, see David A. Martin, Immigration Policy and the Homeland Security Act Reorganization: An Early Agenda for Practical Improvements, Insight (Migration Policy Institute), Apr. 2003, available at http://www.migrationpolicy.org/insight/insight  4 2003.pdf.

86    See, e.g., Memorandum from Johnny N. Williams, Executive Associate Commissioner of the Office of Field Operations of the U.S. Immigration and Naturalization Service, on Family Unity Benefits and Unlawful Presence (Jan. 27, 2003) (available at http://www.aila.org).

87    Id.

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 112 of 129

88    Id.

89    Id.

90    Memorandum from William R. Yates, Associate Director for Operations of U.S. Dep't of Homeland Sec., Citizenship and Immigration Services, on Service Center Issuance of Notice to Appear (Form I 862) (Sept. 12, 2003).

91    Memorandum from William J. Howard, Principal Legal Advisor for U.S. ICE, on Prosecutorial Discretion 2 (October 24, 2005), available at www.shusterman.com/pdf/ice pdmemo1005.pdf.

92    Id. at 3 4.

93    Id. at 5 6.

94    Id. at 8.

95    Memorandum from Julie L. Myers, Assistant Secretary of Homeland Security for Immigration and Customs Enforcement, on Prosecutorial and Custody Discretion (Nov. 7, 2007) (available at http://www.bibdaily.com/pdfs/AS%20MYERS%CC20MEMO%CC20RE%CC20PROSECUTORIAL%CC20AND%CC20CUSTODY%C%#DISCRETION.pdf).

96    Id.

97    Press Release, Kennedy, Delahunt Announce New Guidelines for Immigration Raids (Nov. 16, 2007), available at http:// kennedy.senate.gov/newsroom/press release.cfm?id 0F91969E 96EB 4AB1 832B 2CF42451B587. See also Shoba Sivaprasad Wadhia, Under Arrest: Immigrants' Rights and the Rule of Law, 38 U. Mem. L. Rev. 853 (2008).

98    Press Release, Kennedy, Delahunt Announce New Guidelines for Immigration Raids, id; See also Wadhia, id., at 881.

99    See, e.g., Memorandum from William J. Howard, Principal Legal Advisor for U.S. Immigration and Customs Enforcement, on Exercising Prosecutorial Discretion to Dismiss Adjustment Cases (October 6, 2005), available at www.assistahelp.org/ VAWA/Howard 10 6 05.pdf; Aleinikoff, supra note 4, at 778 (citing to the INS Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing, and Removal, Part X).

100    Wildes, Deferred Action, supra note 8, at 825.

101    Id. at 826.

102    Id. at 827.

103    Id. at 826.

104    Id. at 829.

105    Wildes, Deferred Action, supra note 8, at 831.

106    Id. at 832.

107    Id. at 835.

108    Id. at 833, 836 37.

109    Id. at 838.

110    Recommendation from Prakash Khatri, CIS Ombudsman, to Dr. Emilio T. Gonzalez, Director USCIS on Deferred Action (Apr. 6, 2007), available at http://www.dhs.gov/xlibrary/assets/CISOmbudsman RR 32 O Deferred Action 04 06 07.pdf.

111    Id.

112    Id. at 3.

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 113 of 129

113    Memorandum from Dr. Emilio T. Gonzalez, Director U.S. Citizenship and Immigration Service, to Prakash Khatri, U.S. Citizenship and Immigration Service Ombudsman, on Response to Recommendation #32, Deferred Action (Aug. 7, 2007), available at http://www.dhs.gov/xlibrary/assets/cisombudsman rr 32 o  deferred action uscis response 08 07 07.pdf.

114    Id. at 1.

115    Id. at 2.

116    Id.

117    Id.

118    Press Release, Dep't of Homeland Sec., DHS Establishes Relief for Widows of U. S. Citizens (June 9, 2009), available at http:// www.dhs.gov/ynews/releases/pr  1244578412501.shtm.

119    Id.

120    Development, Relief, and Education for Alien Minors Act of 2009, S. 729, 111th Cong. (2009). See, e.g., Dream Activist News Flash: Taha Receives Deferred Action, http://www.dreamactivist.org/news flash taja recieves deffered action (last visited Apr. 15, 2010).

121    Id. See also Dream Activist, http://www.dreamactivist.org/ (last visited Apr. 15, 2010).

122    Ira Kurzban, Kurzban's Immigration Law Sourcebook 493 (11th ed. 2009). See also Hotel and Restaurant Employees Union Local v. Smith, 846 F.2d 1499, 1501 (D.C. Cir. 1988).

123    Kurzban, id. at 493.

124    U.S. Dep't of Homeland Sec., Fact Sheet, Liberians Provided Deferred Enforced Departure (DED) (Sep. 19, 2007), available at http:// www.dhs.gov/xnews/releases/pr  1189693482537.shtm; see also U.S. Citizenship & Immigration Services, Affirmative Asylum Procedures Manual 57 (Nov. 2007), available at http:// www.uscis.gov/files/nativedocuments/AffrmAsyManFNL.pdf. "Deferred Enforced Departure (DED) grants certain qualified citizens and nationals of designated countries a temporary, discretionary, administrative protection from removal from the United States and eligibility for employment authorization for the period of time in which DED is authorized. The President determines which countries will be designated based upon issues that may include, but are not limited to, ongoing civil strife, environmental disaster, or other extraordinary or temporary conditions. The decision to grant DED is issued as an Executive Order or Presidential Memorandum.

125    Memorandum on Deferred Enforced Departure for Liberians (Mar. 20, 2009), available at http://www.uscis.gov/files/article/Liberia  26mar2009.pdf.

126    INA § 244(a), 8 U.S.C. § 1254(a) (2006).

127    Celesta A. Albonetti, Prosecutorial Discretion: The Effects of Uncertainty, 21 Law & Soc'y Rev. 291, 292 (1987). See also Angela J. Davis, Arbitrary Justice (2007); Angela J. Davis, The American Prosecutor: Independence, Power, and the Threat of Tyranny, 86 Iowa L. Rev. 393 (2001)  hereinafter Davis, American Prosecutor]; Angela J. Davis, They Must Answer for What They've Done, Legal Times, Aug. 2007, at 2  hereinafter Davis, They Must Answer]; Kenneth Culp Davis, Police Discretion (1975). See also Lauren O'Neill Shermer & Brian D. Johnson, Criminal Prosecutions: Examining Prosecutorial Discretion and Charge Reductions in U.S. Federal District Courts, Just. Q., Apr. 2009, at 1 2 ("Importantly, these early case processing decisions are not controlled by the sentencing judge, but instead fall under the auspices of the one of the most powerful and least researched members of the federal courtroom workgroup the U.S. Attorney. ); Id. at 5 ("Few criminal justice pundits would disagree that the prosecutor is one of the most, if not the most influential and power persons in the criminal justice system. ).

128    See, e.g., Shermer & Johnson, id., at 5.

129    Davis, They Must Answer, supra note 127, at 2.

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 114 of 129

130    See, e.g., Davis, Arbitrary Justice, supra note 127; Davis, They Must Answer, supra note 127; Davis, American Prosecutor, supra note 127; Bruce A. Green & Fred C. Zacharias, Prosecutorial Neutrality, 2004 Wis. L. Rev. 837 (2004); Carolyn B. Ramsey, The Discretionary Power of "Public Prosecutors in Historical Perspective, 39 Am. Crim. L. Rev. 1309 (2002); Albonetti, supra note 127; Rachel E. Barkow, Institutional Design and the Policing of Prosecutors: Lessons from Administrative Law, 61 Stan. L. Rev. 869 (2009).

131    Davis, Arbitrary Justice, supra note 127, at 9.

132    Id. at 10.

133    Id. at 10.

134    Id.

135    Id. at 11.

136    Davis, Arbitrary Justice, supra note 127, at 11.

137    Id. at 12.

138    Joan E. Jacoby, The Minnesota County Attorney's Association, The American Prosecutor in Historical Context, available at http://www.mcaa mn.org/docs/2005/AmericanProsecutorHistoricalContext52705.

139    Davis, Arbitrary Justice, supra note 127, at 12.

140    Id. at 12. The power of the American prosecutor was echoed by former Attorney General Robert H. Jackson. James K. Robinson, Restoring Public Confidence in the Fairness of the Department of Justice's Criminal Justice Function, 2 Harv. L. & Pol'y Rev. 237, 239 40 (2008).

141    Davis, Arbitrary Justice, supra note 127, at 23.

142    Id. at 25.

143    See, e.g., id. at 26. See also, Peter J. Henning, Prosecutorial Misconduct in Grand Jury Investigations, 51 S.C. L. Rev. 1, 3 (1999); Susan W. Brenner, The Voice of the Community: A Case for Grand Jury Independence, 3 Va. J. Soc. Pol'y & L. 67, 122 (1995); Kevin K. Washburn, Restoring the Grand Jury, 76 Fordham L. Rev. 2333, 2336 n.4 (2008) ("grand jury review represents, at best, 'a modest screening power, a fact recognized by the familiar courthouse saying that a grand jury would indict a ham sandwich if the prosecutor asked it to do so. ) (citing to Ronald Wright & Marc Miller, The Screening/Bargaining Tradeoff, 55 Stan. L. Rev. 29, 51 n.70 (2002)).

144    Davis, Arbitrary Justice, supra note 127, at 31.

145    Id. at 56. See also Jeffrey Standen, Plea Bargaining in the Shadow of the Guidelines, 81 Cal. L. Rev. 1471 (1993) (discussing the exercise of discretion in plea bargaining); Leslie C. Griffin, The Prudent Prosecutor, 14 Geo. J. Legal Ethics 259, 268 75 (2001) (discussing discretion in the plea bargaining and charging stages).

146    Davis, Arbitrary Justice, supra note 127, at 76.

147    Id. at 78.

148    Robinson, supra note 140, at 239.

149    Principles of Federal Prosecution, U.S. Attorney's Manual § 9 27.001 (1997).

150    U.S. Attorney's Manual § 9 27.140(A) (1997).

151    U.S. Attorney's Manual § 9 27.220 (1997).

152    U.S. Attorney's Manual § 9 27.230(A) (1997).

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 115 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

153    Id.

154    U.S. Attorney's Manual § 9 27.230(B) (1997).

155    Davis, Arbitrary Justice, supra note 127, at 6.

156    Id.

157    Id.

158    U.S. Attorney's Manual § 9 27.230(B) (1997).

159    Id.

160    Davis, Arbitrary Justice, supra note 127, at 18.

161    Id. at 13.

162    Cox & Rodriguez, supra note 68, at 3.

163    Id. at 45 n.147.

164    Id. at 45 ("First, a huge fraction of the noncitizen population is deportable as a technical legal matter. Second, while vast numbers of noncitizens are deportable, only a tiny fraction will ever be placed in removal proceedings. Third, the immigration agencies wield the same power as criminal prosecutors to make selective charging decisions. In this way, the structure of immigration system delegates tremendous power to the executive branch. ).

165    Id. at 50.

166    See Bo Cooper, supra note 54; Doris Meissner, supra note 3.

167    Bo Cooper, supra note 54, at 2 (citing Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 13.2 (2d ed. 1992)).

168    Id.

169    Doris Meissner, supra note 3, at 2.

170    U.S. Attorney's Manual, supra note 151.

171    Doris Meissner, supra note 3, at 5.

172    Id. at 2.

173    See, e.g., TracImmigration, Immigration Convictions for December 2009, http://trac.syr.edu/tracreports/bulletins/ immigration/monthlydec09/gui/ (last visited Apr. 15, 2010); Julia Preston, More Illegal Crossings Are Criminal Cases, Group Says, N.Y. Times, June 18, 2008, at A14; Hearing on the Arrest, Prosecution, and Conviction of Undocumented Workers in Postville, Iowa from May 12 to 22, 2008, H. Comm. on the Judiciary (2008) (Statement of David Wolfe Leopold, American Immigration Lawyers Ass'n); Stephen H. Legomsky, The New Path of Immigration Law: Asymmetric Incorporation of Criminal Justice Norms, 64 Wash. & Lee L. Rev. 469 (2007).

174    See, e.g., INA § 237, 8 U.S.C. § 1227 (2006).

175    8 U.S.C. § 1325 (2006).

176    See, e.g., INA §§ 265, 266, 274(c), 8 U.S.C. §§ 1305, 1306, 1324(c) (2006).

177    INA § 266(b), 8 U.S.C. § 1306(b) (2006). "Any alien or any parent or legal guardian in the United States of any alien who fails to give written notice to the Attorney General, as required by section 265 of this title, shall be guilty of a misdemeanor and shall, upon conviction thereof, be fined not to exceed $200 or be imprisoned not more than thirty days, or both. Irrespective of whether an alien is convicted and punished as herein provided, any alien who fails to give written notice to the Attorney

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 116 of 129

General, as required by section 265, shall be taken into custody and removed in the manner provided by chapter 4 of this title, unless such alien establishes to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful.

178    Daniel C. Richman, Political Control of Federal Prosecutions Looking Back and Looking Forward 2088 (Columbia Law Sch. Pub. Law & Legal Theory, Working Paper No. 08 187, 2008), available at http:// ssrn.com/abstract 1289434. See also Dep't of Justice, United States Attorneys Mission Statement, http://www.usdoj.gov/usao/ (listing the number of U.S. Attorneys) (last visited Apr. 15, 2010).

179    Richman, id. at 2088.

180    Id.

181    TracReports, Prosecutions for Jan. 2009, Immigration and Customs in Homeland Security, http:// trac.syr.edu/tracreports/ bulletins/hsaa/monthlyjan09/fil/ (last visited Apr. 15, 2010). Please note that this data is continually updated, and the above numbers may no longer be accurate at the time of publication.

182    Id. More recent data shows that in May 2009 ICE referred 2147 new prosecutions to the DHS, showing an increase by 18.9 percent from the previous month. According to TRAC, "These data suggest that at least through the first five months of the Obama Administration there has been no let up in the increase in criminal prosecutions as a result of ICE's enforcement activities.  TracReports, ICE Criminal Prosecutions Continueto Rise Under Obama, http://trac.syr.edu/ immigration/reports/216/ (last visited Apr. 15, 2010).

183    TracReports, supra note 181.

184    Dianne Solis, Immigration Prosecutions Surge Under Bush's Watch, Dallas Morning News, Jan. 13, 2009, available at http:// www.dallasnews.com/sharedcontent/dws/dn/latestnews/stories/011309dnmetimmigprosecute. 404437c.html.

185    See generally INA § 287, 8 U.S.C. § 1357 (2006); 8 C.F.R. § 287 (2009).

186    Davis, Arbitrary Justice, supra note 127, at 24.

187    8 C.F.R. § 287.3(d) (2009).

188    Id.

189    U.S. Const. amend VI. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

190    INA § 292, 8 U.S.C. § 1362 (2006). See also Resolution, American Bar Association House of Delegates, ABA Policies on Issues Affecting Immigrants and Refugees (2006), available at http:// www.abanet.org/intlaw/policy/humanrights/ immigration2.06107A.pdf (citing to I.N.A. § 292). Related studies and analyses include: Andrew I. Shoenholtz & Hamutal Bernstein, Improving Immigration Adjudications Through Competent Counsel, 21 Geo. J. Legal Ethics 55 (2008); Jaya Ramji Nogales, Andrew Schoenholtz & Philip G. Schrag, Refugee Roulette: Disparities in Asylum Adjudication, 60 Stan. L. Rev. 295 (2007); Andrew I. Schoenholtz & Jonathan Jacobs, The State of Asylum Representation: Ideas for Change, 16 Geo. Immigr. L.J. 739, 746 n.53 (2002); Donald Kerwin, Revisiting the Need for Appointed Counsel, Insight (Migration Policy Institute), Apr. 2005, available at http://www.migrationpolicy.org/insight/Insight  Kerwin.pdf.

191    See generally Albonetti, supra note 127. See also U.S. Attorney's Manual § 9 27.230 (1997).

192    As specified by one scholar: "Sources of uncertainty are directly related to organizationally and professionally defined measures of success. More specifically, the findings indicate that the exercise of prosecutorial discretion at the initial stage of felony screening is significantly influenced by the uncertainty of the assessment of the prosecutorial merit of a case, which is the probability of conviction. Uncertainty is significantly reduced with the introduction of certain legally relevant evidence.

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 117 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

Achieving a good ratio of convictions to acquittals is a well known criterion for upward movement in the legal profession. Albonetti, supra note 127, at 311.

193    Shermer & Johnson, supra note 127, at 11.

194    See, e.g., INA § 240(c), 8 U.S.C. § 1230(c) (2006).

195    See, e.g., Shermer & Johnson, supra note 127, at 1; Davis, Arbitrary Justice, supra note 127, at 6 7; Leadership Conference on Civil Rights, Justice On Trial: Racial Disparities in the American Criminal Justice System (2000), available at http://www.civilrights.org/publications/justice on trial.

196    For an excellent synopsis of prior research on prosecutorial decisionmaking, see Shermer & Johnson, supra note 127, at 5.

197    Shermer & Johnson, supra note 127, at 6.

198    Id. at 6 7.

199    Id. at 14 ("The FJSP collects and collates data from multiple federal agencies, including the AOUSC and USSC. The FJSP creates a unique identification number that that allows federal offenders to be tracked across the stages of the federal justice system. ). According to Shermer and Johnson, of particular interest in the present study is the possibility of offender disparities associated with prosecutorial charge reductions. If prosecutors systemically rely on offender characteristics like age, race, and gender when deciding charge reductions, then unwarranted differences in justice are likely to characterize the federal punishment process. The present results offer relatively little support for this overarching contention. With regard to offender age, there was no evidence that younger offenders were less likely to receive charge reductions, at least not in any way that lowered the statutory maxima. Similarly, the race and ethnicity of the offender exerted no direct influences on federal charge reductions  black and Hispanic offenders were no less likely to have their charges reduced than whites. Id. at 27 28. But note " a]lthough systemic charging disparities do not appear to characterize the entire federal justice system, then, important differences do emerge for certain offenders convicted of certain offenses. This may suggest that prosecutorial reliance on stereotypical patterned responses is particularly likely when both offender and offense categorizations feed into common attributions of dangerousness and culpability.  Id. at 28. See also id. at 31.

200    Id. at 1.

201    See, e.g., Dep't of Homeland Sec., Office of Immigration Statistics, Annual Report, Immigration Enforcement Actions: 2008, available at http://www.dhs.gov/xlibrary/assets/statistics/publications/enforcement  ar  08.pdf; see generally Legomsky, supra note 173.

202    Telephone Interview with Nancy Morawetz, Immigration Scholar and Professor, New York University (July 15, 2009).

203    Adrian Vermeule, Richard B. Stewart & Cass R. Sunstein, Administrative Law and Regulatory Policy 489 (Stephen G. Breyer ed., 6th ed. 2006).

204    See, e.g., 5 U.S.C. §§ 551, 553, 555 (2009); 7 U.S.C. §§ 701 02, 704, 706 (2009).

205    5 U.S.C. § 553 (2009).

206    Id.

207    Id.

208    Richard Thomas, Prosecutorial Discretion and Agency Self Regulation: CNI v. Young and the Alfatoxin Dance, 44 Admin. L. Rev. 131, 137 38 (1992) (citing to Kenneth Culp Davis, Discretionary Justice: A Preliminary Inquiry (1969)). See also Ronald M. Levin, The Administrative Law Legacy of Kenneth Culp Davis, 42 San Diego L. Rev. 315, 317 (2005) (citing to Kenneth Culp Davis, Administrative Law Treatise §6.15 (Supp. 1970). Kenneth Culp Davis was a seminal scholar whose Administrative Law Treatise became a leading authority in administrative law. According to his former pupil and administrative law scholar Ronald M. Levin, "With Davis's capacity for broad research, incisive analysis, and moral passion on full display, the treatise immediately overshadowed all prior work in the area.

Case 1:18-cv-00068   Document 472-6   Filed on 08/21/20 in TXSD   Page 118 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

209   5 U.S.C. §§ 702, 704, 706 (2006).

210   5 U.S.C. § 701(a) (2006).

211   INA § 242(g) (2006); Reno v. AADC, 525 U.S. 471 (1999).

212   Thomas, supra note 208, at 132.

213   Id. at 133.

214   Heckler v. Chaney, 470 U.S. 821 (1985).

215   Heckler v. Chaney, 470 U.S. 821 (1985).

216   Heckler, 470 U.S. at 823.

217   Id. at 823.

218   Heckler, 470 U.S. at 832 33. See also Administrative Procedure Act  APA], 5 U.S.C. § 701(a)(2) (2006).

219   Thomas, supra note 208, at 132; Community Nutrition Inst. v. Young, 818 F.2d 943 (D.C. Cir. 1987).

220   CNI II, 818 F.2d 943, 943 n.1. "Aflatoxins are by products of certain common molds that grow on various crops, including
      corn.

221   CNI II, 818 F.2d at 949.

222   Id. at 949.

223   Thomas, supra note 208, at 152.

224   Id. at 152 n.126.

225   Id.

226   See, e.g., Pasquini v. Morris, 700 F.2d 658, 661 (11th Cir. 1983); Soon Bok Yoon v. INS, 538 F.2d 1211, 1213 (5th Cir. 1976);
      Lennon v. INS, 527 F.2d 187 (2d Cir. 1975); Wan Chung Wen v. Ferro, 543 F. Supp. 1016 (W.D.N.Y. 1982); Zacharakis v.
      Howerton, 517 F.Supp. 1026, 1027 28 (D. Fla. 1981). See, Velasco Gutierrez v. Crossland, 732 F.2d 792, 798 (10th Cir. 1984).
      See also Siverts v. Craig, 602 F. Supp. 50, 53 (D.Haw. 1985) (construing 1981 instruction).

227   Nicholas v. INS, 590 F.2d 802, 807 (9th Cir. 1979).

228   See, e.g., Memorandum from Doris, supra note 3, at 3; Memorandum from Julie L. Myers, supra note 95.

229   Wildes, Operations Instructions, supra note 6, at 106. One notable case summarized by Wildes, perhaps notable because of the
      author's residence in Pennsylvania, is a district court case Parco v. Morris in which the former INS Director conceded
      that petitioner was denied extended voluntary departure solely because of the rescission of an Operations Instruction. The
      court held that INS was, in practical terms, abiding by an inflexible rule issued by the Immigration Service. The Parco court
      went on to argue that the Operations Instruction had a "substantial impact  on the petitioner and therefore was subject to
      the standards identified in the Administrative Procedures Act. Id. at 113. See also id. at 107 (" t]he particular label placed on
      it by the Commission is not necessarily conclusive for it is the substance of what the Commission has purported to do and has
      done which is decisive.  ) (citing Columbia Broad. Sys. Inc. v. United States, 316 U.S. 407 (1942)).

230   Wildes, Operations Instructions, supra note 6, at 118 19 (citing to 44 Fed. Reg. 26,187 (May 4, 1979)).

231   See, e.g., Wildes, Operations Instructions, supra note 6. See also Mada Luna v. Fitzpatrick, 813 F.2d 1006 (9th Cir. 1987).

232    Factors To Be Considered in the Exercise of Administrative Discretion, 44 Fed. Reg. 36187 (June 21, 1979); Steven O. Ludd, Administrative Discretion and the Immigration and Naturalization Service: To Review or Not to Review?, 8 T. Marshall L. Rev. 65, 78 (1982).

233    44 Fed. Reg. 36187 (June 21, 1979); Ludd, supra note 232, at 78.

234    44 Fed. Reg. 36187 at 36189 (June 21, 1979). The 212(c) waiver was a discretionary waiver available to certain Lawful Permanent Residents "is returning to a lawful, unrelinquished domicile of seven consecutive years.   8 U.S.C. 1182(c) (1976). The discretionary component included a balancing test of adverse and favorable factors outlined in case law. Id.

235    44 Fed. Reg. 36187 at 36189 (June 21, 1979).

236    46 Fed. Reg. 9119 (Jan. 28, 1981).

237    Id.

238    Id.

239    See, e.g., Ludd, supra note 232, at 80 81.

240    See, e.g., id. at 82; Wildes, Deferred Action, supra note 8, at 824.

241    Ludd, supra note 232, at 82.

242    See, e.g., id. at 81.

243    44 Fed. Reg. 36,187 (June 21, 1979).

244    See, e.g., Heckler v. Chaney, 470 U.S. 821 (1985); Reno v. Am. Arab Anti Discrimination Comm., 525 U.S. 471 (1999); In Re Bahta, 22 I. & N. Dec. 1381, 1391 92 (Bd. of Immigr. Appeals 2000); Memorandum from Doris Meissner, supra note 3. But some courts have identified the validity of the agency's exercise of prosecutorial discretion. See Bahta, 22 I. & N. Dec. at 1392 ("The Service may choose to further examine this issue on remand. However, there should be no question within the Service that prosecutorial discretion, and its important concomitant responsibilities, continues to exist.   ).

245    See, e.g., Heckler v. Chaney, 470 U.S. 821 (1985); Reno v. AAADC, 525 U.S. 471; Bahta, 22 I. & N. Dec. 1381.

246    Richard J. Pierce, Jr., Administrative Law Treatise 1252 (4th ed. 2002) (citing to the Confiscation Cases, 74 U.S. 454 (1868)).

247    Id. at 1253.

248    Id. at 1254.

249    Id. at 1258 (citing to Abbot Laboratories v. Gardner, 387 U.S. 136 (1967)).

250    Heckler v. Chaney, 470 U.S. at 833.

251    Id. at 831 32.

252    Hotel and Restaurant Employees Union Local v. Smith, 846 F.2d 1499 (D.C. Cir. 1988).

253    Hotel Restaurant Employees Union Local v. Attorney General, 804 F.2d 1256, 1271 72 (D.C. Cir. 1987).

254    525 U.S. 471.

255    Id. at 473.

256    INA § 242(g), 8 U.S.C. 1252(g) (2006).

257    Reno, 525 U.S. at 484 (citing to C. Gordon, S. Mailman, & S. Yale Loehr, Immigration Law and Procedure §72.03 2] h] (6th ed. 1998)).

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 120 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

258     Id. at n.9.

259     Id. at 488.

260     Id. at 490.

261     Id.

262     Id. at 491.

263     See Transcript of Oral Argument, Reno v. AADC, 525 U.S. 471 (No. 97 1252).

264     Reno, 525 U.S. at 491 (citing to Carlson v. Landon, 342 U.S. 524, 537 (1952)).

265     525 U.S. at 491 492.

266     525 U.S. at 511.

267     525 U.S. at 510.

268     Gerald Neuman, Discretionary Deportation, 20 Geo. Immigr. L.J. 611, 630 631 (2006).

269     David A. Martin, On Counterintuitive Consequences and Choosing the Right Control Group: A Defense of Reno v. AADC, 14 Geo. Immigr. L.J. 363, 375 (2000). The majority of immigration functions now rest with the DHS, but Martin's commentary on the potential role of the DHS of Justice's oversight entities is applicable to them.

270     Id. at 376.

271     See, e.g., Kandamar v. Gonzales, 464 F.3d 65, 74 (1st Cir. 2006) ("To be sure, Moroccan nationals were required to register with DHS while a person in the same situation but not from one of the NSEERS countries would not have been placed in removal proceedings. However, a claim of selective enforcement based on national origin is virtually precluded by Reno v. American Arab Anti Discrimination Committee ; see also Rajah v. Mukasey, 544 F.3d 427 (2d Cir. 2008).

272     Memorandum from Doris Meissner, supra note 3, at 3.

273     Daniel Kanstroom, Deportation Nation: Outsiders in American History 232 (2007).

274     See generally U.S. ICE, Changes to National Security Entry/Exit Registration System (NSEERS) (Dec. 1, 2003), http:// www.ice.gov/pi/news/newsreleases/articles/nseersqa120103.htm; American Arab Anti Discrimination Committee & Penn St. U., Ctr. for Immigrants' Rights, NSEERS: The Consequences of America's Efforts to Secure Its Borders 9 (2009), available at http://www.adc.org/PDF/nseerspaper.pdf.

275     U.S. ICE, supra note 274; American Arab Anti Discrimination Committee, supra note 274, at 9.

276     U.S. ICE, supra note 274.

277     U.S. ICE, supra note 274; American Arab Anti Discrimination Committee, supra note 274, at 33 et seq.

278     U.S. ICE, supra note 274; American Arab Anti Discrimination Committee, supra note 274, at 33 et seq.

279     See generally U.S. ICE, ICE Fugitive Operations Program, http:// www.ice.gov/pi/news/factsheets/NFOP FS.htm.

280     See, e.g., Wadhia, supra note 97.

281     U.S. ICE, ICE Fugitive Operations Program, supra note 279.

282     Notably and in contrast to the prior Administration, DHS Secretary Napolitano issued guidance highlighting that ICE will focus worksite enforcement resources on the criminal prosecution of employers. U.S. ICE, Worksite Enforcement Overview, http:// www.ice.gov/pi/news/factsheets/worksite.htm.

Case 1:18-cv-00068 Document 472-6 Filed on 08/21/20 in TXSD Page 121 of 129

THE ROLE OF PROSECUTORIAL DISCRETION IN..., 9 Conn. Pub. Int. L.J....

283 See, e.g., U.S. ICE, Fiscal Year 2008 Annual Report, available at http://www.ice.gov/pi/reports/annual report/.

284 Memorandum from Doris Meissner, supra note 3, at 6. To its credit, ICE developed guidance for officers conducting worksite raids, but this alone fails to answer the broader question of why ICE focused on nonviolent workers in the first place.

285 Wildes, Nonpriority Goes Public, supra note 7, at 50 (citing to a letter dated July 16, 1973 by then INS Assistant Commission Loughran). See also Memorandum from Doris Meissner, supra note 3, at 4.

286 A similar recommendation appears in an Immigration Blueprint submitted to the Obama Biden Transition Team in November 2008. This blueprint sets forth recommendations in numerous immigration policy areas and reflects input from a diverse group of organizations and individuals. See generally Obama Biden Transition Project, Immigration Policy: Transition Blueprint (Nov. 16, 2008), available at http://www.aila.org/content/fileviewer.aspx? docid 27611&linkid 188816.

287 See generally U.S. Gov't Accountability Office, supra note 5..

288 Memorandum from Doris Meissner, supra note 3, at 11 12.

289 Davis, Arbitrary Justice, supra note 127, at 183.

290 Over the last decade, the oversight of former INS and DHS's exercise of prosecutorial discretion has been limited. In response to a request by Congresswoman Zoe Lofgren, the Government Accountability Office issued a report in October 2007 titled "Immigration Enforcement: ICE Could Improve Controls to Help Guide Alien Removal Decision Making. U.S. Gov't Accountability Office, supra note 5. Three questions: 1. When and how do ICE officers and attorneys exercise discretion during the alien apprehension and removal process? 2. What internal controls has ICE designed to guide officer decision making to enhance its assurance that the exercise of discretion supports operational objectives? 3. What internal controls has ICE designed to oversee and monitor officer decision making during the alien apprehension and removal process to enhance ICE's assurance that the exercise of discretion supports its operational objectives?

291 "According to Pew Hispanic Center estimates, there were 11.9 million unauthorized immigrants living in the United States in March 2008. . . . Unauthorized immigrants make up 30 percent of the nation's foreign born population. . . Approximately 44 percent of the nation's unauthorized immigrants have arrived since 2000. See Aaron Terrazas & Jeanne Batalova, Migration Policy Institute, The Most Up to Date and Frequently Requested Statistics on Immigrants in the United States * 12, (2008), available at http://www.migrationinformation.org/USFocus/display.cfm?ID 714#8.

292 Jeffrey S. Passel & D'Vera Cohn, Pew Hispanic Center, Trends in Unauthorized Immigration: Undocumented Inflow Now Trails Legal Inflow, at iv (2008), available at http://pewhispanic.org/files/reports/94.pdf.

293 Cox & Rodriguez, supra note 68, at 66.

294 For related articles and analyses on this topic, see Shoba Sivaprasad Wadhia, Immigration: Mind Over Matter, 5 U. Md. L.J. Race, Religion, Gender & Class 201 (2005); National Immigration Forum, Comprehensive Reform of Our Immigration Laws, Backgrounder (2008), available at http:// www.immigrationforum.org/images/uploads/CIRBackgrounder.pdf.

295 Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948). Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948).

9 CTPILJ 243

---

**End of Document**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**U.S. Department of Homeland Security**
Citizenship and Immigration Services

---

Office of Associate Director of Operations                    *425 I Street NW*
                                                             *Washington, DC 20536*


                                                             October 8, 2003



MEMORANDUM FOR  DIRECTOR, VERMONT SERVICE CENTER

FROM:                    William R. Yates /s/ by Janis Sposato
                         Associate Director of Operations

SUBJECT:                 Centralization of Interim Relief For
                         U Nonimmigrant Status Applicants


**Background**

   On October 28, 2000, Congress passed the Victims of Trafficking and Violence Protection Act (VTVPA), Pub. L. 106-386.[1]  The VTVPA created the U nonimmigrant status, a new nonimmigrant classification for victims of specific crimes. This nonimmigrant status was created to strengthen the ability of law enforcement agencies to detect, investigate and prosecute cases of domestic violence, sexual assault, trafficking of persons and other criminal activity of which aliens are victims, while offering protection to victims of such offenses.  It provides an immigration mechanism for cooperating victims to remain temporarily in the United States to assist in investigations and/or prosecutions.  It is available to victims of certain criminal activity and their families, and is limited to 10,000 principals per year.

   Regulations implementing this new nonimmigrant status are currently in the clearance process.  In an effort to provide interim relief for this vulnerable population, the Office of Programs issued interim guidance in August 2001, which directed that no one who appeared to be eligible to apply for U nonimmigrant status be removed from the United States until he/she has had the opportunity to avail him/herself of the provisions of the VTVPA.  It further instructed field offices to use existing mechanisms (parole, deferred action, and stays of removal) to achieve this objective.

---

[1] The sections of the VTVPA pertaining to U nonimmigrant status are codified at sections 101(a)(15)(U), 214(o), and 245(l) of the Immigration and Nationality Act (INA).

CAR 1033

Since this guidance was issued, it has become apparent that until the regulations implementing the U nonimmigrant status are published, a more unified, centralized approach is needed in the interim relief process.  Many field offices have been unsure how to proceed in granting interim relief, which has resulted in inconsistent treatment of potential U nonimmigrant status applicants.  It is for these reasons that the U nonimmigrant status interim relief process will be centralized at the Vermont Service Center (VSC) effective immediately.

## Centralization of Interim Relief Process

The VSC will serve as the "clearinghouse" for early-filed applications and will have jurisdiction to assess deferred action in early-filed U nonimmigrant status cases.  Upon receipt of a request for interim relief, the VSC will consider the facts of each case and determine if deferred action is appropriate.  Each decision should be considered individually, based on all the facts present.  Upon authorizing deferred action, the center director will advise the alien, by letter, of the action taken and advise him or her of eligibility to request employment authorization. The center director will include a copy of a G-312 in the alien's A file and maintain that file for docket control.

Deferred action shall not be assessed in those cases where the applicant is clearly ineligible for U nonimmigrant status or is an aggravated felon, and those cases should be referred to the Bureau of Immigration and Customs Enforcement (ICE) for possible issuance of a Notice to Appear.  If the VSC determines that the case is not suitable for deferred action, the alien should be notified of that decision by letter.

By their nature, U nonimmigrant status cases generally possess factors that warrant consideration for deferred action.  In some cases, however, there may be factors present that would militate against deferred action; cases should therefore receive individual scrutiny.  The VSC should maintain records of all assessments of deferred action for statistical and tracking purposes.  In addition, a process for periodic review of the deferred action decisions made by the VSC is planned.  Upon publication of the regulations implementing the U nonimmigrant status, the VSC will send a letter informing early filers to submit an application on the proper form, and monitor the early-filed list to determine whether those assessed deferred action have applied. The VSC will terminate deferred action and refer those who fail to apply within the timeframe established by the regulation to ICE for possible issuance of a Notice to Appear, or for removal.

## Eligibility to apply for U nonimmigrant status

Before determining whether to grant a form of interim relief, VSC personnel must first determine whether the alien adequately demonstrates that he/she may possibly be eligible to apply for U nonimmigrant status when regulations are issued.  This would be demonstrated by the submission of *prima facie* evidence of each eligibility requirement.  In other words, the alien must produce sufficient evidence to render reasonable a conclusion that the alien may be eligible for U nonimmigrant status when regulations are issued implementing that status.  This is <u>not</u> a

CAR 1034

Memorandum for Director, Vermont Service Center                         Page 3
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

determination that an alien is or is not eligible to apply, or an adjudication of the claim itself.  It is a conclusion reached by examining the documents accompanying the request for interim relief based upon perceived eligibility.

   The four basic eligibility requirements that an alien must satisfy in order to be classified as a principal U nonimmigrant are set out in the VTVPA.  Therefore, in order to be eligible to apply for interim relief, an alien must present evidence demonstrating that:

   1.   He/she has suffered substantial physical or mental abuse as a result of having
        been a victim of certain criminal activity;

   2.   He/she (or in the case of an alien child under the age of 16, the parent,
        guardian, or next friend of the alien) possesses information concerning that criminal
        activity;

   3.   He/she (or in the case of an alien child under the age of 16, the parent, guardian, or next
        friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a
        Federal, State, or local law enforcement official; to a Federal, State, or local prosecutor;
        to a Federal or State judge; to the INS;  or to other Federal, State, or local authorities
        investigating or prosecuting the criminal activity; and

   4.   The criminal activity described violated the laws of the United States or occurred in the
        United States (including in Indian country and military installations) or the territories
        and possessions of the United States.

   The criminal activity referred to above is listed at INA § 101(a)(15)(U)(iii).  It is that involving one or more of the following or any similar activity in violation of Federal, State, or local criminal law:  rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes.

   When considering whether an alien has presented sufficient evidence demonstrating he/she may be eligible to apply for U nonimmigrant status and thus eligible to request a form of interim relief, VSC personnel must examine each of the U nonimmigrant status eligibility requirements, taking into consideration the guidance below.

Law enforcement certification

   The possible U nonimmigrant status applicant does not have to be identified to the VSC through a law enforcement official.  However, any request for interim relief from a possible U

CAR 1035

Memorandum for Director, Vermont Service Center                          Page 4
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

nonimmigrant status applicant <u>must</u> be accompanied by some form of certification from a law enforcement official attesting to the fact that the alien has been, is likely to be, or is being helpful in the investigation or prosecution of criminal activity designated in the VTVPA.  There currently is no official DHS-created law enforcement certification form.  Therefore, the law enforcement official certification may be in the form of a letter, or a form created by a non-governmental organization or an applicant's attorney or representative, and should:

- State that the person was a victim of one or more of the crimes listed in the statute;
- Identify the crime(s); and
- Verify the victim is, has been, or is likely to be helpful to the prosecution or investigation of the criminal activity.

Whatever form the certification takes, it must in all cases be signed by the law enforcement official investigating or prosecuting the criminal activity.  The certification submitted must have been signed within six months immediately preceding the submission of the request for interim relief.  In addition, the VTVPA does not require the U nonimmigrant status applicant to assist in both the investigation and prosecution of the criminal activity; the assistance offered by the possible U nonimmigrant status applicant may be in either the investigation or the prosecution, or both.

It is important to note that the law enforcement certification does not have to come from a Federal law enforcement official.  Section 214(o)(1) of the INA identifies from whom a certification may be accepted.  The certification may come from a Federal, State or local law enforcement official, prosecutor, judge or other Federal, State, or local authority investigating the criminal activity.  Further development of the range of criminal activity involved and the types of certifying government officials will occur in the rulemaking process.  At this point, VSC personnel should keep in mind that circumstances will vary from case to case, and it is better to err on the side of caution than to remove a possible U nonimmigrant status applicant.

Time element

The fact that the criminal activity occurred a number of years prior to the current request or that the case in which the applicant is the victim is closed is not a determinative factor at this stage.  The statute contemplates that a person may be eligible for U nonimmigrant status as a result of having been a victim of a crime that occurred at some point in the past.  Until there are regulations interpreting this statutory requirement, VSC personnel should not deny interim relief based on the fact that the criminal activity at issue occurred prior to the enactment date of the VTVPA.

Level of harm

The VTVPA does not specifically reserve U nonimmigrant status solely for individuals who have suffered the most harm.  As with any form of immigration benefit with a harm component, there are some applicants who present cases with more harm than others.  Whether the level of harm meets the statutory requirement of substantial physical or mental abuse will be a question

CAR 1036

Memorandum for Director, Vermont Service Center                                Page 5
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

Bureau of Citizenship and Immigration Services (CIS) officers adjudicating the U nonimmigrant status application will decide in accordance with the regulations once they are promulgated. Therefore, for interim relief purposes, "substantial physical or mental abuse" should be broadly interpreted.  Similarly, the fact that the criminal activity involved in the case was classified as a misdemeanor as opposed to a felony should not be a factor in determining eligibility for interim relief.

## Eligibility for Interim Relief

Once an individual is determined to have submitted *prima facie* evidence of his/her eligibility for U nonimmigrant status, VSC personnel must then decide whether to exercise discretion and assess deferred action.  Absent adverse factors, deferred action will be assessed following established CIS guidelines.  Officers should note that if the alien is in removal proceedings or has a final removal order, the VSC does not have jurisdiction to assess deferred action.  The applicant shall be notified in writing if his/her submission does not establish a *prima facie* case or if deferred action cannot be assessed due to lack of jurisdiction.

It is important to note that deferred action does not confer any immigration status upon an alien.  Since deferred action is not an immigration status, no alien has the right to deferred action. Deferred action does not preclude the CIS from commencing removal proceedings at any time against an alien.

## Employment Authorization

Although deferred action is not an immigration status, an alien may be granted work authorization based on deferred action in his or her case pursuant to 8 C.F.R. 274a.12(c)(14).  If the alien is placed in deferred action, the VSC will notify the alien that he or she may submit an I-765, Application for Employment Authorization.  After the initial deferred action decision and issuance of a one-year employment authorization document, the VSC will hold these files and review the deferred action decision upon each application for extension of work authorization.

## Derivative U Nonimmigrant Status Applicants

To avoid extreme hardship, the VTVPA authorizes CIS to provide U nonimmigrant status to the spouses, children, and, in the case of a child under the age of 16, the parents of U nonimmigrants.  This would require certification by a government official that an investigation or prosecution would be harmed without the assistance of the spouse, child, or in the case of an alien child, the parent of the alien.

Family members who may be eligible to receive derivative U nonimmigrant status and who are present in the United States should not be removed, and shall be eligible for interim relief. The eligible family member(s) must demonstrate extreme hardship if removed from the United States and must also submit a certification of a government official that an investigation or prosecution would be harmed without the spouse, child, or parent of the principal.  This certification must comply with the guidelines outlined in this memo.

Memorandum for Director, Vermont Service Center                    Page 6
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

## Reporting Requirements

Deferred action is a resource utilization tool.  Therefore, the VSC should maintain statistics on deferred action cases to ensure that it is being used appropriately.  These statistics are to be maintained on a current basis so that data can be readily extracted upon request.

Statistics should be maintained in the following categories:

- number of requests in deferred action category at the beginning of the fiscal year;

- number of  requests for which deferred action is assessed;

- number of requests for which deferred action is denied;

- number of requests removed from deferred action category;

- number of deferred action requests pending at the end of the fiscal year.

## Periodic Review

The VSC adjudicators assigned to the early-filed U applications should conduct interim reviews to determine whether deferred action cases should be continued or the alien removed from the deferred action category.  Reviews must determine if there is any change in the circumstances of the case.  Results of the review and a recommendation to continue or terminate deferred action would be reported to the center director via memorandum.  The center director should endorse the memorandum with his or her decision and return it for inclusion in the alien's file.

## Termination of Deferred Action

During the course of the periodic review, or at any other time if the VSC determines that circumstances of the case no longer warrant deferred action, the VSC should recommend termination.  Termination may occur for conduct that occurs after the issuance of interim relief (i.e. conviction of a violent crime), for conduct or a condition not disclosed prior to issuance of interim relief, or based on affirmative evidence that the alien unreasonably refused to provide assistance in a criminal investigation or prosecution.  The VSC should notify the alien of the decision to terminate by letter.  Such a determination is not appealable.  Upon termination of deferred action, any relating employment authorization will be revoked in accordance with the standard revocation procedures set out in 8 CFR § 274a.14(b).

## Record Keeping And Confidentiality

It is imperative that documentation be maintained on all U nonimmigrant status applicants.  As such, information about the possible applicant, including all pertinent information surrounding the applicant's circumstances, must be maintained in the alien's A-file.  If

Memorandum for Director, Vermont Service Center                                      Page 7
Subject: Centralization of Interim Relief For U Nonimmigrant Status Applicants

no A-file exists for the individual, one should be created.

Officers should keep in mind that section 384 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)[3] is applicable to all U nonimmigrant status cases.  Section 384 prohibits employees from making an adverse determination of admissibility or deportability of an alien using information provided solely by:

1) a spouse or parent who has battered the alien or subjected the alien to extreme cruelty;
2) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien or subjected the alien to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty;
3) a spouse or parent who has battered the alien's child or subjected the alien's child to extreme cruelty (without the active participation of the alien in the battery or extreme cruelty);
4) a member of the spouse's or parent's family residing in the same household as the alien who has battered the alien's child or subjected the alien's child to extreme cruelty when the spouse or parent consented to or acquiesced in such battery or cruelty and the alien did not actively participate in such battery or cruelty; or
5) **in the case of an alien applying for status under section 101(a)(15)(U) of the INA, the perpetrator of the substantial physical or mental abuse and the criminal activity**.[4]

Section 384 of IIRIRA also prohibits employees from permitting the use by or disclosure to anyone (other than a sworn officer or employee of the Department of Homeland Security (DHS), or bureau or agency thereof, for legitimate DHS, bureau, or agency purposes) of any information that relates to an alien who has applied for U nonimmigrant status.[5]  Anyone who willfully uses, publishes, or permits such information to be disclosed in violation of IIRIRA § 384 will face disciplinary action and be subject to a civil money penalty of up to $5,000 for each such violation.[6]

When the VSC creates or encounters an A file of an applicant for interim relief based upon eligibility for U nonimmigrant status, the contents of the A file should be placed behind a colored cover sheet that sets out the disclosure parameters and penalties so that the materials are handled with appropriate care.

If you have questions regarding this memorandum or other U nonimmigrant status related issues, please contact Laura Dawkins, Office of Program and Regulation Development, by electronic mail.

---

[3] Codified at 8 U.S.C. § 1367.
[4] As amended by VTVPA § 1513(d).  For limited exceptions to this prohibition *see* IIRIRA § 384(b).
[5] *See* IIRIRA § 384(a)(2) as amended by VTVPA § 1513 (d).
[6] *Id.*

OMB No. 1615-0040

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

## I-765, Application For
## Employment Authorization

---

**Do not write in this block.**

| Remarks | Action Block | Fee Stamp |
|---|---|---|
| A# | | |
| Applicant is filing under §274a.12 _____ | | |

☐ Application Approved. Employment Authorized / Extended *(Circle One)*   until _____ (Date).
_____ (Date).

Subject to the following conditions: _____

Application Denied.
☐ Failed to establish eligibility under 8 CFR 274a.12 (a) or (c).
☐ Failed to establish economic necessity as required in 8 CFR 274a.12(c)(14), (18) and 8 CFR 214.2(f)

---

I am applying for:   ☐ Permission to accept employment.
☐ Replacement *(of lost employment authorization document)*.
☐ Renewal of my permission to accept employment *(attach previous employment authorization document)*.

| | |
|---|---|
| 1. Name (Family Name in CAPS)  (First)          (Middle) | Which USCIS Office?                    Date(s) |
| 2. Other Names Used (include Maiden Name) | Results (Granted or Denied - attach all documentation) |
| 3. Address in the United States (Street Number and Name)   (Apt. Number) | 12. Date of Last Entry into the U.S.   (mm/dd/yyyy) |
| (Town or City)          (State/Country)          (ZIP Code) | 13. Place of Last Entry into the U.S. |
| 4. Country of Citizenship/Nationality | 14. Manner of Last Entry (Visitor, Student, etc.) |
| 5. Place of Birth (Town or City)   (State/Province)   (Country) | 15. Current Immigration Status (Visitor, Student, etc.) |

6. Date of Birth   (mm/dd/yyyy)      7. Gender   ☐ Male   ☐ Female

8. Marital Status   ☐ Married   ☐ Single   ☐ Widowed   ☐ Divorced

9. Social Security Number (include all numbers you have ever used) (if any)

10. Alien Registration Number (A-Number) or I-94 Number (if any)

11. Have you ever before applied for employment authorization from USCIS?
☐ Yes (If "Yes," complete below)   ☐ No

16. Go to **Part 2** of the Instructions, Eligibility Categories. In the space below, place the letter and number of the category you selected from the instructions (For example, (a)(8), (c)(17)(iii), etc.).

Eligibility under 8 CFR 274a.12  ( ___ )  ( ___ )  ( ___ )

17. If you entered the Eligibility Category, (c)(3)(C), in item 16 above, list your degree, your employer's name as listed in E-Verfy, and your employer's E-Verify Company Identification Number or a valid E-Verify Client Company Identification Number in the space below.

Degree: _____

Employer's Name as listed in E-Verify: _____

Employer's E-Verify Company Identification Number or a valid E-Verify Client Company Identification Number _____

---

## Certification

**Your Certification:**  I certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Furthermore, I authorize the release of any information that U.S. Citizenship and Immigration Services needs to determine eligibility for the benefit I am seeking. I have read the Instructions in **Part 2** and have identified the appropriate eligibility category in **Block 16.**

| *Signature* | Telephone Number | Date |
|---|---|---|
| | | |

---

**Signature of Person Preparing Form, If Other Than Above:** I declare that this document was prepared by me at the request of the applicant and is based on all information of which I have any knowledge.

| Print Name | Address | *Signature* | Date |
|---|---|---|---|
| | | | |

| Remarks | Initial Receipt | Resubmitted | Relocated | | Completed | | |
|---|---|---|---|---|---|---|---|
| | | | Rec'd | Sent | Approved | Denied | Returned |
| | | | | | | | |

Form I-765 (Rev. 01/19/11)Y

**CAR 1040**