# Exhibit 22

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| **UNITED STATES OF AMERICA**, et al., | ) | |
| | ) | |
| Defendants | ) | |

### SUPPLEMENTAL DECLARATION OF DONALD DEERE, Ph.D.

My name is Donald Deere, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

#### Qualifications

1.     I am a Senior Economist for Welch Consulting, a firm that provides expert services in economics and statistics to the legal community, as well as general consulting in economics and statistics. Previously, I served as a Senior Economist for Unicon Research Corporation, a firm that conducted grant and contract research for U.S. government agencies.

2.     In 2007, I retired from the tenured faculty of the Department of Economics at Texas A&M University, where I taught courses in labor economics, statistics, and public finance. I have since served as an Adjunct Associate Professor of Economics at Texas A&M University. Formerly, I was Associate Director of the

1

**App. 445**

George Bush School of Government and Public Service, where I also taught as a member of the visiting faculty in 2008.

3.  I received training in economics and statistics at the Massachusetts Institute of Technology, where I earned a Ph.D. in Economics in 1983. I have taught at M.I.T., the University of California, Santa Barbara, and Texas A&M University. My research has been published in numerous professional, peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

4.  Attached to this declaration are true and correct copies of the following documents:

- Appendix 1 includes my curriculum vitae and a list of my publications.

- Appendix 2 sets forth the cases in which I have testified in deposition or at trial during the last four years.

### Scope of Inquiry

5.  I have been retained in this case by the Office of the Attorney General of Texas to examine the potential economic impact on the labor market of the Department of Homeland Security Memorandum dated June 15, 2012 ("DHS Memorandum")[1], with particular focus on the interaction between the DHS Memorandum and the employer mandate provisions in the Affordable Care Act ("ACA").

---

[1] The DHS Memorandum regards the exercise of "prosecutorial discretion" for certain immigrants who are not lawfully present. The subject of the DHS Memorandum, from Janet Napolitano, Secretary of Homeland Security, is "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."

**App. 446**

6.   My billing rate for this matter is $525 per hour.

## Background on the Affordable Care Act and the DHS Memorandum

7.   It is my understanding that as a result of the DHS Memorandum the number of immigrants who are not lawfully present with an Employment Authorization Document ("EAD") has expanded nationwide.[2] I also understand that these individuals authorized to work are not eligible for the premium subsidies provided by the ACA.[3]

8.   The Congressional Budget Office and the Joint Committee on Taxation in March 2012 estimated the impact of the ACA on nonelderly workers and their families who were projected to receive employment-based coverage in 2016 *in the absence of the ACA*. The resulting estimates are that 64 million of these individuals will be eligible for subsidies in the exchanges under the ACA.[4]

---

[2] DACA_Population_Data_Mar_31_2018, available at https://www.uscis.gov/tools/reports-studies/immigration-forms-data.

[3]   HealthCare.gov,   Immigration   status   and   the   Marketplace,   available   at https://www.healthcare.gov/immigrants/immigration-status. See also, 8 U.S. Code § 1611 - Aliens who are not qualified aliens ineligible for Federal public benefits, and 45 CFR 152.2 – Definitions, Legal Information Institute.

[4] Congressional Budget Office, *CBO and JCT's Estimates of the Effects of the Affordable Care Act on the Number of People Obtaining Employment-Based Health Insurance* at 12-14 (Mar. 2012), available at http://www.cbo.gov/sites/default/files/03-15-ACA_and_Insurance_2.pdf. An estimated 8.7 million Marketplace Enrollees were receiving Advance Premium Tax Credits in February 2017. See Kaiser Family Foundation, *Estimated Total Premium Tax Credits Received by Marketplace Enrollees*, available at https://www.kff.org/state-category/health-reform/february-2017-marketplace-enrollment/.

**App. 447**

9.      The ACA mandates that employers with 50 or more full-time employees offer health insurance that provides "minimum value" and is "affordable" to their full-time employees.[5]

10.     To my knowledge, "minimum value" requires that health insurance pay at least 60% of the cost of covered services for employees and their children up to age 26. The ACA does not require the employer to pay the entire cost of this coverage, but the mandate to be "affordable" requires that the cost to the employee for this coverage be no more than 9.56% of the employee's income.[6]

11.     An employer offering coverage that does not provide "minimum value" or is not "affordable" will owe a penalty under the ACA if any of its employees purchases coverage on the insurance exchange *and receives a premium subsidy*. It is my understanding that this penalty is the lesser of a) $2,320 per year per employee after the first 30 employees, or b) $3,480 per year per employee receiving a premium subsidy.[7]

---

[5] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act at Question 1 (2018), available at https://www.irs.gov/affordable-care-act/employers/questions-and-answers-on-employer-shared-responsibility-provisions-under-the-affordable-care-act.

[6] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 38-41.

[7] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 52-54. See also, Edward A. Morse, *Lifting the Fog: Navigating Penalties in the Affordable Care Act*, 46 CREIGHTON L. REV. 207, 221-22 (2013). For the $3,480 penalty to apply, the employer must have less than a minimum of 26.7% of its employees receiving a premium subsidy. This cutoff % rises with the number of employees—to 46.7% for an employer with 100 total employees and to a maximum of 66.7% (the cutoff % equals 2/3 − 20/# employees).

12.     Because this penalty is not a deductible expense for the employer from federal (and possibly state) income taxes,[8] the before-tax penalty amount, which would be compared to the wage, is even larger.[9]

### Interaction of the DHS Memorandum
### and the ACA on the Labor Market

13.     As a threshold matter, the addition of some 694,000 work-eligible individuals nationwide, with 114,000 of these in Texas, will, other things equal, put downward pressure on wages and make it more difficult for some U.S. citizens to find employment.[10]  In addition, the interaction of the DHS Memorandum and the ACA will further impact employment and wages in the labor market.[11]

14.     Consider an employer facing this penalty that is considering hiring one of two prospective employees.  These two employees are equally productive and are the same in all relevant aspects to this employer, except that applicant A is a U.S. citizen and applicant B is a DACA recipient holding an EAD.

15.     Assume applicants A and B are relatively low skilled, so that the cost to the employee of the coverage offered by this employer exceeds 9.56% of the wage that would be offered to them.  Also assume that this employer expects less than 25% of its employees to obtain a premium subsidy.

---

[8] Morse, *supra*, at 223.
[9] For an employer facing a 21% federal corporate income tax rate and the $3,480 penalty, the equivalent annual before-tax amount is at least $4,405.06.
[10] See DACA_Population_Data_Mar_31_2018, *supra*.
[11] As an example, for the employer in footnote 9, the penalty would increase the relative annual cost of employing a worker for 30 hours per week at the federal minimum wage who receives a premium subsidy by almost 40%.

5

**App. 449**

16.    In this scenario, the employer would expect applicant A to be more expensive to employ than applicant B because of the interaction of the ACA penalties described above and the DHS Memorandum.  There is an extra cost of $3,480 per year (plus the tax impact noted above) from hiring applicant A if applicant A will receive a premium subsidy.  In contrast, hiring applicant B entails no extra cost because applicant B is not eligible for a premium subsidy.

17.    An employer subject to the ACA penalties described above that is operating to minimize its expected cost of operations will hire applicant B instead of applicant A.  Applicant A, therefore, will take longer to find employment and the resulting employment is more likely to occur at a lower wage.

18.    Depending on the employee cost of insurance, the incentive to hire applicant B can occur at a range of wage levels, as illustrated in the following two examples.

*Example 1*

19.    In addition to the above facts, suppose that applicants A and B would be paid the federal minimum wage of $7.25 per hour.  Assuming 30 hours per week (the definition of full time in the ACA), a monthly employee cost of $90.10 or greater ($7.25 x 130 hours x 9.56%) would make the employer-provided coverage not "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.[12]  There is no extra cost from hiring applicant B.

---

[12] At 40 hours per week, the monthly employee cost would have to be no more than $120.13 to be "affordable."

**App. 450**

20.    As a result, the employer will hire applicant B instead of applicant A if the employer is operating to minimize its expected cost of operations.

***Example 2***

21.    As an alternative, suppose that applicants A and B would be paid $30,000 per year (about twice the federal minimum wage for 40 hours per week).[13] A monthly employee cost for employee and dependent coverage in excess of $239.00 (9.56% x $30,000/12) would not be "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.  Again, there is no extra cost from hiring applicant B.

22.    Similar to the previous example, the employer in this example would be expected to hire applicant B instead of applicant A in an effort to minimize costs.

### Other Aspects of the Impact of the DHS Memorandum on the Labor Market

23.    Economic theory implies that the demand curve for a labor input slopes downward.[14] In other words, as the price (or wage) of a labor input decreases, other things equal, more of that labor input will be used by employers.  Conversely, as more of a labor input is made available, such as via immigration, the wage of that labor

---

[13] Using 35 hours per week instead of the ACA limit of 30 to define full-time, the U.S. Census Bureau reports that more than 23.8 million persons were employed full-time and full-year in 2016 with annual earnings below $30,000.  U.S. Census Bureau, *Current Population Survey, 2017 Annual Social and Economic Supplement* at Table PINC-10, *available at* https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc/pinc-10.2016.html.

[14] See, for example, Hal R. Varian, *Intermediate Microeconomics: A Modern Approach*, W. W. Norton & Company: New York, 1987, p. 327.

**App. 451**

input will fall, other things equal. Although the theoretical implication that, other things equal, immigration reduces the wages of native workers with the same skills is clear, there is no consensus in the economic literature on the magnitude of this effect.[15]

### Conclusion

24.     The DHS Memorandum and its interaction with the mandate provisions of the ACA gives employers a financial incentive to hire an immigrant who is not lawfully present and who is authorized to work instead of an identically skilled citizen in certain instances.

25.     Based on my knowledge and expertise in labor economics, it is my expert opinion that as a result of DHS Memorandum and its interaction with the ACA, there will be relatively less hiring of U.S. citizens and relatively lower wages on average for those who are hired. The interplay between the DHS Memorandum and the ACA makes some U.S citizens more expensive to hire than equally productive immigrants who are not lawfully present.

26.     This result will have adverse consequences for certain U.S. citizens because some employers will find it financially advantageous to hire an immigrant

---

[15] See, for example, George J. Borjas, "The Labor Demand Curve *Is* Downward Sloping: Reexamining the Impact of Immigration on the Labor Market," *The Quarterly Journal of Economics*, Vol. 118, No. 4 (2003), pp. 1335-1374, and David Card, "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration," *Journal of Labor Economics*, Vol. 19, No. 1 (2001), pp. 22-64.

**App. 452**

who is not lawfully present and who is authorized to work in the U.S. instead of an equally productive U.S. citizen.

27.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this *14th* day of June, 2018.

DONALD DEERE

**App. 453**

Appendix 1



# Donald R. Deere, Ph.D.

**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## EDUCATION

Ph.D., Economics
Massachusetts Institute of Technology
Cambridge, Massachusetts
1983

B.S., Economics
Texas A&M University
College Station, Texas
1978

## PROFESSIONAL EXPERIENCE

Senior Economist
Welch Consulting
Bryan, Texas
2005 – Present

Senior Economist
Unicon Research Corporation
Bryan, Texas
2001 – 2016

Adjunct Associate Professor of Economics
Texas A&M University
College Station, Texas
2007 – 2009
2010 – Present

Visiting Faculty
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
2008

Associate Professor of Economics
Texas A&M University
College Station, Texas
1990 – 2007

Senior Consultant
Welch Consulting
Bryan, Texas
1991 – 2005

Associate Director for Academic Programs
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
1996 – 1999

Donald R. Deere is a Senior Economist in the Bryan, Texas office of Welch Consulting. Dr. Deere's work has included statistical and economic analysis in cases involving claims of discrimination in employment, housing, transportation and insurance, in cases involving wage and hour violations, and in cases involving lost earnings or commercial damages. He also has conducted analyses of compensation practices for internal and OFCCP audit purposes. Dr. Deere has provided testimony in cases in both state and federal courts.

Dr. Deere has a Ph.D. in economics from the Massachusetts Institute of Technology. In 2007, Dr. Deere retired from the tenured faculty of the Department of Economics at Texas A&M University, where he taught courses in labor economics, economic principles and public finance. While at Texas A&M University, he also taught graduate statistics in, and was Associate Director of the George Bush School of Government and Public Service. Dr. Deere also is Senior Economist for Unicon Research Corporation, where he served as Vice President from 2001-2004. Dr. Deere's research has concentrated primarily on labor markets and public policy affecting wages and employment. His research has been published in numerous professional peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

## PUBLICATIONS

"Analyzing Reductions in Force and Other Termination Decisions," with James E. Pearce in Adverse Impact Analysis:  Understanding Data, Statistics, and Risk, edited by Scott B. Morris and Eric M. Dunleavy, Routledge Taylor & Francis Group, (2017): 239-257.

"Minimum Sense," NBIZ Magazine, (Winter 2006):8-10.  Also found on NBIZMag.com.

"Educational Wage Premia and the U.S. Income Distribution: A Survey," with Jelena Vesovic in Handbook of the Economics of Education, edited by E. Hanushek and F. Welch, Elsevier Science, (2006):255-306.

"Inequality, Incentives, and Opportunity," with F. Welch.  Social Philosophy & Policy, 19, no. 1, (Winter 2002).  Also in Should Differences in Income and Wealth Matter? edited by E.F. Paul, F.D. Miller, Jr. and J. Paul. Cambridge University Press (2002):84-109.

"Trends in Wage Inequality in the United States," in Increasing Inequality in America: The Facts, Causes, and Consequences, edited by F. Welch. University of Chicago Press, (2001):9-35.

"Don't Raise the Minimum Wage - The Bar is Already Too High," Brief Analysis No. 270, NCPA, (June 1998).

"Evidence on Minimum Wages and Employment Following the 1990/91 Increase in the Federal Minimum Wage," with K. Murphy and F. Welch.  In Effects of the Minimum Wage, edited by M. Kosters. AEI Press, (1996).

"Minimum Sense: Raising Wages from $4.25 to $5.15 an Hour Will Cause Lower Skilled Workers to Lose Their Jobs," Texas Business, (September 1996).

"Employment and the 1990/91 Minimum Wage Hike," with K. Murphy and F. Welch.  American Economic Review, 85, no. 2, (May 1995):232-37.

"Sense and Nonsense on the Minimum Wage," with K. Murphy and F. Welch.  Regulation, 18, no.1, (1995):47-56.

**App. 455**



# Donald R. Deere, Ph.D.

WELCH CONSULTING
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

**PROFESSIONAL
EXPERIENCE**
(continued)

Visiting Assistant Professor of Economics
University of California
Santa Barbara, California, 1988 – 1989

Assistant Professor of Economics
Texas A&M University
College Station, Texas
1983 –1990

## PUBLICATIONS (continued)

"Home Equity: Texas Should Unlock This Asset," The Dallas Morning News, April 23, 1995.

"Unionization and Profitability: Evidence of Spillover Effects," with S.G. Bronars,  Journal of Political Economy, (December 1994):1281-87.

"The Effects of Unions on Firm Behavior: An Empirical Analysis using Firm-Level Data," with S.G. Bronars and J.S. Tracy, Industrial Relations, (October 1994):426-51.

"A Study of Nonsubscription to the Texas Workers' Compensation System: The Employee Perspective," (July 1994) Texas Workers' Compensation Research Center.

"A Study of Nonsubscription to the Texas Workers' Compensation System," Texas Workers' Compensation Research Center, (August 1993).

"Union Organizing Activity, Firm Growth, and the Business Cycle," with S.G. Bronars. American Economic Review, (March 1993):203-20.

"Unionization, Incomplete Contracting, and Capital Investment," with S.G. Bronars. The Journal of Business, (January 1993):117-32.

Review of "Labor Unions and the Economic Performance of Firms," Industrial and Labor Relations Review, (July 1993):732-33.

"Unemployment Insurance and Employment." Journal of Labor Economics, (October 1991):307-24.

"The Threat of Unionization, the Use of Debt, and the Preservation of Shareholder Wealth," with S.G. Bronars.  Quarterly Journal of Economics, (February 1991):231-54.

"Union Representation Elections and Firm Profitability," with S.G. Bronars.  Industrial Relations, (Winter 1990):15-37.

"On the Potential for Private Insurers to Reduce the Inefficiencies of Moral Hazard."  International Review of Law and Economics, (December 1989):219-22.

"Internal Labor Markets, Large Personnel Systems, and the Military."  Economics of Defense Manpower Conference Final Report, United States Air Force Academy, (June 1988).

"Bilateral Trading as an Efficient Auction Over Time."  Journal of Political Economy, (February 1988):100-15.

"Labor Turnover, Job-Specific Skills, and Efficiency in a Search Model."  Quarterly Journal of Economics, (November 1987):815-33.

## SELECTED WORKING PAPERS

"Plant Closings, Large Layoffs, and Advance Notice Provision," with S.N. Wiggins.

"Tax Rates, Tax Complexity, and the Usage of Paid Tax Return Preparers," with C. Wolfe.

"Subscription to Workers' Compensation in Texas."

"Heads I Win, Tails You Lose:  The Economic Impact of the Texas Lottery on Demographic Groups," with J. Dyer.

**App. 456**



# Donald R. Deere, Ph.D.

**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## SELECTED WORKING PAPERS (continued)

"The Cross Sectional Impact of Unemployment Insurance on Layoffs, Employment, and Wages," with J.A. Miron.

"Part-Time Employment," with S.G. Bronars.

"Union Organizing Activity and Union Membership 1973-1988," with S.G. Bronars.

"Union Membership, Union Organizing Activity, and the Union Wage Differential 1973-1988," with S.G. Bronars.

"Competitive Incentives: School Accountability and Student Outcomes in Texas," with W.E. Strayer.

"Climbing the Economic Ladder," with A.J. Rettenmaier.

## HONORS AND AWARDS

**Fellowships:**
    National Science Foundation Graduate Fellowship.
    Rotary Foundation Graduate Fellowship.
    Sloan Foundation Dissertation Research Fellowship.

**Research Grants/Contracts:**
    Grant from the Smith Richardson Foundation, "Social Security, Wages and Retirement," 1995.

    Four Contracts with the Texas Workers' Compensation Research Center, "Nonsubscription to the Texas Workers' Compensation System," 1992-1995.

    Grant from the Texas Advanced Research Program, "Unionization, Profitability, and Firm Behavior," 1988.

    Grant from the U.S. Department of Health and Human Services, "Demand Variability, Structural Changes in the Labor Market and the Growth of Part-Time Employment," with S.G. Bronars, 1984.

**Peer Review:**

Professional Journals:
    American Economic Review
    Journal of Political Economy
    Quarterly Journal of Economics
    Journal of Labor Economics
    Review of Economic Studies
    Rand Journal of Economics
    Review of Economics and Statistics
    Economic Journal
    Industrial Relations
    Economic Inquiry
    Industrial and Labor Relations Review
    Industrial Relations
    Journal of Labor Research

Grants Competition:
    National Science Foundation

**ABOUT WELCH CONSULTING**

Welch Consulting has more than 30 years experience assisting clients of every size in matters involving employment issues and complex business litigation across a broad spectrum of industries and public sector entities. Our track record in producing rigorous analyses meeting the highest standards of accuracy, clarity and punctuality makes Welch Consulting a consistent choice for industry leading companies and the nation's preeminent law firms.

Welch Consulting has offices in Los Angeles, Texas and Washington DC.

For more information about our professionals and services visit us online at www.welchcon.com

**App. 457**

Appendix 2

## Testimony Given in Last 4 Years by Donald Deere

United States of America and the State of Texas, Ex Rel. Keith Waldmann et al. v.
McAllen Medical Center, et al.
Deposition: 11/10/16
In the United States District Court for the Southern District of Texas McAllen Division
Civil Action No. 7:13-cv-495(M)

AJP Oil Company, LLC, D/B/A Grapeland Fuel and BBQ v. Velvin Oil Company, Inc.
Deposition: 07/12/16
In the 3rd District Court of Houston County, Texas
Civil Action No. 14-0217

Kimberly A. Nice, a Personal Representative of the Estate of Shawn R. Nice v. L-3
Communications Vertex Aerospace, LLC, et al
Deposition: 06/17/16
In the United States District Court for the Northern District of Florida, Pensacola
Division
Civil Action No. 3:12-CV-00009-MCR-CJK

Barbara Semons, as Next Friend and Guardian of William Warren v. Houston Party
Rental, Inc. and Sam Houston Area Council Boy Scouts of America
Deposition: 06/12/15
In the 80th Judicial District Court, Harris County, Texas
Cause No. 201407399

Noll, et al. v. Ebay Inc., et al.
Deposition: 09/29/14
United States District Court Northern District of California, San Jose Division
Case No. 5:11-CV-04585-EJD

2018

**App. 459**