*O*

*Ad Hoc New Yorker Republican Committee*
Trustee Christopher Earl Strunk Amicus
141 Harris Avenue
Lake Luzerne, New York 12846-1721
518-416-8743 Email: strunk@leader.com

**United States District Clerk**
**of the UNITED STATES Court for**
**the Southern District Court Of Texas**
**515 Rusk Street, Room 5300**
**Houston, Texas 77002**

**Regarding: State of Texas et al., V   United States Of America et al., 18-cv-068   (ASH)**

**Subject:  In accordance with Reporting Requirements of Local Rule 5-2 for Related Cases AMICUS CHRISTOPHER EARL STRUNK AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR CHILDHOOD ARRIVAL (DACA)***

**The Honorable Clerk of the Court,**

With reference to the above Subject, I am Christopher Earl Strunk granted Amicus status according to the  21 August 2020 Order by the Honorable Andrew S. Hanen, shown as Docket Item 275, with a motion to reconsider Intervener status with extraordinary FRCvP Rule 65(b) relief shown as Docket Item 483. hereby attaches the accompanying **Amicus Strunk Opposition  Affidavit** of 12 pages with **Exhibits G thru N** with 135 pages:

**Exhibit G:** New York Senior Solicitor Assistant Attorney General Andrew William Amend duly served on 13 October 2020 USPS return receipt 9590 9402 2906 7094 0579 24 - 2 pages;
**Exhibit H:**  The States Amici Curiae Motion For Relief Memorandum of Law  At Docket  Item# 209 In Opposition To Plaintiffs' Request For Injunction Against  DACA - 34 pages;
**Exhibit I:** *Articles of Confederation of 1781* -6 pages
**Exhibit J:** *State of New York Constitution of 1938 as revised, including amendments effective January 1, 2015* -46 pages;
**Exhibit K:**  16 October 2020, NYS AAG ANTHONY ROTUNDI OAG No.: 20-046226-L1 Motion to Dismiss Claim - 39 pages;
**Exhibit L:** August 28 2005 Washington Post Article *Delegation Led by U.S. Senators Detained Briefly at Russian Airport* - 2 pps
**Exhibit M:** August 30, 2005 by the US Senator Richard Lugar report *Lugar and Obama Urge Destruction of Conventional Weapons Stockpiles* -3 pages
**Exhibit N:** 6 September 2009 *American Reporter* published an article *Russia Holds Obama For Suspicion Of Being a British Spy Back In 2005! Investigator In Chicago Fingers Obama For Being A British Spy As Far Back As 2004!* - 3 pages

**Affirmation** with 12 pages; and the **Certificate of  Service** by Certified Mail and emails one page.

Christopher Earl Strunk Trustee for *Ad Hoc New Yorker Republican Committee* declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct with 28 USC §1746.

Dated:  October **20**, 2020
        Lake Luzerne, New York

Christopher Earl Strunk in esse Sui Juris in propria persona
Trustee for the *Ad Hoc New Yorker Republican Committee*
All Rights Reserved Without Prejudice

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

---

STATE OF TEXAS et al. ,

Plaintiff,

v.                                                    Civil Action No. 18-cv-0068 (ASH)

UNITED STATES OF AMERICA  et al.,

Defendant.

---

## CERTIFICATE OF SERVICE

That Movant Undersigned certifies and affirms under 28 USC 1746 hereby that he provides in addition to email, a true and correct copy of the motion practice **AMICUS CHRISTOPHER EARL STRUNK AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR CHILDHOOD ARRIVAL (*DACA)** with Exhibits G thru N affirmed 20 October 2020 based upon the proposed preliminary injunction order placed  in properly addressed envelopes and postage for service by USPS certified / return receipt upon counsels :

**Jeffrey S Robins**
U.S. Department of  Justice
Office of Immigration Litigation
PO Box 868 Washington, DC 20044
202–616–1246

**Todd Lawrence Disher**
Office of the Attorney General of Texas
209 W 14th Street
8th Floor Austin, TX 78701
512–936–0677

**Andrew William Amend**
New York Office of the Attorney General
 28 Liberty Street 14th Fl
New York, NY 10005
212 416–8022

jeffrey.robins@usdoj.gov
todd.disher@oag.texas.gov
ndrew.amend@ag.ny.gov
trent.peroyea@oag.texas.gov,
ryan.bangert@oag.texas.gov,
aaron.goldsmith@usdoj.gov,
daniel.hu@usdoj.gov,
james.walker3@usdoj.gov,
nperales@maldef.org,
cgarcia@garciagarcialaw.com,
dhulett@maldef.org,

douglas.hallward-
driemeier@ropesgray.com,
eherrera@maldef.org,
rsoto@maldef.org,
apincus@mayerbrown.com,
cdashiell@lowenstein.com,
dleit@lowenstein.com,
grooney@lowenstein.com,
irgoldman@mayerbrown.com,
jeremy.hollander@law.njoag.gov,
brian.devito@law.njoag.gov,
kenneth.levine@law.njoag.gov,
nicholas.dolinsky@law.njoag.gov,
Rachel.Apter@njoag.gov,
aschlafly@aol.com,
ljoseph@larryjoseph.com,
sramon@ramonworthington.com,
IBhabha@jenner.com,   JYun@jenner.com,
LHarrison@jenner.com,
TPerrelli@jenner.com,
aamangi@pbwt.com,
johnathan@muslimadvocates.org,
sirine@muslimadvocates.org,
juvaria@muslimadvocates.org,
LLustberg@gibbonslaw.com,
hhshafiqullah@legal-aid.org,
jdegroote@cgsh.com,

jkolodner@cgsh.com,
jli@cooley.com,
malger@cooley.com,
mmcmahon@cooley.com,
msherman@cooley.com,
geoffreybrounell@dwt.com,
peter.karanjia@dlapiper.com,
andrew.amend@ag.ny.gov,
jdavidson@cov.com,
mlynch@cov.com,
garzpalm@aol.com,
mlsaad@venable.com,
SPSheikh@venable.com,
wdcoston@venable.com,
atertas@venable.com,
ametlitsky@omm.com,
ryagura@omm.com,
jsokoler@omm.com,
kranlett@mayerbrown.com,
tleatherbury@velaw.com,
cbadlani@hsplegal.com,
tamar.pachter@doj.ca.gov,
joshua.mcmahon@ag.ny.gov,
coffey@bcalbany.com,
john.hoggan@usdoj.gov

Dated: October **20** 2020
Lake Luzerne New York

**Christopher Earl Strunk**, in propria persona
141 Harris Ave. Lake Luzerne, New York 12846-1721
Ph: 718-414-3760 and 518-416-8743 Email: strunk@leader.com

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

---

**STATE OF TEXAS et al. ,**

**Plaintiff,**

   v.                                 **Civil Action No. 18-cv-0068 (ASH)**

**UNITED STATES OF AMERICA  et al.,**

**Defendant.**

---

**RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH LOCAL RULE 5-2 RELATED CASES OF AMICUS <u>CHRISTOPHER EARL STRUNK</u>, THE NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR FRCvP RULE 65(b) RELIEF AT DOCKET ITEM# 483, <u>AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET ITEM# 209 BY</u> : NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, IOWA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA <u>IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE <i>DEFERRED ACTION FOR CHILDHOOD ARRIVAL (</i></u>DACA)**

1.      This support affirmation of New York county born citizen Christopher Earl Strunk, is of a dejure Natural-Born-Citizen born on soil to U.S. Citizen parents as the generational transfer utility tool for allegiance to the United States of America constitutional republic of limited government under God without need for further oath, regarding our intervener submission filed at Docket Item #465 and #466 that on 21 August 2020 were granted Amicus Status as Trustee of the AD HOC NEW YORKER  REPUBLICAN COMMITTEE shown at Docket Item #475 herein opposes the CIA's *VOID AB INITIO* alien POTUS USURPER a.k.a. Barack Hussein Obama whose Executive Order *Deferred Action for Childhood Arrivals* (**DACA**) by operation of law is VOID AB INITIO too; and

2.      Further in good faith represents the State of New York under the Tenth Amendment against overthrow and whose motion to reconsider his standing as an intervener plaintiff and for extraordinary FRCvP 65(b) injunctive relief against New York for its illegally aiding and abetting ballot access at the 3 November 2020 general election of the California DACA Poster Child KAMALA DEVI (IYER) HARRIS herein filed on 6 October 2020 is shown at Docket Item #483 and despite the malicious bad faith representation by Senior Solicitor Assistant Attorney General Andrew William Amend who was duly served on 13 October 2020 as proven by the USPS return receipt 9590 9402 2906 7094 0579 24 (see **Exhibit G**); and

3.   Further  according to Docket Items 208 and 209:

| 07/21/2018 | 208 | NOTICE of Appearance by Andrew W. Amend on behalf of Proposed Amici States, filed. (Amend, Andrew) (Entered: 07/21/2018) |
| --- | --- | --- |
| 07/21/2018 | 209 | Unopposed MOTION for Leave to File Memorandum of Law as Amici Curiae, Unopposed MOTION for Leave to File Excess Pages( Motion Docket Date 8/13/2018.) by Proposed Amici States, filed. (Attachments: # 1 Memorandum of Law, # 2 Appendix, # 3 Proposed Order)(Amend, Andrew) (Entered: 07/21/2018) |
| | | |

the New York Senior Solicitor Assistant Attorney General Andrew William Amend is the Counsel to be noticed to The States Amici Curiae Motion For Relief At Docket  Item# 209 By : New York, California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Virginia, Vermont, Washington, and District Of Columbia In Opposition To Plaintiffs' Request For Injunction Against **DACA**  by herewith Memorandum of Law **(see Exhibit H); and**

4.      Notwithstanding the Administrative Procedures Act  (APA) and Federal Registry notice required under the *National Emergencies Powers Act* of 1976 (EPA) and *International Economic Emergency Powers Act* of 1977 (IEEPA), DACA is violative of every Constitution of every state as devised under the express terms of the *Articles of Confederation of 1781* (see **Exhibit I** ) and revised

_Constitution for the United States of America ratified on 26 July 1788_ by the State of New York whose _State of New York Constitution of 1938 as revised, including amendments effective January 1, 2015_ (see **Exhibit J**) is used herein by Strunk who opposes Usurper Obama's BIOWEAPONS e.g. the Executive Order _Deferred Action for Childhood Arrivals_ (**DACA**); and

5. Further DACA is violative of the **Immigration and Nationality Act of 1965 (INA)**, also known as the **Hart–Celler Act** [1], and

6. Further DACA is an act of war promulgated by Nazi-Communist enemies of the United States associated with implementation of _the Cloward and Piven Strategy_ by communists Frances Fox Piven and Richard A. Cloward (1971, 1977) who promoted mass insurgency in the United States, occurring especially between 1964 and 1969, produced a series of responses by government, one of the most significant being massive expansion of welfare rolls association between social disorders and welfare caseload associated with the Reagan reaction for a one-time illegal alien amnesty of the treasonous **Immigration Reform and Control Act (IRCA)**, Pub.L.

---

[1] INA the federal law passed by the 89th United States Congress and signed into law by President Lyndon B. Johnson. The law abolished the National Origins Formula, which had been the basis of U.S. immigration policy since the 1920s. The act removed _de facto_ discrimination against Southern and Eastern Europeans, Asians, and other non-Northwestern European ethnic groups from American immigration policy.

The National Origins Formula had been established in the 1920s to preserve American homogeneity by promoting immigration from Northwestern Europe. During the 1960s, at the height of the Civil Rights Movement, this approach increasingly came under attack for being racially discriminatory. With the support of the Johnson administration, Senator Philip Hart and Congressman Emanuel Celler introduced a bill to repeal the formula. The bill received wide support from both northern Democratic and Republican members of Congress, but strong opposition from Southern Republicans and Democrats, the former mostly voting Nay or Not Voting. This issue served as an inter-party commonality amongst constituents and reflects the similar Congressional District and Representative voting patterns. President Johnson signed the Hart–Celler Act into law on October 3, 1965. In opening entry to the U.S. to immigrants other than Northwestern European and Germanic groups, the Act significantly altered immigration demographics in the U.S. Some sources assert that this alteration was intentional; others assert that it was unintentional.

https://en.wikipedia.org/wiki/Immigration_and_Nationality_Act_of_1965 - cite_note-6

The Hart–Celler Act created a seven-category preference system that gives priority to relatives and children of U.S. citizens and legal permanent residents, professionals and other individuals with specialized skills, and refugees. The act maintained per-country and total immigration limits, but included a provision exempting immediate relatives of U.S. citizens from numerical restrictions. The act also set a numerical limit on immigration from the Western Hemisphere for the first time in U.S. history. Though proponents of the bill had argued that it would not have a major effect on the total level of immigration or the demographic mix of the United States, the act greatly increased the total number of immigrants coming to the United States, as well as the share of immigrants coming to the United States from Asia and Africa.

99–603, 100 Stat. 3445, enacted November 6, 1986, also known as the **Simpson–Mazzoli Act** or

the ***Reagan Amnesty***, signed into law by Ronald Reagan on November 6, 1986, is an Act of

Congress which reformed United States immigration law; and

7.      Further, Reagan's insidious IRCA was organized for passage in the House I am

ashamed to say by my friend Robert Kenneth Dornan as a favor for Reagan - FORMER House

member from Orange County California - who in 2004 Strunk began to work with legally and

who as my fellow NBC New Yorker in 2016 personally apologized to me after being reminded

that HE was punished by God in the 1996 seat loss by say 4k illegal alien votes - INS proven

failure of **IRCA** enforcement [2]  ignored by the Vatican's political agent Newt Gingrich.

8.      DACA immigration policy allows some individuals unlawful presence in the United

States after being brought to the country as children to receive a renewable two-year period of

deferred action from deportation and become eligible for work permit is VOID AB INITIO.

### "Refugees as weapons", or "Weapon of Mass Migration"

9.      "Refugees as weapons", or "Weapon of Mass Migration" is a term used for organized

mass exodus of refugees from one state to a hostile state as a "weapon" against that 'targeted'

state. Weaponized migration occurs when a challenging state or non-state actor exploits human

migration—whether voluntary or forced—in order to achieve political, military, and/or economic

objectives.https://en.wikipedia.org/wiki/Refugees_as_weapons-cite_note-3 According to an expert

Kelly Greenhill who counts 56 attempts (1951 to 2006) to employ the direct or indirect threat

of mass migrations as a non-military instrument of influence.

10.      The concept of "Weaponized Migration" is categorized into Infiltration, Coercive,

---

[2] IRCA inter alia required employers to attest to their employees' immigration status; made it illegal to hire or recruit illegal immigrants knowingly; legalized certain seasonal agricultural undocumented immigrants, and; legalized undocumented immigrants who entered the United States before January 1, 1982 and had resided there continuously with the penalty of a fine, back taxes due, and admission of guilt; candidates were required to prove that they were not guilty of crimes, that they were in the country before January 1, 1982 ...

Dispossessive, Exportive, Fifth Column. Perceiving refugees as a weapon prevents the possible solutions to refugee movement, such in the case of Humanitarian aid directed at refugee relief. The empirical verification of populist suspicion (fear of refugees) threat to national security and terror-related activities is relatively scarce.

11.    The instrumental manipulation of population movements as political and military weapons of war, is the "refugee as weapon," has entered the world's arsenals.

12.    Human migration is becoming a viable weapon in the arsenal of many state and non-state actors pursuing non-conventional means to increase regional influence and to achieve objectives.

### the *Articles of Confederation of 1781*

13.    the *Articles of Confederation of 1781* shown as Exhibit I at Article IV provides that:

The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds, and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States

14.    the *Articles of Confederation of 1781* shown as Exhibit I at Article IV provides that:

If any person guilty of, or charged with, treason, felony, or other high misdemeanor in any State, shall flee from justice, and be found in any of the United States, he shall, upon demand of the Governor or executive power of the State from which he fled, be delivered up and removed to the State having jurisdiction of his offense.

15.    the *Articles of Confederation of 1781* shown as Exhibit I at Article VI provides that:

*No State shall lay any imposts or duties, which may interfere with any stipulations in treaties, entered into by the United States in Congress assembled, with any King, Prince or State*, in pursuance of any treaties already proposed by Congress, to the courts of France and Spain.

16.    the *Articles of Confederation of 1781* shown as Exhibit I at Article IX provides that:

*The United States in Congress assembled, shall have the sole and exclusive right and power of determining on peace and war, except in the cases mentioned in the sixth article -- of sending and receiving ambassadors -- entering into treaties and alliances,*

*provided that no treaty of commerce shall be made whereby the legislative power of the respective States shall be restrained from imposing such imposts and duties on foreigners, as their own people are subjected to, or from prohibiting the exportation or importation of any species of goods or commodities whatsoever...*

17.     the *Articles of Confederation of 1781* shown as Exhibit I  at Article XIII  provides that:

*And Whereas it hath pleased the Great Governor of the World to incline the hearts of the legislatures we respectively represent in Congress, to approve of, and to authorize us to ratify the said Articles of Confederation and perpetual Union.*

### State of New York Constitution of 1938 as revised, including amendments effective January 1, 2015

18.     *State of New York Constitution of 1938 as revised, including amendments effective January 1, 2015* shown as  Exhibit J, in the equivalent of the *Preamble* provides that:

WE THE PEOPLE of the State of New York, *grateful to Almighty God* for our Freedom, in order to secure its blessings, DO ESTABLISH THIS CONSTITUTION.

19.     That Strunk contends that *the Great Governor of the World*  recognized in the Articles of Confederation at Article XIII is one and the same as *Almighty God* in the Preamble per se; and

20.     That Strunk contends that DACA persons are equivalent with paupers, vagabonds, and fugitives from justice excepted  from State(s) inhabitants in the Articles of Confederation; and

21.     That Strunk contends DACA persons under the State of New York Constitution shown as Exhibit J defines *inhabitants* at Article III Section 5-a are not part of the ***whole number of persons***:

**[Definition of inhabitants]**
§5-a.    For the purpose of apportioning senate and assembly districts pursuant to the foregoing provisions of this article, *the term "inhabitants, excluding aliens" shall mean the whole number of persons*. (New. Added by vote of the people November 4, 1969.); and

22.     That Strunk contends that DACA persons are illegal aliens who are not to be considered State citizens or legal aliens with a permanent residence, may not vote and or be used inter alia for determining representatives in the legislature or congress ; and

23.     Further, the *State of New York Constitution of 1938 as revised, including amendments effective January 1, 2015 shown as*  Exhibit J  at ARTICLE III for the Legislature Section 4

regarding use of the Federal Census of aliens when NOT enumerated must be done by the State:

**[Readjustments and reapportionments; when federal census to control] Quote:**
"§4. (a) Except as herein otherwise provided, the federal census taken in the year nineteen hundred thirty and *each federal census taken decennially thereafter shall be controlling as to the number of inhabitants in the state or any part thereof for the purposes of the apportionment of members of assembly and readjustment or alteration of senate and assembly districts* next occurring, in so far as such census and the tabulation thereof purport to give the information necessary therefor. *The legislature, by law, shall provide for the making and tabulation by state authorities of an enumeration of the inhabitants of the entire state to be used for such purposes, instead of a federal census, if the taking of a federal census in any tenth year from the year nineteen hundred thirty be omitted or if the federal census fails to show the number of aliens or Indians not taxed. If a federal census, though giving the requisite information as to the state at large, fails to give the information as to any civil or territorial divisions which is required to be known for such purposes, the legislature, by law, shall provide for such an enumeration of the inhabitants of such parts of the state only as may be necessary, which shall supersede in part the federal census* and be used in connection therewith for such purposes. The legislature, by law, may provide in its discretion for an enumeration by state authorities of the inhabitants of the state, to be used..."

24.     Strunk based upon the foregoing challenges the credentials of the New York Senior

Solicitor Assistant Attorney General Andrew William Amend Counsel to The States Amici Curiae

acts in bad faith with the State Constitution and law of the land has unclean hands, may not represent

the State of New York and that Strunk be recognized as a legitimate representative under the U.S.

Constitution Article Tenth amendment basic part of Strunk's right of the Bill of Rights per se; and

25.     Further, Strunk based upon the prima facie law demands that the Plaintiff's motion to

eliminate DACA per se be granted a summary judgment with permanent injunction against

DACA, unless it would become an amendment to the Constitution, and that all the DACA

persons be deported and or show cause why each individual would qualify for a permanent

resident alien status; and

26.     Further different relief that the court deems necessary for justice herein including the

sanctioning of all counsels acting in bad faith.

27.     On 16 October 2020, Strunk received from NYS AAG ANTHONY ROTUNDI (Claim

AAG) is assigned to the OAG No.: 20-046226-L1 Claim, my Claim accrued on 20 August 2020 and was duly filed with the Claims Court still is without a number and or Judge assigned, Claim AAG filed the Defendant's response motion to dismiss the claim (see **Exhibit K**); and

28.     Further Strunk's Claim having been filed in related case *Strunk v California etal.* NDNY 16-cv-1496 (BKS) is already shown in herein case as Exhibit E-4 of the Motion to Reconsider Strunk's status as a Plaintiff Intervener docketed as Item #683, and nevertheless reveals that Strunk's above contention of bad faith is germane and confirms widespread endemic bad faith at the Office of Attorney General Continues and that notwithstanding sophisticated Gaslighting and Jesuit casuistry by Claim AAG of the worst kind remarkably summarizes in the Motion support affirmation at paragraphs 3 and 4 as follows quote:

> *3. To summarize, the claim alleges that under Claimant's interpretation of the 14th Amendment of the United States, Democratic Vice-Presidential candidate Kamala Harris is not a citizen of the United States and therefore ineligible to hold the office of vice-president.*

> *4. The claim requests injunctive relief "for cause that the state be ordered to":*
> *a) Clarify for all voters Claimant's interpretation of citizenship under the 14th Amendment*
> *b) That all requests for absentee ballots make such a clarification;*
> *c) That notice be placed at polls that Senator Harris is not a natural born citizen.*

29.     It should assist the Court to see how under oath the Claim AAG does not mention the nature of *Natural Born Citizen* in the context of the outrageous summary as if there is a statewide directive to protect it from use of the outrageous term *Born a Citizen* as if the US Constitution Article 2 Section 1 Clause 5 *natural born Citizen* term of art were equivalent even so far as to effect retroactively the New York Consolidated Real Property Law Section 18 that somehow should read Born a Citizen rather than the natural born Citizen requirement for private land ownership, lease and or inheritance of New York precious mineral assets, say iron, copper, coal and or other strategic elements, and that somehow the 14th Amendment eliminated the NBC term of art by amending NBC out of required use - go figure because I have heard this garbage for 12 years starting when AAG Joel Graber said in front of the gathered expensive attorneys in

the 2011-6500 case that NYS would not use the NBC term instead of Born a Citizen; and

30.     Further, without any other witness present AAG Joel Graber said to me that Attorney General Andrew M, Cuomo said to correct the term would interfere with his governor election and re-election of the USURPER Barack Hussein Obama in 2012.

31.     That as to matter related the Pilgrims of Great Britain with the USA branch that ran the Obama Administration through Pilgrim Society Directors Paul Volker and Henry Kissinger and that the PILGRIMS / SERCO INC. operate the Senior Executive Service (SES) to overthrow the DJT administration from the Obama mansion down the street from the DJT Admin White House, during my 2007 and 2008 research to file my Federal and States cases re NBC and I ran across August 28 2005 Washington Post Article *Delegation Led by U.S. Senators Detained Briefly at Russian Airport* (see **Exhibit L**), and curiously what drew my attention was followed with an explanation on Tuesday, August 30, 2005 by the US Senator Richard Lugar report *Lugar and Obama Urge Destruction of Conventional Weapons Stockpiles* (see **Exhibit M**); and

*32.*     Then on 6 September 2009 during my State and Federal NBC cases that studied the American Pilgrim Society connection to the Pilgrim's Walter Hubert Annenberg Foundation with Barack Hussein Obama and Weatherman bomber Bill Ayers, *American Reporter* published an article[3] *Russia Holds Obama For Suspicion Of Being a British Spy Back In 2005! Investigator In Chicago Fingers Obama For Being A British Spy As Far Back As 2004!* (see **Exhibit N**).

33.     That if Obama were NBC he would be born on soil of U.S. citizen parents wasn't, and notwithstanding the efforts of the CIA to peddle disinformation and treachery regarding diversion from its role in Afghanistan for decades involving Obama before and after the 2004 US Senate election until this day, based upon information and belief there is an Indonesian father for Soebarkah who like Jeffrey Epstein spread his seed in Britain and elsewhere did so for Subud.

---

[3]  https://americanreporter.wordpress.com/2009/09/06/russia-holds-obama-for-suspicion-of-being-a-british-spy-back-in-2005-investigator-in-chicago-fingers-obama-for-being-a-british-spy-as-far-back-as-2004/

## IN CONCLUSION

34.     In light of the foregoing evidence of a bad faith conspiracy by controlling State of New York officers who relish their trespass on New Yorker Citizen / inhabitant self-interest by pushing seditionist treachery that wants to replace New Yorkers with vulnerable DACA illegals, and therefore Strunk seeks personal plaintiff intervener standing herein as an urgent DACA matter being the sole representative of the State of New York under the Tenth Amendment with demands for national emergency injunctive relief under FRCvP Rule 65(b) for cause in evidence in that the State of New York is without a functioning court system among those similarly situated be ordered to:

a. CLARIFY FOR ALL POTENTIAL VOTERS THAT *BORN A CITIZEN* SUGGESTED BY THE STATE SHOWN AT (NYND 16-cv-1496 docket item 41-1) EXHIBIT E-4-C DOES NOT INCLUDE A 14^(TH)AMENDMENT *BORN A CITIZEN* INTERPRETATION, ONLY INCLUDES THE PRE 14^(TH) AMENDMENT U.S. CONSTITUTION ARTICLE 2 SECTION 1 CLAUSE 5 *NATURAL BORN CITIZEN* TERM OF ART THAT REQUIRES A CANDIDATE FOR POTUS AND OR VPOTUS MUST BE BORN ON SOIL OF CITIZEN PARENTS ACCORDING TO THE SCOTUS FINDINGS IN ***Minor v. Happersett***, 88 U.S. (21 Wall.) 162 (1875) and ***United States v. Wong Kim Ark***, 169 U.S. 649 (1898), and

b. THAT ALL REQUESTS FOR ABSENTEE BALLOTS MAKE SUCH CLARIFICATION; and

c. THAT NOTICE IS PROMINENTLY DISPLAYED AT THE POLLS THAT KAMALA DEVI HARRIS IS NOT A NATURAL BORN CITIZEN; and

d. That Strunk needs an order of the Court to obtain a certified copy of the Birth Certificate of KAMALA DEVI (IYER) HARRIS from Alameda County California; and

e. That Strunk needs an order of the Court for Occidental College to release the financial records for Barry Soetoro aka BARACK HUSSEIN OBAMA among other aliases even in camera if necessary; and

f.  That Strunk needs an order of the Court for Columbia University to release the financial records for Barry Soetoro aka BARACK HUSSEIN OBAMA among other aliases even in camera if necessary; and

g.  That Strunk needs an order of the Court for Harvard University to release the financial records for Barry Soetoro aka BARACK HUSSEIN OBAMA among other aliases even in camera if necessary; and

h.  That Strunk needs an order of the Court for NYS DEPARTMENT OF EDUCATION to release the financial records for Barry Soetoro aka BARACK HUSSEIN OBAMA among other aliases even in camera if necessary; and

i.  That Strunk needs an order of the Court for Business International Corporation (BIC) to release the financial records for its employee Barry Soetoro aka BARACK HUSSEIN OBAMA among other aliases even in camera if necessary; and

j.  That Strunk needs an order of the Court for the US STATE DEPARTMENT / US HOMELAND SECURITY to release the naturalization records for Barry Soetoro aka BARACK HUSSEIN OBAMA among other aliases even in camera if necessary; and

k.  That Strunk needs an order of the Court for the US STATE DEPARTMENT / US HOMELAND SECURITY to release the naturalization records for TED CRUZ among other aliases even in camera if necessary; and

l.  That Strunk needs an order of the Court for the US STATE DEPARTMENT / US HOMELAND SECURITY to release the naturalization records for KAMALA DEVI HARRIS among other aliases even in camera if necessary; and

m. That Strunk needs an order of the Court to declare DACA an unconstitutional VOID AB INITIO Executive Order of BARACK HUSSEIN OBAMA; and

n.  That Strunk needs a hearing for an order of the Court that HARRIS is NOT NBC must be removed from the U.S. Senate, and that BARACK HUSSEIN OBAMA is NOT NBC with emoluments of each to be reported for a claw-back preceding; and

o.  Additional different relief as the court deems necessary for justice herein.

11

*O*

**STATE OF NEW YORK   )**
**COUNTY OF WARREN   )**

Accordingly, I, Christopher Earl Strunk, duly so affirm, depose and say under penalty of perjury:

I have read the foregoing AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET ITEM# 209 IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST DACA AND IN FURTHER SUPPORT OF NOTICE OF MOTION TO RECONSIDER FRCP RULE 24 INTERVENOR PLAINTIFF STATUS DENIAL SHOWN AT DOCKET ITEM 475 WITH RECONSIDERATION MOTION AT DOCKET ITEM 483, AND FOR EXPEDITED FRCP RULE 65(B) EXTRAORDINARY RELIEF DEMAND DENIED IN RELATED CASE NYND 16-CV-1496 MOTION REGARDING THE FOREIGN ALIEN BIOWEAPON JAMAICAN CITIZEN KAMALA DEVI HARRIS, THE DEFACTO U.S. SENATOR USURPER FOR CALIFORNIA IS INELIGIBLE UNDER U.S. CONSTITUTION ARTICLE 1 SECTION 3 AND ARTICLE 2 SECTION 1 CLAUSE 5 PER SE, TORTUOUSLY INTERFERES WITH THE 3 NOVEMBER 2020 AND 14 DECEMBER 2020 ELECTORAL COLLEGE ELECTIONS, INVOLVES THE SUBJECT VOID AB INITIO D.A.C.A. EXECUTIVE ORDERS BY THE PILGRIMS SOCIETY OF GREAT BRITAIN'S: SENIOR EXECUTIVE SERVICE / FBI / CIA'S INDONESIAN CITIZEN POTUS USURPER SOEBARKAH A.K.A. BARACK HUSSEIN OBAMA, during the ongoing National Banking Emergency and related emergencies or time of war under the 12 USC 95a amended 50 USC App. 5b that comply with the Hague Convention and related law including judicial rules herein to safeguard rights.

Pursuant to remedy provided by Congress under 50 USC App. 17, this affirmation supports perfecting evidence at trial in the respective district court under the ongoing Proclamation 2040 National Emergency or time of war that takes private property and infringes personal rights otherwise to be protected by others directly under the authority of the Commander-in-chief POTUS, in that time is of the essence with irreparable harm; and

Affirmant knows the contents thereof apply to me and that the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe it to be true, am available for testimony. The grounds of my beliefs as to all matters not stated upon information and belief are as follows: third parties, books and records, and personal knowledge.

**Christopher Earl Strunk**, in propria persona
141 Harris Ave. Lake Luzerne, New York 12846-1721
518-416-8743  Email: strunk@leader.com
All Rights Reserved Without Prejudice

That on the 20ᵗʰ day of October in the year 2020 before me the undersigned, a Notary Public in and for said State personally appeared, **Christopher Earl Strunk,** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he affirmed and executed the name in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public, State of New York

LORRI A. HOLCOMB
Notary Public, State of New York
Qualified in Warren County
Registration No. 01HO6188754
Commission Expires Aug. 11, 20_24_

12

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS



FILED
OCT 2 1 2020
David J. Bradley, Clerk of Court

STATE OF TEXAS et al.,

**Plaintiff,**

v.                                        Civil Action No. 18-cv-0068 (ASH)

UNITED STATES OF AMERICA et al.,

**Defendant.**

RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH LOCAL RULE 5-2 RELATED CASES OF AMICUS <u>CHRISTOPHER EARL STRUNK</u>, THE NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR FRCvP RULE 65(b) RELIEF AT DOCKET ITEM# 483, <u>AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET ITEM# 209 BY</u> : NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, IOWA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA <u>IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR CHILDHOOD ARRIVAL* (</u>DACA)

# EXHIBIT  G



Complete items 1, 2 and 3.

Print your name and address on the reverse so that we can return the card to you.

Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Andrew William Amend
New York Office of the Attorney General
28 Liberty Street 14th Fl
New York, NY 10005
212 416-8022

OCT 13 2020

STRONG MAIL ROOM

9590 9402 2906 7094 0579 24

7017 1070 0000 8250 9663

PS Form 3811, July 2015 PSN 7530-02-000-9053

---

USPS TRACKING #



9590 9402 2906 7094 0579 24

United States
Postal Service

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box

C E STRUNK
14 HARRIS AV.
LAKE LUZERNE NY
12846



# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

---

STATE OF TEXAS et al. ,

Plaintiff,

v.

Civil Action No. 18-cv-0068 (ASH)

UNITED STATES OF AMERICA  et al.,

Defendant.

---

RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH LOCAL RULE 5-2 RELATED CASES OF AMICUS CHRISTOPHER EARL STRUNK, THE NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR FRCvP RULE 65(b) RELIEF AT DOCKET  ITEM# 483, AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 BY : NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, IOWA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR CHILDHOOD ARRIVAL* (DACA)

# EXHIBIT  H

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| State of Texas, *et al.,* | |
| *Plaintiffs,* | |
| *v.* | |
| The United States of America, *et al.,* | Case No. 1:18-cv-00068 |
| *Defendants,* | |
| Karla Perez, *et al.,* | |
| *Defendants-Intervenors,* | |
| *and* | |
| State of New Jersey, | |
| *Defendant-Intervenor.* | |

**MEMORANDUM OF LAW FOR AMICI CURIAE THE STATES OF NEW YORK,
CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, IOWA,
MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO,
NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA,
VERMONT, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

XAVIER BECERRA
 *Attorney General*
 *State of California*
1300 I St.
Sacramento, CA 95814

BARBARA D. UNDERWOOD
 *Attorney General*
 *State of New York*
28 Liberty Street, 23rd Floor
New York, NY 10005
Telephone: (212) 416-8022
Facsimile: (212) 416-8962

*(Complete counsel list appears on signature pages.)*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

INTEREST OF THE AMICI STATES .......................................................................... 1

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ................................ 2

ARGUMENT ...................................................................................................... 3

PLAINTIFFS' REQUESTED PRELIMINARY INJUNCTION SHOULD BE DENIED ................................ 3

POINT I ........................................................................................................... 3

PLAINTIFFS CANNOT MAKE THE LEGAL SHOWING REQUIRED TO OBTAIN A
PRELIMINARY INJUNCTION ...................................................................................... 3

    A.    Plaintiffs Cannot Show a Likelihood of Success on the Merits Because the
          Deferred Action for Childhood Arrivals (DACA) Policy Is Lawful. ........................ 3

         1.    DACA is consistent with the Immigration and Nationality Act (INA). ........... 3

              a.    The INA vests the Executive with discretion to create class-
                    wide frameworks for evaluating requests for deferred action and
                    related relief. ................................................................................. 3

              b.    DACA is narrower and more tailored than Deferred Action for
                    Parents of Americans and Lawful Permanent Residents
                    (DAPA). ....................................................................................... 8

              c.    Plaintiffs' arguments under the Take Care Clause turn entirely
                    on the incorrect assertion that DACA violates the INA ......................... 10

         2.    Notice and comment was not required prior to DACA's
            implementation. .......................................................................... 10

         3.    Plaintiffs' APA challenges amount to untimely and impermissible
            collateral attacks on decades-old federal policies and regulations. ............... 12

    B.    Plaintiffs Cannot Show That They Will Suffer Irreparable Harm If DACA
          Is Not Enjoined ............................................................................. 14

Page

    1.    States and their lawful residents benefit from the ability of DACA grantees to live and work openly. ................................................................... 14

    2.    Plaintiffs fail to establish any harm traceable to DACA. ............................... 15

    3.    Plaintiffs' nearly six-year delay in seeking an injunction against DACA reinforces their lack of irreparable injury from that policy. .............. 18

C.    The Balance of the Equities and the Public Interest Favor Denying Plaintiffs' Requested Injunction. ........................................................................... 19

POINT II ................................................................................................................................. 21

THE CONFLICT BETWEEN PLAINTIFFS' PROPOSED PRELIMINARY INJUNCTION AND TWO EXISTING PRELIMINARY INJUNCTIONS ALSO WARRANTS DENIAL OF PLAINTIFFS' REQUESTED RELIEF ......................................................................................................... 21

CONCLUSION ....................................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Arizona Dream Act Coal. v. Brewer,*
   855 F.3d 957 (9th Cir. 2017) ..................................................................9

*Arizona v. United States,*
   567 U.S. 387 (2012)........................................................................4, 10

*Arpaio v. Obama,*
   27 F. Supp. 3d 185 (D.D.C. 2014)..............................................3, 9, 12

*Batalla Vidal v. Nielsen,*
   279 F. Supp. 3d 401 (E.D.N.Y. 2018) ............................................ passim

*Benisek v. Lamone,*
   585 U.S. __, 138 S. Ct. 1942 (2018)......................................................18

*Chaudhry v. Holder,*
   705 F.3d 289 (7th Cir. 2013) ..................................................................6

*Colorado River Water Conservation Dist. v. United States,*
   424 U.S. 800 (1976)..............................................................................23

*Crane v. Johnson,*
   783 F.3d 244 (5th Cir 2015) .................................................................16

*DHS v. Regents of Univ. of California,*
   138 S. Ct. 1182 (2018)..........................................................................23

*Dillard v. Security Pac. Corp.,*
   85 F.3d 621, 1996 WL 254971 (5th Cir. 1996) ....................................18

*Dunn-McCampbell Royalty Interest, Inc. v. National Park Serv.,*
   112 F.3d 1283 (5th Cir. 1997) ......................................................... 13-14

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009)..............................................................................21

*Feller v. Brock,*
   802 F.2d 722 (4th Cir. 1986) ................................................................23

*Hotel & Rest. Emps. Union v. Smith,*
   846 F.2d 1499 (D.C. Cir. 1988)..............................................................6

*Kendall v. United States ex rel. Stokes,*
   37 U.S. 524 (1838)................................................................................10

| Cases | Page(s) |
|---|---|

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ......................................................................................................10

*Lydo Enters. v. City of Las Vegas,*
   745 F.2d 1211 (9th Cir. 1984) ......................................................................................18

*Mann Mfg., Inc. v. Hortex, Inc.,*
   439 F.2d 403 (5th Cir. 1971) ................................................................................. 22-23

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ......................................................................................................17

*Mower v. Boyer,*
   811 S.W.2d 560 (Tex. 1991) .........................................................................................23

*NAACP v. Trump,*
   298 F. Supp. 3d 209 (D.D.C. 2018) ..............................................................................22

*Quince Orchard Valley Citizens Ass'n v. Hodel,*
   872 F.2d 75 (4th Cir. 1989) ..........................................................................................18

*Regents of Univ. of Cal. v. DHS,*
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ................................................................. passim

*Reno v. American-Arab Anti-Discrimination Comm.,*
   525 U.S. 471 (1999) ................................................................................................5, 17

*Save Power Ltd. v. Syntek Fin. Corp.,*
   121 F.3d 947 (5th Cir. 1997) ........................................................................................23

*Sutter Corp. v. P & P Indus., Inc.,*
   125 F.3d 914 (5th Cir. 1997) ........................................................................................23

*Texas Sav. & Cmty. Bankers Ass'n v. Federal Hous. Fin. Bd.,*
   201 F.3d 551 (5th Cir. 2000) ........................................................................................11

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ................................................................................. passim

*West Gulf Maritime Ass'n v. ILA Deep Sea Local 24,*
   751 F.2d 721 (5th Cir. 1985) ................................................................................. 22-23

*Wind River Mining Corp. v. United States,*
   946 F.2d 710 (9th Cir. 1991) ........................................................................................14

**Cases**                                                                     **Page(s)**

*Winter v. Natural Res. Defense Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................................................................2

*Wong v. Doar*,
   571 F.3d 247 (2d Cir. 2009) ...............................................................................................14

**Federal Laws**

6 U.S.C. § 202(5) ..........................................................................................................................4

8 U.S.C.
   § 1103(a) ............................................................................................................................4
   § 1182(a)(9)(B) ................................................................................................................13
   § 1227(d)(2) ........................................................................................................................7
   § 1324a ..............................................................................................................................15
   § 1324a(h)(3) ......................................................................................................................5
   § 1601 ................................................................................................................................15
   § 1611(b)(2) ........................................................................................................................5

28 U.S.C. § 2401(a) ....................................................................................................................12

Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5 (2014) ......................15

DHS Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 2142 (2009) ..............................15

DHS Appropriations Act, 2015, Pub. L. No. 114-4, 129 Stat. 39 (2015) ....................................15

Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 ..........................................................7

Real ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 ...............................................................7

USA PATRIOT Act, Pub. L. 107-56, 115 Stat. 272 .......................................................................7

Victims of Trafficking and Violence Prevention Act of 2000, Pub. L. 106-386, 114
   Stat.1464 .............................................................................................................................7

**Administrative Sources**

8 C.F.R.
   § 1.3(a)(4)(vi) ...............................................................................................................5, 13
   § 274a.12(c)(14) ..........................................................................................................13, 15

44 Fed. Reg. 10,369 (Feb. 20, 1979) .............................................................................................5

46 Fed. Reg. 25,079 (May 5, 1981) ...............................................................................................5

**Administrative Sources**                                                                                    **Page(s)**

Mem. from Donald Neufeld et al., *Consolidation of Guidance Concerning Unlawful
    Presence* (May 6, 2009) ............................................................................................................. 6

Mem. from Jeh Charles Johnson, Secretary: *Exercising Prosecutorial Discretion with
    Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent
    Residents* at 2 (Nov. 20, 2014) ................................................................................................ 13

Mem. from Johnny N. Williams, Exec. Assoc. Comm'r, Office of Field Operations,
    *Unlawful Presence* 1, (June 12, 2002) ..................................................................................... 13

Mem. from Janet Napolitano, Secretary: *Exercising Prosecutorial Discretion with
    Respect to Individuals Who Came to the United States as Children* (June 12, 2012) ............... 4

Sam Bernsen, INS Gen. Counsel, *Leave to Labor*, 52 No. 35 Interpreter Releases 291,
    294 (Sep. 1975) ........................................................................................................................... 5

**Miscellaneous Authorities**

H.R. Rep. No. 111-157 (2009) ........................................................................................................ 15

*Immigration Act of 1989: Hearings Before the Subcomm. on Immigration, Refugees, and
    International Law of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. (1990) .......... 6

Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force* (Aug. 25,
    2015) ........................................................................................................................................... 15

*Recent Developments*, 67 No. 6 Interpreter Releases 153 (Feb. 5, 1990) ...................................... 6

S. Rep. No. 99-132 (1985) ............................................................................................................... 6

U.S. Customs & Immigr. Servs., *Number of Form I-821D, Consideration of Deferred
    Action for Childhood Arrivals by Fiscal Year, Quarter, Intake and Case Status*
    (through June 30, 2018) ............................................................................................................. 12

## INTEREST OF THE AMICI STATES

The amici States of New York, California, Connecticut, Delaware, Hawai'i, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Virginia, Vermont, and Washington, and the District of Columbia, would suffer serious harms—to their institutions, fiscs, residents, and economies—from an order preliminarily enjoining the federal policy known as Deferred Action for Childhood Arrivals (DACA).

DACA represents an exercise of the Executive's long-recognized discretion to forbear enforcement against defined classes of persons whom federal immigration law makes removable from the United States: a practice commonly referred to as "deferred action." Specifically, DACA provides a framework for the Department of Homeland Security (DHS) to receive and process requests for deferred action from law-abiding individuals who were brought to the United States as children. Longstanding federal regulations allow deferred-action recipients meeting certain criteria to seek and obtain work authorization, enabling amici's agencies, public universities, and public hospitals to hire DACA grantees. Private businesses and nonprofit organizations within the amici States have also come to employ and depend upon DACA grantees. In all, nearly 750,000 DACA grantees who formerly lived in the shadows now openly contribute to their communities and economies.

As two district courts have now found, ending DACA would injure the amici States as employers, providers of health services, and proprietors of public universities. It would also cause the amici States to lose many millions of dollars in tax revenue. *See Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1046-47 (N.D. Cal. 2018) (four States); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 433-35, 437 (E.D.N.Y. 2018) (sixteen States and the District of Columbia).

In contrast, the harms asserted by the plaintiff States are either illusory or result from factors other than DACA, such as the mere presence of undocumented immigrants or the ancillary consequences of deferred action under decades-old federal regulations and policies. Indeed, the federal government began DACA in 2012, yet plaintiffs waited until 2018 to file this suit—a delay of nearly six years that undermines any claim of immediate, irreparable injury warranting a preliminary injunction. The nationwide injunction that plaintiffs seek is inappropriate for other reasons too: for example, that injunction would directly conflict with preliminary injunctions that two separate district courts have issued in favor of the amici States after rejecting DHS's claims that DACA is unlawful. *See Regents*, 279 F. Supp. 3d at 1048; *Batalla Vidal*, 279 F. Supp. 3d at 437-38. Those preliminary injunctions are currently being reviewed by federal appellate courts, which are the appropriate bodies to rectify any legal errors in the *Regents* and *Batalla Vidal* decisions.

For these reasons and the other reasons stated below, plaintiffs' request for a preliminary injunction should be denied.

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

1. Whether plaintiffs' request for a nationwide preliminary injunction against DACA should be denied because plaintiffs cannot show a likelihood of success on the merits or a likelihood of "irreparable harm in the absence of preliminary relief," or "that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *See Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

2. Whether plaintiffs' requested preliminary injunction should be denied for the additional reason that a nationwide injunction against DACA would conflict with at least two existing injunctions issued by coordinate federal courts.

## ARGUMENT

### PLAINTIFFS' REQUESTED PRELIMINARY INJUNCTION SHOULD BE DENIED

### POINT I

#### PLAINTIFFS CANNOT MAKE THE LEGAL SHOWING REQUIRED TO OBTAIN A PRELIMINARY INJUNCTION

**A.    Plaintiffs Cannot Show a Likelihood of Success on the Merits Because the Deferred Action for Childhood Arrivals (DACA) Policy Is Lawful.**

The Secretary of DHS has broad discretion regarding the enforcement of federal immigration laws. That discretion includes the authority to create frameworks through which defined classes of persons may request relief from removal and seek other benefits (such as work authorization) during periods of discretionary enforcement forbearance. The Executive has repeatedly exercised that authority for more than five decades, and Congress and the courts have repeatedly recognized the legality of such actions. Moreover, because DACA differs significantly in its scope, justifications, and criteria from the policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), the outcome here is not controlled by *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016). Nor are any of plaintiffs' other arguments likely to succeed.

**1.    DACA is consistent with the Immigration and Nationality Act (INA).**

**a.    The INA vests the Executive with discretion to create class-wide frameworks for evaluating requests for deferred action and related relief.**

The federal government lacks the resources to remove even five percent of the over 11 million undocumented immigrants who reside in the country without legal status. *See* U.S. Br. 3-4, *United States v. Texas*, 136 S. Ct. 2271 (No. 15-674) ("*Texas* (U.S.)") (App'x of Amici States ("AA") 36-37); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 192-93 (D.D.C. 2014), *aff'd*, 787

F.3d 11 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 900 (2016). Accordingly, a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012). For persons here unlawfully, federal officials "must decide whether it makes sense to pursue removal at all." *Id.* In choosing whether to offer discretionary relief, DHS may be guided by "immediate humanitarian concerns" as well as the need to prioritize limited enforcement resources. *Id.* For example, DHS may rationally focus on removing dangerous criminals, instead of undocumented immigrants who are "trying to support their families" and have "long ties to the community." *Id.*

To provide a framework for exercising enforcement discretion, the federal government has since the 1960s established more than twenty channels through which individualized forbearance determinations may be made for defined classes of potential applicants who are low priorities for removal. *See* U.S. Br. 5, 48-60, *Texas* (U.S.) (AA 38, 44-56) (enumerating and describing policies). DACA is one such channel. The class for which it provides "case by case review" consists of persons who were brought to this country as children, have strong roots in their U.S. communities, and have not engaged in serious criminal conduct. *See* Mem. from Janet Napolitano, Secretary: *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1-2 (June 12, 2012) ("DACA Memorandum") (AA 1-2).

Some of the Executive's discretionary forbearance policies reflect specific provisions of the INA or other statutes, but many others have been grounded in the Executive's broad statutory power to set immigration enforcement priorities rather than any more targeted grant of authority.[1]

---

[1] *See* 6 U.S.C. § 202(5) (Secretary's responsibility for "[e]stablishing national immigration enforcement policies and priorities"); 8 U.S.C. § 1103(a) (Secretary "shall establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of this Chapter").

The Supreme Court in 1999 expressly approved of the "regular practice" of granting "deferred action" as a "commendable exercise in administrative discretion, developed without express statutory authorization." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999).[2] And "[e]very modern presidential administration has relied on extra-statutory discretionary-relief programs to shield certain removable aliens from deportation." *Batalla Vidal*, 279 F. Supp. 3d at 422.

In a practice also dating back to at least the early 1970s,[3] the federal agencies charged with immigration enforcement have granted recipients of enforcement relief who show economic need the opportunity to work and to receive Social Security benefits earned through their work. The ability to grant work authorization was codified in regulations in 1981, *see* Employment Authorization, 46 Fed. Reg. 25,079, 25,080 (May 5, 1981), and confirmed by Congress thereafter.[4] In 1986—at the same time as it imposed a general prohibition on hiring undocumented immigrants—Congress expressly ratified an employer's ability to hire a person who is "authorized to be so employed by [the INA] *or by the Attorney General.*" 8 U.S.C. § 1324a(h)(3) (emphasis added). As the federal government explained to the Supreme Court, these sources of law reflect "the commonsense proposition that aliens who may remain in this country, as a matter of the

---

[2] *See also Batalla Vidal*, 279 F. Supp. 3d at 422 (noting there is "no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action").

[3] *See* Sam Bernsen, INS Gen. Counsel, *Leave to Labor*, 52 No. 35 Interpreter Releases 291, 294 (Sep. 1975) (noting the ordinary practice of authorizing work for, inter alia, aliens with "extended voluntary departure" or "whose departure or deportation will not be enforced"), *quoted in* U.S. Br. 51, *Texas* (U.S.) (AA 47).

[4] Likewise, regulations dating back to 1979 have allowed deferred-action recipients to participate in Social Security. 44 Fed. Reg. 10,369, 10,371 (Feb. 20, 1979). And the INA now reflects Congress's plain intent to vest the Secretary of DHS with discretion to grant Social Security benefits to aliens who have been granted deferred action. 8 U.S.C. § 1611(b)(2) (bar on granting Social Security benefits "shall not apply . . . to an alien who is lawfully present in the United States *as determined by the [Secretary]*" (emphasis added)); *see also* 8 C.F.R. § 1.3(a)(4)(vi) (defining "lawfully present" "[f]or the purposes of 8 U.S.C. § 1611(b)(2)" to include specified "classes of aliens permitted to remain in the United States because DHS has decided for humanitarian or other public policy reasons not to initiate removal proceedings or enforce departure," including "[a]liens currently in deferred action status").

Executive's discretion, also should be able to lawfully make ends meet for themselves and their families." U.S. Reply Br. 15, *Texas* (U.S.) (AA 59).

In granting deferred action, the Executive has never purported to disturb Congress's exclusive authority to set the criteria for immigrants to obtain lawful immigration status. Plaintiffs confuse matters (Pls.' Br. in Supp. of Prelim. Injunction ("Br.") 23-24) by equating DHS's construction of "lawful presence" with a "lawful status" that would provide a defense to removal. *See, e.g.*, *Chaudhry v. Holder*, 705 F.3d 289, 291-92 (7th Cir. 2013). Federal regulations, agency guidance, and the case law recognize that the Executive treats "lawful presence" and "lawful status" as separate and distinct legal concepts, and does not equate "lawful presence" with a defense to removal.[5]

Congress has repeatedly ratified and confirmed the legality of discretionary relief and work authorization under this longstanding framework. For example, the Reagan and George H. W. Bush administrations offered extended voluntary departure—which entailed forbearance from removal and eligibility for work authorization—to approximately 1.5 million relatives of immigrants newly eligible for lawful status.[6] The Executive implemented this "family fairness" policy just after Congress had deliberately declined to give the exact same class any statutory protection.[7] *See* S. Rep. No. 99-132, at 16 (1985) (AA 23). When Congress later did enact such

---

[5] *See, e.g.*, Mem. from Donald Neufeld, *Consolidation of Guidance Concerning Unlawful Presence* 42 (May 6, 2009) (AA 9) (deferred action "does not make the alien's status lawful"); U.S. Br. 38, *Texas* (U.S.) (AA 40); *Chaudhry*, 705 F.3d at 291-92 ("It is entirely possible for aliens to be lawfully present (*i.e.*, in a 'period of stay authorized by the Attorney General') even though their lawful status has expired.").

[6] *See Recent Developments*, 67 No. 6 Interpreter Releases 153, 153-54 (Feb. 5, 1990) (AA 329-330); *Immigration Act of 1989: Hearings Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. Pt. 2, at 49, 56 (1990) (AA 26, 29) (1.5 million persons were eligible).

[7] As the United States has acknowledged, that policy was "extra-statutory." Tr. of Oral Argument at 88-89, *Texas* (U.S.) (AA 62-63); *see also Hotel & Rest. Emps. Union* v. *Smith*, 846 F.2d 1499, 1519 (D.C. Cir. 1988) (en

protections for a large class including the family fairness recipients, Congress made such relief prospective only, starting one year from passage. For the interim one-year period, Congress expressly relied on the Executive's ongoing discretionary-relief policy. *See* Immigration Act of 1990, Pub. L. 101-649, § 301(g), 104 Stat. 4978, 5030.

In 2008, Congress affirmed another ongoing class-wide discretionary-relief policy that, since 2001, had offered deferred action to victims of human trafficking and other crimes who lacked lawful status but were eligible for U and T visas. When Congress in 2008 authorized administrative stays of removal for that class, it specified that denial of a stay would not "preclude the alien from applying for . . . deferred action" under DHS's extant policy. 8 U.S.C. § 1227(d)(2).

Numerous other statutes have likewise presupposed the legality of deferred action and affirmatively encouraged its use.[8] Congress has never questioned or displaced the Executive's discretionary power to defer enforcement action, or its authority to establish channels for the exercise of that discretion.

Plaintiffs are also misguided in arguing (Br. 31-32) that historical exercises of discretionary relief were permissible only because they were interstitial to statutory legalization schemes. When the Executive has implemented discretionary-relief policies that Congress later ratified, it was not necessarily clear that Congress would ultimately pass legislation to protect the covered groups. Discretionary-relief policies appear interstitial only in retrospect. And as one district court has

---

banc) (per curiam) (op. of Silberman, J.) (describing policy as an "extrastatutory decision to withhold enforcement" as a matter of discretion).

[8] *See, e.g.*, Victims of Trafficking and Violence Prevention Act of 2000, Pub. L. 106-386, § 1503(d)(2)(D)(i)(II), 114 Stat.1464, 1521-22 (making two additional classes eligible for deferred action); USA PATRIOT Act, Pub. L. 107-56, § 423(b), 115 Stat. 272, 361 (extending deferred-action eligibility to certain family members of victims of the September 11, 2001 terrorist attacks); Real ID Act of 2005, Pub. L. No. 109-13, § 202(c)(2)(B)(viii), 119 Stat. 231, 313 (authorizing States to issue driver's licenses to undocumented immigrants with "approved deferred action status").

noted, DACA has hallmarks of an "interstitial" policy "given that both sides of the aisle and our two most recent presidents have called for Dreamer legislation." *Regents*, 279 F. Supp. 3d at 1044 (citation omitted).

### b. DACA is narrower and more tailored than Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).

Plaintiffs' challenge to DACA relies almost entirely on the Fifth Circuit's *Texas* decision regarding the separate DAPA policy. But that decision did not even finally resolve the legality of DAPA: it decided an interlocutory appeal from a preliminary injunction; and it relied in substantial part on preliminary factual findings made by this Court without the benefit of an evidentiary hearing, based on affidavits that are now more than three years old and that have been seriously undermined by the record in this case. Moreover, in concluding that DAPA exceeded the Secretary's discretionary authority and could not be justified through analogy to prior discretionary-relief policies, the Fifth Circuit focused on numerous DAPA-specific rationales that do not apply to the more tailored DACA policy, noting that "any extrapolation from DACA [to DAPA] must be done carefully." *Texas*, 809 F.3d at 173. Given the more limited, tailored nature of DACA, extrapolating in the other direction requires even greater care. Plaintiffs and the federal government are simply incorrect to argue that the Fifth Circuit's decision dictates a conclusion that DACA is unlawful.

*First*, the Fifth Circuit concluded that DAPA was inconsistent with Congress's declared intent because the INA already contained "an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status," which was available to most of those who would have been eligible for deferred action under DAPA. *Id.* at 179 (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255). Congress has created no comparable

avenue for the class of persons eligible for DACA to obtain lawful status. *See Regents*, 279 F. Supp. 3d at 1040 (citing *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 976 n. 10 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018)). Therefore, unlike the parents covered by DAPA, none of the "INA's specific and intricate provisions" have "directly addressed the precise question" of relief available to the young people eligible for DACA. *See Texas*, 809 F.3d at 186 (quotation marks omitted).

*Second*, the Fifth Circuit focused on the sheer number of persons covered by DAPA, which substantially exceeded the scale of any prior discretionary-relief policy. It "conclude[d] *only* that the INA does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Texas*, 809 F.3d at 186 n.202 (emphasis added).[9] DACA covers far fewer persons—and a smaller percentage of the undocumented population—than either DAPA or the family fairness policy ratified by Congress. Both DAPA and the family fairness policy were available to about 40 percent of the undocumented population; only about ten percent of the undocumented population (1.2 million persons) meet DACA's criteria. *See Texas*, 809 F.3d at 174 n.138; *Regents*, 279 F. Supp. 3d at 1042; U.S. Br. 56-57, *Texas* (U.S.) (AA 52-53); *Arpaio*, 27 F. Supp. 3d at 192-93.

*Third*, DACA is tailored to cover only a class of young people who are not at all "likely to have backgrounds" that would warrant higher enforcement scrutiny, *see Texas*, 809 F.3d at 174, and for whom there are substantial humanitarian reasons weighing against removal. Forbearing from enforcement against law-abiding individuals brought to the United States as children—to preserve scarce resources for removing criminals, terrorists, and others whose removal might

---

[9] *See also Texas*, 809 F.3d at 179 (noting that "4.3 million illegal aliens" not eligible for relief under the INA were eligible for DAPA); *id.* at 181 (noting the economic and political significance of a policy covering "4.3 million otherwise removable aliens").

advance the Nation's safety and security—is the paradigm of rational enforcement prioritization. *See Arizona*, 567 U.S. at 396; U.S. Br. 45, *Texas* (U.S.) (AA 41) (noting that DACA-eligible persons possess "particularly strong ties to this country" and that many "have never known another home.").

### c.   Plaintiffs' arguments under the Take Care Clause turn entirely on the incorrect assertion that DACA violates the INA.

Plaintiffs' arguments under the Take Care Clause (Br. 37-40) merely recycle their statutory argument that DACA conflicts with the INA.[10] But contrary to their assertions, the DACA Memorandum did not "dispense" with the INA. *See* Br. 37. Instead, it represented a rational exercise of discretion by the Executive regarding how best to enforce that statute. See *supra* Point I.A.1.a. Given the sums appropriated by Congress, DHS can remove only a small fraction of those here unlawfully. Forbearing enforcement against law-abiding individuals brought here as children in order to pursue more serious offenders is hardly a "complete abdication" (*see* Br. 39) of DHS's statutory responsibilities. See *infra* at 17-18. Nor are plaintiffs correct in their claim (Br. 38) that the INA prohibits DHS from deeming DACA grantees—like all other deferred-action recipients— to be "lawfully present" during periods of discretionary forbearance. See *supra* at 5-6.

### 2.   Notice and comment was not required prior to DACA's implementation.

DACA is a general statement of policy that "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quotation marks omitted). The DACA Memorandum channels undocumented

---

[10] In addition, Plaintiffs misplace their reliance on *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), which they proffer as purported authority for judicial intervention under the Take Care Clause. That case addressed only whether an executive officer could be compelled through mandamus to perform "a mere ministerial act," *id.* at 610, and the President had "disclaimed" any source of authority allowing the officer to avoid that duty, *id.* at 613.

immigrants who meet certain threshold criteria into a process for DHS to make individualized deferred-action determinations. No person has any substantive entitlement to obtain deferred action under DACA, and the Executive retains discretion to revoke any grant of deferred action at any time. *See Texas Sav. & Cmty. Bankers Ass'n v. Federal Hous. Fin. Bd.*, 201 F.3d 551, 556 (5th Cir. 2000) (discretionary "guidelines" that do not impose binding "rights and obligations" on regulated parties are not subject to notice and comment).

Plaintiffs miss the mark in emphasizing (Br. 34-36) statements about DACA's incidental benefits that the amici States made in lawsuits challenging the September 2017 termination of DACA. As amici explained in those suits, terminating DACA categorically deprived DHS officers of the discretion to grant DACA requests and renewals, and stripped existing DACA grantees of deferred action's attendant benefits without any individualized assessment. (AA 165, 168-171, 192.) In contrast, the creation of DACA had no such binding, generalized qualities.

Indeed, as the Fifth Circuit recognized, the language of the DACA Memorandum does not bind DHS agents but "facially purports to confer discretion" to approve or deny deferred-action requests and work authorizations. *See Texas*, 809 F.3d at 170 n. 126, 171 (construing same discretion-granting language in DAPA Memorandum and noting "the express delegation of discretion on the face of the DACA Memo"). Although DACA grantees have obtained work authorization and other incidental benefits via the operation of longstanding DHS regulations, the DACA Memorandum does not itself confer such benefits or vest any person with legal rights or obligations. The memorandum simply creates a process for soliciting deferred-action requests by defining a class of worthy applicants.

The available evidence shows that, as implemented by DHS, the DACA policy does not guarantee deferred action to all eligible persons. The denial rate in 2015—after excluding requests

rejected for technical reasons—was five percent, a rate that is neither negligible nor "[]surprising given the self-selecting nature of the program." *Texas*, 809 F.3d at 210 (King, J., dissenting); *see Arpaio*, 27 F. Supp. 3d at 209 n.13 (statistical evidence shows that "case-by-case review is in operation"). More recent data highlight the discretion DHS has continued to exercise, as the denial rate for initial requests has increased to over eight percent, with a full 77,583 denials since DACA's inception.[11]

In addition, whatever evidence regarding discretion existed in 2015—when DHS had just begun tracking complete data, *Texas*, 809 F.3d at 211 (King, J., dissenting)—has little probative value now. See *supra* at 8. The ongoing discovery mandated by this Court is already confirming that DHS agents have in fact been complying with the text of the DACA Memorandum and evaluating requests on a case-by-case basis. For example, in a different lawsuit, DHS has admitted that it exercises its prerogative to issue discretionary denials even for persons who fully met DACA's criteria. (AA 163.)

### 3. Plaintiffs' APA challenges amount to untimely and impermissible collateral attacks on decades-old federal policies and regulations.

Plaintiffs also can show no likelihood of success on their APA challenges, which amount to time-barred collateral attacks on federal policies adopted decades ago. *See* 28 U.S.C. § 2401(a) (six-year limitations period under APA). Although plaintiffs' suit purportedly "challenges the 2012 directive creating DACA" (Br. 6), the gravamen of their APA claims is not actually a challenge to the DACA Memorandum. Plaintiffs admit to this Court (Br. 24) that deferred action is a permissible classification, "rooted in prosecutorial discretion" and approved by the Supreme

---

[11] U.S. Customs & Immigr. Servs., *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake and Case Status* (through June 30, 2018) (AA 13).

Court. And plaintiffs have conceded to the Supreme Court that deferred action can be offered to a broad class of persons, at least insofar as deferred action consists of "simply forbearing from removal."[12]

Plaintiffs' APA claims thus boil down to substantive and procedural challenges to the agency actions that have extended incidental benefits—such as work authorization—to deferred-action recipients generally. But those ancillary benefits arise out of longstanding regulations exercising the Executive's authority to deem all deferred-action recipients "lawfully present" for certain purposes.[13] See 8 C.F.R. §§ 1.3(a)(4)(vi), 274a.12(c)(14). Plaintiffs are simply incorrect in attributing any of those benefits to the DACA Memorandum (see Br. 23), which does not even mention "lawful presence."[14]

Accordingly, plaintiffs' APA challenge should be rejected as an untimely collateral attack on agency rules promulgated decades before DACA.[15] Contrary to plaintiffs' assertions (see Br. 46-47), neither DHS's promulgation of DACA nor DHS's individualized grants of benefits to any person reset the clock for nonregulated parties like plaintiffs to bring facial APA challenges to DHS's decades-old policies. As the Fifth Circuit has held, "an agency's application of a rule" to a

---

[12] "I do believe that they could do it class based if they were simply forbearing from removal. . . . [G]iven that they are removing 400,000 people per year, we admit that they could do forbearance from removal." Tr. of Oral Arg. at 50, Texas (U.S.) (Scott Keller) (AA 66).

[13] For example, the re-entry bar is tolled for deferred-action recipients because, for at least a decade prior to the DACA Memorandum, DHS formally construed deferred action as entailing a period of authorized stay under 8 U.S.C. § 1182(a)(9)(B)(ii). Mem. from Johnny N. Williams, Exec. Assoc. Comm'r, Office of Field Operations, Unlawful Presence 1 (June 12, 2002) (AA 10).

[14] In contrast, the DAPA Memorandum expressly stated that recipients would be considered "lawfully present in the United States." Mem. from Jeh Charles Johnson, Secretary: Exercising Prosecutorial Discretion with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents at 2 (Nov. 20, 2014) ("DAPA Memorandum") (AA 5).

[15] See Dunn-McCampbell Royalty Interest, Inc. v. National Park Serv., 112 F.3d 1283, 1287 (5th Cir. 1997) (rejecting facial challenge as untimely under APA because there was no "direct, final agency action involving the particular plaintiff within six years of filing suit").

13

specific case "creates a new, six-year cause of action" only for the parties directly regulated by

that specific application.[16] *Dunn-McCampbell*, 112 F.3d at 1287; *accord Wind River Mining Corp.*

*v. United States*, 946 F.2d 710, 716 (9th Cir. 1991) ("challenge must be brought within six years

of the agency's application of the disputed decision *to the challenger*" (emphasis added)); *see also*

*Regents*, 279 F. Supp. 3d at 1044 (citing laches as a "powerful consideration" when discussing

likelihood of the Fifth Circuit upholding a possible injunction against DACA).

## B.    Plaintiffs Cannot Show That They Will Suffer Irreparable Harm If DACA Is Not Enjoined.

### 1.    States and their lawful residents benefit from the ability of DACA grantees to live and work openly.

In the approximately six years since DACA was adopted, its grantees have been eligible to

seek and obtain work authorization. That authorization, in turn, has enabled DACA grantees to

make important contributions to their States and to become integral parts of their communities.

Amici States, for example, employ many grantees as providers of health and social services, public

safety officers, teachers, government agency staff, and faculty and staff at public universities. (AA

172-178, 293-309.)

Plaintiffs are not correct that DACA causes "labor-market distortions" (Br. 13-15) that

harm lawful residents of the plaintiff States by subjecting those residents to competition from

undocumented persons. Contrary to plaintiffs' arguments, work authorization under deferred-

action policies like DACA serves to *ameliorate* distortions of the labor markets that would

---

[16] For procedural challenges, like plaintiffs' notice-and-comment claim, the six-year statute of limitations does not reset even for directly regulated entities. *Wong v. Doar*, 571 F.3d 247, 262-63 (2d Cir. 2009).

otherwise result.[17] Most DACA grantees are likely to remain in this country with or without DACA. The federal government has acknowledged that it directs its limited enforcement resources towards the serious criminals that Congress directed DHS to prioritize for deportation,[18] rather than the "low priority cases" represented by DACA-eligible persons. (AA 1-3.) And the government has acknowledged that persons who "have lived in this country continuously" for years—and who have not, as adults, formed residential ties to any other country—"are particularly unlikely to depart voluntarily" from the place they consider home. *See* U.S. Br. 45, Reply Br. 8, *Texas* (U.S.) (AA 41, 58).

DACA mitigates the harms that arise when these undocumented persons are forced to work in the underground economy at depressed wages, by offering them a means to obtain work authorization. *See* 8 U.S.C. §§ 1324a, 1601; 8 C.F.R. § 274a.12(c)(14). As the federal government has elsewhere explained, that reduction in underground employment helps lawful residents by removing competition for jobs from undocumented persons who are relegated to working illegally, and sometimes forced to accept wages and other workplace conditions that do not comply with legal requirements. *See* U.S. Br. 22 n.5, 46-47, *Texas* (U.S.) (AA 39, 42-43).

## 2.   Plaintiffs fail to establish any harm traceable to DACA.

Although plaintiffs assert that they are harmed by the costs of providing education, emergency medical care, and other services to undocumented persons (Br. 10-13, 41), they have

---

[17] *See, e.g.,* Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force* (Aug. 25, 2015) (concluding that employment data do not support notion that immigration leads to lower employment among native-born Americans) (AA 315-319).

[18] *See, e.g.,* DHS Appropriations Act, 2015, Pub. L. No. 114-4, tit. II, 129 Stat. 39, 43 (2015); Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, div. F., tit. II, 128 Stat. 5, 251 (2014); DHS Appropriations Act, 2010, Pub. L. No. 111-83, tit. II, 123 Stat. 2142, 2149 (2009); H.R. Rep. No. 111-157, at 8 (2009) (AA 20).

not alleged that any State other than Texas will suffer any specific financial harms[19]—and as to Texas they have failed to tie the alleged state expenses to DACA grantees, rather than undocumented persons generally. A showing that "*illegal immigration* is costing [a] state money" is not the same thing as a showing "that *DACA* is costing the state money." *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir 2015). Moreover, to the extent the costs plaintiffs identify stem from services provided to DACA grantees, those costs flow largely from the *presence* of those persons in the plaintiff States—a fact that is likely to persist whether DACA exists or not. Indeed, DACA enhances the economic self-sufficiency of deferred-action recipients, making them less likely to rely on emergency medical care, Medicaid, or other public assistance. *See Regents*, 279 F. Supp. 3d at 1047-48. Put another way, DACA decreases many of the generalized fiscal burdens that plaintiffs identify as injuries.

In addition, plaintiffs cannot plausibly claim to suffer any harm resulting from many of the other benefits received by DACA grantees. For instance, plaintiffs complain that certain DACA grantees have received advance parole and subsequently adjusted their immigration status to lawful permanent residency (LPR), which in turn allows them to apply for citizenship. *See* Br. 25-26. But plaintiffs are not harmed by any qualifying individual's adjustment to LPR status— or citizenship. States suffer no cognizable injury from the presence of additional lawful permanent residents or citizens within their borders. Similarly, the plaintiff States suffer no injury from DACA grantees' qualification for Social Security Numbers, the Earned Income Tax Credit, Medicare, and federal railroad retirement benefits. *See* Br. 27, 31. Plaintiffs do not attempt to

---

[19] The operative complaint states that "[o]ther States besides Texas have similar financial injuries caused by DACA," First Am. Compl. ¶ 236, and have suffered an "institutional injury," *id.* ¶¶ 248-251, but plaintiffs do not identify those injuries or demonstrate that they are irreparable.

explain how these federal benefits increase their fiscal burdens or otherwise cause them any concrete harm; nor can they, since such benefits actually decrease these burdens.

Plaintiffs likewise cannot show any injury from executive measures that they characterize (Br. 10) as "incentiviz[ing]" undocumented persons—including DACA grantees—to remain in the country. That characterization rests on a mistaken assumption that DACA grantees are individuals "who would not remain in the country" (Br. 41) but for DACA. As explained above, however, DACA grantees are distinctly *unlikely* to be removed or to depart voluntarily from the United States. See *supra* at 15. Plaintiffs accordingly are not injured by grants of work authorization or other Executive actions to address the pragmatic and humanitarian concerns posed by grantees' continued presence.

Finally, there is no merit to plaintiffs' argument that they possess per se standing to challenge DACA because it is a federal policy of discretionary forbearance in a field where state powers are preempted. *See* Br. 15-16 (arguing that plaintiffs possess "abdication standing"). As the Supreme Court explained in *Massachusetts v. EPA*, a plaintiff challenging a federal act of forbearance must still satisfy Article III by demonstrating cognizable harm that is traceable to the forbearance, which plaintiffs here cannot do. *See* 549 U.S. 497, 521-23 (2007). And in any event, the Supreme Court has recognized that granting deferred action is not the abdication of a duty, but a "commendable exercise in administrative discretion." *See American-Arab Anti-Discrimination Comm.*, 525 U.S. at 483-84. As the federal government has explained elsewhere, DHS lacks the resources to remove even five percent of the undocumented population in a given year. *See* U.S. Br. 4, *Texas* (U.S.) (AA 37). Accordingly, declining to pursue enforcement against undocumented persons who pose little threat to the Nation's safety and security, and who have deep ties to this country—in order to focus limited resources on more urgent priorities—is a classic exercise of

17

prosecutorial discretion, not an abdication of the Executive's statutory responsibilities to enforce the law. Indeed, DHS deported record numbers of undocumented persons while the DACA policy was in effect. (*See* AA 310-314.)

### 3. Plaintiffs' nearly six-year delay in seeking an injunction against DACA reinforces their lack of irreparable injury from that policy.

Further undermining plaintiffs' claims of irreparable injury is their remarkable delay in bringing this challenge. A "party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. ___, 138 S. Ct. 1942, 1944 (2018) (per curiam). Here, plaintiffs did not sue when the federal government implemented DACA in 2012. Nor did plaintiffs challenge DACA in 2015, when they sued to enjoin DAPA. Instead, they waited another three years before filing this lawsuit—a total delay of nearly six years.

That long delay alone belies any claim that plaintiffs need a preliminary injunction to prevent irreparable harm. As the Fifth Circuit has explained, injunctive relief is inappropriate where, as here, a plaintiff has waited "nearly six years to request injunctive relief, strongly implying that delay" in the resolution of the matter "was not causing irreparable harm." *Dillard v. Security Pac. Corp.*, 85 F.3d 621, 1996 WL 254971, at *4 (5th Cir. 1996) (per curiam) (table decision) (AA 34). For similar reasons, the Supreme Court recently affirmed the denial of a preliminary injunction based primarily on the fact that the plaintiffs there "did not move for a preliminary injunction in the District Court until six years" after the action that they challenged. *Benisek*, 138 S. Ct. at 1944; *see also Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989); *Lydo Enters. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984). The same reasoning applies here.

18

To the extent plaintiffs claim an urgent need for injunctive relief due to the preliminary injunctions issued in *Regents* and *Batalla Vidal* (*see* Br. 44), those injunctions do not explain why plaintiffs failed to bring this suit for the half-decade between the announcement of DACA in 2012 and the announced rescission of DACA last year. Moreover, any argument that this Court must now issue a preliminary injunction to avoid the consequences of other federal injunctions is an inappropriate collateral attack on the orders of coordinate courts. See *infra* Point II.

C.      **The Balance of the Equities and the Public Interest Favor Denying Plaintiffs' Requested Injunction.**

As discussed above (at 14-19), plaintiffs' asserted harms are foreclosed by precedent, not attributable to DACA, or wholly unsupported by record evidence. In contrast, terminating DACA would devastate the grantees who have structured their lives around the policy, while also harming the communities, employers, and educational institutions that have come to depend on the contributions of those grantees.

Whereas DAPA had yet to be implemented at the time it was challenged in *Texas v. United States*, DACA has been in effect for nearly six years. During that time, nearly 800,000 grantees have sought and received deferred action and benefits such as work authorization. *Batalla Vidal*, 279 F. Supp. 3d at 407. Those individuals have "come out of the shadows" and taken on important roles in communities across the country, to the benefit of their families, employers, the institutions with which they are associated, and the States in which they reside. *See id.* at 435.

A preliminary injunction would thus injure not only hundreds of thousands of DACA grantees, but also countless other persons and entities who have benefited from DACA. Ending DACA would cause "approximately 1,400 DACA recipients" to "lose deferred action each work day" and become "legally unemployable in this country." *Id.* at 434. That would swiftly lead to

"profound and irreversible economic and social implications." *Id.* at 435; *see also Regents*, 279 F. Supp. 3d at 1045 (discussing degree to which DACA grantees have "planned their lives according to the dictates of DACA").

The amici States in particular would suffer a variety of distinct harms, as two district courts have already concluded. *See Regents*, 279 F. Supp. 3d at 1046-47; *Batalla Vidal*, 279 F. Supp. 3d at 434-35. The loss of work authorization by DACA grantees would deprive the amici States of highly qualified employees, including faculty at state universities, healthcare workers, information technology specialists, and public safety officers. (AA 73-79, 133-135, 143, 146, 208-210, 247-250, 276-278, 337-343.) State-run educational institutions would lose students and revenue, hindering their ability to promote critical programming. (AA 80-82, 148-152, 199-203, 216-231, 243-250, 25-267, 276-278.) And state and local governments would lose out on the hundreds of millions of dollars in state and local taxes that DACA grantees pay each year. (AA 204-207, 320-328.)

Enjoining DACA would undermine other critical public interests as well. For example, it would place "tremendous burdens on the [amici States'] public health systems" as grantees (and the family members they support) lose their employer-sponsored health coverage. *Batalla Vidal*, 279 F. Supp. 3d at 434. (*See also* AA 232-238, 251-270.) DACA grantees who forgo medical care for fear of being reported to immigration authorities will create public health risks. (AA 211-215, 232-234.) The U.S.-citizen children of DACA grantees may be placed into state custody and foster care if their parents cannot remain legally in the United States, thereby burdening the amici States' child welfare systems. (*See* AA 84-87, 112-116, 239-242.) Enjoining DACA would also harm public safety because persons who are facing the threat of removal are less likely to report violence, abuse, crimes or other harms to the community. (AA 89, 117-118, 121, 126-127, 333-336, 340-354.)

The individual and institutional harms flowing from an injunction against DACA would reverberate nationwide. For example, large numbers of grantees work in the private sector, including as entrepreneurs and members of crucial industries. (*See* AA 154-157, 284-290.) Without DACA, GDP will be $460.3 billion less over the next decade, with Social Security and Medicare tax receipts dropping $24.6 billion. (AA 158-159, 290.)

These harms far outweigh any purported harm to the plaintiff States. Indeed, as noted above (at 14-16), DACA helps the plaintiff States and their residents by ameliorating labor-market distortions and other potential burdens associated with the presence in the United States of a class of undocumented aliens who are exceptionally unlikely to leave or be removed. In sum, the balance of the equities and the public interest weigh heavily against a preliminary injunction.

Finally, plaintiffs are incorrect in contending (Br. 44) that DACA did not create any cognizable reliance interests, such that this court may disregard the massive individual and societal disruptions that would flow from enjoining DACA. A government policy or position can create legitimate reliance interests even where the government may have the power to revoke it. *See, e.g., FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

## POINT II

### THE CONFLICT BETWEEN PLAINTIFFS' PROPOSED PRELIMINARY INJUNCTION AND TWO EXISTING PRELIMINARY INJUNCTIONS ALSO WARRANTS DENIAL OF PLAINTIFFS' REQUESTED RELIEF

Plaintiffs seek a preliminary injunction "that prevents the federal government from implementing [DACA] by issuing or renewing DACA permits." Br. 4. Such relief would unavoidably conflict with existing preliminary injunctions issued by courts in the Northern District

of California and the Eastern District of New York.[20] Those courts have rejected exactly the same arguments plaintiffs press here regarding DACA's legality. *Regents*, 279 F. Supp. 3d at 1037-43; *Batalla Vidal*, 279 F. Supp. 3d at 425-27. And they have found that if DACA is terminated, the plaintiffs in the suits before them—including amici States—will suffer "staggering" and "irreversible" economic and social harms. *Batalla Vidal*, 279 F. Supp. 3d at 434-35; *see also Regents*, 279 F. Supp. 3d at 1046-47. Accordingly, to fully protect the interests of the *Regents* and *Batalla Vidal* state plaintiffs, those courts have entered preliminary injunctions requiring the federal government "to maintain the DACA program on a nationwide basis . . . including allowing DACA enrollees to renew their enrollments," subject to limited exceptions. *Regents*, 279 F. Supp. 3d at 1048; *see also Batalla Vidal*, 279 F. Supp. 3d at 437. As those courts have observed, no "narrower injunction" would be capable of preventing the irreparable harms "extensively documented" by the *Regents* and *Batalla Vidal* state plaintiffs. *Batalla Vidal*, 279 F. Supp. 3d at 437-38; *see also Regents*, 279 F. Supp. 3d at 1049.

Under these circumstances, granting plaintiffs' requested preliminary relief would cause confusion and violate norms of comity and sound judicial administration. District courts must "exercise care to avoid interference with each other's affairs." *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985). Where a district court is confronted with a suit that is "likel[y]" to "substantially overlap" with a suit previously filed in another district court, "considerations of comity and orderly administration of justice demand" that the second court decline to exercise jurisdiction. *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971)

---

[20] *See also NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018) (vacating DACA's rescission, but staying vacatur for 90 days).

(quotation marks omitted).[21] These considerations control regardless of whether the overlapping suits are "identical" in substance, *id.* at 408 n.6, or involve the exact same parties, *Save Power*, 121 F.3d at 951.

The need to defer is especially acute where a district court is asked to issue an injunction that would directly conflict with another court's outstanding injunction. *See West Gulf*, 751 F.2d at 728-32 (issuance of conflicting injunction is an abuse of discretion); *Mann*, 439 F.2d at 407-08 (same). Such injunctions transgress norms of judicial comity and perpetrate "a grave disservice to the public interest in the orderly administration of justice." *Feller v. Brock*, 802 F.2d 722, 727 (4th Cir. 1986).

The relief requested here would squarely conflict with the *Batalla Vidal* and *Regents* injunctions that are now being reviewed by the federal appellate courts.[22] Those injunctions require the federal government to accept and process requests for renewal of DACA status; plaintiffs' requested injunction would forbid it. Indeed, plaintiffs admit that they brought this lawsuit as a calculated attempt to collaterally attack the *Batalla Vidal* and *Regents* injunctions. First Am. Compl. ¶ 208; *see* Br. 44. But even if those injunctions were wrongly issued, as plaintiffs claim, the appellate courts reviewing the injunctions are the appropriate bodies to rectify any legal errors. Fifth Circuit precedent strongly counsels against the entry of a conflicting injunction in these circumstances. *See West Gulf*, 751 F.2d at 728-32.

---

[21] *See also Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 920 (5th Cir. 1997) (failure to transfer action to court where first-filed action was pending was an abuse of discretion); *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 952 (5th Cir. 1997) (same); *cf. Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (noting "the general principle" of "avoid[ing] duplicative litigation . . . between federal district courts"); *Mower v. Boyer*, 811 S.W.2d 560, 563 n.2 (Tex. 1991) (noting similar "general rule" for intrastate actions).

[22] *Regents*, No. 18-15068 (9th Cir. Mar. 15, 2018), ECF No. 51 (AA 281) (expediting briefing); *Batalla Vidal*, No. 18-485 (2d Cir. Mar. 8, 2018), ECF No. 62 (AA 68) (same); *see also DHS v. Regents of Univ. of California*, 138 S. Ct. 1182 (2018) ("assum[ing] that the [Ninth Circuit] will proceed expeditiously to decide the case"). Both appeals are fully briefed. The Ninth Circuit appeal was argued and submitted on May 15, 2018.

# CONCLUSION

For all of these reasons, this Court should deny plaintiffs' motion for a preliminary injunction.

Dated:     New York, New York
           July 21, 2018

                                        Respectfully submitted,

XAVIER BECERRA                          BARBARA D. UNDERWOOD
 *Attorney General*                      *Attorney General*
 *State of California*                   *State of New York*

EDWARD C. DUMONT
 *Solicitor General*                    By:  /s/Andrew W. Amend
MICHAEL J. MONGAN                            ANDREW W. AMEND
 *Deputy Solicitor General*                  Senior Assistant Solicitor General
MICHAEL L. NEWMAN                            Attorney in Charge
 *Supervising Deputy Attorney General*       New York Bar No. 4816716
JAMES F. ZAHRADKA II                         Southern District of Texas Bar No.:
 *Deputy Attorney General*                    *Admitted pro hac vice*
MAX CARTER-OBERSTONE
 *Associate Deputy Solicitor General*        28 Liberty Street, 23rd Floor
   *of Counsel*                              New York, NY 10005
                                             Telephone: (212) 416-8022
1300 I St.                                   Facsimile: (212) 416-8962
Sacramento, CA 95814
                                        ANISHA S. DASGUPTA
                                         *Deputy Solicitor General*
                                        ANDREW W. AMEND
                                         *Senior Assistant Solicitor General*
                                        DAVID S. FRANKEL
                                         *Assistant Solicitor General*
                                           *of Counsel*

*(Counsel listing continues on next page.)*

24

GEORGE JEPSEN
  *Attorney General*
  *State of Connecticut*
55 Elm St.
Hartford, CT 06106

MATTHEW P. DENN
  *Attorney General*
  *State of Delaware*
Department of Justice
Carvel State Bldg, 6th Fl.
820 North French St.
Wilmington, DE 19801

RUSSELL A. SUZUKI
  *Attorney General*
  *State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

LISA MADIGAN
  *Attorney General*
  *State of Illinois*
100 W. Randolph St., 12th Fl.
Chicago, IL 60601

THOMAS J. MILLER
  *Attorney General*
  *State of Iowa*
1305 E. Walnut St.
Des Moines, IA 50319

JANET T. MILLS
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 Saint Paul Pl.
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

LORI SWANSON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55101

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
408 Galisteo St.
Santa Fe, NM 87501

JOSH STEIN
  *Attorney General*
  *State of North Carolina*
114 W. Edenton St.
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of Pennsylvania*
16th Fl., Strawberry Sq.
Harrisburg, PA 17120

PETER F. KILMARTIN
  *Attorney General*
  *State of Rhode Island*
150 S. Main St.
Providence, RI 02903

(*Counsel listing continues on next page.*)

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

MARK R. HERRING
  *Attorney General*
  *Commonwealth of Virginia*
202 North Ninth St.
Richmond, VA 23219

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
800 Fifth Ave., Ste. 2000
Seattle, WA 98104

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
One Judiciary Sq.
441 4th St., N.W.
Washington, DC 20001

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

STATE OF TEXAS et al. ,

Plaintiff,

v.

UNITED STATES OF AMERICA  et al.,

Defendant.

Civil Action No. 18-cv-0068 (ASH)

RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH LOCAL RULE 5-2 RELATED CASES OF AMICUS CHRISTOPHER EARL STRUNK, THE NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR FRCvP RULE 65(b) RELIEF AT DOCKET  ITEM# 483, AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 BY : NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, IOWA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR CHILDHOOD ARRIVAL* (DACA)

# EXHIBIT  I



## Articles of Confederation : March 1, 1781

To all to whom these Presents shall come, we the undersigned Delegates of the States affixed to our Names send greeting.

Articles of Confederation and perpetual Union between the states of New Hampshire, Massachusetts-bay Rhode Island and Providence Plantations, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, North Carolina, South Carolina and Georgia.

I.

The Stile of this Confederacy shall be

**"The United States of America".**

II.

Each state retains its sovereignty, freedom, and independence, and every power, jurisdiction, and right, which is not by this Confederation expressly delegated to the United States, in Congress assembled.

III.

The said States hereby severally enter into a firm league of friendship with each other, for their common defense, the security of their liberties, and their mutual and general welfare, binding themselves to assist each other, against all force offered to, or attacks made upon them, or any of them, on account of religion, sovereignty, trade, or any other pretense whatever.

IV.

The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds, and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions, and restrictions as the inhabitants thereof respectively, provided that such restrictions shall not extend so far as to prevent the removal of property imported into any State, to any other State, of which the owner is an inhabitant; provided also that no imposition, duties or restriction shall be laid by any State, on the property of the United States, or either of them.

If any person guilty of, or charged with, treason, felony, or other high misdemeanor in any State, shall flee from justice, and be found in any of the United States, he shall, upon demand of the Governor or executive power of the State from which he fled, be delivered up and removed to the State having jurisdiction of his offense.

Full faith and credit shall be given in each of these States to the records, acts, and judicial proceedings of the courts and magistrates of every other State.

V.

For the most convenient management of the general interests of the United States, delegates shall be annually appointed in such manner as the legislatures of each State shall direct, to meet in Congress on the first Monday in November, in every year, with a power reserved to each State to recall its delegates, or any of them, at any time within the year, and to send others in their stead for the remainder of the year.

No State shall be represented in Congress by less than two, nor more than seven members; and no person shall be capable of being a delegate for more than three years in any term of six years; nor shall any person, being a delegate, be capable of holding any office under the United States, for which he, or another for his benefit, receives any salary, fees or emolument of any kind.

Each State shall maintain its own delegates in a meeting of the States, and while they act as members of the committee of the States. In determining questions in the United States in Congress assembled, each State shall have one vote.

Freedom of speech and debate in Congress shall not be impeached or questioned in any court or place out of Congress, and the members of Congress shall be protected in their persons from arrests or imprisonments, during the time of their going to and from, and attendence on Congress, except for treason, felony, or breach of the peace.

VI.

No State, without the consent of the United States in Congress assembled, shall send any embassy to, or receive any embassy from, or enter into any conference, agreement, alliance or treaty with any King, Prince or State; nor shall any person holding any office of profit or trust under the United States, or any of them, accept any present, emolument, office or title of any kind whatever from any King, Prince or foreign State; nor shall the United States in Congress assembled, or any of them, grant any title of nobility.

No two or more States shall enter into any treaty, confederation or alliance whatever between them, without the consent of the United States in Congress assembled, specifying accurately the purposes for which the same is to be entered into, and how long it shall continue.

No State shall lay any imposts or duties, which may interfere with any stipulations in treaties, entered into by the United States in Congress assembled, with any King, Prince or State, in pursuance of any treaties already proposed by Congress, to the courts of France and Spain.

No vessel of war shall be kept up in time of peace by any State, except such number only, as shall be deemed necessary by the United States in Congress assembled, for the defense of such State, or its trade; nor shall any body of forces be kept up by any State in time of peace, except such number only, as in the judgement of the United States in Congress assembled, shall be deemed requisite to garrison the forts necessary for the defense of such State; but every State shall always keep up a well-regulated and disciplined militia, sufficiently armed and accoutered, and shall provide and constantly have ready for use, in public stores, a due number of filed pieces and tents, and a proper quantity of arms, ammunition and camp equipage.

No State shall engage in any war without the consent of the United States in Congress assembled, unless such State be actually invaded by enemies, or shall have received certain advice of a resolution being formed by some nation of Indians to invade such State, and the danger is so imminent as not to admit of a delay till the United States in Congress assembled can be consulted; nor shall any State grant commissions to any ships or vessels of war, nor letters of marque or reprisal, except it be after a declaration of war by the United States in Congress assembled, and then only against the Kingdom or State and the subjects thereof, against which war has been so declared, and under such regulations as shall be established by the United States in Congress assembled, unless such State be infested by pirates, in which case vessels of war may be fitted out for that occasion, and kept so long as the danger shall continue, or until the United States in Congress assembled shall determine otherwise.

VII.

When land forces are raised by any State for the common defense, all officers of or under the rank of colonel, shall be appointed by the legislature of each State respectively, by whom such forces shall be raised, or in such manner as such State shall direct, and all vacancies shall be filled up by the State which first made the appointment.

VIII.

All charges of war, and all other expenses that shall be incurred for the common defense or general welfare, and allowed by the United States in Congress assembled, shall be defrayed out of a common treasury, which shall be

supplied by the several States in proportion to the value of all land within each State, granted or surveyed for any person, as such land and the buildings and improvements thereon shall be estimated according to such mode as the United States in Congress assembled, shall from time to time direct and appoint.

The taxes for paying that proportion shall be laid and levied by the authority and direction of the legislatures of the several States within the time agreed upon by the United States in Congress assembled.

IX.

The United States in Congress assembled, shall have the sole and exclusive right and power of determining on peace and war, except in the cases mentioned in the sixth article -- of sending and receiving ambassadors -- entering into treaties and alliances, provided that no treaty of commerce shall be made whereby the legislative power of the respective States shall be restrained from imposing such imposts and duties on foreigners, as their own people are subjected to, or from prohibiting the exportation or importation of any species of goods or commodities whatsoever -- of establishing rules for deciding in all cases, what captures on land or water shall be legal, and in what manner prizes taken by land or naval forces in the service of the United States shall be divided or appropriated -- of granting letters of marque and reprisal in times of peace -- appointing courts for the trial of piracies and felonies commited on the high seas and establishing courts for receiving and determining finally appeals in all cases of captures, provided that no member of Congress shall be appointed a judge of any of the said courts.

The United States in Congress assembled shall also be the last resort on appeal in all disputes and differences now subsisting or that hereafter may arise between two or more States concerning boundary, jurisdiction or any other causes whatever; which authority shall always be exercised in the manner following. Whenever the legislative or executive authority or lawful agent of any State in controversy with another shall present a petition to Congress stating the matter in question and praying for a hearing, notice thereof shall be given by order of Congress to the legislative or executive authority of the other State in controversy, and a day assigned for the appearance of the parties by their lawful agents, who shall then be directed to appoint by joint consent, commissioners or judges to constitute a court for hearing and determining the matter in question: but if they cannot agree, Congress shall name three persons out of each of the United States, and from the list of such persons each party shall alternately strike out one, the petitioners beginning, until the number shall be reduced to thirteen; and from that number not less than seven, nor more than nine names as Congress shall direct, shall in the presence of Congress be drawn out by lot, and the persons whose names shall be so drawn or any five of them, shall be commissioners or judges, to hear and finally determine the controversy, so always as a major part of the judges who shall hear the cause shall agree in the determination: and if either party shall neglect to attend at the day appointed, without showing reasons, which Congress shall judge sufficient, or being present shall refuse to strike, the Congress shall proceed to nominate three persons out of each State, and the secretary of Congress shall strike in behalf of such party absent or refusing; and the judgement and sentence of the court to be appointed, in the manner before prescribed, shall be final and conclusive; and if any of the parties shall refuse to submit to the authority of such court, or to appear or defend their claim or cause, the court shall nevertheless proceed to pronounce sentence, or judgement, which shall in like manner be final and decisive, the judgement or sentence and other proceedings being in either case transmitted to Congress, and lodged among the acts of Congress for the security of the parties concerned: provided that every commissioner, before he sits in judgement, shall take an oath to be administered by one of the judges of the supreme or superior court of the State, where the cause shall be tried, 'well and truly to hear and determine the matter in question, according to the best of his judgement, without favor, affection or hope of reward': provided also, that no State shall be deprived of territory for the benefit of the United States.

All controversies concerning the private right of soil claimed under different grants of two or more States, whose jurisdictions as they may respect such lands, and the States which passed such grants are adjusted, the said grants or either of them being at the same time claimed to have originated antecedent to such settlement of jurisdiction, shall on the petition of either party to the Congress of the United States, be finally determined as near as may be in the same manner as is before prescribed for deciding disputes respecting territorial jurisdiction between different States.

The United States in Congress assembled shall also have the sole and exclusive right and power of regulating the alloy and value of coin struck by their own authority, or by that of the respective States -- fixing the standards of

3

weights and measures throughout the United States -- regulating the trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated -- establishing or regulating post offices from one State to another, throughout all the United States, and exacting such postage on the papers passing through the same as may be requisite to defray the expenses of the said office -- appointing all officers of the land forces, in the service of the United States, excepting regimental officers -- appointing all the officers of the naval forces, and commissioning all officers whatever in the service of the United States -- making rules for the government and regulation of the said land and naval forces, and directing their operations.

The United States in Congress assembled shall have authority to appoint a committee, to sit in the recess of Congress, to be denominated 'A Committee of the States', and to consist of one delegate from each State; and to appoint such other committees and civil officers as may be necessary for managing the general affairs of the United States under their direction -- to appoint one of their members to preside, provided that no person be allowed to serve in the office of president more than one year in any term of three years; to ascertain the necessary sums of money to be raised for the service of the United States, and to appropriate and apply the same for defraying the public expenses -- to borrow money, or emit bills on the credit of the United States, transmitting every half-year to the respective States an account of the sums of money so borrowed or emitted -- to build and equip a navy -- to agree upon the number of land forces, and to make requisitions from each State for its quota, in proportion to the number of white inhabitants in such State; which requisition shall be binding, and thereupon the legislature of each State shall appoint the regimental officers, raise the men and cloath, arm and equip them in a solid-like manner, at the expense of the United States; and the officers and men so cloathed, armed and equipped shall march to the place appointed, and within the time agreed on by the United States in Congress assembled. But if the United States in Congress assembled shall, on consideration of circumstances judge proper that any State should not raise men, or should raise a smaller number of men than the quota thereof, such extra number shall be raised, officered, cloathed, armed and equipped in the same manner as the quota of each State, unless the legislature of such State shall judge that such extra number cannot be safely spread out in the same, in which case they shall raise, officer, cloath, arm and equip as many of such extra number as they judge can be safely spared. And the officers and men so cloathed, armed, and equipped, shall march to the place appointed, and within the time agreed on by the United States in Congress assembled.

The United States in Congress assembled shall never engage in a war, nor grant letters of marque or reprisal in time of peace, nor enter into any treaties or alliances, nor coin money, nor regulate the value thereof, nor ascertain the sums and expenses necessary for the defense and welfare of the United States, or any of them, nor emit bills, nor borrow money on the credit of the United States, nor appropriate money, nor agree upon the number of vessels of war, to be built or purchased, or the number of land or sea forces to be raised, nor appoint a commander in chief of the army or navy, unless nine States assent to the same: nor shall a question on any other point, except for adjourning from day to day be determined, unless by the votes of the majority of the United States in Congress assembled.

The Congress of the United States shall have power to adjourn to any time within the year, and to any place within the United States, so that no period of adjournment be for a longer duration than the space of six months, and shall publish the journal of their proceedings monthly, except such parts thereof relating to treaties, alliances or military operations, as in their judgement require secrecy; and the yeas and nays of the delegates of each State on any question shall be entered on the journal, when it is desired by any delegates of a State, or any of them, at his or their request shall be furnished with a transcript of the said journal, except such parts as are above excepted, to lay before the legislatures of the several States.

X.

The Committee of the States, or any nine of them, shall be authorized to execute, in the recess of Congress, such of the powers of Congress as the United States in Congress assembled, by the consent of the nine States, shall from time to time think expedient to vest them with; provided that no power be delegated to the said Committee, for the exercise of which, by the Articles of Confederation, the voice of nine States in the Congress of the United States assembled be requisite.

XI.

Canada acceding to this confederation, and adjoining in the measures of the United States, shall be admitted into, and entitled to all the advantages of this Union; but no other colony shall be admitted into the same, unless such admission be agreed to by nine States.

XII.

All bills of credit emitted, monies borrowed, and debts contracted by, or under the authority of Congress, before the assembling of the United States, in pursuance of the present confederation, shall be deemed and considered as a charge against the United States, for payment and satisfaction whereof the said United States, and the public faith are hereby solemnly pleged.

XIII.

Every State shall abide by the determination of the United States in Congress assembled, on all questions which by this confederation are submitted to them. And the Articles of this Confederation shall be inviolably observed by every State, and the Union shall be perpetual; nor shall any alteration at any time hereafter be made in any of them; unless such alteration be agreed to in a Congress of the United States, and be afterwards confirmed by the legislatures of every State.

And Whereas it hath pleased the Great Governor of the World to incline the hearts of the legislatures we respectively represent in Congress, to approve of, and to authorize us to ratify the said Articles of Confederation and perpetual Union. Know Ye that we the undersigned delegates, by virtue of the power and authority to us given for that purpose, do by these presents, in the name and in behalf of our respective constituents, fully and entirely ratify and confirm each and every of the said Articles of Confederation and perpetual Union, and all and singular the matters and things therein contained: And we do further solemnly plight and engage the faith of our respective constituents, that they shall abide by the determinations of the United States in Congress assembled, on all questions, which by the said Confederation are submitted to them. And that the Articles thereof shall be inviolably observed by the States we respectively represent, and that the Union shall be perpetual.

In Witness whereof we have hereunto set our hands in Congress. Done at Philadelphia in the State of Pennsylvania the ninth day of July in the Year of our Lord One Thousand Seven Hundred and Seventy-Eight, and in the Third Year of the independence of America.

Agreed to by Congress 15 November 1777 In force after ratification by Maryland, 1 March 1781

Source:

Documents Illustrative of the Formation of the Union of the American States.
Government Printing Office, 1927.
House Document No. 398.
Selected, Arranged and Indexed by Charles C. Tansill

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

STATE OF TEXAS et al. ,

Plaintiff,

v.                                              Civil Action No. 18-cv-0068 (ASH)

UNITED STATES OF AMERICA  et al.,

Defendant.

RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH
LOCAL RULE 5-2 RELATED CASES OF AMICUS CHRISTOPHER EARL STRUNK, THE
NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW
YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR
FRCvP RULE 65(b) RELIEF AT DOCKET  ITEM# 483, AFFIRMATION IN OPPOSITION
TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 BY :
NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAIʻI, ILLINOIS, IOWA,
MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH
CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT,
WASHINGTON, AND THE DISTRICT OF COLUMBIA IN OPPOSITION TO
PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR
CHILDHOOD ARRIVAL* (DACA)

# EXHIBIT  J



# New York State

# Constitution

*As revised, including amendments
effective January 1, 2015*

**ANDREW M. CUOMO**
*Governor*

**ROSSANA ROSADO**
*Secretary of State*

This edition of the *New York State Constitution, available at: www.dos.ny.gov,* is provided as a public service by the:

**Department of State Division of
Administrative Rules One
Commerce Plaza
99 Washington Avenue
Albany, NY 12231-0001**

*Phone*:  (518) 474-6957
*Fax*:  (518) 473-9055
*E-mail*:  adminrules@dos.ny.gov

*For more information about New York State,
please visit: www.ny.gov*

# THE CONSTITUTION OF
# THE
# STATE OF NEW YORK

As Revised, with Amendments adopted by the
Constitutional Convention of 1938 and Approved
by Vote of the People on November 8, 1938
and
Amendments subsequently adopted by the
Legislature and Approved by Vote of the People.

As Amended and in Force January 1, 2015

## ARTICLE I
### BILL OF RIGHTS

§1. Rights, privileges and franchise secured; power of legislature to dispense with primary elections in certain cases.
2. Trial by jury; how waived.
3. Freedom of worship; religious liberty.
4. Habeas corpus.
5. Bail; fines; punishments; detention of witnesses.
6. Grand jury; protection of certain enumerated rights; duty of public officers to sign waiver of immunity and give testimony; penalty for refusal.
7. Compensation for taking private property; private roads; drainage of agricultural lands.
8. Freedom of speech and press; criminal prosecutions for libel.
9. Right to assemble and petition; divorce; lotteries; pool-selling and gambling; laws to prevent; pari-mutuel betting on horse races permitted; games of chance, bingo or lotto authorized under certain restrictions.
10. [Repealed.]
11. Equal protection of laws; discrimination in civil rights prohibited.
12. Security against unreasonable searches, seizures and interceptions.
13. [Repealed.]
14. Common law and acts of the colonial and state legislatures.
15. [Repealed.]
16. Damages for injuries causing death.
17. Labor not a commodity; hours and wages in public work; right to organize and bargain collectively.
18. Workers' compensation.

## ARTICLE II
### SUFFRAGE

§1. Qualifications of voters.
2. Absentee voting.
3. Persons excluded from the right of suffrage.
4. Certain occupations and conditions not to affect residence.
5. Registration and election laws to be passed.
6. Permanent registration.
7. Manner of voting; identification of voters.
8. Bi-partisan registration and election board.
9. Presidential elections; special voting procedures authorized.

## ARTICLE III
### LEGISLATURE

§1. Legislative power.
2. Number and terms of senators and assemblymen.
3. Senate districts.
4. Readjustments and reapportionments; when federal census to control.
5. Apportionment of assemblymen; creation of assembly districts.

5-a. Definition of inhabitants.
5-b. Independent redistricting commission.
6. Compensation, allowances and traveling expenses of members.
7. Qualifications of members; prohibitions on certain civil appointments; acceptance to vacate seat.
8. Time of elections of members.
9. Powers of each house.
10. Journals; open sessions; adjournments.
11. Members not to be questioned for speeches.
12. Bills may originate in either house; may be amended by the other.
13. Enacting clause of bills; no law to be enacted except by bill.
14. Manner of passing bills; message of necessity for immediate vote.
15. Private or local bills to embrace only one subject, expressed in title.
16. Existing law not to be made applicable by reference.
17. Cases in which private or local bills shall not be passed.
18. Extraordinary sessions of the legislature; power to convene on legislative initiative.
19. Private claims not to be audited by legislature; claims barred by lapse of time.
20. Two-thirds bills.
21. Certain sections not to apply to bills recommended by certain commissioners or public agencies.
22. Tax laws to state tax and object distinctly; definition of income for income tax purposes by reference to federal laws authorized.
23. When yeas and nays necessary; three-fifths to constitute quorum.
24. Prison labor; contract system abolished.
25. Emergency governmental operations; legislature to provide for.

## ARTICLE IV
### EXECUTIVE

§1. Executive power; election and terms of governor and lieutenant-governor.
2. Qualifications of governor and lieutenant-governor.
3. Powers and duties of governor; compensation.
4. Reprieves, commutations and pardons; powers and duties of governor relating to grants of.
5. When lieutenant-governor to act as governor.
6. Duties and compensation of lieutenant-governor; succession to the governorship.
7. Action by governor on legislative bills; reconsideration after veto.
8. Departmental rules and regulations; filing; publication.

## ARTICLE V
### OFFICERS AND CIVIL DEPARTMENTS

§1. Comptroller and attorney-general; payment of state moneys without audit void.
2. Civil departments in the state government.
3. Assignment of functions.
4. Department heads.
5. [Repealed.]
6. Civil service appointments and promotions; veterans' credits.
7. Membership in retirement systems; benefits not to be diminished nor impaired.

# The Constitution of the State of New York

## ARTICLE VI
### JUDICIARY

§1. Unified court system; organization; process.
2. Court of appeals; organization; designations; vacancies, how filled; commission on judicial nomination.
3. Court of appeals; jurisdiction.
4. Judicial departments; appellate divisions, how constituted; governor to designate justices; temporary assignments; jurisdiction.
5. Appeals from judgment or order; new trial.
6. Judicial districts; how constituted; supreme court.
7. Supreme court; jurisdiction.
8. Appellate terms; composition; jurisdiction.
9. Court of claims; jurisdiction.
10. County courts; judges.
11. County court; jurisdiction.
12. Surrogate's courts; judges; jurisdiction.
13. Family court; organization; jurisdiction.
14. Discharge of duties of more than one judicial office by same judicial officer.
15. New York city; city-wide courts; jurisdiction.
16. District courts; jurisdiction; judges.
17. Town, village and city courts; jurisdiction; judges.
18. Trial by jury; trial without jury; claims against state.
19. Transfer of actions and proceedings.
20. Judges and justices; qualifications; eligibility for other office or service; restrictions.
21. Vacancies; how filled.
22. Commission on judicial conduct; composition; organization and procedure; review by court of appeals; discipline of judges or justices.
23. Removal of judges.
24. Court for trial of impeachments; judgment.
25. Judges and justices; compensation; retirement.
26. Temporary assignments of judges and justices.
27. Supreme court; extraordinary terms.
28. Administrative supervision of court system.
29. Expenses of courts.
30. Legislative power over jurisdiction and proceedings; delegation of power to regulate practice and procedure.
31. Inapplicability of article to certain courts.
32. Custodians of children to be of same religious persuasion.
33. Existing laws; duty of legislature to implement article.
34. Pending appeals, actions and proceedings; preservation of existing terms of office of judges and justices.
35. Certain courts abolished; transfer of judges, court personnel, and actions and proceedings to other courts.
36. Pending civil and criminal cases.
36-a. Effective date of certain amendments to articles VI and VII.
36-b. [No section.]
36-c. Effective date of certain amendments to article VI, section 22.
37. Effective date of article.

## ARTICLE VII
### STATE FINANCES

§1 Estimates by departments, the legislature and the judiciary of needed appropriations; hearings.
2. Executive budget.
3. Budget bills; appearances before legislature.
4. Action on budget bills by legislature; effect thereof.
5. Restrictions on consideration of other appropriations.
6. Restrictions on content of appropriation bills.
7. Appropriation bills.
8. Gift or loan of state credit or money prohibited; exceptions for enumerated purposes.
9. Short term state debts in anticipation of taxes, revenues and proceeds of sale of authorized bonds.
10. State debts on account of invasion, insurrection, war and forest fires.
11. State debts generally; manner of contracting; referendum.
12. State debts generally; how paid; contribution to sinking funds; restrictions on use of bond proceeds.
13. Refund of state debts.
14. State debt for elimination of railroad crossings at grade; expenses; how borne; construction and reconstruction of state highways and parkways.
15. Sinking funds; how kept and invested; income therefrom and application thereof.
16. Payment of state debts; when comptroller to pay without appropriation.
17. Authorizing the legislature to establish a fund or funds for tax revenue stabilization reserves; regulating payments thereto and withdrawals therefrom.
18. Bonus on account of service of certain veterans in World War II.
19. State debt for expansion of state university.

## ARTICLE VIII
### LOCAL FINANCES

§1. Gift or loan of property or credit of local subdivisions prohibited; exceptions for enumerated purposes.
2. Restrictions on indebtedness of local subdivisions; contracting and payment of local indebtedness; exceptions.
2-a. Local indebtedness for water supply, sewage and drainage facilities and purposes; allocations and exclusions of indebtedness.
3. Restrictions on creation and indebtedness of certain corporations.
4. Limitations on local indebtedness.
5. Ascertainment of debt-incurring power of counties, cities, towns and villages; certain indebtedness to be excluded.
6. Debt-incurring power of Buffalo, Rochester and Syracuse; certain additional indebtedness to be excluded.
7. Debt-incurring power of New York city; certain additional indebtedness to be excluded.
7-a. Debt-incurring power of New York city; certain indebtedness for railroads and transit purposes to be excluded.
8. Indebtedness not to be invalidated by operation of this article.
9. When debt-incurring power of certain counties shall cease.
10. Limitations on amount to be raised by real estate taxes for local purposes; exceptions.
10-a. Application and use of revenues; certain public improvements.
11. Taxes for certain capital expenditures to be excluded from tax limitation.
12. Powers of local governments to be restricted; further limitations on contracting local indebtedness authorized.

## ARTICLE IX LOCAL
### GOVERNMENTS

§1. Bill of rights for local governments.
2. Powers and duties of legislature; home rule powers of local governments; statute of local governments.
3. Existing laws to remain applicable; construction; definitions.

## ARTICLE X
### CORPORATIONS

§1. Corporations; formation of.
2. Dues of corporations.
3. Savings bank charters; savings and loan association charters; special charters not to be granted.
4. Corporations; definition; right to sue and be sued.
5. Public corporations; restrictions on creation and powers; accounts; obligations of.
6. Liability of state for payment of bonds of public corporation to construct state thruways; use of state canal lands and properties.

7. Liability of state for obligations of the port of New York authority for railroad commuter cars; limitations.
8. Liability of state on bonds of a public corporation to finance new industrial or manufacturing plants in depressed areas.

ARTICLE XI
EDUCATION

§1. Common schools.
2. Regents of the University.
3. Use of public property or money in aid of denominational schools prohibited; transportation of children authorized.

ARTICLE XII
DEFENSE

§1. Defense; militia.

ARTICLE XIII
PUBLIC OFFICERS

§1. Oath of office; no other test for public office.
2. Duration of term of office.
3. Vacancies in office; how filled; boards of education.
4. Political year and legislative term.
5. Removal from office for misconduct.
6. When office to be deemed vacant; legislature may declare.
7. Compensation of officers.
8. Election and term of city and certain county officers.
9-12. [No sections 9-12; former 9-12 renumbered 4-7.]
13. Law enforcement and other officers.
14. Employees of, and contractors for, the state and local governments; wages, hours and other provisions to be regulated by legislature.

ARTICLE XIV
CONSERVATION

§1. Forest preserve to be forever kept wild; authorized uses and exceptions.
2. Reservoirs.
3. Forest and wild life conservation; use or disposition of certain lands authorized.
4. Protection of natural resources; development of agricultural lands.
5. Violations of article; how restrained.

ARTICLE XV
CANALS

§1. Disposition of canals and canal properties prohibited.
2. Prohibition inapplicable to lands and properties no longer useful; disposition authorized.
3. Contracts for work and materials; special revenue fund.
4. Lease or transfer to federal government of barge canal system authorized.

ARTICLE XVI
TAXATION

§1. Power of taxation; exemptions from taxation.
2. Assessments for taxation purposes.
3. Situs of intangible personal property; taxation of.
4. Certain corporations not to be discriminated against.
5. Compensation of public officers and employees subject to taxation.
6. Public improvements or services; contract of indebtedness; creation of public corporations.

ARTICLE XVII
SOCIAL WELFARE

§1. Public relief and care.
2. State board of social welfare; powers and duties.
3. Public health.
4. Care and treatment of persons suffering from mental disorder or defect; visitation of institutions for.
5. Institutions for detention of criminals; probation; parole; state commission of correction.
6. Visitation and inspection.
7. Loans for hospital construction.

ARTICLE XVIII
HOUSING

§1. Housing and nursing home accommodations for persons of low income; slum clearance.
2. *Idem;* powers of legislature in aid of.
3. Article VII to apply to state debts under this article, with certain exceptions; amortization of state debts; capital and periodic subsidies.
4. Powers of cities, towns and villages to contract indebtedness in aid of low rent housing and slum clearance projects; restrictions thereon.
5. Liability for certain loans made by the state to certain public corporations.
6. Loans and subsidies; restrictions on and preference in occupancy of projects.
7. Liability arising from guarantees to be deemed indebtedness; method of computing.
8. Excess condemnation.
9. Acquisition of property for purposes of article.
10. Power of legislature; construction of article.

ARTICLE XIX AMENDMENTS
TO CONSTITUTION

§1. Amendments to constitution; how proposed, voted upon and ratified; failure of attorney-general to render opinion not to affect validity.
2. Future constitutional conventions; how called; election of delegates; compensation; quorum; submission of amendments; officers; employees; rules; vacancies.
3. Amendments simultaneously submitted by convention and legislature.

ARTICLE XX WHEN
TO TAKE EFFECT

§1. Time of taking effect.

# THE CONSTITUTION

[1][Preamble] WE THE PEOPLE of the State of New York, grateful to Almighty God for our Freedom, in order to secure its blessings, DO ESTABLISH THIS CONSTITUTION.

## ARTICLE I
BILL OF RIGHTS

**[Rights, privileges and franchise secured; power of legislature to dispense with primary elections in certain cases]**
Section 1. No member of this state shall be disfranchised[2], or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his or her peers, except that the legislature may provide that there shall be no primary election held to nominate candidates for public office or to elect persons to party positions for any political party or parties in any unit of representation of the state from which such candidates or persons are nominated or elected whenever there is no contest or contests for such nominations or election as may be prescribed by general law. (Amended by vote of the people November 3, 1959; November 6, 2001.)[3]

**[Trial by jury; how waived]**
§2. Trial by jury in all cases in which it has heretofore been guaranteed by constitutional provision shall remain inviolate forever; but a jury trial may be waived by the parties in all civil cases in the manner to be prescribed by law. The legislature may provide, however, by law, that a verdict may be rendered by not less than five-sixths of the jury in any civil case. A jury trial may be waived by the defendant in all criminal cases, except those in which the crime charged may be punishable by death, by a written instrument signed by the defendant in person in open court before and with the approval of a judge or justice of a court having jurisdiction to try the offense. The legislature may enact laws, not inconsistent herewith, governing the form, content, manner and time of presentation of the instrument effectuating such waiver. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Freedom of worship; religious liberty]**
§3. The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind; and no person shall be rendered incompetent to be a witness on account of his or her opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state. (Amended by vote of the people November 6, 2001.)

**[Habeas corpus]**
§4. The privilege of a writ or order of habeas corpus shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Bail; fines; punishments; detention of witnesses]**
§5. Excessive bail shall not be required nor excessive fines imposed, nor shall cruel and unusual punishments be inflicted, nor shall witnesses be unreasonably detained.

**[Grand jury; protection of certain enumerated rights; duty of public officers to sign waiver of immunity and give testimony; penalty for refusal]**
§6. No person shall be held to answer for a capital or otherwise infamous crime (except in cases of impeachment, and in cases of militia when in actual service, and the land, air and naval forces in time of war, or which this state may keep with the consent of congress in time of peace, and in cases of petit larceny under the regulation of the legislature), unless on indictment of a grand jury, except that a person held for the action of a grand jury upon a charge for such an offense, other than one punishable by death or life imprisonment, with the consent of the district attorney, may waive indictment by a grand jury and consent to be prosecuted on an information filed by the district attorney; such waiver shall be evidenced by written instrument signed by the defendant in open court in the presence of his or her counsel. In any trial in any court whatever the party accused shall be allowed to appear and defend in person and with counsel as in civil actions and shall be informed of the nature and cause of the accusation and be confronted with the witnesses against him or her. No person shall be subject to be twice put in jeopardy for the same offense; nor shall he or she be compelled in any criminal case to be a witness against himself or herself, providing, that any public officer who, upon being called before a grand jury to testify concerning the conduct of his or her present office or of any public office held by him or her within five years prior to such grand jury call to testify, or the performance of his or her official duties in any such present or prior offices, refuses to sign a waiver of immunity against subsequent criminal prosecution, or to answer any relevant question concerning such matters before such grand jury, shall by virtue of such refusal, be disqualified from holding any other public office or public employment for a period of five years from the date of such refusal to sign a waiver of immunity against subsequent prosecution, or to answer any relevant question concerning such matters before such grand jury, and shall be removed from his or her present office by the appropriate authority or shall forfeit his or her present office at the suit of the attorney-general.

The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law. No person shall be deprived of life, liberty or property without due process of law. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 8, 1949; November 3, 1959; November 6, 1973; November 6, 2001.)

**[Compensation for taking private property; private roads; drainage of agricultural lands]**
§7. (a) Private property shall not be taken for public use without just compensation.

(c) Private roads may be opened in the manner to be prescribed by law; but in every case the necessity of the road and the amount of all damage to be sustained by the opening thereof shall be first determined by a jury of freeholders, and such amount, together with the expenses of the proceedings, shall be paid by the person to be benefitted.

(d) The use of property for the drainage of swamp or agricultural lands is declared to be a public use, and general laws may be passed permitting the owners or occupants of swamp or agricultural lands to construct and maintain for the drainage thereof, necessary drains, ditches and dykes upon the lands of others, under proper restrictions, on making just compensation, and such compensation together with the cost of such drainage may be assessed, wholly or partly, against any property benefitted thereby; but no special laws shall be enacted for such purposes. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Subdivision (e) repealed by vote of the people November 5, 1963. Subdivision (b) repealed by vote of the people November 3, 1964.)

**[Freedom of speech and press; criminal prosecutions for libel]**
§8. Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libels, the truth may be given in

---

[1] Section headings and annotations [enclosed in brackets], and footnotes throughout this document are not a part of the official text.

[2] As so in original.

[3] Except where otherwise indicated, each section hereafter was re-enacted without change by the Constitutional Convention of 1938 and re-adopted by vote of the people November 8, 1938.

4

evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact. (Amended by vote of the people November 6, 2001.)

**[Right to assemble and petition; divorce; lotteries; pool-selling and gambling; laws to prevent; pari-mutuel betting on horse races permitted; games of chance, bingo or lotto authorized under certain restrictions]**
§9. 1. No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government, or any department thereof; nor shall any divorce be granted otherwise than by due judicial proceedings; except as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe, except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government, and except casino gambling at no more than seven facilities as authorized and prescribed by the legislature shall hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section. (Amendment approved by vote of the people November 5, 2013.)
2. Notwithstanding the foregoing provisions of this section, any city, town or village within the state may by an approving vote of the majority of the qualified electors in such municipality voting on a proposition therefor submitted at a general or special election authorize, subject to state legislative supervision and control, the conduct of one or both of the following categories of games of chance commonly known as: (a) bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random; (b) games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previously selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance. If authorized, such games shall be subject to the following restrictions, among others which may be prescribed by the legislature: (1) only bona fide religious, charitable or non-profit organizations of veterans, volunteer firefighter and similar non-profit organizations shall be permitted to conduct such games; (2) the entire net proceeds of any game shall be exclusively devoted to the lawful purposes of such organizations; (3) no person except a bona fide member of any such organization shall participate in the management or operation of such game; and (4) no person shall receive any remuneration for participating in the management or operation of any such game. Unless otherwise provided by law, no single prize shall exceed two hundred fifty dollars, nor shall any series of prizes on one occasion aggregate more than one thousand dollars. The legislature shall pass appropriate laws to effectuate the purposes of this subdivision, ensure that such games are rigidly regulated to prevent commercialized gambling, prevent participation by criminal and other undesirable elements and the diversion of funds from the purposes authorized hereunder and establish a method by which a municipality which has authorized such games may rescind or revoke such authorization. Unless permitted by the legislature, no municipality shall have the power to pass local laws or ordinances relating to such games. Nothing in this section shall prevent the legislature from passing laws more restrictive than any of the provisions of this section. (Amendment approved by vote of the people November 7, 1939; further amended by vote of the people November 5, 1957; November 8, 1966; November 4, 1975; November 6, 1984; November 6, 2001.)

**[Section 10, which dealt with ownership of lands, allodial tenures and escheats, was repealed by amendment approved by vote of the people November 6, 1962.]**

**[Equal protection of laws; discrimination in civil rights prohibited]**
§11. No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Security against unreasonable searches, seizures and interceptions]**
§12. The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Section 13, which dealt with purchase of lands of Indians, was repealed by amendment approved by vote of the people November 6, 1962.]**

**[Common law and acts of the colonial and state legislatures]**
§14. Such parts of the common law, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony, on the nineteenth day of April, one thousand seven hundred seventy-five, and the resolutions of the congress of the said colony, and of the convention of the State of New York, in force on the twentieth day of April, one thousand seven hundred seventy-seven, which have not since expired, or been repealed or altered; and such acts of the legislature of this state as are now in force, shall be and continue the law of this state, subject to such alterations as the legislature shall make concerning the same. But all such parts of the common law, and such of the said acts, or parts thereof, as are repugnant to this constitution, are hereby abrogated. (Formerly §16. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Section 15, which dealt with certain grants of lands and of charters made by the king of Great Britain and the state and obligations and contracts not to be impaired, was repealed by amendment approved by vote of the people November 6, 1962.]**

**[Damages for injuries causing death]**
§16. The right of action now existing to recover damages for injuries resulting in death, shall never be abrogated; and the amount recoverable shall not be subject to any statutory limitation. (Formerly §18. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Labor not a commodity; hours and wages in public work; right to organize and bargain collectively]**
§17. Labor of human beings is not a commodity nor an article of commerce and shall never be so considered or construed.
No laborer, worker or mechanic, in the employ of a contractor or sub-contractor engaged in the performance of any public work, shall be permitted to work more than eight hours in any day or more than five days in any week, except in cases of extraordinary emergency; nor shall he or she be paid less than the rate of wages prevailing in the same trade or occupation in the locality within the state where such public work is to be situated, erected or used.

5

Employees shall have the right to organize and to bargain collectively through representatives of their own choosing. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Workers' compensation]**
§18. Nothing contained in this constitution shall be construed to limit the power of the legislature to enact laws for the protection of the lives, health, or safety of employees; or for the payment, either by employers, or by employers and employees or otherwise, either directly or through a state or other system of insurance or otherwise, of compensation for injuries to employees or for death of employees resulting from such injuries without regard to fault as a cause thereof, except where the injury is occasioned by the wilful intention of the injured employee to bring about the injury or death of himself or herself or of another, or where the injury results solely from the intoxication of the injured employee while on duty; or for the adjustment, determination and settlement, with or without trial by jury, of issues which may arise under such legislation; or to provide that the right of such compensation, and the remedy therefor shall be exclusive of all other rights and remedies for injuries to employees or for death resulting from such injuries; or to provide that the amount of such compensation for death shall not exceed a fixed or determinable sum; provided that all moneys paid by an employer to his or her employees or their legal representatives, by reason of the enactment of any of the laws herein authorized, shall be held to be a proper charge in the cost of operating the business of the employer. (Formerly §19. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

## ARTICLE II
### SUFFRAGE

**[Qualifications of voters]**
Section 1. Every citizen shall be entitled to vote at every election for all officers elected by the people and upon all questions submitted to the vote of the people provided that such citizen is eighteen years of age or over and shall have been a resident of this state, and of the county, city, or village for thirty days next preceding an election. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 2, 1943; November 6, 1945; November 6, 1961; November 8, 1966; November 7, 1995.)

**[Absentee voting]**
§2. The legislature may, by general law, provide a manner in which, and the time and place at which, qualified voters who, on the occurrence of any election, may be absent from the county of their residence or, if residents of the city of New York, from the city, and qualified voters who, on the occurrence of any election, may be unable to appear personally at the polling place because of illness or physical disability, may vote and for the return and canvass of their votes. (Formerly §1-a. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 4, 1947; November 8, 1955; November 5, 1963.)

**[Persons excluded from the right of suffrage]**
§3. No person who shall receive, accept, or offer to receive, or pay, offer or promise to pay, contribute, offer or promise to contribute to another, to be paid or used, any money or other valuable thing as a compensation or reward for the giving or withholding a vote at an election, or who shall make any promise to influence the giving or withholding any such vote, or who shall make or become directly or indirectly interested in any bet or wager depending upon the result of any election, shall vote at such election; and upon challenge for such cause, the person so challenged, before the officers authorized for that purpose shall receive his or her vote, shall swear or affirm before such officers that he or she has not received or offered, does not expect to receive, has not paid, offered or promised to pay, contributed, offered or promised to contribute to another, to be paid or used, any money

or other valuable thing as a compensation or reward for the giving or withholding a vote at such election, and has not made any promise to influence the giving or withholding of any such vote, nor made or become directly or indirectly interested in any bet or wager depending upon the result of such election. The legislature may enact laws excluding from the right of suffrage all persons convicted of bribery or of any infamous crime. (Formerly §2. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Certain occupations and conditions not to affect residence]**
§4. For the purpose of voting, no person shall be deemed to have gained or lost a residence, by reason of his or her presence or absence, while employed in the service of the United States; nor while engaged in the navigation of the waters of this state, or of the United States, or of the high seas; nor while a student of any seminary of learning; nor while kept at any almshouse, or other asylum, or institution wholly or partly supported at public expense or by charity; nor while confined in any public prison. (Formerly §3. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Registration and election laws to be passed]**
§5. Laws shall be made for ascertaining, by proper proofs, the citizens who shall be entitled to the right of suffrage hereby established, and for the registration of voters; which registration shall be completed at least ten days before each election. Such registration shall not be required for town and village elections except by express provision of law. (Formerly §4. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 1951; further amended by vote of the people November 8, 1955; November 8, 1966; November 7, 1995.)

**[Permanent registration]**
§6. The legislature may provide by law for a system or systems of registration whereby upon personal application a voter may be regis- tered and his or her registration continued so long as he or she shall remain qualified to vote from an address within the jurisdiction of the board with which such voter is registered. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 7, 1995; November 6, 2001.)

**[Manner of voting; identification of voters]**
§7. All elections by the citizens, except for such town officers as may by law be directed to be otherwise chosen, shall be by ballot, or by such other method as may be prescribed by law, provided that secrecy in voting be preserved. The legislature shall provide for identification of voters through their signatures in all cases where personal registration is required and shall also provide for the signatures, at the time of voting, of all persons voting in person by ballot or voting machine, whether or not they have registered in person, save only in cases of illiteracy or physical disability. (Formerly §5. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Bi-partisan registration and election boards]**
§8. All laws creating, regulating or affecting boards or officers charged with the duty of qualifying voters, or of distributing ballots to voters, or of receiving, recording or counting votes at elections, shall secure equal representation of the two political parties which, at the general election next preceding that for which such boards or officers are to serve, cast the highest and the next highest number of votes. All such boards and officers shall be appointed or elected in such manner, and upon the nomination of such representatives of said parties respectively, as the legislature may direct. Existing laws on this subject shall continue until the legislature shall otherwise provide. This section shall not apply to town, or village elections. (Formerly §6. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 7, 1995.)

**[Presidential elections; special voting procedures authorized]**
§9. Notwithstanding the residence requirements imposed by section one of this article, the legislature may, by general law, provide special procedures whereby every person who shall have moved from another state to this state or from one county, city or village within this state to another county, city or village within this state and who shall have been an inhabitant of this state in any event for ninety days next preceding an election at which electors are to be chosen for the office of president and vice president of the United States shall be entitled to vote in this state solely for such electors, provided such person is otherwise qualified to vote in this state and is not able to qualify to vote for such electors in any other state. The legislature may also, by general law, prescribe special procedures whereby every person who is registered and would be qualified to vote in this state but for his or her removal from this state to another state within one year next preceding such election shall be entitled to vote in this state solely for such electors, provided such person is not able to qualify to vote for such electors in any other state. (New. Added by vote of the people November 5, 1963; amended by vote of the people November 6, 2001.)

## ARTICLE III
### LEGISLATURE

**[Legislative power]**
Section 1. The legislative power of this state shall be vested in the senate and assembly.

**[Number and terms of senators and assemblymen]**
§2. The senate shall consist of fifty members[4], except as hereinafter provided. The senators elected in the year one thousand eight hundred and ninety-five shall hold their offices for three years, and their successors shall be chosen for two years. The assembly shall consist of one hundred and fifty members. The assembly members elected in the year one thousand nine hundred and thirty-eight, and their successors, shall be chosen for two years. (Amended by vote of the people November 2, 1937; November 6, 2001.)

**[Senate districts]**
§3. The senate districts[5], described in section three of article three of this constitution as adopted by the people on November sixth, eighteen hundred ninety-four are hereby continued for all of the purposes of future reapportionments of senate districts pursuant to section four of this article. (Formerly §3. Repealed and replaced by new §3 amended by vote of the people November 6, 1962.)

**[Readjustments and reapportionments; when federal census to control]**
§4. (a) Except as herein otherwise provided, the federal census taken in the year nineteen hundred thirty and each federal census taken decennially thereafter shall be controlling as to the number of inhabitants in the state or any part thereof for the purposes of the apportionment of members of assembly and readjustment or alteration of senate and assembly districts next occurring, in so far as such census and the tabulation thereof purport to give the information necessary therefor. The legislature, by law, shall provide for the making and tabulation by state authorities of an enumeration of the inhabitants of the entire state to be used for such purposes, instead of a federal census, if the taking of a federal census in any tenth year from the year nineteen hundred thirty be omitted or if the federal census fails to show the number of aliens or Indians not taxed. If a federal census, though giving the requisite information as to the state at large, fails to give the information as to any civil or territorial divisions which is required to be known for such purposes, the legislature, by law, shall provide for such an enumeration of the inhabitants of such parts of the state only as may be necessary, which shall supersede in part the federal census and be used in connection therewith for such purposes. The legislature, by law, may provide in its discretion for an enumeration by state authorities of the inhabitants of the state, to be used

for such purposes, in place of a federal census, when the return of a decennial federal census is delayed so that it is not available at the beginning of the regular session of the legislature in the second year after the year nineteen hundred thirty or after any tenth year therefrom, or if an apportionment of members of assembly and readjustment or alteration of senate districts is not made at or before such a session. At the regular session in the year nineteen hundred thirty-two, and at the first regular session after the year nineteen hundred forty and after each tenth year therefrom the senate districts shall be readjusted or altered, but if, in any decade, counting from and including that which begins with the year nineteen hundred thirty-one, such a readjustment or alteration is not made at the time above prescribed, it shall be made at a subsequent session occurring not later than the sixth year of such decade, meaning not later than nineteen hundred thirty-six, nineteen hundred forty-six, nineteen hundred fifty-six, and so on; provided, however, that if such districts shall have been readjusted or altered by law in either of the years nineteen hundred thirty or nineteen hundred thirty-one, they shall remain unaltered until the first regular session after the year nineteen hundred forty. No town, except a town having more than a full ratio of apportionment, and no block in a city inclosed by streets or public ways, shall be divided in the formation of senate districts. In the reapportionment of senate districts, no district shall contain a greater excess in population over an adjoining district in the same county, than the population of a town or block therein adjoining such district. Counties, towns or blocks which, from their location, may be included in either of two districts, shall be so placed as to make said districts most nearly equal in number of inhabitants, excluding aliens.

No county shall have four or more senators unless it shall have a full ratio for each senator. No county shall have more than one-third of all the senators; and no two counties or the territory thereof as now organized, which are adjoining counties, or which are separated only by public waters, shall have more than one-half of all the senators.

(b) The independent redistricting commission established pursuant to section five-b of this article shall prepare a redistricting plan to establish senate, assembly, and congressional districts every ten years commencing in two thousand twenty-one, and shall submit to the legislature such plan and the implementing legislation therefor on or before January first or as soon as practicable thereafter but no later than January fifteenth in the year ending in two beginning in two thousand twenty-two. The redistricting plans for the assembly and the senate shall be contained in and voted upon by the legislature in a single bill, and the congressional district plan may be included in the same bill if the legislature chooses to do so. The implementing legislation shall be voted upon, without amendment, by the senate or the assembly and if approved by the first house voting upon it, such legislation shall be delivered to the other house immediately to be voted upon without amendment. If approved by both houses, such legislation shall be presented to the governor for action.

If either house shall fail to approve the legislation implementing the first redistricting plan, or the governor shall veto such legislation and the legislature shall fail to override such veto, each house or the governor if he or she vetoes it, shall notify the commission that such legislation has been disapproved. Within fifteen days of such notification and in no case later than February twenty-eighth, the redistricting commission shall prepare and submit to the legislature a second redistricting plan and the necessary implementing legislation for such plan. Such legislation shall be voted upon, without amendment, by the senate or the assembly and, if approved by the first house voting upon it, such legislation shall be delivered to the other house immediately to be voted upon without amendment. If approved by both houses, such legislation shall be presented to the governor for action.

If either house shall fail to approve the legislation implementing the second redistricting plan, or the governor shall veto such legislation and the legislature shall fail to override such veto, each house shall introduce such implementing legislation with any amendments each house of the legislature deems necessary. All such amendments shall comply with the provisions of this article. If approved by both houses, such legislation shall be presented to the governor for action.

All votes by the senate or assembly on any redistricting plan legislation pursuant to this article shall be conducted in accordance with the following rules:

---

[4] State Law §123 sets forth current number of senators.
[5] State Law §124 currently sets forth 63 senate districts.

(1) In the event that the speaker of the assembly and the temporary president of the senate are members of two different political parties, approval of legislation submitted by the independent redistricting commission pursuant to subdivision (f) of section five-b of this article shall require the vote in support of its passage by at least a majority of the members elected to each house.

(2) In the event that the speaker of the assembly and the temporary president of the senate are members of two different political parties, approval of legislation submitted by the independent redistricting commission pursuant to subdivision (g) of section five-b of this article shall require the vote in support of its passage by at least sixty percent of the members elected to each house.

(3) In the event that the speaker of the assembly and the temporary president of the senate are members of the same political party, approval of legislation submitted by the independent redistricting commission pursuant to subdivision (f) or (g) of section five-b of this article shall require the vote in support of its passage by at least two-thirds of the members elected to each house.

(c) Subject to the requirements of the federal constitution and statutes and in compliance with state constitutional requirements, the following principles shall be used in the creation of state senate and state assembly districts and congressional districts:

(1) When drawing district lines, the commission shall consider whether such lines would result in the denial or abridgement of racial or language minority voting rights, and districts shall not be drawn to have the purpose of, nor shall they result in, the denial or abridgement of such rights. Districts shall be drawn so that, based on the totality of the circumstances, racial or minority language groups do not have less opportunity to participate in the political process than other members of the electorate and to elect representatives of their choice.

(2) To the extent practicable, districts shall contain as nearly as may be an equal number of inhabitants. For each district that deviates from this requirement, the commission shall provide a specific public explanation as to why such deviation exists.

(3) Each district shall consist of contiguous territory.

(4) Each district shall be as compact in form as practicable.

(5) Districts shall not be drawn to discourage competition or for the purpose of favoring or disfavoring incumbents or other particular candidates or political parties. The commission shall consider the maintenance of cores of existing districts, of pre-existing political subdivisions, including counties, cities, and towns, and of communities of interest.

(6) In drawing senate districts, towns or blocks which, from their location may be included in either of two districts, shall be so placed as to make said districts most nearly equal in number of inhabitants. The requirements that senate districts not divide counties or towns, as well as the 'block-on-border' and 'town-on-border' rules, shall remain in effect.

During the preparation of the redistricting plan, the independent redistricting commission shall conduct not less than one public hearing on proposals for the redistricting of congressional and state legislative districts in each of the following (i) cities: Albany, Buffalo, Syracuse, Rochester, and White Plains; and (ii) counties: Bronx, Kings, New York, Queens, Richmond, Nassau, and Suffolk. Notice of all such hearings shall be widely published using the best available means and media a reasonable time before every hearing. At least thirty days prior to the first public hearing and in any event no later than September fifteenth of the year ending in one or as soon as practicable thereafter, the independent redistricting commission shall make widely available to the public, in print form and using the best available technology, its draft redistricting plans, relevant data, and related information. Such plans, data, and information shall be in a form that allows and facilitates their use by the public to review, analyze, and comment upon such plans and to develop alternative redistricting plans for presentation to the commission at the public hearings. The independent redistricting commission shall report the findings of all such hearings to the legislature upon submission of a redistricting plan.

(d) The ratio for apportioning senators shall always be obtained by dividing the number of inhabitants, excluding aliens, by fifty, and the senate shall always be composed of fifty members, except that if any county having three or more senators at the time of any apportionment shall be

entitled on such ratio to an additional senator or senators, such additional senator or senators shall be given to such county in addition to the fifty senators, and the whole number of senators shall be increased to that extent.

The senate districts, including the present ones, as existing immediately before the enactment of a law readjusting or altering the senate districts, shall continue to be the senate districts of the state until the expirations of the terms of the senators then in office, except for the purpose of an election of senators for full terms beginning at such expirations, and for the formation of assembly districts.

(e) The process for redistricting congressional and state legislative districts established by this section and sections five and five-b of this article shall govern redistricting in this state except to the extent that a court is required to order the adoption of, or changes to, a redistricting plan as a remedy for a violation of law.

A reapportionment plan and the districts contained in such plan shall be in force until the effective date of a plan based upon the subsequent federal decennial census taken in a year ending in zero unless modified pursuant to court order. (Amended by vote of the people November 6, 1945; further amended by vote of the people November 4, 2014.)

[Apportionment of assemblymen; creation of assembly districts]
§5. The members of the assembly shall be chosen by single districts and shall be apportioned pursuant to this section and sections four and five-b of this article at each regular session at which the senate districts are readjusted or altered, and by the same law, among the several counties of the state, as nearly as may be according to the number of their respective inhabitants, excluding aliens. Every county heretofore established and separately organized, except the county of Hamilton, shall always be entitled to one member of assembly, and no county shall hereafter be erected unless its population shall entitle it to a member. The county of Hamilton shall elect with the county of Fulton, until the population of the county of Hamilton shall, according to the ratio, entitle it to a member. But the legislature may abolish the said county of Hamilton and annex the territory thereof to some other county or counties.

The quotient obtained by dividing the whole number of inhabitants of the state, excluding aliens, by the number of members of assembly, shall be the ratio for apportionment, which shall be made as follows: One member of assembly shall be apportioned to every county, including Fulton and Hamilton as one county, containing less than the ratio and one-half over. Two members shall be apportioned to every other county. The remaining members of assembly shall be apportioned to the counties having more than two ratios according to the number of inhabitants, excluding aliens. Members apportioned on remainders shall be apportioned to the counties having the highest remainders in the order thereof respectively. No county shall have more members of assembly than a county having a greater number of inhabitants, excluding aliens.

The assembly districts[6], including the present ones, as existing immediately before the enactment of a law making an apportionment of members of assembly among the counties, shall continue to be the assembly districts of the state until the expiration of the terms of members then in office, except for the purpose of an election of members of assembly for full terms beginning at such expirations.

In any county entitled to more than one member, the board of supervisors, and in any city embracing an entire county and having no board of supervisors, the common council, or if there be none, the body exercising the powers of a common council, shall assemble at such times as the legislature making an apportionment shall prescribe, and divide such counties into assembly districts as nearly equal in number of inhabitants, excluding aliens, as may be, of convenient and contiguous territory in as compact form as practicable, each of which shall be wholly within a senate district formed under the same apportionment, equal to the number of members of assembly to which such county shall be entitled, and shall cause to be filed in the office of the secretary of state and of the clerk of such county, a description of such districts, specifying the number of each district and of the inhabitants thereof, excluding aliens, according to the census or enumeration used as the population basis for the formation of such districts; and such apportionment

---

[6] State Law §121 sets forth 150 assembly districts.

8

and districts shall remain unaltered until after the next reapportionment of members of assembly, except that the board of supervisors of any county containing a town having more than a ratio of apportionment and one-half over may alter the assembly districts in a senate district containing such town at any time on or before March first, nineteen hundred forty-six. In counties having more than one senate district, the same number of assembly districts shall be put in each senate district, unless the assembly districts cannot be evenly divided among the senate districts of any county, in which case one more assembly district shall be put in the senate district in such county having the largest, or one less assembly district shall be put in the senate district in such county having the smallest number of inhabitants, excluding aliens, as the case may require. Nothing in this section shall prevent the division, at any time, of counties and towns and the erection of new towns by the legislature.

An apportionment by the legislature, or other body, shall be subject to review by the supreme court, at the suit of any citizen, under such reasonable regulations as the legislature may prescribe; and any court before which a cause may be pending involving an apportionment, shall give precedence thereto over all other causes and proceedings, and if said court be not in session it shall convene promptly for the disposition of the same. The court shall render its decision within sixty days after a petition is filed. In any judicial proceeding relating to redistricting of congressional or state legislative districts, any law establishing congressional or state legislative districts found to violate the provisions of this article shall be invalid in whole or in part. In the event that a court finds such a violation, the legislature  shall have a full and reasonable opportunity to correct the law's legal infirmities. (Amended by vote of the people November 6, 1945; further amended by vote of the people November 4, 2014.)

**[Definition of inhabitants]**
§5-a.  For the purpose of apportioning senate and assembly districts pursuant to the foregoing provisions of this article, the term "inhabitants, excluding aliens" shall mean the whole number of persons. (New. Added by vote of the people November 4, 1969.)

**[Independent redistricting commission]**
§5-b.  (a) On or before February first of each year ending with a zero and at any other time a court orders that congressional or state legislative districts be amended, an independent redistricting commission shall be established to determine the district lines for congressional and state legislative offices. The independent redistricting commission shall be composed of ten members, appointed as follows:

(1) two members shall be appointed by the temporary president of the senate;

(2) two members shall be appointed by the speaker of the assembly;

(3) two members shall be appointed by the minority leader of the senate;

(4) two members shall be appointed by the minority leader of the assembly;

(5) two members shall be appointed by the eight members appointed pursuant to paragraphs (1) through (4) of this subdivision by a vote of not less than five members in favor of such appointment, and these two members shall not have been enrolled in the preceding five years in either of the two political parties that contain the largest or second largest number of enrolled voters within the state;

(6) one member shall be designated chair of the commission by a majority of the members appointed pursuant to paragraphs (1) through (5) of this subdivision to convene and preside over each meeting of the commission.

(b) The members of the independent redistricting commission shall be registered voters in this state. No member shall within the last three years:

(1) be or have been a member of the New York state legislature or United States Congress or a statewide elected official;

(2) be or have been a state officer or employee or legislative employee as defined in section seventy-three of the public officers law;

(3) be or have been a registered lobbyist in New York state;

(4) be or have been a political party chairman, as defined in paragraph (k) of subdivision one of section seventy-three of the public officers law;

(5) be the spouse of a statewide elected official or of any member of the United States Congress, or of the state legislature.

(c) To the extent practicable, the members of the independent redistricting commission shall reflect the diversity of the residents of this state with regard to race, ethnicity, gender, language, and geographic residence and to the extent practicable the appointing authorities  shall  consult  with organizations devoted to protecting the voting rights of minority and other voters concerning potential appointees to the commission.

(d) Vacancies in the membership of the commission shall be filled within thirty days in the manner provided for in the original appointments.

(e) The legislature shall provide by law for the compensation of the members of the independent redistricting commission, including compensation for actual and necessary expenses incurred in the performance of their duties.

(f) A minimum of five members of the independent redistricting commission shall constitute a quorum for the transaction of any business or the exercise of any power of such commission prior to the appointment of the two commission members appointed pursuant to paragraph (5) of subdivision (a) of this section, and a minimum of seven members shall constitute a quorum after such members have been appointed, and no exercise of any power of the independent redistricting commission shall occur without the affirmative vote of at least a majority of the members, provided that, in order to approve any redistricting plan and implementing legislation, the following rules shall apply:

(1) In the event that the speaker of the assembly and the temporary president of the senate are members of the same political party, approval of a redistricting plan and implementing legislation by the commission for submission to the legislature shall require the vote in support of its approval by at least seven members including at least one member appointed by each of the legislative leaders.

(2) In the event that the speaker of the assembly and the temporary president of the senate are members of two different political parties, approval of a redistricting plan by the commission for submission to the legislature shall require the vote in support of its approval by at least seven members including at least one member appointed by the speaker of the assembly and one member appointed by the temporary president of the senate.

(g) In the event that the commission is unable to obtain seven votes to approve a redistricting plan on or before January first in the year ending in two or as soon as practicable thereafter, the commission shall submit to the legislature that redistricting plan and implementing legislation that garnered the highest number of votes in support of its approval by the commission with a record of the votes taken. In the event that more than one plan received the same number of votes for approval, and such number was higher than that for any other plan, then the commission shall submit all plans that obtained such number of votes. The legislature shall consider and vote upon such implementing legislation in accordance with the voting rules set forth in subdivision (b) of section four of this article.

(h) (1) The independent redistricting commission shall appoint two co-executive directors by a majority vote of the commission in accordance with the following procedure:

(i) In the event that the speaker of the assembly and the temporary president of the senate are members of two different political parties, the co-executive directors shall be approved by a majority of the commission that includes at least one appointee by the speaker of the assembly and at least one appointee by the temporary president of the senate.

(ii) In the event that the speaker of the assembly and the temporary president of the senate are members of the same political party, the co-executive directors shall be approved by a majority of the commission that includes at least one appointee by each of the legislative leaders.

(2) One of the co-executive directors shall be enrolled in the political party with the highest number of enrolled members in the state and one shall be enrolled in the political party with the second highest number of enrolled

members in the state. The co-executive directors shall appoint such staff as are necessary to perform the commission's duties, except that the commission shall review a staffing plan prepared and provided by the co-executive directors which shall contain a list of the various positions and the duties, qualifications, and salaries associated with each position.

(3) In the event that the commission is unable to appoint one or both of the co-executive directors within forty-five days of the establishment of a quorum of seven commissioners, the following procedure shall be followed:

(i) In the event that the speaker of the assembly and the temporary president of the senate are members of two different political parties, within ten days the speaker's appointees on the commission shall appoint one co-executive director, and the temporary president's appointees on the commission shall appoint the other co-executive director. Also within ten days the minority leader of the assembly shall select a co-deputy executive director, and the minority leader of the senate shall select the other co-deputy executive director.

(ii) In the event that the speaker of the assembly and the temporary president of the senate are members of the same political party, within ten days the speaker's and temporary president's appointees on the commission shall together appoint one co-executive director, and the two minority leaders' appointees on the commission shall together appoint the other co-executive director.

(4) In the event of a vacancy in the offices of co-executive director or co-deputy executive director, the position shall be filled within ten days of its occurrence by the same appointing authority or authorities that appointed his or her predecessor.

(i) The state budget shall include necessary appropriations for the expenses of the independent redistricting commission, provide for compensation and reimbursement of expenses for the members and staff of the commission, assign to the commission any additional duties that the legislature may deem necessary to the performance of the duties stipulated in this article, and require other agencies and officials of the state of New York and its political subdivisions to provide such information and assistance as the commission may require to perform its duties. (New. Added by vote of the people November 4, 2014.)

**[Compensation, allowances and traveling expenses of members]**
§6. Each member of the legislature shall receive for his or her services a like annual salary, to be fixed by law. He or she shall also be reimbursed for his or her actual traveling expenses in going to and returning from the place in which the legislature meets, not more than once each week while the legislature is in session. Senators, when the senate alone is convened in extraordinary session, or when serving as members of the court for the trial of impeachments, and such members of the assembly, not exceeding nine in number, as shall be appointed managers of an impeachment, shall receive an additional per diem allowance, to be fixed by law. Any member, while serving as an officer of his or her house or in any other special capacity therein or directly connected therewith not hereinbefore in this section specified, may also be paid and receive, in addition, any allowance which may be fixed by law for the particular and additional services appertaining to or entailed by such office or special capacity. Neither the salary of any member nor any other allowance so fixed may be increased or diminished during, and with respect to, the term for which he or she shall have been elected, nor shall he or she be paid or receive any other extra compensation. The provisions of this section and laws enacted in compliance therewith shall govern and be exclusively controlling, according to their terms. Members shall continue to receive such salary and additional allowance as heretofore fixed and provided in this section, until changed by law pursuant to this section. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 4, 1947; November 3, 1964; November 6, 2001.)

**[Qualifications of members; prohibitions on certain civil appointments; acceptance to vacate seat]**
§7. No person shall serve as a member of the legislature unless he or she is a citizen of the United States and has been a resident of the state of New

York for five years, and, except as hereinafter otherwise prescribed, of the assembly or senate district for the twelve months immediately preceding his or her election; if elected a senator or member of assembly at the first election next ensuing after a readjustment or alteration of the senate or assembly districts becomes effective, a person, to be eligible to serve as such, must have been a resident of the county in which the senate or assembly district is contained for the twelve months immediately preceding his or her election. No member of the legislature shall, during the time for which he or she was elected, receive any civil appointment from the governor, the governor and the senate, the legislature or from any city government, to an office which shall have been created, or the emoluments whereof shall have been increased during such time. If a member of the legislature be elected to congress, or appointed to any office, civil or military, under the government of the United States, the state of New York, or under any city government except as a member of the national guard or naval militia of the state, or of the reserve forces of the United States, his or her acceptance thereof shall vacate his or her seat in the legislature, providing, however, that a member of the legislature may be appointed commissioner of deeds or to any office in which he or she shall receive no compensation. (New. Derived in part from former §§7 and 8. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 2, 1943.)

**[Time of elections of members]**
§8. The elections of senators and members of assembly, pursuant to the provisions of this constitution, shall be held on the Tuesday succeeding the first Monday of November, unless otherwise directed by the legislature. (Formerly §9. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Powers of each house]**
§9. A majority of each house shall constitute a quorum to do business. Each house shall determine the rules of its own proceedings, and be the judge of the elections, returns and qualifications of its own members; shall choose its own officers; and the senate shall choose a temporary president and the assembly shall choose a speaker. (Formerly §10. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Amended by vote of the people November 5, 1963.)

**[Journals; open sessions; adjournments]**
§10. Each house of the legislature shall keep a journal of its proceedings, and publish the same, except such parts as may require secrecy. The doors of each house shall be kept open, except when the public welfare shall require secrecy. Neither house shall, without the consent of the other, adjourn for more than two days. (Formerly §11. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Members not to be questioned for speeches]**
§11. For any speech or debate in either house of the legislature, the members shall not be questioned in any other place. (Formerly §12. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Bills may originate in either house; may be amended by the other]**
§12. Any bill may originate in either house of the legislature, and all bills passed by one house may be amended by the other. (Formerly §13. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Enacting clause of bills; no law to be enacted except by bill]**
§13. The enacting clause of all bills shall be "The People of the State of New York, represented in Senate and Assembly, do enact as follows," and no law shall be enacted except by bill. (Formerly §14. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Manner of passing bills; message of necessity for immediate vote]**

§14.  No bill shall be passed or become a law unless it shall have been printed and upon the desks of the members, in its final form, at least three calendar legislative days prior to its final passage, unless the governor, or the acting governor, shall have certified, under his or her hand and the seal of the state, the facts which in his or her opinion necessitate an immediate vote thereon, in which case it must nevertheless be upon the desks of the members in final form, not necessarily printed, before its final passage; nor shall any bill be passed or become a law, except by the assent of a majority of the members elected to each branch of the legislature; and upon the last reading of a bill, no amendment thereof shall be allowed, and the question upon its final passage shall be taken immediately thereafter, and the ayes and nays entered on the journal.

For purposes of this section, a bill shall be deemed to be printed and upon the desks of the members if: it is set forth in a legible electronic format by electronic means, and it is available for review in such format at the desks of the members. For purposes of this section "electronic means" means any method of transmission of information between computers or other machines designed for the purpose of sending and receiving such transmissions and which: allows the recipient to reproduce the information transmitted in a tangible medium of expression; and does not permit additions, deletions or other changes to be made without leaving an adequate record thereof. (Formerly §15. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people: November 6, 2001; November 4, 2014.)

**[Private or local bills to embrace only one subject, expressed in title]**

§15.  No private or local bill, which may be passed by the legislature, shall embrace more than one subject, and that shall be expressed in the title. (Formerly §16. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Existing law not to be made applicable by reference]**

§16.  No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or part thereof, shall be applicable, except by inserting it in such act. (Formerly §17. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Cases in which private or local bills shall not be passed]**

§17.  The legislature shall not pass a private or local bill in any of the following cases:

Changing the names of persons.

Laying out, opening, altering, working or discontinuing roads, highways or alleys, or for draining swamps or other low lands. Locating or changing county seats.

Providing for changes of venue in civil or criminal cases.

Incorporating villages.

Providing for election of members of boards of supervisors.

Selecting, drawing, summoning or empaneling grand or petit jurors.

Regulating the rate of interest on money.

The opening and conducting of elections or designating places of voting.

Creating, increasing or decreasing fees, percentages or allowances of public officers, during the term for which said officers are elected or appointed.

Granting to any corporation, association or individual the right to lay down railroad tracks.

Granting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever.

Granting to any person, association, firm or corporation, an exemption from taxation on real or personal property.

Providing for the building of bridges, except over the waters forming a part of the boundaries of the state, by other than a municipal or other public corporation or a public agency of the state. (Formerly §18. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1964.)

**[Extraordinary sessions of the legislature; power to convene on legislative initiative]**

§18.  The members of the legislature shall be empowered, upon the presentation to the temporary president of the senate and the speaker of the assembly of a petition signed by two-thirds of the members elected to each house of the legislature, to convene the legislature on extraordinary occasions to act upon the subjects enumerated in such petition. (New. Added by vote of the people November 4, 1975.)

**[Private claims not to be audited by legislature; claims barred by lapse of time]**

§19.  The legislature shall neither audit nor allow any private claim or account against the state, but may appropriate money to pay such claims as shall have been audited and allowed according to law.

No claim against the state shall be audited, allowed or paid which, as between citizens of the state, would be barred by lapse of time. But if the claimant shall be under legal disability, the claim may be presented within two years after such disability is removed. (Derived in part from former §6 of Art. 7. Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1964.)

**[Two-thirds bills]**

§20.  The assent of two-thirds of the members elected to each branch of the legislature shall be requisite to every bill appropriating the public moneys or property for local or private purposes.

**[Certain sections not to apply to bills recommended by certain commissioners or public agencies]**

§21.  Sections 15, 16 and 17 of this article shall not apply to any bill, or the amendments to any bill, which shall be recommended to the legislature by commissioners or any public agency appointed or directed pursuant to law to prepare revisions, consolidations or compilations of statutes. But a bill amending an existing law shall not be excepted from the provisions of sections 15, 16 and 17 of this article unless such amending bill shall itself be recommended to the legislature by such commissioners or public agency. (Formerly §23. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Tax laws to state tax and object distinctly; definition of income for income tax purposes by reference to federal laws authorized]**

§22.  Every law which imposes, continues or revives a tax shall distinctly state the tax and the object to which it is to be applied, and it shall not be sufficient to refer to any other law to fix such tax or object.

Notwithstanding the foregoing or any other provision of this constitution, the legislature, in any law imposing a tax or taxes on, in respect to or measured by income, may define the income on, in respect to or by which such tax or taxes are imposed or measured, by reference to any provision of the laws of the United States as the same may be or become effective at any time or from time to time, and may prescribe exceptions or modifications to any such provision. (Formerly §24. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 3, 1959.)

**[When yeas and nays necessary; three-fifths to constitute quorum]**

§23.  On the final passage, in either house of the legislature, of any act which imposes, continues or revives a tax, or creates a debt or charge, or makes, continues or revives any appropriation of public or trust money or property, or releases, discharges or commutes any claim or demand of the state, the question shall be taken by yeas and nays, which shall be duly entered upon the journals, and three-fifths of all the members elected to either house shall, in all such cases, be necessary to constitute a quorum therein. (Formerly §25. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Prison labor; contract system abolished]**

§24.  The legislature shall, by law, provide for the occupation and employment of prisoners sentenced to the several state prisons,

11

penitentiaries, jails and reformatories in the state; and no person in any such prison, penitentiary, jail or reformatory, shall be required or allowed to work, while under sentence thereto, at any trade, industry or occupation, wherein or whereby his or her work, or the product or profit of his or her work, shall be farmed out, contracted, given or sold to any person, firm, association or corporation, provided that the legislature may provide by law that such prisoners may voluntarily perform work for nonprofit organizations. As used in this section, the term "nonprofit organization" means an organization operated exclusively for religious, charitable, or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual. This section shall not be construed to prevent the legislature from providing that convicts may work for, and that the products of their labor may be disposed of to, the state or any political division thereof, or for or to any public institution owned or managed and controlled by the state, or any political division thereof. (Formerly §29. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 2001; November 3, 2009.)

**[Emergency governmental operations; legislature to provide for]**
§25. Notwithstanding any other provision of this constitution, the legislature, in order to insure continuity of state and local governmental operations in periods of emergency caused by enemy attack or by disasters (natural or otherwise), shall have the power and the immediate duty (1) to provide for prompt and temporary succession to the powers and duties of public offices, of whatever nature and whether filled by election or appointment, the incumbents of which may become unavailable for carrying on the powers and duties of such offices, and (2) to adopt such other measures as may be necessary and proper for insuring the continuity of governmental operations.

Nothing in this article shall be construed to limit in any way the power of the state to deal with emergencies arising from any cause. (New. Added by vote of the people November 5, 1963.)


**ARTICLE IV**
EXECUTIVE

**[Executive power; election and terms of governor and lieutenant-governor]**
Section 1. The executive power shall be vested in the governor, who shall hold office for four years; the lieutenant-governor shall be chosen at the same time, and for the same term. The governor and lieutenant-governor shall be chosen at the general election held in the year nineteen hundred thirty-eight, and each fourth year thereafter. They shall be chosen jointly, by the casting by each voter of a single vote applicable to both offices, and the legislature by law shall provide for making such choice in such manner. The respective persons having the highest number of votes cast jointly for them for governor and lieutenant-governor respectively shall be elected. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1953; November 6, 2001.)

**[Qualifications of governor and lieutenant-governor]**
§2. No person shall be eligible to the office of governor or lieutenant-governor, except a citizen of the United States, of the age of not less than thirty years, and who shall have been five years next preceding the election a resident of this state. (Amended by vote of the people November 6, 2001.)

**[Powers and duties of governor; compensation]**
§3. The governor shall be commander-in-chief of the military and naval forces of the state. The governor shall have power to convene the legislature, or the senate only, on extraordinary occasions. At extraordinary sessions convened pursuant to the provisions of this section no subject shall be acted upon, except such as the governor may recommend for consideration. The governor shall communicate by message to the legislature at every session the condition of the state, and recommend such matters to it as he or she shall judge expedient. The governor shall expedite all such measures as may be resolved

upon by the legislature, and shall take care that the laws be faithfully executed. The governor shall receive for his or her services an annual salary to be fixed by joint resolution of the senate and assembly, and there shall be provided for his or her use a suitable and furnished executive residence. (Formerly §4. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1953; November 5, 1963; November 6, 2001.)

**[Reprieves, commutations and pardons; powers and duties of governor relating to grants of]**
§4. The governor shall have the power to grant reprieves, commutations and pardons after conviction, for all offenses except treason and cases of impeachment, upon such conditions and with such restrictions and limitations, as he or she may think proper, subject to such regulations as may be provided by law relative to the manner of applying for pardons. Upon conviction for treason, the governor shall have power to suspend the execution of the sentence, until the case shall be reported to the legislature at its next meeting, when the legislature shall either pardon, or commute the sentence, direct the execution of the sentence, or grant a further reprieve. The governor shall annually communicate to the legislature each case of reprieve, commutation or pardon granted, stating the name of the convict, the crime of which the convict was convicted, the sentence and its date, and the date of the commutation, pardon or reprieve. (Formerly §5. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 2001.)

**[When lieutenant-governor to act as governor]**
§5. In case of the removal of the governor from office or of his or her death or resignation, the lieutenant-governor shall become governor for the remainder of the term.

In case the governor-elect shall decline to serve or shall die, the lieutenant-governor-elect shall become governor for the full term.

In case the governor is impeached, is absent from the state or is otherwise unable to discharge the powers and duties of the office of governor, the lieutenant-governor shall act as governor until the inability shall cease or until the term of the governor shall expire.

In case of the failure of the governor-elect to take the oath of office at the commencement of his or her term, the lieutenant-governor-elect shall act as governor until the governor shall take the oath. (Formerly §6. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 8, 1949; November 5, 1963; November 6, 2001.)

**[Duties and compensation of lieutenant-governor; succession to the governorship]**
§6. The lieutenant-governor shall possess the same qualifications of eligibility for office as the governor. The lieutenant-governor shall be the president of the senate but shall have only a casting vote therein.
The lieutenant-governor shall receive for his or her services an annual salary to be fixed by joint resolution of the senate and assembly.

In case of vacancy in the offices of both governor and lieutenant-governor, a governor and lieutenant-governor shall be elected for the remainder of the term at the next general election happening not less than three months after both offices shall have become vacant. No election of a lieutenant-governor shall be had in any event except at the time of electing a governor.

In case of vacancy in the offices of both governor and lieutenant-governor or if both of them shall be impeached, absent from the state or otherwise unable to discharge the powers and duties of the office of governor, the temporary president of the senate shall act as governor until the inability shall cease or until a governor shall be elected.

In case of vacancy in the office of lieutenant-governor alone, or if the lieutenant-governor shall be impeached, absent from the state or otherwise unable to discharge the duties of office, the temporary president of the senate shall perform all the duties of lieutenant-governor during such vacancy or inability.

12

If, when the duty of acting as governor devolves upon the temporary president of the senate, there be a vacancy in such office or the temporary president of the senate shall be absent from the state or otherwise unable to discharge the duties of governor, the speaker of the assembly shall act as governor during such vacancy or inability.

The legislature may provide for the devolution of the duty of acting as governor in any case not provided for in this article. (Formerly §§7 and 8. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 1945; November 3, 1953; November 5, 1963; November 6, 2001.)

**[Action by governor on legislative bills; reconsideration after veto]**
§7. Every bill which shall have passed the senate and assembly shall, before it becomes a law, be presented to the governor; if the governor approve, he or she shall sign it; but if not, he or she shall return it with his or her objections to the house in which it shall have originated, which shall enter the objections at large on the journal, and proceed to reconsider it. If after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill, it shall be sent together with the objections, to the other house, by which it shall likewise be reconsidered; and if approved by two-thirds of the members elected to that house, it shall become a law notwithstanding the objections of the governor. In all such cases the votes in both houses shall be determined by yeas and nays, and the names of the members voting shall be entered by yeas and nays, and the names of the members voting shall be entered on the journal of each house respectively. If any bill shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him or her, the same shall be a law in like manner as if he or she had signed it, unless the legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the governor. No bill shall become a law after the final adjournment of the legislature, unless approved by the governor within thirty days after such adjournment. If any bill presented to the governor contain several items of appropriation of money, the governor may object to one or more of such items while approving of the other portion of the bill. In such case the governor shall append to the bill, at the time of signing it, a statement of the items to which he or she objects; and the appropriation so objected to shall not take effect. If the legislature be in session, he or she shall transmit to the house in which the bill originated a copy of such statement, and the items objected to shall be separately reconsidered. If on reconsideration one or more of such items be approved by two-thirds of the members elected to each house, the same shall be part of the law, notwithstanding the objections of the governor. All the provisions of this section, in relation to bills not approved by the governor, shall apply in cases in which he or she shall withhold approval from any item or items contained in a bill appropriating money. (Formerly §9. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 2001.)

**[Departmental rules and regulations; filing; publication]**
§8.  No rule or regulation made by any state department, board, bureau, officer, authority or commission, except such as relates to the organization or internal management of a state department, board, bureau, authority or commission shall be effective until it is filed in the office of the department of state. The legislature shall provide for the speedy publication of such rules and regulations, by appropriate laws. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**ARTICLE V**
OFFICERS AND CIVIL DEPARTMENTS

**[Comptroller and attorney-general; payment of state moneys without audit void]**
Section 1.  The comptroller and attorney-general shall be chosen at the same general election as the governor and hold office for the same term, and shall possess the qualifications provided in section 2 of article IV. The legislature shall provide for filling vacancies in the office of comptroller and of

attorney-general. No election of a comptroller or an attorney-general shall be had except at the time of electing a governor. The comptroller shall be required: (1) To audit all vouchers before payment and all official accounts; (2) to audit the accrual and collection of all revenues and receipts; and (3) to prescribe such methods of accounting as are necessary for the performance of the foregoing duties. The payment of any money of the state, or of any money under its control, or the refund of any money paid to the state, except upon audit by the comptroller, shall be void, and may be restrained upon the suit of any taxpayer with the consent of the supreme court in appellate division on notice to the attorney-general. In such respect the legislature shall define the powers and duties and may also assign to him or her: (1) supervision of the accounts of any political subdivision of the state; and (2) powers and duties pertaining to or connected with the assessment and taxation of real estate, including determination of ratios which the assessed valuation of taxable real property bears to the full valuation thereof, but not including any of those powers and duties reserved to officers of a county, city, town or village by virtue of sections seven and eight of article nine of this constitution. The legislature shall assign to him or her no administrative duties, excepting such as may be incidental to the performance of these functions, any other provision of this constitution to the contrary notwithstanding. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1953; November 8, 1955; November 6, 2001.)

**[Civil departments in the state government]**
§2.  There shall be not more than twenty civil departments in the state government, including those referred to in this constitution. The legislature may by law change the names of the departments referred to in this constitution. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 2, 1943; November 3, 1959; November 7, 1961.)

**[Assignment of functions]**
§3.  Subject to the limitations contained in this constitution, the legislature may from time to time assign by law new powers and functions to departments, officers, boards, commissions or executive offices of the governor, and increase, modify or diminish their powers and functions. Nothing contained in this article shall prevent the legislature from creating temporary commissions for special purposes or executive offices of the governor and from reducing the number of departments as provided for in this article, by consolidation or otherwise. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 7, 1961.)

**[Department heads]**
§4.  The head of the department of audit and control shall be the comptroller and of the department of law, the attorney-general. The head of the department of education shall be The Regents of the University of the State of New York, who shall appoint and at pleasure remove a commissioner of education to be the chief administrative officer of the department. The head of the department of agriculture and markets shall be appointed in a manner to be prescribed by law. Except as otherwise provided in this constitution, the heads of all other departments and the members of all boards and commissions, excepting temporary commissions for special purposes, shall be appointed by the governor by and with the advice and consent of the senate and may be removed by the governor, in a manner to be prescribed by law. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 7, 1961.)

**[Section 5, which abolished certain offices, was repealed by amendment approved by vote of the people November 6, 1962.]**

**[Civil service appointments and promotions; veterans' credits]**
§6.  Appointments and promotions in the civil service of the state and all of the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive; provided,

13

however, that any member of the armed forces of the United States who served therein in time of war, and who, at the time of such member's appointment or promotion, is a citizen or an alien lawfully admitted for permanent residence in the United States and a resident of this state and is honorably discharged or released under honorable circumstances from such service, shall be entitled to receive five points additional credit in a competitive examination for original appointment and two and one-half points additional credit in an examination for promotion or, if such member was disabled in the actual performance of duty in any war and his or her disability is certified by the United States department of veterans affairs to be in existence at the time of application for appointment or promotion, he or she shall be entitled to receive ten points additional credit in a competitive examination for original appointment and five points additional credit in an examination for promotion. Such additional credit shall be added to the final earned rating of such member after he or she has qualified in an examination and shall be granted only at the time of establishment of an eligible list. No such member shall receive the additional credit granted by this section after he or she has received one appointment, either original entrance or promotion, from an eligible list on which he or she was allowed the additional credit granted by this section, except where a member has been appointed or promoted from an eligible list on which he or she was allowed additional credit for military service and subsequent to such appointment he or she is disabled as provided in this section, such member shall be entitled to ten points additional credit less the number of points of additional credit allowed for the prior appointment. (Formerly §6. Repealed and new section approved by vote of the people November 8, 1949; further amended by vote of the people November 3, 1964; November 3, 1987; November 4, 1997; November 6, 2001; November 4, 2008; November 5, 2013.)

**[Membership in retirement systems; benefits not to be diminished nor impaired]**
§7. After July first, nineteen hundred forty, membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

## ARTICLE VI[7]
### JUDICIARY

**[Unified court system; organization; process]**
Section 1. a. There shall be a unified court system for the state. The state-wide courts shall consist of the court of appeals, the supreme court including the appellate divisions thereof, the court of claims, the county court, the surrogate's court and the family court, as hereinafter provided. The legislature shall establish in and for the city of New York, as part of the unified court system for the state, a single, city-wide court of civil jurisdiction and a single, city-wide court of criminal jurisdiction, as hereinafter provided, and may upon the request of the mayor and the local legislative body of the city of New York, merge the two courts into one city-wide court of both civil and criminal jurisdiction. The unified court system for the state shall also include the district, town, city and village courts outside the city of New York, as hereinafter provided.

b. The court of appeals, the supreme court including the appellate divisions thereof, the court of claims, the county court, the surrogate's court, the family court, the courts or court of civil and criminal jurisdiction of the city of New York, and such other courts as the legislature may determine shall be courts of record.

c. All processes, warrants and other mandates of the court of appeals, the supreme court including the appellate divisions thereof, the court of claims, the county court, the surrogate's court and the family court may be served and executed in any part of the state. All processes, warrants and other mandates of the courts or court of civil and criminal jurisdiction of the city of New York may, subject to such limitation as may be prescribed by the

legislature, be served and executed in any part of the state. The legislature may provide that processes, warrants and other mandates of the district court may be served and executed in any part of the state and that processes, warrants and other mandates of town, village and city courts outside the city of New York may be served and executed in any part of the county in which such courts are located or in any part of any adjoining county.

**[Court of appeals; organization; designations; vacancies, how filled; commission on judicial nomination]**
§2. a. The court of appeals is continued. It shall consist of the chief judge and the six elected associate judges now in office, who shall hold their offices until the expiration of their respective terms, and their successors, and such justices of the supreme court as may be designated for service in said court as hereinafter provided. The official terms of the chief judge and the six associate judges shall be fourteen years.

Five members of the court shall constitute a quorum, and the concurrence of four shall be necessary to a decision; but no more than seven judges shall sit in any case. In case of the temporary absence or inability to act of any judge of the court of appeals, the court may designate any justice of the supreme court to serve as associate judge of the court during such absence or inability to act. The court shall have power to appoint and to remove its clerk. The powers and jurisdiction of the court shall not be suspended for want of appointment when the number of judges is sufficient to constitute a quorum.

b. Whenever and as often as the court of appeals shall certify to the governor that the court is unable, by reason of the accumulation of causes pending therein, to hear and dispose of the same with reasonable speed, the governor shall designate such number of justices of the supreme court as may be so certified to be necessary, but not more than four, to serve as associate judges of the court of appeals. The justices so designated shall be relieved, while so serving, from their duties as justices of the supreme court, and shall serve as associate judges of the court of appeals until the court shall certify that the need for the services of any such justices no longer exists, whereupon they shall return to the supreme court. The governor may fill vacancies among such designated judges. No such justices shall serve as associate judge of the court of appeals except while holding the office of justice of the supreme court. The designation of a justice of the supreme court as an associate judge of the court of appeals shall not be deemed to affect his or her existing office any longer than until the expiration of his or her designation as such associate judge, nor to create a vacancy.

c. There shall be a commission on judicial nomination to evaluate the qualifications of candidates for appointment to the court of appeals and to prepare a written report and recommend to the governor those persons who by their character, temperament, professional aptitude and experience are well qualified to hold such judicial office. The legislature shall provide by law for the organization and procedure of the judicial nominating commission.

d. (l) The commission on judicial nomination shall consist of twelve members of whom four shall be appointed by the governor, four by the chief judge of the court of appeals, and one each by the speaker of the assembly, the temporary president of the senate, the minority leader of the senate, and the minority leader of the assembly. Of the four members appointed by the governor, no more than two shall be enrolled in the same political party, two shall be members of the bar of the state, and two shall not be members of the bar of the state. Of the four members appointed by the chief judge of the court of appeals, no more than two shall be enrolled in the same political party, two shall be members of the bar of the state, and two shall not be members of the bar of the state. No member of the commission shall hold or have held any judicial office or hold any elected public office for which he or she receives compensation during his or her period of service, except that the governor and the chief judge may each appoint no more than one former judge or justice of the unified court system to such commission. No member of the commission shall hold any office in any political party. No member of the judicial nominating commission shall be eligible for appointment to judicial office in any court of the state during the member's period of service or within one year thereafter.

(2) The members first appointed by the governor shall have respectively one, two, three and four year terms as the governor shall designate. The

---

[7] New article, adopted by vote of the people November 7, 1961; repealed and replaced former article adopted November 3, 1925, as amended.

14

members first appointed by the chief judge of the court of appeals shall have respectively one, two, three and four year terms as the chief judge shall designate. The member first appointed by the temporary president of the senate shall have a one-year term. The member first appointed by the minority leader of the senate shall have a two-year term. The member first appointed by the speaker of the assembly shall have a four-year term. The member first appointed by the minority leader of the assembly shall have a three-year term. Each subsequent appointment shall be for a term of four years.

(3) The commission shall designate one of their number to serve as chairperson.

(4) The commission shall consider the qualifications of candidates for appointment to the offices of judge and chief judge of the court of appeals and, whenever a vacancy in those offices occurs, shall prepare a written report and recommend to the governor persons who are well qualified for those judicial offices.

e.  The governor shall appoint, with the advice and consent of the senate, from among those recommended by the judicial nominating commission, a person to fill the office of chief judge or associate judge, as the case may be, whenever a vacancy occurs in the court of appeals; provided, however, that no person may be appointed a judge of the court of appeals unless such person is a resident of the state and has been admitted to the practice of law in this state for at least ten years. The governor shall transmit to the senate the written report of the commission on judicial nomination relating to the nominee.

f.  When a vacancy occurs in the office of chief judge or associate judge of the court of appeals and the senate is not in session to give its advice and consent to an appointment to fill the vacancy, the governor shall fill the vacancy by interim appointment upon the recommendation of a commission on judicial nomination as provided in this section. An interim appointment shall continue until the senate shall pass upon the governor's selection. If the senate confirms an appointment, the judge shall serve a term as provided in subdivision a of this section commencing from the date of his or her interim appointment. If the senate rejects an appointment, a vacancy in the office shall occur sixty days after such rejection. If an interim appointment to the court of appeals be made from among the justices of the supreme court or the appellate divisions thereof, that appointment shall not affect the justice's existing office, nor create a vacancy in the supreme court, or the appellate division thereof, unless such appointment is confirmed by the senate and the appointee shall assume such office. If an interim appointment of chief judge of the court of appeals be made from among the associate judges, an interim appointment of associate judge shall be made in like manner; in such case, the appointment as chief judge shall not affect the existing office of associate judge, unless such appointment as chief judge is confirmed by the senate and the appointee shall assume such office.

g.  The provisions of subdivisions c, d, e and f of this section shall not apply to temporary designations or assignments of judges or justices. (Subdivision a amended, subdivision c repealed and new subdivisions c through g added by vote of the people November 8, 1977; further amended by vote of the people November 6, 2001.)

**[Court of appeals; jurisdiction]**
§3.  a.  The jurisdiction of the court of appeals shall be limited to the review of questions of law except where the judgment is of death, or where the appellate division, on reversing or modifying a final or interlocutory judgment in an action or a final or interlocutory order in a special proceeding, finds new facts and a final judgment or a final order pursuant thereto is entered; but the right to appeal shall not depend upon the amount involved.

b.  Appeals to the court of appeals may be taken in the classes of cases hereafter enumerated in this section;

In criminal cases, directly from a court of original jurisdiction where the judgment is of death, and in other criminal cases from an appellate division or otherwise as the legislature may from time to time provide.

In civil cases and proceedings as follows:

(1) As of right, from a judgment or order entered upon the decision of an appellate division of the supreme court which finally determines an action or special proceeding wherein is directly involved the construction of the constitution of the state or of the United States, or where one or more of the justices of the appellate division dissents from the decision of the court, or where the judgment or order is one of reversal or modification.

(2) As of right, from a judgment or order of a court of record of original jurisdiction which finally determines an action or special proceeding where the only question involved on the appeal is the validity of a statutory provision of the state or of the United States under the constitution of the state or of the United States; and on any such appeal only the constitutional question shall be considered and determined by the court.

(3) As of right, from an order of the appellate division granting a new trial in an action or a new hearing in a special proceeding where the appellant stipulates that, upon affirmance, judgment absolute or final order shall be rendered against him or her.

(4) From a determination of the appellate division of the supreme court in any department, other than a judgment or order which finally determines an action or special proceeding, where the appellate division allows the same and certifies that one or more questions of law have arisen which, in its opinion, ought to be reviewed by the court of appeals, but in such case the appeal shall bring up for review only the question or questions so certified; and the court of appeals shall certify to the appellate division its determination upon such question or questions.

(5) From an order of the appellate division of the supreme court in any department, in a proceeding instituted by or against one or more public officers or a board, commission or other body of public officers or a court or tribunal, other than an order which finally determines such proceeding, where the court of appeals shall allow the same upon the ground that, in its opinion, a question of law is involved which ought to be reviewed by it, and without regard to the availability of appeal by stipulation for final order absolute.

(6) From a judgment or order entered upon the decision of an appellate division of the supreme court which finally determines an action or special proceeding but which is not appealable under paragraph (1) of this subdivision where the appellate division or the court of appeals shall certify that in its opinion a question of law is involved which ought to be reviewed by the court of appeals. Such an appeal may be allowed upon application (a) to the appellate division, and in case of refusal, to the court of appeals, or (b) directly to the court of appeals. Such an appeal shall be allowed when required in the interest of substantial justice.

(7) No appeal shall be taken to the court of appeals from a judgment or order entered upon the decision of an appellate division of the supreme court in any civil case or proceeding where the appeal to the appellate division was from a judgment or order entered in an appeal from another court, including an appellate or special term of the supreme court, unless the construction of the constitution of the state or of the United States is directly involved therein, or unless the appellate division of the supreme court shall certify that in its opinion a question of law is involved which ought to be reviewed by the court of appeals.

(8) The legislature may abolish an appeal to the court of appeals as of right in any or all of the cases or classes of cases specified in paragraph (1) of this subdivision wherein no question involving the construction of the constitution of the state or of the United States is directly involved, provided, however, that appeals in any such case or class of cases shall thereupon be governed by paragraph (6) of this subdivision.

(9) The court of appeals shall adopt and from time to time may amend a rule to permit the court to answer questions of New York law certified to it by the Supreme Court of the United States, a court of appeals of the United States or an appellate court of last resort of another state, which may be determinative of the cause then pending in the certifying court and which in the opinion of the certifying court are not controlled by precedent in the decisions of the courts of New York. (Paragraph (9) added by vote of the people November 5, 1985; further amended by vote of the people November 6, 2001.)

**[Judicial departments; appellate divisions, how constituted; governor to designate justices; temporary assignments; jurisdiction]**
§4.  a.  The state shall be divided into four judicial departments. The first department shall consist of the counties within the first judicial district of the state. The second department shall consist of the counties within the second, ninth, tenth and eleventh judicial districts of the state. The third

## The Constitution of the State of New York

department shall consist of the counties within the third, fourth and sixth judicial districts of the state. The fourth department shall consist of the counties within the fifth, seventh and eighth judicial districts of the state. Each department shall be bounded by the lines of judicial districts. Once every ten years the legislature may alter the boundaries of the judicial departments, but without changing the number thereof.

b. The appellate divisions of the supreme court are continued, and shall consist of seven justices of the supreme court in each of the first and second departments, and five justices in each of the other departments. In each appellate division, four justices shall constitute a quorum, and the concurrence of three shall be necessary to a decision. No more than five justices shall sit in any case.

c. The governor shall designate the presiding justice of each appellate division, who shall act as such during his or her term of office and shall be a resident of the department. The other justices of the appellate divisions shall be designated by the governor, from all the justices elected to the supreme court, for terms of five years or the unexpired portions of their respective terms of office, if less than five years.

d. The justices heretofore designated shall continue to sit in the appellate divisions until the terms of their respective designations shall expire. From time to time as the terms of the designations expire, or vacancies occur, the governor shall make new designations. The governor may also, on request of any appellate division, make temporary designations in case of the absence or inability to act of any justice in such appellate division, for service only during such absence or inability to act.

e. In case any appellate division shall certify to the governor that one or more additional justices are needed for the speedy disposition of the business before it, the governor may designate an additional justice or additional justices; but when the need for such additional justice or justices shall no longer exist, the appellate division shall so certify to the governor, and thereupon service under such designation or designations shall cease.

f. A majority of the justices designated to sit in any appellate division shall at all times be residents of the department.

g. Whenever the appellate division in any department shall be unable to dispose of its business within a reasonable time, a majority of the presiding justices of the several departments, at a meeting called by the presiding justice of the department in arrears, may transfer any pending appeals from such department to any other department for hearing and determination.

h. A justice of the appellate division of the supreme court in any department may be temporarily designated by the presiding justice of his or her department to the appellate division in another judicial department upon agreement by the presiding justices of the appellate division of the departments concerned.

i. In the event that the disqualification, absence or inability to act of justices in any appellate division prevents there being a quorum of justices qualified to hear an appeal, the justices qualified to hear the appeal may transfer it to the appellate division in another department for hearing and determination. In the event that the justices in any appellate division qualified to hear an appeal are equally divided, said justices may transfer the appeal to the appellate division in another department for hearing and determination. Each appellate division shall have power to appoint and remove its clerk.

j. No justice of the appellate division shall, within the department to which he or she may be designated to perform the duties of an appellate justice, exercise any of the powers of a justice of the supreme court, other than those of a justice out of court, and those pertaining to the appellate division, except that the justice may decide causes or proceedings theretofore submitted, or hear and decide motions submitted by consent of counsel, but any such justice, when not actually engaged in performing the duties of such appellate justice in the department to which he or she is designated, may hold any term of the supreme court and exercise any of the powers of a justice of the supreme court in any judicial district in any other department of the state.

k. The appellate divisions of the supreme court shall have all the jurisdiction possessed by them on the effective date of this article and such additional jurisdiction as may be prescribed by law, provided, however, that the right to appeal to the appellate divisions from a judgment or order

which does not finally determine an action or special proceeding may be limited or conditioned by law. (Subdivision e amended by vote of the people November 8, 1977; further amended by vote of the people November 6, 2001.)

**[Appeals from judgment or order; new trial]**
§5. a. Upon an appeal from a judgment or an order, any appellate court to which the appeal is taken which is authorized to review such judgment or order may reverse or affirm, wholly or in part, or may modify the judgment or order appealed from, and each interlocutory judgment or intermediate or other order which it is authorized to review, and as to any or all of the parties. It shall thereupon render judgment of affirmance, judgment of reversal and final judgment upon the right of any or all of the parties, or judgment of modification thereon according to law, except where it may be necessary or proper to grant a new trial or hearing, when it may grant a new trial or hearing.

b. If any appeal is taken to an appellate court which is not authorized to review such judgment or order, the court shall transfer the appeal to an appellate court which is authorized to review such judgment or order.

**[Judicial districts; how constituted; supreme court][8]**
§6. a. The state shall be divided into eleven judicial districts. The first judicial district shall consist of the counties of Bronx and New York. The second judicial district shall consist of the counties of Kings and Richmond. The third judicial district shall consist of the counties of Albany, Columbia, Greene, Rensselaer, Schoharie, Sullivan, and Ulster. The fourth judicial district shall consist of the counties of Clinton, Essex, Franklin, Fulton, Hamilton, Montgomery, St. Lawrence, Saratoga, Schenectady, Warren and Washington. The fifth judicial district shall consist of the counties of Herkimer, Jefferson, Lewis, Oneida, Onondaga, and Oswego. The sixth judicial district shall consist of the counties of Broome, Chemung, Chenango, Cortland, Delaware, Madison, Otsego, Schuyler, Tioga and Tompkins. The seventh judicial district shall consist of the counties of Cayuga, Livingston, Monroe, Ontario, Seneca, Steuben, Wayne and Yates. The eighth judicial district shall consist of the counties of Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans and Wyoming. The ninth judicial district shall consist of the counties of Dutchess, Orange, Putnam, Rockland and Westchester. The tenth judicial district shall consist of the counties of Nassau and Suffolk. The eleventh judicial district shall consist of the county of Queens.

b. Once every ten years the legislature may increase or decrease the number of judicial districts or alter the composition of judicial districts and thereupon re-apportion the justices to be thereafter elected in the judicial districts so altered. Each judicial district shall be bounded by county lines.

c. The justices of the supreme court shall be chosen by the electors of the judicial district in which they are to serve. The terms of justices of the supreme court shall be fourteen years from and including the first day of January next after their election.

d. The supreme court is continued. It shall consist of the number of justices of the supreme court including the justices designated to the appellate divisions of the supreme court, judges of the county court of the counties of Bronx, Kings, Queens and Richmond and judges of the court of general sessions of the county of New York authorized by law on the thirty-first day of August next after the approval and ratification of this amendment by the people, all of whom shall be justices of the supreme court for the remainder of their terms. The legislature may increase the number of justices of the supreme court in any judicial district, except that the number in any district shall not be increased to exceed one justice for fifty thousand, or fraction over thirty thousand, of the population thereof as shown by the last federal census or state enumeration. The legislature may decrease the number of justices of the supreme court in any judicial district, except that the number in any district shall not be less than the number of justices of the supreme court authorized by law on the effective date of this article.

e. The clerks of the several counties shall be clerks of the supreme court, with such powers and duties as shall be prescribed by law.

---

[8] Judiciary Law §140 currently sets forth 13 judicial districts.

**The Constitution of the State of New York**

**[Supreme court; jurisdiction]**

§7. a. The supreme court shall have general original jurisdiction in law and equity and the appellate jurisdiction herein provided. In the city of New York, it shall have exclusive jurisdiction over crimes prosecuted by indictment, provided, however, that the legislature may grant to the city-wide court of criminal jurisdiction of the city of New York jurisdiction over misdemeanors prosecuted by indictment and to the family court in the city of New York jurisdiction over crimes and offenses by or against minors or between spouses or between parent and child or between members of the same family or household.

b. If the legislature shall create new classes of actions and proceedings, the supreme court shall have jurisdiction over such classes of actions and proceedings, but the legislature may provide that another court or other courts shall also have jurisdiction and that actions and proceedings of such classes may be originated in such other court or courts. (Subdivision b repealed and subdivision c relettered b by vote of the people November 8, 1977.)

**[Appellate terms; composition; jurisdiction]**

§8. a. The appellate division of the supreme court in each judicial department may establish an appellate term in and for such department or in and for a judicial district or districts or in and for a county or counties within such department. Such an appellate term shall be composed of not less than three nor more than five justices of the supreme court who shall be designated from time to time by the chief administrator of the courts with the approval of the presiding justice of the appropriate appellate division, and who shall be residents of the department or of the judicial district or districts as the case may be and the chief administrator of the courts shall designate the place or places where such appellate terms shall be held.

b. Any such appellate term may be discontinued and re-established as the appellate division of the supreme court in each department shall determine from time to time and any designation to service therein may be revoked by the chief administrator of the courts with the approval of the presiding justice of the appropriate appellate division.

c. In each appellate term no more than three justices assigned thereto shall sit in any action or proceeding. Two of such justices shall constitute a quorum and the concurrence of two shall be necessary to a decision.

d. If so directed by the appellate division of the supreme court establishing an appellate term, an appellate term shall have jurisdiction to hear and determine appeals now or hereafter authorized by law to be taken to the supreme court or to the appellate division other than appeals from the supreme court, a surrogate's court, the family court or appeals in criminal cases prosecuted by indictment or by information as provided in section six of article one.

e. As may be provided by law, an appellate term shall have jurisdiction to hear and determine appeals from the district court or a town, village or city court outside the city of New York. (Subdivisions a, b and d amended by vote of the people November 8, 1977.)

**[Court of claims; jurisdiction]**

§9. The court of claims is continued. It shall consist of the eight judges now authorized by law, but the legislature may increase such number and may reduce such number to six or seven. The judges shall be appointed by the governor by and with the advice and consent of the senate and their terms of office shall be nine years. The court shall have jurisdiction to hear and determine claims against the state or by the state against the claimant or between conflicting claimants as the legislature may provide.

**[County courts; judges]**

§10. a. The county court is continued in each county outside the city of New York. There shall be at least one judge of the county court in each county and such number of additional judges in each county as may be provided by law. The judges shall be residents of the county and shall be chosen by the electors of the county.

b. The terms of the judges of the county court shall be ten years from and including the first day of January next after their election.

**[County court; jurisdiction]**

§11. a. The county court shall have jurisdiction over the following classes of actions and proceedings which shall be originated in such county court in the manner provided by law, except that actions and proceedings within the jurisdiction of the district court or a town, village or city court outside the city of New York may, as provided by law, be originated therein: actions and proceedings for the recovery of money, actions and proceedings for the recovery of chattels and actions and proceedings for the foreclosure of mechanics liens and liens on personal property where the amount sought to be recovered or the value of the property does not exceed twenty-five thousand dollars exclusive of interest and costs; over all crimes and other violations of law; over summary proceedings to recover possession of real property and to remove tenants therefrom; and over such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law.

b. The county court shall exercise such equity jurisdiction as may be provided by law and its jurisdiction to enter judgment upon a counterclaim for the recovery of money only shall be unlimited.

c. The county court shall have jurisdiction to hear and determine all appeals arising in the county in the following actions and proceedings: as of right, from a judgment or order of the district court or a town, village or city court which finally determines an action or proceeding and, as may be provided by law, from a judgment or order of any such court which does not finally determine an action or proceeding. The legislature may provide, in accordance with the provisions of section eight of this article, that any or all of such appeals be taken to an appellate term of the supreme court instead of the county court.

d. The provisions of this section shall in no way limit or impair the jurisdiction of the supreme court as set forth in section seven of this article. (Subdivision b repealed and subdivisions c, d and e relettered b, c and d by vote of the people November 8, 1977; subdivision a amended by vote of the people November 8, 1983.)

**[Surrogate's courts; judges; jurisdiction]**

§12. a. The surrogate's court is continued in each county in the state. There shall be at least one judge of the surrogate's court in each county and such number of additional judges of the surrogate's court as may be provided by law.

b. The judges of the surrogate's court shall be residents of the county and shall be chosen by the electors of the county.

c. The terms of the judges of the surrogate's court in the city of New York shall be fourteen years, and in other counties ten years, from and including the first day of January next after their election.

d. The surrogate's court shall have jurisdiction over all actions and proceedings relating to the affairs of decedents, probate of wills, administration of estates and actions and proceedings arising thereunder or pertaining thereto, guardianship of the property of minors, and such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law.

e. The surrogate's court shall exercise such equity jurisdiction as may be provided by law.

f. The provisions of this section shall in no way limit or impair the jurisdiction of the supreme court as set forth in section seven of this article.

**[Family court; organization; jurisdiction]**

§13. a. The family court of the state of New York is hereby established. It shall consist of at least one judge in each county outside the city of New York and such number of additional judges for such counties as may be provided by law. Within the city of New York it shall consist of such number of judges as may be provided by law. The judges of the family court within the city of New York shall be residents of such city and shall be appointed by the mayor of the city of New York for terms of ten years. The judges of the family court outside the city of New York, shall be chosen by the electors of the counties wherein they reside for terms of ten years.

b. The family court shall have jurisdiction over the following classes of actions and proceedings which shall be originated in such family court in the manner provided by law: (1) the protection, treatment, correction and commitment of those minors who are in need of the exercise of the authority

of the court because of circumstances of neglect, delinquency or dependency, as the legislature may determine; (2) the custody of minors except for custody incidental to actions and proceedings for marital separation, divorce, annulment of marriage and dissolution of marriage; (3) the adoption of persons; (4) the support of dependents except for support incidental to actions and proceedings in this state for marital separation, divorce, annulment of marriage or dissolution of marriage; (5) the establishment of paternity; (6) proceedings for conciliation of spouses; and (7) as may be provided by law: the guardianship of the person of minors and, in conformity with the provisions of section seven of this article, crimes and offenses by or against minors or between spouses or between parent and child or between members of the same family or household. Nothing in this section shall be construed to abridge the authority or jurisdiction of courts to appoint guardians in cases originating in those courts.

c.  The family court shall also have jurisdiction to determine, with the same powers possessed by the supreme court, the following matters when referred to the family court from the supreme court: habeas corpus proceedings for the determination of the custody of minors; and in actions and proceedings for marital separation, divorce, annulment of marriage and dissolution of marriage, applications to fix temporary or permanent support and custody, or applications to enforce judgments and orders of support and of custody, or applications to modify judgments and orders of support and of custody which may be granted only upon the showing to the family court that there has been a subsequent change of circumstances and that modification is required.

d.  The provisions of this section shall in no way limit or impair the jurisdiction of the supreme court as set forth in section seven of this article. (Amended by vote of the people November 6, 1973.)

**[Discharge of duties of more than one judicial office by same judicial officer]**
§14.  The legislature may at any time provide that outside the city of New York the same person may act and discharge the duties of county judge and surrogate or of judge of the family court and surrogate, or of county judge and judge of the family court, or of all three positions in any county.

**[New York city; city-wide courts; jurisdiction]**
§15. a.  The legislature shall by law establish a single court of city-wide civil jurisdiction and a single court of city-wide criminal jurisdiction in and for the city of New York and the legislature may, upon the request of the mayor and the local legislative body of the city of New York, merge the two courts into one city-wide court of both civil and criminal jurisdiction. The said city-wide courts shall consist of such number of judges as may be provided by law. The judges of the court of city-wide civil jurisdiction shall be residents of such city and shall be chosen for terms of ten years by the electors of the counties included within the city of New York from districts within such counties established by law. The judges of the court of city-wide criminal jurisdiction shall be residents of such city and shall be appointed for terms of ten years by the mayor of the city of New York.

b.  The court of city-wide civil jurisdiction of the city of New York shall have jurisdiction over the following classes of actions and proceedings which shall be originated in such court in the manner provided by law: actions and proceedings for the recovery of money, actions and proceedings for the recovery of chattels and actions and proceedings for the foreclosure of mechanics liens and liens on personal property where the amount sought to be recovered or the value of the property does not exceed twenty-five thousand dollars exclusive of interest and costs, or such smaller amount as may be fixed by law; over summary proceedings to recover possession of real property and to remove tenants therefrom and over such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law. The court of city-wide civil jurisdiction shall further exercise such equity jurisdiction as may be provided by law and its jurisdiction to enter judgment upon a counterclaim for the recovery of money only shall be unlimited.

c.  The court of city-wide criminal jurisdiction of the city of New York shall have jurisdiction over crimes and other violations of law, other than those prosecuted by indictment, provided, however, that the legislature may grant to said court jurisdiction over misdemeanors prosecuted by indictment;

and over such other actions and proceedings, not within the exclusive jurisdiction of the supreme court, as may be provided by law.

d.  The provisions of this section shall in no way limit or impair the jurisdiction of the supreme court as set forth in section seven of this article. (Subdivision b amended by vote of the people November 8, 1983; further amended by vote of the people November 7, 1995.)

**[District courts; jurisdiction; judges]**
§16. a.  The district court of Nassau county may be continued under existing law and the legislature may, at the request of the board of supervisors or other elective governing body of any county outside the city of New York, establish the district court for the entire area of such county or for a portion of such county consisting of one or more cities, or one or more towns which are contiguous, or of a combination of such cities and such towns provided at least one of such cities is contiguous to one of such towns.

b.  No law establishing the district court for an entire county shall become effective unless approved at a general election on the question of the approval of such law by a majority of the votes cast thereon by the electors within the area of any cities in the county considered as one unit and by a majority of the votes cast thereon by the electors within the area outside of cities in the county considered as one unit.

c.  No law establishing the district court for a portion of a county shall become effective unless approved at a general election on the question of the approval of such law by a majority of the votes cast thereon by the electors within the area of any cities included in such portion of the county considered as one unit and by a majority of the votes cast thereon by the electors within the area outside of cities included in such portion of the county considered as one unit.

d.  The district court shall have such jurisdiction as may be provided by law, but not in any respect greater than the jurisdiction of the courts for the city of New York as provided in section fifteen of this article, provided, however, that in actions and proceedings for the recovery of money, actions and proceedings for the recovery of chattels and actions and proceedings for the foreclosure of mechanics liens and liens on personal property, the amount sought to be recovered or the value of the property shall not exceed fifteen thousand dollars exclusive of interest and costs.

e.  The legislature may create districts of the district court which shall consist of an entire county or of an area less than a county.

f.  There shall be at least one judge of the district court for each district and such number of additional judges in each district as may be provided by law.

g.  The judges of the district court shall be apportioned among the districts as may be provided by law, and to the extent practicable, in accordance with the population and the volume of judicial business.

h.  The judges shall be residents of the district and shall be chosen by the electors of the district. Their terms shall be six years from and including the first day of January next after their election.

i.  The legislature may regulate and discontinue the district court in any county or portion thereof. (Subdivision d amended by vote of the people November 8, 1983.)

**[Town, village and city courts; jurisdiction; judges]**
§17. a.  Courts for towns, villages and cities outside the city of New York are continued and shall have the jurisdiction prescribed by the legislature but not in any respect greater than the jurisdiction of the district court as provided in section sixteen of this article.

b.  The legislature may regulate such courts, establish uniform jurisdiction, practice and procedure for city courts outside the city of New York and may discontinue any village or city court outside the city of New York existing on the effective date of this article. The legislature may discontinue any town court existing on the effective date of this article only with the approval of a majority of the total votes cast at a general election on the question of a proposed discontinuance of the court in each such town affected thereby.

c.  The legislature may abolish the legislative functions on town boards of justices of the peace and provide that town councilmen be elected in their stead.

18

d. The number of the judges of each of such town, village and city courts and the classification and duties of such judges shall be prescribed by the legislature. The terms, method of selection and method of filling vacancies for the judges of such courts shall be prescribed by the legislature, provided, however, that the justices of town courts shall be chosen by the electors of the town for terms of four years from and including the first day of January next after their election.

**[Trial by jury; trial without jury; claims against state]**

§18. a. Trial by jury is guaranteed as provided in article one of this constitution. The legislature may provide that in any court of original jurisdiction a jury shall be composed of six or of twelve persons and may authorize any court which shall have jurisdiction over crimes and other violations of law, other than crimes prosecuted by indictment, to try such matters without a jury, provided, however, that crimes prosecuted by indictment shall be tried by a jury composed of twelve persons, unless a jury trial has been waived as provided in section two of article one of this constitution.

b. The legislature may provide for the manner of trial of actions and proceedings involving claims against the state.

**[Transfer of actions and proceedings]**

§19. a. The supreme court may transfer any action or proceeding, except one over which it shall have exclusive jurisdiction which does not depend upon the monetary amount sought, to any other court having jurisdiction of the subject matter within the judicial department provided that such other court has jurisdiction over the classes of persons named as parties. As may be provided by law, the supreme court may transfer to itself any action or proceeding originated or pending in another court within the judicial department other than the court of claims upon a finding that such a transfer will promote the administration of justice.

b. The county court shall transfer any action or proceeding which has not been transferred to it from the supreme court or surrogate's court or family court and over which the county court has no jurisdiction. The county court may transfer any action or proceeding, except a criminal action or proceeding involving a felony prosecuted by indictment or an action or proceeding required by this article to be dealt with in the surrogate's court or family court, to any court, other than the supreme court, having jurisdiction of the subject matter within the county provided that such other court has jurisdiction over the classes of persons named as parties.

c. As may be provided by law, the supreme court or the county court may transfer to the county court any action or proceeding originated or pending in the district court or a town, village or city court outside the city of New York upon a finding that such a transfer will promote the administration of justice.

d. The surrogate's court shall transfer to the supreme court or the county court or the family court or the courts for the city of New York established pursuant to section fifteen of this article any action or proceeding which has not been transferred to it from any of said courts and over which the surrogate's court has no jurisdiction.

e. The family court shall transfer to the supreme court or the surrogate's court or the county court or the courts for the city of New York established pursuant to section fifteen of this article any action or proceeding which has not been transferred to it from any of said courts and over which the family court has no jurisdiction.

f. The courts for the city of New York established pursuant to section fifteen of this article shall transfer to the supreme court or the surrogate's court or the family court any action or proceeding which has not been transferred to it from any of said courts and over which the said courts for the city of New York have no jurisdiction.

g. As may be provided by law, the supreme court shall transfer any action or proceeding to any other court having jurisdiction of the subject matter in any other judicial district or county provided that such other court has jurisdiction over the classes of persons named as parties.

h. As may be provided by law, the county court, the surrogate's court, the family court and the courts for the city of New York established pursuant to section fifteen of this article may transfer any action or

proceeding, other than one which has previously been transferred to it, to any other court, except the supreme court, having jurisdiction of the subject matter in any other judicial district or county provided that such other court has jurisdiction over the classes of persons named as parties.

i. As may be provided by law, the district court or a town, village or city court outside the city of New York may transfer any action or proceeding, other than one which has previously been transferred to it, to any court, other than the county court or the surrogate's court or the family court or the supreme court, having jurisdiction of the subject matter in the same or an adjoining county provided that such other court has jurisdiction over the classes of persons named as parties.

j. Each court shall exercise jurisdiction over any action or proceeding transferred to it pursuant to this section.

k. The legislature may provide that the verdict or judgment in actions and proceedings so transferred shall not be subject to the limitation of monetary jurisdiction of the court to which the actions and proceedings are transferred if that limitation was lower than that of the court in which the actions and proceedings were originated.

**[Judges and justices; qualifications; eligibility for other office or service; restrictions]**

§20. a. No person, other than one who holds such office at the effective date of this article, may assume the office of judge of the court of appeals, justice of the supreme court, or judge of the court of claims unless he or she has been admitted to practice law in this state at least ten years. No person, other than one who holds such office at the effective date of this article, may assume the office of judge of the county court, surrogate's court, family court, a court for the city of New York established pursuant to section fifteen of this article, district court or city court outside the city of New York unless he or she has been admitted to practice law in this state at least five years or such greater number of years as the legislature may determine.

b. A judge of the court of appeals, justice of the supreme court, judge of the court of claims, judge of a county court, judge of the surrogate's court, judge of the family court or judge of a court for the city of New York established pursuant to section fifteen of this article who is elected or appointed after the effective date of this article may not:

(1) hold any other public office or trust except an office in relation to the administration of the courts, member of a constitutional convention or member of the armed forces of the United States or of the state of New York in which latter event the legislature may enact such legislation as it deems appropriate to provide for a temporary judge or justice to serve during the period of the absence of such judge or justice in the armed forces;

(2) be eligible to be a candidate for any public office other than judicial office or member of a constitutional convention, unless he or she resigns from judicial office; in the event a judge or justice does not so resign from judicial office within ten days after his or her acceptance of the nomination of such other office, his or her judicial office shall become vacant and the vacancy shall be filled in the manner provided in this article;

(3) hold any office or assume the duties or exercise the powers of any office of any political organization or be a member of any governing or executive agency thereof;

(4) engage in the practice of law, act as an arbitrator, referee or compensated mediator in any action or proceeding or matter or engage in the conduct of any other profession or business which interferes with the performance of his or her judicial duties.

Judges and justices of the courts specified in this subdivision shall also be subject to such rules of conduct as may be promulgated by the chief administrator of the courts with the approval of the court of appeals.

c. Qualifications for and restrictions upon the judges of district, town, village or city courts outside the city of New York, other than such qualifications and restrictions specifically set forth in subdivision a of this section, shall be prescribed by the legislature, provided, however, that the legislature shall require a course of training and education to be completed by justices of town and village courts selected after the effective date of this article who have not been admitted to practice law in this state. Judges of such courts shall also be subject to such rules of conduct not inconsistent with laws as may be promulgated by the chief administrator of the courts

with the approval of the court of appeals. (Amended by vote of the people November 8, 1977; November 6, 2001.)

**[Vacancies; how filled]**

§21. a. When a vacancy shall occur, otherwise than by expiration of term, in the office of justice of the supreme court, of judge of the county court, of judge of the surrogate's court or judge of the family court outside the city of New York, it shall be filled for a full term at the next general election held not less than three months after such vacancy occurs and until the vacancy shall be so filled, the governor by and with the advice and consent of the senate, if the senate shall be in session, or, if the senate not be in session, the governor may fill such vacancy by an appointment which shall continue until and including the last day of December next after the election at which the vacancy shall be filled.

b. When a vacancy shall occur, otherwise than by expiration of term, in the office of judge of the court of claims, it shall be filled for the unexpired term in the same manner as an original appointment.

c. When a vacancy shall occur, otherwise than by expiration of term, in the office of judge elected to the city-wide court of civil jurisdiction of the city of New York, it shall be filled for a full term at the next general election held not less than three months after such vacancy occurs and, until the vacancy shall be so filled, the mayor of the city of New York may fill such vacancy by an appointment which shall continue until and including the last day of December next after the election at which the vacancy shall be filled. When a vacancy shall occur, otherwise than by expiration of term on the last day of December of any year, in the office of judge appointed to the family court within the city of New York or the city-wide court of criminal jurisdiction of the city of New York, the mayor of the city of New York shall fill such vacancy by an appointment for the unexpired term.

d. When a vacancy shall occur, otherwise than by expiration of term, in the office of judge of the district court, it shall be filled for a full term at the next general election held not less than three months after such vacancy occurs and, until the vacancy shall be so filled, the board of supervisors or the supervisor or supervisors of the affected district if such district consists of a portion of a county or, in counties with an elected county executive officer, such county executive officer may, subject to confirmation by the board of supervisors or the supervisor or supervisors of such district, fill such vacancy by an appointment which shall continue until and including the last day of December next after the election at which the vacancy shall be filled.

**[Commission on judicial conduct; composition; organization and procedure; review by court of appeals; discipline of judges or justices]**

§22. a. There shall be a commission on judicial conduct. The commission on judicial conduct shall receive, initiate, investigate and hear complaints with respect to the conduct, qualifications, fitness to perform or performance of official duties of any judge or justice of the unified court system, in the manner provided by law; and, in accordance with subdivision d of this section, may determine that a judge or justice be admonished, censured or removed from office for cause, including, but not limited to, misconduct in office, persistent failure to perform his or her duties, habitual intemperance, and conduct, on or off the bench, prejudicial to the administration of justice, or that a judge or justice be retired for mental or physical disability preventing the proper performance of his or her judicial duties. The commission shall transmit an[9] such determination to the chief judge of the court of appeals who shall cause written notice of such determination to be given to the judge or justice involved. Such judge or justice may either accept the commission's determination or make written request to the chief judge, within thirty days after receipt of such notice, for a review of such determination by the court of appeals.

b. (l) The commission on judicial conduct shall consist of eleven members, of whom four shall be appointed by the governor, one by the temporary president of the senate, one by the minority leader of the senate, one by the speaker of the assembly, one by the minority leader of the assembly and three by the chief judge of the court of appeals. Of the

members appointed by the governor one person shall be a member of the bar of the state but not a judge or justice, two shall not be members of the bar, justices or judges or retired justices or judges of the unified court system, and one shall be a judge or justice of the unified court system. Of the members appointed by the chief judge one person shall be a justice of the appellate division of the supreme court and two shall be judges or justices of a court or courts other than the court of appeals or appellate divisions. None of the persons to be appointed by the legislative leaders shall be justices or judges or retired justices or judges.

(2) The persons first appointed by the governor shall have respectively one, two, three, and four-year terms as the governor shall designate. The persons first appointed by the chief judge of the court of appeals shall have respectively two, three, and four-year terms as the governor shall designate. The person first appointed by the temporary president of the senate shall have a one-year term. The person first appointed by the minority leader of the senate shall have a two-year term. The person first appointed by the speaker of the assembly shall have a four-year term. The person first appointed by the minority leader of the assembly shall have a three-year term. Each member of the commission shall be appointed thereafter for a term of four years. Commission membership of a judge or justice appointed by the governor or the chief judge shall terminate if such member ceases to hold the judicial position which qualified him or her for such appointment. Membership shall also terminate if a member attains a position which would have rendered him or her ineligible for appointment at the time of appointment. A vacancy shall be filled by the appointing officer for the remainder of the term.

c. The organization and procedure of the commission on judicial conduct shall be as provided by law. The commission on judicial conduct may establish its own rules and procedures not inconsistent with law. Unless the legislature shall provide otherwise, the commission shall be empowered to designate one of its members or any other person as a referee to hear and report concerning any matter before the commission.

d. In reviewing a determination of the commission on judicial conduct, the court of appeals may admonish, censure, remove or retire, for the reasons set forth in subdivision a of this section, any judge of the unified court system. In reviewing a determination of the commission on judicial conduct, the court of appeals shall review the commission's findings of fact and conclusions of law on the record of the proceedings upon which the commission's determination was based. The court of appeals may impose a less or more severe sanction prescribed by this section than the one determined by the commission, or impose no sanction.

e. The court of appeals may suspend a judge or justice from exercising the powers of his or her office while there is pending a determination by the commission on judicial conduct for his or her removal or retirement, or while the judge or justice is charged in this state with a felony by an indictment or an information filed pursuant to section six of article one. The suspension shall continue upon conviction and, if the conviction becomes final, the judge or justice shall be removed from office. The suspension shall be terminated upon reversal of the conviction and dismissal of the accusatory instrument. Nothing in this subdivision shall prevent the commission on judicial conduct from determining that a judge or justice be admonished, censured, removed, or retired pursuant to subdivision a of this section.

f. Upon the recommendation of the commission on judicial conduct or on its own motion, the court of appeals may suspend a judge or justice from office when he or she is charged with a crime punishable as a felony under the laws of this state, or any other crime which involves moral turpitude. The suspension shall continue upon conviction and, if the conviction becomes final, the judge or justice shall be removed from office. The suspension shall be terminated upon reversal of the conviction and dismissal of the accusatory instrument. Nothing in this subdivision shall prevent the commission on judicial conduct from determining that a judge or justice be admonished, censured, removed, or retired pursuant to subdivision a of this section.

g. A judge or justice who is suspended from office by the court of appeals shall receive his or her judicial salary during such period of suspension, unless the court directs otherwise. If the court has so directed

---

[9] As so in original ("an should be "any").

and such suspension is thereafter terminated, the court may direct that the judge or justice shall be paid his or her salary for such period of suspension.

h.  A judge or justice retired by the court of appeals shall be considered to have retired voluntarily. A judge or justice removed by the court of appeals shall be ineligible to hold other judicial office.

i.  Notwithstanding any other provision of this section, the legislature may provide by law for review of determinations of the commission on judicial conduct with respect to justices of town and village courts by an appellate division of the supreme court. In such event, all references in this section to the court on the judiciary and the chief judge thereof shall be deemed references to an appellate division and the presiding justice thereof, respectively.

j.  If a court on the judiciary shall have been convened before the effective date of this section and the proceeding shall not be concluded by that date, the court on the judiciary shall have continuing jurisdiction beyond the effective date of this section to conclude the proceeding. All matters pending before the former commission on judicial conduct on the effective date of this section shall be disposed of in such manner as shall be provided by law. (Former §22 repealed and new §22 added by November 6, 2001.)

**[Removal of judges]**
§23.  a.  Judges of the court of appeals and justices of the supreme court may be removed by concurrent resolution of both houses of the legislature, if two-thirds of all the members elected to each house concur therein.

b.  Judges of the court of claims, the county court, the surrogate's court, the family court, the courts for the city of New York established pursuant to section fifteen of this article, the district court and such other courts as the legislature may determine may be removed by the senate, on the recommendation of the governor, if two-thirds of all the members elected to the senate concur therein.

c.  No judge or justice shall be removed by virtue of this section except for cause, which shall be entered on the journals, nor unless he or she shall have been served with a statement of the cause alleged, and shall have had an opportunity to be heard. On the question of removal, the yeas and nays shall be entered on the journal. (Amended by vote of the people November 6, 2001.)

**[Court for trial of impeachments; judgment]**
§24.  The assembly shall have the power of impeachment by a vote of a majority of all the members elected thereto. The court for the trial of impeachments shall be composed of the president of the senate, the senators, or the major part of them, and the judges of the court of appeals, or the major part of them. On the trial of an impeachment against the governor or lieutenant-governor, neither the lieutenant-governor nor the temporary president of the senate shall act as a member of the court. No judicial officer shall exercise his or her office after articles of impeachment against him or her shall have been preferred to the senate, until he or she shall have been acquitted. Before the trial of an impeachment, the members of the court shall take an oath or affirmation truly and impartially to try the impeachment according to the evidence, and no person shall be convicted without the concurrence of two-thirds of the members present. Judgment in cases of impeachment shall not extend further than to removal from office, or removal from office and disqualification to hold and enjoy any public office of honor, trust, or profit under this state; but the party impeached shall be liable to indictment and punishment according to law. (Amended by vote of the people November 6, 2001.)

**[Judges and justices; compensation; retirement]**
§25.  a.  The compensation of a judge of the court of appeals, a justice of the supreme court, a judge of the court of claims, a judge of the county court, a judge of the surrogate's court, a judge of the family court, a judge of a court for the city of New York established pursuant to section fifteen of this article, a judge of the district court or of a retired judge or justice shall be established by law and shall not be diminished during the term of office for which he or she was elected or appointed. Any judge or justice of a court abolished by section thirty-five of this article, who pursuant to that section becomes a judge or justice of a court established or continued by this article, shall receive without interruption or diminution for the remainder of the term

for which he or she was elected or appointed to the abolished court the compensation he or she had been receiving upon the effective date of this article together with any additional compensation that may be prescribed by law.

b.  Each judge of the court of appeals, justice of the supreme court, judge of the court of claims, judge of the county court, judge of the surrogate's court, judge of the family court, judge of a court for the city of New York established pursuant to section fifteen of this article and judge of the district court shall retire on the last day of December in the year in which he or she reaches the age of seventy. Each such former thereafter perform the duties of a justice of the supreme court, with power to hear and determine actions and proceedings, provided, however, that it shall be certificated in the manner provided by law that the services of such judge or justice are necessary to expedite the business of the court and that he or she is mentally and physically able and competent to perform the full duties of such office. Any such certification shall be valid for a term of two years and may be extended as provided by law for additional terms of two years. A retired judge or justice shall serve no longer than until the last day of December in the year in which he or she reaches the age of seventy-six. A retired judge or justice shall be subject to assignment by the appellate division of the supreme court of the judicial department of his or her residence. Any retired justice of the supreme court who had been designated to and served as a justice of any appellate division immediately preceding his or her reaching the age of seventy shall be eligible for designation by the governor as a temporary or additional justice of the appellate division. A retired judge or justice shall not be counted in determining the number of justices in a judicial district for purposes of subdivision d of section six of this article.

c.  The provisions of this section shall also be applicable to any judge or justice who has not reached the age of seventy-six and to whom it would otherwise have been applicable but for the fact that he or she reached the age of seventy and retired before the effective date of this article. (Subdivision b amended by vote of the people November 8, 1966; further amended by vote of the people November 6, 2001.)

**[Temporary assignments of judges and justices]**
§26.  a.  A justice of the supreme court may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in any judicial district or to the court of claims. A justice of the supreme court in the city of New York may be temporarily assigned to the family court in the city of New York or to the surrogate's court in any county within the city of New York when required to dispose of the business of such court.

b.  A judge of the court of claims may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in any judicial district.

c.  A judge of the county court may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his or her residence or to the county court or the family court in any county or to the surrogate's court in any county outside the city of New York or to a court for the city of New York established pursuant to section fifteen of this article.

d.  A judge of the surrogate's court in any county within the city of New York may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his or her residence.

e.  A judge of the surrogate's court in any county outside the city of New York may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his or her residence or to the county court or the family court in any county or to a court for the city of New York established pursuant to section fifteen of this article.

f.  A judge of the family court may perform the duties of office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his or her residence or to the county court or the family court in any county or to the surrogate's court in any county outside of the city of New York or to a court for the city of New York established pursuant to section fifteen of this article.

g.  A judge of a court for the city of New York established pursuant to section fifteen of this article may perform the duties of office or hold court in

any county and may be temporarily assigned to the supreme court in the judicial department of his or her residence or to the county court or the family court in any county or to the other court for the city of New York established pursuant to section fifteen of this article.

h. A judge of the district court in any county may perform the duties of office or hold court in any county and may be temporarily assigned to the county court in the judicial department of his or her residence or to a court for the city of New York established pursuant to section fifteen of this article or to the district court in any county.

i. Temporary assignments of all the foregoing judges or justices listed in this section, and of judges of the city courts pursuant to paragraph two of subdivision j of this section, shall be made by the chief administrator of the courts in accordance with standards and administrative policies established pursuant to section twenty-eight of this article.

j. (1) The legislature may provide for temporary assignments within the county of residence or any adjoining county, of judges of town, village or city courts outside the city of New York.

(2) In addition to any temporary assignments to which a judge of a city court may be subject pursuant to paragraph one of this subdivision, such judge also may be temporarily assigned by the chief administrator of the courts to the county court, the family court or the district court within his or her county of residence or any adjoining county provided he or she is not permitted to practice law.

k. While temporarily assigned pursuant to the provisions of this section, any judge or justice shall have the powers, duties and jurisdiction of a judge or justice of the court to which assigned. After the expiration of any temporary assignment, as provided in this section, the judge or justice assigned shall have all the powers, duties and jurisdiction of a judge or justice of the court to which he or she was assigned with respect to matters pending before him or her during the term of such temporary assignment. (Subdivision i amended by vote of the people November 8, 1977; subdivision f amended by vote of the people November 8, 1983; further amended by vote of the people November 6, 2001.)

**[Supreme court; extraordinary terms]**
§27. The governor may, when in his or her opinion the public interest requires, appoint extraordinary terms of the supreme court. The governor shall designate the time and place of holding the term and the justice who shall hold the term. The governor may terminate the assignment of the justice and may name another justice in his or her place to hold the term. (Amended by vote of the people November 6, 2001.)

**[Administrative supervision of court system]**
§28. a. The chief judge of the court of appeals shall be the chief judge of the state of New York and shall be the chief judicial officer of the unified court system. There shall be an administrative board of the courts which shall consist of the chief judge of the court of appeals as chairperson and the presiding justice of the appellate division of the supreme court of each judicial department. The chief judge shall, with the advice and consent of the administrative board of the courts, appoint a chief administrator of the courts who shall serve at the pleasure of the chief judge.

b. The chief administrator, on behalf of the chief judge, shall supervise the administration and operation of the unified court system. In the exercise of such responsibility, the chief administrator of the courts shall have such powers and duties as may be delegated to him or her by the chief judge and such additional powers and duties as may be provided by law.

c. The chief judge, after consultation with the administrative board, shall establish standards and administrative policies for general application throughout the state, which shall be submitted by the chief judge to the court of appeals, together with the recommendations, if any, of the administrative board. Such standards and administrative policies shall be promulgated after approval by the court of appeals. (Formerly §28. Repealed and new §28 added by vote of the people November 8, 1977; amended by vote of the people November 6, 2001.)

**[Expenses of courts]**
§29. a. The legislature shall provide for the allocation of the cost of operating and maintaining the court of appeals, the appellate division of the supreme court in each judicial department, the supreme court, the court of claims, the county court, the surrogate's court, the family court, the courts for the city of New York established pursuant to section fifteen of this article and the district court, among the state, the counties, the city of New York and other political subdivisions.

b. The legislature shall provide for the submission of the itemized estimates of the annual financial needs of the courts referred to in subdivision a of this section to the chief administrator of the courts to be forwarded to the appropriating bodies with recommendations and comment.

c. Insofar as the expense of the courts is borne by the state or paid by the state in the first instance, the final determination of the itemized estimates of the annual financial needs of the courts shall be made by the legislature and the governor in accordance with articles four and seven of this constitution.

d. Insofar as the expense of the courts is not paid by the state in the first instance and is borne by counties, the city of New York or other political subdivisions, the final determination of the itemized estimates of the annual financial needs of the courts shall be made by the appropriate governing bodies of such counties, the city of New York or other political subdivisions. (Subdivision b amended by vote of the people November 8, 1977.)

**[Legislative power over jurisdiction and proceedings; delegation of power to regulate practice and procedure]**
§30. The legislature shall have the same power to alter and regulate the jurisdiction and proceedings in law and in equity that it has heretofore exercised. The legislature may, on such terms as it shall provide and subject to subsequent modification, delegate, in whole or in part, to a court, including the appellate division of the supreme court, or to the chief administrator of the courts, any power possessed by the legislature to regulate practice and procedure in the courts. The chief administrator of the courts shall exercise any such power delegated to him or her with the advice and consent of the administrative board of the courts. Nothing herein contained shall prevent the adoption of regulations by individual courts consistent with the general practice and procedure as provided by statute or general rules. (Amended by vote of the people November 8, 1977.)

**[Inapplicability of article to certain courts]**
§31. This article does not apply to the peacemakers courts or other Indian courts, the existence and operation of which shall continue as may be provided by law.

**[Custodians of children to be of same religious persuasion]**
§32. When any court having jurisdiction over a child shall commit it or remand it to an institution or agency or place it in the custody of any person by parole, placing out, adoption or guardianship, the child shall be committed or remanded or placed, when practicable, in an institution or agency governed by persons, or in the custody of a person, of the same religious persuasion as the child.

**[Existing laws; duty of legislature to implement article]**
§33. Existing provisions of law not inconsistent with this article shall continue in force until repealed, amended, modified or superseded in accordance with the provisions of this article. The legislature shall enact appropriate laws to carry into effect the purposes and provisions of this article, and may, for the purpose of implementing, supplementing or clarifying any of its provisions, enact any laws, not inconsistent with the provisions of this article, necessary or desirable in promoting the objectives of this article.

**[Pending appeals, actions and proceedings; preservation of existing terms of office of judges and justices]**
§34. a. The court of appeals, the appellate division of the supreme court, the supreme court, the court of claims, the county court in counties outside the city of New York, the surrogate's court and the district court of Nassau county shall hear and determine all appeals, actions and proceedings pending therein on the effective date of this article except that the appellate division of the supreme court in the first and second judicial departments or the appellate term in such departments, if so directed by the appropriate appellate division of the supreme court, shall hear and determine all appeals

pending in the appellate terms of the supreme court in the first and second judicial departments and in the court of special sessions of the city of New York and except that the county court or an appellate term shall, as may be provided by law, hear and determine all appeals pending in the county court or the supreme court other than an appellate term. Further appeal from a decision of the county court, the appellate term or the appellate division of the supreme court, rendered on or after the effective date of this article, shall be governed by the provisions of this article.

b. The justices of the supreme court in office on the effective date of this article shall hold their offices as justices of the supreme court until the expiration of their respective terms.

c. The judges of the court of claims in office on the effective date of this article shall hold their offices as judges of the court of claims until the expiration of their respective terms.

d. The surrogates, and county judges outside the city of New York, including the special county judges of the counties of Erie and Suffolk, in office on the effective date of this article shall hold office as judges of the surrogate's court or county judge, respectively, of such counties until the expiration of their respective terms.

e. The judges of the district court of Nassau county in office on the effective date of this article shall hold their offices until the expiration of their respective terms.

f. Judges of courts for towns, villages and cities outside the city of New York in office on the effective date of this article shall hold their offices until the expiration of their respective terms.

**[Certain courts abolished; transfer of judges, court personnel, and actions and proceedings to other courts]**

§35. a. The children's courts, the court of general sessions of the county of New York, the county courts of the counties of Bronx, Kings, Queens and Richmond, the city court of the city of New York, the domestic relations court of the city of New York, the municipal court of the city of New York, the court of special sessions of the city of New York and the city magistrates' courts of the city of New York are abolished from and after the effective date of this article and thereupon the seals, records, papers and documents of or belonging to such courts shall, unless otherwise provided by law, be deposited in the offices of the clerks of the several counties in which these courts now exist.

b. The judges of the county court of the counties of Bronx, Kings, Queens and Richmond and the judges of the court of general sessions of the county of New York in office on the effective date of this article appointed, be justices of the supreme court in and for the judicial district which includes the county in which they resided on that date. The salaries of such justices shall be the same as the salaries of the other justices of the supreme court residing in the same judicial district and shall be paid in the same manner. All actions and proceedings pending in the county court of the counties of Bronx, Kings, Queens and Richmond and in the court of general sessions of the county of New York on the effective date of this article shall be transferred to the supreme court in the county in which the action or proceedings was pending, or otherwise as may be provided by law.

c. The legislature shall provide by law that the justices of the city court of the city of New York and the justices of the municipal court of the city of New York in office on the date such courts are abolished shall, for the remainder of the term for which each was elected or appointed, be judges of the city-wide court of civil jurisdiction of the city of New York established pursuant to section fifteen of this article and for such district as the legislature may determine.

d. The legislature shall provide by law that the justices of the court of special sessions and the magistrates of the city magistrates' courts of the city of New York in office on the date such courts are abolished shall, for the remainder of the term for which each was appointed, be judges of the city-wide court of criminal jurisdiction of the city of New York established pursuant to section fifteen provided, however, that each term shall expire on the last day of the year in which it would have expired except for the provisions of this article.

e. All actions and proceedings pending in the city court of the city of New York and the municipal court in the city of New York on the date such courts are abolished shall be transferred to the city-wide court of civil jurisdiction of the city of New York established pursuant to section fifteen of this article or as otherwise provided by law.

f. All actions and proceedings pending in the court of special sessions of the city of New York and the city magistrates' courts of the city of New York on the date such courts are abolished shall be transferred to the city-wide court of criminal jurisdiction of the city of New York established pursuant to section fifteen of this article or as otherwise provided by law.

g. The special county judges of the counties of Broome, Chautauqua, Jefferson, Oneida and Rockland and the judges of the children's courts in all counties outside the city of New York in office on the effective date of this article shall, for the remainder of the terms for which they were elected or appointed, be judges of the family court in and for the county in which they hold office. Except as otherwise provided in this section, the office of special county judge and the office of special surrogate is abolished from and after the effective date of this article and the terms of the persons holding such offices shall terminate on that date.

h. All actions and proceedings pending in the children's courts in counties outside the city of New York on the effective date of this article shall be transferred to the family court in the respective counties.

i. The justices of the domestic relations court of the city of New York in office on the effective date of this article shall, for the remainder of the terms for which they were appointed, be judges of the family court within the city of New York.

j. All actions and proceedings pending in the domestic relations court of the city of New York on the effective date of this article shall be transferred to the family court in the city of New York.

k. The office of official referee is abolished, provided, however, that official referees in office on the effective date of this article shall, for the remainder of the terms for which they were appointed or certified, be official referees of the court in which appointed or certified or the successor court, as the case may be. At the expiration of the term of any official referee, his or her office shall be abolished and thereupon such former official referee shall be subject to the relevant provisions of section twenty-five of this article.

l. As may be provided by law, the non-judicial personnel of the courts affected by this article in office on the effective date of this article shall, to the extent practicable, be continued without diminution of salaries and with the same status and rights in the courts established or continued by this article; and especially skilled, experienced and trained personnel shall, to the extent practicable, be assigned to like functions in the courts which exercise the jurisdiction formerly exercised by the courts in which they were employed. In the event that the adoption of this article shall require or make possible a reduction in the number of non-judicial personnel, or in the number of certain categories of such personnel, such reduction shall be made, to the extent practicable, by provision that the death, resignation, removal or retirement of an employee shall not create a vacancy until the reduced number of personnel has been reached.

m. In the event that a judgment or order was entered before the effective date of this article and a right of appeal existed and notice of appeal therefrom is filed after the effective date of this article, such appeal shall be taken from the supreme court, the county courts, the surrogate's courts, the children's courts, the court of general sessions of the county of New York and the domestic relations court of the city of New York to the appellate division of the supreme court in the judicial department in which such court was located; from the court of claims to the appellate division of the supreme court in the third judicial department, except for those claims which arose in the fourth judicial department, in which case the appeal shall be to the appellate division of the supreme court in the fourth judicial department; from the city court of the city of New York, the municipal court of the city of New York, the court of special sessions of the city of New York and the city magistrates' courts of the city of New York to the appellate division of the supreme court in the judicial department in which such court was located, provided, however, that such appellate division of the supreme court may transfer any such appeal to an appellate term, if such appellate term be established; and from the district court, town, village and city courts outside the city of New York to the county court in the county in which such court was located, provided, however, that the legislature may require the transfer of any such appeal to an appellate term, if such appellate term be

23

established. Further appeal from a decision of a county court or an appellate term or the appellate division of the supreme court shall be governed by the provisions of this article. However, if in any action or proceeding decided prior to the effective date of this article, a party had a right of direct appeal from a court of original jurisdiction to the court of appeals, such appeal may be taken directly to the court of appeals.

n.  In the event that an appeal was decided before the effective date of this article and a further appeal could be taken as of right and notice of appeal therefrom is filed after the effective date of this article, such appeal may be taken from the appellate division of the supreme court to the court of appeals and from any other court to the appellate division of the supreme court. Further appeal from a decision of the appellate division of the supreme court shall be governed by the provisions of this article. If a further appeal could not be taken as of right, such appeal shall be governed by the provisions of this article. (Amended by vote of the people November 6, 2001.)

**[Pending civil and criminal cases]**
§36.  No civil or criminal appeal, action or proceeding pending before any court or any judge or justice on the effective date of this article shall abate but such appeal, action or proceeding so pending shall be continued in the courts as provided in this article and, for the purposes for disposition of such actions or proceedings only, the jurisdiction of any court to which any such action or proceeding is transferred by this article shall be coextensive with the jurisdiction of the former court from which the action or proceeding was transferred. Except to the extent inconsistent with the provisions of this article, subsequent proceedings in such appeal, action or proceeding shall be conducted in accordance with the laws in force on the effective date of this article until superseded in the manner authorized by law.

**[Effective date of certain amendments to articles VI and VII]**
§36-a.  The amendments to the provisions of sections two, four, seven, eight, eleven, twenty, twenty-two, twenty-six, twenty-eight, twenty-nine and thirty of article six and to the provisions of section one of article seven, as first proposed by a concurrent resolution passed by the legislature in the year nineteen hundred seventy-six and entitled "Concurrent Resolution of the Senate and Assembly proposing amendments to articles six and seven of the constitution, in relation to the manner of selecting judges of the court of appeals, creation of a commission on judicial conduct and administration of the unified court system, providing for the effectiveness of such amendments and the repeal of subdivision c of section two, subdivision b of section seven, subdivision b of section eleven, section twenty-two and section twenty-eight of article six thereof relating thereto", shall become a part of the constitution on the first day of January next after the approval and ratification of the amendments proposed by such concurrent resolution by the people but the provisions thereof shall not become operative and the repeal of subdivision c of section two, section twenty-two and section twenty-eight shall not become effective until the first day of April next thereafter which date shall be deemed the effective date of such amendments amend the chief judge and the associate judges of the court of appeals in office on such effective date shall hold their offices until the expiration of their respective terms. Upon a vacancy in the office of any such judge, such vacancy shall be filled in the manner provided in section two of article six. (New. Added by vote of the people November 8, 1977.)

**[No section 36-b]**

**[Effective date of certain amendments to article VI, section 22]**
§36-c.  The amendments to the provisions of section twenty-two of article six as first proposed by a concurrent resolution passed by the legislature in the year nineteen hundred seventy-four and entitled "Concurrent Resolution of the Senate and Assembly proposing an amendment to section twenty-two of article six and adding section thirty-six-c to such article of the constitution, in relation to the powers of and reconstituting the court on the judiciary and creating a commission on judicial conduct", shall become a part of the constitution on the first day of January next after the approval and ratification of the amendments proposed by such concurrent resolution by the people but the provisions thereof shall not become operative until the first day of September next thereafter which date shall be deemed the effective date

of such amendments. (New. Added by vote of the people November 4, 1975.)

**[Effective date of article]**
§37.  This article shall become a part of the constitution on the first day of January next after the approval and ratification of this amendment by the people but its provisions shall not become operative until the first day of September next thereafter which date shall be deemed the effective date of this article.

**ARTICLE VII**
STATE FINANCES

**[Estimates by departments, the legislature and the judiciary of needed appropriations; hearings]**
Section 1.  For the preparation of the budget, the head of each department of state government, except the legislature and judiciary, shall furnish the governor such estimates and information in such form and at such times as the governor may require, copies of which shall forthwith be furnished to the appropriate committees of the legislature. The governor shall hold hearings thereon at which the governor may require the attendance of heads of departments and their subordinates. Designated representatives of such committees shall be entitled to attend the hearings thereon and to make inquiry concerning any part thereof.

Itemized estimates of the financial needs of the legislature, certified by the presiding officer of each house, and of the judiciary, approved by the court of appeals and certified by the chief judge of the court of appeals, shall be transmitted to the governor not later than the first day of December in each year for inclusion in the budget without revision but with such recommendations as the governor may deem proper. Copies of the itemized estimates of the financial needs of the judiciary also shall forthwith be transmitted to the appropriate committees of the legislature. (Amended by vote of the people November 8, 1977;  November 6, 2001.)

**[Executive budget]**
§2.  Annually, on or before the first day of February in each year following the year fixed by the constitution for the election of governor and lieutenant governor, and on or before the second Tuesday following the first day of the annual meeting of the legislature, in all other years, the governor shall submit to the legislature a budget containing a complete plan of expenditures proposed to be made before the close of the ensuing fiscal year and all moneys and revenues estimated to be available therefor, together with an explanation of the basis of such estimates and recommendations as to proposed legislation, if any, which the governor may deem necessary to provide moneys and revenues sufficient to meet such proposed expenditures. It shall also contain such other recommendations and information as the governor may deem proper and such additional information as may be required by law. (New. Derived in part from former §2 of Art. 4-a. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 2, 1965; November 6, 2001.)

**[Budget bills; appearances before legislature]**
§3.  At the time of submitting the budget to the legislature the governor shall submit a bill or bills containing all the proposed appropriations and reappropriations included in the budget and the proposed legislation, if any, recommended therein.

The governor may at any time within thirty days thereafter and, with the consent of the legislature, at any time before the adjournment thereof, amend or supplement the budget and submit amendments to any bills submitted by him or her or submit supplemental bills.

The governor and the heads of departments shall have the right, and it shall be the duty of the heads of departments when requested by either house of the legislature or an appropriate committee thereof, to appear and be heard in respect to the budget during the consideration thereof, and to answer inquiries relevant thereto. The procedure for such appearances and inquiries shall be provided by law. (New. Derived in part from former §§2 and 3 of

24

Art. 4-a. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Action on budget bills by legislature; effect thereof]**
§4.  The legislature may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein, but it may add thereto items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose. None of the restrictions of this section, however, shall apply to appropriations for the legislature or judiciary.

Such an appropriation bill shall when passed by both houses be a law immediately without further action by the governor, except that appropriations for the legislature and judiciary and separate items added to the governor's bills by the legislature shall be subject to approval of the governor as provided in section 7 of article IV. (New. Derived in part from former §3 of Art. 4-a. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Restrictions on consideration of other appropriations]**
§5.  Neither house of the legislature shall consider any other bill making an appropriation until all the appropriation bills submitted by the governor shall have been finally acted on by both houses, except on message from the governor certifying to the necessity of the immediate passage of such a bill. (New. Derived in part from former §4 of Art. 4-a. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Restrictions on content of appropriation bills]**
§6.  Except for appropriations contained in the bills submitted by the governor and in a supplemental appropriation bill for the support of government, no appropriations shall be made except by separate bills each for a single object or purpose. All such bills and such supplemental appropriation bill shall be subject to the governor's approval as provided in section 7 of article IV.

No provision shall be embraced in any appropriation bill submitted by the governor or in such supplemental appropriation bill unless it relates specifically to some particular appropriation in the bill, and any such provision shall be limited in its operation to such appropriation. (New. Derived in part from former §22 of Art. 3 and former §4 of Art. 4-a. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Appropriation bills]**
§7.  No money shall ever be paid out of the state treasury or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within two years next after the passage of such appropriation act; and every such law making a new appropriation or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object or purpose to which it is to be applied; and it shall not be sufficient for such law to refer to any other law to fix such sum. (New. Derived in part from former §21 of Art. 3. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Gift or loan of state credit or money prohibited; exceptions for enumerated purposes]**
§8.  1.  The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private undertaking; nor shall the credit of the state be given or loaned to or in aid of any individual, or public or private corporation or association, or private undertaking, but the foregoing provisions shall not apply to any fund or property now held or which may hereafter be held by the state for educational, mental health or mental rehabilitation purposes.

2.  Subject to the limitations on indebtedness and taxation, nothing in this constitution contained shall prevent the legislature from providing for the aid, care and support of the needy directly or through subdivisions of the state; or for the protection by insurance or otherwise, against the hazards of unemployment, sickness and old age; or for the education and support of the blind, the deaf, the dumb, the physically handicapped, the mentally ill, the emotionally disturbed, the mentally retarded or juvenile delinquents as it may deem proper; or for health and welfare services for all children, either directly or through subdivisions of the state, including school districts; or for the aid, care and support of neglected and dependent children and of the needy sick, through agencies and institutions authorized by the state board of social welfare or other state department having the power of inspection thereof, by payments made on a per capita basis directly or through the subdivisions of the state; or for the increase in the amount of pensions of any member of a retirement system of the state, or of a subdivision of the state; or for an increase in the amount of pension benefits of any widow or widower of a retired member of a retirement system of the state or of a subdivision of the state to whom payable as beneficiary under an optional settlement in connection with the pension of such member. The enumeration of legislative powers in this paragraph shall not be taken to diminish any power of the legislature hitherto existing.

3.  Nothing in this constitution contained shall prevent the legislature from authorizing the loan of the money of the state to a public corporation to be organized for the purpose of making loans to non-profit corporations or for the purpose of guaranteeing loans made by banking organizations, as that term shall be defined by the legislature, to finance the construction of new industrial or manufacturing plants, the construction of new buildings to be used for research and development, the construction of other eligible business facilities, and for the purchase of machinery and equipment related to such new industrial or manufacturing plants, research and development buildings, and other eligible business facilities in this state or the acquisition, rehabilitation or improvement of former or existing industrial or manufacturing plants, buildings to be used for research and development, other eligible business facilities, and machinery and equipment in this state, including the acquisition of real property therefor, and the use of such money by such public corporation for such purposes, to improve employment opportunities in any area of the state, provided, however, that any such plants, buildings or facilities or machinery and equipment therefor shall not be (i) primarily used in making retail sales of goods or services to customers who personally visit such facilities to obtain such goods or services or (ii) used primarily as a hotel, apartment house or other place of business which furnishes dwelling space or accommodations to either residents or transients, and provided further that any loan by such public corporation shall not exceed sixty per centum of the cost of any such project and the repayment of which shall be secured by a mortgage thereon which shall not be a junior encumbrance thereon by more than fifty per centum of such cost or by a security interest if personalty, and that the amount of any guarantee of a loan made by a banking organization shall not exceed eighty per centum of the cost of any such project. (Formerly §1. Derived in part from former §9 of Art. 8. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 1951; November 7, 1961; November 8, 1966; November 6, 1973; November 8, 1977; November 5, 1985; November 6, 2001.)

**[Short term state debts in anticipation of taxes, revenues and proceeds of sale of authorized bonds]**
§9.  The state may contract debts in anticipation of the receipt of taxes and revenues, direct or indirect, for the purposes and within the amounts of appropriations theretofore made. Notes or obligations for the moneys so borrowed shall be issued as may be provided by law, and shall with the interest thereon be paid from such taxes and revenues within one year from the date of issue.

The state may also contract debts in anticipation of the receipt of the proceeds of the sale of bonds theretofore authorized, for the purpose and within the amounts of the bonds so authorized. Notes or obligations for the money so borrowed shall be issued as may be provided by law, and shall with the interest thereon be paid from the proceeds of the sale of such bonds within two years from the date of issue, except as to bonds issued or to be issued for any of the purposes authorized by article eighteen of this constitution, in which event the notes or obligations shall with the interest thereon be paid from the proceeds of the sale of such bonds within five years from the date of issue. (Formerly §2.  Renumbered and amended by Constitutional

Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 4, 1958; November 7, 1995.)

**[State debts on account of invasion, insurrection, war and forest fires]**
§10.  In addition to the above limited power to contract debts, the state may contract debts to repel invasion, suppress insurrection, or defend the state in war, or to suppress forest fires; but the money arising from the contracting of such debts shall be applied for the purpose for which it was raised, or to repay such debts, and to no other purpose whatever. (Formerly §3. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[State debts generally; manner of contracting; referendum]**
§11.  Except the debts or refunding debts specified in sections 9, 10 and 13 of this article, no debt shall be hereafter contracted by or in behalf of the state, unless such debt shall be authorized by law, for some single work or purpose, to be distinctly specified therein. No such law shall take effect until it shall, at a general election, have been submitted to the people, and have received a majority of all the votes cast for and against it at such election nor shall it be submitted to be voted on within three months after its passage nor at any general election when any other law or any bill shall be submitted to be voted for or against.
The legislature may, at any time after the approval of such law by the people, if no debt shall have been contracted in pursuance thereof, repeal the same; and may at any time, by law, forbid the contracting of any further debt or liability under such law. (Formerly §4. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 2, 1993.)

**[State debts generally; how paid; contribution to sinking funds; restrictions on use of bond proceeds]**
§12.  Except the debts or refunding debts specified in sections 9, 10 and 13 of this article, all debts contracted by the state and each portion of any such debt from time to time so contracted shall be subject to the following rules:
1.  The principal of each debt or any portion thereof shall either be paid in equal annual installments or in installments that result in substantially level or declining debt service payments such as shall be authorized by law, or, in the alternative, contributions of principal in the amount that would otherwise be required to be paid annually shall be made to a sinking fund.
2.  When some portions of the same debt are payable annually while other portions require contributions to a sinking fund, the entire debt shall be structured so that the combined amount of annual installments of principal paid and/or annual contributions of principal made in each year shall be equal to the amount that would be required to be paid if the entire debt were payable in annual installments.
3.  When interest on state obligations is not paid at least annually, there shall also be contributed to a sinking fund at least annually, the amount necessary to bring the balance thereof, including income earned on contributions, to the accreted value of the obligations to be paid therefrom on the date such contribution is made, less the sum of all required future contributions of principal, in the case of sinking fund obligations, or payments of principal, in the case of serial obligations. Notwithstanding the foregoing, nothing contained in this subdivision shall be deemed to require contributions for interest to sinking funds if total debt service due on the debt or portion thereof in the year such interest is due will be substantially the same as the total debt service due on such debt or portion thereof in each other year or if the total amount of debt service due in each subsequent year on such debt or portion thereof shall be less than the total debt service due in each prior year.
4.  The first annual installment on such debt shall be paid, or the first annual contribution shall be made to a sinking fund, not more than one year, and the last installment shall be paid, or contribution made not more than forty years, after such debt or portion thereof shall have been contracted, provided, however, that in contracting any such debt the privilege of paying all or any part of such debt prior to the date on which the same shall be due may be reserved to the state in such manner as may be provided by law.

5.  No such debt shall be contracted for a period longer than that of the probable life of the work or purpose for which the debt is to be contracted, or in the alternative, the weighted average period of probable life of the works or purposes for which such indebtedness is to be contracted. The probable lives of such works or purposes shall be determined by general laws, which determination shall be conclusive.
6.  The money arising from any loan creating such debt or liability shall be applied only to the work or purpose specified in the act authorizing such debt or liability, or for the payment of such debt or liability, including any notes or obligations issued in anticipation of the sale of bonds evidencing such debt or liability.
7.  Any sinking funds created pursuant to this section shall be maintained and managed by the state comptroller or an agent or trustee designated by the state comptroller, and amounts in sinking funds created pursuant to this section, and earnings thereon, shall be used solely for the purpose of retiring the obligations secured thereby except that amounts in excess of the required balance on any contribution date and amounts remaining in such funds after all of the obligations secured thereby have been retired shall be deposited in the general fund.
8.  No appropriation shall be required for disbursement of money, or income earned thereon, from any sinking fund created pursuant to this section for the purpose of paying principal of and interest on the obligations for which such fund was created, except that interest shall be paid from any such fund only if, and to the extent that, it is not payable annually and contributions on account of such interest were made thereto.
9.  The provisions of section 15 of this article shall not apply to sinking funds created pursuant to this section.
10.  When state obligations are sold at a discount, the debt incurred for purposes of determining the amount of debt issued or outstanding pursuant to a voter approved bond referendum or other limitation on the amount of debt that may be issued or outstanding for a work or purpose shall be deemed to include only the amount of money actually received by the state notwithstanding the face amount of such obligations. (Derived in part from former §4. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people, November 2, 1993.)

**[Refund of state debts]**
§13.  The legislature may provide means and authority whereby any state debt or debts, or any portion or combination thereof, may be refunded in accordance with the following provisions:
1.  State debts may be refunded at any time after they are incurred provided that the state will achieve a debt service savings on a present value basis as a result of the refunding transaction, and further provided that no maturity shall be called for redemption unless the privilege to pay prior to the maturity date was reserved to the state. The legislature may provide for the method of computation of present value for such purpose.
2.  In no event shall refunding obligations be issued in an amount exceeding that necessary to provide sufficient funds to accomplish the refunding of the obligations to be refunded including paying all costs and expenses related to the refunding transaction and, in no event, shall the proceeds of refunding obligations be applied to any purpose other than accomplishing the refunding of the debt to be refunded and paying costs and expenses related to the refunding.
3.  Proceeds of refunding obligations shall be deposited in escrow funds which shall be maintained and managed by the state comptroller or by an agent or trustee designated by the state comptroller and no legislative appropriation shall be required for disbursement of money, or income earned thereon, from such escrow funds for the purposes enumerated in this section.
4.  Refunding obligations may be refunded pursuant to this section.
5.  Refunding obligations shall either be paid in annual installments or annual contributions shall be made to a sinking fund in amounts sufficient to retire the refunding obligations at their maturity. No annual installments or contributions of principal need be made with respect to all or any portion of an issue of refunding obligations in years when debt service on such refunding obligations or portion thereof is paid or contributed

entirely from an escrow fund created pursuant to subdivision 3 of this section or in years when no installments or contributions would have been due on the obligations to be refunded. So long as any of the refunding obligations remain outstanding, installments or contributions shall be made in any years that installments or contributions would have been due on the obligations to be refunded.

6. In no event shall the last annual installment or contribution on any portion of refunding debt, including refunding obligations issued to refund other refunding obligations, be made after the termination of the period of probable life of the projects financed with the proceeds of the relevant portion of the debt to be refunded, or any debt previously refunded with the refunding obligations to be refunded, determined as of the date of issuance of the original obligations pursuant to section 12 of this article to finance such projects, or forty years from such date, if earlier; provided, however, that in lieu of the foregoing, an entire refunding issue or portion thereof may be structured to mature over the remaining weighted average useful life of all projects financed with the obligations being refunded.

7. Subject to the provisions of subdivision 5 of this section, each annual installment or contribution of principal of refunding obligations shall be equal to the amount that would be required by subdivision 1 of section 12 of this article if such installments or contributions were required to be made from the year that the next installment or contribution would have been due on the obligations to be refunded, if they had not been refunded, until the final maturity of the refunding obligations but excluding any year in which no installment or contribution would have been due on the obligations to be refunded or, in the alternative, the total payments of principal and interest on the refunding bonds shall be less in each year to their final maturity than the total payments of principal and interest on the bonds to be refunded in each such year.

8. The provisions of subdivision 3 and subdivisions 7 through 9 of this section 12 of this article shall apply to sinking funds created pursuant to this section for the payment at maturity of refunding obligations. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 2, 1993.)

**[State debt for elimination of railroad crossings at grade; expenses; how borne; construction and reconstruction of state highways and parkways]**
§14. The legislature may authorize by law the creation of a debt or debts of the state, not exceeding in the aggregate three hundred million dollars, to provide moneys for the elimination, under state supervision, of railroad crossings at grade within the state, and for incidental improvements connected therewith as authorized by this section. The provisions of this article, not inconsistent with this section, relating to the issuance of bonds for a debt or debts of the state and the maturity and payment thereof, shall apply to a state debt or debts created pursuant to this section; except that the law authorizing the contracting of such debt or debts shall take effect without submission to the people pursuant to section 11 of this article. The aggregate amount of a state debt or debts which may be created pursuant to this section shall not exceed the difference between the amount of the debt or debts heretofore created or authorized by law, under the provisions of section 14 of article VII of the constitution in force on July first, nineteen hundred thirty-eight, and the sum of three hundred million dollars.

The expense of any grade crossing elimination the construction work for which was not commenced before January first, nineteen hundred thirty-nine, including incidental improvements connected therewith as authorized by this section, whether or not an order for such elimination shall theretofore have been made, shall be paid by the state in the first instance, but the state shall be entitled to recover from the railroad company or companies, by way of reimbursement (1) the entire amount of the railroad improvements not an essential part of elimination, and (2) the amount of the net benefit to the company or companies from the elimination exclusive of such railroad improvements, the amount of such net benefit to be adjudicated after the completion of the work in the manner to be prescribed by law, and in no event to exceed fifteen per centum of the expense of the elimination, exclusive of all incidental improvements. The reimbursement by the railroad companies shall be payable at such times, in such manner and with interest at such rate as the legislature may prescribe.

The expense of any grade crossing elimination the construction work for which was commenced before January first, nineteen hundred thirty-nine, shall be borne by the state, railroad companies, and the municipality or municipalities in the proportions formerly prescribed by section 14 of article VII of the constitution in force on July first, nineteen hundred thirty-eight, and the law or laws enacted pursuant to its provisions, applicable to such elimination, and subject to the provisions of such former section and law or laws, including advances in aid of any railroad company or municipality, although such elimination shall not be completed until after January first, nineteen hundred thirty-nine.

A grade crossing elimination the construction work for which shall be commenced after January first, nineteen hundred thirty-nine, shall include incidental improvements rendered necessary or desirable because of such elimination, and reasonably included in the engineering plans therefor. Out of the balance of all moneys authorized to be expended under section 14 of article VII of the constitution in force on July first, nineteen hundred thirty-eight, and remaining unexpended and unobligated on such date, fifty million dollars shall be deemed segregated for grade crossing eliminations and incidental improvements in the city of New York and shall be available only for such purposes until such eliminations and improvements are completed and paid for.

Notwithstanding any of the foregoing provisions of this section the legislature is hereby authorized to appropriate, out of the proceeds of bonds now or hereafter sold to provide moneys for the elimination of railroad crossings at grade and incidental improvements pursuant to this section, sums not exceeding in the aggregate sixty million dollars for the construction and reconstruction of state highways and parkways. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 4, 1941.)

**[Sinking funds; how kept and invested; income therefrom and application thereof]**
§15. The sinking funds provided for the payment of interest and the extinguishment of the principal of the debts of the state heretofore contracted shall be continued; they shall be separately kept and safely invested, and neither of them shall be appropriated or used in any manner other than for such payment and extinguishment as hereinafter provided. The comptroller shall each year appraise the securities held for investment in each of such funds at their fair market value not exceeding par. The comptroller shall then determine and certify to the legislature the amount of each of such funds and the amounts which, if thereafter annually contributed to each such fund, would, with the fund and with the accumulations thereon and upon the contributions thereto, computed at the rate of three per centum per annum, produce at the date of maturity the amount of the debt to retire which such fund was created, and the legislature shall thereupon appropriate as the contribution to each such fund for such year at least the amount thus certified.

If the income of any such fund in any year is more than a sum which, if annually added to such fund would, with the fund and its accumulations as aforesaid, retire the debt at maturity, the excess income may be applied to the interest on the debt for which the fund was created.

After any sinking fund shall equal in amount the debt for which it was created no further contribution shall be made thereto except to make good any losses ascertained at the annual appraisals above mentioned, and the income thereof shall be applied to the payment of the interest on such debt. Any excess in such income not required for the payment of interest may be applied to the general fund of the state. (Formerly §5. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 2001.)

**[Payment of state debts; when comptroller to pay without appropriation]**
§16. The legislature shall annually provide by appropriation for the payment of the interest upon and installments of principal of all debts or refunding debts created on behalf of the state except those contracted under section 9 of this article, as the same shall fall due, and for the contribution to all of the sinking funds created by law, of the amounts annually to be

contributed under the provisions of section 12, 13 or 15 of this article. If at any time the legislature shall fail to make any such appropriation, the comptroller shall set apart from the first revenues thereafter received, applicable to the general fund of the state, a sum sufficient to pay such interest, installments of principal, or contributions to such sinking fund, as the case may be, and shall so apply the moneys thus set apart. The comptroller may be required to set aside and apply such revenues as aforesaid, at the suit of any holder of such bonds.

Notwithstanding the foregoing provisions of this section, the comptroller may covenant with the purchasers of any state obligations that they shall have no further rights against the state for payment of such obligations or any interest thereon after an amount or amounts determined in accordance with the provisions of such covenant is deposited in a described fund or with a named or described agency or trustee. In such case, this section shall have no further application with respect to payment of such obligations or any interest thereon after the compliance has been complied with the prescribed conditions of such covenant. (Formerly §11. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 2, 1993.)

**[Authorizing the legislature to establish a fund or funds for tax revenue stabilization reserves; regulating payments thereto and withdrawals therefrom]**
§17. The legislature may establish a fund or funds to aid in the stabilization of the tax revenues of the state available for expenditure or distribution. Any law creating such a fund shall specify the tax or taxes to which such fund relates, and shall prescribe the method of determining the amount of revenue from any such tax or taxes which shall constitute a norm of each fiscal year. Such part as shall be prescribed by law of any revenue derived from such tax or taxes during a fiscal year in excess of such norm shall be paid into such fund. No moneys shall at any time be withdrawn from such fund unless the revenue derived from such tax or taxes during a fiscal year shall fall below the norm for such year; in which event such amount as may be prescribed by law, but in no event an amount exceeding the difference between such revenue and such norm, shall be paid from such fund into the general fund.

No law changing the method of determining a norm or prescribing the amount to be paid into such a fund or to be paid from such a fund into the general fund may become effective until three years from the date of its enactment. (Added by amendment approved by vote of the people November 2, 1943.)

**[Bonus on account of service of certain veterans in World War II]**
§18. The legislature may authorize by law the creation of a debt or debts of the state to provide for the payment of a bonus to each male and female member of the armed forces of the United States, still in the armed forces, or separated or discharged under honorable conditions, for service while on active duty with the armed forces at any time during the period from December seventh, nineteen hundred forty-one to and including September second, nineteen hundred forty-five, who was a resident of this state for a period of at least six months immediately prior to his or her enlistment, induction or call to active duty. The law authorizing the creation of the debt shall provide for payment of such bonus to the next of kin of each male and female member of the armed forces who, having been a resident of this state for a period of six months immediately prior to his or her enlistment, induction or call to active duty, died while on active duty at any time during the period from December seventh, nineteen hundred forty-one to and including September second, nineteen hundred forty-five; or who died while on active duty subsequent to September second, nineteen hundred forty-five, or after his or her separation or discharge under honorable conditions, prior to receiving payment of such bonus. An apportionment of the moneys on the basis of the periods and places of service of such members of the armed forces shall be provided by general laws. The aggregate of the debts authorized by this section shall not exceed four hundred million dollars. The provisions of this article, not inconsistent with this section, relating to the issuance of bonds for a debt or debts of the state and the maturity and payment thereof, shall apply to a debt or debts created

pursuant to this section; except that the law authorizing the contracting of such debt or debts shall take effect without submission to the people pursuant to section eleven of this article.

Proceeds of bonds issued pursuant to law, as authorized by this section as in force prior to January first, nineteen hundred fifty shall be available and may be expended for the payment of such bonus to persons qualified therefor as now provided by this section. (Added by amendment approved by vote of the people November 4, 1947; further amended by vote of the people November 8, 1949.)

**[State debt for expansion of state university]**
§19. The legislature may authorize by law the creation of a debt or debts of the state, not exceeding in the aggregate two hundred fifty million dollars, to provide moneys for the construction, reconstruction, rehabilitation, improvement and equipment of facilities for the expansion and development of the program of higher education provided and to be provided at institutions now or hereafter comprised within the state university, for acquisition of real property therefor, and for payment of the state's share of the capital costs of locally sponsored institutions of higher education approved and regulated by the state university trustees. The provisions of this article, not inconsistent with this section, relating to the issuance of bonds for a debt or debts of the state and the maturity and payment thereof, shall apply to a state debt or debts created pursuant to this section; except that the law authorizing the contracting of such debt or debts shall take effect without submission to the people pursuant to section eleven of this article. (New. Added by vote of the people November 5, 1957.)

**ARTICLE VIII**
LOCAL FINANCES

**[Gift or loan of property or credit of local subdivisions prohibited; exceptions for enumerated purposes]**
Section 1. No county, city, town, village or school district shall give or loan any money or property to or in aid of any individual, or private corporation or association, or private undertaking, or become directly or indirectly the owner of stock in, or bonds of, any private corporation or association; nor shall any county, city, town, village or school district give or loan its credit to or in aid of any individual, or public or private corporation or association, or private undertaking, except that two or more such units may join together pursuant to law in providing any municipal facility, service, activity or undertaking which each of such units has the power to provide separately. Each such unit may be authorized by the legislature to contract joint or several indebtedness, pledge its or their faith and credit for the payment of such indebtedness for such joint undertaking and levy real estate or other authorized taxes or impose charges therefor subject to the provisions of this constitution otherwise restricting the power of such units to contract indebtedness or to levy taxes on real estate. The legislature shall have power to provide by law for the manner and the proportion in which indebtedness arising out of such joint undertakings shall be incurred by such units and shall have power to provide a method by which such indebtedness shall be determined, allocated and apportioned among such units and such indebtedness treated for purposes of exclusion from applicable constitutional limitations, provided that in no event shall more than the total amount of indebtedness incurred for such joint undertaking be included in ascertaining the power of all such participating units to incur indebtedness. Such law may provide that such determination, allocation and apportionment shall be conclusive if made or approved by the comptroller. This provision shall not prevent a county from contracting indebtedness for the purpose of advancing to a town or school district, pursuant to law, the amount of unpaid taxes returned to it.

Subject to the limitations on indebtedness and taxation applying to any county, city, town or village nothing in this constitution contained shall prevent a county, city or town from making such provision for the aid, care and support of the needy as may be authorized by law, nor prevent any such county, city or town from providing for the care, support, maintenance and secular education of inmates of orphan asylums, homes for dependent children or correctional institutions and of children placed in family homes

# The Constitution of the State of New York

by authorized agencies, whether under public or private control, or from providing health and welfare services for all children, nor shall anything in this constitution contained prevent a county, city, town or village from increasing the pension benefits payable to retired members of a police department or fire department or to widows, dependent children or dependent parents of members or retired members of a police department or fire department; or prevent the city of New York from increasing the pension benefits payable to widows, dependent children or dependent parents of members or retired members of the relief and pension fund of the department of street cleaning of the city of New York. Payments by counties, cities or towns to charitable, eleemosynary, correctional and reformatory institutions and agencies, wholly or partly under private control, for care, support and maintenance, may be authorized, but shall not be required, by the legislature. No such payments shall be made for any person cared for by any such institution or agency, nor for a child placed in a family home, who is not received and retained therein pursuant to rules established by the state board of social welfare or other state department having the power of inspection thereof. (Formerly §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1959; November 5, 1963; November 2, 1965.)

**[Restrictions on indebtedness of local subdivisions; contracting and payment of local indebtedness; exceptions]**

§2. No county, city, town, village or school district shall contract any indebtedness except for county, city, town, village or school district purposes, respectively. No indebtedness shall be contracted for longer than the period of probable usefulness of the object or purpose for which such indebtedness is to be contracted, or, in the alternative, the weighted average period of probable usefulness of the several objects or purposes for which such indebtedness is to be contracted, to be determined by the governing body of the county, city, town, village or school district contracting such indebtedness pursuant to general or special laws of the state legislature, which determination shall be conclusive, and in no event for longer than forty years. Indebtedness or any portion thereof may be refunded within either such period of probable usefulness, or average period of probable usefulness, as may be determined by such governing body computed from the date such indebtedness was contracted.

No indebtedness shall be contracted by any county, city, town, village or school district unless such county, city, town, village or school district shall have pledged its faith and credit for the payment of the principal thereof and the interest thereon. Except for indebtedness contracted in anticipation of the collection of taxes actually levied and uncollected or to be levied for the year when such indebtedness is contracted and indebtedness contracted to be paid in one of the two fiscal years immediately succeeding the fiscal year in which such indebtedness was contracted, all such indebtedness and each portion thereof from time to time contracted, including any refunding thereof, shall be paid in annual installments, the first of which, except in the case of refunding of indebtedness heretofore contracted, shall be paid not more than two years after such indebtedness or portion thereof shall have been contracted, and no installment, except in the case of refunding of indebtedness heretofore contracted, shall be more than fifty per centum in excess of the smallest prior installment, unless the governing body of the county, city, town, village or school district contracting such indebtedness provides for substantially level or declining debt service payments as may be authorized by law.

Notwithstanding the foregoing provisions, indebtedness contracted by the city of New York and each portion of any such indebtedness from time to time so contracted for the supply of water, including the acquisition of land in connection with such purpose, may be financed either by serial bonds with a maximum maturity of fifty years, in which case such indebtedness shall be paid in annual installments as hereinbefore provided, or by sinking fund bonds with a maximum maturity of fifty years, which shall be redeemed through annual contributions to sinking funds established and maintained for the purpose of amortizing the indebtedness for which such bonds are issued. Notwithstanding the foregoing provisions, indebtedness hereafter contracted by the city of New York and each portion of any such indebtedness from time to time so contracted for (a) the acquisition,

construction or equipment of rapid transit railroads, or (b) the construction of docks, including the acquisition of land in connection with any of such purposes, may be financed either by serial bonds with a maximum maturity of forty years, in which case such indebtedness shall be paid in annual installments as hereinbefore provided, or by sinking fund bonds with a maximum maturity of forty years, which shall be redeemed through annual contributions to sinking funds established and maintained for the purpose of amortizing the indebtedness for which such bonds are issued.

Notwithstanding the foregoing provisions, but subject to such requirements as the legislature may impose by general or special law, indebtedness contracted by any county, city, town, village or school district and each portion thereof from time to time contracted for any object or purpose for which indebtedness may be contracted may also be financed by sinking fund bonds with a maximum maturity of fifty years, which shall be redeemed through annual contributions to sinking funds established by such county, city, town, village or school district, provided, however, that each such annual contribution shall be at least equal to the amount required, if any, to enable the sinking fund to redeem, on the date of the contribution, the same amount of such indebtedness as would have been paid and then be payable if such indebtedness had been financed entirely by the issuance of serial bonds, except, if an issue of sinking fund bonds is combined for sale with an issue of serial bonds, for the same object or purpose, then the amount of each annual sinking fund contribution shall be at least equal to the amount required, if any, to enable the sinking fund to redeem, on the date of each such annual contribution, (i) the amount which would be required to be paid annually if such indebtedness had been issued entirely as serial bonds, less (ii) the amount of indebtedness, if any, to be paid during such year on the portion of such indebtedness actually issued as serial bonds. Sinking funds established on or after January first, nineteen hundred eighty-six pursuant to the preceding sentence shall be maintained and managed by the state comptroller pursuant to such requirements and procedures as the legislature shall prescribe, including provisions for reimbursement to the issuer of bonds payable from such sinking funds for the expenses related to such maintenance and management.

Provisions shall be made annually by appropriation by every county, city, town, village and school district for the payment of interest on all indebtedness and for the amounts required for (a) the amortization and redemption of term bonds, sinking fund bonds and serial bonds, (b) the redemption of certificates or other evidence of indebtedness (except those issued in anticipation of the collection of taxes or other revenues, or renewals thereof, and which are described in paragraph A of section five of this article and those issued in anticipation of the receipt of the proceeds of the sale of bonds theretofore authorized) contracted to be paid in such year out of the tax levy or other revenues applicable to a reduction thereof, and (c) the redemption of certificates or other evidence of indebtedness issued in anticipation of the collection of taxes or other revenues, or renewals thereof, which are not retired within five years after their date of original issue. If at any time the respective appropriating authorities shall fail to make such appropriations, a sufficient sum shall be set apart from the first revenues thereafter received and shall be applied to such purposes. The fiscal officer of any county, city, town, village or school district may be required to set apart and apply such revenues as aforesaid at the suit of any holder of obligations issued for any such indebtedness.

Notwithstanding the foregoing, all interest need not be paid annually on an issue of indebtedness provided that either (a) substantially level or declining debt service payments (including all payments of interest) shall be made over the life of such issue of indebtedness, or (b) there shall annually be contributed to a sinking fund created pursuant to this section, the amount necessary to bring the balance thereof, including income earned on contributions, to the accreted value of the obligations to be paid therefrom on the date such contribution is made, less the sum of all required future contributions of principal, in the case of sinking fund obligations, or payments of principal, in the case of serial obligations. When obligations are sold by a county, city, town, village or school district at a discount, the debt incurred for the purposes of any debt limitation contained in this constitution, shall be deemed to include only the amount of money actually received by the county, city, town, village or school district, irrespective of the face amount

of the obligations. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 8, 1949; November 3, 1953; November 5, 1985; November 2, 1993.)

**[Local indebtedness for water supply, sewage and drainage facilities and purposes; allocations and exclusions of indebtedness]**

§2-a. Notwithstanding the provisions of section one of this article, the legislature by general or special law and subject to such conditions as it shall impose:

A. May authorize any county, city, town or village or any county or town on behalf of an improvement district to contract indebtedness to provide a supply of water, in excess of its own needs, for sale to any other public corporation or improvement district;

B. May authorize two or more public corporations and improvement districts to provide for a common supply of water and may authorize any such corporation, or any county or town on behalf of an improvement district, to contract joint indebtedness for such purpose or to contract indebtedness for specific proportions of the cost;

C. May authorize any county, city, town or village or any county or town on behalf of an improvement district to contract indebtedness to provide facilities, in excess of its own needs, for the conveyance, treatment and disposal of sewage from any other public corporation or improvement district;

D. May authorize two or more public corporations and improvement districts to provide for the common conveyance, treatment and disposal of sewage and may authorize any such corporation, or any county or town on behalf of an improvement district, to contract joint indebtedness for such purpose or to contract indebtedness for specific proportions of the cost;

E. May authorize any county, city, town or village or any county or town on behalf of an improvement district to contract indebtedness to provide facilities, in excess of its own needs, for drainage purposes from any other public corporation or improvement district.

F. May authorize two or more public corporations and improvement districts to provide for a common drainage system and may authorize any such corporation, or any county or town on behalf of an improvement district, to contract joint indebtedness for such purpose or to contract indebtedness for specific proportions of the cost.

Indebtedness contracted by a county, city, town or village pursuant to this section shall be for a county, city, town or village purpose, respectively. In ascertaining the power of a county, city, town or village to contract indebtedness, any indebtedness contracted pursuant to paragraphs A and B of this section shall be excluded.

The legislature shall provide the method by which a fair proportion of joint indebtedness contracted pursuant to paragraphs D and F of this section shall be allocated to any county, city, town or village.

The legislature by general law in terms and in effect applying alike to all counties, to all cities, to all towns and/or to all villages also may provide that all or any part of indebtedness contracted or proposed to be contracted by any county, city, town or village pursuant to paragraphs D and F of this section for a revenue producing public improvement or service may be excluded periodically in ascertaining the power of such county, city, town or village to contract indebtedness. The amount of any such exclusion shall have a reasonable relation to the extent to which such public improvement or service shall have yielded or is expected to yield revenues sufficient to provide for the payment of the interest on and amortization of or payment of indebtedness contracted or proposed to be contracted for such public improvement or service, after deducting all costs of operation, maintenance and repairs thereof. The legislature shall provide the method by which a fair proportion of joint indebtedness proposed to be contracted pursuant to paragraphs D and F of this section shall be allocated to any county, city, town or village for the purpose of determining the amount of any such exclusion. The provisions of paragraph C of section five and section ten-a of this article shall not apply to indebtedness contracted pursuant to paragraphs D and F of this section.

The legislature may provide that any allocation of indebtedness, or determination of the amount of any exclusion of indebtedness, made pursuant to this section shall be conclusive if made or approved by the state comptroller. (Section added by vote of the people November 3, 1953. Paragraphs C-F added, next unnumbered paragraph amended, and three concluding unnumbered paragraphs added by amendment approved by vote of the people November 8, 1955.)

**[Restrictions on creation and indebtedness of certain corporations]**

§3. No municipal or other corporation (other than a county, city, town, village, school district or fire district, or a river improvement, river regulating, or drainage district, established by or under the supervision of the department of conservation) possessing the power (a) to contract indebtedness and (b) to levy taxes or benefit assessments upon real estate or to require the levy of such taxes or assessments, shall hereafter be established or created, but nothing herein shall prevent the creation of improvement districts in counties and towns, provided that the county or town or towns in which such districts are located shall pledge its or their faith and credit for the payment of the principal of and interest on all indebtedness to be contracted for the purposes of such districts, and in ascertaining the power of any such county or town to contract indebtedness, such indebtedness shall be included, unless such indebtedness would, under the provisions of this article, be excluded in ascertaining the power of a county or town to contract indebtedness. No such corporation now existing shall hereafter contract any indebtedness without the consent, granted in such manner as may be prescribed by general law, of the city or village within which, or of the town within any unincorporated area of which any real estate may be subject to such taxes or assessments. If the real estate subject to such taxes or assessments is wholly within a city, village or the unincorporated area of a town, in ascertaining the power of such city, village or town to contract indebtedness, there shall be included any indebtedness hereafter contracted by such corporation, unless such indebtedness would, under the provisions of this article, be excluded if contracted by such city, village or town. If only part of the real estate subject to such taxes or assessments is within a city, village or the unincorporated area of a town, in ascertaining the power of such city, village or town to contract indebtedness, there shall be included the proportion, determined as prescribed by general law, of any indebtedness hereafter contracted by such corporation, unless such indebtedness would, under the provisions of this article, be excluded if contracted by such city, village or town. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Limitations on local indebtedness]**

§4. Except as otherwise provided in this constitution, no county, city, town, village or school district described in this section shall be allowed to contract indebtedness for any purpose or in any manner which, including existing indebtedness, shall exceed an amount equal to the following percentages of the average full valuation of taxable real estate of such county, city, town, village or school district:

(a) the county of Nassau, for county purposes, ten per centum;

(b) any county, other than the county of Nassau, for county purposes, seven per centum;

(c) the city of New York, for city purposes, ten per centum;

(d) any city, other than the city of New York, having one hundred twenty-five thousand or more inhabitants according to the latest federal census, for city purposes, nine per centum;

(e) any city having less than one hundred twenty-five thousand inhabitants according to the latest federal census, for city purposes, excluding education purposes, seven per centum;

(f) any town, for town purposes, seven per centum;

(g) any village for village purposes, seven per centum; and

(h) any school district which is coterminous with, or partly within, or wholly within, a city having less than one hundred twenty-five thousand inhabitants according to the latest federal census, for education purposes, five per centum; provided, however, that such limitation may be increased in relation to indebtedness for specified objects or purposes with (1) the approving vote of sixty per centum or more of the duly qualified voters of such school district voting on a proposition therefor submitted at a general or special election, (2) the consent of The Regents of the University of the State of New York and (3) the consent of the state comptroller. The legislature shall prescribe by law the qualifications for voting at any such election.

Except as otherwise provided in this constitution, any indebtedness contracted in excess of the respective limitations prescribed in this section shall be void.

In ascertaining the power of any city having less than one hundred twenty-five thousand inhabitants according to the latest federal census to contract indebtedness, indebtedness heretofore contracted by such city for education purposes shall be excluded. Such indebtedness so excluded shall be included in ascertaining the power of a school district which is coterminous with, or partly within, or wholly within, such city to contract indebtedness. The legislature shall prescribe by law the manner by which the amount of such indebtedness shall be determined and allocated among such school districts. Such law may provide that such determinations and allocations shall be conclusive if made or approved by the state comptroller.

In ascertaining the power of a school district described in this section to contract indebtedness, certificates or other evidences of indebtedness described in paragraph A of section five of this article shall be excluded.

The average full valuation of taxable real estate of any such county, city, town, village or school district shall be determined in the manner prescribed in section ten of this article.

Nothing contained in this section shall be deemed to restrict the powers granted to the legislature by other provisions of this constitution to further restrict the powers of any county, city, town, village or school district to contract indebtedness. (New. Approved by vote of the people November 6, 1951. Substituted for §4, derived in part from former §10, renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

[Ascertainment of debt-incurring power of counties, cities, towns and villages; certain indebtedness to be excluded]
§5. In ascertaining the power of a county, city, town or village to contract indebtedness, there shall be excluded:

A. Certificates or other evidences of indebtedness (except serial bonds of an issue having a maximum maturity of more than two years) issued for purposes other than the financing of capital improvements and contracted to be redeemed in one of the two fiscal years immediately succeeding the year of their issue, and certificates or other evidences of indebtedness issued in any fiscal year in anticipation of (a) the collection of taxes on real estate for amounts theretofore actually levied and uncollected or to be levied in such year and payable out of such taxes, (b) moneys receivable from the state which have theretofore been apportioned by the state or which are to be so apportioned within one year after their issue and (c) the collection of any other taxes due and payable or to become due and payable within one year or of other revenues to be received within one year after their issue; excepting any such certificates or other evidences of indebtedness or renewals thereof which are not retired within five years after their date of original issue.

B. Indebtedness heretofore or hereafter contracted to provide for the supply of water.

C. Indebtedness heretofore or hereafter contracted by any county, city, town or village for a public improvement or part thereof, or service, owned or rendered by such county, city, town or village, annually proportionately to the extent that the same shall have yielded to such county, city, town or village net revenue; provided, however, that such net revenue shall be twenty-five per centum or more of the amount required in such year for the payment of the interest on, amortization of, or payment of, such indebtedness. Such exclusion shall be granted only if the revenues of such public improvement or part thereof, or service, are applied to and actually used for payment of all costs of operation, maintenance and repairs, and payment of the amounts required in such year for interest on and amortization of or redemption of such indebtedness, or such revenues are deposited in a special fund to be used solely for such payments. Any revenues remaining after such payments are made may be used for any lawful purpose of such county, city, town or village, respectively.

Net revenue shall be determined by deducting from gross revenues of the preceding year all costs of operation, maintenance and repairs for such year, or the legislature may provide that net revenue shall be determined by deducting from the average of the gross revenues of not to exceed five of the preceding years during which the public improvement or part thereof, or

service, has been in operation, the average of all costs of operation, maintenance and repairs for the same years.

A proportionate exclusion of indebtedness contracted or proposed to be contracted also may be granted for the period from the date when such indebtedness is first contracted or to be contracted for such public improvement or part thereof, or service, through the first year of operation of such public improvement or part thereof, or service. Such exclusion shall be computed in the manner provided in this section on the basis of estimated net revenue which shall be determined by deducting from the gross revenues estimated to be received during the first year of operation of such public improvement or part thereof, or service, all estimated costs of operation, maintenance and repairs for such year. The amount of any such proportionate exclusion shall not exceed seventy-five per centum of the amount which would be excluded if the computation were made on the basis of net revenue instead of estimated net revenue.

Except as otherwise provided herein, the legislature shall prescribe the method by which and the terms and conditions under which the proportionate amount of any such indebtedness to be so excluded shall be determined and no proportionate amount of such indebtedness shall be excluded except in accordance with such determination. The legislature may provide that the state comptroller shall make such determination or it may confer appropriate jurisdiction on the appellate division of the supreme court in the judicial departments in which such counties, cities, towns or villages are located for the purpose of determining the proportionate amount of any such indebtedness to be so excluded.

The provisions of this paragraph C shall not affect or impair any existing exclusions of indebtedness, or the power to exclude indebtedness, granted by any other provision of this constitution.

D. Serial bonds, issued by any county, city, town or village which now maintains a pension or retirement system or fund which is not on an actuarial reserve basis with current payments to the reserve adequate to provide for all current accruing liabilities. Such bonds shall not exceed in the aggregate an amount sufficient to provide for the payment of the liabilities of such system or fund, accrued on the date of issuing such bonds, both on account of pensioners on the pension roll on that date and prospective pensions to dependents of such pensioners and on account of prior service of active members of such system or fund on that date. Such bonds or the proceeds thereof shall be deposited in such system or fund. Each such pension or retirement system or fund thereafter shall be maintained on an actuarial reserve basis with current payments to the reserve adequate to provide for all current accruing liabilities.

E. Indebtedness contracted on or after January first, nineteen hundred sixty-two and prior to January first, two thousand twenty-four, for the construction or reconstruction of facilities for the conveyance, treatment and disposal of sewage. The legislature shall prescribe the method by which and the terms and conditions under which the amount of any such indebtedness to be excluded shall be determined, and no such indebtedness shall be excluded except in accordance with such determination. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; paragraph C further amended by vote of the people November 8, 1949, and November 6, 1951; paragraph A amended by vote of the people November 3, 1953; paragraph E added by vote of the people November 5, 1963 and amended November 6, 1973; further amended by vote of the people November 8, 1983; November 2, 1994; November 4, 2003, November 5, 2013.)

[Debt-incurring power of Buffalo, Rochester and Syracuse; certain additional indebtedness to be excluded]
§6. In ascertaining the power of the cities of Buffalo, Rochester and Syracuse to contract indebtedness, in addition to the indebtedness excluded by section 5 of this article, there shall be excluded:

Indebtedness not exceeding in the aggregate the sum of ten million dollars, heretofore or hereafter contracted by the city of Buffalo or the city of Rochester and indebtedness not exceeding in the aggregate the sum of five million dollars heretofore or hereafter contracted by the city of Syracuse for so much of the cost and expense of any public improvement as may be required by the ordinance or other local law therein assessing the same to be

raised by assessment upon local property or territory. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Debt-incurring power of New York city; certain additional indebtedness to be excluded]**

§7. In ascertaining the power of the city of New York to contract indebtedness, in addition to the indebtedness excluded by section 5 of this article, there shall be excluded:

A. Indebtedness contracted prior to the first day of January, nineteen hundred ten, for dock purposes proportionately to the extent to which the current net revenues received by the city therefrom shall meet the interest on and the annual requirements for the amortization of such indebtedness. The legislature shall prescribe the method by which and the terms and conditions under which the amount of any such indebtedness to be so excluded shall be determined, and no such indebtedness shall be excluded except in accordance with such determination. The legislature may confer appropriate jurisdiction on the appellate division of the supreme court in the first judicial department for the purpose of determining the amount of any such indebtedness to be so excluded.

B. The aggregate of indebtedness initially contracted from time to time after January first, nineteen hundred twenty-eight, for the construction or equipment, or both, of new rapid transit railroads, not exceeding the sum of three hundred million dollars. Any indebtedness thereafter contracted in excess of such sum for such purposes shall not be so excluded, but this provision shall not be construed to prevent the refunding of any of the indebtedness excluded hereunder.

C. The aggregate of indebtedness initially contracted from time to time after January first, nineteen hundred fifty, for the construction, reconstruction and equipment of city hospitals, not exceeding the sum of one hundred fifty million dollars. Any indebtedness thereafter contracted in excess of such sum for such purposes, other than indebtedness contracted to refund indebtedness excluded pursuant to this paragraph, shall not be so excluded.

D. The aggregate of indebtedness initially contracted from time to time after January first, nineteen hundred fifty-two, for the construction and equipment of new rapid transit railroads, including extensions of and interconnections with and between existing rapid transit railroads or portions thereof, and reconstruction and equipment of existing rapid transit railroads, not exceeding the sum of five hundred million dollars. Any indebtedness thereafter contracted in excess of such sum for such purposes, other than indebtedness contracted to refund indebtedness excluded pursuant to this paragraph, shall not be so excluded.

E. Indebtedness contracted for school purposes, evidenced by bonds, to the extent to which state aid for common schools, not exceeding two million five hundred thousand dollars, shall meet the interest and the annual requirements for the amortization and payment of part or all of one or more issues of such bonds. Such exclusion shall be effective only during a fiscal year of the city in which its expense budget provides for the payment of such debt service from such state aid. The legislature shall prescribe by law the manner by which the amount of any such exclusion shall be determined and such indebtedness shall not be excluded hereunder except in accordance with the determination so prescribed. Such law may provide that any such determination shall be conclusive if made or approved by the state comptroller. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Paragraph D added by amendment approved by vote of the people November 8, 1949; paragraphs E and F added by vote of the people November 6, 1951. Former paragraph A deleted; subsequent paragraphs re-lettered A to E by amendment approved by vote of the people November 3, 1953.)

**[Debt-incurring power of New York city; certain indebtedness for railroads and transit purposes to be excluded]**

§7-a. In ascertaining the power of the city of New York to contract indebtedness, in addition to the indebtedness excluded under any other section of this constitution, there shall be excluded:

A. The aggregate of indebtedness initially contracted from time to time by the city for the acquisition of railroads and facilities or properties used in connection therewith or rights therein or securities of corporations owning such railroads, facilities or rights, not exceeding the sum of three hundred fifteen million dollars. Provision for the amortization of such indebtedness shall be made either by the establishment and maintenance of a sinking fund therefor or by annual payment of part thereof, or by both such methods. Any indebtedness thereafter contracted in excess of such sum for such purposes shall not be so excluded, but this provision shall not be construed to prevent the refunding of any such indebtedness.

Notwithstanding any other provision of the constitution, the city is hereby authorized to contract indebtedness for such purposes and to deliver its obligations evidencing such indebtedness to the corporations owning the railroads, facilities, properties or rights acquired, to the holders of securities of such owning corporations, to the holders of securities of corporations holding the securities of such owning corporations, or to the holders of securities to which such acquired railroads, facilities, properties or rights are now subject.

B. Indebtedness contracted by the city for transit purposes, and not otherwise excluded, proportionately to the extent to which the current net revenue received by the city from all railroads and facilities and properties used in connection therewith and rights therein owned by the city and securities of corporations owning such railroads, facilities, properties or rights, owned by the city, shall meet the interest and the annual requirements for the amortization and payment of such non-excluded indebtedness.

In determining whether indebtedness for transit purposes may be excluded under this paragraph of this section, there shall first be deducted from the current net revenue received by the city from such railroads and facilities and properties used in connection therewith and rights therein and securities owned by the city: (a) an amount equal to the interest and amortization requirements on indebtedness for rapid transit purposes heretofore excluded by order of the appellate division, which exclusion shall not be terminated by or under any provision of this section; (b) an amount equal to the interest on indebtedness contracted pursuant to this section and of the annual requirements for amortization on any sinking fund bonds and for redemption of any serial bonds evidencing such indebtedness; (c) an amount equal to the sum of all taxes and bridge tolls accruing to the city in the fiscal year of the city preceding the acquisition of the railroads or facilities or properties or rights therein or securities acquired by the city hereunder, from such railroads, facilities and properties; and (d) the amount of net operating revenue derived by the city from the independent subway system during such fiscal year. The legislature shall prescribe the method by which and the terms and conditions under which the amount of any indebtedness to be excluded hereunder shall be determined, and no indebtedness shall be excluded except in accordance with the determination so prescribed. The legislature may confer appropriate jurisdiction on the appellate division of the supreme court in the first judicial department for the purpose of determining the amount of any debt to be so excluded. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Indebtedness not to be invalidated by operation of this article]**

§8. No indebtedness of a county, city, town, village or school district valid at the time of its inception shall thereafter become invalid by reason of the operation of any of the provisions of this article. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[When debt-incurring power of certain counties shall cease]**

§9. Whenever the boundaries of any city are the same as those of a county, or when any city includes within its boundaries more than one county, the power of any county wholly included within such city to contract indebtedness shall cease, but the indebtedness of such county shall not, for the purposes of this article, be included as a part of the city indebtedness. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

# The Constitution of the State of New York

**[Limitations on amount to be raised by real estate taxes for local purposes; exceptions]**

§10.  Hereafter, in any county, city, village or school district described in this section, the amount to be raised by tax on real estate in any fiscal year, in addition to providing for the interest on and the principal of all indebtedness, shall not exceed an amount equal to the following percentages of the average full valuation of taxable real estate of such county, city, village or school district, less the amount to be raised by tax on real estate in such year for the payment of the interest on and redemption of certificates or other evidence of indebtedness described in paragraphs A and D of section five of this article, or renewals thereof:

(a) any county, for county purposes, one and one-half per centum; provided, however, that the legislature may prescribe a method by which such limitation may be increased to not to exceed two per centum;

(b) any city of one hundred twenty-five thousand or more inhabitants according to the latest federal census, for city purposes, two per centum;

(c) any city having less than one hundred twenty-five thousand inhabitants according to the latest federal census, for city purposes, two per centum;

(d) any village, for village purposes, two per centum;

(e) Notwithstanding the provisions of sub-paragraphs (a) and (b) of this section, the city of New York and the counties therein, for city and county purposes, a combined total of two and one-half per centum.

The average full valuation of taxable real estate of such county, city, village or school district shall be determined by taking the assessed valuations of taxable real estate on the last completed assessment rolls and the four preceding rolls of such county, city, village or school district, and applying thereto the ratio which such assessed valuation on each of such rolls bears to the full valuation, as determined by the state tax commission or by such other state officer or agency as the legislature shall by law direct. The legislature shall prescribe the manner by which such ratio shall be determined by the state tax commission or by such other state officer or agency.

Nothing contained in this section shall be deemed to restrict the powers granted to the legislature by other provisions of this constitution to further restrict the powers of any county, city, town, village or school district to levy taxes on real estate. (Derived in part from former §10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 8, 1949; November 3, 1953; subparagraph (f) added by separate amendment approved by vote of the people November 3, 1953. Former subparagraph (e) repealed and former subparagraph (f) relettered (e) by amendment approved by vote of the people November 5, 1985.)

**[Application and use of revenues: certain public improvements]**

§10-a.  For the purpose of determining the amount of taxes which may be raised on real estate pursuant to section ten of this article, the revenues received in each fiscal year by any county, city or village from a public improvement or part thereof, or service, owned or rendered by such county, city or village for which bonds or capital notes are issued after January first, nineteen hundred fifty, shall be applied first to the payment of all costs of operation, maintenance and repairs thereof, and then to the payment of the amounts required in such fiscal year to pay the interest on and the amortization of, or payment of, indebtedness contracted for such public improvement or part thereof, or service. The provisions of this section shall not prohibit the use of excess revenues for any lawful county, city or village purpose. The provisions of this section shall not be applicable to a public improvement or part thereof constructed to provide for the supply of water. (New section added by amendment approved by vote of the people November 8, 1949. Amended by vote of the people November 3, 1953.)

**[Taxes for certain capital expenditures to be excluded from tax limitation]**

§11. (a) Whenever the city of New York is required by law to pay for all or any part of the cost of capital improvements by direct budgetary appropriation in any fiscal year or by the issuance of certificates or other evidence of indebtedness (except serial bonds of an issue having a maximum maturity of more than two years) to be redeemed in one of the two immediately succeeding fiscal years, taxes required for such appropriation or for the redemption of such certificates or other evidence of indebtedness may be excluded in whole or in part by such city from the tax limitation prescribed by section ten of this article, in which event the total amount so required for such appropriation and for the redemption of such certificates or other evidence of indebtedness shall be deemed to be indebtedness to the same extent and in the same manner as if such amount had been financed through indebtedness payable in equal annual installments over the period of the probable usefulness of such capital improvement, as determined by law. The fiscal officer of such city shall determine the amount to be deemed indebtedness pursuant to this section, and the legislature, in its discretion, may provide that such determination, if approved by the state comptroller, shall be conclusive. Any amounts determined to be deemed indebtedness of any county, city, other than the city of New York, village or school district in accordance with the provisions of this section as in force and effect prior to January first, nineteen hundred fifty-two, shall not be deemed to be indebtedness on and after such date.

(b) Whenever any county, city, other than the city of New York, village or school district which is coterminous with, or partly within, or wholly within, a city having less than one hundred twenty-five thousand inhabitants according to the latest federal census provides by direct budgetary appropriation for any fiscal year for the payment in such fiscal year or in any future fiscal year or years of all or any part of the cost of an object or purpose for which a period of probable usefulness has been determined by law, the taxes required for such appropriation shall be excluded from the tax limitation prescribed by section ten of this article unless the legislature otherwise provides. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 8, 1949, and by vote of the people November 6, 1951.)

**[Powers of local governments to be restricted; further limitations on contracting local indebtedness authorized]**

§12.  It shall be the duty of the legislature, subject to the provisions of this constitution, to restrict the power of taxation, assessment, borrowing money, contracting indebtedness, and loaning the credit of counties, cities, towns and villages, so as to prevent abuses in taxation and assessments and in contracting of indebtedness by them. Nothing in this article shall be construed to prevent the legislature from further restricting the powers herein specified of any county, city, town, village or school district to contract indebtedness or to levy taxes on real estate. The legislature shall not, however, restrict the power to levy taxes on real estate for the payment of interest on or principal of indebtedness theretofore contracted. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Amended by vote of the people November 5, 1963.)

## ARTICLE IX[10]
### LOCAL GOVERNMENTS

**[Bill of rights for local governments]**

Section 1.  Effective local self-government and intergovernmental cooperation are purposes of the people of the state. In furtherance thereof, local governments shall have the following rights, powers, privileges and immunities in addition to those granted by other provisions of this constitution:

(a) Every local government, except a county wholly included within a city, shall have a legislative body elective by the people thereof. Every local government shall have power to adopt local laws as provided by this article.

(b) All officers of every local government whose election or appointment is not provided for by this constitution shall be elected by the people of the local government, or of some division thereof, or appointed by such officers of the local government as may be provided by law.

---

[10]  New article, adopted by amendment approved by vote of the people November 5, 1963. Former Article IX repealed, except sections 5, 6 and 8, which were relettered subdivisions (a), (b) and (c) respectively of new section 13 of Article XIII.

33

(c) Local governments shall have power to agree, as authorized by act of the legislature, with the federal government, a state or one or more other governments within or without the state, to provide cooperatively, jointly or by contract any facility, service, activity or undertaking which each participating local government has the power to provide separately. Each such local government shall have power to apportion its share of the cost thereof upon such portion of its area as may be authorized by act of the legislature.

(d) No local government or any part of the territory thereof shall be annexed to another until the people, if any, of the territory proposed to be annexed shall have consented thereto by majority vote on a referendum and until the governing board of each local government, the area of which is affected, shall have consented thereto upon the basis of a determination that the annexation is in the over-all public interest. The consent of the governing board of a county shall be required only where a boundary of the county is affected. On or before July first, nineteen hundred sixty-four, the legislature shall provide, where such consent of a governing board is not granted, for adjudication and determination, on the law and the facts, in a proceeding initiated in the supreme court, of the issue of whether the annexation is in the over-all public interest.

(e) Local governments shall have power to take by eminent domain private property within their boundaries for public use together with excess land or property but no more than is sufficient to provide for appropriate disposition or use of land or property which abuts on that necessary for such public use, and to sell or lease that not devoted to such use. The legislature may authorize and regulate the exercise of the power of eminent domain and excess condemnation by a local government outside its boundaries.

(f) No local government shall be prohibited by the legislature (1) from making a fair return on the value of the property used and useful in its operation of a gas, electric or water public utility service, over and above costs of operation and maintenance and necessary and proper reserves, in addition to an amount equivalent to taxes which such service, if privately owned, would pay to such local government, or (2) from using such profits for payment of refunds to consumers or for any other lawful purpose.

(g) A local government shall have power to apportion its cost of a governmental service or function upon any portion of its area, as authorized by act of the legislature.

(h) (1) Counties, other than those wholly included within a city, shall be empowered by general law, or by special law enacted upon county request pursuant to section two of this article, to adopt, amend or repeal alternative forms of county government provided by the legislature or to prepare, adopt, amend or repeal alternative forms of their own. Any such form of government or any amendment thereof, by act of the legislature or by local law, may transfer one or more functions or duties of the county or of the cities, towns, villages, districts or other units of government wholly contained in such county to each other or when authorized by the legislature to the state, or may abolish one or more offices, departments, agencies or units of government provided, however, that no such form or amendment, except as provided in paragraph (2) of this subdivision, shall become effective unless approved on a referendum by a majority of the votes cast thereon in the area of the county outside of cities, and in the cities of the county, if any, considered as one unit. Where an alternative form of county government or any amendment thereof, by act of the legislature or by local law, provides for the transfer of any function or duty to or from any village or the abolition of any office, department, agency or unit of government of a village wholly contained in such county, such form or amendment shall not become effective unless it shall also be approved on the referendum by a majority of the votes cast thereon in all the villages so affected considered as one unit.

(2) After the adoption of an alternative form of county government by a county, any amendment thereof by act of the legislature or by local law which abolishes or creates an elective county office, changes the voting or veto power of or the method of removing an elective county officer during his or her term of office, abolishes, curtails or transfers to another county officer or agency any power of an elective county officer or changes the form or composition of the county legislative body shall be subject to a permissive referendum as provided by the legislature. (Amended by vote of the people November 6, 2001.)

**Powers and duties of legislature; home rule powers of local governments; statute of local governments.**

§2. (a) The legislature shall provide for the creation and organization of local governments in such manner as shall secure to them the rights, powers, privileges and immunities granted to them by this constitution.

(b) Subject to the bill of rights of local governments and other applicable provisions of this constitution, the legislature:

(1) Shall enact, and may from time to time amend, a statute of local governments granting to local governments powers including but not limited to those of local legislation and administration in addition to the powers vested in them by this article. A power granted in such statute may be repealed, diminished, impaired or suspended only by enactment of a statute by the legislature with the approval of the governor at its regular session in one calendar year and the re-enactment and approval of such statute in the following calendar year.

(2) Shall have the power to act in relation to the property, affairs or government of any local government only by general law, or by special law only (a) on request of two-thirds of the total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership, or (b) except in the case of the city of New York, on certificate of necessity from the governor reciting facts which in the judgment of the governor constitute an emergency requiring enactment of such law and, in such latter case, with the concurrence of two-thirds of the members elected to each house of the legislature.

(3) Shall have the power to confer on local governments powers not relating to their property, affairs or government including but not limited to those of local legislation and administration, in addition to those otherwise granted by or pursuant to this article, and to withdraw or restrict such additional powers.

(c) In addition to powers granted in the statute of local governments or any other law, (i) every local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to its property, affairs or government and, (ii) every local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to the following subjects, whether or not they relate to the property, affairs or government of such local government, except to the extent that the legislature shall restrict the adoption of such a local law relating to other than the property, affairs or government of such local government:

(1) The powers, duties, qualifications, number, mode of selection and removal, terms of office, compensation, hours of work, protection, welfare and safety of its officers and employees, except that cities and towns shall not have such power with respect to members of the legislative body of the county in their capacities as county officers.

(2) In the case of a city, town or village, the membership and composition of its legislative body.

(3) The transaction of its business.

(4) The incurring of its obligations, except that local laws relating to financing by the issuance of evidences of indebtedness by such local government shall be consistent with laws enacted by the legislature.

(5) The presentation, ascertainment and discharge of claims against it.

(6) The acquisition, care, management and use of its highways, roads, streets, avenues and property.

(7) The acquisition of its transit facilities and the ownership and operation thereof.

(8) The levy, collection and administration of local taxes authorized by the legislature and of assessments for local improvements, consistent with laws enacted by the legislature.

(9) The wages or salaries, the hours of work or labor, and the protection, welfare and safety of persons employed by any contractor or sub-contractor performing work, labor or services for it.

(10) The government, protection, order, conduct, safety, health and well-being of persons or property therein.

(d) Except in the case of a transfer of functions under an alternative form of county government, a local government shall not have power to adopt local laws which impair the powers of any other local government.

(e) The rights and powers of local governments specified in this section insofar as applicable to any county within the city of New York shall be vested in such city. (Amended by vote of the people November 6, 2001.)

**Existing laws to remain applicable; construction; definitions.**
§3. (a) Except as expressly provided, nothing in this article shall restrict or impair any power of the legislature in relation to:

(1) The maintenance, support or administration of the public school system, as required or provided by article XI of this constitution, or any retirement system pertaining to such public school system,

(2) The courts as required or provided by article VI of this constitution, and

(3) Matters other than the property, affairs or government of a local government.

(b) The provisions of this article shall not affect any existing valid provisions of acts of the legislature or of local legislation and such provisions shall continue in force until repealed, amended, modified or superseded in accordance with the provisions of this constitution.

(c) Rights, powers, privileges and immunities granted to local governments by this article shall be liberally construed.

(d) Whenever used in this article the following terms shall mean or include:

(1) "General law." A law which in terms and in effect applies alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages.

(2) "Local government." A county, city, town or village.

(3) "People." Persons entitled to vote as provided in section one of article two of this constitution.

(4) "Special law." A law which in terms and in effect applies to one or more, but not all, counties, counties other than those wholly included within a city, cities, towns or villages.

## ARTICLE X
### CORPORATIONS

**[Corporations; formation of]**
Section 1. Corporations may be formed under general law; but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed. (Formerly §1 of Art. 8. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Dues of corporations]**
§2. Dues from corporations shall be secured by such individual liability of the corporators and other means as may be prescribed by law. (Formerly §2 of Art. 8. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Savings bank charters; savings and loan association charters; special charters not to be granted]**
§3. The legislature shall, by general law, conform all charters of savings banks, savings and loan associations, or institutions for savings, to a uniformity of powers, rights and liabilities, and all charters hereafter granted for such corporations shall be made to conform to such general law, and to such amendments as may be made thereto. The legislature shall have no power to pass any act granting any special charter for banking purposes; but corporations or associations may be formed for such purposes under general laws. (Formerly §4 of Art. 8. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 8, 1983.)

**[Corporations; definition; right to sue and be sued]**
§4. The term corporations as used in this section, and in sections 1, 2 and 3 of this article shall be construed to include all associations and joint-stock companies having any of the powers or privileges of corporations not possessed by individuals or partnerships. And all corporations shall have the right to sue and shall be subject to be sued in all courts in like cases as natural persons. (Formerly §3 of Art. 8. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Public corporations; restrictions on creation and powers; accounts; obligations of]**
§5. No public corporation (other than a county, city, town, village, school district or fire district or an improvement district established in a town or towns) possessing both the power to contract indebtedness and the power to collect rentals, charges, rates or fees for the services or facilities furnished or supplied by it shall hereafter be created except by special act of the legislature.

No such public corporation (other than a county or city) shall hereafter be given both the power to contract indebtedness and the power, within any city, to collect rentals, charges, rates or fees from the owners of real estate, or the occupants of real estate (other than the occupants of premises owned or controlled by such corporation or by the state or any civil division thereof), for services or facilities furnished or supplied in connection with such real estate, if such services or facilities are of a character or nature then or formerly furnished or supplied by the city, unless the electors of the city shall approve the granting to such corporation of such powers by a majority vote at a general or special election in such city; but this paragraph shall not apply to a corporation created pursuant to an interstate compact.

The accounts of every such public corporation heretofore or hereafter created shall be subject to the supervision of the state comptroller, or, if the member or members of such public corporation are appointed by the mayor of a city, to the supervision of the comptroller of such city; provided, however, that this provision shall not apply to such a public corporation created pursuant to agreement or compact with another state or with a foreign power, except with the consent of the parties to such agreement or compact.

Neither the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, nor may the legislature accept, authorize acceptance of or impose such liability upon the state or any political subdivision thereof; but the state or a political subdivision thereof may, if authorized by the legislature, acquire the properties of any such corporation and pay the indebtedness thereof. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Liability of state for payment of bonds of public corporation to construct state thruways; use of state canal lands and properties]**
§6. Notwithstanding any provision of this or any other article of this constitution, the legislature may by law, which shall take effect without submission to the people:

(a) make or authorize making the state liable for the payment of the principal of and interest on bonds of a public corporation created to construct state thruways, in a principal amount not to exceed five hundred million dollars, maturing in not to exceed forty years after their respective dates, and for the payment of the principal of and interest on notes of such corporation issued in anticipation of such bonds, which notes and any renewals thereof shall mature within five years after the respective dates of such notes; and

(b) authorize the use of any state canal lands and properties by such a public corporation for so long as the law may provide. To the extent payment is not otherwise made or provided for, the provisions of section sixteen of article seven shall apply to the liability of the state incurred pursuant to this section, but the powers conferred by this section shall not be subject to the limitations of this or any other article. (New. Added by vote of the people November 6, 1951.)

**[Liability of state for obligations of the port of New York authority for railroad commuter cars; limitations]**
§7. Notwithstanding any provision of this or any other article of this constitution, the legislature may by law, which shall take effect without submission to the people, make or authorize making the state liable for the payment of the principal of and interest on obligations of the port of New

York authority issued pursuant to legislation heretofore or hereafter enacted, to purchase or refinance the purchase of, or to repay advances from this state made for the purpose of purchasing, railroad passenger cars, including self-propelled cars, and locomotives and other rolling stock used in passenger transportation, for the purpose of leasing such cars to any railroad transporting passengers between municipalities in the portion of the port of New York district within the state, the majority of the trackage of which within the port of New York district utilized for the transportation of passengers shall be in the state; provided, however, that the total amount of obligations with respect to which the state may be made liable shall not exceed one hundred million dollars at any time, and that all of such obligations shall be due not later than thirty-five years after the effective date of this section.

To the extent payment is not otherwise made or provided for, the provisions of section sixteen of article seven shall apply to the liability of the state incurred pursuant to this section, but the powers conferred by this section shall not be subject to the limitations of this or any other article. (New. Added by vote of the people November 7, 1961.)

**[Liability of state on bonds of a public corporation to finance new industrial or manufacturing plants in depressed areas]**
§8. Notwithstanding any provision of this or any other article of this constitution, the legislature may by law, which shall take effect without submission to the people, make or authorize making the state liable for the payment of the principal of and interest on bonds of a public corporation to be created pursuant to and for the purposes specified in the last paragraph of section eight of article seven of this constitution, maturing in not to exceed thirty years after their respective dates, and for the principal of and interest on notes of such corporation issued in anticipation of such bonds, which notes and any renewals thereof shall mature within seven years after the respective dates of such notes, provided that the aggregate principal amount of such bonds with respect to which the state shall be so liable shall not at any one time exceed nine hundred million dollars, excluding bonds issued to refund outstanding bonds. (New. Added by vote of the people November 7, 1961. Formerly duplicate §7 added by vote of the people November 7, 1961; renumbered and amended by vote of the people November 4, 1969; further amended by vote of the people November 3, 1981; November 5, 1985; November 5, 1991.)

**ARTICLE XI**
EDUCATION

**[Common schools]**
Section 1. The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated. (Formerly §1 of Art. 9. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Regents of the University]**
§2. The corporation created in the year one thousand seven hundred eighty-four, under the name of The Regents of the University of the State of New York, is hereby continued under the name of The University of the State of New York. It shall be governed and its corporate powers, which may be increased, modified or diminished by the legislature, shall be exercised by not less than nine regents. (Formerly §2 of Art. 9. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Use of public property or money in aid of denominational schools prohibited; transportation of children authorized]**
§3. Neither the state nor any subdivision thereof, shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught, but the legislature may provide for the transportation of children to and from any school or institution of learning. (Formerly §4 of Art. 9. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.

Formerly §4, renumbered §3 without change by amendment approved by vote of the people November 6, 1962; former §4 repealed by same amendment.)

**ARTICLE XII[11]**
DEFENSE

**[Defense; militia]**
Section 1. The defense and protection of the state and of the United States is an obligation of all persons within the state. The legislature shall provide for the discharge of this obligation and for the maintenance and regulation of an organized militia.

**ARTICLE XIII**
PUBLIC OFFICERS

**[Oath of office; no other test for public office]**
Section 1. Members of the legislature, and all officers, executive and judicial, except such inferior officers as shall be by law exempted, shall, before they enter on the duties of their respective offices, take and subscribe the following oath or affirmation: "I do solemnly swear (or affirm) that I will support the constitution of the United States, and the constitution of the State of New York, and that I will faithfully discharge the duties of the office of ......, according to the best of my ability;" and no other oath, declaration or test shall be required as a qualification for any office of public trust, except that any committee of a political party may, by rule, provide for equal representation of the sexes on any such committee, and a state convention of a political party, at which candidates for public office are nominated, may, by rule, provide for equal representation of the sexes on any committee of such party. (Amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Duration of term of office]**
§2. When the duration of any office is not provided by this constitution it may be declared by law, and if not so declared, such office shall be held during the pleasure of the authority making the appointment. (Formerly §3 of Art. 10. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Formerly §6, renumbered §2 without change by amendment approved by vote of the people November 6, 1962; former §2 repealed by same amendment.)

**[Vacancies in office; how filled; boards of education]**
§3. The legislature shall provide for filling vacancies in office, and in case of elective officers, no person appointed to fill a vacancy shall hold his or her office by virtue of such appointment longer than the commencement of the political year next succeeding the first annual election after the happening of the vacancy; provided, however, that nothing contained in this article shall prohibit the filling of vacancies on boards of education, including boards of education of community districts in the city school district of the city of New York, by appointment until the next regular school district election, whether or not such appointment shall extend beyond the thirty-first day of December in any year. (Formerly §5 of Art. 10. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Formerly §8, renumbered §3 without change by amendment approved by vote of the people November 6, 1962; former §3 repealed by same amendment. Amended by vote of the people November 8, 1977; November 6, 2001.)

**[Political year and legislative term]**
§4. The political year and legislative term shall begin on the first day of January; and the legislature shall, every year, assemble on the first Wednesday after the first Monday in January. (Formerly §6 of Art. 10. Renumbered and amended by Constitutional Convention of 1938 and

---

[11] New article, adopted by vote of the people November 6, 1962; repealing and replacing former article adopted November 8, 1938.

approved by vote of the people November 8, 1938. Formerly §9, renumbered §4 without change by amendment approved by vote of the people November 6, 1962; former §4 repealed by same amendment.)

**[Removal from office for misconduct]**
§5. Provision shall be made by law for the removal for misconduct or malversation in office of all officers, except judicial, whose powers and duties are not local or legislative and who shall be elected at general elections, and also for supplying vacancies created by such removal. (Formerly §7 of Art. 10. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Formerly §10, renumbered §5 without change by amendment approved by vote of the people November 6, 1962; former §5 repealed by same amendment.)

**[When office to be deemed vacant; legislature may declare]**
§6. The legislature may declare the cases in which any office shall be deemed vacant when no provision is made for that purpose in this constitution. (Formerly §8 of Art. 10. Renumbered by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Formerly §11, renumbered §6 without change by amendment approved by vote of the people November 6, 1962; former §6 repealed by same amendment.)

**[Compensation of officers]**
§7. Each of the state officers named in this constitution shall, during his or her continuance in office, receive a compensation, to be fixed by law, which shall not be increased or diminished during the term for which he or she shall have been elected or appointed; nor shall he or she receive to his or her use any fees or perquisites of office or other compensation. (Formerly §9 of Art. 10. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Formerly §12, renumbered §7 without change by amendment approved by vote of the people November 6, 1962; former §7 repealed by same amendment; further amended as §12 by vote of the people November 5, 1963; further amended by vote of the people November 6, 2001.)

**[Election and term of city and certain county officers]**
§8. All elections of city officers, including supervisors, elected in any city or part of a city, and of county officers elected in any county wholly included in a city, except to fill vacancies, shall be held on the Tuesday succeeding the first Monday in November in an odd-numbered year, and the term of every such officer shall expire at the end of an odd-numbered year. This section shall not apply to elections of any judicial officer. (New. Added by amendment approved by vote of the people November 2, 1965.)

**[No sections 9-12; former 9-12 renumbered 4-7]**

**[Law enforcement and other officers]**
§13. (a) Except in counties in the city of New York and except as authorized in section one of article nine of this constitution, registers in counties having registers shall be chosen by the electors of the respective counties once in every three years and whenever the occurring of vacancies shall require; the sheriff and the clerk of each county shall be chosen by the electors once in every three or four years as the legislature shall direct. Sheriffs shall hold no other office. They may be required by law to renew their security, from time to time; and in default of giving such new security, their offices shall be deemed vacant. The governor may remove any elective sheriff, county clerk, district attorney or register within the term for which he or she shall have been elected; but before so doing the governor shall give to such officer a copy of the charges against him or her and an opportunity of being heard in his or her defense. In each county a district attorney shall be chosen by the electors once in every three or four years as the legislature shall direct. The clerk of each county in the city of New York shall be appointed, and be subject to removal, by the appellate division of the supreme court in the judicial department in which the county is located. In addition to his or her powers and duties as clerk of the supreme court, he or she shall have power to select, draw, summon and empanel grand and petit jurors in the manner and under the conditions now or hereafter prescribed by

law, and shall have such other powers and duties as shall be prescribed by the city from time to time by local law.

(b) Any district attorney who shall fail faithfully to prosecute a person charged with the violation in his or her county of any provision of this article which may come to his or her knowledge, shall be removed from office by the governor, after due notice and an opportunity of being heard in his or her defense. The expenses which shall be incurred by any county, in investigating and prosecuting any charge of bribery or attempting to bribe any person holding office under the laws of this state, within such county, or of receiving bribes by any such person in said county, shall be a charge against the state, and their payment by the state shall be provided for by law.

(c) The city of New York is hereby vested with power from time to time to abolish by local law, as defined by the legislature, the office of any county officer within the city other than judges, clerks of counties and district attorneys, and to assign any or all functions of such officers to city officers, courts or clerks of counties, and to prescribe the powers, duties, qualifications, number, mode of selection and removal, terms of office and compensation of the persons holding such offices and the employees therein, and to assign to city officers any powers or duties of clerks of counties not assigned by this constitution. The legislature shall not pass any law affecting any such matters in relation to such offices within the city of New York except on message from the governor declaring that an emergency exists and the concurrent action of two-thirds of the members of each house, except that existing laws regarding each such office shall continue in force, and may be amended or repealed by the legislature as heretofore, until the power herein granted to the city has been exercised with respect to that office. The provisions of article nine shall not prevent the legislature from passing general or special laws prescribing or affecting powers and duties of such city officers or such courts or clerks to whom or which functions of such county officers shall have been so assigned, in so far as such powers or duties embrace subjects not relating to property, affairs or government of such city. (Added by vote of the people November 5, 1963. Subdivisions (a), (b) and (c), formerly §§5, 6 and 8 of Art. 9. Subdivision (a) amended by vote of the people November 7, 1972; subdivision (a) further amended by vote of the people November 6, 1984; November 7, 1989; further amended by vote of the people November 6, 2001.)

**[Employees of, and contractors for, the state and local governments; wages, hours and other provisions to be regulated by legislature]**
§14. The legislature may regulate and fix the wages or salaries and the hours of work or labor, and make provisions for the protection, welfare and safety, of persons employed by the state or by any county, city, town, village or other civil division of the state, or by any contractor or subcontractor performing work, labor or services for the state or for any county, city, town, village or other civil division thereof. (New. Added by amendment approved by vote of the people November 5, 1963.)

**ARTICLE XIV**
CONSERVATION

**[Forest preserve to be forever kept wild; authorized uses and exceptions]**
Section 1. The lands of the state, now owned or hereafter acquired, constituting the forest preserve as now fixed by law, shall be forever kept as wild forest lands. They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed. Nothing herein contained shall prevent the state from constructing, completing and maintaining any highway heretofore specifically authorized by constitutional amendment, nor from constructing and maintaining to federal standards federal aid interstate highway route five hundred two from a point in the vicinity of the city of Glens Falls, thence northerly to the vicinity of the villages of Lake George and Warrensburg, the hamlets of South Horicon and Pottersville and thence northerly in a generally straight line on the west side of Schroon Lake to the vicinity of the hamlet of Schroon, then continuing northerly to the vicinity of Schroon Falls, Schroon River and North Hudson, and to the east of Makomis Mountain, east of the

**The Constitution of the State of New York**

hamlet of New Russia, east of the village of Elizabethtown and continuing northerly in the vicinity of the hamlet of Towers Forge, and east of Poke-O-Moonshine Mountain and continuing northerly to the vicinity of the village of Keeseville and the city of Plattsburgh, all of the aforesaid taking not to exceed a total of three hundred acres of state forest preserve land, nor from constructing and maintaining not more than twenty-five miles of ski trails thirty to two hundred feet wide, together with appurtenances thereto, provided that no more than five miles of such trails shall be in excess of one hundred twenty feet wide, on the north, east and northwest slopes of Whiteface Mountain in Essex county, nor from constructing and maintaining not more than twenty-five miles of ski trails thirty to two hundred feet wide, together with appurtenances thereto, provided that no more than two miles of such trails shall be in excess of one hundred twenty feet wide, on the slopes of Belleayre Mountain in Ulster and Delaware counties and not more than forty miles of ski trails thirty to two hundred feet wide, together with appurtenances thereto, provided that no more than eight miles of such trails shall be in excess of one hundred twenty feet wide, on the slopes of Gore and Pete Gay mountains in Warren county, nor from relocating, reconstructing and maintaining a total of not more than fifty miles of existing state highways for the purpose of eliminating the hazards of dangerous curves and grades, provided a total of no more than four hundred acres of forest preserve land shall be used for such purpose and that no single relocated portion of any highway shall exceed one mile in length. Notwithstanding the foregoing provisions, the state may convey to the village of Saranac Lake ten acres of forest preserve land adjacent to the boundaries of such village for public use in providing for refuse disposal and in exchange therefore the village of Saranac Lake shall convey to the state thirty acres of certain true forest land owned by such village on Roaring Brook in the northern half of Lot 113, Township 11, Richards Survey. Notwithstanding the foregoing provisions, the state may convey to the town of Arietta twenty-eight acres of forest preserve land within such town for public use in providing for the extension of the runway and landing strip of the Piseco airport and in exchange therefor the town of Arietta shall convey to the state thirty acres of certain land owned by such town in the town of Arietta. Notwithstanding the foregoing provisions and subject to legislative approval of the tracts to be exchanged prior to the actual transfer of title, the state, in order to consolidate its land holdings for better management, may convey to International Paper Company approximately eight thousand five hundred acres of forest preserve land located in townships two and three of Totten and Crossfield Purchase and township nine of the Moose River Tract, Hamilton county, and in exchange therefore International Paper Company shall convey to the state for incorporation into the forest preserve approximately the same number of acres of land located within such townships and such County on condition that the legislature shall determine that the lands to be received by the state are at least equal in value to the lands to be conveyed by the state. Notwithstanding the foregoing provisions and subject to legislative approval of the tracts to be exchanged prior to the actual transfer of title and the conditions herein set forth, the state, in order to facilitate the preservation of historic buildings listed on the national register of historic places by rejoining an historic grouping of buildings under unitary ownership and stewardship, may convey to Sagamore Institute, Inc., a not-for-profit educational organization, approximately ten acres of land and buildings thereon adjoining the real property of the Sagamore Institute, Inc. and located on Sagamore Road, near Racquette Lake Village, in the Town of Long Lake, county of Hamilton, and in exchange therefor; Sagamore Institute, Inc. shall convey to the state for incorporation into the forest preserve approximately two hundred acres of wild forest land located within the Adirondack Park on condition that the legislature shall determine that the lands to be received by the state are at least equal in value to the lands and buildings to be conveyed by the state and that the natural and historic character of the lands and buildings conveyed by the state will be secured by appropriate covenants and restrictions and that the lands and buildings conveyed by the state will reasonably be available for public visits according to agreement between Sagamore Institute, Inc. and the state. Notwithstanding the foregoing provisions the state may convey to the town of Arietta fifty acres of forest preserve land within such town for public use in providing for the extension of the runway and landing strip of the Piseco airport and providing for the maintenance of a clear zone around such runway, and in exchange therefor,

the town of Arietta shall convey to the state fifty-three acres of true forest land located in lot 2 township 2 Totten and Crossfield's Purchase in the town of Lake Pleasant.

Notwithstanding the foregoing provisions and subject to legislative approval prior to actual transfer of title, the state may convey to the town of Keene, Essex county, for public use as a cemetery owned by such town, approximately twelve acres of forest preserve land within such town and, in exchange therefor, the town of Keene shall convey to the state for incorporation into the forest preserve approximately one hundred forty-four acres of land, together with an easement over land owned by such town including the riverbed adjacent to the land to be conveyed to the state that will restrict further development of such land, on condition that the legislature shall determine that the property to be received by the state is at least equal in value to the land to be conveyed by the state.

Notwithstanding the foregoing provisions and subject to legislative approval prior to actual transfer of title, because there is no viable alternative to using forest preserve lands for the siting of drinking water wells and necessary appurtenances and because such wells are necessary to meet drinking water quality standards, the state may convey to the town of Long Lake, Hamilton county, one acre of forest preserve land within such town for public use as the site of such drinking water wells and necessary appurtenances for the municipal water supply for the hamlet of Raquette Lake. In exchange therefor, the town of Long Lake shall convey to the state at least twelve acres of land located in Hamilton county for incorporation into the forest preserve that the legislature shall determine is at least equal in value to the land to be conveyed by the state. The Raquette Lake surface reservoir shall be abandoned as a drinking water supply source.

Notwithstanding the foregoing provisions and subject to legislative approval prior to actual transfer of title, the state may convey to National Grid up to six acres adjoining State Route 56 in St. Lawrence County where it passes through Forest Preserve in Township 5, Lots 1, 2, 5 and 6 that is necessary and appropriate for National Grid to construct a new 46kV power line and in exchange therefore National Grid shall convey to the state for incorporation into the forest preserve at least 10 acres of forest land owned by National Grid in St. Lawrence county, on condition that the legislature shall determine that the property to be received by the state is at least equal in value to the land conveyed by the state.

Notwithstanding the foregoing provisions, the legislature may authorize the settlement, according to terms determined by the legislature, of title disputes in township forty, Totten and Crossfield purchase in the town of Long Lake, Hamilton county, to resolve longstanding and competing claims of title between the state and private parties in said township, provided that prior to, and as a condition of such settlement, land purchased without the use of state-appropriated funds, and suitable for incorporation in the forest preserve within the Adirondack park, shall be conveyed to the state on the condition that the legislature shall determine that the property to be conveyed to the state shall provide a net benefit to the forest preserve as compared to the township forty lands subject to such settlement.

Notwithstanding the foregoing provisions, the state may authorize NYCO Minerals, Inc. to engage in mineral sampling operations, solely at its expense, to determine the quantity and quality of wollastonite on approximately 200 acres of forest preserve land contained in lot 8, Stowers survey, town of Lewis, Essex county provided that NYCO Minerals, Inc. shall provide the data and information derived from such drilling to the state for appraisal purposes. Subject to legislative approval of the tracts to be exchanged prior to the actual transfer of the title, the state may subsequently convey said lot 8 to NYCO Minerals, Inc., and, in exchange therefor, NYCO Minerals, Inc. shall convey to the state for incorporation into the forest preserve not less than the same number of acres of land, on condition that the legislature shall determine that the lands to be received by the state are equal to or greater than the value of the land to be conveyed by the state and on condition that the assessed value of the land to be conveyed to the state shall total not less than one million dollars. When NYCO Minerals, Inc. terminates all mining operations on such lot 8 it shall remediate the site and convey title to such lot back to the state of New York for inclusion in the forest preserve. In the event that lot 8 is not conveyed to NYCO Minerals, Inc. pursuant to this paragraph, NYCO Minerals, Inc. nevertheless shall convey to the state for incorporation into the forest preserve not less than the

38

# The Constitution of the State of New York

same number of acres of land that is disturbed by any mineral sampling operations conducted on said lot 8 pursuant to this paragraph on condition that the legislature shall determine that the lands to be received by the state are equal to or greater than the value of the lands disturbed by the mineral sampling operations. (Formerly §7 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 4, 1941; November 4, 1947; November 5, 1957; November 3, 1959; November 5, 1963; November 2, 1965; November 6, 1979; November 8, 1983; November 3, 1987; November 5, 1991; November 7, 1995; November 6, 2007; November 3, 2009; November 5, 2013.)

## [Reservoirs]
§2. The legislature may by general laws provide for the use of not exceeding three per centum of such lands for the construction and maintenance of reservoirs for municipal water supply, and for the canals of the state. Such reservoirs shall be constructed, owned and controlled by the state, but such work shall not be undertaken until after the boundaries and high flow lines thereof shall have been accurately surveyed and fixed, and after public notice, hearing and determination that such lands are required for such public use. The expense of any such improvements shall be apportioned on the public and private property and municipalities benefited to the extent of the benefits received. Any such reservoir shall always be operated by the state and the legislature shall provide for a charge upon the property and municipalities benefited for a reasonable return to the state upon the value of the rights and property of the state used and the services of the state rendered, which shall be fixed for terms of not exceeding ten years and be readjustable at the end of any term. Unsanitary conditions shall be created or continued by any such public works. (Derived in part from former §7 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 3, 1953.)

## [Forest and wild life conservation; use or disposition of certain lands authorized]
§3. 1. Forest and wild life conservation are hereby declared to be policies of the state. For the purpose of carrying out such policies the legislature may appropriate moneys for the acquisition by the state of land, outside of the Adirondack and Catskill parks as now fixed by law, for the practice of forest or wild life conservation. The prohibitions of section 1 of this article shall not apply to any lands heretofore or hereafter acquired or dedicated for such purposes within the forest preserve counties but outside of the Adirondack and Catskill parks as now fixed by law, except that such lands shall not be leased, sold or exchanged, or be taken by any corporation, public or private.

2. As to any other lands of the state, now owned or hereafter acquired, constituting the forest preserve referred to in section one of this article, but outside of the Adirondack and Catskill parks as now fixed by law, and consisting in any case of not more than one hundred contiguous acres entirely separated from any other portion of the forest preserve, the legislature may by appropriate legislation, notwithstanding the provisions of section one of this article, authorize: (a) the dedication thereof for the practice of forest or wild life conservation; or (b) the use thereof for public recreational or other state purposes or the sale, exchange or other disposition thereof; provided, however, that all moneys derived from the sale or other disposition of any of such lands shall be paid into a special fund of the treasury and be expended only for the acquisition of additional lands for such forest preserve within either such Adirondack or Catskill park. (Formerly §16 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 5, 1957; November 6, 1973.)

## [Protection of natural resources; development of agricultural lands]
§4. The policy of the state shall be to conserve and protect its natural resources and scenic beauty and encourage the development and improvement of its agricultural lands for the production of food and other agricultural products. The legislature, in implementing this policy, shall include adequate provision for the abatement of air and water pollution and of excessive and unnecessary noise, the protection of agricultural lands, wetlands and shorelines, and the development and regulation of water resources. The legislature shall further provide for the acquisition of lands and waters, including improvements thereon and any interest therein, outside the forest preserve counties, and the dedication of properties so acquired or now owned, which because of their natural beauty, wilderness character, or geological, ecological or historical significance, shall be preserved and administered for the use and enjoyment of the people. Properties so dedicated shall constitute the state nature and historical preserve and they shall not be taken or otherwise disposed of except by law enacted by two successive regular sessions of the legislature. (New. Added by vote of the people November 4, 1969.)

## [Violations of article; how restrained]
§5. A violation of any of the provisions of this article may be restrained at the suit of the people or, with the consent of the supreme court in appellate division, on notice to the attorney-general at the suit of any citizen. (New. Derived from former §7 of Art. 7. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Renumbered §5 by vote of the people November 4, 1969.)

## ARTICLE XV
### CANALS

## [Disposition of canals and canal properties prohibited]
Section 1. The legislature shall not sell, abandon or otherwise dispose of the now existing or future improved barge canal, the divisions of which are the Erie canal, the Oswego canal, the Champlain canal, and the Cayuga and Seneca canals, or of the terminals constructed as part of the barge canal system; nor shall it sell, abandon or otherwise dispose of any portion of the canal system existing prior to the barge canal improvement which portion forms a part of, or functions as a part of, the present barge canal system; but such canals and terminals shall remain the property of the state and under its management and control forever. This prohibition shall not prevent the legislature, by appropriate laws, from authorizing the granting of revocable permits or leases for periods of time as authorized by the legislature for the occupancy or use of such lands or structures. (Formerly §8 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; November 5, 1991.)

## [Prohibition inapplicable to lands and properties no longer useful; disposition authorized]
§2. The prohibition of sale, abandonment or other disposition contained in section 1 of this article shall not apply to barge canal lands, barge canal terminals or barge canal terminal lands which have or may become no longer necessary or useful for canal or terminal purposes; nor to any canal lands and appertaining structures constituting the canal system prior to the barge canal improvement which have or may become no longer necessary or useful in conjunction with the now existing barge canal. The legislature may by appropriate legislation authorize the sale, exchange, abandonment or other disposition of any barge canal lands, barge canal terminals, barge canal terminal lands or other canal lands and appertaining structures which have or may become no longer necessary or useful as a part of the barge canal system, as an aid to navigation thereon, or for barge canal terminal purposes. (Formerly duplicate §8 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; November 5, 1991.)

## [Contracts for work and materials; special revenue fund]
§3. All boats navigating the canals and the owners and masters thereof, shall be subject to such laws and regulations as have been or may hereafter be enacted concerning the navigation of the canals. The legislature shall annually make provision for the expenses of the superintendence and repairs of the canals, and may provide for the improvement of the canals in such manner as shall be provided by law notwithstanding the creation of a special revenue fund as provided in this section. All contracts for work or materials on any canal shall be made with the persons who shall offer to do or provide the same at the lowest responsible price, with adequate security for their performance as provided by law.

All funds that may be derived from any sale or other disposition of any barge canal lands, barge canal terminals, barge canal terminal lands or other canal lands and appertaining structures and any other funds collected for the use of the canals or canal lands shall be paid into a special revenue fund of the treasury. Such funds shall only be expended for the maintenance, construction, reconstruction, development or promotion of the canal, canal lands, or lands adjacent to the canal as provided by law. (Formerly §9 of Art. 7. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; November 5, 1991.)

**[Lease or transfer to federal government of barge canal system authorized]**
§4. Notwithstanding the prohibition of sale, abandonment or other disposition contained in section one of this article, the legislature may authorize by law the lease or transfer to the federal government of the barge canal, consisting of the Erie, Oswego, Champlain, Cayuga and Seneca divisions and the barge canal terminals and facilities for purposes of operation, improvement and inclusion in the national system of inland waterways. Such lease or transfer to the federal government for the purposes specified herein may be made upon such terms and conditions as the legislature may determine with or without compensation to the state. Nothing contained herein shall prevent the legislature from providing annual appropriations for the state's share, if any, of the cost of operation, maintenance and improvement of the barge canal, the divisions thereof, terminals and facilities in the event of the transfer of the barge canal in whole to the federal government whether by lease or transfer.

The legislature, in determining the state's share of the annual cost of operation, maintenance and improvement of the barge canal, the several divisions, terminals and facilities, shall give consideration and evaluate the benefits derived from the barge canal for purposes of flood control, conservation and utilization of water resources. (Added by vote of the people November 3, 1959.)

## ARTICLE XVI[12]
### TAXATION

**[Power of taxation; exemptions from taxation]**
Section 1. The power of taxation shall never be surrendered, suspended or contracted away, except as to securities issued for public purposes pursuant to law. Any laws which delegate the taxing power shall specify the types of taxes which may be imposed thereunder and provide for their review.

Exemptions from taxation may be granted only by general laws. Exemptions may be altered or repealed except those exempting real or personal property used exclusively for religious, educational or charitable purposes as defined by law and owned by any corporation or association organized or conducted exclusively for one or more of such purposes and not operating for profit.

**[Assessments for taxation purposes]**
§2. The legislature shall provide for the supervision, review and equalization of assessments for purposes of taxation. Assessments shall in no case exceed full value.

Nothing in this constitution shall be deemed to prevent the legislature from providing for the assessment, levy and collection of village taxes by the taxing authorities of those subdivisions of the state in which the lands comprising the respective villages are located, nor from providing that the respective counties of the state may loan or advance to any village located in whole or in part within such county the amount of any tax which shall have been levied for village purposes upon any lands located within such county and remaining unpaid.

**[Situs of intangible personal property; taxation of]**
§3. Moneys, credits, securities and other intangible personal property within the state not employed in carrying on any business therein by the owner shall

be deemed to be located at the domicile of the owner for purposes of taxation, and, if held in trust, shall not be deemed to be located in this state for purposes of taxation because of the trustee being domiciled in this state, provided that if no other state has jurisdiction to subject such property held in trust to death taxation, it may be deemed property having a taxable situs within this state for purposes of death taxation. Intangible personal property shall not be taxed ad valorem nor shall any excise tax be levied solely because of the ownership or possession thereof, except that the income therefrom may be taken into consideration in computing any excise tax measured by income generally. Undistributed profits shall not be taxed.

**[Certain corporations not to be discriminated against]**
§4. Where the state has power to tax corporations incorporated under the laws of the United States there shall be no discrimination in the rates and method of taxation between such corporations and other corporations exercising substantially similar functions and engaged in substantially similar business within the state.

**[Compensation of public officers and employees subject to taxation]**
§5. All salaries, wages and other compensation, except pensions, paid to officers and employees of the state and its subdivisions and agencies shall be subject to taxation. (Amended by vote of the people November 6, 2001.)

**[Public improvements or services; contract of indebtedness; creation of public corporations]**
§6. Notwithstanding any provision of this or any other article of this constitution to the contrary, the legislature may by law authorize a county, city, town or village, or combination thereof acting together, to undertake the development of public improvements or services, including the acquisition of land, for the purpose of redevelopment of economically unproductive, blighted or deteriorated areas and, in furtherance thereof, to contract indebtedness. Any such indebtedness shall be contracted by any such county, city, town or village, or combination thereof acting together, without the pledge of its faith and credit, or the faith and credit of the state, for the payment of the principal thereof and the interest thereon, and such indebtedness may be paid without restriction as to the amount or relative amount of annual installments. The amount of any indebtedness contracted under this section may be excluded in ascertaining the power of such county, city, town or village to contract indebtedness within the provisions of this constitution relating thereto. Any county, city, town or village contracting indebtedness pursuant to this section for redevelopment of an economically unproductive, blighted or deteriorated area shall pledge to the payment thereof that portion of the taxes raised by it on real estate in such area which, in any year, is attributed to the increase in value of taxable real estate resulting from such redevelopment. The legislature may further authorize any county, city, town or village, or combination thereof acting together, to carry out the powers and duties conferred by this section by means of a public corporation created therefor. (New. Added by vote of the people November 8, 1983; amended by vote of the people November 6, 2001.)

## ARTICLE XVII
### SOCIAL WELFARE

**[Public relief and care]**
Section 1. The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[State board of social welfare; powers and duties]**
§2. The state board of social welfare shall be continued. It shall visit and inspect, or cause to be visited and inspected by members of its staff, all public and private institutions, whether state, county, municipal, incorporated or not incorporated, which are in receipt of public funds and which are of a charitable, eleemosynary, correctional or reformatory character, including all reformatories for juveniles and institutions or agencies exercising

---
[12] Entire new article, adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.

custody of dependent, neglected or delinquent children, but excepting state institutions for the education and support of the blind, the deaf and the dumb, and excepting also such institutions as are hereinafter made subject to the visitation and inspection of the department of mental hygiene or the state commission of correction. As to institutions, whether incorporated or not incorporated, having inmates, but not in receipt of public funds, which are of a charitable, eleemosynary, correctional or reformatory character, and agencies, whether incorporated or not incorporated, not in receipt of public funds, which exercise custody of dependent, neglected or delinquent children, the state board of social welfare shall make inspections, or cause inspections to be made by members of its staff, but solely as to matters directly affecting the health, safety, treatment and training of their inmates, or of the children under their custody. Subject to the control of the legislature and pursuant to the procedure prescribed by general law, the state board of social welfare may make rules and regulations, not inconsistent with this constitution, with respect to all of the functions, powers and duties with which the department and the state board of social welfare are herein or shall be charged. (New. Derived in part from former §11 of Art. 8. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Public health]**
§3.  The protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefor shall be made by the state and by such of its subdivisions and in such manner, and by such means as the legislature shall from time to time determine. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Care and treatment of persons suffering from mental disorder or defect; visitation of institutions for]**
§4.  The care and treatment of persons suffering from mental disorder or defect and the protection of the mental health of the inhabitants of the state may be provided by state and local authorities and in such manner as the legislature may from time to time determine. The head of the department of mental hygiene shall visit and inspect, or cause to be visited and inspected by members of his or her staff, all institutions either public or private used for the care and treatment of persons suffering from mental disorder or defect. (New. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; amended by vote of the people November 6, 2001.)

**[Institutions for detention of criminals; probation; parole; state commission of correction]**
§5.  The legislature may provide for the maintenance and support of institutions for the detention of persons charged with or convicted of crime and for systems of probation and parole of persons convicted of crime. There shall be a state commission of correction, which shall visit and inspect or cause to be visited and inspected by members of its staff, all institutions used for the detention of sane adults charged with or convicted of crime. (New. Derived in part from former §11 of Art. 8. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938. Amended by vote of the people November 6, 1973.)

**[Visitation and inspection]**
§6.  Visitation and inspection as herein authorized, shall not be exclusive of other visitation and inspection now or hereafter authorized by law. (New. Derived from former §13 of Art. 8. Adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

**[Loans for hospital construction]**
§7.  Notwithstanding any other provision of this constitution, the legislature may authorize the state, a municipality or a public corporation acting as an instrumentality of the state or municipality to lend its money or credit to or in aid of any corporation or association, regulated by law as to its charges, profits, dividends, and disposition of its property or franchises, for the purpose of providing such hospital or other facilities for the prevention, diagnosis or treatment of human disease, pain, injury, disability, deformity

or physical condition, and for facilities incidental or appurtenant thereto as may be prescribed by law. (New. Added by vote of the people November 4, 1969.)

**ARTICLE XVIII[13]**
HOUSING

**[Housing and nursing home accommodations for persons of low income; slum clearance]**
Section 1.  Subject to the provisions of this article, the legislature may provide in such manner, by such means and upon such terms and conditions as it may prescribe for low rent housing and nursing home accommodations for persons of low income as defined by law, or for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas, or for both such purposes, and for recreational and other facilities incidental or appurtenant thereto. (Amended by vote of the people November 2, 1965.)

**[*Idem*; powers of legislature in aid of]**
§2.  For and in aid of such purposes, notwithstanding any provision in any other article of this constitution, but subject to the limitations contained in this article, the legislature may: make or contract to make or authorize to be made or contracted capital or periodic subsidies by the state to any city, town, village, or public corporation, payable only with moneys appropriated therefor from the general fund of the state; authorize any city, town or village to make or contract to make such subsidies to any public corporation, payable only with moneys locally appropriated therefor from the general or other fund available for current expenses of such municipality; authorize the contracting of indebtedness for the purpose of providing moneys out of which it may make or contract to make or authorize to be made or contracted loans by the state to any city, town, village or public corporation; authorize any city, town or village to make or contract to make loans to any public corporation; authorize any city, town or village to guarantee the principal of and interest on, or only the interest on, indebtedness contracted by a public corporation; authorize and provide for loans by the state and authorize loans by any city, town or village to or in aid of corporations regulated by law as to rents, profits, dividends and disposition of their property or franchises and engaged in providing housing facilities or nursing home accommodations; authorize any city, town or village to make loans to the owners of existing multiple dwellings for the rehabilitation and improvement thereof for occupancy by persons of low income as defined by law; grant or authorize tax exemptions in whole or in part, except that no such exemption may be granted or authorized for a period of more than sixty years; authorize cooperation with and the acceptance of aid from the United States; grant the power of eminent domain to any city, town or village, to any public corporation and to any corporation regulated by law as to rents, profits, dividends and disposition of its property or franchises and engaged in providing housing facilities.

As used in this article, the term "public corporation" shall mean any corporate governmental agency (except a county or municipal corporation) organized pursuant to law to accomplish any or all of the purposes specified in this article. (Amended by vote of the people November 2, 1965.)

**[Article VII to apply to state debts under this article, with certain exceptions; amortization of state debts; capital and periodic subsidies]**
§3. The provisions of article VII, not inconsistent with this article, relating to debts of the state shall apply to all debts contracted by the state for the purpose of providing moneys out of which to make loans pursuant to this article, except (a) that any law or laws authorizing the contracting of such debt, not exceeding in the aggregate three hundred million dollars, shall take effect without submission to the people, and the contracting of a greater amount of debt may not be authorized prior to January first, nineteen hundred forty-two; (b) that any such debt and each portion thereof, except as

---

[13] Entire new article, adopted by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.

41

hereinafter provided, shall be paid in equal annual installments, the first of which shall be payable not more than three years, and the last of which shall be payable not more than fifty years, after such debt or portion thereof shall have been contracted; and (c) that any law authorizing the contracting of such debt may be submitted to the people at a general election, whether or not any other law or bill shall be submitted to be voted for or against at such election.

Debts contracted by the state for the purpose of providing money out of which to make loans to or in aid of corporations regulated by law as to rents, profits, dividends and disposition of their property or franchises and engaged in providing housing facilities pursuant to this article may be paid in such manner that the total annual charges required for the payment of principal and interest are approximately equal and constant for the entire period in which any of the bonds issued therefor are outstanding.

Any law authorizing the making of contracts for capital or periodic subsidies to be paid with moneys currently appropriated from the general fund of the state shall take effect without submission to the people, and the amount to be paid under such contracts shall not be included in ascertaining the amount of indebtedness which may be contracted by the state under this article; provided, however, (a) that such periodic subsidies shall not be paid for a period longer than the life of the projects assisted thereby, but in any event for not more than sixty years; (b) that no contracts for periodic subsidies shall be entered into in any one year requiring payments aggregating more than one million dollars in any one year; and (c) that there shall not be outstanding at any one time contracts for periodic subsidies requiring payments exceeding an aggregate of thirty-four million dollars in any one year, unless a law authorizing contracts in excess of such amounts shall have been submitted to and approved by the people at a general election; and any such law may be submitted to the people at a general election, whether or not any other law or bill shall be submitted to be voted for or against at such election. (Amended by vote of the people November 8, 1955; further amended by vote of the people November 5, 1957.)

**[Powers of cities, towns and villages to contract indebtedness in aid of low rent housing and slum clearance projects; restrictions thereon]**

§4. To effectuate any of the purposes of this article, the legislature may authorize any city, town or village to contract indebtedness to an amount which shall not exceed two per centum of the average assessed valuation of the real estate of such city, town or village subject to taxation, as determined by the last completed assessment roll and the four preceding assessment rolls of such city, town or village, for city, town or village taxes prior to the contracting of such indebtedness. In ascertaining the power of a city, or village having a population of five thousand or more as determined by the last federal census, to contract indebtedness pursuant to this article there may be excluded any such indebtedness if the project or projects aided by guarantees representing such indebtedness or by loans for which such indebtedness was contracted shall have yielded during the preceding year net revenue to be determined annually by deducting from the gross revenues, including periodic subsidies therefor, received from such project or projects, all costs of operation, maintenance, repairs and replacements, and the interest on such indebtedness and the amounts required in such year for the payment of such indebtedness; provided that in the case of guarantees such interest and such amounts shall have been paid, and in the case of loans an amount equal to such interest and such amounts shall have been paid to such city or village. The legislature shall prescribe the method by which the amount of any such indebtedness to be excluded shall be determined, and no such indebtedness shall be excluded except in accordance with such determination. The legislature may confer appropriate jurisdiction on the appellate division of the supreme court in the judicial departments in which such cities or villages are located for the purpose of determining the amount of any such indebtedness to be so excluded.

The liability of a city, town or village on account of any contract for capital or periodic subsidies to be paid subsequent to the then current year shall, for the purpose of ascertaining the power of such city, town or village to contract indebtedness, be deemed indebtedness in the amount of the commuted value of the total of such capital or periodic subsidies remaining unpaid, calculated on the basis of an annual interest rate of four per centum. Such periodic subsidies shall not be contracted for a period longer than the life of the projects assisted thereby, and in no event for more than sixty years. Indebtedness contracted pursuant to this article shall be excluded in ascertaining the power of a city or such village otherwise to create indebtedness under any other section of this constitution. Notwithstanding the foregoing the legislature shall not authorize any city or village having a population of five thousand or more to contract indebtedness hereunder in excess of the limitations prescribed by any other article of this constitution unless at the same time it shall by law require such city or village to levy annually a tax or taxes other than an ad valorem tax on real estate to an extent sufficient to provide for the payment of the principal of and interest on any such indebtedness. Nothing herein contained, however, shall be construed to prevent such city or village from pledging its faith and credit for the payment of such principal and interest nor shall any such law prevent recourse to an ad valorem tax on real estate to the extent that revenue derived from such other tax or taxes in any year, together with revenues from the project or projects aided by the proceeds of such indebtedness, shall become insufficient to provide fully for payment of such principal and interest in that year. (Amended by vote of the people November 8, 1949.)

**[Liability for certain loans made by the state to certain public corporations]**

§5. Any city, town or village shall be liable for the repayment of any loans and interest thereon made by the state to any public corporation, acting as an instrumentality of such city, town or village. Such liability of a city, town or village shall be excluded in ascertaining the power of such city, town or village to become indebted pursuant to the provisions of this article, except that in the event of a default in payment under the terms of any such loan, the unpaid balance thereof shall be included in ascertaining the power of such city, town or village to become so indebted. No subsidy, in addition to any capital or periodic subsidy originally contracted for in aid of any project or projects authorized under this article, shall be paid by the state to a city, town, village or public corporation, acting as an instrumentality thereof, for the purpose of enabling such city, town, village or corporation to remedy an actual default or avoid an impending default in the payment of principal or interest on a loan which has been theretofore made by the state to such city, town, village or corporation pursuant to this article. (Amended by vote of the people November 5, 1957.)

**[Loans and subsidies; restrictions on and preference in occupancy of projects]**

§6. No loan, or subsidy shall be made by the state to aid any project unless such project is in conformity with a plan or undertaking for the clearance, replanning and reconstruction or rehabilitation of a substandard and unsanitary area or areas and for recreational and other facilities incidental or appurtenant thereto. The legislature may provide additional conditions to the making of such loans or subsidies consistent with the purposes of this article. The occupancy of any such project shall be restricted to persons of low income as defined by law and preference shall be given to persons who live or shall have lived in such area or areas.

**[Liability arising from guarantees to be deemed indebtedness; method of computing]**

§7. The liability arising from any guarantee of the principal of and interest on indebtedness contracted by a public corporation shall be deemed indebtedness in the amount of the face value of the principal thereof remaining unpaid. The liability arising from any guarantee of only the interest on indebtedness contracted by a public corporation shall be deemed indebtedness in the amount of the commuted value of the total interest guaranteed and remaining unpaid, calculated on the basis of an annual interest rate of four per centum.

**[Excess condemnation]**

§8. Any agency of the state, or any city, town, village, or public corporation, which is empowered by law to take private property by eminent domain for any of the public purposes specified in section one of this article, may be empowered by the legislature to take property necessary for any such purpose but in excess of that required for public use after such purpose shall have been accomplished; and to improve and utilize such excess, wholly or

partly for any other public purpose, or to lease or sell such excess with restrictions to preserve and protect such improvement or improvements.

**[Acquisition of property for purposes of article]**
§9. Subject to any limitation imposed by the legislature, the state, or any city, town, village or public corporation, may acquire by purchase, gift, eminent domain or otherwise, such property as it may deem ultimately necessary or proper to effectuate the purposes of this article, or any of them, although temporarily not required for such purposes.

**[Power of legislature; construction of article]**
§10. The legislature is empowered to make all laws which it shall deem necessary and proper for carrying into execution the foregoing powers. This article shall be construed as extending powers which otherwise might be limited by other articles of this constitution and shall not be construed as imposing additional limitations; but nothing in this article contained shall be deemed to authorize or empower the state, or any city, town, village or public corporation to engage in any private business or enterprise other than the building and operation of low rent dwelling houses for persons of low income as defined by law, or the loaning of money to owners of existing multiple dwellings as herein provided.

### ARTICLE XIX
#### AMENDMENTS TO CONSTITUTION

**[Amendments to constitution; how proposed, voted upon and ratified; failure of attorney-general to render opinion not to affect validity]**
Section 1. Any amendment or amendments to this constitution may be proposed in the senate and assembly whereupon such amendment or amendments shall be referred to the attorney-general whose duty it shall be within twenty days thereafter to render an opinion in writing to the senate and assembly as to the effect of such amendment or amendments upon other provisions of the constitution. Upon receiving such opinion, if the amendment or amendments as proposed or as amended shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, and the ayes and noes taken thereon, and referred to the next regular legislative session convening after the succeeding general election of members of the assembly, and shall be published for three months previous to the time of making such choice; and if in such legislative session, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit each proposed amendment or amendments to the people for approval in such manner and at such times as the legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments by a majority of the electors voting thereon, such amendment or amendments shall become a part of the constitution on the first day of January next after such approval. Neither the failure of the attorney-general to render an opinion concerning such a proposed amendment nor his or her failure to do so timely shall affect the validity of such proposed amendment or legislative action thereon. (Formerly §1 of Art. 14. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 4, 1941; November 6, 2001.)

**[Future constitutional conventions; how called; election of delegates; compensation; quorum; submission of amendments; officers; employees; rules; vacancies]**
§2. At the general election to be held in the year nineteen hundred fifty-seven, and every twentieth year thereafter, and also at such times as the legislature may by law provide, the question "Shall there be a convention to revise the constitution and amend the same?" shall be submitted to and decided by the electors of the state; and in case a majority of the electors voting thereon shall decide in favor of a convention for such purpose, the electors of every senate district of the state, as then organized, shall elect three delegates at the next ensuing general election, and the electors of the state voting at the same election shall elect fifteen delegates-at-large. The delegates so elected shall convene at the capitol on the first Tuesday of

April next ensuing after their election, and shall continue their session until the business of such convention shall have been completed. Every delegate shall receive for his or her services the same compensation as shall then be annually payable to the members of the assembly and be reimbursed for actual traveling expenses, while the convention is in session, to the extent that a member of the assembly would then be entitled thereto in the case of a session of the legislature. A majority of the convention shall constitute a quorum for the transaction of business, and no amendment to the constitution shall be submitted for approval to the electors as hereinafter provided, unless by the assent of a majority of all the delegates elected to the convention, the ayes and noes being entered on the journal to be kept. The convention shall have the power to appoint such officers, employees and assistants as it may deem necessary, and fix their compensation and to provide for the printing of its documents, journal, proceedings and other expenses of said convention. The convention shall determine the rules of its own proceedings, choose its own officers, and be the judge of the election, returns and qualifications of its members. In case of a vacancy, by death, resignation or other cause, of any district delegate elected to the convention, such vacancy shall be filled by a vote of the remaining delegates representing the district in which such vacancy occurs. If such vacancy occurs in the office of a delegate-at-large, such vacancy shall be filled by a vote of the remaining delegates-at-large. Any proposed constitution or constitutional amendment which shall have been adopted by such convention, shall be submitted to a vote of the electors of the state at the time and in the manner provided by such convention, at an election which shall be held not less than six weeks after the adjournment of such convention. Upon the approval of such constitution or constitutional amendments, in the manner provided in the last preceding section, such constitution or constitutional amendment, shall go into effect on the first day of January next after such approval. (Formerly §2 of Art. 14. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938; further amended by vote of the people November 6, 2001.)

**[Amendments simultaneously submitted by convention and legislature]**
§3. Any amendment proposed by a constitutional convention relating to the same subject as an amendment proposed by the legislature, coincidently submitted to the people for approval shall, if approved, be deemed to supersede the amendment so proposed by the legislature. (Formerly §3 of Art. 14. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)

### ARTICLE XX
#### WHEN TO TAKE EFFECT

**[Time of taking effect]**
Section 1. This constitution shall be in force from and including the first day of January, one thousand nine hundred thirty-nine, except as herein otherwise provided. (Formerly §1 of Art. 15. Renumbered and amended by Constitutional Convention of 1938 and approved by vote of the people November 8, 1938.)



★ ★ ★

*DONE in Convention at the Capitol in the city of Albany, the twenty-fifth day of August, in the year one thousand nine hundred thirty-eight, and of the Independence of the United States of America the one hundred and sixty-third.*
*IN WITNESS WHEREOF, we have hereunto subscribed our names.*

FREDERICK E. CRANE,
*President and Delegate-at-Large*

U.H. Boyden, *Secretary*

43

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

STATE OF TEXAS et al. ,

Plaintiff,

v.

Civil Action No. 18-cv-0068 (ASH)

UNITED STATES OF AMERICA  et al.,

Defendant.

RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH
LOCAL RULE 5-2 RELATED CASES OF AMICUS CHRISTOPHER EARL STRUNK, THE
NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW
YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR
FRCvP RULE 65(b) RELIEF AT DOCKET  ITEM# 483, AFFIRMATION IN OPPOSITION
TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 BY :
NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI‘I, ILLINOIS, IOWA,
MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH
CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT,
WASHINGTON, AND THE DISTRICT OF COLUMBIA IN OPPOSITION TO
PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE DEFERRED ACTION FOR
CHILDHOOD ARRIVAL (DACA)

# EXHIBIT  K



**STATE OF NEW YORK**
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF STATE COUNSEL
CLAIMS BUREAU

Telephone No.: (518) 776-2576

October 15, 2020

Mr. Christopher Strunk
141 Harris Avenue
Lake Luzerne, New York 12846-1721

Re:   Strunk vs. The State of New York
Claim No.: NONE
OAG No.: 20-046226-L1

Dear Mr. Strunk:

Enclosed herewith for service upon you pursuant to Section 130-1.1a of the Rules of the Chief

Administrator (22NYCRR) is a copy of the defendant's **NOTICE OF MOTION TO DISMISS and**

**AFFIRMATION IN SUPPORT OF MOTION TO DISMISS** in the above-referenced matter.

By copy of this letter, I am submitting for filing to the Chief Clerk of the Court of Claims a copy

of the defendants **NOTICE OF MOTION TO DISMISS and AFFIRMATION IN SUPPORT OF**

**MOTION TO DISMISS**, together with proof of service.

Should you have any questions, please contact me at the number listed above.

Very truly yours,

ANTHONY ROTONDI
*Assistant Attorney General*

AR/tkm
Enclosure
cc:   Eileen F. Fazzone
      Chief Clerk of the Court of Claims

THE STATE OF NEW YORK : COURT OF CLAIMS

CHRISTOPHER EARL STRUNK, and
AD HOC NEW YORKER REPUBLICAN COMMITTEE

                                                   **NOTICE OF MOTION**
                                                   **TO DISMISS**

                         Claimants,

    - against -

                                                     **CLAIM NO.: NONE**

THE STATE OF NEW YORK,

                         Defendants.

        PLEASE TAKE NOTICE that, Upon the annexed affirmation of Anthony Rotondi, dated

October 15, 2020 and upon all the pleadings filed with this Court, defendant will move this

Court, on Wednesday the 18th day of November 2020, for an order dismissing the claim herein,

pursuant to CPLR § 3211 (a) 2, CPLR § 3211 (a) 3, CPLR § 3211 (a) 7 and the Court of Claims

act § 10 and 11, on the grounds that the Court lacks subject matter jurisdiction over defendant,

the claimant lacks standing and the Claim fails to state a cause of action.

        Answering affidavits, if any, shall be served upon the undersigned at least seven (7) days

before the return date of this motion, in accordance with CPLR § 2214 (b).

Dated: October 15, 2020
       Albany, New York

                                 LETITIA JAMES
                                 Acting Attorney General for the State of New York
                                 Attorney for the Defendant
                                 New York State Office of the Attorney General
                                 The Capitol
                                 Albany, New York 12224
                                 Tel. (518) 776-2576

                                 ANTHONY ROTONDI
                                 *Assistant Attorney General*

TO:   Mr. Christopher Strunk
       141 Harris Avenue
       Lake Luzerne, New York 12846-1721

STATE OF NEW YORK : COURT OF CLAIMS
_____

CHRISTOPHER EARL STRUNK, and
AD HOC NEW YORKER REPUBLICAN COMMITTEE

                    Claimant,

                                        **AFFIRMATION IN SUPPORT**
                                        **OF MOTION TO DISMISS**

THE STATE OF NEW YORK,

                                        CLAIM NO.: NONE
                                        OAG NO.: 20-046226-L1

                    Defendant.
_____

      ANTHONY ROTONDI, an attorney at law duly admitted to practice before the Courts of this State makes the following Affirmation under penalties of perjury:

      1.   I submit this affirmation in support of a pre-answer motion for an order dismissing the claim served upon the Office of the Attorney General on September 12, 2020, pursuant to CPLR 3211 (a) 2, 3211(a) 3 and 3211(a) 7 on the grounds that this Court lacks subject matter jurisdiction over this claim, that the Claimant lacks standing, that the claim fails to state a cause of action and for such other and further relief as to the Court may seem just and proper.

      2.   In addition to this affirmation this application is based upon a copy of the claim, annexed as Exhibit "A".

      3.   To summarize, the claim alleges that under Claimant's interpretation of the 14th Amendment of the United States, Democratic Vice-Presidential candidate Kamala Harris is not a citizen of the United States and therefore ineligible to hold the office of vice-president.

4.     The claim requests injunctive relief "for cause that the state be ordered to":

a) Clarify for all voters Claimant's interpretation of citizenship under the 14th Amendment

b) That all requests for absentee ballots make such a clarification;

c) That notice be placed at polls that Senator Harris is not a natural born citizen.

5.     Claimant also alleges a "lost opportunity" cause of action for "using born citizen misinformation from 2008 through 2020."

### The Court Lacks Subject Matter Jurisdiction over the claim

6.     The claim should be dismissed because the Court lacks subject matter jurisdiction over the request for injunctive relief.

7.     "As a court of limited jurisdiction, the Court of Claims has no jurisdiction to grant strictly equitable relief," *Madura v State of New York*, 12 AD3d 759, 760 (3d Dept 2004), *lv denied* 4 NY3d 704 (2005), citing to *Ozanam Hall of Queens Nursing Home v State of New York*, 241 AD2d 670, 671 (3d Dept 1997); *Psaty v Duryea*, 306 NY 413, 416 (1954)).

8.     Claimant is not requesting money damages for any injury he sustained. Rather, he is requesting that the State be ordered to take certain actions as it relates to an upcoming election. This Court is without power to issue injunctive or a declaratory relief, *Matter of Milner v New York State Higher Educ. Servs. Corp.*, 4 Misc 3d 221, 225 (Ct Cl 2004), *affd* 24 AD3d 977 (3d Dept 2005).

### The Claimant Lacks Standing

9.     The Claimant lacks standing to bring this claim.

10.     As explained in *Strunk v New York State Board of Elections*, 35 Misc3d 1208(A):

"Standing to sue requires an interest in the claim at issue in the

lawsuit that the law will recognize  [***24] as a sufficient

predicate for determining the issue at the litigant's request."

(*Caprer v Nussbaum*, 36 AD3d 176, 181, 825 N.Y.S.2d 55 [2d

Dept 2006]). "An analysis of standing begins with a

determination of whether the party seeking relief has sustained

an injury (*see Society of Plastics Indus. v County of Suffolk*, 77

N.Y.2d 761, 762-773, 573 N.E.2d 1034, 570 N.Y.S.2d 778

[1991])." (*Mahoney v Pataki*, 98 NY2d 45, 52, 772 N.E.2d 1118,

745 N.Y.S.2d 760 [2002]). "The Court of Appeals has defined

the standard by which standing is measured, explaining that a

plaintiff, in order to have standing in a particular dispute, must

demonstrate an injury in fact that falls within the relevant zone of

interests sought to be protected by law." (*Caprer v Nussbaum* at

183). [****12]  A plaintiff, to have standing, "must allege

personal injury fairly traceable to the defendant's allegedly

unlawful conduct and likely to be redressed by the requested

relief." (*Allen v Wright*, 468 U.S. 737, 751, 104 S. Ct. 3315, 82

L. Ed. 2d 556 [1984]). If a plaintiff lacks standing to sue, the

plaintiff may not proceed in the action. (*Stark v Goldberg*, 297

AD2d 203, 746 N.Y.S.2d 280 [1st Dept 2002]).'

"Thus, a private citizen who does not show any special rights or

interests in the matter in controversy, other than those common

to all taxpayers and citizens, has no standing to sue." (*Matter of*

*Meehan v County of Westchester*, 3 AD3d 533, 534, 770

N.Y.S.2d 753 [2d Dept 2004]). (*See Diederich v. Rockland*

*County Police Chiefs' Assn.*, 33 A.D.3d 653, 654, 823 N.Y.S.2d

106 [2d Dept 2006]; *Concerned Taxpayers of Stony Point v*

*Town of Stony Point*, 28 AD3d 657, 658, 813 N.Y.S.2d 227 [2d

Dept 2006]). Plaintiff STRUNK's complaint alleges nothing

more than non-justiciable abstract and theoretical claims.

Therefore, the instant complaint, failing to state any allegation of

a particularized injury, is dismissed [***26] with prejudice.

(*Silver v Pataki* at 539; *Mahoney v Pataki* at 52)."

11.     This claim suffers from the same defects as Claimant's earlier Supreme Court

action. Even if Claimant has stated a cognizable cause of action, he has not alleged any harm,

right or interest other than those common to all citizens. Claimant lacks standing in this matter.

## The Lost Opportunity Cause of Action

12.     The "Lost Opportunity" claim should also be dismissed because it fails to comply

with the pleading requirements of the Court of Claims Act and fails to state a cause of action.

Section 11 (b) of the Court of Claims Act requires that a claim state "the time when and the place

where such claim arose, the nature of same, the items of damage or injuries claimed to have been

sustained and . . . the total sum claimed." " 'Failure to abide by

these pleading requirements constitutes a jurisdictional defect mandating dismissal of the claim,

even though this may be a harsh result' " *Sommer v State of New York*, 131 AD3d 757, 758 (3d

Dept 2015), quoting *Morra v State of New York*, 107 AD3d 1115, 1116 (3d Dept 2013); *see also*

*Kolnacki v State of New York*, 8 NY3d 277 (2007), *rearg denied* 8 NY3d 944 (2007).

Claimant's purported "Lost Opportunity" cause of action states no accrual date, offers no facts

that would form the basis of a cause of action and is otherwise a confused and rambling

paragraph that states no cause of action.

        WHEREFORE, the Defendant requests that this claim be dismissed and such other and

further relief as to the Court may seem just and proper.

Dated:   Albany, New York
         October 15, 2020

                                LETITIA JAMES
                                Attorney General for the State of New York
                                Attorney for the Defendant
                                New York State Office of the Attorney General
                                The Capitol
                                Albany, New York 12224


                                ANTHONY ROTONDI
                                *Assistant Attorney General*

_– 20 046226-U_

Christopher Earl Strunk, Trustee
### AD HOC NEW YORKER REPUBLICAN COMMITTEE
141 Harris Avenue Lake Luzerne, New York 12846-1721
(518) 416-8743 email: strunk@leader.com

Clerk of the Court of Claims
Robert Abrams Building for Law & Justice
7th Floor
State Street
Albany, NY 12223

SEP 14 2020

RE: STRUNK ETAL CLAIM VERSUS THE STATE OF NEW YORK

Subject: Filing New Claim for Expedited Emergency Relief

**Dear Clerk of the Court**

In accordance with Court of Claims Act section 11(a) attached is the original claim and two copies with the original Memorandum and two copies along with a single double sided SCOTUS citations for **United States v. Wong Kim Ark**, 169 U.S. 649 (1898) and **Minor v. Happersett**, 88 U.S. (21 Wall.) 162 (1875), with proof of service sent by fax, and the filing fee of $50.00 attached Postal Money Order.

Respectfully submitted for timely relief,

September 10 2020
Lake Luzerne New York

Christopher Earl : Strunk in esse Sui Juris
sole beneficiary of Claimant
All Rights Reserved Without Prejudice

State of New York
Office of the Attorney General
Claims Bureau
The Capitol
Albany, NY 12224-0341

**State of New York Court of Claims**

---

**CHRISTOPHER EARL STRUNK, and AD HOC
NEW YORKER REPUBLICAN COMMITTEE**

                               **Claimants**

              **v.**

**THE STATE OF NEW YORK**

                           **Defendant**

---

## MEMORANDUM OF LAW IN SUPPORT OF THE CLAIM WITH
## DEMAND BY ORDER TO SHOW CAUSE FOR INJUNCTIVE RELIEF

Claimant, Christopher Earl: Strunk in esse Sui Juris sole beneficiary of the name registered in commerce **CHRISTOPHER EARL STRUNK** and trustee of the AD HOC NEW YORKER REPUBLICAN COMMITTEE, in propria persona submits this MEMORANDUM OF LAW IN SUPPORT OF THE CLAIM of Three Hundred Eighty-Eight Thousand Three Hundred Ninety-Five Dollars ($388,395) in lost opportunity cost against THE STATE OF NEW YORK under the Court of Claims Act (CTC) §3-b, for willfully using **"BORN A CITIZEN"** dis-information with malice from 2008 thru 2020 shown in Exhibit C, and is done instead of the **NATURAL-BORN CITIZEN** requirement of the U.S. Constitution Article 2 Section 1 Clause 5 referenced in the chart shown in Exhibit C for anyone Running For Office President of the United States (POTUS) and by operation of law Vice President of the United States (VPOTUS), appended with the original and two copies with the Fee for the Clerk of the Court according under CTC §11/ §11-A, and with this extraordinary DEMAND BY ORDER TO SHOW CAUSE FOR INJUNCTIVE RELIEF with irreparable harm, with a likelihood of success under the current law of the land that is based upon the preponderance of evidence shown in exhibit, time is of the essence; and

Further, under the requirements of Absentee Balloting that according to Exhibit A schedule for conducting the 3 November 2020 election:

- Any request for an Absentee Ballot according to Exhibit E starts on September 18, 2020 and explains the schedule quote: "You must apply online, postmark, email or fax a completed application or letter request for the General Election Absentee ballot no later than 7 days (October 27, 2020) before the election. You may apply in-person up to the day before the election (November 2, 2020). You may file an application at any time before the deadlines, but ballots will be mailed out beginning on or about September 18, 2020. (PLEASE BE AWARE THAT DESPITE THE ABOVE DEADLINES THE POST OFFICE HAS ADVISED THAT THEY CANNOT GUARANTEE TIMELY DELIVERY OF BALLOTS APPLIED FOR LESS THAN 15 DAYS BEFORE AN ELECTION.)

1

- That voting starts on or about October 19, 2020

- And that based upon my interview of July 22, 2020 shown at Claim paragraph 29,  going into 3 November 2020, my commissioner told me in part quote: "...that masks are voluntary and if not worn a mask or plastic visor will be offered to wear while voting in person, and if rejected the Voter may use a machine properly spaced from other voters"; and

- this OSC demand is notwithstanding the arbitrary political lockdown that varies on a state by state basis to defeat POTUS Donald J. Trump, a lawless set of arbitrary executive order that seemingly have a political life of their own that involves the 2013 Fauci/Obama facilitated Chinese Gain -of-Function modified bio-weapon SARS COV-2 Virus aka COVID-19 (with the on or about 22 August 2020 CDC admission [1] that the actual mortality rate when separated in stark contrast to other morbidity factors is less than say 12,000 deaths to date attributed solely to SARS COV-2, has been fraudulently contrived for political and state financial reasons on a state by state basis - that will end in Federal indictments),

That Claimant respectfully demands injunctive relief for cause that the State be ordered to:

a. CLARIFY FOR ALL POTENTIAL VOTERS THAT *BORN A CITIZEN* SUGGESTED BY THE STATE SHOWN AT EXHIBIT C DOES NOT INCLUDE A 14TH AMENDMENT *BORN A CITIZEN* INTERPRETATION, ONLY INCLUDES THE PRE 14TH AMENDMENT U.S. CONSTITUTION ARTICLE 2 SECTION 1 CLAUSE 5 *NATURAL BORN CITIZEN* TERM OF ART THAT REQUIRES A CANDIDATE FOR POTUS AND OR VPOTUS MUST BE BORN ON SOIL OF CITIZEN PARENTS ACCORDING TO THE SCOTUS; FINDINGS IN *Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1875) and *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), and

b. THAT ALL REQUESTS FOR ABSENTEE BALLOTS MAKE SUCH CLARIFICATION and

c. THAT NOTICE IS PROMINENTLY DISPLAYED AT THE POLLS THAT KAMALA DEVI HARRIS IS NOT A NATURAL BORN CITIZEN; and

d. Additional different relief as the court deems necessary for justice herein.

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/covid-data/pdf/covidview-08-28-2020.pdf

There is a distinct difference between Natural- Born Citizen, Born A Citizen and a naturalized Citizen with a myriad set of statutory variations that we fought a revolution over the fact that we (including my family who have been here on my father's side since 1756) do not want to be subjects of a arbitrary and capricious totalitarian potentate; and

Further in short, back in 2012, I sat with NYS Assistant Attorney General Joel Graber along with the multiple defendants attorneys in the case Kings County Supreme Court 6500-2011 before the hearing convened to present my offer to settle the case were the State to change the Running for Office erroneous Born a Citizen language to Natural Born Citizen, and to the amazed groans of the expensive witnessing attorneys, Mr. Graber rejected the offer, and as such 12 years later now inures to this claim that arises from the malicious political acts of the defendant - especially under an ignorant mass murdering dynastic tyrant - who is too dimwitted to be a Maoist would wear a dunce cap, resembles the Jesuit trained Pol Pot who measured opposition with his brown shirt core to surveil all persons, in particular those who wore glasses because it meant they could read; and from my own experience since 1973, here and now we face results of budget woes that has released State psychiatric patients closed facilities and with municipal leaders set prisoners onto the streets with no bail requirements as a war to maintain power against civil society.

Yes we are long over-due for results to correct the details of said acts or omissions, if you wish, to at least correct the description by the New York Board of Elections Law for those running for office requirements to hold office of POTUS and or VPOTUS shown in Exhibit C that deceptively states that citizenship status must be "BORN A CITIZEN" as per *United States v. Wong Kim Ark*, 169 U.S. 649 (1898)[111] as if one of the requirements of the US Constitution Article 2 Section 1 Clause 5 rather than the express "NATURAL-BORN CITIZEN" (NBC) Term of Art is born on soil of citizen parents explained by the U.S. Supreme Court (SCOTUS) in *Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1875)[121]. A two sided copy of each seminal case is appended herewith for the use of the Court.

That my fellow trustee of **AD HOC NEW YORKER REPUBLICAN COMMITTEE** described in Exhibit B has faxed a copy of the Claim to the Attorney General who will have a follow-up copy of this Memo and Notarized Claim with citations annexed sent by USPS Certified Mail 7017 1070 0000 8250 9700 with certification of service having been notarized accordingly.

Respectfully submitted for timely relief,

September 10 2020
Lake Luzerne New York

Christopher Earl : Strunk in esse Sui Juris
sole beneficiary of Claimant
All Rights Reserved Without Prejudice

3

**State of New York Court of Claims**

───────────────────────────────

**CHRISTOPHER EARL STRUNK, and AD HOC**
**NEW YORKER REPUBLICAN COMMITTEE**

Claimants

v.

**THE STATE OF NEW YORK**

Defendant

**Claim**
with demand by
**Order to Show Cause**
**for Injunctive Relief**

───────────────────────────────

1.  The post office address for claimant CHRISTOPHER EARL STRUNK at his domicile registered to vote on November 3, 2020 (see **Exhibit A**) is 141 Harris Avenue POB 34 Lake Luzerne New York 12846-1721 Phone: 518-416-8743 email: strunk@leader.com.

2.  Absent any New York Republican party leadership and or courage to act herein, Claimant is the trustee of AD HOC NEW YORKER REPUBLICAN COMMITTEE registered with the Secretary of State (see **Exhibit B**)

3.  This claim arises from the acts or omissions of the defendant. Details of said acts or omissions in correcting the description by the New York Board of Elections Law for those running for office requirements to hold office of President of the United States (POTUS) and or Vice President of the United States (VPOTUS) (see **Exhibit C**) deceptively states that citizenship status must be "BORN A CITIZEN" as per *United States v. Wong Kim Ark*, 169 U.S. 649 (1898)[1] as if one of the requirements of the US Constitution Article 2 Section 1 Clause 5 rather than the express "NATURAL-BORN CITIZEN" (NBC) Term of Art is born on soil of citizen parents explained by the U.S. Supreme Court (SCOTUS) in *Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1875)[2].

───────────────────────────────

[1] https://www.law.cornell.edu/supremecourt/text/169/649

[2] https://en.wikisource.org/wiki/Minor_v._Happersett/Opinion_of_the_Court

1

4. The NBC term of art standard has a stricter criteria than the *Wong Kim Ark* decision regarding

   being born a citizen created a simple test for jurisdiction for which *all the elements must be true*:

   1. Child was born in the U.S.;
   2. Birth parents are citizens of, and subject to the laws of, a foreign country;
   3. Birth parents have "a permanent domicile and residence in the United States;"
   4. Birth parents "are carrying on business;" and
   5. Birth parents " are not employed in any diplomatic or official capacity" by the country of their citizenship"

5. The use of "Domicile and residence" are questions of law important in many subject areas

   including taxes, custody, citizenship, student scholarships (in-state vs. out-of-state), etc., and

   SCOTUS defines Domicile: <u>**Mitchell v. United States**</u>, 88 US 350 – Supreme Court 1875

the question before us. There is nothing in the record which tends to show that when he left Louisville he did not intend to return, or that while in the South he had any purpose to remain, or that when he returned to Louisville he had any intent other than to live there as he had done before his departure. Domicile has been thus defined: "A residence at a particular place accompanied with positive or presumptive proof of an intention to remain there for an unlimited time."[1] This definition is approved by Phillimore in his work on the subject.[2] By the term domicile, in its ordinary acceptation, is meant the place where a person lives and has his home.[3] The place where a person lives is taken to be his domicile until facts adduced establish the contrary.[4]

+350 The proof of the domicile of the claimant at Louisville is sufficient. There is no controversy between the parties on that proposition. We need not, therefore, further consider the subject.

A domicile once acquired is presumed to continue until it is shown to have been changed.[5] Where a change of domicile is alleged the burden of proving it rests upon the person making the allegation.[6] To constitute the new domicile two things are indispensable: First, residence in the new locality; and, second, the intention to remain there. The change cannot be made except facto et animo. Both are alike necessary. Either without the other is insufficient. Mere absence from a fixed home, however long continued, cannot work the change. There must be the animus to change the prior domicile for another. Until the new one is acquired, the old one remains.[7] These principles are axiomatic in the law upon the subject.

2

6. The use of the 14th Amendment "subject to the jurisdiction..." clause involves questions of law important herein , and SCOTUS defines it in the **Slaughter-House Cases**, 83 US 36 – Supreme Court 1873

> "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."
>
> The first observation we have to make on this clause is, that it puts at rest both the questions which we stated to have been the subject of differences of opinion. It declares that persons may be citizens of the United States without regard to their citizenship of a particular State, and it overturns the Dred Scott decision by making all persons born within the United States and subject to its jurisdiction citizens of the United States. That its main purpose was to establish the citizenship of the negro can admit of no doubt. The phrase, "subject to its jurisdiction" was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States.

7. The father - child relationship even after a divorce involves questions of law important herein , and SCOTUS defines it in: **Miller v. Albright**, 523 US 420 – Supreme Court 1998

> Petitioner's father, Charlie Miller, is an American citizen residing in Texas.[2] He apparently served in the United States Air Force and was stationed in the Philippines at the time of petitioner's conception. Id., at 21. He never married petitioner's mother, and there is no evidence that he was in the Philippines at the time of petitioner's birth or that he ever returned there after completing his tour of duty. In 1992, Miller filed a petition in a Texas court to establish his relationship with petitioner. The petition was unopposed and the court entered a "Voluntary Paternity Decree" finding him "to be the biological and legal father of Lorelyn Penero Miller." The decree provided that "[t]he parent-child relationship is created between the father and the child as if the child were born to the father and mother during marriage." App. to Pet. for Cert. 36.

3

8.  The use of "Domicile" in the State of California important involves questions of law important

    herein , and SCOTUS reverse a California court: **Adoption of Lindsay C., 229 Cal. App. 3d 404**

    **– Cal: Court of Appeal, 1st Appellate Dist., 3rd Div. 199**

> The United States Supreme Court reversed. The high court held that although the
> Act does not define "domicile," Congress clearly intended a uniform federal law of
> domicile to apply and did not intend for the definition of the word to be a matter of
> state law. It said the Act's purpose was, in part, to make clear that in certain
> situations the state courts did not have jurisdiction over child custody proceedings.
> "Indeed, the congressional findings that are a part of the statute demonstrate that
> Congress perceived the States and their courts as partly responsible for the
> problem it intended to correct." (*Mississippi Choctaw Indian Band v. Holyfield,
> supra, 490 U.S. at p. 45 [104 L.Ed.2d at p. 44]*.)

9.  As for a uniform standard for domicile that involves questions of law important herein , SCOTUS

    defines it in: **Vlandis v. Kline, 412 US 441 – Supreme Court 1973**

> such criteria exist; and since § 126 was invalidated, Connecticut, through an
> official opinion of its Attorney General, has adopted such criteria for determining the residential status of a student. The Attorney General's opinion
> states:
>
>> "In reviewing a claim of in-state status, the issue becomes essentially
>> one of domicile. In general, the domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to
>> which, whenever he is absent, he has the intention of returning. This
>> general statement, however, is difficult of application. Each individual
>> case must be decided on its own particular facts. In reviewing a claim,
>> relevant criteria include year-round residence, voter registration, place
>> of filing tax returns, property ownership, driver's license, car
>> registration, marital status, vacation employment, etc."[10]

as the above figure from the birth certificate lists 2531 Regent Street Berkeley California the usual

residence for the student mother and father such is obviously student housing... a 16 unit

apartment, certainly not a legitimate residence and domicile for citizenship purposes. is listed at

https://www.propertyshark.com/mason/Property/38755137/2531-Regent-St-Berkeley-CA-94704/

10. That KAMALA DEVI HARRIS birth certificate (see **Exhibit D**)  shows she was born to foreign

parents with temporary residence, who based upon information and belief were duly married

Jamaican non-immigrant students present in the California USA only on a non-immigrant student

visas, during which time both parents lived in Stanford University student housing and who did

not have a business per se; and

11. As such KAMALA DEVI HARRIS was born a Jamaican Citizen according to the Jamaican

Constitution [3] and remains under Jamaican Jurisdiction notwithstanding the intent of the 14th

Amendment is defined under the 8 U.S.C. §1101 (a) (15) (F) statutory requirements for her

parents as non-immigrants with U.S. Student Visa status [4].

---

[3] https://pdba.georgetown.edu/Constitutions/Jamaica/jam62.html

[4] **8 U.S.C. § 1101** - U.S. Code - Unannotated Title 8. Aliens and Nationality § 1101. Definitions **(a)**  As used in
this chapter—**(15)**   The term "immigrant" means every alien except an alien who is within one of the following
classes of nonimmigrant aliens—**(F)**  (i)  *an alien having a residence in a foreign country which he has no
intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to
enter the United States temporarily and solely for the purpose of pursuing such a course of study consistent
with section 1184(l) of this title at an established college, university, seminary, conservatory, academic high
school, elementary school,* or other academic institution or in an accredited language training program in the

5

12. Further, and at best arguendo, under the 14th Amendment that remains to be adjudicated  U.S.

Senator KAMALA DEVI HARRIS may be adjudged an  "Anchor Baby" or a "Birth Right

Citizen" as a matter of dual allegiance with limited provision of  Federal jurisdiction over the birth

in California when both non U.S. Citizen parents were using non-immigrant foreign student visas

to study in California in that the mother is from India and the father is from Jamaica as her

Alameda County Birth Certificate shows in Exhibit D, and her Jamaican student father at her birth

in California is under The Jamaica Constitution Order in Council 1962 made on 23rd July 1962

when laid before Parliament 24th July 1962 coming into Operation-Section 3(2) of the Order in

Council, and sections 80, 81, 94 (1) and (2), 103, 104, 111, 124 and 125 (in part) of the

Constitution on the 25th July 1962 with the remainder immediately before the 6th August 1962  at

the Court at Buckingham Palace, the 23rd day of July, 1962  Present, THE QUEEN'S MOST

EXCELLENT MAJESTY IN COUNCIL Her Majesty, by virtue and in exercise of the powers in

that behalf by subsection (1) of section 5 of the West Indies Act, 1962 or otherwise in Her vested,

is pleased, by and with the advice of Her Privy Council 1962 Jamaican Constitution designates

that *KAMALA DEVI HARRIS is a Jamaican Citizen under CHAPTER II CITIZENSHIP Section 3.*

*Persons who become Jamaican citizens on 6th August 1962, subsection 3C - Every person born*

*outside Jamaica shall become a citizen of Jamaica - clause (b) on the date of his birth, in the case*

*of a person born on or after the sixth day of August, 1962, if, at that date, his father or mother is a*

*citizen of Jamaica by birth, descent or registration by virtue of marriage to a citizen of Jamaica;*

---

United States, particularly designated by him and approved by the Attorney General after consultation with the
Secretary of Education, which institution or place of study shall have agreed to report to the Attorney General
the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of
study fails to make reports promptly the approval shall be withdrawn, (ii) the alien spouse and minor children of
any alien described in clause (i) if accompanying or following to join such an alien, and (iii) an alien who is a
national of Canada or Mexico, who maintains actual residence and place of abode in the country of nationality,
who is described in clause (i) except that the alien's qualifications for and actual course of study may be full or
part-time, and who commutes to the United States institution or place of study from Canada or Mexico;

13. That KAMALA DEVI HARRIS' father DONALD JASPER HARRIS status is as follows:

> **Donald Jasper Harris:**
> Born: Aug. 23, 1938, Kingston, Jamaica
> Ship Manifest: Aug. 07, 1959, Jamaica to Puerto Rico
> Citizenship British-Commonwealth-to-Jamaica Commonwealth: Aug. 06, 1962
> Married: Jul. 05, 1963, Gopalan Iyer, Age 24
> Divorced: Dec. 1971, Gopalan (Iyer) Shyamala
> Birth: Oct. 20, 1964, Daughter Kamala
> Political/Economic/NGO/Government Work, ca. 1959-present

14. And as for the non-immigrant student Mother from India who married the non-immigrat student

Jamaican Father:

---

### PART II

### CITIZENSHIP

Citizenship at the commencement of the Constitution.

**5. At the commencement of this Constitution, every person who has his domicile in the territory of India and—**

*(a)* who was born in the territory of India; or

*(b)* either of whose parents was born in the territory of India; or

*(c)* who has been ordinarily resident in the territory of India for not less than five years immediately preceding such commencement,

shall be a citizen of India.

---

15. Jamaica as with India and Canada remain part of the British Commonwealth of Nations, and as

such arguendo, KAMALA DEVI HARRIS as well as her divorced parents remain defacto subjects

of Queen Elizabeth II who serves as the Head of the British Commonwealth .

16. Further as applies herein, KAMALA DEVI HARRIS' parents divorced when she was seven, and

when she was twelve, as subjects of the Commonwealth Queen, Harris and her sister moved with

their mother Shyamala to Montreal, Quebec, Canada, where Shyamala had accepted a research

and teaching position at Jesuit McGill University-affiliated Jewish General Hospital; and

17. Further, KAMALA DEVI HARRIS attended a Jesuit associated French-speaking middle
school, Notre-Dame-des-Neiges, and then Westmount High School in Westmount, Quebec,
graduating in 1981.

18. Arguendo, KAMALA DEVI HARRIS never renounced her Jamaican citizenship like Ted Cruz
did in regards to Canada when he decided to run for POTUS in 2016; and

19. As such, Defendant's use of the *BORN A CITIZEN* term that was used before 2008 until now is
intentional harmful disinformation that Claimant sues the Defendant for as it unjustly causes
Claimants loss of opportunity costs, and now in 2020 is being done all over again for KAMALA
DEVI HARRIS who is a fraudulent candidate on the ballot must be removed and or a warning to
unsuspecting voters that she is a foreigner interfering with the 2020 New York Election; and

20. Claimant has even more concrete evidentiary proof than for the CIA's POTUS Usurper Barack
Hussein Obama Claimant had for judicial use from 2008 through 2016, the Usurper still remains
ineligible to be the President of the United States Trustee / Administrator over any United States
Departments with fiduciary responsibilities the Usurper is not entitled to the emoluments of office
must be clawed back as the Usurper who denied use of Claimant's power of Attorney on January
23, 2009 the Usurper continued as a proven Indonesian and whose every action is void ab initio.

21. Nonetheless as an outlaw entity conducted an act of treason, The 2020 Democratic National
Convention (DNC) held a presidential nominating convention from August 17 to 20, 2020, at the
Wisconsin Center in Milwaukee, Wisconsin, and virtually across the United States.

22. The DNC nominated JOSEPH ROBINETTE BIDEN JR. their POTUS candidate and KAMALA
DEVI HARRIS their VPOTUS candidate, who after 20 August 2020 were certified by NANCY
PELOSI are U.S. Constitution Article 2 Section 1 Clause 5 eligible for the New York ballot.

23. That Claimant from 2008 through 2014 sought relief and exhausted his remedies to no avail;
however in the process provided the State of New York etal full and complete notice regarding
the misrepresentation using BORN A CITIZEN for those running for POTUS / VPOTUS.

24. In my ballot access challenge in the trial court at an IAS Term, Part 27 of the Supreme Court of the State of New York, before Justice Arthur M. Schack held in and for the County of Kings, at the Courthouse, at Civic Center, Brooklyn, New York, on the 11th day of April 2012 for Index No: 6500-2011 decision and order that STRUNK in the matter of Natural Born Citizen and associated conspiracy to be baseless claims about defendants which are *__fanciful, fantastic, delusional and irrational__*; and

25. Further, on 4 March 2014 the New York State Supreme Court Appellate Division for the Second Department Judicial panel sitting in review of Appellant's Amicus motion in Appeal Cases 2012-05515, 2013-06335 and 2014-00297 from orders in the trial court for Index No: 6500-2011, to my demand that it provide *"for civilian due process of law"* rather than the continued *martial due process of law* under statutory direct authority of the POTUS Commander-in-chief over the de facto Federal and New York State Unified Court System courts under statutory authority of 12 USC §95 and 50 USC App. §5(b) ORDERED to deny "for civilian due process of law"; and

26. Further, Strunk has been outrageously branded a delusional frivolous BIRTHER by orders in the trial court for Index No: 6500-2011 with the largest fines ever imposed in New York history in excess of $177,000 and as a full citizen, has been denied free access to the state courts due process without permission; and

27. Further, Strunk has been denied NBC adjudication in any court that now further emboldens the traitorous CIA and Federal Bureau of Investigation (FBI) to enlist U.S. Senator KAMALA DEVI HARRIS born in Oakland California on October 20, 1964 to be Democratic National Committee (DNC) Vice Presidential candidate along with Chinese Communist Party (CCP) / DNC sinecure Presidential candidate JOSEPH R. BIDEN whose treachery together with Governor Andrew Cuomo and too many to be named herein is an act of treason with aiding and abetting foreign tortuous interference with our election to say the least; and

28. That as applies to absentee voting as notice in Exhibit A for November 3, 2020 the State Board of Elections has published instructions for obtaining absentee ballots that currently apply even under the questionable Virus lockdown imposed by Governor Andrew Cuomo(see **Exhibit E**); and

29. That on or about July 22, 2020 Claimant contacted the Warren County Board of Elections where Strunk-Trustee spoke with the Democratic Party Warren County Board of Elections Commissioner Kimberly Ross to ascertain if masks are mandatory for voting at the 3 November 2020 General Election; to wit she stated that masks are voluntary and if not worn a mask or plastic visor will be offered to wear while voting in person, and if rejected the Voter may use a machine properly spaced from other voters; and

30. Further, if a qualified voter is ill or disabled, under election law /state constitution may request an absentee ballot be mailed for return to the County, and the so-called vote by mail proposal shown to be outside the New York law must be stopped or modified to prevent fraud and represents an irreparable harm worthy of action by this Court with time as the essence; and

31. Claimant hereby demands injunctive relief for cause that the State be ordered to
    a. CLARIFY FOR ALL POTENTIAL VOTERS THAT *BORN A CITIZEN* SUGGESTED BY THE STATE SHOWN AT EXHIBIT C DOES NOT INCLUDE A 14TH AMENDMENT *BORN A CITIZEN* INTERPRETATION, ONLY INCLUDES THE PRE 14TH AMENDMENT U.S. CONSTITUTION ARTICLE 2 SECTION 1 CLAUSE 5 *NATURAL BORN CITIZEN* TERM OF ART THAT REQUIRES A CANDIDATE FOR POTUS AND OR VPOTUS MUST BE BORN ON SOIL OF CITIZEN PARENTS ACCORDING TO THE SCOTUS; FINDINGS IN *Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1875) and *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), and
    b. THAT ALL REQUESTS FOR ABSENTEE BALLOTS MAKE SUCH CLARIFICATION and
    c. THAT NOTICE IS PROMINENTLY DISPLAYED AT THE POLLS THAT KAMALA DEVI HARRIS IS NOT A NATURAL BORN CITIZEN; and
    d. Additional different relief as the court deems necessary for justice herein.

10

## LOST OPPORTUNITY CLAIM AGAINST THE STATE OF NEW YORK FOR USING "BORN A CITIZEN" DIS-INFORMATION FROM 2008 THRU 2020 INSTEAD OF NATURAL-BORN CITIZEN

**CHRISTOPHER EARL STRUNK LIFETIME ACTUAL TAXED EARNINGS** recorded and calculated by the Social Security Administration from 1963 through 2008 (when Claimant applied in 2008 at 63 years old for Social Security early instead of 67 years old in 2014) equals $600,000 divided by 45 years equals $13333 per year times 12 years equals $160,000 lost opportunity cost plus inflation difference from 2008 with gold at $840.65 per ounce thru 2020 with gold at $2040.65 per ounce for a 12 year net express value of $1200 per ounce of gold – that went from $35.25 per ounce in 1963 to say $2040.65 per ounce in 2020 with a projection that may touch the rally to $3,000 per Ounce by the end of the year 2021. That $160,000 divided by $840.65 per ounce of gold in 2008 equals 190.32 ounces times $1200 per ounce of gold in 2020 equals $228,395 lost opportunity costs due to inflation plus $160,000 equals $388,395 Total Lost Opportunity Cost adjusted for inflation.

[X] This Claim is served and filed within 90 days of accrual on or about 20 August 2020.

By reason of the foregoing, Claimant was damaged in the amount of $ 388,395 and Claimant demands judgment against the Defendant(s) for said amount.

_____
Claimant

### VERIFICATION

STATE OF NEW YORK     )
COUNTY OF WARREN      )

Christopher Earl Strunk, being duly so affirmed, deposes and says that deponent is the Claimant in the within action; that deponent has read the foregoing Claim and knows the contents thereof; that the same is true to deponent's own knowledge, except as to matters therein stated to be alleged upon information and belief, and that as to those matters, deponent believes it to be true.

Subscribed and so Affirmed before me
this 10 day of September, 2020.

_____
Notary Public, State of New York

COLLEEN B. COOK
Notary Public, State of New York
Warren Co. #01CO6043368
Commission Expires July 24, 2020

11

**State of New York Court of Claims**

---

**CHRISTOPHER EARL STRUNK, and AD HOC**
**NEW YORKER REPUBLICAN COMMITTEE**

Claimants

v.

**THE STATE OF NEW YORK**

Defendant

**Claim**
**with demand by**
**Order to Show Cause**
**for Injunctive Relief**

---

# Exhibit A



Warren County Board of Elections
1340 State Hwy. 9
Lake George, NY 12845




CHRISTOPHER STRUNK
141 HARRIS AVE
LAKE LUZERNE, NY 12846

IMPORTANT VOTER INFORMATION, FOR MORE INFORMATION VISIT OUR WEBSITE   https://www.warrencountyny.gov/bc

**State of New York Court of Claims**

---

**CHRISTOPHER EARL STRUNK, and AD HOC
NEW YORKER REPUBLICAN COMMITTEE**

Claimants

v.

**THE STATE OF NEW YORK**

Defendant

---

**<u>Claim</u>**
**with demand by
Order to Show Cause
for Injunctive Relief**

# Exhibit B

**426273**          **2020 Jun 26 PM10:27**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Christopher Earl Strunk 845-445-6743

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

STRUNK, CHRISTOPHER EARL
141 HARRIS AVENUE
LAKE LUZERNE, NY 12846, USA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | AD HOC NEW YORKER REPUBLICAN COMMITTEE | | | |
|---|---|---|---|---|
| OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 1c. MAILING ADDRESS 141 HARRIS AVENUE | | CITY LAKE LUZERNE | STATE NY | POSTAL CODE 128401721 | COUNTRY USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION ASSOCIATION TRUST | 1f. JURISDICTION OF ORGANIZATION STATE OF NEW YORK | 1g. ORGANIZATIONAL ID #, if any NONE ☒NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any ☐NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | 3b. INDIVIDUAL'S LAST NAME Strunk | FIRST NAME Christopher | MIDDLE NAME Earl | SUFFIX TRUSTEE |
| 3c. MAILING ADDRESS 141 HARRIS AVENUE | | CITY LAKE LUZERNE | STATE NY | POSTAL CODE 128401721 | COUNTRY USA |

4. This FINANCING STATEMENT covers the following collateral:
THE FOLLOWING ITEMS ARE ENTERED INTO THE COMMERCIAL REGISTRY ACCEPTED FOR VALUE EXEMPT FROM LEVY – ALL PROPERTY OF DEBTOR INCLUDING ORGANIZATION NAME "HAROLD WILLIAM VAN ALLEN" NY UCC Filing Number-201902232300012, AS REFERENCED ON THE RECORD OF THE LAMAR COUNTY GEORGIA SUPERIOR COURT FILED AND RECORDED AUGUST 22, 2019 AT 2:25PM IN SPA BOOK 69 PAGES 369 THRU 394, AND "CHRISTOPHER EARL STRUNK" NY UCC Filing Number-201902232304045, ON THE RECORD OF LAMAR COUNTY GEORGIA SUPERIOR COURT RECORDED OCTOBER 15,2012 AT 4:44 PM IN SPA 29 PAGES 172 THRU 178, UPDATED DECEMBER 4, 2012 AT 9:54 AM IN SPA BOOK 29 PAGES 793 THRU 694, IS REGISTERED WITH THE UNITED STATES SECRETARY OF THE TREASURY ON 22 MAY 2013 BY CERT. MAIL 970143990060182230012, AND AMENDED BY CERT. MAIL 70123499990955729106.THAT DEBTOR ORGANIZATION IS A ASSOCIATION TRUST TRANSMITTING UTILITY.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐LESSEE/LESSOR | ☐CONSIGNEE/CONSIGNOR | ☐BAILEE/BAILOR | ☐SELLER/BUYER | ☐AG. LIEN | ☐NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | ☐ CHECK to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐All Debtors ☐Debtor 1 ☐Debtor 2 | | |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**Filing Number-202006268275667**

**426273**        **2020 Jun 26 PM10:27**

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | 9a. ORGANIZATION'S NAME AD HOC NEW YORKER REPUBLICAN COMMITTEE | | |
|---|---|---|---|
| OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

**10. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (11a or 11b) - do not abbreviate or combine names

| | 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

**12.** ☒ **ADDITIONAL SECURED PARTY'S** or ☐ **ASSIGNOR S/P'S** NAME - insert only one name (12a or 12b)

| | 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 12b. INDIVIDUAL'S LAST NAME  Van Allen | FIRST NAME  Harold | MIDDLE NAME  William | SUFFIX  TRUSTEE |

| 12c. MAILING ADDRESS  361 NORTH ROAD | CITY  HURLEY | STATE  NY | POSTAL CODE  12443 | COUNTRY  USA |
|---|---|---|---|---|

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14.** Description of real estate:

**16.** Additional collateral description:

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest).

**17.** Check only if applicable and check only one box.

Debtor is a ☒ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18.** Check only if applicable and check only one box.

☒ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years

☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

**State of New York Court of Claims**

**CHRISTOPHER EARL STRUNK, and AD HOC
NEW YORKER REPUBLICAN COMMITTEE**

Claimants

v.

**THE STATE OF NEW YORK**

Defendant

**<u>Claim</u>**
**with demand by**
**Order to Show Cause**
**for Injunctive Relief**

# Exhibit C

Please refer to the Official Political Calendar for all filing dates.

Additional information may be obtained by calling the New York State Board of Elections at (518) 474-6220 or your county board of elections.

IMPORTANT: REQUIREMENT FOR BALLOT ACCESS RELATED FILINGS BY MAIL OR OVERNIGHT DELIVERY SERVICE. Please read this Filing Requirement document (1/13/2020) for detailed information.

**Requirements to Hold Office**

| OFFICE | CITIZENSHIP | AGE | RESIDENCY | STATUTE |
|---|---|---|---|---|
| President of the United States | Born a citizen | 35 years | 14 years in country | United States Constitution Art. II § 1 |
| United States Senator | Citizen 9 years | 30 years | Resident of state when elected | United States Constitution Art. I § 3 |
| NYS Governor/ Lt. Governor Attorney General Comptroller | Citizen | 30 years | Resident of state 5 years immediately preceding election | New York State Constitution Art. IV § 2 and Art. V § 1 |
| Representative in Congress | Citizen 7 years | 25 years | Resident of state when elected | United States Constitution Art. I § 2 |
| New York State Senator New York State Assembly | Citizen | 18 years | Resident of state for 5 years and resident of district for 12 months immediately preceding election. (In a redistricting year, may be a resident of county for 12 months immediately preceding the election.) | New York State Constitution Art. III § 7 Public Officers Law § 3 |

**General Information on Petitions**

These sample forms were prepared by the State Board of Elections. They are all in Acrobat PDF format. You will need the Adobe (TM) Acrobat Reader to view and print them.

These forms can be printed and filled out by hand.

Electronic signatures are not acceptable.

- SAMPLE DESIGNATING PETITION (2/1/2008) (print on legal size paper)
- SAMPLE INDEPENDENT NOMINATING PETITION (8/16/2007) (print on legal size paper)
- SAMPLE OPPORTUNITY TO BALLOT PETITION (8/16/2007) (print on legal size paper)
- SAMPLE VILLAGE DESIGNATING PETITION (8/16/2007) (print on legal size paper)
- SAMPLE VILLAGE DESIGNATING PETITION - COUNTY (8/14/2007) (to be used if Election is run by the County Board of Elections) (print on legal size paper)
- SAMPLE VILLAGE INDEPENDENT NOMINATING PETITION (8/14/2007) (print on legal size paper)
- SAMPLE VILLAGE INDEPENDENT NOMINATING PETITION - COUNTY (8/14/2007) (to be used if Election is run by the County Board of Elections) (print on legal size paper)
- SAMPLE COVER SHEET (8/2/2007)
- SAMPLE CERTIFICATE OF ACCEPTANCE 6-146 (For Use By Candidate) (3/21/2019)

**State of New York Court of Claims**

**CHRISTOPHER EARL STRUNK, and AD HOC**
**NEW YORKER REPUBLICAN COMMITTEE**

Claimants

v.

**THE STATE OF NEW YORK**

Defendant

**Claim**
**with demand by**
**Order to Show Cause**
**for Injunctive Relief**

# Exhibit D



[Reproduced for educational purposes only. Fair Use relied upon.]



[Reproduced for educational purposes only. Fair Use relied upon.]

**State of New York Court of Claims**

**CHRISTOPHER EARL STRUNK, and AD HOC NEW YORKER REPUBLICAN COMMITTEE**

Claimants

**v.**

**THE STATE OF NEW YORK**

Defendant

**Claim**
with demand by
Order to Show Cause
for Injunctive Relief

# Exhibit E

# Board of Elections

- **Home**
- **About Us**
- **FAQ**
- **Contact Us**
- **Site Index**

## Absentee Voting

**Election Day is Tuesday, November 3, 2020**

**Early Voting Period is October 24,2020 - November 1, 2020**

**Qualifications to Vote by Absentee Ballot (Deadline)**

1. Absent from your county or, if a resident of New York City absent from the five boroughs, on Election Day.
2. Unable to appear at the polls due to temporary or permanent illness or disability (temporary illness includes being unable to appear due to risk of contracting or spreading a communicable disease like COVID-19).
3. Unable to appear because you are the primary care giver of one or more individuals who are ill or physically disabled.
4. A resident or patient of a Veterans Health Administration Hospital.
5. Detained in jail awaiting Grand Jury action or confined in prison after conviction for an offense other than a felony.

**How to Apply for an Absentee Ballot (Deadline)**

You may apply for an absentee ballot in any of the following ways:

- **Electronically through our Absentee Ballot Application Portal:**

    ### Electronic Absentee Ballot Application Portal >

- **By sending an email request to your local county board of elections**
- **By telephoning a request to your local county board of elections**
- **By sending a fax request to your local county board of elections**
- **By going in-person to your local county board of elections**
- **By mailing a paper application to your local county board of elections**

    You can download a PDF version of the New York State Absentee Ballot Application Form:

## Download English Form (⬇ 539KB) >

## Download Spanish Form (⬇ 605KB) >

Upon completion, applications must be mailed to your county board no later than the seventh day before the election or delivered in person no later than the day before the election.

- By sending a letter to your county board of elections. The letter must contain the following information:
    1. Name and date of birth of the voter
    2. the address where you are registered
    3. an address where the ballot is to be sent, and
    4. the reason for the request.

    If you apply by letter, an application form will be mailed with your ballot. The application form must be completed and returned with your ballot.

If you cannot pick up your ballot, or will not be able to receive it through the mail, you have the right to designate someone to pick it up for you. Only that person designated on your application may pick up and deliver your ballot.

If you are permanently ill or disabled, you have the right to receive an Absentee Ballot for each subsequent election without further application. Simply file an application with your county board of elections indicating permanent illness or physical disability.

You will then automatically receive an absentee ballot for every election until your registration is cancelled.

If you are visually impaired or otherwise disabled, such that your disability requires you to use an accessible absentee ballot application, you have two accessible options to request a ballot on this page, either using the Accessible Electronic Ballot Application Portal:

### Electronic Accessible Absentee Ballot Application Portal >

### Accessible Absentee Ballot Application with Instructions (⬇ 96.6KB) >

#### When is it due?

You must apply online, postmark, email or fax a completed application or letter request for the General Election Absentee ballot no later than 7 days (October 27, 2020) before the election. You may apply in-person up to the day before the election (November 2, 2020). You may file an application at any time before the deadlines, but ballots will be mailed out beginning on or about September 18, 2020. (PLEASE BE AWARE THAT DESPITE THE ABOVE DEADLINES THE POST OFFICE HAS ADVISED THAT THEY CANNOT GUARANTEE TIMELY DELIVERY OF BALLOTS APPLIED FOR LESS THAN 15 DAYS BEFORE AN ELECTION.)

#### How to Cast an Absentee Ballot

- Once you receive the ballot, mark the ballot according to your choices for each office following the instructions on the ballot
- Once you have completed marking your ballot fold it up and place it in the Security Envelope. (This envelope will have a place for your signature.)
- Sign and date the outside of the Security Envelope.
- Seal the Security Envelope.

- Place the Security Envelope in the Return Envelope. (This envelope will have the return address of your county Board of Elections on the outside and should have a logo that reads, "Official Election Mail")
- Seal the Return Envelope.
- You may return the ballot in any of the following ways:
    1. Put it in the mail ensuring it receives a postmark no later than November 3rd.
    2. Bringing it to the County Board of Elections Office no later than November 3rd by 9pm.
    3. Bringing it to an early voting poll site between October 24th and November 1st
    4. Bringing it to a poll site on November 3rd by 9pm.

**Mail Time Considerations When Returning an Absentee Ballot**

When mailing your completed ballot, the USPS recommends that voters allow enough time for ballots to be returned to the Board, which is generally seven days ahead of the general election. New York State requires your ballot to be both postmarked by November 3, 2020 and received by our Board by November 10, 2020. Voters who mail in their ballots on Election Day must be aware of the posted collection times on collection boxes and at the Postal Service's retail facilities, and that ballots entered after the last posted collection time will not be postmarked until the following business day.

**You Can Still Vote in Person If You Request an Absentee Ballot**

Even if you request or cast and return an absentee ballot, you may still go to the polls and vote in person. The Election Law recognizes that plans change. The Board of Elections is required to check the poll book before canvassing any absentee ballot. If the voter comes to the poll site, on Election Day or during early voting and votes in person, the absentee ballot is set aside and not counted.



HELP NEW YORK VOTE:
BECOME A POLL WORKER



COURT OF CLAIMS
STATE OF NEW YORK
COUNTY OF ALBANY

CHRISTOPHER STRUNK,

Claimant,

against

THE STATE OF NEW YORK,

Defendant.

CLAIM NO.: NONE

NOTICE OF MOTION TO DISMISS
and MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

LETITIA JAMES
Attorney General of the
State of New York
Attorney for Defendant

Sir/Madam:

Take notice that the within is a copy of

the _____ duly filed and entered in the

office of the Clerk of the Court of Claims

of the State of New York on the _____ day

of _____

Yours, etc.,

LETITIA JAMES
Attorney General
Attorney for Defendant
State of New York
Albany, New York 12224

TO:   Mr. Christopher Strunk
      141 Harris Avenue
      Staten Island, New York 12345

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

---

STATE OF TEXAS et al. ,

**Plaintiff,**

   v.                                                        Civil Action No. 18-cv-0068 (ASH)

UNITED STATES OF AMERICA  et al.,

**Defendant.**

---

RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH LOCAL RULE 5-2 RELATED CASES OF AMICUS CHRISTOPHER EARL STRUNK, THE NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR FRCvP RULE 65(b) RELIEF AT DOCKET  ITEM# 483, AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 BY : NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, IOWA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR CHILDHOOD ARRIVAL (*DACA)

# EXHIBIT  L

The Washington Post

# Delegation Led by U.S. Senators Detained Briefly at Russian Airport

By Peter Finn
August 29, 2005

A U.S. delegation headed by Sen. Richard G. Lugar (R-Ind.), chairman of the Foreign Relations Committee, was detained Sunday for three hours at an airport in Russia before being allowed to leave the country for Ukraine.

Russian border guards at the airport in the Siberian city of Perm demanded they be allowed to search the U.S. government aircraft carrying the delegation, which also included Sen. Barack Obama (D-Ill.), who was making his first foreign trip since becoming a senator. Obama is also a member of the Foreign Relations Committee.

"It's always unbelievable," Lugar told a reporter from the Chicago Tribune traveling with the delegation. "It can be a dysfunctional government."

American officials, citing a U.S.-Russian agreement that does not allow such inspections, refused to let the search take place, leading to a three-hour standoff at the airport, according to Andy Fisher, a spokesman for Lugar who is on the trip.

The congressional delegation was held in a malodorous room adjacent to the tarmac and allowed onto an adjoining porch area only after they surrendered their passports, said Fisher, who spoke by phone from Kiev after the delegation landed there.

"This is not the first time this has happened," Fisher said, noting that a delegation including Lugar was detained in Perm for a short time two years ago. "It may be some kind of internal bureaucratic problem."

U.S. officials in Moscow and Washington intervened with the Russian authorities to secure the group's departure.

The delegation was in Russia as part of a week-long tour of major weapons facilities in former Soviet republics, where U.S. funds are being used to secure or destroy nuclear, chemical and biological weapons. Russia recently agreed to open sensitive sites to U.S. inspection, a development that Lugar heralded at a news conference Friday in Moscow.

"Russians in the past had placed severe limitations on inspections at these storage sites, so this is a significant breakthrough," said Lugar, who is the co-author of the 1991 Cooperative Threat Reduction program.

In Perm, the delegation toured a facility designed to destroy nuclear warheads.

After visiting Ukraine, the delegation will travel to Azerbaijan.

Separately, a spokesman at the U.S. Embassy in Moscow said Sen. Chuck Hagel (R-Neb.) was briefly delayed at an airport in another Siberian city, Irkutsk, because of a problem with flight clearance paperwork. Hagel was in the region to tour a nearby natural gas deposit site as part of a trip to study energy issues. The issue was resolved after the embassy contacted the Russian Foreign Ministry, and Hagel flew on to Bulgaria, a diplomat here said.

💬 0 Comments

**Peter Finn**
Peter Finn is the national security editor at The Washington Post. He was part of a team of editors on the Pulitzer Prize-winning stories based on the documents leaked by Edward Snowden and oversaw the reporting on Russian interference in the presidential election and its fallout that won the 2018 Pulitzer Prize for National Reporting.  Follow 🐦

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS**

STATE OF TEXAS et al. ,

**Plaintiff,**

v.

Civil Action No. 18-cv-0068 (ASH)

UNITED STATES OF AMERICA  et al.,

**Defendant.**

RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH
LOCAL RULE 5-2 RELATED CASES OF AMICUS <u>CHRISTOPHER EARL STRUNK</u>, THE
NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW
YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR
FRCvP RULE 65(b) RELIEF AT DOCKET  ITEM# 483, <u>AFFIRMATION IN OPPOSITION</u>
<u>TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 BY</u> :
NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, IOWA,
MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH
CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT,
WASHINGTON, AND THE DISTRICT OF COLUMBIA <u>IN OPPOSITION TO</u>
<u>PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE</u> <u>*DEFERRED ACTION FOR*</u>
<u>*CHILDHOOD ARRIVAL*</u> (DACA)

# EXHIBIT  M



*Richard G. Lugar*

**United States Senator for Indiana (R)**

# Lugar and Obama Urge Destruction of Conventional Weapons Stockpiles

Tuesday, August 30, 2005

DONETSK, Ukraine – U.S. Senators Dick Lugar (R-IN) and Barack Obama (D-IL) called for the immediate destruction of 15,000 tons of ammunition, 400,000 small arms and light weapons, and 1,000 man-portable air defense systems (MANPADS) or shoulder missile launchers that are often sought by terrorists.

Lugar and Obama toured the Donetsk State Chemical Production Plant, a conventional weapons destruction facility where the U.S. has taken the lead in a three-year NATO program to destroy the weapons. Another 117,000 tons of ammunition and 1.1 million small arms and light weapons are slated for destruction within 12 years.

So far, the U.S. has contributed $2.1 million to the project, and Austria, Bulgaria, Luxembourg, Lithuania, Netherlands, Norway, Slovakia, Switzerland, and the United Kingdom have contributed $1.2 million.

While the destruction is ready to begin, the Ukrainian Rada (parliament) first must pass a law exempting the foreign assistance from taxation. Lugar and Obama discussed this issue with Rada Speaker Volodymyr Lytvyn, Prime Minister Yuliya Tymoshenko and President Viktor Yushchenko in meetings yesterday. All three leaders indicated they would promote action before the March 2006 parliamentary elections.

The visit underscores the importance of legislation Lugar and Obama have authored that would commit additional U.S. resources and expand authorities in cooperative threat reduction of conventional weapons around the world. The bill is part of the Foreign Relations Authorization Bill that is pending in the Senate and will be introduced as a free-standing bill by the senators this fall.

"We discussed MANPADS, landmines and other very highly dangerous explosives. Ukraine has huge stockpiles leftover from previous times that are dangerous to people of this country as well as the possibility for proliferation to other countries," Lugar said. "We are working to obtain funds to secure and destroy these weapons in cooperative threat reduction. We are encouraging the U.S. and Ukraine to work together and to obtain more funds. We came here to see the problem and the solution with our own eyes."

By the late 1980's, 75 percent of all Ukraine's industrial capacity was used to produce Soviet weaponry, including strategic weapons. In June 1996, the Nunn-Lugar Cooperative Threat Reduction program successfully achieved the removal of all 1,240 deployed SS-19 and SS-24 strategic nuclear warheads from Ukraine.

"Vast stocks of conventional munitions and military supplies have accumulated in Ukraine. Some of this stockpile dates from World War I and II, yet most dates from Cold War buildup and the stocks left behind by Soviet withdrawals from East Germany, the Czech Republic, Hungry and Poland," Obama said. "We need to eliminate these stockpiles for the safety of the Ukrainian people and people around world, by keeping them out of conflicts around the world."

Estimates by the NATO Maintenance and Supply Agency suggest a significant proliferation and public safety threat from the 7 million small arms and light weapons and 2 million tons of conventional ammunition stored in more than 80 depots across Ukraine. These depots were never designed to hold such large stockpiles and remain vulnerable to those seeking such weapons or their components, or to spontaneous detonation in some of the older and larger ammunition stockpiles.

In March, the Foreign Relations Committee added the Lugar Disarmament Initiative (LDI) to the Foreign Affairs Authorization Act for Fiscal Years 2006 and 2007. The LDI is modeled on the original Nunn-Lugar Act. Its purpose is to

provide the Department of State with a focused response to the threat posed by vulnerable stockpiles of conventional weapons around the world, including tactical missiles and MANPADS. Such missile systems could be used by terrorists to attack commercial airliners, military installations and government facilities in the U.S. and abroad. Reports suggest that Al Qaeda has attempted to acquire these kinds of weapons. In addition, unsecured conventional weapons stockpiles are a major obstacle to peace, reconstruction and economic development in regions suffering from instability.

This bill declares it to be the policy of the United States to seek out surplus and unguarded stocks of conventional armaments, including small arms and light weapons, and tactical missile systems for elimination or safeguarding. It authorizes the Department of State to carry out an accelerated global effort to destroy such weapons and to cooperate with allies and international organizations when possible. The Secretary of State is charged with devising a strategy for prioritizing, on a country-by-country basis, the obligation of funds in a global program of conventional arms elimination. Lastly, the Secretary is required to unify program planning, coordination and implementation of the strategy into one office at the State Department and to request a budget commensurate with the risk posed by these weapons.

During the trip, the senators have inspected a nuclear warhead storage facility and missile destruction facility in Russia and biological laboratories in Russia and Ukraine. On Thursday, they will review sea interdiction exercises on the Caspian Sea in Azerbaijan.

In 1991, Senator Lugar (R-IN) and former Senator Sam Nunn (D-GA) authored the Nunn-Lugar Act, which established the Cooperative Threat Reduction Program. This program has provided U.S. funding and expertise to help the former Soviet Union safeguard and dismantle its enormous stockpiles of nuclear, chemical and biological weapons, related materials, and delivery systems. In 1997, Lugar and Nunn were joined by Senator Pete Domenici (R-NM) in introducing the Defense Against Weapons of Mass Destruction Act, which expanded Nunn-Lugar authorities in the former Soviet Union and provided WMD expertise to first responders in American cities. In 2003, Congress adopted the Nunn-Lugar Expansion Act, which authorized the Nunn-Lugar program to operate outside the former Soviet Union to address proliferation threats. In October 2004, Nunn-Lugar funds were used for the first time outside of the former Soviet Union to secure chemical weapons in Albania, under a Lugar-led expansion of the program.

The latest Nunn-Lugar Scorecard shows that the program has deactivated or destroyed: 6,760 nuclear warheads; 587 ICBMs; 483 ICBM silos; 32 ICBM mobile missile launchers; 150 bombers; 789 nuclear air-to-surface missiles; 436 submarine missile launchers; 549 submarine launched missiles; 28 nuclear submarines; and 194 nuclear test tunnels.

Beyond the scorecard's nuclear elimination, the Nunn-Lugar program secures and destroys chemical weapons, and works to reemploy scientists and facilities related to biological weapons in peaceful research initiatives. The International Science and Technology Centers, of which the United States is the leading sponsor, have engaged 58,000 former weapons scientists in peaceful work. The International Proliferation Prevention Program has funded 750 projects involving 14,000 former weapons scientists and created some 580 new peaceful high-tech jobs. Ukraine, Belarus and Kazakhstan are nuclear weapons free as a result of cooperative efforts under the Nunn-Lugar program. They otherwise would be the world's the third, forth and eighth largest nuclear weapons powers, respectively.

For more information on the Nunn-Lugar Program, visit http://lugar.senate.gov/nunnlugar.html.

Lugar is Chairman of the Senate Foreign Relations Committee and Obama is a new member of the committee this year.

###

245075

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

---

**STATE OF TEXAS et al. ,**

**Plaintiff,**

   **v.**

**UNITED STATES OF AMERICA  et al.,**

**Defendant.**

                              **Civil Action No. 18-cv-0068 (ASH)**

---

**RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH LOCAL RULE 5-2 RELATED CASES OF AMICUS CHRISTOPHER EARL STRUNK, THE NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR FRCvP RULE 65(b) RELIEF AT DOCKET  ITEM# 483, AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 BY : NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI‘I, ILLINOIS, IOWA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR CHILDHOOD ARRIVAL* (DACA)**

# EXHIBIT  N

# American Reporter

BY MICHELLEBURG1 | SEPTEMBER 6, 2009 · 10:34 AM

## Russia Holds Obama For Suspicion Of Being a British Spy Back In 2005! Investigator In Chicago Fingers Obama For Being A British Spy As Far Back As 2004!

When I heard this the other night it hit me like a ton of bricks! I remember the plane with the US Senator being held at the airport in Russia! I remember thanking it was crazy that they believed the Senator on the Plane was a Spy for the British!

So, for the last 24 hours I have been looking for news articles on this! This is what I have been able thus far! I also want to ask you this... Why would Russia way back in 2005 thank that this Senator was a spy for the British? Could it happen to be that they new he had a British pass port at some point in his life. Hummmmmmm Guys it just got stranger!

It was kind of odd how Chicago investigator Sherman Skolnick *just happened* to pass away just before Barack Obama announced his run for President. Skolnick was founder and chairman of the Citizens Committee to Clean Up the Courts, which nailed two Illinois Supreme Court justices, Roy J. Solfisburg Jr. and Ray Klingbiel, who had accepted bribes of stock from a defendant in a case on which they ruled. The scandal catapulted John Paul Stevens, special counsel to the resulting investigating commission to a seat as a justice on the U.S. Supreme Court.

Skolnick had indeed uncovered so many links between plots and participants in conspiracies that he may have come to see some where none existed...but he also uncovered others that noone else had noticed, and Obama was right in his back yard.

CLOAK'S EXCLUSIVE AUGUST 2005 STORY EXPOSING OBAMA's KENYAN BIRTHPLACE FORCES OBAMA TO SANITIZE HIS PASSPORT FILE

Insiders Report It Was Accomplished With The Assistance of the Clinton Mob

CLOAK EXCLUSIVE!
Filed 8/28/05

BRITISH SPY FINGERED:
ACCUSATIONS CONFIRMED!

BY SHERMAN SKOLNICK

CLOAK Co-host Sherman Skolnick prior to the 2004 Election fingered Barack Obama running in Illinois for the U.S. Senate as a British Intel agent born in Kenya. Skolnick, as a co-spy watcher unmasked Obama on his regular CLOAK program, Shop Talk From Plot H.Q.

Today Russian President V. Putin ordered U.S. Senator Barack Obama, who is also tight with MOSSAD, to be held in custody under suspicion of being a British operative illegally spying in Russia at off-limits secret facilities.

Spying with Obama, who was locked up, was U.S. Senator Richard Lugar, pro-Bush, was detained by Putin but unlike Obama, quickly released. Senate Foreign Relations Committee Chairman Richard Lugar and Committee member Barack Obama at a base near Perm, Russia. This is where mobile launch missiles are being destroyed by the Nunn-Lugar program.

Lugar delegation detained for three hours in Perm after inspecting nuke weapons facility US Senator Richard Lugar, who was briefly detained with a US delegation in Perm, Siberia, after inspecting the site, which is being dismantled with US funding.

Nils Båhmer/Bellona

A US delegation headed by Republican Senator Richard Lugar, chairman of the Senate Foreign Relations Committee, was detained Sunday for three hours at an airport in the Siberian city of Perm, Russia before being allowed to leave the country for Ukraine in a diplomatically chaotic incident Sunday. Charles Digges, 29/08-2005

US officials were nonetheless anxious to downplay the incident in an apparent effort to avoid diplomatic fallout with the increasingly hard-line regime of Russian President Vladimir Putin, who has publicly expressed dismay over a number of US-Russian disarmament programmes.

LUGAR, OBAMA DETAINED IN RUSSIA DELEGATION RELEASED AFTER STANDOFF RESOLVED

A U.S. delegation headed by Sen. Richard Lugar, R-Ind., chairman of the Senate Foreign Relations Committee, was detained Sunday for three hours at an airport in Russia before being allowed to leave the country for Ukraine.

Russian border guards at the airport in the Siberian city of Perm demanded to search the U.S. government aircraft carrying the delegation, which also included Sen. Barack Obama, D-Ill., who was making his first foreign trip since becoming a senator. Obama is also a member of the Foreign Relations Committee.

American officials, citing a U.S.-Russian agreement that does not allow such inspections, refused to allow the search, leading to a three-hour standoff at the airport, ...

**Rate this:**

33 Votes