

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

OCT 2 1 2020

David J. Bradley, Clerk of Court

STATE OF TEXAS et al. ,

Plaintiff,

v.

Civil Action No. 18-cv-0068 (ASH)

UNITED STATES OF AMERICA et al.,

Defendant.

RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH
LOCAL RULE 5-2 RELATED CASES OF AMICUS CHRISTOPHER EARL STRUNK, THE
NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW
YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR
FRCvP RULE 65(b) RELIEF AT DOCKET  ITEM# 483, AFFIRMATION IN OPPOSITION
TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 BY :
NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, IOWA,
MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH
CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT,
WASHINGTON, AND THE DISTRICT OF COLUMBIA IN OPPOSITION TO
PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR
CHILDHOOD ARRIVAL* (DACA)

# EXHIBIT  G



- Complete items 1, 2 and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Andrew William Amend
New York Office of the Attorney General
28 Liberty Street 14th Fl
New York, NY 10005
212 416-8022

9590 9402 2906 7094 0579 24

2. Article Number (Transfer from service label)
7017 1070 0000 8250 9663

PS Form 3811, July 2015 PSN 7530-02-000-9053

OCT 13 2020

ARMONG MAIL ROOM

---

USPS TRACKING #



9590 9402 2906 7094 0579 24

**United States Postal Service**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•



CE STRUNK
141 HARRIS AV.
LAKE LUZERNE NY
12846

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

---

STATE OF TEXAS et al.,

Plaintiff,

v.                                    Civil Action No. 18-cv-0068 (ASH)

UNITED STATES OF AMERICA  et al.,

Defendant.

---

RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH LOCAL RULE 5-2 RELATED CASES OF AMICUS CHRISTOPHER EARL STRUNK, THE NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR FRCvP RULE 65(b) RELIEF AT DOCKET  ITEM# 483, AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET  ITEM# 209 BY : NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, IOWA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR CHILDHOOD ARRIVAL* (DACA)

# EXHIBIT  H

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| State of Texas, *et al.*,<br><br>    *Plaintiffs,*<br><br>    *v.*<br><br>The United States of America, *et al.*,<br><br>    *Defendants,*<br><br>Karla Perez, *et al.*,<br><br>    *Defendants-Intervenors,*<br><br>    *and*<br><br>State of New Jersey,<br><br>    *Defendant-Intervenor.* | Case No. 1:18-cv-00068 |

**MEMORANDUM OF LAW FOR AMICI CURIAE THE STATES OF NEW YORK,
CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, IOWA,
MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO,
NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA,
VERMONT, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

XAVIER BECERRA
 *Attorney General*
 *State of California*
1300 I St.
Sacramento, CA 95814

BARBARA D. UNDERWOOD
 *Attorney General*
 *State of New York*
28 Liberty Street, 23rd Floor
New York, NY 10005
Telephone: (212) 416-8022
Facsimile: (212) 416-8962

*(Complete counsel list appears on signature pages.)*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ iii

INTEREST OF THE AMICI STATES .......................................................................................1

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ...............................2

ARGUMENT ..............................................................................................................................3

PLAINTIFFS' REQUESTED PRELIMINARY INJUNCTION SHOULD BE DENIED ................................3

POINT I .....................................................................................................................................3

PLAINTIFFS CANNOT MAKE THE LEGAL SHOWING REQUIRED TO OBTAIN A
PRELIMINARY INJUNCTION ............................................................................................................3

A.     Plaintiffs Cannot Show a Likelihood of Success on the Merits Because the
Deferred Action for Childhood Arrivals (DACA) Policy Is Lawful. ........................3

      1.     DACA is consistent with the Immigration and Nationality Act (INA). ...........3

            a.     The INA vests the Executive with discretion to create class-
wide frameworks for evaluating requests for deferred action and
related relief. ..........................................................................................3

            b.     DACA is narrower and more tailored than Deferred Action for
Parents of Americans and Lawful Permanent Residents
(DAPA). ................................................................................................8

            c.     Plaintiffs' arguments under the Take Care Clause turn entirely
on the incorrect assertion that DACA violates the INA.........................10

      2.     Notice and comment was not required prior to DACA's
implementation. ...........................................................................................10

      3.     Plaintiffs' APA challenges amount to untimely and impermissible
collateral attacks on decades-old federal policies and regulations. .............12

B.     Plaintiffs Cannot Show That They Will Suffer Irreparable Harm If DACA
Is Not Enjoined.......................................................................................................14

Page

1.  States and their lawful residents benefit from the ability of DACA
    grantees to live and work openly. ...................................................................14

2.  Plaintiffs fail to establish any harm traceable to DACA. ................................15

3.  Plaintiffs' nearly six-year delay in seeking an injunction against
    DACA reinforces their lack of irreparable injury from that policy...............18

C.  The Balance of the Equities and the Public Interest Favor Denying
    Plaintiffs' Requested Injunction..............................................................................19

POINT II ......................................................................................................................................21

THE CONFLICT BETWEEN PLAINTIFFS' PROPOSED PRELIMINARY INJUNCTION AND TWO
EXISTING PRELIMINARY INJUNCTIONS ALSO WARRANTS DENIAL OF PLAINTIFFS'
REQUESTED RELIEF ...............................................................................................................21

CONCLUSION.............................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Arizona Dream Act Coal. v. Brewer,*
  855 F.3d 957 (9th Cir. 2017) ..................................................................................9

*Arizona v. United States,*
  567 U.S. 387 (2012)..........................................................................................4, 10

*Arpaio v. Obama,*
  27 F. Supp. 3d 185 (D.D.C. 2014).................................................................3, 9, 12

*Batalla Vidal v. Nielsen,*
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) ........................................................... passim

*Benisek v. Lamone,*
  585 U.S. __, 138 S. Ct. 1942 (2018)......................................................................18

*Chaudhry v. Holder,*
  705 F.3d 289 (7th Cir. 2013) ...................................................................................6

*Colorado River Water Conservation Dist. v. United States,*
  424 U.S. 800 (1976)...............................................................................................23

*Crane v. Johnson,*
  783 F.3d 244 (5th Cir 2015) ..................................................................................16

*DHS v. Regents of Univ. of California,*
  138 S. Ct. 1182 (2018)...........................................................................................23

*Dillard v. Security Pac. Corp.,*
  85 F.3d 621, 1996 WL 254971 (5th Cir. 1996) .....................................................18

*Dunn-McCampbell Royalty Interest, Inc. v. National Park Serv.,*
  112 F.3d 1283 (5th Cir. 1997) .......................................................................... 13-14

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009)...............................................................................................21

*Feller v. Brock,*
  802 F.2d 722 (4th Cir. 1986) .................................................................................23

*Hotel & Rest. Emps. Union v. Smith,*
  846 F.2d 1499 (D.C. Cir. 1988)...............................................................................6

*Kendall v. United States ex rel. Stokes,*
  37 U.S. 524 (1838)................................................................................................10

| Cases | Page(s) |
|---|---|

*Lincoln v. Vigil,*
    508 U.S. 182 (1993)..................................................................................................10

*Lydo Enters. v. City of Las Vegas,*
    745 F.2d 1211 (9th Cir. 1984) ................................................................................18

*Mann Mfg., Inc. v. Hortex, Inc.,*
    439 F.2d 403 (5th Cir. 1971) ............................................................................. 22-23

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)..................................................................................................17

*Mower v. Boyer,*
    811 S.W.2d 560 (Tex. 1991)......................................................................................23

*NAACP v. Trump,*
    298 F. Supp. 3d 209 (D.D.C. 2018).........................................................................22

*Quince Orchard Valley Citizens Ass'n v. Hodel,*
    872 F.2d 75 (4th Cir. 1989) .....................................................................................18

*Regents of Univ. of Cal. v. DHS,*
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ........................................................... passim

*Reno v. American-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999)............................................................................................5, 17

*Save Power Ltd. v. Syntek Fin. Corp.,*
    121 F.3d 947 (5th Cir. 1997) ...................................................................................23

*Sutter Corp. v. P & P Indus., Inc.,*
    125 F.3d 914 (5th Cir. 1997) ...................................................................................23

*Texas Sav. & Cmty. Bankers Ass'n v. Federal Hous. Fin. Bd.,*
    201 F.3d 551 (5th Cir. 2000) ...................................................................................11

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ........................................................................... passim

*West Gulf Maritime Ass'n v. ILA Deep Sea Local 24,*
    751 F.2d 721 (5th Cir. 1985) ............................................................................. 22-23

*Wind River Mining Corp. v. United States,*
    946 F.2d 710 (9th Cir. 1991) ...................................................................................14

**Cases**          **Page(s)**

*Winter v. Natural Res. Defense Council, Inc.,*
   555 U.S. 7 (2008)................................................................................................2

*Wong v. Doar,*
   571 F.3d 247 (2d Cir. 2009).............................................................................14

**Federal Laws**

6 U.S.C. § 202(5) ...............................................................................................4

8 U.S.C.
   § 1103(a) ........................................................................................................4
   § 1182(a)(9)(B) .............................................................................................13
   § 1227(d)(2) ....................................................................................................7
   § 1324a..........................................................................................................15
   § 1324a(h)(3) ..................................................................................................5
   § 1601...........................................................................................................15
   § 1611(b)(2) ....................................................................................................5

28 U.S.C. § 2401(a) ..........................................................................................12

Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5 (2014).........................15

DHS Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 2142 (2009)................15

DHS Appropriations Act, 2015, Pub. L. No. 114-4, 129 Stat. 39 (2015).....................15

Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 ..............................7

Real ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 ..................................7

USA PATRIOT Act, Pub. L. 107-56, 115 Stat. 272.........................................7

Victims of Trafficking and Violence Prevention Act of 2000, Pub. L. 106-386, 114
   Stat.1464 ........................................................................................................7

**Administrative Sources**

8 C.F.R.
   § 1.3(a)(4)(vi)...........................................................................................5, 13
   § 274a.12(c)(14)......................................................................................13, 15

44 Fed. Reg. 10,369 (Feb. 20, 1979) ................................................................5

46 Fed. Reg. 25,079 (May 5, 1981) ..................................................................5

Case 1:18-cv-00068 Document 201-1 Filed on 07/21/18 in TXSD Page 10 of 42

**Administrative Sources**                                                                    **Page(s)**

Mem. from Donald Neufeld et al., *Consolidation of Guidance Concerning Unlawful Presence* (May 6, 2009) ............................................................................................................6

Mem. from Jeh Charles Johnson, Secretary: *Exercising Prosecutorial Discretion with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* at 2 (Nov. 20, 2014) .................................................................................................13

Mem. from Johnny N. Williams, Exec. Assoc. Comm'r, Office of Field Operations, *Unlawful Presence* 1, (June 12, 2002) .......................................................................................13

Mem. from Janet Napolitano, Secretary: *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 12, 2012) ...............4

Sam Bernsen, INS Gen. Counsel, *Leave to Labor*, 52 No. 35 Interpreter Releases 291, 294 (Sep. 1975) ............................................................................................................................5

**Miscellaneous Authorities**

H.R. Rep. No. 111-157 (2009) .....................................................................................................15

*Immigration Act of 1989: Hearings Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. (1990) ..........6

Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force* (Aug. 25, 2015) ............................................................................................................................................15

*Recent Developments*, 67 No. 6 Interpreter Releases 153 (Feb. 5, 1990) .......................................6

S. Rep. No. 99-132 (1985) ............................................................................................................6

U.S. Customs & Immigr. Servs., *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake and Case Status* (through June 30, 2018) ...........................................................................................................12

## INTEREST OF THE AMICI STATES

The amici States of New York, California, Connecticut, Delaware, Hawai'i, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Virginia, Vermont, and Washington, and the District of Columbia, would suffer serious harms—to their institutions, fiscs, residents, and economies—from an order preliminarily enjoining the federal policy known as Deferred Action for Childhood Arrivals (DACA).

DACA represents an exercise of the Executive's long-recognized discretion to forbear enforcement against defined classes of persons whom federal immigration law makes removable from the United States: a practice commonly referred to as "deferred action." Specifically, DACA provides a framework for the Department of Homeland Security (DHS) to receive and process requests for deferred action from law-abiding individuals who were brought to the United States as children. Longstanding federal regulations allow deferred-action recipients meeting certain criteria to seek and obtain work authorization, enabling amici's agencies, public universities, and public hospitals to hire DACA grantees. Private businesses and nonprofit organizations within the amici States have also come to employ and depend upon DACA grantees. In all, nearly 750,000 DACA grantees who formerly lived in the shadows now openly contribute to their communities and economies.

As two district courts have now found, ending DACA would injure the amici States as employers, providers of health services, and proprietors of public universities. It would also cause the amici States to lose many millions of dollars in tax revenue. *See Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1046-47 (N.D. Cal. 2018) (four States); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 433-35, 437 (E.D.N.Y. 2018) (sixteen States and the District of Columbia).

In contrast, the harms asserted by the plaintiff States are either illusory or result from factors other than DACA, such as the mere presence of undocumented immigrants or the ancillary consequences of deferred action under decades-old federal regulations and policies. Indeed, the federal government began DACA in 2012, yet plaintiffs waited until 2018 to file this suit—a delay of nearly six years that undermines any claim of immediate, irreparable injury warranting a preliminary injunction. The nationwide injunction that plaintiffs seek is inappropriate for other reasons too: for example, that injunction would directly conflict with preliminary injunctions that two separate district courts have issued in favor of the amici States after rejecting DHS's claims that DACA is unlawful. *See Regents*, 279 F. Supp. 3d at 1048; *Batalla Vidal*, 279 F. Supp. 3d at 437-38. Those preliminary injunctions are currently being reviewed by federal appellate courts, which are the appropriate bodies to rectify any legal errors in the *Regents* and *Batalla Vidal* decisions.

For these reasons and the other reasons stated below, plaintiffs' request for a preliminary injunction should be denied.

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

1. Whether plaintiffs' request for a nationwide preliminary injunction against DACA should be denied because plaintiffs cannot show a likelihood of success on the merits or a likelihood of "irreparable harm in the absence of preliminary relief," or "that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *See Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

2. Whether plaintiffs' requested preliminary injunction should be denied for the additional reason that a nationwide injunction against DACA would conflict with at least two existing injunctions issued by coordinate federal courts.

2

## ARGUMENT

### PLAINTIFFS' REQUESTED PRELIMINARY INJUNCTION SHOULD BE DENIED

### POINT I

### PLAINTIFFS CANNOT MAKE THE LEGAL SHOWING REQUIRED TO OBTAIN A PRELIMINARY INJUNCTION

**A.**  **Plaintiffs Cannot Show a Likelihood of Success on the Merits Because the Deferred Action for Childhood Arrivals (DACA) Policy Is Lawful.**

The Secretary of DHS has broad discretion regarding the enforcement of federal immigration laws. That discretion includes the authority to create frameworks through which defined classes of persons may request relief from removal and seek other benefits (such as work authorization) during periods of discretionary enforcement forbearance. The Executive has repeatedly exercised that authority for more than five decades, and Congress and the courts have repeatedly recognized the legality of such actions. Moreover, because DACA differs significantly in its scope, justifications, and criteria from the policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), the outcome here is not controlled by *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016). Nor are any of plaintiffs' other arguments likely to succeed.

    **1.**  **DACA is consistent with the Immigration and Nationality Act (INA).**

        **a.**  **The INA vests the Executive with discretion to create class-wide frameworks for evaluating requests for deferred action and related relief.**

The federal government lacks the resources to remove even five percent of the over 11 million undocumented immigrants who reside in the country without legal status. *See* U.S. Br. 3-4, *United States v. Texas*, 136 S. Ct. 2271 (No. 15-674) ("*Texas* (U.S.)") (App'x of Amici States ("AA") 36-37); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 192-93 (D.D.C. 2014), *aff'd*, 787

F.3d 11 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 900 (2016). Accordingly, a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012). For persons here unlawfully, federal officials "must decide whether it makes sense to pursue removal at all." *Id.* In choosing whether to offer discretionary relief, DHS may be guided by "immediate humanitarian concerns" as well as the need to prioritize limited enforcement resources. *Id.* For example, DHS may rationally focus on removing dangerous criminals, instead of undocumented immigrants who are "trying to support their families" and have "long ties to the community." *Id.*

To provide a framework for exercising enforcement discretion, the federal government has since the 1960s established more than twenty channels through which individualized forbearance determinations may be made for defined classes of potential applicants who are low priorities for removal. *See* U.S. Br. 5, 48-60, *Texas* (U.S.) (AA 38, 44-56) (enumerating and describing policies). DACA is one such channel. The class for which it provides "case by case review" consists of persons who were brought to this country as children, have strong roots in their U.S. communities, and have not engaged in serious criminal conduct. *See* Mem. from Janet Napolitano, Secretary: *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1-2 (June 12, 2012) ("DACA Memorandum") (AA 1-2).

Some of the Executive's discretionary forbearance policies reflect specific provisions of the INA or other statutes, but many others have been grounded in the Executive's broad statutory power to set immigration enforcement priorities rather than any more targeted grant of authority.[1]

---

[1] *See* 6 U.S.C. § 202(5) (Secretary's responsibility for "[e]stablishing national immigration enforcement policies and priorities"); 8 U.S.C. § 1103(a) (Secretary "shall establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of this Chapter").

The Supreme Court in 1999 expressly approved of the "regular practice" of granting "deferred action" as a "commendable exercise in administrative discretion, developed without express statutory authorization." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999).[2] And "[e]very modern presidential administration has relied on extra-statutory discretionary-relief programs to shield certain removable aliens from deportation." *Batalla Vidal*, 279 F. Supp. 3d at 422.

In a practice also dating back to at least the early 1970s,[3] the federal agencies charged with immigration enforcement have granted recipients of enforcement relief who show economic need the opportunity to work and to receive Social Security benefits earned through their work. The ability to grant work authorization was codified in regulations in 1981, *see* Employment Authorization, 46 Fed. Reg. 25,079, 25,080 (May 5, 1981), and confirmed by Congress thereafter.[4] In 1986—at the same time as it imposed a general prohibition on hiring undocumented immigrants—Congress expressly ratified an employer's ability to hire a person who is "authorized to be so employed by [the INA] *or by the Attorney General.*" 8 U.S.C. § 1324a(h)(3) (emphasis added). As the federal government explained to the Supreme Court, these sources of law reflect "the commonsense proposition that aliens who may remain in this country, as a matter of the

---

[2] *See also Batalla Vidal*, 279 F. Supp. 3d at 422 (noting there is "no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action").

[3] *See* Sam Bernsen, INS Gen. Counsel, *Leave to Labor*, 52 No. 35 Interpreter Releases 291, 294 (Sep. 1975) (noting the ordinary practice of authorizing work for, inter alia, aliens with "extended voluntary departure" or "whose departure or deportation will not be enforced"), *quoted in* U.S. Br. 51, *Texas* (U.S.) (AA 47).

[4] Likewise, regulations dating back to 1979 have allowed deferred-action recipients to participate in Social Security. 44 Fed. Reg. 10,369, 10,371 (Feb. 20, 1979). And the INA now reflects Congress's plain intent to vest the Secretary of DHS with discretion to grant Social Security benefits to aliens who have been granted deferred action. 8 U.S.C. § 1611(b)(2) (bar on granting Social Security benefits "shall not apply . . . to an alien who is lawfully present in the United States *as determined by the [Secretary]*" (emphasis added)); *see also* 8 C.F.R. § 1.3(a)(4)(vi) (defining "lawfully present" "[f]or the purposes of 8 U.S.C. § 1611(b)(2)" to include specified "classes of aliens permitted to remain in the United States because DHS has decided for humanitarian or other public policy reasons not to initiate removal proceedings or enforce departure," including "[a]liens currently in deferred action status").

Executive's discretion, also should be able to lawfully make ends meet for themselves and their families." U.S. Reply Br. 15, *Texas* (U.S.) (AA 59).

In granting deferred action, the Executive has never purported to disturb Congress's exclusive authority to set the criteria for immigrants to obtain lawful immigration status. Plaintiffs confuse matters (Pls.' Br. in Supp. of Prelim. Injunction ("Br.") 23-24) by equating DHS's construction of "lawful presence" with a "lawful status" that would provide a defense to removal. *See, e.g.*, *Chaudhry v. Holder*, 705 F.3d 289, 291-92 (7th Cir. 2013). Federal regulations, agency guidance, and the case law recognize that the Executive treats "lawful presence" and "lawful status" as separate and distinct legal concepts, and does not equate "lawful presence" with a defense to removal.[5]

Congress has repeatedly ratified and confirmed the legality of discretionary relief and work authorization under this longstanding framework. For example, the Reagan and George H. W. Bush administrations offered extended voluntary departure—which entailed forbearance from removal and eligibility for work authorization—to approximately 1.5 million relatives of immigrants newly eligible for lawful status.[6] The Executive implemented this "family fairness" policy just after Congress had deliberately declined to give the exact same class any statutory protection.[7] *See* S. Rep. No. 99-132, at 16 (1985) (AA 23). When Congress later did enact such

---

[5] *See, e.g.*, Mem. from Donald Neufeld, *Consolidation of Guidance Concerning Unlawful Presence* 42 (May 6, 2009) (AA 9) (deferred action "does not make the alien's status lawful"); U.S. Br. 38, *Texas* (U.S.) (AA 40); *Chaudhry*, 705 F.3d at 291-92 ("It is entirely possible for aliens to be lawfully present (*i.e.*, in a 'period of stay authorized by the Attorney General') even though their lawful status has expired.").

[6] *See Recent Developments*, 67 No. 6 Interpreter Releases 153, 153-54 (Feb. 5, 1990) (AA 329-330); *Immigration Act of 1989: Hearings Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. Pt. 2, at 49, 56 (1990) (AA 26, 29) (1.5 million persons were eligible).

[7] As the United States has acknowledged, that policy was "extra-statutory." Tr. of Oral Argument at 88-89, *Texas* (U.S.) (AA 62-63); *see also Hotel & Rest. Emps. Union* v. *Smith*, 846 F.2d 1499, 1519 (D.C. Cir. 1988) (en

protections for a large class including the family fairness recipients, Congress made such relief prospective only, starting one year from passage. For the interim one-year period, Congress expressly relied on the Executive's ongoing discretionary-relief policy. *See* Immigration Act of 1990, Pub. L. 101-649, § 301(g), 104 Stat. 4978, 5030.

In 2008, Congress affirmed another ongoing class-wide discretionary-relief policy that, since 2001, had offered deferred action to victims of human trafficking and other crimes who lacked lawful status but were eligible for U and T visas. When Congress in 2008 authorized administrative stays of removal for that class, it specified that denial of a stay would not "preclude the alien from applying for . . . deferred action" under DHS's extant policy. 8 U.S.C. § 1227(d)(2).

Numerous other statutes have likewise presupposed the legality of deferred action and affirmatively encouraged its use.[8] Congress has never questioned or displaced the Executive's discretionary power to defer enforcement action, or its authority to establish channels for the exercise of that discretion.

Plaintiffs are also misguided in arguing (Br. 31-32) that historical exercises of discretionary relief were permissible only because they were interstitial to statutory legalization schemes. When the Executive has implemented discretionary-relief policies that Congress later ratified, it was not necessarily clear that Congress would ultimately pass legislation to protect the covered groups. Discretionary-relief policies appear interstitial only in retrospect. And as one district court has

---

banc) (per curiam) (op. of Silberman, J.) (describing policy as an "extrastatutory decision to withhold enforcement" as a matter of discretion).

[8] *See, e.g.*, Victims of Trafficking and Violence Prevention Act of 2000, Pub. L. 106-386, § 1503(d)(2)(D)(i)(II), 114 Stat.1464, 1521-22 (making two additional classes eligible for deferred action); USA PATRIOT Act, Pub. L. 107-56, § 423(b), 115 Stat. 272, 361 (extending deferred-action eligibility to certain family members of victims of the September 11, 2001 terrorist attacks); Real ID Act of 2005, Pub. L. No. 109-13, § 202(c)(2)(B)(viii), 119 Stat. 231, 313 (authorizing States to issue driver's licenses to undocumented immigrants with "approved deferred action status").

noted, DACA has hallmarks of an "interstitial" policy "given that both sides of the aisle and our two most recent presidents have called for Dreamer legislation." *Regents*, 279 F. Supp. 3d at 1044 (citation omitted).

### b.    DACA is narrower and more tailored than Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).

Plaintiffs' challenge to DACA relies almost entirely on the Fifth Circuit's *Texas* decision regarding the separate DAPA policy. But that decision did not even finally resolve the legality of DAPA: it decided an interlocutory appeal from a preliminary injunction; and it relied in substantial part on preliminary factual findings made by this Court without the benefit of an evidentiary hearing, based on affidavits that are now more than three years old and that have been seriously undermined by the record in this case. Moreover, in concluding that DAPA exceeded the Secretary's discretionary authority and could not be justified through analogy to prior discretionary-relief policies, the Fifth Circuit focused on numerous DAPA-specific rationales that do not apply to the more tailored DACA policy, noting that "any extrapolation from DACA [to DAPA] must be done carefully." *Texas*, 809 F.3d at 173. Given the more limited, tailored nature of DACA, extrapolating in the other direction requires even greater care. Plaintiffs and the federal government are simply incorrect to argue that the Fifth Circuit's decision dictates a conclusion that DACA is unlawful.

*First*, the Fifth Circuit concluded that DAPA was inconsistent with Congress's declared intent because the INA already contained "an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status," which was available to most of those who would have been eligible for deferred action under DAPA. *Id.* at 179 (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255). Congress has created no comparable

avenue for the class of persons eligible for DACA to obtain lawful status. *See Regents*, 279 F. Supp. 3d at 1040 (citing *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 976 n. 10 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018)). Therefore, unlike the parents covered by DAPA, none of the "INA's specific and intricate provisions" have "directly addressed the precise question" of relief available to the young people eligible for DACA. *See Texas*, 809 F.3d at 186 (quotation marks omitted).

*Second*, the Fifth Circuit focused on the sheer number of persons covered by DAPA, which substantially exceeded the scale of any prior discretionary-relief policy. It "conclude[d] *only* that the INA does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Texas*, 809 F.3d at 186 n.202 (emphasis added).[9] DACA covers far fewer persons—and a smaller percentage of the undocumented population—than either DAPA or the family fairness policy ratified by Congress. Both DAPA and the family fairness policy were available to about 40 percent of the undocumented population; only about ten percent of the undocumented population (1.2 million persons) meet DACA's criteria. *See Texas*, 809 F.3d at 174 n.138; *Regents*, 279 F. Supp. 3d at 1042; U.S. Br. 56-57, *Texas* (U.S.) (AA 52-53); *Arpaio*, 27 F. Supp. 3d at 192-93.

*Third*, DACA is tailored to cover only a class of young people who are not at all "likely to have backgrounds" that would warrant higher enforcement scrutiny, *see Texas*, 809 F.3d at 174, and for whom there are substantial humanitarian reasons weighing against removal. Forbearing from enforcement against law-abiding individuals brought to the United States as children—to preserve scarce resources for removing criminals, terrorists, and others whose removal might

---

[9] *See also Texas*, 809 F.3d at 179 (noting that "4.3 million illegal aliens" not eligible for relief under the INA were eligible for DAPA); *id.* at 181 (noting the economic and political significance of a policy covering "4.3 million otherwise removable aliens").

advance the Nation's safety and security—is the paradigm of rational enforcement prioritization. *See Arizona*, 567 U.S. at 396; U.S. Br. 45, *Texas* (U.S.) (AA 41) (noting that DACA-eligible persons possess "particularly strong ties to this country" and that many "have never known another home.").

### c. Plaintiffs' arguments under the Take Care Clause turn entirely on the incorrect assertion that DACA violates the INA.

Plaintiffs' arguments under the Take Care Clause (Br. 37-40) merely recycle their statutory argument that DACA conflicts with the INA.[10] But contrary to their assertions, the DACA Memorandum did not "dispense" with the INA. *See* Br. 37. Instead, it represented a rational exercise of discretion by the Executive regarding how best to enforce that statute. See *supra* Point I.A.1.a. Given the sums appropriated by Congress, DHS can remove only a small fraction of those here unlawfully. Forbearing enforcement against law-abiding individuals brought here as children in order to pursue more serious offenders is hardly a "complete abdication" (*see* Br. 39) of DHS's statutory responsibilities. See *infra* at 17-18. Nor are plaintiffs correct in their claim (Br. 38) that the INA prohibits DHS from deeming DACA grantees—like all other deferred-action recipients— to be "lawfully present" during periods of discretionary forbearance. See *supra* at 5-6.

### 2. Notice and comment was not required prior to DACA's implementation.

DACA is a general statement of policy that "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quotation marks omitted). The DACA Memorandum channels undocumented

---

[10] In addition, Plaintiffs misplace their reliance on *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), which they proffer as purported authority for judicial intervention under the Take Care Clause. That case addressed only whether an executive officer could be compelled through mandamus to perform "a mere ministerial act," *id.* at 610, and the President had "disclaimed" any source of authority allowing the officer to avoid that duty, *id.* at 613.

immigrants who meet certain threshold criteria into a process for DHS to make individualized deferred-action determinations. No person has any substantive entitlement to obtain deferred action under DACA, and the Executive retains discretion to revoke any grant of deferred action at any time. *See Texas Sav. & Cmty. Bankers Ass'n v. Federal Hous. Fin. Bd.*, 201 F.3d 551, 556 (5th Cir. 2000) (discretionary "guidelines" that do not impose binding "rights and obligations" on regulated parties are not subject to notice and comment).

Plaintiffs miss the mark in emphasizing (Br. 34-36) statements about DACA's incidental benefits that the amici States made in lawsuits challenging the September 2017 termination of DACA. As amici explained in those suits, terminating DACA categorically deprived DHS officers of the discretion to grant DACA requests and renewals, and stripped existing DACA grantees of deferred action's attendant benefits without any individualized assessment. (AA 165, 168-171, 192.) In contrast, the creation of DACA had no such binding, generalized qualities.

Indeed, as the Fifth Circuit recognized, the language of the DACA Memorandum does not bind DHS agents but "facially purports to confer discretion" to approve or deny deferred-action requests and work authorizations. *See Texas*, 809 F.3d at 170 n. 126, 171 (construing same discretion-granting language in DAPA Memorandum and noting "the express delegation of discretion on the face of the DACA Memo"). Although DACA grantees have obtained work authorization and other incidental benefits via the operation of longstanding DHS regulations, the DACA Memorandum does not itself confer such benefits or vest any person with legal rights or obligations. The memorandum simply creates a process for soliciting deferred-action requests by defining a class of worthy applicants.

The available evidence shows that, as implemented by DHS, the DACA policy does not guarantee deferred action to all eligible persons. The denial rate in 2015—after excluding requests

11

rejected for technical reasons—was five percent, a rate that is neither negligible nor "[]surprising given the self-selecting nature of the program." *Texas*, 809 F.3d at 210 (King, J., dissenting); *see Arpaio*, 27 F. Supp. 3d at 209 n.13 (statistical evidence shows that "case-by-case review is in operation"). More recent data highlight the discretion DHS has continued to exercise, as the denial rate for initial requests has increased to over eight percent, with a full 77,583 denials since DACA's inception.[11]

In addition, whatever evidence regarding discretion existed in 2015—when DHS had just begun tracking complete data, *Texas*, 809 F.3d at 211 (King, J., dissenting)—has little probative value now. See *supra* at 8. The ongoing discovery mandated by this Court is already confirming that DHS agents have in fact been complying with the text of the DACA Memorandum and evaluating requests on a case-by-case basis. For example, in a different lawsuit, DHS has admitted that it exercises its prerogative to issue discretionary denials even for persons who fully met DACA's criteria. (AA 163.)

### 3. Plaintiffs' APA challenges amount to untimely and impermissible collateral attacks on decades-old federal policies and regulations.

Plaintiffs also can show no likelihood of success on their APA challenges, which amount to time-barred collateral attacks on federal policies adopted decades ago. *See* 28 U.S.C. § 2401(a) (six-year limitations period under APA). Although plaintiffs' suit purportedly "challenges the 2012 directive creating DACA" (Br. 6), the gravamen of their APA claims is not actually a challenge to the DACA Memorandum. Plaintiffs admit to this Court (Br. 24) that deferred action is a permissible classification, "rooted in prosecutorial discretion" and approved by the Supreme

---

[11] U.S. Customs & Immigr. Servs., *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake and Case Status* (through June 30, 2018) (AA 13).

Court. And plaintiffs have conceded to the Supreme Court that deferred action can be offered to a broad class of persons, at least insofar as deferred action consists of "simply forbearing from removal."[12]

Plaintiffs' APA claims thus boil down to substantive and procedural challenges to the agency actions that have extended incidental benefits—such as work authorization—to deferred-action recipients generally. But those ancillary benefits arise out of longstanding regulations exercising the Executive's authority to deem all deferred-action recipients "lawfully present" for certain purposes.[13] See 8 C.F.R. §§ 1.3(a)(4)(vi), 274a.12(c)(14). Plaintiffs are simply incorrect in attributing any of those benefits to the DACA Memorandum (see Br. 23), which does not even mention "lawful presence."[14]

Accordingly, plaintiffs' APA challenge should be rejected as an untimely collateral attack on agency rules promulgated decades before DACA.[15] Contrary to plaintiffs' assertions (see Br. 46-47), neither DHS's promulgation of DACA nor DHS's individualized grants of benefits to any person reset the clock for nonregulated parties like plaintiffs to bring facial APA challenges to DHS's decades-old policies. As the Fifth Circuit has held, "an agency's application of a rule" to a

---

[12] "I do believe that they could do it class based if they were simply forbearing from removal. . . . [G]iven that they are removing 400,000 people per year, we admit that they could do forbearance from removal." Tr. of Oral Arg. at 50, *Texas* (U.S.) (Scott Keller) (AA 66).

[13] For example, the re-entry bar is tolled for deferred-action recipients because, for at least a decade prior to the DACA Memorandum, DHS formally construed deferred action as entailing a period of authorized stay under 8 U.S.C. § 1182(a)(9)(B)(ii). Mem. from Johnny N. Williams, Exec. Assoc. Comm'r, Office of Field Operations, *Unlawful Presence* 1 (June 12, 2002) (AA 10).

[14] In contrast, the DAPA Memorandum expressly stated that recipients would be considered "lawfully present in the United States." Mem. from Jeh Charles Johnson, Secretary: *Exercising Prosecutorial Discretion with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* at 2 (Nov. 20, 2014) ("DAPA Memorandum") (AA 5).

[15] See *Dunn-McCampbell Royalty Interest, Inc. v. National Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997) (rejecting facial challenge as untimely under APA because there was no "direct, final agency action involving the particular plaintiff within six years of filing suit").

specific case "creates a new, six-year cause of action" only for the parties directly regulated by

that specific application.[16] *Dunn-McCampbell*, 112 F.3d at 1287; *accord Wind River Mining Corp.*

*v. United States*, 946 F.2d 710, 716 (9th Cir. 1991) ("challenge must be brought within six years

of the agency's application of the disputed decision *to the challenger*" (emphasis added)); *see also*

*Regents*, 279 F. Supp. 3d at 1044 (citing laches as a "powerful consideration" when discussing

likelihood of the Fifth Circuit upholding a possible injunction against DACA).

**B.     Plaintiffs Cannot Show That They Will Suffer Irreparable Harm If DACA Is Not Enjoined.**

> **1.     States and their lawful residents benefit from the ability of DACA grantees to live and work openly.**

In the approximately six years since DACA was adopted, its grantees have been eligible to

seek and obtain work authorization. That authorization, in turn, has enabled DACA grantees to

make important contributions to their States and to become integral parts of their communities.

Amici States, for example, employ many grantees as providers of health and social services, public

safety officers, teachers, government agency staff, and faculty and staff at public universities. (AA

172-178, 293-309.)

Plaintiffs are not correct that DACA causes "labor-market distortions" (Br. 13-15) that

harm lawful residents of the plaintiff States by subjecting those residents to competition from

undocumented persons. Contrary to plaintiffs' arguments, work authorization under deferred-

action policies like DACA serves to *ameliorate* distortions of the labor markets that would

---

[16] For procedural challenges, like plaintiffs' notice-and-comment claim, the six-year statute of limitations does not reset even for directly regulated entities. *Wong v. Doar*, 571 F.3d 247, 262-63 (2d Cir. 2009).

otherwise result.[17] Most DACA grantees are likely to remain in this country with or without DACA. The federal government has acknowledged that it directs its limited enforcement resources towards the serious criminals that Congress directed DHS to prioritize for deportation,[18] rather than the "low priority cases" represented by DACA-eligible persons. (AA 1-3.) And the government has acknowledged that persons who "have lived in this country continuously" for years—and who have not, as adults, formed residential ties to any other country—"are particularly unlikely to depart voluntarily" from the place they consider home. *See* U.S. Br. 45, Reply Br. 8, *Texas* (U.S.) (AA 41, 58).

DACA mitigates the harms that arise when these undocumented persons are forced to work in the underground economy at depressed wages, by offering them a means to obtain work authorization. *See* 8 U.S.C. §§ 1324a, 1601; 8 C.F.R. § 274a.12(c)(14). As the federal government has elsewhere explained, that reduction in underground employment helps lawful residents by removing competition for jobs from undocumented persons who are relegated to working illegally, and sometimes forced to accept wages and other workplace conditions that do not comply with legal requirements. *See* U.S. Br. 22 n.5, 46-47, *Texas* (U.S.) (AA 39, 42-43).

## 2.    Plaintiffs fail to establish any harm traceable to DACA.

Although plaintiffs assert that they are harmed by the costs of providing education, emergency medical care, and other services to undocumented persons (Br. 10-13, 41), they have

---

[17] *See, e.g.*, Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force* (Aug. 25, 2015) (concluding that employment data do not support notion that immigration leads to lower employment among native-born Americans) (AA 315-319).

[18] *See, e.g.*, DHS Appropriations Act, 2015, Pub. L. No. 114-4, tit. II, 129 Stat. 39, 43 (2015); Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, div. F., tit. II, 128 Stat. 5, 251 (2014); DHS Appropriations Act, 2010, Pub. L. No. 111-83, tit. II, 123 Stat. 2142, 2149 (2009); H.R. Rep. No. 111-157, at 8 (2009) (AA 20).

15

not alleged that any State other than Texas will suffer any specific financial harms[19]—and as to

Texas they have failed to tie the alleged state expenses to DACA grantees, rather than

undocumented persons generally. A showing that "*illegal immigration* is costing [a] state money"

is not the same thing as a showing "that *DACA* is costing the state money." *Crane v. Johnson*,

783 F.3d 244, 252 (5th Cir 2015). Moreover, to the extent the costs plaintiffs identify stem from

services provided to DACA grantees, those costs flow largely from the *presence* of those persons

in the plaintiff States—a fact that is likely to persist whether DACA exists or not. Indeed, DACA

enhances the economic self-sufficiency of deferred-action recipients, making them less likely to

rely on emergency medical care, Medicaid, or other public assistance. *See Regents*, 279 F. Supp.

3d at 1047-48. Put another way, DACA decreases many of the generalized fiscal burdens that

plaintiffs identify as injuries.

In addition, plaintiffs cannot plausibly claim to suffer any harm resulting from many of the

other benefits received by DACA grantees. For instance, plaintiffs complain that certain DACA

grantees have received advance parole and subsequently adjusted their immigration status to

lawful permanent residency (LPR), which in turn allows them to apply for citizenship. *See*

Br. 25-26. But plaintiffs are not harmed by any qualifying individual's adjustment to LPR status—

or citizenship. States suffer no cognizable injury from the presence of additional lawful permanent

residents or citizens within their borders. Similarly, the plaintiff States suffer no injury from

DACA grantees' qualification for Social Security Numbers, the Earned Income Tax Credit,

Medicare, and federal railroad retirement benefits. *See* Br. 27, 31. Plaintiffs do not attempt to

---

[19] The operative complaint states that "[o]ther States besides Texas have similar financial injuries caused by DACA," First Am. Compl. ¶ 236, and have suffered an "institutional injury," *id.* ¶¶ 248-251, but plaintiffs do not identify those injuries or demonstrate that they are irreparable.

16

explain how these federal benefits increase their fiscal burdens or otherwise cause them any concrete harm; nor can they, since such benefits actually decrease these burdens.

Plaintiffs likewise cannot show any injury from executive measures that they characterize (Br. 10) as "incentiviz[ing]" undocumented persons—including DACA grantees—to remain in the country. That characterization rests on a mistaken assumption that DACA grantees are individuals "who would not remain in the country" (Br. 41) but for DACA. As explained above, however, DACA grantees are distinctly *unlikely* to be removed or to depart voluntarily from the United States. See *supra* at 15. Plaintiffs accordingly are not injured by grants of work authorization or other Executive actions to address the pragmatic and humanitarian concerns posed by grantees' continued presence.

Finally, there is no merit to plaintiffs' argument that they possess per se standing to challenge DACA because it is a federal policy of discretionary forbearance in a field where state powers are preempted. *See* Br. 15-16 (arguing that plaintiffs possess "abdication standing"). As the Supreme Court explained in *Massachusetts v. EPA*, a plaintiff challenging a federal act of forbearance must still satisfy Article III by demonstrating cognizable harm that is traceable to the forbearance, which plaintiffs here cannot do. *See* 549 U.S. 497, 521-23 (2007). And in any event, the Supreme Court has recognized that granting deferred action is not the abdication of a duty, but a "commendable exercise in administrative discretion." *See American-Arab Anti-Discrimination Comm.*, 525 U.S. at 483-84. As the federal government has explained elsewhere, DHS lacks the resources to remove even five percent of the undocumented population in a given year. *See* U.S. Br. 4, *Texas* (U.S.) (AA 37). Accordingly, declining to pursue enforcement against undocumented persons who pose little threat to the Nation's safety and security, and who have deep ties to this country—in order to focus limited resources on more urgent priorities—is a classic exercise of

17

prosecutorial discretion, not an abdication of the Executive's statutory responsibilities to enforce the law. Indeed, DHS deported record numbers of undocumented persons while the DACA policy was in effect. (*See* AA 310-314.)

### 3. Plaintiffs' nearly six-year delay in seeking an injunction against DACA reinforces their lack of irreparable injury from that policy.

Further undermining plaintiffs' claims of irreparable injury is their remarkable delay in bringing this challenge. A "party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. __, 138 S. Ct. 1942, 1944 (2018) (per curiam). Here, plaintiffs did not sue when the federal government implemented DACA in 2012. Nor did plaintiffs challenge DACA in 2015, when they sued to enjoin DAPA. Instead, they waited another three years before filing this lawsuit—a total delay of nearly six years.

That long delay alone belies any claim that plaintiffs need a preliminary injunction to prevent irreparable harm. As the Fifth Circuit has explained, injunctive relief is inappropriate where, as here, a plaintiff has waited "nearly six years to request injunctive relief, strongly implying that delay" in the resolution of the matter "was not causing irreparable harm." *Dillard v. Security Pac. Corp.*, 85 F.3d 621, 1996 WL 254971, at *4 (5th Cir. 1996) (per curiam) (table decision) (AA 34). For similar reasons, the Supreme Court recently affirmed the denial of a preliminary injunction based primarily on the fact that the plaintiffs there "did not move for a preliminary injunction in the District Court until six years" after the action that they challenged. *Benisek*, 138 S. Ct. at 1944; *see also Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989); *Lydo Enters. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984). The same reasoning applies here.

To the extent plaintiffs claim an urgent need for injunctive relief due to the preliminary injunctions issued in *Regents* and *Batalla Vidal* (*see* Br. 44), those injunctions do not explain why plaintiffs failed to bring this suit for the half-decade between the announcement of DACA in 2012 and the announced rescission of DACA last year. Moreover, any argument that this Court must now issue a preliminary injunction to avoid the consequences of other federal injunctions is an inappropriate collateral attack on the orders of coordinate courts. See *infra* Point II.

**C.      The Balance of the Equities and the Public Interest Favor Denying Plaintiffs' Requested Injunction.**

As discussed above (at 14-19), plaintiffs' asserted harms are foreclosed by precedent, not attributable to DACA, or wholly unsupported by record evidence. In contrast, terminating DACA would devastate the grantees who have structured their lives around the policy, while also harming the communities, employers, and educational institutions that have come to depend on the contributions of those grantees.

Whereas DAPA had yet to be implemented at the time it was challenged in *Texas v. United States*, DACA has been in effect for nearly six years. During that time, nearly 800,000 grantees have sought and received deferred action and benefits such as work authorization. *Batalla Vidal*, 279 F. Supp. 3d at 407. Those individuals have "come out of the shadows" and taken on important roles in communities across the country, to the benefit of their families, employers, the institutions with which they are associated, and the States in which they reside. *See id.* at 435.

A preliminary injunction would thus injure not only hundreds of thousands of DACA grantees, but also countless other persons and entities who have benefited from DACA. Ending DACA would cause "approximately 1,400 DACA recipients" to "lose deferred action each work day" and become "legally unemployable in this country." *Id.* at 434. That would swiftly lead to

19

"profound and irreversible economic and social implications." *Id.* at 435; *see also Regents*, 279 F. Supp. 3d at 1045 (discussing degree to which DACA grantees have "planned their lives according to the dictates of DACA").

The amici States in particular would suffer a variety of distinct harms, as two district courts have already concluded. *See Regents*, 279 F. Supp. 3d at 1046-47; *Batalla Vidal*, 279 F. Supp. 3d at 434-35. The loss of work authorization by DACA grantees would deprive the amici States of highly qualified employees, including faculty at state universities, healthcare workers, information technology specialists, and public safety officers. (AA 73-79, 133-135, 143, 146, 208-210, 247-250, 276-278, 337-343.) State-run educational institutions would lose students and revenue, hindering their ability to promote critical programming. (AA 80-82, 148-152, 199-203, 216-231, 243-250, 25-267, 276-278.) And state and local governments would lose out on the hundreds of millions of dollars in state and local taxes that DACA grantees pay each year. (AA 204-207, 320-328.)

Enjoining DACA would undermine other critical public interests as well. For example, it would place "tremendous burdens on the [amici States'] public health systems" as grantees (and the family members they support) lose their employer-sponsored health coverage. *Batalla Vidal*, 279 F. Supp. 3d at 434. (*See also* AA 232-238, 251-270.) DACA grantees who forgo medical care for fear of being reported to immigration authorities will create public health risks. (AA 211-215, 232-234.) The U.S.-citizen children of DACA grantees may be placed into state custody and foster care if their parents cannot remain legally in the United States, thereby burdening the amici States' child welfare systems. (*See* AA 84-87, 112-116, 239-242.) Enjoining DACA would also harm public safety because persons who are facing the threat of removal are less likely to report violence, abuse, crimes or other harms to the community. (AA 89, 117-118, 121, 126-127, 333-336, 340-354.)

The individual and institutional harms flowing from an injunction against DACA would reverberate nationwide. For example, large numbers of grantees work in the private sector, including as entrepreneurs and members of crucial industries. (*See* AA 154-157, 284-290.) Without DACA, GDP will be $460.3 billion less over the next decade, with Social Security and Medicare tax receipts dropping $24.6 billion. (AA 158-159, 290.)

These harms far outweigh any purported harm to the plaintiff States. Indeed, as noted above (at 14-16), DACA helps the plaintiff States and their residents by ameliorating labor-market distortions and other potential burdens associated with the presence in the United States of a class of undocumented aliens who are exceptionally unlikely to leave or be removed. In sum, the balance of the equities and the public interest weigh heavily against a preliminary injunction.

Finally, plaintiffs are incorrect in contending (Br. 44) that DACA did not create any cognizable reliance interests, such that this court may disregard the massive individual and societal disruptions that would flow from enjoining DACA. A government policy or position can create legitimate reliance interests even where the government may have the power to revoke it. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

## POINT II

### THE CONFLICT BETWEEN PLAINTIFFS' PROPOSED PRELIMINARY INJUNCTION AND TWO EXISTING PRELIMINARY INJUNCTIONS ALSO WARRANTS DENIAL OF PLAINTIFFS' REQUESTED RELIEF

Plaintiffs seek a preliminary injunction "that prevents the federal government from implementing [DACA] by issuing or renewing DACA permits." Br. 4. Such relief would unavoidably conflict with existing preliminary injunctions issued by courts in the Northern District

of California and the Eastern District of New York.[20] Those courts have rejected exactly the same arguments plaintiffs press here regarding DACA's legality. *Regents*, 279 F. Supp. 3d at 1037-43; *Batalla Vidal*, 279 F. Supp. 3d at 425-27. And they have found that if DACA is terminated, the plaintiffs in the suits before them—including amici States—will suffer "staggering" and "irreversible" economic and social harms. *Batalla Vidal*, 279 F. Supp. 3d at 434-35; *see also Regents*, 279 F. Supp. 3d at 1046-47. Accordingly, to fully protect the interests of the *Regents* and *Batalla Vidal* state plaintiffs, those courts have entered preliminary injunctions requiring the federal government "to maintain the DACA program on a nationwide basis . . . including allowing DACA enrollees to renew their enrollments," subject to limited exceptions. *Regents*, 279 F. Supp. 3d at 1048; *see also Batalla Vidal*, 279 F. Supp. 3d at 437. As those courts have observed, no "narrower injunction" would be capable of preventing the irreparable harms "extensively documented" by the *Regents* and *Batalla Vidal* state plaintiffs. *Batalla Vidal*, 279 F. Supp. 3d at 437-38; *see also Regents*, 279 F. Supp. 3d at 1049.

Under these circumstances, granting plaintiffs' requested preliminary relief would cause confusion and violate norms of comity and sound judicial administration. District courts must "exercise care to avoid interference with each other's affairs." *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985). Where a district court is confronted with a suit that is "likel[y]" to "substantially overlap" with a suit previously filed in another district court, "considerations of comity and orderly administration of justice demand" that the second court decline to exercise jurisdiction. *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971)

---

[20] *See also NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018) (vacating DACA's rescission, but staying vacatur for 90 days).

(quotation marks omitted).[21] These considerations control regardless of whether the overlapping suits are "identical" in substance, *id.* at 408 n.6, or involve the exact same parties, *Save Power*, 121 F.3d at 951.

The need to defer is especially acute where a district court is asked to issue an injunction that would directly conflict with another court's outstanding injunction. *See West Gulf*, 751 F.2d at 728-32 (issuance of conflicting injunction is an abuse of discretion); *Mann*, 439 F.2d at 407-08 (same). Such injunctions transgress norms of judicial comity and perpetrate "a grave disservice to the public interest in the orderly administration of justice." *Feller v. Brock*, 802 F.2d 722, 727 (4th Cir. 1986).

The relief requested here would squarely conflict with the *Batalla Vidal* and *Regents* injunctions that are now being reviewed by the federal appellate courts.[22] Those injunctions require the federal government to accept and process requests for renewal of DACA status; plaintiffs' requested injunction would forbid it. Indeed, plaintiffs admit that they brought this lawsuit as a calculated attempt to collaterally attack the *Batalla Vidal* and *Regents* injunctions. First Am. Compl. ¶ 208; *see* Br. 44. But even if those injunctions were wrongly issued, as plaintiffs claim, the appellate courts reviewing the injunctions are the appropriate bodies to rectify any legal errors. Fifth Circuit precedent strongly counsels against the entry of a conflicting injunction in these circumstances. *See West Gulf*, 751 F.2d at 728-32.

---

[21] *See also Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 920 (5th Cir. 1997) (failure to transfer action to court where first-filed action was pending was an abuse of discretion); *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 952 (5th Cir. 1997) (same); *cf. Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (noting "the general principle" of "avoid[ing] duplicative litigation . . . between federal district courts"); *Mower v. Boyer*, 811 S.W.2d 560, 563 n.2 (Tex. 1991) (noting similar "general rule" for intrastate actions).

[22] *Regents*, No. 18-15068 (9th Cir. Mar. 15, 2018), ECF No. 51 (AA 281) (expediting briefing); *Batalla Vidal*, No. 18-485 (2d Cir. Mar. 8, 2018), ECF No. 62 (AA 68) (same); *see also DHS v. Regents of Univ. of California*, 138 S. Ct. 1182 (2018) ("assum[ing] that the [Ninth Circuit] will proceed expeditiously to decide the case"). Both appeals are fully briefed. The Ninth Circuit appeal was argued and submitted on May 15, 2018.

# CONCLUSION

For all of these reasons, this Court should deny plaintiffs' motion for a preliminary injunction.

Dated:    New York, New York
           July 21, 2018

                                               Respectfully submitted,

XAVIER BECERRA
 *Attorney General*
 *State of California*

                                        BARBARA D. UNDERWOOD
                                         *Attorney General*
                                         *State of New York*

EDWARD C. DUMONT
 *Solicitor General*
MICHAEL J. MONGAN
 *Deputy Solicitor General*
MICHAEL L. NEWMAN
 *Supervising Deputy Attorney General*
JAMES F. ZAHRADKA II
 *Deputy Attorney General*
MAX CARTER-OBERSTONE
 *Associate Deputy Solicitor General*
    *of Counsel*

1300 I St.
Sacramento, CA 95814

By:  /s/Andrew W. Amend
      ANDREW W. AMEND
      Senior Assistant Solicitor General
      Attorney in Charge
      New York Bar No. 4816716
      Southern District of Texas Bar No.:
       *Admitted pro hac vice*

      28 Liberty Street, 23rd Floor
      New York, NY 10005
      Telephone: (212) 416-8022
      Facsimile: (212) 416-8962

      ANISHA S. DASGUPTA
       *Deputy Solicitor General*
      ANDREW W. AMEND
       *Senior Assistant Solicitor General*
      DAVID S. FRANKEL
       *Assistant Solicitor General*
        *of Counsel*

*(Counsel listing continues on next page.)*

24

GEORGE JEPSEN
  *Attorney General*
  *State of Connecticut*
55 Elm St.
Hartford, CT 06106

MATTHEW P. DENN
  *Attorney General*
  *State of Delaware*
Department of Justice
Carvel State Bldg, 6th Fl.
820 North French St.
Wilmington, DE 19801

RUSSELL A. SUZUKI
  *Attorney General*
  *State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

LISA MADIGAN
  *Attorney General*
  *State of Illinois*
100 W. Randolph St., 12th Fl.
Chicago, IL 60601

THOMAS J. MILLER
  *Attorney General*
  *State of Iowa*
1305 E. Walnut St.
Des Moines, IA 50319

JANET T. MILLS
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 Saint Paul Pl.
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

LORI SWANSON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55101

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
408 Galisteo St.
Santa Fe, NM 87501

JOSH STEIN
  *Attorney General*
  *State of North Carolina*
114 W. Edenton St.
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of Pennsylvania*
16th Fl., Strawberry Sq.
Harrisburg, PA 17120

PETER F. KILMARTIN
  *Attorney General*
  *State of Rhode Island*
150 S. Main St.
Providence, RI 02903

*(Counsel listing continues on next page.)*

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

MARK R. HERRING
  *Attorney General*
  *Commonwealth of Virginia*
202 North Ninth St.
Richmond, VA 23219

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
800 Fifth Ave., Ste. 2000
Seattle, WA 98104

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
One Judiciary Sq.
441 4th St., N.W.
Washington, DC 20001

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

---

STATE OF TEXAS et al.,

Plaintiff,

v.                                      Civil Action No. 18-cv-0068 (ASH)

UNITED STATES OF AMERICA et al.,

Defendant.

---

RE SCOTUS RULING IN NO. 18–587 AND DOCKET ITEM #461 STAY ORDER WITH LOCAL RULE 5-2 RELATED CASES OF AMICUS CHRISTOPHER EARL STRUNK, THE NATURAL-BORN-CITIZEN (NBC) BIRTHER TRUSTEE FOR THE AD HOC NEW YORKER REPUBLICAN COMMITTEE, STATUS RECONSIDERATION MOTION FOR FRCvP RULE 65(b) RELIEF AT DOCKET ITEM# 483, AFFIRMATION IN OPPOSITION TO THE STATES AMICI CURIAE MOTION FOR RELIEF AT DOCKET ITEM# 209 BY : NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, IOWA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA IN OPPOSITION TO PLAINTIFFS' REQUEST FOR INJUNCTION AGAINST THE *DEFERRED ACTION FOR CHILDHOOD ARRIVAL* (DACA)

# EXHIBIT  I



## Articles of Confederation : March 1, 1781

To all to whom these Presents shall come, we the undersigned Delegates of the States affixed to our Names send greeting.

Articles of Confederation and perpetual Union between the states of New Hampshire, Massachusetts-bay Rhode Island and Providence Plantations, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, North Carolina, South Carolina and Georgia.

I.

The Stile of this Confederacy shall be

**"The United States of America".**

II.

Each state retains its sovereignty, freedom, and independence, and every power, jurisdiction, and right, which is not by this Confederation expressly delegated to the United States, in Congress assembled.

III.

The said States hereby severally enter into a firm league of friendship with each other, for their common defense, the security of their liberties, and their mutual and general welfare, binding themselves to assist each other, against all force offered to, or attacks made upon them, or any of them, on account of religion, sovereignty, trade, or any other pretense whatever.

IV.

The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds, and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions, and restrictions as the inhabitants thereof respectively, provided that such restrictions shall not extend so far as to prevent the removal of property imported into any State, to any other State, of which the owner is an inhabitant; provided also that no imposition, duties or restriction shall be laid by any State, on the property of the United States, or either of them.

If any person guilty of, or charged with, treason, felony, or other high misdemeanor in any State, shall flee from justice, and be found in any of the United States, he shall, upon demand of the Governor or executive power of the State from which he fled, be delivered up and removed to the State having jurisdiction of his offense.

Full faith and credit shall be given in each of these States to the records, acts, and judicial proceedings of the courts and magistrates of every other State.

V.

For the most convenient management of the general interests of the United States, delegates shall be annually appointed in such manner as the legislatures of each State shall direct, to meet in Congress on the first Monday in November, in every year, with a power reserved to each State to recall its delegates, or any of them, at any time within the year, and to send others in their stead for the remainder of the year.

No State shall be represented in Congress by less than two, nor more than seven members; and no person shall be capable of being a delegate for more than three years in any term of six years; nor shall any person, being a delegate, be capable of holding any office under the United States, for which he, or another for his benefit, receives any salary, fees or emolument of any kind.

Each State shall maintain its own delegates in a meeting of the States, and while they act as members of the committee of the States. In determining questions in the United States in Congress assembled, each State shall have one vote.

Freedom of speech and debate in Congress shall not be impeached or questioned in any court or place out of Congress, and the members of Congress shall be protected in their persons from arrests or imprisonments, during the time of their going to and from, and attendence on Congress, except for treason, felony, or breach of the peace.

VI.

No State, without the consent of the United States in Congress assembled, shall send any embassy to, or receive any embassy from, or enter into any conference, agreement, alliance or treaty with any King, Prince or State; nor shall any person holding any office of profit or trust under the United States, or any of them, accept any present, emolument, office or title of any kind whatever from any King, Prince or foreign State; nor shall the United States in Congress assembled, or any of them, grant any title of nobility.

No two or more States shall enter into any treaty, confederation or alliance whatever between them, without the consent of the United States in Congress assembled, specifying accurately the purposes for which the same is to be entered into, and how long it shall continue.

No State shall lay any imposts or duties, which may interfere with any stipulations in treaties, entered into by the United States in Congress assembled, with any King, Prince or State, in pursuance of any treaties already proposed by Congress, to the courts of France and Spain.

No vessel of war shall be kept up in time of peace by any State, except such number only, as shall be deemed necessary by the United States in Congress assembled, for the defense of such State, or its trade; nor shall any body of forces be kept up by any State in time of peace, except such number only, as in the judgement of the United States in Congress assembled, shall be deemed requisite to garrison the forts necessary for the defense of such State; but every State shall always keep up a well-regulated and disciplined militia, sufficiently armed and accoutered, and shall provide and constantly have ready for use, in public stores, a due number of filed pieces and tents, and a proper quantity of arms, ammunition and camp equipage.

No State shall engage in any war without the consent of the United States in Congress assembled, unless such State be actually invaded by enemies, or shall have received certain advice of a resolution being formed by some nation of Indians to invade such State, and the danger is so imminent as not to admit of a delay till the United States in Congress assembled can be consulted; nor shall any State grant commissions to any ships or vessels of war, nor letters of marque or reprisal, except it be after a declaration of war by the United States in Congress assembled, and then only against the Kingdom or State and the subjects thereof, against which war has been so declared, and under such regulations as shall be established by the United States in Congress assembled, unless such State be infested by pirates, in which case vessels of war may be fitted out for that occasion, and kept so long as the danger shall continue, or until the United States in Congress assembled shall determine otherwise.

VII.

When land forces are raised by any State for the common defense, all officers of or under the rank of colonel, shall be appointed by the legislature of each State respectively, by whom such forces shall be raised, or in such manner as such State shall direct, and all vacancies shall be filled up by the State which first made the appointment.

VIII.

All charges of war, and all other expenses that shall be incurred for the common defense or general welfare, and allowed by the United States in Congress assembled, shall be defrayed out of a common treasury, which shall be

supplied by the several States in proportion to the value of all land within each State, granted or surveyed for any person, as such land and the buildings and improvements thereon shall be estimated according to such mode as the United States in Congress assembled, shall from time to time direct and appoint.

The taxes for paying that proportion shall be laid and levied by the authority and direction of the legislatures of the several States within the time agreed upon by the United States in Congress assembled.

IX.

The United States in Congress assembled, shall have the sole and exclusive right and power of determining on peace and war, except in the cases mentioned in the sixth article -- of sending and receiving ambassadors -- entering into treaties and alliances, provided that no treaty of commerce shall be made whereby the legislative power of the respective States shall be restrained from imposing such imposts and duties on foreigners, as their own people are subjected to, or from prohibiting the exportation or importation of any species of goods or commodities whatsoever -- of establishing rules for deciding in all cases, what captures on land or water shall be legal, and in what manner prizes taken by land or naval forces in the service of the United States shall be divided or appropriated -- of granting letters of marque and reprisal in times of peace -- appointing courts for the trial of piracies and felonies commited on the high seas and establishing courts for receiving and determining finally appeals in all cases of captures, provided that no member of Congress shall be appointed a judge of any of the said courts.

The United States in Congress assembled shall also be the last resort on appeal in all disputes and differences now subsisting or that hereafter may arise between two or more States concerning boundary, jurisdiction or any other causes whatever; which authority shall always be exercised in the manner following. Whenever the legislative or executive authority or lawful agent of any State in controversy with another shall present a petition to Congress stating the matter in question and praying for a hearing, notice thereof shall be given by order of Congress to the legislative or executive authority of the other State in controversy, and a day assigned for the appearance of the parties by their lawful agents, who shall then be directed to appoint by joint consent, commissioners or judges to constitute a court for hearing and determining the matter in question: but if they cannot agree, Congress shall name three persons out of each of the United States, and from the list of such persons each party shall alternately strike out one, the petitioners beginning, until the number shall be reduced to thirteen; and from that number not less than seven, nor more than nine names as Congress shall direct, shall in the presence of Congress be drawn out by lot, and the persons whose names shall be so drawn or any five of them, shall be commissioners or judges, to hear and finally determine the controversy, so always as a major part of the judges who shall hear the cause shall agree in the determination: and if either party shall neglect to attend at the day appointed, without showing reasons, which Congress shall judge sufficient, or being present shall refuse to strike, the Congress shall proceed to nominate three persons out of each State, and the secretary of Congress shall strike in behalf of such party absent or refusing; and the judgement and sentence of the court to be appointed, in the manner before prescribed, shall be final and conclusive; and if any of the parties shall refuse to submit to the authority of such court, or to appear or defend their claim or cause, the court shall nevertheless proceed to pronounce sentence, or judgement, which shall in like manner be final and decisive, the judgement or sentence and other proceedings being in either case transmitted to Congress, and lodged among the acts of Congress for the security of the parties concerned: provided that every commissioner, before he sits in judgement, shall take an oath to be administered by one of the judges of the supreme or superior court of the State, where the cause shall be tried, 'well and truly to hear and determine the matter in question, according to the best of his judgement, without favor, affection or hope of reward': provided also, that no State shall be deprived of territory for the benefit of the United States.

All controversies concerning the private right of soil claimed under different grants of two or more States, whose jurisdictions as they may respect such lands, and the States which passed such grants are adjusted, the said grants or either of them being at the same time claimed to have originated antecedent to such settlement of jurisdiction, shall on the petition of either party to the Congress of the United States, be finally determined as near as may be in the same manner as is before prescribed for deciding disputes respecting territorial jurisdiction between different States.

The United States in Congress assembled shall also have the sole and exclusive right and power of regulating the alloy and value of coin struck by their own authority, or by that of the respective States -- fixing the standards of

weights and measures throughout the United States -- regulating the trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated -- establishing or regulating post offices from one State to another, throughout all the United States, and exacting such postage on the papers passing through the same as may be requisite to defray the expenses of the said office -- appointing all officers of the land forces, in the service of the United States, excepting regimental officers -- appointing all the officers of the naval forces, and commissioning all officers whatever in the service of the United States -- making rules for the government and regulation of the said land and naval forces, and directing their operations.

The United States in Congress assembled shall have authority to appoint a committee, to sit in the recess of Congress, to be denominated 'A Committee of the States', and to consist of one delegate from each State; and to appoint such other committees and civil officers as may be necessary for managing the general affairs of the United States under their direction -- to appoint one of their members to preside, provided that no person be allowed to serve in the office of president more than one year in any term of three years; to ascertain the necessary sums of money to be raised for the service of the United States, and to appropriate and apply the same for defraying the public expenses -- to borrow money, or emit bills on the credit of the United States, transmitting every half-year to the respective States an account of the sums of money so borrowed or emitted -- to build and equip a navy -- to agree upon the number of land forces, and to make requisitions from each State for its quota, in proportion to the number of white inhabitants in such State; which requisition shall be binding, and thereupon the legislature of each State shall appoint the regimental officers, raise the men and cloath, arm and equip them in a solid-like manner, at the expense of the United States; and the officers and men so cloathed, armed and equipped shall march to the place appointed, and within the time agreed on by the United States in Congress assembled. But if the United States in Congress assembled shall, on consideration of circumstances judge proper that any State should not raise men, or should raise a smaller number of men than the quota thereof, such extra number shall be raised, officered, cloathed, armed and equipped in the same manner as the quota of each State, unless the legislature of such State shall judge that such extra number cannot be safely spread out in the same, in which case they shall raise, officer, cloath, arm and equip as many of such extra number as they judge can be safely spared. And the officers and men so cloathed, armed, and equipped, shall march to the place appointed, and within the time agreed on by the United States in Congress assembled.

The United States in Congress assembled shall never engage in a war, nor grant letters of marque or reprisal in time of peace, nor enter into any treaties or alliances, nor coin money, nor regulate the value thereof, nor ascertain the sums and expenses necessary for the defense and welfare of the United States, or any of them, nor emit bills, nor borrow money on the credit of the United States, nor appropriate money, nor agree upon the number of vessels of war, to be built or purchased, or the number of land or sea forces to be raised, nor appoint a commander in chief of the army or navy, unless nine States assent to the same: nor shall a question on any other point, except for adjourning from day to day be determined, unless by the votes of the majority of the United States in Congress assembled.

The Congress of the United States shall have power to adjourn to any time within the year, and to any place within the United States, so that no period of adjournment be for a longer duration than the space of six months, and shall publish the journal of their proceedings monthly, except such parts thereof relating to treaties, alliances or military operations, as in their judgement require secrecy; and the yeas and nays of the delegates of each State on any question shall be entered on the journal, when it is desired by any delegates of a State, or any of them, at his or their request shall be furnished with a transcript of the said journal, except such parts as are above excepted, to lay before the legislatures of the several States.

X.

The Committee of the States, or any nine of them, shall be authorized to execute, in the recess of Congress, such of the powers of Congress as the United States in Congress assembled, by the consent of the nine States, shall from time to time think expedient to vest them with; provided that no power be delegated to the said Committee, for the exercise of which, by the Articles of Confederation, the voice of nine States in the Congress of the United States assembled be requisite.

XI.

Canada acceding to this confederation, and adjoining in the measures of the United States, shall be admitted into, and entitled to all the advantages of this Union; but no other colony shall be admitted into the same, unless such admission be agreed to by nine States.

XII.

All bills of credit emitted, monies borrowed, and debts contracted by, or under the authority of Congress, before the assembling of the United States, in pursuance of the present confederation, shall be deemed and considered as a charge against the United States, for payment and satisfaction whereof the said United States, and the public faith are hereby solemnly pleged.

XIII.

Every State shall abide by the determination of the United States in Congress assembled, on all questions which by this confederation are submitted to them. And the Articles of this Confederation shall be inviolably observed by every State, and the Union shall be perpetual; nor shall any alteration at any time hereafter be made in any of them; unless such alteration be agreed to in a Congress of the United States, and be afterwards confirmed by the legislatures of every State.

And Whereas it hath pleased the Great Governor of the World to incline the hearts of the legislatures we respectively represent in Congress, to approve of, and to authorize us to ratify the said Articles of Confederation and perpetual Union. Know Ye that we the undersigned delegates, by virtue of the power and authority to us given for that purpose, do by these presents, in the name and in behalf of our respective constituents, fully and entirely ratify and confirm each and every of the said Articles of Confederation and perpetual Union, and all and singular the matters and things therein contained: And we do further solemnly plight and engage the faith of our respective constituents, that they shall abide by the determinations of the United States in Congress assembled, on all questions, which by the said Confederation are submitted to them. And that the Articles thereof shall be inviolably observed by the States we respectively represent, and that the Union shall be perpetual.

In Witness whereof we have hereunto set our hands in Congress. Done at Philadelphia in the State of Pennsylvania the ninth day of July in the Year of our Lord One Thousand Seven Hundred and Seventy-Eight, and in the Third Year of the independence of America.

Agreed to by Congress 15 November 1777 In force after ratification by Maryland, 1 March 1781

Source:

Documents Illustrative of the Formation of the Union of the American States.
Government Printing Office, 1927.
House Document No. 398.
Selected, Arranged and Indexed by Charles C. Tansill