**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL.; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, ET AL.; | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KARLA PEREZ ET AL.; | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendants-Intervenors. | ) | |

**BRIEF OF CHARLES BREITERMAN AS *AMICUS CURIAE***
**IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. The Plaintiffs' Briefs Are Inadequate on the Dispensation Concept....................................p. 1

II. Summary of the Argument of This Brief............................................................................p. 1

III. Each grant of DACA is one dispensation that de facto tranforms two unlawful actions
    into lawful actions...............................................................................................................p. 3

IV. A Line of English Cases and Law Notes Dealing With the Dispensation Power..............p. 5

    A. Why The Appointment of the Earl Was A Dispensation...........................................p. 6

    B. *Non Obstante* Becomes "Notwithstanding"...............................................................p. 8

    C. Analyzing DACA in Light of the Archetypal Dispensation in the *Case of the Sheriff*......p. 9

    D. *Thomas v. Sorrell* (King's Bench, 1673)...................................................................p. 10

    E. Lawful Presence Dispensation Potentially Adds 1.5 Million More Dispensations........p. 12

V. From 1341-1688, in the entirety of the 347 years, the English monarchy granted an
    estimated 308,004 dispensations......................................................................................p. 12

    A. The Method For and Challenges Of Estimating.......................................................p. 13

    B. Dispensations Given to Nobility: 6,150....................................................................p. 15

    C. Dispensations to Royal Officials Resulted in 13,070 Dispensations.........................p. 16

    D. Dispensations Granted to Baronets, Knights, and Commoners: 3,740......................p. 18

    E. Dispensations Given to Members of Livery Companies/Guilds: 294,914..................p. 18

        1. Framing the Discussion: Membership Numbers
          of the Livery Companies of London.................................................................p. 19

        2. Why the Guilds/Livery Companies Could Get Dispensations.................................p. 21

        3. Examples of Specific Dispensations to Livery Companies.......................................p. 22

        4. Estimating The Number of Members of Livery Companies in London.................p. 23

        5. The Number of Guild Members in the Rest of England and Wales.......................p. 25

        6. Final Calculation Based on the Foregoing Paragraphs............................................p. 25

        7. Verifying that the Numbers of Guild Members Outside
          of London is Reasonable.................................................................................p. 26

VI. Comparison To Obama Administration...........................................................................p. 28

VII. A Ban on the Dispensation Power Has Been Incorporated Into U.S. Law.....................p. 28

VIII. A Mass Dispensation Power is Destructive of the Separation of Powers.....................p. 30

IX. A Limited Dispensation Power Is Allowable In Our Post-New Deal Government..................p. 31

X. With 1.5 million dispensations issued, DACA is probably the greatest constitutional violation ever perpetrated by any president..............................................................................................p. 33

XI. The Rule of Law is Essential For Economic Growth, Meaning that An Unconstitutional DACA Program Is Not In the Best Interests of the Dreamers............................................................p. 33

XI. Lawful Option #1: Release As Encountered by CBP and ICE on a Case-by-Case Basis............p. 35

XII. Lawful Option #2: The CARR Proposal..............................................................................p. 35

    A. CARR (Childhood Arrivals Rescind and Replace)....................................................p. 36

# TABLE OF AUTHORITIES

## CASES

*Arizona v. United States* 567 U.S. 387 (2012)......................................................................1

*DHS v. Regents of the University of California*, 591 U.S. ___ (Decided 6/18/2020).....................2

*Thomas v. Sorrell* (King's Bench, 1673)...........................................................4, 6, 10, 11, 18, 22, 23

*Case of the Sheriff* 2 Henry VII (Michaelmas Term) (Exchequer Chamber, 1486)......................5-10, 15

*Distinction Between Malum Prohibitum and Malum per Se* Year Book 11 Henry VII (Michaelmas Term) folio 11b-12a plea 35  (King's Bench, 1495)...........................................................5, 32

*Case of the Penal Statutes* (Exchequer Chamber, 1605)...........................................................7, 17

*Marbury v. Madison* 5 U.S. 137 (1803)...........................................................................................8

*Darcy v. Allein* (*Allen*) a/k/a *The Case of Monopolies* (King's Bench, 1602) ...............................22, 31

*Kendall v. United States ex rel. Stokes* 37 U.S. (12 Pet.) 524 (1838)...........................................29

*United States v. Smith* 27 F. Cas. 1192 C.C.D.N.Y. (1806)...........................................................29

## STATUTES

8 USC §1324a(a) and (b)...............................................................................................................3

18 U.S.C. 1324...........................................................................................................................4

18 U.S.C. 1546...........................................................................................................................4

42 Edward 3 ch. 7.......................................................................................................................6

42 Edward 3, ch. 9......................................................................................................................6

1 William & Mary Session 1, Chapter 2 (English Bill of Rights)....................................................13

1 William & Mary Session 2 Chapter 2, Section 12.....................................................................13

7 Edward VI chapter 5, *The Act to Avoid Excessive Prices of Wine*..............................................22

8 USC §1182(a)(6)......................................................................................................36

8 USC §1225(b)(2)(A)...............................................................................................36

8 USC §1229a.......................................................................................................36,37

8 USC §1231..............................................................................................................37

## RULES AND REGULATIONS

8 CFR 274a.2(a)(2) - 274a.12......................................................................................3

8 CFR 274a.2(a)(2)........................................................................................................3

## OTHER AUTHORITIES

Brief of *Amici Curiae* States of Texas, Alabama et al. submitted in relation to *DHS v. Regents of the University of California*, 591 U.S. ___ (Decided 6/18/2020)...........................................................1

DHS v. Regents of the University of California, 591 U.S. ___ (Decided 6/18/2020)...............................1

Arnold R. Ginsburg, *The Power of Dispensation in Administrative Law- A Critical Survey*, University of Pennsylvania L. Rev., Vol. 87 No. 2 (December, 1938), at 203................................................1

Plaintiff States' Brief In Support of their Motion for Summary Judgment, State of Texas   et al. v. United States of America et al., United States District Court for the Southern District of Texas, Brownsville Division, Case No. 1:18-cv-00068, Document 357 Filed 2/4/19....................................1

Plaintiff States' Re-Filed Brief In Support of their Motion for Summary Judgment, State of Texas et al. v. United States of America et al., United States District Court for the Southern District of Texas, Brownsville Division, Case No. 1:18-cv-00068, Document 486 Filed 10/9/20...............1, 12

Deferred Action for Childhood Arrivals (DACA)
Quarterly Report (Fiscal Year 2017, 4th Quarter)......................................................................2

Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671 (2014).................4

CHRISTOPHER N. MAY, PRESIDENTIAL DEFIANCE OF 'UNCONSTITUTIONAL' LAWS: REVIVING THE ROYAL PREROGATIVE Westport Connecticut: Greenwood Press,  (1998)........................................................5, 29

Carolyn A. Edie, *Tactics and Strategies: Parliament's Attack upon the Royal Dispensing Power 1597-1689*, The American Journal of Legal History, Vol. 29, No. 3 (Jul., 1985)........................................................5

Calendar of the Patent Rolls Preserved in the Public Record Office, Edward IV-Henry VI (1467-1477), First published 1900, Reprint Nendeln (Liechtenstein): Kraus Reprint, 1971...........................5

Rolls of Parliament of the Reigns of Edward IV, Richard III, Henry VII, Volume 6.................................7

"Grant of a Patent to Make Iron With Coal, 9 Oct. 1589", pp. 262-266 of TUDOR ECONOMIC DOCUMENTS, BEING SELECT DOCUMENTS ILLUSTRATING THE ECONOMIC AND SOCIAL HISTORY OF TUDOR ENGLAND.  R.H. Tawney and Eileen Power, eds. Volume II, Longmans, Green and Co., 1924..............................................8

Elizabeth Southall, Landon C. Davis III, & Isaac A. McBeth, *A Distinction Without a Difference? An Examination of the Legal and Ethical Difference Between Asset Protection and Fraudulent Transfers Under Virginia Law*, 47 U. Rich. L. Rev. 381 (2012)............................................................................9

ANNE CRAWFORD, A HISTORY OF THE VINTNERS' COMPANY, London: Constable & Co., 1977..11, 20, 22, 23

Deputy Keeper of the Records, ed., *Calendar of the Patent Rolls Preserved in the Public Record Office*, London: Eyre and Spottiswoode, 1897........................................................................................14

TAWNEY AND POWER, EDS., TUDOR ECONOMIC DOCUMENTS, London:
        Longman, Green & Co. 1924.......................................................................................15, 17

British History Online, Petitions to the Pope 1342-1419, Volume XXIV, 1 Innocent IV, 1353, folio 78d...................................................................................................................................................18

WILLIAM HERBERT, THE HISTORY OF THE TWELVE GREAT LIVERY COMPANIES OF LONDON VOLUME I, 1836. Self-published. [Author was Librarian to the Corporation of London]................................................19, 20, 23

W. CAREW HAZLITT, THE LIVERY COMPANIES OF THE CITY OF LONDON, London: Swan Sonnenschein & Co., 1892.................................................................................................................................... 19, 21, 27

ANNE F. SUTTON, THE MERCERY OF LONDON: TRADE, GOODS AND PEOPLE, 1130-1578, Aldershot, Hants, England: Ashgate Publishing, 2005.........................................................................................20, 24

WILLIAM ASHLEY, INTRODUCTION TO ENGLISH ECONOMIC HISTORY AND THEORY, PART II, London: 1906..............20

DAVID B. GRIGG, POPULATION GROWTH AND AGRARIAN CHANGE: AN HISTORICAL PERSPECTIVE, London: Cambridge University Press, 1980........................................................................................25

Stella Kramer, *The Amalgamation of the English Mercantile Crafts, The English Historical Review*, Vol. 23, No. 89 (January, 1908), pp. 15-34......................................................................................27

J.F. Pound, *The Social and Trade Structure of Norwich 1525-1575*, Past & Present, No. 34 (July 1966)................................................................................................................................................27

RONALD M. BERGER, MOST NECESSARY LUXURIES: THE MERCERS' COMPANY OF COVENTRY, 1550-1680, Penn

State University Press, 1993..................................................................................................27

WILLIAM HYDE PRICE, THE ENGLISH PATENTS OF MONOPOLY, Boston: Houghton Mifflin and Company, 1906..................................................................................................31

Julia Preston, *While Seeking Support, Obama Faces a Frustrated Hispanic Electorate*, New York Times, June 10, 2012..................................................................................................31

Miriam Jordan, *Anatomy of a Deferred-Action Dream*, Wall Street Journal, 10/14/2012...................31

Peter Wallsten, *President Obama bristles when he is the target of activist tactics he once used*, Washington Post, June 10, 2012..................................................................................................31

16 PARLIAMENTARY HISTORY OF ENGLAND 257, London: Hansard, 1813..................................................33

Michael McConnell et al., Brief of Governor Abbott *et al.* As *Amici Curiae* in Support of Respondents, United States of America petitioners v. State of Texas et al. respondents, submitted April 1, 2016 in the Supreme Court of the United States, No. 15-674...................................33

World Justice Project's Rule of Law Index 2019..................................................................................................34

ROBERT J. BARRO AND XAVIER SALA-I-MARTIN, ECONOMIC GROWTH, Cambridge: MIT Press, 1999...................34

USCIS Policy Manual last updated 10/15/2020..................................................................................................35

The Hill, *Former ICE chief: Hire more immigration judges* (video), 8/1/2018...........................................40

## I. **The Plaintiffs' Briefs Are Inadequate on the Dispensation Concept**

The dispensation concept is critical to this case. An *amici curiae* brief filed in the Supreme Court of the United States, in 2019, by Texas, Alabama and other states, asserts that "DACA "dispens[es]" with certain immigration statutes."[1] Dispensation[2] is the correct term, yet the brief mentions it once and moves on. Similarly, a 2019 plaintiffs' brief in this litigation states that DACA "constitutes an unlawful dispensation,"[3] yet never mentions it again.

In their re-filed brief to this court supporting their Motion for Summary Judgment, the plaintiff states repeat the language quoted above and add a few more statements. These include, that DACA "constitutes an unlawful dispensation by the Executive of statutes on lawful presence and work authorization, " and that DACA is a "lawful-presence dispensation."[4] Despite the additional sentences, the plaintiffs' discussion of the dispensation concept remains inadequate.

Justice Scalia, in *Arizona v. United States* 567 U.S. 387 (2012) described DACA as requiring "ruling on the biennial requests for dispensation." That thinking is is on-target because it implies plural dispensations. It is impressive considering that the case was decided June 25, 2012 meaning he wrote those words at most 10 days after DACA was announced by President Obama on June 15, 2012.

## II. **Summary of the Argument of This Brief**

DACA is a *mass* dispensation *program.* Every single new grant of DACA and each 2-year renewal is a distinct dispensation. From June, 2012 through 2016, the Obama administration

---

1   DHS v. Regents of the University of California, 591 U.S. ___ (Decided 6/18/2020).  Brief of *Amici Curiae* States of Texas, Alabama et al., at footnote 8 on page 9.

2   Very briefly, the dispensation was the English king's power to exempt particular persons, under special circumstances, from the operation of statutory law.  Arnold R. Ginsburg, *The Power of Dispensation in Administrative Law- A Critical Survey*, Univ. of Pennsylvania L. Rev., Vol. 87 No. 2 (December, 1938), at 203.

3   Plaintiff States' Brief In Support of their Motion for Summary Judgment at 29 and iii, 29,30 and 44.  State of Texas et al. v. United States of America et al., United States District Court for the Southern District of Texas, Brownsville Division,  Case No. 1:18-cv-00068, Document 357 Filed on 2/4/19.

4   Plaintiff States' Re-Filed Brief In Support of their Motion for Summary Judgment in this litigation, Document #486, Filed 10/9/2020 at  29 and 45.

1

granted over 1,500,000 dispensations through DACA.[5]

Through the DACA program, Obama handed out vastly more dispensations than the 318,000 that all British monarchs combined granted between 1341-1688. That period lasts from when the House of Commons first met as an independent body to 1689, when dispensations were banned by the English Bill of Rights, as destructive of the legislative power. Moreover, even a single grant of DACA would have been void even under medieval English law when the monarchy was at the height of its power because none of the DACA announcements or documents contain the required *non obstante* ("any statute notwithstanding") clause.  Even one grant of DACA grabs more dispensation power than ever wielded by any English monarch.

A mass dispensation power lacerates the power of Congress by millions of cuts. DACA is unconstitutional because it is a separation of powers violation.

 The root "dispens" appears in neither the majority nor the dissents of the Supreme Court decision, nor in the transcript of the oral arguments. This district court is free to issue an injunction against DACA if the court bases its decision on material not considered in the Supreme Court decision. The monstrous illegality of DACA overwhelms the reliance interest of DACA recipients enunciated by the Supreme Court in Dept. of Homeland Security v. Regents (2020).[6]

Given the monstrous illegality of DACA, the program must be terminated. One method is as follows: an immediate a ban on new entrants; existing DACA permits and associated federal benefits such as medicaid must expire in due course within 2 years; and all federal immigration benefits that have flowed from DACA such as advance parole, legal permanent residence, and citizenship, must be terminated immediately with the individuals reverting to holders of 2 year DACA grants. The end of this brief proposes lawful solutions for whoever wins the presidential

---

5   1,528,504 to be exact. Deferred Action for Childhood Arrivals (DACA) Quarterly Report (Fiscal Year 2017, 4th Quarter). The report includes the data for all previous quarters. Retrieved from the USCIS "Immigration and Citizenship Data" web page and selecting the filter "DACA," https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data

6   DHS v. Regents of the University of California, 591 U.S. ___ (Decided 6/18/2020)

election.

III. **Each grant of DACA is one dispensation that *de facto* tranforms two unlawful actions into lawful actions.**

Under the terms of the DACA program, individuals apply to USCIS, an agency within the Department of Homeland Security (DHS), which reviews each application. If the individual is accepted into the program, the individual receives an acceptance letter and an Employment Authorization Document (hereinafter EAD). The significance of the letter and EAD is that the recipient will not be deported so long as they abide by the terms of the program,[7] and the person is (purportedly) legally authorized to work in the United States.

In order to hold a job as an employee, 8 USC §1324a(a) and (b) require that the individual present valid documents demonstrating that the person is legally authorized to work in the United States, and that the individual attest to the validity of those documents. These statutory requirements are implemented by 8 CFR 274a.2(a)(2) - 274a.12, some 16 pages of regulations. 8 CFR §274a.2(a)(2) states "Form I–9, Employment Eligibility Verification Form, is used in complying with the requirements of" the immigration statute (Title 8 U.S. Code). That section of the regulations delineates the contents of the Form I-9. Nearly everybody in the United States who is a new hire or who has been referred by a recruiter or agency must fill out Form I-9.

The Form I-9 guides the employer and employee through the process of presenting the documents proving the individual is legally authorized to work in the United States. Page 3 of that form provides a list of acceptable documents. Crucial for the Dreamers is an "Employment authorization document issued by the Department of Homeland Security." That is the EAD.

Reflecting the requirements of 8 USC §1324a(a) and (b), Form I-9 requires that the employee attest under penalty of law that the documents are not fraudulent and that s/he is legally authorized to work in this country. The employee must sign the following:

---

7 The main requirement is that the DACA recipient commit no crimes.

> *I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.*
>
> *I attest, under penalty of perjury, that I am (check one of the following boxes):* [the relevant box is...]     *4. An alien authorized to work*

If the new employee presented fraudulent documents in order to get past the I-9, that would be a violation of 18 U.S.C. 1324 (document fraud). If the new employee falsely attested that fraudulent documents were genuine, that would be a violation of 18 U.S.C. 1546 (false attestation).

The DACA recipient holds an authentic EAD issued by DHS. So when the individual is offered a job and fills out the Form I-9, the individual can present authentic documents and can truthfully attest that s/he is "An alien authorized to work." Before DACA, Dreamers had to present fraudulent documents and had to make a perjurious attestation that they were legally authorized to work, so they were committing 2 federal crimes.

The argument of this brief is that the EAD provided is unlawfully issued and invalid. But from the point of view of the DACA recipient, they are providing a valid government document, so they are not breaking any laws when they present and attest to the EAD during the I-9 process.

Each grant of an EAD under DACA transforms actions that would otherwise have been illegal, and allows the recipients to do them *de facto* legally. That is the very essence of a dispensation, a power held by English monarchs up until 1688. A dispensation was authorization from the monarch that **"makes an action lawful, which without it, had been unlawful."** (emphasis added) Thomas v. Sorrell (King's Bench, 1673) The DACA EAD is a "work permit" in other words, it is a "license," which allows the recipient to get a job, lawfully.  **"For a dispensation is properly to license a person to do a thing which he can do, but is by law penally prevented from doing it."** (emphasis added) (Thomas v. Sorrell)[8]  Each grant of DACA is a single

---

8 Zachary Price has called the dispensation a "prospective license." Zachary Price, Enforcement Discretion and Executive Duty, 67. Vanderbilt Law Review 671 (2014). In that article, so far as this counsel can ascertain, Zachary Price never formally identifies a grant of DACA as a dispensation. But her certainly sets up the framework to make the inference.

dispensation that allows 2 otherwise illegal actions to be done *de facto* lawfully.

## IV. <u>A Line of English Cases and Law Notes Dealing With the Dispensation Power.</u>

In the case note, <u>Distinction Between Malum Prohibitum and Malum per Se</u> (1495), Chief Justice of the King's Bench John Fineux explained the difference between a dispensation and a pardon. The dispensation authorized the act before it was done; the pardon excused or absolved the act after it had been done.[9] The dispensation is more puissant. With a pardon, the person still has to sweat after doing the illegal act. It may be many years before a pardon is issued; the person may incur huge legal fees and go to jail. With a dispensation, everything is excused in advance.

The *Case of the Sheriff* (Exchequer Chamber, 1486)[10] is a leading and fundamental dispensation case. The fact pattern and use of regal powers in the *Case of the Sheriff* are highly analogous to the DACA situation. Edward IV appointed of the Earl of Northumberland to the office of High Sheriff of Northumberland, for life:

> *Aug. 14, 1474, at Windsor. Appointment of the king's kinsman Henry, earl of Northumberland, as sheriff of Northumberland, and grant to him of the office of sheriff for life, rendering to the king 100 £ yearly at the Excheuer without any account.  by p.s.".[11]*  [p.s. means 'privy seal']

The monarch made the appointment in the usual manner of such appointments and indeed many royal actions: in the form of "Letters Patent," which was a hand written document with the waxen image of the monarch's seal affixed.  An example can be seen, as of the date of this brief's filing, at the following link, https://natlib.govt.nz/records/30223722. The letters patent for the earl's particular appointment may not survive. Summaries of the letters patent survive in the form of the "Patent Rolls," which were prepared contemporaneously by the monarch's clerks, and are

---

9 <u>See</u>, Christopher N. May, Presidential Defiance of Unconstitutional' Laws: Reviving the Royal Prerogative Westport Connecticut: Greenwood Press,  (1998), Chapter 1 (pp. 3-6) and pp. 21-23.

10 Mentioned in Carolyn A. Edie, *Tactics and Strategies: Parliament's Attack upon the Royal Dispensing Power 1597-1689*, The American Journal of Legal History, Vol. 29, No. 3 (Jul., 1985), pp. 197-234 at 201. Case to be found on the faculty website of Professor David Seipp, in a searchable archive titled, "Medieval English Legal History An Index and Paraphrase of Printed Year Book Reports, 1268–1535."

11 Calendar of the Patent Rolls Preserved in the Public Record Office, Edward IV-Henry VI (1467-1477), First published 1900, Reprint Nendeln (Liechtenstein): Kraus Reprint, 1971, at page 467.

preserved for the years subsequent to 1201 A.D. The words in italics above are copied from the patent roll. The actual letters patent was far more lengthy and verbose as it was meant to convey the king's majesty. The point is that the EAD issued to each and every DACA recipient is analogous to the monarch's Letters Patent. This will be explained forthwith.

The appointment of the Earl of Northumberland as sheriff for life was challenged in court because two statutes that had been passed by parliament and received royal assent set a sheriff's term of office at one year:  42 Edward 3 ch. 7 (year 1354) and 42 Edward 3, ch. 9 (year 1368). The plaintiff clearly wanted the appointment set aside.

### A. <u>Why The Appointment of the Earl Was A Dispensation</u>

Despite statutes to the contrary, King Edward IV, in 1474 appointed the Earl to a lifetime term as sheriff.[12] That appointment constituted a dispensation. From context we can infer that the dispensation was a setting aside of statutory law for a specified person and for a single, specific circumstance. This is such an early case that it doesn't even formally define the term, and doesn't even call it a "dispensation." However, we can infer the definition and the limits of the dispensation power.  In the more evolved formulation of *Thomas v. Sorrell* (1673): The letters patent provided by the King to the Earl was, effectively, a license to the Earl of Northumberland to hold the office of sheriff for life, even though the statutes said he could only hold it for 1 year; the dispensation allowed the Earl to do something legally, that would otherwise have been illegal. Similarly, the EAD provided to each DACA recipient is an official document that makes an action *de facto* legal, that otherwise would illegal.

Beginning in the fourth line of the case, it reads:

> *And the question was, whether the patent was good; and likewise how this Patent was to be construed. And as to the first point, the Justices held the patent good; for it was such a thing that could well be granted for term of life ...*

So the court is ruling the dispensation lawful. The decision explains kings had the power

---

12 Carolyn Edie, *Tactics and Strategies: Parliament's Attack upon the Royal Dispensing Power, supra,* at 201.

according to custom, and in this particular instance Parliament had, in 1485, implicitly ratified the appointment.[13]

Judge Radcliff continued in Anglo-Norman French (law French), that the Letters Patent also had the required clause:

> *et comment que il ya ad un Non obstante*.

and how there was a *Non obstante*

And the case continues:

> *ou le Statuts sont, que Patents que fautent ceux choses, sera voids, uncore les Patents le Roy sont bons ove un Non obstante, mes sans Non obstante les Patents sont voids per cause de les Statuts, issint icy le Patent ove un Non obstante*

> where there are Statutes, Patents that do these things [dispense] will be void, yet the Patents of the King are good with a *Non obstante* [clause], but without the *Non obstante*, the Patents are void because of the Statutes, thusly here the Patent [is] with a *Non obstante*.

The case states twice that there was a *non obstante* clause in the letters patent of Edward IV granting the office of Sheriff of Northumberland for life.[14] *Non obstante* means "no hindrance" or "no obstacle." *Non obstante* was an abbreviation of the Latin clause *non obstante aliquo statuto in contrarium,* meaning, "any statute to the contrary being no hindrance."

We can infer from a later dispensation case, the *Case of the Penal Statutes* (Exchequer Chamber, 1605),[15] that the reason the *non obstante* clause was required, even in 1486, was

---

13  The Act of Resumption with Proviso is found in the Rolls of Parliament of the Reigns of Edward IV, Richard III, Henry VII, Volume 6, at page 336, (7 November, 1485). The "resumption" means that the incoming king Henry VII recalled all prior grants, while the "proviso" (found on page 344) means that Henry specified that the grant of the office of sheriff to the Earl of Northumberland was retained.

14  Note that some sources get it *wrong,* translating the case as saying that the patent had *no* non-obstante clause. An example is a book from 1739, Jus Parlementarium, by William Petyt, Esq., which features an English translation of the case, and it has that error. But my sources are 1) a 1680 book of law reports in Norman French: Les Reports Des Cases en Ley En le Cinque An Du Roy Edward Le Quart., London: Sawbridge, Rawlins and Roycroft, 1680 at p. 290 of the PDF which is downloadable from Google Books;  and 2) Boston University law Professor Edward Seipp, who is undertaking an extensive and systematic program of translating medieval English law cases, and has access to multiple early law reports on each case (which aids in correcting for the transcription errors of scribes, and the errors of early printers). Boston University School of Law, Legal History: The Year Books.  Seipp Number 1486.076; King Henry VII, Michelmas Term, Regnal Year 2, Plea Number 20.

15  Reported by Sir Edward Coke, 7th Book of Reports, page 36b and elsewhere.

because the dispensation was an awesome power and the courts wanted to be assured that the monarch was intentionally exercising that power: "The power of dispensation is placed in the monarch as head of the commonwealth the fountain of justice and mercy" and "is by the whole realm trusted with it; this confidence and trust is inseparably joined and annexed to the royal person of the King."

### B. *Non Obstante* Becomes "Notwithstanding"

The medieval dispensation documents were written in Latin, and so utilized the *non obstante* clause, but after 1489, the laws and legal documents were increasingly being written in English, so that a patent made October 9, 1589 that granted a monopoly as a reward for a useful invention reads that the patent is valid,[16]

> any statute, Acte, ordinance, provicion, or restrainte thereof to the contrarye maide, had, ordened or provided, or any other thinge, cawse, or matter whatsoever notwhithstandinge.

The "any statute notwithstanding" clause has replaced the *non obstante* <u>clause</u>. Carolyn A. Edie and the Oxford Dictionary of the English Language (OED) state that "notwithstanding" means "in spite of," so that the patent shall be valid, "in spite of any statute, act .... to the contrary."

Returning to the *Case of the Sheriff*, the *non obstante* clause was required. Without a *non obstante*, Patents that do these things [dispense] would be void. However, in that case, there was a *non obstante*, so the Patent was good. The Exchequer Chamber in 1486 thereby asserts the power to rule an action of the executive branch void, yet it doesn't need to exert that power, because the statute had the required clause. This was over 300 years earlier than *Marbury v. Madison* 5 U.S. 137 (1803), where the Supreme Court asserted and exercised the power to rule an action of the Secretary of State illegal, but declined to do anything practical about it because it

---

16 "Grant of a Patent to Make Iron With Coal, 9 Oct. 1589", pp. 262-266 of Tudor Economic Documents, Being Select Documents Illustrating The Economic and Social History of Tudor England. Edited by R.H. Tawney and Eileen Power, Volume II, Longmans, Green and Co., 1924.    Note that this patent shows the antecedents of the industrial revolution were underway in England by 1589.

was not the proper court to issue the Writ of Mandamus. The statement of the power to rule a monarch's act void was a rather gutsy thing to assert in 1486. If the statement were taken as a personal affront to the king, there was the danger of imprisonment or beheading.

The relevance of this is that, every single one of the DACA dispensations would have been void even under the vast power of an English monarch of the year 1486 because none of the DACA dispensations has the required "any statute to the contrary notwithstanding" clause. The court in the Case of the Sheriff would have ruled the entirety of the DACA dispensations void.

### C. Analyzing DACA in Light of the Archetypal Dispensation in the *Case of the Sheriff*.

In the fact pattern of the *Case of the Sheriff*, the document from the king allowed the earl to hold the job of the sheriff (for more than one year).  In the fact pattern of DACA, the document from the president, the EAD, allows the recipient to hold *any job* that s/he is offered. So each DACA dispensation is rather a superdispensation.

However, if one looks at it more rigorously, it is not so facile. In the facts of the *Case of the Sheriff*, it was illegal to hold the office of the sheriff more than one year. A document from king made that action legal.

To match that fact pattern, the DACA facts would have to be that it is illegal for the Dreamers to hold a job in the United States, but the document from the president (the EAD) makes that action legal. But this is not the situation; there is a distinction.

The way the INA is written,  it is not actually illegal for an unauthorized alien to hold a job. The illegality is in the alien utilizing fraudulent documents and making a perjurious attestation that s/he is legally authorized to work. DACA provides a document (EAD) that allows the Dreamer to hand over a genuine document and make a truthful attestation as to being legally authorized to work.

However, I submit to the court that this is a "distinction without a difference:" "while a …

conceptual distinction exists [the] distinction lacks substantive practical effect."[17] This is so because each grant of DACA is still a setting aside of statutory law for a specified person and for a single, specific circumstance, just as was the grant of the office of sheriff to the Earl for life. In both fact patterns, an illegal action becomes legal due to the handing over of a document from the king or president, respectively.

The applicability of English dispensation doctrine is all the stronger if we consider the more evolved doctrine of some 200 years after the *Case of the Sheriff*.

### D. Thomas v. Sorrell (King's Bench, 1673)

A statue made in the 7th year of the reign of Edward VI (the son of Henry VIII) regulated the sale of some types of wine. It stated where the wine could be sold, in what quantities, and who could sell it. The statute listed penalties (fines) for violation. These fines were payable to the crown. The court held that a dispensation to the statute of Edward VI had been issued by James I, in the 9th year of his reign (1611-1612) by letters patent bearing the great seal, to the Company of Vintners (wine merchants), allowing members of the company to sell wine in various locales. The case expressly indicates that that Letters Patent contained the required *non obstante* clause. Sorrell was a member of this company, which was akin to a trade guild.  This dispensation is ruled valid. Sorell was, therefore, allowed to sell the wine even though he was violating the statute.

The plaintiff's attorneys alleged the king could not dispense to an entire trade guild: that "If he could to particular persons, he could not to the Corporation of Vintners, and their successors, whose number or persons the King could never know; and that it stood not with the trust reposed in him by the law, to dispense so generally without any prospect of number or persons."

The court replied,  "Where the King can dispense with the particular persons, he is not

---

17 Elizabeth Southall, Landon C. Davis III, & Isaac A. McBeth, A Distinction Without a Difference? An Examination of the Legal and Ethical Difference Between Asset Protection and Fraudulent Transfers Under Virginia Law, 47 U. Rich. L. Rev. 381 (2012).

confined to number or place, but may license as many, and in such places, as he thinks fit." Note that the court is specifically using the term "dispense" (as in "dispensation") in this case.

One of the legal innovations in *Thomas v. Sorrell* is that it extends the applicability of the dispensation to an organization, so that one dispensation is effectively a dispensation to each and every member and then to their successors. The Vintners had 148 members in 1610.[18] The Vintners required persons to undergo an apprenticeship of several years duration before being admitted to membership. So the breadth of the holding was limited since the membership of the organization was small. However, the king issued dispensations to a few dozen such trade guilds. This increased the effective number of dispensations issued by the crown, and we will cover this in the next section.

Furthermore, in *Sorrell* (1673), the King's Bench defined dispensation with the benefit of 2 more centuries of jurisprudence: a dispensation "makes an action lawful, which without it, had been unlawful." The DACA program makes lawful the handing over of documents and the attestation as to being authorized to work, which without it, would otherwise be unlawful.

*Sorrell* continued, "For a dispensation is properly to license a person to do a thing which he can do, but is by law penally prevented from doing it." The EAD (a work permit) acts as a license itself. Prior to DACA, the person could hand over of fraudulent documents and could make a perjurious attestation as to the validity of the documents, despite being penally prevented from doing. The president (analogous to the king) has licensed the DACA recipients to hold any job they are offered, because previously they could indeed to do that, but they were subject to penalties for using fraudulent documents and making a false attestation as to the validity of those documents. Any DACA recipient used to be "penally prevented" from holding a job in this country, but now they have a license (the EAD) which lets them do so free of penalty.  The key difference between a license and a dispensation may be that a license enables *according to* statute, while a

---

18  Anne Crawford, A History of the Vintners' Company, London: Constable & Co., 1977 at pp. 76-77.

dispensation enables *contrary to* statute.

DACA is a mass dispensation program. Each individual DACA recipient receives his or her own dispensation authorizing employment. Instead of Letters Patent, it is an EAD. From June 15, 2012 through the end of 2016, 1,528,781 DACA grants were made. That was 1,528,781 dispensations.

### E. **Lawful Presence Dispensation Potentially Adds 1.5 Million More Dispensations**

This brief takes no position on whether the DACA program is a dispensation as to lawful presence. Examining that issue would take space that is not available. Again, the problem is that the plaintiffs' brief characterizes it as  "this lawful-presence dispensation"[19] when, if lawful-presence is a dispensation, then it as a distinct dispensation to each Dreamer and each 2-year renewal is a new dispensation. That would add 1.5 million additional dispensations in the Obama administration alone (2012-2016). And since DACA also licenses the violation of 2 other distinct statutes, 18 U.S.C. 1324 (document fraud) and 18 U.S.C. 1546 (false attestation), one can view each of those licenses as an additional 1.5 million dispensations, for a total of 4.5 million dispensations. The view I take in this brief is of DACA being one dispensation that relieves from 3 immigration-related violations of statutory law for the reason stated in the next paragraph.

It doesn't matter for the outcome of the argument whether the Obama administration granted 1.5 million or 4.5 million dispensations. I will stick with the conservative estimate for the number granted by the Obama administration, and an expansive estimate for the estimate of dispensations granted by the English monarchy (318,000). As a result, we will be confident that the argument of the brief is correct.

## V. **From 1341-1688, in the entirety of the 347 years, the English monarchy granted an estimated 318,000 dispensations**

The time under consideration is the 347 years between 1341 when the Commons first sat

---

19  Re-Filed Plaintiffs' Motion for Summary Judgment in this litigation, Document # 486 Filed 10/9/20, at 45.

as a separate House, to 1689 when the monarch's dispensation power was banned in the English

Bill of Rights (1 William & Mary Session 1, Chapter 2) and a subsequent statute (1 William &

Mary Session 2 Chapter 2, Section 12), both in 1689.[20]  This is an appropriate period to examine

because the English political system was broadly similar to the current U.S. system in that there

was a lower house, an upper house, and a monarch that could either assent to a bill passed by

Parliament, or withhold assent. The power to withhold assent, analogous to the U.S. veto power,

was absolute and was utilized prior to the Glorious Revolution of 1688. Since then, the monarchy

has withheld assent only once in over 300 years, in 1707.[21]

A. **The Method For and Challenges Of Estimating**

The types of royal documents in which a dispensation could possibly be granted included

Letters Patent, Charters, Prerogative Writs and Warrants. Every royal document during the period

in question had to be hand-written in calligraphy, and the writing could be very dense. An

example can be seen at the following link, https://natlib.govt.nz/records/30223722 .  That is a

fragment of royal letters patent from the year 1379. It is only the upper left corner, and looks to

be ¼ of a document that would have been a full folio page, probably written on vellum (calf skin).

You can see that even though the document may have only been one "page," it was a considerable

task for a scribe to draft it.

The most accurate method to gauge the number of dispensations issued 1341-1688 would

be to compile all relevant royal documents from the time period, take a random sample from the

---

20 This statute banned dispensations unless the specific statute at issue has wording expressly permitting
dispensations as to itself. That way, the legislature is permitting the dispensation so there is no separation of
powers issue. The Jones Act is an example of a U.S. statute that allows dispensations as to itself, and also
suspensions as to itself. See 46 USC §31329 - Historical Notes: "As previously discussed, these waivers can be on a
case-by-case basis or with a blanket waiver."  The case-by-case waiver is the dispensation. This can only be done
by a government official providing a document to a given shipper authorizing them to violate the law. The blanket
waiver is the suspension. This is done, for example, by a general announcement issued by a government official
that authorizes anybody going to a certain port or ports that they are all authorized to ignore a certain part of the
law. Nobody needs to carry any document with them. They can just reference the general announcement if there
is any problem.
21 Information from the official UK Parliament website: https://www.parliament.uk/site-information/glossary/royal-assent/

pool, say n=200, and then analyze each document to determine whether it contains a dispensation. There is also a complexity that a number royal documents contained a "boilerplate" *non obstante* (notwithstanding) clause that may never actually have gone into effect. If the document never actually counteracted any statute, it is only a dormant clause, not an actual dispensation.  By contrast, every work permit issued under the DACA program is an operative dispensation. In analyzing the royal documents, if one finds a *non obstante* clause that does not specify the statute or make a reference such as "notwithstanding the late ordinance passed in Parliament," then one needs to determine if there really was a statute that the dispensation in fact set aside, or was it just a dormant *non obstante* clause. That inquiry requires a vast knowledge of medieval English law.

The 600-page Calendar Of Patent Rolls for 1381-1385 contains summaries of perhaps all patents issued in those 4 years, but these are far shorter than the originals, and dispensations could easily have been overlooked by the editors. I found 68 instances of the word "notwithstanding," 25 of which were dispensations from statutes passed by Parliament and assented to by the Crown. Other usages were to set aside earlier grants of the King, or set aside ecclesiastical rules, which are generally not relevant as being rules set by the church not duly enacted statutes. An example of a clear dispensation is that, on May 8, 1383, King Richard II granted a,

> *Licence, on account of his age, for John de Briene, prebendary of Lusk in Ireland, to absent himself from Ireland and receive the profits of his prebend,* **notwithstanding the late ordinance in Parliament.**[22]  [emphasis added]

Even though it concerns an ecclesiastical rule, there was a Parliamentary statute, and so this was a relevant dispensation. A prebend was an income from the estate of a cathedral.

25 dispensations over a 4 year period indicates only 2,131 dispensations over the entire

---

22  Deputy Keeper of the Records, ed., *Calendar of the Patent Rolls Preserved in the Public Record Office*, London: Eyre and Spottiswoode, 1897, at p. 271

341 year period 1341-1688. There were definitely more dispensations than that.  That is why I state that Charters, Prerogative Writs and Warrants could also include dispensations. Figuring out how many dispensations were issued by those methods would require finding the equivalent of a "Calendar of _____" for each document type, and researching each trove by whatever interval of years it covers. Another question is how many of the original documents are not preserved in any summary volume? Those would need to be tallied and looked at individually.

A most accurate count would require a visit to England in order to consult with experts, access the archives, digitization of the archives as needed, and a research budget.  For current purposes, I have adopted an alternative estimation method. What follows is an abridged explanation.

B. **Dispensations Given to Nobility: 6,150**

The first stage is to estimate the number of dispensations made to nobility from 1341-1688. We know from the *Case of the Sheriff* (1486) that the Earl of Northumberland had received a dispensation to be sheriff for life. In remarks made in Parliament on Friday, November 20, 1601, Sir Walter Raleigh noted that a monopoly on tin, "being one of the Principal Commodities of this Kingdom, and being in Cornwall, it hath ever (so long as there were any) belonged to the Dukes of Cornwall; and they had special Patents of Privilege."[23]  While the grant to the Duke of Cornwall was accomplished by Letters Patent, the power utilized was the Crown's proclamation power, one of the Crown's prerogative powers. The Crown had the power to make law by so stating (proclaiming). The Letters Patent probably recited that the King hereby proclaims that the Dukes of Cornwall have privilege over tin in Cornwall.  Was the Duke of Cornwall's monopoly on tin a dispensation? Probably not. Unless there was something like a law banning tin production in Cornwall, there was no need for the Duke to be granted a dispensation in order to hold a monopoly of tin production. However, the point of the above description is to convey that the

_____

23 Tawney and Power, eds., Tudor Economic Documents, London: Longman, Green & Co. 1924, at p. 276.

nobility enjoyed numerous privileges, as well as access to the monarch that a commoner simply did not have.  If a noble needed a dispensation, it was possible to ask the Crown directly.  There probably would have been a *quid pro quo*, and the noble probably had to be viewed as loyal. Some dispensations must have been handed out in return for a noble's support of a particular monarch in obtaining the crown.

It is likely that any given noble received more than 1 dispensation during the course of their holding of the title. For the sake of avoiding an underestimation of the number of dispensations issued by the Crown from 1341-1688, I will posit that each noble enjoyed 5 dispensations at all times while s/he held the title.

| Year | Number of Nobles in the Peerage |
|------|--------------------------------|
| 1341 | 175  (number was given for the reign of Edward III (reigned 1327-1377) generally) |
| 1509 | 42   (a great many nobles were killed in the lengthy civil war known as the Wars of the |
| 1539 | 50   Roses and the Tudors were parsimonious in handing out new titles). |
| 1603 | 59   -Accession of James I |
| 1625 | 121  -Accession of Charles I |
| 1649 | 180  -Execution of Charles I.  Followed by the Interregnum. Charles II acceded in 1660. |
| 1685 | 244  -Accession of James II |
| 1688 | 252  -Forced abdication of James II (the Glorious Revolution). End of the dispensing power. |

Assume that each noble holds the title for 30 years. Some nobles may have only held the title for a few years, others for 50 years or more. 30 years seems average. Analysis of the data by results in the estimate that from 1341-1688 there were distinct 1,230 noble lives, each holding the title for 30 years duration. If each held 5 dispensations, that was 6,150 dispensations.

### C. **Dispensations to Royal Officials resulted in 13,070 dispensations**.

Review of summaries of surviving Royal Patents and other documents demonstrates that the Crown would hand out various grants and favors to royal officials, a good number of whom were commoners who had apparently rendered good and loyal service in the posts. I estimate

that there were 300 such officials receiving 1 dispensation at any given time. In the 1300s and 1400s when the machinery of the Crown was relatively small and the number of Parliamentary statutes was small, there may have been far less than 300 dispensation. In the 1600s, as the size of royal government increased, there may have been more than 300. It should balance out. 1341-1688 is 347 years. Dividing that into 30 year intervals is 11.57.  Thus, the estimate is 3,470 such dispensations were granted.

But I found an extraordinary Letters Patent issued to royal official Sir Edward Dier which enabled Dier himself to grant dispensations.[24] How could Dier have received an extraordinary grant from Queen Elizabeth? The answer may be that addition to rendering good service as a government official, he had the Queen's favorite, Robert Dudley, the Earl of Leicester as his patron, and Dier was also one of the best poets of his day.

The Letters Patent issued to Dier was effectively a license to issue dispensations to other people in exchange for money. This patent was almost certainly the dispensation that was ruled illegal by the *Case of the Penal Statutes* (Court of the Exchequer 1605) on the ground that the Crown could not delegate the dispensation power to a private individual because the power was at the heart of the Queen's mercy and public trust. Sir Edward Coke reported the case, but in his brief statement of the facts he did not inform of the specific statute at issue.

The patent to Dier was issued in 1576 and voided by the court in 1605. So it lasted some 30 years. I estimate that Dier granted an additional 3,200 dispensations due to this patent from the Queen. I believe that such a license to grant dispensations was extraordinarily rare. This particular Letters Patent specifically came to the attention of Parliament in 1601[25] and was voided by a court in 1604. It may have represented the height of the abuse of the dispensation

---

24 Tawney and Power, eds., Tudor Economic Documents, London: Longman, Green & Co. 1924, at p. 285. I am aware that what was granted to Dier was really a license to grant dispensations and the dispensations may have gone to commoners. I will correct this in the hoped-for book, but it won't change the number of dispensations, which is the essential thing.
25 *Ibid*.

power. Nevertheless, to avoid underestimating the number of dispensations, I am going to postulate that 2 other people received similar licenses and granted a similar number of dispensations. So add 6,400 dispensations. Total number of dispensations resulting from these licenses to issue dispensations- 9,600. Adding that to 3,470 yields 13,070 dispensations.

### D. Dispensations Granted to Baronets, Knights, and Commoners: 3,740

People of lower rank, not royal officials, and not acting on behalf of a guild/livery company could possibly obtain a dispensation if they worked through a noble, courtier or royal official. If not holding the dignity of a knight or baronet, the person would have had to be wealthy gentry. The person would find some avenue of approach and then work to convince their patron to ask the Crown to grant the dispensation.

For example, John de Briene, who received the dispensation discussed on page 14, was the brother of Baron Guy de Briene.[26] As the brother of a baron, he held no title himself so that he was a commoner. And as a clergyman, it is highly unlikely he was a knight. He got the dispensation because of his brother's influence at court. For the sake of estimation,  I will assume the same numbers as for singular dispensations granted to royal officials in the last section, so I estimate 3,470 dispensations.

### E. Dispensations Given to Members of Livery Companies/Guilds: 294,914

My research indicated that by far the largest numbers of dispensations were enjoyed by members of guilds a/k/a livery companies. The case of *Thomas v. Sorrell* (1673) noted that the Crown could issue a single dispensation that applied to more than one person. In that case, it was a single dispensation issued by James I that applied to every member of the Corporation of Vintners in London. Such plural dispensations removed the great limiting obstacle that each dispensation had to be handwritten to each specific person.

The guilds were voluntary associations of skilled tradespeople based on a 7 year

---

26  British History Online, Petitions to the Pope 1342-1419, Volume XXIV, 1 Innocent IV, 1353, folio 78d.

apprenticeship system. In London, they became known as "livery companies" because each had a distinctive dress uniform, or livery. Note that the livery was only worn by senior members of the company. While called Livery Companies in London, they remained guilds in form and function, and outside London may have continued to be called guilds. The size of the membership was relatively small, from 74-1600 members per company in London. These were not trade unions because company members were highly skilled independent contractors, a significant minority of whom operated considerable businesses.   A master mason could have many laborers working under him. The scope of membership was limited to a city or town.

1. **Framing the Discussion: Membership Numbers of the Livery Companies of London**

Originally, I set out to determine the size of the membership of each guild with datapoints at several years during the relevant time period and then to calculate a number. However, this proved to be a massive task, and I ended up using the data as a means to check the estimate.

The "12 Great Companies" in Chart A are in bold, in column 1. The rest of column 1 is a sampling of the "Minor Companies." In 1377, a list of all the livery companies of London comprised 48,[27] indicating that there were 36 Minor Companies.  In 1421-22, there were 112 "Craft-Gilds" in London,[28] meaning 100 Minor Companies. In 1892, there were 60 Minor Companies. A blank cell in the chart below means "no data." 10 days of work was spent trying to get data.

We are concerned with the years 1341-1688 because those are the years when the Livery Companies could have obtained or utilized dispensations from Acts of Parliament that had been passed by Commons and the Lords and then received the assent of the Crown.

However, where data is sparse for those years, I have used data from post-1688 in order to get some idea of what the numbers might have been.  Of this data, that from pre-industrial

---

27  William Herbert, The History of the Twelve Great Livery Companies of London Volume I, 1836. Self-published. [Author was Librarian to the Corporation of London], pages 30-33.
28  W. Carew Hazlitt, The Livery Companies of the City of London, London: Swan Sonnenschein & Co., 1892, p. 565.

revolution (1800) is much preferred. The industrial revolution wrought such changes in the structure of work as related to the skilled trades that post-1800 data is to be treated with caution for figuring out what the numbers might have been in a prior age. However, for the Apothecaries, such late data might be acceptable because that field didn't really change until the advent of prepackaged drugs, which I suspect was post-WWI, and even today, expertise is required in the field of pharmacy.

### Chart A

| | Year | Total Members | Livery | Year | Total Members | Livery | Year | Total Members | Livery | Year | Total Members | Livery |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mercers**[29] | 1474 | 74 | | 1520 | 155 | 93 | 1562 | 203 | 76 | 1581 | 271 | 83 |
| **Grocers** | 1373 | 124 | | | | | | | | 1795 | 250 | |
| **Drapers** | 1415 | 96 | | 1493 | 229[30] | | | | | | | |
| **Fishmongers** | | | | | | | | | | | | |
| **Goldsmiths** | 1477 | 198 | | 1483 | 149 | | | | | | | |
| **Skinners** | 1537 | 141 | | | | | | | | 1724 | 192 | |
| **Merchant Taylors**[31] | 1501 | | 84 | 1534 | | 97 | | | | 1699 | | 600 |
| **Haberdashers** | 1502 | 120 | 41 | 1595 | 1500 | | | | | 1615 | 1500 | |
| **Salters** | | | | | | | | | | 1708 | | 148 |
| **Ironmongers** | | | | | | | | | | | | |
| **Vintners**[32] | 1501 | 104 | 26 | 1537 | 132 | 33 | | | | 1610 | 148 | |
| **Clothworkers** | | | | | | | | | | 1739 | | 150 |
| Apothecaries | | | | | | | | | | | | |
| Armourers and Braziers | | | | | | | | | | | | |
| Bakers | | | | | | | | | | 1699 | | 146 |
| Barbers | | | | | | | | | | 1699 | | 195 |
| Basket-makers | | | | | | | | | | | | |
| Blacksmiths | | | | | | | | | | 1756 | | 220 |
| Bowyers | | | | | | | | | | | | |

29 Anne F. Sutton, "The Mercery of London: trade, goods and people, 1130-1578," Aldershot, Hants, England: Ashgate Publishing, 2005 at 459. [Dates from 1520-1581 only.]
30 William Ashley, Introduction to English Economic History and Theory, Part II, London: 1906, p. 65
31 Of the Merchant Taylors, "They are a most numerous and very rich company, composed of merchants, mercers, drapers, tailors, and some other trades;" Herbert, History of the Twelve Great Livery Companies of London, 1836, *supra*, p. 384. On p. 387 Herbert writes, "There are 300 on the Livery of Merchant Tailors, which is open to men of all professions," and that not ten are to be found amongst them who are tailors by trade."
32 Anne Crawford, History of the Vintners' Company, at pp. 76-77.

|  |  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|
| Brewers | 1469 | 100[33] |  |  |  |  |  |  |  |  |
| Broderers |  |  |  |  |  |  |  | 1699 | 135 |  |
| Butchers |  |  |  |  | 1699 |  | 218 | 1834 | 1600 |  |
| Carpenters | 1501 |  | 30 |  | 1628 | received[34] | charter |  |  |  |
| Playing-Card Makers |  |  |  |  |  |  |  |  |  |  |
| Plumbers | 1501 |  | 12 |  |  |  |  | 1699 |  | 54 |

Note1: Counsel originally compiled this chart in June, 2019. Counsel now sees he did not fully footnote the chart. Full footnoting would require retracing much of the work I did last June, and there is presently not sufficient time.
Note2: By the late 1800s the livery companies had largely ceased their economic functions and become social clubs. People who had no affiliation with the trade paid to get in.

## 2. <u>Why the Guilds/Livery Companies Could Get Dispensations</u>

In an age where mass taxation was extremely difficult due to administrative obstacles, the guilds and livery companies were wealthy and discrete targets of revenue for the government. In a symbiotic relationship, the monarchy created a very favorable business environment for the guilds in return for high taxes and periodic assessments. Part of the favorable business conditions for the livery companies included dispensations from laws that the various guilds found burdensome.

The basic way it worked was as follows. Suppose there was a national law stating that it was illegal to import wool from Flanders. This law was in place to foster the growth of a strong English wool industry. Then the monarch would grant a dispensation to the Mercer's Guild stating that only they could import wool from Flanders. With the dispensation, the Mercer's Guild had a monopoly on the extremely high quality wool imported from Flanders, and made monopoly profits. But note that while it was a monopoly to the Mercers Guild, since there were some 150 members of the guild at any given time, there were still a number of importers- it was not a

---

33 In 1469, the return of the Brewers to the muster for the City Watch was 210, being the highest of all, and ten more than that of the Mercers. So the Brewers had more members than the Mercers. These guilds did not have sufficient members to fill their watch quota, so they paid for extra people to meet their quota. One writer explained that that was how the paid police force started.

34 The Carpenters were "one of the Associations of comparatively late origin, which has never possessed any substantial standing as a trading body, and has within a measurable distance of time bidden for popularity and the means of subsistence by opening its ranks to all comers." Hazlitt (1892), *supra*, p. 593

monopoly to just one person. The Guild members paid a very large tax bill to the government each year, but the trade was so prosperous that many Mercers became very wealthy. Prime examples are the Boleyn family[35] and the de la Pole family.[36]

The English courts understood and upheld these arrangements between livery companies/trade guilds and monarchy. The court in *Thomas v. Sorrell* (1673) wrote that even though the *Case of Monopolies* (1602)[37] had banned royal dispensations that created monopolies,

> *If exportation, importation of a commodity, or the exercise of a trade be prohibited generally by Parliament, and no cause expressed of the prohibition, a licence may be granted to one or more without limitation to export or import, or to exercise the trade: for by such general restraint the end of the law is conceived to be no more than to limit the over-numerous exporters, importers, or traders in that kind, by putting them to the difficulty of procuring licences, and not otherwise, and therefore such general licences shall not be accounted monopolies.*

The "difficulty of of procuring licenses" probably means only members of livery companies/trade guilds can get the licenses, but the court writes that such licenses "shall not be accounted monopolies."

### 3. <u>Examples of Specific Dispensations to Livery Companies</u>.

Getting information about particular dispensations requires significant research. I have identified 3 dispensations granted to the Vintner's Company of London.  They received a dispensation from Queen Mary "from the Act of 1553." That statute is 7 Edward VI chapter 5, *The Act to Avoid Excessive Prices of Wine*.[38] This dispensation allowed all members to retail wine and

---

35 Geoffrey Boleyn, the grandfather of Anne Boleyn, was a member of the Mercers livery company in London who became immensely wealthy due to his shrewd dealings in the livery company system. In 1462, Geoffrey Boleyn bought Hever Castle from the Fiennes family. The Fiennes were an old family of Norman nobility and knights. Movie actor Ralph Fiennes is descended from this family. Hever Castle became the base of the Boleyn family.

36 William de la Pole (1290-1366) was a Mercer (wool merchant) from Hull who made an immense amount of money and became Chancellor of the Exchequer. Two points arise out of this: (1) that you didn't have to be part of the trade guilds (Livery Companies) in London to become extremely wealthy through the trade guild system; 2) the de la Pole family must have been wealthy before William, meaning wealthy merchant commoners prior to 1290 A.D., because such wealth and such an ascent into royal service could not be done in one generation. William de la Pole's descendants included several Earls and Dukes.

37 *Darcy v. Allein* (Allen) a/k/a *The Case of Monopolies* (11 Coke's King's Bench Reports 84)(1602)

38 Found in Statutes At Large, Volume II, London: Mark Basket, 1763 at p. 465.

keep taverns without an individual license, "notwithstanding the Act."[39]  The terms of the

dispensation imply that the Act required an individual license to retail wine or to keep a tavern.

The dispensation lapsed upon the death of Queen Mary in 1558.  In 1567, the Company received

Letters Patent from Queen Elizabeth that contained a much better dispensation, but along similar

lines. The Company engaged in substantial lobbying and distribution of bribes to obtain this.[40]

Then the decision in the the case of *Thomas v. Sorrell* (King's Bench 1673) explains that James I

issued letters patent bearing the great seal that contained a dispensation to the statute of Edward

VI, allowing any member of the Corporation of Vintners to sell wine in various locales. All of these

3 dispensations were to the same statute of Edward VI.  None were valid simultaneously.  It was 1

dispensation valid at any given time.

### 4. <u>Estimating The Number of Members of Livery Companies in London</u>

A person who had "the freedom" of London is considered by modern scholars to have been

a citizen of London. To be eligible for the freedom of the city in the 1400s, you had to be one of

three things: a member of a guild, own substantial property within the walls (property

qualification) or have a substantial income, generally £40 per anum or above. Therefore, during

1341-1688, only a fraction of London's population were considered citizens.  A similar situation

prevailed in the other cities and large towns. In rural areas, as of 1225 only some 10% of the

population of commoners was considered free; the rest were serfs bound to a local landowner.[41]

For simplicity and to avoid underestimating the number of dispensations, I will proceed

considering all citizens of London as members of a livery company and eligible for a dispensation.

---

39  Anne Crawford, A History of the Vintners' Company, London: Constable & Co., 1977 at p. 62.
40  Crawford, History of the Vintners', *supra*, at p. 65.
41 Being free did not mean you could vote. By a system that developed after a statute of 49 Edward III (1376), the vote in London was restricted to the wealthier members of the livery companies. They had a monopoly of suffrage for most city offices and all the members of Parliament representing London. This system may have continued even the Reform Bill of 1832. (William Herbert, History of the Twelve Great Livery Companies of London, London: The Library, Guildhall, 1834 at 32.  Herbert's book was published in 1834, yet he states that the system "has continued to the present time.").

This will yield the most generous estimate of royal dispensations for comparison to the numbers of dispensations issued under DACA.

In the early 1400s, there were an estimated 3,000 citizens of London.[42]  We will take that as the number of livery company members who would benefit from a dispensation at that time. Hazlitt, writing in 1892, estimated 20,000 members of all 73 livery companies in London at that time.[43]   By 1892, it is possible that membership in the livery companies had declined because the industrial revolution and increasing use of the division of labor had reduced the need for highly skilled tradespeople. Therefore, for 1650, I estimate a higher number of members at 30,000. This is to avoid an underestimate in the number of dispensations issued.

## Chart B

| Year | Number of Citizens of London Who Could Receive a Dispensation |
|------|----------------------------------------------------------------|
| 1340-1370 | 2,500    (Black Death hits in 1348. |
| 1370-1400 | 2,500   The next 200 years are known as the "plague centuries." |
| 1400-1430 | 3,000   Repeated outbreaks of plague kept population low in |
| 1430-1460 | 3,000   the entire nation.) |
| 1460-1490 | 3,000 |
| 1490-1520 | 3,000 |
| 1520-1550 | 5,000 |
| 1550-1580 | 10,000 |
| 1580-1620 | 15,000 |
| 1620-1650 | 20,000 |
| 1650-1680 | 30,000 |

Summing the table gives 87,000 Livery Company (trade guild) cumulative members for London during the period 1341-1688.

The above table estimates the number of livery company members eligible to receive a

42 Anne Sutton, "The Mercery of London: trade, goods and people," *supra*,, p. 182.
43 W. Carew Hazlitt, The Livery Companies of the City of London, London: Swan Sonnenschein & Co., 1892 at p. 83.

dispensation at any given time in 30 year intervals. I choose 30 years as the amount of time a master tradesperson would work.  A typical career would start at age 16 with a 7 year apprenticeship, then entry to the guild/livery company at age 23 as at the freeman rank (also known as a "yeoman"), then after 10 years, entry into the livery of the company if the person had sufficient wealth. I estimate the average tradesperson would work until age 53.[44]

### 5. Number of Guild Members in the Rest of England and Wales

Table 10. *The urban population<sup>a</sup> of England and Wales, 1520–1851*

| Year | Total urban population (1000s) | Urban population without London (1000s) | London (1000s) | England and Wales (1000s) | Urban population as a proportion of total (%) |
|---|---|---|---|---|---|
| c. 1520 | 155 | 95 | 60 | 2500 | 6.2 |
| c. 1600 | 343 | 93 | 250 | 4100 | 8.4 |
| c. 1700 | 812 | 282 | 530 | 5200–5500 | 14.8 to 15.6 |
| c. 1750 | 1200 | 525 | 675 | 6140 | 19.5 |
| 1801 | 2314 | 1354 | 960 | 8892 | 26.0 |
| 1851 | 8028 | 5665 | 2363 | 17927 | 44.8 |

<sup>a</sup> Living in places of more than 5000.

Source: David B. Grigg, Population Growth and Agrarian Change: An Historical Perspective, London: Cambridge University Press, 1980, page 95.

The table above informs us, by comparison of columns 2 and 3, that the urban population in the rest of England and Wales, outside of London, was 61% of the total urban population circa 1520, 27% circa 1600, and 34% circa 1700 (which will serve as a proxy for 1688). So the average urban population in the rest of Great Britain was was 41%.  On average, London had 59% of Great Britain's urban population.

### 6. Final Calculation Based On the Foregoing Paragraphs.

We want to arrive at an estimate derived from population figures for membership in trade

---

44  The may require alteration in the future when I do more research on life expectancy in England in this time period.

guilds  in the rest the country, then add that to the number we have for London (87,000) to arrive at an estimate of the total number of trade guild members in the entire kingdom of England and Wales. We will assume that that people in the rest of the kingdom joined trade guilds in comparable proportion as in London. So, if London had 87,000 cumulative trade guild members from 1341-1688, what number did the rest of England and Wales have? The formula is 87,000=.59x   The result is x=60,457. Adding the two numbers gives us a total of 147,457 trade guild members in England and Wales for the years 1341-1689. London had 59% of those for 87,000 members. The rest of the kingdom had 60,457.  60,457 does equal 41% of 147,457.

The estimated number of trade guild/Livery Company members in the entire kingdom is simply the addition of the London figure with the outside London figure, yielding 147,457. If each livery company always had 2 dispensations active during the years 1341-1688, then the total number of cumulative dispensations was 294,914.

I estimate that each livery company always had 2 dispensations active due to the clout yielded by their symbiotic relationship with the Crown, but modified by their own power in Parliament so they had a good chance to prevent passage of laws they deemed objectionable. Why did the Livery Companies/Trade Guilds have such clout in the Commons?  First, they controlled all the seats for London. During the time in question livery companies had a monopoly on the right of suffrage in London. *See* Footnote 37. Second, if such was the case for the other guilds in their respective cities or towns, then there would have been a great many MPs in the Commons who were either wealthy tradespeople themselves who stood for Parliament and were voted in by their fellows, or people who owed their seats to the guilds/livery companies and voted as the guilds/livery companies requested.

### 7. Verifying that the Numbers of Guild Members Outside of London is Reasonable

Available information confirms the reasonableness of estimates in the previous

paragraphs as to the population of guild members outside of London. Hazlitt (1892) explains that there was an extensive guild membership in towns outside of London. In Bristol, Coventry, Newcastle-on-Tyne, Norwich, and York there were over 150 guilds, some of which were "bodies of great dignity and opulence."[45]  In many towns, the number of persons in any particular trade was small, so there was a tendency for guilds to amalgamate.[46] In the town of Preston in 1628, "the most part of the tradesmen" formed "Wardens and Company of Drapers, Mercers, Grocers, Salters, Ironmongers, and Haberdashers."[47] Getting more information on these guilds would require extensive research, however, the tables below confirm the estimates used herein.

**Guild Membership in Norwich Compared to the Number In London**[48]
Year: 1569   Population of Norwich 13,000. Population of London: 60,000  Population Ratio: 21%
So In Any Trade, Norwich should have 21% the number of guild members as London.

| Trade Guild | Norwich Membership | Membership in London Equivalent Trade circa 1569 | Ratio Norwich/London |
|---|---|---|---|
| Mercers | 48 | 203 | 24% |
| Tanners | 34 | 141 (1537- Skinners) | 24% |

Note1: I can only include trades for which I have comparable data.
Note2: Skinners seems close enough to tanners in their function that the two guilds might have similar numbers.
Note3: Source for London data is Chart A.

For the above chart, we expect 20% based on the population ratio between the two cities. Where we have data, we find 24% based on trade guild membership.

**Guild Membership in Coventry Compared to the Number In London**[49]
Year: 1448   Population of Coventry in 1560: 6,600.   London in 1520: 60,000  Population Ratio: 10%
So In Any Trade, Coventry should have 10% the number of guild members as London.
The population in 1448 would have been about the same as in 1560/1520 because 1348-1548 were the "plague centuries."  Population was significantly reduced by the plague starting in 1348, and did not recover until the plague passed.

| | Coventry | London equivalent | Ratio Coventry/London |
|---|---|---|---|
| Drapers | 59 | 96 (1415) | 6% |

45 Hazlitt (1892), *supra.*, at pp. 72-73.

46  Stella Kramer, The Amalgamation of the English Mercantile Crafts, The English Historical Review, Vol. 23, No. 89 (January, 1908), pp. 15-34.
47 William Ashley, Introduction to English Economic History and Theory, Part II, London: 1906 at 79.
48  J.F. Pound, The Social and Trade Structure of Norwich 1525-1575, Past & Present, No. 34 (July 1966), pp. 49-69.
49 Ronald M. Berger, Most Necessary Luxuries: The Mercers' Company of Coventry, 1550-1680, Penn State University Press, 1993 at p. 108.

| Smiths | 49 | 198 (1477)  Goldsmiths only | 25% (if Blacksmiths, Silversmiths were added, the ratio would be closer to 10%) |
| Mercers | 38 | 74 (1474) | 5% |
| Skinners | 9 | 141 (1537) | 6% |

Note1: I can only include trades for which I have comparable data.
Note2: Source for London data is Chart A.

For the above chart, we expect 10% based on the population ratio between the two cities. Where we have data, we find about 6% based on trade guild membership.

In summary, the expected ratios based on population numbers compared to actual ratios based on membership numbers are not far different. This means that the population-based estimates from the previous section of the number of trade guild members in all of England should be reliable.

Summing the numbers from the sub-sections in this section results in a total of 317,874 dispensations issued by all the Kings and Queens of England[50] from 1341-1689.

## VI. **Comparison To Obama Administration.**

In just 4 years, the Obama administration issued 1,500,000 dispensations in the form of DACA grants. This astoundingly exceeds the estimated 318,000 estimated dispensations granted by the English monarchy in the 347 years from 1341-1689. Moreover, every one of the of the DACA dispensations would have been unlawful and void under English law because none of the dispensations had the required *non obstante* ("any other law notwithstanding") clause.

## VII. **A Ban On the Dispensation Power Has Been Incorporated Into U.S. Law**

The ready objection to the entire discussion of DACA as a mass dispensation program is that the dispensation is a concept from the law of Great Britain that has no application to the United States. On the contrary, the concept of the dispensation has already been made part of

---

50  Since Wales was a part of the kingdom since the 1200s, it should technically read "Kings and Queens of England and Wales."

American law in two authoritative early cases, and is entirely relevant to American law because it speaks to the separation of powers.

The majority in the Supreme Court case *Kendall v. United States ex rel. Stokes* 37 U.S. (12 Pet.) 524 (1838) considered and emphatically rejected the dispensing power.[51]  Supreme Court Justice William Patterson discussed the dispensation power at length in *United States v. Smith* 27 F. Cas. 1192 C.C.D.N.Y. (1806). While it is not a Supreme Court decision, *Smith* is a court record of the thinking of a  Supreme Court Justice who was appointed by George Washington himself and who was a solid participating delegate at the Constitutional Convention as well as signatory to the Constitution. If anybody should know about how the separation of powers is supposed to work, Patterson is that person.

Patterson held in *Smith* that the power of dispensation is prohibited to the President of the United States or any high government official. (And if not allowed to the president or high-level officials, it would make little sense to allow it to middle and low-level officials.)

> *the president does not possess a dispensing power.  ...  The president of the United States cannot control the statute, nor dispense with its execution, and still less can he authorize a person to do what the law forbids.* ***If he could, it would render the execution of the laws dependent on his will and pleasure;*** *which is a doctrine that has not been set up, and will not meet with any supporters in our government. In this particular, the law is paramount.*[52]

So the dispensing power, which Patterson firmly states the president does not have, is the power to grant a license to a citizen or citizens to take an action that is otherwise made illegal by statute. Patterson also stated it is *"the extraordinary privilege of authorizing a person to do what it* [the statute] *expressly prohibits."*[53]  These conceptions are in close agreement with the definitions

---

51  Christopher N. May, Presidential Defiance of Unconstitutional Laws: Reviving the Royal Prerogative, Hastings Constitutional Law Quarterly, Volume 21, No. 4. pp. 867-1011, at 899. May discusses <u>Kendall</u> and also <u>U.S. v. Smith</u>.

52  Patterson also decries the dispensing power a page earlier in the decision, but I omit that quotation because he brings in the Take Care Clause, which is not necessary to decide this case. The case can be decided on separation of powers grounds alone.

53  *United States v. Smith*, at p. 1231  Case No. 16,342 in National Reporter System, United States Service, The Federal Cases, Book 27. St. Paul: West Publishing Co., 1896 at pp. 1192-1245.

fielded earlier in this brief in the discussion of the English cases, and to the facts of DACA as discussed in Section III.

Smith (1806) and Kendall (1838) are cases from the pre-civil war Republic. The subject-matter of those cases was in no way related to slavery, so that their doctrine need not be jettisoned. So dispensation doctrine is a part of U.S. law, *emphatically in the negative*.


## VIII. **A Mass Dispensation Power is Destructive of the Separation of Powers**

A mass dispensation power allows the president to lacerate any statute with thousands or millions of cuts. If there is a law that all smokestacks must emit no more than 75 parts per billion of sulfur dioxide, with the magic of laser printing, the president can issue a dispensation to each of 100 thousand emitters and thereby render the law ineffective. It would make the function of the criminal justice system far more difficult because  many criminals would claim their activity had been approved by some government official. It would also open up our nation to innumerable scams run by government officials. A government official could authorize some group of cronies to violate a law, perhaps a law against the dumping of toxic waste, and then remit to the official some portion of the money the violators saved by not needing to dispose of the waste properly. When the authorities initiate prosecution of the scheme, the violators would plead innocence on the ground that their activities were approved, as in they had a license to violate the law.

Even the power to grant a single dispensation is dangerous. The importation of Cuban cigars was banned by executive order on February 7, 1962. Because it was done by executive order, President Obama had the lawful ability to ease that ban, which he did beginning on January 1, 2015. But imagine that the Cuban cigar ban was done by statute and was still in full effect. A President Fred Flintstone could issue a dispensation stating that only Barney Rubble can import Cuban cigars to the United States. The law remains in effect, and only Rubble has a license to

violate it. Rubble becomes a billionaire thanks to the huge demand for Cuban cigars. In the text of the dispensation, President Flintstone requires 25% of net revenues to be paid to him. President Flintstone would secure a revenue stream for himself independent of any congressional appropriation. In fact, this is what the English monarchs were doing with the dispensation power- even the hallowed Queen Elizabeth I.[54] They were doing it by monopolies on the importation of Irish yarn, Spanish wool, and playing cards, but with the same intent and outcome. The English monarchs were granting dispensations to favored parties, thus benefiting persons and themselves. With DACA, the Obama administration granted massive numbers of dispensations to the benefit of persons and Obama himself in his re-election bid.[55] The available evidence indicates that Obama reacted to pressure from certain interest groups, and a desire to win approval from certain people.[56]

## IX. **A Limited Dispensation Power Is Allowable In Our Post-New Deal Government**

A major difference between the era of *Smith* (1806), *Kendall* (1838) and today is that our society is more complex, the machinery of our government is vast and called upon to do far more things than the pre-Civil War government, and our laws are more numerous and complex.

Due to the limits of human cognition in drafting laws, in some circumstances the law works a gross injustice that is clearly not the intent of the legislature, and it is not feasible for Congress to amend each law rapidly in response to every circumstance when there are individuals who need a resolution of their situation reasonably quickly.  Locke also provides

---

54  See William Hyde Price, The English Patents of Monopoly, Boston: Houghton Mifflin and Company, 1906  pp. 145-149; and  See Darcy v. Allen (11 Coke's King's Bench Reports 84)(1602) (a/k/a The Case of Monopolies).

55  See, Julia Preston, While Seeking Support, Obama Faces a Frustrated Hispanic Electorate, New York Times, June 10, 2012 and Miriam Jordan, Anatomy of a Deferred-Action Dream, Wall Street Journal, 10/14/2012, "In an election year in which his future might turn on Hispanic votes," [the last thing Obama needed was] "young, illegal immigrants who decided to step out of the shadows" ... "agitating, with increasing volume and sophistication..."

56  Peter Wallsten, *President Obama bristles when he is the target of activist tactics he once used*, Washington Post, June 10, 2012. The second half othe article is more informative, beginning with"Tensions mounted when Obama argued that his administration's policy was to focus on deporting criminals and others deemed to be security threats." The article also adds to coverage of the electoral calculus.

rationales in §§159-160 of his *Two Treatises on Government* (1689), "for since many accidents may happen, wherein a strict and rigid observation of the laws may do harm" and "because it is impossible to foresee, and so by laws to provide for, all accidents and necessities that may concern the public."

It is important to note that the monarch was not allowed to dispense with things that were *malum in se* (bad in and of themselves) which meant nearly all criminal statutes. So the king could not lawfully issue someone a document authorizing one person to kill another over a private matter.[57] And no U.K. minister nor U.S. agency nor government official should be allowed to issue such a dispensation.

The king could only dispense with *mala prohibita*- things that were not inherently wrong but were made so by legislation. Immigration happens to be an example. It certainly is not wrong for a person to want to take up residence in a new country. However, nations have the sovereign right to control their borders, and place limits on who may enter. Because immigration is only a *mala prohibita*, it is a statute that the monarch could dispense with.[58]

In the above framework, in a limited number of cases, a dispensation power may be allowed. The big question is, how many dispensations might any given agency be allowed to hand out in any given year?

The section that yielded the estimated number (about 200) had to be cut from this brief due to space limitations. Counsel hopes to have a book in pre-print in sufficient time to be of use to this court.  But whatever the number of allowable dispensations by any given agency, 1.5 million dispensations issued by one agency in 4 years is clearly far too many.

---

57 Distinction Between Malum Prohibitum and Malum per Se (1495), a case note that terminates with *Quod Nota per Fineux Chief Justice*   [That Note [Written] By Fineux Chief Justice].  The author can only be Sir John Fineux (or Fyneux) (c. 1441 – 1526), who was Chief Justice of the King's Bench from 1495-?1526.
58 Ibid.

## X. <u>With 1.5 million dispensations issued, DACA is probably the greatest constitutional violation ever perpetrated by any president</u>

With 1.5 million dispensations issued, DACA is probably the greatest constitutional violation ever perpetrated by any president.  The Obama administration called it prosecutorial discretion. Discretion has degenerated into despotism.[59] The larger point is that U.S. law has lost sight of the dispensation concept, and we need to correct this as many other instances of agency and White House practice that we call "waiver" and "discretion" may go beyond what is constitutionally sound.

Some will argue that DACA was done to help people, so it is not that bad. Plato had something to say about that sentiment:

> *At first, in the early days of his power, he is full of smiles, and he salutes every one whom he meets; --he to be called a tyrant, who is making promises in public and also in private! liberating debtors, and distributing land to the people and his followers, and wanting to be so kind and good to every one!*  Plato, Republic, Book 8.

Should DACA be allowed to stand, history will view it as a definitive step on the path to tyranny.

## XI. <u>The Rule of Law is Essential For Economic Growth, Meaning that An Unconstitutional DACA Program Is Not In the Best Interests of the Dreamers</u>

Ultimately, a DACA program that violates the law and the Constitution is not in the best interests of the Dreamers. There are many organizations that rank the nations of the world

---

[59] Paraphrase of something at 16 Parliamentary History of England 257, London: Hansard, 1813. The passage is dated to December, 1766. It is characterized as "a long Debate, the distinct speeches of which have not been preserved: but the arguments were thrown into the form of one Speech." I was directed to the speech by Michael McConnell et al., Brief of Governor Abbott *et al.* As *Amici Curiae* in Support of Respondents, United States of America petitioners v. State of Texas et al. respondents, submitted April 1, 2016 in the Supreme Court of the United States, No. 15-674.  The circumstances of the speech were explained on pp. 247-248 of Hansards, partially in editor's comments and partially in the speech: The harvest failed "in all parts of England" due to heavy rain. Parliament was not session. On September 10, the King prorogued (delayed) the meeting of Parliament from September 26 to November 11. On September 26, the King banned by Proclamation the export of wheat and wheat-flour (which they call an "embargo"). This export ban is stated to be contrary to statutory law. So what the King had done was suspend the laws allowing the export of wheat and wheat-flour. (It was no exemption of particular persons; everybody was entitled to act as if the law did not exist.) Allies of the monarch in Parliament brought a bill indemnifying the ministers and government officials who had implemented the export ban, needed because these people had violated statutory law. Many in Parliament were furious because if the King hadn't prorogued Parliament, then Parliament could have met that very day the King made the Proclamation (Sept. 26) to consider the matter and take appropriate action. The point was that the need for the King to suspend the law as brought on by the King's own ill-considered action to order the delay in the Parliamentary Session.

according to the quality of their rule of law. Typically, nations such as Denmark and Finland receive top ranking, while nations like Zimbabwe and Venezuela are at the bottom. The World Justice Project is one organization that publishes a Rule of Law ranking.[60] If one views the 2019 version, the United States is not ranked all that high. The U.S. is far outranked by Canada. If the U.S. falls in rank just a little bit, we will be in the company of Chile, Slovenia, Poland and Italy. Not to disparage those nations, but didn't we think we were better than that?

One of the leading analyses of the effect of the rule of law on economic growth is by Barro and Sala-i-Martin (1999).[61] They rank the nations of the world on a scale from 0 to 6, so it is a 7 rank scale: 0,1,2,3,4,5,6.  Barro and Sala-i-Martin's statistical analysis finds that each rank higher on the scale is worth approximately 0.4% of economic growth per year. Due to compound growth, if a nation enjoys 1 rank improvement in the rule of law scale, it's economy will be 22% larger after 50 years, 49% larger after 100 years, and 122% larger after 200 years.  It is clear that over time, the quality of a nation's rule of law is crucial to economic performance.

It is logical that if a nation loses the quality of its rule of law and declines by one rank on the scale, that would be a hit to economic growth of 0.4% per year. DACA is a degradation of the rule of law. If DACA is allowed to stand, 50 years from now, we could see our economy 22% smaller than it otherwise could have been, after 100 years 49% smaller and so on.

If we allow our rule of law to degrade, will our economy be able to generate enough jobs for the Dreamers and ourselves? The parents of the Dreamers brought their children here to part of the 'Shining City on a Hill.' It would be terrible if, in their old age, the Dreamers found

---

60  The 2019 version of the World Justice Project's Rule of Law Index is currently available at: https://worldjusticeproject.org/sites/default/files/documents/ROLI-2019-Reduced.pdf

61  Robert J. Barro and Xavier Sala-i-Martin, Economic Growth, Cambridge: MIT Press, 1999 at p. 440. This a durable finding of mainstream economics. Another article that finds the same result is Acemoglu, Johnson, and Robinson, *The Colonial Origins of Comparative Development: An Empirical Investigation*, American Economic Review, Vol. 91, No. 5 (Dec., 2001), pp. 1361-1401 and their earlier article has an additional confirmatory statistical result: Acemoglu et al., *The Colonial Origins of Comparative Development: An Empirical Investigation*, NBER Working Paper 7771, June 2000.  In the June 2000 paper, column 1 of Appendix Table A4d is where the rule of law-economic growth result is. Unfortunately, there is no time now for counsel to re-read to the 2001 article to find the exact spot where the result is.

themselves living in a 'Trash Heap at the Bottom of a Hill.' Moreover, that DACA is destructive of the rule of law and therefore of our economic dynamism is a betrayal of certain people who only recently have gained the opportunity to advance and enjoy the bounty of this country. Now the whole upward trajectory is put in jeopardy by DACA.

Through history, nations have been typically unified by a common history, common ethnicity, common language, and common religion. In the United States, these things are lacking to varying degrees. In our situation, shared institutions become even more important.  A shared adherence to the Rule of Law and to the Constitution is now as important as it has ever been.

## XII. <u>Lawful Option #1: Release As Encountered by CBP and ICE on a Case-by-Case Basis</u>

Obama could have done- parole+work authorization[62] on a case-by-case basis as Dreamers were encountered in regular CBP and ICE enforcement. The Obama administration's grounds for the action would have been significant public benefit--- we paid for their education so get them working and adding to our economy, they are young and do not contribute to health costs, and get them paying into social security. But this would not have satisfied the interest groups that were pressuring him, nor would it have satisfied his personal friends mentioned in the articles cited

## XIII. <u>Lawful Option #2: The CARR Proposal</u>

It is well worth noting that if this court voids DACA, even if Trump wins the 2020 election, there still will probably not be a harsh outcome for DACA recipients. Trump has tweeted "I love these kids!" and the plaintiff states had to threaten to sue the Trump administration before Trump finally rescinded the DACA memorandum some 9 months into his term *See* Brief of Plaintiff states submitted 10/9/2020 at pp. 14-16.

If this court decides to rule DACA illegal and enjoin it, the winner of the 2020 presidential election may have an option to do a lawful DACA-type program. Call this option CARR for "Childhood Arrivals Rescind and Replace."  The CARR option here proposed will be closely based

---

62  USCIS Policy Manual last updated 10/15/2020  https://www.uscis.gov/policy-manual/volume-10-part-b-chapter-2

on statute  will take longer to implement than DACA's method of just reviewing the paperwork.

I have tried to explain above why it is so important to do any DACA-type program according to the law. While the CARR proposal does require the hiring of additional personnel to adjudicate the cases, I will present ideas for how to pay for and accomplish that after the proposal. Also, while this CARR proposal seems complex, calculations indicate it can be completed in 429 days.

### A. <u>CARR (Childhood Arrivals Rescind and Replace)</u>

If DACA is ruled void and is enjoined, as the DACA cards of the current DACA recipients expire, DACA recipients will revert to being inadmissible under 8 USC §1182(a)(6), titled "Inadmissible aliens." That they are inadmissible under the law is precisely why they now utilize DACA. If they had another option under the law, they wouldn't be a DACA recipient.

In the CARR program, each current DACA recipient, being an inadmissible alien, would then, according to statute, become an "applicant for admission." Each expiring DACA recipient would, by appointment made well in advance, present themselves to an immigration officer for inspection. In this way, CARR adheres to §1225(b)(2)(A), which requires the inspection of any alien who is an applicant for admission. That sub-section continues, if the examining officer determines that the alien "is not clearly and beyond a doubt entitled to be admitted," the person "shall be detained for a proceeding under section 1229a."

So each prospective CARR recipient goes before an immigration officer and under the law, each person is not entitled to be admitted, so they must move on to the stage of a hearing under §1229a. In the CARR plan they would be *temporarily* detained in terms of being in a waiting room for a few hours while they wait for their hearing before an immigration judge also scheduled for that very day. The immigration officer would just tell them at the end of the 1225(b) hearing to consider themselves detained and wait to be called for the hearing before the immigration judge.

36

The former DACA recipient should willingly abide by the detention order because the vast majority of them will receive good news at their 1229a hearing.

At a §1229a proceeding, an immigration judge decides upon whether the alien is admissible or deportable. The proceeding may take place in person, through video conference, by telephone, and if both the government and the alien consent, the alien is allowed not be present. This means if there are exigent circumstances, the Dreamer may be excused from attending this hearing. §1229a(a)(3)  states that "Unless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States" and I am aware of no provision that could exempt Dreamers from this hearing.

Under the CARR proposal, the next step at the §1229a hearing is that the immigration judge will, follow statutory law and declare the former DACA recipient to be inadmissible and order them removed. But this is only a formality. The immigration judge will immediately approve the individual for an EAD according to the words in bold below (emphasis added):

§1231. (a) Detention, release, and removal of aliens ordered removed
(7) Employment authorization No alien ordered removed shall be **eligible to receive authorization to be employed in the United States** unless the Attorney General makes a **specific finding that—**
(A) **the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien,** or
(B) **the removal of the alien is otherwise impracticable or contrary to the public interest**."

Here, the immigration judge would be acting on behalf of the Attorney General (now Secretary of Homeland Security) and pursuant to an Executive Order that establishes the CARR program. This Executive Order would be constitutional because it would closely adhere to the statutory procedure and text.

By an Executive Order that carefully lays out the reasons, it will be 1 of the 3 grounds listed in 1231(a)(7), or a combination thereof as the rationale for declaring the alien (Dreamer) to be

37

eligible for an EAD. If the Court is skeptical of what follows, be aware that even if Trump wins the 2020 election, he has tweeted "I love these kids!" and the plaintiff states had to threaten to sue the Trump administration before Trump finally rescinded the DACA memorandum some 9 months into his term *See* 10/9/2020 brief of plaintiff states at pp. 14-16.

The 1st rationale is "(A) the alien cannot be removed due to the refusal of all countries designated by the alien or  under this section to receive the alien." The incoming president could negotiate a deal with the various countries that are the source for DACA recipients that the nations will bar Dreamers from returning to their countries of origin in return for various things the United States wants. If Trump wins, he could negotiate a hemisphere-wide "Remain in Mexico" program. He explain that the Venezuela refugee crisis is about to get a lot worse, and the deal will keep millions of people out of the U.S. at a time when unemployment is very high, and government budgets are in deficit throughout the country. Such a deal would invoke the president's foreign policy power so that courts would have to give it substantial deference.

The 2nd rationale is that "the removal of the alien is otherwise impracticable." In the past 20 years, the highest number of "aliens removed" that DHS has achieved was 432,281 during the year 2013. Even if the number of removals rose to 500,000, it would still take 24 years to remove the generally estimated 12 million illegal migrants in the United States. As they were brought here by their parents and therefore are not at fault, and since the United States could benefit from their presence under the 3rd rationale below, the Dreamers are the lowest priority for removal so it is rational to move on to aliens who really deserve to be deported.

The 3rd rationale, that "removal of the alien is … contrary to the public interest," is a similar rationale as offered by the Obama administration.  We paid for their K-12 education, they people are young so they don't use our healthcare system much, by working they pay into social security, and we might as well keep them here to benefit from their talents and energies. As I write this in

38

October of 2020, due to the massive U.S. unemployment from COVID-19, this is a harder idea to sell. But some of their countries of origin are even harder hit.

So at the §1229a proceeding, the immigration judge will be under an Executive Order to find that all former DACA recipients who have not committed fraud in their DACA applications and who continue to have clean criminal records be ruled "eligible to received authorization to the employed in the United States." The §1231 allowance to issue employment authorization implies an allowance to allow the alien to remain in the United States. The ability to be employed here cannot exist without the ability to be present here.

If 500 immigration officers and 500 immigration judges are assigned to the CARR proposal, and they each do 3 hearings a day, that is 1500 hearings per day. Since there are currently approximately 643,560 DACA recipients,[63] it would take 429 days to complete all the adjudications. Since DACA grants last 2 years, and would only expire at the end of their 2-year terms, there would be plenty of time to implement the CARR proposal. The DACA recipient with cards expiring soonest would go first so they are not without cards. In the leadup to CARR, immigration officers can prepare the files of all DACA recipients, and do checks for fraud in the existing applications.

Calling for 500 immigration officers and 500 immigration judges to do this is not so far-fetched.  Significant processing fees would help pay for this program, and it is assumed that pro-migrant private organizations will assist Dreamers with these fees. My recollection is that I read that some 350 USCIS personnel have been employed to process DACA applications. This CARR proposal would require that those personnel be transferred to the lawful DACA-type program, and an additional 150 immigration officers be assigned or hired.  This proposal also requires the hiring of 500 immigration judges "to get CARR done," and then afterwards retaining these

---

[63] "Approximate Active DACA Recipients: As of March 31, 2020" retrieved from the USCIS "Citizenship and Data" page, https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data.

immigration judges in order to expedite working through the existing backlog of 700,000 immigration cases.

Democrats might agree to the hiring 500 immigration judges if the opinion of John Sandweg, who served as the acting director of ICE under the Obama administration, is any indication of how Democrats feel. He stated to The Hill in 2018, ""Nobody's going to get elected saying 'I'm going to solve the border crisis by hiring a lot of immigration judges,' but the simple reality is…hire more immigration judges."[64] However,  if it is needed so the Dreamers can lawfully stay and work, then it becomes an election talking point for Democrats. Keeping the judges on after CARR will enable the immigration agencies to get through the 700,000 case backlog, and that will be a talking point for Democrats who can say that they resolved the immigration status for hundreds of thousands of people who had been left hanging for many years.

Republicans can say they upheld the rule of law and with the 500 extra judges our nation will eliminate the backlog of phony asylum claims amongst the 700,000 cases awaiting a hearing, and the U.S. will be able to deport illegal migrants more expeditiously in the future.

The CARR proposal does not necessarily reflect the policy choice I would advise. Since to the knowledge of this counsel, nobody has ever explained how to do a lawful DACA program, this brief seemed to be the appropriate opportunity.


Dated: October 29, 2020                                    Respectfully Submitted,

                                                    ____/s/ Charles Breiterman_____
                                                    Charles Breiterman
                                                    N.Y. Bar #4513685
                                                    45 East 89 Street #24B
                                                    New York, NY 10128
                                                    Tel. 917-528-0474
                                                    BreitermanLaw@gmail.com

---

64 The Hill, Former ICE chief: Hire more immigration judges (video), 8/1/2018.
   https://thehill.com/hilltv/rising/399910-former-ice-chief-hire-more-immigration-judges

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of October, 2020, I caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


_____/s/ Charles Breiterman_____

Charles Breiterman