# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3   STATE OF TEXAS, et al.,      *
           Plaintiffs             *
 4   VS.                          *
                                  *
 5   UNITED STATES OF AMERICA,    *
     et al.,                      *    Case No. 1:18-CV-68
 6        Defendants,             *
                                  *
 7   and                          *
                                  *
 8   KARLA PEREZ, et al.,         *
          Defendant-Intervenors   *
 9

10   ********************************************************

11             ORAL AND VIDEOTAPED DEPOSITION OF
                        MARY FRANKLIN
12                     OCTOBER 5, 2020
                     (Reported Remotely)
13
     ********************************************************
14

15             ORAL AND VIDEOTAPED DEPOSITION of MARY
     FRANKLIN, produced as a witness at the instance of the
16   Defendant-Intervenors, and duly sworn, was taken
     remotely in the above-styled and numbered cause on the
17   5th day of October, 2020, between the hours of
     11:40 a.m. and 2:12 p.m., before TRICIA FOX WILLIAMS,
18   CSR, in and for the State of Texas, reported by machine
     shorthand, at 700 Main Street, Little Rock, Arkansas, in
19   accordance with the Federal Rules of Civil Procedure,
     the State of Texas 26th Emergency Order Regarding the
20   COVID-19 State of Disaster, and the provisions stated on
     the record or attached hereto.

21

22

23

24

25
```

```
 1      Q.    Okay.   And have you seen this document before
 2  today?
 3      A.    Yes.
 4      Q.    Okay.   Now, do you understand that you've been
 5  designated to testify as Arkansas's representative with
 6  respect to the topics; one, and it has subtopics, two,
 7  three, four, five, six, seven, eight, and then also
 8  topics 10 through 17?
 9      A.    I understand that I have been designated
10  beginning with No. 2.
11      Q.    Okay, let's go back up.   Okay.   Are you
12  prepared to answer questions today on topic one?
13      A.    No, I am not, that expert is a contractor with
14  DHS.
15      Q.    Okay.   Understood.   So I will just ask you what
16  you do know about the contractor with DHS and the
17  functions, I'm just going to make a note.   All right.
18  Before we get to that, I'd like to know if there's any
19  testimony that you gave me when I took your deposition
20  last year that you would like to change today.
21      A.    Not that I'm aware of at this moment, no.
22      Q.    And so when you testified last year in your
23  deposition, you gave me information that was accurate to
24  the best of your knowledge; is that correct?
25      A.    Yes.
```

```
 1   the "vague."  Go ahead.

 2        Q.    (By Ms. Perales)  Do you happen -- well, okay.

 3   Ms. Franklin, do you know what this document is used for

 4   by Arkansas DHS?

 5        A.    The document is used -- the purpose of the

 6   document, I believe, is to document how a process works

 7   in the eligibility system, and it's updated if a change

 8   is made to it.

 9        Q.    Okay.  Do you know if this document sets forth

10   all of the information that is maintained in the

11   Arkansas eligibility system about immigration status of

12   beneficiaries?

13              MR. DISHER:  Objection, vague.

14        A.    I do not.

15        Q.    (By Ms. Perales)  Okay.  Let's see, I'm going

16   to go to a specific page, I just have to find it.  I

17   think it might actually help me to make this a little

18   bit smaller so I can see what I'm doing here.  Okay.

19   I'm going to go to the page numbered Bates STATES 838.

20   Okay.  So here we have page 838, and on this page it

21   talks about people who are exempt from the individual --

22   individuals who are exempt from the Medicaid five year

23   bar, and then it has a list of categories.  Is this list

24   something that you're familiar with?

25        A.    Yes, there is a similar list in the Medicaid
```

```
 1   question.  Do you happen to know what the eligibility
 2   system says about a person in terms of their eligibility
 3   if they have an I-797?
 4                   MR. DISHER:  Objection, vague.
 5       A.   It depends on -- it depends on what that
 6   specific information is, and whether or not it's enough
 7   information to determine eligibility.
 8       Q.   (By Ms. Perales)  Do you happen to know if
 9   someone has an I-797, whether the eligibility system
10   records them as having deferred action?
11                   MR. DISHER:  Objection, vague.
12       A.   Again, we're getting too deep in the details of
13   exactly what comes back from the hub, and exactly how
14   the eligibility system is updated.
15       Q.   (By Ms. Perales)  Okay.  So are you able to
16   testify about how the eligibility system interprets
17   information that's coming back from the hub and makes an
18   eligibility determination?
19                   MR. DISHER:  Objection, vague.
20       A.   So this document -- I feel like this document
21   details a lot of that process, and also the eligibility
22   policy also drives those rules that are built into the
23   eligibility system.  But, again, for that specific
24   document type, what happens next in the process, that's
25   beyond my day-to-day expertise.
```

1    Q.   (By Ms. Perales)   Okay.   And with respect to

2  all of these bullets on Bates 935, 936, would it be fair

3  to say that you cannot testify how the eligibility

4  system is taking this information that's coming from the

5  hub and making eligibility determinations; is that

6  right?

7             MR. DISHER:   Objection, vague.   Go ahead

8  and answer.

9    Q.   (By Ms. Perales)   You may answer.

10   A.   So, again, the eligibility system has been

11 designed to follow the rules in the medical policy

12 manual, and use the information from the hub based on

13 the guidance about how the information is received and

14 what different codes stand for, and then does whatever

15 is next appropriate in the process.

16   Q.   Understood.   And would it be fair to say that

17 you cannot provide additional detail about how that

18 information from the hub is interpreted and applied

19 within the eligibility system, other than what you've

20 said?

21   A.   Other than what I've said.   Again, this would

22 take detailed knowledge about exactly how the

23 information is received, what it relates to in the

24 policy manual, and what the system does next.

25   Q.   Okay.   And that -- you aren't able to give us

1  that detailed information today; is that right?

2      A.   That's right.

3      Q.   Do you know if this document, which is Exhibit

4  2, describes all of the immigration-related information

5  that Arkansas would maintain about an individual

6  beneficiary for Medicaid?

7      A.   I don't know that this document would be the

8  only document, we have a Medicaid eligibility policy

9  manual as well.

10     Q.   But in terms of what the eligibility system

11 would maintain in terms of data about an individual, as

12 opposed to policies, in terms of data about an

13 individual, does this exhibit describe all of the

14 immigration-related data that Arkansas would maintain

15 about an individual beneficiary?

16     A.   I'm not certain of that.  Again, because I'm

17 not familiar with the codes that the data service hub

18 sends, and all the exact definitions of those codes.  So

19 I do not believe that just looking at this document

20 would be enough information to make that determination

21 from.

22     Q.   Are you aware of the extent to which this

23 document discusses DACA?

24     A.   No.

25     Q.   Okay.  I'm not going to torment you anymore

1  with this document.  Unless you say something that makes

2  me have to pull it back up again, I won't ask you about

3  it.  Okay.  We're going to go back to a document that

4  you and I discussed in your earlier deposition, let me

5  drop and drag it into the chat.  We're going to talk

6  about this chart that you and I talked about before.

7  It's very small, I'm going to make it a little bit

8  bigger, but I don't know what size screen you're working

9  on.  So I don't know if it's easier for you to look --

10 well, I can get the whole thing on my screen like this.

11 Do you recognize -- and I'd like to mark this as Exhibit

12 3.  Do you recognize this chart as the chart that you

13 and I reviewed in your deposition of last year?

14            (Exhibit 3 marked for identification.)

15      A.    Yes.

16      Q.    (By Ms. Perales)  And this is the chart that's

17 associated with your declaration in the case; is that

18 correct?

19      A.    Yes.

20      Q.    Okay.  I would like to talk with you a little

21 bit more about how these individuals were selected for

22 inclusion in this chart.  And we talked in your last

23 deposition about your request to some people to create

24 this list for you, and they created it for you, and then

25 we talked about it some more.  I'd like to know if you

1  know any more specifically about the information that

2  the eligibility system maintains that would cause

3  somebody to have been included on this list.

4      A.   No, I don't know any additional information

5  other than what went into the query for this report.

6      Q.   Okay.  And I know that you mentioned that you

7  requested a report on people who were identified as DACA

8  within your eligibility system, correct?

9      A.   Yes.

10      Q.   And do you have any details about how somebody

11  is associated with DACA in your eligibility system, or

12  how somebody is indicated as DACA within your

13  eligibility system?

14      A.   My understanding is there's a specific code in

15  the information that comes from the Federal Data

16  Services Hub that identifies an individual as a DACA

17  individual, and then that information is put into the

18  eligibility system.

19      Q.   Do you know -- do you happen to know what the

20  codes are that come from the hub that identifies someone

21  as DACA?

22      A.   Again, not specifically.  I know there are

23  codes, and I know that there -- my understanding is

24  there is a specific code for DACA.

25      Q.   Okay.  Now I want to talk with you for a minute

1    Q.   But are you aware of the communication between

2   Arkansas DHS and eSystems, in which Arkansas DHS asks

3   eSystems to take that information and put it into the

4   eligibility framework so that somebody can come and look

5   it up on an individual case participant's records?

6              MR. DISHER:  Objection, lack of

7   foundation.

8    A.   So I am not aware, beyond the design documents,

9   if there are additional details not included in the

10  design documents that identify specific codes and what

11  those codes mean.  I am not aware beyond the design

12  documents, so I don't know how to give you more

13  information than that.

14   Q.   (By Ms. Perales)  No, that's a perfectly good

15  answer.  Are you aware of any design documents that

16  mention DACA?

17             MR. DISHER:  Objection, vague.  Go ahead.

18   A.   I -- no.  I mean, I don't know anything beyond

19  what's been provided already.

20   Q.   (By Ms. Perales)  Okay.  Let me pull up the

21  other chart.  Let me see if I have any other questions

22  about this.  Actually, I do.  I just want to stay on

23  here for another second.  Did you generate this Exhibit

24  A yourself?

25   A.   No.

```
 1   what I requested.
 2        Q.   Okay.  Do you have any understanding of the
 3   relationship of people who are coded DACA in your
 4   eligibility system, and the people described as deferred
 5   action status in this eSystems Eligibility and
 6   Enrollment Framework document?
 7        A.   Would you restate the question?
 8        Q.   Sure.
 9             MS. PERALES:  I'd like to have the court
10   reporter read it back, if you could, so it's the same
11   question.
12             (Requested portion read back.)
13        A.   I feel like I would need to read this framework
14   document to fully answer that question.
15        Q.   (By Ms. Perales)  Okay.  And if you assume with
16   me that the eligibility framework document for Arkansas
17   does not include the term "DACA," or "deferred action
18   for childhood arrivals," do you have an understanding of
19   the relationship between people described as deferred
20   action status in the eligibility and enrollment
21   framework document, and those people who are coded as
22   DACA in your eligibility system?
23        A.   So I see in the document, on this page that you
24   have highlighted, deferred action status is an exemption
25   to the specific five year ban.  That document's
```

1   relationship to this report -- there's more into pulling

2   a report than looking -- this document is about the

3   eligibility system, but again, I do not see in that

4   document, or the page that you had highlighted, the

5   specific codes that come back from the Federal Data

6   Services Hub, that then the eligibility system puts

7   information specific to those codes onto -- into the

8   eligibility system.

9        Q.   I have the same questions, Ms. Franklin.  If

10  the document that I've been provided by Arkansas, which

11  is the Eligibility and Enrollment Framework Project

12  document, does not mention deferred action for childhood

13  arrivals, or DACA, I don't have an understanding of the

14  relationship between your project, and how it captures

15  information from the hub, and these people who appear in

16  your eligibility system as being associated with DACA.

17  And because of that, I'm asking if you have that

18  information.

19       A.   As I mentioned earlier, I am not the expert in

20  exactly how the system works, and how it takes files

21  from one location and assimilates them and uses them in

22  the eligibility system.  I mentioned earlier that the

23  expert is a contractor, eSystems.

24       Q.   Okay.

25       A.   And you're asking questions that are too deep

1  into the details for me to have specific knowledge

2  about.

3       Q.   Okay.  Thank you.  So let's just look at the --

4  let's just look at Exhibit 3, Total Dollar Amount Paid

5  for Members in the List for Specific Dates of Coverage,

6  that's the title of the document.  Can you tell me how

7  much of the total paid amount was paid by Arkansas as

8  opposed to the federal government?

9       A.   You cannot see that from this document.  This

10 document has total paid amount, and is not split by

11 federal and state.

12      Q.   Okay.  And sitting here today, can you tell me

13 how much of this amount was paid by the federal

14 government and how much --

15      A.   Not from this specific document.

16      Q.   No, not from this document, but sitting here

17 today, can you tell me how much of the $911,418.88 was

18 paid by Arkansas, and how much was paid by the federal

19 government?

20      A.   I cannot give you a specific amount.  I can

21 tell you it depends on whether or not it was a Medicaid

22 claim or a CHIP claim, when the claim occurred, and what

23 the match rate was when that happened.  But, again, I

24 can't give -- tell you that from this document.

25      Q.   Okay.  Is it also correct to say that the

1  document that we're looking at here, Exhibit 3, does not

2  provide the date of service?

3      A.    Scroll back to the top and let me make sure.  I

4  do not think it does, but let me make sure.  No, these

5  are just dates of coverage, these are not specific dates

6  of claims.

7      Q.    And is it also correct to say that this

8  document does not include the date on which the hub

9  returned information that Arkansas has used to conclude

10 the person is a DACA recipient?

11     A.    That is correct.

12     Q.    I have a couple of very small questions about

13 the document.  And if you were there in the deposition

14 of Ms. Mann, I asked her what is a Parent or Caretaker

15 Relative, and she said she didn't know, but I kind of

16 figured you might know.

17     A.    A Parent or Caretaker Relative is a Medicaid

18 eligibility category, and, again, it is Medicaid,

19 everyone in that category is a Medicaid recipient.  And

20 it is for parents who have a dependent child under the

21 age of 18, and who also meet -- they have low income for

22 people who meet the criteria for that category.

23     Q.    Okay.  And that also sounds a little bit like

24 the category Arkansas Works, which my understanding is

25 covers adults age 19 to 64; is that right?

1    from the five year bar, does that mean that when they

2    apply for Medicaid, that Arkansas would then deem them

3    ineligible?

4              MR. DISHER:  Objection, vague.

5         A.   No, because -- no.  This is just one section of

6    the manual.  They may qualify in the Unborn Child

7    category, if you see B 250, Unborn Child category, where

8    it says, "Lawfully admitted aliens who do not meet the

9    five year residency requirement or undocumented aliens."

10   So individuals who have status of DACA can be covered in

11   Unborn Child, and they can also be covered in emergency

12   Medicaid, if they meet the emergency Medicaid criteria,

13   and that could be in multiple different Medicaid

14   categories.  But as a general rule, no, they're not

15   eligible for Medicaid, they're eligible in limited

16   circumstances.

17        Q.   (By Ms. Perales)  Okay.  I'm going to shrink

18   these documents back down.  Okay, we're back to this

19   table again.  So with respect to each individual who's

20   listed in Exhibit 3, can you tell me information about

21   these individuals as they are listed on this

22   spreadsheet?  So, for example, for the person who's on

23   the top line of this spreadsheet, category code 06,

24   description Arkansas Works, we have some dates of

25   coverage, and then we have an amount, $3,186.69.  Are

1    you able to tell me for this person whether they were a

2    DACA recipient on the date of the reimbursed service?

3         A.    No.

4         Q.    Okay.  And is that answer the same for every

5    person on this spreadsheet?

6         A.    So -- yes.

7         Q.    Okay.

8         A.    This spreadsheet does not have the date that

9    the person was determined to be a DACA recipient.

10        Q.    Okay.  And then in terms of the program

11   category under which the service was reimbursed, for the

12   individuals on this spreadsheet, I understand that

13   you're not able to tell me for that specific individual,

14   for example, whether the service might have been

15   reimbursed under CHIP or Medicaid for some of these

16   folks; is that right?

17        A.    For some, but not all.

18        Q.    Okay.  I'm just -- I'm going through the topics

19   on the Schedule A.  And so topic six does say, "For each

20   DACA recipient who received services reimbursed by

21   Arkansas DHS," and then it asks a series of questions.

22   Are you able to testify today -- putting aside this

23   chart.  Are you able to testify today about individual

24   DACA recipients who received services from Arkansas DHS,

25   and answer some questions about them?

 1      A.    Do you mean in general, or specific to

 2   particular individuals?

 3      Q.    Specific to particular individuals.

 4      A.    No, I cannot speak specific to particular

 5   individuals today.

 6      Q.    In our last discussion, you didn't have an

 7   exact number for me, so I did put it on the topics,

 8   whether you know the percent of Medicaid applications

 9   that are submitted to Arkansas DHS online versus in

10   person; do you happen to know that?

11      A.    I looked at a report that was from January of

12   2020, and it was about 42 percent online.

13      Q.    Do you happen to know whether, if someone is

14   applying for Medicaid online, whether the application

15   will go through if it's missing information?

16      A.    It depends on if the missing information is

17   necessary to determine eligibility.

18      Q.    Do you happen to know whether the online

19   application asks for immigration-related information?

20      A.    I know that it does, even though I can't give

21   you the specific questions, because citizenship and

22   status factor into Medicaid eligibility.  So I know

23   there are questions, even though I don't know the

24   specific questions, and I know that if it's not

25   provided, the application would not be immediately

```
 1   denied, but if additional information is needed, the
 2   client would get a notice requesting additional
 3   information.
 4       Q.   Do you know if somebody who failed to put their
 5   immigration status information on the online application
 6   would get contacted and told, "Hey, we need this
 7   information from you before we can make an eligibility
 8   determination"?
 9       A.   They could if we needed additional information.
10       Q.   Okay.  And I guess you had mentioned you hadn't
11   seen the paper application lately for Medicaid, would
12   that answer be the same for the online application for
13   Medicaid?
14       A.   Yes.  I know they're similar, but I have not
15   seen it recently.
16       Q.   Okay.
17       A.   I don't have it in front of me.
18       Q.   Would it also be fair to say that you don't
19   know what specific information would be requested for
20   immigration status, whether it's an identifying number
21   or some other such thing?
22       A.   Yeah, I know that they're asked about
23   citizenship, if they're a citizen or not.  And if
24   they're not a citizen, to provide information about
25   their status.  I just can't give you the specific
```

Mary Franklin                                          October 05, 2020
                                                       Page 64

 1  verbiage without looking at it.
 2      Q.   Okay.  I think I pass the witness.  No, I am
 3  definitely passing the witness.
 4           MR. DISHER:  Jeff, do you have any
 5  questions?
 6           MR. ROBINS:  I don't.
 7                       EXAMINATION
 8  BY MR. DISHER:
 9      Q.   Okay.  I just have one question, I believe,
10  just so the record is clear, Ms. Franklin.  DACA
11  recipients are eligible for what type of services
12  provided by your agency?
13      A.   They are eligible for the Unborn Child category
14  if they are pregnant and otherwise meet the eligibility
15  requirements for that category.  And they are eligible
16  for emergency Medicaid if they meet criteria for that
17  and it can be delivered, and it is not limited to any
18  particular Medicaid category.
19      Q.   Okay.  Thank you.  I pass the witness.
20                      RE-EXAMINATION
21  BY MS. PERALES:
22      Q.   I just have a follow up for that for emergency
23  Medicaid.  If I understand correctly, there could be
24  various program categories for an emergency Medicaid; is
25  that correct?

Mary Franklin                                    October 05, 2020
                                                       Page 69

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   STATE OF TEXAS, et al.,      *
           Plaintiffs             *
 4   VS.                          *
                                  *
 5   UNITED STATES OF AMERICA,    *
     et al.,                      *   Case No. 1:18-CV-68
 6         Defendants,            *
                                  *
 7   and                          *
                                  *
 8   KARLA PEREZ, et al.,         *
           Defendant-Intervenors  *
 9
     ********************************************************
10
                     REPORTER'S CERTIFICATION
11                 DEPOSITION OF MARY FRANKLIN
                        OCTOBER 5, 2020
12                    (Reported Remotely)

13   ********************************************************

14        I, TRICIA FOX WILLIAMS, Certified Shorthand
     Reporter in and for the State of Texas, hereby certify
15   to the following:

16           That the witness, MARY FRANKLIN, was duly sworn
     by the officer and that the transcript of the oral
17   deposition is a true record of the testimony given by
     the witness;
18
             That the deposition transcript was submitted on
19   _____ to the witness or to the attorney for the
     witness for examination, signature and return to me by
20   _____;

21           That the amount of time used by each party at
     the deposition is as follows:
22
          MS. NINA PERALES - 01 HOURS:53 MINUTE(S)
23        MR. TODD DISHER - 00 HOURS:01 MINUTE(S)

24

25
```

Mary Franklin                                          October 05, 2020
                                                           Page 70

 1          That pursuant to information given to the
    deposition officer at the time said testimony was taken,
 2  the following includes counsel for all parties of
    record:
 3
            MR. TODD DISHER, Attorney for Plaintiffs
 4          MS. NINA PERALES, Attorney for
                       Defendant-Intervenors
 5          MR. JEFFREY ROBINS, Attorney for Defendants
            MR. DYLAN JACOBS, Attorney for State of Arkansas
 6          MR. DAVID STERLING, Attorney for State of Arkansas

 7          I further certify that I am neither counsel
    for, related to, nor employed by any of the parties or
 8  attorneys in the action in which this proceeding was
    taken, and further that I am not financially or
 9  otherwise interested in the outcome of the action.

10          Further certification requirements pursuant to
    Rule 203 of TRCP will be certified to after they have
11  occurred.

12          Certified to by me this _____ of

13  _____, 2020.

14

15

16                                    _Tricia Williams_

17          _____
                   TRICIA FOX WILLIAMS
18                 Certified Court Reporter

19

20

21  Certification Number: 8273
    Date of Expiration: 10/31/2022
22  Firm Registration Number: 631
    Business Address:
23      Kim Tindall & Associates
        16416 San Pedro Ave., Suite 900
24      San Antonio, Texas 78232
        (210)697-3400
25