**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-00068 |
| UNITED STATES OF AMERICA, *et al.*, | |
| Defendants, | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| Defendant-Intervenors. | |

**FEDERAL DEFENDANTS' RESPONSE TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.    DACA and DAPA.............................................................................................. 2

    B.    The Original *Texas v. United States* Litigation ....................................... 3

    C.    The Rescission of DACA ................................................................................ 4

    D.    The DACA-Rescission Litigation ................................................................. 5

    E.    Agency Response to Supreme Court Decision ........................................... 7

    F.    The Current *Texas v. United States* Litigation ...................................... 8

STATEMENT OF THE ISSUES.................................................................................... 10

ARGUMENT ................................................................................................................... 10

CONCLUSION ............................................................................................................... 14

# TABLE OF AUTHORITIES

**Federal Cases**

*Alfred L. Snapp & Son v. Puerto Rico*,
  458 U.S. 592 (1982) .......................................................................................... 13

*Atchafalaya Basinkeeper v. Mallard Basin Inc.*,
  No. 6:10-CV-1085, 2012 WL 13041531 (W.D. La. Mar. 15, 2012) ...................................... 14

*Batalla Vidal v. Nielsen*,
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...................................................................... 5

*Casa de Maryland v. DHS*,
  284 F. Supp. 3d 758 (D. Md. 2018) ........................................................................ 6

*Casa De Maryland v. U.S. Dep't of Homeland Sec.*,
  924 F.3d 684 (4th Cir. 2019) ............................................................................... 6

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................................... 10

*Citizens Against the Pellissippi Parkway Extension, Inc. v. Mineta*,
  375 F.3d 412 (6th Cir. 2004) ............................................................................... 14

*ConocoPhillips Co. v. United States Environmental Protection Agency*,
  612 F.3d 822 (5th Cir. 2010) ............................................................................... 11

*DHS v. Regents of the University of California*,
  140 S. Ct. 1891 (2020) ................................................................................ *passim*

*German Language Ctr. v. U.S*, No. CIV. A. H-09-3950,
  2010 WL 3824636 (S.D. Tex. Sept. 27, 2010) ............................................................ 13

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .......................................................................................... 6

*Macktal v. Chao*,
  286 F.3d 822 (5th Cir. 2002) ............................................................................... 13

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C. 2018) ........................................................................ 5

*NAACP v. Trump*,
  315 F. Supp. 3d 457 (D.D.C. 2018) ........................................................................ 5

*NAACP v. Trump*,
  321 F. Supp. 3d 143 (D.D.C. 2018) ........................................................................ 5

*Pratt v. Harris Cty.*,
    822 F.3d 174 (5th Cir. 2016)................................................................................ 10

*Regents of Univ. of Cal. v. DHS*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ............................................................... 5

*Regents of Univ. of Cal. v. DHS,*
    908 F.3d 476 (9th Cir. 2018)................................................................................ 6

*Texas v. United States*,
    136 S. Ct. 2271 (2016) ......................................................................................... 3

*Texas v. United States* (*Texas I*),
    809 F.3d 134 (5th Cir. 2015)........................................................................... 3, 10

*Texas v. United States* (*Texas II*),
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ......................................................... *passim*

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ................................................................ 13

*Topalian v. Ehrman*,
    954 F.2d 1125 (5th Cir. 1992)............................................................................ 10

**Federal Statutes**

5 U.S.C. § 553........................................................................................................... 8

8 U.S.C. § 1182(d)(5)(A) ......................................................................................... 3

**Federal Rules**

Federal Rule of Civil Procedure 56 ........................................................................ 10

## INTRODUCTION

This past summer, the Supreme Court vacated the Department of Homeland Security's (DHS) September 2017 Duke Memorandum, which had attempted to begin an orderly wind down of the policy known as Deferred Action for Childhood Arrivals (DACA). *See DHS v. Regents of the University of California*, 140 S. Ct. 1891 (2020). The Court agreed that DHS may lawfully rescind DACA and did not opine that DACA was lawful or decide "whether DACA or its rescission are sound policies." *Id*. at 1916. Instead, the Court acknowledged that DHS's authority to rescind DACA was undisputed. *Id.* at 1905. And it recognized that deciding the best way to move forward with "a program with the breadth of DACA" involves "important policy choices" that are left to DHS, *id.* at 1910, and that DHS has "considerable flexibility in carrying out" this policy-making responsibility, *id.* at 1914. The Court therefore held that the "appropriate recourse is . . . to remand to DHS so that it may consider the problem anew." *Id*. at 1916. In response to that decision, the Acting Secretary of Homeland Security formally rescinded the Duke Memorandum and announced his determination to conduct "a full and careful consideration of a full rescission" of DACA. *See* Exhibit A, Acting Secretary Chad F. Wolf, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* (July 28, 2020) ("Wolf Memorandum") at 4. During that consideration, DACA would remain available to current beneficiaries, but would not be available to any new requestors. *Id*. at 7-8. The Attorney General in turn rescinded prior memoranda and letters addressing the legality of DACA and related policies. *See* Exhibit B, Letter from Attorney General William P. Barr to Acting Secretary of Homeland Security Chad F. Wolf (June 30, 2020) at 1. Review by DHS regarding a full rescission is ongoing.

While Fifth Circuit precedent and this Court's prior rulings likely require this Court to hold

that DACA is inconsistent with the Immigration and Nationality Act and should have been promulgated using notice and comment procedures, the Acting Secretary has acted lawfully here in maintaining the status quo while he is evaluating the appropriate next steps in light of the Supreme Court decision. Federal Defendants therefore think it appropriate for this Court to permit the Acting Secretary's review to proceed unencumbered by an order from this Court granting Plaintiffs' requested relief that the Court "declare DACA unlawful and prevent Federal Defendants from issuing any new DACA permits or renewing any existing DACA permits." The Supreme Court recently vacated DHS's wind down of DACA because DHS had not considered all relevant aspects of the problem and, in light of that ruling and to ensure that there is certainty and finality in DHS's evaluation, the court should permit DHS to reach its conclusion in an orderly and considered fashion.

## BACKGROUND

### A.     DACA and DAPA

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano announced the policy now known as DACA. *See* ECF Dkt. 358-1 (DACA Memo). DACA made deferred action— a temporary postponement of the removal of individuals unlawfully present in the United States— available to "certain young people who were brought to this country as children" in violation of the immigration laws. DACA Memo at 1. After completion of a background check, successful requestors would receive deferred action for a period of two years, subject to renewal. *Id*. at 2-3. The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1, and that requests would "be decided on a case by case basis," *id*. at 2. The Memo thus provided that DACA "confer[red] no substantive right, immigration status or pathway to citizenship.  Only the Congress, acting through its legislative authority, can confer these rights." *Id*. at 3. The DACA

policy made it possible for those granted deferred action to obtain employment authorization in this country under existing regulations, *id*. at 3, and opened the door for some DACA recipients to obtain advance parole. *See Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/ frequently-askedquestions (last visited Nov. 1, 2020), at Q57; 8 U.S.C. § 1182(d)(5)(A).

In 2014, then-Secretary of Homeland Security Jeh Johnson issued a memorandum expanding DACA and creating a new, similar policy known as DAPA. *See* ECF Dkt. 358-7 (DAPA Memo). DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo 3. The DAPA Memo also expanded DACA by adjusting the date-of-entry requirement from June 2007 to January 2010, removing the requirement to have been born since June 15, 1981, and extending the validity period for DACA grants from two to three years. *Id*. at 3- 4.

### B.    The Original *Texas v. United States* Litigation

The DAPA Memo—including its expansion of DACA—was challenged in this Court by a coalition of 26 States, including all eight of the Plaintiffs in this action. Affirming this Court, the Fifth Circuit upheld a nationwide preliminary injunction barring implementation of DAPA and expanded DACA. *Texas v. United States* (*Texas I*), 809 F.3d 134, 147-48 (5th Cir. 2015). Like this Court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice- and- comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Id*. at 178 n.156. The Fifth Circuit also held that DAPA was "manifestly contrary" to the INA because DAPA and expanded DACA awarded deferred action "to persons who have never had a legal status and may never receive one." *Id*. at 184, 186 (footnotes omitted). That decision was affirmed without opinion by an equally divided Supreme Court, 136 S. Ct. 2271 (2016),

leaving this Court's preliminary injunction order in place.

Faced with the threat of continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its expansion of DACA. *See* ECF Dkt. 358-9. On June 29, 2017, Texas and several other States threatened to amend their complaint to challenge the 2012 DACA Memo directly, noting that it suffers from the same legal flaws that the courts had identified in expanded DACA and DAPA. *See* ECF Dkt. 358-10.

### C.       The Rescission of DACA

On September 4, 2017, then-Attorney General Sessions sent a letter to then-Acting Secretary Duke advising her that DACA should be rescinded. *See* ECF Dkt. 358-11. In the Attorney General's judgment, DACA was an unlawful "open-ended circumvention of immigration laws" that "likely" would be invalidated in the imminent litigation because it contained the same legal defects that the courts had recognized with respect to the DAPA memorandum.  The next day, the Acting Secretary issued a memorandum directing a wind down of the DACA policy in an orderly fashion.  *See* ECF Dkt. 358-12 (Rescission Memo). As she explained, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Memo at 4. Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id*. at 4, and instructed that deferred action going forward should be provided "only on an individualized[,] case-by-case basis," *id*. at 2.

On September 12, 2017, the parties to the original Texas litigation filed a joint stipulation of dismissal.  *See Texas v. United States* (*Texas II*), 328 F. Supp. 3d 662, 672-673 (S.D. Tex. 2018), citing *Texas I*, ECF Dkt. 473.

### D.     The DACA-Rescission Litigation

In the weeks following the Acting Secretary's decision, 12 lawsuits challenging the Rescission Memo were filed in six federal district courts. The government has defended those lawsuits vigorously, including by repeatedly seeking relief from the Supreme Court. In two of the six jurisdictions, however, plaintiffs succeeded in obtaining nationwide preliminary injunctive relief that significantly restricted DHS's ability to wind down DACA on the timeline contemplated by the Rescission Memo. *See Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018); *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th Cir. 2018); *see generally Texas II*, 328 F. Supp. 3d at 681-87 (providing lengthier summary of rescission litigation as of August 2018). In a third jurisdiction, plaintiffs obtained a vacatur of the Rescission Memo, but the district court stayed that order in part so as not to require Federal Defendants to accept new initial requests (or applications for advance parole) during the pendency of the appeal. *NAACP v. Trump,* 298 F. Supp. 3d 209, 243 (D.D.C. 2018); *NAACP v. Trump*, 321 F. Supp. 3d 143, 150 (D.D.C. 2018).[1]

Federal Defendants promptly appealed each adverse ruling. The Ninth Circuit held oral argument on May 15, 2018; the Second Circuit on January 25, 2019; and the D.C. Circuit on February 22, 2019. Nearly six months after oral argument in the Ninth Circuit, the government filed three petitions for a writ of certiorari before judgment in the Supreme Court on November 5, 2018, so that the Court would have an opportunity to consider the validity of DACA's rescission

---

[1] The *NAACP* court invited DHS to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority." 298 F. Supp. 3d at 245-46. Then-Secretary Nielsen issued a memorandum that provided a fuller explanation, but the court subsequently rejected the memorandum, finding, among other grounds, that it "fail[ed] to elaborate meaningfully on the agency's primary rationale for its decision." *NAACP v. Trump*, 315 F. Supp. 3d 457, 460-61, 473-74 (D.D.C. 2018).

during the then-current Term. Three days later, on November 8, 2018, the Ninth Circuit issued a decision affirming the California district court's preliminary injunction (and its partial denial of the government's motion to dismiss), *Regents of Univ. of Cal. v. DHS*, 908 F.3d 476 (9th Cir. 2018).[2]

The Supreme Court ultimately granted certiorari (or certiorari before judgment) in all of the California, District of Columbia, and New York DACA-rescission cases, as to claims that DACA rescission was arbitrary and capricious in violation of the Administrative Procedure Act ("APA") and that it infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause. *Regents*, 140 S. Ct. at 1903.[3] On June 18, 2020, the Supreme Court issued a decision setting aside the Duke Memorandum as arbitrary and capricious under the APA, but finding no equal protection violation. *Id*. at 1916.[4]

The Court determined that it could review a challenge to the DACA rescission under the APA because "the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program— and its rescission—is an 'action [that] provides a focus for judicial review.'" *Id*. at 1906 (citing *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). The Court also acknowledged that DHS's authority

---

[2] A fourth district court upheld the validity of the Rescission Memo but permanently enjoined DHS from making any changes to its existing policy governing the sharing of information provided by DACA requestors. *Casa de Maryland v. DHS*, 284 F. Supp. 3d 758 (D. Md. 2018). The Fourth Circuit reversed that decision and vacated Acting Secretary Duke's rescission as arbitrary and capricious. *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 700 (4th Cir. 2019), *cert. denied sub nom. Dep't of Homeland Sec. v. Casa de Maryland*, No. 18-1469, 2020 WL 3492650 (U.S. June 29, 2020).

[3] The Court noted that "Plaintiffs also raised notice and comment claims, which uniformly failed below[.] . . . Those claims are not before us." *Id*. at 1903 n.1.

[4] The Supreme Court refused to consider the reasons for rescission provided in the Nielsen Memorandum "as impermissible *post hoc* rationalizations [that] are not properly before us." *Id*. at 1908-09.

to rescind DACA was undisputed. *Id.* at 1905. Indeed, it recognized that deciding the best way to move forward with "a program with the breadth of DACA" involves "important policy choices" that are left to DHS, *id.* at 1910, and that DHS has "considerable flexibility in carrying out" this policy-making responsibility, *id.* at 1914. Nonetheless, the Court held that the Duke Memorandum failed to consider alternatives to rescinding DACA in its entirety, and failed to adequately address the possibility of legitimate reliance interests related to DACA. *Id.* at 1912, 1913. Accordingly, the Supreme Court held that a remand to DHS was appropriate "so that it may consider the problem anew." *Id.* at 1916. The Supreme Court also ordered vacatur of both preliminary injunctions, which had required maintaining portions of the DACA policy during the litigation. *See Regents*, 140 S. Ct. at 1916.

### E.     Agency Response to Supreme Court Decision

On June 30, 2020, Attorney General Barr wrote a letter to Acting Secretary Wolf to "facilitate [his] consideration" of DACA. In that letter, Attorney General Barr withdrew the letter of Attorney General Sessions "[w]ithout regard to whether I agree with the views expressed in that letter . . . because I do not wish to maintain a determination as the Attorney General regarding DACA that might constrain the discretion you otherwise possess." Barr Letter at 1. "In other words, I wish to wipe the slate clean to make clear beyond doubt that you are free to exercise your own independent judgment in considering the full range of legal and policy issues implicated by a potential rescission or modification of DACA, as contemplated by the Supreme Court." *Id*. The Attorney General also withdrew a memorandum of the Office of Legal Counsel addressing the legality of DACA and related policies and any other guidance on that topic. *Id.*

On July 28, 2020, Acting Secretary Wolf formally rescinded the Duke Memorandum and the Nielsen Memorandum. Wolf Mem. at 1. The Wolf Memorandum announced the Acting

Secretary's determination, "[i]n accordance with the Supreme Court's decision," "to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified." Wolf Mem. at 5. Given the Acting Secretary's serious enforcement policy concerns, the Wolf Memorandum also made certain immediate changes to the DACA policy. *Id.* at 4-5.

The Wolf Memorandum explained that, until further notice, DHS (1) will not accept first-time DACA requests; (2) will continue to accept renewal requests from DACA recipients, though it will limit the period of any future grants of DACA to one year, rather than the two years provided under the Napolitano Memorandum; and (3) will reject all pending and future applications for advance parole "absent exceptional circumstances." *See id.* at 5. These changes apply to both pending and prospective requests. *Id.* at 7. The Wolf Memorandum noted that "nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted." *Id.* at 6. The Wolf Memorandum also reiterated that DHS will "[c]ontinue to comply with the information-sharing policy" regarding DACA-related information announced in 2012. *Id.* at 8.

### F.     The Current *Texas v. United States* Litigation

Plaintiffs, a group of seven States, filed this action on May 1, 2018. ECF Dkt. 1. On June 14, 2018, Plaintiffs amended their complaint to include one additional state and two Governors, ECF Dkt. 104. The Governor of Maine subsequently withdrew from the litigation. ECF Dkt. 360.

Plaintiffs argue that the DACA policy is unlawful for three reasons: (1) it violates the Take Care Clause of Article II, Section 3 of the United States Constitution; (2) it was not issued through the APA's notice-and-comment procedures, *see* 5 U.S.C. § 553; and (3) it conflicts with the INA and is therefore substantively unlawful under the APA. On May 2, 2018, Plaintiffs filed a motion for a preliminary injunction, in which they sought to "enjoin the 2012 memorandum creating

DACA" on a nationwide basis. ECF Dkt. 5.

On August 31, 2018, this Court denied Plaintiffs' motion because of their delay in bringing a challenge to DACA. *Texas II*, 328 F. Supp. 3d 662. In doing so, however, the Court held that the matter presents a case or controversy for purposes of Article III, *id*. at 687-90; that Plaintiffs have sufficient injury to establish standing, *id*. at 690-705; and that Plaintiffs had a likelihood of success on the merits on their substantive and procedural APA claims, *id*. at 712-36. The Court declined to consider Plaintiffs' Take Care Clause claim based on the doctrine of constitutional avoidance. *Id*. at 710-12.

On February 4, 2019, Plaintiffs filed a motion for summary judgment, on which the Court deferred ruling to accommodate a discovery period and, in November 2019, pending the Supreme Court's ruling in *Regents*. *See* ECF Dkts. 447, 473. Following the *Regents* decision, the Court denied Plaintiffs' Motion for Summary Judgment but granted leave to refile, "incorporating any additional arguments drawn from the *Regents* decision that they deem fit." *Id*. at 8. At Defendant-Intervenors' request, the Court also granted a brief period to conduct additional discovery. *Id*. Federal Defendants provided a timely response, including new documents and objections, to Plaintiff-Intervenors' Fifth and Sixth Sets of Discovery Requests on September 30, 2020.

On October 9, 2020, Plaintiffs filed their new Motion for Summary Judgment. ECF Dkt. 486. Although a response from Federal Defendants and Defendant-Intervenors is currently due on November 6, 2020, Defendant-Intervenors filed a motion to compel and to extend discovery for 30 more days following a deposition of Plaintiff State Arkansas on October 5, 2020. *See* ECF Dkt. 484. Defendant-Intervenors' motion seeks an extension of their response deadline to Plaintiffs' summary judgment motion as well. *Id*. at 3. Briefing on Defendant-Intervenors' motion was completed on October 30. ECF Dkts. 493, 496.

## STATEMENT OF THE ISSUES

The question is whether this Court should grant summary judgment to Plaintiffs on their substantive APA, procedural APA, and Take Care Clause claims and "declare DACA unlawful and prevent Federal Defendants from issuing any new DACA permits or renewing any existing DACA permits to allow for an orderly wind down of the unlawful program." Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate where there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law.  *See Pratt v. Harris Cty.*, 822 F.3d 174, 180 (5th Cir. 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *Topalian v. Ehrman*, 954 F.2d  1125, 1131 (5th Cir. 1992).

## ARGUMENT

This Court has already ruled, as a matter of law, that DACA is likely substantively unlawful because it violates the Immigration and Nationality Act. Federal Defendants have not completed their consideration of next steps regarding DACA in light of *Regents*, and the Attorney General has withdrawn prior guidance on the legality of DACA to ensure DHS can "consider[] the full range of legal and policy issues implicated by a potential rescission or modification of DACA, as contemplated by the Supreme Court." AG Letter at 1. In turn, DHS, "[i]n accordance with the Supreme Court's decision," is "giv[ing] careful consideration to whether the DACA policy should be maintained, rescinded, or modified." Wolf Mem. at 5. Although Acting Secretary Wolf "concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission," he also determined that "fully rescinding the policy would be a significant administration decision that warrants additional careful consideration." *Id.* at 4. The Court should permit DHS to complete this consideration and determine the correct course forward for resolving these issues, as provided for by the Supreme Court. *See Regents*, 140 S. Ct. at 1916

(the "appropriate recourse is . . . to remand to DHS so that it may consider the problem anew");

*see also ConocoPhillips Co. v. United States Environmental Protection Agency,* 612 F.3d 822, 832

(5th Cir. 2010) ("Embedded in an agency's power to make a decision is its power to reconsider

that decision.").[5]

While he conducts "a full and careful consideration of a full rescission," the Acting

Secretary has also made "certain immediate changes to the DACA policy to mitigate [his]

enforcement policy concerns" in the interim—including, for example, that policies like DACA

"send[] mixed messages about DHS's intention to consistently enforce the immigration laws as

Congress has written them." *Id.* at 4-5. The Wolf Memorandum explains that, until further notice,

DHS (1) will not accept first-time DACA requests; (2) will continue to accept renewal requests

from DACA recipients, though it will limit the period of any future grants of DACA to one year,

rather than the two years provided under the Napolitano Memorandum; and (3) will reject all

pending and future applications for advance parole "absent exceptional circumstances." *See id.* at

5. These changes apply to both pending and prospective requests. *Id.* at 7.[6] Given the Supreme

---

[5] Federal Defendants acknowledge that this Court remains bound by the Fifth Circuit's precedential ruling as to the legality of DAPA and expanded DACA in *Texas I*, and that this Court will also very likely not depart from this Court's own prior rulings addressing that precedent as it applies to the DACA challenge in this case. This Court, guided by Fifth Circuit precedent, held that "DACA is 'manifestly contrary' to the statutory scheme promulgated by Congress" in the INA. *Texas II*, 328 F. Supp. 3d at 722 (quoting *Texas I*, 809 F.3d at 186). This Court found that, with respect to their substantive invalidity under the APA, "DACA and DAPA are basically identical, and there is no legal ground for 'striking DAPA that wouldn't apply to DACA' (and certainly no legal ground for striking Expanded DACA that does not apply to DACA itself)." *Id.* at 743; *see* ECF Dkt. 71, at 13-14 (discussing the critical features shared by all three policies). The Supreme Court discussed but did not disturb this precedent in *Regents*. *See* 140 S. Ct at 1911-12.

[6] As of the date of filing, Federal Defendants are aware of fourteen lawsuits challenging the Wolf Memorandum, which are pending in six different federal districts before eight different judges. The plaintiffs' claims vary from case to case, but primarily focus on allegations that the Wolf Memorandum is unlawful because Chad F. Wolf is not lawfully serving as Acting Secretary of Homeland Security, and because the agency's decision is arbitrary and capricious under the APA.

Court's direction that DHS "consider the problem anew" (*Regents*, 140 S. Ct. at 1916), the Wolf Memorandum—which preserves the availability of DACA for existing beneficiaries in a way that accounts for any legitimate reliance interests—is an appropriate exercise of discretion while that consideration is ongoing.

Importantly, Plaintiffs also "are not seeking the immediate termination of existing grants of deferred action status pursuant to DACA," and agree with the Supreme Court that "'deciding how best to address a finding of illegality moving forward' involves 'important policy choices,' and '[t]hose policy choices are for DHS.'" ECF Dkt. 486 at 46 (quoting *Regents*, 140 S. Ct at 1910). The Acting Secretary has announced his intention, consistent with *Regents*, to "consider[] anew the DACA policy" and the "significant questions of law and legal policy" that DACA presents. Wolf Mem. at 4. Acting Secretary Wolf further explained that DACA "presents serious policy concerns that may warrant its full rescission" but that such a "significant . . . decision warrants additional careful consideration." *Id*.; *see id*. at 4-5 (discussing significant enforcement policy concerns).

If DACA is unlawful, there are still important policy questions that must be addressed regarding how to address the existing DACA program and the interests of the people who have relied upon it. This is true even if this Court determines that DACA is unlawful and that summary judgment should be granted.  DHS is considering these issues right now.  Thus, regardless of this Court's determination on the merits, Federal Defendants believe it is appropriate to give DHS time to complete its consideration pursuant to the lawful steps outlined in the Wolf Memorandum, as invited by the Supreme Court's holding in *Regents*. 140 S. Ct. at 1914 ("DHS has considerable flexibility in carrying out its responsibility. The wind-down here is a good example of the kind of options available. . . . But because DHS was 'not writing on a blank slate,' . . . it *was* required to

assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.") (emphasis in original) (internal citation omitted); *see German Language Ctr. v. U.S*, No. CIV. A. H-09-3950, 2010 WL 3824636, at *4 (S.D. Tex. Sept. 27, 2010) ("Reconsideration is allowed as long as that decision is not arbitrary, capricious, or an abuse of discretion.") (citing *Macktal v. Chao,* 286 F.3d 822, 826 (5th Cir. 2002); 5 U.S.C. § 706(2)(A)).

As to Plaintiffs' additional claims, Federal Defendants maintain that this Court need not address Plaintiffs procedural APA claim or their Take Care Clause claim. To the extent that this Court has already found that DACA is substantively unlawful under the INA, it need not address whether the DACA Memo violated the APA's notice-and-comment requirements as well.[7] For the same reason, and as this Court previously determined, under the doctrine of constitutional avoidance this Court should not grant Plaintiffs summary judgment on their Take Care Clause claim. *Texas II*, 328 F. Supp. 3d at 710-12. The Court may hold that DACA is substantively unlawful under the APA without addressing this constitutional issue.[8]

---

[7] Nor should the court address whether DACA is procedurally unlawful under the Fifth Circuit's precedent in *Texas* on the ground that it did not permit the exercise of discretion by agency decisionmakers. At the preliminary-injunction stage, this Court did "not find the evidence of discretion by the individuals processing DACA applications to be compelling either way." *Texas II*, 328 F. Supp. 3d at 732; *see id* at 732-34. The evidence on this issue has not materially changed since then.

[8] Of course, Plaintiffs also must establish standing to obtain summary judgment. Federal Defendants acknowledge, but respectfully disagree with, the Court's earlier ruling that Plaintiffs have standing under the *parens patriae* doctrine and because of increased social-services costs. *Texas II*, 328 F. Supp. 3d at 694-705. "A State does not have standing as *parens patriae* to bring an action against the Federal Government" on behalf of its citizens, *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982), and the "indirect damages" of increased social-services costs were "not caused by" DACA and the "relief requested by Plaintiffs would not redress these damages," *Texas v. United States*, 86 F. Supp. 3d 591, 634 (S.D. Tex. 2015) (rejecting similar standing theory with respect to DAPA and expanded DACA). This brief, however, accepts that this Court ruled that Plaintiffs have standing for purposes of its preliminary-injunction order

Finally, while a determination by this Court that DACA is substantively unlawful under the APA would ordinarily entitle Plaintiffs to their requested declaration, vacatur, and permanent injunction under the Fifth Circuit's controlling precedent in *Texas I*, granting such relief while DHS is considering how best to address the serious policy concerns it has with DACA is inappropriate. *Atchafalaya Basinkeeper v. Mallard Basin Inc.*, No. 6:10-CV-1085, 2012 WL 13041531, at *3 (W.D. La. Mar. 15, 2012) (noting that it can be "an abuse of discretion to prevent an agency from acting to cure the very legal defects asserted by plaintiffs challenging federal action") (citing *Citizens Against the Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 416 (6th Cir. 2004)). An abrupt end to DACA is not being sought by the Plaintiffs, and would harm the reliance interests that the Supreme Court believed DHS should address in the first instance. *Regents*, 140 S. Ct. at 1915 (DHS "was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").

If the Court nevertheless concludes that Plaintiffs' requested relief—a declaration that DACA is unlawful and an order "prevent[ing] Federal Defendants from issuing any new DACA permits or renewing any existing DACA permits," is warranted, the Court should still allow the Acting Secretary to "make the important policy choices" in connection with the future of DACA with respect to current recipients. *Regents*, 140 S. Ct at 1910. As the Supreme Court made clear, DHS is best positioned to balance the interests at stake. *Id*. at 1910, 1915.

## CONCLUSION

For the foregoing reasons, the Court should permit DHS to continue its policy deliberations regarding the future of DACA as envisioned by the Supreme Court in *Regents*.

---

and nothing has changed that would call that holding into question.

Dated: November 6, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

*/s/ James J. Walker*
JAMES J. WALKER
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 532-4468
Fax: (202) 305-7000
Email: james.walker3@usdoj.gov

AUGUST E. FLENTJE
Special Counsel
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section

JEFFREY S. ROBINS
Attorney-in-Charge
Deputy Director

*Attorneys for Federal Defendants*

15

## CERTIFICATE OF SERVICE

I certify that on November 6, 2020, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ James J. Walker
JAMES J. WALKER

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br> Defendants, <br><br> *and* <br><br> KARLA PEREZ, *et al.*, <br><br> Defendant-Intervenors. | Case No. 18-cv-00068 |

DECLARATION OF JAMES J. WALKER IN SUPPORT OF
FEDERAL DEFENDANTS' RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, James J. Walker, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am employed as a Trial Attorney for the Department of Justice, Civil Division, Office of Immigration Litigation, and have been assigned as counsel for Federal Defendants in *Texas v. United States (Texas II)*, 1:18-cv-00068 (S.D. Tex.) (Hanen, J.). As such, I have personal knowledge of the following facts and could testify regarding these facts if called to do so.

2. Attached as Exhibit A is a true, correct, and complete copy of the July 28, 2020 memorandum of Acting Secretary Chad F. Wolf, entitled *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." See*

https://www.dhs.gov/sites/default/files/publications/20_0728_s1_daca-reconsideration-memo.pdf (last visited Nov. 6, 2020).

3. Attached as Exhibit B is a true, correct, and complete copy of the June 30, 2020 letter from Attorney General William P. Barr to Acting Secretary of Homeland Security Chad F. Wolf. *See* https://www.dhs.gov/sites/default/files/publications/20_0630_doj_aj-barr-letter-as-wolf-daca.pdf (last visited Nov. 6, 2020).

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed under the laws of the United States on this 6th day of November, 2020, in Washington, D.C.

*/s/ James J. Walker*
JAMES J. WALKER
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 532-4468
Fax: (202) 305-7000
Email: james.walker3@usdoj.gov

*Attorney for Federal Defendants*

# Exhibit A

Acting Secretary Chad F. Wolf, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* (July 28, 2020)



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

July 28, 2020

MEMORANDUM FOR:    Mark Morgan
                               Senior Official Performing the Duties of Commissioner
                               U.S. Customs and Border Protection

                               Matthew Albence
                               Senior Official Performing the Duties of Director
                               U.S. Immigration and Customs Enforcement

                               Joseph Edlow
                               Deputy Director of Policy
                               U.S. Citizenship and Immigration Services

FROM:                   Chad F. Wolf
                               Acting Secretary

SUBJECT:            **Reconsideration of the June 15, 2012 Memorandum**
                               **Entitled "Exercising Prosecutorial Discretion with Respect to**
                               **Individuals Who Came to the United States as Children"**

On June 15, 2012, Secretary of Homeland Security Janet Napolitano established the policy known as Deferred Action for Childhood Arrivals (DACA) through a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." Ever since, the policy has been subject to substantial controversy. In recent years, Acting Secretary of Homeland Security Elaine Duke and Secretary of Homeland Security Kirstjen Nielsen concluded that the DACA policy should be fully rescinded and issued additional memoranda in 2017 and 2018, respectively, to effect that decision.

On June 18, 2020, the U.S. Supreme Court issued a decision that did not question the authority of the Department of Homeland Security (DHS) to rescind the DACA policy, but determined that the 2017 and 2018 memoranda had not complied with certain requirements for doing so. See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589. Accordingly, the Court concluded that the rescission must be vacated and remanded to DHS so that it "may consider the problem anew." Regents, Slip op. at 29.

By this memorandum, I am rescinding the 2017 and 2018 memoranda, and making certain immediate changes to the DACA policy to facilitate my thorough consideration of how to address DACA in light of the Supreme Court's decision. For the reasons outlined below, pending my full reconsideration of the DACA policy, I direct DHS personnel to take all appropriate actions to reject all pending and future initial requests for DACA, to reject all

pending and future applications for advance parole absent exceptional circumstances, and to shorten DACA renewals consistent with the parameters established in this memorandum.

**Background**

On June 15, 2012, Secretary Napolitano issued the memorandum (Napolitano Memorandum) establishing the DACA policy.  The policy provided for the granting of deferred action to certain individuals with no lawful immigration status "who were brought to this country as children" and who satisfied a list of additional specified criteria.  The memorandum described this deferred action as an exercise of "prosecutorial discretion" to forbear from removing an alien who would otherwise be subject to removal.  Under pre-existing regulations, a grant of deferred action made aliens eligible for certain other attendant benefits, such as work authorization.  The memorandum directed U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS) to establish procedures for granting deferred action and work authorization to eligible aliens for a two-year period, subject to renewal, and for notifying those aliens of DHS's decision to do so.  The memorandum stated, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship."

On November 20, 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum (Johnson Memorandum) to expand the DACA policy and establish a new, related policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  With regard to DACA, this memorandum eliminated a criterion relating to the age of DACA requestors when the policy was announced, extended the deferred-action and work-authorization period from two to three years, and adjusted the date by which requestors must have entered the United States to be eligible for DACA.  The DAPA policy allowed for deferred action to be provided to certain parents whose children are U.S. citizens or lawful permanent residents through a process similar to DACA.

Shortly thereafter, the U.S. District Court for the Southern District of Texas issued a nationwide preliminary injunction preventing both the DAPA policy and the expansion of the DACA policy from taking effect.  In 2015, the U.S. Court of Appeals for the Fifth Circuit affirmed, holding that DAPA and expanded DACA likely violated both the Administrative Procedure Act (APA) and the Immigration and Nationality Act (INA).  In 2016, the U.S. Supreme Court affirmed the court of appeals' decision by an equally divided vote.  On June 15, 2017, Secretary of Homeland Security John Kelly issued a memorandum rescinding the Johnson Memorandum.

Also in June 2017, several of the state plaintiffs from the Texas lawsuit announced their intent to amend their complaint in the then still-pending litigation to challenge the original DACA policy as well.  The States argued that the DACA policy was unlawful for the same reasons as the DAPA policy and the expansion of the DACA policy.  On September 4, 2017, then-Attorney General Jefferson B. Sessions III issued a letter to Acting Secretary Duke (Sessions Letter), concluding that the DACA policy was indeed unlawful and likely would also be enjoined.

On September 5, 2017, Acting Secretary Duke issued her memorandum (Duke Memorandum) rescinding the Napolitano Memorandum and initiating an orderly wind-down of the DACA policy.  The Duke Memorandum explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" in the litigation concerning the Johnson Memorandum, and the Sessions Letter, it was clear to the Acting Secretary that the DACA policy "should be terminated."

Litigation challenging the Duke Memorandum promptly ensued.  As relevant here, suits were filed in the U.S. District Courts for the Northern District of California, Eastern District of New York, District of Maryland, and the District of Columbia.  The District of Columbia district court vacated the rescission entirely, but stayed its ruling for 90 days to permit DHS to reissue a memorandum rescinding the DACA policy and providing a fuller explanation.

In response to that ruling, on June 22, 2018, Secretary Nielsen issued an additional memorandum (Nielsen Memorandum) providing further explanation for the rescission of the DACA policy.  The Nielsen Memorandum explained that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons," including that the policy is contrary to law; that, even if it were not unlawful, Secretary Nielsen lacked sufficient confidence in the policy's legality to continue it; and that it was not sound enforcement policy in multiple respects.  Despite the Nielsen Memorandum, the District of Columbia district court declined to reconsider its previous order vacating the rescission.

On June 18, 2020, having granted review in the California, New York, and D.C. cases, the U.S. Supreme Court held that the rescission of the DACA policy must be vacated.  See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589.  The Court observed that "[a]ll parties agree[d]" that "DHS may rescind DACA," and the Court provided no reason to doubt that consensus.  Slip op. at 9.  But it held that DHS violated the APA in the manner in which it had rescinded the policy.

As a threshold matter, the Court determined that, although agency non-enforcement decisions are generally not reviewable under the APA, the rescission of the DACA policy was reviewable "because DACA is not simply a non-enforcement policy."  Id. at 11.  Rather, the Court stated, the Napolitano Memorandum "created a program for conferring affirmative immigration relief," the creation and rescission of which is subject to review under the APA.  Id.  And it added that the "benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy."  Id.

On the merits, the Court found that when DHS rescinded the DACA policy, it failed to consider important aspects of the problem.  In making that determination, the Court declined to consider the Nielsen Memorandum.  Instead, the Court characterized that memorandum as an impermissible post hoc rationalization of the rescission, because in the Court's view Secretary Nielsen "chose to elaborate on the reasons for the initial rescission rather than take new administrative action."  Id. at 14.  As to the Duke Memorandum, the Court held that it was arbitrary and capricious because (1) the Acting Secretary did not adequately consider whether DHS could and should address the illegality of the DACA policy by retaining the forbearance aspect of the policy (i.e., deferred action), while declining to make DACA recipients eligible for the other associated benefits, such as work authorization, id. at 17-23; and (2) the Acting Secretary did not adequately consider how, if at all, to address any "legitimate reliance" on the Napolitano Memorandum, id. at 23-26.  The Court thus concluded that the rescission must be vacated and that the matter should be "remand[ed] to DHS so that it may consider the problem anew."  Id. at 29.

The Court affirmed the District of Columbia district court's final judgment, vacated the Ninth Circuit's affirmance of the preliminary injunction issued by the Northern District of California, and vacated the preliminary injunction issued by the Eastern District of New York.  Id.

On June 30, 2020, Attorney General William Barr withdrew the Sessions Letter and directed the Department of Justice's Office of Legal Counsel to withdraw all guidance it had provided to DHS on the legality of DACA and related deferred-action policies, including an Office of Legal Counsel opinion that briefly addressed the legality of DACA in connection with related deferred-action policies.  Attorney General Barr explained that he did not "wish to maintain a determination as the Attorney General about the legality of DACA that might constrain the discretion [I] otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA."

**Rescission of the Nielsen and Duke Memoranda, and Reconsideration of the Napolitano Memoranda**

In light of the Supreme Court's decision to vacate the Duke Memorandum and remand to the Department of Homeland Security, and in my capacity as the Acting Secretary of Homeland Security, I am considering anew the DACA policy.  To date, I have considered the Napolitano Memorandum itself, the Duke Memorandum and Acting Secretary Duke's accompanying statement, the Nielsen Memorandum, the administrative record produced in litigation challenging the Duke Memorandum, the briefs and joint appendix filed in the Supreme Court from that litigation, the joint appendix filed in the Fourth Circuit on appeal in the District of Maryland litigation, all of the judicial opinions issued in the litigation over the Duke Memorandum, including the June 18 decision of the Supreme Court, the letter from Attorney General Barr, and letters expressing support for the DACA policy that have been submitted to the President and DHS since the Supreme Court's June 18 decision.

As those materials demonstrate, whether to retain the DACA policy presents significant questions of law and legal policy.  More importantly for present purposes, having considered those materials, I have concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission.  At the same time, I have concluded that fully rescinding the policy would be a significant administration decision that warrants additional careful consideration.  Accordingly, in the exercise of my authority and discretion in establishing national immigration policies and priorities, see 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of a full rescission.  Below, I address each of my enforcement policy concerns and then explain the immediate interim changes.

**Enforcement Policy Concerns:**  There are several reasons of enforcement policy that may warrant the full rescission of the DACA policy.

First, even if the DACA policy could have been justified as a temporary measure when it was created, Congress arguably has had more than sufficient time to consider affording permanent status or immigration relief to the class of aliens covered by the policy.  And yet, although various proposals have been advanced to do that, Congress has so far declined to take action.  Particularly in the face of this failure to reach a legislative solution, I have serious doubts as to whether DHS should continue to provide either a reprieve from removal or a grant of attendant benefits to more than half a million aliens through a broad, class-based deferred-action policy.

By contrast, rescinding DACA entirely may well create a more pressing need for Congress to decide whether it wants to address this issue and the underlying conditions that led to a

population of this size to remain in the United States in violation of our immigration laws for so long, and any other efforts to reform our immigration system in a manner that advances the national interest.  As unilateral executive action, the DACA policy necessarily lacks the permanence of statutory law; it is more akin to a stopgap measure.  For example, DACA recipients, as such, are not entitled to become lawful permanent residents and are not on a path to citizenship.  Congress is best positioned to address that and other concerns on a more permanent basis through duly enacted statutes.

Second, there has been much debate about the discretion exercised by DHS personnel in implementing the DACA policy.  In my view, however, regardless of the amount of discretion that has been exercised or could be exercised under the policy, I have reservations as a matter of policy about setting out a list of detailed criteria, and maintaining a formal process, for non-enforcement.  I am concerned that doing so may tilt the scales in deciding which aliens should receive deferred action and may inhibit individualized consideration of each case, at least for a non-enforcement policy of this scale.

Third, because DHS is a law enforcement agency, I am concerned about sending mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them.  DACA makes clear that, for certain large classes of individuals, DHS will at least tolerate, if not affirmatively sanction, their ongoing violation of the immigration laws.  I am deeply troubled that the message communicated by non-enforcement policies like DACA may contribute to the general problem of illegal immigration in a manner that is inconsistent with DHS's law enforcement mission.

Fourth, these concerns are all the more pressing in the context of children.  It is vitally important to convey a message that discourages individuals from undertaking what can often be a perilous journey to this country with no legitimate claim to enter or remain.  Of course, the DACA policy would not apply to children who are sent or brought to this country today.  But rescinding the DACA policy may further DHS's efforts to discourage illegal immigration involving children going forward.  By contrast, I am concerned that retaining the policy creates some risk of communicating the contrary message and encouraging such illegal conduct by suggesting a potential for similar future policies.

**Changes Pending Reconsideration of the DACA Policy**:  In accordance with the Supreme Court's decision, I am determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified.  In the meantime, given my serious concerns about the policy, I have determined that some changes should immediately be made to the policy to limit its scope in the interim.  First, while my reconsideration of the DACA policy continues, no new initial requests for DACA should be accepted.  Second, advance parole should be granted to current DACA beneficiaries only in exceptional circumstances.  Third, going forward, renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods.

These changes will mitigate my concerns without encroaching materially on the reliance interests that have been raised by individuals, organizations, and state and local governments during the course of the extensive litigation over the Duke and Nielsen Memoranda, and in recent letters to the President and DHS.  As noted by the Supreme Court, these groups have argued that, as the Napolitano Memorandum itself stated, many DACA recipients were brought or sent to the country as children, through no fault of their own, and may have never known another home.

They assert that DACA recipients have structured their lives around the expectation that DHS would forbear from enforcing the immigration laws against them and have come to rely on the other associated benefits—like work authorization, Social Security, and Medicare, as well as advance parole—that are made available to DACA recipients. They point out that other parties, too, would be affected by the rescission of the DACA policy, including the family members, schools, employers, and employees of DACA recipients. They have offered estimates of the amount of economic activity DACA recipients generate and the federal, state, and local tax revenue that DACA recipients provide. And some have even argued that the current COVID-19 and economic crises provide additional reasons to continue the DACA policy, in light of the many DACA recipients who have pursued careers in healthcare and other essential services or who serve in other critical roles in the workforce.

Whatever the merits of these asserted reliance interests on the maintenance of the DACA policy, they are significantly lessened, if not entirely lacking, with regard to aliens who have never before received deferred action pursuant to the policy. And any reliance interests possessed by an alien or a third party within the United States on that alien's ability to remain in the country does not depend on the extraordinary ability to come and go from the country as they please. In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist. Indeed, even after determining that DHS's prior full rescission of the policy was likely unlawful, the district courts in the previous litigation did not require DHS to consider requests for DACA from aliens who had not previously received it or to grant any requests for advance parole. Accordingly, that has been the status quo for more than two years. It makes sense to continue that approach while I reconsider whether to rescind or revise the policy. If I ultimately determine to maintain the policy, there is nothing in the policy that would preclude aliens from making an initial request for DACA or renewing requests for advance parole at that time. And, even in the interim, nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted.

Nor are the asserted reliance interests significantly affected by shortening the renewal periods from two years to one year. Shortening renewal periods granted during this reconsideration period will have the potential benefit of significantly lessening the lasting effects of the DACA policy if I ultimately decide to rescind it. And the costs will be limited in the meantime, because the aliens who currently have DACA grants and have structured their affairs based on their expectation of its continuance may still seek renewal. They will merely have to seek renewal on an annual, rather than biannual, basis. In a similar manner, the third parties who are benefiting from those aliens' continued presence today will continue to receive the same derivative benefits that they are receiving as long as the aliens' renewals continue—whether on an annual or bi-annual basis. Put differently, even assuming that aliens with DACA have legitimate reliance interests in being able to renew at all, they have minimal if any reliance interests in the length of each renewal period, especially since a grant of DACA was and remains revocable.

I recognize that shortening renewal periods on a prospective basis will have the effect, during this interim period as I consider how to address the DACA policy, of increasing the total amount of renewal fees that an alien will be required to pay over a multi-year period. But the fee per application will remain constant, and the fee that DHS charges for the application is associated with the processing costs to DHS. DHS personnel should consider whether it is possible to

reduce renewal fees during this interim period of reconsideration.  In my current view, however, even if renewal fees cannot be reduced, shortening the renewal period is still warranted by my strong desire to limit the scope of the policy during this interim period despite any additional fees incurred by DACA beneficiaries as a result.

Finally, to further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency.  Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes.  Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.[1]  Consistent with the Court's express remand for the agency's reconsideration and the Napolitano Memorandum's clear statement that it conferred no substantive rights, DHS did not expand beyond the status quo of the past several years for a few weeks while it was determining next steps.  I now conclude that all pending and future requests should be treated in the same manner, rather than be subject to differential treatment depending on the fortuity of when DHS received the request within a short period of uncertainty.  Nothing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis.  Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA—much less a legal entitlement to a particular renewal period.  Nor can aliens with pending requests assert any meaningfully greater reliance interests in their initial or continued enjoyment of the policy and the attendant benefits than aliens who submit such requests after the issuance of this memorandum.

Accordingly, effective immediately, DHS shall:

- Reject all initial DACA requests and associated applications for Employment Authorization Documents, and refund all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries.

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.

---

[1]       Prior to July 24, DHS's treatment of advance parole requests from DACA recipients varied.  Many were rejected, while some were accepted and receipted.  To the extent any rejected requestor believes exceptional circumstances support his or her request, he or she may now renew the request for advance parole, and it will be adjudicated on the terms set forth in this memorandum.

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances.

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano Memorandum, and as set forth in USCIS's Form I-821D instructions.  Nothing in this memorandum makes any change to that policy.

\* \* \* \* \*

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or equity by any party in any administrative, civil, or criminal matter.  Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.  Finally, if any aspect of the changes to the DACA policy in this memorandum is found to be unlawful, the remainder of the changes should nonetheless continue in effect.

# Exhibit B

Letter from Attorney General William P. Barr to Acting Secretary of
Homeland Security Chad F. Wolf (June 30, 2020)



# Office of the Attorney General
## Washington, D. C. 20530

June 30, 2020

The Honorable Chad F. Wolf
Acting Secretary of Homeland Security
Washington, DC 20528

Dear Acting Secretary Wolf:

On September 4, 2017, then-Attorney General Jefferson B. Sessions sent a letter to then-Acting Secretary of Homeland Security Elaine Duke that, among other things, expressed his view that the Department of Homeland Security (DHS) policy known as Deferred Action for Childhood Arrivals (DACA) was unlawful. Acting Secretary Duke expressly considered that letter, among other factors, in reaching her decision on September 5, 2017, that the DACA policy should be rescinded.

On June 18, 2020, the U.S. Supreme Court affirmed a lower court judgment vacating Acting Secretary Duke's rescission of the DACA policy. See *Department of Homeland Security v. Regents of the University of California*, Nos. 18-587, 18-588, 18-589. The Supreme Court noted that "[a]ll parties agree" that "DHS may rescind DACA," slip op. at 9, but held that Acting Secretary Duke's decision failed to provide a reasoned explanation as to both the scope of her discretion to rescind DACA and the manner in which she exercised it, *id.* at 29. Accordingly, the Court remanded the matter to DHS so that the agency may consider the issue anew. *Id.*

In order to facilitate that consideration, I am hereby withdrawing Attorney General Sessions's September 4, 2017, letter to Acting Secretary Duke. Without regard to whether I agree with the views expressed in that letter, I withdraw it because I do not wish to maintain a determination as the Attorney General regarding DACA that might constrain the discretion you otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA. In other words, I wish to wipe the slate clean to make clear beyond doubt that you are free to exercise your own independent judgment in considering the full range of legal and policy issues implicated by a potential rescission or modification of DACA, as contemplated by the Supreme Court. For the same reason, I also have directed the Office of Legal Counsel at the Department of Justice to withdraw an opinion that addressed the legality of DACA and related deferred-action policies, see *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op O.L.C. __ (Nov. 19, 2014), as well as any other guidance it has provided to DHS on that topic.

Sincerely,

William P. Barr
Attorney General