**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

STATE OF TEXAS, *et al.*,          )
                                   )
          Plaintiffs,         )
                                   )
          v.                 )  Case No. 1:18-CV-68
                                   )
UNITED STATES OF AMERICA, *et al.*,  )
                                   )
          Defendants,       )
                                   )
KARLA PEREZ, *et al.*,         )
                                   )
          Defendant-Intervenors, )
and                              )
                                   )
STATE OF NEW JERSEY,      )
                                   )
          Defendant-Intervenor.  )

**<u>DEFENDANT-INTERVENOR STATE OF NEW JERSEY'S OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ............................. 3

SUMMARY OF THE ARGUMENT ........................................................................... 3

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............................. 5

    A. Federal Immigration Law ..................................................................... 5

    B. The 2012 Napolitano Memo ................................................................. 7

    C. The Rescission Of The Napolitano Memo .......................................... 8

    D. The Instant Litigation ........................................................................... 9

    E. The Supreme Court's Decision In *Regents* ................................... 10

    F. The 2020 Wolf and Edlow Memos .................................................... 12

    G. Plaintiffs' Summary Judgment Motion ............................................ 16

ARGUMENT ........................................................................................................... 16

    I. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IS MOOT ..................... 16

    II. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR
       CHALLENGE TO THE DACA MEMOS. ............................................... 23

      A. The DACA Memos Are Procedurally Valid Under The APA. ........... 23

        1. The Memos Ensure Officers Exercise Discretion On An Individual Basis. .......... 24

          a. The Memos Are Discretionary On Their Face. ................................. 24

          b. The Memos Are Discretionary In Implementation. ........................... 26

2.  The DACA Memos Do Not Impose Any Rights Or Obligations. ......................... 31

B.  The DACA Memos Are Substantively Valid Under INA. ...................................... 33

1.  The INA Does Not Bar DHS From Issuing The DACA Memos. ......................... 34

2.  DACA Is A Reasonable Exercise Of DHS's Prosecutorial Discretion. ............... 38

C.  DACA Is Constitutionally Valid Under The Take Care Clause. ............................ 41

III. THIS COURT SHOULD NOT ISSUE AN INJUNCTION. ......................................... 42

CONCLUSION ............................................................................................................... 48

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States*, 567 U.S. 387 (2012) .......................................................... 5, 35

*Arpaio v. Obama*, 27 F. Supp. 3d 185 (D.D.C. 2014) ................................................. 5

*Barnhart v. Walton*, 535 U.S. 212 (2002) ................................................................ 34

*Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018) ............................ 8, 41

*Bob Jones University v. United States*, 461 U.S. 574 (1983) ...................................... 22

*Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) ...................................................... 17

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ............................................................. 48

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ...................... 34, 38

*Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199 (D.C. Cir. 1986) .............................. 42

*Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) ............................................... 7, 24, 26

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 139 S. Ct. 2779 (2019) ....................... 9

*Dep't of Homeland Sec. v. Regents of Univ. of Calif.*, 140 S. Ct. 1891 (2020) .................... *passim*

*Diffenderfer v. Cent. Baptist Church of Miami, Fla.*, 404 U.S. 412 (1972) ................................. 17

*Harris v. Amoco Prod. Co.*, 768 F.2d 669 (5th Cir. 1985) ........................................... 22

*In re S.L.E., Inc.*, 674 F.2d 359 (5th Cir. 1982) ........................................................ 22

*INS v. Chadha*, 462 U.S. 919 (1983) ......................................................................... 22

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ...................................................................... 23

*McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004) ..................................................... 17

*Momin v. Gonzales*, 447 F.3d 447 (5th Cir. 2006) .................................................. 36

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ...................................... 43

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . 11

*Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209 (D.D.C.

2018) ............................................................................................................................. 8

*Nikko Trading of Am. Corp. v. Wastemasters, Inc.*, No. 98-48, 2000 WL 284190 (N.D. Tex. Mar. 14, 2000) ................................................................................................................... 22

*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jackson*, 508 U.S. 656 (1993)........ 21

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631 (9th Cir. 2015) .................. 19

*Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592 (5th Cir. 1995)...... 24, 26, 31, 35

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018) .................................................................................................................................. 8

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018).............. 8

*Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471 (1999)............................................. 35, 39

*Roho, Inc. v. Marquis*, 902 F.2d 356 (5th Cir. 1990)................................................................... 48

*Sossamon v. Lone Star State of Tex.*, 560 F.3d 316 (5th Cir. 2009) .......................................... 20

*Serv. Emps. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588 (5th Cir. 2010) ............. 17, 20

*Sierra Club v. Glickman*, 156 F.3d 606 (5th Cir. 1998) ............................................................. 17

*Soltex Polymer Corp. v. Fortex Indus.*, 832 F.2d 1325 (2d Cir. 1987)........................................ 48

*Stauffer v. Gearhart*, 741 F.3d 574 (5th Cir. 2014) ................................................................... 20

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).......................................................... *passim*

*Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015)....................................................... 8

*United States v. Texas*, 136 S. Ct. 2271 (2016) .......................................................................... 8

*United States v. Windsor*, 570 U.S. 744 (2013) ........................................................................ 22

*Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000)........................... 48

*Yarls v. Bunton*, 905 F.3d 905 (5th Cir. 2018)........................................................................... 20

*Zheng v. Gonzales*, 422 F.3d 98 (3d Cir. 2005) ......................................................................... 36

**Statutes**

5 U.S.C. § 553 ........................................................................................................ 23

6 U.S.C. § 202 ..................................................................................................... 5, 43

8 C.F.R. § 1.3 .................................................................................................... 32, 37

8 C.F.R. § 274a.12 ........................................................................................ 6, 32, 37

8 U.S.C. § 1103 .................................................................................................... 5, 6

8 U.S.C. § 1182 ................................................................................................. *passim*

8 U.S.C. § 1225 ......................................................................................................... 6

8 U.S.C. § 1226 ...................................................................................................... 37

8 U.S.C. § 1611 .................................................................................................. 32, 37

U.S. Const. art. II .................................................................................................... 41

**Other Authorities**

Consolidated Appropriations Act, 2014, Pub. L. No. 113-76 ..................................... 6

**Regulations**

46 Fed. Reg. 25,079 (May 5, 1981) ..................................................................... 32, 37

52 Fed. Reg. 16,216 (May 1, 1987) ..................................................................... 32, 37

61 Fed. Reg. 47,039 (Sept. 6, 1996) .................................................................... 32, 37

76 Fed. Reg. 53,764 (Aug. 29, 2011) ................................................................... 32, 37

80 Fed. Reg. 7,912 (Feb. 12, 2015) ..................................................................... 32, 37

## INTRODUCTION

Plaintiffs' request for summary judgment suffers from an important, yet overlooked, flaw: they are challenging a 2012 memorandum that the Federal Government is no longer enforcing. In 2012, as this Court knows well, Federal Defendants issued a memorandum setting forth guidelines for the handling of any requests for deferred action by childhood arrivals (DACA), known as the Napolitano Memo (and referred to here as the 2012 DACA Memo). In their complaint, and again at summary judgment, Plaintiffs claimed that the Napolitano Memo was unlawfully requiring the Department of Homeland Security (DHS) to approve new requests for deferred action, including to award these childhood arrivals the "benefit" of advance parole, without exercising any case-by-case discretion over each individual request. And because they believed that the Napolitano Memo offered benefits to childhood arrivals, and did so via nondiscretionary rules, they argue it violated the Administrative Procedure Act (APA), the Immigration and Nationality Act (INA), and the Take Care Clause. At the preliminary stage, Defendant-Intervenors disagreed with Plaintiffs as to their views of the law and the facts relating to the Napolitano Memo, and Defendant-Intervenors of course still disagree with them. But that dispute no longer lies at the heart of this case, because the Napolitano Memo is no longer the Federal Government's governing legal document.

Indeed, because Plaintiffs took nearly six years to file the instant suit against the Napolitano Memo, subsequent events have overtaken their claims. This summer, DHS issued a series of new memoranda that modified and took the place of the guidance in the Napolitano Memo. First, on July 28, 2020, DHS Acting Secretary Chad Wolf issued a memorandum—the Wolf Memo—which "effect[s] certain immediate changes to limit the scope of the DACA policy pending a full and careful reconsideration of the DACA policy." Ex. 2 (NJAPP011). Among other things, this new memorandum (1) prohibits officers from granting any new initial requests for deferred action

relating to DACA; (2) prohibits granting childhood arrivals advance parole, except in those "exceptional circumstances" consistent with the statute; and (3) places limits on any requests for renewal of deferred action. The Wolf Memo also mandates that officers exercise case-by-case discretion in evaluating DACA requests—which reflects the Federal Government's view that imposing nondiscretionary criteria on the deferred action process would be illegal. The following month, on August 21, 2020, U.S. Citizenship and Immigration Services (USCIS) Deputy Director Joseph Edlow likewise issued a memorandum—the Edlow Memo—that further clarifies the limits placed on new requests and on advance parole, and mandates that USCIS review and replace the governing Standard Operating Procedures (SOPs), guidance documents, and training materials to ensure officers are exercising individualized discretion when reviewing DACA renewal requests. These memoranda—the 2020 DACA Memos—work significant changes to Federal Defendants' approach to deferred action, but Plaintiffs hardly mention the former and altogether ignore the latter.

The issuance of the Wolf and Edlow Memos fundamentally changes all three questions before this Court—namely, jurisdiction, the merits, and Plaintiffs' request for an injunction. As to the first, it is black letter law that Article III courts sit to hear challenges to laws or policies in effect, not ones that have since been replaced. Whatever this Court might have once concluded regarding the case or controversy before it, the challenge is moot—Federal Defendants' decisions not to grant any new initial DACA requests, to limit advance parole, and to ensure that one-year renewals are only granted based on the exercise of individual officer discretion leave Plaintiffs with what they wanted. For the same reasons, Plaintiffs' claims on the merits fail too. For one, while Defendant-Intervenors believe it has always been clear that officers enjoy discretion in evaluating DACA requests, there can no longer be doubt on that score. For another, Plaintiffs'

arguments regarding advance parole and any other "benefits" DACA recipients receive—which have always erroneously conflated DACA with preexisting statutes and regulations—evaporate in light of the changes made by these 2020 Memos. These changes therefore dispose of Plaintiffs' procedural, substantive, and constitutional arguments. And finally, these developments speak to any remedy. Given that Plaintiffs got what they asked for, and in light of the consequential reliance and public interests at stake, no injunctive relief is proper at this stage. Simply put, while Plaintiffs' brief tells the same story they have told this Court since 2018, recent developments—particularly Federal Defendants' issuance of new memoranda—render their narrative obsolete.

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

On October 9, 2020, Plaintiffs moved for summary judgment, asking this Court to declare DHS's 2012 DACA Memorandum unlawful and set it aside under the APA. The Court must now determine whether Plaintiffs are entitled to this relief, even though DHS has since issued a series of memoranda that supersede the elements of the 2012 Memo on which Plaintiffs base their claims; important issues of material fact remain unresolved, especially under the 2020 DACA Memos; and Plaintiffs are not entitled to injunctive relief.

## SUMMARY OF THE ARGUMENT

Plaintiffs' motion for summary judgment runs into three insurmountable hurdles.

I.      The Court should deny Plaintiffs' motion because their suit against the 2012 DACA Memo is moot. Plaintiffs challenge a 2012 memorandum that they allege allows for new grants of forbearance from removal for two-year periods, allows DACA recipients to obtain advance parole for allegedly unlawful reasons, and sets mandatory criteria that entitle individuals to renewal of forbearance with no end date. Even were Plaintiffs correct as to the 2012 memorandum, and they are not, new memoranda and SOPs issued this year made "immediate changes" to DACA, which

3

include eliminating the features Plaintiffs challenge. *First*, the 2020 DACA Memos cease all new grants of forbearance. *Second*, the Memos establish that DACA recipients can only obtain advance parole if they meet the applicable statutory criteria, *e.g.,* to "obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States." Ex. 2 (NJAPP018). *Third*, while the 2020 Memos allow for *renewals* of forbearance (for just one year at a time), the Memos require the exercise of case-by-case discretion in assessing such requests—and even require the amendment of DACA-related SOPs, training materials, and internal guidance to ensure that discretion is used. Yet Plaintiffs have not amended their complaint to address the 2020 Memos, and barely mention them in their brief. Because Plaintiffs urge this Court to render an advisory opinion on an outdated 2012 memorandum, Article III requires this Court to decline the invitation.

II.     Even were this Court to reach the merits, it should deny Plaintiffs' motion because genuine issues of material fact remain unresolved, including on the most central issue in the case: whether DHS agents can exercise discretion in adjudicating DACA requests. As this Court has acknowledged, there was already evidence at the preliminary relief stage supporting the view that officers enjoyed discretion—including increasing rates of DACA denials over time and emails and testimony confirming the importance of discretion. At summary judgment, there is even more such evidence: *inter alia*, the 2020 DACA Memos that mandate case-by-case discretion in considering renewals; increasing rates of denials of DACA requests; and direct confirmation from Federal Defendants that they did not grant all requests that satisfied the 2012 Memo's criteria. The record evidence—including from the 2020 Memos—also confirms that DACA does not entitle anyone to legal rights or benefits. Given the continued role for discretion in the review of each request, it becomes clear that DACA, as it was initially announced and as currently implemented, is a statement of policy to help guide each officer's discretion rather than to control it, and that

Plaintiffs are not entitled to summary judgment on their procedural APA claim. And for the same reason, these individualized one-year extensions of deferred action are consistent with federal immigration law and history, and so Plaintiffs cannot obtain a judgment against the memoranda on substantive APA or Take Care Clause grounds either.

III.     Finally, even if this Court believes that Plaintiffs are entitled to summary judgment, it must remand to DHS with instructions to craft a new approach that sufficiently accounts for Defendant-Intervenors' and other entities' reliance interests. Not only did the Supreme Court already instruct DHS to take such reliance interests into account, but DHS is best equipped to make these complex policy decisions. In the interim, this Court should decline to issue injunctive relief given that the adjustments made under the 2020 DACA Memos address Plaintiffs' concerns, and especially in light of the considerable equities and public interests at stake. DACA recipients, family members, employers, universities, and states and local governments have relied on DACA for years, and any court injunction at this time would be enormously disruptive.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

### A.     Federal Immigration Law

The Secretary of DHS is charged by Congress with administering and enforcing federal immigration laws and "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5); *see also* 8 U.S.C. § 1103(a)(1). Establishing enforcement priorities is key: while there were approximately 11.3 million undocumented immigrants in the United States as of 2014, Congress appropriated only enough funds to remove 400,000 each year. *See Arpaio v. Obama*, 27 F. Supp. 3d 185, 192-93 (D.D.C. 2014). Said another way, "[a] principal feature of the removal system" in the United States is "the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012). "Federal officials . . . must decide whether it makes

sense to pursue removal at all," and whether to afford an alien "discretionary relief allowing [him or her] to remain in the country." *Id.* In exercising such discretion, the Supreme Court has held, DHS may be guided by "immediate human concerns" as well as the need to prioritize its limited enforcement resources. *Id.* After all, Congress authorized the DHS Secretary to "perform such . . . acts as he deems necessary for carrying out his authority," 8 U.S.C. § 1103(a)(3), and to prioritize removals of criminal aliens and aliens detained at the border. *See* Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, sec. 8, tit. II, 128 Stat. 5, 251; 8 U.S.C. § 1225.

DHS's authority to manage and prioritize enforcement efforts includes what is known as "deferred action," a well-recognized practice of "administrative convenience to the government which gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14). Since the 1950s, the Executive Branch has established more than 20 policies for exercising deferred action and/or other forms of prosecutorial discretion to forbear from removal particular classes of undocumented immigrants from the United States. Early examples of such policies include: (a) President Eisenhower's parole of Hungarian refugees, Dkt. 215-1 at 309; (b) the parole of more than 600,000 Cubans in the United States through a series of discretionary programs that took place over the course of four Presidential administrations, *id.* at 317; and (c) President Kennedy's establishment of the Hong Kong Parole Program, which provided extended voluntary departure to 15,000 refugees, *id.* at 344-45. More recently, the "Family Fairness" policies of 1987 and 1990 would have provided forbearance and work authorization for up to 1.5 million undocumented spouses and children of legalized immigrants or those in the process of legalizing their status, or about 40% of the total undocumented population at that time. *See* Dkt. 6 at 225-26, 247, 250-52. Congress has repeatedly encouraged such use of deferred action and has not passed any laws to encumber it.

###### B.      The 2012 Napolitano Memo

On June 15, 2012, DHS Secretary Janet Napolitano issued a Memorandum laying out some criteria to be considered when evaluating whether to defer removal of what DHS considered "low priority" undocumented immigrants, namely "'certain young people who were brought to [the United States] as children and know only this country as home.'" *Crane v. Johnson*, 783 F.3d 244, 248 (5th Cir. 2015) (quoting Memorandum from Janet Napolitano, Sec'y of Homeland Sec., to David Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) [hereinafter Napolitano Memo or 2012 DACA Memo]), Dkt. 6 at 3-5. Said another way, the Napolitano Memo allowed young people born outside the United States and raised in this country to apply for deferred action status. Much like previous deferred actions, the Napolitano Memo specified requests were "to be decided on a case by case basis," and it "confer[red] no substantive right, immigration status or pathway to citizenship" for anyone. *Id.* at 4-5. Texas and the other Plaintiffs here did not file any legal challenge to the Napolitano Memo when it was issued in 2012.

Two years later, DHS Secretary Jeh Johnson issued a separate memorandum: *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* (November 14, 2014) [hereinafter Johnson Memo or DAPA Memo], *Id.* at 7-11. The Johnson Memo established deferred action for undocumented parents of U.S. citizens or lawful permanent residents, and it expanded DACA by (1) removing the age limitation, (2) extending the period of deferred action and work authorization from two to three years, and (3) changing the date of entry requirement from June 15, 2007 to January 1, 2010. *Id.* at 9-10. Texas and several

other states sued DHS over the Johnson Memo but again declined to challenge the Napolitano Memo. *See Texas v. United States*, 86 F. Supp. 3d 591, 606-15 (S.D. Tex. 2015).

On February 16, 2015, this Court granted Plaintiffs' motion for a preliminary injunction and enjoined the Johnson Memo. *See id.* at 677-78. A divided Fifth Circuit panel affirmed, *see Texas v. United States*, 809 F.3d 134, 139 (5th Cir. 2015) [hereinafter *Texas I*], and the Supreme Court affirmed by an equally divided Court. *See United States v. Texas*, 136 S. Ct. 2271 (2016).

### C.        The Rescission Of The Napolitano Memo

After President Trump took office, DHS Secretary John Kelly rescinded the Johnson Memo but left the Napolitano Memo in place. *See* Dkt. 6 at 21. On June 29, 2017, more than five years after issuance of the Napolitano Memo, Texas and ten other states wrote to Attorney General Jeff Sessions, asserting for the first time that the Napolitano Memo is illegal and threatening to amend their original complaint to challenge it in this Court if the United States did not rescind it by September 5, 2017. *Id.* at 15-17. On September 5, 2017, Acting Secretary of Homeland Security Elaine Duke issued a memorandum rescinding the Napolitano Memo. *See id.* at 19-24.

Various plaintiffs (including twenty States and the District of Columbia) filed lawsuits in six federal courts seeking to enjoin the rescission. Those cases led to three nationwide injunctions. *See Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018); *Nat'l Ass'n for the Advancement of Colored People v. Trump*, 298 F. Supp. 3d 209, 215-16 (D.D.C. 2018). The Federal Government filed petitions for certiorari before judgment in all three matters. In November 2018, the Ninth Circuit affirmed one of the three injunctions. *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 486 (9th Cir. 2018). While appeals in the Second Circuit and

D.C. Circuit were pending, the Supreme Court granted all three petitions and consolidated the cases for argument. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 139 S. Ct. 2779 (2019).

### D.     The Instant Litigation

In response to the nationwide injunctions preventing Federal Defendants from rescinding the 2012 DACA Memo, on May 1, 2018, Texas and seven other states filed the instant suit. In their Complaint, Plaintiffs alleged that the 2012 DACA Memo was unlawful and sought both (1) "[a]n order enjoining Defendants from issuing or renewing any DACA permits in the future," and (2) a declaratory judgment that DACA is unlawful. Dkt. 1 at 73; *see also* Dkt. 104 at 73. On May 2, 2018, Plaintiffs filed a motion for a preliminary injunction, in which they sought to "enjoin the 2012 memorandum creating DACA" on a nationwide basis. Dkt. 5 at 13.

Defendant-Intervenors opposed the request for preliminary relief, and this Court denied the motion. Dkt. 319. In its ruling, this Court repeatedly noted that the record contained open questions of fact. Notably, the Court found that there was conflicting evidence in the record as to whether individual decision-makers were permitted to exercise, and actually were exercising, discretion in adjudicating requests pursuant to 2013 DACA SOPs. *See id.* at 101 (noting that the "individuals screening the applications may have some discretion"). As a result, the Court found that Plaintiffs had not made the "clear showing" necessary to carry their burden on this point. *Id.* at 102. Other open questions concerned the number of individuals who could be eligible for deferred action pursuant to the Napolitano Memo, *id.* at 9 n.10, and the extent of the economic harm to Texas as a result of that memorandum, *id.* at 106. *See also* Dkt. 287-1 at 4-7 (describing additional discovery necessary to respond to a motion for summary judgment).

This Court further found that the balance of harms and the public interest weighed against injunctive relief, especially given Plaintiffs' almost six-year delay in filing the suit, and Defendant-

Intervenors' reliance on their inaction and the existence of grants of deferred action in the interim. Dkt. 319 at 108-12, 115. The Court recognized the "immediate effects" an injunction would have on individual recipients who rely upon deferred action for "their ongoing lawful status and their ability to work," and "their ability to travel within the United States and many other benefits that flow from lawful presence." *Id.* at 113. The Court found that enjoining the 2012 DACA Memo would harm New Jersey and other states, cities, and employers who "could lose residents whom they consider to be valuable members of their communities or employees who are integral to various schools, municipalities, and industries." *Id.* at 113-14. This Court thus ultimately held that a preliminary injunction should not issue because "the egg has been scrambled. To try to put it back in the shell with only a preliminary injunction record, and perhaps at great risk to many, does not make sense nor serve the best interests of this country." *Id.* at 115.

Following its denial of preliminary injunctive relief, the Court set forth a considered 18-month discovery schedule. Dkt. 340 at 10:21-25.

E.    **The Supreme Court's Decision In *Regents***

While discovery in this matter was ongoing, the Supreme Court heard oral argument and issued a decision in the consolidated cases challenging DHS's rescission of the Napolitano Memo. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891 (2020) [hereinafter *Regents*]. The Court held that this rescission was arbitrary and capricious because DHS failed to consider two important aspects of the problem before it. *See id.* at 1913.

*First*, the Court determined that the Federal Government had misunderstood the import of the Fifth Circuit's decision in *Texas I*. Although the Attorney General and Acting Secretary Duke read *Texas I* to require the rescission of the 2012 DACA Memo altogether, the *Regents* majority explained that the import of *Texas I* was far more limited. To the contrary, the Fifth Circuit only

found DAPA unlawful based on the conclusion that DAPA "grant[ed] 'eligibility for benefits'—
including work authorization, Social Security, and Medicare—to unauthorized aliens on 'a class-
wide basis.'" *Id.* at 1911 (quoting *Texas I*, 809 F.3d at 170). *Texas I* neither "addressed the
forbearance policy at the heart of DACA nor compelled DHS to abandon that policy," and the
Attorney General and DHS erred in concluding otherwise. *Id.* at 1912. "[G]iven DHS's earlier
judgment that forbearance is 'especially justified' for 'productive young people' who were brought
here as children and 'know only this country as home,'" the Court held that it was arbitrary and
capricious to rescind the 2012 Memo "'without any consideration whatsoever' of a forbearance-
only policy." *Id.* at 1912-13 (quoting *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut.
Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)).

　　　*Second*, the Court concluded that the rescission was arbitrary and capricious because DHS
"failed to address whether there was 'legitimate reliance'" on the grants of deferred action. *Id.* at
1913. The Court noted "[w]hen an agency changes course, as DHS did here, it must be cognizant
that longstanding policies may have engendered serious reliance interests that must be taken into
account." *Id.* (internal quotation marks omitted). The Court highlighted the "noteworthy concerns"
that the respondents and amici had emphasized, including: that "DACA recipients have 'enrolled
in degree programs, embarked on careers, started businesses, purchased homes, and even married
and had children, all in reliance' on the DACA program"; the impacts that rescission of DACA
would have on "recipients' families, including their 200,000 U.S.-citizen children," "the schools
where DACA recipients study and teach," and "the employers who have invested time and money
in training them"; and the economic consequences of excluding these recipients from the labor
force, including an annual loss of $1.25 billion in state and local tax revenue. *Id.* at 1914.

The Court explained that, had DHS properly considered these reliance interests, it might have considered providing "a broader renewal period based on the need for DACA recipients to reorder their affairs," granting "more accommodating termination dates for recipients caught in the middle of a time-bounded commitment" such as a course of study, military service, or medical treatment, or "instruct[ing] immigration officials to give salient weight to [] reliance interests . . . when exercising individualized enforcement discretion." *Id.* While DHS was not required to adopt any of these suggestions, the Court held that its failure to even consider "accommodating particular reliance interests" was arbitrary. *Id.* at 1914-15. The Court remanded the issue back to DHS to determine the proper approach, reasoning that "deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA. Those policy choices are for DHS." *Id.* at 1910.

### F.       The 2020 Wolf and Edlow Memos

In response to the order in *Regents*, Acting Secretary Wolf issued a memo on July 28, 2020 titled "*Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'*" Memo. from Chad Wolf, Acting Sec'y of Homeland Sec., to Mark Morgan, Senior Official Performing Duties of Comm'r, U.S. Customs & Border Prot., et al. (July 28, 2020) [hereinafter Wolf Memo] (Ex. 1 (NJAPP001-09)). Acting Secretary Wolf began by noting that he was carefully reviewing the administrative record, including the briefs, appendices, and judicial opinions from the suits over the rescission memos, to assess the propriety of DACA altogether. *Id.* at NJAPP005. Acting Secretary Wolf explained that "[a]s those materials demonstrate, whether to retain the DACA policy presents significant questions of law and legal policy." *Id.* Though he found that "serious policy concerns [] may warrant [DACA's] full rescission," he recognized "that fully rescinding

the policy would be a significant administration decision that warrants additional careful consideration." *Id.* Acting Secretary Wolf acknowledged that a range of individuals, organizations, and state and local governments had relied on DACA. *Id.* at NJAPP006. Specifically, he noted that these entities explain that recipients "have structured their lives around the expectation of" deferred action; "family members, schools, employers, and employees" would be affected by a rescission; DACA recipients generate "economic activity" and "federal, state, and local tax revenue"; and recipients who pursued careers in healthcare and essential services are particularly needed during the COVID-19 pandemic. *Id.* at NJAPP007.

That said, even while that consideration was underway, Acting Secretary Wolf decided to make "immediate changes to the DACA policy." He ordered that, beginning immediately, (1) no new initial requests for deferred action based on the 2012 DACA Memo could be accepted, and (2) DACA recipients could receive advance parole only in very limited circumstances consistent with the relevant statutes. Because the courts that enjoined the prior rescission "did not require DHS to consider requests for DACA from aliens who had not previously received it or to grant any requests for advance parole," these mandates had "been the status quo for more than two years." *Id.*; Ex. 6 (NJAPP048) (internal USCIS email from May 2019 stating review of filings showed no approvals after September 5, 2017 where requestor did not have prior DACA grant); Ex. 7 (NJAPP050) (internal USCIS email from April 2019 stating USCIS not accepting or approving requests from individuals without prior grant). Moreover, while DHS could continue to grant renewals of DACA and accompanying work authorizations, such renewals could be only for one-year terms, Wolf Memo (Ex. 1 (NJAPP006)), and the Memo required that officers shall "[e]xercise [their] discretionary authority to terminate or deny deferred action at any time when

13

immigration officials determine termination or denial of deferred action is appropriate," even for this population of prior recipients. *Id.* at NJAPP009.

On August 21, 2020, USCIS Associate Director Joseph Edlow issued a Memorandum, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,'"* [hereinafter Edlow Memo[1]] (Ex. 2 (NJAPP011-20)), to "provid[e] additional guidance to facilitate [USCIS's] implementation of the specific changes to the DACA policy that are within [its] purview." *Id.* at NJAPP011. The Edlow Memo orders USCIS to reject all requests from individuals who have never received DACA,[2] *id.* at NJAPP012-13, and to grant advance parole only in exceptional circumstances that qualify as urgent humanitarian reasons or significant public benefit consistent with 8 U.S.C. § 1182(d)(5), *id.* at NJAPP017-18. In particular, the Edlow Memo states that advance parole will generally not be granted for "traveling abroad for educational purposes, employment related purposes, or to visit family members living abroad," and will instead only be granted "to support the national security interests of the United States"; "in furtherance of U.S. federal law enforcement interests," "to obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States," and to "support the immediate safety, well-being, or care of an immediate relative, particularly minor children of the alien." *Id.* at NJAPP018.

---

[1] The Wolf Memo and Edlow Memo are collectively referred to as the 2020 DACA Memos.

[2] Under USCIS's terminology, "initial" requests include requests from individuals who have never before received DACA, and requests from anyone whose DACA grants were terminated or have been expired for more than one year. Edlow Memo (Ex. 2 (NJAPP013)); *see also* Ex. 3 (NJAPP28-29). Therefore, some requests categorized as "initial" by USCIS are still being processed, but no new individuals will receive DACA.

Moreover, the Edlow Memo instructs USCIS not to accept renewal requests more than 150 days prior to expiration absent unusual circumstances, *id.* at NJAP014-15, and confirms that USCIS will reduce the validity period of all new DACA grants from two years to one, *id.* at NJAPP015-16. Finally, the Edlow Memo reinforces individualized discretion in the assessment of requests by requiring the Service Center Operations Directorate (SCOPS) to "immediately review . . . the DACA SOP last revised on August 28, 2013," and any "guidance and training materials," to make sure that they are all consistent with the Wolf and Edlow Memos' requirement of discretion. *Id.* at NJAPP020. SCOPS must make clear that the updated SOP "is intended solely for the instruction of USCIS personnel in the performance of their official duties, and that the SOP is not legally binding, does not confer any substantive rights to removable aliens, and does not otherwise constrain DHS's authority to enforce the immigration laws passed by Congress." *Id.*

Federal Defendants admit that they are presently implementing DACA in accordance with the Wolf and Edlow Memos, not the Napolitano Memo *See* Ex. 3 (NJAPP 028-29); *see also* Ex. 8 (NJAPP053-55) (internal USCIS email providing guidance on Edlow Memo to Service Centers and adjudicators). Notably, this means that the total field of those eligible for DACA is limited to those individuals who have already received DACA, Wolf Memo (Ex. 1 (NJAPP006)); Ex. 5 (NJAPP043) (providing there were 645,610 active DACA recipients as of June 30, 2020), that those who retain DACA grants have to renew them on a more frequent basis and cannot receive advance parole unless they meet the stringent requirements the 2020 Memos lay out, and that USCIS officials have been again instructed regarding the discretion they retain in assessing each individual case.

### G.    Plaintiffs' Summary Judgment Motion

Nearly three months after DHS issued the Wolf Memo—and while the agency is actively considering whether to fully terminate deferred action for childhood arrivals—Plaintiffs filed a motion for summary judgment, urging this Court to declare the 2012 DACA Memo procedurally invalid under the APA, substantively contrary to the INA, and in violation of the Take Care Clause. Plaintiffs' brief includes only two mentions of the Wolf Memo and no mention of the Edlow Memo, and they have not amended their complaint to allege any new claims against—or seek relief from—the 2020 DACA Memos.

## ARGUMENT

## I.    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IS MOOT.

In their Amended Complaint and again in their motion for summary judgment, Plaintiffs pursue claims relating to the purported invalidity of a 2012 DACA Memo that, as a result of intervening action by Federal Defendants, was supplanted by an entirely new framework earlier this year. In light of changes made by the Wolf and Edlow Memos,[3] the alleged infirmities to which Plaintiffs point are no longer on the books. While Plaintiffs could have amended their complaint (or filed a new lawsuit) to challenge the Wolf and Edlow Memos, they did not do so, likely because they know those memoranda resolve their demands. Because Plaintiffs persist in challenging only the prior memorandum, this Court lacks jurisdiction to grant them the relief they seek.

---

[3] New Jersey recognizes that there may be challenges to the Wolf and Edlow Memos, including to Acting Secretary Wolf's authority to issue them, and by no means is endorsing the current approach. But for purposes of the current motion before the Court, the only question is what the status of the law currently is, and there is no question that the Wolf and Edlow Memos are the law. That moots any challenge to the Napolitano Memo, including the features that were specifically replaced by Federal Defendants. Were it otherwise, no challenge to a statute could ever be mooted by amendment.

Mootness "ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit," and a case is moot if "the issues presented are no longer live." *McCorvey v. Hill*, 385 F.3d 846, 848-49 (5th Cir. 2004); *Sierra Club v. Glickman*, 156 F.3d 606, 619 (5th Cir. 1998). Courts, "of course, must examine the statute and the regulations," or, in this case, the DACA Memos, "as they now exist." *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 53 (1974); *see also McCorvey*, 385 F.3d at 849 ("Suits regarding the constitutionality of statutes become moot once the statute is repealed."). To do otherwise risks issuance of an advisory opinion. *See Diffenderfer v. Cent. Baptist Church of Miami, Fla.*, 404 U.S. 412, 414-15 (1972) (finding Court must consider law "as it stands now" and that repeal of challenged legislation meant the case "lost its character as a present, live controversy of the kind that must exist if [courts] are to avoid advisory opinions on abstract propositions of law"); *Serv. Emps. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 603 (5th Cir. 2010) (amendment to ordinance mooted aspects of challenge).

Here, the Wolf and Edlow Memos—which establish Federal Defendants' new framework governing deferred action for childhood arrivals—moot this challenge to the 2012 DACA Memo. Plaintiffs' challenges fall into three buckets: challenges to initial deferred action grants; challenges to grants of advance parole; and challenges to renewals of existing deferred action grants. But under the 2020 DACA Memos, none of the offending provisions remain on the books.

*First*, the Edlow Memo explicitly bars new initial DACA grants. The Edlow Memo states that "USCIS shall reject and return the fees for any DACA requests and associated applications for employment authorization submitted by aliens *who have never before received a grant of DACA*." Edlow Memo (Ex. 2 (NJAPP012)); *see also* Wolf Memo (Ex. 1 (NJAPP008)) (requiring that DHS reject "all initial DACA requests and associated applications for Employment Authorization Documents"). Simply put, the 2020 Memos grant Plaintiffs the relief they sought as

17

to initial requests. *Compare* Dkt. 486 at 55-56, *with* Wolf Memo (Ex. 1 (NJAPP002-03, NJAPP008-09)). The controversy over initial DACA requests is clearly moot.

*Second*, although Plaintiffs spill considerable ink in their brief contending that "DACA" is invalid because it allows for grants of advance parole inconsistent with the governing statute, *see* Dkt. 486 at 48, the Edlow Memo again grants all their requested relief. Under that memorandum, DHS placed "a new general hold on granting advance parole to DACA recipients" and is limiting grants of advance parole to exceptional cases that comply with "INA Section 212(d)(5), 8 U.S.C. § 1182(d)(5)(a), which mandates a case-by-case assessment and a determination that parole of the alien is for urgent humanitarian reasons or significant public benefits." Edlow Memo (Ex. 2 (NJAPP018)); *see id.* (including as an example when someone must leave the country "to obtain life-sustaining medical treatment" not available in the United States). Whatever this Court might have believed regarding grants of advance parole in implementation of the Napolitano Memo,[4] there is no live controversy because Plaintiffs got what they asked for. At bottom, this Court cannot credit any of Plaintiffs' arguments relating to advance parole when assessing their entitlement to judgment.

*Third*, the Wolf and Edlow Memos' approach to DACA recipient renewals again replaces the Napolitano Memo and resolves Plaintiffs' challenges. Although there has, of course, long been a dispute in this litigation over whether DHS officers were entitled to use individualized discretion when evaluating a request under the Napolitano Memo—*see* Section II.A, *infra*, for a discussion of the evidence that shows such discretion existed—there can be no dispute under the 2020 DACA Memos currently in effect. As explained above, the Wolf Memo requires DHS to "[e]xercise its

---

[4] As New Jersey has previously explained, the 2012 DACA Memo's approach to advance parole was consistent with the INA. *See* Dkt. 215 at 26. But that is now irrelevant.

discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate," Wolf Memo (Ex. 1 (NJAPP009)), and the Edlow Memo directs DHS personnel to develop standard operating procedures, guidance, and training materials that make clear that DACA "does not confer any substantive rights to removable aliens, and does not otherwise constrain DHS' authority to enforce the immigration laws passed by Congress." Edlow Memo (Ex. 2 (NJAPP020)). Notably, Plaintiffs cannot argue this language was mere "window dressing"—it explicitly was the result of DHS's own "serious policy concerns" (shared by Plaintiffs) regarding the Napolitano Memo, and thus designed to guarantee "individualized consideration of each case." Wolf Memo (Ex. 1 (NJAPP006)).  In other words, even assuming, incorrectly, that the 2012 Memo did not allow for case-by-case discretion with sufficient clarity, the 2020 DACA Memos clearly do, and there are no facts to so much as suggest—let alone prove—otherwise.[5] The legal claim that DACA is being implemented as a mandatory program thus no longer provides an actual controversy.[6]

---

[5] If this Court has any questions about the discretion involved in implementation of the Wolf and Edlow Memos, it could simply require Plaintiffs to amend their complaint to challenge them, *see Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction."), and allow for additional discovery. Given that even Plaintiffs do not believe that any order from this Court should go into effect for at least two years, *see* Dkt. 486 at 57 (stating "Plaintiff States are not seeking the immediate termination of existing grants of deferred action status pursuant to DACA" and proposing that the Court "stay the effect of its Order in its entirety for two years"), it is hard to see why they would oppose additional time to evaluate whether their legal claims have been addressed by these memoranda.

[6] The Wolf and Edlow Memos make additional changes narrowing the scope of the DACA policy beyond even what Plaintiffs have requested. For example, the Edlow Memo directs that "USCIS will generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period." Edlow Memo (Ex. 2 (NJAPP014)). Similarly, both the Wolf and Edlow Memos reduce the renewal periods for deferred action and work authorization from two years to one. *See id.* at NJAPP015-16; Wolf Memo (Ex. 1 (NJAPP006)). Whatever one thinks of these changes, the fundamental point is simple—these

Any potential response by Plaintiffs that the voluntary cessation exception to mootness applies would plainly be incorrect. That exception recognizes that "a defendant cannot moot a case simply by ending its unlawful conduct once sued." *Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018). In "an ordinary case," the doctrine applies unless "subsequent events [] make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Stauffer v. Gearhart*, 741 F.3d 574, 582 (5th Cir. 2014). However, government litigants bear a "'lighter burden' . . . in proving that the challenged conduct will not recur once the suit is dismissed as moot." *Id.* As the Fifth Circuit has explained, "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom.*, *Sossamon v. Texas*, 563 U.S. 277 (2011). Thus, "[w]ithout evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing." *Id.*; *see also id.* ("We will not require some physical or logical impossibility that the challenged policy will be reenacted absent evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct."); *Yarls*, 905 F.3d at 910 (noting "the goal is to determine whether the defendant's actions are 'litigation posturing' or whether the controversy is actually extinguished"). Indeed, were it otherwise, no statutory amendment could *ever* moot a case—because the legislature could theoretically always reenact a prior policy—but that runs contrary to established mootness law. *See, e.g., SEIU, Local 5*, 595 F.3d at 603.

Here, there is no evidence suggesting that Federal Defendants' issuance of the 2020 Wolf and Edlow Memos is "mere litigation posturing" designed to defeat this lawsuit and reinstate the

---

memoranda, not the 2012 DACA Memo, are what currently govern the issues in this case, making Plaintiffs' challenge to the 2012 Memo moot.

2012 Memo. For one, the record instead demonstrates that these Memos are themselves a product of Federal Defendants' hostility to the 2012 Memo. Since 2017, DHS has consistently attempted to rescind the Napolitano Memo, and it was only after *Regents* invalidated the rescission that DHS issued the 2020 DACA Memos, which are binding on DHS nationwide—not just in the Plaintiff States. *See Sossamon*, 560 F.3d at 325 (finding that an affidavit by the Director of the Texas state prison system stating that the challenged prison policy had been reversed statewide "obviates any concern" that prison officials "might change their minds on a whim").

But the clearest evidence that the 2020 Memos do not constitute litigation posturing is that Federal Defendants *agree* with Plaintiffs regarding the legality of the 2012 Memo. In *Yarls*, the Fifth Circuit concluded that a challenge to Louisiana public defenders' practice of placing certain defendants on waitlists for appointed counsel was mooted by additional funding that "eliminated all waitlists." 905 F.3d at 907. In finding that the voluntary cessation doctrine did not apply, the panel stressed that "the public defenders largely *agreed* that waitlists were unconstitutional, but argued that inadequate funding tied their hands. Indeed, Appellees joined Appellants in urging us to declare the waitlists unconstitutional." *Id.* at 911. Here, too, Federal Defendants urge the Court to adopt Plaintiffs' legal views regarding the Napolitano Memo. *See* Dkt. 366 at 7. Thus, as in *Yarls*, there is no basis to say with sufficient certainty that Federal Defendants "will re-implement" the prior policy, such that the present case can avoid mootness.[7]

---

[7] This case is distinct from *Ne. Fla. Chapter of Associated General Contractors v. City of Jackson*, 508 U.S. 656 (1993), which held that a challenge to a minority set-aside program was not mooted by an amendment because the new program "disadvantage[d] [plaintiffs] in the same fundamental way." *Id.* at 662. In stark contrast here, the 2020 DACA Memos fully remedy Plaintiffs' alleged injuries with respect to initial DACA grants and grants of advance parole—and with respect to renewals, their framework for individualized discretion entirely resolves Plaintiffs' complaint that "applications will be rubber-stamped," Dkt. 104 at 64 ¶ 299.

Finally, even if this Court has questions as to whether this lawsuit is moot, the significant change in the governing DACA memoranda provides new evidence that there is a lack of adversity between the parties in this case. *See In re S.L.E., Inc.*, 674 F.2d 359, 364 (5th Cir. 1982) ("Essential to the concept of a controversy, under Article III, is an on-going adversarial posture between the parties before the court."). In response to Defendant-Intervenors' previous arguments on this score, Plaintiffs argued that although "Plaintiffs and the Federal Defendants agree that DACA is unlawful . . . the government continues to enforce the challenged policy." Dkt. 486 at 30. Indeed, that was the basis of this Court's holding at the preliminary relief stage that "the fact that the Government continues to operate the DACA program and indicates they will continue to operate it in the future" means that "this case presents an Article III controversy between adverse parties." Dkt. 319 at 29. But given the developments laid out here, that reasoning collapses; Federal Defendants are still enforcing *a* policy, but it is certainly not the Napolitano Memo, and it is not one that contains the purported features that drew these legal challenges in this Court. Given that Federal Defendants and Plaintiffs continue to *agree* on the merits of this lawsuit and that Federal Defendants made policy changes based on that agreement, no jurisdiction exists.[8]

---

[8] Plaintiffs' reliance on *United States v. Windsor*, 570 U.S. 744 (2013), *INS v. Chadha*, 462 U.S. 919 (1983), and *Bob Jones University v. United States*, 461 U.S. 574 (1983), is not to the contrary. In *Windsor*, for example, a case or controversy existed where the government refused to refund a plaintiff over $300,000 in estate taxes, despite its decision not to defend the validity of the Defense of Marriage Act. 570 U.S. at 753-58. The Court held there was jurisdiction, but found "[i]t would be a different case if the Executive had taken the further step of paying Windsor the refund to which she was entitled." *Id.* at 758. Here, Federal Defendants have now taken "further steps" to supersede the Napolitano Memo. Nor is Plaintiffs' reliance on the role of Defendant-Intervenors sufficient to create an Article III controversy. *See Nikko Trading of Am. Corp. v. Wastemasters, Inc.*, No. 98-48, 2000 WL 284190, *2 n.5 (N.D. Tex. Mar. 14, 2000) (Ex. 16 (NJAPP152-53)) (finding the involvement of intervenor "cannot resuscitate a non-existent controversy, for '[a]n existing suit within the court's jurisdiction is a prerequisite of an intervention, which is an ancillary proceeding in an already instituted suit'") (quoting *Harris v. Amoco Prod. Co.*, 768 F.2d 669, 675 (5th Cir. 1985)).

## II. PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR CHALLENGE TO THE DACA MEMOS.

DACA, as announced beginning in 2012 and as modified in 2020, reflects an exercise of prosecutorial discretion. It follows that DACA is procedurally and substantively valid under the APA and does not violate the Take Care Clause. To begin, DACA is exempt from APA notice-and-comment requirements as a "general statement of policy," because any reasonable factfinder could (and should) find that it leaves DHS and its decisionmakers free to exercise their discretion in individual cases. Second, DACA—like prior deferred actions—does not conflict with the INA and constitutes a reasonable exercise of prosecutorial discretion. To the degree there was any doubt before, it has been resolved by the 2020 DACA Memos. Finally, because the 2012 and 2020 memoranda governing DACA are valid exercises of forbearance that are compatible with federal immigration law, they do not violate the Take Care Clause.

### A. The DACA Memos Are Procedurally Valid Under The APA.

DACA is exempt from APA notice-and-comment requirements as a "general statement of policy" because it simply sets guideposts for the exercise of prosecutorial discretion without tying DHS's hands in any individual case. The APA exempts from its notice-and-comment requirements "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). General statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted). Whether the challenged action constitutes a general statement of policy turns on two factors.[9] First, a general statement of policy "genuinely leaves the

---

[9] As this Court has explained, there are two ways to conceive of the analysis: either that disproving discretion and establishing third-party rights are two independent prongs Plaintiffs must satisfy, or that they are two criteria as part of one overall analysis. *See* Dkt. 319 at 103 (indicating that they are part of one overall analysis). Either way, Plaintiffs' claim must fail.

agency and its decisionmakers free to exercise discretion." *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995). Second, such a statement "acts prospectively"—that is, "a statement of policy may not have a present effect . . . [and] does not impose any rights and obligations." *Id.* As the Fifth Circuit has explained, "[t]here is some overlap in the analysis of those prongs 'because '[i]f a statement denies the decisionmaker discretion in the area of its coverage . . . then the statement is binding, and creates rights or obligations.'" *Texas I*, 809 F.3d at 171. Because a reasonable factfinder could find that the DACA Memos afford discretion to individual officers and do not establish any rights, there is no basis for summary judgment.

1. The Memos Ensure Officers Exercise Discretion On An Individual Basis.

As this Court recognized in denying Plaintiffs' motion for a preliminary injunction, "the Plaintiffs have not made a 'clear showing' that those processing DACA applications are not free to exercise discretion." Dkt. 319 at 102. Since then, Plaintiffs have not presented any new evidence that would satisfy their obligation; to the contrary, additional record evidence and the 2020 DACA memos now directly undermines Plaintiffs' claims. Simply put, that DHS officers retain discretion is true both on the face of the DACA Memos and in DACA's implementation.

a. *The Memos Are Discretionary On Their Face.*

As the Fifth Circuit concluded in *Crane v. Johnson*, the 2012 Napolitano Memo made "it clear that [DHS agents] shall exercise their discretion in deciding to grant deferred action, and this judgment should be exercised on a case-by-case basis." 783 F.3d 244, 254-55 (5th Cir. 2015). There is good reason for that conclusion: the Napolitano Memo established that DHS's goal was simply to guide its officials' exercise of prosecutorial discretion—and not to guarantee an outcome in any individual case. The Memo stressed that "requests for relief pursuant to this memorandum are to be decided on a case by case basis," and that "DHS cannot provide any assurance that relief

will be granted in all cases." Dkt. 6 at 4. The Memo further provided that its criteria "should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum." *Id.* at 3. The terms "should" and "considered" connote discretionary rather than mandatory action, while "before" implies that satisfaction of the Napolitano Memo's criteria is simply a starting point for determining whether deferred action is warranted. Said another way, Plaintiffs' assertion that "the 2012 DACA memo clearly lays out who is eligible for the program and then directs the Immigration Service Officers to grant eligible applicants deferred action," Dkt. 486 at 42, is incorrect. The Memo repeatedly stressed DACA's discretionary character.

Still more, whatever this Court thinks of the discretion that officers enjoyed from the outset based on the Napolitano Memo, the Wolf and Edlow Memos could not be clearer on this point. The Wolf Memo *requires* DHS to "[e]xercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate"—even when those individuals meet criteria previously laid out. Wolf Memo (Ex. 1 (NJAPP009)). And the Edlow Memo goes further, directing personnel to develop SOPs making clear that DACA "is intended solely for the instruction of USCIS personnel in the performance of their official duties" and that DACA is "not legally binding, does not confer any substantive rights to removable aliens, and does not otherwise constrain DHS' authority to enforce the immigration laws passed by Congress," and to ensure that all training materials and guidance documents that officers receive make the same point. Edlow Memo (Ex. 2 (NJAPP020)). DACA as set forth today thus in no way deprives DHS officers of discretion; instead, it affirmatively instructs them that they must exercise discretion to "deny deferred action at any time when [they] determine" it would be "appropriate."

While both the 2012 and 2020 DACA Memos do offer a *framework* for DHS's exercise of

prosecutorial discretion, if the mere channeling of discretion were sufficient to bring an agency action into the realm of substantive rulemaking, then the APA's exemption for general statements of policy would be dead letter. As the Fifth Circuit has observed, "all statements of policy channel discretion to some degree—indeed, that is their purpose." *Shalala*, 56 F.3d at 600. In *Shalala*, the Food and Drug Administration ("FDA") published guidelines for determining whether to pursue an enforcement action against retail pharmacies that manufactured drugs in violation of federal law. *Id.* at 593-94. The guidelines enumerated nine factors that would inform the FDA's enforcement discretion. *Id.* at 594. The Fifth Circuit held that the guidelines constituted a general statement of policy because "nowhere does [the agency] draw a 'line in the sand' that, once crossed, removes all discretion from the agency." *Id.* at 600-01. To the contrary, "FDA inspectors are free to consider in toto those nine factors, as well as others, and then, based on that guidance and their own judgment, decide whether the pharmacy in question is engaged in drug manufacturing." *Id.* at 601. So too here: the Napolitano Memo drew no "line in the sand" with respect to its non-exclusive criteria, *id.* at 600-01, and the Wolf and Edlow Memos require officers to exercise discretion in each case. It is thus unsurprising that the Fifth Circuit characterized the Napolitano Memo as discretionary and confirmed it "does not guarantee that relief will be granted in all cases." *Crane*, 783 F.3d at 248.

### b.   *The Memos Are Discretionary In Implementation.*

Notwithstanding Plaintiffs' argument that "[t]he undisputed evidence demonstrates that the Immigration Service Officers have no genuine discretion in adjudicating DACA applications," Dkt. 486 at 42, the actual record evidence in this case demonstrates that a factfinder could (and, in fact, should) find that officers did and certainly now do have such discretion, rendering summary judgment inappropriate. There are at least three forms of evidence that demonstrate that officers

did have such discretion under the Napolitano Memo: testimony from a credible USCIS official; internal USCIS emails; and the increase in the DACA denial rate.

Begin with the testimonial evidence. As Donald Neufeld, the Associate Director for USCIS Service Center Operations who began overseeing all four USCIS Service Centers that adjudicated DACA requests in 2010, stated in 2015, "DACA [was] a multi-step, case-specific process" that "necessarily involve[d] the consideration of and exercise of the agency's discretion." Dkt. 6 at 579, 586-88. The 2012 DACA Memo afforded DHS agents multiple layers of discretion—first in determining whether an individual requesting DACA satisfied the criteria, and then in deciding whether the requestor warranted a favorable exercise of discretion. As Neufeld then explained, the Napolitano Memo required DHS officers to exercise discretionary, case-by-case judgment when determining whether a requestor "pose[d] a threat to national security or public safety." *Id.* at 588. Neufeld made clear that some of the 38,597 denials that had been issued at the time of his declaration were based on an agent's discretionary judgment that the requestor "pose[d] a threat to national security or public safety"—for instance, "because the requestor was suspected of gang membership or gang-related activity, had a series of arrests without convictions, arrests resulting in pre-trial diversionary programs, or ongoing criminal investigations." *Id.* at 592. Furthermore, even if a requestor met all of the Napolitano Memo criteria, "USCIS may exercise discretion to deny a request where other factors make the grant of deferred action inappropriate." *Id.* at 588. This is not just theoretical: even before the changes introduced in 2020, requests were in fact "denied on the basis that deferred action was not appropriate for other reasons not expressly set forth in 2012 DACA Memorandum, such as evidence of immigration fraud." *Id.* at 592.

Internal DHS documents corroborated Neufeld's account. For example, a June 2015 email to a team of employees charged with administering DACA indicated that, as of 2015, the Texas

Service Center had "denie[d] significantly more DACA cases based on our view of discretionary denials shifting. . . . Every case is different so we have to review the totality of the circumstances of each case." Dkt. 215-1 at 405. The email goes on to explain that "the supervisors and I also like to jokingly say that our standard is whether or not you would want to live next door to the person." *Id.* These documents thus directly contradict any suggestion that DACA requests that meet certain criteria were, even before 2020, "rubberstamped." *See* Dkt. 486 at 13. Instead, they point to case-by-case assessments made based on an agent's independent and individualized judgment. *See* Dkt. 319 at 100 (recognizing that whatever the merits of this formulation, if this test "were routinely being used, it would certainly be indicative of a discretionary standard").

Perhaps most importantly, this individualized approach is reflected in a denial rate that has increased dramatically since *Texas I*. In *Texas I*, the Fifth Circuit credited this Court's conclusion that the Napolitano Memo's emphasis on discretion was "'merely pretext' because only about 5% of the 723,000 applications accepted for evaluation had been denied." *Texas I*, 809 F.3d at 172. That is no longer true. In fact, denial rates rose to approximately 17 percent in 2014, 22 percent in 2015, 15 percent in 2016, and 20 percent in 2017. Dkt. 215-1 at 377-78. The most recent data provided by Federal Defendants, looking at the period from July 2018 to September 2020—information that was not available when this Court was resolving Plaintiffs' preliminary injunction motion—demonstrate a denial rate of *42%* for DACA requests from individuals living in the plaintiff states whose DACA grants had been terminated or expired for more than one year. Ex. 4 (NJAPP031-36).[10] These increasing denial rates offer a strong indication that, in fact, individual

---

[10] As explained above, *supra* at footnote 2, "initial requests" for DACA refers both to requests from individuals who never received DACA and from individuals who received DACA at some point, but whose DACA grants were terminated or expired for more than one year when they requested a renewal. DHS stopped processing the former in September 2017 but continued to process the latter. Thus, the 42% denial rate cited above refers only to the latter category.

officers were able to exercise their authority in each case even before the major changes implemented in 2020. And that is borne out by DHS's admission that it has not uniformly granted requests from applicants who satisfy the Napolitano Memo's criteria. *See* Ex. 3 (NJAPP025, NJAPP027).[11]

To be sure, this Court has previously recognized there are two ways to think about these numbers. *See* Dkt. 319 at 100-01. The Court has explained that it is quite possible that the change in denial rates over time means, "following this Court's opinion in 2015, the DHS may have begun to shift its process to allow its application processors more discretion." *Id.* Alternatively, this Court held, it might mean that some greater percentage of individuals were applying whose requests did not meet the Napolitano Memo's purportedly rigid criteria. *Id.* at 100. And this Court found at the preliminary stage that it was not "convinced [] which of these alternatives, if either, is accurate". *Id.* at 101. Since that time, several considerations prove Plaintiffs' analysis was clearly incorrect, and at the very least they have not done enough to obtain summary judgment. For one, as explained above, the record now definitively shows that there are individuals who had their initial or renewal requests denied despite meeting the criteria. For another, the sharp jump in denial of DACA requests from July 2018 to September 2020 is all but impossible to explain by Plaintiffs' theory, because it would require concluding that *42%* of individuals who are now requesting DACA did so even though they did not meet the criteria. And importantly, because Plaintiffs bear the burden here—to show *no reasonable factfinder* could canvass the evidence described above and find that

---

[11] This acknowledgement distinguishes this case from *Texas I*, in which the Fifth Circuit noted that "[d]espite a request by the [district] [c]ourt, the [g]overnment's counsel did not provide the number, if any, of requests that were denied [for discretionary reasons] even though the applicant met the DACA criteria." 809 F.3d at 172.

discretion existed before 2020—even inconsistent evidence defeats their claim for summary judgment.[12]

Finally, but critically, the record is missing important information necessary for Plaintiffs to prove their case—*i.e.,* any evidence that current implementation under the new Wolf and Edlow Memos is nondiscretionary. As laid out above, the 2020 DACA Memos repeatedly require officers to exercise discretionary authority to "deny deferred action at any time when [they] determine" it would be "appropriate." Wolf Memo (Ex. 1 (NJAPP009)). They also mandate the development of DHS SOPs, guidance, and training materials that ensure such discretion will be exercised. *See id.*; Edlow Memo (Ex. 2 (NJAPP020)). Indeed, given Federal Defendants' own view that nondiscretionary application of the 2012 DACA Memo would violate the law, it is unthinkable that DHS would not be implementing the governing 2020 DACA Memos in a case-by-case manner, as those memos and Plaintiffs demand. And yet Plaintiffs do not introduce *any* evidence regarding implementation of these operative documents. Given both the text and context of these Memos, Plaintiffs certainly needed to offer *something* to prove the plain language is being ignored, yet Plaintiffs continue to ignore the memos themselves entirely. Needless to say, a reasonable

---

[12] Against all this, Plaintiffs allege that "[t]he USCIS Texas Service Center, which handled DACA applications for many years, has never turned anyone down who met the June 15, 2012 criteria." Dkt. 486 at 42. First, the email Plaintiffs cite is dated May 8, 2018, and they cite no documentation indicating that pattern continues to the present day. Second, even assuming that this is true for the Texas Service Center (despite insufficient evidence), the practices of one service center should not be taken as a proxy for the system as a whole. Moreover, there is clear evidence that could resolve this issue: the rate at which DHS denied requests that met the "criteria" in the Napolitano Memo. But Federal Defendants, who are hoping this Court will invalidate that memorandum, have refused to produce the information necessary to determine the frequency of such denials. *See* Dkt. 386-2 at 10-13; Ex. 3 (NJAPP023-25) (Federal Defendants' objections and responses to Defendant-Intervenors' interrogatories). This Court should not reward that intransigence with factual conclusions that could have been rebutted by information Federal Defendants refuse to supply.

factfinder could thus reject Plaintiffs' claims regarding officers' current ability to exercise case-by-case discretion.

### 2. The DACA Memos Do Not Impose Any Rights Or Obligations.

Although Plaintiffs contend that DACA grants benefits as a matter of law, including lawful presence, they are mistaken. As a threshold matter, the plain language of the 2012 and 2020 DACA Memos and the discretion afforded individual officers both rebut the idea that DACA guarantees anyone rights of any kind. As to the former, the Fifth Circuit has previously explained that when "analyzing whether an agency pronouncement is a statement of policy or a substantive rule, the starting point is the agency's characterization of the rule." *Shalala*, 56 F.3d at 596. The Wolf and Edlow Memos, like the Napolitano Memo before them, could hardly be clearer: they are "not legally binding" and "do[] not confer any substantive rights to removable aliens." Edlow Memo (Ex. 2 (NJAPP020)); *see also* Dkt. 6 at 5 (Napolitano Memo stating that DACA "confers no substantive right, immigration status or pathway to citizenship"). Moreover, the Fifth Circuit identified a correlation between the discretion an individual officer has and the rights and obligations any third party will enjoy. *See Texas I*, 809 F.3d at 171. After all, if an officer can deny an applicant forbearance even if she meets a DACA Memo's criteria, that applicant by definition has no rights under that Memo. That proves fatal to Plaintiffs' claims, especially at this stage, for the reasons given above. And if Plaintiffs' claim is that DHS allows individuals to gain temporary lawful presence through exercise of forbearance on a case-by-case basis, their quarrel is not with DACA but rather with deferred action itself—despite its deep roots in U.S. immigration policy.

The other benefits for which DACA applicants are eligible—including work authorization and access to government programs—are collateral to the applicable memoranda themselves, and are not evidence that the memoranda created substantive benefits. Indeed, those benefits flow from

statutes or from regulations that existed *prior to and independent of* the 2012 and 2020 Memos and that went through notice and comment in their own right. Deferred action recipients may apply for work authorization, for instance, under 8 C.F.R. § 274a.12. *See also* 46 Fed. Reg. 25,079 (May 5, 1981); 52 Fed. Reg. 16,216 (May 1, 1987). Deferred action recipients' eligibility for Social Security benefits derives from 8 C.F.R. § 1.3(a)(4)(vi), while Medicare benefits are available to qualifying deferred action recipients under 8 U.S.C. § 1611(b)(3). *See also* 76 Fed. Reg. 53,764 (Aug. 29, 2011); 61 Fed. Reg. 47,039-41 (Sept. 6, 1996); 80 Fed. Reg. 7,912 (Feb. 12, 2015). Plaintiffs have not challenged the validity of the preexisting statutes or regulations that make up the deferred action system in which deferred action recipients participate, and they cannot bootstrap such claims onto a challenge to DACA. Just as lawful presence is not an innovation of DACA but rather a feature of all deferred action, these collateral benefits attach to deferred action grants pursuant to other regulations. Yet no prior deferred action went through notice-and-comment rulemaking, and neither Congress nor the courts objected—to the contrary, Congress has repeatedly *added* to the list of who could be eligible for deferred action without requiring notice and comment. DACA appropriately continues in that tradition.

Finally, whatever concerns this Court might have had with aspects of the Napolitano Memo were obviated by the Wolf and Edlow Memos. As a general matter, these Memos undermine any claims of third-party rights (which were incorrect to begin with) because they reiterate the role of discretion and ensure SOPs to match; reduce the period of deferred action and work authorization from two years to one, guaranteeing DHS additional opportunities to exercise discretion, Wolf Memo (Ex. 1 (NJAPP008); and make clear "a grant of DACA was and remains revocable," all of which is patently inconsistent with the establishment of any third-party right, *id.* at NJAPP007. But perhaps most importantly, the Wolf and Edlow Memos refute Plaintiffs' claims regarding

advance parole, and they address the concerns this Court laid out at the preliminary relief stage. *See* Dkt. 319 at 76-79. Plaintiffs spill significant ink challenging the Napolitano Memo's allegedly overbroad approach to advance parole, claiming it is inconsistent with the scheme set forth by 8 U.S.C. § 1182(d)(5)(A). *See* Dkt. 486 at 48 (making allegations regarding the ability of DACA recipients to get advance parole, which can in turn result in adjustment of status on return). But as laid out in Section I, whatever was the case then, advance parole is now explicitly warranted only in "exceptional circumstances" consistent with § 1182(d)(5)(A), Wolf Memo (Ex. 1 (NJAPP002-03)), including "to obtain life-sustaining medical treatment," Edlow Memo (Ex. 2 (NJAPP018)). Plaintiffs do not address any of these developments—let alone provide facts to suggest the Wolf and Edlow Memos have been implemented in any contrary manner—and thus are unable to establish their claim that DACA provides recipients with legal rights or benefits.

### B.   The DACA Memos Are Substantively Valid Under INA.

Unable to demonstrate conclusively that this exercise of prosecutorial discretion required notice-and-comment rulemaking under the APA, Plaintiffs argue the Napolitano Memo is invalid under the INA. Strikingly, Plaintiffs fail to identify any concrete conflict with a specific provision of federal law, and instead argue the memorandum is foreclosed by the general federal immigration scheme. *See* Dkt. 486 at 44-45. Plaintiffs are mistaken: deferred action in general—and the DACA Memos in particular—all fall within the Executive's authority to administer and enforce the INA. While this Court expressed its doubt on this score at the preliminary relief stage, the summary judgment record and the 2020 DACA Memos address a number of its concerns.

### 1.    The INA Does Not Bar DHS From Issuing The DACA Memos.

Under the *Chevron* framework, the first question is "whether Congress has directly spoken to the precise question at issue."[13] *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Plaintiffs admit that there is no provision of the INA addressing whether and how a person who arrived in the United States as a child may seek to remain in the United States based on his or her youth, lack of connection to another country, and positive engagements with school or military service. Instead, Plaintiffs piece together various components of the general federal "immigration scheme," Dkt. 486 at 43, to claim that the INA forecloses Federal Defendants from exercising their discretion to ensure these individuals can continue calling the United States home. Unfortunately for Plaintiffs, their arguments cannot withstand closer scrutiny.

Most importantly, Plaintiffs themselves concede that "deferred action may be granted in specific instances," but then assert that Congress could not have intended to allow DHS to "confer . . . lawful status[14] on such a large class of person[s]." *Id.* at 46-47. In other words, the entire basis for Plaintiffs' argument is that the DACA Memos provided lawful status to a group of individuals *on a class-wide basis*, in contravention of the congressional intent they purportedly identify in the INA. But for the reasons given above, Plaintiffs simply misunderstand the governing memoranda. Unlike Plaintiffs' misimpression, DACA—as established by the 2012 Memo, and implemented under the 2020 Memos—does *not* automatically grant lawful presence to a class of individuals,

---

[13] *Chevron* deference is appropriate here based on the tight connection between legal and policy considerations, DHS's expertise with respect to the policy questions at issue, the complexity of administering and enforcing immigration policy, and the significant historical precedent for exercising deferred action as DHS has done here. *See Texas I*, 809 F.3d at 178 n.160 (quoting *Barnhart v. Walton*, 535 U.S. 212, 221 (2002), and noting that interpretations reached "through means less formal than notice and comment rulemaking" may be due *Chevron* deference).

[14] Here Plaintiffs' improperly conflate "lawful status," the legal right to remain in the country, with "lawful presence," what DACA actually confers.

but instead requires DHS officers to exercise discretion on a case-by-case basis. *See* Section II.A, *supra*. While the Memos of course do "channel [the] discretion" used in each case, *Shalala*, 56 F.3d at 600, that is the point of having guidance from agency leadership. Said another way, if individual grants of deferred action are allowed while class-wide relief is not, the summary judgment record presents a serious obstacle for Plaintiffs—especially because the new evidence as to the denial rates, *see supra* at 29, and the individualized discretion required by the Wolf and Edlow Memos, *see supra* at 15, 19, sharply undermine their factual premise that "DACA" imposes class-wide relief. Were Plaintiffs' rule law, it is hard to see how *any* guidance document could help shape the discretionary review of deferred action requests without drawing accusations that the criteria mandated class-wide relief.

Plaintiffs' primary responses are unavailing. *First*, Plaintiffs make much of the undisputed fact that all persons eligible for DACA are removable under the INA. Dkt. 486 at 45-46. But that is a truism: by definition, a grant of deferred action is an administrative decision not to take action "to proceed against an *apparently deportable alien*." *Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 484 (1999) (emphasis added). This exercise of discretion is not based on any specific statutory authorization, but rather is inherent to DHS's prosecutorial role in determining how to allocate its scarce resources to best enforce the nation's immigration laws. *See id.* (noting that executive deferred action had "developed without express statutory authorization"); *Arizona*, 567 U.S. at 396 (noting, without citing statutory authority, that "a principal feature of the removal system is the broad discretion exercised by immigration officials"). Were Plaintiffs right that someone's removability indicated an inability to forebear their removal, then deferred action could never exist at all—a position that Plaintiffs correctly disclaim in their own motion for summary judgment.

*Second*, perhaps because Plaintiffs recognize that some deferred action must be allowed, Plaintiffs pivot to arguing that the deferred action contemplated by DACA simply covers a group Congress would not have wanted to include. But Plaintiffs supply no actual statutory authority to support their proposition that Congress could not have intended for DHS to confer lawful presence on DACA-eligible individuals. Instead, they rely on the fact that Congress made lawful presence available to *certain groups* of otherwise removable aliens, but not *the specific group* made eligible under the 2012 and 2020 DACA Memos. Dkt. 486 at 47. However, it is black letter law that even when Congress speaks with respect to the eligibility of some categories of aliens for one form of relief, that statement "does not in itself conclusively prove that the [agency] cannot" specify the eligibility "of other categories by regulation." *Zheng v. Gonzales*, 422 F.3d 98, 116 (3d Cir. 2005) (citing *Lopez v. Davis*, 531 U.S. 230 (2001)); *see also Momin v. Gonzales*, 447 F.3d 447, 457 (5th Cir. 2006) ("the Attorney General may exercise his discretion by rulemaking rather than case-by-case adjudication"), *vacated as moot*, 462 F.3d 497 (5th Cir. 2006) (mem.). Indeed, the history of deferred action is marked by such Executive actions—for which there was necessarily no prior Congressional action. *See supra*, at 6 (listing President Eisenhower's parole of Hungarian refugees; the parole of 600,000 Cubans over four presidential administrations; President Kennedy's Hong Kong Parole for 15,000 refugees; and Family Fairness policies of 1987 and 1990 that could have covered 40% of total undocumented population at that time). Plaintiffs offer no persuasive reason why DHS could not similarly offer case-by-case forbearance through DACA to a category of immigrants not otherwise covered by statute.

Plaintiffs' additional arguments that DACA violates the INA by granting lawful presence, providing work authorization, and allowing for advance parole similarly fall short. *First,* Plaintiffs incorrectly assert that DACA recipients are eligible for work authorization and considered lawfully

present for other purposes *because of* the Napolitano Memo. *See* Dkt. 486 at 46-48. As discussed above in Section II.A, this is incorrect: those benefits flow from statutes or regulations that existed prior to and independent of the 2012 and 2020 DACA Memos and that went through notice and comment in their own right. *See Regents*, 140 S. Ct. at 1902 (noting recipients of deferred action are eligible for work authorization, Social Security, and Medicare pursuant to "regulations long predating DACA's creation"); 8 C.F.R. § 274a.12; 8 C.F.R. § 1.3(a)(4)(vi); 8 U.S.C. § 1611(b)(3); 46 Fed. Reg. 25,079 (May 5, 1981); 52 Fed. Reg. 16,216 (May 1, 1987); 76 Fed. Reg. 53,764 (Aug. 29, 2011); 61 Fed. Reg. 47,039 (Sept. 6, 1996); 80 Fed. Reg. 7,912 (Feb. 12, 2015).[15]

*Second*, the INA itself provides that the Secretary may grant advance parole to "any alien" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). As discussed repeatedly above, advance parole has not been granted to any DACA recipients since 2017 under the broader standards that previously troubled this Court, Edlow Memo (Ex. 2 (NJAPP020 n.7). And the 2020 DACA Memos explicitly provide advance parole will only be available going forward consistent with the INA's "existing high statutory standard" for exceptional circumstances, such as to "obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States." *id.* at NJAPP018. Any grants of advance parole under the 2020 DACA Memos will thus be in accordance with—not contrary to—the INA.[16]

---

[15] For example, § 1226(a)(3), which Plaintiffs rely on to argue that DACA "contradicts the INA's express limitations on work authorization" Dkt. 486 at 47, does not apply to aliens who "otherwise would (without regard to removal proceedings) be provided such authorization." All deferred action recipients have been eligible for work authorization pursuant to agency regulations since the early 1980s. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14). DACA recipients are therefore "alien[s who] otherwise would . . . be provided with [work] authorization," 8 U.S.C. § 1226(a)(3), and DHS's approval of work authorization applications is not contrary to the INA.

[16] It is true that advance parole could remove one of the *many* bars to obtaining lawful permanent resident status for a DACA recipient who falls within one of the categories set forth in the INA (such as employment skills or family status). *See* Dkt. 286-1 at 41-42. But that is simply how the

2.    DACA Is A Reasonable Exercise Of DHS's Prosecutorial Discretion.

Where the relevant statutes are silent or ambiguous as to the precise question at issue, the court must defer to the agency's reasonable interpretation. *Chevron*, 467 U.S. at 844. DHS is tasked with determining, in some manner, which of the more than 11 million undocumented immigrants to remove, given that Congress has only appropriated funding to remove 400,000 each year. *See Arpaio*, 27 F. Supp. 3d at 192-93. Its use of deferred action to address this problem is supported by considerable historical precedent.

As previously described, a fundamental feature of the nation's immigration system is the Executive's discretion in establishing enforcement priorities, including deciding when to pursue or defer removal. Since the 1950s, the Executive has established more than *twenty* policies for exercising deferred action or other prosecutorial discretion to forbear removal of particular classes of aliens from the United States, including the "Family Fairness" policies of 1987 and 1990, which applied to the ineligible spouses and children of immigrants eligible to legalize their status under the Immigration Reform and Control Act of 1986 and which could have covered up to 1.5 million undocumented immigrants, or 40% of the total undocumented population at that time. Dkt. 6 at 225-26, 247, 250-52. Notably, these family members had been intentionally excluded from the Immigration Reform and Control Act, and Congress repeatedly introduced, but never enacted, legislation to protect them between 1986 and 1990. *Id.* at 225, 247.

Plaintiffs' attempts to distinguish DACA from previous deferred action are either meaningless or inaccurate. *First*, Plaintiffs assert that prior deferred actions "were mostly done on

---

provisions of the INA with respect to advance parole and lawful permanent residence have always interacted for any unlawfully present person, exactly as contemplated by federal law. Particularly in light of the near-total curtailment of advance parole under the 2020 DACA Memos, DACA is not a "clear path to citizenship" or "contrary to law" as Plaintiffs assert.

a country-specific basis, usually in response to war, civil unrest, or natural disasters." Dkt. 486 at 52 (quoting *Texas I*, 809 F.3d at 184). While that describes some of the prior policies, it does not apply to them all. Regardless, Plaintiffs make no attempt to explain why that is legally significant, when, in fact, all of the policies are grounded in the kind of "humanitarian reasons" that have long been the basis for granting deferred action. *Reno*, 525 U.S. at 484.

*Second*, Plaintiffs attempt to distinguish the "Family Fairness" policies as "interstitial to a statutory legalization scheme." Dkt. 486 at 52-53 (quoting *Texas I*, 809 F.3d at 185). But the policies appear to be "interstitial" only in hindsight. In fact, when the Reagan Administration's Immigration and Naturalization Service (INS) adopted a policy of forbearance for children of parents in the process of adjusting their status, and likewise when President George H.W. Bush's INS later expanded the approach, allowing for renewals and work authorizations, Congress had expressly chosen *not* to provide relief to unauthorized spouses and children, and repeatedly failed to enact legislation to address this population.

In fact, the available evidence suggests that, both in size and scope, DACA is substantially more *limited* than the Family Fairness policies of the Reagan-Bush years. Notably, both policies concern similar classes of undocumented immigrants and both involve annual grants of deferred action and work authorization. *Compare* Dkt. 6 at 250-52, *with* Wolf Memo (Ex. 1 (NJAPP008)). But under the 2020 DACA Memos, the DACA population is effectively capped at approximately 646,000, Ex. 5 (NJAPP043), substantially less in absolute terms than the 1.5 million individuals who were potentially eligible for the Family Fairness policies, and most notably a much smaller percentage of the total undocumented population in the country. (This also distinguishes the operative version of DACA even from the one that this Court reviewed at the preliminary stage, although Defendant-Intervenors maintain that the 2012 DACA Memo was well within the

permissible range too.) Further, the difference between the size and scope of DACA, as implemented under the 2020 Memos, and DAPA—which could have reached 4.3 million undocumented immigrants—is at least as significant. In short, it cannot be said that DACA as implemented by the 2020 Memos involves decisions of such "vast economic and political significance" that the INA "cannot reasonably be construed as assigning" them to DHS. *See Texas I*, 809 F.3d at 183 (describing DAPA).

Contrary to Plaintiffs' assertions, the decision in *Texas I* does not control resolution of this case. Although true that the Fifth Circuit affirmed this Court's injunction against implementation of the Johnson Memo's criteria governing *DAPA*, the same result is not required for DACA for three independently sufficient reasons. *First*, as a threshold matter, the Fifth Circuit's substantive APA analysis focused solely on DAPA and did not address Expanded DACA, or the approach established in the Napolitano Memo. *See, e.g.*, *Texas I*, 809 F.3d at 179-80 (referencing only criteria applicable to DAPA and describing policy as applying to 4.3 million aliens). *Second*, as noted above, that is a meaningful difference: the Fifth Circuit focused heavily on the scope and impact of the DAPA Memo, which would have granted deferred action in three-year terms to up to 4.3 million people. By contrast, under the 2020 DACA Memos, deferred action is available only to 646,000 people, one year at a time. Given the importance of the size of the DAPA population in *Texas I*, the smaller size of the DACA population must cut strongly the other way. *Third*, whereas DAPA would have provided relief to a population already covered by specific statutory provisions "without complying with any of the requirements . . . Congress ha[d] deliberately imposed," *id.* at 180, that is not true here. *See id.* at 186 (finding DAPA was foreclosed by law because "the INA prescribes how parents may derive an immigration classification on the basis of their child's status and which classes of aliens can achieve deferred action and eligibility for work

authorization"). The INA does not detail the requirements for a person who arrived in the United States as a child and who knows only this country as home to seek lawful status, and the Napolitano Memo did not fail to comply with requirements that Congress deliberately imposed. The Fifth Circuit's inference "that by creating procedures by which alien parents of U.S. citizens may obtain lawful status, Congress implicitly prohibited the Executive Branch from granting deferred action and work authorization to such individuals based on more permissive criteria," is not applicable here. *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 426 (E.D.N.Y. 2018).

In short, nothing in the INA expressly bars DACA, and DACA is a reasonable exercise of DHS's prosecutorial discretion under the INA. The Court should deny summary judgment on Plaintiffs' claim that DACA is substantively unlawful.

### C. DACA Is Constitutionally Valid Under The Take Care Clause.

Plaintiffs' claim that DACA violates the Take Care Clause fails. The Constitution imposes a duty on the Executive to "take care that the laws be faithfully executed" both "personally and through officers whom [the President] appoints." U.S. Const. art. II, § 1, cl. 1; *id.* art. II, § 3. "As a general rule, when Congress vests enforcement authority in an executive agency, that agency has the discretion to decide whether a particular violation of the law warrants prosecution or other enforcement action." Dkt. 9 at App. 1178. As this Court properly recognized at the preliminary injunction stage, the Take Care Clause is thus the constitutional "source of the President's (and the Executive Branch's) power of prosecutorial discretion." Dkt. 319 at 64.

In arguing that DACA violates the Take Care Clause, Plaintiffs recycle old arguments that the Napolitano Memo is unlawful because it "dispens[es] with certain immigration statutes" and "declar[es] lawful conduct that Congress established as unlawful." Dkt. 486 at 53. (And they once again fail to grapple with the Wolf and Edlow Memos.) Yet, in raising these arguments, Plaintiffs

overlook that the exercise of prosecutorial discretion, contrary to violating the Take Care Clause, is a key aspect of the faithful execution of the laws. *See Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) (holding "[t]he power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws"). Moreover, because DACA in both its 2012 and 2020 iterations constitutes a valid exercise of prosecutorial discretion consistent with immigration law, and DACA in no way "dispens[es] with Congress's carefully delineated immigration policies in favor of its own preferred legal regime," Dkt. 486 at 54; *see* Section II.B, *supra*. Plaintiffs' constitutional claims fall short.

Ultimately, the Court should decline Plaintiffs' invitation to make findings regarding "one of the clauses least explored by both commentators and courts." Dkt. 319 at 64. As this Court found at the preliminary stage, precedent interpreting this provision is both sparse and ill-defined, finding that it serves "as both an authorization and a prohibition on executive action" and "rarely, if ever, set[s] out discernable guideposts for use by lower courts." *Id.* at 65. At that time, the Court noted that it would "defer[] judgment on the Take Care Clause until a full hearing on the merits or until the appropriate court on appeal instructs it to decide the issue." *Id.* at 67. As neither event has occurred, the Court should adhere to its established approach.

## III.    THIS COURT SHOULD NOT ISSUE AN INJUNCTION.

For the reasons discussed above, this matter fails to present a live case or controversy, and Plaintiffs have not established a violation of the APA or the Constitution. If this Court disagrees, however, then this Court should simply remand to the agency for further consideration, and should not issue injunctive relief in the interim. That result makes good sense: DHS is better positioned to assess the overall policy and administrability concerns associated with the DACA memoranda,

and any injunction would be hugely disruptive to DACA recipients, state and local governments, and employers, all of whom relied on DACA for eight years.

As a threshold matter, should this Court conclude that the DACA memoranda before it are legally infirm, the proper course is to remand to the agency. Indeed, Plaintiffs themselves admit this result is necessary, accepting that "rewrit[ing] the [Napolitano] memorandum [and] weighing the DACA recipients' reliance interests against competing policy concerns . . . involves important policy choices that Congress has reserved for the DHS." Dkt. 486 at 55; 6 U.S.C. § 202 (giving DHS Secretary responsibility for carrying out immigration enforcement and establishing enforcement priorities). And in *Regents*, the Supreme Court held that DHS had "considerable flexibility" in addressing the "reliance interests of DACA recipients" and the "administrative complexities" facing the agency. 140 S. Ct. at 1914; *see also id.* at 1910 ("[D]eciding how best to address a finding of illegality moving forward can involve important policy choices. . . . Those policy choices are for DHS."). Importantly, the Supreme Court held that "the Attorney General's illegality determination" did not "foreclose[] the option[ of] accommodating particular reliance interests." *Id.* at 1915. The Supreme Court therefore found that "the appropriate recourse is [] to remand to DHS so that it may consider the problem anew." *Id.* at 1916. Remanding to DHS so that it could "address [any judicial] finding of illegality moving forward," *id.* at 1910, would be equally appropriate here.[17]

But most importantly, this Court should not grant injunctive relief in the interim, whatever its conclusions on the law. *See, e.g., Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57

---

[17] Indeed, DHS indicates that it has begun a "thorough consideration of how to address DACA." Wolf Memo (Ex. 1 (NJAPP002)); *see also id.* at NJAPP006 (noting that DHS is "determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified"). A decision to remand to DHS would allow that ongoing process to run its course.

(2010) (instructing court to consider "the balance of hardships between the plaintiff and defendant" and "the public interest" in evaluating requests for injunctive relief). For one, that DHS recently issued new memoranda on DACA impacts the remedy analysis, just as it did the jurisdictional and merits analyses. Simply put, in light of the Wolf and Edlow Memos—which granted Plaintiffs all they requested regarding initial applicants, advance parole, and case-by-case discretion—there is no reason to think a court order is necessary to satisfy their demands even if they prevail. Indeed, Plaintiffs have always struggled to show any harm flowing from DACA, and doing so would now be all but impossible. Perhaps that is why Plaintiffs themselves have made clear that they are not seeking immediate termination of DACA, but instead welcome a thorough evaluative process by Federal Defendants. For another—and far more importantly—as this Court has already recognized, equitable considerations overwhelmingly support leaving DACA alone while DHS takes the time it needs to evaluate the issues on remand, especially reliance interests. *See Regents*, 140 S. Ct. at 1913-15 (emphasizing importance of reliance interests even where an entity, whether DHS or a court, has reached a final merits decision regarding DACA's lawfulness).

The record establishes that these equitable and public interests are considerable indeed. As New Jersey previously explained at the preliminary injunction stage, the State relies on its DACA-recipient residents in a number of ways and would be substantially harmed were this Court to issue injunctive relief. *See* Dkt. 215 at 50-55. *First*, DACA recipients contribute an estimated $18.7 million per year in state income tax receipts.[18] Dkt. 215-1 at 146. *Second*, approximately 55% of

---

[18] Using the most current numbers available, economist Ike Brannon calculates that New Jersey would lose approximately $756 million in total tax revenue over the next decade if DACA were rescinded. Declaration of James "Ike" Brannon, ¶ 39 (Ex. 21 (NJAPP199-200)). The Institute on Taxation and Economic Policy also projects significant economic losses were DACA to be rescinded. For example, they estimate that, nationwide, there would be an annual loss of $1.7 billion in state and local tax revenue. Declaration of Meg Wiehe & Marco Guzman, ¶ 20 (Ex. 22 (NJAPP347-48)).

DACA recipients have employer-sponsored health care, *id.* at 75-76, and would likely be eligible for state-funded healthcare or have to receive uncompensated care if they lost their jobs, resulting in increased public health spending of approximately $7.6 million annually, *id.* at 81-82. *Third*, approximately 2,200 DACA-recipient students attend New Jersey public colleges and universities, which would be harmed by the loss of these motivated students and their diverse life experiences, not to mention tuition revenue, if they were unable to afford to continue their studies due to losing work authorization. *Id.* at 22-23, 324. *Fourth*, DACA recipients are also valued employees at New Jersey's government agencies and public universities. *Id.* at 162, 246. *And finally*, recipients would be less willing to interact with local law enforcement and report crimes were DACA terminated, harming New Jersey's critical efforts to enforce its criminal laws and protect public safety. *Id.* at 11-12, 188-89. This Court thus correctly found that rescinding DACA would harm governments that "lose residents they consider to be valuable members of their communities or employees who are integral to various schools, municipalities, and industries." Dkt. 319 at 113-14.

The record is even stronger today, including as to the role of DACA recipients in helping states and communities respond to COVID-19. Approximately 27,000 recipients are employed as healthcare workers, including 200 medical students, residents, and doctors who, as of October 2019, were providing care for 1,500 to 4,600 patients a year and may see up to 5 million patients over the course of their careers. Ex. 12 (NJAPP108-09). Hospitals have invested over $5 million in training these physicians, and there would be no easy way to replace DACA recipients given the 10-year training pipeline for individuals in these roles. *Id.* at NJAPP116, NJAPP119. Moreover, at a time where there is a national shortage of doctors, DACA recipients are disproportionately likely to provide needed care in underserved communities. *Id.* at NJAPP111; *see also id.* at NJAPP111-12 (warning, in October 2019, that as "[t]he risk of a pandemic []

45

continues to grow," rescinding DACA would compromise "health security" by "depriv[ing] the public of domestically educated, well-trained, and otherwise qualified health care professionals"). But the numbers only tell part of the story, and the record is replete with concrete examples of DACA recipients fulfilling key roles in the social services and healthcare fields, which would be undermined by any injunction. To take a few illustrative examples:

- College student Maria Hernandez has been volunteering at a COVID testing center multiple days a week since the pandemic began in March, an opportunity made possible through her job as a Legislative Aide for a state senator. Declaration of Maria Hernandez, ¶¶ 6, 9, 11 (Ex. 19 (NJAPP183-85)). At the height of the pandemic, Maria would register over 175 individuals for testing during one shift. *Id.* ¶ 9 (NJAPP184).

- Cinthia Osorio has worked for the Department of Children and Families, Division of Children Protection and Permanency (DCP&P), since 2018. Declaration of Elzbieta Wojtylo ¶ 4 (Ex. 20 (NJAPP188)). She makes home visits in response to reports of child abuse or neglect, including to remove children from dangerous situations. *Id.* ¶ 5 (NJAPP188). During the height of the pandemic, Cinthia volunteered for DCP&P's COVID response team, and was one of a small number of intake workers making field visits throughout the pandemic despite the risks. *Id.* ¶¶ 6-9 (NJAPP188-89). The pandemic has made it harder for DCP&P to hire and train qualified staff, while at the same time creating increased risks to children due to higher rates of mental health challenges, substance abuse, and social isolation. DCP&P employees like Cinthia are an invaluable resource to the state. *Id.* ¶ 14 (NJAPP190-91).

Of course, the contributions of DACA recipients go well beyond the health care and social services fields. More than 800 DACA recipients serve as members of the armed services, which regularly struggle to meet their recruiting goals, and these recipients bring critical skills to support the military's vital missions. Ex. 10 (NJAPP081-92). In the education field, 20,000 DACA recipients serve as teachers in hard-to-fill roles, promoting student achievement in underserved communities and supporting student learning during a time of unprecedented educational challenges. Ex. 9 (NJAPP060-74); Ex. 11 (NJAPP099-103); Ex. 13 (NJAPP129-131); *see* Declaration of Khristina Gonzalez, ¶ 31 (Ex. 17 (NJAPP163)) (Princeton Associate Dean describing alumni who are working as a high school college advisor and teaching students in an

MFA program). DACA recipients are employees at U.S. companies in hard-to-fill roles, owners of businesses that employ U.S. citizens, Ex. 14 (NJAPP136-41), and pastors and staff at houses of worship, Ex. 15 (NJAPP145-48). And DACA recipients are students at the Nation's leading universities. *See* Gonzalez Dec. ¶ 11-20 (Ex. 17 (NJAPP157-60)  (explaining that since 2012, Princeton University has enrolled at least 27 DACA recipients; that recipient-students have won several prestigious fellowships in their fields and otherwise make contributions to campus life through volunteer and leadership roles; that Princeton has invested substantially in these students, including providing academic support and mentoring, offering privately funded financial aid for tuition, room, and board, and designing workshops for DACA recipients; and that any court order would likely force students to stop their studies and leave the University, which would in turn "leave holes in [the] student community").

Microsoft offers a good example of the hiring, recruiting, and organizational decisions that the largest U.S. companies have made in reliance on DACA. Declaration of Jack C. Chen ¶ 2, 7-11 (Ex. 18 (NJAPP167-69)). Microsoft currently employs 61 DACA recipients across its U.S.-based offices. *Id.* ¶ 13 (NJAPP170). Microsoft "invested heavily" in these individuals, including selecting them for participation in its prestigious two-and-a-half month training program for promising new graduates, *id.* ¶¶ 15-17 (NJAPP170-71), and in three-year rotational programs designed to develop employees who are uniquely qualified to lead cross-subject teams, *id.* ¶¶ 19-20 (NJAPP171-72). Employees in these programs are not "fully productive" for much of the time that they spend in them—rather, their participation is part of Microsoft's strategy to develop highly-qualified employees with unique skills "with the expectation that they will be able to put this training into practice through continued work at the company." *Id.* ¶¶ 18, 20, 22-24 (NJAPP171-73). If DACA recipients were unable to continue working at Microsoft, they "would

be very difficult to replace" and "it would cause substantial disruption to multiple ongoing projects and [] costly delays." *Id.* ¶ 26 (NJAPP174). Absent DACA recipients, "Microsoft's workplaces would suffer tremendously, including in [their] ability to foster, retain, and recruit new talent." *Id.* ¶ 32 (NJAPP176). While an individual employee may leave a company at any time, an "en masse" departure of all Microsoft's DACA employees due to "the effective end of DACA" would be uniquely damaging. *Id.* ¶ 31 (NJAPP176).[19]

For all these reasons, if this Court enters any injunction regarding the DACA Memos while DHS continues to assess the policy, DACA recipients would abruptly lose their ability to continue in their professions and their studies, causing significant harm to the patients, students, employers, educational institutions, family members, communities, and states and local governments who rely on them, as well as to the DACA recipients themselves. Such a potential situation counsels strongly against this Court issuing any injunction while DHS considers the issue.

## CONCLUSION

This Court should deny Plaintiffs' motion for summary judgment.

---

[19] If this Court were to disagree, and choose to issue some sort of injunctive relief in this matter, "any 'relief granted should be no broader than necessary to cure the effects of the harm caused.'" *Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990) (quoting *Soltex Polymer Corp. v. Fortex Indus.*, 832 F.2d 1325, 1329 (2d Cir. 1987)); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (holding "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 673 (5th Cir. 2000) (noting "rule that an equitable remedy should be no broader than the scope of the violation"). That would mean tying the relief only to those plaintiffs the Court finds to have proven harm, and only to remedying the harms that they actually demonstrated. Given that Plaintiffs have only even attempted to establish harm for a single state, *see* Dkt 319 at 31, 117, this would be an especially inappropriate context in which to grant a nationwide injunction.

48

Dated: November 6, 2020                    GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Mayur P. Saxena*
    MAYUR P. SAXENA
    Attorney-in-Charge
    Assistant Attorney General
    (admitted pro hac vice)
    124 Halsey St., 5th Floor
    Newark, New Jersey 07101
    PO Box 45029-5029
    Phone: (973) 648-3283
    Fax: (973) 648-4887
    Mayur.Saxena@law.njoag.gov

    Melissa Medoway, Deputy Attorney General
    (admitted pro hac vice)
    Eric L. Apar, Deputy Attorney General
    (admitted pro hac vice)
    Elspeth Faiman Hans,
    Deputy Attorney General
    (admitted pro hac vice)
    Tim Sheehan, Deputy Attorney General
    (admitted pro hac vice)
    *Attorneys for Defendant-Intervenor State of*
    *New Jersey*

## CERTIFICATE OF SERVICE

I certify that on November 6, 2020, I caused this document (and exhibits hereto) to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Mayur P. Saxena*
Mayur P. Saxena

## CERTIFICATE OF CONFERENCE

I certify that on November 5, 2020, I emailed Todd Disher, counsel for Plaintiffs, Nina Perales, counsel for Perez Defendant-Intervenors, and Jeffrey Robins, counsel for Federal Defendants to confer on the motion to exceed page limits. All counsel consent to this request.

*/s/ Mayur P. Saxena*
Mayur P. Saxena

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**APPENDIX**

**VOLUME I: EXHIBITS 1-11**

Pursuant to this Court's Civil Procedures, Rule 9, Defendant-Intervenor State of New Jersey hereby provides the Court with the following table of contents and copies of the documents and authorities cited in its Opposition to Plaintiffs' Motion for Summary Judgment:

| Ex. | Description | Page |
|---|---|---|
| | **VOLUME I** | |
| 1. | Memo. from Chad Wolf, Acting Sec'y of Homeland Sec., to Mark Morgan, Senior Official Performing Duties of Comm'r, U.S. Customs & Border Prot., et al. (July 28, 2020) | NJAPP001 |
| 2. | Memo. from Joseph Edlow, USCIS Associate Director, to Associate Directors and Program Office Chiefs (Aug. 21, 2020) | NJAPP010 |
| 3. | Excerpts from Federal Defendants' Objections and Responses to Defendant-Intervenors' Fifth and Sixth sets of discovery requests (Sept. 30, 2020) | NJAPP021 |
| 4. | Federal Defendants' Responses to Interrogatory No. 15 (Sept. 30, 2020) | NJAPP030 |

| 5. | Email from Victoria Palmer, USCIS Media Affairs Division, and attached Response to Query guidance document (Aug. 24, 2020) | NJAPP037 |
| 6. | Email from Brandon Robinson, USCIS Adjudications Officer (Policy), "Re: DACA Filings After 9/5/17 – No Prior Grant of DACA" | NJAPP047 |
| 7. | Email from Brandon Robinson, USCIS Adjudications Officer (Policy), "DACA Filings After 9/5/17 – No Prior Grant of DACA" (Apr. 26, 2019) | NJAPP049 |
| 8. | Email from Victoria Umoru, USCIS Adjudications Officer (Policy), "Implementing the DACA Memo issued by USCIS Deputy Director for Policy Joseph Edlow" (Aug. 22, 2020) | NJAPP052 |
| 9. | Excerpt from Brief of the National Education Association and National PTA as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP056 |
| 10. | Excerpts from Brief of Former Service Secretaries, Modern Military Association of American, and military and veteran advocacy organizations as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP075 |
| 11. | Excerpt from Brief of Teach for America, Inc., as amicus curiae in support of Respondents in *DHS v. Regents* | NJAPP094 |
| | **VOLUME II** | |
| 12. | Excerpts from Brief of Association of American Medical Colleges et. al., as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP104 |
| 13. | Excerpt from Brief of Lawyers' Committee for Civil Rights Under Law, the Anti-Defamation League, the Leadership Conference on Civil and Human Rights, and 42 other social justice organizations as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP125 |
| 14. | Excerpt from Brief of 143 U.S. business associations and companies as amici curiae in support of respondents in *DHS v. Regents* | NJAPP133 |
| 15. | Excerpt from Brief of 127 religious organizations as amici curiae in support of respondents in *DHS v. Regents* | NJAPP142 |
| 16. | *Nikko Trading of Am. Corp. v. Wastemasters, Inc.*, No. 98-48, 2000 WL 284190 (N.D. Tex. Mar. 14, 2000) | NJAPP150 |
| 17. | Declaration of Khristina Gonzalez | NJAPP154 |
| 18. | Declaration of Jack C. Chen | NJAPP166 |
| 19. | Declaration of Maria Hernandez | NJAPP181 |
| 20. | Declaration of Elzbieta Wojtylo | NJAPP186 |
| | **VOLUME III** | |
| 21. | Declaration of James "Ike" Brannon | NJAPP192 |
| 22. | Declaration of Meg Wiehe | NJAPP340 |

Dated: November 6, 2020

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Mayur P. Saxena*
Assistant Attorney General
(admitted pro hac vice)
124 Halsey St., 5th Floor
Newark, New Jersey 07101
PO Box 45029-5029
Phone: (973) 648-3283
Fax: (973) 648-4887
Mayur.Saxena@law.njoag.gov

Melissa Medoway, Deputy Attorney General
(admitted pro hac vice)
Eric Apar, Deputy Attorney General
(admitted pro hac vice)
Elspeth Hans, Deputy Attorney General
(admitted pro hac vice)
Tim Sheehan
(admitted pro hac vice)
*Attorneys for Defendant-Intervenor State of*
*New Jersey*

# Exhibit 1



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

July 28, 2020

MEMORANDUM FOR:     Mark Morgan
                    Senior Official Performing the Duties of Commissioner
                    U.S. Customs and Border Protection

                    Matthew Albence
                    Senior Official Performing the Duties of Director
                    U.S. Immigration and Customs Enforcement

                    Joseph Edlow
                    Deputy Director of Policy
                    U.S. Citizenship and Immigration Services

FROM:               Chad F. Wolf
                    Acting Secretary

SUBJECT:            **Reconsideration of the June 15, 2012 Memorandum
                    Entitled "Exercising Prosecutorial Discretion with Respect to
                    Individuals Who Came to the United States as Children"**

On June 15, 2012, Secretary of Homeland Security Janet Napolitano established the policy
known as Deferred Action for Childhood Arrivals (DACA) through a memorandum entitled
"Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States
as Children."  Ever since, the policy has been subject to substantial controversy.  In recent years,
Acting Secretary of Homeland Security Elaine Duke and Secretary of Homeland Security
Kirstjen Nielsen concluded that the DACA policy should be fully rescinded and issued additional
memoranda in 2017 and 2018, respectively, to effect that decision.

On June 18, 2020, the U.S. Supreme Court issued a decision that did not question the authority
of the Department of Homeland Security (DHS) to rescind the DACA policy, but determined
that the 2017 and 2018 memoranda had not complied with certain requirements for doing so.
See Department of Homeland Security v. Regents of the University of California, Nos. 18-587,
18-588, 18-589.  Accordingly, the Court concluded that the rescission must be vacated and
remanded to DHS so that it "may consider the problem anew."  Regents, Slip op. at 29.

By this memorandum, I am rescinding the 2017 and 2018 memoranda, and making certain
immediate changes to the DACA policy to facilitate my thorough consideration of how to
address DACA in light of the Supreme Court's decision.  For the reasons outlined below,
pending my full reconsideration of the DACA policy, I direct DHS personnel to take all
appropriate actions to reject all pending and future initial requests for DACA, to reject all

pending and future applications for advance parole absent exceptional circumstances, and to shorten DACA renewals consistent with the parameters established in this memorandum.

**Background**

On June 15, 2012, Secretary Napolitano issued the memorandum (Napolitano Memorandum) establishing the DACA policy.  The policy provided for the granting of deferred action to certain individuals "with no lawful immigration status "who were brought to this country as children" and who satisfied a list of additional specified criteria.  The memorandum described this deferred action as an exercise of "prosecutorial discretion" to forbear from removing an alien who would otherwise be subject to removal.  Under pre-existing regulations, a grant of deferred action made aliens eligible for certain other attendant benefits, such as work authorization.  The memorandum directed U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS) to establish procedures for granting deferred action and work authorization to eligible aliens for a two-year period, subject to renewal, and for notifying those aliens of DHS's decision to do so.  The memorandum stated, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship."

On November 20, 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum (Johnson Memorandum) to expand the DACA policy and establish a new, related policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  With regard to DACA, this memorandum eliminated a criterion relating to the age of DACA requestors when the policy was announced, extended the deferred-action and work-authorization period from two to three years, and adjusted the date by which requestors must have entered the United States to be eligible for DACA.  The DAPA policy allowed for deferred action to be provided to certain parents whose children are U.S. citizens or lawful permanent residents through a process similar to DACA.

Shortly thereafter, the U.S. District Court for the Southern District of Texas issued a nationwide preliminary injunction preventing both the DAPA policy and the expansion of the DACA policy from taking effect.  In 2015, the U.S. Court of Appeals for the Fifth Circuit affirmed, holding that DAPA and expanded DACA likely violated both the Administrative Procedure Act (APA) and the Immigration and Nationality Act (INA).  In 2016, the U.S. Supreme Court affirmed the court of appeals' decision by an equally divided vote.  On June 15, 2017, Secretary of Homeland Security John Kelly issued a memorandum rescinding the Johnson Memorandum.

Also in June 2017, several of the state plaintiffs from the Texas lawsuit announced their intent to amend their complaint in the then still-pending litigation to challenge the original DACA policy as well.  The States argued that the DACA policy was unlawful for the same reasons as the DAPA policy and the expansion of the DACA policy.  On September 4, 2017, then-Attorney General Jefferson B. Sessions III issued a letter to Acting Secretary Duke (Sessions Letter), concluding that the DACA policy was indeed unlawful and likely would also be enjoined.

On September 5, 2017, Acting Secretary Duke issued her memorandum (Duke Memorandum) rescinding the Napolitano Memorandum and initiating an orderly wind-down of the DACA policy.  The Duke Memorandum explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" in the litigation concerning the Johnson Memorandum, and the Sessions Letter, it was clear to the Acting Secretary that the DACA policy "should be terminated."

Litigation challenging the Duke Memorandum promptly ensued.  As relevant here, suits were filed in the U.S. District Courts for the Northern District of California, Eastern District of New York, District of Maryland, and the District of Columbia.  The District of Columbia district court vacated the rescission entirely, but stayed its ruling for 90 days to permit DHS to reissue a memorandum rescinding the DACA policy and providing a fuller explanation.

In response to that ruling, on June 22, 2018, Secretary Nielsen issued an additional memorandum (Nielsen Memorandum) providing further explanation for the rescission of the DACA policy.  The Nielsen Memorandum explained that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons," including that the policy is contrary to law; that, even if it were not unlawful, Secretary Nielsen lacked sufficient confidence in the policy's legality to continue it; and that it was not sound enforcement policy in multiple respects.  Despite the Nielsen Memorandum, the District of Columbia district court declined to reconsider its previous order vacating the rescission.

On June 18, 2020, having granted review in the California, New York, and D.C. cases, the U.S. Supreme Court held that the rescission of the DACA policy must be vacated.  See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589.  The Court observed that "[a]ll parties agree[d]" that "DHS may rescind DACA," and the Court provided no reason to doubt that consensus.  Slip op. at 9.  But it held that DHS violated the APA in the manner in which it had rescinded the policy.

As a threshold matter, the Court determined that, although agency non-enforcement decisions are generally not reviewable under the APA, the rescission of the DACA policy was reviewable "because DACA is not simply a non-enforcement policy."  Id. at 11.  Rather, the Court stated, the Napolitano Memorandum "created a program for conferring affirmative immigration relief," the creation and rescission of which is subject to review under the APA.  Id.  And it added that the "benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy."  Id.

On the merits, the Court found that when DHS rescinded the DACA policy, it failed to consider important aspects of the problem.  In making that determination, the Court declined to consider the Nielsen Memorandum.  Instead, the Court characterized that memorandum as an impermissible post hoc rationalization of the rescission, because in the Court's view Secretary Nielsen "chose to elaborate on the reasons for the initial rescission rather than take new administrative action."  Id. at 14.  As to the Duke Memorandum, the Court held that it was arbitrary and capricious because (1) the Acting Secretary did not adequately consider whether DHS could and should address the illegality of the DACA policy by retaining the forbearance aspect of the policy (i.e., deferred action), while declining to make DACA recipients eligible for the other associated benefits, such as work authorization, id. at 17-23; and (2) the Acting Secretary did not adequately consider how, if at all, to address any "legitimate reliance" on the Napolitano Memorandum, id. at 23-26.  The Court thus concluded that the rescission must be vacated and that the matter should be "remand[ed] to DHS so that it may consider the problem anew."  Id. at 29.

The Court affirmed the District of Columbia district court's final judgment, vacated the Ninth Circuit's affirmance of the preliminary injunction issued by the Northern District of California, and vacated the preliminary injunction issued by the Eastern District of New York.  Id.

On June 30, 2020, Attorney General William Barr withdrew the Sessions Letter and directed the Department of Justice's Office of Legal Counsel to withdraw all guidance it had provided to DHS on the legality of DACA and related deferred-action policies, including an Office of Legal Counsel opinion that briefly addressed the legality of DACA in connection with related deferred-action policies. Attorney General Barr explained that he did not "wish to maintain a determination as the Attorney General about the legality of DACA that might constrain the discretion [I] otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA."

**Rescission of the Nielsen and Duke Memoranda, and Reconsideration of the Napolitano Memoranda**

In light of the Supreme Court's decision to vacate the Duke Memorandum and remand to the Department of Homeland Security, and in my capacity as the Acting Secretary of Homeland Security, I am considering anew the DACA policy. To date, I have considered the Napolitano Memorandum itself, the Duke Memorandum and Acting Secretary Duke's accompanying statement, the Nielsen Memorandum, the administrative record produced in litigation challenging the Duke Memorandum, the briefs and joint appendix filed in the Supreme Court from that litigation, the joint appendix filed in the Fourth Circuit on appeal in the District of Maryland litigation, all of the judicial opinions issued in the litigation over the Duke Memorandum, including the June 18 decision of the Supreme Court, the letter from Attorney General Barr, and letters expressing support for the DACA policy that have been submitted to the President and DHS since the Supreme Court's June 18 decision.

As those materials demonstrate, whether to retain the DACA policy presents significant questions of law and legal policy. More importantly for present purposes, having considered those materials, I have concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission. At the same time, I have concluded that fully rescinding the policy would be a significant administration decision that warrants additional careful consideration. Accordingly, in the exercise of my authority and discretion in establishing national immigration policies and priorities, see 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of a full rescission. Below, I address each of my enforcement policy concerns and then explain the immediate interim changes.

**Enforcement Policy Concerns:** There are several reasons of enforcement policy that may warrant the full rescission of the DACA policy.

First, even if the DACA policy could have been justified as a temporary measure when it was created, Congress arguably has had more than sufficient time to consider affording permanent status or immigration relief to the class of aliens covered by the policy. And yet, although various proposals have been advanced to do that, Congress has so far declined to take action. Particularly in the face of this failure to reach a legislative solution, I have serious doubts as to whether DHS should continue to provide either a reprieve from removal or a grant of attendant benefits to more than half a million aliens through a broad, class-based deferred-action policy.

By contrast, rescinding DACA entirely may well create a more pressing need for Congress to decide whether it wants to address this issue and the underlying conditions that led to a

population of this size to remain in the United States in violation of our immigration laws for so long, and any other efforts to reform our immigration system in a manner that advances the national interest.  As unilateral executive action, the DACA policy necessarily lacks the permanence of statutory law; it is more akin to a stopgap measure.  For example, DACA recipients, as such, are not entitled to become lawful permanent residents and are not on a path to citizenship.  Congress is best positioned to address that and other concerns on a more permanent basis through duly enacted statutes.

Second, there has been much debate about the discretion exercised by DHS personnel in implementing the DACA policy.  In my view, however, regardless of the amount of discretion that has been exercised or could be exercised under the policy, I have reservations as a matter of policy about setting out a list of detailed criteria, and maintaining a formal process, for non-enforcement.  I am concerned that doing so may tilt the scales in deciding which aliens should receive deferred action and may inhibit individualized consideration of each case, at least for a non-enforcement policy of this scale.

Third, because DHS is a law enforcement agency, I am concerned about sending mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them.  DACA makes clear that, for certain large classes of individuals, DHS will at least tolerate, if not affirmatively sanction, their ongoing violation of the immigration laws.  I am deeply troubled that the message communicated by non-enforcement policies like DACA may contribute to the general problem of illegal immigration in a manner that is inconsistent with DHS's law enforcement mission.

Fourth, these concerns are all the more pressing in the context of children.  It is vitally important to convey a message that discourages individuals from undertaking what can often be a perilous journey to this country with no legitimate claim to enter or remain.  Of course, the DACA policy would not apply to children who are sent or brought to this country today.  But rescinding the DACA policy may further DHS's efforts to discourage illegal immigration involving children going forward.  By contrast, I am concerned that retaining the policy creates some risk of communicating the contrary message and encouraging such illegal conduct by suggesting a potential for similar future policies.

**Changes Pending Reconsideration of the DACA Policy**:  In accordance with the Supreme Court's decision, I am determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified.  In the meantime, given my serious concerns about the policy, I have determined that some changes should immediately be made to the policy to limit its scope in the interim.  First, while my reconsideration of the DACA policy continues, no new initial requests for DACA should be accepted.  Second, advance parole should be granted to current DACA beneficiaries only in exceptional circumstances.  Third, going forward, renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods.

These changes will mitigate my concerns without encroaching materially on the reliance interests that have been raised by individuals, organizations, and state and local governments during the course of the extensive litigation over the Duke and Nielsen Memoranda, and in recent letters to the President and DHS.  As noted by the Supreme Court, these groups have argued that, as the Napolitano Memorandum itself stated, many DACA recipients were brought or sent to the country as children, through no fault of their own, and may have never known another home.

They assert that DACA recipients have structured their lives around the expectation that DHS would forbear from enforcing the immigration laws against them and have come to rely on the other associated benefits—like work authorization, Social Security, and Medicare, as well as advance parole—that are made available to DACA recipients.  They point out that other parties, too, would be affected by the rescission of the DACA policy, including the family members, schools, employers, and employees of DACA recipients.  They have offered estimates of the amount of economic activity DACA recipients generate and the federal, state, and local tax revenue that DACA recipients provide.  And some have even argued that the current COVID-19 and economic crises provide additional reasons to continue the DACA policy, in light of the many DACA recipients who have pursued careers in healthcare and other essential services or who serve in other critical roles in the workforce.

Whatever the merits of these asserted reliance interests on the maintenance of the DACA policy, they are significantly lessened, if not entirely lacking, with regard to aliens who have never before received deferred action pursuant to the policy.  And any reliance interests possessed by an alien or a third party within the United States on that alien's ability to remain in the country does not depend on the extraordinary ability to come and go from the country as they please.  In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist.  Indeed, even after determining that DHS's prior full rescission of the policy was likely unlawful, the district courts in the previous litigation did not require DHS to consider requests for DACA from aliens who had not previously received it or to grant any requests for advance parole.  Accordingly, that has been the status quo for more than two years.  It makes sense to continue that approach while I reconsider whether to rescind or revise the policy.  If I ultimately determine to maintain the policy, there is nothing in the policy that would preclude aliens from making an initial request for DACA or renewing requests for advance parole at that time.  And, even in the interim, nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted.

Nor are the asserted reliance interests significantly affected by shortening the renewal periods from two years to one year.  Shortening renewal periods granted during this reconsideration period will have the potential benefit of significantly lessening the lasting effects of the DACA policy if I ultimately decide to rescind it.  And the costs will be limited in the meantime, because the aliens who currently have DACA grants and have structured their affairs based on their expectation of its continuance may still seek renewal.  They will merely have to seek renewal on an annual, rather than biannual, basis.  In a similar manner, the third parties who are benefiting from those aliens' continued presence today will continue to receive the same derivative benefits that they are receiving as long as the aliens' renewals continue—whether on an annual or bi-annual basis.  Put differently, even assuming that aliens with DACA have legitimate reliance interests in being able to renew at all, they have minimal if any reliance interests in the length of each renewal period, especially since a grant of DACA was and remains revocable.

I recognize that shortening renewal periods on a prospective basis will have the effect, during this interim period as I consider how to address the DACA policy, of increasing the total amount of renewal fees that an alien will be required to pay over a multi-year period.  But the fee per application will remain constant, and the fee that DHS charges for the application is associated with the processing costs to DHS.  DHS personnel should consider whether it is possible to

reduce renewal fees during this interim period of reconsideration. In my current view, however, even if renewal fees cannot be reduced, shortening the renewal period is still warranted by my strong desire to limit the scope of the policy during this interim period despite any additional fees incurred by DACA beneficiaries as a result.

Finally, to further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency. Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes. Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.[1] Consistent with the Court's express remand for the agency's reconsideration and the Napolitano Memorandum's clear statement that it conferred no substantive rights, DHS did not expand beyond the status quo of the past several years for a few weeks while it was determining next steps. I now conclude that all pending and future requests should be treated in the same manner, rather than be subject to differential treatment depending on the fortuity of when DHS received the request within a short period of uncertainty. Nothing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis. Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA—much less a legal entitlement to a particular renewal period. Nor can aliens with pending requests assert any meaningfully greater reliance interests in their initial or continued enjoyment of the policy and the attendant benefits than aliens who submit such requests after the issuance of this memorandum.

Accordingly, effective immediately, DHS shall:

- Reject all initial DACA requests and associated applications for Employment Authorization Documents, and refund all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries.

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.

---

[1] Prior to July 24, DHS's treatment of advance parole requests from DACA recipients varied. Many were rejected, while some were accepted and receipted. To the extent any rejected requestor believes exceptional circumstances support his or her request, he or she may now renew the request for advance parole, and it will be adjudicated on the terms set forth in this memorandum.

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances.

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano Memorandum, and as set forth in USCIS's Form I-821D instructions.  Nothing in this memorandum makes any change to that policy.

\* \* \* \* \*

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or equity by any party in any administrative, civil, or criminal matter.  Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.  Finally, if any aspect of the changes to the DACA policy in this memorandum is found to be unlawful, the remainder of the changes should nonetheless continue in effect.

# Exhibit 2

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000



**U.S. Citizenship
and Immigration
Services**

August 21, 2020

# Memorandum

TO:           Associate Directors and Program Office Chiefs

FROM:     Joseph Edlow
                   Deputy Director for Policy

SUBJECT:  Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum,
                   "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial
                   Discretion with Respect to Individuals Who Came to the United States as
                   Children'"

On July 28, 2020, Acting Secretary of Homeland Security Chad Wolf issued a memorandum
entitled, "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to the United States as Children.'" In light of
the U.S. Supreme Court's decision in *Department of Homeland Security (DHS), et al. v. Regents
of the University of California, et al.* Nos. 18-587, 18-588, 18-589, Acting Secretary Wolf
rescinded memoranda issued by former Acting Secretary Elaine Duke in 2017 and former
Secretary Kirstjen Nielsen in 2018 that had concluded that the Deferred Action for Childhood
Arrivals (DACA) policy established on June 15, 2012 by former Secretary Janet Napolitano[1]
(hereafter "the Napolitano memorandum") should be rescinded after an orderly wind-down
process.

Acting Secretary Wolf's memorandum (hereafter "the Wolf Memorandum") also set forth
departmental action to effect certain immediate changes to limit the scope of the DACA policy
pending a full and careful reconsideration of the DACA policy. Through this memorandum, I am
providing additional guidance to facilitate implementation of the specific changes to the DACA
policy that are within the purview of USCIS.

The Wolf Memorandum directed the following actions, effective immediately:

- Reject all initial DACA requests and associated applications for Employment
  Authorization Documents, and refund all associated fees, without prejudice to re-filing

---

[1] Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, Re:
Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June
15, 2012) ("Napolitano memorandum").

www.uscis.gov

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 2

      such requests should DHS determine to begin accepting initial requests again in the future;

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries;

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year;

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods;

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances;

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods;

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate; and

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum changes that policy.

To facilitate implementation of the Wolf Memorandum, I am providing additional guidance to USCIS personnel as follows:

> **Reject all initial DACA requests and associated applications for Employment Authorization Documents, and return all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.**

The Wolf Memorandum makes clear that these changes should apply to all initial DACA requests submitted by aliens who have never before received DACA, whether submitted after the issuance of his memorandum or pending before USCIS at the time his memorandum was issued. In accordance with the Wolf Memorandum, USCIS shall reject and return the fees for any DACA requests and associated applications for employment authorization submitted by aliens *who have never before received a grant of DACA.* Since the Supreme Court's decision in

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 3

*Regents*, these requests, if properly filed, have generally been on hold at the USCIS filing location pending further action by USCIS.[2]

Historically, USCIS policy on DACA renewals has permitted DACA recipients to request renewal of DACA for up to one year after their underlying DACA grant has expired. DACA recipients who failed to submit their renewal requests within the one-year time period following expiration have generally been permitted to request DACA anew. Given the lapse of time between these aliens' last DACA period and their subsequent request to again receive DACA, however, USCIS has treated such requests as requests for "initial" DACA for required evidence, processing, and adjudication purposes. Likewise, DACA recipients whose most recent period of DACA has been terminated by USCIS (rather than expired on its own terms) have also been permitted to request DACA anew, but such requests are treated as requests for "initial" DACA (even if the lapse of time between the termination of their most recent period of DACA and their subsequent request to receive DACA again is less than one year).

Under the preliminary injunctions issued in January and February of 2018,[3] USCIS has accepted and adjudicated DACA requests from aliens who have previously received grants of DACA *at any time*—including requests that are treated as "initial" requests for the reasons described above. Given the Acting Secretary's desire to maintain the status quo of the past few years, USCIS will continue to accept and adjudicate such requests notwithstanding any language in the Wolf Memorandum about rejecting "all" requests for initial DACA.

> **Adjudicate all pending and future DACA renewal requests and associated applications for Employment Authorization Documents from DACA recipients.**

USCIS shall continue to adjudicate all pending DACA renewal requests and renewal requests received after the Wolf Memorandum, as well as certain initial requests as discussed above, under the general adjudicative guidelines in place for DACA. USCIS will continue to reject, without prejudice to re-submission, DACA renewal requests that are not properly filed in accordance with form instructions and USCIS filing guidance, as it has done since USCIS first started accepting DACA renewal requests. While USCIS will continue to adjudicate DACA requests under the same general adjudicative guidelines, USCIS is implementing certain immediate changes to DACA processing consistent with and in furtherance of the Wolf Memorandum.

Since June 2014 when DHS and USCIS announced the DACA renewal process, USCIS has consistently instructed DACA recipients to file renewal requests between 150 days and 120 days

---

[2] Initial DACA requests that were properly filed prior to September 5, 2017, should be adjudicated to completion in the event that any of these requests still remain pending with USCIS. This guidance to reject and return the fees for pending initial DACA requests does not apply to initial DACA requests properly filed prior to September 5, 2017.

[3] See https://www.uscis.gov/humanitarian/deferred-action-for-childhood-arrivals-response-to-january-2018-preliminary-injunction

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 4

prior to their DACA expiration.[4]  Previously, USCIS has accepted renewal requests filed in advance of that period.  In furtherance of the directives in the Wolf Memorandum, USCIS will generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period.  The Wolf Memorandum expressed concerns with the scope of the DACA policy during the interim period the policy is under review.  Exercising discretion to generally reject DACA renewal requests received more than 150 days prior to the expiration of the alien's current period of DACA is more consistent with our long-existing guidance to DACA recipients and serves other important operational interests to improve USCIS's processing and operational efficiencies as a whole.  Additionally, implementing these case intake procedures recognizes that the DACA policy is under comprehensive legal and policy review and may be modified or entirely rescinded by the Acting Secretary once DHS's review of the DACA policy is complete.  Therefore, USCIS believes that it is more prudent to generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period as the DACA policy may be revised or rescinded before USCIS would normally take final adjudicative action on these early filed renewal requests.

USCIS understands that applicants, petitioners, and requestors have an interest in timely adjudications.  This is particularly true for aliens granted temporary authorization to work in the United States who then apply to USCIS to renew their employment authorization documents before their temporary employment authorization expires.  The interim adjustment discussed in this memorandum with respect to early filed DACA renewals balances concerns with the scope of the DACA policy during this interim period with the interests DACA recipients have in preventing gaps in DACA and associated employment authorization.  Further, this guidance reflects an understanding that USCIS processes millions of requests for immigration benefits every year in addition to DACA requests, and therefore USCIS must also balance the interests of all other individuals requesting immigration benefits from the agency.  Of course, this balancing of interests must be done with consideration given to available resources.

USCIS has seen thousands of instances of current DACA recipients filing for DACA renewal when they still have more than 150 days remaining in their current DACA validity.  USCIS data shows that as of June 30, 2020, there were over 11,000 active DACA recipients with DACA renewals pending before USCIS whose current DACA was not set to expire until after January 1, 2021; further, there were nearly 400 active DACA recipients with pending renewal requests whose DACA was not set to expire until the year 2022.

In an effort to minimize overlapping validity periods between an alien's renewed DACA validity period and an alien's current DACA validity period, USCIS has generally withheld issuing final approval of a DACA renewal request until the alien's remaining DACA validity period is closer to the expiration date.  USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period.  However, permitting and accepting DACA renewal requests filed many months in advance of

---

[4] See DACA FAQ 50; https://www.uscis.gov/archive/frequently-asked-questions#renewal; See also; https://www.dhs.gov/news/2014/06/05/secretary-johnson-announces-process-daca-renewal

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 5

DACA expiration only to be preliminarily processed by USCIS and placed on hold is not an efficient use of agency resources.

In assessing whether USCIS should exercise its discretion to begin generally rejecting DACA renewal requests filed more than 150 days prior to expiration, I considered the interests DACA renewal requestors may have in being permitted to file for renewal more than 150 days prior to DACA expiration.  In consideration of these potential interests, I examined DACA renewal processing times.  USCIS data shows that from August 1, 2019 to August 1, 2020, approximately ninety-six percent of DACA renewal requests processed were completed in 120 or fewer days.

The data demonstrate that in the overwhelming majority of DACA renewal cases, it is not necessary to accept DACA renewal requests more than 150 days before the alien's current DACA period expires in order to facilitate timely processing and minimize gaps in DACA and associated employment authorization.  For those aliens, the only effect of this change will be for those early requesters either to wait until the specified period to request renewal or to re-file an early-filed renewal request at the appropriate time.  In cases where the requestor may not continue to meet the DACA guidelines, including concerns that arise from background check results, renewal processing may require more time, but these outliers do not reasonably justify permitting routine acceptance of early filings during this interim period while the DACA policy is under review given USCIS's other policy and operational concerns.

Lastly, nothing precludes USCIS from exercising its discretion to accept a DACA renewal request filed 150 days or more in advance of expiration if there are legitimate reasons for doing so, and nothing precludes USCIS from again modifying recommended filing timelines either during this interim period or should DHS announce changes to the DACA policy in the future.

> **Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.**

As described in the Wolf Memorandum, all requests for DACA and associated employment authorization granted after July 28, 2020 will be for a validity period of no more than one year.[5]

The one-year validity period shall begin on the date the DACA request receives final approval, consistent with past practices, and have an ending validity date that is no more than one year minus one day from the date of approval.  Also consistent with past practices, the associated employment authorization validity period shall end on the same date that the DACA validity period ends.

The Wolf Memorandum acknowledged that shortening validity periods to one year during this interim period will have the effect of increasing the total amount of fees DACA requestors would pay over a multi-year period and asked USCIS to consider whether it is possible to reduce renewal fees during this time.  USCIS is currently considering the merits and feasibility of

---

[5] 8 CFR 274a.12(c) states in pertinent part that "USCIS, in its discretion, may establish a specific validity period for an employment authorization document . . ."

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 6

reducing DACA-related fees during the interim period the DACA policy is under review. Pursuant to INA Section 286(m), DHS may set fees at a level that will "ensure recovery of full costs" of providing adjudication services.  While USCIS has never charged a fee for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, all DACA requestors are required to file Form I-765, Application for Employment Authorization, which does require a fee with very limited exemptions. DACA requestors are also required to pay a biometrics fee.

USCIS notes that the new fee rule, which becomes effective on Oct. 2, 2020, includes a fee increase for the Form I-765, Application for Employment Authorization, for all categories of employment authorization **except** for the DACA category. The fee for DACA-based applications for employment authorization will remain at $410, plus an $85 biometrics fee, for the time being. Lastly, as noted above, USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period, which may lessen some of the economic impact from shortened DACA renewal validity periods.

> ➤ **Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.**

Notwithstanding the prospective changes made by the Wolf Memorandum, USCIS will allow previous two-year grants of DACA and associated employment authorization to remain undisturbed during their existing two-year validity periods (unless USCIS terminates an alien's DACA and associated employment authorization for other reasons).  Consistent with this guidance, two-year DACA recipients who apply for a replacement EAD due to loss, theft, or the mutilation of their prior EAD will receive a replacement EAD with the same expiration date based on the original two-year validity period, assuming the application is otherwise approvable.

> ➤ **Reject all pending and future Form I-131 applications for advance parole from DACA recipients and refund all associated fees, absent exceptional circumstances.**

Acting Secretary Wolf states the following in his memorandum with respect to advance parole:

> "In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist."

Because USCIS will not be able to determine whether Form I-131 applications already received at the DACA-specific filing location fit within Secretary Wolf's stated parole policy without adjudicating the applications, and applicants who filed their Form I-131 before the Wolf Memorandum was issued did not have prior knowledge of the guidance in the memorandum, USCIS has determined that it would be more efficient and fair if applicants refile their applications under the new guidance.  Therefore, USCIS shall reject and return the fees for all Form I-131 applications received at the DACA specific filing location that have been held since July 24, 2020.

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 7

If those DACA recipients still wish to submit a request for advance parole, they may submit their Form I-131 applications consistent with filing instructions that will be announced on the USCIS website. The Form I-131 rejection notice shall inform applicants that they may re-apply for advance parole consistent with the Wolf Memorandum and filing instructions that will be announced on the USCIS website.

Regarding Form I-131 applications filed by DACA recipients at non-DACA filing locations before the Wolf Memorandum was issued and therefore accepted, USCIS will treat these applications similarly to those that have been on hold at the DACA-specific filing location. USCIS will administratively close these cases and refund the fees. USCIS will issue notices informing these applicants that their application has been administratively closed consistent with the Wolf Memorandum. The notice shall inform applicants that they may re-apply for advance parole consistent with the Wolf Memorandum and filing instructions that will be announced on the USCIS website.

USCIS will continue to maintain the current policy for DACA recipients who apply for advance parole in association with other non-DACA immigration requests. For instance, if a DACA recipient has a pending Form I-485 Application to Register Permanent Residence or Adjust Status and requests advance parole on the basis of his or her pending Form I-485, USCIS will adjudicate the advance parole request under the existing policies for Form I-485-based advance parole requests. USCIS will not apply this memorandum to a parole request by a DACA recipient if the request is associated with another underlying immigration benefit (i.e., other than DACA) as described in the instructions to Form I-131 or in USCIS policy guidance.

DACA recipients who have no separate basis for requesting advance parole as described in the instructions to Form I-131 may request advance parole if they have valid DACA and can demonstrate that they warrant the extraordinary privilege of being permitted to return to the United States after traveling abroad, even without a lawful immigration status, pursuant to a valid advance parole travel document.

The Wolf Memorandum sets forth new agency guidance with respect to management of the adjudication of advance parole applications submitted by DACA recipients who do not have a non-DACA basis for advance parole. For nearly three years, advance parole applications submitted by DACA recipients were rejected or denied by USCIS (the applications that were accepted and then denied were accepted solely because they were submitted to an incorrect filing location).

The Wolf Memorandum does not revive the prior DACA-based advance parole standards[6] or add a supplementary exceptional circumstances test to those standards. Rather, the Wolf

---

[6] The prior policy for granting advance parole based on DACA stated that USCIS would generally only grant advance parole if the DACA recipient's travel abroad would be in the furtherance of:

- Humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;
- Educational purposes, such as semester-abroad programs and academic research, or;

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 8

Memorandum institutes a new general hold on granting advance parole to DACA recipients based on prior DACA-based advance parole standards during an interim period while DHS conducts a full review of the DACA policy. As Acting Secretary Wolf noted, it makes sense to continue this approach while he reconsiders whether to rescind or revise the prior policy.  The only difference is that the Wolf Memorandum permits USCIS to process advance parole applications submitted by DACA recipients consistent with INA Section 212(d)(5) and based on a full consideration of all the discretionary factors presented in the alien's application.

Such grants of advance parole should, as a threshold matter, be consistent with the statutory description of parole under INA Section 212(d)(5), 8 U.S.C. § 1182(d)(5)(A), which mandates a case-by-case assessment and a determination that parole of the alien is for urgent humanitarian reasons or significant public benefit.  Accordingly, I am directing USCIS officers to ensure that any grants of advance parole to DACA recipients are consistent with the statute and take into consideration all other discretionary factors present in the case under the totality of circumstances.

Secretary Wolf's memorandum providing for "exceptional circumstances" should be understood in the context of this existing high statutory standard for parole found in INA Section 212(d)(5). Therefore, in most instances, traveling abroad for educational purposes, employment related purposes, or to visit family members living abroad will not warrant advance parole under Secretary Wolf's interim policy regarding the discretionary exercise of parole for urgent humanitarian reasons or significant public benefit.  Additionally, as USCIS has noted since DACA recipients were first permitted to apply for advance parole, travel for vacation is not a valid basis for advance parole.

While the determination of whether to grant advance parole to a DACA recipient based on exceptional circumstances is a case-by-case assessment involving the assessment of the totality of factors presented, some examples of travel that may fit within the statutory standard for parole include, but are not limited to the following:

- Travel to support the national security interests of the United States including U.S. military interests;

- Travel in furtherance of U.S. federal law enforcement interests;

- Travel to obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States;

- Travel needed to support the immediate safety, well-being, or care of an *immediate* relative, particularly minor children of the alien.

The burden shall be on the alien to establish eligibility for parole pursuant to INA section 212(d)(5).

---

- Employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 9

USCIS will consider all discretionary factors presented in the application before making a decision on the advance parole request. The advance permission to travel abroad and return to the United States pursuant to an advance parole travel document is an extraordinary privilege. It is a particularly extraordinary privilege when conferred on an alien who has resided in the United States contrary to our immigration laws (irrespective of when the alien arrived in the United States). The June 15, 2012 Napolitano memorandum itself contained no directive to provide this extraordinary benefit to DACA recipients, and USCIS has not granted this benefit to DACA recipients since the issuance of the September 5, 2017, Duke memorandum.

To ensure compliance with this interim policy, I am directing that any applications for advance parole preliminarily assessed to be approvable by the Service Center(s) designated to adjudicate such applications, receive concurrence from no lower than the Deputy Associate Director for Service Center Operations Directorate (SCOPS) prior to final approval. SCOPS will develop a process to facilitate this review in a timely manner.

SCOPS shall immediately work with the Office of Intake and Document Production (OIDP) and the External Affairs Directorate (EXA) to develop public guidance consistent with this memorandum. The public guidance shall make clear that any applications for advance parole submitted by DACA recipients and received at the designated filing location will be considered a DACA-based application for advance parole based on the Wolf Memorandum.

The public guidance shall make clear that USCIS will accept the application if properly completed and process the fee prior to making an adjudicative determination on whether advance parole should be granted. The public guidance shall also make clear that any applications denied by USCIS because USCIS finds that the application does not merit approval, in the exercise of its discretion, under INA Section 212(d)(5), are not appealable and shall not receive a refund of application fees.

As noted above, INA Section 286(m) gives USCIS authority to collect application fees that "ensure recovery of the full costs of providing [adjudication services]." The determination of whether to grant advance parole under INA Section 212(d)(5) must be made by a trained Immigration Officer after required background checks and other processing requirements are completed. Those services cost money which USCIS recoups from the application fee. As those services must be completed prior to a final determination on whether the alien merits a grant of advance parole USCIS will not refund the application fees on advance parole applications that USCIS denies, consistent with USCIS standard practice.

SCOPS will work with the Office of Policy and Strategy (OP&S) and the Office of the Chief Counsel (OCC) to develop additional training or guidance materials to assist officers in the adjudication of these applications consistent with this memorandum.

> **Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.**

USCIS shall not terminate any previously approved advance parole documents issued to DACA recipients during the stated validity period of the existing advance parole document, absent a

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 10

valid, separate legal basis distinct from the directives in the Wolf Memorandum for terminating advance parole.[7]

> **Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.**

Based on the immediate review of the DACA policy, including the immediate interim changes to the policy discussed in the Wolf Memorandum and this memorandum, I am directing SCOPS to immediately review the internal guidance document referred to as the DACA SOP last revised on August 28, 2013. SCOPS should work with OCC and OP&S to immediately update the DACA SOP consistent with the Wolf Memorandum and this memorandum. The updated DACA SOP shall make clear that it is intended solely for the instruction of USCIS personnel in the performance of their official duties, and that the SOP is not legally binding, does not confer any substantive rights to removable aliens, and does not otherwise constrain DHS' authority to enforce the immigration laws passed by Congress.

SCOPS should also review other internal DACA operational guidance and training materials currently in use to ensure that they are consistent with the Wolf Memorandum and this memorandum.

USCIS must continue to follow the DACA termination procedures required by all relevant court orders as long as they remain in effect.

> **Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum makes any change to that policy.**

USCIS shall continue to operate under the DACA information sharing policy described above. Nothing in this memorandum or the Wolf Memorandum makes any change to that policy.

**Use**

This memorandum is intended solely for the instruction of USCIS personnel in the performance of their official duties. It is not intended to, does not, and may not be relied upon to, create any right or benefit, substantive or procedural, enforceable at law, or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

---

[7] USCIS has not granted advance parole based on the standards associated with DACA since September 5, 2017.

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-00068 |
| KIRSTJEN M. NIELSEN, *et al.*, | |
| Defendants, | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| Defendant-Intervenors. | |

**FEDERAL DEFENDANTS' OBJECTIONS AND RESPONSES TO
DEFENDANT-INTERVENORS' FIFTH AND SIXTH SETS OF DISCOVERY
REQUESTS**

TO: Defendant-Intervenors, by and through their attorneys of record, Nina Perales, Celina Moreno, Jack Salmon, Alejandra Avila, Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas 78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C., P.O. Box 4545 McAllen, Texas 78502.

Federal Defendants serve these objections and responses to Defendant-Intervenors' fifth and sixth set of interrogatories and requests for production of documents pursuant to the Federal Rules of Civil Procedure.

**GENERAL OBJECTIONS**

Federal Defendants state the following General Objections to Defendant-Intervenors' fifth and sixth sets of interrogatories and requests for production of documents ("RFP"), served on August 28 and 30, 2020, respectively (hereafter "August discovery requests"), which are hereby incorporated in and made part of each of the following specific responses.

1

USCIS' common use of the terms in its agency practices regarding DACA: "took [USCIS] to adjudicate," "accepted," and "renewal". The response to Interrogatory No. 18 is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response. Defendant USCIS further objects that the phrase "average number of months" is vague and undefined, and therefore ambiguous. In its response, Defendant USCIS uses a conversion of 30.4 days per month.

**RESPONSE TO INTERROGATORY NO. 18**

Subject to these objections, Federal Defendants refer to the attached chart, entitled "Interrogatory 18, Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Average Processing Time, July 1, 2018 – Sep 8, 2020. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 19**

Please identify the number of DACA applications adjudicated at each of the five service centers within the USCIS Service Center Operations Directorate (SCOPS) each year for the period of July 2018 to September 2020.

**OBJECTIONS TO INTERROGATORY NO. 19**

Federal Defendants specifically object to Interrogatory No. 19 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants object to the following term in Interrogatory No. 19 to the extent that it may be vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends it to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "adjudicated."

**RESPONSE TO INTERROGATORY NO. 19**

Subject to these objections, Federal Defendants refer to the attached chart, entitled "Interrogatory 19, Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials & Renewals, Count of Adjudications by Service Center Location & Fiscal Year, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 20**

Please identify the number of DACA initial applications USCIS has accepted and denied from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, from among that number:

a.  the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of July 2018 to September 2020.

b.  the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of July 2018 to September 2020.

c.  the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

**OBJECTION TO INTERROGATORY NO. 20:**

Federal Defendants specifically object to Interrogatory No. 20 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants further object to the following terms in Interrogatory No. 20 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "initial [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Federal Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Federal Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

 Federal Defendants object to subparts a., b., and c., of this Interrogatory on the grounds that they are vague, overbroad, burdensome, not relevant and/or proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of Interrogatory 20 in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of the electronic and/or paper files of every denial of an initial DACA request for requestors from each Plaintiff State for the requested time period (over 850 cases), as set forth in the attached declaration. To the extent USCIS can offer any good-faith estimate, it avers that, once all of the information from each DACA denial is identified and

gathered, itself a lengthy and resource intense process, Decl. ¶¶ 7-13, individual case-by-case review of the electronic and/or paper files for approximately 2,160 denied initial and renewal DACA requests could take anywhere between approximately 720 hours and 3,240 hours to complete. Decl. ¶ 14. Case-by-case review may also require further consultation with the adjudicator who rendered the decision. Given the strong likelihood that such a search and review would carry on for no less than several months, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of conducting manual case-by-case file review.

Federal Defendants will provide a response to the main question within Interrogatory 20, the number of denials of initial DACA requests from Plaintiff States by month, but note that this information is already provided in the response to Interrogatory 15 and is therefore duplicative.

**RESPONSE TO INTERROGATORY NO. 20**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Count of Denials by Month and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run. In response to subpart c. of Interrogatory No. 20, Federal Defendants respond that based on an inquiry of relevant USCIS service centers, Federal Defendants are anecdotally aware of one initial DACA request for Plaintiff States that was denied because the requestor was the subject of an ongoing civil investigation for employment of unauthorized workers and failure to pay withholding taxes, despite the requestor meeting the DACA guidelines outlined in the bulleted points on the first page of the memorandum entitled, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

**INTERROGATORY NO. 21**

Please identify the number of DACA renewal applications USCIS has accepted and denied from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, from among that number:

    a.   the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of July 2018 to September 2020.

    b.   the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of July 2018 to September 2020.

    c.   the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

**OBJECTION TO INTERROGATORY NO. 21**

Federal Defendants specifically object to Interrogatory No. 21 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Federal Defendants further object to the following terms in Interrogatory No. 21 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Federal Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Federal Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

Federal Defendants object to this Interrogatory on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of this Interrogatory in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper files of every denial of a DACA renewal request for the requestors from each Plaintiff State (nearly 1,300 cases), as set forth in the attached declaration. To the extent USCIS can offer any good-faith estimate, it avers that, once all of the information from each DACA denial is identified and gathered, itself a lengthy and resource intense process, Decl. ¶¶ 7-13, individual case-by-case review of the electronic and/or paper files for approximately 2,160 denied initial and renewal DACA requests could take anywhere between approximately 720 hours and 3,240 hours to complete. Decl. ¶ 14. Case-by-case review may also require further consultation with the adjudicator who rendered the decision. Given the strong likelihood that such a search and review would carry on for no less than several months, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of conducting manual case-by-case file review.

Federal Defendants will provide a response to the main question within Interrogatory 21, the number of denials of DACA renewal requests from Plaintiff States by month, but note that this information is already provided in the response to Interrogatory 16 and is therefore duplicative.

**RESPONSE TO INTERROGATORY NO. 21**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Count of Denials by Month and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run. In response to subpart c. of Interrogatory No. 21, Federal Defendants respond that based on an inquiry of relevant USCIS service centers, Federal Defendants are anecdotally aware of one DACA renewal request from Plaintiff States that was denied because the requestor had an unresolved pending felony charge that would be disqualifying if convicted and would remain unresolved beyond six months, despite the requestor meeting the DACA guidelines outlined in the bulleted points on the first page of the memorandum entitled, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

**INTERROGATORY NO. 22**

Please identify the number of initial DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, from among that number:

a. the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

b. the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;

c. the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

d. the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

e. the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

f. the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

August 21, 2020 USCIS memorandum, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,'"* that are not duplicative of documents or information previously produced in discovery in this matter or previously referenced in Federal Defendants' written discovery responses, and that are maintained by key custodians who are currently employed by a Federal Defendant agency. However, it would be unduly burdensome for Federal Defendants to conduct a comprehensive search for all documents "from the Office of Legal Counsel relating to DACA, the Wolf Memo, or the Edlow Memo" for all potential custodians, or to conduct a comprehensive search for records that were maintained by former Federal Defendant agencies' employees.

Federal Defendants respectfully direct Defendant-Intervenors to the Office of Legal Counsel's website to retrieve that Office's only public, non-privileged document regarding DACA:

- *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others,* 38 Op O.L.C. _ (Nov. 19, 2014),[3] available at https://www.justice.gov/olc/file/1315981/download.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 5:**

Federal Defendants admit that DHS is implementing DACA subject to the guidance in the Wolf Memo and Edlow Memo.

**RESPONSE:**

Federal Defendants admit that USCIS is implementing the DACA policy according to the guidance in Acting Secretary Wolf's July 28, 2020 memorandum, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* and the August 21, 2020 USCIS memorandum, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'"*

**REQUEST FOR ADMISSION NO. 6:**

Admit that DHS is rejecting all initial DACA requests and associated applications for Employment Authorization Documents.

---

[3] Federal Defendants note that this opinion was withdrawn by Attorney General William Barr. *See* Letter for Chad F. Wolf, Acting Secretary of Homeland Security, from William P. Barr, Attorney General (June 30, 2020), available at: https://www.dhs.gov/sites/default/files/publications/20_0630_doj_aj-barr-letter-as-wolf-daca.pdf.

**RESPONSE:**

Federal Defendants admit only that USCIS is rejecting initial DACA requests and associated applications for Employment Authorization Documents from individuals who have not previously received DACA. Federal Defendants aver that USCIS is accepting "initial" DACA requests from individuals who previously received DACA, such as individuals who request DACA more than a year after their previous period of DACA expired or whose previous period of DACA was terminated at any time.

**REQUEST FOR ADMISSION NO. 7:**

Federal Defendants admit that DHS is limiting the period of any deferred action granted pursuant to the DACA initiative to one year.

**RESPONSE:**

Federal Defendants admit only that all requests for DACA granted after July 28, 2020 are for a validity period of no more than one year.

**REQUEST FOR ADMISSION NO. 8:**

Federal Defendants admit that DHS is rejecting all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA initiative, absent exceptional circumstances.

**RESPONSE:**

Federal Defendants deny Request for Admission No. 8. Federal Defendants aver that USCIS is rejecting Form I-131 applications for advance parole submitted by DACA recipients at the DACA-specific filing location and placed on hold that were postmarked before August 24, 2020 and administratively closing pending Form I-131 applications for advance parole filed by DACA recipients at non-DACA specific filing locations prior to August 24, 2020. All associated fees in these cases are being refunded. DACA recipients whose Form I-131 applications are rejected as noted above may refile their Form I-131 applications consistent with the new guidance.

Federal Defendants aver that USCIS accepts and considers all Form I-131 applications received at the DACA-specific direct filing address on or after August 24, 2020 as an application for advance parole based on the new guidance, if properly completed, and processes the required fee. If, in the exercise of discretion, USCIS determines that the DACA recipient does not warrant advance parole under the July 28, 2020 Wolf Memo or the August 21, 2020 Edlow Memo, USCIS will deny the Form I-131 without refunding the processing fees. Defendants further aver that Form I-131 applications for advance parole filed by a DACA recipient that are associated with a separate underlying immigration benefit continue to be adjudicated under existing guidance for those requests, and not under the July 28, 2020 Wolf Memo or the August 21, 2020 Edlow Memo.

**REQUEST FOR ADMISSION NO. 9:**

# Exhibit 4



**Interrogatory 15**

Form I-821D, Consideration of Deferred Action for
Childhood Arrivals

DACA Initials

Count of Accepted Filings, Rejections, Approvals, and
Denials by Month, and Selected State

July 1, 2018 - Sep 8, 2020

| Requestor State | Month | Accepted Filings | Rejections | Total Received | Approved | Denied | Total Completions |
|---|---|---|---|---|---|---|---|
| Alabama | July-18 | 1 | - | 1 | 4 | 4 | 8 |
| Alabama | August-18 | - | - | - | 7 | 12 | 19 |
| Alabama | September-18 | - | - | - | 1 | 4 | 5 |
| Alabama | October-18 | - | - | - | 2 | 3 | 5 |
| Alabama | November-18 | 1 | - | 1 | 1 | 1 | 2 |
| Alabama | December-18 | - | - | - | 1 | 1 | 2 |
| Alabama | January-19 | - | - | - | 1 | - | 1 |
| Alabama | February-19 | 1 | - | 1 | 1 | 1 | 2 |
| Alabama | March-19 | 1 | - | 1 | - | - | - |
| Alabama | April-19 | 1 | - | 1 | - | - | - |
| Alabama | May-19 | 2 | - | 2 | - | 2 | 2 |
| Alabama | June-19 | 1 | - | 1 | - | - | - |
| Alabama | July-19 | 1 | - | 1 | 1 | - | 1 |
| Alabama | August-19 | 6 | - | 6 | 1 | 1 | 2 |
| Alabama | September-19 | 2 | - | 2 | 1 | - | 1 |
| Alabama | October-19 | 1 | - | 1 | 2 | - | 2 |
| Alabama | November-19 | - | - | - | - | - | - |
| Alabama | December-19 | - | - | - | 1 | - | 1 |
| Alabama | January-20 | - | - | - | 2 | 1 | 3 |
| Alabama | February-20 | 1 | - | 1 | 2 | 1 | 3 |
| Alabama | March-20 | 2 | - | 2 | 1 | - | 1 |
| Alabama | April-20 | 1 | - | 1 | - | - | - |
| Alabama | May-20 | - | - | - | 1 | - | 1 |
| Alabama | June-20 | 4 | - | 4 | 1 | - | 1 |
| Alabama | July-20 | 3 | - | 3 | 1 | - | 1 |
| Alabama | August-20 | 1 | - | 1 | - | - | - |
| Alabama | September-20 | - | - | - | - | - | - |
| **Alabama Total** | | **30** | **-** | **30** | **32** | **31** | **63** |
| Arkansas | July-18 | - | - | - | 3 | 7 | 10 |
| Arkansas | August-18 | 1 | - | 1 | 1 | 8 | 9 |
| Arkansas | September-18 | - | - | - | 4 | 1 | 5 |
| Arkansas | October-18 | - | - | - | 1 | 1 | 2 |
| Arkansas | November-18 | 1 | - | 1 | 1 | 1 | 2 |
| Arkansas | December-18 | - | - | - | 1 | 1 | 2 |
| Arkansas | January-19 | - | - | - | - | 1 | 1 |
| Arkansas | February-19 | - | - | - | - | 1 | 1 |
| Arkansas | March-19 | - | - | - | - | - | - |

| Arkansas | April-19 | - | - | - | - | - | - |
|---|---|---|---|---|---|---|---|
| Arkansas | May-19 | - | - | - | 1 | - | 1 |
| Arkansas | June-19 | - | - | - | - | - | - |
| Arkansas | July-19 | 2 | - | 2 | 1 | 1 | 2 |
| Arkansas | August-19 | 2 | - | 2 | - | - | - |
| Arkansas | September-19 | - | - | - | - | - | - |
| Arkansas | October-19 | 3 | - | 3 | - | - | - |
| Arkansas | November-19 | - | - | - | - | - | - |
| Arkansas | December-19 | 1 | - | 1 | 2 | - | 2 |
| Arkansas | January-20 | 2 | - | 2 | - | 1 | 1 |
| Arkansas | February-20 | - | - | - | 2 | - | 2 |
| Arkansas | March-20 | 2 | - | 2 | - | - | - |
| Arkansas | April-20 | 1 | - | 1 | - | - | - |
| Arkansas | May-20 | 2 | - | 2 | - | 1 | 1 |
| Arkansas | June-20 | - | - | - | - | - | - |
| Arkansas | July-20 | 1 | - | 1 | - | - | - |
| Arkansas | August-20 | 2 | - | 2 | - | - | - |
| Arkansas | September-20 | - | - | - | 1 | - | 1 |
| **Arkansas Total** | | **20** | **-** | **20** | **18** | **24** | **42** |
| Kansas | July-18 | - | - | - | 9 | 6 | 15 |
| Kansas | August-18 | 2 | - | 2 | 10 | 2 | 12 |
| Kansas | September-18 | 2 | - | 2 | 2 | 1 | 3 |
| Kansas | October-18 | 3 | - | 3 | 2 | 4 | 6 |
| Kansas | November-18 | 1 | - | 1 | 2 | 2 | 4 |
| Kansas | December-18 | 1 | - | 1 | - | - | - |
| Kansas | January-19 | - | - | - | 1 | - | 1 |
| Kansas | February-19 | - | - | - | 1 | 3 | 4 |
| Kansas | March-19 | 1 | - | 1 | - | 3 | 3 |
| Kansas | April-19 | 1 | - | 1 | 1 | - | 1 |
| Kansas | May-19 | 3 | - | 3 | - | - | - |
| Kansas | June-19 | 2 | - | 2 | 2 | 1 | 3 |
| Kansas | July-19 | 1 | - | 1 | 1 | 1 | 2 |
| Kansas | August-19 | 2 | - | 2 | - | - | - |
| Kansas | September-19 | 4 | - | 4 | - | - | - |
| Kansas | October-19 | - | - | - | - | - | - |
| Kansas | November-19 | 2 | - | 2 | 1 | - | 1 |
| Kansas | December-19 | 2 | - | 2 | 2 | - | 2 |
| Kansas | January-20 | 3 | - | 3 | 1 | 1 | 2 |
| Kansas | February-20 | 2 | - | 2 | 2 | - | 2 |
| Kansas | March-20 | 1 | - | 1 | 2 | - | 2 |
| Kansas | April-20 | 3 | - | 3 | 1 | - | 1 |
| Kansas | May-20 | 2 | - | 2 | 1 | - | 1 |
| Kansas | June-20 | 1 | - | 1 | 1 | 1 | 2 |
| Kansas | July-20 | 2 | - | 2 | - | 1 | 1 |
| Kansas | August-20 | 1 | - | 1 | - | - | - |
| Kansas | September-20 | - | - | - | - | - | - |
| **Kansas Total** | | **42** | **-** | **42** | **42** | **26** | **68** |

| Louisiana | July-18 | - | - | - | 7 | 5 | 12 |
|---|---|---|---|---|---|---|---|
| Louisiana | August-18 | 1 | - | 1 | 4 | 3 | 7 |
| Louisiana | September-18 | - | - | - | 1 | 3 | 4 |
| Louisiana | October-18 | 1 | - | 1 | 1 | 3 | 4 |
| Louisiana | November-18 | 1 | - | 1 | 1 | - | 1 |
| Louisiana | December-18 | - | - | - | - | - | - |
| Louisiana | January-19 | - | - | - | - | - | - |
| Louisiana | February-19 | - | - | - | - | - | - |
| Louisiana | March-19 | - | - | - | - | 1 | 1 |
| Louisiana | April-19 | - | - | - | - | - | - |
| Louisiana | May-19 | - | - | - | - | 3 | 3 |
| Louisiana | June-19 | 1 | - | 1 | - | - | - |
| Louisiana | July-19 | - | - | - | - | - | - |
| Louisiana | August-19 | 1 | - | 1 | - | - | - |
| Louisiana | September-19 | 2 | - | 2 | - | - | - |
| Louisiana | October-19 | - | - | - | - | - | - |
| Louisiana | November-19 | 1 | - | 1 | - | - | - |
| Louisiana | December-19 | - | - | - | - | 1 | 1 |
| Louisiana | January-20 | - | - | - | - | - | - |
| Louisiana | February-20 | - | - | - | 2 | - | 2 |
| Louisiana | March-20 | 1 | - | 1 | - | 1 | 1 |
| Louisiana | April-20 | 1 | - | 1 | - | 1 | 1 |
| Louisiana | May-20 | - | - | - | - | - | - |
| Louisiana | June-20 | 1 | - | 1 | - | - | - |
| Louisiana | July-20 | 1 | - | 1 | - | - | - |
| Louisiana | August-20 | 1 | - | 1 | - | - | - |
| Louisiana | September-20 | - | - | - | - | - | - |
| **Louisiana Total** | | **13** | **-** | **13** | **16** | **21** | **37** |
| Mississippi | July-18 | - | - | - | 1 | 3 | 4 |
| Mississippi | August-18 | - | - | - | 1 | 1 | 2 |
| Mississippi | September-18 | - | - | - | - | - | - |
| Mississippi | October-18 | - | - | - | - | 1 | 1 |
| Mississippi | November-18 | - | - | - | - | - | - |
| Mississippi | December-18 | - | - | - | - | - | - |
| Mississippi | January-19 | - | - | - | - | 1 | 1 |
| Mississippi | February-19 | - | - | - | - | - | - |
| Mississippi | March-19 | - | - | - | - | - | - |
| Mississippi | April-19 | - | - | - | - | - | - |
| Mississippi | May-19 | 1 | - | 1 | - | - | - |
| Mississippi | June-19 | - | - | - | - | - | - |
| Mississippi | July-19 | - | - | - | - | - | - |
| Mississippi | August-19 | 2 | - | 2 | - | - | - |
| Mississippi | September-19 | - | - | - | - | - | - |
| Mississippi | October-19 | - | - | - | - | - | - |
| Mississippi | November-19 | 1 | - | 1 | 1 | - | 1 |
| Mississippi | December-19 | - | - | - | - | - | - |
| Mississippi | January-20 | 2 | - | 2 | 1 | - | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mississippi | February-20 | 2 | - | 2 | - | 1 | 1 |
| Mississippi | March-20 | - | - | - | - | - | - |
| Mississippi | April-20 | - | - | - | - | - | - |
| Mississippi | May-20 | 1 | - | 1 | 1 | - | 1 |
| Mississippi | June-20 | - | - | - | 1 | - | 1 |
| Mississippi | July-20 | 1 | - | 1 | 2 | 1 | 3 |
| Mississippi | August-20 | - | - | - | - | - | - |
| Mississippi | September-20 | - | - | - | - | - | - |
| **Mississippi Total** | | **10** | **-** | **10** | **8** | **8** | **16** |
| Nebraska | July-18 | - | - | - | 6 | 1 | 7 |
| Nebraska | August-18 | - | - | - | 5 | 2 | 7 |
| Nebraska | September-18 | - | - | - | - | 1 | 1 |
| Nebraska | October-18 | 1 | - | 1 | 1 | 1 | 2 |
| Nebraska | November-18 | - | - | - | - | 1 | 1 |
| Nebraska | December-18 | 1 | - | 1 | - | 1 | 1 |
| Nebraska | January-19 | - | - | - | 1 | - | 1 |
| Nebraska | February-19 | 1 | - | 1 | 1 | 1 | 2 |
| Nebraska | March-19 | 1 | - | 1 | - | 1 | 1 |
| Nebraska | April-19 | - | - | - | - | 1 | 1 |
| Nebraska | May-19 | - | - | - | 1 | 1 | 2 |
| Nebraska | June-19 | - | - | - | - | - | - |
| Nebraska | July-19 | - | - | - | 2 | - | 2 |
| Nebraska | August-19 | 1 | - | 1 | - | - | - |
| Nebraska | September-19 | 2 | - | 2 | - | - | - |
| Nebraska | October-19 | 2 | - | 2 | 1 | - | 1 |
| Nebraska | November-19 | 3 | - | 3 | - | - | - |
| Nebraska | December-19 | - | - | - | 1 | - | 1 |
| Nebraska | January-20 | 1 | - | 1 | - | 1 | 1 |
| Nebraska | February-20 | 2 | - | 2 | - | - | - |
| Nebraska | March-20 | 4 | - | 4 | - | - | - |
| Nebraska | April-20 | 1 | - | 1 | 1 | - | 1 |
| Nebraska | May-20 | - | - | - | - | - | - |
| Nebraska | June-20 | 4 | - | 4 | 2 | 1 | 3 |
| Nebraska | July-20 | - | - | - | 6 | - | 6 |
| Nebraska | August-20 | - | - | - | - | - | - |
| Nebraska | September-20 | - | - | - | - | - | - |
| **Nebraska Total** | | **24** | **-** | **24** | **28** | **13** | **41** |
| South Carolina | July-18 | 1 | - | 1 | 9 | 14 | 23 |
| South Carolina | August-18 | 5 | - | 5 | 5 | 14 | 19 |
| South Carolina | September-18 | - | - | - | 7 | 5 | 12 |
| South Carolina | October-18 | - | - | - | 2 | 3 | 5 |
| South Carolina | November-18 | 2 | - | 2 | 3 | - | 3 |
| South Carolina | December-18 | - | - | - | - | 4 | 4 |
| South Carolina | January-19 | 1 | - | 1 | 3 | 1 | 4 |
| South Carolina | February-19 | 1 | - | 1 | 1 | 2 | 3 |
| South Carolina | March-19 | - | - | - | 1 | 1 | 2 |
| South Carolina | April-19 | 2 | - | 2 | 1 | - | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| South Carolina | May-19 | - | - | - | - | 2 | 2 |
| South Carolina | June-19 | 1 | - | 1 | - | 1 | 1 |
| South Carolina | July-19 | 2 | - | 2 | - | - | - |
| South Carolina | August-19 | 1 | - | 1 | 1 | 1 | 2 |
| South Carolina | September-19 | 3 | - | 3 | - | 1 | 1 |
| South Carolina | October-19 | 2 | - | 2 | 1 | 1 | 2 |
| South Carolina | November-19 | 3 | - | 3 | - | - | - |
| South Carolina | December-19 | 1 | - | 1 | 1 | - | 1 |
| South Carolina | January-20 | 2 | - | 2 | - | - | - |
| South Carolina | February-20 | - | - | - | 2 | 1 | 3 |
| South Carolina | March-20 | 2 | - | 2 | 2 | 1 | 3 |
| South Carolina | April-20 | 1 | - | 1 | 1 | - | 1 |
| South Carolina | May-20 | 5 | - | 5 | - | 2 | 2 |
| South Carolina | June-20 | 2 | - | 2 | - | 2 | 2 |
| South Carolina | July-20 | 3 | - | 3 | 3 | - | 3 |
| South Carolina | August-20 | 4 | - | 4 | - | - | - |
| South Carolina | September-20 | - | - | - | - | 1 | 1 |
| **South Carolina Total** | | **44** | **-** | **44** | **43** | **57** | **100** |
| Texas | July-18 | 22 | 2 | 24 | 204 | 149 | 353 |
| Texas | August-18 | 24 | - | 24 | 170 | 132 | 302 |
| Texas | September-18 | 23 | - | 23 | 75 | 107 | 182 |
| Texas | October-18 | 17 | - | 17 | 45 | 57 | 102 |
| Texas | November-18 | 22 | - | 22 | 47 | 20 | 67 |
| Texas | December-18 | 7 | - | 7 | 22 | 21 | 43 |
| Texas | January-19 | 10 | - | 10 | 35 | 19 | 54 |
| Texas | February-19 | 14 | - | 14 | 24 | 24 | 48 |
| Texas | March-19 | 18 | - | 18 | 20 | 15 | 35 |
| Texas | April-19 | 20 | - | 20 | 16 | 5 | 21 |
| Texas | May-19 | 11 | - | 11 | 17 | 12 | 29 |
| Texas | June-19 | 15 | - | 15 | 12 | 11 | 23 |
| Texas | July-19 | 19 | - | 19 | 17 | 6 | 23 |
| Texas | August-19 | 45 | - | 45 | 3 | 1 | 4 |
| Texas | September-19 | 56 | - | 56 | 13 | 11 | 24 |
| Texas | October-19 | 61 | - | 61 | 11 | 3 | 14 |
| Texas | November-19 | 38 | - | 38 | 16 | 6 | 22 |
| Texas | December-19 | 42 | - | 42 | 26 | 5 | 31 |
| Texas | January-20 | 46 | - | 46 | 12 | 6 | 18 |
| Texas | February-20 | 48 | - | 48 | 25 | 13 | 38 |
| Texas | March-20 | 67 | - | 67 | 27 | 13 | 40 |
| Texas | April-20 | 48 | 1 | 49 | 17 | 9 | 26 |
| Texas | May-20 | 69 | - | 69 | 40 | 4 | 44 |
| Texas | June-20 | 73 | - | 73 | 43 | 13 | 56 |
| Texas | July-20 | 82 | - | 82 | 38 | 13 | 51 |
| Texas | August-20 | 57 | - | 57 | 1 | 2 | 3 |
| Texas | September-20 | - | - | - | 5 | - | 5 |
| **Texas Total** | | **954** | **3** | **957** | **981** | **677** | **1,658** |
| West Virginia | July-18 | - | - | - | - | 2 | 2 |

| West Virginia | August-18 | - | - | - | - | - | - |
|---|---|---|---|---|---|---|---|
| West Virginia | September-18 | - | - | - | - | - | - |
| West Virginia | October-18 | - | - | - | - | - | - |
| West Virginia | November-18 | - | - | - | - | - | - |
| West Virginia | December-18 | - | - | - | - | 1 | 1 |
| West Virginia | January-19 | - | - | - | - | - | - |
| West Virginia | February-19 | - | - | - | - | - | - |
| West Virginia | March-19 | - | - | - | - | - | - |
| West Virginia | April-19 | - | - | - | - | - | - |
| West Virginia | May-19 | - | - | - | - | - | - |
| West Virginia | June-19 | - | - | - | - | - | - |
| West Virginia | July-19 | - | - | - | - | - | - |
| West Virginia | August-19 | - | - | - | - | - | - |
| West Virginia | September-19 | - | - | - | - | - | - |
| West Virginia | October-19 | - | - | - | - | - | - |
| West Virginia | November-19 | - | - | - | - | - | - |
| West Virginia | December-19 | - | - | - | - | - | - |
| West Virginia | January-20 | - | - | - | - | - | - |
| West Virginia | February-20 | - | - | - | - | - | - |
| West Virginia | March-20 | - | - | - | - | - | - |
| West Virginia | April-20 | - | - | - | - | - | - |
| West Virginia | May-20 | - | - | - | - | - | - |
| West Virginia | June-20 | - | - | - | - | - | - |
| West Virginia | July-20 | - | - | - | - | - | - |
| West Virginia | August-20 | - | - | - | - | - | - |
| West Virginia | September-20 | - | - | - | - | - | - |
| **West Virginia Total** | | **-** | **-** | **-** | **-** | **3** | **3** |
| **Grand Total** | | **1,137** | **3** | **1,140** | **1,168** | **860** | **2,028** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) For Accepted Filings, Rejections, and Total Received, Month represents the month the DACA Request was received by USCIS.

3) Requestor state for lockbox rejected cases in ELIS is not captured electronically.

4) For Approved, Denied, and Total Completions, Month represents the month the most recent final adjudication action occurred.

5) Requests approved or denied in a given month may have been received in a previous month.

6) State is determined by the requestor's address listed on the form I-821D.

7) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

# Exhibit 5

| **From:** | Palmer, Victoria A ▉▉▉▉▉ @uscis.dhs.gov> |
|---|---|
| **Sent:** | |
| **To:** | USCIS Media ▉▉▉▉ @uscis.dhs.gov> |
| **Subject:** | Communications Materials: USCIS Guidance on Deferred Action for Childhood Arrivals (DACA) |
| **Attach:** | DACA Memo Aug 2020 (USCIS Guidance on DACA) RTQ _08.24.2020.docx |

Colleagues,
Today, Monday, August 24, USCIS published communications related to the USCIS Guidance on Deferred Action for Childhood Arrivals (DACA).

**Documents:**
- **Response to Query (RTQ)** – attached and in the USCIS Talking Points Library as DACA Memo Aug 2020 (USCIS Guidance on DACA) RTQ at https://connect.uscis.dhs.gov/org/OCOMM/USCIS%20Official%20Talking%20Points%20Repository/DACA%20Memo%20Aug%202020%20(USCIS%20Guidance%20on%20DACA)%20RTQ%20_08.24.2020.docx?d=w4c4bb2a6dab2402383b990a1b4c4cecd

**Guidance:**
- Public Affairs Officers – For your information. **Please refer all media inquiries to USCIS Media.**
- Public Engagement, OLIA – For your information.
- Internal Communications – For your information.
- Electronic Communications – For your information.

v/r,
Victoria

**Victoria A. Palmer**
Media Affairs Division, Office of Public Affairs
U.S. Citizenship and Immigration Services
Desk: 202.272.▉▉▉ | Cell: 202.440▉▉▉▉
▉▉▉▉▉ @uscis.dhs.gov
www.uscis.gov | www.uscis.gov/news

Confidential



U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

# Media Response to Query

**ISSUE**
USCIS Guidance on Deferred Action for Childhood Arrivals (DACA)

**LAST MODIFIED**
Aug. 19, 2020

**POC**
Victoria Palmer – ██████████@uscis.dhs.gov, 202-272-8569

*Public Affairs Guidance, Talking Points, Response to Queries and Official Statements contain information and answers to specific questions, guidance and instructions, and key messages **used for responding to media and congressional queries**. The following information does not permit you to speak on behalf of USCIS, unless you are a Public Affairs Officer or are explicitly authorized to address external audiences (media, stakeholders, etc.). These materials are for reference only – please contact OPA's Media Affairs Division for assistance or with questions.*

**GUIDANCE**
Passive - Response to Query only

**BACKGROUND**

The DACA executive amnesty policy was created unilaterally by memorandum on June 15, 2012, without public notice and an opportunity to comment. The Supreme Court's decision in *Department of Homeland Security (DHS) v. Regents of the University of California* on June 18, 2020, did not question the authority of DHS to rescind the DACA policy, but determined that DHS did not comply with certain requirements in attempting to end the policy. Acting Secretary of Homeland Security Chad Wolf issued a memorandum on July 28, 2020, rescinding previous DACA policy memoranda issued in 2017 and 2018, and setting forth departmental action to effect immediate changes limiting the scope of DACA policy in the interim pending a full and careful reconsideration of DACA in light of the Supreme Court's decision.

U.S. Citizenship and Immigration Services is now providing additional guidance regarding how it will implement DACA policy as outlined in the July 28 DHS memorandum.

NJAPP039

Confidential

DEF - 00008382



**U.S. Citizenship and Immigration Services**

*For internal use only*

*Office of Public Affairs*

**IF-ASKED STATEMENT**
Attributable to Deputy Director for Policy Joseph Edlow:

*"The acting secretary expressed serious concerns with the DACA policy and made certain immediate changes to limit the policy's scope while DHS conducts a full and careful review of the policy. Ultimately, DACA is not a long-term solution for anyone. As has been the case since the inception of the policy, any kind of permanent amnesty can only legally come from Congress. While Congress continues to examine this issue, DHS is conducting a full and careful review of DACA policy. In the interim, we have published guidance regarding how USCIS will implement the DACA policy at this time."*

**KEY FACTS**
U.S. Citizenship and Immigration Services is providing <u>guidance </u>regarding how USCIS will implement the DACA policy in keeping with the DHS July 28 memorandum entitled, <u>"Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children'"</u> pending a full and careful reconsideration of the DACA policy.

USCIS will reject all initial DACA requests from aliens who have never previously held DACA and will return all fees. The rejections will be without prejudice, meaning aliens will be able to resubmit their request should USCIS begin accepting new requests in the future.

USCIS will limit grants of deferred action and employment authorization under DACA to no more than one year but will not rescind any currently valid two-year grants of DACA or associated employment authorization documents (EADs), unless USCIS terminates an alien's DACA for failure to continue to meet the DACA criteria (see 2012 Memorandum),  including to warrant a favorable exercise of prosecutorial discretion . USCIS will replace two-year EADs that are lost, stolen, or damaged with the same facial two-year validity period assuming the EAD replacement application is otherwise approvable.

USCIS may exercise its discretion to generally reject DACA renewal requests received more than 150 days before the current grant of DACA expires. USCIS recommends DACA recipients file their renewal requests between 150 and 120 days before their current grant of DACA expires.

USCIS will only grant advance parole for travel outside the United States to DACA recipients pursuant to the advance parole policy described in the acting secretary's memorandum and the USCIS's implementation memorandum. USCIS will reject and return fees for all held or pending Form I-131 applications filed by DACA recipients based on the DACA standards that existed prior to the July 28, 2020, Wolf Memorandum. USCIS will not rescind any previously granted advance parole documents unless there is another legal reason to do so. However, as has always been the case, parole into the United States is not guaranteed. In all cases, aliens are still subject

NJAPP040

Confidential

DEF - 00008383



U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

to immigration inspection at a port-of-entry to determine whether they are eligible to come into the United States.

The determination whether to grant advance parole to an alien is entirely within the discretion of USCIS and must be made on a case-by-case basis. USCIS will review all the factors presented in individual cases before determining whether to approve advance parole for a DACA recipient. Some examples of circumstances that may warrant approval include, but are not limited to, situations such as:

- Travel to support the national security interests of the United States;
- Travel to support U.S. federal law enforcement interests;
- Travel to obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States; or
- Travel needed to support the immediate safety, wellbeing or care of an immediate relative, particularly minor children of the alien.

Even if a requestor establishes that their situation meets one of the examples above, USCIS may still deny the request for advance parole in its discretion under the totality of the circumstances.

**RESPONSE TO QUERIES:**
**Q1. Will DACA renewal requests and applications for work authorization continue to be accepted?**
A1. Yes, DACA renewal requests, including related Applications for Employment Authorization, will continue to be accepted. However, USCIS will limit renewed grants of deferred action and employment authorization under DACA to one year. USCIS will not rescind any currently valid two-year grants of DACA or associated employment authorization documents (EADs), unless USCIS terminates an alien's DACA due to failure to continue to meet the DACA criteria (see 2012 Memorandum), including failure to warrant a favorable exercise of prosecutorial discretion. Any two-year EADs that are lost, stolen or damaged will be replaced with the same facial two-year validity period assuming the EAD replacement application is otherwise approvable. DACA recipients should file their renewal requests between 150 and 120 days prior to their DACA expiration.

**Q2. Will USCIS begin accepting initial I-821D requests? If so, when?**
A2. No. USCIS is not currently accepting initial I-821D requests from aliens who have never received DACA and will reject all initial DACA requests and return all associated fees from aliens who have never previously held DACA. However, the rejections will be without prejudice, meaning aliens will be able to resubmit their request should USCIS begin accepting new requests in the future.

**Q3. Some legal commentators and lawmakers claim the Supreme Court's decision on DACA requires USCIS to open up the DACA program to initial requestors who qualify under the original terms of the program, and that the administration and**

Confidential

DEF - 00008384



U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

**USCIS are defying the Supreme Court by not accepting new requests. Why is USCIS not accepting and processing initial I-821D DACA requests and not restoring the program to its former status?**
A3. The Supreme Court decision specifically stated the executive branch can move to alter the DACA program as it deems appropriate. There was no order within the decision to begin accepting new requests for DACA. While the Department considers the future of DACA policy, including whether to fully rescind the program, DHS will adhere to federal immigration law.

**Q4. Why is USCIS is not accepting new requests for DACA despite the U.S. District Court of Maryland order in *Casa De Maryland et al v. U.S. Department of Homeland Security et al* that required reinstating the program to its pre-September 5, 2017 status and that USCIS begin accepting initial DACA requests after the Supreme Court decision?**
A4. As a matter of practice, USCIS does not comment on ongoing litigation.

**Q5. DACA requestors and advocates say that after the Supreme Court decision USCIS was not sending notices acknowledging receipt of requests. Why did USCIS not notify requestors of what was happening with their initial or renewal requests? Is USCIS now sending notices to all DACA initial and renewal requestors confirming that their request has been received, and how many notices for each type (initial, renewal) have been sent since June 18?**
A5. Since June 18, USCIS has issued approximately 53,408 receipt notices for DACA renewal requests. As noted in the Wolf Memorandum, since the Supreme Court's decision, USCIS has, on an interim basis, generally held properly completed DACA requests from aliens who never before had DACA in anticipation of potential policy changes. Consistent with the Wolf memorandum and USCIS guidance, these DACA initial requests will be rejected and the fees be returned to the requestor.

**Q6. How many initial DACA requests has USCIS received since the June 18 U.S. Supreme Court ruling; how many of these initial requests were rejected and returned; and how many initial requests have been "held"?**
A6. As of Aug. 18, 2020, USCIS has received approximately 3,189 DACA requests from aliens who never before received DACA. As noted in the acting secretary's memorandum, since the Supreme Court decision on June 18, 2020, USCIS has, on an interim basis, generally held properly completed DACA requests from aliens who have never before received DACA. As of Aug. 17, 2020, USCIS rejected and returned the fees on approximately 44 DACA initial requests due to standard rejection reasons, such as an incomplete form, missing required pages or signature, or an incorrect fee, although some rejection notices contained inaccurate rejection language.

Confidential



U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

**Q7. What is the status now with the initial DACA requests received since June 18 – will they continue to be held or will the requests be rejected and a notice of rejection sent to requestors?**
A7. USCIS will reject all initial DACA requests and return all associated fees from aliens who have never previously received DACA, including those initial requests that were held on an interim basis. However, the rejections will be without prejudice, meaning aliens will be able to resubmit their requests should USCIS begin accepting DACA requests from aliens who have never before received DACA in the future.

**Q8. How long is the DACA policy review expected to take and will the Department be taking action to terminate DACA?**
A8. The DACA policy as a whole is under a close and careful review, as instructed by Acting Secretary Wolf's July 28 memorandum. No further details are available at this time.

**Q9. How many aliens currently have DACA?**
A9. Approximately 826,000 aliens have been granted DACA throughout the existence of the policy. As of June 30, 2020, there were approximately 645,610 active DACA recipients.

**Q10. How many illegal aliens would be eligible for DACA if the program were to be restored to its former status?**
A10. We do not have that information readily available since the number of aliens who claim to have entered the U.S. before the age of 16 and meet the other criteria established by the Obama administration is unknown.

**Q11. How many DACA renewals has USCIS received since the June 18 Supreme Court ruling and what will the timeline be for processing these requests?**
A11. USCIS has received 48,545 renewal DACA requests, of which 42,753 were accepted for processing between June 18, 2020 and Aug. 18, 2020.  The processing time goal for DACA renewals is 120 days.  As noted in the archived DACA FAQs, factors that may affect the timely processing of a DACA renewal request include, but are not limited to:

- Failure to appear at an Application Support Center (ASC) for a scheduled biometrics appointment to obtain fingerprints and photographs. No-shows or rescheduling appointments will require additional processing time.
- Issues of national security, criminality or public safety discovered during the background check process that require further vetting.
- Issues of travel abroad that need additional evidence/clarification.
- Name/date of birth discrepancies that may require additional evidence/clarification.
- The renewal submission was incomplete or contained evidence that suggests a requestor may not satisfy the DACA renewal guidelines and USCIS must send a request for additional evidence or explanation.

Confidential

DEF - 00008386


U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

**Q12. For DACA recipients who already received a two-year renewal and two-year EAD, will their DACA and EADs now be reduced to one year? Is the DHS memo guidance retroactive?**
A12. USCIS will not rescind any currently valid two-year grants of DACA or associated employment authorization documents (EADs), unless USCIS terminates an alien's DACA and associated EAD for to continue to meet the DACA criteria (see 2012 Memorandum), including failure to warrant a favorable exercise of prosecutorial discretion. Any two-year EADs that are lost, stolen or damaged will be replaced with the same facial two-year validity period assuming the EAD replacement application is otherwise approvable.

**Q13. If the DHS memo was effective immediately, does that mean that anyone requesting renewal as of July 28 will only get a one-year DACA renewal and EAD?**
A13. Effective July 28, USCIS will limit renewed grants of deferred action and employment authorization under DACA to no more than one year. USCIS will adjudicate all DACA renewal requests, including those received after the July 28 DHS memorandum, under the general adjudicative guidelines in place for DACA with the exception that all DACA grants issued after the DHS memorandum shall be valid for no more than one year. USCIS will continue to reject DACA renewal requests that are not properly completed in accordance with form instructions and USCIS filing guidance.

**Q14. What about DACA renewal requests that were already being processed prior to July 28 but had not been finalized – will they get only a one-year renewal and EAD?**
A14. All DACA grants issued after the July 28 DHS memorandum shall be valid for one year. USCIS will continue to reject DACA renewal requests that are not properly completed in accordance with form instructions and USCIS filing guidance.

**Q15. What is the number of DACA renewals that were being processed prior to the July 28 memo that this new policy guidance will affect, and they will now only get one-year of deferred action and employment authorization instead of two?**
A15. As of July 28, 2020, there were approximately 32,200 DACA renewal requests pending.

**Q16. Renewals for deferred action and work authorizations have been cut to one year instead of two, which effectively doubles the DACA fees, and the DHS memorandum says, *"DHS personnel should consider whether it is possible to reduce the renewal fees during this interim period of reconsideration"*. Is DHS actively considering reducing DACA renewal and EAD fees and when will you announce a decision on this?**
A16. There is no fee for filing Form I-821D, Consideration of Deferred Action for Childhood Arrivals, which means that others seeking lawful immigration benefits continue to subsidize the cost of this unlawful amnesty program. However, all DACA requestors are required to file Form I-765, Application for Employment authorization, which does require a fee with very limited

Confidential                                    DEF - 00008387



**U.S. Citizenship and Immigration Services**

*For internal use only*

*Office of Public Affairs*

exceptions, and all DACA requestors are required to pay a biometrics fee. USCIS is considering the feasibility of reducing DACA-related fees during the interim period the DACA policy is under review in accordance with acting secretary's memorandum.  USCIS notes that the new fee rule, which becomes effective on Oct. 2, 2020, includes a fee increase for the Form I-765, Application for Employment Authorization, for all categories of employment authorization **except** for the DACA category. The fee for DACA-based applications for employment authorization will remain at $410, plus an $85 biometrics fee, for the time being.

In an effort to minimize overlapping validity periods between an alien's renewed DACA validity period and an alien's current DACA validity period, USCIS has generally withheld issuing final approval of a DACA renewal request until the alien's remaining DACA validity period is closer to the expiration date. USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period.

**Q17. I understand USCIS stopped granting advanced parole for DACA recipients; has this changed and will USCIS start accepting travel requests from DACA recipients again? If so, how soon and will the process be the same as it was previously?**
A17. USCIS will only grant advance parole for travel outside the United States to DACA recipients based on urgent humanitarian reasons or significant public benefit, as described in the guidance in the acting secretary's memorandum and the USCIS memorandum implementing the advance parole guidance. USCIS will reject and return fees for all pending Form I-131 applications from DACA recipients that are based on the prior DACA standards. The agency will not rescind any previously granted advance parole documents unless there is another legal reason to do so. However, as has always been the case, parole into the United States is not guaranteed. In all cases, you are still subject to immigration inspection at a port-of-entry to determine whether you are eligible to come into the United States.

The determination whether to grant advance parole to an alien is entirely within the discretion of USCIS and must be made on a case-by-case basis.  USCIS will review all the factors presented in individual cases before determining whether to approve advance parole for a DACA recipient based on the new guidance. Some examples of circumstances that may warrant approval include, but are not limited to, situations such as:
- Travel to support the national security interests of the United States;
- Travel to support U.S. federal law enforcement interests;
- Travel to obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States; or
- Travel needed to support the immediate safety, wellbeing or care of an immediate relative, particularly minor children of the alien.

Even if a requestor establishes that their situation meets one of the examples above, USCIS may still deny the request for advance parole in discretion under the totality of the circumstances.

NJAPP045

Confidential



U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

**CAUTION:** If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

**Q18. Why did it take more than a month after the Supreme Court decision and an order by the U.S. District Court of Maryland before USCIS updated its website with current policy on DACA?**
A18. The Department of Homeland Security and the Department of Justice were reviewing the numerous impacts of the court's decision. All relevant webpages have been updated.

**Q19. The Obama Administration repeatedly claimed that DACA did not provide a path to lawful permanent residence and eventually citizenship for illegal aliens. If DACA recipients are granted advance parole, will they be able to adjust status and become a lawful permanent resident?**
A19. A grant of advance parole alone does not provide an independent ground for adjustment of status. However, thousands of DACA recipients may have used advance parole to meet a particular threshold requirement under INA section 245(a), which requires an alien to be "inspected and admitted *or paroled*" as a precondition for an alien to obtain status as a lawful permanent resident in the United States.  However, such aliens must meet all other applicable eligibility criteria for adjustment of status, including having an immigrant visa immediately available to them.

Parole into the United States is not guaranteed. In all cases, an alien with an advance parole travel document is still subject to immigration inspection at a port-of-entry to determine whether he or she is eligible to come into the United States.  Aliens seeking to travel abroad pursuant to an advance parole travel document may consider consulting with an authorized immigration service provider prior to filing an application for advance parole or undertaking travel abroad.

- USCIS –

Confidential

# Exhibit 6

| **From:** | Robinson, Brandon M ████████████ @uscis.dhs.gov> |
|---|---|
| **Sent:** | |
| **To:** | Jenkins, Jennifer L <████████████s@uscis.dhs.gov>; Shafii-Stier, Sara A <████████████@uscis.dhs.gov>; Rouse, Tracey J <████████████@uscis.dhs.gov> |
| **Cc:** | King, Alexander R </████████████@uscis.dhs.gov>; Umoru, Victoria E ████████████@uscis.dhs.gov>; Padilla, April Y ████████████@uscis.dhs.gov>; Freeman, Mark C ████████████@uscis.dhs.gov>; Woerz, Bret A ████████████@uscis.dhs.gov> |
| **Subject:** | RE: DACA Filings After 9/5/17 - No Prior Grant of DACA |
| **Attach:** | Example Cases.pdf; Example Post-Injunction No Prior DACA NOID (Suspected Fraud).docx |

---

Good afternoon NSC,

Recently we reached out to OPQ to run a report for DACA filings submitted with a receipt date after 9/5/17 where it did not appear the requestor ever had a prior grant of DACA. In review of those cases, while we did not find any approvals, we did come across a certain number of filings where the G-28, preparer and/or requestor appeared to be willfully misrepresenting their immigration filing history (examples attached).

After further discussion with SCOPSs Security Fraud Division, when officers are evaluating cases flagged as having no prior grant of DACA, it is recommended officers review the cases to determine whether the attorney/preparer/requestor are willfully misrepresenting the requestor's immigration history and whether any fraudulent evidence may have been submitted in support of the fraudulent request. If it is determined by the reviewing officer that the requestor does not have a prior grant of deferred action and appears to be willfully misrepresenting their immigration history, we recommend that the "Post-Injunction No Prior DACA" NOID be updated to include language that states how the requestor appears to be willfully misrepresenting their immigration history, note any evidence that does not appear to be credible in support of their DACA request and include the following language from DACA NOID 415:

> In addition, USCIS reminds you that it is a violation of federal law (18 U.S.C. sec. 1001) if you knowingly and willingly submit materially false information in support of your request for DACA, and you may be fined, imprisoned up to five years, or both. In addition, you may be placed in removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

While individuals requesting DACA are not subject to INA 212 inadmissibility grounds, the underlying derogatory conduct should still be considered as a significant negative factor under the totality of the circumstances. Once a NOID response has been received (or if the requestor fails to timely respond to the NOID), should the officer determine the requestor has not overcome the basis of the NOID relative to the component of suspected fraud, please hold the case for further guidance as WATS and SFD work to compose guidance on next steps.

As always, we appreciate any feedback you may have with the above guidance. Please let us know if you have any questions or concerns.

Thanks,
Brandon

Confidential

# Exhibit 7

Thanks,
Jenni

**Jennifer Jenkins | Immigration Services Officer (ISO-3)**
USCIS Nebraska Service Center | DACA BCU | NW1002 | EX0996
☎ (402) 219-███  ✉ ███████@uscis.dhs.gov

---

**From:** Robinson, Brandon M <███████████@uscis.dhs.gov>
**Sent:** Friday, April 26, 2019 1:56 PM
**To:** Shafii-Stier, Sara A <███████████@uscis.dhs.gov>; Jenkins, Jennifer L <███████████@uscis.dhs.gov>; Rouse, Tracey J <███████████@uscis.dhs.gov>
**Cc:** King, Alexander R <███████████@uscis.dhs.gov>; Umoru, Victoria <███████████@uscis.dhs.gov>
**Subject:** DACA Filings After 9/5/17 - No Prior Grant of DACA

Good afternoon NSC,

CSC reached out to us yesterday regarding a DACA request ███████████ that was filed after 9/5/17 and the requestor did not have a prior grant of deferred action under DACA.  Under the current court orders, and in accordance with USCISs response to the Jan/Feb 2018 PIs, USCIS is not accepting or approving DACA requests from individuals who have never received a prior grant of DACA.  While all DACA requests filed as an Initial are reviewed by Lockbox to determine whether the requestor has had a prior grant of DACA, it is possible for someone who has never had a prior grant of DACA to circumvent Lockbox's system logic by filing the DACA request as a renewal.  This appears to be the case for ███████████

In review of the filing, it appears ELIS flagged the case for not having a prior grant of DACA and the request was subsequently re-assigned to CSC as an initial filing.  Unfortunately it's my understanding ELIS does not then provide CSC with a similar alert that the requestor has never had a prior grant of DACA.

To help minimize the possibility of any such DACA filings being approved, we are in need of NSCs assistance in processing these cases.  Going forward, in instances where NSC determines a DACA request was submitted after 9/5/17 and does not have a prior grant of DACA, would NSC please adjudicate those cases to completion using the attached OCC-cleared templates?  The templates should be in ECHO and available for use; however, please let us know if this is not the case.

| | |
|---|---|
| I-821D DACA Post Injunction No Prior DACA Denial (eCISCOR) | DECISIO |
| I-821D DACA Post Injunction No Prior DACA Denial (Elis2) | DECISIO |
| I-821D DACA Post Injunction No Prior DACA NOID (eCISCOR) | NOTICE OF INTEN |
| I-821D DACA Post Injunction No Prior DACA NOID (Elis2) | NOTICE OF INTEN |

Any assistance NSC can provide in resolving this potential issue is greatly appreciated and please don't hesitate should you have any questions or concerns.

V/R,

NJAPP050

DEF - 00008447

Brandon

Brandon Robinson
Adjudications Officer (Policy)
DHS | USCIS HQ | SCOPS | WATS
Cell: 402.304.███
███████████████@uscis.dhs.gov

Confidential

# Exhibit 8

| | |
|---|---|
| **From:** | Umoru, Victoria E <███████████@uscis.dhs.gov> |
| **Sent:** | |
| **To:** | Gooselaw, Kurt G <███████████@uscis.dhs.gov>; Lee, Danielle L <████████████@uscis.dhs.gov>; Adams, Mary-Sarah S (Mary-Sarah (MSA)) <████████████@uscis.dhs.gov>; Casto, Randall W <████████████@uscis.dhs.gov>; Belyea, Daniel M (Dan) (CTR) <████████████@uscis.dhs.gov>; Felix, Raquel J <████████████@uscis.dhs.gov>; Lewis, Theodore R (Ted) <████████████@uscis.dhs.gov>; Herring, Monte R <████████████@uscis.dhs.gov>; Gudehus, Beth C <████████████@uscis.dhs.gov>; Nguyen, Van T <████████████@uscis.dhs.gov>; Posvar, Sarah C <████████████@uscis.dhs.gov>; Rouse, Tracey J <████████████@uscis.dhs.gov>; Shafii-Stier, Sara A <████████████@uscis.dhs.gov>; Holmes, Malethea S <████████████@uscis.dhs.gov>; Hawthorne, Thomas E <████████████@uscis.dhs.gov>; Cobb, Melissa M <████████████@uscis.dhs.gov>; Lee, Tyronda E <████████████@uscis.dhs.gov>; Laroe, Lisa A <████████████@uscis.dhs.gov>; Brouillette, Bradley J <████████████@uscis.dhs.gov>; Nephew, Brad D <████████████@uscis.dhs.gov>; Beyor, Avery G Jr <████████████@uscis.dhs.gov>; Grismore, Carrie A <████████████@uscis.dhs.gov>; Freeman, Mark C <████████████@uscis.dhs.gov>; Woerz, Bret A <████████████@uscis.dhs.gov>; Jenkins, Jennifer L <████████████@uscis.dhs.gov> |
| **Cc:** | Baran, Kathy A <████████████@uscis.dhs.gov>; Crandall, Kristine R <████████████@uscis.dhs.gov>; Miller, Loren K <████████████@uscis.dhs.gov>; Richardson, Gregory A <████████████@uscis.dhs.gov>; Roessler, John E <████████████@uscis.dhs.gov>; Selby, Cara M (Carrie) <████████████@uscis.dhs.gov>; Thompson, Kirt <████████████@uscis.dhs.gov>; Zuchowski, Laura B <████████████@uscis.dhs.gov>; Robinson, Brandon M <████████████@uscis.dhs.gov>; Orise, Sharon R <████████████@uscis.dhs.gov>; Bae, Connie J <████████████@uscis.dhs.gov>; Umoru, Victoria E <████████████@uscis.dhs.gov> |
| **Subject:** | Implementing the DACA Memo issued by USCIS Deputy Director for Policy Joseph Edlow |

Good afternoon all,

The Memo on how USCIS should implement the DHS guidance on DACA was published yesterday. As we review the implementation guidelines, below is a quick update on where we stand in operationalizing the DHS/USCIS guidance as of today:

1. **RFEs, NOIDs and NOITs:** Centers may resume the issuance of RFEs, NOIDs, and NOITs.

Confidential

2. **Denials and Terminations:** Centers may resume processing denials and terminations.  Please note that the Inland Empire injunction remains in place.  USCIS personnel should continue to follow the appropriate termination procedures consistent with the Inland Empire preliminary injunction until further notice.

3. **Approvals (DACA requests):**  OIT has made updates in ELIS to modify the validity period for DACA requests from two years to one year.  Tests have been completed and all looks good, therefore centers may now move forward with approvals.  As indicated in the USCIS memo, all requests for DACA and associated employment authorization granted after July 28, 2020 will be for a validity period of no more than one-year.  The one-year validity period shall begin on the date the DACA request receives final approval, consistent with past practices, and have an ending validity date that is no more than one-year minus one day from the date of approval.

4. **Approvals (EAD Replacement Applications):** Centers may resume approving DACA I765 EAD replacement applications.  Consistent with the guidance in the Edlow memo, centers will replace two-year EADs that are lost, stolen or damaged with the same facial two-year validity period assuming the EAD replacement application is otherwise approvable.  Future EAD replacement applications for one-year DACA/EAD grants will be provided the same facial one-year validity period.

5. **DACA Initials:**  There are no changes for SCOPS. USCIS will continue to accept DACA filings from those who have previously received a grant of DACA.  USCIS will continue its policy of treating DACA filings submitted by those whose prior grant of DACA was either terminated or expired one year or more prior to filing for "renewal" as an initial DACA request for processing and adjudications purposes.  As noted in the Edlow memo, USCIS will also continue to adjudicate all initial DACA filings submitted on or before Sept. 5, 2017 from those who have never been granted DACA.  An internal query shows approximately 100 such cases remain pending.  SCOPS WATS may be reaching out to each center regarding any cases that may require additional review as some appear to be at the NRC.

   The Lockbox will continue to reject all initial DACA requests from requestors who have never previously received DACA and return all fees.

6. **DACA Renewals:** USCIS will continue to accept DACA renewal requests from requestors who have been granted DACA at any time in the past. In an effort to minimize the amount of overlap between two existing grants of DACA, the PPCCE threshold in the DACA renewal streamline process (SP) has been reduced from a 150 day hold to 30 days.  Therefore, final adjudication should not occur more than 30 days prior to the expiration of the previous DACA validity period.  Any manual adjudications of DACA renewals should also be consistent with the 30 day policy.

   In accordance with the Edlow memo, the Lockbox will generally reject DACA renewal requests filed more than 150 days prior to expiration.

7. **DACA Advance Parole**: The NSC will continue to handle the DACA I-131 workload. The Edlow memo directs SCOPS to administratively close all pending and future Form I-131 applications for advance parole from DACA recipients submitted under standards associated with the DACA policy, absent exceptional circumstances, and to refund all associated fees.

   To implement this guidance, any DACA-related I-131 filed on or before August 24, 2020 with be administratively closed and refunded.  SCOPS is currently working with OCC on clearing the admin close/refund notice to be used for this purpose.  Separately, OIDP will issue **rejection** notices for DACA related Form I131s being held at the lockbox. The rejection and admin. closure notices will invite the

Confidential

applicant to refile if they believe they have an exceptional circumstance. Please hold off on processing these pending I131 cases until SCOPS provides the admin closure/refund notice to be used.

To ensure compliance with the USCIS memo's directive, guidance regarding processing DACA advance parole, including revised training materials, are forthcoming. The new guidance will indicate that any advance parole request approved by USCIS must first gain concurrence from the adjudicating officer's first line supervisor, Section Chief, and Associate Center Director prior to being sent to SCOPS HQ via the SCOPS ECN Request for Adjudicative Guidance (RAG) process for final concurrence from the Deputy Associate Director. The ECN RAG page has also been modified to now include **DACA Request Type: I131** for these particular RAGs.

For more information regarding how DACA recipients may request advance parole under DACA, please see the Web Alert that's available on the I-131 webpage. The Direct Filing Address webpage for I-131s provides the corresponding filing information.

Prior to the rescission of DACA, all requests for advance parole were processed via CLAIMS; however, all future requests for advance parole under DACA will be processed in ELIS.  The Lockbox has been working with OIT to send sample cases for review and testing.  We will follow up as soon as more information is available regarding the testing process.

In the past, biometrics were cloned for DACA AP applications. Under the new guidance, USCIS will not be reusing biometrics for DACA I-131s. All DACA recipients requesting advance parole will be required to complete biometrics processing at an ASC. SCOPS is working with OP&S and OIT to ensure that appropriate ASC Appointment biometrics codes are set in the system for DACA I-131s.

Thank you everyone for your patience and assistance as we work together to implement these procedures.

Respectfully,

*Victoria Umoru*

Adjudications Officer (Policy)
Service Center Operations | USCIS HQ | DHS
20 Massachusetts Ave. Washington D.C. 20529
Phone: (202) 631-███

Confidential

# Exhibit 9

Nos. 18-587, 18-588 and 18-589

In the

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Petitioners,*

*v.*

REGENTS OF THE UNIVERSITY
OF CALIFORNIA, *et al.*,

*Respondents.*

*(For Continuation of Caption See Inside Cover)*

On Writ of Certiorari to the United States
Court of Appeals for the Ninth Circuit

## BRIEF *AMICI CURIAE* OF THE NATIONAL EDUCATION ASSOCIATION AND NATIONAL PTA IN SUPPORT OF RESPONDENTS

ALICE O'BRIEN
 *Counsel of Record*
EMMA LEHENY
LUBNA A. ALAM
REBECCA YATES
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, NW
Washington, DC 20036
(202) 822-7048
aobrien@nea.org

*Counsel for Amici Curiae*

October 4, 2019

291673



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

**AR5238**

WMA

*ii*

## TABLE OF CONTENTS

*Page*

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . . iv

INTEREST OF *AMICI* . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION AND SUMMARY OF
    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   A.  DHS Failed to Provide a Reasoned
       Explanation for the Policy Change,
       Including a Consideration of Reliance
       Interests, as Required by the APA. . . . . . . . . . . 5

   B.  In Reliance on DACA, Students
       Pursued Higher Education and Careers
       in Public Service . . . . . . . . . . . . . . . . . . . . . . . . . 8

   C.  DHS Failed to Consider the Reliance
       Interests DACA Engendered in This
       Country's Public Schools . . . . . . . . . . . . . . . . . . 15

       i.   Without DACA, Thousands of
            Educators Would Abruptly Leave Their
            Students . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**AR5241**

*iii*

*Table of Contents*

                                                                *Page*

ii.   Educational Institutions Rely on
      Thousands of DACA Educators to Offset
      the Nationwide Teacher Shortage .......18

iii.  Educational Institutions Rely on DACA
      to Provide Essential Diversity in
      the Teaching Profession................20

iv.   DHS Failed to Consider How DACA
      Rescission Would Undermine Student
      Learning for All Students .............25

CONCLUSION ................................29

**AR5242**

15

**"What will they have to go through?"** Jose Garibay recently graduated from St. Edwards College with a degree in political science. While in college, he volunteered for a college preparedness program for students from low-income communities. DACA meant Garibay was no longer afraid to be open and involved in community service. He hopes to go to law school or pursue a graduate degree in public policy. Garibay worries about his own career, but more than that, he worries about how DACA's rescission will affect his younger brother, who just started college. And he is anxious about what college will look like for the young people he has helped through the college preparedness program. "What will they have to go through?"

These are just a few of the thousands of student and educator stories around the country. *See* Gonzales, *supra*, at 2; Wong, *supra*. By opening the door to higher education and meaningful work in fields of public service, DACA has provided young people with a powerful reason to engage and succeed in their K-12 studies and beyond. If they lose their DACA status, the achievements that they have worked so hard to attain will be cut short. The nation's investment in educating and training DACA holders will be lost. And for DACA recipients still in high school, the DACA opportunities that motivated young people—and improved high school matriculation rates—will summarily vanish.

## C. DHS Failed to Consider the Reliance Interests DACA Engendered in This Country's Public Schools

The harm caused by the loss of DACA would not be borne by its recipients alone. Without DACA renewals, the

**AR5265**

16

status of thousands of educators will expire on different dates throughout the school year. Teachers and staff will abruptly disappear from classrooms to the distress of their students and to the measurable detriment of educational outcomes. In addition, educational institutions across the country rely on thousands of DACA educators to help remedy significant teacher shortages, provide mentorship and role models to students, and diversify the teaching corps.

### i.   Without DACA, Thousands of Educators Would Abruptly Leave Their Students

The loss of DACA would mean that our nation's schools would lose thousands of valued education employees. Zong, *supra*, at 7-8. Given the individual DACA expiration dates of these educators, no district, school, or classroom can adequately prepare students for the staggered departure of beloved teachers. Departures that occur mid-year or at critical points of educational mastery would irreversibly harm children and their educational outcomes. Teacher Karina Alvarez in San Antonio, Texas experienced this first-hand. While awaiting the delayed renewal of her DACA work permit, Alvarez was forced to temporarily resign from her second grade class. Seven-year-olds cannot comprehend the reasons for such a loss, but research abundantly shows that such abrupt changes can have disruptive impacts on young children. *See, e.g.*, Nat'l Sci. Council on the Developing Child, *Young Children Develop in an Environment of Relationships* (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 1, 2004), https://developingchild.harvard.edu/wp-content/uploads/2004/04/Young-Children-Develop-in-an-Environment-of-Relationships.pdf. During Alvarez's absence, her second-graders lost their relationship with

17

a trusted teacher and their academic progress lagged.
This would occur on a much larger scale if thousands of
teachers lose the ability to renew their DACA status.

Teacher turnover has long been shown to harm
student academic achievement. Matthew Ronfeldt et al.,
*How Teacher Turnover Harms Student Achievement*, 50
Am. Educ. Res. J. 4, 31 (2013). Not only would the students
of lost DACA teachers perform worse academically, all
students would be negatively impacted. *Id*. Turnover
causes a decline in student achievement school-wide
because it damages faculty morale, increases the workload
of remaining teachers, and diverts district funds away
from student programs to training new hires. *Id*. at 8, 32.
Moreover, the loss of DACA would cause greater harm in
subjects and at schools most likely to already suffer from
high turnover. The subject with the highest rate of teacher
turnover is English Language Learning ("ELL"). Leib
Sutcher et al., Learning Pol'y Inst., *A Coming Crisis in
Teaching? Teacher Supply, Demand, and Shortages in
the U.S.* 46, Fig. 24 (2016), https://learningpolicyinstitute.
org/sites/default/files/product-files/A_Coming_Crisis_in_
Teaching_REPORT.pdf. Turnover rates are also higher at
schools with a greater percentage of students of color. *Id*.
These are schools and subjects in which DACA educators
are particularly impactful.

Karen Reyes teaches hearing-impaired toddlers.[6]
When she took a class in this specialized area, she felt
it was the illuminating "light at the end of the tunnel" of

---

[6] Based on a personal interview conducted by *amici* and
excerpts from Erica L. Green, *With DACA in Limbo, Teachers
Protected by Program Gird for the Worst*, N.Y. Times (Feb. 1,
2018), https://www.nytimes.com/2018/02/01/us/politics/daca-
teachers-trump.html.

**AR5267**

18

her own education. From that class, she knew she wanted to dedicate her life to teaching children with limited communication abilities. Reyes tries to explain the risk that she will be removed from her students' classroom using pictures and sign language. "They understand when I go on an airplane. Maybe they'll just think I'm on a never-ending flight." Reyes's area of specialization suffers from a teacher shortage. It often takes more than a year to fill a vacancy in her specialty. Were DACA terminated, her students would be left, likely for a long period of time, without an educator adequately trained to teach them. If DACA continues, however, Reyes will not only continue teaching but plans to further her career by acquiring a doctorate with the eventual goal of becoming a school audiologist.

### ii. Educational Institutions Rely on Thousands of DACA Educators to Offset the Nationwide Teacher Shortage

Throughout the country, states face a critical shortage of teachers. The U.S. Department of Education found that every state was "dealing with shortages of teachers in key subject areas" in the 2017-18 school year. Valerie Strauss, *Teacher Shortages Affecting Every State as 2017-18 School Year Begins*, Wash. Post (Aug. 28, 2017), https://www. washingtonpost.com/news/answer-sheet/wp/2017/08/28/ teacher-shortages-affecting-every-state-as-2017-18- school-year-begins/?utm_term%20.0583fbf55b17; *see also* Off. of Postsecondary Educ., U.S. Dep't of Educ., *Teacher Shortage Areas Nationwide Listing 1990-1991 through 2017-2018* (June 2017), https://www2.ed.gov/about/ offices/list/ope/pol/ateachershortageareasreport2017-18. pdf. For the 2018-19 school year, thirty states and the

**AR5268**

19

District of Columbia had shortages of bilingual and ELL teachers. Corey Mitchell, *Wanted: Teachers as Diverse as Their Students*, Educ. Wk., (Sept. 17, 2019), https://www.edweek.org/ew/articles/2019/09/18/wanted-teachers-as-diverse-as-their-students.html. DACA helps districts ease these shortages. A rescission of DACA would leave tens of thousands of students in the breach, many of them in the most underserved schools.

School administrators shore up this data with first-hand experience. Heidi Sipe, the superintendent of the Umatilla School District in eastern Oregon, notes that her district posts positions for three to six months without receiving a single application. And Superintendent Matt Utterback, of the North Clackamas School District in the suburbs of Portland, Oregon, states that his district has not been fully staffed for years. In Sacramento, Superintendent Jorge Aguilar of the Sacramento City Unified School District reports that his district is heavily impacted by the teacher shortage that is felt throughout California. He fears that the end of DACA would exacerbate the district's already-critical need for qualified staff.

Mike Walsh, Immediate Past President of the California School Boards Association and a Trustee of the Butte County Office of Education, observes that the California Mini-Corps, which provides tutoring services to K-12 youth in migrant communities, stands to lose numerous college-student tutors who hold DACA status. Walsh notes, "About eighty percent of tutors go on to obtain a teaching credential or permit to continue to be involved in education." The Mini-Corps tutors are "in the pipeline to become teachers, administrators, [and]

**AR5269**

20

superintendents." If these young people are no longer able to work as tutors, Mini-Corps will lose hard-to-replace staff and the state will lose committed educators. The state's investment in this training and development pipeline will be lost.

Public schools have invested in the K-12 and higher education of these motivated young people whose professional aim is to give back, to educate students like themselves. And in reliance on DACA, educational institutions have hired thousands of DACA educators to fill much needed positions. The termination of DACA would bar these qualified educators from the classrooms that so urgently need them.

### iii. Educational Institutions Rely on DACA to Provide Essential Diversity in the Teaching Profession

Numerous studies have shown that students benefit from teachers who are ethnically and culturally diverse. "Teachers of color are positive role models for all students in breaking down negative stereotypes and preparing students to live and work in a multiracial society." Off. of Plan., Evaluation & Pol'y Dev., U.S. Dep't of Educ., *The State of Racial Diversity in the Educator Workforce* 1 (July 2016), https://www2.ed.gov/rschstat/eval/highered/racial-diversity/state-racial-diversity-workforce.pdf.

There are "meaningful 'role model effects' when minority students are taught by teachers of the same race." Dan Goldhaber et al., Univ. of Wash. Bothell, *The Theoretical and Empirical Arguments for Diversifying the Teacher Workforce: A Review of the Evidence* 6 (Ctr.

**AR5270**

21

for Educ. Data & Res., Working Paper No. 2015-9). These effects are not subjective, but are quantifiable in making a "meaningful impact on student test scores." *Id.* at 3. For example, "a larger presence of black and Hispanic teachers [is linked] to improved treatment or outcomes for black and Hispanic students along a variety of dimensions, including lower rates of exclusionary discipline, lower likelihood of placement in special education, and higher pass rates on standardized tests." Jason A. Grissom et al., *Teacher and Principal Diversity and the Representation of Students of Color in Gifted Programs*, 117 Elementary Sch. J. 396, 400 (2017) (internal citations omitted). Similarly, "non-English proficient Latino children revealed greater gains on a direct assessment of literacy . . . if their teacher was also Latino rather than Caucasian." Jason T. Downer et al., *Teacher-Child Racial/Ethnic Match Within Pre-Kindergarten Classrooms and Children's Early School Adjustment*, 36 Early Childhood Res. Q. 26, 38 (2016).

It is therefore critical for schools to hire teachers whose backgrounds mirror those of an increasingly diverse student population. Yet districts have had difficulty doing so. Between 2003 and 2012, "the increase in the percentage of Hispanic students [in the U.S.] far outpaced the modest increase in the percentage of Hispanic teachers." Goldhaber et al., *supra*, at 1. In the 2011-12 school year, 24% of students were Hispanic, while only 8% of teachers were Hispanic. Off. of Plan., Evaluation & Pol'y Dev., *supra*, at 6. This disparity is only expected to grow: "students of color are expected to make up 56 percent of the student population by 2024." *Id.* at 1.

School districts thus have a pressing need to hire an increasing number of Latino educators to serve the needs

**AR5271**

22

of their changing student populations. DACA teachers have helped to meet this growing need; over 93% of DACA recipients were born in Latin American countries. U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., *Approximate Active DACA Recipients: Country of Birth* 1 (Sept. 4, 2017), https://www.uscis.gov/sites/default/ files/USCIS/Resources/Reports%20and%20Studies/ Immigration%20Forms%20Data/All%20Form%20Types/ DACA/daca_population_data.pdf. Indeed, some districts have specifically recruited DACA recipients for this reason. Tom Boasberg, Superintendent of Denver Public Schools, has advocated for DACA because it "allowed him to find talented bilingual teachers who can connect with his students." Alexia Fernández Campbell, *DACA Immigrants Are Teaching American Children. What Happens After They're Gone?*, Vox (Sept. 15, 2017), https://www. vox.com/policy-and-politics/2017/9/15/16306972/daca- teachers-dreamers. Dallas Independent School District Superintendent Michael Hinojosa spoke highly of the DACA teachers, who "grew up in [the Dallas] community" and spoke both English and Spanish well. Dianne Solis & James Barragan, *U.S. Could Lose an Estimated 20,000 Teachers, Many Bilingual, as DACA is Phased Out*, The Dallas Morning News (Oct. 5, 2017), https://www. dallasnews.com/news/immigration/2017/10/05/u-s-could- lose-an-estimated-20000-teachers-many-bilingual-as- daca-is-phased-out/. Hinojosa said the district employs 68 DACA recipients, "including three dozen teachers." *Id.* Teach for America actively recruits DACA recipients for its corps, noting that these individuals know "first-hand the concerns that undocumented kids face." Teach For Am., *DACA Recipients*, (last visited Oct. 3, 2019), https:// www.teachforamerica.org/how-to-join/eligibility/daca.

**AR5272**

23

**"Schools need to reflect our community."**
Administrators recognize the need for a diverse teaching
staff. Matt Charlton, the superintendent of the Manson
School District in Washington State, said that "students
benefit when they have role models and people teaching
them who come from their background." As a result, his
district is trying to promote Latino para-professionals
to teaching positions because "schools need to reflect our
community." Thomas Ahart, the superintendent of the
Des Moines School District in Iowa, has witnessed the
importance of a "diversity of points of view and different
perspectives informing what happens in our classrooms,"
and that having diverse educators is important so that "all
students see models of success and leadership that look
like them, so they start imagining different possibilities
for themselves."

**"It is so important for students to see themselves
in their educators."** Superintendent Utterback observes
that "students can go thirteen years without experiencing
teachers who look like them." This harms white students
as well, observes Superintendent Utterback since "white
students never experience seeing a person of color in a
professional role." Superintendent Sipe also emphasizes
the importance of having teachers who reflect the student
body. "It is so important for students to see themselves in
their educators . . . so they can see pathways and futures
they did not see before." She reports that the student body
in her district is over 70% Latino, but it does not have
enough Latino educators, although the district actively
pursues Latino candidates. Superintendent Theron
Schutte, of the Marshalltown Community School District
in Iowa, notes that his district is majority minority but the
teaching staff is still predominately white. He explains

**AR5273**

24

that his district has "great difficulty in hiring high-quality educators who mirror student demographics."

**"Just one less child who felt isolated."** Many DACA educators acknowledge that their background makes them especially important to students, and that they have been drawn to teaching because of their desire to act as role models. Jaime Ballesteros, a California educator with DACA, said that he became a teacher because he knew he could reach immigrant students: "I wanted to amplify the voices of students and families who shared both my story and values. I wanted to ensure that there would be even just one less child who felt isolated and helpless because of his or her immigration status." Ginette Magaña, *DACAmented Teachers: Educating and Enriching Their Communities*, Obama White House: Blog (Aug. 4, 2015), https://obamawhitehouse.archives.gov/blog/2015/08/04/dacamented-teachers-educating-and-enriching-their-communities.

**"A role model who has walked in their shoes."** DACA recipient Karina Alvarez speaks to her students, many of whom are Latino immigrants, about her own experience. Alvarez believes that her students "need to have a role model who has walked in their shoes . . . they need to see that college is in their reach, that it is possible for them to be a teacher or whatever they want to be." A.M.P., from Washington State, also understands the importance of sharing her experience with her students. She teaches in a district where 37.9% of the student body – but only 8.2% of the teaching staff – is Latino. She explains: "something that has always driven me was to be the person you needed growing up." Her school had an assembly where she and other immigrant educators talked to students about how they were able to go to college. She noted that

AR5274

25

it was "heartwarming" and the children responded "really
positively." Angelica Reyes in Los Angeles relates that as
an immigrant herself, she is able to "connect very well with
students because of experiences in common, something
many other teachers lack." This connection supports
students' ability to focus on learning rather than becoming
distracted and intimidated by public discourse that is
"scary, it's in our faces, it's destructive to our families."

### iv.   DHS Failed to Consider How DACA Rescission Would Undermine Student Learning for All Students

Public school administrators report that the rescission
of DACA has created an atmosphere of anxiety that makes
it more difficult for students to focus on their studies. This
anxiety is not limited to students with DACA or those
taught by DACA educators.

**"Every single student is affected."** Cindy Marten is
the Superintendent of San Diego Unified School District,
in which Latino students make up about 45 percent of
the student body. The September 5, 2017 announcement
of DACA rescission caused great anxiety among San
Diego students. "Kids are worried about what's going
to happen to them," says Superintendent Marten. While
non-immigrant students are, in Superintendent Marten's
words, "not afraid of being deported, they're afraid about
their best friend or their best friend's mother. Every
single student is affected." And for younger children,
who often misunderstand their family's status or believe
that "immigrant" is synonymous with unauthorized
presence in the U.S., the anxiety and fear that they or
their authorized relatives are in danger of being deported
escalates their anxiety—and that of the classmates

**AR5275**

26

around them. Randy Capps et al., Migration Pol'y Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature* 6 (2015). Starting with the Rescission Memo and increasing through the present day, uncertainty about DACA has undermined students' ability to learn, regardless of their immigration status. These significant negative impacts of DACA rescission were neither considered nor analyzed by DHS.

**"DACA being rescinded takes away the hope from our students."** Superintendent Utterback says "stress has an impact on academics and behavior," and children's ability to "concentrate, their ability to excel is being hampered because they are worried about their safety and future and that of their family members." The same is true in the Highline Public Schools in Washington State, according to Superintendent Susan Enfield. Maile Valu, a counselor in her district, reports that the "constant uncertainty that our DACA students and our students [and] families without legal status face has caused fear, stress, anxiety, [and] hopelessness." Daniela Laureano Francisco, a family liaison in Highline reports, "DACA being rescinded takes away the hope from our students." Superintendent Schutte has also seen first-hand the effects of increased immigration-related anxiety on children, including a "lack of ability to focus, more frequent absenteeism, and lesser achievement with coursework and on test performance."

The experiences of these administrators are confirmed by academic research. A working paper by the Harvard University Center on the Developing Child found that persistent anxiety can change a child's brain and negatively affect their physical, cognitive, and emotional

**AR5276**

27

development, which in turn impacts their ability to learn effectively in school. Nat'l Sci. Council on the Developing Child, *Persistent Fear and Anxiety Can Affect Young Children's Learning and Development* 5 (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 9, 2010), http://developingchild.harvard.edu/wp-content/uploads/2010/05/Persistent-Fear-and-Anxiety-Can-Affect-Young-Childrens-Learning-and-Development.pdf. The anxiety and stress caused by the threatened termination of DACA impacts students' academic success, professional prospects, and personal well-being.

**"We cannot tell them that everything will be okay."** A superintendent in Long Island, New York notes that since the rescission announcement, he can "definitely sense an increase in anxiety and stress, both for the student who fears that the end of DACA means they have to go back to a country they have not lived in since the age of two; and for documented students, the worry is in wondering if their friend will need to go and leave the U.S." Superintendent Sipe, whose school district is in a rural area and serves primarily Latino students, says "the fear is very real in young students all the way up to high schoolers." Sipe observes that the anxiety "puts educators in a really uncomfortable role because we cannot tell them that everything will be okay because we cannot make promises about things that are out of our control."

**"Students are unable to focus."** Superintendent Aguilar also reports that the Rescission Memo has caused considerable student anxiety. Aguilar observes that this anxiety is "taking a toll on our ability to be able to provide the academic intervention necessary. Students are unable to focus on their academic achievement when they are

**AR5277**

Case 1:16-cv-04756-NGG-JO   Document 319-10   Filed 09/04/20   Page 879 of 1805 PageID #: 11267

28

experiencing the kind of trauma, anxiety, and anguish that comes as a result of the ending of DACA." Indeed, more than half of DACA recipients surveyed report thinking about being deported at least once a day and almost 45% think about being detained in an immigration detention facility at least once a day. Wong, *supra* at 10. The repetition of such stark fears, articulated or not, deeply disturbs student learning and family support. Superintendent Charlton notes that in his rural, majority-Latino district, threats to DACA result in a persistent "feeling of angst . . . that translates from families down to the kids . . . which impacts the classroom" and harms children's ability to learn. Superintendent Marten, from San Diego, observes that "as soon as you destabilize your school, you're not delivering the quality of education that children deserve." She emphasized that "the educational outcomes for our students are going to be compromised."

**No "light at the end of the tunnel for these kids."** The Rescission Memo has caused many students to abandon their academic and professional goals as they see carefully crafted plans unravel. Arianna Martinez, an Associate Professor at LaGuardia Community College in New York, teaches many DACA recipients. Those college students' "entire relationship to education and their future" has changed as the students now feel there is no point in obtaining a degree. Through her own academic research, Martinez has found that DACA recipients enrolled in continuing education classes to prepare for college are struggling to envision a way forward. Superintendent Sipe speaks emotionally of a brilliant student who dreams of becoming a pediatrician but may no longer even consider college. She also describes a student with DACA who dropped out of college because of their

**AR5278**

29

disappointment and feeling of "why bother investing [in their education] if it does not do any good." Superintendent Charlton speaks of how DACA gave students "that hope and inspiration to reach higher; to rescind that now is not fair" to his students. Superintendent Schutte expresses his concern that the termination of DACA will lead to a "greater challenge to encourage kids to finish school, a greater challenge to reduce the achievement gap and drop-out rate . . . there is not a light at the end of the tunnel for these kids."

**Kids who "have done everything asked of them."** In Superintendent Utterback's district, "high school counselors and administrators are having conversations with kids who thought they had an avenue for post-secondary education" and now do not know how to plan for the future. "These are really bright kids who have been in the school system for 13 years and have done everything asked of them and now they do not have the same opportunities as their classmates." The DHS decision took none of these reliance interests into account. Hundreds of thousands of "productive young people" who have "contributed to our country in significant ways" see nowhere to go from here.

## CONCLUSION

DHS swept away DACA, together with its recipients' dreams and their communities' needs, in one curt memorandum that failed to provide a reasoned explanation for the agency's drastic change of course. DACA educators, students, and administrators can – and do, here in this brief – attest to the serious reliance interests engendered by DACA, as well as the disastrous results that will

**AR5279**

# Exhibit 10

Nos. 18-587, 18-588, and 18-589
_____

# In the Supreme Court of the United States
_____

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*PETITIONERS*,

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*RESPONDENTS*
_____

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*
_____

**BRIEF OF FORMER SERVICE SECRETARIES, MODERN MILITARY ASSOCIATION OF AMERICA, AND MILITARY AND VETERAN ADVOCACY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS**
_____

PETER E. PERKOWSKI
Modern Military
  Association of America
P.O. Box. 65301
Washington, DC  20035
(202) 328-3244
peter@modermilitary.org

*Counsel for* Amicus Curiae
*Modern Military Association of America*

CHARLES B. KLEIN
  *Counsel of Record*
CLAIRE A. FUNDAKOWSKI
Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC  20006
(202) 282-5000
cklein@winston.com

*Counsel for* Amici Curiae

Additional Captions and Counsel
Listed on Inside Cover

**AR5668**
**WMAR-00005704**

## TABLE OF CONTENTS

**Page(s)**

INTERESTS OF *AMICI CURIAE* ............................... 1

STATEMENT .................................................. 5

SUMMARY OF ARGUMENT ..................................... 8

ARGUMENT ................................................. 9

I.     The Government Must Consider Serious Reliance Interests When Changing Existing Policy ...................................... 9

II.    DACA Engendered Serious Reliance Interests on the Part of Non-Citizens Enlisted in the Military, Their Families, and the American People ............................. 11

       A.     Foreign-Born Recruits Are Integral to the U.S. Military and Vital to Its Mission .................................... 11

       B.     Enlistees Rely on DACA for Eligibility to be Employed by the Military and for a Path to Citizenship ................................ 14

       C.     Enlistees' Families Rely on DACA for the Possibility of Parole in Place or Deferred Action. ............................. 18

       D.     The U.S. Military Relies on Non-Citizens, Including DACA

**AR5670**
**WMAR-00005706**

ii

Recipients, to Protect the American
People....................................................... 20

III.   The Government Violated the APA When
It Rescinded DACA Without Considering
Serious Reliance Interests. ............................... 29

CONCLUSION .......................................................... 31

AR5671
WMAR-00005707

11

## II. DACA Engendered Serious Reliance Interests on the Part of Non-Citizens Enlisted in the Military, Their Families, and the American People.

DACA offers more than deferred removal, and the program affects more than its direct beneficiaries. DACA recipients and their families benefit from numerous pre-exiting policies, which they would not have access to but for DACA. DACA recipients are eligible for employment authorization documents, commonly known as work permits, and recipients with specialized medical or linguistic and cultural skills are eligible to enlist through MAVNI. For those who have enlisted, the military offers the opportunity to serve their adopted country and a path to citizenship. This policy keeps families with non-citizens together and, as explained in depth below, offers the possibility of deferred action or parole in place regardless of DACA eligibility.

For the American people, DACA has facilitated the military readiness on which the country depends, such as enabling the military to approach its recruiting and retention goals by leveraging immigrant and minority communities with unique skills vital to the national interest. DACA has promoted these expectations for more than five years.

### A. Foreign-Born Recruits Are Integral to the U.S. Military and Vital to Its Mission.

The United States has long relied on foreign-born recruits to protect our country. From the Revolutionary War through the 1840s, half of the U.S. military's

**AR5690**
WMAR-00005726

12

recruits were foreign born.[2]  During the Civil War, approximately 300,000 foreign-born members of the military served in the Union Army.  *Ibid.*  These and other foreign-born recruits account for half a million of our country's veterans, more than 700 of whom have received Medals of Honor.  *Ibid.*[3]

Our country's reliance on foreign-born recruits—and specifically, non-citizens—has persisted in recent decades.  Between 1999 and 2010, "some 80,000 non-citizens enlisted across all four services, accounting for 4 percent of all accessions" among the Army, Navy, Air Force, and Marine Corps.[4]  As of June 2010 alone, approximately 16,500 non-citizens were actively serving in the military.  *Id.* at 39.  Another 5,255 non-citizens first enlisted in the military in 2016.[5]

In light of our military's seasoned reliance on the foreign born, it is not surprising that our Government has repeatedly recognized the importance of non-citizen recruits to the U.S. military.  Nearly two dec-

---

[2] Jie Zong & Jeanne Batalova, *Immigrant Veterans in the United States* (May 16, 2019), https://www.migrationpolicy.org/article/immigrant-veterans-united-states.

[3] *See also* U.S. Citizenship and Immigration Servs., *USCIS Facilities Dedicated to the Memory of Immigrant Medal of Honor Recipients*, https://www.uscis.gov/about-us/find-uscis-office/uscis

-facilities-dedicated-memory-immigrant-medal-honor-recipients (last updated Jan. 24, 2014).

[4] Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2010 Summary Report*, at 41, *available at* https://www.cna.org/pop-rep/2010/summary/PopRep10summ.pdf.

[5] Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2016 Summary Report*, at 41, *available at* https://www.cna.org/pop-rep/2016/summary/summary.pdf.

**AR5691**
**WMAR-00005727**

13

ades ago, President George W. Bush issued an Executive Order creating an incentive for non-citizens to serve in the military in exchange for expedited naturalization. Exec. Order 13,269, 67 Fed. Reg. 45287 (July 3, 2002). Under this program, as of 2018, the U.S. Citizenship and Immigration Services (USCIS) reports that "[s]ince Oct. 1, 2001, USCIS has naturalized 129,587 members of the military."[6] In 2008, the Secretary of Defense authorized the MAVNI program, designed to recruit non-citizens who have skills that are "vital to the national interest," including health care professionals and individuals with specific language and cultural skills. *See* 10 U.S.C. § 504(b)(2).

Most recently, in 2014, the Department of Defense provided a pathway for DACA recipients to enlist in the military under MAVNI.[7] As of September 2017, more than 800 highly skilled DACA recipients were serving in the U.S. military through MAVNI.[8] Many more await final background checks so that they too can begin serving. These DACA recipients, along with other MAVNI service members, possess "critical skills" and are "vital" to protecting the American people.

---

[6] U.S. Citizenship and Immigration Servs., *Military Naturalization Statistics*, https://www.uscis.gov/military/military-naturalization-statistics (last updated Dec. 6, 2018).

[7] Memorandum from Jessica Wright, Undersecretary of Defense for Personnel and Readiness, *Military Accessions Vital to the National Interest Program Changes* (Sept. 25, 2014).

[8] Jonah Bennett, *Pentagon: Fewer Than 900 DACA Recipients Are Currently Serving In The Military* (Sept. 6, 2017), https://stream.org/pentagon-fewer-than-900-daca-recipients-are-currently-serving-in-the-military/.

**AR5692**
**WMAR-00005728**

14

## B.    Enlistees Rely on DACA for Eligibility to be Employed by the Military and for a Path to Citizenship.

DACA opened a path for certain non-citizens to obtain work permits and to serve in the military if they possess a "critical skill or expertise" that is both "vital to the national interest" and useful to the armed forces on a daily basis. *See* 10 U.S.C. § 504(b)(2). For example, the military's MAVNI recruiting program targets immigrants with critical medical skills or expertise in certain foreign languages and cultures.[9] The program has recruited 10,400 immigrants from 2008 to 2016.[10,11] In 2016 alone, 359 MAVNI recruits were talented immigrants who could not have participated in the program without DACA.[12]

---

[9] Dep't of Def., MAVNI Fact Sheet, 1, https://dod.defense.gov/news/mavni-fact-sheet.pdf.

[10] U.S. Gov't Accountability Office, *Immigration Enforcement: Actions Needed to Better Handle, Identify, and Track Cases Involving Veterans* 7 (2019).

[11] MAVNI recruiting was indefinitely suspended at the end of fiscal year 2016 pending the implementation of increased security protocols. *See* Dep't of Homeland Security, *MAVNI Program Status for Fiscal Year 2017* (Dec. 2, 2016), https://www.ice.gov /doclib/sevis/pdf/bcm-1612-02.pdf. As discussed below, many MAVNI recruits still await the completion of their background checks so that they can begin serving.

[12] New American Economy, *Outside the Wire: How Barring the DACA-Eligible Population from Enlisting Weakens our Military* (Nov. 8, 2017), https://research.newamericaneconomy.org/report /outside-the-wire-how-barring-the-daca-eligible-population-from-enlisting-weakens-our-military/; *see also* Dep't of Def., MAVNI Fact Sheet, 1.

**AR5693**
**WMAR-00005729**

15

DACA beneficiaries rely on military service to provide a path to citizenship. The United States has long granted citizenship to non-citizens in exchange for their military service. *See* Exec. Order 13,269, 67 Fed. Reg. 45287 (July 3, 2002). By permitting DACA beneficiaries to enlist in the military, the Government has provided them the opportunity to earn citizenship by serving honorably for one year under 8 U.S.C. § 1439(a), or by serving honorably on active duty for a shorter period under 8 U.S.C. § 1440(a).[13] More than 129,000 immigrants earned their citizenship through military service between the attacks on September 11, 2001, and the end of last year. U.S. Citizenship and Immigration Servs., *Military Naturalization Statistics.*

DACA also enables its beneficiaries who have skills vital to the national interest an opportunity to serve in the U.S. military and to become lawful citizens of the country in which they were raised. Beneficiaries wanting to serve and undertake the benefits and responsibilities of citizenship enlisted. After enlisting, they organized their lives around the com-

---

[13] On October 13, 2017, the Department of Defense announced that instead of requiring a single day of active-duty service it would require 180 days before certifying honorable service under 8 U.S.C. § 1440(a). Dep't of Def., *DoD Announces Policy Changes to Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program* (Oct. 13, 2017), https://www.defense.gov/Newsroom/Releases/Release/Article/1342317/dod-announces-policy-changes-to-lawful-permanent-residents-and-the-military-acc/. Citizenship granted under either 8 U.S.C. § 1439 or 8 U.S.C. § 1440 could be revoked if the soldier was "separated from the Armed Forces under other than honorable conditions before the person ha[d] served honorably for a period or periods aggregating five years." 8 U.S.C. §§ 1439(f), 1440(c).

**AR5694**
**WMAR-00005730**

16

mitment to hold themselves constantly ready to serve as soon as their background investigations finished.

Rescinding DACA undermines the reliance interests inherent in the life-changing demands of military service, as well as the path to citizenship offered through the MAVNI program. Like all non-citizens—including otherwise lawful permanent residents—DACA beneficiaries who enlisted are unable to begin basic training until their background investigations are completed.[14] Less than two months before DACA's rescission, NPR reported that more than 4,000 MAVNI recruits were awaiting basic training.[15] Without DACA's protection, DACA recruits awaiting training or who have not served long enough to apply for citizenship will lose their eligibility to participate in MAVNI. They also risk losing their work permits and a range of military employment benefits, including health care, home loans, and educational funds, that generally vest only after a recruit begins or completes a specified term of active-duty service. *See* 38 U.S.C. §§ 3311, 3702; 32 C.F.R. § 199.3. In addition to threatening enlistees' ability to access these benefits, DACA's rescission even threatens enlistees with the prospect of being deported.

This threat was not eliminated by the grandfathering provisions in the DACA rescission memorandum. DHS announced that it would not terminate previously issued deferred action determinations or

---

[14] *See* Dep't of Def., *DoD Announces Policy Changes to Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program* (Oct. 13, 2017).

[15] Tom Bowman, *Citizenship For Military Service Program Under Fire*, NPR (July 11, 2017), https://www.npr.org/2017/07/11/536630223/citizenship-for-military-service-program-under-fire.

**AR5695**
**WMAR-00005731**

17

work permits based on the rescission. *Regents* Pet. App. 118a. It also announced that, if requested within 30 days, it would consider a one-time renewal of DACA benefits for individuals whose periods of deferred action were set to expire within 180 days. *Ibid.* But DACA benefits last only two years. *Regents* Pet. App. 99-100a. Military background checks take up to three. *See* 10 U.S.C. § 513(b)(1)-(3). This means that DACA beneficiaries face a very real prospect that they will lose their DACA benefits before obtaining background clearance, getting scheduled for training, and freeing themselves of the need for DACA by completing the term of service necessary to obtain citizenship.[16]

This fear of deportation after DACA's rescission is not merely hypothetical. A recent report by the Government Accountability Office states that DHS has a system of policies in place for deporting veterans—and that the protections the system offers are not consistently observed. U.S. Gov't Accountability Office, *Immigration Enforcement*, 10-12. Although the data is incomplete, available records show that "approximately 250 veterans were placed in removal proceedings or removed from the United States from fiscal years 2013 through 2018." *Id.* at 16. At the

---

[16] *See, e.g.*, Alex Horton, *The military looked to 'dreamers' to use their vital skills. Now the U.S. might deport them.*, Washington Post (Sept. 7, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them/ (reporting on plight of recruits like Zion Dirgantara, a MAVNI recruit awaiting the completion of his background check who came to the United States at the age of 12, did not know he lacked lawful status until he applied for a driver's license, and now finds himself alongside "hundreds of others in a race against time to avoid deportation back to now unfamiliar nations").

**AR5696**
**WMAR-00005732**

18

time of the study, about 115 of them had been ordered removed and only 25 had been granted relief or protection from removal. *Ibid.* Recruits who have not served are likely to receive less favorable treatment. Some have already fled the country to avoid deportation to countries where they believe their lives would be in danger.[17]

### C.   Enlistees' Families Rely on DACA for the Possibility of Parole in Place or Deferred Action.

Enlistees' families also have relied on DACA. In addition to families' general interest in policies that protect their relatives from deportation—and consequently keep families together—DACA grants family members access to additional benefits as well.

USCIS offers consideration for parole in place or deferred action to the families of service men and women, with the goal of "[f]acilitating military morale and readiness and supporting DoD recruitment policies." U.S. Citizenship and Immigration Services, *Adjudicator's Field Manual*, Chapter 21.1(c). Parole in place is a one-year period of authorization to stay in the United States, subject to extensions as appropriate. *Id.* at Chapter 21.1(c)(1).

---

[17] Alex Horton, *Foreign-born recruits, promised citizenship by the Pentagon, flee the country to avoid deportation*, Washington Post (July 17, 2017), https://www.washingtonpost.com/news /checkpoint/wp/2017/07/17/foreign-born-recruits-promised- citizenship-by-the-pentagon-flee-the-country-to-avoid- deportation/ (telling story of Ranj Rafeeq, an Iraqi Kurd who translated for the U.S. military in 2005 and came to the United States in 2012 hoping to join the Army after earning a graduate degree in civil engineering but who fled to Canada in fear that his path to citizenship would fail and that he would become a target of the Islamic State if deported to Iraq).

AR5697
WMAR-00005733

19

Although a grant of parole in place is discretionary, the fact that an immediate family member serves in the U.S. military "ordinarily weighs heavily in favor of parole in place," so that a grant of parole in place is generally appropriate absent a criminal conviction or other serious adverse factors. *Ibid.* Parole in place is available only to individuals who are not lawfully admitted to the United States. *Ibid.* Parolees are eligible to apply for work permits during the period of their parole. *Ibid.*

Deferred action for family members of service members is similar to parole in place, but it is available only to individuals who have been lawfully admitted to the United States and have overstayed their authorized period of admission. *Id.* at Chapter 21.1(c)(2)(A). Deferred action is available in two-year increments and, like parole in place, makes the recipient eligible to apply for work permits. *Id.* at Chapter 21.1(c)(2)(C). Deferred action determinations are "case-by-case, discretionary judgments based on the totality of the evidence." *Id.* at Chapter 21.1(c)(2)(A).

Although being an immediate family member of a MAVNI recruit or other enlistee awaiting basic training is no guarantee of deferred action, it is considered a strong positive factor. *Ibid.* On the other hand, USCIS may terminate any period of deferred action awarded to the family members of an enlistee awaiting basic training who later becomes disqualified from military service. *Ibid.*

As explained above, DACA's rescission placed enlistees at risk of becoming disqualified for employment and for participation in MAVNI. In so doing, it also placed family members of enlistees at risk of losing their work permits and even of being deported.

**AR5698**
**WMAR-00005734**

20

This is true not only of family members who are direct beneficiaries of DACA, but also of family members who are beneficiaries of parole in place or of deferred action for families of service men and women. As the USCIS Adjudicator's Field Manual notes, "the family members of such recruits often lose their lawful statuses because their statuses depend on those of the recruits." *Ibid.*

Immigrant families have sacrificed for the United States by supporting their relatives in enlisting for military service. They have counted on staying together and earning a living while their relatives were on duty. Whether directly or indirectly, they relied on DACA—and their reliance interests are serious.

### D.   The U.S. Military Relies on Non-Citizens, Including DACA Recipients, to Protect the American People.

The serious consequences of DACA's rescission extend to the American people, who rely on having a strong, ready military to promote and defend U.S. national interests. Unraveling DACA will negatively affect the military's ability to recruit and retain highly qualified service members, which in turn jeopardizes the protection of the American people.

1. The American people rely on a strong, ready U.S. military to promote and defend U.S. national interests. One critical component of a strong military is ensuring that the military is able to recruit and retain enough soldiers, sailors, airmen, Marines, and coast guardsmen to meet the myriad of challenges these men and women are asked to tackle every day. As a result, meeting annual accession goals is a critical component of ensuring military readiness.

**AR5699**
**WMAR-00005735**

21

In recent years, the U.S. military, and by extension its largest branch, the U.S. Army, has "struggl[ed] to find candidates who meet [its] requirements."[18]   Because only 30% of potential recruits qualify to join the military, in 2017, the U.S. Army Recruiting Command was "forced to lower its recruiting standards in hopes of reaching its goal of 80,000 new soldiers." *Ibid.*  In 2016, 1.6% of Army recruits placed in the bottom third of military exams, *ibid.*—scores that typically lead the Army to deny enlistment—  and only 56% of Army recruits were deemed "high-quality personnel." Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2016 Summary Report*, at 3, 17.  Yet as difficulties with military recruitment have risen, Congress has directed the Army to increase its number of active-duty soldiers.  Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018).

DACA recipients do not just add necessary numbers to the U.S. military; they also bring necessary skills.  As a statutory prerequisite to enlistment as non-citizens without green cards, each of the hundreds of DACA recipients enlisted in the military must possess "critical skill[s] . . . vital to the national interest."  10 U.S.C. § 504(b)(2).  These and other MAVNI recruits serve an important role in the military's ability to protect the American people.  As explained by Air Force Maj. Carla Gleason, a Pentagon spokeswoman, "the unique skill sets these individuals bring is one of the reasons the U.S. military is the

---

[18] Eric Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018), https://thehill.com/opinion/national-security/367839-immigration-reform-an-army-recruitment-opportunity.

AR5700
WMAR-00005736

22

world's premier fighting force."[19]  Former Secretary of the Army Eric Fanning has likewise explained that MAVNI recipients serve an important role in forming "a skilled, diverse military force with high levels of integrity that can adapt to today's emerging threats." Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018).  Removing protections for these vital service members and subjecting such service members to discharge runs counter to American interests in protecting our country.

Research and practice have confirmed that non-citizen service members, such as DACA recipients, meet critical needs for the military.  As the Center for Naval Analyses (CNA) observed, "noncitizens are [] an attractive recruiting resource" because "a substantial share of the recruitable U.S. non-citizen population comes from diverse backgrounds and potentially possesses language and cultural skills that are of strategic interest to the U.S. military."[20]  Recognizing the importance of such language and cultural skills, Former Secretary of the Air Force Deborah Lee James emphasized, "diversity of background, experience, demographics, perspective, thought and even organization are essential to our ultimate success."[21]  Former Secretary of the Navy Ray Mabus echoed this

---

[19] Lolita Baldor, *Problems for Pentagon's immigrant recruit program*, AP NEWS (Sept. 30, 2018), https://www.apnews.com /84530d3799004a0a8c15b3d11058e030.

[20] Molly F. McIntosh et al., *Non-Citizens in the Enlisted U.S. Military*, at 57 (Nov. 2011), *available at* https://www.cna.org /CNA_files/PDF/D0025768.A2.pdf.

[21] Memorandum from Deborah Lee James, Secretary of the Air Force, Air Force Diversity & Inclusion (Mar. 4, 2015), *available at* https://www.af.mil/Portals/1/documents/SECAF /FINALDiversity_Inclusion_Memo1.pdf.

**AR5701**
**WMAR-00005737**

23

sentiment, explaining "[a] more diverse force is a stronger force."[22]  As succinctly stated by Secretary Fanning, "[o]ur nation's military is stronger when it reflects the diversity it aims to defend."  Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018).  Today, the military continues to target recruits who are "more diverse linguistically and culturally than citizen recruits . . . [because they are] particularly valuable as the U.S. faces the challenges of the Global War on Terrorism."[23]

CNA projects that non-citizens likely will play a crucial role in meeting recruitment goals in coming years, and thus recommends that "the services should develop strategies to recruit non-citizens more effectively."  McIntosh et al., *Non-Citizens in the Enlisted U.S. Military*, at 2 (Nov. 2011).  Notably, "non-citizen recruits are significantly and substantially less likely than citizen recruits to attrite in the first term."  *Ibid.* After three years, "attrition rates for non-citizens are between nine and 20 percentage points lower than those for white citizens, the largest demographic group in the military."  Air Force News, *The U.S. Military Helps Naturalize Non-Citizens* (2019).  Other analysts have similarly estimated that the attrition rate for non-citizens is more than 10% lower than for

---

[22] Chief of Naval Personnel Public Affairs, SECNAV Releases Updated Diversity, Inclusion Policy Statement (Feb. 25, 2016), *available at* https://www.navy.mil/submit/display.asp?story_id=93282.

[23] Air Force News, *The U.S. Military Helps Naturalize Non-Citizens* (2019), https://www.military.com/join-armed-forces/eligibility-requirements/the-us-military-helps-naturlize-non-citizens.html.

**AR5702**
**WMAR-00005738**

24

citizens, "meaning that noncitizens are more likely to serve in the military for extended periods of time."[24]

The Department of Defense's data has reinforced the significance of the American people's interest in the military's ability to recruit and retain non-citizens, including DACA recipients.   In 2016, the Department of Defense reported that "the majority of non-citizen [non-prior service] accessions are high-quality recruits, with Tier 1 education credentials and an [Armed Forces Qualification Test] score in the top 50 percentiles."  Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2016 Summary Report*, at 42.  In the Army, the Department of Defense observed that 4.8% of accessions in 2016 were non-citizens, and "[a] higher percentage of non-citizen accessions in the Army were high quality compared to citizen accessions (66 percent versus 54 percent)."  *Id.* at 41-42.  That same year, hundreds of DACA recipients newly enlisted in the Army.  New American Economy, *Outside the Wire: How Barring the DACA-Eligible Population from Enlisting Weakens our Military* (Nov. 8, 2017).

The military's reliance on programs such as DACA to protect the American people is not limited to those DACA recipients who currently serve in the military. Analysts have estimated that the military could target many more DACA recipients to improve military readiness.   Of the 45 languages the military has deemed "vital to military success," the New American Economy estimated that "[m]ore than 169,000 mem-

---

[24] Muzaffar Chishti, et al., *Immigrants in the Military: Evolving Recruitment Needs Can Accommodate National Security Concerns* (May 2019), https://www.migrationpolicy.org/sites/default/files/publications/MPI-Noncitizens-Military-Final.pdf.

**AR5703**
**WMAR-00005739**

25

bers of the DACA-eligible population—or more than one in seven of them—speak one of these languages at home." *Ibid.* This organization further concluded that "a substantial portion of the DACA-eligible population has language or workforce training that could help address the military's recruitment challenges." *Ibid.* The authors thus concluded that "[t]here is a strategic advantage to having [DACA recipients] serve in the military, as they will have cultural and linguistic expertise which could be of critical importance." *Ibid.*

Unraveling of DACA protections will likely dissuade these many qualified recipients from enlisting in the military due to the lengthy delays in accession and uncertainty surrounding shipment dates, making it difficult for the military to meet its recruiting goals. Upon rescission of DACA, the military is likely to find that a large number of potential high-quality recruits are ineligible for accession or have left the United States. Thus, a policy with the stated goal of improving the country's national security is likely to undermine that goal by impairing military readiness.

2. In addition to recruitment and retention, another key component of a strong military is morale. As precedent has shown in other contexts, however, ignoring the reliance interests of DACA recipients could significantly damage the relationship of currently serving DACA recipients to the military, undermining their morale and negatively impacting unit cohesion, thus curbing the military's ability to recruit and retain additional non-citizens and immigrants unaffected by DACA.

For example, history has shown that discriminatory policies such as Don't Ask Don't Tell (DADT)—

AR5704
WMAR-00005740

# Exhibit 11

Nos. 18-587, 18-588, and 18-589

### In The
# Supreme Court of the United States

———————◆———————

DEPARTMENT OF HOMELAND SECURITY, et al.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,

*Respondents.*

———————◆———————

DONALD J. TRUMP, President of the United States, et al.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, et al.,

*Respondents.*

———————◆———————

KEVIN K. MCALEENAN,
Acting Secretary of Homeland Security, et al.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, et al.,

*Respondents.*

———————◆———————

**On Writs Of Certiorari To The
United States Courts Of Appeals For The Ninth,
District Of Columbia, And Second Circuits**

———————◆———————

**BRIEF OF TEACH FOR AMERICA, INC.
AS *AMICUS CURIAE* IN SUPPORT OF
RESPONDENTS AND AFFIRMANCE**

———————◆———————

HARVEY L. ROCHMAN
ESRA A. HUDSON
MICHAEL E. OLSEN
MARIO CARDONA
MANATT, PHELPS
 & PHILLIPS, LLP
11355 W. Olympic Blvd.
Los Angeles, CA 90064

RONALD G. BLUM
 *Counsel of Record*
JULIAN POLARIS
MANATT, PHELPS
 & PHILLIPS, LLP
7 Times Square
New York, NY 10036
(212) 830-7186
rblum@manatt.com

===========================================

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

**AR5579**

i

## TABLE OF CONTENTS

| | Page |
|---|---|

INTEREST OF *AMICUS CURIAE* ........................ 1

INTRODUCTION AND SUMMARY OF ARGU-
MENT ................................................................. 2

ARGUMENT ........................................................... 6

  I.  THE APA REQUIRES AN AGENCY TO
CONSIDER "SERIOUS RELIANCE IN-
TERESTS" WHEN IMPLEMENTING A
POLICY CHANGE...................................... 6

  II.  DACA HAS ENGENDERED SERIOUS RE-
LIANCE INTERESTS IN TEACH FOR
AMERICA, TEACHERS, SCHOOLS, AND
STUDENTS................................................... 7

    A.  DACA Freed Undocumented Young Peo-
ple to Pursue Productive Lives ............. 7

      1. Alejandro Fuentes Mena................. 9

      2. Marissa Molina................................ 10

      3. Vanessa Luna ................................... 10

      4. Erik Kwak......................................... 11

      5. Denise Panaligan ............................ 12

      6. Miriam Gonzalez Avila.................... 13

    B.  DACA Teachers Provide Special Value to
Students, Schools, and Communities..... 14

      1. Teacher Diversity Redresses Achieve-
ment Gaps and Promotes Positive Stu-
dent Outcomes ................................... 15

**AR5580**

ii

TABLE OF CONTENTS – Continued

Page

2. Excellent Teachers Offer Great Value, Especially in Teacher Shortage Areas ...................................................... 17

C. Teach For America Has Expended Considerable Resources Recruiting and Supporting Talented DACA Teachers ......... 19

III. THE DEPARTMENT ACTED ARBITRARILY AND CAPRICIOUSLY BY RESCINDING DACA WITHOUT CONSIDERING SERIOUS RELIANCE INTERESTS .......... 22

CONCLUSION ...................................................... 25

**AR5581**

14

Dedicated educators inspired these young people to pursue higher education. Yet their limited post-college prospects nearly stifled that inspiration. DACA brought hope and created a legal path to previously unattainable goals. Their government offered an opportunity and they made the most of it, hoping to give back to the nation that had given them so much. As five former Secretaries of Education explained, rescinding DACA would "violate a promise our nation made to these earnest young people."[4]

## B. DACA Teachers Provide Special Value to Students, Schools, and Communities

Fuentes, Molina, Luna, Kwak, Panaligan, and Gonzalez exemplify the "outstanding and diverse leaders" that Teach For America places in low-income communities, where they "confront both the challenges and joys of expanding opportunities for kids."[5] Teach For America requires strong academic records and leadership skills, attributes often found in DACA students who engage in advocacy and awareness campaigns around immigration issues on campus, in the public square, and in the halls of government. Moreover,

---

[4] Arne Duncan et al., Bipartisan Letter to Congress from Former Education Secretaries at 2, https://www.politico.com/f/?id=0000015e-5b9c-db52-a75e-dffded380001 (last accessed Sept. 29, 2019); *see also ibid.* ("We must not, we cannot, let these children down. The stakes are too high for them and for the future of our country.").

[5] Teach For America, *What We Do*, https://www.teachforamerica.org/what-we-do (last accessed Sept. 29, 2019).

**AR5600**

15

DACA enables Teach For America to recruit and partner with teachers who reflect the diverse demographics in school systems across the country, thereby advancing Teach For America's mission in unique and powerful ways.

**1. Teacher Diversity Redresses Achievement Gaps and Promotes Positive Student Outcomes**

Undocumented youth are a vulnerable group: compared to their U.S.-born peers, they are five times less likely to finish high school, and those who enroll in college are far less likely to graduate.[6] Black and Hispanic students, too, continue to lag behind on standardized test scores, discipline records, and high school graduation rates.[7]

A growing body of research shows that diversity among educators plays a powerful role in closing these achievement gaps, in addition to "providing social advantages for all students."[8] Diverse teachers "break[ ]

_____

[6] Zenen Jaimes Pérez, _Removing Barriers to Higher Education for Undocumented Students_, Ctr. Am. Progress 8–9 (Dec. 2014), https://cdn.americanprogress.org/wp-content/uploads/2014/12/Undoc HigherEd-report2.pdf.

[7] _Status and Trends in the Education of Racial and Ethnic Groups 2017_, Nat'l Ctr. Educ. Statistics, U.S. Dep't Educ., at iii–v (July 2017), https://nces.ed.gov/pubs2017/2017051.pdf.

[8] _The State of Racial Diversity in the Educator Workforce 2016_, U.S. Dep't Educ., at 2 (July 2016), https://eric.ed.gov/ ?id=ED571989; _see also_ Anna J. Egalite & Brian Kisida, _The Effects of Teacher Match on Students' Academic Perceptions and Attitudes. Educational Evaluation and Policy Analysis_, 40 Rev. Res.

**AR5601**

16

down negative stereotypes" and serve as "positive role models" in different ways to different students.[9] Teachers who share demographic traits with their students help upend the tyranny of low expectations, diffuse conflicts that can lead to disciplinary action, and inspire students to be their best selves.

DACA teachers add to the diversity of Teach For America's corps in many ways, including language fluency, national origin, socioeconomic status, race, and ethnicity. Their lived experience as undocumented immigrants is uniquely valuable to the 80,000 DACA-eligible undocumented children who turn 18 each year.[10] A "teacher is often the first adult an undocumented student will ask for help" in overcoming obstacles and planning their future, as the experiences of Fuentes, Molina, Luna, Kwak, Panaligan, and Gonzalez demonstrate.[11] DACA teachers "know first-hand the concerns that undocumented kids face."[12]

---

Educ. 59 (2018); Constance A. Lindsay & Cassandra M. D. Hart, *Exposure to Same-Race Teachers and Student Disciplinary Outcomes for Black Students in North Carolina*, 39 Rev. Res. Educ. 485 (2018); Stephen B. Holt & Nicholas W. Papageorge, *Who Believes in Me? The Effect of Student–Teacher Demographic Match on Teacher Expectations*, Econ. Educ. Rev., Vol. 52, Issue C, at 209 (2016); Anna J. Egalite et al., *Representation in the Classroom: The Effect of Own-Race Teachers on Student Achievement*, Econ. Educ. Rev., Vol. 45, Issue C, at 44 (2015).

[9] *The State of Racial Diversity*, *supra* n.8, at 1.

[10] Jaimes, *supra* n.6, at 8.

[11] *DACA Recipients*, Teach For America, https://www.teachforamerica.org/how-to-join/eligibility/daca (last accessed Sept. 29, 2019).

[12] *Ibid.*

**AR5602**

17

DACA teachers' impact does not stop at the door to the classroom, however; they also pass their specialized knowledge to their peers. Teach For America's DACA Advisory Board encouraged the organization to prepare *all* corps members for the unique needs of undocumented students. With the organization's support and coordination, undocumented corps members and alumni worked to develop and implement a training program for the more than 3,000 teachers who join Teach For America each year.

### 2. Excellent Teachers Offer Great Value, Especially in Teacher Shortage Areas

Teach For America's commitment to excellence in hiring supports educational equality for all students. DACA teachers' backgrounds and skills, enhanced with two years of training and experience as Teach For America corps members, lay the foundation for a lifetime commitment to education and advocacy. The White House's "Champions of Change" series, for example, recognized nine "DACAmented teachers" as "extraordinary educators"; five of the nine were Teach For America corps members or alumni.[13]

These wonderful teachers are especially valuable in the growing number of school districts that face teacher shortages. A 2016 study found a nationwide deficit of approximately 64,000 teachers, and predicted

---

[13] *Champions of Change: Dacamented Teachers*, The White House, https://obamawhitehouse.archives.gov/champions/dacamented-teachers (last accessed Sept. 29, 2019).

**AR5603**

18

an annual teacher shortage of 112,000 in 2018.[14] Those shortages will only increase if America loses the estimated 9,000 education professionals who currently benefit from DACA's protection.[15]

Teach For America recruits corps members to serve in high-need, hard-to-staff schools with high concentrations of low-income students. The DACA corps members are no different, and help to fill crucial needs in these communities. Since 2014, for example, Teach For America has placed more than a quarter of its DACA corps members into science, technology, engineering, and math ("STEM") subjects that represent teacher shortage areas in almost every state in the country.[16] Most states also report shortages of bilingual teachers, or specialists in teaching English Learners or teaching other languages.[17] DACA teachers fill those needs, too, by virtue of their native language

---

[14] Leib Sutcher et al., *A Coming Crisis in Teaching? Teacher Supply, Demand, and Shortages in the U.S.*, Learning Pol'y Inst. 1 (2016), https://learningpolicyinstitute.org/sites/default/files/product-files/A_Coming_Crisis_in_Teaching_REPORT.pdf.

[15] Jie Zong et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Pol'y Inst. 2 (Nov. 2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation.

[16] All states other than Kansas and Ohio identified a STEM subject as a teacher shortage area. *See Teacher Shortage Areas*, U.S. Dep't of Educ., https://tsa.ed.gov; *see also* Sutcher et al., *supra* n.14, at 10–11 (discussing STEM teacher shortages in prior school years).

[17] *See Teacher Shortage Areas*, *supra* n.16; Sutcher et al., *supra* n.14, at 11.

**AR5604**

19

proficiencies and their experiences learning English as
an additional language.

Teachers are the lifeblood of a well-functioning
school system. Districts around the country rely on
Teach For America corps members, and the members'
commitment to teach at least two years. That reliance
is especially pronounced in hard-to-staff schools and
subject areas, where each additional loss worsens a
growing crisis.

### C. Teach For America Has Expended Considerable Resources Recruiting and Supporting Talented DACA Teachers

When President Obama announced DACA in
2012, Teach For America immediately recognized the
policy's potential to promote the organization's mission
of advancing educational equality. Teach For America
hired staff, built administrative infrastructure, and
raised funds to recruit DACA recipients and support
them during their two years of service and beyond.

One prominent example is the financial award
available to Teach For America corps members who
complete their two-year commitment. Most corps members
are eligible for federal education awards to pay
down student debt or pursue additional education.[18]

_____

[18] Teach For America is the largest grantee of the Corporation for National and Community Service, which administers the AmeriCorps program. Like all AmeriCorps volunteers, Teach For America corps members who serve a two-year term are eligible for a Segal AmeriCorps Education Award to pay for student loans

**AR5605**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-68 |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

**APPENDIX**

**VOLUME II: EXHIBITS 12-20**

Pursuant to this Court's Civil Procedures, Rule 9, Defendant-Intervenor State of New Jersey hereby provides the Court with the following table of contents and copies of the documents and authorities cited in its Opposition to Plaintiffs' Motion for Summary Judgment:

| Ex. | Description | Page |
|---|---|---|
| | **VOLUME I** | |
| 1. | Memo. from Chad Wolf, Acting Sec'y of Homeland Sec., to Mark Morgan, Senior Official Performing Duties of Comm'r, U.S. Customs & Border Prot., et al. (July 28, 2020) | NJAPP001 |
| 2. | Memo. from Joseph Edlow, USCIS Associate Director, to Associate Directors and Program Office Chiefs (Aug. 21, 2020) | NJAPP010 |
| 3. | Excerpts from Federal Defendants' Objections and Responses to Defendant-Intervenors' Fifth and Sixth sets of discovery requests (Sept. 30, 2020) | NJAPP021 |
| 4. | Federal Defendants' Responses to Interrogatory No. 15 (Sept. 30, 2020) | NJAPP030 |

| 5. | Email from Victoria Palmer, USCIS Media Affairs Division, and attached Response to Query guidance document (Aug. 24, 2020) | NJAPP037 |
|---|---|---|
| 6. | Email from Brandon Robinson, USCIS Adjudications Officer (Policy), "Re: DACA Filings After 9/5/17 – No Prior Grant of DACA" | NJAPP047 |
| 7. | Email from Brandon Robinson, USCIS Adjudications Officer (Policy), "DACA Filings After 9/5/17 – No Prior Grant of DACA" (Apr. 26, 2019) | NJAPP049 |
| 8. | Email from Victoria Umoru, USCIS Adjudications Officer (Policy), "Implementing the DACA Memo issued by USCIS Deputy Director for Policy Joseph Edlow" (Aug. 22, 2020) | NJAPP052 |
| 9. | Excerpt from Brief of the National Education Association and National PTA as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP056 |
| 10. | Excerpts from Brief of Former Service Secretaries, Modern Military Association of American, and military and veteran advocacy organizations as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP075 |
| 11. | Excerpt from Brief of Teach for America, Inc., as amicus curiae in support of Respondents in *DHS v. Regents* | NJAPP094 |
| | **VOLUME II** | |
| 12. | Excerpts from Brief of Association of American Medical Colleges et. al., as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP104 |
| 13. | Excerpt from Brief of Lawyers' Committee for Civil Rights Under Law, the Anti-Defamation League, the Leadership Conference on Civil and Human Rights, and 42 other social justice organizations as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP125 |
| 14. | Excerpt from Brief of 143 U.S. business associations and companies as amici curiae in support of respondents in *DHS v. Regents* | NJAPP133 |
| 15. | Excerpt from Brief of 127 religious organizations as amici curiae in support of respondents in *DHS v. Regents* | NJAPP142 |
| 16. | *Nikko Trading of Am. Corp. v. Wastemasters, Inc.*, No. 98-48, 2000 WL 284190 (N.D. Tex. Mar. 14, 2000) | NJAPP150 |
| 17. | Declaration of Khristina Gonzalez | NJAPP154 |
| 18. | Declaration of Jack C. Chen | NJAPP166 |
| 19. | Declaration of Maria Hernandez | NJAPP181 |
| 20. | Declaration of Elzbieta Wojtylo | NJAPP186 |
| | **VOLUME III** | |
| 21. | Declaration of James "Ike" Brannon | NJAPP192 |
| 22. | Declaration of Meg Wiehe | NJAPP340 |

Dated: November 6, 2020

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Mayur P. Saxena*
Assistant Attorney General
(admitted pro hac vice)
124 Halsey St., 5th Floor
Newark, New Jersey 07101
PO Box 45029-5029
Phone: (973) 648-3283
Fax: (973) 648-4887
Mayur.Saxena@law.njoag.gov

Melissa Medoway, Deputy Attorney General
(admitted pro hac vice)
Eric Apar, Deputy Attorney General
(admitted pro hac vice)
Elspeth Hans, Deputy Attorney General
(admitted pro hac vice)
Tim Sheehan
(admitted pro hac vice)
*Attorneys for Defendant-Intervenor State of New Jersey*

# Exhibit 12

Nos. 18-587, 18-588, and 18-589

IN THE

# Supreme Court of the United States

————

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

————

**On Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

————

**BRIEF FOR AMICI CURIAE
ASSOCIATION OF AMERICAN
MEDICAL COLLEGES, ET AL.,
IN SUPPORT OF RESPONDENTS**

————

HEATHER J. ALARCON
FRANK R. TRINITY
ASSOCIATION OF
  AMERICAN MEDICAL
  COLLEGES
655 K Street N.W.
Suite 100
Washington, D.C 20001
(202) 478-9939

JONATHAN S. FRANKLIN
  *Counsel of Record*
DAVID KEARNS
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street, N.W.
Washington, D.C. 20001
(202) 662-4663
jonathan.franklin@
  nortonrosefulbright.com

*Counsel for Amici Curiae*

————

Additional Captions Listed on Inside Cover

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.....................................iii

INTEREST OF AMICI CURIAE ..............................1

SUMMARY OF THE ARGUMENT...........................2

ARGUMENT .................................................6

I. AGENCIES CANNOT CHANGE POLICIES WITHOUT FAIRLY ADDRESSING RELIANCE INTERESTS.......................................6

II. LOSS OF DACA STATUS FOR HEALTH CARE TRAINEES AND PROFESSIONALS WOULD NULLIFY SUBSTANTIAL INVESTMENTS MADE BY SCHOOLS, OTHER INSTITUTIONS, AND RECIPIENTS, TO THE PUBLIC'S SIGNIFICANT DETRIMENT ...................................8

  A.  Recipients Depend On DACA For Their Work Eligibility..........................8

  B.  Medical Schools, Teaching Hospitals, And Other Educational And Health Care Institutions Expended Vast Amounts Of Time, Money, And Other Resources In Reliance On DACA.............................10

  C.  DACA Recipients Relied On Their Eligibility To Work When They Decided To Invest Their Own Time, Effort, And Resources In A Health Care Career ...................14

**AR5433**
**WMAR-00005469**

ii

TABLE OF CONTENTS—Continued

Page

D.    Rescinding DACA Will Nullify
      These Investments And Worsen
      A Shortage Of Health Care
      Professionals In The United
      States..................................................16

III. THE GOVERNMENT ACTED
     ARBITRARILY AND CAPRICIOUSLY
     IN FAILING TO TAKE ACCOUNT OF
     ANY OF THESE AND OTHER
     SERIOUS RELIANCE INTERESTS...........24

CONCLUSION ........................................................27

**AR5434**
**WMAR-00005470**

2

**American Medical Association, American Medical Student Association, American Nurses Association, American Psychiatric Association, American Public Health Association, American Society of Hematology, American Society of Nephrology, American Thoracic Society, Association of Academic Health Centers, Association of American Indian Physicians, Association of Schools and Programs of Public Health, Association of Schools of Allied Health Professions, Association of University Programs in Health Administration, California Medical Association, Council on Social Work Education, Greater New York Hospital Association, National Council of Asian Pacific Islander Physicians**, **National Hispanic Medical Association, National Medical Association, Physician Assistant Education Association, Pre-Health Dreamers, and Society of General Internal Medicine.** Additional information regarding these organizations is provided in the Addendum to this brief.

## SUMMARY OF THE ARGUMENT

The law is clear that the government cannot rescind a longstanding policy without, at a minimum, seriously considering the reliance interests that would be disrupted by such a change in course. Yet in this case, the government failed to make any serious effort to consider any of the substantial reliance interests affected by the rescission of the Deferred Action for Childhood Arrivals ("DACA") program.

This is particularly true with respect to the health care sector, for which the avoidance of unnecessary harm is a guiding principle. At this moment, an estimated 27,000 health care workers and support

**AR5443**
**WMAR-00005479**

3

staff depend on DACA for their authorization to work in the United States.[2]   Among those 27,000 are nurses, dentists, pharmacists, physician assistants, home health aides, technicians, and others.  *Id.*

The number also includes nearly 200 medical students, medical residents, and physicians who depend on DACA for their eligibility to practice medicine.  If those trainees and physicians retain their work eligibility, each will care for an average of between 1,533 and 4,600 patients a year.[3]  Together, over the course of their careers, they will touch the lives of 1.7 to 5.1 million U.S. patients.[4]

---

[2] Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Am. Progress (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/ (estimates based upon occupations under health care practitioners and technical occupations and health care support from the University of Minnesota's Integrated Public Use Microdata Series (IPUMS) USA 2017 American Community Survey occupational classification data).

[3] The Physicians Found., *2018 Survey of America's Physicians* at 57 (2018), https://physiciansfoundation.org/wp-content/uploads/2018/09/physicians-survey-results-final-2018.pdf (data indicating physicians see 20 patients per day on average, and work 230 days per year); Mark Murray et al., *Panel Size: How Many Patients Can One Doctor Manage?*, Family Practice Mgmt. at 47 (April 2007), https://www.aafp.org/fpm/2007/0400/p44.pdf (data indicates each patient is seen by their doctor one to three times a year).

[4] This calculation is based on 14.3% of patients being new patients during any given year, *see* Nat'l Ctr. for Health Stat., Ctr. for Disease Control, *National Ambulatory Medical Care Survey:   2016   National   Summary   Tables* (2016), https://www.cdc.gov/nchs/data/ahcd/namcs_summary/2016_namcs_web_tables.pdf, and an average career length of 35 years,

AR5444
WMAR-00005480

4

If DACA is rescinded, however, almost none of these people will be able to serve the American public in their chosen fields.   This action would therefore nullify the substantial and long-term investments that DACA recipients, educational institutions, and the public have made in educating and training those recipients to provide needed health care services to the Nation.   Their loss will have potentially devastating effects.  It can take a decade or more to educate and train a new physician.  As health care professional institutions and organizations, *amici* know that the resources to competently train capable physicians, nurses, and other medical and public health professionals are subject to substantial limitations.  Each year and each dollar that a school spends to train one future physician or other health care worker is a year or dollar not spent training another.  The decision to expend vast amounts of time, money, and effort in educating and training DACA recipients in the health care sector was thus made in reliance on the expectation that such individuals would be able to serve the public once educated and trained.  Rescinding the program negates all of that substantial time, money, and effort spent.

Nor is the country prepared to fill the loss that would result if DACA recipients were excluded from the health care workforce.  The number of physicians in the United States has not kept pace with our growing and aging population and a commensurate increase in patients needing care for a variety of chronic health conditions.  It is estimated that in the next eleven years, the country will have between

_____

using data from the AAMC's 2019 National Sample Survey of Physicians, (publication forthcoming; data on file with AAMC).

**AR5445**
**WMAR-00005481**

5

46,900 and 121,900 fewer primary and specialty care physicians than it needs.[5]  Shortages in other health professions, such as mental health, dentistry, and nursing, are worsening as well.[6]  These shortages will be felt most keenly in medically underserved areas, such as rural settings and poor neighborhoods— precisely the areas in which DACA recipients are likeliest to work.[7]

The risk of a pandemic also continues to grow, since infectious diseases can spread around the globe in a matter of days due to increased urbanization and international travel.[8]  These conditions pose a threat to America's health security—its preparedness for and ability to withstand incidents with public-health consequences.  To ensure health security, the country needs a robust health workforce.  Rescinding DACA, however, would deprive the public of domestically educated, well-trained, and otherwise qualified health

---

[5] Ass'n of Am. Med. Colls., *The Complexities of Physician Supply & Demand: Projections from 2017 to 2032* at 2 (Apr. 2019), https://tinyurl.com/yxbh2nhv.

[6] *See* Henry J. Kaiser Fam. Found., *Mental Health Care Health Professional Shortage Areas (HPSAs)* (last visited September 24, 2019), https://tinyurl.com/y9u2g69b; Henry J. Kaiser Fam. Found., *Dental Care Health Professional Shortage Areas (HPSAs)* (last visited September 24, 2019), https://tinyurl.com/yye44kpy.

[7] Angela Chen, PhD et al., *PreHealth Dreamers: Breaking More Barriers Survey Report* at 27 (Sept. 2019), https://tinyurl.com/y436och3.

[8] Office of the Assistant Sec'y for Preparedness and Response, Dep't of Health and Human Servs., *National Health Security Strategy 2019-2002* at 5-6, (last visited Sept. 24, 2019), https://www.phe.gov/Preparedness/planning/authority/nhss/Documents/NHSS-Strategy-508.pdf.

AR5446
WMAR-00005482

6

care professionals who have been provided education in reliance on their ability to continue to work in the United States as health care professionals.

As the courts below correctly recognized, the government failed to seriously consider these or any of the other substantial reliance interests engendered by DACA.  By rescinding DACA on the basis of a cursory and conclusory analysis that failed to consider real-world effects, the government ignored the significant reliance interests of U.S. health professional schools, hospitals, other institutions, and U.S. patients, as well as those of DACA recipients themselves.  The rescission was therefore arbitrary and capricious, and the decisions below should be affirmed.

## ARGUMENT

### I.  AGENCIES CANNOT CHANGE POLICIES WITHOUT FAIRLY ADDRESSING RELIANCE INTERESTS.

Under the Administrative Procedure Act ("APA"), courts must set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).  That standard requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency acts arbitrarily or capriciously if it "fail[s] to consider an important aspect of the problem" it is addressing.  *Id.*

Where—as here—an agency considers reversing or rescinding an existing policy, one "important aspect of the problem," *State Farm*, 463 U.S. at 43, is the possibility that segments of the public may have ordered their affairs in reliance on existing rules.  This Court has made clear that in such circumstances,

**AR5447**
**WMAR-00005483**

10

### B. Medical Schools, Teaching Hospitals, And Other Educational And Health Care Institutions Expended Vast Amounts Of Time, Money, And Other Resources In Reliance On DACA.

Medical schools, teaching hospitals, and other health care institutions have invested heavily in DACA recipients, in reliance on the premise that they would be legally authorized to perform the jobs for which they have been, or are being, trained. Those investments, moreover, were made to serve the public interest, as the country faces an ever-increasing shortage in the number of health care professionals.

Since 1982, students who arrived in the United States without legal authorization as children have been able to benefit from public K-12 education. *Plyler* v. *Doe,* 457 U.S. 202, 223 (1982). Some of these children have found ways to pay for college educations. However, prior to DACA, medical school was not a realistic option for undocumented immigrants who were brought to the U.S. as children. Without formal recognition of deferred action status from the government, undocumented immigrants were legally foreclosed from working as licensed physicians and thus could not meet the technical standards for admission into most medical schools. There are a limited number of seats in medical schools, and each medical school takes seriously its responsibility to the public to use every available seat to produce a physician capable of contributing to the health care workforce. Consequently, before 2013 no medical school had any published policy allowing undocumented immigrants to be accepted into their programs.

**AR5451**
**WMAR-00005487**

11

DACA changed this calculus. As related by one department chair, DACA provided the "missing link" for medical schools to accept qualified noncitizens because it offered a route to work permits for recipients.[10]  In the autumn of 2013, the first DACA recipients entered medical school, and in the ensuing years the number of DACA applicants and matriculants steadily grew.  As of the 2019 application cycle, 65 medical schools across the country have reported admissions policies that include DACA recipients.  Those schools include Alpert Medical School at Brown University, Georgetown University School of Medicine, Harvard Medical School, Stritch School of Medicine at Loyola University ("Stritch"), Michigan State University College of Human Medicine, University of Minnesota Medical School, University of Nevada Reno School of Medicine, Medical College of Wisconsin, Yale School of Medicine, and others.  According to AAMC data, nearly 200 DACA recipients have matriculated into medical school, and many of them have graduated and entered or completed their medical residencies.

It was DACA that allowed medical schools to accept and train nearly all of these students.  For example, Rosa Aramburo graduated college with degrees in biology and literature.  *Id*.  One of her college advisors wrote to the department chair of medical education at Stritch that "one of the brightest students he had ever encountered was about to slip through the cracks because of her undocumented status."  *Id*.

---

[10] Sarah Conway & Alex V. Hernandez, *Loyola's DACA Medical Students, Largest Group in the Country, Plagued with Uncertainty*, Chicago Trib. (Sept. 13, 2017), https://tinyurl.com/y485wmxu.

AR5452
WMAR-00005488

12

Dr. Aramburo's talent and drive, along with DACA's extension of work authorization, inspired Stritch to admit her. She has since earned her M.D. and is now in the first year of her Obstetrics and Gynecology residency.

More broadly, DACA recipients, like their citizen counterparts, were selected for admission to medical school because of their academic and personal achievements. Many were high school valedictorians. Most have undergraduate degrees in complex sciences, such as integrative biology, neurology, physics, and molecular and cellular biology. Many have impressive volunteer and leadership experiences. All scored competitively on the Medical College Admission Test. Moreover, the very fact of their having met the rigorous qualifications for admission to medical school is a testament to their determination and fortitude—precisely the attributes one looks for in a physician.

Teaching hospitals have also invested substantial time and money in training residents with DACA-dependent work authorization. There are currently an estimated 41 medical residents with DACA status, including many whose residencies are nearly complete. The direct training costs for these residents has been estimated at $157,602 per resident, per year.[11]   Based upon available data, the AAMC

---

[11] Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Cost Estimates for Training Residents in a Teaching Health Center* at 2 (last visited Sept. 24, 2019), https://bhw.hrsa.gov/sites/default/files/bhw/grants/thc-costing-fact-sheet.pdf. This number does not include indirect costs or those associated with the physical space and equipment retrofitting required to host and train medical residents.

**AR5453**
**WMAR-00005489**

13

estimates that, as of February 2019, hospitals in the U.S. have invested approximately $5 million training medical residents with DACA status.[12] Accompanying this significant financial investment is an investment of tens of thousands of hours in supervision, training, and administration. As with all physicians' residency training, enormous resources have been expended with the expectation of a return on that investment in the form of highly-trained professionals able to serve the public by practicing medicine independently. These investments would not have been made but for reliance on DACA recipients' continued eligibility to work in the U.S.

Other health professional schools have invested in the training of DACA recipients for the health care workforce. DACA recipients are also pursuing or have obtained graduate degrees in medical sciences. With the support of privately funded fellowships or in collaboration with universities, these individuals are researching radiation sensors, the role of cholesterol regulation in breast cancer cells, the formation of genetic abnormalities associated with cancer, changes in the structure and function of proteins that may result in autoimmune disorders, and cognitive

---

[12] According to available self-reported AAMC data, most recently updated in February 2019, there was one DACA resident in 2016-2017, eight DACA residents in 2017-2018, and twenty DACA residents in 2018-2019. Because the AAMC has not collected data on DACA status consistently across programs, these numbers are not comprehensive. The five million dollar figure quoted above does not include costs associated with an additional 20 or more DACA residents who began residencies in 2019. (Data on file with AAMC).

**AR5454**
**WMAR-00005490**

14

neuroscience, among other things.[13] As with other health care professionals, these researchers' ability to continue their work in their fields is contingent upon work authorization.

All of these institutions have invested money, time, and other resources into DACA recipients' training and development because of the promise presented by these bright learners, eager to contribute their talents to the health care workforce. Institutions would not have made these investments but for their reliance on the continued work authorization afforded by the DACA program.

### C. DACA Recipients Relied On Their Eligibility To Work When They Decided To Invest Their Own Time, Effort, And Resources In A Health Care Career.

Thousands of DACA recipients have also invested vast amounts of their own time, effort, and resources to be able to serve the United States health care system.  Health professional education is expensive, and financing that education presents even greater challenges for most DACA recipients than it does for citizens.

The necessary financial investments only increase with medical school.  Many DACA recipients patch together tuition with merit-based scholarships and private loans, all provided and accepted with the expectation that they will be eligible for future employment in the field in which they are being

---

[13] Evelyn Valdez-Ward, *The End of DACA Would Be a Blow to Science*, Sci. Am. Blog Network (Dec. 12, 2018), https://blogs.scientificamerican.com/voices/the-end-of-daca-would-be-a-blow-to-science/.

AR5455
WMAR-00005491

15

trained.[14]   Because most DACA students are not eligible for federal loans,[15] most finance their education through the private sector.   Their only realistic route to repay those loans turns on their ability to practice medicine after residency, which in turn is dependent on their continued work authorization through DACA.

Even apart from financial investments, DACA recipients have made substantial investments of both time and effort in the reasonable expectation that they will practice in their chosen field.  Physicians, for example, between post-graduate preparatory courses, four years of medical school, and three to nine years in internships, residencies, and fellowships, may spend more than half of their lives in training before being able to independently practice.[16]   Like others pursuing a career in medicine, DACA recipients who are or will become physicians have delayed making an income for four or more years after graduating college, and may have instead accrued debt, so that they could acquire the skills they will need to treat patients. Other health care workers make similar sacrifices.

---

[14] Pre-Health Dreamers, *Frequently Asked Questions & Answers about Medical School for Pre-med Undocumented Students Across the Nation* at 11-14 (last visited Sept. 24, 2019), https://tinyurl.com/yyhcsqkt.

[15] *See* Fed. Student Aid, U.S. Dep't of Educ., *Who Gets Aid: Non-U.S. Citizens* (last visited Sept. 24, 2019), https://studentaid.ed.gov/sa/eligibility/non-us-citizens ("Undocumented students, including DACA recipients, are not eligible for federal student aid.").

[16] Amy E. Thompson, MD, *A Physician's Education*, J. Am. Med. Assoc. (Dec. 10, 2014), https://jamanetwork.com/journals/jama/fullarticle/2020375.

16

### D. Rescinding DACA Will Nullify These Investments And Worsen A Shortage Of Health Care Professionals In The United States.

Each DACA recipient in the health care sector embodies a substantial, irreplaceable investment of time and resources made with the reasonable expectation that that recipient would be eligible to put his or her education and training into practice. Every dollar or hour invested in a DACA recipient's education and training during the past seven years is a dollar or hour not invested in someone else's.

For that reason, the resources expended on DACA recipients' educations cannot ever be recouped. If those individuals are prevented from working in the U.S., their abrupt absence will leave a critical gap in the health professional workforce. While the medical field has worked to expand its training capacity, it cannot backfill such a significant number of trainees. Even if new resources were suddenly found to educate and train replacement physicians, it would be ten years before any of those physicians had the training and preparation to practice medicine independently. Because of these limitations, medical schools and teaching hospitals strive not to lose a single medical student or resident. The loss of all DACA medical students and residents if DACA is rescinded would mark a concrete and enduring loss to medical schools, teaching hospitals, and the U.S. public at large.

In addition to the harm to educational institutions, rescinding DACA also threatens to exacerbate a broader threat facing the country. Over the next decade, the United States will face increased health care challenges arising from its aging population. By 2050, adults over the age of 65 will make up 20% of

**AR5457**
**WMAR-00005493**

17

the population, outnumbering children for the first time in U.S. history.[17]  Almost half of the population is expected to have at least one chronic disease by 2020, and as the population ages this number will increase.[18]  Due in large part to the aging population, the growth in demand for health care services workers in the next decade is projected to outstrip that of any other occupational group.[19]

This increase in demand will be met by a projected decrease in supply.  More than a third of all currently active physicians will be 65 or older within the next decade, and will retire at a rate faster than new graduates can replace them.[20]  The AAMC's workforce studies have projected a future shortfall of between 46,900 to 121,900 primary and specialty care physicians by 2032.[21]  Shortages are and will continue to be experienced in other health care professions as well.[22]

---

[17]  U.S. Census Bureau, *Older People Projected to Outnumber Children for First Time in U.S. History* (Sept. 6, 2018).

[18]  Wullianallur Raghupathi & Viju Raghupathi, *An Empirical Study of Chronic Diseases in the United States: A Visual Analytics Approach to Public Health*, 15 Int'l J. Envtl. Res. & Pub. Health 431, 431 (Mar. 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5876976/.

[19]  Bureau of Labor Stat., U.S. Dep't of Labor, *Occupational Outlook Handbook: Healthcare Occupations* (September 4, 2019), https://www.bls.gov/ooh/healthcare/home.htm.

[20]  Ass'n of Am. Med. Colls., *supra* note 5, at x, 4.

[21]  *Id.* at 1-2.

[22]  Ctr. For Health Workforce Studies, SUNY-Albany Sch. of Pub Health, *Health Care Employment Projections, 2016-2026: An Analysis of Bureau of Labor Statistics Projections by Setting and by Occupation* at 3 (Feb. 2018), https://tinyurl.com/y58hfz6x

**AR5458**
**WMAR-00005494**

18

These shortages are nationwide. Texas, for example, has nearly 1,200 health professional shortage areas (HPSAs) that have been designated by the Health Resources and Services Administration (HRSA).[23]   Nationwide, there are 6,782 dental HPSAs, with 56 million affected people, requiring 9,951 additional practitioners to fill the gaps. Over the next decade, thirty-seven states will have a shortage of primary care physicians, seven will face a shortage of nurses, and there will be shortages among cardiologists, gastroenterologists, hematologists, oncologists, and pulmonologists.[24]  Across the nation,

---

(projecting annual need of 37,000 new physicians, nurse practitioners, and physician assistants).  The Henry J. Kaiser Family Foundation similarly estimates a nationwide shortage of 6,894 mental-health professionals and 10,635 dental health professionals.  Henry J. Kaiser Fam. Found., *supra* note 6.

[23] *See generally* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Health Professional Shortage Areas* (last visited Sept. 24, 2019), https://bhw.hrsa.gov/shortage-designation/hpsas.

[24] Nat'l Ctr. For Health Workforce Analysis, U.S. Dep't of Health & Human Servs., *State-Level Projections of Supply and Demand for Primary Care Practitioners: 2013-2025*, at 5 (Nov. 2016), https://bhw.hrsa.gov/sites/default/files/bhw/health-workforce-analysis/research/projections/primary-care-state-projections2013-2025.pdf; Nat'l Ctr. For Health Workforce Analysis, U.S. Dep't of Health & Human Servs., *Supply and Demand Projections of the Nursing Workforce: 2014-2030*, at 4-5 (July 21, 2017), https://bhw.hrsa.gov/sites/default/files/bhw/nchwa/projections/NCHWA_HRSA_Nursing_Report.pdf (identifying shortages of RNs in 7 states and shortages of LPNs in 33 states); Nat'l Ctr. For Health Workforce Analysis, U.S. Dep't of Health & Human Servs., *National and Regional Projections of Supply and Demand for Internal Medicine Subspecialty Practitioners: 2013-2025*, at 4 (Dec. 2016), https://bhw.hrsa.gov/sites/default/files/bhw/health-workforce-

**AR5459**
**WMAR-00005495**

19

HRSA has identified more than 5,000 areas in the U.S. with a shortage of mental-health professionals, which means that less than half of this nation's need for mental health treatment is being addressed.[25] By removing current and expected health professionals from practice, rescinding DACA will only worsen these shortages.

DACA health care workers are an important part of the nation's response to health care shortages in regions and communities with insufficient access to health care or culturally responsive care, as these are the communities where DACA recipients have shown a propensity to work. According to a survey of undocumented youth interested in health careers conducted in 2016, 97% expressed plans to ultimately work in the neighborhoods in which they grew up, or other underserved areas.[26] That number is consistent with other studies demonstrating that individuals who are under-represented in medicine are twice as likely to pursue careers working with underserved populations.[27]

---

analysis/research/projections/internal-medicine-subspecialty-report.pdf.

[25] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Map Tool—Shortage Areas*, (last visited Sept. 24, 2019), https://data.hrsa.gov/hdw/tools/MapTool.aspx (showing mental health shortage areas).

[26] Chen, *supra* note 7, at 27 .

[27] Andrea N. Garcia et al., *Factors Associated with Medical School Graduates' Intention to Work with Underserved Populations: Policy Implications for Advancing Workforce Diversity*, Acad. Med. (Sept. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5743635/.

AR5460
WMAR-00005496

20

DACA recipients currently in health professional schools have discussed painful childhood experiences that motivated them to pursue careers in the medical profession: family members unnecessarily suffering—and even dying—from treatable conditions like diabetes, breast cancer, stroke, heart conditions, prostate cancer, and anemia due to a lack of access to care.  "The older I got," says Ali Torabi, a medical student at Stritch, "the more I recognized the disparities between my community and the communities that had access to health care.  I've had injuries where I've avoided going to the hospital * * * because broken bones are expensive."[28] Blanca Morales, a fourth-year medical student at Harvard, recalls how some of her family members with diabetes went without medical support.  "I remember thinking that we have all this new technology and these new advances in managing diabetes, but we can't access them."  *Id.*  For these young people, becoming a physician for the underserved is not just a profession but a calling.  As Hector Perez, a public health graduate student at Columbia, puts it: "my passion for public health arose from my undocumented immigrant identity."[29] "Seeing * * * all the extra hurdles you have to go through when you are underprivileged," says Sharjeel

---

[28] Gabrielle Redford, DACA Students Risk Everything to Become Doctors (Sept. 17, 2018), https://www.aamc.org/news-insights/daca-students-risk-everything-become-doctors.

[29] Hector Sanchez Perez, *Student Blog: I'm a Mailman Dreamer* (Feb 20, 2018), https://www.mailman.columbia.edu/public-health-now/news/student-blog-im-mailman-dreamer.

**AR5461**
**WMAR-00005497**

21

Syed, a medical student at Stanford, "makes me want to * * * create solutions."[30]

States have recognized the criticality of DACA recipients to health care in rural and underserved areas. After the Arkansas Board of Nursing announced in 2017 that it would no longer license DACA recipients to practice, the state legislature quickly reversed course in light of the impact of the loss of these trained nurses. The legislature instead recognized that Arkansas was "suffering from a nursing shortage across the state," such that it was "in the best interest of the State of Arkansas to make full use of the skills and talents in the state by ensuring that an individual who is work-authorized under the [DACA] policy is able to obtain an occupational or professional license and practice his or her occupation or profession."[31] Similar bills have been passed in other states with health care shortages, such as Nebraska, Indiana, and Nevada.[32]

---

[30] Redford, *supra* note 30.

[31] H.B. 1552, 92d Gen. Assemb., Reg. Sess., § 1(a)(6) (Ark. 2019), http://www.arkleg.state.ar.us/assembly/2019/2019R/Bills/HB1552.pdf.

[32] A.B. 275, 80th Sess., § 2 (Nev. 2019), https://legiscan.com/NV/text/AB275/id/2030359/Nevada-2019-AB275-Enrolled.pdf ("The Legislature hereby finds and declares that * * * It is in the best interests of this State to make full use of the skills and talents of every resident of this State [and] it is the public policy of this State that each resident of this State, regardless of his or her immigration status, is eligible to receive the benefit of applying for a license, certificate or permit pursuant to 8 U.S.C. 1621(d)."); S.E.A. 419, 120th Gen. Assemb., 2d Reg. Sess., § 1(C) (Ind. 2018), http://iga.in.gov/static-documents/3/5/f/f/35ff8b3b/SB0419.05.ENRH.pdf (expands eligibility for professional licensure to individuals who have been "authorized by the federal

AR5462
WMAR-00005498

# Exhibit 13

Nos. 18-587, 18-588, 18-589

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL., RESPONDENTS.

———

*ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE NINTH CIRCUIT*

———

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL., RESPONDENTS.

———

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

———

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL., PETITIONERS,

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL., RESPONDENTS.

———

*ON WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

———

**BRIEF FOR LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW, THE ANTI-DEFAMATION
LEAGUE, THE LEADERSHIP CONFERENCE ON
CIVIL AND HUMAN RIGHTS, AND 42 OTHER SOCIAL
JUSTICE ORGANIZATIONS AS *AMICI CURIAE*
IN SUPPORT OF RESPONDENTS**

———

KRISTEN CLARKE
JON GREENBAUM
DARIELY RODRIGUEZ
DORIAN SPENCE
PHYLICIA H. HILL
MARYUM JORDAN
LAWYERS' COMMITTEE FOR
    CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600

WILLIAM D. COSTON
    *Counsel of Record*
MARTIN L. SAAD
SAMEER P. SHEIKH
VENABLE LLP
600 Massachusetts Ave NW
Washington, DC 20001
(202) 344-4813
wdcoston@venable.com

*Counsel for Amici Curiae*

October 4, 2019

WILSON-EPES PRINTING CO., INC.  –  (202) 789-0096  –  WASHINGTON, D. C. 20002

AR6012
WMAR-00006048

TABLE OF CONTENTS

Page

QUESTIONS PRESENTED ............................... i

TABLE OF AUTHORITIES................................ iv

INTEREST OF *AMICI CURIAE* ........................ 1

INTRODUCTION ............................................. 3

ARGUMENT...................................................... 5

  I.  THE GOVERNMENT WAS REQUIRED TO CONSIDER RELIANCE INTERESTS PRIOR TO TERMINATING DACA ......... 5

  II.  DACA ENGENDERED SERIOUS RELIANCE INTERESTS THAT THE GOVERNMENT FAILED TO CONSIDER...... 11

    A. Reliance Interests of DACA Students, Educators and Educational Institutions...................................................... 13

    B. DACA Enrollees Purchased Homes and Lending Institutions Extended Loans in Reliance on DACA................ 17

    C. Promises of "Expedited Citizenship" for DACA Enrollees Serving Vital Military Interests ................................ 19

CONCLUSION ................................................... 22

APPENDIX

    APPENDIX: LIST OF *AMICI CURIAE* ........ 1a

**AR6014**
WMAR-00006050

13

make significant contributions to the economy. And, indeed, they have. "DACA enrollees and their households pay $5.7 billion in federal taxes and $3.1 billion in state and local taxes annually."[8] The termination of DACA will only place further strain on states and local communities that were already under economic pressure.

The Department's failure to consider such reliance interests, let alone provide an "analysis" of its action "is arbitrary and capricious and so cannot carry the force of law." *Encino Motor Cars*, 136 S. Ct. at 2125.

### A. Reliance Interests of DACA Students, Educators and Educational Institutions

It is indisputable that access to education is vitally important to all persons in the United States—whether citizens, lawful resident aliens, or undocumented persons. *See Plyler v. Doe*, 457 U.S. 202, 226 (1982). In *Plyler*, this Court ruled that undocumented school age children had a constitutional right to a free public education. *Id.* ("Education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all . . . "[e]ducation has a fundamental role in maintaining the fabric of our society." Because of *Plyler*, generations of undocumented persons have succeeded in school and integrated into the American culture.

The DACA program has had the practical effect of extending the rationale of *Plyler* to post-secondary education. By relying on the rights granted by DACA, tens of thousands of undocumented persons have

---

[8] Nicole Svjlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Amer. Progress, (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/.

AR6033
WMAR-00006069

14

gained access to and invested substantial time and money in a college education. And many of those persons, once educated, have entered the workforce as teachers, giving back to their communities.

DACA teachers, in particular, are a significant asset to our nation's public schools, especially in cities with large, immigrant student populations. An estimated 20,000 DACA recipients are employed as educators throughout the U.S., and many of them possess in-demand bilingual language skills.[9] There is currently a severe shortage nationally of teachers in the public education sector, estimated to be as high as 327,000.[10] The consequences of a shortage in public educators are well known: larger class sizes, fewer teacher aides, fewer guidance counselors, and fewer extra-curricular activities.

Further, in the past few decades, the racial makeup of the country's student population has drastically shifted, but the overwhelming majority of public school teachers continue to be white.[11] Public schools have

---

[9] Moriah Balingit, *As DACA Winds Down, 20,000 Educators Are in Limbo*, Wash. Post (Oct. 25, 2017), https://www.washingtonpost.com/local/education/as-daca-winds-down-20000-educators-are-in-limbo/2017/10/25/4cd36de4-b9b3-11e7-a908-a3470754bbb9_story.html (citing data provided by the Migration Policy Institute); *see also* Greg Toppo, *20,000 DACA Teachers At Risk — and Your Kids Could Feel the Fallout, Too*, USA Today (Oct. 11, 2017,), https://www.usatoday.com/story/news/2017/10/11/thousands-daca-teachers-risk/752082001/.

[10] Elise Gould, *Local Public Education Employment May Have Weathered Recent Storms, But Schools Are Still Short 327,000 Public Educators*, Econ. Pol'y. Inst. (Oct. 6, 2017), http://www.epi.org/publication/teacher-employment-may-have-weathered-storms-but-schools-are-still-short-327000-public-educators/.

[11] "Racial and ethnic minorities accounted for 20% of all public elementary and secondary school teachers in the United States

**AR6034**
**WMAR-00000670**

15

seen increased enrollment by students of color, especially by Latinos.[12] By 2025, it is expected that a majority of high school graduates will be students of color.[13] DACA has allowed schools to recruit qualified teachers serving students of diverse backgrounds.

DACA teachers do much more than just fill available positions; they also serve as mentors and role models. For many communities, DACA teachers mirror the experiences of their immigrant students, which informs their teaching with cultural competence, helps develop positive relationships with students, and creates more welcoming school environments.[14] "Foreign-born teachers not only educate Americans, but also serve as cultural ambassadors for immigrant students who may not be as familiar with American traditions, customs, and social norms."[15]

_____

during the 2015-16 school year." A.W. Geiger, *America's Public School Teachers Are Far Less Racially And Ethnically Diverse Than Their Students*, Pew Research Center (Aug. 27, 2018), https://www.pewresearch.org/fact-tank/2018/08/27/americas-public-school-teachers-are-far-less-racially-and-ethnically-diverse-than-their-students/.

[12] Alice Yin, *Education by the Numbers*, N.Y. Times (Sept. 8, 2017), https://www.nytimes.com/2017/09/08/magazine/education-by-the-numbers.html.

[13] *Id.*

[14] Lisette Partelow, *America Needs More Teachers of Color*, Ctr. for Amer. Progress (Sept. 14, 2017), https://www.americanprogress.org/issues/education-k-12/reports/2017/09/14/437667/america-needs-teachers-color-selective-teaching-profession/.

[15] Yukiko Furuya et al., *A Portrait of Foreign-Born Teachers In The United States,* George Mason University, Institute for Immigration Research (Jan. 2019), https://www.immigrationresearch.org/system/files/Teacher_Paper.pdf.

AR6035
WMAR-00006071

16

Viridiana Carrizales, who led the DACA Initiative at Teach or America, aptly noted that "[w]e cannot afford to lose so many teachers and impact so many students . . . [e]very time a student loses a teacher, that is a disruption in the student's learning." [16] As Vanessa Luna, a DACA recipient who taught as a Teach for America teacher and now serves as the Co-Founder and Chief Programming Officer at ImmSchools, explains: "We're going to lose leaders and lose teachers – it's not only their presence, but having a teacher that can share the same experiences that you possibly had growing up. . . . Their advocacy, their leadership, their resilience is extraordinary because of their own personal journey."[17]

School environments with DACA educators help reflect the diversity of communities, the country, and the world, which, in turn, helps open students' minds to new perspectives and actively engage them in learning. Prejudice and bias are countered in schools and communities when respect for diversity is taught, modeled, and experienced firsthand by children.[18] The loss of 20,000 DACA teachers will cause severe and lasting harm to students and their educational trajectories, and more broadly our country, which depends on the great talent of future generations.

---

[16] *See* Toppo, *supra* n.9.

[17] Liz Robbins, *For Teachers Working Through DACA, a Bittersweet Start to the School Year*, N.Y. Times (Sept. 7, 2017), https://www.nytimes.com/2017/09/07/nyregion/daca-teachers.html.

[18] Anti-Defamation League (ADL), *Creating an Anti-Bias Learning Environment*, https://www.adl.org/education/resources/tools-and-strategies/creating-an-anti-bias-learning-environment.

**AR6036**
**WMAR-00006072**

17

In *Plyler*, the Court made an observation that is apt for the present DACA revocation:

> In determining the rationality of § 21.031 [denying access to school to undocumented persons], we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in §21.031 can hardly be considered rational unless it furthers some substantive goal of the State.

Here, as in *Plyler*, the federal government failed to consider the profound reliance interests and costs to DACA recipients and their educational communities around the nation resulting from the rescission of DACA.

### B. DACA Enrollees Purchased Homes and Lending Institutions Extended Loans in Reliance on DACA

Homeownership has long been recognized as an integral part of the American dream. Indeed, the federal government and its agencies have developed programs and marketing around that well-accepted precept.[19] DACA put that dream within reach for enrollees and provided them an opportunity to achieve financial security for themselves and their families and contribute to the economic stability of their communities through homeownership. They made these significant and life changing investments in reliance on DACA.

---

[19] *See, e.g.*, U.S. Dep't of Housing and Urb. Dev., *The National Homeownership Strategy: Partners in the American Dream* (1995).

**AR6037**
**WMAR-00006073**

# Exhibit 14

Nos. 18-587, 18-588, and 18-589

# In the Supreme Court of the United States

———

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

———

**On Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

———

**BRIEF OF 143 U.S. BUSINESS
ASSOCIATIONS AND COMPANIES
AS *AMICI CURIAE*
IN SUPPORT OF RESPONDENTS**

———

ANDREW J. PINCUS
  *Counsel of Record*
  *Mayer Brown LLP*
  *1999 K Street, NW*
  *Washington, DC 20006*
  *(202) 263-3000*
  *apincus@mayerbrown.com*

KAREN W. LIN
  *Mayer Brown LLP*
  *1221 Avenue of the*
  *Americas*
  *New York, NY 10020*
  *(212) 506-2500*

*Counsel for* Amici Curiae

*Additional Captions Listed On Inside Cover*

**AR4952**
**WMAR-00004988**

i

## TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICI CURIAE* .......................1

INTRODUCTION AND  SUMMARY OF ARGUMENT ................................................2

ARGUMENT ..............................................3

I.   RESCINDING DACA WILL HARM U.S. COMPANIES AND THE ENTIRE ECONOMY..........................................3

   A. Dreamers Contribute To The Success Of U.S. Companies And The Economy As A Whole.............................................5

   B. Dreamers Help Grow The Economy By Filling Jobs That Otherwise Would Remain Vacant Due To An Insufficient Supply Of Workers. .........................9

   C. Rescinding DACA Will Inflict Enormous Harm On Individuals, Companies, And The Economy..................................15

II.  THE DACA RECISSION IS INVALID. ..............20

   A. The Rescission Decision Is Subject To Judicial Review Under The APA. .................21

   B. The Rescission Decision Must Be Set Aside...............................................26

CONCLUSION ........................................31

**AR4954**
**WMAR-00004990**

6

represent every major sector of the U.S. economy and generate almost $3 trillion in annual revenue.

Dreamers' contributions are not limited to their work product alone. Immigrants like Dreamers bring diverse backgrounds and experiences to their workplaces, which bolster their colleagues' creativity and innovation.[10] People with different backgrounds offer different perspectives when confronted with a problem, and their different opinions and perspectives enable colleagues to anticipate alternative possibilities and work harder to evaluate those possibilities.[11]

### 2. *Dreamers Are Business Owners.*

*Second*, many Dreamers are entrepreneurs, who have created companies themselves. Six percent of Dreamers (and nearly nine percent of Dreamers 25 years and older) started their own businesses after receiving DACA.[12] Those businesses create jobs for other U.S. residents: Each DACA business owner with full-time employees employs on average 4.5 other workers.[13] That is nearly 86,000 additional jobs that otherwise would not exist.

---

[10]  See Katherine W. Phillips, *How Diversity Makes Us Smarter*, Scientific American, Oct. 1, 2014, https://tinyurl.com/y4vrn8q2.

[11]  *Ibid.*; see also Deloitte, *Waiter, Is That Inclusion in My Soup? A New Recipe to Improve Business Performance* 8 (2013), https://tinyurl.com/jnnszk4.

[12]  Tom K. Wong, et al., Ctr. for Am. Progress, *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November* (Sept. 19, 2019), https://tinyurl.com/y3c742re; *see also* New Am. Economy, *Spotlight, supra* n.8 (4.5 percent of DACA-eligible individuals are entrepreneurs).

[13]  Wong, *Livelihoods*, *supra* n.12.

AR4976
WMAR-00005021

7

The businesses started by Dreamers also generate revenue: In 2015, DACA-eligible entrepreneurs had a total business income of $658.7 million.[14] Those funds are spent on wages, or goods and services from other companies, or reinvested, producing more overall growth.

This entrepreneurial activity is particularly focused on the local, small business level. Immigrants make up an outsized proportion of Main Street business owners.[15] Those businesses attract others in the community, which often helps to revitalize declining neighborhoods and reverse declining population trends.[16] Immigrant-owned businesses have revived communities from Philadelphia to Lexington, Nebraska to Minneapolis-St. Paul to Nashville.[17]

### 3. Dreamers Are Consumers.

*Third*, Dreamers also consume the goods produced and services provided by U.S. companies—contributing to the growth of those companies and the economy as a whole.

Not surprisingly, receiving a grant of deferred action under DACA—and the resulting eligibility to ap-

---

[14] New Am. Economy, *Spotlight, supra* n. 8.

[15] David Dyssegaard Kalick, Americas Soc'y/Council of the Americas, *Bringing Vitality to Main Street: How Immigrant Small Businesses Help Local Economies Grow* at 2, 5, 8-9, Jan. 2015, https://tinyurl.com/lzuglue.

[16] *Id.* at 12.

[17] *Id.* at 14-34; Sara McElmurry, Ctr. for Am. Progress, *Proactive and Patient: Managing Immigration and Demographic Change in 2 Rural Nebraska Communities*, Nov. 14, 2018, https://tinyurl.com/y4lu3etx.

**AR4977**
WMAR-00005022

15

reported having "few or no qualified applicants" for construction jobs.[50] Construction, meanwhile, is the second largest industry employing DACA-eligible individuals.[51] Additionally, there are significant labor shortages in food preparation and serving-related occupations and personal care and services occupations.[52] But "[a]mong less-educated workers, those born in the United States tend to have jobs in manufacturing or mining, while immigrants tend to have jobs in personal services and agriculture."[53] And a substantial proportion of Dreamers have jobs in food preparation.[54]

In sum, DACA has enabled thousands of young people who grew up in the United States to obtain jobs that fill critical gaps in the economy and that produce benefits for United States' workers, companies, and economy.

### C. Rescinding DACA Will Inflict Enormous Harm On Individuals, Companies, And The Economy.

All of the above benefits—and more—will be lost if DACA's rescission is permitted to stand. Over the next decade, our country's GDP would lose between $215 and $460.3 billion; and federal tax revenue will

---

[50] Nat'l Fed'n of Indep. Bus., *supra* n.39.

[51] New Am. Economy, *Spotlight, supra* n.8; *cf.* Ryan Nunn, et al., *A Dozen Facts about Immigration* (Oct. 2018), https://tinyurl.com/y5ra3r8l.

[52] U.S. Dep't of Labor, Bureau of Labor Statistics, Employment Projections, https://tinyurl.com/y4lzn72u.

[53] Peri, *supra* n.28.

[54] Svajlenka, *supra* n.20.

**AR4985**
**WMAR-00005023**

16

drop by approximately $60 to 90 billion.[55] Texas alone would lose $6.3 billion in GDP; California would experience a $11.6 billion decline in GDP.[56] And Social Security and Medicare contributions would lose out on $40.9 billion over 10 years.[57]

This economic contraction would result directly from Dreamers' loss of work authorization. Under federal law, employers are prohibited from employing individuals who do not have a valid work authorization document. Accordingly, all of the hundreds of thousands of employed Dreamers would lose their jobs. In addition to the obvious harm to Dreamers themselves, the loss of so many workers will have severe repercussions for U.S. companies and workers.

Already, the possibility that DACA's rescission might go into effect is impacting Dreamers and, by extension, the companies for which they work. Dream-

---

[55] See Decl. of Ike Brannon & Logan Albright ¶ 11, Doc. 45-3 at 359, *Regents of the Univ. of Calif.* v. *U.S. Dep't of Homeland Sec'y*, No. 18-18056 (9th Cir. Mar. 13, 2018); Nicole Prchal Svajlenka et al., Ctr. for Am. Progress, *A New Threat to DACA Could Cost States Billions of Dollars* (July 21, 2017), https://goo.gl/7udtFu; Jose Magaña-Salgado, Immigrant Legal Res. Ctr., *Money on the Table: The Economic Cost of Ending DACA* 4, 6-7 (2016), https://goo.gl/3ZwGVJ; see also Ike Brannon & Logan Albright, The Cato Inst., *The Economic and Fiscal Impact of Repealing DACA* 1 (Jan. 18, 2017), https://goo.gl/jFXw4g; Jacqueline Varas, Am. Action Forum, *The Fiscal Implications of the DACA Program* (Jan. 18, 2018), https://tinyurl.com/y36tlgh9.

[56] Svajlenka et al., *supra* n.55.

[57] Jose Magaña-Salgado & Tom K. Wong, Immigration Legal Res. Cntr., *Draining the Trust Funds* (Oct. 2017), https://tinyurl.com/y6y65jvy.

AR4986
WMAR-00005024

17

ers now live with the constant threat of job loss, with-drawal from society, and forced removal from the only country they have ever known.

Seventy-six percent of Dreamers reported living with the daily worry of being separated from their children.[58] The fear for the future that is now a daily part of life for Dreamers and their families affects both physical and mental health.[59] That, in turn, neg-atively affects employee productivity and perfor-mance, illness and absenteeism, accidents, and turn-over.[60]

If this Court permits the DACA rescission to take effect and thereby end Dreamers' work authorization, companies will face an estimated $6.3 billion in costs to replace Dreamers—if they can even find new em-ployees to fill the empty positions.[61] Companies will forfeit the funds invested in training Dreamers, and will incur costs recruiting and training new employ-ees, who will be less experienced and therefore less

---

[58] Tom K. Wong et al., United We Dream, *Ending DACA Would Have Wide-Ranging Effects but Immigrant Youth are Fired Up and Politically Engaged* (Aus. 23, 2018), https://ti-nyurl.com/y49stg87.

[59] See Tiziana Rinaldi & Angilee Shah, *Immigration Limbo Is a 'Tug of Emotions.' It's Also a Mental Health Issue*, PRI's The World (Aug. 22, 2017), https://goo.gl/WLXMZ4; Sarah Elizabeth Richards, *How Fear of Deportation Puts Stress on Families*, The Atlantic (Mar. 22, 2017), https://goo.gl/qDgeRf.

[60] See World Health Org. & Int'l Labour Org., *Mental Health And Work: Impact, Issues and Good Practices* 1 (2000), https://goo.gl/ecH1Ut; Ortega, *supra* n.33, at 9-10.

[61] See David Bier, *Ending DACA Will Impose Billions in Em-ployer Compliance Costs*, Cato Institute (Sept. 1, 2017), https://goo.gl/1FMidk; *see also* Magaña-Salgado, *supra* n.55, at 4.

AR4987
WMAR-00005025

19

affect the wages or employment of U.S. farmworkers."[64] Instead, farms responded by *eliminating* the jobs—often by moving production abroad or going out of business.[65]

Removing Dreamers from the workforce is likely to have the very same negative effect on U.S. employment. As documented above, companies are already struggling to fill job openings; additional labor shortages will further hamper productivity and growth. The resulting drag on the economy will be exacerbated as Dreamers are forced to shutter businesses—putting the jobs of nearly 86,000 other U.S. workers at risk—and companies lose the income from Dreamers and Dreamers' employees that has helped drive demand and production of goods and services provided by U.S.-born workers.[66]

More fundamentally, just as DACA sent a powerful message of inclusion, its rescission tells the immigrants who have been integral to the growth and development of our society and economy for decades that they are no longer welcome here. As a result, DACA's

---

[64] Michael A. Clemens, *Does Kicking Out Mexicans Create Jobs?*, Politico Magazine (Feb. 15, 2017), https://goo.gl/XwLj1x.

[65] *Id.*

[66] Cf. Ben Gitis & Jacqueline Varas, Am. Action Forum, *The Labor and Output Declines From Removing All Undocumented Immigrants* (May 5, 2016), https://goo.gl/UAt3dJ (concluding that removing undocumented immigrants from the workforce would cause private sector employment to decline by 4 to 6.8 million workers, would reduce real private sector output by $381.5 to $623.2 billion, and would have further negative economic impacts through the loss of consumption, investments, and entrepreneurship).

**AR4989**
**WMAR-00005026**

# Exhibit 15

Nos. 18-587, 18-588, 18-589

IN THE

# Supreme Court of the United States

◆━◆

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Petitioners*,

—v.—

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,

*Respondents.*

(*Caption continued on inside cover*)

—————

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT
OF APPEALS FOR THE NINTH, DISTRICT OF COLUMBIA AND SECOND CIRCUITS

## BRIEF OF *AMICI CURIAE* 127 RELIGIOUS ORGANIZATIONS IN SUPPORT OF RESPONDENTS

STEVEN A. ZALESIN
 *Counsel of Record*
ADEEL A. MANGI
MICHAEL N. FRESCO
MOHAMMED A. BADAT
PATTERSON BELKNAP WEBB
 & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
sazalesin@pbwt.com

FARHANA KHERA
JUVARIA KHAN
MUSLIM ADVOCATES
P.O. Box 34440
Washington, DC 20043
(202) 897-2622

*Attorneys for Amici Curiae*

**AR6046**

i

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..........................................ii

INTERESTS OF AMICI CURIAE.............................1

SUMMARY OF THE ARGUMENT...........................5

ARGUMENT   ............................................................7

I.     RELIGIOUS ORGANIZATIONS SUPPORT DACA AS A JUST RESPONSE TO A HUMANITARIAN CRISIS .................................................................7

II.    TERMINATION OF DACA WILL CAUSE AMICI, THEIR CONGREGATIONS, AND THEIR COMMUNITIES IRREPARABLE HARM AND POSES A GRAVE THREAT TO PUBLIC WELFARE................................. 12

       A.    Direct Harm to Amici and Their Congregants ......................................... 13

       B.    Impairment of Amici's Ability to Carry out Their Missions.................... 19

       C.    As Sensitive Locations for Immigration Enforcement Purposes, Some Amici Will Be Called upon to Provide Sanctuary While at the Same Time Risking Being Targeted for Immigration Raids.................................................... 20

CONCLUSION ........................................................ 25

**AR6048**
**WMAR-00006084**

13

workforces whose loss of status will not only disrupt their lives, but harm *amici* who benefit from their participation.    Second, termination of the DACA program will impair the ability of *amici* and other religiously-affiliated organizations to carry out their missions to help people of all backgrounds and faiths. Third, as institutions of faith and sensitive locations for immigration enforcement purposes, many *amici* face the grim prospect that following their spiritual calling to provide sanctuary for targeted Dreamers will result in the religious entities themselves being targeted by immigration enforcement authorities, a concern that would increase dramatically with the termination of DACA.

### A. Direct Harm to *Amici* and Their Congregants

To illustrate the irreparable harm at issue in this case, *amici* provide the Court with the following examples of individual DACA recipients brought to this country as children who have enriched their communities, organizations and congregations.

**Nancy**.[7]   Nancy, Associate Rector at *amicus* St. Luke's Episcopal Church in Long Beach, California, came to the United States from Mexico at age seven. Like many Dreamers, Nancy did not know she was undocumented until her junior year of high school, when she applied to college and learned what a social

---

[7] Declarations from the individual DACA recipients attesting to the information presented here are on file with counsel.  The last names of these individuals have been withheld here to protect their privacy.

**AR6066**
**WMAR-00006102**

14

security number was—and that she did not have one. Nancy describes her life after learning her immigration status as "in the shadows"; she could not get a driver's license, and could not drive a car for fear of getting pulled over and risking deportation.  For a teenager in Los Angeles, this was no idle fear.

Nonetheless, Nancy was active in her community. The Episcopal Church served as an extended family during her childhood, and by the time she turned 17 Nancy led the largest youth group in the Episcopal Diocese of Los Angeles.  So great was her dedication that the Church paid for her tuition to college and seminary school, where she obtained a Master's of Divinity degree.   After obtaining DACA status, Nancy was able to fulfill her dream of becoming an ordained Episcopal minister.  Today, Nancy is the associate rector at *amicus* St. Luke's Episcopal Church, and the Diocese of Los Angeles's first Latina leader to have grown up in a Spanish-speaking Episcopal Church and gone on to pursue ordination. At St. Luke's, she is actively involved in immigrants' rights activism and education initiatives.

For Nancy, the Government's announcement on September 5, 2017 was "a moment of complete fear and hopelessness."  She and others like her have "made a life here, trusted the system and tried to do things the right way," but now "run the risk that we will be hunted down and sent to a country that we do not know."

**Rafael**.  Brought to Los Angeles at three years old, Rafael, an office assistant with *amicus* New

**AR6067**
**WMAR-00006103**

15

Mexico Faith Coalition for Immigrant Justice, was born in Guanajuato, Mexico. Rafael's parents, having risked everything to bring him to the United States, sought to instill in him the values of hard work and education. They succeeded. Rafael completed a Bachelor's Degree with a double major in History and Chicano Studies from California State University Dominguez Hills while working full time to pay his tuition and support himself. After obtaining DACA status, Rafael went on to obtain a Master's Degree in American Studies at the University of New Mexico, where he is now a Ph.D. candidate and an instructor.

Rafael's parents also instilled in him the values of Catholicism. He believes that faith-based organizations "fill the gaps of social justice and service that many times nation-states do not offer." As such, he works for *amicus* New Mexico Faith Coalition for Immigrant Justice as an office assistant. Rafael is proud to contribute to their work, which he sees as fulfilling community needs and a natural expression of his Catholic faith.

For Rafael, the end of DACA represents drastic and dangerous change. It spells the end of access to the work that he loves and a halt to his career after graduation. Moreover, it means "going back to living in the reality of survival mode," forever uncertain of his place and permanence in his own home, and without opportunity to flourish and grow.

**Andrea**. Andrea is a legal assistant at *amicus* American Friends Service Committee. Andrea was born and baptized in Ecuador, but brought to New

**AR6068**
**WMAR-00006104**

16

Jersey by her parents when she was a year and a half old. Andrea grew up in the Catholic Church. She went to Sunday school, took First Communion, and received Confirmation at her church in the Newark area, where she continues to volunteer in youth groups and for fundraising activities.

Andrea's parents, like many parents of Dreamers, prioritized her education. Knowing she could not obtain financial aid, Andrea's parents, both union members, carefully saved. After Andrea earned a paralegal degree from community college, her parents put her through Rutgers University's undergraduate program. Nonetheless, until DACA, Andrea's life was one of fear and constraint. She kept her undocumented status secret, and had to refrain from the normal day-to-day activities and jobs that her friends freely engaged in.

Andrea graduated from Rutgers summa cum laude. After she obtained DACA status, she was hired as a paralegal at a law firm, and was proud to have a job and a salary. Andrea's dream is to go to law school in the United States. For her, the end of DACA puts her dream in doubt and threatens to send her to Ecuador, a place in which she has never set foot since she was an infant. In the face of this peril, Andrea maintains, "I love this country and I can't imagine living elsewhere."

\*   \*   \*

The harm that these individuals would suffer as a result of their loss of DACA status is readily apparent. *See Nunez v. Boldin*, 537 F. Supp. 578,

**AR6069**
**WMAR-00006105**

17

587 (S.D. Tex. 1982) ("Deportation to a country where one's life would be threatened obviously would result in irreparable injury."); *Kalaw v. Ferro*, 651 F. Supp. 1163, 1167 (W.D.N.Y. 1987) (enjoining deportation proceeding and finding irreparable harm because "petitioner's deportation would make her ineligible for any subsequent application for legalization"). *Amici* would be harmed as well; not only do people like Nancy, Rafael, and Andrea contribute richly to religious and faith-based organizations through their own individual efforts, they serve as mentors and inspire others to give back to institutions from which they have benefitted. If the Termination Memo goes into effect, nearly 800,000 Dreamers—many with stories similar to the three detailed above—will be forced out of the country or into hiding. *Amici* will suffer incalculable harm if they are deprived of the contributions and talents of these young congregants and community members.

Moreover, as *amici* know from their work in other parts of the world, Dreamers deported would face tremendous challenges and even physical danger. For example, Gerry Lee and others from *amicus* Maryknoll Office for Global Concerns have lived and worked with impoverished families in Mexico, El Salvador, Guatemala, and other countries to which DACA recipients face deportation. In Haiti, for example, "Maryknoll Sisters have witnessed the bare struggle for post-disaster survival in the massive slums of Cite Soleil, where they help residents subsist from gardens grown in discarded tires on turf fought over by rival gangs." In El Salvador, a Maryknoll Lay Missioner witnessed "the anger and

**AR6070**
**WMAR-00006106**

# Exhibit 16

2000 WL 284190
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

NIKKO TRADING OF AMERICA CORPORATION, et al., Plaintiffs, Counter-Claim Defendants,

v.

WASTEMASTERS, INC., Defendant, Cross-Claim Defendant,
Stewart RAHR, Intervenor as Counter-Claim Plaintiff in the right and on behalf of Wastemasters,

v.

SECURITIES TRANSFER CORPORATION, Additional Counter-Claim Defendant,

v.

Edward ROUSH, Jr., Intervenor as Counter-Claim Defendant,

v.

WASTEMASTERS, INC., et al., Third-Party Defendants.

No. Civ.A.3:98-CV-0048-G.
|
March 14, 2000.

*MEMORANDUM ORDER*

FISH, J.

**\*1** Before the court is the motion of intervenor Stewart Rahr ("Rahr"), proceeding derivatively in the right and on behalf of WasteMasters, Inc. ("WasteMasters"), a public company, to vacate the consent judgment entered by this court on February 5, 1998. For the reasons stated below, the motion is granted.

The factual underpinnings for this motion have been set forth by Rahr in several previous filings.[1] As noted in an earlier order,[2] the evidence submitted by Rahr, while objected to on various evidentiary grounds, is virtually undisputed. Much of that evidence has been relied on by the court in earlier orders,[3] which are here incorporated by reference. Nothing added to the record since those earlier orders were issued has caused the court to change the conclusions expressed therein, which are also incorporated by reference. In short, the evidence demonstrates that this suit was, from its very inception, a collusive effort to obtain the *imprimatur* of this court on a modern-day form of alchemy-a scheme to transform water (in the form of additional WasteMasters stock) into gold (proceeds from the sale of that additional WasteMasters stock).

[1]     *See* Intervenor Stewart Rahr's Exhibits in Support of Motion to Intervene and Petition in Intervention received December 16, 1998; Counter-Claim Plaintiff's Proposed Findings of Fact and Conclusions of Law with Respect to His Application for a Preliminary Injunction filed January 28, 1999; Counter-Claim Plaintiff's Notification Regarding Evidence in Support of His Request for a Preliminary Injunction filed January 28, 1999; Counter-Claim Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding His Motion to Vacate the Consent Judgment filed March 13, 2000 and Appendix thereto.

[2]     *See* Memorandum Opinion and Order filed February 28, 2000 at 2 n.I.

[3]     *See* Order of Preliminary Injunction filed April 5, 1999; Modification to Order of Preliminary Injunction filed April 8, 1999; Memorandum Opinion and Order filed February 28, 2000.

NJAPP151

Unhappily, collusive efforts to use the courts for ulterior purposes are not new. This case is merely a latter-day incarnation of *Cleveland v. Chamberlain,* 66 U.S. 419 (1861), from which it is indistinguishable in all important particulars. In that case, Cleveland-a judgment creditor of the La Crosse and Milwaukie Railroad Company ("the La Crosse Railroad")-sought to set aside, as a fraud on his rights, conveyances made by the La Crosse Railroad to Chamberlain and others. *Id.* at 419-20. While the case was pending, the La Crosse Railroad was dissolved, its charter and property being transferred to a new entity named the Milwaukie and Minnesota Railroad Company ("the Milwaukie Railroad"). *Id.* at 421. As a result, the only party against whom Cleveland obtained relief was Chamberlain, who thereafter took an appeal to the Supreme Court. *Id.* In the meantime, Chamberlain paid off Cleveland in return for an assignment of Cleveland's rights under the judgment. *Id.* Thus, by the time the case reached the Supreme Court, Chamberlain's interests were represented by counsel on each side of the case. *Id.* at 421-22. Dismissal of the appeal was urged by third parties, *viz.,* the creditors of the La Crosse Railroad, who-possessing a lien on the assets of that company-had foreclosed their lien and converted their debt into stock of the new Milwaukie Railroad.[4] *Id.* at 422. The Milwaukie Railroad's title to these assets, however, was junior to Cleveland's judgment. *Id.* If Chamberlain's collusive appeal were successful, resulting in a reversal of the judgment against him, he stood to benefit at the expense of the Milwaukie Railroad's shareholders. *Id.* at 422-23.

[4]     The Supreme Court has approved the practice, utilized in this case (*see* order of February 22, 2000), of determining a lack of genuine controversy by motion and affidavits. In *Hatfield v. King,* 184 U.S. 162 (1902), the Court, considering a contention "that there was no real controversy between the parties nominally opposed to each other, and that the litigation was in fact carried on under the direction and control of the plaintiff," stated:

> It is well settled that questions of this kind may be examined, upon motion, supported by affidavits, and that it is the duty of a court to make such inquiry, in order that it may not be imposed on by an apparent controversy to which there are really no adverse parties.

> *Id.* at 164-65.

On this state of facts, the Supreme Court's unanimous opinion tersely begins and ends with the observation that the case must be dismissed:

> **\*2**  This appeal must be dismissed. Selah Chamberlain is, in fact, both appellant and appellee. By the intervention of a friend he has purchased the debt demanded by Cleveland in his bill, and now carries on a pretended controversy by counsel, chosen and paid by himself, and on a record selected by them, for the evident purpose of obtaining a decision injurious to the rights and interests of third parties.

> [I]t appearing to the court here, from affidavits and other evidence filed in this case in behalf of persons not parties to this suit, that this appeal is not conducted by parties having adverse interests, but for the purpose of obtaining a decision of this court, to affect the interests of persons not parties-it is therefore now here ordered and adjudged by this court, that the appeal in this case be and the same is hereby dismissed, with costs.

*Id.* at 425, 426.

So it is in the instant case. The "pretended controversy," to use the language of *Cleveland v. Chamberlain,* between the original plaintiffs (Nikko Trading of America Corporation, *et al.*) and the original defendant (WasteMasters), all of whom were serving the same masters, was-again in the language of *Cleveland v. Chamberlain-*for the purpose of "affect[ing] the interests of persons not parties." Under these circumstances, all proceedings in the case leading to the purported consent judgment of February 5, 1998 are a nullity. That judgment must be VACATED and this case DISMISSED.[5]

[5]     This case must be dismissed because, under Article III of the United States Constitution, this court has subject matter jurisdiction only over "cases or controversies." See *Allen v. State of Georgia,* 166 U.S. 138, 140 (1897) ("In civil cases it has been the universal practice to dismiss the case whenever it became apparent that there was no real dispute remaining

between the plaintiff and the defendant, or that the case had been settled or otherwise disposed of by agreement of the parties, and there was no actual controversy pending."). Rahr's addition to the case as an intervener cannot resuscitate a non-existent controversy, for "[a]n existing suit within the court's jurisdiction is a prerequisite of an intervention, which is an ancillary proceeding in an already instituted suit." *Harris v. Amoco Production Co.,* 768 F.2d 669, 675 (5th Cir.1985) (quoting *Kendrick v. Kendrick,* 16 F.2d 744, 745 (5th Cir.1926), *cert. denied,* 273 U.S. 758 (1927)), *cert. denied,* 475 U.S. 1011 (1986).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 284190

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants,<br><br>KARLA PEREZ,  *et al.*,<br><br>Defendant-Intervenors,<br><br>and<br><br>STATE OF NEW JERSEY,  *et al.*,<br><br>Defendant-Intervenor. | Case No. 1:18-cv-68<br><br>DECLARATION OF KHRISTINA GONZALEZ IN SUPPORT OF STATE OF NEW JERSEY'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

I, Khristina Gonzalez, declare as follows:

1.      I serve as the Associate Dean of the College and Director of Programs for Access and Inclusion at Princeton University ("Princeton").   I am over the age of 18 and make this declaration based on my personal knowledge.   If called as a witness, I could and would be competent to testify to the facts in this declaration.

2.      I have held the role of Associate Dean since 2015.   In this role, I have become very familiar with the effects of federal immigration policy on Princeton and our student body.

3.      Prior to this role, I served as the Associate Director for the Writing Program at Princeton, as well as a faculty member in the Princeton Writing Program. I am also a co-founder of the national First-Generation, Lower-Income (FGLI) Consortium, through which I have

knowledge of the effects of immigration policy on students from a wide variety of selective institutions of higher education in the United States. I am a graduate of Dartmouth College (B.A.), the University of Notre Dame (M.A.), and Brown University (Ph.D).

4.      In my role as Associate Dean of the College and Director of Programs for Access and Inclusion at Princeton, I am responsible for leading programming, policy, and support that promote the success and well-being of underrepresented students at Princeton, including DACA-beneficiary students. Some of these services and programs are discussed in greater detail below. My position gives me a view into the matriculation and campus life of students and alumni who are and have been DACA recipients.

5.      Princeton is a private, non-profit educational institution dedicated to extraordinary scholarship, research, and instruction. The University has long aspired to attract and support students, faculty, and staff with the broadest possible range of backgrounds, perspectives, and experiences. To achieve excellence, Princeton must be accessible to talented students from all backgrounds. Matriculating students with a broad range of experiences, perspectives, and interests promotes the exchange of different ideas. The result is a dynamic learning environment, in which students develop a more nuanced understanding of the world and each other. As a result, we strive to create an environment in which all members of the community engage in open-minded and thoughtful dialogue.

6.      I am familiar with the claims in this lawsuit and the possibility that, if Plaintiffs prevail, the program known as DACA could be permanently enjoined.

7.      The threat of effectively ending DACA would cause substantial disruption and harm to Princeton's students who are DACA recipients and have structured their lives and educations around the continued existence of the program.

8.      It would also disrupt the administration and daily life at Princeton.  For one, every student in a Princeton class is an asset to the University; each brings their own background and lived experiences to the University community.  Princeton selects a class of students in order to foster a dynamic learning environment that depends upon the contribution of each and every student, and our DACA students bring tremendous talents and irreplaceable perspectives to the University.  If they were unable to continue their studies, it would seriously damage the University's community of scholars.

9.      Princeton has also made a serious investment in its students' education and professional success.  The University puts substantial time, energy, and resources into teaching, supporting, advising, mentoring, and otherwise helping its students—including DACA students— to flourish.  Campus life, scholarship, and programming, both curricular and extracurricular, have been built in reliance on the ability of DACA recipients to remain part of the Princeton community. The University has even established specific groups and programming for its DACA students.

10.     Enjoining DACA would also produce devastating ripple effects in the lives and families of DACA-recipient students, in the broader Princeton community, and in the wider world.

I.    **DACA Recipients Are Valued and Essential Members of Princeton's Community.**

11.     Since 2012, at least 27 DACA recipients have enrolled at Princeton.  Each DACA student was admitted on the basis of personal merit and academic credentials commensurate with those of any other student on Princeton's campus.  In reviewing their applications myself, I have

seen how DACA-beneficiary students have overcome substantial obstacles, demonstrating amazing strength of character and resilience.

12.     The Princeton admissions process is extremely competitive.  For example, the University received 32,836 applications for admission to the class of 2024.  Only 1,823 of those applicants were offered admission—an admissions rate of about 5.5 percent.

13.     In selecting its class, Princeton is choosing students of the highest caliber who represent diverse backgrounds, will create a vibrant community of scholars, and will learn, grow, and thrive at Princeton.  Princeton makes careful and considered choices about the outstanding young people in which it will invest.

14.     Enjoining DACA would leave holes in our student community that could not be filled.  When Princeton chooses to admit a student, we are envisioning how that person will contribute to and help forge the student community.  Each student adds his or her own immeasurable and distinct value and voice—bringing to bear life experiences and perspectives to enrich campus life and learning.  That is why Princeton admissions staff spend months reviewing applications.  This act of choosing individual students who, together, build a Princeton class is critical to the functioning and success of the University.

15.     Princeton is cognizant of the important role we play in helping to build an optimal learning environment.  Based on personal experience, we know that matriculating students from across a range of demographic groups delivers important benefits to our campus community.  For example, diverse and inclusive environments encourage intellectual and social growth.  This is corroborated by studies across a wide range of fields, including economics, psychology, and sociology.  The research demonstrates that experience in diverse settings promotes intellectual development, improves self-confidence, and helps individuals identify commonalities as well as

cognitive biases.   Building a diverse and inclusive environment also increases awareness of inequalities and prejudices, while reducing the likelihood that individuals will engage in negative stereotyping.

16.     For Princeton, the result of building a diverse and inclusive student body is a collaborative and creative space, characterized by vigorous debate in addition to nuanced and thoughtful conversation on countless issues.   Simply put, a diverse student body is essential to achieving our educational mission.

17.     DACA students are irreplaceable members of Princeton's community.   They have unique viewpoints not otherwise represented.   Sharing their perspectives across various fields of study and through extracurricular activities, DACA students spark the thoughtful and nuanced conversations Princeton aspires to nurture.   These conversations promote understanding and help eliminate blind spots.

18.     DACA students currently enrolled at or recently graduated from Princeton have studied in a wide variety of fields, including ecology and evolutionary biology, comparative literature, policy, geosciences, computer science, molecular biology, mechanical and aerospace engineering, psychology, and politics.   They collaborate on important research, including through the University's Computer Science Summer Programming Experience, and through the University's Keller Center for Innovation.   They publish in campus publications and, as discussed below, serve in several critical roles on campus.

19.     Princeton's DACA students have been recognized for excellence in their fields, receiving the Henry Richardson Labouisse Prize Fellowship (which provides $30,000 to a graduating senior who wishes to work or study abroad on matters related to on-the-ground policy development), the M. Taylor Pyne Honor Prize (the University's highest honor for an

undergraduate), and the Mellon Mays Undergraduate Fellowship (which provides repayment of undergraduate loans up to $10,000 if the student pursues doctoral study in an eligible field). One of our recent DACA alumni received the prestigious Soros Fellowship for New Americans, a scholarship enabling this person's graduate education. In short, DACA students are highly accomplished and well-respected within the University community.

20.     DACA students also play a host of other important roles in campus life. They are part of the Dream Team, an on-campus organization that mentors migrant students, hosts activism workshops and lectures, and advocates on and off campus for immigrants' rights. They tutor underprivileged students in the local community through an organization called Community House. They have served as peer-academic advisors and as elected members of academic advisor counsels where they advocate for fellow students, including by providing feedback on curricular issues and on the sufficiency of student resources. One of our DACA students was responsible for leading a conference on the needs of first-generation college students that brought over 400 students, faculty, and staff from across the Ivy League to Princeton's campus.

21.     Without DACA beneficiaries on campus, these roles might well go unfilled. And certainly, these voices could not be replaced.

## II.   Princeton Students Have Relied on DACA's Continuing Existence to Structure Their Educations, Work, and Lives.

22.     DACA has had a profound effect on Princeton's student body. Before the program was implemented, few undocumented students came to the University. DACA recipients have explained that, before DACA, even routine activities could be stressful: Many students report they lived under constant fear that they, or their family, could be deported at any time—including, for example, if they were pulled over for a speeding ticket. DACA recipients also express that, before DACA, they were distracted and could not focus on building a life, including investing in

education or career, because there was no promise that they could remain in the U.S. to study and work.

23.     Alumni have conveyed to me their experience prior to DACA.  Undocumented students who studied at Princeton prior to DACA were without government-issued identification and accordingly were often unable to travel to and from campus.  They largely lived in the shadows; they rarely reached out for help, and they were less engaged in their classrooms and in campus activities for fear of being too visible.

24.     Previously undocumented students have now come out of the shadows.  DACA— and its promise of continued safe harbor—instilled in them the expectation of safety and security. An important part of that is the ability to remain in the U.S. and at Princeton to continue to study.

25.     The threat of having DACA revoked thus risks casting these Princeton students back in the shadows.  Worse, it threatens to interrupt their studies—and their lives—built on DACA's promise.  Enjoining DACA may force these students to stop their studies, leave the University, and perhaps leave the United States.

26.     To that end, under the threat of having DACA enjoined, students have reported that they are very worried that information they provided in their DACA applications will be used to deport them and their families.  This information includes, for example, personal and identifying information, such as mailing addresses, additional contact information, and other sensitive materials.  DACA students supplied this information to the government voluntarily but only on the understanding that this information would be used to facilitate their remaining in the United States—including to pursue studies at Princeton.  In reporting their concerns, several DACA students have emphasized that they would not have applied for DACA had they perceived any risk that the sensitive and identifying information furnished in their submission might be used to

remove them or their families from the United States.  The government's assurances that it would not use students' information to effectuate their removal were essential to these students' decision to apply for the DACA program.

27.    DACA's continued existence is also important to recipient students because, through attendant work authorization, it allows them to pursue employment, both while enrolled at Princeton and after graduation.

28.    If DACA were enjoined, it would mean that Princeton students could not obtain future work authorizations or many grants, student loans and scholarships, and other building blocks for their futures.  These implications are devastating.  These students have worked for their entire college career to develop the knowledge and credentials needed to pursue employment opportunities or graduate or professional school.  They have done so based on the understanding that they could, in fact, complete their studies and work in the United States.  To have invested so much time and energy to pursuing a specific goal and then to be unable to reap the benefits of those investments would be heartbreaking.  It would also be a loss to innovation and growth in U.S. communities where these students wish to live and work.

29.    Even if a student were in a position to abandon his or her family, friends, and home upon graduation to pursue opportunities overseas, it is by no means clear that employment opportunities would exist outside the United States.   For DACA students, personal and professional networks are here, not abroad.  The students have worked hard to position themselves to secure post-graduate opportunities in the United States, the only country that many have meaningfully known.

30.    Enjoining DACA would further, in the case of alumni, disrupt their careers, which are already underway.   These alumni have constructed their educations and professional lives

around the promise of their continued ability to work in the United States.  They came to Princeton—sometimes moving across the country or deferring work opportunities—on the expectation that they would, after earning their degree, be able to work in the United States.  They depend on that ability to continue in their jobs and to earn a living and support their families.  Some pursued, also at great expense and sacrifice, additional professional degrees on the expectation that they could practice domestically.

31.     Because many Princeton alumni have gone on to work in the service of their communities, the effects of enjoining DACA would have terrible ripple effects.  Several DACA beneficiaries who have graduated from Princeton have gone on to work in fields sorely in need of additional help.  For example, one graduate has worked in an independent school district in the United States as a college success advisor; another has entered law school and is focusing on immigration law; one graduate has enrolled in medical school; and another is teaching college students in an MFA program.

32.     Beyond the devastation of students' interrupted studies and careers, losing work authorization both during college and after graduation has serious consequences for DACA students' finances and the finances of their families.  In light of events that have threatened to curtail DACA, including the pendency of this lawsuit, several students have sought guidance from the Office of the Dean of the College about coping with the stark reality that their loss of income will have consequences for loved ones, who have sacrificed tremendously—often over the course of many years—to help them secure admission to and thrive at Princeton, and who had the reasonable expectation of financial assistance upon the students' graduation.  Given these concerns, it is easy to understand why so many DACA students indicate they would not have

applied to DACA absent government assertions that they would be able to renew their status, so long as they continued to abide the law.

## III.   The University Has Made Substantial Commitments in Reliance on DACA's Continued Existence.

33.    The elimination of DACA would cause Princeton a tremendous loss as regards both its community and the resources it has dedicated to DACA students with the expectation that they could remain.

34.    Princeton dedicates itself to each and every one of the students it admits and who matriculate.  This includes, for example, academic training and support to help first-year students adjust to and become successful at Princeton; one-on-one academic advising; peer-to-peer mentorship; and other programs created to foster community and to support students.

35.    Princeton is proud to make these investments in its students.  It does so with the expectation that these students, including those who are DACA recipients, will be able to remain enrolled at Princeton—and remain full participants in University life.

36.    Recognizing the invaluable contributions that DACA students make to Princeton, the University has devoted substantial resources to supporting recipients.  It made these investments—in the form of faculty time and attention; privately funded financial aid for tuition, room, and board; and other resources—with the expectation that DACA students would be able to complete their Princeton education and apply it across a variety of fields after graduation.  In reliance on DACA, Princeton's administration, faculty, and staff have taught and nurtured these students; they have trained them, mentored them, and sought to prepare them for professional and academic success.  Thus, not only DACA students, but also *Princeton* would suffer an irreparable loss if DACA were enjoined and these students' educations were cut short.

37.     Princeton also implemented programming designed specifically for DACA students. The Office of the Dean of the College has collaborated with the Davis International Center and Career Services to host legal advising sessions, workshops on post-graduate professional opportunities available to DACA students, counseling sessions focused on stress management and mental health, and networking opportunities with supportive alumni who can assist students in their postgraduate career searches. This programming was designed to ensure that DACA students had the support, knowledge, and resources necessary to navigate a now-uncertain future in which many opportunities they wanted to pursue may no longer be available to them.

38.     The ripple effects of enjoining DACA would radiate out from these students and alumni, their families, and Princeton.  As discussed above, Princeton's DACA students have profound skills and talents to offer to businesses, organizations, and institutions of higher learning in the United States.  Enjoining DACA would have terrible costs—both social and financial—for these Princeton's students, the Princeton community, and this country.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October _23_, 2020 in Princeton, New Jersey.

# Exhibit 18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>　　　　　　Defendants,<br><br>KARLA PEREZ, *et al.*,<br><br>　　　　　　Defendant-Intervenors,<br><br>and<br><br>STATE OF NEW JERSEY, *et al.*,<br><br>　　　　　　Defendant-Intervenor. | Case No. 1:18-cv-68<br><br><br>DECLARATION OF JACK C. CHEN IN SUPPORT OF STATE OF NEW JERSEY'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

I, Jack C. Chen, declare as follows:

1.　　I serve as Associate General Counsel for the U.S. Immigration practice group at Microsoft Corporation ("Microsoft"). I am over the age of 18 and make this declaration based on my personal knowledge.  If called as a witness, I could and would be competent to testify to the facts in this declaration.

2.　　Microsoft is a global technology leader that develops, licenses, and supports software, services, devices, and technology solutions that deliver new value for customers and help people and businesses realize their full potential.  Microsoft is headquartered in Redmond, Washington, and it has offices across the United States.

3.      I have held this role since May 2019.   Prior to my current position, I served as an Assistant General Counsel.

4.      I have 17 years of experience as a practicing attorney, and over 13 years of experience at Microsoft supporting legal and policy matters involving people-related functions and operations at Microsoft.

5.      In my role as Associate General Counsel at Microsoft, I am responsible for the legal team that provides advice and programmatic support for visa-dependent employees in the U.S. These services relate to hiring and retaining top global talent, and ensuring the proper maintenance of immigration status and work authorization, while supporting individuals in the employment-based green card process. These responsibilities encompass the support of DACA recipients who are employed at the company.

6.      I am familiar with the claims in his lawsuit and the possibility that, if Plaintiffs prevail, the immigration program known as Deferred Action for Childhood Arrivals ("DACA") could be permanently enjoined.

7.      Microsoft has hired and trained numerous DACA recipients.  Microsoft did so in reliance on the continued existence of DACA, which has allowed these employees not only to remain in the United States, but also to step out of the shadows, obtain work authorizations, and build lives, including professional lives at Microsoft.

8.      Microsoft has structured its recruitment, training, business planning and operations in reliance on DACA recipients' continued ability to work in the U.S., and the company has come to depend on its DACA employees.   In particular, as a cutting-edge technology company, Microsoft must substantially invest in its personnel, including DACA employees, via months- and

years-long training programs that teach the highly specialized skills and depth of knowledge that Microsoft needs in its employees and future leaders.

9.      In part because of this heavy investment, enjoining DACA would cause substantial interruption to Microsoft's ongoing operations.  Microsoft has placed DACA employees in key roles across its products and teams.  The DACA recipients who work at Microsoft are critical to continued success of those teams, and their inability to remain at the company would cause substantial productivity losses that could not be remedied.

10.     Enjoining DACA would also cause a dramatic upheaval of these individuals' lives.  They, like Microsoft, have structured their choices—including their professional, personal, and financial decisions—based on the expectation of DACA's continued protections.

**I.      Microsoft Has Depended on DACA in Hiring, Personnel Training, and Business Planning, and Has Invested Substantial Resources in DACA Employees in Reliance On the Program.**

11.     DACA has been critical to Microsoft's hiring decisions.  Microsoft looks to recruit top talent to work in its headquarters and across its U.S. sites.  The company understands that this means hiring a diverse workforce that brings different backgrounds and experiences.

12.     I am aware, from our DACA employees, that becoming DACA beneficiaries permitted them to come out of the shadows and establish lives, including professional lives, in the United States.  Because DACA secured their ability to obtain work authorization, these employees could find gainful employment and set about establishing long-term careers in the United States.  In many cases, DACA also enabled them to move across the country, including the Microsoft's headquarters in Redmond, Washington, and to other offices, such as in San Francisco, California, Charlotte, and North Carolina.

13.     Microsoft currently has 61 employees who are DACA recipients. These individuals were hired based on the expectation that they could work—and continue to work—at Microsoft's U.S.-based offices.

14.     And Microsoft has invested heavily in these individuals.  Microsoft understands that building a talented and successful workforce involves extensive, rigorous, and continual training and investment in recruits and employees.

15.     For example, Microsoft has hired DACA recipients through the Microsoft Academy of College Hires ("MACH") program.  The MACH program recruits students directly from universities to work as employees at Microsoft.  These hires have no substantial work experience and are hired based on their potential, drive, and ability to collaborate and absorb information.

16.     The investment Microsoft makes in MACH program participants is significant. Once accepted, employees are trained on technology, presentation, and professional skills.  They receive standard Microsoft On Board training followed by 60 additional days of specialized training.  During this time, MACH employees are not producing any quantifiable results for the company.  After this two-month training period, they shadow more senior Microsoft employees for two weeks to gain practical experience.  This is also a use of Microsoft resources, as the productivity of our senior employees typically decreases when they are training MACH employees.  Finally, MACH employees are assigned a mentor from the current Microsoft staff who coaches them weekly for the first year of employment.  The amount of resources Microsoft expends on these MACH employees is unlike any other program at the company.

17.     Microsoft has enrolled DACA employees in this program on the expectation that they will be able to continue to work—and continue to grow—at Microsoft.  With the MACH

program, Microsoft is trying to grow leaders, not just employees.  Because they are impressively credentialed, and because Microsoft makes substantial investments in them, the recruits that come out of this program are highly valued by the company.  They are quickly hired into to a wide variety of position within Microsoft's various product groups and other business groups.  The experience of being customer facing from the start of employment is an invaluable skill that MACH recruits take with them to their roles across Microsoft.

18.     Microsoft makes a substantial investment of time and resources in the MACH hires, including DACA recipients.  Each hire requires a great deal of training before they can begin to produce a benefit to Microsoft.  Typical industry hires can hit the ground running because of their past work experience, so the company starts seeing returns on industry hires quite quickly.  With MACH hires, Microsoft expends a great deal of resources from the outset and, because the company sees these employees as long-term leaders of the future, the return comes later in their careers. To have an employee removed after completing the MACH program because of the effective end of DACA would result in an unrecoverable loss of past resource allocation.

19.     Microsoft offers equally intensive training programs for more senior employees, and it has invested in DACA recipients through those programs as well.  For example, the Structured Finance team at Microsoft arranges bank financing to support Microsoft sales and arranges access to financing for Microsoft partners and supports Microsoft procurement to get longer terms while offering suppliers access to working capital financing at attractive rates.  This team, like others at Microsoft, has a robust employee rotation program that lasts approximately three years.  Employees in the rotation spend time in three to four teams over the length of the program.  One employee in the current rotation is a DACA beneficiary.

20.     As employees move through this rotation program, they are afforded the opportunity to learn a great deal about specific work groups at Microsoft.  They bring the knowledge they gain into both their next rotation and the future roles they hold at Microsoft.  This is a profound growth opportunity and Microsoft invests a substantial amount of time and resources into these rotation employees.  When an employee moves to a new rotation, it takes about 45 days to get them to a point where they are fully productive.  At the conclusion of the program, the rotation employees are in a unique position to lead cross-subject team projects because they have a complete and intimate understanding of what each group does and how they work.  Losing an employee in this program due to the effective cessation of DACA would be a loss of this time investment and a loss of a specially developed employee.

21.     As the rotation employees shift between groups, they spend time with the employee that is stepping into their role and pass on parts of the knowledge they gained in the role.  This is not just a summary of what they learned, but a continual reference point for the incoming employee that could not be encapsulated in any other format.  This collective wisdom builds over the entire length of the program and cannot be replicated without starting over with a new set of employees.  If an employee who is part of the rotation were removed because DACA was enjoined, it would render this training all for naught.  And it would leave a gap in the work unit that could not be addressed.

22.     The DACA employee involved in this rotation has received a great deal of positive feedback during the time with Microsoft.  This person has demonstrated a high level of motivation, has a positive attitude, and is constantly looking for new ways to make an impact at Microsoft.  The employee has developed a reporting system surrounding bad debts that we are required to keep for auditing purposes, developed a Bloomberg dashboard for our internal activities, and

conducted all the feedback collection work for an offsite program we were involved in. This person is already a role model for other incoming employees. If this person is forced to leave our company (and country) due to DACA's being invalidated, Microsoft would be losing a valuable employee in whom it has invested substantial time, training and resources with the expectation that this employee could continue to work at Microsoft.

23.     That same on-the-job training is reflected across Microsoft teams and sectors. This is essential to the way Microsoft grows its employees—with the expectation that they will be able to put this training into practice through continued work at the company.

24.     For example, as part of its team focused on Azure (Microsoft's cloud-based computing platform), Microsoft requires all employees—including DACA employees on the Azure team—to attend and complete boot camps, including regarding the product and underlying technology, security training, and on the job training experiences. The Azure boot camp is a two-day, intense lab experience that helps employees prepare to work with Azure services. The security training ("STRIKE") is a two-day event where high-profile Microsoft engineers and executives from software security participate in case studies and laboratory classes. Microsoft has provided this training with the understanding and expectation that the DACA employees who have gone through it will remain eligible and able to work at Microsoft—to put this training into practice. If DACA employees are unable to continue working, Microsoft would lose out on the return that is set to come from its investment.

## II.     Enjoining DACA Would Hamper Microsoft's Operations, Delay Productivity, and Cause Substantial Losses.

25.     DACA recipients play critical roles in numerous divisions across Microsoft. For example, one DACA employee customizes SharePoint applications for clients and uses SharePoint Designer, InfoPath, Visual Studio, and front-end scripting languages to implement client solutions.

Another works on developing Azure cloud-based services that deploy Dynamics AX in Azure infrastructure.  This includes creating and configuring the cloud infrastructure so that consumers can access cloud-based services.  Another is a Senior Sales Development Representative at LinkedIn who has responsibility for accounts that represent over $2 million in revenue for the company.  Many of these individuals have highly specialized computing, software, and mathematics skills that they acquired either in college or graduate programs, additional skills-building training, and/or Microsoft's extensive training programs.

26.    Microsoft has placed these DACA recipients in these roles with the expectation that they will be able to remain.  If DACA were enjoined, and these individuals had to cease working in Microsoft's U.S. offices, it would cause substantial disruption to multiple ongoing projects and cause costly delays.  As a result of their individual roles and their specialized skill sets, these employees would be very difficult to replace.

27.    For example, the Consumer and Device Sales division, which develops the ERP application *Dynamics 365 for Finance and Operations* as part of the larger business suite *Dynamics 365*, includes a small team of five employees, one of whom is a DACA recipient.  Any movement in this group creates a big impact on its work product.  (Prior losses of employees in this group have taken upwards of six months to address.)  If the group were to lose an employee in this group because of the effective cessation of DACA, it is reasonable to say it would take this group around six months to return to the same level of efficiency and productivity. That setback would affect not just this team, but the customers it serves, creating a ripple effect of declining productivity.

28.    The team is currently working on the initial deployment and configuration for Dynamics 365 Financials and Operations ("D365FO"), a functionality that has a substantial impact

on customers' perception of the ability to manage Microsoft's Dynamics 365 system. This has a major influence on customers' willingness to agree to business deals for D365FO. If the DACA employee could no longer work for Microsoft, the team's ability to maintain quality and to address requests for change would immediately diminish and would also be delayed until a replacement was found. As mentioned above, this process would take several months, at minimum, causing significant disruption and delays. The team has also started working on the next deployment service based on a new Azure technology. If the DACA employee could no longer work for Microsoft, the team would have to delay our timelines for delivering this project, too.

29. It is essential to emphasize that this DACA employee brings a unique point of view to this team and could never be fully replaced. Because of the relatively young age of this employee and the mindset that comes with that age demographic, the employee is able to provide a generational point of view as to a certain customer base that is not found elsewhere in the group. Moreover, the employee is bringing new problem-solving ideas to the team and a consumer point of view that is not otherwise represented on the team. And, age aside, this employee brings unique life experience that provides strength to the team by increasing the diversity of ideas and opinions. This makes the team more dynamic and better able to address the diversity in the marketplace. This DACA employee's background also helps Microsoft improve its understanding of user behavior in utilizing our product and the experiences that we build within the product.

30. The disruption this team would face is emblematic of what Microsoft would see across multiple divisions were DACA enjoined. As another example, the Structured Finance team includes a DACA employee who has been driving a project that involves developing processes and operations and moving those tasks to a new team. This project was started in August 2017 and the DACA employee has been handling it from its inception. This project is currently not

complete.  If this person were removed prior to the completion of this project, it would create disruption in the transfer that would be detrimental to Microsoft and its customers.  Microsoft would have to spend around two months getting a new employee up to date on the project, and he or she would never have the institutional knowledge that comes from owning a project from the start.  Microsoft customers' financing cases would be negatively impacted, as their ability to implement their projects would be delayed.

31.    DACA employees also play other important roles at Microsoft, in which they could not be replaced—again, Microsoft placed them in the roles with the expectation that the company would not need to replace them en masse because of the effective end of DACA.

32.    For example, DACA employees contribute meaningfully to important diversity and inclusion initiatives—with the expectation that their commitments and involvement can continue because of DACA.  If DACA were enjoined and these employees were unable to continue to play these roles, Microsoft's workplaces would suffer tremendously, including in the company's ability to foster, retain, and recruit new talent.

33.    For one, DACA employees have held numerous leadership positions in the group Finance Latinos at Microsoft ("FinLat").  The mission of FinLat is to create an inclusive community for Latino finance employees and provide opportunities for career development and networking to foster professional growth and retention for Latinos at Microsoft.  This includes networking and career development events and, importantly, recruiting events, which help Microsoft continue to attract top talent.

34.    DACA employees also held lead Hispanics of LinkedIn Alliance ("HOLA") and Out@In, both of which create space for employees with different experiences and backgrounds to engage in discussion, share ideas, and learn from one another.  These groups have fostered a

tremendous sense of community, belonging, and collaboration between employees, and they have helped Microsoft maintain a happy, healthy, and productive worth environment, where personnel report high job satisfaction and thus choose to stay with the company.

35.     Microsoft's DACA employees have also worked to assure Microsoft's Latinx retention by mentoring new employees as they grow their own careers.  This has helped Microsoft to nurture and keep talent from diverse backgrounds, including first generation professionals.

36.     DACA employees have likewise held important leadership roles in the Association of Latino Professionals for America ("ALPFA"), a national networking group that includes chapters at universities and colleges.  Through their involvement in this group, DACA employees have helped Microsoft to attract top talent, including other DACA recipients.  Indeed, some DACA employees came to Microsoft through ALPFA connections.

## III.     Enjoining DACA Would Devastate Microsoft Employees Who Have Built Their Lives in Reliance on the Program.

37.     DACA recipients who work at Microsoft have, quite literally, structured their young adult and adult lives in reliance DACA.  To a person, they describe the process of becoming DACA beneficiaries as "coming out of the shadows" to be recognized as an individual within the United States.  DACA meant they could push forward with their education, including through access to student loans and scholarship money.

38.     At least one DACA employee transferred from community college to the University of California at Berkeley because DACA enabled this person to open a bank account, work and earn money, and move to Northern California to pursue a course of study.

39.     DACA recipients made these choices—choices they otherwise may not have made—based on the understanding that they would be able to obtain a work permit and legally earn money and build a career in the United States.  That promise by the government made them

feel comfortable and able to incur student debt, move, pursue additional higher education, and take other steps that they could not have otherwise justified without the promise of future income.

40.     In preparing for careers in technology in the U.S., many took highly specialized courses of study at university, such as Data Structures, Computer Architecture, Discrete Math and Probability Theory, Artificial Intelligence, Database Systems, Efficient Algorithms and Intractable Problems, Operating Systems and Systems Programming, Software Engineering, Signals and Systems, Microelectronic Circuits, and Linear Integrated Circuits.

41.     They have also spent time and money acquiring specialized skills in anticipation of and since joining Microsoft such as Java, Python, Objective C, C#, C++, CSS3, Powershell, Scheme, MIPS, MATLAB, Ruby, Rails, Bootstrap, LESS, JSON, REST, HTML5, SASS, jQuery, Backbone.js, AngularJS, React, SQL Server, MySQL, Microsoft Access, A/B Testing, and User Centered Design.  They have done so precisely because they are able, under DACA, to maintain work authorization to put these skills to use at Microsoft.

42.     DACA employees have expressed that they plan to continue learning and growing at Microsoft because of the continued existence of DACA.  Many have just begun their careers and have anticipated that they will be able to develop professionally and personally in their communities, including their professional community at Microsoft.  They have studied and worked hard with the expectation that they can put that education and training to use in their careers, to contribute to Microsoft and to society.  Many have expressed that they feel they have my whole future ahead of them, during which they have planned and prepared to continue giving back to the only country they truly call home.  Enjoining DACA would destroy those expectations.

43.     The threat of enjoining DACA has caused some employees to consider putting part of their lives on hold by suspending saving for retirement.  These employees have taken advantage

of Microsoft's 401K matching program, on the expectation that they can continue to work in the U.S. so will not need all of their assets to be liquid.  But with the threat that DACA could end, DACA recipients express urgency to have cash on hand in case they are unable to retain their jobs. This uncertainty means that these employees regret contributions that are now locked up in retirement accounts.

44.     Many DACA recipients have bought or have long thought about buying houses or have started or thought about starting families, all on the expectation that they could remain and continue to legally work in the United States.  Enjoining DACA would force many to uproot their lives.  And they have expressed a need to make sure family members, including parents and siblings, will be taken care of.

45.     Some DACA employees have made clear that if DACA were effectively terminated, not only would they not be able to continue working at Microsoft, but they would also no longer be able to pay for their homes or cars.  They fear they will become homeless.  They have expressed that the same may be true of family members who count on DACA employees for financial support.

46.     DACA employees have also said that the threat of enjoining DACA would put them back in the mental and emotional space of feeling as though they have a great deal of potential but no way to put it to use.

47.     Many have no memories of living in their birth countries and no network there, so they would be alone in a country that I have not lived in since infancy and in which they have no support system.  As one DACA employee reflected: "I w[ould] lose a significant portion of my life that I have worked so hard to obtain.  The work I have done over the course of years will be

lost.  I may have to move to a country I did not grow up in, and may be forced to leave my entire family and my place of employment."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 20, 2020 in Redmond, Washington.

# Exhibit 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:18-CV-68 |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

## DECLARATION OF MARIA HERNANDEZ

I, Maria Hernandez, hereby declare the following:

1.      I arrived in the United States in 2005 when I was five years old. I lived in

Roselle, New Jersey, for the first year that I was in the United States. I have lived

in Elizabeth, New Jersey for the last fourteen years.

2.      I am currently a third year student at Saint Peter's University in Jersey

City, New Jersey, where I am studying political science and criminal justice.

3.      I first received Deferred Action for Childhood Arrivals (DACA) in July

2017. Since initially applying for DACA, I have renewed twice, most recently in

2020.

4.       Because of DACA, I have been able to obtain work authorization and a driver's license. My work authorization first allowed me to work in retail in 2017. After I was able to get some experience in the workplace, I wanted to branch out and try to get a job within my field of study. It was a huge relief for me to be able to pay for university on my own, and to be able to buy my own books, clothes, and other necessities without having to ask my parents.

5.       In February 2020, I started a job with the office of New Jersey State Senator Joseph Cryan as a legislative aide. I help the Senator at events, with constituent relations, and with any other projects that our office takes on. For example, now we are working with constituents to help them complete their claims for unemployment.

6.       In March 2020, in response to the coronavirus outbreak in New Jersey, Senator Cryan gave staff the option of volunteering at a COVID-19 testing center during our work hours. I chose to volunteer at the Union County free drive-through testing site at Kean University because I wanted to help out during the pandemic. I thought about all the people who were getting sick and who needed to know if they had COVID-19; I thought that if I or my family were sick, I would hope that other people would do the same for us.

7.       At the testing center, in addition to the certified clinicians who perform the tests, there are approximately 20 volunteers who direct the vehicles and register patients for testing. Although I can be assigned to any post, I am usually in charge of registering the patients who arrive for testing. In addition to gathering all the

information needed to process the tests, one of the important tasks I do as part of registration is encourage all people who show up at the testing center to get tested. We want people who have been exposed to someone with COVID-19 symptoms to get tested. So for example, when someone drives a family member to the testing site, I encourage the driver to get tested as well.

8.      At the testing site, I am required to wear personal protective equipment to reduce the risk of exposure while I interact with patients. I am provided with a mask, hand sanitizer, and gloves to keep me safe. Additionally, we are instructed to enter and exit the facility in certain locations to prevent the spread of infection.

9.      From March 2020 through the summer, I worked at the testing site from 8:00 a.m. to 4:00 p.m. three days a week. On the busiest days during the height of the pandemic in New Jersey, we processed over 700 vehicles at the testing center. I was generally one of four people doing registration, so there were days that I registered over 175 people during my shift.

10.     In the middle of May 2020, my family and I became ill with COVID-19 and had to quarantine. I am not sure where I was exposed; it could have been at the testing site but also could have been at our workplaces. I was mostly asymptomatic, but my mother had a persistent cough and I was very anxious about what would happen. Thankfully, we have all recovered by now.

11.     Since returning to school this fall, I have continued to work at the testing site. Fewer people are coming to the testing site now, and the testing site is only open two days a week now, but we still get about 250 vehicles a day. In addition

to drive-through testing, Union County has started walk-up testing that is accessible to even more people and offers flu shots in addition to COVID-19 tests. When the testing site at Kean University started conducting walk-up testing, I split my time between doing registration work at the drive-through location and the walk-up location. I am currently working only at the walk-up location. Earlier in the fall, I worked two afternoons and one full day a week at the testing site, but they recently reduced the hours for testing again so now I work two afternoons a week.

12.     My work at the testing site inspired me to join the Medical Reserve Corps. I applied in July, and I am waiting for a decision on my application. As a Medical Reserve Corps volunteer, I would continue working at the testing center and be available to do other public health and emergency response work in my community. Without DACA, I would not be able to volunteer with the Medical Reserve Corps because it requires U.S. citizenship or lawful presence.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November ___5th___, 2020, in ____Elizabeth____, New Jersey

_____
Maria Hernandez

# Exhibit 20

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-68 |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

## DECLARATION OF ELZBIETA WOJTYLO

I, Elzbieta Wojtylo, hereby declare the following:

1.      I am employed as a Supervising Family Service Specialist 2 by the New

Jersey Department of Children and Families, Division of Child Protection and

Permanency (DCP&P). I have been a DCP&P employee for fourteen years, and have

been a supervisor since 2015. I am currently based in the Morris County DCP&P office.

Prior to becoming a supervisor, I had worked as an intake worker in Bergen, Sussex and

Warren Counties.

2.      As a supervisor with DCP&P, I supervise a team of five Field

Investigators who are responsible for conducting child abuse/neglect investigations and

welfare assessments, ensuring the safety, stability, and permanency of children, and

referring families to appropriate services. As a supervisor, I am responsible for overseeing the investigations and mentoring my staff.

3.      Since August 2018, I have supervised Cinthia Osorio, who is a DACA recipient.

4.      Cinthia earned a Bachelors of Social Work degree from Centenary College in 2018. She first joined DCP&P as an undergraduate social work intern with DCP&P's prestigious, year-long Baccalaureate Child Welfare Education Program in September 2017. At that time, her supervisor was Rose Arackathara (*see* Declaration of Rose Arackathara, Dkt. 215-1, pp. 160-63).

5.      Upon completing her internship and graduating with her degree, Cinthia was hired as a full-time DCP&P field worker  (initially as a Family Service Specialist Trainee, and now, after completing her probationary period, as a Family Service Specialist 2). Cinthia's regular duties in this role include conducting intake investigations in Morris County, New Jersey, in response to referrals involving potential child abuse or neglect or other child welfare concerns. As an intake field worker, she gathers information through interviews, home visits, and other means to determine whether the children face immediate danger and refers families to community and contracted service providers for ongoing assistance. Cinthia is a strong intake worker and advocate for the families she works with. She is able to accurately assess whether a child is at risk. She is very knowledgeable and refers families to appropriate services to mitigate risk and ensure children are safe.

6.      In response to the COVID-19 pandemic, in order to protect employees, DCP&P required most field workers to work from home from late March through early

July—that is, the vast majority of DCP&P employees were not permitted to visit the families they worked with or otherwise work in the field. DCP&P then created a volunteer-only response team consisting of a small number of field workers who would make in-person visits when needed, often in the case of an emergency. Longer-term case management was handled by other staff who were not part of the response team.

7.     Cinthia volunteered to do intake investigative work as a member of the COVID-19 response team, and she handled cases in Morris, Passaic, and Sussex counties.

8.     Hours for response team field workers were long. Cinthia was assigned to work from 8:00 a.m. to 4:00 p.m. five days a week, but she often ended up working until 8:00 p.m. or as late as 11:00 p.m. She was also on-call and often had to make visits on one of the two days a week that she was not assigned to work.

9.     The response team intake field investigators, including Cinthia, had to follow strict protocols to protect themselves from possible exposure to COVID-19. For example, they were required, when possible, to conduct interviews with family members outside and to wear personal protective equipment when going into homes to assess conditions. When a family was known to have COVID-19, the caseworkers were sometimes able to use FaceTime to conduct their assessment of the interior of the home, but this was not always possible and, on certain occasions, Cinthia had to enter the homes of COVID-19-positive families to assess the safety of the children she was charged with protecting.

10.     As part of her work on the COVID response team, Cinthia responded primarily to high-risk/high-priority cases where a child was at imminent risk of harm. In these cases, she had to take emergency actions to protect children's safety and health,

including removing a child from the home, taking a child to the hospital, arranging for psychiatric evaluations, and buying food for a family.

11.     Cinthia also volunteered to serve as a "buddy," accompanying another field worker on calls where there was believed to be specific security risk for the field workers. Many of these visits were in areas that are not part of Cinthia's regularly-assigned geographic region.

12.     As Cinthia's supervisor, I have been struck by her ability as field worker. Her compassion, dedication, and language skills, as well as her ability to connect with families and build trust, make her a fantastic asset to DCP&P.

13.     During the height of the COVID-19 pandemic, Cinthia played a critical role as part of the COVID response team in ensuring that DCP&P was able to continue to protect New Jersey's children, even in the midst of a global pandemic. She continues to play a critical role in the State's efforts to protect New Jersey children and support New Jersey families.

14.     Without DACA, Cinthia would not be able to work for DCP&P, and DCP&P would lose a trained, experienced, skilled, and hardworking child advocate. Given the education and training required, it is always difficult for DCP&P to replace field workers, let alone field workers with Cinthia's abilities. During the pandemic, DCP&P caseworkers are more vital than ever given the limited interaction that many children have with adults outside the family. Since the start of the pandemic, we have also seen a rise in mental health issues and substance use, as well as a rise in domestic violence—all of which have an adverse impact on children's safety. At the same time, it is even harder to replace our field workers due to the personal risks involved in working

as a field worker during the pandemic and the limitations on training. In short, losing Cinthia would be a significant loss for DCP&P and the State of New Jersey.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November __5__, 2020, in __Andover__, New Jersey

Elzbieta Wojtylo
DCP&P Supervisor

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-68 |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

**APPENDIX**

**VOLUME III: EXHIBITS 21-22**

Pursuant to this Court's Civil Procedures, Rule 9, Defendant-Intervenor State of New

Jersey hereby provides the Court with the following table of contents and copies of the documents

and authorities cited in its Opposition to Plaintiffs' Motion for Summary Judgment:

| Ex. | Description | Page |
|---|---|---|
| | **VOLUME I** | |
| 1. | Memo. from Chad Wolf, Acting Sec'y of Homeland Sec., to Mark Morgan, Senior Official Performing Duties of Comm'r, U.S. Customs & Border Prot., et al. (July 28, 2020) | NJAPP001 |
| 2. | Memo. from Joseph Edlow, USCIS Associate Director, to Associate Directors and Program Office Chiefs (Aug. 21, 2020) | NJAPP010 |
| 3. | Excerpts from Federal Defendants' Objections and Responses to Defendant-Intervenors' Fifth and Sixth sets of discovery requests (Sept. 30, 2020) | NJAPP021 |
| 4. | Federal Defendants' Responses to Interrogatory No. 15 (Sept. 30, 2020) | NJAPP030 |

| 5. | Email from Victoria Palmer, USCIS Media Affairs Division, and attached Response to Query guidance document (Aug. 24, 2020) | NJAPP037 |
|----|----|----|
| 6. | Email from Brandon Robinson, USCIS Adjudications Officer (Policy), "Re: DACA Filings After 9/5/17 – No Prior Grant of DACA" | NJAPP047 |
| 7. | Email from Brandon Robinson, USCIS Adjudications Officer (Policy), "DACA Filings After 9/5/17 – No Prior Grant of DACA" (Apr. 26, 2019) | NJAPP049 |
| 8. | Email from Victoria Umoru, USCIS Adjudications Officer (Policy), "Implementing the DACA Memo issued by USCIS Deputy Director for Policy Joseph Edlow" (Aug. 22, 2020) | NJAPP052 |
| 9. | Excerpt from Brief of the National Education Association and National PTA as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP056 |
| 10. | Excerpts from Brief of Former Service Secretaries, Modern Military Association of American, and military and veteran advocacy organizations as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP075 |
| 11. | Excerpt from Brief of Teach for America, Inc., as amicus curiae in support of Respondents in *DHS v. Regents* | NJAPP094 |
| | **VOLUME II** | |
| 12. | Excerpts from Brief of Association of American Medical Colleges et. al., as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP104 |
| 13. | Excerpt from Brief of Lawyers' Committee for Civil Rights Under Law, the Anti-Defamation League, the Leadership Conference on Civil and Human Rights, and 42 other social justice organizations as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP125 |
| 14. | Excerpt from Brief of 143 U.S. business associations and companies as amici curiae in support of respondents in *DHS v. Regents* | NJAPP133 |
| 15. | Excerpt from Brief of 127 religious organizations as amici curiae in support of respondents in *DHS v. Regents* | NJAPP142 |
| 16. | *Nikko Trading of Am. Corp. v. Wastemasters, Inc.*, No. 98-48, 2000 WL 284190 (N.D. Tex. Mar. 14, 2000) | NJAPP150 |
| 17. | Declaration of Khristina Gonzalez | NJAPP154 |
| 18. | Declaration of Jack C. Chen | NJAPP166 |
| 19. | Declaration of Maria Hernandez | NJAPP181 |
| 20. | Declaration of Elzbieta Wojtylo | NJAPP186 |
| | **VOLUME III** | |
| 21. | Declaration of James "Ike" Brannon | NJAPP192 |
| 22. | Declaration of Meg Wiehe | NJAPP340 |

Dated: November 6, 2020

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Mayur P. Saxena*
Assistant Attorney General
(admitted pro hac vice)
124 Halsey St., 5th Floor
Newark, New Jersey 07101
PO Box 45029-5029
Phone: (973) 648-3283
Fax: (973) 648-4887
Mayur.Saxena@law.njoag.gov

Melissa Medoway, Deputy Attorney General
(admitted pro hac vice)
Eric Apar, Deputy Attorney General
(admitted pro hac vice)
Elspeth Hans, Deputy Attorney General
(admitted pro hac vice)
Tim Sheehan
(admitted pro hac vice)
*Attorneys for Defendant-Intervenor State of New Jersey*

# Exhibit 21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,    )
                            )
   Plaintiffs,    )
                            )
  v.    )  Case No. 1:18-CV-68
                            )
UNITED STATES OF AMERICA, *et al.*,    )
                            )
   Defendants,    )
                            )
KARLA PEREZ, *et al.*,    )
                            )
   Defendant-Intervenors,    )
and    )
                            )
STATE OF NEW JERSEY,    )
                            )
   Defendant-Intervenor.    )
                            )

## DECLARATION OF IKE BRANNON

I, James Isaac (Ike) Brannon, declare as follows:

1.  I am currently an economist and president of the consulting firm Capital Policy Analytics.  I also have an affiliation with the Jack Kemp Foundation.

2.  I received my MA and Ph.D. in Economics from Indiana University.

3.  I was an economics professor in the University of Wisconsin System from 1994 to 2002.  In 2001 I was granted tenure and promoted to associate professor.

4.  Since then I have worked in Washington D.C., for the Office of Management and Budget (2001-2002), the Congressional Joint Economic Committee (2002-2005), the Senate Finance Committee (2005-2007), the U.S. Treasury (2007-2008), the Republican Policy

1

Committee of the U.S. Senate (2009), and the House Energy and Commerce Committee (2009-2011).

5.       In 2008, I was chief economist for the John McCain for President campaign.

6.       I have co-authored, along with Logan Albright and M. Kevin McGee, several studies on the economic consequences of the termination of Deferred Action for Childhood Arrivals (DACA).

7.       In 2011, Albright received his master's degree in economics from Georgia State University, and he has worked as a policy analyst in Washington, DC for the last five years, including in positions at think tanks and policy organizations such as the American Action Forum, FreedomWorks, and Free the People.  From 1982-2016, McGee was a professor of economics at the University of Wisconsin Oshkosh. He is now retired.

8.       Albright, McGee, and I investigated the economic and fiscal costs that terminating DACA would impose on the federal government, and on the economy as a whole. We published that research in January 2017. The report is available at https://www.cato.org/blog/economic-fiscal-impact-repealing-daca.

9.       In February 2018, McGee and I published a study entitled "A New Estimate of the Cost of Reversing DACA," which appeared as a Cato Institute Working Paper.  The report is available at https://object.cato.org/sites/cato.org/files/pubs/pdf/working-paper-49.pdf, and a true and correct copy of that study is attached as Exhibit A.

10.       In July 2019, McGee and I published a study entitled "Estimating the Economic Impacts of DACA."  The report is available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3420511, and a true and correct copy of that study is attached as Exhibit B.

2

11.     In the 2018 and 2019 studies, we estimated the educational attainment, earnings, and state and federal tax payments of the DACA-eligible population.[1] To estimate the impact of DACA, we first estimated these values assuming that DACA is made permanent. We then estimated the same values assuming DACA is terminated. Our estimated impacts are the difference between these two estimates.

12.     We estimated the high school graduation rates of the DACA-eligible population, based on Census data for Hispanics and on studies that show that illegal status reduces graduation rates about 10%.

13.     The Census data for Hispanics is a reasonable proxy for the DACA population as a whole because, according to USCIS, about 93% of DACA recipients come from Mexico, El Salvador, Guatemala, Honduras, Peru, Ecuador, Columbia, Argentina, Venezuela, Uruguay, Bolivia, Costa Rica, Chile, Nicaragua, or Panama. 88% come from Mexico, El Salvador, Guatemala, or Honduras.

14.     We also estimated college enrollment rates and college graduation rates, based on Department of Education data and on studies that show that illegal status reduces college enrollment rates.

15.     By 2027, all DACA-eligible residents will have earned a high school degree or equivalent. This is a requirement for continued DACA eligibility.

16.     In our 2019 study, we estimated that if DACA continues, by 2033 about 55% of the DACA-eligible population will have attended college, and 24% of the DACA-eligible population will have college degrees.

---

[1] The DACA-eligible population refers here to the population eligible for DACA under the Department of Homeland Security memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," dated June 15, 2012.

3

17.     This is a very conservative estimate, since the Census department estimated in 2017 that by the age of 34, 36.4% of all Hispanics who graduate from high school will have earned college degrees.

18.     We used Bureau of Labor Statistics data on Hispanic employment to estimate the employment/population ratio for this DACA-eligible population over the next ten years, available at https://www.bls.gov/charts/employment-situation/employment-population-ratio.htm. We used estimated age-earnings profiles to project forward average earnings profiles for each of these DACA-eligible groups—*i.e.*, DACA-eligible residents who only finish high school, DACA residents who attend some college but do not graduate, and DACA-eligible residents with college degrees—should DACA be renewed.

19.     Our estimated earnings profiles for DACA high school graduates and for DACA-eligible residents with some college were based on Department of Education estimates of Hispanic earnings by education, and by studies estimating age earnings profiles by educational attainment.

20.     To estimate starting salaries for DACA recipients with college degrees, we received data from Thedream.us on its population of approximately 3,000 scholarship recipients. Thedream.us is a nonprofit that provides financial and other support to DACA recipients attending college. We used the information on their choice of major and institution and expected graduation date to project an average starting income for each student, using income data from the financial technology company payscale.com, which surveyed 2.3 million graduates at over 2,700 colleges to calculate the average starting income for a student based on the student's major and the institution the student attended.

4

21.     We averaged these individual starting incomes to estimate the average starting income for DACA recipients who graduate from college. This is in Table 1 of our 2018 paper on page 9.

22.     In our 2019 paper, we adjusted this estimate downward to align it more closely with Department of Education estimates of average earnings for Hispanics with college degrees, while taking into account that DACA recipients attend universities in states with a median household income 5.28% higher than in the country as a whole.

23.     We re-estimated all of these age-earnings profiles should DACA be terminated, based on studies that show that illegal status reduces employment rates by about six percentage points, and reduces the returns to education by nearly half.

24.     From this, we estimated that, if DACA continues, the DACA-eligible population will earn $437 billion from 2020 until 2029 and that they will pay $102 billion in federal taxes, which includes payroll taxes. This data can be found in table 14 on page 29 of our 2019 report.

25.     However, we estimated that if DACA is terminated, the DACA-eligible population will earn only $316 billion from 2020 until 2029 and that they will pay $30 billion in federal taxes, which includes payroll taxes. This data can be found in table 14 on page 29 of our 2019 report.

26.     This disparity mostly reflects the increased productivity and earnings of the DACA college graduates who would continue to have legal employment status. People without legal work status in the U.S. are mainly limited to low-skill, off-the-books work arrangements in food preparation and construction, which pay much less than employment available to college-educated workers.

27.     Our 2018 study used a somewhat different methodology, but its findings were broadly consistent with the 2019 paper: under DACA, this population will acquire more educational capital, be more productive, earn more income, and pay more taxes than if DACA were eliminated.

28.     We use our 2019 numbers to estimate the impact that rescinding DACA would have on aggregate income for state residents and on state tax revenues in New Jersey and Texas.

29.     To do so, we multiply the reduced national income resulting from DACA's rescission by the share of the DACA recipients in each state.

30.     We use the Migration Policy Institute's ("MPI") 2018 estimates of the total DACA-eligible population in each state, available at

https://www.migrationpolicy.org/sites/default/datahub/State-County-DACA-Estimates of DACA-Eligible Population_2018.xlsx. MPI estimated that in 2018 New Jersey had 65,000 DACA-eligible residents (3.77% of the total DACA-eligible population) and Texas had 254,000 DACA-eligible residents (14.73% of the total DACA-eligible population).

31.     We also adjusted for the relative income of workers in each state.

32.     Median household income in the U.S. was $60,366 in 2017, the last year for which data had been released when we published our 2019 study.

33.     In 2017, New Jersey's median household income was $80,088, 24% above the national median, and Texas's median household income was $59,206, 8% below the national median. This data comes from the U.S. Census Bureau's American Community Service Brief titled Household Income 2017:  https://www.census.gov/library/publications/2018/acs/acsbr17-01.html. It was the most recently available data at the time that we published our 2019 study.

34.     Consistent with this data, our analysis assumes that a DACA-eligible person in New Jersey or Texas would earn 24% more and 8% less, respectively, than the average corresponding DACA-eligible resident in the U.S. This would apply to college graduates as well as to those with less education.

35.     Given these assumptions, we estimate that the loss of income to Texas residents from rescinding the DACA policy would be $16.32 billion over the next decade, and for New Jersey residents it would be $5.66 billion over the next decade.  These estimates assume that the DACA-eligible population would be employed only as undocumented workers and would not have work authorization if DACA were terminated. These numbers are in Table 15 on page 30 of our 2019 report.

36.     We also estimated the lost tax revenue to each state from ending DACA.

37.     To do this we computed the ratio of additional aggregate income projected to be earned by DACA-eligible residents in both New Jersey and Texas over the next decade provided DACA continues, to the aggregate personal income of each state's residents. We applied that ratio to state property, sales and income tax revenues for 2015, the most recent data available at the time of our study.

38.     The result would be $623 million in reduced property taxes and $712 million in lost sales taxes for Texas over the 10-year period from 2020 to 2029 (Texas has no income tax), for total tax losses of $1.335 billion over the next decade, assuming DACA-eligible residents remain in Texas and work illegally. This data is in Table 15 on page 30 of our 2019 report.

39.     Applying the same standard to New Jersey, we estimate it would lose $285 million in property taxes, $136 million in sales taxes, and $335 million in state income tax revenue for a total loss of revenue of approximately $756 million over the next ten years if

DACA-eligible residents remain in New Jersey and work illegally. This data is contained in Table 15 on page 30 of our report.

40.     What's more, foreign-born workers are, statistically, more mobile than workers born in the U.S., which means they are more likely to relocate in communities where there is a genuine shortage of workers. This undermines the notion that their jobs could easily be filled by native born workers.[2]

41.     In summary, the rescinding or rollback of the DACA program would have a significant negative fiscal and economic impact on the country, and would disproportionately affect the states in which DACA recipients are most prevalent, including Texas and New Jersey.

42.     Attached as Exhibit C is a list of my publications over the past decade and a list of all other cases over the past four years in which I have testified as an expert at trial or by deposition. This list is current as of July 15, 2019.

43.     I am to be paid $300 per hour for this declaration and $300 per hour if I am to give a deposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and complete to the best of my knowledge.

James Isaac Brannon, Ph.D.

---

[2] See, for example: "Immigrants Equilibrate Labor Markets: Evidence from the Great Recession," https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4991313/

8

# Exhibit A

# A New Estimate of the Cost of Reversing DACA

By Logan Albright
Ike Brannon
M. Kevin McGee

February 15, 2018

## CATO WORKING PAPER
### No. 49



1000 Massachusetts Avenue NW
Washington DC 20001

*Cato Working Papers are intended to circulate research in progress for comment and discussion.*
*Available at www.cato.org/workingpapers.*

## A New Estimate of the Cost of Reversing DACA

**Logan Albright[1]**
**Ike Brannon[2]**
**M. Kevin McGee[3]**

February 15, 2018

### Abstract

We obtained data on the age and educational outcomes of nearly 3,000 college students who are DACA recipients—Deferred Action for Childhood Arrivals—and used it to forecast their income in the ensuing decade. We then used this data, along with the income we forecast for DACA recipients not in college, to estimate the total economic and fiscal impact over the next decade of allowing this cohort to remain in the country and legally pursue employment.  We estimate that reversing DACA would cost the U.S. economy $351 billion from 2019 to 2028 in lost income and that the U.S. Treasury would lose $92.9 billion in tax revenue.

### Background

As of our publication date, the status of the recipients of the Deferred Action for Childhood Arrivals—or DACA—has yet to be resolved.  DACA provides work authorization and protections from deportations for individuals who were transported to the United States as children and who have since proven themselves to be productive members of society by meeting education benchmarks and having refrained from criminal activity.  In October, President Trump announced that he was suspending the program—which was originally provided via an executive order from President Obama—but that he would delay its termination by six months to give Congress sufficient time to pass legislation to replace the executive order. Such legislation has proven elusive.

One argument put forth by those opposed to any renewal is that allowing these immigrants to remain in the country would impose a cost on U.S. taxpayers; a CBO study published in December 2017 estimates that legislation reinstating the legal status of the estimated 800,000 DACA immigrants would cost the federal government $26 billion over the next ten years.[4]

1

These results were at odds with our own research published in early 2017.[5] In that research, we stated that our *a priori* perspective was that cancelling DACA would make it nearly impossible for this cohort to obtain lawful employment and result in a reduction in tax revenues and economic activity in the domestic economy.

We estimated the economic and fiscal impact by extrapolating from related research that estimated the impact of expanding the pool of H-1B visa holders on economic activity.[6] We compared the demographic characteristics of the H-1B population and the DACA population—in general DACA recipients are younger and a sizeable fraction will likely not complete college. The result is that their income is quite a bit lower than for H-1B holders but it grows at a faster rate. We then estimated income and tax revenue by using the estimates for the H-1B population and adjusting those numbers by the income path and population differences.

We determined that reversing the policy would cost the U.S. economy $280 billion over a ten-year period, and that the resulting loss of government revenue would amount to roughly $60 billion in that decade.

**A Brief History of DACA**

President Barack Obama first established DACA visa executive action in 2012. From 2012 to 2017, roughly 800,000 people received DACA status. While this population could attend most colleges despite their lack of a legal status, the program gave them a temporary work permit and a Social Security number, which allowed them to work as well.

During his presidential campaign, Donald Trump promised to rescind DACA early in his presidency, and in September of 2017, the Attorney General announced that the program was, in fact, being suspended, with DACA recipients given up to a six-month grace period to get their affairs in order. The president challenged Congress to pass its own legislation to protect the status of DACA recipients, and at various times indicated that he felt some empathy for their plight and wanted a humane and reasonable solution of the issue.

This announcement was met with multiple legal challenges from state governments and individuals alike. The U.S. District Court of the Northern District of California has ruled that the reversal of DACA was unlawful, and has ordered the government to continue the program until further notice.

2

One proposed bill under consideration is the DREAM Act of 2017.  The Congressional Budget Office estimated that it would increase budget deficits by approximately $26 billion over the next decade.[7]  The rationale given for this result is that immigrants without work permits pay certain taxes, most notably payroll taxes, but cannot claim benefits. By granting them legal status these workers become eligible for various benefit programs and Social Security but without paying much more in federal income taxes.

**The DACA Population**

To understand the economic impact of reversing DACA it helps to understand what distinguishes DACA recipients from other cohorts of legal and illegal immigrants. Since the DACA population grew up in the United States, they more closely resemble native-born Americans and second-generation immigrants more than first-generation immigrants. Having experienced the American school system and a peer group comprised mainly of Americans, the difficulties presented by language barriers, culture shock, and other obstacles to assimilation have dissipated, thus affording DACA recipients more opportunities for economic success than immigrants as a whole.

Moreover, DACA recipients must necessarily be free from criminal activity, as well as have the ability to enroll and remain in some sort of post-secondary education in order to qualify for the program, leaving us with a cohort that has largely performed well in school and stayed out of trouble.

Analysis done by the Center for American Progress found that DACA recipients tend to perform well in post-secondary education and have lower attrition rates than their peers.[8] A primary reason for this is that the opportunity cost for a DACA student to leave school before completion is higher than for a native student: it is more difficult for DACA students to procure financial aid or scholarships and it becomes nearly impossible to do such a thing if a student leaves school for a spell.

The Migration Policy Institute (MPI) estimated that in 2014 nearly half of the DACA-eligible population who have completed a high school degree had no further education, with an additional 29 percent enrolled in college, 16 percent having completed some post-secondary education, and only 7 percent with college degrees.[9] Since DACA enrollment only began in

3

2012, this paucity of college graduates is understandable; more impressive is the surge in college enrollment. For the rest of the U.S. population, approximately 60 percent of high school graduates attended some sort of post-secondary institution and one third of the population eventually obtained a college degree.

These numbers would presumably have been even higher had MPI been able to look only at DACA enrollees. They estimated that in 2016, only 68 percent of the DACA-eligible population enrolled in the program. Clearly, those with at least some post-secondary education have a greater incentive to apply for DACA status than the average DACA-eligible person, since that status opens up legal employment opportunities that substantially increase with education. Therefore, we conclude that those with DACA *status* have a higher college enrollment rate as compared to the entire population of DACA-eligible unlawful immigrants.[10] From that, we assume that the college-enrollment rate among DACA enrollees is around 40 percent in 2014, about a third higher than for all DACA-eligibles, which would in turn suggest that by 2019 the current DACA-enrolled population will be--roughly--evenly divided between those with only a high school degree, those with some post-secondary education, those currently in college, and those with college degrees.[11]

**Methodology**

Estimating the economic production and tax revenues that DACA enrollees are likely to generate over the next decade entails three steps. First, we needed to generate a profile of the DACA-eligible population over time, as its members move from high school either directly into the workforce, or through post-secondary education and then into the workforce. That profile needs to include reasonable transition probabilities that would estimate both high school and college drop out rates that are consistent with the patterns observed in the data.

Second, we needed to estimate reasonable age-earnings profiles for three groups of DACA-eligible individuals: those projected to have only high school degrees, those projected to have some college or other post-secondary education but no degree, and those projected to complete college. Finally, we needed to estimate how many of those DACA-eligible individuals would in fact apply for and be approved for DACA status.

4

*DACA-eligible Workforce Entry*

We used Migration Policy Institute research on the characteristics and numbers of the DACA-eligible population to estimate the distribution of educational attainment for this population.[12] Using the Hispanic dropout rates in the Census Department's CPS Historical Time Series Tables on School Enrollment, we generated a plausible pattern of DACA-eligible high school enrollment, which gradually tapered from 98,000 freshmen in 2012 to 8,000 freshmen in 2023.[13] We then assumed that 35 percent of these high school graduates would move directly into the workforce. MPI estimated that there were 396,000 DACA-eligible high school graduates in 2014 who were not pursuing additional education, which would then imply that 309,000 DACA-eligible, unlawful immigrants had already graduated from high school by 2011.

The remaining high school graduates were divided between college enrollment (50 percent) and other post-secondary enrollment (15 percent). Even those numbers were insufficient to generate MPI's estimate of 241,000 DACA-eligible college enrollees in 2014; so we assumed a surge of over 95,000 college enrollees in 2013, from among the population that had previously graduated from high school. Our estimates imply that by 2033, 36.35 percent of the DACA-eligible population will have college degrees, in line with Census department's 2017 estimate that by the age of 34, 36.4 percent of Hispanics who graduate from high school have gone on to earn college degrees.[14]

We assumed that college enrollees have an 81 percent graduation rate, consistent both with the rates observed by thedream.us, an organization that provides scholarship money for DACA students to help cover the cost of college. This is above the national 6-year graduation rates for full-time college students; we attribute this to the fact that a substantial proportion of our sample obtained an associate's degree, which is a common step for this cohort seeking post-college education. We assumed that enrollees in other post-secondary programs had a 50 percent annual attrition rate, either from dropping out or from completion of their program. This gave a flow of DACA-eligibles into the workforce that includes about 44,000 college graduates per year between 2017 and 2023.

We then had to reduce this workforce-entry flow for two reasons. First, not all high school graduates are in the labor force, and not all labor force participants are employed as the population includes those who are unemployed but looking for work. The Bureau of Labor

5

Statistics (BLS) reports a 75.3 percent employment-population ratio among Hispanics age 25 to 34, so we reduced our estimates of labor force entrants accordingly.[15]

Secondly, not all DACA-eligible unlawful immigrants apply for, or are granted, DACA status. MPI estimated that 68 percent of DACA-eligibles have applied for that status with an acceptance rate above 95 percent.[16] We reasoned that since the benefits of DACA status are greater the greater one's earnings potential, we ascribed DACA status to all of the DACA-eligibles with some college or a college degree, but to only one-third of those with only high school degrees. Those assumptions imply that DACA status will slowly rise to 68.8 percent of the eligible population by 2028. If DACA is not just reinstated as a temporary, 2-year renewable status, but is legally enshrined in a permanent status, we would expect DACA participation to rise and the revenue impacts of DACA will increase accordingly.

*DACA-eligible Age-earnings Profiles*

The estimated age-earnings profiles of DACA-eligibles with only high school or some college are based on the corresponding median 2017 weekly earnings for Hispanics as reported by the BLS.[17] For individuals with high school degrees only, median earnings were $33,852 a year; using Thornton and his coauthor's research, real earnings rise by about 1 percent a year until about age 40, and are flat thereafter.[18] The resulting pattern begins at about $27,500 at age 19, when these individuals are assumed to enter the workforce, and rises to the median wage by age 40.

For individuals with some college, median earnings were $38,324 a year. According to Tamborini and his coauthors, median earnings for these workers are 5.6 percent higher than their high school-only counterparts for those aged 20-29, and 12.6 percent higher for those aged 30-39.[19] The resulting estimated real earnings profile consistent with these values rises from $28,000 at age 21 to $39,300 at age 40.

We assigned the starting median salary to all employed DACA-participating individuals at the beginning of their work careers and assumed that their real incomes would rise with age according to the rates above. In reality, some individuals will earn more than those median earnings, and others less. The progressivity of the tax code implies that our revenue estimates for these workers will understate the true revenue impacts, although probably not my much, since

6

most of these individuals will remain in a relatively low tax bracket regardless of how much they vary from the median.  Their estimated taxes were based on the tax rates adopted in December 2017 for single individuals. For years after 2018, nominal tax payments were inflated using an annual 2 percent inflation rate. Per CBO custom, we do not discount the income or tax revenues of future years.

To estimate the earnings of the DACA college graduates, we obtained data from thedream.us. Just under 3,000 students have received financial assistance from thedream.us. For these individuals, we have data on the college in which they are currently enrolled, their expected graduation, their choice of major, previous post-secondary education (a substantial proportion have already earned an associates degree), and their city and state of residence. While we do not have data on their academic performance, a student's area of study is much more relevant to post-college income.

We paired the educational data with income data we obtained from the financial technology company payscale.com, which has an estimated starting salary for college students based on degree, school, and major using reported salary data.[20] Our data set had 2,563 usable observations with sufficient data to assign an estimated starting salary. To generate an age-earnings profile, we used estimates from Thornton and his coauthors that found that salaries initially grow at a 4 percent real annual rate, gradually tapering to a 3 percent real annual rate after 10 years.

To account for the fact that most college students begin their employment careers mid-year, we reduced first-year salaries by 60 percent.  With this group as well, our tax estimates were based on the tax rates adopted in December 2017 for single individuals. We calculated estimated taxes for each individual for each year in their earnings profile, and then averaged over our entire sample, giving us a profile of average tax payments per college graduate that does account for earnings variability.  As with the other two groups, we ascribed these average tax payments to each individual college graduate, beginning in the year they enter the labor force. Once again, we reduce the number of entrants to 75.6 percent of all graduates to reflect employment rates, and inflate nominal payments by a 2 percent inflation rate.

*Three Possible Scenarios*

7

The estimate derived above assumes that current DACA recipients are offered a legal way to stay in the country, attend university, and obtain productive employment. From a fiscal standpoint, this would be the most preferred outcome but two others are also possible.  The second scenario is that DACA ends and the immigrants currently in the country under its protection will be deported to their countries of origin. Under this scenario, the U.S. government does not only fail to gain any tax revenue from current DACA recipients, but also has to locate and deport 800,000 individuals, a task that would cost over $10 billion if it were feasible.[21]

The more likely scenario if Congress fails to reach a deal and current DACA recipients lose their legal status is that the vast majority remain in the country illegally and work largely in jobs that require little skill but can be done on a cash basis, allowing them to receive their wages under the table. A proportion might be able to obtain employment by using another person's Social Security Number, a common ruse, which would force them to pay income and payroll taxes, albeit without any ability to collect Social Security or other benefits.  Of course, as residents and consumers, they would also continue to pay sales and excise taxes. Given that this activity would happen outside of the law, it is impossible to estimate the revenue impact beyond saying that it would fall somewhere between the first two scenarios.

**Estimating the Income and Tax Impacts of Repealing DACA**

From the above analysis, we projected the number of DACA recipients in each of the four educational attainment categories for each year and then assigned them an income based on their experience and educational attainment by education (Table 1). For the college graduates we estimated a starting salary based on school and choice of major.  The average DACA recipient will earn a salary of approximately $73,921 per year for the 10-year period from 2019 to 2028. These earnings represent an equivalent gain to U.S. gross domestic product. Factoring in the 75.6 percent employment rate cited above and multiplying by the total number of DACA recipients, we estimate the ten-year GDP impact to be $351 billion.

8

Table 1
DACA Recipients by Educational Category

|  | 2019 | 2021 | 2023 | 2025 | 2027 |
|---|---|---|---|---|---|
| **Number** |  |  |  |  |  |
| HS degree only | 184,767 | 199,719 | 209,687 | 216,031 | 218,749 |
| Enrolled in College | 193,389 | 165,564 | 122,726 | 81,945 | 47,128 |
| Some college | 190,547 | 208,521 | 221,908 | 231,164 | 236,846 |
| College degrees | 245,305 | 311,468 | 376,693 | 430,371 | 467,533 |
| Total | 814,008 | 885,272 | 931,014 | 959,511 | 970,256 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| **Percentages** |  |  |  |  |  |
| HS degree only | 22.7% | 22.6% | 22.5% | 22.5% | 22.5% |
| Enrolled in College | 23.8% | 18.7% | 13.2% | 8.5% | 4.9% |
| Some college | 23.4% | 23.6% | 23.8% | 24.1% | 24.4% |
| College degrees | 30.1% | 35.2% | 40.5% | 44.9% | 48.2% |
|  | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| **Average Earnings** |  |  |  |  |  |
| HS degree only | $30,332 | $32,019 | $33,844 | $35,816 | $37,959 |
| Enrolled in College | $0 | $0 | $0 | $0 | $0 |
| Some college | $32,736 | $34,878 | $37,211 | $39,764 | $42,564 |
| College degrees | $63,216 | $69,963 | $76,810 | $84,671 | $93,383 |
| Total | $33,598 | $40,054 | $47,569 | $55,621 | $63,946 |

*Note: "Some college" includes those with more than a high school and less than a college degree who are not currently enrolled in college.*

Applying the appropriate tax rates, we also determined that government would gain $39.2 billion in revenue from DACA recipients over the next ten years. Additionally, we can expect a FICA tax rate of 15.3 percent, resulting in payroll tax revenue of $53.7 billion over the next ten years. Therefore, the total tax revenue impact would be $92.9 billion.[22] The imputed tax revenue adds up to 25 percent of projected income, the majority of which is driven by FICA.

We projected out an additional year and found that, from the ten-year period comprising 2020 through 2029, the GDP impact would be $384 billion, and the revenue impact would be $43.6 billion. If we include the FICA tax (both the employer and employee share), we add an additional $58.8 billion, for a total tax impact of $102.4 billion.

It should be noted that salary estimates are based on data that are a few years old and may understate current incomes, and there is reason to believe that incomes will grow faster than

9

during the previous decade. These estimates do not include the cost of actually tracking down and physically removing all 690,000 DACA recipients from the country, a significant expenditure in itself that would increase the fiscal costs of DACA.

**Comparisons with Other Estimates**

The above-mentioned Congressional Budget Office score the DREAM Act finds significantly lower revenue gains from DACA recipients than we do here.[23] There are several reasons for this.  The first is that CBO regards the income of DACA recipients as merely switching over from "underground" to legal status, and does not believe that this would result in much of a gain in income for those workers, an assumption that we think is without merit. What's more, the legislation would make these people become eligible for a large number of federal government welfare programs, which it believes would outweigh any tax revenue boost from their newfound legality.

CBO's methodology essentially assumes the formal employment of DACA recipients merely transfers income from the employer (who would have been taxed on that income had the employee not been hired) to the employee (who is then taxed on the transferred income).  The CBO's estimate also contains offsets for health insurance premium support offered through the Affordable Care Act. However, our analysis suggests that DACA recipients who complete college--a significant proportion of the cohort--become significantly less likely to qualify for premium support soon after completing college.

Finally, CBO makes no allowance for the effects of education and specialization, conducted in a legal environment, on income. DACA recipients who complete college have the potential for considerable income growth, which would result in higher tax obligations and more revenue to the federal government. For these reasons, we estimate that the revenue cost to the federal government of reversing DACA would be substantially higher than the estimate implicitly contained in the DREAM Act.

It should also be noted that our cost estimates look only at the cost of fully reversing the current DACA program, whereas the DREAM Act contains other provisions providing a path to citizenship for immigrants beyond the status quo. A full scoring of the DREAM Act is beyond

10

the scope of this paper, and the differences found in this somewhat apples-to-oranges comparison are to be expected.

## Conclusion

Our revised findings from data of DACA recipients currently matriculating are consistent with our previous analysis and suggest that ending the deferred arrivals program would represent a significant cost to the United States Treasury and the broader economy.  We estimate that reversing DACA would cost the U.S. economy $351 billion from 2019 to 2028 in lost income, and that the U.S. Treasury would lose $92.9 billion in revenue, including payroll taxes.

---

[1] Director of Research at Free the People, labright@freethepeople.org

[2] Visiting fellow at the Cato Institute, ike.brannon@gmail.com

[3] Professor emeritus at the University of Wisconsin Oshkosh, mcgee@uwosh.edu

[4] "S. 1615, Dream Act of 2017," Congressional Budget Office Cost Estimate, December 15, 2017, https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/s1615.pdf.

[5] Ike Brannon and Logan Albright, "The Economic and Fiscal Impact of Repealing DACA," Cato-At-Liberty, January 18, 2017, https://www.cato.org/blog/economic-fiscal-impact-repealing-daca.

[6] Thomas V. Church, "Estimating the Economic and Budgetary Effects of New H-1B Visas in the Senate Gang of Eight's Proposed Immigration Bill," Hoover Institution (Stanford: Hoover, May 7, 2013), http://www.hoover.org/sites/default/files/uploads/aafs/2013/05/Estimating-the-Economic-and-Budgetary-Effects-of-H-1B-Reform-In-S.744.pdf.

[7] "S. 1615, Dream Act of 2017," Congressional Budget Office Cost Estimate, December 15, 2017, https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/s1615.pdf.

[8] Tom K Wong, "Results of Tom K. Wong, National Immigration Law Center, and Center for American Progress national survey National Immigrant Law Center," *Center for American Progress Memo*, June 2015.

[9] Randy Capps, Michael Fix, and Jie Zong, "The Education and Work Profiles of the DACA Population," Migration Policy Institute, August 2017, https://www.migrationpolicy.org/research/education-and-work-profiles-daca-population, p. 4.

[10] Ibid.

[11] Ibid.

[12] Ibid.

[13] "CPS Historical Time Series Tables on School Enrollment," U.S. Census, August 23, 2017, https://www.census.gov/data/tables/time-series/demo/school-enrollment/cps-historical-time-series.html.

[14] "Educational Attainment in the United States: 2017, U.S.," U.S. Census, December 14, 2017, https://www.census.gov/data/tables/2017/demo/education-attainment/cps-detailed-tables.html, Table 1.

[15] "Labor Force Statistics from the Current Population Survey," Bureau of Labor Statistics, January 19, 2018, https://www.bls.gov/cps/cpsaat04.htm.

11

[16] Randy Capps, Michael Fix, and Jie Zong, "The Education and Work Profiles of the DACA Population," Migration Policy Institute, August 2017, https://www.migrationpolicy.org/research/education-and-work-profiles-daca-population, p. 3.

[17] "Usual Weekly Earnings of Wage and Salary Workers, Fourth Quarter 2017," Bureau of Labor Statistics, News Release, January 17, 2018, https://www.bls.gov/news.release/pdf/wkyeng.pdf.

[18] Robert Thornton, James Rogers and Michael Brookshire, "On the Interpretation of Age-Earnings Profiles," *Journal of Labor Research* 18(2) 1997, Table 4.

[19] Christopher R. Tamborini, ChangHwan Kim and Arthur Sakamoto, "Education and Lifetime Earnings in the United States," *Demography* 52 2015.

[20] Paysale.com, About Us Page, https://www.payscale.com/about

[21] John Hudak and Elaine Kamarck, "The Mind-Boggling Cost of DACA Repeal," Brookings Institution, September 7, 2017, https://www.brookings.edu/blog/fixgov/2017/09/07/the-mind-boggling-cost-of-daca-repeal/.

[22] We assume that the personal tax rates will not change and ignore the fact that current law repeals them in 2026.

[23] "S. 1615, Dream Act of 2017," Congressional Budget Office Cost Estimate, December 15, 2017, https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/s1615.pdf.

12

# Exhibit B

# Estimating the Economic Impacts of DACA

Ike Brannon

Senior Fellow, Jack Kemp Foundation


M. Kevin McGee

Professor Emeritus, UW Oshkosh

July 5, 2019

## Abstract

This paper estimates the economic impacts of DACA, on the educational attainment, earnings and federal tax payments of the DACA population, on state and local tax revenues, on the broader American workforce, and on the U.S. economy as a whole. We construct two models of the DACA population and its economic behaviors, the first assuming DACA is made permanent, and the second assuming DACA is terminated at the end of 2019.

We find that eliminating DACA is lose-lose-lose. The DACA population would lose about $120 billion in income, the federal government would lose roughly $72 billion in tax revenue, and states and local governments would lose about $15 billion in tax revenue over the 2020-29 decade.

Those losses would come without any offsetting gains. Eliminating DACA would be, in effect, throwing away some of our nation's human capital resources, dramatically reducing the returns to education for the DACA population, and channeling them into jobs where legal status is ignored, and that do not allow them to take full advantage of their human capital.

This failure to employ all of our human capital would hurt low-to-moderate income workers. Eliminating DACA would merely increase the competition for the kinds of jobs that tend to have an excess supply of workers, while reducing the supply of employable skilled workers in the areas where we have the most acute labor shortages. Overall, we find that eliminating DACA would benefit virtually no one while hurting pretty much everyone.

NJAPP216

Electronic copy available at: https://ssrn.com/abstract=3420511

The Deferred Action for Childhood Arrivals (DACA) was first established in 2012 via an executive order of President Barack Obama. DACA protects from deportation individuals who were transported to the United States as children and who have since proven themselves to be productive members of society, both by maintaining strong educational attainment and not engaging in any criminal activities. From 2012 to 2017 roughly 800,000 people claimed DACA status. While this population could prior to DACA attend most colleges despite their lack of a legal status, the program gave them temporary work permits and access to Social Security numbers, which allowed them to work as well.

During his presidential campaign, Donald Trump promised to rescind DACA. Following up on that promise, in September 2017 Attorney General Jeff Sessions announced that the program was, in fact, being suspended, with DACA recipients given six months grace to get their affairs in order. Four months later, the U.S. District Court of the Northern District of California ruled that the reversal of DACA was unconstitutional, and ordered the government to continue to accept DACA renewals until further notice. A similar injunction was issued by the U.S. District Court of the Eastern District of New York in February 2018. In November 2018, the Ninth Circuit Court of Appeals affirmed the Northern District of California injunction. In May 2019, the Fourth Circuit Court of Appeals vacated the DACA rescission as "arbitrary and capricious." As we write, DACA renewals are currently being accepted and processed, but new applications are not being accepted, and the U.S. Supreme Court has agreed to hear the administration's appeal of the Ninth Circuit Court's decision in the fall.

In July 2017, Sens. Graham, Durbin, Flake, and Schumer introduced the DREAM Act of 2017, S. 1615. The Act would have granted permanent residential status to most DACA recipients. In its analysis of the Act, the Congressional Budget Office (CBO) estimated that the Act would cost the government approximately $24 billion in lost tax revenue over the following decade. It provided a similar $26 billion estimate for the DREAM Act of 2019, H.R 2820. CBO's rationale was that immigrants without work

Electronic copy available at: https://ssrn.com/abstract=3420511

permits pay certain taxes, most notably payroll taxes, typically by procuring another person's Social Security number, but cannot claim benefits.  By granting them legal status these workers would become eligible for various benefit programs and Social Security benefits without paying much more in federal income taxes.

This paper explores the issue of DACA's economic impacts on the educational attainment, earnings and federal tax payments of the DACA population, state and local tax revenues, the broader American workforce, and the U.S. economy as a whole.  We find that the biggest impact of ending DACA would be to dramatically reduce the returns to education for the DACA population, channeling them into jobs where legal status is ignored, and that do not allow them to take full advantage of their human capital.

Eliminating DACA would be, in effect, throwing away some of our nation's capital resources.  We estimated that its elimination would cost the DACA population about $120 billion in reduced income, with a somewhat greater total loss of economic output that would be even greater. We also estimated that its elimination would cost the federal government roughly $72 billion in lost tax revenue over the 2020-29 decade, consisting of $26 billion in foregone income taxes and $46 billion in foregone payroll taxes.  State and local governments would lose another $15 billion during that decade.

Those losses would come without any offsetting gains.  Human capital and physical capital are complements, so the failure to employ all of our human capital would hurt the suppliers of physical capital, low-to-moderate income workers.  Eliminating DACA would merely increase the competition for the kinds of jobs that tend to have an excess supply of workers, while reducing the supply of employable skilled workers in the areas where we have the most acute labor shortages.  Overall, we find that eliminating DACA is lose-lose-lose, benefiting virtually no one while hurting pretty much everyone.

To more accurately estimate DACA's impacts we construct two models of the DACA population and its economic behaviors.  The first model estimates their behavior should DACA be made permanent.  Under that scenario, the DACA population can be expected

Electronic copy available at: https://ssrn.com/abstract=3420511

to behave very much like the rest of the legal-status Hispanic population, with similar high school and college completion rates, along with similar post-graduation earnings.[1] Our first model estimates their educational attainment, earnings profiles, and tax payments using the corresponding estimates for the Hispanic population as a whole.[2]

The second model estimates their behavior assuming DACA is terminated at the end of 2019. Under that scenario, the DACA population can be expected to behave very much like the rest of the undocumented Hispanic population, albeit with the higher levels of education that much of this population would have attained prior to its termination. We assume that the roughly 30% of the DACA population that had not yet completed its education by that point would revert to undocumented education rates, and the employment and earnings of the DACA population reflect their lack of legal status following DACA's termination.[3]

## 1   Economic Outcomes if DACA Is Made Permanent

Estimating the economic production and tax revenues that DACA enrollees are likely to generate over the next decade, should DACA be made permanent, involves three steps. First, we need to generate a profile of the DACA-eligible population over time, as its members move from high school either directly into the workforce, or through post-secondary education into the workforce. That profile needs to include estimates of both high school and college drop out rates consistent with the patterns observed in the data.

Second, we need to estimate age-earnings profiles for three groups of DACA-eligible individuals: those projected to have only high school degrees, those projected to have some college or other post-secondary education but no Bachelor's degree, and those

---

[1] According to the U.S. Citizenship and Immigration Services (2017), 93.8% of the DACA population are Hispanic.

[2] Since many measures of the Hispanic population do not distinguish between those with legal status and those without, our estimates of the DACA population's economic outcomes in this model are probably biased downward. If so, our paper will understate the true economic impacts of DACA.

[3] A third potential scenario would be to model the DACA population as being deported to their countries of origin. Under this scenario, the U.S. government would not only fail to gain any revenues at all from current DACA recipients, but would also have to locate and deport 800,000 individuals, a task that would cost over ten billion dollars if it were feasible, either from a practical or political perspective. See Hudak and Kamarck (2017).

Electronic copy available at: https://ssrn.com/abstract=3420511

projected to complete college. Finally, we need to estimate the taxes that these incomes would generate.

## 1.1   DACA population profile

To understand the economic impact of reversing DACA it helps to understand what distinguishes DACA recipients from other cohorts of legal and illegal immigrants. To be eligible to apply for DACA, immigrants had to be younger than 31 on June 15, 2012, must have come to the U.S. when they were younger than 16, and must have lived in the U.S. since 2007. Since the DACA population grew up in the United States, they more closely resemble native-born Americans and second-generation immigrants more than first-generation immigrants. Having experienced the American school system and a peer group comprised mainly of Americans, the difficulties presented by language barriers, culture shock, and other obstacles to assimilation have dissipated, thus affording DACA recipients more opportunities for economic success than immigrants as a whole.

Table 1: MPI DACA-eligible Population Estimates

| Year | | |
|---|---|---|
| 2014 | Enrolled in Secondary School | 365,000 |
| | Completed High School, not in Higher Ed. | 396,000 |
| | Enrolled in Higher Education | 241,000 |
| | Completed Some College | 134,000 |
| | Completed a B.A. or B.S. | 57,000 |
| | Total | 1,193,000 |
| 2016 | Enrolled in or completed Secondary School | 1,300,000 |
| | Under Age 15 | 228,000 |
| | Total | 1,528,000 |

Moreover, DACA recipients must necessarily be free from criminal activity, as well as have the ability to enroll and remain in some sort of post-secondary education in order

5

Electronic copy available at: https://ssrn.com/abstract=3420511

to qualify for the program. They are, therefore, a cohort that has largely performed well in school and remained out of trouble.

To generate a reasonable age profile for these immigrants, we began with the Migration Policy Institute's (MPI) 2014 estimates of educational attainment and school enrollment for the DACA-eligible population, and their 2016 estimates of the DACA-eligible population.[4]  They estimated a 2014 DACA-eligible population of 1.19 million, roughly equally divided between those still in high school, those in or having some college education, and those who had completed high school but had no post-secondary education (Table 1). They also estimated a 2016 DACA-eligible (in high school or high school degree) population of 1.3 million, with an additional 228,000 children below the age of 15 that could eventually become DACA-eligible.[5]

Using these estimates, we generated a time profile of DACA-eligible high school enrollment that gradually tapered from 98,000 freshmen starting high school in 2012 to 8,000 freshmen starting high school in 2023 (Table 2). This pattern fits the constraints of (a) the MPI's estimate of roughly 365,000 high school students in 2014, (b) the MPI's estimate of roughly 228,000 children below the age of 15 in 2016, and (c) the DACA-eligibility requirement that the person be foreign born, but a U. S. resident prior to 2007.

We then used the Hispanic dropout rates from the Census Department's CPS Historical Time Series Tables on School Enrollment to generate a profile of high school graduates from this population.  The assumed dropout rate after 2017 of 5.6% is the average of the observed rates from 2012 to 2017. These dropout rates are for students in grades 10 to 12, so we applied them only to students in those three grades.[6]

Our DACA-eligible age profile suggests that by September 2019, the number of DACA-eligibles with high school degrees or better will have risen to 1.3 million, with

---

[4]Capps, Fix, Zong (2017).

[5]They also estimated that in 2016, there were another 398,000 potential eligibles who did not have the required high school diploma, but could meet that requirement with adult education. Throughout our study, we make the conservative assumption that no poentially-DACA-eligible high school dropouts acquire a high school equivalent degree. Thus, our economic impact estimates likely underestimate the true impact.

[6]A 5.6% dropout rate over three years implies an 84% graduation rate, which aligns with the 84% post-2012 graduation rate estimated by Kuka et al (2018).

Electronic copy available at: https://ssrn.com/abstract=3420511

an additional 209,000 enrolled in high school and 80,000 enrolled in elementary school.

Table 2: DACA-eligible Age Profile

| Year | dropout rate | begin HS-9 | HS-10 | HS-11 | HS-12 | HS total | HS grads |
|------|------|------|------|------|------|------|------|
| pre-2012 | | | | | | | 580,356 |
| 2012 | 5.09% | 98,000 | 97,858 | 93,000 | 88,000 | 376,858 | 82,500 |
| 2013 | 5.26% | 96,000 | 98,000 | 92,710 | 88,107 | 374,817 | 83,370 |
| 2014 | 7.19% | 92,000 | 96,000 | 90,955 | 86,045 | 365,000 | 81,773 |
| 2015 | 5.69% | 84,000 | 92,000 | 90,533 | 85,776 | 352,309 | 81,145 |
| 2016 | 4.30% | 72,000 | 84,000 | 88,048 | 86,644 | 330,692 | 82,091 |
| 2017 | 6.08% | 60,000 | 72,000 | 78,892 | 82,694 | 293,587 | 81,376 |
| 2018 | 5.60% | 48,000 | 60,000 | 67,966 | 74,473 | 250,439 | 78,062 |
| 2019 | 5.60% | 40,000 | 48,000 | 56,638 | 64,159 | 208,797 | 70,301 |
| 2020 | 5.60% | 32,000 | 40,000 | 45,311 | 53,465 | 170,777 | 60,564 |
| 2021 | 5.60% | 24,000 | 32,000 | 37,759 | 42,772 | 136,531 | 50,470 |
| 2022 | 5.60% | 16,000 | 24,000 | 30,207 | 35,643 | 105,851 | 40,376 |
| 2023 | 5.60% | 8,000 | 16,000 | 22,655 | 28,515 | 75,170 | 33,647 |
| 2024 | 5.60% | 0 | 8,000 | 15,103 | 21,386 | 44,490 | 26,917 |
| 2025 | 5.60% | 0 | 0 | 7,552 | 14,258 | 21,809 | 20,188 |
| 2026 | 5.60% | 0 | 0 | 0 | 7,129 | 7,129 | 13,459 |
| 2027 | 5.60% | 0 | 0 | 0 | 0 | 0 | 6,729 |

Note: The numbers progress diagonally: 98,000 freshmen in 2012 become 98,000 sophomores in 2013, 90,955 juniors in 2014, 85,776 seniors in 2015, and 82,091 graduates in 2016.

## 1.2   DACA college graduates

Estimating the number of DACA-eligibles with high school degrees who would proceed into post-secondary education was straightforward. The U. S. Department of Education, National Center for Education Statistics (NCES) *Digest for Education Statistics* (table 302.20) reports the percentage of recent high school completers enrolled in college, by race and ethnicity. From 2011 to 2016 the 3-year moving average for Hispanic high school completers enrolled in college has ranged from 64.7% and 70.6%; it averaged 67.1% over that 6-year period. Therefore we assumed that 67.1% of DACA-eligibles with high school degrees would enroll in college.

7

Electronic copy available at: https://ssrn.com/abstract=3420511

Estimating the number of DACA-eligibles who complete college with a Bachelor's degree is more complicated. The NCES *Digest for Education Statistics* (table 326.10) reports the graduation rates for first-time, full-time bachelor's degree-seeking students from the 4-year postsecondary institutions they started at. For Hispanics, this graduation rate has steadily risen from 45.5% after 6 years for the 1996 starting cohort to 55.0% for the 2011 starting cohort. However, this measure may understate the true graduation rate, as it omits students who graduated from a different 4-year institution after transferring. It may also overstate the true graduation rate, since it omits students who began their postsecondary career at a 2-year institution, which have significantly lower first-year retention rates.[7] And over half of all Hispanics begin their postsecondary careers at a 2-year institution, a far higher percentage than any other ethnic group.[8]

Table 3: Estimated Hispanic College Graduation Rates

| Year | 18 year-olds | HS grads | % Coll. | Coll. Enroll | Year | Coll. Grds. | Grad. Rate |
|------|--------------|----------|---------|--------------|------|-------------|------------|
| 2010 | 950,102 | 799,257 | 59.7% | 477,120 | 2015 | 218,098 | 45.7% |
| 2011 | 954,441 | 802,907 | 66.6% | 534,663 | 2016 | 235,190 | 44.0% |
| 2012 | 949,696 | 798,915 | 70.3% | 561,591 | 2017 | 252,166 | 44.9% |

To overcome this hurdle, we began with the total numbers of Hispanic 18-year-olds reported annually by the U.S. Census Department's *Annual Estimates*, shown in the second column of Table 3. We reduce these population estimates to high school graduate estimates in the third column, using the 5.60% annual attrition rate used in Table 2. We then convert these graduate estimates to college enrollment estimates in the fourth column, using the annual 3-year moving averages for Hispanic high school completers enrolled in college from the NCES *Digest for Education Statistics* (table 302.20). We obtained the number of Hispanic Bachelor's degrees earned for the 2014-15, 2015-16, and 2016-17 academic years from the NCES *Digest for Education Statistics* (table 302.20).

---

[7] First-year retention rates are from the NCES *Digest for Education Statistics* (table 326.30). However, the differences in retention may just reflect a much higher likelihood to transfer to a different (probably 4-year) institution after one year at a 2-year college.

[8] NCES *Digest for Education Statistics* (table 306.40)

8

Electronic copy available at: https://ssrn.com/abstract=3420511

We then compared total Bachelor's degrees to estimated enrollees from 5 years earlier to derive estimated graduation rates, which average 44.8% over the three years.

Table 4 shows our initial estimates of post-secondary educational enrollment for the DACA-eligible population. The first column reports the estimated high school graduations from Table 2. The next two columns divide these graduates into the 67.1% who pursue further education and the 32.9% who move directly into the workforce.

Table 4: DACA Post-secondary Education

| Year | HS grads | HS only | College | Coll Enr | Some Coll | BA/BS |
|------|---------|---------|---------|----------|-----------|---------|
| 2012 | 82,500 | 27,142 | 55,358 | 55,358 | 0 | 0 |
| 2013 | 83,370 | 27,429 | 55,941 | 94,692 | 16,607 | 0 |
| 2014 | 81,773 | 26,903 | 54,870 | 125,030 | 41,139 | 0 |
| 2015 | 81,145 | 26,697 | 54,448 | 148,985 | 71,632 | 0 |
| 2016 | 82,091 | 27,008 | 55,083 | 161,387 | 101,913 | 12,401 |
| 2017 | 81,376 | 26,773 | 54,603 | 163,865 | 132,206 | 34,233 |
| 2018 | 78,062 | 25,682 | 52,380 | 161,265 | 162,397 | 59,022 |
| 2019 | 70,301 | 23,129 | 47,172 | 154,363 | 191,924 | 83,570 |
| 2020 | 60,565 | 19,926 | 40,639 | 142,842 | 219,525 | 108,130 |
| 2021 | 50,471 | 16,605 | 33,866 | 127,511 | 244,188 | 132,664 |
| 2022 | 40,377 | 13,284 | 27,093 | 109,481 | 265,320 | 156,655 |
| 2023 | 33,647 | 11,070 | 22,577 | 92,213 | 282,741 | 179,080 |
| 2024 | 26,918 | 8,856 | 18,062 | 75,955 | 297,100 | 199,041 |
| 2025 | 20,188 | 6,642 | 13,546 | 60,832 | 308,714 | 216,096 |
| 2026 | 13,459 | 4,428 | 9,031 | 46,707 | 317,836 | 230,131 |
| 2027 | 6,729 | 2,214 | 4,515 | 33,088 | 324,464 | 241,637 |
| 2028 | | | | 19,598 | 328,600 | 250,993 |
| 2029 | | | | 10,622 | 330,244 | 258,327 |
| 2030 | | | | 4,805 | 330,750 | 263,638 |
| 2031 | | | | 1,518 | 330,750 | 266,926 |
| 2032 | | | | 253 | 330,750 | 268,191 |
| 2033 | | | | | 330,750 | 268,444 |

The last three columns describe the aggregate DACA-eligible college population. To achieve the estimated 44.8% graduation rate, we assume that 30% of all college en-

9

Electronic copy available at: https://ssrn.com/abstract=3420511

rollees leave after one year, either because they completed some certification program or because they dropped out; that 20% of all remaining enrollees leave after their second year; that another 20% of all remaining enrollees leave after their third year; and that all the remaining enrollees graduate, half after four years, another three-eights after five years, and the remaining one-eighth after six years.[9]

Table 5: Adjusted DACA Post-secondary Education

| Year | HS grads | HS only | College | Backlog | Coll Enr | Some Coll | BA/BS |
|------|----------|---------|---------|---------|----------|-----------|-------|
| Pre-2012 | 580,356 | 314,526 | 265,830 | | 59,760 | 16,940 | 30,120 |
| 2012 | 82,500 | 27,142 | 55,358 | 90,000 | 185,118 | 27,981 | 39,080 |
| 2013 | 83,370 | 27,429 | 55,941 | 60,000 | 243,452 | 76,628 | 48,040 |
| 2014 | 81,773 | 26,903 | 54,870 | 9,010 | 241,000 | 134,000 | 57,000 |
| 2015 | 81,145 | 26,697 | 54,448 | | 234,812 | 185,676 | 65,960 |
| 2016 | 82,091 | 27,008 | 55,083 | | 214,593 | 223,938 | 103,001 |
| 2017 | 81,376 | 26,773 | 54,603 | | 186,381 | 255,241 | 154,513 |
| 2018 | 78,062 | 25,682 | 52,380 | | 166,643 | 285,432 | 196,440 |
| 2019 | 70,301 | 23,129 | 47,172 | | 154,867 | 314,959 | 225,862 |
| 2020 | 60,565 | 19,926 | 40,639 | | 142,842 | 342,560 | 250,926 |
| 2021 | 50,471 | 16,605 | 33,866 | | 127,511 | 367,223 | 275,460 |
| 2022 | 40,377 | 13,284 | 27,093 | | 109,481 | 388,355 | 299,451 |
| 2023 | 33,647 | 11,070 | 22,577 | | 92,213 | 405,776 | 321,876 |
| 2024 | 26,918 | 8,856 | 18,062 | | 75,955 | 420,135 | 341,837 |
| 2025 | 20,188 | 6,642 | 13,546 | | 60,832 | 431,749 | 358,892 |
| 2026 | 13,459 | 4,428 | 9,031 | | 46,707 | 440,871 | 372,927 |
| 2027 | 6,729 | 2,214 | 4,515 | | 33,088 | 447,499 | 384,433 |
| 2028 | | | | | 19,598 | 451,635 | 393,824 |
| 2029 | | | | | 10,622 | 453,279 | 401,123 |
| 2030 | | | | | 4,805 | 453,785 | 406,434 |
| 2031 | | | | | 1,518 | 453,785 | 409,722 |
| 2032 | | | | | 253 | 453,785 | 410,987 |
| 2033 | | | | | 0 | 453,785 | 411,240 |

Table 4's estimates fall well short of the MPI's 2014 DACA-eligible college enrollment and college completion numbers, reported in Table 1. The MPI estimated that in 2014, 241,000 DACA-eligibles were enrolled in higher education, 134,000 had com-

---

[9]Multiplying 70% x 80% x 80% gives a 44.8% graduation rate.

NJAPP225

Electronic copy available at: https://ssrn.com/abstract=3420511

pleted some college, and 57,000 had completed a B.A. or B.S. Our model shows only 125,030 enrollees in 2014, 41,139 DACA-eligibles with some college, and no bachelor's degrees. Clearly, two things must have occurred. First, some small percentage of this population had been enrolling in post-secondary education before DACA was created, despite their lack of legal status. Second, some fraction of this population that had graduated from high school prior to 2012 had chosen to enroll in post-secondary education shortly after DACA gave them at least temporary legal status.

To capture these effects, we added estimated values for pre-DACA enrollments and backlog first-time enrollments in 2012 and 2013 to the model. We chose the numbers to bring our totals up to the MPI estimates while remaining consistent with our estimated attrition rates. The results are in Table 5. Our estimates imply that by now, not quite half of the DACA-eligibles who had graduated from high school prior to DACA will have enrolled in post-secondary education, significantly lower than the 67.1% rate observed in the overall Hispanic population.[10] Our estimates also imply that by 2033, 27.91% of the DACA-eligible population will have college degrees. This falls short of the Census department's 2017 estimate that by the age of 34, 36.4% of all Hispanics who graduate from high school have earned college degrees, suggesting that our methodology may be overly conservative.[11]

Our estimates in Table 5 allow us to project three streams of workforce entrants from the DACA-eligible population: those with high school degrees only, those with some college, and those with Bachelor's Degrees.[12] To account for the facts that not all high school graduates are in the labor force, and not all labor force participants are employed, we reduced all three entry streams to reflect the average 2011 through 2018 employment rates for each level of educational attainment.[13] The resulting projections, in Table 6,

---

[10]The 265,830 pre-2012 high school graduates who are projected to have enrolled in college include the 106,820 who were enrolled or had some degree of college completion in 2011, plus the 159,010 "backlog" enrollees in 2012-14.

[11]Our calculation, based on U.S. Census Bureau, "Educational Attainment in the United States: 2017," Table 1.

[12]Although it is extremely likely that some share of those earning Bachelor's Degrees will continue on into Graduate School, we did not attempt to incorporate that into our model.

[13]NCES *Digest for Education Statistics* (table 501.50)

11

Electronic copy available at: https://ssrn.com/abstract=3420511

allow us to subsequently project the economic impacts of DACA in the next subsection.

Table 6: DACA Workforce Entry

| | HS only | Some Coll | BA/BS |
|---|---|---|---|
| % Empl | 69.94% | 75.96% | 84.89% |
| Pre-2012 | 219,979 | 12,868 | 25,569 |
| 2012 | 18,983 | 8,386 | 7,606 |
| 2013 | 19,184 | 36,952 | 7,606 |
| 2014 | 18,816 | 43,580 | 7,606 |
| 2015 | 18,672 | 39,253 | 7,606 |
| 2016 | 18,889 | 29,064 | 31,444 |
| 2017 | 18,725 | 23,778 | 43,729 |
| 2018 | 17,962 | 22,933 | 35,592 |
| 2019 | 16,176 | 22,429 | 24,976 |
| 2020 | 13,936 | 20,966 | 21,277 |
| 2021 | 11,614 | 18,734 | 20,827 |
| 2022 | 9,291 | 16,052 | 20,366 |
| 2023 | 7,742 | 13,233 | 19,037 |
| 2024 | 6,194 | 10,907 | 16,945 |
| 2025 | 4,645 | 8,822 | 14,478 |
| 2026 | 3,097 | 6,929 | 11,914 |
| 2027 | 1,548 | 5,035 | 9,767 |
| 2028 | 0 | 3,142 | 7,942 |
| 2029 | 0 | 1,249 | 6,226 |
| 2030 | 0 | 384 | 4,509 |
| 2031 | 0 | 0 | 2,791 |
| 2032 | 0 | 0 | 1,074 |
| 2033 | 0 | 0 | 215 |
| Totals | 425,453 | 344,696 | 349,102 |

## 1.3   DACA age-earnings profiles

Earnings change with age, and the rate at which earnings rise with age differ systematically by educational attainment. To reasonably estimate the effects of DACA on the future earnings of the DACA-eligible population, we need to take the various age-earnings profiles into account.

12

Electronic copy available at: https://ssrn.com/abstract=3420511

We began by estimating an age-earnings profile for DACA-eligibles with no schooling beyond high school. Median annual earnings for Hispanics age 25 to 34 years old with only high school degrees averaged $30,354 a year from 2010 through 2017.[14] According to Thornton et al. (1997, Table 4), real earnings for workers with high school degrees only rise by about 1% a year until about age 40, and remain flat thereafter. To match this pattern, we assumed that this cohort would initially earn about $27,300 (in 2017 dollars) at age 19, when we assume these individuals enter the workforce, attain the median of $30,354 a year at age 29 and one half, and top off at about $33,700 at age 40 (Table 7).

For Hispanics age 25 to 34 years old with some college but no degree, median earnings averaged $33,499 a year from 2010 through 2017; for those with associate's degrees, median earnings averaged $35,761 a year.[15] According to Tamborini et al. (2015, Tables 2 and 3), median earnings for these workers are 5.6% higher for men and 11.3% higher for women at ages 20-29; at ages 30-39 earnings are 11.9% higher for men and 16.7% higher for women than their high-school-only counterparts. Since we have no estimate of the breakdown between those with some-college-but-no-degree and those with associate's degrees within the DACA-eligible population, nor of the gender breakdown among those who entered post-secondary education but did not earn a Bachelor's degree, we keep our age-earnings profile reasonably consistent with all of these values. It starts at $29,700 at age 21, rising by 1.53% a year thereafter. The resulting earnings at age 24 are 8.2% higher than those with high school degrees only, at age 29 are about $33,500, and at age 34 are 14% higher than those with high school degrees only – all generally fitting the given values (Table 7).

To estimate the earnings of the DACA college graduates, we obtained data from dreamers.us, an organization that provides scholarship money for DACA students to help cover the cost of college. Just under 3,000 students received financial assistance from dreamers.us. For these individuals, we have data on their current college, expected

---

[14]NCES *Digest for Education Statistics* (table 502.30).
[15]NCES *Digest for Education Statistics* (table 502.30).

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 7: DACA Age-Earnings Profiles and Taxes, by Education

| Age | HS only | | Some Coll | | BA/BS | |
|---|---|---|---|---|---|---|
| | Income | Taxes | Income | Taxes | Income | Taxes |
| 19 | $27,343 | $1,647 | | | | |
| 20 | $27,616 | $1,680 | | | | |
| 21 | $27,892 | $1,713 | $29,700 | $1,930 | | |
| 22 | $28,171 | $1,747 | $30,154 | $1,984 | | |
| 23 | $28,453 | $1,780 | $30,615 | $2,040 | $41,487 | $3,344 |
| 24 | $28,738 | $1,815 | $31,083 | $2,096 | $43,146 | $3,544 |
| 25 | $29,025 | $1,849 | $31,559 | $2,153 | $44,829 | $3,745 |
| 26 | $29,315 | $1,884 | $32,042 | $2,211 | $46,533 | $3,950 |
| 27 | $29,608 | $1,919 | $32,532 | $2,270 | $48,255 | $4,157 |
| 28 | $29,904 | $1,954 | $33,030 | $2,330 | $49,992 | $4,365 |
| 29 | $30,203 | $1,990 | $33,535 | $2,390 | $51,742 | $4,679 |
| 30 | $30,505 | $2,027 | $34,048 | $2,452 | $53,501 | $5,066 |
| 31 | $30,810 | $2,063 | $34,569 | $2,514 | $55,267 | $5,455 |
| 32 | $31,118 | $2,100 | $35,098 | $2,578 | $57,036 | $5,844 |
| 33 | $31,429 | $2,137 | $35,635 | $2,642 | $58,804 | $6,233 |
| 34 | $31,743 | $2,175 | $36,180 | $2,708 | $60,568 | $6,621 |
| 35 | $32,060 | $2,213 | $36,734 | $2,774 | $62,324 | $7,007 |
| 36 | $32,381 | $2,252 | $37,296 | $2,842 | $64,069 | $7,391 |
| 37 | $32,705 | $2,291 | $37,867 | $2,910 | $65,799 | $7,772 |
| 38 | $33,032 | $2,330 | $38,446 | $2,980 | $67,510 | $8,148 |
| 39 | $33,362 | $2,369 | $39,034 | $3,050 | $69,198 | $8,520 |
| 40 | $33,696 | $2,410 | $39,631 | $3,122 | $70,859 | $8,885 |
| 41 | $33,696 | $2,410 | $40,237 | $3,194 | $72,489 | $9,244 |
| 42 | $33,696 | $2,410 | $40,853 | $3,268 | $74,084 | $9,594 |
| 43 | $33,696 | $2,410 | $41,478 | $3,343 | $75,640 | $9,937 |
| 44 | $33,696 | $2,410 | $42,113 | $3,420 | $77,153 | $10,270 |
| 45 | $33,696 | $2,410 | $42,757 | $3,497 | $78,619 | $10,592 |

graduation date, their choice of major, previous post-secondary education (a substantial proportion have already earned an associates degree), and their city and state of residence. We have no data on college performance.

We paired the educational data with income data we obtained from the fintech company payscale.com, which has an estimated starting salary for college students based on degree, school, and major using reported salary data. Our data set had 2,563 usable

14

Electronic copy available at: https://ssrn.com/abstract=3420511

observations, with a median expected starting salary of $59,875.[16] This is probably too high an estimate, as it is well above the $46,443 median annual earnings for 25 to 34 year old Hispanics with a Bachelor's degree, or even the $50,858 median annual earnings for all 25 to 34 year olds a Bachelor's degree, as reported in the NCES *Digest for Education Statistics* (table 502.30; average of 2010 to 2017, in 2017 dollars). However, our data set shows that the DACA college students attend universities in states with a median household income 5.28% higher than in the country as a whole, suggesting that a 2017 median salary of $53,500 at age 30 would be a reasonable estimate.

Table 8: Aggregate DACA Income and Taxes, by Education ($B)

| Year | HS only | | Some Coll | | BA/BS | |
|------|---------|-------|-----------|-------|---------|-------|
|      | Income  | Taxes | Income    | Taxes | Income  | Taxes |
| 2019 | $10.905 | $0.696 | $6.901  | $0.467 | $9.135  | $0.792 |
| 2020 | $11.631 | $0.747 | $7.839  | $0.534 | $10.578 | $0.931 |
| 2021 | $12.319 | $0.797 | $8.779  | $0.602 | $12.096 | $1.080 |
| 2022 | $12.966 | $0.845 | $9.694  | $0.670 | $13.690 | $1.242 |
| 2023 | $13.591 | $0.891 | $10.565 | $0.736 | $15.322 | $1.417 |
| 2024 | $14.192 | $0.937 | $11.384 | $0.799 | $16.954 | $1.604 |
| 2025 | $14.767 | $0.982 | $12.162 | $0.860 | $18.563 | $1.798 |
| 2026 | $15.312 | $1.026 | $12.902 | $0.920 | $20.134 | $1.997 |
| 2027 | $15.825 | $1.068 | $13.607 | $0.979 | $21.680 | $2.163 |
| 2028 | $16.303 | $1.109 | $14.274 | $1.036 | $23.206 | $2.339 |
| 2029 | $16.795 | $1.151 | $14.898 | $1.091 | $24.712 | $2.526 |
| 2030 | $17.302 | $1.195 | $15.429 | $1.141 | $26.190 | $2.722 |
| 2031 | $17.825 | $1.240 | $15.978 | $1.192 | $27.631 | $2.927 |
| 2032 | $18.363 | $1.286 | $16.547 | $1.246 | $28.968 | $3.142 |
| 2033 | $18.818 | $1.323 | $17.136 | $1.302 | $30.341 | $3.363 |

To generate an age-earnings profile for college graduates, we assumed those salaries, per Thornton et al. (1997), would initially grow at a 4% real annual rate, gradually tapering to a 3% real annual rate after 10 years, and a 2% real annual rate after another decade. That gave us an average starting salary of $41,487.

For all three of these groups, we assigned the age-profile starting salaries to all em-

---

[16]The mean was virtually the same, $59,640.

Electronic copy available at: https://ssrn.com/abstract=3420511

ployed DACA-participating individuals at the beginning of their work careers, with their real incomes rising with age. In reality, some individuals will earn more than those median earnings, and others less. The progressivity of the tax code implies that our revenue estimates for these workers will understate the true revenue impacts, although probably not by much, since most of these individuals will remain in a relatively low tax bracket for the next decade, regardless of how much their income varies from the median.

Table 9: Aggregate DACA Income and Taxes ($B)

| Year | Income | Inc. Taxes | FICA Taxes |
|------|--------|------------|------------|
| 2019 | $26.941 | $1.955 | $4.122 |
| 2020 | $30.048 | $2.212 | $4.597 |
| 2021 | $33.194 | $2.479 | $5.079 |
| 2022 | $36.350 | $2.757 | $5.562 |
| 2023 | $39.478 | $3.044 | $6.040 |
| 2024 | $42.530 | $3.340 | $6.507 |
| 2025 | $45.492 | $3.640 | $6.960 |
| 2026 | $48.348 | $3.943 | $7.397 |
| 2027 | $51.112 | $4.210 | $7.820 |
| 2028 | $53.783 | $4.484 | $8.229 |
| 2029 | $56.405 | $4.768 | $8.630 |
| 2030 | $58.921 | $5.058 | $9.015 |
| 2031 | $61.434 | $5.359 | $9.399 |
| 2032 | $63.878 | $5.674 | $9.773 |
| 2033 | $66.295 | $5.988 | $10.143 |
| 2020-29 | $436.740 | $34.877 | $66.821 |
| 2021-30 | $465.613 | $37.723 | $71.239 |

Their estimated income taxes were based on the tax rates adopted in December 2017 for single individuals. FICA taxes are 15.3% of income, which includes both the employer's and employee's share. For years after 2018, nominal income and tax payments were inflated using an annual 2% inflation rate. Per CBO custom we do not discount the income or tax revenues of future years.

Table 8 reports the annual estimated aggregate nominal income and income tax payments of the three DACA-eligible education groups for the years 2019-2033, in billions of

Electronic copy available at: https://ssrn.com/abstract=3420511

dollars. Table 9 aggregates these income and income tax estimates by year, and reports the corresponding FICA taxes. Overall, we estimate that if DACA were continued, for the decade 2020-2029 the DACA-eligible population would have an aggregate income of $437 billion, pay $35 billion in income taxes, and generate $67 billion in FICA taxes.

As we will show below, those numbers are all substantially greater than our estimated income and tax payments for the DACA-eligible population, if DACA is eliminated.

## 2   Economic Outcomes if DACA Ends

The elimination of DACA would profoundly affect this population. The 440,000 DACA-eligibles who are still in school would have a reduced incentive to continue their education, since DACA's elimination would severely restrict their future employment opportunities. And many of the 1.06 million DACA-eligibles currently in the workforce would be forced to leave their current employment, migrating to the typically less rewarding and less productive jobs that can be done without legal employment status.

To estimate the economic impacts of eliminating DACA, we estimate the effect that would have on educational outcomes, earnings, and labor force participation. Those estimates in turn provide us with estimated aggregate income and tax payments for the DACA-eligible population, which can be compared to the corresponding estimates from a continued DACA in the previous section.

### 2.1   Educational attainment without DACA

To estimate how educational outcomes in the DACA population would change if DACA ended, we begin by estimating how its creation affected those outcomes. The clearest impact has been on high school graduation, since its effect is unambiguous. DACA provides benefits, both pecuniary (principally greater post-graduation employment opportunities) and non-pecuniary (primarily a temporary reduction in deportation risk) only

17

Electronic copy available at: https://ssrn.com/abstract=3420511

if high school graduation is attained. Three studies have explored how legal status affects high school graduation, all concluding that DACA has increased the high school graduation rate significantly in the DACA population.

In an analysis that pre-dated DACA, Passel and Cohn (2009) estimated a high school completion rate of only 72% among undocumented immigrants who arrived in the United States before the age of 14 years, 10% lower than native-born Americans. Similarly, using (2000 to 2011) pre-DACA data on teenagers aged 13 to 17, Liscow and Woolston (2018) found that undocumented siblings of Mexican heritage were roughly twice as likely to not be enrolled in school as their U.S.-born siblings. Since Passel and Cohn reported a better than 2-to-1 ratio of U.S.-born to foreign-born children in undocumented immigrant families, and the overall Hispanic dropout rate averaged 5.8% over that 12 year period, Liscow and Woolston's "double likelihood" estimate suggests annual dropout rates of 4.3% and 8.8%, and high school graduation rates of 88% and 76%, among Hispanic U.S.-born versus foreign-born children.

Using data than spanned the creation of DACA, Kuka et al (2018) compared the educational attainment of potentially DACA-eligible Hispanics to that of foreign-born citizens with the same age and year of arrival profiles. They found that DACA increased high school completion of 19 to 22 year olds by 5.9 percentage points, to about an 84% graduation rate. Merging these three studies suggests that the high school graduation rate with legal status is the 84% we used in our estimate of the economic outcomes under DACA, and without legal status would be roughly 76%.[17]

However, DACA's effect on college enrollment is not unambiguous. It increases the benefits of higher education by opening up future employment opportunities that would not be accessible without legal status. But it also raises the opportunity cost of higher education, by increasing the current income that must be foregone in pursuing that higher education. We would expect that the former effect would predominate if DACA recipients

---

[17]This would imply an annual dropout rate of 8.7% for each of the last three years of high school.

Electronic copy available at: https://ssrn.com/abstract=3420511

perceive DACA as being likely to provide permanent legal status, but that the latter effect would predominate if DACA recipients saw the program as only a temporary opportunity to work legally.

It is therefore not surprising that the evidence on DACA's effect on college enrollment is mixed. Hsin and Ortega (2018) estimated the effects of DACA on DACA-eligibles who were already enrolled in college when DACA was first announced. They note that the DACA college-enrolled population was already positively selected compared to immigrants with legal status, with higher average high school GPAs and lower pre-DACA dropout rates, indicating that the lack of legal status had deterred college enrollment. They found that DACA increased the college dropout rate by 7.3 percentage points among students at four-year colleges, while decreasing the full-time enrollment rate at community colleges by 5.5 percentage points. Their results suggest that not quite one-tenth of already-enrolled DACA recipients reacted as if the program would be only temporary. Of course, since they were only studying DACA-eligibles already enrolled in college, they could not possibly have found any enrollment increase.

Pope (2016) compared DACA participants who barely met the qualifications (by being just below the age of 16 when they entered the country, or just below the age of 30 when DACA was announced) to their peers who barely missed qualifying for DACA, and found DACA had no effect on education. And Kuka et al (2018), using data comparing potentially DACA-eligible Hispanics to foreign-born citizens, found that DACA increased college attendance by only around 3 percentage points. However, we suspect that this result may be strongly affected by the significant differences in family educational backgrounds between DACA-eligible Hispanics and foreign-born citizens.

In strong contrast to these results, Kaushal (2008) reported that for the 1997-2005 period only about 29% of the young noncitizen adults of Mexican origin age 23-28 with high school degrees had any college attendance, as compared to 43% of young noncit-

Electronic copy available at: https://ssrn.com/abstract=3420511

izen non-Mexican Latinos and 75% of young noncitizen non-Latinos.[18] According to the U.S. Citizenship and Immigration Services (2017), 79.4% of the DACA population are of Mexican origin, and another 14.4% are of other Latin American origin. Applying these 1997-2005 college attendance rates to the immediately pre-DACA period suggests that about only 38% of DACA-eligibles who graduated from high school prior to 2012 would have attended college before DACA, well shy of the 67.1% of Hispanic high school completers enrolled in college reported by the NCES *Digest for Education Statistics* (table 302.20).

Cortes (2013) reaches similar conclusions by comparing the educational attainment of young immigrants legalized by the 1986 Immigration Reform and Control Act (IRCA) to other undocumented immigrant youth. She found that legal status in 2000 increased college enrollment in that population by 15 percentage points, at a time when overall Hispanic college enrollment was only around 50%. Similarly, Wong et al (2016, 2017, 2018) found, in a series of on-line surveys of DACA recipients, that 64% of the respondents reported having "pursued educational opportunities that I previously could not," principally, post-secondary education.

Recall that, to make sense of the MPI's 2014 DACA-eligible college enrollment and college completion numbers, as reported in Table 1, we had to incorporate into Table 6 estimated values for pre-DACA college enrollments and for backlog first-time enrollments in 2012 and 2013. Our numbers suggest that prior to DACA, only about 18% of the future-DACA-eligible high school graduates enrolled in college, but that the aggregate college enrollment among these pre-2012 high school graduates jumped to 45% by 2014. We then used the NCES *Digest for Education Statistics'* estimated 67.1% college enrollment rate for Hispanic high school completers for the high school cohorts who graduated after DACA was established.[19]

---

[18]These differences are probably due to the fact that many non-Mexican undocumented immigrants arrived in the U.S. on student visas, and subsequently overstayed those visas.

[19]In a report on a 2013 survey of DACA participants, a year after DACA began, Gonzales, Terriquez and Ruszczyk (2014) found that 22% had already obtained a bachelor's degree, another 69% either had or were attending a 4-year or community college. Our simulation numbers are generally in line with their findings.

Electronic copy available at: https://ssrn.com/abstract=3420511

Overall, we believe that it is reasonable to estimate that if DACA ended, the college enrollment rate would drop back down to only about 40% of high school completers.[20]

Table 10 reflects these changes, and recalculates the numbers from Table 6 beginning in 2020. The annual high school dropout rate has risen to 8.7%, only 40% of high school completers enroll in college, and the college dropout rates for those who were enrolled when DACA expired has risen to 40% after one year and 30% after the second and third year, reflecting the likelihood that many DACA-eligibles who enrolled in college under the promise of DACA would become discouraged by its elimination. As we did in Table 6, we applied employment rates to each level of educational attainment from the NCES *Digest for Education Statistics* (table 501.50), adding the corresponding employment rate for those with less than high school completion. We further adjusted those employment rates to reflect the lower likelihood of employment when a worker is undocumented, which we will address more fully in the the next subsection.[21]

Table 10 shows 52 more high-school-only DACA-eligible workforce entrants, 45,466 fewer workforce entrants with some college, and 63,966 fewer college graduates in the workforce than in Table 6. There are also 9,575 additional high school dropouts from this population in the workforce. These changes primarily reflect the impacts of eliminating DACA on employment rather than on education. The estimated changes in educational attainment are in fact relatively moderate, primarily because we estimate that 71% of the Table 6's population had completed its education and entered the workforce before DACA's termination.[22]

Amuedo-Dorantes and Antman (2016) found that DACA decreased education among DACA-eligibles relative to DACA-ineligible undocumented immigrants. However, their small DACA-eligible sample sizes and the high level of post-secondary education in their DACA-eligible group prior to DACA lead us to discount their results.

[20]Our overall results are not very sensitive to this estimate, since in our model about 83% of the DACA population has already completed high school by the time DACA is assumed to end.

[21]The high school dropouts reported in the table are our estimated net increase in dropouts due to the elimination of DACA. Undocumented immigrants who would already have dropped out had DACA continued would be unaffected by the policy change.

[22]Technically, the elimination of DACA, modeled as occurring at the end of 2019, would not affect workforce entry prior to 2020. However, it would reduce the employment of those earlier workforce cohorts thereafter. Reducing the workforce entry numbers for the years before 2020 simplifies the calculation of the economic affects after DACA is eliminated.

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 10: No-DACA Workforce Entry

|  | HS dropout | HS only | Some Coll | BA/BS |
|---|---:|---:|---:|---:|
| % Empl (DACA) | 57.18% | 69.94% | 75.96% | 84.89% |
| % Empl (No DACA) | 51.18% | 63.94% | 69.96% | 78.89% |
| Pre-2012 | 0 | 201,108 | 11,852 | 23,762 |
| 2012 | 0 | 17,355 | 7,724 | 7,069 |
| 2013 | 0 | 17,538 | 34,033 | 7,069 |
| 2014 | 0 | 17,202 | 40,137 | 7,069 |
| 2015 | 0 | 17,070 | 36,153 | 7,069 |
| 2016 | 0 | 17,269 | 26,767 | 29,222 |
| 2017 | 0 | 17,119 | 21,900 | 40,638 |
| 2018 | 0 | 16,421 | 21,122 | 33,076 |
| 2019 | 0 | 14,789 | 20,656 | 23,211 |
| 2020 | 2,676 | 22,472 | 27,313 | 19,773 |
| 2021 | 2,056 | 18,112 | 16,244 | 18,149 |
| 2022 | 1,606 | 14,014 | 10,416 | 15,853 |
| 2023 | 1,278 | 11,679 | 6,753 | 12,896 |
| 2024 | 950 | 9,343 | 5,466 | 10,016 |
| 2025 | 622 | 7,007 | 4,382 | 7,812 |
| 2026 | 294 | 4,671 | 3,442 | 6,120 |
| 2027 | 93 | 2,336 | 2,500 | 4,924 |
| 2028 | 0 | 0 | 1,560 | 3,981 |
| 2029 | 0 | 0 | 619 | 3,121 |
| 2030 | 0 | 0 | 191 | 2,260 |
| 2031 | 0 | 0 | 0 | 1,399 |
| 2032 | 0 | 0 | 0 | 539 |
| 2033 | 0 | 0 | 0 | 108 |
| Totals | 9,575 | 425,505 | 299,230 | 285,136 |

## 2.2   Employment without DACA

There are two reasons to expect that the termination of DACA would reduce, but not eliminate, employment in the DACA population. The first, already captured in the previous section, is the reduced educational attainment. As the NCES *Digest for Education Statistics* (table 501.50) reports, employment rates are higher, the higher the level of education, so less educational attainment means fewer employed workers. That effect

Electronic copy available at: https://ssrn.com/abstract=3420511

is already reflected into the numbers in Table 10.

Secondly, the loss of legal status will itself prove a hindrance to obtaining employment. Pope (2016), comparing the labor market outcomes of DACA participants to their peers who barely missed qualifying for DACA, found that DACA increased labor force participation and decreased unemployment among DACA participants, increasing the likelihood than an individual was employed by between 4.8 and 7.7 percentage points. Since Pope found no effect of DACA on education in his study, this employment effect must be independent of the effects of education.

In Table 10, the employment rates have all been reduced by 6 percentage points to reflect Pope's estimates. However, when the employment rate is only 69.94%, a 6 percentage point decline in employment reduces the employment rate to 63.94%, which is a nearly 9% reduction.[23]

## 2.3 Earnings without DACA

It would be surprising if legal status did not impact the financial rewards to employment. Being able to work legally opens up a wide array of job opportunities that would otherwise be unavailable to the worker, almost certainly leading to an increase in earnings.

Two studies of the effects of the Immigration Reform and Control Act (IRCA) of 1986 on the earnings of previously undocumented Mexican immigrants found exactly that. Rivera-Batiz (1999) compared the earnings of undocumented Mexican immigrants surveyed in 1987-8 with their earnings in 1992, after gaining legal status through IRCA. The majority of his sample were poorly educated, with nine or fewer years of education. He found, after accounting for changes in education, language proficiency, employment sector, and employment experience that had occurred during the intervening period, that legal status increased men's earnings by about 8% and women's earnings by nearly 13%.

---

[23]$0.6394/0.6994 = 91.4\%$.

Electronic copy available at: https://ssrn.com/abstract=3420511

Kossoudji and Cobb-Clark (2002) compared the same population of Mexican immigrant men who gained legal status under IRCA with a sample of (primarily U.S.-born) Latino man who entered the job market at about the same time. Similar to Rivera-Batiz, they concluded that prior to IRCA, the lack of legal status had reduced the men's earnings by 14% to 22%. They also found that prior to gaining legal status, there was only a small, statistically insignificant wage premium for education among the Mexican immigrants, which increased dramatically after legal status was obtained.

Pope (2016) looked at the effects of DACA on earnings, and found that DACA increased incomes in the bottom half of those working by 5% to 20%, but had little effect on those in the top of income distribution. This latter result is surprising, since Borjas (2017, Table 3) estimated than the returns to education for undocumented workers were only slightly more than half those of native-born workers.[24] He also found that the overall wage penalty to undocumented immigrants who had been in the U.S. for over a decade declined from around 12% prior to 2007 to around 8% in 2011-14.

Two sets of surveys report earnings gains for DACA recipients. Gonzales, Terriquez and Ruszczyk (2014) surveyed 2,381 DACA recipients in 2013, shortly after the program was implemented. 59% of those surveyed reported having obtained a new job, and 45% reported increased job earnings. Both positive outcomes were significantly more likely for those who had earned college degrees. Wong et al (2016, 2017, 2018), in three surveys with a total of 5,421 DACA respondents, reported that 64% of those surveyed reported having obtained a better paying job, 51% reported having obtained a job that better fit their education, and 68% reported increased job earnings. Their average earnings rose 65% for the full sample, and 88% for those 25 and older in the 2017 or 2018 surveys.

Since the acquisition of legal status clearly raised DACA recipients' incomes, the loss of that status would reduce those incomes. We model the impact of ending DACA as

---

[24]His education coefficients (in regressions of log income on various demographic measures) for native-born Americans averaged 0.118; they averaged 0.064 for undocumented immigrants.

Electronic copy available at: https://ssrn.com/abstract=3420511

reducing the earnings of all the DACA-eligibles of the previous section, but especially of those with the highest education. We began by assuming that otherwise-DACA-eligibles who dropped out of high school earn $21,800 a year in 2017 dollars, with only an inflationary increase over time; that is, with no increasing age-earnings profile. The $21,800 roughly equals the $20,000 that DACA respondents reported earning on average prior to DACA in Wong's 2017 and 2018 surveys, adjusted for inflation. It also represents a 15% wage penalty relative to the median income for all Hispanics with less than a high school education, $25,520 a year in 2017 dollars.[25]

In Table 11 we have adjusted downward the age-earnings profiles from Table 7, relative to that $21,800 figure. For those with high school degrees or some college, our without-DACA incomes are 55% of the difference between the with-DACA incomes and the $21,800 base.[26] For those with college degrees, without-DACA incomes are 40% of the difference between the with-DACA incomes and the $21,800 base. This reflects the fact that many of the highest paying jobs open to college graduates with legal status – such as Chemical Engineer or Systems Analyst – would be totally inaccessible once that status is removed. These adjustments capture Borjas' (2017) estimate that lack of legal status cuts the returns to education roughly in half, and are consistent with Kossoudji and Cobb-Clark's (2002) finding that legal status dramatically increased the education wage premium.

## 2.4   Income and Taxes without DACA

Combining the adjusted age-earnings profiles in Table 11 with the streams of workforce entrants in Table 10 gives income streams and aggregate income tax payments for each of the four education levels, which we present in Table 12. Note that the 2019 numbers are identical to those in Table 8, since we are modeling the policy change as occurring

---

[25]NCES *Digest for Education Statistics* (table 502.30).

[26]Thus, a 25 year-old with some college who would have earned $31,559 under DACA would now earn {$21,800 +0.55($31,559-$21,800)} = $27,167.

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 11: No-DACA Age-Earnings Profiles, by Education

| Age | HS dropout | HS only | Some Coll | BA/BS |
|-----|-----------|---------|-----------|-------|
| 19 | $21,800 | $24,849 | | |
| 20 | $21,800 | $24,999 | | |
| 21 | $21,800 | $25,151 | $26,145 | |
| 22 | $21,800 | $25,304 | $26,395 | |
| 23 | $21,800 | $25,459 | $26,648 | $29,675 |
| 24 | $21,800 | $25,616 | $26,906 | $30,338 |
| 25 | $21,800 | $25,774 | $27,167 | $31,012 |
| 26 | $21,800 | $25,933 | $27,433 | $31,693 |
| 27 | $21,800 | $26,094 | $27,703 | $32,382 |
| 28 | $21,800 | $26,257 | $27,977 | $33,077 |
| 29 | $21,800 | $26,422 | $28,254 | $33,777 |
| 30 | $21,800 | $26,588 | $28,536 | $34,480 |
| 31 | $21,800 | $26,756 | $28,823 | $35,187 |
| 32 | $21,800 | $26,925 | $29,114 | $35,894 |
| 33 | $21,800 | $27,096 | $29,409 | $36,602 |
| 34 | $21,800 | $27,269 | $29,709 | $37,307 |
| 35 | $21,800 | $27,443 | $30,014 | $38,010 |
| 36 | $21,800 | $27,620 | $30,323 | $38,708 |
| 37 | $21,800 | $27,798 | $30,637 | $39,400 |
| 38 | $21,800 | $27,978 | $30,955 | $40,084 |
| 39 | $21,800 | $28,159 | $31,279 | $40,759 |
| 40 | $21,800 | $28,343 | $31,607 | $41,424 |
| 41 | $21,800 | $28,343 | $31,940 | $42,076 |
| 42 | $21,800 | $28,343 | $32,279 | $42,714 |
| 43 | $21,800 | $28,343 | $32,623 | $43,336 |
| 44 | $21,800 | $28,343 | $32,972 | $43,941 |
| 45 | $21,800 | $28,343 | $33,326 | $44,528 |

at the end of 2019.

We again aggregate these income and income tax estimates by year and report the corresponding FICA taxes in Table 13. The results suggest that if DACA were terminated, for the decade 2020-2029 the formerly DACA-eligible population would have an aggregate income of only $316 billion, pay only $20 billion in income taxes, and generate only $48 billion in FICA taxes.

26

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 12: No-DACA Aggregate Income and Taxes, by Education ($B)

| Year | HS dropout | | HS only | | Some Coll | | BA/BS | |
|------|---------|---------|---------|---------|---------|---------|---------|---------|
| | Income | Taxes | Income | Taxes | Income | Taxes | Income | Taxes |
| 2019 | | | $10.905 | $0.696 | $6.901 | $0.467 | $9.135 | $0.792 |
| 2020 | $0.061 | $0.003 | $9.658 | $0.550 | $7.024 | $0.379 | $6.626 | $0.459 |
| 2021 | $0.109 | $0.005 | $10.390 | $0.594 | $7.685 | $0.439 | $7.475 | $0.522 |
| 2022 | $0.150 | $0.007 | $11.041 | $0.634 | $8.210 | $0.483 | $8.295 | $0.585 |
| 2023 | $0.183 | $0.008 | $11.652 | $0.673 | $8.652 | $0.520 | $9.061 | $0.646 |
| 2024 | $0.210 | $0.009 | $12.221 | $0.709 | $9.074 | $0.552 | $9.769 | $0.703 |
| 2025 | $0.230 | $0.010 | $12.744 | $0.744 | $9.479 | $0.584 | $10.435 | $0.759 |
| 2026 | $0.242 | $0.011 | $13.216 | $0.776 | $9.871 | $0.615 | $11.071 | $0.814 |
| 2027 | $0.249 | $0.011 | $13.635 | $0.805 | $10.248 | $0.645 | $11.691 | $0.857 |
| 2028 | $0.254 | $0.011 | $13.996 | $0.832 | $10.608 | $0.676 | $12.301 | $0.902 |
| 2029 | $0.260 | $0.012 | $14.367 | $0.860 | $10.930 | $0.705 | $12.902 | $0.947 |
| 2030 | $0.265 | $0.012 | $14.748 | $0.888 | $11.262 | $0.733 | $13.492 | $0.995 |
| 2031 | $0.270 | $0.012 | $15.139 | $0.917 | $11.605 | $0.762 | $14.067 | $1.043 |
| 2032 | $0.275 | $0.012 | $15.541 | $0.948 | $11.959 | $0.792 | $14.604 | $1.093 |
| 2033 | $0.281 | $0.013 | $15.904 | $0.973 | $12.325 | $0.823 | $15.154 | $1.144 |

However, those numbers assume that this population would, despite the loss of legal status, fully comply with the tax laws and pay all of their required tax liabilities. A far more reasonable assumption would be that a considerable fraction of these taxes would go unpaid. Social Security's Office of Chief Actuary (Goss el al 2013) has estimated that only about 44% of undocumented workers paid Social Security taxes in 2010.[27] Since we cannot imagine why an underground worker who is not paying Social Security taxes would then pay income taxes, we apply this 44% compliance rate to both sets of taxes. Under this assumption, the formerly DACA-eligible population would again have an aggregate 2020-2029 income of $316 billion, but pay just $9 billion in income taxes, and generate just $21 billion in FICA taxes.

---

[27]They estimated that there were about 7 million unauthorized workers that year, of whom 3.9 million were identified as working in the underground economy, and thus not paying taxes, with the remaining 3.1 million unauthorized workers tax compliant.

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 13: No-DACA Aggregate Income and Taxes ($B)

| Year | Income | Inc. Taxes | FICA Taxes |
|------|--------|------------|------------|
| 2019 | $26.941 | $1.955 | $4.122 |
| 2020 | $23.369 | $1.391 | $3.575 |
| 2021 | $25.659 | $1.560 | $3.926 |
| 2022 | $27.696 | $1.709 | $4.237 |
| 2023 | $29.548 | $1.847 | $4.521 |
| 2024 | $31.274 | $1.973 | $4.785 |
| 2025 | $32.888 | $2.097 | $5.032 |
| 2026 | $34.400 | $2.216 | $5.263 |
| 2027 | $35.823 | $2.318 | $5.481 |
| 2028 | $37.159 | $2.421 | $5.685 |
| 2029 | $38.459 | $2.524 | $5.884 |
| 2030 | $39.767 | $2.628 | $6.084 |
| 2031 | $41.081 | $2.734 | $6.285 |
| 2032 | $42.379 | $2.845 | $6.484 |
| 2033 | $43.664 | $2.953 | $6.681 |
| Assuming Full Tax Compliance | | | |
| 2019-28 | $304.757 | $19.487 | $46.627 |
| 2020-29 | $316.275 | $20.056 | $48.389 |
| 2021-30 | $332.673 | $21.293 | $50.898 |
| Assuming 44% Tax Compliance after 2019 | | | |
| 2019-28 | $304.757 | $9.669 | $22.824 |
| 2020-29 | $316.275 | $8.825 | $21.291 |
| 2021-30 | $332.673 | $9.369 | $22.395 |

## 3   Consequences of Ending DACA

As the previous two sections show, ending DACA would have significant economic consequences, summarized in Table 14. The DACA population would face a 28% decline in earnings, primarily through a loss in the return to education. Ending DACA would be, in effect, a 50% tax on their return to investment in human capital, an investment made in good faith when the promise of legal status was held out to them. Ending DACA would also result in a roughly $72 billion loss in tax revenue to the federal government over the 2020-29 decade.

Ending DACA would also affect state and local government tax revenues, the earnings

28

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 14: Consequences of Ending DACA ($B)

| 2020-29 | Income | Inc. Taxes | FICA Taxes |
|---|---|---|---|
| Under DACA | $436.740 | $34.877 | $66.821 |
| DACA Terminated | $316.275 | $8.825 | $21.291 |
| Difference | $120.465 | $26.052 | $45.530 |
| % Difference | 27.58% | 74.70% | 68.14% |

of American citizens, and the U.S. economy as a whole. We address each of those changes in the subsections below.

## 3.1   The Impact on State and Local Governments

Ending DACA would reduce state and local government tax revenues by reducing the incomes and resulting consumer spending that those governments tax. To estimate those revenue affects, we calculated each state's share of the total DACA population, based on the Migration Policy Institute (2018) estimated distribution.[28] These shares were then weighted by states' 2017 median household incomes to estimate the share of total DACA income to attribute to each state.

State and local tax revenues as a percent of state personal income were downloaded from the Urban Institute-Brookings Institution Tax Policy Center. Our estimated changes in property tax revenue and in sales and gross receipts tax revenue for each state are the products of our estimated change in DACA income times the state's weighted income share, multiplied by that tax's revenue as a percent of state personal income. We calculate estimated changes in income tax revenue similarly, but assume that only 44% of the DACA population's income would be reported if DACA were eliminated.

Table 15 reports these tax revenue losses for the 10 states with the largest income shares and for the nation as a whole, in million of dollars. Overall, the 50 states, Washington D.C., and their local tax jurisdictions would lose about $15 billion during the 2020-

---

[28]The MPI's estimates include 40 states, covering 98.9% of the DACA-eligible population.

29

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 15: 2020-29 State/Local Tax Revenue Cost of Ending DACA ($M)

| State | Share | Inc Loss | Prop Tax | Sales Tax | Inc Tax | Tax Loss |
|---|---|---|---|---|---|---|
| California | 33.57% | $40,442 | $1,096 | $1,290 | $3,567 | $5,953 |
| Texas | 13.55% | $16,320 | $623 | $712 | | $1,335 |
| New York | 5.90% | $7,113 | $325 | $255 | $845 | $1,425 |
| Illinois | 4.82% | $5,811 | $235 | $208 | $294 | $737 |
| New Jersey | 4.69% | $5,649 | $285 | $136 | $335 | $756 |
| Florida | 4.55% | $5,479 | $150 | $209 | | $359 |
| Georgia | 3.09% | $3,719 | $101 | $112 | $218 | $431 |
| North Carolina | 2.52% | $3,034 | $69 | $101 | $208 | $378 |
| Arizona | 2.34% | $2,824 | $74 | $120 | $98 | $292 |
| Washington | 2.17% | $2,619 | $68 | $147 | | $215 |
| Total | 98.9% | $119,139 | $3,751 | $4,138 | $7,168 | $15,057 |

29 decade.

## 3.2   The Impact on American Workers

One of the ironies of the proposal to end DACA is that it would convert a population with a substantial fraction of high-skilled workers into a population of at best moderate-to-low skilled workers. A high-school-only DACA-eligible worker currently employed in retail sales would face a comparatively small loss in income if he lost that job when his DACA work authorization ended, since there are undoubtedly many small retailers willing to hire him to do the same job, albeit off the books at a somewhat lower wage. But a DACA-eligible worker with a degree in structural engineering would be unlikely to find an employer willing to hire her without work authorization, forcing her to compete in that same market for retail jobs.

The economics literature shows that skilled immigrant workers have a beneficial impact on the employment of both skilled and unskilled American citizens. One reason for this is that skilled immigrants have a relatively small substitution effect on skilled domestic workers, because those skilled immigrants are relatively mobile and go where there

30

Electronic copy available at: https://ssrn.com/abstract=3420511

are many available jobs. In contrast, the U.S. labor force is less flexible: geographic mobility has gradually diminished in the U.S. since the 1950s, and has fallen by 10% in just the last few years.[29] The chief reason for this trend is the rise in two-income households, which increases the cost of moving for one spouse's job.

Skilled immigrants also have a positive impact on domestic employment because they create what economists call a "scale effect": skilled immigrants boost overall economic activity, creating more opportunities and jobs for both skilled and unskilled domestic workers. This scale effect outweighs their small substitution effect for skilled domestic workers. For example, Peri et. al. (2014a) showed that reducing the number of skilled foreign workers coming to a community significantly reduced the wages of college-educated U.S.-born workers in those communities who work with computers.[30]

Skilled immigrants have an unambiguously positive effect on unskilled U.S. born workers. Skilled workers and unskilled workers are, in general, complementary, just as skilled workers and capital are complementary – that is, an increase in the quantity of one increases the demand and price for the other (Chiswick 2011). Hence, an increase in the supply of skilled immigrants increases the amount of capital in the economy and – along with it – the demand for unskilled workers. This results in higher wage and employment levels for unskilled workers, even without the scale effect (Kiley 1999).

Highly-skilled immigrants are also more likely to create new businesses than U.S. citizens with similar skills and education. Immigrants in the U.S. are 30% more likely to start a new business than a native worker, and 25% of all startups in Silicon Valley have been founded by immigrants (Wolla 2014).

In addition, highly-skilled, well-educated workers, both foreign-born and domestic, have high employment levels, are less likely to avail themselves of public services such as food stamps or welfare, and are more likely to be in occupations that are hard to fill. As a result, they boost U.S. tax revenues while having little impact on government

---

[29] Feintzeig and Weber (2018).
[30] See also Peri, Shih, and Sparber (2014b).

31

Electronic copy available at: https://ssrn.com/abstract=3420511

spending.[31]

Ending DACA would reduce the supply of high skilled workers while increasing the supply of low skilled workers in the economy.[32] The increased competition for low-skilled jobs would hurt low skilled domestic workers; the DACA population's loss of income would create a negative scale effect, reducing the demand for high and low skill workers alike.

Thus, any belief that ending DACA would be a boon for low skilled American workers is therefore sadly out on line with the facts.

# 4   Conclusion

DACA provides legal status, and legal work authorization, to over a million young people who came to this country as children, and who, except for their currently tenuous legal status, mostly identify as Americans. As the Congressional Budget Office (CBO) implicitly and we believe correctly assumed when they scored S. 1615, these young people are highly likely to remain in the U.S., and in the U.S. workforce, regardless of whether DACA is discontinued. The primary impact of ending DACA would therefore be to channel them into jobs where legal status is ignored, and therefore for the most part into jobs that do not allow them to take full advantage of their human capital.

Eliminating DACA would be, in effect, throwing away some of our nation's capital resources. We estimated that its elimination would cost the DACA population about $120 billion in reduced income (Table 14). But workers rarely capture all of their productivity in wage income, so the total loss of economic output would be even greater. As a result, the losses in tax revenue at both the federal and state/local level will likely exceed our

---

[31]For a literature review on this topic see Brannon and Albright (2016).

[32]The Congressional Budget Office (CBO) score for S. 1615 effectively assumed that DACA merely switches the DACA population from underground to legal status, without having any effect on their income. While we find this latter assumption implausible, we would note that they do *not* assume that DACA has any significant impact on these workers' willingness to be employed. Hence the CBO's scoring of S. 1615 implicitly agrees with our assessment that ending DACA would not remove a large number of low-skilled workers from the workforce.

Electronic copy available at: https://ssrn.com/abstract=3420511

estimates in the previous sections.

Since human capital and physical capital are complements, the failure to employ all of our human capital would hurt the suppliers of physical capital, low-to-moderate income workers. Opponents of DACA, displaying a tragic lack of understanding of how the economy works, argue that its elimination would "open up jobs for Americans." But as section 3.2 showed, its elimination would merely increase the competition for the kinds of jobs that tend to have an excess supply of workers, while reducing the supply of employable skilled workers in the areas where we have the most acute labor shortages. Overall, we find that eliminating DACA would be a lose-lose-lose economic policy, hurting these young immigrants, federal, state, and local government treasuries, the aggregate economy, and the incomes of low-to-moderate income workers.

NJAPP248

Electronic copy available at: https://ssrn.com/abstract=3420511

# References

[1] Amuedo-Dorantes, Catalina, and Francisca Antman, 2017. "Schooling and labor market effects of temporary authorization: Evidence from DACA," *Journal of Population Economics* 30: 339-373.

[2] Borjas, George J., 2017. " The Earnings of Undocumented Immigrants," NBER Working Paper 23236. Available at: http://www.nber.org/papers/w23236.

[3] Brannon, Ike and Logan Albright, "Immigration's Impact on the Texas Economy," *Texas Public Policy Institute*, March 2016.

[4] Capps, Randy, Michael Fix, and Jie Zong, 2017. "The Education and Work Profiles of the DACA Population," Washington, DC: Migration Policy Institute.

[5] Chiswick, Barry, 2011. "Immigration: High-skilled vs Low-skilled Labor," IZA: Institute for the Study of Labor, Policy Paper 28.

[6] Cortes, Kalena E. 2013. "Achieving the DREAM: The Effect of IRCA on Immigrant Youth Postsecondary Educational Access." *American Economic Review*, 103(3): 428-432.

[7] Feintzeig, Lauren and Lauren Weber, "Fewer Americans Uproot Themselves for a New Job," *The Wall Street Journal*, 20 August 2018.

[8] Gonzales, Roberto G. , Veronica Terriquez and Stephen P. Ruszczyk, 2014. "Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)," *American Behavioral Scientist* :1-21.

[9] Goss, Stephen, Alice Wade, J. Patrick Skirvin, et al, 2013. "Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds," Social Security Administration, Actuarial Note, 151. Available at: https://www.ssa.gov/oact/NOTES/pdf_notes/note151.pdf.

34

Electronic copy available at: https://ssrn.com/abstract=3420511

[10] Hsin, Amy and Francesc Ortega, 2018. "The Effects of Deferred Action for Child-hood Arrivals on the Educational Outcomes of Undocumented Students," *Demography* 55: 1487-1506.

[11] Hudak, John and Elaine Kamarck, 2017. "The Mind-boggling Cost of DACA Repeal." Washington DC: The Brookings Institute. Available at: https://www.brookings.edu/blog/fixgov/2017/09/07/the-mind-boggling-cost-of-daca-repeal/

[12] Kaushal, Neeraj. 2008. "In-State Tuition for the Undocumented: Education Effects on Mexican Young Adults." *Journal of Policy Analysis and Management* 27(4): 771-92.

[13] Kiley, Michael T, 1999. "The Supply of Skilled Labor and Skills-biased Technological Progress," *Economics Journal*.

[14] Kossoudji, Sherrie A, and Deborah A Cobb-Clark, 2002. "Coming out of the shadows: Learning about legal status and wages from the legalized population." *Journal of Labor Economics*, 20(3): 598-628.

[15] Kuka, Elira, Na'ama Shenhav, and Kevin Shih. 2018. "Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA," NBER Working Paper, 24315.

[16] Liscow, Zachary and William Gui Woolston, 2018. "Does Legal Status Matter for Educational Choices? Evidence from Immigrant Teenagers" *American Law and Economics Review* 20: 318-381.

[17] Migration Policy Institute, 2018. "National and State Estimates of Immigrant Populations Eligible for the Deferred Action for Childhood Arrivals (DACA) Program, 2018." Available at: https://www.migrationpolicy.org/sites/default/files/datahub/State-County-DACA-Estimates of DACA-Eligible Population_2018.xlsx.

Electronic copy available at: https://ssrn.com/abstract=3420511

[18] Passel, Jeffrey and D'Vera Cohn. 2009. "A Portrait of Unauthorized Immigrants in the United States," Washington, DC: Pew Hispanic Center Report.

[19] Peri, Giovanni, Kevin Shih, Chad Sparber, and Angie Marek-Zeitlin, 2014a. "Closing Economic Windows: How H-1B Visa Denials Cost U.S.-born Tech Workers Jobs and Wages during the Great Recession," *The Partnership for a New American Economy,*.

[20] Peri, Giovanni, Kevin Shih, and Chad Sparber, 2014b. "Foreign Scientists and Engineers and Economic Growth," *Cato Papers on Public Policy* 3: 107-184.

[21] Pope, Nolan G., 2016. "The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants," *Journal of Public Economics* 143: 98-114.

[22] Rivera-Batiz, Francisco L. 1999. "Undocumented workers in the labor market: An analysis of the earnings of legal and illegal Mexican immigrants in the United States." *Journal of Population Economics* 12(1): 91-116.

[23] Tamborini, Christopher R., ChangHwan Kim and Arthur Sakamoto, 2015."Education and Lifetime Earnings in the United States," *Demography* 52: 1383-1407.

[24] Thornton, Robert, James Rogers and Michael Brookshire, 1997. "On the Interpretation of Age-Earnings Profiles," *Journal of Labor Research* 18(2): 351-365.

[25] U.S. Census Bureau, "Table H-8. Median Household Income by State: 1984 to 2017." Available at: https://www2.census.gov/programs-surveys/cps/tables/time-series/historical-income-households/h08.xls.

[26] U.S. Census Bureau, "Annual Estimates of the Resident Population by Sex, Single Year of Age, Race Alone or in Combination, and Hispanic Origin for the United States: April 1, 2010 to July 1, 2017." Available at: https://www.census.gov/newsroom/press-kits/2018/estimates-characteristics.html.

36

Electronic copy available at: https://ssrn.com/abstract=3420511

[27] U.S. Census Bureau, "CPS Historical Time Series Tables on School Enrollment." Available at: https://www.census.gov/data/tables/time-series/demo/school-enrollment/ cps-historical-time-series.html, Table A-4.

[28] U.S. Census Bureau, "Educational Attainment in the United States: 2017." Available at: https://www.census.gov/data/tables/2017/demo/education-attainment/cps-detailed-tables.html.

[29] U.S. Citizenship and Immigration Services, 2017."Approximate Active DACA Recipients: Country of Birth." Available at: https://www.uscis.gov/sites/default/files/ USCIS/Resources/Reports and Studies/Immigration Forms Data/All FormTypes/ DACA/daca_population_data.pdf

[30] U. S. Department of Education, Institute of Education Sciences, National Center for Education Statistics, *Digest for Education Statistics*. https://nces.ed.gov/programs/ digest/.

[31] The Urban Institute-Brookings Institution Tax Policy Center, State & Local Government Finance Data Query System. Available at: http://www.taxpolicycenter.org/slf-dqs/pages.cfm.

[32] Wolla, Scott, 2014. "The Economics of Immigration," The Federal Reserve Bank of St. Louis.

[33] Wong, Tom K., Greisa Martinez Rosas, Adrian Reyna, Ignacia Rodriguez, Patrick OShea, Tom Jawetz, and Philip E. Wolgin, 2016, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Washington D.C.: Center for American Progress. Available at: https://www.americanprogress.org/issues/immigration/news/ 2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes/.

Electronic copy available at: https://ssrn.com/abstract=3420511

[34] Wong, Tom K., Greisa Martinez Rosas, Adam Luna, Henry Manning, Adrian Reyna, Patrick OShea, Tom Jawetz, and Philip E. Wolgin, 2017, *DACA Recipients Economic and Educational Gains Continue to Grow*, Washington D.C.: Center for American Progress. Available at: https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/ daca-recipients-economic-educational-gains-continue-grow/.

[35] Wong, Tom K., Sanaa Abrar, Tom Jawetz, Ignacia Rodriguez Kmec, Patrick O'Shea, Greisa Martinez Rosas, and Philip E. Wolgin, 2018, *Amid Legal and Political Uncertainty, DACA Remains More Important Than Ever*, Washington D.C.: Center for American Progress. Available at: https://www.americanprogress.org/issues/immigration/news/2018/08/15/454731/ amid-legal-political-uncertainty-daca-remains-important-ever/.

NJAPP253

Electronic copy available at: https://ssrn.com/abstract=3420511

# Exhibit C

# IKE BRANNON, PH.D

2012 Wyoming Ave NW #301, Washington DC 20009 ●(202) 309-0893 ● Ike.Brannon@gmail.com

**Attributes:** Ph.D. Economist with a background in academia and public service with a focus on tax and financial market issues.

## CurrentPositions

| | |
|---|---|
| ***Capital Policy Analytics Group, President*** | **2012-** |

- Consulting firm focused on providing objective analyses of public policy and political analysis concerning taxes, regulatory policy, and health care for a variety of clients inside and outside of Washington.

| | |
|---|---|
| ***The Jack Kemp Foundation, Senior Fellow*** | **2018-** |

- Write and edit research on public policy issues

| | |
|---|---|
| ***The Savings and Retirement Foundation, Founder/Director*** | **2012-** |

- The Foundation organizes a monthly seminar for researchers and Congressional staff. It also has a blog and hosts regular events on Capitol Hill.

| | |
|---|---|
| ***Forbes,* Columnist** | **2017-** |

| | |
|---|---|
| ***Regulation, Contributing Editor*** | ***2013-*** |

## Previous Experience

| | |
|---|---|
| ***The Weekly Standard*, Contributing Editor** | 2015-2018 |

- Over 100 articles published in the magazine

| | |
|---|---|
| **The Cato Institute, Nonresident Senior Fellow** | 2015-2018 |

- Wrote studies, blog posts, and opinion articles

| | |
|---|---|
| **The American Action Forum, *Director of Economic Policy & Gov't Relations*** | 2011-2012 |

- Oversaw Forum's research agenda on tax, trade, & entitlement reform
- Coordinated Forum's outreach to Congressional Members & staff

| | |
|---|---|
| **Committee on Energy and Commerce, *Chief Economist*** | 2009-2011 |

- Directed research on health care, energy & environmental analysis
- Liaised with Congressional Budget Office & JCT

| | |
|---|---|
| **Republican Policy Committee, Senate Leadership, *Chief Economist*** | 2008-2009 |

- Advised party leadership and conference on savings, pension, & tax issues
- Wrote memos and advised Senate staff

| | |
|---|---|
| **John McCain 2008, *Senior Policy Adviser/Chief Economist*** | 2008 |

- Represented campaign via talks, interviews, and media appearances

- Recruited, organized, & managed network of external economic advisers

**United States Treasury,** *Senior Adviser for Tax Policy*                      2007-2008
- Co-author & co-editor of 2007 studies on corporate tax reform
- Contributed to Treasury's response to subprime crisis & fiscal stimulus

**Senate Finance Committee, Orrin Hatch,** *Principal Economic adviser*         2005-2007
- Prepared legislation & counseled Senator on savings and taxation issues

**The Joint Economic Committee of Congress,** *Chief Economist*                  2004-2005
                                              *Senior Economist*                 2002-2004
- Supervised staff of 15 with a research focus on tax, budget, & entitlements

**Office of Management and Budget,** *Senior Economist, OIRA*                    2001-2002
- Analyzed major regulations promulgated by federal agencies

**Department of Economics, University of Wisconsin, Oshkosh, WI**               1994-2001
- Promoted to Associate Professor and granted tenure in 2000
- Teaching award in the College of Letters and Sciences, 2000
- Research Associate with the Wisconsin Policy Research Institute, 1998-2001

**Department of Finance, Indiana University, Bloomington, IN**                   1998
- Visiting Associate Professor

## Education

- Ph.D., M.A., Economics, Indiana University, Bloomington, IN                    1993
- B.A., Math, Economics, Spanish, Augustana College,  Rock Island, IL           1988
  - Augustana College Young Alumni Of The Year, 2004.

## Other Activities

- Director of the Prosperity Caucus                                              2004-
  - A DC policy forum with a membership of over 250 dedicated to issues related to economic growth, investment, and prosperity
- Director of the Tax Economists' Forum                                          2006-
  - Biweekly, bipartisan seminar for tax economists
- Lecturer, NATO Orientation Program, National Defense University               2005-2010
  - Monthly talk to senior officers with new postings in NATO
- Visiting Fellow, The Badger Institute                                          2018-
- Alumni of the year, Mossville School, Mossville, IL                            2019

| Publication | Date | Type of Piece | Co-Authors | Links | General Subject Matter | Title | Notes |
|---|---|---|---|---|---|---|---|
| Forbes Online | 7/16/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/07/16/the-increased-politicization-of-proxy-votes/#5d568adb63b6 | Proxy Votes | "The Increased Politicization Of Proxy Votes" | |
| Forbes Online | 7/11/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/07/11/diminishing-the-power-of-proxy-advisory-firms/#6e84a631452c | Proxy Advisory Firms | "Diminishing the Power of Proxy Advisory Firms" | |
| SSRN | 7/11/19 | Policy Analysis | | https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3417313 | Healthcare-Suprise Billing | "The Potential Pitfalls from Methods to End Surprise Billing in Healthcare" | |
| Bloomberg Law | 7/9/19 | Article | | https://news.bloomberglaw.com/us-law-week/insight-gene-therapy-price-controls-would-be-short-sighted-deter-innovation-3 | Gene Threapy Price Controls | "Gene Therapy Price Controls Would Be Short-Sighted, Deter Innovation" | |
| Forbes Online | 7/8/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/07/08/increasing-the-passenger-facilities-charge-makes-little-sense | Passenger Facility Charge | "Increasing the Passenger Facility Charge Makes Little Sense" | |
| The Hill | 7/8/19 | Op-Ed | | https://thehill.com/opinion/healthcare/451340-revealing-negotiated-prices-wont-reduce-health-care-costs | Health Care Costs | "Revealing negotiated prices won't reduce health care costs" | |
| SSRN | 7/5/19 | Policy Analysis | M. Kevin McGee | https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3420511 | DACA | "Estimating the Economic Impacts of DACA" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Southern Illinoisan | 6/26/19 | Op-Ed | | https://thesouthern.com/opinion/columnists/opinion-ike-brannon-real-time-payments-are-here-for-the/article_0ed3d741-d0b4-5f27-a2f4-b36dc9404b7e.html | Real-Time Payments | "Ike Brannon: Real-time payments are here for the US" | |
| Forbes Online | 6/7/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/06/07/the-government-must-tred-lightly-with-industry-consolidation-in-the-shrinking-print-industry/#4c7d585b5f52 | Printing Company Mergers | "The Government Must Tred Lightly With Industry Consolidation In The Shrinking Print Industry" | |
| SSRN | 6/7/19 | Policy Analysis | Robert H. Jennings | https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3391834 | Equity Exchange Fees | "Equity Exchange Fees and Revenues" | |
| The Washington Times | 6/6/19 | Op-Ed | | https://www.washingtontimes.com/news/2019/jun/6/dc-circulator-bus-time-to-say-good-riddance-to-the/ | D.C. Buses | "Good riddance to the 'free' D.C. Circulator bus" | |
| Forbes Online | 6/4/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/06/04/amid-irs-overreach-congress-has-a-real-opportunity-to-reform-conservation-easement-legislation/#91b7d5739fc9 | Conservation Easement | "Amid IRS Overreach, Congress Has A Real Opportunity to Reform Conservation Easement Legislation" | |

| The Washington Times | 5/19/19 | Op-Ed | | https://www.washingtontimes.com/news/2019/may/19/havana-ruined-impoverished-by-60-years-of-statism/ | Havana Trapped in the 60s | "Nothing Changes in Havana" | |
| Wispolitics | 5/18/19 | Op-Ed | | https://www.wispolitics.com/2019/ike-brannon-a-new-approach-for-economic-development-in-wisconsin/ | Making Towns Desirable to Live In | "A new approach for economic development in Wisconsin" | |
| SSRN | 5/8/19 | Policy Analysis | Anthony T. L | https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3373135 | Gene Replacement Therapy | "Properly Valuing Investment in the Development of Gene Replacement Therapy" | |
| The Washington Times | 5/8/19 | Op-Ed | | https://www.washingtontimes.com/news/2019/may/8/dc-has-an-awful-parking-policy/ | D.C. Parking | "Parking in the nation's capital is a giveaway to the rich" | |
| Forbes Online | 4/30/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/04/30/drug-prices-should-reflect-efficacy/#3d9a6bcb4ec4 | Drug Prices | "Drug Prices Should Reflect Efficacy" | |
| Forbes Online | 4/29/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/04/29/titanium-productions-perilous-u-s-future/#3d5887686a72 | Titanium Sponge (lack of domestic producers) | "Titanium Production's Perilous U.S. Future" | |
| The Washington Times | 4/24/19 | Op-Ed | | https://www.washingtontimes.com/news/2019/apr/24/peru-faced-down-terrorism-insurgencies-and-prevail/ | Former Peruvian President Alan Garcia | "A Peruvian president's ignominious end" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Forbes Online | 4/22/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/04/22/ending-drug-rebates-will-not-reduce-drug-prices/#d772d7d20098 | Drug Rebates | "Ending Drug Rebates Will Not Reduce Drug Prices" | |
| Forbes Online | 4/9/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/04/09/intellectual-property-disputes-threaten-to-spread-to-new-venue/ | Intellectual Property | "Intellectual Property Disputes Threaten To Spread To New Venue" | |
| Forbes Online | 4/5/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/04/05/imposing-more-price-controls-on-debit-cards-may-not-help-consumers/#af3512f293ce | Debit Card Price Controls | "Imposing More Price Controls On Debit Cards May Not Help Consumers" | |
| SSRN | 4/2/19 | Policy Analysis | M. Kevin McGee | https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3349786 | H-4 Visa Work Authorization | "Repealing H-4 Visa Work Authorization: A Cost-Benefit Analysis" | |
| The Washington Post | 3/27/19 | Article | Kevin McGee | https://www.washingtonpost.com/outlook/2019/03/27/trump-says-he-wants-skilled-immigrants-hes-about-stop-working/?utm_term=.b893a68ac608 | H-4 Visas | "Trump says he wants skilled immigrants. He's about to stop 70,000 from working." | |
| Forbes Online | 3/19/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/03/19/fannie-and-freddie-need-more-capital/#2aa0d4455436 | Fannie Mae and Freddie Mac Need More Capital | "Fannie And Freddie Need More Capital" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Forbes Online | 3/18/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/03/18/the-folly-of-having-the-u-s-government-build-a-5g-network/#6abf3a893af6 | 5G Network | "The Folly of Having The U.S. Government Build A 5G Network" | |
| Forbes Online | 3/15/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/03/15/coming-to-grips-with-the-potential-benefits-of-gene-therapy/#11cbf96b5172 | Gene Therapy | "Coming to Grips with The Potential Benefits Of Gene Therapy" | |
| Forbes Online | 3/14/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/03/14/stable-value-cryptocurrencies-need-regulatory-clarity/#2e4a5fee672b | Cryptocurrency Regulation | "Stable Value Cryptocurrencies Need Regulatory Clarity" | |
| The Washington Times | 3/13/19 | Op-Ed | | https://www.washingtontimes.com/news/2019/mar/13/dc-metrobus-app-and-reality-out-of-sync/ | D.C. Metrobus App | "D.C. Metrobus app and reality out of sync" | |
| Forbes Online | 3/5/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/03/05/at-what-cost-assessing-the-high-cost-of-removing-h-4-visa-holders-from-the-american-workforce/ | H-4 Visa Holders | "At What Cost: Assessing the High Cost of Removing H-4 Visa Holders from the American Workforce" | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Forbes Online | 2/28/19 | Op-Ed | https://www.forbes.com/sites/ikebrannon/2019/02/28/the-real-time-payments-market-does-not-need-government-competition/#fd6678c4b4e0 | Real Time Payments Systems | "The Real Time Payments Market Does Not Need Government Competition" | |
| Forbes Online | 2/27/19 | Op-Ed | https://www.forbes.com/sites/ikebrannon/2019/02/27/credit-card-revenue-increased-solely-because-we-use-credit-cards-more/#5883841a2b28 | Credit Interchange Fees | "Credit Card Revenue Increased Solely Because We Use Credit Cards More" | |
| Wispolitics | 2/22/19 | Op-Ed | https://www.wispolitics.com/2019/ike-brannon-abolishing-unfair-sales-act-would-help-mitigate-impact-of-gas-tax-hike/ | Unfair Sales Act | "Abolishing Unfair Sales Act would help mitigate impact of gas tax hike" | |
| The Washington Times | 2/17/19 | Op-Ed | https://www.washingtontimes.com/news/2019/feb/17/encourage-metrobus-ridership/ | D.C. Bus Ridership | "How to encourage people to take the bus" | |
| Peoria Journal Star | 2/15/19 | Op-Ed | https://www.pjstar.com/opinion/20190215/spotlight-minimum-wage-increase-bad-for-downstate | Illinois Minimum Wage | "Spotlight: Minimum wage increase bad for downstate" | |
| Forbes Online | 2/8/19 | Op-Ed | https://www.forbes.com/sites/ikebrannon/2019/02/08/putting-profits-before-politics-at-u-s-corporations/ | Proxy Advisory Firms Investing due to Politics, not Profit seeking | "Putting Profits Before Politics At U.S. Corporations" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Forbes Online | 2/5/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/02/05/the-post-get-squishy-on-a-progressive-tax-code-when-it-comes-to-upper-class-incentives-for-housing/#5ecb40f4f23f | Eliminating state and local tax deducations | "The Post get Squishy on a Progressive Tax Code When it comes to Upper-Class Incentives for Housing" | |
| Forbes Online | 2/1/19 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2019/02/01/the-facile-game-of-blaming-pharmacy-benefit-managers-for-high-drug-prices/#780a497468e2 | Pharmacy Benefit Managers | "The Facile Game Of Blaming Pharmacy Benefit Managers For High Drug Prices" | |
| The Washington Post | 12/28/18 | Op-Ed | | https://www.washingtonpost.com/opinions/the-government-should-pay-living-kidney-donors/2018/12/28/3f61ef1e-056b-11e9-958c-0a601226ff6b_story.html?noredirect=on&utm_term=.b9e4deade7fb | Living Kidney Donors | "The government should pay living kidney donors" | |
| The Hill | 12/26/18 | Op-Ed | | https://thehill.com/opinion/finance/421523-having-the-fed-compete-in-real-time-payment-services-makes-no-sense | Real-time payment services | "Having the Fed compete in real-time payment services makes no sense" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 12/6/18 | Article | | https://www.weeklystandard.com/ike-brannon/a-conservative-case-for-a-carbon-tax-no-seriously | Carbon Tax | "A Conservative Case for a Carbon Tax. No, Seriously." | |
| RealClear Markets | 12/6/18 | Article | | https://www.realclearmarkets.com/articles/2018/12/06/jack_bogle_has_discovered_a_downside_to_low_index_fees_103526.html | Index Fees | "Jack Bogle Has Discovered a Downside to Low Index Fees" | |
| Forbes Online | 11/27/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/11/27/legislative-clarity-on-utility-tokens-will-lead-to-greater-investor-confidence/#6666299278c0 | Utility Token Regulation | "Legislative Clarity On Utility Tokens Will Lead To Greater Investor Confidence" | |
| Forbes Online | 11/13/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/11/13/who-ultimately-regulates-blockchain-and-cryptocurrencies-does-matter/#6b92b95b3901 | Cryptocurrency Regulation | "Who Ultimately Regulates Blockchain and Cryptocurrencies Does Matter" | |
| The Weekly Standard | 11/12/18 | Article | | https://www.weeklystandard.com/ike-brannon/how-to-the-government-can-save-2-billion-in-prescription-drug-costs-with-eye-droppers | Reducing Prescription Drugs Costs | "How the Government Can Save $2 Billion with Eye Droppers" | |

| | | | | | | |
|---|---|---|---|---|---|---|
| The Weekly Standard | 11/1/18 | Article | https://www.weeklystandard.com/ike-brannon/is-cybersecurity-a-good-reason-to-subsidize-coal-and-nuclear-energy | Coal and Nuclear Energy Subsidies | "Is Cybersecurity a Good Reason to Subsidize Coal and Nuclear Energy?" | |
| Forbes Online | 10/31/18 | Op-Ed | https://www.forbes.com/sites/ikebrannon/2018/10/31/department-of-transportations-deregulatory-actions-begin-to-bear-fruit/#65de3a3a7f9d | DOT De-Regulation | "Department Of Transportation's Deregulatory Actions Begin To Bear Fruit" | |
| Forbes Online | 10/18/18 | Op-Ed | https://www.forbes.com/sites/ikebrannon/2018/10/18/kill-the-proxy-zombies/#3db6d9172727 | Zombie Proposals | "Kill The Proxy Zombies" | |
| The Weekly Standard | 10/15/18 | Article | https://www.weeklystandard.com/ike-brannon/governments-want-access-to-your-data | Data Localization | "Governments Want Access To Your Data" | |
| Forbes Online | 10/5/18 | Op-Ed | https://www.forbes.com/sites/ikebrannon/2018/10/05/rethinking-the-mandate-that-investment-funds-vote-their-proxies/#1961ef7d6af6 | Proxy Voting (Investment Managers) | "Rethinking The Mandate That Investment Funds Vote Their Proxies" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Forbes Online | 9/26/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/09/26/abolishing-drug-rebates-may-push-consumer-drug-costs-higher/#15a514d14488 | Drug Rebates | "Abolishing Drug Rebates May Push Consumer Drug Costs Higher" | |
| The Weekly Standard | 9/20/18 | Article | Jared Whitley | https://www.weeklystandard.com/ike-brannon/how-to-protect-our-elections | Protecting Elections | "Here's How To Protect Our Elections" | |
| Badger Institute | 9/6/18 | Article | Andrew Hanson | https://www.badgerinstitute.org/News/2017-2018/A-Blueprint-for-Finding-More-Wisconsin-Workers.htm | Increasing Wisconsin Labor Force Participation Rate | "Drawing sidelined Wisconsin workers back to the labor force" | |
| SSRN | 8/20/18 | Policy Analysis | Jared Whitley | https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3224511 | Proxy Advisory Firms | "Corporate Governance Oversight and Proxy Advisory Firms" | |
| Forbes Online | 8/6/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/08/06/our-internet-data-behemoths-wont-swallow-the-world/#2b548fad1e32 | Data possessed by Social Media Companies | Our Internet Data Behemoths Won't Swallow The World | |
| Forbes Online | 7/26/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/07/26/put-chinese-and-american-payment-companies-on-an-even-playing-field/#1b3afb42598b | China's Unfair Treatment of American Companies | "Put Chinese And American Payment Companies On An Even Playing Field" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Forbes Online | 7/2/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/07/02/steel-tariffs-are-not-creating-american-jobs-at-least-not-in-missouri/#db54db5457b2 | Steel Tariffs | "Steel Tariffs Are Not Creating American Jobs--At Least Not In Missouri" | |
| Forbes Online | 6/11/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/06/11/bad-rules-can-cost-money-even-before-implemented/#685a3e764be3 | Beryllium Regulations | "Bad Rules Can Cost Money Even Before Being Implemented" | |
| SSRN | 6/8/18 | Policy Analysis | Anthony T. Lo | https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3186918 | Drug Rebates | "Drug Rebates Do Not Increase Costs to Consumers" | |
| Forbes Online | 6/6/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/06/06/pharmacy-benefit-managers-are-not-the-cause-of-high-prescription-drug-prices/#377634326b9a | Pharmacy Benefit Managers/High Cost of Prescription Drugs | "Pharmacy Benefit Managers Are Not The Cause Of High Prescription Drug Prices" | |
| The Weekly Standard | 6/1/18 | Article | | https://www.weeklystandard.com/ike-brannon/remembering-longtime-congressional-gop-staffer-roger-mahan | Roger Mahan | "My Dinners with Roger" | |

| Forbes Online | 5/31/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/05/31/financing-broadband-access-should-not-entail-taxing-broadband-access/#d26978596340 | Financing Broadband | "Financing Broadband Access Should Not Entail Taxing Broadband Access" | |
| Forbes Online | 5/28/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/06/28/a-better-eyedrop-may-save-billions-and-improve-americans-health/#151223e13503 | Reducing Prescription Drugs Costs | "A Better Eyedrop May Save Billions and Improve Americans' Health" | |
| Forbes Online | 5/25/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/05/25/if-employment-guide-immigration-policy-repealing-international-entrepreneur-visa-makes-no-sense/#76fb194e16bf | International Entreprenuer Visa | "If Employment Guide Immigration Policy, Repealing International Entrepreneur Visa Makes No Sense" | |
| Forbes Online | 5/23/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/05/23/injecting-common-sense-into-financial-markets/#3dff822e1e83 | Fixing Financial Regulations | "Injecting Common Sense Into Financial Markets" | |

| Forbes Online | 5/17/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/05/17/a-tipped-minimum-wage-for-dc-waiters-is-opposed-by-dc-waiters-for-good-reason/#4c8c7a0a2b58 | D.C. Restaurant worker minimum wage | "A Tipped Minimum Wage for DC Waiters Is Opposed by DC Waiters--For Good Reason" | |
| Forbes Online | 5/3/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/#39290d684645 | Airline Fees | "Airline Fees And Common Sense: Prohibiting Ancillary Charges Would Not Benefit Passengers" | |
| Forbes Online | 5/1/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/05/01/end-the-food-truck-lottery-auctioning-spaces-benefits-consumers-and-the-city/#1e9150d94417 | Food Trucks | "End The Food Truck Lottery: Auctioning Spaces Would Benefit Consumers And The City" | |
| Cato at Liberty | 4/26/18 | Blog Post | | https://www.cato.org/blog/department-labor-determines-esg-efforts-are-not-fiduciary-best-interests-investors | ESG Efforts | "The Department of Labor Determines that ESG Efforts are not in the Fiduciary Best Interests of Investors" | |
| The Weekly Standard | 4/16/18 | Article | | https://www.weeklystandard.com/ike-brannon/will-an-upcoming-supreme-court-decision-hurt-the-economy | Online Sales Tax | "Will An Upcoming Supreme Court Decision Hurt the Economy?" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 4/9/18 | Article | | https://www.weeklystandard.com/ike-brannon/is-puerto-rico-serious-about-reforming | Puerto Rico Fiscal Reform | "Is Puerto Rico Serious About Reforming?" | |
| SSRN | 3/20/18 | Policy Analy | Michelle Han | https://papers.ssrn.com | Internet Sales Tax | "Internet Sales Taxes and the Discriminatory Burden on Remote Retailers – An Economic Analysis" | |
| The Weekly Standard | 3/19/18 | Article | | https://www.weeklystandard.com/ike-brannon/marxism-for-our-times | Marxism | "Marxism For Our Times" | |
| SSRN | 3/8/18 | Policy Analysis | | https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3133140 | DACA | "A New Estimate of the Cost of Reversing DACA" | |
| Cato at Liberty | 3/7/18 | Blog Post | | https://www.cato.org/blog/californias-pension-woes-exacerbated-politics | California Pension System | "California's Pension Woes Exacerbated by Politics" | |
| Peoria Journal Star | 3/3/18 | Op-Ed | | https://www.pjstar.com/opinion/20180303/spotlight-attacking-generics-will-only-hike-drug-prices | Generic Drugs | "Spotlight: Attacking generics will only hike drug prices" | |
| The Weekly Standard | 2/27/18 | Article | | https://www.weeklystandard.com/ike-brannon/puerto-ricos-hurricane-damage-should-not-preclude-real-fiscal-reform | Puerto Rico Fiscal Reform | "Puerto Rico's Hurricane Damage Should Not Preclude Real Fiscal Reform" | |

| Cato Institute | 2/15/18 | Policy Analysis | Logan Albright, M. Kevin McGee | https://www.cato.org/publications/working-paper/new-estimate-cost-reversing-daca | DACA | "A New Estimate of the Cost of Reversing DACA" | |
| Forbes Online | 2/13/18 | Op-Ed | Burchell Wilson | https://www.forbes.com/sites/ikebrannon/2018/02/13/expanding-stock-market-wealth-to-the-middle-class/#2789bf9f2b3f | Shareholder Proposal | "Expanding Stock Market Wealth To The Middle Class | |
| Washington Examiner | 2/6/18 | Article | Charles Sauer | http://www.washingtonexaminer.com/will-the-sec-take-on-the-shareholder-proposal-process/article/2648274 | Shareholder Proposal | "Will the SEC take on the shareholder proposal process?" | |
| Forbes Online | 1/26/18 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2018/01/26/of-user-fees-and-taxes-the-passenger-facility-charge-is-a-user-fee-and-it-shouldnt-become-a-tax/#71e5e0c535c4 | Airline Fees | "Of User Fees And Taxes: The Passenger Facility Charge Is A User Fee, And It Shouldn't Become a Tax" | |
| The Weekly Standard | 1/25/18 | Article | | http://www.weeklystandard.com/why-ill-be-watching-the-god-awful-pro-bowl-this-weekend/article/2011285 | NFL | "Why I'll Be Watching The God-Awful Pro Bowl This Weekend" | |
| Cato At Liberty | 12/26/17 | Blog Post | | https://www.cato.org/blog/fannie-freddie-continue-limbo-while-congress-looks-permanent-fix-housing-finance-market | Mortage Financing Reform | "Fannie and Freddie Continue in Limbo while Congress Looks for a Permanent Fix for the Housing Finance Market" | |

| Tax Notes | 12/18/17 | Article | Gordon Gray | https://object.cato.org/sites/cato.org/files/articles/brannon-taxnotes-12-18-17.pdf | Tax Reform | "The Incredible Durability of The U.S. Corporate Tax Rate" | |
| Cato At Liberty | 12/14/17 | Blog Post | | https://www.cato.org/blog/lower-corporate-tax-rate-much-we-can-while-we-can | Tax Reform | "Lower the Corporate Tax Rate As Much As We Can, While We Can" | |
| RealClearMarkets | 12/14/17 | Article | Jared Whitley | https://www.realclearmarkets.com/articles/2017/12/14/without_serious_reforms_us_postal_service_could_be_next_bailout_recipient_103053.html | Postal Service | "Without Serious Reforms, U.S. Postal Service Could Be Next Bailout Recipient" | |
| Forbes Online | 12/13/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/12/13/exclude-puerto-rico-from-tax-reform/#5503e18370cd | Tax Reform | "Exclude Puerto Rico From Tax Reform" | |
| The Weekly Standard | 12/13/17 | Article | | http://www.weeklystandard.com/tax-breaks-for-the-wealthy-make-true-tax-reform-more-difficult/article/2010825 | Tax Reform | "Tax Breaks for the Wealthy Make True Tax Reform More Difficult" | |
| The Weekly Standard | 12/13/17 | Article | | http://www.weeklystandard.com/the-best-christmas-song-of-the-millennium/article/2010831 | Best Christmas Song | "The Best Christmas Song of the Millennium" | |
| Bloomberg BNA | 12/4/17 | Article | | https://object.cato.org/sites/cato.org/files/articles/brannon-bloomberg-bna-12-04-17.pdf | Corporate Tax reform | "The Benefits of Integrating the Personal and Corporate Tax Codes" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cato Institute | 12/1/17 | Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2017/12/regulation-v40n4-5.pdf | Tax Reform | "How to win friends and influence people while working in government: Harry Grubert 1937-2017" | |
| Cato Institute | 12/1/2017 | Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2016/12/regulation-v39n4-7_1.pdf#page=5 | Antitrust | "When Does Antitrust Activity Stifle Innovation?" | |
| Forbes Online | 11/30/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/11/30/how-tax-reform-could-accelerate-gse-reform-and-not-necessarily-in-a-good-way/#2c3aab741013 | GSE Reform | "How Tax Reform Could Accelerate GSE Reform and Not Necessarily in a Good Way" | |
| The Weekly Standard | 11/14/17 | Article | | http://www.weeklystandard.com/should-passive-funds-be-active/article/2010470 | Index Funds | "Should Passive Funds Be Active?" | |
| SSRN | 11/12/2017 | Policy Analysis | Ari Blask | https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3067573 | National Flood Insurance Program | "Reforming the National Flood Insurance Program: Toward Private Flood Insurance" | |
| The Weekly Standard | 11/8/2017 | Article | | http://www.weeklystandard.com/tax-reform-must-not-keep-tax-breaks-for-real-estate/article/2010388 | Tax Reform | "Tax Reform Must Not Keep Tax Breaks for Real Estate" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Forbes Online | 11/7/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/11/07/hugh-hewitts-phony-budget-accounting-in-defense-of-the-mortgage-interest-deduction/#51f2edf85ac0 | Mortgage Interest Deduction | "Hugh Hewitt's Phony Budget Accounting In Defense Of The Mortgage Interest Deduction" | |
| Forbes Online | 11/2/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/11/02/how-state-pension-funds-and-401k-managers-prioritize-politics-over-returns/#2e20facc1e84 | State Pension Funds and 401Ks | "How State Pension Funds--And 401k Managers-- Prioritize Politics Over Returns" | |
| Bloomberg BNA | 11/1/17 | Article | | https://object.cato.org/sites/cato.org/files/articles/brannon-bna-11-1-2017.pdf | Mortgage Interest Deduction | "The Mortgage Interest Deduction Must Go" | |
| Forbes Online | 10/24/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/10/24/what-do-manufacturers-want-from-tax-reform-heres-what-they-told-us/#1f465b551ffc | Tax Reform | "What Do Manufacturers Want from Tax Reform? Here's What they Told Us" | |
| The Weekly Standard | 10/6/17 | Article | | http://www.weeklystandard.com/kevin-warsh-candidate-for-federal-reserve-chair-is-not-even-an-economist/article/2009986 | Federal Reserve | "Kevin Warsh, Candidate for Federal Reserve Chair, Is Not Even an Economist" | |

| The Weekly Standard | 10/4/17 | Article | | http://www.weeklystandard.com/how-we-tax-employee-ownership-is-one-thing-our-screwed-up-tax-code-actually-gets-right/article/2009923 | Tax Reform | "How We Tax Employee-Ownership is One Thing our Screwed Up Tax Code Actually Gets Right" | |
| Forbes Online | 9/28/17 | Op-Ed | Jared Whitley | https://www.forbes.com/sites/ikebrannon/2017/09/27/a-system-on-trial-south-korean-political-reform-requires-evidence-not-stagecraft/#4b0c0a6a357b | South Korean political reform | "A System On Trial: South Korean Political Reform Requires Evidence, Not Stagecraft" | Forbes op-ed by Ike Brannon and Jared Whitley on South Korean political reform: "A System On Trial: South Korean Political Reform Requires Evidence, Not Stagecraft" |
| Cato At Liberty | 9/28/17 | Blog Post | | https://www.cato.org/blog/dubious-defense-jones-act | Jones Act | "The Dubious Defense of the Jones Act" | |
| Tax Notes | 9/25/17 | Article | Michelle Hanlon | https://object.cato.org/sites/cato.org/files/articles/brannon-taxnotes-v156n13.pdf | Tax Reform | "The Equipment Manufacturing Industry's Perspective on Tax Reform" | |
| The Weekly Standard | 9/21/17 | Article | | http://www.weeklystandard.com/in-pursuit-of-the-second-best-policy/article/2009758 | Flood Insurance | "In Pursuit of the Second Best Policy" | |
| Daily Record (NC) | 9/19/17 | Op-ed | | http://www.mydailyrecord.com/eedition/employer-tax-cuts-help-employees/ | Employer tax cuts | "Employer Tax Cuts Help Employees" | Weekly Standard op-ed by Ike Brannon on employer tax cuts re-printed at Daily Record (NC): "Employer Tax Cuts Help Employees" |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cato At Liberty | 9/19/17 | Blog Post | | https://www.cato.org/blog/green-investment-pension-con | Green Investment | "The Green Investment Pension Con" | |
| Newsweek | 9/17/17 | Article | | http://www.newsweek.com/rescinding-daca-will-cost-us-economy-200-billion-666288 | Immigration | "RESCINDING DACA WILL COST THE US ECONOMY $200 BILLION" | |
| The Weekly Standard | 9/13/17 | Article | | http://www.weeklystandard.com/cutting-the-corporate-tax-can-help-workers.-really./article/2009647 | Tax Reform | "Cutting the Corporate Tax Can Help Workers. Really." | |
| Weekly Standard | 9/13/17 | Op-ed | | http://www.weeklystandard.com/cutting-the-corporate-tax-can-help-workers.-really./article/2009647 | Corporate tax rate | "Cutting the Corporate Tax Can Help Workers. Really." | |
| The Weekly Standard | 9/7/17 | Article | | http://www.weeklystandard.com/bring-on-the-hurricane-irma-bowl/article/2009565 | NFL | "Bring on the Hurricane Irma Bowl!" | |
| The Weekly Standard | 9/5/17 | Article | | http://www.weeklystandard.com/how-not-to-fix-fannie-mae-and-freddie-mac/article/2009542 | Financial Crisis | "How Not to Fix Fannie Mae and Freddie Mac" | |
| Time Magazine | 9/5/17 | Op-ed | Ari Blask | http://time.com/4927852/hurricane-harvey-flood-insurance/ | NFIP | "Hurricane Harvey Proved We Need More Flood Insurance Competition" | Ike Brannon and Ari Blask authored an op-ed on the NFIP: "Hurricane Harvey Proved We Need More Flood Insurance Competition" |

| Regulation | 9/1/17 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2017/9/regulation-v40n3-7_0.pdf#page=3 | Regulatory Reform | "Deregulation through No Regulation?" | |
| Regulation | 9/1/17 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/9/regv36n3-8n_6.pdf#page=13 | Drug Legalization | "Legalizing Marijuana: Money Over Minds" | |
| Regulation | 9/1/17 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2017/9/regulation-v40n3-6.pdf | Telecommunication Regulation | "The Innocation Won't Be Televised" | |
| Cato At Liberty | 8/31/17 | Blog Post | | https://www.cato.org/blog/economic-budgetary-cost-repealing-daca-state-level | DACA | "The Economic and Budgetary Cost of Repealing DACA at the State Level" | |
| Cato At Liberty | 8/31/17 | Blog Post | | https://www.cato.org/blog/will-harvey-reform-flood-insurance | Flood Insurance | "Will Harvey Reform Flood Insurance" | |
| SSRN | 8/30/17 | Policy Analysis | | https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3028135 | Income Tax | "Corporate Income Taxes and Labor: An Investigation of Empirical Evidence" | |
| The Weekly Standard | 8/25/17 | Article | | http://www.weeklystandard.com/the-sordid-prosecution-of-aaron-schock/article/2009425 | Aaron Schock | "The Sordid Prosecution of Aaron Schock" | |
| The Weekly Standard | 8/21/17 | Article | | http://www.weeklystandard.com/ode-to-a-couch/article/2009234 | Garbage | "Ode to a Couch" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Badger Institute | 8/16/17 | Article | | https://www.badgerinstitute.org/Commentary/Foxconn-deal-There-are-better-ways-to-create-jobs-and-growth.htm | Foxconn Tax Incentives | "Foxconn deal: There are better ways to create jobs and growth" | |
| Forbes Online | 8/14/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/08/14/president-moons-anti-corporate-policies-jeopardize-south-koreas-future/#49a0b4091ce3 | South Korea's anti-corporate policies | "President Moon's Anti-Corporate Policies Jeopardize South Korea's Future" | |
| The Weekly Standard | 8/9/17 | Article | | http://www.weeklystandard.com/remembering-glen-campbell/article/2009212 | Glenn Campbell | "Remembering Glen Campbell" | |
| Politico | 8/8/17 | Op-ed | Ari Blask | http://www.politico.com/agenda/story/2017/08/08/hidden-subsidy-rich-flood-insurance-000495 | Federal flood insurance | "The government's hidden housing subsidy for the rich" | Ike Brannon and Ari Blask authored an op-ed on federal flood insurance: "The government's hidden housing subsidy for the rich" |
| The Weekly Standard | 8/4/17 | Article | | http://www.weeklystandard.com/rename-the-rose-fitzgerald-greenway/article/2009156 | Rose Fitzgerald Greenway | "Rename the Rose Fitzgerald Greenway" | |
| The Weekly Standard | 8/3/17 | Article | | http://www.weeklystandard.com/the-deep-state-takes-on-tillerson/article/2009117 | Rex Tillerson | "The Deep State Takes on Tillerson" | |

| The Weekly Standard | 8/2/17 | Article | | http://www.weeklystandard.com/a-tough-but-telling-race-in-virginia/article/2009099 | Virginia Elections | "A Tough But Telling Race in Virginia" | |
|---|---|---|---|---|---|---|---|
| Forbes Online | 7/31/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/07/31/puerto-ricos-fuzzy-economics/#5172d4513f83 | Puerto Rico | "Puerto Rico's Fuzzy Economics" | |
| The Weekly Standard | 7/27/17 | Article | | http://www.weeklystandard.com/still-stupid/article/992197 | Economy | "Still Stupid" | |
| The Weekly Standard | 7/27/17 | Article | | http://www.weeklystandard.com/will-illinois-need-a-federal-bailout/article/2008648 | Illinois' debt crisis | "Will Illinois Need a Federal Bailout?" | |
| The Hill | 7/20/17 | Op-Ed | Ari Blask | http://thehill.com/blogs/congress-blog/politics/343031-the-private-alternative-to-the-national-flood-insurance-program | Flood Insurance | "The private alternative to the National Flood Insurance Program " | |
| The Hill Online | 7/20/17 | Op-ed | Ari Blask | http://thehill.com/blogs/congress-blog/politics/343031-the-private-alternative-to-the-national-flood-insurance-program | Federal flood insurance | "The private alternative to the National Flood Insurance Program " | Ike Brannon and Ari Blask co-authored an op-ed on federal flood insurance: "The private alternative to the National Flood Insurance Program" |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cato Institute | 7/19/17 | Policy Analysis | Ari Black | https://www.cato.org/publications/policy-analysis/reforming-national-flood-insurance-program-toward-private-flood | Flood Insurance | "Reforming the National Flood Insurance Program: Toward Private Flood Insurance" | |
| Hudson Institute | 7/10/17 | Policy Analysis | Thomas J. Duesterberg | https://www.hudson.org/research/13748-tax-reform-and-the-republican-manufacturing-and-growth-agendas | Tax Reform | "Tax Reform and the Republican Manufacturing and Growth Agendas" | |
| Peoria Journal Star | 6/29/17 | Op-Ed | | http://www.pjstar.com/opinion/20170629/brannon-hello-uncle-sam-goodbye-illinois-constitution | Illinois | "Brannon: Hello Uncle Sam, goodbye Illinois Constitution" | |
| Peoria Journal Star (IL) | 6/29/17 | Op-ed | | http://www.pjstar.com/opinion/20170629/brannon-hello-uncle-sam-goodbye-illinois-constitution | Illinois' debt crisis | "Brannon: Hello Uncle Sam, goodbye Illinois Constitution" | Weekly Standard (IL) op-ed by Ike Brannon on the Illinois debt crisis re-printed at Peoria Journal Star (IL): "Brannon: Hello Uncle Sam, goodbye Illinois Constitution" |
| Weekly Standard | 6/27/17 | Op-ed | | http://www.weeklystandard.com/will-illinois-need-a-federal-bailout/article/2008648 | Whether Illinois will need a federal bailout | "Will Illinois Need a Federal Bailout?" | |
| Cato At Liberty | 6/20/17 | Blog Post | | https://www.cato.org/blog/towards-private-flood-insurance-market | Private Flood insurance | "Towards a Private Flood Insurance Market" | |
| Cato At Liberty | 6/15/17 | Blog Post | | https://www.cato.org/blog/impetus-gse-reform | GSE Reform | "The Impetus for GSE Reform" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 6/9/17 | Article | | http://www.weeklystandard.com/the-solar-power-market-is-under-threatfrom-one-of-its-own/article/2008413 | Solar Power | "The Solar Power Market Is Under Threat--From One of Its Own" | |
| Weekly Standard | 6/9/17 | Op-ed | | http://www.weeklystandard.com/the-solar-power-market-is-under-threatfrom-one-of-its-own/article/2008413 | The solar power industry | "The Solar Power Market Is Under Threat--From One of Its Own" | |
| The Weekly Standard | 6/6/17 | Article | | http://www.weeklystandard.com/david-malpass-treasurys-conservative-standard-bearer/article/2008352 | Department of Treasury | "David Malpass, Treasury's Conservative Standard Bearer" | |
| The Weekly Standard | 6/5/17 | Article | | http://www.weeklystandard.com/never-eat-lunch-at-your-desk/article/2008339 | Lunch | "Never Eat Lunch at Your Desk" | |
| Peoria Journal Star | 5/29/17 | Op-ed | | https://www.pjstar.com/article/20170629/opinion/170629407 | Illinois Budget | "Hello Uncle Sam, goodbye Illinois Constitution" | |
| The Weekly Standard | 5/24/17 | Article | | http://www.weeklystandard.com/puerto-ricos-faux-pension-reform/article/2008192 | Puerto Rico | "Puerto Rico's Faux Pension Reform" | |
| Weekly Standard | 5/24/17 | Article | | http://www.weeklystandard.com/puerto-ricos-faux-pension-reform/article/2008192 | Puerto Rico Pension Plan | "Puerto Rico's Faux Pension Reform" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cato At Liberty | 5/24/17 | Blog Post | | https://www.cato.org/blog/wall-street-journal-declares-creditor-emptor | Puerto Rico | "The Wall Street Journal Declares "Creditor Emptor"" | |
| Forbes Online | 5/22/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/05/22/how-would-corporate-tax-reform-benefit-workers/#2157e0222b9d | Corporate tax reform | "How Would Corporate Tax Reform Benefit Workers?" | |
| The Weekly Standard | 5/22/17 | Article | | http://www.weeklystandard.com/take-a-hike/article/2008164 | Government Subsidies | "Take a Hike" | |
| Investor's Business Daily | 5/22/17 | Op-ed | | http://www.investors.com/politics/commentary/the-high-cost-of-not-paying-your-bills-puerto-ricos-bankruptcy-bodes-poorly-for-islands-future/ | Puerto Rico | "The High Cost Of Not Paying Your Bills: Puerto Rico's Bankruptcy Bodes Poorly For Its Future" | |
| Milwaukee Wisconsin Journal Sentinel (WI) | 5/21/17 | Op-ed | | http://www.jsonline.com/story/opinion/2017/05/21/flanders-brannon-repeal-minimum-markup-law/101983328/ | Minimum markup laws | "Flanders, Brannon: Repeal minimum markup law" | Ike Brannon and Will Flanders authored an op-ed on minimum markup laws: "Flanders, Brannon: Repeal minimum markup law" |
| The Weekly Standard | 5/15/17 | Article | | http://www.weeklystandard.com/no-dems-havent-cracked-the-code-for-winning-over-rural-trump-supporters/article/2008058 | National Election | "No, Dems Haven't Cracked the Code for Winning Over Rural Trump Supporters" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| National Review | 5/15/17 | Book Review | | https://www.nationalreview.com/magazine/2017-05-15-0100/jfk-and-the-reagan-revolution | "JFK and the Reagan Revolution: A Secret History of American Prosperity, by Lawrence Kudlow and Brian Domitrovic" | "The Ture-Kennedy Blueprint" | |
| The Hill Online | 5/10/17 | Op-ed | | http://thehill.com/blogs/pundits-blog/economy-budget/332805-beryllium-broadside-obamas-last-minute-rulemaking-will-cost | Workplace regulations | "Beryllium broadside: Obama's last-minute rulemaking will cost jobs" | |
| The Hill | 5/10/17 | Op-Ed | | http://thehill.com/blogs/pundits-blog/economy-budget/332805-beryllium-broadside-obamas-last-minute-rulemaking-will-cost | Economy | "Beryllium broadside: Obama's last-minute rule-making will cost jobs" | |
| Cato At Liberty | 5/8/17 | Blog Post | | https://www.cato.org/blog/new-approach-occupational-licensing-wisconsin | Occupational Licensing | "A New Approach for Occupational Licensing in Wisconsin" | |
| Wisconsin Institute for Law & Liberty | 5/1/17 | Policy Analysis | Will Flanders | https://object.cato.org/sites/cato.org/files/articles/brannon-will-may-2017.pdf | Minimum markup laws | "A Policy in Search of a Problem: A Study of the Impact of Minimum Markup Laws on Small Businesses and Gas Stations" | |
| The Weekly Standard | 4/27/17 | Article | | http://www.weeklystandard.com/the-wheels-of-change-turn-slowly/article/2007793 | Economy | "The Wheels of Change Turn Slowly" | |

| The Weekly Standard | 4/18/17 | Article | | http://www.weeklystandard.com/oxfam-is-opposing-corporate-tax-reform-that-would-actually-be-conducive-to-economic-growth/article/2007681 | Tax Reform | "Oxfam Is Opposing Corporate Tax Reform That Would Actually Be Conducive to Economic Growth" | |
| Weekly Standard | 4/18/17 | Op-ed | | http://www.weeklystandard.com/oxfam-is-opposing-corporate-tax-reform-that-would-actually-be-conducive-to-economic-growth/article/2007681 | Corporate tax reform | "Oxfam Is Opposing Corporate Tax Reform That Would Actually Be Conducive to Economic Growth" | |
| The Weekly Standard | 4/10/17 | Article | | http://www.weeklystandard.com/time-to-fix-fannie-and-freddie/article/2007465 | Financial Crisis | "Time to Fix Fannie and Freddie" | |
| The Weekly Standard | 4/6/17 | Article | | http://www.weeklystandard.com/how-tax-reform-could-hasten-housing-finance-reform/article/2007536 | Tax Reform | "How Tax Reform Could Hasten Housing-Finance Reform" | |
| Cato At Liberty | 4/5/17 | Blog Post | | https://www.cato.org/blog/puerto-rico-continues-ignore-congress | Puerto Rico | "Puerto Rico Continues to Ignore Congress" | |
| The Weekly Standard | 4/5/17 | Article | | http://www.weeklystandard.com/rock-and-roll-hall-of-fame-hoochie-coo/article/2007523 | Rock and Roll Hall of Fame | "Rock and Roll Hall of Fame Hoochie Coo" | |
| Cato At Liberty | 4/4/17 | Blog Post | | https://www.cato.org/blog/marketplace-radio-laments-ubers-victims-investment-banks | Investment Banks | "Marketplace Radio Laments Uber's Victims: Investment Banks" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wisconsin Interest | 4/1/17 | Article | Devorah Goldman | https://object.cato.org/sites/cato/files/articles/brannon-goldman-wisconsin-interest-spring-2017.pdf | Opioids | "A Deadly Grip: Wisconsin's opioid scourge: Its origins and possible solutions" | |
| WPRI Special Report | 4/1/17 | White Paper | Logan Albright | https://object.cato.org/sites/cato/files/articles/brannon-wpri-special-report.pdf | Occupational Licensing | "Occupational Licensing in Wisconsin: Who Are We Really Protecting?" | |
| Grassroot Institute of Hawaii | 4/1/17 | Article | Russ Kasian, Jeff Pagel | https://object.cato.org/sites/cato/files/articles/brannon-grassroots-hawaii.pdf | Shipping Regulation | "THE JONES ACT IN PERSPECTIVE: A survey of costs and effects of the 1920 Merchant Marine Act" | |
| Cato At Liberty | 3/20/17 | Blog Post | | https://www.cato.org/blog/puerto-ricos-half-hearted-stab-fiscal-reform-threatens-islands-long-term-prospects | Puerto Rico | "Puerto Rico's Half-Hearted Stab at Fiscal Reform Threatens the Island's Long-Term Prospects" | |
| Forbes Online | 3/15/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/03/15/rushed-beryllium-rule-deserves-a-second-look/#12cbaf095598 | Beryllium | "Rushed Beryllium Rule Deserves A Second Look" | |
| Regulation | 3/1/17 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato/files/serials/files/regulation/2017/3/regulation-v40n1-8_1.pdf#page=4 | Regulatory Reform | "Obama's Record-Setting 'Midnight'" | |

| Forbes Online | 2/27/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/02/27/improve-dont-destroy-the-gig-economy/#36d9a2b225ab | Gig Economy | "Improve, Don't Destroy, The Gig Economy" | |
| The Weekly Standard | 2/24/17 | Article | | http://www.weeklystandard.com/the-house-tax-reform-plan-is-not-a-fundraising-ploy/article/2006988 | Tax Reform | "The House Tax Reform Plan Is Not a Fundraising Ploy" | |
| Weekly Standard | 2/24/17 | Op-ed | | http://www.weeklystandard.com/the-house-tax-reform-plan-is-not-a-fundraising-ploy/article/2006988 | Tax reform | "The House Tax Reform Plan Is Not a Fundraising Ploy" | |
| Weekly Standard | 2/23/17 | Op-ed | | http://www.weeklystandard.com/how-one-companys-perfidy-makes-your-cell-phone-more-expensive-than-it-should-be/article/2006927 | Perfidy in America | "How One Company's Perfidy Makes Your Cell Phone More Expensive Than It Should Be" | |
| Weekly Standard | 2/23/17 | Op-ed | | http://www.weeklystandard.com/how-one-companys-perfidy-makes-your-cell-phone-more-expensive-than-it-should-be/article/2006927 | Perfidy in America | "How One Company's Perfidy Makes Your Cell Phone More Expensive Than It Should Be" | |

| | | | | | | |
|---|---|---|---|---|---|---|
| The Weekly Standard | 2/22/17 | Article | | http://www.weeklystandard.com/how-one-companys-perfidy-makes-your-cell-phone-more-expensive-than-it-should-be/article/2006927 | Corporate Finances | "How One Company's Perfidy Makes Your Cell Phone More Expensive Than It Should Be" |
| Forbes Online | 2/21/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/02/21/its-more-important-to-get-puerto-rican-pension-reform-right-than-to-do-it-fast/#5850438c4e37 | Puerto Rican pension reform | "It's More Important To Get Puerto Rican Pension Reform Right Than To Do It Fast" |
| Forbes Online | 2/21/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/02/21/its-more-important-to-get-puerto-rican-pension-reform-right-than-to-do-it-fast/#6cd5b0b14e37 | Puerto Rican pension reform | "It's More Important To Get Puerto Rican Pension Reform Right Than To Do It Fast" |
| The Weekly Standard | 2/17/17 | Article | | http://www.weeklystandard.com/bob-michel-house-gop-statesman-across-five-decades-dies-at-age-93/article/2006892 | Bob Michael | "Bob Michel, House GOP Statesman Across Five Decades, Dies at Age 93" |
| The Weekly Standard | 2/14/17 | Article | | http://www.weeklystandard.com/revenge-of-the-nerds/article/2006817 | Tax Reform | "Revenge of the Nerds" |
| The Weekly Standard | 2/13/17 | Article | | http://www.weeklystandard.com/housings-drag-on-the-economy/article/2006659 | Economy | "Housing's Drag on the Economy" |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 2/13/17 | Article | | http://www.weeklystandard.com/lets-boost-building/article/2006725 | Infrastrcture | "Let's Boost Building" | |
| The Weekly Standard | 2/1/17 | Article | | http://www.weeklystandard.com/how-the-nfl-can-make-a-bigger-investment-to-combat-cte/article/2006609 | NFL | "How the NFL Can Make a Bigger Investment to Combat CTE" | |
| The Weekly Standard | 1/25/17 | Article | | http://www.weeklystandard.com/what-dow-20000-means/article/2006484 | Economy | "What Dow 20,000 Means" | |
| The Weekly Standard | 1/24/17 | Article | | http://www.weeklystandard.com/the-pro-bowl-takes-a-step-toward-resembling-a-real-nfl-game/article/2006467 | NFL | "The Pro Bowl Takes a Step Toward Resembling a Real NFL Game" | |
| The Weekly Standard | 1/23/17 | Article | | http://www.weeklystandard.com/liberal-opposition-to-new-housing-reaches-its-reductio-ad-absurdum/article/2006442 | Infrastrcture | "Liberal Opposition to New Housing Reaches its Reductio Ad Absurdum" | |
| Cato At Liberty | 1/18/17 | Blog Post | | https://www.cato.org/blog/economic-fiscal-impact-repealing-daca | DACA | "The Economic and Fiscal Impact of Repealing DACA" | |
| Forbes Online | 1/18/17 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2017/01/18/the-high-costs-of-an-immediate-repeal-of-daca/ | Repealing DACA | "The High Costs Of An Immediate Repeal Of DACA" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 1/16/17 | Article | | http://www.weeklystandard.com/puerto-ricos-new-governor-should-be-given-time-to-get-recovery-plan-right/article/2006319 | Puerto Rico | "Puerto Rico's New Governor Should be Given Time to Get Recovery Plan Right" | |
| The Weekly Standard | 12/22/16 | Article | | http://www.weeklystandard.com/how-trump-can-repeal-and-replace-daca/article/2005986 | Immigration | "How Trump Can Repeal and Replace DACA" | |
| Weekly Standard | 12/22/16 | Op-ed | | http://www.weeklystandard.com/how-trump-can-repeal-and-replace-daca/article/2005986 | Trump repealing DACA | "How Trump Can Repeal and Replace DACA" | |
| The Weekly Standard | 12/20/16 | Article | | http://www.weeklystandard.com/the-fda-finally-sees-the-light-on-chantix/article/2005962 | FDA | "The FDA--Finally--Sees the Light on Chantix" | |
| The Hill | 12/20/16 | Op-Ed | | http://thehill.com/blogs/pundits-blog/finance/311179-will-trump-let-the-eu-kill-a-us-manufacturing-deal | Economy | "Will Trump let the EU kill a US manufacturing deal?" | |
| The Hill | 12/13/16 | Op-Ed | Logan Albright | http://thehill.com/blogs/pundits-blog/finance/310156-puerto-ricos-path-forward-shouldnt-include-old-advisers | Puerto Rico | "Puerto Rico's path forward shouldn't include old advisers" | |

| Peoria Journal Star (IL) | 12/9/16 | Op-ed | | https://www.cato.org/publications/commentary/cutting-corporate-tax-rates-would-help-peoria | Cutting corporate taxes | "Cutting corporate tax rates would help Peoria" | |
| Peoria Journal Star | 12/9/16 | Op-Ed | | http://www.pjstar.com/opinion/20161209/spotlight-cutting-corporate-tax-rates-would-help-peoria | Tax Reform | "Spotlight: Cutting corporate tax rates would help Peoria" | |
| The Weekly Standard | 12/7/16 | Article | | http://www.weeklystandard.com/puerto-rico-is-using-a-phony-pension-crisis-to-sabotage-reform/article/2005715 | Puerto Rico | "Puerto Rico Is Using a Phony Pension Crisis to Sabotage Reform" | |
| Cato At Liberty | 12/5/16 | Blog Post | | https://www.cato.org/blog/problems-paid-family-leave-redux | Family Leave | "Problems with Paid Family Leave Redux" | |
| Desert Sun | 12/4/16 | Column | | http://www.desertsun.com/story/opinion/2016/12/04/column-heres-how-begin-fixing-colleges/94433774/ | Education | "Column: Here's how to begin fixing colleges" | |
| Forbes Online | 12/4/16 | Op-Ed | | https://www.forbes.com/sites/ikebrannon/2016/12/04/how-and-why-we-should-fix-the-biodiesel-tax-credit/#7306fb894c57 | Tax Credits | "How And Why We Should Fix The Biodiesel Tax Credit" | |
| Regulation | 12/1/16 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2016/12/regulation-v39n4-7_4.pdf#page=10 | Mortgage Interest Deduction | "Defending the Indefensible Mortgage Interest Deduction" | |

| Regulation | 12/1/16 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2016/12/regulation-v39n4-4.pdf | Regulatory Reform | "Five Guiding Thoughts for Regulatory Reform in the Next Administration" | |
|---|---|---|---|---|---|---|---|
| Cato At Liberty | 11/28/16 | Blog Post | | https://www.cato.org/blog/dcs-paid-family-leave-bucks-trend-economics | Economy | "DC's Paid Family Leave Bucks the Trend—and Economics" | |
| The Weekly Standard | 11/18/16 | Article | | http://www.weeklystandard.com/the-dangerous-ideological-roots-of-climate-disclosure/article/2005456 | Environment | "The Dangerous Ideological Roots of Climate Disclosure" | |
| The Weekly Standard | 11/17/16 | Article | | http://www.weeklystandard.com/puerto-ricos-oversight-board-may-be-on-the-verge-of-a-misstep/article/2005422 | Puerto Rico | "Puerto Rico's Oversight Board May Be on the Verge of a Misstep" | |
| Cato At Liberty | 11/4/16 | Blog Post | | https://www.cato.org/blog/washington-dc-progressives-fight-reserve-gas-stations | Gas Stations | "Washington DC Progressives Fight to Preserve Gas Stations" | |
| The Weekly Standard | 11/1/16 | Article | | http://www.weeklystandard.com/the-unofficial-gear-of-major-league-baseball/article/2005181 | MLB | "The 'Unofficial' Gear of Major League Baseball" | |
| Foundation for Economic Education | 10/28/16 | Article | | https://fee.org/articles/is-parking-really-free-if-you-cant-find-any/ | Transportation | "Is Parking Really "Free" If You Can't Find Any?" | |
| Cato At Liberty | 10/27/16 | Blog Post | | https://www.cato.org/blog/why-dont-we-allow-markets-dictate-parking-policy | Parking Policy | "Why Don't We Allow Markets to Dictate Parking Policy?" | |

| The Weekly Standard | 10/24/16 | Article | | http://www.weeklystandard.com/harry-caray-is-my-wingman/article/2004882 | MLB | "Harry Caray Is My Wingman" | |
| Weekly Standard | 10/24/16 | Op-ed | | http://www.weeklystandard.com/harry-caray-is-my-wingman/article/2004882 | Harry Caray | "Harry Caray Is My Wingman" | |
| The Weekly Standard | 10/17/16 | Article | | http://www.weeklystandard.com/a-chicago-cubs-love-story/article/2004913 | MLB | "A Chicago Cubs Love Story" | |
| The Hill | 10/13/16 | Op-Ed | | http://thehill.com/blogs/pundits-blog/economy-budget/300836-how-puerto-ricos-oversight-board-can-follow-others-success | Puetro Rico | "How Puerto Rico's oversight board can follow others' success" | |
| The Weekly Standard | 10/10/16 | Article | | http://www.weeklystandard.com/as-goes-puerto-rico-so-go-the-states/article/2004802 | MLB | "As Goes Puerto Rico So Go the States?" | |
| Cato At Liberty | 10/7/16 | Blog Post | | https://www.cato.org/blog/ending-tax-breaks-real-estate | Tax Policy | "Ending the Tax Breaks for Real Estate" | |
| The Weekly Standard | 10/7/16 | Article | | http://www.weeklystandard.com/incompetence-is-no-reason-for-a-government-agency-not-to-do-its-job/article/2004766 | FDA | "Incompetence Is No Reason for a Government Agency Not To Do Its Job" | |
| Cato At Liberty | 10/4/16 | Blog Post | | https://www.cato.org/blog/answer-new-government-program-whats-question | Limited Government | "The Answer Is a New Government Program. What's the Question?" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 10/3/16 | Article | | http://www.weeklystandard.com/the-complicated-dynamics-of-insurance-companies-and-drug-prices/article/2004670 | Insurance | "The Complicated Dynamics of Insurance Companies and Drug Prices" | |
| Weekly Standard | 10/3/16 | Op-ed | | http://www.weeklystandard.com/the-complicated-dynamics-of-insurance-companies-and-drug-prices/article/2004670 | Obamacare | "The Complicated Dynamics of Insurance Companies and Drug Prices" | |
| Lincoln Times-News (NC) | 9/16/16 | Op-ed | | https://www.cato.org/blog/reason-why-poverty-rate-fell | Poverty | "The reason why the poverty rate fell" | |
| Cato At Liberty | 9/13/16 | Blog Post | | https://www.cato.org/blog/reason-why-poverty-rate-fell | Poverty | "The Reason Why the Poverty Rate Fell" | |
| The Weekly Standard | 9/12/16 | Article | | http://www.weeklystandard.com/up-in-smoke/article/2004289 | FDA | "Up in Smoke" | |
| Weekly Standard | 9/12/16 | Op-ed | | http://www.weeklystandard.com/up-in-smoke/article/2004289 | FDA warning labels and smoking | "Up in Smoke" | Ike Brannon and Devorah Goldman authored an op-ed on FDA warning labels and smoking: "Up in Smoke" |
| Cato At Liberty | 9/6/16 | Blog Post | | https://www.cato.org/blog/tentative-steps-away-gas-tax-towards-better-system | Tax Policy | "Tentative Steps Away from the Gas Tax and towards a Better System" | |
| Regulation | 9/1/16 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2016/9/regulation-v39n3-6.pdf#page=2 | Lending Policy | "The Government is Lousy at Lending" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cato At Liberty | 8/4/16 | Blog Post | | https://www.cato.org/blog/its-time-end-governments-outsized-role-housing-finance | Finance | "It's Time to End the Government's Outsized Role in Housing Finance" | |
| Cato At Liberty | 8/3/16 | Blog Post | | https://www.cato.org/blog/how-growth-can-impact-spending-why-spending-doesnt-necessarily-drive-growth | Economy | "How Growth Can Impact Spending and Why Spending Doesn't Necessarily Drive Growth" | |
| Cato At Liberty | 7/28/16 | Blog Post | | https://www.cato.org/blog/sales-tax-holidays-make-terrible-tax-policy | Tax Policy | "Sales Tax Holidays Make for Terrible Tax Policy" | |
| Cato At Liberty | 7/19/16 | Blog Post | | https://www.cato.org/blog/tyranny-free-parking | Free Parking | "The Tyranny of Free Parking" | |
| The Hill | 7/8/16 | Op-ed | | | Reducing drug deaths through legalization | "Global Warming Alarmist Reveals The Anti-Science Con" | |
| The Hill | 7/8/16 | Op-Ed | | http://thehill.com/blogs/pundits-blog/healthcare/286965-legalize-marijuana-and-reduce-deaths-from-drug-abuse | Marijuana | "Legalize marijuana and reduce deaths from drug abuse" | |
| The Weekly Standard | 6/28/16 | Article | | http://www.weeklystandard.com/puerto-ricos-false-deadline/article/2003061 | Puerto Rico | "Puerto Rico's False Deadline" | |
| The Weekly Standard | 6/24/16 | Article | | http://www.weeklystandard.com/for-whom-the-bridge-tolls/article/2003016 | Infrastructure | "For Whom the Bridge Tolls" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 6/21/16 | Article | | http://www.weeklystandard.com/treasurys-tax-regulations-will-dampen-domestic-investment/article/2002945 | Department of Treasury | "Treasury's Tax Regulations Will Dampen Domestic Investment" | |
| Weekly Standard | 6/21/16 | Op-ed | | http://www.weeklystandard.com/treasurys-tax-regulations-will-dampen-domestic-investment/article/2002945 | Tax regulations | "Treasury's Tax Regulations Will Dampen Domestic Investment" | |
| The Weekly Standard | 6/13/16 | Article | | http://www.weeklystandard.com/fixing-regulatory-overreach/article/2002667 | Federal Regulation | "Fixing Regulatory Overreach" | |
| Weekly Standard | 6/13/16 | Op-ed | | http://www.weeklystandard.com/fixing-regulatory-overreach/article/2002667 | Financial regulatory overreach | "Fixing Regulatory Overreach" | |
| The Hill | 6/13/16 | Op-Ed | | http://thehill.com/blogs/pundits-blog/economy-budget/283226-how-the-puerto-rico-rescue-makes-state-pensioners-the-big | Puerto Rico | "How the Puerto Rico rescue makes state pensioners the big winner" | |
| The Hill Online | 6/13/16 | Op-ed | | http://www.weeklystandard.com/treasurys-tax-regulations-will-dampen-domestic-investment/article/2002945 | State pensions | "How the Puerto Rico rescue makes state pensioners the big winner" | |
| The Weekly Standard | 6/6/16 | Article | | http://www.weeklystandard.com/how-to-change-bankruptcy-law/article/2002578 | Bankruptcy | "How to Change Bankruptcy Law" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Weekly Standard | 6/6/16 | Op-ed | | http://www.weeklystandard.com/how-to-change-bankruptcy-law/article/2002578 | Bankruptcy laws | "How to Change Bankruptcy Law" | |
| Regulation | 6/4/16 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2016/4/regulation-v39n1-9_3.pdf#page=8 | Economics | "Are Cigarettes a Giffen Good for Poor, Expectant Woman?" | |
| Regulation | 6/4/16 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2016/4/regulation-v39n1-9_1.pdf#page=3 | Transplant policy | "Could PAYGO End the Prohibition on Paying Organ Donors?" | |
| Regulation | 6/4/16 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2016/4/regulation-v39n1-10-updated_6.pdf#page=15 | Safety Regulation | "Don't Stop Me Before I Injure Myself" | |
| Regulation | 6/1/16 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2016/6/regulation-v39n2-6_2.pdf#page=8 | Transportation Reform | "Free Parking's High Cost on Transit" | |
| Regulation | 6/1/16 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2016/6/regulation-v39n2-6_0.pdf#page=2 | Paid Leave | "Would Expanded Family Leave Hurt Workers?" | |
| The Weekly Standard | 5/30/16 | Article | | http://www.weeklystandard.com/the-gig-is-up/article/2002474 | Economy | "The Gig Is Up" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Weekly Standard | 5/30/16 | Op-ed | | http://www.weeklystandard.com/the-gig-is-up/article/2002474 | U.S. economy | "The Gig Is Up" | |
| RealClearMarkets | 5/26/16 | Article | | http://www.realclearmarkets.com/articles/2016/05/26/the_gig_economy_is_great_for_the_u_s_economy_102186.html | Economy | "The 'Gig' Economy Is Great For the U.S. Economy" | |
| The Weekly Standard | 5/20/16 | Article | | http://www.weeklystandard.com/treasury-pretends-not-to-know-what-a-bailout-is/article/2002501 | Department of Treasury | "Treasury Pretends Not to Know What a 'Bailout' Is" | |
| Weekly Standard | 5/20/16 | Op-ed | | http://www.weeklystandard.com/treasury-pretends-not-to-know-what-a-bailout-is/article/2002501 | Puerto Rico's debt crisis | "Treasury Pretends Not to Know What a 'Bailout' Is" | |
| Tax Notes | 5/9/16 | Article | | https://object.cato.org/sites/cato.org/files/articles/151tn0963-brannon.pdf | Tax Reform | "The Ineluctable Logic of Adopting an IP Box Tax Regime" | |
| The Hill | 5/5/16 | Op-Ed | | http://thehill.com/blogs/pundits-blog/economy-budget/278804-what-we-do-in-puerto-rico-sets-a-precedent-like-it-or-not | Puerto Rico | "What we do in Puerto Rico sets a precedent, like it or not" | |
| The Hill Online | 5/5/16 | Op-ed | | http://thehill.com/blogs/pundits-blog/economy-budget/278804-what-we-do-in-puerto-rico-sets-a-precedent-like-it-or-not | Puerto Rico's debt problems | "What we do in Puerto Rico sets a precedent, like it or not" | |

| RealClearMarkets | 5/2/16 | Article | | http://www.realclearmarkets.com/articles/2016/05/02/puerto_rico_contagion_will_cost_taxpayers_102149.html | Puerto Rico | "Puerto Rico Contagion Will Cost Taxpayers" | |
|---|---|---|---|---|---|---|---|
| RealClearMarkets | 4/28/16 | Article | | http://www.realclearmarkets.com/articles/2016/04/28/treasury_and_fed_team_up_to_create_the_next_meltdown_102140.html | Department of Treasury | "Treasury and Fed Team Up to Create the Next Meltdown" | |
| TribTalk | 4/26/16 | Article | | https://www.tribtalk.org/2016/04/26/texas-strong-economic-growth-is-a-cause-and-effect-of-immigration/ | Immigration | "Texas' strong economic growth is a cause — and effect — of immigration" | |
| Cato At Liberty | 4/26/16 | Blog Post | | https://www.cato.org/blog/who-are-victims-volkswagen-scandal-not-their-customers | Volkswagon Scandal | "Who Are the Victims of the Volkswagen Scandal? Not Their Customers" | |
| The Weekly Standard | 4/25/16 | Article | | http://www.weeklystandard.com/we-need-a-serious-approach-to-international-tax-reform/article/2002106 | Tax Reform | "We Need a Serious Approach to International Tax Reform" | |
| Cato At Liberty | 4/22/16 | Blog Post | | https://www.cato.org/blog/food-labeling-regulations-are-bad-health | Food Labels | "Food Labeling Regulations Are Bad for Your Health" | |
| Cato At Liberty | 4/22/16 | Blog Post | | https://www.cato.org/blog/lets-name-something-cool-after-prince-stop-naming-things-after-politicians-while-were-it | Naming Rights | "Let's Name Something Cool after Prince. And Stop Naming Things after Politicians While We're at It" | |

| Peoria Journal Star | 4/22/16 | Op-Ed | | http://www.pjstar.com/news/20160422/op-ed-who-would-benefit-from-per-mile-fee-peorians | Transportation | "Op-Ed: Who would benefit from a per-mile fee? Peorians" | |
| The Weekly Standard | 4/20/16 | Article | | http://www.weeklystandard.com/luck-o-the-turkish/article/2002045 | Turkey | "Luck o' the Turkish" | |
| The Weekly Standard | 4/15/16 | Article | | http://www.weeklystandard.com/andrew-ross-sorkins-misplaced-faith-in-the-non-economist-great-men-of-fsoc/article/2001993 | FSOC | "Andrew Ross Sorkin's Misplaced Faith in the Non-economist Great Men of FSOC" | |
| Cato At Liberty | 4/14/16 | Blog Post | | https://www.cato.org/blog/laws-are-inconvenient-just-change-them-dubious-legality-another-puerto-rican-reform | Puerto Rico | "If the Laws are Inconvenient, Just Change Them: The Dubious Legality of Another Puerto Rican Reform" | |
| The Hill | 4/14/16 | Op-Ed | | http://thehill.com/blogs/pundits-blog/economy-budget/276263-let-obama-have-his-supreme-court-justice-in-exchange-for | Tax Reform | "Let Obama have his Supreme Court justice, in exchange for tax reform" | |
| The Weekly Standard | 4/11/16 | Article | | http://www.weeklystandard.com/government-takes-aim-at-fitness-instructors/article/2001923 | Department of Labor | "Government Takes Aim at Fitness Instructors" | |

| The Weekly Standard | 4/8/16 | Article | | http://www.weeklystandard.com/the-proposed-puerto-rico-bailout-is-good-on-rhetoric-but-bad-in-reality/article/2001908 | Puerto Rico | "The Proposed Puerto Rico Bailout is Good on Rhetoric But Bad in Reality" | |
| Foundation for Economic Education | 3/18/16 | Article | | https://fee.org/articles/make-risky-loans-dont-charge-for-them/ | Federal Regulation | "Feds' Crazy Plan: Make Risky Loans, Don't Charge for Them" | |
| The Weekly Standard | 3/17/16 | Article | | http://www.weeklystandard.com/tax-policy-not-luck-of-the-irish-is-responsible-for-irelands-economic-success/article/2001604 | Tax Reform | "Tax Policy, Not Luck of the Irish, Is Responsible For Ireland's Economic Success" | |
| Cato At Liberty | 3/16/16 | Blog Post | | https://www.cato.org/blog/government-directed-lending-comes-america | Government Lending | "Government-Directed Lending Comes to America" | |
| The Weekly Standard | 3/14/16 | Article | | http://www.weeklystandard.com/higher-ed-higher-prices/article/2001409 | Education | "Higher Ed, Higher Prices" | |
| Cato At Liberty | 3/10/16 | Blog Post | | https://www.cato.org/blog/stop-encouraging-homeownership | Homeownership | "Stop Encouraging Homeownership" | |
| Cato At Liberty | 3/3/16 | Blog Post | | https://www.cato.org/blog/administrations-puerto-rico-jujitsu-threatens-states-ability-borrow | State's Rights/Puerto Rico | "The Administration's Puerto Rico Jujitsu Threatens the States' Ability to Borrow" | |
| The Weekly Standard | 3/2/16 | Article | | http://www.weeklystandard.com/dusty-agonistes/article/2001361 | MLB | "Dusty Agonistes" | |

| The Hill | 2/24/16 | Op-Ed | | http://thehill.com/blogs/pundits-blog/finance/270567-what-would-a-puerto-rican-bankruptcy-look-like | Tax Reform | "What would a Puerto Rican bankruptcy look like?" | |
| The Weekly Standard | 2/22/16 | Article | | http://www.weeklystandard.com/let-them-go-bankrupt/article/2001047 | Student Loans | "Let Them Go Bankrupt" | |
| Cato At Liberty | 2/5/16 | Blog Post | | https://www.cato.org/blog/using-congressional-budget-rules-not-save-money | Congressional Budget | "Using Congressional Budget Rules To (Not) Save Money" | |
| The Weekly Standard | 2/2/16 | Article | | http://www.weeklystandard.com/why-its-so-important-to-get-puerto-ricos-reform-right/article/2000873 | Puerto Rico | "Why It's So Important To Get Puerto Rico's Reform Right" | |
| The Weekly Standard | 2/1/16 | Article | | http://www.weeklystandard.com/retire-this-idea/article/2000698 | State Debt | "Retire This Idea" | |
| The Weekly Standard | 1/30/16 | Article | | http://www.weeklystandard.com/the-pro-bowl-should-at-least-resemble-an-actual-football-game/article/2000834 | NFL | "The Pro Bowl Should At Least Resemble an Actual Football Game" | |
| The Weekly Standard | 1/25/16 | Article | | http://www.weeklystandard.com/dont-abandon-all-hope/article/2000592 | Tax Reform | "Don't Abandon All Hope" | |
| The Weekly Standard | 1/19/16 | Article | | http://www.weeklystandard.com/oxfam-schmoxfam/article/2000650 | Wealth Distribution | "Oxfam, Schmoxfam" | |

| | | | | | | |
|---|---|---|---|---|---|---|
| The Weekly Standard | 1/13/16 | Article | | http://www.weeklystandard.com/d.c.-bobos-sabotage-housing-construction-to-protect-their-free-parking/article/2000555 | DC Construction | "D.C. Bobos Sabotage Housing Construction to Protect Their Free Parking" |
| Cato At Liberty | 1/6/16 | Blog Post | | https://www.cato.org/blog/will-natural-monopoly-energy-distribution-come-end-heres-hoping | Energy Distribution | "Will the Natural Monopoly in Energy Distribution Come to an End? Here's Hoping" |
| Cato At Liberty | 12/18/15 | Blog Post | | https://www.cato.org/blog/states-have-no-business-creating-their-own-retirement-accounts | State's Rights/Economy | "The States Have No Business Creating Their Own Retirement Accounts" |
| The Weekly Standard | 12/16/15 | Article | | http://www.weeklystandard.com/pulling-away-punch-bowls/article/2000251 | Economy | "Pulling Away Punch Bowls" |
| The Weekly Standard | 12/9/15 | Article | | http://www.weeklystandard.com/the-unending-morass-of-housing-finance-reform/article/2000148 | Housing Finance | "The Unending Morass of Housing Finance Reform" |
| Cato At Liberty | 12/8/15 | Blog Post | | https://www.cato.org/blog/inequality-delando-est | Inequality | Inequality Delenda Est |
| The Weekly Standard | 12/4/15 | Article | | http://www.weeklystandard.com/the-reform-next-time/article/2000078 | Social Security | "The Reform Next Time" |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Regulation | 12/1/15 | Book Review | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2015/12/regulation-v38n4-9_0.pdf#page=3 | Monetary Policy | "Can the Fed Safely Pop Bubbles?" | |
| Cato At Liberty | 12/1/15 | Blog Post | | https://www.cato.org/blog/food-labels-kill | Food Labels/FDA | "Food Labels Kill" | |
| Regulation | 12/1/15 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/regulation/2015/12/regulation-v38n4-8_2.pdf#page=6 | Regulatory Reform | "What Regulatory 'Ossification'?" | |
| The Hill | 11/30/15 | Op-Ed | | http://thehill.com/blogs/pundits-blog/finance/261454-us-should-respond-to-oecd-tax-project-with-an-innovation-box | Tax Reform | "US should respond to OECD tax project with an 'innovation box'" | |
| The Weekly Standard | 11/29/15 | Article | | http://www.weeklystandard.com/the-paris-trap/article/1070373 | Environment | "The Paris Trap" | |
| The Weekly Standard | 11/23/15 | Article | | http://www.weeklystandard.com/princeton-protestors-hand-college-fundraisers-a-golden-opportunity/article/1068598 | Education | "Princeton Protestors Hand College Fundraisers a Golden Opportunity" | |
| The Weekly Standard | 11/20/15 | Article | | http://www.weeklystandard.com/liz-warren-moves-to-sabotage-tax-reform/article/1067206 | Tax Reform | "Liz Warren Moves to Sabotage Tax Reform" | |

| The Weekly Standard | 11/12/15 | Article | | http://www.weeklystandard.com/goldmans-inexplicable-grip-on-the-fed/article/1063073 | Federal Reserve | "Goldman's Inexplicable Grip on the Fed" | |
| The Hill | 11/9/15 | Op-Ed | | http://thehill.com/blogs/pundits-blog/finance/259510-a-politically-viable-puerto-rico-reform-plan | Puerto Rico | "A politically viable Puerto Rico reform plan" | |
| The Weekly Standard | 10/27/15 | Article | Jared Whitley | http://www.weeklystandard.com/bill-walker-alters-the-deal-and-threatens-alaskas-prosperity-in-the-process/article/1054115 | Economy | "Bill Walker 'Alters the Deal,' and Threatens Alaska's Prosperity in the Process" | |
| The Weekly Standard | 10/21/15 | Article | | http://www.weeklystandard.com/patently-ridiculous/article/1049567 | Patents | "Patently Ridiculous" | |
| The Weekly Standard | 10/12/15 | Article | | http://www.weeklystandard.com/how-to-succeed-in-the-hinterland/article/1039624 | Economy | "How to Succeed in the Hinterland" | |
| The Weekly Standard | 10/2/15 | Article | | http://www.weeklystandard.com/a-brief-exegesis-of-the-central-illinois-music-scene/article/1039774 | Illinois | "A Brief Exegesis of the Central Illinois Music Scene" | |
| The Weekly Standard | 9/28/15 | Article | | http://www.weeklystandard.com/saving-puerto-rico-from-the-federal-government/article/1037977 | Puerto Rico | "Saving Puerto Rico from the Federal Government" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Hill | 9/23/15 | Op-Ed | | http://thehill.com/blogs/pundits-blog/transportation/254601-how-investment-in-transportation-infrastructure-boosts | Transportation | "How investment in transportation infrastructure boosts productivity" | |
| The Weekly Standard | 9/18/15 | Article | | http://www.weeklystandard.com/yellen-punts/article/1032817 | Federal Reserve | "Yellen Punts" | |
| Bloomberg BNA | 9/17/15 | Article | Mike Gorman | https://www.bna.com/us-business-loses-n17179936219/ | Infrastructure | "U.S. Business Loses Big From Lack of Transportation Infrastructure Investment" | |
| The Weekly Standard | 9/14/15 | Article | | http://www.weeklystandard.com/labors-wishful-thinking/article/1024817 | Department of Labor | "Labor's Wishful Thinking" | |
| The Weekly Standard | 9/14/15 | Article | | http://www.weeklystandard.com/no-more-denali-commissions/article/1028741 | Environment | "No More Denali Commissions" | |
| The Weekly Standard | 9/10/15 | Article | | http://www.weeklystandard.com/in-amending-the-eb-5-program-first-do-no-harm/article/1028180 | Immigration | "In Amending the EB-5 Program, First Do No Harm" | |
| The Weekly Standard | 9/9/15 | Article | | http://www.weeklystandard.com/the-food-truck-farce-continued/article/1027768 | Public Property | "The Food Truck Farce, Continued" | |
| The Weekly Standard | 9/3/15 | Article | | http://www.weeklystandard.com/in-defense-of-the-cadillac-tax/article/1024566 | Tax | "In Defense of the 'Cadillac Tax" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 8/26/15 | Article | | http://www.weeklystandard.com/fixing-the-grid-and-improving-energy-policy/article/1019146 | Energy Policy | "Fixing the Grid and Improving Energy Policy" | |
| The Weekly Standard | 8/25/15 | Article | | http://www.weeklystandard.com/in-washington-d.c.-parking-policy-dictates-housing-policy/article/1018280 | Housing Policy | "In Washington, D.C., Parking Policy Dictates Housing Policy" | |
| The Weekly Standard | 8/24/15 | Article | | http://www.weeklystandard.com/stock-markets-have-the-china-syndrome/article/1017705 | Economy | "Stock Markets Have the China Syndrome" | |
| The Weekly Standard | 8/19/15 | Article | | http://www.weeklystandard.com/pathetic-spin-from-goldman-sachs/article/1014736 | Economy | "Pathetic Spin from Goldman Sachs" | |
| The Weekly Standard | 8/17/15 | Article | | http://www.weeklystandard.com/even-economists-cant-invest/article/1006585 | Economy | "Even Economists Can't Invest" | |
| The Weekly Standard | 8/13/15 | Article | | http://www.weeklystandard.com/kill-the-coins/article/1010743 | Monetary Policy | "Kill the Coins" | |
| City Journal | 8/13/15 | Article | Bryan Weaver | https://www.city-journal.org/html/parking-price-10469.html | Transportation | "Parking for a Price" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Hill | 8/10/15 | Op-Ed | | http://thehill.com/blogs/pundits-blog/finance/250624-is-retirement-planning-about-to-become-more-difficult | Retirement | "Is retirement planning about to become more difficult?" | |
| The Hill | 6/30/15 | Op-Ed | | http://thehill.com/blogs/pundits-blog/uncategorized/246501-a-problem-congress-cant-solve | Congress | "A problem Congress can't solve" | |
| Peoria Journal Star | 6/12/15 | Op-Ed | | http://www.pjstar.com/article/20150612/OPINION/150619732 | Economy | "Op-Ed: Central Illinois needs Uber" | |
| Regulation | 6/1/15 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/policy-report/2015/6/regulation-v38n2-10-3.pdf | FDA | "The Menu Labeling Morass" | |
| The Hill | 5/26/15 | Op-Ed | | http://thehill.com/blogs/pundits-blog/economy-budget/243060-how-obama-could-hijack-tax-reform | Tax Reform | "How Obama could hijack tax reform" | |
| The Weekly Standard | 5/25/15 | Article | | http://www.weeklystandard.com/fixing-puerto-rico/article/946678 | Puerto Rico | "Fixing Puerto Rico" | |
| The Weekly Standard | 5/6/15 | Article | | http://www.weeklystandard.com/jamaal-strikes-blow-for-diversity-in-npr-fantasyland/article/940158 | Race | "Jamaal Strikes Blow for Diversity in NPR Fantasyland" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 5/4/15 | Article | | http://www.weeklystandard.com/india-needs-to-enforce-its-trade-agreements/article/937584 | India | "India Needs to Enforce Its Trade Agreements" | |
| The Weekly Standard | 4/29/15 | Article | | http://www.weeklystandard.com/housing-subsidies-a-play-in-one-act/article/934046 | Housing Subsidies | "Housing Subsidies: A Play in One Act" | |
| American Enterprise Institute | 4/28/15 | Article | | https://www.aei.org/publication/the-case-for-an-innovation-box/ | Economy | "The case for 'an innovation box'" | |
| The Hill | 4/21/15 | Op-Ed | Jared Whitley | http://thehill.com/blogs/pundits-blog/international/239455-when-a-chinese-anti-corruption-drive-is-anything-but | China | "When a Chinese 'anti-corruption' drive is anything but" | |
| The Hill | 4/16/15 | Op-Ed | | http://thehill.com/blogs/congress-blog/economy-budget/238963-can-there-be-a-role-for-the-government-in-the-advent-of | Crypto Currency | "Can there be a role for the government in the advent of crypto-currencies?" | |
| RealClearMarkets | 4/15/15 | Article | | http://www.realclearmarkets.com/articles/2015/04/15/jeff_bezos_may_have_found_amazons_latest_money_pit_101622.html | Amazon | "Jeff Bezos May Have Found Amazon's Latest Money Pit" | |
| The Federalists | 4/10/15 | Article | | https://thefederalist.com/2015/04/10/ivy-leagues-shame-kids-for-making-their-way-in-the-world/ | Education | "Ivy Leagues Shame Kids For Making Their Way In The World" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 3/30/15 | Article | | http://www.weeklystandard.com/how-chinese-regulatory-authorities-impose-protectionist-trade-policies/article/903435 | China | "How Chinese Regulatory Authorities Impose Protectionist Trade Policies" | |
| Peoria Journal Star | 3/27/15 | Op-Ed | | http://www.pjstar.com/article/20150327/OPINION/150329197 | Food Trucks | "In the Spotlight: Peoria should auction food trucks to highest bidders" | |
| The Hill | 3/19/15 | Op-Ed | | http://thehill.com/blogs/congress-blog/healthcare/236143-more-must-be-done-to-improve-access-to-biosimilar-drugs | Health | "More must be done to improve access to biosimilar drugs" | |
| The Weekly Standard | 3/2/15 | Article | | http://www.weeklystandard.com/republicans-appoint-keith-hall-to-head-cbo/article/872401 | CBO | "Republicans Appoint Keith Hall to Head CBO" | |
| Cato Institute | 3/1/2015 | Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2015/3/regulation-v38n1-9.pdf | Smalltown USA | "A Liberal Heretic Contradicts Piketty" | |
| Regulation | 3/1/15 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2015/3/regulation-v38n1-8_0.pdf#page=2 | Regulatory Reform | "EPA's Analytical Jujitsu" | |

| CNBC | 2/11/15 | Article | https://www.cnbc.com/2015/02/11/puerto-ricos-economic-woes-are-only-short-term-commentary.html | Puerto Rico | "Puerto Rico's economic woes are only short-term" | |
| The Weekly Standard | 2/4/15 | Article | http://www.weeklystandard.com/the-food-truck-farce/article/837954 | DC Subsidies | "The Food Truck Farce" | |
| The Weekly Standard | 1/29/15 | Article | http://www.weeklystandard.com/an-epic-fail-from-the-new-york-times/article/830793 | Journalism | "An Epic Fail from the New York Times" | |
| The Weekly Standard | 1/26/15 | Article | http://www.weeklystandard.com/obamas-latest-giveaway-.-.-./article/823837 | Federal Subsidies | "Obama's Latest Giveaway . . ." | |
| The Weekly Standard | 1/21/15 | Article | http://www.weeklystandard.com/conservatives-should-buy-obamas-tax-increaseif-he-makes-it-bigger/article/824218 | Tax Reform | "Conservatives Should Buy Obama's Tax Increase—If He Makes It Bigger" | |
| The Weekly Standard | 1/14/15 | Article | http://www.weeklystandard.com/federal-regs-making-it-difficult-for-members-of-military-to-borrow-money/article/823738 | Federal Regulation | "Federal Regs Making it Difficult for Members of Military to Borrow Money" | |
| The Weekly Standard | 1/9/15 | Article | http://www.weeklystandard.com/get-biosimilars-to-the-market-place/article/823418 | Health | "Get Biosimilars to the Market Place" | |

| American Enterprise Institute | 1/6/15 | Article | | https://www.aei.org/publication/congress-help-small-community-banks/ | Dodd-Frank | "Congress should help small communities by amending the Dodd-Frank Act" | |
| The Weekly Standard | 12/29/14 | Article | | http://www.weeklystandard.com/a-year-later-the-exchanges-still-stink/article/821880 | Economy | "A Year Later, the Exchanges Still Stink" | |
| The Weekly Standard | 12/24/14 | Article | | http://www.weeklystandard.com/the-white-houses-college-report-card-will-accomplish-nothing/article/822418 | Education | "The White House's College Report Card Will Accomplish Nothing" | |
| Regulation | 12/1/14 | Book Review | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/12/regulation-v37n4-10_2.pdf#page=11 | Infrastructure | "Building Better Infrastructure" | |
| Regulation | 12/1/14 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/12/regulation-v37n4-9_0.pdf#page=2 | Regulatory Publication | "Explaining Delays in Regulatory Publication" | |
| The Weekly Standard | 11/25/14 | Article | Devorah Goldman | http://www.weeklystandard.com/why-are-urban-hospitals-closing-everywhere-but-bayonne-medical-center-is-still-open/article/820161 | Health | "Why Are Urban Hospitals Closing Everywhere, but Bayonne Medical Center Is Still Open?" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 10/21/14 | Article | | http://www.weeklystandard.com/how-to-make-the-inversion-problem-even-worse/article/816947 | Department of Treasury | "How to Make the Inversion Problem Even Worse" | |
| Regulation | 10/1/14 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/10/regulationv37n3-8_2.pdf#page=6 | Tax Reform | "The IRS's War on Locum Tenes" | |
| Regulation | 10/1/14 | Book Review | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/10/regulationv37n3-9_3.pdf#page=13 | Political Entitlement | "The Entitlement 'Crisitunity'" | |
| Regulation | 10/1/14 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/10/regulationv37n3-8_0.pdf#page=2 | Regulatory Reform | "The Highs and Lows in OIRA's Report to Congress" | |
| The Weekly Standard | 9/30/14 | Article | | http://www.weeklystandard.com/a-legislative-sleight-of-hand-for-fannie-mae-and-freddie-mac/article/808389 | Financial Crisis | "A Legislative Sleight of Hand for Fannie Mae and Freddie Mac" | |
| George W. Bush Institute | 9/23/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/09/when-a-minimum-wage-is-not-a-minimum-wage.html | Minimum Wage | "When a Minimum Wage is Not a Minimum Wage" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| American Enterprise Institute | 9/17/14 | Article | | https://www.aei.org/publication/why-the-government-wont-let-colleges-reduce-tuition/ | Education | "Why the Government Won't Let Colleges Reduce Tuition" | |
| George W. Bush Institute | 9/16/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/09/paying-for-paving-tax-driving-not-gas.html | Tax Reform | "Paying for paving: Tax driving, not gas" | |
| George W. Bush Institute | 9/15/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/09/how-britains-tax-reform-boosted-economic-growth.html | British Tax Reform | "How Britain's Tax Reform Boosted Economic Growth" | |
| The Weekly Standard | 9/8/14 | Article | | http://www.weeklystandard.com/a-peorian-makes-sense-of-turkey/article/804010 | Turkey | "A Peorian Makes Sense of Turkey" | |
| American Enterprise Institute | 9/7/14 | Article | | https://www.aei.org/publication/the-minimum-wage-can-never-be-high-enough/ | Minimum Wage | "The Minimum Wage Can Never Be High Enough" | |
| The Weekly Standard | 9/4/14 | Article | | http://www.weeklystandard.com/the-costs-of-a-miscarriage-of-justice/article/804340 | Legal | "The Costs of a Miscarriage of Justice" | |
| The Weekly Standard | 8/11/14 | Article | | http://www.weeklystandard.com/paying-for-paving/article/800450 | Transportation | "Paying for Paving" | |
| The Weekly Standard | 7/25/14 | Article | | http://www.weeklystandard.com/detroit-hard-luck-city/article/797406 | Detroit | "Detroit Hard Luck City" | |

| The Weekly Standard | 7/23/14 | Article | | http://www.weeklystandard.com/the-administrations-cynical-fight-against-corporate-inversions/article/797291 | Tax Reform | "The Administration's Cynical Fight Against Corporate Inversions" | |
| The Federalists | 7/22/14 | Article | | https://thefederalist.com/2014/07/22/no-corporate-tax-inversions-are-not-an-unpatriotic-economic-crisis/ | Tax Reform | "No, Corporate Tax Inversions Are Not An Unpatriotic Economic Crisis" | |
| George W. Bush Institute | 7/22/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/07/the-tax-inversion-manufactured-crisis.html | Tax Inversion | "The tax inversion manufactured crisis" | |
| Regulation | 7/1/14 | Journal Article | Logan Albright | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/7/regulation-v37n2-7.pdf | Minimum Wage | "A Federal Minimum Wage and the States" | |
| Regulation | 7/1/14 | Book Review | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/7/regulation-v37n2-11_3.pdf#Page=10 | Macroeconomics | "Can Macroeconomics Be Saved - or Understood?" | |
| Regulation | 7/1/14 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/7/regulation-v37n2-10-edit.pdf#page=4 | Regulatory Reform | "The Obama Regulatory Rush: | |
| The Weekly Standard | 6/30/14 | Article | | http://www.weeklystandard.com/student-loan-relief-now/article/795407 | Education | "'Student Loan Relief Now'" | |

| George W. Bush Institute | 6/23/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/06/more-economic-growth-is-possible-and-will-soon-become-a-higher-priority-for-our-government.html | Economy | "More Economic Growth is Possible and Will Soon Become a Higher Priority for Our Government" | |
| The Weekly Standard | 6/16/14 | Article | | http://www.weeklystandard.com/paygo-begone/article/794411 | Federal Budget | "PAYGO Begone" | |
| George W. Bush Institute | 6/6/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/06/-tax-policy-the-texas-way--in-washington-dc.html | Tax Policy | "Tax Policy the Texas Way--in Washington, D.C." | |
| The Weekly Standard | 6/3/14 | Article | | http://www.weeklystandard.com/tax-policy-the-texas-wayin-washington-d.c./article/794275 | Tax Reform | "Tax Policy the Texas Way—in Washington, D.C." | |
| American Enterprise Institute | 5/25/14 | Article | | https://www.aei.org/publication/new-flight-rules-are-a-heavy-load/ | Transportation | "New Flight Rules Are a Heavy Load" | |
| The Hill | 5/22/14 | Op-Ed | | http://thehill.com/blogs/congress-blog/economy-budget/206814-why-fannie-and-freddies-failed-stress-test-proves-nothing | Financial Crisis | "Why Fannie and Freddie's failed stress test proves nothing" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| George W. Bush Institute | 4/28/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/04/is-the-time-ripe-for-a-revolution-in-transportation-funding.html | Transportation Funding | "Is the Time Ripe for a Revolution in Transportation Funding?" | |
| George W. Bush Institute | 4/28/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/04/rule-of-law-for-me-but-not-for-thee.html | Rule of Law | "Rule of Law for me but not for Thee" | |
| The Weekly Standard | 4/28/14 | Article | | http://www.weeklystandard.com/rule-of-law-for-me-not-for-thee/article/787493 | Property Laws | "Rule of Law For Me, Not For Thee" | |
| R Street Institute | 4/24/14 | Policy Analysis | Zackary Hawley, Andrew Hanson | http://www.rstreet.org/policy-study/rethinking-tax-benefits-for-home-owners/ | Tax Reform | "Rethinking tax benefits for home owners" | |
| R Street Institute | 4/22/14 | Policy Analysis | Zackary Hawley, Andrew Hanson | http://www.rstreet.org/policy-study/homesick-how-housing-tax-breaks-benefit-the-wealthy-and-create-mcmansions/ | Tax Reform | "Homesick: How housing tax breaks benefit the wealthy and create McMansions" | |
| Cato Institute | 4/1/2014 | Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/4/regulation-v37n1-5.pdf | Income | "Income Inequality and the NBA" | |
| National Affairs | 4/1/2014 | Journal Article | | http://epublications.marquette.edu/econ_fac/520/ | Tax Reform | "Rethinking Tax Benefits for Home Owners" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Regulation | 4/1/14 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/4/v37n1-11_1.pdf#page=6 | SEC Reform | "The Meaninglessness of the SEC Pay Disclosure Rule" | |
| George W. Bush Institute | 3/28/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/03/sisyphus-and-tax-reform.html | Tax Reform | "Sisyphus and Tax Reform" | |
| RealClearMarkets | 3/23/14 | Article | | http://www.realclearmarkets.com/articles/2014/05/23/economic_sanctions_on_russia_would_be_worse_than_futile_101075.html | Russia | "Economic Sanctions On Russia Would Be Worse Than Futile" | |
| Cato Institute | 3/18/14 | Policy Analysis | Mark A. Calabria | https://www.cato.org/publications/working-paper/paths-mortgage-finance-reform-their-budgetary-implications | Mortgage Finance Reform | "The Paths to Mortgage Finance Reform and Their Budgetary Implications" | |
| The Weekly Standard | 3/17/14 | Article | | http://www.weeklystandard.com/dont-guarini-me-bro/article/784287 | Tax Reform | "Don't Guarini Me, Bro!" | |
| The Weekly Standard | 3/10/14 | Article | | http://www.weeklystandard.com/ive-saved-thousands-of-dollars-waiting-to-get-on-obamacare/article/784372 | Healthcare | "I've Saved Thousands of Dollars Waiting to Get on Obamacare" | |
| The Weekly Standard | 2/7/14 | Article | | http://www.weeklystandard.com/ive-been-trying-since-novemberbut-i-still-cant-sign-up-for-obamacare/article/778833 | Healthcare | "I've Been Trying Since November—But I Still Can't Sign Up for Obamacare" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| George W. Bush Institute | 1/30/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/01/innovation-and-productivity-go-hand-in-hand.html | Economy | "Innovation and Productivity Go Hand in Hand" | |
| The Weekly Standard | 1/25/14 | Article | | http://www.weeklystandard.com/how-to-fix-the-pro-bowl/article/775376 | NFL | "How to Fix the Pro Bowl" | |
| National Review | 1/22/14 | Article | | http://www.nationalreview.com/corner/369201 | Financial Crisis | "How the Obama Administration Stole Fannie and Freddie" | |
| George W. Bush Institute | 1/17/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/01/praise-for-french-policy-reforms.html | French Policy | "Praise for French Policy Reforms" | |
| George W. Bush Institute | 1/7/14 | Blog Post | | http://www.bushcenter.org/publications/articles/2014/01/immigration-and-the-texas-boom.html | Immigration | "Immigration and the Texas Boom" | |
| Regulation | 1/1/14 | Book Review | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/1/regulation-v36n4-11_5.pdf#page=13 | Economic Stagnation | "It's Lousy Being You (Unless You're Rich)" | |
| Regulation | 1/1/14 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/1/regulation-v36n4-5.pdf | Economics | "The Fruits of a Failed Dissertation: Ed Clarke 1939-2013" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Regulation | 1/1/14 | Book Review | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/1/regulation-v36n4-11_0.pdf#page=2 | Gridlock | "The Fruits of Gridlock" | |
| Regulation | 1/1/14 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2014/1/regulation-v36n4-10_3.pdf#page=5 | Union policy | "White House Skirts the Law in Expanding Davis-Bacon" | |
| The Weekly Standard | 12/26/13 | Article | | http://www.weeklystandard.com/after-a-month-of-trying-i-still-cant-sign-up-for-obamacare/article/772303 | Healthcare | "After a Month of Trying, I Still Can't Sign Up for Obamacare" | |
| George W. Bush Institute | 12/26/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/12/the-tax-reform-chasm-widens.html | Tax Reform | "The Tax Reform Chasm Widens" | |
| George W. Bush Institute | 12/23/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/12/environmental-solutions-by-fiat.html | Environment | "Environmental Solutions by Fiat" | |
| The Weekly Standard | 12/23/13 | Article | | http://www.weeklystandard.com/subsidizing-rich-and-poor/article/770848 | Government Subsidies | "Subsidizing Rich and Poor" | |
| George W. Bush Institute | 12/12/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/12/tax-reform-break-up-edition.html | Tax Reform | "Tax Reform: Break-Up Edition" | |

| George W. Bush Institute | 11/21/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/11/homer-simpsons-bear-tax-dc-edition.html | Tax Reform | "Homer Simpson's Bear Tax: DC Edition" | |
| George W. Bush Institute | 10/31/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/10/growth-wont-save-entitlements.html | Economy | "Growth Won't Save Entitlements" | |
| The Weekly Standard | 10/14/13 | Article | | http://www.weeklystandard.com/europe-leads-the-way/article/759172 | Economy | "Europe Leads the Way?" | |
| George W. Bush Institute | 10/8/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/10/a-better-way-to-measure-growth.html | Economy | "A Better Way to Measure Growth" | |
| George W. Bush Institute | 9/30/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/09/californias-perfect-tax-scam.html | Tax Reform | "California's Perfect Tax Scam" | |
| George W. Bush Institute | 9/23/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/09/the-rich-are-different-so-what.html | Economy | "The Rich Are Different. So What?" | |
| Regulation | 9/1/13 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/9/regv36n3-2n.pdf | Privitization | "Could Dan Snyder End Publicly Financed Stadiums?" | |
| Regulation | 9/1/2013 | Book Review | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/9/regv36n3-9n_0.pdf#page=3 | Economic History | "The Glory of Gridlock" | |

| Regulation | 9/1/2013 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/9/regv36n3-8n.pdf | Financial regulatory overreach | "The Unknown Costs of Dodd-Frank" | |
| George W. Bush Institute | 8/17/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/08/who-should-be-teaching-college.html | Education | "Who Should be Teaching College?" | |
| George W. Bush Institute | 8/13/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/08/making-policy-the-wrong-way.html | Tax Reform | "Making Policy the Wrong Way" | |
| George W. Bush Institute | 8/1/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/08/baby-steps-to-tax-reform.html | Tax Reform | "Baby Steps to Tax Reform" | |
| George W. Bush Institute | 7/29/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/07/the-death-of-growth-has-been-greatly-exaggerated.html | Economy | "The Death of Growth Has Been Greatly Exaggerated" | |
| George W. Bush Institute | 7/23/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/07/stopping-the-mandarins.html | China | "Stopping the Mandarins" | |
| George W. Bush Institute | 7/19/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/07/tax-reform-would-play-well-in-peoria.html | Tax Reform | "Tax Reform Would Play Well in Peoria" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| George W. Bush Institute | 7/8/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/07/capitalism--chocolate-chip-cookies.html | Economy | "Capitalism & Chocolate-Chip Cookies" | |
| George W. Bush Institute | 6/27/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/06/the-case-for-a-carbon-tax.html | Environment/Tax Reform | "The Case for a Carbon Tax" | |
| American Enterprise Institute | 6/26/13 | Article | | https://www.aei.org/publication/warning-pollution/ | Environment | "Warning Pollution" | |
| George W. Bush Institute | 6/14/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/06/patent-wars-restrain-growth.html | Patents | "Patent Wars Restrain Growth" | |
| George W. Bush Institute | 6/7/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/06/is-there-a-future-for-driverless-cars.html | Technology | "Is There a Future for Driverless Cars?" | |
| Regulation | 6/1/13 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/6/regulation-v36n2-6_1.pdf#page=3 | Tax Reform | "Asking the Tax Code to Do Less" | |
| Regulation | 6/1/13 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/6/regulation-v36n2-6_0.pdf#page=2 | Regulatory Reform | "The Need for Retro-spective Review of Regulations" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Regulation | 6/1/13 | Book Review | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/6/regulation-v36n2-7_3.pdf#page=12 | Tax Reform | "Two Hundred Way the Tax Code Stinks" | |
| The Weekly Standard | 5/22/13 | Article | | http://www.weeklystandard.com/a-glimmer-of-hope-for-the-illinois-gop/article/728804 | Illinois | "A Glimmer of Hope for the Illinois GOP" | |
| George W. Bush Institute | 5/22/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/05/changing-how-we-pay-teachers.html | Education | "Changing How We Pay Teachers" | |
| Salon | 5/17/13 | Article | | https://www.salon.com/2013/05/17/how_a_fight_with_rick_santorum_made_an_irs_commissioner/ | IRS | "How a fight with Rick Santorum made an IRS commissioner" | |
| RealClearMarkets | 5/14/13 | Article | | http://www.realclearenergy.org/articles/2013/05/14/why_you_just_may_come_to_like_a_carbon_tax_107016.html | Environment | "Why You Just May Come to Like a Carbon Tax" | |
| George W. Bush Institute | 5/13/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/05/taxes-hurt-competitiveness-abroad.html | Tax Reform | "Taxes Hurt Competitiveness Abroad" | |
| R Street Institute | 5/13/13 | Op-Ed | | http://www.rstreet.org/?media-mention=were-already-paying-a-carbon-tax-in-disaster-relief-2 | Environment | "We're Already Paying a Carbon Tax in Disaster Relief" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| George W. Bush Institute | 5/1/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/05/saving-on-snacks-the-washington-way.html | Economy | "Saving on Snacks, the Washington Way" | |
| George W. Bush Institute | 4/23/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/04/spending-without-stimulus.html | Economy | "Spending Without Stimulus" | |
| RealClearMarkets | 4/22/13 | Op-Ed | | http://www.rstreet.org/op-ed/its-time-to-ask-cyprus-for-a-real-concession/ | Cyprus | "It's time to ask Cyprus for a real concession" | |
| George W. Bush Institute | 4/22/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/04/time-for-a-carbon-tax.html | Environment/Tax Reform | "Time for a Carbon Tax?" | |
| The Weekly Standard | 4/22/13 | Article | | http://www.weeklystandard.com/waiting-for-obama/article/716286 | Tax Reform | "Waiting for Obama" | |
| The Weekly Standard | 4/19/13 | Article | | http://www.weeklystandard.com/not-worth-the-paper-its-printed-on/article/745835 | OMB | "Not Worth the Paper It's Printed On" | |
| The Weekly Standard | 4/13/13 | Op-Ed | | http://www.rstreet.org/op-ed/waiting-for-obama/ | Executive Branch | "Waiting for Obama" | |
| George W. Bush Institute | 4/4/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/04/haircuts-for-the-wrong-heads.html | Banking | "Haircuts for the Wrong Heads" | |

| RealClearMarkets | 3/22/13 | Article | | http://www.realclearmarkets.com/articles/2013/03/22/its_time_to_ask_cyprus_for_a_real_concession_100215.html | Cyprus | "It's Time To Ask Cyprus For a Real Concession" | |
| George W. Bush Institute | 3/22/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/03/striking-a-deal-on-social-security.html | Social Security | "Striking a Deal on Social Security" | |
| George W. Bush Institute | 3/21/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/03/what-4-growth-would-mean-for-america.html | Economy | "What 4% Growth Would Mean For America" | |
| Salon | 3/18/13 | Article | | https://www.salon.com/2013/03/18/how_republicans_really_view_social_security/ | Social Security | "How Republicans really view Social Security" | |
| George W. Bush Institute | 3/13/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/03/silver-linings-playbook.html | Economy | "Silver Linings Playbook" | |
| Regulation | 3/1/13 | Book Review | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/3/v36n1-13.pdf#page=1 | Economic Growth | "Grow Your Pie and Eat It Too" | |
| Regulation | 3/1/13 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/3/v36n1-14_1.pdf#page=3 | Regulatory Reform | "No 'Midnight' After This Election" | |
| Regulation | 3/1/13 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/3/v36n1-6.pdf | Regulatory Reform | "Toward a New and Improved Regulatory Apparatus" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| George W. Bush Institute | 2/27/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/sequester-in-search-of-leadership.html | Legislative Branch | "Sequester: In Search Of Leadership" | |
| George W. Bush Institute | 2/13/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/canada-turns-the-tables-on-the-us.html | Canada | "Canada Turns the Tables on the U.S." | |
| George W. Bush Institute | 2/13/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/once-again-theres-no-free-lunch.html | Government Lending | "Once Again, There's No Free Lunch" | |
| George W. Bush Institute | 2/13/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/the-true-cost-of-the-fiscal-cliff-deal.html | Legislative Branch | "The True Cost of the Fiscal Cliff Deal" | |
| The Weekly Standard | 2/11/13 | Article | | http://www.weeklystandard.com/why-we-might-get-tax-reform/article/699212 | Tax Reform | "Why We Might Get Tax Reform" | |
| George W. Bush Institute | 2/6/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/no-canary-in-the-coal-mine--yet.html | Economy | "No Canary in the Coal Mine … Yet" | |
| George W. Bush Institute | 2/1/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/backing-away-from-the-cliff.html | Economy | "Backing Away from the Cliff" | |
| George W. Bush Institute | 2/1/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/moving-the-growth-debate-beyond-taxes.html | Tax Reform | "Moving the Growth Debate Beyond Taxes" | |

| George W. Bush Institute | 2/1/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/pension-shortfalls-a-bipartisan-opportunity.html | Pension | "Pension Shortfalls: A Bipartisan Opportunity?" | |
| George W. Bush Institute | 2/1/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/public-pension-plans-face-insolvency.html | Pension | "Public Pension Plans Face Insolvency" | |
| George W. Bush Institute | 2/1/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/resisting-automatic-savings.html | Banking | "Resisting Automatic Savings" | |
| George W. Bush Institute | 2/1/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/tax-cuts-require-entitlement-reform.html | Tax Reform | "Tax Cuts Require Entitlement Reform" | |
| George W. Bush Institute | 2/1/13 | Blog Post | | http://www.bushcenter.org/publications/articles/2013/02/why-keynesian-economics-died.html | Economy | "Why Keynesian Economics Died" | |
| Regulation | 1/1/13 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/1/v35n4-8_1.pdf#page=4 | Regulatory Reform | "Examining the U.S. Regulatory Budget" | |
| Regulation | 1/1/13 | Book Review | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2013/1/v35n4-7_1.pdf#page=4 | Tax Reform | "It It Time for the X-Tax?" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Regulation | 1/1/13 | Book Review | | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/201 3/1/v35n4- 7_0.pdf#page=2 | Innovation Economics | "The Pitfalls of Reforming a Broken System" | |
| Regulation | 11/1/12 | Journal Article | Elizabeth Lowell | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/201 2/11/v35n3-9.pdf | Federal Stimulus | "Derailing High-Speed Rail" | |
| Regulation | 11/1/12 | Journal Article | Sam Batkins | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/201 2/11/v35n3- 9.pdf#page=3 | Regulatory Reform | "Small Business Regulation: A Case Study and Options for Reform" | |
| Regulation | 10/1/12 | Book Review | | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/201 2/10/v31n2- inreview.pdf#page=1 | Economics | "Can Someone Make a Rational Decision?" | |
| George W. Bush Institute | 9/25/12 | Blog Post | | http://www.bushcenter .org/publications/articl es/2012/10/the-hidden- cost-of-unreliable- transportation.html | Transportation | "The Hidden Cost of Unreliable Transportation" | |
| George W. Bush Institute | 9/11/12 | Blog Post | ` | http://www.bushcenter .org/publications/articl es/2012/10/productivit y-growth-the-numbers- and-the-reality.html | Economy | "Productivity Growth: The Numbers and the Reality" | |
| George W. Bush Institute | 8/31/12 | Blog Post | | http://www.bushcenter .org/publications/articl es/2012/10/growth- fuels-turkeys- promise.html | Turkey | "Growth Fuels Turkey's Promise" | |

| George W. Bush Institute | 8/14/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/the-battle-over-the-regulatory-state.html | Regulation | "The Battle Over the Regulatory State" | |
| George W. Bush Institute | 8/9/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/quarterbacks-vigilantes-and-economic-growth.html | Economy | "Quarterbacks, Vigilantes, and Economic Growth" | |
| Regulation | 8/1/12 | Policy Report | Elizabeth Lowell | https://object.cato.org/sites/cato.org/files/serials/files/policy-report/2012/8/v35n2-7.pdf#page=3 | Export-Import Bank | "Reforming the Export-Import Bank" | |
| George W. Bush Institute | 8/1/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/the-wrong-reason-for-the-right-policy.html | Economy | "The Wrong Reason for the Right Policy" | |
| George W. Bush Institute | 7/30/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/counting-on-living-longer.html | Age and Economy | "Counting on Living Longer" | |
| George W. Bush Institute | 7/12/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/the-benefits-of-growth-slow-but-inexorable.html | Economy | "The Benefits of Growth: Slow but Inexorable" | |
| George W. Bush Institute | 7/8/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/the-italian-job-improving-productivity-and-employment.html | Economy | "The Italian Job: Improving Productivity and Employment" | |

| Regulation | 7/1/12 | Journal Article | Elizabeth Lowell | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2012/7/v34n4-5.pdf | Flood Insurance | "The Flood Insurance Fix" | |
| George W. Bush Institute | 6/29/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/in-defense-of-finance.html | Finance | "In Defense of Finance" | |
| American Enterprise Institute | 6/21/12 | Article | | https://www.aei.org/publication/the-costliest-regulation-youve-never-heard-of/ | Federal Regulation | "The Costliest Regulation You've Never Heard Of" | |
| George W. Bush Institute | 6/19/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/problems-with-productivity--or-not.html | Economy | "Problems with Productivity ... or Not" | |
| George W. Bush Institute | 6/15/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/a-tax-deal-that-is-no-bargain.html | Tax Reform | "A Tax Deal That Is No Bargain" | |
| The Weekly Standard | 6/8/12 | Article | | http://www.weeklystandard.com/another-bad-sign-productivity-falls-by-.9-percent/article/646800 | Economy | "Another Bad Sign: Productivity Falls by .9 Percent" | |
| George W. Bush Institute | 6/7/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/letting-innovators-innovate.html | Regulation | "Letting Innovators Innovate" | |
| George W. Bush Institute | 5/31/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/luddites-lumps-of-labor-and-a-laundry-list-of-illogic.html | Economy | "Luddites, Lumps of Labor, and a Laundry List of Illogic" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| George W. Bush Institute | 5/24/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/real-investment-instead-of-short-term-stimulus.html | Investments | "Real Investment Instead of Short-Term Stimulus" | |
| George W. Bush Institute | 5/18/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/the-importance-of-productivity.html | Economy | "The Importance of Productivity" | |
| George W. Bush Institute | 5/10/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/short-run-productivity-measures-tell-us-little.html | Economy | "Short Run Productivity Measures Tell Us Little" | |
| George W. Bush Institute | 5/4/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/enjoying-every-sandwich-life-expectancy-and-growth.html | Age and Economy | "Enjoying Every Sandwich: Life Expectancy and Growth" | |
| The Weekly Standard | 4/30/12 | Article | | http://www.weeklystandard.com/oecds-prescription-to-raise-taxes-is-the-wrong-medicine-for-u.s./article/642253 | Tax Reform | "OECD's Prescription to Raise Taxes Is the Wrong Medicine for U.S." | |
| George W. Bush Institute | 4/27/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/lessons-from-the-1-how-to-get-ahead-in-life.html | Economy | "Lessons from the 1%: How to Get Ahead in Life" | |

| The Weekly Standard | 4/24/12 | Article | | http://www.weeklystandard.com/obama-administration-stops-foreigners-from-clogging-teller-windows/article/642044 | Immigration | "Obama Administration Stops Foreigners from Clogging Teller Windows" | |
| American Enterprise Institute | 4/18/12 | Article | | https://www.aei.org/publication/about-those-better-roads-in-china/ | China | "About Those Better Roads in China" | |
| George W. Bush Institute | 4/16/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/the-cost-of-increasing-tax-rates-on-capital-gains-and-dividends.html | Tax Reform | "The Cost of Increasing Tax Rates On Capital Gains and Dividends" | |
| George W. Bush Institute | 4/10/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/making-future-generations-foot-the-bill.html | Economy | "Making Future Generations Foot the Bill" | |
| The Weekly Standard | 4/4/12 | Article | | http://www.weeklystandard.com/year-104-and-counting-a-cubs-fan-survival-strategy/article/635403 | MLB | "Year 104 and Counting: A Cubs Fan Survival Strategy" | |
| Regulation | 4/1/2012 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2012/4/v35n1-7.pdf#page=2 | Regulatory Reform | "First-Year Grades on Obama Regulatory Reform" | |
| Regulation | 4/1/12 | Journal Article | Matt Thoman | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2012/4/v35n1-7.pdf | Occupational Licensing | "Taxi Medallions Coming to a City Near You" | |

| National Review | 3/29/12 | Article | | http://www.nationalreview.com/corner/294768 | Oil | "Domestic Oil Policies Do Impact Oil Prices" | |
| The Weekly Standard | 3/28/12 | Article | Logan Albright | http://www.weeklystandard.com/o-canada/article/634791 | Canada | "O Canada!" | |
| George W. Bush Institute | 3/23/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/how-growth-benefits-us-all--the-1990s-vs-the-2000s.html | Economy | "How Growth Benefits Us All — the 1990s vs. the 2000s" | |
| The Weekly Standard | 3/21/12 | Article | | http://www.weeklystandard.com/ryans-tax-plan-moves-the-ball/article/634323 | Tax Reform | "Ryan's Tax Plan Moves the Ball" | |
| George W. Bush Institute | 3/15/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/should-peorians-care-about-corporate-tax-reform-yes.html | Tax Reform | "Should Peorians Care about Corporate Tax Reform? (Yes)" | |
| George W. Bush Institute | 3/9/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/chinas-retreat-from-state-directed-capitalism.html | China | "China's Retreat from State-Directed Capitalism" | |
| George W. Bush Institute | 3/1/12 | Blog Post | | http://www.bushcenter.org/publications/articles/2012/10/material-progress-and-the-plight-of-the-poor--.html | Economy | "Material Progress and the Plight of the Poor" | |
| The Weekly Standard | 1/23/12 | Article | Sam Batkins | http://www.weeklystandard.com/obama-burdens-the-banks/article/616738 | Banking | "Obama Burdens the Banks" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| The Weekly Standard | 1/20/12 | Article | | http://www.weeklystandard.com/la-gloire-de-lconomie-franaise/article/617346 | France | "À la Gloire de L'économie Française" | |
| The Weekly Standard | 12/26/11 | Article | Eli Lehrer | http://www.weeklystandard.com/mortgaging-our-future/article/613475 | Economy | "Mortgaging Our Future" | |
| The Weekly Standard | 12/21/11 | Article | Andrew Hanson, Zach Hawley | http://www.weeklystandard.com/who-benefits-from-the-mortgage-interest-deduction/article/614586 | Mortgage | "Who Benefits from the Mortgage Interest Deduction?" | |
| American Enterprise Institute | 12/13/11 | Article | Matt Thoman | https://www.aei.org/publication/why-unemployment-is-worse-than-you-think/ | Unemployment | "Why Unemployment Is Worse Than You Think" | |
| The Weekly Standard | 11/7/11 | Article | | http://www.weeklystandard.com/a-cure-for-the-housing-blues/article/604177 | Housing | "A Cure for the Housing Blues" | |
| The Weekly Standard | 11/4/11 | Article | Elizabeth Lowell | http://www.weeklystandard.com/privatizing-the-liquor-market/article/607746 | Privitization | "Privatizing the Liquor Market" | |
| National Review | 10/31/11 | Article | | http://www.nationalreview.com/corner/281706 | Washington,D.C. | "Halloween on the Hill" | |
| The Weekly Standard | 10/17/11 | Article | Eli Lehrer | http://www.weeklystandard.com/lets-start-all-over-again/article/595196 | Tax Reform | "Let's Start All Over Again" | |
| The Hill | 10/17/11 | Op-Ed | Eli Lehrer | http://thehill.com/opinion/op-ed/188045-zeroing-in-on-simplifying-the-tax-system | Tax Reform | "Zeroing in on simplifying the tax system" | |

| National Review | 10/12/11 | Article | | http://www.nationalreview.com/corner/279912 | Foreign Investment | "Increasing Foreign Investment, the Chicago Way" | |
| American Action Forum | 9/26/11 | Article | | https://www.americanactionforum.org/insight/european-disunion/ | Europe | "European Disunion" | |
| American Enterprise Institute | 9/22/11 | Article | Matt Thoman | https://www.aei.org/publication/european-disunion-2/ | Europe | "European Disunion" | |
| The Weekly Standard | 9/13/11 | Article | | http://www.weeklystandard.com/time-for-an-honest-accounting-of-our-disaster-budget/article/593142 | Federal Budget | "Time for an Honest Accounting of Our Disaster Budget" | |
| National Review | 9/8/11 | Article | | http://www.nationalreview.com/corner/276689 | Infrastructure | "Let's Have Infrastructure Investment, But the Right Kind" | |
| National Review | 9/6/11 | Article | | http://www.nationalreview.com/corner/276257 | Economy | "Stimulus Still Creating Jobs?" | |
| Regulation | 9/1/11 | Journal Article | Sam Batkins | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2011/9/regv34n3-2.pdf | Regulatory Reform | "Obama, Ryan, and the Future of Regulatory Reform" | |
| The Weekly Standard | 8/15/11 | Article | Benjamin Gitis | http://www.weeklystandard.com/the-mortgage-interest-boondoggle/article/582077 | Mortgage | "The Mortgage Interest Boondoggle" | |
| American Action Forum | 8/6/11 | Article | | https://www.americanactionforum.org/insight/the-downgrade-what-it-is-and-what-it-isnt/ | Economy | "THE DOWNGRADE: WHAT IT IS AND WHAT IT ISN'T" | |
| National Review | 8/5/11 | Article | | http://www.nationalreview.com/corner/273859 | Economy | "The Downgrade: What It Is And What It Isn't" | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| American Action Forum | 7/22/11 | Article | Sam Batkins | https://www.american actionforum.org/insight /dodd-frank-turns-one/ | Legislation | "Dodd-Frank Turns One" | |
| American Action Forum | 7/21/11 | Article | | https://www.american actionforum.org/insight /new-urbanism-isnt-going-to-save-the-economy-now-or-ever1/ | Economy | "NEW URBANISM ISN'T GOING TO SAVE THE ECONOMY NOW OR EVER" | |
| American Action Forum | 7/19/11 | Article | Doug Holtz-Eakin, and Elizabeth Lowell | https://www.american actionforum.org/resear ch/how-reform-of-the-u-s-corporate-tax-code-can-create-short-and-long-term-ec/ | Tax Reform | "HOW REFORM OF THE U.S. CORPORATE TAX CODE CAN CREATE SHORT- AND LONG-TERM ECONOMIC GROWTH" | |
| Regulation | 7/1/2011 | Book Review | Edward Glaeser | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/201 1/7/regv34n2-9.pdf | The allure of big cities | "Lure of the Big City" | Reviewed by Ike Brannon. Written by Edward Glaeser |
| Regulation | 7/1/2011 | Journal Article | | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/201 1/7/regv34n2-5.pdf#page=5 | EPA | "Obfuscation at the EPA" | |
| American Action Forum | 6/30/11 | Article | Sam Batkins | https://www.american actionforum.org/resear ch/obfuscation-at-the-epa/ | EPA | "Obfuscation At The EPA" | |
| American Action Forum | 6/29/11 | Book Review | | https://www.american actionforum.org/insight /lure-of-the-big-city-reviewed-by-ike-brannon/ | "Triumph of the City: How Our Greatest Invention Makes Us Richer, Smarter, Greener, Healthier, and Happier by Edward Glaeser 352 pages; Penguin Press, 2011" | "Lure Of The Big City" | |

| American Action Forum | 6/28/11 | Article | Willam Melick, Eric Andersen | https://www.americanactionforum.org/research/employment-effects-of-reducing-capital-gains-tax-rates-in-ohio/ | Tax Reform | "EMPLOYMENT EFFECTS OF REDUCING CAPITAL GAINS TAX RATES IN OHIO" | |
| American Enterprise Institute | 6/16/11 | Article | | http://www.aei.org/publication/the-upside-of-voter-id-initiatives/ | Voter ID | "The Upside of Voter ID Initiatives" | |
| American Action Forum | 6/14/11 | Article | | https://www.americanactionforum.org/insight/a-different-route-to-redemption-for-anthony-weiner/ | Anthony Weiner | "A DIFFERENT ROUTE TO REDEMPTION FOR ANTHONY WEINER" | |
| American Action Forum | 5/17/11 | Article | | https://www.americanactionforum.org/insight/blaming-the-speculators-and-other-fairy-tales/ | Oil | "Blaming The Speculators And Other Fairy Tales" | |
| American Enterprise Institute | 5/11/2011 | Article | | http://www.aei.org/publication/who-really-stands-to-win-in-the-union-fights/ | Union | "Who Really Stands to Win in the Union Fights?" | |
| American Action Forum | 5/1/2011 | White Paper | Elizabeth Lowell | https://www.americanactionforum.org/wp-content/uploads/sites/default/files/Ex-Im%20Final%20Draft21.pdf | Export-Import Bank | "Export-Import Bank: Obstacles and Options for Reform" | |
| The Weekly Standard | 4/11/2011 | Article | Sam Batkins | http://www.weeklystandard.com/all-benefits-no-costs/article/556153 | Federal Regulations | "All Benefits, No Costs" | |
| American Action Forum | 4/1/2011 | Article | Ken Solow | https://www.americanactionforum.org/insight/the-disaster-playbook-for-investors/ | Investing | "The Disaster Playbook For Investors" | |

| The Weekly Standard | 3/14/2011 | Article | | http://www.weeklystandard.com/what-happened-to-loebs-deli/article/552971 | Economy | "What Happened to Loeb's Deli?" | |
| Regulation | 6/4/2010 | Journal Article | | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2010/6/regv33n2-2.pdf | Snow Clearance | "When DC Freezes Over" | |
| The Weekly Standard | 3/12/2010 | Article | | http://www.weeklystandard.com/hop-aboard-the-nanny-train/article/422531 | DC Metro | "Hop Aboard the Nanny Train" | |
| Cato Institute | 1/1/2009 | Policy Analysis | Chris Edwards | https://www.cato.org/publications/tax-budget-bulletin/troubling-return-keynesianism | Keynesianism | "The Troubling Return of Keynesianism" | |
| Cato Journal | 11/1/2008 | Book Review | Richard H. Thaler and Cass R. Sunstein | https://object.cato.org/sites/cato.org/files/serials/files/cato-journal/2008/11/cj28n3-12.pdf | Improving Economic Decisions | "Nudge: Improving Decisions about Health, Wealth, and Happiness" | Reviewed by Ike Brannon. Written by Richard H. Thaler and Cass R. Sunstein |
| Regulation | 6/1/2008 | Book Review | Tim Harford | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2008/6/v31n2-inreview.pdf#page=8 | Economics | "Yet Another Pop Econ Book" | Reviewed by Ike Brannon. Written by Tim Harford |
| Regulation | 10/1/2007 | Book Review | Amity Shlaes | https://object.cato.org/sites/cato.org/files/serials/files/regulation/2007/10/v30n3-inreview.pdf#page=1 | Great Depression | "FDR at Breakfast" | Reviewed by Ike Brannon. Written by Amity Shlaes |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Regulation | 3/1/2006 | Journal Article | Suzanne Stewart | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/200 6/3/v29n1-noted.pdf#page=4 | Housing Bubble | "A Collapsing Housing Bubble?" | |
| Regulation | 3/1/2006 | Journal Article | | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/200 6/3/v29n1-2.pdf | John Muth | "Remembering the Man Behind Rational Expectations" | |
| Regulation | 12/1/2005 | Book Review | Robert Hahn | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/200 5/12/v28n4-inreview.pdf#page=3 | Economic Regulation | "Treating the Unserious Seriously" | Reviewed by Ike Brannon. Written by Robert Hahn |
| Regulation | 12/1/2004 | Journal Article | | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/200 4/12/v27n4-8.pdf | Life's Worth | "What Is a Life Worth?" | |
| Regulation | 12/1/2002 | Journal Article | Michael F. Gorman | https://object.cato.org/ sites/cato.org/files/seri als/files/regulation/200 2/12/v25n4-5.pdf | Economy | "How the Packers Lost Out" | |

# Exhibit 22

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Proposed Defendant-Intervenor. | ) | |

**DECLARATION OF MEG WIEHE AND MARCO GUZMAN**

We, Meg Wiehe and Marco Guzman, declare as follows:

1.      We are tax policy experts employed by the Institute on Taxation and Economic Policy (ITEP). ITEP is a non-profit, non-partisan research organization that provides in-depth analyses on the effects of federal, state, and local tax policies. ITEP's mission is to ensure the nation has a fair and sustainable tax system that raises enough revenue to fund our common priorities, including education, health care, infrastructure, and public safety. ITEP researchers use a proprietary microsimulation tax model to produce analyses of current tax systems and proposed changes at the federal, state, and local level. That model uses a large sample of tax returns and other data to estimate the impact of tax systems and tax proposals on taxpayers at different income levels. This is the same type of tax model used by the U.S. Treasury Department, the Congressional

1

Joint Committee on Taxation, and the Congressional Budget Office, as well as by many state revenue departments. The ITEP model is updated several times a year to reflect current economic projections, incorporate the most recently available IRS Statistics of Income data, and to include changes enacted to state and federal tax law.

2.      Meg Wiehe is the Deputy Executive Director of ITEP. She has worked with ITEP since 2010. She is a nationally recognized expert on state and local taxation, and she provides commentary on historical and current trends in state tax and budget policy. In particular, her analyses focus both on how tax and budget policies affect low- and moderate-income families and on how fiscal policies affect state and local governments' ability to fund basic public priorities, including education, infrastructure, and health care. She has conducted hundreds of revenue and distributional analyses of proposed tax changes in more than 40 states using ITEP's microsimulation tax model.  She also is a lead author of ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.*[1] She holds a Master of Public Administration from the Maxwell School at Syracuse University and a Bachelor of Arts in Anthropology from the University of Virginia.

3.      Marco Guzman has been a State Policy Analyst at ITEP since February 2020. He holds a Master of Public Policy from George Mason University and a Bachelor of Science in Human Communication from Arizona State University.

4.      According to U.S. Citizenship and Immigration Services (USCIS), the agency that administers Deferred Action for Childhood Arrivals (DACA), as of March 31, 2020, there were

---

[1] Davis, Carl, et al. *Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 6th ed.*, Institute on Taxation and Economic Policy, October 2018, *available at* www.whopays.org.

approximately 643,560 active DACA recipients.[2] The Migration Policy Institute (MPI), a non-profit, non-partisan think tank that analyzes the movement of people worldwide, estimates that an additional 682,440 individuals are eligible for DACA in 2020 but have not submitted DACA requests.[3]

5.      We used the above USCIS and MPI estimates of the current population of DACA recipients and DACA-eligible individuals to estimate the annual aggregate state and local tax contributions of DACA recipients and DACA-eligible individuals.[4]

6.      Undocumented immigrants eligible for or granted DACA pay state and local income, property, sales, and excise taxes.  We estimate that the total DACA-recipient and DACA-eligible population contributes more than $3 billion annually in state and local taxes. $2.4 billion of that is from current DACA recipients. We used the following methodology to calculate the sales and excise, income, and property taxes of the DACA-recipient and DACA-eligible population.

7.      A 2020 national survey of 1,157 DACA recipients found that 88.5 percent of respondents were employed.[5] DACA recipients receive a temporary social security number, which allows them to file federal and state income taxes. They pay the same income taxes (in states with

---

[2] U.S. Citizenship and Immigration Services, "Approximate Active DACA Recipients," *available at* https://www.uscis.gov/sites/default/files/document/data/Approximate%20Active%20DACA%20 Receipts%20-%20March%2031%2C%202020.pdf.

[3] The Migration Policy Institute provided these estimates to ITEP by request.

[4] The DACA-eligible population refers here to the population eligible for DACA under the Department of Homeland Security memorandum entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, dated June 15, 2012.

[5] Tom Wong, *New DHS Policy Threatens to Undo Gains Made by DACA Recipients*, Center for American Progress (Oct. 5, 2020), *available at* https://www.americanprogress.org/issues/immigration/news/2020/10/05/491017/ new-dhs-policy-threatens-undo-gains-made-daca-recipients/.

income taxes) as other lawfully present individuals. In addition, they pay the same payroll taxes as other lawfully present individuals. Applying this employment rate to the March 2020 USCIS data regarding DACA recipients (cited in paragraph 4), we estimate that 569,436 DACA recipients are currently employed.

8.     The national survey referenced in footnote 5 also found that prior to obtaining DACA only 45.3 percent of survey respondents were employed. Our analysis assumes an employment rate of 45.3 percent for the population of individuals who are eligible for DACA but who are not currently DACA recipients. Applying this employment rate to the estimated number of DACA-eligible immigrants who are not currently DACA recipients (based on the MPI data cited in paragraph 4), we estimate that 311,469 DACA-eligible immigrants are currently employed, separate and apart from the estimated 569,436 employed DACA recipients.

9.     Immigrants' wages change depending on whether they are able to work legally. According to updated survey results from Tom Wong, Associate Professor of political science and Founding Director of the U.S. Immigration Policy Center at the University of California, San Diego, DACA-eligible workers earned an annual median wage of $22,120 prior to receiving DACA.[6] The survey respondents reported a new median annual wage of $42,000 after they were granted DACA and were able to work legally.

10.     Thus, we estimate that the median annual wage for working DACA recipients is $42,000, and the median annual wage for the working DACA-eligible population is $22,120.

11.     Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by the DACA-eligible and DACA-recipient population in each state were calculated as follows.

---

[6] Center for American Progress, *supra* note 5.

12.     ITEP's microsimulation tax model applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law as it existed in 2018. In October of 2018, ITEP released the 6th edition of *Who Pays?*, which estimates the share of their income that taxpayers pay in state and local taxes, otherwise known as their effective tax rates. We use these data to estimate the state and local tax contributions of the DACA-eligible and DACA-recipient populations in all 50 states.

13.     We estimate that the DACA-eligible and DACA-recipient populations contribute $403.5 million in state and local income taxes annually. Our methodology is as follows.

14.     DACA recipients are required to pay personal income taxes using a temporary social security number. Thus, this study assumes the 569,436 DACA-recipient workers are fully complying with their state and local personal income tax obligations.

15.     Researchers have estimated that between 50 and 75 percent of undocumented immigrants currently pay personal income taxes.[7] This analysis conservatively assumes a 50 percent compliance rate for DACA-eligible immigrants who are not DACA recipients, and it assumes that there would be a 50 percent compliance rate for DACA recipients if DACA were rescinded and protections were lost. Effective personal income tax rates in each state were therefore applied to 50 percent of the estimated income for DACA-eligible residents who are not receiving DACA.

---

[7] *See, e.g.,* Wayne Cornelius & Jessica Lewis, Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities (2007); Joel Feinleib & David Warner. *The Impact of Immigration on Social Security and the National Economy*, Social Security Advisory Board, Issue Brief No. 1, Dec. 2005.

16.     We estimate that the DACA-eligible and DACA-recipient populations contribute nearly $918 million annually in state and local property taxes. DACA-eligible and DACA-recipient populations pay property taxes either directly as homeowners, or indirectly through higher rents as tenants. For renters, the ITEP model assumes that half of the cost of the property tax paid by rental property owners is passed through to renters, taking a conservative approach to the broad economic consensus that a portion of these taxes are passed through to renters in the form of higher rents.

17.     We estimate that the DACA-eligible and DACA-recipient populations contribute $1.7 billion annually in state and local sales and excise taxes. Like anyone purchasing goods or services, the DACA-eligible and DACA-recipient populations pay consumption taxes directly at the point of sale. This analysis assumes that DACA recipients and DACA-eligible individuals pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes.

18.     A useful way to compare taxes paid across income levels is the effective tax rate. This is the total of all taxes paid—income, property, and sales and excise—as a share of income. ITEP found the DACA-eligible and DACA-recipient populations pay an average effective tax rate of 10 percent. ITEP's 2018 report, *Who Pays?*, found that the middle 20% of taxpayers pay on average an effective tax rate of 9.9 percent.[8] Thus, the DACA-eligible and DACA-recipient populations pay state and local taxes at a similar rate to middle income taxpayers across the country.

19.     We estimate that if DACA were rescinded, the DACA-eligible and DACA-recipient populations would continue to contribute to state and local tax revenues, but at much

---

[8] Institute on Taxation and Economic Policy, *supra* note 1.

lower levels. If DACA recipients were to lose their DACA protections, we estimate a total annual loss of $1.7 billion in state and local tax revenues. Our reasoning is as follows.

20.     The DACA policy has the effect of increasing state and local tax contributions because the policy increases employment rates, average salaries, and compliance with state and local tax laws. Surveys of DACA recipients found that after being granted DACA, they were employed at higher rates and earned higher wages. This is likely because the work authorizations and deferral from deportation provided by DACA allow recipients to guard against wage theft by unscrupulous employers, secure more remunerative employment, and pursue advanced degrees. Thus, rescinding DACA would substantially reduce DACA recipients' tax contributions.

21.     According to our analysis, every state tax revenue stream would be harmed by the loss of DACA protections. In New Jersey, 40,000 residents are eligible for or have been granted DACA, and we estimate that they are contributing $79.1 million in state and local taxes, which represents an average effective tax rate of 9.4 percent. This includes $1 million in state and local income tax, $40 million in property tax, and $38.1 million in sales and excise taxes. If DACA were rescinded, DACA recipients' contributions would decrease by $35.5 million to $45.6 million annually.[9]

22.     In Texas, 231,000 residents are eligible for or have been granted DACA, and we estimate that they are contributing $517.6 million in state and local taxes, which represents an average effective tax rate of 10 percent. This includes $145.6 million in property tax, and $371.9

---

[9] ITEP used USCIS and MPI data and ITEP *Who Pays?* figures to calculate the estimates in paragraphs 21 and 22 for New Jersey and Texas. Our methodology for calculating these estimates mirrored that which we used to reach our national estimates cited above.

million in sales and excise taxes. If DACA were rescinded, DACA recipients' contributions would decrease by more than half to $253.1 million annually.

23.     For the foregoing reasons, according to our analysis and in our professional opinions, rescinding DACA would reduce the state and local tax contributions of the DACA-eligible and DACA-recipient population by almost half in New Jersey and Texas and by nearly $1.7 billion annually nationwide. This would decrease state and local tax revenues and hurt state and local economies.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of our knowledge.

_____          _____
Meg Wiehe                          Marco Guzman

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-68 |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

## <u>ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

This matter came before the Court on Plaintiffs' Motion for Summary Judgment, Dkt. 486, on Counts I, II, and III of their First Amended Complaint, Dkt. 104. After reviewing the briefing on the matter, the evidence properly offered in support of Plaintiffs' Motion for Summary Judgment, and all other matters properly before the Court, the Court finds that Plaintiffs' lawsuit is moot and that genuine issues of material fact remain unresolved. Further, the Court finds that Plaintiffs are not entitled to summary judgment as to their substantive Administrative Procedure Act (APA) claim, their procedural APA claim, or their Take Care Clause claim.

Accordingly, IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment is denied.

SIGNED on this the _____ day of _____, 2020.


_____
Hon. Andrew S. Hanen,
U.S. District Court Judge