**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## APPENDIX

## VOLUME I: EXHIBITS 1-11

Pursuant to this Court's Civil Procedures, Rule 9, Defendant-Intervenor State of New Jersey hereby provides the Court with the following table of contents and copies of the documents and authorities cited in its Opposition to Plaintiffs' Motion for Summary Judgment:

| Ex. | Description | Page |
|---|---|---|
| | **VOLUME I** | |
| 1. | Memo. from Chad Wolf, Acting Sec'y of Homeland Sec., to Mark Morgan, Senior Official Performing Duties of Comm'r, U.S. Customs & Border Prot., et al. (July 28, 2020) | NJAPP001 |
| 2. | Memo. from Joseph Edlow, USCIS Associate Director, to Associate Directors and Program Office Chiefs (Aug. 21, 2020) | NJAPP010 |
| 3. | Excerpts from Federal Defendants' Objections and Responses to Defendant-Intervenors' Fifth and Sixth sets of discovery requests (Sept. 30, 2020) | NJAPP021 |
| 4. | Federal Defendants' Responses to Interrogatory No. 15 (Sept. 30, 2020) | NJAPP030 |

| 5. | Email from Victoria Palmer, USCIS Media Affairs Division, and attached Response to Query guidance document (Aug. 24, 2020) | NJAPP037 |
|---|---|---|
| 6. | Email from Brandon Robinson, USCIS Adjudications Officer (Policy), "Re: DACA Filings After 9/5/17 – No Prior Grant of DACA" | NJAPP047 |
| 7. | Email from Brandon Robinson, USCIS Adjudications Officer (Policy), "DACA Filings After 9/5/17 – No Prior Grant of DACA" (Apr. 26, 2019) | NJAPP049 |
| 8. | Email from Victoria Umoru, USCIS Adjudications Officer (Policy), "Implementing the DACA Memo issued by USCIS Deputy Director for Policy Joseph Edlow" (Aug. 22, 2020) | NJAPP052 |
| 9. | Excerpt from Brief of the National Education Association and National PTA as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP056 |
| 10. | Excerpts from Brief of Former Service Secretaries, Modern Military Association of American, and military and veteran advocacy organizations as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP075 |
| 11. | Excerpt from Brief of Teach for America, Inc., as amicus curiae in support of Respondents in *DHS v. Regents* | NJAPP094 |
| | **VOLUME II** | |
| 12. | Excerpts from Brief of Association of American Medical Colleges et. al., as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP104 |
| 13. | Excerpt from Brief of Lawyers' Committee for Civil Rights Under Law, the Anti-Defamation League, the Leadership Conference on Civil and Human Rights, and 42 other social justice organizations as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP125 |
| 14. | Excerpt from Brief of 143 U.S. business associations and companies as amici curiae in support of respondents in *DHS v. Regents* | NJAPP133 |
| 15. | Excerpt from Brief of 127 religious organizations as amici curiae in support of respondents in *DHS v. Regents* | NJAPP142 |
| 16. | *Nikko Trading of Am. Corp. v. Wastemasters, Inc.*, No. 98-48, 2000 WL 284190 (N.D. Tex. Mar. 14, 2000) | NJAPP150 |
| 17. | Declaration of Khristina Gonzalez | NJAPP154 |
| 18. | Declaration of Jack C. Chen | NJAPP166 |
| 19. | Declaration of Maria Hernandez | NJAPP181 |
| 20. | Declaration of Elzbieta Wojtylo | NJAPP186 |
| | **VOLUME III** | |
| 21. | Declaration of James "Ike" Brannon | NJAPP192 |
| 22. | Declaration of Meg Wiehe | NJAPP340 |

Dated: November 6, 2020

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Mayur P. Saxena*
Assistant Attorney General
(admitted pro hac vice)
124 Halsey St., 5th Floor
Newark, New Jersey 07101
PO Box 45029-5029
Phone: (973) 648-3283
Fax: (973) 648-4887
Mayur.Saxena@law.njoag.gov

Melissa Medoway, Deputy Attorney General
(admitted pro hac vice)
Eric Apar, Deputy Attorney General
(admitted pro hac vice)
Elspeth Hans, Deputy Attorney General
(admitted pro hac vice)
Tim Sheehan
(admitted pro hac vice)
*Attorneys for Defendant-Intervenor State of
New Jersey*

# Exhibit 1



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

July 28, 2020

MEMORANDUM FOR:    Mark Morgan
Senior Official Performing the Duties of Commissioner
U.S. Customs and Border Protection

Matthew Albence
Senior Official Performing the Duties of Director
U.S. Immigration and Customs Enforcement

Joseph Edlow
Deputy Director of Policy
U.S. Citizenship and Immigration Services

FROM:    Chad F. Wolf
Acting Secretary

SUBJECT:    **Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

On June 15, 2012, Secretary of Homeland Security Janet Napolitano established the policy known as Deferred Action for Childhood Arrivals (DACA) through a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." Ever since, the policy has been subject to substantial controversy. In recent years, Acting Secretary of Homeland Security Elaine Duke and Secretary of Homeland Security Kirstjen Nielsen concluded that the DACA policy should be fully rescinded and issued additional memoranda in 2017 and 2018, respectively, to effect that decision.

On June 18, 2020, the U.S. Supreme Court issued a decision that did not question the authority of the Department of Homeland Security (DHS) to rescind the DACA policy, but determined that the 2017 and 2018 memoranda had not complied with certain requirements for doing so. See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589. Accordingly, the Court concluded that the rescission must be vacated and remanded to DHS so that it "may consider the problem anew." Regents, Slip op. at 29.

By this memorandum, I am rescinding the 2017 and 2018 memoranda, and making certain immediate changes to the DACA policy to facilitate my thorough consideration of how to address DACA in light of the Supreme Court's decision. For the reasons outlined below, pending my full reconsideration of the DACA policy, I direct DHS personnel to take all appropriate actions to reject all pending and future initial requests for DACA, to reject all

pending and future applications for advance parole absent exceptional circumstances, and to shorten DACA renewals consistent with the parameters established in this memorandum.

## Background

On June 15, 2012, Secretary Napolitano issued the memorandum (Napolitano Memorandum) establishing the DACA policy.  The policy provided for the granting of deferred action to certain individuals with no lawful immigration status "who were brought to this country as children" and who satisfied a list of additional specified criteria.  The memorandum described this deferred action as an exercise of "prosecutorial discretion" to forbear from removing an alien who would otherwise be subject to removal.  Under pre-existing regulations, a grant of deferred action made aliens eligible for certain other attendant benefits, such as work authorization.  The memorandum directed U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS) to establish procedures for granting deferred action and work authorization to eligible aliens for a two-year period, subject to renewal, and for notifying those aliens of DHS's decision to do so.  The memorandum stated, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship."

On November 20, 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum (Johnson Memorandum) to expand the DACA policy and establish a new, related policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  With regard to DACA, this memorandum eliminated a criterion relating to the age of DACA requestors when the policy was announced, extended the deferred-action and work-authorization period from two to three years, and adjusted the date by which requestors must have entered the United States to be eligible for DACA.  The DAPA policy allowed for deferred action to be provided to certain parents whose children are U.S. citizens or lawful permanent residents through a process similar to DACA.

Shortly thereafter, the U.S. District Court for the Southern District of Texas issued a nationwide preliminary injunction preventing both the DAPA policy and the expansion of the DACA policy from taking effect.  In 2015, the U.S. Court of Appeals for the Fifth Circuit affirmed, holding that DAPA and expanded DACA likely violated both the Administrative Procedure Act (APA) and the Immigration and Nationality Act (INA).  In 2016, the U.S. Supreme Court affirmed the court of appeals' decision by an equally divided vote.  On June 15, 2017, Secretary of Homeland Security John Kelly issued a memorandum rescinding the Johnson Memorandum.

Also in June 2017, several of the state plaintiffs from the Texas lawsuit announced their intent to amend their complaint in the then still-pending litigation to challenge the original DACA policy as well.  The States argued that the DACA policy was unlawful for the same reasons as the DAPA policy and the expansion of the DACA policy.  On September 4, 2017, then-Attorney General Jefferson B. Sessions III issued a letter to Acting Secretary Duke (Sessions Letter), concluding that the DACA policy was indeed unlawful and likely would also be enjoined.

On September 5, 2017, Acting Secretary Duke issued her memorandum (Duke Memorandum) rescinding the Napolitano Memorandum and initiating an orderly wind-down of the DACA policy.  The Duke Memorandum explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" in the litigation concerning the Johnson Memorandum, and the Sessions Letter, it was clear to the Acting Secretary that the DACA policy "should be terminated."

Litigation challenging the Duke Memorandum promptly ensued. As relevant here, suits were filed in the U.S. District Courts for the Northern District of California, Eastern District of New York, District of Maryland, and the District of Columbia. The District of Columbia district court vacated the rescission entirely, but stayed its ruling for 90 days to permit DHS to reissue a memorandum rescinding the DACA policy and providing a fuller explanation.

In response to that ruling, on June 22, 2018, Secretary Nielsen issued an additional memorandum (Nielsen Memorandum) providing further explanation for the rescission of the DACA policy. The Nielsen Memorandum explained that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons," including that the policy is contrary to law; that, even if it were not unlawful, Secretary Nielsen lacked sufficient confidence in the policy's legality to continue it; and that it was not sound enforcement policy in multiple respects. Despite the Nielsen Memorandum, the District of Columbia district court declined to reconsider its previous order vacating the rescission.

On June 18, 2020, having granted review in the California, New York, and D.C. cases, the U.S. Supreme Court held that the rescission of the DACA policy must be vacated. See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589. The Court observed that "[a]ll parties agree[d]" that "DHS may rescind DACA," and the Court provided no reason to doubt that consensus. Slip op. at 9. But it held that DHS violated the APA in the manner in which it had rescinded the policy.

As a threshold matter, the Court determined that, although agency non-enforcement decisions are generally not reviewable under the APA, the rescission of the DACA policy was reviewable "because DACA is not simply a non-enforcement policy." Id. at 11. Rather, the Court stated, the Napolitano Memorandum "created a program for conferring affirmative immigration relief," the creation and rescission of which is subject to review under the APA. Id. And it added that the "benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy." Id.

On the merits, the Court found that when DHS rescinded the DACA policy, it failed to consider important aspects of the problem. In making that determination, the Court declined to consider the Nielsen Memorandum. Instead, the Court characterized that memorandum as an impermissible post hoc rationalization of the rescission, because in the Court's view Secretary Nielsen "chose to elaborate on the reasons for the initial rescission rather than take new administrative action." Id. at 14. As to the Duke Memorandum, the Court held that it was arbitrary and capricious because (1) the Acting Secretary did not adequately consider whether DHS could and should address the illegality of the DACA policy by retaining the forbearance aspect of the policy (i.e., deferred action), while declining to make DACA recipients eligible for the other associated benefits, such as work authorization, id. at 17-23; and (2) the Acting Secretary did not adequately consider how, if at all, to address any "legitimate reliance" on the Napolitano Memorandum, id. at 23-26. The Court thus concluded that the rescission must be vacated and that the matter should be "remand[ed] to DHS so that it may consider the problem anew." Id. at 29.

The Court affirmed the District of Columbia district court's final judgment, vacated the Ninth Circuit's affirmance of the preliminary injunction issued by the Northern District of California, and vacated the preliminary injunction issued by the Eastern District of New York. Id.

On June 30, 2020, Attorney General William Barr withdrew the Sessions Letter and directed the Department of Justice's Office of Legal Counsel to withdraw all guidance it had provided to DHS on the legality of DACA and related deferred-action policies, including an Office of Legal Counsel opinion that briefly addressed the legality of DACA in connection with related deferred-action policies.  Attorney General Barr explained that he did not "wish to maintain a determination as the Attorney General about the legality of DACA that might constrain the discretion [I] otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA."

**Rescission of the Nielsen and Duke Memoranda, and Reconsideration of the Napolitano Memoranda**

In light of the Supreme Court's decision to vacate the Duke Memorandum and remand to the Department of Homeland Security, and in my capacity as the Acting Secretary of Homeland Security, I am considering anew the DACA policy.  To date, I have considered the Napolitano Memorandum itself, the Duke Memorandum and Acting Secretary Duke's accompanying statement, the Nielsen Memorandum, the administrative record produced in litigation challenging the Duke Memorandum, the briefs and joint appendix filed in the Supreme Court from that litigation, the joint appendix filed in the Fourth Circuit on appeal in the District of Maryland litigation, all of the judicial opinions issued in the litigation over the Duke Memorandum, including the June 18 decision of the Supreme Court, the letter from Attorney General Barr, and letters expressing support for the DACA policy that have been submitted to the President and DHS since the Supreme Court's June 18 decision.

As those materials demonstrate, whether to retain the DACA policy presents significant questions of law and legal policy.  More importantly for present purposes, having considered those materials, I have concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission.  At the same time, I have concluded that fully rescinding the policy would be a significant administration decision that warrants additional careful consideration.  Accordingly, in the exercise of my authority and discretion in establishing national immigration policies and priorities, see 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of a full rescission.  Below, I address each of my enforcement policy concerns and then explain the immediate interim changes.

**Enforcement Policy Concerns:**  There are several reasons of enforcement policy that may warrant the full rescission of the DACA policy.

First, even if the DACA policy could have been justified as a temporary measure when it was created, Congress arguably has had more than sufficient time to consider affording permanent status or immigration relief to the class of aliens covered by the policy.  And yet, although various proposals have been advanced to do that, Congress has so far declined to take action. Particularly in the face of this failure to reach a legislative solution, I have serious doubts as to whether DHS should continue to provide either a reprieve from removal or a grant of attendant benefits to more than half a million aliens through a broad, class-based deferred-action policy.

By contrast, rescinding DACA entirely may well create a more pressing need for Congress to decide whether it wants to address this issue and the underlying conditions that led to a

population of this size to remain in the United States in violation of our immigration laws for so long, and any other efforts to reform our immigration system in a manner that advances the national interest. As unilateral executive action, the DACA policy necessarily lacks the permanence of statutory law; it is more akin to a stopgap measure. For example, DACA recipients, as such, are not entitled to become lawful permanent residents and are not on a path to citizenship. Congress is best positioned to address that and other concerns on a more permanent basis through duly enacted statutes.

Second, there has been much debate about the discretion exercised by DHS personnel in implementing the DACA policy. In my view, however, regardless of the amount of discretion that has been exercised or could be exercised under the policy, I have reservations as a matter of policy about setting out a list of detailed criteria, and maintaining a formal process, for non-enforcement. I am concerned that doing so may tilt the scales in deciding which aliens should receive deferred action and may inhibit individualized consideration of each case, at least for a non-enforcement policy of this scale.

Third, because DHS is a law enforcement agency, I am concerned about sending mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them. DACA makes clear that, for certain large classes of individuals, DHS will at least tolerate, if not affirmatively sanction, their ongoing violation of the immigration laws. I am deeply troubled that the message communicated by non-enforcement policies like DACA may contribute to the general problem of illegal immigration in a manner that is inconsistent with DHS's law enforcement mission.

Fourth, these concerns are all the more pressing in the context of children. It is vitally important to convey a message that discourages individuals from undertaking what can often be a perilous journey to this country with no legitimate claim to enter or remain. Of course, the DACA policy would not apply to children who are sent or brought to this country today. But rescinding the DACA policy may further DHS's efforts to discourage illegal immigration involving children going forward. By contrast, I am concerned that retaining the policy creates some risk of communicating the contrary message and encouraging such illegal conduct by suggesting a potential for similar future policies.

**Changes Pending Reconsideration of the DACA Policy**: In accordance with the Supreme Court's decision, I am determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified. In the meantime, given my serious concerns about the policy, I have determined that some changes should immediately be made to the policy to limit its scope in the interim. First, while my reconsideration of the DACA policy continues, no new initial requests for DACA should be accepted. Second, advance parole should be granted to current DACA beneficiaries only in exceptional circumstances. Third, going forward, renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods.

These changes will mitigate my concerns without encroaching materially on the reliance interests that have been raised by individuals, organizations, and state and local governments during the course of the extensive litigation over the Duke and Nielsen Memoranda, and in recent letters to the President and DHS. As noted by the Supreme Court, these groups have argued that, as the Napolitano Memorandum itself stated, many DACA recipients were brought or sent to the country as children, through no fault of their own, and may have never known another home.

They assert that DACA recipients have structured their lives around the expectation that DHS would forbear from enforcing the immigration laws against them and have come to rely on the other associated benefits—like work authorization, Social Security, and Medicare, as well as advance parole—that are made available to DACA recipients.  They point out that other parties, too, would be affected by the rescission of the DACA policy, including the family members, schools, employers, and employees of DACA recipients.  They have offered estimates of the amount of economic activity DACA recipients generate and the federal, state, and local tax revenue that DACA recipients provide.  And some have even argued that the current COVID-19 and economic crises provide additional reasons to continue the DACA policy, in light of the many DACA recipients who have pursued careers in healthcare and other essential services or who serve in other critical roles in the workforce.

Whatever the merits of these asserted reliance interests on the maintenance of the DACA policy, they are significantly lessened, if not entirely lacking, with regard to aliens who have never before received deferred action pursuant to the policy.  And any reliance interests possessed by an alien or a third party within the United States on that alien's ability to remain in the country does not depend on the extraordinary ability to come and go from the country as they please.  In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist.  Indeed, even after determining that DHS's prior full rescission of the policy was likely unlawful, the district courts in the previous litigation did not require DHS to consider requests for DACA from aliens who had not previously received it or to grant any requests for advance parole.  Accordingly, that has been the status quo for more than two years.  It makes sense to continue that approach while I reconsider whether to rescind or revise the policy.  If I ultimately determine to maintain the policy, there is nothing in the policy that would preclude aliens from making an initial request for DACA or renewing requests for advance parole at that time.  And, even in the interim, nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted.

Nor are the asserted reliance interests significantly affected by shortening the renewal periods from two years to one year.  Shortening renewal periods granted during this reconsideration period will have the potential benefit of significantly lessening the lasting effects of the DACA policy if I ultimately decide to rescind it.  And the costs will be limited in the meantime, because the aliens who currently have DACA grants and have structured their affairs based on their expectation of its continuance may still seek renewal.  They will merely have to seek renewal on an annual, rather than biannual, basis.  In a similar manner, the third parties who are benefiting from those aliens' continued presence today will continue to receive the same derivative benefits that they are receiving as long as the aliens' renewals continue—whether on an annual or bi-annual basis.  Put differently, even assuming that aliens with DACA have legitimate reliance interests in being able to renew at all, they have minimal if any reliance interests in the length of each renewal period, especially since a grant of DACA was and remains revocable.

I recognize that shortening renewal periods on a prospective basis will have the effect, during this interim period as I consider how to address the DACA policy, of increasing the total amount of renewal fees that an alien will be required to pay over a multi-year period.  But the fee per application will remain constant, and the fee that DHS charges for the application is associated with the processing costs to DHS.  DHS personnel should consider whether it is possible to

reduce renewal fees during this interim period of reconsideration.  In my current view, however, even if renewal fees cannot be reduced, shortening the renewal period is still warranted by my strong desire to limit the scope of the policy during this interim period despite any additional fees incurred by DACA beneficiaries as a result.

Finally, to further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency.  Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes.  Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.[1]  Consistent with the Court's express remand for the agency's reconsideration and the Napolitano Memorandum's clear statement that it conferred no substantive rights, DHS did not expand beyond the status quo of the past several years for a few weeks while it was determining next steps.  I now conclude that all pending and future requests should be treated in the same manner, rather than be subject to differential treatment depending on the fortuity of when DHS received the request within a short period of uncertainty.  Nothing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis.  Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA—much less a legal entitlement to a particular renewal period.  Nor can aliens with pending requests assert any meaningfully greater reliance interests in their initial or continued enjoyment of the policy and the attendant benefits than aliens who submit such requests after the issuance of this memorandum.

Accordingly, effective immediately, DHS shall:

- Reject all initial DACA requests and associated applications for Employment Authorization Documents, and refund all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries.

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.

---

[1] Prior to July 24, DHS's treatment of advance parole requests from DACA recipients varied.  Many were rejected, while some were accepted and receipted.  To the extent any rejected requestor believes exceptional circumstances support his or her request, he or she may now renew the request for advance parole, and it will be adjudicated on the terms set forth in this memorandum.

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances.

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano Memorandum, and as set forth in USCIS's Form I-821D instructions.  Nothing in this memorandum makes any change to that policy.

* * * * *

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or equity by any party in any administrative, civil, or criminal matter.  Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.  Finally, if any aspect of the changes to the DACA policy in this memorandum is found to be unlawful, the remainder of the changes should nonetheless continue in effect.

# Exhibit 2



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

**U.S. Citizenship
and Immigration
Services**

August 21, 2020

# Memorandum

TO:         Associate Directors and Program Office Chiefs

FROM:       Joseph Edlow
            Deputy Director for Policy

SUBJECT:    Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum,
            "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial
            Discretion with Respect to Individuals Who Came to the United States as
            Children'"

On July 28, 2020, Acting Secretary of Homeland Security Chad Wolf issued a memorandum
entitled, "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to the United States as Children.'" In light of
the U.S. Supreme Court's decision in *Department of Homeland Security (DHS), et al. v. Regents
of the University of California, et al.* Nos. 18-587, 18-588, 18-589, Acting Secretary Wolf
rescinded memoranda issued by former Acting Secretary Elaine Duke in 2017 and former
Secretary Kirstjen Nielsen in 2018 that had concluded that the Deferred Action for Childhood
Arrivals (DACA) policy established on June 15, 2012 by former Secretary Janet Napolitano[1]
(hereafter "the Napolitano memorandum") should be rescinded after an orderly wind-down
process.

Acting Secretary Wolf's memorandum (hereafter "the Wolf Memorandum") also set forth
departmental action to effect certain immediate changes to limit the scope of the DACA policy
pending a full and careful reconsideration of the DACA policy. Through this memorandum, I am
providing additional guidance to facilitate implementation of the specific changes to the DACA
policy that are within the purview of USCIS.

The Wolf Memorandum directed the following actions, effective immediately:

- Reject all initial DACA requests and associated applications for Employment
  Authorization Documents, and refund all associated fees, without prejudice to re-filing

---

[1] Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, Re:
Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June
15, 2012) ("Napolitano memorandum").

www.uscis.gov

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 2

such requests should DHS determine to begin accepting initial requests again in the future;

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries;

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year;

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods;

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances;

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods;

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate; and

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano memorandum, and as set forth in USCIS's Form I-821D instructions.  Nothing in this memorandum changes that policy.

To facilitate implementation of the Wolf Memorandum, I am providing additional guidance to USCIS personnel as follows:

> **Reject all initial DACA requests and associated applications for Employment Authorization Documents, and return all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.**

The Wolf Memorandum makes clear that these changes should apply to all initial DACA requests submitted by aliens who have never before received DACA, whether submitted after the issuance of his memorandum or pending before USCIS at the time his memorandum was issued. In accordance with the Wolf Memorandum, USCIS shall reject and return the fees for any DACA requests and associated applications for employment authorization submitted by aliens *who have never before received a grant of DACA.*  Since the Supreme Court's decision in

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 3

*Regents*, these requests, if properly filed, have generally been on hold at the USCIS filing location pending further action by USCIS.[2]

Historically, USCIS policy on DACA renewals has permitted DACA recipients to request renewal of DACA for up to one year after their underlying DACA grant has expired. DACA recipients who failed to submit their renewal requests within the one-year time period following expiration have generally been permitted to request DACA anew. Given the lapse of time between these aliens' last DACA period and their subsequent request to again receive DACA, however, USCIS has treated such requests as requests for "initial" DACA for required evidence, processing, and adjudication purposes. Likewise, DACA recipients whose most recent period of DACA has been terminated by USCIS (rather than expired on its own terms) have also been permitted to request DACA anew, but such requests are treated as requests for "initial" DACA (even if the lapse of time between the termination of their most recent period of DACA and their subsequent request to receive DACA again is less than one year).

Under the preliminary injunctions issued in January and February of 2018,[3] USCIS has accepted and adjudicated DACA requests from aliens who have previously received grants of DACA *at any time*—including requests that are treated as "initial" requests for the reasons described above. Given the Acting Secretary's desire to maintain the status quo of the past few years, USCIS will continue to accept and adjudicate such requests notwithstanding any language in the Wolf Memorandum about rejecting "all" requests for initial DACA.

> **Adjudicate all pending and future DACA renewal requests and associated applications for Employment Authorization Documents from DACA recipients.**

USCIS shall continue to adjudicate all pending DACA renewal requests and renewal requests received after the Wolf Memorandum, as well as certain initial requests as discussed above, under the general adjudicative guidelines in place for DACA. USCIS will continue to reject, without prejudice to re-submission, DACA renewal requests that are not properly filed in accordance with form instructions and USCIS filing guidance, as it has done since USCIS first started accepting DACA renewal requests. While USCIS will continue to adjudicate DACA requests under the same general adjudicative guidelines, USCIS is implementing certain immediate changes to DACA processing consistent with and in furtherance of the Wolf Memorandum.

Since June 2014 when DHS and USCIS announced the DACA renewal process, USCIS has consistently instructed DACA recipients to file renewal requests between 150 days and 120 days

---

[2] Initial DACA requests that were properly filed prior to September 5, 2017, should be adjudicated to completion in the event that any of these requests still remain pending with USCIS. This guidance to reject and return the fees for pending initial DACA requests does not apply to initial DACA requests properly filed prior to September 5, 2017.

[3] See https://www.uscis.gov/humanitarian/deferred-action-for-childhood-arrivals-response-to-january-2018-preliminary-injunction

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 4

prior to their DACA expiration.[4]  Previously, USCIS has accepted renewal requests filed in advance of that period.  In furtherance of the directives in the Wolf Memorandum, USCIS will generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period.  The Wolf Memorandum expressed concerns with the scope of the DACA policy during the interim period the policy is under review.  Exercising discretion to generally reject DACA renewal requests received more than 150 days prior to the expiration of the alien's current period of DACA is more consistent with our long-existing guidance to DACA recipients and serves other important operational interests to improve USCIS's processing and operational efficiencies as a whole.  Additionally, implementing these case intake procedures recognizes that the DACA policy is under comprehensive legal and policy review and may be modified or entirely rescinded by the Acting Secretary once DHS's review of the DACA policy is complete.  Therefore, USCIS believes that it is more prudent to generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period as the DACA policy may be revised or rescinded before USCIS would normally take final adjudicative action on these early filed renewal requests.

USCIS understands that applicants, petitioners, and requestors have an interest in timely adjudications.  This is particularly true for aliens granted temporary authorization to work in the United States who then apply to USCIS to renew their employment authorization documents before their temporary employment authorization expires.  The interim adjustment discussed in this memorandum with respect to early filed DACA renewals balances concerns with the scope of the DACA policy during this interim period with the interests DACA recipients have in preventing gaps in DACA and associated employment authorization.  Further, this guidance reflects an understanding that USCIS processes millions of requests for immigration benefits every year in addition to DACA requests, and therefore USCIS must also balance the interests of all other individuals requesting immigration benefits from the agency.  Of course, this balancing of interests must be done with consideration given to available resources.

USCIS has seen thousands of instances of current DACA recipients filing for DACA renewal when they still have more than 150 days remaining in their current DACA validity.  USCIS data shows that as of June 30, 2020, there were over 11,000 active DACA recipients with DACA renewals pending before USCIS whose current DACA was not set to expire until after January 1, 2021; further, there were nearly 400 active DACA recipients with pending renewal requests whose DACA was not set to expire until the year 2022.

In an effort to minimize overlapping validity periods between an alien's renewed DACA validity period and an alien's current DACA validity period, USCIS has generally withheld issuing final approval of a DACA renewal request until the alien's remaining DACA validity period is closer to the expiration date.  USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period.  However, permitting and accepting DACA renewal requests filed many months in advance of

---

[4] See DACA FAQ 50; https://www.uscis.gov/archive/frequently-asked-questions#renewal; See also; https://www.dhs.gov/news/2014/06/05/secretary-johnson-announces-process-daca-renewal

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 5

DACA expiration only to be preliminarily processed by USCIS and placed on hold is not an efficient use of agency resources.

In assessing whether USCIS should exercise its discretion to begin generally rejecting DACA renewal requests filed more than 150 days prior to expiration, I considered the interests DACA renewal requestors may have in being permitted to file for renewal more than 150 days prior to DACA expiration. In consideration of these potential interests, I examined DACA renewal processing times. USCIS data shows that from August 1, 2019 to August 1, 2020, approximately ninety-six percent of DACA renewal requests processed were completed in 120 or fewer days.

The data demonstrate that in the overwhelming majority of DACA renewal cases, it is not necessary to accept DACA renewal requests more than 150 days before the alien's current DACA period expires in order to facilitate timely processing and minimize gaps in DACA and associated employment authorization. For those aliens, the only effect of this change will be for those early requesters either to wait until the specified period to request renewal or to re-file an early-filed renewal request at the appropriate time. In cases where the requestor may not continue to meet the DACA guidelines, including concerns that arise from background check results, renewal processing may require more time, but these outliers do not reasonably justify permitting routine acceptance of early filings during this interim period while the DACA policy is under review given USCIS's other policy and operational concerns.

Lastly, nothing precludes USCIS from exercising its discretion to accept a DACA renewal request filed 150 days or more in advance of expiration if there are legitimate reasons for doing so, and nothing precludes USCIS from again modifying recommended filing timelines either during this interim period or should DHS announce changes to the DACA policy in the future.

> **Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.**

As described in the Wolf Memorandum, all requests for DACA and associated employment authorization granted after July 28, 2020 will be for a validity period of no more than one year.[5]

The one-year validity period shall begin on the date the DACA request receives final approval, consistent with past practices, and have an ending validity date that is no more than one year minus one day from the date of approval. Also consistent with past practices, the associated employment authorization validity period shall end on the same date that the DACA validity period ends.

The Wolf Memorandum acknowledged that shortening validity periods to one year during this interim period will have the effect of increasing the total amount of fees DACA requestors would pay over a multi-year period and asked USCIS to consider whether it is possible to reduce renewal fees during this time. USCIS is currently considering the merits and feasibility of

---

[5] 8 CFR 274a.12(c) states in pertinent part that "USCIS, in its discretion, may establish a specific validity period for an employment authorization document . . ."

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 6

reducing DACA-related fees during the interim period the DACA policy is under review. Pursuant to INA Section 286(m), DHS may set fees at a level that will "ensure recovery of full costs" of providing adjudication services.  While USCIS has never charged a fee for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, all DACA requestors are required to file Form I-765, Application for Employment Authorization, which does require a fee with very limited exemptions. DACA requestors are also required to pay a biometrics fee.

USCIS notes that the new fee rule, which becomes effective on Oct. 2, 2020, includes a fee increase for the Form I-765, Application for Employment Authorization, for all categories of employment authorization **except** for the DACA category. The fee for DACA-based applications for employment authorization will remain at $410, plus an $85 biometrics fee, for the time being. Lastly, as noted above, USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period, which may lessen some of the economic impact from shortened DACA renewal validity periods.

> ➤ **Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.**

Notwithstanding the prospective changes made by the Wolf Memorandum, USCIS will allow previous two-year grants of DACA and associated employment authorization to remain undisturbed during their existing two-year validity periods (unless USCIS terminates an alien's DACA and associated employment authorization for other reasons).  Consistent with this guidance, two-year DACA recipients who apply for a replacement EAD due to loss, theft, or the mutilation of their prior EAD will receive a replacement EAD with the same expiration date based on the original two-year validity period, assuming the application is otherwise approvable.

> ➤ **Reject all pending and future Form I-131 applications for advance parole from DACA recipients and refund all associated fees, absent exceptional circumstances.**

Acting Secretary Wolf states the following in his memorandum with respect to advance parole:

> "In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist."

Because USCIS will not be able to determine whether Form I-131 applications already received at the DACA-specific filing location fit within Secretary Wolf's stated parole policy without adjudicating the applications, and applicants who filed their Form I-131 before the Wolf Memorandum was issued did not have prior knowledge of the guidance in the memorandum, USCIS has determined that it would be more efficient and fair if applicants refile their applications under the new guidance.  Therefore, USCIS shall reject and return the fees for all Form I-131 applications received at the DACA specific filing location that have been held since July 24, 2020.

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 7

If those DACA recipients still wish to submit a request for advance parole, they may submit their Form I-131 applications consistent with filing instructions that will be announced on the USCIS website. The Form I-131 rejection notice shall inform applicants that they may re-apply for advance parole consistent with the Wolf Memorandum and filing instructions that will be announced on the USCIS website.

Regarding Form I-131 applications filed by DACA recipients at non-DACA filing locations before the Wolf Memorandum was issued and therefore accepted, USCIS will treat these applications similarly to those that have been on hold at the DACA-specific filing location. USCIS will administratively close these cases and refund the fees. USCIS will issue notices informing these applicants that their application has been administratively closed consistent with the Wolf Memorandum. The notice shall inform applicants that they may re-apply for advance parole consistent with the Wolf Memorandum and filing instructions that will be announced on the USCIS website.

USCIS will continue to maintain the current policy for DACA recipients who apply for advance parole in association with other non-DACA immigration requests. For instance, if a DACA recipient has a pending Form I-485 Application to Register Permanent Residence or Adjust Status and requests advance parole on the basis of his or her pending Form I-485, USCIS will adjudicate the advance parole request under the existing policies for Form I-485-based advance parole requests. USCIS will not apply this memorandum to a parole request by a DACA recipient if the request is associated with another underlying immigration benefit (i.e., other than DACA) as described in the instructions to Form I-131 or in USCIS policy guidance.

DACA recipients who have no separate basis for requesting advance parole as described in the instructions to Form I-131 may request advance parole if they have valid DACA and can demonstrate that they warrant the extraordinary privilege of being permitted to return to the United States after traveling abroad, even without a lawful immigration status, pursuant to a valid advance parole travel document.

The Wolf Memorandum sets forth new agency guidance with respect to management of the adjudication of advance parole applications submitted by DACA recipients who do not have a non-DACA basis for advance parole. For nearly three years, advance parole applications submitted by DACA recipients were rejected or denied by USCIS (the applications that were accepted and then denied were accepted solely because they were submitted to an incorrect filing location).

The Wolf Memorandum does not revive the prior DACA-based advance parole standards[6] or add a supplementary exceptional circumstances test to those standards. Rather, the Wolf

---

[6] The prior policy for granting advance parole based on DACA stated that USCIS would generally only grant advance parole if the DACA recipient's travel abroad would be in the furtherance of:

- Humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;
- Educational purposes, such as semester-abroad programs and academic research, or;

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 8

Memorandum institutes a new general hold on granting advance parole to DACA recipients based on prior DACA-based advance parole standards during an interim period while DHS conducts a full review of the DACA policy. As Acting Secretary Wolf noted, it makes sense to continue this approach while he reconsiders whether to rescind or revise the prior policy. The only difference is that the Wolf Memorandum permits USCIS to process advance parole applications submitted by DACA recipients consistent with INA Section 212(d)(5) and based on a full consideration of all the discretionary factors presented in the alien's application.

Such grants of advance parole should, as a threshold matter, be consistent with the statutory description of parole under INA Section 212(d)(5), 8 U.S.C. § 1182(d)(5)(A), which mandates a case-by-case assessment and a determination that parole of the alien is for urgent humanitarian reasons or significant public benefit. Accordingly, I am directing USCIS officers to ensure that any grants of advance parole to DACA recipients are consistent with the statute and take into consideration all other discretionary factors present in the case under the totality of circumstances.

Secretary Wolf's memorandum providing for "exceptional circumstances" should be understood in the context of this existing high statutory standard for parole found in INA Section 212(d)(5). Therefore, in most instances, traveling abroad for educational purposes, employment related purposes, or to visit family members living abroad will not warrant advance parole under Secretary Wolf's interim policy regarding the discretionary exercise of parole for urgent humanitarian reasons or significant public benefit. Additionally, as USCIS has noted since DACA recipients were first permitted to apply for advance parole, travel for vacation is not a valid basis for advance parole.

While the determination of whether to grant advance parole to a DACA recipient based on exceptional circumstances is a case-by-case assessment involving the assessment of the totality of factors presented, some examples of travel that may fit within the statutory standard for parole include, but are not limited to the following:

- Travel to support the national security interests of the United States including U.S. military interests;

- Travel in furtherance of U.S. federal law enforcement interests;

- Travel to obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States;

- Travel needed to support the immediate safety, well-being, or care of an *immediate* relative, particularly minor children of the alien.

The burden shall be on the alien to establish eligibility for parole pursuant to INA section 212(d)(5).

---

- Employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 9

USCIS will consider all discretionary factors presented in the application before making a decision on the advance parole request. The advance permission to travel abroad and return to the United States pursuant to an advance parole travel document is an extraordinary privilege. It is a particularly extraordinary privilege when conferred on an alien who has resided in the United States contrary to our immigration laws (irrespective of when the alien arrived in the United States). The June 15, 2012 Napolitano memorandum itself contained no directive to provide this extraordinary benefit to DACA recipients, and USCIS has not granted this benefit to DACA recipients since the issuance of the September 5, 2017, Duke memorandum.

To ensure compliance with this interim policy, I am directing that any applications for advance parole preliminarily assessed to be approvable by the Service Center(s) designated to adjudicate such applications, receive concurrence from no lower than the Deputy Associate Director for Service Center Operations Directorate (SCOPS) prior to final approval. SCOPS will develop a process to facilitate this review in a timely manner.

SCOPS shall immediately work with the Office of Intake and Document Production (OIDP) and the External Affairs Directorate (EXA) to develop public guidance consistent with this memorandum. The public guidance shall make clear that any applications for advance parole submitted by DACA recipients and received at the designated filing location will be considered a DACA-based application for advance parole based on the Wolf Memorandum.

The public guidance shall make clear that USCIS will accept the application if properly completed and process the fee prior to making an adjudicative determination on whether advance parole should be granted. The public guidance shall also make clear that any applications denied by USCIS because USCIS finds that the application does not merit approval, in the exercise of its discretion, under INA Section 212(d)(5), are not appealable and shall not receive a refund of application fees.

As noted above, INA Section 286(m) gives USCIS authority to collect application fees that "ensure recovery of the full costs of providing [adjudication services]." The determination of whether to grant advance parole under INA Section 212(d)(5) must be made by a trained Immigration Officer after required background checks and other processing requirements are completed. Those services cost money which USCIS recoups from the application fee. As those services must be completed prior to a final determination on whether the alien merits a grant of advance parole USCIS will not refund the application fees on advance parole applications that USCIS denies, consistent with USCIS standard practice.

SCOPS will work with the Office of Policy and Strategy (OP&S) and the Office of the Chief Counsel (OCC) to develop additional training or guidance materials to assist officers in the adjudication of these applications consistent with this memorandum.

> ➢ **Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.**

USCIS shall not terminate any previously approved advance parole documents issued to DACA recipients during the stated validity period of the existing advance parole document, absent a

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 10

valid, separate legal basis distinct from the directives in the Wolf Memorandum for terminating advance parole.[7]

> ➢ **Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.**

Based on the immediate review of the DACA policy, including the immediate interim changes to the policy discussed in the Wolf Memorandum and this memorandum, I am directing SCOPS to immediately review the internal guidance document referred to as the DACA SOP last revised on August 28, 2013. SCOPS should work with OCC and OP&S to immediately update the DACA SOP consistent with the Wolf Memorandum and this memorandum. The updated DACA SOP shall make clear that it is intended solely for the instruction of USCIS personnel in the performance of their official duties, and that the SOP is not legally binding, does not confer any substantive rights to removable aliens, and does not otherwise constrain DHS' authority to enforce the immigration laws passed by Congress.

SCOPS should also review other internal DACA operational guidance and training materials currently in use to ensure that they are consistent with the Wolf Memorandum and this memorandum.

USCIS must continue to follow the DACA termination procedures required by all relevant court orders as long as they remain in effect.

> ➢ **Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum makes any change to that policy.**

USCIS shall continue to operate under the DACA information sharing policy described above. Nothing in this memorandum or the Wolf Memorandum makes any change to that policy.

**Use**

This memorandum is intended solely for the instruction of USCIS personnel in the performance of their official duties. It is not intended to, does not, and may not be relied upon to, create any right or benefit, substantive or procedural, enforceable at law, or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

---

[7] USCIS has not granted advance parole based on the standards associated with DACA since September 5, 2017.

# Exhibit 3

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-00068 |
| KIRSTJEN M. NIELSEN, *et al.*, | |
| Defendants, | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| Defendant-Intervenors. | |

**FEDERAL DEFENDANTS' OBJECTIONS AND RESPONSES TO
DEFENDANT-INTERVENORS' FIFTH AND SIXTH SETS OF DISCOVERY
REQUESTS**

TO: Defendant-Intervenors, by and through their attorneys of record, Nina Perales, Celina Moreno, Jack Salmon, Alejandra Avila, Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas 78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C., P.O. Box 4545 McAllen, Texas 78502.

Federal Defendants serve these objections and responses to Defendant-Intervenors' fifth and sixth set of interrogatories and requests for production of documents pursuant to the Federal Rules of Civil Procedure.

**GENERAL OBJECTIONS**

Federal Defendants state the following General Objections to Defendant-Intervenors' fifth and sixth sets of interrogatories and requests for production of documents ("RFP"), served on August 28 and 30, 2020, respectively (hereafter "August discovery requests"), which are hereby incorporated in and made part of each of the following specific responses.

1

USCIS' common use of the terms in its agency practices regarding DACA: "took [USCIS] to adjudicate," "accepted," and "renewal". The response to Interrogatory No. 18 is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response. Defendant USCIS further objects that the phrase "average number of months" is vague and undefined, and therefore ambiguous. In its response, Defendant USCIS uses a conversion of 30.4 days per month.

**RESPONSE TO INTERROGATORY NO. 18**

Subject to these objections, Federal Defendants refer to the attached chart, entitled "Interrogatory 18, Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Average Processing Time, July 1, 2018 – Sep 8, 2020. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 19**

Please identify the number of DACA applications adjudicated at each of the five service centers within the USCIS Service Center Operations Directorate (SCOPS) each year for the period of July 2018 to September 2020.

**OBJECTIONS TO INTERROGATORY NO. 19**

Federal Defendants specifically object to Interrogatory No. 19 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants object to the following term in Interrogatory No. 19 to the extent that it may be vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends it to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "adjudicated."

**RESPONSE TO INTERROGATORY NO. 19**

Subject to these objections, Federal Defendants refer to the attached chart, entitled "Interrogatory 19, Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials & Renewals, Count of Adjudications by Service Center Location & Fiscal Year, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 20**

Please identify the number of DACA initial applications USCIS has accepted and denied from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, from among that number:

a.  the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of July 2018 to September 2020.

b.  the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of July 2018 to September 2020.

c.  the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

**OBJECTION TO INTERROGATORY NO. 20:**

Federal Defendants specifically object to Interrogatory No. 20 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants further object to the following terms in Interrogatory No. 20 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "initial [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Federal Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Federal Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

Federal Defendants object to subparts a., b., and c., of this Interrogatory on the grounds that they are vague, overbroad, burdensome, not relevant and/or proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of Interrogatory 20 in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of the electronic and/or paper files of every denial of an initial DACA request for requestors from each Plaintiff State for the requested time period (over 850 cases), as set forth in the attached declaration. To the extent USCIS can offer any good-faith estimate, it avers that, once all of the information from each DACA denial is identified and

gathered, itself a lengthy and resource intense process, Decl. ¶¶ 7-13, individual case-by-case review of the electronic and/or paper files for approximately 2,160 denied initial and renewal DACA requests could take anywhere between approximately 720 hours and 3,240 hours to complete. Decl. ¶ 14. Case-by-case review may also require further consultation with the adjudicator who rendered the decision. Given the strong likelihood that such a search and review would carry on for no less than several months, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of conducting manual case-by-case file review.

Federal Defendants will provide a response to the main question within Interrogatory 20, the number of denials of initial DACA requests from Plaintiff States by month, but note that this information is already provided in the response to Interrogatory 15 and is therefore duplicative.

**RESPONSE TO INTERROGATORY NO. 20**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Count of Denials by Month and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run. In response to subpart c. of Interrogatory No. 20, Federal Defendants respond that based on an inquiry of relevant USCIS service centers, Federal Defendants are anecdotally aware of one initial DACA request for Plaintiff States that was denied because the requestor was the subject of an ongoing civil investigation for employment of unauthorized workers and failure to pay withholding taxes, despite the requestor meeting the DACA guidelines outlined in the bulleted points on the first page of the memorandum entitled, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

**INTERROGATORY NO. 21**

Please identify the number of DACA renewal applications USCIS has accepted and denied from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, from among that number:

a. the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of July 2018 to September 2020.

b. the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of July 2018 to September 2020.

c. the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

**OBJECTION TO INTERROGATORY NO. 21**

Federal Defendants specifically object to Interrogatory No. 21 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Federal Defendants further object to the following terms in Interrogatory No. 21 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Federal Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Federal Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

Federal Defendants object to this Interrogatory on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of this Interrogatory in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper files of every denial of a DACA renewal request for the requestors from each Plaintiff State (nearly 1,300 cases), as set forth in the attached declaration. To the extent USCIS can offer any good-faith estimate, it avers that, once all of the information from each DACA denial is identified and gathered, itself a lengthy and resource intense process, Decl. ¶¶ 7-13, individual case-by-case review of the electronic and/or paper files for approximately 2,160 denied initial and renewal DACA requests could take anywhere between approximately 720 hours and 3,240 hours to complete. Decl. ¶ 14. Case-by-case review may also require further consultation with the adjudicator who rendered the decision. Given the strong likelihood that such a search and review would carry on for no less than several months, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of conducting manual case-by-case file review.

Federal Defendants will provide a response to the main question within Interrogatory 21, the number of denials of DACA renewal requests from Plaintiff States by month, but note that this information is already provided in the response to Interrogatory 16 and is therefore duplicative.

**RESPONSE TO INTERROGATORY NO. 21**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Count of Denials by Month and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run. In response to subpart c. of Interrogatory No. 21, Federal Defendants respond that based on an inquiry of relevant USCIS service centers, Federal Defendants are anecdotally aware of one DACA renewal request from Plaintiff States that was denied because the requestor had an unresolved pending felony charge that would be disqualifying if convicted and would remain unresolved beyond six months, despite the requestor meeting the DACA guidelines outlined in the bulleted points on the first page of the memorandum entitled, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

**INTERROGATORY NO. 22**

Please identify the number of initial DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, from among that number:

   a. the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

   b. the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;

   c. the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

   d. the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

   e. the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

   f. the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

August 21, 2020 USCIS memorandum, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,'"* that are not duplicative of documents or information previously produced in discovery in this matter or previously referenced in Federal Defendants' written discovery responses, and that are maintained by key custodians who are currently employed by a Federal Defendant agency. However, it would be unduly burdensome for Federal Defendants to conduct a comprehensive search for all documents "from the Office of Legal Counsel relating to DACA, the Wolf Memo, or the Edlow Memo" for all potential custodians, or to conduct a comprehensive search for records that were maintained by former Federal Defendant agencies' employees.

Federal Defendants respectfully direct Defendant-Intervenors to the Office of Legal Counsel's website to retrieve that Office's only public, non-privileged document regarding DACA:

- *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others,* 38 Op O.L.C. _ (Nov. 19, 2014),[3] available at https://www.justice.gov/olc/file/1315981/download.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 5:**

Federal Defendants admit that DHS is implementing DACA subject to the guidance in the Wolf Memo and Edlow Memo.

**RESPONSE:**

Federal Defendants admit that USCIS is implementing the DACA policy according to the guidance in Acting Secretary Wolf's July 28, 2020 memorandum, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* and the August 21, 2020 USCIS memorandum, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'"*

**REQUEST FOR ADMISSION NO. 6:**

Admit that DHS is rejecting all initial DACA requests and associated applications for Employment Authorization Documents.

---

[3] Federal Defendants note that this opinion was withdrawn by Attorney General William Barr. *See* Letter for Chad F. Wolf, Acting Secretary of Homeland Security, from William P. Barr, Attorney General (June 30, 2020), available at: https://www.dhs.gov/sites/default/files/publications/20_0630_doj_aj_barr-letter-as-wolf-daca.pdf.

**RESPONSE:**

Federal Defendants admit only that USCIS is rejecting initial DACA requests and associated applications for Employment Authorization Documents from individuals who have not previously received DACA. Federal Defendants aver that USCIS is accepting "initial" DACA requests from individuals who previously received DACA, such as individuals who request DACA more than a year after their previous period of DACA expired or whose previous period of DACA was terminated at any time.

**REQUEST FOR ADMISSION NO. 7:**

Federal Defendants admit that DHS is limiting the period of any deferred action granted pursuant to the DACA initiative to one year.

**RESPONSE:**

Federal Defendants admit only that all requests for DACA granted after July 28, 2020 are for a validity period of no more than one year.

**REQUEST FOR ADMISSION NO. 8:**

Federal Defendants admit that DHS is rejecting all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA initiative, absent exceptional circumstances.

**RESPONSE:**

Federal Defendants deny Request for Admission No. 8. Federal Defendants aver that USCIS is rejecting Form I-131 applications for advance parole submitted by DACA recipients at the DACA-specific filing location and placed on hold that were postmarked before August 24, 2020 and administratively closing pending Form I-131 applications for advance parole filed by DACA recipients at non-DACA specific filing locations prior to August 24, 2020. All associated fees in these cases are being refunded. DACA recipients whose Form I-131 applications are rejected as noted above may refile their Form I-131 applications consistent with the new guidance.

Federal Defendants aver that USCIS accepts and considers all Form I-131 applications received at the DACA-specific direct filing address on or after August 24, 2020 as an application for advance parole based on the new guidance, if properly completed, and processes the required fee. If, in the exercise of discretion, USCIS determines that the DACA recipient does not warrant advance parole under the July 28, 2020 Wolf Memo or the August 21, 2020 Edlow Memo, USCIS will deny the Form I-131 without refunding the processing fees. Defendants further aver that Form I-131 applications for advance parole filed by a DACA recipient that are associated with a separate underlying immigration benefit continue to be adjudicated under existing guidance for those requests, and not under the July 28, 2020 Wolf Memo or the August 21, 2020 Edlow Memo.

**REQUEST FOR ADMISSION NO. 9:**

# Exhibit 4



**Interrogatory 15**

Form I-821D, Consideration of Deferred Action for Childhood Arrivals

DACA Initials

Count of Accepted Filings, Rejections, Approvals, and Denials by Month, and Selected State

July 1, 2018 - Sep 8, 2020

| Requestor State | Month | Accepted Filings | Rejections | Total Received | Approved | Denied | Total Completions |
|---|---|---|---|---|---|---|---|
| Alabama | July-18 | 1 | - | 1 | 4 | 4 | 8 |
| Alabama | August-18 | - | - | - | 7 | 12 | 19 |
| Alabama | September-18 | - | - | - | 1 | 4 | 5 |
| Alabama | October-18 | - | - | - | 2 | 3 | 5 |
| Alabama | November-18 | 1 | - | 1 | 1 | 1 | 2 |
| Alabama | December-18 | - | - | - | 1 | 1 | 2 |
| Alabama | January-19 | - | - | - | 1 | - | 1 |
| Alabama | February-19 | 1 | - | 1 | 1 | 1 | 2 |
| Alabama | March-19 | 1 | - | 1 | - | - | - |
| Alabama | April-19 | 1 | - | 1 | - | - | - |
| Alabama | May-19 | 2 | - | 2 | - | 2 | 2 |
| Alabama | June-19 | 1 | - | 1 | - | - | - |
| Alabama | July-19 | 1 | - | 1 | 1 | - | 1 |
| Alabama | August-19 | 6 | - | 6 | 1 | 1 | 2 |
| Alabama | September-19 | 2 | - | 2 | 1 | - | 1 |
| Alabama | October-19 | 1 | - | 1 | 2 | - | 2 |
| Alabama | November-19 | - | - | - | - | - | - |
| Alabama | December-19 | - | - | - | 1 | - | 1 |
| Alabama | January-20 | - | - | - | 2 | 1 | 3 |
| Alabama | February-20 | 1 | - | 1 | 2 | 1 | 3 |
| Alabama | March-20 | 2 | - | 2 | 1 | - | 1 |
| Alabama | April-20 | 1 | - | 1 | - | - | - |
| Alabama | May-20 | - | - | - | 1 | - | 1 |
| Alabama | June-20 | 4 | - | 4 | 1 | - | 1 |
| Alabama | July-20 | 3 | - | 3 | 1 | - | 1 |
| Alabama | August-20 | 1 | - | 1 | - | - | - |
| Alabama | September-20 | - | - | - | - | - | - |
| **Alabama Total** | | **30** | **-** | **30** | **32** | **31** | **63** |
| Arkansas | July-18 | - | - | - | 3 | 7 | 10 |
| Arkansas | August-18 | 1 | - | 1 | 1 | 8 | 9 |
| Arkansas | September-18 | - | - | - | 4 | 1 | 5 |
| Arkansas | October-18 | - | - | - | 1 | 1 | 2 |
| Arkansas | November-18 | 1 | - | 1 | 1 | 1 | 2 |
| Arkansas | December-18 | - | - | - | 1 | 1 | 2 |
| Arkansas | January-19 | - | - | - | - | 1 | 1 |
| Arkansas | February-19 | - | - | - | - | 1 | 1 |
| Arkansas | March-19 | - | - | - | - | - | - |

| | | | | | | |
|---|---|---|---|---|---|---|
| Arkansas | April-19 | - | - | - | - | - | - |
| Arkansas | May-19 | - | - | - | 1 | - | 1 |
| Arkansas | June-19 | - | - | - | - | - | - |
| Arkansas | July-19 | 2 | - | 2 | 1 | 1 | 2 |
| Arkansas | August-19 | 2 | - | 2 | - | - | - |
| Arkansas | September-19 | - | - | - | - | - | - |
| Arkansas | October-19 | 3 | - | 3 | - | - | - |
| Arkansas | November-19 | - | - | - | - | - | - |
| Arkansas | December-19 | 1 | - | 1 | 2 | - | 2 |
| Arkansas | January-20 | 2 | - | 2 | - | 1 | 1 |
| Arkansas | February-20 | - | - | - | 2 | - | 2 |
| Arkansas | March-20 | 2 | - | 2 | - | - | - |
| Arkansas | April-20 | 1 | - | 1 | - | - | - |
| Arkansas | May-20 | 2 | - | 2 | - | 1 | 1 |
| Arkansas | June-20 | - | - | - | - | - | - |
| Arkansas | July-20 | 1 | - | 1 | - | - | - |
| Arkansas | August-20 | 2 | - | 2 | - | - | - |
| Arkansas | September-20 | - | - | - | 1 | - | 1 |
| **Arkansas Total** | | **20** | **-** | **20** | **18** | **24** | **42** |
| Kansas | July-18 | - | - | - | 9 | 6 | 15 |
| Kansas | August-18 | 2 | - | 2 | 10 | 2 | 12 |
| Kansas | September-18 | 2 | - | 2 | 2 | 1 | 3 |
| Kansas | October-18 | 3 | - | 3 | 2 | 4 | 6 |
| Kansas | November-18 | 1 | - | 1 | 2 | 2 | 4 |
| Kansas | December-18 | 1 | - | 1 | - | - | - |
| Kansas | January-19 | - | - | - | 1 | - | 1 |
| Kansas | February-19 | - | - | - | 1 | 3 | 4 |
| Kansas | March-19 | 1 | - | 1 | - | 3 | 3 |
| Kansas | April-19 | 1 | - | 1 | 1 | - | 1 |
| Kansas | May-19 | 3 | - | 3 | - | - | - |
| Kansas | June-19 | 2 | - | 2 | 2 | 1 | 3 |
| Kansas | July-19 | 1 | - | 1 | 1 | 1 | 2 |
| Kansas | August-19 | 2 | - | 2 | - | - | - |
| Kansas | September-19 | 4 | - | 4 | - | - | - |
| Kansas | October-19 | - | - | - | - | - | - |
| Kansas | November-19 | 2 | - | 2 | 1 | - | 1 |
| Kansas | December-19 | 2 | - | 2 | 2 | - | 2 |
| Kansas | January-20 | 3 | - | 3 | 1 | 1 | 2 |
| Kansas | February-20 | 2 | - | 2 | 2 | - | 2 |
| Kansas | March-20 | 1 | - | 1 | 2 | - | 2 |
| Kansas | April-20 | 3 | - | 3 | 1 | - | 1 |
| Kansas | May-20 | 2 | - | 2 | 1 | - | 1 |
| Kansas | June-20 | 1 | - | 1 | 1 | 1 | 2 |
| Kansas | July-20 | 2 | - | 2 | - | 1 | 1 |
| Kansas | August-20 | 1 | - | 1 | - | - | - |
| Kansas | September-20 | - | - | - | - | - | - |
| **Kansas Total** | | **42** | **-** | **42** | **42** | **26** | **68** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Louisiana | July-18 | - | - | - | 7 | 5 | 12 |
| Louisiana | August-18 | 1 | - | 1 | 4 | 3 | 7 |
| Louisiana | September-18 | - | - | - | 1 | 3 | 4 |
| Louisiana | October-18 | 1 | - | 1 | 1 | 3 | 4 |
| Louisiana | November-18 | 1 | - | 1 | 1 | - | 1 |
| Louisiana | December-18 | - | - | - | - | - | - |
| Louisiana | January-19 | - | - | - | - | - | - |
| Louisiana | February-19 | - | - | - | - | - | - |
| Louisiana | March-19 | - | - | - | - | 1 | 1 |
| Louisiana | April-19 | - | - | - | - | - | - |
| Louisiana | May-19 | - | - | - | - | 3 | 3 |
| Louisiana | June-19 | 1 | - | 1 | - | - | - |
| Louisiana | July-19 | - | - | - | - | - | - |
| Louisiana | August-19 | 1 | - | 1 | - | - | - |
| Louisiana | September-19 | 2 | - | 2 | - | - | - |
| Louisiana | October-19 | - | - | - | - | - | - |
| Louisiana | November-19 | 1 | - | 1 | - | - | - |
| Louisiana | December-19 | - | - | - | - | 1 | 1 |
| Louisiana | January-20 | - | - | - | - | - | - |
| Louisiana | February-20 | - | - | - | 2 | - | 2 |
| Louisiana | March-20 | 1 | - | 1 | - | 1 | 1 |
| Louisiana | April-20 | 1 | - | 1 | - | 1 | 1 |
| Louisiana | May-20 | - | - | - | - | - | - |
| Louisiana | June-20 | 1 | - | 1 | - | - | - |
| Louisiana | July-20 | 1 | - | 1 | - | - | - |
| Louisiana | August-20 | 1 | - | 1 | - | - | - |
| Louisiana | September-20 | - | - | - | - | - | - |
| **Louisiana Total** | | **13** | **-** | **13** | **16** | **21** | **37** |
| Mississippi | July-18 | - | - | - | 1 | 3 | 4 |
| Mississippi | August-18 | - | - | - | 1 | 1 | 2 |
| Mississippi | September-18 | - | - | - | - | - | - |
| Mississippi | October-18 | - | - | - | - | 1 | 1 |
| Mississippi | November-18 | - | - | - | - | - | - |
| Mississippi | December-18 | - | - | - | - | - | - |
| Mississippi | January-19 | - | - | - | - | 1 | 1 |
| Mississippi | February-19 | - | - | - | - | - | - |
| Mississippi | March-19 | - | - | - | - | - | - |
| Mississippi | April-19 | - | - | - | - | - | - |
| Mississippi | May-19 | 1 | - | 1 | - | - | - |
| Mississippi | June-19 | - | - | - | - | - | - |
| Mississippi | July-19 | - | - | - | - | - | - |
| Mississippi | August-19 | 2 | - | 2 | - | - | - |
| Mississippi | September-19 | - | - | - | - | - | - |
| Mississippi | October-19 | - | - | - | - | - | - |
| Mississippi | November-19 | 1 | - | 1 | 1 | - | 1 |
| Mississippi | December-19 | - | - | - | - | - | - |
| Mississippi | January-20 | 2 | - | 2 | 1 | - | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mississippi | February-20 | 2 | - | 2 | - | 1 | 1 |
| Mississippi | March-20 | - | - | - | - | - | - |
| Mississippi | April-20 | - | - | - | - | - | - |
| Mississippi | May-20 | 1 | - | 1 | 1 | - | 1 |
| Mississippi | June-20 | - | - | - | 1 | - | 1 |
| Mississippi | July-20 | 1 | - | 1 | 2 | 1 | 3 |
| Mississippi | August-20 | - | - | - | - | - | - |
| Mississippi | September-20 | - | - | - | - | - | - |
| **Mississippi Total** | | **10** | **-** | **10** | **8** | **8** | **16** |
| Nebraska | July-18 | - | - | - | 6 | 1 | 7 |
| Nebraska | August-18 | - | - | - | 5 | 2 | 7 |
| Nebraska | September-18 | - | - | - | - | 1 | 1 |
| Nebraska | October-18 | 1 | - | 1 | 1 | 1 | 2 |
| Nebraska | November-18 | - | - | - | - | 1 | 1 |
| Nebraska | December-18 | 1 | - | 1 | - | 1 | 1 |
| Nebraska | January-19 | - | - | - | 1 | - | 1 |
| Nebraska | February-19 | 1 | - | 1 | 1 | 1 | 2 |
| Nebraska | March-19 | 1 | - | 1 | - | 1 | 1 |
| Nebraska | April-19 | - | - | - | - | 1 | 1 |
| Nebraska | May-19 | - | - | - | 1 | 1 | 2 |
| Nebraska | June-19 | - | - | - | - | - | - |
| Nebraska | July-19 | - | - | - | 2 | - | 2 |
| Nebraska | August-19 | 1 | - | 1 | - | - | - |
| Nebraska | September-19 | 2 | - | 2 | - | - | - |
| Nebraska | October-19 | 2 | - | 2 | 1 | - | 1 |
| Nebraska | November-19 | 3 | - | 3 | - | - | - |
| Nebraska | December-19 | - | - | - | 1 | - | 1 |
| Nebraska | January-20 | 1 | - | 1 | - | 1 | 1 |
| Nebraska | February-20 | 2 | - | 2 | - | - | - |
| Nebraska | March-20 | 4 | - | 4 | - | - | - |
| Nebraska | April-20 | 1 | - | 1 | 1 | - | 1 |
| Nebraska | May-20 | - | - | - | - | - | - |
| Nebraska | June-20 | 4 | - | 4 | 2 | 1 | 3 |
| Nebraska | July-20 | - | - | - | 6 | - | 6 |
| Nebraska | August-20 | - | - | - | - | - | - |
| Nebraska | September-20 | - | - | - | - | - | - |
| **Nebraska Total** | | **24** | **-** | **24** | **28** | **13** | **41** |
| South Carolina | July-18 | 1 | - | 1 | 9 | 14 | 23 |
| South Carolina | August-18 | 5 | - | 5 | 5 | 14 | 19 |
| South Carolina | September-18 | - | - | - | 7 | 5 | 12 |
| South Carolina | October-18 | - | - | - | 2 | 3 | 5 |
| South Carolina | November-18 | 2 | - | 2 | 3 | - | 3 |
| South Carolina | December-18 | - | - | - | - | 4 | 4 |
| South Carolina | January-19 | 1 | - | 1 | 3 | 1 | 4 |
| South Carolina | February-19 | 1 | - | 1 | 1 | 2 | 3 |
| South Carolina | March-19 | - | - | - | 1 | 1 | 2 |
| South Carolina | April-19 | 2 | - | 2 | 1 | - | 1 |

| State | Month | | | | | |
|---|---|---|---|---|---|---|
| South Carolina | May-19 | - | - | - | - | 2 | 2 |
| South Carolina | June-19 | 1 | - | 1 | - | 1 | 1 |
| South Carolina | July-19 | 2 | - | 2 | - | - | - |
| South Carolina | August-19 | 1 | - | 1 | 1 | 1 | 2 |
| South Carolina | September-19 | 3 | - | 3 | - | 1 | 1 |
| South Carolina | October-19 | 2 | - | 2 | 1 | 1 | 2 |
| South Carolina | November-19 | 3 | - | 3 | - | - | - |
| South Carolina | December-19 | 1 | - | 1 | 1 | - | 1 |
| South Carolina | January-20 | 2 | - | 2 | - | - | - |
| South Carolina | February-20 | - | - | - | 2 | 1 | 3 |
| South Carolina | March-20 | 2 | - | 2 | 2 | 1 | 3 |
| South Carolina | April-20 | 1 | - | 1 | 1 | - | 1 |
| South Carolina | May-20 | 5 | - | 5 | - | 2 | 2 |
| South Carolina | June-20 | 2 | - | 2 | - | 2 | 2 |
| South Carolina | July-20 | 3 | - | 3 | 3 | - | 3 |
| South Carolina | August-20 | 4 | - | 4 | - | - | - |
| South Carolina | September-20 | - | - | - | - | 1 | 1 |
| **South Carolina Total** | | **44** | **-** | **44** | **43** | **57** | **100** |
| Texas | July-18 | 22 | 2 | 24 | 204 | 149 | 353 |
| Texas | August-18 | 24 | - | 24 | 170 | 132 | 302 |
| Texas | September-18 | 23 | - | 23 | 75 | 107 | 182 |
| Texas | October-18 | 17 | - | 17 | 45 | 57 | 102 |
| Texas | November-18 | 22 | - | 22 | 47 | 20 | 67 |
| Texas | December-18 | 7 | - | 7 | 22 | 21 | 43 |
| Texas | January-19 | 10 | - | 10 | 35 | 19 | 54 |
| Texas | February-19 | 14 | - | 14 | 24 | 24 | 48 |
| Texas | March-19 | 18 | - | 18 | 20 | 15 | 35 |
| Texas | April-19 | 20 | - | 20 | 16 | 5 | 21 |
| Texas | May-19 | 11 | - | 11 | 17 | 12 | 29 |
| Texas | June-19 | 15 | - | 15 | 12 | 11 | 23 |
| Texas | July-19 | 19 | - | 19 | 17 | 6 | 23 |
| Texas | August-19 | 45 | - | 45 | 3 | 1 | 4 |
| Texas | September-19 | 56 | - | 56 | 13 | 11 | 24 |
| Texas | October-19 | 61 | - | 61 | 11 | 3 | 14 |
| Texas | November-19 | 38 | - | 38 | 16 | 6 | 22 |
| Texas | December-19 | 42 | - | 42 | 26 | 5 | 31 |
| Texas | January-20 | 46 | - | 46 | 12 | 6 | 18 |
| Texas | February-20 | 48 | - | 48 | 25 | 13 | 38 |
| Texas | March-20 | 67 | - | 67 | 27 | 13 | 40 |
| Texas | April-20 | 48 | 1 | 49 | 17 | 9 | 26 |
| Texas | May-20 | 69 | - | 69 | 40 | 4 | 44 |
| Texas | June-20 | 73 | - | 73 | 43 | 13 | 56 |
| Texas | July-20 | 82 | - | 82 | 38 | 13 | 51 |
| Texas | August-20 | 57 | - | 57 | 1 | 2 | 3 |
| Texas | September-20 | - | - | - | 5 | - | 5 |
| **Texas Total** | | **954** | **3** | **957** | **981** | **677** | **1,658** |
| West Virginia | July-18 | - | - | - | - | 2 | 2 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| West Virginia | August-18 | - | - | - | - | - | - |
| West Virginia | September-18 | - | - | - | - | - | - |
| West Virginia | October-18 | - | - | - | - | - | - |
| West Virginia | November-18 | - | - | - | - | - | - |
| West Virginia | December-18 | - | - | - | - | 1 | 1 |
| West Virginia | January-19 | - | - | - | - | - | - |
| West Virginia | February-19 | - | - | - | - | - | - |
| West Virginia | March-19 | - | - | - | - | - | - |
| West Virginia | April-19 | - | - | - | - | - | - |
| West Virginia | May-19 | - | - | - | - | - | - |
| West Virginia | June-19 | - | - | - | - | - | - |
| West Virginia | July-19 | - | - | - | - | - | - |
| West Virginia | August-19 | - | - | - | - | - | - |
| West Virginia | September-19 | - | - | - | - | - | - |
| West Virginia | October-19 | - | - | - | - | - | - |
| West Virginia | November-19 | - | - | - | - | - | - |
| West Virginia | December-19 | - | - | - | - | - | - |
| West Virginia | January-20 | - | - | - | - | - | - |
| West Virginia | February-20 | - | - | - | - | - | - |
| West Virginia | March-20 | - | - | - | - | - | - |
| West Virginia | April-20 | - | - | - | - | - | - |
| West Virginia | May-20 | - | - | - | - | - | - |
| West Virginia | June-20 | - | - | - | - | - | - |
| West Virginia | July-20 | - | - | - | - | - | - |
| West Virginia | August-20 | - | - | - | - | - | - |
| West Virginia | September-20 | - | - | - | - | - | - |
| **West Virginia Total** | | **-** | **-** | **-** | **-** | **3** | **3** |
| **Grand Total** | | **1,137** | **3** | **1,140** | **1,168** | **860** | **2,028** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) For Accepted Filings, Rejections, and Total Received, Month represents the month the DACA Request was received by USCIS.

3) Requestor state for lockbox rejected cases in ELIS is not captured electronically.

4) For Approved, Denied, and Total Completions, Month represents the month the most recent final adjudication action occurred.

5) Requests approved or denied in a given month may have been received in a previous month.

6) State is determined by the requestor's address listed on the form I-821D.

7) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

# Exhibit 5

| | |
|---|---|
| **From:** | Palmer, Victoria A ███████████ @uscis.dhs.gov> |
| **Sent:** | |
| **To:** | USCIS Media <█████ @uscis.dhs.gov> |
| **Subject:** | Communications Materials: USCIS Guidance on Deferred Action for Childhood Arrivals (DACA) |
| **Attach:** | DACA Memo Aug 2020 (USCIS Guidance on DACA) RTQ _08.24.2020.docx |

Colleagues,
Today, Monday, August 24, USCIS published communications related to the USCIS Guidance on Deferred Action for Childhood Arrivals (DACA).

**Documents:**
- **Response to Query (RTQ)** – attached and in the USCIS Talking Points Library as DACA Memo Aug 2020 (USCIS Guidance on DACA) RTQ at https://connect.uscis.dhs.gov/org/OCOMM/USCIS%20Official%20Talking%20Points%20Repository/DACA%20Memo%20Aug%202020%20(USCIS%20Guidance%20on%20DACA)%20RTQ%20_08.24.2020.docx?d=w4c4bb2a6dab2402383b990a1b4c4cecd

**Guidance:**
- Public Affairs Officers – For your information. **Please refer all media inquiries to USCIS Media.**
- Public Engagement, OLIA – For your information.
- Internal Communications – For your information.
- Electronic Communications – For your information.

v/r,
Victoria

**Victoria A. Palmer**
Media Affairs Division, Office of Public Affairs
U.S. Citizenship and Immigration Services
Desk: 202.272.███ | Cell: 202.440 ███████
████████ @uscis.dhs.gov
www.uscis.gov | www.uscis.gov/news
            .

Confidential



U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

# Media Response to Query

**ISSUE**
USCIS Guidance on Deferred Action for Childhood Arrivals (DACA)

**LAST MODIFIED**
Aug. 19, 2020

**POC**
Victoria Palmer – █████████@uscis.dhs.gov, 202-272-8569

*Public Affairs Guidance, Talking Points, Response to Queries and Official Statements contain information and answers to specific questions, guidance and instructions, and key messages **used for responding to media and congressional queries**. The following information does not permit you to speak on behalf of USCIS, unless you are a Public Affairs Officer or are explicitly authorized to address external audiences (media, stakeholders, etc.). These materials are for reference only – please contact OPA's Media Affairs Division for assistance or with questions.*

**GUIDANCE**
Passive - Response to Query only

**BACKGROUND**

The DACA executive amnesty policy was created unilaterally by memorandum on June 15, 2012, without public notice and an opportunity to comment. The Supreme Court's decision in *Department of Homeland Security (DHS) v. Regents of the University of California* on June 18, 2020, did not question the authority of DHS to rescind the DACA policy, but determined that DHS did not comply with certain requirements in attempting to end the policy. Acting Secretary of Homeland Security Chad Wolf issued a memorandum on July 28, 2020, rescinding previous DACA policy memoranda issued in 2017 and 2018, and setting forth departmental action to effect immediate changes limiting the scope of DACA policy in the interim pending a full and careful reconsideration of DACA in light of the Supreme Court's decision.

U.S. Citizenship and Immigration Services is now providing additional guidance regarding how it will implement DACA policy as outlined in the July 28 DHS memorandum.

Confidential



U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

**IF-ASKED STATEMENT**
Attributable to Deputy Director for Policy Joseph Edlow:

*"The acting secretary expressed serious concerns with the DACA policy and made certain immediate changes to limit the policy's scope while DHS conducts a full and careful review of the policy. Ultimately, DACA is not a long-term solution for anyone. As has been the case since the inception of the policy, any kind of permanent amnesty can only legally come from Congress. While Congress continues to examine this issue, DHS is conducting a full and careful review of DACA policy. In the interim, we have published guidance regarding how USCIS will implement the DACA policy at this time."*

**KEY FACTS**
U.S. Citizenship and Immigration Services is providing guidance regarding how USCIS will implement the DACA policy in keeping with the DHS July 28 memorandum entitled, "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children'" pending a full and careful reconsideration of the DACA policy.

USCIS will reject all initial DACA requests from aliens who have never previously held DACA and will return all fees. The rejections will be without prejudice, meaning aliens will be able to resubmit their request should USCIS begin accepting new requests in the future.

USCIS will limit grants of deferred action and employment authorization under DACA to no more than one year but will not rescind any currently valid two-year grants of DACA or associated employment authorization documents (EADs), unless USCIS terminates an alien's DACA for failure to continue to meet the DACA criteria (see 2012 Memorandum),  including to warrant a favorable exercise of prosecutorial discretion . USCIS will replace two-year EADs that are lost, stolen, or damaged with the same facial two-year validity period assuming the EAD replacement application is otherwise approvable.

USCIS may exercise its discretion to generally reject DACA renewal requests received more than 150 days before the current grant of DACA expires. USCIS recommends DACA recipients file their renewal requests between 150 and 120 days before their current grant of DACA expires.

USCIS will only grant advance parole for travel outside the United States to DACA recipients pursuant to the advance parole policy described in the acting secretary's memorandum and the USCIS's implementation memorandum. USCIS will reject and return fees for all held or pending Form I-131 applications filed by DACA recipients based on the DACA standards that existed prior to the July 28, 2020, Wolf Memorandum. USCIS will not rescind any previously granted advance parole documents unless there is another legal reason to do so. However, as has always been the case, parole into the United States is not guaranteed. In all cases, aliens are still subject

Confidential



**U.S. Citizenship and Immigration Services**

*For internal use only*

*Office of Public Affairs*

to immigration inspection at a port-of-entry to determine whether they are eligible to come into the United States.

The determination whether to grant advance parole to an alien is entirely within the discretion of USCIS and must be made on a case-by-case basis. USCIS will review all the factors presented in individual cases before determining whether to approve advance parole for a DACA recipient. Some examples of circumstances that may warrant approval include, but are not limited to, situations such as:

- Travel to support the national security interests of the United States;
- Travel to support U.S. federal law enforcement interests;
- Travel to obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States; or
- Travel needed to support the immediate safety, wellbeing or care of an immediate relative, particularly minor children of the alien.

Even if a requestor establishes that their situation meets one of the examples above, USCIS may still deny the request for advance parole in its discretion under the totality of the circumstances.

**RESPONSE TO QUERIES:**

**Q1. Will DACA renewal requests and applications for work authorization continue to be accepted?**
A1. Yes, DACA renewal requests, including related Applications for Employment Authorization, will continue to be accepted. However, USCIS will limit renewed grants of deferred action and employment authorization under DACA to one year. USCIS will not rescind any currently valid two-year grants of DACA or associated employment authorization documents (EADs), unless USCIS terminates an alien's DACA due to failure to continue to meet the DACA criteria (see 2012 Memorandum), including failure to warrant a favorable exercise of prosecutorial discretion. Any two-year EADs that are lost, stolen or damaged will be replaced with the same facial two-year validity period assuming the EAD replacement application is otherwise approvable. DACA recipients should file their renewal requests between 150 and 120 days prior to their DACA expiration.

**Q2. Will USCIS begin accepting initial I-821D requests? If so, when?**
A2. No. USCIS is not currently accepting initial I-821D requests from aliens who have never received DACA and will reject all initial DACA requests and return all associated fees from aliens who have never previously held DACA. However, the rejections will be without prejudice, meaning aliens will be able to resubmit their request should USCIS begin accepting new requests in the future.

**Q3. Some legal commentators and lawmakers claim the Supreme Court's decision on DACA requires USCIS to open up the DACA program to initial requestors who qualify under the original terms of the program, and that the administration and**

Confidential



*For internal use only*

*Office of Public Affairs*

**USCIS are defying the Supreme Court by not accepting new requests. Why is USCIS not accepting and processing initial I-821D DACA requests and not restoring the program to its former status?**
A3. The Supreme Court decision specifically stated the executive branch can move to alter the DACA program as it deems appropriate. There was no order within the decision to begin accepting new requests for DACA. While the Department considers the future of DACA policy, including whether to fully rescind the program, DHS will adhere to federal immigration law.

**Q4. Why is USCIS is not accepting new requests for DACA despite the U.S. District Court of Maryland order in *Casa De Maryland et al v. U.S. Department of Homeland Security et al* that required reinstating the program to its pre-September 5, 2017 status and that USCIS begin accepting initial DACA requests after the Supreme Court decision?**
A4. As a matter of practice, USCIS does not comment on ongoing litigation.

**Q5. DACA requestors and advocates say that after the Supreme Court decision USCIS was not sending notices acknowledging receipt of requests. Why did USCIS not notify requestors of what was happening with their initial or renewal requests? Is USCIS now sending notices to all DACA initial and renewal requestors confirming that their request has been received, and how many notices for each type (initial, renewal) have been sent since June 18?**
A5. Since June 18, USCIS has issued approximately 53,408 receipt notices for DACA renewal requests. As noted in the Wolf Memorandum, since the Supreme Court's decision, USCIS has, on an interim basis, generally held properly completed DACA requests from aliens who never before had DACA in anticipation of potential policy changes. Consistent with the Wolf memorandum and USCIS guidance, these DACA initial requests will be rejected and the fees be returned to the requestor.

**Q6. How many initial DACA requests has USCIS received since the June 18 U.S. Supreme Court ruling; how many of these initial requests were rejected and returned; and how many initial requests have been "held"?**
A6. As of Aug. 18, 2020, USCIS has received approximately 3,189 DACA requests from aliens who never before received DACA. As noted in the acting secretary's memorandum, since the Supreme Court decision on June 18, 2020, USCIS has, on an interim basis, generally held properly completed DACA requests from aliens who have never before received DACA. As of Aug. 17, 2020, USCIS rejected and returned the fees on approximately 44 DACA initial requests due to standard rejection reasons, such as an incomplete form, missing required pages or signature, or an incorrect fee, although some rejection notices contained inaccurate rejection language.

Confidential



U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

**Q7. What is the status now with the initial DACA requests received since June 18 – will they continue to be held or will the requests be rejected and a notice of rejection sent to requestors?**
A7. USCIS will reject all initial DACA requests and return all associated fees from aliens who have never previously received DACA, including those initial requests that were held on an interim basis. However, the rejections will be without prejudice, meaning aliens will be able to resubmit their requests should USCIS begin accepting DACA requests from aliens who have never before received DACA in the future.

**Q8. How long is the DACA policy review expected to take and will the Department be taking action to terminate DACA?**
A8. The DACA policy as a whole is under a close and careful review, as instructed by Acting Secretary Wolf's July 28 memorandum. No further details are available at this time.

**Q9. How many aliens currently have DACA?**
A9. Approximately 826,000 aliens have been granted DACA throughout the existence of the policy. As of June 30, 2020, there were approximately 645,610 active DACA recipients.

**Q10. How many illegal aliens would be eligible for DACA if the program were to be restored to its former status?**
A10. We do not have that information readily available since the number of aliens who claim to have entered the U.S. before the age of 16 and meet the other criteria established by the Obama administration is unknown.

**Q11. How many DACA renewals has USCIS received since the June 18 Supreme Court ruling and what will the timeline be for processing these requests?**
A11. USCIS has received 48,545 renewal DACA requests, of which 42,753 were accepted for processing between June 18, 2020 and Aug. 18, 2020.  The processing time goal for DACA renewals is 120 days.  As noted in the archived DACA FAQs, factors that may affect the timely processing of a DACA renewal request include, but are not limited to:

- Failure to appear at an Application Support Center (ASC) for a scheduled biometrics appointment to obtain fingerprints and photographs. No-shows or rescheduling appointments will require additional processing time.
- Issues of national security, criminality or public safety discovered during the background check process that require further vetting.
- Issues of travel abroad that need additional evidence/clarification.
- Name/date of birth discrepancies that may require additional evidence/clarification.
- The renewal submission was incomplete or contained evidence that suggests a requestor may not satisfy the DACA renewal guidelines and USCIS must send a request for additional evidence or explanation.

Confidential

DEF - 00008386



U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

**Q12. For DACA recipients who already received a two-year renewal and two-year EAD, will their DACA and EADs now be reduced to one year? Is the DHS memo guidance retroactive?**
A12. USCIS will not rescind any currently valid two-year grants of DACA or associated employment authorization documents (EADs), unless USCIS terminates an alien's DACA and associated EAD for to continue to meet the DACA criteria (see 2012 Memorandum), including failure to warrant a favorable exercise of prosecutorial discretion. Any two-year EADs that are lost, stolen or damaged will be replaced with the same facial two-year validity period assuming the EAD replacement application is otherwise approvable.

**Q13. If the DHS memo was effective immediately, does that mean that anyone requesting renewal as of July 28 will only get a one-year DACA renewal and EAD?**
A13. Effective July 28, USCIS will limit renewed grants of deferred action and employment authorization under DACA to no more than one year. USCIS will adjudicate all DACA renewal requests, including those received after the July 28 DHS memorandum, under the general adjudicative guidelines in place for DACA with the exception that all DACA grants issued after the DHS memorandum shall be valid for no more than one year. USCIS will continue to reject DACA renewal requests that are not properly completed in accordance with form instructions and USCIS filing guidance.

**Q14. What about DACA renewal requests that were already being processed prior to July 28 but had not been finalized – will they get only a one-year renewal and EAD?**
A14. All DACA grants issued after the July 28 DHS memorandum shall be valid for one year. USCIS will continue to reject DACA renewal requests that are not properly completed in accordance with form instructions and USCIS filing guidance.

**Q15. What is the number of DACA renewals that were being processed prior to the July 28 memo that this new policy guidance will affect, and they will now only get one-year of deferred action and employment authorization instead of two?**
A15. As of July 28, 2020, there were approximately 32,200 DACA renewal requests pending.

**Q16. Renewals for deferred action and work authorizations have been cut to one year instead of two, which effectively doubles the DACA fees, and the DHS memorandum says, *"DHS personnel should consider whether it is possible to reduce the renewal fees during this interim period of reconsideration"*. Is DHS actively considering reducing DACA renewal and EAD fees and when will you announce a decision on this?**
A16. There is no fee for filing Form I-821D, Consideration of Deferred Action for Childhood Arrivals, which means that others seeking lawful immigration benefits continue to subsidize the cost of this unlawful amnesty program. However, all DACA requestors are required to file Form I-765, Application for Employment authorization, which does require a fee with very limited

Confidential



U.S. Citizenship
and Immigration
Services

*For internal use only*

*Office of Public Affairs*

exceptions, and all DACA requestors are required to pay a biometrics fee. USCIS is considering the feasibility of reducing DACA-related fees during the interim period the DACA policy is under review in accordance with acting secretary's memorandum.  USCIS notes that the new fee rule, which becomes effective on Oct. 2, 2020, includes a fee increase for the Form I-765, Application for Employment Authorization, for all categories of employment authorization **except** for the DACA category. The fee for DACA-based applications for employment authorization will remain at $410, plus an $85 biometrics fee, for the time being.

In an effort to minimize overlapping validity periods between an alien's renewed DACA validity period and an alien's current DACA validity period, USCIS has generally withheld issuing final approval of a DACA renewal request until the alien's remaining DACA validity period is closer to the expiration date. USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period.

**Q17. I understand USCIS stopped granting advanced parole for DACA recipients; has this changed and will USCIS start accepting travel requests from DACA recipients again? If so, how soon and will the process be the same as it was previously?**
A17. USCIS will only grant advance parole for travel outside the United States to DACA recipients based on urgent humanitarian reasons or significant public benefit, as described in the guidance in the acting secretary's memorandum and the USCIS memorandum implementing the advance parole guidance. USCIS will reject and return fees for all pending Form I-131 applications from DACA recipients that are based on the prior DACA standards. The agency will not rescind any previously granted advance parole documents unless there is another legal reason to do so. However, as has always been the case, parole into the United States is not guaranteed. In all cases, you are still subject to immigration inspection at a port-of-entry to determine whether you are eligible to come into the United States.

The determination whether to grant advance parole to an alien is entirely within the discretion of USCIS and must be made on a case-by-case basis.  USCIS will review all the factors presented in individual cases before determining whether to approve advance parole for a DACA recipient based on the new guidance. Some examples of circumstances that may warrant approval include, but are not limited to, situations such as:

- Travel to support the national security interests of the United States;
- Travel to support U.S. federal law enforcement interests;
- Travel to obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States; or
- Travel needed to support the immediate safety, wellbeing or care of an immediate relative, particularly minor children of the alien.

Even if a requestor establishes that their situation meets one of the examples above, USCIS may still deny the request for advance parole in discretion under the totality of the circumstances.

Confidential



**U.S. Citizenship and Immigration Services**

*For internal use only*

*Office of Public Affairs*

**CAUTION:** If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

**Q18. Why did it take more than a month after the Supreme Court decision and an order by the U.S. District Court of Maryland before USCIS updated its website with current policy on DACA?**
A18. The Department of Homeland Security and the Department of Justice were reviewing the numerous impacts of the court's decision. All relevant webpages have been updated.

**Q19. The Obama Administration repeatedly claimed that DACA did not provide a path to lawful permanent residence and eventually citizenship for illegal aliens. If DACA recipients are granted advance parole, will they be able to adjust status and become a lawful permanent resident?**
A19. A grant of advance parole alone does not provide an independent ground for adjustment of status. However, thousands of DACA recipients may have used advance parole to meet a particular threshold requirement under INA section 245(a), which requires an alien to be "inspected and admitted *or paroled*" as a precondition for an alien to obtain status as a lawful permanent resident in the United States.  However, such aliens must meet all other applicable eligibility criteria for adjustment of status, including having an immigrant visa immediately available to them.

Parole into the United States is not guaranteed. In all cases, an alien with an advance parole travel document is still subject to immigration inspection at a port-of-entry to determine whether he or she is eligible to come into the United States.  Aliens seeking to travel abroad pursuant to an advance parole travel document may consider consulting with an authorized immigration service provider prior to filing an application for advance parole or undertaking travel abroad.

- USCIS –

NJAPP046

Confidential

# Exhibit 6

| | |
|---|---|
| **From:** | Robinson, Brandon M ███████████ @uscis.dhs.gov> |
| **Sent:** | |
| **To:** | Jenkins, Jennifer L < ███████████ s@uscis.dhs.gov>; Shafii-Stier, Sara A < ███████████ @uscis.dhs.gov>; Rouse, Tracey J < ███████████ @uscis.dhs.gov> |
| **Cc:** | King, Alexander R < ███████████ @uscis.dhs.gov>; Umoru, Victoria E ███████████ @uscis.dhs.gov>; Padilla, April Y ███████████ @uscis.dhs.gov>; Freeman, Mark C ███████████ @uscis.dhs.gov>; Woerz, Bret A ███████████ @uscis.dhs.gov> |
| **Subject:** | RE: DACA Filings After 9/5/17 - No Prior Grant of DACA |
| **Attach:** | Example Cases.pdf; Example Post-Injunction No Prior DACA NOID (Suspected Fraud).docx |

Good afternoon NSC,

Recently we reached out to OPQ to run a report for DACA filings submitted with a receipt date after 9/5/17 where it did not appear the requestor ever had a prior grant of DACA.  In review of those cases, while we did not find any approvals, we did come across a certain number of filings where the G-28, preparer and/or requestor appeared to be willfully misrepresenting their immigration filing history (examples attached).

After further discussion with SCOPSs Security Fraud Division, when officers are evaluating cases flagged as having no prior grant of DACA, it is recommended officers review the cases to determine whether the attorney/preparer/requestor are willfully misrepresenting the requestor's immigration history and whether any fraudulent evidence may have been submitted in support of the fraudulent request.  If it is determined by the reviewing officer that the requestor does not have a prior grant of deferred action and appears to be willfully misrepresenting their immigration history, we recommend that the "Post-Injunction No Prior DACA" NOID be updated to include language that states how the requestor appears to be willfully misrepresenting their immigration history, note any evidence that does not appear to be credible in support of their DACA request and include the following language from DACA NOID 415:

> In addition, USCIS reminds you that it is a violation of federal law (18 U.S.C. sec. 1001) if you knowingly and willingly submit materially false information in support of your request for DACA, and you may be fined, imprisoned up to five years, or both. In addition, you may be placed in removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

While individuals requesting DACA are not subject to INA 212 inadmissibility grounds, the underlying derogatory conduct should still be considered as a significant negative factor under the totality of the circumstances.  Once a NOID response has been received (or if the requestor fails to timely respond to the NOID), should the officer determine the requestor has not overcome the basis of the NOID relative to the component of suspected fraud, please hold the case for further guidance as WATS and SFD work to compose guidance on next steps.

As always, we appreciate any feedback you may have with the above guidance.  Please let us know if you have any questions or concerns.

Thanks,
Brandon

Confidential

# Exhibit 7

Thanks,
Jenni

**Jennifer Jenkins | Immigration Services Officer (ISO-3)**
USCIS Nebraska Service Center | DACA BCU | NW1002 | EX0996
☎ (402) 219-█████ ✉ J█████████@uscis.dhs.gov

---

**From:** Robinson, Brandon M <█████████████@uscis.dhs.gov>
**Sent:** Friday, April 26, 2019 1:56 PM
**To:** Shafii-Stier, Sara A <█████████@uscis.dhs.gov>; Jenkins, Jennifer L
█████████@uscis.dhs.gov>; Rouse, Tracey J <████████@uscis.dhs.gov>
**Cc:** King, Alexander R █████████@uscis.dhs.gov>; Umoru, Victoria <████████@uscis.dhs.gov>
**Subject:** DACA Filings After 9/5/17 - No Prior Grant of DACA

Good afternoon NSC,

CSC reached out to us yesterday regarding a DACA request█████████that was filed after 9/5/17 and
the requestor did not have a prior grant of deferred action under DACA.  Under the current court orders, and in
accordance with USCISs response to the Jan/Feb 2018 PIs, USCIS is not accepting or approving DACA requests
from individuals who have never received a prior grant of DACA.  While all DACA requests filed as an Initial are
reviewed by Lockbox to determine whether the requestor has had a prior grant of DACA, it is possible for
someone who has never had a prior grant of DACA to circumvent Lockbox's system logic by filing the DACA
request as a renewal.  This appears to be the case for ████████.

In review of the filing, it appears ELIS flagged the case for not having a prior grant of DACA and the request was
subsequently re-assigned to CSC as an initial filing.  Unfortunately it's my understanding ELIS does not then
provide CSC with a similar alert that the requestor has never had a prior grant of DACA.

To help minimize the possibility of any such DACA filings being approved, we are in need of NSCs assistance in
processing these cases.  Going forward, in instances where NSC determines a DACA request was submitted after
9/5/17 and does not have a prior grant of DACA, would NSC please adjudicate those cases to completion using
the attached OCC-cleared templates?  The templates should be in ECHO and available for use; however, please
let us know if this is not the case.

| | |
|---|---|
| I-821D DACA Post Injunction No Prior DACA Denial (eCISCOR) | DECISIO |
| I-821D DACA Post Injunction No Prior DACA Denial (Elis2) | DECISIO |
| I-821D DACA Post Injunction No Prior DACA NOID (eCISCOR) | NOTICE OF INTEN |
| I-821D DACA Post Injunction No Prior DACA NOID (Elis2) | NOTICE OF INTEN |

Any assistance NSC can provide in resolving this potential issue is greatly appreciated and please don't hesitate
should you have any questions or concerns.

V/R,

Confidential                                                    DEF - 00008447

Brandon

Brandon Robinson
Adjudications Officer (Policy)
DHS | USCIS HQ | SCOPS | WATS
Cell: 402.304.████
████████████@uscis.dhs.gov

Confidential                                                      DEF - 00008448

# Exhibit 8

**From:** Umoru, Victoria E <████████@uscis.dhs.gov>
**Sent:**
**To:** Gooselaw, Kurt G <████████@uscis.dhs.gov>; Lee, Danielle L
<████████@uscis.dhs.gov>; Adams, Mary-Sarah S (Mary-Sarah (MSA))
<████████@uscis.dhs.gov>; Casto, Randall W
<████████@uscis.dhs.gov>; Belyea, Daniel M (Dan) (CTR)
<████████@uscis.dhs.gov>; Felix, Raquel J
<████████@uscis.dhs.gov>; Lewis, Theodore R (Ted)
<████████@uscis.dhs.gov>; Herring, Monte R
<████████@uscis.dhs.gov>; Gudehus, Beth C
<████████@uscis.dhs.gov>; Nguyen, Van T
<████████@uscis.dhs.gov>; Posvar, Sarah C
<████████@uscis.dhs.gov>; Rouse, Tracey J
<████████@uscis.dhs.gov>; Shafii-Stier, Sara A <████████
<████████@uscis.dhs.gov>; Holmes, Malethea S
<████████@uscis.dhs.gov>; Hawthorne, Thomas E
<████████@uscis.dhs.gov>; Cobb, Melissa M
<████████@uscis.dhs.gov>; Lee, Tyronda E
<████████@uscis.dhs.gov>; Laroe, Lisa A <████████@uscis.dhs.gov>;
Brouillette, Bradley J <████████@uscis.dhs.gov>; Nephew, Brad D
<████████@uscis.dhs.gov>; Beyor, Avery G Jr <████████@uscis.dhs.gov>;
████████@uscis.dhs.gov>; Grismore, Carrie A <████████@uscis.dhs.gov>;
Freeman, Mark C <████████@uscis.dhs.gov>; Woerz, Bret A
<████████@uscis.dhs.gov>; Jenkins, Jennifer L
<████████@uscis.dhs.gov>
**Cc:** Baran, Kathy A <████████@uscis.dhs.gov>; Crandall, Kristine R
<████████@uscis.dhs.gov>; Miller, Loren K
<████████@uscis.dhs.gov>; Richardson, Gregory A
<████████@uscis.dhs.gov>; Roessler, John E
<████████@uscis.dhs.gov>; Selby, Cara M (Carrie)
<████████@uscis.dhs.gov>; Thompson, Kirt
<████████@uscis.dhs.gov>; Zuchowski, Laura B
<████████@uscis.dhs.gov>; Robinson, Brandon M
<████████@uscis.dhs.gov>; Orise, Sharon R
<████████@uscis.dhs.gov>; Bae, Connie J <████████@uscis.dhs.gov>;
Umoru, Victoria E <████████@uscis.dhs.gov>
**Subject:** Implementing the DACA Memo issued by USCIS Deputy Director for Policy
Joseph Edlow

Good afternoon all,

The Memo on how USCIS should implement the DHS guidance on DACA was published yesterday. As we review the implementation guidelines, below is a quick update on where we stand in operationalizing the DHS/USCIS guidance as of today:

1. **RFEs, NOIDs and NOITs:** Centers may resume the issuance of RFEs, NOIDs, and NOITs.

Confidential                                                    DEF - 00008579

2.  **Denials and Terminations:** Centers may resume processing denials and terminations.  Please note that the Inland Empire injunction remains in place.  USCIS personnel should continue to follow the appropriate termination procedures consistent with the Inland Empire preliminary injunction until further notice.

3.  **Approvals (DACA requests):**  OIT has made updates in ELIS to modify the validity period for DACA requests from two years to one year.  Tests have been completed and all looks good, therefore centers may now move forward with approvals.  As indicated in the USCIS memo, all requests for DACA and associated employment authorization granted after July 28, 2020 will be for a validity period of no more than one-year.  The one-year validity period shall begin on the date the DACA request receives final approval, consistent with past practices, and have an ending validity date that is no more than one-year minus one day from the date of approval.

4.  **Approvals (EAD Replacement Applications)**: Centers may resume approving DACA I765 EAD replacement applications.  Consistent with the guidance in the Edlow memo, centers will replace two-year EADs that are lost, stolen or damaged with the same facial two-year validity period assuming the EAD replacement application is otherwise approvable.  Future EAD replacement applications for one-year DACA/EAD grants will be provided the same facial one-year validity period.

5.  **DACA Initials:**  There are no changes for SCOPS. USCIS will continue to accept DACA filings from those who have previously received a grant of DACA.  USCIS will continue its policy of treating DACA filings submitted by those whose prior grant of DACA was either terminated or expired one year or more prior to filing for "renewal" as an initial DACA request for processing and adjudications purposes.  As noted in the Edlow memo, USCIS will also continue to adjudicate all initial DACA filings submitted on or before Sept. 5, 2017 from those who have never been granted DACA.  An internal query shows approximately 100 such cases remain pending.  SCOPS WATS may be reaching out to each center regarding any cases that may require additional review as some appear to be at the NRC.

    The Lockbox will continue to reject all initial DACA requests from requestors who have never previously received DACA and return all fees.

6.  **DACA Renewals:** USCIS will continue to accept DACA renewal requests from requestors who have been granted DACA at any time in the past. In an effort to minimize the amount of overlap between two existing grants of DACA, the PPCCE threshold in the DACA renewal streamline process (SP) has been reduced from a 150 day hold to 30 days.  Therefore, final adjudication should not occur more than 30 days prior to the expiration of the previous DACA validity period.  Any manual adjudications of DACA renewals should also be consistent with the 30 day policy.

    In accordance with the Edlow memo, the Lockbox will generally reject DACA renewal requests filed more than 150 days prior to expiration.

7.  **DACA Advance Parole**: The NSC will continue to handle the DACA I-131 workload. The Edlow memo directs SCOPS to administratively close all pending and future Form I-131 applications for advance parole from DACA recipients submitted under standards associated with the DACA policy, absent exceptional circumstances, and to refund all associated fees.

    To implement this guidance, any DACA-related I-131 filed on or before August 24, 2020 with be administratively closed and refunded.  SCOPS is currently working with OCC on clearing the admin close/refund notice to be used for this purpose.  Separately, OIDP will issue **rejection** notices for DACA related Form I131s being held at the lockbox. The rejection and admin. closure notices will invite the

Confidential

applicant to refile if they believe they have an exceptional circumstance. Please hold off on processing these pending I131 cases until SCOPS provides the admin closure/refund notice to be used.

To ensure compliance with the USCIS memo's directive, guidance regarding processing DACA advance parole, including revised training materials, are forthcoming. The new guidance will indicate that any advance parole request approved by USCIS must first gain concurrence from the adjudicating officer's first line supervisor, Section Chief, and Associate Center Director prior to being sent to SCOPS HQ via the SCOPS ECN Request for Adjudicative Guidance (RAG) process for final concurrence from the Deputy Associate Director. The ECN RAG page has also been modified to now include **DACA Request Type: I131** for these particular RAGs.

For more information regarding how DACA recipients may request advance parole under DACA, please see the Web Alert that's available on the I-131 webpage. The Direct Filing Address webpage for I-131s provides the corresponding filing information.

Prior to the rescission of DACA, all requests for advance parole were processed via CLAIMS; however, all future requests for advance parole under DACA will be processed in ELIS.  The Lockbox has been working with OIT to send sample cases for review and testing.  We will follow up as soon as more information is available regarding the testing process.

In the past, biometrics were cloned for DACA AP applications. Under the new guidance, USCIS will not be reusing biometrics for DACA I-131s. All DACA recipients requesting advance parole will be required to complete biometrics processing at an ASC. SCOPS is working with OP&S and OIT to ensure that appropriate ASC Appointment biometrics codes are set in the system for DACA I-131s.

Thank you everyone for your patience and assistance as we work together to implement these procedures.

Respectfully,

*Victoria Umoru*

Adjudications Officer (Policy)
Service Center Operations | USCIS HQ | DHS
20 Massachusetts Ave. Washington D.C. 20529
Phone: (202) 631-████

Confidential                                    DEF - 00008581

# Exhibit 9

Nos. 18-587, 18-588 and 18-589

IN THE

# Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Petitioners,*

*v.*

REGENTS OF THE UNIVERSITY
OF CALIFORNIA, *et al.*,

*Respondents.*

*(For Continuation of Caption See Inside Cover)*

ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE NINTH CIRCUIT

## BRIEF *AMICI CURIAE* OF THE NATIONAL EDUCATION ASSOCIATION AND NATIONAL PTA IN SUPPORT OF RESPONDENTS

ALICE O'BRIEN
    *Counsel of Record*
EMMA LEHENY
LUBNA A. ALAM
REBECCA YATES
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, NW
Washington, DC 20036
(202) 822-7048
aobrien@nea.org

*Counsel for Amici Curiae*

October 4, 2019

291673



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

*ii*

**TABLE OF CONTENTS**

*Page*

QUESTION PRESENTED ........................i

TABLE OF CONTENTS...........................ii

TABLE OF CITED AUTHORITIES ..............iv

INTEREST OF *AMICI* ...........................1

INTRODUCTION AND SUMMARY OF
    ARGUMENT.................................2

ARGUMENT....................................5

    A.   DHS Failed to Provide a Reasoned
        Explanation for the Policy Change,
        Including a Consideration of Reliance
        Interests, as Required by the APA...........5

    B.   In Reliance on DACA, Students
        Pursued Higher Education and Careers
        in Public Service .........................8

    C.   DHS Failed to Consider the Reliance
        Interests DACA Engendered in This
        Country's Public Schools .................15

        i.   Without DACA, Thousands of
            Educators Would Abruptly Leave Their
            Students ...........................16

**AR5241**

*iii*

*Table of Contents*

                                                                *Page*

ii.   Educational Institutions Rely on
      Thousands of DACA Educators to Offset
      the Nationwide Teacher Shortage .......18

iii.  Educational Institutions Rely on DACA
      to Provide Essential Diversity in
      the Teaching Profession................20

iv.   DHS Failed to Consider How DACA
      Rescission Would Undermine Student
      Learning for All Students ..............25

CONCLUSION ................................29

**AR5242**

15

**"What will they have to go through?"** Jose Garibay recently graduated from St. Edwards College with a degree in political science. While in college, he volunteered for a college preparedness program for students from low-income communities. DACA meant Garibay was no longer afraid to be open and involved in community service. He hopes to go to law school or pursue a graduate degree in public policy. Garibay worries about his own career, but more than that, he worries about how DACA's rescission will affect his younger brother, who just started college. And he is anxious about what college will look like for the young people he has helped through the college preparedness program. "What will they have to go through?"

These are just a few of the thousands of student and educator stories around the country. *See* Gonzales, *supra*, at 2; Wong, *supra*. By opening the door to higher education and meaningful work in fields of public service, DACA has provided young people with a powerful reason to engage and succeed in their K-12 studies and beyond. If they lose their DACA status, the achievements that they have worked so hard to attain will be cut short. The nation's investment in educating and training DACA holders will be lost. And for DACA recipients still in high school, the DACA opportunities that motivated young people—and improved high school matriculation rates—will summarily vanish.

## C.  DHS Failed to Consider the Reliance Interests DACA Engendered in This Country's Public Schools

The harm caused by the loss of DACA would not be borne by its recipients alone. Without DACA renewals, the

**AR5265**

WMA

16

status of thousands of educators will expire on different dates throughout the school year. Teachers and staff will abruptly disappear from classrooms to the distress of their students and to the measurable detriment of educational outcomes. In addition, educational institutions across the country rely on thousands of DACA educators to help remedy significant teacher shortages, provide mentorship and role models to students, and diversify the teaching corps.

### i.   Without DACA, Thousands of Educators Would Abruptly Leave Their Students

The loss of DACA would mean that our nation's schools would lose thousands of valued education employees. Zong, *supra*, at 7-8. Given the individual DACA expiration dates of these educators, no district, school, or classroom can adequately prepare students for the staggered departure of beloved teachers. Departures that occur mid-year or at critical points of educational mastery would irreversibly harm children and their educational outcomes. Teacher Karina Alvarez in San Antonio, Texas experienced this first-hand. While awaiting the delayed renewal of her DACA work permit, Alvarez was forced to temporarily resign from her second grade class. Seven-year-olds cannot comprehend the reasons for such a loss, but research abundantly shows that such abrupt changes can have disruptive impacts on young children. *See, e.g.*, Nat'l Sci. Council on the Developing Child, *Young Children Develop in an Environment of Relationships* (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 1, 2004), https://developingchild.harvard.edu/wp-content/uploads/2004/04/Young-Children-Develop-in-an-Environment-of-Relationships.pdf. During Alvarez's absence, her second-graders lost their relationship with

**AR5266**

17

a trusted teacher and their academic progress lagged.
This would occur on a much larger scale if thousands of
teachers lose the ability to renew their DACA status.

Teacher turnover has long been shown to harm
student academic achievement. Matthew Ronfeldt et al.,
*How Teacher Turnover Harms Student Achievement*, 50
Am. Educ. Res. J. 4, 31 (2013). Not only would the students
of lost DACA teachers perform worse academically, all
students would be negatively impacted. *Id*. Turnover
causes a decline in student achievement school-wide
because it damages faculty morale, increases the workload
of remaining teachers, and diverts district funds away
from student programs to training new hires. *Id.* at 8, 32.
Moreover, the loss of DACA would cause greater harm in
subjects and at schools most likely to already suffer from
high turnover. The subject with the highest rate of teacher
turnover is English Language Learning ("ELL"). Leib
Sutcher et al., Learning Pol'y Inst., *A Coming Crisis in
Teaching? Teacher Supply, Demand, and Shortages in
the U.S.* 46, Fig. 24 (2016), https://learningpolicyinstitute.
org/sites/default/files/product-files/A_Coming_Crisis_in_
Teaching_REPORT.pdf. Turnover rates are also higher at
schools with a greater percentage of students of color. *Id.*
These are schools and subjects in which DACA educators
are particularly impactful.

Karen Reyes teaches hearing-impaired toddlers.[6]
When she took a class in this specialized area, she felt
it was the illuminating "light at the end of the tunnel" of

---

[6] Based on a personal interview conducted by *amici* and
excerpts from Erica L. Green, *With DACA in Limbo, Teachers
Protected by Program Gird for the Worst*, N.Y. Times (Feb. 1,
2018), https://www.nytimes.com/2018/02/01/us/politics/daca-
teachers-trump.html.

**AR5267**

18

her own education. From that class, she knew she wanted
to dedicate her life to teaching children with limited
communication abilities. Reyes tries to explain the risk
that she will be removed from her students' classroom
using pictures and sign language. "They understand
when I go on an airplane. Maybe they'll just think I'm
on a never-ending flight." Reyes's area of specialization
suffers from a teacher shortage. It often takes more
than a year to fill a vacancy in her specialty. Were DACA
terminated, her students would be left, likely for a long
period of time, without an educator adequately trained to
teach them. If DACA continues, however, Reyes will not
only continue teaching but plans to further her career by
acquiring a doctorate with the eventual goal of becoming
a school audiologist.

### ii.   Educational Institutions Rely on Thousands of DACA Educators to Offset the Nationwide Teacher Shortage

Throughout the country, states face a critical shortage
of teachers. The U.S. Department of Education found that
every state was "dealing with shortages of teachers in key
subject areas" in the 2017-18 school year. Valerie Strauss,
*Teacher Shortages Affecting Every State as 2017-18 School
Year Begins*, Wash. Post (Aug. 28, 2017), https://www.
washingtonpost.com/news/answer-sheet/wp/2017/08/28/
teacher-shortages-affecting-every-state-as-2017-18-
school-year-begins/?utm_term%20.0583fbf55b17; *see
also* Off. of Postsecondary Educ., U.S. Dep't of Educ.,
*Teacher Shortage Areas Nationwide Listing 1990-1991
through 2017-2018* (June 2017), https://www2.ed.gov/about/
offices/list/ope/pol/ateachershortageareasreport2017-18.
pdf. For the 2018-19 school year, thirty states and the

**AR5268**

19

District of Columbia had shortages of bilingual and ELL teachers. Corey Mitchell, *Wanted: Teachers as Diverse as Their Students*, Educ. Wk., (Sept. 17, 2019), https://www.edweek.org/ew/articles/2019/09/18/wanted-teachers-as-diverse-as-their-students.html. DACA helps districts ease these shortages. A rescission of DACA would leave tens of thousands of students in the breach, many of them in the most underserved schools.

School administrators shore up this data with first-hand experience. Heidi Sipe, the superintendent of the Umatilla School District in eastern Oregon, notes that her district posts positions for three to six months without receiving a single application. And Superintendent Matt Utterback, of the North Clackamas School District in the suburbs of Portland, Oregon, states that his district has not been fully staffed for years. In Sacramento, Superintendent Jorge Aguilar of the Sacramento City Unified School District reports that his district is heavily impacted by the teacher shortage that is felt throughout California. He fears that the end of DACA would exacerbate the district's already-critical need for qualified staff.

Mike Walsh, Immediate Past President of the California School Boards Association and a Trustee of the Butte County Office of Education, observes that the California Mini-Corps, which provides tutoring services to K-12 youth in migrant communities, stands to lose numerous college-student tutors who hold DACA status. Walsh notes, "About eighty percent of tutors go on to obtain a teaching credential or permit to continue to be involved in education." The Mini-Corps tutors are "in the pipeline to become teachers, administrators, [and]

**AR5269**

20

superintendents." If these young people are no longer able to work as tutors, Mini-Corps will lose hard-to-replace staff and the state will lose committed educators. The state's investment in this training and development pipeline will be lost.

Public schools have invested in the K-12 and higher education of these motivated young people whose professional aim is to give back, to educate students like themselves. And in reliance on DACA, educational institutions have hired thousands of DACA educators to fill much needed positions. The termination of DACA would bar these qualified educators from the classrooms that so urgently need them.

### iii. Educational Institutions Rely on DACA to Provide Essential Diversity in the Teaching Profession

Numerous studies have shown that students benefit from teachers who are ethnically and culturally diverse. "Teachers of color are positive role models for all students in breaking down negative stereotypes and preparing students to live and work in a multiracial society." Off. of Plan., Evaluation & Pol'y Dev., U.S. Dep't of Educ., *The State of Racial Diversity in the Educator Workforce* 1 (July 2016), https://www2.ed.gov/rschstat/eval/highered/racial-diversity/state-racial-diversity-workforce.pdf.

There are "meaningful 'role model effects'" when minority students are taught by teachers of the same race." Dan Goldhaber et al., Univ. of Wash. Bothell, *The Theoretical and Empirical Arguments for Diversifying the Teacher Workforce: A Review of the Evidence* 6 (Ctr.

**AR5270**

21

for Educ. Data & Res., Working Paper No. 2015-9). These effects are not subjective, but are quantifiable in making a "meaningful impact on student test scores." *Id.* at 3. For example, "a larger presence of black and Hispanic teachers [is linked] to improved treatment or outcomes for black and Hispanic students along a variety of dimensions, including lower rates of exclusionary discipline, lower likelihood of placement in special education, and higher pass rates on standardized tests." Jason A. Grissom et al., *Teacher and Principal Diversity and the Representation of Students of Color in Gifted Programs*, 117 Elementary Sch. J. 396, 400 (2017) (internal citations omitted). Similarly, "non-English proficient Latino children revealed greater gains on a direct assessment of literacy . . . if their teacher was also Latino rather than Caucasian." Jason T. Downer et al., *Teacher-Child Racial/Ethnic Match Within Pre-Kindergarten Classrooms and Children's Early School Adjustment*, 36 Early Childhood Res. Q. 26, 38 (2016).

It is therefore critical for schools to hire teachers whose backgrounds mirror those of an increasingly diverse student population. Yet districts have had difficulty doing so. Between 2003 and 2012, "the increase in the percentage of Hispanic students [in the U.S.] far outpaced the modest increase in the percentage of Hispanic teachers." Goldhaber et al., *supra*, at 1. In the 2011-12 school year, 24% of students were Hispanic, while only 8% of teachers were Hispanic. Off. of Plan., Evaluation & Pol'y Dev., *supra*, at 6. This disparity is only expected to grow: "students of color are expected to make up 56 percent of the student population by 2024." *Id.* at 1.

School districts thus have a pressing need to hire an increasing number of Latino educators to serve the needs

**AR5271**

22

of their changing student populations. DACA teachers have helped to meet this growing need; over 93% of DACA recipients were born in Latin American countries. U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., *Approximate Active DACA Recipients: Country of Birth* 1 (Sept. 4, 2017), https://www.uscis.gov/sites/default/ files/USCIS/Resources/Reports%20and%20Studies/ Immigration%20Forms%20Data/All%20Form%20Types/ DACA/daca_population_data.pdf. Indeed, some districts have specifically recruited DACA recipients for this reason. Tom Boasberg, Superintendent of Denver Public Schools, has advocated for DACA because it "allowed him to find talented bilingual teachers who can connect with his students." Alexia Fernández Campbell, *DACA Immigrants Are Teaching American Children. What Happens After They're Gone?*, Vox (Sept. 15, 2017), https://www. vox.com/policy-and-politics/2017/9/15/16306972/daca- teachers-dreamers. Dallas Independent School District Superintendent Michael Hinojosa spoke highly of the DACA teachers, who "grew up in [the Dallas] community" and spoke both English and Spanish well. Dianne Solis & James Barragan, *U.S. Could Lose an Estimated 20,000 Teachers, Many Bilingual, as DACA is Phased Out*, The Dallas Morning News (Oct. 5, 2017), https://www. dallasnews.com/news/immigration/2017/10/05/u-s-could- lose-an-estimated-20000-teachers-many-bilingual-as- daca-is-phased-out/. Hinojosa said the district employs 68 DACA recipients, "including three dozen teachers." *Id.* Teach for America actively recruits DACA recipients for its corps, noting that these individuals know "first-hand the concerns that undocumented kids face." Teach For Am., *DACA Recipients*, (last visited Oct. 3, 2019), https:// www.teachforamerica.org/how-to-join/eligibility/daca.

**AR5272**

23

**"Schools need to reflect our community."**
Administrators recognize the need for a diverse teaching
staff. Matt Charlton, the superintendent of the Manson
School District in Washington State, said that "students
benefit when they have role models and people teaching
them who come from their background." As a result, his
district is trying to promote Latino para-professionals
to teaching positions because "schools need to reflect our
community." Thomas Ahart, the superintendent of the
Des Moines School District in Iowa, has witnessed the
importance of a "diversity of points of view and different
perspectives informing what happens in our classrooms,"
and that having diverse educators is important so that "all
students see models of success and leadership that look
like them, so they start imagining different possibilities
for themselves."

**"It is so important for students to see themselves
in their educators."** Superintendent Utterback observes
that "students can go thirteen years without experiencing
teachers who look like them." This harms white students
as well, observes Superintendent Utterback since "white
students never experience seeing a person of color in a
professional role." Superintendent Sipe also emphasizes
the importance of having teachers who reflect the student
body. "It is so important for students to see themselves in
their educators . . . so they can see pathways and futures
they did not see before." She reports that the student body
in her district is over 70% Latino, but it does not have
enough Latino educators, although the district actively
pursues Latino candidates. Superintendent Theron
Schutte, of the Marshalltown Community School District
in Iowa, notes that his district is majority minority but the
teaching staff is still predominately white. He explains

**AR5273**

WMA

24

that his district has "great difficulty in hiring high-quality educators who mirror student demographics."

**"Just one less child who felt isolated."** Many DACA educators acknowledge that their background makes them especially important to students, and that they have been drawn to teaching because of their desire to act as role models. Jaime Ballesteros, a California educator with DACA, said that he became a teacher because he knew he could reach immigrant students: "I wanted to amplify the voices of students and families who shared both my story and values. I wanted to ensure that there would be even just one less child who felt isolated and helpless because of his or her immigration status." Ginette Magaña, *DACAmented Teachers: Educating and Enriching Their Communities*, Obama White House: Blog (Aug. 4, 2015), https://obamawhitehouse.archives.gov/blog/2015/08/04/dacamented-teachers-educating-and-enriching-their-communities.

**"A role model who has walked in their shoes."** DACA recipient Karina Alvarez speaks to her students, many of whom are Latino immigrants, about her own experience. Alvarez believes that her students "need to have a role model who has walked in their shoes . . . they need to see that college is in their reach, that it is possible for them to be a teacher or whatever they want to be." A.M.P., from Washington State, also understands the importance of sharing her experience with her students. She teaches in a district where 37.9% of the student body – but only 8.2% of the teaching staff – is Latino. She explains: "something that has always driven me was to be the person you needed growing up." Her school had an assembly where she and other immigrant educators talked to students about how they were able to go to college. She noted that

25

it was "heartwarming" and the children responded "really positively." Angelica Reyes in Los Angeles relates that as an immigrant herself, she is able to "connect very well with students because of experiences in common, something many other teachers lack." This connection supports students' ability to focus on learning rather than becoming distracted and intimidated by public discourse that is "scary, it's in our faces, it's destructive to our families."

### iv.   DHS Failed to Consider How DACA Rescission Would Undermine Student Learning for All Students

Public school administrators report that the rescission of DACA has created an atmosphere of anxiety that makes it more difficult for students to focus on their studies. This anxiety is not limited to students with DACA or those taught by DACA educators.

**"Every single student is affected."** Cindy Marten is the Superintendent of San Diego Unified School District, in which Latino students make up about 45 percent of the student body. The September 5, 2017 announcement of DACA rescission caused great anxiety among San Diego students. "Kids are worried about what's going to happen to them," says Superintendent Marten. While non-immigrant students are, in Superintendent Marten's words, "not afraid of being deported, they're afraid about their best friend or their best friend's mother. Every single student is affected." And for younger children, who often misunderstand their family's status or believe that "immigrant" is synonymous with unauthorized presence in the U.S., the anxiety and fear that they or their authorized relatives are in danger of being deported escalates their anxiety—and that of the classmates

**AR5275**

WMA

26

around them. Randy Capps et al., Migration Pol'y Inst., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature* 6 (2015). Starting with the Rescission Memo and increasing through the present day, uncertainty about DACA has undermined students' ability to learn, regardless of their immigration status. These significant negative impacts of DACA rescission were neither considered nor analyzed by DHS.

**"DACA being rescinded takes away the hope from our students."** Superintendent Utterback says "stress has an impact on academics and behavior," and children's ability to "concentrate, their ability to excel is being hampered because they are worried about their safety and future and that of their family members." The same is true in the Highline Public Schools in Washington State, according to Superintendent Susan Enfield. Maile Valu, a counselor in her district, reports that the "constant uncertainty that our DACA students and our students [and] families without legal status face has caused fear, stress, anxiety, [and] hopelessness." Daniela Laureano Francisco, a family liaison in Highline reports, "DACA being rescinded takes away the hope from our students." Superintendent Schutte has also seen first-hand the effects of increased immigration-related anxiety on children, including a "lack of ability to focus, more frequent absenteeism, and lesser achievement with coursework and on test performance."

The experiences of these administrators are confirmed by academic research. A working paper by the Harvard University Center on the Developing Child found that persistent anxiety can change a child's brain and negatively affect their physical, cognitive, and emotional

**AR5276**

27

development, which in turn impacts their ability to learn effectively in school. Nat'l Sci. Council on the Developing Child, *Persistent Fear and Anxiety Can Affect Young Children's Learning and Development* 5 (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 9, 2010), http://developingchild.harvard.edu/wp-content/uploads/2010/05/Persistent-Fear-and-Anxiety-Can-Affect-Young-Childrens-Learning-and-Development.pdf. The anxiety and stress caused by the threatened termination of DACA impacts students' academic success, professional prospects, and personal well-being.

**"We cannot tell them that everything will be okay."** A superintendent in Long Island, New York notes that since the rescission announcement, he can "definitely sense an increase in anxiety and stress, both for the student who fears that the end of DACA means they have to go back to a country they have not lived in since the age of two; and for documented students, the worry is in wondering if their friend will need to go and leave the U.S." Superintendent Sipe, whose school district is in a rural area and serves primarily Latino students, says "the fear is very real in young students all the way up to high schoolers." Sipe observes that the anxiety "puts educators in a really uncomfortable role because we cannot tell them that everything will be okay because we cannot make promises about things that are out of our control."

**"Students are unable to focus."** Superintendent Aguilar also reports that the Rescission Memo has caused considerable student anxiety. Aguilar observes that this anxiety is "taking a toll on our ability to be able to provide the academic intervention necessary. Students are unable to focus on their academic achievement when they are

**AR5277**

WMA

28

experiencing the kind of trauma, anxiety, and anguish that comes as a result of the ending of DACA." Indeed, more than half of DACA recipients surveyed report thinking about being deported at least once a day and almost 45% think about being detained in an immigration detention facility at least once a day. Wong, *supra* at 10. The repetition of such stark fears, articulated or not, deeply disturbs student learning and family support. Superintendent Charlton notes that in his rural, majority-Latino district, threats to DACA result in a persistent "feeling of angst . . . that translates from families down to the kids . . . which impacts the classroom" and harms children's ability to learn. Superintendent Marten, from San Diego, observes that "as soon as you destabilize your school, you're not delivering the quality of education that children deserve." She emphasized that "the educational outcomes for our students are going to be compromised."

**No "light at the end of the tunnel for these kids."** The Rescission Memo has caused many students to abandon their academic and professional goals as they see carefully crafted plans unravel. Arianna Martinez, an Associate Professor at LaGuardia Community College in New York, teaches many DACA recipients. Those college students' "entire relationship to education and their future" has changed as the students now feel there is no point in obtaining a degree. Through her own academic research, Martinez has found that DACA recipients enrolled in continuing education classes to prepare for college are struggling to envision a way forward. Superintendent Sipe speaks emotionally of a brilliant student who dreams of becoming a pediatrician but may no longer even consider college. She also describes a student with DACA who dropped out of college because of their

**AR5278**

29

disappointment and feeling of "why bother investing [in their education] if it does not do any good." Superintendent Charlton speaks of how DACA gave students "that hope and inspiration to reach higher; to rescind that now is not fair" to his students. Superintendent Schutte expresses his concern that the termination of DACA will lead to a "greater challenge to encourage kids to finish school, a greater challenge to reduce the achievement gap and drop-out rate . . . there is not a light at the end of the tunnel for these kids."

**Kids who "have done everything asked of them."** In Superintendent Utterback's district, "high school counselors and administrators are having conversations with kids who thought they had an avenue for post-secondary education" and now do not know how to plan for the future. "These are really bright kids who have been in the school system for 13 years and have done everything asked of them and now they do not have the same opportunities as their classmates." The DHS decision took none of these reliance interests into account. Hundreds of thousands of "productive young people" who have "contributed to our country in significant ways" see nowhere to go from here.

### CONCLUSION

DHS swept away DACA, together with its recipients' dreams and their communities' needs, in one curt memorandum that failed to provide a reasoned explanation for the agency's drastic change of course. DACA educators, students, and administrators can – and do, here in this brief – attest to the serious reliance interests engendered by DACA, as well as the disastrous results that will

**AR5279**

# Exhibit 10

**Nos. 18-587, 18-588, and 18-589**

# In the Supreme Court of the United States

———————

DEPARTMENT OF HOMELAND SECURITY, ET AL.,
*PETITIONERS*,

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*RESPONDENTS*

———————

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE NINTH CIRCUIT*

———————

**BRIEF OF FORMER SERVICE SECRETARIES,
MODERN MILITARY ASSOCIATION OF AMER-
ICA, AND MILITARY AND VETERAN ADVO-
CACY ORGANIZATIONS AS *AMICI CURIAE* IN
SUPPORT OF RESPONDENTS**

———————

PETER E. PERKOWSKI
Modern Military
  Association of America
P.O. Box 65301
Washington, DC  20035
(202) 328-3244
peter@modermilitary.org

*Counsel for* Amicus Curiae
*Modern Military Association
of America*

CHARLES B. KLEIN
  *Counsel of Record*
CLAIRE A. FUNDAKOWSKI
Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC  20006
(202) 282-5000
cklein@winston.com

*Counsel for* Amici Curiae

Additional Captions and Counsel
Listed on Inside Cover

**AR5668**
**WMAR-00005704**

**TABLE OF CONTENTS**

**Page(s)**

INTERESTS OF *AMICI CURIAE* .............................. 1

STATEMENT ................................................. 5

SUMMARY OF ARGUMENT ...................................... 8

ARGUMENT ................................................. 9

I.   The Government Must Consider Serious Reliance Interests When Changing Existing Policy ..................................... 9

II.  DACA Engendered Serious Reliance Interests on the Part of Non-Citizens Enlisted in the Military, Their Families, and the American People .............................. 11

     A.   Foreign-Born Recruits Are Integral to the U.S. Military and Vital to Its Mission ..................................... 11

     B.   Enlistees Rely on DACA for Eligibility to be Employed by the Military and for a Path to Citizenship .............................. 14

     C.   Enlistees' Families Rely on DACA for the Possibility of Parole in Place or Deferred Action. ............................. 18

     D.   The U.S. Military Relies on Non-Citizens, Including DACA

**AR5670**
**WMAR-00005706**

ii

Recipients, to Protect the American People.....................................................20

III.    The Government Violated the APA When It Rescinded DACA Without Considering Serious Reliance Interests. ..............................29

CONCLUSION .........................................................31

AR5671
WMAR-00005707

11

## II. DACA Engendered Serious Reliance Interests on the Part of Non-Citizens Enlisted in the Military, Their Families, and the American People.

DACA offers more than deferred removal, and the program affects more than its direct beneficiaries. DACA recipients and their families benefit from numerous pre-exiting policies, which they would not have access to but for DACA. DACA recipients are eligible for employment authorization documents, commonly known as work permits, and recipients with specialized medical or linguistic and cultural skills are eligible to enlist through MAVNI. For those who have enlisted, the military offers the opportunity to serve their adopted country and a path to citizenship. This policy keeps families with non-citizens together and, as explained in depth below, offers the possibility of deferred action or parole in place regardless of DACA eligibility.

For the American people, DACA has facilitated the military readiness on which the country depends, such as enabling the military to approach its recruiting and retention goals by leveraging immigrant and minority communities with unique skills vital to the national interest. DACA has promoted these expectations for more than five years.

### A.   Foreign-Born Recruits Are Integral to the U.S. Military and Vital to Its Mission.

The United States has long relied on foreign-born recruits to protect our country. From the Revolutionary War through the 1840s, half of the U.S. military's

**AR5690**
WMAR-00005726

12

recruits were foreign born.[2]   During the Civil War, approximately 300,000 foreign-born members of the military served in the Union Army.  *Ibid.*  These and other foreign-born recruits account for half a million of our country's veterans, more than 700 of whom have received Medals of Honor.  *Ibid.*[3]

Our country's reliance on foreign-born recruits— and specifically, non-citizens—has persisted in recent decades.  Between 1999 and 2010, "some 80,000 non- citizens enlisted across all four services, accounting for 4 percent of all accessions" among the Army, Na- vy, Air Force, and Marine Corps.[4]  As of June 2010 alone, approximately 16,500 non-citizens were active- ly serving in the military.  *Id.* at 39.  Another 5,255 non-citizens first enlisted in the military in 2016.[5]

In light of our military's seasoned reliance on the foreign born, it is not surprising that our Government has repeatedly recognized the importance of non- citizen recruits to the U.S. military.  Nearly two dec-

---

[2] Jie Zong & Jeanne Batalova, *Immigrant Veterans in the United States* (May 16, 2019), https://www.migrationpolicy.org/article /immigrant-veterans-united-states.

[3] *See also* U.S. Citizenship and Immigration Servs., *USCIS Fa- cilities Dedicated to the Memory of Immigrant Medal of Honor Recipients*,  https://www.uscis.gov/about-us/find-uscis-office/uscis

-facilities-dedicated-memory-immigrant-medal-honor-recipients (last updated Jan. 24, 2014).

[4] Dep't of Def., *Population Representation in the Military Ser- vices: Fiscal Year 2010 Summary Report*, at 41, *available at* https://www.cna.org/pop-rep/2010/summary /PopRep10summ.pdf.

[5] Dep't of Def., *Population Representation in the Military Ser- vices: Fiscal Year 2016 Summary Report*, at 41, *available at* https://www.cna.org/pop-rep/2016/summary/summary.pdf.

**AR5691**
**WMAR-00005727**

13

ades ago, President George W. Bush issued an Executive Order creating an incentive for non-citizens to serve in the military in exchange for expedited naturalization. Exec. Order 13,269, 67 Fed. Reg. 45287 (July 3, 2002). Under this program, as of 2018, the U.S. Citizenship and Immigration Services (USCIS) reports that "[s]ince Oct. 1, 2001, USCIS has naturalized 129,587 members of the military."[6] In 2008, the Secretary of Defense authorized the MAVNI program, designed to recruit non-citizens who have skills that are "vital to the national interest," including health care professionals and individuals with specific language and cultural skills. *See* 10 U.S.C. § 504(b)(2).

Most recently, in 2014, the Department of Defense provided a pathway for DACA recipients to enlist in the military under MAVNI.[7] As of September 2017, more than 800 highly skilled DACA recipients were serving in the U.S. military through MAVNI.[8] Many more await final background checks so that they too can begin serving. These DACA recipients, along with other MAVNI service members, possess "critical skills" and are "vital" to protecting the American people.

---

[6] U.S. Citizenship and Immigration Servs., *Military Naturalization Statistics*, https://www.uscis.gov/military/military-naturalization-statistics (last updated Dec. 6, 2018).

[7] Memorandum from Jessica Wright, Undersecretary of Defense for Personnel and Readiness, *Military Accessions Vital to the National Interest Program Changes* (Sept. 25, 2014).

[8] Jonah Bennett, *Pentagon: Fewer Than 900 DACA Recipients Are Currently Serving In The Military* (Sept. 6, 2017), https://stream.org/pentagon-fewer-than-900-daca-recipients-are-currently-serving-in-the-military/.

**AR5692**
**WMAR-00005728**

14

### B. Enlistees Rely on DACA for Eligibility to be Employed by the Military and for a Path to Citizenship.

DACA opened a path for certain non-citizens to obtain work permits and to serve in the military if they possess a "critical skill or expertise" that is both "vital to the national interest" and useful to the armed forces on a daily basis. *See* 10 U.S.C. § 504(b)(2). For example, the military's MAVNI recruiting program targets immigrants with critical medical skills or expertise in certain foreign languages and cultures.[9] The program has recruited 10,400 immigrants from 2008 to 2016.[10,11] In 2016 alone, 359 MAVNI recruits were talented immigrants who could not have participated in the program without DACA.[12]

---

[9] Dep't of Def., MAVNI Fact Sheet, 1, https://dod.defense.gov/news/mavni-fact-sheet.pdf.

[10] U.S. Gov't Accountability Office, *Immigration Enforcement: Actions Needed to Better Handle, Identify, and Track Cases Involving Veterans* 7 (2019).

[11] MAVNI recruiting was indefinitely suspended at the end of fiscal year 2016 pending the implementation of increased security protocols. *See* Dep't of Homeland Security, *MAVNI Program Status for Fiscal Year 2017* (Dec. 2, 2016), https://www.ice.gov/doclib/sevis/pdf/bcm-1612-02.pdf. As discussed below, many MAVNI recruits still await the completion of their background checks so that they can begin serving.

[12] New American Economy, *Outside the Wire: How Barring the DACA-Eligible Population from Enlisting Weakens our Military* (Nov. 8, 2017), https://research.newamericaneconomy.org/report/outside-the-wire-how-barring-the-daca-eligible-population-from-enlisting-weakens-our-military/; *see also* Dep't of Def., MAVNI Fact Sheet, 1.

**AR5693**
**WMAR-00005729**

15

DACA beneficiaries rely on military service to provide a path to citizenship. The United States has long granted citizenship to non-citizens in exchange for their military service. *See* Exec. Order 13,269, 67 Fed. Reg. 45287 (July 3, 2002). By permitting DACA beneficiaries to enlist in the military, the Government has provided them the opportunity to earn citizenship by serving honorably for one year under 8 U.S.C. § 1439(a), or by serving honorably on active duty for a shorter period under 8 U.S.C. § 1440(a).[13] More than 129,000 immigrants earned their citizenship through military service between the attacks on September 11, 2001, and the end of last year. U.S. Citizenship and Immigration Servs., *Military Naturalization Statistics.*

DACA also enables its beneficiaries who have skills vital to the national interest an opportunity to serve in the U.S. military and to become lawful citizens of the country in which they were raised. Beneficiaries wanting to serve and undertake the benefits and responsibilities of citizenship enlisted. After enlisting, they organized their lives around the com-

---

[13] On October 13, 2017, the Department of Defense announced that instead of requiring a single day of active-duty service it would require 180 days before certifying honorable service under 8 U.S.C. § 1440(a). Dep't of Def., *DoD Announces Policy Changes to Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program* (Oct. 13, 2017), https://www.defense.gov/Newsroom/Releases/Release/Article/1342317/dod-announces-policy-changes-to-lawful-permanent-residents-and-the-military-acc/. Citizenship granted under either 8 U.S.C. § 1439 or 8 U.S.C. § 1440 could be revoked if the soldier was "separated from the Armed Forces under other than honorable conditions before the person ha[d] served honorably for a period or periods aggregating five years." 8 U.S.C. §§ 1439(f), 1440(c).

AR5694
WMAR-00005730

16

mitment to hold themselves constantly ready to serve as soon as their background investigations finished.

Rescinding DACA undermines the reliance interests inherent in the life-changing demands of military service, as well as the path to citizenship offered through the MAVNI program. Like all non-citizens—including otherwise lawful permanent residents—DACA beneficiaries who enlisted are unable to begin basic training until their background investigations are completed.[14]  Less than two months before DACA's rescission, NPR reported that more than 4,000 MAVNI recruits were awaiting basic training.[15] Without DACA's protection, DACA recruits awaiting training or who have not served long enough to apply for citizenship will lose their eligibility to participate in MAVNI. They also risk losing their work permits and a range of military employment benefits, including health care, home loans, and educational funds, that generally vest only after a recruit begins or completes a specified term of active-duty service. *See* 38 U.S.C. §§ 3311, 3702; 32 C.F.R. § 199.3. In addition to threatening enlistees' ability to access these benefits, DACA's rescission even threatens enlistees with the prospect of being deported.

This threat was not eliminated by the grandfathering provisions in the DACA rescission memorandum. DHS announced that it would not terminate previously issued deferred action determinations or

---

[14] *See* Dep't of Def., *DoD Announces Policy Changes to Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program* (Oct. 13, 2017).

[15] Tom Bowman, *Citizenship For Military Service Program Under Fire*, NPR (July 11, 2017), https://www.npr.org/2017/07/11/536630223/citizenship-for-military-service-program-under-fire.

**AR5695**
**WMAR-00005731**

17

work permits based on the rescission. *Regents* Pet. App. 118a. It also announced that, if requested within 30 days, it would consider a one-time renewal of DACA benefits for individuals whose periods of deferred action were set to expire within 180 days. *Ibid.* But DACA benefits last only two years. *Regents* Pet. App. 99-100a. Military background checks take up to three. *See* 10 U.S.C. § 513(b)(1)-(3). This means that DACA beneficiaries face a very real prospect that they will lose their DACA benefits before obtaining background clearance, getting scheduled for training, and freeing themselves of the need for DACA by completing the term of service necessary to obtain citizenship.[16]

This fear of deportation after DACA's rescission is not merely hypothetical. A recent report by the Government Accountability Office states that DHS has a system of policies in place for deporting veterans—and that the protections the system offers are not consistently observed. U.S. Gov't Accountability Office, *Immigration Enforcement*, 10-12. Although the data is incomplete, available records show that "approximately 250 veterans were placed in removal proceedings or removed from the United States from fiscal years 2013 through 2018." *Id.* at 16. At the

---

[16] *See, e.g.*, Alex Horton, *The military looked to 'dreamers' to use their vital skills. Now the U.S. might deport them.*, Washington Post (Sept. 7, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them/ (reporting on plight of recruits like Zion Dirgantara, a MAVNI recruit awaiting the completion of his background check who came to the United States at the age of 12, did not know he lacked lawful status until he applied for a driver's license, and now finds himself alongside "hundreds of others in a race against time to avoid deportation back to now unfamiliar nations").

AR5696
WMAR-00005732

18

time of the study, about 115 of them had been ordered removed and only 25 had been granted relief or protection from removal. *Ibid.* Recruits who have not served are likely to receive less favorable treatment. Some have already fled the country to avoid deportation to countries where they believe their lives would be in danger.[17]

### C.   Enlistees' Families Rely on DACA for the Possibility of Parole in Place or Deferred Action.

Enlistees' families also have relied on DACA. In addition to families' general interest in policies that protect their relatives from deportation—and consequently keep families together—DACA grants family members access to additional benefits as well.

USCIS offers consideration for parole in place or deferred action to the families of service men and women, with the goal of "[f]acilitating military morale and readiness and supporting DoD recruitment policies." U.S. Citizenship and Immigration Services, *Adjudicator's Field Manual*, Chapter 21.1(c). Parole in place is a one-year period of authorization to stay in the United States, subject to extensions as appropriate. *Id.* at Chapter 21.1(c)(1).

---

[17] Alex Horton, *Foreign-born recruits, promised citizenship by the Pentagon, flee the country to avoid deportation*, Washington Post (July 17, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/07/17/foreign-born-recruits-promised-citizenship-by-the-pentagon-flee-the-country-to-avoid-deportation/ (telling story of Ranj Rafeeq, an Iraqi Kurd who translated for the U.S. military in 2005 and came to the United States in 2012 hoping to join the Army after earning a graduate degree in civil engineering but who fled to Canada in fear that his path to citizenship would fail and that he would become a target of the Islamic State if deported to Iraq).

**AR5697**
**WMAR-00005733**

19

Although a grant of parole in place is discretionary, the fact that an immediate family member serves in the U.S. military "ordinarily weighs heavily in favor of parole in place," so that a grant of parole in place is generally appropriate absent a criminal conviction or other serious adverse factors. *Ibid.* Parole in place is available only to individuals who are not lawfully admitted to the United States. *Ibid.* Parolees are eligible to apply for work permits during the period of their parole. *Ibid.*

Deferred action for family members of service members is similar to parole in place, but it is available only to individuals who have been lawfully admitted to the United States and have overstayed their authorized period of admission. *Id.* at Chapter 21.1(c)(2)(A). Deferred action is available in two-year increments and, like parole in place, makes the recipient eligible to apply for work permits. *Id.* at Chapter 21.1(c)(2)(C). Deferred action determinations are "case-by-case, discretionary judgments based on the totality of the evidence." *Id.* at Chapter 21.1(c)(2)(A).

Although being an immediate family member of a MAVNI recruit or other enlistee awaiting basic training is no guarantee of deferred action, it is considered a strong positive factor. *Ibid.* On the other hand, USCIS may terminate any period of deferred action awarded to the family members of an enlistee awaiting basic training who later becomes disqualified from military service. *Ibid.*

As explained above, DACA's rescission placed enlistees at risk of becoming disqualified for employment and for participation in MAVNI. In so doing, it also placed family members of enlistees at risk of losing their work permits and even of being deported.

**AR5698**
**WMAR-00005734**

20

This is true not only of family members who are direct beneficiaries of DACA, but also of family members who are beneficiaries of parole in place or of deferred action for families of service men and women. As the USCIS Adjudicator's Field Manual notes, "the family members of such recruits often lose their lawful statuses because their statuses depend on those of the recruits." *Ibid.*

Immigrant families have sacrificed for the United States by supporting their relatives in enlisting for military service. They have counted on staying together and earning a living while their relatives were on duty. Whether directly or indirectly, they relied on DACA—and their reliance interests are serious.

### D. The U.S. Military Relies on Non-Citizens, Including DACA Recipients, to Protect the American People.

The serious consequences of DACA's rescission extend to the American people, who rely on having a strong, ready military to promote and defend U.S. national interests. Unraveling DACA will negatively affect the military's ability to recruit and retain highly qualified service members, which in turn jeopardizes the protection of the American people.

1. The American people rely on a strong, ready U.S. military to promote and defend U.S. national interests. One critical component of a strong military is ensuring that the military is able to recruit and retain enough soldiers, sailors, airmen, Marines, and coast guardsmen to meet the myriad of challenges these men and women are asked to tackle every day. As a result, meeting annual accession goals is a critical component of ensuring military readiness.

**AR5699**
**WMAR-00005735**

21

In recent years, the U.S. military, and by extension its largest branch, the U.S. Army, has "struggl[ed] to find candidates who meet [its] requirements."[18]   Because only 30% of potential recruits qualify to join the military, in 2017, the U.S. Army Recruiting Command was "forced to lower its recruiting standards in hopes of reaching its goal of 80,000 new soldiers."  *Ibid.*  In 2016, 1.6% of Army recruits placed in the bottom third of military exams, *ibid.*—scores that typically lead the Army to deny enlistment—  and only 56% of Army recruits were deemed "high-quality personnel."  Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2016 Summary Report*, at 3, 17.  Yet as difficulties with military recruitment have risen, Congress has directed the Army to increase its number of active-duty soldiers.  Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018).

DACA recipients do not just add necessary numbers to the U.S. military; they also bring necessary skills.  As a statutory prerequisite to enlistment as non-citizens without green cards, each of the hundreds of DACA recipients enlisted in the military must possess "critical skill[s] . . . vital to the national interest."  10 U.S.C. § 504(b)(2).  These and other MAVNI recruits serve an important role in the military's ability to protect the American people.  As explained by Air Force Maj. Carla Gleason, a Pentagon spokeswoman, "the unique skill sets these individuals bring is one of the reasons the U.S. military is the

---

[18] Eric Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018), https://thehill.com/opinion/national-security/367839-immigration-reform-an-army-recruitment-opportunity.

AR5700
WMAR-00005736

22

world's premier fighting force."[19]   Former Secretary of the Army Eric Fanning has likewise explained that MAVNI recipients serve an important role in forming "a skilled, diverse military force with high levels of integrity that can adapt to today's emerging threats." Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018).  Removing protections for these vital service members and subjecting such service members to discharge runs counter to American interests in protecting our country.

Research and practice have confirmed that noncitizen service members, such as DACA recipients, meet critical needs for the military.  As the Center for Naval Analyses (CNA) observed, "noncitizens are [] an attractive recruiting resource" because "a substantial share of the recruitable U.S. non-citizen population comes from diverse backgrounds and potentially possesses language and cultural skills that are of strategic interest to the U.S. military."[20]  Recognizing the importance of such language and cultural skills, Former Secretary of the Air Force Deborah Lee James emphasized, "diversity of background, experience, demographics, perspective, thought and even organization are essential to our ultimate success."[21] Former Secretary of the Navy Ray Mabus echoed this

---

[19] Lolita Baldor, *Problems for Pentagon's immigrant recruit program*, AP NEWS (Sept. 30, 2018), https://www.apnews.com /84530d3799004a0a8c15b3d11058e030.

[20] Molly F. McIntosh et al., *Non-Citizens in the Enlisted U.S. Military*, at 57 (Nov. 2011), *available at* https://www.cna.org /CNA_files/PDF/D0025768.A2.pdf.

[21] Memorandum from Deborah Lee James, Secretary of the Air Force, Air Force Diversity & Inclusion (Mar. 4, 2015), *available at* https://www.af.mil/Portals/1/documents/SECAF /FINALDiversity_Inclusion_Memo1.pdf.

**AR5701**
**WMAR-00005737**

23

sentiment, explaining "[a] more diverse force is a stronger force."[22]  As succinctly stated by Secretary Fanning, "[o]ur nation's military is stronger when it reflects the diversity it aims to defend."  Fanning, *Immigration reform: An Army recruitment opportunity* (Jan. 8, 2018).  Today, the military continues to target recruits who are "more diverse linguistically and culturally than citizen recruits . . . [because they are] particularly valuable as the U.S. faces the challenges of the Global War on Terrorism."[23]

CNA projects that non-citizens likely will play a crucial role in meeting recruitment goals in coming years, and thus recommends that "the services should develop strategies to recruit non-citizens more effectively."  McIntosh et al., *Non-Citizens in the Enlisted U.S. Military*, at 2 (Nov. 2011).  Notably, "non-citizen recruits are significantly and substantially less likely than citizen recruits to attrite in the first term."  *Ibid.*  After three years, "attrition rates for non-citizens are between nine and 20 percentage points lower than those for white citizens, the largest demographic group in the military."  Air Force News, *The U.S. Military Helps Naturalize Non-Citizens* (2019).  Other analysts have similarly estimated that the attrition rate for non-citizens is more than 10% lower than for

---

[22] Chief of Naval Personnel Public Affairs, SECNAV Releases Updated Diversity, Inclusion Policy Statement (Feb. 25, 2016), *available at* https://www.navy.mil/submit/display.asp?story_id=93282.

[23] Air Force News, *The U.S. Military Helps Naturalize Non-Citizens* (2019), https://www.military.com/join-armed-forces/eligibility-requirements/the-us-military-helps-naturlize-non-citizens.html.

**AR5702**
**WMAR-00005738**

24

citizens, "meaning that noncitizens are more likely to serve in the military for extended periods of time."[24]

The Department of Defense's data has reinforced the significance of the American people's interest in the military's ability to recruit and retain noncitizens, including DACA recipients.  In 2016, the Department of Defense reported that "the majority of non-citizen [non-prior service] accessions are high-quality recruits, with Tier 1 education credentials and an [Armed Forces Qualification Test] score in the top 50 percentiles."  Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2016 Summary Report*, at 42.  In the Army, the Department of Defense observed that 4.8% of accessions in 2016 were non-citizens, and "[a] higher percentage of non-citizen accessions in the Army were high quality compared to citizen accessions (66 percent versus 54 percent)."  *Id.* at 41-42.  That same year, hundreds of DACA recipients newly enlisted in the Army.  New American Economy, *Outside the Wire: How Barring the DACA-Eligible Population from Enlisting Weakens our Military* (Nov. 8, 2017).

The military's reliance on programs such as DACA to protect the American people is not limited to those DACA recipients who currently serve in the military.  Analysts have estimated that the military could target many more DACA recipients to improve military readiness.  Of the 45 languages the military has deemed "vital to military success," the New American Economy estimated that "[m]ore than 169,000 mem-

---

[24] Muzaffar Chishti, et al., *Immigrants in the Military: Evolving Recruitment Needs Can Accommodate National Security Concerns* (May 2019), https://www.migrationpolicy.org/sites/default/files/publications/MPI-Noncitizens-Military-Final.pdf.

AR5703
WMAR-00005739

25

bers of the DACA-eligible population—or more than one in seven of them—speak one of these languages at home." *Ibid.* This organization further concluded that "a substantial portion of the DACA-eligible population has language or workforce training that could help address the military's recruitment challenges." *Ibid.* The authors thus concluded that "[t]here is a strategic advantage to having [DACA recipients] serve in the military, as they will have cultural and linguistic expertise which could be of critical importance." *Ibid.*

Unraveling of DACA protections will likely dissuade these many qualified recipients from enlisting in the military due to the lengthy delays in accession and uncertainty surrounding shipment dates, making it difficult for the military to meet its recruiting goals. Upon rescission of DACA, the military is likely to find that a large number of potential high-quality recruits are ineligible for accession or have left the United States. Thus, a policy with the stated goal of improving the country's national security is likely to undermine that goal by impairing military readiness.

2. In addition to recruitment and retention, another key component of a strong military is morale. As precedent has shown in other contexts, however, ignoring the reliance interests of DACA recipients could significantly damage the relationship of currently serving DACA recipients to the military, undermining their morale and negatively impacting unit cohesion, thus curbing the military's ability to recruit and retain additional non-citizens and immigrants unaffected by DACA.

For example, history has shown that discriminatory policies such as Don't Ask Don't Tell (DADT)—

**AR5704**
**WMAR-00005740**

# Exhibit 11

Nos. 18-587, 18-588, and 18-589

In The
# Supreme Court of the United States

━━━━━━━━━━◆━━━━━━━━━━

DEPARTMENT OF HOMELAND SECURITY, et al.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,

*Respondents.*

━━━━━━━━━━◆━━━━━━━━━━

DONALD J. TRUMP, President of the United States, et al.,

*Petitioners,*

v.

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, et al.,

*Respondents.*

━━━━━━━━━━◆━━━━━━━━━━

KEVIN K. MCALEENAN,
Acting Secretary of Homeland Security, et al.,

*Petitioners,*

v.

MARTIN JONATHAN BATALLA VIDAL, et al.,

*Respondents.*

━━━━━━━━━━◆━━━━━━━━━━

**On Writs Of Certiorari To The
United States Courts Of Appeals For The Ninth,
District Of Columbia, And Second Circuits**

━━━━━━━━━━◆━━━━━━━━━━

**BRIEF OF TEACH FOR AMERICA, INC.
AS *AMICUS CURIAE* IN SUPPORT OF
RESPONDENTS AND AFFIRMANCE**

━━━━━━━━━━◆━━━━━━━━━━

HARVEY L. ROCHMAN
ESRA A. HUDSON
MICHAEL E. OLSEN
MARIO CARDONA
MANATT, PHELPS
  & PHILLIPS, LLP
11355 W. Olympic Blvd.
Los Angeles, CA 90064

RONALD G. BLUM
  *Counsel of Record*
JULIAN POLARIS
MANATT, PHELPS
  & PHILLIPS, LLP
7 Times Square
New York, NY 10036
(212) 830-7186
rblum@manatt.com

━━━━━━━━━━━━━━━━━━━━

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

**AR5579**

i

## TABLE OF CONTENTS

Page

INTEREST OF *AMICUS CURIAE* ........................ 1

INTRODUCTION AND SUMMARY OF ARGU-
MENT ................................................................. 2

ARGUMENT .......................................................... 6

I.   THE APA REQUIRES AN AGENCY TO
     CONSIDER "SERIOUS RELIANCE IN-
     TERESTS" WHEN IMPLEMENTING A
     POLICY CHANGE ...................................... 6

II.  DACA HAS ENGENDERED SERIOUS RE-
     LIANCE INTERESTS IN TEACH FOR
     AMERICA, TEACHERS, SCHOOLS, AND
     STUDENTS ................................................. 7

     A.   DACA Freed Undocumented Young Peo-
          ple to Pursue Productive Lives ............ 7

          1. Alejandro Fuentes Mena ................. 9

          2. Marissa Molina ................................ 10

          3. Vanessa Luna ................................... 10

          4. Erik Kwak ....................................... 11

          5. Denise Panaligan ............................ 12

          6. Miriam Gonzalez Avila .................... 13

     B.   DACA Teachers Provide Special Value to
          Students, Schools, and Communities ..... 14

          1. Teacher Diversity Redresses Achieve-
             ment Gaps and Promotes Positive Stu-
             dent Outcomes .................................. 15

**AR5580**

ii

TABLE OF CONTENTS – Continued

                                                        Page

        2.  Excellent Teachers Offer Great Value,
            Especially in Teacher Shortage Ar-
            eas ....................................................   17

    C.  Teach For America Has Expended Con-
        siderable Resources Recruiting and Sup-
        porting Talented DACA Teachers .........   19

III.   THE DEPARTMENT ACTED ARBITRAR-
       ILY AND CAPRICIOUSLY BY RESCIND-
       ING  DACA  WITHOUT  CONSIDERING
       SERIOUS RELIANCE INTERESTS ..........   22

CONCLUSION ....................................................   25

**AR5581**

14

Dedicated educators inspired these young people to pursue higher education. Yet their limited post-college prospects nearly stifled that inspiration. DACA brought hope and created a legal path to previously unattainable goals. Their government offered an opportunity and they made the most of it, hoping to give back to the nation that had given them so much. As five former Secretaries of Education explained, rescinding DACA would "violate a promise our nation made to these earnest young people."[4]

### B. DACA Teachers Provide Special Value to Students, Schools, and Communities

Fuentes, Molina, Luna, Kwak, Panaligan, and Gonzalez exemplify the "outstanding and diverse leaders" that Teach For America places in low-income communities, where they "confront both the challenges and joys of expanding opportunities for kids."[5] Teach For America requires strong academic records and leadership skills, attributes often found in DACA students who engage in advocacy and awareness campaigns around immigration issues on campus, in the public square, and in the halls of government. Moreover,

---

[4] Arne Duncan et al., Bipartisan Letter to Congress from Former Education Secretaries at 2, https://www.politico.com/f/?id=0000015e-5b9c-db52-a75e-dffded380001 (last accessed Sept. 29, 2019); *see also ibid.* ("We must not, we cannot, let these children down. The stakes are too high for them and for the future of our country.").

[5] Teach For America, *What We Do*, https://www.teachforamerica.org/what-we-do (last accessed Sept. 29, 2019).

**AR5600**

15

DACA enables Teach For America to recruit and part-
ner with teachers who reflect the diverse demographics
in school systems across the country, thereby advanc-
ing Teach For America's mission in unique and power-
ful ways.

**1. Teacher Diversity Redresses Achieve-
ment Gaps and Promotes Positive Stu-
dent Outcomes**

Undocumented youth are a vulnerable group: com-
pared to their U.S.-born peers, they are five times less
likely to finish high school, and those who enroll in col-
lege are far less likely to graduate.[6] Black and Hispanic
students, too, continue to lag behind on standardized
test scores, discipline records, and high school gradua-
tion rates.[7]

A growing body of research shows that diversity
among educators plays a powerful role in closing these
achievement gaps, in addition to "providing social ad-
vantages for all students."[8] Diverse teachers "break[]

_____

[6] Zenen Jaimes Pérez, _Removing Barriers to Higher Educa-
tion for Undocumented Students_, Ctr. Am. Progress 8–9 (Dec. 2014),
https://cdn.americanprogress.org/wp-content/uploads/2014/12/Undoc
HigherEd-report2.pdf.

[7] _Status and Trends in the Education of Racial and Ethnic
Groups 2017_, Nat'l Ctr. Educ. Statistics, U.S. Dep't Educ., at iii–v
(July 2017), https://nces.ed.gov/pubs2017/2017051.pdf.

[8] _The State of Racial Diversity in the Educator Workforce
2016_, U.S. Dep't Educ., at 2 (July 2016), https://eric.ed.gov/
?id=ED571989; _see also_ Anna J. Egalite & Brian Kisida, _The Ef-
fects of Teacher Match on Students' Academic Perceptions and At-
titudes. Educational Evaluation and Policy Analysis_, 40 Rev. Res.

**AR5601**

16

down negative stereotypes" and serve as "positive role models" in different ways to different students.[9] Teachers who share demographic traits with their students help upend the tyranny of low expectations, diffuse conflicts that can lead to disciplinary action, and inspire students to be their best selves.

DACA teachers add to the diversity of Teach For America's corps in many ways, including language fluency, national origin, socioeconomic status, race, and ethnicity. Their lived experience as undocumented immigrants is uniquely valuable to the 80,000 DACA-eligible undocumented children who turn 18 each year.[10] A "teacher is often the first adult an undocumented student will ask for help" in overcoming obstacles and planning their future, as the experiences of Fuentes, Molina, Luna, Kwak, Panaligan, and Gonzalez demonstrate.[11] DACA teachers "know first-hand the concerns that undocumented kids face."[12]

---

Educ. 59 (2018); Constance A. Lindsay & Cassandra M. D. Hart, *Exposure to Same-Race Teachers and Student Disciplinary Outcomes for Black Students in North Carolina*, 39 Rev. Res. Educ. 485 (2018); Stephen B. Holt & Nicholas W. Papageorge, *Who Believes in Me? The Effect of Student–Teacher Demographic Match on Teacher Expectations*, Econ. Educ. Rev., Vol. 52, Issue C, at 209 (2016); Anna J. Egalite et al., *Representation in the Classroom: The Effect of Own-Race Teachers on Student Achievement*, Econ. Educ. Rev., Vol. 45, Issue C, at 44 (2015).

[9] *The State of Racial Diversity*, *supra* n.8, at 1.

[10] Jaimes, *supra* n.6, at 8.

[11] *DACA Recipients*, Teach For America, https://www.teachfor america.org/how-to-join/eligibility/daca (last accessed Sept. 29, 2019).

[12] *Ibid.*

**AR5602**

17

DACA teachers' impact does not stop at the door to the classroom, however; they also pass their specialized knowledge to their peers. Teach For America's DACA Advisory Board encouraged the organization to prepare *all* corps members for the unique needs of undocumented students. With the organization's support and coordination, undocumented corps members and alumni worked to develop and implement a training program for the more than 3,000 teachers who join Teach For America each year.

### 2. Excellent Teachers Offer Great Value, Especially in Teacher Shortage Areas

Teach For America's commitment to excellence in hiring supports educational equality for all students. DACA teachers' backgrounds and skills, enhanced with two years of training and experience as Teach For America corps members, lay the foundation for a lifetime commitment to education and advocacy. The White House's "Champions of Change" series, for example, recognized nine "DACAmented teachers" as "extraordinary educators"; five of the nine were Teach For America corps members or alumni.[13]

These wonderful teachers are especially valuable in the growing number of school districts that face teacher shortages. A 2016 study found a nationwide deficit of approximately 64,000 teachers, and predicted

---

[13] *Champions of Change: Dacamented Teachers*, The White House, https://obamawhitehouse.archives.gov/champions/dacamented-teachers (last accessed Sept. 29, 2019).

**AR5603**

18

an annual teacher shortage of 112,000 in 2018.[14] Those shortages will only increase if America loses the estimated 9,000 education professionals who currently benefit from DACA's protection.[15]

Teach For America recruits corps members to serve in high-need, hard-to-staff schools with high concentrations of low-income students. The DACA corps members are no different, and help to fill crucial needs in these communities. Since 2014, for example, Teach For America has placed more than a quarter of its DACA corps members into science, technology, engineering, and math ("STEM") subjects that represent teacher shortage areas in almost every state in the country.[16] Most states also report shortages of bilingual teachers, or specialists in teaching English Learners or teaching other languages.[17] DACA teachers fill those needs, too, by virtue of their native language

---

[14] Leib Sutcher et al., *A Coming Crisis in Teaching? Teacher Supply, Demand, and Shortages in the U.S.*, Learning Pol'y Inst. 1 (2016), https://learningpolicyinstitute.org/sites/default/files/product-files/A_Coming_Crisis_in_Teaching_REPORT.pdf.

[15] Jie Zong et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Pol'y Inst. 2 (Nov. 2017), https://www.migrationpolicy.org/research/profile-current-daca-recipients-education-industry-and-occupation.

[16] All states other than Kansas and Ohio identified a STEM subject as a teacher shortage area. *See Teacher Shortage Areas*, U.S. Dep't of Educ., https://tsa.ed.gov; *see also* Sutcher et al., *supra* n.14, at 10–11 (discussing STEM teacher shortages in prior school years).

[17] *See Teacher Shortage Areas*, *supra* n.16; Sutcher et al., *supra* n.14, at 11.

**AR5604**

19

proficiencies and their experiences learning English as
an additional language.

Teachers are the lifeblood of a well-functioning
school system. Districts around the country rely on
Teach For America corps members, and the members'
commitment to teach at least two years. That reliance
is especially pronounced in hard-to-staff schools and
subject areas, where each additional loss worsens a
growing crisis.

### C.  Teach For America Has Expended Con-
    siderable Resources Recruiting and Sup-
    porting Talented DACA Teachers

When President Obama announced DACA in
2012, Teach For America immediately recognized the
policy's potential to promote the organization's mission
of advancing educational equality. Teach For America
hired staff, built administrative infrastructure, and
raised funds to recruit DACA recipients and support
them during their two years of service and beyond.

One prominent example is the financial award
available to Teach For America corps members who
complete their two-year commitment. Most corps mem-
bers are eligible for federal education awards to pay
down student debt or pursue additional education.[18]

_____

[18] Teach For America is the largest grantee of the Corpora-
tion for National and Community Service, which administers the
AmeriCorps program. Like all AmeriCorps volunteers, Teach For
America corps members who serve a two-year term are eligible
for a Segal AmeriCorps Education Award to pay for student loans

**AR5605**