**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
|        Plaintiffs, | ) |
| | ) |
|   v. | )  Case No. 1:18-CV-68 |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
|        Defendants, | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
|        Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
|        Defendant-Intervenor. | ) |

## APPENDIX

## VOLUME II: EXHIBITS 12-20

Pursuant to this Court's Civil Procedures, Rule 9, Defendant-Intervenor State of New Jersey hereby provides the Court with the following table of contents and copies of the documents and authorities cited in its Opposition to Plaintiffs' Motion for Summary Judgment:

| Ex. | Description | Page |
|---|---|---|
| | **VOLUME I** | |
| 1. | Memo. from Chad Wolf, Acting Sec'y of Homeland Sec., to Mark Morgan, Senior Official Performing Duties of Comm'r, U.S. Customs & Border Prot., et al. (July 28, 2020) | NJAPP001 |
| 2. | Memo. from Joseph Edlow, USCIS Associate Director, to Associate Directors and Program Office Chiefs (Aug. 21, 2020) | NJAPP010 |
| 3. | Excerpts from Federal Defendants' Objections and Responses to Defendant-Intervenors' Fifth and Sixth sets of discovery requests (Sept. 30, 2020) | NJAPP021 |
| 4. | Federal Defendants' Responses to Interrogatory No. 15 (Sept. 30, 2020) | NJAPP030 |

| 5. | Email from Victoria Palmer, USCIS Media Affairs Division, and attached Response to Query guidance document (Aug. 24, 2020) | NJAPP037 |
|---|---|---|
| 6. | Email from Brandon Robinson, USCIS Adjudications Officer (Policy), "Re: DACA Filings After 9/5/17 – No Prior Grant of DACA" | NJAPP047 |
| 7. | Email from Brandon Robinson, USCIS Adjudications Officer (Policy), "DACA Filings After 9/5/17 – No Prior Grant of DACA" (Apr. 26, 2019) | NJAPP049 |
| 8. | Email from Victoria Umoru, USCIS Adjudications Officer (Policy), "Implementing the DACA Memo issued by USCIS Deputy Director for Policy Joseph Edlow" (Aug. 22, 2020) | NJAPP052 |
| 9. | Excerpt from Brief of the National Education Association and National PTA as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP056 |
| 10. | Excerpts from Brief of Former Service Secretaries, Modern Military Association of American, and military and veteran advocacy organizations as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP075 |
| 11. | Excerpt from Brief of Teach for America, Inc., as amicus curiae in support of Respondents in *DHS v. Regents* | NJAPP094 |
| | **VOLUME II** | |
| 12. | Excerpts from Brief of Association of American Medical Colleges et. al., as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP104 |
| 13. | Excerpt from Brief of Lawyers' Committee for Civil Rights Under Law, the Anti-Defamation League, the Leadership Conference on Civil and Human Rights, and 42 other social justice organizations as amici curiae in support of Respondents in *DHS v. Regents* | NJAPP125 |
| 14. | Excerpt from Brief of 143 U.S. business associations and companies as amici curiae in support of respondents in *DHS v. Regents* | NJAPP133 |
| 15. | Excerpt from Brief of 127 religious organizations as amici curiae in support of respondents in *DHS v. Regents* | NJAPP142 |
| 16. | *Nikko Trading of Am. Corp. v. Wastemasters, Inc.*, No. 98-48, 2000 WL 284190 (N.D. Tex. Mar. 14, 2000) | NJAPP150 |
| 17. | Declaration of Khristina Gonzalez | NJAPP154 |
| 18. | Declaration of Jack C. Chen | NJAPP166 |
| 19. | Declaration of Maria Hernandez | NJAPP181 |
| 20. | Declaration of Elzbieta Wojtylo | NJAPP186 |
| | **VOLUME III** | |
| 21. | Declaration of James "Ike" Brannon | NJAPP192 |
| 22. | Declaration of Meg Wiehe | NJAPP340 |

Dated: November 6, 2020

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Mayur P. Saxena*
Assistant Attorney General
(admitted pro hac vice)
124 Halsey St., 5th Floor
Newark, New Jersey 07101
PO Box 45029-5029
Phone: (973) 648-3283
Fax: (973) 648-4887
Mayur.Saxena@law.njoag.gov

Melissa Medoway, Deputy Attorney General
(admitted pro hac vice)
Eric Apar, Deputy Attorney General
(admitted pro hac vice)
Elspeth Hans, Deputy Attorney General
(admitted pro hac vice)
Tim Sheehan
(admitted pro hac vice)
*Attorneys for Defendant-Intervenor State of*
*New Jersey*

# Exhibit 12

Nos. 18-587, 18-588, and 18-589

IN THE

# Supreme Court of the United States

————

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners,*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

————

**On Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

————

**BRIEF FOR AMICI CURIAE
ASSOCIATION OF AMERICAN
MEDICAL COLLEGES, ET AL.,
IN SUPPORT OF RESPONDENTS**

————

HEATHER J. ALARCON
FRANK R. TRINITY
ASSOCIATION OF
  AMERICAN MEDICAL
  COLLEGES
655 K Street N.W.
Suite 100
Washington, D.C 20001
(202) 478-9939

JONATHAN S. FRANKLIN
  *Counsel of Record*
DAVID KEARNS
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street, N.W.
Washington, D.C. 20001
(202) 662-4663
jonathan.franklin@
  nortonrosefulbright.com

*Counsel for Amici Curiae*

Additional Captions Listed on Inside Cover

**AR5431**
**WMAR-00005467**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES....................................iii

INTEREST OF AMICI CURIAE ..............................1

SUMMARY OF THE ARGUMENT...........................2

ARGUMENT ...............................................6

   I. AGENCIES CANNOT CHANGE POLICIES WITHOUT FAIRLY ADDRESSING RELIANCE INTERESTS.......................................6

  II. LOSS OF DACA STATUS FOR HEALTH CARE TRAINEES AND PROFESSIONALS WOULD NULLIFY SUBSTANTIAL INVESTMENTS MADE BY SCHOOLS, OTHER INSTITUTIONS, AND RECIPIENTS, TO THE PUBLIC'S SIGNIFICANT DETRIMENT...................................8

     A. Recipients Depend On DACA For Their Work Eligibility..........................8

     B. Medical Schools, Teaching Hospitals, And Other Educational And Health Care Institutions Expended Vast Amounts Of Time, Money, And Other Resources In Reliance On DACA............................10

     C. DACA Recipients Relied On Their Eligibility To Work When They Decided To Invest Their Own Time, Effort, And Resources In A Health Care Career ...................14

**AR5433**
**WMAR-00005469**

ii

TABLE OF CONTENTS—Continued

Page

D.   Rescinding DACA Will Nullify These Investments And Worsen A Shortage Of Health Care Professionals In The United States ................................................... 16

III. THE GOVERNMENT ACTED ARBITRARILY AND CAPRICIOUSLY IN FAILING TO TAKE ACCOUNT OF ANY OF THESE AND OTHER SERIOUS RELIANCE INTERESTS ........... 24

CONCLUSION ........................................................ 27

AR5434
WMAR-00005470

2

**American Medical Association, American Medical Student Association, American Nurses Association, American Psychiatric Association, American Public Health Association, American Society of Hematology, American Society of Nephrology, American Thoracic Society, Association of Academic Health Centers, Association of American Indian Physicians, Association of Schools and Programs of Public Health, Association of Schools of Allied Health Professions, Association of University Programs in Health Administration, California Medical Association, Council on Social Work Education, Greater New York Hospital Association, National Council of Asian Pacific Islander Physicians**, **National Hispanic Medical Association, National Medical Association, Physician Assistant Education Association, Pre-Health Dreamers, and Society of General Internal Medicine.** Additional information regarding these organizations is provided in the Addendum to this brief.

## SUMMARY OF THE ARGUMENT

The law is clear that the government cannot rescind a longstanding policy without, at a minimum, seriously considering the reliance interests that would be disrupted by such a change in course. Yet in this case, the government failed to make any serious effort to consider any of the substantial reliance interests affected by the rescission of the Deferred Action for Childhood Arrivals ("DACA") program.

This is particularly true with respect to the health care sector, for which the avoidance of unnecessary harm is a guiding principle. At this moment, an estimated 27,000 health care workers and support

**AR5443**
**WMAR-00005479**

3

staff depend on DACA for their authorization to work in the United States.[2]  Among those 27,000 are nurses, dentists, pharmacists, physician assistants, home health aides, technicians, and others.  *Id.*

The number also includes nearly 200 medical students, medical residents, and physicians who depend on DACA for their eligibility to practice medicine.  If those trainees and physicians retain their work eligibility, each will care for an average of between 1,533 and 4,600 patients a year.[3]  Together, over the course of their careers, they will touch the lives of 1.7 to 5.1 million U.S. patients.[4]

---

[2] Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Am. Progress (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/ (estimates based upon occupations under health care practitioners and technical occupations and health care support from the University of Minnesota's Integrated Public Use Microdata Series (IPUMS) USA 2017 American Community Survey occupational classification data).

[3] The Physicians Found., *2018 Survey of America's Physicians* at 57 (2018), https://physiciansfoundation.org/wp-content/uploads/2018/09/physicians-survey-results-final-2018.pdf (data indicating physicians see 20 patients per day on average, and work 230 days per year); Mark Murray et al., *Panel Size: How Many Patients Can One Doctor Manage?*, Family Practice Mgmt. at 47 (April 2007), https://www.aafp.org/fpm/2007/0400/p44.pdf (data indicates each patient is seen by their doctor one to three times a year).

[4] This calculation is based on 14.3% of patients being new patients during any given year, *see* Nat'l Ctr. for Health Stat., Ctr. for Disease Control, *National Ambulatory Medical Care Survey: 2016 National Summary Tables* (2016), https://www.cdc.gov/nchs/data/ahcd/namcs_summary/2016_namcs_web_tables.pdf, and an average career length of 35 years,

**AR5444**
**WMAR-00005480**

4

If DACA is rescinded, however, almost none of these people will be able to serve the American public in their chosen fields. This action would therefore nullify the substantial and long-term investments that DACA recipients, educational institutions, and the public have made in educating and training those recipients to provide needed health care services to the Nation. Their loss will have potentially devastating effects. It can take a decade or more to educate and train a new physician. As health care professional institutions and organizations, *amici* know that the resources to competently train capable physicians, nurses, and other medical and public health professionals are subject to substantial limitations. Each year and each dollar that a school spends to train one future physician or other health care worker is a year or dollar not spent training another. The decision to expend vast amounts of time, money, and effort in educating and training DACA recipients in the health care sector was thus made in reliance on the expectation that such individuals would be able to serve the public once educated and trained. Rescinding the program negates all of that substantial time, money, and effort spent.

Nor is the country prepared to fill the loss that would result if DACA recipients were excluded from the health care workforce. The number of physicians in the United States has not kept pace with our growing and aging population and a commensurate increase in patients needing care for a variety of chronic health conditions. It is estimated that in the next eleven years, the country will have between

_____

using data from the AAMC's 2019 National Sample Survey of Physicians, (publication forthcoming; data on file with AAMC).

**AR5445**
**WMAR-00005481**

5

46,900 and 121,900 fewer primary and specialty care physicians than it needs.[5]  Shortages in other health professions, such as mental health, dentistry, and nursing, are worsening as well.[6]  These shortages will be felt most keenly in medically underserved areas, such as rural settings and poor neighborhoods— precisely the areas in which DACA recipients are likeliest to work.[7]

The risk of a pandemic also continues to grow, since infectious diseases can spread around the globe in a matter of days due to increased urbanization and international travel.[8]  These conditions pose a threat to America's health security—its preparedness for and ability to withstand incidents with public-health consequences.  To ensure health security, the country needs a robust health workforce.  Rescinding DACA, however, would deprive the public of domestically educated, well-trained, and otherwise qualified health

---

[5] Ass'n of Am. Med. Colls., *The Complexities of Physician Supply & Demand: Projections from 2017 to 2032* at 2 (Apr. 2019), https://tinyurl.com/yxbh2nhv.

[6] *See* Henry J. Kaiser Fam. Found., *Mental Health Care Health Professional Shortage Areas (HPSAs)* (last visited September 24, 2019), https://tinyurl.com/y9u2g69b; Henry J. Kaiser Fam. Found., *Dental Care Health Professional Shortage Areas (HPSAs)* (last visited September 24, 2019), https://tinyurl.com/yye44kpy.

[7] Angela Chen, PhD et al., *PreHealth Dreamers: Breaking More Barriers Survey Report* at 27 (Sept. 2019), https://tinyurl.com/y436och3.

[8] Office of the Assistant Sec'y for Preparedness and Response, Dep't of Health and Human Servs., *National Health Security Strategy 2019-2002* at 5-6, (last visited Sept. 24, 2019), https://www.phe.gov/Preparedness/planning/authority/nhss/Doc uments/NHSS-Strategy-508.pdf.

**AR5446**
**WMAR-00005482**

6

care professionals who have been provided education in reliance on their ability to continue to work in the United States as health care professionals.

As the courts below correctly recognized, the government failed to seriously consider these or any of the other substantial reliance interests engendered by DACA. By rescinding DACA on the basis of a cursory and conclusory analysis that failed to consider real-world effects, the government ignored the significant reliance interests of U.S. health professional schools, hospitals, other institutions, and U.S. patients, as well as those of DACA recipients themselves. The rescission was therefore arbitrary and capricious, and the decisions below should be affirmed.

## ARGUMENT

### I. AGENCIES CANNOT CHANGE POLICIES WITHOUT FAIRLY ADDRESSING RELIANCE INTERESTS.

Under the Administrative Procedure Act ("APA"), courts must set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). That standard requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency acts arbitrarily or capriciously if it "fail[s] to consider an important aspect of the problem" it is addressing. *Id.*

Where—as here—an agency considers reversing or rescinding an existing policy, one "important aspect of the problem," *State Farm*, 463 U.S. at 43, is the possibility that segments of the public may have ordered their affairs in reliance on existing rules. This Court has made clear that in such circumstances,

**AR5447**
**WMAR-00005483**

10

## B. Medical Schools, Teaching Hospitals, And Other Educational And Health Care Institutions Expended Vast Amounts Of Time, Money, And Other Resources In Reliance On DACA.

Medical schools, teaching hospitals, and other health care institutions have invested heavily in DACA recipients, in reliance on the premise that they would be legally authorized to perform the jobs for which they have been, or are being, trained. Those investments, moreover, were made to serve the public interest, as the country faces an ever-increasing shortage in the number of health care professionals.

Since 1982, students who arrived in the United States without legal authorization as children have been able to benefit from public K-12 education. *Plyler* v. *Doe,* 457 U.S. 202, 223 (1982). Some of these children have found ways to pay for college educations. However, prior to DACA, medical school was not a realistic option for undocumented immigrants who were brought to the U.S. as children. Without formal recognition of deferred action status from the government, undocumented immigrants were legally foreclosed from working as licensed physicians and thus could not meet the technical standards for admission into most medical schools. There are a limited number of seats in medical schools, and each medical school takes seriously its responsibility to the public to use every available seat to produce a physician capable of contributing to the health care workforce. Consequently, before 2013 no medical school had any published policy allowing undocumented immigrants to be accepted into their programs.

**AR5451**
**WMAR-00005487**

11

DACA changed this calculus. As related by one department chair, DACA provided the "missing link" for medical schools to accept qualified noncitizens because it offered a route to work permits for recipients.[10] In the autumn of 2013, the first DACA recipients entered medical school, and in the ensuing years the number of DACA applicants and matriculants steadily grew. As of the 2019 application cycle, 65 medical schools across the country have reported admissions policies that include DACA recipients. Those schools include Alpert Medical School at Brown University, Georgetown University School of Medicine, Harvard Medical School, Stritch School of Medicine at Loyola University ("Stritch"), Michigan State University College of Human Medicine, University of Minnesota Medical School, University of Nevada Reno School of Medicine, Medical College of Wisconsin, Yale School of Medicine, and others. According to AAMC data, nearly 200 DACA recipients have matriculated into medical school, and many of them have graduated and entered or completed their medical residencies.

It was DACA that allowed medical schools to accept and train nearly all of these students. For example, Rosa Aramburo graduated college with degrees in biology and literature. *Id.* One of her college advisors wrote to the department chair of medical education at Stritch that "one of the brightest students he had ever encountered was about to slip through the cracks because of her undocumented status." *Id.*

---

[10] Sarah Conway & Alex V. Hernandez, *Loyola's DACA Medical Students, Largest Group in the Country, Plagued with Uncertainty*, Chicago Trib. (Sept. 13, 2017), https://tinyurl.com/y485wmxu.

AR5452
WMAR-00005488

12

Dr. Aramburo's talent and drive, along with DACA's extension of work authorization, inspired Stritch to admit her. She has since earned her M.D. and is now in the first year of her Obstetrics and Gynecology residency.

More broadly, DACA recipients, like their citizen counterparts, were selected for admission to medical school because of their academic and personal achievements. Many were high school valedictorians. Most have undergraduate degrees in complex sciences, such as integrative biology, neurology, physics, and molecular and cellular biology. Many have impressive volunteer and leadership experiences. All scored competitively on the Medical College Admission Test. Moreover, the very fact of their having met the rigorous qualifications for admission to medical school is a testament to their determination and fortitude—precisely the attributes one looks for in a physician.

Teaching hospitals have also invested substantial time and money in training residents with DACA-dependent work authorization. There are currently an estimated 41 medical residents with DACA status, including many whose residencies are nearly complete. The direct training costs for these residents has been estimated at $157,602 per resident, per year.[11]   Based upon available data, the AAMC

---

[11] Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Cost Estimates for Training Residents in a Teaching Health Center* at 2 (last visited Sept. 24, 2019), https://bhw.hrsa.gov/sites/default/files/bhw/grants/thc-costing-fact-sheet.pdf.  This number does not include indirect costs or those associated with the physical space and equipment retrofitting required to host and train medical residents.

**AR5453**
**WMAR-00005489**

13

estimates that, as of February 2019, hospitals in the U.S. have invested approximately $5 million training medical residents with DACA status.[12] Accompanying this significant financial investment is an investment of tens of thousands of hours in supervision, training, and administration. As with all physicians' residency training, enormous resources have been expended with the expectation of a return on that investment in the form of highly-trained professionals able to serve the public by practicing medicine independently. These investments would not have been made but for reliance on DACA recipients' continued eligibility to work in the U.S.

Other health professional schools have invested in the training of DACA recipients for the health care workforce. DACA recipients are also pursuing or have obtained graduate degrees in medical sciences. With the support of privately funded fellowships or in collaboration with universities, these individuals are researching radiation sensors, the role of cholesterol regulation in breast cancer cells, the formation of genetic abnormalities associated with cancer, changes in the structure and function of proteins that may result in autoimmune disorders, and cognitive

---

[12] According to available self-reported AAMC data, most recently updated in February 2019, there was one DACA resident in 2016-2017, eight DACA residents in 2017-2018, and twenty DACA residents in 2018-2019. Because the AAMC has not collected data on DACA status consistently across programs, these numbers are not comprehensive. The five million dollar figure quoted above does not include costs associated with an additional 20 or more DACA residents who began residencies in 2019. (Data on file with AAMC).

AR5454
WMAR-00005490

14

neuroscience, among other things.[13] As with other health care professionals, these researchers' ability to continue their work in their fields is contingent upon work authorization.

All of these institutions have invested money, time, and other resources into DACA recipients' training and development because of the promise presented by these bright learners, eager to contribute their talents to the health care workforce. Institutions would not have made these investments but for their reliance on the continued work authorization afforded by the DACA program.

### C. DACA Recipients Relied On Their Eligibility To Work When They Decided To Invest Their Own Time, Effort, And Resources In A Health Care Career.

Thousands of DACA recipients have also invested vast amounts of their own time, effort, and resources to be able to serve the United States health care system. Health professional education is expensive, and financing that education presents even greater challenges for most DACA recipients than it does for citizens.

The necessary financial investments only increase with medical school. Many DACA recipients patch together tuition with merit-based scholarships and private loans, all provided and accepted with the expectation that they will be eligible for future employment in the field in which they are being

---

[13] Evelyn Valdez-Ward, *The End of DACA Would Be a Blow to Science*, Sci. Am. Blog Network (Dec. 12, 2018), https://blogs.scientificamerican.com/voices/the-end-of-daca-would-be-a-blow-to-science/.

**AR5455**
**WMAR-00005491**

15

trained.[14]   Because most DACA students are not eligible for federal loans,[15] most finance their education through the private sector.   Their only realistic route to repay those loans turns on their ability to practice medicine after residency, which in turn is dependent on their continued work authorization through DACA.

Even apart from financial investments, DACA recipients have made substantial investments of both time and effort in the reasonable expectation that they will practice in their chosen field.  Physicians, for example, between post-graduate preparatory courses, four years of medical school, and three to nine years in internships, residencies, and fellowships, may spend more than half of their lives in training before being able to independently practice.[16]   Like others pursuing a career in medicine, DACA recipients who are or will become physicians have delayed making an income for four or more years after graduating college, and may have instead accrued debt, so that they could acquire the skills they will need to treat patients. Other health care workers make similar sacrifices.

_____

[14] Pre-Health Dreamers, *Frequently Asked Questions & Answers about Medical School for Pre-med Undocumented Students Across the Nation* at 11-14 (last visited Sept. 24, 2019), https://tinyurl.com/yyhcsqkt.

[15] *See* Fed. Student Aid, U.S. Dep't of Educ., *Who Gets Aid: Non-U.S. Citizens* (last visited Sept. 24, 2019), https://studentaid.ed.gov/sa/eligibility/non-us-citizens ("Undocumented students, including DACA recipients, are not eligible for federal student aid.").

[16] Amy E. Thompson, MD, *A Physician's Education*, J. Am. Med. Assoc. (Dec. 10, 2014), https://jamanetwork.com/journals/jama/fullarticle/2020375.

**AR5456**
**WMAR-00005492**

16

### D. Rescinding DACA Will Nullify These Investments And Worsen A Shortage Of Health Care Professionals In The United States.

Each DACA recipient in the health care sector embodies a substantial, irreplaceable investment of time and resources made with the reasonable expectation that that recipient would be eligible to put his or her education and training into practice. Every dollar or hour invested in a DACA recipient's education and training during the past seven years is a dollar or hour not invested in someone else's.

For that reason, the resources expended on DACA recipients' educations cannot ever be recouped. If those individuals are prevented from working in the U.S., their abrupt absence will leave a critical gap in the health professional workforce. While the medical field has worked to expand its training capacity, it cannot backfill such a significant number of trainees. Even if new resources were suddenly found to educate and train replacement physicians, it would be ten years before any of those physicians had the training and preparation to practice medicine independently. Because of these limitations, medical schools and teaching hospitals strive not to lose a single medical student or resident. The loss of all DACA medical students and residents if DACA is rescinded would mark a concrete and enduring loss to medical schools, teaching hospitals, and the U.S. public at large.

In addition to the harm to educational institutions, rescinding DACA also threatens to exacerbate a broader threat facing the country. Over the next decade, the United States will face increased health care challenges arising from its aging population. By 2050, adults over the age of 65 will make up 20% of

**AR5457**
**WMAR-00005493**

17

the population, outnumbering children for the first time in U.S. history.[17]  Almost half of the population is expected to have at least one chronic disease by 2020, and as the population ages this number will increase.[18]  Due in large part to the aging population, the growth in demand for health care services workers in the next decade is projected to outstrip that of any other occupational group.[19]

This increase in demand will be met by a projected decrease in supply.  More than a third of all currently active physicians will be 65 or older within the next decade, and will retire at a rate faster than new graduates can replace them.[20]  The AAMC's workforce studies have projected a future shortfall of between 46,900 to 121,900 primary and specialty care physicians by 2032.[21]  Shortages are and will continue to be experienced in other health care professions as well.[22]

---

[17] U.S. Census Bureau, *Older People Projected to Outnumber Children for First Time in U.S. History* (Sept. 6, 2018).

[18] Wullianallur Raghupathi & Viju Raghupathi, *An Empirical Study of Chronic Diseases in the United States: A Visual Analytics Approach to Public Health*, 15 Int'l J. Envtl. Res. & Pub. Health 431, 431 (Mar. 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5876976/.

[19] Bureau of Labor Stat., U.S. Dep't of Labor, *Occupational Outlook Handbook: Healthcare Occupations* (September 4, 2019), https://www.bls.gov/ooh/healthcare/home.htm.

[20] Ass'n of Am. Med. Colls., *supra* note 5, at x, 4.

[21] *Id.* at 1-2.

[22] Ctr. For Health Workforce Studies, SUNY-Albany Sch. of Pub Health, *Health Care Employment Projections, 2016-2026: An Analysis of Bureau of Labor Statistics Projections by Setting and by Occupation* at 3 (Feb. 2018), https://tinyurl.com/y58hfz6x

**AR5458**
**WMAR-00005494**

18

These shortages are nationwide. Texas, for example, has nearly 1,200 health professional shortage areas (HPSAs) that have been designated by the Health Resources and Services Administration (HRSA).[23]   Nationwide, there are 6,782 dental HPSAs, with 56 million affected people, requiring 9,951 additional practitioners to fill the gaps. Over the next decade, thirty-seven states will have a shortage of primary care physicians, seven will face a shortage of nurses, and there will be shortages among cardiologists, gastroenterologists, hematologists, oncologists, and pulmonologists.[24] Across the nation,

---

(projecting annual need of 37,000 new physicians, nurse practitioners, and physician assistants). The Henry J. Kaiser Family Foundation similarly estimates a nationwide shortage of 6,894 mental-health professionals and 10,635 dental health professionals. Henry J. Kaiser Fam. Found., *supra* note 6.

[23] *See generally* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Health Professional Shortage Areas* (last visited Sept. 24, 2019), https://bhw.hrsa.gov/shortage-designation/hpsas.

[24] Nat'l Ctr. For Health Workforce Analysis, U.S. Dep't of Health & Human Servs., *State-Level Projections of Supply and Demand for Primary Care Practitioners: 2013-2025*, at 5 (Nov. 2016), https://bhw.hrsa.gov/sites/default/files/bhw/health-workforce-analysis/research/projections/primary-care-state-projections2013-2025.pdf; Nat'l Ctr. For Health Workforce Analysis, U.S. Dep't of Health & Human Servs., *Supply and Demand Projections of the Nursing Workforce: 2014-2030*, at 4-5 (July 21, 2017), https://bhw.hrsa.gov/sites/default/files/bhw/nchwa/projections/NCHWA_HRSA_Nursing_Report.pdf (identifying shortages of RNs in 7 states and shortages of LPNs in 33 states); Nat'l Ctr. For Health Workforce Analysis, U.S. Dep't of Health & Human Servs., *National and Regional Projections of Supply and Demand for Internal Medicine Subspecialty Practitioners: 2013-2025*, at 4 (Dec. 2016), https://bhw.hrsa.gov/sites/default/files/bhw/health-workforce-

**AR5459**
**WMAR-00005495**

19

HRSA has identified more than 5,000 areas in the U.S. with a shortage of mental-health professionals, which means that less than half of this nation's need for mental health treatment is being addressed.[25]  By removing current and expected health professionals from practice, rescinding DACA will only worsen these shortages.

DACA health care workers are an important part of the nation's response to health care shortages in regions and communities with insufficient access to health care or culturally responsive care, as these are the communities where DACA recipients have shown a propensity to work.  According to a survey of undocumented youth interested in health careers conducted in 2016, 97% expressed plans to ultimately work in the neighborhoods in which they grew up, or other underserved areas.[26] That number is consistent with other studies demonstrating that individuals who are under-represented in medicine are twice as likely to pursue careers working with underserved populations.[27]

---

analysis/research/projections/internal-medicine-subspecialty-report.pdf.

[25] *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Human Servs., *Map Tool—Shortage Areas*, (last visited Sept. 24, 2019),  https://data.hrsa.gov/hdw/tools/MapTool.aspx  (showing mental health shortage areas).

[26] Chen, *supra* note 7, at 27 .

[27] Andrea N. Garcia et al., *Factors Associated with Medical School Graduates' Intention to Work with Underserved Populations: Policy Implications for Advancing Workforce Diversity*, Acad. Med. (Sept. 2017), https://www.ncbi.nlm.nih.gov /pmc/articles/PMC5743635/.

**AR5460**
**WMAR-00005496**

20

DACA recipients currently in health professional schools have discussed painful childhood experiences that motivated them to pursue careers in the medical profession: family members unnecessarily suffering—and even dying—from treatable conditions like diabetes, breast cancer, stroke, heart conditions, prostate cancer, and anemia due to a lack of access to care. "The older I got," says Ali Torabi, a medical student at Stritch, "the more I recognized the disparities between my community and the communities that had access to health care. I've had injuries where I've avoided going to the hospital * * * because broken bones are expensive."[28] Blanca Morales, a fourth-year medical student at Harvard, recalls how some of her family members with diabetes went without medical support. "I remember thinking that we have all this new technology and these new advances in managing diabetes, but we can't access them." *Id.* For these young people, becoming a physician for the underserved is not just a profession but a calling. As Hector Perez, a public health graduate student at Columbia, puts it: "my passion for public health arose from my undocumented immigrant identity."[29] "Seeing * * * all the extra hurdles you have to go through when you are underprivileged," says Sharjeel

---

[28] Gabrielle Redford, DACA Students Risk Everything to Become Doctors (Sept. 17, 2018), https://www.aamc.org/news-insights/daca-students-risk-everything-become-doctors.

[29] Hector Sanchez Perez, *Student Blog: I'm a Mailman Dreamer* (Feb 20, 2018), https://www.mailman.columbia.edu/public-health-now/news/student-blog-im-mailman-dreamer.

AR5461
WMAR-00005497

21

Syed, a medical student at Stanford, "makes me want to * * * create solutions."[30]

States have recognized the criticality of DACA recipients to health care in rural and underserved areas.    After the Arkansas Board of Nursing announced in 2017 that it would no longer license DACA recipients to practice, the state legislature quickly reversed course in light of the impact of the loss of these trained nurses.  The legislature instead recognized that Arkansas was "suffering from a nursing shortage across the state," such that it was "in the best interest of the State of Arkansas to make full use of the skills and talents in the state by ensuring that an individual who is work-authorized under the [DACA] policy is able to obtain an occupational or professional license and practice his or her occupation or profession."[31]   Similar bills have been passed in other states with health care shortages, such as Nebraska, Indiana, and Nevada.[32]

---

[30] Redford, *supra* note 30.

[31] H.B. 1552, 92d Gen. Assemb., Reg. Sess., § 1(a)(6) (Ark. 2019), http://www.arkleg.state.ar.us/assembly/2019/2019R/Bills/HB1552.pdf.

[32] A.B. 275, 80th Sess., § 2 (Nev. 2019), https://legiscan.com/NV/text/AB275/id/2030359/Nevada-2019-AB275-Enrolled.pdf ("The Legislature hereby finds and declares that * * * It is in the best interests of this State to make full use of the skills and talents of every resident of this State [and] it is the public policy of this State that each resident of this State, regardless of his or her immigration status, is eligible to receive the benefit of applying for a license, certificate or permit pursuant to 8 U.S.C. 1621(d)."); S.E.A. 419, 120th Gen. Assemb., 2d Reg. Sess., § 1(C) (Ind. 2018), http://iga.in.gov/static-documents/3/5/f/f/35ff8b3b/SB0419.05.ENRH.pdf (expands eligibility for professional licensure to individuals who have been "authorized by the federal

AR5462
WMAR-00005498

# Exhibit 13

**Nos. 18-587, 18-588, 18-589**

# In the Supreme Court of the United States

DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL., RESPONDENTS.

_____

*ON WRIT OF CERTIORARI TO THE UNITED STATES*
*COURT OF APPEALS FOR THE NINTH CIRCUIT*

_____

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS,

v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, ET AL., RESPONDENTS.

_____

*ON WRIT OF CERTIORARI BEFORE JUDGMENT*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE DISTRICT OF COLUMBIA CIRCUIT*

_____

KEVIN K. MCALEENAN, ACTING SECRETARY OF
HOMELAND SECURITY, ET AL., PETITIONERS,

v.

MARTIN JONATHAN BATALLA VIDAL, ET AL., RESPONDENTS.

_____

*ON WRIT OF CERTIORARI BEFORE JUDGMENT*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

_____

**BRIEF FOR LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW, THE ANTI-DEFAMATION
LEAGUE, THE LEADERSHIP CONFERENCE ON
CIVIL AND HUMAN RIGHTS, AND 42 OTHER SOCIAL
JUSTICE ORGANIZATIONS AS *AMICI CURIAE*
IN SUPPORT OF RESPONDENTS**

_____

KRISTEN CLARKE
JON GREENBAUM
DARIELY RODRIGUEZ
DORIAN SPENCE
PHYLICIA H. HILL
MARYUM JORDAN
LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600

October 4, 2019

WILLIAM D. COSTON
   *Counsel of Record*
MARTIN L. SAAD
SAMEER P. SHEIKH
VENABLE LLP
600 Massachusetts Ave NW
Washington, DC 20001
(202) 344-4813
wdcoston@venable.com

*Counsel for Amici Curiae*

WILSON-EPES PRINTING CO., INC.  –  (202) 789-0096  –  WASHINGTON, D. C. 20002

AR6012
WMAR-00006048

TABLE OF CONTENTS

Page

QUESTIONS PRESENTED ............................... i

TABLE OF AUTHORITIES................................ iv

INTEREST OF *AMICI CURIAE* ........................ 1

INTRODUCTION .............................................. 3

ARGUMENT..................................................... 5

I.   THE GOVERNMENT WAS REQUIRED TO CONSIDER RELIANCE INTERESTS PRIOR TO TERMINATING DACA ......... 5

II.  DACA ENGENDERED SERIOUS RELIANCE INTERESTS THAT THE GOVERNMENT FAILED TO CONSIDER...... 11

A. Reliance Interests of DACA Students, Educators and Educational Institutions...................................................... 13

B. DACA Enrollees Purchased Homes and Lending Institutions Extended Loans in Reliance on DACA................ 17

C. Promises of "Expedited Citizenship" for DACA Enrollees Serving Vital Military Interests ................................ 19

CONCLUSION .................................................. 22

APPENDIX

APPENDIX: LIST OF *AMICI CURIAE* ........ 1a

(iii)

AR6014
WMAR-00006050

13

make significant contributions to the economy. And, indeed, they have. "DACA enrollees and their households pay $5.7 billion in federal taxes and $3.1 billion in state and local taxes annually."[8] The termination of DACA will only place further strain on states and local communities that were already under economic pressure.

The Department's failure to consider such reliance interests, let alone provide an "analysis" of its action "is arbitrary and capricious and so cannot carry the force of law." *Encino Motor Cars*, 136 S. Ct. at 2125.

## A. Reliance Interests of DACA Students, Educators and Educational Institutions

It is indisputable that access to education is vitally important to all persons in the United States—whether citizens, lawful resident aliens, or undocumented persons. *See Plyler v. Doe*, 457 U.S. 202, 226 (1982). In *Plyler*, this Court ruled that undocumented school age children had a constitutional right to a free public education. *Id.* ("Education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all . . . "[e]ducation has a fundamental role in maintaining the fabric of our society." Because of *Plyler*, generations of undocumented persons have succeeded in school and integrated into the American culture.

The DACA program has had the practical effect of extending the rationale of *Plyler* to post-secondary education. By relying on the rights granted by DACA, tens of thousands of undocumented persons have

---

[8] Nicole Svjlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Amer. Progress, (Sept. 5, 2019), https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states/.

**AR6033**
**WMAR-00006069**

14

gained access to and invested substantial time and money in a college education. And many of those persons, once educated, have entered the workforce as teachers, giving back to their communities.

DACA teachers, in particular, are a significant asset to our nation's public schools, especially in cities with large, immigrant student populations. An estimated 20,000 DACA recipients are employed as educators throughout the U.S., and many of them possess in-demand bilingual language skills.[9] There is currently a severe shortage nationally of teachers in the public education sector, estimated to be as high as 327,000.[10] The consequences of a shortage in public educators are well known: larger class sizes, fewer teacher aides, fewer guidance counselors, and fewer extra-curricular activities.

Further, in the past few decades, the racial makeup of the country's student population has drastically shifted, but the overwhelming majority of public school teachers continue to be white.[11] Public schools have

---

[9] Moriah Balingit, *As DACA Winds Down, 20,000 Educators Are in Limbo*, Wash. Post (Oct. 25, 2017), https://www.washingtonpost.com/local/education/as-daca-winds-down-20000-educators-are-in-limbo/2017/10/25/4cd36de4-b9b3-11e7-a908-a3470754bbb9_story.html (citing data provided by the Migration Policy Institute); *see also* Greg Toppo, *20,000 DACA Teachers At Risk — and Your Kids Could Feel the Fallout, Too*, USA Today (Oct. 11, 2017,), https://www.usatoday.com/story/news/2017/10/11/thousands-daca-teachers-risk/752082001/.

[10] Elise Gould, *Local Public Education Employment May Have Weathered Recent Storms, But Schools Are Still Short 327,000 Public Educators*, Econ. Pol'y. Inst. (Oct. 6, 2017), http://www.epi.org/publication/teacher-employment-may-have-weathered-storms-but-schools-are-still-short-327000-public-educators/.

[11] "Racial and ethnic minorities accounted for 20% of all public elementary and secondary school teachers in the United States

AR6034
WMAR-00000670

15

seen increased enrollment by students of color, especially by Latinos.[12] By 2025, it is expected that a majority of high school graduates will be students of color.[13] DACA has allowed schools to recruit qualified teachers serving students of diverse backgrounds.

DACA teachers do much more than just fill available positions; they also serve as mentors and role models. For many communities, DACA teachers mirror the experiences of their immigrant students, which informs their teaching with cultural competence, helps develop positive relationships with students, and creates more welcoming school environments.[14] "Foreign-born teachers not only educate Americans, but also serve as cultural ambassadors for immigrant students who may not be as familiar with American traditions, customs, and social norms."[15]

---

during the 2015-16 school year." A.W. Geiger, *America's Public School Teachers Are Far Less Racially And Ethnically Diverse Than Their Students*, Pew Research Center (Aug. 27, 2018), https://www.pewresearch.org/fact-tank/2018/08/27/americas-public-school-teachers-are-far-less-racially-and-ethnically-diverse-than-their-students/.

[12] Alice Yin, *Education by the Numbers*, N.Y. Times (Sept. 8, 2017), https://www.nytimes.com/2017/09/08/magazine/education-by-the-numbers.html.

[13] *Id.*

[14] Lisette Partelow, *America Needs More Teachers of Color*, Ctr. for Amer. Progress (Sept. 14, 2017), https://www.americanprogress.org/issues/education-k-12/reports/2017/09/14/437667/america-needs-teachers-color-selective-teaching-profession/.

[15] Yukiko Furuya et al., *A Portrait of Foreign-Born Teachers In The United States,* George Mason University, Institute for Immigration Research (Jan. 2019), https://www.immigrationresearch.org/system/files/Teacher_Paper.pdf.

AR6035
WMAR-00006071

16

Viridiana Carrizales, who led the DACA Initiative at Teach or America, aptly noted that "[w]e cannot afford to lose so many teachers and impact so many students . . . [e]very time a student loses a teacher, that is a disruption in the student's learning." [16] As Vanessa Luna, a DACA recipient who taught as a Teach for America teacher and now serves as the Co-Founder and Chief Programming Officer at ImmSchools, explains: "We're going to lose leaders and lose teachers – it's not only their presence, but having a teacher that can share the same experiences that you possibly had growing up. . . . Their advocacy, their leadership, their resilience is extraordinary because of their own personal journey."[17]

School environments with DACA educators help reflect the diversity of communities, the country, and the world, which, in turn, helps open students' minds to new perspectives and actively engage them in learning. Prejudice and bias are countered in schools and communities when respect for diversity is taught, modeled, and experienced firsthand by children.[18] The loss of 20,000 DACA teachers will cause severe and lasting harm to students and their educational trajectories, and more broadly our country, which depends on the great talent of future generations.

---

[16] *See* Toppo, *supra* n.9.

[17] Liz Robbins, *For Teachers Working Through DACA, a Bittersweet Start to the School Year*, N.Y. Times (Sept. 7, 2017), https://www.nytimes.com/2017/09/07/nyregion/daca-teachers.html.

[18] Anti-Defamation League (ADL), *Creating an Anti-Bias Learning Environment*, https://www.adl.org/education/resources/tools-and-strategies/creating-an-anti-bias-learning-environment.

**AR6036**
**WMAR-00006072**

17

In *Plyler*, the Court made an observation that is apt for the present DACA revocation:

> In determining the rationality of § 21.031 [denying access to school to undocumented persons], we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in §21.031 can hardly be considered rational unless it furthers some substantive goal of the State.

Here, as in *Plyler*, the federal government failed to consider the profound reliance interests and costs to DACA recipients and their educational communities around the nation resulting from the rescission of DACA.

### B. DACA Enrollees Purchased Homes and Lending Institutions Extended Loans in Reliance on DACA

Homeownership has long been recognized as an integral part of the American dream. Indeed, the federal government and its agencies have developed programs and marketing around that well-accepted precept.[19] DACA put that dream within reach for enrollees and provided them an opportunity to achieve financial security for themselves and their families and contribute to the economic stability of their communities through homeownership. They made these significant and life changing investments in reliance on DACA.

---

[19] *See*, *e.g.*, U.S. Dep't of Housing and Urb. Dev., *The National Homeownership Strategy: Partners in the American Dream* (1995).

**AR6037**
**WMAR-00006073**

# Exhibit 14

Nos. 18-587, 18-588, and 18-589

# In the Supreme Court of the United States

———

DEPARTMENT OF HOMELAND SECURITY, ET AL.,

*Petitioners*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,

*Respondents.*

———

**On Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

———

**BRIEF OF 143 U.S. BUSINESS
ASSOCIATIONS AND COMPANIES
AS *AMICI CURIAE*
IN SUPPORT OF RESPONDENTS**

———

ANDREW J. PINCUS
*Counsel of Record*
*Mayer Brown LLP*
*1999 K Street, NW*
*Washington, DC 20006*
*(202) 263-3000*
*apincus@mayerbrown.com*

KAREN W. LIN
*Mayer Brown LLP*
*1221 Avenue of the
Americas*
*New York, NY 10020*
*(212) 506-2500*

*Counsel for* Amici Curiae

*Additional Captions Listed On Inside Cover*

**AR4952**
**WMAR-00004988**

i

# TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICI CURIAE* .......................1

INTRODUCTION AND  SUMMARY OF ARGUMENT ...............................................2

ARGUMENT ...............................................3

I.  RESCINDING DACA WILL HARM U.S. COMPANIES AND THE ENTIRE ECONOMY...........................................3

    A.  Dreamers Contribute To The Success Of U.S. Companies And The Economy As A Whole...........................................5

    B.  Dreamers Help Grow The Economy By Filling Jobs That Otherwise Would Remain Vacant Due To An Insufficient Supply Of Workers. ........................9

    C.  Rescinding DACA Will Inflict Enormous Harm On Individuals, Companies, And The Economy...................................15

II.  THE DACA RECISSION IS INVALID. ..............20

    A.  The Rescission Decision Is Subject To Judicial Review Under The APA. .................21

    B.  The Rescission Decision Must Be Set Aside.............................................26

CONCLUSION .......................................31

**AR4954**
**WMAR-00004990**

6

represent every major sector of the U.S. economy and generate almost $3 trillion in annual revenue.

Dreamers' contributions are not limited to their work product alone. Immigrants like Dreamers bring diverse backgrounds and experiences to their workplaces, which bolster their colleagues' creativity and innovation.[10] People with different backgrounds offer different perspectives when confronted with a problem, and their different opinions and perspectives enable colleagues to anticipate alternative possibilities and work harder to evaluate those possibilities.[11]

### 2. Dreamers Are Business Owners.

*Second*, many Dreamers are entrepreneurs, who have created companies themselves. Six percent of Dreamers (and nearly nine percent of Dreamers 25 years and older) started their own businesses after receiving DACA.[12] Those businesses create jobs for other U.S. residents: Each DACA business owner with full-time employees employs on average 4.5 other workers.[13] That is nearly 86,000 additional jobs that otherwise would not exist.

---

[10]  See Katherine W. Phillips, *How Diversity Makes Us Smarter*, Scientific American, Oct. 1, 2014, https://tinyurl.com/y4vrn8q2.

[11]  *Ibid.*; see also Deloitte, *Waiter, Is That Inclusion in My Soup? A New Recipe to Improve Business Performance* 8 (2013), https://tinyurl.com/jnnszk4.

[12]  Tom K. Wong, et al., Ctr. for Am. Progress, *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November* (Sept. 19, 2019), https://tinyurl.com/y3c742re; *see also* New Am. Economy, *Spotlight, supra* n.8 (4.5 percent of DACA-eligible individuals are entrepreneurs).

[13]  Wong, *Livelihoods*, *supra* n.12.

**AR4976**
**WMAR-00005021**

7

The businesses started by Dreamers also generate revenue: In 2015, DACA-eligible entrepreneurs had a total business income of $658.7 million.[14] Those funds are spent on wages, or goods and services from other companies, or reinvested, producing more overall growth.

This entrepreneurial activity is particularly focused on the local, small business level. Immigrants make up an outsized proportion of Main Street business owners.[15] Those businesses attract others in the community, which often helps to revitalize declining neighborhoods and reverse declining population trends.[16] Immigrant-owned businesses have revived communities from Philadelphia to Lexington, Nebraska to Minneapolis-St. Paul to Nashville.[17]

### 3.   *Dreamers Are Consumers.*

*Third*, Dreamers also consume the goods produced and services provided by U.S. companies—contributing to the growth of those companies and the economy as a whole.

Not surprisingly, receiving a grant of deferred action under DACA—and the resulting eligibility to ap-

---

[14] New Am. Economy, *Spotlight, supra* n. 8.

[15] David Dyssegaard Kalick, Americas Soc'y/Council of the Americas, *Bringing Vitality to Main Street: How Immigrant Small Businesses Help Local Economies Grow* at 2, 5, 8-9, Jan. 2015, https://tinyurl.com/lzuglue.

[16] *Id.* at 12.

[17] *Id.* at 14-34; Sara McElmurry, Ctr. for Am. Progress, *Proactive and Patient: Managing Immigration and Demographic Change in 2 Rural Nebraska Communities*, Nov. 14, 2018, https://tinyurl.com/y4lu3etx.

**AR4977**
**WMAR-00005022**

15

reported having "few or no qualified applicants" for construction jobs.[50] Construction, meanwhile, is the second largest industry employing DACA-eligible individuals.[51] Additionally, there are significant labor shortages in food preparation and serving-related occupations and personal care and services occupations.[52] But "[a]mong less-educated workers, those born in the United States tend to have jobs in manufacturing or mining, while immigrants tend to have jobs in personal services and agriculture."[53] And a substantial proportion of Dreamers have jobs in food preparation.[54]

In sum, DACA has enabled thousands of young people who grew up in the United States to obtain jobs that fill critical gaps in the economy and that produce benefits for United States' workers, companies, and economy.

## C. Rescinding DACA Will Inflict Enormous Harm On Individuals, Companies, And The Economy.

All of the above benefits—and more—will be lost if DACA's rescission is permitted to stand. Over the next decade, our country's GDP would lose between $215 and $460.3 billion; and federal tax revenue will

---

[50] Nat'l Fed'n of Indep. Bus., *supra* n.39.

[51] New Am. Economy, *Spotlight, supra* n.8; *cf.* Ryan Nunn, et al., *A Dozen Facts about Immigration* (Oct. 2018), https://tinyurl.com/y5ra3r8l.

[52] U.S. Dep't of Labor, Bureau of Labor Statistics, Employment Projections, https://tinyurl.com/y4lzn72u.

[53] Peri, *supra* n.28.

[54] Svajlenka, *supra* n.20.

**AR4985**
**WMAR-00005023**

16

drop by approximately $60 to 90 billion.[55] Texas alone would lose $6.3 billion in GDP; California would experience a $11.6 billion decline in GDP.[56] And Social Security and Medicare contributions would lose out on $40.9 billion over 10 years.[57]

This economic contraction would result directly from Dreamers' loss of work authorization. Under federal law, employers are prohibited from employing individuals who do not have a valid work authorization document. Accordingly, all of the hundreds of thousands of employed Dreamers would lose their jobs. In addition to the obvious harm to Dreamers themselves, the loss of so many workers will have severe repercussions for U.S. companies and workers.

Already, the possibility that DACA's rescission might go into effect is impacting Dreamers and, by extension, the companies for which they work. Dream-

---

[55] See Decl. of Ike Brannon & Logan Albright ¶ 11, Doc. 45-3 at 359, *Regents of the Univ. of Calif.* v. *U.S. Dep't of Homeland Sec'y*, No. 18-18056 (9th Cir. Mar. 13, 2018); Nicole Prchal Svajlenka et al., Ctr. for Am. Progress, *A New Threat to DACA Could Cost States Billions of Dollars* (July 21, 2017), https://goo.gl/7udtFu; Jose Magaña-Salgado, Immigrant Legal Res. Ctr., *Money on the Table: The Economic Cost of Ending DACA* 4, 6-7 (2016), https://goo.gl/3ZwGVJ; see also Ike Brannon & Logan Albright, The Cato Inst., *The Economic and Fiscal Impact of Repealing DACA* 1 (Jan. 18, 2017), https://goo.gl/jFXw4g; Jacqueline Varas, Am. Action Forum, *The Fiscal Implications of the DACA Program* (Jan. 18, 2018), https://tinyurl.com/y36tlgh9.

[56] Svajlenka et al., *supra* n.55.

[57] Jose Magaña-Salgado & Tom K. Wong, Immigration Legal Res. Cntr., *Draining the Trust Funds* (Oct. 2017), https://tinyurl.com/y6y65jvy.

AR4986
WMAR-00005024

17

ers now live with the constant threat of job loss, withdrawal from society, and forced removal from the only country they have ever known.

Seventy-six percent of Dreamers reported living with the daily worry of being separated from their children.[58] The fear for the future that is now a daily part of life for Dreamers and their families affects both physical and mental health.[59] That, in turn, negatively affects employee productivity and performance, illness and absenteeism, accidents, and turnover.[60]

If this Court permits the DACA rescission to take effect and thereby end Dreamers' work authorization, companies will face an estimated $6.3 billion in costs to replace Dreamers—if they can even find new employees to fill the empty positions.[61] Companies will forfeit the funds invested in training Dreamers, and will incur costs recruiting and training new employees, who will be less experienced and therefore less

---

[58] Tom K. Wong et al., United We Dream, *Ending DACA Would Have Wide-Ranging Effects but Immigrant Youth are Fired Up and Politically Engaged* (Aus. 23, 2018), https://tinyurl.com/y49stg87.

[59] See Tiziana Rinaldi & Angilee Shah, *Immigration Limbo Is a 'Tug of Emotions.' It's Also a Mental Health Issue*, PRI's The World (Aug. 22, 2017), https://goo.gl/WLXMZ4; Sarah Elizabeth Richards, *How Fear of Deportation Puts Stress on Families*, The Atlantic (Mar. 22, 2017), https://goo.gl/qDgeRf.

[60] See World Health Org. & Int'l Labour Org., *Mental Health And Work: Impact, Issues and Good Practices* 1 (2000), https://goo.gl/ecH1Ut; Ortega, *supra* n.33, at 9-10.

[61] See David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, Cato Institute (Sept. 1, 2017), https://goo.gl/1FMidk; *see also* Magaña-Salgado, *supra* n.55, at 4.

**AR4987**
**WMAR-00005025**

19

affect the wages or employment of U.S. farmworkers."[64] Instead, farms responded by *eliminating* the jobs—often by moving production abroad or going out of business.[65]

Removing Dreamers from the workforce is likely to have the very same negative effect on U.S. employment. As documented above, companies are already struggling to fill job openings; additional labor shortages will further hamper productivity and growth. The resulting drag on the economy will be exacerbated as Dreamers are forced to shutter businesses—putting the jobs of nearly 86,000 other U.S. workers at risk—and companies lose the income from Dreamers and Dreamers' employees that has helped drive demand and production of goods and services provided by U.S.-born workers.[66]

More fundamentally, just as DACA sent a powerful message of inclusion, its rescission tells the immigrants who have been integral to the growth and development of our society and economy for decades that they are no longer welcome here. As a result, DACA's

---

[64] Michael A. Clemens, *Does Kicking Out Mexicans Create Jobs?*, Politico Magazine (Feb. 15, 2017), https://goo.gl/XwLj1x.

[65] *Id.*

[66] Cf. Ben Gitis & Jacqueline Varas, Am. Action Forum, *The Labor and Output Declines From Removing All Undocumented Immigrants* (May 5, 2016), https://goo.gl/UAt3dJ (concluding that removing undocumented immigrants from the workforce would cause private sector employment to decline by 4 to 6.8 million workers, would reduce real private sector output by $381.5 to $623.2 billion, and would have further negative economic impacts through the loss of consumption, investments, and entrepreneurship).

**AR4989**
**WMAR-00005026**

# Exhibit 15

Nos. 18-587, 18-588, 18-589

IN THE

# Supreme Court of the United States

◆━◆

DEPARTMENT OF HOMELAND SECURITY, *et al.*,

—v.—                                *Petitioners*,

REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,

*Respondents.*

(*Caption continued on inside cover*)

————————

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT
OF APPEALS FOR THE NINTH, DISTRICT OF COLUMBIA AND SECOND CIRCUITS

## BRIEF OF *AMICI CURIAE* 127 RELIGIOUS ORGANIZATIONS IN SUPPORT OF RESPONDENTS

STEVEN A. ZALESIN
   *Counsel of Record*
ADEEL A. MANGI
MICHAEL N. FRESCO
MOHAMMED A. BADAT
PATTERSON BELKNAP WEBB
   & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
sazalesin@pbwt.com

FARHANA KHERA
JUVARIA KHAN
MUSLIM ADVOCATES
P.O. Box 34440
Washington, DC 20043
(202) 897-2622

*Attorneys for Amici Curiae*

**AR6046**

i

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.........................................ii

INTERESTS OF AMICI CURIAE ............................ 1

SUMMARY OF THE ARGUMENT ........................... 5

ARGUMENT   ........................................................... 7

I.      RELIGIOUS ORGANIZATIONS
        SUPPORT DACA AS A JUST
        RESPONSE TO A HUMANITARIAN
        CRISIS ............................................................ 7

II.     TERMINATION OF DACA WILL CAUSE
        AMICI, THEIR CONGREGATIONS, AND
        THEIR COMMUNITIES IRREPARABLE
        HARM AND POSES A GRAVE THREAT
        TO PUBLIC WELFARE ............................... 12

        A.      Direct Harm to Amici and Their
                Congregants ........................................ 13

        B.      Impairment of Amici's Ability to
                Carry out Their Missions................... 19

        C.      As Sensitive Locations for
                Immigration Enforcement
                Purposes, Some Amici Will Be
                Called upon to Provide Sanctuary
                While at the Same Time Risking
                Being Targeted for Immigration
                Raids.................................................... 20

CONCLUSION ....................................................... 25

**AR6048**
WMAR-00006084

13

workforces whose loss of status will not only disrupt their lives, but harm *amici* who benefit from their participation.   Second, termination of the DACA program will impair the ability of *amici* and other religiously-affiliated organizations to carry out their missions to help people of all backgrounds and faiths. Third, as institutions of faith and sensitive locations for immigration enforcement purposes, many *amici* face the grim prospect that following their spiritual calling to provide sanctuary for targeted Dreamers will result in the religious entities themselves being targeted by immigration enforcement authorities, a concern that would increase dramatically with the termination of DACA.

### A. Direct Harm to *Amici* and Their Congregants

To illustrate the irreparable harm at issue in this case, *amici* provide the Court with the following examples of individual DACA recipients brought to this country as children who have enriched their communities, organizations and congregations.

**Nancy.**[7]   Nancy, Associate Rector at *amicus* St. Luke's Episcopal Church in Long Beach, California, came to the United States from Mexico at age seven. Like many Dreamers, Nancy did not know she was undocumented until her junior year of high school, when she applied to college and learned what a social

---

[7] Declarations from the individual DACA recipients attesting to the information presented here are on file with counsel.   The last names of these individuals have been withheld here to protect their privacy.

**AR6066**
**WMAR-00006102**

14

security number was—and that she did not have one. Nancy describes her life after learning her immigration status as "in the shadows"; she could not get a driver's license, and could not drive a car for fear of getting pulled over and risking deportation.  For a teenager in Los Angeles, this was no idle fear.

Nonetheless, Nancy was active in her community. The Episcopal Church served as an extended family during her childhood, and by the time she turned 17 Nancy led the largest youth group in the Episcopal Diocese of Los Angeles.  So great was her dedication that the Church paid for her tuition to college and seminary school, where she obtained a Master's of Divinity degree.   After obtaining DACA status, Nancy was able to fulfill her dream of becoming an ordained Episcopal minister.  Today, Nancy is the associate rector at *amicus* St. Luke's Episcopal Church, and the Diocese of Los Angeles's first Latina leader to have grown up in a Spanish-speaking Episcopal Church and gone on to pursue ordination. At St. Luke's, she is actively involved in immigrants' rights activism and education initiatives.

For Nancy, the Government's announcement on September 5, 2017 was "a moment of complete fear and hopelessness."  She and others like her have "made a life here, trusted the system and tried to do things the right way," but now "run the risk that we will be hunted down and sent to a country that we do not know."

**Rafael**.  Brought to Los Angeles at three years old, Rafael, an office assistant with *amicus* New

**AR6067**
**WMAR-00006103**

15

Mexico Faith Coalition for Immigrant Justice, was born in Guanajuato, Mexico. Rafael's parents, having risked everything to bring him to the United States, sought to instill in him the values of hard work and education. They succeeded. Rafael completed a Bachelor's Degree with a double major in History and Chicano Studies from California State University Dominguez Hills while working full time to pay his tuition and support himself. After obtaining DACA status, Rafael went on to obtain a Master's Degree in American Studies at the University of New Mexico, where he is now a Ph.D. candidate and an instructor.

Rafael's parents also instilled in him the values of Catholicism. He believes that faith-based organizations "fill the gaps of social justice and service that many times nation-states do not offer." As such, he works for *amicus* New Mexico Faith Coalition for Immigrant Justice as an office assistant. Rafael is proud to contribute to their work, which he sees as fulfilling community needs and a natural expression of his Catholic faith.

For Rafael, the end of DACA represents drastic and dangerous change. It spells the end of access to the work that he loves and a halt to his career after graduation. Moreover, it means "going back to living in the reality of survival mode," forever uncertain of his place and permanence in his own home, and without opportunity to flourish and grow.

**Andrea**. Andrea is a legal assistant at *amicus* American Friends Service Committee. Andrea was born and baptized in Ecuador, but brought to New

**AR6068**
**WMAR-00006104**

16

Jersey by her parents when she was a year and a half old. Andrea grew up in the Catholic Church. She went to Sunday school, took First Communion, and received Confirmation at her church in the Newark area, where she continues to volunteer in youth groups and for fundraising activities.

Andrea's parents, like many parents of Dreamers, prioritized her education. Knowing she could not obtain financial aid, Andrea's parents, both union members, carefully saved. After Andrea earned a paralegal degree from community college, her parents put her through Rutgers University's undergraduate program. Nonetheless, until DACA, Andrea's life was one of fear and constraint. She kept her undocumented status secret, and had to refrain from the normal day-to-day activities and jobs that her friends freely engaged in.

Andrea graduated from Rutgers summa cum laude. After she obtained DACA status, she was hired as a paralegal at a law firm, and was proud to have a job and a salary. Andrea's dream is to go to law school in the United States. For her, the end of DACA puts her dream in doubt and threatens to send her to Ecuador, a place in which she has never set foot since she was an infant. In the face of this peril, Andrea maintains, "I love this country and I can't imagine living elsewhere."

\* \* \*

The harm that these individuals would suffer as a result of their loss of DACA status is readily apparent. *See Nunez v. Boldin*, 537 F. Supp. 578,

**AR6069**
**WMAR-00006105**

17

587 (S.D. Tex. 1982) ("Deportation to a country where one's life would be threatened obviously would result in irreparable injury."); *Kalaw v. Ferro*, 651 F. Supp. 1163, 1167 (W.D.N.Y. 1987) (enjoining deportation proceeding and finding irreparable harm because "petitioner's deportation would make her ineligible for any subsequent application for legalization"). *Amici* would be harmed as well; not only do people like Nancy, Rafael, and Andrea contribute richly to religious and faith-based organizations through their own individual efforts, they serve as mentors and inspire others to give back to institutions from which they have benefitted. If the Termination Memo goes into effect, nearly 800,000 Dreamers—many with stories similar to the three detailed above—will be forced out of the country or into hiding. *Amici* will suffer incalculable harm if they are deprived of the contributions and talents of these young congregants and community members.

Moreover, as *amici* know from their work in other parts of the world, Dreamers deported would face tremendous challenges and even physical danger. For example, Gerry Lee and others from *amicus* Maryknoll Office for Global Concerns have lived and worked with impoverished families in Mexico, El Salvador, Guatemala, and other countries to which DACA recipients face deportation. In Haiti, for example, "Maryknoll Sisters have witnessed the bare struggle for post-disaster survival in the massive slums of Cite Soleil, where they help residents subsist from gardens grown in discarded tires on turf fought over by rival gangs." In El Salvador, a Maryknoll Lay Missioner witnessed "the anger and

AR6070
WMAR-00006106

# Exhibit 16

2000 WL 284190

Only the Westlaw citation is currently available.

United States District Court, N.D. Texas, Dallas Division.

NIKKO TRADING OF AMERICA CORPORATION, et al., Plaintiffs, Counter-Claim Defendants,

v.

WASTEMASTERS, INC., Defendant, Cross-Claim Defendant,

Stewart RAHR, Intervenor as Counter-Claim Plaintiff in the right and on behalf of Wastemasters,

v.

SECURITIES TRANSFER CORPORATION, Additional Counter-Claim Defendant,

v.

Edward ROUSH, Jr., Intervenor as Counter-Claim Defendant,

v.

WASTEMASTERS, INC., et al., Third-Party Defendants.

No. Civ.A.3:98-CV-0048-G.

|

March 14, 2000.

*MEMORANDUM ORDER*

FISH, J.

**\*1** Before the court is the motion of intervenor Stewart Rahr ("Rahr"), proceeding derivatively in the right and on behalf of WasteMasters, Inc. ("WasteMasters"), a public company, to vacate the consent judgment entered by this court on February 5, 1998. For the reasons stated below, the motion is granted.

The factual underpinnings for this motion have been set forth by Rahr in several previous filings.[1] As noted in an earlier order,[2] the evidence submitted by Rahr, while objected to on various evidentiary grounds, is virtually undisputed. Much of that evidence has been relied on by the court in earlier orders,[3] which are here incorporated by reference. Nothing added to the record since those earlier orders were issued has caused the court to change the conclusions expressed therein, which are also incorporated by reference. In short, the evidence demonstrates that this suit was, from its very inception, a collusive effort to obtain the *imprimatur* of this court on a modern-day form of alchemy-a scheme to transform water (in the form of additional WasteMasters stock) into gold (proceeds from the sale of that additional WasteMasters stock).

[1]    *See* Intervenor Stewart Rahr's Exhibits in Support of Motion to Intervene and Petition in Intervention received December 16, 1998; Counter-Claim Plaintiff's Proposed Findings of Fact and Conclusions of Law with Respect to His Application for a Preliminary Injunction filed January 28, 1999; Counter-Claim Plaintiff's Notification Regarding Evidence in Support of His Request for a Preliminary Injunction filed January 28, 1999; Counter-Claim Plaintiff's Proposed Findings of Fact and Conclusions of Law Regarding His Motion to Vacate the Consent Judgment filed March 13, 2000 and Appendix thereto.

[2]    *See* Memorandum Opinion and Order filed February 28, 2000 at 2 n.I.

[3]    *See* Order of Preliminary Injunction filed April 5, 1999; Modification to Order of Preliminary Injunction filed April 8, 1999; Memorandum Opinion and Order filed February 28, 2000.

Unhappily, collusive efforts to use the courts for ulterior purposes are not new. This case is merely a latter-day incarnation of *Cleveland v. Chamberlain,* 66 U.S. 419 (1861), from which it is indistinguishable in all important particulars. In that case, Cleveland-a judgment creditor of the La Crosse and Milwaukie Railroad Company ("the La Crosse Railroad")-sought to set aside, as a fraud on his rights, conveyances made by the La Crosse Railroad to Chamberlain and others. *Id.* at 419-20. While the case was pending, the La Crosse Railroad was dissolved, its charter and property being transferred to a new entity named the Milwaukie and Minnesota Railroad Company ("the Milwaukie Railroad"). *Id.* at 421. As a result, the only party against whom Cleveland obtained relief was Chamberlain, who thereafter took an appeal to the Supreme Court. *Id.* In the meantime, Chamberlain paid off Cleveland in return for an assignment of Cleveland's rights under the judgment. *Id.* Thus, by the time the case reached the Supreme Court, Chamberlain's interests were represented by counsel on each side of the case. *Id.* at 421-22. Dismissal of the appeal was urged by third parties, *viz.,* the creditors of the La Crosse Railroad, who-possessing a lien on the assets of that company-had foreclosed their lien and converted their debt into stock of the new Milwaukie Railroad.[4] *Id.* at 422. The Milwaukie Railroad's title to these assets, however, was junior to Cleveland's judgment. *Id.* If Chamberlain's collusive appeal were successful, resulting in a reversal of the judgment against him, he stood to benefit at the expense of the Milwaukie Railroad's shareholders. *Id.* at 422-23.

[4]     The Supreme Court has approved the practice, utilized in this case (*see* order of February 22, 2000), of determining a lack of genuine controversy by motion and affidavits. In *Hatfield v. King,* 184 U.S. 162 (1902), the Court, considering a contention "that there was no real controversy between the parties nominally opposed to each other, and that the litigation was in fact carried on under the direction and control of the plaintiff," stated:

>      It is well settled that questions of this kind may be examined, upon motion, supported by affidavits, and that it is the duty of a court to make such inquiry, in order that it may not be imposed on by an apparent controversy to which there are really no adverse parties.

> *Id.* at 164-65.

On this state of facts, the Supreme Court's unanimous opinion tersely begins and ends with the observation that the case must be dismissed:

>   **\*2**  This appeal must be dismissed. Selah Chamberlain is, in fact, both appellant and appellee. By the intervention of a friend he has purchased the debt demanded by Cleveland in his bill, and now carries on a pretended controversy by counsel, chosen and paid by himself, and on a record selected by them, for the evident purpose of obtaining a decision injurious to the rights and interests of third parties.

>   [I]t appearing to the court here, from affidavits and other evidence filed in this case in behalf of persons not parties to this suit, that this appeal is not conducted by parties having adverse interests, but for the purpose of obtaining a decision of this court, to affect the interests of persons not parties-it is therefore now here ordered and adjudged by this court, that the appeal in this case be and the same is hereby dismissed, with costs.

*Id.* at 425, 426.

So it is in the instant case. The "pretended controversy," to use the language of *Cleveland v. Chamberlain,* between the original plaintiffs (Nikko Trading of America Corporation, *et al.*) and the original defendant (WasteMasters), all of whom were serving the same masters, was-again in the language of *Cleveland v. Chamberlain*-for the purpose of "affect[ing] the interests of persons not parties." Under these circumstances, all proceedings in the case leading to the purported consent judgment of February 5, 1998 are a nullity. That judgment must be VACATED and this case DISMISSED.[5]

[5]     This case must be dismissed because, under Article III of the United States Constitution, this court has subject matter jurisdiction only over "cases or controversies." See *Allen v. State of Georgia,* 166 U.S. 138, 140 (1897) ("In civil cases it has been the universal practice to dismiss the case whenever it became apparent that there was no real dispute remaining

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

between the plaintiff and the defendant, or that the case had been settled or otherwise disposed of by agreement of the parties, and there was no actual controversy pending."). Rahr's addition to the case as an intervener cannot resuscitate a non-existent controversy, for "[a]n existing suit within the court's jurisdiction is a prerequisite of an intervention, which is an ancillary proceeding in an already instituted suit." *Harris v. Amoco Production Co.,* 768 F.2d 669, 675 (5th Cir.1985) (quoting *Kendrick v. Kendrick,* 16 F.2d 744, 745 (5th Cir.1926), *cert. denied,* 273 U.S. 758 (1927)), *cert. denied,* 475 U.S. 1011 (1986).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 284190

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br> Defendants, <br><br> KARLA PEREZ,  *et al.*, <br><br> Defendant-Intervenors, <br><br> and <br><br> STATE OF NEW JERSEY,  *et al.*, <br><br> Defendant-Intervenor. | Case No. 1:18-cv-68 <br><br> DECLARATION OF KHRISTINA GONZALEZ IN SUPPORT OF STATE OF NEW JERSEY'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

I, Khristina Gonzalez, declare as follows:

1.      I serve as the Associate Dean of the College and Director of Programs for Access and Inclusion at Princeton University ("Princeton").  I am over the age of 18 and make this declaration based on my personal knowledge.  If called as a witness, I could and would be competent to testify to the facts in this declaration.

2.      I have held the role of Associate Dean since 2015.   In this role, I have become very familiar with the effects of federal immigration policy on Princeton and our student body.

3.      Prior to this role, I served as the Associate Director for the Writing Program at Princeton, as well as a faculty member in the Princeton Writing Program. I am also a co-founder of the national First-Generation, Lower-Income (FGLI) Consortium, through which I have

knowledge of the effects of immigration policy on students from a wide variety of selective institutions of higher education in the United States.  I am a graduate of Dartmouth College (B.A.), the University of Notre Dame (M.A.), and Brown University (Ph.D).

4.       In my role as Associate Dean of the College and Director of Programs for Access and Inclusion at Princeton, I am responsible for leading programming, policy, and support that promote the success and well-being of underrepresented students at Princeton, including DACA-beneficiary students.  Some of these services and programs are discussed in greater detail below. My position gives me a view into the matriculation and campus life of students and alumni who are and have been DACA recipients.

5.       Princeton is a private, non-profit educational institution dedicated to extraordinary scholarship, research, and instruction.  The University has long aspired to attract and support students, faculty, and staff with the broadest possible range of backgrounds, perspectives, and experiences.  To achieve excellence, Princeton must be accessible to talented students from all backgrounds.  Matriculating students with a broad range of experiences, perspectives, and interests promotes the exchange of different ideas.  The result is a dynamic learning environment, in which students develop a more nuanced understanding of the world and each other.  As a result, we strive to create an environment in which all members of the community engage in open-minded and thoughtful dialogue.

6.       I am familiar with the claims in this lawsuit and the possibility that, if Plaintiffs prevail, the program known as DACA could be permanently enjoined.

7.       The threat of effectively ending DACA would cause substantial disruption and harm to Princeton's students who are DACA recipients and have structured their lives and educations around the continued existence of the program.

8.      It would also disrupt the administration and daily life at Princeton.  For one, every student in a Princeton class is an asset to the University; each brings their own background and lived experiences to the University community.  Princeton selects a class of students in order to foster a dynamic learning environment that depends upon the contribution of each and every student, and our DACA students bring tremendous talents and irreplaceable perspectives to the University.  If they were unable to continue their studies, it would seriously damage the University's community of scholars.

9.      Princeton has also made a serious investment in its students' education and professional success.  The University puts substantial time, energy, and resources into teaching, supporting, advising, mentoring, and otherwise helping its students—including DACA students—to flourish.  Campus life, scholarship, and programming, both curricular and extracurricular, have been built in reliance on the ability of DACA recipients to remain part of the Princeton community. The University has even established specific groups and programming for its DACA students.

10.     Enjoining DACA would also produce devastating ripple effects in the lives and families of DACA-recipient students, in the broader Princeton community, and in the wider world.

I.      **DACA Recipients Are Valued and Essential Members of Princeton's Community.**

11.     Since 2012, at least 27 DACA recipients have enrolled at Princeton.  Each DACA student was admitted on the basis of personal merit and academic credentials commensurate with those of any other student on Princeton's campus.  In reviewing their applications myself, I have

seen how DACA-beneficiary students have overcome substantial obstacles, demonstrating amazing strength of character and resilience.

12.     The Princeton admissions process is extremely competitive.  For example, the University received 32,836 applications for admission to the class of 2024.  Only 1,823 of those applicants were offered admission—an admissions rate of about 5.5 percent.

13.     In selecting its class, Princeton is choosing students of the highest caliber who represent diverse backgrounds, will create a vibrant community of scholars, and will learn, grow, and thrive at Princeton.  Princeton makes careful and considered choices about the outstanding young people in which it will invest.

14.     Enjoining DACA would leave holes in our student community that could not be filled.  When Princeton chooses to admit a student, we are envisioning how that person will contribute to and help forge the student community.  Each student adds his or her own immeasurable and distinct value and voice—bringing to bear life experiences and perspectives to enrich campus life and learning.  That is why Princeton admissions staff spend months reviewing applications.  This act of choosing individual students who, together, build a Princeton class is critical to the functioning and success of the University.

15.     Princeton is cognizant of the important role we play in helping to build an optimal learning environment.  Based on personal experience, we know that matriculating students from across a range of demographic groups delivers important benefits to our campus community.  For example, diverse and inclusive environments encourage intellectual and social growth.  This is corroborated by studies across a wide range of fields, including economics, psychology, and sociology.  The research demonstrates that experience in diverse settings promotes intellectual development, improves self-confidence, and helps individuals identify commonalities as well as

cognitive biases.  Building a diverse and inclusive environment also increases awareness of inequalities and prejudices, while reducing the likelihood that individuals will engage in negative stereotyping.

16.     For Princeton, the result of building a diverse and inclusive student body is a collaborative and creative space, characterized by vigorous debate in addition to nuanced and thoughtful conversation on countless issues.  Simply put, a diverse student body is essential to achieving our educational mission.

17.     DACA students are irreplaceable members of Princeton's community.  They have unique viewpoints not otherwise represented.  Sharing their perspectives across various fields of study and through extracurricular activities, DACA students spark the thoughtful and nuanced conversations Princeton aspires to nurture.  These conversations promote understanding and help eliminate blind spots.

18.     DACA students currently enrolled at or recently graduated from Princeton have studied in a wide variety of fields, including ecology and evolutionary biology, comparative literature, policy, geosciences, computer science, molecular biology, mechanical and aerospace engineering, psychology, and politics.  They collaborate on important research, including through the University's Computer Science Summer Programming Experience, and through the University's Keller Center for Innovation.  They publish in campus publications and, as discussed below, serve in several critical roles on campus.

19.     Princeton's DACA students have been recognized for excellence in their fields, receiving the Henry Richardson Labouisse Prize Fellowship (which provides $30,000 to a graduating senior who wishes to work or study abroad on matters related to on-the-ground policy development), the M. Taylor Pyne Honor Prize (the University's highest honor for an

undergraduate), and the Mellon Mays Undergraduate Fellowship (which provides repayment of undergraduate loans up to $10,000 if the student pursues doctoral study in an eligible field). One of our recent DACA alumni received the prestigious Soros Fellowship for New Americans, a scholarship enabling this person's graduate education. In short, DACA students are highly accomplished and well-respected within the University community.

20.     DACA students also play a host of other important roles in campus life. They are part of the Dream Team, an on-campus organization that mentors migrant students, hosts activism workshops and lectures, and advocates on and off campus for immigrants' rights. They tutor underprivileged students in the local community through an organization called Community House. They have served as peer-academic advisors and as elected members of academic advisor counsels where they advocate for fellow students, including by providing feedback on curricular issues and on the sufficiency of student resources. One of our DACA students was responsible for leading a conference on the needs of first-generation college students that brought over 400 students, faculty, and staff from across the Ivy League to Princeton's campus.

21.     Without DACA beneficiaries on campus, these roles might well go unfilled. And certainly, these voices could not be replaced.

## II.     Princeton Students Have Relied on DACA's Continuing Existence to Structure Their Educations, Work, and Lives.

22.     DACA has had a profound effect on Princeton's student body. Before the program was implemented, few undocumented students came to the University. DACA recipients have explained that, before DACA, even routine activities could be stressful: Many students report they lived under constant fear that they, or their family, could be deported at any time—including, for example, if they were pulled over for a speeding ticket. DACA recipients also express that, before DACA, they were distracted and could not focus on building a life, including investing in

education or career, because there was no promise that they could remain in the U.S. to study and work.

23.     Alumni have conveyed to me their experience prior to DACA.  Undocumented students who studied at Princeton prior to DACA were without government-issued identification and accordingly were often unable to travel to and from campus.  They largely lived in the shadows; they rarely reached out for help, and they were less engaged in their classrooms and in campus activities for fear of being too visible.

24.     Previously undocumented students have now come out of the shadows.  DACA—and its promise of continued safe harbor—instilled in them the expectation of safety and security. An important part of that is the ability to remain in the U.S. and at Princeton to continue to study.

25.     The threat of having DACA revoked thus risks casting these Princeton students back in the shadows.  Worse, it threatens to interrupt their studies—and their lives—built on DACA's promise.  Enjoining DACA may force these students to stop their studies, leave the University, and perhaps leave the United States.

26.     To that end, under the threat of having DACA enjoined, students have reported that they are very worried that information they provided in their DACA applications will be used to deport them and their families.  This information includes, for example, personal and identifying information, such as mailing addresses, additional contact information, and other sensitive materials.  DACA students supplied this information to the government voluntarily but only on the understanding that this information would be used to facilitate their remaining in the United States—including to pursue studies at Princeton.  In reporting their concerns, several DACA students have emphasized that they would not have applied for DACA had they perceived any risk that the sensitive and identifying information furnished in their submission might be used to

remove them or their families from the United States. The government's assurances that it would not use students' information to effectuate their removal were essential to these students' decision to apply for the DACA program.

27.     DACA's continued existence is also important to recipient students because, through attendant work authorization, it allows them to pursue employment, both while enrolled at Princeton and after graduation.

28.     If DACA were enjoined, it would mean that Princeton students could not obtain future work authorizations or many grants, student loans and scholarships, and other building blocks for their futures. These implications are devastating. These students have worked for their entire college career to develop the knowledge and credentials needed to pursue employment opportunities or graduate or professional school. They have done so based on the understanding that they could, in fact, complete their studies and work in the United States. To have invested so much time and energy to pursuing a specific goal and then to be unable to reap the benefits of those investments would be heartbreaking. It would also be a loss to innovation and growth in U.S. communities where these students wish to live and work.

29.     Even if a student were in a position to abandon his or her family, friends, and home upon graduation to pursue opportunities overseas, it is by no means clear that employment opportunities would exist outside the United States. For DACA students, personal and professional networks are here, not abroad. The students have worked hard to position themselves to secure post-graduate opportunities in the United States, the only country that many have meaningfully known.

30.     Enjoining DACA would further, in the case of alumni, disrupt their careers, which are already underway. These alumni have constructed their educations and professional lives

around the promise of their continued ability to work in the United States.  They came to Princeton—sometimes moving across the country or deferring work opportunities—on the expectation that they would, after earning their degree, be able to work in the United States.  They depend on that ability to continue in their jobs and to earn a living and support their families.  Some pursued, also at great expense and sacrifice, additional professional degrees on the expectation that they could practice domestically.

31.     Because many Princeton alumni have gone on to work in the service of their communities, the effects of enjoining DACA would have terrible ripple effects.  Several DACA beneficiaries who have graduated from Princeton have gone on to work in fields sorely in need of additional help.  For example, one graduate has worked in an independent school district in the United States as a college success advisor; another has entered law school and is focusing on immigration law; one graduate has enrolled in medical school; and another is teaching college students in an MFA program.

32.     Beyond the devastation of students' interrupted studies and careers, losing work authorization both during college and after graduation has serious consequences for DACA students' finances and the finances of their families.  In light of events that have threatened to curtail DACA, including the pendency of this lawsuit, several students have sought guidance from the Office of the Dean of the College about coping with the stark reality that their loss of income will have consequences for loved ones, who have sacrificed tremendously—often over the course of many years—to help them secure admission to and thrive at Princeton, and who had the reasonable expectation of financial assistance upon the students' graduation.  Given these concerns, it is easy to understand why so many DACA students indicate they would not have

applied to DACA absent government assertions that they would be able to renew their status, so long as they continued to abide the law.

## III.   The University Has Made Substantial Commitments in Reliance on DACA's Continued Existence.

33.   The elimination of DACA would cause Princeton a tremendous loss as regards both its community and the resources it has dedicated to DACA students with the expectation that they could remain.

34.   Princeton dedicates itself to each and every one of the students it admits and who matriculate.  This includes, for example, academic training and support to help first-year students adjust to and become successful at Princeton; one-on-one academic advising; peer-to-peer mentorship; and other programs created to foster community and to support students.

35.   Princeton is proud to make these investments in its students.  It does so with the expectation that these students, including those who are DACA recipients, will be able to remain enrolled at Princeton—and remain full participants in University life.

36.   Recognizing the invaluable contributions that DACA students make to Princeton, the University has devoted substantial resources to supporting recipients.   It made these investments—in the form of faculty time and attention; privately funded financial aid for tuition, room, and board; and other resources—with the expectation that DACA students would be able to complete their Princeton education and apply it across a variety of fields after graduation.  In reliance on DACA, Princeton's administration, faculty, and staff have taught and nurtured these students; they have trained them, mentored them, and sought to prepare them for professional and academic success.  Thus, not only DACA students, but also *Princeton* would suffer an irreparable loss if DACA were enjoined and these students' educations were cut short.

37.     Princeton also implemented programming designed specifically for DACA students. The Office of the Dean of the College has collaborated with the Davis International Center and Career Services to host legal advising sessions, workshops on post-graduate professional opportunities available to DACA students, counseling sessions focused on stress management and mental health, and networking opportunities with supportive alumni who can assist students in their postgraduate career searches. This programming was designed to ensure that DACA students had the support, knowledge, and resources necessary to navigate a now-uncertain future in which many opportunities they wanted to pursue may no longer be available to them.

38.     The ripple effects of enjoining DACA would radiate out from these students and alumni, their families, and Princeton.  As discussed above, Princeton's DACA students have profound skills and talents to offer to businesses, organizations, and institutions of higher learning in the United States.  Enjoining DACA would have terrible costs—both social and financial—for these Princeton's students, the Princeton community, and this country.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October _23_, 2020 in Princeton, New Jersey.

# Exhibit 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>　　　　　　Defendants,<br><br>KARLA PEREZ,  *et al.*,<br><br>　　　　　　Defendant-Intervenors,<br><br>and<br><br>STATE OF NEW JERSEY,  *et al.*,<br><br>　　　　　　Defendant-Intervenor. | Case No. 1:18-cv-68<br><br><br>DECLARATION OF JACK C. CHEN IN SUPPORT OF STATE OF NEW JERSEY'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

I, Jack C. Chen, declare as follows:

　　　1.　　I serve as Associate General Counsel for the U.S. Immigration practice group at Microsoft Corporation ("Microsoft"). I am over the age of 18 and make this declaration based on my personal knowledge.  If called as a witness, I could and would be competent to testify to the facts in this declaration.

　　　2.　　Microsoft is a global technology leader that develops, licenses, and supports software, services, devices, and technology solutions that deliver new value for customers and help people and businesses realize their full potential.  Microsoft is headquartered in Redmond, Washington, and it has offices across the United States.

3.      I have held this role since May 2019.   Prior to my current position, I served as an Assistant General Counsel.

4.      I have 17 years of experience as a practicing attorney, and over 13 years of experience at Microsoft supporting legal and policy matters involving people-related functions and operations at Microsoft.

5.      In my role as Associate General Counsel at Microsoft, I am responsible for the legal team that provides advice and programmatic support for visa-dependent employees in the U.S. These services relate to hiring and retaining top global talent, and ensuring the proper maintenance of immigration status and work authorization, while supporting individuals in the employment-based green card process. These responsibilities encompass the support of DACA recipients who are employed at the company.

6.      I am familiar with the claims in his lawsuit and the possibility that, if Plaintiffs prevail, the immigration program known as Deferred Action for Childhood Arrivals ("DACA") could be permanently enjoined.

7.      Microsoft has hired and trained numerous DACA recipients.  Microsoft did so in reliance on the continued existence of DACA, which has allowed these employees not only to remain in the United States, but also to step out of the shadows, obtain work authorizations, and build lives, including professional lives at Microsoft.

8.      Microsoft has structured its recruitment, training, business planning and operations in reliance on DACA recipients' continued ability to work in the U.S., and the company has come to depend on its DACA employees.   In particular, as a cutting-edge technology company, Microsoft must substantially invest in its personnel, including DACA employees, via months- and

years-long training programs that teach the highly specialized skills and depth of knowledge that Microsoft needs in its employees and future leaders.

9.      In part because of this heavy investment, enjoining DACA would cause substantial interruption to Microsoft's ongoing operations.  Microsoft has placed DACA employees in key roles across its products and teams.  The DACA recipients who work at Microsoft are critical to continued success of those teams, and their inability to remain at the company would cause substantial productivity losses that could not be remedied.

10.     Enjoining DACA would also cause a dramatic upheaval of these individuals' lives. They, like Microsoft, have structured their choices—including their professional, personal, and financial decisions—based on the expectation of DACA's continued protections.

**I.      Microsoft Has Depended on DACA in Hiring, Personnel Training, and Business Planning, and Has Invested Substantial Resources in DACA Employees in Reliance On the Program.**

11.     DACA has been critical to Microsoft's hiring decisions.  Microsoft looks to recruit top talent to work in its headquarters and across its U.S. sites.  The company understands that this means hiring a diverse workforce that brings different backgrounds and experiences.

12.     I am aware, from our DACA employees, that becoming DACA beneficiaries permitted them to come out of the shadows and establish lives, including professional lives, in the United States.  Because DACA secured their ability to obtain work authorization, these employees could find gainful employment and set about establishing long-term careers in the United States. In many cases, DACA also enabled them to move across the country, including the Microsoft's headquarters in Redmond, Washington, and to other offices, such as in San Francisco, California, Charlotte, and North Carolina.

13.     Microsoft currently has 61 employees who are DACA recipients. These individuals were hired based on the expectation that they could work—and continue to work—at Microsoft's U.S.-based offices.

14.     And Microsoft has invested heavily in these individuals.  Microsoft understands that building a talented and successful workforce involves extensive, rigorous, and continual training and investment in recruits and employees.

15.     For example, Microsoft has hired DACA recipients through the Microsoft Academy of College Hires ("MACH") program.  The MACH program recruits students directly from universities to work as employees at Microsoft.  These hires have no substantial work experience and are hired based on their potential, drive, and ability to collaborate and absorb information.

16.     The investment Microsoft makes in MACH program participants is significant. Once accepted, employees are trained on technology, presentation, and professional skills.  They receive standard Microsoft On Board training followed by 60 additional days of specialized training.  During this time, MACH employees are not producing any quantifiable results for the company.  After this two-month training period, they shadow more senior Microsoft employees for two weeks to gain practical experience.  This is also a use of Microsoft resources, as the productivity of our senior employees typically decreases when they are training MACH employees.  Finally, MACH employees are assigned a mentor from the current Microsoft staff who coaches them weekly for the first year of employment.  The amount of resources Microsoft expends on these MACH employees is unlike any other program at the company.

17.     Microsoft has enrolled DACA employees in this program on the expectation that they will be able to continue to work—and continue to grow—at Microsoft.  With the MACH

program, Microsoft is trying to grow leaders, not just employees. Because they are impressively credentialed, and because Microsoft makes substantial investments in them, the recruits that come out of this program are highly valued by the company. They are quickly hired into to a wide variety of position within Microsoft's various product groups and other business groups. The experience of being customer facing from the start of employment is an invaluable skill that MACH recruits take with them to their roles across Microsoft.

18.     Microsoft makes a substantial investment of time and resources in the MACH hires, including DACA recipients. Each hire requires a great deal of training before they can begin to produce a benefit to Microsoft. Typical industry hires can hit the ground running because of their past work experience, so the company starts seeing returns on industry hires quite quickly. With MACH hires, Microsoft expends a great deal of resources from the outset and, because the company sees these employees as long-term leaders of the future, the return comes later in their careers. To have an employee removed after completing the MACH program because of the effective end of DACA would result in an unrecoverable loss of past resource allocation.

19.     Microsoft offers equally intensive training programs for more senior employees, and it has invested in DACA recipients through those programs as well. For example, the Structured Finance team at Microsoft arranges bank financing to support Microsoft sales and arranges access to financing for Microsoft partners and supports Microsoft procurement to get longer terms while offering suppliers access to working capital financing at attractive rates. This team, like others at Microsoft, has a robust employee rotation program that lasts approximately three years. Employees in the rotation spend time in three to four teams over the length of the program. One employee in the current rotation is a DACA beneficiary.

20.     As employees move through this rotation program, they are afforded the opportunity to learn a great deal about specific work groups at Microsoft.  They bring the knowledge they gain into both their next rotation and the future roles they hold at Microsoft.  This is a profound growth opportunity and Microsoft invests a substantial amount of time and resources into these rotation employees.  When an employee moves to a new rotation, it takes about 45 days to get them to a point where they are fully productive.  At the conclusion of the program, the rotation employees are in a unique position to lead cross-subject team projects because they have a complete and intimate understanding of what each group does and how they work.  Losing an employee in this program due to the effective cessation of DACA would be a loss of this time investment and a loss of a specially developed employee.

21.     As the rotation employees shift between groups, they spend time with the employee that is stepping into their role and pass on parts of the knowledge they gained in the role.  This is not just a summary of what they learned, but a continual reference point for the incoming employee that could not be encapsulated in any other format.  This collective wisdom builds over the entire length of the program and cannot be replicated without starting over with a new set of employees.  If an employee who is part of the rotation were removed because DACA was enjoined, it would render this training all for naught.  And it would leave a gap in the work unit that could not be addressed.

22.     The DACA employee involved in this rotation has received a great deal of positive feedback during the time with Microsoft.  This person has demonstrated a high level of motivation, has a positive attitude, and is constantly looking for new ways to make an impact at Microsoft.  The employee has developed a reporting system surrounding bad debts that we are required to keep for auditing purposes, developed a Bloomberg dashboard for our internal activities, and

conducted all the feedback collection work for an offsite program we were involved in. This person is already a role model for other incoming employees. If this person is forced to leave our company (and country) due to DACA's being invalidated, Microsoft would be losing a valuable employee in whom it has invested substantial time, training and resources with the expectation that this employee could continue to work at Microsoft.

23.     That same on-the-job training is reflected across Microsoft teams and sectors. This is essential to the way Microsoft grows its employees—with the expectation that they will be able to put this training into practice through continued work at the company.

24.     For example, as part of its team focused on Azure (Microsoft's cloud-based computing platform), Microsoft requires all employees—including DACA employees on the Azure team—to attend and complete boot camps, including regarding the product and underlying technology, security training, and on the job training experiences. The Azure boot camp is a two-day, intense lab experience that helps employees prepare to work with Azure services. The security training ("STRIKE") is a two-day event where high-profile Microsoft engineers and executives from software security participate in case studies and laboratory classes. Microsoft has provided this training with the understanding and expectation that the DACA employees who have gone through it will remain eligible and able to work at Microsoft—to put this training into practice. If DACA employees are unable to continue working, Microsoft would lose out on the return that is set to come from its investment.

## II.     Enjoining DACA Would Hamper Microsoft's Operations, Delay Productivity, and Cause Substantial Losses.

25.     DACA recipients play critical roles in numerous divisions across Microsoft. For example, one DACA employee customizes SharePoint applications for clients and uses SharePoint Designer, InfoPath, Visual Studio, and front-end scripting languages to implement client solutions.

Another works on developing Azure cloud-based services that deploy Dynamics AX in Azure infrastructure. This includes creating and configuring the cloud infrastructure so that consumers can access cloud-based services. Another is a Senior Sales Development Representative at LinkedIn who has responsibility for accounts that represent over $2 million in revenue for the company. Many of these individuals have highly specialized computing, software, and mathematics skills that they acquired either in college or graduate programs, additional skills-building training, and/or Microsoft's extensive training programs.

26. Microsoft has placed these DACA recipients in these roles with the expectation that they will be able to remain. If DACA were enjoined, and these individuals had to cease working in Microsoft's U.S. offices, it would cause substantial disruption to multiple ongoing projects and cause costly delays. As a result of their individual roles and their specialized skill sets, these employees would be very difficult to replace.

27. For example, the Consumer and Device Sales division, which develops the ERP application *Dynamics 365 for Finance and Operations* as part of the larger business suite *Dynamics 365*, includes a small team of five employees, one of whom is a DACA recipient. Any movement in this group creates a big impact on its work product. (Prior losses of employees in this group have taken upwards of six months to address.) If the group were to lose an employee in this group because of the effective cessation of DACA, it is reasonable to say it would take this group around six months to return to the same level of efficiency and productivity. That setback would affect not just this team, but the customers it serves, creating a ripple effect of declining productivity.

28. The team is currently working on the initial deployment and configuration for Dynamics 365 Financials and Operations ("D365FO"), a functionality that has a substantial impact

on customers' perception of the ability to manage Microsoft's Dynamics 365 system. This has a major influence on customers' willingness to agree to business deals for D365FO. If the DACA employee could no longer work for Microsoft, the team's ability to maintain quality and to address requests for change would immediately diminish and would also be delayed until a replacement was found. As mentioned above, this process would take several months, at minimum, causing significant disruption and delays. The team has also started working on the next deployment service based on a new Azure technology. If the DACA employee could no longer work for Microsoft, the team would have to delay our timelines for delivering this project, too.

29.     It is essential to emphasize that this DACA employee brings a unique point of view to this team and could never be fully replaced. Because of the relatively young age of this employee and the mindset that comes with that age demographic, the employee is able to provide a generational point of view as to a certain customer base that is not found elsewhere in the group. Moreover, the employee is bringing new problem-solving ideas to the team and a consumer point of view that is not otherwise represented on the team. And, age aside, this employee brings unique life experience that provides strength to the team by increasing the diversity of ideas and opinions. This makes the team more dynamic and better able to address the diversity in the marketplace. This DACA employee's background also helps Microsoft improve its understanding of user behavior in utilizing our product and the experiences that we build within the product.

30.     The disruption this team would face is emblematic of what Microsoft would see across multiple divisions were DACA enjoined. As another example, the Structured Finance team includes a DACA employee who has been driving a project that involves developing processes and operations and moving those tasks to a new team. This project was started in August 2017 and the DACA employee has been handling it from its inception. This project is currently not

complete.  If this person were removed prior to the completion of this project, it would create disruption in the transfer that would be detrimental to Microsoft and its customers.  Microsoft would have to spend around two months getting a new employee up to date on the project, and he or she would never have the institutional knowledge that comes from owning a project from the start.  Microsoft customers' financing cases would be negatively impacted, as their ability to implement their projects would be delayed.

31.     DACA employees also play other important roles at Microsoft, in which they could not be replaced—again, Microsoft placed them in the roles with the expectation that the company would not need to replace them en masse because of the effective end of DACA.

32.     For example, DACA employees contribute meaningfully to important diversity and inclusion initiatives—with the expectation that their commitments and involvement can continue because of DACA.  If DACA were enjoined and these employees were unable to continue to play these roles, Microsoft's workplaces would suffer tremendously, including in the company's ability to foster, retain, and recruit new talent.

33.     For one, DACA employees have held numerous leadership positions in the group Finance Latinos at Microsoft ("FinLat").  The mission of FinLat is to create an inclusive community for Latino finance employees and provide opportunities for career development and networking to foster professional growth and retention for Latinos at Microsoft.  This includes networking and career development events and, importantly, recruiting events, which help Microsoft continue to attract top talent.

34.     DACA employees also held lead Hispanics of LinkedIn Alliance ("HOLA") and Out@In, both of which create space for employees with different experiences and backgrounds to engage in discussion, share ideas, and learn from one another.  These groups have fostered a

tremendous sense of community, belonging, and collaboration between employees, and they have helped Microsoft maintain a happy, healthy, and productive worth environment, where personnel report high job satisfaction and thus choose to stay with the company.

35.     Microsoft's DACA employees have also worked to assure Microsoft's Latinx retention by mentoring new employees as they grow their own careers.  This has helped Microsoft to nurture and keep talent from diverse backgrounds, including first generation professionals.

36.     DACA employees have likewise held important leadership roles in the Association of Latino Professionals for America ("ALPFA"), a national networking group that includes chapters at universities and colleges.  Through their involvement in this group, DACA employees have helped Microsoft to attract top talent, including other DACA recipients.  Indeed, some DACA employees came to Microsoft through ALPFA connections.

## III.    Enjoining DACA Would Devastate Microsoft Employees Who Have Built Their Lives in Reliance on the Program.

37.     DACA recipients who work at Microsoft have, quite literally, structured their young adult and adult lives in reliance DACA.  To a person, they describe the process of becoming DACA beneficiaries as "coming out of the shadows" to be recognized as an individual within the United States.  DACA meant they could push forward with their education, including through access to student loans and scholarship money.

38.     At least one DACA employee transferred from community college to the University of California at Berkeley because DACA enabled this person to open a bank account, work and earn money, and move to Northern California to pursue a course of study.

39.     DACA recipients made these choices—choices they otherwise may not have made—based on the understanding that they would be able to obtain a work permit and legally earn money and build a career in the United States.  That promise by the government made them

feel comfortable and able to incur student debt, move, pursue additional higher education, and take other steps that they could not have otherwise justified without the promise of future income.

40.    In preparing for careers in technology in the U.S., many took highly specialized courses of study at university, such as Data Structures, Computer Architecture, Discrete Math and Probability Theory, Artificial Intelligence, Database Systems, Efficient Algorithms and Intractable Problems, Operating Systems and Systems Programming, Software Engineering, Signals and Systems, Microelectronic Circuits, and Linear Integrated Circuits.

41.    They have also spent time and money acquiring specialized skills in anticipation of and since joining Microsoft such as Java, Python, Objective C, C#, C++, CSS3, Powershell, Scheme, MIPS, MATLAB, Ruby, Rails, Bootstrap, LESS, JSON, REST, HTML5, SASS, jQuery, Backbone.js, AngularJS, React, SQL Server, MySQL, Microsoft Access, A/B Testing, and User Centered Design.  They have done so precisely because they are able, under DACA, to maintain work authorization to put these skills to use at Microsoft.

42.    DACA employees have expressed that they plan to continue learning and growing at Microsoft because of the continued existence of DACA.  Many have just begun their careers and have anticipated that they will be able to develop professionally and personally in their communities, including their professional community at Microsoft.  They have studied and worked hard with the expectation that they can put that education and training to use in their careers, to contribute to Microsoft and to society.  Many have expressed that they feel they have my whole future ahead of them, during which they have planned and prepared to continue giving back to the only country they truly call home.  Enjoining DACA would destroy those expectations.

43.    The threat of enjoining DACA has caused some employees to consider putting part of their lives on hold by suspending saving for retirement.  These employees have taken advantage

of Microsoft's 401K matching program, on the expectation that they can continue to work in the U.S. so will not need all of their assets to be liquid. But with the threat that DACA could end, DACA recipients express urgency to have cash on hand in case they are unable to retain their jobs. This uncertainty means that these employees regret contributions that are now locked up in retirement accounts.

44.    Many DACA recipients have bought or have long thought about buying houses or have started or thought about starting families, all on the expectation that they could remain and continue to legally work in the United States. Enjoining DACA would force many to uproot their lives. And they have expressed a need to make sure family members, including parents and siblings, will be taken care of.

45.    Some DACA employees have made clear that if DACA were effectively terminated, not only would they not be able to continue working at Microsoft, but they would also no longer be able to pay for their homes or cars. They fear they will become homeless. They have expressed that the same may be true of family members who count on DACA employees for financial support.

46.    DACA employees have also said that the threat of enjoining DACA would put them back in the mental and emotional space of feeling as though they have a great deal of potential but no way to put it to use.

47.    Many have no memories of living in their birth countries and no network there, so they would be alone in a country that I have not lived in since infancy and in which they have no support system. As one DACA employee reflected: "I w[ould] lose a significant portion of my life that I have worked so hard to obtain. The work I have done over the course of years will be

lost.  I may have to move to a country I did not grow up in, and may be forced to leave my entire family and my place of employment."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 20, 2020 in Redmond, Washington.

# Exhibit 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:18-CV-68 |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

<u>**DECLARATION OF MARIA HERNANDEZ**</u>

I, Maria Hernandez, hereby declare the following:

1.      I arrived in the United States in 2005 when I was five years old. I lived in

Roselle, New Jersey, for the first year that I was in the United States. I have lived

in Elizabeth, New Jersey for the last fourteen years.

2.      I am currently a third year student at Saint Peter's University in Jersey

City, New Jersey, where I am studying political science and criminal justice.

3.      I first received Deferred Action for Childhood Arrivals (DACA) in July

2017. Since initially applying for DACA, I have renewed twice, most recently in

2020.

4.      Because of DACA, I have been able to obtain work authorization and a driver's license. My work authorization first allowed me to work in retail in 2017. After I was able to get some experience in the workplace, I wanted to branch out and try to get a job within my field of study. It was a huge relief for me to be able to pay for university on my own, and to be able to buy my own books, clothes, and other necessities without having to ask my parents.

5.      In February 2020, I started a job with the office of New Jersey State Senator Joseph Cryan as a legislative aide. I help the Senator at events, with constituent relations, and with any other projects that our office takes on. For example, now we are working with constituents to help them complete their claims for unemployment.

6.      In March 2020, in response to the coronavirus outbreak in New Jersey, Senator Cryan gave staff the option of volunteering at a COVID-19 testing center during our work hours. I chose to volunteer at the Union County free drive-through testing site at Kean University because I wanted to help out during the pandemic. I thought about all the people who were getting sick and who needed to know if they had COVID-19; I thought that if I or my family were sick, I would hope that other people would do the same for us.

7.      At the testing center, in addition to the certified clinicians who perform the tests, there are approximately 20 volunteers who direct the vehicles and register patients for testing. Although I can be assigned to any post, I am usually in charge of registering the patients who arrive for testing. In addition to gathering all the

information needed to process the tests, one of the important tasks I do as part of registration is encourage all people who show up at the testing center to get tested. We want people who have been exposed to someone with COVID-19 symptoms to get tested. So for example, when someone drives a family member to the testing site, I encourage the driver to get tested as well.

8.      At the testing site, I am required to wear personal protective equipment to reduce the risk of exposure while I interact with patients. I am provided with a mask, hand sanitizer, and gloves to keep me safe. Additionally, we are instructed to enter and exit the facility in certain locations to prevent the spread of infection.

9.      From March 2020 through the summer, I worked at the testing site from 8:00 a.m. to 4:00 p.m. three days a week. On the busiest days during the height of the pandemic in New Jersey, we processed over 700 vehicles at the testing center. I was generally one of four people doing registration, so there were days that I registered over 175 people during my shift.

10.     In the middle of May 2020, my family and I became ill with COVID-19 and had to quarantine. I am not sure where I was exposed; it could have been at the testing site but also could have been at our workplaces. I was mostly asymptomatic, but my mother had a persistent cough and I was very anxious about what would happen. Thankfully, we have all recovered by now.

11.     Since returning to school this fall, I have continued to work at the testing site. Fewer people are coming to the testing site now, and the testing site is only open two days a week now, but we still get about 250 vehicles a day. In addition

to drive-through testing, Union County has started walk-up testing that is accessible to even more people and offers flu shots in addition to COVID-19 tests. When the testing site at Kean University started conducting walk-up testing, I split my time between doing registration work at the drive-through location and the walk-up location. I am currently working only at the walk-up location. Earlier in the fall, I worked two afternoons and one full day a week at the testing site, but they recently reduced the hours for testing again so now I work two afternoons a week.

12.     My work at the testing site inspired me to join the Medical Reserve Corps. I applied in July, and I am waiting for a decision on my application. As a Medical Reserve Corps volunteer, I would continue working at the testing center and be available to do other public health and emergency response work in my community. Without DACA, I would not be able to volunteer with the Medical Reserve Corps because it requires U.S. citizenship or lawful presence.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November ___5th___, 2020, in ___Elizabeth___, New Jersey

_____

Maria Hernandez

# Exhibit 20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-68 |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

## DECLARATION OF ELZBIETA WOJTYLO

I, Elzbieta Wojtylo, hereby declare the following:

1.      I am employed as a Supervising Family Service Specialist 2 by the New

Jersey Department of Children and Families, Division of Child Protection and

Permanency (DCP&P). I have been a DCP&P employee for fourteen years, and have

been a supervisor since 2015. I am currently based in the Morris County DCP&P office.

Prior to becoming a supervisor, I had worked as an intake worker in Bergen, Sussex and

Warren Counties.

2.      As a supervisor with DCP&P, I supervise a team of five Field

Investigators who are responsible for conducting child abuse/neglect investigations and

welfare assessments, ensuring the safety, stability, and permanency of children, and

referring families to appropriate services. As a supervisor, I am responsible for overseeing the investigations and mentoring my staff.

3.      Since August 2018, I have supervised Cinthia Osorio, who is a DACA recipient.

4.      Cinthia earned a Bachelors of Social Work degree from Centenary College in 2018. She first joined DCP&P as an undergraduate social work intern with DCP&P's prestigious, year-long Baccalaureate Child Welfare Education Program in September 2017. At that time, her supervisor was Rose Arackathara (*see* Declaration of Rose Arackathara, Dkt. 215-1, pp. 160-63).

5.      Upon completing her internship and graduating with her degree, Cinthia was hired as a full-time DCP&P field worker  (initially as a Family Service Specialist Trainee, and now, after completing her probationary period, as a Family Service Specialist 2). Cinthia's regular duties in this role include conducting intake investigations in Morris County, New Jersey, in response to referrals involving potential child abuse or neglect or other child welfare concerns. As an intake field worker, she gathers information through interviews, home visits, and other means to determine whether the children face immediate danger and refers families to community and contracted service providers for ongoing assistance. Cinthia is a strong intake worker and advocate for the families she works with. She is able to accurately assess whether a child is at risk. She is very knowledgeable and refers families to appropriate services to mitigate risk and ensure children are safe.

6.      In response to the COVID-19 pandemic, in order to protect employees, DCP&P required most field workers to work from home from late March through early

July—that is, the vast majority of DCP&P employees were not permitted to visit the families they worked with or otherwise work in the field. DCP&P then created a volunteer-only response team consisting of a small number of field workers who would make in-person visits when needed, often in the case of an emergency. Longer-term case management was handled by other staff who were not part of the response team.

7.     Cinthia volunteered to do intake investigative work as a member of the COVID-19 response team, and she handled cases in Morris, Passaic, and Sussex counties.

8.     Hours for response team field workers were long. Cinthia was assigned to work from 8:00 a.m. to 4:00 p.m. five days a week, but she often ended up working until 8:00 p.m. or as late as 11:00 p.m. She was also on-call and often had to make visits on one of the two days a week that she was not assigned to work.

9.     The response team intake field investigators, including Cinthia, had to follow strict protocols to protect themselves from possible exposure to COVID-19. For example, they were required, when possible, to conduct interviews with family members outside and to wear personal protective equipment when going into homes to assess conditions. When a family was known to have COVID-19, the caseworkers were sometimes able to use FaceTime to conduct their assessment of the interior of the home, but this was not always possible and, on certain occasions, Cinthia had to enter the homes of COVID-19-positive families to assess the safety of the children she was charged with protecting.

10.     As part of her work on the COVID response team, Cinthia responded primarily to high-risk/high-priority cases where a child was at imminent risk of harm. In these cases, she had to take emergency actions to protect children's safety and health,

including removing a child from the home, taking a child to the hospital, arranging for psychiatric evaluations, and buying food for a family.

11.     Cinthia also volunteered to serve as a "buddy," accompanying another field worker on calls where there was believed to be specific security risk for the field workers. Many of these visits were in areas that are not part of Cinthia's regularly-assigned geographic region.

12.     As Cinthia's supervisor, I have been struck by her ability as field worker. Her compassion, dedication, and language skills, as well as her ability to connect with families and build trust, make her a fantastic asset to DCP&P.

13.     During the height of the COVID-19 pandemic, Cinthia played a critical role as part of the COVID response team in ensuring that DCP&P was able to continue to protect New Jersey's children, even in the midst of a global pandemic. She continues to play a critical role in the State's efforts to protect New Jersey children and support New Jersey families.

14.     Without DACA, Cinthia would not be able to work for DCP&P, and DCP&P would lose a trained, experienced, skilled, and hardworking child advocate. Given the education and training required, it is always difficult for DCP&P to replace field workers, let alone field workers with Cinthia's abilities. During the pandemic, DCP&P caseworkers are more vital than ever given the limited interaction that many children have with adults outside the family. Since the start of the pandemic, we have also seen a rise in mental health issues and substance use, as well as a rise in domestic violence—all of which have an adverse impact on children's safety. At the same time, it is even harder to replace our field workers due to the personal risks involved in working

as a field worker during the pandemic and the limitations on training. In short, losing Cinthia would be a significant loss for DCP&P and the State of New Jersey.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November __5__, 2020, in __Andover__, New Jersey

Elzbieta Wojtylo
DCP&P Supervisor