**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.,* | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.,* | § | |
| | § | |
| Defendant-Intervenors. | § | |


**DEFENDANT-INTERVENORS' BRIEF IN SUPPORT OF THEIR MOTION FOR**
**SUMMARY JUDGMENT AND IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.      **Statement of the Issues** ................................................................................. 1

II.     **Introduction** .................................................................................................. 1

III.    **Statement of the Nature And Stage of the Proceedings** ............................ 4

   A.    History of Deferred Action in the Immigration Context ................................ 4

   B.    Deferred Action for Childhood Arrivals ........................................................ 5

   C.    Developments since the DACA Memorandum ............................................... 7

     1.   Texas I (DAPA) ......................................................................................... 7

     2.   Attempt to Withdraw DACA ..................................................................... 8

     3.   Texas II (Present Litigation) ...................................................................... 9

     4.   *Regents* Decision ..................................................................................... 10

     5.   "New DACA" ........................................................................................... 13

IV.     **Summary of the Argument** ........................................................................ 16

V.      **Argument** ................................................................................................... 16

   A.    Threshold Issues Bar This Court's Review .................................................. 16

     1.   Plaintiffs Do Not Have Standing to Challenge New DACA .................... 17

     2.   Plaintiffs Do Not Have Standing to Sue to Challenge 2012 DACA .......... 18

     3.   This Action Does Not Present an Article III Case or Controversy .............. 33

     4.   The Court Should Deny Plaintiffs' Motion for Summary Judgment Due to Plaintiffs' Lack of Standing ................................................................. 36

   B.    Disputed Issues of Fact Prevent a Ruling in Plaintiffs' Favor ..................... 36

     1.   The Wolf and Edlow Memoranda, Which Established New DACA, Highlight the Flaws in Plaintiffs' Reasoning and Pose New Lawfulness Questions that Plaintiffs Have Not Addressed ................................................................. 37

     2.   2012 DACA Is Lawful As Implemented and Administered ........................ 38

     3.   A Ruling on Plaintiffs' Take Care Clause Claims Should Be Deferred Until after a Merits Hearing ............................................................................. 45

   C.    The Court Should Abstain from Ordering Injunctive Relief ........................ 46

     1.   Vacatur Is Neither Necessary Nor Appropriate in This Case ................... 46

     2.   The Balance of the Equities Tips Strongly Away from Plaintiffs .............. 48

     3.   Nationwide Injunctions Should Be Disfavored Generally, and in this Case in Particular ................................................................................................. 49

     4.   To the Extent the Court Is Going to Fashion a Remedy, the Court Must Consider Reliance Interests and Consider Allowing for Continued Forbearance from Removal ............................................................................................. 49

VI.     **Conclusion** ................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
   458 U.S. 592 (1982)................................................................................25

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993)...............................................................46

*Arizona v. United States*,
   567 U.S. 387 (2012)....................................................................4, 26, 41

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
   178 F.3d 350 (5th Cir. 1999) ............................................................17, 36

*Batalla Vidal v. Nielsen*,
   279 F. Supp. 3d 401 (E.D.N.Y. 2018), *vacated in part, rev'd in part, aff'd in
   part*, 140 S. Ct. 1891 (2020) .............................................................8, 10

*Bennett v. Spear*,
   520 U.S. 154 (1997)................................................................................35

*Boudreaux v. Swift Transp. Co.*,
   402 F.3d 536 (5th Cir. 2005) .................................................................45

*Cent. & S. W. Servs., Inc. v. EPA*,
   220 F.3d 683 (5th Cir. 2000) .................................................................46

*CQ, Inc. v. TXU Mining Co., L.P.*,
   565 F.3d 268 (5th Cir. 2009) .................................................................29

*Del. Dep't of Nat'l Res. & Env't Control v. FERC*,
   558 F.3d 575 (D.C. Cir. 2009)...............................................................32

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
   140 S. Ct. 1891 (2020).................................................................. *passim*

*Dine Citizens Against Ruining Our Env't v. Bernhardt*,
   923 F.3d 831 (10th Cir. 2019)................................................................46

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)................................................................................48

*Gov't of Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019)..........................................................25, 26

*INS v. Chadha*,
    462 U.S. 919 (1983) ................................................................34, 35

*K.P. v. LeBlanc*,
    627 F.3d 115 (5th Cir. 2010) ........................................................24

*Kirkland v. N.Y. State Dep't of Corr. Servs.*,
    No. 82-cv-0295, 1988 WL 108485 (S.D.N.Y. Oct. 12, 1988) ................35

*Lawson v. Callahan*,
    111 F.3d 403 (5th Cir. 1997) ........................................................25

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................ *passim*

*Lynch Props., Inc. v. Potomac Ins. Co.*,
    140 F.3d 622 (5th Cir. 1998) ..........................................................4

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ......................................................26, 31, 32

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ....................................................................26

*Md. People's Counsel v. FERC*,
    760 F.2d 318 (D.C. Cir. 1985) ......................................................25

*Michigan v. EPA*,
    581 F.3d 524 (7th Cir. 2009) ........................................................25

*Moore v. Charlotte-Mecklenburg Bd. of Ed.*,
    402 U.S. 47 (1971) ......................................................................33

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) ................................................................32

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) ..........................................8, 10

*North Carolina v. EPA*,
    550 F.3d 1176 (D.C. Cir. 2008) ....................................................46

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) ........................................................25

*Parm v. Shumate*,
    Civil Action No. 3-01-2624, 2006 WL 1228846 (W.D. La. May 1, 2006) ............29

*Ranger Ins. Co. v. Culberson*,
    454 F.2d 857 (5th Cir. 1971) ...................................................................30

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th Cir. 2018),
    *rev'd in part, vacated in part*, 140 S. Ct. 1891 (2020) .................................... *passim*

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999)...........................................................................4, 39

*Seaman v. Seacor Marine L.L.C.*,
    326 F. App'x 721 (5th Cir. 2009) .........................................................21

*Smith v. Palafox*,
    728 F. App'x 270 (5th Cir. 2018) .........................................................30

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)....................................................................16, 17

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)..............................................................................21

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ..............................................................47

*Texas v. United States*,
    809 F.3d 134 (5th Cir.2015) ....................................................... *passim*

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018).........................................................................26

*United Pub. Workers of Am. (C.I.O.) v. Mitchell*,
    330 U.S. 75 (1947)...............................................................................33

*United States v. Texas*,
    136 S. Ct. 2271 (2016) ...........................................................................8

*United States v. Windsor*,
    570 U.S. 744 (2013).................................................................34, 35, 36

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982).............................................................................48

*Wells v. SmithKline Beecham Corp.*,
    601 F.3d 375 (5th Cir. 2010) ...............................................................28

## Statutes

5 U.S.C. § 1001 *et seq.* (Administrative Procedure Act)....................................... *passim*

5 U.S.C. § 3345 *et seq.* (Federal Vacancies Reform Act) ...............................................14

6 U.S.C. § 101 *et seq.* (Homeland Security Act of 2002)...............................................14

6 U.S.C. § 202(5) ...............................................................................................................4

8 U.S.C. § 1101 *et. seq.*....................................................................................................6

8 U.S.C. § 1103 .................................................................................................................4

8 U.S.C. § 1182(d)(5)(A)...............................................................................................6, 41

8 U.S.C. § 1227(d)(2) ........................................................................................................4

28 U.S.C. § 471 *et seq.* (Civil Justice Reform Act).........................................................25

28 U.S.C. § 1292(b) ..........................................................................................................9

42 U.S.C. § 2201 *et. seq.* (Declaratory Judgment Act)...................................................25

42 U.S.C. § 18001 *et seq.* (Patient Protection and Affordable Care Act)..............29, 31

## Other Authorities

8 C.F.R. § 274a.12(c)(14) ..................................................................................................4

46 Fed. Reg. 25,080 (May 5, 1981)................................................................................6, 40

52 Fed. Reg. 16,228 (May 1, 1987)................................................................................6, 40

61 Fed. Reg. 47,039 (Sept. 6, 1996) ..............................................................................6, 40

76 Fed. Reg. 53,764 (Aug. 29, 2011)..............................................................................6, 40

80 Fed. Reg. 7,912 (Feb. 12, 2015) ................................................................................6, 40

Fed. R. Civ. P. 56 ..................................................................................................4, 10, 29, 30

Fed. R. Civ. P. 65(a)(2)......................................................................................................19

Fed. R. Evid. 602 ..........................................................................................................29, 30

H.R. 6, 116th Cong. (1st Sess. 2019)................................................................................6

## I.      STATEMENT OF THE ISSUES

On August 21, 2020, the Court denied Plaintiffs' Motion for Summary Judgment, Dkt. 356, without prejudice and granted Plaintiffs leave to re-file the motion, incorporating additional arguments from *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891 (2020)("*Regents*").  *See* Dkt. 473 at 8.  Plaintiffs re-filed their Motion for Summary Judgment on October 9, 2020 ("MSJ").  *See* Dkt. 486.  Defendant-Intervenors Karla Perez, *et al.*, ("Defendant-Intervenors") now respectfully request that the Court deny Plaintiffs' MSJ and instead grant summary judgment in favor of Defendant-Intervenors due to Plaintiffs' lack of standing.

## II.     INTRODUCTION

Plaintiffs' Motion for Summary Judgment merely recycles the same arguments from Plaintiffs' earlier briefing regarding the 2012 DACA memorandum, without meaningfully grappling with the dramatic ways in which the legal context has changed over the eight years since DACA was first issued.  Most notably, just recently, Federal Defendants substantially revised DACA from the memorandum released in 2012.  Moreover, Federal Defendants did so in response to the clear instructions, both of this Court in its order denying a preliminary injunction and the Supreme Court's opinion in *Regents*, that any resolution of the numerous complicated issues addressed by DACA must take account of the reliance interests of thousands of young people who have, in the intervening years, established themselves as contributing members in the only country they have ever known.  Because Plaintiffs' motion takes aim at a strawman (the 2012 DACA memorandum) that no longer exists, and fails to address the central issues, their Motion for Summary Judgment necessarily fails.  Even more fundamentally, because Plaintiffs fail to present any evidence of how they are harmed by the federal government's exercise of removal forbearance, much less how they are harmed by Federal Defendants' modified implementation of DACA, they

1

have failed to establish the minimum prerequisite to maintaining suit, and summary judgment should be granted in favor of Defendant-Intervenors.

Plaintiffs' Motion for Summary Judgment hardly acknowledges how the relevant landscape had changed (adversely to Plaintiffs' position) since this Court denied Plaintiffs' motion for a preliminary injunction.  Most saliently, in *Regents*, the Supreme Court underscored—as this Court had in its preliminary injunction opinion—the DREAMers' significant reliance interests in DACA, and that any resolution of the immigration issues addressed by DACA is, in the first instance, one for the political branches, with explicit consideration of those reliance interests.  *See* 140 S. Ct. at 1913–15.  The Supreme Court observed that the Fifth Circuit's decision in *Texas v. United States*, 809 F.3d 134 (5th Cir.2015) ("*Texas DAPA*"), did *not* speak to the validity of deferred action, the core of DACA, and that neither the Attorney General nor the Fifth Circuit in *Texas DAPA* had concluded that removal-forbearance is unlawful.  *Regents*, 140 S. Ct. at 1911–12.  Notably, the *Regents* decision did *not* itself make any determination on 2012 DACA's legality, but explicitly declined to "evaluate the claims challenging the explanation and correctness of [the Attorney General's] illegality conclusion."  *Id.* at 1910.  Instead, the Court stressed that, *even taking as a given the Attorney General's illegality conclusion*, that would not necessarily lead to DACA's termination. *See id.*  Recognizing that, under regulations not before the Supreme Court, the Attorney General's illegality conclusion was binding on the Department of Homeland Security ("DHS"), the Court remanded to DHS to consider the appropriate next steps, *taking into account DREAMers' reliance interests*.  *Id.* at 1910, 1916.

In response to *Regents*, Federal Defendants have significantly altered DACA, including limiting the grant of advance parole that features so prominently in Plaintiffs' motion.  *See, e.g.*, Dkt. 486 at 11–12.  Regardless of whether Federal Defendants' latest actions comport with

procedural and substantive constraints (an issue not before this Court), DACA as it is implemented today is not DACA as Plaintiffs describe it in their motion.  Plaintiffs have not amended their complaint to address these important changes, or grappled with the Supreme Court's analysis.  In short, Plaintiffs instead ask this Court to do what the Supreme Court refused to do:  order the termination of DACA.  The Court should likewise decline Plaintiffs' invitation.

Although new discovery has been propounded and *Regents* has clarified certain key questions, Plaintiffs do not adequately account for those factual or legal developments.  Accordingly, the key deficiencies in Plaintiffs' summary judgment motion are even more egregious now.  Plaintiffs have failed to introduce evidence to meet their burden to show that DACA has caused Plaintiffs any injuries sufficient to establish standing.  Indeed, Plaintiffs have conceded that they cannot identify any plaintiff state's expenditures made on DACA recipients, and Plaintiffs have offered no evidence that DACA recipients would "self-deport" if DACA were to end, as Plaintiffs *must* show in order to establish that the Court can grant relief that addresses their purported injury.  Dkt. 486 at 27–28.[1]  Similarly, Plaintiffs have failed to prove their legally flawed and factually unsupported theory of harm based on "labor-market distortions."  Dkt. 486 at 23.  And they have offered no evidence at all as to any harms from "new" DACA, as revised.

Because Plaintiffs have failed to carry their burden to show that they have standing and that this case continues to present an Article III controversy, the Court should grant summary judgment dismissing Plaintiffs' complaint.  Should the Court nonetheless consider the case on the merits, the Court should deny Plaintiffs' request for summary judgment because genuine disputes of material fact remain, particularly regarding the use of discretion in DHS's operation of DACA, both as it was implemented in 2012 and as it exists today.  These "genuine dispute[s] as to []

---

[1] *See, e.g.,* Ex. 46 at ¶¶ 3–4; Ex. 47 at ¶¶ 4–5; Ex. 48 at ¶ 3.  *See also* note 5, *infra*.

material fact[s]" preclude a grant of summary judgment in Plaintiffs' favor.  Fed. R. Civ. P. 56(a);

*see also Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998).

## III.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

### A.     History of Deferred Action in the Immigration Context

Congress has charged the Secretary of Homeland Security with the administration and

enforcement of immigration laws.  8 U.S.C. § 1103(a)(1).  Recognizing that these laws vest the

Executive Branch with broad enforcement discretion, Congress has also directed the Secretary to

establish "national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).  Congress

appropriates only enough funds to remove or return approximately 450,000 immigrants each year,

even though approximately 12 million immigrants are potentially subject to removal.  *Cf.* Dkt.

400-9, Ex. 62-A; *see also* Dkt. 400-3, Ex. 15 ¶¶ 8–10.  As a result, the Executive must necessarily

exercise prosecutorial discretion in the immigration context, including through "deferred action"

with respect to removal of certain non-U.S. citizens. DHS has frequently granted discretionary

relief from removal to undocumented immigrants through deferred action, codified in regulation

as "an act of administrative convenience to the government which gives some cases lower

priority."  *See* 8 C.F.R. § 274a.12(c)(14).  *See generally* Dkt. 224 at 13–14 (citing 8 U.S.C.

§ 1154(a)(1)(K); *id.* § 1184(p)(6); *id.* § 1255(a)); *see also* Dkt. 400-8, Ex. 55.

The Supreme Court has recognized that "[a] principal feature of the removal system is the

broad discretion exercised by immigration officials." *Arizona v. United States,* 567 U.S. 387, 396

(2012).  More specifically, "deferred action," the Court has noted, is a "regular practice . . . of

exercising that discretion."  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84

(1999).  Congress has even codified the existence of deferred action.  *See* 8 U.S.C. § 1227(d)(2)

(distinguishing "deferred action" from an "administrative stay of removal").  For decades, the

Executive Branch has implemented deferred action and other forms of prosecutorial discretion

4

both for individual non-U.S. citizens and for various classes of non-U.S. citizens. *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1019–22 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th Cir. 2018), *rev'd in part, vacated in part*, 140 S. Ct. 1891 (2020) (describing programs since 1975).

### B.      Deferred Action for Childhood Arrivals

In 2012, the Secretary of Homeland Security issued a memorandum providing guidelines for the exercise of discretion to grant deferred action to non-U.S. citizens brought to the United States as children who meet certain criteria, including having continuously resided in the United States since June 15, 2007 (the "DACA Memorandum," creating "2012 DACA"). *See* Dkt. 400-7, Ex. 36. The DACA Memorandum provided guidance to all three branches of DHS— Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and United States Citizenship and Immigration Services ("USCIS")—in exercising their enforcement discretion. Because DACA applies only to immigrants who arrived as children before mid-2007, the number of individuals who may be affected is fixed and the number of DACA recipients who renew each year is diminishing. As of April 2019, there were 669,080 DACA recipients. *See* Dkt. 400-9, Ex. 62-G at 6.

As with the many forms of discretionary relief that preceded it, deferred action under DACA is an exercise in prosecutorial discretion, granted in an individualized, temporary, and contingent manner. *See* Dkt. 400-9, Ex. 62-H at 8, 18; Dkt. 400-9, Ex. 62-I; Dkt. 400-9, Ex. 62-B. DACA is "not a benefit and does not *confer* any status," nor does it "*lead* to any status;" it "simply means that action to remove someone is deferred until a certain date and that the decision to pursue removal may be revisited at some point in the future." Dkt. 400-9, 62-B at 6. By its own terms, the DACA Memorandum does not "confer[] . . . [a] pathway to citizenship." Dkt. 400-7, Ex. 36 at App. 0004. Like other recipients of deferred action such as individuals under orders

5

of supervision or witnesses in criminal investigations, some DACA recipients may never be able to adjust their status to lawful permanent resident.  As such, DACA differs fundamentally from the proposed Development, Relief, and Education for Alien Minors  (DREAM) Act, which would provide a path to permanent  residence and U.S. *citizenship* for recipients.  *See, e.g.*, H.R. 6, 116th Cong. (1st Sess. 2019). (Dkt. 400-7, Ex. 43).

Although DACA recipients may be eligible for work authorization or other benefits, that is a consequence not of the DACA Memorandum itself, but of independent rules promulgated through formal rulemaking procedures long before the DACA Memorandum.  *See* Dkt. 400-8, Exs. 59–53 (46 Fed. Reg. 25,080 (May 5, 1981); 52 Fed. Reg. 16,228 (May 1, 1987); 76 Fed. Reg. 53,764 (Aug. 29, 2011); 61 Fed. Reg. 47,039 (Sept. 6, 1996); 80 Fed. Reg. 7,912 (Feb. 12, 2015)); *see also Regents*, 140 S. Ct. at 1902, 1911–12.  Plaintiffs do not challenge any of those substantive regulations as either being beyond DHS's authority or having been adopted without appropriate procedures.

Although Plaintiffs cite "advance parole" as evidence that DACA was beyond DHS's authority, *see* Dkt. 486 at 11–12, advance parole does not grant immigration status to DACA recipients.  Plaintiffs misapprehend both DACA and advance parole when they claim that DACA "allows DACA recipients to apply for advance parole, which removes a significant impediment that would otherwise prevent many unlawfully present aliens from adjusting their immigration status."  Dkt. 486 at 11.  First, no language in the 2012 DACA Memorandum mentions advance parole or grants permission to DACA recipients to apply for or receive advance parole.  Second, the Immigration and Nationality Act ("INA") provides that advance parole is available to "any" individual, and nothing in the INA mentions or provides special consideration to DACA recipients. 8 U.S.C. § 1182(d)(5)(A).

Advance parole "allows an[y] alien to physically enter into the United States for a specific purpose." Ex. 1 at 1.  It is neither focused on nor limited to any category of undocumented person, including DACA recipients.  *Id.*  An advance parole document is a document issued by USCIS "for urgent humanitarian reasons or significant public benefit to a foreign national inside the United States who is preparing to travel abroad and is planning to return."  Dkt. 400-4, Ex. 19 at 2; Dkt. 400-1, Ex. 2 ¶¶ 21–26; Dkt. 402-1, Ex. 62-J.  The advance parole document is not "a grant of parole," and CBP officers make "a separate discretionary decision regarding the parole request upon the foreign national's arrival at the point of entry." Dkt. 400-4, Ex. 19 at 2; Dkt. 400-1, Ex. 2 ¶¶ 21–26; Dkt. 402-1, Ex. 62-J.  Advance parole does not grant immigration status and those travelling with advance parole documents may still be denied entry back into the United States at the border.[2] Ex. 1 at 1.  Having travelled with an advance parole document, any undocumented individual, including a DACA recipient, who adjusts status to lawful permanent resident must have grounds, independent of the advance parole, to adjust.  *See* Dkt. 400-3, Ex. 14 ¶ 31.

## C.    Developments since the DACA Memorandum

### 1.    *Texas I (DAPA)*

In 2014, over two years after announcing DACA, DHS announced a distinct policy regarding DHS's exercise of enforcement discretion, referred to as Deferred Action for Parents of Americans ("DAPA").  *See generally* Dkt. 478-8, Ex. 8; Dkt. 400-3, Ex. 18.  DAPA guided the exercise of discretion, specifically grants of deferred action, with respect to a potential group of up to 4 million parents of U.S. citizens and lawful residents.  *See* Dkt. 400-3, Ex. 18.  Shortly

---

[2] Advance parole is a regular component of immigration enforcement and has not been purposefully created or amended to open a path to immigration status for DACA recipients.  Between 2013 and 2015, USCIS issued advance parole documents to 2.85% of all DACA recipients, and only 0.69% of all DACA grantees applied to adjust their status after receiving advance parole.  Dkt. 400-4, Ex. 19 at 6–8; *see also* Ex. 19 ¶ 7.  Moreover, USCIS "has not granted advance parole based on the standards associated with DACA since September 5, 2017."  Ex. 2 at 10 n.7.

thereafter, on December 3, 2014, a number of states—including certain Plaintiffs in the instant action—brought suit to challenge the legality of DAPA, but not DACA. The Court of Appeals for the Fifth Circuit ultimately affirmed a ruling by this Court that the Secretary of Homeland Security's adoption of DAPA exceeded her authority. *Texas DAPA*, 809 F.3d at 188. The Supreme Court granted review, but an evenly divided Court was unable to rule on the merits of the government's appeal. *United States v. Texas*, 136 S. Ct. 2271, 2272 (2016).

### 2.    Attempt to Withdraw DACA

On September 4, 2017, Attorney General Jeff Sessions sent a letter to the Acting Secretary of Homeland Security summarizing his view that DACA, which had not been challenged, was also unlawful, Dkt. 400-4, Ex. 21, and the next day the DHS Secretary ordered the wind down of DACA. Dkt. 400-4, Ex. 22. Shortly after DHS announced its intention to wind down DACA, numerous plaintiffs, including individuals whose removal proceedings had been deferred pursuant to DACA, challenged the determinations of the Attorney General and DHS Secretary in several courts around the country.

On January 9, 2018, the U.S. District Court for the Northern District of California issued a preliminary injunction against DHS and the DHS Secretary, ordering them to "maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments," subject to certain exceptions. *Regents*, 279 F. Supp. 3d at 1048; *see also Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018), *vacated in part, rev'd in part, aff'd in part*, 140 S. Ct. 1891 (2020) (similar injunction on Feb. 13, 2018). On April 24, 2018, the U.S. District Court for the District of Columbia issued a preliminary injunction that vacated DHS's September 5 memorandum rescinding DACA, which then required the Department to accept new DACA applications. *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018). On June 22, 2018, in

response to the District of Columbia order, DHS issued a memorandum purporting to clarify its decision to wind down DACA, and reiterating that the rescission was not done as a policy choice, but based on the premise that the "the DACA policy was contrary to law." Ex. 12 at 2.

### 3.    Texas II (present litigation)

On May 1, 2018—nearly six years after the DACA Memorandum was originally issued, almost eight months after DHS's memorandum directing the wind-down of DACA, and only after numerous judicial orders compelled DHS to maintain DACA in place—Plaintiffs filed the instant action, challenging for the first time the lawfulness of the 2012 DACA Memorandum. *See* Dkt. 1. On May 2, 2018, Plaintiffs filed a motion for a preliminary injunction ("PI"). *See* Dkt. 5. This Court then ordered the parties to conduct limited expedited discovery related to the Plaintiffs' motion. *See* Dkt. 53.

The Court ultimately denied Plaintiffs' motion for a preliminary injunction, *see* Dkt. 319 at 117, in part because Plaintiffs could not prove "the legal element" of irreparable harm due to their nearly-six-year delay in challenging DACA. *See* Dkt. 319 at 111–12. The Court reasoned that a "delay in seeking an injunction has been viewed as a concession or an indication that the alleged harm does not rise to a level that merits an injunction." Dkt. 319 at 109. The Court noted that to halt DACA on the current record "does not make sense nor serve the best interests of this country." Dkt. 319 at 115. Additionally, although Plaintiffs argued in their preliminary injunction briefing that summary judgment was appropriate, *see* Dkt. 218 at 55–56, the Court rejected that contention. *See* Dkt. 302 at 6 ("I know there is a pleading by the states that said, why don't you just go ahead and grant a summary judgment?  I am not doing that.").

This Court certified its order pursuant to 28 U.S.C. § 1292(b), so as to permit Plaintiffs the option to seek immediate appellate review of the legal questions presented.  Plaintiffs chose not to appeal notwithstanding the Court's invitation.  Therefore, the Court ordered a full case

management and discovery schedule through August of 2019. *See* Dkt. 337A (Nov. 14, 2018 minute entry). Notwithstanding that the parties were still engaged in discovery, on February 4, 2019, Plaintiffs filed a motion for summary judgment. *See* Dkt. 356. Shortly thereafter, Defendant-Intervenors filed a Rule 56(d) motion to defer or deny summary judgment on the ground that the full discovery period ordered by this Court had not yet closed and Plaintiffs had refused to answer Defendant-Intervenors' then-pending discovery requests. Dkt. 363. Defendant-Intervenors submitted their brief in opposition to Plaintiffs' Motion for Summary Judgment on June 14, 2019. *See* Dkt. 399.

On June 28, 2019, the Supreme Court granted certiorari in *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018), and consolidated that case with *NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018), and *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018). *See* 139 S. Ct. 2779 (2019). In light of the Supreme Court's grant of certiorari, Defendant-Intervenor New Jersey filed a motion to stay this case pending the Supreme Court's decision. *See* Dkt. 427. The Court granted New Jersey's motion on November 22, 2019. *See* Dkt. 447. The Court noted that, during oral arguments in *Regents*, the Justices' questions addressed issues important to this case's resolution, *id.* at 2, including "questions on the topic of reliance," which is "quite relevant to the public and private interest factors which this Court must address if it reaches the question of whether to issue an injunction—the very relief requested by the Plaintiffs." *Id.* at 7.

### 4. Regents *Decision*

The Supreme Court announced its opinion in *Department of Homeland Security v. Regents of the University of California* and the consolidated cases on June 18, 2020. 140 S. Ct. 1891. Although the Supreme Court concluded that the Administrative Procedure Act ("APA") did not preclude its review of DACA's rescission, *id.* at 1906–07, the Supreme Court did not make an

10

independent determination on DACA's legality, or conduct its own evaluation of "the claims challenging the explanation and correctness of the [Attorney General's] illegality conclusion." *Id.* at 1910.  Instead, the Supreme Court took as its starting point the fact that Acting DHS Secretary Duke was bound by the Attorney General's conclusion that DACA was unlawful (regardless of whether the Attorney General's conclusion was legally correct).  *Id.*  Nonetheless, while the Supreme Court merely assumed for purposes of analysis that Acting Secretary Duke was constrained by the Attorney General's reasoning, the Supreme Court held that "nothing about [the Attorney General's illegality determination] foreclosed or even addressed the options of retaining forbearance or accommodating particular reliance interests." *Id.* at 1915.  Because Acting Secretary Duke failed to consider these two "conspicuous issues," the Supreme Court found DACA's rescission arbitrary and capricious.  *Id.* at 1916.

As this Court predicted in its November 22, 2019 Order granting New Jersey's motion to stay, *see* Dkt. 447 at 7—and consistent with this Court's reasoning in its August 31, 2018, Order denying Plaintiffs' motion for a preliminary injunction, *see* Dkt. 319 at 112–15—DACA recipients' reliance interests weighed heavily in the Supreme Court's analysis. *See Regents*, 140 S. Ct. at 1913–14.  In fact, the Supreme Court found Acting Secretary Duke's memorandum lacking precisely because it "failed to address whether there was legitimate reliance on the DACA Memorandum." *Id.* at 1913 (citation omitted).  In support of its emphasis on the importance of DACA recipients' reliance interests, the Supreme Court highlighted evidence submitted by plaintiffs and their *amici. Id.* at 1914.  According to that evidence, the consequences of DACA's rescission would affect not only DACA recipients, but also: their families and U.S.-citizen children; the schools where they teach and study; the employers who have invested in their training; and the State and local economies that count on them to generate economic activity and

11

pay taxes.  *Id.* at 1914–15.  While the Supreme Court reasoned that DHS was not required to "consider all policy alternatives in reaching [its] decision," DHS "*was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Id.* at 1915 (citation omitted).  Had DHS done so, the Supreme Court suggested, Acting Secretary Duke may have "considered a broader renewal period" to give DACA recipients time to "reorder their affairs" and to accommodate DACA recipient's reliance interests, including their "time-bound commitment[s]" such as courses of study, military service, or medical treatments.  *Id.* at 1914.

The Supreme Court also faulted Acting Secretary Duke for failing to consider continuing to grant removal-forbearance.  *Id.* at 1911–12.  According to the Supreme Court, because the Fifth Circuit's decision in *Texas I* did *not* speak to the validity of deferred action itself, neither the Attorney General nor the Fifth Circuit in *Texas I* determined that removal-forbearance is unlawful. *Id.* at 1911–12.  In short, according to the Supreme Court, *Texas I* does not concern removal-forbearance, which the Supreme Court described as DACA's "centerpiece," *id.* at 1913, and so the APA required Acting Secretary Duke to consider a policy that retained it (even if other aspects of DACA were deemed unlawful).

According to the Supreme Court, Acting Secretary Duke's "dual failure" to consider reliance and forbearance raised doubts "about whether the agency appreciated the scope of its discretion or exercised that discretion in a reasonable manner."  *Id.* at 1916.  As a result, the Supreme Court remanded to DHS.  *Id.*  Although the Supreme Court assumed that DHS was bound by the Attorney General's legal determination, the Court concluded that DHS failed adequately to consider how to respond or to weigh its remaining policy choices.  And "[t]hose policy choices," the Supreme Court explained, "are for DHS."  *Id.* at 1910.

5.      *"New DACA"*

Rather than return to the pre-rescission status quo, Federal Defendants responded to the Supreme Court's decision in *Regents* with a series of letters and memoranda (collectively "New DACA") that together resulted in "certain immediate changes to the DACA policy" by "limit[ing] its scope." Ex. 3, at 1, 5.  New DACA, as implemented and operated, differs significantly from 2012 DACA.   For example, New DACA requires DHS officials to reject immediately new applications for initial DACA and certain types of applications for advance parole, which they had discretion to accept and grant under 2012 DACA.  *Compare* Dkt. 400-7, Ex. 36, *with* Ex. 3 at 6– 8, *and* Ex. 2 at 6–8 (explaining changes to advance parole).  New DACA also limits the renewal period of deferred action to one year, whereas DACA recipients were eligible for a renewable forbearance period of two years under 2012 DACA.  *See* Ex. 3 at 6–7.

In turn, these changes to DACA generated a new round of litigation.  In these challenges to New DACA—including in *FIEL Houston v. Wolf*, 4:20-cv-2515 (S.D. Tex., filed July 17, 2020), a case which Federal Defendants noticed as related, *see* Dkt. 468 at 1—plaintiffs argue that, by implementing New DACA and failing to return to the pre-rescission status quo, Federal Defendants have violated the APA, disregarded the Supreme Court's mandate, or both.  *See, e.g.*, Am. Compl., *FIEL Houston v. Wolf*, No. 4:20-cv-2515 (S.D. Tex.), Dkt. 4, ¶¶ 8, 70–82; Second Am. Supp. Compl., *New York v. Trump*, No. 1:17-cv-05228 (E.D.N.Y.), Dkt. 271, ¶¶ 10–12, 328– 31; Fourth Am. Compl., *Batalla Vidal v. Wolf*, , No. 1:16-cv-04756-NGG-JO, (E.D.N.Y.), Dkt. 308, ¶¶ 219–28; *see generally* Pls.' Mot. to Show Cause, *Casa de Maryland v. U.S. Dep't of Homeland Sec.*, No. 8:17-cv-02942-PWG, Dkt. 115.[3]  Despite these challenges, as of November

---

[3] Some plaintiffs in the cases challenging New DACA also argue that Acting Secretary Wolf assumed his position in violation of the Federal Vacancies Reform Act and Homeland Security Act, making the Wolf Memorandum an ultra vires action that is void ab initio.  *See, e.g.*, Second Am. Supp. Compl., *New York*, No. 1:17-cv-05228 (E.D.N.Y.), Dkt. No. 271, ¶¶ 332–36; Compl., *Santa Fe Dreamers Project v. Wolf*, No. 1:20-cv-02465 (D.D.C.), Dkt. No. 1.

6, 2020, Federal Defendants continue to operate New DACA, which differs significantly from 2012 DACA.  Plaintiffs have not amended their complaint to challenge New DACA.

The paragraphs that follow describe New DACA in more detail.

(a)   Attorney General Barr's June 30, 2020, letter

On June 30, 2020, Attorney General William P. Barr wrote to Acting DHS Secretary Chad Wolf regarding the Supreme Court's decision in *Regents*.  *See* Ex. 9.  In his letter, Attorney General Barr indicated that, to "facilitate" DHS's renewed consideration of DACA and to "wipe the slate clean," he had withdrawn Attorney General Sessions's September 4, 2017, letter to Acting Secretary Duke, and had ordered the Department of Justice's Office of Legal Counsel to withdraw its November 19, 2014, opinion on DACA's legality, as well as any other related guidance.  *Id.* According to Attorney General Barr, he withdrew Attorney General Sessions's letter "because [he did] not wish to maintain a determination as the Attorney General regarding DACA that might constrain the discretion [Acting Secretary Wolf] otherwise possess[es] as Acting Secretary of Homeland Security to consider whether and how to rescind DACA."  *Id.*

(b)   Wolf Memorandum

On July 28, 2020, Acting Secretary of DHS Wolf issued his own memorandum "making certain immediate changes to the DACA policy."  Ex. 3 at 1 (the "Wolf Memorandum").  In particular, based on his "serious concerns" about the DACA policy, Acting Secretary Wolf "determined that some changes should immediately be made to the policy to limit its scope."  *Id.* at 5. To limit DACA's scope, Acting Secretary Wolf announced that, among other changes, DHS would immediately:

---

Because no court has yet ruled on the merits of those challenges, however, the Wolf and Edlow Memoranda remain in effect.

- "Reject all initial DACA requests and associated applications for Employment Authorization Documents . . . ."
- "Limit the period of any deferred action granted pursuant to the DACA policy . . . (and thereby limit the period of any associated work authorization) to one year."
- "Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy . . . absent exceptional circumstances."
- "Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate."

*Id.* at 7–8.

(c)   Edlow Memorandum

On August 21, 2020, USCIS's Deputy Director for Policy, Joseph Edlow, issued a memorandum to "provid[e] additional guidance to facilitate the implementation" of the Wolf Memorandum.  Ex. 2 at 1.  As relevant here, Deputy Director Edlow's memorandum (the "Edlow Memorandum") provides two significant pieces of guidance to USCIS.  First, the Edlow Memorandum instructs the Deputy Associate Director for Service Center Operations Directorate ("SCOPS") to review and update its DACA standard operating procedures ("SOP") to "make clear that [DACA SOP] is intended solely for the instruction of USCIS personnel in the performance of their official duties, and that the SOP is not legally binding, does not confer any substantive rights to removable aliens, and does not otherwise constrain DHS' authority to enforce the immigration laws passed by Congress."  *Id.* at 10.  Second, the Edlow Memorandum "direct[s] USCIS officers to ensure that any grants of advance parole to DACA recipients are consistent with [the statutory description of advance parole under the INA]," including its requirement of a case-by-case assessment of certain discretionary factors.  *Id.* at 8.  In issuing this directive, Deputy Director Edlow recognized that "[t]he Wolf Memorandum does not revive the prior DACA-based advance parole standards," but instead "institutes a new general hold on granting advance parole to DACA recipients based on prior DACA-based advance parole standards."  *Id.* at 7–8.

## IV.    SUMMARY OF THE ARGUMENT

Plaintiffs have failed to introduce evidence sufficient to show that they have suffered any concrete injury and whether the remedy Plaintiffs seek would redress any such alleged injury. Because Plaintiffs have failed entirely to establish their standing to sue and to demonstrate this Court's Article III jurisdiction, Defendant-Intervenors respectfully request that the Court grant summary judgment on these threshold issues in their favor.

Even if the Court reaches the merits of Plaintiffs' claims, summary judgment in Plaintiffs' favor is inappropriate because genuine disputes of material fact remain: the evidence shows that, at the very least, there are genuine disputes whether DACA (as instituted in 2012 or particularly as implemented now) requires USCIS adjudicators to exercise discretion and, as a result, is consistent with the INA.  Finally, if the Court ultimately rules on DACA's legality, *Regents* also suggests that the Court should not grant an injunction.  The Supreme Court in *Regents* explained that it is appropriate for *DHS*, in the first instance, to fashion the appropriate remedy, taking appropriate consideration of the DREAMers' significant reliance interests (and, in fact, through New DACA, Plaintiffs have already secured the relief that they seek).  As a result, if the Court were to conclude that DACA is unlawful, it should remand to the agency to exercise its remedial discretion, rather than vacating DACA.

## V.    ARGUMENT

### A.    Threshold Issues Bar This Court's Review

Defendant-Intervenors should be granted summary judgment, because Plaintiffs have not carried their burden to establish that, as a matter of law, either New DACA or 2012 DACA caused them harm.  Without making that showing, Plaintiffs have no injury-in-fact standing. *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547–48 (2016).  Injuries that are "hypothetical" or "conjectural," such as those asserted by Plaintiffs, cannot establish Article III standing.  *Id.* (quotations omitted).

Plaintiffs have also failed to prove they have *parens patriae* standing, and they are equally unable to prove that they are owed special solicitude.  When, as here, a defendant moves for summary judgment because of standing, the burden to prove standing always rests with the plaintiff.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff facing summary judgment motion related to standing must "set forth by affidavit or other evidence specific facts," and cannot "rest on [] mere allegations") (quotations omitted); *see also Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999).  Because Plaintiffs are unable to carry their burden to demonstrate standing, this Court should grant summary judgment in favor of Defendant-Intervenors.  *See id.*

To the extent the Court is inclined to accept Plaintiffs' legal theories concerning standing, such that the Court believes a grant of summary judgment to *Defendant-Intervenors* is unwarranted, it should nevertheless deny Plaintiffs' Motion for Summary Judgment.  Even assuming Plaintiffs *could* establish standing, there are genuine disputes of material fact as to whether 2012 DACA (let alone New DACA) caused any of Plaintiffs' alleged direct injuries, which Plaintiffs must demonstrate in order to establish standing.

### 1.    *Plaintiffs Do Not Have Standing to Challenge New DACA*

The theoretical basis for Plaintiffs' argument—that DACA "incentiviz[es] unlawfully present aliens to remain in the country," Dkt. 486 at 27—is even more suspect with respect to New DACA, which is *specifically designed* to reduce the incentives to remain by avoiding "sending mixed messages about DHS's intention to consistently enforce the immigration laws."  Ex. 3 at 5. Plaintiffs fail entirely to consider this distinction in their outdated motion.

Plaintiffs have also introduced *no* evidence to show that *New DACA* supports their labor-market distortion theory, which is critical to both their special solicitude and *parens patriae* standing arguments.  *See* Dkt. 486 at 23–26.  Instead, the declarations and other evidence Plaintiffs

rely on to purportedly demonstrate labor market distortions take as their starting point *2012 DACA*, *see, e.g.*, Dkt. 487-22, Ex. 22 ¶ 5, which granted deferred action for two years and which allowed DACA recipients to travel for "[e]mployment purposes such as overseas assignments, interviews, conferences, or training, or meetings with clients overseas."  Ex. 2 at 7–8 n.6; Ex. 3 at 5.  Plaintiffs introduce *no* evidence to suggest that the alleged labor market distortions hold true under *New DACA*, which prevents DACA recipients from using advance parole to travel abroad for employment, *see* Ex. 2 at 8, and cuts the deferred-action period in half, *see* Ex. 3 at 5.

New DACA also makes Plaintiffs' redressability theory even more speculative and unfounded.  In addition to failing to satisfy any of the criteria Plaintiffs' own expert, Dr. Lloyd Potter, identified as making immigrants more likely to return to their country of origin, *see* Dkt. 288 at 9, the individuals eligible for forbearance under New DACA have also already received DACA.  *See* Ex. 3 at 7 (instructing DHS to reject all initial DACA requests).  As a result, they have likely further developed family, educational, and employment ties that make them even more unlikely to leave the country, suggesting that none of Plaintiffs' alleged harms could be redressed by New DACA's termination.

### 2.    *Plaintiffs Do Not Have Standing to Sue to Challenge 2012 DACA*

Even if DHS had not changed how DACA operates in practice, Plaintiffs would still fail to satisfy their burden to demonstrate standing.  The Supreme Court's decision in *Regents* only underscores the long-existing flaws in Plaintiffs' arguments.

(a)    Defendant-Intervenors Are Entitled to Summary Judgment on the Question Whether Plaintiffs Have Suffered An Injury In Fact, as Required for Article III Standing

First, Plaintiffs attempt to argue only that Texas incurs increased expenditures, *see* Dkt. 486 at 28, but none of Texas' alleged harms are directly caused by 2012 DACA, and Plaintiffs offer *zero* evidence connecting Texas' purported expenditures to DACA recipients.  *See* Dkt. 288

18

at 5–8.[4]   Unable to prove its standing through its own evidence, Texas relies on the expert testimony of Dr. Ray Perryman to argue that DACA recipients cost the state millions of dollars in the form of expenditures in social services.  *See* Dkt. 486 at 28.  Texas' reliance on Dr. Perryman's analysis is misplaced: Dr. Perryman provides no evidence of costs to Texas related to DACA in his report or analysis.  *See* Dkt. 400-2, Ex. 7 ¶ 6; *see also id.* ¶¶ 7–14.  Dr. Perryman merely *assumed*, without basis, in his initial report that DACA recipients impose costs on the State, solely for purposes of conducting his cost-benefit analysis.  *Id*. ¶ 8.  Even if Texas *were* able to identify a DACA recipient that creates costs for Texas (and Texas cannot and has not), the State would incur such costs whether or not the individual was a DACA recipient.  *See id.* ¶ 14 (testifying that DACA does not cause any assumed costs; "it's not because they are in DACA, it's because they are here.").  Tellingly, none of the Plaintiff States has fared better than Texas in quantifying their alleged economic injuries:  *No Plaintiff* has been able—and Arkansas continues to refuse, *see* Dkt. 484—to provide *any* quantitative analysis identifying the economic harm they suffer from the DACA recipients' presence.[5]

Instead, Plaintiffs claim that 2012 DACA resulted in an unspecified—and entirely conjectural—increase to pre-existing education, healthcare, and law enforcement costs.  Plaintiffs *speculate* that some cost is incurred because 2012 DACA "incentiviz[es] unlawfully present aliens

---

[4] Defendant-Intervenors incorporate by reference their preliminary injunction briefing and evidence in this Memorandum.  *See* Fed. R. Civ. P. 65(a)(2).

[5] *See, e.g.,* Ex. 27 at ¶ 5 (Alabama "cannot calculate the expenditure of [law enforcement] agency funds on statewide law enforcement activity for specific DACA individuals"); Ex. 28 at ¶ 8; Ex. 29 at ¶ 3 (Arkansas "cannot determine the amount of state or federal funds spent on any student by immigration status"); Ex. 30 at ¶¶ 2–3; Ex. 31 at ¶ 4; Ex. 32 at ¶ 2–3 (Kansas "cannot calculate the specific past or future education costs spent on children without lawful immigration status, including DACA recipients"); Ex. 33 at ¶ 4; Ex. 34 at ¶ 4 (Louisiana "does not track the costs of services or benefits provided by law enforcement) to undocumented immigrants"); Ex. 35 (failing to account for DACA specifically); Ex. 36 at ¶¶ 4–5 (Mississippi Division of Medicaid "cannot calculate specific past or future costs spent on specific individuals"); Ex. 37 at ¶¶ 4–5; Ex. 38 at ¶¶ 3–4; Ex. 39 at ¶ 4 (Nebraska "cannot calculate specific past or future costs spent on specific students" without additional information); Ex. 40 at ¶¶ 4–5; Ex. 41 at ¶ 4; Ex. 42 at ¶ 4; Ex. 43 at ¶¶ 3–4; Ex. 44 at ¶ 4; Ex. 45 at ¶ 2; Ex. 46 at ¶¶ 3–4; Ex. 47 at ¶¶ 4–5; Ex. 48 at ¶ 3; Ex. 49 at ¶¶ 4–5; Ex. 50 at ¶¶ 4–5; Ex. 51 at ¶¶ 4–5; Ex. 52 at ¶ 3; Ex. 53 at 60:17–62:5; Ex. 54 at 77:1–79:10.

to remain in the country." Dkt. 486 at 27. Even if Plaintiffs' conjectural harm was theoretically sound—which it is not—Plaintiffs offer no empirical evidence of this "incentive" in operation. Dkt. 486 at 28–29. Yet, the record contains ample evidence to the contrary. *Cf. Texas DAPA*, 86 F. Supp. 3d at 635 (concluding that some of plaintiff states' alleged injuries, similar to those now asserted by Texas, were *indirect* and *speculative* and *without* apparent redressability).

Plaintiffs' theory not only lacks empirical support; it is also fatally overbroad. If the court accepted Plaintiffs' standing under this theory, Plaintiffs would have standing to challenge virtually *any* law or policy that caused the population of their states to increase. Article III requirements—which requires an actual injury be suffered—prohibit such expansive, and easily politicized, theories of standing. *See, e.g.*, *Lujan*, 504 U.S. at 560 (stressing that the "irreducible constitutional minimum" requires a plaintiff show an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical") (quotations omitted).

Notably, Plaintiffs have also provided no evidence to demonstrate that the 2012 DACA recipients pose any more burden on the state's fisc than do any other individuals. Nor have Plaintiffs demonstrated that any costs associated with these DACA recipients residing in the states outweigh the added revenue the states receive from their taxes and their contributions to the public (including through their work as healthcare professions, educators, and in other service jobs).

 Unable to establish standing based on their own evidence, Plaintiffs erroneously attempt to bootstrap a claim to standing based on the *Regents* Court's "implicit[]" finding that the plaintiffs had standing to challenge DACA's rescission. Dkt. 486 at 22. But *Regents* does not support Plaintiffs' standing in this case, whether explicitly, implicitly, or otherwise. Simply put, no court involved in the *Regents* litigation ever analyzed the issue of standing with respect to these Plaintiff States. The *Regents* district court's finding that the plaintiff states had standing to challenge the

*rescission* of 2012 DACA is distinguishable from Plaintiffs' claim here that they have standing to challenge the *legality* of 2012 DACA. *Regents*, 279 F. Supp. 3d at 1033–34. The *Regents* plaintiffs' harms were directly tied to the rescission of DACA, *id.*, whereas here Plaintiffs' alleged harm stems only from a vague complaint that there are too many people in the state. *See* Dkt. 486 at 27–28. In short, the standing of the *Regents* plaintiffs is wholly unrelated to the standing of the Plaintiffs in this case. Finally, even if the Supreme Court had "implicitly" made a finding as to standing, *see id.* at 22, "implicit" jurisdictional rulings are not precedential. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).

Plaintiffs also assert that ending DACA would cause DACA recipients to "self deport," thus alleviating Plaintiffs' purported harm. *See* Dkt. 486 at 28. Texas relies on testimony by their expert, Dr. Lloyd Potter, and a question in a survey by New Jersey's expert, Dr. Tom Wong, to establish an injury-in-fact based on this "self-deportation" theory. As Defendant-Intervenors have repeatedly noted, there are serious problems with the expert testimony that Texas relies on for this "self-deportation theory." Dkt. 390 at 13–14.[6] Yet again, Plaintiffs fail to meet their burden.

First, Dr. Potter based his opinions on the erroneous assumption that DACA recipients could not work, and therefore would leave the United States, if DACA were rescinded. Dkt. 390 at 13–14. Dr. Potter himself later conceded that he had been mistaken. *Id.* at 13–15 (adding, "Well, I hadn't really kind of thought that whole thing through"). He could not provide *any* estimate of how many DACA recipients were likely to leave Texas under his "self-deportation"

---

[6] On February 14, 2020, the Court denied without prejudice Defendant-Intervenors' Motion to Strike Plaintiffs' Experts, but noted that the Court would "treat the points raised in [that] motion as objections to the expert testimony/reports in considering the pending summary judgment motion and will rule on them as objections to the extent it needs to resolve those issues." Dkt. 452 at 1–2. Defendant-Intervenors thus respectfully reassert the points raised in their Motion to Strike to highlight Dr. Perryman's and Dr. Deere's lack of expertise and argue that their testimony fails to create a genuine dispute of material fact. *See, e.g., Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 723–28 (5th Cir. 2009).

theory, *id.* at 16, nor could he identify any research on the possibility that DACA recipients would return to their country of origin, *id.* at 15. *See also* Dkt. 390-2, Ex. 2 at 66:10-67:16, 91:16-92:3 ("I don't believe that I can quantify a number other than I think some would."). Indeed, Dr. Potter's own statements reveal that DACA recipients, as a group, have grown up immersed in American culture, and the scholarly research on which he purports to rely finds that immigrants with the characteristics of DACA recipients are less likely to leave the United States. Dkt. 288 at 9; Dkt. 224 at 18–20 (citing Potter deposition); *see also* Ex. 18 ¶ 8; Ex. 19 ¶ 8; Ex. 20 ¶ 9; Ex. 21 ¶ 11 ("This is my home. It is all that I know and I want to remain in the U.S."); Ex. 22 ¶ 9; Ex. 25 ¶ 7; Ex. 26 ¶ 11 ("If DACA were ended, I would do everything in my power to remain in the United States."). Given these deficiencies, Dr. Potter's testimony does not imply, let alone establish as a matter of law, that Plaintiffs incur costs they would not incur in the absence of DACA.

Second, in his supplemental declaration, Dr. Perryman explains that Dr. Wong's survey also cannot establish Plaintiffs' "self-deportation" theory. Plaintiffs point to responses to a *single* survey question—"How likely are you to leave the country if DACA ends?"—as evidence that some 2012 DACA recipients would self-deport should DACA end, but that question is misleading, speculative, and not predictive of actual behavior. *See* Dkt. 288 at 11 (highlighting established research on survey design showing that question order can inaccurately bias survey-takers); *see also* Dkt. 400-2, Ex. 7 ¶¶ 15–16 (opining that question suffers from survey bias because series of questions immediately preceding "emphasize uncertainties related to the future of DACA, therefore likely affecting the respondents' mindset and potentially increasing the number of respondents who indicate they would leave the country if DACA ends.").

Third, there is no evidence in the record that shows Federal Defendants would, in fact, deport 2012 DACA recipients if DACA ended (and, indeed, *Regents* suggests that Federal

Defendants would be required to consider taking an alternative course of action in that circumstance, due to reliance interests, *see* 140 S. Ct. at 1913–14, 1916).  On the contrary, there is ample evidence in the record showing that if DACA were rescinded, DACA recipients would remain where they are, as undocumented immigrants, instead of leaving the United States.  *See* Dkt. 288 at 12 (noting Defendant-Intervenors' testimony about their desire to remain in the United States even if DACA ended); Dkt. 400-1, Ex. 2 ¶¶ 43–44 (expert testifying DACA rescission would not cause recipients to leave the U.S.); Dkt. 400-2, Ex. 9 ¶ 36 (expert testifying that, if DACA ends, DACA recipients are likely to simply "return to the shadows").  As Dr. Robert Smith explains in his declaration, current studies show that DACA recipients do not return to their country of origin, including because of the ties to the United States that the Supreme Court highlighted in *Regents*.  *See* Dkt. 400-2, Ex. 8 ¶¶ 35–36; 140 S. Ct. at 1914.  In fact, Dr. Smith testified that none of the DACA recipients in his study have left the U.S. to return to live in their country of origin.  Dkt. 400-2, Ex. 8 ¶ 35.  These data points—which focus on actual behavior as a measure of future behavior, as opposed to hypothetical speculation—are "a better basis to analyze the likelihood that DACA recipients will return or not return to their countries of birth than the single datum in the Wong survey."  *Id.*

Finally, Plaintiffs offer no demographic evidence that 2012 DACA causes an overall decrease in emigration relative to *normally occurring* emigration rates within the DACA-eligible population.  Plaintiffs cannot show that DACA has impelled a *greater* number of individuals to remain in the United States than would have in DACA's absence—which is what Plaintiffs must show to tie their alleged injuries to DACA.[7]  Without some baseline emigration rate as a

---

[7] Plaintiffs' failure to demonstrate causation is even more apparent when considering their use of Dr. Wong's survey evidence.  *See* Dkt. 486 at 28.  Whatever value Dr. Wong's survey has to show whether any DACA recipients would leave the United States upon DACA's rescission, whether DACA recipients would do so is not the relevant question.

comparison, Plaintiffs' inferences about DACA's effect on emigration patterns are wholly speculative. In fact, contrary to Plaintiffs' view, multiple experts have demonstrated that recent migration patterns have nothing to do with DACA at all. *See* Dkt. 288 at 13–15; *see also* Dkt. 400-1, Ex. 2 ¶¶ 47–51; Dkt. 400-2, Ex. 12 ¶¶ 12–13.

In sum, summary judgment is appropriate for Defendant-Intervenors, or at the very least inappropriate for Plaintiffs, because of the ample evidence demonstrating that Plaintiffs have failed to establish that 2012 DACA has created an injury in fact.

> (b)  Defendant-Intervenors Are Entitled to Summary Judgment on the Question Whether Plaintiffs' Injuries Are Redressable, as Required for Article III Standing

Even if Plaintiffs could establish that 2012 DACA caused an injury-in-fact (and they cannot), Plaintiffs cannot show, let alone show beyond dispute, that their injuries are redressable, as is required to establish standing. *See Lujan*, 504 U.S. at 561–62; *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (Plaintiffs must show a "favorable decision will relieve a discrete injury") (quotations omitted). Indeed, Texas has failed to establish that DACA recipients would leave their states, that social costs would decrease, or that U.S. citizens in the Plaintiff States would encounter increased job opportunities in the absence of DACA. *See* Part V.A.2(a), *supra*; Part V.A.2(c), *infra*; *see also* Dkt. 288 at 5–18. The other Plaintiff States have not offered *any* credible evidence of harm, and therefore have not demonstrated standing. *See* Dkt. 319 at 106; Dkt. 484 at 2. Because these states have not alleged any specific harms, they cannot establish redressability as required under *Lujan*, 504 U.S. at 561–62, and summary judgment should be granted in favor of Defendant-Intervenors.[8]

---

To establish standing, Plaintiffs must instead show those same recipients only stayed in the United States to begin with *because of DACA*, which Dr. Wong's survey does not even purport to address.

[8] Likewise, Plaintiffs lack standing to pursue a declaratory judgment. *See Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997) (finding that a plaintiff did not have standing to sue for declaratory relief under the Civil Justice Reform

Plaintiffs' tenuous redressability arguments are even more speculative in light of the Supreme Court's decision in *Regents*. The Supreme Court established that "[e]ven if it is illegal for DHS to extend work authorization and other benefits to DACA recipients, that conclusion supported only 'disallow[ing]' benefits," but "did 'not cast doubt'" on the legality of forbearance or upon DHS's original reasons for extending forbearance to childhood arrivals." *Regents*, 140 S. Ct. at 1912 (citation omitted). As a result, *Regents* recognized that, even if DACA *were* unlawful, DHS need not entirely abandon deferred action for DACA recipients. *Id.* at 1914. Instead, *Regents* makes plain that DHS maintains discretion to remediate that unlawfulness; if DHS exercises that discretion to continue to grant deferred action, Plaintiffs' alleged expenditures would remain. This uncertainty undermines Plaintiffs' Article III standing.

      (c)    Plaintiffs Cannot Assert *Parens Patriae* Standing Against the United States, and Even if They Could, They Offer No Evidence that DACA Has Harmed a Substantial Portion of Texans

*Parens patriae* standing is not available to states in suits against the federal government. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923)); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 180–81 (D.C. Cir. 2019); *Michigan v. EPA*, 581 F.3d 524, 529 (7th Cir. 2009); *Md. People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985). Although some statutes provide limited exceptions to this general rule, the APA is not one of them. *Compare Md. People's*, 760 F.2d at 320–21 (holding that Natural Gas Act provides an exception to *Mellon* rule because it expressly notes that an "agency of a State" may bring suit) (emphasis omitted), *with Gov't of Manitoba*, 923 F.3d at 180–81 (holding that, unlike Natural Gas Act, APA provides no exception to "*Mellon* bar").

---

Act or the Declaratory Judgment Act because she could not show injury, causation, and *redressability*); *Okpalobi v. Foster*, 244 F.3d 405, 431 (5th Cir. 2001) (en banc) (Higginbotham, J., concurring) ("[T]he Declaratory Judgment Act . . . does not jettison traditional standing requirements.").

Likewise, the Supreme Court did not create an exception to the *Mellon* bar in *Massachusetts v. EPA*, 549 U.S. 497 (2007). *See Gov't of Manitoba*, 923 F.3d at 181–83. Indeed, the D.C. Circuit has clarified that *Massachusetts* was not a *parens patriae* standing case at all—and the analysis of quasi-sovereign interests therein related only to the Court's discussion of special solicitude. *See id.* at 182 (quoting *Massachusetts*, 549 U.S. at 522). Rather, *Massachusetts* simply reiterates the Court's express, eighty-year stance on the issue: *Mellon* prohibits a state from acting as *parens patriae* to "protect her citizens from the operation of federal statutes" (including the APA), but the state may sue the United States to "assert *its* rights under federal law," as when Massachusetts alleged that the EPA caused direct injury to *its own* territory. *See Gov't of Manitoba*, 923 F.3d at 181–83 (quoting *Massachusetts*, 549 U.S. at 520 n.17) (emphasis added). Here, Plaintiffs do not seek to assert their own rights under federal law, but rather seek to challenge the operation of federal immigration priorities on the basis of purported injury to a subpopulation of state residents by the federal government. As *Gov't of Manitoba* confirms, this they may not do. The longstanding and clear limit on a state's power to challenge the federal government under a theory of *parens patriae* is especially appropriate in the field of immigration, which is under the *exclusive control* of the federal government. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018); *Arizona*, 567 U.S. at 395 ("The federal power to determine immigration policy is well settled," and immigration policy must be determined by "one national sovereign, not the 50 separate States.").

Even if *parens patriae* standing *were* available to Plaintiffs, Plaintiffs' theory of harm to Texas residents from "labor market distortions" is legally flawed and factually unsupported; as such, the Court should grant summary judgment in Defendant-Intervenors' favor. At the very

least, this alleged harm is intensely disputed throughout the record, and is not ripe for resolution in Plaintiffs' favor on summary judgment.

Separate from the limits discussed above, a state cannot claim *parens patriae* standing to defend the economic well-being of a subpopulation of its residents, *see* Dkt. 486 at 25–27, where, as here, the government action it challenges does not harm—*or may even benefit*—the overall state population.  More specifically, as relevant here, a state cannot assert *parens patriae* standing to challenge federal policy or legislation in order to vindicate the interests of *some* unknown subset of state residents the state deems worthy of protecting, and who purportedly face harm in the form of increased marketplace "competition," as a result of the presence of *other* state residents the state does not wish to protect.  *Parens patriae* is simply not a procedural mechanism by which a state can engage in the nakedly political selection of winners and losers among its residents.

Here, the parties seriously dispute the extent to which 2012 DACA harms Plaintiffs economically, and facts on this issue are clearly material to Plaintiffs' purported *parens patriae* standing.  However, the objective record is replete with evidence that the economic *benefits* created and experienced by DACA recipients substantially outweigh any purported harm to any other state residents.  For instance, Dr. Perryman (an expert on labor markets who has performed extensive research on econometrics in Texas), concludes that, for Texas,

> [T]he direct gains in business activity associated with DACA recipients include an estimated $11.5 billion in output (gross product) and $7.2 billion in income each year in addition to more than 108,100 jobs.  When multiplier effects are included, the total rises to $25.8 billion in annual output, $16.0 billion in income per year, and 324,000 jobs.

Dkt. 400-1, Ex. 6 ¶ 39.  Discovery has disproven Plaintiffs' claim that DACA displaces U.S. citizen workers, *see* Dkt. 400-1, Ex. 4 ¶¶ 21–30, and revealed more evidence demonstrating that, to the contrary, DACA recipients *strengthen* the U.S. economy and society by running businesses

27

that could employ U.S. citizens and lawful workers, or by filling important jobs such as EMTs, teachers, and medical doctors. *Id.* ¶ 32; *see also* Ex. 17 ¶ 3; Ex. 18 ¶ 2; Ex. 19 ¶¶ 5–6; Ex. 20 ¶ 3; *cf.* Ex. 10.  The Supreme Court itself noted that rescinding DACA might cost $215 billion in nationwide economic activity. *See Regents*, 140 S. Ct. at 1914 (citing Brief for Regents at 6).  The Supreme Court's recognition of this tremendous economic harm further bolsters the conclusion that Texas cannot establish *parens patriae* standing in this case on the basis of economic harm to citizens *from DACA*.  In fact, it is Plaintiff States whose preferred outcome would cause harm, not only to DACA recipients, who have strong reliance interests in DACA, but to Texas itself (and, doubtless, to other Plaintiff States as well).

Plaintiffs fail to offer *any* reliable evidence supporting their allegations of job loss or depressed wages (which, even if true, would not be grounds for *parens patriae* standing given the more-than-commensurate benefits provided by DACA recipients).  At the summary judgment stage, Plaintiffs' conjectures of "potential[]" harm, *see* Dkt. 486 at 26, are simply inadequate.

Plaintiffs' one expert on this issue—Dr. Donald Deere—admits that he has not specifically studied immigration's effect on wages or the economy, Dkt. 390 at 16; Dkt. 400-4, Ex. 28 at 8:9–17, 64:11–20, nor has he conducted any analysis focused on the DACA population specifically. As such, he is not qualified to offer an expert opinion on Plaintiffs' labor distortion claims, and his statements are not reliable, relevant, or admissible to support Plaintiffs' allegations.  *See Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380 (5th Cir. 2010) (affirming district court's decision to exclude experts, in part, because they failed to bridge analytical gap between generalized nature of a class-wide study and specific characteristics of product at issue).

Dr. Deere is similarly unqualified to offer an expert opinion on the allegedly harmful interplay between DACA and the Affordable Care Act ("ACA").  *See* Dkt. 486 at 26 (citing Dkt.

28

487-22).  As argued more fully in Defendant-Intervenors' Motion to Strike, rather than offering any credible evidence, Dr. Deere offers only a *hypothetical thought experiment* of how the ACA *might* impact some employers' decision-making, taking as true contested assumptions for which he does not offer *any* evidence.  *See* Dkt. 487-22, Ex. 22 ¶¶ 13–22; *see also* Dkt. 390 at 6–10.  Dr. Deere's theories do not come close to meeting federal standards for admissible evidence.  *See, e.g.*, *CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 278–79 (5th Cir. 2009) (finding expert's proffered evidence not reliable where it is "based on speculation and conjecture" and "requires numerous speculative leaps" to support the relevant allegations).   In any event, the Supreme Court emphasized in *Regents* that DACA recipients' eligibility or ineligibility for coverage under the ACA (and thus any alleged effect on employers' decision-making), "does [not] flow inexorably" from DACA,  140 S. Ct. at 1911 n.5, as it ***must*** to support Plaintiffs' standing argument.

Plaintiffs also cite unsupported conjecture about 2012 DACA's effect on jobs by then-Attorney General Sessions, who has neither personal nor expert knowledge of the matter at issue, and who is not a disclosed witness in this case.  *See* Dkt. 486 at 16, 24.  This "evidence" cannot be presented in a form that would be admissible at trial, *see* Fed. R. Evid. 602, and as such, cannot support a motion for summary judgment, *see* Fed. R. Civ. P. 56(c).  Similarly, Plaintiffs rely on purported concessions from business amici in this case that DACA displaces U.S. citizen workers.  Dkt. 486 at 24.  However, Plaintiffs misstate the comments from amici, and in any event, amicus briefs alone are not competent summary judgment evidence.  *See, e.g.*, *Parm v. Shumate*, Civil Action No. 3-01-2624, 2006 WL 1228846, at *1 n.3 (W.D. La. May 1, 2006) ("Summary judgment evidence may not be submitted by a non-party").[9]

---

[9] Moreover, it is not clear whether the content of the legal briefs of these *amici* is supported by either the personal knowledge or expert opinion of the briefs' authors, and whether Plaintiffs plan to call those authors to testify on their behalf at trial. *Cf.* Fed. R. Evid. 602; Fed. R. Civ. P. 56(c). As such, they cannot be relied on to support summary

Plaintiffs point to various expert statements to attempt to demonstrate that 2012 DACA recipients, who are already-present immigrants, have adversely affected labor competition, but these statements do not prove Plaintiffs' standing. *Compare* Dkt. 486 at 26–27, *with* Dkt. 487-25, Ex. 25 at 97:13–17 (Dr. Perryman expressly states that he does not "know one way or the other" whether "an employer has hired a DACA recipient for a job that a U.S. citizen also applied for") *and* Dkt. 289-3, Ex. 294 at 93:20–94:1 [10] (Dr. Brannon's referenced statements regard only "general economic principle[s]," rather than any specific empirical evidence about DACA's effects on wages).

In the same vein, evidence that some 2012 DACA recipients have found productive employment in the United States, Dkt. 486 at 26, could only, even in theory, support a finding of harm to Plaintiffs through a purely speculative chain of inferences:  that (i) citizens of Plaintiff States (ii) with adequate qualifications (iii) were not successful in securing those same jobs because of DACA, and then (iv) did not find reasonably equivalent employment before their economic wellbeing was injured.  There is no such evidence in the record. *See* Dkt. 319 at 39 n.44 (noting "the record does not indicate why these candidates were chosen"); *Ranger Ins. Co. v. Culberson*, 454 F.2d 857, 862 n.1 (5th Cir. 1971) (noting that "facts," not "hypotheses," are required for summary judgment).

---

judgment until Plaintiffs "explain[] how the [documents] could be reduced to admissible evidence at trial." *See Smith v. Palafox*, 728 F. App'x 270, 276 (5th Cir. 2018).

[10] To the extent Dr. Brannon's testimony can be characterized as evidence that "unskilled" DACA recipients displace and depress the wages of "unskilled" U.S. citizens, Dr. Perryman's expert testimony directly contradicts this evidence. Dkt. 400-2, Ex. 7 ¶¶ 18–26 (testifying he has "no information that there are DACA recipients competing for low-skilled jobs with non-DACA workers," and even if there were DACA recipients competing for such jobs, he has no evidence that there are "measurable negative effect on wages, particularly in light of the fact that employers are [ ] increasing wages for unskilled workers due to [labor] shortages").  Therefore, summary judgment for Plaintiffs on the basis of Dr. Brannon's testimony is inappropriate.

Finally, even if the Court determined that some of this testimony might be admissible, and additionally might plausibly support Plaintiffs' allegations of harm, the record also contains empirical evidence directly and materially contrary to Plaintiffs' unsupported allegations, rendering summary judgment in Plaintiffs' favor inappropriate. For example, Defendant-Intervenors' expert Dr. Ku submits that there "has not been any overall decline in employment for U.S. born workers, following the implementation of DACA or the ACA." Dkt. 400-1, Ex. 4 ¶ 30. And, notwithstanding his sweeping claims about immigration reducing native worker wages, even Dr. Deere admits that "there is no consensus in the economic literature on the magnitude of this effect," and even the scholarly research *he relies on* concludes that the effect of undocumented workers in the labor market "seems to cluster *around zero*." *See* Dkt. 487-22, Ex. 22 ¶ 23 & n.15; Dkt. 400-8, Ex. 61 at 2 (emphasis added). Indeed, in its opinion denying Plaintiffs' preliminary injunction motion, this Court recognized that Defendant-Intervenors might ultimately be proven right on their argument that Plaintiffs have not suffered any overall, net injury traceable to DACA. *See* Dkt. 319 at 106–07.

Further discovery has clarified that DACA has not had a harmful effect on the employment and wages of U.S. citizens in Texas. Even if Texas could show that DACA increased economic competition for a subset of Texans, its overarching benefits to the Texas economy would preclude Texas from asserting standing *parens patriae* to challenge DACA.

(d)    Plaintiffs Are Not Owed Special Solicitude

To make up for the fact that Plaintiffs are unable to establish standing under well-established rules, Plaintiffs claim in the alternative that they are owed "special solicitude" under *Massachusetts*, 549 U.S. at 520. However, Plaintiffs offer no evidence that 2012 DACA has harmed their "quasi-sovereign interests," as required by *Massachusetts*. *See id.* at 518–20; Dkt. 486 at 22–25. Moreover, a generic cause of action under the APA does not give Plaintiffs any

31

specific "procedural right" to challenge 2012 DACA. *Cf. Massachusetts*, 549 U.S. at 516, 518 (attaching "critical importance" to the "procedural right" afforded by the Clean Air Act to challenge the EPA's denial of a petition for rulemaking on emissions standards).

Additionally, although the Fifth Circuit previously believed that states had "special solicitude" to defend against DAPA's "institutional injury to their lawmaking authority," *Texas DAPA*, 809 F.3d at 154, the Supreme Court has since clarified the relationship between the federal government and the states in connection with federal legislation in a manner that undermines the Fifth Circuit's analysis. In *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), the Supreme Court considered the difference between federal legislation that operates as a "direct command to the States" in a manner that implicates their sovereign interests, and federal governmental action that only directly regulates private individuals. *Id.* at 1479–81. Here, DACA is the latter, a mere exercise of federal enforcement discretion that directly affects only private parties (*i.e.*, DACA recipients). DACA does not operate on the states themselves, and neither "nullifie[s]" nor "strip[s]" any state powers. *Contra* Dkt. 486 at 29. Accordingly, there is no intrusion on the Plaintiffs' sovereignty, and Plaintiffs are owed no "special solicitude" to object to the incidental effects of federal policy.

Moreover, even if Plaintiffs *were* owed "special solicitude," that would not "eliminate the state petitioner's obligation to establish a concrete injury." *Del. Dep't of Nat'l Res. & Env't Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009). Here, 2012 DACA has caused no such injury, either directly to Texas or to a substantial portion of its citizens' economic well-being.

Finally, to the extent that Plaintiffs claim a *separate* cause of action due to their alleged "institutional injury" being coupled with the federal government's "abdication" of responsibility under federal statutes, *see* Dkt. 486 at 29–30, this novel theory is not backed by *any* controlling

precedent, and is wholly implausible.  In *Massachusetts*, "abdication" was simply part of the Court's standard injury-in-fact analysis, and provided no independent basis for standing. Conferring independent "abdication standing" on Plaintiffs would invite states to complain to a federal court virtually every time they had a policy disagreement with the federal government over how to allocate limited resources, which would, in an era of ever-increasing polarization, foreseeably occur with great frequency.  *See United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 90–91 (1947) (courts should not become "the organ of political theories" or opine on "ill defined controversies").  No such basis for standing exists, and this Court should not find one here.

Plaintiffs lack standing to challenge even 2012 DACA.  Defendant-Intervenors thus respectfully request that the Court grant summary judgment in their favor.  At the very least, disputes of material fact remain as to Plaintiffs' claims to standing, indicating that, in no event is summary judgment in Plaintiffs' favor, based on this record, appropriate.

3.      *This action does not present an Article III case or controversy*

There is no actual case or controversy within the meaning of Article III of the Constitution here because Plaintiffs and the Federal Defendants are, in fact, aligned, and, because, under the Wolf and Edlow Memoranda, the Federal Defendants are no longer implementing the challenged policy, 2012 DACA.  Plaintiffs and the Federal Defendants "desire precisely the same result," and "[t]here is, therefore, no case or controversy within the meaning of Art. III of the Constitution." *Moore v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 47, 47–48 (1971) (per curiam).  After Plaintiffs filed the instant case seeking a declaration that DACA is unlawful, Federal Defendants expressly and unequivocally reaffirmed that "Plaintiffs and Federal Defendants agree—DACA is unlawful." Dkt. 71 at 13.  Plaintiffs have received support from the supposedly adverse Federal Defendants at every stage in this matter, *see generally* Dkt. 118, and indeed, Federal Defendants urged the Court to *grant* Plaintiffs' motion for summary judgment, *see* Dkt. 366 at 7–10.  Federal

33

Defendants have propounded no discovery on Plaintiffs, and Plaintiffs and Federal Defendants have both been intransigent in cooperating with Defendant-Intervenors during the discovery phase, requiring Defendant-Intervenors to seek the assistance of the Court in compelling the supposedly adverse parties to participate in the court-ordered discovery process.  Dkt. 383; Dkt. 386; Dkt. 420; Dkt. 429; Dkt. 484.

Plaintiffs previously relied on Federal Defendants' continued enforcement of 2012 DACA to argue that this case presents an Article III controversy, *see* Dkt. 357 at 20–21, but now that Federal Defendants have, through the Wolf and Edlow Memoranda, abandoned 2012 DACA, this case lacks the adversity that the Constitution requires.   Plaintiffs claim—without relevant citation—that, despite the Wolf Memorandum, this case still presents an Article III controversy. *See* Dkt. 486 at 21.  However, unlike in *United States v. Windsor*, 570 U.S. 744, 757–59 (2013), and *INS v. Chadha*, 462 U.S. 919, 939–40 (1983), Federal Defendants are no longer enforcing 2012 DACA.  Instead, the Wolf and Edlow Memoranda significantly altered 2012 DACA by implementing "immediate changes to the DACA policy" to "limit its scope," Ex. 3 at 1, 5, and Plaintiffs have not amended their complaint to challenge New DACA.

Rather than addressing this fundamental shift in the parties' positions, Plaintiffs suggest (again, without any support) that an Article III controversy remains because "the Wolf Memorandum is being challenged in multiple lawsuits."  Dkt. 486 at 21.  However, the theoretical possibility that other courts may, in the future, rule on the legality of the Wolf and Edlow Memoranda does not create an Article III controversy in this Court now.  Instead, the challenges to the Wolf and Edlow Memoranda Plaintiffs rely upon undermine their argument:  the plaintiffs in those cases are challenging New DACA precisely *because* the Federal Defendants are no longer enforcing the 2012 DACA policy Plaintiffs challenged, and continue to challenge, here.  *See, e.g.*,

Am. Compl., *FIEL Houston v. Wolf*, No. 4:20-cv-02515, Dkt. 4, ¶ 73; Mem. in Supp. of Pls.' Mot. to Show Cause, *Casa de Md. v. DHS*, No. 8:17-cv-02942-PWG, Dkt. 115 at 13–14.  As a result, because Federal Defendants no longer intend to enforce the challenged policy and have "taken the further step" of declining to implement 2012 DACA, this is "a different case" than *Windsor* or *Chadha*, *see* Dkt. 319 at 28–29 (quotations omitted), and it no longer presents an Article III controversy.

The fact that Defendant-Intervenors are participating in the litigation likewise "does not create sufficient adversity to provide jurisdiction. [Instead, t]hey have properly called the court's attention to the lack of subject matter jurisdiction." *Kirkland v. N.Y. State Dep't of Corr. Servs.*, No. 82-cv-0295, 1988 WL 108485, at *3 (S.D.N.Y. Oct. 12, 1988).  While the Supreme Court has previously recognized Congressional litigants' "proper" role in defending federal legislation, *Chadha*, 462 U.S. at 940, Defendant-Intervenors share no comparable nexus to the federal actions challenged here, *cf. Windsor*, 570 U.S. at 807 (Alito, J., dissenting) (representing *Windsor* to apply only "in the narrow category of cases in which a court strikes down an Act of Congress[,] and the Executive declines to defend the Act, [whereupon] Congress both has standing to defend the undefended statute and is a proper party to do so").

Furthermore, even if this case presented an Article III controversy, separate prudential considerations regarding the "proper—and properly limited—role of the courts in a democratic society" favor dismissal of this challenge to the federal government's administration of immigration laws. *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "Even when Article III permits the exercise of federal jurisdiction, prudential considerations demand that the Court insist upon 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult

35

constitutional questions.'"  *Windsor*, 570 U.S. at 760 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  Given that it is, at best, ambiguous whether this case presents the requisite adverseness, prudential considerations favor dismissal for lack of an actual case or controversy.

> 4.  *The Court Should Deny Plaintiffs' Motion for Summary Judgment Due to Plaintiffs' Lack of Standing*

As described above, there is no genuine issue of material fact remaining on the issue of standing, Plaintiffs lack standing, and the Court should grant summary judgment in Defendant-Intervenors' favor.  *See Lujan*, 504 U.S. at 561; *Ass'n of Cmty. Orgs. for Reform Now*, 178 F.3d at 357.  If the Court does not grant summary judgment for Defendant-Intervenors, questions of fact would remain as to Plaintiffs' standing, and the Court should still accordingly deny Plaintiffs' motion.

## B.   Disputed Issues of Fact Prevent a Ruling in Plaintiffs' Favor

Plaintiff States' procedural and substantive APA arguments both rest on two faulty premises.  First, Plaintiffs erroneously argue that DACA itself modifies substantive rights and confers benefits such as work authorization.  *See* Dkt. 486 at 31–32, 38–39.  Second, Plaintiffs mistakenly contend that, through DACA, DHS "confe[rred] lawful presence on [a] class of aliens," rather than exercising its discretion to grant deferred action "in specific instances."  *Id.* at 37–38.  The evidence in this case, and the Supreme Court's decision in *Regents*, reveal the flaws in Plaintiffs' arguments.  DACA recipients gain access to benefits through *separate*, pre-DACA regulations that Plaintiffs have not challenged here, and USCIS adjudicators exercise significant individualized discretion in granting forbearance, rather than rubber-stamping applications according to a class-wide policy.  Rather than grapple with the evidence that USCIS adjudicators exercise discretion, or distinguish the Supreme Court's holding in *Regents*, Plaintiffs cite a "concurrence" from Justice Thomas, *see id.* at 31, 36, 43, that in fact was a *dissent* from the relevant

portion of the Supreme Court's holding, meaning that *Regents* held the *opposite* of what Plaintiffs allege.  *See Regents*, 140 S. Ct. at 1919 & n.1 (Thomas, J., concurring in the judgment in part and dissenting in part).  Moreover, as with the issue of standing, Plaintiffs have entirely failed to address the new lawfulness issues posed by New DACA.

As the evidence and the Supreme Court's binding opinion in *Regents* show, DACA is a lawful implementation and exercise of Executive enforcement discretion.  Therefore, this Court should deny Plaintiffs' Motion for Summary Judgment.

> 1.    *The Wolf and Edlow Memoranda, Which Established New DACA, Highlight the Flaws in Plaintiffs' Reasoning and Pose New Lawfulness Questions that Plaintiffs Have Not Addressed*

Plaintiffs make no serious attempt to argue that New DACA—the actual forbearance policy implemented by Federal Defendants today—is unlawful.  Nor do Plaintiffs introduce any evidence related to USCIS's exercise of discretion under New DACA.  Instead, Plaintiffs rely on stale evidence regarding advance parole, even though "USCIS has not granted advance parole based on the standards associated with [2012] DACA since September 5, 2017," and will not grant advance parole based on those standards in the future.  *See* Ex. 2, at 6–10 & n.7.  New DACA thus only magnifies the errors in the two false premises underlying Plaintiffs' argument.

First, New DACA further attenuates the connection between forbearance and benefits, particularly the grants of advance parole that Plaintiffs find so problematic.  *See, e.g.*, Dkt. 486 at 11–12, 39–41.  In fact, New DACA "institutes a new general hold on granting advance parole to DACA recipients based on prior DACA-based advance parole standards" and aligns the criteria for advance parole with the INA.  Ex. 2 at 6–9.  As a result, Plaintiffs' unfounded argument that "DACA clears a pathway to citizenship" through advance parole entirely misses the mark with respect to New DACA (and, as explained above at Part III.B, *supra*, Plaintiffs miss the mark when

they incorrectly claim 2012 DACA creates eligibility for advance parole, which is already available to any non-U.S. citizen without status).

Second, New DACA re-emphasizes that DHS and USCIS exercise significant discretion when deciding whether to grant deferred action. The Wolf Memorandum instructs DHS to "[e]xercise its *discretionary authority* to terminate or deny deferred action *at any time* when immigration officials determine termination or denial of deferred action is appropriate." Ex. 3 at 8 (emphasis added). In defending the Wolf Memorandum in a related case purporting to challenge its legality, Federal Defendants explained that the Wolf Memorandum "expressly modified DHS's preexisting guidance for the exercise of enforcement discretion regarding DACA requests." Defs.' Opp. to Mot. for Prelim. Inj. at 21, *FIEL Houston, Inc. v. Wolf*, No. 4:20-cv-02515 (S.D. Tex. filed July 16, 2020), Dkt. No. 23. The Edlow Memorandum likewise instructs USCIS to review and update its SOP to "make clear that it is intended *solely for the instruction* of USCIS personnel," that it is "not legally binding, does not confer any substantive rights," and that it "does not otherwise constrain DHS' authority to enforce the immigration laws passed by Congress." Ex. 2 at 10 (emphasis added). New DACA thus even further supports the evidence described below that USCIS adjudicators must and do exercise discretion. Plaintiffs make no effort and introduce no evidence to explain why they are entitled to summary judgment with respect to New DACA in light of this evidence, nor could they.

### 2.     *2012 DACA Is Lawful As Implemented and Administered*[11]

Even if DHS had not significantly limited the grants of advance parole that are so essential to Plaintiffs' argument, and even if DHS had not reaffirmed that New DACA requires adjudicators to exercise discretion, summary judgment in Plaintiffs' favor would still be inappropriate. In

---

[11] For further and more detailed discussion, *see* Dkt. 224 at 30–48.

*Regents*, the Supreme Court did *not* decide 2012 DACA's legality. *See* 140 S. Ct. at 1910. Instead, the Supreme Court emphasized that 2012 DACA does not directly confer public or other benefits, *see id.* at 1911–13 & nn.5–6, and that the INA permits USCIS adjudicators to exercise "individualized enforcement discretion," *id.* at 1914, which the evidence shows they have done. Summary judgment in Plaintiffs' favor is thus inappropriate because there are, at the very least, disputed issues of material fact as to whether 2012 DACA is procedurally and substantively unlawful.

(a)     2012 DACA Permits Forbearance from Removal, and Does Not Confer Immigration Status or Other Benefits

Plaintiffs' arguments that 2012 DACA violates the procedural and substantive APA depend on their erroneous argument that 2012 DACA grants benefits on a class-wide basis. Contrary to Plaintiffs' arguments, *see* Dkt. 486 at 36, 43–44, however, the Supreme Court in *Regents* reaffirmed that, because DHS is responsible for "[e]stablishing national immigration enforcement policies and priorities," removal forbearance through deferred action "remain[s] squarely within [DHS's] discretion." 140 S. Ct. at 1911–12 (quoting 6 U.S.C. § 202(5)). Indeed, deferred action is an established practice of DHS, recognized by Congress, and supported by historical precedent. *Reno*, 525 U.S. at 484–85 (praising deferred action as a "commendable exercise in administrative discretion, developed without express statutory authorization" (quoting Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, 6 *Immigration Law and Procedure* § 72.03[2][h] (1998))).

The Plaintiff States have repeatedly promoted the legal theory that the Fifth Circuit decided in *Texas DAPA* that 2012 DACA is unlawful. *See e.g.*, Dkt. 486 at 31–32 (citing *Texas DAPA*, 809 F.3d at 171–78 (regarding procedural unlawfulness)); *id.* at 33 (citing *Texas DAPA*, 809 F.3d at 184 (regarding substantive unlawfulness)); *id.* at 27 (citing Dkt. 319 at 48–55, in turn relying on *Texas DAPA*, 809 F.3d at 159–60 (regarding standing)). Although Defendant-Intervenors have

previously explained why that is incorrect, the Supreme Court itself has now weighed in directly

on this issue.  In *Regents*, the Supreme Court emphasized that, because the Fifth Circuit's decision

did *not* speak to the validity of deferred action itself, neither the Attorney General nor the Fifth

Circuit concluded that removal-forbearance is unlawful.  *Regents*, 140 S. Ct. at 1911–12.  In short,

according to the Supreme Court, *Texas DAPA* does not concern removal-forbearance, *id.*, which

the Supreme Court held constitutes the "centerpiece" of DACA, *see id.* at 1913.  Accordingly,

neither *Regents* nor *Texas DAPA* provides any basis for declaring DACA as a whole unlawful.

Moreover, Texas has *not*, in its pleadings or at any other point in this litigation, formally

asked the Court to invalidate the separate regulations that confer the benefits identified by the

Supreme Court in *Regents*.  *See* Dkt. 104 ¶¶ 52, 352–56 (challenging only "DACA" in Plaintiffs'

causes of action); 140 S. Ct. at 1912 n.6.  Thus, Plaintiffs' reliance on *Texas DAPA*, which

concerned only the benefits-eligibility portion of DACA, is misplaced, and is not dispositive

Indeed, in *Regents*, the Supreme Court affirmed that deferred action itself does not confer work

authorization or public benefits.[12]  *See* 140 S. Ct. at 1911–12 & nn.5–6; *see also Texas DAPA*, 809

F.3d at 168 (recognizing that deferred action under DAPA was "a change in designation," not

immigration status).

 Parole—such as advance or humanitarian parole—does not confer immigration status

either.  The INA grants discretion to DHS to parole individuals who lack immigration status into

the United States, and that action by DHS has never been understood to contradict the statutory

---

[12] Non-U.S. citizens granted deferred action pursuant to DACA may be eligible for work authorization or benefits by virtue of *independent rules promulgated prior to the existence of the DACA Memorandum*.  *See* 46 Fed. Reg. 25,080 (May 5, 1981); 52 Fed. Reg. 16,228 (May 1, 1987) (authorizing individuals with deferred action to request work authorization based on economic need); 76 Fed. Reg. 53,764 (Aug. 29, 2011); 61 Fed. Reg. 47,039 (Sept. 6, 1996); 80 Fed. Reg. 7,912 (Feb. 12, 2015) (lifting barriers for certain noncitizens to participate in Social Security retirement and disability and Medicare benefits).  Each of these regulations was formally adopted years ago, and Plaintiffs raise no challenge to those regulations, either as a matter of substance or procedure.  The *only* thing accomplished by DACA is it provides guidance in the exercise of discretion that may, if exercised favorably, permit additional individuals to benefit under these independent rules and regulations.  DACA does not itself confer any benefits.

scheme for immigration.  8 U.S.C. § 1182(d)(5)(A).  Plaintiffs have asserted that DACA is unlawful because it allows recipients access to "advance parole, which clears a path to legal status," Dkt. 486 at 39–41, but advance parole does not clear a path to status for anyone who lacks eligibility for adjustment of status, *see* Dkt. 400-3, Ex. 14 ¶ 31, and, furthermore, "USCIS has not granted advance parole based on the standards associated with DACA since September 5, 2017." Ex. 2 at 10 n.7.

In short, by conflating the legality of removal-forbearance with the Attorney General's and *Texas DAPA*'s decisions about benefits-conferral, Plaintiffs' motion makes the same error as Justice Thomas's "lead dissent," which was rejected by the Supreme Court.  140 S. Ct. at 1913. As explained in *Regents*, nothing in *Texas DAPA* impairs DHS's forbearance authority, and deferred action remains "squarely within" DHS's discretion.  *Id.* at 1911–12.

      (b)      <u>2012 DACA, As Written and Implemented, Requires the Exercise of Prosecutorial Discretion, and Is Thus Entirely Lawful</u>

Plaintiffs agree, as they must, that "deferred action may be granted in specific instances." Dkt. 486 at 37.  Indeed, a "principal feature of the removal system is the broad discretion exercised by immigration officials," including the discretion not to pursue removal at all.  *Arizona*, 567 U.S. at 396.  DACA is one such exercise of the Secretary's broad removal discretion.  *Cf. id.*  The DACA Memorandum simply sets forth *discretionary criteria* for which immigrants subject to removal can be considered for a favorable exercise of discretion—a prioritization that Congress has effectively *required* by appropriating only enough funds to remove approximately 450,000 non-U.S. citizens a year (or approximately 3.75% of the total relevant population).  *See* Dkt. 224 at 31–33; Dkt. 400-3, Ex. 15 ¶¶ 8–10.  Plaintiffs contend that 2012 DACA is unlawful, however, because they argue that it "confer[s] lawful presence on [a] *class* of aliens."  Dkt. 486 at 37–38 (emphasis added); *see also id.* at 42–43.

Contrary to Plaintiffs' argument, both the law and the facts demonstrate that 2012 DACA is *not* a class-wide grant of deferred action. In *Regents*, the Court highlighted that USCIS adjudicators *do* exercise significant individualized discretion when carrying out 2012 DACA. The Court held that the USCIS proceedings to determine whether to grant DACA are "effectively adjudicat[ions]," whereby "USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance." 140 S. Ct. at 1906. Further underscoring the Supreme Court's understanding of the case-by-case nature of the DACA adjudication process, the Court suggested, in its discussion of DACA recipients' reliance interests, that Acting DHS Secretary Duke "might have instructed immigration officials to give salient weight to any reliance interests engendered by DACA *when exercising individualized enforcement discretion*." *Id.* at 1914 (emphasis added).

Plaintiffs do not discuss this aspect of the Supreme Court's decision, relying instead on Justice Thomas's partial concurrence to support their claims regarding DACA's legality. *See, e.g.*, Dkt. 486 at 36. Plaintiffs' reliance on Justice Thomas's opinion is misplaced, if not disingenuous. Justice Thomas's opinion takes issue with the majority's relevant determinations, and more effectively functions as a "lead dissent." *Regents*, 140 S. Ct. at 1914. Nevertheless, Plaintiffs cite to a footnote of this "lead dissent" as primary support from *Regents* for their position that DACA is unlawful. Dkt. 486 at 31 (citing *Regents*, 140 S. Ct. at 1927 n.8 (Thomas, J., concurring in the judgment in part and dissenting in part)).

Plaintiffs also rely on Justice Thomas's *de facto* dissent to support their argument that "[b]asing the Secretary's ability to completely overhaul immigration law on these general grants of authority would eviscerate [the INA's] deliberate statutory scheme." Dkt. 486 at 36 (quoting *Regents*, 140 S. Ct. at 1925 (Thomas, J., concurring in the judgment in part and dissenting in part)).

42

The majority in *Regents* held the opposite, acknowledging the overwhelming evidence that USCIS adjudicators do exercise discretion.

The evidence shows that DHS internal guidelines, like the 2012 DACA Memorandum itself, require USCIS adjudicators to exercise discretion, and that adjudicators do in practice engage in a discretionary, case-by-case review when deciding whether to defer action with respect to individual requestors.  The 2012 DACA Memorandum, by its plain language, disclaims any intent to bind adjudicators.  The memorandum requires adjudicators to exercise discretion on an individualized basis for requestors who meet certain preliminary criteria.  Dkt. 400-7, Ex. 36 at App. 0002–0004.  The memorandum makes clear that the specified criteria "should be satisfied *before an individual is considered* for an exercise of prosecutorial discretion pursuant to this memorandum."  *Id.* at App. 0002.  In other words, the criteria do not *preclude* discretion, but instead *precede* the exercise of discretion.  Only if an individual satisfies those factors can an adjudicator exercise discretion to make a final determination.

Deciding whether certain of the above criteria are met inherently *requires* the adjudicator to exercise individual discretion.  For example, determining whether a person "*otherwise* poses a threat to national security," or whether a prior misdemeanor conviction is a "significant" one, involves the exercise of discretionary judgment by individual USCIS adjudicators.  *See id.* (emphasis added); *see also* Dkt. 400-2, Ex. 11 ¶ 17.  Furthermore, the DACA Memorandum requires that, even once these criteria are satisfied, requestors undergo a complete background check and, in some cases, a personal interview.  Dkt. 400-7, Ex. 36 at App. 003; Dkt. 400-2, Ex. 11 ¶¶ 12, 21.  As a result, adjudicators have a substantial body of information upon which to base their individualized decision as to whether to defer action in a particular case.

The significant and increasing denial rate for deferred action likewise confirms the use of case-by-case, individualized discretion.  Through the first two quarters of fiscal year 2018, USCIS adjudicators denied about 20% of requests for initial grants of deferred action under DACA.  *See* Dkt. 224-2, Ex. 25 at 469.  This denial rate is "consistent with other discretionary applications such as adjustment of status," and the relatively high acceptance rate is based on "the high caliber of the DACA applications submitted to USCIS" *notwithstanding the exercise of enforcement discretion by adjudicators.*  Dkt. 400-1, Ex. 2 ¶¶ 13–20.  Denial rates have since consistently risen, and were at approximately 13.4% in 2014, 17.4% in 2015, 17.8% in 2016, 16.4% in 2017, and 20.1% through the first two quarters of fiscal year 2018 for initial applications.[13]  In fact, between July 2018 and September 2020, USCIS denied *greater than 40%* of the initial DACA applications it received from individuals living in plaintiff states.  *See* Ex. 14 at 6, 60.[14]  These denial rates simply do not support any contention that DACA applications have been "rubberstamped."

At the preliminary injunction stage, the Court deemed this factual record insufficient to determine conclusively whether agency officials exercise discretion in granting DACA requests.  *See* Dkt. 319 at 102.  The Court characterized the discretion-related evidence submitted by the parties as creating genuine issues of material fact that would need further development prior to final judgment.  *Id.* at 100–02.  Discussing the issue of discretion, the Court noted that the evidence

---

[13] The percentages are based on USCIS data for fiscal years 2012-2018.  *See* Dkt. 224-2, Ex. 25 at 469.  These calculations are based on applications that were either approved or denied in the given year, and do not include requests that were rejected *ab initio*.  Nor do they include requests that were submitted but were still awaiting decision at the end of the given year (labelled as "pending" on the chart).  For 2014, there were 20,987 denials and 136,101 approvals. For 2015, there were 19,070 denials and 90,629 approvals.  For 2016, there were 11,396 denials and 52,708 approvals. For 2017, there were 9,250 denials and 47,298 approvals.  And through the first two quarters of fiscal year 2018, there were 3,839 denials and 15,294 approvals.  The percentage of denials noted above was calculated by dividing the number of denials by the total of approvals plus denials.

[14] Federal Defendants define "initial" DACA applications to include both applications from "individuals who have not previously received DACA," as well as applications "filed by prior DACA recipients whose most recent period of DACA was terminated or whose previous period of DACA expired" before certain dates.  Ex. 14 at 6.

presented by Plaintiffs "is not convincing, either in its quantity or quality, and there is at least some evidence presented by the Defendant-Intervenors to the contrary." *Id.* at 101.

Nothing has changed concerning the record related to agency discretion since that ruling by this Court. Plaintiffs rely on the same limited, dated, and disproven evidence they did at the preliminary injunction stage to allege a lack of discretion. *See* Dkt. 486 at 32–33. This evidence was inadequate then, *see* Dkt. 319 at 98–99, and does not speak in any way to the discretion DHS adjudicators exercise today under New DACA, the version of DACA that is currently in effect.

The Court correctly found that Plaintiffs could not meet their burden based on this limited evidence at the preliminary injunction phase. Dkt. 319 at 100–02. Plaintiffs likewise cannot meet their burden on the basis of that *same* inadequate record now. *See, e.g.*, *Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir. 2005) (noting that the movant has the burden of proof for establishing that there are no issues of material fact).

> ### 3.   A ruling on Plaintiffs' Take Care Clause claims should be deferred until after a merits hearing

The Executive had the authority to adopt DACA, and DACA does not violate the Take Care Clause. At the preliminary injunction stage, the Court acknowledged, "[T]he Take Care Clause could actually be the basis for arguing that DACA is both constitutionally permissible and constitutionally impermissible . . . . The instant case pits the concept of faithfully enforcing the law against the concept of prosecutorial discretion." Dkt. 319 at 64–65.

The Court "deferr[ed] judgment on the Take Care Clause until a full hearing on the merits or until the appropriate court on appeal instructs it to decide the issue." Dkt. 319 at 67. Given that the Plaintiff States refused to take an appeal to the Fifth Circuit, and given further that New DACA rescinds or substantially alters both the consideration for advance parole and the Office of Legal Counsel opinion at the heart of Plaintiffs' Motion, *see* Ex. 3 at 6–9; Ex. 9; *see also* Dkt. 486 at 44–

45, Defendant-Intervenors respectfully request that the Court defer judgment on the Take Care Clause. *See* Dkt. 319 at 67.

## C. The Court Should Abstain from Ordering Injunctive Relief

A nationwide injunction, as requested by Plaintiffs, would not be a proper remedy, particularly here, where most Plaintiff States have adduced no evidence whatsoever of even a purported injury.[15] *See, e.g.*, notes 1, 5, *supra*. Moreover, the balance of equities and public interest in this case weigh strongly against providing Plaintiffs with injunctive relief of any kind. The record before the Court is essentially the same as the record during the preliminary injunction phase, and the Court expressly declined to issue an injunction or grant summary judgment upon that record. Dkt. 319 at 117. The Court should do the same here.

### 1. Vacatur Is Neither Necessary Nor Appropriate in This Case

Even if the Court finds that 2012 or New DACA are invalid, the Court should remand DACA to DHS, rather than vacating the rule. When determining if vacatur is an appropriate, the courts should consider (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)" and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993); *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (applying the *Allied-Signal* factors to remand a rule to the EPA). Although the Court should consider both

---

[15] Plaintiffs' attempt to recast their requested remedy as non-injunctive is incorrect, unavailing, and inconsistent with their own previous filings. *See* Dkt. 387 at 8–10 (arguing that "[p]ermanent injunctive relief is unnecessary" and reasoning that a "vacatur" of DACA is the "appropriate remedy" in this case). To be clear, Plaintiffs seek injunctive relief in their Amended Complaint, Dkt. 104 ¶ 12, which they have not since amended. Additionally, Plaintiffs' recent summary judgment brief again requests that the Court "prevent Federal Defendants from issuing any new DACA permits or renewing any existing DACA permits." Dkt. 486 at 47. Moreover, a "[v]acatur of agency action is a . . . form of injunctive relief" that restores the status quo. *See Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019) (emphasis added) (citation omitted) (cited in Dkt. 387 at 9). Finally, to the extent Plaintiffs (incorrectly) argue that a vacatur order would not require Federal Defendants to actually do anything, it would consequently do nothing to remedy their alleged injuries, in which case Plaintiffs should be denied standing for lack of redressability.

of the *Allied-Signal* factors, the Court has discretion to balance the equities and practicalities of the alternative remedies available.  *See, e.g.*, *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (remanding without vacatur, despite serious flaws in rule, where vacatur would be disruptive).

Here, the "disruptive consequences" of an immediate vacatur of DACA would be profound.  DACA provides considerable economic and societal benefits, both in Texas and nationwide, and DACA's termination would run contrary to the public interest.  DACA recipients are integrated members of society.  DACA recipients pay taxes, own businesses, work in a variety of industries, volunteer in their communities, and often advocate for other vulnerable populations. *See, e.g.*, Ex. 17 ¶¶ 3–4; Ex. 18 ¶ 5; Ex. 20 ¶ 3–4, 6; Ex. 21 ¶¶ 3, 8–9; Ex. 26 ¶¶ 3, 6; Dkt. 224 at 53–54 & n.28; *see also* Part V.A.2(c), *supra* (outlining overall economic benefits of DACA to Texas).  Halting DACA would negatively affect public safety and the wellbeing of Plaintiffs' residents, both immigrant and non-immigrant.  Terminating DACA would discourage immigrants' willingness to assist law enforcement with criminal investigations, *see* Dkt. 224 at 15; Dkt. 400-1, Ex. 3 ¶¶ 10–15, and by "compound[ing] the harmful effects of employment and economic loss . . . could result in additional demands placed on our mental health and social welfare system[s]."  Dkt. 224 at 54; Dkt. 400-1, Ex. 4 ¶ 42; *see also* Ex. 17 ¶¶ 8–9; Ex. 18 ¶ 7; Ex. 19 ¶¶ 9, 11, 14; Ex. 21 ¶ 7; Ex. 25 ¶¶ 5–6.

Even in cases (unlike here) where a rule "clearly violates the APA" and vacatur would be the normal remedy, the Court retains the discretion to fashion an equitable remedy.  *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002).  Remand is appropriate where "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante." *Id.* at 97.  As this Court has recognized, the DACA "egg has been scrambled," and "many DACA

recipients and others nationwide have relied upon it for the last six years." Dkt. 319 at 115; *see also id.* (concluding, on substantially the same record as currently before the Court, that Defendant-Intervenors' and the public's interest "outweigh those of the Plaintiff States").

Remand would also be consistent with the Supreme Court's instructions in *Regents*. Even assuming for purposes of argument that DACA was unlawful, the Supreme Court nevertheless held that the Attorney General's determination regarding lawfulness did *not* eliminate the discretion DHS was *obligated* to exercise to determine next steps, especially with respect to remedy (which the *Regents* Court emphasized *must* take into account the weighty reliance interests at stake). *See, e.g.*, 140 S. Ct. at 1914 ("DHS has considerable flexibility in carrying out its responsibility."). In *Regents*, the Supreme Court in effect determined—as this Court indicated was the appropriate ultimate resolution in its Preliminary Injunction ruling, *see* Dkt. 319 at 5–6, 117—that the political branches, not the courts, must decide the appropriate, long-term solution for DREAMers, and must, when doing so, take account their reliance interests. Accordingly, this Court should not—consistent with the Supreme Court's decision in *Regents*—vacate DACA, no matter what decision the Court makes on the merits.

### 2. *The Balance of the Equities Tips Strongly Away from Plaintiffs*

As this Court previously found, Plaintiffs are not entitled to the injunctive relief they seek. Plaintiffs' delay in filing this action demonstrates their lack of irreparable harm; other remedies are available to redress Texas' alleged harm; DACA recipients face far greater hardship from losing DACA than Texas faces from DACA remaining in place; and ending DACA would considerably harm the public interest, both nationwide and in Texas. *See, e.g.*, Ex. 19 ¶¶ 9, 11, 14; Ex. 22 ¶¶ 6–9; Ex. 26 ¶¶ 1, 3; *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (injunctive relief must not be awarded when the balance of the equities weighs against it). As this Court previously found, the

harmful consequences to DACA recipients of vacating DACA would be severe, and result in significant hardship and substantial detriment to the public interest. Accordingly, the balance of equities weighs heavily against Plaintiffs, such that they cannot be entitled to injunctive relief (regardless of this Court's decision on the merits).

3.  *Nationwide Injunctions Should Be Disfavored Generally, and in this Case in Particular*

This Court has recognized that nationwide injunctions against the Federal Government are ill advised. *See* Dkt. 319 at 14–15 (compiling commentary on nationwide injunctions and their disadvantages). Federal Defendants have long agreed. *See* Dkt. 400-7, Ex. 44 at 24 (noting, "[n]ationwide injunctions . . . transgress both Article III and longstanding equitable principles by affording relief that it is not necessary to redress any cognizable, irreparable injury to the parties in the case"); *see also* Dkt. 400-7, Ex. 45.

Here, a nationwide injunction is particularly inappropriate, because only one Plaintiff, Texas, has *even seriously attempted* to demonstrate injury from DACA. *See* Dkt. 319 at 106; *see also* Dkt. 484; Dkt. 486 at 28 (arguing that the "evidence introduced" shows that "Texas" has borne costs associated with DACA, and naming no other Plaintiff States). Granting a nationwide injunction based on the purported injuries suffered by one state—even assuming those injuries were sufficient to establish standing and prove Plaintiffs' case, which they are not—would be ill advised. Doing so where even those injuries are speculative, disputed, and the subject of pending motions to compel discovery, would be even more inappropriate.

4.  *To the Extent the Court Is Going to Fashion a Remedy, the Court Must Consider Reliance Interests and Consider Allowing for Continued Forbearance from Removal*

In the alternative, should the Court deem it necessary to fashion its own remedy, the Court should exercise its equitable discretion to consider reliance interests. *Regents*, 140 S. Ct. at 1913.

49

Such reliance interests may include those considered by the Supreme Court in *Regents*.  For example, this Court could grant "a broader renewal period based on the need for DACA recipients to reorder their affairs."  *Id.* at 1914.  This Court could also issue "more accommodating termination dates for recipients caught in the middle of a time-bounded commitment, to allow them to, say, graduate from their course of study, complete their military service, or finish a medical treatment regimen."  *Id.*  Additionally, the Court could also provide for the "[instruction of] immigration officials to give salient weight to any reliance interests engendered by DACA when exercising individualized enforcement discretion."  *Id.*  Those instructions, for example, might be rooted in the "noteworthy" concerns that, "since 2012, DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA program."  *Id*. at 1914 (quoting Br. for Regents at 41, *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) (No. 18-587)); *see also* Ex. 17 ¶¶ 5–7; Ex. 18 ¶ 6 ("DACA has helped me think about the future in a way that is more expansive."); Ex. 19 ¶ 8; Ex. 20 ¶¶ 6–7; Ex. 21 ¶¶ 6, 8; Ex. 22 ¶ 8; Ex. 25 ¶ 5; Ex. 26 ¶ 7.  Seeing as the reliance interests at stake here are serious and significant for individuals and institutions, this Court must give them weight in fashioning a remedy, if the Court is inclined to do so (rather than to remand).

## VI.   CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court deny Plaintiffs' motion for summary judgment, or in the alternative, grant Defendant-Intervenors' motion for summary judgment as to Plaintiffs' lack of standing.

Dated: November 6, 2020                Respectfully Submitted,

                                       **MEXICAN AMERICAN LEGAL
                                       DEFENSE AND EDUCATIONAL FUND**

                                       By:  /s/ *Nina Perales*
                                       Nina Perales (Tex. Bar No. 24005046);
                                       (SD of Tex. Bar No. 21127)
                                       Attorney-in-Charge
                                       110 Broadway, Suite 300
                                       San Antonio, Texas 78205
                                       Phone:  (210) 224-5476
                                       Facsimile:  (210) 224-5382
                                       Email:  nperales@maldef.org

                                       **ROPES & GRAY LLP**
                                       Douglas H. Hallward-Driemeier
                                       2099 Pennsylvania Ave NW
                                       Washington, DC  20006-6807
                                       (202) 508-4600
                                       (202) 508-4776 (direct dial)
                                       Douglas.Hallward-Driemeier@ropesgray.com
                                       (Admitted pro hac vice)

                                       **GARCÍA & GARCÍA,
                                       ATTORNEYS AT LAW P.L.L.C.**
                                       Carlos Moctezuma García
                                       (Tex. Bar No. 24065265)
                                       (SD of Tex. Bar No. 1081768)
                                       P.O. Box 4545
                                       McAllen, TX  78502
                                       Phone:  (956) 630-3889
                                       Facsimile:  (956) 630-3899
                                       Email:  cgarcia@garciagarcialaw.com

                                       Attorneys for Defendant-Intervenors

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on the 6th day of November, 2020, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*
Nina Perales