**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**DEFENDANT-INTERVENORS' APPENDIX
IN SUPPORT OF THEIR BRIEF IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Dated: November 6, 2020

Respectfully Submitted,

**MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND**

By: */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC 20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-Driemeier@ropesgray.com
(Admitted pro hac vice)

**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

*Attorneys for Defendant-Intervenors*

| Exhibit No. | Description/Source | Vol. No. |
|:-:|:--|:-:|
| 1 | Instructions for Application for Travel Document, *available at* https://www.uscis.gov/sites/default/files/document/forms/i-131instr.pdf (last visited Nov. 6, 2020). | 1 |
| 2 | Joseph Edlow Memorandum, dated Aug. 21, 2020, *available at* https://www.uscis.gov/sites/default/files/document/policy-alerts/dacamemo.pdf (last visited Nov. 6, 2020) | 1 |
| 3 | Chad Wolf Memorandum, dated July 28, 2020, *available at* https://www.dhs.gov/sites/default/files/publications/20_0728_s1_daca-reconsideration-memo.pdf (last visited Nov. 6, 2020) | 1 |
| 4 | Amended Complaint, *FIEL Houston Inc. v. Wolf*, No. 4:20-cv-2515 (S.D. Tex. July 17, 2020), Dkt. 4 | 1 |
| 5 | Second Amended Supplemental Complaint, *New York v. Trump*, No. 1:17-cv-05228 (E.D.N.Y. Aug. 28, 2020), Dkt. 271 | 1 |
| 6 | Fourth Amended Complaint, *Batalla Vidal v. Wolf*, No. 1:16-cv-04756, (E.D.N.Y. Aug. 28, 2020), Dkt. 308 | 1 |
| 7 | Plaintiffs Motion to Show Cause and Brief in Support, *Casa de Maryland v. U.S. Dep't of Homeland Sec.*, No. 8:17-cv-02942 (D. Md. Aug. 14, 2020), Dkt. 115 | 1 |
| 8 | Complaint, *Santa Fe Dreamers Project v. Wolf*, No. 1:20-cv-02465 (D.D.C. Sept. 3, 2020), Dkt. 1 | 1 |
| 9 | Attorney General William Barr's Letter to Acting Secretary Chad Wolf on DACA, dated June 30, 2020, *available at* https://www.dhs.gov/sites/default/files/publications/20_0630_doj_aj-barr-letter-as-wolf-daca.pdf (last visited Nov. 6, 2020) | 1 |
| 10 | Letter from Coalition for the American Dream to President Donald J. Trump (July 11, 2020), *available at* https://www.coalitionfortheamericandream.us/wp-content/uploads/2020/07/C4AD-Letter-July-11-2020.pdf (last visited Nov. 6, 2020) | 1 |
| 11 | *Parm v. Shumate*, No. 3:01-cv-2624, 2006 WL 1228846 (W.D. La. May 1, 2006) | 1 |
| 12 | *Kirkland v. N.Y. State Dep't of Corr. Servs.*, No. 82 CIV. 0295, 1988 WL 108485 (S.D.N.Y. Oct. 12, 1988) | 1 |
| 13 | Defendants' Opposition to Motion for Preliminary Injunction, *FIEL Houston Inc. v. Wolf*, No. 4:20-cv-2515 (S.D. Tex. Sept. 4, 2020), Dkt. 23 | 1 |
| 14 | Federal Defendants' Objections & Responses to Defendant-Intervenors' Fifth & Sixth Sets of Discovery Requests, dated September 30, 2020 | 1 |
| 15 | *Smith v. Palafox*, 728 F. App'x 270 (5th Cir. 2018) | 1 |
| 16 | *Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721 (5th Cir. 2009) | 1 |
| 17 | Declaration of Karla Perez, dated November 5, 2020 | 1 |
| 18 | Declaration of Jin Park, dated November 6, 2020 | 1 |
| 19 | Declaration of Denise Romero, dated November 6, 2020 | 1 |
| 20 | Declaration of M. Kamau Chege, dated November 6, 2020 | 1 |
| 21 | Declaration of Oscar Alvarez, dated November 6, 2020 | 1 |
| 22 | Declaration of Luis A. Rafael, dated November 5, 2020 | 1 |
| 23 | INTENTIONALLY OMITTED | 1 |
| 24 | INTENTIONALLY OMITTED | 1 |
| 25 | Declaration of Elly Marisol Estrada, dated November 5, 2020 | 2 |
| 26 | Declaration of Hyo-Won Jeon, dated November 6, 2020 | 2 |
| 27 | Declaration of Robert Brantley, dated July 17, 2019 | 2 |
| 28 | Declaration of Andy Craig, dated July 12, 2019 | 2 |

| Exhibit No. | Description/Source | Vol. No. |
|---|---|---|
| 29 | Declaration of Gregory Rogers, dated August 6, 2019 | 2 |
| 30 | Declaration of William J. Bryant, dated August 7, 2019 | 2 |
| 31 | Declaration of "Law Enforcement", dated July 16, 2019 | 2 |
| 32 | Declaration of Dale M. Dennis, dated July 17, 2019 | 2 |
| 33 | Declaration of Alexander Billioux, dated July 10, 2019 | 2 |
| 34 | Declaration of Kevin W. Reeves, dated July 10, 2019 | 2 |
| 35 | Declaration of Michael Boutte, dated July 10, 2019 | 2 |
| 36 | Declaration of Drew Snyder, dated July 17, 2019 | 2 |
| 37 | Declaration of Jacob Black, dated July 17, 2019 | 2 |
| 38 | Declaration of Marshall L. Fisher, dated July 16, 2019 | 2 |
| 39 | Declaration of Brian L. Halstead, dated July 17, 2019 | 2 |
| 40 | Declaration of John A. Bolduc, dated July 16, 2019 | 2 |
| 41 | Declaration of Matthew Van Patton, dated July 16, 2019 | 2 |
| 42 | Declaration of Adam L. Whitsett, dated July 26, 2019 | 2 |
| 43 | Declaration of Lawrence B. Livingston, dated July 16, 2019 | 2 |
| 44 | Declaration of Molly M. Spearman, dated July 19, 2019 | 2 |
| 45 | Declaration of Rusty Monhollon, dated July 24, 2019 | 2 |
| 46 | Declaration of Leonardo R. Lopez, dated July 15, 2019 | 2 |
| 47 | Declaration of Monica Smoot, dated July 29, 2019 | 2 |
| 48 | Declaration of Skylor Hearn, dated August 05, 2019 | 2 |
| 49 | Declaration of Cynthia Beane, dated July 22, 2019 | 2 |
| 50 | Declaration of Jeffrey S. Sandy, dated July 23, 2019 | 2 |
| 51 | Declaration of Steven L. Paine, dated July 19, 2019 | 2 |
| 52 | Declaration of Mary Franklin, dated October, 27, 2020 | 2 |
| 53 | Excerpts of Deposition of Mary Franklin, dated October 05, 2020 | 2 |
| 54 | Excerpts of Deposition of Mary Franklin, dated September 18, 2019 | 2 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| Defendant-Intervenor. | § | |

**DEFENDANT-INTERVENORS' APPENDIX**
**IN SUPPORT OF THEIR BRIEF IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

# Volume 1
# Exhibits 1 - 24

# EXHIBIT 1



# Instructions for Application for Travel Document

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS
Form I-131**

OMB No. 1615-0013
Expires 04/30/2022

## What Is the Purpose of This Form?

This form is for applying to U.S. Citizenship and Immigration Services (USCIS) for the following travel documents:

1. **Reentry Permit**

   A Reentry Permit allows a lawful permanent resident or conditional permanent resident to apply for admission to the United States upon returning from abroad during the permit's validity without the need to obtain a returning resident visa from a U.S. Embassy or U.S. Consulate.

2. **Refugee Travel Document**

   A Refugee Travel Document is issued to an individual in valid refugee or asylee status, or to a lawful permanent resident who obtained such status as a refugee or asylee in the United States. Individuals who hold asylee or refugee status and are not lawful permanent residents must have a Refugee Travel Document to return to the United States after travel abroad, unless they possess an Advance Parole Document. A Department of Homeland Security (DHS) officer at the U.S. port-of-entry will determine your admissibility when you present your travel document.

3. **Advance Parole Document for Individuals Who Are Currently in the United States**

   Parole allows an alien to physically enter into the United States for a specific purpose. An individual who has been "paroled" has not been admitted to the United States and remains an "applicant for admission" even while paroled.

   DHS, as a matter of discretion, may issue an Advance Parole Document to authorize an alien to appear at a port-of-entry to seek parole into the United States. The document may be accepted by a transportation company in lieu of a visa as an authorization for the holder to travel to the United States. An Advance Parole Document is not issued to serve in place of any required passport.

   **WARNING:** The document does not entitle you to be paroled into the United States; a separate discretionary decision on a request for parole will be made when you arrive at a port-of-entry upon your return.

   **WARNING:** DHS may revoke or terminate your Advance Parole Document at any time, including while you are outside the United States, in which event you may be unable to return to the United States unless you have a valid visa or other document that permits you to travel to the United States and seek admission.

   **NOTE:** Generally, if you are in the United States and have applied for adjustment of status to that of a lawful permanent resident, your application will be deemed abandoned if you leave the United States without first obtaining an Advance Parole Document. Your application for adjustment of status generally will not be deemed abandoned, even if you do not apply for an Advance Parole Document before traveling abroad while an adjustment application is pending, if you currently are in one of the following nonimmigrant classifications, and remain eligible for and would be admissible in one of the following categories upon applying for admission at a port-of-entry:

   a. An H-1 temporary worker, or H-4 spouse or child of an H-1;

   b. An L-1 intracompany transferee, or L-2 spouse or child of an L-1;

   c. A K-3 spouse, or K-4 child of a U.S. citizen; or

   d. A V-1 spouse, or V-2/V-3 child of a lawful permanent resident.

**NOTE:** Upon returning to the United States, most individuals must present a valid H, L, K, or V nonimmigrant visa and must continue to be otherwise admissible. If you do not have a valid or unexpired H, L, K, or V nonimmigrant visa, then you generally need to obtain an H, L, K, or V nonimmigrant visa at a U.S. Department of State (DOS) visa issuing post. Individuals will need a valid nonimmigrant visa, advance parole, or other travel document to present for reentry.

**4. Advance Parole Document for Individuals Outside the United States**

The granting of an Advance Parole Document for individuals outside the United States is an extraordinary measure used sparingly to allow an otherwise inadmissible alien to travel to the United States and to seek parole into the United States for a temporary period of time due to urgent humanitarian reasons or for significant public benefit (significant public benefit parole is typically limited to law enforcement or homeland security-related reasons). An Advance Parole Document cannot be used to circumvent normal visa-issuance procedures and is not a means to bypass delays in visa issuance.

## Who May File Form I-131?

Each applicant must file a separate application for a travel document.

**NOTE:** Do not file Form I-131 if you are seeking release from immigration custody and you want to remain in the United States as a parolee. You should contact ICE about your request.

**1. Reentry Permit**

   **a.** If you are in the United States as a lawful permanent resident or conditional permanent resident, you may apply for a Reentry Permit. You must be physically present in the United States when you file the Reentry Permit application and complete the biometrics services requirement. After filing your application for a Reentry Permit, USCIS will inform you in writing when to go to your local Application Support Center (ASC) for your biometrics services appointment. (See **Item Number 3. Biometrics Services Requirement** in the **General Requirements** section of these Instructions.)

   **NOTE:** A Reentry Permit may be sent to a U.S. Embassy, U.S. Consulate, or DHS office abroad for you to pick up, if you make such a request when you file your application.

   With the exception of having to obtain a returning resident visa abroad, a Reentry Permit does not exempt you from compliance with any of the requirements of U.S. immigration laws. If you are in possession of a valid, unexpired Reentry Permit, you will not be deemed to have abandoned your status as a lawful permanent resident or conditional permanent resident based solely on the duration of your absences from the United States while the permit is valid.

   An absence from the United States for 1 year or more will generally break the continuity of your required continuous residence for the purpose of naturalization. If you intend to remain outside the United States for 1 year or more, you may be eligible to file Form N-470, Application to Preserve Residence for Naturalization Purposes. For further information, contact your local USCIS office.

   **b. Validity of Reentry Permit**

      **(1)** Generally, a Reentry Permit issued to a lawful permanent resident is valid for 2 years from the date of issuance. See 8 CFR section 223.3(a)(1). However, if you have been outside the United States for more than 4 of the last 5 years since becoming a lawful permanent resident, the permit will be limited to 1 year, except that a permit with a validity of 2 years may be issued to the following:

         **(a)** A lawful permanent resident whose travel is on the order of the U.S. Government, other than an exclusion, deportation, removal, or rescission order;

         **(b)** A lawful permanent resident employed by a public international organization of which the United States is a member by treaty or statute; or

**(c)** A lawful permanent resident who is a professional athlete and regularly competes in the United States and worldwide.

**(2)** A Reentry Permit issued to a conditional permanent resident is valid for 2 years from the date of issuance, or to the date the conditional permanent resident must apply for removal of the conditions on his or her status, whichever date comes first.

**(3)** A Reentry Permit may not be extended.

**c.   A Reentry Permit may not be issued to you if:**

**(1)** You have already been issued such a document, and it is still valid, unless the prior document has been returned to USCIS or you can demonstrate that it was lost; or

**(2)** A notice was published in the Federal Register that precludes the issuance of such a document for travel to the area where you intend to go.

**NOTICE to lawful permanent or conditional permanent residents concerning possible abandonment of status:**  If you do not obtain a Reentry Permit, lengthy or frequent absences from the United States could be factors supporting a conclusion that you have abandoned your lawful permanent resident status.  If DHS determines, upon your return to the United States, that you have abandoned your lawful permanent resident status, you may challenge that determination if you are placed in removal proceedings.

**2.   Refugee Travel Document**

**a.   If you are in the United States** in valid refugee or asylee status, or if you are a lawful permanent resident as a direct result of your refugee or asylee status in the United States, you may apply for a Refugee Travel Document. You should apply for a Refugee Travel Document **BEFORE** you leave the United States.  **If biometrics services are required and you fail to appear to have the biometrics collected, the application may be denied.**

After filing your application for a Refugee Travel Document, USCIS will inform you in writing when to go to your local USCIS ASC for your biometrics services appointment.  Unless you have other appropriate documentation, such as a Permanent Resident Card and passport, you must have a Refugee Travel Document to return to the United States after temporary travel abroad.  A Refugee Travel Document may be sent to a U.S. Embassy, U.S. Consulate, or DHS office abroad for you to pick up, if you request it when you file your application.

**b.   If you are outside of the United States** and:

**(1)** Have valid refugee or asylee status; or

**(2)** You are a lawful permanent resident as a direct result of your refugee or asylee status in the United States, you may be permitted to file Form I-131 and apply for a Refugee Travel Document.  The USCIS Overseas District Director with jurisdiction over your location makes this decision in his or her discretion.

Your application must be filed within 1 year of your last departure from the United States and should include an explanation of why you failed to apply for a Refugee Travel Document before you departed from the United States.

**Travel Warning Regarding Voluntary Re-availment**

**WARNING to asylees who travel to the country of claimed persecution:**  If you applied for asylum on or after April 1, 1997, your asylum status may be terminated if the U.S. Government determines that you have voluntarily availed yourself of the protection of your country of nationality or, if stateless, country of last habitual residence.  See section 208(c)(2)(D) of the Immigration and Nationality Act (INA), 8 USC 1158(c)(2)(D).

**c.   Validity of Refugee Travel Document**

**(1)** A Refugee Travel Document is valid for 1 year.

**(2)** A Refugee Travel Document may not be extended.

**d. A Refugee Travel Document may not be issued to you if:**

**(1)** You have already been issued such a document and it is still valid, unless the prior document has been returned to USCIS or you can demonstrate that it was lost; or

**(2)** A notice was published in the Federal Register that precludes the issuance of such a document for travel to the area where you intend to go.

**NOTE:** You should apply for a Refugee Travel Document before you leave the United States. However, a Refugee Travel Document may be sent to a U.S. Embassy, U.S. Consulate, or DHS office abroad for you to pick up, if you make such a request when you file your application. Departure from the United States before a decision is made on the application usually does not affect the application decision. However, if biometrics collection is required and the applicant departs the United States before biometrics are collected, the application may be denied.

**NOTICE to lawful permanent residents who obtain permanent residence as a result of their refugee or asylee status:** If you do not obtain a Reentry Permit (see **Item 1. Reentry Permit** above) and remain outside the United States, lengthy or frequent absences from the United States could be factors supporting a conclusion that you have abandoned your lawful permanent resident status. With the exception of having to obtain a returning resident visa abroad, a Reentry Permit does not exempt you from compliance with any of the requirements of U.S. immigration laws. If you are in possession of a valid unexpired Reentry Permit, you will not be deemed to have abandoned your status as a lawful permanent resident or conditional permanent resident based solely on the duration of your absences from the United States while the permit is valid.

An absence from the United States for 1 year or more will generally break the continuity of your required continuous residence for purpose of naturalization. If you intend to remain outside the United States for 1 year or more, you may be eligible to file Form N-470, Application to Preserve Residence for Naturalization Purposes. For further information, contact your local USCIS office.

If DHS determines, upon your return to the United States, that you have abandoned your lawful permanent resident status, you may challenge that determination if you are placed in removal proceedings, and seek a determination whether you may retain asylum status even if you cannot retain lawful permanent resident status.

**3. Advance Parole Document for Individuals Who Are Currently in the United States**

**If any of the items listed under Item a. below apply to you, select Item Number 1.d. in Part 2. of the form.**

**a. If you are in the United States and seek an Advance Parole Document, you may apply if:**

**(1)** You have a pending application to adjust status, Form I-485, and you seek to travel abroad temporarily for "urgent humanitarian reasons" or in furtherance of a "significant public benefit," which may include a personal or family emergency or bona fide business reasons.

**(2)** You have a pending application for Temporary Protected Status (TPS) (Form I-821), have been granted TPS, or have been granted T or U nonimmigrant status. Whether you are permitted to retain TPS upon your return will depend on whether you continue to meet the requirements for TPS. If you have TPS and leave the United States and reenter the United States during the validity period of your Advance Parole Document, you will not break the continuous physical presence requirement for maintaining your TPS.

**Important:** If you have a TPS or other application pending and you leave the United States on advance parole, you may miss important notices from USCIS regarding your application, including requests for additional evidence. If you do not respond timely to these notices, USCIS may deem your application abandoned and, in that event, you will not receive the benefit you seek. It is very important that you make appropriate arrangements to ensure that you do not miss any such important notices.

**(3)** You have been granted parole pursuant to INA section 212(d)(5), **AND** you seek to travel abroad temporarily for urgent humanitarian reasons or in furtherance of a significant public benefit. Humanitarian reasons include travel to obtain medical treatment, attend funeral services for a family member, or visit an ailing relative.

**(4)** USCIS or U.S. Immigration and Customs Enforcement (ICE) has deferred action in your case as a childhood arrival based on the guidelines described in the Secretary of Homeland Security's memorandum issued on June 15, 2012 ("Deferred Action for Childhood Arrivals" (DACA)).  USCIS may, in its discretion, grant advance parole if you are traveling outside the United States for educational purposes, employment purposes, or humanitarian purposes.

    **(a)** Educational purposes include, but are not limited to, semester abroad programs or academic research;

    **(b)** Employment purposes include, but are not limited to, overseas assignments, interviews, conferences, training, or meetings with clients; and

    **(c)** Humanitarian purposes include, but are not limited to, travel to obtain medical treatment, attend funeral services for a family member, or visit an ailing relative.

**NOTE:**  Travel for vacation is not a valid purpose.  You must **NOT** file Form I-131 with your deferred action request or your package will be rejected and returned to you.

**(5)** USCIS has granted you IMMACT 90 or LIFE Act Family Unity Program benefits, **AND** you seek to travel abroad temporarily for urgent humanitarian reasons or in furtherance of a significant public benefit, which may include a personal or family emergency or bona fide business reasons.

**(6)** You have a pending application for temporary resident status pursuant to INA section 245A, and you seek to travel abroad temporarily for urgent humanitarian reasons or in furtherance of a significant public benefit, which may include a personal or family emergency or bona fide business reasons.

**(7)** You have been granted V nonimmigrant status in the United States, **AND** you seek to travel abroad temporarily for urgent humanitarian reasons or in furtherance of a significant public benefit, which may include a personal or family emergency or bona fide business reasons.

**b.  Travel Warning**

**Before you apply for an Advance Parole Document, read the following travel warning carefully.**

For any kind of Advance Parole Document provided to you while you are in the United States:

**(1)** Leaving the United States, even with an Advance Parole Document, may impact your ability to return to the United States.

**(2)** If you use an Advance Parole Document to leave and return to a port-of-entry in the United States, you will, upon your return, be an "applicant for admission."

**(3)** As an applicant for admission, you will be subject to inspection at a port-of-entry, and you may not be admitted if you are found to be inadmissible under any applicable provision of INA section 212(a) or 235 or any other provision of U.S. law regarding denial of admission to the United States.  If DHS determines that you are inadmissible, you may be subject to expedited removal proceedings or to removal proceedings before an immigration judge, as authorized by law and regulations.

**(4)** As noted above, issuance of an Advance Parole Document does **NOT** entitle you to parole and does not guarantee that DHS will parole you into the United States upon your return.

**(5)** As noted above, DHS will make a separate discretionary decision whether to parole you each time you use an Advance Parole Document to return to the United States.

**(6)** If, upon your return, you are paroled into the United States, you will remain an applicant for admission.

**(7)** As noted above, DHS may revoke or terminate your Advance Parole Document at any time, including while you are outside the United States.  Even if you have already been paroled, upon your return to the United States, DHS may also revoke or terminate your parole in accordance with 8 CFR 212.5.

    If you are outside the United States, revocation or termination of your Advance Parole Document may preclude you from returning to the United States unless you have a valid visa or other document that permits you to travel to the United States and seek admission.

**(8)** If you are in the United States when DHS revokes or terminates your parole, you will be an unparoled applicant for admission, and may be subject to removal as an applicant for admission who is inadmissible under INA section 212, rather than as an admitted alien who is deportable under INA section 237. In addition to the above, if you received deferred action under DACA, you should also be aware of the following:

**(a)** Even after USCIS or ICE has deferred action in your case under DACA, you should not travel outside the United States unless USCIS has approved your application for an Advance Parole Document. Deferred action will terminate automatically if you travel outside the United States without obtaining an Advance Parole Document from USCIS.

**(b)** If you obtain an Advance Parole Document in connection with a decision to defer removal in your case under DACA and if, upon your return, you are paroled into the United States, your case will generally continue to be deferred. The deferral will continue until the date specified by USCIS or ICE in the deferral notice given to you or until the decision to defer removal action in your case has been terminated, whichever is earlier.

**(c)** If you have been ordered excluded, deported, or removed, departing from the United States without having had your exclusion, deportation, or removal proceedings reopened and administratively closed or terminated will result in your being considered excluded, deported, or removed, even if USCIS or ICE has deferred action in your case under DACA and you have been granted advance parole.

**c.** **If you are in the United States and seek an Advance Parole Document, a document may not be issued to you if:**

**(1)** You hold a nonimmigrant status, such as J-1, that is subject to the 2-year foreign residence requirement as a result of that status. Exception: If you are someone who was subject to this requirement but are now eligible to apply for adjustment of status to lawful permanent resident, USCIS may consider your application for advance parole; or

**(2)** You are in exclusion, deportation, removal, or rescission proceedings, unless you have received deferred action under DACA. You may, however, request parole from ICE. See **NOTE** below.

**d.** **If you depart from the United States before the Advance Parole Document is issued, your application for an Advance Parole Document will be considered abandoned.**

**NOTE:** Do not use this form if you are seeking release from immigration custody and you want to remain in the United States as a parolee. You should contact your local ICE office about your request (**www.ice.gov/contact/ero**).

**4.** **Advance Parole Document for Individuals Outside the United States**

**a.** **If you or someone else is outside the United States and needs to visit the United States temporarily for an urgent humanitarian reason or for significant public benefit:**

**(1)** You may apply for an Advance Parole Document if you cannot obtain the necessary visa and any required waiver of inadmissibility or consent to reapply for admission. Under these conditions, an Advance Parole Document is granted on a case-by-case basis for a temporary period of time, according to any conditions that may be placed on parole.

**(2)** An individual in the United States may file this application on your behalf. This individual must complete **Part 1.** of the form with information about himself or herself.

**(3)** If you were paroled into the United States when you arrived with an Advanced Parole Document, and need to remain in the United States beyond the authorized parole period to accomplish the purpose for which parole was approved, you must file a new Form I-131 with all supporting documentation to request a new parole authorization and type or print REPAROLE in capital letters at the top of the new Form I-131.

**b.** **An Advance Parole Document may also be granted to qualified individuals outside the United States as part of specific USCIS Family Reunification Parole policies.**

If Items (1), (2), or (3) below apply to you, type or print the appropriate parole policy name at the top of Form I-131 and check box 1.f. under Part 2. of the form.

**NOTE:** A derivative beneficiary can only receive benefits under any of the specific Family Reunification Parole policies if the principal beneficiary receives benefits. A separate application and fee for each individual principal and derivative beneficiary is required. Applications for a principal beneficiary and any of his or her derivative beneficiaries must be submitted in one package when mailed to USCIS.

**(1)** **Cuban Family Reunification Parole (CFRP) Program.** Under the CFRP Program, USCIS offers certain beneficiaries of approved family-based immigrant petitions the opportunity to seek, on a case-by-case basis, a discretionary grant of parole into the United States to apply for lawful permanent resident status, rather than remain in Cuba waiting for their immigrant visas to become available. You may apply for advance parole under this program ONLY if you have received an invitation to apply. The invitation contains instructions on eligibility and how to apply. If you apply for parole under this program without having received an invitation to apply, your application for parole may be denied.

**(2)** **Haitian Family Reunification Parole (HFRP) Program.** Under the HFRP program, USCIS offers certain beneficiaries of family-based immigrant petitions, approved on or before December 18, 2014, an opportunity to seek, on a case-by-case basis, a discretionary grant of parole into the United States up to approximately 2 years before their immigrant visas become available (as indicated in the Application Final Action Dates chart in the Department of State's Visa Bulletin), rather than remain in Haiti awaiting availability of their immigrant visas. You may apply for advance parole under this program ONLY if you have received an invitation to apply. The invitation contains instructions on eligibility and how to apply. If you apply for this program without having received an invitation to apply, your application for parole may be denied.

**(3)** **Filipino WWII Veterans Parole (FWVP) Program.** Under the FWVP program, USCIS offers certain beneficiaries of family-based immigrant petitions, approved on or before the date the request for advance parole is filed, an opportunity to seek, on a case-by-case basis, a discretionary grant of parole into the United States before their immigrant visas become available, rather than remain in another country awaiting availability of their immigrant visas. An invitation is not needed to apply for parole under this program.

You may apply for parole on behalf of your family members under this program if:

**(a)** You are living in the United States and are either a Filipino World War II veteran, as defined by section 405 of IMMACT 90, as amended, or the surviving spouse of such individual;

**(b)** You have filed a Form I-130, Petition for Alien Relative, for a family member whose visa is not yet available (as indicated in the Application Final Action Dates chart in the Department of State's Visa Bulletin), and whose Form I-130 petition was approved on or before the date your request for advance parole under the FWVP program is filed; and

**(c)** Your qualifying relationship with your family member existed on or before May 9, 2016.

**NOTE:** If you are the surviving spouse of a Filipino World War II veteran, you may only apply for parole under the FWVP program on behalf of a child, son, or daughter who is also the child, son, or daughter of the Filipino World War II veteran. You may apply for parole under the FWVP program on behalf of such individuals, even if the approved Form I-130 on which they are beneficiaries had been filed by the deceased veteran, as long as that Form I-130 was reinstated by USCIS.

**NOTE:** If the Filipino World War II veteran and his or her spouse are both deceased, certain beneficiaries of an approved Form I-130 that was automatically revoked and which USCIS reinstated, may apply for parole under this program on their own behalf.

**NOTE:** Additional information regarding eligibility under the terms of the FWVP program is described under "**Filipino WWII Veterans Parole Program**" at **www.uscis.gov/FWVP**.

## General Instructions

If you are completing this form on a computer, the data you enter will be captured using 2D barcode technology.  This capture will ensure that the data you provide is accurately entered into USCIS systems.  As you complete each field, the 2D barcode field at the bottom of each page will shift as data is captured.  Upon receipt of your form, USCIS will use the 2D barcode to extract the data from the form.  Please **do not damage the 2D barcode** (puncture, staple, spill on, write on, etc.) as this could affect the ability of USCIS to timely process your form.

USCIS provides most forms in PDF format free of charge through the USCIS website.  In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which can be downloaded for free at **http://get.adobe.com/reader/**.

Each application must be properly signed and accompanied by the appropriate fee.  (See the **What is the Filing Fee** section of these Instructions.)  A photocopy of a signed application or a typewritten name in place of a signature is not acceptable.  If you are under 14 years of age, your parent or legal guardian may sign the application on your behalf.

**Evidence.**  You must submit all required initial evidence along with all the supporting documentation with your application at the time of filing.

**Biometrics Services Appointment.**  After receiving your application and ensuring completeness, USCIS will inform you in writing when to go to your local USCIS Application Support Center (ASC) for your biometrics services appointment.  Failure to attend the biometrics services appointment may result in denial of your application.

**Copies.**  Unless specifically required that an original document be filed with an application, a legible photocopy may be submitted.  Original documents submitted when not required may remain a part of the record, and will not be automatically returned to you.

**Translations.**  Any document containing foreign language submitted to USCIS must be accompanied by a full English language translation which the translator has certified as complete and accurate, and by the translator's certification that he or she is competent to translate from the foreign language into English.

**How To Fill Out Form I-131**

1.  Type or print legibly in black ink.

2.  If extra space is needed to complete any item, attach a separate sheet and type or print your name and Alien Registration Number (A-Number) (if any), at the top of each sheet of paper; indicate the **Part** and **Item Number**s to which your answer refers; and date and sign each sheet.

3.  Answer all questions fully and accurately.  If an item is not applicable or the answer is none, print or type N/A.

## General Requirements

1.  **Initial Evidence**

    All applications must include a **copy of an official photo identity document showing your photo, name, and date of birth.**  (Examples:  Your current Employment Authorization Document, if available; a valid government-issued driver's license; passport identity page; Form I-551, Permanent Resident Card; or any other official identity document.)  The copy must **clearly** show the photo and identity information.  **Form I-94 Arrival-Departure Record is not acceptable as a photo identity document.**

    You must file your application with all required evidence.  Not submitting required evidence will delay the issuance of the document you are requesting.  USCIS may request additional information or evidence or may request that you appear at a USCIS office for an interview or for fingerprinting.  (See **Item 3. Biometric Services Requirement** below).

**If you are applying for:**

**a.   Reentry Permit**

You **must** attach:

**(1)**  A copy of the front and back of your Form I-551; or

**(2)**  If you have not yet received your Form I-551, a copy of the biographic pages of your passport and a copy of the visa page showing your initial admission as a lawful permanent resident, or other evidence that you are a lawful permanent resident; or

**(3)**  A copy of the Form I-797, Notice of Action, approval notice of an application for replacement of your Form I-551 or temporary evidence of lawful permanent resident status.

**b.   Refugee Travel Document**

You **must** attach a copy of the document issued to you by USCIS showing your refugee or asylee status and the expiration date of such status.

**c.   Advance Parole Document for Individuals Who Are Currently in the United States**

If you are in the United States, you **must** attach:

**(1)**  A copy of any document issued to you by USCIS showing your present status, if any, in the United States; and

**(2)**  An explanation or other evidence showing the circumstances that warrant issuance of an Advance Parole Document; or

**(3)**  If you are an applicant for adjustment of status, a copy of a USCIS receipt as evidence that you filed the adjustment application; or

**(4)**  If you are traveling to Canada to apply for an immigrant visa, a copy of the U.S. consular appointment letter; or

**(5)**  If USCIS has deferred action in your case under DACA, you must include a copy of the  Form I-797, Notice of Action, showing that the decision on your Form I-821D was to defer action in your case.  If ICE deferred action in your case under DACA, submit a copy of the approval order, notice or letter issued by ICE.

**You must complete Part 4. of the form indicating how your intended travel fits within 1 of the 3 purposes below.**  You must also provide evidence of your reason for travel outside of the United States including the dates of travel and the expected duration outside the United States.  If your advance parole application is approved, the validity dates of your Advance Parole Document will be for the duration of the documented need for travel.  Below are examples of acceptable evidence:

**Educational Purposes**

**(a)**  A letter from a school employee acting in an official capacity describing the purpose of the travel and explaining why travel is required or beneficial; or

**(b)**  A document showing enrollment in an educational program requiring travel.

**Employment Purposes**

A letter from your employer or a conference host describing the need for the travel.

**Humanitarian Purposes**

**(a)**  A letter from your physician explaining the nature of your medical condition, the specific medical treatment to be sought outside of the United States, and a brief explanation why travel outside the U.S. is medically necessary; or

**(b)**  Documentation of a family member's serious illness or death.

**d. Advance Parole Document for Individuals Outside the United States**

**(1)** If you are applying for an Advance Parole Document for an individual who is outside the United States under one of the Family Reunification Parole policies, you must attach:

    **(a)** For the HFRP Program, complete documentation as described in the application instructions included in the invitation letter;

    **(b)** For the CFRP Program, complete documentation as described in the application instructions included in the invitation letter; or

    **(c)** For the FWVP program:

        **(i)** A copy of your Form I-797, Notice of Action, indicating approval of your Form I-130, or printout from Case Status Online, which shows an approved Form I-130, Petition for Alien Relative, filed by the Filipino veteran or the surviving spouse, for your family member;

        **(ii)** Form I-134, Affidavit of Support, completed as directed in the Form I-134 instructions;

        **(iii)** Evidence that the Filipino veteran's World War II military service was previously recognized by the U.S. Army as defined by section 405 of the Immigration Act of 1990, as amended; and

        **(iv)** If you are the surviving spouse of the Filipino World War II veteran: evidence of your marriage, and a copy of the veteran's death certificate.

    **NOTE:** If you wish to apply for a child who is the derivative beneficiary of an approved Form I-130 petition, he or she must be under 21 years of age and unmarried on the date USCIS receives the FWVP program application you file on his or her behalf and otherwise satisfy the definition of "child" as defined by INA section 203(d). You may only apply for a derivative beneficiary if you are also applying for the principal beneficiary on that same approved Form I-130.

    **NOTE:** If you are eligible to self-apply for parole under the FWVP program as described in the **Who May File Form I-131** section of these Instructions, you must complete documentation described above and also submit evidence to establish a qualifying family relationship with the deceased Filipino World War II veteran or his or her spouse and evidence of reinstatement by USCIS of your Form I-130.

    **NOTE:** Additional information regarding required documentation is described in "**Filipino WWII Veterans Parole Program**" at **www.uscis.gov/FWVP**.

**(2)** If you are applying for an Advance Parole Document for an individual who is outside the United States (either for yourself or another individual), other than under one of the Family Reunification Parole policies noted in **Item (1)** above, you must attach:

    **(a)** A detailed description of the urgent humanitarian or significant public benefit reason for which an Advance Parole Document is requested, an explanation for the length of time for which parole is requested, and copies of evidence that support the basis for your request;

    **(b)** Form I-134, Affidavit of Support, completed as directed in the Form I-134 instructions;

    **(c)** A statement explaining why a U.S. visa cannot be obtained, including when and where attempts were made to obtain a visa, or an explanation of why a visa was not sought to enter the United States;

    **(d)** If applicable, a statement explaining why a waiver of inadmissibility cannot be obtained to allow issuance of a visa, including when and where attempts were made to obtain a waiver, and a copy of any DHS decision on your waiver request, or an explanation of why a waiver has not been sought;

    **(e)** A copy of any decision on an immigrant or non-immigrant petition or application filed for an individual seeking to enter the United States, and evidence regarding any pending immigrant or non-immigrant petition or application;

**(f)** In addition to the identity document described in **Item 1. Initial Evidence** above, unless such document is a valid passport:

    **(i)** A copy of the biographical page of the beneficiary's passport or, if it is not available, an explanation why a passport is not available and another government-issued identity document that establishes the beneficiary's citizenship; and

    **(ii)** Copies of the petitioner's and Form I-134 sponsor's official identity documents and evidence of their citizenship or U.S. immigration status (such as a copy of a U.S. passport, lawful permanent resident card, or birth certificate).

**NOTE:** If a civil document submitted in support of a request for advance parole has annotations on either the front or the back of the document, copies of both sides of the document must be submitted.

**NOTE:** Additional information regarding types of evidence that may be relevant to specific parole requests is described under "**Humanitarian Parole**" at **www.uscis.gov/humanitarian/humanitarian-parole**.

## 2. Photographs

**a. If you are outside the United States and filing for a Refugee Travel Document, or if you are in the United States and filing for an Advance Parole Document:**

You **must** submit 2 identical color photographs of yourself taken within 30 days of the filing of this application. The photos must have a white to off-white background, be printed on thin paper with a glossy finish, and be unmounted and unretouched.

**NOTE:  Because of the current USCIS scanning process, if a digital photo is submitted, it must be produced from a high-resolution camera that has at least 3.5 mega pixels of resolution.**

Passport-style photos must be 2" x 2."  The photos must be in color with full face, frontal view on a white to off-white background.  Head height should measure 1" to 1 3/8" from top of hair to bottom of chin, and eye height is between 1 1/8" to 1 3/8" from bottom of photo.  Your head must be bare unless you are wearing headwear as required by a religious denomination of which you are a member.  Using pencil or felt pen, lightly print your name and A-Number on the back of the photo.

**b. If applying for an Advance Parole Document for individuals outside the United States:**

    **(1)** If you are applying for an Advance Parole Document on your own behalf, and you are outside the United States, submit photographs with your application.

    **(2)** If you are applying for an Advance Parole Document on behalf of another individual who is outside the United States, submit the required photographs of the individual who would be issued the Advance Parole Document.

## 3. Biometrics Services Requirement

**a.** All applicants for a Refugee Travel Document or a Reentry Permit must complete biometrics at a USCIS Application Support Center (ASC) or, if applying for a Refugee Travel Document while outside of the United States at an overseas USCIS facility.  If you are between ages 14 through 79 and you are applying for a Refugee Travel Document or a Reentry Permit, you must also be fingerprinted as part of USCIS biometrics services requirement.  After you have filed this application, USCIS will notify you in writing of the time and location for your biometrics services appointment.  Failure to appear to be fingerprinted or for other biometrics services may result in a denial of your application.

**b.** All applicants for Reentry Permits and/or Refugee Travel Documents between the ages of 14 through 79 are required to pay the additional **$85** biometrics services fee.  (See the **What Is the Filing Fee** section of these Instructions.)

**c.** An individual outside the United States who is seeking an Advance Parole Document for humanitarian reasons or for significant public benefit, including under one of the Family Reunification Parole policies, and who is between ages 14 through 79, must be fingerprinted as part of the USCIS biometrics services requirement.  Depending on the individual's location, USCIS or the Department of State will advise the location for the biometrics services appointment.

**4. Invalidation of Travel Document**

Any travel document obtained by making a material false representation or concealment in this application will be invalid.  A travel document will also be invalid if you are ordered removed or deported from the United States.

In addition, a Refugee Travel Document will be invalid if the United Nations Convention of July 28, 1951, shall cease to apply or shall not apply to you as provided in Articles 1C, D, E, or F of the Convention.

**5. Expedite Request Instructions**

To request expedited processing of an application for a Reentry Permit, a Refugee Travel Document, or an Advance Parole Document for an individual outside the United States, other than under one of the Family Reunification Parole policies, type or print the word EXPEDITE in the top right corner of the application in black ink.  USCIS recommends that you provide e-mail addresses and a fax number with any expedite request for a Reentry Permit, Refugee Travel Document, or Advance Parole Document.

Include a written explanation of the reason for the request to expedite with any supporting evidence available.  The burden is on the applicant to demonstrate that one or more of the expedite criteria have been met.  The criteria are as follows:

**a.** Severe financial loss to company or individual;

**b.** Extreme emergent situation;

**c.** Humanitarian situation; or

**d.** Non-profit status of requesting organization in furtherance of the cultural and social interests of the United States Department of Defense or National Interest Situation.  (**Note:** The request must come from an official United States Government entity and state that a delay will be detrimental to the U.S. Government.)

---

| **What Is the Filing Fee?** |
| --- |

**Reentry Permit:**  The filing fee for a Reentry Permit is **$575**.  A biometrics services fee of **$85** is required for applicants ages 14 through 79.

**Refugee Travel Document:**  The filing fee for a Refugee Travel Document for an applicant **age 16 or older** is **$135**.  The fee for a child younger than 16 is $105.  A biometrics services fee of **$85** is required for applicants ages 14 through 79.

**Advance Parole Document for Individuals Who Are Currently in the United States (including individuals whose cases were deferred pursuant to DACA):**  The filing fee for an Advance Parole Document for an individual who is currently in the United States is **$575**.  The biometrics services fee is not required.

**Advance Parole Document for Individuals Outside the United States, Including Under Family Reunification Parole Policies:**  The filing fee for an Advance Parole Document for an individual who is outside the United States is **$575**. The biometrics services fee is not required. The filing fee may be waived based upon a demonstrated inability to pay. Applicants should file Form I-912, Request for Fee Waiver, when filing Form I-131 to ensure such requests are supported in accordance with 8 CFR 103.7(c).

**NOTE:  If you filed Form I-485 on or after July 30, 2007, and you paid the Form I-485 application fee required, then no fee is required to file a request for an Advance Parole Document or Refugee Travel Document on Form I-131 if your Form I-485 is still pending, if:**

1.  You now hold U.S. refugee or asylee status, and are applying for a Refugee Travel Document (see **Part 2. Application Type**, **Item Number 1.b.** of Form I-131); or

2.  You are applying for an Advance Parole Document to allow you to return to the United States after temporary foreign travel (see **Part 2. Application Type**, **Item Number 1.d.** of Form I-131).

Under these circumstances, you may file Form I-131 together with your Form I-485, or you may submit Form I-131 at a later date.  If you file Form I-131 separately, you must also submit a copy of your Form I-797, Notice of Action, receipt as evidence that you filed and paid the fee for Form I-485 required on or after July 30, 2007.

**Replacement Travel Document:**  If you are filing to replace a travel document that was lost, stolen, mutilated, or contains erroneous information, such as a misspelled name, a filing fee is required.

**NOTE:**  If you are requesting a replacement Advance Parole Document as an adjustment applicant filed under the fee structure implemented July 30, 2007, then the full filing fee will be required; however, no biometrics services fee is required.

**Incorrect Card:**  No fee is required if you are filing to correct a USCIS error on your travel document.  If USCIS did not cause the error, you must pay the application fees.

**NOTE:**  The filing fee and biometric services fee are not refundable, regardless of any action USCIS takes on this application.  **DO NOT MAIL CASH.**  You must submit all fees in the exact amounts.

**Use the following guidelines when you prepare your checks or money orders for the Form I-131 filing fee and biometric services fee:**

1.  The check or money order must be drawn on a bank or other financial institution located in the United States and must be payable in U.S. currency; **and**

2.  Make the checks or money orders payable to **U.S. Department of Homeland Security**

**NOTE:**  Spell out U.S. Department of Homeland Security; do not use the initials "USDHS" or "DHS."

3.  If you live outside the United States, contact the nearest U.S. Embassy or U.S. Consulate for instructions on the method of payment .

**Notice to Those Making Payment by Check.**  If you send us a check, USCIS will convert it into an electronic funds transfer (EFT). This means we will copy your check and use the account information on it to electronically debit your account for the amount of the check.  The debit from your account will usually take 24 hours and your bank will show it on your regular account statement.

You will not receive your original check back.  We will destroy your original check, but will keep a copy of it.  If USCIS cannot process the EFT for technical reasons, you authorize us to process the copy in place of your original check.  If your check is returned as unpayable, USCIS will re-submit the payment to the financial institution one time.  If the check is returned as unpayable a second time, we will reject your application and charge you a returned check fee.

**How To Check If the Fees Are Correct**

Form I-131's filing fee and biometric services fees are current as of the edition date in the lower left corner of this page.  However, because USCIS fees change periodically, you can verify that the fees are correct by following one of the steps below.

1. Visit the USCIS website at **www.uscis.gov**, select "FORMS," and check the appropriate fee; or

2. Call the USCIS National Customer Service Center at **1-800-375-5283** and ask for fee information. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**Fee Waiver**

You may be eligible for a fee waiver under 8 CFR 103.7(c). If you believe you are eligible for a fee waiver, complete Form I-912, Request for Fee Waiver (or a written request), and submit it and any required evidence of your inability to pay the filing fee with this application. You can review the fee waiver guidance at **www.uscis.gov/feewaiver** .

---

### Where to File?

Please see our website at **www.uscis.gov/I-131** or call our USCIS National Customer Service Center at **1-800-375-5283** for the most current information about where to file this benefit request. For TTY (hearing impaired) call: **1-800-767-1833**.

---

### Address Changes

If you have changed your address, you must inform USCIS of your new address. For information on filing a change of address go to the USCIS website at **www.uscis.gov/addresschange** or contact the USCIS National Customer Service Center at **1-800-375-5283**. For TTY (hearing impaired) call: **1-800-767-1833**.

**NOTE:** Do not submit a change of address to the USCIS Lockbox facilities because the USCIS Lockbox facilities do not process change of address requests.

---

### Processing Information

Any Form I-131 that is not signed or accompanied by the correct fees will be rejected with a notice that Form I-131 is deficient. You may correct the deficiency and resubmit Form I-131. An application or petition is not considered properly filed until accepted by USCIS.

**Initial Processing**

Once a Form I-131 has been accepted, it will be checked for completeness, including submission of the required initial evidence. If you do not completely fill out the form, or file it without required initial evidence, you will not establish a basis for eligibility, and we may deny your Form I-131.

**Requests for More Information, Including Biometrics, or Interview**

We may request more information or evidence, or we may request that you appear at a USCIS office, U.S. Embassy, or U.S. Consulate for an interview. We may also request that you submit the originals of any copy. We will return these originals when they are no longer required.

At the time of any interview or other appearance at a USCIS office, U.S. Embassy, or U.S. Consulate, USCIS may require you to provide biometrics information (for example, photographs, fingerprints) to verify your identity and update your background information.

**Decision**

The decision on Form I-131 involves a determination of whether you have established eligibility for the requested document. You will be notified of the decision in writing.

**What If You Claim Nonresident Alien Status on Your Federal Income Tax Return?**

If you are an alien who has been admitted as an immigrant or adjusted status to that of an immigrant, and are considering the filing of a nonresident alien tax return or the non-filing of a tax return on the ground that you are a nonresident alien, you should carefully review the consequences of such actions under the INA.

If you file a nonresident alien tax return or do not file a tax return, you may be regarded as having abandoned residence in the United States and as having lost your lawful permanent resident status under the INA.  As a consequence, you may be ineligible for a visa or other document for which lawful permanent resident aliens are eligible.

You may also be inadmissible to the United States if you seek admission as a returning resident, and you may become ineligible for adjustment of status as a lawful permanent resident or naturalization on the basis of your original entry.

## USCIS Forms and Information

To ensure you are using the latest version of this form, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  If you do not have internet access, you may order USCIS forms by calling the USCIS Contact Center at **1-800-375-5283**.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

Instead of waiting in line for assistance at your local USCIS office, you can schedule an appointment online at **www.uscis.gov**.  Select "Tools," then under "Self Service Tools," select "Appointments" and follow the screen prompts to set up your appointment.  Once you finish scheduling an appointment, the system will generate an appointment notice for you.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with this request, we will deny your Form I-131 and may deny any other immigration benefit.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this application, and the associated evidence, is collected under the Immigration and Nationality Act sections 103, 208(c)(1)(C), 211, 212(d)(5)(A), 215 and 8 CFR sections 211.1(a)(3-4), 212.5, and 223.1-223.3.

**PURPOSE:**  The primary purpose for providing the requested information on this application is to apply for a Reentry Permit, Refugee Travel Document, or Advance Parole Document, to include urgent humanitarian reasons or in furtherance of a significant public benefit.  DHS uses the information you provide to grant or deny the immigration benefit you are seeking.

**DISCLOSURE:**  The information you provide is voluntary. However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in denial of your application.

**ROUTINE USES:**  DHS may share the information you provide on this application and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-001 - Alien File, Index, and National File Tracking System and DHS/USCIS-007 - Benefits Information System] and the published privacy impact assessments [DHS/USCIS/PIA-003(b) Integrated Digitization Document Management Program, DHS/USCIS/PIA-016a Computer Linked Application Information Management System and Associated Systems, and DHS/USCIS/PIA-051 Case and Activity Management for International Operations] which you can find at **www.dhs.gov/privacy**.  DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 1.90 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.  The collection of biometrics is estimated to require 1.17 hours.  The collection of passport-style photographs is estimated at 0.50 hours.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 20 Massachusetts Ave NW, Washington, DC 20529-2140; OMB No .1615-0013.  **Do not mail your completed Form I-131 to this address.**

# EXHIBIT 2

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000



**U.S. Citizenship and Immigration Services**

August 21, 2020

# Memorandum

TO:   Associate Directors and Program Office Chiefs

FROM:   Joseph Edlow
Deputy Director for Policy

SUBJECT:   Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children'"

On July 28, 2020, Acting Secretary of Homeland Security Chad Wolf issued a memorandum entitled, "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'" In light of the U.S. Supreme Court's decision in *Department of Homeland Security (DHS), et al. v. Regents of the University of California, et al.* Nos. 18-587, 18-588, 18-589, Acting Secretary Wolf rescinded memoranda issued by former Acting Secretary Elaine Duke in 2017 and former Secretary Kirstjen Nielsen in 2018 that had concluded that the Deferred Action for Childhood Arrivals (DACA) policy established on June 15, 2012 by former Secretary Janet Napolitano[1] (hereafter "the Napolitano memorandum") should be rescinded after an orderly wind-down process.

Acting Secretary Wolf's memorandum (hereafter "the Wolf Memorandum") also set forth departmental action to effect certain immediate changes to limit the scope of the DACA policy pending a full and careful reconsideration of the DACA policy. Through this memorandum, I am providing additional guidance to facilitate implementation of the specific changes to the DACA policy that are within the purview of USCIS.

The Wolf Memorandum directed the following actions, effective immediately:

- Reject all initial DACA requests and associated applications for Employment Authorization Documents, and refund all associated fees, without prejudice to re-filing

---

[1] Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) ("Napolitano memorandum").

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 2

such requests should DHS determine to begin accepting initial requests again in the future;

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries;

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year;

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods;

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances;

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods;

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate; and

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum changes that policy.

To facilitate implementation of the Wolf Memorandum, I am providing additional guidance to USCIS personnel as follows:

> **Reject all initial DACA requests and associated applications for Employment Authorization Documents, and return all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.**

The Wolf Memorandum makes clear that these changes should apply to all initial DACA requests submitted by aliens who have never before received DACA, whether submitted after the issuance of his memorandum or pending before USCIS at the time his memorandum was issued. In accordance with the Wolf Memorandum, USCIS shall reject and return the fees for any DACA requests and associated applications for employment authorization submitted by aliens *who have never before received a grant of DACA.*  Since the Supreme Court's decision in

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 3

*Regents*, these requests, if properly filed, have generally been on hold at the USCIS filing location pending further action by USCIS.[2]

Historically, USCIS policy on DACA renewals has permitted DACA recipients to request renewal of DACA for up to one year after their underlying DACA grant has expired.  DACA recipients who failed to submit their renewal requests within the one-year time period following expiration have generally been permitted to request DACA anew.  Given the lapse of time between these aliens' last DACA period and their subsequent request to again receive DACA, however, USCIS has treated such requests as requests for "initial" DACA for required evidence, processing, and adjudication purposes.  Likewise, DACA recipients whose most recent period of DACA has been terminated by USCIS (rather than expired on its own terms) have also been permitted to request DACA anew, but such requests are treated as requests for "initial" DACA (even if the lapse of time between the termination of their most recent period of DACA and their subsequent request to receive DACA again is less than one year).

Under the preliminary injunctions issued in January and February of 2018,[3] USCIS has accepted and adjudicated DACA requests from aliens who have previously received grants of DACA *at any time*—including requests that are treated as "initial" requests for the reasons described above.  Given the Acting Secretary's desire to maintain the status quo of the past few years, USCIS will continue to accept and adjudicate such requests notwithstanding any language in the Wolf Memorandum about rejecting "all" requests for initial DACA.

> ➢ **Adjudicate all pending and future DACA renewal requests and associated applications for Employment Authorization Documents from DACA recipients.**

USCIS shall continue to adjudicate all pending DACA renewal requests and renewal requests received after the Wolf Memorandum, as well as certain initial requests as discussed above, under the general adjudicative guidelines in place for DACA. USCIS will continue to reject, without prejudice to re-submission, DACA renewal requests that are not properly filed in accordance with form instructions and USCIS filing guidance, as it has done since USCIS first started accepting DACA renewal requests.  While USCIS will continue to adjudicate DACA requests under the same general adjudicative guidelines, USCIS is implementing certain immediate changes to DACA processing consistent with and in furtherance of the Wolf Memorandum.

Since June 2014 when DHS and USCIS announced the DACA renewal process, USCIS has consistently instructed DACA recipients to file renewal requests between 150 days and 120 days

---

[2] Initial DACA requests that were properly filed prior to September 5, 2017, should be adjudicated to completion in the event that any of these requests still remain pending with USCIS.  This guidance to reject and return the fees for pending initial DACA requests does not apply to initial DACA requests properly filed prior to September 5, 2017.

[3] See https://www.uscis.gov/humanitarian/deferred-action-for-childhood-arrivals-response-to-january-2018-preliminary-injunction

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 4

prior to their DACA expiration.[4]  Previously, USCIS has accepted renewal requests filed in advance of that period.  In furtherance of the directives in the Wolf Memorandum, USCIS will generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period.  The Wolf Memorandum expressed concerns with the scope of the DACA policy during the interim period the policy is under review.  Exercising discretion to generally reject DACA renewal requests received more than 150 days prior to the expiration of the alien's current period of DACA is more consistent with our long-existing guidance to DACA recipients and serves other important operational interests to improve USCIS's processing and operational efficiencies as a whole.  Additionally, implementing these case intake procedures recognizes that the DACA policy is under comprehensive legal and policy review and may be modified or entirely rescinded by the Acting Secretary once DHS's review of the DACA policy is complete.  Therefore, USCIS believes that it is more prudent to generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipient's current DACA validity period as the DACA policy may be revised or rescinded before USCIS would normally take final adjudicative action on these early filed renewal requests.

USCIS understands that applicants, petitioners, and requestors have an interest in timely adjudications.  This is particularly true for aliens granted temporary authorization to work in the United States who then apply to USCIS to renew their employment authorization documents before their temporary employment authorization expires.  The interim adjustment discussed in this memorandum with respect to early filed DACA renewals balances concerns with the scope of the DACA policy during this interim period with the interests DACA recipients have in preventing gaps in DACA and associated employment authorization.  Further, this guidance reflects an understanding that USCIS processes millions of requests for immigration benefits every year in addition to DACA requests, and therefore USCIS must also balance the interests of all other individuals requesting immigration benefits from the agency.  Of course, this balancing of interests must be done with consideration given to available resources.

USCIS has seen thousands of instances of current DACA recipients filing for DACA renewal when they still have more than 150 days remaining in their current DACA validity.  USCIS data shows that as of June 30, 2020, there were over 11,000 active DACA recipients with DACA renewals pending before USCIS whose current DACA was not set to expire until after January 1, 2021; further, there were nearly 400 active DACA recipients with pending renewal requests whose DACA was not set to expire until the year 2022.

In an effort to minimize overlapping validity periods between an alien's renewed DACA validity period and an alien's current DACA validity period, USCIS has generally withheld issuing final approval of a DACA renewal request until the alien's remaining DACA validity period is closer to the expiration date.  USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period.  However, permitting and accepting DACA renewal requests filed many months in advance of

---

[4] See DACA FAQ 50; https://www.uscis.gov/archive/frequently-asked-questions#renewal; See also; https://www.dhs.gov/news/2014/06/05/secretary-johnson-announces-process-daca-renewal

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 5

DACA expiration only to be preliminarily processed by USCIS and placed on hold is not an efficient use of agency resources.

In assessing whether USCIS should exercise its discretion to begin generally rejecting DACA renewal requests filed more than 150 days prior to expiration, I considered the interests DACA renewal requestors may have in being permitted to file for renewal more than 150 days prior to DACA expiration. In consideration of these potential interests, I examined DACA renewal processing times. USCIS data shows that from August 1, 2019 to August 1, 2020, approximately ninety-six percent of DACA renewal requests processed were completed in 120 or fewer days.

The data demonstrate that in the overwhelming majority of DACA renewal cases, it is not necessary to accept DACA renewal requests more than 150 days before the alien's current DACA period expires in order to facilitate timely processing and minimize gaps in DACA and associated employment authorization. For those aliens, the only effect of this change will be for those early requesters either to wait until the specified period to request renewal or to re-file an early-filed renewal request at the appropriate time. In cases where the requestor may not continue to meet the DACA guidelines, including concerns that arise from background check results, renewal processing may require more time, but these outliers do not reasonably justify permitting routine acceptance of early filings during this interim period while the DACA policy is under review given USCIS's other policy and operational concerns.

Lastly, nothing precludes USCIS from exercising its discretion to accept a DACA renewal request filed 150 days or more in advance of expiration if there are legitimate reasons for doing so, and nothing precludes USCIS from again modifying recommended filing timelines either during this interim period or should DHS announce changes to the DACA policy in the future.

> **Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.**

As described in the Wolf Memorandum, all requests for DACA and associated employment authorization granted after July 28, 2020 will be for a validity period of no more than one year.[5]

The one-year validity period shall begin on the date the DACA request receives final approval, consistent with past practices, and have an ending validity date that is no more than one year minus one day from the date of approval. Also consistent with past practices, the associated employment authorization validity period shall end on the same date that the DACA validity period ends.

The Wolf Memorandum acknowledged that shortening validity periods to one year during this interim period will have the effect of increasing the total amount of fees DACA requestors would pay over a multi-year period and asked USCIS to consider whether it is possible to reduce renewal fees during this time. USCIS is currently considering the merits and feasibility of

---

[5] 8 CFR 274a.12(c) states in pertinent part that "USCIS, in its discretion, may establish a specific validity period for an employment authorization document . . ."

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 6

reducing DACA-related fees during the interim period the DACA policy is under review. Pursuant to INA Section 286(m), DHS may set fees at a level that will "ensure recovery of full costs" of providing adjudication services.  While USCIS has never charged a fee for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, all DACA requestors are required to file Form I-765, Application for Employment Authorization, which does require a fee with very limited exemptions. DACA requestors are also required to pay a biometrics fee.

USCIS notes that the new fee rule, which becomes effective on Oct. 2, 2020, includes a fee increase for the Form I-765, Application for Employment Authorization, for all categories of employment authorization **except** for the DACA category. The fee for DACA-based applications for employment authorization will remain at $410, plus an $85 biometrics fee, for the time being. Lastly, as noted above, USCIS will continue to manage DACA renewal processing to limit significant overlaps in the renewal validity period and the alien's current DACA validity period, which may lessen some of the economic impact from shortened DACA renewal validity periods.

> ➢ **Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.**

Notwithstanding the prospective changes made by the Wolf Memorandum, USCIS will allow previous two-year grants of DACA and associated employment authorization to remain undisturbed during their existing two-year validity periods (unless USCIS terminates an alien's DACA and associated employment authorization for other reasons).  Consistent with this guidance, two-year DACA recipients who apply for a replacement EAD due to loss, theft, or the mutilation of their prior EAD will receive a replacement EAD with the same expiration date based on the original two-year validity period, assuming the application is otherwise approvable.

> ➢ **Reject all pending and future Form I-131 applications for advance parole from DACA recipients and refund all associated fees, absent exceptional circumstances.**

Acting Secretary Wolf states the following in his memorandum with respect to advance parole:

> "In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist."

Because USCIS will not be able to determine whether Form I-131 applications already received at the DACA-specific filing location fit within Secretary Wolf's stated parole policy without adjudicating the applications, and applicants who filed their Form I-131 before the Wolf Memorandum was issued did not have prior knowledge of the guidance in the memorandum, USCIS has determined that it would be more efficient and fair if applicants refile their applications under the new guidance.  Therefore, USCIS shall reject and return the fees for all Form I-131 applications received at the DACA specific filing location that have been held since July 24, 2020.

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 7

If those DACA recipients still wish to submit a request for advance parole, they may submit their Form I-131 applications consistent with filing instructions that will be announced on the USCIS website. The Form I-131 rejection notice shall inform applicants that they may re-apply for advance parole consistent with the Wolf Memorandum and filing instructions that will be announced on the USCIS website.

Regarding Form I-131 applications filed by DACA recipients at non-DACA filing locations before the Wolf Memorandum was issued and therefore accepted, USCIS will treat these applications similarly to those that have been on hold at the DACA-specific filing location. USCIS will administratively close these cases and refund the fees. USCIS will issue notices informing these applicants that their application has been administratively closed consistent with the Wolf Memorandum. The notice shall inform applicants that they may re-apply for advance parole consistent with the Wolf Memorandum and filing instructions that will be announced on the USCIS website.

USCIS will continue to maintain the current policy for DACA recipients who apply for advance parole in association with other non-DACA immigration requests. For instance, if a DACA recipient has a pending Form I-485 Application to Register Permanent Residence or Adjust Status and requests advance parole on the basis of his or her pending Form I-485, USCIS will adjudicate the advance parole request under the existing policies for Form I-485-based advance parole requests. USCIS will not apply this memorandum to a parole request by a DACA recipient if the request is associated with another underlying immigration benefit (i.e., other than DACA) as described in the instructions to Form I-131 or in USCIS policy guidance.

DACA recipients who have no separate basis for requesting advance parole as described in the instructions to Form I-131 may request advance parole if they have valid DACA and can demonstrate that they warrant the extraordinary privilege of being permitted to return to the United States after traveling abroad, even without a lawful immigration status, pursuant to a valid advance parole travel document.

The Wolf Memorandum sets forth new agency guidance with respect to management of the adjudication of advance parole applications submitted by DACA recipients who do not have a non-DACA basis for advance parole. For nearly three years, advance parole applications submitted by DACA recipients were rejected or denied by USCIS (the applications that were accepted and then denied were accepted solely because they were submitted to an incorrect filing location).

The Wolf Memorandum does not revive the prior DACA-based advance parole standards[6] or add a supplementary exceptional circumstances test to those standards. Rather, the Wolf

---

[6] The prior policy for granting advance parole based on DACA stated that USCIS would generally only grant advance parole if the DACA recipient's travel abroad would be in the furtherance of:

- Humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;
- Educational purposes, such as semester-abroad programs and academic research, or;

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum Page 8

Memorandum institutes a new general hold on granting advance parole to DACA recipients based on prior DACA-based advance parole standards during an interim period while DHS conducts a full review of the DACA policy. As Acting Secretary Wolf noted, it makes sense to continue this approach while he reconsiders whether to rescind or revise the prior policy. The only difference is that the Wolf Memorandum permits USCIS to process advance parole applications submitted by DACA recipients consistent with INA Section 212(d)(5) and based on a full consideration of all the discretionary factors presented in the alien's application.

Such grants of advance parole should, as a threshold matter, be consistent with the statutory description of parole under INA Section 212(d)(5), 8 U.S.C. § 1182(d)(5)(A), which mandates a case-by-case assessment and a determination that parole of the alien is for urgent humanitarian reasons or significant public benefit. Accordingly, I am directing USCIS officers to ensure that any grants of advance parole to DACA recipients are consistent with the statute and take into consideration all other discretionary factors present in the case under the totality of circumstances.

Secretary Wolf's memorandum providing for "exceptional circumstances" should be understood in the context of this existing high statutory standard for parole found in INA Section 212(d)(5). Therefore, in most instances, traveling abroad for educational purposes, employment related purposes, or to visit family members living abroad will not warrant advance parole under Secretary Wolf's interim policy regarding the discretionary exercise of parole for urgent humanitarian reasons or significant public benefit. Additionally, as USCIS has noted since DACA recipients were first permitted to apply for advance parole, travel for vacation is not a valid basis for advance parole.

While the determination of whether to grant advance parole to a DACA recipient based on exceptional circumstances is a case-by-case assessment involving the assessment of the totality of factors presented, some examples of travel that may fit within the statutory standard for parole include, but are not limited to the following:

- Travel to support the national security interests of the United States including U.S. military interests;

- Travel in furtherance of U.S. federal law enforcement interests;

- Travel to obtain life-sustaining medical treatment that is not otherwise available to the alien in the United States;

- Travel needed to support the immediate safety, well-being, or care of an *immediate* relative, particularly minor children of the alien.

The burden shall be on the alien to establish eligibility for parole pursuant to INA section 212(d)(5).

---

- Employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 9

USCIS will consider all discretionary factors presented in the application before making a decision on the advance parole request. The advance permission to travel abroad and return to the United States pursuant to an advance parole travel document is an extraordinary privilege. It is a particularly extraordinary privilege when conferred on an alien who has resided in the United States contrary to our immigration laws (irrespective of when the alien arrived in the United States). The June 15, 2012 Napolitano memorandum itself contained no directive to provide this extraordinary benefit to DACA recipients, and USCIS has not granted this benefit to DACA recipients since the issuance of the September 5, 2017, Duke memorandum.

To ensure compliance with this interim policy, I am directing that any applications for advance parole preliminarily assessed to be approvable by the Service Center(s) designated to adjudicate such applications, receive concurrence from no lower than the Deputy Associate Director for Service Center Operations Directorate (SCOPS) prior to final approval. SCOPS will develop a process to facilitate this review in a timely manner.

SCOPS shall immediately work with the Office of Intake and Document Production (OIDP) and the External Affairs Directorate (EXA) to develop public guidance consistent with this memorandum. The public guidance shall make clear that any applications for advance parole submitted by DACA recipients and received at the designated filing location will be considered a DACA-based application for advance parole based on the Wolf Memorandum.

The public guidance shall make clear that USCIS will accept the application if properly completed and process the fee prior to making an adjudicative determination on whether advance parole should be granted. The public guidance shall also make clear that any applications denied by USCIS because USCIS finds that the application does not merit approval, in the exercise of its discretion, under INA Section 212(d)(5), are not appealable and shall not receive a refund of application fees.

As noted above, INA Section 286(m) gives USCIS authority to collect application fees that "ensure recovery of the full costs of providing [adjudication services]." The determination of whether to grant advance parole under INA Section 212(d)(5) must be made by a trained Immigration Officer after required background checks and other processing requirements are completed. Those services cost money which USCIS recoups from the application fee. As those services must be completed prior to a final determination on whether the alien merits a grant of advance parole USCIS will not refund the application fees on advance parole applications that USCIS denies, consistent with USCIS standard practice.

SCOPS will work with the Office of Policy and Strategy (OP&S) and the Office of the Chief Counsel (OCC) to develop additional training or guidance materials to assist officers in the adjudication of these applications consistent with this memorandum.

> **Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.**

USCIS shall not terminate any previously approved advance parole documents issued to DACA recipients during the stated validity period of the existing advance parole document, absent a

Implementation of Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' Memorandum
Page 10

valid, separate legal basis distinct from the directives in the Wolf Memorandum for terminating advance parole.[7]

> **Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.**

Based on the immediate review of the DACA policy, including the immediate interim changes to the policy discussed in the Wolf Memorandum and this memorandum, I am directing SCOPS to immediately review the internal guidance document referred to as the DACA SOP last revised on August 28, 2013. SCOPS should work with OCC and OP&S to immediately update the DACA SOP consistent with the Wolf Memorandum and this memorandum. The updated DACA SOP shall make clear that it is intended solely for the instruction of USCIS personnel in the performance of their official duties, and that the SOP is not legally binding, does not confer any substantive rights to removable aliens, and does not otherwise constrain DHS' authority to enforce the immigration laws passed by Congress.

SCOPS should also review other internal DACA operational guidance and training materials currently in use to ensure that they are consistent with the Wolf Memorandum and this memorandum.

USCIS must continue to follow the DACA termination procedures required by all relevant court orders as long as they remain in effect.

> **Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano memorandum, and as set forth in USCIS's Form I-821D instructions. Nothing in this memorandum makes any change to that policy.**

USCIS shall continue to operate under the DACA information sharing policy described above. Nothing in this memorandum or the Wolf Memorandum makes any change to that policy.

**Use**

This memorandum is intended solely for the instruction of USCIS personnel in the performance of their official duties. It is not intended to, does not, and may not be relied upon to, create any right or benefit, substantive or procedural, enforceable at law, or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

---

[7] USCIS has not granted advance parole based on the standards associated with DACA since September 5, 2017.

# EXHIBIT 3



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

July 28, 2020

MEMORANDUM FOR:    Mark Morgan
Senior Official Performing the Duties of Commissioner
U.S. Customs and Border Protection

Matthew Albence
Senior Official Performing the Duties of Director
U.S. Immigration and Customs Enforcement

Joseph Edlow
Deputy Director of Policy
U.S. Citizenship and Immigration Services

FROM:    Chad F. Wolf
Acting Secretary

SUBJECT:    **Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

On June 15, 2012, Secretary of Homeland Security Janet Napolitano established the policy known as Deferred Action for Childhood Arrivals (DACA) through a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." Ever since, the policy has been subject to substantial controversy. In recent years, Acting Secretary of Homeland Security Elaine Duke and Secretary of Homeland Security Kirstjen Nielsen concluded that the DACA policy should be fully rescinded and issued additional memoranda in 2017 and 2018, respectively, to effect that decision.

On June 18, 2020, the U.S. Supreme Court issued a decision that did not question the authority of the Department of Homeland Security (DHS) to rescind the DACA policy, but determined that the 2017 and 2018 memoranda had not complied with certain requirements for doing so. See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589. Accordingly, the Court concluded that the rescission must be vacated and remanded to DHS so that it "may consider the problem anew." Regents, Slip op. at 29.

By this memorandum, I am rescinding the 2017 and 2018 memoranda, and making certain immediate changes to the DACA policy to facilitate my thorough consideration of how to address DACA in light of the Supreme Court's decision. For the reasons outlined below, pending my full reconsideration of the DACA policy, I direct DHS personnel to take all appropriate actions to reject all pending and future initial requests for DACA, to reject all

pending and future applications for advance parole absent exceptional circumstances, and to shorten DACA renewals consistent with the parameters established in this memorandum.

**Background**

On June 15, 2012, Secretary Napolitano issued the memorandum (Napolitano Memorandum) establishing the DACA policy.  The policy provided for the granting of deferred action to certain individuals with no lawful immigration status "who were brought to this country as children" and who satisfied a list of additional specified criteria.  The memorandum described this deferred action as an exercise of "prosecutorial discretion" to forbear from removing an alien who would otherwise be subject to removal.  Under pre-existing regulations, a grant of deferred action made aliens eligible for certain other attendant benefits, such as work authorization.  The memorandum directed U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS) to establish procedures for granting deferred action and work authorization to eligible aliens for a two-year period, subject to renewal, and for notifying those aliens of DHS's decision to do so.  The memorandum stated, however, that it "confer[red] no substantive right, immigration status or pathway to citizenship."

On November 20, 2014, Secretary of Homeland Security Jeh Johnson issued a memorandum (Johnson Memorandum) to expand the DACA policy and establish a new, related policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).  With regard to DACA, this memorandum eliminated a criterion relating to the age of DACA requestors when the policy was announced, extended the deferred-action and work-authorization period from two to three years, and adjusted the date by which requestors must have entered the United States to be eligible for DACA.  The DAPA policy allowed for deferred action to be provided to certain parents whose children are U.S. citizens or lawful permanent residents through a process similar to DACA.

Shortly thereafter, the U.S. District Court for the Southern District of Texas issued a nationwide preliminary injunction preventing both the DAPA policy and the expansion of the DACA policy from taking effect.  In 2015, the U.S. Court of Appeals for the Fifth Circuit affirmed, holding that DAPA and expanded DACA likely violated both the Administrative Procedure Act (APA) and the Immigration and Nationality Act (INA).  In 2016, the U.S. Supreme Court affirmed the court of appeals' decision by an equally divided vote.  On June 15, 2017, Secretary of Homeland Security John Kelly issued a memorandum rescinding the Johnson Memorandum.

Also in June 2017, several of the state plaintiffs from the Texas lawsuit announced their intent to amend their complaint in the then still-pending litigation to challenge the original DACA policy as well.  The States argued that the DACA policy was unlawful for the same reasons as the DAPA policy and the expansion of the DACA policy.  On September 4, 2017, then-Attorney General Jefferson B. Sessions III issued a letter to Acting Secretary Duke (Sessions Letter), concluding that the DACA policy was indeed unlawful and likely would also be enjoined.

On September 5, 2017, Acting Secretary Duke issued her memorandum (Duke Memorandum) rescinding the Napolitano Memorandum and initiating an orderly wind-down of the DACA policy.  The Duke Memorandum explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings" in the litigation concerning the Johnson Memorandum, and the Sessions Letter, it was clear to the Acting Secretary that the DACA policy "should be terminated."

Litigation challenging the Duke Memorandum promptly ensued.  As relevant here, suits were filed in the U.S. District Courts for the Northern District of California, Eastern District of New York, District of Maryland, and the District of Columbia.  The District of Columbia district court vacated the rescission entirely, but stayed its ruling for 90 days to permit DHS to reissue a memorandum rescinding the DACA policy and providing a fuller explanation.

In response to that ruling, on June 22, 2018, Secretary Nielsen issued an additional memorandum (Nielsen Memorandum) providing further explanation for the rescission of the DACA policy.  The Nielsen Memorandum explained that "the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons," including that the policy is contrary to law; that, even if it were not unlawful, Secretary Nielsen lacked sufficient confidence in the policy's legality to continue it; and that it was not sound enforcement policy in multiple respects.  Despite the Nielsen Memorandum, the District of Columbia district court declined to reconsider its previous order vacating the rescission.

On June 18, 2020, having granted review in the California, New York, and D.C. cases, the U.S. Supreme Court held that the rescission of the DACA policy must be vacated.  See Department of Homeland Security v. Regents of the University of California, Nos. 18-587, 18-588, 18-589.  The Court observed that "[a]ll parties agree[d]" that "DHS may rescind DACA," and the Court provided no reason to doubt that consensus.  Slip op. at 9.  But it held that DHS violated the APA in the manner in which it had rescinded the policy.

As a threshold matter, the Court determined that, although agency non-enforcement decisions are generally not reviewable under the APA, the rescission of the DACA policy was reviewable "because DACA is not simply a non-enforcement policy."  Id. at 11.  Rather, the Court stated, the Napolitano Memorandum "created a program for conferring affirmative immigration relief," the creation and rescission of which is subject to review under the APA.  Id.  And it added that the "benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy."  Id.

On the merits, the Court found that when DHS rescinded the DACA policy, it failed to consider important aspects of the problem.  In making that determination, the Court declined to consider the Nielsen Memorandum.  Instead, the Court characterized that memorandum as an impermissible post hoc rationalization of the rescission, because in the Court's view Secretary Nielsen "chose to elaborate on the reasons for the initial rescission rather than take new administrative action."  Id. at 14.  As to the Duke Memorandum, the Court held that it was arbitrary and capricious because (1) the Acting Secretary did not adequately consider whether DHS could and should address the illegality of the DACA policy by retaining the forbearance aspect of the policy (i.e., deferred action), while declining to make DACA recipients eligible for the other associated benefits, such as work authorization, id. at 17-23; and (2) the Acting Secretary did not adequately consider how, if at all, to address any "legitimate reliance" on the Napolitano Memorandum, id. at 23-26.  The Court thus concluded that the rescission must be vacated and that the matter should be "remand[ed] to DHS so that it may consider the problem anew."  Id. at 29.

The Court affirmed the District of Columbia district court's final judgment, vacated the Ninth Circuit's affirmance of the preliminary injunction issued by the Northern District of California, and vacated the preliminary injunction issued by the Eastern District of New York.  Id.

On June 30, 2020, Attorney General William Barr withdrew the Sessions Letter and directed the Department of Justice's Office of Legal Counsel to withdraw all guidance it had provided to DHS on the legality of DACA and related deferred-action policies, including an Office of Legal Counsel opinion that briefly addressed the legality of DACA in connection with related deferred-action policies.  Attorney General Barr explained that he did not "wish to maintain a determination as the Attorney General about the legality of DACA that might constrain the discretion [I] otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA."

**Rescission of the Nielsen and Duke Memoranda, and Reconsideration of the Napolitano Memoranda**

In light of the Supreme Court's decision to vacate the Duke Memorandum and remand to the Department of Homeland Security, and in my capacity as the Acting Secretary of Homeland Security, I am considering anew the DACA policy.  To date, I have considered the Napolitano Memorandum itself, the Duke Memorandum and Acting Secretary Duke's accompanying statement, the Nielsen Memorandum, the administrative record produced in litigation challenging the Duke Memorandum, the briefs and joint appendix filed in the Supreme Court from that litigation, the joint appendix filed in the Fourth Circuit on appeal in the District of Maryland litigation, all of the judicial opinions issued in the litigation over the Duke Memorandum, including the June 18 decision of the Supreme Court, the letter from Attorney General Barr, and letters expressing support for the DACA policy that have been submitted to the President and DHS since the Supreme Court's June 18 decision.

As those materials demonstrate, whether to retain the DACA policy presents significant questions of law and legal policy.  More importantly for present purposes, having considered those materials, I have concluded that the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission.  At the same time, I have concluded that fully rescinding the policy would be a significant administration decision that warrants additional careful consideration.  Accordingly, in the exercise of my authority and discretion in establishing national immigration policies and priorities, see 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of a full rescission.  Below, I address each of my enforcement policy concerns and then explain the immediate interim changes.

**Enforcement Policy Concerns:**  There are several reasons of enforcement policy that may warrant the full rescission of the DACA policy.

First, even if the DACA policy could have been justified as a temporary measure when it was created, Congress arguably has had more than sufficient time to consider affording permanent status or immigration relief to the class of aliens covered by the policy.  And yet, although various proposals have been advanced to do that, Congress has so far declined to take action.  Particularly in the face of this failure to reach a legislative solution, I have serious doubts as to whether DHS should continue to provide either a reprieve from removal or a grant of attendant benefits to more than half a million aliens through a broad, class-based deferred-action policy.

By contrast, rescinding DACA entirely may well create a more pressing need for Congress to decide whether it wants to address this issue and the underlying conditions that led to a

population of this size to remain in the United States in violation of our immigration laws for so long, and any other efforts to reform our immigration system in a manner that advances the national interest.  As unilateral executive action, the DACA policy necessarily lacks the permanence of statutory law; it is more akin to a stopgap measure.  For example, DACA recipients, as such, are not entitled to become lawful permanent residents and are not on a path to citizenship.  Congress is best positioned to address that and other concerns on a more permanent basis through duly enacted statutes.

Second, there has been much debate about the discretion exercised by DHS personnel in implementing the DACA policy.  In my view, however, regardless of the amount of discretion that has been exercised or could be exercised under the policy, I have reservations as a matter of policy about setting out a list of detailed criteria, and maintaining a formal process, for non-enforcement.  I am concerned that doing so may tilt the scales in deciding which aliens should receive deferred action and may inhibit individualized consideration of each case, at least for a non-enforcement policy of this scale.

Third, because DHS is a law enforcement agency, I am concerned about sending mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them.  DACA makes clear that, for certain large classes of individuals, DHS will at least tolerate, if not affirmatively sanction, their ongoing violation of the immigration laws.  I am deeply troubled that the message communicated by non-enforcement policies like DACA may contribute to the general problem of illegal immigration in a manner that is inconsistent with DHS's law enforcement mission.

Fourth, these concerns are all the more pressing in the context of children.  It is vitally important to convey a message that discourages individuals from undertaking what can often be a perilous journey to this country with no legitimate claim to enter or remain.  Of course, the DACA policy would not apply to children who are sent or brought to this country today.  But rescinding the DACA policy may further DHS's efforts to discourage illegal immigration involving children going forward.  By contrast, I am concerned that retaining the policy creates some risk of communicating the contrary message and encouraging such illegal conduct by suggesting a potential for similar future policies.

**Changes Pending Reconsideration of the DACA Policy**:  In accordance with the Supreme Court's decision, I am determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified.  In the meantime, given my serious concerns about the policy, I have determined that some changes should immediately be made to the policy to limit its scope in the interim.  First, while my reconsideration of the DACA policy continues, no new initial requests for DACA should be accepted.  Second, advance parole should be granted to current DACA beneficiaries only in exceptional circumstances.  Third, going forward, renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods.

These changes will mitigate my concerns without encroaching materially on the reliance interests that have been raised by individuals, organizations, and state and local governments during the course of the extensive litigation over the Duke and Nielsen Memoranda, and in recent letters to the President and DHS.  As noted by the Supreme Court, these groups have argued that, as the Napolitano Memorandum itself stated, many DACA recipients were brought or sent to the country as children, through no fault of their own, and may have never known another home.

They assert that DACA recipients have structured their lives around the expectation that DHS would forbear from enforcing the immigration laws against them and have come to rely on the other associated benefits—like work authorization, Social Security, and Medicare, as well as advance parole—that are made available to DACA recipients. They point out that other parties, too, would be affected by the rescission of the DACA policy, including the family members, schools, employers, and employees of DACA recipients. They have offered estimates of the amount of economic activity DACA recipients generate and the federal, state, and local tax revenue that DACA recipients provide. And some have even argued that the current COVID-19 and economic crises provide additional reasons to continue the DACA policy, in light of the many DACA recipients who have pursued careers in healthcare and other essential services or who serve in other critical roles in the workforce.

Whatever the merits of these asserted reliance interests on the maintenance of the DACA policy, they are significantly lessened, if not entirely lacking, with regard to aliens who have never before received deferred action pursuant to the policy. And any reliance interests possessed by an alien or a third party within the United States on that alien's ability to remain in the country does not depend on the extraordinary ability to come and go from the country as they please. In light of my concerns about the policy as a whole, I do not believe that, at least absent exceptional circumstances, DHS should continue to make the benefit of advance parole available while I reconsider whether the DACA policy itself should exist. Indeed, even after determining that DHS's prior full rescission of the policy was likely unlawful, the district courts in the previous litigation did not require DHS to consider requests for DACA from aliens who had not previously received it or to grant any requests for advance parole. Accordingly, that has been the status quo for more than two years. It makes sense to continue that approach while I reconsider whether to rescind or revise the policy. If I ultimately determine to maintain the policy, there is nothing in the policy that would preclude aliens from making an initial request for DACA or renewing requests for advance parole at that time. And, even in the interim, nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted.

Nor are the asserted reliance interests significantly affected by shortening the renewal periods from two years to one year. Shortening renewal periods granted during this reconsideration period will have the potential benefit of significantly lessening the lasting effects of the DACA policy if I ultimately decide to rescind it. And the costs will be limited in the meantime, because the aliens who currently have DACA grants and have structured their affairs based on their expectation of its continuance may still seek renewal. They will merely have to seek renewal on an annual, rather than biannual, basis. In a similar manner, the third parties who are benefiting from those aliens' continued presence today will continue to receive the same derivative benefits that they are receiving as long as the aliens' renewals continue—whether on an annual or bi-annual basis. Put differently, even assuming that aliens with DACA have legitimate reliance interests in being able to renew at all, they have minimal if any reliance interests in the length of each renewal period, especially since a grant of DACA was and remains revocable.

I recognize that shortening renewal periods on a prospective basis will have the effect, during this interim period as I consider how to address the DACA policy, of increasing the total amount of renewal fees that an alien will be required to pay over a multi-year period. But the fee per application will remain constant, and the fee that DHS charges for the application is associated with the processing costs to DHS. DHS personnel should consider whether it is possible to

reduce renewal fees during this interim period of reconsideration. In my current view, however, even if renewal fees cannot be reduced, shortening the renewal period is still warranted by my strong desire to limit the scope of the policy during this interim period despite any additional fees incurred by DACA beneficiaries as a result.

Finally, to further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency. Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes. Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.[1] Consistent with the Court's express remand for the agency's reconsideration and the Napolitano Memorandum's clear statement that it conferred no substantive rights, DHS did not expand beyond the status quo of the past several years for a few weeks while it was determining next steps. I now conclude that all pending and future requests should be treated in the same manner, rather than be subject to differential treatment depending on the fortuity of when DHS received the request within a short period of uncertainty. Nothing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis. Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA—much less a legal entitlement to a particular renewal period. Nor can aliens with pending requests assert any meaningfully greater reliance interests in their initial or continued enjoyment of the policy and the attendant benefits than aliens who submit such requests after the issuance of this memorandum.

Accordingly, effective immediately, DHS shall:

- Reject all initial DACA requests and associated applications for Employment Authorization Documents, and refund all associated fees, without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future.

- Adjudicate all pending and future properly submitted DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries.

- Limit the period of any deferred action granted pursuant to the DACA policy after the issuance of this memorandum (and thereby limit the period of any associated work authorization) to one year.

- Refrain from terminating any grants of previously issued deferred action or revoking any Employment Authorization Documents based solely on the directives in this memorandum for the remaining duration of their validity periods.

---

[1]       Prior to July 24, DHS's treatment of advance parole requests from DACA recipients varied. Many were rejected, while some were accepted and receipted. To the extent any rejected requestor believes exceptional circumstances support his or her request, he or she may now renew the request for advance parole, and it will be adjudicated on the terms set forth in this memorandum.

- Reject all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA policy and refund all associated fees, absent exceptional circumstances.

- Refrain from terminating any grants of previously approved advance parole based solely on the directives in this memorandum for the remaining duration of their validity periods.

- Exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

- Continue to comply with the information-sharing policy as reflected in the DACA Frequently Asked Questions issued alongside the Napolitano Memorandum, and as set forth in USCIS's Form I-821D instructions.  Nothing in this memorandum makes any change to that policy.

*  *  *  *  *

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or equity by any party in any administrative, civil, or criminal matter.  Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.  Finally, if any aspect of the changes to the DACA policy in this memorandum is found to be unlawful, the remainder of the changes should nonetheless continue in effect.

# EXHIBIT 4

Raed Gonzalez, Esq.
GONZALEZ OLIVIERI, LLC
2200 Southwest Freeway, Suite 550
Houston, Texas 77098
Tel: 713-481-3040
Fax: 713-588-8683
*Counsel of Record for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| FIEL Houston Inc., et al., | |
| *Plaintiffs*, | |
| v. | Case No. 4:20-cv-2515 |
| Chad F. Wolf, Acting Secretary of the U.S. Department of Homeland Security; and Kenneth T. Cuccinelli, Acting Director of the U.S. Citizenship and Immigration Services, | |
| *Defendants*. | Date: July 17, 2020 |

## AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND WRIT OF MANDAMUS

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

This is a Amended Complaint, pursuant to Federal Rule of Civil Procedure 15(a), for relief under the Administrative Procedure Act ("APA") and for Writ of Mandamus.[1] The Plaintiffs file the instant Complaint and Writ of Mandamus against Defendants because the U.S. Citizenship and Immigration Services ("USCIS"), a federal agency within the Department of Homeland Security ("DHS"), violated the APA by willfully defying the U.S. Supreme Court's decision in *Department of Homeland Security v. Regents of the University of California*, 2020 WL 3271746 * (Jun. 18, 2020), which held that the rescission of the Deferred Action for Childhood Arrivals ("DACA") program was unlawful, because it continues to refuse to accept new DACA Applications. *See* Exhibit 1—USCIS Website Printout. Through this Complaint and Writ, Plaintiffs request that this Court compel the USCIS to accept and adjudicate their DACA Applications pursuant to the APA, 5 U.S.C. § 706, and the All Writs Act, 28 U.S.C. § 1651.

Plaintiffs seek a declaratory judgement stating that the USCIS must accept and adjudicate their DACA Applications and that it is abusing its discretion, acting arbitrarily, capriciously, and not in accordance with the law by not following the U.S. Supreme Court's decision in *Regents*; and seek relief under the APA and All

---

[1] The reason for this Amended Complaint is that more Plaintiffs wishing to be added to the Complaint were identified and this triggered the need to put forth Class allegations.

2

Writs Act, to compel the USCIS to accept and adjudicate their DACA Applications.

The instant action is being filed against the following Defendants: Chad F. Wolf, in his purported official capacity as the Acting Secretary of the DHS; and Kenneth T. Cuccinelli, in his purported official capacity as the Acting Director of the USCIS.

## I.  INTRODUCTION

1.  On June 15, 2012, the DHS issued a policy memorandum implementing a new program known as DACA. *See* Exhibit 2—Policy Memorandum (Jun. 15, 2012). The goal of the program was to protect migrants who had been brought to the United States illegally as children. *Id*.

2.  On September 5, 2017, after a change in administrations, the DHS issued a second policy memorandum on DACA, which rescinded the program. *See* Exhibit 3—Policy Memorandum (Sep. 5, 2017). The basis for the rescission was that the DACA program was illegal. *Id*.

3.  After lengthy litigation on the issue of whether the DHS properly terminated the DACA program, the case finally reached the U.S. Supreme Court.

4.  On June 18, 2020, the Supreme Court held that the DHS' rescission of the DACA program was unlawful because it violated the APA. *Regents*, 2020 WL 3271746 at *14-15. Specifically, the Supreme Court held that the DHS' failure to address "options of retaining forebearance or accommodating particular reliance

interests," was arbitrary and capricious. *Id*. at 15.

5.  The day of the Supreme Court's decision, the USCIS released a statement on its website stating: "Today's court opinion has no basis in law and merely delays the President's lawful ability to end the illegal [DACA] amnesty program."[2]

6.  In turn, Acting Secretary Chad Wolf stated: "The DACA program was created out of thin air and implemented illegally. The American people deserve to have the Nation's laws faithfully executed as written by their representatives in Congress—not based on the arbitrary decisions of a past Administration. This ruling usurps the clear authority of the Executive Branch to end unlawful programs."[3]

7.  Finally, Acting Secretary Kenneth Cuccinelli stated: "The Supreme Court's decision is an affront to the rule of law and gives Presidents power to extend discretionary policies into future Administrations. No Justice will say that the DACA program is lawful, and that should be enough reason to end it."[4]

8.  It is clear from the aforementioned statements that the Government and its officials believe that the Supreme Court's decision in *Regents* is erroneous and that they are refusing to follow the Court's decision. This conclusion is not speculative on the part of Plaintiffs herein because following the ruling in

---

[2] https://www.uscis.gov/news/news-releases/uscis-statement-supreme-courts-daca-decision
[3] https://www.dhs.gov/news/2020/06/18/dhs-statement-supreme-court-decision-daca
[4] *Id.*

*Regents*, that upheld continuing validity of the DACA program, a DACA Application was filed by an individual only to be rejected by the USCIS in a clear violation of the Supreme Court's decision. *See* Exhibit 4—USCIS Rejection Notice.

9. Furthermore, the USCIS's own website still states as of today's date that "USCIS is not accepting requests from individuals who have never before been granted deferred action under DACA." *See* Exhibit 1, *supra.* Once again, this is in clear violation of the ruling in *Regents*.

10. In light of the above, Plaintiffs maintain that the USCIS's continued refusal to accept new Forms I-821D violates the APA. Accordingly, Plaintiffs brought this action to compel the USCIS to fulfill its nondiscretionary duty to accept their DACA Applications and adjudicate them on the merits, in full compliance with the Supreme Court's holding in *Regents*.

11. Subsequent to the filing of the original Complaint (ECF No. 1), Plaintiffs identified new individuals who are also not able to file new DACA Applications because the USCIS refuses to allow them to do so. Therefore, Plaintiffs now file this Amended Complaint to add these individuals to this suit and to put forth Class allegations.

## II. JURISDICTION AND VENUE

12. This action arises under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, and the APA, 5 U.S.C. §§ 701 *et seq*. Because this matter involves the federal laws of the United States, subject-matter jurisdiction is proper under 8 U.S.C. § 1331.

13. This Court also has jurisdiction under 28 U.S.C. § 1361, which gives federal courts "original jurisidiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Plaintiffs reside in Houston, Texas, or the surrounding metropolitan area.

## III. PARTIES

15. FIEL Houston is an immigrant civil rights organization located in Houston, Texas.

16. Plaintiffs Maria Gutierrez, Enrique Contreras, Fernando Miranda Marin, Orlando Saenz, Shayli Rodriguez, Anahi Lagunas, Elizabeth Rebolloso, and Cesar Espinosa are all residents of Houston, Texas or its metropolitan area.

17. Class members Lesly Saenz, Alberto Saenz, Carlos Campos, Aura Barrera, Maximilliano Segura, Maria Ramirez Dominguez, and Joel Aguirre are all

residents of Houston, Texas or its metropolitan area.

18. Defendant, Chad F. Wolf, is the purported Acting Secretary of the DHS. He is sued in his official capacity. He may be served at 2707 Martin Luther King Jr. Ave. SE, Washington, D.C. 20528-0485.

19. Defendant, Kenneth T. Cuccinelli, is the purported Acting Director of the USCIS. He is sued in his official capacity. He may be served at 20 Massachussetts Ave., Room 4210, Washington D.C. 20529.

## IV. STATUTORY AND REGULATORY BACKGROUND

20. Because the DACA program was not implemented via statute or regulation, but through executive action of the Executive Branch, there are no relevant statutes or regulations to mention with respect to the program. The implementing memorandum is thus the only framework applicable to DACA eligibility and the parameters of the program. *See* Exhibit 2—Policy Memorandum (Jun. 15, 2012).

21. District Courts have the authority to "compel agency action unlawfully withheld," and "hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 8 U.S.C. § 706(1)-(2)(A).

22. "Agency action" is defined to include the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act. 5 U.S.C. § 551(13).

7

23. District Courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

24. District Courts have original jurisdiction in any mandamus action that seeks to compel an officer or employee of the United States to perform a duty that is owed to the Plaintiff. 28 U.S.C. § 1361.

## V. FACTUAL BACKGROUND

25. Effective March 1, 2003, the DHS assumed responsibility for the functions of the agency formerly known as the "Immigration and Naturalization Service." The Secretary of DHS is now vested with "[a]ll authorities and functions of the Department of Homeland Security to administer and enforce the immigration laws." 8 C.F.R. § 2.1.

26. The USCIS is a bureau within the DHS and delegated supervisory authority over all operations by the Secretary of DHS. *Id.* The USCIS is responsible for accepting and adjudicating all DACA Applications. *See* Exhibit 2, *supra*.

27. Plaintiff FIEL Houston is an immigration organization located in Houston, Texas. FIEL seeks to advance the legal rights of immigrants by advocating for just laws for young immigrants and their families.

28. Plaintiff Maria Gutierrez is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. She entered the United States before the age of

8

sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, she is not able to file her initial DACA Application.

29. Plaintiff Enrique Contreras is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. He entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, he is not able to file his initial DACA Application.

30. Plaintiff Fernando Miranda Marin is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. He entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense,

9

and is not above the age of thirty. At present, however, he is not able to file his initial DACA Application.

31. Plaintiff Orlando Saenz is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. He entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, he is not able to file his initial DACA Application.

32. Plaintiff Shayli Rodriguez is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. She entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, she is not able to file her initial DACA Application.

33. Plaintiff Anahi Lagunas is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. She entered the United States before the age of

10

sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, she is not able to file her initial DACA Application.

34. Plaintiff Elizabeth Rebolloso is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. She entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, she is not able to file her initial DACA Application.

35. Plaintiff Cesar Espinosa is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. He entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not

11

above the age of thirty. At present, however, he is not able to file his initial DACA Application.

36. Class member Lesly Saenz, is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. She entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, she is not able to file her initial DACA Application.

37. Class member Alberto Saenz is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. He entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, he is not able to file his initial DACA Application.

38. Class member Carlos Campos is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. He entered the United States before the age

12

of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, he is not able to file his initial DACA Application.

39. Class member Aura Barrera is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. She entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, she is not able to file her initial DACA Application.

40. Class member Maximilliano Segura is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. He entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense,

and is not above the age of thirty. At present, however, he is not able to file his initial DACA Application.

41. Class member Maria Ramirez Dominguez is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. She entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, she is not able to file her initial DACA Application.

42. Class member Joel Aguirre is eligible for DACA in accordance with the USCIS's 2012 policy memorandum. He entered the United States before the age of sixteen, has continuously resided in the United States for five years prior to June 15, 2012, was present in the United States on or before June 15, 2012, is currently in school or has graduated from high school or obtained a general education certificate, has not been convicted of a disqualifying criminal offense, and is not above the age of thirty. At present, however, he is not able to file his initial DACA Application.

43. At this time, there is no way for Plaintiffs and Class members to file their DACA Applications because the USCIS is not accepting them and, as is evident from

the example being provided to this Court, the USCIS continues to reject such filings. *See* Exhibit 4, *supra*. Because there are no other forums or means available to Plaintiffs, they are filing the present action seeking relief under the APA.

## VI.   CLASS ACTION ALLEGATIONS

44. Plaintiffs incorporate by reference the allegations in paragraphs 1-43.

45. Plaintiffs herein, along with the other idenitified Class members, bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rules of Civil Procedure ("FRCP") 23(a) and 23(b)(2).

46. The Class consists of individuals who have been denied the ability to file their DACA Applications by the USCIS. Excluded from the Class are Defendants named herein and the Agencies for which they work. Likewise excluded from the class is any judge or judicial officer presiding over this matter and any members of their family and judicial staff.

47. Class certification is appropriate because this action involves questions of law and fact common to the class, the class is so numerous that joinder of all members is impractical, the claims of the Plaintiffs are typical of the claims of the class, the Plaintiffs will fairly and adequately protect the interests of the class, and Defendants have acted on grounds that apply generally to the class, so that final declaratory relief is appropriate with respect to the class as a whole. *See*

FRCP 23(a).

48. With respect to numerosity, a "plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members. *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981).

49. The number of actual class members is not the determinative question, as "[t]he proper focus (under Rule 23(a)(1)) is not on the numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Phillips v. Joint Legislative Committee*, 637 F.2d 1014, 1022 (5th Cir. 1981).

50. In determining whether joinder of members is impracticable, a court may consider "geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman*, 651 F.2d at 1038.

51. A class consisting of more than forty members "should raise a presumption that joinder is impracticable." *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999) (quoting 1 Newberg on Class Actions § 3.05, at 3-25 (3d ed. 1992)).

52. At present, as noted above, Plaintiffs have identified 8 other Class members. However, the precise number of potential Class members is still not known by Plaintiffs at this time, and they have no way of communicating with those

members. Although it is not possible to accurately state the total number of DACA-eligible individuals who may potentially be class members, estimates indicate that there are as many as 300,000 potential DACA applicants who have not previously received DACA benefits.[5] Plaintiffs also wish to point out that there are an estimated 85,000 individuals in the state of Texas alone that are eligible for DACA and are not able to file their applications.[6] Those individuals are all potential Class members and can be identified as this case progresses. Therefore, Plaintiffs maintain that numerosity is easily met in this case.

53. Furthermore, Plaintiffs believe that as this case progresses, the Class will reach a number that would raise the presumption that joinder is impracticable, especially considering the thousands and thousands of potential DACA eligible individuals that reside in Texas. As a result, a class action is superior to all other available methods for the fair and efficient adjudication of this matter.

54. With respect to commonality, the test is not demanding and is met "where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. County of El Paso*, 118 F.3d 421,

---

[5] Svajlenka, Nicole Prchal, Jawetz, Tom, and Wolgin, Phillip E. "The Trump Administration Must Immediately Resume Processing New DACA Applications" (Jul. 13, 2020) https://www.americanprogress.org/issues/immigration/news/2020/07/13/487514/trump-administration-must-immediately-resume-processing-new-daca-applications/
[6] https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles

426 (5th Cir. 1997).

55. In this case, Plaintiffs, and already identified Class members, seek to represent the following nationwide class that, as demonstrated by the factual pattern of all Class members, have the following questions of law and fact in common:

    a.  Whether the Class members are are eligible for DACA relief;

    b.  Whether the Class members are able to file initial DACA Applications with the USCIS after the U.S. Supreme Court's decision in *Regents*;

    c.  Whether the USCIS's refusal to allow Class members to file their initial DACA Applications is an agency action that is being unlawfully withheld;

    d.  Whether the USCIS has acted arbitrarily, capriciously, abused its discretion, and not in accordance with the law by not allowing Class members to file their initial DACA Applications;

    e.  Whether the members of the Class have been aggrieved or otherwise been legally wronged by the USCIS's refusal to allow them to file their DACA Applications;

    f.  Whether, in light of the Supreme Court's decision in *Regents*, the USCIS is compelled to accept and adjudicate the Class members' DACA Applications.

56. Given the aforementioned common issues of law and fact, Plaintiffs maintain

18

that commonality has been met in this case.

57. Similar to commonality, the test for typicality is not demanding and "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Lightborn*, 118 F.3d at 426.

58. Here, Plaintiffs' claim is typical for the claims of all Class members because, as noted above, each member has been similarly affected by the USCIS's refusal to allow them to file their initial DACA Applications, contrary to the U.S. Supreme Court's decision in *Regents*.

59. Lastly, with respect to adequate and fair representation of the class, a named plaintiff is only rendered an inadequate representative if the differences between the named plaintiff and class members creates a conflict between the named plaintiff's and class members' interests. *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).

60. In this case, Plaintiffs affirm that they will adequately and fairly protect the interests of the members of the Class, as they has been legally wronged by the USCIS, just like all other Class members have been, and they have retained competent counsel to remedy that wrong.

61. Furthermore, Plaintiffs have no interests that are unethical or in conflict with other members of the Class. Accordingly, they maintain that they will be a fair and adequate representatives of the Class.

62. Finally, Defendants have acted on grounds generally applicable to the proposed Class, thereby making appropriate final declaratory relief proper with respect to the entire Class.

63. Having satisfied the requirements under Rule 23(a), Plaintiffs will now address how the proposed Class also satisfies the requirements of Rule 23(b)(3).

64. Under Rule 23(b)(3), a class action can be maintained if: "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members (predominance), and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy (superiority)."

65. Relevant to the Rule 23(b) requirements are: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

66. The members of the Class, because they share the same legal wrong committed against them by the USCIS, will have no interest in individually controlling the prosecution or defense of separate actions.

67. Because the Class members' cases are identical to each other, in that they share

20

the exact same questions of law and fact, they have a strong desire and interest that litigation be concentrated in one forum.

68. Further, there will be no difficulty, on the part of Plaintiffs and her counsel, in managing a class action complaint, as said counsel has extensive experience involving complex immigration law issues.

69. In sum, Plaintiffs move that the proposed Class, having met all the requirements under Rule 23(a) and (b)(3), be certified by this Court.

## VII.  CLAIMS FOR RELIEF

### 1.  Count 1—Violation of the APA

70. Plaintiffs incorporate by reference the allegations in paragraphs 1-69.

71. Plaintiffs contend that under the APA, the USCIS's refusal to allow for the filing of initial DACA applications—as evidenced by both their website and their rejection of attempted filings—is an agency action that is "unlawfully withheld." 5 U.S.C. § 706(1). Plaintiffs thus request the Court to compel the USCIS to accept and adjudicate their DACA Applications.

72. As noted above, after the Supreme Court's decision in *Regents* declared the rescission of DACA to be arbitrary and capricious, DACA returned to its pre-2017 status. *See Casa De Maryland, et al., v. U.S. Dep't of Homeland Sec.*, 8:17-cv-02942-PWG (Dist. MD, Jul. 17, 2020) (finding that DACA is now restored to its pre-September 5, 2017 status). Therefore, the USCIS is now mandated to

21

accept and adjudicate all new DACA Applications in accordance with its 2012 policy memorandum. *See* Exhibit 2, *supra*.

73. However, to date, the USCIS has failed to adhere to the Supreme Court's mandate that new DACA Applications must be accepted by continuing to refuse to accept and to adjudicate such DACA Applications. *See* Exhibits 1 and 4, *supra*. Therefore, the USCIS is unlawfully withholding agency action and Plaintiffs move this Court to compel the USCIS to act in accordance with the Supreme Court's decision in *Regents* and its own 2012 policy memorandum on DACA.

74. Plaintiffs next contend that under the APA, the USCIS's refusal to accept initial DACA Applications is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs thus request this Court to compel the USCIS to accept and adjudicate their DACA Applications on the merits.

75. The U.S. Supreme Court has held that an agency's actions may be considered arbitrary, capricious, or an abuse of discretion if said actions inexplicably depart from the agency's own course of adjudication, regulations, or policies. *See INS v. Yang*, 519 U.S. 26, 32 (1996) ("Though an agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be

22

governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion'"); *see also Lugo-Resendez v. Lynch*, 831 F.3d 337, 338 (5th Cir. 2016) (finding the BIA abuses its discretion when it issues a decision that is based on unexplained departures from regulations or established policies); *Wong Wing Hang v. INS*, 360 F.2d 715, 718-19 (2d Cir. 1996) (finding that an agency abuses its discretion when it inexplicably departs from prior procedures).

76. Prior to the 2017 rescission of the DACA program, the USCIS adjudicated new DACA Applications in accordance with the 2012 policy memorandum. *See* Exhibit 2, *supra*. After the rescission memorandum came out in 2017, new DACA applications were no longer accepted. *See* Exhibit 3, *supra*. Now, however, the Supreme Court has invalidated the DACA rescission memorandum, and so, the USCIS must accept and adjudicate new DACA Applications in accordance with the 2012 memorandum.

77. In this case, the USCIS is not allowing Plaintiffs to file their DACA Applications, even though it is mandated to accept and adjudicate those applications in accordance with the 2012 memorandum. *See* Exhibit 2, *supra*. As further evidence that the USCIS will not adjudicate Plaintiffs' DACA Applications, Plaintiffs point the Court to Exhibit 4, which clearly shows that

the USCIS is indeed rejecting new DACA Applications even though the Supreme Court has mandated otherwise. Therefore, the USCIS has departed from its prior, settled course of adjudication and policies regarding the DACA program, and as such, has acted arbitrarily, capriciously, and has abused its discretion.

78. In addition, the USCIS can abuse its discretion in departing from prior binding precedent. *See*, *e.g.*, *INS v. Yang*, 519 U.S. 26, 32 (1996) (finding that the government abuses discretion by departing from prior precedent).

79. The Supreme Court's decision in *Regents* was clear: the 2017 termination of the DACA program was unlawful, as it violated the APA. Therefore, after the Court's decision, the DACA program reverted back to its pre-2017 status. That means that the USCIS must, pursuant the Supreme Court's decision, accept new DACA Applications.

80. By refusing to allow Plaintiffs to file new DACA Applications, the USCIS failed to follow the binding precendential decision of the Supreme Court in *Regents*. As a result, the USCIS's refusal to accept new filings is an ultra vires action as well as an abuse of its discretion.

81. Finally, the USCIS's refusal to allow the filing of new DACA Applications is legally erroneous. As noted in the 2012 policy memorandum, which is now once again the law, the USCIS is mandated to accepted and adjudicate new DACA

Applications. By refusing to allow filing said Applications, the USCIS violates the law.

82. In sum, given the law and evidence presented, Plaintiffs maintain that judicial review under the APA is proper because USCIS has acted arbitrarily, capriciously, has abused its discretion, and has not acted in accordance with the law.

### 2. Count 2—Mandamus Relief

83. Plaintiffs incorporate by reference the allegations in paragraphs 1-82.

84. Plaintiffs maintain that mandamus relief is appropriate in this case because the USCIS has a nondiscretionary duty to accept and adjudicate their DACA Applications. Plaintiffs thus request that this Court to grant mandamus relief and compel the USCIS to accept and adjudicate their DACA Applications on the merits.

85. As noted above, the All Writs Act, 28 U.S.C. § 1651(a), confers the power of mandamus on the District Courts.

86. District Courts have original jurisdiction in a mandamus action to compel an officer or employee of the United States to perform a duty owed to the plaintiff. 28 U.S.C. § 1361.

87. The power of a district court to compel official action by mandatory order is limited to the enforcement of nondiscretionary, plainly defined, and purely

ministerial duties. *Decatur v. Paulding*, 39 U.S. (1 Pet.) 496, 514-17 (1840); *Work v. Rives*, 267 U.S. 175, 177 (1925); *Wilbur v. United States*, 281 U.S. 206, 218 (1930).

88. An official action is not ministerial unless "the duty in a particular situation is so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur*, 267 U.S. at 177.

89. In this case, the USCIS, pursuant to its 2012 policy memorandum, has a nondiscretionary, plainly defined duty to accept and adjudicate new DACA Applications for those who meet the required criteria. *See* Exhibit 2, *supra*.

90. The duty to accept and adjudicate new DACA Applications is a ministerial one because the 2012 policy memorandum leaves no doubt whatsoever that the USCIS is required to accept and adjudicate DACA Applications on a case-by-case basis, and the policy memorandum equates to a "positive command" to accept and adjudicate new DACA Applications. *Id.*

91. In sum, the 2012 policy memorandum, which is now once again in affect after the Supreme Court's ruling in *Regents*, mandates that USCIS accept and adjudicate new DACA Applications on the merits. By not allowing Plaintiffs to file their initial DACA Applications, the USCIS has failed to carry out its nondiscretionary duty that the memorandum plainly spells out. Plaintiffs thus request for this Court to grant mandamus relief, in order to compel the USCIS to

accept and adjudicate their DACA Applications.

### 3. Count 3—Equal Access to Justice Act

92. Plaintiffs incorporate by reference the allegations in paragraphs 1-91.

93. "Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).

94. Furthermore, "[a]n agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding." 5 U.S.C. § 504(a)(1).

95. It is clear that Defendants have failed—without any legal or factual basis—to begin accepting new DACA Applications. Such a failure has resulted in Plaintiffs' having been forced to retain the services of an attorney to pursue the instant action, in addition to other costs and expenses incurred, in order to insure that their DACA Applications are accepted and adjudicated by the USCIS.

96. Plaintiffs, as the prevailing party in the instant action are clearly entitled to post-

27

judgment attorney's fees and associated costs given Defendants' open and public defiance of a Supreme Court decision

97. Wherefore, Plaintiffs respectfully request that the Court award reasonable attorneys' fees and costs to Plaintiffs, pursuant to the Equal Access to Justice Act. *See* 5 U.S.C. § 504(a) and 28 U.S.C. § 2412(d).

## VIII. CONCLUSION

98. The continued refusal of the USCIS to accept new DACA Applications is an agency action that was unlawfully withheld and arbitrary, capricious, an abuse of discretion and not in accordance with the law. Judicial review by this Court is therefore warranted under the APA.

99. Moreover, the decision to reject or not accept newly filed DACA Applications amounts to a failure to fulfull the USCIS's nondiscretionary duty to accept and adjudicate said applications, as required by the 2012 policy memorandum. Therefore mandamus relief is appropriate.

## IX. PRAYER FOR RELIEF

100. Wherefore, Plaintiffs respectfully request that this Court:

    a. accept jurisdiction and venue as proper;

    b. issue an order certifying Plaintiffs' Class, appointing Plaintiffs as the representatives of that Class, and designating Plaintiffs' counsel as counsel for the Class;

    c. issue a declaratory judgment that the the USCIS is mandated to accept and

adjudicate all new DACA Applications under the APA and the All Writs Act.

d.  issue a writ of mandamus that the USCIS has a nondiscretionary duty to allow Plaintiffs to file their DACA Applications, and it is failing to carry out that duty;

e.  grant reasonable attorney's fees, expenses, and costs of court pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412; and

f.  grant Plaintiffs any and all other relief as the Court may deem just and proper.

Respectfully submitted,

GONZALEZ OLIVIERI, LLC

*/s/ Raed Gonzalez*

_____
Raed Gonzalez, Esq.
Attorney for Plaintiff
Texas Bar No. 24010063
2200 Southwest Freeway, Suite 550
Houston, Texas 77098
Phone: 713-481-3040
Fax: 713-588-8683
rgonzalez@gonzalezolivierillc.com

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

STATES OF NEW YORK,
MASSACHUSETTS, WASHINGTON,
COLORADO, CONNECTICUT,
DELAWARE, DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA, OREGON,
PENNSYLVANIA, RHODE ISLAND,
VERMONT, and VIRGINIA,

                Plaintiffs,

       v.

DONALD TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF HOMELAND
SECURITY; CHAD WOLF, in his official
capacity as Acting Secretary of Homeland
Security; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; and the UNITED
STATES OF AMERICA,

        Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

**SECOND AMENDED SUPPLEMENTAL
COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## __INTRODUCTION__

1.     The States of New York, Massachusetts, Washington, Colorado, Connecticut,

Delaware, Hawaii, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode

Island, Vermont, Virginia and the District of Columbia (the "States") bring this action to protect

the States—including their residents, employers, small governmental jurisdictions, regulatory

systems, and educational institutions—against the unlawful actions of the President of the United

States and the federal government.

2.      Since 2012, the Deferred Action for Childhood Arrivals ("DACA") program has protected from deportation and extended work authorization to over 825,000 young people who grew up in this country, most of whom have known no home other than the United States.

3.      DACA has allowed these young people to live, study, and work in the States (and throughout the country) as contributors and leaders in their communities. DACA grantees attend public and private universities, and are employed by companies, nonprofit organizations, and governmental agencies and institutions, all of which benefit from their skills and productivity. DACA grantees also provide financial support to their families, help to grow the economy, and contribute significantly to State and local revenues and tax bases.

4.      On September 5, 2017, the Defendants definitively and categorically terminated the DACA program, as detailed in a U.S. Department of Homeland Security ("DHS") Memorandum by former Acting Secretary of Homeland Security Elaine Duke ("2017 DHS Memorandum"). *See* Ex. 74[1] (Memorandum from Acting Secretary Elaine Duke to James McCament, Acting Director of U.S. Citizenship and Immigration Services, *Rescission of Deferred Action for Childhood Arrivals*, September 5, 2017).

5.      Ending DACA is a culmination of President's Trump's oft-stated commitments— whether personally held, stated to appease some portion of his constituency, or some combination thereof—to punish and disparage immigrants, especially those with Mexican roots, who make up more than 78 percent of DACA grantees. *See* Ex. 1 (Updated USCIS, *Consideration of Deferred Action for Childhood Arrivals Fiscal Years 2012-2017*, June 8, 2017).

---

[1] References to Exs. 1 to 179 in this Second Amended Supplemental Complaint are to the Exhibits docketed on October 4, 2017, at ECF No. 55.  References to Exs. 180 and 181 are to the Exhibits appended to this Second Amended Supplemental Complaint and filed on August 27, 2020.

6.     Pursuant to the 2017 DHS Memorandum, the federal government began only to issue renewals for grantees whose benefits expire before March 5, 2018, provided they apply for renewal by October 5, 2018. DHS immediately ceased accepting all new applications under DACA.

7.     In 2018, this Court entered a preliminary injunction requiring DHS to continue processing renewal applications. *See Batalla Vidal v. Duke*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018). The federal government petitioned for certiorari while its appeal was pending before the Second Circuit, and the Supreme Court granted that petition along with the federal government's petitions for certiorari in parallel litigation in the Ninth Circuit and the U.S. District Court for the District of Columbia.

8.     On June 18, 2020, the Supreme Court held that Duke's 2017 rescission of DACA was arbitrary and capricious under the APA. *See Department of Homeland Security v. Regents of Univ. of California* ("*Regents*"), 140 S. Ct. 1891, 1915 (2020). Among other things, the Supreme Court expressly affirmed in full a summary judgment ruling "that DACA's rescission was unlawful and must be set aside." *NAACP v. Trump*, 315 F. Supp. 3d 457, 473 (D.D.C. 2018); *see Regents*, 140 S. Ct. at 1916 & n.7. Shortly thereafter, the Supreme Court denied the federal government's petition for certiorari from a Fourth Circuit summary judgment ruling vacating the 2017 rescission of DACA as arbitrary and capricious under the APA. *Casa de Md. v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 706 (4th Cir. 2019)*, cert. denied*, — S.Ct. —, 2020 WL 3492650 (Mem.) (U.S. June 29, 2010) (No. 18-1469).

9.     On June 30, 2020, the Fourth Circuit issued the mandate associated with its summary judgment ruling. Mandate, *Casa de Maryland*, 18-1521, ECF No. 71 (4th Cir. June 30, 2020).  The issuance of that mandate had the effect of vacating the 2017 DACA rescission

3

nationwide. *See, e.g., New York v. U.S. Dep't of Homeland Sec.*, No. 19-3591, 2020 WL 4457951, at *31 (2d Cir. Aug. 4, 2020) (describing the effect of a final judgment vacating agency action under the APA).

10. Notwithstanding *Regents* and the Fourth Circuit's mandate, DHS did not recommence processing DACA applications but instead "generally held" applications "in anticipation of potential policy changes." Ex. 180 (Chad F. Wolf, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,"* July 28, 2020 (Wolf Memo)).

11. On July 28, 2020, Defendant Chad Wolf—in his capacity as purported Acting Secretary of Homeland Security—issued a memorandum directing DHS to make interim changes to DACA while Wolf considered whether to fully rescind DACA. *Id.* In particular, the Wolf Memo orders DHS to reject all new initial DACA applications, to change the renewal period for current beneficiaries from two years to one year, and to reject all advance parole applications absent exceptional circumstances. *Id.* at 7-8.

12. The Wolf Memo purports to apply these changes retroactively to all applications submitted after the June 18, 2020 *Regents* decision. Ex. 180 at 7 (Wolf Memo).

13. Because Defendant Wolf was improperly serving in the role of Acting Secretary of Homeland Security in violation of the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. § 3341 *et seq.*, and the Homeland Security Act of 2002, 6 U.S.C. § 111 *et seq.* ("HSA"), he lacked the authority to issue the memorandum or to direct the changes to DACA pursuant to it. Accordingly, the Wolf Memo is an ultra vires agency action that was void ab initio.

14.     The consequence of Defendants' decisions is that hundreds of thousands of young people who have availed themselves of the program will ultimately lose some or all of its protections, and will be exposed to removal when their authorizations expire.

15.     Individuals who have relied on DACA are now even more vulnerable to removal than before the program was initiated, as they turned over sensitive information to the federal government in their applications. Despite the federal government's repeated promises that it would not use such information to conduct enforcement measures, the 2017 DHS Memorandum and Wolf Memo do not explain how the government will keep that information secure, nor does it provide any assurances that immigration enforcement agents will not use such information to find and remove those who applied for DACA.

16.     Terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will harm hundreds of thousands of the States' residents, injure State-run colleges and universities, upset the States' workplaces, damage the States' economies, hurt State-based businesses and nonprofits, negatively affect the States' small governmental jurisdictions, and disrupt the States' statutory and regulatory interests.

17.     The States respectfully request that the Court invalidate the Wolf Memo and the portions of the 2017 DHS Memorandum challenged here, and vacate any changes effected to the DACA program by the Wolf Memo. Further, the States ask that the Court enjoin the federal government from using personal information gathered for the DACA program in immigration enforcement.

## JURISDICTION AND VENUE

18.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

19.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Eastern District of New York.

20.     The States bring this action to redress harms to their proprietary and sovereign interests and their interests as *parens patriae*.

## PARTIES

### PLAINTIFFS

21.     The Plaintiff States of New York, Massachusetts, Washington, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia and the District of Columbia, represented by and through their Attorneys General, are sovereign states[2] of the United States of America.

22.     The States are aggrieved and have standing to bring this action because of the injuries to the States caused by the termination of DACA or failure to restore DACA to its pre-September 5, 2017 status, including immediate and irreparable injuries to their sovereign, quasi-sovereign, and proprietary interests.

---

[2] The District of Columbia, which is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government of the United States, shall be included herein as a "State" for ease of reference.

## DEFENDANTS

23.     Defendant Donald Trump is the President of the United States. He is sued in his official capacity.

24.     Defendant DHS is a federal cabinet agency responsible for implementing the DACA program. DHS is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

25.     Defendant United States Citizenship and Immigration Services ("USCIS") is an Operational and Support Component agency within DHS. USCIS is the sub-agency responsible for administering the DACA program.

26.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is an Operational and Support Component agency within DHS. ICE is responsible for enforcing federal immigration law, including identifying, apprehending, detaining, and removing non-citizens.

27.     Defendant Chad Wolf is the Acting Secretary of Homeland Security.[3] He is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees USCIS and ICE. He is sued in his official capacity.

28.     Defendant the United States of America includes all government agencies and departments responsible for the implementation, modification, and termination of the DACA program.

---

[3] Plaintiffs refer to Defendant Wolf by reference to the title DHS has designated for him, without conceding that he is lawfully exercising the powers of that position, as alleged in Plaintiffs' Ninth Claim for Relief below.

## GENERAL ALLEGATIONS

**Establishment of the DACA Program**.

29.     On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum"). *See* Ex. 13 (2012 DACA Memorandum). Under DACA, "certain young people who were brought to this country as children and know only this country as home" could request deferred action for a period of two years, subject to renewal. *Id.* at 1-2. DACA grantees also were eligible for work authorizations so that they could work legally in the United States during the deferred action period, pursuant to long-standing federal regulation. *See id.*; 8 C.F.R. § 274a.12(c)(14) (providing that "an alien who has been granted deferred action" may obtain work authorization upon demonstrating economic necessity).

30.     Deferred action is a well-established form of prosecutorial discretion under which the federal government forbears from taking removal action against an individual for a designated period of time. According to the 2012 DACA memorandum, it was appropriate for the government to exercise such discretion for DACA grantees because immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language." *See* Ex. 13 at 1.

31.     The 2012 DACA Memorandum provided that an applicant could be considered for an exercise of prosecutorial discretion only if he or she:

     a.  came to the United States before the age of sixteen;

     b.  continuously resided in the United States for at least five years preceding June 15, 2012, and was present in the United States on that date;

    c.   was in enrolled in school on the date of his/her application, had graduated

        from high school, had obtained a general education development certificate, or

        was an honorably discharged veteran of the Coast Guard or Armed Forces of

        the United States;

    d.   had not been convicted of a felony offense, a significant misdemeanor

        offense, or multiple misdemeanor offenses, and did not otherwise pose a

        threat to national security or public safety; and

    e.   was not over the age of thirty on June 15, 2012.

*Id.* at 1.

32.    USCIS described DACA as follows: "Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based upon unlawful presence, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer lawful status upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence." *See* Ex. 14, Question 1 (USCIS Help Center, *DACA FAQs*).

**The DACA Application Process.**

33.    Under DACA, "[a]ll individuals who believe[d] they [met] the guidelines" could "affirmatively request consideration of DACA from USCIS" through an established process. After receiving the applicant's forms, evidence, supporting documents and application fee, USCIS "review[ed] them for completeness," considered complete applications "on an individual,

case-by-case basis," and notified applicants of its determination in writing. *See* Ex. 16 (USCIS Help Center, *How do I request consideration of DACA?*).

34.     In order to apply for the DACA program, applicants had to submit extensive documentation establishing that they met the eligibility criteria. Applicants also had to submit a Form I-765 Application for Employment Authorization, and pay a $495 fee. *See* Ex. 14 at Questions 28-41; *see also* Ex. 17 (USCIS, I-821D, *Consideration of Deferred Action for Childhood Arrivals*) (explaining that the filing fee for a DACA application could not be waived).

35.     DACA applicants were required to undergo biometric and biographic background checks. When conducting these checks, DHS reviewed the applicant's biometric and biographic information "against a variety of databases maintained by DHS and other federal government agencies." *See* Ex. 14 at Question 23. If any information "indicate[d] that [the applicant's] presence in the United States threaten[ed] public safety or national security," the applicant was ineligible for DACA absent "exceptional circumstances." *Id.* at Question 65.

36.     Once individuals were admitted into the DACA program, internal USCIS "Standard Operating Procedures" dictated that, absent an "Egregious Public Safety" issue, DACA grantees were not to be terminated from the program until the government provided a "Notice of Intent to Terminate" which "thoroughly explain[ed]" the grounds for the termination." *See* Ex. 18 at 132, Appendix I (DHS, *National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals*, Apr. 4, 2013). DHS policy further provided that recipients of such notice should be afforded 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of participation in the DACA program. *Id.*

37.     At the expiration of their two-year DACA term, grantees could seek renewal, and were considered for renewal if they met the guidelines for consideration as well as other specified criteria. *See* Ex. 19 (USCIS Help Center, *How will USCIS evaluate my request for renewal of DACA?*).

**Benefits Provided Under the DACA Program.**

38.     DACA confers numerous benefits on its grantees.

39.     Notably, DACA grantees are granted the right not to be arrested or detained based solely on their immigration status during the time period during which their deferred action is in effect. *See* Ex. 14 at Question 9.

40.     DACA grantees also are granted eligibility for work authorization. As USCIS has explained, "an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action . . . .'" *Id.* at Question 1.

41.     DACA grantees are eligible to receive certain public benefits. These include Social Security, retirement, and disability benefits. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d).

42.     DACA enables grantees to open bank accounts, obtain credit cards, start businesses, purchase homes and cars, and conduct other aspects of daily life that are otherwise often unavailable for undocumented immigrants. *See* Ex. 5 ¶¶ 12, 16, 22 (Decl. Wong).

43.     DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs— all on the books." *See* Ex. 15 (Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu, Dec. 30, 2016).

44.     These positive effects have rippled throughout the States' economies. As DHS recognized more than four years after the implementation of DACA, our nation "continue[s] to benefit . . . from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future." *Id.*

45.     Terminating DACA or failing to restore DACA to its pre-September 5, 2017 status would not only rip away the life-changing benefits to individual DACA grantees, but would also reverse the benefits to the community at large, including to innumerable small businesses, non-profits, and governments.[4]

**The Government's Assurances That the Information Provided by DACA Applicants Would be Kept Confidential and Not Used for Enforcement.**

46.     When the DACA program was first implemented, many eligible young people were reluctant to voluntarily disclose information that could help facilitate their removal from the United States. To encourage applications, DHS repeatedly promised applicants that information they provided as part of the DACA application process would "not later be used for immigration enforcement purposes." *See* Ex. 15 (Letter from Sec'y Johnson).

47.     USCIS affirmatively represented to DACA applicants that, except in limited circumstances, "[i]nformation provided in [a DACA request] is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings." *See* Ex. 25 (USCIS Help

---

[4] *See* e.g., Ex. 20 (Ike Brannon, *The Economic and Fiscal Impact of Repealing DACA*, the Cato Institute, Jan. 18, 2017) ("The deportation of DACA participants would cost the American economy billions of dollars, as well as billions of tax dollars foregone, while doing little to address the true concerns that Americans may have about unauthorized immigrants."); Ex. 21 (Tom Wong, *et al.*, *DACA Grantees' Economic and Educational Gains Continue to Grow*, Center for American Progress, Aug. 28, 2017) (quoting multiple DACA grantees whose small businesses will suffer or even close if DACA is terminated); Ex. 22 (Tom Wong *et al.*, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Center for American Progress, Oct. 18, 2016) (study showing that 9 percent of DACA grantees work at non-profits, a significant percentage work in education, and 6 percent started their own business, including one owner who employs nine people and hopes to continue to grow and "hire even more people from the community" [internal brackets and quotation marks omitted]).

Center, *Will the information I share in my request for DACA be used for immigration enforcement purposes?*).

48. USCIS affirmatively represented to DACA applicants that, except in limited circumstances, their case would not be "referred to ICE for purposes of removal proceedings" even if UCSIS decided not to defer action on a case. *See* Ex. 26 (USCIS Help Center, *If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?*).

49. In the exceptional circumstance in which USCIS referred a DACA applicant to ICE, USCIS affirmatively represented to DACA applicants that "information related to [their] family members or guardians that is contained in [their] request [would] not be referred to ICE for purposes of immigration enforcement against family members or guardians." *See* Ex. 27 (USCIS Help Center, *If my DACA case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?*).

50. USCIS affirmatively represented to employers of DACA applicants that, except in limited circumstances, if they provided an employee "with information regarding his or her employment to support a request for consideration of DACA," the information would not be "shared with ICE for civil immigration enforcement purposes." *See* Ex. 28 (USCIS Help Center, *If I provide my employee with information regarding his or her employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me and/or my company?*).

51. The government's representations that, absent exceptional circumstances, information provided by a DACA grantee would not be used against him or her for later immigration enforcement proceedings were unequivocal and atypical. For example, the federal

government does not make the same representations for participants in other similar programs, such as Temporary Protected Status. These assurances were key to the success of the DACA program. By making repeated, unique, and strong representations, the federal government induced persons to rely on those representations and apply to become DACA grantees despite the potential risks.

**The Government's Commitment to Continuity and Fair Treatment for DACA Grantees.**

52.     Numerous public officials from both political parties have reinforced the federal government's promise to provide continuity and fair treatment to DACA grantees, and have recognized that DACA grantees have relied on the government's representations in applying for DACA. For example, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson acknowledged that there are hundreds of thousands of DACA grantees who have "relied on the U.S. government's representations" about DACA, and asserted that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored." *See* Ex. 15.

53.     On December 19, 2016, then-President-elect Trump stated in an interview with TIME magazine that he would find an accommodation for DACA grantees, stating, "We're going to work something out that's going to make people happy and proud." *See* Ex. 29 (Michael Scherer, *Person of the Year 2016*, TIME Magazine, Dec. 19, 2016). He further recognized, "[DACA grantees] got brought here at a very young age, they've worked here, they've gone to school here. Some were good students. Some have wonderful jobs. And they're in never-never land because they don't know what's going to happen." *Id.*

54.     Again, on January 18, 2017, then President-elect Trump promised in an interview with Fox & Friends that he was working on a plan to make DACA grantees "very happy." *See*

Ex. 30 (Francesca Chambers, *Trump signals he's softening on immigration as he says he's 'working on a plan' that will make DREAMers 'very happy,'* Daily Mail, Jan. 18, 2017). He further stated, "We're working on a plan right now. And that plan, over the next two to three months, is going to come out. And it's a plan that's going to be very firm, but it's going to have a lot of heart." Id.

55.     In January 2017, Speaker of the House Paul Ryan stated that the government must ensure that "the rug doesn't get pulled out from under" DACA grantees, who have "organize[d] [their] li[ves] around" the DACA program. *See* Ex. 31 (CNN, *Transcript of CNN Town Hall with Speaker Paul Ryan*, Jan. 12, 2017).

56.     On January 25, 2017, President Trump again stated in an interview with David Muir that "[DACA grantees] shouldn't be very worried. I do have a big heart." *See* Ex. 32 (ABC News, *Transcript of ABC News anchor David Muir interview with Donald Trump*, Jan. 25, 2017).

57.     In February 2017, then-Secretary of DHS John Kelly issued a memorandum relating to enforcement priorities. This memorandum terminated "all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," including prior enforcement priorities, but left DACA unchanged. *See* Ex. 2 (Memorandum from Secretary John Kelly to Keven McAleenan, Acting CBP Commissioner, *Enforcement of the Immigration Laws to Serve the National Interest*, Feb. 20, 2017); *see also* Ex. 10 (*Q&A: DHS Implementation of the Executive Order on Enhancing Public Safety in the Interior of the United States*, Feb. 21, 2017) ("Q22: Do these memoranda affect recipients of Deferred Action for Childhood Arrivals (DACA)? A22: No.").

58.     On March 29, 2017, Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer." *See* Ex. 33 (Ted Hesson & Seung Min Kim, *Wary Democrats Look to Kelly for Answers on Immigration*, Politico, Mar. 29, 2017).

59.     On April 21, 2017, President Trump represented that his Administration's policy was not to deport DACA grantees, and suggested that they "should rest easy." *See* Ex. 34 (The Associated Press, Interview Transcript, Apr. 21, 2017).

60.     On June 15, 2017, Secretary Kelly issued a memo terminating the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program created in 2014, but keeping DACA in place. *See* Ex. 23 (Memorandum from Secretary John Kelly to Keven McAleenan, Acting CBP Commissioner, *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents*, June 15, 2017).

61.     The government's commitment to the DACA program was further communicated to young people through DHS's publication entitled "National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA)" (the "DACA SOP"). *See* Ex. 18. This document includes more than 150 pages of specific instructions for granting or denying deferred action.

62.     Moreover, the approval notice granting deferred action under DACA listed only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" as grounds for revoking DACA. *See* Ex. 24 (USCIS, DACA Approval Notice).

63.     In reliance on these representations, hundreds of thousands of young people applied to participate in the DACA program, or sought renewal of their benefits since 2017. *See* Ex. 1.

**President Trump's Statements about Mexicans.**

64.     Despite these various and repeated promises to DACA grantees made by the federal government and by President Trump, including a recognition of DACA's continued legal viability, value, and successes, President Trump has a long history of disparaging Mexicans, who comprise the vast majority of DACA grantees.

65.     In announcing his presidential campaign, then-candidate Trump compared Mexican immigrants to rapists, stating: "When Mexico sends its people, they're not sending their best. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people." *See* Ex. 35 (Washington Post, *Transcript of Donald Trump's Presidential Bid Announcement*, June 16, 2015).

66.     During the first Republican presidential debate, then-candidate Trump again stated his distaste for immigrants from Mexico: "The Mexican government is much smarter, much sharper, much more cunning. And they send the bad ones over because they don't want to pay for them. They don't want to take care of them." *See* Ex. 36 (Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News, Aug. 6, 2015).

67.      Soon after, on August 25, 2015, then-candidate Trump refused to answer questions about immigration posed by Jorge Ramos, a Mexican-American and the top news anchor at Univision, a Spanish-language news network. After sending his bodyguard to physically remove Mr. Ramos, then-candidate Trump derisively told Mr. Ramos to "Go back to

Univision." *See* Ex. 37 (Phillip Rucker, *First, Trump booted Univision anchor Jorge Ramos out of his news conference. Then things got interesting*, The Washington Post, Aug. 25, 2015).

68.     In May 2016, then-candidate Trump referred to anti-Trump protestors who carried the Mexican flag as "criminals" and "thugs." *See* Ex. 38 (Donald Trump, "The protestors in New Mexico were thugs who were flying the Mexican Flag," Twitter, May 25, 2016); *See* Ex. 39 (Donald Trump, "Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals," Twitter, June 4, 2016).

69.     In June 2016, then-candidate Trump impugned the integrity of a federal judge presiding over a lawsuit against one of his businesses because the judge is Hispanic. Trump commented that Judge Gonzalo Curiel's rulings against him "[H]as to do with perhaps that I'm very, very strong on the border. . . Now, he is Hispanic, I believe. He is a very hostile judge to me." *See* Ex. 40 (Jose A. DelReal and Katie Zezima, *Trump's personal, racially tinged attacks on federal judge alarm legal experts*, The Washington Post, June 1, 2016).

70.     In an interview with CBS News on June 5, 2016, then-candidate Trump again reiterated his anti-Mexican views, noting that "[Judge Curiel]'s a member of a club or society very strongly, pro-Mexican, which is all fine. But I say he's got bias." *See* Ex. 41 (CBS News, Transcript of Face the Nation, June 5, 2016). Judge Curiel is a member of the San Diego Chapter of the La Raza Lawyers Association. *See* Ex. 42 (Michelle Ye Hee Lee, *Trump supporters' false claim that Trump U judge is a member of a pro-immigrant group*, The Washington Post, June 7, 2016).

71.     On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole. They later told police that "Donald Trump was right; all these illegals need to be deported." When asked about the incident, then-candidate Trump failed to condemn

the men, instead describing them as "passionate." *See* Ex. 43 (Adrian Walker, *'Passionate'*

*Trump fans behind homeless man's beating?*, The Boston Globe, Aug. 21, 2015). Specifically,

Trump stated, "[i]t would be a shame . . . I will say that people who are following me are very

passionate. They love this country and they want this country to be great again. They are

passionate. Id.

72.     In October 2016, during a presidential debate, then-candidate Trump responded to

a question about immigration by stating: "We have some bad hombres here and we're going to

get them out." *See* Ex. 44 (Katie Zezima, *Trump on immigration: There are 'bad hombres' in the*

*United States*, The Washington Post, Aug. 30, 2017).

73.     On January 27, 2017, newly-inaugurated President Trump and Mexico's President

Peña Nieto discussed President Trump's proposal for a border wall over the phone. During that

transcribed conversation, President Trump again referred to "hombres" stating: "You have some

pretty tough hombres in Mexico that you may need help with, and we are willing to help you

with that big-league. But they have to be knocked out and you have not done a good job of

knocking them out." *See* Ex. 45 (Greg Miller *et. al.*, *Full Transcripts of Trump's Calls with*

*Mexico and Australia*, The Washington Post, Aug. 3, 2017).

74.     On August 25, 2017, President Trump pardoned former Maricopa County Sheriff

Joe Arpaio, who was to be sentenced for criminal contempt for failing to comply with a federal

judge's order to stop racially profiling Latinos. *See* Ex. 46 (Julie Hirschfield Davis and Maggie

Haberman, *Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal*

*Immigration*, The N.Y. Times, Aug. 25, 2017).

75.     Sheriff Arpaio had been detaining people ostensibly because they had violated the

law. But in practice, his office detained huge numbers of individuals solely because they looked

19

Latino, without any reasonable suspicion of illegal conduct. *See generally Melendres v. Arpaio*, Findings of Fact & Conclusions of Law, 2:07-cv-02513-GMS, ECF Doc. No.579 (D. Az. May 24, 2013). After a federal court enjoined that practice in 2011, Arpaio continued his unlawful and discriminatory practices unabated, "announc[ing] to the world and to his subordinates that he was going to continue business as usual no matter who said otherwise." *United States v. Arpaio*, Findings of Fact & Conclusions of Law, 2:16-cr-01012-SRB, ECF Doc. No. 210 at 13 (D. Ariz. July 31, 2017). On July 31, 2017, a federal court held Arpaio in criminal contempt, holding that he had willfully acted in "flagrant disregard" of the injunction. *Id.*

76.     Before issuing the pardon, President Trump asked, "Was Sheriff Joe convicted for doing his job?" *See* Ex. 46. (Davis and Haberman, *Trump Pardons Joe Arpaio*). After issuing the pardon, President Trump sent a tweet calling Mr. Arpaio "an American patriot." *Id.*

77.     As President Trump's statements about Mexico and those with Mexican origins demonstrate, the President is willing to disparage Mexicans in a misguided attempt to secure support from his constituency.

**Trump Administration's Threatening Statements about Deporting Immigrants.**

78.     On June 13, 2017, Acting ICE Director Thomas Homan testified in front of the House Appropriations Committee's Subcommittee on Homeland Security, stating as to "every immigrant in the country without papers," that they "should be uncomfortable. You should look over your shoulder. And you need to be worried." *Hearing on the ICE and CBP F.Y. 2018 Budget Before the Subcomm. on Homeland Security of the H. Comm. on Appropriations*, 115th Cong. (2017) 2017 WLNR 18737622.

79.     On April 19, 2017, United States Attorney General Jefferson B. Sessions stated in an interview on Fox News' "Happening Now," program—in response to a question regarding the

deportation of a DACA recipient—that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported -- well, they are. . . . we can't promise people who are here unlawfully that they aren't going to be deported." Ex. 49 (Adam Shaw, *Sessions defends immigration policies after reported 'DREAMer' deportation*, Fox News, Apr. 19, 2017).

**President Trump Terminates DACA in Response to the Litigation Threats of a State Found to Have Discriminated Against Latinos/Hispanics Nine Times Since 2012.**

80.　　On June 29, 2017, the Attorneys General of ten states, led by the State of Texas, sent U.S. Attorney General Sessions a letter threatening to add claims to litigation currently pending in the Southern District of Texas "to challenge both the DACA program and the remaining expanded DACA permits," if the Executive Branch did not agree to end the DACA program by September 5, 2017. Ex. 177 (Letter from Ken Paxton *et.al.* to Attorney General Jeff Sessions, June 29, 2017).

81.　　The demand that President Trump eliminate DACA is part of a history of intentional discrimination against Latinos/Hispanics by the State of Texas.

82.　　Over the preceding decade, federal courts have repeatedly found the State of Texas liable for engaging in unlawful discrimination based on race and/or national origin.

83.　　For example, in *Texas v. United States*, 887 F. Supp. 2d 133, 161 (D.D.C. 2012), three federal judges blocked a Congressional and State House redistricting plan after finding that it "was enacted with discriminatory purpose."

84.　　The litigation eventually culminated in a ruling by a three-judge panel on August 15, 2017 finding, again, that the 2010 congressional districts had been created with "racially discriminatory intent" against Latinos and African American voters. *Perez v. Abbott*, SA-11-CV-360, 2017 U.S. Dist. LEXIS 129982, at *55 (W.D. Tex. Aug. 15, 2017).

85.     On October 9, 2014, in separate litigation challenging a state voter photo identification ("ID") law, a Texas federal district court judge found that the provision had been "imposed with an unconstitutional discriminatory purpose" and "constitute[d] an unconstitutional poll tax." *Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014).

86.     On remand from the Fifth Circuit, a federal district court concluded that the 2011 Legislature intentionally discriminated against minority voters by requiring presentation of a photo ID when casting their ballots. *Veasey v. Abbott*, 2017 U.S. Dist. LEXIS 54253, at *14-18 (S.D. Tex. Apr. 10, 2017).

87.     DHS issued the 2017 DHS Memorandum terminating DACA on September 5, 2017, in direct response to the threats of the State of Texas and the other ten states, fulfilling the demand of a State marked with a history of racial and national origin discrimination.

**President Trump Backtracks on His Promise and Terminates DACA.**

88.     Attorney General Sessions announced the termination of DACA via a live press conference. He explained, without evidence, "The effect of this unilateral executive amnesty, among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *See* Ex. 75 (DOJ, *Attorney General Sessions Delivers Remarks on DACA*, Prepared Remarks, Sept. 5, 2017).

89.     Under the 2017 DHS Memorandum, which accompanied this announcement, the government's new policy provides no discretion to approve new applications on a case-by-case basis. Instead, the 2017 DHS Memorandum is a final decision that an entire class of people is no longer eligible for deferred action, employment authorization, and other benefits. Per the 2017 DHS Memorandum, DHS "[w]ill reject all DACA initial requests and associated applications for

Employment Authorization Documents filed after the date of this memorandum." DHS will also reject all renewal applications it receives after October 5, 2017, and all renewal applications for authorizations that expire after March 5, 2018. *See* Ex. 74 (DHS Memorandum).

90.     In issuing the 2017 DHS Memorandum, the federal government misleadingly claimed that DACA was unconstitutional, *see* Ex. 74, despite the fact that no court has made that determination, and despite previous determinations by DOJ and DHS, including under the Trump administration, that DACA is lawful and should be left in place. In fact, as recently as June 15, 2017, then-Secretary of Homeland Security John Kelly chose to allow DACA to continue (while terminating the DAPA program) "after consulting with the Attorney General." *See* Ex. 23

91.     Even after the announcement, the government's position on the reasoning for the termination has been unclear and inconsistent. On the day of the termination, President Trump re-tweeted a statement that "We are a nation of laws. No longer will we incentivize illegal immigration." *See* Ex. 47 (Josh Saul, *Jeff Sessions Always Wanted to Deport Undocumented Immigrant Youth. Now He Can*, Newsweek, Sept. 5, 2017). The President appears to have deleted this tweet. Later on September 5, the President tweeted, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!" *See* Ex. 48 (Donald J. Trump, Twitter, Sept. 5, 2017). On September 14, 2017, he tweeted, "Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really! ....." *See* Ex. 50 (Donald J. Trump, Twitter, Sept. 14, 2017).

92.     As a result of the 2017 DHS Memorandum, DACA grantees whose benefits expire after March 5, 2018 will immediately lose their employment authorization, as well as

other vital benefits, such as social security cards, driver's licenses, financial aid, disability and health benefits, among others.

93.     They also may lose their homes and communities if the program is allowed to expire. An internal White House memo reported on by CNN stated that DHS now is urging DACA grantees "to prepare for and arrange their departure from the United States" when their DACA terms end. *See* Ex. 88 (Tal Kopan & Jim Acosta, *Admin Memo: DACA recipients should prepare for departure from the United States*, CNN, Sept. 5, 2017). This threat of deportation is consistent with past references to deportation of DACA grantees, such as a statement by Attorney General Sessions in response to a question regarding the deportation of a DACA grantee that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported -- well, they are. . . . we can't promise people who are here unlawfully that they aren't going to be deported." *See* Ex. 49 (Adam Shaw, *Sessions defends immigration policies after reported 'DREAMer' deportation*, Fox News, Apr. 19, 2017).

94.     President Trump also has taken affirmative steps to reduce the privacy protections applicable to DACA grantee information. In January 2017, President Trump issued an Executive Order directing all agencies, including DHS, to "ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information." *See* Ex. 76 (Executive Order 13768, "Enhancing Public Safety in the Interior of the United States," Jan. 25, 2017). In response to the Executive Order, DHS adopted a privacy policy that "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement." *See* Ex. 51 (DHS, *Privacy Policy 2017-01 Questions & Answers,* Apr. 27, 2017).

24

95.     The 2017 DHS Memorandum provides no assurance to DACA grantees, or direction to USCIS and ICE, that information contained in DACA applications cannot be used for the purpose of future immigration enforcement proceedings.

96.     To the contrary, on the same day that the 2017 DHS Memorandum was issued, DHS changed its public guidance about the use of DACA application data for immigration enforcement. DHS removed the webpage containing the assurance that, absent exceptional circumstances, DACA application data "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings." *Cf.* Ex. 25 (containing link to USCIS webpage that now contains an error alert and a message stating, "The page you are looking for may not exist or is temporarily unavailable."). The same day, DHS posted a new policy governing the use of information provided by DACA applicants. DHS now states that USCIS "[g]enerally" will not "proactively provid[e] information obtained through DACA to ICE and CBP. *See* Ex. 89 (DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals,* Sept. 5, 2017). The new policy imposes no restrictions on USCIS providing DACA data at the request of ICE, CBP, or any other law enforcement entity. *Id.* DHS also reserves the right to change its new policy "at any time without notice" and states that the policy "may not be relied upon" by any party. *Id.*

97.     DACA grantees thus immediately face the risk that information they provided to the federal government could be used against them at any time, without notice, for purposes of immigration enforcement, including detention or removal.

**The Defendants' Failure to Notify Certain DACA Grantees of the October 5, 2017 Renewal Deadline.**

98.     Before the termination of DACA, Defendants had a written policy and practice allowing DACA grantees to submit their renewal application up to one year after the date of

expiration of their participation in DACA. If DACA grantees failed to renew within one year of the expiration date, they had the option to re-apply as initial applicants. *See* Ex. 14 (USCIS FAQs – Q50).

99.     In addition, USCIS and DHS had a long-standing practice of using the address information they maintain for DACA grantees to send individualized notices to those grantees regarding their renewal expiration dates. *See* Ex. 178 (DACA Renewal Notice).

100.     On information and belief, no standard renewal notices have been provided to DACA grantees whose participation in DACA expires between February 6, 2018 and March 5, 2018. Prior to termination of DACA, a DACA grantee whose renewal status expires in February 2018 would have received an individualized renewal notice informing the grantee that he or she had to file a renewal 120-150 days prior to expiration, i.e., by November 2017, in order to avoid a lapse in deferred action and employment authorization. *See, e.g., id.* However, since the termination, Defendants have not yet sent this group of DACA grantees any notices regarding when and how they can renew.

101.     On information and belief, the government sent standard renewal notices up until August 1, 2017 for DACA grantees whose participation in DACA expires by January 2018, informing the grantees they had the standard 120-150 days prior to the expiration date to renew if they wished to "avoid a lapse in [their] period of deferred action and employment authorization". *See, e.g., id.* However, in light of DHS's decision to impose an absolute cut-off date of October 5, 2017 for all renewal applications, the information conveyed in these notices is now incorrect. The notices misleadingly suggest to DACA grantees that they have several additional months beyond October 5 to renew their DACA status without a gap in employment authorization. Moreover, the faulty renewal notices were not followed with individualized corrected notices

informing this group of grantees that there is a new, absolute October 5 deadline for renewal, and that DACA grantees will no longer have up to one year after the date of expiration of their DACA to submit a renewal application.

102.    As a result of Defendants' failure to provide individualized notice regarding the new October 5, 2017 renewal deadline to DACA grantees whose participation expires before March 5, 2018, individuals who received no notice or incorrect notice of the new deadline may be forever ineligible to renew their participation in DACA. These DACA grantees will no longer be protected from deportation and will lose work authorization that they may have otherwise had. They may also lose health insurance, social security cards, driver's licenses and other benefits.

103.    On October 3, 2017, DHS issued a press release stating that "[o]f the approximately 154,200 individuals whose DACA is set to expire between Sept. 5, 2017, and March 5, 2018, just over 106,000 either have renewal requests currently pending with USCIS, or have already had USCIS adjudicate their renewal request." *See* Ex. 82 (DHS Press Release *Department of Homeland Security Acting Secretary Elaine Duke Reminds Eligible DACA Recipients to File Renewal Requests,* October 3, 2017). Therefore, up to one third of DACA grantees who are eligible for renewal had not applied as of two days before the October 5, 2017 deadline.

**The Government's Failure to Notify DACA Grantees of their Inability to Renew Their DACA Status If It Expires After March 5, 2018.**

104.    On information and belief, Defendants' termination of DACA was solely communicated to DACA grantees through the publication of DHS's memorandum on September 5, 2017 on the DHS website and by a concurrent television announcement from Attorney

General Sessions. *See* Ex. 74 (DHS Memo); *See* Ex. 75 (*Attorney General Sessions Delivers Remarks on DACA*).

105. On information and belief, the government did not and does not plan to issue individualized notices to any DACA grantees informing them of the termination of DACA and their inability to renew if their DACA status expires after March 5, 2018.

106. Many DACA grantees relied upon their ability to apply to renew DACA in making important decisions related to their employment, education and families, among other things.

**The Government's Failure to Comply with the Supreme Court's Invalidation of the DACA Rescission and Subsequent Vacatur of that Rescission.**

107. Ignoring the Supreme Court's June 18, 2020 *Regents* decision holding that Defendants' 2017 rescission of DACA was arbitrary and capricious, 140 S. Ct. at 1915, and the subsequent vacatur of the rescission by the Fourth Circuit on June 30, 2020, DHS failed to recommence processing DACA applications. Instead, it "generally held" applications "in anticipation of potential policy changes." Wolf Memo at 7.

**The Wolf Memo Orders Interim Changes to DACA Pending DHS's Consideration of Fully Rescinding the DACA Program.**

108. In the Wolf Memo, issued on July 28, 2020, Defendant Wolf announced that "I am considering anew the DACA policy," that "the DACA policy, at a minimum, presents serious policy concerns that may warrant its full rescission," and that, "in the exercise of my authority and discretion in establishing national immigration policies and priorities . . . I am rescinding the Nielsen Memorandum and Duke Memorandum, and making certain immediate changes to the DACA policy to mitigate my enforcement policy concerns while I conduct a full and careful consideration of the full rescission." Wolf Memo at 4.

109.     Specifically, the Wolf Memo orders DHS to reject all new initial applications, to change the renewal period for current beneficiaries from two years to one year, and to reject all advance parole applications absent exceptional circumstances.  *Id.* at 7-8.

110.     The Wolf Memo purports to apply these changes retroactively to all applications submitted after the Supreme Court's June 18, 2020 *Regents* decision.  *Id.* at 7.

111.     On August 21, 2020, DHS Deputy Director of Policy Joseph Edlow issued a memorandum purporting to implement the Wolf Memo, instructing USCIS officials to take the actions directed by the Wolf Memo.  Ex. 181.

**Defendant Wolf Lacked the Authority to Issue the Wolf Memo.**

112.     The U.S. Government Accountability Office ("GAO") concluded that Defendant Wolf has never lawfully served in the role of Acting Secretary of Homeland Security because his assumption of that role violated the FVRA and HSA.

113.     Article II of the Constitution requires that the President obtain the "Advice and Consent" of the Senate for Cabinet officials.

114.     The FVRA established a default framework for authorizing acting officials to fill Senate-confirmed roles, with three options for who may serve as an acting official.  5 U.S.C. § 3345.  Under this framework, (1) the "first assistant to the office" of the vacant officer generally becomes the acting official, *id.* § 3345(a)(1), unless (2) the President appoints someone already serving in a different Senate-confirmed position, *id.* § 3345(a)(2), or (3) the President authorizes "an officer or employee" of the relevant agency to serve as the acting official if the officer or employee has held a position in the agency above the GS-15 pay rate for 90 days or more within the preceding year, *id.* § 3345(a)(3).  The FVRA further provides that a position may be occupied by an acting official for a maximum of 210 days.  *Id.* § 3346.  This framework

29

is the "exclusive means" for authorizing acting officials unless a specific statute authorizes "the President, a court, or the head of an Executive department" to designate one.  *Id.* § 3347.

115.    DHS has such a statute—the HSA—which establishes an order of succession for the Acting Secretary, expressly superseding the FVRA's default options.  6 U.S.C. § 113(g). First in line under the HSA is the Deputy Secretary, and then the Under Secretary for Management. *Id.* §§ 113(a)(1)(A), 113(g)(1). After these two offices, the order of succession is set by the Secretary of Homeland Security. *Id.* § 113(g)(2).

116.    Under the FVRA, official actions taken by unlawfully serving acting officials "shall have no force or effect" and "may not be ratified" after the fact, including acting officials that assume their roles through agency-specific statutes like the HSA.  5 U.S.C. § 3348(d)(1), (2).

117.    Secretary Kirstjen Nielsen was the most recent Senate-confirmed Secretary of Homeland Security. On February 15, 2019, she exercised her power under the HSA to set an order of succession for the position of Acting Secretary of DHS should the Deputy Secretary and Under Secretary of Management positions be vacant. She did so by amending the existing order of succession that had been issued by then-Secretary Jeh Johnson in 2016—Delegation 00106.

118.    Nielsen's February Delegation provided two grounds for accession of an Acting Secretary: (1) the Secretary's death, resignation, or inability to perform the functions of the office; and (2) the Secretary's unavailability to act during a disaster or catastrophic emergency. Each ground set forth the order of succession that would govern under those circumstances. In the case of the Secretary's death, resignation, or inability to perform the functions of office, Executive Order 13753—the most recent prior amendment to the order of succession in the Department—would govern the order of succession. If the Secretary were unavailable to act

during a disaster or catastrophic emergency, the order of succession would be governed by Annex A to the February Delegation.

119.　　At the time of the February Delegation, the orders of succession found in E.O. 13753 and Annex A were identical; the first four positions in the order of succession for both were as follows: (1) Deputy Secretary; (2) Under Secretary of Management, (3) Administrator of the Federal Emergency Management Agency (FEMA) and (4) Director of the Cybersecurity and Infrastructure Security Agency (CISA).  The February Delegation further provided that officials who were only acting in the listed positions (rather than appointed to those positions) were ineligible to serve as Acting DHS Secretary, such that the position of Acting Secretary would pass to the next Senate-confirmed official.

120.　　Nielsen originally announced her resignation from the Secretary position effective April 7, 2019. Under the order of succession in effect at that time, and in view of the vacancy in the Deputy Secretary position, the Acting Secretary position would have been assumed by Claire Grady, the Deputy Under Secretary for Management. *See* 6 U.S.C. §§ 113(a)(1)(A), 113(g)(1). But Nielsen then purported to remain in office until April 10, and Grady resigned on April 9.

121.　　Before leaving office on April 10, 2019, Nielsen made a partial amendment to DHS's order of succession. In this April Delegation, Nielsen retained the two separate grounds for accession to the role of Acting Secretary: vacancies arising from Secretary's death, resignation, or inability to perform the functions of office were still governed by E.O. 13753, and vacancies arising from the Secretary's unavailability to act during a disaster or catastrophic emergency were still governed by Annex A to the Delegation. Nielsen also did not amend E.O. 13753, which continued to govern the order of succession in the event of a vacancy created by the Secretary's death, resignation or inability to perform the functions of the office. Secretary

31

Nielsen did, however, amend Annex A, which set forth the order of succession for when the Secretary is unavailable to act during a disaster or catastrophic emergency; the new order of succession was as follows: (1) Deputy Secretary; (2) Under Secretary of Management; (3) Commissioner of U.S. Customs and Border Protection (CBP), and (4) Administrator of FEMA.

122.    Senate-confirmed Commissioner of CBP Kevin McAleenan then assumed the role of Acting Secretary, supposedly pursuant to Annex A. Yet E.O. 13753 rather than Annex A governed the relevant order of succession because the vacancy in the position of Secretary was created by Nielsen's resignation, not through the Secretary's unavailability during a disaster or catastrophic emergency.

123.    On November 8, 2019, McAleenen substituted Annex A for E.O. 13753 to govern the order of succession when the Secretary dies, resigns, or is unable to perform the functions of office. McAleenan then directed the order of succession in Annex A to be: (1) Deputy Secretary, (2) Under Secretary of Management; (3) Commissioner of CBP; and (4) Under Secretary for Strategy, Policy, and Plans. On November 13, 2019, McAleenan resigned as both Acting Secretary and Commissioner of CBP. Because the first three positions in the line of succession were vacant, the Senate-confirmed Under Secretary of Strategy, Policy, and Plans—Chad Wolf—assumed the role of Acting Secretary.

124.    On November 15, 2019, two days after Wolf assumed the Acting Secretary role, the Chairman of the House of Representatives Committee on Homeland Security and the Acting Chairwoman of the House Committee on Oversight and Reform wrote a letter to the head of GAO "to express serious concerns with the legality of the appointment" of Chad Wolf as Acting

Secretary of DHS and Ken Cuccinelli as Senior Official Performing the Duties of Deputy Secretary.

125.    In particular, the Chairman and Acting Chairwoman expressed concern that Wolf was serving in violation of the FVRA and HSA because former Acting Secretary McAleenan did not lawfully assume the Acting Secretary position, and so McAleenan had no authority to make the changes to DHS's order of succession that formed the basis for Wolf's accession to Acting Secretary.

126.    On August 14, 2020, GAO issued a report responding to the Chairman and Acting Chairwoman's request, and assessing the legality of the appointment of Chad Wolf as Acting Secretary of DHS and Ken Cuccinelli as Senior Official Performing the Duties of Deputy Secretary. GAO, *DHS-Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, File No. B-331650, Aug. 14, 2020.

127.    In the report, GAO explained that "[i]n the case of vacancy in the positions of Secretary, Deputy Secretary, and Under Secretary of Management, the HSA provides a means for an official to assume the title of Acting Secretary pursuant to a designation of further order of succession by the Secretary." *Id.* at 11. Based on the amendments Secretary Nielsen made to the order of succession in April 2019, GAO concluded that the Senate-confirmed CBP Commissioner (McAleenan) "would have been the appropriate official" to serve as Acting Secretary only if Secretary Nielsen had been "unavailable to act during a disaster or catastrophic emergency." *Id.* at 7.

128.    GAO concluded that because Secretary Nielsen had *resigned*, E.O. 13753 controlled under "the plain language of the April Delegation." *Id.* GAO explained that after

Nielsen's resignation, then-Director of CISA, Christopher Krebs, should have assumed the position Acting Secretary because he was the first Senate-confirmed official in the E.O. 13753 order of succession, which governed following a Secretary's resignation.[5] *Id.* at 8 & n.11. GAO noted that although "McAleenan assumed the title of Acting Secretary upon the resignation of Secretary Nielsen," "the express terms of the existing [succession] designation required [Krebs] to assume that title" and so "McAleenan did not have authority to amend the Secretary's existing designation." *Id.* at 11. GAO thus concluded that Wolf and Cuccinelli were improperly serving in their acting roles because they assumed those acting roles under "[the] invalid order of succession" established by McAleenan in November 2019. *Id.*

129.    GAO recognized that Secretary Nielsen's conduct may have suggested that she intended McAleenan to become Acting Secretary upon her resignation, but GAO concluded that "it would be inappropriate, in light of the clear express directive of the April Delegation"— which provided that McAleenan would only take over if Nielsen was unavailable to act during a disaster or catastrophic emergency—to interpret the order of succession based on post-hoc actions." *Id.* at 9. GAO did not assess the consequences of Wolf's and Cuccinelli's unlawful appointments and instead referred that question to the DHS Office of Inspector General. *Id.* at 11.

130.    Because Defendant Wolf unlawfully assumed the position of Acting Secretary of Homeland Security in violation of the FVRA and HSA. Under the plain terms of the FVRA, all official actions taken by Wolf as Acting Secretary—including his issuance of the Wolf Memo— are therefore invalid.

---

[5] The FEMA Administrator had resigned a week before Nielsen resigned. (GAO, *DHS-Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, File No. B-331650, Aug. 14, 2020).

## HARM TO PLAINTIFF STATES

131.    The States will suffer harm as a result of the termination of the DACA program or failure to restore DACA to its pre-September 5, 2017 status, including immediate and irreparable injuries to their sovereign, quasi-sovereign, and proprietary interests.

### PLAINTIFF STATE OF NEW YORK

132.    The State of New York is home to an estimated 80,000 or more DACA-eligible residents.[6] Approximately 28,180 active DACA recipients live in New York.[7]

133.    As of March 31, 2020, USCIS reported that it had approved 40,807 initial DACA applications and 83,987 renewals for residents of New York.[8]

134.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of New York, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

135.    As of October 4, 2017, an estimated 38,848 New York DACA grantees were employed. *See* Ex. 5 ¶ 64 (Decl. Wong). An estimated 2,295 were business owners. *Id.* An estimated 19,084 were in school, and 13,645 were pursuing a bachelor's degree or higher. *Id.* ¶ 65.

---

[6] *See* Migration Policy Institute, National and State Estimates of Immigrant Populations Eligible for the Deferred Action for Childhood Arrivals (DACA) Program, June 2020, *available at* https://www.migrationpolicy.org/sites/default/files/datahub/State%20Estimates%20of%20DACA-Eligible%20Population_June%202020.xlsx ("June 2020 MPI Estimates").

[7] *See* USCIS, Approximate Active DACA Receipts – March 31, 2020 (July 22, 2020), *available at* https://www.uscis.gov/sites/default/files/document/data/Approximate%20Active%20DACA%20Receipts%20-%20March%2031%2C%202020.pdf ("USCIS March 2020 Estimates").

[8] *See* USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Status, by Fiscal Year, Quarter, and Case Status: Aug. 15, 2012-Mar. 31, 2020 (July 22, 2020), *available at* https://www.uscis.gov/sites/default/files/document/data/I914t_visastatistics_fy2020_qtr2.pdf ("USCIS March 2020 Quarterly Report").

136.     An estimated 9,200 DACA recipients in New York are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[9]

137.     In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the New York economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $140 million annually in state and local taxes in New York—a contribution that was estimated to drop by $55 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the New York economy with $10.7 billion in budgetary costs and $38.6 billion economic costs. *See* Ex. 4, Table 1 (Decl. Brannon).  DACA recipients currently contribute an estimated $238.8 million annually in state and local taxes in New York.[10]

---

[9] *See* Nicole Prchal Svajlenka, Center for American Progress, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response*, Center for American Progress (Apr. 6, 2020), https://www.americanprogress.org/issues/immigration/news/2020/04/06/482708/demographic-profile-daca-recipients-frontlines-coronavirus-response/ ("CAP COVID-19 Report").

[10] *See* Nicole Prchal Svajlenka & Philip E. Wolgin, Center for American Progress, What We Know About the Demographic and Economic Impacts of DACA Recipients: Spring 2020 Edition (Apr. 6, 2020), https://www.americanprogress.org/issues/immigration/news/2020/04/06/482676/know-demographic-economic-impacts-daca-recipients-spring-2020-edition/ ("CAP Demographic and Economic Impacts Report").

## PLAINTIFF COMMONWEALTH OF MASSACHUSETTS

138.    The Commonwealth of Massachusetts is home to an estimated 17,000 or more DACA-eligible residents.[11] Approximately 5,480 DACA recipients live in Massachusetts.[12]

139.    As of March 31, 2020, USCIS reported that it had approved 7,654 initial DACA applications and 16,257 renewals for residents of Massachusetts.[13]

140.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Massachusetts, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

141.    As of October 4, 2017, an estimated 7,360 Massachusetts DACA grantees were employed. *See* Ex. 5 ¶ 56 (Decl. Wong). An estimated 435 were business owners. *Id.* An estimated 3,616 were in school, and 2,585 currently were pursuing a bachelor's degree or higher. *Id*. ¶ 57.

142.    An estimated 2,000 DACA recipients in Massachusetts are frontline workers in sectors that are essential for the Commonwealth's COVID-19 response: health care, education, and food-related jobs.[14]

143.    In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Massachusetts economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State.

---

[11] *See* June 2020 MPI Estimates.

[12] *See* USCIS March 2020 Estimates.

[13] *See* USCIS March 2020 Quarterly Report.

[14] *See* CAP COVID-19 Report.

According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $24.2 million annually in state and local taxes in Massachusetts—a contribution that was estimated to drop by $9.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the Massachusetts economy with $258 million in budgetary costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $32.5 million annually in state and local taxes in Massachusetts.[15]

## PLAINTIFF STATE OF WASHINGTON

144.    The State of Washington is home to an estimated 26,000 or more DACA-eligible residents.[16] Approximately 16,030 DACA recipients live in Washington.[17]

145.    As of March 31, 2020, USCIS reported that it had approved 19,308 initial DACA applications and 43,442 renewals for residents of Washington.[18]

146.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Washington, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

147.    As of October 4, 2017, an estimated 16,394 Washington DACA grantees were employed. *See* Ex. 5 ¶ 88 (Decl. Wong). An estimated 969 were business owners. *Id.* An estimated 8,054 were in school, and 5,758 were pursuing a bachelor's degree or higher. *Id.* ¶ 89.

---

[15] *See* CAP Demographic and Economic Impacts Report.

[16] *See* June 2020 MPI Estimates.

[17] *See* USCIS March 2020 Estimates.

[18] *See* USCIS March 2020 Quarterly Report.

148.     An estimated 6,400 DACA recipients in Washington are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[19]

149.     In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Washington economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $51 million annually in state and local taxes in Washington—a contribution that was estimated to drop by $19 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the Washington economy with $1.8 billion in budgetary costs and $6.4 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $90.5 million annually in state and local taxes in Washington.[20]

### PLAINTIFF STATE OF COLORADO

150.     The State of Colorado is home to an estimated 23,000 or more DACA-eligible residents.[21] Approximately 14,520 DACA recipients live in Colorado.[22]

151.     As of March 31, 2020, USCIS reported that it had approved 18,555 initial DACA applications and 41,107 renewals for residents of Colorado.[23]

---

[19] *See* CAP COVID-19 Report.

[20] *See* CAP Demographic and Economic Impacts Report.

[21] *See* June 2020 MPI Estimates.

[22] *See* USCIS March 2020 Estimates.

[23] *See* USCIS March 2020 Quarterly Report.

152.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Colorado, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

153.     As of October 4, 2017, an estimated 15,281 Colorado DACA grantees were employed. *See* Ex. 5 ¶ 28 (Decl. Wong). An estimated 935 were business owners. *Id.* An estimated 7,772 were in school, and 5,557 were pursuing a bachelor's degree or higher. *Id.* ¶ 29.

154.     An estimated 4,300 DACA recipients in Colorado are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[24]

155.     In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Colorado economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $33.9 million annually in state and local taxes in Colorado—a contribution that was estimated to drop by $16.4 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the Colorado economy with $768 million in budgetary costs and $2.7 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $58.7 million annually in state and local taxes in Colorado.[25]

---

[24] *See* CAP COVID-19 Report.

[25] *See* CAP Demographic and Economic Impacts Report.

## PLAINTIFF STATE OF CONNECTICUT

156.     The State of Connecticut is home to an estimated 11,000 or more DACA-eligible residents.[26] Approximately 3,560 DACA recipients live in Connecticut.

157.     As of March 31, 2020, USCIS reported that it had approved 4,886 initial DACA applications and 10,479 renewals for residents of Connecticut.[27]

158.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Connecticut, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

159.     As of October 4, 2017, an estimated 4,560 Connecticut DACA grantees were employed. *See* Ex. 5 ¶ 32 (Decl. Wong). An estimated 269 were business owners. *Id.* An estimated 2,240 were in school, and 1,602 were pursuing a bachelor's degree or higher. *Id.* ¶ 33.

160.     An estimated 1,300 DACA recipients in Connecticut are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[28]

161.     In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Connecticut economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $17 million annually in state and local taxes in Connecticut—a contribution that was estimated to drop by $5

---

[26] *See* June 2020 MPI Estimates.

[27] *See* USCIS March 2020 Quarterly Report.

[28] *See* CAP COVID-19 Report.

million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the Connecticut economy with $642 million in budgetary costs and $2.3 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $21.8 million annually in state and local taxes in Connecticut.[29]

### PLAINTIFF STATE OF DELAWARE

162.    The State of Delaware is home to an estimated 3,000 or more DACA-eligible residents.[30] Approximately 1,310 DACA recipients live in Delaware.[31]

163.    As of March 31, 2020, USCIS reported that it had approved 1,532 initial DACA applications and 3,581 renewals for residents of Delaware.[32]

164.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Delaware, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

165.    As of October 4, 2017, an estimated 1,326 Delaware DACA grantees were employed. *See* Ex. 5 ¶ 36 (Decl. Wong). An estimated 651 were in school, and 466 were pursuing a bachelor's degree or higher. *Id.* ¶ 37.

166.    In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Delaware economy generally. Stripping DACA grantees of the ability to work legally will cause many to

---

[29] *See* CAP Demographic and Economic Impacts Report.

[30] *See* June 2020 MPI Estimates.

[31] *See* USCIS March 2020 Estimates.

[32] *See* USCIS March 2020 Quarterly Report.

lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $2.4 million annually in state and local taxes in Delaware—a contribution that was estimated to drop by $1 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the Delaware economy with $258 million in budgetary costs and $924 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $4.3 million annually in state and local taxes in Delaware.[33]

## PLAINTIFF THE DISTRICT OF COLUMBIA

167.    The District of Columbia ("District") is home to an estimated 2,000 or more DACA-eligible residents.[34] Approximately 600 DACA recipients live in the District.[35]

168.    As of March 31, 2020, USCIS reported that it had approved 738 initial DACA applications and 1,701 renewals for residents of the District.[36]

169.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of the District, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

---

[33] *See* CAP Demographic and Economic Impacts Report.

[34] *See* June 2020 MPI Estimates.

[35] *See* USCIS March 2020 Estimates.

[36] *See* USCIS March 2020 Quarterly Report.

170.     As of October 4, 2017, an estimated 707 District DACA grantees were employed. *See* Ex. 5 ¶ 40 (Decl. Wong). An estimated 347 were in school, and 248 were pursuing a bachelor's degree or higher. *Id.* ¶ 41.

171.     An estimated 200 DACA recipients in the District are frontline workers in sectors that are essential for the District's COVID-19 response: health care, education, and food-related jobs.[37]

172.     In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the District's economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $2.7 million annually in state and local taxes in the District—a contribution that was estimated to drop by $946,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the District's economy $900 million in budgetary costs and $3.2 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $2.9 million annually in local taxes in the District.[38]

---

[37] *See* CAP COVID-19 Report.

[38] *See* CAP Demographic and Economic Impacts Report.

## PLAINTIFF STATE OF HAWAII

173.    The State of Hawaii is home to an estimated 4,000 or more DACA-eligible residents.[39] Approximately 340 DACA recipients live in Hawaii.[40]

174.    As of March 31, 2020, USCIS reported that it had approved 368 initial DACA applications and 935 renewals for residents of Hawaii.[41]

175.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Hawaii, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

176.    As of October 4, 2017, an estimated 532 Hawaii DACA grantees were employed. *See* Ex. 5 ¶ 44 (Decl. Wong). An estimated 261 were in school, and 187 were pursuing a bachelor's degree or higher. *Id*. ¶ 45.

177.    An estimated 100 DACA recipients in Hawaii are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[42]

178.    In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Hawaii economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in a loss of tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $3.2 million annually in state and local taxes in Hawaii—a contribution that was estimated to drop by

---

[39] *See* June 2020 MPI Estimates.

[40] *See* USCIS March 2020 Estimates.

[41] *See* USCIS March 2020 Quarterly Report.

[42] *See* CAP COVID-19 Report.

$870,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate

predicted that terminating DACA would, over a ten-year period, impact the Hawaii economy

$126 million in budgetary costs and $451.5 million economic costs. *See* Ex. 4, Table 1 (Decl.

Brannon). DACA recipients currently contribute an estimated $3.1 million annually in state and

local taxes in Hawaii.[43]

## PLAINTIFF STATE OF ILLINOIS

179.    The State of Illinois is home to an estimated 67,000 or more DACA-eligible

residents.[44] Approximately 33,940 DACA recipients live in Illinois.[45]

180.    As of March 31, 2020, USCIS reported that it had approved 45,002 initial DACA

applications and 97,003 renewals for residents of Illinois.[46]

181.    Obtaining DACA status has allowed these individuals, many of whom are long-

term residents of Illinois, to work legally, open bank accounts, access lines of credit, purchase

homes and cars, receive in-state tuition at public universities, and obtain employer-based health

insurance, among other benefits.

182.    As of October 4, 2017, an estimated 38,879 Illinois DACA grantees were

employed. *See* Ex. 5 ¶ 48 (Decl. Wong). An estimated 2,297 were business owners. *Id.* An

estimated 19,099 were in school, and 13,656 were pursuing a bachelor's degree or higher. *Id.* ¶

49.

---

[43] *See* CAP Demographic and Economic Impacts Report.

[44] *See* June 2020 MPI Estimates.

[45] *See* USCIS March 2020 Estimates.

[46] *See* USCIS March 2020 Quarterly Report.

183.    An estimated 11,400 DACA recipients in Illinois are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[47]

184.    In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Illinois economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $131 million annually in state and local taxes in Illinois—a contribution that was estimated to drop by $54.7 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, cost the Illinois economy $1.9 billion in lost tax revenue and $6.9 billion overall. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $209.5 million annually in state and local taxes in Illinois.[48]

## PLAINTIFF STATE OF IOWA

185.    The State of Iowa is home to an estimated 4,000 or more DACA-eligible residents.[49] Approximately 2,420 DACA recipients live in Iowa.[50]

186.    As of March 31, 2020, USCIS reported that it had approved 2,920 initial DACA applications and 7,054 renewals for residents of Iowa.[51]

---

[47] *See* CAP COVID-19 Report.

[48] *See* CAP Demographic and Economic Impacts Report.

[49] *See* June 2020 MPI Estimates.

[50] *See* USCIS March 2020 Estimates.

[51] *See* USCIS March 2020 Quarterly Report.

187.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Iowa, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

188.     As of October 4, 2017, an estimated 2,570 Iowa DACA grantees were employed. *See* Ex. 5 ¶ 52 (Decl. Wong). An estimated 152 were business owners. *Id.* An estimated 1,263 were in school, and 903 were pursuing a bachelor's degree or higher. *Id*. ¶ 53.

189.     An estimated 1,100 DACA recipients in Iowa are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[52]

190.     In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Iowa economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $6.8 million annually in state and local taxes in Iowa—a contribution that was estimated to drop by $3.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the Iowa economy with $258 million in budgetary costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). Yet another estimate predicted that the state's GDP would contract by $55.83 million if DACA is terminated. *See* Ex. 85 ¶ 9 (Decl. Swenson, Iowa St. University). DACA recipients currently contribute an estimated $11.1 million annually in state and local taxes in Iowa.[53]

---

[52] *See* CAP COVID-19 Report.

[53] *See* CAP Demographic and Economic Impacts Report.

## PLAINTIFF STATE OF NEW MEXICO

191.    The State of New Mexico is home to an estimated 8,000 or more DACA-eligible residents.[54] Approximately 5,690 DACA recipients live in New Mexico.[55]

192.    As of March 31, 2020, USCIS reported that it had approved 7,616 initial DACA applications and 14,994 renewals for residents of New Mexico.[56]

193.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of New Mexico, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

194.    As of October 4, 2017, an estimated 6,250 New Mexico DACA grantees were employed. *See* Ex. 5 ¶ 60 (Decl. Wong). An estimated 369 were business owners. *Id.* An estimated 3,070 were in school, and 2,195 were pursuing a bachelor's degree or higher. *Id.* ¶ 61.

195.    An estimated 1,900 DACA recipients in New Mexico are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[57]

196.    In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the New Mexico economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 2017, DACA-eligible residents contributed approximately $18.8 million

---

[54] *See* June 2020 MPI Estimates.

[55] *See* USCIS March 2020 Estimates.

[56] *See* USCIS March 2020 Quarterly Report.

[57] *See* CAP COVID-19 Report.

annually in state and local taxes in New Mexico—a contribution that was estimated to drop by $7.5 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the New Mexico economy with $258 million in budget costs and $924.5 million in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $18.6 million annually in state and local taxes in New Mexico.[58]

## PLAINTIFF STATE OF NORTH CAROLINA

197.    The State of North Carolina is home to an estimated 38,000 or more DACA-eligible residents.[59] Approximately 24,050 DACA recipients live in North Carolina.[60]

198.    As of March 31, 2020, USCIS reported that it had approved 29,665 initial DACA applications and 67,232 renewals for residents of North Carolina.[61]

199.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of North Carolina, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

200.    As of October 4, 2017, an estimated 24,094 North Carolina DACA grantees were employed. *See* Ex. 5 ¶ 68 (Decl. Wong). An estimated 1,483 were business owners. *Id.* An estimated 12,327 were in school, and 8,814 were pursuing a bachelor's degree or higher. *Id.* ¶ 69.

---

[58] *See* CAP Demographic and Economic Impacts Report.

[59] *See* June 2020 MPI Estimates.

[60] *See* USCIS March 2020 Estimates.

[61] *See* USCIS March 2020 Quarterly Report.

201.     An estimated 7,600 DACA recipients in North Carolina are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[62]

202.     In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the North Carolina economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $63.6 million annually in state and local taxes in North Carolina—a contribution that was estimated to drop by $29 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the North Carolina economy with $2.1 billion in budgetary costs and $7.8 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $80.3 million annually in state and local taxes in North Carolina.[63]

### PLAINTIFF STATE OF OREGON

203.     The State of Oregon is home to an estimated 14,000 or more DACA-eligible residents.[64] Approximately 9,710 DACA recipients live in Oregon.[65]

204.     As of March 31, 2020, USCIS reported that it had approved 12,060 initial DACA applications and 27,595 renewals for residents of Oregon.[66]

---

[62] *See* CAP COVID-19 Report.

[63] *See* CAP Demographic and Economic Impacts Report.

[64] *See* June 2020 MPI Estimates.

[65] *See* USCIS March 2020 Estimates.

[66] *See* USCIS March 2020 Quarterly Report.

205.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Oregon, to work legally, acquire driver's licenses, open bank accounts, access lines of credit, purchase homes and cars, have more ready access to in-state tuition, and obtain employer-based health insurance, among other benefits.

206.    As of October 4, 2017, an estimated 10,347 Oregon DACA grantees were employed. *See* Ex. 5 ¶ 72 (Decl. Wong). An estimated 611 were business owners. *Id.* An estimated 5,083 were in school, and 3,634 were pursuing a bachelor's degree or higher. *Id.* ¶ 73.

207.    An estimated 4,800 DACA recipients in Oregon are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[67]

208.    The State of Oregon's revenue structure relies heavily on income taxes, including capital gains for investors, wages paid to workers, and corporate taxes that are directly linked to profitability. *See* Ex. 126 ¶ 9 (Decl. Read).

209.    In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Oregon economy generally. Eliminating DACA grantee Oregonians' ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the state and impairment of the state's economic health. See, e.g., Ex. 100 ¶ 6 (Decl. Nicolas). According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $20 million annually in state and local taxes in Oregon—a contribution that was estimated to drop by $11 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the Oregon economy

---

[67] *See* CAP COVID-19 Report.

with $384 million in budgetary costs and $1.3 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $39.9 million annually in state and local taxes in Oregon.[68]

210.    In addition, the inability to work legally and enjoy the other benefits of legal status such as better access to credit and the banking system will make it more difficult, if not impossible, for DACA grantee Oregonians to start businesses that contribute to the State's economy and overall financial health. *See* Ex. 126 ¶ 12 (Decl. Read).

211.    In addition to the direct benefits to state programs of increased state revenues, the State is also an investor and a borrower. *See* Ex. 126 ¶¶ 5-9 (Decl. Read). The State's credit rating, cost of borrowing, and the performance of the State's investments are all tied to the overall economic health of the State. *See* Ex. 126 ¶ 9 (Decl. Read). A reduced state tax base, and potential downward pressure on corporate performance, has the potential to adversely affect these interests as well. Many of the companies in which Oregon and Oregonians have holdings have expressed concern that the rescission of the DACA program is a threat and will be disruptive to their employees, their productivity, and their competitiveness. Any such disruption or downward pressure on corporate profits also potentially affects Oregon as a taxing entity and a shareholder.

### PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

212.    The Commonwealth of Pennsylvania is home to an estimated 14,000 or more DACA-eligible residents.[69] Approximately 4,480 DACA recipients live in Pennsylvania.[70]

---

[68] *See* CAP Demographic and Economic Impacts Report.

[69] *See* June 2020 MPI Estimates.

[70] *See* USCIS March 2020 Estimates.

213.     As of March 31, 2020, USCIS reported that it had approved 5,669 initial DACA applications and 12,703 renewals for residents of Pennsylvania.[71]

214.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Pennsylvania, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

215.     As of October 4, 2017, an estimated 5,468 Pennsylvania DACA grantees were employed. *See* Ex. 5 ¶ 76 (Decl. Wong). An estimated 323 were business owners. *Id.* An estimated 2,686 were in school, and 1,920 were pursuing a bachelor's degree or higher. *Id.* ¶ 77.

216.     An estimated 1,700 DACA recipients in Pennsylvania are frontline workers in sectors that are essential for the Commonwealth's COVID-19 response: health care, education, and food-related jobs.[72]

217.     In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Pennsylvania economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $20.7 million annually in state and local taxes in Pennsylvania—a contribution that was estimated to drop by $7.5 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, impact the Pennsylvania economy with $258 million in budgetary costs and $924.5 million in economic

---

[71] *See* USCIS March 2020 Quarterly Report.

[72] *See* CAP COVID-19 Report.

costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute an estimated $19.9 million annually in state and local taxes in Pennsylvania.[73]

## PLAINTIFF STATE OF RHODE ISLAND

218.    The State of Rhode Island is home to an estimated 3,000 or more DACA-eligible residents.[74]  Approximately 890 DACA recipients live in Rhode Island.[75]As of March 31, 2020, USCIS reported that it had approved 1,168 initial DACA applications and 2,630 renewals for residents of Rhode Island.[76]

219.    Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Rhode Island, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

220.    As of October 4, 2017, an estimated 1,141 Rhode Island DACA grantees were employed. *See* Ex. 5 ¶ 80 (Decl. Wong). An estimated 560 were in school, and 401 were pursuing a bachelor's degree or higher. *Id.* ¶ 81.

221.    An estimated 200 DACA recipients in Rhode Island are frontline workers in sectors that are essential for the State's COVID-19 response: health care, education, and food-related jobs.[77]

222.    In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Rhode Island economy generally. Stripping DACA grantees of the ability to work legally will cause many to

---

[73] *See* CAP Demographic and Economic Impacts Report.

[74] *See* June 2020 MPI Estimates.

[75] *See* USCIS March 2020 Estimates.

[76] *See* USCIS March 2020 Quarterly Report.

[77] *See* CAP COVID-19 Report.

lose their jobs, resulting, among other things, in less tax revenue for the State. The Rhode Island Office of Management and Budget ("RIOMB") estimates that the termination of DACA could lead to over $1 million in lost state and local income, real estate and vehicle taxes. *See* Ex. 128 ¶ 3 (Decl. Womer, RIOMB). According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $3.8 million annually in state and local taxes in Rhode Island—a contribution that was predicted to drop by $1.2 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). According to the Institute on Taxation and Economic Policy ("ITEP"), the State of Rhode Island alone will lose $2.6 million in state and local taxes if DACA protections are lost. *See* Ex. 54. (Misha Hill and Meg Wiehe, *State and Local Contributions of Young Undocumented Immigrants*, Institute on Taxation and Economic Policy, April 25, 2017). According to the Center for American Progress, Rhode Island will lose over $61 million in annual GDP loss from removing DACA workers. *See id*. DACA recipients currently contribute an estimated $3.9 million annually in state and local taxes in Rhode Island.[78]

### PLAINTIFF STATE OF VERMONT

223. As of October 4, 2017, the State of Vermont was home to an estimated 100 or more DACA-eligible residents. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Approximately 20 DACA recipients live in Vermont.[79]

224. As of March 31, 2020, USCIS reported that it had approved 12 initial DACA applications and 55 renewals for residents of Vermont.[80]

---

[78] *See* CAP Demographic and Economic Impacts Report.

[79] *See* USCIS March 2020 Estimates.

[80] *See* USCIS March 2020 Quarterly Report.

225.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Vermont, to work legally, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits.

226.     As of October 4, 2017, an estimated 37 DACA grantees were employed in Vermont. *See* Ex. 53 (Nicole Prchal Svajlenka, *et al.*, A New Threat to DACA Could Cost States Billions of Dollars, Center for American Progress, July, 21, 2017).

227.     In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Vermont economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. According to one estimate, as of October 4, 2017, DACA-eligible residents contributed approximately $140,000 annually in state and local taxes in Vermont—a contribution that was estimated to drop by $48,000 without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another 2017 estimate predicted that terminating DACA would, over a ten-year period, cost the Vermont economy $2.4 million in Gross Domestic Product. *See* Ex. 53 (Prchal Svajlenka, *et. al.*, *A New Threat to DACA*).

### PLAINTIFF COMMONWEALTH OF VIRGINIA

228.     The Commonwealth of Virginia is home to an estimated 27,000 or more DACA-eligible residents.[81] Approximately 9,410 DACA recipients live in Virginia.[82]

229.     As of March 31, 2020, USCIS reported that it had approved 12,368 initial DACA applications and 27,411 renewals for residents of Virginia.[83]

---

[81] *See* June 2020 MPI Estimates.

[82] *See* USCIS March 2020 Estimates.

[83] *See* USCIS March 2020 Quarterly Report.

230.     Obtaining DACA status has allowed these individuals, many of whom are long-term residents of Virginia, to work legally, open bank accounts, access lines of credit, purchase homes and cars, receive in-state tuition at public universities, and obtain employer-based health insurance, among other benefits.

231.     As of October 4, 2017, an estimated 11,195 Virginia DACA grantees were employed. *See* Ex. 5 ¶ 84 (Decl. Wong). An estimated 661 were business owners. *Id.* An estimated 5,499 were in school, and 3,932 currently were pursuing a bachelor's degree or higher. *Id.* ¶ 85.

232.     An estimated 2,700 DACA recipients in Virginia are frontline workers in sectors that are essential for the Commonwealth's COVID-19 response: health care, education, and food-related jobs.[84]

233.     In addition to the many harms identified below, *see* ¶¶ 234-279, terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will hurt the Virginia economy generally. Stripping DACA grantees of the ability to work legally will cause many to lose their jobs, resulting, among other things, in less tax revenue for the State. As of October 4, 2017, DACA-eligible residents contributed approximately $34.7 million annually in state and local taxes in Virginia—a contribution that was estimated to drop by $12.7 million without DACA. *See* Ex. 3 ¶ 7 (Decl. Essig, Wiehe and Hill). Another estimate suggests that terminating DACA would, over a ten-year period, impact the Virginia economy with $1 billion in budgetary costs and $3.6 billion in economic costs. *See* Ex. 4, Table 1 (Decl. Brannon). DACA recipients currently contribute approximately $48.7 million annually in state and local taxes in Virginia.[85]

---

[84] *See* CAP COVID-19 Report.

[85] *See* CAP Demographic and Economic Impacts Report.

## HARM TO PLAINTIFF STATES BY CATEGORY

### *Diversity, Inclusion, and Constitutional Values.*

234.    The States have an interest in prohibiting the deprivation of life, liberty or property without due process, and in preventing any practice that denies equal protection of the laws or otherwise discriminates on the basis of race, color, or national origin. For example:

a.    New York's Constitution guarantees all persons the right to equal treatment under the law and forbids discrimination based on race, color, creed or religion. N.Y. Const. art. I, § 11. And New York's statutes reiterate the State's strong interest in combatting discrimination and prejudice. *See* N.Y. Exec. Law § 290.

b.    Washington has declared that practices that discriminate against any of its inhabitants because of race, color, or national origin are matters of public concern that threaten the rights and proper privileges of the State and harm the public welfare, health, and peace of the people. *See* Wash. Rev. Code 49.60.010.

c.    Colorado welcomes people of all backgrounds. Colorado law prohibits unlawful discrimination against people based on, among other things, race, national origin, and ancestry. *See* C.R.S. § 24-34-601; C.R.S. § 24-34-402; C.R.S. § 24-34-502.

d.    The State of Connecticut has a strong public policy mandating inclusion, and state law forbids discrimination in education, employment, and public accommodations, and other public goods and rights based on race, national origin, and ancestry. *See* Conn. Gen. Stat. §§ 46a-60 (employment); 46a-64 (public accommodations); 10-15c (public education); 46a-75 (other educational and vocational programs).

59

e.  The Illinois Human Rights Act, 775 ILCS 5/1 *et seq.*, establishes a public policy "to secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her … national origin." *See* 775 ILCS 5/1-102(A). It further establishes a public policy "to prevent discrimination based on citizenship status in employment." *See* 775 ILCS 5/1-102(C).

f.  Delaware law broadly prohibits discrimination in multiple areas, including public accommodations, insurance, and employment. *See* Del. Code. Ann. tit. 6, § 4500-4516; Del. Code. Ann. tit. 18, § 2304(22); Del. Code. Ann. tit. 19, § 711. The Delaware Equal Accommodations Law "is intended to prevent, in places of public accommodations, practices of discrimination against any person" on numerous bases, including race, color, or national origin. *See* Del. Code. Ann. tit. 6, § 4501. The law is to be "liberally construed to the end that the rights herein provided for all people. . . may be effectively safeguarded." *Id.*

g.  The Council of the District of Columbia enacted the District's Human Rights Act "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit," including discrimination based on national origin. *See* D.C. Code Ann. § 2-1401.01. The District's Human Rights Act prohibits discrimination in a broad range of areas including employment, education, places of public accommodation, public services, housing and commercial space accommodations, the sale of motor vehicle insurance and the rental of motor vehicles.

h.  Through a long tradition of including and incorporating foreign-born persons into its institutions, businesses, and governments, New Mexico has become one of the

60

most socially and politically diverse states. New Mexico enshrined in its state constitution three provisions protecting the Spanish language and those who speak it. *See* N.M. Const. art. VII, § 3 (stating that "[t]he right of any citizen of the state to vote, hold office or sit upon juries shall never be restricted, abridged or impaired on account of . . . language . . . or inability to speak, read or write the English or Spanish languages except as otherwise provided in this constitution"); N.M. Const. art. XII, § 8 (requiring teachers to become proficient in English and Spanish); and N.M. Const. art. XII. § 10 (guaranteeing that "[c]hildren of Spanish descent in the state of New Mexico shall never be denied the right and privilege of admission and attendance in the public schools or other public educational institutions of the state, and they shall never be classed in separate schools, but shall forever enjoy perfect equality with other children in all public schools and educational institutions of the state").

i.  Oregon has codified its state policy that practices of unlawful discrimination against any of its inhabitants because of religion or national origin are "a matter of state concern," and that such discrimination "menaces the institutions and foundation of a free democratic state." *See* ORS § 659A.006.

j.  Pennsylvania's laws reflect its commitment to values of diversity, multiculturalism and openness to others of different races and nationalities. For example, Pennsylvania's Human Relations Act recognizes that an individual's opportunity to obtain employment, public accommodation, housing accommodation and commercial property without discrimination on the basis of "race, color, familial status … ancestry [and] national origin" is a "civil right" that

61

is "enforceable" under Pennsylvania law. *See* 43 P.S. § 953. *See also* 43 P.S. § 955.

k.   In keeping with its history of freedom of conscience, equality and tolerance, Rhode Island has prohibited practices that discriminate against any of its inhabitants because of race, color, or national origin. *See* R.I. Constitution Article 1, section 2; R.I. Gen. Laws 12-19-38 (Hate Crimes Sentencing Act); R.I. Gen. Laws § 42-112-1 (The Civil Rights Act of 1990); R.I. Gen. Laws 28-5-1 (Fair Employment Practices Act); R.I. Gen. Laws 34-37-1 (Fair Housing Practices Act).

235.   The States also have an interest in ensuring that their residents are not excluded from the benefits that flow from participation in the federal system, including the rights and privileges provided by the U.S. Constitution and federal law.

***Harm to States as Employers.***

236.   The States have an interest in maintaining qualified, trained workforces.

237.   Terminating DACA or failing to restore DACA to its pre-September 5, 2017 status will cause the States to lose qualified State employees. Many DACA recipients work in government or at state-run institutions, and they were hired because of their specialized skills and qualifications. The States expended time and funds to hire, train, and manage DACA recipients. If these individuals become ineligible to work, the States will lose the value of their investment and the services of employees who perform important functions for the States. They will also incur the costs associated with the need to recruit, hire, and train replacements. *See, e.g.*, Ex. 52 ¶ 8 (Decl. Mostofi, NYC Mayor's Office of Immigrant Affairs); Ex. 56 ¶¶ 2-4 (Decl. Quinonez); Ex. 70 ¶ 6 (Decl. I.V.); Ex. 61 ¶ 10 (Decl. Heatwole, UMass); Ex. 62 ¶ 3 (Decl.

Monroe, Wash. Dept. of Ecology); Ex. 65 ¶ 3 (Decl. Kaplan, WA Dept. of Social and Health

Svcs.); Ex. 92 ¶ 3 (Decl. Jones, Wash. Treasury); Ex. 91 ¶ 3 (Decl. Garza, Big Bend Community

College); Ex. 64 ¶ 3 (Decl. Glatt, Columbia Basin College); Ex. 58 ¶ 4 (Decl. Loera, Wash. State

Univ.); Ex. 130 ¶ 3 (Decl. Conly, WA Dept. of Veterans Affairs); Ex. 113 ¶ 3 (Decl. Schuh, City

of Anacortes, WA); Ex. 157 ¶ 9-10 (Decl. Ridder, Portland State Univ.); Ex. 154 ¶ 11 (Decl.

Cuprill-Comas, Oregon Health and Science Univ.); Ex. 153 ¶¶ 6, 9 (Decl. Karpilo, Eastern

Oregon Univ.); Ex. 156 ¶¶ 9-10 (Decl. Mitsui, Portland Community College); Ex. 167 ¶¶ 3-6

(Decl. Reveley, College of William & Mary); Ex. 134 ¶¶ 31, 37 (Decl. Herbst, Univ. of Conn.);

Ex. 124 ¶¶ 4, 11 (Decl. Salaveria, Hawaii Dept. of Business, Economic Development and

Tourism); Ex. 168 ¶¶ 3-7 (Decl. Cabrera, George Mason Univ.).

***Harm to State Colleges and Universities.***

238.     The States have an interest in the special contributions that DACA grantees make

to State colleges and universities as students, employees, and alumni.

239.     Terminating DACA or failing to restore DACA to its pre-September 5, 2017

status will harm the ability of the States' colleges and universities, including public universities,

to satisfy their educational missions and prepare the States' residents for the workforce. *See* Ex.

61 ¶¶ 5-7 (Decl. Heatwole); Ex. 146 ¶¶ 12-13 (Decl. Clark *et al.,* Mass. State Univ. Pres.); Ex.

134 ¶¶ 15-38 (Decl. Herbst); Ex. 133 ¶¶ 15-24 (Decl. Pachis, Eastern Conn. State Univ.); Ex.

136 ¶¶ 1, 4 (Decl. Hardwick, Univ. of the District of Columbia); Ex. 166 ¶¶ 4-7 (Decl. Sullivan,

Univ. of Vermont); Ex. 167 ¶¶ 5-6 (Decl. Reveley); Ex. 137 ¶¶ 4-10 (Decl. Straney, Univ. of

Hawaii); Ex. 131 ¶¶ 4-9 (Decl. Miranda, Colorado State Univ.); Ex. 132 ¶¶ 3-10 (Decl. Allen,

Univ. of Colorado); Ex. 135 ¶¶ 3-14 (Decl. Rakes, Delaware Tech. Community College); Ex.

152 ¶¶ 10-11, 21 (Decl. Mathewson & Pareja, Univ. of New Mexico School of Law); Ex. 149

(New Mexico Council of Univ. Presidents Letter); Ex. 157 ¶ 6 (Decl. Ridder); Ex 159 ¶ 5 (Decl.

Galvan, Univ. of Oregon); Ex. 155 ¶ 5 (Decl. Alexander, Oregon State Univ.); Ex. 154 ¶¶ 7, 10

(Decl. Cuprill-Comas); Ex. 153 ¶ 7 (Decl. Karpilo); Ex. 160 ¶¶ 7-8 (Decl. Hagemann, Western

Oregon Univ.); Ex. 158 ¶ 6 (Decl. Trueblood-Gamble, Southern Oregon Univ.); Ex. 168 ¶¶ 3-7

(Decl. Cabrera); Ex. 86 ¶¶ 7-9 (Decl. Wadhia, Penn. St. University); Ex. 142 ¶¶ 4-5 (Decl.

Edgehill-Walden, Northern Illinois Univ.); Ex. 145 ¶ 15 (Decl. Kennedy, Mass. Community

Colleges' Presidents' Council).

240.    DACA has made it possible for many young people to attend colleges and

universities in the States, as work authorization allows DACA grantees to work both while they

pursue their education and after graduation. More than 90 percent of DACA grantees report that

DACA allowed them to pursue educational opportunities previously unavailable to them. *See* Ex.

5 ¶ 18 (Decl. Wong).  For example:

    a.   The University of Colorado estimates that there are over 200 DACA grantees

        enrolled across the University. Ex. 132 ¶ 5 (Decl. Allen). Colorado State

        University has approximately 189 DACA grantees. Ex. 131 ¶ 8 (Decl. Miranda).

    b.   Connecticut's state and private colleges and universities welcome DACA

        grantees. To cite just one instances: Eastern Connecticut State University is home

        to 205 DACA recipient from across the country, as part of a scholarship program

        that enables undocumented students from "locked out" states, or states that do not

        allow undocumented students to attend public college, to pursue a college

        education.[86]

---

[86] *See* Press Release, *Eastern Hosts Press Conference in Support of DACA* (Nov. 13, 2019),
https://www.easternct.edu/news/_stories-and-releases/2019/11-november/eastern-hosts-press-conference-in-support-of-daca.html.

c.  Delaware Technical and Community College ("DTCC") has at least 148 DACA students and at least another 242 graduates who are DACA grantees. *See* Ex. 135 ¶ 5 (Decl. Rakes). Many of DTCC's DACA students are nontraditional learners who support their families in addition to pursuing their education. *Id.* ¶ 8. Another approximate 75 DACA grantees currently attend Delaware State University ("DSU"). *See* Ex. 66 (Scott Gross, *DSU immigrant students fear Trump's DACA decision*, Delawareonline, Sept. 2, 2017). During the 2019-2020 school year, there were about 150 DACA grantees enrolled at DSU.[87]

d.  As of September 2017, there were 16 students who had reported their DACA status to the University of Hawaii and who were pursuing various degrees at multiple University campuses. Ex. 137 ¶ 6 (Decl. Straney). As of Spring 2020, the University of Hawaii had 17 DACA students.

e.  In the University of Illinois System, approximately 350 of its students and 100 of its employees would be affected by the termination of DACA. Ex. 143 ¶ 8 (Decl. Wilson, Univ. of Illinois System).

f.  In New York, both the State University of New York ("SUNY") and the City University of New York ("CUNY") have encouraged DACA grantees to apply as part of their strong commitment to diversity, equity, and inclusion. *See* Ex. 12 ¶ 10 (Decl. Milliken, CUNY); Ex. 99 (Decl. Johnson, SUNY). At CUNY, hundreds of DACA grantees have enrolled in the university, many with the benefit of full scholarships. *See* Ex. 12 ¶ 6 (Decl. Milliken); Ex. 171 ¶8 (Decl. Park).

---

[87] Delaware State University, *1st Dreamer Class Graduates* (May 16, 2020), https://www.desu.edu/news/2020/05/1st-dreamer-class-graduates.

g.  Many of Oregon's public colleges and universities, including Portland State University, the University of Oregon, Oregon State University, Oregon Health and Science University, Eastern Oregon University, Western Oregon University, Southern Oregon University and Portland Community College enroll, and in some cases employ, DACA grantees. *See* Ex. 157 ¶ 4 (Decl. Ridder); Ex. 159 ¶ 5 (Decl. Galvan); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 154 ¶ 5 (Decl. Cuprill-Comas); Ex. 153 ¶¶ 5-6 (Decl. Karpilo); Ex. 160 ¶¶ 6-7 (Decl. Hagemann); Ex. 158 ¶¶ 4-5 (Decl. Trueblood-Gamble); Ex. 156 ¶¶ 6, 9 (Decl. Mitsui); Ex. 94 ¶¶ 5-8 8 (Decl. Ramirez Cuevas); Ex. 101 ¶¶ 1, 3 (Decl. Preciado).

h.  Many institutions of higher education in Virginia have students presently enrolled in their educational programs who are DACA grantees. According to the State Council of Higher Education for Virginia ("SCHEV"), the Commonwealth's coordinating body for higher education, there are more than 1,300 DACA students in Virginia attending institutions of higher education. *See* Ex. 127 ¶¶ 4 (Decl. Blake, SCHEV).

i.  According to the Washington Student Achievement Council ("WSAC"), the state agency that advances educational opportunities in Washington, there are more than 1,400 DACA students in Washington attending institutions of higher education. *See* Ex. 59 ¶ 9 (Decl. Thompson, WSAC). More than one hundred DACA grantees attend the University of Washington, based in Seattle. *See* Ex. 57 ¶ 4 (Decl. Ballinger, Univ. of Wash.). More than 150 DACA grantees attend Washington State University, based in Pullman. *See* Ex. 58 ¶ 4 (Decl. Loera, Wash. State Univ.).

j.    Many public colleges and universities in the States have diverse student populations, including a high percentage of Latino/Hispanic students and students who are first generation Americans and first in their families to attend college, as well as undocumented students. *See, e.g.*, Ex. 162 (Letter from Meghan Hughes, Community College of Rhode Island); Ex. 150 ¶ 7 (Decl. Abdallah, University of New Mexico). Although many such schools do not keep data on immigration status, they know that they have DACA grantees as alumni and current students. *See* Ex. 163 (Letter from Frank Sánchez, Rhode Island College President); Ex. 164 ¶ 6 (Decl. Farish, Roger Williams University); Ex. 161 (Letter from Richard M. Locke, Brown University Provost); Ex. 86 ¶ 6 (Decl. Wadhia); Ex. 146 ¶ 9 (Decl. Clark et al.).

241.    DACA grantees who are residents of Connecticut, Delaware, District of Columbia, Hawaii, Illinois, New Mexico, Massachusetts, Virginia, or Washington receive in-state tuition at public universities within their state of residence and/or are eligible for other financial assistance. *See* C.R.S. § 23-7-110; Ex. 132 ¶ 4 (Decl. Allen); 110 ILCS 305/7e-5; Ex. 131 ¶ 7 (Decl. Miranda); Ex. 134 ¶ 8 (Decl. Herbst); Ex. 7 (Mass. Dept. of Higher Education Memorandum, *Residency Status for Tuition Classification Purposes – Deferred Action for Childhood Arrivals*, Nov. 21, 2012); Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 146 ¶ 7 (Decl. Clark et al.); Ex. 133 ¶¶ 8-12 (Decl. Pachis); Conn. Gen. Stat. § 10a-29; Ex. 135 ¶¶ 11-12 (Decl. Rakes); Ex. 136 ¶ 10 (Decl. Hardwick); Ex. 150 ¶ 12 (Decl. Abdallah); Or. Rev. Stat. § 352.287; Ex. 167 ¶ 4 (Decl. Reveley); Ex. 106 ¶ 5 (Decl. Suria); Ex. 137 ¶ 5 (Decl. Straney); Ex. 157 ¶ 4 (Decl. Ridder); Ex. 94 ¶ 7 (Decl. Ramirez Cuevas).

242.     If the DACA program is terminated or not restored to its pre-September 5, 2017 status, talented young immigrants will be less likely to apply to and attend State schools because they will not be able to afford tuition given the loss of available financial assistance (in some of the States) and the likelihood that they will not be able to work legally upon graduation (in all the States). Those already enrolled will be less likely to finish their education at State schools due to the loss of current and future earning potential. *See* Ex. 12 ¶ 7-8 (Decl. Milliken); Ex. 56 ¶ 7 (Decl. Quinonez); Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 146 ¶¶ 8, 12 (Decl. Clark *et al.*); Ex. 72 ¶ 5 (Decl. Teodoro); Ex. 132 ¶ 7 (Decl. Allen); Ex. 131 ¶ 8 (Decl. Miranda); Ex. 136 ¶ 6 (Decl. Hardwick); Ex. 69 ¶¶ 8, 10 (Decl. Mendes); Ex. 60 ¶¶ 6, 9 (Decl. Guevara); Ex. 145 ¶ 8 (Decl. Kennedy); Ex. 135 ¶¶ 7-10 (Decl. Rakes); Ex. 139 ¶ 6 (Decl. Dietz, Illinois State Univ.); Ex. 143 ¶ 8 (Decl. Wilson); Ex. 106 ¶ 7 (Decl. Suria); Ex. 105 ¶ 5 (Decl. Oduyoye); Ex. 134 ¶¶ 16-17 (Decl. Herbst); Ex. 137 ¶ 7 (Decl. Straney); Ex. 152 ¶¶ 18-20 (Decl. Mathewson & Pareja); Ex. 101 ¶ 4 (Decl. Preciado); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 168 ¶ 6 (Decl. Cabrera); Ex. 160 ¶¶ 7-8 (Decl. Hagemann); Ex. 153 ¶¶ 7-8 (Decl. Karpilo); Ex. 95 ¶ 8 (Decl. Solano); Ex. 157 ¶¶ 6-7 (Decl. Ridder); Ex. 159 ¶¶ 5-6 (Decl. Galvan);  Ex. 158 ¶¶ 6, 8, 11 (Decl. Trueblood-Gamble); Ex. 154 ¶¶ 7-10 (Decl. Cuprill-Comas); Ex. 133 ¶ 13 (Decl. Pachis); Ex. 57 ¶ 4 (Decl. Ballinger); Ex. 58 ¶ 5 (Decl. Loera); Ex. 163 (Sánchez Letter, Rhode Island College); Ex. 165 ¶ 4 (Decl. Linde, Rhode Island College); Ex. 166 ¶ 6 (Decl. Sullivan); Ex. 167 ¶¶ 4-5 (Decl. Reveley); Ex. 164 ¶ 7 (Decl. Farish); Ex. 171 ¶¶7-9 (Decl. Park).

243.     Additionally, DACA students enrolled in programs that require employment authorization or entail licensing requirements to complete elements of the program—such as paid internships, clinical placement, residency training, or programs that require significant lab or field work—will be severely and adversely impacted if DACA is terminated or not restored to its

pre-September 5, 2017 status. Indeed, these students may not be able to complete the academic requirements of their degrees. *See, e.g.*, Ex. 12 ¶ 8 (Decl. Milliken); Ex. 61 ¶ 6 (Decl. Heatwole); Ex. 135 ¶ 9 (Decl. Rakes); Ex. 136 ¶ 7 (Decl. Hardwick); Ex. 166 ¶¶ 6-7 (Decl. Sullivan); Ex. 134 ¶ 33 (Decl. Herbst); Ex. 132 ¶ 7 (Decl. Allen); Ex. 131 ¶ 8 (Decl. Miranda); Ex. 152 ¶ 19 (Decl. Mathewson & Pareja); Ex. 145 ¶ 9 (Decl. Kennedy); Ex 6 ¶¶ 13-15 (Decl. C. Andrade).

244.     DACA students in graduate programs at public universities in the States will be significantly affected by the termination of the DACA program or failure to restore it to its pre-September 5, 2017 status because the loss of employment authorization needed for graduate assistantship (research or teaching) will likely mean the loss of tuition waivers and other benefits such as subsidized health, dental, and vision insurance for the students and their families. The loss of graduate assistants also is a significant harm to the States because of the services they provide in assisting faculty and instructing students. *See* Ex. 61 ¶ 5 (Decl. Heatwole); Ex. 134 ¶¶ 31-32 (Decl. Herbst).

245.     Losing these talented young immigrants will deprive the States' schools of the special and unique contributions and perspectives they bring to campus communities, both as students and alumni. *See, e.g.*, Ex. 57 ¶¶ 4-6 (Decl. Ballinger); Ex. 58 ¶¶ 4-8 (Decl. Loera); Ex. 61 ¶ 7 (Decl. Heatwole); Ex. 132 ¶¶ 6-7 (Decl. Allen);  Ex. 131 ¶ 9 (Decl. Miranda); Ex. 134 ¶¶ 19-26, 36-38 (Decl. Herbst); Ex. 133 ¶¶ 23-24 (Decl. Pachis); Ex. 135 ¶¶ 3, 13 (Decl. Rakes); Ex. 137 ¶¶ 7-8, 10 (Decl. Straney); Ex. 139 ¶¶ 3, 4, 7 (Decl. Dietz); Ex. 152 ¶¶ 10, 18, 21 (Decl. Mathewson & Pareja); Ex. 157 ¶ 11 (Decl. Ridder); Ex. 159 ¶¶ 8-9 (Decl. Galvan); Ex. 155 ¶¶ 6, 8 (Decl. Alexander); Ex. 154 ¶ 7 (Decl. Cuprill-Comas); Ex. 153 ¶ 10 (Decl. Karpilo); Ex. 160 ¶ 5 (Decl. Hagemann); Ex. 158 ¶ 9 (Decl. Trueblood-Gamble); Ex. 163 (Sánchez Letter); Ex. 165

¶ 4 (Decl. Linde); Ex. 166 ¶¶ 6-7 (Decl. Sullivan); Ex. 167 ¶¶ 4-5 (Decl. Reveley); Ex. 136 ¶ 8 (Decl. Hardwick); Ex. 145 ¶¶ 10-11 (Decl. Kennedy).

246.    The States' public universities and colleges will also suffer direct financial harm, including lost tuition revenue and scholarship funds, if DACA students are forced to withdraw or are unable to enroll. *See, e.g.*, Ex. 57 ¶¶ 4-6 (Decl. Ballinger); Ex. 58 ¶¶ 4-8 (Decl. Loera,); Ex. 61 ¶ 7 (Decl. Heatwole); Ex. 134 ¶¶ 27-28 (Decl. Herbst); Ex. 133 ¶¶ 17-18 (Decl. Pachis); Ex. 136 ¶ 8 (Decl. Hardwick); Ex. 137 ¶ 9 (Decl. Straney); Ex. 157 ¶¶ 6-7 (Decl. Ridder); Ex. 159 ¶ 5 (Decl. Galvan); Ex. 155 ¶ 5 (Decl. Alexander); Ex. 154 ¶ 8 (Decl. Cuprill-Comas); Ex. 153 ¶¶ 7-8 (Decl. Karpilo); Ex. 160 ¶¶ 6-8 (Decl. Hagemann); Ex. 158 ¶ 6 (Decl. Trueblood-Gamble); Ex. 163 (Sánchez Letter); Ex. 164 ¶ 9 (Decl. Farish); Ex. 132 ¶ 10 (Decl. Allen); Ex. 131 ¶ 9 (Decl. Miranda); Ex. 145 ¶¶ 10-14 (Decl. Kennedy). In at least one state (Oregon), current demographic and enrollment trends and other factors suggest that this lost revenue will not be replaced by other students for many universities, and will represent an absolute loss of revenue. *See* Ex. 160 ¶ 8 (Decl. Hagemann); Ex. 158 ¶ 7 (Decl. Trueblood-Gamble); Ex. 157 ¶ 7 (Decl. Ridder).

247.    The termination of DACA or failure to return DACA to its-pre-September 5, 2017 status also will impose additional tangible costs on our public colleges and universities, which already have experienced disruption as a result of uncertainty over the future of the program and are preparing for the likelihood of expending additional resources to address the detrimental effects of DACA termination. *See, e.g.*, Ex. 61 ¶¶ 8-9 (Decl. Heatwole); Ex. 134 ¶¶ 35, 38 (Decl. Herbst); Ex. 136 ¶¶ 8-9 (Decl. Hardwick); Ex. 157 ¶ 12 (Decl. Ridder); Ex. 155 ¶ 7 (Decl. Alexander); Ex. 153 ¶ 11 (Decl. Karpilo); Ex. 160 ¶ 9 (Decl. Hagemann); Ex. 158 ¶¶ 10, 12 (Decl. Trueblood-Gamble); Ex. 132 ¶ 9 (Decl. Allen); Ex. 167 ¶ 6 (Decl. Reveley).

248.     The termination of DACA or failure to return DACA to its-pre-September 5, 2017 status will further deprive the States of the earning potential of graduates from public colleges and universities who are most likely to stay in-State and join the States' workforces. *See, e.g.*, Ex. 132 ¶ 9 (Decl. Allen). For example:

   a.  Nine out of ten Massachusetts public higher education graduates remain in the State, working or pursuing further education. *See* Ex. 93 (Mass. Dept. of Higher Education, *Time to Lead, The Need for Excellence in Public Higher Education*, Sept. 2012).

   b.  The majority of Iowa public higher education graduates remain in Iowa, working or pursuing further education. *See* Ex. 67 at 26 (The University of Iowa Pomerantz Career Center, 2015-2016 Annual Report); Ex. 68 (Iowa State University 6-Month Post Graduation Status, 2014-2015; Ex. 73 at 2 (Career Ready, University of Northern Iowa Career Services, 2016).

   c.  Nearly 90 percent of Community College of Rhode Island graduates stay in Rhode Island after graduation to live and raise their families. Ex. 162 (Hughes Letter).

   d.  About 75 percent of Connecticut's public college and university graduates stay in Connecticut to begin their careers.[88] At Eastern Connecticut State University, which hosts a nationwide scholarship program for DACA grantees, the in-state retention rate is even higher: Approximately 85 to 87 percent of Eastern Connecticut State University graduates stay in Connecticut after graduation to

---

[88] *See* Connecticut Business and Industry Association, *Why College Graduates Choose Connecticut* (Jan. 29, 2020), https://www.cbia.com/news/economy/why-college-graduates-choose-connecticut/.

"contribute[] to the growth and vitality of Connecticut's economy." Ex. 133 ¶ 16 (Decl. Pachis).

249.    Terminating DACA will also undermine the investment in and efforts to develop a well-educated workforce that can contribute to the States' overall economies and competitiveness, and the States' ability to meet certain critical workforce needs such as healthcare in rural areas. *See, e.g.*, Ex. 159 ¶ 6 (Decl. Galvan); Ex. 154 ¶¶ 6, 10 (Decl. Cuprill-Comas); Ex. 156 ¶ 11 (Decl. Mitsui). As of October 4, 2017, 100 DACA grantees are medical students and medical resident physicians at schools that are members of the Association of American Medical Colleges, and approximately two-thirds of these DACA grantees are pursuing their medical education in one of the States. *See* Ex. 114 ¶ 4 (Decl. Prescott, Association of American Medical Colleges). Aspiring DACA-grantee physicians contribute to a diverse and culturally responsive workforce to meet the needs of underserved populations. *See id.* ¶¶ 5-6. Terminating DACA or failing to to return DACA to its-pre-September 5, 2017 status will cause the States to lose specific investments that they have made in this workforce and will leave significant gaps in the States' healthcare workforce. *See id.* ¶ 7; Ex. 85 ¶¶ 5-6 (Decl. Swenson). For example:

    a.  In Illinois, DACA grantees have participated in a loan program, through the Illinois Finance Authority, in which students receive interest-free loans so long as they agree to repay the principal and commit to four years of work in an underserved Illinois community following their graduation. Ex. 141 ¶ 6 (Decl. Pelissero & Callahan, Loyola Univ. of Chicago). Without DACA, underserved Illinois communities will lose access to these committed medical professionals. *Id.* ¶ 8.

72

b. Oregon's legislature has established a program to provide scholarships to health professional students who commit to practicing in rural and underserved areas of the state for a period of time following graduation. *See* ORS 348.303.

250. The nation's leading private universities will suffer harms if DACA is terminated or not restored to its pre-September 5, 2017 status. As of October 4, 2017, for example, Harvard University had more than 50 DACA students enrolled. *See* Ex. 96 ¶ 6 (Decl. Madsen, Harvard Univ.). Tufts University had more than 25 DACA students as of that date. *See* Ex. 97 ¶ 8 (Decl. Jeka, Tufts Univ.). Brown University had approximately 12 DACA students as of that date. *See* Ex. 161 (Locke Letter). Roger Williams University, home to Rhode Island's only law school, had at least six DACA students as of that date. *See* Ex. 164 ¶ 6 (Decl. Farish). These students often have had to overcome significant challenges in order to gain acceptance and bring critical perspectives, insights, and experiences to their universities. They make important and lasting contributions, including through their classroom participation, their extracurricular engagements, and their commitment to independent study and research. *See, e.g.*, Ex. 97 ¶ 5 (Decl. Jeka); Ex. 96 ¶¶ 5, 7, 12 (Decl. Madsen); Ex. 144 ¶¶ 4-5 (Decl. Martin, Amherst College); Ex. 147 ¶ 7 (Decl. Stephens, Mount Holyoke College); Ex. 140 ¶¶ 4, 6, 9 (Decl. Jensen, Illinois Wesleyan Univ.); Ex. 141 ¶¶ 4, 5, 6, 7,8 (Decl. Pelissero & Callahan); Ex. 138 ¶¶ 6, 11 (Decl. Salgado, City Colleges of Chicago); Ex. 164 ¶¶ 8-9 (Decl. Farish); Ex. 161 (Locke Letter).

251. Employment authorization gives these students and their universities an assurance that they may put their talents to use in the United States job market after graduation, benefitting the States and the nation as a whole. *See, e.g.*, Ex. 96 ¶¶ 12-15 (Decl. Madsen); Ex. 161 (Locke Letter); Ex. 144 ¶ 9 (Decl. Martin, Amherst); Ex. 147 ¶¶ 8-9 (Decl. Stephens). The New Mexico legislature in January 2020 passed amendments to permit professional licensure eligibility

73

without regard to citizenship status or lawful presence, SB 137, signed March 6, 2020, a measure directly benefitting DACA students. Two of the most effective spokeswomen for the amendments to professional licensure laws were then students themselves—one, a law student now graduated and serving immigrants seeking citizenship status; the other, a medical student now in surgical rotations, whose intent is to serve the immigrant community in public health settings.

252.     DACA has allowed these students to step outside the shadow of their immigration status and to participate fully as members of academic and campus communities in ways that likely would not be possible otherwise. *See, e.g.*, Ex. 140 ¶¶ 7, 8 (Decl. Jensen); Ex. 97 ¶ 7 (Decl. Jeka); Ex. 96 ¶ 12 (Decl. Madsen); Ex. ¶ 7 (Decl. Martin, Amherst). Terminating DACA or failing to restore it to its pre-September 5, 2017 status will take important opportunities away from DACA students and reintroduce fear and uncertainty into their lives, with significant adverse effects on these students, their universities, and the broader community. *See* Ex. 140 ¶¶ 7, 8 (Decl. Jensen); Ex. 97 ¶¶ 8-10 (Decl. Jeka); Ex. 96 ¶ 13 (Decl. Madsen); Ex. 144 ¶ 10 (Decl. Martin, Amherst); Ex. 148 ¶ 6 (Decl. Martin, Northeastern Univ.); Ex. 147 ¶ 10 (Decl. Stephens); Ex. 161 (Locke Letter); Ex. 103 ¶ 8 (Decl. Perla); Ex. 106 ¶ 7 (Decl. Suria); Ex. 105 ¶ 5 (Decl. Oduyoye); Ex. 104 ¶ 7 (Decl. G.L.); Ex. 102 ¶¶ 12-14 (Decl. Juarez); Ex. 152 ¶ 19 (Decl. Mathewson & Pareja); Ex. 151 ¶¶ 14, 16 (Decl. Roth, UNMHSC); Ex. 107 ¶¶ 7-8 (Decl. Torrez).

***Harm to State Law, Regulation, and Policy.***

253.     The States have an interest in preserving their legal, regulatory, and policy frameworks that take the DACA program into account.

74

254. Many of the States have enacted laws, promulgated regulations, and/or established policies that contemplate and rely on the DACA program. If DACA is terminated or not restored to its pre-September 5, 2017 status, these legal, regulatory, and policy regimes will be harmed. For example:

a. Since 2012, Connecticut has granted driver's licenses to approximately 5,000 DACA grantees who are Connecticut residents, many of whom have also purchased and registered vehicles in Connecticut. *See* Ex. 121 ¶¶ 6-7 (Decl. Bzdyra). DACA grantees who have purchased and registered vehicles will have paid Connecticut sales tax and local property taxes for such vehicles. *Id.* ¶¶ 8-9.

b. Illinois has enacted laws to enable DACA grantees to participate in the economy professionally. These include providing that no person in Illinois shall be prohibited from receiving a law license solely because he or she is not a citizen and explicitly allowing DACA grantees to apply for a license to practice law. *See* 705 Ill. Comp. Stat. 205/2. DACA grantees are also eligible to receive state-issued identification cards and drivers' licenses; own motor vehicles which are registered, titled and licensed in the state of Illinois; and own businesses and property in Illinois. *See* Ex. 125 ¶ 6 (Decl. White, Illinois Secretary of State). The Office of the Illinois Secretary of State will be adversely impacted if DACA is terminated by the loss of revenue from licensing fees and taxes, as well as costs and system disruptions related to eligibility determinations of license renewals for DACA recipients. *Id.* ¶ 7. Illinois administrative rules, regulations and laws will also need to be amended to conform to the changes in the DACA program. *Id.*

c. Under DACA, thousands of young Massachusetts and Oregon residents are able to receive social security cards and thereby have access to driver's licenses, which they depend on to attend heath care appointments, to commute to work and school, and to attend to other necessities for themselves and their family members. *See* Ex. 9 (Mass. Registry of Motor Vehicles, *Social Security Number (SSN) Requirements*); ORS 807.021 (proof of legal presence required to issue, renew or replace driver license); Ex. 175 (Attorney General Advisory Letter to Acting Commissioner J. Eric Boyette, Jan.17, 2013); Ex. 101 ¶ 3 (Decl. Preciado); Ex. 71 ¶¶ 5-7, 9 (Decl. I.T.); Ex. 69 ¶¶ 7-8 (Decl. Mendes); Ex. 70 ¶¶ 5, 8 (Decl. I.V.). Terminating DACA will make it impossible for these individuals to apply for new licenses or renew the licenses they have, leading to a number of adverse outcomes, including a decrease in licensing fees paid to the States, a decrease in productivity of these residents, and an increase in unlicensed drivers on the road.

***Harm to Public Health and Health Care Costs.***

255. The States have an interest in protecting the public health and in minimizing health care costs expended by the States.

256. Terminating DACA or failing to restore it to its pre-September 5, 2017 status will harm public health and impose additional health care costs on the States. Work authorization allows DACA grantees to access employer-sponsored health benefits. *See, e.g.*, Ex. 72 ¶ 4 (Decl. Teodoro); Ex. 69 ¶¶ 6, 10 (Decl. Mendes); Ex. 171 ¶18 (Decl. Park); Ex. 172 ¶8 (Decl. Morales); Ex. 110 ¶ 8 (Decl. Schlosberg, District of Columbia Department of Health Care Finance). In fact, more than 50% of DACA grantees have obtained employer-provided insurance. *See* Ex. 5 ¶ 12

(Decl. Wong). Without these benefits, more of the States' residents are likely to forgo needed health care, including preventive care, which will create more costly health problems in the long run. It also will cause more people to rely on state-funded and/or state-administered public health care and other benefits and thus impose additional costs on the States. For example:

a. Colorado provides emergency Medicaid regardless of immigration status, which covers the hospital delivery of children for qualified undocumented immigrants. *See* Ex. 78 at 1-2 (Colorado Department of Health Care Policy and Financing letter dated June 28, 2005).

b. Delaware provides limited emergency and labor/delivery services to residents whose immigration status otherwise keeps them from accessing health care benefits and services. *See* Ex. 122 ¶¶ 6-7 (Decl. Groff).

c. The D.C. HealthCare Alliance is the District of Columbia's state-sponsored insurance program of last resort. *See* Ex. 110 ¶¶ 6, 9 (Decl. Schlosberg); *see also* D.C. Code § 7-771.07(2). The placement of all of the individuals in the District participating in the DACA program in 2017 onto the D.C. HealthCare Alliance would require the District to spend additional money on that program, harm District finances, and prevent the District from spending that money on other public health priorities. *See* Ex. 110 ¶ 10 (Decl. Schlosberg). In fact, the placement of these individuals onto the D.C. HealthCare Alliance could cost the District an additional $283,000 per month in District of Columbia Fiscal Year 2018. *See id.* ¶ 12.

d. Under Hawaii's Prepaid Health Care Act, Haw. Rev. Stat. ch. 393, Hawaii employers are required to provide regular employees who meet wage

requirements with coverage under a qualifying prepaid group health care plan. *See* Haw. Rev. Stat. § 393-11. The termination of DACA will likely cause more people to rely on Hawaii's state-administered Medicaid One-Time Emergency services. Hawaii reimburses hospitals for emergency and urgent services provided to qualifying uninsured Hawaii patients, including undocumented immigrants. Ex. 123 ¶¶ 5-6 (Decl. Peterson, Med-QUEST Division, Hawaii Department of Human Services).

e.   In Massachusetts, DACA grantees who lose employer-based coverage may be eligible for MassHealth, a state-funded health insurance program. *See* Ex. 83 ¶¶ 5-7 (Decl. Caplan, Mass. Executive Office of Health and Human Services). In addition, Massachusetts will very likely have to cover some, if not all, of the costs of health care visits for these individuals through its state-administered Health Safety Net program or other programs. *Id.* ¶¶ 8-9. Finally, some DACA grantees who lose employer-based coverage will likely use providers, like community-based health centers, that are funded in part by grants and other funding streams available through the state. *Id.* ¶¶ 10-14.

257.   The State of New York currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See* Ex. 77 (Office of Health Insurance Program, *Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens*, May 7, 2013). Terminating DACA may reduce access to Medicaid for current DACA grantees. The State of New York currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible

immigrants. *See Id.* Individuals in New York who are not DACA grantees may only qualify for Medicaid coverage of care and services necessary to treat an emergency condition. Terminating DACA will require New York to either seek a State legislative change to maintain current Medicaid coverage formerly DACA-eligible immigrants with state dollars only or limit Medicaid coverage to treatment of emergency conditions for some or all of these individuals.

***Harm to Small Cities, Counties, and Towns.***

258.    The States have an interest in preventing economic and other harm to their small cities, towns, counties, and other small governmental jurisdictions.

259.    Terminating DACA or failing to restore it to its pre-September 5, 2017 status will harm small governmental jurisdictions in the States. If DACA is terminated, small governmental jurisdictions will lose talented and trained employees, adversely affecting operations and costing time, money, and effort to replace and retrain these employees. *See, e.g.*, Ex. 111 ¶¶ 10-11 (Decl. Ambrosino & Bourque, City of Chelsea, MA and Chelsea Public Schools); Ex. 113 ¶¶ 4-6 (Decl. Schuh). Many of these employees are highly skilled workers, including in critical fields such as nursing. *See, e.g.*, Ex. 135 ¶¶ 10, 13 (Decl. Rakes); Ex. 98 ¶ 7, 10-11 (Naveed).

260.    Terminating DACA or failing to restore it to its pre-September 5, 2017 status will have a direct, adverse effect on economies and sales tax revenues of small cities and towns, as DACA grantees will lose their jobs and refrain from buying goods and services from local vendors. *See, e.g.*, Ex. 111 ¶ 16 (Decl. Ambrosino & Bourque); Ex. 176 ¶¶ 8-10, 13 (Decl. Kennedy, City of Newburgh).

261.    DACA grantees average higher earning capacities than their undocumented peers and are able to better participate in the States' economies, for example by purchasing homes and cars that are taxed by our state and local authorities. *See* Ex. 5 ¶ 16 (Decl. Wong). If DACA is

terminated or not restored to its pre-September 5, 2017 status, cities and towns will lose other

local tax revenue, including real estate taxes and motor vehicle excise taxes, from DACA

grantees who can no longer access lines of credit or afford to buy cars or homes.

262.    If DACA is terminated or not restored to its pre-September 5, 2017 status, small

governmental jurisdictions will lose the benefits that full access by and participation of a diverse

community fosters through community activities, including, for example, activities in libraries

and local government-sponsored recreational camps or sports leagues. *See, e.g*, Ex. 109 ¶¶ 5-6

(Decl. Meyer, New Castle County, Del.). The termination of DACA or failure to restore it to its

pre-September 5, 2017 status will also have a destructive effect on local industries of small

governmental jurisdictions that rely on the work of highly qualified and trained DACA

recipients. Ex. 176 ¶¶ 4, 8-10, 13 (Decl. Kennedy, City of Newburgh).

263.    Terminating DACA or failing to restore it to its pre-September 5, 2017 status will

also adversely affect public safety, health, and wellbeing in the States' cities, towns, and schools.

Without DACA status, DACA grantees afraid of deportation will be less likely to report

violence, abuse, crimes or other harms to the community. If DACA is terminated or not restored

to its pre-September 5, 2017 status, 53% of current DACA grantees may be less likely to report a

crime they witnessed; 47% may be less likely to report a crime even if they were the victim; 48%

may be less likely to go to the hospital if they suffered an injury, and 60% may be less likely to

report wage theft by their employer. *See* Ex. 5 ¶ 24 (Decl. Wong). This will make it harder for

local police and other officials to provide for the public safety and welfare. *See, e.g.*, Ex. 111 ¶

15 (Decl. Ambrosino & Bourque); Ex. 108 ¶¶ 7-10 (Decl. Hughes); Ex. 109 ¶ 6 (Decl. Meyer);

Ex. 116 ¶¶ 10-13 (Decl. Graham, Delaware Community Legal Aid Society, Inc.). For example,

since the Trump Administration announced plans to end DACA, Delaware law enforcement and

legal aid have recognized an increased reluctance among Delaware immigrants to engage with aspects of the criminal justice system—even when that interaction would have been to protect their own victim rights. *See, e.g.*, Ex. 108 ¶¶ 7-10 (Decl. Hughes); Ex. 116 ¶¶ 10-13 (Decl. Graham).

***Harm to School Districts, Including Small School Districts.***

264.     The States have an interest in effectively educating elementary and secondary students and in preventing economic harm to small and large school districts.

265.     If DACA is terminated or not restored to its pre-September 5, 2017 status, public school districts will suffer financial harm as well as harm to their educational missions.

266.     Terminating DACA or failing to restore it to its pre-September 5, 2017 status will cause school districts to lose talented and experienced teachers and other staff members who are DACA grantees, adversely affecting student education and costing time, money, and effort to replace and retrain these employees. *See* Ex. 111 ¶ 11 (Decl. Ambrosino & Bourque); Ex. 79 (Whaley, *Denver Public Schools say ending DACA would have "catastrophic" effect*, Denver Post, Aug. 31, 2017).

267.     In Connecticut, Colorado, Illinois, Massachusetts, New Mexico, and New York, Teach for America has placed teachers who are DACA grantees in shortage-area subjects and hard-to-staff schools in low-income communities. *See* Ex. 11 ¶¶ 3, 11 (Decl. Carrizales, Teach For America). Terminating DACA or failing to restore it to its pre-September 5, 2017 status will not only deprive schools of their employees, but also deprive students of teachers whose live experiences may mirror their own lives. *Id.* ¶¶ 10, 11.

268.     Public elementary and secondary schools have a constitutional obligation to educate students irrespective of immigration status. *See Plyler v. Doe*, 457 U.S. 202 (1982). The

termination of DACA or failure to restore it to its pre-September 5, 2017 status will harm the States' ability to educate DACA-eligible students as required by federal law. *See* Ex. 111 ¶¶ 12,14 (Decl. Ambrosino & Bourque); Ex. 112 ¶ 3-4 (Decl. Kanninen, Arlington, VA Public Schools).

269. If DACA-eligible students are no longer able to work legally after high school or cannot afford to go to college, these students will be less motivated to achieve in school. *See* Ex. 111 ¶ 12 (Decl. Ambrosino & Bourque); Ex. 112 ¶ 3 (Decl. Kanninen). This will result in lower scores and higher dropout rates for these students. *See* Ex. 111 ¶ 12 (Decl. Ambrosino & Bourque).

270. Poorer performance will impact school districts' accountability ratings and could require removal of administrators and teachers as well as increased state funding to flow to these school districts. *See, e.g.*, Ex. 179 (Mass. Dep't of Early and Secondary Educ., *School Leader's Guide to the 2017 Accountability Determinations*, Sept. 2017). Decreased school performance will also negatively impact the community, with families not wanting to buy homes in a lower-performing district. *See* Ex. 111 ¶ 13 (Decl. Ambrosino & Bourque).

271. Finally, DACA-eligible students will experience higher levels of anxiety about their futures and their families' futures, and will require additional counseling and support from guidance counselors and other school personnel, costing school districts time and money. *See* Ex. 111 ¶ 14 (Decl. Ambrosino & Bourque).

***Harm to Businesses and Nonprofits.***

272. The States have an interest in their tax revenues, economies, and the financial well-being of their businesses and nonprofits.

273.     Immigration is an important economic driver in the States. Many of the States' workers are immigrants, and many of those immigrant workers are DACA grantees. *See, e.g.*, Ex. 5 ¶¶ 28, 32, 36, 40, 44, 48, 52, 56, 60, 64, 68, 72, 76, 80, 84, 88 (Decl. Wong); Ex. 126 ¶ 11 (Decl. Read, Oregon State Treasurer); Ex. 95 ¶ 7 (Decl. Solano); Ex. 101 ¶ 4 (Decl. Preciado); Ex. 100 ¶ 6 (Decl. Nicolas); Ex. 124 ¶¶ 4, 10-11 (Decl. Salaveria); Ex. 168 ¶ 3 (Decl. Cabrera); Ex. 120 ¶ 4 (Decl. Romero, Barrera Legal Group, PLLC); Ex. 174 ¶¶ 4,6,8 (Decl. Wylde, Partnership for NYC); Ex. 81 ¶¶ 2-3, 5-6 (Decl. Pinsky, ABNY). Many companies in the States are dependent on DACA grantees to operate and grow their businesses. The market for highly skilled workers and employees is extremely competitive. Terminating DACA grantees' work authorization will inhibit the States' companies' ability to adequately staff their organizations, develop their workforces, recruit talent, and maintain trained employees. The Center for American Progress estimates that it costs businesses roughly one-fifth of a worker's salary to replace a worker due to productivity loss, the cost of hiring and training a new employee, and ramp-up periods for new employees. *See* Ex. 80 (Heather Boushey and Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Center for American Progress, November 16, 2012).

274.     If companies lose employees and recruiting efforts are less successful, their ability to develop and deliver successful products and services may be adversely affected. *See e.g.*, Ex. 63 ¶¶ 4-5 (Decl. Blackwell-Hawkins, Amazon); Ex. 90 ¶¶ 7-12, 14 (Decl. Shively, Microsoft); Ex. 8 ¶¶ 7-8 (Decl. Mutty, Starbucks); Ex. 84 ¶¶ 4-11 (Decl. Kalvert, TripAdvisor); Ex. 119 ¶¶ 5-6 (Decl. Tingen, Tingen & Williams, PLLC); Ex. 174 ¶¶ 5-8 (Decl. Wylde, Partnership for NYC). For example:

a. Colorado's talented workforce has attracted major industries to the State, including aerospace, high-tech, start-ups, and STEM-based employers. Many companies in Colorado rely heavily on immigrants to operate their business. Terminating DACA or failing to restore it to its pre-September 5, 2017 status will disrupt these companies with DACA employees that are forced to terminate qualified and talented employees.

b. Terminating DACA or failing to restore it to its pre-September 5, 2017 status will kneecap Connecticut's technology-driven economy, which dependent on immigrant workers: Nearly a quarter of employees in the state's vital science, technology, engineering, and math sector are immigrants.[89]

c. In Hawaii, businesses rely heavily on immigrants who bring their talent, knowledge, and expertise to Hawaii's labor force. *See* Ex. 124 ¶ 4 (Decl. Salaveria). Prior to the increase in unemployment caused by the COVID-19 crisis, Hawaii had a very low unemployment rate, and the state's businesses had difficulty filling their vacant positions. *Id*. ¶ 8. If or when the COVID-19 crisis ends, and Hawaii returns to the low level of unemployment that was previously the trend, the departure of the DACA population from Hawaii's workforce will eventually cause difficulty for Hawaii employers, and have a negative impact on Hawaii's economy. *Id*. ¶ 11.

d. Agriculture and forestry are two of Virginia's largest private industries. The Virginia Department of Agriculture and Consumer Services estimates that

---

[89] *See* New American Economy, *Immigrants and the Economy in Connecticut*, https://www.newamericaneconomy.org/locations/connecticut/.

approximately 1,944 of Virginia's DACA grantees employed in primary agricultural production. *See* Ex. 129 ¶ 3 (Decl. Gooden, Virginia Sec'y of Agriculture and Forestry). Further, a percentage of DACA recipients are also likely to be regulated pesticide applicators. The loss of DACA status for these individuals would harm agricultural production and reduce income to Virginia from pesticide applicator licensing fees. *See id.* ¶ 7.

e. In Washington, DACA grantees work for the largest companies as software engineers, finance professionals, and retail and sales associates, including for Amazon, Microsoft and Starbucks. *See* Ex. 63 ¶¶ 4-5 (Decl. Blackwell-Hawkins, Amazon); Ex. 90 ¶¶ 7-12, 14 (Decl. Shively, Microsoft); Ex. 8 ¶¶ 7-8 (Decl. Mutty, Starbucks).

f. In New York, businesses depend on the work of DACA grantees. *See* Ex. 170 ¶¶ 3, 7-8, 10 (Decl. Schwartz, Univision); Ex. 169 ¶ 7 (Decl. Greenberg, Warby Parker); Ex. 172 ¶¶ 4-5 (Decl. Morales); Ex. 174 ¶¶ 4-8 (Decl. Wylde, Partnership for NYC). DACA recipients are the consumer base for many New York businesses. Ex. 170 ¶¶ 5-6 (Decl. Schwartz, Univision); Ex. 169 ¶¶ 6-7 (Decl. Greenberg, Warby Parker). DACA grantees also provide diverse perspectives and promote inclusiveness. Ex. 170 ¶¶ 3-9 (Decl. Schwartz, Univision); Ex. 169 ¶¶ 8-11 (Decl. Greenberg, Warby Parker); Ex. 174 ¶¶ 5,8 (Decl. Wylde, Partnership for NYC); ; Ex. 81 ¶¶ 2-8 (Decl. Pinsky, ABNY).

275. The impact on small businesses and nonprofit organizations will be especially stark. For entities with limited staff and operating budgets, losing even one skilled and trained DACA grantee employee will place an economic strain on operations, hiring, and training. *See,*

*e.g*, Ex. 118 ¶¶ 9-11 (Decl. Igneri); Ex. 117 ¶¶ 5-8 (Decl. Tracy); Ex. 120 ¶ 4 (Decl. Romero); Ex. 119 ¶¶ 5-6 (Decl. Tingen). Further, many DACA grantees contribute their talents to nonprofits in a range of fields, including education and civic engagement. *See, e.g*, Ex. 55 ¶¶ 8-9 (Decl. Perez); Ex 98 ¶ 12 (Decl. 98 Naveed).

276.   The mission of nonprofit organizations in the States will also be adversely affected by the termination of DACA or failure to restore it to its pre-September 5, 2017 status. Ex. 174 ¶¶ 3-8 (Decl. Wylde, Partnership for NYC). Many nonprofit organizations in the States serve immigrant communities, including by providing legal services and advocacy. Termination of DACA or failure to restore it to its pre-September 5, 2017 status will throw families into crisis, creating higher demand for services from organizations with limited resources. *See* Ex. 117 ¶¶ 12-14 (Decl. Tracy, Brazilian Worker Center); Ex. 115 ¶¶ 2-7 (Decl. Tack-Hooper, Am. Civil Liberties Union of Delaware); Ex. 116 ¶¶ 2-8 (Decl. Graham).

**Harm to Families.**

277.   The States have an interest in protecting the welfare of all of their residents, including the families of DACA grantees.

278.   Terminating DACA or failing to restore it to its pre-September 5, 2017 status will harm the general welfare of the States' DACA grantees and their families in profound ways. Most DACA grantees live in households with family members who are American citizens. One expert survey estimates that 73% percent of DACA grantees in the country live with a citizen sibling, spouse, or child. *See* Ex. 5 ¶ 34 (Decl. Wong). Terminating DACA or failing to restore it to its pre-September 5, 2017 status will lead to increased uncertainty in these mixed-status families, and it will increase the likelihood of splitting DACA grantees from their citizen family members. *See e.g.*, Ex. 176 ¶ 12 (Decl. Kennedy, City of Newburgh). Moreover, many of these

families rely on the income of a DACA grantee, and the termination of DACA or failure to return DACA to its pre-September 5, 2017 status will threaten their financial and housing security. *See, e.g.*, Ex. 87 ¶ 8 (Decl. Rubin); Ex. 135 ¶ 8 (Decl. Rakes); Ex. 157 ¶¶ 12-13 (Decl. Ridder); Ex. 172 ¶¶ 4-5, 7-8 (Decl. Morales); Ex. 173 ¶¶ 3, 5-6 (Decl. Hidalgo Hernandez).

279.    Many DACA grantees also have families overseas, including parents and siblings. DACA had made it possible for these grantees to visit family members, often for the first time in years. *See, e.g.*, Ex. 72 ¶ 7 (Decl. Teodoro); Ex. 70 ¶ 5 (Decl. I.V.). Terminating DACA or failing to restore it to its pre-September 5, 2017 status will cause DACA grantees to lose touch with these family members and become further estranged from their countries of origin, making the prospect of deportation even more injurious to DACA grantees and their families.

## FIRST CAUSE OF ACTION

### (Fifth Amendment – Equal Protection)

280.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

281.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

282.    The 2017 DHS Memorandum and Wolf Memo target individuals for discriminatory treatment, without lawful justification.

283.    The 2017 DHS Memorandum and Wolf Memo were motivated, at least in part, by a discriminatory motive and/or a desire to harm a particular group.

284.    The discriminatory terms and application of the 2017 DHS Memorandum and Wolf Memo cannot be sufficiently justified by federal interests, under any standard of review.

285.     Through their actions above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

286.     Defendants' violation causes ongoing harm to the States and their residents.

## SECOND CAUSE OF ACTION

### (Fifth Amendment – Due Process – Information Use)

287.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

288.     The Due Process Clause of the Fifth Amendment requires that actions taken by the federal government be fundamentally fair.

289.     Given the federal government's prior representations about the allowable uses of information provided by DACA applicants, the change to DHS's policy of protecting against the disclosure of information in DACA applications and renewal requests is fundamentally unfair.

290.     Also given the federal government's prior representations about the allowable uses of information provided by DACA applicants, the new policy's refusal to prohibit the use of information contained in DACA applications and renewal requests for purposes of immigration enforcement—including identifying, apprehending, detaining, or deporting non-citizens—is fundamentally unfair.

291.     Through their actions above, Defendants have violated the due process guarantee of the Fifth Amendment.

292.     Defendants' violation causes ongoing harm to the States and their residents.

## THIRD CAUSE OF ACTION

### (Equitable Estoppel)

293.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

294. The doctrine of equitable estoppel prevents injustice where the government has made representations on which individuals have reasonably and detrimentally relied.

295. In order to encourage DACA applications, Defendants made repeated, affirmative statements about the protections that would be given to the personal information provided by DACA applicants. Defendants also placed affirmative restrictions on the use of such information for purposes of immigration enforcement.

296. In submitting DACA applications and renewal requests, DACA applicants reasonably and detrimentally relied on Defendants' affirmative representations and conduct.

297. Defendants should be equitably estopped from revoking DHS's longstanding, affirmative policy of protecting against the disclosure of information in DACA applications and renewal requests.

298. Equitable estoppel should also bar Defendants from implementing DHS's new policy of refusing to prohibit the use of information contained in DACA applications and renewal requests for purposes of immigration enforcement, including to identify, apprehend, detain, or deport non-citizens.

299. Failure to estop Defendants from revoking DHS's previous policy and imposing the new policy will harm the States and their residents.

### FOURTH CAUSE OF ACTION

**(Administrative Procedure Act – Substantively Arbitrary and Capricious, Abuse of Discretion, Contrary to Constitution or Statute)**

300. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

301. The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary, unconstitutional, and contrary to statute. In implementing the

2017 DHS Memorandum and terminating DACA with minimal formal guidance, federal agencies have taken unconstitutional and unlawful action, as alleged herein, in violation of the Administrative Procedure Act.

302.    In promulgating and implementing the 2017 DHS Memorandum, federal agencies have abused their discretion, and acted arbitrarily and capriciously and otherwise not in accordance with law, in violation of the APA.

303.    Defendants' violation causes ongoing harm to the States and their residents.

## FIFTH CAUSE OF ACTION

### (Administrative Procedure Act – Procedurally Arbitrary and Capricious, Notice and Comment)

304.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

305.    The APA, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct formal rule making before engaging in action that impacts substantive rights.

306.    DHS is an "agency" under the APA. 5 U.S.C. § 551(1).

307.    The actions that DHS has taken to implement the 2017 DHS Memorandum are "rules" under the APA. 5 U.S.C. § 551(4).

308.    In promulgating and implementing the 2017 DHS Memorandum, federal agencies have categorically and definitively changed the substantive criteria by which individual DACA grantees work, live, attend school, obtain credit, and travel in the United States. Federal agencies did not follow the procedures required by the APA before taking action impacting these substantive rights.

309.    With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking. 5 U.S.C. § 553.

90

310.    The Defendants promulgated and relied upon the rules established by the 2017 DHS Memorandum without authority and without notice-and-comment rulemaking in violation of the APA.

311.    The States will be impacted because they have not had the opportunity to comment on the termination of DACA.

312.    Defendants' violation causes ongoing harm to the States and their residents.

## SIXTH CAUSE OF ACTION

**(Regulatory Flexibility Act – Failure to Issue Regulatory Flexibility Analyses)**

313.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

314.    The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small entities and publish initial and final versions of those analyses for public comment. 5 U.S.C. §§ 603-604.

315.    "Small entities" for purposes of the RFA includes small businesses, small nonprofits, and small governmental jurisdictions. 5 U.S.C. § 601(6).

316.    The promulgation and implementation of the 2017 DHS Memorandum and Wolf Memo established "rules" under the RFA. 5 U.S.C. § 601(2).

317.    Implementation of the 2017 DHS Memorandum and Wolf Memo is likely to have a significant economic impact on a substantial number of small entities. 5 U.S.C. § 602(a)(1).

318.    Defendants have not issued the required analyses of DHS's new rules.

319.    Defendants' failure to issue the initial and final Regulatory Flexibility Analyses violates the RFA and is unlawful.

320.     Defendants' violation causes ongoing harm to the States, their small governmental jurisdictions, nonprofits, and businesses, and their residents.

## SEVENTH CAUSE OF ACTION

### (Fifth Amendment-Procedural Due Process)

321.     The Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

322.     The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their liberty interests or property interests without due process of law.

323.     Defendants have failed to provide DACA grantees with the due process to which they are entitled, by failing to provide them with adequate notice about the procedures and timeline for renewing their DACA status.

324.     Defendants have failed to provide DACA grantees with the due process to which they are entitled, by failing to give them adequate notice about the general termination of the DACA program after March 5, 2018 and by failing to provide DACA grantees adequate notice of their inability to apply for renewal of their DACA status after March 5, 2018.

325.     Defendants are thus depriving Plaintiff States' residents of their liberty and property interests in living and working in the United States without providing them adequate notice or opportunity to be heard.

326.     Defendants' conduct violates the Due Process Clause of the Fifth Amendment.

327.     Defendants' violations cause ongoing harm to the States and their residents.

### EIGHTH CAUSE OF ACTION

**(Administrative Procedure Act – Arbitrary and Capricious, Contrary to Law, Excess of Statutory Authority – July 2020 Wolf Memo)**

328. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

329. The Administrative Procedure Act ("APA"), prohibits federal agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or that is in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C).

330. Defendants' implementation of the Wolf Memo to make interim changes to the DACA program are not supported by any reasonable explanation for the agency action, fail to assess the harms of applying the policy retroactively, fail to consider the significant reliance interests at stake, and were ordered by an agency official acting in his position without lawful authority, and are therefore arbitrary, capricious, contrary to law, and in excess of Defendants' statutory authority, in violation of the APA.

331. Defendants' violation causes ongoing harm to the States and their residents.

### NINTH CAUSE OF ACTION

**(Federal Vacancies Reform Act and Homeland Security Act)**

332. The Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Second Amended Supplemental Complaint.

333. Under the FVRA, an agency action taken by an unlawfully serving acting official "shall have no force and effect" and "may not be ratified" after the fact. 5 U.S.C. § 3348(d)(1), (2).

334. The HSA establishes an order of succession for the position of Acting Secretary of Homeland Security. 6 U.S.C. § 113(a)(1)(A), 113(g)(1), 113(g)(2).

335.     Defendant Wolf's predecessor, Acting Secretary Kevin McAleenan, was not the lawful successor to former Secretary Kirstjen Nielsen, and therefore lacked the authority to amend DHS's order of succession that made Defendant Wolf next in line for the acting role. Because, under the FVRA, 5 U.S.C. § 3348(d)(1).  McAleenan's amendments to the order of succession were performed without lawful authority, they "shall have no force and effect." In turn, Defendant Wolf's assumption of the role of Acting Secretary based on McAleenan's ultra vires amendment to the succession order is also unlawful under the HSA and FVRA.

336.     Because Defendant Wolf is unlawfully serving as Acting Secretary, the official actions he has taken in that role, including making changes to the DACA program through the Wolf Memo, are ultra vires actions that are void ab initio under the plain terms of the FVRA. Under the FVRA, the changes to the DACA program ordered by the Wolf Memo therefore have "no force and effect." 5 U.S.C. § 3348(d)(1).

337.     Defendants' violation causes ongoing harm to the States and their residents.

**PRAYER FOR RELIEF**

Wherefore, the States pray that the Court:

a.   Declare that the 2017 DHS Memorandum terminating the DACA program and the Wolf Memo changing the DACA program are unauthorized by and contrary to the Constitution and laws of the United States;

b.   Declare that the actions that DHS has taken to implement the 2017 DHS Memorandum terminating the DACA program and the Wolf Memo changing the DACA program are procedurally unlawful under the APA;

94

c. Declare that the actions that DHS has taken to implement the 2017 DHS Memorandum terminating the DACA program and the Wolf Memo changing the DACA program are substantively unlawful under the APA;

d. Declare that the actions that DHS has taken to implement the 2017 DHS Memorandum terminating the DACA program and the Wolf Memo changing the DACA program are unlawful under the RFA;

e. Declare that Defendant Wolf's service as Acting Secretary of Homeland Security is unlawful under the FVRA and HSA;

f. Declare that the Wolf Memo is invalid under the Federal Vacancies Reform Act and Homeland Security Act;

g. Vacate the changes the Wolf Memo effected to the DACA program;

h. Enjoin Defendants from terminating or amending the DACA program, including enjoining the Defendants from limiting rights to submit applications to renew DACA benefits, pending further orders from this Court;

i. Enjoin Defendants from revoking the DHS policy protecting DACA application and renewal data from disclosure to ICE, CBP, or any other agency for purposes of immigration enforcement;

j. Enjoin Defendants from using information obtained in any DACA application or renewal request to identify, apprehend, detain, or deport any DACA applicant or member of any DACA applicant's family, or take any action against a DACA applicant's current or former employer;

k.   Hold the Wolf Memo invalid and vacate the changes the Wolf Memo effected to

DACA; and

l.   Award such additional relief as the interests of justice may require.

DATED: August 28, 2020

LETITIA JAMES
Attorney General of the State of New York

By:   */s/ Matthew Colangelo*
Matthew Colangelo,
  Chief Counsel for Federal Initiatives
Sania Khan, Assistant Attorney General
Joseph Wardenski, Senior Trial Counsel
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Matthew.Colangelo@ag.ny.gov
Tel. (212) 416-6057
Fax (212) 416-6007

**MAURA HEALEY**
Attorney General for the Commonwealth of
Massachusetts

By:   */s/ Abigail B. Taylor*
Abigail B. Taylor (*pro hac vice*)
David Ureña
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Abigail.Taylor@mass.gov
David.Urena@mass.gov
Tel. (617) 727-2200

**BOB FERGUSON**
Attorney General of the State of Washington

By:   */s/ Robert W Ferguson*
Robert W. Ferguson (*pro hac vice*)
Attorney General
Colleen M. Melody (*pro hac vice*)
Civil Rights Unit Chief
Marsha Chien (*pro hac vice*)
Assistant Attorney General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
ColleenM1@atg.wa.gov
MarshaC@atg.wa.gov
Tel. (206) 464-7744

96

**WILLIAM TONG**
Attorney General
State of Connecticut

By:  */s/ Joshua Perry*_____
     Joshua Perry*
     Special Counsel for Civil Rights
     Office of the Attorney General
     165 Capitol Avenue
     Hartford, CT 06106
     Joshua.perry@ct.gov
     (860) 808-5372


*Pro hac vice motion pending

**CLARE E. CONNORS**
Attorney General of the State of Hawaii

By:  */s/ Robert T. Nakatsuji*
     Robert T. Nakatsuji (*pro hac vice*)
     Deputy Attorney General
     State of Hawaii, Department of the
     Attorney General
     425 Queen Street
     Honolulu, HI 96813
     Robert.T.Nakatsuji@hawaii.gov
     Tel. (808) 586-1360

**THOMAS J. MILLER**
Attorney General of the State of Iowa

By:  /s/ Nathan Blake
     Nathan Blake (*pro hac vice*)
     Deputy Attorney General
     Office of the Attorney General of Iowa
     1305 E. Walnut Street
     Des Moines, IA 50319
     nathan.blake@ag.iowa.gov
     Tel. (515) 281-4325
     Fax (515) 281-4209

**KARL A. RACINE**
Attorney General for the District of Columbia

By:  */s/ Kathleen Konopka*
     Deputy Attorney General
     Public Advocacy Division
     400 6th Street, NW
     Washington, DC 20001
     Kathleen.Konopka@dc.gov
     Tel. (202) 724-6610

**KWAME RAOUL**
Attorney General of the State of Illinois

By:  */s/ Jeffrey J. VanDam*
     Jeffrey J. VanDam
     Public Interest Counsel
     Office of the Illinois Attorney General
     100 W. Randolph Street
     Chicago, IL 60601
     jvandam@atg.state.il.us
     Tel. (312) 814-3400
     Fax (312) 814-3212

**HECTOR H. BALDERAS**
Attorney General of the State of New Mexico

By:  */s/ Tania Maestas*
     Tania Maestas (*pro hac vice*)
     Chief Deputy Attorney General
     Jennie Lusk, Assistant Attorney General
     Civil Rights Bureau Chief
     New Mexico Office of the Attorney
     General
     408 Galisteo St.
     Santa Fe, NM 87501
     tmaestas@nmag.gov
     Tel. (505) 490-4060
     Fax (505) 490-4883

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: /s/ Christian Douglas Wright
    Christian Douglas Wright (*pro hac vice*)
    Director of Impact Litigation
    Vanessa L. Kassab
    Deputy Attorney General
    Delaware Department of Justice
    820 N. French Street, 5th Floor
    Wilmington, DE 19801
    christian.wright@delaware.gov
    Phone: (302) 577-8600

**PETER NERONHA**
Attorney General of the State of Rhode Island

By: /s/ Michael W. Field
Michael W. Field*
*Assistant Attorney General*
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 x 2380
mfield@riag.ri.gov

*Application for pro hac vice admission forthcoming

**JOSHUA H. STEIN**
Attorney General of the State of North Carolina

By: /s/ Sripriya Narasimhan
    Sripriya Narasimhan*
    Deputy General Counsel
    North Carolina Department of Justice
    114 W. Edenton Street
    Raleigh, NC 27603
    SNarasimhan@ncdoj.gov
    Tel. (919) 716-6400

*Application for pro hac vice admission forthcoming

**ELLEN F. ROSENBLUM**
Attorney General of the State of Oregon

By: /s/ Brian de Haan
    Brian de Haan, Assistant Attorney
    General
    Trial Attorney
    brian.a.dehaan@doj.state.or.us
    Tel. (971) 673-1880
    Fax (971) 673-5000

**JOSH SHAPIRO**
Attorney General of the Commonwealth of Pennsylvania

By: /s/ Aimee D. Thomson
    Aimee D. Thomson*
    Deputy Attorney General
    Impact Litigation Section
    1600 Arch St., Suite 300
    Philadelphia, PA 19103
    athomson@attorneygeneral.gov
    Tel. (267) 374-2787

* Application for admission forthcoming

**THOMAS J. DONOVAN, JR.**
Attorney General of the State of Vermont

By: /s/ Benjamin D. Battles
    Benjamin D. Battles
    Solicitor General
    Julio A. Thompson, Assistant Attorney
    General, Director, Civil Rights Unit
    Office of the Vermont Attorney General
    109 State Street
    Montpelier, VT 05609
    Benjamin.Battles@vermont.gov
    Tel. (802) 828-5500

**MARK R. HERRING**
Attorney General of the Commonwealth of Virginia

By: */s/ Michelle S. Kallen*
 Michelle S. Kallen (*pro hac vice*)
 Deputy Solicitor General
 202 North Ninth Street
 Richmond, VA 23219
 mkallen@oag.state.va.us
 Tel. (804) 786-7240

**PHILIP J. WEISER**
Attorney General of the State of Colorado

By: */s/ Eric R. Olson*
 Eric R. Olson (pro hac vice)
 Solicitor General
 Office of the Attorney General
 Colorado Department of Law
 1300 Broadway, 10th Floor
 Denver, CO 80203
 Phone: (720) 508-6548
 Eric.Olson@coag.gov

# EXHIBIT 6

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

_____

)
MARTÍN JONATHAN BATALLA VIDAL,  )
ANTONIO ALARCÓN, ELIANA FERNANDEZ,  )
CARLOS VARGAS, CAROLINA FUNG FENG,  )
M.B.F., by her next friend LUCIA FELIZ,  )
XIMENA ZAMORA, SONIA MOLINA  )
and JOHANA LARIOS SAINZ,  )
)
      On behalf of themselves and all other  )
      similarly situated individuals,  )
)
and MAKE THE ROAD NEW YORK,  )
)
      On behalf of itself, its members, and its  )
      clients,  )
)
      *Plaintiffs*,  )
)
v.  )
)
CHAD WOLF, in his official capacity as the  )
purported Acting Secretary of Homeland Security,  )
JOSEPH EDLOW, in his official capacity as the  )
Deputy Director for Policy, U.S. Citizenship and  )
and Immigration Services, DONALD J. TRUMP,  )
in his official capacity as President of the United  )
States, U.S. CITIZENSHIP AND IMMIGRATION  )
SERVICES, and the U.S. DEPARTMENT OF  )
HOMELAND SECURITY,  )
)
)
      *Defendants*.  )
_____)

**FOURTH AMENDED COMPLAINT**

Case No. 1:16-cv-04756 (NGG)(JO)

## **INTRODUCTION**

On June 18, 2020, the United States Supreme Court affirmed what this Court and others

around the country had already concluded in virtual unison: the Trump Administration's 2017

attempt to terminate the Deferred Action for Childhood Arrivals ("DACA") program was unlawful.

*Department of Homeland Security v. Regents of the University of California*, 591 U.S. ___, 140 S.

Ct. 1891 (2020) ("*Regents*"). In the weeks that followed, Defendants sowed confusion among the more than one million individuals impacted by the Supreme Court's decision, first by denouncing the decision as having "no basis in law" and then by refusing to abide by its directive to return to the *status quo ante*. Less than six weeks after the Supreme Court ruling, Defendants compounded the harm by issuing a new memorandum dismantling the DACA program, thereby prolonging the daily uncertainty faced by those who have, or are eligible for, DACA. This latest assault on DACA is no less unlawful than the first.

Defendant Wolf's July 28, 2020 memorandum ("Wolf Memorandum") requires the Department of Homeland Security ("DHS") to immediately, categorically, and retroactively deny first-time applications for DACA, cut the renewal periods for current DACA recipients in half, and severely limit the availability of advance parole for DACA recipients.[1] This directive is cruel, heartless, and unlawful. Defendants enacted life-altering changes to DACA even though Defendant Wolf was improperly designated as Acting DHS Secretary and thus lacked the authority to issue the Wolf Memorandum. In addition, the Wolf Memorandum and the agency's actions to implement it are arbitrary and capricious. Finally, the Wolf Memorandum and a subsequent implementing directive issued by Defendant Edlow on August 21, 2020 ("Edlow Memorandum") have violated due process by (1) depriving DACA applicants whose applications for deferred action or advance parole were pending between June 30 and July 28, 2020 of a fair opportunity to have their applications adjudicated; (2) failing to provide notice that it would reject first-time applications and most advance parole requests during this timeframe; and (3) changing the terms of renewal without advance notice.

---

[1] Plaintiffs use the terms "first-time" and "initial" applications interchangeably in this amended complaint and subsequent filings to refer to applications made by someone who has never before had DACA.

Plaintiffs Martín Jonathan Batalla Vidal, Antonio Alarcón, Eliana Fernandez, Carlos Vargas, Carolina Fung Feng, M.B.F., Ximena Zamora, Sonia Molina, and Johana Larios Sainz ("Individual Plaintiffs"), on behalf of themselves and all other similarly situated individuals, and Make the Road New York ("MRNY"), on behalf of itself, its members, and its clients (collectively "Plaintiffs" or "Named Plaintiffs"), bring this action to challenge the Trump Administration's latest unlawful attempt to dismantle the DACA program and eviscerate its protections. The Wolf Memorandum violates the U.S. Constitution, the Administrative Procedure Act, the Federal Vacancies Reform Act, and the Homeland Security Act, and must be set aside. So, too, must the implementing memorandum issued by Defendant Edlow ("Edlow Memorandum"), which violates the U.S. Constitution and the Administrative Procedure Act. The stakes cannot be overstated: over a million young people seek to live securely in the only country they know as home, and the DACA program properly affords them that opportunity, as well as the opportunity to work and support their families, and to travel for humanitarian, educational, or employment reasons. Plaintiffs therefore ask this Court to again enjoin the Trump Administration's unlawful efforts to gut the DACA program.

## JURISDICTION AND VENUE

1.        This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the Fifth Amendment of the U.S. Constitution; the Appointments Clause, U.S. Const. art. II, § 2, cl. 2; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*; the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. §§ 3345 *et seq.*; and the Homeland Security Act of 2002 ("HSA"), 6 U.S.C. §§ 112-113.

2.      This Court is authorized to award the requested declaratory and injunctive relief under the APA, 5 U.S.C. § 706; the FVRA, 5 U.S.C. § 3348; the Declaratory Judgment Act, 28 U.S.C. § 2201-2202; and the Court's equitable powers.

3.      Venue properly lies in this district because most Individual Plaintiffs reside in the district, and Plaintiff MRNY operates four of its five community centers in this district in Bushwick, Brooklyn; Jackson Heights, Queens; Port Richmond, Staten Island; and Brentwood, Long Island. 28 U.S.C. § 1391(e)(1). Venue also properly lies in this district because a substantial part of the events or omissions giving rise to this action occurred in the district. 28 U.S.C. § 1391(b).

## **PARTIES**

**Plaintiff Martín Jonathan Batalla Vidal**

4.      Plaintiff Martín Jonathan Batalla Vidal ("Mr. Batalla Vidal") is a recipient of DACA.

5.      Mr. Batalla Vidal was born in Mexico and grew up in Queens, New York. He graduated from Bushwick Leaders High School for Academic Excellence in Brooklyn, New York in June 2008. Mr. Batalla Vidal has a younger brother who has also received DACA, and two brothers who were born in the United States.

6.      Mr. Batalla Vidal obtained DACA on February 17, 2015 with the assistance of MRNY. Receiving DACA reinvigorated Mr. Batalla Vidal's dreams of working in the medical profession, which he had previously abandoned due to his concern that he could not get a job in the field without employment authorization. In fall 2015, he enrolled at ASA College in a medical assistant's degree program. With DACA, Mr. Batalla Vidal was able to earn money for school and also received a scholarship for DACA recipients from ASA College. He is trained as a Physical Therapist to a Rehabilitation Certified Nursing Assistant and, prior to the COVID-19 pandemic,

he was working full-time at Park Terrace Rehabilitation and Nursing Center, where he cared for patients with serious health needs.

7.     Through the employment he was able to obtain with DACA, Mr. Batalla Vidal was able to financially support himself, his mother, and his younger siblings. With this new income, Mr. Batalla Vidal rented his first apartment on his own, and, since his mother has osteoarthritis and thyroid issues and cannot work, he provides her financial support as well. Mr. Batalla Vidal's mother contracted COVID-19 early in the pandemic and spent two weeks hospitalized. Her illness worsened her health and continues to negatively impact her. Shortly thereafter, Mr. Batalla Vidal's brother was in a serious car accident and spent two weeks in an Intensive Care Unit.

8.     Since he obtained DACA in 2015, Mr. Batalla Vidal has consistently renewed and maintained his DACA. Because of this Court's February 2018 preliminary injunction, he was able to renew his DACA for a two-year period most recently on April 23, 2020. Per the Wolf Memorandum, he must now request renewal and pay the application fee every year once his current DACA grant expires. He anticipates seeking a new job in the future and worries that this change will make it more difficult for him to get employment and that, in addition to the increased costs in renewal fees, the Wolf Memorandum will cause him and other DACA holders financial hardship.

9.     The Wolf Memorandum and Defendants' continued attacks on DACA have caused Mr. Batalla Vidal to suffer from significant anxiety and guilt. He feels anxiety over his future ability to obtain employment and to support himself and his family, because the shortened renewal period will necessitate paying more in renewal fees and may make DACA holders less desirable job applicants for employers. He feels guilty because of his efforts to encourage other DACA-eligible youth to apply for the first time following the Supreme Court's decision in June and his efforts to encourage DACA holders to renew their DACA. Since the Wolf Memorandum, he has

been in contact with many people who are negatively impacted by the changes and have expressed tremendous disappointment to him.

10.     Mr. Batalla Vidal would like to obtain advance parole to travel to visit his grandmother, who is in poor health. He has been unable to see her in several years due to the 2017 termination of advance parole for DACA holders. Under Defendants' new guidance, he is unsure if his intended travel would qualify him for advance parole and feels scared to apply and to travel given the uncertainty around DACA.

**Plaintiff Antonio Alarcón**

11.     Plaintiff Antonio Alarcón ("Mr. Alarcón") is a recipient of DACA. He resides in Queens, New York.

12.     Mr. Alarcón was born in Mexico and has lived in New York since he was eleven years old. As a child, he lived in New York with his parents, while his younger brother stayed in Mexico with his grandparents. When Mr. Alarcón was seventeen, his grandparents passed away, and his parents felt compelled to return to Mexico to care for his younger brother. When his parents left, Mr. Alarcón moved in with his aunt and uncle. His parents and younger brother continue to reside in Mexico.

13.     Mr. Alarcón received DACA on March 26, 2013 with the assistance of MRNY, which then hired Mr. Alarcon as an Immigrant Youth Organizer. Employment by virtue of DACA enabled Mr. Alarcón to financially support himself, his aunt, and his uncle as he pursued his education.

14.     Mr. Alarcón graduated from Flushing High School in 2012, and he received his associate's degree from LaGuardia Community College in 2015. He then pursued a Bachelor of Arts degree in Film Studies from Queens College and graduated in May 2018.

15.     Through his employment and volunteer activities, Mr. Alarcón has become a leading voice for youth in his community and beyond. From facilitating local youth meetings and retreats, to serving as a regional coordinator on national campaigns, he has worked to expand educational opportunities for immigrant youth throughout New York and the United States. He currently works as a Civic Engagement Coordinator for MRNY and helps to coordinate the work of a census-outreach team that has contacted over 100,000 New Yorkers to educate them about the importance of completing the 2020 Census. Through this outreach, the team has helped thousands of predominantly immigrant and non-English-speaking New Yorkers complete the census. Mr. Alarcón is also a frequent spokesperson in English- and Spanish-language media helping to encourage participation in the census and debunk common concerns among immigrant New Yorkers.

16.     Since first obtaining DACA in 2013, Mr. Alarcón has consistently renewed and maintained his DACA. Because of this Court's February 2018 preliminary injunction, he was able to renew his DACA for a two-year period most recently on April 2, 2020. Per the Wolf Memorandum, he must now request renewal every year once his current DACA grant expires. He is worried that this change means additional time in limbo for himself and other DACA recipients, who are anxious and vulnerable to changes in policy while awaiting each renewal, and greater financial expense.

17.     Defendants' failure to process advance parole applications since 2017 has inflicted significant harm on Mr. Alarcón. In 2014 and 2017, Mr. Alarcón obtained and traveled on advance parole. But because of the Administration's attacks on DACA, he has not been able to leave the country or to see his parents and younger brother in Mexico for nearly four years. He was unable to visit them in June 2020 when both of his parents became ill. He is eager to travel on advance

parole to see his family, particularly because his mother now needs surgery, and for educational purposes. But under the Wolf and Edlow Memoranda, he is unsure if travel to see family would qualify as a valid reason to obtain advance parole and does not believe that educational travel would be.

**Plaintiff Eliana Fernandez**

18.     Plaintiff Eliana Fernandez ("Ms. Fernandez") is a recipient of DACA. She resides in Suffolk County, New York.

19.     Ms. Fernandez was born in Ecuador and came to the United States at the age of fourteen, where she was finally able to reunite with her parents after not seeing them for many years. She has lived in New York since she was fourteen years old. She lives with her two New York-born, U.S. citizen children, entering third and eighth grades this year.

20.     Ms. Fernandez first received DACA on December 11, 2012 and has consistently renewed and maintained her DACA since that time. Because of this Court's February 2018 preliminary injunction, Ms. Fernandez was able to renew her DACA for a two-year period most recently on April 20, 2020. Per the Wolf Memorandum, she must now request renewal every year and will have to spend twice the amount of time and money she expected to maintain her DACA and remain in the country.

21.     Ms. Fernandez has worked hard to build a life for herself and her family. Despite being ineligible for financial aid and other types of support, she attended St. Joseph's College, where she was on the Dean's List many semesters and earned a degree in Sociology in 2015. She now works as a Lead Organizer in MRNY's Long Island office, where she was previously an Immigration Case Manager. She is also a homeowner. She has been able to achieve these goals

because of DACA, which allowed her to go back to school, earn a living wage, and purchase a home in which her children can grow up.

22.     The shortening of DACA renewals under the Wolf Memorandum has caused Ms. Fernandez tremendous stress, as she feels a loss of stability and control over her life. Without the stable employment authorization that her DACA provides, she would not be able to afford her mortgage or her family's health insurance. Defendants' attacks on the DACA program also put Ms. Fernandez at risk of being separated from her children, as she was from her parents as a child.

23.     As a result of the Administration's unlawful termination of DACA in 2017, Ms. Fernandez developed anxiety and stress. She began suffering migraines and pain soon after Defendants' 2017 termination, which she attributes to the stress and emotional toll of her uncertain future. She also began attending therapy. Following the issuance of the Wolf Memorandum, her physical symptoms, including migraines and neck pain, returned, because the shortening of the DACA renewal period has once again heightened her anxiety and fear of separation from her family.

24.     Ms. Fernandez is eager to obtain advance parole and travel abroad. Given the uncertainty around DACA and her worries about how a termination of DACA could impact her life and the lives of her children, Ms. Fernandez has begun to explore masters' programs at universities in Toronto as well as job opportunities there and has consulted with an immigration attorney in Canada. But because she has never been to Canada, she does not feel she can uproot and relocate her family without first visiting. She would also need to visit universities and attend job interviews there. Because of this, she is eager to travel on advance parole. With the Supreme Court decision in June, Ms. Fernandez thought she would be able to achieve her goal of traveling

to Canada. However, because of the extremely narrow grounds for advance parole set out in Wolf and Edlow Memoranda, she now fears that her intended travel will be impossible.

**Plaintiff Carlos Vargas**

25.     Plaintiff Carlos Vargas ("Mr. Vargas") is a recipient of DACA. He resides in Staten Island, New York.

26.     Mr. Vargas was born in Puebla, Mexico. He has lived in New York City since he was four, and in Staten Island since he was sixteen. Mr. Vargas began working full-time to help his family at age thirteen. After graduating from James Madison High School in Brooklyn, Mr. Vargas began working sixty hours per week to support his family, while remaining committed to going to college and earning a degree.

27.     Mr. Vargas first obtained DACA on December 13, 2012. DACA allowed Mr. Vargas to obtain work authorization and a New York driver's license for the first time in his life, thereby opening up new employment and life opportunities. By taking classes at night and working full time during the day, Mr. Vargas obtained his Bachelor of Science degree in Business from City University of New York ("CUNY") in Staten Island in 2014.

28.     After volunteering for many years in Staten Island for MRNY, El Centro del Inmigrante, and the Staten Island Community Job Center, Mr. Vargas became accredited as a U.S. Department of Justice Accredited Representative, authorizing him to represent individuals before U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review, the component of the Department of Justice that hears immigration cases. Mr. Vargas now works at MRNY, where he assists individuals in applying for DACA and other forms of immigration relief.

In fall 2017, he began attending classes at CUNY School of Law. He plans to become a lawyer so that he can be a more effective advocate for his community.

29.     Mr. Vargas financially supports himself and his elderly mother who is unable to work due to depression, anxiety, vision problems, and other medical issues. Mr. Vargas is his mother's primary caretaker, accompanies her to her many medical appointments, and pays for her medical expenses. He is also financially responsible for multiple mortgages on homes he owns with his brother.

30.     Since first obtaining DACA in 2012, Mr. Vargas has consistently renewed and maintained his DACA. Because of this Court's February 2018 preliminary injunction, he was able to renew his DACA for a two-year period most recently on February 14, 2020. Per the Wolf Memorandum, he must now request renewal every year once his current DACA grant expires. Mr. Vargas is concerned that the shortened renewal period puts DACA holders like him at heightened risk of losing their DACA, jobs, and health insurance. Shortly after the start of the current pandemic, Mr. Vargas was diagnosed with COVID-19 and hospitalized. The experience caused him to become even more committed to maintaining the DACA program as a means for DACA-eligible individuals like him to be able to access health insurance and basic job protections and security especially during a time of pandemic and economic instability.

31.     Mr. Vargas has traveled on advance parole in the past and would like to be able to travel on advance parole again. His mother, for whom he is the primary caretaker, is planning to travel to Mexico soon and he wants to be able to accompany and support her during the trip. But he is concerned that under Defendants' new guidelines, the standard to obtain advance parole is so narrow that his intended travel will not qualify.

**Plaintiff Carolina Fung Feng**

32.      Plaintiff Carolina Fung Feng ("Ms. Fung Feng") is a recipient of DACA. She resides in Middle Village, Queens.

33.      Ms. Fung Feng was born in Costa Rica and came to the United States to live with her aunt in 2001 when she was twelve. Ms. Fung Feng first obtained DACA around December 2012. With DACA, Ms. Fung Feng graduated from Hunter College in January 2013 with a Bachelor of Arts in English-Spanish Translation and Interpretation, and English Language Arts. She also received an English teaching certification from Teaching House in 2015. She was also able to support her younger brother, a U.S. citizen who graduated from CUNY City College in 2017, and her younger cousin, who came to the U.S. to study. She currently works in a temporary position as a digital organizer at the Center for Popular Democracy, focusing primarily on their campaign to encourage participation in the 2020 Census.

34.      Since first obtaining DACA in 2012, Ms. Fung Feng has consistently renewed and maintained her DACA. Because of this Court's February 2018 preliminary injunction, she was able to renew her DACA for a two-year period most recently on November 4, 2019. She is very concerned that needing to renew her DACA every year, after her current DACA grant expires, will make future job searches more difficult, because employers prefer to hire people who can be at a job long term. She is also concerned about the impact of shortened renewals on DACA holders' ability to get and renew other forms of identification. Ms. Fung Feng has been unable to renew either her driver's license or New York City identification since the start of the current pandemic and has become fearful to leave the house as a result.

**Plaintiff M.B.F.**

35.     Plaintiff M.B.F., through her next friend Lucia Feliz, is a 17-year-old applicant for DACA whose first-time application was received by USCIS on or around July 7, 2020. She resides in Queens, New York.

36.     M.B.F. was born in the Dominican Republic and has lived in New York continuously since she was four years old. Since arriving in the United States, M.B.F. has never left the country. M.B.F. has attended New York City schools since kindergarten; in June 2020, she graduated from Francis Lewis High School in Queens, New York.

37.     M.B.F. is eligible for DACA under the terms of the 2012 memorandum that established the program. Mem. from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Dir., U.S. Citizenship and Immigration Servs., *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children*, June 15, 2012 ("Napolitano Memorandum"). She came to the U.S. prior to June 15, 2007, over a decade before her 16th birthday. On June 15, 2012, she was present in the U.S.—as a fourth grader at her Queens elementary school—and did not have lawful status. She has a high school degree and has never been arrested or convicted of a crime. M.B.F. first began preparing to apply for DACA in 2017, in the months leading up to her 15th birthday. However, the program was unlawfully terminated within days of her 15th birthday.

38.     M.B.F.'s lack of immigration status and inability to access the DACA program imposed increasing hardship on her and her family in the years that followed. She was unable to drive; unable to access many forms of financial aid; unable to participate in school programs that involved international travel; and, most difficult for her, unable to work. As a result, M.B.F. had trouble even affording college applications and had to abandon her dream of studying at a college

13

out of state. Instead, she enrolled at a State University of New York ("SUNY") campus near to her home. Even with her attending SUNY, her family is facing significant financial hardship to afford her tuition. Although M.B.F. has always dreamed of becoming a lawyer, she worries that without DACA it will prove impossible.

39. In April 2020, as M.B.F. was completing her senior year of high school and applying to college, she received a Notice to Appear in immigration court by mail. M.B.F. became afraid she would be ordered deported and forced to leave the U.S. at any time. She briefly considered abandoning her college plans altogether. But two months later, she learned through her mother and the family's lawyer that she could once again apply for DACA as a result of the Supreme Court's *Regents* decision. Her attorney filed her application in early July; it was received by USCIS on or around July 7, 2020. M.B.F. states that for her, this opportunity "changed everything." She began planning to transfer colleges and was overjoyed at the prospect of knowing with certainty she would someday be able to use her college and law degrees.

40. As a result of the Wolf and Edlow Memoranda, M.B.F.'s DACA application will now not be processed or adjudicated by Defendants. In addition to her educational and economic harms, M.B.F. faces imminent and irreparable harm through Defendants' failure to adjudicate her DACA application. First, without deferred action, she could be ordered removed and then deported. Second, M.B.F.'s path to lawful status through family members could be foreclosed. M.B.F.'s grandmother is a U.S. citizen and has petitioned for her mother to obtain lawful status. This petition could yield a path to lawful status for M.B.F. But in March 2021, she will reach 18.5 years of age and trigger certain bars to admissibility to the U.S. due to the accrual of unlawful presence. *See* 8 U.S.C. § 1182(a)(9)(B)(i). Neither minors nor individuals with valid deferred action accrue unlawful presence. *Id.* at § (a)(9)(B)(iii); *see* 9 FAM 302.11-3(B)(1)(U) (individuals in deferred

action status do not accrue unlawful presence); USCIS Adjudicator's Field Manual Chapter 40.9.2 (same). With the triggering of these bars, her potential path to lawful status through her family members could be effectively foreclosed. M.B.F. describes obtaining DACA before March 2021 as "the last opportunity I have to be able to stay in this country."

**Plaintiff Johana Larios Sainz**

41.     Plaintiff Johana Larios Sainz is an applicant for DACA whose first-time application was received by USCIS on or around July 27, 2020. She resides in Staten Island, New York with her two children, ages two and six, who are both U.S. citizens.

42.     Ms. Larios Sainz was born in Mexico and has lived in the United States continuously since she was two years old. Since arriving in the United States, Ms. Larios Sainz has never left the country. Ms. Larios Sainz attended New York City public schools from kindergarten through twelfth grade. In August 2014, she graduated from Port Richmond High School in Staten Island, New York.

43.     Ms. Larios Sainz is eligible for DACA under the terms of the Napolitano Memorandum. She came to the U.S. more than ten years before both June 15, 2007 and her 16th birthday. On June 15, 2012, she was present in the U.S. and did not have lawful status. She has a high school degree and has never been arrested or convicted of a crime.

44.     Ms. Larios Sainz was preparing to apply for DACA in the summer of 2017 and had an appointment to complete her application scheduled for just a few days after the program was unlawfully terminated on September 5, 2017. At the time, she was a single mother trying to rebuild her life after leaving an unhealthy relationship. With DACA, she hoped to support herself and her son; obtain a driver's license and car; and afford a place to live. But Defendants' unlawful termination of the program dashed her hopes.

45.     In June 2020, Ms. Larios Sainz saw on the news that the Supreme Court had restored the DACA program and she could once again apply. She immediately began contacting legal services organizations. Weeks later, with the coronavirus pandemic still keeping many offices closed and none returning her calls, she went in person to MRNY's Staten Island office and knocked on the door. Plaintiff Vargas, who is an accredited legal representative at MRNY, ultimately came out and helped her begin the DACA application process.

46.     With her family's help, Ms. Larios Sainz and Mr. Vargas worked together to gather documents for her DACA application and, on July 24, 2020, mailed it to USCIS. USCIS received the application on or around July 27, 2020.

47.     After the issuance of the Wolf Memorandum the next day, Ms. Larios Sainz learned that her application for DACA would no longer be processed. Ms. Larios Sainz seeks to apply for DACA so that she can better provide for her family and return to school. She dreams of a career in the medical field, a steady income, a car, and the ability to buy her children new clothes and other things that they need.

**Plaintiff Sonia Molina**

48.     Plaintiff Sonia Molina is a DACA holder whose application for renewal was pending with USCIS on July 28, 2020. She resides in Queens, New York.

49.     Ms. Molina was born in Mexico and has lived in the United States continuously since she was eight years old. She graduated from Information Technology High School in Long Island City in 2008. She has had DACA since 2012. DACA opened new professional and intellectual opportunities for her and made it easier for her to afford her college education. She obtained her bachelor's degree from New York City College of Technology ("City Tech") in 2016.

16

Ms. Molina is currently a Senior Office Manager at MRNY, where she helps to manage operations at the organization's busiest office located in Queens.

50.     Ms. Molina renewed her DACA most recently on May 1, 2019.

51.     Ms. Molina applied to renew her DACA again on April 1, 2020, or 149 days before the filing of this complaint. Although her current DACA does not expire until April 2021, she applied early in the hope of being able to plan for her future and know that she had two years of stability regardless of the outcome of the DACA litigation in the Supreme Court.

52.     Through her work at MRNY, Ms. Molina has seen firsthand the huge impact of the Trump Administration's efforts to end DACA. When DACA was unlawfully terminated in 2017, she had the difficult experience of having to explain to many callers and visitors to MRNY that new applications were no longer possible. With the Supreme Court decision in 2020, Ms. Molina again saw the broad hope that it inspired and the questions that people had in the absence of clear guidance from the government about whether they could apply for DACA for the first time. She allowed herself to feel happy and hopeful about the prospects for DACA recipients like herself and future DACA recipients for the first time since the 2017 unlawful termination years before.

53.     With the Wolf Memorandum and the Edlow Memorandum issued after it, Ms. Molina's hopes of planning for her future and experiencing a two-year period of stability were dashed. She views the shortening of the DACA renewal period as eliminating the time when people can feel secure and relax. Without that, she feels tremendous uncertainty and pressure. The experience, which she calls a "rollercoaster of emotions," has taken a heavy toll on her.

**Plaintiff Ximena Zamora**

54.     Plaintiff Ximena Zamora is 18 years old and qualifies for DACA under the terms of the Napolitano Memorandum. She is a member of MRNY and resides in Queens, New York.

In September 2017 and again in July 2020, she was days away from submitting her first-time application for DACA when the program was unlawfully terminated for first-time applicants.

55. Ms. Zamora was born in Mexico and has lived in the United States continuously since she was two years old. Since arriving in the United States, Ms. Zamora has never left the country. Ms. Zamora has attended New York City public schools throughout her life and, in June 2020, she graduated from Academy of Finance and Enterprise High School in Queens, New York.

56. Ms. Zamora is eligible for DACA under the terms of the Napolitano Memorandum. She came to the U.S. prior to June 15, 2007 and long before her 16th birthday. On June 15, 2012, she was present in the U.S.—as a fourth grader at her Queens elementary school—and did not have lawful status. She has a high school degree and has never been arrested or convicted of a crime. Ms. Zamora first prepared her application for DACA in the summer of 2017, when she turned 15 years old. The program was unlawfully terminated just days after her family had gotten the check for the filing fee—the last document she needed to submit her application.

57. In the years that followed, because of the unlawful termination of DACA, Ms. Zamora was unable to get a regular job or save money for college. She was also unable to participate in internship programs through her school; and, for much of her junior year, she did not believe she would be able to attend college at all without a social security number. With the help of a guidance counselor and staff at MRNY, she learned this was not true and was able to gain admission and apply for financial aid to study at Baruch College, a campus within the CUNY system, where she plans to major in finance.

58. When the Supreme Court decision on DACA was announced in June 2020, Ms. Zamora was excited to apply again. With DACA, she hoped she could now fulfill her dreams of

getting a regular job, transferring to a college in California, and eventually beginning a career in forensic accounting.

59.     Ms. Zamora worked with the legal team at MRNY to prepare her application throughout July 2020. The process was slowed by the coronavirus pandemic, which prevented in-person meetings and meant that she had to send MRNY documents, such as her photos, by mail. Just days after Ms. Zamora had mailed her final signed copies of the application to MRNY to file, DACA was again severely curtailed and closed to her through the unlawful issuance of the Wolf Memorandum and the Edlow Memorandum after that.

**Plaintiff Make the Road New York**

60.     Plaintiff Make the Road New York ("MRNY") brings this action on behalf of itself, its members, and its clients. MRNY is a nonprofit, membership-based § 501(c)(3) organization dedicated to empowering immigrant, Latino, and working-class communities in New York. With offices in Brooklyn, Queens, Staten Island, Suffolk County, and Westchester County, MRNY integrates adult and youth education, legal and survival services, and community and civic engagement, in order to assist low-income New Yorkers improve their lives and neighborhoods.

61.     MRNY has a legal department staffed by twenty-four attorneys and eighteen advocates who provide a broad range of civil legal services to immigrant New Yorkers. MRNY's immigration team provides individualized assistance to immigrants facing deportation, as well as immigrants submitting affirmative applications for immigration relief. MRNY directly helps individuals prepare the documentation and paperwork necessary for DACA applications and renewals, as well as applications for advance parole. Given the immigrant-rich nature of the New York neighborhoods it serves, MRNY's limited staff is unable to fully meet the high demand for its services and resources.

62.     From June of 2012 until the fall of 2017, MRNY held weekly DACA screening workshops at its Queens office and similar services at its other sites on an as-needed basis, escalating the number of workshops, screenings, and appointments in the final month that U.S. Citizenship and Immigration Services ("USCIS"), a component of DHS, accepted DACA renewal applications. From the time that DACA was created until its unlawful termination in 2017, MRNY assisted approximately 8% of all DACA applicants in New York State.

63.     Both before and after Defendants' 2017 attempts to end DACA, MRNY assisted DACA-eligible individuals with renewal applications through its Action NYC program, which provides comprehensive immigration screenings to New Yorkers, and other legal services programs. From October 5, 2017 through July 28, 2020, MRNY staff filed 2,158 DACA renewal applications. On July 28, 2020, the date of the Wolf Memorandum, 166 MRNY clients had renewal applications pending with USCIS, some filed as long ago as March 1, 2020. Of those clients, 32 are members of MRNY.

64.     Following the Supreme Court decision in June 2020, MRNY engaged in significant community outreach and education to advise community members about the decision and address questions. This included sending a bilingual email to all MRNY staff; mass texts to 1,198 of its prior DACA clients and members inviting them to informational sessions; and a Facebook Live explaining the decision, which reached 6,100 individuals.

65.     Following *Regents*, MRNY received over 260 inquiries regarding DACA. Of these, 28 were from current DACA recipients who were interested in applying for advance parole. The remaining 232 individuals were either youth or their parents who wanted to apply for DACA for the first time. To address this outpouring of community interest, MRNY's legal team began holding regular information sessions on DACA and advance parole, in English and Spanish, for

potential applicants and their parents and individuals hoping to obtain DACA or advance parole. MRNY has continued to hold these sessions even after the July 28, 2020 Wolf Memorandum given the large number of questions that individuals have regarding eligibility for DACA and associated benefits following the Supreme Court decision and the Wolf Memorandum, with the most recent held on August 18, 2020. In total, seven of these sessions were held between June 26, 2020, and August 18, 2020, with a total of 201 individuals attending. MRNY expended significant resources in planning these workshops, due to Defendants' failure to establish clear guidelines for how and when the Supreme Court's June 18 decision would be implemented.

66. In addition, MRNY legal staff began conducting legal clinics for one-on-one follow-up and screening of potential DACA applicants who attended an initial information session and who had begun to gather documents in support of their DACA applications. MRNY held five such clinics from July 8 to July 23, 2020, providing individual assistance to around three dozen applicants. MRNY legal staff completed and filed three first-time DACA applications prior to the Wolf Memo's issuance on July 28, 2020. One, on behalf of Plaintiff Larios Sainz, was received the day before the memo's issuance; two others, filed on behalf of MRNY members, were sent by USPS Priority Mail prior to July 28 but not received by USCIS until July 29, the day after the memo's issuance. One of those, sent by USPS Priority Mail on July 25th and received by USCIS on July 30, 2020, was filed on behalf of a 19-year-old MRNY member on Long Island who had been in the process of gathering the documents necessary to file a first-time DACA application when the program was terminated in September 2017. The second, sent by USPS Priority Mail on July 27th and received by USCIS on July 29, 2020, was filed on behalf of a 17-year-old MRNY member on Long Island who aged into DACA eligibility after the 2017 termination.

67.     MRNY also identified numerous individuals among its existing clients who were eligible to submit first-time DACA applications and began working with them to prepare those applications. Some of these individuals present an urgent need for DACA because they are subject to removal orders or ongoing removal proceedings. For instance, MRNY represents a DACA-eligible individual in removal proceedings whose merits hearing is scheduled for 2022. He resides in Westchester County. He has resided continuously in the U.S. since 2003, when he was 14 years old, and qualifies for DACA under the terms of the Napolitano Memorandum. He is married to a U.S. citizen and has three U.S.-citizen children; his parents are also U.S. citizens. Under the Wolf Memorandum, he cannot apply for DACA. Without DACA, he risks being ordered removed and ultimately deported.

68.     MRNY has more than 24,000 dues-paying members residing in New York City and Long Island, primarily in the boroughs of Queens and Brooklyn. Its members include Plaintiffs Batalla Vidal, Alarcón, Fernandez, Vargas, Fung Feng, Molina, and Zamora, along with many other members whose lives have been thrown into uncertainty because of Defendants' repeated attacks on the DACA program.

69.     MRNY does not ask or track the immigration status of its members. But it knows through information collected on behalf of members who are also clients of MRNY's legal department that the organization has, at a minimum, several hundred members who are DACA holders.

70.     Approximately sixteen current MRNY employees have DACA, including Plaintiffs Alarcón, Fernandez, Molina, and Vargas.

71.     Plaintiff MRNY, its staff, its members, and its clients are aggrieved both by Defendants' failure to comply with the Supreme Court decision prior to July 28, 2020 and by their

final agency action on July 28, 2020 and have no administrative remedies available to them.

72.      The legal interests of MRNY, its staff, its members, and its clients in not having the DACA program unlawfully curtailed, and in having their DACA applications, renewals, and advance parole applications considered, are germane to MRNY's purpose of advocating for the rights of low-income immigrant communities and providing survival services that allow its clients and members to achieve stability and success and to avoid separation from their families; and to its role as an employer of individuals with DACA, and are inextricably bound up with the legal services that MRNY attorneys provide the organization's clients.

73.      MRNY's clients face hinderances to bringing suit to protect their own interests, including but not limited to lack of notice, privacy concerns, fear of retaliation (against themselves and/or their families), language barriers, and lack of resources.

74.      MRNY will sustain further injuries because of Defendants' actions as it is forced to devote additional resources to assist its DACA employees, clients, and members to submit renewals on the new yearly schedule. MRNY will also have to continue to divert resources to educate its members, clients, and the broader immigrant communities it serves about the implications of Defendants' actions with respect to DACA, which have confused and misled the public. This diversion of resources includes following up with and advising the large number of individuals who contacted the organization in the wake of the Supreme Court decision in June 2020 and who now are unable to file first-time DACA applications.

75.      MRNY has also expended extensive resources in bringing the current action to vindicate the rights of its members, its clients, itself, and others who are affected.

76.      These injuries to MRNY, its members, and its clients would be redressed by a favorable decision from this Court.

**Defendants**

77.     Defendant Chad Wolf is an officer of DHS who was purportedly designated to temporarily exercise the functions of Acting Secretary of Homeland Security. He is sued in his official capacity.

78.     Defendant Joseph Edlow is the Deputy Director for Policy of USCIS. He is sued in his official capacity.

79.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

80.     Defendant United States Citizenship and Immigration Services ("USCIS") is a component of DHS, 6 U.S.C. § 271, and an agency within the meaning of the APA, 5 U.S.C. § 551(1). USCIS is responsible for processing and adjudicating DACA applications.

81.     Defendant United States Department of Homeland Security ("DHS") is an agency within the meaning of the APA, 5 U.S.C. § 551(1). DHS is responsible for implementing the DACA program and oversees USCIS.

## STATEMENT OF FACTS

**The DACA Program's Origins and Impact**

82.      On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano announced the creation of the DACA program, which set out guidelines for USCIS to use its prosecutorial discretion to extend deferred action to certain young immigrants "who were brought to this country as children and know only this country as home." Napolitano Memorandum at 1. Those granted deferred action also became eligible for employment authorization via a pre-existing regulation. 8 C.F.R. § 274a.12(c)(14).

83.     In her memorandum, then-Secretary Napolitano explained that individuals eligible to apply for DACA "have already contributed to our country in significant ways" and "lacked the intent to violate the law." Napolitano Memorandum at 1. She found that our nation's immigration laws "are not designed to be blindly enforced without consideration given to the individual circumstances of each case," and that the limited resources of DHS must be "focused on people who meet our enforcement priorities." *Id.*

84.     In the eight years following the DACA program's announcement, over 800,000 individuals have received deferred action and employment authorization. Approximately 30,000 of those individuals live in New York State alone. As a result of the DACA program, these young people have been able to enroll in colleges and universities, and to obtain jobs, driver's licenses, bank accounts, and health insurance (through employment, college, or state-run programs). DACA recipients rely on the program to work, study, and live without the constant threat of deportation and family separation. Indeed, in reliance on the program, DACA recipients have made significant investments in their futures, such as enrolling in higher education and graduate programs; pursuing employment opportunities; marrying and having children of their own; and purchasing homes and automobiles, to name a few examples.

**The Trump Administration's First Unlawful Termination of the DACA Program**

85.     After more than five years of the DACA program's success—and despite the incalculable benefit and opportunity the program created in those years—then-Secretary of Homeland Security Elaine Duke announced on September 5, 2017 that DHS would terminate the DACA program. *See* Mem. from Elaine C. Duke, Acting Sec'y of Homeland Sec., to James W. McCament, Acting Dir., U.S. Citizenship and Immigration Servs., *Memorandum on Rescission of Deferred Action For Childhood Arrivals (DACA)*, Sept. 5, 2017 ("Duke Memorandum"). Based

on spurious legal reasoning, the Duke Memorandum directed DHS to categorically reject all first-time DACA applications received after September 5, 2017 and severely limit the renewal-eligible population.

86.     DACA's abrupt and unlawful termination followed Defendant Trump's incessant stream of racist and nativist comments about individuals of Latinx, and especially Mexican, heritage. Both on the campaign trail and in the Oval Office, Defendant Trump did not hesitate to call Latinx and Mexican individuals "criminals, "killers," and even "animals." His policies reflect his animus.

**Ensuing Litigation and the Supreme Court's Decision in *DHS v. Regents***

87.     The same day that the unlawful termination of DACA was announced, many of the Plaintiffs here informed this Court of their intent to sue. ECF No. 46. *See also* Second Amended Complaint, *Batalla Vidal et al. v. Nielsen et al.*, No. 16-cv-4756, ECF. No. 60 (E.D.N.Y. Sept. 19, 2017) ("*Batalla Vidal*").

88.     Defendants' actions also triggered a wave of other lawsuits across the nation by DACA recipients, civil rights organizations, universities, private corporations, labor unions, states, and municipalities. *See State of New York et al. v. Trump et al.*, No. 17-cv-5228 (E.D.N.Y. Sept. 6, 2017); *Regents of the University of California et al. v. Department of Homeland Security et al.*, No. 17-cv-5211 (N.D. Cal. Sept. 8, 2017) ("*UC Regents District Court*"); *State of California et al. v. Department of Homeland Security et al.*, No. 17-cv-5235 (N.D. Cal. Sept. 11, 2017); *County of Santa Clara et al. v. Trump et al.*, No. 17-cv-5813 (N.D. Cal. Oct. 10, 2017); *City of San Jose v. Trump et al.*, No. 17-cv-5329 (N.D. Cal. Sept. 14, 2017); *Garcia et al. v. United States et al.*, No. 17-cv-5380 (N.D. Cal. Sept. 18, 2017); *NAACP et al. v. Trump et al.*, No. 17-cv-1907 (D.D.C. Sept. 18, 2017) ("*NAACP*"); *Trustees of Princeton University et al. v. United States et al.*, No. 17-

cv-2325 (D.D.C. Nov. 3, 2017); *CASA de Maryland et al. v. Trump et al.*, No. 17-cv-2942 (D. Md. Oct. 5, 2017).

89.     The results of this litigation were swift and clear: in every case but one, district courts held that the 2017 DACA termination was likely arbitrary and capricious in violation of the APA, with circuit courts affirming the same. On January 9, 2018, the Northern District of California issued a preliminary injunction requiring USCIS to accept renewal applications. Order, *UC Regents District Court*, ECF No. 234 (N.D. Cal. Jan. 19, 2018). On February 13, 2018, this Court did the same. Memorandum & Order, *Batalla Vidal*, ECF No. 255 (E.D.N.Y. Feb. 13, 2018). And on April 24, 2018, the District Court for the District of Columbia partially granted summary judgment in plaintiffs' favor and vacated the Duke Memorandum, thus restoring the DACA program to its pre-termination status. Order, *NAACP*, ECF No. 22 (D.D.C. Apr. 24, 2018). After staying its decision and allowing then-Secretary Kirstjen Nielsen to submit a memorandum to better explain the reasoning behind the DACA termination ("Nielsen Memorandum"), the district court again held that the DACA termination was arbitrary and capricious despite the additional explanation. Order, *NAACP*, ECF No. 27 (D.D.C. Aug. 3, 2018).

90.     The government appealed all these decisions and also petitioned the U.S. Supreme Court for writs of certiorari before judgment. The Ninth Circuit affirmed the *UC Regents* District Court's preliminary injunction on November 8, 2018. Opinion, *DHS v. Regents*, No. 18-15068, ECF. No. 199-1 (9th Cir. Nov. 8, 2018). The Supreme Court granted certiorari before the Second or D.C. Circuits could rule in those pending appeals. The Supreme Court consolidated the cases and heard oral argument on November 12, 2019.

91.     On June 18, 2020, the Supreme Court—like all courts whose decisions it was reviewing—concluded that Defendants' 2017 termination of the DACA program was arbitrary and

capricious in violation of the APA. *Department of Homeland Security v. Regents of the University of California,* 591 U.S. ___, 140 S. Ct. 1891, 1916 (2020) ("*Regents*"). The Supreme Court explained that Defendants had failed to conduct the reasoned analysis required by the APA and that Defendants did not adequately consider the incredible hardship their decision would inflict on DACA recipients and their communities. *Id.* at 1910-1915. That two-fold error necessitated the vacatur of the 2017 termination. *Id.* at 1916.

92.     By setting aside the Duke Memorandum, *Regents* required Defendants to fully restore the DACA program to the terms of the Napolitano Memorandum—including the acceptance of (1) first-time DACA applications from the approximately 300,000 individuals who had become eligible during the pendency of the litigation and (2) requests for advance parole.[2]

**The Administration's Reaction to *Regents* and Post-*Regents* Proceedings**

93.     On June 18, 2020, Defendant Trump described the *Regents* decision as one of several recent "horrible & politically charged decisions" that were "shotgun blasts into the face of people that are proud to call themselves Republicans or Conservatives."[3] In a similar vein, the day after the *Regents* decision, Defendant Edlow declared on USCIS's official website that the Supreme Court's decision "has no basis in law" and "merely delays the President's lawful ability to end the illegal Deferred Action for Childhood Arrivals amnesty program."[4] In the same statement, Defendant Edlow also falsely stated that DACA allowed recipients to "remain in our country in violation of the laws" and "take jobs" from "Americans."[5]

---

[2] Nicole Prchal Svajlenka et al., *The Trump Administration Must Immediately Resume Processing New DACA Applications*, CENTER FOR AMERICAN PROGRESS (Jul. 13, 2020), https://ampr.gs/32euYw7.
[3] Donald J. Trump (@realDonaldTrump), TWITTER, (June 18, 2020, 11:08 AM), https://twitter.com/realdonaldtrump/status/1273633632742191106.
[4] *See* U.S. Citizenship and Immigration Servs., *USCIS Statement on Supreme Court's DACA Decision* (June 19, 2020), https://www.uscis.gov/news/news-releases/uscis-statement-on-supreme-courts-daca-decision.
[5] *Id.*

94.     At no time after the Supreme Court and prior to the Wolf Memorandum issued its decision in *Regents* did Defendants offer guidance as to how they would comply with the ruling or provide any notice regarding the future of the DACA program. Defendants' own officials disclosed that "they ha[d] yet to receive any guidance in the wake of the DACA decision, including whether or not they should restart processing new applications."[6]

95.     On June 30, 2020, the U.S. Court of Appeals for the Fourth Circuit issued its mandate in a related case in which the Supreme Court denied certiorari following the *Regents* decision. Mandate, *CASA de Maryland v. U.S. Dep't of Homeland Security*, No. 18-1521, ECF No. 71 (4th Cir. June 30, 2020). That mandate effectuated the court's previous holding "that the Department's decision to rescind DACA was arbitrary and capricious and must be set aside." *CASA de Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 705 (4th Cir. 2019). As a result, on June 30, 2020, the Fourth Circuit's vacatur of the 2017 DACA termination took effect nationwide.

96.     Pursuant to the issuance of that mandate, the U.S. District Court for the District of Maryland ordered Defendants to reinstate the DACA program as it existed prior to the September 5, 2017 termination. Order, *CASA de Maryland v. DHS*, 8:17-cv-02942-PWG, ECF No. 97 (D. Md. July 17, 2020).

97.     Despite the Fourth Circuit's mandate and the District of Maryland's order, for weeks Defendants failed to provide the public information on the status of the DACA program, including whether first-time DACA applications and advance parole requests would be accepted and processed, or whether there would be any changes to the renewal process. Defendants provided

---

[6] Molly O'Toole, *The Supreme Court Rejected Trump's Attempt to End DACA. Now What?*, L.A. TIMES (June 18, 2020), *available at* https://www.latimes.com/politics/story/2020-06-18/the-supreme-court-rejected-trumps-attempt-to-end-daca-now-what.

no information to applicants, counsel, or the general public regarding the status of the DACA program except for a perfunctory July 10th response to a Congressional inquiry stating that USCIS "will work with DHS on next steps." Letter from Joseph Edlow to the Hon. Joaquin Castro, July 10, 2020.[7] As a result, many attorneys and advocates both in New York and nationwide did not advise clients to file DACA applications immediately and instead chose to advise clients to await guidance from the agency. Among attorneys and their clients who did file DACA applications and expected them to be processed according to the Napolitano Memorandum, few, if any, received receipt notices—leaving them with uncertainty as to the status of their applications and the program as a whole.

98.     On July 24, 2020, the district court in *CASA de Maryland* held a status conference on the vacatur of the Duke Memorandum. There, Defendants revealed for the first time that, instead of complying with the court's order and the Fourth Circuit's mandate, Defendants were "plac[ing]" first-time DACA applications "into a bucket" without considering them, granting them, or rejecting them. Tr. of Virtual Status Conference Proceedings at 17-18, *CASA de Maryland v. DHS*, 8:17-cv-02942-PWG (D. Md. Jul. 24, 2020). The court described it as a "distinction without a difference" to say these "application[s] ha[ve] not been denied." *Id.* at 18. The court also observed that "the agency ha[d] not found the time or resources to change their website to even accurately reflect what the status [of DACA] is," which had "impacts" on both "initial applications" and "advance parole." *Id.* at 19.

99.     On July 29, 2020, the Second Circuit issued its mandate in this case and remanded

---

[7] *See also* Molly O'Toole, *Despite Supreme Court Ruling, Trump Administration Rejects New DACA Applications*, L.A. TIMES (July 16, 2020), https://www.latimes.com/politics/story/2020-07-16/trump-refuses-new-daca-supreme-court ("USCIS employees say they've received no guidance on the Supreme Court ruling or new DACA applications. The agency did not immediately respond to requests for comment Thursday.")

the matter to this Court for further proceedings.[8]

100.     Litigation brought by Texas, nine other states, and two state governors regarding the procedural and substantive legality of the DACA program is also ongoing in the Southern District of Texas. In that case, Judge Andrew Hanen recently denied Plaintiffs' motion for summary judgment with leave to re-file in order to account for the *Regents* opinion's bearing on the Plaintiffs' arguments. Order, *State of Texas et al. v. United States et al.*, No. 1:18-cv-0068, ECF No. 473 (S.D. Tex. Aug. 21, 2020). Judge Hanen had also requested that, by August 25, 2020, the government produce the administrative record that was considered by the agency when it issued the Napolitano Memorandum. Order, *State of Texas et al. v. United States et al.*, No. 1:18-cv-0068, ECF No. 467 (S.D. Tex. Aug. 4, 2020).

**The Wolf Memorandum's Renewed Attack on DACA Recipients**

101.     After more than a month of silence on the status of the DACA program, Defendant Wolf issued the Wolf Memorandum on July 28, 2020, rescinding the Duke and Nielsen Memoranda in their entirety.  Mem. from Chad Wolf, to Mark Morgan, Matthew Albence, Joseph Edlow, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,"* July 28, 2020. Although the Wolf Memorandum was framed as a "[r]econsideration" of the Napolitano Memorandum, it in fact rescinded core components of the Napolitano Memorandum and made "immediate changes" to the DACA program.

102.     Among those "immediate changes" are instructions for DHS personnel to "reject all pending and future initial requests for DACA, to reject all pending and future applications for

---

[8] The D.C. and Ninth Circuits also issued mandates in their respective cases after receiving certified copies of the *Regents* judgment from the Supreme Court. Mandate, *NAACP et al. v. Trump et al.*, No. 18-5243 (D.C. Cir. Aug. 4, 2020); Mandate, *Regents v. DHS*, No. 18-15068, ECF. No. 217 (9th Cir. Aug. 4, 2020).

advance parole absent 'exceptional circumstances,' and to shorten DACA renewals" from two years to one year. *Id.* at 1-2. The Wolf Memorandum makes no distinction in how the agency is to treat first-time or renewal applications for DACA filed after the Supreme Court's decision in *Regents* (June 18, 2020), after the Fourth Circuit's mandate (June 30, 2020), or after the Wolf Memorandum (June 28, 2020). It retroactively rejects the applications of individuals like Plaintiffs M.B.F. and Larios Sainz, who applied for DACA after the *Regents* decision went into effect and before the Wolf Memorandum was issued.

103.     The Wolf Memorandum orders that renewals of deferred action and the accompanying work authorization should be granted for one-year, rather than two-year, periods, claiming that there are no asserted reliance interests affected by the shortening of renewal periods. There is no rational explanation supporting the reduction in renewal periods besides the Trump Administration's desire to limit the scope of the policy during what is presented as an "interim" period. While Defendant Wolf acknowledged that the change entails an increase in the total amount of renewal fees that applicants will be required to pay, it justifies these fees as "processing costs." *Id.* at 6. *But see Oversight of U.S. Citizenship and Immigration Services: Ensuring Agency Priorities Comply with the Law*, 114th Cong. (2015) (responses of Joseph Moore, Donald Neufeld, and Daniel Renaud) ("[C]urrent fees charged to DACA requestors have been sufficient to recover the full costs of administering the DACA policy.").[9]

104.     Beyond the cursory and abrupt nature of these changes, the Wolf Memorandum also fails to explain why the agency was not bound to return to the *status quo ante* after *Regents* or after the issuance of the Fourth Circuit's mandate. Instead, it merely states that Defendant Wolf froze the program "on an interim basis." *Id.* at 7.

---

[9] *Available at* https://www.judiciary.senate.gov/imo/media/doc/Moore-Neufeld-Renaud%20Responses.pdf.

105. The Wolf Memorandum again upends the lives of over 800,000 DACA recipients, and their families, communities, and employers.

106. Additionally, the Wolf Memorandum renders approximately 300,000 putative class members—many of whom became eligible for DACA during the course of the litigation[10]—unable to apply for DACA despite Defendants' unambiguous obligation to accept and process first-time applications. These individuals will continue to face the threat of deportation and, thus, may be forced to leave the only country that many of them have known as home. Like Plaintiffs, many putative class members have grown up in American neighborhoods, attended American schools, nurtured American families, and have structured their lives around living in the United States.

107. By cutting renewal periods in half—from two years to one year—DACA recipients are now forced to pay double the amount in fees, spend twice as much time preparing renewal applications, and experience increased anxiety and uncertainty, for no rational purpose. These unreasonable renewal costs impose great financial and emotional hardship on Plaintiffs and putative class members.

108. By severely restricting applications for advance parole to only those that present an undefined category of "exceptional circumstances," Defendants are imposing an unreasonably high threshold requirement for advance parole applications. Under the Napolitano Memorandum and its implementing guidance, DACA recipients were able to obtain advance parole to travel abroad for humanitarian, educational, and employment purposes, as permitted by statute. *See* 8 U.S.C. § 1182(d)(5). The Wolf Memorandum fails to give any reason supporting this drastic change and limiting such an important benefit to unspecified "extraordinary" circumstances.

109. The Wolf Memorandum also fails to provide any guidance on the new adjudicatory

---

[10] Svajlenka et al., *supra* note 1.

standard for advance parole requests. The Wolf Memorandum fails to consider the deterrent effect that this lack of clarity has on DACA recipients hesitant to pay the $575 application fee, and on immigration providers hesitant to counsel their clients to pay such a large amount.

110.     The Wolf Memorandum's mere recitation that DACA recipients have reliance interests fails to engage with the profound and widespread impacts of a decision to deny new applications, severely restrict advance parole, and shorten renewal periods.

111.     On August 21, 2020, Defendant Edlow issued additional guidance on the implementation of the Wolf Memorandum. Mem. from Joseph Edlow, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum,* August 21, 2020 ("Edlow Memorandum").[11]

112.     The Edlow Memorandum confirmed that USCIS will reject all first-time DACA applications from individuals who have never received DACA previously, regardless of when they were submitted. The Edlow Memorandum reiterated that the agency will continue to accept requests for renewal and advance parole from individuals who had been previously granted DACA, albeit in limited form: USCIS will (1) limit renewed grants of deferred action and employment authorization under DACA to no more than one year, and (2) impose a stricter threshold on advance parole requests than the relevant statutory provision. *See* 8 U.S.C. § 1182(d)(5)(A) (allowing advance parole "for urgent humanitarian reasons or significant public benefit"). *See also* Form I-131 Instructions (defining "significant public benefit" to include a personal or family emergency or bona fide business reasons).[12] Again, these changes came without any rational explanation.

**The Unlawful Designations at the Department of Homeland Security**

113.     The designation of Defendant Wolf as Acting DHS Secretary was made in

---

[11] *Available at* https://www.uscis.gov/sites/default/files/document/policy-alerts/DACA%20implementation%20memo%20v2%208.21.20%20final.pdf.

[12] *Available at* https://www.uscis.gov/sites/default/files/document/forms/i-131instr.pdf.

contravention of the Appointments Clause of the U.S. Constitution, the Federal Vacancies Reform Act ("FVRA") and the Homeland Security Act ("HSA"). As a result, Defendant Wolf lacks the authority to revoke critical components to the DACA program purportedly made through the Wolf Memorandum.

***The Appointments Clause***

114. Under the Appointments Clause, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers, of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const., art II, § 2, cl. 2. Congress may "by Law vest the Appointment of such inferior Officers as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

115. The Appointments Clause sets out a scheme for Congress to exercise its oversight power to "curb Executive abuses of the appointments power" and "to promote a judicious choice of persons" for filling positions of vital importance. *Edmond v. United States*, 520 U.S. 651, 659 (1997).

116. DHS is an Executive Department, 5 U.S.C. § 101, and the Secretary of Homeland Security, as a Head of Department, is subject to the Appointments Clause. *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 590 U.S. ____, 140 S. Ct. 1649, 1657 (2020)*.

117. The Secretary of Homeland Security and other DHS offices—including but not limited to the Deputy Secretary; the Under Secretary for Management; the DHS Under Secretary for Strategy, Policy, and Plans; the Commissioner of U.S. Customs and Border Protection ("CBP"); the Director of USCIS; and the Director of U.S. Immigration and Customs Enforcement ("ICE")— are offices whose officers must be appointed by the President, by and with the advice and consent

of the Senate. 6 U.S.C. § 112(a)(1), § 113(a)(1) (commonly referred to as a "PAS," or "Presidential Appointment needing Senate confirmation," Position).

118.     Acting officials currently purport to exercise the functions of Secretary of Homeland Security, Chief of Staff, and Assistant Secretary of Public Affairs. The positions of Deputy Secretary, General Counsel, Under Secretary for Management, Under Secretary for Science and Technology, Director of USCIS, Commissioner of CBP, and Director of ICE remain vacant, with various individuals exercising the functions of these offices under the novel title of "Senior Official Performing the Duties" of those positions.

119.     Upon information and belief, Congress has not provided for the position of "Senior Official Performing the Duties" of any executive office in any statute.

120.     The President has publicly expressed his inclination to appoint acting officials as a means of evading Senate confirmation. The President has stated:

a.     "Well, I'm in no hurry. I have 'acting' . . . I sort of like 'acting.' It gives me more flexibility."[13]

b.     "It's OK. It's easier to make moves when they're acting." "I like acting because I can move so quickly. It gives me more flexibility."[14]

c.     "Acting gives you much more flexibility. A lot easier to do things."[15]

d.     "I'm generally not going to make a lot of appointments that would normally be – because you don't need them."[16]

---

[13] Felicia Sonmez, *Trump Says He's 'in No Hurry' to Replace Acting Cabinet Members,* WASH. POST (Jan. 6, 2019), https://www.washingtonpost.com/politics/trump-says-hes-in-no-hurry-to-replace-acting-cabinet-members/2019/01/06/afac5fea-11e4-11e9-b6ad-9cfd62dbb0a8_story.html.
[14]     *Transcript: President Trump on "Face the Nation,"* CBS NEWS (Feb. 3, 2019), https://www.cbsnews.com/news/transcript-president-trump-on-face-the-nation-february-3-2019/.
[15]     Editorial Board, *An Administration of Temps,* BLOOMBERG OPINION (Jul. 25, 2019), https://www.bloomberg.com/opinion/articles/2019-07-25/trump-s-washington-has-an-acting-officials-problem.
[16] Randall Lane, *Inside Trump's Head: An Exclusive Interview with the President, and the Single Theory That Explains Everything,* FORBES (Oct. 10, 2017), https://www.forbes.com/donald-trump/exclusive-interview/#501570b4bdec.

121.    The Trump Administration has repeatedly sought to evade Congressional oversight of irresponsible executive appointments.[17] By holding PAS positions vacant for unreasonably long periods of time, and by relying on acting officials to perform the functions of these positions, the Trump Administration has flouted the framework for accountability set up by the Appointments Clause and other statutes.

**The FVRA and the HSA**

122.    Congress enacted the FVRA to "reclaim[]" its "Appointments Clause power" and reassert its authority over temporary appointments. *See Sw. Gen.*, *Inc.* v. *NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017).

123.    The FVRA was intended to protect the Senate's authority under the Appointments Clause, preventing the Executive from undermining the separation of powers through the manipulation of official appointments. S. Rep. No. 105-250, at 4-5 (1998) ("[T]he Senate's confirmation power is being undermined as never before."). *See also Edmond*, 520 U.S. at 659 ("The Appointments Clause is more than a matter of 'etiquette or protocol;' it is among the significant structural safeguards of the constitutional scheme.").

124.    The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the consent of the Senate," unless a statute specifically provides otherwise. 5 U.S.C. § 3347(a). The FVRA limits who may serve as the acting head of an agency "[i]f an officer of an Executive agency . . . whose appointment . . . is required

---

[17] For instance, Kevin McAleenan and Kenneth Cuccinelli avoided Senate oversight since they were not nominated to their positions in accordance with the Appointments Clause and, therefore, were purportedly designated to occupy vacant positions outside the established process by law. *See generally* Government Accountability Office, *Matter of Department of Homeland Security – Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, B-331650, August 14, 2020.

to be made by the President, by and with the advice and consent of the Senate . . . resigns." *Id.* § 3345(a).

125.    The FVRA provides that, in the event of a resignation from a PAS position, the first assistant assumes the role as the acting head of the agency. 5 U.S.C. § 3345(a)(1). Alternatively, the President may either direct a person who holds a PAS Position to "perform the functions and duties of the vacant office temporarily in an acting capacity," 5 U.S.C. § 3345(a)(2), or may "direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity" if they meet the relevant tenure and salary qualifications under the statute, 5 U.S.C. § 3345(a)(3).[18]

126.    The FVRA stipulates that a person may not serve as an acting officer "for longer than 210 days beginning on the date the vacancy occurs." 5 U.S.C. § 3346(a).[19]

127.    If no officer is appointed in a manner consistent with the FVRA, "the office shall remain vacant." 5 U.S.C. § 3348(b)(1).

128.    The FVRA permits amendments to its standard order of succession, as long as they are expressly authorized by another statutory provision. 5 U.S.C. § 3347(a)(1).

129.    The HSA does just this for the order of succession for vacancies arising in the position of Secretary of Homeland Security. 6 U.S.C. § 113(g).

130.    Under the HSA, the order of succession in the event of a vacancy in the office of the DHS Secretary is the Deputy Secretary and then the Under Secretary for Management. 6 U.S.C. § 113(a)(1)(A), (g)(1). The HSA also authorizes the Secretary to designate additional officers "in further order of succession" to serve as Acting Secretary if the top three positions (i.e., Secretary,

---

[18] Because the HSA defines the relevant orders of succession, 5 U.S.C. § 3345(a)(2)-(3) are not applicable to the Department of Homeland Security.

[19] The period may be extended under circumstances that are inapplicable here. *See* 5 U.S.C. § 3346.

Deputy Secretary, and Under Secretary of Management) are vacant. *Id.* § 113(g)(2).

***The February Delegation***

131.    On December 5, 2017, Kirstjen Nielsen was confirmed by the U.S. Senate as DHS Secretary. Secretary Nielsen was the last officer to exercise the functions of DHS Secretary who was appointed with the advice and consent of the Senate.

132.    On February 15, 2019, Secretary Nielsen exercised her power to designate an order of succession under 6 U.S.C. §113(g)(2), issuing HSA Delegation 00106, Revision No. 08.4 ("February Delegation").

133.    The February Delegation stipulates two scenarios in which an officer may assume the position of Acting Secretary: first, in case of the Secretary's death, resignation, or inability to perform the functions of the office, February Delegation § II.A; and second, if the Secretary were unavailable to act during a disaster or catastrophic emergency, February Delegation § II.B. Under the February Delegation, each of these scenarios triggers a different order of succession.

134.    Under the February Delegation, where the Secretary is unavailable to act during a disaster or catastrophic emergency, Annex A to February Delegation ("Annex A") governed the order of succession. February Delegation, § II.B.

135.    Under the February Delegation, where the position of Secretary of Homeland Security becomes vacant because of the Secretary's death, resignation, or inability to perform the functions of the office, the order of succession is governed by Executive Order 13753 ("E.O. 13753"). February Delegation § II.A.

136.    Under E.O. 13753, the next position after the Deputy Secretary and the Under Secretary for Management in the order of succession in the event of resignation is the Administrator of the Federal Emergency Management Agency ("FEMA").

137.     The FEMA Administrator resigned on March 8, 2019, prior to Nielsen's resignation, and the position was vacant until January 14, 2020, when the Senate confirmed Administrator Peter T. Gaynor.

**Secretary Nielsen's Resignation and the April Delegation**

138.     On April 7, 2019, Secretary Nielsen tendered her resignation, "effective April 7th, 2019." Letter from Kirstjen M. Nielsen, Sec'y of Homeland Sec., to Donald J. Trump, President, Apr. 7, 2019.[20]

139.     On April 7, 2019, the date Secretary Nielsen's resignation became effective, the office of Deputy Secretary was vacant. Consistent with the 6 U.S.C. § 113(g)(1) and the February Delegation, then-Under Secretary for Management, Claire Grady, assumed the functions of Acting Secretary by operation of law.

140.     Nevertheless, also on April 7, 2019, Defendant Trump announced via Twitter that Kevin McAleenan (then-CBP Commissioner) would actually assume the role of Acting DHS Secretary, even though Mr. McAleenan was seventh in the order of succession under E.O. 13753, which, per the February Delegation, governed in the event of a resignation.[21]

141.     At 10:36 pm that same day, Secretary Nielsen announced via Twitter that she would supposedly remain Secretary until April 10, 2019.[22]

142.     According to DHS, before leaving office on April 10th, Secretary Nielsen updated the February Delegation to again change the order of succession. HSA Delegation 00106, Revision No. 08.5 ("April Delegation").

---

[20] *Available at* https://www.dhs.gov/sites/default/files/publications/19_0407_s1_nielsen-resignation-letter.pdf.
[21] Donald J. Trump (@realDonaldTrump), Twitter, (Apr. 7, 2020, 6:02 PM),
https://twitter.com/realDonaldTrump/status/1115011885303312386.
[22] Secretary Kirstjen M. Nielsen (@SecNielsen), Twitter, (Apr. 7, 2020, 10:36 PM),
https://twitter.com/SecNielsen/status/1115080823068332032.

143.    The April Delegation preserved the two-track order of succession established by the February Delegation. April Delegation § II.A.

144.    The April Delegation only changed the order of succession for vacancies caused by disaster or catastrophic emergency. In those cases, vacancies in the office of Secretary or Deputy Secretary would be governed by amended Annex A.

145.    Under amended Annex A, the order of succession to the position of Acting Secretary in case of disaster or catastrophic emergency is as follows:

> (1) Deputy Secretary;
>
> (2) Under Secretary for Management;
>
> (3) CBP Commissioner; and
>
> (4) FEMA Administrator.

April Delegation, Annex A. The April Delegation removed the Director of the Cybersecurity and Infrastructure Security Agency (CISA) from the order of succession and elevated the CBP Commissioner to third in that order, pushing the FEMA Administrator to fourth.

146.    The April Delegation also changed the order of succession for Deputy Secretary, as listed under Annex B. Following the April Delegation, the first four positions in the order of succession to the position of Deputy Secretary were:

> (1) Under Secretary for Management,
>
> (2) Administrator of the Transportation Security Administration ("TSA"),
>
> (3) FEMA Administrator, and
>
> (4) Director of CISA.

April Delegation, Annex B.

147.    Importantly, the April Delegation did not alter the applicability of E.O. 13753 for

41

vacancies caused by the Secretary's death, resignation, or inability to perform the functions of the office. In those instances, the order of succession designated by E.O. 13753 continued to govern.

148.     As a result, the order of succession to the position of Secretary in case of death, resignation, or inability to perform the functions of the office, at the time of Secretary Nielsen's resignation, remained as:

(1) Deputy Secretary,

(2) Under Secretary for Management,

(3) FEMA Administrator, and

(4) Director of CISA.

149.     Thus, if the position of Secretary became vacant on account of a disaster or catastrophic emergency, the order of succession would be governed by the amended Annex A to the April Delegation, April Delegation § II.B, and if the position became vacant on account of death, resignation, or inability to perform the position's functions, the order of succession that governed was set by E.O. 13753. *Compare* April Delegation, Annex A *with* E.O. 13753.

### Kevin McAleenan's Unlawful Installation and the November Delegation

150.     On April 10, 2020, Under Secretary for Management Claire Grady resigned, leaving that position vacant and making the CISA Director the first Senate-confirmed officer in line to assume the role of Acting Secretary.

151.     Following the resignations of both Secretary Nielsen and the Under Secretary of Management Grady, CBP Commissioner Kevin McAleenan assumed the title of Acting Secretary even though the CISA Director, the Under Secretary for National Protection and Programs, and the Under Secretary for Intelligence and Analysis preceded him in the governing order of succession.

152. DHS has claimed that Mr. McAleenan took the position of Acting Secretary pursuant to the April Delegation. Had Secretary Nielsen been unable to perform the duties of Secretary because of an emergency or catastrophe, then Mr. McAleenan, would, indeed, have been next in the order of succession under the amended Annex A. *See* April Delegation § II.B. This was not the case, however, as the office of the Secretary became vacant upon the Secretary's *resignation*. *See id.* § II.A. Under the terms of E.O. 13753—which still governed in this situation— in the absence of a Deputy Secretary, an Under Secretary of Management, and a FEMA Director, the CISA Director—*not* the CBP Commissioner—would assume the functions of Acting Secretary. E.O. 13753 § 1. Consequently, Mr. McAleenan's succession to Acting Secretary was not valid.

153. On November 8, 2019, the 212th day of his purported designation as Acting Secretary, Mr. McAleenan revised HSA Delegation 00106 to once again change the order of succession. HSA Delegation 00106, Revision No. 08.6 ("November Delegation")

154. Even if Mr. McAleenan had properly succeeded Nielsen as Acting Secretary of Homeland Security—which he did not—he lacked any statutory authority whatsoever to issue this change because he exceeded the FVRA's 210-day deadline for acting officials, regardless of whether HSA or the FVRA governed his designation.

155. The November Delegation purported to change the order of succession for vacancies caused by death, resignation, or inability to perform the position's functions, which was governed by E.O. 13753 at the time. The November Delegation attempted to change that order of succession to the order outlined in the April Delegation's Annex A. As a result, both vacancy tracks—those on account of death, resignation, illness, or inability to perform, and those on account of a catastrophe or emergency—now supposedly followed the order of succession outlined in the April Delegation's Annex A.

156.     The November Delegation then purported to change that universal order of succession. The order became: (1) Deputy Secretary; (2) Under Secretary for Management; (3) CBP Commissioner; and (4) Under Secretary for Strategy, Policy, and Plans. November Delegation, Annex A. The revision removed the FEMA Administrator and the CISA Director, replacing them with the CBP Commissioner and the Under Secretary for Strategy, Policy, and Plans.

157.     In sum, the November Delegation purported to revise the order of succession for the position of DHS Secretary, and applied that order to both vacancy tracks contemplated by prior iterations of the delegation. But, as Mr. McAleenan was unlawfully exercising the functions of Acting Secretary at the time it was issued, the November Delegation lacks legal force.

***Mr. McAleenan's Purported Resignation and Defendant Wolf's Purported Installment***

158.     On November 13, 2019, Defendant Wolf was confirmed by the Senate to the position of DHS Under Secretary for Strategy, Policy, and Plans—the fourth position in the order of succession for DHS Secretary under the unlawful November Delegation's Annex A.

159.     Also, on November 13, 2019, Mr. McAleenan resigned as Acting DHS Secretary and CBP Commissioner. Although the FVRA provides that an acting officer may only serve as Acting Secretary for 210 days since the position becomes vacant, Mr. McAleenan had purportedly held the position of Acting Secretary for a total of 216 days.

160.     At the time of Mr. McAleenan's resignation, the positions of Deputy Secretary of Homeland Security and Under Secretary of Management in the Department of Homeland Security remained vacant. Because the November Delegation was unlawfully issued and E.O. 13753 was still operative, the next positions in the order of succession were the FEMA Administrator and

then the CISA Director. Because the office of the FEMA Administrator was vacant as well, CISA Director Christopher Krebs should have assumed the role of Acting DHS Secretary.

161.    Despite the invalidity of the November Delegation and its order of succession, Defendant Wolf purportedly assumed the role of Acting DHS Secretary when Mr. McAleenan resigned from his purported role on November 13, 2019.

162.    Because Mr. McAleenan could not assume the functions of Acting DHS Secretary, no officer was lawfully appointed Acting Secretary within 210 days of Secretary Nielsen's resignation. Accordingly, neither Defendant Wolf nor any other person can validly assume the position of Acting DHS Secretary now. Only a constitutionally compliant appointment can fill the vacancy. And more than 500 days after Secretary Nielsen's resignation, the President indicated his intent to nominate Defendant Wolf for DHS Secretary on August 25, 2020.[23]

**Defendant Wolf Lacks Legal Authority to Issue the Wolf Memorandum**

163.    The FVRA provides that any action taken in the performance of a function or duty of a vacant office by any person who occupies the position contrary to the FVRA "shall have no force or effect." 5 U.S.C. § 3348(d)(1). Such actions "may not be ratified." 5 U.S.C. § 3348(d)(2).

164.    Establishing national immigration enforcement policies and priorities is a function of the DHS Secretary. 6 U.S.C. § 202(5). The FVRA defines a "function or duty" as any function or duty that is established by statute or regulation, and that is "required by statute [or regulation] to be performed by the applicable officer". 5 U.S.C. § 3348(a)(2).

165.    The Wolf Memorandum purports to set enforcement priorities, a function of the DHS Secretary. Wolf Memorandum at 4.

---

[23] *See supra* note 19.

166.     Because Defendant Wolf lacks the authority to exercise the functions that are legally delegated to the Acting Secretary in accordance with the FVRA, the Wolf Memorandum has no legal force.

167.     Under the FVRA, the Comptroller General of the United States, who is head of the Government Accountability Office ("GAO"), is required to report to Congress any violations of the time limitations on acting service. 5 U.S.C. § 3349.

168.     On August 14, 2020, the GAO issued an opinion reviewing the legality of Defendant Wolf's designation as Acting DHS Secretary and concluded that Wolf was improperly designated. GAO, *Matter of Department of Homeland Security – Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security*, B-331650, August 14, 2020.[24]

169.     Since Defendant Wolf never had the legal authority to exercise the functions of Acting Secretary, he cannot issue a memorandum altering enforcement priorities.

**Defendant Edlow Lacks Legal Authority to Implement the Wolf Memorandum**

170.     The Wolf Memorandum is addressed in significant part to Defendant Edlow, who similarly lacks the legal authority to exercise the functions and powers of the office to which he has been designated.

171.     Defendant Wolf purportedly designated Defendant Edlow Deputy Director for Policy at USCIS on February 19, 2020.

---

[24] *Available at* https://www.gao.gov/assets/710/708830.pdf. After DHS requested GAO to rescind its decision, GAO affirmed its decision after concluding that DHS had not shown material errors of fact or law, nor provided information not previously considered that warranted reversal or modification of the decision. *See* GAO, *Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security—Reconsideration,* B-332451, August 21. 2020.

172.    Because he was not lawfully serving as Acting Secretary, Defendant Wolf lacked any legal authority to designate Defendant Edlow to the position of USCIS Deputy Director for Policy.

173.    Previously, between July 2019 and February 2020, Defendant Edlow served as Chief Counsel of the Office of the Chief Counsel at USCIS, a PAS Position.

174.    Defendant Edlow has not since been confirmed by the Senate to any other senior position.

175.    Despite being unlawfully designated by an individual lacking legal authority to serve Acting DHS Secretary, Defendant Edlow issued the Edlow Memorandum on August 21, 2020, attempting to implement the Wolf Memorandum.

## CLASS ALLEGATIONS

176.    Individual Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), on behalf of themselves and all other persons for whom Defendants' implementation of the Wolf Memorandum, not least through the Edlow Memorandum, interferes with their ability to apply for DACA, renew DACA, or seek advance parole.

177.    Individual Plaintiffs seek certification of a class (the "DACA Class") (for the claims challenging the appointment of Defendant Wolf and the legality of the Wolf Memorandum and its implementing guidance, including the Edlow Memorandum) consisting of: All persons who are or will be prima facie eligible for deferred action under the terms of the Napolitano Memorandum.

178.    Individual Plaintiffs also seek certification of a subclass (the "Pending Applications Subclass") (for the claims challenging the application of the Wolf Memorandum and its implementing guidance, including the Edlow Memorandum, to certain DACA applications) consisting of: All persons who had an application for deferred action through DACA, whether

first-time or renewal, pending at USCIS on any date between June 30, 2020, and July 28, 2020, that have not been or will not be adjudicated in accordance with the Napolitano Memorandum.

179.     Excluded from the DACA Class and the Pending Applications Subclass are the individuals who are prima facie eligible for deferred action through DACA and who bring a federal lawsuit challenging the Wolf Memorandum.

180.     This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

181.     The DACA Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1). The precise number of members of the DACA class is not known, but as of June 30, 2020, USCIS reported that there were 645,610 current DACA recipients.[25] An estimated 1.1 million undocumented immigrants are prima facie eligible for DACA, including an estimated 300,000 individuals who are eligible to submit first-time applications for DACA.[26]

182.     The total number of the members of the Pending Applications Subclass is also unknown. As of June 30, 2020, there were 27,850 DACA applications pending at USCIS.[27] Plaintiff Make the Road New York's legal department on its own had more than 166 clients with renewal applications pending when the Wolf Memorandum was issued.

183.     The claims of the DACA Class members share common issues of law and fact, resolution of which will not require individualized determinations, satisfying Rule 23(a)(2). Some common questions of law and fact include but are not limited to:

---

[25] *See* Quarterly Summary Report, at 12, *Regents of the Univ. of California v. U.S. Dep't. of Homeland Sec*., No. 17-cv-5211 (N.D. Cal. July 1, 2020), ECF No. 299-2.
[26] *See* Nicole Prchal Svajlenka, Tom Jawetz, and Philip E. Wolgin, "The Trump Administration Must Immediately Resume Processing New DACA Applications," CENTER FOR AMERICAN PROGRESS (July 13, 2020), https://ampr.gs/32euYw7.
[27] Quarterly Summary Report, at 12, *Regents of the Univ. of California v. U.S. Dep't. of Homeland Sec.*, No. 17-cv-5211 (N.D. Cal. July 1, 2020), ECF No. 299-2.

(1) Whether Defendant Wolf is serving unlawfully as the Acting Secretary of Homeland Security in violation of the order of succession set out by the Federal Vacancies Reform Act and the Homeland Security Act;

(2) Whether Defendant Wolf lacked legal authority to issue the Wolf Memorandum, and therefore it "must have no force or effect," 5 U.S.C. § 3348(d);

(3) Whether Mr. McAleenan's assumption of the role of Acting Secretary of Department of Homeland Security was unlawful, such that any changes to orders of succession that he made were unlawful;

(4) Whether the Edlow Memorandum is invalid and must be set aside; and

(5) Whether the Wolf Memorandum is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

184.    The claims of the Pending Applications Subclass members share common issues of law and fact, resolution of which will not require individualized determinations, satisfying Rule 23(a)(2).  Some common questions of law and fact include, but are not limited to:

(1) Whether class members are entitled to have their DACA applications adjudicated in accordance with the Napolitano Memorandum;

(2) Whether class members' due process rights were violated by USCIS's failure to adjudicate their requests for deferred action in accordance with the terms of the Napolitano Memorandum; and

(3) Whether Defendants violated the due process rights of class members by applying the terms of the Wolf Memorandum and Edlow Memorandum without providing adequate notice.

185. The claims or defenses of Individual Plaintiffs are typical of the claims or defenses of the members of the DACA Class, satisfying Rule 23(a)(3). Like other members of the class, Individual Plaintiffs have been harmed, among other things, by Defendants' failure to lawfully abide by statutory limitations on their actions. Individual Plaintiffs have been further harmed by Defendants' unlawful appointment of Defendant Wolf as the Acting Secretary of DHS and will be deprived of the opportunity to access DACA pursuant to the terms of the Napolitano Memorandum.

186. The claims or defenses of Plaintiffs Johana Larios, Sonia Molina, and M.B.F. are typical of the claims or defenses of the members of the Pending Applications Subclass, satisfying Rule 23(a)(3). Like other members of the class, these plaintiffs are harmed by Defendants' failure to consider their DACA application under the terms of the Napolitano Memorandum, in violation of the APA and the Due Process Clause.

187. Individual Plaintiffs will fairly and adequately protect the interests of the DACA Class and Plaintiffs Johanna Larios, Sonia Molina, and M.B.F. will fairly and adequately protect the interests of the Pending Applications Subclass, satisfying Rule 23(a)(4). The Plaintiffs will defend the rights of the proposed DACA Class fairly and adequately, and have no interest that is now or may be potentially antagonistic to the interests of the DACA Class. Plaintiffs Johanna Larios, Sonia Molina, and M.B.F. will defend the rights of the proposed Applications Class fairly and adequately, and have no interest that is now or may be potentially antagonistic to the interests of the Applications Class.

188. The attorneys representing the named Plaintiffs include experienced civil rights and immigration attorneys who are considered able practitioners in federal constitutional and statutory litigation. These attorneys should be appointed as class counsel.

189.    The members of the proposed class are readily ascertainable through objective means.

190.    Through the issuance of the Wolf Memorandum at the center of Plaintiffs' Class allegations, Defendants have acted, have threatened to act, and will act on grounds generally applicable to the DACA Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The DACA Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

191.    By adjudicating the Pending Applications Subclass's applications for DACA under the terms of the Wolf and Edlow Memoranda rather than the Napolitano Memorandum, Defendants have acted or will act in a manner generally applicable to the Applications Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The DACA Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Federal Vacancies Reform Act and Homeland Security Act**
**Unlawful Appointment**
**By all Plaintiffs against Defendants Trump, Wolf, and DHS**

192.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

193.    The Secretary of Homeland Security must be appointed by the President with the advice and consent of the Senate. 6 U.S.C. § 112(a)(1).

194.    When the office of the Secretary of Homeland Security is vacant, only a valid Acting Secretary may perform the functions or duties of the position.

195. The Federal Vacancies Reform Act ("FVRA") is the exclusive means for temporarily filling vacant offices whose appointments must be made by the President, by and with the advice and consent of the Senate.

196. Under the Homeland Security Act of 2002 ("HSA"), the Secretary of Homeland Security may "designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2).

197. Establishing national immigration enforcement policies and priorities is a function of the Secretary of Homeland Security. 6 U.S.C. § 202(5).

198. Mr. McAleenan and subsequently Defendant Wolf both improperly assumed the position of Acting Secretary in violation of the order of succession set forth by the FVRA and the HSA. Neither had legal authority to perform the functions of Secretary of Homeland Security.

199. In addition, Defendant Wolf improperly assumed the position of Acting Secretary in violation of FVRA and HSA because by the time he purported to assume the office, Mr. McAleenan had already served longer than 210 days as Acting Secretary, in violation of the FVRA's prohibition on acting officers serving for longer than 210 days. As a result, Mr. McAleenan lacked the authority to issue the November Delegation, which issued after the FVRA's 210-day prohibition.

200. As of no later than November 6, 2019 no individual could lawfully serve as an Acting Secretary of DHS.

201. Therefore, Defendant Wolf did not have the legal authority to issue the Wolf Memorandum.

202. At the time that the Wolf Memorandum was issued, the FVRA required that the position of Secretary of Homeland Security remain vacant because the FVRA's 210-day time

period had lapsed. *See* 5 U.S.C. § 3348(b)(1).

203.    As a result, no officer could perform the functions of Acting Secretary of Homeland Security, and no officer had the legal authority to issue the Wolf Memorandum or any other memorandum changing the DACA policy as established under the Napolitano Memorandum.

204.    The Wolf Memorandum was issued by an unlawfully designated officer and thus "must have no force or effect." 5 U.S.C. § 3348(d).


## SECOND CLAIM FOR RELIEF
### Appointments Clause
### Unlawful Appointment
### By all Plaintiffs against Defendants Trump, Wolf, and DHS

205.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206.    Under the Appointments Clause of the U.S. Constitution, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers, of the United States," though Congress may "by Law vest the Appointment of such inferior Officers as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const., art II, § 2, cl. 2.

207.    The Department of Homeland Security is an Executive Department, 5 U.S.C. § 101, and the Secretary of Homeland Security, as a Head of Department, is subject to the Appointments Clause. *See Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 590 U.S. ___, 140 S. Ct. 1649, 1657 (2020).

208.    Defendant Wolf has not been confirmed by the Senate to the position of DHS Secretary.

209.     By holding the position of the DHS Secretary vacant for an unreasonably long period of time and relying on Defendant Wolf to unlawfully perform the functions of Secretary in an acting capacity, the Defendant Trump has flouted the framework for accountability established by the Appointments Clause.

210.     Accordingly, Defendant Wolf is serving in the position of Acting Secretary in violation of the Appointments Clause, and no function taken in his official capacity is lawful.

### THIRD CLAIM FOR RELIEF
### Administrative Procedure Act
### Agency Actions that are Arbitrary and Capricious, An Abuse of Discretion, and Otherwise Not In Accordance with Law
### By all Plaintiffs against Defendants Edlow, Wolf, DHS and USCIS

211.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

212.     The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

213.     As Defendants concede, Defendants' issuance of the Wolf Memorandum constitutes final agency action reviewable under the APA. Letter, *Batalla Vidal*, No. 16-cv-4756, ECF No. 304 (E.D.N.Y. Aug. 12, 2020), at 2.

214.     Defendants' issuance of the Edlow Memorandum likewise constitutes final agency action reviewable under the APA.

215.     The Wolf Memorandum is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law, not least because it: (a) lacks a reasoned explanation; (b) failed to consider all relevant factors, including the reliance interests at stake in the DACA

program; and/or (c) was issued by an individual who did not have legal authority to issue the Memorandum because Defendant Wolf was not lawfully serving as Acting DHS Secretary.

216. The Edlow Memorandum is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, not least because it was issued by an individual who did not have legal authority to issue the Memorandum because Defendant Edlow was designated to serve in his position by Defendant Wolf, who was and is unlawfully serving as Acting DHS Secretary.

217. Defendants characterize their actions as an "interim" measure, expressly admitting that they did not conduct a full APA-compliant consideration of the contemplated action.

218. The Wolf Memorandum, and the Edlow Memorandum that followed it, are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A), and must be held unlawful and set aside.

## FOURTH CLAIM FOR RELIEF
### Fifth Amendment (Procedural Due Process)
### By all Plaintiffs against Defendants Edlow, Wolf, DHS, and USCIS

*Refusal to Adjudicate Properly Submitted Applications for DACA and Advance Parole*

219. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

220. The hallmark of due process is notice and opportunity to be heard.

221. The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from depriving individuals of their liberty or property interests without due process of law. Due process interests are at stake in the adjudication of DACA and advance parole applications, even if the ultimate determination by the agency is discretionary. *See INS v. St. Cyr*,

533 U.S. 289, 307-08 (2001) (finding plaintiff had a right to a ruling, even if the *outcome* of that ruling is discretionary).

222.    Defendants have not provided DACA applicants with the process to which they are entitled.

223.    The Supreme Court's opinion in *Regents* and the Fourth Circuit mandate in *CASA de Maryland* were both applicable nationwide. Both decisions required Defendants to return to the *status quo ante* by adjudicating first-time applications for DACA, continuing to accept two-year renewal requests, and accepting applications for advance parole.

224.    Moreover, under the terms of the DACA guidance as it existed prior to the 2017 termination, "[e]ach request for consideration of DACA will be reviewed on an individual, case-by-case basis."[28]

225.    By their own admission, Defendants refused to adjudicate first-time DACA and advance parole applications filed between June 30, 2020 and July 28, 2020—the period between the issuance of Fourth Circuit mandate and the issuance of the Wolf Memorandum. Instead, Defendants "placed" these first-time applications "into a bucket" pending future action by the agency. Tr. of Virtual Status Conference Proceedings at 17-18, *CASA de Maryland v. DHS*, 8:17-cv-02942-PWG (D. Md. Jul. 24, 2020).

226.    In the Wolf and Edlow Memoranda, Defendants maintained their refusal to adjudicate these first-time applications on an individual, case-by-case basis, instead rejecting them retroactively and categorically.

227.    Defendants continue to refuse to provide individual review of any first-time DACA applications or advance parole requests, and have begun granting DACA renewals for a one-year

---

[28] *Frequently Asked Questions*, U.S. Citizenship and Immigration Services, *available at* https://www.uscis.gov/archive/frequently-asked-questions.

period.

228.    Defendants' failure to adjudicate applications submitted and postmarked prior to July 28, 2020 according to the terms of the Napolitano Memorandum violates the Due Process Clause of the Fifth Amendment.

**Failure to Provide Notice of Refusal to Adjudicate First-Time Applications**

229.    Defendants' categorical refusal to adjudicate first-time DACA applications after June 30, 2020, contravened the DACA program as it existed prior to Defendants' unlawful 2017 termination.

230.    Between June 30, 2020 and July 24, 2020, Defendants never provided individualized or even general notice to applicants, their counsel, or the public that it had changed the DACA program to refuse to adjudicate new DACA applications.

231.    On July 24, 2020, Defendants articulated this change during a status conference in *CASA de Maryland v. U.S. Dep't of Homeland Security*, before the District of Maryland. To date, despite not issuing the Wolf Memorandum until July 28, 2020, Defendants have not explained when this shift occurred.

232.    Under the terms of the DACA guidance as it existed prior to the 2017 termination, DACA applicants are entitled to individualized review of their applications.

233.    Defendants' failure to provide individualized notice to first-time applicants that their applications would not be adjudicated violates the Due Process Clause of the Fifth Amendment.

234.    Defendants' virtual silence on the DACA program before the Wolf Memorandum also prevented Plaintiff MRNY from correctly advising its members, clients, and the general public

of their eligibility for DACA in the wake of the Supreme Court's decision and the Fourth Circuit's mandate.

235.     Defendants' failure to notify applicants' counsel or the public of this policy change likewise violates the Due Process Clause of the Fifth Amendment.

### *Failure to Provide Notice of Changes to Renewal Process*

236.     The DACA program as it existed both before and after Defendants' unlawful 2017 termination set the DACA grant period at two years from the date of approval.

237.     Under the Wolf Memorandum, no matter when they applied for DACA renewal, individuals whose renewal applications are approved after the date of the memorandum are eligible only for one-year grants. This includes individuals whose renewal applications were pending with Defendants as of the date of the memorandum.

238.     Defendants did not provide individual notice to these individuals that their period of DACA would be limited despite their having already submitted renewal applications.

239.     Defendants' virtual silence on the DACA program before the Wolf Memorandum also prevented Plaintiff MRNY from correctly advising its members, clients, and the general public of the length of renewals in the wake of the Supreme Court's decision and the Fourth Circuit's mandate.

240.     Defendants' failure to provide notice to these individuals that their DACA would be limited to one year rather than two violates the Due Process Clause of the Fifth Amendment.

### *Failure to Provide Notice of Changes to Advance Parole Standard*

241.     The DACA program as it existed before Defendants' unlawful 2017 termination of the program allowed DACA recipients to apply for and receive advance parole if their travel

abroad would further humanitarian purposes, educational purposes, or employment purposes.[29]

242.    Under the Wolf and Edlow Memoranda, no matter when DACA recipients requested advance parole, Defendants intend to reject all applications for advance parole from DACA recipients "absent exceptional circumstances." This includes individuals whose advance parole applications were pending with Defendants as of the date of the Wolf Memorandum.

243.    Defendants did not provide individual notice to these individuals that their pending applications for advance parole would be subject to this new heightened standard.

244.    Defendants' virtual silence on the DACA program before the Wolf Memorandum also prevented Plaintiff MRNY from correctly advising its members, clients, and the general public of their eligibility for advance parole in the wake of the Supreme Court's decision and the Fourth Circuit's mandate.

245.    Defendants' failure to provide notice to these individuals that their advance parole applications would be rejected absent exceptional circumstances violates the Due Process Clause of the Fifth Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.  Certify a class and subclass consisting, respectively, of: (A) All persons who are or will be prima facie eligible for deferred action under the terms of the 2012 Napolitano Memorandum; and (B) All persons who had an application for deferred action through DACA, whether first-time or renewal, pending at USCIS on any date between June 30, 2020, and July 28, 2020, that have not been or will not be adjudicated in accordance with the 2012 Napolitano Memorandum. Excluded from the class and subclass are: The

---

[29] *Frequently Asked Questions*, *supra* note 20.

individual recipients of, or requestors for, deferred action through DACA who proceed with a challenge to the Wolf Memorandum;

2. Appoint the undersigned counsel as class counsel;

3. Declare that Defendant Wolf is unlawfully serving as Acting Secretary of Homeland Security, in violation of the Federal Vacancies Reform Act, the Homeland Security Act, and the Appointments Clause;

4.  Declare that the Wolf Memorandum has no force or effect as an unlawful exercise of authority;

5. Declare that the Wolf Memorandum and actions taken by Defendants to implement the Wolf Memorandum, including the Edlow Memorandum, are void and without force or effect, and cannot be ratified;

6. Declare that the Wolf Memorandum and Edlow Memorandum are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

7. Declare that the Wolf Memorandum, the Edlow Memorandum, and actions taken by Defendants are in violation of the procedural due process guarantee of the Fifth Amendment of the U.S. Constitution;

8. Issue a declaration under 28 U.S.C. § 2201 that the DACA program as established by the Napolitano Memorandum is a lawful exercise of executive power;

9. Vacate and set aside the Wolf Memorandum and any other action, including but not limited to the Edlow Memorandum, taken by Defendants to terminate the DACA program in whole or in part;

10. Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and persons in active concert or participation with any of the Defendants, from implementing or

enforcing the Wolf Memorandum and the Edlow Memorandum, and from taking any other action to terminate or curtail first-time applications for DACA, DACA renewals, advance parole for DACA recipients, or other aspects of the DACA program that is not in compliance with applicable law or the U.S. Constitution;

11. Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of the Defendants, from denying individuals the opportunity, when eligible under the terms of the Napolitano Memorandum, to apply for or to renew their DACA, or to apply for advance parole;

12. Enjoin Defendants to adjudicate all first-time DACA applications filed from June 30, 2020 to the present in accordance with the terms of the Napolitano Memorandum, even if Defendants have heretofore rejected those applications, with appropriate notice to applicants and their counsel;

13. Enjoin Defendants to adjudicate first-time DACA applications from any applicant who can establish that they are eligible for DACA under the terms of the Napolitano Memorandum at any point from September 5, 2017 to the present, and who files such application within a reasonable period of time following the date of decision in this case, notwithstanding any future efforts by Defendants to again terminate the program;

14. Enjoin Defendants to issue a two-year grant of DACA and Employment Authorization Document ("EAD") to all renewal applicants that have received a one-year grant of their DACA or EAD as of July 28, 2020, with appropriate notice to applicants and their counsel;

15. Award Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law; and

16. Grant such other relief as this Court deems just and proper.

Dated: August 28, 2020

Respectfully submitted,

/s/ Marisol Orihuela
Maria Camila Bustos, Law Student Intern*
Armando Ghinaglia, Law Student Intern
Edgar A. Melgar, Law Student Intern*
Ramis Wadood, Law Student Intern
Muneer I. Ahmad, Esq. (MA 9360)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SERVICES ORG.
muneer.ahmad@yale.edu
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800

Karen C. Tumlin, Esq. (*pro hac vice*)
Cooperating Attorney
JEROME N. FRANK LEGAL SERVICES ORG.
P.O. Box 209090
New Haven, CT 06520
(323) 316-0944

Trudy S. Rebert, Esq. (TR 6959)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 721361
Jackson Heights, NY 11372
(646) 867-8793

Araceli Martínez-Olguín, Esq. (AM 2927)
Mayra B. Joachin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd. #108-62
Los Angeles, CA 90010
(213) 639-3900

Paige Austin, Esq. (PA 9075)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
(718) 418-7690

*Attorneys for Plaintiffs*

* Motion for law student appearance
forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2020, a true and correct copy of the foregoing Fourth Amended Complaint was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Marisol Orihuela
Marisol Orihuela, Esq. (*pro hac vice*)
JEROME N. FRANK LEGAL SERVICES ORG.
marisol.orihuela@yale.edu
P.O. Box 209090
New Haven, CT 06520
(203) 432-4800

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| |
|---|
| CASA DE MARYLAND, *et. al.*,<br><br>      Plaintiffs,<br><br>   v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, *et. al.,*<br><br>      Defendants. |

Case No.: 17-cv-2942-PWG

**PLAINTIFFS' MOTION TO SHOW CAUSE WHY DEFENDANTS
SHOULD NOT BE HELD IN CONTEMPT, OR IN THE ALTERNATIVE,
TO COMPEL COMPLIANCE WITH THE FOURTH CIRCUIT MANDATE**

Plaintiffs Casa de Maryland, *et. al*. ("Plaintiffs") respectfully move this Court for an order to show cause why the U.S. Department of Homeland Security, *et. al.* ("Defendants") should not be held in contempt for their violation of this Court's July 17 Order restoring the DACA program "to its pre-September 5, 2017 status." ECF No. 97. In the alternative, Plaintiffs respectfully move this Court for an order to compel Defendants' compliance with the Fourth Circuit mandate, issued June 30, 2020, ordering the same relief. ECF No. 93.

For the reasons set forth in the accompanying Memorandum in Support of Plaintiffs' Motion to Show Cause Why Defendants Should Not Be Held in Contempt, or in the Alternative, to Compel Compliance with the Fourth Circuit Mandate, Defendants are in violation of this Court's July 17 Order which (1) restored the DACA program "to its pre-September 5, 2017 status" and (2) enjoined Defendants "from implementing or enforcing the DACA rescission and from taking

any other action to rescind DACA that is not in compliance with applicable law." ECF No. 97 at

3. Defendants have likewise failed to comply with the Fourth Circuit's mandate directing the same

relief. ECF No. 93; *Casa De Maryland v. U.S. Department of Homeland Security*, 924 F.3d 684,

706 (4th Cir. 2019) (vacating the DACA rescission and restoring "DACA to its pre-September 5,

2017, status"). Accordingly, Plaintiffs respectfully request this Court hold Defendants in civil

contempt and compel Defendants to restore the DACA program in full to its pre-rescission

operation until such time as Defendants complete their DACA reconsideration process. *See*

*Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891,

1913–16 (2020).


Dated: August 14, 2020

        */s/*

Elizabeth J. Bower (*pro hac vice*)
Kevin B. Clark (D. Md. 04771)
Kyle A. Mathews (*pro hac vice*)
Willkie Farr & Gallagher LLP
1875 K Street, NW
Washington, DC 20006-1238
(202) 303-1000
EBower@willkie.com

Dennis A. Corkery (D. Md. 19076)
Washington Lawyers' Committee
For Civil Rights And Urban Affairs
700 14th Street NW, Suite 400
Washington, DC 20005
(202) 319-1000
dennis_corkery@washlaw.org

Respectfully submitted,

John A. Freedman (D. Md. 20276)
Ronald A. Schechter (*pro hac vice*)
Nancy L. Perkins (*pro hac vice*)
Emily Dillingham (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com


*Attorneys for Plaintiffs*

CERTIFICATE OF SERIVCE

I hereby certify that on August 14, 2020, a copy of the foregoing was served on

all counsel of record via the Court's CM/ECF system.

_____
*/s/*
Elizabeth J. Bower

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et. al.*,

        Plaintiffs,

   v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et. al.,*

        Defendants.

Case No.: 17-cv-2942-PWG

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT, OR IN THE ALTERNATIVE, TO COMPEL COMPLIANCE WITH THE FOURTH CIRCUIT MANDATE

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ........................................................................... 3

    A.      DACA and DACA Rescission-Related Litigation ........................................ 3

    B.      Defendants' Intentional Noncompliance with the Courts' Orders .............................. 5

III.    ARGUMENT ....................................................................................................... 11

    A.      The Duke Memorandum Was Vacated, Rendering it Null and Void, and Thus
        the DACA Program Returned to the Status Quo Ante. ................................. 12

    B.      Defendants are Required to Administer the Status Quo Ante. ................................... 13

    C.      Defendants Knew Their Actions Did Not Comply With the Requirement to
        Restore the DACA Program to the Status Quo Ante. ................................... 15

    D.      Plaintiffs and the Public Have Been Harmed by Defendants' Noncompliance.......... 17

    E.      Contempt and Compelled Compliance are Appropriate Here Because the
        Government Has Knowingly and Intentionally Defied Court Decrees. ..................... 18

IV.     CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action on Smoking and Health v. C.A.B.,*
  713 F.2d 795 (D.C. Cir. 1983) ..................................................................12, 13

*American Great Lakes Ports Ass'n v. Schultz,*
  962 F.3d 510 (D.C. Cir. 2020) ..........................................................................12

*Batalla Vidal v. Nielsen,*
  No. 18-589 ......................................................................................................3, 4

*Calvillo Manriquez v. Devos,*
  411 F. Supp. 3d 535 (N.D. Cal. 2019) ..............................................................19

*Casa De Maryland v. United States Department of Homeland Security,*
  924 F.3d 684, 706 (4th Cir. 2019) ........................................................... *passim*

*Department of Homeland Security v. Regents of the University of California,*
  140 S. Ct. 1891 (2020) .............................................................................. *passim*

*In re General Motors Corp.,*
  61 F.3d 256 (4th Cir. 1995) ..............................................................................11

*International Ladies' Garment Workers' Union v. Donovan,*
  733 F.2d 920 (D.C. Cir. 1984) ....................................................................13, 19

*In re Kessler,*
  100 F.3d 1015 (D.C. Cir. 1996), *as amended* (Jan. 17, 1997) ..........................18

*Mangum v. Hallembaek,*
  910 F.3d 770 (4th Cir. 2018) ................................................................12, 15, 17

*Marbury v. Madison,*
  5 U.S. 137 (1803) ................................................................................................2

*NAACP v. Trump,*
  No. 18-588 ...........................................................................................................3

*National Venture Capital Ass'n. v. Duke,*
  291 F. Supp. 3d 5 (D.D.C. 2017) ......................................................................19

*Rainbow School, Inc. v. Rainbow Early Education Holding LLC,*
  887 F.3d 610 (4th Cir. 2018) ............................................................................11

*Shillitani v. United States,*
    384 U.S. 364 (1966) ....................................................................................................18

*South Carolina v. United States,*
    907 F.3d 742 (4th Cir. 2018) ....................................................................................19

*United States v. Bell,*
    5 F.3d 64 (4th Cir. 1993) ..........................................................................................11

**Statutes**

18 U.S.C. 401 ....................................................................................................................11

**Other Authorities**

Adam Liptak and Michael D. Shear, *Trump Can't Immediately End DACA,*
    *Supreme Court Rules*, NEW YORK TIMES,
    https://www.nytimes.com/2020/06/18/us/trump-daca-supreme-court.html ...........................5

Department of Homeland Security, Department of Homeland Security Will Reject
    Initial Requests for DACA As It Weighs Future of the Program (July 28,
    2020), https://www.dhs.gov/news/2020/07/28/department-homeland-security-
    will-reject-initial-requests-daca-it-weighs-future .....................................................9

Mark Joseph Stern, *Trump is Now Openly Defying the Supreme Court*, SLATE
    (July 28, 2020, 5:20 PM), https://slate.com/news-and-politics/2020/07/daca-
    donald-trump-supreme-court.html ..........................................................................11

Mot. to Stay Mandate, *Casa De Md.*, No. 18-1521 (4th Cir. May 31, 2019) ................4

*Statement On Supreme Court Decision On DACA* (June 18, 2020)
    https://www.dhs.gov/news/2020/06/18/dhs-statement-supreme-court-decision-
    daca ......................................................................................................................5, 6

*Trump didn't like rulings on DACA. So he's defying them*, WASHINGTON POST
    (Aug. 1, 2020), https://www.washingtonpost.com/opinions/trump-didnt-like-
    rulings-on-daca-so-hes-defying-them/2020/07/31/36458e06-d1e1-11ea-9038-
    af089b63ac21_story.html .........................................................................................10

TWITTER (July 30, 2020),
    https://twitter.com/homelandken/status/1288910645161799682?s=11 ..................10

TWITTER (June 18, 2020, 12:20 PM),
    https://twitter.com/realDonaldTrump/status/1273666793362673665 .......................5

TWITTER (June 19, 2020, 1:42 PM),
    https://twitter.com/HomelandKen/status/1274034795576791046 ...........................14

*What Does the Trump Administration's Decisions Mean for DACA Recipients?,*
NPR, July 29, 2020, https://www.npr.org/2020/07/29/896605451/what-does-
the-trump-administrations-decision-mean-for-daca-recipients..................................................10

# I.      INTRODUCTION

The gravamen of the DACA-rescission litigation has not been whether Defendants have the authority to rescind the DACA program, but whether Defendants adequately considered the implications of rescinding the DACA program and explained their choice to do so.  The Supreme Court (and Fourth Circuit) found that Defendants did not.  The Department of Homeland Security ("DHS") rescinded the DACA program but "failed to consider [an] important aspect of the problem" as well as "what if anything to do about the hardship to DACA recipients."  *Department of Homeland Security v. Regents of the University of California,* 140 S. Ct. 1891, 1913–16 (2020) ("*Regents*"); *see also Casa De Maryland v. United States Department of Homeland Security*, 924 F.3d 684, 706 (4th Cir. 2019) ("*Casa De Md.*").  In short, the Supreme Court held the Defendants' obligations under the Administrative Procedure Act ("APA") are not optional.

After losing in the Supreme Court, Defendants' rescission of the DACA program was vacated, and the effect of that vacatur was the restoration of the program as it existed prior to September 5, 2017.  The program as of that date included the ability of eligible individuals to be initially considered for DACA and for existing DACA recipients to renew their status for two year periods and be considered for advance parole under the program rules then in effect.  That restoration of the DACA program would be a return to the status quo ante.  Defendants knew this would be the result of vacatur, and that once the rescission was vacated they would be obligated, under the status quo ante, to accept and process initial requests for DACA status, requests for two year renewals, and requests for advance parole.

Despite their acknowledged obligation to return the DACA program to the status quo ante, Defendants opted instead for a strategy of obfuscation and defiance, starting by denouncing the Supreme Court decision and declaring it an "affront to the rule of law."  Defendants failed to

restore the DACA program as it existed prior to September 5, 2017, and failed to inform the public of any changes to the DACA program resulting from the vacatur of the rescission.

The culmination of that defiance was Defendants' issuance of a memorandum on July 28, 2020 (the "Wolf Memorandum") purporting to announce "interim" changes to the DACA program, that effected a rescission of the DACA program with respect to initial applicants and a substantial modification of that program for existing DACA recipients. These changes were expressly made without the Defendants having conducted a review of the DACA program and were given immediate effect while the Defendants conduct a review to decide "whether the DACA policy should be maintained, rescinded, or modified." While the legality of the Wolf Memorandum under the APA is an issue for another day, Defendants have once again apparently decided that, although they may ultimately be able to effect a rescission or substantial modification of the DACA program, in the interim they need not satisfy pertinent legal obligations, in this case those mandated by law and the Supreme Court's *Regents* decision, the Fourth Circuit mandate, and this Court's July 17 Order (together the "Courts' Orders").

Process matters. *See, e.g., Regents,* 140 S. Ct. at 1909 ("the Government should turn square corners in dealing with the people") (citation omitted). The rule of law also matters. As does respect for the judiciary. *See, e.g., Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the Judicial Department to say what the law is."). Defendants' statements in response to *Regents* demonstrated their intent to defy the clear mandate of the Supreme Court, and their subsequent conduct further underscores their contempt of the Court's ruling in *Regents*, as well as the mandate of the Fourth Circuit and this Court's July 17 Order.

For these reasons, and as further demonstrated below, Plaintiffs respectfully submit that the Court should order Defendants to show cause why they should not be held in contempt for their violation of the July 17 Order, and it should compel compliance with the Fourth Circuit mandate. The mandate and order require Defendants to restore the DACA program in full to its pre-rescission operation until such time as Defendants complete their DACA reconsideration process.

## II.    FACTUAL BACKGROUND

### A.    DACA and DACA Rescission-Related Litigation

Created in 2012, the DACA program allows for grants of deferred action to individuals who meet specific criteria. Deferred status individuals are also eligible for various benefits, including work authorization and advance parole, the ability to depart and return to territory of the United States. *See* Pls.' Compl., ECF No. 1 at 4, 22–23.

On September 5, 2017, Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum (the "Duke Memorandum") rescinding the DACA program by directing, among other things, that "all initial DACA requests" and "applications for advance parole" be rejected. *Id.* at 8. In response, four challenges were filed. *Regents*, No. 18-587; *Batalla Vidal v. Nielsen*, No. 18-589 ("*Batalla Vidal*"); *Casa De Md.*, Pls.' Compl., ECF No. 1; *NAACP v. Trump*, No. 18-588 ("*NAACP*"). The district courts in *Regents* and *Batalla Vidal* enjoined Defendants, finding that the plaintiffs were likely to succeed on their claim that the rescission was arbitrary and capricious under the APA. These injunctions required DHS to allow existing DACA recipients to renew their enrollments. *Regents*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018); *Batalla Vidal*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018). Similarly, the *NAACP* court granted partial summary judgment to the plaintiffs on their APA claim, finding the Duke Memorandum was inadequately explained. 298 F. Supp. 3d 209, 243 (D.D.C. 2018). After Defendants failed to cure this

deficiency, the *NAACP* court vacated the Duke Memorandum, but stayed any effects of vacatur beyond DHS's obligations under the preliminary injunctions issued in *Regents* and *Batalla Vidal*. 315 F. Supp. 3d 457, 460, 473–474 (D.D.C. 2018). The Government filed petitions for *certiorari* before judgment with the Supreme Court in each of these cases.

In this case, the parties cross-appealed Judge Titus's March 5, 2018 decision granting and denying in part summary judgment and granting an injunction to the Fourth Circuit. On May 17, 2019, the Fourth Circuit vacated "DACA's rescission . . . as arbitrary and capricious" and remanded the matter for further proceedings consistent with the opinion. *Casa De Md.*, 924 F.3d 684, 706 (4th Cir. 2019) (judgment vacating the DACA rescission "restores DACA to its pre-September 5, 2017, status"). The Government filed a petition for a writ of *certiorari* with the Supreme Court as well as a motion to stay the Fourth Circuit mandate.

In requesting a stay from the Fourth Circuit, the Government recognized that, on its face, the Fourth Circuit decision required a restoration of the status quo ante and resumption of processing initial requests for DACA and applications for advance parole. The Government's stay motion stated that a stay was needed to avoid an "upset [of the] status quo by requiring, *inter alia*, that the government process DACA requests from individuals who have not previously received DACA." Mot. to Stay Mandate at 1, *Casa De Md.*, No. 18-1521 (4th Cir. May 31, 2019), ECF No. 64. Similarly, in requesting that the Plaintiffs agree to a stay, the Department of Justice wrote:

> We will ask for the entire mandate to be stayed, but as you know, that would only have effect as to the areas in which the decision is broader than the injunctions (on plaintiffs' consent, DDC stayed its order as to new applications and advance parole, so the Fourth Circuit's decision would be the first to change the status quo with respect to the injunctions).

Ex. A (May 22, 2019 email from A. Wright to J. Freedman, T. Pulham, and E. Dillingham re: Mandate).

The Fourth Circuit stayed its mandate during the pendency of the petition.  *See* ECF Nos. 86, 89.  Following its June 18, 2020 decision affirming the *NAACP* order vacating the Duke Memorandum as arbitrary and capricious, the Supreme Court denied the Government's petition for *certiorari* in this case on June 29, 2020.  ECF No. 92.  The Fourth Circuit's mandate became effective on June 30, 2020.  ECF No. 93.

On July 17, 2020, in accordance with *Regents* and the Fourth Circuit mandate, this Court issued an order granting relief to Plaintiffs (the "July 17 Order").  ECF No. 97.  The July 17 Order contained seven distinct elements, including that "[t]he rescission of the DACA policy is VACATED, and the policy is restored to its pre-September 5, 2017 status," and that "Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, are ENJOINED from implementing or enforcing the DACA rescission and from taking any other action to rescind DACA that is not in compliance with applicable law."  ECF No. 97 at 3 (citing *Casa De Md.*, 924 F.3d at 706).

## B.     Defendants' Intentional Noncompliance with the Courts' Orders

Following *Regents*, Defendants issued a series of public denouncements:

- On June 18, 2020, President Trump wrote, "I am asking for a legal solution on DACA . . . The Supreme Court is not willing to give us one."[1]  He also stated, "now we have to start this process all over again."[2]

- On June 18, 2020, DHS posted a statement on its website from Acting DHS Secretary Chad Wolf declaring that the *Regents* "ruling usurps the clear authority of the Executive Branch to end unlawful programs."[3]

---

[1] Donald J. Trump (@realDonaldTrump), TWITTER (June 18, 2020, 12:20 PM), https://twitter.com/realDonaldTrump/status/1273666793362673665.

[2] *Id*.; Adam Liptak and Michael D. Shear, *Trump Can't Immediately End DACA, Supreme Court Rules*, NEW YORK TIMES, https://www.nytimes.com/2020/06/18/us/trump-daca-supreme-court.html.

[3] Department of Homeland Security, *DHS Statement On Supreme Court Decision On DACA*, (June 18, 2020) https://www.dhs.gov/news/2020/06/18/dhs-statement-supreme-court-decision-daca.

- On June 18, 2020, DHS posted a second statement on its website from Acting DHS Deputy Secretary Ken Cuccinelli asserting that "The Supreme Court's decision is an affront to the rule of law."[4]

By July 24, 2020, Plaintiffs had twice informed this Court of Defendants' noncompliance with the Courts' Orders and their failure to restore the DACA program "to its pre-September 5, 2017, status."  ECF Nos. 96, 99.  Specifically, Plaintiffs demonstrated the U.S. Citizenship and Immigration Services ("USCIS") and U.S. Immigration and Customs Enforcement websites continued to state the agency was not accepting initial requests for DACA and also that "USCIS will not accept or approve advance parole requests from DACA recipients." *Id.*  Plaintiffs also showed that Defendants had sent a DACA applicant a rejection of an initial request for DACA on the grounds that USCIS was not accepting initial requests for DACA.  *Id*.

At the July 24 hearing, Defendants admitted that they had not restored the DACA program "to its pre-September 5, 2017, status," as they had been ordered to do.  Defendants admitted:

- New applications for DACA were not being processed and decided as they had been prior to September 5, 2017:  "[U]pon receipt of the Supreme Court's opinion, a change was made such that . . . although the application would be received by the Department, it would be neither granted nor rejected.  It instead would be held, placed into a bucket pending the policy consideration that was to take place . . .," July 24, 2020 Hr'g Tr. at 17–18; "[t]hey are being held, again, pending future potential policy changes."  *Id*. at 27.

- Applications for advance parole were not being processed in the manner they had been prior to September 5, 2017:  "[T]he same answer applied to advance parole such that requests for advanced parole were neither being rejected nor granted.  Instead, they were being held in a separate pending bucket while these ongoing policy deliberations completed," *id.* at 21; "certain applications for advance parole . . . had been rejected, rather than what they should have been . . . ."  *Id*.

At the July 24 hearing, the Court authorized Plaintiffs to conduct limited discovery to support a show cause motion.  ECF No. 101.

---

[4] *Id.*

6

Plaintiffs sent Defendants a discovery proposal on the afternoon of July 27, 2020.  Ex. B

(July 27, 2020 email from E. Bower to S. Pezzi, B. Rosenberg, and R. Westmoreland re: Casa de

Maryland, et al. v. DHS, et al.;  Case No. 8:17 cv 02942 PWG).  The following day, Defendants

issued the Wolf Memorandum purporting to announce substantive "interim" changes to the DACA

program while the Defendants consider "whether the DACA policy should be maintained,

rescinded or modified."  ECF No. 102-1 at 6.  The changes included the denial of all initial requests

for DACA status, the denial of all but "exceptional" requests for advance parole, and limiting

DACA renewals to one year rather than two.  *Id*.  The Wolf Memorandum stated that Defendants

were making these significant substantive changes to the pre-September 5, 2017 DACA program

prior to conducting a full evaluation.  *E.g., id.* at 2 (" I am . . . making certain immediate changes

to the DACA policy <u>to facilitate my thorough consideration of how to address</u> *DACA* in light of

the Supreme Court's decision.") (emphasis added); *id*. at 6 (describing "Changes Pending

Reconsideration of the DACA Policy").

The Wolf Memorandum did not address the affirmatively misleading statements that DHS

and its component agencies posted on their websites for six weeks following the Supreme Court

decision nor their obligations under the Fourth Circuit's mandate or the July 17 Order.  Instead,

the Wolf Memorandum made clear that the changes would apply retroactively to compel the denial

of applications for DACA and advance parole that had been received since the Supreme Court

decision.  *Id*. at 8 (declaring "I have determined that these changes should apply both to DACA

and advance parole requests submitted after the issuance of this memorandum <u>and requests that</u>

<u>are currently pending before the agency</u> . . . all pending and future requests should be treated in

the same manner, rather than be subject to differential treatment depending on the fortuity of when

DHS received the request") (emphasis added).

7

The Wolf Memorandum confirmed that Defendants had not been complying with the Courts' Orders to return DACA "to its pre-September 5, 2017, status." *Id*. at 7 ("Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes.  Since July 24, DHS has likewise, on an interim basis, held all requests for advanced parole from current DACA recipients.").  The Wolf Memorandum also confirmed Defendants have no intention of complying with the Courts' Orders to return DACA "to its pre-September 5, 2017, status" while they undertake the necessary steps to reconsider the DACA policy.  *Id*. at 6 ("In accordance with the Supreme Court decision, I am determined to give careful consideration to . . . the DACA policy. . . . *In the meantime*, . . . I have determined that some changes should *immediately* be made to the policy . . . .").  The Wolf Memorandum also acknowledged that its purpose and purported effect is to enable Defendants to grant themselves an extra-judicial stay of the Fourth Circuit's mandate and this Court's July 17 Order by placing the DACA program into the status it held *prior to* the Courts' Orders.  *See id*. at 7 ("It makes sense to continue [the DACA program status prior to the Courts' final decisions] while I consider whether to rescind or revise the policy.").

In a press briefing discussing the release of the Wolf Memorandum, Defendants made clear their unambiguous intent to defy the Courts' Orders.  A "senior administration official" who spoke in connection with the release of the Wolf Memorandum stated:

- "When the administration next acts on DACA, it will be on the basis of the comprehensive review."

- "These actions will limit the scope of the program while DHS and the administration review."

- When asked how the Wolf Memorandum did not violate this Court's July 17 Order, the official responded, "one judge's orders are not a penultimate here."

8

- On a direct follow up, the official stated, "we are <u>not</u> going back to the pre-2017 status quo."[5]

- And after a third follow up, the official explained, "Under the judge's order, absent any intervening action from this administration, we would be back to a pre-2017 context. This memo is an intervening action . . . ."[6]

Ex. C at 2–6 (Transcript of Background Press Call by Senior Administration Officials on the Administration's Actions on the DACA Program, July 28, 2020) (emphasis added).

The same day the Wolf Memorandum was announced, DHS updated their website to publicize these immediate changes.[7]  This stands in stark contrast to Defendants' refusal to update their websites following the Supreme Court decision, and their representations to this Court five weeks after the Supreme Court decision when questioned about their failure to correct misleading information on their websites.  July 24, 2020 Hr'g Tr. at 15–16, 19, 22, 28–29.

Since the issuance of the Wolf Memorandum, senior DHS officials have continued to make false statements about their compliance with the Fourth Circuit's mandate and the July 17 Order. For example:

- The day after issuing the Wolf Memorandum, Acting Deputy Secretary Cuccinelli stated in response to a question, "why not follow the law?",  "Well, of course, we are following the law . . . and the Maryland ruling was last Friday.  And <u>following that Maryland ruling</u>, we took interim action."[8]

---

[5] The follow up question asked, "how do you reconcile not accepting new applications when a federal judge has ordered that you do so?"  Ex. C at 5–6.

[6] The third follow up question asked, "It seems pretty clear from the Maryland federal judge's decision that it restored DACA to its pre-termination status. I don't understand your explanation. Forgive me, but doesn't that status exist today in the law?  And shouldn't you be accepting new applications?"  *Id.* at 6.

[7] Department of Homeland Security, Department of Homeland Security Will Reject Initial Requests for DACA As It Weighs Future of the Program (July 28, 2020), https://www.dhs.gov/news/2020/07/28/department-homeland-security-will-reject-initial-requests-daca-it-weighs-future.

[8] What Does the Trump Administration's Decision Mean for DACA Recipients?, NPR, July 29, 2020, https://www.npr.org/2020/07/29/896605451/what-does-the-trump-administrations-decision-mean-for-daca-recipients, (emphasis added).

9

- Testifying before Congress the same day, USCIS Deputy Director for Policy Joseph Edlow stated, "what we did at that point was begin to hold new applications while we continued to talk with our attorneys, both within the department, as well as with the Department of Justice, to figure out what the next steps would be. But there has not been an opportunity to apply for an initial DACA or have that processed, since 2017-2018."[9]

- Deputy Director Edlow also testified "following the Supreme Court . . . we stopped immediately, stopped rejecting new applications. We were holding them. So we were--we had them ready to go should--should this decision have come out. And--and the acting Secretary--if the acting Secretary had directed us to accept." Ex. D at 16.

- On July 30, 2020, Acting Deputy Secretary Cuccinelli falsely tweeted it was "ridiculous #FakeNews" that DHS had been ordered to restore the DACA program to the pre-September 5, 2017 status quo.[10]

Defendants' actions undermine the rule of law, and have been widely and publicly condemned for defying the courts' mandates. For example, the *Washington Post* wrote on August 1, 2020 that:

> The Trump administration regards compliance with federal court orders as optional . . . . [A] federal district court judge in July ordered the administration to restore the protections and benefits it tried to abolish when it rescinded [DACA] in 2017. The administration has refused to comply.[11]

Similarly, in an oversight hearing conducted by the House Judiciary Subcommittee on Immigration and Citizenship on July 29, 2020, Chair Zoe Lofgren stated, "the department was clearly in violation of the Supreme Court decision," and "I would just like to note how distressing it is that at the hearing, which took place 40 days after the Supreme Court's decision was issued, DOJ [] stated that the USCIS had not found the time or resources to change their website." Ex. D at 10–

---

[9] Transcript of House Judiciary Subcommittee on Immigration and Citizenship Hearing on Citizenship and Immigration Services Oversight, July 29, 2020, Ex. D at 12–13.

[10] Acting Deputy Secretary Ken Cuccinelli (@HomelandKen), TWITTER (July 30, 2020), https://twitter.com/homelandken/status/1288910645161799682?s=11.

[11] *Trump didn't like rulings on DACA. So he's defying them*, WASHINGTON POST (Aug. 1, 2020), https://www.washingtonpost.com/opinions/trump-didnt-like-rulings-on-daca-so-hes-defying-them/2020/07/31/36458e06-d1e1-11ea-9038-af089b63ac21_story.html.

11.  Similar sentiments were expressed by Representative Pramila Jayapal.  *Id*. at 18 ("This administration does not get to decide which orders it complies with or not.  It does not get to decide that it can put up a statement that says the Supreme Court decision was--that you don't agree with it, but you don't actually comply.").  And at least one legal commentator noted that Defendants' actions "flout[ed] a decision by the Supreme Court, effectively rejecting the judiciary's authority to say what the law is."[12]

## III.  ARGUMENT

A federal court's power to find and punish contempt is inherent as well as statutory. *Rainbow School, Inc. v. Rainbow Early Education Holding LLC*, 887 F.3d 610, 617 (4th Cir. 2018) ("[t]o ensure compliance with its orders, a district court has the inherent authority to hold parties in civil contempt."); 18 U.S.C. 401 ("A court of the United States shall have power to punish . . . disobedience or resistance to its lawful writ, process, order, rule, decree, or command").  The purpose of civil contempt is twofold: to coerce compliance with court orders, and also to compensate the complainant for losses associated with such noncompliance.  *In re General Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995).  A party may be held in civil contempt when there is clear and convincing evidence that the party alleged to be in contempt had actual or constructive knowledge of a ruling in favor of the movant, that their conduct violated the ruling, and that movant was harmed by the noncompliance.  *Rainbow School, Inc.*, 887 F.3d at 617 (*quoting United States v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017)).

Defendants are legally required to follow the Fourth Circuit's mandate, which "is controlling as to matters within its compass."  *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993).

---

[12] Mark Joseph Stern, *Trump is Now Openly Defying the Supreme Court*, SLATE (July 28, 2020, 5:20 PM), https://slate.com/news-and-politics/2020/07/daca-donald-trump-supreme-court.html.

This "mandate rule" applies not just to lower courts but also to administrative agencies and requires them—including Defendants—to "'implement both the letter and spirit of the . . . mandate." *Mangum v. Hallembaek*, 910 F.3d 770, 776, 778 (4th Cir. 2018) (quoting *Bell*, 5 F.3d at 66) (alteration added) (finding that an agency's "actions on remand were directly contrary" to the Fourth Circuit's holding). There is no question that the Defendants were aware of the Courts' Orders. In failing to *ever* return the DACA program to its pre-September 5, 2017, status, Defendants violated the Fourth Circuit's mandate as well as this Court's July 17 Order. In so doing, they willfully deprived Plaintiffs' of long-sought relief to which they are unquestionably entitled.

### A. The Duke Memorandum Was Vacated, Rendering it Null and Void, and Thus the DACA Program Returned to the Status Quo Ante.

The Courts' Orders vacated the Duke Memorandum rescinding the DACA program. *Regents*, 140 S. Ct. at 1916; *Casa De Md.*, 924 F.3d at 706; Order, ECF No. 97 at 3. The effect of vacating an agency decision is to render the offending agency action null and void. *Action on Smoking and Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (quoting 91 C.J.S. Vacate (1955) ("to vacate. . .means to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of not authority or validity; to set aside.")). The parties' positions return to the status quo prior to the issuance of the action vacated. *Id.* ("Thus, by vacating or rescinding the rescissions . . . , the judgment of this court had the effect of reinstating the rules previously in force."). Agency actions taken pursuant to the vacated agency action, like the rejection of initial requests for DACA, are void. *See American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) ("vacatur would mean that [actions pursuant to the vacated rule were] erroneous").

Defendants acknowledged that the issuance of the Fourth Circuit's mandate would require them to accept and consider initial requests for DACA and applications for advance parole.  Mot. to Stay Mandate at 9–10, *Casa De Md.*, No. 18-1521 (4th Cir. May 31, 2019), ECF No. 64 ("[B]ecause it vacates the decision to rescind the DACA policy in its entirety, it requires the government to continue fully the DACA policy, including accepting and adjudicating requests from individuals who never previously received DACA and accepting applications for advance parole under standards associated with the DACA policy.") (emphasis added).  *See also* Ex. A (Department of Justice statement that the stay of the Fourth Circuit mandate "would only have effect as to . . . new applications and advance parole").

### B.      Defendants are Required to Administer the Status Quo Ante.

The vacatur of the Duke Memorandum requires restoration of the status quo ante, which means Defendants are required to administer the pre-rescission DACA program in full.  *See Action on Smoking and Health*, 713 F.2d at 798 (noting the effect of vacatur was to "reinstate the protections" of the prior rule which "cannot again be revoked" without a lawful rulemaking process).  Furthermore, Defendants cannot evade compliance with a mandate by using an interim action to create a *de facto* stay.  *International Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984) (holding plaintiffs' challenge to "a final 'emergency' rule suspending the effect of [the D.C. Circuit's] decision 'for a period of 120 days'" should be treated as a motion to compel compliance and not a motion to enjoin a new action).  When an agency "has simply reimplemented" the same action it "is the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding."  *Id*. at 922–23.

There is nothing in *Regents* or the other Courts' Orders  that relieves Defendants of their obligation to restore the status quo ante.  Moreover, the Supreme Court made clear that, if

Defendants seek to rescind or modify DACA, they must *first* complete a lawful, thorough consideration of the DACA program pursuant to the procedures outlined by the Court.  "This is not the case for cutting corners . . . ."  *Regents*, 140 S. Ct. at 1909–10.  This Court's July 17 Order reaffirmed that point by ***enjoining*** Defendants from taking any action to rescind DACA that is not compliant with the law.  ECF No. 97 at 3.

Defendants are well aware of their legal obligations.  As they have stated, they must "restart the DACA process in accordance with #scotus's ruling"[13] and complete "a comprehensive review of the DACA program."  Ex. C at 2.  This review, which "will have to take time," *id*., is still incomplete.

Despite the incomplete and ongoing nature of the review, the Wolf Memorandum purports to make "certain immediate changes to the DACA policy."  ECF No. 102-1 at 2.  It also claims that "[i]n accordance with the Supreme Court's decision, [Acting Secretary Wolf is] determined to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified."  *Id*. at 6.  This process is not turning "square corners."  *Regents*, 140 S. Ct. at 1909.  These "immediate changes" cannot be squared with "careful consideration" "in accordance with the Supreme Court's decision."[14]  The Wolf Memorandum purports to reinstate critical elements of the Duke Memorandum without having fully considered the issues identified in *Regents*.  Rather than return to and maintain the status quo ante until the DACA review process is completed, as the Courts' Orders require, Defendants have rescinded DACA again for new applicants and advance parole applicants prior to completing the required review.  These are precisely the types of changes

---

[13] Acting Deputy Secretary Ken Cuccinelli (@HomelandKen), Twitter (June 19, 2020, 1:42 PM), https://twitter.com/HomelandKen/status/1274034795576791046.

[14]  For example, the Wolf Memorandum addresses neither the forbearance issue nor the impact of the Fourth Circuit's mandate on the scope of the Acting Secretary's discretionary authority.

that the Supreme Court held must go through a full consideration of all the relevant factors, and

that this Court enjoined on July 17, 2020.  *See Mangum*, 910 F.3d at 776 (remanding for failure to

"evaluate the relevant factors" as required by the Fourth Circuit's prior opinion and mandate).

## C.    Defendants Knew Their Actions Did Not Comply With the Requirement to Restore the DACA Program to the Status Quo Ante.

Through their statements and representations, it is indisputable Defendants knew (i) the

effect of the Courts' Orders was to restore the status quo ante, and (ii) that restoration included

consideration of initial requests for DACA, consideration of advance parole applications, and

maintenance of the two-year renewal period available to existing DACA recipients.  There is also

no question that Defendants willfully ignored their obligation to restore the status quo ante in

defiance of the Fourth Circuit's mandate and the July 17 Order.

Defendants immediately issued public statements criticizing the Supreme Court, but they

took no action to restore the DACA program as it existed prior to September 5, 2017.  They

similarly continued to post misleading information on their websites about DACA benefits being

unavailable some 40 days after the Supreme Court decision, and continue to make misleading

statements to the public about their obligations under the Courts' Orders.  The directive from those

decisions is clear:  as of June 18, 2020, the date the Supreme Court affirmed the District Court for

the District of Columbia's vacatur of the Duke Memorandum—and no later than June 30, 2020,

when the Fourth Circuit's mandate became effective—the Defendants were under a judicial

obligation to fully restore the DACA program as it existed in practice prior to the issuance of the

Duke Memorandum.  This included considering initial requests for DACA as well as applications

for advance parole from current DACA recipients.[15]

---

[15] Existing DACA recipients were also permitted 2-year renewals of that status with coterminous employment authorization.

As Deputy Director Edlow testified to Congress following *Regents*, Defendants "immediately" began "to hold new applications while we continued to talk."  Ex. D at 12–13. USCIS began holding applications in anticipation of the decision of the Acting Secretary (*i.e.*, the Wolf Memorandum).  *Id*. at 16 ("We were holding them.  So we were--we had them ready to go should--should this decision have come out.").  Thus, rather than implement the status quo ante, the Defendants surreptitiously rejected or "held" initial requests and advance parole applications. Such conduct is a clear effort to evade court-ordered obligations.

With the release of the Wolf Memorandum, Defendants' rejected all initial requests for DACA that had been held in abeyance "[s]ince the issuance of the Supreme Court's decision" as well as pending requests for advance parole.  ECF No. 102-1 at 8.  This decision constitutes clear and convincing evidence that Defendants violated the Courts' Orders by retroactively applying the changes purportedly implemented by the Wolf Memorandum to requests received during a period when the DACA program had been ordered restored, by operation of law, to its pre-September 5, 2017, status.

In addition, for the six weeks between the Supreme Court's decision on June 18, 2020 and the Wolf Memorandum on July 28, 2020, the Defendants did nothing to update their public disclosures about DACA.  Instead they deceived the public by providing incorrect information about the status of the DACA program and whether initial requests for DACA status or advance parole applications were eligible for consideration.  *See* ECF Nos. 96, 99.  As the Department of Justice stated at the July 24 hearing, the "websites run by DHS and USCIS right now, frankly, have some outdated and inaccurate information with respect to the current status quo with respect to DACA.  That is unfortunate . .. we all agree [there] is a regrettable lack of clarity."  July 24,

2020 Hr'g Tr. at 16, 20.  It bears emphasis that Defendants updated their websites on July 28, 2020 to reflect the release of the Wolf Memorandum earlier that day.

In light of the Defendants' statements regarding their intentions (*i.e.*, "we are not going back to the pre-2017 status quo"), Ex. C at 6, and capabilities (*i.e.*, near instantaneous publicizing of Defendants' objections to *Regents* on June 18, 2020 and the Wolf Memorandum on July 28, 2020), this Court should conclude Defendants deliberately misinformed the public to deter individuals from applying for relief under the judicially-restored DACA program.

In summary, Defendants' actions clearly and convincingly demonstrated a knowledge of their obligations under the Courts' Orders, as well as their intention to violate the "the letter and spirit of the … mandate" and the other Courts' Orders.  *Mangum v. Hallembaek*, 910 F.3d 770, 776, 778.

### D. Plaintiffs and the Public Have Been Harmed by Defendants' Noncompliance.

Defendants' noncompliance with the Courts' Orders have harmed many people.  Individual Plaintiff A.M., who is eligible for DACA status, has been prevented from submitting an initial request for DACA status.  ECF No. 1 ¶ 38.  And he is not alone.  Numerous members of Plaintiff organizations and other individuals are similarly situated.  Some submitted initial requests for DACA following *Regents* and were summarily denied or held in abeyance.  *See* ECF No. 102-1 at 7.  Still others requested advance parole and, as the Wolf Memorandum admits, many requests from DACA recipients "were rejected," as "[p]rior to July 24, DHS's treatment of advance parole requests from DACA recipients varied."  *See id.* at 8, n.1.  Although DHS has never explained why treatment varied, the fact remains, Defendants failed to review advance parole requests from DACA recipients under the parameters of the DACA program as it existed prior to September 5, 2017.  That DHS now permits rejected requestors to submit a request to "be adjudicated on the

[new] terms set forth in this memorandum," *id.*, offers no relief and instead merely highlights the impropriety of their actions.

Critically, many members of the public and members of the organizational Plaintiffs were deterred from applying in reliance on Defendants' false and misleading statements that initial requests for DACA were not being considered by the agency.  *See* ECF No. 96 at 2, Ex. A.  Current DACA recipients were likewise deterred from submitting advance parole applications and still others are likely currently deterred by the combination of the steep application fee[16] and Defendants' vague exception for "exceptional circumstances."  *See* ECF No. 102-1 at 7.  *Regents* concluded nearly three years of litigation with a finding that the Defendants' actions, including their summary denial of initial applications for DACA and requests for advance parole, were unlawful.  Plaintiffs eligible for either form of relief have been harmed because their access to the DACA program as it existed prior to September 5, 2017, has been fully foreclosed by Defendants' willful noncompliance.

Plaintiffs and the public have been further injured by Defendants' refusal to abide by the rule of law.  The Defendants refusal to "turn square corners in dealing with the people," *Regents*, 140 S. Ct. at 1909,  warrants judicial censure.  The Defendants should be held in contempt.

### E.    Contempt and Compelled Compliance are Appropriate Here Because the Government Has Knowingly and Intentionally Defied Court Decrees.

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."  *Shillitani v. United States,* 384 U.S. 364, 370 (1966).  "Contempt orders have been levied against executive branch officials and agencies without even so much as a hint that such orders offend separation of powers."  *In re Kessler*, 100 F.3d 1015,

---

[16] The filing fee for an advance parole application is $575.  USCIS, *I-131, Application for Travel Document* (June 29, 2020), https://www.uscis.gov/i-131.

1017 (D.C. Cir. 1996), *as amended* (Jan. 17, 1997) (citations omitted).  The use of civil contempt

is particularly appropriate when, as here, a court is addressing violations of the APA.  *South*

*Carolina v. United States*, 907 F.3d 742, 756 (4th Cir. 2018) ("The plain text of § 706 shows that

a reviewing court lacks discretion when faced with unlawful agency inaction. Again, §

706(1) provides that: 'The reviewing court *shall*— (1) compel agency action unlawfully withheld

or unreasonably delayed ....'. And 'the word "shall" usually creates a mandate,' indicating that 'the

district court has some nondiscretionary duty to perform.'") (citation omitted).  Furthermore, an

agency's claims of "good faith" does not provide an exception to compliance with a court order.

*See, e.g.*, *Calvillo Manriquez v. Devos*, 411 F. Supp. 3d 535, 539 (N.D. Cal. 2019) ("[T]here is no

good faith exception to the requirement of obedience to a court order.") (citation omitted).

Defendants did not innocently avoid their responsibilities to provide relief to the prevailing

parties.  Instead, they intentionally refused to comply and obfuscated their non-compliance.  In

granting themselves an undisclosed, extra-judicial stay, Defendants have avoided the scrutiny

attendant to properly requested relief from final judgments.  *Cf. National Venture Capital Ass'n.*

*v. Duke*, 291 F. Supp. 3d 5, 21 (D.D.C. 2017) (finding a "claim that a stay is necessary to save

expenses and avoid reliance interests as [DHS] fashions a new Rule" does not justify a stay).  In

effect, Defendants have dared this Court (or any other) to enforce their orders vacating the Duke

Memorandum and restoring DACA to the status quo ante.

Defendants' inequitable conduct is deserving of a finding of contempt and Plaintiffs are

deserving of the relief ordered by the Supreme Court, the Fourth Circuit, and this Court.

Furthermore, enforcement of the Fourth Circuit's unambiguous mandate, "is an interest that the

District Court [is] empowered to protect."  *Int'l Ladies' Garment Workers' Union*, 733 F.2d at

922.  It is particularly egregious that Defendants opted to mislead the public to deter potential

applicants from taking advantage of the reinstated DACA program. Defendants cannot and should not succeed here in declaring themselves accountable to no one but themselves. The rule of law and separation of powers requires that Defendants not just comply with Congress's commands in the form of the APA, but also with the judicial branch, including both the Fourth Circuit mandate and this Court's July 17 Order.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue an order to show cause why defendants should not be held in contempt or, in the alternative, to compel compliance with the Fourth Circuit mandate to restore DACA to its pre-September 5, 2017, status, and grant any further relief it deems appropriate.

Dated: August 14, 2020                                        Respectfully submitted,


_____/s/_____
Elizabeth J. Bower (*pro hac vice*)                          John A. Freedman (D. Md. 20276)
Kevin B. Clark (D. Md. 04771)                                Ronald A. Schechter (*pro hac vice*)
Kyle A. Mathews (*pro hac vice*)                             Nancy L. Perkins (*pro hac vice*)
Willkie Farr & Gallagher LLP                                 Emily Dillingham (*pro hac vice*)
1875 K Street, NW                                            Arnold & Porter Kaye Scholer LLP
Washington, DC 20006-1238                                    601 Massachusetts Ave., NW
(202) 303-1000                                               Washington, DC  20001-3743
EBower@willkie.com                                           (202) 942-5000
                                                             John.Freedman@arnoldporter.com

Dennis A. Corkery (D. Md. 19076)
Washington Lawyers' Committee
For Civil Rights And Urban Affairs
700 14th Street NW, Suite 400                                *Attorneys for Plaintiffs*
Washington, DC 20005
(202) 319-1000
dennis_corkery@washlaw.org


20

CERTIFICATE OF SERIVCE

I hereby certify that on August 14, 2020, a copy of the foregoing was served on all

counsel of record via the Court's CM/ECF system.


*/s/*
_____

Elizabeth J. Bower

# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SANTA FE DREAMERS PROJECT
1213 Mercantile Road
Santa Fe, New Mexico 87507,

SPANISH COMMUNITY CENTER
309 N. Eastern Avenue
Joliet, Illinois 60432,

and

AMERICAN GATEWAYS
314 E. Highland Mall Boulevard
Suite 501
Austin, Texas 78752,

*Plaintiffs*,

vs.

CHAD F. WOLF, in his purported official capacity
as Acting Secretary of Homeland Security
c/o Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485,

KENNETH T. CUCCINELLI, in his purported
official capacities as Senior Official Performing the
Duties of Deputy Secretary of Homeland Security
and Acting Director of U.S. Citizenship and
Immigration Services
c/o Office of the Chief Counsel
U.S. Citizenship and Immigration Services
20 Massachusetts Ave, NW
Room 4210
Washington, DC 20529,

MATTHEW T. ALBENCE, in his purported official
capacities as Deputy Director and Senior Official
Performing the Duties of Director of U.S.
Immigration and Customs Enforcement
500 12th St., SW
Washington, DC 20536,

**Case No.**

**COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF**

1

JOSEPH EDLOW, in his purported official capacity as Deputy Director of Policy of U.S. Citizenship and Immigration Services
c/o Office of the Chief Counsel
U.S. Citizenship and Immigration Services
20 Massachusetts Ave, NW
Room 4210
Washington, DC 20529,

MARK A. MORGAN, in his purported official capacity as Senior Official Performing the Duties of Commissioner of U.S. Customs and Border Protection
1300 Pennsylvania Ave, NW
Washington, DC 20229,

UNITED STATES DEPARTMENT OF HOMELAND SECURITY
c/o Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485,

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES
c/o Office of the Chief Counsel
U.S. Citizenship and Immigration Services
20 Massachusetts Ave, NW
Room 4210
Washington, DC 20529,

UNITED STATES CUSTOMS AND IMMIGRATION ENFORCEMENT
500 12th St., SW
Washington, DC 20536,

and

UNITED STATES CUSTOMS AND BORDER PROTECTION
1300 Pennsylvania Ave, NW
Washington, DC 20229

*Defendants*.

2

## INTRODUCTION

1.     Plaintiffs Santa Fe Dreamers Project, Spanish Community Center, and American Gateways ("Plaintiffs") bring this action to enjoin and vacate the unlawful July 28, 2020 memorandum (the "Wolf Memorandum" or "Memorandum") issued by Defendant Chad Wolf, in his purported capacity as the Acting Secretary of the U.S. Department of Homeland Security ("DHS"), imposing draconian changes to the Deferred Action for Childhood Arrivals ("DACA") initiative.[1]  Because Defendant Wolf assumed the position of Acting Secretary in violation of the Homeland Security Act ("HSA") and the Federal Vacancies Reform Act ("FVRA"), he lacked statutory authority to issue the Memorandum, rendering it *ultra vires*, without force or effect, and void.  Alternatively, even if Defendant Wolf had statutory authority to assume the position of Acting Secretary, his purported accession to office violated the Appointments Clause of the United States Constitution, and he consequently had no authority to issue the Memorandum.

2.     DHS has already begun to implement the restrictions purportedly set forth in the Wolf Memorandum, including by issuing directives from Defendant United States Citizenship and Immigration Services ("USCIS") that, among other items, require all initial applications for DACA participation and work authorization to be rejected; cap any DACA or related work-authorization renewals for current recipients at one year rather than two; and require all pending and future applications for advance parole to be rejected absent "exceptional circumstances" (the "USCIS Directives").[2]  These actions, which are *ultra vires* and unlawful, have directly and

---

[1] *See* Chad F. Wolf, Reconsideraton of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (July 28, 2020), https://www.dhs.gov/sites/default/files/publications/20_0728_s1_daca-reconsideration-memo.pdf.

[2] *See* Joseph Edlow, Implementing Acting Secretary Chad Wolf's July 28 Memorandum, "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial

irreparably disrupted the DACA-application and -renewal processes and impeded the ability of immigrant-services organizations like Plaintiffs to carry out their core missions, which require them to offer free or substantially subsidized legal services to every eligible undocumented person who walks through their doors.

3.    As a direct consequence of Defendant Wolf's unlawful changes to the DACA initiative, Plaintiffs have been and will continue to be forced to divert a large portion of their resources—much of which had been earmarked for non-DACA issues and clients—to advising DACA recipients and applicants, their families, and their employers on the impact of these new restrictions.  Moreover, by reducing the length of DACA renewals from two years to one year, the Wolf Memorandum will force Plaintiffs to double the resources they expend assisting DACA recipients with renewing their participation in the initiative.  These resources, too, will come at the expense of Plaintiffs' ability to assist clients with other immigration-related proceedings and issues.

4.    These lost financial and staffing resources are unrecoverable.  Plaintiffs have no means of recouping funds to make up for the unexpected shortfall in money and manpower because humanitarian-grant opportunities are scarce and the COVID-19 public-health crisis has dramatically limited Plaintiffs' ability to fundraise and recruit volunteers.

5.    The ensuing shortfall also threatens to tarnish Plaintiffs' reputations as effective advocates for immigrants.  Plaintiffs have been in operation for many years—over five decades in the case of Plaintiff Spanish Community Center—and have built up reputations in their respective communities as compassionate providers of quality legal services.  The Wolf Memorandum threatens to substantially undermine the goodwill Plaintiffs have worked hard to

---

Discretion with Respect to Individuals Who Came to the United States as Children'" (Aug. 21, 2020), https://www.uscis.gov/sites/default/files/document/policy-alerts/dacamemo.pdf.

build by forcing them to choose which clients to prioritize in light of the substantial changes to DACA.

6.      Absent immediate injunctive relief and, ultimately, vacatur of the Wolf Memorandum, Plaintiffs will continue to suffer these irreparable injuries, as will similar immigrant-services organizations across the country.

7.      Accordingly, this Court should vacate the Wolf Memorandum on the grounds that it is *ultra vires*, has no force or effect, and violates the APA.  Alternatively, the Court should vacate the Wolf Memorandum on the ground that it was issued by an official purporting to hold office in violation of the Appointments Clause.  Either way, because the Wolf Memorandum was unlawfully issued, the Court should immediately enjoin enforcement and implementation of its terms against any person.

## PARTIES

### *Plaintiffs*

8.      Plaintiff Santa Fe Dreamers Project is a non-profit organization based in Santa Fe, New Mexico that provides free legal services to immigrants to promote economic empowerment, community development, family unity, and liberation from detention.  Santa Fe Dreamers Project "gets its name from our country's Dreamers: the undocumented immigrant youth who, through tireless campaigning and bottomless courage, are shaping immigration policy in the US."  Its mission is to represent every eligible immigrant who walks through its doors, to use service strategies that expand vulnerable peoples' access to legal counsel, and to elevate the voices and narratives of immigrants in our community to support positive reform.

9.      Santa Fe Dreamers Project provides immigration legal services, including individual legal representation and assistance with DACA applications and renewals, to all people who qualify for immigration relief.  Before the Wolf Memorandum, Santa Fe Dreamers

Project assisted approximately 500 clients per year with DACA-renewal applications. It does so through one-on-one sessions via telephone and in-person at Santa Fe Dreamers Project's office and, before the COVID-19 public-health crisis, through weekly in-person clinics that it hosts. Santa Fe Dreamers Project continues to host virtual clinics every week and will resume hosting weekly in-person clinics as soon as it is again safe to do so.

10. Having faithfully and reliably served the Santa Fe immigrant community at no cost since 2015, Santa Fe Dreamers Project has cultivated substantial goodwill with that community. Many of Santa Fe Dreamers Project's clients have come to rely on and trust its quality, no-cost immigration services and return to seek those services as the need arises. Many of Santa Fe Dreamers Project's clients refer members of their family or friends who need no-cost immigration services to Santa Fe Dreamers Project. Santa Fe Dreamers Project has cultivated and maintained this goodwill largely by adhering to its core mission of providing high-quality, no-cost immigration services to all eligible immigrants who seek them.

11. Santa Fe Dreamers Project does not charge any fees for its services. Clients using its services pay any application- or biometric-processing fees directly to immigration authorities and for postage, where applicable.

12. The Wolf Memorandum and USCIS Directives have already forced Santa Fe Dreamers Project to devote a greater portion of its limited staff and volunteer hours to advising clients, their families, and the clients' employers about the clients' eligibility for DACA as well as their ability to obtain or renew their period of deferred action and work authorization under DACA. In the few weeks since the Memorandum was issued, approximately sixty-five clients or prospective clients have contacted Santa Fe Dreamers Project regarding the Memorandum's effects on their eligibility for the DACA initiative, the availability of advance parole, and the financial burden of applying for DACA renewal annually rather than bi-annually. Santa Fe

Dreamers Project's staff have had to spend at least thirty additional hours fielding telephone calls and correspondence from these clients and advising them about the changes wrought by the Wolf Memorandum and USCIS Directives, hours the staff would not have had to expend but-for the Memorandum and Directives.  Santa Fe Dreamers Project anticipates that it will continue to have to devote substantial staff time and resources to fielding telephone calls and correspondence from clients who would be eligible for DACA were it not for the Wolf Memorandum and USCIS Directives, advising those clients about the changes wrought by the Memorandum and Directives, and researching and advising those clients on whether other avenues of immigration relief are available to them unless and until USCIS begins accepting first-time DACA applications.

13.     Moreover, because USCIS officials have begun reducing the length of DACA renewals from two years to one year under the Wolf Memorandum and USCIS Directives, many of Santa Fe Dreamers Project's clients will need to submit DACA renewals every year instead of every other year.  Santa Fe Dreamers Project anticipates that, because its DACA clients now must renew their DACA benefits twice as frequently, it will soon need to assist with at least twice as many DACA-renewal applications per year compared to past years.  As a result, Santa Fe Dreamers Project will need to expend a substantially greater portion of its limited financial, staffing, and volunteer resources on assisting DACA recipients with renewal applications, including by increasing the duration and frequency of in-person DACA-renewal clinics that it hosts.

14.     Santa Fe Dreamers Project already plans to spend more of its operating budget to hire at least one additional staff member to help handle the increased workload.  This and other, similar expenditures will substantially deplete the resources Santa Fe Dreamers Project is able to expend assisting other clients with other immigration-related proceedings or issues.  Santa Fe

7

Dreamers Project has already earmarked much of its resources to assisting clients with these other types of proceedings and issues and will have to divert those resources to handle its increased DACA-related workload.

15.     Santa Fe Dreamers Project will not be able to make up for the financial and staffing resources lost because of the Wolf Memorandum and USCIS Directives through additional donation- or grant-based fundraising or by recruiting additional volunteers, particularly because the COVID-19 public-health crisis has substantially impeded in-person fundraising events and the recruitment of volunteers.

16.     The substantially increased workload caused by the Wolf Memorandum and USCIS Directives and the resulting shortfall in Santa Fe Dreamers Project's resources puts at grave risk the goodwill that Santa Fe Dreamers Project has carefully built with the Santa Fe immigrant community by providing high-quality services to all qualified immigrants who seek them.  This goodwill advances Santa Fe Dreamers Project's core organizational mission because it causes recurring clients to return and new clients to seek Santa Fe Dreamers Project's services for the first time.  By forcing Santa Fe Dreamers Project to pick and choose which clients to serve in a timely manner and which to turn away or place on months-long waitlists for services, however, or by substantially increasing the length of waitlists for Santa Fe Dreamers Project's services, the Memorandum and Directives will substantially undermine this goodwill and, consequently, Santa Fe Dreamers Project's reputation.  This in turn will impede Santa Fe Dreamers Project's ability to carry out its core mission.

17.     These ongoing and imminent harms negatively affect Santa Fe Dreamers Project's ability to fulfill its core mission, an essential part of which is to offer free, quality legal services to each and every eligible person who walks through the door.  The Wolf Memorandum and USCIS Directives have made it substantially more costly for Santa Fe Dreamers Project to serve

the needs of its clients, jeopardizing and irreparably impeding its ability to carry out its core organizational mission.

18.     These harms to Santa Fe Dreamers Project also directly harm its clients.  If Santa Fe Dreamers Project is forced to expend a substantially greater portion of its resources to serve clients with DACA-related issues, it will have fewer resources available to help victims of mental or physical abuse or human trafficking obtain specialized humanitarian visas; offer periodic legal workshops to recently arrived families seeking asylum in the United States; or assist youths who have been abused, abandoned, or neglected obtain permanent residency, among other vital services.  Without no-cost legal assistance from Santa Fe Dreamers Project, many members of these served populations will be at grave risk of unemployment; separation from their families, friends, and communities; immigration detention; or removal from this country.

19.     Plaintiff Spanish Community Center is a non-profit organization based in Joliet, Illinois that provides low- or no-cost legal and social services to immigrants, among other populations.  Spanish Community Center's mission is to help improve the quality of life for Latinos, immigrants, and low-income people through educational and social services.

20.     Spanish Community Center provides immigration legal services, including assistance with DACA applications and renewals, to all individuals who seek its services. Historically, Spanish Community Center has assisted approximately eighty clients per year with DACA-renewal applications.  It does so through one-on-one, in-person sessions at Spanish Community Center's offices and, before the COVID-19 public-health crisis, through monthly in-person workshops that it hosts.  Spanish Community Center will resume hosting these workshops as soon as it is again safe to do so.

9

21.    Spanish Community Center is the only organization in Will County, Illinois that provides low-cost immigration services.  Because several other immigrant-services organizations in the surrounding area have closed during the COVID-19 public-health crisis, Spanish Community Center has seen an influx of new clients from outside Will County.

22.    Having faithfully served the immigrant community of Joliet and surrounding areas at low cost since 1969, Spanish Community Center has cultivated substantial goodwill with that community.  Many of Spanish Community Center's clients have come to rely on and trust its quality, low-cost immigration services and return to seek those services as the need arises.  Many of Spanish Community Center's clients refer members of their family or friends who need low-cost immigration services to Spanish Community Center.  Spanish Community Center has cultivated and maintained this goodwill largely by adhering to its core mission of providing high-quality, low-cost immigration services to all immigrants who seek them.

23.    Spanish Community Center charges no more than $50 per DACA-renewal application, though it waives that fee for clients who cannot afford to pay it and for clients who seek DACA-renewal assistance at one of Spanish Community Center's in-person workshops.  Although clients using Spanish Community Center's services pay any application- or biometric-processing fees directly to immigration authorities, Spanish Community Center pays the costs of shipping necessary documents to those authorities, and its staff translate documents from Spanish to English or vice versa as necessary and at no cost to clients.

24.    The Wolf Memorandum and USCIS Directives have already forced Spanish Community Center to devote a greater portion of its limited staff and volunteer hours to advising clients on the clients' eligibility for DACA as well as their ability to obtain or renew their period of deferred action and work authorization under DACA.  In the weeks between the U.S. Supreme Court's June 2020 decision invalidating the Trump Administration's first effort to rescind DACA

and the issuance of the Wolf Memorandum, Spanish Community Center had assisted approximately forty clients with preparing and finalizing first-time DACA applications for submission to USCIS. Spanish Community Center staff spent at least eighty hours preparing those applications. Since the Wolf Memorandum was issued, however, Spanish Community Center has had to expend substantial, additional staff time and resources contacting those approximately forty clients individually to explain that they once again are unable to apply for DACA and creating and managing a waitlist to serve those clients in the event USCIS again begins accepting first-time DACA applications. Spanish Community Center would not have had to expend these resources but-for the Wolf Memorandum and USCIS Directives. Spanish Community Center anticipates that it will continue to have to devote substantial staff time and resources to fielding telephone calls and correspondence from clients who would be eligible for DACA were it not for the Wolf Memorandum and USCIS Directives, advising those clients about the changes wrought by the Memorandum and Directives, and researching and advising those clients on whether other avenues of immigration relief are available to them unless and until USCIS begins accepting first-time DACA applications.

25. Moreover, because USCIS officials have begun reducing the length of DACA renewals from two years to one year under the Wolf Memorandum and USCIS Directives, many of Spanish Community Center's clients will need to submit DACA renewals every year instead of every other year. Spanish Community Center anticipates that, because its DACA clients now must renew their DACA benefits twice as frequently, it will soon need to assist with at least twice as many DACA-renewal applications per year compared to past years. As a result, Spanish Community Center will need to expend a substantially greater portion of its limited financial and staffing resources on assisting DACA recipients with renewal applications,

including the amount of staff time that Spanish Community Center's staff must spend translating documents.

26.     Spanish Community Center has already earmarked much of its resources to assisting clients with immigration proceedings and issues not related to DACA and will have to divert those resources to handle its increased DACA-related workload.  Spanish Community Center cannot afford to hire any additional staff members to help handle the increased workload. Instead, Spanish Community Center will have to divert the limited time of its small staff from assisting clients with, for example, applications for U-visas, Violence Against Women Act benefits, and asylum to assisting clients with DACA-renewal applications.    This will substantially deplete the resources Spanish Community Center is able to expend assisting clients with immigration-related proceedings or issues unrelated to DACA.

27.     Spanish Community Center will not be able to make up for the financial and staffing resources lost because of the Wolf Memorandum and USCIS Directives through additional donation- or grant-based fundraising or by recruiting additional volunteers.  If budget or resource shortfalls caused by the Memorandum and Directives become too great, Spanish Community Center will likely have to increase the modest fee it ordinarily charges for immigration services or else limit or discontinue those services.

28.     The substantially increased workload caused by the Wolf Memorandum and USCIS Directives, the resulting shortfall in Spanish Community Center's resources, and any necessary increase in the fee it charges for its services will put at grave risk the goodwill that Spanish Community Center has carefully built with the immigrant community in Joliet and surrounding areas by providing high-quality services to all immigrants who seek them.  This goodwill advances Spanish Community Center's core organizational mission because it causes recurring clients to return and new clients to seek Spanish Community Center's services for the

first time.  By forcing Spanish Community Center to pick and choose which clients to serve and which to turn away, however, or by substantially increasing the length of waitlists for Spanish Community Center's services, the Wolf Memorandum and USCIS Directives will substantially undermine this goodwill, which in turn will impede Spanish Community Center's ability to carry out its core mission.

29.     These ongoing and imminent harms negatively affect Spanish Community Center's ability to fulfill its core mission, an essential part of which is to offer low-cost, quality legal services to each and every undocumented person who walks through the door.  The Wolf Memorandum and USCIS Directives have made it substantially more costly for Spanish Community Center to serve the needs of its clients, jeopardizing and irreparably impeding its ability to carry out its core organizational mission.

30.     These harms to Spanish Community Center also directly harm its clients.  If Spanish Community Center is forced to expend a substantially greater portion of its resources to serve clients with DACA-related issues, it will have fewer resources available to help victims of mental or physical abuse obtain specialized visas; defend clients who are in removal proceedings; or assist victims of persecution obtain asylum in the United States, among other vital services.  Without low-cost legal assistance from Spanish Community Center, many members of these served populations will be at grave risk of unemployment; separation from their families, friends, and communities; immigration detention; or removal from this country.

31.     Plaintiff American Gateways is a non-profit organization based in Austin, Texas and with additional offices in San Antonio and Waco, Texas.  It provides low- or no-cost legal education and advocacy to immigrants in twenty-three central Texas counties whose incomes are at or below 200% of the federal poverty guidelines and is the only organization in Texas that does so.  American Gateways' mission is to champion the dignity and human rights of

13

immigrants, refugees, and survivors of persecution, torture, conflict, and human trafficking through exceptional immigration legal services at no or low cost, education, and advocacy.

32.     American Gateways provides immigration legal services, including assistance with DACA applications and renewals, to as many financially qualified people as its resources allow.  Historically, American Gateways has assisted at least 130 clients per year with DACA-renewal applications.  It does so through one-on-one, in-person sessions at its offices and, before the COVID-19 public-health crisis, through periodic in-person clinics that it hosts.  American Gateways will resume hosting these clinics as soon as it is again safe to do so.

33.     American Gateways charges a $100 fee for its DACA-renewal services but waives that fee for clients who cannot afford it.  Clients using American Gateways' services pay any application- or biometric-processing fees directly to immigration authorities.

34.     The Wolf Memorandum and USCIS Directives have already forced American Gateways to devote a greater portion of its limited staff and volunteer hours to advising clients on their eligibility for DACA as well as their ability to obtain or renew their period of deferred action and work authorization under DACA.  In the weeks between the U.S. Supreme Court's June 2020 decision invalidating the Trump Administration's first effort to rescind DACA and the issuance of the Wolf Memorandum, American Gateways staff had spent substantial time advising and educating the public and potential and current clients about DACA and the renewed viability of first-time DACA applications; contacting forty-nine clients in preparation for a virtual legal clinic at which American Gateways would assist those clients with first-time DACA applications; and assisting several clients with preparing and finalizing first-time DACA applications for submission to USCIS.  Since the Wolf Memorandum was issued, however, American Gateways staff have had to expend substantial, additional time contacting these clients individually to explain that they once again are unable to apply for DACA; creating and

14

managing a waitlist to serve those clients in the event USCIS again begins accepting first-time DACA applications; and researching and advising those clients on whether other avenues of immigration relief are available to them. American Gateways would not have had to expend these additional resources but-for the Wolf Memorandum and USCIS Directives. American Gateways anticipates that it will continue to have to devote substantial staff time and resources to fielding telephone calls and correspondence from clients who would be eligible for DACA were it not for the Wolf Memorandum and USCIS Directives, advising those clients about the changes wrought by the Memorandum and Directives, and researching and advising those clients on whether other avenues of immigration relief are available to them unless and until USCIS begins accepting first-time DACA applications.

35. Moreover, because USCIS officials have begun reducing the length of DACA renewals from two years to one year under the Wolf Memorandum and USCIS Directives, many of American Gateways' clients will need to submit DACA renewals every year instead of every other year. American Gateways anticipates that, because its DACA clients now must renew their DACA benefits twice as frequently, it will soon be called upon to assist with at least twice as many DACA-renewal applications per year compared to past years. As a result, American Gateways will need to expend a substantially greater portion of its limited financial and staffing resources on assisting DACA recipients with renewal applications.

36. Because many of its current and prospective clients are not aware of changes wrought by the Wolf Memorandum and USCIS Directives, American Gateways has, consistent with its core mission, spent significant staff hours and resources on additional public education and outreach regarding the changes to DACA eligibility and renewal terms. American Gateways' management and legal staff have spent substantial time drafting and translating social-media communications regarding the changes wrought by the Wolf Memorandum and

USCIS Directives and preparing to give information sessions on this topic to students and staff at local schools and community colleges. American Gateways is scheduled to give one of these information sessions in mid-September 2020.

37. American Gateways must devote much of its resources to assisting clients—at least some of whom would be eligible for DACA benefits were it not for the Wolf Memorandum and USCIS Directives—with immigration proceedings and issues not related to DACA. American Gateways cannot afford to hire any additional staff members to help handle the increased DACA-renewal workload. Instead, to deal with the resources shortfall, American Gateways will have to choose between (a) diverting the limited time of its staff from assisting clients with, for example, applications for U-visas, Violence Against Women Act benefits, removal defense, and asylum, to assisting clients with DACA-renewal applications, thereby substantially depleting the resources American Gateways is able to expend assisting clients with immigration-related proceedings or issues unrelated to DACA; (b) placing more clients seeking assistance with DACA-renewal applications on waitlists; or (c) refraining from assisting some clients with DACA-renewal applications altogether. Any one of these outcomes is contrary to American Gateways' mission of providing exceptional legal services to immigrants at no or low cost.

38. American Gateways will not be able to make up for the financial and staffing resources lost because of the Wolf Memorandum and USCIS Directives through additional donation- or grant-based fundraising or by recruiting additional volunteers.

39. These ongoing and imminent harms negatively affect American Gateways' ability to fulfill its core mission, an essential part of which is to offer no- or low-cost, quality legal services to as many low-income undocumented people as its resources allow. The Wolf Memorandum and USCIS Directives have made it substantially more costly for American

Gateways to serve the needs of its clients, jeopardizing and irreparably impeding its ability to carry out its core organizational mission.

40.     These harms to American Gateways also directly harm its clients.  Under the Wolf Memorandum and USCIS Directives, USCIS has already rejected first-time DACA applications submitted by at least two of American Gateways' clients.  If American Gateways expends a substantially greater portion of its resources to serve clients with DACA-related issues, it will have fewer resources available to help victims of mental or physical abuse obtain specialized visas; defend clients who are in removal proceedings; or assist victims of persecution obtain asylum in the United States, among other vital services.  Without no- or low-cost legal assistance from American Gateways, and if American Gateways is unable to find other immigration-services organizations in the area to assist them, many members of these served populations will be at grave risk of unemployment; separation from their families, friends, and communities; immigration detention; or removal from this country.

*Defendants*

41.     Defendant Chad F. Wolf purports to serve as Acting Secretary of Homeland Security and therefore as the "head" of the Department of Homeland Security with "direction, authority, and control over it."  *See* 6 U.S.C. § 112(a)(2).  He purports to exercise the duties and functions of the Secretary of Homeland Security and issued the Wolf Memorandum in that purported capacity.  Plaintiffs sue Defendant Wolf in his purported official capacity.

42.     Defendant Kenneth T. Cuccinelli purports to serve as the "Senior Official Performing the Duties of Deputy Secretary of Homeland Security" and as Acting Director of U.S. Citizenship and Immigration Services.  On information and belief, Defendant Cuccinelli is, or soon will be, implementing and enforcing the Wolf Memorandum, as Defendant Edlow has already done.  Plaintiffs sue Defendant Cuccinelli in his purported official capacity.

43.     Defendant Matthew T. Albence purports to serve as Deputy Director and "Senior Official Performing the Duties of Director" of U.S. Immigration and Customs Enforcement. The Wolf Memorandum was addressed to Defendant Albence. On information and belief, Defendant Albence is, or soon will be, implementing and enforcing the Wolf Memorandum, as the Wolf Memorandum orders him to do, and as Defendant Edlow has already done. Plaintiffs sue Defendant Albence in his purported official capacity.

44.     Defendant Joseph Edlow purports to serve as Deputy Director of Policy of U.S. Citizenship and Immigration Services. Defendant Wolf purported to appoint Defendant Edlow as Deputy Director of USCIS on February 19, 2020. The Wolf Memorandum was addressed to Defendant Edlow. Defendant Edlow issued the USCIS Directives in his purported capacity as USCIS Deputy Director of Policy. Plaintiffs sue him in his purported official capacity.

45.     Defendant Mark A. Morgan purports to serve as "Senior Official Performing the Duties of Commissioner" of U.S. Customs and Border Protection. On information and belief, Defendant Morgan is, or soon will be, implementing and enforcing the Wolf Memorandum, as the Memorandum orders him to do, and as Defendant Edlow has already done. The Wolf Memorandum was addressed to Defendant Morgan. Plaintiffs sue Defendant Morgan in his purported official capacity.

46.     Defendant Department of Homeland Security is the executive department principally charged with administering the federal immigration laws. *See, e.g.*, 6 U.S.C. §§ 202(5), 251; 8 U.S.C. § 1103(a)(1), (5).

47.     Defendant United States Citizenship and Immigration Services is a component agency of DHS. *See* 6 U.S.C. § 271. It is the agency primarily responsible for administering the DACA initiative, including adjudicating first-time and renewal applications, applications for work authorization, applications for advance parole, and other proceedings.

48. Defendant United States Immigration and Customs Enforcement is a component agency of DHS. It is responsible for, among other functions, enforcing the federal immigration laws. *See* 6 U.S.C. § 251-52.

49. Defendant United States Customs and Border Protection is a component agency of DHS. It is responsible for, among other functions, "enforce[ing] and administer[ing] all immigration laws" in "coordination with U.S. Immigration and Customs Enforcement and United States Citizenship and Immigration Services" as well as "the detection, interdiction, [and] removal" of "persons unlawfully entering, or who have recently unlawfully entered, the United States." 6 U.S.C. § 211(c)(8).

## JURISDICTION AND VENUE

50. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

51. Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (e)(1).

## FACTUAL AND LEGAL BACKGROUND

52. It is a bedrock principle of the United States of America that our country, more than any other, is welcoming of immigrants and that its people are better for it. Describing the United States as a "shining city on a hill," President Ronald Reagan explained that the "visitors to that city on the Potomac do not come as white or black, red or yellow; they are not Jews or Christians; conservatives or liberals; or Democrats or Republicans. They are Americans awed by what has gone before, proud of what for them is still . . . a shining city on a hill."[3] Twenty-six years later, then-U.S. Senator Barack Obama invoked the dream of a "city on a hill" in describing college students of diverse backgrounds, most of whom were the first members of their families to attend college: "I look out at a sea of faces that are African-American and

---

[3] Ronald Reagan, Election Eve Address: A Vision for America (Nov. 11, 1980), https://www.reaganlibrary.gov/11-3-80.

Hispanic-American and Asian-American and Arab-American and Anglo-American. I see students who have come here from over 100 different countries, believing like those first settlers that they too could find a home in that City on a Hill—that they too could find success in the unlikeliest of places."[4]

53.  From these principles was born the Deferred Action for Childhood Arrivals ("DACA") initiative, which, since June 15, 2012, has granted forbearance from removal proceedings, temporary work authorization, and other benefits to hundreds of thousands of young people who came to the United States as children and satisfy specific criteria. As President Obama explained, DACA "is about young people who grew up in America—kids who study in our schools, young adults who are starting careers, patriots who pledge allegiance to our flag. These Dreamers are Americans in their hearts, in their minds, in every single way but one: on paper. They were brought to this country by their parents, sometimes even as infants. They may not know a country besides ours. They may not even know a language besides English. They often have no idea they're undocumented until they apply for a job, or college, or a driver's license."[5]

54.  President Obama further explained why providing relief through DACA is so critical, not just to DACA recipients, but to the country as a whole: "Ultimately, this is about basic decency. This is about whether we are a people who kick hopeful young strivers out of

---

[4] Barack Obama, Commencement Address at University of Massachusetts at Boston (June 2, 2006), https://youtu.be/qWQG8aE8o7s?t=518 (8:38-9:09).

[5] *Obama's Statement Following Trump's Ending of DACA*, Politico, June 5, 2017, https://www.politico.com/story/2017/09/05/obamas-statement-following-trumps-ending-of-daca-transcript-242339.

America, or whether we treat them the way we'd want our own kids to be treated. It's about who we are as a people—and who we want to be."[6]

55.     Consistent with this rationale, the DACA initiative has, to date, benefitted hundreds of thousands of young people who were brought to the United States as children. It has kept families together and shielded recipients from being removed from the only country many of them have ever known. To be eligible, applicants must have entered the United States before the age of sixteen; have lived continuously in the United States since June 2007; be in school, have attained certain educational milestones, or have served honorably in the United States armed services; have no significant criminal history; and pose no threat to national security, among other criteria. Until July 28, 2020, those granted DACA's protections were designated low priorities for removal and received authorization to work legally in the United States for a two-year, renewable period.

56.     This case concerns the Trump Administration's latest salvo against DACA and its efforts to run roughshod over the values of our "shining city on a hill" by destroying DACA any way it can. In an attempted end-run around the Supreme Court's recent decision invalidating the Administration's efforts to terminate DACA, *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 & n.7 (2020), Defendant Wolf issued the Wolf Memorandum on July 28, 2020, placing new and draconian restrictions on DACA. Because Defendant Wolf lacked statutory or constitutional authority to issue the Wolf Memorandum, however, the Memorandum is *ultra vires*, without force or effect, void, and should be vacated.

## I.     The Deferred Action for Childhood Arrivals Initiative

57.     On June 15, 2012, under the Obama Administration, then-Secretary of Homeland Security Janet Napolitano issued a memorandum (the "Napolitano Memorandum") entitled

---

[6] *Id.*

"Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." The memorandum established an immigration-enforcement initiative known as DACA.[7]

58.     The Napolitano Memorandum establishes guidelines for the exercise of immigration-enforcement discretion with respect to young immigrants who were brought to the United States as children and meet criteria demonstrating that they are low priorities for removal. Deferred action is a type of enforcement discretion under which DHS does not seek, for a limited period, to remove an individual who is present in the United States without authorization.

59.     In its most recent iteration before July 28, 2020, DACA provided renewable, two-year periods of forbearance from removal proceedings, temporary work authorization, and other benefits to young, undocumented people who entered the United States as children.  To be eligible for an exercise of enforcement discretion under the DACA initiative, a person must (1) have come to the United States under the age of sixteen; (2) have continuously resided in the United States since before June 12, 2007, and been present in the U.S. on June 12, 2012; (3) be in school, have graduated from high school, have obtained a general education development certificate or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) not have been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety; and (5) not be above the age of thirty.  Until Defendant Wolf purported to amend DACA on July 28, 2020, DACA recipients were required to seek renewal of deferred action and work authorization and pay a $495 renewal fee every two years.

---

[7] Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

60.     Over 640,000 young people were benefitting from DACA as of March 31, 2020.[8] The initiative has allowed them to live and work in this country without fear of being unexpectedly separated from their jobs, family members, and communities.  Relying on DACA's effective guarantee of forbearance from removal, DACA recipients have made plans to pursue higher learning, settle into new jobs, and care for their families.

## II.     The Administration's First Attempt to Eliminate DACA

61.     On September 5, 2017, then-Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum (the "Duke Memorandum") entitled "Rescission of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'"[9]  The Duke Memorandum purported to rescind the Napolitano Memorandum and terminate the DACA initiative.  The Duke Memorandum directed DHS officials to entertain renewal applications from DACA recipients whose benefits were set to expire within six months but reject all first-time and all other renewal applications for relief under the initiative.

62.     On June 22, 2018, in response to several district-court orders enjoining enforcement of the Duke Memorandum because, among other grounds, it was arbitrary and capricious and violated the Administrative Procedure Act ("APA"), then-Secretary of Homeland Security Nielsen issued a second memorandum (the "Nielsen Memorandum") that purported to

---

[8] See U.S. Citizenship & Immigr. Servs., Approximate Active DACA Recipients: As of March 31, 2020 (July 22, 2020), https://www.uscis.gov/sites/default/files/document/data/Approximate%20Active%20DACA%20 Receipts%20-%20March%2031%2C%202020.pdf.

[9] Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

clarify and elaborate on the Duke Memorandum's reasoning and recommit DHS to rescinding DACA.[10]

63.     Litigation concerning the legality of the Duke and Nielsen Memoranda wound its way to the United States Supreme Court.  On June 18, 2020, the Court invalidated Acting Secretary Duke's order terminating DACA.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 & n.7 (2020).  Holding that Duke's order was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Court concluded that the order had (1) "failed to address" whether DACA recipients had legitimately come to rely on the initiative's protections and would suffer hardship in its absence; and (2) had failed to consider or adequately explain the decision to terminate forbearance from removal under DACA rather than only the initiative's extension of work authorization and other benefits.  *Id.* at 1910-16.  Having concluded that the Duke Memorandum's "dual failure" to "consider the conspicuous issues of whether to retain forbearance and what if anything to do about the hardship to DACA recipients" raised "doubts about whether the agency appreciated the scope of its discretion or exercised that discretion in a reasonable manner," the Court affirmed the vacatur of Duke's order rescinding DACA and remanded the matter to the Department of Homeland Security "so that it may consider the problem anew."  *Id.* at 1916 & n.7.

### III.     Defendant Wolf's Subsequent Unlawful Attempt to Restrict DACA

64.     The Trump Administration wasted no time on remand.  In a matter of weeks, Defendant Wolf issued the Wolf Memorandum in his purported capacity as Acting Secretary. The Wolf Memorandum severely restricted access to DACA for new applicants and current

---

[10] Kirstjen M. Nielsen, Memorandum from Secretary Kirstjen M. Nielsen (June 22, 2018), https://www.dhs.gov/sites/default/files/publications/18_0622_S1_Memorandum_DACA.pdf.

recipients alike. It was also issued without authority because Defendant Wolf never lawfully assumed the office of Acting Secretary.

### A.     The Federal Vacancies Reform Act and Homeland Security Act

65.     Two federal statutes govern the order of succession for Acting Secretary of Homeland Security: the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*, and the Homeland Security Act, 6 U.S.C. § 101 *et seq.*

66.     Under 6 U.S.C. § 113(a)(1)(A) and 5 U.S.C. § 3345(a)(1), the Deputy Secretary of Homeland Security, a Presidentially nominated and Senate-confirmed official, assumes the office of Acting Secretary of Homeland Security in the event the Secretary of Homeland Security dies, resigns, or is otherwise unable to perform the functions and duties of the office.

67.     Under 6 U.S.C. § 113(g)(1), the Under Secretary for Management of the Department of Homeland Security, a Presidentially nominated and Senate-confirmed official, assumes the office of Acting Secretary of Homeland Security in the event neither the Secretary of Homeland Security nor the Deputy Secretary of Homeland Security are available to exercise the functions and duties of Secretary.

68.     Under 6 U.S.C. § 113(g)(2), the Secretary of Homeland Security may designate other officers of the Department of Homeland Security in further order of succession to serve as Acting Secretary in the event neither the Secretary nor the Deputy Secretary nor the Under Secretary for Management are available to exercise the functions and duties of Secretary.

69.     Under 5 U.S.C. § 3346(a)(1), acting officials "may serve in the office . . . for no longer than 210 days beginning on the date the vacancy occurs." After these 210 days elapse, "the office shall remain vacant," *id.* § 3348(b)(1), and any action taken by someone purporting to hold that office shall have neither force nor effect, *see id.* § 3348(d)(1).

**B.**   **The Trump Administration Shuffles Officials at the Department of Homeland Security**

70.     Until April 2019, the order of succession at DHS beyond the Deputy Secretary and Under Secretary of Management was governed by two documents: Executive Order 13753 ("Executive Order 13753"), dated December 9, 2016, and DHS Delegation Number 00106 ("Directive 00106"), dated December 15, 2016 and issued pursuant to then-Secretary Jeh Johnson's authority under 6 U.S.C. § 113(g)(2).

71.     Executive Order 13753 designated the order of DHS officials who would become Acting Secretary "during any period in which the Secretary has died, resigned, or otherwise become unable to perform the functions and duties of the office of Secretary," provided they could assume office consistent with the FVRA and were not already holding office in an acting capacity.[11]

72.     Section II.A of Directive 00106 adopted the order of succession laid out in President Obama's executive order "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office."

73.     Section II.B of Directive 00106, however, imposed a separate and different order of succession for Acting Secretary in the event the Secretary becomes "unavailable to act during a disaster or catastrophic emergency." This second order of succession for disasters and emergencies was laid out in an appendix to Directive 00106 called "Annex A." Directive 00106 and Annex A's order of succession remained unchanged until April 9, 2019.

74.     President Donald J. Trump nominated Kirstjen Nielsen to be Secretary of Homeland Security on October 11, 2017. On December 5, 2017, the Senate confirmed her nomination.

---

[11] *See* Exec. Order 13753 § 1, Amending the Order of Succession in the Department of Homeland Security, 81 Fed. Reg. 90,667, 90,667 (Dec. 9, 2016).

75.     On April 7, 2019, Secretary Nielsen announced via Twitter that she had resigned

that office effective that day.[12]  A little over three hours later, however, she tweeted that she had

"agreed to stay on as Secretary through Wednesday, April 10th to assist with an orderly

transition and ensure that key DHS missions are not impacted."[13]

76.     Before Secretary Nielsen departed office on April 10, 2019, she signed a

memorandum that amended Directive 00106 by striking the text of Annex A and replacing it

with a new order of succession for Secretary of Homeland Security.  This memorandum was

issued "[p]ursuant to Title 6, United States Code, Section 113(g)(2)."[14]

77.     Secretary Nielsen's memorandum did not amend the text of Directive 00106

itself.  It left intact the language in Sections II.A and B of Directive 00106 providing,

respectively, that Executive Order 13753 would govern the order of succession for the Secretary

"[i]n case of the Secretary's death, resignation, or inability to perform the functions of the

Office" and that Annex A would govern the order only in the event the Secretary is "unavailable

to act during a disaster or catastrophic emergency."[15]

78.     Under Secretary Nielsen's new Annex A, the CBP Commissioner, a position then

held by Kevin McAleenan, became third in line to serve as Acting Secretary in the event of the

---

[12] *See* @SecNielsen, Twitter (Apr. 7, 2019, 4:02 PM),
https://twitter.com/SecNielsen/status/1115027147893235712.

[13] @SecNielsen, Twitter (April 7, 2019, 7:36 PM),
https://twitter.com/SecNielsen/status/1115080823068332032.

[14] The United States produced a copy of Nielsen's April 9, 2019 memorandum amending
Directive 00106 in litigation pending in the District of Maryland.  *See* Neal J. Swartz Decl. Ex. 1,
ECF No. 41-2, *Casa de Maryland, Inc. v. Wolf*, No. 8:20-cv-02118-PX (D. Md.).

[15] A copy of Directive 00106 as amended by Secretary Nielsen in April 2019 is available as
Enclosure B to a November 15, 2019 letter from Representatives Bennie G. Thompson and
Carolyn B. Maloney to the Comptroller General of the United States.  That letter is in turn
available here:
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro%
20re%20Letter%20to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf.

Secretary's unavailability due to a disaster or catastrophic emergency, after the Deputy Secretary and Under Secretary for Management.

79.     Under the unamended Section II.A, however, which retained the order of succession laid out in Executive Order 13753, Commissioner McAleenan was seventh in line to become Acting Secretary in the event of the Secretary's *resignation*—after the Deputy Secretary of Homeland Security; the Under Secretary for Management; the Administrator of the Federal Emergency Management Agency ("FEMA"); the Under Secretary for National Protection and Programs; the Under Secretary for Science and Technology; and the Under Secretary for Intelligence and Analysis, to the extent those positions were filled by Presidentially nominated and Senate-confirmed appointees.

80.     On April 10, 2019, the offices of Deputy Secretary of Homeland Security, Under Secretary for Management, FEMA Administrator, and Under Secretary for Science and Technology were vacant.  The offices of Under Secretary for National Protection and Programs and the Under Secretary for Intelligence and Analysis were not.

81.     Because Secretary Nielsen resigned her office as Secretary and had not become "unavailable to act during a disaster or catastrophic emergency," two other Senate-confirmed officials—Christopher Krebs, the Senate-confirmed Under Secretary for National Protection and Programs, followed by David Glawe, at the time the Senate-confirmed Under Secretary for Intelligence and Analysis—were lawfully designated to succeed Secretary Nielsen under Section II.A of Directive 00106.

82.     Nonetheless, in obvious contravention of Directive 00106 and Executive Order 13753, on April 10, 2019, CBP Commissioner McAleenan purported to assume Nielsen's office as Acting Secretary of Homeland Security.

83.     Six months later, on October 11, 2019, President Trump tweeted that Commissioner McAleenan would be departing DHS.[16]

84.     On November 8, 2019—212 days after Nielsen vacated the office of Secretary of Homeland Security and 2 days past the 210 days allotted under 5 U.S.C. § 3346(a)(1)— Commissioner McAleenan issued an order in his purported capacity as Acting Secretary purporting to further amend Directive 00106 by striking the text of Section II.A and replacing it with language providing that Annex A would govern the order of succession for the Secretary "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," rather than only in the event of the Secretary's unavailability due to a disaster or catastrophic emergency.[17]

85.     Pursuant to his purported authority as Acting Secretary under 6 U.S.C. § 113(g)(2), Commissioner McAleenan's order also struck the text of Annex A to Directive 00106 and replaced it with a new order of succession in which the CBP Commissioner and the Under Secretary for Strategy, Policy, and Plans would become third and fourth in line to serve as Acting Secretary, respectively, after the Deputy Secretary and Under Secretary for Management.

86.     On November 8, 2019, the offices of Deputy Secretary, Under Secretary for Management, and Under Secretary for Strategy, Policy, and Plans were vacant. But President Trump's nomination of Defendant Wolf as Under Secretary for Strategy, Policy, and Plans was already pending in the Senate.

---

[16] @realDonaldTrump, Twitter (Oct. 11, 2019, 4:46 PM), https://twitter.com/realdonaldtrump/status/1182804700699086848?lang=en.

[17] A copy of Commissioner McAleenan's order purportedly amending Directive 00106 is available as Enclosure A to a November 15, 2019 letter from Representatives Bennie G. Thompson and Carolyn B. Maloney to the Comptroller General of the United States. That letter is in turn available here: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro%20re%20Letter%20to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf.

87. The Senate confirmed Defendant Wolf as Under Secretary for Strategy, Policy, and Plans on November 13, 2019.

88. On November 13, 2019—216 days after Nielsen vacated the office of Secretary and 6 days past the 210 days allotted under 5 U.S.C. § 3346(a)(1)—Commissioner McAleenan resigned as Acting Secretary of Homeland Security. Because the Deputy Secretary, Under Secretary of Management, and CBP Commissioner positions were vacant, Defendant Wolf purported to take office that same day as Acting Secretary of Homeland Security under Commissioner McAleenan's November 8, 2019 order purportedly amending Directive 00106.

89. On November 15, 2019, Bennie G. Thompson, Chairman of the House Committee on Homeland Security, and Carolyn B. Maloney, then the Acting Chairwoman of the House Committee on Oversight and Reform, wrote the United States Comptroller General—head of the United States Government Accountability Office ("GAO")—expressing skepticism that Commissioner McAleenan lawfully assumed office as Acting Secretary of Homeland Security consistent with 6 U.S.C. § 113(g), that he lawfully amended Directive 00106 on November 8, 2019 consistent with the Federal Vacancies Reform Act, 6 U.S.C. § 3345 *et seq.*, and that Defendant Wolf lawfully purported to succeed Commissioner McAleenan as Acting Secretary. The letter requested that the GAO "conduct an expedited review to resolve whether Mr. Wolf," who is "now engaged in decision-making that impact[s] the security of every American," is "legally serving in the position" of Acting Secretary of Homeland Security.[18]

90. On August 14, 2020, the GAO's General Counsel issued a report in response to Representatives Thompson and Maloney's letter. The report observed that although

---

[18] Letter from U.S. Reps. Bennie G. Thompson, Chairman, Homeland Security Committee, and Carolyn Maloney, Acting Chairwoman, Committee on Oversight & Reform, to U.S. Comptroller General Gene Dodaro (Nov. 15, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro%20re%20Letter%20to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf.

Commissioner "McAleenan assumed the title of Acting Secretary upon the resignation of Secretary Nielsen," "the express terms of the existing designation" governing the order of succession to the office of Secretary of Homeland Security "required another official to assume that title." "As such," the report explained, Commissioner "McAleenan did not have the authority to amend the Secretary's existing designation" to permit Defendant Wolf to succeed McAleenan as Acting Secretary. "Accordingly," the report concluded, "Messrs. Wolf and Cuccinelli were named to their respective positions of Acting Secretary and Senior Official Performing the Duties of Deputy Secretary by reference to an invalid order of succession." The report announced that GAO would refer the questions of "who should be serving as the Acting Secretary and the Senior Official Performing the Duties of Deputy Secretary" and the "consequences of actions taken by these officials" to the "DHS Office of Inspector General for its review."[19]

91. On August 25, 2020, President Trump announced via Twitter that he intended to nominate Defendant Wolf as the permanent Secretary of Homeland Security.[20] As of the filing of this Complaint, President Trump has not done so. Nor has he ever designated Defendant Wolf as Acting Secretary of Homeland Security.

### C. The Wolf Memorandum and USCIS Directives

92. On July 28, 2020—474 days after Secretary Nielsen vacated the office of Secretary of Homeland Security and 258 days after Defendant Wolf purportedly assumed office as Acting Secretary—Wolf issued the Wolf Memorandum, which is entitled "Reconsideration of

---

[19] U.S. Gov't Accountability Office, B-3321650, Decision Letter on Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security (Aug. 14, 2020) at 11, https://www.gao.gov/assets/710/708830.pdf.

[20] @realDonaldTrump, Twitter (Aug. 25, 2020, 9:30 AM), https://twitter.com/realDonaldTrump/status/1298296592764735490.

the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'"

93.    In "the exercise of [Defendant Wolf's purported] authority and discretion in establishing national immigration policies and priorities" under 8 U.S.C. § 1103(a)(1) and 6 U.S.C. § 202(5), the Wolf Memorandum purports to rescind the Duke and Nielsen Memoranda, states that Defendant Wolf is "considering" the DACA initiative "anew," and purports to order "certain immediate changes to the DACA policy."

94.    As a practical matter, the Wolf Memorandum purports to rescind, but effectively reinstates, the Duke and Nielsen Memoranda.  Addressed to Defendants Albence, Edlow, and Morgan in their official capacities, the Memorandum orders them to immediately implement changes to DACA similar to those wrought by the Duke Memorandum in 2017, and effectively eliminates DACA for new applicants.  Specifically, the Wolf Memorandum orders Defendants Albence, Edlow, and Morgan to take the following steps, among others, "effective immediately":

- Reject all initial applications for DACA participation, reject associated applications for work authorization, and refund all associated fees, purportedly "without prejudice to re-filing such requests should DHS determine to begin accepting initial requests again in the future";

- Process all pending and future properly submitted DACA- and work-authorization-renewal applications submitted by current DACA recipients;

- Limit any DACA or related work-authorization renewals to one year rather than two;

- Reject all pending and future applications for advance parole from DACA beneficiaries "absent" unexplained "exceptional circumstances";

- Refrain from terminating previously approved grants of deferred action, work authorization, or advance parole "for the remaining duration of their validity periods" solely on the basis of the Memorandum's purported directives; and

- Exercise "discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate."

95. On August 21, 2020, USCIS, the arm of DHS chiefly responsible for administering immigration services and benefits, issued policy directives purporting to implement the Wolf Memorandum's changes to DACA. The USCIS Directives instruct all USCIS personnel to immediately act as follows:

- Reject all initial DACA requests and associated applications for employment authorization submitted by immigrants who have never before been granted DACA relief, and return all associated fees, without prejudice to refiling such requests should DHS elect to begin accepting initial requests again;

- Reject DACA renewal requests received more than 150 days prior to the expiration of the recipient's current DACA validity period;

- Limit the period of any grant of deferred action and any associated period of work authorization under DACA to one year;

- Continue to charge a $410 processing fee and $85 biometrics fee for applications for work-authorization renewals despite the fact that future periods of deferred action and work authorization will be halved;[21]

---

[21] Though not discussed in the USCIS implementation directives, USCIS's website indicates that the same $495 fee covers associated applications for renewed grants of deferred action under DACA even though the length of any such renewal, like the length of work-authorization renewals, has been halved.

- Reject all pending and future Form 1-131 applications for advance parole from DACA recipients, unless the applicant can demonstrate "exceptional circumstances"; and

- Immediately update USCIS's internal operating procedures to permit DHS officers to exercise "discretionary authority" under the Wolf Memorandum "to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate."

96.     Under the Wolf Memorandum and USCIS Directives, USCIS has already denied first-time applications for DACA benefits submitted by clients of Plaintiffs and, absent relief from this Court, will continue to do so.  On information and belief, absent relief from this Court, USCIS will soon begin granting applications for renewed deferred action and work authorization submitted by clients of Plaintiffs for only one year rather than two.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### The Wolf Memorandum and USCIS Directives Are Void Because They Were Issued by Defendant Wolf While He Was Purporting to Serve As Acting Secretary In Violation of the Homeland Security Act and the Federal Vacancies Reform Act

97.     Plaintiffs repeat and incorporate by reference the preceding allegations.

98.     Defendant Wolf's purported accession to the office of Acting Secretary of Homeland Security violated the Homeland Security Act, as follows:

99.     When he purported to assume the office of Acting Secretary of Homeland Secretary on April 10, 2019 upon Secretary Kirstjen Nielsen's resignation, former CBP Commissioner McAleenan did so in violation of the DHS directive governing the order of succession to that office issued by Secretary of Homeland Security Jeh Johnson and amended by Secretary Nielsen pursuant to the Homeland Security Act, 6 U.S.C. § 113(g)(2).  Therefore,

Commissioner McAleenan was never lawfully designated Acting Secretary of Homeland Security and never lawfully assumed the functions, duties, and powers of that office.

100.    Because Commissioner McAleenan never lawfully assumed the functions, duties, and powers of the office of Acting Secretary of Homeland Security, he lacked lawful authority to further amend the DHS directive governing the order of succession to that office under 6 U.S.C. § 113(g)(2).  Thus, his November 8, 2019 order purporting to do so was *ultra vires* and void.

101.    Defendant Wolf purported to assume office as Acting Secretary of Homeland Security, and could only have done so, under Commissioner McAleenan's November 8, 2019 order purportedly amending the DHS directive governing the order of succession to that office pursuant to 6 U.S.C. § 113(g)(2).  Because Commissioner McAleenan's order was *ultra vires* and void, however, Defendant Wolf was never lawfully designated Acting Secretary of Homeland Security, and purported to assume the functions, duties, and powers of that office in violation of the Homeland Security Act.

102.    Defendant Wolf's purported accession to the office of Acting Secretary of Homeland Security also violated the Federal Vacancies Reform Act, as follows:

103.    *First*, when Commissioner McAleenan purported to amend the DHS directive governing the order of succession to the office of Secretary of Homeland Security on November 8, 2019, the office had been vacant since Secretary Nielsen departed on April 10, 2019—that is, for 212 days.  The office was therefore "vacant" under the Federal Vacancies Reform Act, 5 U.S.C. §§ 3346(a)(1), 3348(b)(1), and Commissioner McAleenan's November 8, 2019 order claiming to amend the order of succession lacked "force or effect," *id.* § 3348(d)(2).  Because Commissioner McAleenan's order lacked force or effect, and because Defendant Wolf purported to assume office as Acting Secretary and could only have done so under that order, Defendant Wolf was never lawfully designated Acting Secretary of Homeland Security and purported to

assume the functions, duties, and powers of that office in violation of the Federal Vacancies Reform Act. Under 5 U.S.C. § 3348(d)(1), his promulgation of the Wolf Memorandum in his purported capacity as Acting Secretary had no force or effect.

104. *Second*, when Defendant Wolf purported to assume office as Acting Secretary of Homeland Security on November 13, 2019, the office of Secretary had been vacant for at least 216 days. Under the Federal Vacancies Reform Act, 5 U.S.C. §§ 3346(a)(1), 3348(b)(1), the office was to "remain vacant" unless and until a permanent Secretary of Homeland Security was nominated and confirmed. Defendant Wolf purported to assume office as Acting Secretary of Homeland Security in violation of these provisions. Under 5 U.S.C. § 3348(d)(1), his promulgation of the Wolf Memorandum in his purported capacity as Acting Secretary had no force or effect.

105. The President has never designated Defendant Wolf as Acting Secretary of Homeland Security under 5 U.S.C. § 3345 or any other statute, and Defendant Wolf has never served as first assistant to the Secretary of Homeland Security.

106. Because Defendant Wolf purported to assume office in violation of the Homeland Security Act and the Federal Vacancies Reform Act, he was never lawfully designated Acting Secretary of Homeland Security and never lawfully assumed the functions, duties, and powers of that office. As a result, he lacked any lawful authority to issue the Wolf Memorandum. The Wolf Memorandum is therefore *ultra vires*, without force or effect, and void.

107. Furthermore, because Defendant Wolf was never lawfully designated Acting Secretary of Homeland Security and never lawfully assumed the functions, duties, and powers of that office, he lacked any lawful authority to appoint Defendant Edlow as Deputy Director for Policy of U.S. Citizenship and Immigration Services on February 19, 2020. Thus, Defendant Edlow never lawfully assumed the functions, duties, and powers of that office.

108.    Because the Wolf Memorandum is *ultra vires*, without force or effect, and void, and because Defendant Edlow never lawfully assumed the functions, duties, and powers of the office of Deputy Director for Policy of U.S. Citizenship and Immigration Services, Defendant Edlow lacked any lawful authority to issue the USCIS Directives implementing the Wolf Memorandum, and those Directives are themselves *ultra vires* and void.

109.    Plaintiffs are suffering and will continue to suffer irreparable injury resulting from the implementation and enforcement of the unlawfully issued Wolf Memorandum and USCIS Directives.

## SECOND CAUSE OF ACTION

## The Wolf Memorandum and USCIS Directives Violate the Administrative Procedure Act

110.    Plaintiffs repeat and incorporate by reference the preceding allegations.

111.    The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

112.    Defendant Wolf's promulgation of the Wolf Memorandum was a final agency action.

113.    Defendant Edlow's promulgation of the USCIS Directives was a final agency action.

114.    Defendant Wolf issued the Wolf Memorandum in his purported capacity as Acting Secretary of Homeland Security.

115.    Defendant Edlow issued the USCIS Directives in his purported capacity as Deputy Director for Policy of U.S. Citizenship and Immigration Services.

116.     Because Defendant Wolf purported to assume office in violation of the Homeland Security Act and the Federal Vacancies Reform Act, he was never lawfully designated Acting Secretary of Homeland Security and never lawfully assumed the functions, duties, and powers of that office.  As a result, he lacked any lawful authority to issue the Wolf Memorandum.

117.     The Wolf Memorandum was therefore issued "not in accordance with law," "in excess of statutory . . . authority," and/or "short of statutory right" and must be vacated.  5 U.S.C. § 706(2)(A), (C).

118.     Because the Wolf Memorandum was issued in violation of the APA, and because Defendant Edlow never lawfully assumed the functions, duties, and powers of the office of Deputy Director for Policy of U.S. Citizenship and Immigration Services, Defendant Edlow lacked lawful authority to issue the USCIS Directives implementing the Wolf Memorandum.

119.     The USCIS Directives were therefore also issued "not in accordance with law," "in excess of statutory . . . authority," and/or "short of statutory right" and must be vacated.  5 U.S.C. § 706(2)(A), (C).

120.     Plaintiffs are suffering and will continue to suffer irreparable injury resulting from the implementation and enforcement of the unlawfully issued Wolf Memorandum and USCIS Directives.

## **THIRD CAUSE OF ACTION**

### **In the Alternative to Counts One and Two, the Wolf Memorandum and USCIS Directives Were Issued in Violation of the Appointments Clause, U.S. Const. art. II, § 2, cl.2**

121.     Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 96.

122.     The Appointments Clause of the United States Constitution provides that principal officers of the United States must be appointed by the President "by and with the Advice and Consent of the Senate."  U.S. Const. art. II, § 2, cl. 2.

123.   By purporting to exercise the duties and functions of Acting Secretary of Homeland Security, the head of an executive department, Defendant Wolf purports to serve as a principal officer for purposes of the Appointments Clause.

124.   On February 19, 2020, ninety-eight days into Defendant Wolf's purported tenure as Acting Secretary of Homeland Security, he purportedly appointed Defendant Edlow to the office of Deputy Director for Policy of U.S. Citizenship and Immigration Services.  At the time, the office of Secretary of Homeland Security had been vacant without a permanent appointee for 315 days, and Defendant Wolf had not been nominated by the President or confirmed by the Senate to that position.

125.   On July 28, 2020, 258 days into Defendant's Wolf's purported tenure as Acting Secretary of Homeland Security, he issued the Wolf Memorandum heavily restricting—and in some instances, eliminating altogether—access to DACA. At the time, the office of Secretary of Homeland Security had been vacant without a permanent appointee for 475 days, and Defendant Wolf had not been nominated by the President or confirmed by the Senate to that position.

126.   To date, Defendant Wolf has not been nominated by the President by the President or confirmed by the Senate to the office of Secretary of Homeland Security.

127.   Thus, to the extent Defendant Wolf's purported service as Acting Secretary of Homeland Security on February 19, 2020 and July 28, 2020 was consistent with the Homeland Security Act and/or the Federal Vacancies Reform Act, his purported service in that office nonetheless violated the Appointments Clause.  Accordingly, Defendant Wolf's purported appointment of Defendant Edlow to the office of Deputy Director for Policy of U.S. Citizenship and Immigration Services and issuance of the Wolf Memorandum violated the Appointments Clause.

128.     Because the Wolf Memorandum was issued in violation of the Appointments Clause, and because Defendant Wolf appointed Defendant Edlow to the office of Deputy Director for Policy of U.S. Citizenship and Immigration Services in violation of the Appointments Clause, Defendant Edlow lacked lawful authority to issue the USCIS Directives implementing the Wolf Memorandum.

129.     The Wolf Memorandum and USCIS Directives are therefore invalid and must be vacated.

130.     Plaintiffs are suffering and will continue to suffer irreparable injury resulting from the implementation and enforcement of the unlawfully issued Wolf Memorandum and USCIS Directives.

## FOURTH CAUSE OF ACTION

### Declaratory Judgment Act

131.     Plaintiffs repeat and incorporate by reference the preceding allegations.

132.     Plaintiffs are suffering and will continue to suffer irreparable injury resulting from the implementation and enforcement of the unlawfully issued Wolf Memorandum and USCIS Directives.

133.     The Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, provides that "[i]n a case of actual controversy within its jurisdiction . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Id.* § 2201(a).

134.     The Court has equitable jurisdiction to enjoin "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *see Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing an

"implied private right of action directly under the Constitution to challenge governmental action under the Appointments Clause").

135.  Defendant Wolf was appointed in violation of the Homeland Security Act and the Federal Vacancies Reform Act or, in the alternative, the Appointments Clause.  Plaintiffs are entitled to a declaration that Defendant Wolf's designation as Acting Secretary of Homeland Security violated federal law or the United States Constitution, that Defendant Edlow's purported appointment as Deputy Director for Policy of U.S. Citizenship and Immigration Services violated federal law or the United States Constitution, and that the Wolf Memorandum and USCIS Directives are therefore invalid.

136.  The Wolf Memorandum, which Defendant Wolf promulgated under his purported authority as Acting Secretary of Homeland Security, and the USCIS Directives, which Defendant Edlow promulgated under the purported authority of the Wolf Memorandum and under his own purported authority as Deputy Director for Policy of U.S. Citizenship and Immigration Services, harm Plaintiffs for the reasons stated above.

## REQUEST FOR RELIEF

For the foregoing reasons, Plaintiffs request that the Court:

1. Declare that the Wolf Memorandum and USCIS Directives were issued in violation of the Homeland Security Act and the Federal Vacancies Reform Act and are therefore *ultra vires* and have no force or effect;

2. Declare that the Wolf Memorandum and USCIS Directives were issued not in accordance with law, in violation of the Administrative Procedure Act;

3. In the alternative, declare the Wolf Memorandum and USCIS Directives were issued in violation of the Appointments Clause of the U.S. Constitution;

4. Vacate the Wolf Memorandum and USCIS Directives;

5. Immediately and permanently enjoin Defendants and all their officers, employees, agents, and successors from implementing, applying, or enforcing the Wolf Memorandum or the USCIS Directives implementing it;

6. Declare Defendant Chad F. Wolf's purported accession as Acting Director of Homeland Security and Defendant Joseph Edlow's purported appointment as Deputy Director for Policy of U.S. Citizenship and Immigration Services invalid under the Homeland Security Act and the Federal Vacancies Reform Act or, alternatively, the Appointments Clause of the United States Constitution;

7. Award Plaintiffs their costs and reasonable attorneys' fees; and

8. Grant such further and other relief as this Court deems just and proper.

Dated: September 3, 2020

Respectfully submitted,
MUNGER, TOLLES & OLSON LLP

By: _____/s/ Adele M. El-Khouri_____
ADELE M. EL-KHOURI

THOMAS A. SAENZ
tsaenz@MALDEF.org
(*Pro Hac Vice* application filed concurrently)
ERNEST I. HERRERA
eherrera@MALDEF.org
(*Pro Hac Vice* application filed concurrently)
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND
634 South Spring Street
Los Angeles, California 90014
Telephone:    (213) 629-2512
Facsimile:     (213) 629-0266

E. MARTIN ESTRADA
(*Pro Hac Vice* application filed concurrently)
BRANDON E. MARTINEZ
(*Pro Hac Vice* application filed concurrently)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90017
Telephone:    (213) 683-9100
Facsimile:     (213) 687-3702

ADELE M. EL-KHOURI
Adele.El-Khouri@mto.com
XIAONAN APRIL HU
(*Pro Hac Vice* application filed concurrently)
April.Hu@mto.com
MUNGER, TOLLES & OLSON LLP
1117 F. Street, N.W., 7th Floor
Washington, D.C. 20004–1357
Telephone:    (202) 220-1100
Facsimile:     (202) 220-2300

*Counsel for Plaintiffs*

# EXHIBIT 9



# Office of the Attorney General
## Washington, D. C. 20530

June 30, 2020

The Honorable Chad F. Wolf
Acting Secretary of Homeland Security
Washington, DC 20528

Dear Acting Secretary Wolf:

On September 4, 2017, then-Attorney General Jefferson B. Sessions sent a letter to then-Acting Secretary of Homeland Security Elaine Duke that, among other things, expressed his view that the Department of Homeland Security (DHS) policy known as Deferred Action for Childhood Arrivals (DACA) was unlawful. Acting Secretary Duke expressly considered that letter, among other factors, in reaching her decision on September 5, 2017, that the DACA policy should be rescinded.

On June 18, 2020, the U.S. Supreme Court affirmed a lower court judgment vacating Acting Secretary Duke's rescission of the DACA policy. See *Department of Homeland Security v. Regents of the University of California*, Nos. 18-587, 18-588, 18-589. The Supreme Court noted that "[a]ll parties agree" that "DHS may rescind DACA," slip op. at 9, but held that Acting Secretary Duke's decision failed to provide a reasoned explanation as to both the scope of her discretion to rescind DACA and the manner in which she exercised it, *id.* at 29. Accordingly, the Court remanded the matter to DHS so that the agency may consider the issue anew. *Id.*

In order to facilitate that consideration, I am hereby withdrawing Attorney General Sessions's September 4, 2017, letter to Acting Secretary Duke. Without regard to whether I agree with the views expressed in that letter, I withdraw it because I do not wish to maintain a determination as the Attorney General regarding DACA that might constrain the discretion you otherwise possess as Acting Secretary of Homeland Security to consider whether and how to rescind DACA. In other words, I wish to wipe the slate clean to make clear beyond doubt that you are free to exercise your own independent judgment in considering the full range of legal and policy issues implicated by a potential rescission or modification of DACA, as contemplated by the Supreme Court. For the same reason, I also have directed the Office of Legal Counsel at the Department of Justice to withdraw an opinion that addressed the legality of DACA and related deferred-action policies, see *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op O.L.C. __ (Nov. 19, 2014), as well as any other guidance it has provided to DHS on that topic.

Sincerely,

William P. Barr
Attorney General

# EXHIBIT 10

**COALITION** *for the*
**AMERICAN DREAM**

July 11, 2020

President Donald J. Trump
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20050

Dear Mr. President:

The Coalition for the American Dream is an organization of business leaders
supporting Deferred Action for Childhood Arrivals (DACA) recipients and pursuing a
bipartisan, permanent legislative solution for Dreamers. Our membership includes more
than 140 employers and trade associations spanning a variety of U.S. industries, from
retail to manufacturing to tech, that represent more than half of American private sector
workers.

As large American employers and employer organizations, we strongly urge you to
leave the DACA program in place.  DACA recipients have been critical members of our
workforce, industries, and communities for years now, and they have abided by the laws
and regulations of our country in order to maintain their DACA status.  Their work and
commitment to our companies, their families and communities are critical to our nation's
strength, especially since there are tens of thousands of DACA recipients working as
front line doctors and nurses and in other critical industries fighting COVID-
19.  Moreover, poll after poll has shown that the overwhelming majority of Americans of
all political backgrounds agree that we should protect DACA recipients from
deportation.

This is no time to disrupt the economic recovery of our companies and communities, nor
time to jeopardize the health and safety of these vulnerable individuals.  We ask that
you leave DACA in place and refrain from taking any additional administrative actions
that would negatively impact the DACA program.

Respectfully,
The Coalition for the American Dream




























WARBY PARKER



















































































# EXHIBIT 11

2006 WL 1228846
Only the Westlaw citation is currently available.
United States District Court, W.D. Louisiana,
Monroe Division.

Normal PARM Jr., et al

v.

Mark W. SHUMATE, in his U.S. Official
Capacity as Sheriff of East Carroll Parish.

Civil Action No. 3-01-2624.
|
May 1, 2006.

**Attorneys and Law Firms**

Paul L. Hurd, Law Office of Paul L. Hurd, Monroe, LA, for Plaintiff.

Freeman R. Matthews, Ana T. Fuentes, Craig E. Frosch, Usry Weeks & Matthews, New Orleans, LA, John V. Quaglino, Juge Napolitano et al ., Metairie, LA, for Defendant.

MEMORANDUM ORDER

JAMES D. KIRK, Magistrate Judge.

**\*1** Before the court is a motion by Walker Lands, Inc. (Walker) for leave to participate in pending motions for summary judgment as amicus curiae [Doc. # 84]. In the motion Walker, who was allowed to file a brief amicus curiae in connection with motions # 5 and 11, seeks permission to "file pleadings as may be appropriate" with respect to the district judge's action on Report and Recommendation, Doc. # 82. Walker also seeks permission to file an appeal[1] of my order of April 21st striking the exhibits attached to Walker's amicus brief as not allowed.

[1] Erroneously termed "objection" by Walker in its memorandum and proposed order.

The motion is granted in part and denied in part.

Walker was permitted to file only a brief to assist the court with respect to the undersigned's consideration of motions for summary judgment 5 and 11. Despite Walker's counsel suggesting at a hearing on the motions[2] that Walker might

seek leave to intervene or file an amicus brief, only amicus status was sought by Walker. Walker now seeks to participate with regard to the district judge's consideration of my Report and Recommendation.

[2] Although at that time Walker had not been granted any status in the case, its attorney, who appeared in the "audience" at the hearing was allowed to address the court.

Because Walker appears only amicus curiae, it has no standing in this case and it may not raise issues or file an appeal of an order such as the order to strike evidence it attempted to file in connection with the motions for summary judgment.[3] See *Resident Council of Allen parkway v. United States,* 980 F.2d 1043 (5th Cir.1993); *Exxon Corp. v. Board of Education,* 849 FSupp. 479 (S.D.Miss.1994). See also *United States v. Hooker Chemicals & Plastics, Corp.,* 749 F.2d 968 (2nd Cir.1984); *Manago v. Rosario,* 91 Fed. Appx. 9 (9th Cir.2004). "The bright line between an amicus and a named party centers around control of the litigation. The named parties should always remain in control, with the amicus merely responding to the issues presented by the parties. An amicus cannot initiate, create, extend, or enlarge issues. Further, an amicus has no right to appeal or dismiss issues." *Wyatt v. Hanan,* 868 F.Supp. 1356 (M .D.Alabama, 1994). A person appearing amicus curiae does not have party status and does not have all the rights of a party, including the right of full participation in the proceedings as well as the right of appeal or further participation in the proceedings. *United States v. Microsoft Corporation,* 1995 WL 121107 (D.D.C., 1995); *Waste Management of Pennsylvania v. City of York,* 162 F.R .D. 34 (M.D.Penn, 1995).

[3] Summary judgment evidence may not be submitted by a non-party.

For these reasons, IT IS ORDERED that Walker is allowed to file an amicus brief, within the page limits set by local rules, regarding any objections to the Report and Recommendation which are filed by the parties to this suit; however, because it is not a party to this suit, it will not be permitted to file an Objection itself and will be limited to briefing only those issues raised by the parties pursuant to their Objections. Further Walker may not submit evidence and may not attach documents to its amicus brief. Walker's sole status in this proceeding is to assist the court with regard to the issues raised by the parties to the suit based on the evidence submitted by them in the suit. To permit further participation would be, in effect, to grant Walker intervenor status, which will not

be done at this late stage in this proceeding which has been pending since 2001.

 **\*2**  IT IS FURTHER ORDERED that Walker's motion for leave to appeal the Order Striking its exhibits is DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1228846

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 12

Case 1:18-cv-00068 Document 504-2 Filed on 11/06/20 in TXSD Page 319 of 548

Kirkland v. New York State Dept. of Correctional Services, Not Reported in F.Supp. (1988)

1988 WL 108485, 48 Empl. Prac. Dec. P 38,631

1988 WL 108485
United States District Court, S.D. New York.

Edward L. KIRKLAND, et al., Plaintiffs,
v.
The NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al., Defendants.

No. 82 CIV. 0295 (TPG).
|
Oct. 12, 1988.

*OPINION*

GRIESA, District Judge.

**\*1** Plaintiffs Edward Kirkland et. al., a class of black corrections employees, originally brought this action in 1982 against the New York State Civil Service Commission and the Department of Correctional Services. Plaintiffs claimed that the 1981 Correction Lieutenant examination administered by Civil Service was racially discriminatory. The parties reached a settlement involving a consent decree, which was approved by this court on November 9, 1982.

In January 1988 a joint motion was made by plaintiffs and defendants for an order approving a particular method of "zone" or "bandwidth" scoring. If approved, defendants propose to apply zone scoring to the results of the 1987 Correction Lieutenant examination. Both plaintiffs and defendants agree that zone scoring would be permissible under the terms of the settlement and is the most desirable method of scoring. However, a group of correction employees who took the 1987 exam have intervened. They move to dismiss the joint motion for lack of subject matter jurisdiction on the ground that it presents no case or controversy to this court. They propose to challenge the scoring method under state law in a state court. However, the interveners assert that, if the federal court exercises jurisdiction over the joint motion, they wish to contest approval of the scoring system on the merits.

The interveners' motion to dismiss the joint motion for lack of subject matter jurisdiction is granted.

*Facts*

The 1982 settlement provided, among other things, for a particular method of scoring for the *1981* examination. The settlement did not specify a scoring method for future examinations. Future selection procedures were simply to avoid "adverse impact" on minority candidates.

The next Correction Lieutenant examination was held in 1987. After the examination was administered, the Civil Service, in conjunction with plaintiffs' expert psychologist, decided to use the zone method of scoring. Essentially, this method considers all scores within a given range to be equivalent, *e.g.,* if scores 90–100 are designated as the top "band," a 99 and a 91 would be ranked equally.

In July 1987 the Appellate Division of the New York Supreme Court decided an unrelated case dealing with zone scoring. *McGowan v. Burstein,* 130 A.D.2d 123, 518 N.Y.S.2d 247 (3d Dept.1987). The court held that this method *presumptively* violates New York's constitutional requirement that promotional exams be based on merit and fitness. The Appellate Division upheld an injunction prohibiting the State from using zone scoring unless authorized to do so by prior court order. This injunction was so broad as to cover the proposed use of zone scoring by the State in the present case.

On January 5, 1988, while review of the *McGowan* decision was pending in the New York Court of Appeals, plaintiffs and defendants in the present case filed the motion now before this court, seeking an order approving application of the zone scoring method to the 1987 Correction Lieutenant examination. The parties claimed that such a motion was appropriate because of the injunction in *McGowan.*

**\*2** On February 22, 1988 a group of white employees who took the 1987 Correction Lieutenant examination filed a motion in the present case seeking to intervene as of right for the purpose of moving to dismiss the joint motion for lack of subject matter jurisdiction or, in the alternative, contesting the approval of the scoring method on the merits. All parties consented to the application to intervene, which was subsequently granted on April 12, 1988.

1988 WL 108485, 48 Empl. Prac. Dec. P 38,631

In a decision filed June 2, 1988 the New York Court of Appeals reversed the Appellate Division in *McGowan* and held that zone scoring is not presumptively unconstitutional. The court ruled that the validity of the particular application of the zone method must be ruled upon where challenged, but that there is no presumption of invalidity. *McGowan v. Burstein,* 71 N.Y.2d 729, 530 N.Y.S.2d 64. The injunction entered below was vacated.

Despite the vacating of the injunction in *McGowan,* plaintiffs and defendants in the *Kirkland* case persist in their joint motion.

### The Present Motion

The interveners claim this court has no subject matter jurisdiction because the joint motion of plaintiffs and defendants presents no case or controversy. This claim is based on the fact that plaintiffs and defendants are in full agreement about the validity of their scoring method and are jointly seeking the *same ruling* from the court. Additionally they claim that plaintiffs have no standing and their claims are now moot since these plaintiffs have all been offered positions as Correction Lieutenants.

If the joint motion is dismissed for lack of jurisdiction, interveners state that they will challenge the zone scoring in a New York State court, under New York State constitutional law, in the event defendants actually apply the zone scoring method.

Plaintiffs and defendants claim that there is in fact a justiciable controversy. Plaintiffs argue that the court's jurisdiction over the original case covers the joint motion since they are seeking to enforce the prior consent decree. Moreover, plaintiffs claim to have standing to enforce provisions of the settlement which they bargained for and received.

Plaintiffs and defendants claim that a controversy arises from defendants' reluctance to proceed with zone scoring without court approval. Originally they claimed that the *McGowan* injunction forced defendants to take a position adverse to plaintiffs and to decline to apply zone scoring. Although the injunction has been vacated, defendants state that they are still reluctant to use zone scoring due to the uncertainty over New York law. Allegedly, a future action in State court might produce a ruling in conflict with the 1982 settlement in this case. They further claim that the interveners' opposition creates a justiciable controversy if one did not otherwise exist.

### Discussion

The federal judicial power is limited to actual cases or controversies. U.S. Const. art III, § 2. This requires a conflict between at least two genuinely adverse parties.

**\*3** When both parties affirmatively desire the same result, no justiciable case is presented. *Moore v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 47 (1971); Wright, Miller & Cooper, 13 *Federal Practice and Procedure* § 3530 at 317 (1984). The court must dismiss a case where the cooperation of the plaintiff and the defendant might adversely affect the rights of outsiders if the question of law is decided in the manner that both of the parties desire. *Lord v. Veazie,* 49 U.S. 251 (1850).

Parties may be sufficiently adverse while taking the same position on the proper outcome, if they are legally required to adopt contrary positions absent a judicial determination. *INS v. Chadha,* 462 U.S. 919 (1983). In *Chadha,* the INS agreed with Chadha that it was unconstitutional for the House of Representatives to veto its suspension of his deportation. However, INS was "adverse" to Chadha because in the absence of a ruling by the Supreme Court, the INS would be forced to comply with the veto and deport him.

In the present case, plaintiffs and defendants desire precisely the same result: an order by this court approving the application of zone scoring to the 1987 Correction Lieutenant examination.

There is no external constraint here forcing the parties to adopt adverse positions, as there was in *Chadha.* Defendants' claim that the lower court injunction in *McGowan* required them to adopt a contrary position to plaintiffs is now moot, since that injunction has been vacated. While the validity of zone scoring may still be an open question, defendants are legally free to apply any scoring method which they believe complies both with New York law and with the consent decree in this case. If a lawsuit is brought to challenge the scoring method, then that would present a justiciable controversy. Indeed, interveners have indicated that they will bring

1988 WL 108485, 48 Empl. Prac. Dec. P 38,631

such an action. However, since the issues to be raised are primarily, if not exclusively, under state law, interveners have quite properly indicated that they will sue in a state court.

There is no inherent necessity for this court to approve zone scoring as part of the administration or enforcement of the 1982 consent decree. That decree does not require the use of zone scoring. Any scoring method which avoids adverse racial impact complies with the decree.

The issue which provoked plaintiffs' and defendants' application to the court is whether or not zoning scoring comports with New York's constitutional requirement that examinations be based on merit and fitness. But plaintiffs and defendants are not adverse in any way on this issue. This issue will only be ripe for decision if and when zone scoring is actually instituted by the State and a genuinely adverse party with standing challenges it in an appropriate forum.

In sum, jurisdiction over the 1982 action does not provide jurisdiction over the present motion.

The presence of the *interveners* in this action does not create sufficient adversity to provide jurisdiction. They have properly called the court's attention to the lack of subject matter jurisdiction in respect to the motion as brought by plaintiffs and defendants. If defendants do in fact apply the zone scoring method, interveners properly propose to challenge the zone scoring in New York state court, if that method is in fact applied by defendants. Then

there will be questions arising under New York law that will be ripe for adjudication.

**\*4** Brief mention should be made of the interveners' claim that plaintiffs lack standing to raise any issue regarding application of zone scoring to the 1987 examination because plaintiffs and the members of plaintiff class have succeeded in achieving the purpose of their litigation—*i.e.,* obtaining offers of the position of Correction Lieutenant as a result of the 1981 examination. Plaintiffs respond that the consent decree which they obtained contained provisions not only about the procedures regarding the 1981 test but certain general provisions about future selection procedures, and plaintiffs have standing to raise questions about such procedures.

This standing issue, as the parties present it, has not been adequately briefed and the court does not decide it. There is no necessity to do so in view of the court's ruling on the lack of a justiciable controversy.

There is no case or controversy before the court. The motion of the interveners to dismiss the joint motion for lack of subject matter jurisdiction is granted.

SO ORDERED.

## All Citations

Not Reported in F.Supp., 1988 WL 108485, 48 Empl. Prac. Dec. P 38,631

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 13

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| FIEL HOUSTON, INC., *et al.*,<br><br>      *Plaintiffs*,<br><br>      v.<br><br>CHAD F. WOLF, in his official capacity as<br>the Acting Secretary of Homeland Security, *et al.*,<br><br>      *Defendants*. | Civil Action No. 4:20-cv-02515 |

## DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

DAVID M. MORRELL
Deputy Assistant Attorney General

RYAN K. PATRICK
United States Attorney

BRAD P. ROSENBERG
Assistant Branch Director

By: GALEN N. THORP (VA Bar No. 75517)
Senior Trial Counsel
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-4781
Fax: (202) 616-8470
Email: galen.thorp@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iv

APPENDIX CONTENTS ..................................................................................................... x

INTRODUCTION AND SUMMARY ................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 4

I.      The DACA Policy .................................................................................................... 4

II.     Litigation Challenging Rescission of DACA ........................................................ 5

III.    The Wolf Memorandum ........................................................................................ 7

NATURE AND STAGE OF PROCEEDINGS ................................................................... 8

STATEMENT OF ISSUES .................................................................................................. 8

STANDARDS OF REVIEW ................................................................................................ 9

ARGUMENT ....................................................................................................................... 10

I.      The Amended Complaint Must Be Dismissed. ................................................. 10

      A.    Plaintiffs' APA Claims Must Be Dismissed For Lack of Jurisdiction and Failure to State a Claim. ................................................. 10

            1.    Plaintiffs Primarily Challenge Interlocutory Steps That Do Not Constitute Final Agency Action Reviewable Under the APA. ........................ 10

            2.    The Department Has Not Withheld Mandatory Agency Action. ................... 13

                 i.    Acceptance of initial DACA requests is not demanded by law.......... 13

                 ii.   Plaintiffs lack standing to challenge DHS actions in the short period between the *Regents* decision and issuance of the Wolf Memorandum, which were reasonable and did not prejudice Plaintiffs. ................................................. 16

            3.    The Department Has Not Abused Its Discretion. ............................................ 20

      B.    Plaintiffs ' Mandamus Act Claim Fails Because it Does Not Provide Relief Beyond the APA. ................................................. 22

            1.    The Mandamus Claim Must Be Dismissed Because the APA Provides an Adequate Remedy. ................................................. 23

2.      Plaintiffs Have Also Failed To Establish Any Clear Duty to Act or Clear Right to Relief...................................................................................................23

3.      Even if Plaintiffs Had Established the Elements of a Mandamus Claim, the Writ Should Be Denied on Equitable Grounds............................................26

C.      Plaintiffs' EAJA Claim Fails Because They Are Not the Prevailing Party...................26

II.      Plaintiffs Are Not Entitled to Preliminary Injunctive Relief. ......................................................27

A.      Plaintiffs Are Unlikely to Succeed on the Merits............................................................27

B.      Plaintiffs Have Not Established Irreparable Harm. .........................................................27

C.      The Balance of Equities and Public Interest Weigh Against an Injunction................31

CONCLUSION.......................................................................................................................................32

# TABLE OF AUTHORITIES

## CASES

*10 Ring Precision, Inc. v. Jones*,
  722 F.3d 711 (5th Cir. 2013) ................................................................................. 20

*Alexander v. AmeriPro Funding, Inc.*,
  848 F.3d 698 (5th Cir. 2017) ................................................................................. 30

*Ali v. Rice*,
  No. H-07-1868, 2008 WL 11502058 (S.D. Tex. July 31, 2008) ................................... 22, 26

*All Pro Cleaning Servs. Inc. v. Dep't of Labor*,
  No. H-05-250, 2005 WL 4045866 (S.D. Tex. Aug. 26, 2005) ...................................... 19, 25

*Allied Home Mortgage Corp. v. Donovan*,
  830 F. Supp. 2d 223 (S.D. Tex. 2011) ......................................................................... 28, 30

*Alkhadi v. Gonzales*,
  No. H-07-1002, 2007 WL 2314287 (S.D. Tex. Aug. 10, 2007) ....................................... 18

*Arizona v. United States*,
  567 U.S. 387 (2012) ......................................................................................... 4, 31

*Associated Builders & Contractors of Texas, Inc. v. NLRB*,
  826 F.3d 215 (5th Cir. 2016) ................................................................................. 20

*Barrera-Montenegro v. United States*,
  74 F.3d 657 (5th Cir. 1996) ................................................................................. 9

*Batalla Vidal v. Nielsen*,
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...........................................................5, 15, 29, 30

*Beckwith v. City of Houston*,
  No. 4:17-CV-02859, 2018 WL 4298345 (S.D. Tex. July 31, 2018) ..................................... 9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................... 10

*Bennett v. Spear*,
  520 U.S. 154 (1997) ......................................................................................... 11, 12

*Bluefield Water Ass'n, Inc. v. City of Starkville*,
  577 F.3d 250 (5th Cir. 2009) ................................................................................. 10

*Brooks v. Ellis*,
  No. H–14–3071, 2014 WL 5460599 (S.D. Tex. Oct. 27, 2014) ...................................... 29, 31

*Canal Auth. of State of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) .................................................................................................31

*Carlson v. USCIS*, No. 12-cv-7893,
  2012 WL 4758118 (C.D. Cal. Oct. 3, 2012) ..........................................................................29

*Carter v. Seamans*,
  411 F.2d 767 (5th Cir. 1969) .................................................................................................22

*Casa de Maryland v. DHS*,
  284 F. Supp. 3d 758 (D. Md. 2018) ........................................................................................6

*Casa de Maryland v. DHS*,
  924 F.3d 684 (4th Cir. 2019) ...................................................................................................6

*Cicalese v. University of Texas Medical Branch*,
  No. 3:17-cv-0067, 2020 WL 4012104 (S.D. Tex. Feb. 5, 2020) ...........................................12

*Cuvillier v. Taylor*,
  503 F.3d 397 (5th Cir. 2007) ...................................................................................................9

*Defense Distributed v. U.S. Dep't of State*,
  838 F.3d 451 (5th Cir. 2016) .................................................................................................32

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ................................................................................................*passim*

*Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*,
  112 F.3d 1283 (5th Cir. 1997) .........................................................................................23, 24

*Fed. Sav. & Loan Ins. Corp. v. Dixon*,
  835 F.2d 554 (5th Cir. 1987) .................................................................................................31

*Friends of Lydia Ann Channel v. Lydia Ann Channel Moorings, LLC*,
  No. 2:19-CV-00148, 2020 WL 1434706 (S.D. Tex. Mar. 24, 2020) .......................................9

*Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*,
  No. 17-40259, 701 F. App'x 352 (5th Cir. Aug. 9, 2017) ......................................................11

*Funk v. Stryker Corp.*,
  631 F.3d 777 (5th Cir. 2011) .................................................................................................10

*Giddings v. Chandler*,
  979 F.2d 1104 (5th Cir. 1992) ...............................................................................................24

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) ...........................................................................................28, 29

*Gulf Restoration Network v. McCarthy,*
    783 F.3d 227 (5th Cir. 2015) ................................................................20

*Home Health Innovations, Inc. v. Sebelius,*
    No. 14-124, 2014 WL 12540881 (W.D. Tex. Feb. 18, 2014) ...........................24

*Hussain v. Mueller,*
    No. H-07-2755, 2008 WL 2557565 (S.D. Tex. June 20, 2008) .......................18

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig.,*
    668 F.3d 281 (5th Cir. 2012) ..................................................................9

*Ineos Technologies USA, LLC v. Basf Corp.,*
    No. 4:16-CV-1145, 2016 WL 6909296 (S.D. Tex. May 23, 2016) ............ 27, 32

*INS v. Yang,*
    519 U.S. 26 (1996) ...............................................................................21

*Jeon v. Holder,*
    354 F. App'x 50 (5th Cir. 2009) ...............................................................29

*Jones v. S. Univ.,*
    No. 18-1034, 2019 WL 3883109 (M.D. La. Aug. 16, 2019) .........................12

*King v. Nat'l Transp. Safety Bd.,*
    766 F.2d 200 (5th Cir. 1985) ..................................................................19

*La. Pub. Serv. Comm'n v. FERC,*
    761 F.3d 540 (5th Cir. 2014) ..................................................................20

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.,*
    328 F.3d 192 (5th Cir. 2003) ..................................................................27

*Latitude Solutions, Inc. v. DeJoria,*
    922 F.3d 690 (5th Cir. 2019) ..................................................................16

*Louisiana v. U.S. Army Corps of Eng'rs,*
    834 F.3d 574 (5th Cir. 2016) ..................................................................11

*Louisiana v. United States,*
    948 F.3d 317 (5th Cir. 2020) ..................................................................13

*Lugo-Resendez v. Lynch,*
    831 F.3d 337 (5th Cir. 2016) ..................................................................21

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ..............................................................................16

*McManaway v. KBR, Inc.*,
    906 F. Supp. 2d 654 (S.D. Tex. 2012) .................................................................. 10

*Miller v. French*,
    530 U.S. 327 (2000) .......................................................................................... 22

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) ...................................................................... 5

*NAACP v. Trump*,
    321 F. Supp. 3d 143 (D.D.C. 2018) .................................................................... 30

*NAACP v. Trump*,
    315 F. Supp. 3d 457 (D.D.C. 2018) ...................................................................... 5

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007) .......................................................................................... 20

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................................................... 31

*NLRB v. SW Gen.*,
    137 S. Ct. 929 (2017) ........................................................................................ 21

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ...................................................................................... 13, 14

*Oniwon v. USCIS*, No. H-19-3519,
    2020 WL 1940879 (S.D. Tex. Apr. 6, 2020) ......................................................... 23

*Patterson v. Defense POW/MIA Accounting Agency*,
    343 F. Supp. 3d 637 (W.D. Tex. Nov. 20, 2017) ............................................ 11, 24

*Pedrozo v. Clinton*,
    610 F. Supp. 2d 730 (S.D. Tex. 2009) .................................................................. 18

*Pierce v. Hearne Ind. Sch. Dist.*,
    600 F. App'x 194 (5th Cir. 2015) ...................................................................... 12

*Pierce v. Underwood*,
    487 U.S. 552 (1988) .......................................................................................... 27

*Play Hard Pray Harder LLC v. ScriptureArt LLC*,
    No. 3:12-CV-5121-N, 2013 WL 12124515 n.4 (N.D. Tex. July 2, 2013) .................... 29

*Rahman v. Mueller*,
    No. H–07–311, 2007 WL 7238942 (S.D. Tex. June 26, 2007) ............................ 18, 23

*Randall D. Wolcott, M.D., P.A. v. Sebellius*,
   635 F.3d 757 (5th Cir. 2011) ........................................................................*passim*

*Range v. United States*,
   256 B.R. 868 (S.D. Tex. 2000) .................................................................................27

*Regents of the Univ. of Cal. v. DHS*,
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ............................................................. 5, 30

*Reno v. Am. Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ...................................................................................................4

*Sawan v. Chertoff*,
   589 F. Supp. 2d 817 (S.D. Tex. 2008) ...................................................... 14, 18, 23

*Shanks v. City of Dallas, Tex.*,
   752 F.2d 1092 (5th Cir. 1985) ........................................................................ 29, 31

*Sierra Club v. Peterson*,
   228 F.3d 559 (5th Cir. 2000) ...................................................................................11

*Sims v. Apfel*,
   238 F.3d 597 (5th Cir. 2001) ...................................................................................27

*Skyline Corp. v. N.L.R.B.*,
   613 F.2d 1328 (5th Cir. 1980) .................................................................................29

*Slide Fire Solutions, L.P. v. Bump Fire Sys., LLC*,
   No. 3:14-CV-3358-M, 2016 WL 3361552 (N.D. Tex. Apr. 14, 2016) ...................28

*Smith v. Criner*,
   No. 4:19-CV-1614, 2020 WL 4784741 (S.D. Tex. Mar. 31, 2020) .......................17

*Statoil USA E&P Inc. v. U.S. Dep't of the Interior*,
   No. 4:16-CV-00860, 2017 WL 7053924 (S.D. Tex. Sept. 29, 2017) ............. 11, 12

*Tex. Health & Human Servs Comm'n v. United States*,
   166 F. Supp. 3d 706 (N.D. Tex. 2016) ...................................................................28

*United Offshore Co. v. S. Deepwater Pipeline Co.*,
   899 F.2d 405 (5th Cir. 1990) ...................................................................................10

*United States v. Transocean Deepwater Drilling, Inc.*,
   537 F. App'x 358 (5th Cir. 2013) ...........................................................................31

*Valentine v. Collier*,
   960 F.3d 707 (5th Cir. 2020) ...................................................................................12

*White v. Carlucci*,
    862 F.2d 1209 (5th Cir. 1989) ........................................................................................28

*Whitehorse v. Illinois Central R.R. Co.*,
    349 U.S. 366 (1955) ........................................................................................................26

*Wilbur v. United States*,
    281 U.S. 206 (1930) ........................................................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .....................................................................................................10, 28

*Yan v. Mueller*,
    No. H-07-0313, 2007 WL 1521732 (S.D. Tex. May 24, 2007) ...............................18, 23

## STATUTES

5 U.S.C. § 704 .........................................................................................................................11

5 U.S.C. § 706 ...........................................................................................................13, 19, 20

6 U.S.C. § 202 .........................................................................................................................15

8 U.S.C. § 1103 .......................................................................................................................15

26 U.S.C. § 7430 .....................................................................................................................27

28 U.S.C. § 1361 .....................................................................................................................22

28 U.S.C. § 2412 .....................................................................................................................27

## RULES

Fed. R. Civ. P. 12 ......................................................................................................................9

## REGULATIONS

8 C.F.R. § 274a.12 .....................................................................................................................4

## TREATISES

42 Am. Jur. 2d Injunctions § 7 ...............................................................................................27

# APPENDIX CONTENTS

A.  Stay of Mandate Under Fed. R. App. P. 41(d)(1), *Casa de Maryland v. DHS*, No. 8:17-cv-02942, ECF No. 86 (May 31, 2019)

B.  Notice of Denial of Certiorari, *Casa de Maryland v. DHS*, No. 8:17-cv-02942, ECF No. 92 (June 29, 2020)

C.  Fourth Circuit Mandate, *Casa de Maryland v. DHS*, No. 8:17-cv-02942, ECF No. 93 (June 30, 2020)

D.  Letter from Plaintiffs to the Honorable Paul W. Grimm, *Casa de Maryland v. DHS*, No. 8:17-cv-2942, ECF No. 96 (July 17, 2020)

E.  Order, *Casa de Maryland v. DHS*, No. 8:17-cv-02942, ECF No. 97 (Jul. 17, 2020)

F.  Transcript of Virtual Status Conference Proceedings, *Casa de Maryland v. DHS*, No. 8:17-cv-2942 (July 24, 2020) (excerpts)

G.  Order, *Texas v. United States*, No. 1:18-cv-0068, ECF No. 473 (S.D. Tex. Aug. 21, 2020)

## INTRODUCTION AND SUMMARY

The Department of Homeland Security (DHS) has broad discretion in its enforcement of the nation's immigration laws. DHS adopted the Deferred Action for Childhood Arrivals (DACA) policy as an exercise of enforcement discretion in 2012, but decided to rescind DACA in 2017. In the subsequent litigation challenging the rescission, no plaintiff disputed DHS's authority to modify or rescind the DACA policy, but instead challenged how DHS had done so. In June 2020, the U.S. Supreme Court held that the rescission must be vacated because DHS failed to consider important aspects of the problem, including the potential reliance interests of existing DACA recipients, and directed a remand to DHS "so that it may consider the problem anew." *See Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020). On July 28, 2020, eight days after the Supreme Court's judgment was issued, Acting Secretary of Homeland Security Chad Wolf issued a memorandum making changes to the Department's DACA policy (Wolf Memorandum). The Wolf Memorandum implemented the Supreme Court's direction that the Department's 2017 and 2018 memoranda rescinding DACA be vacated. Further, on the basis of specifically-identified concerns about DACA and review of an extensive record, the Acting Secretary decided (among other changes not at issue here) to limit the ability to request DACA to those who have previously received DACA and to limit the period of deferred action granted under DACA after July 28, 2020, and related employment authorization, to one-year.

Plaintiffs—an immigration organization and eight individuals who wish to file DACA requests for the first time and who seek to represent a class of those similarly situated—filed suit shortly before the Supreme Court's judgment. Their operative complaint, which has already been amended once the day after it was filed, is premised on the fear that DHS would not comply with the Supreme Court's decision. That fear was never justified, but was fully put to rest less than two weeks later, and only eight days after the Supreme Court's judgment issued, when DHS issued the Wolf Memorandum,

1

which demonstrates full compliance with relevant court decisions and exercises DHS's discretion to make new changes to DACA. Instead of engaging with DHS's new action or seeking to again amend their complaint to challenge it, Plaintiffs chose to file a preliminary injunction motion on July 31, 2020, relying on their pre-Wolf Memorandum theories. Because DHS has acted well within its discretionary authority, Plaintiffs' Amended Complaint should be dismissed and Plaintiffs' preliminary-injunction motion should be denied.

As a threshold matter, Plaintiffs' effort to challenge DHS's interim actions or inaction before issuance of the Wolf Memorandum fails to state an Administrative Procedure Act (APA) claim because such actions are not final—they are not the culmination of the decisionmaking process and did not have legal consequences for the Plaintiffs. Holding new first-time DACA requests for a few weeks while deliberating over the future of DACA is quintessentially a non-reviewable interlocutory matter.

Neither of Plaintiffs' two legal theories is meritorious. First, Plaintiffs argue that DHS has a mandatory duty to immediately process first-time DACA requests due to the 2012 memorandum creating DACA and court orders vacating DHS's rescission memoranda. This claim fails both under the APA and the Mandamus Act because neither the 2012 memorandum nor the court orders reinstating that memorandum prohibited DHS from exercising its discretion to modify the enforcement policy. Nor did DHS's choice to hold properly submitted incoming first-time DACA requests from June 19 to July 28 violate any mandatory duty.

Second, Plaintiffs argue that DHS abused its discretion in violation of the APA by treating first-time DACA requests differently than provided for in the 2012 memorandum. But DHS did not make unexplained departures from its prior guidance. Instead, it expressly maintained the bulk of the original DACA policy while making specific changes in light of serious concerns about the policy. Such an approach is neither arbitrary nor an abuse of DHS's enforcement discretion, nor is it

foreclosed by the original 2012 memorandum, which expressly noted that it "confer[red] no substantive right, immigration status or pathway to citizenship." Indeed, the Supreme Court directed this remand to the agency, and Acting Secretary Wolf made a reasoned decision on the basis of the relevant factors, including those highlighted in the *Regents* decision.

Even if there was some procedural defect in DHS's actions in the brief period before issuance of the Wolf Memorandum, Plaintiffs were not prejudiced. They do not allege that any named Plaintiff or named putative class member submitted a first-time DACA request between June 18 and July 28, 2020; nor do they allege that their request was improperly denied. Instead, they simply wish to file first-time DACA requests in the future, and may no longer do so because of the reasoned policy changes adopted by the Wolf Memorandum. Relief under the APA and Mandamus Act is unwarranted where Plaintiffs challenge action that did not affect them.

For these reasons, as described in more detail below, Plaintiffs' Amended Complaint should be dismissed. The same reasons demonstrate the Plaintiffs are unlikely to succeed on the merits, requiring denial of Plaintiffs' Motion for Preliminary Injunction. In addition, Plaintiffs have failed to support their motion with any competent evidence, relying instead on sweeping conclusory allegations that fail to demonstrate irreparable harm. Numerous courts have recognized that those who have never been approved for DACA do not have an imminent irreparable injury requiring interim relief while the cases proceed. Finally, the public interest and balance of equities weigh strongly against an injunction frustrating the Acting Secretary's exercise of his discretion to allocate enforcement resources and balance complex considerations.[1]

---

[1] The parties filed a joint motion for enlargement of the page limit for briefing Plaintiffs' Motion for Preliminary Injunction, which remains *sub judice*. (Dkt. 19.) Defendants have consolidated their memorandum in support of their motion to dismiss with their opposition to Plaintiffs' preliminary injunction motion. While the Court's individual procedures would have permitted up to 40 pages collectively if the two filings were separated, Defendants' brief is only 32 pages. Defendants are prepared to adjust their filings if the Court does not accept Defendant's approach.

## FACTUAL BACKGROUND

### I.    The DACA Policy

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano announced the policy known as DACA, or Deferred Action for Childhood Arrivals. *See* Am. Compl. ¶ 1 & Ex. 2 (Napolitano Mem.) (Dkt. 4-1.) DACA made deferred action—a practice of individualized enforcement discretion to issue a reversible notification that DHS does not intend to remove an alien for a set period of time—available to "certain young people who were brought to this country as children" and remained here in violation of the immigration laws. Napolitano Mem. at 1. Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to renewal. *Id.* at 2-3. Under DHS regulations, aliens granted deferred action may receive certain benefits, including work authorization for the same period if they establish economic necessity. *See* 8 C.F.R. § 274a.12(c)(14). The Napolitano Memorandum stated that deferred action pursuant to DACA was an "exercise of prosecutorial discretion." Napolitano Mem. at 1; *see also Reno v. Am. Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999); *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority"). This "broad discretion" is a "principal feature of the removal system." *Arizona v. United States*, 567 U.S. 387, 396 (2012). To that end, the Napolitano Memorandum explained that DACA "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." Napolitano Mem. at 3. The Napolitano Memorandum was issued without notice-and-comment rulemaking procedures.

On September 5, 2017, then-Acting Secretary of Homeland Security Elaine Duke, exercising her authority to establish national immigration policies and priorities, rescinded the Napolitano Memorandum, and decided to wind down DACA in an orderly fashion (Duke Memorandum). *See* Am. Compl. ¶ 2 & Ex. 3 (Dkt. 4-1.) Numerous lawsuits followed, challenging that agency decision

on various grounds.

## II.    Litigation Challenging Rescission of DACA[2]

In five related cases challenging the Duke Memorandum, on January 9, 2018, the U.S. District Court for the Northern District of California granted a motion for a preliminary injunction, and ordered Defendants to "maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments." *Regents of the Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018). That injunction, however, specifically excluded (1) "new applications from applicants who have never before received deferred action" and (2) DACA-based requests for advance parole. *Id.* ; *see also* Am. Compl. ¶ 76 (acknowledging that after the Duke Memorandum "new DACA applications were no longer accepted"). Shortly thereafter, a co-extensive preliminary injunction was issued by the U.S. District Court for the Eastern District of New York. *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018). And the U.S. District Court for the District of Columbia later issued a final judgment vacating the Duke Memorandum in its entirety, *NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018), and also rejected a subsequent agency explanation (the Nielsen Memorandum) on similar grounds, 315 F. Supp. 3d 457 (D.D.C. 2018). With plaintiffs' consent, however, the D.C. court stayed its order in part pending appeal, so that the practical effect of the D.C. judgment was coextensive with the California and New York preliminary injunctions.

A separate lawsuit had been filed in the U.S. District Court for the District of Maryland raising claims similar to those in *Regents*. On March 5, 2018, that court granted summary judgment to Defendants in substantial part, holding that the Duke Memorandum did not violate the APA or the

---

[2] Separate from the litigation challenging the 2017 rescission of DACA, several states filed suit in this district to challenge the legality of DACA itself. *See Texas v. United States*, No. 1:18-cv-0068 (S.D. Tex.). That court has ordered new briefing in light of the *Regents* decision. *See id.*, Order, ECF No. 473 (S.D. Tex. Aug. 21, 2020) (attached as App'x G) (setting schedule for renewed motion for summary judgment).

Constitution. *See Casa de Maryland v. DHS*, 284 F. Supp. 3d 758, 771-78 (D. Md. 2018). The district court granted judgment in part to Plaintiffs, however, on their estoppel claim regarding the DACA information-sharing policy, and enjoined Defendants from modifying or rescinding that policy. *See id.* The Fourth Circuit reversed the district court's arbitrary-and-capricious holding, vacated DACA's rescission in its entirety, and remanded the matter for "further proceedings consistent with this opinion." *Casa de Maryland v. DHS*, 924 F.3d 684, 706 (4th Cir. 2019). It also vacated the information-sharing injunction, and reversed that portion of the judgment. *Id.* The Fourth Circuit, however, stayed the mandate pending appeal to the Supreme Court. *See Casa de Maryland v. DHS*, No. 8:17-cv-02942, ECF No. 86 (May 31, 2019) (attached as App'x A).

The Supreme Court ultimately granted certiorari (or certiorari before judgment) in all of the California, New York, and District of Columbia DACA-rescission cases. On June 18, 2020, the Supreme Court issued a decision setting aside the Duke Memorandum as arbitrary and capricious under the APA, and declining to consider the Nielsen Memorandum. The Court acknowledged that DHS's authority to rescind DACA was undisputed. *Regents*, 140 S. Ct. at 1905. Indeed, it recognized that deciding the best way to move forward with "a program with the breadth of DACA" involves "important policy choices" that are left to DHS, *id.* at 1910, and that DHS has "considerable flexibility in carrying out" this policy-making responsibility, *id.* at 1914. Nonetheless, the Court held that the Duke Memorandum failed to consider alternatives to rescinding DACA in its entirety, and failed to adequately address the possibility of legitimate reliance interests related to DACA. *Id.* at 1912, 1913. Accordingly, the Court held that a remand to DHS was appropriate "so that it may consider the problem anew." *Id.* at 1916. The Supreme Court's judgment issued on July 20, 2020. *See Regents*, Judgment, No. 18-157 (U.S. July 20, 2020), https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/18-587.html. The Supreme Court also ordered vacatur of the New York and California injunctions, which had required maintaining portions of the DACA policy during

the litigation. *See Regents*, 140 S. Ct. at 1916.

On June 29, 2020, after deciding *Regents*, the Supreme Court denied certiorari in *Casa de Maryland*; the Fourth Circuit issued its mandate a day later. *See Casa de Maryland v. DHS*, No. 8:17-cv-02942, ECF Nos. 92, 93 (attached as App'x B, C). On July 17, 2020, the district court issued an order implementing the Fourth Circuit's mandate, which read, in relevant part: "The rescission of the DACA policy is VACATED, and the policy is restored to its pre-September 5, 2017 status. . . . Defendants . . . are ENJOINED from implementing or enforcing the DACA rescission and from taking any other action to rescind DACA that is not in compliance with applicable law." Order at 3, *Casa de Maryland v. DHS*, No. 8:17-cv-02942, ECF No. 97 (Jul. 17, 2020) (attached as App'x E).

## III. The Wolf Memorandum

Eight days after the Supreme Court issued its judgment in *Regents*, on July 28, 2020, Acting Secretary of Homeland Security Chad F. Wolf formally rescinded the Duke Memorandum and the Nielsen Memorandum. *See* Pls.' Mot. Ex. 1 (Dkt. 11-1); *also available at* https://www.dhs.gov/publication/reconsideration-june-15-2012-memo-entitled-exercising-prosecutorial-discretion-respect (published July 28, 2020). The Wolf Memorandum announced the Acting Secretary's determination, "[i]n accordance with the Supreme Court's decision," "to give careful consideration to whether the DACA policy should be maintained, rescinded, or modified." Wolf Mem. at 5. Given the Acting Secretary's serious enforcement policy concerns—for example, that policies like DACA "send[] mixed messages about DHS's intention to consistently enforce the immigration laws as Congress has written them," *id.* at 4-5—the Wolf Memorandum also made certain immediate changes to DACA. *Id.*

The Wolf Memorandum explains that, until further notice, DHS (1) will not accept first-time DACA requests; (2) will continue to accept renewal requests from DACA recipients, though it will limit the period of any future grants of DACA to one year, rather than the two years provided under

the Napolitano Memorandum; and (3) will allow DACA recipients to submit requests for advance parole, to be granted in "exceptional circumstances." *See id.* at 5. These changes apply to both pending and prospective requests. *Id.* at 7. The Acting Secretary explained that, immediately after the *Regents* decision was announced, DHS "generally held properly submitted initial requests for DACA in anticipation of potential policy changes." *Id.* at 7. Pursuant to the Wolf Memorandum, these held initial requests would now be rejected along with any new requests from individuals who had not previously been DACA recipients. *Id.* at 7. Finally, the Wolf Memorandum noted that "nothing in this memorandum precludes the exercise of deferred action on a truly individualized, case-by-case basis when and if warranted." *Id.* at 6.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs filed this action on July 16, 2020. (Dkt. 1.) The next day, Plaintiffs amended their complaint to state a class action and identify certain absent members of the putative class. (Dkt. 4.) The U.S. Attorney's Office received service of the complaint on Monday, July 27, 2020. Later that week, on July 31, 2020, Plaintiffs filed a motion for preliminary injunction seeking to require USCIS to accept and process initial DACA requests. (Dkt. 11.) That same day, Plaintiffs filed a motion to certify a class action on behalf of all "individuals who have been denied the ability to file their DACA Applications by the USCIS." (Dkt. 12 at 4.) On August 14, 2020, Defendants submitted a letter requesting an opportunity to seek an extension of time to respond to the preliminary injunction motion, which motion was filed pursuant to the Court's direction on August 17, 2020. (Dkt. 15, 17.) The Court granted an extension through September 4, 2020 to respond to the preliminary injunction motion. (Dkt. 18.) The Court also granted Defendants' request to suspend class certification briefing until after the Court rules on the injunction and dismissal motions. (Dkt. 18.)

## STATEMENT OF ISSUES

(1) Whether Plaintiffs' Amended Complaint should be dismissed because DHS has

neither violated a mandatory duty to accept first-time DACA requests that could give rise to a claim under APA or Mandamus Act, nor abused its discretion in adopting a new memorandum to guide its exercise of enforcement discretion.

(2) Whether Plaintiffs have satisfied the requirements for a preliminary injunction where their claims are subject to dismissal for failure to state a claim and thus unlikely to succeed on the merits; where their proposed injunction will not remedy any irreparable harm; and where the balance of equities and public interest weigh against disruption of the status quo.

## STANDARDS OF REVIEW

Under Fed. R. Civ. P. 12(b)(1), a claim should be dismissed for lack of subject matter jurisdiction "when the court does not have statutory or constitutional power to adjudicate the case." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quotation marks omitted).[3] "A motion to dismiss for lack of jurisdiction may be decided by the district court on any one of three separate bases: the complaint alone, the complaint supplemented by undisputed facts in the record, or facts plus the court's resolution of disputed facts." *Friends of Lydia Ann Channel v. Lydia Ann Channel Moorings, LLC*, No. 2:19-CV-00148, 2020 WL 1434706, at *3 (S.D. Tex. Mar. 24, 2020); *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996).

A claim must be dismissed under Fed. R. Civ. P. 12(b)(6) if Plaintiffs' complaint "(1) does not include a cognizable legal theory or (2) includes a cognizable legal theory but fails to plead enough facts to state a claim to relief that is plausible on its face." *Beckwith v. City of Houston*, No. 4:17-CV-02859, 2018 WL 4298345, at *4 (S.D. Tex. July 31, 2018). The factual allegations must be enough to "raise a right to relief above the speculative level." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007)

---

[3] Hereinafter, internal quotation marks, citations, and alterations omitted unless otherwise noted.

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). While the Court "assumes all well-pleaded facts contained in the complaint are true" it does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *McManaway v. KBR, Inc.*, 906 F. Supp. 2d 654, 660-61 (S.D. Tex. 2012). When reviewing a Rule 12(b)(6) motion, the Court "must consider the complaint in its entirety" along with "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); *see also id.* (upholding judicial notice of agency documents as matters of public record).

A plaintiff seeking a preliminary injunction must establish the following: that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Fifth Circuit has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009); *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 408 (5th Cir. 1990) (plaintiffs "must clearly carry the burden of persuasion on each factor"); *see also Winter*, 555 U.S. at 21 (2008) (plaintiff must make a "clear showing" of entitlement to relief).

## ARGUMENT

### I. The Amended Complaint Must Be Dismissed.

#### A. Plaintiffs' APA Claims Must Be Dismissed For Lack of Jurisdiction and Failure to State a Claim.

##### 1. Plaintiffs Primarily Challenge Interlocutory Steps That Do Not Constitute Final Agency Action Reviewable Under the APA.

Plaintiffs filed and immediately thereafter amended their complaint, all before DHS took any final agency action subsequent to the *Regents* decision. Accordingly, their operative complaint does not challenge any "final agency action" subject to judicial review under the APA. *See Statoil USA*

*E&P Inc. v. U.S. Dep't of the Interior*, No. 4:16-CV-00860, 2017 WL 7053924, at *6 (S.D. Tex. Sept. 29, 2017) (quoting 5 U.S.C. § 704). As this Court has recognized, if Plaintiffs do not meet this threshold requirement "the action is not reviewable." *Id.* The Fifth Circuit has held that courts lack subject-matter jurisdiction over agency conduct that is not construed as a final agency action. *See, e.g.*, *Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, No. 17-40259, 701 F. App'x 352, 359 (5th Cir. Aug. 9, 2017) ("[A] federal court lacks subject matter jurisdiction if there is no final agency action under the APA."); *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (en banc) ("Absent a specific and final agency action, we lack jurisdiction to consider a challenge to agency conduct.").

Two conditions must be met to establish finality. "First, the action must mark the consummation of the agency's decision making process—it must not be of a merely tentative or interlocutory nature. Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Statoil USA*, 2017 WL 7053924, at *6 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Practical consequences for a plaintiff are not enough to establish finality. *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 583 (5th Cir. 2016). Finality is required even where a plaintiff challenges agency inaction. *See Sierra Club*, 228 F.3d at 569 ("In certain circumstances, agency inaction may be *sufficiently final* to make judicial review appropriate." (emphasis added)). Plaintiffs must show that the alleged inaction "mark[s] the consummation of the agency's decisionmaking process." *Patterson v. Defense POW/MIA Accounting Agency*, 343 F. Supp. 3d 637, 651 (W.D. Tex. Nov. 20, 2017). Moreover, "final agency action must exist at the time a plaintiff files suit." *Statoil USA*, 2017 WL 7053924, at *7-8 (dismissing case where "there ha[d] been no consummation of the agency's decision making process" at the time plaintiff filed suit).

Here, the relevant final agency action is the Wolf Memorandum itself, which Plaintiffs have

not sought to amend their complaint to challenge.[4] *See, e.g.*, Pls.' Mot. at 4 (mentioning the Wolf Memorandum in motion filed three days after memorandum was issued); *cf. Jones v. S. Univ.*, No. 18-1034, 2019 WL 3883109, at *7 (M.D. La. Aug. 16, 2019) ("The law is well-settled that arguments in a brief are not a substitute for properly pleaded allegations[.]").  Everything prior to the issuance of the Wolf Memorandum that Plaintiffs appear to challenge is not reviewable final action.  Such actions or inactions were merely "step[s] toward a final agency decision." *Statoil USA*, 2017 WL 7053924, at *7. For example, Plaintiffs believe that DHS was categorically rejecting all first-time DACA requests after the Supreme Court's opinion.  *See* Am. Compl. ¶ 8.  In fact, it was holding properly filed first-time DACA requests pending completion of the deliberations that resulted in the Wolf Memorandum.  *See* Wolf Mem. at 7 ("Since the issuance of the Supreme Court's decision, DHS has, on an interim basis, generally held properly submitted initial requests for DACA in anticipation of potential policy changes.").  This is quintessentially a "tentative or interlocutory action" without "legal consequences." *Bennett*, 520 U.S. at 177-78.  Plaintiffs also appear to allege that DHS improperly delayed updating its website.  *See* Am. Compl. ¶ 9.  But the information on the website does not give rise to legal consequences.

Accordingly, the Court should dismiss Plaintiffs' APA claims for failure to challenge a final agency action.  To the extent the Court considers Plaintiffs' arguments in light of DHS's July 28, 2020 final agency action, *see, e.g.*, *Pierce v. Hearne Ind. Sch. Dist.*, 600 F. App'x 194, 200 (5th Cir. 2015), the APA claims must be dismissed for numerous additional reasons.

---

[4] The Court can consider the Wolf Memorandum for purposes of both Defendants' motion to dismiss and Plaintiffs' preliminary injunction motion.  While not attached to the complaint, Plaintiffs attached and relied on it in their motion.  *See* Pls.' Mot. at 4 & Ex. 1.  Regardless, the Court can take judicial notice of an agency document published on its website.  *See Cicalese v. University of Texas Medical Branch*, No. 3:17-cv-0067, 2020 WL 4012104, at *9 (S.D. Tex. Feb. 5, 2020); *see also Valentine v. Collier*, 960 F.3d 707, 708 (5th Cir. 2020) (Davis., J., concurring in judgment) ("We have recognized that courts reviewing preliminary injunctions can take judicial notice of subsequent factual developments bearing on the case.").

## 2. The Department Has Not Withheld Mandatory Agency Action.

Plaintiffs first argue that "USCIS' refusal to allow for the filing of initial DACA applications" is an agency action that is "unlawfully withheld" in violation of 5 U.S.C. § 706(1). Am. Compl. ¶ 71. The APA permits courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Supreme Court has explained that § 706(1) is rooted in the historical mandamus remedy and "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). "This 'required-action' limitation 'rules out judicial direction of even discrete agency action that is not demanded by law.'" *Louisiana v. United States*, 948 F.3d 317, 323 (5th Cir. 2020) (quoting *Norton*, 542 U.S. at 65). Plaintiffs' claim fails because they cannot show that DHS has withheld any action "demanded by law."

### i. Acceptance of initial DACA requests is not demanded by law.

Plaintiffs' central premise appears to be that the Supreme Court's decision and the U.S. District Court for the District of Maryland's order *prohibited* DHS from making any change to DACA, and instead *required* DACA to be preserved, untouched, on the terms that were in effect before September 5, 2017. *See, e.g.*, Pls.' Mot. at 4 (arguing that the Wolf Memorandum constitutes "blatantly defying the Supreme Court by refusing to allow Plaintiffs to file their initial DACA Applications"); Am. Compl. ¶ 73 (alleging a "Supreme Court mandate that new DACA Applications must be accepted"). But that premise is wrong. None of Plaintiffs' three sources—1) the "2012 policy memorandum on DACA," 2) "the Supreme Court's mandate that DACA must be returned to its pre-2017 status," or 3) "the decision in *Casa de Maryland*," Pls.' Mot. at 4-5; Am. Compl. ¶¶ 72-73—locks in such a restriction.

First, the Napolitano Memorandum that adopted DACA makes plain that the DACA policy was subject to change, as a discretionary non-enforcement policy that conferred no substantive rights

and that had been adopted without any notice-and-comment procedures. Given the nature of the policy at issue, absent a new Act of Congress no policy like DACA will ever (or could ever) be permanent. That is why, even when DACA was first announced in 2012, Secretary Napolitano said that her "memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." Napolitano Mem. at 3. Similarly, President Obama described it as "not a permanent fix," but a "temporary stopgap measure." The White House, *Remarks by President Obama on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY. Such a memorandum cannot constrain the discretion of future Secretaries of Homeland Security to modify it on a reasoned basis. For these reasons, Acting Secretary Wolf reasonably concluded that "[n]othing in the Napolitano Memo purports to preclude me from exercising my enforcement discretion to make these changes on an interim basis while I consider whether to make more substantial changes on a permanent basis." Wolf Mem. at 7.

Moreover, the Napolitano Memorandum is not a "'legally binding commitment' to take action," *Sawan v. Chertoff*, 589 F. Supp. 2d 817, 828 (S.D. Tex. 2008) (ultimately quoting *Norton*, 542 U.S. at 72). It emphasizes "requests for relief are to be decided on a case-by-case basis" and that "DHS cannot provide any assurance that relief will be granted in all cases." Napolitano Mem. at 3; *see also* Wolf Mem. at 7 ("Even under the Napolitano Memo, no aliens had a legal entitlement to receive DACA[.]"). The memorandum was framed in terms of what DHS components "should" do in exercising prosecutorial discretion, and as noted above, it "confers no substantive right." *Id.* Like the land use plans at issue in *Norton*, "it guides and constrains actions, but does not (at least in the usual case) prescribe them." 542 U.S. at 71.

Second, nothing in the Supreme Court's opinion in *Regents* precludes DHS from making further changes to its DACA policy. In nearly three years of litigation in multiple jurisdictions over the rescission of DACA, to the Government's recollection, *nobody* suggested that it would *ever* be

14

appropriate to issue an order that would require DACA to continue indefinitely, even in the face of additional agency action seeking to modify or rescind it. Instead, that litigation was always about whether DHS had *adequately explained* its previous attempts to rescind DACA. As the Supreme Court put it: "The dispute before the Court is not whether DHS may rescind DACA. All parties agree that it may. The dispute is instead primarily about the procedure the agency followed in doing so." *Regents*, 140 S. Ct. at 1905; *see also Batalla Vidal*, 279 F. Supp. 3d at 408 ("Defendants indisputably can end the DACA program."). Thus, Plaintiffs' allegation that the Wolf Memorandum violates court orders merely by modifying the 2012 policy is necessarily inconsistent with that previously undisputed consensus, and with the Supreme Court's opinion in *Regents*. Nor did *Regents* turn on any notion that DHS could never make changes to its policy with respect to first time DACA requesters. As discussed above, first-time requesters were excluded from the preliminary injunction, *see supra* Factual Background § II, and were not the focus of the Supreme Court's reasoning. *See, e.g.*, *Regents*, 140 S. Ct. at 1914 (holding that Acting Secretary Duke "should have considered whether she had . . . flexibility in addressing any reliance interests of DACA recipients").

Third, the *Casa de Maryland* court's order, which implemented a Fourth Circuit decision with reasoning similar to *Regents*, goes no farther than *Regents*. It states: "The rescission of the DACA policy is VACATED, and the policy is restored to its pre-September 5, 2017 status." Order at 3, *Casa de Maryland v. DHS*, No. 8:17-cv-2942, ECF No. 97 (July 17, 2020) (attached as App'x E). This order plainly requires the Duke Memorandum to be vacated, and the Wolf Memorandum explicitly effectuates that command. *See* Wolf Mem. at 4 ("[I]n the exercise of my authority and discretion in establishing national immigration policies and priorities, *see* 8 U.S.C. § 1103(a)(1); 6 U.S.C. § 202(5), I am rescinding the Nielsen Memorandum and the Duke Memorandum."). But nothing in the *Casa de Maryland* order can reasonably be understood to operate as a separate, mandatory command that the DACA policy *must* be governed *indefinitely* by the Napolitano Memorandum—even in the face of future

policy changes by the agency. By restoring the "pre-September 5, 2017 status," that court did not make the Napolitano Memorandum any more binding or mandatory than it had ever been. In any event, the meaning of the relevant orders in *Casa de Maryland* is a matter for the district court in *Casa de Maryland* to decide—and is an issue that is the subject of ongoing briefing in that court. Plaintiffs' suggestion that this Court should intervene to interpret another Court's order is inappropriate.

In sum, none of the legal authority on which Plaintiffs rely currently imposes on DHS "a nondiscretionary duty to accept [Plaintiffs' first-time] DACA Applications and adjudicate them on the merits." Am. Compl. ¶ 10. While the Napolitano Memorandum would have provided for new first-time DACA requests if left unmodified, in fact that memorandum has been partially reconsidered and, the Wolf Memorandum is now DHS's operative guidance. And Plaintiffs' complaint does not even challenge the substantive legality of the Wolf Memorandum, so there is no basis to order a departure from it here.

> ## ii. Plaintiffs lack standing to challenge DHS actions in the short period between the Regents decision and issuance of the Wolf Memorandum, which were reasonable and did not prejudice Plaintiffs.

Any challenge by Plaintiffs to DHS's actions in the short period between the Supreme Court's ruling and issuance of the Wolf Memorandum must likewise fail. As a threshold matter, Plaintiffs appear to lack standing to challenge DHS's actions in that period. *See Smith v. Criner*, No. 4:19-CV-1614, 2020 WL 4784741, at *3 (S.D. Tex. Mar. 31, 2020) ("A 'party invoking federal jurisdiction bears the burden of establishing the standing elements.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *Latitude Solutions, Inc. v. DeJoria*, 922 F.3d 690, 695 (5th Cir. 2019) ("A plaintiff must demonstrate standing for each claim she seeks to press and have standing separately for each form of relief sought."). The Amended Complaint does not allege that any Plaintiff submitted an initial DACA request in that period. *See, e.g.*, Am. Compl. ¶¶ 28-35 (asserting only that each individual plaintiff "is not able to file [his/her] initial DACA Application"). Therefore, Plaintiffs lack an injury that is

"concrete and particularized as well as actual or imminent, not conjectural or hypothetical," *Smith*, 2020 WL 4784741, at *2, as to any actions DHS took with regarding to first-time DACA requests submitted before issuance of the Wolf Memorandum.

Even if Plaintiffs had standing, they appear to rely primarily on the mistaken impression that DHS officials were "refusing to follow the [Supreme] Court's decision." Am. Compl. ¶ 8. To the contrary, the government accepts the binding nature of the Supreme Court's decision and has complied with it. The public statements several DHS officials made disagreeing with the reasoning of the *Regents* decision, *see, e.g.*, Am. Compl. ¶¶ 5-7, are not defiance of the Supreme Court's authority to decide the case before it. Indeed, after the Supreme Court ruled but before the Wolf Memorandum had issued, DHS was not enforcing the prior DACA-rescission memoranda, as reflected by the fact that it both *continued* to grant DACA renewals and that it *stopped* rejecting properly-filed initial DACA requests from first-time requestors. *See* Wolf Mem. at 7.[5]

Plaintiffs do not appear to make an unreasonable delay argument under § 706(1) for the short

---

[5] As noted above, first-time DACA requests were subject to rejection after September 5, 2017, throughout the pendency of the *Regents* litigation. *See supra* Factual Background § II. DHS acknowledged the Supreme Court's decision by holding properly filed first-time DACA requests received after June 18, 2020, rather than immediately rejecting them as it had generally been doing since September, 2017. *See* Wolf Mem. at 7; *see also* Hr'g Tr. 26:25-27:3, *Casa de Maryland v. DHS*, No. 8:17-cv-2942 (July 24, 2020) (attached as App'x F) ("[I]t is not accurate that there is a categorical policy . . . to be rejecting all DACA requests from first time requesters. They are being held, again, pending future potential policy changes."). Plaintiffs attach one instance in which an unidentified individual's first-time DACA request was rejected on July 3, 2020, *see* Am. Compl. ¶ 8 & Ex. 4, which appears to be the same document that was attached in a July 17, 2020 filing in another case. *See* Letter from Plaintiffs, Exhibit A, *Casa de Maryland v. DHS*, No. 8:17-cv-2942, ECF No. 96-1 (July 17, 2020) (attached as App'x D). As DHS explained at a hearing in *Casa de Maryland*, since the *Regents* decision, "some requests for first-time requestors . . . were rejected for [not meeting all of the threshold procedural requirements] just as they would have been rejected in 2012 for those sorts of reasons." Hr'g Tr. 22:16-23:5. While it is likely that such procedural deficiencies are why the request was rejected rather than held, "that form letter [included] incorrect information saying, the reason this request was rejected was because the agency is no longer accepting requests from first-time requestors when that is, in fact, not the reason why the application was rejected." *Id.* 26:14-25 (explaining that DHS was working to correct "that information as soon as possible to minimize that confusion moving forward"). Any such failure of communication had no effect on the Plaintiffs.

period after the *Regents* decision in which DHS held properly-filed incoming DACA requests from first-time requestors. *See* Wolf Mem. at 7. Regardless, any such argument would fail for two reasons. First, this brief period of time that elapsed while DHS was deliberating regarding how to proceed was reasonable and cannot be the basis for an unreasonable delay claim under § 706(1). *See, e.g.*, *Pedrozo v. Clinton*, 610 F. Supp. 2d 730, 738 (S.D. Tex. 2009) (holding that eleven months for processing petition for non-immigrant status was not unreasonable delay under § 706(1)); *Yan v. Mueller*, No. H-07-0313, 2007 WL 1521732, * 9 (S.D. Tex. May 24, 2007) (observing that a lengthy three-year FBI name check delay does not necessarily mean an application is "unlawfully withheld or unreasonably delayed" for purposes of the APA). Indeed, "[t]he passage of time, standing alone, is not evidence of unreasonable delay where immigration applications are concerned." *Yan*, 2007 WL 1521732, at *9. Here, no statute or regulation required the processing of DACA requests within a specific time period, which precludes such a claim. *See Savan*, 589 F. Supp. 2d at 826 ("No statute or regulation imposes a duty on the FBI to conduct name checks in connection with naturalization applications."); *Hussain v. Mueller*, No. H-07-2755, 2008 WL 2557565, at *3 (S.D. Tex. June 20, 2008) (dismissing case where statute and regulation did not provide deadline for action); *Alkhadi v. Gonzales*, No. H-07-1002, 2007 WL 2314287, at *1 (S.D. Tex. Aug. 10, 2007) (same); *Rahman v. Mueller*, No. H–07–311, 2007 WL 7238942, at *4-5 (S.D. Tex. June 26, 2007) (same).[6]

Second, even if there was some reason to question the reasonableness of a delay, "relief under

---

[6] Plaintiffs' observation that USCIS was delayed in updating its website, Am. Compl. ¶ 9, also provides no basis for an APA claim. Plaintiffs identify no legal provision requiring that agency websites be updated within a specific period of time. On July 28, 2020, USCIS did update its website to reflect the current status in light of the Wolf Memorandum. *See* USCIS, Consideration of Deferred Action for Childhood Arrivals (DACA), https://www.uscis.gov/archive/consideration-of-deferred-action-for-childhood-arrivals-daca (July 28, 2020); *see also* Press Release, Department of Homeland Security Will Reject Initial Requests for DACA As It Weights Future of the Program, https://www.dhs.gov/news/2020/07/28/department-homeland-security-will-reject-initial-requests-daca-it-weighs-future (July 28, 2020).
.

§ 706(1) requires 'a showing of prejudice before agency action can be set aside for its lack of punctuality.'" *All Pro Cleaning Servs., Inc. v. Dep't of Labor*, No. H-05-250, 2005 WL 4045866, at *14 (S.D. Tex. Aug. 26, 2005) (quoting *King v. Nat'l Transp. Safety Bd.*, 766 F.2d 200, 202 (5th Cir. 1985)); *see also* 5 U.S.C. § 706 (requiring APA claims to take "due account . . . of the rule of prejudicial error"). DHS issued the Wolf Memorandum on July 28—that is, just 8 days after the Supreme Court's judgment, or 11 days after the district court's order in *Casa de Maryland*. Plaintiffs have not argued that this brief period caused them any prejudice. Nor could they. They do not allege that any Plaintiff submitted an initial DACA request in that period or that any Plaintiff was dissuaded by outdated information on DHS's or USCIS's website from submitting a request.

More fundamentally, even requesters who did submit a request during that brief period are subject to the same policy change. *See* Wolf Mem. at 7 ("[T]o further mitigate my concerns, I have determined that these changes should apply both to DACA and advance parole requests submitted after the issuance of this memorandum and requests that are currently pending before the agency."). Even when DHS was accepting initial DACA requests from first-time requestors, that process (which requires a background check, among other things) typically took approximately 6-8 *months*. *See* USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/. Thus, *none* of the first-time requests that had been submitted after the *Regents* opinion but before the Wolf Memorandum would have actually been *approved*—even if DHS had been accepting and processing those requests (instead of holding those requests) during that brief period. The only difference to such requesters would have been a few days or weeks of administrative processing that would not have benefited the requesters. Accordingly, as of July 28, *none* of those requesters (let alone any of the actual Plaintiffs in this case) would have been in any different position, even if some processing of first-time DACA requests had begun in the preceding days or weeks. No matter how one looks at it, Plaintiffs could not have been prejudiced by DHS's actions or inactions in the brief period between the Supreme Court's ruling and

19

the issuance of the Wolf Memorandum.

### 3. The Department Has Not Abused Its Discretion.

Plaintiffs' second APA argument fares no better. They argue that DHS "acted arbitrarily, capriciously, and has abused its discretion" in violation of 5 U.S.C. § 706(2)(A) by "depart[ing] from its prior settled course of adjudication and policies regarding the DACA program" and "failing to adhere to binding Supreme Court precedent." Pls.' Mot. at 6; *see also* Am. Compl. ¶¶ 74-80. These arguments simply repackage the same claims discussed above and are equally meritless.

Review under the arbitrary-and-capricious standard is "extremely limited and highly deferential." *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 243 (5th Cir. 2015). Courts apply "a presumption that the agency's decision is valid," which is Plaintiffs' burden to overcome. *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 558 (5th Cir. 2014). The Court must "uphold an agency's action if its reasons and policy choices satisfy minimum standards of rationality." *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013). It "need only find a rational explanation for *how* the [agency] reached its decision." *Associated Builders & Contractors of Texas, Inc. v. NLRB*, 826 F.3d 215, 225 (5th Cir. 2016). By contrast, to fail this standard, an agency must have:

> relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

For reasons discussed above, under § 706(2)(A), Plaintiffs cannot challenge DHS's interlocutory choice to hold properly filed first-time DACA requests pending the then-imminent issuance of the Wolf Memorandum because that interlocutory action was not final. *See supra* Arg. § I.A.1. Regardless, such a choice is plainly reasonable. DHS expected to take imminent action, and it would have been inefficient for the agency to begin processing requests that might shortly be rejected across-the-board. And, in fact, that is exactly what would have happened, as the Wolf

Memorandum ultimately confirmed.

Plaintiffs appear to construe this argument in their Amended Complaint to now encompass a challenge to the Wolf Memorandum, *see* Pls.' Mot. at 4. They should not be permitted to seek an injunction based on claims that are not alleged in their complaint. Nevertheless, to the extent the Court permits such a challenge without amendment of the pleading, Acting Secretary Wolf's memorandum readily satisfies the APA's reasonableness standard.[7] DHS has not made an "irrational departure" from a "settled course of adjudication." *INS v. Yang*, 519 U.S. 26, 32 (1996) (cited in Am. Compl. ¶¶ 75, 78). Instead, as the Supreme Court has recognized, an agency can make an "avowed alteration of" its prior course without acting arbitrarily or abusing its discretion. *Id.* Far from an "unexplained departure[] from regulations or established policies," *Lugo-Resendez v. Lynch*, 831 F.3d 337, 338 (5th Cir. 2016) (cited in Am. Compl. ¶ 75), the Acting Secretary considered the relevant record, explained his reasoning, and expressly modified DHS's preexisting guidance for the exercise of enforcement discretion regarding DACA requests. *See generally* Wolf Mem. Indeed, the Supreme Court ruled that the matter was to be remanded to DHS "so that it may consider the problem anew." *Regents*, 140 S. Ct. at 1916. Thus, the manner in which DHS departed from the Napolitano Memorandum does not give rise to a claim under § 706(2)(A).

Nor has DHS failed "to adhere to binding Supreme Court precedent." Pls.' Mot. at 6. As discussed extensively above, nothing in the Supreme Court's opinion in *Regents* precludes DHS from making further changes to its DACA policy. *See supra*, Arg. § I.A.2.i. Indeed, the Supreme Court

---

[7] To whatever extent Plaintiffs seek to challenge the Wolf Memorandum, they have made clear that the argument that Acting Secretary Wolf "is not a properly serving secretary" is "not the subject of this litigation." Pls.' Mot. at 4 n.1. At any rate, Plaintiffs' cryptic footnote does not contain a meaningful argument. An acting secretary may exercise the powers of the office. *See, e.g.*, *NLRB v. SW Gen.*, 137 S. Ct. 929, 935 (2017) (noting that "[s]ince President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant [office requiring Presidential appointment and Senate confirmation] without first obtaining Senate approval.").

expressly observed: "The dispute before the Court is not whether DHS may rescind DACA. All parties agree that it may. The dispute is instead primarily about the procedure the agency followed in doing so." *Regents*, 140 S. Ct. at 1905. The Supreme Court further explained "because DHS was not writing on a blank slate, . . . it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1915. Acting Secretary Wolf's procedure is consistent with this guidance. He considered an extensive record, including but not limited to the record before the Supreme Court in *Regents*, and weighed the relevant factors, including the reliance interests upon which the Supreme Court focused. *See generally* Wolf Mem.; *see also Regents*, 140 S. Ct. at 1913-14. Plaintiffs' vague assertions about failing to comply with precedent do not state an APA claim for arbitrary action or abuse of discretion.

For all of these reasons, Plaintiffs' APA claims must be dismissed.

### B. Plaintiffs ' Mandamus Act Claim Fails Because it Does Not Provide Relief Beyond the APA.

The Mandamus Act provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. In order to grant a writ of mandamus, a court must find that three elements are satisfied: (1) the plaintiff has a clear right to relief, (2) the defendant a clear duty to act, and (3) no other adequate remedy exists. *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 768 (5th Cir. 2011). Plaintiff has the burden to make a "clear and undisputable" showing to establish each of these elements. *See Ali v. Rice*, No. H-07-1868, 2008 WL 11502058, at *8 (S.D. Tex. July 31, 2008) (quoting *Miller v. French*, 530 U.S. 327, 339 (2000)). Mandamus is an "extraordinary remedy which should be utilized only in the clearest and most compelling of cases." *Carter v. Seamans*, 411 F.2d 767, 773 (5th Cir. 1969); *see also Ali*, 2008 WL 11502058, at *8 (noting that mandamus relief is "to be invoked only in extraordinary situations").

1. **The Mandamus Claim Must Be Dismissed Because the APA Provides an Adequate Remedy.**

The third element disposes of Plaintiffs' claims here. Where Plaintiffs can challenge the substance of an agency action under the APA, the APA provides an adequate remedy and mandamus must be denied. *See Oniwon v. USCIS*, No. H-19-3519, 2020 WL 1940879, at *5 (S.D. Tex. Apr. 6, 2020) ("Because the court finds that [plaintiff] may have a remedy under the APA, mandamus must be denied."); *Sawan v. Chertoff*, 589 F. Supp. 2d 817, 825-26 (S.D. Tex. 2008) ("[T]he mandamus claim adds nothing to the APA claim and should be dismissed" because "APA provides a remedy for unlawfully delayed agency action; mandamus is not necessary for relief"). Indeed, courts in this district have repeatedly noted that a mandamus claim is redundant with a § 706(1) claim. *See, e.g.*, *Rahman v. Mueller*, No. H–07–311, 2007 WL 7238942, at *4 (S.D. Tex. June 26, 2007) ("Courts have recognized that when a petitioner seeks both mandamus relief and relief under the APA, courts apply the same principles and standards both to determine jurisdiction and to assess the merits."); *Yan*, 2007 WL 1521732, at *8 ("Because both statutes offer similar means of compelling an agency to take action which by law it is required to take, claims made under this provision of the APA and the federal mandamus statute are subject to the same standard."). Therefore, the mandamus claim should be dismissed.

2. **Plaintiffs Have Also Failed To Establish Any Clear Duty to Act or Clear Right to Relief.**

Plaintiffs have also failed to establish the other two elements of a mandamus claim. In order to satisfy the duty prong of the Mandamus Act, Plaintiffs "must demonstrate that a government officer owes the [Plaintiffs] a legal duty that is a specific, ministerial act, devoid of the exercise of judgment or discretion." *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1288 (5th Cir. 1997). "The legal duty must be set out in the Constitution or by statute, and its performance must be positively commanded and so plainly prescribed as to be free from doubt." *Id.* at 1288 (citation

omitted); *see also Randall D. Wolcott*, 635 F.3d at 768 ("[M]andamus is not available to review discretionary acts of agency officials."); *Home Health Innovations, Inc. v. Sebelius*, No. 14-124, 2014 WL 12540881, at *2 (W.D. Tex. Feb. 18, 2014) (requiring "a clear nondiscretionary duty"). The Supreme Court long ago elaborated that "[m]andamus has never been regarded as the proper writ to control the judgment and discretion of an officer as to the decision of a matter which the law gave him the power and imposed upon him the duty to decide for himself." *Wilbur v. United States*, 281 U.S. 206, 219-20 (1930).

Plaintiffs' claim fails at the threshold of this element because the Fifth Circuit requires that the nondiscretionary duty arise from the statute itself. *See Dunn-McCampbell*, 112 F.3d at 1288 (5th Cir. 1997) ("The legal duty must be set out in the Constitution or by statute[.]"); *Giddings v. Chandler*, 979 F.2d 1104, 1108 (5th Cir. 1992) ("Any duty owed to the plaintiff must arise from another statute . . . or from the United States Constitution."); *Patterson v. Defense POW/MIA Accounting Agency*, 343 F. Supp. 3d 637, 653 (W.D. Tex. Nov. 20, 2017) (rejecting effort to derive nondiscretionary duty from "regulations and policies" in part because these regulations were not "the Constitution or [a] statute"). Here, Plaintiffs do not point to any constitutional or statutory requirement. Instead, they exclusively rely on court orders vacating one agency memorandum and thus reinstating a prior agency memorandum. *See* Pls.' Mot. at 4-5; Am. Compl. ¶¶ 72-73. Under the Fifth Circuit's interpretation, such a discretionary agency memorandum cannot be the basis for a mandamus duty. *See Dunn-McCampbell*, 112 F.3d at 1288.

But even if the duty could arise from an agency memorandum, or court orders reinstating that memorandum, Plaintiffs have failed to establish any of the duties they claim. In order to satisfy the duty prong of the Mandamus Act, Plaintiffs "must demonstrate that a government officer owes the [Plaintiffs] a legal duty that is a specific, ministerial act, devoid of the exercise of judgment or discretion." *Dunn-McCampbell*, 112 F.3d at 1288; *see also id.* ("The legal duty . . . must be positively

24

commanded and so plainly prescribed as to be free from doubt."). "[M]andamus is not available to review discretionary acts of agency officials." *Randall D. Wolcott,* 635 F.3d at 768; *All Pro Cleaning Servs.,* 2005 WL 4045866, at *13 (same). As discussed above, neither of the court orders Plaintiffs rely on established a non-discretionary duty to perpetuate the Napolitano memorandum or to process initial DACA requests in any specific time period. *See supra*, Arg. § I.A.1.

Not least, Plaintiffs have also failed to establish that they have "a clear right to relief." *Randal D. Wolcott*, 635 F.3d at 768; *see also All Pro Cleaning Servs.*, 2005 WL 4045866, at *13 (plaintiff's claim must be "clear and certain"). For this element, a plaintiff must do more than "merely suggest[] that it is possible that a breach [of some statutory duty] may have occurred." *Randal D. Wolcott*, 635 F.3d at 772. Instead, the complaint must specifically plead that "there was a breach of the duty such that [plaintiff] is clearly entitled to relief in mandamus." *Id.* Here, Plaintiffs have not only failed to establish any mandatory duties, they have also failed to establish their own right to relief. As discussed above, Plaintiffs lack standing to challenge to DHS's alleged failures between the *Regents* decision and issuance of the Wolf Memorandum. *See supra*, Arg. § I.A.2.ii. Plaintiffs do not allege that they themselves submitted DACA requests during this period. Therefore, Plaintiffs were not harmed by DHS's decision to hold incoming requests pending issuance of the Wolf Memorandum. *See* Wolf Mem. at 7. And even if DHS mistakenly rejected an initial DACA request for some other requester during this period, *see* Am. Compl. ¶ 8 & Ex. 4,[8] that does not constitute a breach of any of Plaintiffs' rights. Finally, Plaintiffs have identified no mandatory duty for DHS to update its website within a specific period of time, and cannot establish that delayed updates to the website constituted a breach entitling these Plaintiffs to relief. After all, "[m]ere time delay in administrative action . . . is not necessarily sufficient to warrant a writ of mandamus." *Ali*, 2008 WL 11502058, at *9 (finding no clear right to

---

[8] As discussed above, it is likely that this request was properly rejected for failing to meet the threshold requirements, but an erroneous notice was issued. *See supra* footnote 4.

relief where statute "provide[d] no specific time period in which action must be taken").

### 3. Even if Plaintiffs Had Established the Elements of a Mandamus Claim, the Writ Should Be Denied on Equitable Grounds.

Plaintiffs have failed to establish any of the elements of a mandamus claim. But even if the Court could grant the writ—it cannot—it should nonetheless exercise its discretion to deny it because the public interest would not ultimately be served by granting relief. *See Randall D. Wolcott*, 635 F.3d at 768 ("Even when a court finds that all three elements are satisfied, the decision to grant or deny the writ remains within the court's discretion because of the extraordinary nature of the remedy."); *Whitehorse v. Illinois Central R.R. Co.*, 349 U.S. 366, 373 (1955) ("[M]andamus . . . is to be granted only in the exercise of sound discretion."). Here, equitable principles weigh against granting the writ, even if some nondiscretionary duty and breach were found. As discussed in more detail below in response to the preliminary injunction motion, compelling DHS to accept and process Plaintiffs' first-time DACA requests (and potentially tens of thousands more if Plaintiffs' putative class action were certified) would provide no meaningful relief to the DACA requesters—the pendency of the requests would provide no certainty and it would be many months before USCIS decided the requests, by which time DHS or the courts may have reached different conclusions regarding the fate of DACA. By contrast, such extraordinary relief is not warranted to constrain DHS's significant discretion as to whether, and under what circumstances, to exercise prosecutorial discretion with respect to individuals not lawfully in this country. It would frustrate and displace both the Acting Secretary's substantive judgment as to how his prosecutorial discretion should be exercised, as well as his further judgment as to how best balance the relevant interests.

### C. Plaintiffs' EAJA Claim Fails Because They Are Not the Prevailing Party.

In sum, for all of these reasons, Plaintiffs' claims under the APA and Mandamus Act must be dismissed. *See supra*, Arg. §§ I.A-B. Accordingly, their final count seeking fees and costs under the

Equal Access to Justice Act (EAJA), Am. Compl. ¶¶ 92-97, must also be dismissed. An EAJA award depends on being the "prevailing party" where the "position of the United States was [not] substantially justified." 28 U.S.C. § 2412(d)(1)(A); *Sims v. Apfel*, 238 F.3d 597, 600-02 (5th Cir. 2001); *see also Range v. United States*, 256 B.R. 868, 875-76 (S.D. Tex. 2000) (applying parallel bankruptcy statute, 26 U.S.C. § 7430). Plaintiffs cannot prevail because their claims must be dismissed. And for the reasons set forth above, the position of the United States has a "reasonable basis both in law and fact." *Sims*, 238 F.3d at 602 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

## II. Plaintiffs Are Not Entitled to Preliminary Injunctive Relief.

### A. Plaintiffs Are Unlikely to Succeed on the Merits.

For the reasons discussed above, Plaintiffs cannot succeed on their APA claims. *See supra*, Arg. § I.B.[9] Accordingly, they have failed to carry their burden to show that they are likely to succeed on the merits, and they cannot receive injunctive relief. *See Ineos Technologies USA, LLC v. Basf Corp.*, No. 4:16-CV-1145, 2016 WL 6909296, at *3 (S.D. Tex. May 23, 2016) ("An 'absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law.'") (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003)). The Court need not reach any of the other injunction factors; nevertheless, all the factors weigh against injunctive relief.

### B. Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs have failed to carry their burden to show that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "[T]he injury at

---

[9] Plaintiffs do not rely on the Mandamus Act in their preliminary injunction motion. Nor could they. The Fifth Circuit has made clear that the Mandamus Act "does not grant jurisdiction to consider actions asking for other types of relief—such as injunctive relief." *Randall D. Wolcott*, 635 F.3d at 766. The Mandamus Act only grants jurisdiction to "command[] the performance of a particular duty that rests on the defendant," *id.* (quoting 42 Am. Jur. 2d Injunctions § 7), but does not grant jurisdiction to "prohibit the defendants from acting in a certain manner in the future." *Id.*

issue must be actual and imminent, not speculative or remote." *Allied Home Mortgage Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011); *see also Google, Inc. v. Hood*, 822 F.3d 212, 227 (5th Cir. 2016) (even invocation of constitutional rights "cannot substitute for the presence of an imminent, non-speculative irreparable injury").

First, Plaintiffs have provided no admissible evidence to support their injury claims. More than the conclusory allegations of their complaint is required to show irreparable harm in a preliminary injunction motion. *See White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) ("Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue."); *Tex. Health & Human Servs Comm'n v. United States*, 166 F. Supp. 3d 706, 712 (N.D. Tex. 2016) ("To establish irreparable injury, the [plaintiff] must demonstrate that the harm is real, imminent, and significant—not merely speculative or potential—with *admissible evidence* and a clear likelihood of success.") (emphasis added); *Slide Fire Solutions, L.P. v. Bump Fire Sys., LLC*, No. 3:14-CV-3358-M, 2016 WL 3361552, at *2 (N.D. Tex. Apr. 14, 2016) (concluding plaintiff failed to establish irreparable harm where it "fails to substantiate [] conclusory assertions with any competent evidence"). Plaintiffs submitted no declarations or other evidence supporting their bare allegations that they satisfy the terms set out in the 2012 Napolitano Memorandum to request deferred action. *Cf.* Am. Compl. ¶¶ 28-42 (making identical generic allegations on behalf of eight plaintiffs and seven putative class members). Nor do Plaintiffs specifically allege in their complaint, let alone support with evidence, any of the key facts they assert and rely on in the irreparable harm section of their brief: (1) that Plaintiffs "do not have lawful status in the United States," (2) that some of them "have orders of removal," (3) that they would "lose any property or homes that they have purchased," (4) that they have families from which they would be separated, or (5) that they are currently suffering "economic hardship" due to the inability to "obtain legal employment in the United States." Pls.' Mot. at 7. "Statements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980); *Jeon v. Holder*,

28

354 F. App'x 50, 53 (5th Cir. 2009) (same); *cf. Play Hard Pray Harder LLC v. ScriptureArt LLC*, No. 3:12-CV-5121-N, 2013 WL 12124515, at *3 n.4 (N.D. Tex. July 2, 2013) ("[F]actual allegations in a brief are not to be considered on a motion to dismiss for failure to state a claim.").  Plaintiffs simply cannot carry their burden to show the likelihood of irreparable harm without admissible evidence.

Second, the issues Plaintiffs identify do not suggest "imminent, nonspeculative" harm. *Google*, 822 F.3d at 227.  Plaintiffs' counsel suggests that their clients would be injured in various ways if Plaintiffs "are removed."  Pls.' Mot. at 7.  But Plaintiffs have identified no reason they are likely to be removed before this lawsuit can be resolved.  *See Shanks v. City of Dallas, Tex.*, 752 F.2d 1092, 1096 (5th Cir. 1985) (preliminary injunction "is typically granted during the pendency of a lawsuit to prevent irreparable injury that may result before a final decision on the merits"); *Brooks v. Ellis*, No. H–14–3071, 2014 WL 5460599, at *1 (S.D. Tex. Oct. 27, 2014) (same).  The removal process is lengthy and Plaintiffs provide no reason to believe that any Plaintiff is likely to be targeted for enforcement action, let alone that the Plaintiffs could be placed in removal proceedings and have those proceedings completed before this Court can rule on summary judgment motions in this case.  Other courts have concluded that, in the absence of any specific allegations of "pending removal proceedings against plaintiffs here," the "risk of deportation is speculative at present" and too remote "to conclude that irreparable harm is *likely*, as required under *Winter*." *Carlson v. USCIS*, No. 12-cv-7893, 2012 WL 4758118, at *9 (C.D. Cal. Oct. 3, 2012).  Indeed, courts considering challenges to the 2017 DACA rescission declined to preliminarily enjoin DHS's decision to stop accepting first-time DACA requests, largely due to the absence of an irreparable harm showing.  For example, in the Eastern District of New York, the court held that the "possibility of deportation from the country" for those who were not DACA recipients was "not sufficiently 'likely' for purposes of establishing irreparable harm," and "declin[ing] to grant a preliminary injunction on this basis." *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y. 2018); *see also id.* at 437 (holding that Plaintiffs had not shown that those who had

29

never applied for DACA "would be irreparably harmed without injunctive relief or that the balance of equities favor these individuals to the same extent it favors existing DACA beneficiaries").[10] Plaintiffs cannot show that their alleged removal-related injuries are likely or imminent, nor do they have reliance interests comparable to DACA recipients. Accordingly, as in the prior cases, "Defendants' refusal to adjudicate new initial DACA applications" does not amount to an irreparable harm warranting injunctive relief. *Batalla Vidal*, 279 F. Supp. 3d at 437.[11]

Third, some of the issues Plaintiffs identify would not be remedied by the relief they seek. People already subject to final removal orders who are detained by immigration officials for the purpose of removal, *see* Pls.' Mot. at 7, cannot postpone their removal merely by having a DACA request pending. Moreover, Plaintiffs seek an injunction requiring USCIS to accept and process their requests. *See* Pls.' Mot. at 11. Yet they receive no immediate benefit from the mere acceptance of their request. Their alleged injuries would only be mitigated if their DACA requests were approved. In light of the fact that initial DACA requests took an average of 6-8 months to process due to background checks and other requirements, *see, e.g.*, USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/, even if the Court granted the requested injunction,

---

[10] Other courts reached the same conclusion. In the Northern District of California, while finding irreparable injury for DACA recipients, the court held that plaintiffs "ha[d] not made a comparable showing as to individuals who have never applied for or obtained DACA." *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1048-49 (N.D. Cal. 2018) (excluding from its injunction "new applications from applicants who have never before received deferred action"). And in the District of Columbia, the court reached the same conclusion when it granted a partial stay of its final judgment, holding that the plaintiffs in that case would suffer no irreparable injury from allowing the rescission to take effect, pending appeal, "as to initial DACA applications." *NAACP v. Trump*, 321 F. Supp. 3d 143, 148 (D.D.C. 2018).

[11] Plaintiffs also allege no facts supporting the notion that any of them are subject to immediate and irreparable "economic hardship" in the absence of work authorization. Pls.' Mot. at 7. *Cf. Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 707 n.10 (5th Cir. 2017) (rejecting "bald assertion" at motion-to-dismiss stage because plaintiffs offered "nothing to support" it). Given the paucity of Plaintiffs' allegations, they could be students supported by citizen relatives who do not need or qualify for work authorization. Plaintiffs have identified no "actual and imminent, not speculative or remote" economic injuries. *Allied Home Mortgage Corp.*, 830 F. Supp. 2d at 227.

Plaintiffs would be unlikely to be approved for DACA before this Court can reach judgment on the underlying claims. Thus, the purpose of a preliminary injunction would not be served by the relief they seek. *See Shanks*, 752 F.2d at 1096; *Brooks*, 2014 WL 5460599, at *1; *see also Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("The focus always must be on prevention of injury by a proper order[.]").

In sum, Plaintiffs have failed to establish irreparable harm, providing an additional reason their preliminary injunction motion must be denied.

## C. The Balance of Equities and Public Interest Weigh Against an Injunction.

The final two factors, the balance of the equities and the public interest, also weigh against granting Plaintiffs' motion. These factors "merge when the Government is the opposing party." *United States v. Transocean Deepwater Drilling, Inc.*, 537 F. App'x 358, 360 (5th Cir. 2013) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (noting that "the public interest is entrusted" to a "governmental agency"). As noted above, the federal government possesses broad authority over the subject of immigration and the status and presence of aliens in this county. *Arizona*, 567 U.S. at 394. This includes significant discretion as to whether, and under what circumstances, to exercise prosecutorial discretion with respect to individuals not lawfully in this country, such as granting deferred action. Here, the Acting Secretary decided to pursue an approach in which individuals who previously received DACA could continue to request DACA, while those who have not previously been approved under DACA can request deferred action on an "individualized, case-by-case basis," as has historically been available. *See* Wolf Mem. at 6. In adopting this approach, the Acting Secretary sought to balance his significant concerns about this categorical use of enforcement discretion against the potential reliance interests of those who have received DACA. *See id.* at 4-7.

The injunctive relief sought by Plaintiffs would frustrate and displace both the Acting

Secretary's substantive judgment as to how his prosecutorial discretion should be exercised, as well as his further judgment as to how best to balance the relevant interests, while providing minimal, if any, relief to the harms identified by Plaintiffs for the reasons discussed above. Accordingly, these factors weigh strongly against granting Plaintiffs the injunction they seek. *Cf. Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459-60 (5th Cir. 2016) (upholding district court conclusion that "the public interest in national defense and national security [was] stronger" than the public interest in protection of constitutional rights); *Ineos Technologies*, 2016 WL 6909296, at *4 (holding that the "equities do not weigh in Plaintiff's favor" where "there is not a likelihood of success on the merits").

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Amended Complaint and deny Plaintiffs' Motion for Preliminary Injunction.

Dated: September 4, 2020

Respectfully submitted,

DAVID M. MORRELL
Deputy Assistant Attorney General

RYAN K. PATRICK
United States Attorney

BRAD P. ROSENBERG
Assistant Branch Director

/s/   Galen N. Thorp
GALEN N. THORP (VA Bar No. 75517)
Senior Trial Counsel
*Attorney-in-Charge*
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 514-4781
Fax: (202) 616-8470
Email: galen.thorp@usdoj.gov

*Attorneys for Defendants*

**Certificate of Service**

I certify that on September 4, 2020, I filed this document via CM/ECF, which will serve all counsel registered.

/s/ *Galen N. Thorp*
Galen N. Thorp

# EXHIBIT 14

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-00068 |
| KIRSTJEN M. NIELSEN, *et al.*, | |
| Defendants, | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| Defendant-Intervenors. | |

**FEDERAL DEFENDANTS' OBJECTIONS AND RESPONSES TO
DEFENDANT-INTERVENORS' FIFTH AND SIXTH SETS OF DISCOVERY
REQUESTS**

TO: Defendant-Intervenors, by and through their attorneys of record, Nina Perales, Celina Moreno, Jack Salmon, Alejandra Avila, Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas 78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C., P.O. Box 4545 McAllen, Texas 78502.

     Federal Defendants serve these objections and responses to Defendant-Intervenors' fifth and sixth set of interrogatories and requests for production of documents pursuant to the Federal Rules of Civil Procedure.

**GENERAL OBJECTIONS**

     Federal Defendants state the following General Objections to Defendant-Intervenors' fifth and sixth sets of interrogatories and requests for production of documents ("RFP"), served on August 28 and 30, 2020, respectively (hereafter "August discovery requests"), which are hereby incorporated in and made part of each of the following specific responses.

1

1.      Federal Defendants object to Defendant-Intervenors' August discovery requests to the extent that they require the production of documents or things outside the limited scope of the 40-day discovery period permitted by the Court, are unduly burdensome, are overly broad, or seek information that is not relevant to this phase of this case and will not lead to the discovery of such relevant information, or are equally accessible to Defendant-Intervenors through third-party discovery requests, publicly available government websites, other websites, or other sources. Indeed, the time required to comply with many of Defendant-Intervenors' requests—including to develop search terms, determine likely custodians, collect potentially-responsive documents, process those documents for electronic review, conduct such a review, and then filter responsive documents for privileges—is simply not possible in the time permitted. See attached Declaration. Given the unlikely possibility that any discovery now will help to resolve an issue in this case, and the lack of grounds that the Court found to justify this limited discovery period, as described below, Federal Defendants object to the additional burden of searching for or production of any additional documents beyond those provided with this response. Federal Defendants also object to the inevitable delay in the Court's summary judgment briefing schedule that a full production of documents in response to all of Defendant-Intervenors' broad requests would necessitate. To the extent Federal Defendants could conduct a search and review for existing information in response to Defendant-Intervenors' August discovery requests, Federal Defendants aver that it would take a substantial amount of time that is impossible to calculate due to the numerous variables. *See* attached Declaration.

2.      Federal Defendants object to Defendant-Intervenors' August discovery requests to the extent that they are beyond the scope of the claims in this case or they are not relevant to any party's claim or defense. Federal Defendants further object to the August discovery requests to the extent that they are not proportional to the needs of the case, given that the discovery period ended a year ago, after more than 18 months of discovery was conducted on the very issues that Defendant-Intervenors seek additional discovery on here. On the issues of standing, reliance interests, and the scope of the administrative record, the Court found that Defendant-Intervenors made no showing to justify additional discovery. *See* Dkt. 473 at 4 ("[T]o the extent discovery is . . . needed to define the scope of the administrative record, no reason has been given as to why it has not already been done."); *id*. at 5 ("[A]ll sides have had significant time to conduct discovery on the issue" of standing."); *id*. at 7 (the Court has already "accepted and adopted" Defendant-Intervenors' reliance interests argument and Defendant-Intervenors "have not made the case that additional formal discovery is needed."). Indeed, the Court found that Defendant-Intervenors' proposed discovery and supplemental briefing schedule would "needlessly" and "clearly complicate" consideration of Plaintiffs' pending motion for summary judgment "that has been delayed too long already." Dkt. 473 at 3. Thus, it is unclear why the Court still permitted a 40-day period for additional discovery, *id*. at 8, and Federal Defendants object to Defendant-Intervenors' August discovery requests to the extent that they require Federal Defendants to expend resources beyond the limited time period and arguably limited scope permitted by the Court.

3.      Federal Defendants also object to Defendant-Intervenors' August discovery requests as disproportionate to the needs of the case in considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Specifically, to the

extent Defendant-Intervenors' August discovery requests seek information related to the question of whether some discretion can be established in the current adjudication of DACA requests, *see, e.g.*, Interrogatory Nos. 15-18, 22, 23; RFP Nos. 11-17, this Court has already made findings that render that issue moot. In denying Defendant-Intervenors' Preliminary Injunction Motion, the Court held that, "[d]espite the less-than-convincing evidence" supporting Plaintiffs' claim that that DACA adjudicators are not free to exercise discretion, "and given the overwhelming evidence concerning the rights conferred and the obligations imposed, . . . Plaintiff States have shown DACA to be a substantive rule that should have complied with the notice-and-comment procedures required by the APA." Dkt. 319 at 103. Thus, the issue before the Court is "whether the DACA program itself (and the manner in which it was instituted) is legal," *id.* at 5, and the Court held that "[f]or these reasons, the Plaintiff States have clearly shown, as a matter of law, that they are likely to succeed on the merits." *Id.* at 104. To the extent Defendant-Intervenors' August discovery requests seek information related to the question of reliance interests, *see, e.g.*, Interrogatory Nos. 19, 20, 21, 24, 25, this Court has also made findings that render that issue moot. Dkt. 473 at 7 (the Court has already "accepted and adopted" Defendant-Intervenors' reliance interests argument and Defendant-Intervenors "have not made the case that additional formal discovery is needed."). Federal Defendants object to Defendant-Intervenors' overbroad and burdensome requests to develop additional facts on issues that are no longer in controversy in this case.

4.     Federal Defendants object to Defendant-Intervenors' August discovery requests because the information Defendant-Intervenors seek is overbroad and irrelevant to any claim within Plaintiff States' imminent motion for summary judgment, thus the requests are disproportionate to the needs of the case as it stands now. *See Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 435 (5th Cir. 1990), *opinion modified on denial of reh'g* (Apr. 27, 1990) (upholding district court's stay of depositions until after determinations of summary judgement motions that did not require discovery); *cf. Guajardo v. Martinez*, No. 2:14-CV-450, 2015 WL 12831683, at *2 (S.D. Tex. Dec. 22, 2015) (staying discovery before Court ruled on motion to dismiss as it would be otherwise unduly burdensome and expensive). Rather, the Court can resolve this case based on the record as it exists now and on the motion for summary judgment that is scheduled to be filed anew on October 2, 2020, which is, in the Court's words, "more than ripe for consideration." Dkt. 473 at 6. Indeed, the Court's July 26, 2019 order envisions no additional discovery beyond that ordered at the hearing on July 24, 2019 until after it rules on Plaintiff-States' motion for summary judgment. *See* Dkt. 412 ("If the Court ultimately denies Plaintiff-States' Motion for Summary Judgement [Dkt. 356], the Court will at that time entertain a request to re-open discovery, should any party so request and show good cause.").

5.     Federal Defendants object to Defendant-Intervenors' "Definitions and Instructions" to the extent that they are vague and ambiguous, and therefore may lead to differing interpretations among the parties to this litigation as well as the Court, resulting in confusion. Federal Defendants further object to Defendant-Intervenors' "Definitions and Instructions" to the extent that they are inconsistent with the Federal Rules of Civil Procedure or with the Court's orders dated August 21, 2020 (Dkt. 473) and June 20, 2018 (Dkt. 97) or to the extent that they are confusing or unduly burdensome.

6.     Federal Defendants object to Defendant-Intervenors' August discovery requests to the extent that Defendant-Intervenors seek disclosures of information protected from disclosure by

the Privacy Act of 1974, 5 U.S.C. Section 552a(b), attorney-client privilege, attorney work product doctrine, deliberative process privilege, law enforcement / investigatory files privilege, self-critical analysis privilege, executive privilege, and official information privilege, and other applicable privileges.

7.     Federal Defendants object to Defendant-Intervenors' August discovery requests to the extent that they require the production of electronically stored information on electronic media, including any general search of email or retrieval of backup tapes of Federal Defendant agencies, including Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), and U.S. Immigration and Customs Enforcement ("ICE"), that are not reasonably accessible because of the undue time, burden, and cost associated with retrieving, reviewing, and producing the information, especially in relation to the limited scope of expedited discovery at this stage of proceedings.

8.     Federal Defendants object to Defendant-Intervenors' August discovery requests to the extent that they require the production of material outside of a properly designated administrative record by DHS, insofar as this action may be construed as a suit for judicial review of agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

9.     Federal Defendants object to Defendant-Intervenors' August discovery requests to the extent they purport to require the disclosure of information in the possession, custody or control of entities other than properly named Defendants on the grounds that such production is beyond the scope of Fed. R. Civ. P. 33 and 34 and other applicable law.

10.    Federal Defendants object, in light of the Court's Orders dated August 21, 2020 (Dkt. 473) and June 20, 2018 (Dkt. 97), to the extent Defendant-Intervenors' August discovery requests seek to compel Federal Defendants to search for, identify, or log drafts or non-final documents or produce documents in their native format.

11.    Federal Defendants object to Defendant-Intervenors' fifth set of interrogatories to the extent that they exceed the limit of 25 interrogatories, including all subparts, allowed under Fed. R. Civ. P. 33, without stipulation or leave from the court. Defendant-Intervenors have clearly promulgated more than twenty-five interrogatories in this set alone, much less in all prior sets of interrogatories.

12.    Federal Defendants' responses to Defendant-Intervenors' August discovery requests are made without waiving:

    (a)     The right to object to the competence, relevance, materiality, or admissibility as evidence of any information, or the subject matter thereof, in any aspect of this civil action or any other matter;

    (b)     The right to object at any time and upon any grounds to any other discovery requests;

    (c)     The right at any time and for any reason to revise, supplement, correct, add or to clarify these responses;

(d)      The right to amend or supplement these responses if the Federal Defendants discover additional information; and

(e)      Any applicable privilege, including but not limited to the attorney/client privilege, the law enforcement privilege, the investigation files privilege, executive privilege, and the official information privilege.

13.      Federal Defendants' objections to Defendant-Intervenors' August discovery requests are based upon the information presently known by the Federal Defendants, and are made without prejudice to the Federal Defendants' right to assert additional objections in the event that additional grounds for objections should be discovered by the Federal Defendants subsequent to this response.

14.      Without waiving the above objections, Federal Defendants will provide responses to only relevant non-privileged matters based on information currently available to them and obtainable without undue burden.

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENORS' FIFTH SET OF INTERROGATORIES

### INTERROGATORY NO. 15

Please identify the number of initial DACA applications received by the Department of Homeland Security from each Plaintiff State for each month during the period July 2018 to September 2020, and identify, of that number:

  a.  the number of initial DACA applications approved by the Department of Homeland Security from each Plaintiff State for each month during the period of July 2018 to September 2020.

  b.  the number of initial DACA applications denied by the Department of Homeland Security from each Plaintiff State for each month during the period of July 2018 to September 2020.

  c.  the number of initial DACA applications rejected by the Department of Homeland Security from each Plaintiff State for each month during the period of July 2018 to September 2020.

### OBJECTIONS TO INTERROGATORY NO. 15

Federal Defendants specifically object to Interrogatory No. 15 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants object to the following terms and phrases in Interrogatory No. 15 to the extent that they are vague, undefined, and therefore ambiguous, and

to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practice regarding DACA: "initial [DACA application]," "received by the Department of Homeland Security," "approved by the Department of Homeland Security," "denied by the Department of Homeland Security," and "rejected by the Department of Homeland Security." Federal Defendants' responses to this Interrogatory are based on Federal Defendants' common usage of those terms and phrases in their DACA business practices during the relevant time periods reflected in the response.

ICE specifically objects to being required to search for information responsive to Interrogatory No. 15 for the period from July 2018 through September 2020. It appears that ICE never compiled or "tracked" information responsive to Interrogatory No. 15 for this time period. Specifically, ICE previously queried the Enforcement and Removal Operations ("ERO") database and found no information responsive to Defendant-Intervenors' Interrogatory No. 3, which sought identical information as Interrogatory No. 15 for the time period of June 2012 to June 2018. In addition, ICE previously queried several then-current agency employees who potentially might have possessed information responsive to Interrogatory No. 3 and was advised that they possessed no responsive information. ICE has no reason to believe that a new query of the ERO database or of any current ICE employees would generate responsive information to Interrogatory No. 15.

**RESPONSE TO INTERROGATORY NO. 15**

Subject to these objections, Federal Defendants refer to the attached chart, entitled "Interrogatory 15, Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Count of Accepted Filings, Rejections, Approvals, and Denials by Month, and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run. The data on "DACA Initials" includes Form I-821Ds filed by individuals who have not previously received DACA, as well as Form I-821Ds filed by prior DACA recipients whose most recent period of DACA was terminated or whose previous period of DACA expired before September 5, 2016 (effective February 14, 2018 – July 31, 2019) or more than a year before they submitted a new DACA request (effective until February 14, 2018 and again August 1, 2019 – present). USCIS considers DACA requests filed by individuals whose most recent period of DACA was terminated or who requested DACA after their previous period of DACA had expired as noted above as "initial" requests for required evidence, processing, and adjudication purposes.

**INTERROGATORY NO. 16**

Please identify the number of renewal DACA applications received by the Department of Homeland Security from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, of that number:

   a. the number of renewal DACA applications approved by the Department of Homeland Security from each Plaintiff State for each month during the period of July 2018 to September 2020.

b.  the number of renewal DACA applications denied by the Department of Homeland Security from each Plaintiff State for each month during the period of July 2018 to September 2020.

c.  the number of renewal DACA applications rejected by the Department of Homeland Security from each Plaintiff State for each month during the period of July 2018 to September 2020.

**OBJECTIONS TO INTERROGATORY NO. 16**

Federal Defendants specifically object to Interrogatory No. 16 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants object to the following terms and phrases in Interrogatory No. 16 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [DACA application]," "received by the Department of Homeland Security," "approved by the Department of Homeland Security," "denied by the Department of Homeland Security," and "rejected by the Department of Homeland Security." With respect to that portion of the response to this Interrogatory provided by Defendant USCIS, the response is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response.

**RESPONSE TO INTERROGATORY NO. 16**

Subject to these objections, Federal Defendants refer to the attached chart, entitled "Interrogatory 16, Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Count of Accepted Filings, Rejections, Approvals, and Denials by Month, and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 17**

Please identify the average number of months it took USCIS to adjudicate an accepted DACA initial application:

a.  For the period of July 2018 to September 2020

**OBJECTIONS TO INTERROGATORY NO. 17**

Federal Defendants specifically object to Interrogatory No. 17 to the extent that it uses terms that do not apply to DACA, such as "application." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial

discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "application" to mean such a request for DACA. Federal Defendants object to the following terms and phrases in Interrogatory No. 17 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "took [USCIS] to adjudicate," "accepted," and "initial [application]." The response to Interrogatory No. 17 is based on Defendant USCIS' common usage of those terms and phrases in its DACA agency practices during the relevant time periods reflected in the response. Defendant USCIS further objects that the phrase "average number of months" is vague and undefined, and therefore ambiguous. In its response, Defendant USCIS uses a conversion of 30.4 days per month.

**RESPONSE TO INTERROGATORY NO. 17**

Subject to these objections, Federal Defendants refer to the attached chart, entitled "Interrogatory 17, Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Average Processing Time, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run. The data on "DACA Initials" includes Form I-821Ds filed by individuals who have not previously received DACA, as well as Form I-821Ds filed by prior DACA recipients whose most recent period of DACA was terminated or whose previous period of DACA expired before September 5, 2016 (effective February 14, 2018 – July 31, 2019) or more than a year before they submitted a new DACA request (effective until February 14, 2018 and again Aug 1, 2019 – present). USCIS considers DACA requests filed by individuals whose most recent period of DACA was terminated or who requested DACA after their previous period of DACA had expired as noted above as "initial" requests for required evidence, processing, and adjudication purposes.

**INTERROGATORY NO. 18**

Please identify the average number of months it took USCIS to adjudicate an accepted DACA renewal application:

   a.   For the period of July 2018 to September 2020

**OBJECTIONS TO INTERROGATORY NO. 18**

Federal Defendants specifically object to Interrogatory No. 18 to the extent that it uses terms that do not apply to DACA, such as "application." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "application" to mean such a request for DACA. Federal Defendants object to the following terms and phrases in Interrogatory No. 18 to the extent that they are vague, undefined, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meanings that do not comport with Defendant

8

USCIS' common use of the terms in its agency practices regarding DACA: "took [USCIS] to adjudicate," "accepted," and "renewal". The response to Interrogatory No. 18 is based on Defendant USCIS' common usage of those terms and phrases in its DACA business practices during the relevant time periods reflected in the response. Defendant USCIS further objects that the phrase "average number of months" is vague and undefined, and therefore ambiguous. In its response, Defendant USCIS uses a conversion of 30.4 days per month.

**RESPONSE TO INTERROGATORY NO. 18**

Subject to these objections, Federal Defendants refer to the attached chart, entitled "Interrogatory 18, Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Average Processing Time, July 1, 2018 – Sep 8, 2020. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 19**

Please identify the number of DACA applications adjudicated at each of the five service centers within the USCIS Service Center Operations Directorate (SCOPS) each year for the period of July 2018 to September 2020.

**OBJECTIONS TO INTERROGATORY NO. 19**

Federal Defendants specifically object to Interrogatory No. 19 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants object to the following term in Interrogatory No. 19 to the extent that it may be vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends it to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "adjudicated."

**RESPONSE TO INTERROGATORY NO. 19**

Subject to these objections, Federal Defendants refer to the attached chart, entitled "Interrogatory 19, Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials & Renewals, Count of Adjudications by Service Center Location & Fiscal Year, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 20**

Please identify the number of DACA initial applications USCIS has accepted and denied from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, from among that number:

    a.  the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of July 2018 to September 2020.

    b.  the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of July 2018 to September 2020.

    c.  the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

**OBJECTION TO INTERROGATORY NO. 20:**

Federal Defendants specifically object to Interrogatory No. 20 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants further object to the following terms in Interrogatory No. 20 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the term in its agency practices regarding DACA: "initial [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Federal Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Federal Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

Federal Defendants object to subparts a., b., and c., of this Interrogatory on the grounds that they are vague, overbroad, burdensome, not relevant and/or proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of Interrogatory 20 in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of the electronic and/or paper files of every denial of an initial DACA request for requestors from each Plaintiff State for the requested time period (over 850 cases), as set forth in the attached declaration. To the extent USCIS can offer any good-faith estimate, it avers that, once all of the information from each DACA denial is identified and

gathered, itself a lengthy and resource intense process, Decl. ¶¶ 7-13, individual case-by-case review of the electronic and/or paper files for approximately 2,160 denied initial and renewal DACA requests could take anywhere between approximately 720 hours and 3,240 hours to complete. Decl. ¶ 14. Case-by-case review may also require further consultation with the adjudicator who rendered the decision. Given the strong likelihood that such a search and review would carry on for no less than several months, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of conducting manual case-by-case file review.

Federal Defendants will provide a response to the main question within Interrogatory 20, the number of denials of initial DACA requests from Plaintiff States by month, but note that this information is already provided in the response to Interrogatory 15 and is therefore duplicative.

**RESPONSE TO INTERROGATORY NO. 20**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Count of Denials by Month and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run. In response to subpart c. of Interrogatory No. 20, Federal Defendants respond that based on an inquiry of relevant USCIS service centers, Federal Defendants are anecdotally aware of one initial DACA request for Plaintiff States that was denied because the requestor was the subject of an ongoing civil investigation for employment of unauthorized workers and failure to pay withholding taxes, despite the requestor meeting the DACA guidelines outlined in the bulleted points on the first page of the memorandum entitled, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

**INTERROGATORY NO. 21**

Please identify the number of DACA renewal applications USCIS has accepted and denied from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, from among that number:

a. the number of DACA applications denied at least in part because the applicant was a suspected gang member, from each Plaintiff State for each month during the period of July 2018 to September 2020.

b. the number of DACA applications denied at least in part because the applicant posed a threat to national security or public safety, from each Plaintiff State for each month during the period of July 2018 to September 2020.

c. the number of DACA applications denied after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum.

**OBJECTION TO INTERROGATORY NO. 21**

  Federal Defendants specifically object to Interrogatory No. 21 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Federal Defendants further object to the following terms in Interrogatory No. 21 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [application]," "accepted," "denied," "suspected gang member," and "posed a threat to public safety or national security." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices. Federal Defendants object that "the five criteria outlined in the 2012 DACA memo" is vague and ambiguous, and Federal Defendants do not have sufficient knowledge to know exactly which criteria Defendant-Intervenor is referencing with this phrase.

  Federal Defendants object to this Interrogatory on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

  USCIS databases do not electronically capture, in a readily retrievable, systematic manner, information regarding subparts a., b., and c., of this Interrogatory in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper files of every denial of a DACA renewal request for the requestors from each Plaintiff State (nearly 1,300 cases), as set forth in the attached declaration. To the extent USCIS can offer any good-faith estimate, it avers that, once all of the information from each DACA denial is identified and gathered, itself a lengthy and resource intense process, Decl. ¶¶ 7-13, individual case-by-case review of the electronic and/or paper files for approximately 2,160 denied initial and renewal DACA requests could take anywhere between approximately 720 hours and 3,240 hours to complete. Decl. ¶ 14. Case-by-case review may also require further consultation with the adjudicator who rendered the decision. Given the strong likelihood that such a search and review would carry on for no less than several months, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of conducting manual case-by-case file review.

Federal Defendants will provide a response to the main question within Interrogatory 21, the number of denials of DACA renewal requests from Plaintiff States by month, but note that this information is already provided in the response to Interrogatory 16 and is therefore duplicative.

**RESPONSE TO INTERROGATORY NO. 21**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Count of Denials by Month and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run. In response to subpart c. of Interrogatory No. 21, Federal Defendants respond that based on an inquiry of relevant USCIS service centers, Federal Defendants are anecdotally aware of one DACA renewal request from Plaintiff States that was denied because the requestor had an unresolved pending felony charge that would be disqualifying if convicted and would remain unresolved beyond six months, despite the requestor meeting the DACA guidelines outlined in the bulleted points on the first page of the memorandum entitled, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

**INTERROGATORY NO. 22**

Please identify the number of initial DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, from among that number:

a. the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

b. the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;

c. the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

d. the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

e. the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

f. the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

g.   the number of RFEs related to whether the applicant had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety.

**OBJECTION TO INTERROGATORY NO. 22**

Federal Defendants specifically object to Interrogatory No. 22 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Federal Defendants further object to the following terms in Interrogatory No. 22 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial [DACA applications]," "accepted," "and subsequently issued Requests for Evidence ("RFE")." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to subparts a. through g. of this Interrogatory on the grounds that they are overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not reliably electronically capture, in a readily retrievable, systematic manner, information regarding subparts a. through g. in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper copies of the Request for Evidence (RFEs) sent for every initial DACA request from each Plaintiff State (more than 850), as set forth in the attached declaration. Decl. ¶ 15. This number does not even include multiple RFEs sent for the same request, which would need to be manually reviewed as well. Given the strong likelihood that a search and review would carry on for an unknown but certainly extensive period of time beyond the limited window allowed for this discovery period, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of conducting manual case-by-case file review.

Federal Defendants will provide a response to the main question within Interrogatory 22, the number of initial DACA requests for which USCIS has accepted and subsequently issued a RFE from Plaintiff States by month.

14

**RESPONSE TO INTERROGATORY NO. 22**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Count of Requests for Evidence (RFE) by Month and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 23**

Please identify the number of renewal DACA applications USCIS has accepted and subsequently issued Requests for Evidence ("RFEs") from each Plaintiff State for each month during the period of July 2018 to September 2020, and identify, from among that number:

a. the number of RFEs related to whether the applicant was under the age of 31 as of June 15, 2012;

b. the number of RFEs related to whether the applicant came to the United States before reaching his or her 16th birthday;

c. the number of RFEs related to whether the applicant has continuously resided in the United States since June 15, 2007, up to the time of application;

d. the number of RFEs related to whether the applicant was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action;

e. the number of RFEs related to whether the applicant had no lawful status on June 15, 2012;

f. the number of RFEs related to whether the applicant was currently in school, graduated or obtained a certificate of completion from high school, obtained a general education development (GED) certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

g. the number of RFEs related to whether the applicant had not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and did not otherwise pose a threat to national security or public safety.

**OBJECTION TO INTERROGATORY NO. 23**

Federal Defendants specifically object to Interrogatory No. 23 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application," nor are requestors considered "applicants." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA and

15

"applicant" to mean a requestor of DACA. Federal Defendants further object to the following terms in Interrogatory No. 23 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "renewal [DACA applications]," "accepted," and "and subsequently issued Requests for Evidence ("RFE")." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to subparts a. through g. of this Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not reliably electronically capture, in a readily retrievable, systematic manner, information regarding subparts a. through g. in the ordinary course of business. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper copies of the Request for Evidence (RFEs) sent for every DACA renewal request from each Plaintiff State (more than 3,200), as set forth in the attached declaration. Decl. ¶ 15. This number does not even include multiple RFEs sent for the same request, which would need to be manually reviewed as well. Given the strong likelihood that a search and review would carry on for an unknown but certainly extensive period of time beyond the limited window allowed for this discovery period, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of conducting manual case-by-case file review.

Federal Defendants will provide a response to the main question within Interrogatory 23, the number of DACA renewal requests for which USCIS has accepted and subsequently issued a RFE from Plaintiff States by month.

**RESPONSE TO INTERROGATORY NO. 23**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Count of Requests for Evidence (RFE) by Month and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 24**

Please identify the number of approved, initial DACA applications submitted by individuals who indicated on their I-821D, in response to Part 3. Question 4., that their immigration status on June 15, 2012 was "Status Expired" or "Parole Expired," and who answered in the affirmative in

response to Part 3. Question 5.a. ("Were you EVER issued an Arrival-Departure Record"), for each Plaintiff State for each month during the period of July 2018 to September 2020.

**OBJECTION INTERROGATORY NO. 24**

Federal Defendants specifically object to Interrogatory No. 24 to the extent that it uses terms that do not apply to DACA, such as "applications." DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this Interrogatory only, however, Federal Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants further object to the following terms in Interrogatory No. 24 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "approved," and "initial [DACA applications]." Defendant USCIS' response is based on its common usage of such terms in its DACA agency practices.

Federal Defendants object to this Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a reliable, readily retrievable, systematic and complete manner, the responses to Part 3, Question 4 on the Form I-821D, in the ordinary course of business. USCIS databases also do not electronically capture, in a readily retrievable, systematic manner, responses to Part 3, Question 5a on the Form I-821D for DACA requests that were processed in USCIS' Computer Linked Application Information Management System (CLAIMS 3), in the ordinary course of business. CLAIMS 3 is an electronic case management system. See the publicly available Privacy Impact Assessment for CLAIMS 3 (DHS/USCIS/PIS-06(a)), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-claims3appendixaupdate-may2018.pdf. This information "is difficult to calculate" and "not easily derivable from the information kept by the Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of ELIS records, an electronic copy of the Form I-821D, or the original paper version of the Form I-821D if an electronic copy is not available, for every approved initial DACA request for each Plaintiff State (more than 1,100), as set forth in the attached declaration. Decl. ¶¶ 16-17. Given the strong likelihood that a search and review would carry on for an unknown but certainly extensive period of time beyond the limited window allowed for this discovery period, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of conducting manual case-by-case file review.

Federal Defendants will provide a partial response regarding the number of approved initial DACA requests where "Yes" was marked in Part 3, Question 5a. on the Form I-821D, for cases processed in USCIS' Electronic Immigration System (ELIS). ELIS is an online, electronic account and immigration case management system that stores information submitted or integrated into the system for the processing of specific applications, petitions, or requests. *See* the publicly available Privacy Impact Assessment for ELIS (DHS/USCIS/PIA-056 ELIS), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-elisappendixaupdate-may2018.pdf.

**RESPONSE TO INTERROGATORY NO. 24**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Count of Approved Requests with 'Yes' marked in Part 3 Question 5a 'Were you EVER issued an Arrival-Departure Record' by Month and Selected State, July 1, 2018 – Sep 8, 2020," which provides information only from ELIS. The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run.

**INTERROGATORY NO. 25**

Please identify the number of DACA recipients who adjusted their status to lawful permanent resident, for each Plaintiff State for each month during the period of July 2018 to September 2020, and identify among that number:

    a.  the number of DACA recipients who adjusted under 8 U.S.C. 1255(i)

    b.  the number of DACA recipients who adjusted under 8 U.S.C. 1255(a)

**OBJECTION TO INTERROGATORY NO. 25**

Federal Defendants object to this Interrogatory on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

USCIS databases do not electronically capture, in a readily retrievable, systematic manner, whether an individual adjusted status to lawful permanent residence under 8 U.S.C. § 1255(a) or (i) in the ordinary course of business. Although, USCIS was able to derive some of this data based on information in data systems relating to the fee paid with the adjustment application, USCIS is not able to systematically identify within the adjustment data which DACA recipients adjusted under § 1255(i) but were exempt from the $1,000 fee. This information "is difficult to calculate" and "not easily derivable from the information kept by the

Federal Defendants" because it would require USCIS to conduct a manual, case-by-case review of electronic and/or paper files for all DACA recipients who adjusted status to lawful permanent residence during the specified period for each Plaintiff State for whom USCIS could not systematically identify the basis for adjustment as § 1255(i) or another provision besides § 1255(a) (more than 6,000), as set forth in the attached declaration.

**RESPONSE TO INTERROGATORY NO. 25**

Subject to these objections, Federal Defendants refer to the attached chart entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Form I-485, Application to Register Permanent Residence or Adjust Status, Count of DACA Recipients who Adjusted Status after DACA Approval by Date of Adjustment and Selected State, July 1, 2018 – Sep 8, 2020." The data provided in response to this Interrogatory is approximate data and reflects best available information to USCIS at the time the data report was run. The data provided on 8 U.S.C. § 1255(i) adjustments omits data regarding § 1255(i) adjustment by those who were exempt from the $1,000 fee, *i.e.*, under the age of 17, because such data is not collected electronically. Accordingly, DACA recipients who adjusted under § 1255(i) but who were exempt from the $1,000 fee may be counted in the § 1255(a) data. Deriving the remaining data on § 1255(i) adjustment by those who were exempt from the $1,000 fee would require a burdensome case-by-case review as described in Federal Defendants' objection to this interrogatory.

## VERIFICATION OF ANSWERS TO INTERROGATORIES

I am Larry DeNayer, Acting Deputy Director for Operations of USCIS. I believe, based on inquiry, that the foregoing USCIS answers are true and correct to the best of my knowledge, information and belief.

I verify, under penalty of perjury, that the foregoing is true and correct.

Executed September 30, 2020.

_____ (signature)
Larry DeNayer
Acting Deputy Director for Operations
U.S. Citizenship and Immigration Services
Department of Homeland Security

20

## SPECIFIC OBJECTIONS AND RESPONSES TO DEFENDANT-INTERVENORS' FIFTH AND SIXTH SET OF REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 11**:

Produce all documents relating to guidelines followed by DHS, and any of its subsidiary agencies, departments, agents, and employees, from July 2018 to September 2020, to evaluate, process, and adjudicate Deferred Action for Childhood Arrivals ("DACA") applications, including, but not limited to: (1) internal agency documents, memoranda, and communications that set forth any guidance, rules, or procedures that agents and employees follow when they evaluate, process, and adjudicate DACA applications; (2) training materials provided to agents or employees related to DACA evaluations and adjudications; and (3) changes in any guidance, rules, or procedures that agents and employees follow when they evaluate, process, and adjudicate DACA applications.

**OBJECTION TO REQUEST FOR PRODUCTION NO. 11:**

Federal Defendants specifically object to Request for Production (RFP) No. 11 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Federal Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants further object to the following terms in RFP No. 11 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "relating to guidelines," "to evaluate, process and adjudicate," "guidance, rules or procedures," "training materials," and "changes in any guidance, rules, or procedures." Federal Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Federal Defendants object to RFP No. 11 to the extent that the request is beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Due to the breadth of RFP No. 11, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails "relating to" guidelines followed by DHS to evaluate, process, and adjudicate DACA requests that would not be overly broad and result in hundreds of thousands of materials to be reviewed for responsiveness and

privileges. It is additionally unduly burdensome for Federal Defendants to collect potentially responsive documents from potential custodians who are no longer employed by Federal Defendant agencies and to review and produce such documents. See attached Declaration. Federal Defendants specifically object to having to conduct a search for and log the emails and other records of DHS and other DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form.

USCIS is prepared to provide readily available, final versions of non-case specific responsive documents containing guidelines followed to evaluate, process, and adjudicate DACA requests, that were in existence and in use at any time between July 2018 and approximately September 11, 2020, that are not duplicative of documents or information previously produced in discovery in this matter or previously referenced in Federal Defendants' written discovery responses, and that are maintained by key custodians who are currently employed by USCIS. However, it would be unduly burdensome for USCIS to conduct a comprehensive search for all emails and other documents "relating to guidelines followed by DHS . . . to evaluate, process, and adjudicate" DACA requests for all potential custodians, or to conduct a comprehensive search for records that were maintained by former USCIS employees. Such a time- and resource-consuming search would clearly exceed the limited scope of the 40-day discovery period permitted by the Court.

For this response, USCIS conducted an inquiry of more than 20 potential custodians who were most likely to have responsive documents and requested that they search for and provide documents that they determined to be responsive to this Request. In addition, USCIS conducted electronic key word searches of the records of several individuals who are current USCIS employees and who are or were in senior leadership positions at USCIS for the July 2018-September 2020 time period. Of the 9,520 documents already collected, USCIS was able to review just 942 documents in the time permitted to collect and review documents for this production, most of which are comprised of documents from the custodians who conducted their own record searches and not from the second group for whom the electronic key word searches were performed. There remain a number of documents from the initial custodian group that were not reviewed, as well as the majority of the documents collected from the senior leadership custodians.

USCIS avers that there are likely additional documents responsive to RFP No. 11 from the initial custodians who provided documents based on their own assessment of responsiveness, from additional likely custodians who were not yet approached, and from the custodians whose records were collected using keyword searches. Based on an average review time of 35 documents per hour derived from past document review projects of a similar nature, the remaining 8,578 documents alone would require approximately 12 more weeks to review for responsiveness and privileges. Due to multiple unknown variables involved, USCIS is unable to provide a reliable estimate of the number of hours it would take to conduct a comprehensive search and collection of potentially responsive email records of all potential custodians who are current and former USCIS employees. See Decl. ¶¶ 21-32. Given the strong likelihood that such

a search and review would carry on for no less than several months, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of searching for or production of any additional documents beyond those provided with this response.

DHS headquarters also conducted an inquiry of potential custodians, which did not yield any responsive documents that are not already included in the Wolf Memo Administrative Record or privilege log. A more formalized search and collection of likely DHS custodians through the development of search terms, followed by a review for responsiveness and privileges, would present many of the same burdens on time and resources outlined in the USCIS declaration. Furthermore, where DHS recently compiled the administrative record for the Wolf Memo for separate litigation, it is unlikely that a search here of documents related to DACA would produce different results. Lastly, given the strong likelihood that a search and review would carry on for an unknown but certainly extensive period of time beyond the limited window allowed for this discovery period, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of searching for or production of any additional documents beyond those provided with this response.

ICE specifically objects to being required to search for and/or produce documents responsive to Request No. 11 for the period of time from July 2018 through September 2020. ICE previously contacted several individuals then-currently employed by ICE and determined that they had no documents responsive to Defendant-Intervenors' Request No. 5, which sought identical information as Request No. 11 for the time period of June 2012 to June 2018. To the extent that responsive documents might exist, they would be among the emails of former ICE employees. ICE objects to being required to conduct an electronic search of such emails for the period of July 2018 through September 2020 on the grounds that such a requirement would be overbroad, burdensome, and not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). It is unclear what search terms could be used to locate responsive emails, especially because it is unknown whether any responsive emails were ever created, transmitted, and/or retained.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11**

Subject to these objections and subsequent to the internal document collection and review of as many of these collected documents as time permitted for responsiveness and privileges, Federal Defendants provide Production Volume 1 as responsive to this Request.

In addition, Federal Defendants respectfully refer Defendant-Intervenors to the attached July 28, 2020 Wolf Memo, which contains the only changes to the core DACA policy between

July 2018 and September 2020,[1] as well as to Production Volume 2, containing the administrative record developed for the creation of the Wolf Memo, and, as a courtesy and in the interest of resolving Defendant-Intervenors' discovery requests, the privilege log for the Wolf Memo that was recently filed in *Batalla Vidal v. Wolf*, Civ. No. 16-cv-4756 (E.D. NY).[2]

**REQUEST FOR PRODUCTION NO. 12**:

Produce all documents relating to the process by which DHS, and any of its subsidiary agencies, departments, agents, and employees, from July 2018 to September 2020, evaluates, processes, and adjudicates DACA applications, including but not limited to: (1) under what circumstances a DACA application is rejected, denied, or approved; (2) the number and location of agents and employees whose work relates to the evaluation and adjudication of DACA applications; (3) the procedure(s) employed by agents and employees who work in the evaluation and adjudication of DACA applications; and (4) changes in the process for evaluating, processing, and adjudicating DACA applications.

**OBJECTION TO REQUEST NO. 12:**

Defendants specifically object to Request for Production (RFP) No. 12 to the extent that it uses terms that do not apply to DACA, such as "applications." DACA may be requested by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA. Federal Defendants object to RFP No. 12 to the extent that the request seeks documents that are beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Defendants further object to the following terms in RFP No. 12 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "relating to the

---

[1] The August 21, 2020 memo from Joseph Edlow, USCIS Deputy Director for Policy, includes guidance to USCIS officers on implementing the Wolf Memo, but does not itself change DACA policy. The Edlow Memo is available at

https://www.uscis.gov/sites/default/files/document/policy-alerts/dacamemo.pdf

[2] Federal defendants do not concede that a privilege log is necessary in filing an administrative record. *Oceana, Inc. v. Locke*, 634 F. Supp. 2d 49, 52–53 (D.D.C. 2009), *rev'd*, 670 F.3d 1238 (D.C. Cir. 2011) ("Deliberative documents are excluded from the record because, when a party challenges agency action as arbitrary and capricious, the reasonableness of the agency's action 'is judged in accordance with its stated reasons.'") (citing *In re Subpoena Duces Tecum Serviced on Office of Comptroller of Currency*, 156 F.3d 1279, 1279 (D.C. Cir. 1998)); *see Exxon Mobil Corp. v. Mnuchin*, No. 3:17-CV-1930-B, 2018 WL 10396585, at *3 (N.D. Tex. June 26, 2018), *objections overruled*, No. 3:17-CV-1930-B, 2018 WL 4103724 (N.D. Tex. Aug. 29, 2018) ("the Court has found no Fifth Circuit authority" that requires a privilege log with an administrative record).

24

process by which … evaluates, processes, adjudicates DACA [applications]," "rejected, denied, or approved," "evaluation and adjudication," and "changes in the process for evaluating, processing, and adjudicating DACA applications." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Defendants also object to RFP 12 to the extent that it is unclear what documents Defendant-Intervenor seeks that are different from documents sought in RFP 11, and to the extent that RFPs object to, or that RFP 12 seeks documents that are duplicative of those sought in RFP 11. Such apparently duplicative and overlapping requests are overly burdensome and confusing for Defendants to interpret and understand how to respond. Defendants further object that the use of the word "and" in "who work in the evaluation and adjudication of DACA applications" is ambiguous and creates confusion. Defendants do not know whether each such employee noted must do *both* actions, "evaluation *and* adjudication," or whether each employee must be involved at least in either "evaluation" or "adjudication" of DACA requests.

Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Due to the breadth of RFP No. 12, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents and emails "relating to" guidelines followed by DHS to evaluate, process, and adjudicate DACA requests that would not be overly broad and result in hundreds of thousands of materials to be reviewed for responsiveness and privileges. It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. Federal Defendants specifically objects to having to conduct a search for and log the emails and other records of DHS and other DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form. Federal Defendants further object to subparts (1), (3) and (4), to the extent they are duplicative of RFP No. 11.

USCIS is prepared to provide readily available, final versions of non-case specific responsive documents describing the process by which DHS evaluates, processes, and adjudicates DACA requests, that were in existence and in use at any time between July 2018 and approximately September 11, 2020, that are not duplicative of documents or information previously produced in discovery in this matter or previously referenced in Federal Defendants' written discovery responses, and that are maintained by key custodians who are currently employed by a Federal Defendant agency. However, it would be unduly burdensome for USCIS to conduct a comprehensive search for all emails and other documents "relating to the process by

which DHS . . . evaluates, processes, and adjudicates DACA" requests for all potential custodians, or to conduct a comprehensive search for records that were maintained by former USCIS employees. Such a time- and resource-consuming search would clearly exceed the limited scope of the 40-day discovery period permitted by the Court.

For this response, USCIS conducted an inquiry of more than 20 potential custodians who were most likely to have responsive documents and requested that they search for and provide documents that they determined to be responsive to this Request. In addition, USCIS conducted electronic key word searches of the records of several individuals who are current USCIS employees and who are or were in senior leadership positions at USCIS for the July 2018-September 2020 time period. Of the 9,520 documents already collected, USCIS was able to review just 942 documents in the time permitted to collect and review documents for this production, most of which are comprised of documents from the custodians who conducted their own record searches and not from the second group for whom the electronic key word searches were performed. There remain a number of documents from the initial custodian group that were not reviewed, as well as the majority of the documents collected from the senior leadership custodians.

USCIS avers that there are likely additional documents responsive to RFP No. 12 from the initial custodians who provided documents based on their own assessment of responsiveness from additional likely custodians who were not yet approached, and from the custodians whose records were collected using keyword searches. Based on an average review time of 35 documents per hour derived from past document review projects of a similar nature, the remaining 8,578 documents alone would require approximately 12 more weeks to review for responsiveness and privileges. Due to multiple unknown variables involved, USCIS is unable to provide a reliable estimate of the number of hours it would take to conduct a comprehensive search and collection of potentially responsive email records of all potential custodians who are current and former USCIS employees. *See* Decl. ¶¶ 21-32. Given the strong likelihood that such a search and review would carry on for no less than several months, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of searching for or production of any additional documents beyond those provided with this response.

DHS headquarters also conducted an inquiry of potential custodians, which did not yield any responsive documents that are not already included in the Wolf Memo Administrative Record or privilege log. A more formalized search and collection of likely DHS custodians through the development of search terms, followed by a review for responsiveness and privileges, would present many of the same burdens on time and resources outlined in the USCIS declaration. Furthermore, where DHS recently compiled the administrative record for the Wolf Memo for separate litigation, it is unlikely that a search here of documents related to DACA would produce different results. Lastly, given the strong likelihood that a search and review would carry on for an unknown but certainly extensive period of time beyond the limited window allowed for this discovery period, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of

26

searching for or production of any additional documents beyond those provided with this response.

ICE specifically objects to being required to search for and/or produce documents responsive to Request No. 12 for the period of time from July 2018 through September 2020. ICE previously contacted several individuals then-currently employed by ICE and determined that they had no documents responsive to Defendant-Intervenors' Request No. 6, which sought identical information as Request No. 12 for the time period of June 2012 to June 2018. To the extent that responsive documents might exist, they would be among the emails of former ICE employees. ICE objects to being required to conduct an electronic search of such emails for the period of July 2018 through September 2020 on the grounds that such a requirement would be overbroad, burdensome, and not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). It is unclear what search terms could be used to locate responsive emails, especially because it is unknown whether any responsive emails were ever created, transmitted, and/or retained.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12**

Subject to these objections and subsequent to the internal document collection and review of as many of these collected documents as time permitted for responsiveness and privileges, Federal Defendants provide Production Volume 1 as responsive to this Request.

In addition, Federal Defendants respectfully refer Defendant-Intervenors to the attached July 28, 2020 Wolf Memo, which contains the only change to DACA policy between July 2018 and September 2020, as well as to Production Volume 2, containing the administrative record developed for the creation of the Wolf Memo, and, as a courtesy and in the interest of resolving Defendant-Intervenors' discovery requests, the privilege log for the Wolf Memo that was recently filed in *Batalla Vidal v. Wolf*, Civ. No. 16-cv-4756 (E.D. NY).

In addition, USCIS respectfully refers Defendant-Intervenors to the following pages of the USCIS website:

- "Notice to Appear Policy Memorandum"
  https://www.uscis.gov/laws-and-policy/other-resources/notice-to-appear-policy-memorandum
- USCIS Policy Memorandum, PM-602-0161, *Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) When Processing a Case Involving Information Submitted by a Deferred Action for Childhood Arrivals (DACA) Requestor in Connection With a DACA Request or a DACA-Related Benefit Request (Past or Pending) or Pursuing Termination of DACA* (June 28, 2018)
  https://www.uscis.gov/sites/default/files/document/memos/2018-06-28-PM-602-0161-DACA-Notice-to-Appear.pdf
- USCIS Policy Memorandum, PM-602-0163, *Issuance of Certain RFEs and NOIDs; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.5(a), Chapter 10.5(b)* (July 13, 2018)
  https://www.uscis.gov/sites/default/files/document/memos/AFM_10_Standards_for_RFEs_and_NOIDs_FINAL2.pdf

- "USCIS response to COVID-19"
  - Deadlines for Certain Requests, Notices and Appeals
  - Application Support Center (ASC) Appointments and Rescheduling
    https://www.uscis.gov/about-us/uscis-response-to-covid-19
- "USCIS Extends Flexibility for Responding to Agency Requests" (July 1, 2020)
  https://www.uscis.gov/news/alerts/uscis-extends-flexibility-for-responding-to-agency-requests-0
- "USCIS Extends Flexibility for Responding to Agency Requests" (September 11, 2020)

  https://www.uscis.gov/news/alerts/uscis-extends-flexibility-for-responding-to-agency-requests-1
- "USCIS to Continue Processing Applications for Employment Authorization Extension Requests Despite Application Support Center Closures"
  https://www.uscis.gov/news/alerts/uscis-to-continue-processing-applications-for-employment-authorization-extension-requests-despite

**REQUEST FOR PRODUCTION NO. 13:**

Produce documents showing the number of DACA applications received, rejected, denied, and approved, from July 2018 to September 2020, including but not limited to: (1) the number of initial DACA applications received, rejected, denied, and approved by each Plaintiff state, for each month during the period July 2018 to September 2020; (2) the number of renewal DACA applications received, rejected, denied, and approved by each Plaintiff state, for each month during the period of July 2018 to September 2020; and (3) the number of DACA applications accepted but denied, during the period of July 2018 to September 2020, after the adjudicator determined the applicant met the five criteria in the June 15, 2012 DACA memorandum but was otherwise not a qualifying applicant, including because the applicant posed a threat to national security or public safety, by each Plaintiff state, for each month.

**OBJECTION TO REQUEST NO. 13:**

Defendants specifically object to Request for Production (RFP) No. 13 to the extent that it uses terms that do not apply to DACA, such as "applications" and "applicant." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA and "applicant" to mean a requestor of DACA. Defendants further object to the following terms in RFP No. 13 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial DACA [applications]," "renewal DACA [applications]," "received," "rejected," "denied," and "approved." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices. Defendant also objects that the phrase "met the five criteria in the June 15, 2012 DACA memorandum," is ambiguous, and Defendant is without sufficient knowledge to know exactly which "five criteria" Defendant-Intervenor is referencing with this phrase. The reference to the "June 15, 2012 DACA

28

memorandum" lacks specificity, and thus is ambiguous, but Defendants will interpret it to mean the memorandum entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* from former Secretary of Homeland Security, Janet Napolitano, dated June 15, 2012.

Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or compel the production of documents in their native form. Federal Defendants further object to this Request to the extent it seeks statistics that are duplicative of information that is being provided in response to the Interrogatories.

Due to the breadth of RFP No. 13, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and, given the time frame for the requests and the number of potential custodians, result in potentially thousands of documents to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of the email and other electronic records of all potential custodians and to review all of the resulting documents. Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms. It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendant-Intervenors to the responses to Interrogatories and the following pages of the USCIS website:

- DACA Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data
- USCIS Electronic Reading Room, which includes responses to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable: https://www.uscis.gov/about-us/electronic-reading-room

**REQUEST FOR PRODUCTION NO. 14:**

Produce all documents relating to process by which DHS, and any of its subsidiary agencies, departments, agents, and employees, from July 2018 to September 2020, evaluates and adjudicates applications or requests for deferred action other than DACA, including but not

limited to: (1) under what circumstances an application or request is rejected, denied, or accepted; (2) the number and location of agents and employees whose work relates to the evaluation and adjudication of deferred action applications or requests; (3) and the procedure(s) employed by agents and employees who work in the evaluation and adjudication of deferred action applications or requests; and (4) any changes in the process by which DHS evaluates and adjudicates applications or requests for deferred action other than DACA since January 20, 2017.

**OBJECTION TO REQUEST FOR PRODUCTION NO. 14:**

Defendants specifically object to Request for Production (RFP) No. 14 to the extent that it uses terms that do not apply to DACA or to deferred action generally, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. Non-DACA deferred action is also made by written request, not an application, to DHS. As such, neither DACA, nor non-DACA deferred action is obtained through an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications…for deferred action other than DACA" to mean written requests for non-DACA deferred action. Defendants further object to the following terms in RFP No. 14 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendants common use of the terms in its agency practices regarding deferred action: "evaluates," "adjudicates," "rejected,", "denied," "accepted," "evaluation and adjudication of deferred action applications or requests," "procedures(s) employed by…who work in the evaluation and adjudication of deferred action," and "any changes in the process by which DHS evaluates and adjudicates applications or requests for deferred action other than DACA since January 20, 2017." Defendants' response is based on Defendants' common usage of such terms in its agency practices. Federal Defendants object to RFP No. 14 to the extent that the request is beyond the scope of the claims in this case or they are not relevant to any party's claim or defense and not likely to lead to the discovery of relevant information.

Federal Defendants further object to this Request on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case and is outside the scope of the relief sought in this action. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Due to the breadth of RFP No. 14, including the time frame for the request, and the number of potential custodians, it would be unduly burdensome and not proportional to the needs of this case for Federal Defendants to conduct broad keyword searches of the email and other electronic records of all potential custodians and to review all of the resulting documents. It is additionally unduly burdensome for Federal Defendants to collect potentially responsive documents from potential custodians who are no longer employed by Federal Defendant agencies, and to review and produce such documents. See attached declaration. Federal

Defendants specifically object to having to conduct a search for and log the emails and other records of DHS or DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or to compel the production of documents in their native form. Federal Defendants further object to this Request to the extent that it seeks every deferred action request that was ever denied.

Federal Defendants are prepared to provide readily available, final versions of non-case specific documents regarding the process by which Federal Defendants evaluate, process, and adjudicate requests for deferred action other than DACA, that were in existence and in use at any time between July 2018 and approximately September 11, 2020, that are not duplicative of documents or information previously produced in discovery in this matter or previously referenced in Federal Defendants' written discovery responses, and that are maintained by key custodians who are currently employed by a Federal Defendant agency. However, it would be unduly burdensome to conduct a comprehensive search for all emails and other documents "relating to [the] process by which DHS . . . evaluates and adjudicates" non-DACA deferred action requests for all potential custodians, or to conduct a comprehensive search for records that were maintained by former USCIS employees.

For this response, USCIS conducted an inquiry of more than 20 potential custodians who were most likely to have responsive documents and requested that they search for and provide documents that they determined to be responsive to this Request. In addition, USCIS conducted electronic key word searches of the records of several individuals who are current USCIS employees and who are or were in senior leadership positions at USCIS for the July 2018-September 2020 time period. Of the 9,520 documents already collected, USCIS was able to review just 942 documents in the time permitted to collect and review documents for this production, most of which are comprised of documents from the custodians who conducted their own record searches and not from the second group for whom the electronic key word searches were performed. There remain a number of documents from the initial custodian group that were not reviewed, as well as the majority of the documents collected from the senior leadership custodians.

USCIS avers that there are likely additional documents responsive to RFP No. 14 from the initial custodians who provided documents based on their own assessment of responsiveness, from additional likely custodians who were not yet approached, and from the custodians whose records were collected using keyword searches. Based on an average review time of 35 documents per hour derived from past document review projects of a similar nature, the remaining 8,578 documents alone would require approximately 12 more weeks to review for responsiveness and privileges. Due to multiple unknown variables involved, USCIS is unable to provide a reliable estimate of the number of hours it would take to conduct a comprehensive search and collection of potentially responsive email records of all potential custodians who are current and former USCIS employees. *See* Decl. ¶¶ 21-32. Given the strong likelihood that such a search and review would carry on for no less than several months, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is

not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of searching for or production of any additional documents beyond those provided with this response.

DHS headquarters also conducted an inquiry of potential custodians, which did not yield any responsive documents that are not already included in the Wolf Memo Administrative Record or privilege log. A more formalized search and collection of likely DHS custodians through the development of search terms, followed by a review for responsiveness and privileges, would present many of the same burdens on time and resources outlined in the USCIS declaration. Furthermore, given the strong likelihood that a search and review would carry on for an unknown but certainly extensive period of time beyond the limited window allowed for this discovery period, and given that this request is beyond the scope of the claims in this case, is not relevant to any party's claim or defense, and is not likely to lead to the discovery of relevant information, Federal Defendants object to the additional burden of searching for or production of any additional documents beyond those provided with this response.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14**

Subject to these objections and subsequent to the internal document collection and review of as many of these collected documents as time permitted for responsiveness and privileges, Federal Defendants provide Production Volume 1 as responsive to this Request.

In addition, Federal Defendants refer to the publicly-available news alert, https://www.uscis.gov/news/alerts/uscis-re-opens-previously-pending-deferral-requests, which reflect a temporary change to non-DACA deferred action policy in August 2019, and the reversal of that policy in September 2019.

**REQUEST FOR PRODUCTION NO. 15:**

Produce all documents relating to the number of DACA applications received, rejected, denied, and approved at each of the five USCIS Service Centers, from July 2018 to September 2020, including but not limited to: (1) the number of initial DACA applications received, rejected, denied, and approved from each Plaintiff state, every month, during the period of July 2018 to September 2020; and (2) the number of renewal DACA applications received, rejected, denied, and approved from each Plaintiff state, every month, during the period of July 2018 to September 2020.

**OBJECTION TO REQUEST NO. 15:**

Defendants specifically object to Request for Production (RFP) No. 15 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants further object to the following terms in RFP No. 15 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with

Defendant USCIS' common use of the terms in its agency practices regarding DACA: "initial DACA [applications]," "renewal DACA [applications]," "received," "rejected," "denied," and "approved." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices.

Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp*., Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former USCIS employees, or to compel the production of documents in their native form. Federal Defendants further object to this RFP to the extent it seeks statistics that are duplicative of information that is being provided in response to the Interrogatories. Federal Defendants also object to this RFP as vague and ambiguous as to the time period for which it requests documents.

Due to the breadth of RFP No. 15, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and, given the ambiguous time frame for the requests and the number of potential custodians, result in potentially thousands of documents to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians and to review all of the resulting documents. Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms. It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

USCIS respectfully refers Defendants-Intervenors to the pages of the USCIS website:

- DACA Quarterly Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals
- Other DACA Statistics: https://www.uscis.gov/tools/reports-studies/immigration-forms-data
- USCIS Electronic Reading Room, which includes responses to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable: https://www.uscis.gov/about-us/electronic-reading-room

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Subject to the above-raised objections, Federal Defendants have identified data that is responsive to this request and Federal Defendants refer to the attached charts – created to respond to this request – entitled, "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Initials, Count of Accepted Filings, Rejections, Approvals, and Denials by Month, Selected State, and USCIS Service Center, July 1, 2018 – Sep 8, 2020," and "Form I-821D, Consideration of Deferred Action for Childhood Arrivals, DACA Renewals, Count of Accepted Filings, Rejections, Approvals, and Denials by Month, Selected State, and USCIS Service Center, July 1, 2018 – Sep 8, 2020."

**REQUEST FOR PRODUCTION NO. 16:**

Produce all documents relating to the USCIS processing time of accepted and approved DACA applications, July 2018 to September 2020, including but not limited to: (1) the amount of time that elapses between the date USCIS accepts an application and the time the application is approved; (2) the amount of time that elapses between the date USCIS approves an application and an applicant receives an employment authorization document; and (3) any changes in the processing time described above since January 20, 2017.

**OBJECTION TO REQUEST FOR PRODUCTION NO. 16:**

Defendants specifically object to Request for Production (RFP) No. 16 to the extent that it uses terms that do not apply to DACA, such as "applications." A request for DACA may be submitted by certain individuals brought to the United States as children who seek DHS' prosecutorial discretion not to subject them to removal action for a specified period from approval of the request. As such, it is not an immigration benefit "application." For purposes of responding to this RFP only, however, Defendants will interpret "applications" to mean such requests for DACA. Defendants further object to the following terms in RFP No. 16 to the extent that they are vague, undefined by Defendant-Intervenor, and therefore ambiguous, and to the extent that Defendant-Intervenor intends them to have meaning that does not comport with Defendant USCIS' common use of the terms in its agency practices regarding DACA: "processing time," "accepted," "approved," and "any changes in the processing time described above since January 20, 2017." Defendants' response is based on Defendant USCIS' common usage of such terms in its DACA agency practices Defendants also object that "amount of time that elapses" is vague and undefined, and therefore ambiguous.

Federal Defendants further object to this Request on the grounds that it is overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments to is being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are

former USCIS employees, or to compel the production of documents in their native form. Federal Defendants further object to the extent this Request seeks documents duplicative of information provided in response to the Interrogatories. Federal Defendants also object to the Request as vague and ambiguous as to the time period for which it requests documents.

Due to the breadth of RFP No. 16, Federal Defendants are unable to identify search terms sufficiently tailored to capture all responsive documents that would not be overly broad and, given the ambiguous time frame for the requests and the number of potential custodians, result in potentially thousands of documents to be reviewed for responsiveness and privileges. It would be unduly burdensome and not proportional to the needs of this case for USCIS to conduct broad keyword searches of email and other electronic records of all potential custodians and to review all of the resulting documents. Using search terms would also necessarily run the risk of excluding responsive documents that do not happen to contain the search terms. It is additionally unduly burdensome for USCIS to collect potentially responsive documents from potential custodians who are no longer employed by USCIS and to review and produce such documents. See attached declaration. USCIS specifically objects to having to conduct a search for and log the emails and other records of DHS and DHS component counsel for documents responsive to this Request, as such documents contain advice and other information that is privileged.

In lieu of providing responsive documents, USCIS respectfully refers Defendants-Intervenors to its responses to the Interrogatories and publicly available documents on the following pages of the USCIS website:

- Website for checking current case processing times:
  https://egov.uscis.gov/processing-times/
- USCIS Electronic Reading Room, which includes responses to Congressional inquiries, among other documents, that contain statistics and other information that may pertain to this RFP and is electronically searchable:
  https://www.uscis.gov/about-us/electronic-reading-room

**REQUEST FOR PRODUCTION NO. 17:**

Produce all documents, including, without limitation, all memoranda or opinions, from the Office of Legal Counsel relating to DACA, the Wolf Memo, or the Edlow Memo.

**OBJECTION TO REQUEST FOR PRODUCTION NO. 17:**

Federal Defendants object to Request for Production (RFP) No. 17 on the grounds that it is vague, overbroad, burdensome, not relevant and proportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."); *see, e.g., Medicinova, Inc. v. Genzyme Corp.*, Case No. 14-cv-2513-L(KSC), 2017 WL 2829691, *5 (S.D. Cal. June 29, 2017) ("The intent of the recent amendments is to being about a change in the legal culture that embraces the leave no stone unturned . . . approach to discovery") (citation omitted).

Federal Defendants also object that the terms "Wolf Memo" and "Edlow Memo" are ambiguous, and Federal Defendant are without sufficient knowledge to know exactly which memoranda Defendant-Intervenors are referencing with these terms. Defendants will interpret "Wolf Memo" to mean the memorandum entitled *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* from Acting Secretary of Homeland Security, Chad Wolf, dated July 28, 2020, and will interpret "Edlow Memo" to mean the memorandum entitled *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children'"* from USCIS Deputy Director for Policy, Joseph Edlow, dated August 21, 2020.

Due to the breadth of RFP No. 17, including the ambiguous timeframe for the request, and the number of potential custodians, it would be unduly burdensome and not proportional to the needs of this case for Federal Defendants to conduct broad keyword searches of the email and other electronic records of all potential custodians and to review all of the resulting documents. It is additionally unduly burdensome for Federal Defendants to collect potentially responsive documents from potential custodians who are no longer employed by a Federal Defendant agency and to review and produce such documents. *See* attached declaration. Federal Defendants are also confident that responsive, non-public documents originating from the Office of Legal Counsel, if any, will contain advice and other information that is privileged. Federal Defendants therefore specifically object to having to conduct such a broad search for and log the emails and other records of DHS and other DHS component counsel for documents responsive to this Request.

DHS headquarters conducted an inquiry of potential custodians, which did not yield any responsive documents that are not already included in the Wolf Memo Administrative Record or privilege log. A more formalized search and collection of likely DHS custodians through the development of search terms, followed by a review for responsiveness and privileges, would present many of the same burdens on time and resources outlined in the USCIS declaration. Furthermore, given the strong likelihood that a search and review would carry on for an unknown but certainly extensive period of time beyond the limited window allowed for this discovery period, and given that this request is not likely to lead to the discovery of responsive information, Federal Defendants object to the additional burden of searching for or production of any additional documents beyond those provided with this response.

Federal Defendants object to this Request to the extent that it seeks to compel them to search for non-final, draft documents, to search for documents maintained by custodians who are former Federal Defendant agency employees, or compel the production of documents in their native form. Federal Defendants also object to this RFP as vague and ambiguous as to the time period for which it requests documents.

To the extent any exist, Federal Defendants are prepared to provide readily available, final versions of non-case specific responsive documents from the Department of Justice Office of Legal Counsel, relating to DACA, Acting Secretary Wolf's July 28, 2020 memorandum, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*," or the

August 21, 2020 USCIS memorandum, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,'"* that are not duplicative of documents or information previously produced in discovery in this matter or previously referenced in Federal Defendants' written discovery responses, and that are maintained by key custodians who are currently employed by a Federal Defendant agency. However, it would be unduly burdensome for Federal Defendants to conduct a comprehensive search for all documents "from the Office of Legal Counsel relating to DACA, the Wolf Memo, or the Edlow Memo" for all potential custodians, or to conduct a comprehensive search for records that were maintained by former Federal Defendant agencies' employees.

Federal Defendants respectfully direct Defendant-Intervenors to the Office of Legal Counsel's website to retrieve that Office's only public, non-privileged document regarding DACA:

- *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others,* 38 Op O.L.C. _ (Nov. 19, 2014),[3] available at https://www.justice.gov/olc/file/1315981/download.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 5:**

Federal Defendants admit that DHS is implementing DACA subject to the guidance in the Wolf Memo and Edlow Memo.

**RESPONSE:**

Federal Defendants admit that USCIS is implementing the DACA policy according to the guidance in Acting Secretary Wolf's July 28, 2020 memorandum, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* and the August 21, 2020 USCIS memorandum, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.'"*

**REQUEST FOR ADMISSION NO. 6:**

Admit that DHS is rejecting all initial DACA requests and associated applications for Employment Authorization Documents.

---

[3] Federal Defendants note that this opinion was withdrawn by Attorney General William Barr. *See* Letter for Chad F. Wolf, Acting Secretary of Homeland Security, from William P. Barr, Attorney General (June 30, 2020), available at: https://www.dhs.gov/sites/default/files/publications/20_0630_doj_aj_barr-letter-as-wolf-daca.pdf.

**RESPONSE:**

Federal Defendants admit only that USCIS is rejecting initial DACA requests and associated applications for Employment Authorization Documents from individuals who have not previously received DACA. Federal Defendants aver that USCIS is accepting "initial" DACA requests from individuals who previously received DACA, such as individuals who request DACA more than a year after their previous period of DACA expired or whose previous period of DACA was terminated at any time.

**REQUEST FOR ADMISSION NO. 7:**

Federal Defendants admit that DHS is limiting the period of any deferred action granted pursuant to the DACA initiative to one year.

**RESPONSE:**

Federal Defendants admit only that all requests for DACA granted after July 28, 2020 are for a validity period of no more than one year.

**REQUEST FOR ADMISSION NO. 8:**

Federal Defendants admit that DHS is rejecting all pending and future Form I-131 applications for advance parole from beneficiaries of the DACA initiative, absent exceptional circumstances.

**RESPONSE:**

Federal Defendants deny Request for Admission No. 8. Federal Defendants aver that USCIS is rejecting Form I-131 applications for advance parole submitted by DACA recipients at the DACA-specific filing location and placed on hold that were postmarked before August 24, 2020 and administratively closing pending Form I-131 applications for advance parole filed by DACA recipients at non-DACA specific filing locations prior to August 24, 2020. All associated fees in these cases are being refunded. DACA recipients whose Form I-131 applications are rejected as noted above may refile their Form I-131 applications consistent with the new guidance.

Federal Defendants aver that USCIS accepts and considers all Form I-131 applications received at the DACA-specific direct filing address on or after August 24, 2020 as an application for advance parole based on the new guidance, if properly completed, and processes the required fee. If, in the exercise of discretion, USCIS determines that the DACA recipient does not warrant advance parole under the July 28, 2020 Wolf Memo or the August 21, 2020 Edlow Memo, USCIS will deny the Form I-131 without refunding the processing fees. Defendants further aver that Form I-131 applications for advance parole filed by a DACA recipient that are associated with a separate underlying immigration benefit continue to be adjudicated under existing guidance for those requests, and not under the July 28, 2020 Wolf Memo or the August 21, 2020 Edlow Memo.

**REQUEST FOR ADMISSION NO. 9:**

Federal Defendants admit that the Wolf Memo and Edlow Memo reflect the exercise of discretion by the Department of Homeland Security, as contemplated by the Supreme Court's decision in *Department of Homeland Security (DHS), et al. v. Regents of the University of California, et al.,* ___ U.S. ___ (2020), regarding appropriate steps in light of legal deficiencies identified by former Attorney General Sessions in the Sessions Letter.

**RESPONSE:**

Federal Defendants deny.

Dated: September 30, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section

/s/ *Jeffrey S. Robins*
JEFFREY S. ROBINS
Attorney-in-Charge
Assistant Director
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Washington, DC 20044
Telephone: (202) 616-1246
Facsimile: (202) 305-7000
jeffrey.robins@usdoj.gov

JAMES J. WALKER
Trial Attorney
Office of Immigration Litigation
District Court Section

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KIRSTJEN M. NIELSEN, *et al.*,<br><br>Defendants,<br><br>*and*<br><br>KARLA PEREZ, *et al.*,<br><br>Defendant-Intervenors. | Case No. 18-cv-00068 |

## DECLARATION OF LARRY DENAYER

I, Larry DeNayer, hereby make the following declaration with respect to the above captioned matter.

1. I am employed by the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), as the Acting Deputy Director for Operations. I have served in this role since March 9, 2020.  As the Acting Deputy Director for Operations, I am responsible for the Management Directorate functions of USCIS and investigations, equal opportunity and inclusion, and privacy.   In fulfilling my responsibilities and the mission of USCIS, I also work and coordinate closely with other USCIS directorates and program offices including the Service Center Operations Directorate and the Immigration Records and Identity Services Directorate.  Prior to this role, I served as the Associate Director of the

1

Management Directorate since February 2, 2020 and before that as the Deputy Associate

Director of the Management Directorate since September 29, 2019.  As the Associate

Director of the Management Directorate, I was responsible for delivering key management

and enterprise services such as information technology, finance, human resources,

contracting, facilities, security, intake and document production, performance, and

investment governance and oversight in support of the USCIS mission. Prior to joining the

Management Directorate front office in 2019, I was the Deputy Chief Information Officer for

Operations in the Office of Information Technology, where I planned and oversaw the

management, administration, development, implementation, and evaluation of global

information technology systems. I first joined USCIS on January 27, 2013.

2.   I make this declaration on the basis of my personal knowledge and information made

available to me at this time during the course of my official duties.

3.   I understand that on August 28, 2020, Defendant-Intervenors propounded their Fifth set of

Discovery Requests to Defendants and on August 31, 2020 Defendant-Intervenors

propounded their Sixth set of Discovery Requests to Defendants.

4.   All estimates provided below are based on best-case scenarios, assuming no unusual

situations or circumstances arise.

### Burdens of Collecting and Manually Reviewing Records to Obtain Data Sought in Interrogatories Nos. 20-25

5.   USCIS began accepting initial DACA requests on August 15, 2012, and began accepting

DACA renewal requests on June 4, 2014.

6.   The Computer Linked Application Information Management System (CLAIMS 3) and the

Electronic Immigration System (ELIS) are electronic case management systems that USCIS

uses to process certain immigration requests. From the inception of the DACA policy in 2012

2

until November 2015, all DACA requests were manually data entered into and processed in CLAIMS 3. See the publicly available Privacy Impact Assessment for CLAIMS 3 (DHS/USCIS/PIS-06(a)), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-claims3appendixaupdate-may2018.pdf.  On November 1, 2015, USCIS began ingesting some DACA requests in ELIS.  In February 2016, USCIS transitioned to ELIS for the ingesting and processing of all newly filed DACA requests.  *See* the publicly available Privacy Impact Assessment for ELIS (DHS/USCIS/PIA-056 ELIS), https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-elisappendixaupdate-may2018.pdf.

7. Based on its ordinary business practices, USCIS maintains electronic and/or paper copies of its initial and renewal DACA decisions and its Requests for Evidence (RFEs) in DACA cases.  However, USCIS' case management systems do not electronically capture the underlying basis (bases) for denial of an initial or renewal DACA request or the basis (bases) on which a Request for Evidence (RFE) was sent, in a manner that can be systematically and reliably obtained.

8. Because USCIS' case management systems do not electronically capture the data Defendant-Intervenors seek in the subparts of Interrogatories Nos. 20-23 in the normal course of business in a manner that can be reliably provided, manual case-by-case file review would be necessary for USCIS to determine the underlying basis (bases) for denials or Requests for Evidence (RFEs).  Individual case-by-case review of the electronic and/or paper files for thousands of cases would be a highly burdensome undertaking.

9. For purposes of determining the basis (bases) for initial or renewal DACA denial (Interrogatories Nos. 20-21) from each Plaintiff State between July 2018 and September

2020, USCIS would need to gather records from the Alien File (A-file), the ELIS database, and/or any relevant systems information, including but not limited to emails on adjudicative guidance in Outlook, notices and correspondence in the Enterprise Correspondence Handling Online (ECHO) system, and records from TECS, ENFORCE Alien Removal Module (EARM), and/or EID Arrest Guide for Law Enforcement (EAGLE).  USCIS would then need to identify whether any of the A-files for the selected individuals are in electronic format and accessible in agency systems, such as the Enterprise Document Management System A-file repository (EDMS), and determine the location of the paper A-file for all others, because they will reside at different locations throughout the country. Not all A-files will be immediately available to USCIS for purposes of this review as they may be in use by other DHS components or other USCIS offices. Individual, manual case-by-case review of the electronic and/or paper records for approximately 2,160 denied DACA requests (approximately 860 denied initial requests and approximately 1,300 denied renewal requests for Plaintiff States from July 1, 2018 to September 8, 2020) to determine the underlying basis (bases) for the denials and whether the request was denied "at least in part because the applicant was a suspected gang member[,] . . . posed a threat to national security or public safety[,]" or was denied "after the adjudicator determined the applicant met the five criteria outlined in the 2012 DACA memorandum[,]" would be a highly burdensome undertaking.

10. Furthermore, the bases for denial identified in Interrogatories Nos. 20-21 are not necessarily mutually exclusive and/or conducive to clear categorization.  For example, generally an individual who is a suspected gang member may also be considered to pose a threat to public safety.  Additionally, a suspected gang member with disqualifying convictions may have been issued a denial notice referencing the disqualifying convictions. Accordingly, it will

likely be difficult to reconstruct and consistently determine all the applicable reasons an officer denied a request, particularly if a significant period of time has passed since the adjudication. Case-by-case review to answer these questions may also require further consultation with the adjudicator who rendered the decision, who may not be available for consultation and/or may not recall the specific adjudication.

11. For each case requiring paper A-file review, USCIS would need to first determine the location of the paper A-file, because A-files will reside at different locations throughout the country and each A-file would need to be manually requested for transfer. At times, an individual will have supplemental files, known as "T-files," created out of operational necessity when the physical A-file is in use at another location, that are also considered part of the overall A-file record for a person.  Many variables would impact the time it would take for the complete A-files to be transferred to an officer for review, including the current location of the A-file and any supplemental T-files, and whether they are in use by another DHS component or another USCIS office. If the A-file is in use by another USCIS or DHS office and cannot be released immediately, USCIS would need to wait for the physical A-file to be released to an officer/employee for purposes of this review, which could be months.

12. The COVID-19 pandemic exacerbates the burden of paper A-file review. If any A-files needed for review are located at a National Archives and Records Administration (NARA) Federal Records Center (FRC), transfer of the A-file to a USCIS officer for review may be delayed due to limited on site staff available to facilitate the physical processing and transfer of A-files, which increases the time it takes for an A-file to be transferred to an officer for review.  Additionally, the ability of USCIS officers to physically retrieve paper A-files once

transferred to their office for purposes of this review is limited, due to office limitations on

individuals physically entering USCIS offices during the COVID-19 pandemic.

13.  Assuming most paper A-files that would be needed for this review are located at USCIS'

National Records Center (NRC) and not otherwise currently needed by another DHS

component or USCIS office, USCIS estimates that it would take at least approximately 15

business days from the date the A-file is requested, to the date it is received by a USCIS

officer for review.

14. USCIS further estimates that once all relevant information is gathered, electronically and/or

physically, including from relevant systems, and the record is before the officer conducting

the review, manual review of the paper A-file (if it can even be obtained in a timely manner

due to the limitations described above) and/or electronic record to determine the underlying

basis (bases) for denial, including an assessment of the evidence upon which the officer made

the denial determination, would take anywhere from approximately 20 to 90 minutes per

case, depending on the complexity of the case and the volume of the record.   Therefore,

USCIS estimates that individual case-by-case review of the electronic and/or paper files for

approximately 2,160 denied DACA requests could take anywhere between approximately

720 hours and 3,240 hours to complete.

15. For purposes of determining the basis (bases) for an initial or renewal Request for Evidence

(RFE) (Interrogatories Nos. 22-23), USCIS would need to access a copy of the RFE.  If the

RFE was created in ECHO, an officer would access an electronic copy and confirm in ELIS

or CLAIMS 3 that the notice was issued and mailed. Individual case-by-case review of the

electronic and/or paper copies of the RFEs sent for more than approximately 4,000 initial and

renewal DACA requests (approximately 865 initial requests received RFEs and

approximately 3,200 renewal requests received RFEs for Plaintiff States from July 1, 2018 to September 8, 2020) to determine the basis (bases) for sending the RFE would also be an unduly burdensome undertaking.  USCIS estimates that it would take approximately five minutes per case to retrieve and review an electronic copy of the RFE, in order to determine the basis (bases) on which the RFE was sent.  To conduct this case-by-case electronic review for approximately 4,000 requests would take more than approximately 330 hours to complete.  However, some RFEs may not be available for review electronically, therefore the time required to complete this task would increase significantly depending on the number of physical A-files that would need to be retrieved and reviewed.  USCIS is not able to estimate the number of RFEs that are not electronically available and therefore is not able to estimate the number of physical A-files that would need to be retrieved and reviewed, however the steps and time burden described in Paragraphs 11-13 above regarding locating and requesting individual A-files for transfer to an officer for review would still apply, including the additional time burdens and limitations due to the ongoing COVID-19 pandemic.

16. Obtaining the complete information sought in Interrogatory 24 would likewise require a manual, case-by-case file review because the information sought by Defendant-Intervenors is not electronically captured in a reliable, readily retrievable, systematic and complete manner. A response to Part 3, Question 4 on the Form I-821D (Interrogatory No. 24) is not required in order for USCIS to accept and process the Form I-821D.  USCIS officers review the evidence submitted with the request to determine the requestor's status on June 15, 2012.  A DACA requestor may have left the response to Part 3, Question 4 blank, handwritten a response to the question, or selected one of three standard responses available in a dropdown box that is available when completing the electronic PDF version of the Form I-821D.  The

7

three standard responses that a DACA requestor may select in the dropdown box for Part 3, Question 4 are: "Status Expired," "Parole Expired," or "No Lawful Status".  Therefore, an electronic Form I-821D record in either CLAIMS 3 or ELIS may have a blank response for this question, or the response entered by the requestor on the Form I-821D may not have been in a format that was recordable electronically given USCIS electronic formatting limitations.  CLAIMS 3 does not electronically capture the standard, dropdown responses to Part 3, Question 4, on the Form I-821D, and ELIS does not systematically capture this data in a manner that can be reliably provided.  Additionally, as explained in Note 3 of the chart provided in response to Interrogatory No. 24, CLAIMS 3 does not electronically record the response to Part 3, Question 5a; only cases processed in ELIS contain this information electronically. Accordingly, manual, individual, case-by-case review would be necessary to obtain this information.

17. For purposes of determining the response provided on approved initial DACA requests to Part 3, Question 4 for approvals processed in ELIS and CLAIMS 3, and Part 3, Question 5a for approvals processed in CLAIMS 3, USCIS would need to review the individual case in ELIS, access a copy of the Form I-821D retained in the EDMS database, or locate and review the paper Form I-821D in the A-file if not available elsewhere.  Individual case-by-case review of ELIS records, a digitized version of the Form I-821D, or the original paper version of the Form I-821D, for more than approximately 1,100 approved initial DACA requests for Plaintiff States from July 1, 2018 to September 8, 2020 to determine which of the three standard dropdown responses to Part 3, Question 4 is applicable to the requestor for ELIS and CLAIMS 3 cases, and the response to Part 3, Question 5a for CLAIMS 3 cases, would take approximately 10 minutes per case, for a total of more than approximately 180 hours.

For any cases that require paper review of the original Form I-821D, USCIS would need to first determine the location of the paper A-file, because A-files will reside at different locations throughout the country and each A-file would need to be manually requested for transfer. USCIS is not able to estimate the number of cases for which an electronic copy of the Form I-821D would not be available, however the steps and time burden described in Paragraphs 11-13 above regarding locating and requesting individual A-files for transfer to an officer for review would still apply, including the additional time burdens and limitations due to the ongoing COVID-19 pandemic.

18. With respect to the data sought in Interrogatory 25, USCIS databases do not electronically capture the underlying statutory basis for which an individual is eligible for adjustment of status to lawful permanent residence in a manner that can be systematically obtained. Although some data can be derived based on information in USCIS data systems relating to the fee paid with the adjustment application, USCIS is not able to systematically identify which DACA recipients adjusted under 8 U.S.C. § 1255(i) but were exempt from paying the $1,000 fee. Deriving this information would require manual, case-by-case review of the files of more than 6,000 DACA recipients who adjusted status from Plaintiff States during the specified time period for whom USCIS could not systematically identify the basis for adjustment as § 1255(i) or another provision besides § 1255(a) based on the filing fee.

19. Individual case-by-case review of electronic and/or paper records to extract the data sought in Interrogatories Nos. 20-25 would require the diversion of officers and employees from other mission critical work. To the extent officers/employees would need to review certain paper records, the files would need to be located and transferred, if even possible in every case, to the officer/employee, which may take considerable time as such files are frequently in use by

other DHS offices, such as U.S. Immigration and Customs Enforcement (ICE) trial attorneys in removal proceedings.  USCIS may not be able to obtain certain A-files if they are actively in use by another office, which may make the review necessary to determine the basis (bases) for denial or RFE nearly impossible.

20. Many of the officers/employees who would have to manually review the electronic and/or paper records on each case to determine the reasons for denial, RFE, the responses selected on the Form I-821D to Part 3, Questions 4 and 5a, or the statutory basis for adjustment, would likely need to be diverted from reviewing, processing, and adjudicating DACA requests or immigration benefit requests, including potentially the review and resolution of background check hits and/or other security vetting procedures, as these individuals are most familiar with the Form I-821D and the DACA adjudications process. Those ongoing operations would be detrimentally affected if adjudicators were diverted to work on this burdensome discovery, with the potential to significantly negatively impact and delay the adjudication of DACA requests, which could lead to other burdensome litigation against USCIS.

**Burden of Comprehensive Document Collection**

21. USCIS has identified more than approximately 35 potential non-attorney custodians who are current USCIS employees in numerous offices and directorates, and an additional approximately 16 potential custodians who are current agency counsel in the USCIS Office of the Chief Counsel.  USCIS has also identified at least 4 potential custodians who are no longer employees of USCIS, some of whom were former agency counsel.

22. Given the broad wording of Defendant-Intervenors' Requests for Production Nos. 11-17, the time frame for the requests, and the number of potential custodians, conducting broad

keyword searches for email and other electronic records for all potential custodians would likely result in thousands of records that would need to be transferred to the Department of Justice (DOJ) and reviewed for responsiveness and privileges by agency counsel.

23. Due to multiple unknown variables involved, USCIS is unable to provide a reliable estimate of the number of hours it would take to conduct a comprehensive search and collection of potentially responsive email records of all potential custodians who are current and former USCIS employees.  This type of comprehensive collection of emails for the period of July 2018 to September 2020 requires the use of two separate tools: the Enterprise Vault Discovery Accelerator (EVDA) (for the period of July 2018 through May 31, 2020) and Microsoft eDiscovery (for the period of February 1, 2020 to September 2020).

24. Recovery of emails through EVDA would require, at a minimum, the following steps:

Step 1: Searching of four journaling archives that maintain a record of USCIS emails;

Step 2: Accepting the results;

Step 3: Deduplication and exporting the results to a server;

Step 4: Transferring the files from the initial server to a forensic server;

Step 5: Replicating the files to a second forensic server;

Step 6: Uploading the files to a secure cloud file sharing service to transfer the files to DOJ.

25. Recovery of emails through Microsoft eDiscovery would require, at a minimum, the following steps:

Step 1: Searching of individual user archives;

Step 2: Preparing search results for export;

Step 3: Deduplication and exporting the results to the local system;

11

Step 4: Transferring the files from the local system to a forensic server;

Step 5: Replicating the files to a second forensic server;

Step 6: Uploading the files to a secure cloud file sharing service to transfer the files to DOJ.

26. Step one in EVDA can take several hours to complete per custodian, depending on the number and complexity of keyword sets used for the search. Step one in Microsoft eDiscovery generally takes less than an hour per search, per custodian, but is limited to 20 keywords per search.  Accordingly, multiple searches per custodian may be required depending on the number of keywords to be searched. USCIS estimates that searching custodian emails in both EVDA and Microsoft eDiscovery would take approximately two to four hours per custodian, for a total of approximately 110 to 220 hours for 55 potential custodians.

27. USCIS estimates that completing Step 2 in both EVDA and Microsoft eDiscovery would take up to an hour per search, per custodian, for the two-year time period of the discovery requests, for a total of approximately 55 hours for 55 potential custodians.

28. The time estimate for completing Step 3 in EVDA is impossible to reliably determine.  Due to software limitations, USCIS can export no more than four sets of files at a time across the entire application, although this four file export limit does not apply to Microsoft eDiscovery. In EVDA, files are queued for export on a first in, first out basis, so if exports are already being run for other cases, the files for this case would be placed at the end of the queue, and therefore the exporting process for this case would be slowed significantly depending on the volume of files queued for export in other cases. A high volume of exports for this case would likewise significantly negatively impact USCIS's ability to effectively comply with

discovery requests in other USCIS litigation. USCIS estimates that Step 3 could take approximately 1.5 hours per custodian to complete, for a total of approximately 82.5 hours for 55 potential custodians.

29. It is also impossible to reliably estimate the time burden for completing Steps 4 through 6 as the burden entirely depends on the number of file results that remain after deduplication. Each transfer and replication step takes approximately 15 minutes per 1.5 GB to complete. If only 1.5 GB of email data per custodian remained after deduplication, it would take approximately 45 minutes per custodian to complete Steps 4 through 6, for a total of approximately 41.25 hours for 55 potential custodians.  However, in light of the two-year date range of the discovery requests and the broad search terms that would need to be used to conduct the search, 1.5GB is a very low benchmark for this calculation.

30. This overall estimate of approximately 288.75 to 398.75 hours to complete email searches and data transfers for 55 potential custodians is an exceedingly low estimate that assumes near perfect technological processing at every step.  Due to the high likelihood that custodians would have significantly more data to be transferred than the 1.5GB benchmark used above, as well as the high likelihood that data transfer speed would not be perfect, it is likely that the total time required to complete a search, collection, and transfer of this magnitude and complexity would be at least two to three times the number of hours indicated above.

31. The above estimates only relate to email searches. If potential custodians maintain responsive records on their hard drive or share drives, additional burdens and limitations will apply to the searching and collection of such records. Documents only maintained locally on a former employee's hard drive cannot be recovered if the computer has been reimaged and reissued to

another user.  Documents maintained on a former employee's share drive may be recovered if the share drive data was maintained on the local office's server.  The burden of retrieving data from both current and former employees' personal share drive and/or local drive, and transferring this data to DOJ, and the burden of reviewing these records for responsiveness and privileges, depends entirely on the amount of data obtained.  Due to limitations in USCIS' ability to search within all types of data files for keywords, entire contents of folders containing any files with relevant keywords would generally need to be extracted.  This method typically results in significantly large amounts of data to be obtained, transferred to DOJ, and reviewed for responsiveness and privileges.  USCIS estimates that it would take a minimum of 5 hours to complete each data transfer per custodian to USCIS' forensic server, another 5 hours per custodian to transfer the data to the second forensic server, and an additional 5 hours per custodian to transfer the data to DOJ.  Four searches and collections of this non-email data can be run simultaneously, therefore, USCIS estimates that it would take a minimum of approximately 825 hours to complete this collection and transfer for 55 potential custodians.  This estimate would increase if custodians stored potentially responsive records in multiple locations, such that USCIS would need to extract folders from both a personal share drive and a local drive.

32. All the time burden estimates regarding email and non-email record collection would increase if additional custodians are identified and if the time frame for the search is expanded prior to July 2018.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my

knowledge and belief.

Executed this 30th day of September of 2020.

Larry DeNayer
Acting Deputy Director for Operations
U.S. Citizenship and Immigration Services
Department of Homeland Security

**Interrogatory 15**

Form I-821D, Consideration of Deferred Action for Childhood Arrivals

DACA Initials

Count of Accepted Filings, Rejections, Approvals, and Denials by Month, and Selected State

July 1, 2018 - Sep 8, 2020



U.S. Citizenship and Immigration Services

| Requestor State | Month | Accepted Filings | Rejections | Total Received | Approved | Denied | Total Completions |
|---|---|---|---|---|---|---|---|
| Alabama | July-18 | 1 | - | 1 | 4 | 4 | 8 |
| Alabama | August-18 | - | - | - | 7 | 12 | 19 |
| Alabama | September-18 | - | - | - | 1 | 4 | 5 |
| Alabama | October-18 | - | - | - | 2 | 3 | 5 |
| Alabama | November-18 | 1 | - | 1 | 1 | 1 | 2 |
| Alabama | December-18 | - | - | - | 1 | 1 | 2 |
| Alabama | January-19 | - | - | - | 1 | - | 1 |
| Alabama | February-19 | 1 | - | 1 | 1 | 1 | 2 |
| Alabama | March-19 | 1 | - | 1 | - | - | - |
| Alabama | April-19 | 1 | - | 1 | - | - | - |
| Alabama | May-19 | 2 | - | 2 | - | 2 | 2 |
| Alabama | June-19 | 1 | - | 1 | - | - | - |
| Alabama | July-19 | 1 | - | 1 | 1 | - | 1 |
| Alabama | August-19 | 6 | - | 6 | 1 | 1 | 2 |
| Alabama | September-19 | 2 | - | 2 | 1 | - | 1 |
| Alabama | October-19 | 1 | - | 1 | 2 | - | 2 |
| Alabama | November-19 | - | - | - | - | - | - |
| Alabama | December-19 | - | - | - | 1 | - | 1 |
| Alabama | January-20 | - | - | - | 2 | 1 | 3 |
| Alabama | February-20 | 1 | - | 1 | 2 | 1 | 3 |
| Alabama | March-20 | 2 | - | 2 | 1 | - | 1 |
| Alabama | April-20 | 1 | - | 1 | - | - | - |
| Alabama | May-20 | - | - | - | 1 | - | 1 |
| Alabama | June-20 | 4 | - | 4 | 1 | - | 1 |
| Alabama | July-20 | 3 | - | 3 | 1 | - | 1 |
| Alabama | August-20 | 1 | - | 1 | - | - | - |
| Alabama | September-20 | - | - | - | - | - | - |
| **Alabama Total** | | **30** | **-** | **30** | **32** | **31** | **63** |
| Arkansas | July-18 | - | - | - | 3 | 7 | 10 |
| Arkansas | August-18 | 1 | - | 1 | 1 | 8 | 9 |
| Arkansas | September-18 | - | - | - | 4 | 1 | 5 |
| Arkansas | October-18 | - | - | - | 1 | 1 | 2 |
| Arkansas | November-18 | 1 | - | 1 | 1 | 1 | 2 |
| Arkansas | December-18 | - | - | - | 1 | 1 | 2 |
| Arkansas | January-19 | - | - | - | - | 1 | 1 |
| Arkansas | February-19 | - | - | - | - | 1 | 1 |
| Arkansas | March-19 | - | - | - | - | - | - |

| Arkansas | April-19 | - | - | - | - | - | - |
|---|---|---|---|---|---|---|---|
| Arkansas | May-19 | - | - | - | 1 | - | 1 |
| Arkansas | June-19 | - | - | - | - | - | - |
| Arkansas | July-19 | 2 | - | 2 | 1 | 1 | 2 |
| Arkansas | August-19 | 2 | - | 2 | - | - | - |
| Arkansas | September-19 | - | - | - | - | - | - |
| Arkansas | October-19 | 3 | - | 3 | - | - | - |
| Arkansas | November-19 | - | - | - | - | - | - |
| Arkansas | December-19 | 1 | - | 1 | 2 | - | 2 |
| Arkansas | January-20 | 2 | - | 2 | - | 1 | 1 |
| Arkansas | February-20 | - | - | - | 2 | - | 2 |
| Arkansas | March-20 | 2 | - | 2 | - | - | - |
| Arkansas | April-20 | 1 | - | 1 | - | - | - |
| Arkansas | May-20 | 2 | - | 2 | - | 1 | 1 |
| Arkansas | June-20 | - | - | - | - | - | - |
| Arkansas | July-20 | 1 | - | 1 | - | - | - |
| Arkansas | August-20 | 2 | - | 2 | - | - | - |
| Arkansas | September-20 | - | - | - | 1 | - | 1 |
| **Arkansas Total** | | **20** | **-** | **20** | **18** | **24** | **42** |
| Kansas | July-18 | - | - | - | 9 | 6 | 15 |
| Kansas | August-18 | 2 | - | 2 | 10 | 2 | 12 |
| Kansas | September-18 | 2 | - | 2 | 2 | 1 | 3 |
| Kansas | October-18 | 3 | - | 3 | 2 | 4 | 6 |
| Kansas | November-18 | 1 | - | 1 | 2 | 2 | 4 |
| Kansas | December-18 | 1 | - | 1 | - | - | - |
| Kansas | January-19 | - | - | - | 1 | - | 1 |
| Kansas | February-19 | - | - | - | 1 | 3 | 4 |
| Kansas | March-19 | 1 | - | 1 | - | 3 | 3 |
| Kansas | April-19 | 1 | - | 1 | 1 | - | 1 |
| Kansas | May-19 | 3 | - | 3 | - | - | - |
| Kansas | June-19 | 2 | - | 2 | 2 | 1 | 3 |
| Kansas | July-19 | 1 | - | 1 | 1 | 1 | 2 |
| Kansas | August-19 | 2 | - | 2 | - | - | - |
| Kansas | September-19 | 4 | - | 4 | - | - | - |
| Kansas | October-19 | - | - | - | - | - | - |
| Kansas | November-19 | 2 | - | 2 | 1 | - | 1 |
| Kansas | December-19 | 2 | - | 2 | 2 | - | 2 |
| Kansas | January-20 | 3 | - | 3 | 1 | 1 | 2 |
| Kansas | February-20 | 2 | - | 2 | 2 | - | 2 |
| Kansas | March-20 | 1 | - | 1 | 2 | - | 2 |
| Kansas | April-20 | 3 | - | 3 | 1 | - | 1 |
| Kansas | May-20 | 2 | - | 2 | 1 | - | 1 |
| Kansas | June-20 | 1 | - | 1 | 1 | 1 | 2 |
| Kansas | July-20 | 2 | - | 2 | - | 1 | 1 |
| Kansas | August-20 | 1 | - | 1 | - | - | - |
| Kansas | September-20 | - | - | - | - | - | - |
| **Kansas Total** | | **42** | **-** | **42** | **42** | **26** | **68** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Louisiana | July-18 | - | - | - | 7 | 5 | 12 |
| Louisiana | August-18 | 1 | - | 1 | 4 | 3 | 7 |
| Louisiana | September-18 | - | - | - | 1 | 3 | 4 |
| Louisiana | October-18 | 1 | - | 1 | 1 | 3 | 4 |
| Louisiana | November-18 | 1 | - | 1 | 1 | - | 1 |
| Louisiana | December-18 | - | - | - | - | - | - |
| Louisiana | January-19 | - | - | - | - | - | - |
| Louisiana | February-19 | - | - | - | - | - | - |
| Louisiana | March-19 | - | - | - | - | 1 | 1 |
| Louisiana | April-19 | - | - | - | - | - | - |
| Louisiana | May-19 | - | - | - | - | 3 | 3 |
| Louisiana | June-19 | 1 | - | 1 | - | - | - |
| Louisiana | July-19 | - | - | - | - | - | - |
| Louisiana | August-19 | 1 | - | 1 | - | - | - |
| Louisiana | September-19 | 2 | - | 2 | - | - | - |
| Louisiana | October-19 | - | - | - | - | - | - |
| Louisiana | November-19 | 1 | - | 1 | - | - | - |
| Louisiana | December-19 | - | - | - | - | 1 | 1 |
| Louisiana | January-20 | - | - | - | - | - | - |
| Louisiana | February-20 | - | - | - | 2 | - | 2 |
| Louisiana | March-20 | 1 | - | 1 | - | 1 | 1 |
| Louisiana | April-20 | 1 | - | 1 | - | 1 | 1 |
| Louisiana | May-20 | - | - | - | - | - | - |
| Louisiana | June-20 | 1 | - | 1 | - | - | - |
| Louisiana | July-20 | 1 | - | 1 | - | - | - |
| Louisiana | August-20 | 1 | - | 1 | - | - | - |
| Louisiana | September-20 | - | - | - | - | - | - |
| **Louisiana Total** | | **13** | **-** | **13** | **16** | **21** | **37** |
| Mississippi | July-18 | - | - | - | 1 | 3 | 4 |
| Mississippi | August-18 | - | - | - | 1 | 1 | 2 |
| Mississippi | September-18 | - | - | - | - | - | - |
| Mississippi | October-18 | - | - | - | - | 1 | 1 |
| Mississippi | November-18 | - | - | - | - | - | - |
| Mississippi | December-18 | - | - | - | - | - | - |
| Mississippi | January-19 | - | - | - | - | 1 | 1 |
| Mississippi | February-19 | - | - | - | - | - | - |
| Mississippi | March-19 | - | - | - | - | - | - |
| Mississippi | April-19 | - | - | - | - | - | - |
| Mississippi | May-19 | 1 | - | 1 | - | - | - |
| Mississippi | June-19 | - | - | - | - | - | - |
| Mississippi | July-19 | - | - | - | - | - | - |
| Mississippi | August-19 | 2 | - | 2 | - | - | - |
| Mississippi | September-19 | - | - | - | - | - | - |
| Mississippi | October-19 | - | - | - | - | - | - |
| Mississippi | November-19 | 1 | - | 1 | 1 | - | 1 |
| Mississippi | December-19 | - | - | - | - | - | - |
| Mississippi | January-20 | 2 | - | 2 | 1 | - | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mississippi | February-20 | 2 | - | 2 | - | 1 | 1 |
| Mississippi | March-20 | - | - | - | - | - | - |
| Mississippi | April-20 | - | - | - | - | - | - |
| Mississippi | May-20 | 1 | - | 1 | 1 | - | 1 |
| Mississippi | June-20 | - | - | - | 1 | - | 1 |
| Mississippi | July-20 | 1 | - | 1 | 2 | 1 | 3 |
| Mississippi | August-20 | - | - | - | - | - | - |
| Mississippi | September-20 | - | - | - | - | - | - |
| **Mississippi Total** | | **10** | **-** | **10** | **8** | **8** | **16** |
| Nebraska | July-18 | - | - | - | 6 | 1 | 7 |
| Nebraska | August-18 | - | - | - | 5 | 2 | 7 |
| Nebraska | September-18 | - | - | - | - | 1 | 1 |
| Nebraska | October-18 | 1 | - | 1 | 1 | 1 | 2 |
| Nebraska | November-18 | - | - | - | - | 1 | 1 |
| Nebraska | December-18 | 1 | - | 1 | - | 1 | 1 |
| Nebraska | January-19 | - | - | - | 1 | - | 1 |
| Nebraska | February-19 | 1 | - | 1 | 1 | 1 | 2 |
| Nebraska | March-19 | 1 | - | 1 | - | 1 | 1 |
| Nebraska | April-19 | - | - | - | - | 1 | 1 |
| Nebraska | May-19 | - | - | - | 1 | 1 | 2 |
| Nebraska | June-19 | - | - | - | - | - | - |
| Nebraska | July-19 | - | - | - | 2 | - | 2 |
| Nebraska | August-19 | 1 | - | 1 | - | - | - |
| Nebraska | September-19 | 2 | - | 2 | - | - | - |
| Nebraska | October-19 | 2 | - | 2 | 1 | - | 1 |
| Nebraska | November-19 | 3 | - | 3 | - | - | - |
| Nebraska | December-19 | - | - | - | 1 | - | 1 |
| Nebraska | January-20 | 1 | - | 1 | - | 1 | 1 |
| Nebraska | February-20 | 2 | - | 2 | - | - | - |
| Nebraska | March-20 | 4 | - | 4 | - | - | - |
| Nebraska | April-20 | 1 | - | 1 | 1 | - | 1 |
| Nebraska | May-20 | - | - | - | - | - | - |
| Nebraska | June-20 | 4 | - | 4 | 2 | 1 | 3 |
| Nebraska | July-20 | - | - | - | 6 | - | 6 |
| Nebraska | August-20 | - | - | - | - | - | - |
| Nebraska | September-20 | - | - | - | - | - | - |
| **Nebraska Total** | | **24** | **-** | **24** | **28** | **13** | **41** |
| South Carolina | July-18 | 1 | - | 1 | 9 | 14 | 23 |
| South Carolina | August-18 | 5 | - | 5 | 5 | 14 | 19 |
| South Carolina | September-18 | - | - | - | 7 | 5 | 12 |
| South Carolina | October-18 | - | - | - | 2 | 3 | 5 |
| South Carolina | November-18 | 2 | - | 2 | 3 | - | 3 |
| South Carolina | December-18 | - | - | - | - | 4 | 4 |
| South Carolina | January-19 | 1 | - | 1 | 3 | 1 | 4 |
| South Carolina | February-19 | 1 | - | 1 | 1 | 2 | 3 |
| South Carolina | March-19 | - | - | - | 1 | 1 | 2 |
| South Carolina | April-19 | 2 | - | 2 | 1 | - | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| South Carolina | May-19 | - | - | - | - | 2 | 2 |
| South Carolina | June-19 | 1 | - | 1 | - | 1 | 1 |
| South Carolina | July-19 | 2 | - | 2 | - | - | - |
| South Carolina | August-19 | 1 | - | 1 | 1 | 1 | 2 |
| South Carolina | September-19 | 3 | - | 3 | - | 1 | 1 |
| South Carolina | October-19 | 2 | - | 2 | 1 | 1 | 2 |
| South Carolina | November-19 | 3 | - | 3 | - | - | - |
| South Carolina | December-19 | 1 | - | 1 | 1 | - | 1 |
| South Carolina | January-20 | 2 | - | 2 | - | - | - |
| South Carolina | February-20 | - | - | - | 2 | 1 | 3 |
| South Carolina | March-20 | 2 | - | 2 | 2 | 1 | 3 |
| South Carolina | April-20 | 1 | - | 1 | 1 | - | 1 |
| South Carolina | May-20 | 5 | - | 5 | - | 2 | 2 |
| South Carolina | June-20 | 2 | - | 2 | - | 2 | 2 |
| South Carolina | July-20 | 3 | - | 3 | 3 | - | 3 |
| South Carolina | August-20 | 4 | - | 4 | - | - | - |
| South Carolina | September-20 | - | - | - | - | 1 | 1 |
| **South Carolina Total** | | **44** | **-** | **44** | **43** | **57** | **100** |
| Texas | July-18 | 22 | 2 | 24 | 204 | 149 | 353 |
| Texas | August-18 | 24 | - | 24 | 170 | 132 | 302 |
| Texas | September-18 | 23 | - | 23 | 75 | 107 | 182 |
| Texas | October-18 | 17 | - | 17 | 45 | 57 | 102 |
| Texas | November-18 | 22 | - | 22 | 47 | 20 | 67 |
| Texas | December-18 | 7 | - | 7 | 22 | 21 | 43 |
| Texas | January-19 | 10 | - | 10 | 35 | 19 | 54 |
| Texas | February-19 | 14 | - | 14 | 24 | 24 | 48 |
| Texas | March-19 | 18 | - | 18 | 20 | 15 | 35 |
| Texas | April-19 | 20 | - | 20 | 16 | 5 | 21 |
| Texas | May-19 | 11 | - | 11 | 17 | 12 | 29 |
| Texas | June-19 | 15 | - | 15 | 12 | 11 | 23 |
| Texas | July-19 | 19 | - | 19 | 17 | 6 | 23 |
| Texas | August-19 | 45 | - | 45 | 3 | 1 | 4 |
| Texas | September-19 | 56 | - | 56 | 13 | 11 | 24 |
| Texas | October-19 | 61 | - | 61 | 11 | 3 | 14 |
| Texas | November-19 | 38 | - | 38 | 16 | 6 | 22 |
| Texas | December-19 | 42 | - | 42 | 26 | 5 | 31 |
| Texas | January-20 | 46 | - | 46 | 12 | 6 | 18 |
| Texas | February-20 | 48 | - | 48 | 25 | 13 | 38 |
| Texas | March-20 | 67 | - | 67 | 27 | 13 | 40 |
| Texas | April-20 | 48 | 1 | 49 | 17 | 9 | 26 |
| Texas | May-20 | 69 | - | 69 | 40 | 4 | 44 |
| Texas | June-20 | 73 | - | 73 | 43 | 13 | 56 |
| Texas | July-20 | 82 | - | 82 | 38 | 13 | 51 |
| Texas | August-20 | 57 | - | 57 | 1 | 2 | 3 |
| Texas | September-20 | - | - | - | 5 | - | 5 |
| **Texas Total** | | **954** | **3** | **957** | **981** | **677** | **1,658** |
| West Virginia | July-18 | - | - | - | - | 2 | 2 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| West Virginia | August-18 | - | - | - | - | - | - |
| West Virginia | September-18 | - | - | - | - | - | - |
| West Virginia | October-18 | - | - | - | - | - | - |
| West Virginia | November-18 | - | - | - | - | - | - |
| West Virginia | December-18 | - | - | - | - | 1 | 1 |
| West Virginia | January-19 | - | - | - | - | - | - |
| West Virginia | February-19 | - | - | - | - | - | - |
| West Virginia | March-19 | - | - | - | - | - | - |
| West Virginia | April-19 | - | - | - | - | - | - |
| West Virginia | May-19 | - | - | - | - | - | - |
| West Virginia | June-19 | - | - | - | - | - | - |
| West Virginia | July-19 | - | - | - | - | - | - |
| West Virginia | August-19 | - | - | - | - | - | - |
| West Virginia | September-19 | - | - | - | - | - | - |
| West Virginia | October-19 | - | - | - | - | - | - |
| West Virginia | November-19 | - | - | - | - | - | - |
| West Virginia | December-19 | - | - | - | - | - | - |
| West Virginia | January-20 | - | - | - | - | - | - |
| West Virginia | February-20 | - | - | - | - | - | - |
| West Virginia | March-20 | - | - | - | - | - | - |
| West Virginia | April-20 | - | - | - | - | - | - |
| West Virginia | May-20 | - | - | - | - | - | - |
| West Virginia | June-20 | - | - | - | - | - | - |
| West Virginia | July-20 | - | - | - | - | - | - |
| West Virginia | August-20 | - | - | - | - | - | - |
| West Virginia | September-20 | - | - | - | - | - | - |
| **West Virginia Total** | | **-** | **-** | **-** | **-** | **3** | **3** |
| **Grand Total** | | **1,137** | **3** | **1,140** | **1,168** | **860** | **2,028** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) For Accepted Filings, Rejections, and Total Received, Month represents the month the DACA Request was received by USCIS.

3) Requestor state for lockbox rejected cases in ELIS is not captured electronically.

4) For Approved, Denied, and Total Completions, Month represents the month the most recent final adjudication action occurred.

5) Requests approved or denied in a given month may have been received in a previous month.

6) State is determined by the requestor's address listed on the form I-821D.

7) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

**Interrogatory 16**
Form I-821D, Consideration of Deferred Action for
Childhood Arrivals
DACA Renewals
Count of Accepted Filings, Rejections, Approvals, and
Denials by Month, and Selected State
July 1, 2018 - Sep 8, 2020



U.S. Citizenship
and Immigration
Services

| Requestor State | Month | Accepted Filings | Rejections | Total Received | Approved | Denied | Total Completions |
|---|---|---|---|---|---|---|---|
| Alabama | July-18 | 167 | 1 | 168 | 155 | 1 | 156 |
| Alabama | August-18 | 251 | - | 251 | 196 | 1 | 197 |
| Alabama | September-18 | 127 | - | 127 | 169 | 2 | 171 |
| Alabama | October-18 | 202 | - | 202 | 178 | - | 178 |
| Alabama | November-18 | 175 | - | 175 | 212 | - | 212 |
| Alabama | December-18 | 178 | - | 178 | 129 | - | 129 |
| Alabama | January-19 | 229 | 1 | 230 | 187 | 2 | 189 |
| Alabama | February-19 | 212 | - | 212 | 202 | - | 202 |
| Alabama | March-19 | 219 | - | 219 | 233 | 3 | 236 |
| Alabama | April-19 | 195 | - | 195 | 223 | - | 223 |
| Alabama | May-19 | 182 | - | 182 | 219 | 2 | 221 |
| Alabama | June-19 | 186 | - | 186 | 135 | - | 135 |
| Alabama | July-19 | 202 | 1 | 203 | 203 | - | 203 |
| Alabama | August-19 | 205 | - | 205 | 182 | 3 | 185 |
| Alabama | September-19 | 199 | 1 | 200 | 225 | 2 | 227 |
| Alabama | October-19 | 159 | - | 159 | 245 | 1 | 246 |
| Alabama | November-19 | 148 | - | 148 | 116 | 2 | 118 |
| Alabama | December-19 | 108 | - | 108 | 129 | 1 | 130 |
| Alabama | January-20 | 147 | - | 147 | 139 | 4 | 143 |
| Alabama | February-20 | 170 | - | 170 | 114 | 1 | 115 |
| Alabama | March-20 | 216 | - | 216 | 136 | 2 | 138 |
| Alabama | April-20 | 165 | - | 165 | 234 | 2 | 236 |
| Alabama | May-20 | 176 | - | 176 | 243 | - | 243 |
| Alabama | June-20 | 195 | - | 195 | 196 | 3 | 199 |
| Alabama | July-20 | 142 | - | 142 | 110 | 1 | 111 |
| Alabama | August-20 | 143 | - | 143 | 21 | - | 21 |
| Alabama | September-20 | - | - | - | 67 | - | 67 |
| **Alabama Total** | | **4,698** | **4** | **4,702** | **4,598** | **33** | **4,631** |
| Arkansas | July-18 | 161 | - | 161 | 180 | 1 | 181 |
| Arkansas | August-18 | 363 | - | 363 | 201 | 4 | 205 |
| Arkansas | September-18 | 158 | - | 158 | 227 | 2 | 229 |
| Arkansas | October-18 | 231 | - | 231 | 221 | 4 | 225 |
| Arkansas | November-18 | 215 | - | 215 | 250 | 1 | 251 |
| Arkansas | December-18 | 163 | - | 163 | 131 | 2 | 133 |
| Arkansas | January-19 | 225 | - | 225 | 177 | 3 | 180 |
| Arkansas | February-19 | 201 | 1 | 202 | 206 | 1 | 207 |
| Arkansas | March-19 | 269 | - | 269 | 236 | 2 | 238 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Arkansas | April-19 | 228 | - | 228 | 248 | 1 | 249 |
| Arkansas | May-19 | 232 | - | 232 | 247 | 4 | 251 |
| Arkansas | June-19 | 212 | - | 212 | 198 | 1 | 199 |
| Arkansas | July-19 | 207 | - | 207 | 250 | - | 250 |
| Arkansas | August-19 | 181 | - | 181 | 188 | 3 | 191 |
| Arkansas | September-19 | 189 | - | 189 | 222 | 2 | 224 |
| Arkansas | October-19 | 199 | - | 199 | 212 | 3 | 215 |
| Arkansas | November-19 | 205 | - | 205 | 146 | 3 | 149 |
| Arkansas | December-19 | 148 | 1 | 149 | 212 | 3 | 215 |
| Arkansas | January-20 | 181 | - | 181 | 165 | 1 | 166 |
| Arkansas | February-20 | 172 | - | 172 | 161 | 1 | 162 |
| Arkansas | March-20 | 236 | - | 236 | 138 | 2 | 140 |
| Arkansas | April-20 | 234 | - | 234 | 261 | - | 261 |
| Arkansas | May-20 | 237 | - | 237 | 310 | 1 | 311 |
| Arkansas | June-20 | 202 | - | 202 | 245 | 1 | 246 |
| Arkansas | July-20 | 167 | - | 167 | 85 | 1 | 86 |
| Arkansas | August-20 | 144 | - | 144 | 34 | 1 | 35 |
| Arkansas | September-20 | - | - | - | 77 | - | 77 |
| **Arkansas Total** | | **5,360** | **2** | **5,362** | **5,228** | **48** | **5,276** |
| Kansas | July-18 | 220 | - | 220 | 185 | 2 | 187 |
| Kansas | August-18 | 410 | - | 410 | 277 | 2 | 279 |
| Kansas | September-18 | 191 | - | 191 | 282 | 2 | 284 |
| Kansas | October-18 | 264 | - | 264 | 240 | 2 | 242 |
| Kansas | November-18 | 288 | - | 288 | 283 | 2 | 285 |
| Kansas | December-18 | 247 | - | 247 | 195 | 2 | 197 |
| Kansas | January-19 | 286 | - | 286 | 291 | 5 | 296 |
| Kansas | February-19 | 285 | - | 285 | 236 | 3 | 239 |
| Kansas | March-19 | 317 | - | 317 | 303 | 1 | 304 |
| Kansas | April-19 | 310 | - | 310 | 356 | 4 | 360 |
| Kansas | May-19 | 271 | - | 271 | 277 | 3 | 280 |
| Kansas | June-19 | 265 | - | 265 | 229 | 3 | 232 |
| Kansas | July-19 | 298 | - | 298 | 325 | 1 | 326 |
| Kansas | August-19 | 272 | - | 272 | 273 | 3 | 276 |
| Kansas | September-19 | 267 | - | 267 | 272 | 3 | 275 |
| Kansas | October-19 | 200 | 1 | 201 | 316 | 1 | 317 |
| Kansas | November-19 | 190 | - | 190 | 147 | 2 | 149 |
| Kansas | December-19 | 179 | - | 179 | 157 | 4 | 161 |
| Kansas | January-20 | 218 | - | 218 | 209 | 3 | 212 |
| Kansas | February-20 | 237 | 1 | 238 | 201 | 3 | 204 |
| Kansas | March-20 | 276 | - | 276 | 215 | 4 | 219 |
| Kansas | April-20 | 237 | - | 237 | 287 | 1 | 288 |
| Kansas | May-20 | 228 | - | 228 | 357 | 1 | 358 |
| Kansas | June-20 | 330 | - | 330 | 287 | 2 | 289 |
| Kansas | July-20 | 183 | - | 183 | 157 | 3 | 160 |
| Kansas | August-20 | 145 | - | 145 | 20 | 4 | 24 |
| Kansas | September-20 | - | - | - | 86 | - | 86 |
| **Kansas Total** | | **6,614** | **2** | **6,616** | **6,463** | **66** | **6,529** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Louisiana | July-18 | 75 | - | 75 | 60 | 2 | 62 |
| Louisiana | August-18 | 110 | 1 | 111 | 79 | 1 | 80 |
| Louisiana | September-18 | 72 | - | 72 | 88 | - | 88 |
| Louisiana | October-18 | 68 | 1 | 69 | 83 | 2 | 85 |
| Louisiana | November-18 | 85 | - | 85 | 72 | - | 72 |
| Louisiana | December-18 | 62 | - | 62 | 60 | - | 60 |
| Louisiana | January-19 | 91 | - | 91 | 73 | 1 | 74 |
| Louisiana | February-19 | 73 | - | 73 | 72 | - | 72 |
| Louisiana | March-19 | 99 | - | 99 | 90 | 1 | 91 |
| Louisiana | April-19 | 107 | - | 107 | 102 | 1 | 103 |
| Louisiana | May-19 | 79 | - | 79 | 96 | - | 96 |
| Louisiana | June-19 | 100 | - | 100 | 76 | - | 76 |
| Louisiana | July-19 | 91 | - | 91 | 99 | 1 | 100 |
| Louisiana | August-19 | 91 | - | 91 | 86 | 3 | 89 |
| Louisiana | September-19 | 85 | - | 85 | 95 | 1 | 96 |
| Louisiana | October-19 | 77 | - | 77 | 99 | - | 99 |
| Louisiana | November-19 | 56 | - | 56 | 59 | 2 | 61 |
| Louisiana | December-19 | 49 | - | 49 | 61 | - | 61 |
| Louisiana | January-20 | 74 | - | 74 | 59 | 1 | 60 |
| Louisiana | February-20 | 46 | 1 | 47 | 59 | 1 | 60 |
| Louisiana | March-20 | 57 | 1 | 58 | 50 | - | 50 |
| Louisiana | April-20 | 65 | - | 65 | 62 | 1 | 63 |
| Louisiana | May-20 | 92 | - | 92 | 108 | 2 | 110 |
| Louisiana | June-20 | 89 | - | 89 | 89 | - | 89 |
| Louisiana | July-20 | 61 | - | 61 | 41 | 2 | 43 |
| Louisiana | August-20 | 53 | - | 53 | 8 | 1 | 9 |
| Louisiana | September-20 | - | - | - | 46 | - | 46 |
| **Louisiana Total** | | **2,007** | **4** | **2,011** | **1,972** | **23** | **1,995** |
| Mississippi | July-18 | 41 | - | 41 | 43 | - | 43 |
| Mississippi | August-18 | 89 | - | 89 | 61 | 1 | 62 |
| Mississippi | September-18 | 37 | - | 37 | 65 | 1 | 66 |
| Mississippi | October-18 | 63 | - | 63 | 52 | - | 52 |
| Mississippi | November-18 | 69 | - | 69 | 64 | 1 | 65 |
| Mississippi | December-18 | 59 | - | 59 | 49 | - | 49 |
| Mississippi | January-19 | 69 | - | 69 | 61 | - | 61 |
| Mississippi | February-19 | 64 | - | 64 | 59 | - | 59 |
| Mississippi | March-19 | 57 | 2 | 59 | 67 | - | 67 |
| Mississippi | April-19 | 65 | - | 65 | 77 | - | 77 |
| Mississippi | May-19 | 81 | - | 81 | 64 | - | 64 |
| Mississippi | June-19 | 67 | - | 67 | 49 | 1 | 50 |
| Mississippi | July-19 | 55 | - | 55 | 78 | - | 78 |
| Mississippi | August-19 | 60 | - | 60 | 62 | - | 62 |
| Mississippi | September-19 | 60 | - | 60 | 59 | - | 59 |
| Mississippi | October-19 | 69 | - | 69 | 71 | 3 | 74 |
| Mississippi | November-19 | 46 | - | 46 | 44 | 1 | 45 |
| Mississippi | December-19 | 38 | - | 38 | 46 | 1 | 47 |
| Mississippi | January-20 | 59 | - | 59 | 49 | 1 | 50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mississippi | February-20 | 45 | - | 45 | 58 | 1 | 59 |
| Mississippi | March-20 | 63 | - | 63 | 41 | - | 41 |
| Mississippi | April-20 | 61 | - | 61 | 72 | 1 | 73 |
| Mississippi | May-20 | 65 | - | 65 | 84 | - | 84 |
| Mississippi | June-20 | 70 | - | 70 | 68 | - | 68 |
| Mississippi | July-20 | 52 | - | 52 | 34 | - | 34 |
| Mississippi | August-20 | 33 | - | 33 | 6 | - | 6 |
| Mississippi | September-20 | - | - | - | 25 | 1 | 26 |
| **Mississippi Total** | | **1,537** | **2** | **1,539** | **1,508** | **13** | **1,521** |
| Nebraska | July-18 | 122 | - | 122 | 102 | - | 102 |
| Nebraska | August-18 | 201 | - | 201 | 153 | - | 153 |
| Nebraska | September-18 | 107 | - | 107 | 140 | 2 | 142 |
| Nebraska | October-18 | 150 | - | 150 | 146 | - | 146 |
| Nebraska | November-18 | 120 | - | 120 | 157 | 3 | 160 |
| Nebraska | December-18 | 120 | - | 120 | 71 | 1 | 72 |
| Nebraska | January-19 | 128 | - | 128 | 146 | 1 | 147 |
| Nebraska | February-19 | 139 | - | 139 | 101 | 5 | 106 |
| Nebraska | March-19 | 169 | - | 169 | 138 | 3 | 141 |
| Nebraska | April-19 | 150 | - | 150 | 177 | 1 | 178 |
| Nebraska | May-19 | 144 | - | 144 | 139 | 1 | 140 |
| Nebraska | June-19 | 129 | - | 129 | 118 | - | 118 |
| Nebraska | July-19 | 148 | - | 148 | 161 | 1 | 162 |
| Nebraska | August-19 | 135 | 1 | 136 | 137 | 2 | 139 |
| Nebraska | September-19 | 124 | - | 124 | 155 | - | 155 |
| Nebraska | October-19 | 144 | - | 144 | 139 | 1 | 140 |
| Nebraska | November-19 | 107 | 1 | 108 | 99 | 1 | 100 |
| Nebraska | December-19 | 125 | - | 125 | 116 | 3 | 119 |
| Nebraska | January-20 | 137 | - | 137 | 111 | 1 | 112 |
| Nebraska | February-20 | 139 | - | 139 | 131 | 1 | 132 |
| Nebraska | March-20 | 161 | - | 161 | 110 | 2 | 112 |
| Nebraska | April-20 | 139 | - | 139 | 179 | 2 | 181 |
| Nebraska | May-20 | 135 | - | 135 | 187 | 2 | 189 |
| Nebraska | June-20 | 162 | - | 162 | 168 | - | 168 |
| Nebraska | July-20 | 85 | - | 85 | 82 | 3 | 85 |
| Nebraska | August-20 | 75 | - | 75 | 8 | 3 | 11 |
| Nebraska | September-20 | - | - | - | 44 | 1 | 45 |
| **Nebraska Total** | | **3,495** | **2** | **3,497** | **3,415** | **40** | **3,455** |
| South Carolina | July-18 | 253 | - | 253 | 192 | 2 | 194 |
| South Carolina | August-18 | 325 | - | 325 | 276 | 5 | 281 |
| South Carolina | September-18 | 219 | 1 | 220 | 213 | - | 213 |
| South Carolina | October-18 | 294 | - | 294 | 295 | - | 295 |
| South Carolina | November-18 | 286 | - | 286 | 310 | 1 | 311 |
| South Carolina | December-18 | 259 | - | 259 | 203 | 2 | 205 |
| South Carolina | January-19 | 249 | - | 249 | 275 | 1 | 276 |
| South Carolina | February-19 | 307 | - | 307 | 250 | 1 | 251 |
| South Carolina | March-19 | 331 | - | 331 | 294 | - | 294 |
| South Carolina | April-19 | 291 | - | 291 | 314 | 3 | 317 |

| | | | | | | |
|---|---|---|---|---|---|---|
| South Carolina | May-19 | 303 | 1 | 304 | 266 | 2 | 268 |
| South Carolina | June-19 | 267 | - | 267 | 273 | 2 | 275 |
| South Carolina | July-19 | 320 | - | 320 | 332 | 1 | 333 |
| South Carolina | August-19 | 271 | - | 271 | 290 | 2 | 292 |
| South Carolina | September-19 | 257 | - | 257 | 298 | 3 | 301 |
| South Carolina | October-19 | 287 | - | 287 | 333 | 7 | 340 |
| South Carolina | November-19 | 196 | - | 196 | 172 | 2 | 174 |
| South Carolina | December-19 | 169 | - | 169 | 233 | 2 | 235 |
| South Carolina | January-20 | 222 | - | 222 | 184 | 2 | 186 |
| South Carolina | February-20 | 218 | - | 218 | 224 | 1 | 225 |
| South Carolina | March-20 | 292 | 1 | 293 | 153 | - | 153 |
| South Carolina | April-20 | 247 | 1 | 248 | 342 | 3 | 345 |
| South Carolina | May-20 | 274 | 1 | 275 | 339 | 3 | 342 |
| South Carolina | June-20 | 278 | - | 278 | 310 | 3 | 313 |
| South Carolina | July-20 | 177 | - | 177 | 130 | - | 130 |
| South Carolina | August-20 | 196 | - | 196 | 16 | 2 | 18 |
| South Carolina | September-20 | - | - | - | 98 | 1 | 99 |
| **South Carolina Total** | | **6,788** | **5** | **6,793** | **6,615** | **51** | **6,666** |
| Texas | July-18 | 4,416 | 8 | 4,424 | 3,774 | 37 | 3,811 |
| Texas | August-18 | 8,307 | 4 | 8,311 | 5,170 | 31 | 5,201 |
| Texas | September-18 | 3,475 | 4 | 3,479 | 5,746 | 24 | 5,770 |
| Texas | October-18 | 4,719 | 4 | 4,723 | 4,721 | 37 | 4,758 |
| Texas | November-18 | 4,572 | 3 | 4,575 | 4,998 | 40 | 5,038 |
| Texas | December-18 | 3,983 | 1 | 3,984 | 3,488 | 23 | 3,511 |
| Texas | January-19 | 5,086 | 2 | 5,088 | 4,486 | 40 | 4,526 |
| Texas | February-19 | 4,802 | 3 | 4,805 | 4,418 | 23 | 4,441 |
| Texas | March-19 | 5,694 | 4 | 5,698 | 4,899 | 26 | 4,925 |
| Texas | April-19 | 5,944 | 1 | 5,945 | 6,418 | 44 | 6,462 |
| Texas | May-19 | 5,563 | 1 | 5,564 | 5,340 | 57 | 5,397 |
| Texas | June-19 | 5,324 | 2 | 5,326 | 4,579 | 28 | 4,607 |
| Texas | July-19 | 6,110 | 9 | 6,119 | 6,202 | 43 | 6,245 |
| Texas | August-19 | 5,421 | 3 | 5,424 | 5,535 | 53 | 5,588 |
| Texas | September-19 | 4,889 | 1 | 4,890 | 6,050 | 45 | 6,095 |
| Texas | October-19 | 4,371 | 3 | 4,374 | 5,836 | 54 | 5,890 |
| Texas | November-19 | 3,911 | - | 3,911 | 3,250 | 38 | 3,288 |
| Texas | December-19 | 3,234 | 2 | 3,236 | 3,876 | 47 | 3,923 |
| Texas | January-20 | 4,373 | - | 4,373 | 3,866 | 44 | 3,910 |
| Texas | February-20 | 3,934 | 1 | 3,935 | 3,872 | 53 | 3,925 |
| Texas | March-20 | 5,612 | 3 | 5,615 | 3,124 | 48 | 3,172 |
| Texas | April-20 | 4,691 | 2 | 4,693 | 5,867 | 58 | 5,925 |
| Texas | May-20 | 5,195 | - | 5,195 | 6,960 | 32 | 6,992 |
| Texas | June-20 | 5,685 | - | 5,685 | 6,022 | 37 | 6,059 |
| Texas | July-20 | 3,558 | 1 | 3,559 | 2,737 | 25 | 2,762 |
| Texas | August-20 | 3,293 | 2 | 3,295 | 499 | 28 | 527 |
| Texas | September-20 | 1 | - | 1 | 1,945 | 6 | 1,951 |
| **Texas Total** | | **126,163** | **64** | **126,227** | **123,678** | **1,021** | **124,699** |
| West Virginia | July-18 | 7 | - | 7 | 4 | - | 4 |

| West Virginia | August-18 | 7 | - | 7 | 6 | - | 6 |
|---|---|---|---|---|---|---|---|
| West Virginia | September-18 | 8 | - | 8 | 6 | 1 | 7 |
| West Virginia | October-18 | 4 | - | 4 | 9 | - | 9 |
| West Virginia | November-18 | 8 | - | 8 | 6 | - | 6 |
| West Virginia | December-18 | 3 | - | 3 | 4 | - | 4 |
| West Virginia | January-19 | 12 | - | 12 | 7 | - | 7 |
| West Virginia | February-19 | 4 | - | 4 | 8 | - | 8 |
| West Virginia | March-19 | 4 | - | 4 | 4 | - | 4 |
| West Virginia | April-19 | 3 | - | 3 | 5 | - | 5 |
| West Virginia | May-19 | 5 | - | 5 | 4 | - | 4 |
| West Virginia | June-19 | 10 | - | 10 | 3 | - | 3 |
| West Virginia | July-19 | 2 | - | 2 | 10 | - | 10 |
| West Virginia | August-19 | 5 | - | 5 | 3 | 1 | 4 |
| West Virginia | September-19 | 5 | - | 5 | 4 | 1 | 5 |
| West Virginia | October-19 | 3 | - | 3 | 6 | - | 6 |
| West Virginia | November-19 | 5 | - | 5 | 3 | - | 3 |
| West Virginia | December-19 | 3 | - | 3 | 3 | - | 3 |
| West Virginia | January-20 | 2 | - | 2 | 4 | - | 4 |
| West Virginia | February-20 | 3 | - | 3 | 3 | - | 3 |
| West Virginia | March-20 | 4 | - | 4 | 2 | - | 2 |
| West Virginia | April-20 | 5 | - | 5 | 7 | - | 7 |
| West Virginia | May-20 | 8 | - | 8 | 6 | - | 6 |
| West Virginia | June-20 | 5 | - | 5 | 8 | - | 8 |
| West Virginia | July-20 | 4 | - | 4 | 2 | - | 2 |
| West Virginia | August-20 | 2 | - | 2 | - | - | - |
| West Virginia | September-20 | - | - | - | 2 | - | 2 |
| **West Virginia Total** | | **131** | **-** | **131** | **129** | **3** | **132** |
| **Grand Total** | | **156,793** | **85** | **156,878** | **153,606** | **1,298** | **154,904** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) For Accepted Filings, Rejections, and Total Received, Month represents the month the DACA Request was received by USCIS.

3) Requestor state for lockbox rejected cases in ELIS is not captured electronically.

4) For Approved, Denied, and Total Completions, Month represents the month the most recent final adjudication action occurred.

5) Requests approved or denied in a given month may have been received in a previous month.

6) State is determined by the requestor's address listed on the form I-821D.

7) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

**Interrogatory 17**

Form I-821D, Consideration of Deferred Action
for Childhood Arrivals

DACA Initials

Average Processing Time

July 1, 2018 - Sep 8, 2020



**U.S. Citizenship and Immigration Services**

| Completion Date Range | Average Processing Time (Months) |
|---|---|
| July 1, 2018 - Sep 8, 2020 | 11.7 |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Rejected and pending cases are excluded.

3) Processing time is calculated as the elapsed number of days between the date USCIS received the case until the date of the final adjudicative action.

4) The number of months is determined by using a conversion of 30.4 days per month.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

| Interrogatory 18<br>Form I-821D, Consideration of Deferred Action<br>for Childhood Arrivals<br>DACA Renewals<br>Average Processing Time<br>July 1, 2018 - Sep 8, 2020 |  U.S. Citizenship and Immigration Services |
|---|---|
| **Completion Date Range** | **Average Processing Time (Months)** |
| July 1, 2018 - Sep 8, 2020 | 1.4 |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2)  Rejected and pending cases are excluded.

3)  Processing time is calculated as the elapsed number of days between the date USCIS received the case until the date of the final adjudicative action.

4)  The number of months is determined by using a conversion of 30.4 days per month.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

**Interrogatory 19**
Form I-821D, Consideration of Deferred Action
for Childhood Arrivals
DACA Initials & Renewals
Count of Adjudications by Service Center Location & Fiscal Year
July 1, 2018 - Sep 8, 2020

**U.S. Citizenship and Immigration Services**

| Service Center | Adjudication Fiscal Year | DACA - Initial Adjudications | DACA - Renewal Adjudications | Grand Total Adjudications |
|---|---|---|---|---|
| California Service Center | 2018 | 4,589 | - | 4,589 |
| California Service Center | 2019 | 2,973 | - | 2,973 |
| California Service Center | 2020 | 1,985 | - | 1,985 |
| **California Service Center Total** | | **9,547** | **-** | **9,547** |
| Nebraska Service Center | 2018 | 8 | 83,915 | 83,923 |
| Nebraska Service Center | 2019 | 19 | 379,759 | 379,778 |
| Nebraska Service Center | 2020 | 14 | 278,902 | 278,916 |
| **Nebraska Service Center Total** | | **41** | **742,576** | **742,617** |
| Texas Service Center | 2018 | - | - | - |
| Texas Service Center | 2019 | 3 | 2 | 5 |
| Texas Service Center | 2020 | - | - | - |
| **Texas Service Center Total** | | **3** | **2** | **5** |
| Vermont Service Center | 2018 | 48 | 1,541 | 1,589 |
| Vermont Service Center | 2019 | 80 | 8,891 | 8,971 |
| Vermont Service Center | 2020 | 81 | 6,358 | 6,439 |
| **Vermont Service Center Total** | | **209** | **16,790** | **16,999** |
| **Grand Total** | | **9,800** | **759,368** | **769,168** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Potomac Service Center had 0 DACA adjudications.

3) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.



**Interrogatory 20**
Form I-821D, Consideration of Deferred Action
for Childhood Arrivals
DACA Initials
Count of Denials by Month and Selected State
July 1, 2018 - Sep 8, 2020

U.S. Citizenship
and Immigration
Services

| State | Month | Denials |
|---|---|---|
| Alabama | July-18 | 4 |
| Alabama | August-18 | 12 |
| Alabama | September-18 | 4 |
| Alabama | October-18 | 3 |
| Alabama | November-18 | 1 |
| Alabama | December-18 | 1 |
| Alabama | January-19 | - |
| Alabama | February-19 | 1 |
| Alabama | March-19 | - |
| Alabama | April-19 | - |
| Alabama | May-19 | 2 |
| Alabama | June-19 | - |
| Alabama | July-19 | - |
| Alabama | August-19 | 1 |
| Alabama | September-19 | - |
| Alabama | October-19 | - |
| Alabama | November-19 | - |
| Alabama | December-19 | - |
| Alabama | January-20 | 1 |
| Alabama | February-20 | 1 |
| Alabama | March-20 | - |
| Alabama | April-20 | - |
| Alabama | May-20 | - |
| Alabama | June-20 | - |
| Alabama | July-20 | - |
| Alabama | August-20 | - |
| Alabama | September-20 | - |
| **Alabama Total** | | **31** |
| Arkansas | July-18 | 7 |
| Arkansas | August-18 | 8 |
| Arkansas | September-18 | 1 |
| Arkansas | October-18 | 1 |
| Arkansas | November-18 | 1 |
| Arkansas | December-18 | 1 |
| Arkansas | January-19 | 1 |
| Arkansas | February-19 | 1 |
| Arkansas | March-19 | - |
| Arkansas | April-19 | - |
| Arkansas | May-19 | - |

| Arkansas | June-19 | - |
|---|---|---|
| Arkansas | July-19 | 1 |
| Arkansas | August-19 | - |
| Arkansas | September-19 | - |
| Arkansas | October-19 | - |
| Arkansas | November-19 | - |
| Arkansas | December-19 | - |
| Arkansas | January-20 | 1 |
| Arkansas | February-20 | - |
| Arkansas | March-20 | - |
| Arkansas | April-20 | - |
| Arkansas | May-20 | 1 |
| Arkansas | June-20 | - |
| Arkansas | July-20 | - |
| Arkansas | August-20 | - |
| Arkansas | September-20 | - |
| **Arkansas Total** | | **24** |
| Kansas | July-18 | 6 |
| Kansas | August-18 | 2 |
| Kansas | September-18 | 1 |
| Kansas | October-18 | 4 |
| Kansas | November-18 | 2 |
| Kansas | December-18 | - |
| Kansas | January-19 | - |
| Kansas | February-19 | 3 |
| Kansas | March-19 | 3 |
| Kansas | April-19 | - |
| Kansas | May-19 | - |
| Kansas | June-19 | 1 |
| Kansas | July-19 | 1 |
| Kansas | August-19 | - |
| Kansas | September-19 | - |
| Kansas | October-19 | - |
| Kansas | November-19 | - |
| Kansas | December-19 | - |
| Kansas | January-20 | 1 |
| Kansas | February-20 | - |
| Kansas | March-20 | - |
| Kansas | April-20 | - |
| Kansas | May-20 | - |
| Kansas | June-20 | 1 |
| Kansas | July-20 | 1 |
| Kansas | August-20 | - |
| Kansas | September-20 | - |
| **Kansas Total** | | **26** |
| Louisiana | July-18 | 5 |
| Louisiana | August-18 | 3 |

| | | |
|---|---|---|
| Louisiana | September-18 | 3 |
| Louisiana | October-18 | 3 |
| Louisiana | November-18 | - |
| Louisiana | December-18 | - |
| Louisiana | January-19 | - |
| Louisiana | February-19 | - |
| Louisiana | March-19 | 1 |
| Louisiana | April-19 | - |
| Louisiana | May-19 | 3 |
| Louisiana | June-19 | - |
| Louisiana | July-19 | - |
| Louisiana | August-19 | - |
| Louisiana | September-19 | - |
| Louisiana | October-19 | - |
| Louisiana | November-19 | - |
| Louisiana | December-19 | 1 |
| Louisiana | January-20 | - |
| Louisiana | February-20 | - |
| Louisiana | March-20 | 1 |
| Louisiana | April-20 | 1 |
| Louisiana | May-20 | - |
| Louisiana | June-20 | - |
| Louisiana | July-20 | - |
| Louisiana | August-20 | - |
| Louisiana | September-20 | - |
| **Louisiana Total** | | **21** |
| Mississippi | July-18 | 3 |
| Mississippi | August-18 | 1 |
| Mississippi | September-18 | - |
| Mississippi | October-18 | 1 |
| Mississippi | November-18 | - |
| Mississippi | December-18 | - |
| Mississippi | January-19 | 1 |
| Mississippi | February-19 | - |
| Mississippi | March-19 | - |
| Mississippi | April-19 | - |
| Mississippi | May-19 | - |
| Mississippi | June-19 | - |
| Mississippi | July-19 | - |
| Mississippi | August-19 | - |
| Mississippi | September-19 | - |
| Mississippi | October-19 | - |
| Mississippi | November-19 | - |
| Mississippi | December-19 | - |
| Mississippi | January-20 | - |
| Mississippi | February-20 | 1 |
| Mississippi | March-20 | - |

| | | |
|---|---|---|
| Mississippi | April-20 | - |
| Mississippi | May-20 | - |
| Mississippi | June-20 | - |
| Mississippi | July-20 | 1 |
| Mississippi | August-20 | - |
| Mississippi | September-20 | - |
| **Mississippi Total** | | **8** |
| Nebraska | July-18 | 1 |
| Nebraska | August-18 | 2 |
| Nebraska | September-18 | 1 |
| Nebraska | October-18 | 1 |
| Nebraska | November-18 | 1 |
| Nebraska | December-18 | 1 |
| Nebraska | January-19 | - |
| Nebraska | February-19 | 1 |
| Nebraska | March-19 | 1 |
| Nebraska | April-19 | 1 |
| Nebraska | May-19 | 1 |
| Nebraska | June-19 | - |
| Nebraska | July-19 | - |
| Nebraska | August-19 | - |
| Nebraska | September-19 | - |
| Nebraska | October-19 | - |
| Nebraska | November-19 | - |
| Nebraska | December-19 | - |
| Nebraska | January-20 | 1 |
| Nebraska | February-20 | - |
| Nebraska | March-20 | - |
| Nebraska | April-20 | - |
| Nebraska | May-20 | - |
| Nebraska | June-20 | 1 |
| Nebraska | July-20 | - |
| Nebraska | August-20 | - |
| Nebraska | September-20 | - |
| **Nebraska Total** | | **13** |
| South Carolina | July-18 | 14 |
| South Carolina | August-18 | 14 |
| South Carolina | September-18 | 5 |
| South Carolina | October-18 | 3 |
| South Carolina | November-18 | - |
| South Carolina | December-18 | 4 |
| South Carolina | January-19 | 1 |
| South Carolina | February-19 | 2 |
| South Carolina | March-19 | 1 |
| South Carolina | April-19 | - |
| South Carolina | May-19 | 2 |
| South Carolina | June-19 | 1 |

| | | |
|---|---|---|
| South Carolina | July-19 | - |
| South Carolina | August-19 | 1 |
| South Carolina | September-19 | 1 |
| South Carolina | October-19 | 1 |
| South Carolina | November-19 | - |
| South Carolina | December-19 | - |
| South Carolina | January-20 | - |
| South Carolina | February-20 | 1 |
| South Carolina | March-20 | 1 |
| South Carolina | April-20 | - |
| South Carolina | May-20 | 2 |
| South Carolina | June-20 | 2 |
| South Carolina | July-20 | - |
| South Carolina | August-20 | - |
| South Carolina | September-20 | 1 |
| **South Carolina Total** | | **57** |
| Texas | July-18 | 149 |
| Texas | August-18 | 132 |
| Texas | September-18 | 107 |
| Texas | October-18 | 57 |
| Texas | November-18 | 20 |
| Texas | December-18 | 21 |
| Texas | January-19 | 19 |
| Texas | February-19 | 24 |
| Texas | March-19 | 15 |
| Texas | April-19 | 5 |
| Texas | May-19 | 12 |
| Texas | June-19 | 11 |
| Texas | July-19 | 6 |
| Texas | August-19 | 1 |
| Texas | September-19 | 11 |
| Texas | October-19 | 3 |
| Texas | November-19 | 6 |
| Texas | December-19 | 5 |
| Texas | January-20 | 6 |
| Texas | February-20 | 13 |
| Texas | March-20 | 13 |
| Texas | April-20 | 9 |
| Texas | May-20 | 4 |
| Texas | June-20 | 13 |
| Texas | July-20 | 13 |
| Texas | August-20 | 2 |
| Texas | September-20 | - |
| **Texas Total** | | **677** |
| West Virginia | July-18 | 2 |
| West Virginia | August-18 | - |
| West Virginia | September-18 | - |

| | | |
|---|---|---|
| West Virginia | October-18 | - |
| West Virginia | November-18 | - |
| West Virginia | December-18 | 1 |
| West Virginia | January-19 | - |
| West Virginia | February-19 | - |
| West Virginia | March-19 | - |
| West Virginia | April-19 | - |
| West Virginia | May-19 | - |
| West Virginia | June-19 | - |
| West Virginia | July-19 | - |
| West Virginia | August-19 | - |
| West Virginia | September-19 | - |
| West Virginia | October-19 | - |
| West Virginia | November-19 | - |
| West Virginia | December-19 | - |
| West Virginia | January-20 | - |
| West Virginia | February-20 | - |
| West Virginia | March-20 | - |
| West Virginia | April-20 | - |
| West Virginia | May-20 | - |
| West Virginia | June-20 | - |
| West Virginia | July-20 | - |
| West Virginia | August-20 | - |
| West Virginia | September-20 | - |
| **West Virginia Total** | | **3** |
| **Grand Total** | | **860** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Month represents the month the most recent final adjudication action occurred.

3) Requests denied in a given month may have been received in a previous month.

4) State is determined by the requestor's address listed on the form I-821D.

5) Reason for denial is not captured electronically.

6) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

| Interrogatory 21<br>Form I-821D, Consideration of Deferred Action for Childhood Arrivals<br>DACA Renewals<br>Count of Denials by Month and Selected State<br>July 1, 2018 - Sep 8, 2020 | | U.S. Citizenship and Immigration Services |
|---|---|---|
| **State** | **Month** | **Denials** |
| Alabama | July-18 | 1 |
| Alabama | August-18 | 1 |
| Alabama | September-18 | 2 |
| Alabama | October-18 | - |
| Alabama | November-18 | - |
| Alabama | December-18 | - |
| Alabama | January-19 | 2 |
| Alabama | February-19 | - |
| Alabama | March-19 | 3 |
| Alabama | April-19 | - |
| Alabama | May-19 | 2 |
| Alabama | June-19 | - |
| Alabama | July-19 | - |
| Alabama | August-19 | 3 |
| Alabama | September-19 | 2 |
| Alabama | October-19 | 1 |
| Alabama | November-19 | 2 |
| Alabama | December-19 | 1 |
| Alabama | January-20 | 4 |
| Alabama | February-20 | 1 |
| Alabama | March-20 | 2 |
| Alabama | April-20 | 2 |
| Alabama | May-20 | - |
| Alabama | June-20 | 3 |
| Alabama | July-20 | 1 |
| Alabama | August-20 | - |
| Alabama | September-20 | - |
| **Alabama Total** | | **33** |
| Arkansas | July-18 | 1 |
| Arkansas | August-18 | 4 |
| Arkansas | September-18 | 2 |
| Arkansas | October-18 | 4 |
| Arkansas | November-18 | 1 |
| Arkansas | December-18 | 2 |
| Arkansas | January-19 | 3 |
| Arkansas | February-19 | 1 |
| Arkansas | March-19 | 2 |
| Arkansas | April-19 | 1 |
| Arkansas | May-19 | 4 |

| | | |
|---|---|---|
| Arkansas | June-19 | 1 |
| Arkansas | July-19 | - |
| Arkansas | August-19 | 3 |
| Arkansas | September-19 | 2 |
| Arkansas | October-19 | 3 |
| Arkansas | November-19 | 3 |
| Arkansas | December-19 | 3 |
| Arkansas | January-20 | 1 |
| Arkansas | February-20 | 1 |
| Arkansas | March-20 | 2 |
| Arkansas | April-20 | - |
| Arkansas | May-20 | 1 |
| Arkansas | June-20 | 1 |
| Arkansas | July-20 | 1 |
| Arkansas | August-20 | 1 |
| Arkansas | September-20 | - |
| **Arkansas Total** | | **48** |
| Kansas | July-18 | 2 |
| Kansas | August-18 | 2 |
| Kansas | September-18 | 2 |
| Kansas | October-18 | 2 |
| Kansas | November-18 | 2 |
| Kansas | December-18 | 2 |
| Kansas | January-19 | 5 |
| Kansas | February-19 | 3 |
| Kansas | March-19 | 1 |
| Kansas | April-19 | 4 |
| Kansas | May-19 | 3 |
| Kansas | June-19 | 3 |
| Kansas | July-19 | 1 |
| Kansas | August-19 | 3 |
| Kansas | September-19 | 3 |
| Kansas | October-19 | 1 |
| Kansas | November-19 | 2 |
| Kansas | December-19 | 4 |
| Kansas | January-20 | 3 |
| Kansas | February-20 | 3 |
| Kansas | March-20 | 4 |
| Kansas | April-20 | 1 |
| Kansas | May-20 | 1 |
| Kansas | June-20 | 2 |
| Kansas | July-20 | 3 |
| Kansas | August-20 | 4 |
| Kansas | September-20 | - |
| **Kansas Total** | | **66** |
| Louisiana | July-18 | 2 |
| Louisiana | August-18 | 1 |

| | | |
|---|---|---:|
| Louisiana | September-18 | - |
| Louisiana | October-18 | 2 |
| Louisiana | November-18 | - |
| Louisiana | December-18 | - |
| Louisiana | January-19 | 1 |
| Louisiana | February-19 | - |
| Louisiana | March-19 | 1 |
| Louisiana | April-19 | 1 |
| Louisiana | May-19 | - |
| Louisiana | June-19 | - |
| Louisiana | July-19 | 1 |
| Louisiana | August-19 | 3 |
| Louisiana | September-19 | 1 |
| Louisiana | October-19 | - |
| Louisiana | November-19 | 2 |
| Louisiana | December-19 | - |
| Louisiana | January-20 | 1 |
| Louisiana | February-20 | 1 |
| Louisiana | March-20 | - |
| Louisiana | April-20 | 1 |
| Louisiana | May-20 | 2 |
| Louisiana | June-20 | - |
| Louisiana | July-20 | 2 |
| Louisiana | August-20 | 1 |
| Louisiana | September-20 | - |
| **Louisiana Total** | | **23** |
| Mississippi | July-18 | - |
| Mississippi | August-18 | 1 |
| Mississippi | September-18 | 1 |
| Mississippi | October-18 | - |
| Mississippi | November-18 | 1 |
| Mississippi | December-18 | - |
| Mississippi | January-19 | - |
| Mississippi | February-19 | - |
| Mississippi | March-19 | - |
| Mississippi | April-19 | - |
| Mississippi | May-19 | - |
| Mississippi | June-19 | 1 |
| Mississippi | July-19 | - |
| Mississippi | August-19 | - |
| Mississippi | September-19 | - |
| Mississippi | October-19 | 3 |
| Mississippi | November-19 | 1 |
| Mississippi | December-19 | 1 |
| Mississippi | January-20 | 1 |
| Mississippi | February-20 | 1 |
| Mississippi | March-20 | - |

| | | |
|---|---|---|
| Mississippi | April-20 | 1 |
| Mississippi | May-20 | - |
| Mississippi | June-20 | - |
| Mississippi | July-20 | - |
| Mississippi | August-20 | - |
| Mississippi | September-20 | 1 |
| **Mississippi Total** | | **13** |
| Nebraska | July-18 | - |
| Nebraska | August-18 | - |
| Nebraska | September-18 | 2 |
| Nebraska | October-18 | - |
| Nebraska | November-18 | 3 |
| Nebraska | December-18 | 1 |
| Nebraska | January-19 | 1 |
| Nebraska | February-19 | 5 |
| Nebraska | March-19 | 3 |
| Nebraska | April-19 | 1 |
| Nebraska | May-19 | 1 |
| Nebraska | June-19 | - |
| Nebraska | July-19 | 1 |
| Nebraska | August-19 | 2 |
| Nebraska | September-19 | - |
| Nebraska | October-19 | 1 |
| Nebraska | November-19 | 1 |
| Nebraska | December-19 | 3 |
| Nebraska | January-20 | 1 |
| Nebraska | February-20 | 1 |
| Nebraska | March-20 | 2 |
| Nebraska | April-20 | 2 |
| Nebraska | May-20 | 2 |
| Nebraska | June-20 | - |
| Nebraska | July-20 | 3 |
| Nebraska | August-20 | 3 |
| Nebraska | September-20 | 1 |
| **Nebraska Total** | | **40** |
| South Carolina | July-18 | 2 |
| South Carolina | August-18 | 5 |
| South Carolina | September-18 | - |
| South Carolina | October-18 | - |
| South Carolina | November-18 | 1 |
| South Carolina | December-18 | 2 |
| South Carolina | January-19 | 1 |
| South Carolina | February-19 | 1 |
| South Carolina | March-19 | - |
| South Carolina | April-19 | 3 |
| South Carolina | May-19 | 2 |
| South Carolina | June-19 | 2 |

| | | |
|---|---:|---:|
| South Carolina | July-19 | 1 |
| South Carolina | August-19 | 2 |
| South Carolina | September-19 | 3 |
| South Carolina | October-19 | 7 |
| South Carolina | November-19 | 2 |
| South Carolina | December-19 | 2 |
| South Carolina | January-20 | 2 |
| South Carolina | February-20 | 1 |
| South Carolina | March-20 | - |
| South Carolina | April-20 | 3 |
| South Carolina | May-20 | 3 |
| South Carolina | June-20 | 3 |
| South Carolina | July-20 | - |
| South Carolina | August-20 | 2 |
| South Carolina | September-20 | 1 |
| **South Carolina Total** | | **51** |
| Texas | July-18 | 37 |
| Texas | August-18 | 31 |
| Texas | September-18 | 24 |
| Texas | October-18 | 37 |
| Texas | November-18 | 40 |
| Texas | December-18 | 23 |
| Texas | January-19 | 40 |
| Texas | February-19 | 23 |
| Texas | March-19 | 26 |
| Texas | April-19 | 44 |
| Texas | May-19 | 57 |
| Texas | June-19 | 28 |
| Texas | July-19 | 43 |
| Texas | August-19 | 53 |
| Texas | September-19 | 45 |
| Texas | October-19 | 54 |
| Texas | November-19 | 38 |
| Texas | December-19 | 47 |
| Texas | January-20 | 44 |
| Texas | February-20 | 53 |
| Texas | March-20 | 48 |
| Texas | April-20 | 58 |
| Texas | May-20 | 32 |
| Texas | June-20 | 37 |
| Texas | July-20 | 25 |
| Texas | August-20 | 28 |
| Texas | September-20 | 6 |
| **Texas Total** | | **1,021** |
| West Virginia | July-18 | - |
| West Virginia | August-18 | - |
| West Virginia | September-18 | 1 |

| West Virginia | October-18 | - |
| West Virginia | November-18 | - |
| West Virginia | December-18 | - |
| West Virginia | January-19 | - |
| West Virginia | February-19 | - |
| West Virginia | March-19 | - |
| West Virginia | April-19 | - |
| West Virginia | May-19 | - |
| West Virginia | June-19 | - |
| West Virginia | July-19 | - |
| West Virginia | August-19 | 1 |
| West Virginia | September-19 | 1 |
| West Virginia | October-19 | - |
| West Virginia | November-19 | - |
| West Virginia | December-19 | - |
| West Virginia | January-20 | - |
| West Virginia | February-20 | - |
| West Virginia | March-20 | - |
| West Virginia | April-20 | - |
| West Virginia | May-20 | - |
| West Virginia | June-20 | - |
| West Virginia | July-20 | - |
| West Virginia | August-20 | - |
| West Virginia | September-20 | - |
| **West Virginia Total** | | **3** |
| **Grand Total** | | **1,298** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Month represents the month the most recent final adjudication action occurred.

3) Requests denied in a given month may have been received in a previous month.

4) State is determined by the requestor's address listed on the form I-821D.

5) Reason for denial is not captured electronically.

6) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

**Interrogatory 22**
Form I-821D, Consideration of Deferred Action
for Childhood Arrivals
DACA Initials
Count of Requests for Evidence (RFE) by Month and Selected State
July 1, 2018 - Sep 8, 2020

**U.S. Citizenship and Immigration Services**

| State | Month | Requests for Evidence |
|---|---|---|
| Alabama | July-18 | 2 |
| Alabama | August-18 | 1 |
| Alabama | September-18 | 1 |
| Alabama | October-18 | - |
| Alabama | November-18 | - |
| Alabama | December-18 | 2 |
| Alabama | January-19 | 1 |
| Alabama | February-19 | - |
| Alabama | March-19 | - |
| Alabama | April-19 | - |
| Alabama | May-19 | 3 |
| Alabama | June-19 | - |
| Alabama | July-19 | 2 |
| Alabama | August-19 | - |
| Alabama | September-19 | 2 |
| Alabama | October-19 | - |
| Alabama | November-19 | 3 |
| Alabama | December-19 | 3 |
| Alabama | January-20 | - |
| Alabama | February-20 | - |
| Alabama | March-20 | 1 |
| Alabama | April-20 | - |
| Alabama | May-20 | 1 |
| Alabama | June-20 | 3 |
| Alabama | July-20 | 1 |
| Alabama | August-20 | - |
| Alabama | September-20 | - |
| **Alabama Total** | | **26** |
| Arkansas | July-18 | - |
| Arkansas | August-18 | 2 |
| Arkansas | September-18 | - |
| Arkansas | October-18 | - |
| Arkansas | November-18 | - |
| Arkansas | December-18 | 1 |
| Arkansas | January-19 | 1 |
| Arkansas | February-19 | 1 |
| Arkansas | March-19 | - |
| Arkansas | April-19 | 1 |
| Arkansas | May-19 | - |

| | | |
|---|---|---|
| Arkansas | June-19 | - |
| Arkansas | July-19 | - |
| Arkansas | August-19 | - |
| Arkansas | September-19 | - |
| Arkansas | October-19 | - |
| Arkansas | November-19 | 3 |
| Arkansas | December-19 | - |
| Arkansas | January-20 | 1 |
| Arkansas | February-20 | 1 |
| Arkansas | March-20 | 1 |
| Arkansas | April-20 | 1 |
| Arkansas | May-20 | 1 |
| Arkansas | June-20 | 1 |
| Arkansas | July-20 | 2 |
| Arkansas | August-20 | - |
| Arkansas | September-20 | - |
| **Arkansas Total** | | **17** |
| Kansas | July-18 | 3 |
| Kansas | August-18 | 2 |
| Kansas | September-18 | - |
| Kansas | October-18 | - |
| Kansas | November-18 | - |
| Kansas | December-18 | 5 |
| Kansas | January-19 | 2 |
| Kansas | February-19 | 1 |
| Kansas | March-19 | - |
| Kansas | April-19 | 1 |
| Kansas | May-19 | - |
| Kansas | June-19 | - |
| Kansas | July-19 | - |
| Kansas | August-19 | - |
| Kansas | September-19 | 1 |
| Kansas | October-19 | - |
| Kansas | November-19 | 1 |
| Kansas | December-19 | 1 |
| Kansas | January-20 | 1 |
| Kansas | February-20 | 2 |
| Kansas | March-20 | 2 |
| Kansas | April-20 | - |
| Kansas | May-20 | 3 |
| Kansas | June-20 | 1 |
| Kansas | July-20 | 2 |
| Kansas | August-20 | - |
| Kansas | September-20 | - |
| **Kansas Total** | | **28** |
| Louisiana | July-18 | 3 |
| Louisiana | August-18 | 2 |

| | | |
|---|---|---|
| Louisiana | September-18 | - |
| Louisiana | October-18 | - |
| Louisiana | November-18 | 1 |
| Louisiana | December-18 | - |
| Louisiana | January-19 | 1 |
| Louisiana | February-19 | 1 |
| Louisiana | March-19 | - |
| Louisiana | April-19 | - |
| Louisiana | May-19 | - |
| Louisiana | June-19 | - |
| Louisiana | July-19 | - |
| Louisiana | August-19 | 1 |
| Louisiana | September-19 | - |
| Louisiana | October-19 | - |
| Louisiana | November-19 | - |
| Louisiana | December-19 | 3 |
| Louisiana | January-20 | - |
| Louisiana | February-20 | - |
| Louisiana | March-20 | - |
| Louisiana | April-20 | - |
| Louisiana | May-20 | 1 |
| Louisiana | June-20 | 1 |
| Louisiana | July-20 | - |
| Louisiana | August-20 | - |
| Louisiana | September-20 | - |
| **Louisiana Total** | | **14** |
| Mississippi | July-18 | 1 |
| Mississippi | August-18 | - |
| Mississippi | September-18 | - |
| Mississippi | October-18 | - |
| Mississippi | November-18 | - |
| Mississippi | December-18 | - |
| Mississippi | January-19 | - |
| Mississippi | February-19 | - |
| Mississippi | March-19 | - |
| Mississippi | April-19 | - |
| Mississippi | May-19 | - |
| Mississippi | June-19 | - |
| Mississippi | July-19 | - |
| Mississippi | August-19 | 1 |
| Mississippi | September-19 | - |
| Mississippi | October-19 | - |
| Mississippi | November-19 | 2 |
| Mississippi | December-19 | - |
| Mississippi | January-20 | - |
| Mississippi | February-20 | 1 |
| Mississippi | March-20 | - |

| | | |
|---|---|---|
| Mississippi | April-20 | - |
| Mississippi | May-20 | 1 |
| Mississippi | June-20 | 2 |
| Mississippi | July-20 | - |
| Mississippi | August-20 | - |
| Mississippi | September-20 | - |
| **Mississippi Total** | | **8** |
| Nebraska | July-18 | - |
| Nebraska | August-18 | 2 |
| Nebraska | September-18 | 1 |
| Nebraska | October-18 | - |
| Nebraska | November-18 | 1 |
| Nebraska | December-18 | 3 |
| Nebraska | January-19 | - |
| Nebraska | February-19 | - |
| Nebraska | March-19 | 1 |
| Nebraska | April-19 | - |
| Nebraska | May-19 | 1 |
| Nebraska | June-19 | - |
| Nebraska | July-19 | - |
| Nebraska | August-19 | - |
| Nebraska | September-19 | - |
| Nebraska | October-19 | 1 |
| Nebraska | November-19 | - |
| Nebraska | December-19 | - |
| Nebraska | January-20 | - |
| Nebraska | February-20 | 1 |
| Nebraska | March-20 | 1 |
| Nebraska | April-20 | 3 |
| Nebraska | May-20 | 4 |
| Nebraska | June-20 | 2 |
| Nebraska | July-20 | - |
| Nebraska | August-20 | - |
| Nebraska | September-20 | 1 |
| **Nebraska Total** | | **22** |
| South Carolina | July-18 | 6 |
| South Carolina | August-18 | 3 |
| South Carolina | September-18 | - |
| South Carolina | October-18 | 2 |
| South Carolina | November-18 | - |
| South Carolina | December-18 | 3 |
| South Carolina | January-19 | 2 |
| South Carolina | February-19 | 1 |
| South Carolina | March-19 | 1 |
| South Carolina | April-19 | - |
| South Carolina | May-19 | 1 |
| South Carolina | June-19 | 1 |

| | | |
|---|---|---|
| South Carolina | July-19 | 2 |
| South Carolina | August-19 | - |
| South Carolina | September-19 | 1 |
| South Carolina | October-19 | 1 |
| South Carolina | November-19 | - |
| South Carolina | December-19 | 6 |
| South Carolina | January-20 | 1 |
| South Carolina | February-20 | 1 |
| South Carolina | March-20 | 1 |
| South Carolina | April-20 | 1 |
| South Carolina | May-20 | 2 |
| South Carolina | June-20 | 3 |
| South Carolina | July-20 | 1 |
| South Carolina | August-20 | - |
| South Carolina | September-20 | - |
| **South Carolina Total** | | **40** |
| Texas | July-18 | 68 |
| Texas | August-18 | 39 |
| Texas | September-18 | 21 |
| Texas | October-18 | 19 |
| Texas | November-18 | 32 |
| Texas | December-18 | 51 |
| Texas | January-19 | 25 |
| Texas | February-19 | 14 |
| Texas | March-19 | 18 |
| Texas | April-19 | 8 |
| Texas | May-19 | 18 |
| Texas | June-19 | 8 |
| Texas | July-19 | 15 |
| Texas | August-19 | 10 |
| Texas | September-19 | 15 |
| Texas | October-19 | 15 |
| Texas | November-19 | 23 |
| Texas | December-19 | 43 |
| Texas | January-20 | 12 |
| Texas | February-20 | 38 |
| Texas | March-20 | 27 |
| Texas | April-20 | 22 |
| Texas | May-20 | 50 |
| Texas | June-20 | 74 |
| Texas | July-20 | 42 |
| Texas | August-20 | 1 |
| Texas | September-20 | 2 |
| **Texas Total** | | **710** |
| West Virginia | July-18 | - |
| West Virginia | August-18 | - |
| West Virginia | September-18 | - |

| | | |
|---|---|---|
| West Virginia | October-18 | - |
| West Virginia | November-18 | - |
| West Virginia | December-18 | - |
| West Virginia | January-19 | - |
| West Virginia | February-19 | - |
| West Virginia | March-19 | - |
| West Virginia | April-19 | - |
| West Virginia | May-19 | - |
| West Virginia | June-19 | - |
| West Virginia | July-19 | - |
| West Virginia | August-19 | - |
| West Virginia | September-19 | - |
| West Virginia | October-19 | - |
| West Virginia | November-19 | - |
| West Virginia | December-19 | - |
| West Virginia | January-20 | - |
| West Virginia | February-20 | - |
| West Virginia | March-20 | - |
| West Virginia | April-20 | - |
| West Virginia | May-20 | - |
| West Virginia | June-20 | - |
| West Virginia | July-20 | - |
| West Virginia | August-20 | - |
| West Virginia | September-20 | - |
| **West Virginia Total** | | **-** |
| **Grand Total** | | **865** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Month represents the month the first RFE was sent.

3) DACA Requests with multiple RFEs are only counted in the month the 1st request for evidence was sent.

4) State is determined by the requestor's address listed on the form I-821D.

5) Reason for RFE is not captured electronically.

6) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

**Interrogatory 23**
Form I-821D, Consideration of Deferred Action
for Childhood Arrivals
DACA Renewals
Count of Requests for Evidence (RFE) by Month and Selected State
July 1, 2018 - Sep 8, 2020

U.S. Citizenship
and Immigration
Services

| State | Month | Requests for Evidence |
|---|---|---|
| Alabama | July-18 | 4 |
| Alabama | August-18 | 4 |
| Alabama | September-18 | 4 |
| Alabama | October-18 | 4 |
| Alabama | November-18 | 3 |
| Alabama | December-18 | 9 |
| Alabama | January-19 | 6 |
| Alabama | February-19 | 2 |
| Alabama | March-19 | - |
| Alabama | April-19 | 7 |
| Alabama | May-19 | 3 |
| Alabama | June-19 | 3 |
| Alabama | July-19 | 7 |
| Alabama | August-19 | 3 |
| Alabama | September-19 | 5 |
| Alabama | October-19 | 8 |
| Alabama | November-19 | 3 |
| Alabama | December-19 | 3 |
| Alabama | January-20 | - |
| Alabama | February-20 | 2 |
| Alabama | March-20 | - |
| Alabama | April-20 | - |
| Alabama | May-20 | 3 |
| Alabama | June-20 | 4 |
| Alabama | July-20 | 4 |
| Alabama | August-20 | 4 |
| Alabama | September-20 | - |
| **Alabama Total** | | **95** |
| Arkansas | July-18 | 4 |
| Arkansas | August-18 | 5 |
| Arkansas | September-18 | 4 |
| Arkansas | October-18 | 6 |
| Arkansas | November-18 | 3 |
| Arkansas | December-18 | 9 |
| Arkansas | January-19 | 7 |
| Arkansas | February-19 | 6 |
| Arkansas | March-19 | 3 |
| Arkansas | April-19 | 7 |
| Arkansas | May-19 | 4 |

| | | |
|---|---|---|
| Arkansas | June-19 | 2 |
| Arkansas | July-19 | 2 |
| Arkansas | August-19 | 4 |
| Arkansas | September-19 | 8 |
| Arkansas | October-19 | 2 |
| Arkansas | November-19 | 2 |
| Arkansas | December-19 | 2 |
| Arkansas | January-20 | 1 |
| Arkansas | February-20 | 1 |
| Arkansas | March-20 | - |
| Arkansas | April-20 | 4 |
| Arkansas | May-20 | 5 |
| Arkansas | June-20 | 3 |
| Arkansas | July-20 | 5 |
| Arkansas | August-20 | 1 |
| Arkansas | September-20 | - |
| **Arkansas Total** | | **100** |
| Kansas | July-18 | 17 |
| Kansas | August-18 | 11 |
| Kansas | September-18 | 15 |
| Kansas | October-18 | 6 |
| Kansas | November-18 | 7 |
| Kansas | December-18 | 12 |
| Kansas | January-19 | 11 |
| Kansas | February-19 | 9 |
| Kansas | March-19 | 11 |
| Kansas | April-19 | 9 |
| Kansas | May-19 | 1 |
| Kansas | June-19 | 4 |
| Kansas | July-19 | 6 |
| Kansas | August-19 | 5 |
| Kansas | September-19 | 10 |
| Kansas | October-19 | 8 |
| Kansas | November-19 | 6 |
| Kansas | December-19 | 4 |
| Kansas | January-20 | - |
| Kansas | February-20 | 2 |
| Kansas | March-20 | 4 |
| Kansas | April-20 | 3 |
| Kansas | May-20 | 5 |
| Kansas | June-20 | 7 |
| Kansas | July-20 | 5 |
| Kansas | August-20 | 5 |
| Kansas | September-20 | 2 |
| **Kansas Total** | | **185** |
| Louisiana | July-18 | 2 |
| Louisiana | August-18 | 3 |

| | | |
|---|---|---|
| Louisiana | September-18 | - |
| Louisiana | October-18 | 4 |
| Louisiana | November-18 | 1 |
| Louisiana | December-18 | 9 |
| Louisiana | January-19 | 5 |
| Louisiana | February-19 | 1 |
| Louisiana | March-19 | 2 |
| Louisiana | April-19 | 1 |
| Louisiana | May-19 | - |
| Louisiana | June-19 | 1 |
| Louisiana | July-19 | 2 |
| Louisiana | August-19 | 1 |
| Louisiana | September-19 | 3 |
| Louisiana | October-19 | 3 |
| Louisiana | November-19 | 1 |
| Louisiana | December-19 | 3 |
| Louisiana | January-20 | 1 |
| Louisiana | February-20 | 1 |
| Louisiana | March-20 | - |
| Louisiana | April-20 | - |
| Louisiana | May-20 | 3 |
| Louisiana | June-20 | 3 |
| Louisiana | July-20 | 1 |
| Louisiana | August-20 | 1 |
| Louisiana | September-20 | - |
| **Louisiana Total** | | **52** |
| Mississippi | July-18 | 4 |
| Mississippi | August-18 | 2 |
| Mississippi | September-18 | 2 |
| Mississippi | October-18 | - |
| Mississippi | November-18 | - |
| Mississippi | December-18 | 3 |
| Mississippi | January-19 | 2 |
| Mississippi | February-19 | - |
| Mississippi | March-19 | - |
| Mississippi | April-19 | - |
| Mississippi | May-19 | 1 |
| Mississippi | June-19 | 1 |
| Mississippi | July-19 | 5 |
| Mississippi | August-19 | 2 |
| Mississippi | September-19 | 3 |
| Mississippi | October-19 | 1 |
| Mississippi | November-19 | 3 |
| Mississippi | December-19 | - |
| Mississippi | January-20 | - |
| Mississippi | February-20 | 1 |
| Mississippi | March-20 | 1 |

| | | |
|---|---|---|
| Mississippi | April-20 | 2 |
| Mississippi | May-20 | 1 |
| Mississippi | June-20 | 1 |
| Mississippi | July-20 | - |
| Mississippi | August-20 | - |
| Mississippi | September-20 | - |
| **Mississippi Total** | | **35** |
| Nebraska | July-18 | 4 |
| Nebraska | August-18 | 6 |
| Nebraska | September-18 | 2 |
| Nebraska | October-18 | 4 |
| Nebraska | November-18 | 3 |
| Nebraska | December-18 | 16 |
| Nebraska | January-19 | 5 |
| Nebraska | February-19 | 4 |
| Nebraska | March-19 | - |
| Nebraska | April-19 | - |
| Nebraska | May-19 | 3 |
| Nebraska | June-19 | 3 |
| Nebraska | July-19 | 4 |
| Nebraska | August-19 | 4 |
| Nebraska | September-19 | 5 |
| Nebraska | October-19 | 3 |
| Nebraska | November-19 | 2 |
| Nebraska | December-19 | 3 |
| Nebraska | January-20 | 1 |
| Nebraska | February-20 | 8 |
| Nebraska | March-20 | 3 |
| Nebraska | April-20 | - |
| Nebraska | May-20 | 3 |
| Nebraska | June-20 | 3 |
| Nebraska | July-20 | 2 |
| Nebraska | August-20 | - |
| Nebraska | September-20 | - |
| **Nebraska Total** | | **91** |
| South Carolina | July-18 | 12 |
| South Carolina | August-18 | 7 |
| South Carolina | September-18 | 22 |
| South Carolina | October-18 | 17 |
| South Carolina | November-18 | 6 |
| South Carolina | December-18 | 16 |
| South Carolina | January-19 | 14 |
| South Carolina | February-19 | 3 |
| South Carolina | March-19 | 3 |
| South Carolina | April-19 | 5 |
| South Carolina | May-19 | 6 |
| South Carolina | June-19 | 4 |

| | | |
|---|---|---|
| South Carolina | July-19 | 6 |
| South Carolina | August-19 | 3 |
| South Carolina | September-19 | 6 |
| South Carolina | October-19 | 4 |
| South Carolina | November-19 | 4 |
| South Carolina | December-19 | 5 |
| South Carolina | January-20 | 5 |
| South Carolina | February-20 | 1 |
| South Carolina | March-20 | 5 |
| South Carolina | April-20 | 5 |
| South Carolina | May-20 | 3 |
| South Carolina | June-20 | 4 |
| South Carolina | July-20 | 4 |
| South Carolina | August-20 | 1 |
| South Carolina | September-20 | 2 |
| **South Carolina Total** | | **173** |
| Texas | July-18 | 147 |
| Texas | August-18 | 129 |
| Texas | September-18 | 176 |
| Texas | October-18 | 184 |
| Texas | November-18 | 102 |
| Texas | December-18 | 254 |
| Texas | January-19 | 173 |
| Texas | February-19 | 60 |
| Texas | March-19 | 68 |
| Texas | April-19 | 81 |
| Texas | May-19 | 75 |
| Texas | June-19 | 87 |
| Texas | July-19 | 85 |
| Texas | August-19 | 76 |
| Texas | September-19 | 91 |
| Texas | October-19 | 94 |
| Texas | November-19 | 67 |
| Texas | December-19 | 69 |
| Texas | January-20 | 52 |
| Texas | February-20 | 45 |
| Texas | March-20 | 53 |
| Texas | April-20 | 58 |
| Texas | May-20 | 89 |
| Texas | June-20 | 69 |
| Texas | July-20 | 52 |
| Texas | August-20 | 56 |
| Texas | September-20 | 14 |
| **Texas Total** | | **2,506** |
| West Virginia | July-18 | - |
| West Virginia | August-18 | - |
| West Virginia | September-18 | - |

| | | |
|---|---|---|
| West Virginia | October-18 | - |
| West Virginia | November-18 | - |
| West Virginia | December-18 | - |
| West Virginia | January-19 | - |
| West Virginia | February-19 | - |
| West Virginia | March-19 | - |
| West Virginia | April-19 | - |
| West Virginia | May-19 | - |
| West Virginia | June-19 | - |
| West Virginia | July-19 | - |
| West Virginia | August-19 | - |
| West Virginia | September-19 | - |
| West Virginia | October-19 | - |
| West Virginia | November-19 | - |
| West Virginia | December-19 | - |
| West Virginia | January-20 | - |
| West Virginia | February-20 | - |
| West Virginia | March-20 | - |
| West Virginia | April-20 | - |
| West Virginia | May-20 | - |
| West Virginia | June-20 | - |
| West Virginia | July-20 | - |
| West Virginia | August-20 | - |
| West Virginia | September-20 | - |
| **West Virginia Total** | | - |
| **Grand Total** | | **3,237** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Month represents the month the first RFE was sent.

3) DACA Requests with multiple RFEs are only counted in the month the 1st request for evidence was sent.

4) State is determined by the requestor's address listed on the form I-821D.

5) Reason for RFE is not captured electronically.

6) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

**Interrogatory 24**
Form I-821D, Consideration of Deferred Action
for Childhood Arrivals
DACA Initials
Count of Approved Requests with "Yes" marked in Part 3
Question 5a "Were you EVER issued an Arrival-Departure
Record" by Month and Selected State
July 1, 2018 - Sep 8, 2020



| State | Month | Part 3 Question 5a - Yes |
|---|---|---|
| Alabama | July-18 | - |
| Alabama | August-18 | - |
| Alabama | September-18 | - |
| Alabama | October-18 | - |
| Alabama | November-18 | - |
| Alabama | December-18 | - |
| Alabama | January-19 | - |
| Alabama | February-19 | - |
| Alabama | March-19 | - |
| Alabama | April-19 | - |
| Alabama | May-19 | 1 |
| Alabama | June-19 | - |
| Alabama | July-19 | - |
| Alabama | August-19 | - |
| Alabama | September-19 | - |
| Alabama | October-19 | - |
| Alabama | November-19 | - |
| Alabama | December-19 | - |
| Alabama | January-20 | - |
| Alabama | February-20 | - |
| Alabama | March-20 | - |
| Alabama | April-20 | - |
| Alabama | May-20 | - |
| Alabama | June-20 | - |
| Alabama | July-20 | - |
| Alabama | August-20 | - |
| Alabama | September-20 | - |
| **Alabama Total** | | **1** |
| Arkansas | July-18 | - |
| Arkansas | August-18 | - |
| Arkansas | September-18 | - |
| Arkansas | October-18 | - |
| Arkansas | November-18 | - |
| Arkansas | December-18 | - |
| Arkansas | January-19 | - |
| Arkansas | February-19 | - |
| Arkansas | March-19 | - |

| | | |
|---|---|---|
| Arkansas | April-19 | - |
| Arkansas | May-19 | - |
| Arkansas | June-19 | - |
| Arkansas | July-19 | - |
| Arkansas | August-19 | - |
| Arkansas | September-19 | - |
| Arkansas | October-19 | - |
| Arkansas | November-19 | - |
| Arkansas | December-19 | - |
| Arkansas | January-20 | - |
| Arkansas | February-20 | - |
| Arkansas | March-20 | - |
| Arkansas | April-20 | - |
| Arkansas | May-20 | - |
| Arkansas | June-20 | - |
| Arkansas | July-20 | - |
| Arkansas | August-20 | - |
| Arkansas | September-20 | - |
| **Arkansas Total** | | **-** |
| Kansas | July-18 | - |
| Kansas | August-18 | - |
| Kansas | September-18 | - |
| Kansas | October-18 | - |
| Kansas | November-18 | - |
| Kansas | December-18 | - |
| Kansas | January-19 | - |
| Kansas | February-19 | - |
| Kansas | March-19 | 1 |
| Kansas | April-19 | - |
| Kansas | May-19 | - |
| Kansas | June-19 | - |
| Kansas | July-19 | - |
| Kansas | August-19 | - |
| Kansas | September-19 | - |
| Kansas | October-19 | - |
| Kansas | November-19 | - |
| Kansas | December-19 | - |
| Kansas | January-20 | - |
| Kansas | February-20 | - |
| Kansas | March-20 | - |
| Kansas | April-20 | - |
| Kansas | May-20 | - |
| Kansas | June-20 | - |
| Kansas | July-20 | - |
| Kansas | August-20 | - |
| Kansas | September-20 | - |
| **Kansas Total** | | **1** |

| Louisiana | July-18 | - |
|---|---|---|
| Louisiana | August-18 | - |
| Louisiana | September-18 | - |
| Louisiana | October-18 | - |
| Louisiana | November-18 | - |
| Louisiana | December-18 | - |
| Louisiana | January-19 | - |
| Louisiana | February-19 | - |
| Louisiana | March-19 | - |
| Louisiana | April-19 | - |
| Louisiana | May-19 | - |
| Louisiana | June-19 | - |
| Louisiana | July-19 | - |
| Louisiana | August-19 | - |
| Louisiana | September-19 | - |
| Louisiana | October-19 | - |
| Louisiana | November-19 | - |
| Louisiana | December-19 | - |
| Louisiana | January-20 | - |
| Louisiana | February-20 | - |
| Louisiana | March-20 | - |
| Louisiana | April-20 | - |
| Louisiana | May-20 | - |
| Louisiana | June-20 | - |
| Louisiana | July-20 | - |
| Louisiana | August-20 | - |
| Louisiana | September-20 | - |
| **Louisiana Total** | | **-** |
| Mississippi | July-18 | - |
| Mississippi | August-18 | - |
| Mississippi | September-18 | - |
| Mississippi | October-18 | - |
| Mississippi | November-18 | - |
| Mississippi | December-18 | - |
| Mississippi | January-19 | - |
| Mississippi | February-19 | - |
| Mississippi | March-19 | - |
| Mississippi | April-19 | - |
| Mississippi | May-19 | 1 |
| Mississippi | June-19 | - |
| Mississippi | July-19 | - |
| Mississippi | August-19 | - |
| Mississippi | September-19 | - |
| Mississippi | October-19 | - |
| Mississippi | November-19 | - |
| Mississippi | December-19 | - |
| Mississippi | January-20 | - |

| | | |
|---|---|---:|
| Mississippi | February-20 | - |
| Mississippi | March-20 | - |
| Mississippi | April-20 | - |
| Mississippi | May-20 | - |
| Mississippi | June-20 | - |
| Mississippi | July-20 | - |
| Mississippi | August-20 | - |
| Mississippi | September-20 | - |
| **Mississippi Total** | | **1** |
| Nebraska | July-18 | - |
| Nebraska | August-18 | - |
| Nebraska | September-18 | - |
| Nebraska | October-18 | - |
| Nebraska | November-18 | - |
| Nebraska | December-18 | - |
| Nebraska | January-19 | - |
| Nebraska | February-19 | - |
| Nebraska | March-19 | - |
| Nebraska | April-19 | - |
| Nebraska | May-19 | - |
| Nebraska | June-19 | - |
| Nebraska | July-19 | - |
| Nebraska | August-19 | - |
| Nebraska | September-19 | - |
| Nebraska | October-19 | - |
| Nebraska | November-19 | - |
| Nebraska | December-19 | - |
| Nebraska | January-20 | - |
| Nebraska | February-20 | - |
| Nebraska | March-20 | - |
| Nebraska | April-20 | - |
| Nebraska | May-20 | - |
| Nebraska | June-20 | - |
| Nebraska | July-20 | - |
| Nebraska | August-20 | - |
| Nebraska | September-20 | - |
| **Nebraska Total** | | **-** |
| South Carolina | July-18 | - |
| South Carolina | August-18 | - |
| South Carolina | September-18 | - |
| South Carolina | October-18 | - |
| South Carolina | November-18 | - |
| South Carolina | December-18 | - |
| South Carolina | January-19 | - |
| South Carolina | February-19 | - |
| South Carolina | March-19 | - |
| South Carolina | April-19 | 1 |

| South Carolina | May-19 | - |
|---|---|---|
| South Carolina | June-19 | - |
| South Carolina | July-19 | 1 |
| South Carolina | August-19 | - |
| South Carolina | September-19 | - |
| South Carolina | October-19 | - |
| South Carolina | November-19 | - |
| South Carolina | December-19 | - |
| South Carolina | January-20 | - |
| South Carolina | February-20 | - |
| South Carolina | March-20 | - |
| South Carolina | April-20 | - |
| South Carolina | May-20 | - |
| South Carolina | June-20 | - |
| South Carolina | July-20 | - |
| South Carolina | August-20 | - |
| South Carolina | September-20 | - |
| **South Carolina Total** | | **2** |
| Texas | July-18 | 1 |
| Texas | August-18 | 1 |
| Texas | September-18 | 1 |
| Texas | October-18 | - |
| Texas | November-18 | 3 |
| Texas | December-18 | - |
| Texas | January-19 | 1 |
| Texas | February-19 | 1 |
| Texas | March-19 | 4 |
| Texas | April-19 | 1 |
| Texas | May-19 | 1 |
| Texas | June-19 | - |
| Texas | July-19 | 3 |
| Texas | August-19 | 1 |
| Texas | September-19 | 3 |
| Texas | October-19 | 2 |
| Texas | November-19 | 2 |
| Texas | December-19 | 1 |
| Texas | January-20 | 1 |
| Texas | February-20 | - |
| Texas | March-20 | - |
| Texas | April-20 | 2 |
| Texas | May-20 | 3 |
| Texas | June-20 | - |
| Texas | July-20 | - |
| Texas | August-20 | - |
| Texas | September-20 | - |
| **Texas Total** | | **32** |
| West Virginia | July-18 | - |

| | | |
|---|---|---|
| West Virginia | August-18 | - |
| West Virginia | September-18 | - |
| West Virginia | October-18 | - |
| West Virginia | November-18 | - |
| West Virginia | December-18 | - |
| West Virginia | January-19 | - |
| West Virginia | February-19 | - |
| West Virginia | March-19 | - |
| West Virginia | April-19 | - |
| West Virginia | May-19 | - |
| West Virginia | June-19 | - |
| West Virginia | July-19 | - |
| West Virginia | August-19 | - |
| West Virginia | September-19 | - |
| West Virginia | October-19 | - |
| West Virginia | November-19 | - |
| West Virginia | December-19 | - |
| West Virginia | January-20 | - |
| West Virginia | February-20 | - |
| West Virginia | March-20 | - |
| West Virginia | April-20 | - |
| West Virginia | May-20 | - |
| West Virginia | June-20 | - |
| West Virginia | July-20 | - |
| West Virginia | August-20 | - |
| West Virginia | September-20 | - |
| **West Virginia Total** | | **-** |
| **Grand Total** | | **37** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Month represents the month the DACA request was received by USCIS.

3)  Part 3 question 5a is not recorded electronically in CLAIMS3 system.  Only cases processed in ELIS contain this information

4)  USCIS began processing cases in ELIS on Nov 1, 2015

5)  Part 3 Question 4 "Immigration Status on June 15, 2012" is not captured electronically.

6) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

**Interrogatory 25**
Form I-821D, Consideration of Deferred Action for Childhood Arrivals
Form I-485, Application to Register Permanent Residence or Adjust Status
Count of DACA Recipients who Adjusted Status after DACA Approval by Date of Adjustment, Section of Law, and Selected State
July 1, 2018 - Sep 8, 2020


U.S. Citizenship and Immigration Services

| State | Adjustment of Status Month | 8 U.S.C. 1225(a) | 8 U.S.C. 1225(i) | Other Adjustments | Grand Total |
|---|---|---|---|---|---|
| Alabama | July-18 | 3 | - | - | 3 |
| Alabama | August-18 | 7 | - | 1 | 8 |
| Alabama | September-18 | 6 | - | - | 6 |
| Alabama | October-18 | 10 | - | - | 10 |
| Alabama | November-18 | 6 | 1 | - | 7 |
| Alabama | December-18 | 1 | - | - | 1 |
| Alabama | January-19 | 11 | - | - | 11 |
| Alabama | February-19 | 7 | - | - | 7 |
| Alabama | March-19 | 5 | - | - | 5 |
| Alabama | April-19 | 3 | - | - | 3 |
| Alabama | May-19 | 2 | - | - | 2 |
| Alabama | June-19 | 1 | - | - | 1 |
| Alabama | July-19 | 3 | - | - | 3 |
| Alabama | August-19 | 4 | - | - | 4 |
| Alabama | September-19 | 3 | - | - | 3 |
| Alabama | October-19 | 3 | - | - | 3 |
| Alabama | November-19 | 2 | - | - | 2 |
| Alabama | December-19 | - | - | - | - |
| Alabama | January-20 | 7 | - | 1 | 8 |
| Alabama | February-20 | 1 | - | - | 1 |
| Alabama | March-20 | 4 | - | - | 4 |
| Alabama | April-20 | - | - | - | - |
| Alabama | May-20 | - | - | - | - |
| Alabama | June-20 | 2 | - | - | 2 |
| Alabama | July-20 | - | - | - | - |
| Alabama | August-20 | 2 | - | 1 | 3 |
| Alabama | September-20 | - | - | - | - |
| **Alabama Total** | | **93** | **1** | **3** | **97** |
| Arkansas | July-18 | 10 | - | - | 10 |
| Arkansas | August-18 | 9 | - | - | 9 |
| Arkansas | September-18 | 12 | 2 | - | 14 |
| Arkansas | October-18 | 9 | 3 | - | 12 |
| Arkansas | November-18 | 7 | - | - | 7 |
| Arkansas | December-18 | 5 | - | - | 5 |
| Arkansas | January-19 | 3 | 1 | - | 4 |
| Arkansas | February-19 | 9 | 6 | - | 15 |

| Arkansas | March-19 | 3 | 2 | - | 5 |
|---|---|---|---|---|---|
| Arkansas | April-19 | 8 | - | - | 8 |
| Arkansas | May-19 | 2 | 1 | - | 3 |
| Arkansas | June-19 | 11 | - | - | 11 |
| Arkansas | July-19 | 2 | - | - | 2 |
| Arkansas | August-19 | 4 | 3 | - | 7 |
| Arkansas | September-19 | 3 | - | - | 3 |
| Arkansas | October-19 | 1 | - | - | 1 |
| Arkansas | November-19 | 4 | 1 | 1 | 6 |
| Arkansas | December-19 | 2 | - | 1 | 3 |
| Arkansas | January-20 | 5 | - | - | 5 |
| Arkansas | February-20 | 1 | - | - | 1 |
| Arkansas | March-20 | 1 | 1 | 3 | 5 |
| Arkansas | April-20 | - | 1 | - | 1 |
| Arkansas | May-20 | 1 | 1 | - | 2 |
| Arkansas | June-20 | - | - | - | - |
| Arkansas | July-20 | 4 | - | - | 4 |
| Arkansas | August-20 | 8 | - | - | 8 |
| Arkansas | September-20 | 2 | - | - | 2 |
| **Arkansas Total** | | **126** | **22** | **5** | **153** |
| Kansas | July-18 | 9 | - | - | 9 |
| Kansas | August-18 | 16 | 2 | 1 | 19 |
| Kansas | September-18 | 8 | - | - | 8 |
| Kansas | October-18 | 12 | 2 | 1 | 15 |
| Kansas | November-18 | 11 | 2 | - | 13 |
| Kansas | December-18 | 14 | - | - | 14 |
| Kansas | January-19 | 20 | 1 | - | 21 |
| Kansas | February-19 | 12 | 5 | 1 | 18 |
| Kansas | March-19 | 12 | - | 2 | 14 |
| Kansas | April-19 | 16 | 1 | - | 17 |
| Kansas | May-19 | 11 | 3 | - | 14 |
| Kansas | June-19 | 11 | 1 | 2 | 14 |
| Kansas | July-19 | 13 | 1 | 2 | 16 |
| Kansas | August-19 | 2 | - | 2 | 4 |
| Kansas | September-19 | 10 | 1 | 1 | 12 |
| Kansas | October-19 | 5 | 1 | - | 6 |
| Kansas | November-19 | 6 | 1 | - | 7 |
| Kansas | December-19 | 8 | 3 | - | 11 |
| Kansas | January-20 | 10 | - | 2 | 12 |
| Kansas | February-20 | 8 | - | - | 8 |
| Kansas | March-20 | 6 | 1 | 1 | 8 |
| Kansas | April-20 | 2 | - | 1 | 3 |
| Kansas | May-20 | - | - | 1 | 1 |
| Kansas | June-20 | 2 | - | - | 2 |
| Kansas | July-20 | 3 | - | - | 3 |
| Kansas | August-20 | 12 | 2 | - | 14 |
| Kansas | September-20 | 4 | - | - | 4 |

| | | | | | |
|---|---|---|---|---|---|
| **Kansas Total** | | **243** | **27** | **17** | **287** |
| Louisiana | July-18 | 1 | - | - | 1 |
| Louisiana | August-18 | 2 | - | - | 2 |
| Louisiana | September-18 | 6 | - | 1 | 7 |
| Louisiana | October-18 | 3 | - | - | 3 |
| Louisiana | November-18 | 11 | - | - | 11 |
| Louisiana | December-18 | 3 | - | - | 3 |
| Louisiana | January-19 | 5 | - | - | 5 |
| Louisiana | February-19 | 3 | - | - | 3 |
| Louisiana | March-19 | 6 | - | - | 6 |
| Louisiana | April-19 | 2 | - | - | 2 |
| Louisiana | May-19 | 4 | 1 | - | 5 |
| Louisiana | June-19 | 1 | 1 | - | 2 |
| Louisiana | July-19 | 1 | - | - | 1 |
| Louisiana | August-19 | 4 | - | 2 | 6 |
| Louisiana | September-19 | 3 | - | - | 3 |
| Louisiana | October-19 | 2 | 1 | - | 3 |
| Louisiana | November-19 | 3 | - | 1 | 4 |
| Louisiana | December-19 | 1 | - | - | 1 |
| Louisiana | January-20 | - | - | 1 | 1 |
| Louisiana | February-20 | 4 | - | - | 4 |
| Louisiana | March-20 | - | - | - | - |
| Louisiana | April-20 | - | - | - | - |
| Louisiana | May-20 | 1 | - | - | 1 |
| Louisiana | June-20 | 2 | - | - | 2 |
| Louisiana | July-20 | 1 | - | - | 1 |
| Louisiana | August-20 | - | - | - | - |
| Louisiana | September-20 | - | - | - | - |
| **Louisiana Total** | | **69** | **3** | **5** | **77** |
| Mississippi | July-18 | 2 | - | - | 2 |
| Mississippi | August-18 | 8 | 2 | - | 10 |
| Mississippi | September-18 | 3 | - | - | 3 |
| Mississippi | October-18 | 5 | - | - | 5 |
| Mississippi | November-18 | 1 | - | - | 1 |
| Mississippi | December-18 | 2 | - | - | 2 |
| Mississippi | January-19 | 1 | - | - | 1 |
| Mississippi | February-19 | 3 | - | - | 3 |
| Mississippi | March-19 | - | - | - | - |
| Mississippi | April-19 | 2 | - | - | 2 |
| Mississippi | May-19 | 2 | - | - | 2 |
| Mississippi | June-19 | - | 1 | - | 1 |
| Mississippi | July-19 | 1 | - | - | 1 |
| Mississippi | August-19 | 4 | - | - | 4 |
| Mississippi | September-19 | 1 | - | - | 1 |
| Mississippi | October-19 | 3 | - | - | 3 |
| Mississippi | November-19 | 1 | - | - | 1 |
| Mississippi | December-19 | - | - | - | - |

| | | | | | |
|---|---|---|---|---|---|
| Mississippi | January-20 | - | - | - | - |
| Mississippi | February-20 | 2 | - | - | 2 |
| Mississippi | March-20 | - | 1 | - | 1 |
| Mississippi | April-20 | - | - | - | - |
| Mississippi | May-20 | 1 | - | - | 1 |
| Mississippi | June-20 | 1 | - | - | 1 |
| Mississippi | July-20 | - | - | - | - |
| Mississippi | August-20 | - | - | - | - |
| Mississippi | September-20 | - | - | - | - |
| **Mississippi Total** | | **43** | **4** | **-** | **47** |
| Nebraska | July-18 | 7 | - | - | 7 |
| Nebraska | August-18 | 4 | 2 | - | 6 |
| Nebraska | September-18 | 4 | 1 | - | 5 |
| Nebraska | October-18 | 4 | 3 | - | 7 |
| Nebraska | November-18 | 1 | 1 | - | 2 |
| Nebraska | December-18 | 1 | - | - | 1 |
| Nebraska | January-19 | - | 1 | - | 1 |
| Nebraska | February-19 | 2 | - | - | 2 |
| Nebraska | March-19 | 3 | 2 | 1 | 6 |
| Nebraska | April-19 | 3 | 5 | 1 | 9 |
| Nebraska | May-19 | 6 | - | - | 6 |
| Nebraska | June-19 | 3 | 1 | - | 4 |
| Nebraska | July-19 | - | - | 2 | 2 |
| Nebraska | August-19 | 2 | - | 1 | 3 |
| Nebraska | September-19 | 4 | 2 | - | 6 |
| Nebraska | October-19 | 3 | 1 | - | 4 |
| Nebraska | November-19 | 3 | 1 | - | 4 |
| Nebraska | December-19 | 1 | - | 1 | 2 |
| Nebraska | January-20 | 2 | - | - | 2 |
| Nebraska | February-20 | 3 | - | 1 | 4 |
| Nebraska | March-20 | 4 | - | - | 4 |
| Nebraska | April-20 | - | - | 2 | 2 |
| Nebraska | May-20 | - | - | - | - |
| Nebraska | June-20 | - | - | 2 | 2 |
| Nebraska | July-20 | - | 1 | 1 | 2 |
| Nebraska | August-20 | - | - | - | - |
| Nebraska | September-20 | 1 | - | - | 1 |
| **Nebraska Total** | | **61** | **21** | **12** | **94** |
| South Carolina | July-18 | 7 | - | - | 7 |
| South Carolina | August-18 | 11 | 1 | 1 | 13 |
| South Carolina | September-18 | 3 | - | 1 | 4 |
| South Carolina | October-18 | 8 | - | - | 8 |
| South Carolina | November-18 | 7 | - | - | 7 |
| South Carolina | December-18 | 8 | - | - | 8 |
| South Carolina | January-19 | 8 | 1 | - | 9 |
| South Carolina | February-19 | 13 | - | - | 13 |
| South Carolina | March-19 | 4 | 2 | - | 6 |

| | | | | |
|---|---|---|---|---|
| South Carolina | April-19 | 8 | - | 1 | 9 |
| South Carolina | May-19 | 2 | - | 1 | 3 |
| South Carolina | June-19 | 5 | - | - | 5 |
| South Carolina | July-19 | 1 | - | 1 | 2 |
| South Carolina | August-19 | 2 | - | 1 | 3 |
| South Carolina | September-19 | 4 | - | - | 4 |
| South Carolina | October-19 | 2 | - | - | 2 |
| South Carolina | November-19 | 5 | - | - | 5 |
| South Carolina | December-19 | 4 | - | - | 4 |
| South Carolina | January-20 | 3 | - | 1 | 4 |
| South Carolina | February-20 | 11 | - | 1 | 12 |
| South Carolina | March-20 | 5 | - | - | 5 |
| South Carolina | April-20 | - | 1 | 1 | 2 |
| South Carolina | May-20 | 1 | - | 3 | 4 |
| South Carolina | June-20 | - | - | - | - |
| South Carolina | July-20 | - | - | 1 | 1 |
| South Carolina | August-20 | 9 | 1 | - | 10 |
| South Carolina | September-20 | - | - | - | - |
| **South Carolina Total** | | **131** | **6** | **13** | **150** |
| Texas | July-18 | 167 | 20 | 3 | 190 |
| Texas | August-18 | 276 | 31 | 1 | 308 |
| Texas | September-18 | 263 | 28 | 8 | 299 |
| Texas | October-18 | 253 | 32 | 3 | 288 |
| Texas | November-18 | 278 | 18 | 3 | 299 |
| Texas | December-18 | 212 | 9 | 3 | 224 |
| Texas | January-19 | 351 | 49 | 3 | 403 |
| Texas | February-19 | 408 | 48 | 4 | 460 |
| Texas | March-19 | 377 | 51 | 3 | 431 |
| Texas | April-19 | 314 | 50 | 4 | 368 |
| Texas | May-19 | 298 | 42 | 4 | 344 |
| Texas | June-19 | 247 | 39 | 5 | 291 |
| Texas | July-19 | 219 | 38 | 9 | 266 |
| Texas | August-19 | 205 | 33 | 3 | 241 |
| Texas | September-19 | 250 | 37 | 6 | 293 |
| Texas | October-19 | 167 | 32 | - | 199 |
| Texas | November-19 | 149 | 22 | 9 | 180 |
| Texas | December-19 | 166 | 24 | 3 | 193 |
| Texas | January-20 | 202 | 33 | 4 | 239 |
| Texas | February-20 | 201 | 40 | 5 | 246 |
| Texas | March-20 | 85 | 15 | 4 | 104 |
| Texas | April-20 | 20 | 9 | - | 29 |
| Texas | May-20 | 15 | 7 | 4 | 26 |
| Texas | June-20 | 20 | 3 | 3 | 26 |
| Texas | July-20 | 39 | 4 | 3 | 46 |
| Texas | August-20 | 83 | 8 | 1 | 92 |
| Texas | September-20 | 29 | 6 | 2 | 37 |
| **Texas Total** | | **5,294** | **728** | **100** | **6,122** |

| | | | | |
|---|---|---|---|---|
| West Virginia | July-18 | 1 | - | - | 1 |
| West Virginia | August-18 | - | - | - | - |
| West Virginia | September-18 | 3 | - | - | 3 |
| West Virginia | October-18 | - | - | - | - |
| West Virginia | November-18 | - | - | - | - |
| West Virginia | December-18 | 2 | - | - | 2 |
| West Virginia | January-19 | 1 | - | - | 1 |
| West Virginia | February-19 | - | - | - | - |
| West Virginia | March-19 | 2 | - | - | 2 |
| West Virginia | April-19 | - | - | - | - |
| West Virginia | May-19 | - | - | - | - |
| West Virginia | June-19 | - | - | - | - |
| West Virginia | July-19 | - | - | - | - |
| West Virginia | August-19 | - | - | - | - |
| West Virginia | September-19 | - | - | - | - |
| West Virginia | October-19 | - | - | - | - |
| West Virginia | November-19 | - | - | - | - |
| West Virginia | December-19 | - | - | - | - |
| West Virginia | January-20 | - | - | - | - |
| West Virginia | February-20 | - | - | - | - |
| West Virginia | March-20 | 2 | - | - | 2 |
| West Virginia | April-20 | - | - | - | - |
| West Virginia | May-20 | - | - | - | - |
| West Virginia | June-20 | - | - | - | - |
| West Virginia | July-20 | - | - | - | - |
| West Virginia | August-20 | 1 | - | - | 1 |
| West Virginia | September-20 | - | - | - | - |
| **West Virginia Total** | | **12** | **-** | **-** | **12** |
| **Grand Total** | | **6,072** | **812** | **155** | **7,039** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Adjustment of Status Month represents the month in which the I-485 was approved.

3) DACA recipients who filed the form I-485 before DACA approval are excluded from these counts.

4) I-821D and I-485 approvals are linked by Alien Number.

5) State is determined by the applicant's address listed on the form I-485.

6) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

**Request for Production 15 (1)**
Form I-821D, Consideration of Deferred Action for Childhood Arrivals
DACA Initials
Count of Accepted Filings, Rejections, Approvals, and Denials by Month, Selected State,
and USCIS Service Center
July 1, 2018 - Sep 8, 2020



U.S. Citizenship
and Immigration
Services

| Service Center | Requestor State | Month | Accepted Filings | Rejections | Total Received | Approved | Denied | Total Completions |
|---|---|---|---|---|---|---|---|---|
| California SC | Alabama | July-18 | 1 | - | 1 | 4 | 4 | 8 |
| California SC | Alabama | August-18 | - | - | - | 7 | 12 | 19 |
| California SC | Alabama | September-18 | - | - | - | 1 | 4 | 5 |
| California SC | Alabama | October-18 | - | - | - | 2 | 3 | 5 |
| California SC | Alabama | November-18 | 1 | - | 1 | 1 | 1 | 2 |
| California SC | Alabama | December-18 | - | - | - | 1 | 1 | 2 |
| California SC | Alabama | January-19 | - | - | - | 1 | - | 1 |
| California SC | Alabama | February-19 | 1 | - | 1 | 1 | 1 | 2 |
| California SC | Alabama | March-19 | 1 | - | 1 | - | - | - |
| California SC | Alabama | April-19 | 1 | - | 1 | - | - | - |
| California SC | Alabama | May-19 | 2 | - | 2 | - | 2 | 2 |
| California SC | Alabama | June-19 | 1 | - | 1 | - | - | - |
| California SC | Alabama | July-19 | 1 | - | 1 | 1 | - | 1 |
| California SC | Alabama | August-19 | 6 | - | 6 | 1 | 1 | 2 |
| California SC | Alabama | September-19 | 2 | - | 2 | 1 | - | 1 |
| California SC | Alabama | October-19 | 1 | - | 1 | 2 | - | 2 |
| California SC | Alabama | November-19 | - | - | - | - | - | - |
| California SC | Alabama | December-19 | - | - | - | 1 | - | 1 |
| California SC | Alabama | January-20 | - | - | - | 2 | 1 | 3 |
| California SC | Alabama | February-20 | 1 | - | 1 | 2 | 1 | 3 |
| California SC | Alabama | March-20 | 2 | - | 2 | 1 | - | 1 |
| California SC | Alabama | April-20 | 1 | - | 1 | - | - | - |
| California SC | Alabama | May-20 | - | - | - | 1 | - | 1 |
| California SC | Alabama | June-20 | 4 | - | 4 | 1 | - | 1 |
| California SC | Alabama | July-20 | 3 | - | 3 | 1 | - | 1 |
| California SC | Alabama | August-20 | 1 | - | 1 | - | - | - |
| California SC | Alabama | September-20 | - | - | - | - | - | - |
| **California SC** | **Alabama Total** | | **30** | **-** | **30** | **32** | **31** | **63** |
| California SC | Arkansas | July-18 | - | - | - | 3 | 7 | 10 |
| California SC | Arkansas | August-18 | 1 | - | 1 | 1 | 8 | 9 |
| California SC | Arkansas | September-18 | - | - | - | 4 | 1 | 5 |
| California SC | Arkansas | October-18 | - | - | - | 1 | 1 | 2 |
| California SC | Arkansas | November-18 | 1 | - | 1 | 1 | 1 | 2 |
| California SC | Arkansas | December-18 | - | - | - | 1 | 1 | 2 |
| California SC | Arkansas | January-19 | - | - | - | - | 1 | 1 |
| California SC | Arkansas | February-19 | - | - | - | - | 1 | 1 |
| California SC | Arkansas | March-19 | - | - | - | - | - | - |
| California SC | Arkansas | April-19 | - | - | - | - | - | - |
| California SC | Arkansas | May-19 | - | - | - | 1 | - | 1 |
| California SC | Arkansas | June-19 | - | - | - | - | - | - |
| California SC | Arkansas | July-19 | 2 | - | 2 | 1 | 1 | 2 |
| California SC | Arkansas | August-19 | 2 | - | 2 | - | - | - |
| California SC | Arkansas | September-19 | - | - | - | - | - | - |
| California SC | Arkansas | October-19 | 3 | - | 3 | - | - | - |
| California SC | Arkansas | November-19 | - | - | - | - | - | - |
| California SC | Arkansas | December-19 | 1 | - | 1 | 2 | - | 2 |
| California SC | Arkansas | January-20 | 2 | - | 2 | - | 1 | 1 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| California SC | Arkansas | February-20 | - | - | - | 2 | - | 2 |
| California SC | Arkansas | March-20 | 2 | - | 2 | - | - | - |
| California SC | Arkansas | April-20 | 1 | - | 1 | - | - | - |
| California SC | Arkansas | May-20 | 2 | - | 2 | - | 1 | 1 |
| California SC | Arkansas | June-20 | - | - | - | - | - | - |
| California SC | Arkansas | July-20 | 1 | - | 1 | - | - | - |
| California SC | Arkansas | August-20 | 2 | - | 2 | - | - | - |
| California SC | Arkansas | September-20 | - | - | - | 1 | - | 1 |
| **California SC** | **Arkansas Total** | | **20** | **-** | **20** | **18** | **24** | **42** |
| California SC | Kansas | July-18 | - | - | - | 9 | 6 | 15 |
| California SC | Kansas | August-18 | 2 | - | 2 | 10 | 2 | 12 |
| California SC | Kansas | September-18 | 2 | - | 2 | 2 | 1 | 3 |
| California SC | Kansas | October-18 | 3 | - | 3 | 2 | 4 | 6 |
| California SC | Kansas | November-18 | 1 | - | 1 | 2 | 2 | 4 |
| California SC | Kansas | December-18 | 1 | - | 1 | - | - | - |
| California SC | Kansas | January-19 | - | - | - | 1 | - | 1 |
| California SC | Kansas | February-19 | - | - | - | 1 | 3 | 4 |
| California SC | Kansas | March-19 | 1 | - | 1 | - | 3 | 3 |
| California SC | Kansas | April-19 | 1 | - | 1 | 1 | - | 1 |
| California SC | Kansas | May-19 | 3 | - | 3 | - | - | - |
| California SC | Kansas | June-19 | 2 | - | 2 | 2 | 1 | 3 |
| California SC | Kansas | July-19 | 1 | - | 1 | 1 | 1 | 2 |
| California SC | Kansas | August-19 | 2 | - | 2 | - | - | - |
| California SC | Kansas | September-19 | 4 | - | 4 | - | - | - |
| California SC | Kansas | October-19 | - | - | - | - | - | - |
| California SC | Kansas | November-19 | 2 | - | 2 | 1 | - | 1 |
| California SC | Kansas | December-19 | 2 | - | 2 | 2 | - | 2 |
| California SC | Kansas | January-20 | 3 | - | 3 | 1 | 1 | 2 |
| California SC | Kansas | February-20 | 2 | - | 2 | 2 | - | 2 |
| California SC | Kansas | March-20 | 1 | - | 1 | 2 | - | 2 |
| California SC | Kansas | April-20 | 3 | - | 3 | 1 | - | 1 |
| California SC | Kansas | May-20 | 2 | - | 2 | 1 | - | 1 |
| California SC | Kansas | June-20 | 1 | - | 1 | 1 | 1 | 2 |
| California SC | Kansas | July-20 | 2 | - | 2 | - | 1 | 1 |
| California SC | Kansas | August-20 | 1 | - | 1 | - | - | - |
| California SC | Kansas | September-20 | - | - | - | - | - | - |
| **California SC** | **Kansas Total** | | **42** | **-** | **42** | **42** | **26** | **68** |
| California SC | Louisiana | July-18 | - | - | - | 7 | 5 | 12 |
| California SC | Louisiana | August-18 | 1 | - | 1 | 4 | 3 | 7 |
| California SC | Louisiana | September-18 | - | - | - | 1 | 3 | 4 |
| California SC | Louisiana | October-18 | 1 | - | 1 | - | 3 | 3 |
| California SC | Louisiana | November-18 | 1 | - | 1 | 1 | - | 1 |
| California SC | Louisiana | December-18 | - | - | - | - | - | - |
| California SC | Louisiana | January-19 | - | - | - | - | - | - |
| California SC | Louisiana | February-19 | - | - | - | - | - | - |
| California SC | Louisiana | March-19 | - | - | - | - | 1 | 1 |
| California SC | Louisiana | April-19 | - | - | - | - | - | - |
| California SC | Louisiana | May-19 | - | - | - | - | 3 | 3 |
| California SC | Louisiana | June-19 | 1 | - | 1 | - | - | - |
| California SC | Louisiana | July-19 | - | - | - | - | - | - |
| California SC | Louisiana | August-19 | 1 | - | 1 | - | - | - |
| California SC | Louisiana | September-19 | 2 | - | 2 | - | - | - |
| California SC | Louisiana | October-19 | - | - | - | - | - | - |
| California SC | Louisiana | November-19 | 1 | - | 1 | - | - | - |
| California SC | Louisiana | December-19 | - | - | - | - | 1 | 1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| California SC | Louisiana | January-20 | - | - | - | - | - | - |
| California SC | Louisiana | February-20 | - | - | - | 2 | - | 2 |
| California SC | Louisiana | March-20 | 1 | - | 1 | - | 1 | 1 |
| California SC | Louisiana | April-20 | 1 | - | 1 | - | 1 | 1 |
| California SC | Louisiana | May-20 | - | - | - | - | - | - |
| California SC | Louisiana | June-20 | 1 | - | 1 | - | - | - |
| California SC | Louisiana | July-20 | 1 | - | 1 | - | - | - |
| California SC | Louisiana | August-20 | 1 | - | 1 | - | - | - |
| California SC | Louisiana | September-20 | - | - | - | - | - | - |
| **California SC** | **Louisiana Total** | | **13** | **-** | **13** | **15** | **21** | **36** |
| California SC | Mississippi | July-18 | - | - | - | 1 | 3 | 4 |
| California SC | Mississippi | August-18 | - | - | - | 1 | 1 | 2 |
| California SC | Mississippi | September-18 | - | - | - | - | - | - |
| California SC | Mississippi | October-18 | - | - | - | - | 1 | 1 |
| California SC | Mississippi | November-18 | - | - | - | - | - | - |
| California SC | Mississippi | December-18 | - | - | - | - | - | - |
| California SC | Mississippi | January-19 | - | - | - | - | 1 | 1 |
| California SC | Mississippi | February-19 | - | - | - | - | - | - |
| California SC | Mississippi | March-19 | - | - | - | - | - | - |
| California SC | Mississippi | April-19 | - | - | - | - | - | - |
| California SC | Mississippi | May-19 | 1 | - | 1 | - | - | - |
| California SC | Mississippi | June-19 | - | - | - | - | - | - |
| California SC | Mississippi | July-19 | - | - | - | - | - | - |
| California SC | Mississippi | August-19 | 2 | - | 2 | - | - | - |
| California SC | Mississippi | September-19 | - | - | - | - | - | - |
| California SC | Mississippi | October-19 | - | - | - | - | - | - |
| California SC | Mississippi | November-19 | 1 | - | 1 | 1 | - | 1 |
| California SC | Mississippi | December-19 | - | - | - | - | - | - |
| California SC | Mississippi | January-20 | 2 | - | 2 | 1 | - | 1 |
| California SC | Mississippi | February-20 | 2 | - | 2 | - | 1 | 1 |
| California SC | Mississippi | March-20 | - | - | - | - | - | - |
| California SC | Mississippi | April-20 | - | - | - | - | - | - |
| California SC | Mississippi | May-20 | 1 | - | 1 | 1 | - | 1 |
| California SC | Mississippi | June-20 | - | - | - | 1 | - | 1 |
| California SC | Mississippi | July-20 | 1 | - | 1 | 2 | 1 | 3 |
| California SC | Mississippi | August-20 | - | - | - | - | - | - |
| California SC | Mississippi | September-20 | - | - | - | - | - | - |
| **California SC** | **Mississippi Total** | | **10** | **-** | **10** | **8** | **8** | **16** |
| California SC | Nebraska | July-18 | - | - | - | 5 | 1 | 6 |
| California SC | Nebraska | August-18 | - | - | - | 5 | 2 | 7 |
| California SC | Nebraska | September-18 | - | - | - | - | 1 | 1 |
| California SC | Nebraska | October-18 | 1 | - | 1 | 1 | 1 | 2 |
| California SC | Nebraska | November-18 | - | - | - | - | 1 | 1 |
| California SC | Nebraska | December-18 | 1 | - | 1 | - | 1 | 1 |
| California SC | Nebraska | January-19 | - | - | - | 1 | - | 1 |
| California SC | Nebraska | February-19 | 1 | - | 1 | 1 | 1 | 2 |
| California SC | Nebraska | March-19 | 1 | - | 1 | - | 1 | 1 |
| California SC | Nebraska | April-19 | - | - | - | - | 1 | 1 |
| California SC | Nebraska | May-19 | - | - | - | 1 | 1 | 2 |
| California SC | Nebraska | June-19 | - | - | - | - | - | - |
| California SC | Nebraska | July-19 | - | - | - | 2 | - | 2 |
| California SC | Nebraska | August-19 | 1 | - | 1 | - | - | - |
| California SC | Nebraska | September-19 | 1 | - | 1 | - | - | - |
| California SC | Nebraska | October-19 | 2 | - | 2 | - | - | - |
| California SC | Nebraska | November-19 | 3 | - | 3 | - | - | - |

| California SC | Nebraska | December-19 | - | - | - | 1 | - | 1 |
|---|---|---|---|---|---|---|---|---|
| California SC | Nebraska | January-20 | 1 | - | 1 | - | 1 | 1 |
| California SC | Nebraska | February-20 | 2 | - | 2 | - | - | - |
| California SC | Nebraska | March-20 | 4 | - | 4 | - | - | - |
| California SC | Nebraska | April-20 | 1 | - | 1 | 1 | - | 1 |
| California SC | Nebraska | May-20 | - | - | - | - | - | - |
| California SC | Nebraska | June-20 | 3 | - | 3 | 2 | 1 | 3 |
| California SC | Nebraska | July-20 | - | - | - | 5 | - | 5 |
| California SC | Nebraska | August-20 | - | - | - | - | - | - |
| California SC | Nebraska | September-20 | - | - | - | - | - | - |
| **California SC** | **Nebraska Total** | | **22** | **-** | **22** | **25** | **13** | **38** |
| California SC | South Carolina | July-18 | 1 | - | 1 | 9 | 14 | 23 |
| California SC | South Carolina | August-18 | 5 | - | 5 | 5 | 14 | 19 |
| California SC | South Carolina | September-18 | - | - | - | 7 | 5 | 12 |
| California SC | South Carolina | October-18 | - | - | - | 2 | 3 | 5 |
| California SC | South Carolina | November-18 | 2 | - | 2 | 3 | - | 3 |
| California SC | South Carolina | December-18 | - | - | - | - | 4 | 4 |
| California SC | South Carolina | January-19 | 1 | - | 1 | 3 | 1 | 4 |
| California SC | South Carolina | February-19 | 1 | - | 1 | 1 | 2 | 3 |
| California SC | South Carolina | March-19 | - | - | - | 1 | 1 | 2 |
| California SC | South Carolina | April-19 | 2 | - | 2 | 1 | - | 1 |
| California SC | South Carolina | May-19 | - | - | - | - | 2 | 2 |
| California SC | South Carolina | June-19 | 1 | - | 1 | - | 1 | 1 |
| California SC | South Carolina | July-19 | 2 | - | 2 | - | - | - |
| California SC | South Carolina | August-19 | 1 | - | 1 | 1 | 1 | 2 |
| California SC | South Carolina | September-19 | 3 | - | 3 | - | 1 | 1 |
| California SC | South Carolina | October-19 | 2 | - | 2 | 1 | 1 | 2 |
| California SC | South Carolina | November-19 | 3 | - | 3 | - | - | - |
| California SC | South Carolina | December-19 | 1 | - | 1 | 1 | - | 1 |
| California SC | South Carolina | January-20 | 2 | - | 2 | - | - | - |
| California SC | South Carolina | February-20 | - | - | - | 2 | 1 | 3 |
| California SC | South Carolina | March-20 | 2 | - | 2 | 2 | 1 | 3 |
| California SC | South Carolina | April-20 | 1 | - | 1 | 1 | - | 1 |
| California SC | South Carolina | May-20 | 5 | - | 5 | - | 1 | 1 |
| California SC | South Carolina | June-20 | 2 | - | 2 | - | 2 | 2 |
| California SC | South Carolina | July-20 | 3 | - | 3 | 3 | - | 3 |
| California SC | South Carolina | August-20 | 4 | - | 4 | - | - | - |
| California SC | South Carolina | September-20 | - | - | - | - | 1 | 1 |
| **California SC** | **South Carolina Total** | | **44** | **-** | **44** | **43** | **56** | **99** |
| California SC | Texas | July-18 | 21 | 2 | 23 | 204 | 149 | 353 |
| California SC | Texas | August-18 | 24 | - | 24 | 169 | 131 | 300 |
| California SC | Texas | September-18 | 23 | - | 23 | 73 | 106 | 179 |
| California SC | Texas | October-18 | 17 | - | 17 | 45 | 56 | 101 |
| California SC | Texas | November-18 | 22 | - | 22 | 46 | 20 | 66 |
| California SC | Texas | December-18 | 7 | - | 7 | 21 | 21 | 42 |
| California SC | Texas | January-19 | 10 | - | 10 | 35 | 19 | 54 |
| California SC | Texas | February-19 | 14 | - | 14 | 24 | 24 | 48 |
| California SC | Texas | March-19 | 17 | - | 17 | 19 | 15 | 34 |
| California SC | Texas | April-19 | 20 | - | 20 | 16 | 5 | 21 |
| California SC | Texas | May-19 | 11 | - | 11 | 16 | 11 | 27 |
| California SC | Texas | June-19 | 14 | - | 14 | 11 | 10 | 21 |
| California SC | Texas | July-19 | 19 | - | 19 | 16 | 5 | 21 |
| California SC | Texas | August-19 | 43 | - | 43 | 3 | 1 | 4 |
| California SC | Texas | September-19 | 56 | - | 56 | 12 | 11 | 23 |
| California SC | Texas | October-19 | 59 | - | 59 | 11 | 3 | 14 |

| California SC | Texas | November-19 | 37 | - | 37 | 16 | 6 | 22 |
|---|---|---|---|---|---|---|---|---|
| California SC | Texas | December-19 | 42 | - | 42 | 24 | 5 | 29 |
| California SC | Texas | January-20 | 45 | - | 45 | 12 | 5 | 17 |
| California SC | Texas | February-20 | 47 | - | 47 | 24 | 13 | 37 |
| California SC | Texas | March-20 | 64 | - | 64 | 27 | 13 | 40 |
| California SC | Texas | April-20 | 46 | 1 | 47 | 16 | 8 | 24 |
| California SC | Texas | May-20 | 68 | - | 68 | 39 | 4 | 43 |
| California SC | Texas | June-20 | 69 | - | 69 | 43 | 12 | 55 |
| California SC | Texas | July-20 | 81 | - | 81 | 37 | 11 | 48 |
| California SC | Texas | August-20 | 55 | - | 55 | - | 2 | 2 |
| California SC | Texas | September-20 | - | - | - | 4 | - | 4 |
| **California SC** | **Texas Total** | | **931** | **3** | **934** | **963** | **666** | **1,629** |
| California SC | West Virginia | July-18 | - | - | - | - | 2 | 2 |
| California SC | West Virginia | August-18 | - | - | - | - | - | - |
| California SC | West Virginia | September-18 | - | - | - | - | - | - |
| California SC | West Virginia | October-18 | - | - | - | - | - | - |
| California SC | West Virginia | November-18 | - | - | - | - | - | - |
| California SC | West Virginia | December-18 | - | - | - | - | 1 | 1 |
| California SC | West Virginia | January-19 | - | - | - | - | - | - |
| California SC | West Virginia | February-19 | - | - | - | - | - | - |
| California SC | West Virginia | March-19 | - | - | - | - | - | - |
| California SC | West Virginia | April-19 | - | - | - | - | - | - |
| California SC | West Virginia | May-19 | - | - | - | - | - | - |
| California SC | West Virginia | June-19 | - | - | - | - | - | - |
| California SC | West Virginia | July-19 | - | - | - | - | - | - |
| California SC | West Virginia | August-19 | - | - | - | - | - | - |
| California SC | West Virginia | September-19 | - | - | - | - | - | - |
| California SC | West Virginia | October-19 | - | - | - | - | - | - |
| California SC | West Virginia | November-19 | - | - | - | - | - | - |
| California SC | West Virginia | December-19 | - | - | - | - | - | - |
| California SC | West Virginia | January-20 | - | - | - | - | - | - |
| California SC | West Virginia | February-20 | - | - | - | - | - | - |
| California SC | West Virginia | March-20 | - | - | - | - | - | - |
| California SC | West Virginia | April-20 | - | - | - | - | - | - |
| California SC | West Virginia | May-20 | - | - | - | - | - | - |
| California SC | West Virginia | June-20 | - | - | - | - | - | - |
| California SC | West Virginia | July-20 | - | - | - | - | - | - |
| California SC | West Virginia | August-20 | - | - | - | - | - | - |
| California SC | West Virginia | September-20 | - | - | - | - | - | - |
| **California SC** | **West Virginia Total** | | **-** | **-** | **-** | **-** | **3** | **3** |
| **California SC Total** | | | **1,112** | **3** | **1,115** | **1,146** | **848** | **1,994** |
| Nebraska SC | Alabama | July-18 | - | - | - | - | - | - |
| Nebraska SC | Alabama | August-18 | - | - | - | - | - | - |
| Nebraska SC | Alabama | September-18 | - | - | - | - | - | - |
| Nebraska SC | Alabama | October-18 | - | - | - | - | - | - |
| Nebraska SC | Alabama | November-18 | - | - | - | - | - | - |
| Nebraska SC | Alabama | December-18 | - | - | - | - | - | - |
| Nebraska SC | Alabama | January-19 | - | - | - | - | - | - |
| Nebraska SC | Alabama | February-19 | - | - | - | - | - | - |
| Nebraska SC | Alabama | March-19 | - | - | - | - | - | - |
| Nebraska SC | Alabama | April-19 | - | - | - | - | - | - |
| Nebraska SC | Alabama | May-19 | - | - | - | - | - | - |
| Nebraska SC | Alabama | June-19 | - | - | - | - | - | - |
| Nebraska SC | Alabama | July-19 | - | - | - | - | - | - |
| Nebraska SC | Alabama | August-19 | - | - | - | - | - | - |

| Nebraska SC | Alabama | September-19 | - | - | - | - | - | - |
|---|---|---|---|---|---|---|---|---|
| Nebraska SC | Alabama | October-19 | - | - | - | - | - | - |
| Nebraska SC | Alabama | November-19 | - | - | - | - | - | - |
| Nebraska SC | Alabama | December-19 | - | - | - | - | - | - |
| Nebraska SC | Alabama | January-20 | - | - | - | - | - | - |
| Nebraska SC | Alabama | February-20 | - | - | - | - | - | - |
| Nebraska SC | Alabama | March-20 | - | - | - | - | - | - |
| Nebraska SC | Alabama | April-20 | - | - | - | - | - | - |
| Nebraska SC | Alabama | May-20 | - | - | - | - | - | - |
| Nebraska SC | Alabama | June-20 | - | - | - | - | - | - |
| Nebraska SC | Alabama | July-20 | - | - | - | - | - | - |
| Nebraska SC | Alabama | August-20 | - | - | - | - | - | - |
| Nebraska SC | Alabama | September-20 | - | - | - | - | - | - |
| **Nebraska SC** | **Alabama Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Nebraska SC | Arkansas | July-18 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | August-18 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | September-18 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | October-18 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | November-18 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | December-18 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | January-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | February-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | March-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | April-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | May-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | June-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | July-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | August-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | September-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | October-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | November-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | December-19 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | January-20 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | February-20 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | March-20 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | April-20 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | May-20 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | June-20 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | July-20 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | August-20 | - | - | - | - | - | - |
| Nebraska SC | Arkansas | September-20 | - | - | - | - | - | - |
| **Nebraska SC** | **Arkansas Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Nebraska SC | Kansas | July-18 | - | - | - | - | - | - |
| Nebraska SC | Kansas | August-18 | - | - | - | - | - | - |
| Nebraska SC | Kansas | September-18 | - | - | - | - | - | - |
| Nebraska SC | Kansas | October-18 | - | - | - | - | - | - |
| Nebraska SC | Kansas | November-18 | - | - | - | - | - | - |
| Nebraska SC | Kansas | December-18 | - | - | - | - | - | - |
| Nebraska SC | Kansas | January-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | February-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | March-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | April-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | May-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | June-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | July-19 | - | - | - | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nebraska SC | Kansas | August-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | September-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | October-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | November-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | December-19 | - | - | - | - | - | - |
| Nebraska SC | Kansas | January-20 | - | - | - | - | - | - |
| Nebraska SC | Kansas | February-20 | - | - | - | - | - | - |
| Nebraska SC | Kansas | March-20 | - | - | - | - | - | - |
| Nebraska SC | Kansas | April-20 | - | - | - | - | - | - |
| Nebraska SC | Kansas | May-20 | - | - | - | - | - | - |
| Nebraska SC | Kansas | June-20 | - | - | - | - | - | - |
| Nebraska SC | Kansas | July-20 | - | - | - | - | - | - |
| Nebraska SC | Kansas | August-20 | - | - | - | - | - | - |
| Nebraska SC | Kansas | September-20 | - | - | - | - | - | - |
| **Nebraska SC** | **Kansas Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Nebraska SC | Louisiana | July-18 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | August-18 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | September-18 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | October-18 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | November-18 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | December-18 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | January-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | February-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | March-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | April-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | May-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | June-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | July-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | August-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | September-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | October-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | November-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | December-19 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | January-20 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | February-20 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | March-20 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | April-20 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | May-20 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | June-20 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | July-20 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | August-20 | - | - | - | - | - | - |
| Nebraska SC | Louisiana | September-20 | - | - | - | - | - | - |
| **Nebraska SC** | **Louisiana Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Nebraska SC | Mississippi | July-18 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | August-18 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | September-18 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | October-18 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | November-18 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | December-18 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | January-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | February-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | March-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | April-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | May-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | June-19 | - | - | - | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nebraska SC | Mississippi | July-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | August-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | September-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | October-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | November-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | December-19 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | January-20 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | February-20 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | March-20 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | April-20 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | May-20 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | June-20 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | July-20 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | August-20 | - | - | - | - | - | - |
| Nebraska SC | Mississippi | September-20 | - | - | - | - | - | - |
| **Nebraska SC** | **Mississippi Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Nebraska SC | Nebraska | July-18 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | August-18 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | September-18 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | October-18 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | November-18 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | December-18 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | January-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | February-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | March-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | April-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | May-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | June-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | July-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | August-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | September-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | October-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | November-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | December-19 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | January-20 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | February-20 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | March-20 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | April-20 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | May-20 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | June-20 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | July-20 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | August-20 | - | - | - | - | - | - |
| Nebraska SC | Nebraska | September-20 | - | - | - | - | - | - |
| **Nebraska SC** | **Nebraska Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Nebraska SC | South Carolina | July-18 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | August-18 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | September-18 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | October-18 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | November-18 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | December-18 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | January-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | February-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | March-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | April-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | May-19 | - | - | - | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nebraska SC | South Carolina | June-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | July-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | August-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | September-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | October-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | November-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | December-19 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | January-20 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | February-20 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | March-20 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | April-20 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | May-20 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | June-20 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | July-20 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | August-20 | - | - | - | - | - | - |
| Nebraska SC | South Carolina | September-20 | - | - | - | - | - | - |
| **Nebraska SC** | **South Carolina Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Nebraska SC | Texas | July-18 | - | - | - | - | - | - |
| Nebraska SC | Texas | August-18 | - | - | - | - | - | - |
| Nebraska SC | Texas | September-18 | - | - | - | - | - | - |
| Nebraska SC | Texas | October-18 | - | - | - | - | - | - |
| Nebraska SC | Texas | November-18 | - | - | - | - | - | - |
| Nebraska SC | Texas | December-18 | - | - | - | - | - | - |
| Nebraska SC | Texas | January-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | February-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | March-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | April-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | May-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | June-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | July-19 | - | - | - | - | 1 | 1 |
| Nebraska SC | Texas | August-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | September-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | October-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | November-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | December-19 | - | - | - | - | - | - |
| Nebraska SC | Texas | January-20 | - | - | - | - | - | - |
| Nebraska SC | Texas | February-20 | - | - | - | 1 | - | 1 |
| Nebraska SC | Texas | March-20 | - | - | - | - | - | - |
| Nebraska SC | Texas | April-20 | - | - | - | - | - | - |
| Nebraska SC | Texas | May-20 | - | - | - | - | - | - |
| Nebraska SC | Texas | June-20 | - | - | - | - | 1 | 1 |
| Nebraska SC | Texas | July-20 | - | - | - | - | - | - |
| Nebraska SC | Texas | August-20 | - | - | - | - | - | - |
| Nebraska SC | Texas | September-20 | - | - | - | - | - | - |
| **Nebraska SC** | **Texas Total** | | **-** | **-** | **-** | **1** | **2** | **3** |
| Nebraska SC | West Virginia | July-18 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | August-18 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | September-18 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | October-18 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | November-18 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | December-18 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | January-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | February-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | March-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | April-19 | - | - | - | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nebraska SC | West Virginia | May-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | June-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | July-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | August-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | September-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | October-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | November-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | December-19 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | January-20 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | February-20 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | March-20 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | April-20 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | May-20 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | June-20 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | July-20 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | August-20 | - | - | - | - | - | - |
| Nebraska SC | West Virginia | September-20 | - | - | - | - | - | - |
| **Nebraska SC** | **West Virginia Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| **Nebraska SC Total** | | | **-** | **-** | **-** | **1** | **2** | **3** |
| Vermont SC | Alabama | July-18 | - | - | - | - | - | - |
| Vermont SC | Alabama | August-18 | - | - | - | - | - | - |
| Vermont SC | Alabama | September-18 | - | - | - | - | - | - |
| Vermont SC | Alabama | October-18 | - | - | - | - | - | - |
| Vermont SC | Alabama | November-18 | - | - | - | - | - | - |
| Vermont SC | Alabama | December-18 | - | - | - | - | - | - |
| Vermont SC | Alabama | January-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | February-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | March-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | April-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | May-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | June-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | July-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | August-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | September-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | October-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | November-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | December-19 | - | - | - | - | - | - |
| Vermont SC | Alabama | January-20 | - | - | - | - | - | - |
| Vermont SC | Alabama | February-20 | - | - | - | - | - | - |
| Vermont SC | Alabama | March-20 | - | - | - | - | - | - |
| Vermont SC | Alabama | April-20 | - | - | - | - | - | - |
| Vermont SC | Alabama | May-20 | - | - | - | - | - | - |
| Vermont SC | Alabama | June-20 | - | - | - | - | - | - |
| Vermont SC | Alabama | July-20 | - | - | - | - | - | - |
| Vermont SC | Alabama | August-20 | - | - | - | - | - | - |
| Vermont SC | Alabama | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **Alabama Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Vermont SC | Arkansas | July-18 | - | - | - | - | - | - |
| Vermont SC | Arkansas | August-18 | - | - | - | - | - | - |
| Vermont SC | Arkansas | September-18 | - | - | - | - | - | - |
| Vermont SC | Arkansas | October-18 | - | - | - | - | - | - |
| Vermont SC | Arkansas | November-18 | - | - | - | - | - | - |
| Vermont SC | Arkansas | December-18 | - | - | - | - | - | - |
| Vermont SC | Arkansas | January-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | February-19 | - | - | - | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Vermont SC | Arkansas | March-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | April-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | May-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | June-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | July-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | August-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | September-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | October-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | November-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | December-19 | - | - | - | - | - | - |
| Vermont SC | Arkansas | January-20 | - | - | - | - | - | - |
| Vermont SC | Arkansas | February-20 | - | - | - | - | - | - |
| Vermont SC | Arkansas | March-20 | - | - | - | - | - | - |
| Vermont SC | Arkansas | April-20 | - | - | - | - | - | - |
| Vermont SC | Arkansas | May-20 | - | - | - | - | - | - |
| Vermont SC | Arkansas | June-20 | - | - | - | - | - | - |
| Vermont SC | Arkansas | July-20 | - | - | - | - | - | - |
| Vermont SC | Arkansas | August-20 | - | - | - | - | - | - |
| Vermont SC | Arkansas | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **Arkansas Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Vermont SC | Kansas | July-18 | - | - | - | - | - | - |
| Vermont SC | Kansas | August-18 | - | - | - | - | - | - |
| Vermont SC | Kansas | September-18 | - | - | - | - | - | - |
| Vermont SC | Kansas | October-18 | - | - | - | - | - | - |
| Vermont SC | Kansas | November-18 | - | - | - | - | - | - |
| Vermont SC | Kansas | December-18 | - | - | - | - | - | - |
| Vermont SC | Kansas | January-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | February-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | March-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | April-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | May-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | June-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | July-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | August-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | September-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | October-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | November-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | December-19 | - | - | - | - | - | - |
| Vermont SC | Kansas | January-20 | - | - | - | - | - | - |
| Vermont SC | Kansas | February-20 | - | - | - | - | - | - |
| Vermont SC | Kansas | March-20 | - | - | - | - | - | - |
| Vermont SC | Kansas | April-20 | - | - | - | - | - | - |
| Vermont SC | Kansas | May-20 | - | - | - | - | - | - |
| Vermont SC | Kansas | June-20 | - | - | - | - | - | - |
| Vermont SC | Kansas | July-20 | - | - | - | - | - | - |
| Vermont SC | Kansas | August-20 | - | - | - | - | - | - |
| Vermont SC | Kansas | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **Kansas Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Vermont SC | Louisiana | July-18 | - | - | - | - | - | - |
| Vermont SC | Louisiana | August-18 | - | - | - | - | - | - |
| Vermont SC | Louisiana | September-18 | - | - | - | - | - | - |
| Vermont SC | Louisiana | October-18 | - | - | - | 1 | - | 1 |
| Vermont SC | Louisiana | November-18 | - | - | - | - | - | - |
| Vermont SC | Louisiana | December-18 | - | - | - | - | - | - |
| Vermont SC | Louisiana | January-19 | - | - | - | - | - | - |

| Vermont SC | Louisiana | February-19 | - | - | - | - | - | - |
|---|---|---|---|---|---|---|---|---|
| Vermont SC | Louisiana | March-19 | - | - | - | - | - | - |
| Vermont SC | Louisiana | April-19 | - | - | - | - | - | - |
| Vermont SC | Louisiana | May-19 | - | - | - | - | - | - |
| Vermont SC | Louisiana | June-19 | - | - | - | - | - | - |
| Vermont SC | Louisiana | July-19 | - | - | - | - | - | - |
| Vermont SC | Louisiana | August-19 | - | - | - | - | - | - |
| Vermont SC | Louisiana | September-19 | - | - | - | - | - | - |
| Vermont SC | Louisiana | October-19 | - | - | - | - | - | - |
| Vermont SC | Louisiana | November-19 | - | - | - | - | - | - |
| Vermont SC | Louisiana | December-19 | - | - | - | - | - | - |
| Vermont SC | Louisiana | January-20 | - | - | - | - | - | - |
| Vermont SC | Louisiana | February-20 | - | - | - | - | - | - |
| Vermont SC | Louisiana | March-20 | - | - | - | - | - | - |
| Vermont SC | Louisiana | April-20 | - | - | - | - | - | - |
| Vermont SC | Louisiana | May-20 | - | - | - | - | - | - |
| Vermont SC | Louisiana | June-20 | - | - | - | - | - | - |
| Vermont SC | Louisiana | July-20 | - | - | - | - | - | - |
| Vermont SC | Louisiana | August-20 | - | - | - | - | - | - |
| Vermont SC | Louisiana | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **Louisiana Total** | | **-** | **-** | **-** | **1** | **-** | **1** |
| Vermont SC | Mississippi | July-18 | - | - | - | - | - | - |
| Vermont SC | Mississippi | August-18 | - | - | - | - | - | - |
| Vermont SC | Mississippi | September-18 | - | - | - | - | - | - |
| Vermont SC | Mississippi | October-18 | - | - | - | - | - | - |
| Vermont SC | Mississippi | November-18 | - | - | - | - | - | - |
| Vermont SC | Mississippi | December-18 | - | - | - | - | - | - |
| Vermont SC | Mississippi | January-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | February-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | March-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | April-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | May-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | June-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | July-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | August-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | September-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | October-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | November-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | December-19 | - | - | - | - | - | - |
| Vermont SC | Mississippi | January-20 | - | - | - | - | - | - |
| Vermont SC | Mississippi | February-20 | - | - | - | - | - | - |
| Vermont SC | Mississippi | March-20 | - | - | - | - | - | - |
| Vermont SC | Mississippi | April-20 | - | - | - | - | - | - |
| Vermont SC | Mississippi | May-20 | - | - | - | - | - | - |
| Vermont SC | Mississippi | June-20 | - | - | - | - | - | - |
| Vermont SC | Mississippi | July-20 | - | - | - | - | - | - |
| Vermont SC | Mississippi | August-20 | - | - | - | - | - | - |
| Vermont SC | Mississippi | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **Mississippi Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Vermont SC | Nebraska | July-18 | - | - | - | 1 | - | 1 |
| Vermont SC | Nebraska | August-18 | - | - | - | - | - | - |
| Vermont SC | Nebraska | September-18 | - | - | - | - | - | - |
| Vermont SC | Nebraska | October-18 | - | - | - | - | - | - |
| Vermont SC | Nebraska | November-18 | - | - | - | - | - | - |
| Vermont SC | Nebraska | December-18 | - | - | - | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Vermont SC | Nebraska | January-19 | - | - | - | - | - | - |
| Vermont SC | Nebraska | February-19 | - | - | - | - | - | - |
| Vermont SC | Nebraska | March-19 | - | - | - | - | - | - |
| Vermont SC | Nebraska | April-19 | - | - | - | - | - | - |
| Vermont SC | Nebraska | May-19 | - | - | - | - | - | - |
| Vermont SC | Nebraska | June-19 | - | - | - | - | - | - |
| Vermont SC | Nebraska | July-19 | - | - | - | - | - | - |
| Vermont SC | Nebraska | August-19 | - | - | - | - | - | - |
| Vermont SC | Nebraska | September-19 | 1 | - | 1 | - | - | - |
| Vermont SC | Nebraska | October-19 | - | - | - | 1 | - | 1 |
| Vermont SC | Nebraska | November-19 | - | - | - | - | - | - |
| Vermont SC | Nebraska | December-19 | - | - | - | - | - | - |
| Vermont SC | Nebraska | January-20 | - | - | - | - | - | - |
| Vermont SC | Nebraska | February-20 | - | - | - | - | - | - |
| Vermont SC | Nebraska | March-20 | - | - | - | - | - | - |
| Vermont SC | Nebraska | April-20 | - | - | - | - | - | - |
| Vermont SC | Nebraska | May-20 | - | - | - | - | - | - |
| Vermont SC | Nebraska | June-20 | 1 | - | 1 | - | - | - |
| Vermont SC | Nebraska | July-20 | - | - | - | 1 | - | 1 |
| Vermont SC | Nebraska | August-20 | - | - | - | - | - | - |
| Vermont SC | Nebraska | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **Nebraska Total** | | **2** | **-** | **2** | **3** | **-** | **3** |
| Vermont SC | South Carolina | July-18 | - | - | - | - | - | - |
| Vermont SC | South Carolina | August-18 | - | - | - | - | - | - |
| Vermont SC | South Carolina | September-18 | - | - | - | - | - | - |
| Vermont SC | South Carolina | October-18 | - | - | - | - | - | - |
| Vermont SC | South Carolina | November-18 | - | - | - | - | - | - |
| Vermont SC | South Carolina | December-18 | - | - | - | - | - | - |
| Vermont SC | South Carolina | January-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | February-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | March-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | April-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | May-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | June-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | July-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | August-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | September-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | October-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | November-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | December-19 | - | - | - | - | - | - |
| Vermont SC | South Carolina | January-20 | - | - | - | - | - | - |
| Vermont SC | South Carolina | February-20 | - | - | - | - | - | - |
| Vermont SC | South Carolina | March-20 | - | - | - | - | - | - |
| Vermont SC | South Carolina | April-20 | - | - | - | - | - | - |
| Vermont SC | South Carolina | May-20 | - | - | - | - | 1 | 1 |
| Vermont SC | South Carolina | June-20 | - | - | - | - | - | - |
| Vermont SC | South Carolina | July-20 | - | - | - | - | - | - |
| Vermont SC | South Carolina | August-20 | - | - | - | - | - | - |
| Vermont SC | South Carolina | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **South Carolina Total** | | **-** | **-** | **-** | **-** | **1** | **1** |
| Vermont SC | Texas | July-18 | 1 | - | 1 | - | - | - |
| Vermont SC | Texas | August-18 | - | - | - | 1 | 1 | 2 |
| Vermont SC | Texas | September-18 | - | - | - | 2 | 1 | 3 |
| Vermont SC | Texas | October-18 | - | - | - | - | 1 | 1 |
| Vermont SC | Texas | November-18 | - | - | - | 1 | - | 1 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Vermont SC | Texas | December-18 | - | - | - | 1 | - | 1 |
| Vermont SC | Texas | January-19 | - | - | - | - | - | - |
| Vermont SC | Texas | February-19 | - | - | - | - | - | - |
| Vermont SC | Texas | March-19 | 1 | - | 1 | 1 | - | 1 |
| Vermont SC | Texas | April-19 | - | - | - | - | - | - |
| Vermont SC | Texas | May-19 | - | - | - | 1 | 1 | 2 |
| Vermont SC | Texas | June-19 | 1 | - | 1 | 1 | 1 | 2 |
| Vermont SC | Texas | July-19 | - | - | - | 1 | - | 1 |
| Vermont SC | Texas | August-19 | 2 | - | 2 | - | - | - |
| Vermont SC | Texas | September-19 | - | - | - | 1 | - | 1 |
| Vermont SC | Texas | October-19 | 2 | - | 2 | - | - | - |
| Vermont SC | Texas | November-19 | 1 | - | 1 | - | - | - |
| Vermont SC | Texas | December-19 | - | - | - | 2 | - | 2 |
| Vermont SC | Texas | January-20 | 1 | - | 1 | - | 1 | 1 |
| Vermont SC | Texas | February-20 | 1 | - | 1 | - | - | - |
| Vermont SC | Texas | March-20 | 3 | - | 3 | - | - | - |
| Vermont SC | Texas | April-20 | 2 | - | 2 | 1 | - | 1 |
| Vermont SC | Texas | May-20 | 1 | - | 1 | 1 | - | 1 |
| Vermont SC | Texas | June-20 | 4 | - | 4 | - | - | - |
| Vermont SC | Texas | July-20 | 1 | - | 1 | 1 | 2 | 3 |
| Vermont SC | Texas | August-20 | 2 | - | 2 | 1 | - | 1 |
| Vermont SC | Texas | September-20 | - | - | - | 1 | - | 1 |
| **Vermont SC** | **Texas Total** | | **23** | **-** | **23** | **17** | **8** | **25** |
| Vermont SC | West Virginia | July-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | August-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | September-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | October-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | November-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | December-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | January-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | February-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | March-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | April-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | May-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | June-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | July-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | August-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | September-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | October-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | November-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | December-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | January-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | February-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | March-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | April-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | May-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | June-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | July-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | August-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **West Virginia Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| **Vermont SC Total** | | | **25** | **-** | **25** | **21** | **9** | **30** |
| Other | Alabama | July-18 | - | - | - | - | - | - |
| Other | Alabama | August-18 | - | - | - | - | - | - |
| Other | Alabama | September-18 | - | - | - | - | - | - |

| Other | Alabama | October-18 | - | - | - | - | - | - |
|-------|---------|------------|---|---|---|---|---|---|
| Other | Alabama | November-18 | - | - | - | - | - | - |
| Other | Alabama | December-18 | - | - | - | - | - | - |
| Other | Alabama | January-19 | - | - | - | - | - | - |
| Other | Alabama | February-19 | - | - | - | - | - | - |
| Other | Alabama | March-19 | - | - | - | - | - | - |
| Other | Alabama | April-19 | - | - | - | - | - | - |
| Other | Alabama | May-19 | - | - | - | - | - | - |
| Other | Alabama | June-19 | - | - | - | - | - | - |
| Other | Alabama | July-19 | - | - | - | - | - | - |
| Other | Alabama | August-19 | - | - | - | - | - | - |
| Other | Alabama | September-19 | - | - | - | - | - | - |
| Other | Alabama | October-19 | - | - | - | - | - | - |
| Other | Alabama | November-19 | - | - | - | - | - | - |
| Other | Alabama | December-19 | - | - | - | - | - | - |
| Other | Alabama | January-20 | - | - | - | - | - | - |
| Other | Alabama | February-20 | - | - | - | - | - | - |
| Other | Alabama | March-20 | - | - | - | - | - | - |
| Other | Alabama | April-20 | - | - | - | - | - | - |
| Other | Alabama | May-20 | - | - | - | - | - | - |
| Other | Alabama | June-20 | - | - | - | - | - | - |
| Other | Alabama | July-20 | - | - | - | - | - | - |
| Other | Alabama | August-20 | - | - | - | - | - | - |
| Other | Alabama | September-20 | - | - | - | - | - | - |
| **Other** | **Alabama Total** | | - | - | - | - | - | - |
| Other | Arkansas | July-18 | - | - | - | - | - | - |
| Other | Arkansas | August-18 | - | - | - | - | - | - |
| Other | Arkansas | September-18 | - | - | - | - | - | - |
| Other | Arkansas | October-18 | - | - | - | - | - | - |
| Other | Arkansas | November-18 | - | - | - | - | - | - |
| Other | Arkansas | December-18 | - | - | - | - | - | - |
| Other | Arkansas | January-19 | - | - | - | - | - | - |
| Other | Arkansas | February-19 | - | - | - | - | - | - |
| Other | Arkansas | March-19 | - | - | - | - | - | - |
| Other | Arkansas | April-19 | - | - | - | - | - | - |
| Other | Arkansas | May-19 | - | - | - | - | - | - |
| Other | Arkansas | June-19 | - | - | - | - | - | - |
| Other | Arkansas | July-19 | - | - | - | - | - | - |
| Other | Arkansas | August-19 | - | - | - | - | - | - |
| Other | Arkansas | September-19 | - | - | - | - | - | - |
| Other | Arkansas | October-19 | - | - | - | - | - | - |
| Other | Arkansas | November-19 | - | - | - | - | - | - |
| Other | Arkansas | December-19 | - | - | - | - | - | - |
| Other | Arkansas | January-20 | - | - | - | - | - | - |
| Other | Arkansas | February-20 | - | - | - | - | - | - |
| Other | Arkansas | March-20 | - | - | - | - | - | - |
| Other | Arkansas | April-20 | - | - | - | - | - | - |
| Other | Arkansas | May-20 | - | - | - | - | - | - |
| Other | Arkansas | June-20 | - | - | - | - | - | - |
| Other | Arkansas | July-20 | - | - | - | - | - | - |
| Other | Arkansas | August-20 | - | - | - | - | - | - |
| Other | Arkansas | September-20 | - | - | - | - | - | - |
| **Other** | **Arkansas Total** | | - | - | - | - | - | - |
| Other | Kansas | July-18 | - | - | - | - | - | - |
| Other | Kansas | August-18 | - | - | - | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Other | Kansas | September-18 | - | - | - | - | - | - |
| Other | Kansas | October-18 | - | - | - | - | - | - |
| Other | Kansas | November-18 | - | - | - | - | - | - |
| Other | Kansas | December-18 | - | - | - | - | - | - |
| Other | Kansas | January-19 | - | - | - | - | - | - |
| Other | Kansas | February-19 | - | - | - | - | - | - |
| Other | Kansas | March-19 | - | - | - | - | - | - |
| Other | Kansas | April-19 | - | - | - | - | - | - |
| Other | Kansas | May-19 | - | - | - | - | - | - |
| Other | Kansas | June-19 | - | - | - | - | - | - |
| Other | Kansas | July-19 | - | - | - | - | - | - |
| Other | Kansas | August-19 | - | - | - | - | - | - |
| Other | Kansas | September-19 | - | - | - | - | - | - |
| Other | Kansas | October-19 | - | - | - | - | - | - |
| Other | Kansas | November-19 | - | - | - | - | - | - |
| Other | Kansas | December-19 | - | - | - | - | - | - |
| Other | Kansas | January-20 | - | - | - | - | - | - |
| Other | Kansas | February-20 | - | - | - | - | - | - |
| Other | Kansas | March-20 | - | - | - | - | - | - |
| Other | Kansas | April-20 | - | - | - | - | - | - |
| Other | Kansas | May-20 | - | - | - | - | - | - |
| Other | Kansas | June-20 | - | - | - | - | - | - |
| Other | Kansas | July-20 | - | - | - | - | - | - |
| Other | Kansas | August-20 | - | - | - | - | - | - |
| Other | Kansas | September-20 | - | - | - | - | - | - |
| **Other** | **Kansas Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Other | Louisiana | July-18 | - | - | - | - | - | - |
| Other | Louisiana | August-18 | - | - | - | - | - | - |
| Other | Louisiana | September-18 | - | - | - | - | - | - |
| Other | Louisiana | October-18 | - | - | - | - | - | - |
| Other | Louisiana | November-18 | - | - | - | - | - | - |
| Other | Louisiana | December-18 | - | - | - | - | - | - |
| Other | Louisiana | January-19 | - | - | - | - | - | - |
| Other | Louisiana | February-19 | - | - | - | - | - | - |
| Other | Louisiana | March-19 | - | - | - | - | - | - |
| Other | Louisiana | April-19 | - | - | - | - | - | - |
| Other | Louisiana | May-19 | - | - | - | - | - | - |
| Other | Louisiana | June-19 | - | - | - | - | - | - |
| Other | Louisiana | July-19 | - | - | - | - | - | - |
| Other | Louisiana | August-19 | - | - | - | - | - | - |
| Other | Louisiana | September-19 | - | - | - | - | - | - |
| Other | Louisiana | October-19 | - | - | - | - | - | - |
| Other | Louisiana | November-19 | - | - | - | - | - | - |
| Other | Louisiana | December-19 | - | - | - | - | - | - |
| Other | Louisiana | January-20 | - | - | - | - | - | - |
| Other | Louisiana | February-20 | - | - | - | - | - | - |
| Other | Louisiana | March-20 | - | - | - | - | - | - |
| Other | Louisiana | April-20 | - | - | - | - | - | - |
| Other | Louisiana | May-20 | - | - | - | - | - | - |
| Other | Louisiana | June-20 | - | - | - | - | - | - |
| Other | Louisiana | July-20 | - | - | - | - | - | - |
| Other | Louisiana | August-20 | - | - | - | - | - | - |
| Other | Louisiana | September-20 | - | - | - | - | - | - |
| **Other** | **Louisiana Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Other | Mississippi | July-18 | - | - | - | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Other | Mississippi | August-18 | - | - | - | - | - | - |
| Other | Mississippi | September-18 | - | - | - | - | - | - |
| Other | Mississippi | October-18 | - | - | - | - | - | - |
| Other | Mississippi | November-18 | - | - | - | - | - | - |
| Other | Mississippi | December-18 | - | - | - | - | - | - |
| Other | Mississippi | January-19 | - | - | - | - | - | - |
| Other | Mississippi | February-19 | - | - | - | - | - | - |
| Other | Mississippi | March-19 | - | - | - | - | - | - |
| Other | Mississippi | April-19 | - | - | - | - | - | - |
| Other | Mississippi | May-19 | - | - | - | - | - | - |
| Other | Mississippi | June-19 | - | - | - | - | - | - |
| Other | Mississippi | July-19 | - | - | - | - | - | - |
| Other | Mississippi | August-19 | - | - | - | - | - | - |
| Other | Mississippi | September-19 | - | - | - | - | - | - |
| Other | Mississippi | October-19 | - | - | - | - | - | - |
| Other | Mississippi | November-19 | - | - | - | - | - | - |
| Other | Mississippi | December-19 | - | - | - | - | - | - |
| Other | Mississippi | January-20 | - | - | - | - | - | - |
| Other | Mississippi | February-20 | - | - | - | - | - | - |
| Other | Mississippi | March-20 | - | - | - | - | - | - |
| Other | Mississippi | April-20 | - | - | - | - | - | - |
| Other | Mississippi | May-20 | - | - | - | - | - | - |
| Other | Mississippi | June-20 | - | - | - | - | - | - |
| Other | Mississippi | July-20 | - | - | - | - | - | - |
| Other | Mississippi | August-20 | - | - | - | - | - | - |
| Other | Mississippi | September-20 | - | - | - | - | - | - |
| **Other** | **Mississippi Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Other | Nebraska | July-18 | - | - | - | - | - | - |
| Other | Nebraska | August-18 | - | - | - | - | - | - |
| Other | Nebraska | September-18 | - | - | - | - | - | - |
| Other | Nebraska | October-18 | - | - | - | - | - | - |
| Other | Nebraska | November-18 | - | - | - | - | - | - |
| Other | Nebraska | December-18 | - | - | - | - | - | - |
| Other | Nebraska | January-19 | - | - | - | - | - | - |
| Other | Nebraska | February-19 | - | - | - | - | - | - |
| Other | Nebraska | March-19 | - | - | - | - | - | - |
| Other | Nebraska | April-19 | - | - | - | - | - | - |
| Other | Nebraska | May-19 | - | - | - | - | - | - |
| Other | Nebraska | June-19 | - | - | - | - | - | - |
| Other | Nebraska | July-19 | - | - | - | - | - | - |
| Other | Nebraska | August-19 | - | - | - | - | - | - |
| Other | Nebraska | September-19 | - | - | - | - | - | - |
| Other | Nebraska | October-19 | - | - | - | - | - | - |
| Other | Nebraska | November-19 | - | - | - | - | - | - |
| Other | Nebraska | December-19 | - | - | - | - | - | - |
| Other | Nebraska | January-20 | - | - | - | - | - | - |
| Other | Nebraska | February-20 | - | - | - | - | - | - |
| Other | Nebraska | March-20 | - | - | - | - | - | - |
| Other | Nebraska | April-20 | - | - | - | - | - | - |
| Other | Nebraska | May-20 | - | - | - | - | - | - |
| Other | Nebraska | June-20 | - | - | - | - | - | - |
| Other | Nebraska | July-20 | - | - | - | - | - | - |
| Other | Nebraska | August-20 | - | - | - | - | - | - |
| Other | Nebraska | September-20 | - | - | - | - | - | - |
| **Other** | **Nebraska Total** | | **-** | **-** | **-** | **-** | **-** | **-** |

| Other | South Carolina | July-18 | - | - | - | - | - | - |
|---|---|---|---|---|---|---|---|---|
| Other | South Carolina | August-18 | - | - | - | - | - | - |
| Other | South Carolina | September-18 | - | - | - | - | - | - |
| Other | South Carolina | October-18 | - | - | - | - | - | - |
| Other | South Carolina | November-18 | - | - | - | - | - | - |
| Other | South Carolina | December-18 | - | - | - | - | - | - |
| Other | South Carolina | January-19 | - | - | - | - | - | - |
| Other | South Carolina | February-19 | - | - | - | - | - | - |
| Other | South Carolina | March-19 | - | - | - | - | - | - |
| Other | South Carolina | April-19 | - | - | - | - | - | - |
| Other | South Carolina | May-19 | - | - | - | - | - | - |
| Other | South Carolina | June-19 | - | - | - | - | - | - |
| Other | South Carolina | July-19 | - | - | - | - | - | - |
| Other | South Carolina | August-19 | - | - | - | - | - | - |
| Other | South Carolina | September-19 | - | - | - | - | - | - |
| Other | South Carolina | October-19 | - | - | - | - | - | - |
| Other | South Carolina | November-19 | - | - | - | - | - | - |
| Other | South Carolina | December-19 | - | - | - | - | - | - |
| Other | South Carolina | January-20 | - | - | - | - | - | - |
| Other | South Carolina | February-20 | - | - | - | - | - | - |
| Other | South Carolina | March-20 | - | - | - | - | - | - |
| Other | South Carolina | April-20 | - | - | - | - | - | - |
| Other | South Carolina | May-20 | - | - | - | - | - | - |
| Other | South Carolina | June-20 | - | - | - | - | - | - |
| Other | South Carolina | July-20 | - | - | - | - | - | - |
| Other | South Carolina | August-20 | - | - | - | - | - | - |
| Other | South Carolina | September-20 | - | - | - | - | - | - |
| **Other** | **South Carolina Total** | | **-** | **-** | **-** | **-** | **-** | **-** |
| Other | Texas | July-18 | - | - | - | - | - | - |
| Other | Texas | August-18 | - | - | - | - | - | - |
| Other | Texas | September-18 | - | - | - | - | - | - |
| Other | Texas | October-18 | - | - | - | - | - | - |
| Other | Texas | November-18 | - | - | - | - | - | - |
| Other | Texas | December-18 | - | - | - | - | - | - |
| Other | Texas | January-19 | - | - | - | - | - | - |
| Other | Texas | February-19 | - | - | - | - | - | - |
| Other | Texas | March-19 | - | - | - | - | - | - |
| Other | Texas | April-19 | - | - | - | - | - | - |
| Other | Texas | May-19 | - | - | - | - | - | - |
| Other | Texas | June-19 | - | - | - | - | - | - |
| Other | Texas | July-19 | - | - | - | - | - | - |
| Other | Texas | August-19 | - | - | - | - | - | - |
| Other | Texas | September-19 | - | - | - | - | - | - |
| Other | Texas | October-19 | - | - | - | - | - | - |
| Other | Texas | November-19 | - | - | - | - | - | - |
| Other | Texas | December-19 | - | - | - | - | - | - |
| Other | Texas | January-20 | - | - | - | - | - | - |
| Other | Texas | February-20 | - | - | - | - | - | - |
| Other | Texas | March-20 | - | - | - | - | - | - |
| Other | Texas | April-20 | - | - | - | - | 1 | 1 |
| Other | Texas | May-20 | - | - | - | - | - | - |
| Other | Texas | June-20 | - | - | - | - | - | - |
| Other | Texas | July-20 | - | - | - | - | - | - |
| Other | Texas | August-20 | - | - | - | - | - | - |
| Other | Texas | September-20 | - | - | - | - | - | - |

| Other | Texas Total | | - | - | - | - | 1 | 1 |
|-------|-------------|--|---|---|---|---|---|---|
| Other | West Virginia | July-18 | - | - | - | - | - | - |
| Other | West Virginia | August-18 | - | - | - | - | - | - |
| Other | West Virginia | September-18 | - | - | - | - | - | - |
| Other | West Virginia | October-18 | - | - | - | - | - | - |
| Other | West Virginia | November-18 | - | - | - | - | - | - |
| Other | West Virginia | December-18 | - | - | - | - | - | - |
| Other | West Virginia | January-19 | - | - | - | - | - | - |
| Other | West Virginia | February-19 | - | - | - | - | - | - |
| Other | West Virginia | March-19 | - | - | - | - | - | - |
| Other | West Virginia | April-19 | - | - | - | - | - | - |
| Other | West Virginia | May-19 | - | - | - | - | - | - |
| Other | West Virginia | June-19 | - | - | - | - | - | - |
| Other | West Virginia | July-19 | - | - | - | - | - | - |
| Other | West Virginia | August-19 | - | - | - | - | - | - |
| Other | West Virginia | September-19 | - | - | - | - | - | - |
| Other | West Virginia | October-19 | - | - | - | - | - | - |
| Other | West Virginia | November-19 | - | - | - | - | - | - |
| Other | West Virginia | December-19 | - | - | - | - | - | - |
| Other | West Virginia | January-20 | - | - | - | - | - | - |
| Other | West Virginia | February-20 | - | - | - | - | - | - |
| Other | West Virginia | March-20 | - | - | - | - | - | - |
| Other | West Virginia | April-20 | - | - | - | - | - | - |
| Other | West Virginia | May-20 | - | - | - | - | - | - |
| Other | West Virginia | June-20 | - | - | - | - | - | - |
| Other | West Virginia | July-20 | - | - | - | - | - | - |
| Other | West Virginia | August-20 | - | - | - | - | - | - |
| Other | West Virginia | September-20 | - | - | - | - | - | - |
| Other | West Virginia Total | | - | - | - | - | - | - |
| Other Total | | | - | - | - | - | 1 | 1 |
| Grand Total | | | 1,137 | 3 | 1,140 | 1,168 | 860 | 2,028 |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) For Accepted Filings, Rejections, and Total Received, Month represents the month the DACA Request was received by USCIS.

3) Requestor state for lockbox rejected cases in ELIS is not captured electronically.

4) For Approved, Denied, and Total Completions, Month represents the month the most recent final adjudication action occurred.

5) Requests approved or denied in a given month may have been received in a previous month.

6) State is determined by the requestor's address listed on the form I-821D.

7) "Other" in the Service Center represents data for non-Service Center Offices.

8) Texas Service Center and Potomac Service Center had no DACA initial results for the requested time period.

9) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

**Request for Production 15 (2)**
Form I-821D, Consideration of Deferred Action for Childhood Arrivals
DACA Renewals
Count of Accepted Filings, Rejections, Approvals, and Denials by Month, Selected State
and USCIS Service Center
July 1, 2018 - Sep 8, 2020



U.S. Citizenship
and Immigration
Services

| Service Center | Requestor State | Month | Accepted Filings | Rejections | Total Received | Approved | Denied | Total Completions |
|---|---|---|---|---|---|---|---|---|
| Nebraska SC | Alabama | July-18 | 164 | 1 | 165 | 151 | 1 | 152 |
| Nebraska SC | Alabama | August-18 | 247 | - | 247 | 191 | 1 | 192 |
| Nebraska SC | Alabama | September-18 | 126 | - | 126 | 167 | 2 | 169 |
| Nebraska SC | Alabama | October-18 | 200 | - | 200 | 173 | - | 173 |
| Nebraska SC | Alabama | November-18 | 169 | - | 169 | 209 | - | 209 |
| Nebraska SC | Alabama | December-18 | 174 | - | 174 | 126 | - | 126 |
| Nebraska SC | Alabama | January-19 | 223 | 1 | 224 | 180 | 2 | 182 |
| Nebraska SC | Alabama | February-19 | 208 | - | 208 | 197 | - | 197 |
| Nebraska SC | Alabama | March-19 | 215 | - | 215 | 229 | 3 | 232 |
| Nebraska SC | Alabama | April-19 | 189 | - | 189 | 218 | - | 218 |
| Nebraska SC | Alabama | May-19 | 177 | - | 177 | 211 | 2 | 213 |
| Nebraska SC | Alabama | June-19 | 180 | - | 180 | 133 | - | 133 |
| Nebraska SC | Alabama | July-19 | 200 | 1 | 201 | 195 | - | 195 |
| Nebraska SC | Alabama | August-19 | 200 | - | 200 | 180 | 3 | 183 |
| Nebraska SC | Alabama | September-19 | 194 | 1 | 195 | 220 | 2 | 222 |
| Nebraska SC | Alabama | October-19 | 155 | - | 155 | 241 | 1 | 242 |
| Nebraska SC | Alabama | November-19 | 148 | - | 148 | 115 | 2 | 117 |
| Nebraska SC | Alabama | December-19 | 107 | - | 107 | 127 | 1 | 128 |
| Nebraska SC | Alabama | January-20 | 141 | - | 141 | 137 | 4 | 141 |
| Nebraska SC | Alabama | February-20 | 166 | - | 166 | 112 | 1 | 113 |
| Nebraska SC | Alabama | March-20 | 208 | - | 208 | 131 | 1 | 132 |
| Nebraska SC | Alabama | April-20 | 159 | - | 159 | 231 | 2 | 233 |
| Nebraska SC | Alabama | May-20 | 171 | - | 171 | 232 | - | 232 |
| Nebraska SC | Alabama | June-20 | 192 | - | 192 | 193 | 3 | 196 |
| Nebraska SC | Alabama | July-20 | 140 | - | 140 | 105 | 1 | 106 |
| Nebraska SC | Alabama | August-20 | 140 | - | 140 | 21 | - | 21 |
| Nebraska SC | Alabama | September-20 | - | - | - | 66 | - | 66 |
| **Nebraska SC** | **Alabama Total** | | **4,593** | **4** | **4,597** | **4,491** | **32** | **4,523** |
| Nebraska SC | Arkansas | July-18 | 159 | - | 159 | 177 | 1 | 178 |
| Nebraska SC | Arkansas | August-18 | 354 | - | 354 | 200 | 4 | 204 |
| Nebraska SC | Arkansas | September-18 | 155 | - | 155 | 222 | 1 | 223 |
| Nebraska SC | Arkansas | October-18 | 228 | - | 228 | 215 | 4 | 219 |
| Nebraska SC | Arkansas | November-18 | 211 | - | 211 | 248 | 1 | 249 |
| Nebraska SC | Arkansas | December-18 | 163 | - | 163 | 131 | 2 | 133 |
| Nebraska SC | Arkansas | January-19 | 223 | - | 223 | 171 | 3 | 174 |
| Nebraska SC | Arkansas | February-19 | 196 | 1 | 197 | 204 | 1 | 205 |
| Nebraska SC | Arkansas | March-19 | 264 | - | 264 | 233 | 2 | 235 |
| Nebraska SC | Arkansas | April-19 | 226 | - | 226 | 243 | 1 | 244 |
| Nebraska SC | Arkansas | May-19 | 231 | - | 231 | 243 | 3 | 246 |
| Nebraska SC | Arkansas | June-19 | 209 | - | 209 | 197 | 1 | 198 |
| Nebraska SC | Arkansas | July-19 | 205 | - | 205 | 247 | - | 247 |
| Nebraska SC | Arkansas | August-19 | 179 | - | 179 | 186 | 3 | 189 |
| Nebraska SC | Arkansas | September-19 | 187 | - | 187 | 219 | 2 | 221 |
| Nebraska SC | Arkansas | October-19 | 197 | - | 197 | 211 | 3 | 214 |
| Nebraska SC | Arkansas | November-19 | 200 | - | 200 | 145 | 3 | 148 |
| Nebraska SC | Arkansas | December-19 | 147 | 1 | 148 | 211 | 3 | 214 |
| Nebraska SC | Arkansas | January-20 | 179 | - | 179 | 161 | - | 161 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nebraska SC | Arkansas | February-20 | 172 | - | 172 | 160 | 1 | 161 |
| Nebraska SC | Arkansas | March-20 | 235 | - | 235 | 137 | 2 | 139 |
| Nebraska SC | Arkansas | April-20 | 227 | - | 227 | 261 | - | 261 |
| Nebraska SC | Arkansas | May-20 | 233 | - | 233 | 309 | 1 | 310 |
| Nebraska SC | Arkansas | June-20 | 199 | - | 199 | 238 | 1 | 239 |
| Nebraska SC | Arkansas | July-20 | 160 | - | 160 | 83 | 1 | 84 |
| Nebraska SC | Arkansas | August-20 | 139 | - | 139 | 34 | 1 | 35 |
| Nebraska SC | Arkansas | September-20 | - | - | - | 74 | - | 74 |
| **Nebraska SC** | **Arkansas Total** | | **5,278** | **2** | **5,280** | **5,160** | **45** | **5,205** |
| Nebraska SC | Kansas | July-18 | 212 | - | 212 | 182 | 2 | 184 |
| Nebraska SC | Kansas | August-18 | 393 | - | 393 | 264 | 2 | 266 |
| Nebraska SC | Kansas | September-18 | 190 | - | 190 | 273 | 1 | 274 |
| Nebraska SC | Kansas | October-18 | 260 | - | 260 | 237 | 2 | 239 |
| Nebraska SC | Kansas | November-18 | 275 | - | 275 | 281 | 2 | 283 |
| Nebraska SC | Kansas | December-18 | 240 | - | 240 | 189 | 1 | 190 |
| Nebraska SC | Kansas | January-19 | 277 | - | 277 | 275 | 5 | 280 |
| Nebraska SC | Kansas | February-19 | 277 | - | 277 | 228 | 3 | 231 |
| Nebraska SC | Kansas | March-19 | 305 | - | 305 | 295 | 1 | 296 |
| Nebraska SC | Kansas | April-19 | 296 | - | 296 | 346 | 1 | 347 |
| Nebraska SC | Kansas | May-19 | 264 | - | 264 | 263 | 3 | 266 |
| Nebraska SC | Kansas | June-19 | 258 | - | 258 | 224 | 3 | 227 |
| Nebraska SC | Kansas | July-19 | 292 | - | 292 | 315 | 1 | 316 |
| Nebraska SC | Kansas | August-19 | 264 | - | 264 | 267 | 1 | 268 |
| Nebraska SC | Kansas | September-19 | 256 | - | 256 | 267 | 2 | 269 |
| Nebraska SC | Kansas | October-19 | 194 | 1 | 195 | 306 | 1 | 307 |
| Nebraska SC | Kansas | November-19 | 184 | - | 184 | 143 | 2 | 145 |
| Nebraska SC | Kansas | December-19 | 167 | - | 167 | 153 | 4 | 157 |
| Nebraska SC | Kansas | January-20 | 214 | - | 214 | 199 | 3 | 202 |
| Nebraska SC | Kansas | February-20 | 232 | 1 | 233 | 193 | 3 | 196 |
| Nebraska SC | Kansas | March-20 | 270 | - | 270 | 212 | 4 | 216 |
| Nebraska SC | Kansas | April-20 | 231 | - | 231 | 283 | 1 | 284 |
| Nebraska SC | Kansas | May-20 | 224 | - | 224 | 349 | - | 349 |
| Nebraska SC | Kansas | June-20 | 322 | - | 322 | 282 | 2 | 284 |
| Nebraska SC | Kansas | July-20 | 176 | - | 176 | 155 | 3 | 158 |
| Nebraska SC | Kansas | August-20 | 135 | - | 135 | 19 | 4 | 23 |
| Nebraska SC | Kansas | September-20 | - | - | - | 82 | - | 82 |
| **Nebraska SC** | **Kansas Total** | | **6,408** | **2** | **6,410** | **6,282** | **57** | **6,339** |
| Nebraska SC | Louisiana | July-18 | 75 | - | 75 | 60 | 2 | 62 |
| Nebraska SC | Louisiana | August-18 | 109 | 1 | 110 | 79 | 1 | 80 |
| Nebraska SC | Louisiana | September-18 | 72 | - | 72 | 88 | - | 88 |
| Nebraska SC | Louisiana | October-18 | 68 | 1 | 69 | 82 | 1 | 83 |
| Nebraska SC | Louisiana | November-18 | 84 | - | 84 | 72 | - | 72 |
| Nebraska SC | Louisiana | December-18 | 61 | - | 61 | 59 | - | 59 |
| Nebraska SC | Louisiana | January-19 | 88 | - | 88 | 72 | 1 | 73 |
| Nebraska SC | Louisiana | February-19 | 70 | - | 70 | 69 | - | 69 |
| Nebraska SC | Louisiana | March-19 | 96 | - | 96 | 87 | 1 | 88 |
| Nebraska SC | Louisiana | April-19 | 106 | - | 106 | 100 | 1 | 101 |
| Nebraska SC | Louisiana | May-19 | 78 | - | 78 | 94 | - | 94 |
| Nebraska SC | Louisiana | June-19 | 99 | - | 99 | 75 | - | 75 |
| Nebraska SC | Louisiana | July-19 | 91 | - | 91 | 98 | 1 | 99 |
| Nebraska SC | Louisiana | August-19 | 90 | - | 90 | 86 | 3 | 89 |
| Nebraska SC | Louisiana | September-19 | 83 | - | 83 | 94 | 1 | 95 |
| Nebraska SC | Louisiana | October-19 | 74 | - | 74 | 98 | - | 98 |
| Nebraska SC | Louisiana | November-19 | 55 | - | 55 | 57 | 2 | 59 |
| Nebraska SC | Louisiana | December-19 | 49 | - | 49 | 60 | - | 60 |

| Nebraska SC | Louisiana | January-20 | 74 | - | 74 | 58 | 1 | 59 |
|---|---|---|---|---|---|---|---|---|
| Nebraska SC | Louisiana | February-20 | 46 | 1 | 47 | 59 | 1 | 60 |
| Nebraska SC | Louisiana | March-20 | 57 | 1 | 58 | 49 | - | 49 |
| Nebraska SC | Louisiana | April-20 | 64 | - | 64 | 62 | 1 | 63 |
| Nebraska SC | Louisiana | May-20 | 91 | - | 91 | 108 | 2 | 110 |
| Nebraska SC | Louisiana | June-20 | 89 | - | 89 | 89 | - | 89 |
| Nebraska SC | Louisiana | July-20 | 60 | - | 60 | 39 | 1 | 40 |
| Nebraska SC | Louisiana | August-20 | 52 | - | 52 | 8 | 1 | 9 |
| Nebraska SC | Louisiana | September-20 | - | - | - | 46 | - | 46 |
| **Nebraska SC** | **Louisiana Total** | | **1,981** | **4** | **1,985** | **1,948** | **21** | **1,969** |
| Nebraska SC | Mississippi | July-18 | 40 | - | 40 | 42 | - | 42 |
| Nebraska SC | Mississippi | August-18 | 89 | - | 89 | 60 | 1 | 61 |
| Nebraska SC | Mississippi | September-18 | 37 | - | 37 | 65 | 1 | 66 |
| Nebraska SC | Mississippi | October-18 | 63 | - | 63 | 52 | - | 52 |
| Nebraska SC | Mississippi | November-18 | 68 | - | 68 | 64 | 1 | 65 |
| Nebraska SC | Mississippi | December-18 | 57 | - | 57 | 49 | - | 49 |
| Nebraska SC | Mississippi | January-19 | 67 | - | 67 | 58 | - | 58 |
| Nebraska SC | Mississippi | February-19 | 64 | - | 64 | 58 | - | 58 |
| Nebraska SC | Mississippi | March-19 | 57 | 2 | 59 | 66 | - | 66 |
| Nebraska SC | Mississippi | April-19 | 63 | - | 63 | 77 | - | 77 |
| Nebraska SC | Mississippi | May-19 | 78 | - | 78 | 62 | - | 62 |
| Nebraska SC | Mississippi | June-19 | 66 | - | 66 | 47 | 1 | 48 |
| Nebraska SC | Mississippi | July-19 | 55 | - | 55 | 76 | - | 76 |
| Nebraska SC | Mississippi | August-19 | 58 | - | 58 | 62 | - | 62 |
| Nebraska SC | Mississippi | September-19 | 58 | - | 58 | 57 | - | 57 |
| Nebraska SC | Mississippi | October-19 | 68 | - | 68 | 69 | 3 | 72 |
| Nebraska SC | Mississippi | November-19 | 45 | - | 45 | 44 | - | 44 |
| Nebraska SC | Mississippi | December-19 | 37 | - | 37 | 46 | 1 | 47 |
| Nebraska SC | Mississippi | January-20 | 59 | - | 59 | 48 | 1 | 49 |
| Nebraska SC | Mississippi | February-20 | 45 | - | 45 | 57 | 1 | 58 |
| Nebraska SC | Mississippi | March-20 | 62 | - | 62 | 41 | - | 41 |
| Nebraska SC | Mississippi | April-20 | 61 | - | 61 | 71 | 1 | 72 |
| Nebraska SC | Mississippi | May-20 | 63 | - | 63 | 84 | - | 84 |
| Nebraska SC | Mississippi | June-20 | 69 | - | 69 | 68 | - | 68 |
| Nebraska SC | Mississippi | July-20 | 51 | - | 51 | 33 | - | 33 |
| Nebraska SC | Mississippi | August-20 | 33 | - | 33 | 6 | - | 6 |
| Nebraska SC | Mississippi | September-20 | - | - | - | 25 | 1 | 26 |
| **Nebraska SC** | **Mississippi Total** | | **1,513** | **2** | **1,515** | **1,487** | **12** | **1,499** |
| Nebraska SC | Nebraska | July-18 | 120 | - | 120 | 101 | - | 101 |
| Nebraska SC | Nebraska | August-18 | 194 | - | 194 | 150 | - | 150 |
| Nebraska SC | Nebraska | September-18 | 107 | - | 107 | 137 | 2 | 139 |
| Nebraska SC | Nebraska | October-18 | 148 | - | 148 | 142 | - | 142 |
| Nebraska SC | Nebraska | November-18 | 119 | - | 119 | 155 | 3 | 158 |
| Nebraska SC | Nebraska | December-18 | 116 | - | 116 | 71 | 1 | 72 |
| Nebraska SC | Nebraska | January-19 | 124 | - | 124 | 142 | 1 | 143 |
| Nebraska SC | Nebraska | February-19 | 134 | - | 134 | 100 | 5 | 105 |
| Nebraska SC | Nebraska | March-19 | 169 | - | 169 | 131 | 2 | 133 |
| Nebraska SC | Nebraska | April-19 | 146 | - | 146 | 176 | 1 | 177 |
| Nebraska SC | Nebraska | May-19 | 141 | - | 141 | 136 | 1 | 137 |
| Nebraska SC | Nebraska | June-19 | 128 | - | 128 | 114 | - | 114 |
| Nebraska SC | Nebraska | July-19 | 146 | - | 146 | 159 | 1 | 160 |
| Nebraska SC | Nebraska | August-19 | 134 | 1 | 135 | 135 | 2 | 137 |
| Nebraska SC | Nebraska | September-19 | 124 | - | 124 | 154 | - | 154 |
| Nebraska SC | Nebraska | October-19 | 143 | - | 143 | 139 | 1 | 140 |
| Nebraska SC | Nebraska | November-19 | 105 | 1 | 106 | 99 | - | 99 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nebraska SC | Nebraska | December-19 | 121 | - | 121 | 116 | 3 | 119 |
| Nebraska SC | Nebraska | January-20 | 132 | - | 132 | 108 | - | 108 |
| Nebraska SC | Nebraska | February-20 | 138 | - | 138 | 128 | - | 128 |
| Nebraska SC | Nebraska | March-20 | 159 | - | 159 | 109 | 2 | 111 |
| Nebraska SC | Nebraska | April-20 | 138 | - | 138 | 179 | 2 | 181 |
| Nebraska SC | Nebraska | May-20 | 133 | - | 133 | 184 | 2 | 186 |
| Nebraska SC | Nebraska | June-20 | 159 | - | 159 | 166 | - | 166 |
| Nebraska SC | Nebraska | July-20 | 82 | - | 82 | 79 | 3 | 82 |
| Nebraska SC | Nebraska | August-20 | 75 | - | 75 | 8 | 3 | 11 |
| Nebraska SC | Nebraska | September-20 | - | | - | 42 | 1 | 43 |
| **Nebraska SC** | **Nebraska Total** | | **3,435** | **2** | **3,437** | **3,360** | **36** | **3,396** |
| Nebraska SC | South Carolina | July-18 | 246 | - | 246 | 189 | 2 | 191 |
| Nebraska SC | South Carolina | August-18 | 322 | - | 322 | 268 | 4 | 272 |
| Nebraska SC | South Carolina | September-18 | 214 | 1 | 215 | 211 | - | 211 |
| Nebraska SC | South Carolina | October-18 | 285 | - | 285 | 289 | - | 289 |
| Nebraska SC | South Carolina | November-18 | 282 | - | 282 | 304 | - | 304 |
| Nebraska SC | South Carolina | December-18 | 252 | - | 252 | 202 | 2 | 204 |
| Nebraska SC | South Carolina | January-19 | 242 | - | 242 | 264 | 1 | 265 |
| Nebraska SC | South Carolina | February-19 | 292 | - | 292 | 245 | 1 | 246 |
| Nebraska SC | South Carolina | March-19 | 323 | - | 323 | 277 | - | 277 |
| Nebraska SC | South Carolina | April-19 | 284 | - | 284 | 307 | 3 | 310 |
| Nebraska SC | South Carolina | May-19 | 291 | 1 | 292 | 253 | 2 | 255 |
| Nebraska SC | South Carolina | June-19 | 262 | - | 262 | 269 | 2 | 271 |
| Nebraska SC | South Carolina | July-19 | 311 | - | 311 | 323 | - | 323 |
| Nebraska SC | South Carolina | August-19 | 267 | - | 267 | 281 | 2 | 283 |
| Nebraska SC | South Carolina | September-19 | 248 | - | 248 | 295 | 3 | 298 |
| Nebraska SC | South Carolina | October-19 | 280 | - | 280 | 321 | 7 | 328 |
| Nebraska SC | South Carolina | November-19 | 190 | - | 190 | 170 | 2 | 172 |
| Nebraska SC | South Carolina | December-19 | 163 | - | 163 | 229 | 2 | 231 |
| Nebraska SC | South Carolina | January-20 | 218 | - | 218 | 177 | 1 | 178 |
| Nebraska SC | South Carolina | February-20 | 213 | - | 213 | 221 | 1 | 222 |
| Nebraska SC | South Carolina | March-20 | 287 | 1 | 288 | 147 | - | 147 |
| Nebraska SC | South Carolina | April-20 | 244 | 1 | 245 | 337 | 2 | 339 |
| Nebraska SC | South Carolina | May-20 | 266 | 1 | 267 | 336 | 2 | 338 |
| Nebraska SC | South Carolina | June-20 | 270 | - | 270 | 304 | 3 | 307 |
| Nebraska SC | South Carolina | July-20 | 174 | - | 174 | 125 | - | 125 |
| Nebraska SC | South Carolina | August-20 | 195 | - | 195 | 16 | 2 | 18 |
| Nebraska SC | South Carolina | September-20 | - | | - | 96 | 1 | 97 |
| **Nebraska SC** | **South Carolina Total** | | **6,621** | **5** | **6,626** | **6,456** | **45** | **6,501** |
| Nebraska SC | Texas | July-18 | 4,380 | 8 | 4,388 | 3,738 | 35 | 3,773 |
| Nebraska SC | Texas | August-18 | 8,248 | 4 | 8,252 | 5,142 | 31 | 5,173 |
| Nebraska SC | Texas | September-18 | 3,452 | 4 | 3,456 | 5,704 | 19 | 5,723 |
| Nebraska SC | Texas | October-18 | 4,677 | 4 | 4,681 | 4,690 | 36 | 4,726 |
| Nebraska SC | Texas | November-18 | 4,527 | 3 | 4,530 | 4,972 | 38 | 5,010 |
| Nebraska SC | Texas | December-18 | 3,931 | 1 | 3,932 | 3,461 | 21 | 3,482 |
| Nebraska SC | Texas | January-19 | 5,029 | 2 | 5,031 | 4,409 | 38 | 4,447 |
| Nebraska SC | Texas | February-19 | 4,759 | 3 | 4,762 | 4,368 | 20 | 4,388 |
| Nebraska SC | Texas | March-19 | 5,619 | 4 | 5,623 | 4,835 | 23 | 4,858 |
| Nebraska SC | Texas | April-19 | 5,873 | 1 | 5,874 | 6,368 | 41 | 6,409 |
| Nebraska SC | Texas | May-19 | 5,495 | 1 | 5,496 | 5,255 | 54 | 5,309 |
| Nebraska SC | Texas | June-19 | 5,259 | 2 | 5,261 | 4,528 | 26 | 4,554 |
| Nebraska SC | Texas | July-19 | 6,052 | 9 | 6,061 | 6,121 | 41 | 6,162 |
| Nebraska SC | Texas | August-19 | 5,368 | 3 | 5,371 | 5,480 | 50 | 5,530 |
| Nebraska SC | Texas | September-19 | 4,833 | 1 | 4,834 | 6,005 | 41 | 6,046 |
| Nebraska SC | Texas | October-19 | 4,309 | 3 | 4,312 | 5,774 | 48 | 5,822 |

| Nebraska SC | Texas | November-19 | 3,835 | - | 3,835 | 3,227 | 35 | 3,262 |
|---|---|---|---|---|---|---|---|---|
| Nebraska SC | Texas | December-19 | 3,191 | 2 | 3,193 | 3,855 | 46 | 3,901 |
| Nebraska SC | Texas | January-20 | 4,322 | - | 4,322 | 3,787 | 41 | 3,828 |
| Nebraska SC | Texas | February-20 | 3,886 | 1 | 3,887 | 3,832 | 52 | 3,884 |
| Nebraska SC | Texas | March-20 | 5,556 | 3 | 5,559 | 3,070 | 47 | 3,117 |
| Nebraska SC | Texas | April-20 | 4,640 | 2 | 4,642 | 5,832 | 56 | 5,888 |
| Nebraska SC | Texas | May-20 | 5,146 | - | 5,146 | 6,910 | 29 | 6,939 |
| Nebraska SC | Texas | June-20 | 5,616 | - | 5,616 | 5,964 | 36 | 6,000 |
| Nebraska SC | Texas | July-20 | 3,514 | 1 | 3,515 | 2,694 | 22 | 2,716 |
| Nebraska SC | Texas | August-20 | 3,248 | 2 | 3,250 | 492 | 26 | 518 |
| Nebraska SC | Texas | September-20 | 1 | - | 1 | 1,922 | 4 | 1,926 |
| **Nebraska SC** | **Texas Total** | | **124,766** | **64** | **124,830** | **122,435** | **956** | **123,391** |
| Nebraska SC | West Virginia | July-18 | 7 | - | 7 | 4 | - | 4 |
| Nebraska SC | West Virginia | August-18 | 7 | - | 7 | 6 | - | 6 |
| Nebraska SC | West Virginia | September-18 | 8 | - | 8 | 6 | 1 | 7 |
| Nebraska SC | West Virginia | October-18 | 4 | - | 4 | 9 | - | 9 |
| Nebraska SC | West Virginia | November-18 | 8 | - | 8 | 6 | - | 6 |
| Nebraska SC | West Virginia | December-18 | 3 | - | 3 | 4 | - | 4 |
| Nebraska SC | West Virginia | January-19 | 12 | - | 12 | 7 | - | 7 |
| Nebraska SC | West Virginia | February-19 | 4 | - | 4 | 8 | - | 8 |
| Nebraska SC | West Virginia | March-19 | 4 | - | 4 | 4 | - | 4 |
| Nebraska SC | West Virginia | April-19 | 3 | - | 3 | 5 | - | 5 |
| Nebraska SC | West Virginia | May-19 | 5 | - | 5 | 4 | - | 4 |
| Nebraska SC | West Virginia | June-19 | 10 | - | 10 | 3 | - | 3 |
| Nebraska SC | West Virginia | July-19 | 2 | - | 2 | 10 | - | 10 |
| Nebraska SC | West Virginia | August-19 | 5 | - | 5 | 3 | 1 | 4 |
| Nebraska SC | West Virginia | September-19 | 5 | - | 5 | 4 | 1 | 5 |
| Nebraska SC | West Virginia | October-19 | 3 | - | 3 | 6 | - | 6 |
| Nebraska SC | West Virginia | November-19 | 5 | - | 5 | 3 | - | 3 |
| Nebraska SC | West Virginia | December-19 | 3 | - | 3 | 3 | - | 3 |
| Nebraska SC | West Virginia | January-20 | 2 | - | 2 | 4 | - | 4 |
| Nebraska SC | West Virginia | February-20 | 3 | - | 3 | 3 | - | 3 |
| Nebraska SC | West Virginia | March-20 | 4 | - | 4 | 2 | - | 2 |
| Nebraska SC | West Virginia | April-20 | 5 | - | 5 | 7 | - | 7 |
| Nebraska SC | West Virginia | May-20 | 8 | - | 8 | 6 | - | 6 |
| Nebraska SC | West Virginia | June-20 | 5 | - | 5 | 8 | - | 8 |
| Nebraska SC | West Virginia | July-20 | 3 | - | 3 | 2 | - | 2 |
| Nebraska SC | West Virginia | August-20 | 2 | - | 2 | - | - | - |
| Nebraska SC | West Virginia | September-20 | - | - | - | 2 | - | 2 |
| **Nebraska SC** | **West Virginia Total** | | **130** | **-** | **130** | **129** | **3** | **132** |
| **Nebraska SC Total** | | | **154,725** | **85** | **154,810** | **151,748** | **1,207** | **152,955** |
| Vermont SC | Alabama | July-18 | 3 | - | 3 | 4 | - | 4 |
| Vermont SC | Alabama | August-18 | 4 | - | 4 | 5 | - | 5 |
| Vermont SC | Alabama | September-18 | 1 | - | 1 | 2 | - | 2 |
| Vermont SC | Alabama | October-18 | 2 | - | 2 | 5 | - | 5 |
| Vermont SC | Alabama | November-18 | 6 | - | 6 | 3 | - | 3 |
| Vermont SC | Alabama | December-18 | 4 | - | 4 | 3 | - | 3 |
| Vermont SC | Alabama | January-19 | 6 | - | 6 | 7 | - | 7 |
| Vermont SC | Alabama | February-19 | 4 | - | 4 | 5 | - | 5 |
| Vermont SC | Alabama | March-19 | 4 | - | 4 | 4 | - | 4 |
| Vermont SC | Alabama | April-19 | 6 | - | 6 | 5 | - | 5 |
| Vermont SC | Alabama | May-19 | 5 | - | 5 | 8 | - | 8 |
| Vermont SC | Alabama | June-19 | 6 | - | 6 | 2 | - | 2 |
| Vermont SC | Alabama | July-19 | 2 | - | 2 | 8 | - | 8 |
| Vermont SC | Alabama | August-19 | 5 | - | 5 | 2 | - | 2 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Vermont SC | Alabama | September-19 | 5 | - | 5 | 5 | - | 5 |
| Vermont SC | Alabama | October-19 | 4 | - | 4 | 4 | - | 4 |
| Vermont SC | Alabama | November-19 | - | - | - | 1 | - | 1 |
| Vermont SC | Alabama | December-19 | 1 | - | 1 | 2 | - | 2 |
| Vermont SC | Alabama | January-20 | 6 | - | 6 | 2 | - | 2 |
| Vermont SC | Alabama | February-20 | 4 | - | 4 | 2 | - | 2 |
| Vermont SC | Alabama | March-20 | 8 | - | 8 | 5 | 1 | 6 |
| Vermont SC | Alabama | April-20 | 6 | - | 6 | 3 | - | 3 |
| Vermont SC | Alabama | May-20 | 5 | - | 5 | 11 | - | 11 |
| Vermont SC | Alabama | June-20 | 3 | - | 3 | 3 | - | 3 |
| Vermont SC | Alabama | July-20 | 2 | - | 2 | 5 | - | 5 |
| Vermont SC | Alabama | August-20 | 3 | - | 3 | - | - | - |
| Vermont SC | Alabama | September-20 | - | - | - | 1 | - | 1 |
| **Vermont SC** | **Alabama Total** | | **105** | **-** | **105** | **107** | **1** | **108** |
| Vermont SC | Arkansas | July-18 | 2 | - | 2 | 3 | - | 3 |
| Vermont SC | Arkansas | August-18 | 9 | - | 9 | 1 | - | 1 |
| Vermont SC | Arkansas | September-18 | 3 | - | 3 | 5 | 1 | 6 |
| Vermont SC | Arkansas | October-18 | 3 | - | 3 | 6 | - | 6 |
| Vermont SC | Arkansas | November-18 | 4 | - | 4 | 2 | - | 2 |
| Vermont SC | Arkansas | December-18 | - | - | - | - | - | - |
| Vermont SC | Arkansas | January-19 | 2 | - | 2 | 6 | - | 6 |
| Vermont SC | Arkansas | February-19 | 5 | - | 5 | 2 | - | 2 |
| Vermont SC | Arkansas | March-19 | 5 | - | 5 | 3 | - | 3 |
| Vermont SC | Arkansas | April-19 | 2 | - | 2 | 5 | - | 5 |
| Vermont SC | Arkansas | May-19 | 1 | - | 1 | 4 | 1 | 5 |
| Vermont SC | Arkansas | June-19 | 3 | - | 3 | 1 | - | 1 |
| Vermont SC | Arkansas | July-19 | 2 | - | 2 | 3 | - | 3 |
| Vermont SC | Arkansas | August-19 | 2 | - | 2 | 2 | - | 2 |
| Vermont SC | Arkansas | September-19 | 2 | - | 2 | 3 | - | 3 |
| Vermont SC | Arkansas | October-19 | 2 | - | 2 | 1 | - | 1 |
| Vermont SC | Arkansas | November-19 | 5 | - | 5 | 1 | - | 1 |
| Vermont SC | Arkansas | December-19 | 1 | - | 1 | 1 | - | 1 |
| Vermont SC | Arkansas | January-20 | 2 | - | 2 | 4 | 1 | 5 |
| Vermont SC | Arkansas | February-20 | - | - | - | 1 | - | 1 |
| Vermont SC | Arkansas | March-20 | 1 | - | 1 | 1 | - | 1 |
| Vermont SC | Arkansas | April-20 | 7 | - | 7 | - | - | - |
| Vermont SC | Arkansas | May-20 | 4 | - | 4 | 1 | - | 1 |
| Vermont SC | Arkansas | June-20 | 3 | - | 3 | 7 | - | 7 |
| Vermont SC | Arkansas | July-20 | 7 | - | 7 | 2 | - | 2 |
| Vermont SC | Arkansas | August-20 | 5 | - | 5 | - | - | - |
| Vermont SC | Arkansas | September-20 | - | - | - | 3 | - | 3 |
| **Vermont SC** | **Arkansas Total** | | **82** | **-** | **82** | **68** | **3** | **71** |
| Vermont SC | Kansas | July-18 | 8 | - | 8 | 3 | - | 3 |
| Vermont SC | Kansas | August-18 | 17 | - | 17 | 13 | - | 13 |
| Vermont SC | Kansas | September-18 | 1 | - | 1 | 9 | 1 | 10 |
| Vermont SC | Kansas | October-18 | 4 | - | 4 | 3 | - | 3 |
| Vermont SC | Kansas | November-18 | 13 | - | 13 | 2 | - | 2 |
| Vermont SC | Kansas | December-18 | 7 | - | 7 | 6 | 1 | 7 |
| Vermont SC | Kansas | January-19 | 9 | - | 9 | 16 | - | 16 |
| Vermont SC | Kansas | February-19 | 8 | - | 8 | 8 | - | 8 |
| Vermont SC | Kansas | March-19 | 12 | - | 12 | 8 | - | 8 |
| Vermont SC | Kansas | April-19 | 14 | - | 14 | 10 | 3 | 13 |
| Vermont SC | Kansas | May-19 | 7 | - | 7 | 14 | - | 14 |
| Vermont SC | Kansas | June-19 | 7 | - | 7 | 5 | - | 5 |
| Vermont SC | Kansas | July-19 | 6 | - | 6 | 10 | - | 10 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Vermont SC | Kansas | August-19 | 8 | - | 8 | 6 | 2 | 8 |
| Vermont SC | Kansas | September-19 | 11 | - | 11 | 5 | 1 | 6 |
| Vermont SC | Kansas | October-19 | 6 | - | 6 | 10 | - | 10 |
| Vermont SC | Kansas | November-19 | 6 | - | 6 | 4 | - | 4 |
| Vermont SC | Kansas | December-19 | 12 | - | 12 | 4 | - | 4 |
| Vermont SC | Kansas | January-20 | 4 | - | 4 | 10 | - | 10 |
| Vermont SC | Kansas | February-20 | 5 | - | 5 | 8 | - | 8 |
| Vermont SC | Kansas | March-20 | 6 | - | 6 | 3 | - | 3 |
| Vermont SC | Kansas | April-20 | 6 | - | 6 | 4 | - | 4 |
| Vermont SC | Kansas | May-20 | 4 | - | 4 | 8 | 1 | 9 |
| Vermont SC | Kansas | June-20 | 8 | - | 8 | 5 | - | 5 |
| Vermont SC | Kansas | July-20 | 7 | - | 7 | 2 | - | 2 |
| Vermont SC | Kansas | August-20 | 10 | - | 10 | 1 | - | 1 |
| Vermont SC | Kansas | September-20 | - | - | - | 4 | - | 4 |
| **Vermont SC** | **Kansas Total** | | **206** | **-** | **206** | **181** | **9** | **190** |
| Vermont SC | Louisiana | July-18 | - | - | - | - | - | - |
| Vermont SC | Louisiana | August-18 | 1 | - | 1 | - | - | - |
| Vermont SC | Louisiana | September-18 | - | - | - | - | - | - |
| Vermont SC | Louisiana | October-18 | - | - | - | 1 | 1 | 2 |
| Vermont SC | Louisiana | November-18 | 1 | - | 1 | - | - | - |
| Vermont SC | Louisiana | December-18 | 1 | - | 1 | 1 | - | 1 |
| Vermont SC | Louisiana | January-19 | 3 | - | 3 | 1 | - | 1 |
| Vermont SC | Louisiana | February-19 | 3 | - | 3 | 3 | - | 3 |
| Vermont SC | Louisiana | March-19 | 3 | - | 3 | 3 | - | 3 |
| Vermont SC | Louisiana | April-19 | 1 | - | 1 | 2 | - | 2 |
| Vermont SC | Louisiana | May-19 | 1 | - | 1 | 2 | - | 2 |
| Vermont SC | Louisiana | June-19 | 1 | - | 1 | 1 | - | 1 |
| Vermont SC | Louisiana | July-19 | - | - | - | 1 | - | 1 |
| Vermont SC | Louisiana | August-19 | 1 | - | 1 | - | - | - |
| Vermont SC | Louisiana | September-19 | 2 | - | 2 | 1 | - | 1 |
| Vermont SC | Louisiana | October-19 | 3 | - | 3 | 1 | - | 1 |
| Vermont SC | Louisiana | November-19 | 1 | - | 1 | 2 | - | 2 |
| Vermont SC | Louisiana | December-19 | - | - | - | 1 | - | 1 |
| Vermont SC | Louisiana | January-20 | - | - | - | 1 | - | 1 |
| Vermont SC | Louisiana | February-20 | - | - | - | - | - | - |
| Vermont SC | Louisiana | March-20 | - | - | - | 1 | - | 1 |
| Vermont SC | Louisiana | April-20 | 1 | - | 1 | - | - | - |
| Vermont SC | Louisiana | May-20 | 1 | - | 1 | - | - | - |
| Vermont SC | Louisiana | June-20 | - | - | - | - | - | - |
| Vermont SC | Louisiana | July-20 | 1 | - | 1 | 2 | 1 | 3 |
| Vermont SC | Louisiana | August-20 | 1 | - | 1 | - | - | - |
| Vermont SC | Louisiana | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **Louisiana Total** | | **26** | **-** | **26** | **24** | **2** | **26** |
| Vermont SC | Mississippi | July-18 | 1 | - | 1 | 1 | - | 1 |
| Vermont SC | Mississippi | August-18 | - | - | - | 1 | - | 1 |
| Vermont SC | Mississippi | September-18 | - | - | - | - | - | - |
| Vermont SC | Mississippi | October-18 | - | - | - | - | - | - |
| Vermont SC | Mississippi | November-18 | 1 | - | 1 | - | - | - |
| Vermont SC | Mississippi | December-18 | 2 | - | 2 | - | - | - |
| Vermont SC | Mississippi | January-19 | 2 | - | 2 | 3 | - | 3 |
| Vermont SC | Mississippi | February-19 | - | - | - | 1 | - | 1 |
| Vermont SC | Mississippi | March-19 | - | - | - | 1 | - | 1 |
| Vermont SC | Mississippi | April-19 | 2 | - | 2 | - | - | - |
| Vermont SC | Mississippi | May-19 | 3 | - | 3 | 2 | - | 2 |
| Vermont SC | Mississippi | June-19 | 1 | - | 1 | 2 | - | 2 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Vermont SC | Mississippi | July-19 | - | - | - | 2 | - | 2 |
| Vermont SC | Mississippi | August-19 | 2 | - | 2 | - | - | - |
| Vermont SC | Mississippi | September-19 | 2 | - | 2 | 2 | - | 2 |
| Vermont SC | Mississippi | October-19 | 1 | - | 1 | 2 | - | 2 |
| Vermont SC | Mississippi | November-19 | 1 | - | 1 | - | 1 | 1 |
| Vermont SC | Mississippi | December-19 | 1 | - | 1 | - | - | - |
| Vermont SC | Mississippi | January-20 | - | - | - | 1 | - | 1 |
| Vermont SC | Mississippi | February-20 | - | - | - | 1 | - | 1 |
| Vermont SC | Mississippi | March-20 | 1 | - | 1 | - | - | - |
| Vermont SC | Mississippi | April-20 | - | - | - | 1 | - | 1 |
| Vermont SC | Mississippi | May-20 | 2 | - | 2 | - | - | - |
| Vermont SC | Mississippi | June-20 | 1 | - | 1 | - | - | - |
| Vermont SC | Mississippi | July-20 | 1 | - | 1 | 1 | - | 1 |
| Vermont SC | Mississippi | August-20 | - | - | - | - | - | - |
| Vermont SC | Mississippi | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **Mississippi Total** | | **24** | **-** | **24** | **21** | **1** | **22** |
| Vermont SC | Nebraska | July-18 | 2 | - | 2 | 1 | - | 1 |
| Vermont SC | Nebraska | August-18 | 7 | - | 7 | 3 | - | 3 |
| Vermont SC | Nebraska | September-18 | - | - | - | 3 | - | 3 |
| Vermont SC | Nebraska | October-18 | 2 | - | 2 | 4 | - | 4 |
| Vermont SC | Nebraska | November-18 | 1 | - | 1 | 2 | - | 2 |
| Vermont SC | Nebraska | December-18 | 4 | - | 4 | - | - | - |
| Vermont SC | Nebraska | January-19 | 4 | - | 4 | 4 | - | 4 |
| Vermont SC | Nebraska | February-19 | 5 | - | 5 | 1 | - | 1 |
| Vermont SC | Nebraska | March-19 | - | - | - | 7 | 1 | 8 |
| Vermont SC | Nebraska | April-19 | 4 | - | 4 | 1 | - | 1 |
| Vermont SC | Nebraska | May-19 | 3 | - | 3 | 3 | - | 3 |
| Vermont SC | Nebraska | June-19 | 1 | - | 1 | 4 | - | 4 |
| Vermont SC | Nebraska | July-19 | 2 | - | 2 | 2 | - | 2 |
| Vermont SC | Nebraska | August-19 | 1 | - | 1 | 2 | - | 2 |
| Vermont SC | Nebraska | September-19 | - | - | - | 1 | - | 1 |
| Vermont SC | Nebraska | October-19 | 1 | - | 1 | - | - | - |
| Vermont SC | Nebraska | November-19 | 2 | - | 2 | - | 1 | 1 |
| Vermont SC | Nebraska | December-19 | 4 | - | 4 | - | - | - |
| Vermont SC | Nebraska | January-20 | 5 | - | 5 | 3 | 1 | 4 |
| Vermont SC | Nebraska | February-20 | 1 | - | 1 | 3 | 1 | 4 |
| Vermont SC | Nebraska | March-20 | 2 | - | 2 | 1 | - | 1 |
| Vermont SC | Nebraska | April-20 | 1 | - | 1 | - | - | - |
| Vermont SC | Nebraska | May-20 | 2 | - | 2 | 3 | - | 3 |
| Vermont SC | Nebraska | June-20 | 3 | - | 3 | 2 | - | 2 |
| Vermont SC | Nebraska | July-20 | 3 | - | 3 | 3 | - | 3 |
| Vermont SC | Nebraska | August-20 | - | - | - | - | - | - |
| Vermont SC | Nebraska | September-20 | - | - | - | 2 | - | 2 |
| **Vermont SC** | **Nebraska Total** | | **60** | **-** | **60** | **55** | **4** | **59** |
| Vermont SC | South Carolina | July-18 | 7 | - | 7 | 3 | - | 3 |
| Vermont SC | South Carolina | August-18 | 3 | - | 3 | 8 | 1 | 9 |
| Vermont SC | South Carolina | September-18 | 5 | - | 5 | 2 | - | 2 |
| Vermont SC | South Carolina | October-18 | 9 | - | 9 | 6 | - | 6 |
| Vermont SC | South Carolina | November-18 | 4 | - | 4 | 6 | 1 | 7 |
| Vermont SC | South Carolina | December-18 | 7 | - | 7 | 1 | - | 1 |
| Vermont SC | South Carolina | January-19 | 7 | - | 7 | 11 | - | 11 |
| Vermont SC | South Carolina | February-19 | 15 | - | 15 | 5 | - | 5 |
| Vermont SC | South Carolina | March-19 | 8 | - | 8 | 17 | - | 17 |
| Vermont SC | South Carolina | April-19 | 7 | - | 7 | 7 | - | 7 |
| Vermont SC | South Carolina | May-19 | 12 | - | 12 | 13 | - | 13 |

| Vermont SC | South Carolina | June-19 | 5 | - | 5 | 4 | - | 4 |
|---|---|---|---|---|---|---|---|---|
| Vermont SC | South Carolina | July-19 | 9 | - | 9 | 9 | 1 | 10 |
| Vermont SC | South Carolina | August-19 | 4 | - | 4 | 9 | - | 9 |
| Vermont SC | South Carolina | September-19 | 9 | - | 9 | 3 | - | 3 |
| Vermont SC | South Carolina | October-19 | 7 | - | 7 | 12 | - | 12 |
| Vermont SC | South Carolina | November-19 | 6 | - | 6 | 2 | - | 2 |
| Vermont SC | South Carolina | December-19 | 6 | - | 6 | 4 | - | 4 |
| Vermont SC | South Carolina | January-20 | 4 | - | 4 | 7 | 1 | 8 |
| Vermont SC | South Carolina | February-20 | 5 | - | 5 | 3 | - | 3 |
| Vermont SC | South Carolina | March-20 | 5 | - | 5 | 6 | - | 6 |
| Vermont SC | South Carolina | April-20 | 3 | - | 3 | 5 | 1 | 6 |
| Vermont SC | South Carolina | May-20 | 8 | - | 8 | 3 | 1 | 4 |
| Vermont SC | South Carolina | June-20 | 8 | - | 8 | 6 | - | 6 |
| Vermont SC | South Carolina | July-20 | 3 | - | 3 | 5 | - | 5 |
| Vermont SC | South Carolina | August-20 | 1 | - | 1 | - | - | - |
| Vermont SC | South Carolina | September-20 | - | - | - | 2 | - | 2 |
| **Vermont SC** | **South Carolina Total** | | **167** | **-** | **167** | **159** | **6** | **165** |
| Vermont SC | Texas | July-18 | 36 | - | 36 | 36 | 2 | 38 |
| Vermont SC | Texas | August-18 | 59 | - | 59 | 28 | - | 28 |
| Vermont SC | Texas | September-18 | 23 | - | 23 | 42 | 5 | 47 |
| Vermont SC | Texas | October-18 | 42 | - | 42 | 31 | 1 | 32 |
| Vermont SC | Texas | November-18 | 45 | - | 45 | 26 | 2 | 28 |
| Vermont SC | Texas | December-18 | 52 | - | 52 | 27 | 2 | 29 |
| Vermont SC | Texas | January-19 | 57 | - | 57 | 77 | 2 | 79 |
| Vermont SC | Texas | February-19 | 43 | - | 43 | 50 | 3 | 53 |
| Vermont SC | Texas | March-19 | 75 | - | 75 | 64 | 3 | 67 |
| Vermont SC | Texas | April-19 | 71 | - | 71 | 50 | 3 | 53 |
| Vermont SC | Texas | May-19 | 68 | - | 68 | 85 | 3 | 88 |
| Vermont SC | Texas | June-19 | 65 | - | 65 | 51 | 2 | 53 |
| Vermont SC | Texas | July-19 | 58 | - | 58 | 81 | 2 | 83 |
| Vermont SC | Texas | August-19 | 53 | - | 53 | 55 | 3 | 58 |
| Vermont SC | Texas | September-19 | 56 | - | 56 | 45 | 4 | 49 |
| Vermont SC | Texas | October-19 | 62 | - | 62 | 62 | 6 | 68 |
| Vermont SC | Texas | November-19 | 76 | - | 76 | 23 | 3 | 26 |
| Vermont SC | Texas | December-19 | 43 | - | 43 | 21 | 1 | 22 |
| Vermont SC | Texas | January-20 | 51 | - | 51 | 79 | 3 | 82 |
| Vermont SC | Texas | February-20 | 48 | - | 48 | 40 | 1 | 41 |
| Vermont SC | Texas | March-20 | 56 | - | 56 | 54 | 1 | 55 |
| Vermont SC | Texas | April-20 | 51 | - | 51 | 35 | 2 | 37 |
| Vermont SC | Texas | May-20 | 49 | - | 49 | 50 | 3 | 53 |
| Vermont SC | Texas | June-20 | 69 | - | 69 | 58 | 1 | 59 |
| Vermont SC | Texas | July-20 | 44 | - | 44 | 43 | 3 | 46 |
| Vermont SC | Texas | August-20 | 45 | - | 45 | 7 | 2 | 9 |
| Vermont SC | Texas | September-20 | - | - | - | 23 | 2 | 25 |
| **Vermont SC** | **Texas Total** | | **1,397** | **-** | **1,397** | **1,243** | **65** | **1,308** |
| Vermont SC | West Virginia | July-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | August-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | September-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | October-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | November-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | December-18 | - | - | - | - | - | - |
| Vermont SC | West Virginia | January-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | February-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | March-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | April-19 | - | - | - | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Vermont SC | West Virginia | May-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | June-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | July-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | August-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | September-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | October-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | November-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | December-19 | - | - | - | - | - | - |
| Vermont SC | West Virginia | January-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | February-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | March-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | April-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | May-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | June-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | July-20 | 1 | - | 1 | - | - | - |
| Vermont SC | West Virginia | August-20 | - | - | - | - | - | - |
| Vermont SC | West Virginia | September-20 | - | - | - | - | - | - |
| **Vermont SC** | **West Virginia Total** | | **1** | **-** | **1** | **-** | **-** | **-** |
| **Vermont SC Total** | | | **2,068** | **-** | **2,068** | **1,858** | **91** | **1,949** |
| **Grand Total** | | | **156,793** | **85** | **156,878** | **153,606** | **1,298** | **154,904** |

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) For Accepted Filings, Rejections, and Total Received, Month represents the month the DACA Request was received by USCIS.

3) Requestor state for lockbox rejected cases in ELIS is not captured electronically.

4) For Approved, Denied, and Total Completions, Month represents the month the most recent final adjudication action occurred.

5) Requests approved or denied in a given month may have been received in a previous month.

6) State is determined by the requestor's address listed on the form I-821D.

7) California, Texas, and Potomac Service Centers had no DACA renewal results for the requested time period.

8) "-" represents 0.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

SAS PME C3 Consolidated, ELIS queried 09/2020, TRK 6477.

# EXHIBIT 15

728 Fed.Appx. 270
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

Gary Charles SMITH, Plaintiff-Appellant

v.

Andrew J. PALAFOX, Medical
Doctor, Defendant-Appellee

No. 17-50152
|
Filed March 21, 2018

**Synopsis**
**Background:** Federal prisoner brought malpractice action
against doctor who performed three surgeries on
prisoner's arm. The United States District Court for the
Western District of Texas, David Briones, J., 2017 WL
5197182, adopted in part report and recommendation of
Robert F. Castaneda, United States Magistrate Judge,
2016 WL 10515973, and granted doctor's motion for
summary judgment. Prisoner appealed.

**Holdings:** The Court of Appeals held that:

[1] unsworn expert reports were not competent summary
judgment evidence;

[2] rejecting prisoner's expert witness's sworn declaration
as competent summary judgment evidence was within the
discretion of the District Court;

[3] prisoner's declaration in response to summary
judgment motion was inadmissible hearsay; and

[4] statements by doctor who performed three surgeries on
prisoner's arm did not show that doctor knew that he was
negligent or concealed a known wrong.

Affirmed.

**West Headnotes (4)**

**[1]** **Federal Civil Procedure**
    Admissibility

Unsworn expert reports, that surgery
performed on federal prisoner's arm did not
adhere to the standard of care for such
operations, were not competent summary
judgment evidence in federal prisoner's action
for medical negligence. Fed. R. Civ. P. 26, 56.

2 Cases that cite this headnote

**[2]** **Federal Civil Procedure**
    Form and requisites

Rejecting expert's sworn declaration as
competent summary judgment evidence was
within the discretion of the District Court
in medical negligence action by federal
prisoner; prisoner failed to file the declaration
in accordance with local rules and only
tried to submit declaration as evidence after
magistrate judge had issued a report and
recommendation. U.S.Dist.Ct.Rules W.D.
Tex., Rule 7(f)(1).

2 Cases that cite this headnote

**[3]** **Evidence**
    Hearsay evidence of opinions

**Federal Civil Procedure**
    Matters which may be shown

Federal prisoner's declaration in response to
summary judgment motion was inadmissible
hearsay in prisoner's action for medical-
negligence; prisoner stated in the declaration
that he was told that the surgeries on his arm
did not follow standard medical techniques.
Fed. R. Evid. 801(c).

Cases that cite this headnote

**[4]** **Limitation of Actions**
    What constitutes concealment

Statements by doctor, who performed three surgeries on prisoner's arm, did not show that doctor knew about any negligence or concealed a known wrong, so as to toll statute of limitations on prisoner's medical-negligence claim under doctrine of fraudulent concealment, where doctor stated that he believed the first two surgeries were successful. Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a) (13).

Cases that cite this headnote

**\*271** Appeal from the United States District Court for the Western District of Texas, USDC No. 3:15-CV-201

**Attorneys and Law Firms**

Felix Valenzuela, Valenzuela Law Firm, El Paso, TX, Jonathan King Gitlen, Law Office of Jonathan Gitlen, Washington, DC, Stephen A. Saltzburg, Esq., George Washington University, Washington, DC, for Plaintiff-Appellant

Cynthia Catalina Llamas, Hicks & Llamas, P.C., El Paso, TX, for Defendant-Appellee

Before STEWART, Chief Judge, and CLEMENT and SOUTHWICK, Circuit Judges.

**Opinion**

PER CURIAM:[*]

[*]    Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

Plaintiff-Appellant Gary Smith appeals the district court's summary judgment in **\*272** favor of Defendant-Appellee Dr. Andrew Palafox. Because we hold that Smith failed to provide competent summary judgment evidence in support of his claim of fraudulent concealment, we affirm.

**I. Facts & Procedural History**

Smith was a federal prisoner when he suffered a broken arm at La Tuna Federal Correctional Institution in Anthony, Texas. Dr. Palafox performed surgery on Smith's arm on three separate occasions: January 17th, May 7th, and November 19th of 2013. Smith was hospitalized for seventy-three days after the third operation and claims that he contracted two life-threatening infections as a result.

Smith filed a complaint in federal district court against Dr. Palafox on June 30, 2015, raising various medical malpractice claims. Dr. Palafox filed an answer to Smith's complaint wherein he asserted that Smith's suit was barred by the Texas Medical Liability Act's two-year statute of limitations. TEX. CIV. PRAC. & REM. CODE §§ 74.001(a)(13); 74.251(a). In October 2015, Dr. Palafox filed a motion for summary judgment on limitations wherein he alleged that Smith's suit was time-barred. In November 2015, Smith filed a response and an amended response to Dr. Palafox's motion for summary judgment alleging entitlement to relief under the fraudulent concealment doctrine, an affirmative defense that tolls the statute of limitations in medical malpractice cases. Smith attached his own sworn declaration to the amended response. On December 9, 2015, Smith filed an amended complaint. On June 3, 2016, Smith notified Dr. Palafox of his intended Designation of Experts wherein he attached the unsworn report of Dr. Raymond Vance.

On June 6, 2016, Dr. Palafox filed an amended motion for summary judgment, again asserting that Smith's claims were time-barred and that the statute of limitations ran two years after the second operation took place on May 7, 2013.[1] Dr. Palafox attached Smith's notice of Designation of Experts and the accompanying unsworn report of Dr. Vance to his amended motion for summary judgment.[2] Dr. Vance's unsworn report provided that, after reviewing Smith's medical records and x-rays, he concluded that Dr. Palafox had "failed to exercise reasonable care in the initial two surgeries" in that he did not restore the bones to an anatomic position, used inadequate fixation techniques, and that the failures resulted from "[i]nadequate plate and screw selection." Dr. Vance opined, however, that Dr. Palafox properly performed the third surgery.

1    The parties agreed to dismiss all claims regarding the third operation and to proceed only on the claims involving the first two operations.

2    It is relevant to note that Dr. Vance's report was only attached by Dr. Palafox as an exhibit to his June 2016 amended motion for summary judgment. Smith never entered Dr. Vance's unsworn report into evidence during the summary judgment proceedings.

In opposition to Dr. Palafox's amended motion for summary judgment, Smith again alleged entitlement to the Texas fraudulent concealment doctrine. Smith contended that Dr. Palafox misrepresented the number of screws that would be used to attach metal plates to Smith's broken bones. Smith asserted that Dr. Palafox told him he would use eight screws, but he instead used six screws and never informed him otherwise. He claimed that the fraudulent concealment lasted until June 8, 2016, when Dr. Vance reviewed his x-rays and notified him that only six screws were **\*273** used. Smith maintained that the alleged fraudulent concealment operated to toll the statute of limitations and thus his complaint was timely. He attached his own sworn declaration to his opposition to summary judgment. In his sworn declaration, Smith stated that Dr. Palafox told him he would use eight screws to attach the metal plates and that he assured him numerous times that the first two surgeries were successful until admitting before the third surgery that they were not.

Smith then filed a motion for leave to file a supplemental unsworn expert report by Dr. Vance. Dr. Vance's supplemental unsworn expert report provided only that he would be critical of Dr. Palafox's performance of the surgeries regardless of how many screws were used. The magistrate judge granted Smith's motion and allowed the supplemental report to be filed into the record but nevertheless concluded that the report was not a sworn declaration and therefore not competent summary judgment evidence.

The magistrate judge issued a report and recommendation that Dr. Palafox's motion for summary judgment be granted on grounds that Smith's claims were barred by the applicable statute of limitations. In his report, the magistrate judge explained that Smith had failed to adequately plead because he did not "assert, or allege facts in his amended complaint to support, a defense of fraudulent concealment in avoidance of limitations even after Defendant had raised the limitations defense in his original summary judgment motion." The magistrate

judge continued that Smith had produced no competent summary judgment evidence in support of his claims that Dr. Palafox had committed malpractice or negligence. The unsworn report of Dr. Vance that Dr. Palafox had attached as an exhibit to his amended motion for summary judgment did not qualify as competent summary judgment evidence because it did not comply with the applicable Federal Rules of Civil Procedure. The magistrate judge further opined that "[e]ven if the expert report were in a form constituting competent summary judgment evidence, [Smith] has provided no competent summary judgment evidence that [Dr. Palafox] actually knew that he had committed medical malpractice or been medically negligent in performing either [Smith's] January or May 2013 surgeries." The magistrate judge ultimately concluded that:

> [Smith] has failed to carry his burden to establish fraudulent concealment tolling the limitations period on his medical malpractice/ negligence claims or to raise a genuine question of material fact regarding such defense in avoidance of limitations ... [and] viewing the record in this light, no rational trier of fact could find that [Smith's] limitations period was so tolled to render his claims timely.

Smith filed objections to the magistrate judge's report wherein he attached a sworn declaration by Dr. Vance. Dr. Vance's sworn declaration provided essentially the same opinion and information as his unsworn declaration —that Dr. Palafox did not adhere to the standard of care in the first two surgeries but did adhere in the third surgery. Smith also attached his personal sworn declaration which provided more of his own statements in support of his fraudulent concealment claim.

The district court adopted in part the magistrate judge's report and recommendation and granted Dr. Palafox's motion for summary judgment. In its reasons for judgment, the district court noted that it would not address the issue of whether Smith had properly pled fraudulent concealment because it could resolve the case on the narrower grounds that Smith had **\*274** failed

to provide competent summary judgment evidence in support of each element of his fraudulent concealment claim. The district court noted that Dr. Vance's unsworn report and unsworn supplemental report did not comply with Federal Rule of Civil Procedure 56's requirement that, for summary judgment evidence, all affidavits must be sworn. Additionally, the sworn report of Dr. Vance that Smith attempted to introduce for the first time in his objections to the magistrate judge's report did not constitute competent summary judgment evidence because it was filed without leave and in violation of the local rules of the Western District of Texas. *See* W.D. Tex. Civ. R. 7(f)(1). Citing *Cupit v. Whitley*, 28 F.3d 532, 535 n.5 (5th Cir. 1994), the district court also noted its own discretion in refusing to consider evidence after a magistrate judge issues a report and recommendation. The district court observed that the statement in Smith's declaration that Dr. Palafox said he would use eight screws instead of six could be admitted as a party-opponent statement but could not be used to prove that Dr. Palafox knew he had committed medical malpractice or that he intended to conceal that he did. This is because Smith's statement that Dr. Vance told him that Dr. Palafox only used six screws and not eight was inadmissible hearsay in that it was an out-of-court statement being used for the truth of the matter asserted—thus, the hearsay statement could not be used to impeach or contradict the party-opponent statement. To the extent that Dr. Vance stated as much in his own unsworn and sworn reports, those reports were not considered competent summary judgment evidence for reasons previously explained. The district court further concluded that Dr. Palafox's statements that the first two surgeries were successful did not show that he knew he had committed malpractice or that he intended to conceal that he did because there was no evidence that Dr. Palafox knew the statements were false when he made them. *See Shah v. Moss*, 67 S.W.3d 836, 845–46 (Tex. 2001); *Earle v. Ratliff*, 998 S.W.2d 882, 889 (Tex. 1999). Finally, the district court noted that Smith's "reliance" argument failed because the Texas Supreme Court does not require a plaintiff to rely on a defendant's deception to prove fraudulent concealment. The district court concluded that Smith's objections to the magistrate judge's report and recommendation did "not save his claims from summary judgment because [Smith] failed to establish the elements of fraudulent concealment." Smith filed this appeal.

## II. Standard of Review

This court reviews the district court's grant of summary judgment de novo. *Davis v. Fernandez*, 798 F.3d 290, 292 (5th Cir. 2015). "To decide whether summary judgment is proper here, we must, as a threshold matter, determine what evidence in the record is to be considered." *Id.* "[A]s a general matter, the competent evidence of the summary judgment movant is to be accepted and credited." *Id.* But if "the testimony that [the nonmovant] initially offer[s] in opposition to summary judgment [is] neither sworn nor declared under penalty of perjury to be true and correct, it [is] not competent evidence." *Id.*; *see also Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) ("To avoid the use of materials that lack authenticity or violate other evidentiary rules, the new rule allows a party to object 'that the material cited to support or dispute a fact cannot be presented in a form that would be admissible [in] evidence.' " (quoting Fed. R. Civ. P. 56(c)(2) ) ).

## III. Discussion

Smith first argues that Dr. Vance's unsworn expert reports were admissible evidence **\*275** and should have been considered in support of his opposition to summary judgment. Second, Smith argues that "[i]f Dr. Vance's reports are considered together with [his own] declarations, they are sufficient to establish malpractice, knowledge by defendant of malpractice, and concealment." Smith also argues that the district court abused its discretion in declining to consider his submissions after the magistrate judge issued his report and recommendation. Finally, Smith argues that the Federal Rules of Civil Procedure do not require that he raise an affirmative defense of fraudulent concealment in either his complaint or amended complaint. We address each of Smith's arguments in turn.

Negligence and malpractice claims are governed by the Texas Medical Liability Act's two-year statute of limitations. TEX. CIV. PRAC. & REM. CODE §§ 74.001(a)(13); 74.251(a). "[T]he limitations period for medical negligence claims [is measured] from one of three dates: (1) the occurrence of the breach or tort, (2) the last date of the relevant course of treatment, or (3) the last date of the relevant hospitalization." *Shah*, 67 S.W.3d at 841. A

plaintiff is not entitled to "choose the most favorable date" of the three categories. *Id.* "Rather, if the date the alleged tort occurred is ascertainable, limitations must begin on that date." *Id.* Moreover, if the date is ascertainable, there is no further inquiry into the second and third categories. *Id.*

In medical-negligence cases, fraudulent concealment "estops a health-care provider from relying on limitations to bar a plaintiff's claim." *Id.* The plaintiff is required to prove that "the health-care provider actually knew a wrong occurred, had a fixed purpose to conceal the wrong, and did conceal the wrong from the patient." *Id.* If successfully proven, "[f]raudulent concealment tolls limitations until the plaintiff discovers the fraud or could have discovered the fraud with reasonable diligence." *Id.* "A plaintiff who asserts fraudulent concealment to avoid summary judgment on limitations grounds must raise a fact issue that would support this assertion." *Id.*

 **[1]** Smith's first argument that the district court should have credited Dr. Vance's unsworn expert reports as competent summary judgment evidence is unsupported by the Federal Rules of Civil Procedure. Smith asserts that expert reports need not be sworn under Federal Rule of Civil Procedure 26(a)(2)(B). Rule 26, however, pertains to discovery. Fed. R. Civ. P. 26. While it is true that Rule 26 does not provide an express requirement that a report be sworn, it does not alter Rule 56's requirement that evidence proffered in opposition to summary judgment must be sworn or declared under penalty of perjury, or the proponent must otherwise show that a statement could be reduced to admissible evidence at trial. [3] *See Davis*, 798 F.3d at 292 (noting that "because the testimony that [the nonmovant] initially offered in opposition to summary judgment was neither sworn nor declared under penalty of perjury to be true and correct, it was not competent evidence"); *see also Lee*, 859 F.3d at 355 ("To avoid the use of materials that lack authenticity or violate other evidentiary rules, the new rule allows a party to object 'that the material cited to support or dispute a fact cannot be presented in a form that would be admissible as evidence.' " (quoting **\*276** Fed. R. Civ. P. 56(c)(2) ) ). Dr. Vance's expert reports were not sworn or made under penalty of perjury and Smith has not explained how the reports could be reduced to admissible evidence at trial. [4] Consequently, the district court did not err in excluding Dr. Vance's unsworn reports on grounds that they did not

constitute competent summary judgment evidence. [5] *See Davis*, 798 F.3d at 292.

[3] Federal Rule of Civil Procedure 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *See also* Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

[4] Further, the reports did not comply with Rule 26 because they did not contain the medical records, reports and x-rays that Dr. Vance stated he relied upon in forming his expert opinions. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii) (noting that expert reports should include "the facts or data considered by the witness" in forming the expert opinion).

[5] Smith argues that because Dr. Palafox attached Dr. Vance's unsworn expert report to his motion for summary judgment, Smith is entitled to rely on it as competent summary judgment evidence. This argument is unavailing, however, because regardless of how the report appeared in the summary judgment proceedings, it failed to comply with Rule 56's requirement that it be sworn. Dr. Palafox's attachment of the unsworn report as an exhibit to his amended motion for summary judgment does not cure this defect.

 **[2]** Smith's contention that the district court should have considered Dr. Vance's sworn declaration to be competent summary judgment evidence also fails. The district court properly declined to consider the declaration for several reasons, including Smith's failure to file the evidence in accordance with the local rules [6] and Smith's numerous prior opportunities to submit the declaration before the magistrate judge issued a report and recommendation. Moreover, "the district court has discretion to determine whether, in light of all pertinent circumstances, the new evidence should be accepted" after the magistrate judge issues his report and recommendation. *See id.* ("In this circuit, when objecting to a magistrate judge's report and recommendation on summary judgment, litigants may submit additional evidence for the district court's de novo review [but] the district court has discretion to determine whether, in light of all pertinent circumstances, the new evidence should be accepted."); *see also Cupit*, 28 F.3d at 535 n.5 ("[A] party has a duty to put its best foot forward before the Magistrate Judge—i.e., to spell out

its arguments squarely and distinctly—and, accordingly, that [ ] party's entitlement to de novo review before the district court upon filing objections to the Report and Recommendation of the Magistrate Judge does not entitle it to raise issues at that stage that were not adequately presented to the Magistrate Judge[.]" (internal quotation marks omitted) ). Thus, the district court was within its discretion in rejecting Dr. Vance's sworn declaration. *See id.*

[6]    Local Rule 7 provides: "Generally. A party may file a reply in support of a motion. Absent leave of court, no further submissions on the motion are allowed." W.D. Tex. Civ. R. 7(f)(1).

**[3]**    **[4]**    Finally, Smith's argument that his own declarations, in conjunction with Dr. Vance's expert reports, were sufficient to establish malpractice and concealment, is also meritless. As the magistrate judge and district court noted, much of the content of Smith's declarations constitutes inadmissible hearsay. The Federal Rules of Evidence define hearsay as a statement that "the declarant does not make while testifying at the current trial or hearing" that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Smith's statement that he learned from Dr. Vance that Dr. Palafox used six screws instead of eight screws and did not follow standard medical techniques in performing the surgeries **\*277** falls within the scope of this hearsay prohibition. *Id.* Although Smith's statement that Dr. Palafox told him he would use eight screws to attach the metal plate is admissible as a statement against a party opponent under Federal Rule of Evidence 801(d)(2)(A), such a statement alone does not raise a material fact issue as to whether Dr. Palafox misled Smith or committed malpractice, as would be necessary to support his fraudulent-concealment allegation. *See Shah*, 67 S.W.3d at 846 ("The affidavit, however, does not allege any facts suggesting that [the doctor] knew, after the ... surgery, that he was negligent and that he concealed this known wrong to deceive [the plaintiff]."); *Earle*, 998

S.W.2d at 889. Additionally, as the district court noted, Smith's assertion in his declaration that Dr. Palafox told him that the first two surgeries were successful does not show that he knew he had committed malpractice or that he intended to conceal that he did because no evidence was presented that he knew the statements were false when he made them. *See Shah*, 67 S.W.3d at 846 ("[T]his evidence does not show, or even suggest, that [the doctor] made these assurances to conceal a known wrong or to deceive [the plaintiff]."); *see also Earle*, 998 S.W.2d at 889 ("[The plaintiff] offers no evidence, direct or circumstantial, that [the doctor] actually knew these statements were in fact false when he made them, let alone that [the doctor's] purpose in making them was deceit.... [the plaintiff] has offered no summary judgment evidence that [the doctor] acted fraudulently by concealing a known wrong."). Accordingly, the district court did not err in declining to consider Smith's declarations to support his claims of fraudulent concealment. *See Davis*, 798 F.3d at 292.[7]

[7]    Although Smith makes arguments in his brief rebutting the magistrate judge's conclusion that he failed to properly plead his fraudulent concealment defense, the district court properly rendered summary judgment on other grounds. Thus, it is unnecessary for this court to address the issue.

### IV. Conclusion

Because Smith failed to provide competent summary judgment evidence in support of each element of his fraudulent concealment claim, we affirm the district court's summary judgment in favor of Defendant-Appellee Dr. Andrew Palafox.

**All Citations**

728 Fed.Appx. 270

End of Document    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 16

Case 1:18-cv-00068 Document 504-2 Filed on 11/06/20 in TXSD Page 509 of 548

Seaman v. Seacor Marine L.L.C., 326 Fed.Appx. 721 (2009)

2009 A.M.C. 1506, 79 Fed. R. Evid. Serv. 604

326 Fed.Appx. 721
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Larry SEAMAN, Plaintiff–Appellant

v.

SEACOR MARINE L.L.C.,
Defendant–Appellee.

No. 08–30911.
|
April 30, 2009.

**Synopsis**

**Background:** Seaman sued his former employer under the Jones Act and general maritime law for exposure injuries that he claimed to have sustained while working for the employer as the captain of several vessels. Employer moved for summary judgment and to exclude the seaman's expert. The United States District Court for the Eastern District of Louisiana, Jay C. Zainey, J., 564 F.Supp.2d 598, excluded testimony of seaman's expert and granted summary judgment in favor of employer. Seaman appealed.

**Holdings:** The Court of Appeals held that:

[1] expert's opinion was neither factually supported nor scientifically reliable, and thus inadmissible;

[2] there was insufficient evidence of causation to support imposition of liability; and

[3] employer was not liable for failing to detect seaman's cancer.

Affirmed.

West Headnotes (5)

**[1]** **Evidence** 🔑 **Medical Testimony**

Expert's opinion as to whether seaman's bladder cancer was caused by his work-related exposure to diesel exhaust and a substance containing benzene and aromatic hydrocarbons was neither factually supported nor scientifically reliable, and was thus inadmissible in Jones Act case; testimony that aromatic hydrocarbons are known carcinogens was insufficient to establish general causation as to bladder cancer, scholarly studies failed to establish the allegedly harmful level of exposure as required to establish general causation, and expert knew nothing about the seaman's exposure to the allegedly dangerous chemicals as required to establish specific causation. 46 U.S.C.A. § 30104; Fed.Rules Evid.Rule 702, 28 U.S.C.A.

70 Cases that cite this headnote

**[2]** **Seamen** 🔑 **Weight and Sufficiency of Evidence**

Deposition testimony of employer's expert did not establish general and specific causation in Jones Act case brought by seaman, since it did not reveal requisite causal link between seaman's bladder cancer and work-related exposure to diesel exhaust and a substance containing benzene and aromatic hydrocarbons. 46 U.S.C.A. § 30104.

26 Cases that cite this headnote

**[3]** **Seamen** 🔑 **Weight and Sufficiency of Evidence**

Without expert testimony to place them in context, declarations of three coworkers were insufficient to establish that seaman's exposure to diesel exhaust and substance containing benzene and aromatic hydrocarbons reached allegedly harmful levels, for purposes of establishing general and specific causation in Jones Act case. 46 U.S.C.A. § 30104.

2009 A.M.C. 1506, 79 Fed. R. Evid. Serv. 604

15 Cases that cite this headnote

**[4]**   **Federal Civil Procedure** 🔑 Matters
Considered

Seaman who raised issues of employer's alleged
duty to detect his bladder cancer and to provide
him medical monitoring in brief opposing
summary judgment in Jones Act suit placed them
at issue for summary judgment. 46 U.S.C.A. §
30104.

**[5]**   **Seamen** 🔑 Personal Injuries

Even if employer had a duty to provide medical
monitoring to seaman, it was not liable for
failing to detect seaman's bladder cancer absent
evidence that nondetection played any part in the
development of his cancer. 46 U.S.C.A. § 30104;
46 C.F.R. § 197.560(b, c).

**Attorneys and Law Firms**

**\*722** Terri B. Loughlin, Richter Kelin & Hilbert Sher
Garner Cahill, New Orleans, LA, Kearney Soniat Loughlin,
Gallagher Law Firm, Metairie, LA, for Plaintiff–Appellant.

Rufus C. Harris, III, Harris & Rufty, New Orleans, LA, for
Defendant–Appellee.

Appeal from the United States District Court for the Eastern
District of Louisiana, USDC No. 2:07–CV–3354.

Before WIENER, DENNIS, and CLEMENT, Circuit Judges.

**Opinion**

PER CURIAM:[*]

**\*\*1** Plaintiff–Appellant Larry Seaman sued his former
employer Defendant–Appellee Seacor Marine, L.L.C.,
alleging that its negligence caused Seaman's bladder cancer.
The district court excluded the testimony of Seaman's only
causation expert and granted summary judgment in favor
of Seacor. Holding that the district court acted within its
discretion in excluding the expert testimony and that Seacor
is entitled to summary judgment, we affirm.

**I. FACTS AND PROCEEDINGS**

From 1982 until March 2003, Seaman worked as a captain
aboard several of Seacor's vessels. In 2003, Seaman,
complaining of hematuria—blood in his urine—went **\*723**
to a doctor. The doctor told Seaman to see a urologist if his
urine did not clear. Then, in August 2005, Seaman went to an
infectious disease specialist because of continued hematuria.
Seaman told the specialist he had been experiencing
hematuria and urethral discharge for seven to ten years. The
specialist recommended that Seaman see a urologist. When
Seaman did so in 2006, the urologist diagnosed Seaman
with bladder cancer. Seaman had surgery, and the cancer is
currently in remission.

In June 2007, Seaman filed the instant suit in district court
alleging that while aboard Seacor's vessels he "inhaled
and was otherwise exposed to a host of hazardous and
toxic chemicals including drilling mud, caustic soda, barium
sulfate, Barite, ammonia, muriatic acid, and others." Seaman
pursues his claim under the Jones Act and general maritime
law and alleges that he developed bladder cancer as a result
of the chemical exposures. Seaman specifically contends that
Seacor's negligence caused his injuries. He also alleges that
Seacor had a duty to detect his bladder cancer and failed to
do so.

Seacor simultaneously filed motions (1) to exclude the
testimony of Dr. Perri Prellop, Seaman's sole summary expert
and (2) for summary judgment. The district court, holding
that Dr. Prellop's opinion was neither factually supported nor
scientifically reliable, excluded her testimony. The court then
granted summary judgment in Seacor's favor. Seaman filed a
motion to alter or amend the district court's judgment, which
the court denied.

Seaman timely filed a notice of appeal.

**II. STANDARDS OF REVIEW**

"We review the district court's determination of admissibility
of expert evidence under *Daubert* for abuse of discretion."[1]
"A trial court abuses its discretion when its ruling is based
on an erroneous view of the law or a clearly erroneous
assessment of the evidence."[2] If the trial court abused its

Case 1:18-cv-00068   Document 504-2   Filed on 11/06/20 in TXSD   Page 511 of 548

Seaman v. Seacor Marine L.L.C., 326 Fed.Appx. 721 (2009)

2009 A.M.C. 1506, 79 Fed. R. Evid. Serv. 604

discretion, the harmless error doctrine applies, and we reverse the ruling only if it affected the substantial rights of the complaining party.[3]

Once we make the necessary evidentiary determinations, "[t]hen, with the record defined, we must review *de novo* the order granting judgment as a matter of law."[4]

## III. ANALYSIS

### A. Exclusion of Dr. Prellop's Testimony

### 1. Applicable Law

**\*\*2**  "Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."[5] A plaintiff in such a case cannot expect lay fact-finders to understand medical causation; expert testimony is thus required to establish causation.[6]

**\*724**  Courts use "a two-step process in examining the admissibility of causation evidence in toxic tort cases. First, the district court must determine where there is *general causation.* Second, if it concludes that there is admissible general-causation evidence, the district court must determine whether there is admissible *specific-causation* evidence."[7] "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury."[8]

Attempting to establish these requisite facts, Seaman proffered the report and deposition testimony of Dr. Perri Prellop, his only medical-causation expert. As the proponent of Dr. Prellop's testimony, Seaman had the burden of establishing by a preponderance of the evidence that the proffered testimony was admissible.[9] A district court assesses expert testimony under Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the

testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[10]

Rule 702 was most recently amended in 2000 in response to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* which "charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony."[11] Pursuant to *Daubert,* a trial court ensures that testimony is "supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known."[12] And, "a district court has *broad discretion* to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion."[13]

In carrying out its gate-keeping function, the trial court "ensures that the proffered evidence is both 'reliable' and 'relevant.' Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.' Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.' "[14]

**\*725**  "[T]he expert's testimony must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."[15] "Where an expert's opinion is based on insufficient information, the analysis is unreliable."[16] Still, there is no bright-line standard and when an expert "otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility of the expert's testimony."[17] The Supreme Court has offered a non-exhaustive list of *Daubert* factors that trial courts should consider: "[1] whether the theory or technique the expert employs is generally accepted; [2] whether the theory has been subjected to peer review and publication; [3] whether the theory can and has been tested; [4] whether the known or potential rate of error is acceptable; and [5] whether there are standards controlling the technique's operation."[18]

### 2. District Court Acted Within Its Discretion

**\*\*3**  Dr. Prellop, a radiation oncologist who completed her residency in radiation oncology in 2006, has never before provided expert testimony. She does not have a particular expertise in bladder cancer and its causes, and,

Case 1:18-cv-00068 Document 504-2 Filed on 11/06/20 in TXSD Page 512 of 548

**Seaman v. Seacor Marine L.L.C., 326 Fed.Appx. 721 (2009)**

2009 A.M.C. 1506, 79 Fed. R. Evid. Serv. 604

in her career, has only treated three patients diagnosed with bladder cancer.[19] She is also the sister-in-law of Seaman's trial counsel (who continues to represent Seaman in the instant appeal). Dr. Prellop submitted a two-page report that concluded:

> Mr. Seaman's history of occupational exposure to diesel exhaust and chemicals including aromatic hydrocarbons[, particularly a chemical called Ferox,] put him at increased risk for bladder cancer. Of course, we could never be certain that these occupational exposures were the definite cause of Mr. Seaman's bladder cancer but I have no information suggesting that Mr. Seaman's cancer was caused by other external agents.

Dr. Prellop based her opinion on (1) her "understand[ing] that Mr. Seaman's occupational history includes regular exposure to diesel exhaust and exposure to Ferox at least once a week, twenty-six weeks per year, over more than a decade" and (2) her determination that Mr. Seaman has no risk factor for bladder cancer, e.g., smoking, family history, or age, other than his male gender. To arrive at her conclusion, Dr. Prellop reviewed Seaman's deposition and medical records, the material safety data sheet ("MSDS") for Ferox,[20] and two scholarly articles about the risk factors for **726** bladder cancer. She never saw or spoke with Seaman, whose complaint and deposition testimony mentioned nothing about either Ferox or diesel exhaust. Dr. Prellop based her "understanding" of Seaman's regular exposure to Ferox and diesel exhaust on nothing more than the suggestion to her by Seaman's counsel that another Seacor employee said that Seaman had been exposed to the substances.

[1] The district court determined that Dr. Prellop's assumption of regular exposure without any "facts upon which Dr. Prellop could have possibly surmised exposure levels, rendered her causation opinion mere guesswork."[21] The court also noted that Dr. Prellop never discussed, in either her report or her deposition testimony, the studies on which her two cited journal articles were based.[22] In excluding Dr. Prellop's testimony, the district court concluded that her "opinion is neither factually supported nor scientifically reliable."[23] We agree and hold that the district court acted well within its discretion in excluding Dr. Prellop's testimony. Here is why.

First, Dr. Prellop does not establish general causation. Her Ferox-related testimony relies on no scholarly studies and

merely recites her opinion that Ferox contains aromatic hydrocarbons, which are known carcinogens. Yet, Dr. Prellop makes no connection between Ferox and *bladder* cancer specifically.[24] And, she provides no clue regarding what would be a harmful level of Ferox exposure.[25] Without some showing of a "statistically significant" link between Ferox and bladder cancer, Dr. Prellop's testimony does not establish general causation for Ferox.[26]

**4** As for her opinion that diesel exhaust causes bladder cancer, Dr. Prellop cites two articles as support: *An Updated Review of the Literature: Risk Factors for Bladder Cancer with Focus on Occupational Exposures* ("*Updated Review* "),[27] and *Projecting Individualized Probabilities of Developing Bladder Cancer in White Individuals* ("*Projecting Probabilities* ").[28] *Updated Review* is an overview of bladder-cancer literature which notes that one analysis found that "[w]orkers with high exposure to diesel exhaust" (the term "high exposure" is left undefined) have an increased risk of bladder cancer.[29] The article cautions that research of occupational bladder cancer is complicated because smoking is the main risk for bladder cancer and it is difficult to separate bladder cancer caused by smoking from that caused by occupational exposures.[30] *Updated Review* mentions nothing about the *level of exposure* that over time might increase one's risk of bladder cancer.

The authors of *Projecting Probabilities* created a model that was "consistent with diesel exhaust exposure ... having a strong etiologic role in [bladder cancer], with numerous studies showing an excess incidence of [bladder cancer] in truck drivers **727** and those exposed to diesel exhausts."[31] Like *Updated Review, Projecting Possibilities* is silent on the *level of exposure* to diesel exhaust that would be significant. These articles thus do not assist Dr. Prellop in meeting Seaman's "minimal" burden of establishing by "[s]cientific knowledge ... the harmful level of exposure to a chemical."[32] Without any facts that would establish the allegedly harmful level of exposure (or even some link to bladder cancer), as with her Ferox opinion, Dr. Prellop's opinion regarding diesel exhaust does not establish general causation.

Neither does Dr. Prellop establish specific causation. Seaman makes the contention—with which we disagree—that our opinion in *Bocanegra v. Vicmar Services, Inc.*[33] mandates that any shortcomings in Dr. Prellop's opinion go to its weight, not its admissibility. In that vehicle-collision case,

2009 A.M.C. 1506, 79 Fed. R. Evid. Serv. 604

the plaintiff used a toxicology expert to testify about the effects of marijuana on a motorist's perception, reaction time, and overall driving ability.[34] Stressing that "[t]he real world ... does not operate like a controlled study," we held that the expert's testimony was admissible despite unknown variables related to the potency and quantity of the marijuana ingested by the defendant.[35] In *Bocanegra*, the reason that these unknown variables went to the weight and not to the admissibility of the expert's testimony is because the record also contained sufficient exposure information: It was undisputed both that (1) being high on marijuana impairs perception, *viz.*, it *generally* has that effect, and (2) the defendant driver had been high within the relevant twelve-hour window, *viz.*, the *specific* effect.[36] We cautioned that we were "not concluding that a trial court may never exclude testimony in a ... case based on the fact that unknown variables render the testimony unhelpful to the jury."[37] Instead, we "simply [held] that in th[at] case, the variables d[id] not undermine the expert's testimony to the point that it [was] of no assistance to the jury."[38]

**\*\*5** Unlike in *Bocanegra*,[39] the unknown variables of the instant case do render Dr. Prellop's testimony unhelpful. Dr. Prellop's **\*728** opinion is based on nothing other than counsel for Seaman informing her that Seaman was exposed to Ferox and diesel exhaust "at least once a week, twenty-six weeks per year, over more than a decade." Even if reliance on counsel's suggestion were permitted, Dr. Prellop still had no information about the amount of exposure to which Seaman was subjected "at least once a week," *viz.*, duration, concentration, and other circumstances of the exposure. She provided nothing that would offer the fact-finder a clue as to Seaman's exposure to the allegedly dangerous chemicals.

In short, Dr. Prellop's "background information concerning [Seaman's] exposure ... is so sadly lacking as to be mere guesswork. The expert[ ] did not rely on data concerning [Seaman's] exposure that suffices to sustain [her] opinions" under *Daubert* or Rule 702.[40] Dr. Prellop's testimony does not come close to establishing either general or specific causation. The district court did not abuse its discretion in excluding her testimony.[41]

## B. Summary Judgment

### 1. Applicable Law

Having defined the record, we next determine whether summary judgment was proper. "Summary judgment is appropriate only 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' "[42] In making our determination, we view the evidence in the light most favorable to the non-moving party, here, Seaman.[43] "[W]e are not limited to the district court's reasons for its grant of summary judgment. We may affirm the district court's summary judgment on any ground raised below and supported by the record."[44]

### 2. Seacor is Entitled to Summary Judgment

**[2]** Deprived of Dr. Prellop's testimony, Seaman nevertheless urges that summary judgment was improper for two principal reasons: (1) Other sources provide sufficient causation evidence, and (2) the district court erred by granting summary judgment *sua sponte* on Seacor's purported duty to detect Seaman's cancer irrespective of causation by chemicals aboard Seacor's vessels. In rejecting these arguments we hold that Seaman failed to establish a genuine issue of material fact that would justify denial of summary judgment.

### \*729 i. Lack of Expert Causation Evidence

Seaman first contends that the deposition testimony of Seacor's own expert, Dr. Richard Airhart, establishes both general and specific causation. Our review of Dr. Airhart's deposition makes clear that his testimony does no such thing and instead fully supports his expert report, which emphasized that he was "unable to find any direct carcinogen for Mr. Seaman's disease based on the evidence of his records." The report focused on Seaman's childhood second-hand exposure to cigarette smoke as a more significant risk factor than any demonstrated occupational risk. Dr. Airhart's deposition testimony contains the following representative statements: (1) diesel exhaust has potential carcinogens in it but that "[w]hen you look at how much of a potential it is, especially for bladder cancer, it's not proven"; (2) "I think [second-hand smoke] caused his cancer.... That's a little stronger than more probable [than not].... I feel very strongly that this is the most likely cause of [Seaman's cancer]"; and (3) if Seaman worked around carcinogens, information about parts per million, length of exposure, and type of ventilation would all be relevant. In summary, the testimony and report of Seacor's expert, Dr. Airhart, does not support Seaman's position at all. Dr. Airhart's deposition does not

2009 A.M.C. 1506, 79 Fed. R. Evid. Serv. 604

reveal the requisite causal link between Seaman's cancer and either Ferox or diesel exhaust. And, without admissible expert evidence in this toxic-tort case, Seaman cannot prove causation.[45]

**6 [3] In an effort to establish his exposure to Ferox and diesel exhaust, Seaman points to the declarations of three of Seaman's co-workers.[46] Each co-worker submitted a similar declaration that said: (1) Seacor's vessel was supplied with Ferox; (2) Seaman applied Ferox "regularly," "usually two or three times every week" using a brush or a pneumatic spray gun; (3) the crew never wore safety gear; (3) half of the time that the crew applied Ferox, it did so in enclosed spaces; (4) Seaman inhaled diesel exhaust fumes every day that he served aboard the vessel; (5) the smell of diesel exhaust was noticeable at all times; and (6) Seacor's vessel routinely carried benzene and other chemicals. Without expert testimony to place these declarations in context, they do not demonstrate that Seaman was exposed to whatever may be the allegedly harmful level of Ferox or diesel exhaust.[47]

Seaman lacks competent summary judgment evidence that would create a genuine fact issue regarding the causation of his cancer.

### ii. Seaman's Duty–to–Detect Claim

The district court dismissed all of Seaman's claims based on his failure to offer evidence that exposure to chemicals while aboard Seacor's vessels caused his cancer. Seaman asserts, however, that Seacor never sought summary judgment on his independent cause of action related to Seacor's **730 alleged duty to discover Seaman's symptoms irrespective of whether Ferox or diesel exhaust caused his cancer. According to Seaman, the district court erred in granting summary judgment *sua sponte* on this issue.[48] We hold that to the extent that an independent claim existed,[49] the district court did not reversibly err in rejecting that claim.

[4] Seaman's memorandum in opposition to Seacor's motion for summary judgment described his theory related to Seacor's alleged duties to detect his cancer and to provide him medical monitoring. By raising these issues in his opposition brief, Seaman, who makes no representation that he was

Footnotes

deprived of an opportunity to present additional evidence, placed them at issue for summary judgment.[50]

[5] According to Seaman, Seacor's duty to detect his bladder cancer fell under Seacor's fundamental Jones Act duty to provide a "reasonably safe place to work."[51] Even assuming *arguendo* that Seacor had a duty to provide medical monitoring to Seaman,[52] he has offered no summary judgment evidence that would establish that Seacor's alleged breach of that duty caused his cancer, i.e., that Seacor's non-detection "played *any part*—however small—in the development of his" cancer.[53] No one disputes that early diagnosis of bladder cancer is important. And, Seaman contends that Seacor was at fault for his not receiving treatment for bladder cancer until 2006. Seaman disregards the fact, however, that he did see a doctor for hematuria in 2003 and that the doctor recommended seeing a urologist if Seaman's urine did not clear. Yet, it was not until 2006 that Seaman saw a urologist. Seaman offers no evidence that routine medical monitoring would have altered his prognosis any more than did seeing his doctor in 2003, particularly given that Seaman had been experiencing symptoms for *seven to ten years before* his 2005 visit to the infectious disease specialist. As Seaman has not established a genuine issue of **731 material fact in support of this cause of action, Seacor is entitled to summary judgment on all of Seaman's claims.[54]

## IV. CONCLUSION

**7 We affirm the district court's *Daubert*-based exclusion of Dr. Prellop's expert testimony as unreliable. We also affirm the court's grant of summary judgment in favor of Seacor because Seaman failed to demonstrate the presence of a disputed issue of material fact.

AFFIRMED.

## All Citations

326 Fed.Appx. 721, 2009 WL 1158799, 2009 A.M.C. 1506, 79 Fed. R. Evid. Serv. 604

2009 A.M.C. 1506, 79 Fed. R. Evid. Serv. 604

\*     Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1     *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 351 (5th Cir.2007); *see Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

2     *Knight,* 482 F.3d at 351 (internal quotation marks omitted).

3     *Id.*

4     *Curtis v. M & S Petrol., Inc.,* 174 F.3d 661, 668 (5th Cir.1999).

5     *Allen v. Pa. Eng'g Corp.,* 102 F.3d 194, 199 (5th Cir.1996).

6     *Id.* (demanding not just knowledge but *scientific* knowledge); *Atkins v. Ferro Corp.,* 534 F.Supp.2d 662, 666 (M.D.La.2008) (concluding that there was no genuine issue of material fact for trial because "plaintiffs [had] not produced any *expert testimony or report* to establish that[ ] plaintiffs: (1) were actually exposed to a harmful level of the chemical, or (2) were physically injured by the [chemical] allegedly released from the plant" (emphasis added)), *aff'd* 314 Fed.Appx. 662, 663 (5th Cir.2009) (per curiam) (unpublished) ( "Because plaintiffs presented no expert testimony in support of causation, there is no error in the summary judgment ...." (citing *Allen,* 102 F.3d at 199)); *see Templet v. HydroChem Inc.,* 367 F.3d 473, 484 n. 15 (5th Cir.2004) (Dennis, J., dissenting) (emphasizing the need for expert testimony to prove a complex toxic tort case); *Wills v. Amerada Hess Corp.,* 379 F.3d 32, 50 (2d Cir.2004) ("Absent admissible expert testimony on the issue of causation, [a plaintiff is] unable to sustain her burden to prove causation.").

7     *Knight,* 482 F.3d at 351 (emphases added).

8     *Id.*

9     *United States v. Fullwood,* 342 F.3d 409, 412 (5th Cir.2003) (citing Fed.R.Evid. 104(a), cmt.); *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir.1998) (en banc).

10     Fed.R.Evid. 702.

11     Advisory Committee Notes to Fed.R.Evid. 702 (2000 Amendments) (citing *Daubert,* 509 U.S. 579, 113 S.Ct. 2786 (1993)).

12     *Allen v. Pa. Eng'g Corp.,* 102 F.3d 194, 196 (5th Cir.1996) (quotation omitted).

13     *Knight,* 482 F.3d at 354 (emphasis added)

14     *Id.* at 355 (quoting *Daubert,* 509 U.S. at 589, 592–93, 113 S.Ct. 2786) (internal citations omitted).

15     *Id.* at 355 (internal quotation marks omitted).

16     *Paz v. Brush Engineered Materials, Inc.,* 555 F.3d 383, 388 (5th Cir.2009); *see Knight,* 482 F.3d at 355 (stating that if the data relied on by a party's expert "fail[s] to provide a 'relevant' link with the facts at issue, his expert opinion was not based on 'good grounds' ").

17     *Knight,* 482 F.3d at 354 (internal quotation marks omitted).

18     *Id.* at 351 (citing *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786); *see id.* at 355 ("District courts must carefully analyze the studies on which experts rely for their opinions before admitting their testimony.").

19     Although Seacor challenged Dr. Prellop's qualifications to render an opinion on causation, the district court instead excluded the evidence under the *Daubert* standard. The district court also noted, however, that "[i]t is clear from Dr. Prellop's deposition that she has no specific expertise in the causes or diagnosis of bladder cancer." *Seaman v. Seacor Marine LLC,* 564 F.Supp.2d 598, 601 n. 2 (E.D.La.2008).

20     According to Dr. Prellop, Ferox contains the aromatic hydrocarbons benzene, xylene, and ethylbenzene.

21     *Seaman,* 564 F.Supp.2d at 604.

22     *Id.*

23     *Id.*

24     *See Allen v. Pa. Eng'g Corp.,* 102 F.3d 194, 197 (5th Cir.1996) (noting that causation evidence of cancer generally-rather than the specific cancer from which the plaintiff suffers-is insufficient).

25     *See id.* at 199 (making clear that such a showing is required).

26     *See id.* at 195.

27     Sandra M. Olfert et al., *Updated Review,* 99 S. Med. J. 1256 (2006).

28     Xifeng Wu et al., *Projecting Probabilities,* 25 J. Clinical Oncology 4974 (2007).

29     *Updated Review* at 1261.

30     *See id.* at 1261–62.

31     *Projecting Probabilities* at 4979. The Projecting Probabilities model, however, still requires "validation ... in an external population [as] an essential next step towards practical use in the clinical setting." *Id.*

Case 1:18-cv-00068 Document 504-2 Filed on 11/06/20 in TXSD Page 516 of 548

Seaman v. Seacor Marine L.L.C., 326 Fed.Appx. 721 (2009)

2009 A.M.C. 1506, 79 Fed. R. Evid. Serv. 604

32 *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir.1996); *see also id.* (citing *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107–08 (8th Cir.1996) (rejecting an expert's testimony that "was not based on any knowledge about what amounts of [a chemical] involve an appreciable risk of harm to human beings who breathe them")). *But see Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir.2007) (noting that not every expert must back his opinion with published studies that *unequivocally* support that opinion).

33 320 F.3d 581 (5th Cir.2003).

34 *Id.* at 586. The plaintiff used a separate accident-reconstruction expert to connect impaired driving ability to an increased likelihood of a crash. *Id.*

35 *Id.* at 588–90.

36 *Id.* at 587–89.

37 *Id.* at 589–90 n. 5.

38 *Id.*

39 Our holding in *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661 (5th Cir.1999) is consistent with that of *Bocanegra*. In *Curtis*, although the precise level of chemical exposure was unknown, there was "sufficient information of the level" of exposure, e.g., (1) abnormally high, albeit imprecise, readings on an exposure measuring device, (2) work practices conducive to high exposure, and (3) inadequate factory design. *Curtis*, 174 F.3d at 671–72. Determining that the expert's exposure testimony was supported by more than a mere "paucity of facts," we held that it was admissible. *Id.* at 672 (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 n. 10 (5th Cir.1998) (en banc) (questioning as suspect causation testimony based on a "paucity of facts")).

40 *See Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198–99 (5th Cir.1996) (discussing the shortcoming of an expert opinion under Federal Rule of Evidence 703, which requires that if an expert relies on inadmissible facts, they be of a type "reasonably relied on by other experts in the field" (citing Fed.R.Evid. 703)).

41 The reduced burden of establishing proximate cause in Jones Act cases, *see, e.g., Landry v. Two R. Drilling Co.*, 511 F.2d 138, 142 (5th Cir.1975) (describing the burden as "featherweight"), is irrelevant to our holding. The standards of reliability and credibility to determine the admissibility of expert testimony under *Daubert* and Rule 702 apply regardless whether a seaman's burden on proximate causation is reduced. *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 47 (2d Cir.2004) (stating this rule and emphasizing that the Federal Rules of Evidence and the applicable standard of causation are "distinct issues and do not affect one another") (quotation omitted); *see also Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347 (5th Cir.2007) (applying *Daubert* to an expert's causation testimony in a Jones Act case).

42 *Gray Law LLP v. Transcont. Ins. Co.*, 560 F.3d 361, 365 (5th Cir.2009) (quoting Fed.R.Civ.P. 56(c)).

43 *Id.*

44 *Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 478 (5th Cir.2008).

45 *See, e.g., Allen*, 102 F.3d at 199; *Atkins v. Ferro Corp.*, 534 F.Supp.2d 662, 666 (M.D.La.2008), *aff'd* 314 Fed.Appx. 662 (5th Cir.2009) (per curiam) (unpublished).

46 We re-emphasize that Dr. Prellop relied on only the suggestion of Seaman's counsel. The co-workers executed their declarations *after* the dates of Dr. Prellop's report and deposition, so she could not have relied on them.

47 In the absence of complementary expert evidence, we are skeptical that the declarations of lay co-workers might be of any assistance to Seaman's case. *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 49–50 (2d Cir.2004) ("Absent some technical or professional expertise in detecting and quantifying toxic emissions, [the seaman's] testimony was insufficient to establish dosage amount.").

48 *See Lozano v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 641 (5th Cir.2007) (stating that generally a district court may not grant summary judgment *sua sponte* unless it gives the parties ten days notice).

49 Seaman's complaint offers almost no indication of this claim and merely alleges that Seacor failed to provide a safe place to work and to "investigate, remedy, and/or warn Mr. Seaman of all hazards."

50 *See O'Hara v. Gen. Motors Corp.*, 508 F.3d 753, 763–64 (5th Cir.2007) (recognizing a harmless error exception to the ten-day notice rule when the non-movant had an adequate opportunity to brief the issue and to present its evidence, i.e., notice would have served no valid purpose); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1399 (5th Cir.1994) ("Because the homeowners have not identified a material fact issue regarding their [claim], it would be a useless procedure to reverse the [d]istrict [c]ourt because it did not allow ten days to elapse before entering summary judgment." (internal quotation marks omitted)).

51 *See Ober v. Penrod Drilling Co.*, 726 F.2d 1035, 1037 (5th Cir.1984) (per curiam) (discussing this general duty).

52   Vessels that carry benzene of greater than 0.5% by volume as bulk cargo must provide medical monitoring to those employees expected to be exposed to a specific quantity of benzene in a given year. *See* 46 C.F.R. § 197.560(b)–(c) (detailing medical-examination requirements); *see also id.* § 197.501 (outlining to which vessels the requirement applies); § 197.505 (defining levels of benzene exposure). It is unclear whether Seaman would have been entitled to medical monitoring. Seaman submitted the report of John Edgar, who described relevant safety guidelines and regulations but who also conceded that he had no data on Seaman's actual exposure.

53   *Davis v. Odeco, Inc.,* 18 F.3d 1237, 1242–43 (5th Cir.1994) (requiring evidence of medical causation in a Jones Act case where the plaintiff alleged, *inter alia,* failure to medically monitor).

54   Seaman also urges that the district court erred in denying his motion to alter or amend the judgment. Determining that that contention is meritless, we affirm the district court's denial of Seaman's motion.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant-Intervenors. | § | |

<u>**DECLARATION OF KARLA QUETZALLI PEREZ**</u>

My name is Karla Quetzalli Perez.  I am over the age of 18 and fully competent to make this declaration.

1.      I am 28 years old and I live in Houston, Texas.

2.      I graduated magna cum laude from the University of Houston, where I received a Bachelor's degree in Business Administration in Marketing and a minor in

1

Mexican American Studies.  I graduated from University of Houston Law Center in 2018 and was admitted to the Texas Bar that same year.

3.     I currently work as a Staff Attorney at the non-profit Tahirih Justice Center, providing immigration representation to women and children fleeing gender-based violence.

4.     I pay sales, federal income, and state income taxes.

5.     I was a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA) from 2012 to 2020.  In 2016, I applied for an advance parole document. Although I was approved for the document, I changed my plans and did not travel outside the U.S. or use the advance parole. Receiving DACA allowed me to begin working as well as open and contribute to a Roth Individual Retirement Account. DACA was the catalyst that allowed me to become more involved in my community, advocate for others. DACA affirmed my interest in becoming a public interest attorney. My work helping vulnerable populations would have been impossible without DACA.

6.     DACA enabled me to obtain an education and start my legal career.  It kept me safe from removal as I grew up and became an adult.  In 2017, I married and in 2019, I was able to adjust my status to lawful permanent resident.

7.     It is impossible to emphasize enough how much protection from deportation enabled me as a young person, and as I entered my legal career, to look forward to and invest in my future, build a home, strengthen my community, and now, start a family, as I am currently pregnant with my first child.

8.      The Administration's attempts to rescind DACA caused me to develop depression and anxiety in 2017. At the time, my community was in crisis as Houston was recovering from Hurricane Harvey and a new state immigration law went into effect. Fortunately, DACA allowed me to obtain mental health services and receive treatment for my depression, but so many others aren't as fortunate.

9.      The human cost of eliminating DACA is immense. Ending DACA does not just affect the DACA recipient; it impacts recipients' children, family members, and community members that rely on DACA recipients.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 5 th day of November 2020 in Houston, Texas.

_____
Signature

Karla Perez
_____
Printed Name

# EXHIBIT 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant-Intervenors. | § | |

## DECLARATION OF JIN PARK

My name is Jin Park.  I am over the age of 18 and fully competent to make this declaration.

1.     I am 24 years old and live in New York City.

2.     I graduated from Harvard University with a Bachelor of Arts in Molecular and Cellular Biology. I currently attend Harvard Medical School remotely. I am in my

second year of an MD PhD. dual-degree program.  I also work part-time as a tutor.

3.      I pay sales, state, and federal income taxes.

4.      I received deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA). I have never applied for advance parole to leave the United States.

5.      Since I received DACA, I was able to obtain a driver's license and open a bank account.  DACA also allowed me to become more active in my community, working in a variety of programs to provide services for undocumented immigrants and high school students.

6.      DACA has helped me think about the future in a way that is more expansive. I was able to think more comprehensively about where to go to school for my higher education, and DACA has opened the door to many opportunities.

7.      It has been very stressful to see the Administration's attempts to rescind DACA. In the fall of 2017, I took a semester off from college. I was set to graduate in May 2018, but I was afraid to graduate without DACA's protection.  Because DACA has continued, I was able to return to school, finish my undergraduate degree and start medical school.

8.      I have lived in the United States since I arrived from South Korea when I was seven years old.  I wish to remain in the U.S.. If this isn't home, I don't know where home would be. Receiving deferred action is critical to my ability to live, work, and study in the United States and losing deferred action would impose a great hardship on myself and my family.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __6__ th day of November 2020 in New York, NY.

_____
Signature


Jin Park_____
Printed Name

# EXHIBIT 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF DENISE GUADALUPE ROMERO GONZALEZ

My name is Denise Guadalupe Romero Gonzalez.  I am over the age of 18 and fully competent to make this declaration.

1.      I live in New York City, New York.

2.       I was born in Mexico and came to the United States with my parents in 2001 when I was 9 years old.

1

3.     I  graduated from Long Island City High School, where I participated in Global
       Kids, a nonprofit educational organization and leadership program that sparked
       my interest in advocacy and grassroots organizing.

4.     I am 28 years old and currently pursuing a Bachelor's degree in Liberal Arts from
       City University of New York.  I attend school part-time. Upon graduation, I hope
       to practice social work.

5.     I work as a paralegal and public benefits advocate at Mobilization for Justice, a
       nonprofit organization that provides free legal assistance to low-income tenants in
       New York.

6.     I also volunteer with the New York State Youth Leadership Council, the first
       undocumented youth-led organization in New York, where I have served as a
       spokesperson for the organization.

7.     I  am a recipient of deferred action through the initiative known as Deferred
       Action for Childhood Arrivals (DACA). I first applied for DACA in 2013 when I
       was 23 years old.  Since initially receiving DACA, I successfully renewed my
       deferred action in October 2016. I renewed again in 2018, and I am currently in
       the process of renewing once more.  In 2016 I applied for an advance parole
       document in order to visit my grandfather who was very ill.  My application was
       denied on discretionary grounds and I did not receive the advance parole.

8.     I  have lived in the United States for most of my life and I wish to remain in the
       United States.  I grew up and have spent most of my life here. This is my country.
       My husband is a United States citizen, and the rest of my family is here as well. I
       also have a stable job here.

2

9.      Receiving DACA is critical to my ability to live and work in the United States and losing DACA would impose a great hardship on me.

10.     Because of DACA, I was able to attain a driver's permit.

11.     I have only been able to work because of my DACA grant. In addition, my job gave me access to health care services which includes my employer paying for out of network services including mental health counseling to help me cope with deportation proceedings facing members of my family.

12.     I have been able to open a bank account because of my DACA.

13.     I have also become more involved in my community because of DACA. I have continued to be involved in the immigrants' rights movement and organizing against deportations. I have been asked to speak at schools about my personal experience as a DACA recipient, and about my immigrants' rights work. I have also had my writings published.

14.     The decision to rescind DACA has negatively affected me, especially my mental health.

15.     I pay sales tax, federal income tax, as well as state income taxes.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this <u>6</u> th day of November 2020 in New York, NY.

_____
Signature

Denise Romero_____
Printed Name

4

# EXHIBIT 20

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | §   Case No. 1:18-CV-68 |
| | § |
| UNITED STATES OF AMERICA, *et al.*, | § |
| | § |
| Defendants, | § |
| | § |
| and | § |
| | § |
| KARLA PEREZ, MARIA ROCHA, | § |
| JOSE MAGAÑA-SALGADO, | § |
| NANCI J. PALACIOS GODINEZ, | § |
| ELLY MARISOL ESTRADA, KARINA | § |
| RUIZ DE DIAZ, CARLOS AGUILAR | § |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § |
| RAFAEL, DARWIN VELASQUEZ, | § |
| JIN PARK, OSCAR ALVAREZ, | § |
| NANCY ADOSSI, DENISE ROMERO, | § |
| PRATISHTHA KHANNA, JUNG WOO | § |
| KIM, ANGEL SILVA, MOSES KAMAU | § |
| CHEGE, HYO-WON JEON, ELIZABETH | § |
| DIAZ, MARIA DIAZ, and BLANCA | § |
| GONZALEZ, | § |
| | § |
| Defendant-Intervenors. | § |

## DECLARATION OF MOSES KAMAU CHEGE

My name is Moses Kamau Chege.  I am over the age of 18 and fully competent to make this declaration.

1.  I am 25 years old, and I live in Seattle, Washington.

2.  I attended public schools in the U.S. from elementary school through college. I graduated from Whitworth University with a Bachelor's degree in Business Administration and Accounting.

1

3.      I am currently the Director at the Washington Census Alliance, leading the largest non-profit coalition of organizations of color. We recently completed our work on the 2020 Census, where we helped Washington finish second in the country in self-response rates.   My organization is also leading the response to assist Washington families affected by COVID-19.

4.      I pay sales, state, and federal income taxes.

5.      I received deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA) when I was 18 years old. I have never applied for advance parole to leave the United States.

6.      When I received DACA, I was able to work, which allowed me to pay for my education and complete my community college classes. I have also been able to engage meaningfully with my community, including serving on the Human Services Commission of the City of Tacoma, WA.

7.      DACA has allowed me to think about the future in a long-term way. With work authorization, I have begun my career, which has allowed me to open and contribute to a 401k retirement account.  This was an important personal goal of mine and DACA allowed me to achieve it.

8.      The Administration's attempts to rescind DACA has devalued the long-term planning and security that DACA provides. I am hesitant to plan for the future because DACA always seems to be on the chopping block. Based on my experience and conversations with other DACA recipients, I feel that the attempts to end DACA have subtracted from DACA's benefits to the economy, create

confusion, and work to make DACA recipients scared and skeptical about the security of their information.

9.     I have lived in the United States since I arrived from Kenya when I was six years old, and I wish to remain in the United States. Receiving deferred action is critical to my ability to live and work in the United States. Losing deferred action would impose a great hardship on me, my family, and it would be a loss for my local community.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __6th__ day of November, 2020 in Seattle, WA.

_____
Signature


Moses Kamau Chege
Printed Name

# EXHIBIT 21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Defendant-Intervenors. | § | |

<u>**DECLARATION OF OSCAR ALVAREZ**</u>

My name is Oscar Alvarez.  I am over the age of 18 and fully competent to make this

declaration.

1.    I am 25 years old and I live in Los Angeles, California.

2.    I attended California public schools from elementary through high school. After I

graduated from Ánimo Ralph Bunche Charter High School in Los Angeles, I

attended the University of California at Berkeley. I graduated in fall 2018 with a

1

Bachelor of Arts in American Studies with a focus in Public Policy and Education.

3.     I currently work as a Community Organizer with Community Coalition, an organization that seeks to transform the social and economic conditions in South Los Angeles that foster addiction, crime, violence and poverty through public policy.

4.     I pay sales taxes, as well as state income, and federal taxes.

5.     I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA). I initially applied for DACA in 2013, when I was 18. Since initially receiving DACA, I have successfully renewed my deferred action in 2014, 2016, and 2018. I am currently in the process of renewing my DACA again. I have never taken advance parole.

6.     After I received DACA, I was able to obtain a driver's license, open a bank account, and attend college. DACA enabled me to participate in work study that helped fund my education.

7.     Because I have DACA, I feel less anxious than I otherwise would when interacting with law enforcement.

8.     I have received many opportunities because of DACA. This includes internships and fellowships that have prepared me for my career, including an internship with MALDEF in Washington, D.C. and an internship with the U.S. House of Representatives. Growing up here is the reason that all of my career, major, and college were focused on public service.

9.  I am more involved in my community because of DACA. In college, I was involved in student groups involved in immigration work. I also volunteered with different organizations working for social and economic justice for communities of color, and currently I serve on a board of directors helping underrepresented graduate students.

10. The decision to rescind DACA affected me substantially. When the decision came out, I withdrew from the university for a semester because I was afraid to graduate without DACA.

11. I have lived in the United States since I arrived from Mexico when I was two years old. This is my home. It is all that I know and I want to remain in the U.S. Receiving deferred action is critical to my ability to live and work in the United States, and losing deferred action would impose a great hardship on me and my family.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 6th day of November 2020 in Los Angeles, CA.

_____
Signature

Oscar Alvarez_____
Printed Name

# EXHIBIT 22

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, § | |
| § | |
| Plaintiffs, § | |
| § | |
| v. § | Case No. 1:18-CV-68 |
| § | |
| UNITED STATES OF AMERICA, *et al.*, § | |
| § | |
| Defendants, § | |
| § | |
| and § | |
| § | |
| KARLA PEREZ, MARIA ROCHA, § | |
| JOSE MAGAÑA-SALGADO, § | |
| NANCI J. PALACIOS GODINEZ, § | |
| ELLY MARISOL ESTRADA, KARINA § | |
| RUIZ DE DIAZ, CARLOS AGUILAR § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. § | |
| RAFAEL, DARWIN VELASQUEZ, § | |
| JIN PARK, OSCAR ALVAREZ, § | |
| NANCY ADOSSI, DENISE ROMERO, § | |
| PRATISHTHA KHANNA, JUNG WOO § | |
| KIM, ANGEL SILVA, MOSES KAMAU § | |
| CHEGE, HYO-WON JEON, ELIZABETH § | |
| DIAZ, MARIA DIAZ, and BLANCA § | |
| GONZALEZ, § | |
| § | |
| Defendant-Intervenors. § | |

## DECLARATION OF LUIS ALDAIR RAFAEL

My name is Luis Aldair Rafael.  I am over the age of 18 and fully competent to make this declaration.

1.     I am 25 years old and live in Chicago, Illinois.

2.     I attended Illinois public schools from elementary school through high school.

1

3.      I am a full-time student at Kennedy King Community College. I major in Philosophy, and hope to have a career in public policy. I also work part-time for a cleaning company.

4.      I pay several types of taxes including sales tax, federal income tax, and state income tax.

5.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA) since shortly after I graduated high school. I have successfully renewed my deferred action in 2015 and 2017. The last time I renewed DACA was in July of 2019.

6.      Since I received DACA, I have been able to obtain a driver's license, open a bank account, and attend college. DACA allowed me to become more active in my community, such as serving as a volunteer with organizations like The Resurrection Project, an organization that promotes gang violence prevention among young people in low- income communities.

7.      When DACA passed, I wanted to express my gratitude and tried to sign up for the National Guard. However, they denied my application because they decided not to accept DACA recipients, which is a shame because I really wanted to serve my country.

8.      DACA's biggest impact in my life is that it has allowed me to provide for myself, my family, and most importantly, my son.

9.      I have lived in the United States since I arrived from Mexico when I was three years old. I wish to remain in the United States. I feel like this is my country.

Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this _05__th day of November 2020 in Chicago, IL.



Signature

Luis A. Rafael
Printed Name

4

# EXHIBIT 23

# Intentionally Omitted

# EXHIBIT 24

# Intentionally Omitted