# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS,
### BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,

        Plaintiffs,

      v.

UNITED STATES OF AMERICA, *et al*.,

        Defendants,

KARLA PEREZ, *et al*.,

        Defendant-Intervenors,

        and

STATE OF NEW JERSEY,

        Defendant-Intervenor.

Case No. 1:18-cv-00068-ASH

---

**BRIEF OF *AMICI CURIAE* 54 LOCAL GOVERNMENTS AND LOCAL GOVERNMENT ADVOCACY ORGANIZATIONS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

Michael Feuer
  City Attorney
  Michael J. Dundas (*pro hac vice*)
200 North Main Street
City Hall East Suite 800
Los Angeles, California 90012
Telephone:  213.978.8130

Attorneys for *Amicus Curiae* City of Los Angeles

Nicholas Whilt
  Attorney in Charge
  S.D. Tex. No. CA247738
Margaret L. Carter*
Daniel R. Suvor*
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone:  213.430.6000

Attorneys for *Amicus Curiae* County of Los Angeles

*pro hac vice* pending

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................II

STATEMENT OF INTEREST AND SUMMARY OF THE ARGUMENT ..................................1

ARGUMENT ..............................................................................................................3

    I.      DACA Recipients Have Made *Amici*'s Communities More Prosperous And Safe..............................................................................................3

    II.     DACA Does Not Confer Work Authorization, And Thus Is Not Subject To The APA's Notice-And-Comment Requirements Or Contrary To The INA. ........................................................................................7

          A.     Recipients Of Deferred Action Obtain Work Authorization Through Valid Laws And Regulations Independent Of DACA. .................8

                1.     The Work Authorization Regulation Is Independent of DACA. ...............................................................................8

                2.     The Work Authorization Regulation Is Lawful. ............................10

          B.     DACA Does Not Confer Work Authorization, And Its Promulgation Did Not Violate The APA....................................................12

                1.     DACA Was Not Required To Undergo Notice-and-Comment Rulemaking Because It Does Not Confer Work Authorization. .................................................................12

                2.     DACA Does Not Conflict With The INA's Work Authorization Scheme................................................................15

CONCLUSION............................................................................................................17

LIST OF ADDITIONAL AMICI CURIAE ..........................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Department of Homeland Security v. Regents of the University of California*,
 140 S. Ct. 1891 (2020) ............................................................................................. 3, 14

*Doe v. United States*,
 398 F.3d 686 (5th Cir. 2005) .......................................................................................... 15

*INS v. Nat'l Ctr. For Immigrants' Rights*,
 502 U.S. 183 (1991) ...................................................................................................... 16

*Perales v. Casillas*,
 903 F.2d 1043 (5th Cir. 1990) ........................................................................................ 15

*Texas v. Rettig*,
 968 F.3d 402 (5th Cir. 2020) .......................................................................................... 10

*Texas v. United States*,
 809 F.3d 134 (5th Cir. 2015) ............................................................................ 9, 10, 11, 13

*W & T Offshore, Inc. v. Bernhardt*,
 946 F.3d 227 (5th Cir. 2019) ...................................................................................... 12, 14

**Statutes**

28 U.S.C. § 2401(a) ............................................................................................................ 10

5 U.S.C. § 553(b)(A) .......................................................................................................... 12

8 U.S.C. § 1101(i)(2) .......................................................................................................... 15

8 U.S.C. § 1103(a)(1) ..................................................................................................... 11, 15

8 U.S.C. § 1151 .................................................................................................................. 16

8 U.S.C. § 1152 .................................................................................................................. 16

8 U.S.C. § 1153 .................................................................................................................. 16

8 U.S.C. § 1154(a)(1)(K) .................................................................................................... 15

8 U.S.C. § 1184(g) .............................................................................................................. 16

8 U.S.C. § 1184(o) .............................................................................................................. 16

8 U.S.C. § 1184(p) .............................................................................................................. 16

8 U.S.C. § 1226(a)(3) .......................................................................................................... 12

8 U.S.C. § 1324a(h)(3) ................................................................................................... passim

8 U.S.C. § 1601(5) .............................................................................................................. 16

**Regulations**

46 Fed. Reg. 25,079 (May 5, 1981) ...................................................................... 8, 10, 14, 16

**TABLE OF AUTHORITIES**
(continued)

Page(s)

52 Fed. Reg. 16,216 (May 1, 1987) ................................................................... 10

52 Fed. Reg. 46,092 (Dec. 4, 1987) .................................................................. 11

8 C.F.R. § 109.1(b)(7) ........................................................................................ 9

8 C.F.R. § 274a.12(c)(14) ........................................................................... passim

**Other Authorities**

Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, Police Found. (Apr. 2009) .................................... 6

Bridget Balch, *DACA physicians serve on COVID-19 front lines*, AAMC (June 18, 2020) ............................................................................................................. 4

Erica L. Green, *With DACA in Limbo, Teachers Protected by the Program Gird for the Worst*, The N.Y. Times (Feb. 1, 2018) .............................................. 4

George White, *Teachers Who Are DACA Recipients Help Ease Anxiety of Undocumented Students*, EdSource (Sept. 15, 2017) ....................................... 4

Gregory Korte et al., *Trump Administration Struggles with Fate of 900 DREAMers Serving in the Military*, USA Today (Sept. 7, 2017) ............................ 6

Hr'g Before the S. Comm. on the Judiciary, 114th Cong. 2 (2015) ............................ 6

John Burnett, *New Immigration Crackdowns Creating 'Chilling Effect' on Crime Reporting*, NPR (May 25, 2017) .................................................................... 6

Julia Wick, *L.A.-Area DACA Recipients Contribute Approximately $5.5 Billion Annually to Economy, Chamber Estimates*, LAist (Sept. 21, 2017) ......................... 5

Maya Torres, *Muralist Yehimi Cambrón speaks of immigration reform and social justice*, The Signal (Nov. 19, 2019) ................................................................. 6

Memorandum for David V. Aguilar, et al. from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) ................................................................. 13

Michel Martin, *Actor Who Came Out As Undocumented Is Fighting for Hollywood To Stand With DACA*, NPR (Dec. 2, 2017) ............................................ 6

Nicole Prchal Svajlenka, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response*, Ctr. for Am. Progress (Apr. 6, 2020) ................... 4, 5

Nicole Prchal Svajlenka, *What We Know About DACA Recipients, by Metropolitan Area*, Ctr. for Am. Progress (Spring 2020) ....................................... 5

Nik Theodore, Dep't of Urban Planning & Policy, Univ. of Ill. at Chi., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (2013) .................................................................................. 6

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Notice of Filing of Quarterly Summary Reports, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211-WHA (N.D. Cal. July 1, 2020), ECF No. 299 ................................................................................................ 2

Randy Capps et al., Migration Policy Inst., *Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement* (2011)...................................... 6

Rob D'Amico, *Texas teachers union cheers DACA decision impacting thousands of educators*, Texas AFT (June 18, 2020)........................................................................ 5

Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, *Two Years and Counting: Assessing the Growing Power of DACA* 9 (June 16, 2014) ...................................................................................................................... 7

Roberto G. Gonzales, *Here's How DACA Changed the Lives of Young Immigrants, According to Research*, Vox Media (Feb. 16, 2018 ) ........................................ 4, 7

Shoba S. Wadhia, *Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases*, 6.1 Colum. J. of Race and L. 1 (2016)............................. 10

Silva Mathema, *Ending DACA Will Cost States Billions of Dollars*, Ctr. for Am. Progress (Jan. 9, 2017).......................................................................................... 5

*State & Local Tax Contributions of Young Undocumented Immigrants*, Inst. on Taxation & Econ. Policy (Apr. 30, 2018) ..................................................................... 5

Stephanie Griffith, *For Actor Bambadjan Bamba, the Battles for DACA and Racial Justice Are One and the Same*, Ctr. for Am. Progress (July 10, 2020) ....................... 6

The COVID Tracking Project, *U.S. Daily Cases*, https://covidtracking.com/data/charts/us-daily-positive (last visited Nov. 13, 2020) ................................................................................................................... 4

U.S. Dep't of Justice, NCJ 253043, *Criminal Victimization, 2018* (Sept. 2019) ......................... 7

USCIS, *Frequently Asked Questions*, https://www.uscis.gov/archive/frequently-asked-questions .................................................................................................. 13

Written Testimony of Stephen H. Legomsky, Hearing Before the U.S. H. Comm. on the Judiciary (Feb. 25, 2015)............................................................................ 9, 10

Zenén Jaimes Pérez, United We Dream, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* (Oct. 2015)....................................................................................................... 7

### STATEMENT OF INTEREST AND SUMMARY OF THE ARGUMENT[1]

*Amici Curiae* are 54 local governments and local government advocacy organizations from every corner of the country, including the United States Conference of Mayors, the National League of Cities, the International Municipal Lawyers Association, and the International City/County Management Association.[2] *Amici* come from a wide range of economic, political, and social diversity and share a common interest in building communities where all residents, regardless of immigration status, feel safe and empowered to participate in civic life.  At their core, local governments exist to provide for the health, safety, and welfare of their residents.  Deferred Action for Childhood Arrivals (DACA) directly benefits all of our residents by encouraging DACA recipients to openly participate in their communities and interact with local governments.

Before DACA was instituted, many DACA recipients feared the basic tasks of everyday life like going to work, attending school and church, or simply buying groceries.  Mothers and fathers with American citizen children often left in the morning uncertain if they would come home and see their sons and daughters again.  These fears are precisely why DACA was created: to both focus limited immigration enforcement resources on the removal of serious criminals and

---

[1] The parties do not oppose the filing of this brief.  No party's counsel authored this brief in whole or in part, and no person or entity other than *Amici* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(4).

[2] *Amici Curiae* are located across the United States and include the County of Los Angeles, California; the City of Los Angeles, California; the City of Akron, Ohio; the City of Alameda, California; the City of Alexandria, Virginia; the City of Austin, Texas; the City of Berkeley, California; the City of Boston, Massachusetts; the County of Boulder, Colorado; the City of Boulder, Colorado; Cameron County, Texas; the Town of Carrboro, North Carolina; the City of Central Falls, Rhode Island; the Town of Chapel Hill, North Carolina; the City of Chelsea, Massachusetts; the City of Chicago, Illinois; the City of Dayton, Ohio; the City and County of Denver, Colorado; the City of Fresno, California; the City of Hartford, Connecticut; the City of Houston, Texas; the City of Iowa City, Iowa; the City of Las Cruces, New Mexico; the City of Madison, Wisconsin; the City of Minneapolis, Minnesota; the City of New Rochelle, New York; the City of New York, New York; the City of North Lauderdale, Florida; the City of Oakland, California; the City of Palm Springs, California; the City of Philadelphia, Pennsylvania; the City of Phoenix, Arizona; the City of Pittsburgh, Pennsylvania; the City of Portland, Oregon; the Municipality of Princeton, New Jersey; the City of Providence, Rhode Island; the City of Rochester, New York; the City of Sacramento, California; the City of Saint Paul, Minnesota; the City of Salinas, California; the City of San Antonio, Texas; the City and County of San Francisco, California; the City of Santa Monica, California; the County of Santa Cruz, California; the City of Seattle, Washington; the City of Somerville, Massachusetts; the City of Stamford, Connecticut; the City of Tacoma, Washington; the City of Tucson, Arizona; the City of West Hollywood, California; the International City/County Management Association; the International Municipal Lawyers Association; the National League of Cities; and the United States Conference of Mayors.  A complete list of *Amici* is provided at the end of this brief.

to enable young people, who often know no country other than this one, to contribute to their communities.

*Amici* will suffer substantial harm if DACA is set aside.  More than 46% of current DACA recipients—nearly 305,000 individuals—call *Amici*'s metropolitan areas home.[3]  These individuals are no different than the tens of millions of people who live and work alongside them in *Amici*'s cities and counties.

DACA recipients have made enormous contributions to our communities and to our country.  They are the students who study to become our newest doctors, nurses, and lawyers. They are the entrepreneurs who build businesses and revitalize our local economies.  They are the teachers and civil servants who help transform their communities and the next generation. Without deferred action, these contributions and others would not be possible.  *Amici* are stronger and safer because of DACA.

*Amici* submit this brief to inform the Court of the profound impact that DACA has had on recipients and communities like *Amici* and to highlight the consequences that setting aside DACA would have on *Amici* and our residents.  Any order of this Court on Plaintiffs' and Defendant-Intervenors' Motions should consider these significant reliance interests and effects that Plaintiffs' extremely belated challenge to DACA would have on recipients and communities nationwide.

*Amici* also write to address a discrete legal issue—Plaintiffs' assertion that DACA should be set aside because it purportedly conferred work authorization "benefits" on recipients.  The Department of Homeland Security (DHS) had discretion to grant work authorization to immigrants with deferred action long before DACA was implemented; the fact that grants of deferred action under DACA made recipients eligible to apply for work authorization under a separate regulatory scheme does not render DACA a substantive rule requiring notice and

---

[3] Figures are based on recipients' residency in a Core Based Statistical Area, as defined by the U.S. Office of Management and Budget, at the time of their most recent DACA application.  *See* Notice of Filing of Quarterly Summary Reports, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211-WHA (N.D. Cal. July 1, 2020), ECF No. 299.

comment under the Administrative Procedure Act (APA), nor does it conflict with the Immigration and Nationality Act (INA) as Plaintiffs argue.

Plaintiffs' efforts to set aside DACA jeopardize *Amici*'s interests by harming hundreds of thousands of DACA recipients in *Amici*'s communities. They also threaten DACA recipients' neighbors, coworkers, employers, and local governments, who benefit from the countless contributions that DACA recipients have made and will continue to make to our country. The Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendant-Intervenors' Motion for Summary Judgment.

## ARGUMENT

## I.    DACA Recipients Have Made *Amici*'s Communities More Prosperous And Safe.

Since its inception in 2012, DACA has advanced *Amici's* best interests by allowing recipients to live without fear in the communities they call home. *Amici* have witnessed how deferred immigration enforcement action through DACA has changed hundreds of thousands of young people's lives. For example, recipients have applied for and received work authorization, which has allowed them to go to college, get better jobs, reinvest in their communities by buying homes and paying taxes, and in every way contribute to the communities in which they live. *Amici* have also experienced firsthand the benefit to their economies and public safety programs from DACA recipients' open participation in the economy and increased interaction with local governments and law enforcement. These contributions are some of the very same that the Supreme Court recognized mere months ago,[4] and any order of this Court on Plaintiffs' and Defendant-Intervenors' Motions for Summary Judgment should consider these substantial reliance interests and the effects that DACA has had on recipients and communities like *Amici*. *See* Defendant-Intervenors' Brief in Support of Their Motion for Summary Judgment and in

---

[4] In *Department of Homeland Security v. Regents of the University of California*, the Supreme Court concluded that the Government's attempt to rescind DACA in 2017 violated the APA because, among other reasons, the Government failed to consider the reliance interests engendered by DACA. *See* 140 S. Ct. 1891, 1914 (2020) (Government acted arbitrarily and capriciously by refusing to consider recipients' reliance interests as well as the "consequences of the rescission, [which] would 'radiate outward' to DACA recipients' families," schools, employers, and communities.).

Opposition to Plaintiff's Motion for Summary Judgment ("Perez et al. MSJ."), Dkt. 504 at 46–50.

DACA has drastically improved recipients' lives.  DACA recipients are not only granted deferred action from removal, but are afforded the building blocks of modern life.  They are eligible to apply for work authorization and a social security card.  In *Amici*'s states, they can receive a driver's license, and in several states those choosing to pursue higher education can take advantage of tuition levels afforded to in-state residents.  Buoyed by the safety afforded by deferred action, countless recipients have pursued higher education, enhancing their economic productivity and enriching their futures.[5]

The positive experiences of individual DACA recipients also benefit *Amici*.  Across the country, more than 200,000 DACA recipients are working on the frontlines to protect the health and safety of Americans.[6]  Health care workers on the front line of the current pandemic include Dr. Manuel Bernal, a second-year emergency medicine resident at Advocate Christ Medical Center in Oak Lawn, Illinois, and Dr. Jirayut New Latthivongskorn, a first-year medical resident at Zuckerberg San Francisco General Hospital and Trauma Center, both of whom are treating their neighbors infected with COVID-19.[7]  And these contributions are now more critical than ever.  As of this filing, the United States set records for new coronavirus cases on each of the last three days and 100,000 or more new cases have been recorded on nine consecutive days.[8]

Some 15,000 recipients are teachers, like Chicagoan Cynthia Sanchez and Austinite Karen Reyes, who have worked to educate students at schools, often in underserved communities of color, and have had to shift from the physical to the digital classroom.[9]  More than 142,000

---

[5] Roberto G. Gonzales, *Here's How DACA Changed the Lives of Young Immigrants, According to Research*, Vox Media (Feb. 16, 2018 ), https://perma.cc/PB6B-9S9L.

[6] Nicole Prchal Svajlenka, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response*, Ctr. for Am. Progress (Apr. 6, 2020), https://www.americanprogress.org/issues/immigration/news/2020/04/06/482708/demographic-profile-daca-recipients-frontlines-coronavirus-response.

[7] Bridget Balch, *DACA physicians serve on COVID-19 front lines*, AAMC (June 18, 2020), https://www.aamc.org/news-insights/daca-physicians-serve-covid-19-front-lines.

[8] The COVID Tracking Project, *U.S. Daily Cases*, https://covidtracking.com/data/charts/us-daily-positive (last visited Nov.13, 2020).

[9] Svajlenka, *supra* n.6.  *See also* George White, *Teachers Who Are DACA Recipients Help Ease Anxiety of Undocumented Students*, EdSource (Sept. 15, 2017), https://perma.cc/PPJ2-KR3P; Erica L. Green, *With DACA in*

4

DACA recipients classified as essential workers in food-related occupations work tirelessly to ensure that food makes it to tables in every community throughout the country.[10]   All told, nearly one-third of current DACA recipients are working on the front lines to safeguard the health and safety of their neighbors during this pandemic.[11]

These stories show how in good times and difficult ones, DACA recipients add to the economic and social strength of their communities.   DACA recipients reinvest their earnings in local businesses and commerce, and their businesses create jobs.   In Los Angeles alone, recipients are responsible for approximately $5.5 billion of the annual gross domestic product (GDP).[12]   Nationally, the nearly 650,000 current DACA recipients are estimated to contribute more than $433 billion to the United States GDP over the next decade.[13]   DACA has also helped generate tax revenue necessary to support state and local programs.   In the Los Angeles metro area, DACA recipients pay nearly $785 million in federal taxes, and close to $400 million in taxes to state and local governments.[14]   In New York, recipient tax contributions are approximately $540 million and $320 million, respectively.[15]   DACA recipients nationwide collectively pay an estimated $5.6 billion in federal taxes, as well as $3.1 billion in state and local taxes ever year that go to fund critical programs administered by *Amici*.[16]   These economic contributions have never been more critical than in this time of shrinking state and local budgets.

---

*Limbo, Teachers Protected by the Program Gird for the Worst*, The N.Y. Times (Feb. 1, 2018), https://www.nytimes.com/2018/02/01/us/politics/daca-teachers-trump.html?hp&action=click&pgtype=Homepage& clickSource=story-heading&module=first-column-region&region=top-news&WT.nav=top-news; *see also* Rob D'Amico, *Texas teachers union cheers DACA decision impacting thousands of educators*, Texas AFT (June 18, 2020), https://www.texasaft.org/releases/texas-teachers-union-cheers-daca-decision-impacting-thousands-of-educators/.  Although the exact number of DACA recipients employed as teachers is unknown, the Migration Policy Institute estimates that 20,000 "DACA eligible" individuals are teachers, although some may have attained lawful status by other means.

[10] Svajlenka, *supra* n.6.

[11] *Id.*

[12] Julia Wick, *L.A.-Area DACA Recipients Contribute Approximately $5.5 Billion Annually to Economy, Chamber Estimates*, LAist (Sept. 21, 2017), https://perma.cc/9VDJ-HEDB.

[13] Silva Mathema, *Ending DACA Will Cost States Billions of Dollars*, Ctr. for Am. Progress (Jan. 9, 2017), https://perma.cc/7NSZ-Y2L7.

[14] Nicole Prchal Svajlenka, *What We Know About DACA Recipients, by Metropolitan Area*, Ctr. for Am. Progress (Spring 2020), https://www.americanprogress.org/issues/immigration/news/2020/04/30/484225/know-daca-recipients-metropolitan-area-2/.

[15] *Id.*

[16] *Id.*; *see also State & Local Tax Contributions of Young Undocumented Immigrants*, Inst. on Taxation & Econ. Policy (Apr. 30, 2018), https://perma.cc/WKL6-U2HJ.

Hundreds of DACA recipients have protected our country by serving in the military as part of a Pentagon pilot program.[17]  Others have made lasting impacts in the arts, like Yehimi Cambron, an arts teacher and artist from Atlanta who has used her own immigrant experience to teach her high school students to find expression and empowerment in art, or Bambadjan Bamba, an actor who grew up in the South Bronx, who worked to put himself through drama school, and now claims credits including NBC's *The Good Place* and Disney's *Black Panther*.[18]

In addition to making *Amici*'s communities more prosperous and more vibrant, DACA has also made them safer because recipients are able to cooperate freely and effectively with law enforcement.  Community policing strategies in *Amici* cities and counties call for trust and engagement between law enforcement and the people they protect.[19]  Police agencies report that trust is undermined when immigration enforcement and the threat of deportation increases.[20] Extensive evidence confirms that undocumented immigrants are less likely to report crimes, including violent crimes, when they fear turning to the police will bring adverse immigration consequences.[21]

---

[17] Gregory Korte et al., *Trump Administration Struggles with Fate of 900 DREAMers Serving in the Military*, USA Today (Sept. 7, 2017), https://perma.cc/EH4W-2DSL.

[18] *See* Maya Torres, *Muralist Yehimi Cambrón speaks of immigration reform and social justice*, The Signal (Nov. 19, 2019), https://georgiastatesignal.com/muralist-yehimi-cambron-speaks-of-immigration-reform-and-social-justice/; Stephanie Griffith, *For Actor Bambadjan Bamba, the Battles for DACA and Racial Justice Are One and the Same*, Ctr. for Am. Progress (July 10, 2020), https://www.americanprogress.org/issues/immigration/news/2020/07/10/487498/actor-bambadjan-bamba-battles-daca-racial-justice-one/; Michel Martin, *Actor Who Came Out As Undocumented Is Fighting for Hollywood To Stand With DACA*, NPR (Dec. 2, 2017), https://www.npr.org/2017/12/02/567785978/actor-who-came-out-as-undocumented-is-fighting-for-hollywood-to-stand-with-daca.

[19] *E.g.*, Hr'g Before the S. Comm. on the Judiciary, 114th Cong. 2 (2015) (statement of Tom Manger, Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n), https://perma.cc/SKM2-QKV9; Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, Police Found. (Apr. 2009), https://perma.cc/KL5A-EQWR.

[20] John Burnett, *New Immigration Crackdowns Creating 'Chilling Effect' on Crime Reporting*, NPR (May 25, 2017), https://perma.cc/3VJ3-Q8NK.

[21] *See, e.g.*, Nik Theodore, Dep't of Urban Planning & Policy, Univ. of Ill. at Chi., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5–6 (2013), https://perma.cc/4B5R-7JL4 (finding that 67% of undocumented individuals are less likely to offer information to law enforcement as a witness and 70% are less likely to contact law enforcement even if they were victims of a crime); Randy Capps et al., Migration Policy Inst., *Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement* 43 (2011), https://perma.cc/T3PR-X4LG (finding in multiple counties that increased local-federal law enforcement cooperation meant "community respondents were especially likely to report that immigrants were venturing into public places with less frequency, failing to report crimes or interact with police, interacting less with schools and other institutions, patronizing local businesses less often, and changing their driving patterns") (footnotes omitted).

DACA supports *Amici*'s efforts to strengthen trust between law enforcement and communities—nearly eight in ten recipients reported that they were less afraid of removal, and 60% reported that they were less afraid of law enforcement and more willing to report a crime than they would have been without DACA.[22]  Trust and cooperation with local law enforcement is particularly important for young people.  A study by the Bureau of Justice Statistics noted that the percent of young people aged 18 to 34 that have been victims of violent crime—a population encompassing most current DACA recipients—has increased in recent years, with the prevalence rate of victimization higher for those groups than older individuals.[23]  A strong rapport between young people and law enforcement is critical to protecting these young people and solving crimes.  Because DACA increases trust in law enforcement, it bolsters *Amici*'s public safety initiatives and makes communities safer.

In short, Plaintiffs' effort to set aside DACA threatens not only the hundreds of thousands of young people who currently receive protection under DACA, but also their communities, like *Amici*, and millions of neighbors who have come to rely on DACA and the open participation of recipients over the last six years to grow their economies and become safer.

## II.    DACA Does Not Confer Work Authorization, And Thus Is Not Subject To The APA's Notice-And-Comment Requirements Or Contrary To The INA.

Plaintiffs' attempt to set aside DACA should be rejected.  Defendant-Intervenors set forth myriad reasons that Plaintiffs' Motion fails on both procedural grounds and on the merits, *see* Defendant-Intervenor State of New Jersey's Opposition to Plaintiffs' Motion for Summary Judgment ("NJ MSJ Opp."), Dkt. 502 at 16–42; Perez et al. MSJ at 16–45, and *Amici* will not repeat them here.  *Amici* instead write to address Plaintiffs' repeated assertion that DACA confers substantive "benefits"—specifically, work authorization—to recipients.  First, Plaintiffs argue that because DACA confers such a "benefit," it is a substantive rule that must be set aside

---

[22] Zenén Jaimes Pérez, United We Dream, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three-Years Later* 23 (Oct. 2015), https://perma.cc/AGE7-X5UH; Roberto G. Gonzales & Angie M. Bautista-Chavez, Am. Immigration Council, *Two Years and Counting: Assessing the Growing Power of DACA* 9 (June 16, 2014), https://perma.cc/6UBEZ9AK; Gonzales, *supra* n.5.
[23] U.S. Dep't of Justice, NCJ 253043, *Criminal Victimization, 2018*, 16, 19, 31 (Sept. 2019), https://www.bjs.gov/content/pub/pdf/cv18.pdf.

under the APA for failure to engage in notice-and-comment rulemaking.  *See* Plaintiff States'
Motion for Summary Judgment ("Pls' MSJ"), Dkt. 486 at 31–32.  Second, they assert that
conferral of work authorization is contrary to the INA and thus violates the APA.  *See id.* at 38–
39.  Plaintiffs' theory misunderstands the source of work authorization, however.  It does not
come from DACA, but from decades-old regulations not at issue here, which grant the
government authority to confer work authorization to certain individuals without lawful
immigration status, including those receiving discretionary grants of deferred action.  *See* 8
C.F.R. § 274a.12(c)(14).  Plaintiffs' flawed argument should be rejected and their Motion should
be denied.

> **A.  Recipients Of Deferred Action Obtain Work Authorization Through Valid Laws And Regulations Independent Of DACA.**

Plaintiffs' Motion argues that DACA should be set aside because, when creating DACA,
the Obama Administration violated the APA's procedural and substantive requirements.  One of
Plaintiffs' main arguments is based on the false premise that DACA unlawfully confers the
substantive "benefit" of work authorization on recipients.  *See* Pls' MSJ at 26, 31–32, 38.  In
fact, work authorization is afforded to *any* recipient of deferred action, not merely DACA
recipients, pursuant to a long-standing regulatory scheme that is *independent* of DACA.  And
although Plaintiffs spend much of the Motion trying to conflate DACA and the work
authorization regulation, they, critically, do not challenge the legality of the latter regulation or
DHS's broad authority under it.

> 1.  The Work Authorization Regulation Is Independent of DACA.

Since the 1980s, regulations promulgated pursuant to notice-and-comment rulemaking
have authorized certain recipients of deferred action to obtain work authorization.  In 1981, the
Reagan Administration issued regulations that allowed immigrants granted deferred action by the
then-existing Immigration and Naturalization Service (INS) to obtain work authorization if the
individual "establishes . . . that he/she is financially unable to maintain himself/herself and
family without employment."  46 Fed. Reg. 25,079, 25,081 (May 5, 1981) (formerly codified at

8 C.F.R. § 109.1(b)(7) (1982)); *see also* Written Testimony of Stephen H. Legomsky, Hearing Before the U.S. H. Comm. on the Judiciary ("Legomsky Testimony") (Feb. 25, 2015), ("From the earliest days of the Reagan Administration, the former INS (where the analogous immigration responsibilities then resided) understood [its] authority to include the power to decide which noncitizens should receive permission to work.  Exercising this power, the INS regulations specifically authorized work permits for recipients of deferred action.").  In 1987, INS promulgated the current version of the work authorization regulation, which similarly provides that "[a]n alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority," may apply for work authorization "if the alien establishes an economic necessity for employment."  *See* 8 C.F.R. § 274a.12(c)(14); *see also Texas v. United States (Texas I)*, 809 F.3d 134, 197 (5th Cir. 2015) (King, J. dissenting).

This regulation, which remains in force today, does not circumscribe DHS's ability to extend work authorization to only certain classes of immigrants granted deferred action, like DACA recipients.  Instead, the only predicate for eligibility, aside from economic need, is that the DHS Secretary (Secretary) grant the individual deferred action, a finding that Plaintiffs cannot dispute lies solely within the Secretary's broad discretion.  *See* 8 C.F.R. § 274a.12(c)(14) ("An alien within a class of aliens described [in 8 C.F.R. § 274a.12(c)] must apply for work authorization. . . .  An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment"); 8 U.S.C. § 1324a(h)(3) ("[T]he term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time . . . authorized to be so employed by this chapter or by the [Secretary].").  DHS's practice confirms what the regulatory text makes clear:  work authorization is not unique assistance flowing from DACA, instead eligibility to apply for work authorization flows collaterally. Indeed, from 2012 to 2014 alone, DHS granted work authorization to thousands of individuals

who received deferred action *independent of DACA*.[24]  In short, regardless of DACA's existence, recipients of deferred action that demonstrate an economic need are eligible to apply for work authorization.

    2.  <u>The Work Authorization Regulation Is Lawful.</u>

  The work authorization regulation is also unquestionably lawful.  Indeed, Plaintiffs do not even argue to the contrary.  But even if Plaintiffs had, such an argument would fail because the regulation was properly promulgated and is consistent with Congress's express grants of authority to DHS.

  The work authorization regulation, as well as its predecessor regulation, was promulgated by notice-and-comment rulemaking.[25]  Throughout the rulemaking process, the government responded to public comments relating to the regulation and set forth its justifications for the rule.  As relevant here, the government explained that the work authorization rules were meant to provide clarity to immigrants and their employers, promote consistency with governing statutes, and ensure continuity with existing guidelines and guidance.  *E.g.*, 52 Fed. Reg. 16,216, 16,217 (May 1, 1987).  They were also meant to provide flexibility—both for immigrants with demonstrated need and for employers and others required to comply with relevant statutory and regulatory procedures.  *E.g.*, 46 Fed. Reg. at 25,080 (discussing changes to final rule to cover additional classes of nonimmigrant aliens and to "alleviate th[e] burden of the regulation" on immigrants seeking work authorization); 52 Fed. Reg. at 16,217 (noting that the rule is meant to "minimize the impact of [the] requirements on the affected parties" and to promote flexibility). The regulation was never challenged or set aside, and the period for challenging it has long since passed.  *See* 28 U.S.C. § 2401(a); *see also Texas v. Rettig*, 968 F.3d 402, 413 (5th Cir. 2020) (denying challenge to agency rule passed in 2002 because "APA challenges are governed by 28 U.S.C. § 2401(a), which provides that 'every civil action commenced against the United States

---

[24] *See* Shoba S. Wadhia, *Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases*, 6.1 Colum. J. of Race and L. 1, 16 (2016).
[25] Legomsky Testimony at 16; *Texas I*, 809 F.3d at 198 (King, J. dissenting).

shall be barred unless the complaint is filed within six years after the right of action first accrues'").

Even if the regulation could be challenged, it is plainly consistent with the broad discretion granted by Congress to the Secretary to determine which classes of immigrants are eligible for work authorization and to promulgate regulations based on that discretion.  Broadly speaking, Congress delegated the authority to administer the nation's immigration laws to the Secretary.  *See* 8 U.S.C. § 1103(a)(1).  The INA directs the Secretary to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this Act."  *Id.*

In 1986, Congress passed the Immigration Reform and Control Act (IRCA).  Though Congress was aware that the INS promulgated a regulation five years earlier through which it granted work authorization to certain individuals lacking lawful immigration status, it did not overturn the regulation or meaningfully limit the Secretary's discretion.  Instead, IRCA made the Secretary's authority explicit.  In defining an "unauthorized alien" under the act, Congress excluded individuals "*authorized to be . . . employed by*" the Secretary.  8 U.S.C. § 1324a(h)(3); *see also* 52 Fed. Reg. 46,092, 46,093 (Dec. 4, 1987) ("[T]he only logical way to interpret this phrase in [8 U.S.C. § 1324a(h)(3)] is that Congress, being fully aware of the [Secretary's] authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the [Secretary] through the regulatory process, in addition to those who are authorized employment by statute.").  One year later, following Congress's express reference to such authority in IRCA, the INS promulgated the effective work authorization regulation.  *See* 8 C.F.R. § 274a.12(c)(14); 52 Fed. Reg. at 46,093 ("Accordingly, on May 1, 1987 . . . the Service published regulations relating to IRCA which (among other things) transferred 8 CFR Part 109 to 8 CFR Part 274a and significantly expanded the material covered."); *see also Texas I*, 809 F.3d at 217 (King, J. dissenting).

11

For the last thirty years, the Secretary has relied on this authority under the INA, IRCA, and work authorization regulation to determine who may obtain work authorization, and has routinely granted such authorization to recipients of deferred action. *See* 8 C.F.R. 274a.12(c)(14). Congress has no doubt been aware of this fact, but has never acted to curtail the Secretary's authority even when it has done so in other instances unrelated to DACA. *See* 8 U.S.C. § 1226(a)(3). The unmistakable conclusion that flows from Congress's inaction is that Congress implicitly approved DHS's interpretation of the Secretary's authority and application of such authority through the work authorization regulation. Certainly, if Congress had wanted to curtail DHS's authority, it could have done so generally via IRCA or specifically with new legislation any time in the eight years since DACA was announced.

### B.   DACA Does Not Confer Work Authorization, And Its Promulgation Did Not Violate The APA.

Because DACA does not confer work authorization, DACA recipients' eligibility for work authorization pursuant to an independent regulation does not demonstrate any violation of the APA's procedural or substantive requirements. First, DACA recipients' eligibility for work authorization does not require DACA to undergo notice-and-comment rulemaking because DACA did not create or confer any work authorization "benefit." Second, recipients' eligibility for work authorization, which they share with all other deferred action recipients, is consistent with the broad discretion granted to the Secretary under the INA and thus is not contrary to law in violation of the APA.

#### 1.   DACA Was Not Required To Undergo Notice-and-Comment Rulemaking Because It Does Not Confer Work Authorization.

The Court should reject Plaintiffs' argument that DACA recipients' eligibility for work authorization means DACA violates the APA because it did not undergo notice-and-comment rulemaking. *See* Pls' MSJ at 32. DACA is exempt from this APA requirement because it is a "general statement of policy." 5 U.S.C. § 553(b)(A) (explaining that "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" are exempt from the APA's notice-and-comment requirements); *W & T Offshore, Inc. v. Bernhardt*, 946

F.3d 227, 237 (5th Cir. 2019) ("[Substantive rules] typically grant rights, impose obligations, or produce other significant effects on private interests") (internal quotations omitted).

Courts look to two factors to determine if an agency action is a general policy statement exempt from notice-and-comment or a substantive rule that must comply with notice-and-comment procedures.  *See Texas I*, 809 F.3d at 171.  The court considers whether the action "genuinely leaves the agency and its decision-makers free to exercise discretion" and whether the rule "impose[s] any rights and obligations."  *Id.*

Plaintiffs do not seriously contest that DACA leaves DHS "free to exercise [its] discretion" in deciding when to grant deferred action, *see* Pls' MSJ at 32–33, and Defendant-Intervenors explain at length how the discretion afforded to DHS weighs against concluding that DACA is a substantive rule.  *See* NJ MSJ Opp. at 24–30.  Instead, Plaintiffs' argument is grounded in their mistaken belief that, in creating DACA, DHS decided to grant recipients the "benefit" of work authorization.  *See* Pls' MSJ at 31–32.  Plaintiffs are simply wrong.  As discussed above, work authorization granted to individuals with deferred action, including DACA recipients, flows from statutory and regulatory authority independent of DACA, which has been in place for decades.  *See* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14).

This conclusion is consistent with the express terms of DACA itself.  The 2012 memorandum by Secretary Napolitano that established DACA did not purport to grant recipients work authorization or any other benefit.  In fact, it said the exact opposite:  "This memorandum confers no substantive right, immigration status or pathway to citizenship."[26]  In the months following the creation of DACA, U.S. Citizenship and Immigration Services (USCIS) published public guidance making clear that DACA merely provided recipients with deferred action, while separate and preexisting regulations made recipients of deferred action eligible to apply for work authorization.[27]  The Supreme Court has also recognized the separation between DACA and

---

[26] Memorandum for David V. Aguilar, et al. from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 3 (June 15, 2012).

[27] USCIS, *Frequently Asked Questions*, https://www.uscis.gov/archive/frequently-asked-questions ("**Q4: If my removal is deferred under the consideration of DACA, am I eligible for employment authorization?** A4: Yes. **Under existing regulations**, if your case is deferred, you may obtain employment authorization from USCIS provided you can demonstrate an economic necessity for employment.") (emphasis added).

work authorization, noting, in the fact recitation of the case, that DACA simply "directs [USCIS] to 'accept applications to determine whether these individuals qualify for work authorization during this period of deferred action,' . . . *as permitted under regulations long predating DACA's creation*." *Regents*, 140 S. Ct. at 1902 (citing see 8 C.F.R. § 274a.12(c)(14); 46 Fed. Reg. at 25,080–81) (emphasis added).

The interaction between DACA and the work authorization regulation is similar to other deferred action initiatives that have been previously implemented by DHS. Like DACA, other deferred action initiatives permit recipients of deferred action to obtain work authorization under the work authorization regulation. *See* Defendant-Intervenor State of New Jersey's Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction, Dkt. 215 at 15, 27. And like DACA, none of those deferred action initiatives engaged in notice-and-comment rulemaking, and none have been set aside for any purported failure to do so. *See id.* at 27. Plaintiffs offer no explanation for why DACA should be treated differently than any other deferred action initiative, or why DACA and other initiatives should be set aside because recipients are made eligible for collateral "benefits" available under other lawful regulations (*i.e.*, statutes or notice-and-comment regulations). Nor do they offer authority for why *eligibility to apply for* work authorization under a separate and discretionary regulatory scheme should be treated as *conferral of substantive benefits*.

Because DACA does not confer work authorization on recipients, but instead merely makes them, like all individuals granted deferred action, eligible to apply for work authorization pursuant to other regulations, DACA recipients' eligibility for work authorization does not demonstrate that DACA imposes substantive "rights and obligations" for purposes of the APA. *See W & T Offshore, Inc*, 946 F.3d at 237. DACA recipients' eligibility for work authorization thus is not a basis to set aside DACA for failure to engage in notice-and-comment rulemaking.

2.    DACA Does Not Conflict With The INA's Work Authorization Scheme.

The Court should also reject Plaintiffs' argument that DACA must be set aside because it is contrary to law in violation of the APA.  Among other things, Plaintiffs argue that DACA "is incompatible with Congress's careful delineation in the area of work authorization" because it purportedly conflicts with the INA's limitations on work authorization.  *See* Pls' MSJ at 38–39 (internal quotations omitted).  Fundamentally, this argument rests on the same faulty premise that DACA somehow affirmatively grants work authorization despite the existence of preexisting regulations that apply generally to deferred action recipients, and it fails to explain how a work authorization regulation independent of DACA renders DACA unlawful, but does not void every other deferred action initiative.

Plaintiffs' argument also misunderstands the INA's work authorization scheme and related authority.  In their Motion, Plaintiffs try to ignore that Congress, through the INA, delegated broad authority to the Secretary to administer the nation's immigration laws and establish any regulations "necessary for carrying out [such] authority."  8 U.S.C. § 1103(a)(1).  Plaintiffs instead argue that the Secretary's discretion is narrow because the INA sets forth some limitations on certain classes of individuals who may be granted work authorization.  *See* Pls' MSJ at 38.  It is true that Congress has committed to statute that certain classes of individuals must receive work authorization and others must not.  *E.g.*, 8 U.S.C. §§ 1101(i)(2), 1154(a)(1)(K).  These statutory grants and denials of work authorization to certain classes are silent as to deferred action recipients and cannot be read to eviscerate the discretion granted to the Secretary elsewhere in the federal immigration laws.  *See* 8 U.S.C. § 1324a(h)(3); *Doe v. United States*, 398 F.3d 686, 688 (5th Cir. 2005) ("When interpreting a statute, we start with the plain text, and read all parts of the statute together to produce a harmonious whole.").  The Fifth Circuit has explicitly recognized that the Secretary has the authority to grant work authorization explaining that "the agency's decision to grant . . . work authorization has been committed to agency discretion by law."  *Perales v. Casillas*, 903 F.2d 1043, 1045 (5th Cir. 1990).

15

Plaintiffs' only answer—that Congress must have intended to prevent the Secretary from granting work authorization to deferred action recipients because immigration laws are meant to regulate the presence of immigrant workers in the labor force—is wrong because it fails to explain how a general goal of the immigration laws repudiates Congress's specific grant of discretion to the Secretary. *See* Pls' MSJ at 38 (citing *INS v. Nat'l Ctr. For Immigrants' Rights*, 502 U.S. 183, 194 (1991)). Indeed, the only example Plaintiffs offer to support that proposition—Congress's passage of IRCA in 1986—undermines their position instead. In IRCA, Congress chose *not* to explicitly limit the original work authorization regulation or the Secretary's broad authority under it to grant deferred action to individuals lacking lawful immigration status and to offer such individuals work authorization for demonstrated financial need. *See* 46 Fed. Reg. at 25,081. Instead, IRCA made the Secretary's authority explicit, 8 U.S.C. § 1324a(h)(3), and did nothing to restrict the INS's ongoing exercise of that authority to grant work authorization to individuals previously granted deferred action. *See* 8 C.F.R. § 274a.12(c)(14). When passing IRCA, Congress also did not place any limit on the Secretary's discretion because IRCA did not limit the number of work permits that USCIS could grant to deferred action recipients under 8 C.F.R. § 274a.12(c)(14). Congress knows how to impose limits in the area of immigration law when it wants to impose such limits. *See* 8 USC §§ 1151– 1153, 1184(g), (o), (p). But it chose not to do so here.

Finally, Plaintiffs' argument relies on one goal of the immigration laws, but ignores another. Congress also considers it a compelling government interest to enact new rules "to assure that aliens be self-reliant in accordance with national immigration policy," See 8 U.S.C. § 1601(5). Both DACA and the work authorization regulation align with this compelling interest.

**CONCLUSION**

For the foregoing reasons, the Court should reject Plaintiffs' attempt to set aside DACA, deny Plaintiffs' Motion for Summary Judgment, and grant Defendant-Intervenors' Motion for Summary Judgment.

Dated:  November 13, 2020                    Respectfully Submitted,


By: /s/ Michael J. Dundas                    By: /s/ Nicholas Whilt

    Michael Feuer                           Nicholas Whilt
     City Attorney                            Attorney-in-Charge
    Michael J. Dundas (*pro hac vice*)        S.D. Tex. No. CA247738
    200 North Main Street                   Margaret L. Carter*
    City Hall East Suite 800                Daniel R. Suvor*
    Los Angeles, California 90012           O'Melveny & Myers LLP
    Telephone:  (213) 978-8130              400 South Hope Street
    mike.dundas@lacity.org                  Los Angeles, California 90071
                                            Telephone:  (213) 430-7503
    Attorneys for *Amicus Curiae* City of     Facsimile:  (213) 430-6407
    Los Angeles, California                 nwhilt@omm.com

                                            *pro hac vice* pending

                                            Attorneys for *Amicus Curiae* County
                                            of Los Angeles


*Additional Counsel for Amici Curiae Listed Below*

17

## LIST OF ADDITIONAL AMICI CURIAE

Eve V. Belfance
Director of Law
Ocasek Government Office Building
161 South High Street, Suite 202
Akron, OH 44308

*Counsel for the City of Akron, Ohio*

Joanna C. Anderson
City Attorney
301 King Street
Alexandria, VA 22314

*Counsel for the City of Alexandria, Virginia*

Farimah F. Brown
City Attorney
2180 Milvia Street, 4th Floor
Berkeley, CA 94704

*Counsel for the City of Berkeley, California*

Ben Pearlman
County Attorney
P.O. Box 471
Boulder, CO 80306

*Counsel for the County of Boulder, Colorado*

Juan A. Gonzalez
Attorney in Charge
1100 E. Monroe Street
Brownsville, TX 78520

*Counsel for Cameron County, Texas*

Matthew Jerzyk
City Solicitor
580 Broad Street
Central Falls, RI 02863

*Counsel for the City of Central Falls, Rhode Island*

Yibin Shen
City Attorney
2263 Santa Clara Avenue, Room 280
Alameda, CA 94501

*Counsel for the City of Alameda, California*

Anne L. Morgan
City Attorney
P.O. Box 1546
Austin, TX 78767

*Counsel for the City of Austin, Texas*

Eugene L. O'Flaherty
Corporation Counsel
City Hall, Room 615
Boston MA, 02201

*Counsel for the City of Boston, Massachusetts*

Thomas A. Carr
City Attorney
1777 Broadway
Boulder, CO 80302

*Counsel for the City of Boulder, Colorado*

Nick Herman
General Counsel
1526 East Franklin Street, Suite 200
Chapel Hill, NC 27514

*Counsel for the Town of Carrboro, North Carolina*

Ralph Karpinos
Town Attorney
405 Martin Luther King
Jr. Boulevard
Chapel Hill, NC 27514

*Counsel for the Town of Chapel Hill, North Carolina*

18

Cheryl Watson Fisher
City Solicitor
500 Broadway, Room 307
Chelsea, MA 02150

*Counsel for the City of Chelsea,*
*Massachusetts*

Barbara J. Doseck
City Attorney
101 West Third Street
P.O. Box 22
Dayton, OH 45401

*Counsel for the City of Dayton, Ohio*

Douglas T. Sloan
City Attorney
2600 Fresno Street
Fresno, CA 93721

*Counsel for the City of Fresno, California*

Ronald C. Lewis
City Attorney
900 Bagby, 4th Floor
Houston, TX 77002

*Counsel for the City of Houston, Texas*

Jennifer Vega-Brown
City Attorney
700 North Main
Las Cruces, NM 88001

*Counsel for the City of Las Cruces,*
*New Mexico*

James R. Rowader, Jr.
City Attorney
City Hall, Room 210
350 South Fifth Street
Minneapolis, MN 55415

*Counsel for the City of Minneapolis,*
*Minnesota*

Mark A. Flessner
Corporation Counsel
30 North LaSalle Street, Suite 800
Chicago, IL 60602

*Counsel for the City of Chicago, Illinois*

Kristin M. Bronson
City Attorney
1437 Bannock Street, Room 353
Denver, CO 80202

*Counsel for the City and County of Denver,*
*Colorado*

Howard G. Rifkin
Corporation Counsel
550 Main Street, Room 210
Hartford, CT 06103

*Counsel for the City of Hartford, Connecticut*

Eleanor M. Dilkes
City Attorney
410 East Washington Street
Iowa City, IA 52240

*Counsel for the City of Iowa City, Iowa*

Michael R. Haas
City Attorney
210 Martin Luther King Jr. Boulevard,
Room 401
Madison, WI 53703

*Counsel for the City of Madison, Wisconsin*

Kathleen E. Gill
Corporation Counsel
515 North Avenue
New Rochelle, NY 10801

*Counsel for the City of New Rochelle,*
*New York*

James E. Johnson
Corporation Counsel
100 Church Street
New York, NY 10007

*Counsel for the City of New York,
New York*

Barbara J. Parker
City Attorney
One Frank H. Ogawa Plaza,
6th Floor
Oakland, CA 94612

*Counsel for the City of Oakland, California*

Marcel S. Pratt
City Solicitor
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

*Counsel for the City of Philadelphia,
Pennsylvania*

Yvonne S. Hilton
City Solicitor
City-County Building
414 Grant Street
Pittsburgh, PA 15217

*Counsel for the City of Pittsburgh,
Pennsylvania*

Trishka Waterbury Cecil
Municipal Attorney
Mason, Griffin & Pierson, P.C.
101 Poor Farm Road
Princeton, NJ 08540

*Counsel for the Municipality of Princeton,
New Jersey*

Timothy R. Curtin
Corporation Counsel
30 Church Street, Room 400A
Rochester, NY 14614

*Counsel for the City of Rochester,
New York*

Samuel S. Goren
Goren Cherof Doody & Ezrol, PA
3099 East Commercial Boulevard, Suite 200
Fort Lauderdale, FL 33308

*Counsel for the City of North Lauderdale,
Florida*

Jeff Ballinger
City Attorney
3200 East Tahquitz Canyon Way,
Palm Springs, CA 92262

*Counsel for the City of Palm Springs,
California*

Cris Meyer
City Attorney
200 West Washington Street, 13th Floor
Phoenix, AZ 85003

*Counsel for the City of Phoenix, Arizona*

Tracy P. Reeve
City Attorney
1221 SW Fourth Avenue, Suite 430
Portland, OR 97240

*Counsel for the City of Portland, Oregon*

Jeffrey Dana
City Solicitor
444 Westminster Street, Suite 220
Providence, RI 02903

*Counsel for the City of Providence,
Rhode Island*

Susana Alcala Wood
City Attorney
915 I Street, Fourth Floor
Sacramento, CA. 95814

*Counsel for the City of Sacramento,
California*

Lyndsey M. Olson
City Attorney
400 City Hall and Court House
15 West Kellogg Boulevard
Saint Paul, Minnesota 55102

*Counsel for the City of Saint Paul, Minnesota*

Andrew Segovia
City Attorney
506 Dolorosa
San Antonio, TX 78204

*Counsel for the City of San Antonio, Texas*

George S. Cardona
Interim City Attorney
1685 Main Street
Santa Monica, CA 90401

*Counsel for the City of Santa Monica, California*

Peter S. Holmes
City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

*Counsel for the City of Seattle, Washington*

Kathryn Emmett
Corporation Counsel
888 Washington Boulevard
Stamford, CT 06904

*Counsel for the City of Stamford, Connecticut*

Mike Rankin
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210

*Counsel for the City of Tucson, Arizona*

Christopher A. Callihan
City Attorney
200 Lincoln Avenue
Salinas, CA 93901

*Counsel for the City of Salinas, California*

Dennis J. Herrera
City Attorney
City Hall Room 234
One Dr. Carlton B. Goodlett Place
San Francisco, CA 94102

*Counsel for the City and County of San Francisco, California*

Jason M. Heath
County Counsel
701 Ocean Street, Room 505
Santa Cruz, CA 95060

*Counsel for the County of Santa Cruz, California*

Francis X. Wright, Jr.
City Solicitor
93 Highland Avenue
Somerville, MA 02143

*Counsel for the City of Somerville, Massachusetts*

William Fosbre
City Attorney
747 Market Street, Room 1120
Tacoma, WA 98402

*Counsel for the City of Tacoma, Washington*

Michael Jenkins
City Attorney
Best Best & Krieger LLP
1230 Rosecrans Avenue, Suite 110
Manhattan Beach, CA 90266

*Counsel for the City of West Hollywood, California*

International City/County
Management Association
770 North Capitol Street NE, Suite 500
Washington, DC 20002

Chuck Thompson
General Counsel
51 Monroe Street, Suite 404
Rockville, MD 20850

*Counsel for the International Municipal
Lawyers Association*

National League of Cities
660 North Capitol Street NW
Washington, DC 20001

John Daniel Reaves
General Counsel
1750 K Street NW, 11th Floor
Washington, DC 20006

*Counsel for the U.S. Conference of Mayors*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that service of the foregoing document was automatically accomplished on all known filing users through the Court's CM/ECF system and/or in accordance with the Federal Rules of Civil Procedure on this 13th day of November, 2020.

/s/ Nicholas Whilt
Nicholas Whilt